JS 44 (Rev. 12/07) (CAND Rev 1/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Harry Bass, on behalf of themselves and all others similarly situated

**DEFENDANTS**

Apple Inc.

**(b)** County of Residence of First Listed Plaintiff   Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant      Santa Clara County, CA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Francis M. Gregorek
Wolf Haldenstein Adler Freeman & Herz LLP
750 B St., Suite 2770, San Diego, CA 92101
Tel: 619/239-4599 Fax: 619/234-4599

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 871 IRS—Third Party | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | 26 USC 7609 | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | Transferred from | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 2

Brief description of cause:
Unlawful monopolization of the iPhone Applications Aftermarket and the iPhone Voice and Data Services Aftermarket

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".   In re Apple & AT&T Antitrust Litigation, Case No. 07-CV-5152 JW

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND      ☐ SAN JOSE      ☐ EUREKA

DATE
December 29, 2011

SIGNATURE OF ATTORNEY OF RECORD

1   FRANCIS M. GREGOREK (144785)
    gregorek@whafh.com
2   BETSY C. MANIFOLD (182450)
    manifold@whafh.com
3   RACHELE R. RICKERT (190634)
    rickert@whafh.com
4   WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
5   750 B Street, Suite 2770
    San Diego, CA 92101
6   Telephone: 619/239-4599
    Facsimile:  619/234-4599
7
    MARK C. RIFKIN (*pro hac vice pending*)
8   rifkin@whafh.com
    ALEXANDER H. SCHMIDT (*pro hac vice pending*)
9   schmidt@whafh.com
    MICHAEL LISKOW (243899)
10  liskow@whafh.com
    WOLF HALDENSTEIN ADLER
11   FREEMAN & HERZ LLP
    270 Madison Avenue
12  New York, NY 10016
    Telephone: 212/545-4600
13  Facsimile:  212/545-4677
14
    Plaintiffs' Counsel
15
16
17                  UNITED STATES DISTRICT COURT
18           FOR THE NORTHERN DISTRICT OF CALIFORNIA
19                      SAN FRANSICO DIVISION
20  ROBERT PEPPER, STEPHEN H.
    SCHWARTZ, EDWARD W. HAYTER,         )
21  and HARRY BASS on behalf of themselves  )
    and all others similarly situated,   )   **CLASS ACTION COMPLAINT**
22                                       )
                                         )
23                Plaintiffs,            )
                                         )
24          v.                           )
                                         )
25                                       )
    APPLE INC.,                          )
26                                       )
                  Defendant.             )   **DEMAND FOR JURY TRIAL**
27  _____  )
28

    CLASS ACTION COMPLAINT

Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Harry Bass ("Plaintiffs"), for their class action complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1.      This is an antitrust class action pursuant to section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), brought by Plaintiffs on their own behalf and on behalf of a class of persons similarly situated, those being persons who purchased an Apple iPhone from Defendant Apple Inc. ("Apple") or non-party AT&T Mobility, LLC ("ATTM"), or elsewhere, and then purchased wireless voice and data services or applications for the iPhone from December 29, 2007 through February 3, 2011 (the "Class Period")

### A.      Summary Of Material Facts

2.      Apple launched its iPhone on or about June 29, 2007. Prior to launch, Apple entered into a secret five-year contract with ATTM that established ATTM as the exclusive provider of cell phone voice and data services for iPhone customers through some time in 2012 ("Exclusivity Agreement"). As part of the contract, Apple shared in ATTM's revenues and profits with respect to the first generation of iPhones launched, known as the iPhone 2G, which was a unique arrangement in the industry. The Plaintiffs and other class members who purchased iPhones did not agree to use ATTM for five years. Apple's undisclosed five-year Exclusivity Agreement with ATTM, however, effectively locked iPhone users into using ATTM for five years, contrary to those users' knowledge, wishes and expectations.

3.      To enforce ATTM's exclusivity, Apple, among other things, programmed and installed software locks on each iPhone it sold that prevented the purchaser from switching to another carrier that competed with ATTM in the cell phone voice and data services industry. Under an exemption to the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 1201, *et seq.* (2008) (the "DMCA"), cell phone consumers have an absolute legal right to modify their phones to use the network of their carrier of choice. Apple has prevented iPhone customers from `exercising that legal right by locking the iPhones and refusing to give customers the software

1    codes needed to unlock them.

2         4.    Under its Exclusivity Agreement with ATTM, Apple retained exclusive control
3    over the design, features and operating software for the iPhone. To enhance its iPhone-related
4    revenues, Apple enabled the creation of numerous software programs called "applications," such
5    as ringtones, instant messaging, Internet access, gaming, entertainment, video and photography
6    enabling software that can be downloaded and used by iPhone owners.

7         5.    In March 2008, Apple released a "software development kit" ("SDK") for the
8    stated purpose of enabling independent software developers to design applications for use on the
9    iPhone. For an annual fee of $99, the SDK allows developers to submit applications to be
10   distributed through Apple's applications market, the "iTunes App Store." If the application is not
11   made available for free in the App Store, Apple collects 30% of the sale of each application, with
12   the developer receiving the remaining 70%. On information and belief, throughout the Class
13   Period, Apple refused to "approve" any application by a developer who did not pay the annual fee,
14   or agree to Apple's apportionment scheme. Apple also unlawfully discouraged iPhone customers
15   from downloading competing applications software (hereafter "Third Party Apps") by telling
16   customers that Apple would void and refuse to honor the iPhone warranty of any customer who
17   downloaded Third Party Apps.

18        6.    iPhone consumers were not provided a means by which they could download Third
19   Party Apps that were not approved by Apple for sale on the App Store.

20        7.    Through these actions, Apple has unlawfully stifled competition, reduced output
21   and consumer choice, and artificially increased prices in the aftermarkets for iPhone voice and
22   data services and for iPhone software applications.

23   **B.   Summary Of Claims**

24        8.    In pursuit and furtherance of its unlawful anticompetitive activities, Apple (a) failed
25   to obtain iPhone consumers' contractual consent to the five-year Exclusivity Agreement between
26   Apple and ATTM, the effect of which was to lock consumers into using ATTM as their voice and
27   data service provider, even if they wished to discontinue their use of ATTM service; (b) failed to
28   obtain iPhone consumers' contractual consent to having their iPhones "locked" to only accept

CLASS ACTION COMPLAINT

- 2 -

ATTM Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone purchasers from using any cell phone voice and data service provider other than ATTM; (c) failed to obtain iPhone consumers' contractual consent to make unavailable to them the "unlock code" that would enable the consumers to use a service other than ATTM, even though ATTM routinely provides such unlock codes for other types of cell phones; and (d) failed to obtain iPhone consumers' contractual consent to Apple prohibiting iPhone owners from downloading Third Party Apps.

9.     Apple violated section 2 of the Sherman Act by conspiring with ATTM to monopolize the aftermarket for voice and data services for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices in that aftermarket.

10.     Apple also violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those applications.

11.     Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiffs seek an order: (a) restraining Apple from selling iPhones that are programmed in any way to prevent or hinder consumers from unlocking their SIM cards or from downloading Third Party Apps; (b) requiring Apple to provide the iPhone SIM unlock codes to members of the class and other iPhone consumers immediately upon request; and (c) restraining Apple from selling or distributing locked iPhones without adequately disclosing the fact that they are locked to work only with ATTM SIM cards and without obtaining the consumers' contractual consent to have their iPhones locked.[1]

---

[1]     Apple has released five models of the iPhone to date. From the earliest to most recent, the models are the iPhone 2G, the iPhone 3G, the iPhone 3GS, the iPhone 4 and the iPhone 4S. Apple created the first three iPhones to operate only on the ATTM wireless network, as part of the Exclusivity Agreement. One version of the iPhone 4 is locked to work only on ATTM's network, while another version, which was released on February 3, 2011, works on Verizon's network. The iPhone 4S is designed to be able to operate on *any* domestic carrier's network. Despite this, Apple and ATTM *still refuse* to unlock any iPhone 4S purchased by an ATTM customer.

CLASS ACTION COMPLAINT

## THE PARTIES

12.     Plaintiff Robert Pepper is an individual residing in Chicago, Illinois who, on or about June 29, 2007, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

13.     Plaintiff Stephen H. Schwartz is an individual residing in Ardsley, New York who, in October 2010, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

14.     Plaintiff Edward W. Hayter is an individual residing in Brooklyn, New York who, in March 2008, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

15.     Plaintiff Harry Bass is an individual residing in Brooklyn, New York, who, in December 2008, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

16.     Defendant Apple is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014.  Apple regularly conducts and transacts business in this District, as well as throughout Illinois, New York and elsewhere in the United States.  Apple manufactures, markets, and sells the iPhone, among other electronic devices.

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 and pursuant to 26, 28 U.S.C. §§ 1331 and 1337.

18.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because some Plaintiffs purchased iPhones in this District, Apple has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and Apple is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

CLASS ACTION COMPLAINT

- 4 -

20.   Each Plaintiff and member of the Class, in order to activate their iPhone, was required to download and install iTunes software provided by Apple.  In order to use this program, Plaintiffs and all other members of the Class were required to accept the "iTunes Store Terms and Conditions" (the "Terms").  The Terms state, in pertinent part, that "You expressly agree that exclusive jurisdiction for *any claim or dispute with Apple* or relating in any way to your use of the iTunes Service resides in the courts in the State of California."  (emphasis added) (available at http://www.apple.com/legal/itunes/us/terms.html#GIFTS).

## FACTUAL ALLEGATIONS

**A.   Plaintiffs' Injuries**

21.   In Spring 2007, Apple began a massive advertising campaign to market their new wireless communication device, the iPhone.  The iPhone was advertised as a mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability.

22.   The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[2] consumers waited in line to get their hands on one.

23.   Pursuant to the secret Exclusivity Agreement between Apple and ATTM described more fully below, during the Class Period the iPhone was sold at both Apple's and ATTM's retail and online stores, among other places.

24.   Apple and ATTM entered into a five-year exclusive service provider agreement, which on information and belief was originally scheduled to expire in 2012, although it appears to have been terminated early by Apple before February 2011, when Verizon began selling voice and data service for the iPhone.

25.   Each Plaintiff purchased one or more iPhones.  Each Plaintiff also purchased wireless voice and data services from ATTM for their iPhones.

26.   Prior to Plaintiffs' purchases of their iPhones and ATTM voice and data services, Apple had not even disclosed – much less obtained the Plaintiffs' contractual consent to – either

---

[2]   Initially, the 4GB iPhone 2G retailed for $499 and the 8GB iPhone 2G retailed for $599.

CLASS ACTION COMPLAINT

- 5 -

1  (a) the existence of Apple's five-year Exclusivity Agreement with ATTM, or (b) that Apple's
2  five-year agreement would effectively lock Plaintiffs into using ATTM as their voice and data
3  service provider for the duration of the five-year agreement. In fact, neither Apple's nor ATTM's
4  sales or customer service representatives were told about the length of the secret Exclusivity
5  Agreement.

6      27.      Prior to Plaintiffs' purchases of their iPhones and voice and data service, Apple had
7  not disclosed – much less obtained Plaintiffs' contractual consent to – the fact (a) that Plaintiffs'
8  iPhones were locked to only work with ATTM SIM cards, or (b) that the unlock codes would not
9  be provided to them on request.

10     28.      On information and belief, ATTM provides unlock codes for cell phones other than
11  the iPhone if requested by a consumer.

12     29.      Plaintiff Pepper wanted to have the option of switching to a competing domestic
13  voice and data service provider other than ATTM.

14     30.      Plaintiff Schwartz would like the ability to unlock his SIM card for international
15  travel and to switch to a competing domestic voice and data service provider other than ATTM.

16     31.      Plaintiff Hayter wanted to have the option of switching to a competing domestic
17  voice and data service provider other than ATTM.

18     32.      Plaintiff Bass wanted to have the option of switching to a competing domestic
19  voice and data service provider other than ATTM.

20  **B.    The Cell Phone Industry**

21     33.      Cellular telephone service began to be offered to consumers in 1983. Cellular
22  telephones operate using radio frequency channels allocated by the Federal Communications
23  Commission ("FCC"). Geographical service areas, sometimes known as "cells," are serviced by
24  base stations using low-power radio telephone equipment, sometimes known as "cell towers."
25  The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the
26  switching between cell phones and land line phones, accessed through the public-switched
27  telephone network, and to other cell telephones.

28     34.      In cellular service there are two main competing network technologies:  Global

CLASS ACTION COMPLAINT

1  System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA").
2  GSM is the product of an international organization founded in 1987 dedicated to providing,
3  developing, and overseeing a worldwide wireless standard. CDMA is an alternative technological
4  platform, developed by Qualcomm, Inc., used in much of North America and parts of Asia.

5         35.    To enable cell phones to send and receive emails, stream video and provide other
6  services requiring higher data transfer speeds, both CDMA and GSM carriers adopted
7  technologies to comply with what the industry refers to as "3rd or 4th generation," or "3G" or
8  "4G" standards. These technologies require the cell phone to operate on a separate 3G or 4G
9  network. The ATTM services provided to users of the first-generation iPhone were on ATTM's
10  2G network, whereas later versions of the iPhone operate on 3G and 4G networks.

11         36.    While there are a number of cellular phone service providers in the United States,
12  only four have substantial national networks: ATTM, T-Mobile USA, Inc. ("T-Mobile"), Sprint
13  Corporation ("Sprint"), and Cellco Partnership d/b/a Verizon Wireless ("Verizon") (collectively,
14  the "Major Carriers"). Other suppliers may in effect be "resellers" of cellular telephone service
15  which they purchase from the Major Carriers. ATTM and T-Mobile operate GSM networks,
16  while Sprint and Verizon operate CDMA networks.

17         37.    ATTM and the other wireless carriers have long dominated and controlled the cell
18  phone industry in the United States in a manner that, according to a *Wall Street Journal* article,
19  "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the
20  U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a
21  powerful hand-held computer." Walter S. Mossberg, *Free My Phone*, WALL STREET JOURNAL,
22  Oct. 22, 2007, at R3, col. 1.

23         38.    Unlike the personal computer market in general – where computer manufacturers
24  and software developers can offer products directly to consumers without having to gain the
25  approval of Internet service providers, and without paying those providers a penny – the wireless
26  carriers have used their ability to grant or deny access to their wireless networks to control both
27  the type of cell phone hardware and software that can be manufactured and to extract payments
28  from manufacturers granted access to their networks and customers. *Id.*

CLASS ACTION COMPLAINT

1      39.    The anticompetitive nature of the wireless telephone market the carriers have

2  created and facilitated gave rise to the commercial context in which Apple was able to commit the

3  wrongs and offenses alleged herein.

4  **C.    The Cell Phone Industry's History Of Misusing Locked SIM Cards**

5      40.    In the United States, as a general rule, only GSM phones use SIM cards.  The

6  removable SIM card allows phones to be instantly activated, interchanged, swapped out and

7  upgraded, all without carrier intervention.  The SIM card itself is tied to the network rather than

8  the actual phone.  Phones that are SIM card-enabled generally can be used with any GSM carrier.

9      41.    Thus, the hardware of all GSM compatible cell phones give consumers some

10  degree of choice to switch among GSM carriers' wireless networks by enabling them to replace

11  their SIM card, a process that the average individual consumer easily can do with no training by

12  following a few simple instructions in a matter of minutes.  SIM cards are very inexpensive, now

13  typically costing a few dollars.  When the card is changed to the SIM card of another carrier, the

14  cell phone is immediately usable on the other carrier's network.  To switch from ATTM to

15  T-Mobile, or the other way around, all that is required is this simple change of the SIM card.

16      42.    For telephone users who travel, particularly to Europe, the ability to change SIM

17  cards to a European carrier such as Orange, Vodaphone or TIM, allows the user of a GSM

18  American phone to "convert it" to a "local" phone in the country where they have traveled.

19  Absent a conversion to local service, a consumer using an American GSM cell phone abroad must

20  pay both for the American service and for "roaming" charges, that is, the right to call or retrieve

21  data from outside of the customer's primary calling area.  Roaming charges are typically very high,

22  often a dollar or more a minute.  As a result, U.S.-based cell phone users traveling abroad can

23  yield very substantial savings by switching the SIM card and paying for local service rather than

24  using the U.S.-based GSM carrier.

25      43.    In an effort to minimize consumers' ability to switch carriers or avoid roaming

26  charges by simply switching SIM cards, the Major Carriers, acting in concert through trade

27  associations and standards setting organizations such as the CDMA Development Group, the

28  Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance

CLASS ACTION COMPLAINT

1   for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless
2   Communications Consortium, and the Cellular Telephone Industry Association, and otherwise,
3   agreed to implement "Programming Lock" features which effectively "locked" individual handsets
4   so that they could not be used without the "unlocking" code. GSM carriers obtain a locking code
5   (normally only six digits long) unique to each cell phone from the cell phone manufacturer.
6   Absent obtaining the unlocking code from their GSM carrier, consumers who purchase a
7   telephone manufactured to work with one of the two GSM Major Carriers can not switch to
8   another carrier, even temporarily while traveling abroad, without buying an entirely new phone.

9        44.    The two GSM carriers, ATTM and T-Mobile, adopted a SIM-lock standard that
10   locked each GSM phone to a particular SIM card, thereby preventing consumers from simply
11   changing their SIM cards to switch carriers. However, throughout the Class Period both T-Mobile
12   and ATTM (for cell phones other than the iPhone) typically unlocked SIM cards on request for
13   international travel, or even if customers wanted to cancel their accounts and switch to another
14   carrier. In most cases, the unlock code was given on request, almost instantly, over the telephone.

15        45.    Accordingly, ATTM unlocked SIM cards on telephones sold exclusively through
16   them, such as the Blackberry Torch and the Samsung Blackjack. There is but one exception: the
17   iPhone. Even today, ATTM refuses to provide the unlock code for iPhones for international travel
18   or otherwise.[3] On information and belief, that is because, as described more fully below, Apple
19   and ATTM unlawfully agreed as part of the Exclusivity Agreement that the iPhone would not be
20   unlocked under any circumstances.

21   **D.**   **Apple's Misuse Of Other Locked Program Codes**

22        46.    The iPhone operating system also contains "security measures" which are, in effect,
23   Program Locks designed to restrict the consumer from using programs or services on the iPhone
24   other than those sanctioned by, and which generate revenue for, Apple. By design, Apple

25

---

26   [3]   Despite the fact that the iPhone 4S can be operated on either a GSM or CDMA network,
27   ATTM appears to still refuse to provide unlock codes for any iPhones. *See* http://www.att.com/
esupport/article.jsp?sid=55002&cv=820&title=What+is+the+unlock+code+for+my+phone%3F#f
28   bid=s-46_WT1tko ("iPhone(R) cannot be unlocked, even if you are out of contract.").

CLASS ACTION COMPLAINT

1  programmed the iPhone in a manner that prevented iPhone purchasers from downloading any
2  Third Party Apps offered by software manufacturers who did not share their revenues with Apple
3  or pay a fee to Apple to sell through iTunes.

4      47.    However, because of the design of the Apple operating system, which is based on
5  the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps and to
6  prevent iPhone customers from unlocking their SIM cards were ineffective, as clever consumers
7  and programmers of Third Party Apps quickly circumvented Apple's locking codes and made both
8  "unlocked" iPhones and "unlocking" software for iPhones available for sale on the Internet.

9  **E.**    **Apple Knows It Cannot Legally Prevent Consumers From Unlocking iPhones**

10      48.    Several years ago, the Major Carriers were subject to lawsuits that sought to
11  impose liability based on the existence of Program Locks. Carriers had claimed that Program
12  Locks were necessary to protect their copyrighted intellectual property and claimed then, as Apple
13  has done, that the reason for the locks was to benefit consumers and protect against fraud.
14  Carriers had also sought to assert that under the terms of the DMCA, disabling the Program Locks
15  or unlocking a SIM card would be a violation of law.

16      49.    The DMCA was enacted in 1998 to prohibit third parties from circumventing
17  technological measures (called "access controls") that copyright owners had employed to control
18  access to their protected intellectual property. However, in November 2006, the Librarian of
19  Congress, who by statute has authority to create exemptions to the restrictions in § 1201 of the
20  DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works,
21  announced a three-year exemption from the prohibition against circumvention of access controls
22  for "[c]omputer programs in the form of firmware that enable wireless telephone handsets to
23  connect to a wireless telephone communication network, when circumvention is accomplished for
24  the sole purpose of lawfully connecting to a wireless telephone communication network." The
25  exemption stemmed for a recommendation by the Register of Copyrights, which concluded that
26  "the access controls [on cell phones] do not appear to actually be deployed in order to protect the
27  interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are*
28  *used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business*

CLASS ACTION COMPLAINT

- 10 -

1 *decision that has nothing whatsoever to do with the interests protected by copyright.*" 71 Fed.

2 Reg. 68472, 68476 (Nov. 27, 2006).

3       50.    In 2009, the Librarian of Congress extended the initial three-year exemption

4 applicable to cell phone access controls on an interim basis. 74 Fed. Reg. 55138, 55139 (Oct. 27,

5 2009). On July 27, 2010, the Librarian of Congress issued a final rule to this effect. 75 Fed. Reg.

6 43825, 43832 (July 27, 2010).

7       51.    Because Apple was unable to enforce its SIM card Program Locks through legal

8 means, it engaged in a scheme to enforce them unlawfully as to the iPhone.

9 **F.**    **The Apple – ATTM Exclusivity Agreement**

10       52.    On January 9, 2007, a little over a month after the initial adverse Librarian of

11 Congress ruling, Apple announced that it had entered into an exclusive agreement making ATTM

12 the only authorized provider of wireless voice and data services for iPhones in the United States.

13 Apple did not announce that the duration of that exclusive agreement was five years.

14       53.    While the terms of that Exclusivity Agreement and any related agreements

15 (collectively, the "Agreement") still have not been made public, some rumored details emerged.

16 First, ATTM and Apple agreed to share ATTM's voice service and data service revenue received

17 from iPhone customers. This was a unique arrangement in the industry and gave Apple strong

18 motivation to force iPhone consumers to continue purchasing voice and data services from ATTM

19 for as long as possible.

20       54.    Second, while ATTM offered iPhone purchasers industry standard monthly voice

21 and data service that could be terminated at any time prior to two years for a fee, Apple had

22 secretly agreed to give ATTM iPhone exclusivity for five years, so that iPhone customers would

23 have no choice but to continue purchasing voice and data services from ATTM until sometime in

24 2012 in order for their iPhone to continue to operate – even if the customers wanted to terminate

25 their ATTM service early to switch to a less expensive carrier, such as T-Mobile in the United

26 States.

27       55.    Third, on information and belief, Apple and ATTM agreed to enforce ATTM's

28 exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose

CLASS ACTION COMPLAINT

- 11 -

1 the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for
2 international travel or to lawfully switch to another carrier.

3      56.    Fourth, the Agreement allowed Apple to control the features, content, software
4 programming and design of the iPhone.

5      57.    Fifth, since both Apple and ATTM recognized that the iPhone would create a
6 unique product for which consumers would pay a premium price compared to other cell phones,
7 the pricing structure of the ATTM exclusivity deal was different than a typical agreement between
8 a carrier and a handset manufacturer. Typically, the carrier subsidizes the purchase price of the
9 handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in
10 return for the consumer purchasing wireless service from the carrier for a period of time. This
11 arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price. The
12 carriers, however, charge an early termination fee if consumers wish to discontinue their purchase
13 of wireless service prior to the agreed upon length of time, which fee the carriers argue is justified
14 by their subsidization of the cell phone price. Upon termination, the cell phone customer can
15 obtain cell phone service from any carrier using the same network protocol (*i.e.*, GSM or CDMA).

16      58.    In Apple's and ATTM's Agreement, ATTM did not agree to subsidize the purchase
17 of the iPhone handset initially but nevertheless still charged iPhone consumers a fee for
18 terminating their voice and data service within the first two years. The early termination fee by
19 ATTM was not justifiable absent subsidization of the handset price. The benefits of the
20 termination fee were also illusory because even those iPhone consumers who discontinued their
21 ATTM voice and data services by paying the early termination fee were prevented from obtaining
22 wireless service for their iPhone from one of ATTM's competitors domestically or abroad.

23      59.    Sixth, on information and belief, ATTM and Apple agreed that they would take
24 action, legal or otherwise, to prevent users from circumventing the SIM card locks. A central
25 purpose of this agreement was to suppress lawful competition domestically by T-Mobile against
26 ATTM in the iPhone aftermarket for voice and data services.

27      60.    Finally, on information and belief, Apple and ATTM agreed that Apple would be
28 restrained for a period of time from developing a CDMA version of the iPhone to suppress

CLASS ACTION COMPLAINT
- 12 -

1   competition by Sprint and Verizon. Apple and ATTM agreed to this restraint notwithstanding that
2   Apple could easily develop an iPhone for use on CDMA networks. In fact, Apple originally
3   approached Verizon to be the iPhone exclusive service provider before Apple approached ATTM.

4       61.     None of the above details of the Exclusivity Agreement were disclosed to
5   purchasers of the iPhone, by representatives of Apple and ATTM or otherwise. Nor did any
6   iPhone purchaser ever contractually consent to any of those terms upon purchasing their iPhone.

7       62.     On information and belief, Apple and ATTM ceased sharing ATTM's revenues,
8   and reverted to a more traditional carrier-handset manufacturer arrangement whereby ATTM
9   simply purchases the hand-sets from Apple without kicking back its future revenues to Apple,
10  with respect to the iPhone 3G, iPhone 3GS, iPhone 4 and iPhone 4S. Apple and ATTM, however,
11  continued to abide by and enforce the other anticompetitive terms of their Agreement, such as the
12  Program Locks and their refusal to give consumers the unlock codes for their iPhones, in order to
13  continue to suppress competition in the voice and data service aftermarket and to continue to enjoy
14  the supracompetitive profits stemming from their Agreement.

15  **G.    Apple And ATTM Quickly Faced Unwanted Competition In The iPhone Aftermarkets**

16      63.     Almost immediately after the iPhone 2G was launched, Third Party Apps for the
17  iPhone started to appear that generated competition for Apple in the applications aftermarket and
18  for ATTM in the cellular voice and data service aftermarket. For example, Mobile Chat and
19  FlickIM gave iPhone users access to instant messaging programs from which Apple derived no
20  revenues.

21      64.     Apple also faced competition for iPhone ringtones. When a customer purchased a
22  song for $1 from the Apple iTunes store, Apple charged the customer an additional 99 cents to
23  convert any portion of that song into a ringtone. A number of competing programmers promptly
24  offered a variety of ringtone programs that enabled iPhone consumers to download both for free.
25  Some of these programs allowed customers to use samples of popular songs lawfully downloaded
26  from Apple's iTunes store as a ringtone for their iPhone. Other programs, such as I-Toner from
27  Ambrosia Software, and iPhone RingToneMaker from Efiko software, allowed customers to
28  "clip" portions of songs purchased by them from iTunes for use as ringtones.

CLASS ACTION COMPLAINT

65. Since many of these programs used songs downloaded from iTunes, Apple initially sought to block the use of those songs as ringtones by updating the iTunes software to install Program Locks that would interfere with such use. However, those efforts were all quickly defeated by third party programmers, sometimes within hours of the release of the update.

66. The availability of Third Party Apps for iPhones reduced Apple's share of the iPhone aftermarket for ringtones and other applications and greatly reduced or threatened to reduce Apple's expected supracompetitive revenues and profits in that aftermarket.

67. The availability of SIM card unlocking solutions took a little longer and was more complicated. Initially, some customers sought to evade the program lock by altering the hardware. In August 2007, a high-school student announced the first "hardware unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the solutions involved a small change in the software, in some cases in as little as two bytes of code.

68. The availability of SIM card unlocking solutions enabled iPhone customers to lawfully terminate their ATTM voice and data service if they were unhappy with ATTM's service and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid ATTM's excessive international roaming charges by replacing the ATTM SIM card with a local carrier's SIM card while traveling.

69. The availability of SIM card unlocking solutions reduced ATTM's and Apple's share of the iPhone voice and data services aftermarket and threatened to reduce the supra competitive revenues and profits they conspired to earn.

## CLASS ALLEGATIONS

70. Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed class (hereinafter the "Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following class comprised of:

**All persons, exclusive of Apple and its employees, who purchased an iPhone anywhere in the United States at any time, and who then also paid for voice**

CLASS ACTION COMPLAINT

- 14 -

1    **and data service from ATTM or purchased applications from Apple from December 29, 2007 through February 3, 2011 (the "Class Period").**

2    71.    The Class for whose benefit this action is brought are so numerous that joinder of
3    all members is impractical.

4    72.    Plaintiffs are unable to state the exact number of class members without discovery
5    of Apple and ATTM's records but, on information and belief, state that tens of millions of iPhones
6    were sold for use on the ATTM network during the Class Period.

7    73.    There are questions of law and fact common to the Class which predominate over
8    any questions affecting only individual members.    The common questions of law and fact
9    affecting the rights of all members of the Class include the following:

10                  a.    Whether Apple failed to obtain consumers' contractual consent to the fact
11                       that Apple had entered into the five-year Exclusivity Agreement with
12                       ATTM whereby consumers would be unable to switch to a competing voice
13                       and data service provider during the period of the Exclusivity Agreement;

14                  b.    Whether Apple failed to obtain consumers' contractual consent to the fact
15                       that the iPhones would be locked to only accept ATTM SIM cards;

16                  c.    Whether Apple failed to obtain consumers' contractual consent to the fact
17                       that they would not provide consumers with the unlock codes for their
18                       iPhones so that the iPhones could be used with non-ATTM SIM cards;

19                  d.    Whether Apple failed to obtain consumers' contractual consent to the fact
20                       that Apple would seek to prohibit iPhone owners from downloading Third
21                       Party Apps;

22                  e.    Whether Apple violated section 2 of the Sherman Act by monopolizing or
23                       attempting to monopolize the aftermarket for iPhone software applications;
24                       and

25                  h.    Whether Apple violated section 2 of the Sherman Act by conspiring to
26                       monopolize the aftermarket for iPhone wireless voice and data services.

27    74.    Each of these enumerated commons questions of law and fact is identical for each
28    and every member of the Class.

CLASS ACTION COMPLAINT
- 15 -

75.     Plaintiffs are members of the Class they seek to represent, and their claims arise from the same factual and legal basis as those of the Class; they assert the same legal theories as do all Class members.

76.     Plaintiffs will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent themselves and those similarly situated.

77.     The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

78.     Plaintiffs are typical of the Class in that their claims, like those of the Class, are based on the same unconscionable business practices, and the same legal theories.

79.     Apple has acted on grounds generally applicable to the Class.

80.     A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

## RELEVANT MARKET ALLEGATIONS

81.     The iPhone is a unique, premium priced product that generates a unique aftermarket for voice and data services and software applications that can be used only on iPhones. During at least the Class Period, the price of iPhones was not responsive to an increase in iPhone service or application prices because (a) consumers who purchased an iPhone could not, at the point of sale, reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime), and (b) consumers were "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset.  The aftermarkets for iPhone voice and data services and applications are thus economically distinct product markets, and the service and application products that are sold within those markets had no acceptable substitutes.  The geographic scope of the iPhone voice and data services and applications aftermarkets are national.

82.     The aftermarkets for iPhone services and applications include: (a) the aftermarket for wireless voice and data services (the "iPhone Voice and Data Services Aftermarket"), and (b) the aftermarket for software applications that can be downloaded on the iPhone for managing

CLASS ACTION COMPLAINT

1  such functions as ringtones, instant messaging, photographic capability and Internet applications
2  (the "Applications Aftermarket").

3      83.    The iPhone Voice and Data Services Aftermarket came into existence immediately
4  upon the sale of the first iPhones, because (a) the iPhone Voice and Data Services Aftermarket is
5  derivative of the iPhone market; (b) no Plaintiff or member of the Class contractually agreed to
6  permit Apple to impose any restrictions in this aftermarket; (c) the Plaintiffs and members of the
7  Class were entitled to terminate service with ATTM at any time upon payment of a termination
8  fee; and (d) no Plaintiffs or members of the Class agreed with anyone to not purchase and use
9  voice and data services from providers other than ATTM.

10      84.    Similarly, the Applications Aftermarket came into existence immediately upon the
11  sale of the first iPhones because (a) the Applications Aftermarket is derivative of the iPhone
12  market; and (b) no Plaintiff or member of the Class agreed to any restrictions on their access to the
13  Applications Aftermarket.

14  **COUNT 1**<br>**Unlawful Monopolization of the Applications Aftermarket**<br>15  **in Violation of Section 2 of the Sherman Act**<br>**(Seeking Damages and Equitable Relief)**

16      85.    Plaintiffs reallege and incorporate paragraphs 1 through 84 above as if set forth
17  fully herein.

18      86.    Apple has acquired monopoly power in the iPhone Applications Aftermarket
19  through unlawful willful acquisition or maintenance of that power. Specifically, Apple has
20  unlawfully acquired monopoly power by: (a) "approving" only applications that generate
21  revenues for Apple, and/or that are submitted to Apple for approval after the developer pays Apple
22  an annual fee of $99; (b) discouraging iPhone customers from using competing Third Party Apps
23  by spreading misinformation; and (c) programming the iPhone operating system in a way that
24  prevents iPhone customers from downloading Third Party Apps, disables Third Party Apps and/or
25  disables or destroys the full functionality of the iPhones of users who download Third Party Apps.

26      87.    Apple's unlawful acquisition of monopoly power has reduced output and
27  competition and resulted in increased prices for products sold in the iPhone Applications
28  Aftermarket and, thus, harms competition generally in that market.

CLASS ACTION COMPLAINT

- 17 -

88.     Plaintiffs have been injured in fact by Apple's unlawful monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones disabled or destroyed.

89.     Apple's unlawful monopolization of the iPhone Applications Aftermarket violates section 2 of the Sherman Act, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

**COUNT II**
**Attempted Monopolization of the Applications Aftermarket in**
**Violation of Section 2 of the Sherman Act**
**(Seeking Damages and Equitable Relief)**

90.     Plaintiffs reallege and incorporate paragraphs 1 through 89 above as if set forth fully herein.

91.     Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Applications Aftermarket.  Specifically, Apple has attempted unlawfully to acquire monopoly power by (a) "approving" only applications that generate revenues for Apple, and/or that are submitted to Apple for approval after the developer pays Apple an annual fee of $99; (b) discouraging iPhone customers from using competing Third Party Apps by spreading misinformation; and (c) programming the iPhone operating system in a way that prevents iPhone customers from downloading Third Party Apps, disables Third Party Apps and/or disables or destroys the full functionality of the iPhones of users who download Third Party Apps.  Apple did not have a legitimate business justification for any of these actions.

92.     Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Applications Aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has

CLASS ACTION COMPLAINT

- 18 -

1  effectively foreclosed new and potential entrants from entering the market or gaining their
2  naturally competitive market shares.

3      93.    Apple's attempted acquisition of monopoly power has reduced output and
4  competition and resulted in increased prices for products sold in the iPhone Applications
5  Aftermarket and, thus, harms competition generally in that market.

6      94.    Plaintiffs have been injured in fact by Apple's attempted monopolization because
7  they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay
8  higher prices for Apple "approved" applications, and/or (c) had their iPhones disabled or
9  destroyed.

10     95.    Apple's attempted monopolization of the iPhone Applications Aftermarket violates
11  section 2 of the Sherman Act and its anticompetitive practices are continuing and will continue
12  unless they are permanently enjoined.   Plaintiffs and members of the Class have suffered
13  economic injury to their property as a direct and proximate result of Apple's attempted
14  monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in
15  amounts to be proved at trial.

16                          **COUNT III**
                **Conspiracy to Monopolize the iPhone Voice and Data Services Aftermarket**
17                 **in Violation of Section 2 of the Sherman Act**
                       **(Seeking Damages and Equitable Relief)**

18     96.    Plaintiffs reallege and incorporate paragraphs 1 through 95 above as if set forth
19  fully herein.

20     97.    Apple knowingly and intentionally conspired with ATTM with the specific intent
21  to monopolize the iPhone Voice and Data Services Aftermarket.  In furtherance of the conspiracy,
22  Apple and its co-conspirator agreed without Plaintiffs' knowledge or consent to make ATTM the
23  exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs'
24  reasonable expectations that they could switch at any time to another carrier in the first two years
25  that they owned their iPhone after paying the $175 early termination fee, and without charge after
26  that period.

27     98.    ATTM unlawfully achieved an economically significant degree of market power in
28  the iPhone Voice and Data Services Aftermarket as a result of the conspiracy and effectively

CLASS ACTION COMPLAINT

1 | foreclosed new and potential entrants from entering the market or gaining their naturally
2 | competitive market shares.

3 |      99.    Apple and ATTM's conspiracy reduced output and competition and resulted in
4 | increased prices in the iPhone Voice and Data Services Aftermarket and, thus, harmed competition
5 | generally in that market.

6 |      100.    Plaintiffs were injured in fact by Apple and ATTM's conspiracy because they were
7 | (a) deprived of alternatives for voice and data services domestically, and (b) forced to pay
8 | supracompetitive prices for iPhone voice and data services.

9 |      101.    Apple's conspiracy to monopolize the iPhone Voice and Data Services Aftermarket
10 | violated Section 2 of the Sherman Act and its anticompetitive practices are continuing and will
11 | continue unless they are permanently enjoined. Plaintiffs and members of the Class have suffered
12 | economic injury to their property as a direct and proximate result of Apples' conspiracy, and
13 | Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proven at
14 | trial.

15 |      **WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against
16 | Apple as follows:

17 |     a.    Permanently enjoining Apple from selling locked iPhones that can only be used
18 |          with ATTM SIM cards unless such information is adequately disclosed to
19 |          consumers prior to sale;

20 |     b.    Ordering Apple to provide the unlock code upon request to all members of the
21 |          Class who purchased an iPhone prior to the disclosures described above;

22 |     c.    Permanently enjoining Apple from monopolizing or attempting to monopolize the
23 |          iPhone Applications Aftermarket;

24 |     d.    Permanently enjoining Apple from conspiring to monopolize the iPhone Voice and
25 |          Data Services Aftermarket;

26 |     e.    Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's
27 |          violations of the federal antitrust laws;

28 |     f.    Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

CLASS ACTION COMPLAINT

1    g.    Granting such other and further relief as the Court may deem just and proper.

2                    **DEMAND FOR TRIAL BY JURY**

3        Plaintiffs hereby demand a trial by jury.

4    DATED: December 29, 2011            WOLF HALDENSTEIN ADLER
                                         FREEMAN & HERZ LLP
5                                        FRANCIS M. GREGOREK
                                         BETSY C. MANIFOLD
6                                        RACHELE R. RICKERT

7

8                                        _____
                                         FRANCIS M. GREGOREK
9
                                         750 B. Street, Suite 2770
10                                       San Diego, California 92101
                                         Telephone: 619/239-4599
11                                       Facsimile: 619/234-4599
                                         gregorek@whafh.com
12                                       manifold@whafh.com
                                         rickert@whafh.com
13
                                         WOLF HALDENSTEIN ADLER
14                                         FREEMAN & HERZ LLP
15                                       MARK C. RIFKIN (*pro hac vice pending*)
                                         ALEXANDER H. SCHMIDT (*pro hac vice pending*)
16                                       MICHAEL LISKOW
17                                       270 Madison Avenue
                                         New York, New York 10016
18                                       Telephone: 212/545-4600
                                         Facsimile: 212/545-4677
19                                       rifkin@whafh.com
20                                       schmidt@whafh.com
                                         liskow@whafh.com
21

22

23

24

25

26

27   APPLE2/18595.CPL

28

CLASS ACTION COMPLAINT
                                        - 21 -