1   FRANCIS M. GREGOREK (144785)
    gregorek@whafh.com
2   RACHELE R. RICKERT (190634)
    rickert@whafh.com
3   WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
4   750 B Street, Suite 2770
    San Diego, CA 92101
5   Telephone: 619/239-4599
    Facsimile: 619/234-4599
6
    MARK C. RIFKIN (*pro hac vice*)
7   rifkin@whafh.com
    ALEXANDER H. SCHMIDT (*pro hac vice*)
8   schmidt@whafh.com
    MICHAEL LISKOW (243899)
9   liskow@whafh.com
    WOLF HALDENSTEIN ADLER                        REGINALD TERRELL
10    FREEMAN & HERZ LLP                          reggiet2@aol.com
11  270 Madison Avenue                            THE TERRELL LAW GROUP
    New York, NY 10016                            P.O. BOX 13315, PMB # 148
12  Telephone: 212/545-4600                       Oakland, CA 94661
    Facsimile: 212/545-4677                       Telephone: 510/237-9700
13                                                Facsimile: 510/237-4616
    Counsel for Plaintiffs
14  Robert Pepper, Stephen H. Schwartz,          Counsel for Plaintiffs Eric Terrell, James
    Edward W. Hayter and Harry Bass              Blackwell, and Crystal Boykin

15

16

17                    UNITED STATES DISTRICT COURT

18              FOR THE NORTHERN DISTRICT OF CALIFORNIA

19                        SAN FRANSICO DIVISION

20   In re Apple iPhone Antitrust Litigation  )   No. C 11-06714 JW
                                              )
21                                            )   **CONSOLIDATED CLASS ACTION**
                                              )   **COMPLAINT**
22                                            )
                                              )
23                                            )
                                              )
24                                            )
                                              )
25                                            )   **DEMAND FOR JURY TRIAL**
                                              )
26                                            )
                                              )
27   _____ )

28

Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, Harry Bass, Eric Terrell, James Blackwell, and Crystal Boykin ("Plaintiffs"), for their class action complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1.     This is an antitrust class action pursuant to section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), brought by Plaintiffs on their own behalf and on behalf of a class of persons similarly situated, those being persons who purchased an Apple iPhone from Defendant Apple Inc. ("Apple") or non-party AT&T Mobility, LLC ("ATTM"), or elsewhere, and then purchased wireless voice and data services or applications for the iPhone from December 29, 2007 through February 3, 2011 (the "Class Period")

A.     **Summary Of Material Facts**

2.     Apple launched its iPhone on or about June 29, 2007.  Prior to launch, Apple entered into a secret five-year contract with ATTM that established ATTM as the exclusive provider of cell phone voice and data services for iPhone customers through some time in 2012 ("Exclusivity Agreement").  As part of the contract, Apple shared in ATTM's revenues and profits with respect to the first generation of iPhones launched, known as the iPhone 2G, which was a unique arrangement in the industry.  The Plaintiffs and other class members who purchased iPhones did not agree to use ATTM for five years.  Apple's undisclosed five-year Exclusivity Agreement with ATTM, however, effectively locked iPhone users into using ATTM for five years, contrary to those users' knowledge, wishes and expectations.

3.     To enforce ATTM's exclusivity, Apple, among other things, programmed and installed software locks on each iPhone it sold that prevented the purchaser from switching to another carrier that competed with ATTM in the cell phone voice and data services industry. Under an exemption to the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 1201, *et seq.* (2008) (the "DMCA"), cell phone consumers have an absolute legal right to modify their phones to use the network of their carrier of choice.  Apple has prevented iPhone customers from `exercising that legal right by locking the iPhones and refusing to give customers the software

codes needed to unlock them.

4.      Under its Exclusivity Agreement with ATTM, Apple retained exclusive control over the design, features and operating software for the iPhone.  To enhance its iPhone-related revenues, Apple enabled the creation of numerous software programs called "applications," such as ringtones, instant messaging, Internet access, gaming, entertainment, video and photography enabling software that can be downloaded and used by iPhone owners.

5.      In March 2008, Apple released a "software development kit" ("SDK") for the stated purpose of enabling independent software developers to design applications for use on the iPhone.  For an annual fee of $99, the SDK allows developers to submit applications to be distributed through Apple's applications market, the "iTunes App Store."  If the application is not made available for free in the App Store, Apple collects 30% of the sale of each application, with the developer receiving the remaining 70%.  On information and belief, throughout the Class Period, Apple refused to "approve" any application by a developer who did not pay the annual fee, or agree to Apple's apportionment scheme.  Apple also unlawfully discouraged iPhone customers from downloading competing applications software (hereafter "Third Party Apps") by telling customers that Apple would void and refuse to honor the iPhone warranty of any customer who downloaded Third Party Apps.

6.      iPhone consumers were not provided a means by which they could download Third Party Apps that were not approved by Apple for sale on the App Store.

7.      Through these actions, Apple has unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarkets for iPhone voice and data services and for iPhone software applications.

**B.      Summary Of Claims**

8.      In pursuit and furtherance of its unlawful anticompetitive activities, Apple (a) failed to obtain iPhone consumers' contractual consent to the five-year Exclusivity Agreement between Apple and ATTM, the effect of which was to lock consumers into using ATTM as their voice and data service provider, even if they wished to discontinue their use of ATTM service; (b) failed to obtain iPhone consumers' contractual consent to having their iPhones "locked" to only accept

ATTM Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone purchasers from using any cell phone voice and data service provider other than ATTM; (c) failed to obtain iPhone consumers' contractual consent to make unavailable to them the "unlock code" that would enable the consumers to use a service other than ATTM, even though ATTM routinely provides such unlock codes for other types of cell phones; and (d) failed to obtain iPhone consumers' contractual consent to Apple prohibiting iPhone owners from downloading Third Party Apps.

9.    Apple violated section 2 of the Sherman Act by conspiring with ATTM to monopolize the aftermarket for voice and data services for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices in that aftermarket.

10.    Apple also violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those applications.

11.    Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiffs seek an order: (a) restraining Apple from selling iPhones that are programmed in any way to prevent or hinder consumers from unlocking their SIM cards or from downloading Third Party Apps; (b) requiring Apple to provide the iPhone SIM unlock codes to members of the class and other iPhone consumers immediately upon request; and (c) restraining Apple from selling or distributing locked iPhones without adequately disclosing the fact that they are locked to work only with ATTM SIM cards and without obtaining the consumers' contractual consent to have their iPhones locked.[1]

---

[1]    Apple has released five models of the iPhone to date. From the earliest to most recent, the models are the iPhone 2G, the iPhone 3G, the iPhone 3GS, the iPhone 4 and the iPhone 4S. Apple created the first three iPhones to operate only on the ATTM wireless network, as part of the Exclusivity Agreement. One version of the iPhone 4 is locked to work only on ATTM's network, while another version, which was released on February 3, 2011, works on Verizon's network. The iPhone 4S is designed to be able to operate on *any* domestic carrier's network. Despite this, Apple and ATTM *still refuse* to unlock any iPhone 4S purchased by an ATTM customer.

CONSOLIDATED CLASS ACTION COMPLAINT -- NO. C 11-06714 JW

## THE PARTIES

12.     Plaintiff Robert Pepper is an individual residing in Chicago, Illinois who, on or about June 29, 2007, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

13.     Plaintiff Stephen H. Schwartz is an individual residing in Ardsley, New York who, in October 2010, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

14.     Plaintiff Edward W. Hayter is an individual residing in Brooklyn, New York who, in March 2008, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

15.     Plaintiff Harry Bass is an individual residing in Brooklyn, New York, who, in December 2008, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the Class Period.

15.1     Plaintiff Eric Terrell is an individual residing in Oakland, California who, on or about June 29, 2007, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the class period.

15.2     Plaintiff James Blackwell is an individual residing in Pinole, California who, in October 2010, purchased an iPhone and paid for ATTM voice and data service for his iPhone at ATTM's stated rates during the class period.

15.3     Plaintiff Crystal Boykin is an individual residing in Oakland, California who, in March 2008, purchased an iPhone and paid for ATTM voice and data service for her iPhone at ATTM's stated rates during the class period.

16.     Defendant Apple is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014.  Apple regularly conducts and transacts business in this District, as well as throughout Illinois, New York and elsewhere in the United States.  Apple manufactures, markets, and sells the iPhone, among other electronic devices.

**JURISDICTION AND VENUE**

17.    This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 and pursuant to 26, 28 U.S.C. §§ 1331 and 1337.

18.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because some Plaintiffs purchased iPhones in this District, Apple has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and Apple is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

20.    Each Plaintiff and member of the Class, in order to activate their iPhone, was required to download and install iTunes software provided by Apple.  In order to use this program, Plaintiffs and all other members of the Class were required to accept the "iTunes Store Terms and Conditions" (the "Terms").  The Terms state, in pertinent part, that "You expressly agree that exclusive jurisdiction for *any claim or dispute with Apple* or relating in any way to your use of the iTunes Service resides in the courts in the State of California."  (emphasis added) (available at http://www.apple.com/legal/itunes/us/terms.html#GIFTS).

**FACTUAL ALLEGATIONS**

A.    **Plaintiffs' Injuries**

21.    In Spring 2007, Apple began a massive advertising campaign to market their new wireless communication device, the iPhone.  The iPhone was advertised as a mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability.

22.    The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[2] consumers waited in line to get their hands on one.

23.    Pursuant to the secret Exclusivity Agreement between Apple and ATTM described

---

[2]    Initially, the 4GB iPhone 2G retailed for $499 and the 8GB iPhone 2G retailed for $599.

1  more fully below, during the Class Period the iPhone was sold at both Apple's and ATTM's retail
2  and online stores, among other places.

3      24.    Apple and ATTM entered into a five-year exclusive service provider agreement,
4  which on information and belief was originally scheduled to expire in 2012, although it appears to
5  have been terminated early by Apple before February 2011, when Verizon began selling voice and
6  data service for the iPhone.

7      25.    Each Plaintiff purchased one or more iPhones.  Each Plaintiff also purchased
8  wireless voice and data services from ATTM for their iPhones.

9      26.    Prior to Plaintiffs' purchases of their iPhones and ATTM voice and data services,
10 Apple had not even disclosed – much less obtained the Plaintiffs' contractual consent to – either
11 (a) the existence of Apple's five-year Exclusivity Agreement with ATTM, or (b) that Apple's
12 five-year agreement would effectively lock Plaintiffs into using ATTM as their voice and data
13 service provider for the duration of the five-year agreement.  In fact, neither Apple's nor ATTM's
14 sales or customer service representatives were told about the length of the secret Exclusivity
15 Agreement.

16     27.    Prior to Plaintiffs' purchases of their iPhones and voice and data service, Apple had
17 not disclosed – much less obtained Plaintiffs' contractual consent to – the fact (a) that Plaintiffs'
18 iPhones were locked to only work with ATTM SIM cards, or (b) that the unlock codes would not
19 be provided to them on request.

20     28.    On information and belief, ATTM provides unlock codes for cell phones other than
21 the iPhone if requested by a consumer.

22     29.    Plaintiff Pepper wanted to have the option of switching to a competing domestic
23 voice and data service provider other than ATTM.

24     30.    Plaintiff Schwartz would like the ability to unlock his SIM card for international
25 travel and to switch to a competing domestic voice and data service provider other than ATTM.

26     31.    Plaintiff Hayter wanted to have the option of switching to a competing domestic
27 voice and data service provider other than ATTM.

28

CONSOLIDATED CLASS ACTION COMPLAINT -- NO. C 11-06714 JW

32.     Plaintiff Bass wanted to have the option of switching to a competing domestic voice and data service provider other than ATTM.

**B.      The Cell Phone Industry**

33.     Cellular telephone service began to be offered to consumers in 1983. Cellular telephones operate using radio frequency channels allocated by the Federal Communications Commission ("FCC").  Geographical service areas, sometimes known as "cells," are serviced by base stations using low-power radio telephone equipment, sometimes known as "cell towers." The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the switching between cell phones and land line phones, accessed through the public-switched telephone network, and to other cell telephones.

34.     In cellular service there are two main competing network technologies:  Global System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA"). GSM is the product of an international organization founded in 1987 dedicated to providing, developing, and overseeing a worldwide wireless standard.  CDMA is an alternative technological platform, developed by Qualcomm, Inc., used in much of North America and parts of Asia.

35.     To enable cell phones to send and receive emails, stream video and provide other services requiring higher data transfer speeds, both CDMA and GSM carriers adopted technologies to comply with what the industry refers to as "3rd or 4th generation," or "3G" or "4G" standards.  These technologies require the cell phone to operate on a separate 3G or 4G network.  The ATTM services provided to users of the first-generation iPhone were on ATTM's 2G network, whereas later versions of the iPhone operate on 3G and 4G networks.

36.     While there are a number of cellular phone service providers in the United States, only four have substantial national networks: ATTM, T-Mobile USA, Inc. ("T-Mobile"), Sprint Corporation ("Sprint"), and Cellco Partnership d/b/a Verizon Wireless ("Verizon") (collectively, the "Major Carriers").  Other suppliers may in effect be "resellers" of cellular telephone service which they purchase from the Major Carriers.  ATTM and T-Mobile operate GSM networks, while Sprint and Verizon operate CDMA networks.

37.     ATTM and the other wireless carriers have long dominated and controlled the cell

phone industry in the United States in a manner that, according to a *Wall Street Journal* article, "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a powerful hand-held computer."  Walter S. Mossberg, *Free My Phone*, WALL STREET JOURNAL, Oct. 22, 2007, at R3, col. 1.

38.    Unlike the personal computer market in general – where computer manufacturers and software developers can offer products directly to consumers without having to gain the approval of Internet service providers, and without paying those providers a penny – the wireless carriers have used their ability to grant or deny access to their wireless networks to control both the type of cell phone hardware and software that can be manufactured and to extract payments from manufacturers granted access to their networks and customers.  *Id.*

39.    The anticompetitive nature of the wireless telephone market the carriers have created and facilitated gave rise to the commercial context in which Apple was able to commit the wrongs and offenses alleged herein.

C.    **The Cell Phone Industry's History Of Misusing Locked SIM Cards**

40.    In the United States, as a general rule, only GSM phones use SIM cards.  The removable SIM card allows phones to be instantly activated, interchanged, swapped out and upgraded, all without carrier intervention.  The SIM card itself is tied to the network rather than the actual phone.  Phones that are SIM card-enabled generally can be used with any GSM carrier.

41.    Thus, the hardware of all GSM compatible cell phones give consumers some degree of choice to switch among GSM carriers' wireless networks by enabling them to replace their SIM card, a process that the average individual consumer easily can do with no training by following a few simple instructions in a matter of minutes.  SIM cards are very inexpensive, now typically costing a few dollars.  When the card is changed to the SIM card of another carrier, the cell phone is immediately usable on the other carrier's network.  To switch from ATTM to T-Mobile, or the other way around, all that is required is this simple change of the SIM card.

42.    For telephone users who travel, particularly to Europe, the ability to change SIM cards to a European carrier such as Orange, Vodaphone or TIM, allows the user of a GSM

American phone to "convert it" to a "local" phone in the country where they have traveled. Absent a conversion to local service, a consumer using an American GSM cell phone abroad must pay both for the American service and for "roaming" charges, that is, the right to call or retrieve data from outside of the customer's primary calling area. Roaming charges are typically very high, often a dollar or more a minute. As a result, U.S.-based cell phone users traveling abroad can yield very substantial savings by switching the SIM card and paying for local service rather than using the U.S.-based GSM carrier.

43.    In an effort to minimize consumers' ability to switch carriers or avoid roaming charges by simply switching SIM cards, the Major Carriers, acting in concert through trade associations and standards setting organizations such as the CDMA Development Group, the Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless Communications Consortium, and the Cellular Telephone Industry Association, and otherwise, agreed to implement "Programming Lock" features which effectively "locked" individual handsets so that they could not be used without the "unlocking" code. GSM carriers obtain a locking code (normally only six digits long) unique to each cell phone from the cell phone manufacturer. Absent obtaining the unlocking code from their GSM carrier, consumers who purchase a telephone manufactured to work with one of the two GSM Major Carriers can not switch to another carrier, even temporarily while traveling abroad, without buying an entirely new phone.

44.    The two GSM carriers, ATTM and T-Mobile, adopted a SIM-lock standard that locked each GSM phone to a particular SIM card, thereby preventing consumers from simply changing their SIM cards to switch carriers. However, throughout the Class Period both T-Mobile and ATTM (for cell phones other than the iPhone) typically unlocked SIM cards on request for international travel, or even if customers wanted to cancel their accounts and switch to another carrier. In most cases, the unlock code was given on request, almost instantly, over the telephone.

45.    Accordingly, ATTM unlocked SIM cards on telephones sold exclusively through them, such as the Blackberry Torch and the Samsung Blackjack. There is but one exception: the iPhone. Even today, ATTM refuses to provide the unlock code for iPhones for international travel

or otherwise.[3]  On information and belief, that is because, as described more fully below, Apple and ATTM unlawfully agreed as part of the Exclusivity Agreement that the iPhone would not be unlocked under any circumstances.

**D.      Apple's Misuse Of Other Locked Program Codes**

46.    The iPhone operating system also contains "security measures" which are, in effect, Program Locks designed to restrict the consumer from using programs or services on the iPhone other than those sanctioned by, and which generate revenue for, Apple.  By design, Apple programmed the iPhone in a manner that prevented iPhone purchasers from downloading any Third Party Apps offered by software manufacturers who did not share their revenues with Apple or pay a fee to Apple to sell through iTunes.

47.    However, because of the design of the Apple operating system, which is based on the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps and to prevent iPhone customers from unlocking their SIM cards were ineffective, as clever consumers and programmers of Third Party Apps quickly circumvented Apple's locking codes and made both "unlocked" iPhones and "unlocking" software for iPhones available for sale on the Internet.

**E.      Apple Knows It Cannot Legally Prevent Consumers From Unlocking iPhones**

48.    Several years ago, the Major Carriers were subject to lawsuits that sought to impose liability based on the existence of Program Locks.  Carriers had claimed that Program Locks were necessary to protect their copyrighted intellectual property and claimed then, as Apple has done, that the reason for the locks was to benefit consumers and protect against fraud. Carriers had also sought to assert that under the terms of the DMCA, disabling the Program Locks or unlocking a SIM card would be a violation of law.

49.    The DMCA was enacted in 1998 to prohibit third parties from circumventing technological measures (called "access controls") that copyright owners had employed to control access to their protected intellectual property.  However, in November 2006, the Librarian of

---

[3]      Despite the fact that the iPhone 4S can be operated on either a GSM or CDMA network, ATTM appears to still refuse to provide unlock codes for any iPhones.  *See* http://www.att.com/ esupport/article.jsp?sid=55002&cv=820&title=What+is+the+unlock+code+for+my+phone%3F#f bid=s-46_WT1tko ("iPhone(R) cannot be unlocked, even if you are out of contract.").

CONSOLIDATED CLASS ACTION COMPLAINT  -- NO. C 11-06714 JW

1    Congress, who by statute has authority to create exemptions to the restrictions in § 1201 of the

2    DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works,

3    announced a three-year exemption from the prohibition against circumvention of access controls

4    for "[c]omputer programs in the form of firmware that enable wireless telephone handsets to

5    connect to a wireless telephone communication network, when circumvention is accomplished for

6    the sole purpose of lawfully connecting to a wireless telephone communication network."  The

7    exemption stemmed for a recommendation by the Register of Copyrights, which concluded that

8    "the access controls [on cell phones] do not appear to actually be deployed in order to protect the

9    interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are*

10   *used by wireless carriers to limit the ability of subscribers to switch to other carriers*, *a business*

11   *decision that has nothing whatsoever to do with the interests protected by copyright.*"  71 Fed.

12   Reg. 68472, 68476 (Nov. 27, 2006).

13       50.    In 2009, the Librarian of Congress extended the initial three-year exemption

14   applicable to cell phone access controls on an interim basis.  74 Fed. Reg. 55138, 55139 (Oct. 27,

15   2009).  On July 27, 2010, the Librarian of Congress issued a final rule to this effect.  75 Fed. Reg.

16   43825, 43832 (July 27, 2010).

17       51.    Because Apple was unable to enforce its SIM card Program Locks through legal

18   means, it engaged in a scheme to enforce them unlawfully as to the iPhone.

19   **F.     The Apple – ATTM Exclusivity Agreement**

20       52.    On January 9, 2007, a little over a month after the initial adverse Librarian of

21   Congress ruling, Apple announced that it had entered into an exclusive agreement making ATTM

22   the only authorized provider of wireless voice and data services for iPhones in the United States.

23   Apple did not announce that the duration of that exclusive agreement was five years.

24       53.    While the terms of that Exclusivity Agreement and any related agreements

25   (collectively, the "Agreement") still have not been made public, some rumored details emerged.

26   First, ATTM and Apple agreed to share ATTM's voice service and data service revenue received

27   from iPhone customers.  This was a unique arrangement in the industry and gave Apple strong

28

motivation to force iPhone consumers to continue purchasing voice and data services from ATTM for as long as possible.

54.     Second, while ATTM offered iPhone purchasers industry standard monthly voice and data service that could be terminated at any time prior to two years for a fee, Apple had secretly agreed to give ATTM iPhone exclusivity for five years, so that iPhone customers would have no choice but to continue purchasing voice and data services from ATTM until sometime in 2012 in order for their iPhone to continue to operate – even if the customers wanted to terminate their ATTM service early to switch to a less expensive carrier, such as T-Mobile in the United States.

55.     Third, on information and belief, Apple and ATTM agreed to enforce ATTM's exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for international travel or to lawfully switch to another carrier.

56.     Fourth, the Agreement allowed Apple to control the features, content, software programming and design of the iPhone.

57.     Fifth, since both Apple and ATTM recognized that the iPhone would create a unique product for which consumers would pay a premium price compared to other cell phones, the pricing structure of the ATTM exclusivity deal was different than a typical agreement between a carrier and a handset manufacturer.  Typically, the carrier subsidizes the purchase price of the handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in return for the consumer purchasing wireless service from the carrier for a period of time.  This arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price.  The carriers, however, charge an early termination fee if consumers wish to discontinue their purchase of wireless service prior to the agreed upon length of time, which fee the carriers argue is justified by their subsidization of the cell phone price.  Upon termination, the cell phone customer can obtain cell phone service from any carrier using the same network protocol (*i.e.*, GSM or CDMA).

58.     In Apple's and ATTM's Agreement, ATTM did not agree to subsidize the purchase of the iPhone handset initially but nevertheless still charged iPhone consumers a fee for

terminating their voice and data service within the first two years.  The early termination fee by ATTM was not justifiable absent subsidization of the handset price.  The benefits of the termination fee were also illusory because even those iPhone consumers who discontinued their ATTM voice and data services by paying the early termination fee were prevented from obtaining wireless service for their iPhone from one of ATTM's competitors domestically or abroad.

59.     Sixth, on information and belief, ATTM and Apple agreed that they would take action, legal or otherwise, to prevent users from circumventing the SIM card locks.  A central purpose of this agreement was to suppress lawful competition domestically by T-Mobile against ATTM in the iPhone aftermarket for voice and data services.

60.     Finally, on information and belief, Apple and ATTM agreed that Apple would be restrained for a period of time from developing a CDMA version of the iPhone to suppress competition by Sprint and Verizon.  Apple and ATTM agreed to this restraint notwithstanding that Apple could easily develop an iPhone for use on CDMA networks.  In fact, Apple originally approached Verizon to be the iPhone exclusive service provider before Apple approached ATTM.

61.     None of the above details of the Exclusivity Agreement were disclosed to purchasers of the iPhone, by representatives of Apple and ATTM or otherwise.  Nor did any iPhone purchaser ever contractually consent to any of those terms upon purchasing their iPhone.

62.     On information and belief, Apple and ATTM ceased sharing ATTM's revenues, and reverted to a more traditional carrier-handset manufacturer arrangement whereby ATTM simply purchases the hand-sets from Apple without kicking back its future revenues to Apple, with respect to the iPhone 3G, iPhone 3GS, iPhone 4 and iPhone 4S.  Apple and ATTM, however, continued to abide by and enforce the other anticompetitive terms of their Agreement, such as the Program Locks and their refusal to give consumers the unlock codes for their iPhones, in order to continue to suppress competition in the voice and data service aftermarket and to continue to enjoy the supracompetitive profits stemming from their Agreement.

G.     **Apple And ATTM Quickly Faced Unwanted Competition In The iPhone Aftermarkets**

63.     Almost immediately after the iPhone 2G was launched, Third Party Apps for the iPhone started to appear that generated competition for Apple in the applications aftermarket and

CONSOLIDATED CLASS ACTION COMPLAINT  -- NO. C 11-06714 JW

for ATTM in the cellular voice and data service aftermarket. For example, Mobile Chat and FlickIM gave iPhone users access to instant messaging programs from which Apple derived no revenues.

64. Apple also faced competition for iPhone ringtones. When a customer purchased a song for $1 from the Apple iTunes store, Apple charged the customer an additional 99 cents to convert any portion of that song into a ringtone. A number of competing programmers promptly offered a variety of ringtone programs that enabled iPhone consumers to download both for free. Some of these programs allowed customers to use samples of popular songs lawfully downloaded from Apple's iTunes store as a ringtone for their iPhone. Other programs, such as I-Toner from Ambrosia Software, and iPhone RingToneMaker from Efiko software, allowed customers to "clip" portions of songs purchased by them from iTunes for use as ringtones.

65. Since many of these programs used songs downloaded from iTunes, Apple initially sought to block the use of those songs as ringtones by updating the iTunes software to install Program Locks that would interfere with such use. However, those efforts were all quickly defeated by third party programmers, sometimes within hours of the release of the update.

66. The availability of Third Party Apps for iPhones reduced Apple's share of the iPhone aftermarket for ringtones and other applications and greatly reduced or threatened to reduce Apple's expected supracompetitive revenues and profits in that aftermarket.

67. The availability of SIM card unlocking solutions took a little longer and was more complicated. Initially, some customers sought to evade the program lock by altering the hardware. In August 2007, a high-school student announced the first "hardware unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the solutions involved a small change in the software, in some cases in as little as two bytes of code.

68. The availability of SIM card unlocking solutions enabled iPhone customers to lawfully terminate their ATTM voice and data service if they were unhappy with ATTM's service and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid ATTM's excessive international roaming charges by replacing the ATTM SIM card with a local carrier's

1   SIM card while traveling.

2       69.   The availability of SIM card unlocking solutions reduced ATTM's and Apple's

3   share of the iPhone voice and data services aftermarket and threatened to reduce the supra

4   competitive revenues and profits they conspired to earn.

5                                 **CLASS ALLEGATIONS**

6       70.   Plaintiffs bring this action as a class action on behalf of themselves and all others

7   similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis.

8   Plaintiffs' proposed class (hereinafter the "Class") is defined under Federal Rules of Civil

9   Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following class

10  comprised of:

11          **All persons, exclusive of Apple and its employees, who purchased an iPhone
            anywhere in the United States at any time, and who then also paid for voice
12          and data service from ATTM or purchased applications from Apple from
            December 29, 2007 through February 3, 2011 (the "Class Period").**

13      71.   The Class for whose benefit this action is brought are so numerous that joinder of

14  all members is impractical.

15      72.   Plaintiffs are unable to state the exact number of class members without discovery

16  of Apple and ATTM's records but, on information and belief, state that tens of millions of iPhones

17  were sold for use on the ATTM network during the Class Period.

18      73.   There are questions of law and fact common to the Class which predominate over

19  any questions affecting only individual members.   The common questions of law and fact

20  affecting the rights of all members of the Class include the following:

21          a.    Whether Apple failed to obtain consumers' contractual consent to the fact

22                that Apple had entered into the five-year Exclusivity Agreement with

23                ATTM whereby consumers would be unable to switch to a competing voice

24                and data service provider during the period of the Exclusivity Agreement;

25          b.    Whether Apple failed to obtain consumers' contractual consent to the fact

26                that the iPhones would be locked to only accept ATTM SIM cards;

27

28

CONSOLIDATED CLASS ACTION COMPLAINT -- NO. C 11-06714 JW

     c.    Whether Apple failed to obtain consumers' contractual consent to the fact that they would not provide consumers with the unlock codes for their iPhones so that the iPhones could be used with non-ATTM SIM cards;

     d.    Whether Apple failed to obtain consumers' contractual consent to the fact that Apple would seek to prohibit iPhone owners from downloading Third Party Apps;

     e.    Whether Apple violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the aftermarket for iPhone software applications; and

     h.    Whether Apple violated section 2 of the Sherman Act by conspiring to monopolize the aftermarket for iPhone wireless voice and data services.

74. Each of these enumerated commons questions of law and fact is identical for each and every member of the Class.

75. Plaintiffs are members of the Class they seek to represent, and their claims arise from the same factual and legal basis as those of the Class; they assert the same legal theories as do all Class members.

76. Plaintiffs will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent themselves and those similarly situated.

77. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

78. Plaintiffs are typical of the Class in that their claims, like those of the Class, are based on the same unconscionable business practices, and the same legal theories.

79. Apple has acted on grounds generally applicable to the Class.

80. A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

**RELEVANT MARKET ALLEGATIONS**

81.     The iPhone is a unique, premium priced product that generates a unique aftermarket for voice and data services and software applications that can be used only on iPhones. During at least the Class Period, the price of iPhones was not responsive to an increase in iPhone service or application prices because (a) consumers who purchased an iPhone could not, at the point of sale, reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime), and (b) consumers were "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset.  The aftermarkets for iPhone voice and data services and applications are thus economically distinct product markets, and the service and application products that are sold within those markets had no acceptable substitutes.  The geographic scope of the iPhone voice and data services and applications aftermarkets are national.

82.     The aftermarkets for iPhone services and applications include: (a) the aftermarket for wireless voice and data services (the "iPhone Voice and Data Services Aftermarket"), and (b) the aftermarket for software applications that can be downloaded on the iPhone for managing such functions as ringtones, instant messaging, photographic capability and Internet applications (the "Applications Aftermarket").

83.     The iPhone Voice and Data Services Aftermarket came into existence immediately upon the sale of the first iPhones, because (a) the iPhone Voice and Data Services Aftermarket is derivative of the iPhone market; (b) no Plaintiff or member of the Class contractually agreed to permit Apple to impose any restrictions in this aftermarket; (c) the Plaintiffs and members of the Class were entitled to terminate service with ATTM at any time upon payment of a termination fee; and (d) no Plaintiffs or members of the Class agreed with anyone to not purchase and use voice and data services from providers other than ATTM.

84.     Similarly, the Applications Aftermarket came into existence immediately upon the sale of the first iPhones because (a) the Applications Aftermarket is derivative of the iPhone market; and (b) no Plaintiff or member of the Class agreed to any restrictions on their access to the Applications Aftermarket.

1
2

**COUNT I**
**Unlawful Monopolization of the Applications Aftermarket**
**in Violation of Section 2 of the Sherman Act**
**(Seeking Damages and Equitable Relief)**

3        85.     Plaintiffs reallege and incorporate paragraphs 1 through 84 above as if set forth
4    fully herein.

5        86.     Apple has acquired monopoly power in the iPhone Applications Aftermarket
6    through unlawful willful acquisition or maintenance of that power.  Specifically, Apple has
7    unlawfully acquired monopoly power by:  (a) "approving" only applications that generate
8    revenues for Apple, and/or that are submitted to Apple for approval after the developer pays Apple
9    an annual fee of $99; (b) discouraging iPhone customers from using competing Third Party Apps
10   by spreading misinformation; and (c) programming the iPhone operating system in a way that
11   prevents iPhone customers from downloading Third Party Apps, disables Third Party Apps and/or
12   disables or destroys the full functionality of the iPhones of users who download Third Party Apps.

13       87.     Apple's unlawful acquisition of monopoly power has reduced output and
14   competition and resulted in increased prices for products sold in the iPhone Applications
15   Aftermarket and, thus, harms competition generally in that market.

16       88.     Plaintiffs have been injured in fact by Apple's unlawful monopolization because
17   they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay
18   higher prices for Apple "approved" applications, and/or (c) had their iPhones disabled or
19   destroyed.

20       89.     Apple's unlawful monopolization of the iPhone Applications Aftermarket violates
21   section 2 of the Sherman Act, and its unlawful monopolization practices are continuing and will
22   continue unless they are permanently enjoined.  Plaintiffs and members of the Class have suffered
23   economic injury to their property as a direct and proximate result of Apple's unlawful
24   monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in
25   amounts to be proved at trial.

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**
**Attempted Monopolization of the Applications Aftermarket in**
**Violation of Section 2 of the Sherman Act**
**(Seeking Damages and Equitable Relief)**

90.　Plaintiffs reallege and incorporate paragraphs 1 through 89 above as if set forth fully herein.

91.　Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Applications Aftermarket.  Specifically, Apple has attempted unlawfully to acquire monopoly power by (a) "approving" only applications that generate revenues for Apple, and/or that are submitted to Apple for approval after the developer pays Apple an annual fee of $99; (b) discouraging iPhone customers from using competing Third Party Apps by spreading misinformation; and (c) programming the iPhone operating system in a way that prevents iPhone customers from downloading Third Party Apps, disables Third Party Apps and/or disables or destroys the full functionality of the iPhones of users who download Third Party Apps.  Apple did not have a legitimate business justification for any of these actions.

92.　Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Applications Aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

93.　Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

94.　Plaintiffs have been injured in fact by Apple's attempted monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones disabled or destroyed.

95.　Apple's attempted monopolization of the iPhone Applications Aftermarket violates section 2 of the Sherman Act and its anticompetitive practices are continuing and will continue

CONSOLIDATED CLASS ACTION COMPLAINT  -- NO. C 11-06714 JW
- 20 -

unless they are permanently enjoined. Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

**COUNT III**
**Conspiracy to Monopolize the iPhone Voice and Data Services Aftermarket**
**in Violation of Section 2 of the Sherman Act**
**(Seeking Damages and Equitable Relief)**

96.     Plaintiffs reallege and incorporate paragraphs 1 through 95 above as if set forth fully herein.

97.     Apple knowingly and intentionally conspired with ATTM with the specific intent to monopolize the iPhone Voice and Data Services Aftermarket. In furtherance of the conspiracy, Apple and its co-conspirator agreed without Plaintiffs' knowledge or consent to make ATTM the exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations that they could switch at any time to another carrier in the first two years that they owned their iPhone after paying the $175 early termination fee, and without charge after that period.

98.     ATTM unlawfully achieved an economically significant degree of market power in the iPhone Voice and Data Services Aftermarket as a result of the conspiracy and effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

99.     Apple and ATTM's conspiracy reduced output and competition and resulted in increased prices in the iPhone Voice and Data Services Aftermarket and, thus, harmed competition generally in that market.

100.    Plaintiffs were injured in fact by Apple and ATTM's conspiracy because they were (a) deprived of alternatives for voice and data services domestically, and (b) forced to pay supracompetitive prices for iPhone voice and data services.

101.    Apple's conspiracy to monopolize the iPhone Voice and Data Services Aftermarket violated Section 2 of the Sherman Act and its anticompetitive practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Class have suffered

CONSOLIDATED CLASS ACTION COMPLAINT -- NO. C 11-06714 JW
- 21 -

economic injury to their property as a direct and proximate result of Apples' conspiracy, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proven at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Apple as follows:

a.    Permanently enjoining Apple from selling locked iPhones that can only be used with ATTM SIM cards unless such information is adequately disclosed to consumers prior to sale;

b.    Ordering Apple to provide the unlock code upon request to all members of the Class who purchased an iPhone prior to the disclosures described above;

c.    Permanently enjoining Apple from monopolizing or attempting to monopolize the iPhone Applications Aftermarket;

d.    Permanently enjoining Apple from conspiring to monopolize the iPhone Voice and Data Services Aftermarket;

e.    Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's violations of the federal antitrust laws;

f.    Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

g.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  March 21, 2012

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT


_____/s/ Rachele R. Rickert_____
RACHELE R. RICKERT

750 B. Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

CONSOLIDATED CLASS ACTION COMPLAINT  -- NO. C 11-06714 JW
- 22 -

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
MARK C. RIFKIN (*pro hac vice*)
ALEXANDER H. SCHMIDT (*pro hac vice*)
MICHAEL LISKOW
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4677

Counsel for Plaintiffs Robert Pepper, Stephen H.
Schwartz, Edward W. Hayter and Harry Bass

DATED:  March 21, 2012      THE TERRELL LAW GROUP
                      REGINALD TERRELL


                          /s/ Reginald Terrell
                      REGINALD TERRELL

P.O. BOX 13315, PMB # 148
Oakland, CA 94661
Telephone:  510/237-9700
Facsimile:  510/237-4616

Counsel for Plaintiffs Eric Terrell, James Blackwell,
and Crystal Boykin

## DECLARATION REGARDING CONCURRENCE

I, Rachele R. Rickert, am the ECF User whose identification and password are being used to file this CONSOLIDATED CLASS ACTION COMPLAINT.  In compliance with General Order 45.X.B, I hereby attest that Reginald Terrell has concurred in this filing.

DATED:  March 21, 2012      WOLF HALDENSTEIN ADLER FREEMAN
                      & HERZ LLP


By: _____ /s/ Rachele R. Rickert
        RACHELE R. RICKERT

APPLE2/18779.CPL

DECLARATION OF SERVICE

I, MAUREEN LONGDO , the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San Diego, California 92101.

2.      That on March 21, 2012, declarant served CONSOLIDATED CLASS ACTION COMPLAINT via the CM/ECF System to the parties who are registered participants of the CM/ECF System.

3.      That on March 21, 2012, declarant served the parties who are not registered participants of the CM/ECF System, via Electronic Mail and United States Mail.

4.      That there is regular communication between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21st day of March 2012, at San Diego, California.


_____
MAUREEN LONGDO

APPLE2
Service List – March 7, 2012
Page 1

COUNSEL FOR PLAINTIFFS

Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
        619/239-4599
        619/234-4599 (fax)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com

Mark C. Rifkin
Alexander H. Schmidt
Michael Liskow
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY  10016
        212/545-4600
        212/545-4653 (fax)
rifkin@whafh.com
schmidt@whafh.com
liskow@whafh.com

Counsel for Plaintiffs Robert Pepper,
Stephen H. Schwartz, Edward W. Hayter
and Harry Bass

THE TERRELL LAW GROUP
REGINALD TERRELL
P.O. BOX 13315, PMB # 148
Oakland, CA 94661
        510/237-9700
        510/237-4616 (fax)

Counsel for Plaintiffs Eric Terrell, James
Blackwell, and Crystal

COUNSEL FOR DEFENDANTS

Daniel M. Wall
Christopher S. Yates
Sadik Huseny
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 1900
San Francisco, CA 94111
        415/391-0600
dan.wall@lw.com
al.pfeiffer@lw.com
chris.yates@lw.com
sadik.huseny@lw.com