LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
  Christopher S. Yates (Bar No. 161273)
  Sadik Huseny (Bar No. 224659)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Dan.Wall@lw.com
Email: Chris.Yates@lw.com
Email: Sadik.Huseny@lw.com

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | CASE NO. C 11-06714-YGR<br>RELATED CASE NO. C 07-05152-JW<br><br>**DEFENDANT APPLE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**<br><br>Date:      December 18, 2012<br>Time:      2:00 P.M.<br>Place:     Courtroom TBD<br><br>The Honorable Yvonne Gonzalez Rogers |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF ISSUES TO BE DECIDED ............................................... 3

III.  LEGAL STANDARD ...................................................................................... 3

IV.  PROCEDURAL HISTORY ............................................................................ 4

V.    PLAINTIFFS CONCEDE THAT THEIR VOICE AND DATA
ANTITRUST CLAIM MUST BE DISMISSED .............................................. 5

VI.  THE APPS ANTITRUST CLAIMS MUST BE DISMISSED ......................... 6

     A.    The Factual Allegations ..................................................................... 6

     B.    Plaintiffs Do Not Have Standing To Pursue Their Apps Claims.......... 7

          1.    Plaintiffs Lack Article III Standing.......................................... 7

          2.    Plaintiffs Are Indirect Purchasers And Lack Antitrust
Standing Under *Illinois Brick* ................................................ 8

     C.    Plaintiffs Fail To Plead The Requisite Elements Of Their Antitrust
Claims ............................................................................................. 11

          1.    Plaintiffs Fail to Plead A Relevant Antitrust Market............... 11

          2.    Plaintiffs Do Not—And Cannot—Allege That Apple
Possesses Monopoly Power In The Claimed Relevant
Market................................................................................... 16

          3.    Plaintiffs Fail To Allege Unlawful Anticompetitive
Conduct ................................................................................ 17

VII.  CONCLUSION ............................................................................................ 20

i

# TABLE OF AUTHORITIES

## CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991(9th Cir. 2010) ................................................................................ 18

*Apple Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................... 2, 12, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................... 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)........................................................................................... 20

*Bd. of Trade of Chicago v. United States*,
  246 U.S. 231 (1918)........................................................................................... 19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 3

*Birdsong v. Apple, Inc.*,
  590 F.3d 955 (9th Cir. 2009) ............................................................................. 8

*Brown Shoe v. United States*,
  370 U.S. 294 (1962)........................................................................................... 12

*Campos v. Ticketmaster Corp.*,
  140 F.3d 1166 (8th Cir. 1998) ........................................................................... 9

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
  567 F.3d 1084 (9th Cir. 2009) ........................................................................... 12

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004)............................................................ 12

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)........................................................................................... 8

*Del. Valley Surg. Supply, Inc. v. Johnson & Johnson*,
  523 F.3d 1116 (9th Cir. 2008) ........................................................................... 10

*Digital Equip. Corp. v. Uniq Digital Techs.*,
  73 F.3d 756 (7th Cir. 1996) ............................................................................... 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)...................................................................................... 14, 15

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
  No. C-09-3854 MMC, 2010 U.S. Dist. LEXIS 47896 (N.D. Cal. Apr. 16,
  2010) .................................................................................................................. 13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977)...................................................................................................... 1, 8, 9

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,*
  790 F. Supp. 804 (C.D. Ill. 1992) ........................................................................................ 19

*In re Apple & AT&TM Antitrust Litigation,*
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) ........................................................................ passim

*In re ATM Fee Antitrust Litig.,*
  686 F.3d 741 (9th Cir. 2012) ........................................................................................ passim

*Kendall v. Visa U.S.A., Inc.,*
  518 F.3d 1042 (9th Cir. 2008) .............................................................................................. 3

*Knievel v. ESPN,*
  393 F.3d 1068 (9th Cir. 2005) .............................................................................................. 7

*L & J Crew Station, LLC v. Banco Popular de P.R.,*
  278 F. Supp. 2d 547 (D.V.I. 2003) ..................................................................................... 16

*Lewis v. Casey,*
  518 U.S. 343 (1996)............................................................................................................. 8

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)............................................................................................................. 8

*Menasha Corp. v. New Am. Mktg. In-Store, Inc.,*
  354 F.3d 661 (7th Cir. 2004) .............................................................................................. 17

*Newcal Indus., Inc. v. Ikon Office Solution,*
  513 F.3d 1038 (9th Cir. 2008) ........................................................................ 2, 11, 12, 14, 15

*POURfect Prods. v. KitchenAid,*
  No. CV-09-2660-PHX-GMS, 2010 U.S. Dist. LEXIS 42890 (D. Ariz. May 3,
  2010) ................................................................................................................................. 12

*PSI Repair Servs., Inc. v. Honeywell, Inc.,*
  104 F.3d 811 (6th Cir. 1997) .............................................................................................. 14

*Rebel Oil v. Atlantic Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ........................................................................................ 11, 16

*Rick-Mik Enters. v. Equilon Enters., LLC,*
  532 F.3d 963 (9th Cir. 2008) .............................................................................................. 17

*Safeway, Inc. v. Abbott Labs.,*
  No. C 07–05470 CW, 2010 U.S. Dist. LEXIS 2145 (N.D. Cal. Jan. 12, 2010) ................... 20

*Schor v. Abbott Labs.,*
  457 F.3d 608 (7th Cir. 2006) .............................................................................................. 14

iii

*Shred-It Am., Inc. v. Macnaughton*,
   No. CV NO 10-00547 DAE-KSC, 2011 U.S. Dist. LEXIS 51933 (D. Haw.
   May 13, 2011)............................................................................................................12

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)......................................................................................................8

*SMS Sys. Maintenance Servs., Inc. v. Digital Equipment Corp.*,
   188 F.3d 11 (1st Cir. 1999).......................................................................................16

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)..................................................................................................11

*Stepp v. Ford Motor Credit Co.*,
   623 F. Supp. 583 (E.D. Wis. 1985)..........................................................................16

*Trinko* and *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009)..................................................................................................19

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).....................................................................................11, 16, 17

*Universal Avionics Sys. Corp. v. Rockwell Intl. Corp.*,
   184 F. Supp. 2d 947 (D. Ariz. 2001) .......................................................................15

*Universal Grading Serv. v. eBay, Inc.*,
   No. C-09-2755 RMW, 2012 U.S. Dist. LEXIS 2325 (N.D. Cal. Jan. 9, 2012).............12, 13

*USM Corp. v. SPS Techs., Inc.*,
   694 F.2d 505 (7th. Cir. 1982) ...................................................................................19

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..................................................................................................11

*William O. Gilley Enters. v. Atlantic Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ......................................................................................4

*Yang v. Dar Al-Handash Consultants*,
   250 Fed. Appx. 771 (9th Cir. 2007)............................................................................7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NUMBER: (
DEFENDANT SOGHIKIAN'

# **NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on December 18, 2012 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, at 1301 Clay Street, Oakland City Center, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers, Defendant Apple Inc. will, and hereby does, move the Court for an order dismissing Plaintiffs' Amended Consolidated Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and for an order under Rule 12(f) of the Federal Rules of Civil Procedure striking all allegations concerning, and requests for injunction based on, the voice and data claims as immaterial, impertinent or improper.

This motion is based on the Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Request for Judicial Notice, the Proposed Order, the pleadings on file in this action, and upon such other matters presented to the Court at the time of the hearing.

# **RELIEF SOUGHT**

Defendant Apple Inc. seeks dismissal of each claim asserted in Plaintiffs' Amended Consolidated Class Action Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Defendant Apple Inc. also seeks an order under Rule 12(f) of the Federal Rules of Civil Procedure striking all allegations concerning, and requests for injunction based on, the voice and data claims as immaterial, impertinent or improper.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The allegations in the Amended Consolidated Complaint ("Complaint") focus on the claim that Apple Inc. ("Apple") and AT&T Mobility ("ATTM") conspired to monopolize the "aftermarket" for iPhone voice and data service. The questionable merits of that claim aside, those allegations are utterly irrelevant. As the Plaintiffs acknowledge, the voice and data claim must be dismissed given their failure to name ATTM as a defendant in this matter as previously ordered by the Court. All that remains to this Complaint are claims that Apple monopolized or attempted to monopolize an alleged "aftermarket" for software applications ("Apps") for the iPhone.[1] The few allegations related to these "Apps" claims are, however, little more than an afterthought. Indeed, stripped of the voice and data allegations, there is little to this Complaint.

The conclusory allegations related to the Apps claims are deficient in almost every respect. Plaintiffs have failed to adequately plead almost every element of their case, including standing, market definition, market power, and anticompetitive conduct. Moreover, what is pleaded demonstrates that Plaintiffs will not be able to cure these defects. The Complaint should be dismissed with prejudice for four separate and independent reasons, any one of which is sufficient.

First, Plaintiffs lack standing to bring these claims. The Complaint is based on restrictions that Apple allegedly places on *developers* of Apps that supposedly lead to higher prices for *consumers* purchasing Apps for the iPhone. As a matter of substantive antitrust law, that means Plaintiffs—who are consumers—are "indirect purchasers" who lack antitrust standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-31, 734 (1977). Furthermore, the Complaint does not even attempt to allege a basis for Article III standing. There are no factual allegations that any named Plaintiff ever purchased an App, much less that any Plaintiff was

---

[1] Plaintiffs filed a brand new case two weeks ago called *Ward v. Apple*, Case No. 12-CV-05404, that copies the voice and data allegations from this action (but deletes all references to the Apps claims). Apple has filed a notice of related case regarding *Ward*.

overcharged for an App, did not know about Apple's widely publicized Apps policies, or was injured in any way by Apple's supposed monopolization or attempted monopolization.

Second, Plaintiffs do not allege a relevant antitrust market as a matter of law. The market allegations impermissibly treat all Apps as a single market, even though the Complaint itself recognizes that Apps perform a multitude of widely different functions (some provide instant messaging, some are games, some permit the creation of ringtones, some provide "photographic capability," and so on) and plainly are not substitutes for one another. This violates the rule that "[w]hether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices." *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008).

In addition, Plaintiffs' attempt to plead a *single-brand* market (one limited to Apps for the iPhone) fails. Apple has many competitors: companies like Google, Amazon, RIM, Samsung, and many others. Apple is obviously not a "monopolist" if that competition is counted. Plaintiffs try to plead around that inconvenient fact by defining a so-called "aftermarket" that is limited to Apps for the iPhone and thus excludes Apple's many competitors from the market. An "aftermarket" is a unique antitrust market developed to deal with the potential that manufacturers of durable goods might exploit "locked-in" customers who need "aftermarket products" (such as post-sale parts or service) to utilize their durable goods. The aftermarket doctrine is limited in several important ways, one of which is that claims of aftermarket monopoly will not lie where consumers know or can "reasonably discover" the aftermarket policies of the alleged monopolist. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1048-49 (9th Cir. 2008). Here, Plaintiffs do not even attempt to allege that they could not "reasonably discover" Apple's Apps policies, which is not surprising since Plaintiffs are complaining about one of the most widely known features of Apple's iPhone strategy.

Third, Plaintiffs do not even attempt to allege any facts to support their entirely conclusory assertion that Apple has monopoly power in their claimed market. That is because Plaintiffs know that Apple sells only a limited number of Apps and has nothing approaching the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

market share needed to state a claim.

Fourth, the Complaint does not include any allegations that Apple engaged in conduct that was anticompetitive or otherwise violated antitrust law. Plaintiffs' Apps claims appear to be based upon the premise that Apple has an obligation to provide developers of Apps the unfettered ability to develop Apps without rules or restrictions. This contention has no basis in the antitrust laws. Apple developed an Apps program that, like franchise programs, automobile dealerships and many other business opportunities, comes with a set of rules that constrain how business is done. That in itself does not violate the antitrust laws: we challenge Plaintiffs to cite any case that finds a program comparable to Apple's Apps program a form of monopolization. The Complaint admits that Apple developed a brand new set of products (the iPhone and the App Store) and that this led to an explosion of new software development (billions of Apps downloaded in the four years that the App Store has been in existence). One simply cannot build a monopolization claim by postulating that even more Apps might have been developed and the price of Apps might have been cheaper if Apple had not imposed certain restrictions on developers wishing to access the iPhone platform.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiffs' voice and data claim should be dismissed and all allegations and requested relief concerning the voice and data claim should be stricken.

2.    Whether Plaintiffs' Apps claims should be dismissed for lack of standing.

3.    Whether Plaintiffs' Apps claims should be dismissed for failure to state a claim.

## III.   LEGAL STANDARD

The Supreme Court and Ninth Circuit have made clear that "notice pleading" is insufficient.[2] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-60 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 682-83 (2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 n.5 (9th Cir. 2008) (finding *Twombly* "specifically abrogated" the notice pleading rule). A plaintiff is

---

[2]    Unless otherwise indicated, internal quotation marks and citations have been omitted from case quotations.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

obligated to provide the "grounds" of her "entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also William O. Gilley Enters. v. Atlantic Richfield Co.*, 588 F.3d 659, 669 (9th Cir. 2009) ("claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts" quoting *Kendall*, 518 F.3d at 1047). This more rigorous pleading requirement is especially important in antitrust cases. *Twombly*, 550 U.S. at 558.

## IV. PROCEDURAL HISTORY

This case is a vestige of an earlier action called *In re Apple & AT&TM Antitrust Litigation*, Case No. 07-CV-5152-JW. The earlier case focused on the allegation that ATTM is a "monopolist" in the provision of voice and data cellular service to consumers who own iPhones, and that Apple allegedly conspired with ATTM to create that "monopoly." Although that earlier case—like the current case—included a second set of claims against Apple concerning the development and distribution of Apps for the iPhone, those claims were not a focus of the complaint or the motion practice that occurred. Judge Ware stayed the earlier case after finding it was subject to arbitration.

This case was filed four weeks after Judge Ware entered his order compelling arbitration of plaintiffs' claims. *In re Apple & AT&TM Antitrust Litigation*, 826 F. Supp. 2d 1168, 1175, 1179 (N.D. Cal. 2011) (ordering arbitration of the claims against ATTM and Apple in accordance with the arbitration provision in ATTM's Wireless Service Agreement).[3] Counsel in the prior case are the putative class counsel in the instant case. They essentially repeated the allegations of their earlier case, but did not name ATTM as a defendant and removed express references to ATTM's wireless service agreement with the arbitration provision in a ploy to avoid Judge Ware's earlier arbitration decision. Apple moved to dismiss the original complaint in this case pursuant to Rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure and

---

[3] Apple and ATTM's motions to dismiss in the earlier related case were granted in part and denied in part. Plaintiffs were found, based on the allegations of the complaint in that case, to have stated antitrust claims. *In re Apple and AT&T Antitrust Litig.*, 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

also moved to compel arbitration. On July 11, 2012, Judge Ware granted Apple's motion to dismiss Plaintiffs' Consolidated Class Action Complaint under Rule 12(b)(7). *In re Apple iPhone Antitrust Litig.*, No. C 11-06714 JW, 2012 U.S. Dist. LEXIS 97105, at *26-31 (N.D. Cal. July 11, 2012). The Court held that, insofar as Plaintiffs wished to maintain claims based on an alleged voice and data services aftermarket, ATTM is a necessary party and must be added. *Id.* In light of its Rule 12(b)(7) dismissal, the Court denied, without prejudice, Apple's motion to dismiss under Rule 12(b)(6) (*id.* at *31-32 n.27), and denied, without prejudice, Apple's motion to compel arbitration. *Id.* at *25. Plaintiffs were given leave to file the amended Complaint that is the subject of this motion.

## V. PLAINTIFFS CONCEDE THAT THEIR VOICE AND DATA ANTITRUST CLAIM MUST BE DISMISSED

We begin with what ought to be a noncontroversial point. Judge Ware's Order granting Apple's motion to dismiss for failure to join an indispensable party was crystal clear: if Plaintiffs wished to pursue any claims related to the alleged voice and data aftermarket, ATTM was required to be added as a party.

> The Court ORDERS that ATTM be made a party to this action. [fn. This Order is not intended to *require* that Plaintiffs maintain claims based on an alleged voice and data services aftermarket. Instead, it holds that insofar as Plaintiffs wish to maintain such claims, ATTM must be added as a party.]

*In re Apple iPhone Antitrust Litig.,* 2012 U.S. Dist. LEXIS 97105, at *33-34 & n.29.

Despite this plain direction, Plaintiffs' Complaint (1) continues to include factual allegations that concern only the voice and data claims (*e.g.*, paragraphs 56-66 concerning the agreement between ATTM and Apple); (2) seeks an injunction that is based on the voice and data claims and would enjoin "Apple from selling locked iPhones that can only be used with ATTM SIM cards" and require "Apple to provide the unlock codes" for ATTM SIM card (Compl. at 21); and (3) includes a Count (Compl. ¶¶ 100-105 ("Count III")) that alleges a conspiracy to monopolize the iPhone voice and data services aftermarket.

This is improper, and Plaintiffs acknowledge it. The Complaint includes a notation that the voice and data claim being brought (Count III) is "preserved for appeal" as well as a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

paragraph stating that Plaintiffs decline to add ATTM as a defendant and giving reasons why

Plaintiffs re-allege the dismissed count. Compl. ¶ 9. There is no need to debate this strategy

since Plaintiffs are accepting the outcome: dismissal, without leave to amend, of the voice and

data claim. Consequently, all allegations concerning, and requests for injunction based on, the

voice and data claim become immaterial, impertinent or improper and must be stricken pursuant

to Rule 12(f) of the Federal Rules of Civil Procedure.

## VI.  THE APPS ANTITRUST CLAIMS MUST BE DISMISSED

### A.  The Factual Allegations

Apple began selling its first cellular telephone, the iPhone, in June 2007. Compl. ¶ 2. At

the time, there was no App Store and users could not download Apps to the iPhone. Apple

released a "software development kit" ("SDK") in March 2008 to enable developers to create

applications for the iPhone. *Id.* ¶ 5. Apple also created the App Store which made it easy for

consumers to find and download reliable software applications. Although we take this for

granted today, a ubiquitous, centralized platform for developing, downloading and running Apps

on mobile devices is something Apple pioneered barely four years ago.

The Complaint continues to focus on the allegations about the voice and data claims, with

extremely few allegations about Apps. The fundamental premise of Plaintiffs' Apps claims appears

to be found at paragraphs 5-7 of the Complaint and relates to two well-known attributes of Apple's

Apps program: the App Store, which is the exclusive means by which Apps for the iPhone may be

downloaded, and the developer rules that govern what Apps can be sold through the App Store. In

paragraph 6, Plaintiffs allege that "iPhone consumers were not provided a means by which they

could download Third Party Apps that were not approved for sale on the App Store." *Id.* ¶ 6.

Plaintiffs' theory appears to be that Apple acted wrongfully by restricting the ability of consumers

to download Apps from a source other than the App Store, allegedly leading to "artificially

increased prices" and "reduced output and consumer choice." *Id.* ¶ 7. Paragraph 5 summarizes the

restrictions that Plaintiffs apparently take issue with: (1) that developers use a particular SDK if

they want to distribute apps through the App Store and the $99 charge for the SDK; (2) that

developers submit Apps to Apple for review and approval prior to being made available on the App

6

1  Store; and (3) that developers pay Apple 30% of the sales price of any paid App sold through the

2  App Store.  Compl. ¶ 5.

3       This information was prominently announced by Apple.  Indeed, the allegations in

4  paragraph 5 of the Complaint refer to Apple's March 2008 announcement regarding the creation of

5  its App Store, which set forth the terms under which Apps would be made available to iPhone

6  owners:

> The App Store enables developers to reach every iPhone and iPod touch user.  **Developers set the price for their applications— including free—and retain 70 percent of all sales revenues**.  Users can download free applications at no charge to either the user or developer, or purchase priced applications with just one click. Enterprise customers will be able to create a secure, private page on the App Store accessible only by their employees. Apple will cover all credit card, web hosting, infrastructure and DRM costs associated with offering applications on the App Store. **Third party iPhone and iPod touch applications must be approved by Apple and will be available exclusively through the App Store.**

14  Request for Judicial Notice ("RJN"), Ex. 1 (emphasis added).[4]

15       Nor do Plaintiffs' dispute that the information was and is widely known.  There are no

16  allegations that Apple "sprung" its Apps policies on locked-in iPhone users, that anyone was

17  surprised by Apple's policies after they bought iPhones, or that any Plaintiff was ever misled by

18  or unaware of Apple's Apps policies or the terms under which Apps would be made available for

19  download.  Plaintiffs' complaint is simply that they do not like the original set of Apple Apps

20  policies because, in their view, a program without restrictions would be better for developers and

21  ultimately consumers.

22       **B.    Plaintiffs Do Not Have Standing To Pursue Their Apps Claims**

23              1.    **Plaintiffs Lack Article III Standing**

24  A plaintiff seeking relief in federal court must establish Article III standing "separately

---

25  [4]   As set forth in greater detail in Apple's accompanying Request for Judicial Notice, the Court
26  may take judicial notice of Apple's press releases, especially where, as here, the Complaint
   purports to summarize portions of them. *Yang v. Dar Al-Handash Consultants*, 250 Fed.
27  Appx. 771, 772 (9th Cir. 2007); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.
   2005).

28

for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). A plaintiff must have suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must also establish "a causal connection between the injury and the conduct complained of," and it must be likely that the injury "will be redressed by a favorable decision." *Id*. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). The same standing requirements apply in putative class actions: "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Birdsong v. Apple, Inc.*, 590 F.3d 955, 960 (9th Cir. 2009).

The Complaint is devoid of any allegations regarding standing. There is not a single assertion that any named Plaintiff even *purchased* an App, much less that he was overcharged for an App, that any supposed overcharge was the result of the allegedly wrongful conduct, or, indeed, that any Plaintiff was injured in any way by Apple's supposed monopolization or attempted monopolization. Plaintiffs never contend that they were unaware of Apple's Apps' policies. *See* Compl. ¶¶ 13-19 (allegations about named Plaintiffs' purchases of iPhone and ATTM voice and data service, but no allegations about Apps), ¶¶ 25-36 (section of the Complaint entitled "Plaintiffs' Injuries" does not mention Apps once, instead focusing entirely on the voice and data claims). Furthermore, there are no allegations that Plaintiffs were misled in any way about Apple's App policies (which is not an antitrust injury anyway). A failure to include any one of these elements would be fatal—and Plaintiffs have included *none* of them. In sum, Plaintiffs have not even tried to plead Article III standing with respect to Apps. The claims must therefore be dismissed.

### 2. Plaintiffs Are Indirect Purchasers And Lack Antitrust Standing Under *Illinois Brick*

Even if Plaintiffs were allowed to amend their Complaint to attempt to allege the actual purchase of Apps, injury, and the other missing factual allegations regarding Article III standing,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

their claims would still fail for lack of *antitrust standing*.[5]  This is incurable.  Plaintiffs are, if anything, Apps consumers—not Apps developers.  *E.g.*, Compl. ¶¶ 13-19.  Consumers download Apps available through Apple's App Store.  Plaintiffs' complaint is that consumers are indirect victims of Apple's policies because (a) Apple restricts developers in various ways, (b) this leads to fewer or more expensive Apps, and (c) consumers suffer accordingly.  Compl. ¶¶ 5-7.  In fact, Plaintiffs assert that because *developers* must pay Apple a $99 yearly developer fee and 30% of each paid App, the putative class has been injured because it has "(a) been deprived of lower cost alternatives for applications; (b) been forced to pay higher prices for Apple "approved" applications; and/or (c) had their iPhones disabled or destroyed."  Compl. ¶ 92.

The problem with this reasoning is that it runs straight into the rule established by the Supreme Court in *Illinois Brick,* that *indirect* victims of anticompetitive conduct do not have standing to bring the claim.  431 U.S. at 730-31, 734.  As the Ninth Circuit recently made clear, "a bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations."  *In re ATM Fee Antitrust Litig*., 686 F.3d at 748.  This often comes up in price-fixing cases where the direct purchaser (such as a wholesaler) can sue for damages but an indirect purchaser (a retailer or consumer) cannot.  But it applies to monopolization claims as well, where the law regards indirect victims of allegedly exclusionary conduct as "indirect purchasers."  *See Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169-70 (8th Cir. 1998) ("An indirect purchaser is one who bears some portion of a monopoly overcharge only by virtue of an antecedent transaction between the monopolist and another, independent purchaser. Such indirect purchasers may not sue to recover damages for the portion of the overcharge they bear. The right to sue for damages rests with the direct purchasers, who participate in the antecedent transaction with the monopolist.")

Both *In re ATM Fees* and *Ticketmaster* are on point—and foreclose Plaintiffs' claims here. *In re ATM Fees* challenged supposedly unlawful ATM network "interchange" fees.  These are fees

---

[5]  "Standing is a question of law for the district court to decide.  Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination."  *In re ATM Fee Antitrust Litig*., 686 F.3d 741, 747 (9th Cir. 2012).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

that banks participating in an ATM network pay *to each other,* but that plaintiffs claimed resulted in consumers paying inflated "foreign ATM fees" when using their ATM cards at ATM machines not owned by their own bank. The Ninth Circuit concluded that the consumers were indirect purchasers:

> Plaintiffs concede that they have never directly paid interchange fees. Instead, card-issuing banks (including Bank Defendants) pay interchange fees and then include them when they charge foreign ATM fees (alleged by Plaintiffs to be artificially inflated). In other words, the Bank Defendants pass on the cost of the interchange fees through the foreign ATM fees. The district court found Plaintiffs to be indirect purchasers, because they do not directly pay the fixed interchange fee, labeled by the district court as the alleged "unlawful fee." The district court found it important that "Plaintiffs do not allege that the Defendants or any other banks have conspired to fix the foreign ATM fee that the Plaintiffs must pay." We agree with the district court that Plaintiffs are indirect purchasers.

*In re ATM Fee Antitrust Litig.*, 686 F.3d at 749-50.

Similarly, in *Ticketmaster*, Ticketmaster had exclusive contracts with most major music venues. This allegedly allowed Ticketmaster "to extract from the plaintiffs supracompetitive fees for ticket distribution services." 140 F.3d at 1169. The ticketing service fees were added to the face amount of the ticket and collected directly by Ticketmaster. Plaintiffs claimed that because Ticketmaster added the challenged ticketing service fee to the amount charged by the venue for the concert and received payment from the consumer, it made those who bought tickets through Ticketmaster direct purchasers. *Id.* at 1171. The court disagreed: "we do not find billing practices to be determinative of indirect purchaser status." *Id.*

> As the plaintiff's complaint makes clear, ticket buyers only buy Ticketmaster's services because concert venues have been required to buy those services first. . . . [S]uch derivative dealing is the essence of indirect purchaser status, and it constitutes a bar under the antitrust laws to the plaintiffs' suit for damages.

*Id.*; *see also Del. Valley Surg. Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122 (9th Cir. 2008).

Here, Apple's alleged wrongful conduct restricts developers. Everything else that follows is an indirect effect. The developer sets the price of the Apps and, in accordance with Apple's App Store policies, the developer pays Apple 30% of the price of any downloaded Apps.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

It is that antecedent transaction between Apple and the developer that the Complaint asserts causes an unlawful increase in the price of Apps, which means that Plaintiffs are indirect purchasers. The antecedent nature of the $99 annual developer fee is even more clear: these are fees that the developers owe and thus pay directly to Apple, without any involvement by consumers. Plaintiffs lack antitrust standing to bring their Apps claims in this Court, and there is no amendment that can cure this failing. The Apps claims should be dismissed with prejudice.

**C.      Plaintiffs Fail To Plead The Requisite Elements Of Their Antitrust Claims**

Plaintiffs' Apps claims also fail because they do not adequately plead the requisite elements of their monopolization and attempted monopolization claims under Section 2 of the Sherman Act (Counts I and II). A failure to plead any one of these elements is fatal to these claims; Plaintiffs have not adequately pled any of them.

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power . . . ." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993) ("the plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power"); *Rebel Oil v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432-33 (9th Cir. 1995). Plaintiffs must plead that Apple has monopoly power (or at least a dangerous probability of achieving it, in the case of attempted monopolization) in one or more cognizable and relevant antitrust markets, and that Apple has acquired or seeks to acquire such power through anticompetitive or exclusionary conduct. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*"). The Complaint fails to allege facts sufficient to plead either of these elements.

1.      **Plaintiffs Fail to Plead A Relevant Antitrust Market**

The Ninth Circuit has made clear that there are "legal principles that govern the definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal*, 513 F.3d at 1045.

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

"First and foremost, the relevant market must be a product market." *Id.*; *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962). "Second, the market must encompass the product at issue as well as all economic substitutes for the product. As the Supreme Court has instructed, 'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Newcal*, 513 F.3d at 1045; *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 567 F.3d 1084, 1094 (9th Cir. 2009).[6] Courts routinely dismiss antitrust claims under Rule 12(b)(6) when the pleaded relevant market is patently overbroad. *See, e.g., Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2012 U.S. Dist. LEXIS 2325, at *18-19 (N.D. Cal. Jan. 9, 2012).[7]

Plaintiffs claim that Apple monopolized the alleged aftermarket for "iPhone Applications" (Compl. ¶¶ 90-99), which they define as all "software applications that can be used only on iPhones." *Id.* ¶ 85 ("Relevant Market Allegations"). Plaintiffs' product market definition fails, as a matter of law, for two different reasons.

### a. Apps Are Not All Substitutes For One Another

Plaintiffs allege a relevant market that consists of all "software applications that can be used only on iPhones." Compl. ¶ 85; *see also id.* ¶ 86 ("the aftermarket for software applications that can be downloaded on the iPhone for managing such functions as ringtones, instant messaging, photographic capability and Internet applications (the 'Applications Aftermarket')"). This is like saying that there is a relevant market for everything in a Walmart. There are over *half a million* different Apps on Apple's App Store, of virtually every kind and variety. *Id.* ¶¶ 4,

---

[6] Two products are reasonably interchangeable if consumers would consider them adequate substitutes for one another. *Apple v. Psystar*, 586 F. Supp. 2d at 1196.

[7] *See also Shred-It Am., Inc. v. Macnaughton*, No. CV NO 10-00547 DAE-KSC, 2011 U.S. Dist. LEXIS 51933, at *17, 20 (D. Haw. May 13, 2011) (dismissing complaint that "does not contain any allegations concerning economic substitutes for Shred-it's proposed product market"); *POURfect Prods. v. KitchenAid*, No. CV-09-2660-PHX-GMS, 2010 U.S. Dist. LEXIS 42890, at *12 (D. Ariz. May 3, 2010) (rejecting proposed product market of attachments for KitchenAid mixers as a matter of law because plaintiff failed to "allege[] facts regarding how the prices of some aftermarket attachments affect the demand for other attachments"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971-72 (W.D. Tenn. 2004) (alleged market of "hair care products" "could include shampoos, cosmetics, hair rinses, styling aids, or something more. . . . When the complaint gives such a deficient proposal for a relevant market, it fails to state a civil antitrust complaint").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

67-68, 86; RJN, Ex. 2.  The Complaint speaks of Apps that serve as instant messaging programs (¶ 67), Apps that permit the creation of ringtones (¶ 68), Apps that provide "photographic capability" (¶ 86), Apps that are games (¶ 4), Apps that serve as "entertainment" (¶ 4), and Apps that provide "video and photography enabling software" (¶ 4).  They could not possibly be in the same antitrust market because they are plainly not substitutes.  The Complaint contains none of the required allegations of substitutability, and there is no plausible way for Plaintiffs to ever assert that the half-million different products available through the App Store are all substitutes that compete with each other in the same product market.  Plaintiffs' claimed market fails as a matter of law.  *See Golden Gate Pharm. Servs. v. Pfizer, Inc.*, No. C-09-3854 MMC, 2010 U.S. Dist. LEXIS 47896, at *9 (N.D. Cal. Apr. 16, 2010), *aff'd* 433 Fed. Appx. 598 (9th Cir. 2011) (alleged markets of "'all pharmaceutical products,' all 'prescription pharmaceutical products,' all 'non-prescription pharmaceutical products,' or all 'brand-name pharmaceuticals products'" insufficient as a matter of law because there were no allegations plausibly suggesting that all of the products were reasonably interchangeable); *Universal Grading Serv.*, 2012 U.S. Dist. LEXIS 2325, at *18-19 (rejecting as "overbroad" and "amorphous" a market definition which would "encompass the market for every one of the millions of items sold through eBay").

   b.  **Plaintiffs Have Also Failed To Plead A Cognizable "Aftermarket"**

  Apple is obviously not a monopolist if one accounts for the iPhone's many competitors.  That inconvenient truth forces Plaintiffs to try and plead a so-called "aftermarket" for applications limited *just* to the iPhone.  A market limited to a single brand is counterintuitive to the normal market definition exercise in antitrust, and the few decisions that have defined an "aftermarket" have been very careful to limit its application.  Plaintiffs' allegations here fail to meet the demanding standards of the aftermarket doctrine.

  The aftermarket doctrine is an exception to the normal rule that the primary market is the relevant market.  For example, durable goods like copiers often require repair parts, service and supplies that are purchased after the initial purchase of the copier.  It is sometimes said that these additional purchases take place in "aftermarkets."  P. Areeda & H. Hovenkamp, *Antitrust Law*

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

¶ 564b (3d ed. 2006) ("An aftermarket is a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good.").

Aftermarket cases invariably involve (a) a manufacturer which changes its aftermarket policies to the detriment of a "locked-in" installed base, and (b) circumstances where the consumer could not "reasonably discover" or anticipate the aftermarket policies of the alleged monopolist. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 476 (1992) ("*Kodak*"); *Newcal,* 513 F.3d at 1048. As Judge Easterbrook explained in *Schor v. Abbott Labs.,* 457 F.3d 608, 614 (7th Cir. 2006), that was the situation in the initial case (*Kodak*) recognizing aftermarkets:

> [Initially,] Kodak sold copiers that customers could service themselves (or through independent service organizations). Having achieved substantial sales, Kodak then moved to claim all of the repair work for itself. That change had the potential to raise the total cost of copier-plus-service above the competitive level – and . . . above the price that Kodak could have charged had it followed a closed-service model from the outset.

*See also PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811, 820 (6th Cir. 1997) ("the change in policy in *Kodak* was the crucial factor in the Court's decision"); *Digital Equip. Corp. v. Uniq Digital Techs.,* 73 F.3d 756, 763 (7th Cir. 1996) ("[I]f spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive lifecycle prices. The material dispute that called for a trial was whether the change in policy enabled *Kodak* to extract supra-competitive prices from customers who had already purchased its machines."). The Ninth Circuit reads *Kodak* the same way: "[C]onsumers could not, at the time of purchase, *reasonably discover* that Kodak monopolized the service market and charged supracompetitive prices for its service." *Newcal,* 513 F.3d at 1048 (emphasis added).

Plaintiffs do not even attempt to allege that there was a change in policy that permitted Apple to exploit any unwitting iPhone purchaser in any "aftermarket." Nor do they allege that they (or any other consumer) could not "reasonably discover" Apple's Apps policies. Nor is that curable since Plaintiffs are complaining about the original, publicly-stated structure of Apple's

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

Apps program, *announced in a press release* just a few months after the iPhone was first sold. There was not a prior, "more open" Apps program that Apple "closed down" to exploit locked-in iPhone customers; thus, the analogy to either *Kodak* or *Newcal* is completely lacking. *Newcal*, 513 F.3d at 1048. The primary market, which includes Apple's competitors, is the relevant market unless Apple's aftermarket policies were essentially unknowable, as they were in *Kodak*. *Universal Avionics Sys. Corp. v. Rockwell Intl. Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) ("In assessing the issue of information deficits between the foremarket and the aftermarket, perfect information about the aftermarket is not required. In fact, very imperfect knowledge suffices to defeat the assertion of a *Kodak* lock-in market.").[8] Here, Apple's Apps policies were "reasonably discoverable"—and Plaintiffs do not and cannot allege otherwise.

Plaintiffs will undoubtedly cite Judge Ware's decision in *In re Apple & AT&TM Antitrust Litigation,* but it is unavailing. The earlier decision focused on the voice and data issues and hardly at all on Apps. And, as Judge Alsup explained when dismissing yet another aftermarket claim against Apple in a different context, Judge Ware's analysis turned entirely on the alleged nondisclosure of an unknowable fact: the allegedly "secret" Apple and ATTM five-year exclusivity agreement (where plaintiffs had only entered into two-year ATTM contracts):

> The [*In re Apple & AT&TM Antitrust Litigation*] decision found that the undisclosed exclusivity agreement allowed the plaintiffs to plead a viable aftermarket. The decision is inapposite because Psystar does not allege any undisclosed exclusivity agreement; like the initial two-year service contract in *In re Apple & AT&TM Antitrust Litigation*, the aftermarket restriction in this case was fully disclosed and expressly agreed upon.

*Apple v. Psystar*, 586 F. Supp. 2d at 1202. There is no comparable alleged "secret" with respect to Apps. Plaintiffs' complaint is with the substance of what Apple actually announced, not that it was sprung on anyone by surprise. In that circumstance, the law presumes that Apple's behavior is disciplined by competition, *e.g.,* consumers who don't like Apple's policies can buy an

---

[8] *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 564 (3d ed. 2006) ("[I]gnorance should be measured by an objective test requiring proof that aftermarket prices were simply not available . . .; otherwise, we reward customers for not making reasonable inquiries about aftermarket costs.").

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Android or Windows phone.  Thus, no aftermarket can exist and the relevant market includes all competitive alternatives.  *SMS Sys. Maintenance Servs., Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 17 (1st Cir. 1999).

2. **Plaintiffs Do Not—And Cannot—Allege That Apple Possesses Monopoly Power In The Claimed Relevant Market**

A plaintiff bringing a suit for attempted and actual monopolization is also required to plead facts indicating that the alleged monopolist has monopoly power or a dangerous probability of achieving it in the allegedly relevant market.  *Rebel Oil*, 51 F.3d at 1432-33.  This generally means a plaintiff must plead a sufficiently high market share to create the inference of such power.  *Grinnell*, 384 U.S. at 571; *Stepp v. Ford Motor Credit Co.*, 623 F. Supp. 583, 592 (E.D. Wis. 1985) ("As a matter of law, a successful monopolization claim requires a very large market share of the relevant market."); *L & J Crew Station, LLC v. Banco Popular de P.R.*, 278 F. Supp. 2d 547, 558 (D.V.I. 2003) (dismissing for failure to allege monopoly power where "plaintiff merely alleges that the market for banking is split in unstated proportions among three banks" and offers nothing "to establish the supposed market share" of each bank).

Plaintiffs' Complaint fails here, too.  Even assuming Plaintiffs' relevant market (all "software applications that can be used only on iPhones") were proper, Plaintiffs do not make any allegations that would support the existence of market power directly or circumstantially (*i.e.*, Apple's market share).  Plaintiffs allege that billions of Apps have been downloaded and it is a known fact that there are hundreds of thousands of developers selling over half a million Apps.  But, despite their  obligation to do so, there are no allegations concerning whether Apple develops and sells 1% of the Apps, 5%, 30%, or more.[9]  Without such allegations, dismissal is proper because the "first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws."  *Menasha Corp. v. New Am. Mktg. In-Store,*

---

[9]  The Complaint does mention that Apple developed a ringtone App, which competes with other ringtone Apps.  Compl. ¶ 68.  Even as to this "ringtone" sliver of the claimed relevant market of all iPhone Apps, there is no indication of Apple's market share.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

*Inc.*, 354 F.3d 661, 663 (7th Cir. 2004); *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (affirming order granting motion to dismiss antitrust complaint because plaintiff failed to allege any facts regarding defendant's market power in the gasoline franchise market).

### 3. Plaintiffs Fail To Allege Unlawful Anticompetitive Conduct

Possession of monopoly power will only be found to be unlawful where it is acquired or maintained through *anticompetitive conduct*. *Trinko*, 540 U.S. at 407. Plaintiffs fail to allege the "willful acquisition or maintenance of monopoly power [by Apple] as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," *i.e.*, conduct that excludes competitors and thereby harms consumers. *Grinnell*, 384 U.S. at 570-71.

Plaintiffs' allegations are about a collection of policies whereby Apple provides a platform for the development and distribution of Apps for the iPhone. Apple has always been very clear about its view that the iPhone platform would be better and more competitive if Apps were approved by Apple and downloaded through a safe and secure App Store free of pornography, malware, and content that could harm cellular networks. So the few factual allegations that Plaintiffs make about Apple's Apps policies, drawn from Apple's press releases, were and are well known: developers must submit Apps to Apple for approval, approved Apps are only to be distributed through the App Store, Apple gets 30% of the price of paid Apps (and nothing with respect to free Apps), and iPhones, by design, do not provide iPhone customers with a means to download Apps other than from Apple's App Store. Compl. ¶¶ 5-7.[10]

---

[10] To be clear, while it is true that developers are restricted by policy from distributing the particular software embodiment of their Apps intended solely for loading onto Apple's devices (i.e., the version of the App designed, programmed and intended solely for Apple devices) through portals other than the App Store, there are no allegations that this is a restriction on any developer's right or ability to create and distribute versions of the very same applications programmed to work with different operating system platforms. Nor could there be—there are innumerable examples of developers creating versions of popular Apps (*e.g.*, Facebook) for the many platforms that compete with Apple (*e.g.*, Google Android). And consumers are of course free to choose that competing platform and access the very same software applications, to the extent a developer has chosen to create a version of their application for the alternate platforms.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1    Plaintiffs appear to claim that Apple has an antitrust duty to use a different, more "open"

2    set of Apps policies. But Plaintiffs nowhere allege or explain what supposedly gives rise to this

3    obligation. There is no antitrust case that could arguably condemn Apple's Apps policies. There

4    is an extensive antitrust jurisprudence on anticompetitive conduct, identifying numerous

5    practices that may be anticompetitive in pursuit or defense of monopoly. *See generally* ABA

6    Antitrust Section, Antitrust Law Developments (Seventh) (2012) at 240-303. These include

7    tying, exclusive dealing, refusals to deal, predatory pricing and many other practices. But there

8    is nothing in the case law that arguably condemns Apple's Apps policies, or allows Plaintiffs'

9    supposition—that fewer rules would facilitate more competition—to state a claim of

10   monopolization. If anything, the case law is openly hostile to the notion that innovative activity

11   can be deemed exclusionary by any logic. *See, e.g.*, *Allied Orthopedic Appliances Inc. v. Tyco*

12   *Health Care Group LP*, 592 F.3d 991, 998-99 (9th Cir. 2010) (establishing a rule protecting

13   product redesign decisions from monopolization claims so long as the new design improves on

14   the old one). It is thus incumbent on Plaintiffs to explain the legal basis for condemning Apple's

15   Apps policies; otherwise they must be dismissed.

16       Far from being anticompetitive, Plaintiffs admit that "tens of millions of iPhones and

17   billions of applications were purchased during the Class Period." Compl. ¶ 76. In other words,

18   the iPhone platform and the App Store have dramatically increased output and produced at least

19   some substantial benefits for consumers and developers. This success is demonstrably the

20   consequence of a "superior product," the iPhone platform, because the Complaint admits that

21   when Apple launched the iPhone, it was new to mobile telephony—and thus had zero percent of

22   any conceivable market. There was no market power, however defined, that Apple could have

23   wielded to exclude competition, and the Complaint does not say there was. The complaint is that

24   the new thing Apple created, even though it admittedly resulted in *billions* of downloads of

25   Apps, had rules that allegedly restricted on the margin the enormous new competitive

26   opportunities it created.

27       There is no antitrust doctrine that condemns the creation of new products, business

28   models, or business opportunities on the ground that they come with "strings attached." This is

18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED COMPLAINT
CASE NUMBER: C 11-06714-YGR

because when one creates something new, like the iPhone platform, competition and consumer welfare are presumptively *enhanced*, such that the plaintiffs' complaint can at most be that the conduct failed to "optimize" consumer welfare and competitive opportunities. That, however, does not state a claim under the antitrust laws. "There is a difference between positive and negative duties, and the antitrust laws . . . have generally been understood to impose only the latter." *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 513 (7th. Cir. 1982). As a result, antitrust law is concerned only with conduct that leaves markets *less competitive than they were*: "The true test of legality is whether the restraint imposed . . . promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918). The court in *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 790 F. Supp. 804, 821 (C.D. Ill. 1992), *aff'd* 998 F.2d 391, 393 (7th Cir. 1993), made short work of a similar claim:

> Some of Plaintiffs' allegations ignore the nature of the obligations imposed by the antitrust laws. For example, Plaintiffs' complaint that the Defendants refused to disclose the ABE content of their gasoline in order to make it easier for others to mix it into gasohol is basically a complaint that Defendants did not do enough to promote gasohol. However, businesses needn't acquiesce to every demand placed upon them by competitors or customers; their duties are negative – to refrain from anticompetitive conduct – rather than affirmative – to promote competition.

In short, if conduct does not suppress or destroy competition, no further inquiry is warranted.

A corollary of the bedrock principle that there is no duty to maximize output is the long-established antitrust rule that "there is no duty to aid competitors." *Trinko*, 540 U.S. at 411. The duty is only to avoid excluding competitors by anticompetitive means. In *Trinko* and *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009), Verizon and AT&T controlled critical network platform assets that competitors sought access to on better terms. There is no doubt that, by some measures, competition would have been facilitated by mandating access to those platform assets. Yet in both *Trinko* and *Linkline*, the Supreme Court held "that such claims are not cognizable under the Sherman Act in the absence of a duty to deal," *Linkline*, 555 U.S. at 450-51, which arises only in the exceptional case where a monopolist defendant tries to close down a competitive market by changing an existing policy of dealing with a competitor. *Aspen*

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985); *Trinko*, 540 U.S. at 409; *Safeway, Inc. v. Abbott Labs.*, No. C 07–05470 CW, 2010 U.S. Dist. LEXIS 2145, at *18-19 (N.D. Cal. Jan. 12, 2010) ("liability under Section 2" on the basis of a duty to aid a competitor "can arise when a defendant voluntarily alters a course of dealing and 'anticompetitive malice' motivates the defendant's conduct").  The same holds here.  Apple is under no antitrust "duty to aid competitors," whether they are third party App developers such as Google, Microsoft, or the tens of thousands of other companies and individual developers who may want to create Apps for the iPhone but may not want to abide by Apple's App policies.[11]  And, in fact, Google, Microsoft, Facebook and others have demonstrated the fierce competitiveness of the handset and mobile platform markets by electing to create and distribute Apps for iPhone via the App Store as well as for other handsets and mobile operating systems via the alternative, competing download platforms for those handsets.

## VII.     CONCLUSION

For the foregoing reasons, Apple's Motion to Dismiss should be granted and Plaintiffs' Amended Complaint should be dismissed with prejudice.

Dated:  November 2, 2012                      Respectfully submitted,

                                             LATHAM & WATKINS LLP


                                             By _____/s/ Daniel M. Wall_____
                                                 Daniel M. Wall
                                                 Attorneys for Defendant APPLE INC.

SF\1223246

---

[11]  This is common sense.  Antitrust does not require McDonald's to stock and sell Burger King products, or Walmart to stock and sell Costco-brand *Kirkland* products—despite the fact that consumers would otherwise undoubtedly have a greater selection of products at those establishments.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO