1  FRANCIS M. GREGOREK (144785)
2  RACHELE R. RICKERT (190634)
   rickert@whafh.com
3  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
4  750 B Street, Suite 2770
   San Diego, CA 92101
5  Telephone: 619/239-4599
   Facsimile: 619/234-4599

6  MARK C. RIFKIN (*pro hac vice*)
7  rifkin@whafh.com
   ALEXANDER H. SCHMIDT (*pro hac vice*)
8  schmidt@whafh.com
   MICHAEL M. LISKOW (243899)
9  restituyo@whafh.com
   WOLF HALDENSTEIN ADLER
10    FREEMAN & HERZ LLP
   270 Madison Avenue
11 New York, NY 10016
   Telephone: 212/545-4600
12 Facsimile: 212/545-4677

13 Plaintiffs' Interim Class Counsel

14

15                UNITED STATES DISTRICT COURT

16        FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                    OAKLAND DIVISION

18  IN RE APPLE & AT&TM ANTITRUST          )  Case No. C 11-06714-YGR
    LITIGATION                             )  Related Case No. C 07-5152-JW
19                                         )
                                           )  **PLAINTIFFS' MEMORANDUM
20                                         )  OF POINTS AND AUTHORITIES
                                           )  IN OPPOSITION TO DEFENDANT
21                                         )  APPLE'S MOTION TO DISMISS
                                           )  THE AMENDED CONSOLIDATED
22                                         )  COMPLAINT**
                                           )
23                                         )  DATE:      January 15, 2013
                                           )  TIME:      2:00 p.m.
24                                         )  CRTRM:     TBD
                                           )  JUDGE:     Hon. Yvonne Gonzalez Rogers
25  _____       )

26

27

28

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................... 1

II.   RELEVANT BACKGROUND AND
      PROCEDURAL HISTORY ...................................................................... 3

      A.   Apple I ......................................................................................... 3

      B.   Apple II ....................................................................................... 6

      C.   Apple III ...................................................................................... 7

III.  LEGAL ARGUMENT ............................................................................... 7

      A.   Apple's Motion to Dismiss
           is Improper Under Rule 12(g) ..................................................... 7

      B.   Apple Is Collaterally Estopped
           from Re-Asserting its Arguments ................................................ 9

      C.   Apple's Arguments in Any Event
           Lack Merit .................................................................................. 11

           1.   Plaintiffs are Direct Purchasers
                with Antitrust Standing ....................................................... 11

           2.   Plaintiffs Have Article III Standing ................................... 14

           3.   Plaintiffs Plead Cognizable Aftermarket
                Monopolization Claims ....................................................... 15

           4.   Plaintiffs Plead a Relevant Antitrust
                Aftermarket and Monopoly Power ...................................... 18

           5.   Plaintiffs Plead Anticompetitive Conduct .......................... 20

V.    CONCLUSION ......................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*766347 Ontario, Ltd. v. Zurich Capital Markets, Inc.,*
  274 F. Supp. 2d 926 (N.D. Ill. 2003) ........................................................................ 9

*In re Apple & AT&TM Antitrust Litigation,*
  596 F. Supp. 2d 1288 (N.D. 2008) ............................................................. 4, 10, 20

*In re Apple & ATTM Antitrust Litigation,*
  No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270 (N.D. Cal. July 8, 2010) ................. *passim*

*In re Apple & ATTM Antitrust Litigation,*
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) ........................................................................ 5

*In re Apple & ATTM Antitrust Litigation,*
  No. C 07-05152 JW, 2012 U.S. Dist. LEXIS 16505 (N.D. Cal. Feb. 1, 2012) .......................... 5

*In re Apple & ATTM Antitrust Litigation,*
  No. C 11-06714 JW, 2012 U.S. Dist. LEXIS 97105 (N.D. Cal. July 11, 2012) ....................... 6

*In re ATM Fee Antitrust Litigation,*
  686 F.3d 741 (9th Cir. 2012) .......................................................................... 2, 12, 13

*AT&T Mobility LLC v. Concepcion,*
  131 S. Ct. 1740 (2011) ................................................................................................ 5

*Campos v. Ticketmaster Corp.,*
  140 F.3d 1166 (8th Cir. 1998) ............................................................................. 4, 5, 12

*Chilicky v. Schweiker,*
  796 F.2d 1131 (9th Cir. 1986),
  *rev'd on other grounds,* 487 U.S. 412 (1988) ................................................................ 7

*Church of Scientology v. Linberg,*
  529 F. Supp. 945 (C.D. Cal. 1981) .............................................................................. 9

*Cook v. Aagard,*
  No. 12-00157, 2012 U.S. Dist. LEXIS 167425 (D. Utah Nov. 26, 2012) ................................ 11

*Eastman Kodak Co. v. Image Technical Services,*
  504 U.S. 451 (1992) ......................................................................... 15, 16, 17, 18

*EP Operating Ltd. Partnership v. Placid Oil Co.,*
  No. 93-0257, 1994 U.S. Dist. LEXIS 13065 (E.D. La. Sept. 13, 1994) ................................ 8

*Forsyth v. Humana,*
  114 F.3d 1467 (9th Cir. 1997)...................................................................................15

*Gilldorn Savings Association v. Commerce Savings Association,*
  804 F.2d 390 (7th Cir. 1986)....................................................................................11

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977)..........................................................................................*passim*

*Kamilche Co. v. United States,*
  53 F.3d 1059 (9th Cir. 1995).....................................................................................9

*Lewis v. Casey,*
  518 U.S. 343 (1996)..................................................................................................14

*Luben Industries, Inc. v. United States,*
  707 F.2d 1037 (9th Cir. 1983)..................................................................................10

*Lummus Co. v. Commonwealth Oil Refining Co.,*
  297 F.2d 80 (2d Cir. 1961) (Friendly, J.) ...............................................................10

*Myers v. American Dental Association,*
  695 F.2d 716 (3d Cir. 1982).......................................................................................7

*New York City Employees' Retirement System v. Berry,*
  667 F. Supp. 2d 1121 (N.D. Cal. 2009) (Ware, J.)...................................................2

*Newcal Industries, Inc. v. IKON Office Solution,*
  513 F.3d 1038 (9th Cir. 2008)............................................................................*passim*

*Nichols v. Brown,*
  859 F. Supp. 2d 1118 (C.D. Cal. 2012)....................................................................14

*Parklane Hosiery Co. v. Shore,*
  439 U.S. 322 (1979)....................................................................................................9

*Queen City Pizza v. Domino's Pizza,*
  124 F.3d 430 (3d Cir. 1997).....................................................................................15

*Sears Petroleum & Transportation Corp. v. Ice Ban America Inc.,*
  217 F.R.D. 305 (N.D.N.Y. 2003) ..............................................................................9

*In re Static Random Access Memory (SRAM) Antitrust Litigation,*
  No. M:07-cv-01819 CW, MDL No. 1819,
  2008 U.S. Dist. LEXIS 15826 (N.D. Cal. Feb. 14, 2008).......................................14

*Sun Mircrosystems, Inc. v. Hynix Semiconductor, Inc.,*
   608 F. Supp. 2d 1166 (N.D. Cal. 2009) ............................................................ 14

*Sunnergren v. Ahern,*
   No. 10-2690, 2010 U.S. Dist. LEXIS 114874 (N.D. Cal. Oct. 27, 2010) (Koh, J.) ..................... 8

*United States Fidelity & Guaranty Co. v. Jepsen,*
   No. 90-6931, 1991 U.S. Dist. LEXIS 16818 (N.D. Ill. Nov. 1, 1991) ..................... 8, 9

*Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.,*
   247 F. Supp. 2d 987 (N.D. Ill. 2002) .................................................. 8

## STATUTES & RULES

Federal Rules of Civil Procedure
   7(a) ........................................................................................ 14
   12 ....................................................................................... *passim*
   12(b) ................................................................................... 8, 9
   12(b)(1) ................................................................................. *passim*
   12(b)(6) ................................................................................. *passim*
   12(b)(7) ................................................................................. 6, 8
   12(f) ....................................................................................... 2
   12(g) .................................................................................. 1, 2, 7, 9
   12(g)(2) ..................................................................................... 8
   12(h)(2) ..................................................................................... 8
   19 .......................................................................................... 7

Restatement (Second) of Judgments (1982)
   §13 ........................................................................................ 10
   §27 ........................................................................................ 10

## OTHER AUTHORITIES

2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.23 at 12-31 (3d ed. 2012) .................. 8

Duffy, M.M., *Note: Chipping Away at the Illinois Brick Wall: Expanding Suggestions to the Indirect Purchaser Rule,* 87 Notre Dame L. Rev. 1709, 1937 n. 154 (2012) ............................ 13

# I.    **INTRODUCTION**

The present motion by Defendant Apple Inc. ("Apple") in this case[1] seeks to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Plaintiffs' claim that Apple has unlawfully monopolized and attempted to monopolize the aftermarket for software applications for its highly popular iPhone (the "Apps" claim).  Apple's motion is procedurally improper and lacks even a modicum of substantive merit.

This is the third motion to dismiss that Apple has filed in this case.  In its first two Rule 12 motions, both brought while former Chief Judge James Ware was still presiding over the case, Apple ***never*** sought to dismiss Plaintiffs' Apps claim – and for good reason.  Judge Ware already had sustained the exact same claim in the prior action (*Apple I*), and he rejected each of the central arguments Apple now repeats here.  In *Apple I*, Judge Ware ruled that the plaintiffs had standing as direct purchasers and properly alleged an aftermarket monopolization claim and cognizable product market for the Apps.  When Apple filed its first two Rule 12 motions in this case, it undoubtly expected Judge Ware to follow his prior decisions and again reject any renewed motion to dismiss the Apps claim.  So when Judge Ware was still assigned to this case, Apple deliberately omitted from its first two Rule 12 motions any argument that Plaintiffs lacked standing (Rule 12(b)(1)) or that they failed to state a claim (Rule 12(b)(6)) as grounds for dismissal.

Now that this case has been reassigned, Apple is just trying its luck with a different judge, hoping to convince this Court to overrule Judge Ware's prior decisions against Apple.  Apple's gamesmanship should not be condoned, and its present motion should be summarily rejected for three separate reasons:

*First*, Apple's motion is prohibited by Federal Rule of Civil Procedure 12(g), which permits a defendant to make only ***one*** pre-answer Rule 12 motion.  Rule 12(g) prevents Apple from wasting judicial and adverse party resources by making successive pre-answer motions on

---

[1]    This case, *In re Apple iPhone Antitrust Litigation*, No. C-11-06714-YGR ("*Apple II*"), is related to two other actions.  The first, filed four years ***before*** this case, is *In re Apple & AT&TM Antitrust Litigation*, No. C-07-05152 JW ("*Apple I*").  The second, filed the year after this case, is *Ward v. Apple Inc.*, No. 12-cv-05404-YGR ("*Apple III*").  All three related cases are described below.

different grounds. Rule 12(g) required Apple to assert all of its Rule 12(b)(1) and 12(b)(6) arguments against the Apps claim in a single motion. Apple's failure to raise these arguments in its first and second Rule 12 motions bars it making them now in its **third** Rule 12 motion.

*Second*, Judge Ware's prior decision in *Apple I* collaterally estops Apple from raising identical arguments that Plaintiffs lack standing or fail to state a claim in this case.

*Third*, even if Apple could raise these arguments again, its arguments lack merit precisely for the reasons already articulated by Judge Ware. There is no reason this Court should ignore or overrule Judge Ware's prior decision on these identical issues. The only new wrinkle in Apple's latest argument is the Ninth Circuit's recent decision on direct purchaser standing in *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), but that wrinkle is easily ironed out. The *ATM Fee* case simply reaffirms pre-existing law and fortifies Judge Ware's holding that iPhone Apps consumers are direct purchasers who are entitled to sue. Apple misrepresents the critical facts and holdings of the case to twist it into supporting Apple's position when it plainly does not.

Finally, Apple's motion to strike Plaintiffs' allegations and request for injunctive relief on the voice and data aftermarket claims that Judge Ware dismissed earlier in this case should also be denied. It is common practice within this Circuit for plaintiffs filing amended complaints to restate previously dismissed claims in an amended pleading. Indeed, until recently, such dismissed claims **had** to be restated to preserve them for appeal. The amended complaint expressly alleges that Plaintiffs repled their voice and data aftermarket monopolization claims solely to preserve those claims for an appeal. Apple does not (and cannot) assert that it has been prejudiced or harmed in the least by the re-pleading. Apple has not met its burden of proving that those allegations are scandalous, impertinent, or immaterial within the meaning of Rule 12(f).[2]

Accordingly, Apple's latest motion to dismiss should be denied in all respects.

---

[2] *See New York City Emps. Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) (Ware, J.) (quoting *Rivers v. County of Marin*, C 05-4251, 2006 U.S. Dist. LEXIS 12496, at *6, 2006 WL 581096, at *2 (N.D. Cal. 2006)) (other citations omitted) (motions to strike "are generally regarded with disfavor" and should only be granted if "'the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit'"; where the "moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike 'even though the offending matter literally [was] within one or more of the categories set forth in Rule 12(f)'").

## II.     RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### A.     *Apple I*

*Apple I* consolidated several class actions filed shortly after Apple launched its first iPhone on June 29, 2007.  The cases were assigned to Ware, who designated the current Plaintiffs' counsel as interim lead counsel in April 2008.  [ECF No. 100]  The consolidated amended complaint in *Apple I* alleged two distinct antitrust claims.  The "Voice and Data Service" claims alleged that Apple and AT&T Mobility LLC ("ATTM"), which was also named as a defendant in *Apple I*, had engaged in a classic aftermarket monopolization scheme by entering into a secret agreement to make ATTM the exclusive cell phone service provider for iPhones for five years while letting iPhone buyers believe they were entering into ordinary two-year service agreements with ATTM that were terminable at will.  As a result of the secret five-year deal (which was so secret Apple and ATTM did not even tell their own sales personnel about it), iPhone customers were unknowingly "locked in" to ATTM in the iPhone voice and data services aftermarket for five years.  The scheme enabled Apple and ATTM to sell more iPhones than they would have sold if customers knew they would be stuck with ATTM for five years, and it enabled ATTM to charge more for its voice and data service plans than it would have been able to charge absent the illegal lock-in agreement.  [ECF No. 109, at ¶¶ 1-12, 27-33, 65-70, 77-86, 91-93, 120-121, 133-150]

The Apps claim alleged that Apple monopolized the aftermarket for downloadable software applications providing such functions as internet access, instant messaging, ring tones, games, and video and photography capability for the iPhone.  Apple achieved its aftermarket monopoly by preventing iPhone consumers from downloading any software applications that it did not "approve" and by requiring all "approved" apps to be sold only through Apple's own "Apps Store," which enabled it to impose a fee equal to 30% of the price of any apps they sold.  [*Id.* at ¶¶ 71-73, 87-90, 122-132]

On June 27, 2008, Apple moved to dismiss the *Apple I* complaint and ATTM moved to compel arbitration as against it pursuant to an arbitration clause in its standard two-year wireless service agreement with all iPhone consumers.  [ECF Nos. 122, 115]  With respect to the Apps claim, Apple argued that the plaintiffs in *Apple I* failed adequately to plead the required elements

of their claim (including the "relevant market," "monopoly power" and "anticompetitive conduct" elements).  [ECF No. 122 at 6-11, 12-13]  That argument in *Apple I* was identical to one of the arguments against the Apps claim that Apple now repeats on the present motion.

Judge Ware denied both defendants' motions on October 1, 2008.  *Apple I*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008).  Judge Ware concluded that if the plaintiffs' allegations were proved, Apple would have committed antitrust violations under Section 2 of the Sherman Act as to both the Voice and Data Service claims and the Apps claim.  *Id.* at 1301-06.  In doing so, Judge Ware expressly held that the plaintiffs plausibly alleged a relevant market, market power and anticompetitive conduct in support of their Apps claim:

> Apple moves to dismiss on the ground that Plaintiffs have made no legally cognizable claim of market power or monopolization in the alleged iPhone applications aftermarket.
>
> The allegations in the Complaint recite facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications. . . . Plaintiffs . . . have alleged that Apple enforced entry into the Applications Aftermarket, and limited access to software applications in which it maintained a financial interest.
>
> \*      \*      \*
>
> Through the initial iPhone purchase and contracting, Apple is alleged to have gained the "special access" to consumers by which it is then able to lock consumers into use of only applications in which Apple maintained a financial interest. . . . Apple is then alleged to have enforced its special position through technological controls and the issuance of software update Version 1.1.1.
>
> In sum, Plaintiffs have sufficiently alleged market power and monopolization in the iPhone voice and data services [sic – applications] aftermarket, which, taken with Plaintiffs' market allegations, is sufficient to state a claim for violation of § 2 of the Sherman Act.

*Id.* at 1304, 1306 (citations omitted).

The *Apple I* plaintiffs moved for class certification in January 2010.  [ECF No. 240 (filed under seal)]  In opposing class certification, Apple made another argument that it again repeats on this motion, namely, that the plaintiffs lacked standing to assert the Apps claim because they were supposedly "indirect purchasers" of the Apps under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and the Eighth Circuit's decision in *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th

Cir. 1998). [ECF No. 365 at 28-29] Judge Ware granted class certification on July 8, 2010, and he expressly rejected Apple's indirect purchaser argument and its misguided reliance on *Ticketmaster*:

> [T]he Court rejects Apple's contention that certification of a class as to the applications aftermarket is barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977). (See Apple Opp'n at 28-29.) . . . "The Supreme Court has defined an indirect purchaser as one who is not the immediate buyer from the alleged antitrust violator or one who does not purchase the monopolized product directly from the antitrust defendant." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (citing *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990); *California v. ARC America Corp.*, 490 U.S. 93, 97, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989)). Here, [Plaintiffs' expert] Dr. Wilkie's analysis does not rest on an indirect purchaser model. Rather, his analysis is of "sales of approved apps through [Apple's] App Store." (Wilkie Decl. P 71.) Thus, the class members deal directly with the accused monopolist, Apple. Although *Campos* found that *Illinois Brick* applied in a context where class members dealt directly with the monopolist (Ticketmaster)—"ticket buyers only buy Ticketmaster's services [at marked up prices] because concert venues have been required to buy those services first"—the Court is not aware of any Ninth Circuit case that applied *Illinois Brick* in this manner, and the Court declines to do so here.

*Apple I*, No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270, at *40-42 n.27 (N.D. Cal. July 8, 2010) (other citations omitted).

Ultimately, after the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), Judge Ware granted a renewed motion by ATTM to compel arbitration of the plaintiffs' claims in *Apple I*, and ordered each of the nine plaintiffs to arbitrate individually against Apple as well (even though Apple's own service agreement required the plaintiffs to sue Apple in court in California), finding that Apple was entitled to invoke ATTM's arbitration clause under equitable estoppel principles. *Apple I*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011). Judge Ware granted the plaintiffs leave to appeal his decision to compel arbitration as against Apple, *Apple I*, No. C 07-05152 JW, 2012 U.S. Dist. LEXIS 16505 (N.D. Cal. Feb. 1, 2012), but on April 27, 2012, the Ninth Circuit declined to accept the interlocutory appeal. [ECF No. 570]

## B. *Apple II*

On December 29, 2011, Plaintiffs filed the first of two actions that became consolidated into this case. Plaintiffs sued only Apple and not ATTM. Plaintiffs here asserted the exact same Apps claim against Apple as the plaintiffs had asserted in *Apple I*. *See* Amended Complaint [ECF No. 26], at ¶¶ 4-7, 10, 46-47, 63-66, 81-95. However, in this case, Plaintiffs asserted their Voice and Data Services claims only against Apple and did not in any way rely on the ATTM service contract that contained the arbitration clause at issue in *Apple I*. In a prior decision in this case, Judge Ware acknowledged that the Voice and Data Services claims in the two cases differed. *See Apple II*, No. C 11-06714, 2012 U.S. Dist. LEXIS 97105, at *23-24 (N.D. Cal. July 11, 2012) ("The Court rejects Defendant's contention that the Court should order Plaintiffs to arbitrate their claims in this case because these claims are 'the same' as the claims that were subjected to arbitration in the *In re Apple & AT&TM Antitrust Litigation*. . . . Plaintiffs have not contended that any of their claims arise from ATTM service contracts.").

Apple filed its first Rule 12 motion in the present case on March 2, 2012, while the case was still pending before Judge Ware. Apple's first motion was limited to seeking dismissal of the Voice and Data Service claims under Rule 12(b)(7) for failure to join ATTM as a purportedly necessary and indispensable party. [ECF No. 14] *Apple did not make a motion to dismiss the Apps claim before Judge Ware*. Apple's first Rule 12 motion was denied as moot by Judge Ware on March 20, 2012, because it was directed at only the first of the two filed complaints in this case and Plaintiffs had not yet consolidated their claims in a single complaint. [ECF No. 25]

Apple filed its second Rule 12 motion in this case on April 16, 2012. In that motion Apple repeated its initial Rule 12(b)(7) argument and added as well a new argument under Rule 12(b)(6) that Count III of the amended complaint alleging a conspiracy between Apple and ATTM to monopolize the Voice and Data Services aftermarket failed to state a claim. [ECF No. 37]. Apple again *did not move to dismiss the Apps claim before Judge Ware*.

The Court held that ATTM was a necessary party and directed dismissal of Plaintiffs' *Voice and Data Service claims* unless Plaintiffs filed an amended complaint joining ATTM. *Apple II*, 2012 U.S. Dist. LEXIS 97105, at *31-34. However, Judge Ware's Order permitted

1  Plaintiffs to proceed with their Apps claim against Apple.  Plaintiffs elected not to add ATTM as a

2  party, and filed their amended complaint on September 28, 2012.  [ECF No. 81]

3  Apple filed its third motion to dismiss on November 2, 2012, after Judge Ware's

4  retirement, asserting for the first time in this case its Rule 12(b)(1) and 12(b)(6) defenses directed

5  at Plaintiffs' Apps claim.  [ECF No. 88]

6  **C.** ***Apple III***

7  On October 10, 2012, Zack Ward and Thomas Buchar, who were not named plaintiffs in

8  either *Apple I* or *Apple II*, filed a new complaint against Apple only, in which they allege a single

9  claim that Apple conspired to monopolize the iPhone Voice and Data Services aftermarket.  [Case

10  No. 12-05404, ECF No. 1]  The complaint in *Apple III* does not assert an Apps claim, it does not

11  name ATTM as a defendant, and it does not rely in any way on ATTM's service contract.

12  As stated in the parties' recently-filed Joint Case Management Statement, the *Apple III*

13  plaintiffs consent to re-submitting the briefing that was previously submitted in *Apple II* with

14  respect to Apple's argument that ATTM is a necessary and indispensible party under Rule 19 as to

15  the Voice and Data Services claim, if the Court agrees to that procedure.  [ECF No. 15, at 5]

16  **III.**  **LEGAL ARGUMENT**

17  **A.**  **Apple's Motion to Dismiss is Improper Under Rule 12(g)**

18  Apple's current motion, which raises grounds not asserted in either of its two prior motions

19  to dismiss in this action, is barred under Rule 12(g).  Rules 12(g) and (h) "promote the early and

20  simultaneous presentation and determination of preliminary defenses." *Chilicky v. Schweiker*, 796

21  F.2d 1131, 1136 (9th Cir. 1986), *rev'd on other grounds*, 487 U.S. 412 (1988).  Thus, Rule 12(g)

22  "requires that a party who raises a defense by motion prior to an answer raise all such possible

23  defenses in a single motion; ***omitted defenses cannot be raised in a second, pre-answer motion***."

24  *Id.* at 1136 (emphasis added).  *See also, e.g., Myers v. Am. Dental Ass'n*, 695 F.2d 716, 720 (3d

25  Cir. 1982) (same).  Rule 12(g) eliminated a practice permitted under "the original rule," which

26  divided defenses "into two groups which could be the subjects of two successive motions" – now,

27  Rule 12(g) bars a defendant from successive, piecemeal motion practice. Fed. R. Civ. P. 12 (Adv.

28  Comm. notes to 1946 amendments).  *See also id.* (Adv. Comm. notes to 1966 amendments)

("Amended subdivision (g) is to the same effect. This required consolidation of defenses and objections in a Rule 12 motion is salutary in that it works against piecemeal consideration of a case.")

Rule 12(g)(2) expressly states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Under Rule 12(h), certain defenses are deemed non-waivable – including the Rule 12(b)(6) defenses Apple seeks to assert here. However, even non-waivable defenses *cannot be the subject of successive Rule 12(b) motions*:

> If omitted from the initial motion, those matters *may not be raised in a successive Rule 12(b) motion*, but may be raised in any Rule 7(a) responsive pleading, in a Rule 12(c) motion for judgment on the pleadings, or at trial.

2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.23 at 12-31 (3d ed. 2012)) (emphasis added).

Numerous courts in this Circuit and elsewhere have so held. *See*, *e.g.*, *Sunnergren v. Ahern*, No. C 10-2690, 2010 U.S. Dist. LEXIS 114874, at *2 n.1 (N.D. Cal. Oct. 27, 2010) (Koh., J.) ("Rule 12(g) requires that a party who raises a defense through a pre-answer motion raise all such possible defenses in a single motion; *omitted defenses cannot be raised in a second, pre-answer motion*") (emphasis added); *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 999 (N.D. Ill. 2002) (defendants precluded from asserting 12(b)(6) defense by second pre-answer motion when they failed to do so in initial motion); *EP Operating L.P. v. Placid Oil Co.*, No. 93-0257, 1994 U.S. Dist. LEXIS 13065, at *6 (E.D. La. Sept. 13, 1994) (defendants' attempt to move to dismiss under 12(b)(7) despite having earlier brought a Rule 12(b) motion "is clearly precluded by the Federal Rules of Civil Procedure"); *United States Fidelity & Guaranty Co. v. Jepsen*, No. 90-6931, 1991 U.S. Dist. LEXIS 16818, at *5 (N.D. Ill. Nov. 1, 1991) (second pre-answer 12(b)(6) motion denied in part because "[o]mitted defenses cannot be raised in a second pre-answer motion" and "the few novel Rule 12(b)(6) arguments raised in the second motion to dismiss were all available to [the defendant] at the time of his first motion to dismiss").

It makes no difference that the complaint has been amended since Apple's initial 12(b) motions, because the exact same Apps claim was pled in the original complaint in this case and Apple is raising defenses it was fully capable of raising in its initial 12(b) motions had it chosen to do so while the case remained before Judge Ware. *See, e.g.*, *Church of Scientology v. Linberg*, 529 F. Supp. 945, 967 (C.D. Cal. 1981) (rejecting argument that Rule 12(b) defense not raised in initial motion was preserved where complaint had been subsequently amended, noting that "Rule 12(g) specifically rejects this possibility where, as here, the grounds for the objections were 'available' at the time the previous motion was filed."); *Sears Petroleum & Transp. Corp. v. Ice Ban Am., Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y 2003) (if complaint is amended, defendant may bring second Rule 12 motion to object only to any new allegations that were added); *766347 Ontario, Ltd. v. Zurich Capital Mkts., Inc.*, 274 F. Supp. 2d 926, 930 (N.D. Ill. 2003) (same); *United States Fidelity*, 1991 U.S. Dist. LEXIS 16818, at *7 (the amended complaint "does not automatically revive all the defenses" waived by failure to raise them in a first motion to dismiss).

Accordingly, the mere fact that Judge Ware ordered Plaintiffs to file an amended complaint to add a defendant **on other claims** does not revive Apple's right to raise defenses to the Apps claim that it was required to raise in its first Rule 12 motion. The Court should deny Apple's present motion under Rule 12(g).

## B.    Apple Is Collaterally Estopped from Re-Asserting its Arguments

Even if Apple's current motion were procedurally proper, it still should be denied under the doctrine of non-mutual offensive collateral estoppel. That doctrine bars a party like Apple from making in a later case the very same arguments it fully and fairly litigated but lost in a prior action. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). Federal courts are granted "broad discretion" to apply the doctrine, *id.*, 439 U.S. at 331, whenever "the estopped issue is identical to an issue" that was litigated and "decided in the first case." *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995) (internal citations omitted).

Apple's contention that the Apps claim was "not a focus of the complaint or the motion practice that occurred" in *Apple I*, Def's. Mem. at 4, is simply false. As shown above, in *Apple I*, Apple fully raised and lost before Judge Ware each of the central arguments it makes here. *Apple*

*I*, 2010 U.S. Dist. LEXIS 98270, at \*40-42 n.27 (rejecting Apple's identical *Illinois Brick* indirect purchaser argument); *Apple I*, 596 F. Supp. 2d at 1304-06 (rejecting Apple's argument that plaintiff failed to plead the requisite elements of Apps claim). Chief Judge Ware's rejection of these arguments in *Apple I* precludes Apple from raising any form or variation of them again; not just the precise arguments Apple made. *See Kamilche*, 53 F.3d at 1063 ("'once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case'") (quoting *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)). *See also* Restatement (Second) of Judgments § 27 (1982) ("If the party against whom preclusion is sought did in fact litigate an issue . . . and suffered an adverse determination . . . new arguments may not be presented to obtain a different determination.").

The Court's orders in *Apple I* disposing of Apple's current arguments are "final" for the purposes of collateral estoppel. The Ninth Circuit has made clear that,

> [t]o be "final" for collateral estoppel purposes, a decision need not possess "finality" in the sense of 28 U.S.C. § 1291. A "final judgment" for purposes of collateral estoppel can be any prior adjudication of an issue in another action that is determined to be "sufficiently firm" to be accorded conclusive effect.

*Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983) (quoting, *inter alia*, *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979)). *See also Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.) ("'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."). *Luben* further relied on the Restatement (Second) of Judgments § 13 (1982), for its statement that

> Preclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for purpose of preclusion.

*Id.* at Comment g (emphasis omitted).

For these reasons, denials of pre-trial motions are often sufficiently "final" for collateral estoppel. *See, e.g., Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 392-94 (7th Cir. 1986) (finding a state court's order denying a party's motion to dismiss sufficiently final for collateral estoppel purposes even though there was no written opinion and the decision was not appealable); *Cook v. Aagard*, No. 12-00157, 2012 U.S. Dist. LEXIS 167425, at *22 (D. Utah Nov. 26, 2012) (finding that an order denying a motion to dismiss/suppress "constituted a final order for purposes of issue preclusion"). Chief Judge Ware's rulings on Apple's arguments were well-reasoned and definitive. There is no reason to doubt that he would have adhered to them had Apple dared to try to relitigate these issues again on its first two Rule 12 motions, which explains why Apple did not repeat those arguments while Judge Ware was still assigned to this case.

Accordingly, the aforementioned orders are sufficiently "final" for collateral estoppel purposes. The Court should therefore exercise its discretion to bar Apple from relitigating issues that it already raised unsuccessfully before the Court.

## C. Apple's Arguments in Any Event Lack Merit

### 1. Plaintiffs are Direct Purchasers with Antitrust Standing

Apple's argument that Plaintiffs are indirect purchasers of Apps and therefore lack standing under *Illinois Brick* is premised on a contorted and incorrect version of the facts alleged. The Amended Complaint plainly alleges that Plaintiffs purchased **directly from Apple** certain Apps that were **made by Apple itself**, Compl. ¶¶ 63-66, such as songs converted into ringtones, for which "Apple charged the customer an additional 99 cents," *id.* ¶ 64. Plaintiffs also allege that iPhone consumers were forced to buy third party developers' applications **directly from Apple's Apps Store**, and that iPhone consumers were forced **to pay Apple** a 30% fee on top of the cost for the apps. *Id.* at ¶¶ 4-5.

As Judge Ware recognized in *Apple I*, both kinds of purchases exemplify classic direct purchaser situations. In the first, consumers bought apps made by the monopolist (Apple) directly from the monopolist. In the second, consumers bought apps made by third party manufacturers, but again bought them directly from the monopolist (Apple) in its role as distributor of all the apps. In both cases, consumers paid the supracompetitive price **directly to the monopolist** –

Apple – which kept the entirety of the overcharges for itself. As Judge Ware recognized when he rejected Apple's indirect purchaser argument in *Apple I*, Plaintiffs' "analysis does not rest on an indirect purchaser model" but rather on "sales of approved apps through [Apple's] App Store." *Apple I*, 2010 U.S. Dist. LEXIS 98270, at *40-42 n.27.

Apple admits that Plaintiffs are "Apps consumers" – that is, Apps purchasers – (*see* Def. Mem. at 9), but then completely ignores Plaintiffs' allegations about Apple's own-manufactured apps, which are made only by Apple and sold only by Apple. Plaintiffs undoubtedly are direct purchasers of those apps. Apple then attempts to convolute Plaintiffs' allegations about third-party apps to make it appear as though the apps developers, rather than iPhone consumers, were the direct purchasers of third-party apps. *See* Def. Mem. at 9. Putting aside that Apple's illogical version bears little resemblance to what Plaintiffs actually allege, Apple's argument still fails to identify an indirect purchase because under Apple's argument the developers are not purchasers of the apps at all: the developers **make** the third-party apps, they do not buy them from Apple. The only purchasers of apps are iPhone consumers, who must purchase third party apps – the tainted product – directly from Apple exclusively on its Apps Store. And iPhone consumers pay the challenged supracompetitive 30% fee directly to the Apps Store at the time of purchase.

As the Ninth Circuit has recently reiterated in the case that Apple itself relies upon, the *sine qua non* for direct purchaser status is **whether the plaintiff paid the alleged unlawful fee directly to the alleged wrongdoer**. *In re ATM Fee Antitrust Litig.*, 686 F.3d at 746, 751 (upholding district court's finding of indirect purchaser status where the plaintiffs admitted they "did not directly pay the alleged fixed interchange fees" to the alleged wrongdoer). Under the Ninth Circuit's straightforward standing test, because Plaintiffs paid the alleged unlawful price – here Apple's 30% fee – directly to Apple (the alleged monopolist), they are direct purchasers and have standing to sue Apple under Ninth Circuit jurisprudence. *Id*. at 754.

Apple mistakenly focuses on the $99 annual fee that apps developers pay Apple for the right to distribute their apps through Apple's Apps Store to argue that the developers, too, are "victims" of Apple, in an effort to twist the facts here to resemble those in the Eighth Circuit's *Campos v. Ticketmaster* case. Here, of course, Plaintiffs do not challenge the $99 fee that the

developers paid to Apple since Plaintiffs never paid that fee themselves.  Rather, Plaintiffs challenge only the 30% fee that they paid directly to Apple.  That the developers may also be victims of Apple as to the $99 annual fee is completely irrelevant to whether Plaintiffs are direct purchasers as to the totally distinct 30% apps fee under Ninth Circuit law.  The *Ticketmaster* case is, in any event, an outlier that has "been widely criticized for a variety of reasons."  Duffy, M.M., *Note: Chipping Away at the Illinois Brick Wall: Expanding Exceptions to the Indirect Purchaser Rule*, 87 Notre Dame L. Rev. 1709, 1737 n.154 (2012).  As Judge Ware already noted, there is no "Ninth Circuit case that applied *Illinois Brick* in th[e] manner" that *Ticketmaster* did, and Judge Ware previously properly "decline[d] to do so here."  *Apple I*, 2010 U.S. Dist. LEXIS 98270, at *40-42 n.27.

Apple disingenuously implies that the Ninth Circuit adopted the *Ticketmaster* approach in its recent decision in the *ATM Fee Antitrust Litigation*.  But the Ninth Circuit did not even cite *Ticketmaster*, much less adopt it, and the facts of the two cases are vastly different.  The *ATM Fee* case involved classic indirect purchaser allegations: the plaintiffs claimed that the defendants fixed one fee, called the "interchange fee," which the plaintiffs did ***not*** pay, and that the enhanced price was "passed on" by others in the form of ***another*** fee, called the "foreign ATM fee," which the plaintiffs did pay.  Because the plaintiffs did not pay the illegally fixed fee to the alleged wrongdoer, the court ruled they were indirect purchasers.  686 F.3d at 744, 749-50.  As Judge Ware previously held, *Ticketmaster* – which found the plaintiffs to be indirect purchasers even though they dealt directly with the alleged monopolist – is not the law in the Ninth Circuit and, indeed, its analysis is entirely inconsistent with Ninth Circuit precedent, including the recent decision in the *ATM Fee* case.  *See Apple I*, 2010 U.S. Dist. LEXIS 98270, at *40-42 n.27.  Given the Ninth Circuit's emphasis that direct purchaser status exists whenever the plaintiff pays the challenged unlawful fee directly to the monopolist, *In re ATM Fee Antitrust Litig.*, 686 F.3d at 746, 751, 754, *Ticketmaster*'s strained, counterintuitive analysis is unlikely to be adopted by the Ninth Circuit any time soon.

Plaintiffs are direct purchasers and have antitrust standing.

## 2. Plaintiffs Have Article III Standing

Contrary to Apple's argument that Plaintiffs have not pled that they were personally injured by Apple's monopolization of the apps aftermarket, Plaintiffs specifically do allege that they "have been injured in fact by Apple's unlawful monopolization [and attempted monopolization] because they have (a) been deprived of lower cost alternatives for applications, (b) forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones disabled or destroyed."  Compl. ¶¶ 88, 94.  [ECF No. 26]  These are specific factual allegations whereby the Plaintiffs collectively contend they each suffered some or all of these types of direct and personal harms.  Nothing more is required to "show that they personally have been injured" for Article III standing purposes.  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

In a Rule 7(a) notice pleading case like this one,[3] each individual plaintiff is not required to particularize separately the precise harm and injury in fact he or she suffered, as Apple intimates. Apple has not cited a case suggesting otherwise.  To the extent such a heightened pleading requirement existed, Plaintiffs could easily amend their complaint to meet it.[4]  *See* accompanying Declaration of Michael M. Liskow, dated December 7, 2012, attaching several Plaintiff Declarations particularizing their allegations of injury.[5]

Plaintiffs have Article III standing.

---

[3]     Even under today's stricter "plausibility" pleading standards, an antitrust complaint must contain only a "'short and plain statement of the claim showing that the pleader is entitled to relief,' … [and] [t]he Federal Rules … do not require a claimant to set out in detail the facts upon which it bases its claim."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. M:07-cv-01819 CW, MDL No. 1819, 2008 U.S. Dist. LEXIS 15826, at *38-39 (N.D. Cal. Feb. 14, 2008) (quoting Fed. R. Civ. P. 8(a), 8(e)).

[4]     If a court is inclined to grant a motion to dismiss, it is "generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile."  *In re SRAM Antitrust Litig.*, 2008 U.S. Dist. LEXIS 15826, at *39 (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990)).

[5]     Plaintiffs are permitted to submit declarations buttressing their standing in response to a Rule 12(b)(1) motion.  *Nichols v. Brown*, 859 F. Supp. 2d 1118, 1128 n.4 (C.D. Cal. 2012); *Sun Microsys., Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1211 (N.D. Cal. 2009).

### 3. Plaintiffs Plead Cognizable Aftermarket Monopolization Claims

As Apple concedes, whether Plaintiffs' Apps claim is viable is controlled by the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992), and the Ninth Circuit's application of *Kodak* in *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008). Contrary to Apple's argument, however, those cases – particularly the Ninth Circuit's analysis in *Newcal* – compel the conclusion that Plaintiffs' Apps claim is adequately pled.

In *Newcal*, the Ninth Circuit sustained a complaint alleging that IKON, a copier manufacturer, schemed to foreclose competition in two aftermarkets – for "upgrade equipment" and for "lease-end services" – by inducing customers to sign lease and service contract amendments that secretly extended the duration of its customers' original agreements. 513 F.3d at 1043-44. The Ninth Circuit held each of the two alleged aftermarkets was a "relevant market" for antitrust purposes. *Id.* at 1046.

The Ninth Circuit analyzed the issue in *Newcal*, first, by distinguishing two cases on which Apple once relied, *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430 (3d Cir. 1997), and *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). The Ninth Circuit found that in both cases the plaintiffs had "contractually" bound themselves to buy aftermarket goods or services solely from the defendants and, therefore, could not plead viable "economically distinct antitrust" markets. 513 F.3d at 1046-47 (Dominos' franchisees "knowingly and voluntarily signed" "an explicit contractual provision" to use "only Domino's-approved ingredients and supplies"; Humana's insureds' policies had "explicit contractual provisions" limiting them to using certain hospitals).

The Ninth Circuit next analyzed *Kodak* and, distinguishing that case from *Queens City Pizza* and *Humana*, found that *Kodak* supported Newcal's aftermarket definition:

> The critical distinction between *Eastman Kodak* and the two circuit court opinions was that the Kodak customers did not knowingly enter a contract that gave Kodak the exclusive right to provide parts and services for the life of the equipment. In other words, the simple purchase of Kodak-brand equipment (unlike the signing of a Domino's franchise agreement or the purchase of a Humana insurance policy) did not constitute a binding contractual agreement to consume Kodak parts and services in the aftermarket.

513 F.3d at 1048. The court continued:

> Equally critically, the Supreme Court found that market imperfections, including information and switching costs, prevented consumers from discovering, as they were shopping for equipment, that the Kodak brand would include a de facto commitment to consume only supracompetitively priced Kodak-brand service contracts.

*Id.* (citations to *Kodak* omitted).

Thus, under *Newcal*, the relevant inquiry for ascertaining if a proper antitrust aftermarket has been alleged is (i) "whether a consumer's selection of a particular brand in the competitive market is the ***functional equivalent of a contractual commitment*** giving that brand an agreed-upon right to monopolize its consumers in an aftermarket," and (ii) "whether consumers ***entered into such 'contracts' knowing*** that they were agreeing to such a commitment." 513 F.3d at 1049 (emphasis added). Whether consumers "knowingly contracted" and committed to buy aftermarket services and products only from the branded manufacturer is, of course, an inherently factual inquiry, like other "market definition" related inquiries. *See id.* at 1045, 1051.

Under *Newcal*, the relevant inquiry on this Rule 12(b)(6) motion challenging Plaintiffs' aftermarket definitions is whether Plaintiffs have plausibly alleged that, when buying their iPhones, they did not contract knowingly to buy only "Apple-approved" iPhone applications for as long as they owned their iPhones, and did not knowingly contract to pay Apple a 30% fee for every app they buy at Apple's Apps Store. The facts alleged in the Amended Complaint more than plausibly demonstrate that Plaintiffs did not knowingly agree to do either of those things.

In *Newcal*, the Ninth Circuit resolved this inquiry in the plaintiff's favor for four reasons, each of which compels the same result here. *First*, Newcal pled the existence of both a competitive "primary" product (the initial copier lease and service agreement) and "an aftermarket [for replacement equipment and lease-end services] in which the consumers claim that they should be able to shop for a secondary product." 513 F.3d at 1049. Here, Plaintiffs allege a competitive "primary" product (the iPhone) and an aftermarket in which Plaintiffs want to shop for secondary products – third-party applications that can be downloaded for free or more cheaply than the "Apple-approved" applications.

As explained in *Newcal*, the secondary market should be "derivative from and dependent on" the primary market; that is, the secondary market would not exist without the primary market. *Id.* This addresses the Supreme Court's concern in *Kodak* that suppliers of a primary product might exploit their "unique position" with their customers "to gain monopoly power in the derivative services market" when such power "was neither naturally nor contractually created." *Id.* In *Newcal*, the market for copier parts and services was derivative from and dependent on the market for copiers, and that market would not exist without the market for initial leases and service contracts. *Id.* While IKON had a "contractually-created monopoly over services provided under *original* IKON contracts" that did not itself violate the antitrust laws, it gave IKON a unique "contractual *relationship*" with those original consumers that IKON, like Kodak, exploited "to gain [unlawful] monopoly power in a derivative aftermarket in which its power is not contractually mandated." *Id.* at 1050 (emphasis in original).

As Judge Ware previously found, Plaintiffs make a substantially identical claim here. The iPhone was a unique and innovative product through which Apple lawfully gained a contractual relationship with consumers who bought the product. Apple exploited that original contractual relationships and its position as the provider of the iPhone operating software to prevent consumers from buying iPhone apps in which Apple has no financial interest, thus giving Apple supracompetitive profits and a monopolistic control over the applications aftermarket that it neither naturally nor contractually earned. Accordingly, under *Newcal*, Plaintiffs allege that the applications aftermarket is a derivate market that would not exist without the primary market for iPhones.

*Second*, the Ninth Circuit found a viable *Kodak* claim in *Newcal* because Newcal's allegations of anticompetitive conduct related "only to the aftermarket" and not to the primary market. 513 F.3d at 1050. Again, as Judge Ware previously found, Plaintiffs make essentially the same allegation here.

*Third*, the plaintiffs in *Newcal* alleged that IKON's market power was derived from the "relationship with" and "special access" to its consumers. *Id.* "In other words, no provision of IKON's initial contract [gave] it the power . . . to extend the contract beyond 60 months . . . or to

prevent competition in lease-end services." *Id.* Here, nothing in Apple's terms of sale with iPhone purchasers gave Apple the exclusive right to dictate the use of only Apple-approved applications or to charge a 30% surcharge on every app. Instead, Apple derived that market power from its relationship with and special access to iPhone customers who were already invested in the product.

*Fourth*, in *Newcal*, "market imperfections" and the defendants' "fraud and deceit" in failing to disclose their intent to monopolize the aftermarkets, "prevent[ed] consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Id.* Just as in *Kodak* and *Newcal*, Plaintiffs' factual allegations here rebut any "presumption that [iPhone] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market" to buy an iPhone. *Id*

In the end, the Ninth Circuit summarized that Newcal's case against IKON:

> is not a case in which the alleged market power flows from contractual exclusivity. IKON is not simply enforcing a contractual provision that gives it the exclusive right to provide replacement equipment and lease-end services. Rather, it is leveraging a special relationship with its contracting partners to restrain trade in a wholly derivative aftermarket. We therefore reverse the district court's holding that *Queens City Pizza* and *Forsyth* render Newcal's complaint legally invalid.

513 F.3d at 1050. This Court should reach the same conclusion about Apple's conduct alleged here, just as Judge Ware did, and the Court should likewise sustain Plaintiffs' antitrust claims.

### 4. **Plaintiffs Plead a Relevant Antitrust Aftermarket and Monopoly Power**

As shown above, Apple cannot successfully challenge Plaintiffs' applications aftermarket definition on this motion to dismiss unless Plaintiffs "knowingly contracted" away their right to object to Apple's monopolization of apps that could be downloaded to iPhones. Plaintiffs were unaware of Apple's policy barring third-party applications at the time of purchase and never agreed to any such limitation on their aftermarket behavior in their original agreement with Apple. *See* Liskow Decl. at Exhs. A-E. To the extent Apple argues otherwise, or contends that its Apps Store policies became generally known at some point in time, thereby limiting the duration of its unlawful monopolization, those are factual issues that cannot be resolved on a motion to dismiss.

Apple's arguments that the aftermarket cannot be limited just to iPhone applications and that Apple cannot have market power in the claimed relevant market, Def. Mem. at 13-17, are misleading. While similar arguments might be relevant in a case challenging a ***primary*** product market (*e.g.*, if Plaintiffs had alleged that Apple monopolized the smartphone market), they have no relevance where an ***aftermarket*** is alleged to have been monopolized. That is because ***by definition*** in an aftermarket case, the "relevant market" is the ***aftermarket*** for the particular primary market product involved. Here, by definition, the relevant market is the aftermarket for iPhone applications. And since it is alleged – and indeed, undisputed – that Apple is the sole distributor of iPhone apps, Apple by definition has "monopoly power" in that relevant market.

Apple's argument that the Applications Aftermarket should not be defined to include all apps, including products that are not substitutes for each other, such as like ringtones, music and photo applications, and other software, Def. Mem. at 12-13, also completely misses the point. An aftermarket monopolization case is not analyzed the same way as a primary market monopolization case. Because Apple ***by definition*** has 100% monopoly control over ***every*** app that is available for sale to iPhone consumers, ***by definition*** there is no competition for the sale of ***any*** type of app, and the fact that the various apps Apple controls are not substitutes for one another is totally irrelevant. The Court does not need to do a market analysis of each type of app to determine if there are reasonable substitutes for that app controlled by other iPhone apps providers that should be included within the product market definition – because it is undisputed that ***there are no other iPhone apps providers*** with which Apple competes in the apps aftermarket ***for any type of app***. Apple's "substitutability" argument, like its market definition and market power arguments, is a total red herring in the context of this aftermarket monopolization case.[6]

---

[6] Even if Apple's inherently irrelevant substitutability argument were correct, it would not be a basis for dismissal. Rather, the proper remedy would be to refine the Applications Aftermarket into economically distinct submarkets for separately competing applications, *i.e.*, a ringtone applications submarket, a music maker submarket, etc. Creating such submarkets is a well-accepted practice in antitrust law. *See Newcal*, 513 F.3d at 1045 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

### 5. Plaintiffs Plead Anticompetitive Conduct

Finally, Apple's argument that Plaintiffs have failed to allege anticompetitive conduct, Def. Mem. at 17-20, is likewise one that might warrant attention were this not an aftermarket monopolization case, but it has no bearing here. Under *Newcal*, when a manufacturer of a primary product like Apple's iPhone locks iPhone consumers into an aftermarket, the manufacturer **by definition** has engaged in anticompetitive conduct unless the consumers "knowingly contracted" to be locked in. *See* 513 F.3d at 1049. Plaintiffs have adequately pleaded they did not knowingly contract to be locked in to Apple's Apps Store or to pay Apple's exorbitant 30% fee whenever they purchased apps for their iPhone. Nor more needs to be alleged.

In *Apple I*, Judge Ware sustained the identical Apps claims that Plaintiffs make here. *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d at 1304, 1306. These Plaintiffs' Apps related antitrust claims should be sustained as well.

## V.  CONCLUSION

Apple's motion to dismiss should be DENIED.

Dated:  December 7, 2012

<div style="margin-left:40%;">

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
RACHELE R. RICKERT
750 B. Street, Suite 2770
San Diego, California 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599
gregorek@whafh.com
rickert@whafh.com


WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
MARK C. RIFKIN (*pro hac vice*)
ALEXANDER H. SCHMIDT (*pro hac vice*)
MICHAEL M. LISKOW (243899)

     /s/  Alexander H. Schmidt
     ALEXANDER H. SCHMIDT
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4677
rifkin@whafh.com

</div>

schmidt@whafh.com
liskow@whafh.com

Plaintiffs' Interim Lead Counsel