UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE APPLE IPHONE ANTITRUST
LITIGATION

Case No.: 11-cv-06714-YGR

**ORDER GRANTING APPLE'S MOTION TO
DISMISS AMENDED CONSOLIDATED
COMPLAINT**

Pending before the Court is Defendant Apple's Motion to Dismiss Plaintiffs' Amended Consolidated Complaint.  (Dkt. No. 88.)[1]  Plaintiffs allege antitrust claims based on unlawful monopolization and attempted monopolization of an aftermarket for iPhone applications in violation of section 2 of the Sherman Act ("Section 2").  Plaintiffs allege a third claim for conspiracy to monopolize an iPhone voice and data services aftermarket in violation of Section 2 to preserve their ability to challenge the previous dismissal of that claim.

Having carefully considered the papers submitted and the pleadings in this action, the arguments of counsel, and for the reasons set forth below, the Court hereby **GRANTS** Apple's Motion to Dismiss **WITH LEAVE TO AMEND** and **GRANTS** Apple's Motion to Strike.

I.   **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**[2]

A.   *In re Apple & AT&TM Antitrust Litigation*, **Case No. 07-05152 ("*Apple I*")**

Prior to the instant action, the Honorable James Ware presided over another class action involving defendants Apple and AT&T Mobility, LLC.  (*In re Apple & AT&TM Antitrust Litigation*,

---

[1] Apple's Motion to Dismiss contains a request to strike certain allegations pursuant to Fed. R. Civ. P. 12(f).  The Court will refer to the request to strike as the "Motion to Strike."

[2] The following background section is not intended to provide an exhaustive factual or procedural summary of this action or any related actions summarized herein.

United States District Court
Northern District of California

United States District Court
Northern District of California

Case No. 07-05152 ("*Apple I*").)  In *Apple I*, plaintiffs alleged five claims for violation of federal antitrust statutes, in addition to violations of consumer protection laws.  (*See* Dkt. No. 109 [Revised Consolidated Amended Class Action Complaint ("*Apple I* Complaint")].)[3]  Plaintiffs alleged that Apple and AT&TM violated Section 2 of the Sherman Act in two ways: first, by "monopolizing, attempting to monopolize or conspiring to monopolize the aftermarket for voice and data services for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those aftermarket services."  (*Id.* ¶ 10.)  Second, Plaintiffs alleged Apple "monopoliz[ed] or attempt[ed] to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those applications."  (*Id.* ¶ 11.)

Apple moved to dismiss the Section 2 claims because Plaintiffs had "neither alleged legally cognizable markets under the Sherman Act, nor legally sufficient monopolization of those markets." (Order Denying Defendant AT&TM's Motion to Compel Arbitration and to Dismiss; Denying Defendant AT&TM's Motion to Stay Discovery; Granting in Part and Denying in Part Defendant Apple's Motion to Dismiss [*Apple I*, Dkt. No. 144] at 12.)  Judge Ware held that plaintiffs had sufficiently alleged relevant aftermarkets, market power, and monopolization for both the voice and data services and applications aftermarkets to state a claim.  (*Id.* at 15–19.)  In the same order, Judge Ware also denied AT&TM's motion to compel arbitration.  (*Id.* at 6–10.)

---

[3] The *Apple I* plaintiffs alleged that prior to the launch of the iPhone on or about June 29, 2007, Apple entered into a "secret" five-year contract with AT&TM, under which AT&TM would be the exclusive provider of cell phone voice and data services for iPhone customers through 2012.  (*Apple I* Complaint ¶ 2.)  Plaintiffs alleged they and class members purchased iPhones and agreed to enter into a two-year voice and/or data service plan with AT&TM, but did not agree to use those services for five years.  (*Id.*)  In effect, the undisclosed five-year exclusivity agreement locked iPhone users into using AT&TM for five years, contrary to users' contractual expectations.  (*Id.*)  In addition, plaintiffs alleged that Apple "created a number of software programs called 'applications,' such as ring tone, instant messaging, Internet access, and video and photography enabling software that can be downloaded and used by iPhone owners."  (*Id.* ¶ 4.)  Apple entered into agreements with software manufacturers by which Apple approved their software applications for iPhone use in exchange for a share of the manufacturer's revenues.  (*Id.*)  Apple allegedly discouraged iPhone customers from downloading competing third-party application software by refusing to honor warranties if customers downloaded competing applications.  (*Id.*)

Plaintiffs moved for class certification in January 2010.  (*See* Dkt. Nos. 240 & 289; Order Granting Defendant Apple's Motion for Summary Judgment; Granting in Part Plaintiffs' Motion for Class Certification; Denying Folkenflik & McGerity's Motion for Appointment as Co-Lead Counsel [Dkt. No. 466] at 2 n.2.)   The court certified a class of "[a]ll persons who purchased or acquired an iPhone in the United States and entered into a two-year agreement with Defendant AT&T Mobility, LLC for iPhone voice and data service any time from June 29, 2007, to the present."  (*Id.* at 25.)

Following the decision in *AT&T Mobility LLC v. Concepcion*, the Court permitted defendants to file motions to compel arbitration and to decertify the class.  (*See* Dkt. Nos. 502, 504, 511 & 514.)  On December 1, 2011, Judge Ware issued an Order Granting Motions to Compel Arbitration and Granting Motions to Decertify Class.  (Dkt. No. 553.)  On December 14, 2011, plaintiffs filed a Motion for Leave to Seek Reconsideration and/or in Addition to Amend the Order to Certify for Immediate Interlocutory Appeal.  (Dkt. No. 554.)  The Court certified "its December 1 Order for interlocutory appeal solely as to the issue of whether a non-signatory defendant may assert equitable estoppel against a signatory plaintiff."  (Dkt. No. 564 at 12.)  The Ninth Circuit denied plaintiffs' petition for permission to appeal on April 27, 2012.  (Dkt. No. 570.)

**B.      The Instant Action (*"Apple II"*)**

**1.      Procedural Background**

Plaintiffs Robert Pepper, Stephen Schwartz, Edward Hayter, and Harry Bass commenced the instant action on December 29, 2011 against Apple Inc. (Dkt. No. 1.)  Apple filed a motion to dismiss on March 2, 2012.  (Dkt. No. 14.)  Judge Ware consolidated this action with another case, thereby mooting the motion to dismiss and re-naming the action "*In re Apple iPhone Antitrust Litigation*" (hereafter, "*Apple II*").  (Dkt. No. 25.)

A Consolidated Class Action Complaint in *Apple II* was filed on March 21, 2012 ("Prior *Apple II* Complaint").  (Dkt. No. 26.)  There, Plaintiffs alleged that Apple entered into a secret five-year contract with *non-party AT&T Mobility, LLC* ("ATTM") that established ATTM as the exclusive provider of cell phone voice and data services for iPhones through 2012.  (*Id.* ¶ 2 (effect of undisclosed agreement was to lock iPhone users into ATTM services for five years).)  Apple allegedly programmed and installed software locks on iPhones to prevent purchasers from switching to other

United States District Court
Northern District of California

competing carriers.  (*Id.* ¶ 3.)  Apple also "enabled the creation of numerous software programs called 'applications'" and released a software development kit in March 2008 that enabled independent software developers to design applications for use on the iPhone.  (*Id.* ¶¶ 4–5.)  For an annual $99 fee, the kit allowed developers to submit applications to be distributed "through Apple's applications market, the 'iTunes App Store.'"  (*Id.* ¶ 5.)  Certain applications were made available for free in the App Store, but for any application purchased, Apple allegedly "collect[ed] 30% of the sale of each application, with the developer receiving the remaining 70%."  (*Id.*)  Plaintiffs allege Apple refused to approve developers who either did not agree to pay the annual fee or agree to the "apportionment scheme."  (*Id.*)  Apple also "unlawfully discouraged iPhone customers from downloading competing applications software . . . by telling customers that Apple would void and refuse to honor the iPhone warranty of any customer who downloaded Third Party Apps."  (*Id.*)  Consumers "were not provided a means by which they could download Third Party Apps that were not approved by Apple for sale on the App Store."  (*Id.* ¶ 6.)

In the Prior *Apple II* Complaint, Plaintiffs alleged three violations of Section 2 by Apple based on two aftermarkets: (1) unlawful monopolization of the applications aftermarket; (2) attempted monopolization of the applications aftermarket; and (3) conspiracy to monopolize the voice and data services aftermarket.  Apple moved to dismiss the then-operative complaint and to compel arbitration of claims.  (Dkt. Nos. 37 & 48.)  In the motion to dismiss, Apple sought dismissal under Fed. R. Civ. P. 12(b)(7) on the grounds that (i) the complaint failed to name ATTM as a defendant, and (ii) ATTM was a necessary and indispensable party pursuant to Fed. R. Civ. P. 19.

On July 11, 2012, Judge Ware issued an Order Denying Without Prejudice Defendant's Motion to Compel Arbitration; Granting in Part Defendant's Motion to Dismiss.  (Dkt. No. 75.)  The court held that ATTM was a necessary party and that in order to evaluate the alleged conspiracy to monopolize the iPhone voice and data services aftermarket, it must evaluate whether "ATTM unlawfully achieved market power in that Aftermarket due to the conspiracy and thereby foreclosed other companies from entering the market."  (*Id.* at 13 (citing Prior *Apple II* Complaint ¶ 98).)  "Such an evaluation of ATTM's conduct would necessarily implicate the interests of ATTM, which means that ATTM is a necessary party pursuant to Rule 19(a)."  (Dkt. No. 75 at 13.)  The court also held that

it was feasible for ATTM to be joined "as this is a proper venue, [it] is subject to the Court's personal jurisdiction, and joinder would not destroy the Court's subject matter jurisdiction." (*Id.* at 15.)  As such, the court ordered that ATTM be made a party to the action, but noted that Plaintiffs were *not required* to maintain their claims based on the voice and data services aftermarket.  (*Id.* at 16 n.29.)  Rather, *if* Plaintiffs sought to maintain the claim, the court explicitly ordered that ATTM be added as a party.  (*Id.*)

## 2.    Operative Complaint

Plaintiffs filed an Amended Consolidated Class Action Complaint on September 28, 2012 ("*Apple II* Amended Complaint").  (Dkt. No. 81.)  Plaintiffs "decline[d] to add ATTM as a party, [and] thereby recognize[d] that the conspiracy to monopolize claim . . . will remain dismissed." (*Id.* ¶ 8 (stating that the claim "has been retained in this amended complaint solely and exclusively to preserve the right of Plaintiffs . . . to challenge the claim's dismissal on appeal"); *see id.* at p. 20.)[4]

The remaining Section 2 claims in *Apple II* are based on the aftermarket "for software applications that can be downloaded on the iPhone for managing such functions as ringtones, instant messaging, photographic capability and Internet applications (the 'Applications Aftermarket')." (*Apple II* Amended Complaint ¶ 86.)  Plaintiffs allege the Applications Aftermarket "came into existence immediately upon the sale of the first iPhones because: (a) [it] is derivative of the iPhone market; and (b) no Plaintiff or member of the Class agreed to any restrictions on their access to the Applications Aftermarket.  (*Id.* ¶ 88; *id.* ¶ 9 (Apple "failed to obtain iPhone consumers' contractual consent to Apple prohibiting iPhone owners from downloading Third Party Apps").)  Plaintiffs assert their claims on behalf of a class of: "[a]ll persons, exclusive of Apple and its employees, who

---

[4] Zack Ward and Thomas Buchar initiated a third action against Apple, Case No. 12-05404 (hereafter, "*Apple III*") on October 19, 2012.  Plaintiffs alleged a violation of Section 2 of the Sherman Act for conspiracy to monopolize the iPhone voice and data services aftermarket.  In other words, the sole claim in *Apple III* was the conspiracy claim that Judge Ware previously dismissed in *Apple II*, upon which Plaintiffs elected not to proceed.  This Court related *Apple II* and *Apple III*.  By stipulation of the parties, this Court dismissed *Apple III* with prejudice for the reasons set forth in Judge Ware's Order in *Apple II* dated July 11, 2012, and entered judgment in favor of Apple.  (Dkt. Nos. 23 & 26.)  An appeal of the dismissal and judgment in *Apple III* is currently pending before the Ninth Circuit Court of Appeals.

purchased an iPhone anywhere in the United States at any time, and who then also purchased applications from Apple from December 29, 2007 through the present."  (*Id.* ¶ 74.)

Plaintiffs further allege:

4.      Under its Exclusivity Agreement with ATTM, Apple retained exclusive control over the design, features and operating software for the iPhone.  To enhance its iPhone-related revenues, Apple enabled the creation of numerous software programs called "applications," such as ringtones, instant messaging, Internet access, gaming, entertainment, video and photography enabling software that can be downloaded and used by iPhone owners.

5.      In March 2008, Apple released a "software development kit" ("SDK") for the stated purpose of enabling independent software developers to design applications for use on the iPhone.  For an annual fee of $99, the SDK allows developers to submit applications to be distributed through Apple's applications market, the "iTunes App Store."  If the application is not made available for free in the App Store, Apple collects 30% of the sale of each application, with the developer receiving the remaining 70%.  On information and belief, throughout the Class Period, Apple refused to "approve" any application by a developer who did not pay the annual fee or agree to Apple's apportionment scheme.  Apple also unlawfully discouraged iPhone customers from downloading competing applications software (hereafter "Third Party Apps") by telling customers that Apple would void and refuse to honor the iPhone warranty of any customer who downloaded Third Party Apps.

6.      iPhone consumers were not provided a means by which they could download Third Party Apps that were not approved by Apple for sale on the App Store.

7.      Through these actions, Apple has unlawfully stifled competition, reduced output and consumer choice, and *artificially increased prices* in the aftermarket[] for . . . iPhone software applications.

(*Apple II* Amended Complaint ¶¶ 4–7 (emphasis supplied).)

Plaintiffs allege that by monopolizing or attempting to monopolize the software applications aftermarket for iPhones, it has "harmed competition and injured consumers by reducing output and *increasing prices for those applications*."  (*Id.* ¶ 11 (emphasis supplied).)  Apple has, by design, programmed the iPhone such that iPhone purchasers are "prevented . . . from downloading any Third Party Apps offered by software manufacturers who did not share their revenues with Apple or pay a fee to Apple to sell through iTunes."  (*Id.* ¶ 50.)   Third Party Apps appeared immediately after the iPhone 2G was launched and "generated competition for Apple in the applications aftermarket."  (*Id.* ¶ 67.)  Further, Apple faced "competition for iPhone ringtones.  When a customer purchased a song

United States District Court

Northern District of California

for $1 from the Apple iTunes store, Apple charged the customer an additional 99 cents to convert any portion of that song into a ringtone." (*Id.* ¶ 68.)  On the other hand, competing programmers sought to offer a variety of ringtone programs offering free downloads.  (*Id.*)  Apple initially sought to eliminate Third Party Apps, but "programmers of Third Party Apps quickly circumvented Apple's locking codes."  (*Id.* ¶¶ 51 & 69 (Apple sought to update iTunes software to block third-party ringtone programs).)  "The availability of Third Party Apps for iPhones reduced Apple's share of the iPhone aftermarket for ringtones and other applications and greatly reduced or threatened to reduce Apple's expected supracompetitive revenues and profits in that aftermarket."  (*Id.* ¶ 70.)  Put another way, Plaintiffs allege that Apple's anticompetitive actions have "reduced output and competition and resulted in *increased prices for products sold in the iPhone Applications Aftermarket* and, thus, harms competition generally in that market."  (*Id.* ¶¶ 91 & 97 (emphasis supplied).)

## II.    PENDING MOTION TO DISMISS AND MOTION TO STRIKE

Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f) are raised in this Motion. Although there is no mandatory "sequencing of jurisdictional issues," jurisdictional questions ordinarily must precede merits determinations in dispositional order.  *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)).  The Court therefore proceeds first with its jurisdictional analysis of the pending Motion under Rule 12(b)(1), and will then proceed with Plaintiffs' failure to add ATTM as a party despite Judge Ware's July 11, 2012 order, the Motion to Strike under Rule 12(f), and finally the Rule 12(b)(6) portion of the Motion to Dismiss.

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1.    Standard Under Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter jurisdiction of the Court.  *See, e.g.*, *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 (9th Cir. 2003), *cert. denied*, 541 U.S. 1009 (2004).  When subject matter jurisdiction is challenged, the burden of proof is placed on the party asserting that jurisdiction exists.  *Scott v. Breeland,* 792 F.2d 925, 927 (9th Cir.1986) (holding that "the party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists").  Accordingly, the court will

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    presume lack of subject matter jurisdiction until the plaintiff proves otherwise in response to the

2    motion to dismiss.  *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376–78 (1994).

3          Motions under Rule 12(b)(1) may be either "facial" or "factual."  *Safe Air for Everyone v.*

4    *Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.

5    2000)).  In a facial attack, the movant argues that the allegations of a complaint are insufficient to

6    establish federal jurisdiction.  *Id.*  By contrast, a factual attack or "speaking motion" disputes the

7    allegations that would otherwise invoke federal jurisdiction.  *Id.*  In resolving a factual attack, district

8    courts may review evidence beyond the complaint without converting the motion to dismiss into a

9    motion for summary judgment.  *Id.* (citing *Savage*, 343 F.3d at 1039 n.2).  Courts consequently need

10   not presume the truthfulness of a plaintiff's allegations in such instances.  *Id.* (citing *White*, 227 F.3d

11   at 1242).  Indeed, "[o]nce the moving party has converted a motion to dismiss into a factual motion by

12   presenting affidavits or other evidence properly before the court, the party opposing the motion must

13   furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter

14   jurisdiction."  *Id.* (quoting *Savage*, 343 F.3d at 1039 n.2).  Further, the existence of disputed material

15   facts will not preclude a trial court from evaluating for itself the merits of jurisdictional claims, except

16   where the jurisdictional and substantive issues are so intertwined that the question of jurisdiction is

17   dependent on the resolution of factual issues going to the merits.  *Augustine v. United States*, 704 F.2d

18   1074, 1077 (9th Cir. 1983) (citing *Thornhill Publ'g Co. v. Gen. Tel. Corp.*, 594 F.2d 730, 733–35 (9th

19   Cir. 1979)).

20         Because Apple argues that Plaintiffs' allegations are insufficient to establish standing, the

21   Court treats the pending Motion as a facial attack on subject matter jurisdiction.

22                          **2.    Article III Standing**

23         Apple challenges Plaintiffs' Article III standing.  A plaintiff has Article III standing

24   when: (1) he or she suffers a "concrete and particularized" injury-in-fact; (2) there is a "causal

25   connection between the injury and the conduct complained of"; and (3) the injury will likely be

26   redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992);

27   *Wedges/Ledges of California, Inc. v. City of Phoenix, Arizona*, 24 F.3d 56, 61 (9th Cir. 1994).  In

28   class actions, the named plaintiffs must satisfy the requirements of standing.  *Lewis v. Casey*, 518 U.S.

United States District Court
Northern District of California

343, 357 (1996) ("even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (internal quotations and citations omitted).  The absence of any one element deprives a plaintiff of Article III standing and requires dismissal.  *See Whitmore v. Fed. Election Comm'n*, 68 F.3d 1212, 1215 (9th Cir. 1995).

Apple argues that Plaintiffs' claims must be dismissed because no named Plaintiff alleges he or she ever purchased an App or was overcharged; that any overcharge was the result of allegedly wrongful conduct; nor that named Plaintiffs suffered any injury therefrom.  (Mot. at 8.)  Apple further argues that Plaintiffs do not allege they were "unaware" of Apple's Apps policies or misled regarding the policies.  (*Id.*)

Plaintiffs disagree and specifically emphasize their "collective[]" allegations that they have been deprived lower cost alternatives, paid higher prices for "Apple 'approved' applications," and/or had their iPhones disabled or destroyed.  (Opp. at 14; *Apple II* Amended Complaint ¶¶ 92 & 98.)  Five of seven named Plaintiffs submit declarations in opposition to the Motion particularizing their allegations of injury.  (Opp. at 14.)  In sum, these declarations state that named Plaintiffs purchased iPhone applications from the App Store, "would have liked" the ability to download or purchase applications "not available on the App Store," and were not aware at the time of the iPhone purchase that they would be limited to App Store applications nor that "Apple would charge . . . a fee for purchasing applications equivalent to 30% of the purchase price."  (*See* Declaration of Michael Liskow in Support of Plaintiffs' Opposition to Defendant Apple's Motion to Dismiss Plaintiffs' Amended Complaint ["Liskow Decl." (Dkt. No. 100)] at Exs. A–E, attaching declarations.)  Each declaration concludes with a statement (or substantively similar statement) that "[i]f the 30% fee is proven to be an antitrust violation, or if my inability to obtain apps from sources other than the App Store is proven to be an antitrust violation, I believe that I have been injured by such violations because I was then overcharged for my apps and prevented from buying apps I wanted to download." (*Id.*; *see also id.*, Ex. D ("I was deprived of certain apps and could have been overcharged").)

The Court finds that Plaintiffs' allegations in the Amended Complaint are insufficient to establish Article III standing.  Notably, the Amended Complaint contains allegations that each named

United States District Court
Northern District of California

1    Plaintiff purchased an iPhone and "paid for ATTM *voice and data service* for [his/her] iPhone at

2    ATTM's stated rates during the Class [P]eriod." (*Apple II* Amended Complaint ¶¶ 13–19 (emphasis

3    supplied); *id.* ¶ 29 ("Each Plaintiff purchased one or more iPhones . . . [and] also purchased wireless

4    *voice and data services* from ATTM for their iPhones.") (emphasis supplied); *id.* ¶¶ 30–32 (alleging

5    Apple failed to disclose information prior to the purchase of voice and data services).)  The Amended

6    Complaint also alleges that four of the seven named Plaintiffs either "wanted to have the option of

7    switching" to another voice and data service provider and/or "would like the ability to unlock his SIM

8    card for international travel." (*Id.* ¶¶ 33–36.)  None of these allegations speak to named Plaintiffs'

9    standing with respect to the *applications aftermarket* claims.

10          Plaintiffs do not satisfy Article III standing with collective allegations that they have been

11   deprived of lower cost alternatives, paid higher prices for Apple-approved applications, *and/or* had

12   their iPhones disabled or destroyed. (*Id.* ¶¶ 92 & 98.)[5]  At a minimum, Plaintiffs must allege facts

13   showing that each named Plaintiff has *personally suffered* an injury-in-fact based on Apple's alleged

14   conduct.  This requires that Plaintiffs at least purchased applications.

15          While the Plaintiffs' declarations purport to provide information that may satisfy certain

16   deficiencies, the Court considers those declarations only with respect to whether leave to amend

17   should be granted.[6]  In this case, the Court finds that leave to amend is appropriate because additional

18   _____

19   [5] Moreover, based on Plaintiffs' allegations, named Plaintiffs do not allege facts showing they satisfy
     the requirements of the class they purport to represent—*i.e.*, "persons . . . who purchased an iPhone

20   . . . and who then also purchased applications from Apple from December 29, 2007 through the
     present." (*Apple II* Amended Complaint ¶ 74.)

21
     [6] As noted above, Apple does not dispute the allegations that would otherwise invoke federal

22   jurisdiction and thus raises a facial challenge to Plaintiffs' claims.  *See Safe Air for Everyone*, 373
     F.3d at 1039.  Plaintiffs cite two district court cases for the proposition that they are "permitted to

23   submit declarations buttressing their standing in response to a Rule 12(b)(1) motion." (Opp. at 14
     n.5.)  Neither case states a categorical rule that declarations may be considered in a *facial attack* under

24   Fed. R. Civ. P. 12(b)(1).  In *Nichols v. Brown*, 859 F. Supp. 2d 1118, 1126 (C.D. Cal. 2012), the court
     considered a Rule 12(b)(1) facial attack on the complaint for lack of subject matter jurisdiction.  The

25   court held that plaintiff lacked Article III standing because the complaint did not allege an injury-in-
     fact, but rather alleged only a desire to engage in a prohibited activity.  *Id.* at 1128.  The court

26   referenced plaintiff's declaration to emphasize that—like the complaint—the declaration similarly
     failed to allege an injury-in-fact.  *Id.* at 1128 n.4.  In *Sun Microsystems Inc. v. Hynix Semiconductor*

27   *Inc.*, 608 F. Supp. 2d 1166, 1184 (N.D. Cal. 2009), the court considered a factual attack on the
     complaint for lack of subject matter jurisdiction.  Notably, a prior order of the court permitted a

28

facts could be alleged to satisfy Plaintiffs' Article III standing requirements.  *See Lujan*, 504 U.S. at 560–61 (Article III standing satisfied where plaintiff suffers a "concrete and particularized" injury-in-fact, there is a "causal connection between the injury and the conduct complained of" and the injury will likely be redressed by a favorable decision).  However, the Court notes that Plaintiffs' allegations showing injury-in-fact should not be conclusory in nature.  (*See* Liskow Decl., Exs. A–E ¶ 8 ("[i]f the 30% fee is proven to be an antitrust violation, . . . I believe that I have been injured by such violations because I was then overcharged for my apps and prevented from buying apps I wanted to download" or "I was deprived of certain apps and could have been overcharged").)

For the foregoing reasons, the Court **GRANTS** Defendant's Motion based on a lack of Article III standing **WITH LEAVE TO AMEND**.  The Court requests that if Plaintiffs amend their complaint, the document be captioned to reflect that it is a "second amended" complaint.

**B.      Plaintiffs' Failure to Add ATTM as a Party on the Voice and Data Claim**

Apple seeks dismissal of the voice and data aftermarket claim for failure to add ATTM as a party, as required by Judge Ware's July 11, 2012 Order.  (Mot. at 5.)  Plaintiffs concede in the *Apple II* Amended Complaint that the third claim "remain[s] dismissed" and was retained in the complaint "solely and exclusively to preserve" the right of appeal.  (*Apple II* Amended Complaint ¶ 8 & p. 20.)  In light of these allegations and the fact that the dismissal of this claim is now on appeal in *Apple III* following a stipulated judgment by the parties, the third claim in this action for Conspiracy to Monopolize the iPhone Voice and Data Services Aftermarket is hereby **DISMISSED WITH PREJUDICE**.

**C.      Motion to Strike**

**1.      Standard Under Federal Rule of Civil Procedure 12(f)**

Fed. R. Civ. P. 12(f) provides that the court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]"

renewed motion to dismiss "after an appropriate amount of discovery" had been taken to "fully develop" arguments.  *Id.* at 1175.  Because the "speaking motion" was based on facts in the record, the court considered the factual evidence presented and overruled defendants' objections to exhibits contained in plaintiff's cross declaration.  *Id.* at 1211.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Whittlestone Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)).  Motions to strike are generally disfavored (*Colaprico v. Sun Microsystem, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)) and are not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation (*LeDuc v. Kentucky Cent. Life Ins. Co.,* 814 F. Supp. 820, 830 (N.D. Cal. 1992)). Consequently, when a court considers a motion to strike, it "must view the pleading in a light most favorable to the pleading party."  *In re 2TheMart.com, Inc. Sec Lit.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2010).  In deciding whether to grant a motion to strike under Rule 12(f), the court must start with the rule's plain language and determine whether the matter at issue is: (1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous.  *Id.* at 973–74.

### 2.   Summary of Arguments

Apple moves to strike "all allegations concerning, and requests for injunction based on, the voice and data claim," which Plaintiffs effectively dismissed by not adding ATTM as a party per Judge Ware's July 11, 2012 Order.  Apple contends these allegations are immaterial, impertinent, and improper.  (Mot. at 6.)

Plaintiffs argue that Apple has not shown the allegations regarding the voice and data services and that aftermarket are scandalous, impertinent, or immaterial, nor is there any prejudice in the re-pleading of that claim such that Plaintiffs preserve the claim for appeal.  (Opp. at 2.)

### 3.   Analysis

The Court agrees with Apple that Plaintiffs' allegations regarding a dismissed claim are, at a minimum, immaterial and impertinent.  Plaintiffs elected not to proceed with their voice and data services aftermarket claim, yet a significant portion of their allegations are still directed to ATTM's voice and data services.  (*See, e.g.*, *Apple II* Amended Complaint ¶¶ 2 (undisclosed five-year agreement between Apple and ATTM "locked iPhone users" into five years of service), 3 (Apple installed software locks and prevented purchasers from switching carriers), 9 (consumers did not consent to: using ATTM as data and service provider for five years; having phones locked such that SIM cards of other providers would not work; not having access to unlock codes), 13–19 (named Plaintiffs each purchased iPhone and paid ATTM for voice and data services), 25–49 & 52–55

1   (focusing on locking of phones with respect to voice and data services) & 56–66 (focusing on five-

2   year exclusivity agreement with ATTM).)  In addition, Plaintiffs continue to allege a conspiracy with

3   third-party ATTM.  (*See, e.g.*, *Apple II* Amended Complaint ¶¶ 55, 63 & 66.)

4   For these reasons, the Court **GRANTS** Apple's Motion to Strike and **ORDERS** that Plaintiffs not

5   include allegations relating to voice and data services or a conspiracy with ATTM if a second

6   amended complaint is filed.

7       **D.**    **Motion to Dismiss for Failure to State a Claim**

8           **1.**    **Standard Under Federal Rule of Civil Procedure 12(b)(6)**

9   Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed against a defendant

10  for failure to state a claim upon which relief may be granted against that defendant.  Dismissal may be

11  based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

12  cognizable legal theory.  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990);

13  *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984).  For purposes of

14  evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be

15  true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los*

16  *Angeles,* 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved in favor of the

17  pleading.  *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir. 1973).

18  However, mere conclusions couched in factual allegations are not sufficient to state a cause of

19  action.  *Papasan v. Allain,* 478 U.S. 265, 286 (1986); *see also McGlinchy v. Shell Chem. Co.,* 845

20  F.2d 802, 810 (9th Cir. 1988).  The complaint must plead "enough facts to state a claim [for] relief

21  that is plausible on its face."  *Bell Atlantic. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  A claim is

22  plausible on its face "when the plaintiff pleads factual content that allows the court to draw the

23  reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556

24  U.S. 662, 678 (2009).  Thus, "for a complaint to survive a motion to dismiss, the non-conclusory

25  'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim

26  entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009).  Courts

27  may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment.

28  *Lopez v. Smith,* 203 F.3d 1122, 1129 (9th Cir. 2000).

United States District Court
Northern District of California

## 2.      Request for Judicial Notice

In ruling on a Rule 12(b)(6) motion, generally, a court "may not consider any material beyond the pleadings." *United States v. Corinthian Colleges*, 655 F.3d 984, 998–999 (9th Cir. 2011) (citing *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001)).  A court may, however, "consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Corinthian Colleges*, 655 F.3d at 999 (citing *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006) and *Lee*, 250 F.3d at 688).  In addition, Fed. R. Evid. 201 allows a court to take judicial notice of "matters of public record," but not facts that may be subject to a reasonable dispute.  *Lee*, 250 F.3d at 689–90; Fed. R. Evid. 201(b)(2) (judicial notice may be taken of facts not subject to a reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  Taking judicial notice of "matters of public record" under Fed. R. Evid. 201 and consideration of documents "necessarily relie[d] upon in the complaint are two separate exceptions to the general rule that a court may not consider material beyond the pleadings on a Rule 12(b)(6) motion.  *Lee*, 250 F.3d at 689–90.

As part of its Motion, Apple seeks judicial notice of two press releases referenced in, but not attached to, the operative complaint.  (Defendant Apple's Request for Judicial Notice in Support of Its Motion to Dismiss Plaintiffs' Amended Consolidated Complaint ("RJN" [Dkt. No. 89]), Exs. 1 & 2; *see Apple II* Amended Complaint ¶¶ 5 & 76.)  These press releases—entitled "Apple Announces iPhone 2.0 Software Beta" (dated March 6, 2008) and "Apple's App Store Downloads Top 25 Billion" (dated March 5, 2012)—are available online.  Apple contends judicial notice is proper because the documents are necessarily relied on in the complaint and Plaintiffs purport to summarize the contents of the press releases therein.  (RJN at 1–3.)

Plaintiffs did not file an opposition or objection to the request for judicial notice, nor did they object at the hearing to the RJN itself or defense counsel's statements based on the contents of the exhibits at issue.

While Plaintiffs have not disputed the authenticity of the exhibits, the Court finds it is not appropriate to take judicial notice in this instance.  The fact of the issuance of press releases may be

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    undisputed, but the contents therein may nonetheless be subject to a reasonable dispute.  For these

2    reasons, the Court **DENIES** Apple's Request for Judicial Notice.

3                    **3.    Antitrust Standing**

4                         **a.    *Illinois Brick* Doctrine**

5                              In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held

6    that "only direct purchasers have standing under section 4 of the Clayton Act[7] to seek damages for

7    antitrust violations."  *Delaware Valley*, 523 F.3d at 1120–21 (citing *Illinois Brick*, 431 U.S. at 735).

8    Under *Illinois Brick*, "only the first party in the chain of distribution to purchase a price-fixed product

9    has standing to sue."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 864 (N.D.

10   Cal. 2012) ("*In re CRT*"); *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) ("[A]

11   direct purchaser has 'been injured in its business as required by [§ ] 4' even though it passes on

12   'claimed illegal overcharge[s] to' its customers.") (first alteration supplied) (quoting *Illinois Brick*,

13   431 U.S. at 724).  Indirect purchasers are precluded from suing "based on unlawful overcharges

14   passed on to them by intermediaries in the distribution chain who purchased directly from the alleged

15   antitrust violator."  *In re CRT*, 911 F. Supp. 2d at 864 (citations omitted).  While *Illinois Brick*

16   prevented offensive use of a "pass-through" theory by indirect purchasers, it also prohibited

17   defendants from using a pass-on theory to challenge the standing of direct purchasers.  *In re CRT*, 911

18   F. Supp. 2d at 864; *In re ATM Fee*, 686 F.3d at 748.

19         Standing does not depend solely on a purchaser's status as direct or indirect.  Instead, standing

20   of indirect purchasers depends upon whether any of the recognized exceptions to the *Illinois Brick*

21   rule apply.  *In re CRT*, 911 F. Supp. 2d at 865.  In *In re ATM Fee*, the Ninth Circuit explained there

22   are three exceptions to the rule that indirect purchasers do not have standing: (1) "when a preexisting

23   cost-plus contract with the direct purchaser exists"; (2) where an indirect purchaser "establishes a

---

24

25   [7] Section 4 of the Clayton Act, 15 U.S.C. section 15(a) ("Section 4"), provides that "any person who

26   shall be injured in his business or property by reason of anything forbidden in the antitrust laws may
     sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a

27   reasonable attorney's fee."  "The Supreme Court has interpreted th[is] section narrowly, thereby
     constraining the class of parties that have statutory standing to recover damages through antitrust

28   suits."  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120 (9th Cir.
     2008).

1  price-fixing conspiracy between the manufacturer and the middleman" and the conspiracy "fix[es] the

2  price paid by the plaintiffs"—known as the "co-conspirator exception"; and (3) "when customers of

3  the direct purchaser own or control the direct purchaser" or "when a conspiring seller owns or controls

4  the direct purchaser." *In re ATM Fee*, 686 F.3d at 749 (citations omitted).[8]

### b.  Summary of Arguments Regarding Antitrust Standing

6          Apple argues that Plaintiffs' Amended Complaint impermissibly seeks

7  damages for injuries sustained by Plaintiffs as indirect purchasers, in violation of *Illinois Brick*.

8  Plaintiffs are "indirect victims of Apple's policies" because *the developers* are alleged to pay Apple a

9  $99 annual developer fee and 30% of each paid application.  (Mot. at 9.)  Plaintiffs do not allege that

10  their injury includes payment of the $99 annual fee.  Rather, their injury consists of "(a) be[ing]

11  deprived of lower cost alternatives for applications; (b) be[ing] forced to pay higher prices for Apple

12  'approved' applications; and/or (c) ha[ving] their iPhones disabled or destroyed."  (*Apple II* Amended

13  Complaint ¶¶ 92 & 98.)

14          Apple relies heavily on *In re ATM Fee*, where ATM cardholders challenged certain fees

15  associated with use of ATMs not owned by their card-issuing bank, or a "foreign" ATM.  (Mot. at 9–

16  10.)  *In re ATM Fee*, 686 F.3d at 744–45.  While cardholders paid certain fees for using a foreign

17  ATM, at least one other fee was paid by the card-issuing bank to the ATM owner (an "interchange

18  fee").  *Id.* at 745.  Plaintiffs alleged that defendants engaged in horizontal price fixing by colluding to

19  fix this "interchange fee," which was then passed on to plaintiffs as part of the foreign ATM fee paid

20  by cardholders to the card-issuing bank.  *Id.* at 746.  The district court held that the allegedly unlawful

21  (interchange) fee was not directly paid by cardholder-plaintiffs, and thus they were indirect

22  purchasers.  *Id.* at 750.  The Ninth Circuit affirmed that plaintiff-cardholders were indirect purchasers

23  and thus lacked standing under *Illinois Brick*.  *Id.* at 750.

24          Notably, the Ninth Circuit also agreed with the district court that the co-conspirator exception

25  to *Illinois Brick* did not provide a basis for standing.  That exception allows an indirect purchaser to

---

27  [8] The Ninth Circuit also recognized a potential fourth exception that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue."  *In re ATM Fee*, 686

28  F.3d at 749 (noting, however, a lack of clarity regarding whether the exception exists).

United States District Court<br>Northern District of California

United States District Court
Northern District of California

sue when the direct purchaser conspires horizontally or vertically to fix the price paid by plaintiffs.

*Id.* In contrast, the ATM cardholders alleged that defendants fixed the interchange fee that was paid

between members of the ATM network and *then* passed along the artificially inflated fee to plaintiffs.

*Id.* at 750–51.[9]  In the Ninth Circuit, however, "the price paid by a plaintiff must be *set by the*

*conspiracy* and not merely affected by the setting of another price."  *Id.* at 754 (emphasis supplied).

Because it was not the case that defendants conspired to fix the actual price plaintiffs paid, the

exception did not apply.[10]

      Apple argues that here there are no allegations that an actual price was fixed.  All the allegedly

wrongful conduct is ancillary as it restricts developers only: the developer sets the price of the Apps in

accordance with Apple's policies, the developer agrees to pay Apple 30% of the price of any

downloaded Apps, and the developer pays the $99 developer fee.  (Mot. at 10.)  Thus, as was the case

in *Campos*, the alleged unlawful increase in price is caused by the antecedent transaction between

Apple and the developers.  (*Id.* at 11.)  The consumer's involvement is therefore derivative of the

antecedent transaction and, consequently, they are indirect purchasers without antitrust standing.

---

[9] The Ninth Circuit rejected plaintiffs' argument that "conspiring to set a price for the purpose and
effect of raising the price at issue equates to fixing that price and makes the payers of the raised price
direct purchasers."  *In re ATM Fee*, 686 F.3d at 753; *id.* at 755 (declining to extend co-conspirator
exception beyond when the conspiracy involves setting the price paid by the plaintiffs).

[10] Apple also relies on *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) for the
proposition that indirect victims of exclusionary conduct are indirect purchasers who "bear[] some
portion of a monopoly overcharge only by virtue of an antecedent transaction between the monopolist
and another, independent purchaser."  In *Campos*, plaintiffs were music fans who sued Ticketmaster
for, among other things, engaging in price fixing with concert venues and promoters and
monopolizing (and attempting to monopolize) the market for ticket distribution servicers.  *Id.* at 1168.
The district court dismissed the action, holding that plaintiffs lacked standing under *Illinois Brick*,
which the Eighth Circuit affirmed.  *Id.* at 1171–72.  There, plaintiffs argued they were direct
purchasers of "ticket distribution services" because they paid directly to Ticketmaster service *and*
convenience fees.  *Id.* at 1171 (Eighth Circuit noted that "like the Third Circuit, [it] d[id] not find
billing practices to be determinative of indirect purchaser status.").  The appellate court noted that
Ticketmaster had exclusive contracts with concert promoters that required venues to use Ticketmaster
for ticket distribution to those events; thus, plaintiffs' alleged inability to obtain ticket delivery
services in a competitive market was the consequence of the "antecedent inability of venues to do so."
*Id.* ("[T]icket buyers only buy Ticketmaster's services because concert venues have been required to
buy those services first.").  This "derivative dealing" was the "essence of indirect purchaser status"
which, accordingly, constituted a bar to the antitrust claims for damages.  *Id.*

1    Plaintiffs disagree.  Plaintiffs contend under *In re ATM Fee*, direct purchaser status is

2    determined by "whether the plaintiff paid the alleged unlawful fee directly to the alleged wrongdoer."

3    (Opp. at 12 (emphasis omitted).)  Here, Plaintiffs allege they were "forced to buy third party

4    developers' applications *directly from Apple's App Store*, and that iPhone consumers were forced *to*

5    *pay Apple* a 30% fee on top of the cost for the apps."  (Opp. at 11 (citing *Apple II* Amended

6    Complaint ¶¶ 4–5) (emphasis added in Opposition)).)  As such, "they are direct purchasers and have

7    standing to sue under Ninth Circuit jurisprudence."  (*Id.* at 12 (citing *In re ATM Fee*, 686 F.3d at

8    754).)[11]

9        Plaintiffs emphasize that Apple ignores an entire category of apps alleged in the *Apple II*

10   Amended Complaint.  Specifically, Plaintiffs are direct purchasers because they brought both

11   (i) Apple-made Apps directly from Apple, and (ii) third-party developer Apps directly from Apple's

12   App Store.  (Opp. at 11; *see Apple II* Amended Complaint ¶¶ 67–70.)[12]  An example of such Apple-

13   made apps were "songs converted into ringtones, for which 'Apple charged the customer an additional

14   99 cents."  (Opp. at 11; *Apple II* Amended Complaint ¶ 68 ("Apple also faced competition for iPhone

15   ringtones.  When a customer purchased a song for $1 from the Apple iTunes store, Apple charged the

16   customer an additional 99 cents to convert any portion of that song into a ringtone.")  "In both cases

17   [of Apple-made apps and third party apps], consumers paid the supracompetitive price *directly to the*

18   *monopolist* – Apple – which kept the entirety of the overcharges for itself."  (Opp. at 11–12.)[13]  In

19   addition, Plaintiffs note that Apple attempts to convolute the allegations to make it appear as though

20   the app developers are the direct purchasers.  (Opp. at 12.)  This is not the case: Apple cannot be a

---

21   [11] Plaintiffs acknowledge in their Opposition that they do not challenge the $99 annual fee paid by
22   developers to Apple.  (Opp. at 12–13 (conceding Plaintiffs did not pay that fee themselves).)
     "Plaintiffs challenge *only the 30% fee* that they paid directly to Apple."  (Opp. at 13 (emphasis
23   supplied).)

24   [12] The Court notes that throughout the Opposition, Plaintiffs appear to cite to paragraph numbers from
25   a prior complaint, and not the operative Amended Complaint.

26   [13] Plaintiffs argue that the Eighth Circuit's holding in *Campos v. Ticketmaster*—that plaintiffs were
     indirect purchasers even though they dealt directly with the alleged monopolist—is inconsistent with
27   Ninth Circuit precedent.  (Opp. at 13.)  In fact, Judge Ware in *Apple I* noted in his order granting in
     part plaintiffs' motion for class certification that "the Court is not aware of any Ninth Circuit case that
28   applied *Illinois Brick* in this manner."  (*Apple I*, Dkt. No. 466 at 19 n.27.)

direct purchaser because it does not buy the apps, but iPhone consumers buy the apps directly from Apple because they are not otherwise available to purchase on an iPhone.

In its Reply, Apple contends Plaintiffs' argument that iPhone consumers were forced to pay Apple a 30% fee *on top of* the cost of the app is not reflected in the operative complaint, which only states that for each paid app made available in the app store, "Apple collects 30% of the sale of each application, with the developer receiving the remaining 70%." (*Apple II* Amended Complaint ¶ 5; Reply at 8.)  In other words, Apple does not charge consumers a 30% fee on top of the cost of the app, but Apple charges the developers a 30% fee for the apps they choose to offer for a cost in the App Store. (Reply at 8.)   Apple argues this is identical to *In re ATM Fee* because this 30/70% "apportionment scheme" leads developers to pass on the 30% fee to consumers by charging higher prices for their Apps, similar to how the "interchange fee" in *In re ATM Fee* was allegedly passed on to cardholders as a "foreign ATM fee" that they directly paid.  (*Id.* at 9.)

### c.   Analysis

An analysis under *Illinois Brick* centers on whether the alleged unlawful fee was paid directly or through a pass-through.  The burden is on Plaintiffs to allege the theory and facts upon which they are proceeding.  The allegations in the Amended Complaint contradict the arguments made in opposition to Apple's Motion.  The *Apple II* Amended Complaint does not allege a "supracompetitive" or "fixed" price, but rather a mark-up.  Plaintiffs allege throughout the Amended Complaint that Apple's conduct has "unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarkets for . . . iPhone software applications." (*Apple II* Amended Complaint ¶ 7; *id.* ¶¶ 11 ("increased price for those applications"), 91 & 97.) Nowhere do Plaintiffs explain how Apple's conduct results in increased "prices" or how said prices were paid.  In their Opposition, Plaintiffs confirm that they challenge "only the 30% fee" (Opp. at 13) but also, for the first time, argue that "iPhone consumers were forced *to pay Apple* a 30% fee on top of the cost for the apps" (Opp. at 11 (emphasis in original)).[14]  Because the Court's analysis focuses

---

[14] On this point, Plaintiffs cite to the complaint at paragraphs 4–5. The Court notes, however, that the only reference to a 30% fee in this paragraph range does not provide that the fee is paid "on top of" the cost of the application.  Rather, it states: "Apple collects 30% of the sale of each application, with the developer receiving the remaining 70%."  (*Apple II* Amended Complaint ¶ 5.)

United States District Court
Northern District of California

1   on the actual allegations of the Amended Complaint, and those allegations do not sufficiently identify

2   the basis upon which Plaintiffs are proceeding, the Court declines to issue an advisory opinion

3   analyzing *Illinois Brick* as relevant here.

4       Accordingly, the Court **GRANTS** leave to amend the complaint to address antitrust standing

5   and *Illinois Brick*.

### 4. Other Arguments Regarding Failure to State a Claim

7       In light of the Court's dismissal based on a lack of Article III standing, the Court

8   declines to address additional arguments raised by Apple.  To the extent that Plaintiffs file a second

9   amended complaint, Apple *may not raise* for the first time on a future motion to dismiss any argument

10  that was *previously available but not raised* in this Motion.

## III.   EFFECT OF PRIOR ORDERS

### A.   Effect of Federal Rule of Civil Procedure 12(g) on Pending Motion to Dismiss

13      Plaintiffs argue that Apple's Motion is improper under Fed. R. Civ. P. 12(g)(2), which

14  provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule

15  must not make another motion under this rule raising a defense or objection that was available to the

16  party but omitted from its earlier motion."  Rule 12(h)(2) states that failure to state a claim upon

17  which relief can be granted, to join a person under Rule 19(b), or to state a legal defense to a claim

18  may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule

19  12(c); or (C) at trial.  Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks

20  subject-matter jurisdiction, the court must dismiss the action."[15]

21      Plaintiffs contend that Apple is barred from asserting lack of standing and failure to state a

22  claim because it failed to raise these arguments on either of the two prior motions to dismiss.  (Opp. at

---

[15] The Advisory Committee Notes to Fed. R. Civ. P. 12 explain the policy behind the prohibition against successive motions: "This required consolidation of defenses and objections in a Rule 12 motion is salutary in that it works against piecemeal consideration of a case."  In addition, "[a] party who by motion invites the court to pass upon a threshold defense should bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job.  The waiver reinforces the policy of subdivision (g) forbidding successive motions."

7–9 (arguing that claims based on applications aftermarket are the "exact same" as the Prior *Apple II* Complaint and Apple was "fully capable" of raising its arguments earlier).)[16]

Apple responds that it is not barred by Rule 12(g) because the defense of failure to state a claim and challenges to subject matter jurisdiction are never waived, and may be asserted at any time before trial.  (Reply at 3–4.)

Apple is correct that its defenses of failure to state a claim and lack of subject matter jurisdiction were not waived if not included in its first Rule 12 motion.  Such defenses may be raised by a Rule 12(c) motion or at trial.  However, Apple is incorrect to the extent that it implies it may repeatedly make Rule 12(b) motions to assert such defenses.  (*See* Reply at 4.)  While specific defenses may not have been waived, Apple does not enjoy an unbridled ability to file successive motions to dismiss.  Successive motions under Rule 12(b) are generally not permissible and create significant inefficiencies within the court system.

District courts in the Ninth Circuit have noted, however, that Rule 12(g) applies to situations where successive motions are filed for "sole purpose of delay."  *Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2010 WL 5141843, at *3 (N.D. Cal. Dec. 13, 2010) (citing *Abarca v. Franklin County Water Dist.,* No. 1:07–CV–0388, 2009 WL 1393508, at *2 (E.D. Cal. May 18, 2009)); *see Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011) ("Rule 12(g) is designed to avoid repetitive motion practice, delay, and ambush tactics."); *see Davidson v. Countrywide Home Loans, Inc.*, No. 09-CV-2694-IEG JMA, 2011 WL 1157569, at *4 (S.D. Cal. Mar. 29, 2011) (successive motions not brought for purpose of wasting time under Rule 12 where defendants responded to multiple amended complaints).  Even if a party files successive motions, a court has discretion to consider the arguments to expedite final disposition on particular issues.  *Davidson*, 2011 WL 1157569, at *4; *Allstate Ins.*, 824 F. Supp. 2d at 1175 (noting substantial

---

[16] Apple's first motion to dismiss in *Apple II* sought dismissal for failure to join an indispensable party.  Judge Ware denied the motion as moot when he ordered that Plaintiffs file a consolidated complaint.  Apple's second motion to dismiss re-raised the failure to join an indispensable party under Rule 12(b)(7), and sought dismissal of the voice and data services aftermarket claim under Rule 12(b)(6) for failure to state a claim for conspiracy or to allege a cognizable aftermarket.  Judge Ware granted the motion for failure to join ATTM as a necessary party under Rule 12(b)(7) and denied the Rule 12(b)(6) motion as premature without prejudice to renew on a different ground after joining ATTM.

United States District Court
Northern District of California

1   authority provides that "successive Rule 12(b)(6) motions may be considered where they have not

2   been filed for the purpose of delay, where entertaining the motion would expedite the case, and where

3   the motion would narrow the issues involved").

4        The Court rejects Plaintiffs' argument that Rule 12(g) bars the consideration of subject matter

5   jurisdiction in the pending Motion.  Because the Court is obligated to dismiss an action in the absence

6   of subject matter jurisdiction—whether by its own motion or by motion of a party—consideration of

7   this issue promotes efficiency and expedites disposition of the action on the merits.  In addition, the

8   Court notes that because Apple would be permitted to file a Rule 12(c) motion on the grounds raised

9   in this Motion, efficiency is served by addressing the issues sooner.  *See Aldabe v. Aldabe,* 616 F.2d

10   1089, 1093 (9th Cir. 1980) (motion for judgment on pleadings to raise defense of failure to state claim

11   may be made even after filing answer).

12        **B.     Collateral Estoppel**

13        Plaintiffs argue Apple is barred by the doctrine of non-mutual offensive collateral estoppel

14   from raising "the very same arguments it fully and fairly litigated but lost in a prior action."  (Opp. at

15   9.)  Collateral estoppel "bars the relitigation of issues actually adjudicated in previous litigation

16   between the same parties."  *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320 (9th Cir.1992).  A

17   party asserting collateral estoppel must show: (i) "that the estopped issue is identical to an issue

18   litigated in a previous action"; and (ii) that "the issue to be foreclosed in the second litigation must

19   have been litigated and decided in the first case."  *Kamilche Co. v. United States*, 53 F.3d 1059, 1062

20   (9th Cir. 1995), *opinion amended on reh'g sub nom. Kamilche v. United States*, 75 F.3d 1391 (9th Cir.

21   1996) (citations omitted).

22        Plaintiffs argue that because Apple fully raised and lost "each of the central arguments" on this

23   Motion before Judge Ware, it is precluded "from raising any form or variation of them again[,] not

24   just the precise arguments Apple made."  (Opp. at 9–10.)[17]  Moreover, Plaintiffs contend that Judge

25   Ware's Order disposing of Apple's arguments was sufficiently "final" for collateral estoppel purposes

26   because it was firm enough to be accorded preclusive effect.  (*Id.* at 10–11 (denials of pre-trial

27   ────────────────────

28   [17] Specifically, Judge Ware held in *Apple I* that plaintiffs had sufficiently alleged relevant
     aftermarkets, market power, and monopolization for both the voice and data services and applications
     aftermarkets to state a claim.  (Dkt. No. 144 at 15–19.)

United States District Court
Northern District of California

United States District Court
Northern District of California

motions are "often sufficiently 'final' for collateral estoppel").)  Plaintiffs acknowledge that it is within the court's discretion to apply the doctrine of collateral estoppel.  (Opp. at 9.)

Apple responds that it is not barred by collateral estoppel because the claims in *Apple II* are not "identical" to *Apple I*.  (Reply at 5–6.)  Apple identifies the allegations regarding the 30/70% "apportionment scheme" as being a "core" allegation in this action that was not alleged in *Apple I*.  (*Id.* (further arguing that the primary allegations have evolved from consumers being unable to download third-party applications to a dispute over the terms of permitting downloads).)  In addition, Apple disputes that any ruling by Judge Ware constituted a final judgment with regard to the pending apps claims.  (Reply at 7 (ruling was part of an interlocutory order).)  Finally, Apple argues that the ruling regarding the apps claims was not essential to any judgment because Judge Ware ultimately ordered the action to arbitration.  While "an appeal may be taken from Judge Ware's arbitration order, and/or from the arbitrator's decision if appropriate," no appeal can be taken from Judge Ware's interim order on whether Plaintiffs stated their apps claims.  (*Id.* at 7–8.)

The Court agrees with Apple that collateral estoppel does not bar its arguments here.  The allegations in the two actions are similar and significantly overlap, but not identical.  Further, the Court does not agree with Plaintiffs that Judge Ware's order on a motion to dismiss is sufficiently final, where the rulings could not have been appealed while the action was pending in this district *and* Judge Ware ultimately ordered the action to arbitration.  The Court hereby rejects Plaintiffs' argument that collateral estoppel bars Apple's arguments on this Motion.

## IV.  CONCLUSION

For the foregoing reasons, Apple's Motion to Dismiss Plaintiffs' Amended Consolidated Complaint is **GRANTED WITH LEAVE TO AMEND** as set forth herein.  Plaintiffs' second amended complaint shall be filed within twenty-one (21) days of the date of this Order.  A Case Management Conference is scheduled for November 4, 2013 at 2:00 p.m.  This Order terminates Dkt. No. 88.

**IT IS SO ORDERED.**

Dated: August 15, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**