FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
ALEXANDER H. SCHMIDT (*pro hac vice*)
schmidt@whafh.com
MICHAEL LISKOW (243899)
liskow@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:    212/545-4653

Plaintiffs' Interim Class Counsel

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | Case No. C 11-06714-YGR |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Stephen H. Schwartz, Edward W. Hayter, Eric Terrell, and Robert Pepper ("Plaintiffs"), for their class action complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

### NATURE OF ACTION

1. This is an antitrust class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), brought by Plaintiffs on their own behalf and on behalf of a class of persons similarly situated, those being persons who purchased software applications or licenses for software applications from the "iTunes" site or "App Store" owned and operated by Defendant Apple Inc. ("Apple") for use on an Apple iPhone between December 29, 2007 and the present (the "Class Period").

**A.  Summary Of Material Facts**

2. With great fanfare, Apple launched its first iPhone, called the iPhone 2G, on June 29, 2007. Prior to and after its launch, Apple hailed the iPhone as a revolutionary, "breakthrough" "smartphone" that functioned like a mobile computer with desktop-class email and other Internet communications capability. Apple built the iPhone's operating system, known as "iOS," to enable iPhone users to download and run computer-like software programs (called "applications" or "apps") to browse the Internet, transform music into cell phone ringtones, take photos, play games and engage in other functions typically performed on desktop or laptop computers.

3. Unbeknownst to iPhone consumers, however, from the time it launched the iPhone through the present date, Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iPhone applications in order to control and derive supracompetitive profits from the distribution of iPhone apps worldwide. As a result of its scheme, Apple has, from introduction of the iPhone 2G in 2007 through the present, cornered 100% of the worldwide distribution market for iPhone applications.

4. Apple has succeeded in totally eliminating any and all competition in that multi-billion dollar market. Apple's App Store is the only store in the entire world – online or off-line – where the tens of millions of U.S.-based iPhone owners (and the many tens of millions of iPhone

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – C 11-06714 YGR

- 1 -

1  owners worldwide) can buy an iPhone app, and Apple's unlawful monopolization of the apps
2  market has enabled Apple to charge and collect a supracompetitive 30% fee from iPhone
3  consumers for each and every one of the billions of iPhone apps they have bought since the
4  iPhone's launch six years ago.  Consequently, iPhone consumers nationwide have paid hundreds
5  of millions of dollars more for iPhone apps than they would have paid in a competitive market.
6       5.   Unlike traditional desktop or laptop computer manufacturers, whose computers'
7  operating systems allow consumers to buy software applications from any and all competing
8  software distributors, Apple's iOS system prohibits iPhone consumers from buying software
9  applications from anyone other than Apple.
10      6.   Even Apple's own iMac and MacBook desktop and laptop computers' operating
11 systems – from which the iPhone's iOS operating system was derived – allow consumers to buy
12 software from whatever source they like, and to pay the software manufacturer or distributor
13 directly without having to pay an additional fee to Apple.  There is no legitimate basis for Apple to
14 treat its iPhone customers any differently than it treats its iMac or MacBook customers, or to
15 charge its iPhone customers a 30% mark-up for any and all software they buy for their iPhones.
16      7.   But when Apple developed its unique iPhone, Apple took advantage of the heavy
17 demand for its novel product to equip it with an operating system that foreclosed iPhone
18 consumers from buying software from any source other than Apple, and Apple then forced those
19 foreclosed consumers to pay Apple a 30% fee for each and every iPhone app they buy.  Stated in
20 antitrust terminology, Apple improperly exploited its relationships with customers who purchased
21 Apple's highly desirable and expensive iPhone by locking them in, without their knowledge or
22 consent, into an aftermarket for iPhone apps that was monopolized by Apple.
23      8.   Apple's motive for its anticompetitive conduct was simple: Apple did not want its
24 iPhone-related revenue stream to end when a consumer bought an iPhone, like it generally does
25 when consumers purchase iMac and MacBook computers.  So Apple concocted and maintained a
26 plan to continue generating additional revenues over the entire useful life of every iPhone it sold
27 by cornering the distribution market for iPhone applications and charging consumers an extra 30%
28 for every app.  Through this scheme Apple would profit not only from the sales of tens of millions

1  of iPhones, it would also profit from each and every one of the billions of future apps sales made
2  to Apple's iPhone customers.

3        9.      Apple's anticompetitive scheme has generated enormous supracompetitive profits
4  for Apple.  Apple now offers more than 850,000 apps, and iPhone consumers worldwide have
5  downloaded apps more than 50 billion times since July 2008.  While the majority of iPhone apps
6  are now free, United States iPhone consumers have been overcharged hundreds of millions of
7  dollars for paid apps during the Class Period as a result of Apple's anticompetitive conduct.

8        10.     That Apple has engaged in unlawful monopolistic behavior with respect to iPhone
9  apps is perfectly consistent with Apple's attitude towards antitrust compliance generally.  A
10 federal district court judge who observed Apple's attitude towards antitrust compliance during a
11 recent trial found that Apple had unlawfully fixed e-book prices and concluded that Apple as an
12 institution simply "does not want to engage in retail price competition" – indeed, "one of its
13 principal goals was the elimination of all retail price competition," and "it was happy if a result of
14 that … was an increases in prices" that "the consumer had to pay."[1]

15       11.     That district court further stated that "[t]he record at trial demonstrated a blatant
16 and aggressive disregard at Apple for the requirements of the law," (Hr'g Tr. 17:1-2) even among
17 "Apple lawyers and its highest executives," (*id.* at 17:5-6) and concluded that an injunction was
18 needed to ensure that a "comprehensive and effective" (*id*. at 19:18) antitrust compliance training
19 program would be undertaken by "each of Apple's officers and directors engaged in whole or in
20 part in activities relating to the supply of content," including "apps" (*id.* at 13:18-20).  "Neither
21 Mr. [Eddy] Cue," the Apple executive responsible for  Apple's App Store, nor "his assigned in-
22 house counsel, could remember [having] any training on antitrust issues," and "[t]hey and those on
23 their teams need to understand what the law requires and how to conform their business practices
24 to the law."[2]

---

[1]     Hearing Transcript ("Hr'g Tr.") at 11:4-5, 33:10-13, *U. S. v. Apple Inc.*, No. 12 Civ. 2826 (S.D.N.Y. Aug. 27, 2013).

[2]     Hr'g Tr. at 18:11-13.

12. Apple's unlawful monopolization of the iPhone applications aftermarket from July 2007 through the present is a direct reflection of Apple's goal of "eliminating all retail price competition" and its culture of disdaining antirust compliance in order to increase the prices its customers pay. Through its actions, Apple has unlawfully stifled competition by erecting impenetrable barriers to entry to would-be distributors of iPhone apps, reduced consumer choice in what would otherwise be a robust and competitive iPhone software applications marketplace, and artificially increased prices for iPhone software applications to supracompetitive levels.

13. Apple's illegal iPhone apps monopoly should be enjoined and dismantled, and Plaintiffs and the tens of millions of nationwide iPhone consumers they seek to represent should be reimbursed by Apple for the hundreds of millions of dollars they have been overcharged.

**B.      Summary Of Claims**

14. In pursuit and furtherance of its unlawful anticompetitive activities, Apple: (a) failed to obtain iPhone consumers' contractual consent to Apple's monopolization of the iPhone applications aftermarket, the effect of which was to lock consumers into buying apps only from Apple and paying Apple's 30% fee, even if they wished to buy apps elsewhere or pay less; and (b) failed to obtain iPhone consumers' contractual consent to having their iPhones "locked" to prohibit them from using any app that was not approved or sold by Apple, thereby preventing iPhone purchasers from downloading and using other apps, called "Third Party Apps."

15. Apple violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured iPhone apps consumers by reducing output and consumer choice, and by increasing prices for iPhone apps to supracompetitive levels.

16. Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiffs seek an order restraining Apple from selling iPhones that are programmed in any way to prevent or hinder consumers from downloading Third Party Apps, or minimally, restraining Apple from selling or distributing iPhones without fist obtaining the consumers' express contractual consent to (a) buying apps only from Apple and (b) having their iPhones locked to accept only apps purchased from Apple.

## THE PARTIES

17. Plaintiff Stephen H. Schwartz is an individual residing in Ardsley, New York who, in October 2010, purchased an iPhone and paid Apple for iPhone apps during the Class Period.

18. Plaintiff Edward W. Hayter is an individual residing in Brooklyn, New York who, in March 2008, purchased an iPhone and paid Apple for iPhone apps during the Class Period.

19. Plaintiff Eric Terrell is an individual residing in Oakland, California who, on or about June 29, 2007, purchased an iPhone and paid Apple for iPhone apps during the Class Period.

20. Plaintiff Robert Pepper is an individual residing in Chicago, Illinois who, on or about June 29, 2007, purchased an iPhone and paid Apple for iPhone apps during the Class Period.

21. Defendant Apple is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014. Apple regularly conducts and transacts business in this District, as well as throughout Illinois, New York and elsewhere in the United States. Apple manufactures, markets, and sells the iPhone, among other electronic devices.

## JURISDICTION AND VENUE

22. This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

23. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because some Plaintiffs purchased iPhones in this District, Apple has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and Apple is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

25. Each Plaintiff and member of the Class, in order to activate their iPhone, was required to accept Apple's "iPhone Terms and Conditions" (the "Terms"). The Terms state, in pertinent part, that "You expressly agree that exclusive jurisdiction for any claim or dispute with Apple … resides in the courts in the State of California."

**FACTUAL ALLEGATIONS**

**A.    Apple's Anticompetitive Conduct**

26.    In Spring 2007, Apple began a massive advertising campaign to market its new wireless communication device, the iPhone. The iPhone was advertised as a combined mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability. The iPhone was, in effect, the world's first mobile computer. The iPhone shifted the paradigm for smartphones, and it changed the entire cell phone manufacturing industry.

27.    Having designed and manufactured a highly advanced and desirable new product, Apple profited handsomely from selling its revolutionary new handset. The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag, consumers waited in line to get their hands on one.[3] Apple has rightfully earned billions of dollars in revenue from selling its iPhones.

28.    But Apple wanted more. It did not want to limit its revenues to what consumers were willing to pay for the iPhone itself. Apple wanted a substantial piece of every dollar that would ever be paid to buy any kind of software for the iPhone at any time anywhere in the world.

29.    To achieve that end, Apple embarked on a scheme to monopolize the aftermarket for iPhone applications and to foreclose and protect Apple against any and all competition it might face in the distribution of iPhone applications. In contrast to the robust competition Apple faces in the software aftermarket for its desktop and laptop computers, Apple wanted the entire iPhone software aftermarket for itself. Apple achieved its unlawful goal, through a series of actions.

30.    Apple at all times retained exclusive control over the design, features and operating software for the iPhone, known as iOS, which is based on the same technologies that are used in Apple's desktop and laptop computers' operating systems, known as OS X. Although Apple has

---

[3]    Initially, the 4GB iPhone 2G retailed for $499 and the 8GB iPhone 2G retailed for $599. Apple has since released five other iPhone models, the iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S and iPhone 5, and it is expected shortly to release its new iPhone 5S. Currently, Apple sells 16GB, 32GB and 64GB versions of the iPhone 5, which range in price from $199 to $849, unless they are purchased as part of a handset-subsidized voice and data service plan offered by a cell phone service provider such as Verizon, Sprint, T-Mobile or AT&T Mobility.

1  always maintained OS X as an "open" system that allows iMac and MacBook consumers to run
2  software manufactured or sold by any distributor, Apple modified its iOS version to be a "closed"
3  system by installing "security measures" or "program locks" designed to prevent iPhone
4  consumers from installing and running apps that were not sold or approved by Apple.

5       31.    Apple did not close the iOS system for the purpose of protecting its proprietary
6  right to own, sell or license iOS. Apple closed the iOS system for the specific purpose, and with
7  the specific intent, of foreclosing competition from other potential iPhone software manufacturers
8  and distributors so that Apple could monopolize and derive monopoly profits from the iPhone
9  apps aftermarket.

10      32.    After Apple launched its iPhone 2G in June 2007, Apple enhanced its iPhone-
11 related revenues either by developing its own apps for ringtones, instant messaging, Internet
12 access, gaming, entertainment, video and photography or by enabling "approved" third party
13 manufacturers to develop iPhone apps. Apple always conditioned its "approval" of such apps on
14 the third party's agreement to give Apple a share of the third party's sales proceeds.

15      33.    However, because Apple's OS X and iOS operating systems were based on the
16 widely available Unix platform and included technologies and services that were based on other
17 open software systems, Apple's initial program locks designed to eliminate Third Party Apps
18 proved ineffective, as clever third party programmers quickly circumvented Apple's security
19 measures and made non-Apple approved iPhone apps available for sale on the Internet.

20      34.    Almost immediately after the iPhone's launch unapproved Third Party Apps started
21 to appear and threatened to compete with Apple in the iPhone apps aftermarket. For example,
22 Mobile Chat and FlickIM gave iPhone users access to instant messaging programs from which
23 Apple derived no revenues. Apple responded to these threats by updating its iOS to eliminate
24 iPhone consumers' ability to use these Third Party Apps and by warning its iPhone customers that
25 using Third Party Apps would nullify Apple's iPhone warranty.

26      35.    Apple also faced threatened competition for iPhone ringtones. When a customer
27 purchased a song for $1 from the Apple iTunes store, Apple charged the customer an additional 99
28 cents to convert any portion of that song into a ringtone. A number of competing programmers

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – C 11-06714 YGR

1  promptly offered a variety of ringtone programs that enabled iPhone consumers to download both
2  songs and ringtones for free. Some of these programs allowed customers to use samples of
3  popular songs lawfully downloaded from Apple's iTunes store as a ringtone. Other programs,
4  such as I-Toner from Ambrosia Software and iPhone RingToneMaker from Efiko software,
5  allowed customers to "clip" portions of songs purchased by them from iTunes for use as ringtones.

6  36.  Since many of these programs used songs downloaded from iTunes, Apple initially
7  sought to block the use of those songs as ringtones by updating the iTunes software to install
8  program locks that would interfere with such use. However, those efforts were all quickly
9  defeated by third party programmers, sometimes within hours of the release of the update. So
10 Apple again responded to these threats by updating its iOS to eliminate iPhone consumers' ability
11 to use these Third Party Apps and by voiding the warranties of iPhone customers who used them.

12 37.  Ultimately, Apple eliminated the threat of competition from unapproved apps
13 developers by conceiving and implementing the App Store in order to become the exclusive
14 distributor of iPhone apps, and by thereafter rigorously enforcing and maintaining its monopoly.

15 38.  Apple laid the groundwork for its App Store in March 2008, when Apple released a
16 "software development kit" ("SDK") for the stated purpose of enabling independent software
17 developers to design applications for use on the iPhone. For an annual fee of $99, the SDK allows
18 developers to supply apps to Apple for distribution through Apple's App Store.

19 39.  Apple opened its App Store in July 2008. Apple owns 100% of the App Store,
20 staffs the App Store with Apple employees or agents, and controls all of the App Store sales,
21 revenue collections and other business operations.

22 40.  Apple informs its prospective apps developers (though not its iPhone consumers)
23 that the developers' apps cannot be sold anywhere except in the App Store. Apple also informs its
24 developers (but not its iPhone customers) that Apple will charge iPhone consumers a 30%
25 commission for any non-free app sold in the App Store.

26 41.  Consequently, the prices for apps available in Apple's App Store include the
27 developers' price plus Apple's 30% mark-up. When an iPhone customer buys an app from Apple,
28 it pays the full purchase price, including Apple's 30% commission, directly to Apple. Apple takes

1   its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the
2   developer. Apple sells the apps (or, more recently, licenses for the apps) directly to the customer,
3   collects the entire purchase price, and pays the developers after the sale. The developers at no
4   time directly sell the apps or licenses to iPhone customers or collect payments from the customers.

5   42. On information and belief, throughout the Class Period, Apple threatened to
6   terminate any developer that made its apps available on its own website or through a distributor
7   other than Apple, and Apple continued to discourage iPhone customers from downloading Third
8   Party Apps by telling customers that Apple would void and refuse to honor the iPhone warranty of
9   any customer who downloaded a Third Party App.

10   43. By designing the iPhone iOS as a closed system, installing security measures and
11   program locks to prevent Third Party App downloads, establishing the App Store as the exclusive
12   worldwide distributor of iPhone apps, and enforcing the App Store's exclusive distributor status
13   by terminating apps developers who sold apps in competition with Apple and voiding the
14   warranties of iPhone consumers who bought competing apps, Apple has since June 2007 willfully
15   acquired and maintained a monopoly in the iPhone apps aftermarket and has positioned itself as
16   the one and only distributor of iPhone apps on the entire planet. Apple has no competition in the
17   multi-billion dollar iPhone apps aftermarket, domestically or abroad, whatsoever.

18   44. Prior to Plaintiffs' purchases of their iPhones, Apple had not even disclosed – much
19   less obtained the Plaintiffs' contractual consent to – either (a) Apple's monopolization of and
20   collection of monopoly profits from the iPhone applications aftermarket, or (b) having their
21   iPhones locked to prohibit Plaintiffs from using any app that was not approved or sold by Apple.
22   Absent obtaining Plaintiffs' contractual consent, Apple's monopolization of the iPhone
23   applications aftermarket constitutes an antitrust violation under Section 2 of the Sherman Act.

24   **B.     Plaintiffs' Injuries**

25   45. Plaintiffs have been injured by Apple's anticompetitive conduct because they paid
26   more for their iPhone apps than they would have paid in a competitive market. Plaintiffs have
27   also been injured because Apple's unlawful monopolization of the iPhone apps aftermarket has
28   extinguished Plaintiffs' freedom of choosing between Apple's App Store and lower cost market

alternatives that would have been available had Apple not monopolized the market. Plaintiffs have also been injured because Apple's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of iPhone apps, which would have been more abundantly available in a competitive market.

46. That Plaintiffs have paid supracompetitive prices is obvious for several reasons. Under basic and fundamental economic principles, the absence of competition leads to increased prices, and increased competition leads to lower prices. In a competitive market, an economically rational manufacturer or distributor will sell its products at prices equal to their cost plus a reasonable marginal rate of return (profit) dictated by the market environment. But an economically rational monopolist that is unconstrained by the downward pricing pressures of a competitive market will charge the highest price it can in light of the demand for its products; the greater the demand, the higher the profits. Indeed, it is hornbook economics that commercial entities strive to acquire and maintain monopoly power precisely because they want to reap the monopoly profits that market domination typically generates.

47. Apple and the iPhone apps aftermarket are not immune from these presumptively valid economic principles. Indeed, as shown above, the generation of monopoly profits was exactly why Apple chose to monopolize the iPhone apps aftermarket.

48. That Apple's 30% fee is a monopoly price is also obvious from Apple's cost structure. Each developer's $99 annual fee covers most or all of Apple's costs of reviewing that developer's apps and the related proportional costs of operating and maintaining the App Store, even if the developer submits several apps annually. As to successive sales of that developer's apps, therefore, Apple's 30% fee constitutes virtually pure profit for Apple. In a competitive environment, where developers could sell their apps on their own websites without charging Apple's 30% mark-up and discount retailers could obtain volume discounts and sell for far less than a 30% profit, Apple would be under considerable pressure to substantially lower its 30% profit margin because, otherwise, its App Store would be priced out of the market and lose substantial market share. In a truly competitive iPhone apps distribution environment, Apple's 30% margin would be simply unsustainable.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – C 11-06714 YGR

49. A truly competitive iPhone apps distribution market would also give Plaintiffs and other iPhone customers the freedom to choose between Apple's high-priced App Store and less costly alternatives, such as buying direct from apps developers or volume-driven and other software discounters. Plaintiffs' freedom to choose between these market alternatives has been eliminated by Apple's monopolistic conduct, and Plaintiffs have been forced to pay supracompetitive prices to Apple as a result.

50. The lack of a truly competitive environment has also led to reduced output and supply of iPhone apps because developers are barred from selling apps at prices below Apple's inflated 30% marked-up price. Under basic economic principles, lower prices would generate both increased demand and increased supply to meet that demand in the iPhone apps aftermarket as a whole. Apple's unlawful monopoly naturally restricts both supply and demand.

**C.     Injury To Competition**

51. The same conditions – the existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output and supply – demonstrate that Apple's monopolistic conduct has likewise injured competition generally in the iPhone apps aftermarket.

52. The iPhone apps market is not remotely like the genuinely competitive personal computer software market, where computer hardware manufacturers – including Apple itself – do not control or have a financial stake in every sale of software that is downloaded on the computers they make. In the aftermarkets for desktop and laptop computer software, the software developers can offer products directly to consumers or through discounters without having to gain the computer manufacturer's approval and without the software customers paying the manufacturer a penny. Consequently, there is an abundant supply of competing software applications, and consumers can shop among multiple vendors without paying above market prices.

53. The iPhone apps market lacks all of these indicia of competitiveness. Because Apple has unlawfully cornered the nationwide (and, indeed, worldwide) distribution market for iPhone apps, the iPhone apps aftermarket has been harmed generally by Apple's anticompetitive conduct, which is precisely the type of harm the antitrust laws were enacted to remedy.

## CLASS ALLEGATIONS

54. Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed class (the "Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following Class comprised of:

> **All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased an iPhone application or application license from Apple for use on an iPhone at any time from December 29, 2007 through the present.**

55. The Class for whose benefit this action is brought is so numerous that joinder of all members is impractical.

56. Plaintiffs are unable to state the exact number of Class members without discovery of Apple's records but, on information and belief, state that billions of iPhone apps or licenses for apps were purchased during the Class Period.

57. There are questions of law and fact common to the Class which predominate over any questions affecting only individual members including, among others, (1) whether Apple violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the aftermarket for iPhone software applications; (2) whether Apple's violation caused harm to the relevant market generally and to Plaintiffs and the Class specifically; and (3) whether Apple should be enjoined from continuing its monopolistic practices and from continuing to monopolize and charge monopoly prices in the iPhone apps aftermarket without first obtaining iPhone consumers' contractual consent.

58. The common questions of law and fact are identical for each and every member of the Class.

59. Plaintiffs are members of the Class they seek to represent, and their claims arise from the same factual and legal bases as those of the Class; they assert the same legal theories as do all Class members.

60. Plaintiffs will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent them and those similarly situated.

61. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and cause needless expenditure of judicial resources.

62. Plaintiffs are typical of the Class in that their claims, like those of the Class, are based on the same anticompetitive business practices and the same legal theories.

63. Apple has acted on grounds generally applicable to the Class.

64. A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

## **RELEVANT MARKET ALLEGATIONS**

65. The iPhone is a unique, premium-priced product that generates a unique aftermarket for software applications that can be used only on iPhones. During at least the Class Period, the price of iPhones was not responsive to an increase in iPhone application prices because Apple did not obtain iPhone customers' knowledgeable contractual consent to Apple's monopolization of and monopoly pricing in the apps aftermarket. Consequently, (a) consumers who purchased iPhones could not, at the point of sale, reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime); and (b) consumers were "locked into" the iPhone due to its high price tag and would incur significant costs to switch to another handset. The aftermarket for iPhone applications is thus an economically distinct product market, and the applications that are distributed within that market have no acceptable substitutes.

66. The existence of competition in the smartphone market between Apple's iPhone and the makers of competing handsets such as Google's Android phones is irrelevant to the relevant market analysis in a Section 2 Sherman Act aftermarket monopolization case, in which the existence or lack of competition in the aftermarket at issue is the only economically meaningful inquiry. The existence of Android phone applications and applications geared toward other smartphone brands is likewise irrelevant because those applications are technologically incompatible with the iPhone and, therefore, are not reasonably interchangeable substitutes for iPhone apps. Even if those other smartphone apps were technologically compatible, Apple's exclusionary and monopolistic conduct would bar such apps from being sold in competition with

Apple for the same reasons and in the same manner that Apple has foreclosed such competition for iPhone Third Party Apps generally.

67. The geographic scope of the iPhone applications aftermarket is national.

68. The aftermarket for iPhone applications includes the market for distributing software applications that can be downloaded on the iPhone for managing such functions as ringtones, instant messaging, photographic and video capability, gaming and other entertainment, Internet applications, and any other downloadable software-driven functions.

69. The applications aftermarket came into existence immediately upon the sale of the first iPhones because: (a) the applications aftermarket is derivative of the iPhone; and (b) no Plaintiff or member of the Class agreed to any restrictions on their ability to access a competitive iPhone applications aftermarket.

**COUNT I**
**Unlawful Monopolization Of The Applications Aftermarket**
**In Violation Of Section 2 Of The Sherman Act**
**(Seeking Damages And Equitable Relief)**

70. Plaintiffs reallege and incorporate paragraphs 1 through 69 above as if set forth fully herein.

71. Apple has acquired monopoly power in the iPhone applications aftermarket through unlawful, willful acquisition and maintenance of that power. Specifically, Apple has unlawfully acquired monopoly power by: (a) designing the iPhone iOS as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone apps; and (c) enforcing the App Store's monopoly status by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing apps.

72. Apple's unlawful acquisition of monopoly power has reduced output and competition and resulted in increased, supracompetitive prices for products sold in the iPhone applications aftermarket and, thus, harms competition generally in that market.

73. Plaintiffs have been injured in fact by Apple's unlawful monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supracompetitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

74. Apple's unlawful monopolization of the iPhone applications aftermarket violates Section 2 of the Sherman Act, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

**COUNT II**
**Attempted Monopolization Of The Applications Aftermarket In**
**Violation Of Section 2 Of The Sherman Act**
**(Seeking Damages And Equitable Relief)**

75. Plaintiffs reallege and incorporate paragraphs 1 through 74 above as if set forth fully herein.

76. Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone applications aftermarket. Specifically, Apple has attempted unlawfully to acquire monopoly power by: (a) designing the iPhone iOS as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing apps.

77. Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the applications aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

78. Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased, supracompetitive prices for products sold in the iPhone applications aftermarket and, thus, harms competition generally in that market.

79. Plaintiffs have been injured in fact by Apple's attempted monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supracompetitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

80. Apple's attempted monopolization of the iPhone applications aftermarket violates Section 2 of the Sherman Act, and its anticompetitive practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Apple as follows:

    a. Permanently enjoining Apple from monopolizing or attempting to monopolize the iPhone applications aftermarket or, minimally, restraining Apple from selling or distributing iPhones without first obtaining the consumers' express contractual consent to (a) Apple's monopolization of and charging of monopoly prices in the iPhone apps aftermarket, and (b) having their iPhones locked to accept only apps or purchased from Apple;

    b. Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's violations of the federal antitrust laws;

    c. Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

    d. Granting such other and further relief as the Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

| | |
|---|---|
| DATED:  September 5, 2013 | WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP<br>FRANCIS M. GREGOREK<br>RACHELE R. RICKERT |
| | /s/ Rachele R. Rickert<br>RACHELE R. RICKERT |
| | 750 B Street, Suite 2770<br>San Diego, California 92101<br>Telephone:  619/239-4599<br>Facsimile:   619/234-4599 |
| | WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP<br>MARK C. RIFKIN<br>ALEXANDER H. SCHMIDT<br>MICHAEL LISKOW<br>270 Madison Avenue<br>New York, New York 10016<br>Telephone:  212/545-4600<br>Facsimile:   212/545-4677 |
| | Plaintiffs' Interim Class Counsel |

APPLE2/20198

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – C 11-06714 YGR