1  LATHAM & WATKINS LLP
   Daniel M. Wall (Bar No. 102580)
2    Christopher S. Yates (Bar No. 161273)
   Sadik Huseny (Bar No. 224659)
3  505 Montgomery Street, Suite 2000
  San Francisco, California  94111-6538
4  Telephone:  (415) 391-0600
  Facsimile:  (415) 395-8095
5  Email:   Dan.Wall@lw.com
  Email:   Chris.Yates@lw.com
6  Email:   Sadik.Huseny@lw.com

7  Attorneys for Defendant
  APPLE INC.

8

9            UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA

11            OAKLAND DIVISION

12

13 IN RE APPLE IPHONE ANTITRUST
  LITIGATION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | CASE NO. C 11-06714-YGR<br>RELATED CASE NO. C 07-05152-JW<br><br>**DEFENDANT APPLE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:      November 5, 2013<br>Time:     2:00 PM<br>Place:    Courtroom 5, 2nd Floor<br><br>The Honorable Yvonne Gonzalez Rogers |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ......................................... 3

        1.      Whether Plaintiffs' claims should be dismissed because Plaintiffs do not have antitrust standing................................... 3

        2.      Whether Plaintiffs' claims should be dismissed for failure to state a claim. ....................................................................... 3

III.    LEGAL STANDARD.................................................................................... 3

IV.     PROCEDURAL HISTORY AND STATEMENT OF FACTS.................... 3

    A.      A Brief Summary Of The Procedural History Of This Case And The Earlier Cases ....................................................................... 3

    B.      The Factual Allegations In The Second Amended Complaint ............................ 4

V.      ARGUMENT ................................................................................................ 6

    A.      The SAC Confirms That Plaintiffs Are Indirect Purchasers And Lack Antitrust Standing Under *Illinois Brick* ...................................... 6

    B.      Plaintiffs Fail To Plead The Requisite Elements Of Their Antitrust Claims ............................................................................................ 10

        1.      Plaintiffs Have Not Cured, And Indeed Have Exacerbated, The Deficiencies In Their Specious "Aftermarket" Theory ................... 10

        2.      Plaintiffs Fail To Allege That Apple's Alleged "Closed System" Constitutes Unlawful Anticompetitive Conduct ...................... 13

VI.     CONCLUSION.............................................................................................. 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3
*Ala. Airlines, Inc. v. United Airlines, Inc.,*
  948 F.2d 536 (9th Cir. 1991) ............................................................................................ 10
4

5
*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
  592 F.3d 991 (9th Cir. 2010) ........................................................................... 2, 14, 15, 16

6
*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*
  *Publ'ns, Inc.,*
7
  108 F.3d 1147 (9th Cir. 1997) .......................................................................................... 10

8
*Andrews v. Metro N. Commuter R.R. Co.,*
  882 F.2d 705 (2d Cir. 1989) ............................................................................................... 9
9

10
*Apple Inc. v. Psystar Corp.,*
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................................ 13

11
*Bd. of Trade of Chicago v. United States,*
  246 U.S. 231 (1918) .......................................................................................................... 15
12

13
*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................................ 3

14
*Campos v. Ticketmaster Corp.,*
  140 F.3d 1166 (8th Cir. 1998) ................................................................................... 6, 7, 8
15

16
*Digital Equip. Corp. v. Uniq Digital Techs.,*
  73 F.3d 756 (7th Cir. 1996) .............................................................................................. 12

17
*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) .................................................................................................... 11, 12
18

19
*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
  703 F.2d 534 (9th Cir. 1983) ............................................................................................ 14

20
*Gray v. JPMorgan Chase Bank,*
  2012 U.S. Dist. LEXIS 54549 (C.D. Cal. Apr. 18, 2012) .................................................. 9
21

22
*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,*
  790 F. Supp. 804 (C.D. Ill. 1992) ..................................................................................... 15

23
*Harbridge v. Schwarzenegger,*
  2011 U.S. Dist. LEXIS 150789 (C.D. Cal. Aug. 31, 2011) ............................................... 9
24

25
*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) .............................................................................................. 1, 4, 5, 6, 7

26
*In re Apple & AT&TM Antitrust Litig.,*
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) .......................................................................... 3, 4
27

28
*In re ATM Fee Antitrust Litig.,*
  686 F.3d 741 (9th Cir. 2012) .................................................................................... 1, 6, 8

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .................................................................................. 3

*Newcal Indus., Inc. v. IKON Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ................................................. 2, 10, 11, 12, 13

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ................................................................................ 12

*Robinson v. Salazar*,
    885 F. Supp. 2d 1002 (E.D. Cal. 2012) ................................................................ 9

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) .................................................................................... 11

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................................. 10

*Stearns v. Select Comfort Retail Corp.*,
    763 F. Supp. 2d 1128 (N.D. Cal. 2010) ................................................................ 9

*United States v. Grinnell*,
    384 U.S. 563 (1966) ................................................................................................. 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 15

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ................................................................... 12

*Universal Grading Serv. v. eBay, Inc.*,
    2012 U.S. Dist. LEXIS 2325 (N.D. Cal. Jan. 9, 2012) ..................................... 13

*USM Corp. v. SPS Techs., Inc.*,
    694 F.2d 505 (7th Cir. 1982) ................................................................................ 15

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .................................................................. 2, 10, 13, 14

*William O. Gilley Enters. v. Atlantic Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ................................................................................. 3

**TREATISES**

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 564b (3d ed. 2006) ............................ 11

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1

**NOTICE OF MOTION AND MOTION**

2

PLEASE TAKE NOTICE that on November 5, 2013, or as soon thereafter as the matter

3 may be heard, in the United States District Court, Northern District of California, at 1301 Clay

4 Street, Oakland City Center, Oakland, CA 94612, before the Honorable Yvonne Gonzalez

5 Rogers, Defendant Apple Inc. will, and hereby does, move the Court for an order dismissing

6 Plaintiffs' Second Amended Consolidated Class Action Complaint pursuant to Rule 12(b)(6) of

7 the Federal Rules of Civil Procedure.

8

This motion is based on the Notice of Motion and Motion, the accompanying

9 Memorandum of Points and Authorities, the Proposed Order, the pleadings on file in this action,

10 and upon such other matters presented to the Court at the time of the hearing.

11

**RELIEF SOUGHT**

12

Defendant Apple Inc. seeks dismissal of each claim asserted in Plaintiffs' Second

13 Amended Consolidated Class Action Complaint, pursuant to Rule 12(b)(6) of the Federal Rules

14 of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

1

1            **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

2 **I.    INTRODUCTION**

3         Plaintiffs were given leave to amend "to address antitrust standing and *Illinois Brick*."

4 (Dkt. 108 at 20.)  They have altogether failed to do so, making no meaningful changes to their

5 standing and "indirect purchaser" contentions despite nearly 80 new paragraphs of allegations.

6 The problem remains that Plaintiffs are *consumers* of iOS applications software ("Apps")

7 complaining about restrictions on Apps *developers* that allegedly indirectly affect the prices set

8 by those developers.  That is a pass-through theory barred by *Illinois Brick Co. v. Illinois*, 431

9 U.S. 720 (1977) and *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012).  The Court's

10 August 15 Order recognized this in principle, and gave leave to amend only because Plaintiffs

11 had argued in briefing that they could plead that Apple itself added a 30% fee to the developer's

12 price. (Dkt. 108 at 19-20.)  The Court declined to consider whether that was legally sufficient

13 until Plaintiffs actually pleaded it.  But the Second Amended Complaint ("Complaint" or "SAC")

14 alleges no such facts.  The changes Plaintiffs made with respect to *Illinois Brick* are cosmetic at

15 best, and in the end Plaintiffs are still forced to acknowledge that Apple earns a commission

16 from *developers*, which at worst is passed-on to Plaintiffs.  (*See* SAC ¶ 41 ("Apple takes its 30%

17 commission off the top and then remits the balance, or 70% of the purchase price, to the

18 developer."); *id.* ¶ 40 (referring to a 30% commission).)  Under the authorities discussed by the

19 Court in its earlier Order, that is an indirect injury theory foreclosed as a matter of law.

20         Apple respectfully submits that the Court's analysis need go no further:  without antitrust

21 standing, these claims cannot proceed.  We cannot ignore, however, the extensive changes

22 Plaintiffs have made to the substance of their attack on Apple's App Store policies.  These

23 amendments seek to transform the case into something it has never been before:  a direct attack

24 on Apple's business model implemented six plus years ago—what Plaintiffs call Apple's

25 decision to "design[ ] the iPhone iOS as a closed system."  (*Id.* ¶¶ 3, 43.)[1]

26 _____

27 [1]   Mindful that this is a motion to dismiss, Apple will for these purposes accept the allegation
that its iPhone business model and iOS operating system are "closed."  But the truth, as

28 Plaintiffs themselves allude to in the SAC, is that the iPhone Apps program is open to any

1    Plaintiffs' theory has too many deficiencies to discuss them all in detail.  The market

2    definition issues raised by Apple previously (but not addressed by the Court) have gotten worse,

3    since Plaintiffs' new focus on the original design of Apple's "closed system" logically forecloses

4    its "iPhone aftermarket" theory.  And, given the attack on the allegedly "closed" business model,

5    Plaintiffs have not—and cannot—allege that they could not "reasonably discover" Apple's

6    "aftermarket" policies, which means that the claimed aftermarket is not a relevant antitrust

7    market.  *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1048 (9th Cir. 2008).

8    More fundamentally, Plaintiffs have done nothing to establish that Apple's decision to

9    pursue what they call a "closed" business model is unlawful in any way.  Antitrust law does not

10   constrain the design of products (like the iPhone or the iOS operating system) or business models

11   (Apple's allegedly "closed system") on the grounds that they are not "open" enough.  The

12   Supreme Court and Ninth Circuit have repeatedly held that *even a monopolist* (which Apple is

13   not) "has no duty to help its competitors survive or expand when introducing an improved

14   product design."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d

15   991, 1002 (9th Cir. 2010) ("*Tyco*"); *see also Verizon Commc'ns, Inc. v. Law Offices of Curtis V.

16   Trinko, LLP*, 540 U.S. 398, 415-16 (2004) ("*Trinko*") (The Sherman Act "does not give judges

17   *carte blanche* to insist that a monopolist alter its way of doing business whenever some other

18   approach might yield greater competition.") (emphasis in original).  The acknowledged (and

19   indisputable) contributions that Apple's so-called "closed system" has made to competition—"a

20   highly advanced and desirable new product" (SAC ¶ 27), 850,000 Apps now available on the

21   App Store (*id.* ¶ 9), and a whole new "paradigm for smartphones [that] changed the entire cell

22   phone manufacturing industry" (*id.* ¶ 26)—are more than sufficient under *Tyco* to defeat

23   Plaintiffs' new theory.  One simply cannot build a monopolization claim by postulating that there

24   would have been *more* competitive benefits if Apple had chosen to structure its business

25   differently.

26

27   developer who is willing to pay a nominal $99 fee and abide by the program rules.  Some
     300,000 developers have participated in the program.  That is hardly "closed."

28

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1    Apple respectfully submits that Plaintiffs' Second Amended Complaint should be

2 dismissed with prejudice.

3 **II.     STATEMENT OF ISSUES TO BE DECIDED**

4         1.    Whether Plaintiffs' claims should be dismissed because Plaintiffs do not have

5             antitrust standing.

6         2.    Whether Plaintiffs' claims should be dismissed for failure to state a claim.

7 **III.    LEGAL STANDARD**

8         In order to survive a motion to dismiss, a plaintiff must allege *evidentiary facts* that, if

9 true, would "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550

10 U.S. 544, 555-56 (2007); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).  A

11 plaintiff is obligated to provide the "grounds" of her "entitlement to relief," which "requires

12 more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

13 will not do."  *Twombly*, 550 U.S. at 555 (internal citations omitted); *see also William O. Gilley*

14 *Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 669 (9th Cir. 2009) ("claimants must plead

15 not just ultimate facts (such as a conspiracy), but evidentiary facts") (quoting *Kendall*, 518 F.3d

16 at 1047).  This more rigorous pleading requirement is especially important in antitrust cases.

17 *Twombly*, 550 U.S. at 558.

18 **IV.    PROCEDURAL HISTORY AND STATEMENT OF FACTS**

19         **A.    A Brief Summary Of The Procedural History Of This Case And The Earlier**
            **Cases**

20

21         This case is one of three filed by the same plaintiffs' counsel against Apple.  Initially, all

22 three cases focused on the allegation that Apple had conspired with AT&T Mobility to

23 monopolize a claimed aftermarket for voice and data services for the iPhone.  The claims in the

24 first case were ordered to arbitration after the Supreme Court issued its opinion in *AT&T*

25 *Mobility v. Concepcion*.  *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1175,

26 1179 (N.D. Cal. 2011).  The third case, again claiming monopolization of an alleged

27 "aftermarket for voice and data services for the iPhone," was dismissed with prejudice for failure

28 to join AT&T Mobility; plaintiffs' appeal of that dismissal is presently before the Ninth Circuit.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1   This is the second of the three cases.  On August 15, 2013, the Court issued its Order in

2   this case granting Apple's motion to strike and also its motion to dismiss Plaintiffs' First

3   Amended Complaint, with leave to amend.  (Dkt. 108.)  That Order directed "that Plaintiffs not

4   include allegations relating to voice and data services or a conspiracy with ATTM" in any

5   amended complaint.  (*Id.* at 13.)  The Court dismissed the Apps claims on two grounds.[2]  It first

6   held that Plaintiffs had failed to plead Article III standing because they had not alleged "facts

7   showing that each named Plaintiff has *personally suffered* an injury-in-fact based on Apple's

8   alleged conduct.  This requires that Plaintiffs at least purchased applications."  (*Id.* at 10.)  The

9   Court further directed that "Plaintiffs' allegations showing injury-in-fact should not be

10   conclusory in nature."  (*Id.* at 11.)  The Court also addressed antitrust standing under the

11   "indirect purchaser" doctrine of *Illinois Brick*.  In short, the Court explained that Plaintiffs could

12   not assert "a mark-up" theory by which a cost to developers was passed-on to the Plaintiffs, and

13   reserved judgment as to whether Plaintiffs would have standing if Plaintiffs pleaded, as they

14   suggested they could, that Apple added a fee to the price set by developers for an App.  (*Id.* at

15   19-20.)

16   The Court thus gave Plaintiffs "leave to amend to address antitrust standing and *Illinois*

17   *Brick*."  (*Id.* at 20.)  In light of that ruling, the Court "decline[d] to address the additional

18   arguments raised by Apple."  (*Id.*)

19   **B.    The Factual Allegations In The Second Amended Complaint**

20   Rather than adding specific allegations regarding each named Plaintiff's alleged injury-

21   in-fact and to address antitrust standing, the SAC changes and expands their earlier theory.[3]

22   Plaintiffs now allege that "from the time it launched the iPhone" in June 2007 (SAC ¶ 3), Apple

23

24   [2]   The plaintiffs in the first of the related cases, *In re Apple & AT&TM Antitrust Litigation*,
25   Case No. 07-CV-5152-JW, asserted claims regarding software applications for the iPhone;
     however, as the Court held in its Order granting Apple's motion to dismiss, the Apps claims
26   in the earlier case were not identical to the Apps claims asserted in the First Amended
     Complaint in this case.  (Dkt. 108 at 23.)

27   [3]   The allegations specific to each named Plaintiff simply assert that the person "purchased an
     iPhone and paid Apple for iPhone apps during the Class Period."  (SAC ¶¶ 17-20.)

28

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1   "design[ed]" a closed App system (*id.* ¶ 30), and that "designing the iPhone iOS as a closed

2   system" violates the antitrust laws. (*Id.* ¶ 43.)

3        Plaintiffs' Complaint does acknowledge that the iPhone was a "novel" and

4   "breakthrough" product that "shifted the paradigm for smartphones, and [] changed the entire

5   cell phone manufacturing industry." (*Id.* ¶¶ 2, 7, 26.) The Complaint also admits that the

6   "closed system" they now challenge has led to a proliferation of software programs: "Apple now

7   offers more than 850,000 apps, and iPhone consumers worldwide have downloaded apps more

8   than 50 billion times since July 2008." (*Id.* ¶ 9.) It further admits that "the majority" of the

9   850,000 "iPhone apps are now free." (*Id.*) Nonetheless, Plaintiffs claim that, absent the

10  allegedly anticompetitive conduct, there would have been *even more* Apps: "Apple's

11  establishment and maintenance of monopoly pricing has caused a reduction in the output and

12  supply of iPhone apps, which would have been more abundantly available in a competitive

13  market." (*Id.* ¶ 45.)

14        Plaintiffs' Complaint refers to both Apple's first sale of the iPhone in June 2007 and the

15  March 2008 release of a software development kit ("SDK") that enabled App developers to

16  lawfully access Apple's copyrighted iOS for the purpose of creating Apps for the iPhone. (*Id.* ¶¶

17  2, 26, 27, 38, 39.) Plaintiffs allege that prospective Apps developers were informed that

18  "developers' apps cannot be sold anywhere except in the App Store" and that Apple would retain

19  30% of the price of paid apps as a "commission." (*Id.* ¶ 40.) There are no allegations that

20  Apple's policies have changed in the last six years. The attack is entirely on decisions Apple

21  allegedly made when creating its iPhone ecosystem. At bottom, Plaintiffs' complaint is simply

22  that they do not like the nature of the original iPhone business model because, in their view, a

23  more "open" program would be better for developers and ultimately consumers.

24        Plaintiffs' SAC makes almost no meaningful changes to the allegations relevant to the

25  *Illinois Brick* issues. Plaintiffs' First Amended Complaint challenged what it called "Apple's

26  apportionment scheme" whereby "[i]f the application is not made available for free in the App

27  Store, Apple collects 30% of the sale of each application, with the developer receiving the

28  remaining 70%." (First Amended Complaint, Dkt. 81 ¶ 5.) Apple's *Illinois Brick* arguments

1   targeted that (close to accurate) description of Apple's policies, in response to which Plaintiffs

2   told the Court that they could allege that "iPhone consumers were forced *to pay Apple* a 30% fee

3   <u>on top of the cost for the apps</u>."  (Opp. to Mot. to Dismiss, Dkt. 99 ("Opp.") at 11, italics in

4   original, underscoring added.)  The SAC, however, does not allege that consumers pay Apple a

5   30% fee "on top of the cost for the apps."  Plaintiffs do repeatedly allege that consumers pay a

6   fee, which they call "Apple's fee," but they never allege that such a fee is added by Apple "on

7   top of the cost for the apps."  Instead, just as in the First Amended Complaint, Plaintiffs

8   acknowledge that "Apple takes its 30% commission off the top and then remits the balance, or

9   70% of the purchase price, to the developer."  (SAC ¶ 41; *see also id.* ¶ 40 (referring to a 30%

10  commission).)

11      Plaintiffs could never honestly allege that Apple adds a fee—any fee—to the price set by

12  developers for their Apps.  The truth of Plaintiffs' original allegation, repeated in SAC ¶ 41, that

13  Apple takes a commission off of *the developer's price,* is evident every time a consumer buys an

14  App from the App Store.

15  **V.      ARGUMENT**

16      **A.      The SAC Confirms That Plaintiffs Are Indirect Purchasers And Lack
                  Antitrust Standing Under *Illinois Brick***
17

18      The Order granting Apple's motion to dismiss contains an extensive analysis of the

19  *Illinois Brick* doctrine and the leading cases analyzing whether plaintiffs challenging price fixing

20  or monopolization taking place "upstream" from the plaintiffs have antitrust standing.  (Dkt. 108

21  at 15-20, discussing inter alia *In re ATM Fee* and *Campos v. Ticketmaster Corp.*, 140 F.3d 1166

22  (8th Cir. 1998).)  The Order explained that "[i]n the Ninth Circuit … 'the price paid by a plaintiff

23  must be set by the conspiracy [or monopolist] and not merely affected by the setting of another

24  price.'"  (*Id.* at 17) (quoting *In re ATM Fee,* 686 F.3d at 754).)  The Court found that Plaintiffs

25  had *not* met their burden of alleging a direct injury, because the operative complaint did not

26  allege a "'fixed' price, but rather a mark-up."  (*Id.* at 19.)  The Court acknowledged "Plaintiffs'

27  argument that iPhone consumers were forced to pay Apple a 30% fee *on top of the cost of the

28  app*" (*id.*, emphasis added), but declined to issue "an advisory opinion" about that contention

6

1   since the argument was "not reflected in the operative complaint." (*Id.* at 19, 20.)  The Court

2   recognized that Plaintiffs were muddling the distinct concepts of a *fee to developers* that is

3   reflected in the developer's price and a *fee added by Apple* to the developer's price, and therefore

4   directed Plaintiffs, in any amendment, to "explain how Apple's conduct results in increased

5   'prices' or how said prices were paid." (*Id.* at 19.)

6          The clear intent of the Order was to give Plaintiffs an opportunity to demonstrate that

7   they were not making a claim based on "mark-up" or pass-through dynamics, but instead based

8   on something Apple did directly to the consumer, *e.g.*, an Apple "fee on top of the cost of the

9   app."  The former theory is a non-starter, since the core holding of *Illinois Brick* is that due to the

10  "nearly insuperable difficulty" of trying to determine how much of an upstream price increase

11  may have been passed on downstream, a plaintiff whose claim is based on a "pass-on theory"

12  does not suffer injury within the meaning of Section 4 of the Clayton Act.  *Illinois Brick Co.*, 431

13  U.S. at 725 n.3, 726.  The latter theory is deficient as well, as seen in *Campos*.  140 F.3d at 1169-

14  71 (*Illinois Brick* barred claim even though Ticketmaster added fees made possible through

15  upstream monopolization).  But the Court understandably did not want to deal with that arguably

16  closer issue if it was not presented.

17         The Second Amended Complaint does its best to avoid doing what the Order directed,

18  while attempting to give the impression of compliance.  Instead of alleging evidentiary facts

19  about how Apple's App Store works or explaining the pricing mechanics, the SAC tries to talk

20  around the issue by using labels and conclusions that skirt the key point.  The most pertinent

21  allegations imply that (a) there is a 30% fee, (b) that fee is Apple's, (c) Apple collects it, and (d)

22  consumers pay it for every App they buy.  (*See* SAC ¶¶ 4, 6, 7, 8, 14, 41.)  But the allegations

23  studiously avoid a simple declarative sentence that Apple takes a price that has been established

24  by the developer and adds 30% (or anything) to that.  The Court was crystal clear that there is an

25  important difference between claiming that the fee Apple charges developers is included in the

26  price of an App and claiming that Apple charges its own fee on top of the developer-set price.

27  (Dkt. 108 at 19 n.14.)  In fact, that is the entire point of footnote 14 in the Court's Order.  Yet

28  Plaintiffs, knowing perfectly well that it would be frivolous to claim that Apple engages in the

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1    latter practice, dance around the issue with statements like Apple "charg[es] consumers an extra

2    30% for every app" (*see, e.g.*, SAC ¶ 8) that sound responsive to the Court's Order but are just a

3    repackaging of Plaintiffs' argument that the developer's price is burdened by Apple's

4    "commission."

5           These intentionally vague and conclusory allegations are particularly insufficient given

6    the Court's express direction to Plaintiffs to *explain how the 30% fee is paid by consumers*:  as a

7    pass-through from developers, or as an entirely separate charge Apple adds "on top of" the

8    developers' App price when the consumer makes a purchase.  (Dkt. 108 at 19-20.)  The Court

9    asked for clarity on a simple binary distinction about who *first* bears Apple's fee.  If it is the App

10   developer, then Plaintiffs do not have standing to pursue their claim against Apple—even if the

11   fee is "anticompetitive" and passed-through to the consumer.  *In re ATM Fee*, 686 F.3d at 744-

12   45, 754 (no consumer antitrust standing where consumers did not directly pay the allegedly fixed

13   fee from antecedent transaction between banks, and the ATM fees consumers did pay were at

14   most "merely affected by the setting of another price"); *Campos*, 140 F.3d at 1169-70  ("An

15   indirect purchaser is one who bears some portion of a monopoly overcharge only by virtue of an

16   antecedent transaction between the monopolist and another, independent purchaser.  Such

17   indirect purchasers may not sue ….").  Notwithstanding Plaintiffs' likely arguments to the

18   contrary, it makes no difference that Apple collects the price for the App from the consumer.

19   That was the case in both *In re ATM Fee*, 686 F.3d at 749-50 (plaintiffs dealt directly with

20   banks), and *Campos*, 140 F.3d at 1171 (plaintiffs bought tickets from Ticketmaster), and it did

21   not matter.  The fact of a pass-through, rather than the mechanism by which the pass-through is

22   collected, determines indirect purchaser status.  *See Campos*, 140 F.3d at 1171 ("we do not find

23   billing practices to be determinative of indirect purchaser status").

24          It is enough for this motion to be granted that Plaintiffs failed to include the allegation

25   about added fees that they told the Court they could plead.  Yet Plaintiffs also cannot bury their

26   earlier allegations *admitting there is no added fee*.  Plaintiffs' First Amended Complaint got the

27   relevant facts basically right, alleging that "[i]f the application is not made available for free in

28   the App Store, Apple collects 30% of the sale of each application, with the developer receiving

8

1   the remaining 70%." (First Amended Complaint, Dkt. 81 ¶ 5.) That does not now disappear.

2   "The amendment of a pleading does not make it any the less an admission of the party."

3   *Robinson v. Salazar*, 885 F. Supp. 2d 1002, 1024 n.12 (E.D. Cal. 2012) (quoting *Andrews v.*

4   *Metro N. Commuter R.R. Co*., 882 F.2d 705, 707 (2d Cir. 1989)). While a pleading may be

5   "superseded" by an amended pleading, the original pleading remains "admissible. . . as an

6   admission or prior inconsistent statement" that a Court may consider on a motion to dismiss. *Id.*

7   This Court need not presume the truth of any inconsistent allegation made by Plaintiffs and can

8   give full weight to Plaintiffs' earlier admission.[4]

9          Finally, *this* Complaint still admits the key facts. It states, "Apple takes its 30%

10   commission off the top and then remits the balance, or 70% of the purchase price, to the

11   developer." (SAC ¶ 41.) It also states, "Apple always conditioned its 'approval' of such apps on

12   the third party's agreement to give Apple *a share of the third party's sales proceeds*." (*Id.* ¶ 32,

13   emphasis added.) These allegations make clear that Apple's allegedly wrongful conduct acts in

14   the first instance *on developers*, effectively imposing a distribution cost on them. Most

15   everything else Plaintiffs allege, if true, would likewise only *restrict developers* (*i.e.*, the

16   restriction on developers' ability to use alternative means of distribution). The effects on

17   consumers are by definition indirect effects. The developer, not Apple, sets the "price" for the

18   App and the developer's ultimate proceeds are net of Apple's commission. It is the antecedent

19   transaction between Apple and the developer that causes the allegedly unlawful increase in the

20   price of Apps. As a result, Plaintiffs do not have antitrust standing.

21

22

23

---

24   [4]   *See Gray v. JPMorgan Chase Bank*, 2012 U.S. Dist. LEXIS 54549, at *4 (C.D. Cal. Apr. 18,
      2012) (ignoring and striking inconsistent allegations in an amended pleading where neither

25   plaintiffs' amended pleading nor opposition brief provided an explanation for the
      inconsistency between the original and amended pleadings); *Harbridge v. Schwarzenegger*,

26   2011 U.S. Dist. LEXIS 150789, at *3 n.3, 22 (C.D. Cal. Aug. 31, 2011) ("the court declines
      to accept the truth of the inconsistent allegations"); *Stearns v. Select Comfort Retail Corp*.,

27   763 F. Supp. 2d 1128, 1145 (N.D. Cal. 2010) (J. Fogel) (refusing to accept as true on a
      dismissal motion allegations that contradicted prior pleadings).

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

**B.     Plaintiffs Fail To Plead The Requisite Elements Of Their Antitrust Claims**

Plaintiffs' Apps claims also fail because they do not adequately plead the required elements of a monopolization or attempted monopolization claim.  Although there are multiple deficiencies concerning core issues such as market definition, monopoly power, and anticompetitive conduct, Apple will focus on the two most significant substantive deficiencies.

1.     **Plaintiffs Have Not Cured, And Indeed Have Exacerbated, The Deficiencies In Their Specious "Aftermarket" Theory**

To plead a monopolization claim, Plaintiffs must allege evidentiary facts suggesting that Apple "(i) possessed monopoly power in the relevant market[], (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury." *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997); *Trinko*, 540 U.S. at 407.  To support a claim of attempted monopolization, a plaintiff must plead: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).[5]

Monopoly power in a relevant antitrust market is the threshold element.  The Ninth Circuit has made clear that there are "legal principles that govern the definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."  *Newcal*, 513 F.3d at 1045.

In its prior motion to dismiss, Apple discussed at length Plaintiffs' theory that Apple is a monopolist—despite having many strong competitors like Samsung, Google, Microsoft, etc.— because there is separate and distinct "aftermarket" for iPhone applications.  Plaintiffs' theory does not rest on the absence of substitutes for iPhones or iPhone applications, since it is common knowledge that there are other brands of mobile phones in competition with Apple, each with

---

[5]  "The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full-blown monopolization has necessarily been accomplished."  *Ala. Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541-42 (9th Cir. 1991).

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1   their own versions of applications, including popular Apps such as Angry Birds or Facebook.

2   Rather, Plaintiffs' theory is that a distinct aftermarket for software applications for the iPhone

3   was created the moment Apple began selling iPhones in June 2007 because Apple did not obtain

4   consumers' "contractual consent" to its "closed system."  (SAC ¶¶ 14, 43, 65, 71, 76.)

5       "An aftermarket is a type of derivative market consisting of consumable goods or

6   replacement components that must be used for the proper functioning of some primary good."  P.

7   Areeda & H. Hovenkamp, *Antitrust Law* ¶ 564b (3d ed. 2006).  As the name implies,

8   aftermarkets involve goods or services purchased *after* the primary product.  In *Eastman Kodak*

9   *Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 476 (1992) ("*Kodak*"), the Supreme Court held

10  that firms with competition in the primary good (in that case a copier) can sometimes have

11  monopoly power in a derivative aftermarket (copier repair parts) if the aftermarket becomes

12  economically disassociated from the primary market.  That is not normally the case.  *See Kodak,*

13  504 U.S. at 477 n.24; *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17-18

14  (1st Cir. 1999).  As *Newcal* notes, the "economic presumption" is that aftermarket power is

15  ordinarily constrained by competition in the primary market because "consumers make a

16  knowing choice to restrict their aftermarket options when they decide in the initial (competitive)

17  market" to make a purchase that restricts later choices.  513 F.3d at 1050.  But in *Kodak*, the

18  Supreme Court noted that two economic conditions, "the existence of significant information and

19  switching costs," could cause an aftermarket to become disassociated from a primary market.

20  504 U.S. at 473.

21      Plaintiffs have now advanced an extreme twist on this doctrine, suggesting that a

22  manufacturer is required to obtain consumers' written contractual approval of its product design

23  or business model choices—*and if it does not it is an aftermarket monopolist*.  There is no

24  authority for this proposition.

25      *Newcal* is one of a number of cases holding that *if there is* contractual consent to

26  aftermarket restrictions, there *cannot be* aftermarket power.  513 F.3d at 1048 ("the law prohibits

27  an antitrust claimant from resting on market power that arises solely from contractual rights that

28  consumers knowingly and voluntarily gave to the defendant") (emphasis omitted).  The logic of

11

1   that rule is that explicit contractual consent to an aftermarket restriction removes all doubt as to

2   whether the consumer made a "knowing" decision to accept whatever is in the contract, so that it

3   is impossible to argue that the aftermarket is disassociated from the primary market.  Plaintiffs

4   seek a negative inference from this rule:  that without contractual consent there necessarily is

5   aftermarket power.  But that is both illogical (a tiny firm with dozens of strong competitors could

6   fail to get contractual consent; that would not give it monopoly power), and directly contrary to

7   *Newcal's* holding that "a consumer's selection of a particular brand in the competitive market

8   [can be] the functional equivalent of a contractual commitment," and is when consumers know

9   or could "reasonably discover" what awaits them in the aftermarket.  *Id.*  In fact, the aftermarket

10  case law consistently holds that where consumers can "reasonably discover" aftermarket

11  practices (and irrespective of whether they contractually agree to them) the aftermarket is *not* the

12  relevant antitrust market.  *Newcal*, 513 F.3d at 1048; *PSI Repair Servs., Inc. v. Honeywell, Inc.*,

13  104 F.3d 811, 820 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs, Inc.,* 73 F.3d 756,

14  763 (7th Cir. 1996); *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947,

15  956 (D. Ariz. 2001), *aff'd*, 52 F. App'x 897 (9th Cir. 2002).[6]

16          Plaintiffs do not even attempt to allege that they or other iPhone purchasers could not

17  "reasonably discover" Apple's allegedly "closed" App Store policies.  Plaintiffs do not allege

18  that the iPhone was ever what they accept as an "open" system, and Plaintiffs admit that "Apple

19  informs its prospective apps developers" that the developers' Apps cannot be distributed to

20  iPhones except through the App Store.  (SAC ¶ 40.)  Plaintiffs' Complaint offers no allegations

21  explaining why the information admittedly provided to App developers is not reasonably

22  discoverable by consumers such as Plaintiffs, especially given the alleged Apple warnings

23  regarding the use of unapproved third party applications.  (*Id.* ¶ 34.)  And the main thing

24  Plaintiffs' complain about, the fact that downloadable Apps can only be obtained through the

25  

26  [6]   In the seminal *Kodak* case, all nine Justices agreed that where consumers have reasonable
        notice of what awaits them in the aftermarket, they cannot claim later that they were victims
27      of an aftermarket monopoly.  *See Kodak*, 504 U.S. at 477 n.24 (majority opinion), 492
        (Scalia, J., dissenting); *see also Newcal,* 513 F.3d at 1048-49.

28  

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  App Store, is self-evident because, in fact, that is the only way to download Apps that run the

2  iOS operating system.  It is inconceivable that consumers could not "discover" that.

3  Accordingly, under *Newcal*, Plaintiffs' alleged aftermarket for software applications for the

4  iPhone is not a relevant antitrust market.[7]  513 F.3d at 1048-49.

5          2.      **Plaintiffs Fail To Allege That Apple's Alleged "Closed System"
                   Constitutes Unlawful Anticompetitive Conduct**

6

7          Possession of monopoly power will only be found to be unlawful where it is acquired or

8  maintained through *anticompetitive conduct*:

9              The mere possession of monopoly power, and the concomitant
10             charging of monopoly prices, is not only not unlawful; it is an
               important element of the free-market system. . . . To safeguard the
11             incentive to innovate, the possession of monopoly power will not
               be found unlawful unless it is accompanied by an element of
12             anticompetitive conduct.

13  *Trinko*, 540 U.S. at 407.  Plaintiffs fail to allege the "willful acquisition or maintenance of

14  monopoly power [by Apple] as distinguished from growth or development as a consequence of a

15  superior product, business acumen, or historic accident."  *United States v. Grinnell*, 384 U.S.

16  563, 570-71 (1966).

17         Plaintiffs' new claim is a broadside attack on Apple's fundamental decisions,

18  implemented upon its entry into the mobile phone business, to adopt what Plaintiffs call a

19  "closed" system, including for Apps distribution, and the steps Apple allegedly took to prevent

20

21  _____

    [7]  Plaintiffs' product market definition varies throughout the Complaint.  Plaintiffs allege both a
22  product market of "software applications that can be used only on iPhones" and also claim
    that the "aftermarket for iPhone applications *includes the market for distributing software*
23  *applications* that can be downloaded on the iPhone…."  (SAC ¶¶ 65, 68, emphasis added.)  A
    product market of all software applications for the iPhone is "overbroad" and "amorphous"
24  and fails as a matter of law.  *Universal Grading Serv. v. eBay, Inc.*, 2012 U.S. Dist. LEXIS
    2325, at *18-19 (N.D. Cal. Jan. 9, 2012).  Moreover, distribution services are a distinct
25  product from software applications and cannot be part of the same product market.  *Apple
    Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) ("Whether products are
26  part of the same or different markets under antitrust law depends on whether consumers view
    those products as reasonable substitutes for one another and would switch among them in
27  response to changes in relative prices[.]").

28

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1    hacking of that "closed" system.[8]  Plaintiffs allege that Apple

2          unlawfully acquired monopoly power by: (a) designing the iPhone iOS
3          as a closed system and installing security measures and program locks
           for the specific purpose of preventing Third Party App downloads; (b)
4          establishing the App Store as the exclusive worldwide distributor of
           iPhone apps; and (c) enforcing the App Store's monopoly status by
5          terminating or threatening to terminate apps developers who sell apps
           in competition with Apple and by voiding the warranties of iPhone
6          consumers who buy competing apps.

7    (SAC ¶ 71; *see also id.* ¶ 43.)  Plaintiffs assert that a more "open" Apps system would be better

8    for developers and consumers and that Apple was somehow obligated to provide their preferred

9    system.  Plaintiffs nowhere allege or explain what supposedly gives rise to this obligation.  There

10   is nothing in the case law that arguably condemns Apple's App Store policies, or allows

11   Plaintiffs' supposition—that a more "open" platform is preferable—to state a claim of

12   monopolization.  In fact, the law is to the contrary.

13          The Supreme Court has made clear that "there is no duty to aid competitors."  *Trinko*,

14   540 U.S. at 411.  As a result, even "a monopolist has no duty to help its competitors survive or

15   expand when introducing an improved product design."  *Tyco*, 592 F.3d at 1002; *see also id.* at

16   998-99 (establishing a rule protecting product redesign decisions from monopolization claims so

17   long as the new design improves on the old one).[9]  This is because when one creates something

18   _____

19   8    There are no allegations that Apple's supposed "closed system" restricts any developer's
         right or ability to create and distribute versions of the very same applications programmed to
20       work with different operating system platforms.  Nor could there be—there are innumerable
         examples of developers creating versions of popular Apps (*e.g.*, Angry Birds and Facebook)
21       for the many platforms that compete with Apple (*e.g.*, Google Android).  And consumers are
         of course free to choose that competing platform and access the very same software
22       applications, to the extent a developer has chosen to create a version of their application for
         the alternate platforms.  Consumers can also access a developer's web Apps, if the developer
23       chooses to offer them.

     9    "A monopolist, no less than any other competitor, is permitted and indeed encouraged to
24       compete aggressively on the merits, and any success it may achieve solely through 'the
         process of invention and innovation' is necessarily tolerated by the antitrust laws."  *Foremost
25       Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544-45 (9th Cir. 1983) (holding that
         plaintiff-photofinisher failed to state a Section 2 claim against defendant-manufacturer who
26       allegedly developed new products that were incompatible with then-existing products and
         with photofinishing equipment).  As the Ninth Circuit explained, the defendant had no duty
27       "to constrict[] product development so as to facilitate sales of rival products" or to help
         competitors "survive or expand."  *Id.* at 545 (citations omitted).

28

                                                 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT; MPAS IN SUPPORT
CASE NUMBER: C 11-06714-YGR

1   new, like the iPhone ecosystem, competition and consumer welfare are presumptively *enhanced*,

2   such that the Plaintiffs' complaint can at most be that the conduct failed to "optimize" consumer

3   welfare and competitive opportunities.  That, however, does not state a claim under the antitrust

4   laws.  "There is a difference between positive and negative duties, and the antitrust laws . . . have

5   generally been understood to impose only the latter."  *USM Corp. v. SPS Techs., Inc.*, 694 F.2d

6   505, 513 (7th Cir. 1982).  As a result, antitrust law is concerned only with conduct that leaves

7   markets *less competitive than they were*:  "[t]he true test of legality is whether the restraint

8   imposed . . . promotes competition or whether it is such as may suppress or even destroy

9   competition."  *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).  As stated in

10  *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 790 F. Supp. 804, 821 (C.D. Ill. 1992),

11  *aff'd*, 998 F.2d 391, 393 (7th Cir. 1993), "businesses needn't acquiesce to every demand placed

12  upon them by competitors or customers; their duties are negative – to refrain from

13  anticompetitive conduct – rather than affirmative – to promote competition." (citations omitted).

14        Arguably the most difficult type of conduct claim to advance—meaning the most

15  disfavored—is a challenge to the basic design of a product or a business.  "As a general rule,

16  courts are properly very skeptical about claims that competition has been harmed by a dominant

17  firm's product design changes."  *United States v. Microsoft Corp.,* 253 F.3d 34, 65 (D.C. Cir.

18  2001); *Tyco*, 592 F.3d at 998 (quoting *Microsoft*).  The standard a plaintiff must meet to

19  challenge a product design is severe:  unless the challenged design serves *no purpose other than*

20  *protecting a monopoly*, it is not actionable.  *Tyco*, 592 F.3d at 998.  "In contrast, a design change

21  that improves a product by providing a new benefit to consumers does not violate Section 2

22  absent some associated anticompetitive conduct."  *Id.* at 998-99.  Importantly, "[t]here is no

23  room in this analysis for balancing the benefits or worth of a product improvement against its

24  anticompetitive effects.  If a monopolist's design change is an improvement, it is 'necessarily

25  tolerated by the antitrust laws' unless the monopolist abuses or leverages its monopoly power in

26  some other way when introducing the product."  *Id.* at 1000 (citation omitted).

27        Here, Plaintiffs admit—as they must—that the iPhone was an improvement over previous

28  mobile devices; in fact, it is alleged to have "shifted the paradigm for smartphones, and it

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   changed the entire cell phone manufacturing industry."  (SAC ¶¶ 2, 26.)  Moreover, the

2   Complaint admits that the iPhone's supposedly "closed" iOS system has actually led to the

3   creation of more than 850,000 software applications (most of which are free) that have been

4   downloaded over 50 billion times.  (*Id.* ¶ 9.)  In other words, the allegedly "closed" iPhone

5   platform and the App Store have dramatically increased output and produced substantial benefits

6   for both developers and consumers.

7         Under *Tyco,* those are fatal admissions.  It simply cannot be that the design of the iPhone

8   and Apple's App Store serve no purpose other than to create or defend a monopoly when it

9   admittedly produced tangible consumer benefits of that dimension.  This means that Plaintiffs do

10   not—and cannot—plead that having the "closed" system constitutes anticompetitive conduct:

11   the design of the "system" cannot be deemed anticompetitive.  *Tyco,* 592 F.3d at 998-99.  At

12   least in theory, *something else*—"associated conduct"—might be anticompetitive, but the SAC

13   alleges nothing that might qualify.  *Id.* at 999.  The SAC targets the supposed "closed system"

14   itself, which is not actionable.

15         Plaintiffs have thus failed to state a cause of action for unlawful monopolization.

16   **VI.    CONCLUSION**

17         For the foregoing reasons, Apple's Motion to Dismiss should be granted and Plaintiffs'

18   Second Amended Complaint should be dismissed with prejudice.

19

20   Dated:  September 30, 2013               Respectfully submitted,

21                                      LATHAM & WATKINS LLP

22

23                            By      /s/ Daniel M. Wall

                                   Daniel M. Wall

                                   Attorneys for Defendant APPLE INC.

24   SF\5617471

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO