FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
ALEXANDER H. SCHMIDT (*pro hac vice*)
schmidt@whafh.com
MICHAEL M. LISKOW (243899)
restituyo@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile:  212/545-4677

Plaintiffs' Interim Class Counsel

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE iPHONE ANTITRUST LITIGATION | Lead Case No. C 11-06714-YGR |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT APPLE'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT** |
| | DATE:      November 5, 2013 |
| | TIME:      2:00 p.m. |
| | CRTRM:   5, 2nd Floor |
| | JUDGE:    Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................... 1

II.     THE CURATIVE FACTS ALLEGED IN
        THE SECOND AMENDED COMPLAINT ............................................................. 4

III.    LEGAL STANDARD .............................................................................................. 7

IV.     LEGAL ARGUMENT .............................................................................................. 7

        A.      Plaintiffs are Direct Purchasers
                with Antitrust Standing ................................................................................ 7

                1.      Apple's Argument Ignores the
                        Relevant Pleaded Facts ..................................................................... 7

                2.      Apple's Argument Ignores the
                        Well-Settled Law of this Circuit ...................................................... 9

        B.      Plaintiffs Plead Cognizable Aftermarket
                Monopolization Claims ............................................................................... 12

                1.      The Governing Law .......................................................................... 12

                2.      Apple's Arguments are Baseless ...................................................... 16

        C.      Apple is not Immune from the Antitrust Laws ........................................... 21

V.      CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES                                                                Page(s)

Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,
  592 F.3d 991 (9th Cir. 2010)................................................................ 24, 25

In re Apple & AT&TM Antitrust Litigation,
  596 F. Supp. 2d 1288 (N.D. Cal. 2008) ..............................................passim

In re Apple & AT&TM Antitrust Litigation,
  No. C 07-05152 JW,
  2010 U.S. Dist. LEXIS 98270 (N.D. Cal. July 8, 2010) ..................... 1, 9, 11

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
  472 U.S. 585 (1985) ............................................................................ 22, 23

In re ATM Fee Antitrust Litigation,
  686 F.3d 741 (9th Cir. 2012)........................................................ 1, 9, 10, 11

Campos v. Ticketmaster Corp.,
  140 F.3d 1166 (8th Cir. 1998)...................................................... 1, 9, 10, 11

Cascade Health Solutions v. PeaceHealth,
  515 F.3d 883 (9th Cir. 2008)........................................................................ 22

In re Cathode Ray Tube (CRT) Antitrust Litigation,
  911 F. Supp. 2d 857 (N.D. Cal. 2012) ................................................. 8, 9, 10

City of Anaheim v. S. Cal. Edison Co.,
  955 F.2d 1373 (9th Cir. 1992)..................................................................... 23

Eastman Kodak Co. v. Image Technical Services, Inc.,
  504 U.S. 451 (1992) .............................................................................passim

Forsyth v. Humana, Inc.,
  114 F.3d 1467 (9th Cir. 1997)................................................................ 12, 15

Free Freehand Corp. v. Adobe Systems Inc.,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ....................................................... 22

Gray v. JP Morgan Chase Bank,
  No. CV 11-05337 DDP (PLAx),
  2012 U.S. Dist. LEXIS 54549 (C.D. Cal. Apr. 18, 2012)............................ 12

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ................................................................................ 1, 7, 8, 10, 11

*High Technology Careers v. San Jose Mercury News,*
  996 F.2d 987 (9th Cir. 1993) ............................................................................... 17

*Image Technical Services v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) .................................................................... *passim*

*Kamakahi v. American Society for Reproductive Medicine,*
  No. C 11-01781 SBA,
  2013 U.S. Dist. LEXIS 61250 (N.D. Cal. Mar. 29, 2013) ........................................ 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................... 4

*Mercoid Corp. v. Mid-Continent Investment Co.,*
  320 U.S. 661 (1943) ............................................................................................. 24

*Newcal Industries, Inc. v. IKON Office Solution,*
  513 F.3d 1038 (9th Cir. 2008) ................................................................... *passim*

*PAE Gov't Servs., Inc., v. MPRI, Inc.,*
  514 F.3d 856 (9th Cir. 2007) ............................................................................... 11

*Queen City Pizza v. Domino's Pizza,*
  124 F.3d 430 (3d Cir. 1997) .......................................................................... 12, 13

*State National Insurance Co. v. Khatri,*
  No. C 13-00433 LB,
  2013 U.S. Dist. LEXIS 132167 (N.D. Cal. Sept. 13, 2013) .................................... 11

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  05-CV-1673-RS,
  2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ...................................................... 22

*Times-Picayune Publishing Co. v. United States*,
  345 U.S. 594 (1953) ............................................................................................. 23

*United States v. Apple Inc.,*
  12 Civ. 2826 (DLC), 12 Civ. 3394 (DLC),
  2013 U.S. Dist. LEXIS 96424 (S.D.N.Y. July 10, 2013) ...................................... 22

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ................................................................... 22, 24, 25

*United States v. Syufy Enterprises,*
  903 F.2d 659 (9th Cir. 1990) ............................................................................ 6

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) .......................................................................................... 22


**STATUTES & RULES**

Federal Rules of Civil Procedure 12(b)(6) ............................................... 13, 17

The Sherman Antitrust Act
  § 2 ..................................................................................................................... 21


**OTHER AUTHORITIES**

Duffy, M.M., *Note: Chipping Away at the Illinois Brick Wall: Expanding Exceptions*
  *to the Indirect Purchaser Rule,* 87 Notre Dame L. Rev. 1709, 1737 n.154 (2012) ................. 11

Phillip E. Areeda & Herbert Hovenkamp,
  *Antitrust Law* ¶ 501 (3d ed. 2007) .................................................................. 6

I.    **INTRODUCTION**

This Court's August 15, 2013 Order dismissing Plaintiffs' Amended Consolidated Complaint with leave to replead (Dkt. No. 108) ("Order") directed that Plaintiffs' second amended complaint should clarify that (i) each Plaintiff was a direct purchaser from Defendant Apple Inc. ("Apple") and (ii) each Plaintiff personally suffered an injury-in-fact. *Id*. at 10-11, 18.

As shown below, Plaintiffs' Second Amended Consolidated Class Action Complaint (Dkt. No. 111) ("SAC") amply clarifies and thus adequately pleads both Plaintiffs' direct purchaser status and their injury-in-fact. Apple tacitly concedes as much with respect to injury-in-fact and no longer challenges Plaintiffs' Article III standing. *See* Defendant Apple's Notice Of Motion And Motion to Dismiss Plaintiffs' Second Amended Complaint; Memorandum Of Points And Authorities In Support (Dkt. No. 115) ("Apple Mem."), at 3 (Statement of Issues to be Decided).

Apple continues to argue that Plaintiffs are indirect purchasers who lack antitrust standing by speciously "cherry-picking" from Plaintiffs' allegations to make them fit Apple's tired and contrived theory that, under *Campos v. Ticketmaster Corp*., 140 F.3d 1166 (8th Cir. 1998) (a case Judge Ware held is inapplicable to these iPhone actions), Apple's 30% fee is "passed-on" to Plaintiffs by apps developers rather than imposed by Apple and paid directly by Plaintiffs to Apple. Apple invites the Court to ignore the vast bulk of Plaintiffs' allegations, which show indisputably that Apple *itself* sells every app *directly* to iPhone consumers, Apple *itself* imposes and *directly* collects from iPhone consumers every 30% fee it charges, and Apple's 30% fee is a supracompetitive price that exceeds the prices consumers otherwise would pay for apps had Apple not unlawfully monopolized the iPhone apps aftermarket. In the Ninth Circuit, the direct purchaser rule is very straightforward: If Plaintiffs bought the alleged monopoly-priced item directly from the alleged monopolist, then Plaintiffs are direct purchasers. *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012). That is indisputably what happened here. Apple simply has no basis for asking this Court to ignore Judge Ware's earlier ruling that iPhone consumers are, in fact, *direct purchasers* of apps under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *In re Apple & AT&M Antitrust Litig.* ("*Apple I*"), No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270, at *40-42 n.27 (July 8, 2010).

Apple also attempts to revive arguments (also already rejected by Judge Ware) that Plaintiffs have failed to plead a cognizable aftermarket and that every iPhone purchaser supposedly "knew" (without being told) that Apple would monopolize the apps aftermarket. Apple seeks to induce the Court to revisit these previously rejected arguments by falsely claiming that Plaintiffs have added new allegations that "transform the case into something it has never been before." Apple Mem. at 1. That is not remotely true, as Plaintiffs' claims always have been about whether Apple unlawfully cornered the iPhone apps aftermarket by designing the iPhone's operating system to prevent iPhone customers from buying software applications for their iPhones from anyone other than Apple, so that Apple could extract a supracompetitive fee from every iPhone apps sale that is ever made. As Judge Ware found, Plaintiffs' apps claims are valid and sustainable Section 2 aftermarket monopolization claims under the Ninth Circuit's decision in *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008).

Apple stubbornly ignores one of the most fundamental principles for defining a relevant market in an aftermarket monopolization case – that the existence of competition in the primary product market is irrelevant, as Judge Ware explained in *Apple I*.[1] Thus, Apple's argument that the SAC should be dismissed unless the relevant market includes Android smartphones (and their apps) is disingenuous and fallacious. In any event, defining a relevant market is an inherently factual issue that should not be resolved on a motion to dismiss. So is the ultimate inquiry of whether iPhone buyers "knowingly and voluntarily" consented to Apple's aftermarket monopolization scheme, as Judge Ware also ruled.[2]

Finally, Apple's argument that it is immune from the anti-monopolization laws simply because it developed a new and improved smartphone is preposterous. Under Apple's theory, manufacturers would have *carte blanche* to trap unwitting customers into monopolized

---

[1] *Apple I*, 596 F. Supp. 2d at 1303 (under *Newcal*, "there can be a legally cognizable aftermarket in a single brand's products"); *see also id*. at 1305 (existence of competition in the primary product market does not in and of itself "'suffice to discipline anticompetitive practices in the aftermarket'") (quoting *Newcal*, 513 F.3d at 1050).

[2] *Id*. at 1306.

1  aftermarkets every time they tweaked a product design, and, with every Windows update,

2  Microsoft could legally delete any software previously loaded onto PC's nationwide and force PC

3  owners to buy replacement programs only from Microsoft for 30% above the software developers'

4  stated prices.  Unsurprisingly, Apple does not cite a single aftermarket monopolization case to

5  support its untenable theory, and none of the cases Apple does cite remotely condones the type of

6  rampant anticompetitive activity that its radical theory would generate if adopted by this Court.

7      It is well-settled in antitrust law that ordinarily lawful activities – such as a business

8  merger or designing a computer operating system – become unlawful if they are performed to

9  achieve an illegal anticompetitive objective.  That principle applies here.  Apple designed its

10  iPhone operating system to accept only Apple-approved software because Apple wanted to

11  unlawfully monopolize the iPhone apps aftermarket and reap the monopoly profits that would

12  naturally flow from being the sole iPhone apps distributor in the entire world.  No manufacturer

13  has a right to create a business model that violates the antitrust laws.  That includes Apple.[3]

14      Apple has undeniably succeeded in eliminating retail price competition for iPhone apps.

15  Even the apps developers themselves are forbidden by Apple from selling their own products

16  directly to iPhone consumers.  Absent Apple's unlawful exclusion of all competition from the

17  apps aftermarket, iPhone consumers could buy apps from the developers and numerous software

18  retailers without having to pay Apple's 30% fee, and many more apps would be available to

19  consumers in a competitive market than are available today.

20      Apple's feeble arguments on this motion do not and cannot possibly justify Apple's

21  blatantly anticompetitive misconduct, and Apple's arguments should be given the short shrift they

22  deserve.  Apple's motion to dismiss – it's *fourth* such motion in this case – should be promptly

23  denied so this case can at long last proceed to discovery and trial.

24

25  _____

26  [3]      Apple was recently adjudged an antitrust law violator in connection with selling e-books on its
    App Store.  The federal district court judge presiding over that trial found that Apple had "a blatant and
    aggressive disregard" for antitrust compliance and that one of the "principal goals" of Apple's business

27  model "was the elimination of all retail price competition."  *See* SAC ¶¶ 10-11 (SAC is hereafter cited by
    "¶" numbers).

28

1   **II.      THE CURATIVE FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT**

2          Plaintiffs' SAC cures each of the pleading deficiencies identified in the Court's Order.

3          With respect to Article III standing, the Court found that Plaintiffs' prior complaint failed

4   to demonstrate that Plaintiffs had individually suffered injury-in-fact because it pleaded only

5   "collective allegations that they have been deprived of lower cost alternatives, paid higher prices

6   for Apple-approved applications, *and/or* had their iPhones disabled or destroyed."  Order at 10

7   (emphasis in original).   To establish Article III standing, the Court ruled, Plaintiffs, "[a]t a

8   minimum, … must allege facts showing that each named Plaintiff has *personally suffered* an

9   injury-in-fact based on Apple's alleged conduct.  This requires that Plaintiffs at least purchased

10  applications."  *Id.*  (emphasis in original).  Further, the Court held that Plaintiffs must allege facts

11  showing that they each are among "the class they purport to represent – *i.e.*, 'persons … who

12  purchased an iPhone … and who then also purchased applications from Apple from December 29,

13  2007 through the present.'"  *Id.* at 10 n.5.

14         As Apple concedes, Plaintiffs' SAC cures the Court's observed deficiencies.    The

15  remaining named Plaintiffs each allege that they "purchased an iPhone and paid Apple for iPhone

16  apps during the Class Period."  ¶¶ 17-20.  Apple no longer argues that Plaintiffs lack Article III

17  standing.  *See* Apple Mem. at 3 (Statement of Issues to be Decided).[4]

18         As to Plaintiffs' antitrust standing, this Court held that Plaintiffs' direct purchaser status

19  depends on whether Apple's challenged 30% fee "was paid directly or through a pass-through"

20  and found that Plaintiffs' prior complaint failed to allege that the 30% fee is a "supracompetitive"

21  or "fixed" price.   Order at 19 (internal quotations omitted).   The Court directed Plaintiffs to

22  "explain how Apple's conduct results in increased 'prices' or how said prices were paid" to show

23  that the 30% fee was in addition to (or "on top of") the cost of the apps.  *Id.*

24  _____

25  [4]       The Order also stated that Plaintiffs should allege "'concrete and particularized'" facts showing a
    "'causal connection between the injury and the conduct complained of'" and that "the injury will likely be
26  redressed by a favorable decision."  *Id.* at 11 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61
    (1992)).  These requirements are met by the SAC's allegations explaining how Apple's conduct caused
27  Plaintiffs to buy apps at supracompetitive prices, which are detailed in the discussion of Plaintiffs' direct
    purchaser allegations below, and Plaintiffs' damages allegations.  *See* ¶¶ 74, 80.
28

Plaintiffs' SAC satisfies each of the Court's concerns.  *First*, the SAC alleges that Apple's 30% fee that Plaintiffs paid was "on top of" what Plaintiffs would otherwise pay for the apps:

- "Consequently, ***the prices for apps*** available in Apple's App Store ***include the developers' price plus Apple's 30%*** mark-up." ¶ 41 (emphasis added).
- Apple charges "***an extra 30%*** for every app." ¶ 8 (emphasis added).

*Second*, the SAC shows that Apple's 30% fee was a direct charge by Apple rather than a "pass-through" from the apps developers:

- "Apple owns 100% of the App Store, staffs the App Store with Apple employees or agents, and controls all of the App Store sales, revenue collections and other business operations." ¶ 39.
- "Apple informs its prospective apps developers … (but not its iPhone customers) that ***Apple will charge iPhone consumers*** a 30% commission for any non-free app sold in the App Store." ¶ 40 (emphasis added).
- "There is no legitimate basis ***for Apple … to charge its iPhone customers*** a 30% mark-up for any and all software they buy for their iPhones." ¶ 6 (emphasis added).
- "***Apple sells the apps*** (or, more recently, licenses for the apps) ***directly to the customer, collects the entire purchase price***, and pays the developers after the sale." ¶ 41 (emphasis added).
- Thus, "an iPhone customer ***buys an app from Apple***, [and] ***it pays the full purchase price, including Apple's 30%*** commission, ***directly to Apple***." *Id.* (emphasis added).
- "The ***developers at no time directly sell*** the apps or licenses to iPhone customers ***or collect payments*** from the customers." *Id.* (emphasis added).

*Third*, the SAC demonstrates why Apple's 30% fee was a supracompetitive price:

- "Apple has, from introduction of the iPhone 2G in 2007 through the present, cornered 100% of the worldwide distribution market for iPhone applications" and "has succeeded in totally eliminating any and all competition in that multi-billion dollar market." ¶¶ 3-4.
- "Apple did not want its iPhone-related revenue stream to end when a consumer bought an iPhone, like it generally does when consumers purchase iMac and MacBook computers.  So Apple concocted and maintained a plan to continue generating additional revenues over the entire useful life of every iPhone it sold by cornering the distribution market for iPhone applications and charging consumers an extra 30% for every app." ¶ 8.

- "In contrast to the robust competition Apple faces in the software aftermarket for its desktop and laptop computers, Apple wanted the entire iPhone software aftermarket for itself." ¶ 29.

- "Apple's monopolization of the iPhone applications aftermarket … *lock[ed] consumers into buying apps only from Apple and paying Apple's 30% fee, even if they wished to buy apps elsewhere or pay less*." ¶ 14 (emphasis added).

- "That Plaintiffs have paid supracompetitive prices is obvious" because under "hornbook" economics  the "absence of competition leads to increased prices, and … *an economically rational monopolist* [*like Apple*] that is unconstrained by the downward pricing pressures of a competitive market *will charge the highest price it can in light of the demand for its products.*"  ¶ 46 (emphasis added).[5]

- "Indeed, as shown above, the generation of monopoly profits was exactly why Apple chose to monopolize the iPhone apps aftermarket." ¶ 47.

- "That Apple's 30% fee is a monopoly price is also obvious from Apple's cost structure.  Each developer's $99 annual fee covers most or all of Apple's costs of reviewing that developer's apps and the related proportional costs of operating and maintaining the App Store, even if the developer submits several apps annually.   As to successive sales of that developer's apps, therefore, *Apple's 30% fee constitutes virtually pure profit for Apple*."  ¶ 48 (emphasis added).

- "In a competitive environment, where developers could sell their apps on their own websites without charging Apple's 30% mark-up and discount retailers could obtain volume discounts and *sell for far less than a 30% profit*, Apple would be under considerable pressure to substantially lower its 30% profit margin because, otherwise, its App Store would be priced out of the market and lose substantial market share.  *In a truly competitive iPhone apps distribution environment, Apple's 30% margin would be simply unsustainable*."   *Id.* (emphasis added).

*Finally*, the SAC shows how Apple's anticompetitive conduct caused Plaintiffs' injuries:

---

[5]    These basic economic principles are not subject to debate.  *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 501 (3d ed. 2007) (When a defendant with market power, such as a monopolist, is presented with "sufficient demand for the product and no significant rivals" selling the product, "the defendant can reap supracompetitive prices and profits" until existing rivals expand production or new rivals enter the market and "push prices back toward the competitive level.").  *See also*, *e.g.*, *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990) ("When a producer is shielded from competition, he is likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal.  This is the evil the antitrust laws are meant to avert.").  Apple has shielded itself entirely from competition in the iPhone apps aftermarket, and its exclusionary conduct ensures that no rivals can enter that market to push apps prices back to competitive levels.  *See* SAC ¶¶ 3-4, 7-9, 12, 28-31, 37, 42-43, 45-53.

- "Apple's unlawful monopolization of the apps market has enabled Apple to *charge and collect a supracompetitive 30% fee* from iPhone consumers for each and every one of the billions of iPhone apps they have bought since the iPhone's launch six years ago. Consequently, *iPhone consumers nationwide have paid hundreds of millions of dollars more for iPhone apps than they would have paid in a competitive market*." ¶ 4 (emphasis added).

- "The lack of a truly competitive environment has also led to *reduced output and supply* of iPhone apps because *developers are barred from selling apps at prices below Apple's inflated 30% marked-up price*." ¶ 50 (emphasis added).

- Plaintiffs' *"freedom to choose between Apple's high-priced App Store and less costly alternatives*, such as buying direct from apps developers or volume-driven and other software discounters[,] … *has been eliminated* by Apple's monopolistic conduct, and Plaintiffs have been forced to pay supracompetitive prices to Apple as a result." ¶ 49 (emphasis added).

## III.  LEGAL STANDARD

The standards for a motion to dismiss are set forth in the Court's Order, at page 13.  *See also Kamakahi v. Am. Soc'y for Reproductive Med.*, No. C 11-01781 SBA, 2013 U.S. Dist. LEXIS 61250, at *12-13 (N.D. Cal. Mar. 29, 2013).

## IV.  LEGAL ARGUMENT

### A.  Plaintiffs are Direct Purchasers with Antitrust Standing

#### 1.  Apple's Argument Ignores the Relevant Pleaded Facts

Apple's sole argument on the antitrust standing issue, that Plaintiffs are supposedly indirect purchasers of apps under *Illinois Brick*, is based on a "cherry-picked" and, therefore, fundamentally misleading version of the facts alleged in Plaintiffs' SAC.

Apple's whole argument rests on the *entirely false* premise that the SAC "does not allege that consumers pay a 30% fee 'on top of the cost for the apps.'"  Apple Mem. at 6, 7.  Apple simply ignores Plaintiffs' unequivocal allegation that "the prices for apps available in Apple's App Store *include the developers' price plus Apple's 30% mark-up*." ¶ 41 (emphasis added). The allegation that iPhone apps buyers pay the developers' price *plus* Apple's 30% fee is merely a technical, less colloquial way of saying that iPhone consumers pay Apple's 30% fee "on top of the cost for the apps."  Plainly, the two expressions mean precisely the same thing.  Thus, contrary to Apple's argument, Plaintiffs have indeed alleged in "a simple declarative sentence" that Apple's

1   fee is in addition to the developers' price for the apps.  *See* Apple Mem. at 7.  Apple's indirect

2   purchaser argument, which simply brushes aside this allegation, should fail for this reason alone.

3       Plaintiffs' allegation that iPhone apps buyers pay the apps developers' price "***plus***"

4   Apple's 30% fee is not even the sole allegation that makes this point.  Plaintiffs also make many

5   corroborative allegations, which Apple similarly ignores:  Plaintiffs allege that Apple charges "an

6   ***extra*** 30% for every app," ¶ 8 (emphasis added); that ***Apple*** charges the 30% fee, not the apps

7   developers, ¶ 40; that iPhone consumers would "pay less" for apps if they were not unlawfully

8   locked into buying apps only from Apple and paying Apple's 30% fee, ¶ 14; that apps developers

9   have been barred by Apple "from selling apps at prices below Apple's ***inflated 30% marked-up***

10  ***price***," ¶ 50 (emphasis added); that "Apple's 30% fee constitutes virtually pure profit for Apple,"

11  ¶ 48; that in "a competitive apps distribution environment," developers would be able to sell their

12  own apps directly to consumers "without charging Apple's 30% mark-up" and software retailers

13  could sell apps "for far less than a 30% profit," ¶ 48; and that the absence of competition has

14  caused iPhone consumers to pay "hundreds of millions of dollars ***more*** for iPhone apps than they

15  would have paid in a competitive market," ¶ 4 (emphasis added).

16      Taken collectively, these allegations plainly state that in a competitive market, apps

17  developers could have sold their own apps to Plaintiffs without adding on the 30% fee that Apple

18  forced Plaintiffs to pay in its monopolized apps aftermarket.  Absent Apple's unlawful monopoly,

19  consumers would have paid only the apps developers' lower prices.  Plaintiffs, therefore,

20  unambiguously allege that Apple's fee was "on top of" the developers' costs, thus unquestionably

21  demonstrating antitrust injury.

22      It is Plaintiffs' allegations, of course, and every reasonable inference therefrom that control

23  on this motion to dismiss.  *See* Order at 13.  Apple's alternative version of the facts drawn from its

24  misleading selection of just one snippet from the SAC is irrelevant and should be ignored.

25      Apple's indirect purchaser argument is factually nonsensical in any event.  As this Court

26  wrote, "[u]nder *Illinois Brick*, 'only the first party in the chain of distribution to purchase a price-

27  fixed product has standing to sue.'"  Order at 15 (quoting *In re Cathode Ray Tube (CRT) Antitrust*

28  *Litig*, 911 F. Supp. 2d 857, 864 (N.D. Cal. 2012) ("*In re CRT*")).  Thus, in this Circuit, an

1  "indirect purchaser" is a person who did not "'purchase[] directly from the alleged antitrust

2  violator,'" and a "direct purchaser" is someone who bought directly from the wrongdoer. *In re*

3  *CRT*, 911 F. Supp. 2d at 864 (quoting *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-12

4  (9th Cir. 1984)). *See also In re ATM Fee Antitrust Litig.*, 686 F.3d at 749-50 (plaintiffs who "did

5  not directly pay the alleged fixed interchange fees" to alleged wrongdoer are indirect purchasers).

6      Here, the "price-fixed products" are the apps and Apple is the "alleged antitrust violator."

7  *In re CRT*, 911 F. Supp. 2d at 864. **Apple** imposes the illegal 30% fee on top of the price of the

8  apps, Plaintiffs purchase the illegal-fee laden apps ***directly from Apple***, and Plaintiffs pay the

9  illegal 30% ***directly to Apple***, which keeps the entire 30% fee ***for itself***. SAC ¶¶ 40-41. Plaintiffs,

10  therefore, are the direct purchasers and have standing to sue for damages under this Circuit's

11  "straightforward" direct purchaser analysis. *In re CRT*, 911 F. Supp. 2d at 864.

12      Moreover, ***only the Plaintiffs "purchased" apps***. Apple does not buy apps – it ***sells*** them.

13  The apps developers also ***sell***, rather than buy, apps. Thus, Plaintiffs are not merely "the ***first***

14  party in the chain of distribution to purchase [the] price-fixed product," Order at 15, Plaintiffs are

15  the ***only party*** in the chain that ***buys*** the price-fixed product. Apple does not explain how the apps

16  developers, whom Apple contends are the direct purchasers, could possibly be labeled as such

17  when they ***sold*** rather than purchased apps.

18      When Judge Ware rejected Apple's identical indirect purchaser argument in *Apple I*, he

19  ruled that Plaintiffs' claims do "not rest on an indirect purchaser model" but on "sales of approved

20  apps through [Apple's] App Store." *Apple I*, No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270,

21  at *40-42 n.27 (N.D. Cal. July 8, 2010). Nothing about that has changed, and there is no basis for

22  revisiting Judge Ware's sound conclusion here.

23        **2.**    <u>**Apple's Argument Ignores the Well-Settled Law of this Circuit**</u>

24      Notwithstanding that the lynchpin ***in this Circuit*** for direct purchaser status is whether the

25  Plaintiffs bought the apps directly from the alleged wrongdoer and paid the alleged unlawful fee

26  directly to the wrongdoer, Apple argues yet again that, under the Eighth Circuit's *Campos v.*

27  *Ticketmaster* decision, "it makes no difference that Apple collects the price for the App from the

28

1   consumer." Apple Mem. at 8. Apple stubbornly refuses to accept that *Campos* is irreconcilable

2   with the governing Ninth Circuit law.

3       *Campos* was a split decision where the dissenting judge properly maligned the majority for

4   creating the concept of an "antecedent transaction" that "appears nowhere" in *Illinois Brick* or any

5   other direct purchaser case and which upends the traditional rule that an "indirect purchaser" is

6   "someone in a vertical supply chain who purchases a monopolized product ***from someone other***

7   ***than a monopolist***." *Campos*, 140 F.3d at 1174 (Arnold, J., dissenting) (emphasis added). That

8   traditional definition of an "indirect purchaser," not the *Campos* majority's aberrant view, is the

9   controlling law in the Ninth Circuit. *See In re ATM Fee*, 686 F.3d at 749-50; *In re CRT*, 911 F.

10  Supp. 2d at 864. Because it is at odds with binding Ninth Circuit precedent, the *Campos*

11  majority's "antecedent transaction" concept of an indirect purchaser cannot be applied in this case.

12      But Apple's theory is exactly that: an "antecedent transaction" theory. *See* Apple Mem. at

13  8 (quoting *Campos*, 140 F.3d at 1169-70). Apple posits (based on its selective reading of the

14  SAC) that because Apple *told* the apps developers that Apple would charge a 30% fee on all App

15  Store purchases *before* Apple actually charged and collected that fee from iPhone consumers,

16  Apple's fee *could be* a "pass through" from the apps developers under *Campos*. Apple Mem. at

17  8.[6] Any such antecedent communication between Apple and the developers, Apple argues,

18  insulates Apple from liability to Plaintiffs under *Campos* – even if Plaintiffs bought the apps

19  directly from Apple, Plaintiffs directly bore "the entirety of the monopoly overcharge," *Campos*,

20  140 F.3d at 1174 (Arnold, J., dissenting), and Plaintiffs were the only ones damaged by Apple's

21  imposition of its alleged illegal 30% fee. Unfortunately for Apple, "*Illinois Brick* requires more

22  than a mere antecedent transaction for an antitrust defendant to avoid suit." *Id.* Because *Campos*

23  is plainly not the law in this Circuit, Apple's indirect purchaser theory fails.

24

25

---

26  [6]     Apple does not actually take the position that the apps developers paid any portion of Apple's 30%
    fee. Instead, Apple merely speculates that "*[i]f it is* the App developer" who "*first* bears Apple's fee," then
27  Plaintiffs lack standing. App. Mem. at 8 (first emphasis added). Apple's speculation, of course, is
    inconsistent with Plaintiffs' allegations and cannot be considered on this motion.
28

1    Apple continues wrongly to imply that the Ninth Circuit adopted the *Campos* approach in

2   the *ATM Fee* case.  But the Ninth Circuit did not even cite *Campos* in *ATM Fee*, much less adopt

3   it, and the facts of the two cases are vastly different.  The *ATM Fee* case involved classic indirect

4   purchaser allegations:   the plaintiffs claimed that the defendants fixed one fee, called the

5   "interchange fee," which the plaintiffs did ***not*** pay, and that the enhanced price was "passed on"

6   by others in the form of ***another*** fee, called the "foreign ATM fee," which the plaintiffs did pay.

7   Because the plaintiffs did not pay the illegally fixed fee to the alleged wrongdoer, the court ruled

8   they were indirect purchasers.  686 F.3d at 749-50.  The case, therefore, contradicts rather than

9   supports *Campos*'s counterintuitive "antecedent transaction" definition of an indirect purchaser.

10   *Campos* has rightly "been widely criticized for a variety of reasons."  Duffy, M.M., *Note:*

11   *Chipping Away at the Illinois Brick Wall: Expanding Exceptions to the Indirect Purchaser Rule*,

12   87 Notre Dame L. Rev. 1709, 1737 n.154 (2012).  As this Court noted, Judge Ware found no

13   "Ninth Circuit case that applied *Illinois Brick* in th[e] manner" that *Campos* did, *see* Order at 18

14   n.13 (quoting *Apple I*).  Judge Ware properly "decline[d] to do so" in *Apple I*, 2010 U.S. Dist.

15   LEXIS 98270, at *40-42 n.27, and this Court should likewise ignore *Campos* here.

16   Apple's argument that Plaintiffs should be held to a supposed "admission" in their prior

17   complaint that there "is no added fee" and that the Court "need not presume the truth of any

18   inconsistent allegation" in the SAC, Apple Mem. at 8 (emphasis deleted), is frivolous.  Plaintiffs

19   made no such admission, and the cases on which Apple relies have been effectively overruled by

20   the Ninth Circuit.  Any such rule would effectively deny plaintiffs the benefit of orders granting

21   leave to replead.  *See State Nat'l Ins. Co. v. Khatri*, No. C 13-00433 LB, 2013 U.S. Dist. LEXIS

22   132167, at *20-21 (N.D. Cal. Sept. 13, 2013) ("there is nothing in the Federal Rules of Civil

23   Procedure to prevent a party from filing successive pleadings that make inconsistent or even

24   contradictory allegations") (citing *PAE Gov't Servs., Inc., v. MPRI, Inc*., 514 F.3d 856, 859-60

25   (9th Cir. 2007) (absent showing of bad faith under Rule 11, "[t]he district court has no free-

26   standing authority to strike pleadings simply because it believes that a party has taken inconsistent

27   positions")).

28

The cases Apple cites, *see* Apple Mem. at 9 n.4, in any event are not remotely on point. The plaintiffs in those cases pleaded diametrically contradictory facts in successive complaints and failed to explain the reasons for the change.  Here, Apple **concedes** that Plaintiffs' SAC ***still*** pleads the same supposed admission, *id.* at 9, and Plaintiffs have explained they have ***always*** pleaded (or at least attempted to) that Apple's 30% fee was an "added fee" on top of the app developer's price.  The SAC's allegations therefore must be afforded their ordinary due weight. *See*, *e.g.*, *Gray v. JP Morgan Chase Bank*, No. CV 11-05337 DDP (PLAx), 2012 U.S. Dist. LEXIS 54549, at *5 (C.D. Cal. Apr. 18, 2012) ("Where a party explains the error in a subsequent pleading or by amendment, the court must afford the explanation due weight.").

**B.**     **Plaintiffs Plead Cognizable Aftermarket Monopolization Claims**

**1.**     **The Governing Law**

Apple concedes that Plaintiffs' claims are controlled by the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs.*, *Inc.*, 504 U.S. 451 (1992), and the Ninth Circuit's application of *Kodak* in *Newcal*, 513 F.3d at 1038.  Contrary to Apple's argument, however, those cases – particularly the Ninth Circuit's analysis in *Newcal* – compel the conclusion that Plaintiffs' apps aftermarket claims are adequately pled.

In *Newcal*, the Ninth Circuit sustained a complaint alleging that IKON, a copier manufacturer, schemed to foreclose competition in two aftermarkets – one for "upgrade equipment" and another for "lease-end services" – by inducing customers to sign lease and service contract amendments that secretly extended the duration of its customers' original agreements. 513 F.3d at 1043-44.  The Ninth Circuit held that each of the two alleged aftermarkets was a "relevant market" in which IKON had market power for antitrust purposes.  *Id.* at 1046.

In *Newcal*, the Ninth Circuit analyzed the issue, first, by distinguishing two cases on which Apple once relied, *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430 (3d Cir. 1997), and *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997).  The Ninth Circuit found that in both cases the plaintiffs had ***entered into contracts*** binding them to buy aftermarket products solely from the defendants and, therefore, could not plead viable "economically distinct" aftermarkets.  513 F.3d at 1046-47 (Dominos' franchisees "knowingly and voluntarily signed" "an explicit contractual

provision" to use "only Domino's-approved ingredients and supplies"; Humana's insureds'

policies had "explicit contractual provisions" limiting them to using certain hospitals).

The Ninth Circuit next analyzed *Kodak* and, distinguishing that case from *Queen City Pizza* and *Humana*, found that *Kodak* supported plaintiff Newcal's aftermarket definition:

> The critical distinction between *Eastman Kodak* and the two circuit court opinions was that the ***Kodak customers did not knowingly enter a contract*** that gave Kodak the exclusive right to provide parts and services for the life of the equipment. In other words, ***the simple purchase of Kodak-brand equipment*** (unlike the signing of a Domino's franchise agreement or the purchase of a Humana insurance policy) ***did not constitute a binding contractual agreement*** to consume Kodak parts and services in the aftermarket.

513 F.3d at 1048 (emphasis added). The Ninth Circuit continued:

> Equally critically, the Supreme Court found that market imperfections, including information and switching costs, ***prevented consumers from discovering***, as they were shopping for equipment, ***that the Kodak brand would include a de facto commitment to consume only supracompetitively priced Kodak-brand service contracts***.

*Id.* (citations to *Kodak* omitted) (emphasis added).

Thus, under *Newcal*, the relevant inquiry for ascertaining if a proper antitrust aftermarket has been alleged is (i) "whether a consumer's selection of a particular brand in the competitive market is the ***functional equivalent of a contractual commitment*** giving that brand an agreed-upon right to monopolize its consumers in an aftermarket," and (ii) "whether consumers ***entered into such 'contracts' knowing*** that they were agreeing to such a commitment." 513 F.3d at 1049 (emphasis added). Whether consumers "knowingly contracted" and committed to buy aftermarket services and products only from the branded manufacturer is, of course, ***an inherently factual inquiry***, like other "market definition" related inquiries. *See id.* at 1045, 1051.

Under *Newcal*, the relevant inquiry on this Rule 12(b)(6) motion challenging Plaintiffs' aftermarket definition is whether Plaintiffs have plausibly alleged that, ***when buying their iPhones, they did not contract knowingly*** to buy only "Apple-approved" iPhone applications for as long as they owned their iPhones, and did not knowingly contract ***to pay Apple a 30% fee for every app*** they buy in Apple's App Store. The facts alleged in the SAC more than plausibly

1  demonstrate that Plaintiffs did not knowingly agree to do either of those things, *see* ¶¶ 3, 14, 44,

2  *and Apple does not contend otherwise* with respect to the 30% fee.

3        In *Newcal*, the Ninth Circuit resolved the relevant inquiry in the plaintiff's favor for four

4  reasons, each of which compels the same result here.  *First*, Newcal pled the existence of both a

5  competitive "primary" product (the initial copier lease and service agreement) and "an aftermarket

6  [for replacement equipment and lease-end services] in which the consumers claim that they should

7  be able to shop for a secondary product."  513 F.3d at 1049.  Here, Plaintiffs allege a competitive

8  primary product (the iPhone) and an aftermarket in which Plaintiffs want the freedom to shop for

9  secondary products – apps that can be purchased without Apple's 30% fee.

10        As explained in *Newcal*, the secondary market should be "derivative from and dependent

11  on" the primary market; that is, the secondary market would not exist without the primary market.

12  *Id.*  This addresses the Supreme Court's concern in *Kodak* that suppliers of a primary product

13  might exploit their "unique position" with their customers "to gain monopoly power in the

14  derivative services market" when such power "was neither naturally nor contractually created."

15  *Id.*  In *Newcal*, the market for copier parts and services was derivative from and dependent on the

16  market for copiers, and that market would not exist without the market for initial leases and

17  service contracts.  *Id.*  While IKON had a "contractually-created monopoly over services provided

18  under *original* IKON contracts" that did not itself violate the antitrust laws, it gave IKON a

19  unique "contractual *relationship*" with those original consumers that IKON, like Kodak, exploited

20  "to gain monopoly power in a derivative aftermarket in which its power is not contractually

21  mandated" or "naturally created."  *Id.* at 1049-50 (emphasis in original).

22        As Judge Ware previously found, *Apple I*, 596 F. Supp. 2d at 1304, 1306, Plaintiffs make

23  an identical claim here.  The iPhone was a unique and innovative product through which Apple

24  lawfully gained a contractual relationship with consumers who bought the product.  Apple

25  exploited that original contractual relationships and its position as the provider of the iPhone

26  operating software to prevent consumers from buying iPhone apps in which Apple has no

27  financial interest, thus giving Apple supracompetitive profits and a monopolistic control over the

28  applications aftermarket that it neither naturally nor contractually earned.  SAC ¶¶ 7, 14, 26-44.

1    Accordingly, under *Newcal*, Plaintiffs allege that the iPhone applications aftermarket is a derivate

2    market that would not exist without the primary market for iPhones.  *See also* SAC ¶ 69.

3         *Second*, the Ninth Circuit found a viable *Kodak* claim in *Newcal* because Newcal's

4    allegations of anticompetitive conduct related "only to the aftermarket" and not to the primary

5    market.  513 F.3d at 1050.  Again, as Judge Ware previously found, Plaintiffs make the same

6    allegation here.  *Apple I*, 596 F. Supp. 2d at 1304.

7         *Third*, the plaintiffs in *Newcal* alleged that IKON's market power was derived from the

8    "relationship with" and "special access" to its consumers.  *Newcal*, 513 F.3d at 1050.  "In other

9    words, no provision of IKON's initial contract [gave] it the power … to extend the contract

10   beyond 60 months … or to prevent competition in lease-end services."  *Id.*  Here, nothing in

11   Apple's terms of sale with iPhone purchasers – or any other agreement between the parties for that

12   matter – gave Apple the exclusive right to dictate the use of only Apple-approved applications or

13   to charge a 30% surcharge on every app.  Instead, Apple derived its aftermarket power solely from

14   its relationship with and special access to iPhone customers, who were already invested in the

15   expensive product.  *See Apple I*, 596 F. Supp. 2d at 1306.  *See also* SAC ¶¶ 7, 14, 26-44.

16        *Fourth*, in *Newcal*, "market imperfections" and the defendants' "fraud and deceit" in

17   failing to disclose their intent to monopolize the aftermarkets, "***prevent[ed] consumers from***

18   ***realizing that their choice in the initial market will impact their freedom to shop in the***

19   ***aftermarket***."  *Newcal*, 513 F.3d at 1050 (emphasis added).  Just as in *Kodak* and *Newcal*,

20   Plaintiffs' factual allegations here rebut any "presumption that [iPhone] consumers make a

21   knowing choice to restrict their aftermarket options when they decide in the initial (competitive)

22   market" to buy an iPhone.  *Id.  See also* SAC ¶¶ 3, 14, 27-28, 40-41, 44, 52-53, 65.

23        In the end, the Ninth Circuit explained that Newcal's case against IKON is:

24        not a case in which the alleged market power flows from contractual exclusivity.
          IKON is not simply enforcing a contractual provision that gives it the exclusive right
25        to provide replacement equipment and lease-end services. Rather, ***it is leveraging a***
          ***special relationship with its contracting partners to restrain trade in a wholly***
26        ***derivative aftermarket***.  We therefore reverse the district court's holding that
          *Queens City Pizza* and *Forsyth* render Newcal's complaint legally invalid.
27

28   *Id.* (emphasis added).

1    Following *Newcal*, Judge Ware held that the plaintiffs in *Apple I* likewise had plausibly

2    alleged a relevant market and market power in connection with their apps claims:

3
         **Plaintiffs have alleged an aftermarket for iPhone applications that "would not**
4        **exist without" the primary market for iPhones**, and is thus "wholly derivative from
         and dependent on the primary market." … **The allegations in the Complaint recite**
5        **facts, which, if presumed to be true, would support the existence of an aftermarket**
         **for iPhone applications**…. Plaintiffs … have alleged that Apple enforced entry into
6        the Applications Aftermarket, and limited access to software applications in which it
         maintained a financial interest.
7

8                                         *        *        *

9        Through the initial iPhone purchase and contracting, **Apple is alleged to have**
         **gained the "special access" to consumers by which it is then able to lock**
10       **consumers into use of only applications in which Apple maintained a financial**
         **interest**. … Apple is then alleged to have enforced its special position through
11       technological controls and the issuance of software update Version 1.1.1.

12       In sum, **Plaintiffs have sufficiently alleged market power and monopolization** in
         the iPhone voice and data services [sic – applications] aftermarket, **which, taken**
13       **with Plaintiffs' market allegations, is sufficient to state a claim for violation of § 2**
         **of the Sherman Act**.
14

15
16   *Apple I*, 596 F. Supp. 2d at 1304, 1306 (citations omitted) (emphasis added).

17       This Court should reach the exact same conclusion and should likewise sustain Plaintiffs'

18   iPhone applications aftermarket claims here, which are identical to those made in *Apple I*.

19                          **2.    Apple's Arguments are Baseless**

20       Apple makes several cursory and rambling arguments in its misguided effort to have this

21   Court overrule Judge Ware's earlier ruling.  Each such argument is easily dispatched.

22       Initially, Apple repeats its canned argument that the product market in this case includes

23   other smartphones made by Samsung and Google and others, as well the apps that work only on

24   their phones (and which do not work on iPhones).  Apple Mem. at 10-11.  This argument ignores

25   a fundamental principle for defining a relevant market in an aftermarket monopolization case –

26   that the existence of competition or market power in the primary product market (here, the

27   smartphone market) is irrelevant.  As Judge Ware explained in *Apple I*, in an aftermarket case,

28   "according to the *Newcal* analysis, **there can be a legally cognizable aftermarket in a single**

1   ***brand's products, even if that market is created by a contractual relationship***."  596 F. Supp. 2d

2   at 1303 (emphasis added); *see Newcal*, 513 F.3d at 1048 ("the law permits an antitrust claimant to

3   restrict the relevant market to a single brand of the product at issue").  That is because an

4   aftermarket is, by definition, one that is "wholly derivative from and dependent on the primary

5   market" and would not exist otherwise, *Newcal*, 513 F.3d at 1049, and because the existence of

6   competition in the primary product market does not in and of itself "'suffice to discipline

7   anticompetitive practices in the aftermarket.'"  *Apple I*, 596 F. Supp. 2d at 1305 (quoting *Newcal*,

8   513 F.3d at 1050).

9       This principle has been well-known since the Supreme Court decided *Kodak* in 1992.  The

10  Ninth Circuit stated after remand in *Kodak* that "the Supreme Court noted ***two guiding principles***

11  pertinent to the relevant market definition" in an aftermarket monopolization case, the second of

12  which is "***that a single brand could constitute a separate market***."  *Image Tech. Servs. v.*

13  *Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) (emphasis added).  Thus, in *Kodak*,

14  "there was no claim" – and no need to plead – "that Kodak held market power ***in the predicate***

15  ***market for copiers themselves***."  *Apple I*, 596 F. Supp. 2d at 1302 (emphasis added); s*ee Newcal*,

16  513 F.3d at 1046, 1048.  Apple knows this, and its obstinate argument to the contrary is

17  disingenuous.

18       "Ultimately, what constitutes a relevant market is a factual determination for the jury."

19  *Image Tech. Servs.*, 125 F.3d at 1203 (citation omitted).  Because the market definition and

20  market power elements of an antitrust claim need not "be pled with specificity" and "the validity

21  of the 'relevant market' is typically a factual element rather than a legal element, alleged markets

22  may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or

23  trial."  *Newcal*, 513 F.3d at 1045 (citing *High Technology Careers v. San Jose Mercury News*, 996

24  F.2d 987, 990 (9th Cir. 1993) (market definition depends on "a factual inquiry into the

25  'commercial realities' faced by consumers")) (other citations omitted).  Apple's contention that

26  this is not a case like *Kodak* where a single-brand aftermarket is appropriate, Apple Mem. at 11,

27  apart from being incorrect, cannot be accepted on a 12(b)(6) motion and must await discovery and

28  expert witness analysis.

1     Contrary to Apple's next argument, an "aftermarket" is not a market that literally appears

2  only "after" the primary product is purchased.  Rather, it is a market for parts, goods or services

3  that is "wholly derivative from and dependent on the primary market" product and would not exist

4  otherwise.  *Newcal*, 513 F.3d at 1049; *Apple I*, 596 F. Supp. 2d at 1303.  Plainly, iPhone apps

5  would not exist without the iPhone.  Apple does not cite a single case supporting its purely

6  semantic argument that, "[a]s the name implies, aftermarkets involve goods or services purchased

7  *after* the primary market."  Apple Mem. at 11.  Apple does, however, overlook that Judge Ware

8  held precisely the opposite when he rejected Apple's identical argument concerning the *Apple I*

9  plaintiffs' voice and data aftermarket claims.  There, Judge Ware correctly ruled that an

10  aftermarket, in fact, can begin when an iPhone is purchased.[7]  Even if Apple's definition was

11  correct, it could not be a basis for dismissal because it is beyond dispute that Plaintiffs had no

12  choice but to purchase all of their apps *after* they bought their iPhones.  As a practical matter, they

13  could not buy any apps until they took their iPhones home and registered them on iTunes.

14     Apple wildly misses the mark by arguing that "Plaintiffs have now advanced an extreme

15  twist" on the *Newcal* aftermarket doctrine by suggesting that an aftermarket monopolist will be

16  held liable for an antitrust violation unless it obtains "written contractual approval" from its

17  customers.  Apple Mem. at 11.  *First*, Plaintiffs do not allege that "written" contractual approval is

18  required, and Apple does not cite an SAC paragraph that does.  *Newcal* holds that consumers must

19  "enter into" the "functional equivalent of a contractual commitment" in which they "knowing[ly]"

20  give the defendant "an agreed-upon right to monopolize its consumers in an aftermarket."  513

21  F.3d at 1049.  That is precisely what Plaintiffs allege did ***not*** happen here.

22     *Second*, Apple grossly mischaracterizes *Newcal* by stating that it merely held "that *if there*

23  *is* contractual consent to aftermarket restrictions, there *cannot be* aftermarket power."  Apple

---

25  [7]   *See Apple I*, 596 F. Supp. 2d at 1303-04 ("Apple also contends that there is no aftermarket because

26  'the iPhone purchase and ATTM service agreement were both part of the *initial foremarket transaction*,"
but the aftermarket "allegations state a claim which is ripe for adjudication because Plaintiffs are alleging

27  that at the point of purchase and initiation of service, Defendants involuntarily impose on consumers a
contract exclusivity restriction which restricts their freedom from that point forward … conceivably for the

28  life of the iPhone.") (emphasis in original).

---

1  Mem. at 11 (emphasis in original).  As shown above, *Newcal* most certainly also held that a

2  plaintiff who alleges it did not knowingly enter into the functional equivalent of a contract states a

3  valid aftermarket claim.  There are many elements to proving that claim, including in this case that

4  the iPhone apps aftermarket is indeed the relevant market.  If Plaintiffs prove that (which they

5  will), then Apple indisputably has market power in that market because ***it controls 100% of it***.  If

6  Plaintiffs then prove that they did not knowingly consent to let Apple monopolize and charge

7  monopoly prices in that aftermarket (which they also will), then, under *Newcal*, Apple will be

8  liable for Plaintiffs' damages.

9       Apple is dead wrong when it argues that Apple cannot be held liable here because it

10 believes consumers could have "reasonably discover[ed]" that "Apps can only be obtained

11 through the App Store."  Mem. at 12-13 (citing *Newcal*, 513 F.3d at 1048) (other citations

12 omitted).  Plaintiffs need only show that they did not knowingly consent to Apple's aftermarket

13 monopolization and do not have to plead or prove that they could not have discovered Apple had

14 corned the apps market.  *Apple I*, 596 F. Supp. 2d at 1306 (an aftermarket "monopolization claim

15 ***can proceed*** where it is alleged that a plaintiff did not 'knowingly and voluntarily' place the

16 defendant in a monopoly position") (emphasis added).  If Plaintiffs had that burden, they would

17 easily meet it.  Consumers who bought iPhones before the App Store opened certainly could not

18 reasonably have known about it, and to this day Apple does not advertise or disclose the existence

19 of its App Store monopoly to any of the millions of people who visit Apple's retail stores or shop

20 on-line every day.  It is only after the point of purchase, and often well after, that shoppers

21 discover that they can only download Angry Birds or Facebook apps from the App Store and

22 cannot obtain those apps anywhere else, not even from the app developers themselves.

23      Assuming, *arguendo*, that Plaintiffs had the burden and failed to prove that they could not

24 reasonably have discovered the App Store's monopoly, it would not end the case, even under

25 Apple's theory.  *Newcal* makes clear that, in addition to determining whether Apple's customers

26 knowingly entered a contract giving Apple a monopoly, it is equally critical to determine whether

27 those customers ***also knew*** that buying an iPhone "would include a *de facto* commitment to

28 consume only ***supracompetitively priced***" apps.  *Newcal*, 513 F.3d at 1048 (citing *Kodak*, 504

U.S. at 473-78).  Thus, even if consumers could have reasonably discovered that they only would be able to buy apps from Apple (which is dubious at best), it is inconceivable how iPhone consumers could have known or reasonably discovered that Apple was charging them 30% more than what the consumers would have paid if Apple had not monopolized the apps aftermarket. Apple's argument overlooks this critical second prong of the *Newcal* analysis entirely.

Apple's statement that "Plaintiffs do not even attempt to allege that they or other iPhone purchasers could not 'reasonably discover' Apple's" monopoly "policies," Apple Mem. at 12, is misleading and immaterial, for two reasons.  *First*, Apple again wrongly *assumes* that Plaintiffs have the burden of pleading they could not reasonably discover that fact.  (Again, *Newcal* does not impose that burden on them and requires Plaintiffs only to plead they did not knowingly enter into a contract giving Apple a monopoly and allowing it to charge monopoly prices.)  If what Plaintiffs could have discovered is relevant at all, it is a defense as to which Apple has the burden of pleading and proof.  *Second*, Apple's statement is factually incorrect, because Plaintiffs do, in fact, allege that "consumers who purchased iPhones could not, at the point of sale, reasonably or accurately inform themselves of the 'lifecycle costs' (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime)." SAC ¶ 65.

Apple's arguments about what Plaintiffs could have reasonably discovered are, in any event, quintessential factual issues that cannot be resolved on a motion to dismiss.  As Judge Ware held, "[t]he fact that Apple disputes whether Plaintiffs 'knowingly placed [Apple] in a monopoly position' merely creates a factual dispute better suited for resolution at a later stage of this litigation." *Apple I*, 596 F. Supp. 2d at 1306 (second brackets in original).

Plaintiffs have adequately pleaded a relevant antitrust market.[8]

---

[8]     Apple wrongly contends that Plaintiffs' aftermarket definition is overbroad.  Apple Mem. at 13 n.7.  Plaintiffs challenge to Apple's domination of the market where iPhone apps are bought and sold properly includes both apps and the distribution of apps because Apple has a 30% financial stake in every app sold and has excluded every other potential apps distributor from the market.  The product market can include *all* apps because the "commercial reality" of the market from the iPhone consumers' perspective is that all apps are equally burdened by Apple's elimination of retail price competition and its 30% monopoly fee.  *See Image Tech. Servs.*, 125 F.3d at 1203 (one market consisting of thousands of types of Kodak copier parts was the "commercial reality" faced by Kodak service providers and equipment owners).

1

**C.     Apple is not Immune from the Antitrust Laws**

2      Apple's final argument – that its "business model" of "closing" the iPhone's iOS operating

3   system and making its App Store the exclusive worldwide supplier of iPhone apps cannot be

4   deemed "anticompetitive conduct" – is made of straw.   Apple's argument boils down to the

5   proposition that anyone who makes a new or improved product has *carte blanche* to monopolize

6   every derivative aftermarket with complete immunity from the antitrust laws.   In Apple's view,

7   *Kodak* and *Newcal*, and Section 2 of the Sherman Act simply do not apply to product innovators.

8   Needless to say, that is not and cannot be the law.

9      As an initial matter, Apple tries to add vigor to its argument by contending that the SAC

10   made "extensive changes" to Plaintiffs' allegations that "transform this case" into "a direct attack

11   on Apple's business model" and its 2007 "decision to 'design[] the iPhone iOS as a closed

12   system.'"  Apple Mem. at 1; *see also id.* at 13.   That contention is a lame pretense.   Plaintiffs

13   ***always*** have alleged that Apple designed the iPhone operating system as a closed system in order

14   to foreclose competition in the apps aftermarket.   *See* Amended Consolidated Class Action

15   Complaint (Dkt. No. 81) at ¶ 50 ("The iPhone operating system also contains "security measures"

16   which are, in effect, Program Locks designed to restrict the consumer from using programs or

17   services on the iPhone other than those sanctioned by, and which generate revenue for, Apple.  By

18   design, Apple programmed the iPhone" to prevent downloads of unapproved apps).  *See also*

19   *Apple I*, 596 F. Supp. 2d at 1304 ("Apple built technological restrictions into the iPhone" to

20   prevent downloads of unapproved apps) (quoting complaint).   Plaintiffs once again allege in the

21   SAC that "Apple modified its iOS version to be a 'closed' system by installing 'security

22   measures' or 'program locks' designed to prevent iPhone consumers from installing and running

23   apps that were not sold or approved by Apple."  ¶ 30.  That Plaintiffs used the word "closed" for

24   the first time in the SAC does not change the nature of their claim or "transform this case."

25      Apple's mischaracterization of the SAC aside, Apple's argument that it is entitled to

26   design a business model that enables it to monopolize the apps aftermarket is legal hogwash.  As

27   Apple itself was recently reminded by the District Court for the Southern District of New York

28   when it found that Apple had conspired to fix e-book prices, a company cannot use what

1  ordinarily would be lawful business practices "to effect an unreasonable restraint of trade."

2  *United States v. Apple Inc.*, 12 Civ. 2826 (DLC), 12 Civ. 3394 (DLC), 2013 U.S. Dist. LEXIS

3  96424, at *154 (S.D.N.Y. July 10, 2013); *see also id.* at *184 (the means that Apple used to enter

4  the e-book market were not "wrongful, either alone or in combination.  What was wrongful was

5  the use of those components to facilitate a conspiracy" in violation of the antitrust laws).[9]

6       That a company can use otherwise perfectly lawful means to achieve an anticompetitive

7  objective is not remotely a new concept.  Indeed, several of the cases on which Apple itself relies

8  enunciate or demonstrate the principle.  As two "sister court[s]" of this Court have recently

9  "observed, 'anticompetitive' conduct may include otherwise **legal** conduct."  *Free Freehand*

10  *Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) (quoting *Tele Atlas N.V. v.*

11  *NAVTEQ Corp.*, 05-CV-1673-RS, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008) (citing

12  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004);

13  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *United States v.*

14  *Microsoft*, 253 F.3d 34 (D.C. Cir. 2001))) (internal quotations omitted) (emphasis in original).

15       So while "[t]he possession of monopoly power will not be found unlawful unless it is

16  accompanied by an element of anticompetitive conduct," *Trinko*, 540 U.S. at 507, under Ninth

17  Circuit law, any "'behavior that **tends to impair the opportunities of rivals** and either **does not**

18  **further competition** on the merits or does so **in an unnecessarily restrictive way**'" is

19  "anticompetitive conduct," whether the individual steps taken to achieve the anticompetitive result

20  are legal or not.  *Free Freehand*, 852 F. Supp. 2d 1180 (emphasis added) (citing *Cascade Health*

21  *Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Image Tech. Servs.*, 125 F.3d at

22  1208 (use of monopoly power "to foreclose competition, to gain a competitive advantage, or to

23  destroy a competitor" is anticompetitive conduct)).

24       In rejecting a dominant software supplier's argument that there can be no Section 2

25  violation so long as the defendant's individual actions are lawful, Judge Koh recently wrote:

26  _____

27  [9]     Judge Denise Cote rejected Apple's arguments that it was entitled to eliminate retail price
competition in the e-books market so long as it had an economic interest in doing so and took no steps that
were in and of themselves unlawful.  *See id.*, 2013 U.S. Dist. LEXIS 96424, at *152-55, *158-61, *184.

28

> Under the theory of monopoly broth, there are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under Section 2 if done by a monopolist. ***The Ninth Circuit has likewise stated that it is "not proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."***

*Id*. (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992)) (other citations and other internal quotations omitted) (emphasis added).  *See also Trinko*, 540 U.S. at 408 (a monopolist's right to refuse to deal with a competitor is not "unqualified"; "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2") (citation omitted); *Aspen Skiing*, 472 U.S. at 593-94, 601-02, 608, 610-11 (monopolist found liable for anticompetitive conduct even though it engaged in otherwise perfectly legal activity); *Kodak*, 504 U.S. at 488 (Scalia, J., dissenting) (under Section 2, "behavior that might otherwise not be of concern to the antitrust laws – or that might even be viewed as procompetitive – can take on exclusionary connotations when practiced by a monopolist") (citation omitted); *Image Tech. Servs.*, 125 F.3d at 1207 ("Legal actions, when taken by a monopolist, may give rise to liability if anticompetitive.").

It is likewise well-settled that the innovator of a new product, a patent holder or other natural monopolist that lawfully acquired a dominant share of one market cannot use its legal market advantage to leverage itself into a monopoly position in another economically distinct market.  After the Supreme Court's remand in *Kodak*, the Ninth Circuit made plain – in the aftermarket monopolization context – that a monopolist cannot use "its monopoly in one market ***to monopolize or attempt to monopolize the downstream market***."  *Image Tech. Servs.*, 125 F.3d at 1209 (emphasis added).  Even a patent holder – the ultimate innovator and natural monopolist – cannot "extend a lawful monopoly beyond the grant of the patent" or engage in "exclusionary conduct that extends natural monopolies into separate markets."  *Id*. at 1216 (citations omitted).

In *Kodak*, the Supreme Court reiterated that it had "held many times that power gained through some natural advantage such as … ***business acumen*** can give rise to liability if '***a seller exploits his dominant position in one market to expand his empire into the next***.'"  504 U.S. at 480 n.29 (quoting *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611 (1953)

1   (other citations omitted) (emphasis added).  *See also Mercoid Corp. v. Mid-Continent Inv. Co.*,

2   320 U.S. 661, 665 (1943) (the method used to unlawfully expand a monopoly "is immaterial").

3       This principle is expressed emphatically in the case on which Apple most heavily leans,

4   the Ninth Circuit's decision in *Tyco*.  There the Ninth Circuit merely held that "[i]nnovation does

5   not violate the antitrust laws **on its own**."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care*

6   *Grp. LP*, 592 F.3d 991, 994 (9th Cir. 2010) (emphasis added).  But the court repeatedly qualified

7   that holding by explaining that a change in product design **can** violate the antirust laws if – as here

8   – it is accompanied by exclusionary conduct aimed at preventing or eliminating competition.  *See*

9   *id.* at 998-99 ("changes in product design … may constitute an unlawful means of maintaining a

10  monopoly under Section 2" if there is "some associated anticompetitive conduct" such as

11  employing "exclusionary means of attempting to monopolize the relevant market") (citations and

12  internal quotations omitted); *see also id.* at 984, 1000, 1002.

13      In short, the law is crystal clear that "patent … holders are [not] immune from antitrust

14  liability," *Image Tech. Servs.*, 125 F.3d at 1215, that companies that make "changes in product

15  design are not immune from antitrust scrutiny," *Tyco*, 592 F.3d at 998, and that manufacturers

16  with "inherent power" in one market are not "immunize[d] … from the antitrust laws in another

17  market," *Kodak*, 504 U.S. at 480 n.29.  Apple is not immune from antitrust scrutiny or liability

18  simply because it invented the iPhone and the App Store.

19      Taken to its logical extreme, Apple's argument that a firm that invents or improves a

20  product has virtually unfettered license to monopolize the aftermarkets for that product would

21  mean that Microsoft could monopolize the entire PC software market every time it upgraded its

22  Windows operating system.  Microsoft, however, was famously found liable for violating the

23  antitrust laws when it tried to engage in similar activity in order to maintain its Windows

24  monopoly and leverage itself into a dominant position in the derivative market for internet search

25  engine software applications (or "browsers").  *See Microsoft*, 253 F.3d at 34, 59-63, 70-71, 73-75

26  (condemning Microsoft's business model whereby it bound Internet Explorer to Windows with

27  "technological shackles"; entered into restrictive licenses with computer manufacturers –

28  including Apple – and exclusive contracts with internet access providers to make Explorer the

1  default or sole available browser; and contracted with computer software developers to use only

2  Microsoft's code and not the competing Java software development platform).

3        Apple completely misstates the law when it argues it cannot be found liable for a product

4  design "unless the challenged design serves *no purpose other than protecting a monopoly*."  Apple

5  Mem. at 15 (emphasis in original).  Apple cites *Tyco*, but the page cited does *not* state that Apple

6  gets to monopolize aftermarkets so long as it has *one* legitimate business purpose for doing so.

7  Rather, the court was merely quoting the *Microsoft* court's statement that Microsoft, in trying to

8  meet its burden of providing a "'procompetitive justification'" for its anticompetitive conduct, had

9  "failed to show 'that its conduct serve[d] a purpose other than protecting its operating system

10  monopoly.'"  *Tyco*, 592 F.3d at 998 (quoting *Microsoft*, 253 F.3d at 59, 66-67).  Even if Apple

11  offers a procompetitive purpose, it will still be liable if Plaintiffs show Apple's purpose is

12  pretextual or was achievable by less restrictive means.  *See Image Tech. Servs.*, 125 F.3d at 1212.

13        Plaintiffs have amply satisfied their burden on this motion of plausibly pleading that Apple

14  engaged in impermissible exclusionary conduct by (i) designing the iPhone to prevent its

15  customers from downloading apps in which Apple has no financial stake; (ii) making the App

16  Store the exclusive global distributor of iPhone apps; and (iii) enforcing its App Store monopoly

17  through the coercive means of terminating apps developers who sell apps in competition with

18  Apple and voiding the warranties of customers who buy competing apps.  SAC ¶¶ 43, 71.

19  Exclusionary conduct designed to obtain or maintain a monopoly, of course, is a paradigm

20  example of the type of anticompetitive conduct the antitrust laws were intended to avoid.  *See*,

21  *e.g.*, *Tyco*, 592 F.3d at 998-99, 1000; *Image Tech. Servs.*, 125 F.3d at 1208.

22  **V.    CONCLUSION**

23        Apple's motion to dismiss should be DENIED.

24  Dated:  October 15, 2013      By:         /s/  Alexander H. Schmidt

25            ALEXANDER H. SCHMIDT

26          WOLF HALDENSTEIN ADLER

         FREEMAN & HERZ LLP

27

28

1                         MARK C. RIFKIN (*pro hac vice*)

ALEXANDER H. SCHMIDT (*pro hac vice*)

2                         MICHAEL M. LISKOW

270 Madison Avenue

3                         New York, New York 10016

Telephone:  212/545-4600

4                         Facsimile:   212/545-4677

5

6                         WOLF HALDENSTEIN ADLER

  FREEMAN & HERZ LLP

7                         FRANCIS M. GREGOREK

RACHELE R. RICKERT

8                         750 B. Street, Suite 2770

San Diego, California 92101

9                         Telephone:  619/239-4599

Facsimile:   619/234-4599

10                       Plaintiffs' Interim Lead Counsel

APPLE2:20286.Opp.