|     |     |
| --- | --- |
| 1   | LATHAM & WATKINS LLP |
|     |    Daniel M. Wall (Bar No. 102580) |
| 2   |    Christopher S. Yates (Bar No. 161273) |
|     |    Sadik Huseny (Bar No. 224659) |
| 3   | 505 Montgomery Street, Suite 2000 |
|     | San Francisco, California  94111-6538 |
| 4   | Telephone:  (415) 391-0600 |
|     | Facsimile:  (415) 395-8095 |
| 5   | Email:   Dan.Wall@lw.com |
|     | Email:   Chris.Yates@lw.com |
| 6   | Email:   Sadik.Huseny@lw.com |
| 7   | Attorneys for Defendant |
|     | APPLE INC. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| IN RE APPLE IPHONE ANTITRUST LITIGATION | CASE NO. C 11-06714-YGR |
| --- | --- |
|  | RELATED CASE NO. C 07-05152-JW |
|  | **DEFENDANT APPLE'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
|  | Date:       November 5, 2013 |
|  | Time:       10:00 AM |
|  | Place:      Courtroom 5, 2nd Floor |
|  | The Honorable Yvonne Gonzalez Rogers |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION .................................................................................................................... 1

II. THE OPPOSITION CONFIRMS THAT PLAINTIFFS ARE INDIRECT PURCHASERS WHO LACK ANTITRUST STANDING UNDER *ILLINOIS BRICK* ................................................................................................................. 3

    A. Plaintiffs' Argument That "Buying Directly From the Alleged Monopolist" Is Sufficient to Circumvent *Illinois Brick* Is Foreclosed By The Court's Order Dismissing Plaintiffs' Previous Complaint And Is Contrary To Law ............................................................ 3

    B. Plaintiffs Have Failed To Allege That They Are Direct Purchasers, And Their Contrary Claims In Opposition Once Again Fail To Comport With The Actual Allegations Of Their Complaint .............................. 4

III. PLAINTIFFS DO NOT PLEAD A COGNIZABLE PRODUCT MARKET ................................................................................................................................ 8

    A. Plaintiffs Do Not—And Cannot—Allege That Consumers Could Not Reasonably Discover Apple's "Closed" iOS System ..................................... 8

    B. Plaintiffs' Product Market Fails As A Matter Of Law ........................................ 11

IV. GIVEN THEIR CHALLENGE TO THE "CLOSED" SYSTEM, PLAINTIFFS DO NOT PLEAD ACTIONABLE ANTICOMPETITIVE CONDUCT ............................................................................................................... 12

V. CONCLUSION ..................................................................................................................... 15

i

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

# TABLE OF AUTHORITIES

**CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
    592 F.3d 991 (9th Cir. 2010) .................................................................................. 2, 12, 13, 15

*Andrews v. Metro N. Commuter R.R. Co.*,
    882 F.2d 705 (2d Cir. 1989) ............................................................................................... 5

*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................................... 11

*Bd. of Trade of Chicago v. United States*,
    246 U.S. 231 (1918) .................................................................................................. 13, 15

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) ............................................................................................ 4

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
    73 F.3d 756 (7th Cir. 1996) ............................................................................................... 9

*Doe v. Abbott Labs.*,
    571 F.3d 930 (9th Cir. Cal. 2009) .................................................................................... 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ........................................................................... 1, 8, 9, 10, 11, 12

*Fasugbe v. Willms*,
    2011 U.S. Dist. LEXIS 56569 (E.D. Cal. May 25, 2011) .................................................. 5

*Free Freehand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................... 13, 14, 15

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
    2010 U.S. Dist. LEXIS 47896 (N.D. Cal. Apr. 16, 2010) ................................................ 12

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    790 F. Supp. 804 (C.D. Ill. 1992) .................................................................................... 12

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005) .............................................................................................. 9

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................................ 3, 4, 6, 7, 8

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ..................................................................... 12, 13, 14, 15

*In re ATM Fee Antitrust Litig.*,
    686 F.3d 741 (9th Cir. 2012) ..................................................................................... 1, 3, 4

*Newcal Indus., Inc. v. IKON Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ..................................................................... 1, 8, 9, 10, 11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
   514 F.3d 856 (9th Cir 2007) ............................................................................................... 5, 6

*POURfect Prods. v. KitchenAid*,
   2010 U.S. Dist. LEXIS 42890 (D. Ariz. May 3, 2010) .................................................. 11, 12

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ............................................................................................ 9, 11

*Robinson v. Salazar*,
   885 F. Supp. 2d 1002 (E.D. Cal. 2012) .................................................................................. 5

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999) ..................................................................................................... 9

*State Nat'l Ins. Co. v. Khatri*,
   2013 U.S. Dist. LEXIS 132167 (N.D. Cal. Sept. 13, 2013) .................................................... 5

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................................................ 15

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
   184 F. Supp. 2d 947 (D. Ariz. 2001) ...................................................................................... 9

*Universal Grading Serv. v. eBay, Inc.*,
   2012 U.S. Dist. LEXIS 2325 (N.D. Cal. Jan. 9, 2012) ..................................................... 11, 12

*USM Corp. v. SPS Techs., Inc.*,
   694 F.2d 505 (7th Cir. 1982) ......................................................................................... 13, 15

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004) .............................................................................................................. 12

iii

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

## I. INTRODUCTION

Plaintiffs were given leave to plead, if they could consistent with Rule 11, that they were "direct purchasers" within the meaning of the antitrust laws because "iPhone consumers were forced *to pay Apple* a 30% fee on top of the cost for the apps." (Dkt. 108 at 19, emphasis in original.)  The essence of the Court's decision was that *if* Plaintiffs could plead that Apple *added fees* to prices for Apps set by developers, it would consider the legal sufficiency of that contention.  If, on the other hand, Plaintiffs continued to allege only that Apple's fees to developers were passed-through to consumers in the developer's App prices, the complaint would fail.

Plaintiffs' Opposition now acknowledges that their Second Amended Complaint ("SAC" or "Complaint") does not use those words, but claims they use another "expression" that "mean[s] precisely the same thing." (Dkt. 116 ("Opp.") at 7.)  That is not true.  The particular allegation that Plaintiffs point to (SAC ¶ 41) illustrates the game Plaintiffs are playing.  It states that "the prices for apps available in Apple's App Store include the developers' price plus Apple's 30% mark-up."  It does not state—despite the Court's express request for clarity on this point—that Apple's so-called "mark-up" was *added to* the developer's price.  There is nothing about this phrasing nor the SAC's other allegations ("an extra 30% for every app," "Apple's 30% fee," and so on) that is different from the allegations in the complaint the Court deemed insufficient.  There is no mystery why Plaintiffs won't simply state "Apple adds 30% to the developer's price":  they know it is not true.  Under the Ninth Circuit's *In re ATM Fee* decision, Plaintiffs are indirect purchasers without antitrust standing and the SAC should be dismissed with prejudice.

Plaintiffs also have not met their burden of pleading a cognizable antitrust market or anticompetitive conduct, and the radical arguments they advance can and should be rejected now.  Neither the Ninth Circuit's *Newcal* decision nor the Supreme Court's *Kodak* decision holds that a legally relevant aftermarket is *created* unless a company obtains a "contract" approving all of the features of its product or business models.  To the contrary, the well-established rule is that if a consumer can "reasonably discover" the challenged aftermarket practices, the aftermarket is *not* the relevant antitrust market.  And, contrary to Plaintiffs'

1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

contention, it is Plaintiffs' burden to plead the relevant market and thus to allege facts plausibly suggesting that consumers could not reasonably discover the challenged practices. Unlike *Apple I*, this case has nothing to do with aftermarket practices that were allegedly sprung on consumers by surprise. Plaintiffs' own Complaint acknowledges that developers are informed about the challenged practices, and the nature of Apple's allegedly "closed system" inherently reveals itself because, as Plaintiffs assert, downloadable Apps are indeed only available through the App Store. This is why the SAC never alleges that consumers could not "reasonably discover" Apple's practices. Plaintiffs have failed to plead a cognizable antitrust market.

Plaintiffs are similarly wrong in contending that Apple's launch of what Plaintiffs call a "closed system" can constitute actionable anticompetitive conduct. As an initial matter, Plaintiffs' claim that they "***always*** have alleged that Apple designed the iPhone operating system as a closed system" is not correct. (Opp. at 21, emphasis in original.) Plaintiffs' expert in *Apple I* testified that "Apple's right to utilize a closed system of distribution for its programs and applications is not in dispute." *In re Apple & AT&TM Antitrust Litig.*, 07-05152, Dkt. 249-2, at 6 n.4. As a result, Plaintiffs' extensive reliance on Judge Ware's decisions in the earlier case is misplaced.

Plaintiffs' new theory has no merit. If Plaintiffs' theory were correct, then Gillette monopolizes aftermarkets for razor blades every time it launches a new razor that only accepts its own replacement blades; Nespresso would not be able to sell coffee machines that only accept Nespresso coffee pods; and so on. This is not the law. Products that fall within Plaintiffs' definition of "closed systems" are commonplace. As a general matter, the antitrust laws do not interfere with "closed systems." The Ninth Circuit's *Tyco* decision in particular makes clear that the antitrust laws do not compel manufacturers of new devices to make them compatible with products manufactured by others. Since the Complaint admits that the iPhone ecosystem is an improvement on prior technologies and has led to the creation of over 850,000 new products (Apps), Apple's launch of what Plaintiffs call a "closed system" cannot constitute anticompetitive conduct.

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

## II. THE OPPOSITION CONFIRMS THAT PLAINTIFFS ARE INDIRECT PURCHASERS WHO LACK ANTITRUST STANDING UNDER *ILLINOIS BRICK*

Filtering through the Opposition's invective, Plaintiffs make two arguments for why they are not "indirect purchasers" under *Illinois Brick*. <u>First</u>, Plaintiffs argue that purchasing third-party Apps directly through the App Store is enough to make them "direct purchasers." <u>Second</u>, Plaintiffs claim they have adequately alleged that Apple adds a separate 30% fee "on top of" the App developer's price. Plaintiffs are incorrect on both counts, and their Opposition confirms that Plaintiffs are indirect purchasers under controlling law.

### A. Plaintiffs' Argument That "Buying Directly From the Alleged Monopolist" Is Sufficient to Circumvent *Illinois Brick* Is Foreclosed By The Court's Order Dismissing Plaintiffs' Previous Complaint And Is Contrary To Law

Plaintiffs first assert that the Ninth Circuit's "direct purchaser rule" turns solely on whether a plaintiff bought directly from the alleged wrongdoer. (Opp. at 1, 9; Pls.' Proposed Or., Dkt. 116-1, at 1.) Plaintiffs further claim that Judge Ware already so ruled, and that Apple now improperly seeks to overturn Judge Ware's ruling. (Opp. at 9.)

Plaintiffs are wrong. Plaintiffs tried both arguments in opposing Apple's last motion to dismiss, using essentially identical statements and rhetoric—and failed. (*See* Dkt. 99 at 12.)[1] This Court did not accept either of the arguments, and instead dismissed Plaintiffs' complaint. (Dkt. 108 at 19.) The Court's Order follows *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), in which the same literal construction of "direct" was advanced and rejected. The plaintiff class in *In re ATM Fee* was in privity with the bank defendants, no less than Plaintiffs

---

[1] *Compare* Plaintiffs' December 2012 Opposition at 12:

 "As the Ninth Circuit has recently reiterated in the case that Apple itself relies upon, the *sine qua non* for direct purchaser status is whether the plaintiff paid the alleged unlawful fee directly to the alleged wrongdoer. *In re ATM Fee Antitrust Litig.*, 686 F.3d at 746, 751.… Under the Ninth Circuit's straightforward standing test, because Plaintiffs paid the alleged unlawful price – here Apple's 30% fee – directly to Apple (the alleged monopolist), they are direct purchasers and have standing to sue Apple under Ninth Circuit jurisprudence." (Dkt. 99 at 12, emphasis omitted.)

"As Judge Ware recognized when he rejected Apple's indirect purchaser argument in *Apple I*, Plaintiffs' 'analysis does not rest on an indirect purchaser model" but rather on "sales of approved apps through [Apple's] App Store.'" (*Id.*, citation omitted.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

here are in privity with Apple.  But the Ninth Circuit held that it does not matter if "the theory of recovery depends on pass-on damages"; if it does, the plaintiffs "run into the *Illinois Brick* wall." *In re ATM Fee*, 686 F.3d at 755-56.  This Court recognized that the "analysis under *Illinois Brick* centers on whether the allegedly unlawful fee was paid directly or through a pass-through." (Dkt. 108 at 19.)  The Court understood that Plaintiffs were confusing an Apple *fee to developers* that is reflected in or "passed through" via the developer's price, versus a *fee added by Apple to* the developer's price.  (*Id.* at 19-20.)  Plaintiffs were allowed to file an amended complaint to demonstrate that they were *not* making a claim based on "mark-up" or pass-through dynamics, but instead based on something Apple did directly to the consumer, *e.g.*, an Apple "fee on top of the cost of the app." (*Id.* at 19.)  The entire *Illinois Brick* doctrine turns on the Supreme Court's unwillingness to permit inquiry into "[t]he intricacies of tracing the effect of [the alleged] overcharge on the [direct] purchaser's prices, costs, sales, and profits[.]"  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 744 (1977).[2]  The simplistic notion that Apple has a "direct" relationship with Plaintiffs does not even begin to solve this problem.

Plaintiffs raise no legitimate argument for why the Court should reconsider this issue, and under the controlling law of this Circuit, it makes no difference that Apple collects the price for the App from the consumer on behalf of the developer.

**B.      Plaintiffs Have Failed To Allege That They Are Direct Purchasers, And Their Contrary Claims In Opposition Once Again Fail To Comport With The Actual Allegations Of Their Complaint**

There is only one reason why Plaintiffs would argue again for a literal "direct purchaser"

---

[2] For that reason, Plaintiffs' effort to dismiss *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998) as bad out-of-circuit law is without merit. (*See* Opp. at 9-11.)  *Campos* is hardly the only case to apply *Illinois Brick* when the plaintiffs purchased directly from the defendants.  *In re ATM Fee*—a controlling Ninth Circuit case—does as well.  And both come to that conclusion because they follow the Supreme Court's teaching that the purpose of the *Illinois Brick* doctrine is to avoid having to consider how antecedent conspiracies or monopolies affect pricing to consumers.  If *Campos* has any additional meaning, it is because it stands for an even stronger proposition:  *even if* an upstream monopolist independently "adds fees"—*e.g.*, if Apple here really did impose a separate and direct fee on consumers—plaintiffs are still barred by *Illinois Brick* given the antecedent, up-stream transaction.  *Campos*, 140 F.3d at 1169-71.  The Court did not need to reach this issue because Plaintiffs had not even alleged the threshold requirement that Apple had imposed its own "fee on top of the cost of the apps[.]"  (Dkt. 108 at 19-20.)  That remains the case.

4

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1 rule that ignores the substance of any pass-through and focuses entirely on collection mechanics.
2 It is because Plaintiffs are unable to allege that iPhone consumers were forced to pay Apple a
3 30% fee that Apple separately and independently placed "on top of" the price set by the App
4 developer. Plaintiffs have admitted this is a pass-through case previously, they still admit it is,
5 and they still cannot state unambiguously that Apple itself adds anything to developers' App
6 prices. That is the end of the matter.

7 <u>First, Plaintiffs cannot bury their earlier allegations admitting there is no added fee, and
8 the Court should consider them in assessing Plaintiffs' new claims and ever evolving story.</u> The
9 "amendment of a pleading does not make it any the less an admission of the party." *Robinson v.
10 Salazar*, 885 F. Supp. 2d 1002, 1024 n.12 (E.D. Cal. 2012) (quoting *Andrews v. Metro N.
11 Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)). While a pleading may indeed be
12 "superseded" by a later pleading, the original pleading remains "admissible. . . as an admission
13 or prior inconsistent statement" that a court may consider on a motion to dismiss. (*Id.*; *see also*
14 Mot., Dkt. 115, at 8-9.)

15 Plaintiffs call this principle "frivolous," without citing to a single contrary case. (Opp. at
16 11.) Indeed, Plaintiffs' own authority recognizes that "courts may, and have, looked to a
17 plaintiff's prior allegations when deciding whether the plaintiff's operative allegations suggest []
18 plausible claims[.]" *State Nat'l Ins. Co. v. Khatri*, 2013 U.S. Dist. LEXIS 132167, at *20-21
19 (N.D. Cal. Sept. 13, 2013); *see also Fasugbe v. Willms*, 2011 U.S. Dist. LEXIS 56569, at *13
20 (E.D. Cal. May 25, 2011) (a "court may properly consider the plausibility of the [amended
21 pleading] in light of the prior allegations"). Plaintiffs' citation to *PAE Gov't Servs., Inc. v. MPRI,
22 Inc.*, 514 F.3d 856 (9th Cir 2007), is a mystery. The Ninth Circuit held only that a district court
23 may not, absent a showing of bad faith, *strike* a pleading due to inconsistent allegations. *Id.* at
24 860. But neither *PAE Gov't Servs.* nor any other case cited by Plaintiffs requires that this Court
25 ignore Plaintiffs' previous allegations, or presume the truth of Plaintiffs' new inconsistent

26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1 allegations.[3]

2       Plaintiffs First Amended Complaint alleged—correctly—that "Apple collects 30% of the
3 sale of each application, with the developer receiving the remaining 70%." (Dkt. 81 ¶ 5.) Faced
4 with the *Illinois Brick* wall, Plaintiffs backtracked, trying to create the impression without
5 actually saying that Apple itself added a separate fee on top of the developer's price. But the
6 Court recognized that "[t]he allegations in the Amended Complaint *contradict* the arguments
7 [Plaintiffs] made in opposition to Apple's Motion." (Dkt. 108 at 19, emphasis added.) These
8 earlier allegations do not disappear now that Plaintiffs have filed the SAC.

9       <u>Second, Plaintiffs' assertions that they have pled the requisite facts requested by the
10 Court—and that Apple has "cherry-picked" allegations—are meritless</u>. The changes Plaintiffs
11 made in the SAC with respect to *Illinois Brick* avoid the key issue. We are here now because
12 months ago, Plaintiffs told the Court that their earlier complaint alleged that "iPhone consumers
13 were forced *to pay Apple* a 30% fee on top of the cost for the apps." (Dkt. 99 at 11, emphasis in
14 original.) The Court correctly found Plaintiffs' claim to be false, but gave Plaintiffs leave to
15 amend to actually include that allegation. (Dkt. 108 at 19-20.) *They have not done so*—because
16 they can't, at least not truthfully. Their claim that the SAC says essentially the same thing, albeit
17 in a "technical, less colloquial way" (Opp. at 7), is wrong.

18       Plaintiffs claim that the following allegation means "precisely the same thing" as the
19 missing allegation:

20         the prices for apps available in Apple's App Store include the
21         developers' price plus Apple's 30% mark-up

22 (Opp. at 7; SAC ¶ 41.) Not so. It begs the key question, which is how Apple's supposed "mark-
23 up" is included in the cost of the App. If it is "included" through pass-through dynamics,
24 Plaintiffs do not have standing. If it is "included" because Apple adds it to the developer's price,

---

[3] Plaintiffs also state that the cases relied on by Apple have been overruled. (Opp. at 11.) Plaintiffs, however, do not cite any authority in support of this assertion. To the extent they intend to rely on *PAE Gov't Servs.,* that case is not only inapposite, but all of the cases cited by Apple were decided *after* the *PAE decision,* are consistent with that case's holding, and remain valid authority.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1  then and only then is there any basis to argue that "[t]he intricacies of tracing the effect of [the

2  alleged] overcharge" to developers on the prices to Plaintiffs can be avoided.  *Illinois Brick*, 431

3  U.S. at 744.  But instead what we have is a purposefully vague and ambiguous statement meant

4  to conceal *who exactly* is charging the consumer "Apple's 30% mark-up"— the App developer,

5  via a pass-through, or Apple.  The only thing that might matter remains un-alleged.

6        The obfuscation is particularly troubling when the allegation is viewed in context.  Here

7  is the full paragraph of the SAC from which the allegation is drawn:

> Consequently, the prices for apps available in Apple's App Store include the developers' price plus Apple's 30% mark-up. When an iPhone customer buys an app from Apple, it pays the full purchase price, including Apple's 30% commission, directly to Apple. Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the developer. Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iPhone customers or collect payments from the customers.

15  (SAC ¶ 41.)  The full paragraph makes clear that Plaintiffs are doing exactly what they did in the

16  last round of briefing:  claiming that an allegation says Apple is directly charging the consumers

17  an independent additional fee by citing a statement that actually makes clear that Plaintiffs are

18  complaining about Apple's restrictions *on developers*, who pay Apple its 30% commission, and

19  then (ostensibly) pass through that fee to consumers.

20        The additional allegations Plaintiffs point to fare no better.  Every one—"extra 30% for

21  every app," "Apple's inflated 30% marked-up price," "Apple's 30% fee," "Apple's 30% mark-

22  up"—uses labels and conclusions that entirely skirt the key point.  Again, there is not a single,

23  simple declarative sentence that Apple takes a price that has been established by the developer

24  and adds 30% (or anything) to that which it then charges customers.  And these intentionally

25  vague and conclusory allegations are particularly insufficient given the Court's express direction

26  to Plaintiffs to explain how the 30% fee is paid by consumers.

27        <u>Third</u>, Plaintiffs do not even try to explain away the allegations in the SAC that admit the

28  <u>key facts—and they continue to further admit the key facts themselves in their Opposition brief.</u>

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

As noted in Apple's motion, the SAC itself contains more allegations that reveal the truth. The SAC admits that "Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the developer," (¶ 41) and further alleges that "Apple always conditioned its 'approval' of such apps on the third party's agreement to give Apple *a share of the third party's sales proceeds*." (*Id.* ¶ 32, emphasis added.) These allegations show that Apple's allegedly wrongful conduct acts *on developers*, and that any effects on consumers are by definition indirect effects barred by *Illinois Brick*.

Were more needed to show that Plaintiffs have not sufficiently pled their claims, Plaintiffs include the following description of the SAC's allegations in their Opposition brief:

> "Taken collectively, these allegations plainly state that in a competitive market, **apps developers could have sold their own apps to Plaintiffs without adding on the 30% fee** that Apple forced plaintiffs to pay in its monopolized aftermarket." (Opp. at 8, emphasis added.)

> "[I]n 'a competitive apps distribution environment,' developers would be able to sell their own apps directly to consumers '**without charging Apple's 30% mark-up**'…." (*Id.*, citing SAC ¶ 48, emphasis added.)

This, of course, is exactly the point: it is the App developers that decide whether to include some, none, or all of Apple's 30% commission in the price they set for their Apps. Whether or not Plaintiffs are correct in believing that App developers would not include Apple's 30% commission in the price they set for Apps if there were distribution outlets other than the App Store, any consumer "harm" results from those App developer decisions. What is crystal clear, from Plaintiffs' own allegations, is that Plaintiffs are *consumers* of Apps complaining about restrictions on App *developers* that allegedly indirectly affect the prices set by those developers. Plaintiffs' claims are thus barred by *Illinois Brick* and should be dismissed with prejudice.

## III. PLAINTIFFS DO NOT PLEAD A COGNIZABLE PRODUCT MARKET

### A. Plaintiffs Do Not—And Cannot—Allege That Consumers Could Not Reasonably Discover Apple's "Closed" iOS System

Plaintiffs assert that "*Newcal* ... held that a plaintiff who alleges it did not knowingly enter into the functional equivalent of a contract states a valid aftermarket claim." (Opp. at 19.) Plaintiffs misstate the law. Neither *Kodak*, *Newcal*, nor any other case holds that an aftermarket is created if a seller fails to obtain consumers' contractual consent, or the functional equivalent of

8

1  contractual consent, to its aftermarket policies. Instead, *Newcal* distinguishes between cases in
2  which a franchisee, for instance, has agreed to aftermarket policies in a contract (the "*Queen City*
3  *Pizza* category") as opposed to situations where there is no contract and any aftermarket power is
4  economically created (the "*Eastman Kodak* category"). *Newcal Indus., Inc. v. IKON Office*
5  *Solution*, 513 F.3d 1038, 1048-49 (9th Cir. 2008). If there is no contract, then the *Kodak*
6  analysis applies and a plaintiff may establish an aftermarket by alleging certain market
7  conditions. *See id.* at 1048. One of these (referred to in *Kodak* as "information costs") concerns
8  whether consumers should have understood what they were getting into when committing to a
9  product like the Kodak copier or the iPhone. *See id*. The rule has developed that an aftermarket
10 can only be the relevant market if the plaintiffs could not "reasonably discover" the challenged
11 aftermarket policies. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473-75
12 (1992); *Newcal*, 513 F.3d at 1048, 1050; *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d
13 811, 820 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th
14 Cir. 1996). The critical question is whether a plaintiff can plead and then show that "they are
15 'ignorant' in the sense that they could not reasonably anticipate later 'exploitation'[.]" *Universal*
16 *Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001), *aff'd*, 52
17 F. App'x 897 (9th Cir. 2002).[4]

18   The complaint in *Newcal* alleged a cognizable aftermarket because it alleged "market
19 imperfections, as well as IKON's fraud and deceit" that "prevent[ed] consumers from realizing
20 that their choice in the initial market [would] impact their freedom to shop in the aftermarket."
21 *Newcal*, 513 F.3d at 1050. As the Ninth Circuit explained,

> [j]ust as the plaintiffs had in *Eastman Kodak*, Newcal offers factual
> allegations to rebut the economic presumption that IKON consumers
> make a knowing choice to restrict their aftermarket options when they

---

[4] This standard does not require that consumers be provided with "perfect information" about the manufacturer's aftermarket policies. *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 n.3 (1st Cir. 1999); *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 382 (3d Cir. 2005) ("Perfect information is not required for the primary market to check the aftermarket."); *Universal Avionics*, 184 F. Supp. 2d at 956 ("very imperfect knowledge" is sufficient). "[I]gnorance should be measured by an objective test requiring proof that aftermarket prices were simply not available in the relevant literature[.]" Areeda & Hovenkamp, Fundamentals of Antitrust Law, at § 5.12b.

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

      decide in the initial (competitive) market to enter an IKON contract. Competition in the initial market, therefore, does not necessarily suffice to discipline anticompetitive practices in the aftermarket.

*Id.*[5]  In other words, the plaintiff in *Newcal* pleaded evidentiary facts plausibly suggesting that consumers could not reasonably discover IKON's challenged aftermarket policies.

      The Complaint here does not offer factual allegations that consumers were ignorant of the allegedly "closed" nature of the iPhone ecosystem—and the Complaint does not, accordingly, rebut the economic presumption that consumers made a knowing choice to restrict their aftermarket options.  Plaintiffs' allegations are expressly based on their flawed theory that *contractual* consent is required.  In other words, Plaintiffs repeatedly allege (and assert in their Opposition) that a distinct aftermarket for software applications for the iPhone was created the moment Apple began selling iPhones because Apple did not obtain consumers' "contractual consent" to its "closed system." (*See, e.g.*, SAC ¶¶ 14, 43, 44, 65, 71, 76; *see also* Opp. at 13-14.)  It is thus not surprising that Plaintiffs do not allege what they must: that iPhone purchasers could not "reasonably discover" Apple's allegedly "closed" system.[6]

      Nor could they, consistent with Rule 11.  Plaintiffs allege that App developers were informed of both Apple's 30% commission and that "developers' apps cannot be sold anywhere except in the App Store." (SAC ¶ 40.)  That alone means that hundreds of thousands of people knew of Apple's policies, the vast majority of whom are likely class members.  The policies are also self-revealing because they in fact limit the availability of iOS Apps, which people would

---

[5]  Plaintiffs assert that Apple "ignores a fundamental principle for defining a relevant market in an aftermarket monopolization case – that the existence of competition or market power in the primary product market (here, the smartphone market) is irrelevant." (Opp. at 16.)  Plaintiffs are again wrong, as the quote from *Newcal* above makes abundantly clear.  An aftermarket can only exist if "the existence of significant information and switching costs" causes the aftermarket to become disassociated from a primary market.  *Kodak*, 504 U.S. at 473.

[6]  Plaintiffs' reliance on paragraph 65's conclusory assertion that consumers could not inform themselves of iPhone "lifecycle costs" (Opp. at 20) is insufficient for multiple reasons.  First, that paragraph clearly alleges that consumers supposedly could not inform themselves of lifecycle costs because Apple did not obtain "contractual consent," which is irrelevant.  Second and most importantly, Plaintiffs' theory challenges the allegedly "closed system" itself and Plaintiffs rote recitation of legalese regarding lifecycle costs says nothing about whether consumers could reasonably discover the "closed" system.

notice. Had they been candid, Plaintiffs would have also acknowledged that Apple's App policies (including that downloadable Apps would only be available in the App Store and that Apple would earn a 30% commission on paid downloaded Apps) were announced via press release before the App Store even opened. This is altogether different than *Newcal*, where in addition to the structural "market imperfections" required for an aftermarket, the plaintiffs alleged "fraud and deceit" that prevented consumers from discovering the defendant's policies.[7] 513 F.3d at 1050. Nothing like that is found here.

Although they claim otherwise (Opp. at 20), Plaintiffs bear the burden of alleging a relevant market and must provide "factual allegations" that rebut the "presumption" that when they purchased their iPhones in the competitive market, they made "a knowing choice to restrict their aftermarket options[.]" *Id.*; *see also POURfect Prods. v. KitchenAid*, 2010 U.S. Dist. LEXIS 42890, at *10 (D. Ariz. May 3, 2010) (dismissing aftermarket claim where plaintiff had "not plausibly alleged facts" that supported the existence of "[h]igh information costs" necessary for stating a viable aftermarket claim). Plaintiffs' failure to do so means that the alleged aftermarket of software applications for the iPhone is not a relevant antitrust market. *Newcal*, 513 F.3d at 1048-49.

**B.    Plaintiffs' Product Market Fails As A Matter Of Law**

Apple's motion to dismiss asserted that a product market of all software applications for the iPhone is "overbroad" and "amorphous," and fails as a matter of law. (Mot. at 13, n.7, citing *Universal Grading Serv. v. eBay, Inc.*, 2012 U.S. Dist. LEXIS 2325, at *18-19 (N.D. Cal. Jan. 9, 2012).) Apple's motion also noted that distribution services are a distinct product from software applications and cannot be part of the same product market. (*Id.*, citing *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008).) Plaintiffs' Opposition does not mention

---

[7] It is notable that Plaintiffs also do not allege any post-purchase "change in policy" by Apple to exploit its "locked-in" installed base—a crucial feature and requirement of *Kodak* and other aftermarket cases. *Kodak*, 504 U.S. at 476; *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("the change in policy in *Kodak* was the crucial factor in the Court's decision").

11

either case and instead asserts, in conclusory fashion, that their product market definition is plausible because it is the "commercial reality" faced by consumers. (Opp. at 20 n.8.)

Plaintiffs are incorrect. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, the sole case upon which Plaintiffs rely, held that a market for all service parts for Kodak copiers existed because the plaintiff service providers needed access to "all parts" in order to fulfill service contracts and compete with Kodak. 125 F.3d 1195, 1205 (9th Cir. 1997). Plaintiffs here allege no facts that suggest that anyone needs access to all Apps to fulfill service contracts—or even to have their iPhones function properly. If Plaintiffs' "commercial realities" argument applied outside the specific context of service providers who need to fulfill service contracts, then a plaintiff could allege a product market for all products sold by eBay (or Safeway or Costco). But that is not the law as *Universal Grading* and other cases make clear.

At bottom, there are no allegations that the Apps mentioned in the Complaint—"for ringtones, instant messaging, Internet access, gaming, entertainment, video and photography" (SAC ¶ 32)—are substitutes for one another. As a result, Plaintiffs' claimed market fails as a matter of law. *Universal Grading Serv.*, 2012 U.S. Dist. LEXIS 2325, at *18-19; *POURfect Prods.*, 2010 U.S. Dist. LEXIS 42890, at *12 n.1; *Golden Gate Pharm. Servs. v. Pfizer, Inc.*, 2010 U.S. Dist. LEXIS 47896, at *9 (N.D. Cal. Apr. 16, 2010), *aff'd*, 433 F. App'x 598 (9th Cir. 2011).

## IV. GIVEN THEIR CHALLENGE TO THE "CLOSED" SYSTEM, PLAINTIFFS DO NOT PLEAD ACTIONABLE ANTICOMPETITIVE CONDUCT

As Apple explained in its motion to dismiss, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." (Mot. at 13, quoting *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004).) The required anticompetitive conduct must itself harm competition—it is not enough that conduct fails to further competition or aid competitors. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 1002 (9th Cir. 2010); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 790 F. Supp. 804, 821 (C.D. Ill. 1992), *aff'd*, 998 F.2d 391, 393 (7th Cir. 1993). Plaintiffs' Opposition

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1  contends that Apple's introduction of a "closed" system itself adequately constitutes
2  anticompetitive conduct.  (Opp. at 22-25 (citing SAC ¶¶ 43, 71).)  It does not.
3     Setting their hyperbole aside, the thrust of Plaintiffs' argument is that antitrust law puts a
4  substantive restriction on the kind of business model that a company like Apple can adopt.
5  Apple, supposedly, was allowed to create and offer the iPhone to the world *only* if it relinquished
6  control of its copyrighted iOS software and enabled third party distribution outlets.  (Opp. at 22-
7  23.)  Stated differently, Plaintiffs' theory is that Apple was required to design the iPhone
8  ecosystem as "open" in the sense that the copyrighted iPhone iOS should be accessible (for free
9  and without any limitations) to any third party developer so that consumers could ultimately have
10 access to even more than the 850,000 software application programs that Apple's business model
11 has made available.
12    Nothing in the antitrust laws compels such a result.  The antitrust laws are not nearly so
13 regulatory or intrusive into business methods.  Plaintiffs' own case—*Free Freehand Corp. v.*
14 *Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1183-84 (N.D. Cal. 2012)—makes clear that "[a
15 manufacturer] has no duty to license its technology to foster competition or to give away its
16 technology for others to clone."  Neither innovation nor competition are served by requiring a
17 company to relinquish its intellectual property in order to bring a new product to the market, and
18 the antitrust laws do not mandate such a result.  *See Bd. of Trade of Chicago v. United States*, 246
19 U.S. 231, 238 (1918); *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 513 (7th Cir. 1982).  That is
20 precisely why courts are extremely skeptical of any antitrust claim premised on product design,
21 much less a "revolutionary" new product like the one admittedly at issue here.  *Tyco*, 592 F.3d at
22 998-1000; *see also Doe v. Abbott Labs.*, 571 F.3d 930, 934 (9th Cir. Cal. 2009) (addressing "price
23 squeeze" claim; "if a firm has no antitrust duty to deal with its competitors … it certainly has no
24 duty to deal under terms and conditions that the rivals find commercially advantageous ….
25 AT&T could have stopped providing DSL transport service without violating § 2, so it was not
26 required to offer this service at the wholesale prices the plaintiffs would have preferred." (internal
27 quotations and citations omitted)).
28

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1        Plaintiffs rely primarily on two cases in contending that Apple's design of a "closed" iPhone ecosystem nonetheless constitutes actionable anticompetitive conduct: *Image Technical Services, Inc. v. Eastman Kodak Co.* and *Free Freehand Corporation v. Adobe Systems*. Neither case stands for the broad propositions Plaintiffs suggest. *Image Technical Services* involved an appeal from the jury verdict on remand after the Supreme Court's *Kodak* decision. As noted above, the *Kodak* decision turned largely on the contention that after having first set up the parts and service markets as open for all competitors, Kodak reversed course and destroyed a great deal of existing competition. As the Ninth Circuit put it, "we are faced with a situation in which a monopolist made a conscious choice to change an established pattern of distribution to the detriment of competitors" and as part of an effort to "control a downstream market." *Image Tech. Servs.*, 125 F.3d at 1211. Nothing in *Image Technical Services* challenged the design of Kodak's products, let alone Kodak's original business model; rather, the anticompetitive conduct was the *change* to an existing business model—which harmed existing competition at the expense of locked-in customers. The case is not remotely analogous to Plaintiffs' broadside attack on Apple's fundamental model.

       *Free Freehand* is similarly far afield and Plaintiffs' effort to rely on a case applying the "monopoly broth" theory only confirms their failure to plead actionable anticompetitive conduct. As alleged in *Free Freehand*, defendant Adobe acquired Aldus, but was required by a consent order with the FTC to divest itself of the "Freehand" illustration software—a principal competitor to Adobe's Illustrator software. 852 F. Supp. 2d at 1175-77. Almost immediately after the consent order expired, Adobe purchased the Freehand software it had been forced to divest. *Id.* at 1175-76. Following that purchase, plaintiffs alleged Adobe raised prices for Illustrator multiple times, engaged in improper product bundling, refused to provide Freehand's source code to the "open source community," and, despite alleged assurances to the contrary, ceased support and development for Freehand. *Id.* at 1176-77. The entire basis for the *Free Freehand* holding was this well-pled constellation of facts showing that *already-existing* competition in the illustration software market had been harmed by defendant's series of acts, aimed at diminishing such existing competition. *Id.* at 1180. Furthermore, the only allegation in *Free Freehand* which is

14

REPLY ISO MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT
CASE NUMBER: C 11-06714-YGR

1  arguably analogous to Plaintiffs' claim—challenging Adobe's refusal to provide its software to
2  the "open source community"—was deemed insufficient, and the court refused to consider it as
3  part of the "monopoly broth" of anticompetitive conduct. *Id*. at 1183-1184.

4        In contrast to the conduct at issue in those cases, the only anticompetitive act alleged by
5  Plaintiffs was Apple's design decision to create and enforce what they call a "closed" iPhone iOS.
6  Absent from the SAC are any allegations of a change in policy or harm to an established
7  competitive market, as in *Free Freehand* and *Image Technical Services*. And Plaintiffs point to
8  no case holding that a company introducing a new product, such as Apple's iPhone, has any duty
9  to alter its product once launched simply to create a market that Plaintiffs believe would be more
10 competitive. That is because there is no such obligation under established law.[8] Indeed, *Tyco* and
11 other cases make clear that even monopolists—which Apple is not—are permitted to innovate and
12 introduce new products.[9] Absent well-pled allegations that Apple engaged in actionable
13 anticompetitive conduct which lessened competition, Plaintiffs' claims must be dismissed.

14 **V.   CONCLUSION**

15       For the foregoing reasons, Apple's Motion to Dismiss should be granted and Plaintiffs'
16 Second Amended Complaint should be dismissed with prejudice.

17 Dated: October 22, 2013            Respectfully submitted,
18                                    LATHAM & WATKINS LLP
19                                    By      /s/ Daniel M. Wall
20                                            Daniel M. Wall
                                              Attorneys for Defendant APPLE INC.

---

[8] Plaintiffs' assertion—that the "logical extreme" of Apple's argument is that "a firm that invents or improves a product has virtually unfettered license to monopolize the aftermarkets for that product" (Opp. at 24)—is not credible. The appropriate question in such cases is the impact that *changes* to existing practices have on existing competition, as *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), makes clear. Plaintiffs allege no *changes* in Apple's practices and only challenge the original design of the "closed" iPhone ecosystem.

[9] *See, e.g.*, *Tyco*, 592 F.3d at 1002; *see also* Mot. at 14-16. Moreover, as Apple explained in its motion, the antitrust laws concern themselves with "negative duties" in order to prevent conduct that lessens existing competition, not "positive duties" that require each company to actively increase it. (Mot. at 15, citing *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 513 (7th Cir. 1982); *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).)