1

2

3                        UNITED STATES DISTRICT COURT

4                        NORTHERN DISTRICT OF CALIFORNIA

5

6

7  IN RE APPLE IPHONE ANTITRUST          Case No.: 11-cv-06714-YGR
   LITIGATION
8                                        **ORDER GRANTING APPLE'S MOTION TO
                                         DISMISS SECOND AMENDED COMPLAINT
9                                        WITH PREJUDICE**

10

11

12

13        The thrust of Plaintiffs' Second Amended Complaint ("SAC") is that Apple has engaged in

14  antitrust conduct by collecting thirty percent of the price of iPhone applications ("Apps") from

15  independent software developers for Apps sold in Apple's App Store.  Notably, the SAC is devoid of

16  allegations regarding any attempt on the part of Apple to set fixed prices for Apps, to have acted in

17  concert with the independent software developers to fix said prices, or to otherwise control the

18  independent software developers.  Instead, Plaintiffs attempt to plead that they are aggrieved direct

19  purchasers by arguing that the thirty-percent portion obtained by Apple is a direct, fixed cost to

20  consumers who are "first" in the chain to purchase the Apps.  In so arguing, Plaintiffs attempt to avoid

21  being categorized as indirect purchasers who pay Apple a fee via a pass-through because in such a

22  situation they would lack standing to allege antitrust claims under *Illinois Brick Co. v. Illinois*.

23  Pending before the Court is Defendant Apple's Motion to Dismiss Plaintiffs' Second Amended

24  Complaint ("SAC").  (Dkt. No. 115.)[1]

25

26

27  [1] *See also* Plaintiffs' Opposition to Defendant Apple's Motion to Dismiss Plaintiffs' Second Amended
    Consolidated Complaint (Dkt. No. 116) and Apple's Reply in Support of Motion to Dismiss
28  Plaintiffs' Second Amended Complaint (Dkt. No. 118).  The Court held oral argument on November
    5, 2013.

Having carefully considered the papers submitted and the pleadings in this action, the arguments of counsel, and for the reasons set forth below, the Court hereby **GRANTS** Apple's Motion to Dismiss **WITHOUT LEAVE TO AMEND**.

I.   **BACKGROUND**[2]

Named Plaintiffs Stephen Schwartz, Edward Hayter, Eric Terrell, and Robert Pepper filed the SAC on their behalf and on behalf of a class of:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased an iPhone application or application license from Apple for use on an iPhone at any time from December 29, 2007 through the present.

(SAC ¶ 54.)  Plaintiffs allege one claim for unlawful monopolization of an aftermarket for iPhone applications in violation of section 2 of the Sherman Act and a second claim for attempted monopolization of the same aftermarket.  The aftermarket of iPhone applications "includes the market for distributing software applications that can be downloaded on the iPhone for managing such functions as ringtones, instant messaging, photographic and video capability, gaming and other entertainment, Internet applications, and any other downloadable software-driven functions."  (*Id.* ¶ 68.)

In terms of this alleged aftermarket, Plaintiffs contend that Apple has instituted, first, "an anticompetitive scheme to monopolize the aftermarket for iPhone applications in order to control and derive supracompetitive profits from the distribution of iPhone apps worldwide."  (SAC ¶ 3.)  Second, Plaintiffs claim that in implementing a closed iPhone operating system, known as an "iOS," the App Store is the only store in the world for iPhone users to buy Apps for their iPhones.  (*Id.* ¶¶ 1, 4.)  Thus, Apple has "cornered 100% of the distribution market for iPhone applications" and effectively "foreclosed iPhone customers from buying software from any source other than Apple."[3]  (*Id.* ¶¶ 3, 7.)

---

[2] A detailed procedural and factual background of this action can be found in this Court's Order Granting Apple's Motion to Dismiss Amended Consolidated Complaint ("Prior Order").  (Dkt. No. 108.)  The background section of this Order will focus solely on the allegations in Plaintiffs' SAC.

[3] In particular, Apple modified the "open" operating system used in Apple desktop and laptop computers (OS X) to a "closed" iOS for the iPhone, which included security measures and program locks designed to prevent iPhone users from installing and running Apps that were not sold or approved by Apple.  (SAC ¶ 30.)  Plaintiffs contend that Apple's closed system was not intended to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In this market environment, Plaintiffs allege Apple charges and collects a "supracompetitive

2    30% fee from iPhone consumers" for each App purchased.  (SAC ¶ 4; *see also id.* ¶ 6 (referring to the

3    fee as a "30% mark-up"), ¶ 7 ("Apple then forced those foreclosed customers to pay Apple a 30% fee

4    for each and every iPhone app they buy"),  ¶ 8 ("charging customers an extra 30% for every app"),

5    ¶ 40 ("30% commission") & ¶ 48 ("30% profit margin").)[4]  Plaintiffs concede "the majority of iPhone

6    apps are now free," but also allege that "iPhone consumers have been overcharged hundreds of

7    millions of dollars for paid apps."  (*Id.* ¶ 9 (also alleging that Apple offers more than 850,000 Apps

8    and iPhone customers worldwide have downloaded more than 50 billion Apps since July 2008).)

9    With regard to the relationship between Apple and the independent software developers

10   creating Apps for iPhones, the SAC identifies three notable characteristics.  First, "Apple always

11   conditioned its 'approval' of such apps on the third party's agreement to give Apple *a share of* the

12   third party's sales proceeds"—namely, 30% identified as both a "commission" and a "mark-up."  (*Id.*

13   ¶¶ 32 (emphasis supplied), 40, 41.)  Second, Apple released a "software development kit" to

14   "enable[e] independent software developers to design applications for use on the iPhone" for an

15   annual price of $99.  (*Id.* ¶ 38.)  Third, Plaintiffs allege Apple "takes its 30% commission off the top

16   and then remits the balance, or 70% of the purchase price, to the developer.  Apple sells the apps (or,

17   more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and

18   pays the developers after the sale.  The developers at no time directly sell the apps or licenses to

19   iPhone customers or collect payments from the customers."  (*Id.* ¶ 41.)

20   Based on these allegations, Plaintiffs summarily conclude that they have been injured by

21   Apple's conduct "because they paid more for their iPhone apps than they would have paid in a

22   competitive market."[5]  (SAC ¶ 45.)  Plaintiffs proffer that Apple's 30% fee is an "obvious" monopoly

---

23   protect its proprietary right to own, sell, or license iOS, but rather, it was closed "for the specific
     purpose . . . of foreclosing competition from other potential iPhone software manufacturers and
24   distributors so that Apple could monopolize and derive monopoly profits from the iPhone apps
25   aftermarket."  (*Id.* ¶ 31.)

26   [4] Plaintiffs allege that Apple did not disclose to them that Apps could only be purchased from Apple
     and by "paying Apple's 30% fee." (SAC ¶ 14.)
27

28   [5] Plaintiffs also identify as injuries (i) the deprivation of the "freedom of choosing between Apple's
     App Store and lower cost market alternatives that would have been available had Apple not

1   price because the developers' flat $99 annual fee "covers most or all of Apple's costs" in reviewing

2   developers' apps and maintaining the App Store.  (*Id.* ¶ 48.)  Based on this "obvious" conclusion,

3   Plaintiffs simply equate the 30% fee as "virtually pure profit for Apple."  (*Id.*)  Plaintiffs then suggest

4   that if developers could sell apps independently, they and discount volume retailers would sell them

5   for "far less than a 30% profit."  (*Id.*)

6   **II.   DISCUSSION**

7        **A.       Standard Under Federal Rule of Civil Procedure 12(b)(6)**

8        A complaint may be dismissed against a defendant for failure to state a claim upon which

9   relief may be granted against that defendant.  Fed. R. Civ. P. 12(b)(6). Dismissal may be based on

10  either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

11  cognizable legal theory.  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990);

12  *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984).  For purposes of

13  evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be

14  true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los*

15  *Angeles,* 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved in favor of the

16  pleading.  *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir. 1973).

17       Mere conclusions couched in factual allegations are not sufficient to state a cause of action.

18  *Papasan v. Allain,* 478 U.S. 265, 286 (1986); *see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802,

19  810 (9th Cir. 1988).  As set forth in the seminal antitrust case, *Bell Atlantic. Corp. v. Twombly*, a

20  complaint must plead "enough facts to state a claim [for] relief that is plausible on its face."  550 U.S.

21  544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows

22  the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

23  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Thus, "for a complaint to survive a motion to dismiss,

24  the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly

25  suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969

26

27

28  monopolized the market" and (ii) "a reduction in the output and supply of iPhone apps, which would
    have been more abundantly available in a competitive market" if not for Apple's monopoly pricing.
    (SAC ¶ 45.)

United States District Court
Northern District of California

United States District Court
Northern District of California

(9th Cir. 2009).  Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment.  *Lopez v. Smith,* 203 F.3d 1122, 1129 (9th Cir. 2000).

Apple's Motion to Dismiss sets forth two primary arguments: first, Plaintiffs lack antitrust standing; and second, Plaintiffs fail to state a claim upon which relief can be granted because they do not allege a relevant antitrust market nor any anticompetitive conduct.  As a threshold matter, the Court begins with the issue of antitrust standing.

**B.      Antitrust Standing**

**1.      Legal Framework of the *Illinois Brick* Doctrine**

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that "only direct purchasers have standing under section 4 of the Clayton Act[6] to seek damages for antitrust violations."  *Delaware Valley*, 523 F.3d at 1120–21 (citing *Illinois Brick*, 431 U.S. at 735).  Under *Illinois Brick*, "only the first party in the chain of distribution to purchase a price-fixed product has standing to sue."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 864 (N.D. Cal. 2012) ("*In re CRT*"); *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) (a "direct purchaser has 'been injured in its business as required by [§ ] 4' even though it passes on 'claimed illegal overcharge[s] to' its customers") (quoting *Illinois Brick*, 431 U.S. at 724).  Indirect purchasers are precluded from suing "based on unlawful overcharges passed on to them by intermediaries in the distribution chain who purchased directly from the alleged antitrust violator."  *In re CRT*, 911 F. Supp. 2d at 864 (citations omitted).  While *Illinois Brick* prevented offensive use of a "pass-through" theory by indirect purchasers, it also prohibited defendants from using a pass-on theory to challenge the standing of direct purchasers.  *In re CRT*, 911 F. Supp. 2d at 864; *In re ATM Fee*, 686 F.3d at 748.

Standing does not depend exclusively on a purchaser's status as direct or indirect.  Standing of indirect purchasers can also be conferred if any of the recognized exceptions to the *Illinois Brick* doctrine applies.  *In re CRT*, 911 F. Supp. 2d at 865.  In the Ninth Circuit, three exceptions exist

---

[6] Section 4 of the Clayton Act, 15 U.S.C. section 15(a), provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  "The Supreme Court has interpreted th[is] section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits."  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120 (9th Cir. 2008).

which would grant standing, namely when an indirect purchaser can establish, one, "a preexisting cost-plus contract with the direct purchaser" or, two, "a price-fixing conspiracy between the manufacturer and the middleman" where the conspiracy "fix[es] the price paid" by the indirect purchasers.  The third exception arises "when customers of the direct purchaser own or control [said] direct purchaser" or "when a conspiring seller owns or controls the direct purchaser."  *In re ATM Fee*, 686 F.3d at 749 (citations omitted).[7]  There, the indirect purchaser is, in effect, the first non-controlled purchaser.

Here, in its Prior Order, the Court dismissed the prior complaint based on lack of Article III standing and granted leave to amend the complaint to address standing issues.  Noting that Plaintiffs bear the burden of alleging the theory and facts upon which they are proceeding, the Court observed that the allegations in the prior complaint contradicted the arguments made in Plaintiffs' opposition to the prior motion to dismiss.  The Court further stated the following:

> The *Apple II* Amended Complaint does not allege a "supracompetitive" or "fixed" price, but rather a mark-up.  Plaintiffs allege throughout the Amended Complaint that Apple's conduct has "unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarkets for . . . iPhone software applications."  (*Apple II* Amended Complaint ¶ 7; *id.* ¶¶ 11 ("increased price for those applications"), 91 & 97.)  Nowhere do Plaintiffs explain how Apple's conduct results in increased "prices" or how said prices were paid.  In their Opposition, Plaintiffs confirm that they challenge "only the 30% fee" (Opp. at 13) but also, for the first time, argue that "iPhone consumers were forced *to pay Apple* a 30% fee on top of the cost for the apps"  (Opp. at 11 (emphasis in original)).  Because the Court's analysis focuses on the actual allegations of the Amended Complaint, and those allegations do not sufficiently identify the basis upon which Plaintiffs are proceeding, the Court declines to issue an advisory opinion analyzing *Illinois Brick* as relevant here.

(Prior Order at 19–20 (footnote omitted) (alteration in original).)

The Prior Order identified two primary areas lacking clarity: (i) the nature of how the 30% fee was paid—whether it was paid directly or through a pass-through; and (ii) how Apple's alleged conduct resulted in an increased (or marked-up) price and, if so, how it was paid.  Plaintiffs' prior briefing stood in stark contrast to the allegations of the prior complaint, which claimed that "Apple

---

[7] The Ninth Circuit also recognized a potential fourth exception that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue."  *In re ATM Fee*, 686 F.3d at 749 (noting, however, a lack of clarity regarding whether the exception exists).

United States District Court
Northern District of California

collects 30% of the sale of each application, with the developer receiving the remaining 70%." (Dkt. No. 81 ¶ 5.)

### 2. Revised Allegations Regarding Antitrust Standing

Plaintiffs contend that the SAC supports two different theories upon which they establish standing as direct purchasers: (1) consumers pay the price of the entire App to Apple directly; and (2) consumers are the only purchasers of Apps and therefore cannot be deemed indirect purchasers. Plaintiffs argue they are straightforward direct purchasers because "Apple *itself* sells every app *directly* to iPhone consumers, Apple *itself* imposes and *directly* collects from iPhone consumers every 30% fee it charges, and Apple's 30% fee is a supracompetitive price that exceeds the prices consumers otherwise would pay for apps had Apple not unlawfully monopolized the iPhone apps aftermarket." (Opposition at 1; *see* SAC ¶ 41.) Said differently, Plaintiffs claim the price of an App has two components: "*the developers' price plus Apple's 30% mark-up*" or Apple's 30% fee "on top of the cost for the apps." (Opposition at 7 (underlined emphasis supplied).) Thus, Plaintiffs argue Apple, as the alleged antitrust violator, "imposes the illegal 30% fee on top of the price of the apps, Plaintiffs purchase the illegal-fee laden apps *directly from Apple*, and Plaintiffs pay the illegal 30% *directly to Apple*, which keeps the entire 30% fee *for itself*." (Opposition at 9 (citing SAC ¶¶ 40–41).) Plaintiffs also point out that only they—the consumers—purchased the apps. Thus, as they are the *only party* in the chain that buys the "price-fixed" product, Plaintiffs conclude they are straightforward direct purchasers. (Opposition at 9.)

Apple disagrees. Apple concedes that Plaintiffs allege that (i) there is a 30% fee, (ii) the fee is Apple's, (iii) Apple collects said fee, and (iv) consumers pay the fee for every App they purchase. (Motion at 7 (citing SAC ¶¶ 4, 6, 7, 8, 14 & 41).) However, Apple contends that its *collection* of the entire price of the App *from consumers* is irrelevant to the standing analysis: "[t]he fact of a pass-through, rather than the mechanism by which the pass-through is collected, determines indirect purchaser status." (Motion at 8.) Put another way, if the developers first bear Apple's fee, then

United States District Court
Northern District of California

1  Plaintiffs do not have standing to pursue their claims regardless of whether the actual collection of the

2  30% happens directly from consumers to Apple.[8]

3        Apple emphasizes that the allegations in the SAC support their proposition and explain the

4  interplay between it and the developers vis-à-vis the consumer.  Specifically, Apple notes that

5  Plaintiffs allege (i) "Apple always conditioned its 'approval' of such apps on the third party's

6  agreement to give Apple *a share of the third party's sales proceeds,*" (ii) that "the full purchase

7  price[] includ[es] Apple's 30% commission," which is paid directly to Apple, and (iii) once paid,

8  "Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase

9  price, to the developer."  (SAC ¶¶ 32 (emphasis supplied), 41.)  According to Apple, these allegations

10  describe a distribution cost or commission imposed on consumers, which renders them indirect

11  purchasers under *Illinois Brick* because the 30% fee is charged to developers in the first instance and

12  that cost is passed-through to consumers.

13        **3.**     **Analysis**

14        The allegations in the SAC essentially pose the question of whether consumers have

15  standing to challenge the 30% received by Apple for each App sold from an independent software

16  developer.  Plaintiffs cast themselves as direct purchasers while Apple argues that they are indirect

17  purchasers.

18        *In re ATM Fee* is instructive, and relied upon by both parties.  In that case, plaintiff-ATM

19  cardholders alleged that large banks had conspired with the STAR ATM network (which facilitated

20  connections between ATM owners and card-issuing banks) in order to fix a fee that the card-issuing

21  bank paid to an ATM owner when certain transactions were routed over the network.  *In re ATM Fee*

22  *Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912, at *2 (N.D. Cal. Sept. 16, 2010), *aff'd*, 686

23  F.3d 741 (9th Cir. 2012) (district court's Order Granting Defendants' Motion for Summary

24  _____

25  [8] Apple emphasizes that Plaintiffs did not amend the complaint to add any allegations that the 30% fee is on top of the cost for the apps; nor did Plaintiffs explicitly explain, as directed by the Court, how

26  the 30% fee is paid by consumers—whether "as a pass-through from developers, or as an entirely separate charge Apple adds 'on top of' the developers' App price when the consumer makes a

27  purchase."  (Motion at 8.)  Instead, Plaintiffs still acknowledge that Apple earns a commission from the developers, which is "at worst" passed on to Plaintiffs, making their injury indirect.  (*Id.* at 1

28  (citing SAC ¶¶ 40, 41).)

United States District Court
Northern District of California

Judgment).  Specifically, ATM cardholders challenged fees associated with use of ATMs not owned by their card-issuing bank, also known as a "foreign" ATM.  686 F.3d at 744–45.  When a cardholder used a foreign ATM, four fees were generated: two paid by the cardholders and two paid by the card-issuing bank.  The fee disputed by plaintiffs was called an "interchange fee" and was paid by the card-issuing bank to the foreign ATM owner.  *Id.* at 745.  The plaintiffs alleged that the defendants engaged in horizontal price fixing by colluding to fix the price of this "interchange fee," which was then passed-on to the plaintiffs as part of the foreign ATM fee paid by cardholders to the card-issuing bank.  *Id.* at 746.  As framed by the district court, plaintiffs alleged that "[a]s a result of th[e] alleged 'price fix,' interchange fees [we]re . . . higher than they would otherwise be."  2010 WL 3701912, at *2.

There, the district court observed that plaintiffs *did not allege* that defendants "conspired to illegally fix the foreign ATM fee that [p]laintiffs pay to their bank when they use a foreign ATM." 686 F.3d at 746 (citing district court order).  Rather, plaintiffs' complaint was that *their banks paid* an unlawfully-inflated interchange fee, which the banks then passed-on to them through the foreign ATM fee.  *Id.*  The district court held that because the interchange fee was not directly paid by the ATM cardholder-plaintiffs, they lacked standing to sue under *Illinois Brick*.  *Id.* at 750.

The Ninth Circuit affirmed and analyzed the meaning of "fixing" a price.[9]  683 F.3d at 752–53.  The Court agreed that "in the *Illinois Brick* context, fixing a price sets the price directly paid, not a price latter [*sic*] passed-on as part of the price at issue."  *Id.* at 753.  The Court rejected plaintiffs' argument which attempted to equate price fixing with "conspiring to set a price for the purpose and effect of raising the price at issue," and which would thereby transform the ATM cardholders into direct purchasers.  *Id.* at 753.  Ultimately, the Court held that "the price paid by plaintiffs must be the price set (not merely 'fixed' in some broad sense) for plaintiffs to be a direct purchaser under the narrowly defined injury requirement of § 4 of the Clayton Act."  *Id.* at 754.

---

[9] As part of the Ninth Circuit's analysis, the court also examined the co-conspirator exception to *Illinois Brick* to determine whether plaintiffs had standing despite being an indirect purchaser.  That exception does not apply here.

1    Here, at best, Plaintiffs allege that the ultimate price paid by them is somehow "fixed" across-

2    the-board at a level 30% higher than it would otherwise be if not for Apple's conduct.  The Court

3    finds that under *In re ATM Fee*, the alleged conduct does not equate to price fixing.  Despite

4    Plaintiffs' efforts, the SAC is fairly read to complain about a fee created by agreement and borne *by*

5    *the developers* to pay Apple 30% from their own proceeds—an amount which is passed-on to the

6    consumers as part of the purchase price.  Plaintiffs attempt to recast themselves as the sole purchasers

7    of the Apps because Apple collects the entire purchase price is unavailing.  To find otherwise would

8    require the Court to ignore the other allegations in the SAC, which identify the developers' obligation

9    to pay or share the thirty percent with Apple.   Consequently, the Court finds the SAC does not allege

10   facts from which Plaintiffs can be classified as direct purchasers.

11   In terms of an analysis of whether Plaintiffs' SAC demonstrates standing for indirect

12   purchasers, the facts required to fall into one of the exceptions under the *Illinois Brick* doctrine are

13   missing.  Despite the Court's instruction to do so if they could, Plaintiffs do not allege in the SAC any

14   price "fixed" by Apple.  To the extent that Plaintiffs intimate that developers would necessarily charge

15   only 70% of the purchase price if not for Apple, such conclusion requires the Court to speculate into

16   developers' pricing structure, their costs, ability to find a distribution chain, and/or desired profits or

17   rates of return.  Simply put, the Court cannot assume, as Plaintiffs do, that developers charging 99

18   cents for an App would necessarily have charged 70%, or 69 cents, if not for the agreement with

19   Apple to pay them 30% of the purchase price.  Further, the SAC lacks allegations of a conspiracy of

20   any kind.

21   For the reasons set forth above, the Court finds that the 30% figure for which Plaintiffs

22   complain is not a fixed fee, but a cost passed-on to consumers by independent software developers.

23   As such, any injury to Plaintiffs is an indirect effect resulting from the software developers' own

24   costs.  Given that none of the exceptions to the *Illinois Brick* doctrine apply, Plaintiffs are barred from

25   bringing claims because they are indirect purchasers.  Having found that Plaintiffs lack antitrust

26   standing, the Court declines to address Apple's further arguments regarding Plaintiffs' failure to state

27   their antitrust claims.

28

**III.     CONCLUSION**

For the foregoing reasons, Apple's Motion to Dismiss Plaintiffs' Second Amended Complaint is **GRANTED WITH PREJUDICE**.

This Order terminates Dkt. No. 115.

**IT IS SO ORDERED.**

Dated: December 2, 2013

                                    _____
                                    **YVONNE GONZALEZ ROGERS**
                                    **UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

11