THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

VERONICA S. LEWIS (Texas Bar No.
24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone:    214.698.3100
Facsimile:    214.571.2900

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR |
|---|---|
| | **APPLE INC.'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*[Declaration of Jay P. Srinivasan and Proposed Order filed concurrently herewith]*<br><br>Honorable Magistrate Judge Thomas S. Hixson<br><br>Hearing Date: September 10, 2020<br>Hearing Time: 10:00 AM |
| DONALD R. CAMERON, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>APPLE INC.,<br><br>                Defendant. | CASE NO. 4:19-cv-03074-YGR |

Gibson, Dunn &
Crutcher LLP

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         **PLEASE TAKE NOTICE THAT** pursuant to Federal Rule of Civil Procedure 45(d)(2)(B),

3    Defendant Apple Inc. files the present motion seeking to compel the respondent, Samsung Electronics

4    America, Inc. ("Samsung") to comply with a Subpoena to Produce Documents, Information, or Objects

5    in a Civil Case that Apple has served on it. Pursuant to Federal Rule of Civil Procedure 37(a)(1) and

6    Local Civil Rule 37-1(a), the undersigned counsel for Apple represents that he has attempted in good

7    faith to confer with counsel for Samsung with respect to the subjects of this motion, but that efforts to

8    resolve the dispute without the Court's assistance were unavailing.

9         Apple's motion is based on this Notice of Motion and Motion, the accompanying Memorandum

10   of Points and Authorities, the concurrently filed Declaration of Jay Srinivasan and Exhibits, any other

11   matters of which the Court may take judicial notice, other documents on file in these actions action,

12   and any oral argument of counsel.

13

14   Dated: July 31, 2020                    GIBSON, DUNN & CRUTCHER LLP

15

16                                           By:   */s/ Jay Srinivasan*

17                                                 Jay Srinivasan

18                                                 *Attorney for Defendant Apple Inc.*

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

Page

3

I.    INTRODUCTION ........................................................................................................... 1

4

II.   BACKGROUND ........................................................................................................... 2

5

    A.    Apple is defending two lawsuits challenging the basic design of its App Store. ......... 2

6

    B.    Apple will contest Plaintiffs' iOS-only market definitions, their theory of
        competitive harm, and claims that Apple's safety and privacy concerns are
        pretextual........................................................................................................................ 2

7

8

    C.    Samsung is Apple's major rival in devices and operates an established Android
        app marketplace. ........................................................................................................... 3

9

    D.    Apple served a subpoena on Samsung about device competition, app
        marketplace competition, and protections against malicious apps. ............................. 4

10

11

    E.    Samsung has resisted any meaningful response to Apple's subpoena......................... 5

12

III.  ARGUMENT ................................................................................................................. 7

13

    A.    The Requests seek relevant information. ...................................................................... 8

14

        1.    Documents concerning device and platform competition
            (Request Nos. 10-13) ......................................................................................... 8

15

16

        2.    Documents concerning competition between app marketplaces
            (Request  Nos. 1-9, 20) .................................................................................... 10

17

        3.    Documents concerning app review, mobile security, and privacy
            (Request Nos. 14-15, 18) ................................................................................. 12

18

19

        4.    Communications with Google about app review, mobile security, and
            competition (Request Nos. 16-19) ................................................................... 12

20

        5.    Galaxy Store organizational charts or employee directories
            (Request No. 21) .............................................................................................. 13

21

    B.    Samsung's objections lack merit................................................................................. 14

22

        1.    Samsung's claimed lack of documents is implausible.................................... 15

23

        2.    Other sources of information are inadequate. ................................................. 17

24

        3.    Samsung's competitor status does not excuse its blanket
            noncompliance. ............................................................................................... 19

25

IV. CONCLUSION............................................................................................................... 22

26

27

28

i

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AFMS LLC v. UPS Co.*,
No. 12-cv-1503, 2012 WL 3112000 (S.D. Cal. July 30, 2012) ..........................................11, 14, 21

*Apple Inc. v. Samsung Elecs. Co. Ltd.*,
No. 12-CV-0630-LHK, 2013 WL 1942163 (N.D. Cal. May 9, 2013) ...................................1, 8, 14

*In re Apple iPhone Antitrust Litig.*,
846 F.3d 313 (9th Cir. 2017)................................................................20

*Audio MPEG, Inc. v. HP Inc.*,
No.16-mc-80271-HRL, 2017 WL 950847 (N.D. Cal. Mar. 10, 2017) ...........................................20

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
881 F. Supp. 860 (W.D.N.Y. 1994) ..............................................................................9

*Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*,
107 F.R.D. 288 (D. Del. 1985)................................................................21

*Braun v. Primary Distrib. Doe No. 1*,
No. 12-4102-YGR, 2013 WL 12142998 (N.D. Cal. Jan. 11, 2013) .............................................14

*In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
MDL No. 2187, 2014 WL 1660386 (S.D.W. Va. Apr. 22, 2014) ...............................................20

*Cal. Computer Prods., Inc. v. IBM Corp.*,
613 F.2d 727 (9th Cir. 1979)...................................................................7

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999).................................................................17

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
No. 2:06-MC-0034, 2006 WL 2871834 (S.D. Ohio Aug. 7, 2006)................................17

*Compaq Computer Corp. v. Packard Bell Elecs., Inc.*,
163 F.R.D. 329 (N.D. Cal. 1995)...............................................................20

*Covey Oil Co. v. Cont'l Oil Co.*,
340 F.2d 993 (10th Cir. 1965), *abrogated on other grounds by United States v. Ryan*, 402 U.S. 530 (1971).................................................................7, 21

*In re Currency Conversion Fee Antitrust Litig.*,
MDL No. 1409, 2004 WL 848171 (S.D.N.Y. Apr. 21, 2004)................................10, 21

*D.F. v. Sikorsky Aircraft Corp.*,
    No. 13-cv-331-GPC, 2016 WL 3360515 (S.D. Cal. June 13, 2016) ...............................................1

*Dial Corp. v. News Corp.*,
    No. 13-cv-6802, 2015 WL 3778533 (S.D.N.Y. May 19, 2015) .................................................7, 21

*Diamond State Ins. Co. v. Rebel Oil Co., Inc.*,
    157 F.R.D. 691 (D. Nev. 1994) ........................................................................................20

*DIRECTV, Inc. v. Trone*,
    209 F.R.D. 455 (C.D. Cal. 2002) .....................................................................................14

*Gonzales v. Google, Inc.*,
    234 F.R.D. 674 (N.D. Cal. 2006) ................................................................................19, 20

*Gradillas Ct. Reporters, Inc. v. Cherry Bekaert, LLP*,
    No. 18-mc-80064-KAW, 2018 WL 2197544 (N.D. Cal. May 14, 2018) ...........................18, 19, 21

*Illumina Cambridge Ltd. v. Complete Genomics, Inc.*,
    No. 19-mc-80215-WHO, 2020 WL 820327 (N.D. Cal. Feb. 19, 2020) ........................................17

*Juno Therapeutics, Inc. v. Kite Pharm., Inc.*,
    No. CV 17-7639-SJO, 2019 WL 3069009 (C.D. Cal. Apr. 29, 2019)..........................................21

*La. Pac. Corp. v. Money Market 1 Instit. Inv. Dealer*,
    285 F.R.D. 481 (N.D. Cal. 2012) .....................................................................................14

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*,
    No. 3:12-cv-26, 2013 WL 3872077 (S.D. Ohio July 25, 2013).........................................11, 19, 21

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    No. 06-0620, 2012 WL 298480 (E.D. PA. Jan. 31, 2012).....................................................17, 20

*N.M. Oncology v. Presbyt'n Healthcare Servs.*,
    No. 12-526 MV/GBW, 2016 WL 3452757 (D.N.M. May 10, 2016) .......................7, 9, 10, 17, 20

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008)............................................................................................9

*Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*,
    838 F.2d 360 (9th Cir. 1988).............................................................................................7

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..............................................................................................7, 9, 11

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978) ......................................................................................................14

*Pasadena Oil & Gas Wyo. LLC v. Mont. Oil Props. Inc.*,
    320 F. App'x 675 (9th Cir. 2009) ....................................................................................19

iii

Gibson, Dunn &
Crutcher LLP

*Pecover v. Elec. Arts, Inc.*,
    No. 12-mc-80064, 2012 WL 951255 (N.D. Cal. Mar. 20, 2012) ...................................10

*R. J. Reynolds v. Philip Morris, Inc.*,
    29 F. App'x 880 (3rd Cir. 2002) .......................................................................................21

*Seifi v. Mercedes-Benz USA, LLC*,
    No. 12-cv-05493, 2014 WL 7187111 (N.D. Cal. Dec. 16, 2014)......................................17

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992).................................................................................................7

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .............................................................................................................7

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990)............................................................................................12

*Waymo LLC v. Uber Techs.*,
    Inc., No. 17-cv-00939, 2017 WL 2929439 (N.D. Cal. July 7, 2017) .................................19

**Other Authorities**

Android, *Google Android Security 2017 Year in Review* (March 2018),
    https://source.android.com/security/reports/Google_Android_Security_2017_Repo
    rt_Final.pdf........................................................................................................................13

Arturo Lovazzano, LinkedIn, https://www.linkedin.com/in/arturolovazzano/ ....................16

Chris Jo, LinkedIn, https://www.linkedin.com/in/chris-jo-5162b61/ ..................................16

European Comm'n, Case AT.40099, *Google Android* (July 18. 2018),
    https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3
    .pdf ....................................................................................................................................18

G. Monserrat Guerrero, LinkedIn, https://www.linkedin.com/in/gmontserratguerrero/ ......................16

Galaxy Store, https://developer.samsung.com/galaxy-store (last visited July 29, 2020).....................18

Google, *Android Security & Privacy 2018 Year in Review* (March 2019),
    https://source.android.com/security/reports/Google_Android_Security_2018_Repo
    rt_Final.pdf........................................................................................................................13

*How Samsung Plans to Fix its Galaxy Apps Store*, CNET (Sept. 3, 2014),
    https://www.cnet.com/news/how-samsung-plans-to-fix-its-galaxy-apps-store/............................16

*How Samsung Plans to Snare Game Developers with its 'Made for Samsung'*
    *Program*, VentureBeat (May 15, 2016), https://venturebeat.com/2016/05/15/how-
    samsung-plans-to-snare-game-developers-with-made-for-samsung-program/ ............................16

Gibson, Dunn &
Crutcher LLP

Hyunah Elise Kwon, LinkedIn, https://www.linkedin.com/in/hyunahkwon/ ...................................... 16

John Pleasants, LinkedIn, https://www.linkedin.com/in/john-pleasants-5985a04/ (last
visited July 28, 2020) ...................................................................................................... 16

Mihai Pohontu, LinkedIn, https://www.linkedin.com/in/mihaipohontu/ (last visited
July 28, 2020) ................................................................................................................... 16

Phones & Tablets, https://www.android.com/phones-tablets/ (last visited July 28,
2020) .................................................................................................................................... 3

Ravi Belwal, LinkedIn, https://www.linkedin.com/in/belwal/ (last visited July 28,
2020) .................................................................................................................................. 16

Regional Departments and Divisions,
https://www.samsung.com/levant/aboutsamsung/company/divisions/ (last visited
July 28, 2020) .............................................................................................................. 6, 15

*Samsung Decided To Start Attacking Apple After Steve Jobs Died*, Business Insider
(Apr. 16, 2014), https://www.businessinsider.in/Samsung-Decided-To-Start-
Attacking-Apple-After-Steve-Jobs-Died/articleshow/33827703.cms ..................................... 13, 16

*Samsung Galaxy App Store Gains Ground in the U.S. with Each Smartphone Launch*,
VentureBeat (April 22, 2017), https://venturebeat.com/2017/04/22/samsung-
galaxy-app-store-gains-ground-in-the-u-s-with-each-smartphone-launch/ .................................. 16

*Samsung Joins the App Store Party*, Wired (Aug. 31, 2009),
https://www.wired.com/2009/08/samsung-app-store/ .................................................................. 20

Valerie Denappe, LinkedIn, https://www.linkedin.com/in/valeriedenappe/ ........................................ 16

**Rules**

Fed. R. Civ. P. 26(b) ............................................................................................................ 8

Gibson, Dunn &

Crutcher LLP

# I.    INTRODUCTION

Apple is currently defending against two class action antitrust lawsuits that attack the fundamental design, structure, and business model of the App Store. Apple does not have a dominant market share in any market where we do business and is certainly not a monopolist. To the contrary, the App Store has opened the flood gates for developers and revolutionized the way software developers distribute their products, with more than 1.7 million apps on the App Store today that provide customers a high-quality, reliable, and secure user experience.

In defending against Plaintiffs' frivolous accusations, Apple seeks discovery from its competitors about the relevant market, as well as the effects of and justifications for the business practices challenged by Plaintiffs. Samsung Electronics America, Inc. ("Samsung") is one such competitor. In its dual role as a handheld device manufacturer and an app distributor, Samsung has a unique perspective on issues central to the underlying lawsuits, including competition in the handheld device market, competition among app marketplaces, and the need for safeguards against malware. Accordingly, Apple served Samsung with a subpoena for documents tailored to these subjects.

Apple has repeatedly made clear that "it does not want every document that touches on" the subjects of its subpoena, and has offered to work with Samsung to facilitate production while minimizing Samsung's burden as a non-party. Yet despite the relevance of Apple's requests (which Samsung has not seriously questioned), Samsung has so far refused to provide a meaningful response, ostensibly on the basis that it lacks responsive material, that the documents sought are available elsewhere, or that Samsung's status as a competitor immunizes it from its "obligations, once subject to a subpoena, to participate in transparent and collaborative discovery." *Apple Inc. v. Samsung Elecs. Co. Ltd.*, No. 12-CV-0630-LHK, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013).

None of these objections withstands scrutiny. Efforts to resolve this dispute amicably have failed. Apple therefore respectfully asks the Court to compel Samsung's compliance with the subpoena.[1]

---

[1]  Although the subpoena designated the Southern District of New York as the place of compliance, Samsung and Apple have agreed pursuant to Fed. R. Civ. P. 45(f) to submit this and future disputes in the above-captioned cases for resolution by this Court, which issued the relevant subpoena. *See Pepper* Dkt. 212 (Joint Letter Br.) at 1 n.1; *see also D.F. v. Sikorsky Aircraft Corp.*, No. 13-cv-331-GPC, 2016 WL 3360515, at *1 n.1 (S.D. Cal. June 13, 2016) (similar arrangement).

1

DEFENDANT APPLE INC.'S MOTION TO COMPEL
DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.
CASE NOS. 4:11-CV-06714-YGR, 4:19-CV-03074-YGR

Gibson, Dunn &
Crutcher LLP

## II.      BACKGROUND

**A.      Apple is defending two lawsuits challenging the basic design of its App Store.**

This dispute stems from two antitrust lawsuits pending before this Court—one from a putative class of iPhone users and another from a putative class of iOS app developers. Both allege that Apple has monopolized iOS app distribution by allegedly requiring that all apps be distributed through Apple's App Store after a pre-distribution review. *See Cameron* Dkt. 53 (Developer Compl.) ¶ 2; *Pepper* Dkt. 111 (Consumer Compl.) ¶¶ 2-4. Plaintiffs allege that Apple requires distribution through the App Store in order to foreclose competition from other app distributors and thereby charge developers a supracompetitive 30% commission on the sale of apps and certain in-app purchases. *E.g.*, Dev. Compl. ¶¶ 29-31.

In Plaintiffs' telling, Apple is a monopolist in relevant markets limited to iOS apps (Cons. Compl. ¶ 65-66, 71; Dev. Compl. ¶¶ 51-52), in which competition between Apple and other device manufacturers, operating systems, and app distributors play no part. *See, e.g.*, Cons. Compl. ¶ 66 ("The existence of competition in the smartphone market between Apple's iPhone and the makers of competing handsets such as Google's Android phones is irrelevant to the relevant market analysis . . . ."); Dev. Compl. ¶ 57 ("[No] other entity providing app and in-app-product distribution services . . . provide[s] any constraints to Apple's market power."). According to Plaintiffs, if Apple facilitated the installation of iOS apps from sources other than the App Store, Apple would be "pressure[d] to substantially lower its 30%" commission because of price competition from other app distributors. Cons. Compl. ¶ 48; *see* Dev. Compl. ¶¶ 82, 96. Plaintiffs reject as "overblown pretense" Apple's belief that its challenged policies help to "protect its device customers from bad apps and malware." *Id.* ¶ 53.

**B.      Apple will contest Plaintiffs' iOS-only market definitions, their theory of competitive harm, and claims that Apple's safety and privacy concerns are pretextual.**

Apple strongly denies these charges. Relevant to the present dispute, Apple denies the existence of a relevant market limited to iOS apps. On the contrary, "[c]ompetition both inside and outside the App Store is fierce at every level: for devices, platforms, and individual apps." *Cameron* Dkt. 74 (Answer to Developer Complaint) ("Dev. Answer") at 4. First, Apple faces vigorous competition at the

1   device and platform level from "some of the largest companies in the world" (*id.*), including Samsung.

2   Apple intends to argue that this competition meaningfully constrains Apple's pricing and policies

3   concerning the App Store. Second, and relatedly, Apple faces competition for app distribution from

4   other app distributors—most directly from other mobile app marketplaces such as Google Play,

5   Amazon's Appstore, and the Samsung Galaxy Store. *See id.*

6        Further, Apple intends to contest plaintiff's central theory of competitive harm—that Apple's

7   commission is artificially high because developers allegedly must sell through the App Store. And

8   Apple will also argue that its policy of requiring all iOS apps developed using Apple's software to

9   undergo rigorous, human-assisted pre-distribution review by Apple is supported by legitimate business

10  reasons because it helps ensure the "safety, security, privacy, and seamless integration" of apps on iOS

11  devices. *Id.* at 2.

12  **C.   Samsung is Apple's major rival in devices and operates an established Android app marketplace.**

13

14       As alluded to already, Samsung is implicated by these claims and defenses. First and foremost,

15  Samsung is Apple's most significant U.S. competitor in the sale of handheld devices—primarily

16  smartphones. According to material cited in Samsung's objections, Apple and Samsung together

17  account for more than half of U.S. smartphone sales. *See, e.g.*, *U.S. Smartphone Market Share by

18  Quarter*, Counterpoint (May 17, 2020), *cited in* Declaration of Jay P. Srinivasan in Support of Apple

19  Inc.'s Motion to Compel ("Srinivasan Decl.") Ex. B (Samsung Resp. & Obj.) ("Objections") at 33 n.6.

20  Unlike Apple's devices, which run on Apple's own proprietary iOS operating system, Samsung's

21  devices run on an operating system, Android, designed and controlled by a third party, Google. *See

22  Phones & Tablets, https://www.android.com/phones-tablets/ (last visited July 28, 2020) (listing

23  Samsung as one of several "Featured Brands" on Android).

24       Second, Samsung operates an app marketplace, the Galaxy Store.[2] As Apple understands, the

25  Galaxy Store runs much like the App Store: Samsung offers app developers services and tools to help

26  them build apps; developers may then submit those apps to Samsung, which reviews the apps for

27  quality, performance, content, and security before publishing them in the Galaxy Store. *See* Objections

28  ────────────

[2]  Samsung's store previously went by the names "Samsung Apps" and "Samsung Galaxy Apps." For
     convenience, we use "Galaxy Store" throughout.

at 14 & n.3, 43 & n.10. And as in the App Store, Samsung charges developers a commission on sales of apps and in-app products.

Third, as in the marketplace hypothesized by Plaintiffs' complaint, the Galaxy Store is not the only source of apps for users of Samsung's devices. Notably, the Galaxy Store faces competition within Android from Google Play, Android's centralized app marketplace, which also comes preinstalled along with the Galaxy Store on Samsung's Android OS devices. *See* Srinivasan Decl. Ex. G (Samsung 6/10 Letter) at 6 (confirming that "all Samsung Android OS phones that [Samsung] has sold in the U.S. since 2009 have been preloaded with the Galaxy Store . . . and the Google Play store . . . ."). Additionally, Samsung's users may obtain apps from sources other than a preinstalled app marketplace, such as competing stores or app developers themselves. *See* Objections at 61 (confirming that "Samsung phones and tablets with Android OS can install and download from app stores other than Google Play and the Galaxy Store."); *see also* Dev. Compl. ¶¶ 69, 70, 72, 80 (describing competition between app distributors in Android).

**D.    Apple served a subpoena on Samsung about device competition, app marketplace competition, and protections against malicious apps.**

The Court has acknowledged that "how competition works" concerning the App Store and similar platforms is "where the debate is" in these cases. Case Mgmt. Conf. (CMC) Tr. 24:5-9 (Oct. 7, 2019). To help answer that question, on March 16, 2020, Apple served Samsung with a subpoena for documents under Federal Rule of Civil Procedure 45.[3] *See* Srinivasan Decl. ¶ 2 & Ex. A (Subpoena). Apple's subpoena was carefully drafted to elicit documents about Samsung's sale of handheld devices and operation of the Galaxy Store as they relate to Apple's defenses in the App Store litigations. In particular, the subpoena sought:

· ***Documents about device and platform competition (Request Nos. 10-13)***, including high-level internal documents about competition between mobile platforms regarding apps or app marketplaces, and security and privacy;

· ***Documents about app marketplace competition (Request Nos. 1-9, 20)***, including certain aggregated data about the Galaxy Store's installation rate, usage and revenues, as well as high-level internal documents about the Galaxy Store's performance and Samsung's competitive positioning of, and plans for, the Galaxy Store; and

---

[3]   Samsung has not been singled out—Apple has served other subpoenas on companies that operate marketplaces for digital content, but there are presently no disputes to bring to the Court on those matters.

DEFENDANT APPLE INC.'S MOTION TO COMPEL
DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.
CASE NOS. 4:11-CV-06714-YGR, 4:19-CV-03074-YGR

Gibson, Dunn &
Crutcher LLP

- · *Documents about app review and security (**Request Nos. 14-15, 17-18**)*, including documents about Samsung's app review procedures for the Galaxy Store, its approaches to mobile security and privacy, and its statements about risks from downloading apps.

In addition, the Subpoena sought communications with Samsung's partner, Google, about these three topics (Request Nos. 16, 17 and 19).[4]

**E.   Samsung has resisted any meaningful response to Apple's subpoena.**

Samsung served Apple with Responses and Objections to its subpoena a few weeks later. Despite running to 65 pages, Samsung's response can be summarized in five words: "[Samsung] will not produce documents." Objections at 20, 22, 25, 27, 29, 32, 35, 37, 40, 42, 47, 50, 52, 63. Other than directing Apple to a few elementary public materials—many of which Apple had already reviewed in order to prepare the subpoena—Samsung flatly ruled out providing substantive responses, maintaining (erroneously) that the information requested was mostly public or in Apple's possession, and that Samsung should not have to produce "sensitive" information to its competitor even under a protective order. *See, e.g.*, *id.* at 3-5.

Since then, during a four-month back-and-forth involving hours of phone calls and dozens of pages of correspondence, Apple has endeavored to explain the relevance of its Requests and explore ways to ease Samsung's burden of compliance. *See* Srinivasan Decl. ¶¶ 4, 7, 9, 13, 15 (documenting five meet-and-confers, totaling five hours). For instance, in its first phone call with Samsung, Apple's counsel made clear that certain requests for documents from "Executives or Directors" (Request Nos. 4-12) were meant to target documents such as decisional, strategic reports and analyses so that Samsung would not have to conduct a review and production from hundreds of employees who are likely to possess relevant documents. *Id.* ¶ 4.

In subsequent written correspondence, Apple outlined in painstaking detail why each Request sought relevant documents, and described how certain Requests could be satisfied with minimal effort, *see* Srinivasan Decl. Ex. E (Apple 5/14 Letter), such as by confirming that publicly available information is complete (*id.* at 2), confirming basic facts about Samsung's products and services (*id.* at 2, 6), providing aggregated data (*id.* at 3), and producing specific documents, such as internal app

---

[4]  The subpoena also sought Samsung's organizational charts relating to the Galaxy Store and app review and security, as well as any communications with the Consumer or Developer Plaintiffs (Request Nos. 21-23).

Gibson, Dunn & Crutcher LLP

review guidelines (*id.* at 4-5). Apple also made clear that it would accept documents from a more limited time period (*see, e.g.*, *id.* at 3), but Samsung has never indicated that it would produce documents in response to any Request if Apple would narrow the time period. And Apple repeatedly stressed that "it does not want every document that touches on the subjects" covered by its subpoena, and would work with Samsung to assist its compliance with some of the more substantial requests. *See id.* at 3 (expressing willingness to discuss time period, specificity, and aggregation of data); *id.* at 4 (expressing willingness to "work with Samsung to identify the relevant" custodians); Srinivasan Decl. Ex. C (Apple 4/28 Letter) at 3 ("Apple is willing to negotiate and to modify the scope of certain Requests if it will result in a meaningful production.").

Yet during this time, Samsung's bottom-line position has barely shifted, and its excuses for noncompliance have multiplied. Samsung has continued to argue that by highlighting basic public information in its objections, it somehow complied with the lion's share of a subpoena seeking qualitatively different information. *See* Srinivasan Decl. Ex. D (Samsung 5/1 Letter) at 3-4 (describing material Samsung previously pointed out in Objections); Samsung 6/10 Letter at 2-4 (doing so again); *see also* Srinivasan Decl. ¶¶ 4, 7. And it has steadfastly refused to produce meaningful internal documents about its app marketplace and device competition on the grounds that Samsung competes with Apple. *See* Samsung 5/1 Letter at 5.

About two-and-a-half months into these talks, Samsung shifted to yet another reason for noncompliance—it claimed that it does not in fact have most of the information Apple is requesting because relevant functions are performed by Samsung's Korean parent company. *See* Samsung 6/10 Letter at 1-2, 6; *see also* Joint Letter Br. at 6 ("Most of the documents Apple seeks would be in Samsung [Korea] not [Samsung Electronics America]." (emphasis omitted)). Despite employing thousands of people (including those with wide-ranging and lofty job titles), Samsung described the U.S. company as a mere "sales and marketing arm" for its Korean parent, importing phones to be sold in the United States. Srinivasan Decl. ¶ 4. But Samsung's own materials tout the company's responsibility for "build[ing] applications, content and service platforms," managing "developer relationships," and "deliver[ing] innovative, connected experiences across Samsung's mobile and digital ecosystem." *See*

Gibson, Dunn &
Crutcher LLP

1  Regional   Departments   and   Divisions,   https://www.samsung.com/levant/aboutsamsung/

2  company/divisions/ (last visited July 28, 2020).

3       Ultimately, all Apple has to show from four months of effort with Samsung is a few links,

4  screenshots, and descriptions of public materials. And while Samsung has grudgingly offered to

5  produce a small amount of data and third-party research in its possession (*see* Samsung 6/10 Letter at

6  5), the offer falls short of Apple's needs for this important case, lacks critical details about the Galaxy

7  Store (*see* Srinivasan Decl. ¶ 9), and is "expressly contingent" on Apple's dropping its other requests.

8  *See* Samsung 6/10 Letter at 1 n.1; Srinivasan Decl. ¶ 9.

9                          **III.    ARGUMENT**

10      Apple has a right to defend itself against these class actions by seeking discovery related to the

11  relevant market, the nature of competition in the relevant market and any related markets, the

12  competitive effects of Apple's alleged conduct in these markets, and Apple's business reasons for

13  structuring the App Store the way it has—all of which are potentially dispositive of Plaintiffs'

14  monopolization claims.[5]

15      As in many complex antitrust cases, evidence from other market participants is necessary for

16  Apple to develop and prove its defenses. *See, e.g.*, *Covey Oil Co. v. Cont'l Oil Co.*, 340 F.2d 993, 998

17  (10th Cir. 1965) ("Exploration into the businesses of admitted rivals may well reveal the validity or

18  invalidity of the charge of competition suppression."), *abrogated on other grounds by United States v.*

19  *Ryan*, 402 U.S. 530 (1971); *N.M. Oncology v. Presbyt'n Healthcare Servs.*, No. 12-526 MV/GBW,

20  2016 WL 3452757, at *3 (D.N.M. May 10, 2016) (observing, in monopolization case, that "[w]ithout

21
22
23
24
25
26
27
28

---

[5]  To establish Apple's liability under Section 2 of the Sherman Act, Plaintiffs must prove two elements: Apple's "possession of monopoly power in the relevant market" and its "willful acquisition or maintenance of that power" through exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Proving monopoly power requires defining a relevant market, which is "the area of effective competition" defined as "the arena within which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (internal quotation marks omitted). To prove anticompetitive conduct, meanwhile, Plaintiffs must show that Apple's conduct "caus[ed] unreasonable exclusionary or anticompetitive effects." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (Marshall, J.) (quotation marks omitted). But Apple can avoid liability if "legitimate business justifications" explain its actions. *Id.* at 189 (collecting cases). Lastly, as private litigants, Plaintiffs must prove antitrust injury—namely "injury causally linked to the asserted violation . . . of the type the antitrust laws were intended to prevent." *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 732 (9th Cir. 1979).

7

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO COMPEL
DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.
CASE NOS. 4:11-CV-06714-YGR, 4:19-CV-03074-YGR

1   question, competitors' views and evaluation of the market are relevant to defining a market and

2   evaluating market power"); *Dial Corp. v. News Corp.*, No. 13-cv-6802, 2015 WL 3778533, at *2

3   (S.D.N.Y. May 19, 2015) ("Because Plaintiffs acknowledge that Valassis is News Corp.'s only viable

4   competitor in the [relevant] markets, documents evaluating Valassis could foreseeably be used by News

5   Corp. in connection with defenses asserted in this case."). The Court itself has recognized that market

6   definition is a hotly contested issue, and that evaluating Apple's business practices will entail discovery

7   of what "other companies are doing who have apps as well." CMC Tr. 19:18-22, 45:23-46:5.

8        Apple's subpoena to Samsung fits well within this tradition, targeting information about

9   competition between mobile devices and app marketplaces and business practices that goes directly to

10  the Plaintiffs' claims and Apple's defenses. But instead of working productively with Apple, Samsung

11  has chosen a path of "obfuscation [and] obstinacy." *Samsung Elecs.*, 2013 WL 1942163, at *3. It has

12  refused to budge from the same absolute and unwarranted positions it staked out in its original

13  Objections, refused to engage with Apple's suggested ways to ease its burden, refused to provide

14  straightforward answers about where documents are located and who has access—and, ultimately,

15  refused to produce responsive materials it very likely possesses.[6] This Court should order Samsung's

16  compliance.

17  **A.     The Requests seek relevant information.**

18       The Federal Rules permit discovery from nonparties "regarding any nonprivileged matter that

19  is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P.

20  26(b); *see, e.g.*, *Samsung Elecs.*, 2013 WL 1942163, at *1 (scope of non-party discovery under Federal

21  Rule 45 is the same as under Federal Rule 26(b)). As set forth below, Apple's document requests more

22  than meet these standards.

23       **1.     Documents concerning device and platform competition (Request Nos. 10-13)**

24       First, the Requests seek certain high-level internal documents about competition between Apple

25  and Samsung at the device level. These are relevant to market definition, which the Court has

26  recognized is an important disputed issue. *See* CMC Tr. at 19:17-22 ("[Y]ou've got economics

27

28  ───────────────
    [6]  Apple is not moving in this instance to compel responses to Request Nos. 1, 2, 20(a)-(b), 22, or 23. *See* Srinivasan Decl. Ex. I (Apple 7/7 Email) at 1.

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO COMPEL
DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.
CASE NOS. 4:11-CV-06714-YGR, 4:19-CV-03074-YGR

professors on both sides of the aisle already arguing market definition in this case."). The Supreme Court has held that when it comes to two-sided platforms like Apple's, which "provid[e] services to two different groups"—here, consumers and developers—"who depend on the platform to intermediate between them," "[o]nly other two-sided platforms can compete with a two-sided platform for transactions." *Am. Express*, 138 S. Ct. at 2277, 2287. Yet despite this precedent, both Complaints allege that other two-sided mobile platforms like Samsung provide no competitive constraint on Apple's App Store business. *See, e.g.*, Cons. Compl. ¶ 66 ("The existence of competition in the smartphone market between Apple's iPhone and the makers of competing handsets such as Google's Android phones is irrelevant to the relevant market analysis in a Section 2 Sherman Act aftermarket monopolization case . . . ."); Dev. Compl. ¶ 57 ("[No] other entity providing app and in-app-product distribution services . . . provide[s] any constraints to Apple's market power.").

Discovery from Samsung—Apple's most significant U.S. competitor in devices—is necessary to address these allegations. By requesting Samsung's internal documents about, in particular, consumer preferences for app marketplaces on handheld devices (Request Nos. 12, 13), and competition concerning the availability of apps and app marketplaces (Request Nos. 10, 11), Apple aims to understand the role app stores play in a vigorously competitive market for devices in which Apple and Samsung are the major participants. For instance, evidence that app stores, and the selection of apps they contain, indeed influence competition between device manufacturers would undermine plaintiffs' claim that iOS apps are an isolated market in which Apple can exercise monopoly power. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1051 (9th Cir. 2008) (explaining that "initial market's actual ability, through cross-elasticity of demand, to discipline anti-competitive conduct in the aftermarket is a factual question" relevant to an aftermarket claim).[7]

Courts acknowledge that "competitors' views and evaluation of the market are relevant to defining a market and evaluating market power" and have ordered discovery accordingly. *N.M.*

---

[7] Apple has made clear in calls and correspondence that its interest in device-level competition between Apple and Samsung is "related to apps and app marketplaces" and that in Request Nos. 10-13, it seeks "responsive documents concerning competition between handheld devices and operating systems related to the availability of apps or app marketplaces." Apple 7/7 Email at 1. Thus, Apple has no need for documents just comparing, say, the screen resolution or battery life of Apple and Samsung devices. Samsung knows full well that Apple is not "seek[ing] all of [Samsung's] documents concerning U.S. consumer preferences for and attitudes towards [smartphones and tablets]." (emphasis omitted). *But see* Joint Letter Br. at 5.

9

*Oncology*, 2016 WL 3452757, at *3 (citing *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 873 (W.D.N.Y. 1994)). For instance, in *New Mexico Oncology*, hospitals sought discovery from their competitors to defend against allegations that they possessed monopoly power. Recognizing that the defendants had a substantial need for these documents because "[t]ypically, the only source of competitors' views of the market is from the competitors themselves," the district court ordered the rival hospitals to produce several "high level strategy and planning documents" related to various competitive dynamics, including pricing and entry. *Id.* at *3; *see also, e.g.*, *Pecover v. Elec. Arts, Inc.*, No. 12-mc-80064, 2012 WL 951255, at *3 (N.D. Cal. Mar. 20, 2012) (ordering discovery from market participant concerning its interactions with antitrust defendant and views about who defendant's competitors were because such information "is directly relevant to the parameters of the market that [defendant] allegedly monopolized."); *In re Currency Conversion Fee Antitrust Litig.*, MDL No. 1409, 2004 WL 848171, at *1 (S.D.N.Y. Apr. 21, 2004) ("This Court gives no credence to American Express' contention that foreign currency conversion information from the third player in a three-player market is irrelevant to an antitrust action focusing on foreign currency conversion fees.").

### 2. Documents concerning competition between app marketplaces (Request Nos. 1-9, 20)

Next, several of the Requests seek documents about competition between app marketplaces. These documents are relevant on at least two fronts:

***First***, responsive documents will likely show the nature and extent of direct competition between the App Store and the Galaxy Store. This is again relevant to market definition—particularly concerning the developers' complaint. Developer Plaintiffs allege a relevant market limited to "iOS app and in-app-product distribution services," claiming that other app distribution services like Google Play, Amazon's Appstore, and the Samsung Galaxy Store "offer[] no competition to, and [are] not a substitute for, the App Store." Dev. Compl. ¶¶ 106-07. Several of the documents requested, including strategic documents about Samsung's launch of the Galaxy Store (Request No. 4), documents discussing Samsung's differentiation and positioning of the Galaxy Store versus other app marketplaces (Request Nos. 6, 7), and internal documents about competition between Android app marketplaces and the App Store, could be used to challenge developers' narrow definition by showing

Gibson, Dunn & Crutcher LLP

whether Samsung views Apple as a competitor in attracting developers and distributing apps and should therefore be included in the relevant market. *See Am. Express*, 138 S. Ct. at 2285 (relevant market is defined as "the arena within which significant substitution in consumption or production occurs").

*Second*, documents concerning competition between app marketplaces *within* the Android ecosystem (*e.g.*, between the Samsung Galaxy Store and Google Play) are relevant to one of the primary theories underlying Plaintiffs' lawsuits—the idea that if iOS users could download apps from sources other than Apple's App Store, competition between distribution channels would force Apple to reduce its commission. *See, e.g.*, Cons. Compl. ¶¶ 48-49; Dev. Compl. ¶ 31. Unlike iOS, but like the marketplace hypothesized in Plaintiffs' complaint, the Android ecosystem facilitates the installation of apps from multiple sources. *See, e.g.*, *10 Best Third-Party App Stores for Android And Other Options Too*, Android Authority (Apr. 28, 2020), *cited in* Objections at 53 n.11 (listing Android app marketplaces including Amazon Appstore, Samsung Galaxy Store, and Google Play).

Evidence about how app marketplaces like Samsung's actually compete within Android may therefore be used to address plaintiffs' theory of competitive harm. Samsung's internal data and documents about the Galaxy Store and its track record of competing against Google Play within Android may undermine Plaintiffs' claim that requiring Apple to facilitate distribution outside the App Store would usher in meaningful competition to the App Store. *See* Dev. Compl. ¶ 96. Apple could use such evidence not only to argue that its conduct does not have the requisite anticompetitive effect, but also that a significant number of class members are not injured. *See AFMS LLC v. UPS Co.*, No. 12-cv-1503, 2012 WL 3112000, at *5 (S.D. Cal. July 30, 2012) (ordering discovery of non-party's customer lists and communications relevant to whether defendant's conduct had a substantial adverse effect on competition); *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, No. 3:12-cv-26, 2013 WL 3872077, *4-7 (S.D. Ohio July 25, 2013) (ordering discovery of competitor's financial reports and strategic plans and analyses to show whether defendants' conduct harmed competition). Accordingly, in addition to the documents already described, the Requests call for aggregated data about the Galaxy Store's performance, usage, and rate of installation (Request Nos. 3, 20(c)), its performance and popularity with developers and phone users (Request No. 5), and competition between Android app marketplaces (Request No. 8).

3. **Documents concerning app review, mobile security, and privacy (Request Nos. 14-15, 18)**

Documents about Samsung's app review procedures, approaches to mobile security and privacy, and statements about app download risks are relevant to Apple's business justifications defense. Apple believes that subjecting all iOS apps to rigorous pre-distribution vetting serves to protect iPhone users from malicious and poor quality apps. *See, e.g.*, Dev. Answer at 2. Apple therefore intends to argue that the rules and features challenged by Plaintiffs are justified as a means of ensuring that consumers have access only to secure and high-quality apps. *Id.* at 2, 20; *see Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) ("[A]n antitrust defendant's conduct is redeemed by a legitimate business purpose.").

Understanding how Samsung views and responds to risks from harmful apps is relevant to this defense because, like Apple, Samsung is a device manufacturer with a vertically integrated app marketplace. Just like Apple, then, Samsung may face serious costs and reputational damage when users encounter harmful apps on their devices. Comparing the approaches of the two companies to app security issues may help show why Apple's practices are reasonable. For instance, evidence that Samsung, like Apple, takes seriously the threats from unverified apps and app marketplaces could help rebut Plaintiffs' claim that Apple's security concerns are "overblown pretense" masking anticompetitive intent. Dev. Compl. ¶ 53. The subpoena therefore asks for documents "sufficient to show" Samsung's "guidelines, policies, and/or procedures for reviewing apps" made available to its customers (whether through the Galaxy Store or other channels) (Request No. 14), and documents concerning Samsung's customers' ability to download apps from sources other than the Galaxy Store and Google Play (Request No. 18).

4. **Communications with Google about app review, mobile security, and competition (Request Nos. 16-19)**

Apple's subpoena seeks communications between Samsung and Google about several of the topics already discussed, including harm caused by apps (Request No. 16), policies and procedures for reviewing apps, and competition between mobile platforms and app marketplaces (Request Nos. 17, 19).

Gibson, Dunn &
Crutcher LLP

These requests are relevant for obtaining an accurate picture of Samsung's approaches to and views on the topics above. As explained, Google provides the operating system for Samsung phones and tablets available for sale in the United States. *See* Objections at 61 (describing features of Samsung's "Android OS" phones and tablets). In that role, it provides security features for Samsung's devices.[8] And through the centralized Google Play store, Google distributes many (if not most) of the apps used by Samsung's customers on Samsung devices following Google's own pre-distribution review. *See* Android, *Google Android Security 2017 Year in Review*, at 11 (March 2018), https://source.android.com/security/reports/Google_Android_Security_2017_Report_Final.pdf ("Google reviews all apps before publishing them in Google Play."). The security of Samsung's devices, then, appears to rely in part on Google. Thus, to the extent Samsung has had concerns about risks from harmful apps and sideloading, we would expect Samsung to express those concerns to Google.

Similarly, because Google and Samsung provide complementary elements (*i.e.*, the operating system and the hardware) of a mobile platform that competes with Apple, we would expect discussions about competition with Apple—including competition relating to apps and app marketplaces—to take place within those communications. *See, e.g.*, *Samsung Decided To Start Attacking Apple After Steve Jobs Died*, Business Insider (Apr. 16, 2014), https://www.businessinsider.com/samsung-emails-on-apple-2014-4 (internal email among Samsung U.S. executives suggesting that Samsung "go to Google and ask them to launch a campaign against Apple"). Again, the documents requested are relevant because they may show that a mobile platform's app marketplace policies, including its transaction fees, are meaningfully constrained by competition from other mobile platforms, which would help rebut Plaintiffs' cramped Apple-only market definitions.

### 5.    Galaxy Store organizational charts or employee directories (Request No. 21)

Lastly, Apple moves to compel compliance with Request No. 21, seeking organizational charts or employee directories relating to the Galaxy Store and app review. Though Samsung claims its

---

[8]  *See, e.g.*, Google, *Android Security & Privacy 2018 Year in Review*, at 6-11 (March 2019), https://source.android.com/security/reports/Google_Android_Security_2018_Report_Final.pdf (describing Android platform security features, including encryption, device scanning for security threats, and sending unknown apps to Google).

13

Gibson, Dunn &
Crutcher LLP

1    "organizational structure" is "not related to any issue in the underlying litigation," Srinivasan Decl. Ex.

2    H (Samsung 7/3 Email) at 2, it knows very well that discovery is not "limited to the merits of the case."

3    *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Here, Apple may use this information

4    to conduct further discovery—including depositions of pertinent decisionmakers. *See AFMS*, 2012 WL

5    3112000, at *5-6 (finding that antitrust defendant had substantial need for third party's customer list in

6    order to conduct follow-up discovery).

7        Apple may also use this information to test the adequacy of Samsung's responses to Apple's

8    substantive requests. *See, e.g.*, *Samsung Elecs.*, 2013 WL 1942163, at *3 (ordering discovery that

9    would "aid in uncovering the sufficiency of [a non-party's] production"). Such discovery is particularly

10   appropriate here where Samsung appears to claim that its executives in the United States play no

11   substantive role in its operation of the Galaxy Store, despite public sources suggesting otherwise. *See*

12   *infra*. At Samsung's suggestion, Apple has consulted sources including LinkedIn to identify employees

13   who may have responsive information; but as Samsung itself acknowledges, these sources are not

14   always accurate. *Compare* Samsung 6/10 Letter at 7 (telling Apple to search LinkedIn), *with* Samsung

15   7/3 Email at 1-2 (telling Apple that the people it found on LinkedIn "are no longer employed by

16   [Samsung]").

17                                         * * *

18       For these reasons, documents responsive to Apple's Requests are proper subjects of discovery

19   under the Federal Rules' "extremely broad" standard for relevance. *Braun v. Primary Distrib. Doe*

20   *No. 1*, No. 12-4102-YGR, 2013 WL 12142998, at *2 (N.D. Cal. Jan. 11, 2013).

21   **B.      Samsung's objections lack merit.**

22       Because Apple has established the relevance of its requests, Samsung "has the burden of

23   showing that discovery should not be allowed." *La. Pac. Corp. v. Money Market 1 Instit. Inv. Dealer*,

24   285 F.R.D. 481, 485 (N.D. Cal. 2012) (citing *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal.

25   2002)). Besides boilerplate references to relevance in its Objections, Samsung has never seriously

26   contested (or much engaged with) the relevance of Apple's Requests. Instead, it has invoked a number

27   of vague, shifting, and implausible objections, none of which justify Samsung's stonewalling.

28

Gibson, Dunn &
Crutcher LLP

### 1.    Samsung's claimed lack of documents is implausible.

First, Samsung claims it does not possess documents responsive to several Requests. Samsung says it lacks data and documents about the Galaxy Store—including standard terms and conditions, information about tools and software provided to app developers, and Samsung's app review and approval policies—on the grounds that the relevant functions are performed by Samsung's Korean parent. *See* Samsung 6/10 Letter at 1-2. Samsung further claims that it has had no communications with Google about subjects identified in Apple's subpoena and therefore has nothing to produce in response to Request Nos. 16-17, and 19. *Id.* at 6; Samsung 7/3 Email at 1-2. At times, Samsung has also vaguely suggested that this position may apply to Apple's subpoena more broadly, asserting that "*most of the documents* Apple seeks would be in the possession of" Samsung Korea, and not its U.S. subsidiary. Joint Letter Brief at 6 (emphasis added). Putting aside that it took Apple fully two-and-a-half months and three teleconferences to extract this excuse from Samsung (*see* Srinivasan Decl. ¶ 9; Samsung 6/10 Letter at 1-2, 6), even a cursory internet search shows the claim is not credible.

As an initial matter, at least when it comes to the Galaxy Store, Samsung is clearly more than a sales and marketing arm importing and distributing phones for its Korean parent, as has been suggested by Samsung on multiple occasions. Srinivasan Decl. ¶¶ 4, 15. According to Samsung's own publicity materials, it has a division "[b]ased in the heart of Silicon Valley" that delivers "innovative, connected experiences across Samsung's mobile and digital ecosystem" including, notably, "applications [and] content and service platforms." Regional Departments and Divisions, https://www.samsung.com/levant/aboutsamsung/company/divisions/ (last visited July 28, 2020) (describing "Samsung Media Solutions Center America, . . . a division of . . . [Samsung Electronics America]"). This same division also "develops content partnerships, distribution strategies and developer relationships to offer an integrated platform, enabling consumers to experience content and services on smartphones" and other devices. *Id.* Samsung evidently does more than just put phones in boxes.

Other public sources further confirm Samsung's significant role in managing and operating the Galaxy Store. Over the years, U.S.-based Samsung executives have spoken publicly about the company's competitive strategy for its app marketplace. For instance:

15

Gibson, Dunn &
Crutcher LLP

· In 2014, John Pleasants, an executive who was then head of a "unit responsible for the app store," explained how Samsung planned to attract developers and integrate the store with other software and devices. *How Samsung Plans to Fix its Galaxy Apps Store*, CNET (Sept. 3, 2014), https://www.cnet.com/news/how-samsung-plans-to-fix-its-galaxy-apps-store/. John Pleasants was then head of Samsung's Media Solutions team, based in Mountain View. *See* John Pleasants, LinkedIn, https://www.linkedin.com/in/john-pleasants-5985a04/ (last visited July 28, 2020).

· Similarly, in 2016, Mihai Pohontu, then "vice president of emerging platforms at Samsung," told an interviewer that the Galaxy Store is "definitely an underdog," but that it planned to compete with Google Play by, among other things, "offer[ing] heavy and sustained promotion to game developers in exchange for exclusivity for their games." *How Samsung Plans to Snare Game Developers with its 'Made for Samsung' Program*, VentureBeat (May 15, 2016), https://venturebeat.com/2016/05/15/how-samsung-plans-to-snare-game-developers-with-made-for-samsung-program/. Like Pleasants, Pohontu was based in the Bay Area during his time at Samsung. Mihai Pohontu, LinkedIn, https://www.linkedin.com/in/mihaipohontu/ (last visited July 28, 2020).

· And in 2017, Ravi Belwal, then "head strategic partner manager for games at Samsung" spoke publicly about the Galaxy Store's popularity as well as Samsung's strategy for selecting and curating apps. *Samsung Galaxy App Store Gains Ground in the U.S. with Each Smartphone Launch*, VentureBeat (April 22, 2017), https://venturebeat.com/2017/04/22/samsung-galaxy-app-store-gains-ground-in-the-u-s-with-each-smartphone-launch/. Belwal, too, was based in Mountain View. *See* Ravi Belwal, LinkedIn, https://www.linkedin.com/in/belwal/ (last visited July 28, 2020).

Although these executives have moved on from Samsung, the company employs (or has recently employed) people in California with such titles as: "Head of Galaxy Store," the Galaxy Store's "Senior Manager," its "Director [of] Product Management," its "Content Strategist," and a "Senior Contracts Manager" responsible for app store applications.[9] Given all the above, it appears that Samsung and its personnel are deeply involved in operating and managing the Galaxy Store, including in devising and implementing its competitive strategy. It is therefore not credible that this entity does not possess the documents requested about the Galaxy Store.[10]

---

[9] *See* Chris Jo, LinkedIn, https://www.linkedin.com/in/chris-jo-5162b61/ ("VP General Manager, Head of Galaxy Store, Partnership & Biz Operations management"); Arturo Lovazzano, LinkedIn, https://www.linkedin.com/in/arturolovazzano/ ("Senior Manager, Galaxy Store"); Hyunah Elise Kwon, LinkedIn, https://www.linkedin.com/in/hyunahkwon/ ("Director, Product Management | Galaxy Store & Game Launcher"); G. Monserrat Guerrero, LinkedIn, https://www.linkedin.com/in/gmontserratguerrero/ ("Content Strategist Samsung Galaxy Store"); Valerie Denappe, LinkedIn, https://www.linkedin.com/in/valeriedenappe/ ("Senior Contracts Manager") (all last visited July 28, 2020).

[10] Similar evidence undermines Samsung's claim that it has not communicated with Google about the subjects of Apple's subpoena. *See Samsung Decided To Start Attacking Apple After Steve Jobs Died*, Business Insider (Apr. 16, 2014), https://www.businessinsider.in/Samsung-Decided-To-Start-Attacking-Apple-After-Steve-Jobs-Died/articleshow/33827703.cms (Samsung U.S. subsidiary's then-CEO and chief marketing officer were asked if they could "go to Google" and "ask them to launch a campaign against Apple").

16

1    Samsung ignores these facts and instead spins Apple's argument as being about whether

2    Samsung has "control" over its Korean parent's documents. Joint Letter Br. at 6 ("Apple argues that if

3    [Samsung Korea] has responsive documents, [Samsung] necessarily has access to them."). It isn't.

4    Apple's point is that, based on public information about Samsung and its role regarding the Galaxy

5    Store, it seems highly likely that Samsung *itself* possesses responsive documents. Thus, while Apple

6    agrees that in the Ninth Circuit "a 'practical ability to obtain the requested documents' from a related

7    organization is not enough to constitute control" for purposes of Rule 45, *Seifi v. Mercedes-Benz USA,*

8    *LLC*, No. 12-cv-05493, 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014) (quoting *In re Citric Acid*

9    *Litig.*, 191 F.3d 1090, 1107-08 (9th Cir. 1999)), that case law simply is not relevant here. "The phrase

10   'possession, custody or control' in Rule 45 'is in the disjunctive and only one of the numerated

11   requirements need be met." *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-

12   WHO, 2020 WL 820327, at *8 (N.D. Cal. Feb. 19, 2020) (Hixson, M.J.). So, whether or not Samsung

13   has "control" over its Korean parent's documents or is responsible for generating them, if Samsung

14   "ha[s] possession or custody of" responsive material—as Apple strongly suspects—it must cough it

15   up. *Id.*

16        **2.      Other sources of information are inadequate.**

17        Second, Samsung resists producing responsive documents by arguing that information in the

18   public realm or in Apple's possession should suffice. *E.g.*, Objections at 38 n.8. This objection also

19   lacks merit. As Apple's major rival in the sale of handheld devices, Samsung has a unique and credible

20   perspective on the competitive dynamics of this market that is impossible to replicate through Apple's

21   internal documents or third-party industry analysis. "Typically, the only source for competitors' views

22   of the market is from the competitors themselves." *N.M. Oncology*, 2016 WL 3452757, at *3. In similar

23   circumstances, subpoenas have been enforced on the basis that, "from a tactical standpoint,"

24   information from a rival market participant may "present advantages in the litigation not easily

25   recognized from parties or experts." *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 2:06-

26   MC-0034, 2006 WL 2871834, at *1-2 (S.D. Ohio Aug. 7, 2006) (enforcing drywall manufacturer's

27   subpoena seeking information from its "direct and largest competitor" about market conditions and

28   conduct); *see also In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2012 WL 298480,

17

Gibson, Dunn &
Crutcher LLP

at *4 (E.D. PA. Jan. 31, 2012) (enforcing non-party subpoena when "it is likely that [non-party] possesses relevant documents that [antitrust defendant] does not"). And the mere existence of other less probative or reliable evidence "does not automatically mean that [Apple] lacks a substantial need for the information sought here." *Gradillas Ct. Reporters, Inc. v. Cherry Bekaert, LLP*, No. 18-mc-80064-KAW, 2018 WL 2197544, at *4 (N.D. Cal. May 14, 2018).

But in any event, Samsung is wrong as a factual matter. Much of the information sought, especially relating to the Galaxy Store, is unavailable from anywhere else. Contrary to Samsung's claims, there appears to be little to no publicly available data or analysis about the competitive strength of Samsung's Galaxy Store compared with other app marketplaces. *But see* Objections at 21; Samsung 5/1 Letter at 3. As Apple has noted in correspondence, the best-regarded sources of third-party data about app downloads and usage, App Annie and SensorTower, do not publish information about the Galaxy Store, *see* Apple 5/14 Letter at 3 n.2 (explaining that neither service covers the Galaxy Store), and Apple has found no other sources of information with sufficient breadth or reliability for use in an antitrust litigation. Nor, despite its claims, has Samsung pointed Apple to any. *Id.*[11]

The same is true of Apple's other requests. In response to Request No. 14, for instance, Samsung has pointed Apple to its publicly available app review guidelines. *See* Objections at 43 n.10. These sources are insufficient for this case. As the Court has recognized, adjudicating Apple's defenses will require comparing "Apple's business practices" with those of "other companies . . . who have apps

---

[11] For instance, although Samsung claims to have identified in its Objections "how Apple could locate responsive information about Galaxy Store users, app downloads, and geographic distribution" (Samsung 5/1 Letter, at 3), the referenced material consists merely of a promotional webpage listing three statistics about the Galaxy Store. *See* Galaxy Store, https://developer.samsung.com/galaxy-store (last visited July 29, 2020), *cited in* Objections at 16-17 n.4. No doubt recognizing the dearth of information from other sources, Samsung has offered to produce, in response to Apple's Request No. 3, data sufficient to show "the current number of U.S. active users of the Galaxy Store," "the current number of U.S. apps in the Galaxy Store," and "current data regarding awareness and usage of" different app marketplaces. Samsung 6/10 Letter at 5. But this data is insufficient for Apple's purposes, first, because it would provide only current figures in a case about more than 10 years of competition between app platforms; and second, because it would not reflect the actual performance of the Galaxy Store as compared with its rivals, which at the very least requires app download figures. *Cf.* European Comm'n, Case AT.40099, *Google Android*, at 128 (July 18. 2018), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf (calculating market shares based on "the number of apps downloaded via" app marketplaces because "[t]his method allows for an assessment of the economic strength of an Android app store at the level of users of Android devices"). Further, the "syndicated research" Samsung has offered to produce about mobile app development, marketplaces, and usage, is unlikely to be helpful when, by Samsung's own admission, such research might not cover the Galaxy Store in much detail. *See* Srinivasan Decl. ¶ 9.

as well." CMC Tr. at 45:23-46:3. Apple cannot do that without evidence of *what those companies actually do*. The materials Samsung has identified set forth rules and guidelines for its store, but only vaguely describe the steps Samsung actually takes to review apps. *See* How to Distribute, Samsung Developers, *cited in* Objections at 43 n.10 ("Before your app can be made available to the public, you must submit a Review request to the Review team. When submitting your request, you may also leave a message for the reviewer."); App Distribution Guide, Samsung Developers, *cited in* Objections at 43 n.10 ("For the benefit of its developers and customers, Samsung ensures the [apps] meet high standards of quality."). They do not show, for instance, whether Samsung relies mostly on human reviewers or automated systems. And they do not detail the steps Samsung takes to protect users from harmful apps downloaded from other sources, which is important because Samsung's devices (unlike Apple's) allow for alternative distribution. In short, Samsung is simply wrong that there is "a wealth of publicly-available information" on topics covered by Apple's subpoena. Samsung 5/1 Letter at 5.

### 3.    Samsung's competitor status does not excuse its blanket noncompliance.

Third, Samsung refuses to comply with Apple's subpoena out of "concern[] about Apple's purported need for and use of its highly confidential, commercially sensitive information." Samsung 5/1 Letter at 4. In particular, Samsung resists producing purportedly sensitive documents to a competitor. *E.g.*, Objections at 4; *see* Srinivasan Decl. ¶ 4. But "[t]he fact that [Samsung] competes with [Apple] is insufficient to thwart the free flow of information at the heart of the discovery rules." *Elizabeth Place*, 2013 WL 3872077, at *7.

"[T]hat . . . documents are commercially sensitive does not make them non-discoverable." *Waymo LLC v. Uber Techs.*, Inc., No. 17-cv-00939, 2017 WL 2929439, at *2 (N.D. Cal. July 7, 2017). Courts routinely order nonparties to produce commercially sensitive information in response to discovery requests from fierce rivals—as cases cited throughout this brief show. In such instances, courts "weigh the claim to privacy against the need for disclosure in each case, and district courts can enter protective orders allowing discovery but limiting the use of the discovered documents." *Gradillas Ct. Reporters*, 2018 WL 2197544, at *5 (quoting *Pasadena Oil & Gas Wyo. LLC v. Mont. Oil Props. Inc.*, 320 F. App'x 675, 677 (9th Cir. 2009)); *see also Gonzales v. Google, Inc.*, 234 F.R.D. 674, 686-

1  87 (N.D. Cal. 2006) (requiring Google to produce sample of 50,000 URLs from its search index where

2  list "shall be protected by protective order").

3       As an initial matter, though, it is *Samsung*'s responsibility to make a "strong showing" that the

4  information sought constitutes protected trade secrets or confidential commercial information. *Id.* at

5  684. Proprietary information is "more than routine business data." *In re C.R. Bard, Inc. Pelvic Repair*

6  *Sys. Prod. Liab. Litig.*, MDL No. 2187, 2014 WL 1660386, at *5 (S.D.W. Va. Apr. 22, 2014). Only

7  documents that "if disclosed, would cause substantial economic harm to the [producing party's]

8  competitive position" deserve extra protection. *Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157

9  F.R.D. 691, 697 (D. Nev. 1994).

10      Samsung "does not contend that all of the requested information is highly confidential."

11  Samsung 5/1 Letter at 2. Nor could it. For one thing (and as Samsung has frequently noted), some of

12  Apple's Requests seek documents from the late 2000s.[12] Apple has requested information about the

13  launch of the Galaxy Store in 2009 (Request No. 4), as well as aggregated data going back several

14  years (Request No. 3). It is absurd to think this information "might, in today's marketplace, be used to

15  [Samsung's] detriment." *In re Mushroom*, 2012 WL 298480, at *5; *accord In re C.R. Bard*, 2014 WL

16  1660386, at *7 (similar); *N.M. Oncology*, 2016 WL 3452757, at *3 (ordering production of

17  competitors' "less sensitive" general market analysis and non-current business strategy plans). The

18  potential commercial sensitivity of *some* responsive documents does not justify Samsung's outright

19  refusal to comply with *any* request.

20      But in any event, discovery of commercially sensitive documents is "virtually always ordered

21  once the movant has established that the secret information is both relevant and necessary." *Compaq*

22  *Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995) (alteration omitted)

---

[12] The scope of Apple's subpoena is understandable given the scope and nature of Plaintiffs' complaints. Plaintiffs challenge decisions that Apple made upon launching the App Store in 2008, and the alleged class periods date back to 2007. *See* Cons. Compl. ¶¶ 7-8, 54; Dev. Compl. ¶¶ 2, 113. Indeed, Consumer Plaintiffs filed their first complaint in this case in 2011. *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 316 (9th Cir. 2017) (describing case history). Samsung launched its first app marketplace in 2009. *See Samsung Joins the App Store Party*, Wired (Aug. 31, 2009), https://www.wired.com/2009/08/samsung-app-store/. Because Samsung has been a market participant for most of the class period, Apple's requests for documents going back to the late 2000s—and at the very least, to the launch of Samsung's Galaxy Store—are justified. *Cf. Audio MPEG, Inc. v. HP Inc.*, No.16-mc-80271-HRL, 2017 WL 950847, at *5 (N.D. Cal. Mar. 10, 2017) (quashing subpoena because issuing party "ha[d] not stated why 15 years' worth of data is necessary").

20

Gibson, Dunn &
Crutcher LLP

(quoting *Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985)). Apple has made that showing. As set forth above, the documents sought are relevant to issues of market definition, anticompetitive effects, and Apple's legitimate business justifications, and are unavailable from sources other than Samsung. At the very least, discovery from Samsung is necessary to rebut Plaintiffs' claims that competition from Samsung—Apple's most significant U.S. competitor in the sale of mobile devices—in no way constrains Apple's App Store policies and conduct; to develop real-world evidence concerning Plaintiffs' claims about the scope and nature of competition between app distributors in the marketplace Plaintiffs hypothesize; and to compare Apple's challenged business practices against those of its rival.

Lastly, any concern Samsung has that production of the subpoenaed documents would compromise trade secrets or commercially sensitive information is "obviated" by the protective order in this case. *In re Currency Conversion Fee*, 2004 WL 848171, at *1 (ordering production to competitor because of protective order); *accord, e.g.*, *R. J. Reynolds v. Philip Morris, Inc.*, 29 F. App'x 880, 882 (3rd Cir. 2002) (same); *Covey Oil*, 340 F.2d at 999 (same); *Dial Corp.*, 2015 WL 3778533, at *3 (same); *Elizabeth Place*, 2013 WL 3872077, at *7 (same). The protective order allows a non-party to designate information as "Highly Confidential – Attorneys' Eyes Only." *See Pepper* Dkt. 199, *Cameron* Dkt. 85 (Protective Order) § 7.3; *see also id.* § 10 (protecting non-party's material). Such orders have been held "sufficient to protect a nonparty's trade secrets"—including when produced to a competitor. *See, e.g.*, *AFMS*, 2012 WL 3112000, at *7.[13] Samsung's apparent belief that it shouldn't produce even under a protective order because it "cannot effectively police the use of that information" (*e.g.*, Objections at 4), lacks any support in law. *See Gradillas Ct. Reporters*, 2018 WL 2197544, at *5-7 ("[T]he Court declines to assume that the attorneys will violate a court order, exposing themselves to contempt of court and sanctions."); *AFMS*, 2012 WL 3112000, at *7 ("The relatively remote potential for inadvertent disclosure of confidential documents does not justify the withholding of discovery altogether.").

---

[13]  And if the Court believes that the "Highly Confidential – Attorneys' Eyes Only" designation does not provide adequate protection because it still allows disclosure to certain in-house counsel, the Court may order additional protections limiting such disclosure. *See Juno Therapeutics, Inc. v. Kite Pharm., Inc.*, No. CV 17-7639-SJO, 2019 WL 3069009, at *6 (C.D. Cal. Apr. 29, 2019).

Gibson, Dunn & Crutcher LLP

1

## IV. CONCLUSION

2      For the foregoing reasons, the Court should grant Apple's Motion to Compel.

3

4   Dated: July 31, 2020                    GIBSON, DUNN & CRUTCHER LLP

5                                           By: */s/ Jay Srinivasan*

6                                               Theodore J. Boutrous Jr.
7                                               Richard J. Doren
                                                Daniel G. Swanson
                                                Veronica S. Lewis
8                                               Cynthia E. Richman
                                                Jay P. Srinivasan
9                                               Ethan D. Dettmer
                                                Eli M. Lazarus
10
11                                              *Attorneys for Defendant Apple Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT APPLE INC.'S MOTION TO COMPEL
DISCOVERY FROM NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.
CASE NOS. 4:11-CV-06714-YGR, 4:19-CV-03074-YGR

Gibson, Dunn &
Crutcher LLP