BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITANY N. DeJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
MATTHEW M. GUINEY (*pro hac vice*)
guiney@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:    212/545-4653

*Plaintiffs' Interim Class Counsel*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | Case No. C 11-06714-YGR |
| | |
| | **STIPULATION AND [PROPOSED] ORDER FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | |
| | JUDGE:      Hon. Yvonne Gonzalez Rogers |
| | CTRM:       1 – 4th Floor |

Pursuant to Civil Local Rule 7-12, Plaintiffs Robert Pepper ("Pepper"), Stephen H. Schwartz ("Schwartz"), Edward W. Hayter ("Hayter"), and Edward Lawrence ("Lawrence"), (collectively, "Consumer Plaintiffs") and Defendant Apple Inc. ("Defendant" or "Apple") (collectively, the "Parties"), by and through their respective counsel, hereby agree as follows:

WHEREAS, on December 29, 2011, Plaintiffs Pepper, Schwartz, Hayter, and Harry Bass ("Bass") filed a complaint against Apple in the Northern District of California, Case No. 11-cv-06714 (the "*Pepper* Action") asserting violations of Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, for monopolization and attempted monopolization of the iPhone applications market (*Pepper* Action, ECF No. 1);

WHEREAS, on January 17, 2012, Plaintiffs Eric Terrell ("Terrell"), James Blackwell ("Blackwell"), and Crystal Boykin ("Boykin") filed a complaint against Apple in the Northern District of California, Case No. 12-cv-00259 (the "*Terrell* Action"), asserting substantially similar facts and the same claims as the *Pepper* Action (*Terrell* Action, ECF No. 1);

WHEREAS, on February 9, 2012, the Court issued an order finding that the *Terrell* Action was related to the *Pepper* Action (*Pepper* Action, ECF No. 11);

WHEREAS, on March 20, 2012, the Court issued an order consolidating the *Terrell* Action with the *Pepper* Action and designating the *Pepper* Action as the lead case. The consolidation order provided that all future filings shall bear the caption: "*In re Apple iPhone Antitrust Litigation*" (*Pepper* Action, ECF No. 25);

WHEREAS, on March 21, 2012, Plaintiffs Pepper, Schwartz, Hayter, Bass, Terrell, Blackwell, and Boykin filed a Consolidated Class Action Complaint (*Pepper* Action, ECF No. 26);

WHEREAS, on July 11, 2012, the Court denied in part and granted in part Apple's motion to dismiss that complaint, holding that AT&T Mobility, LLC ("ATTM") was a necessary party, not to the iPhone apps claim, but to the voice and data services claims which are no longer part of this case (*Pepper* Action, ECF No. 75);

1   WHEREAS, on September 28, 2012, Plaintiffs Pepper, Schwartz, Hayter, Bass, Terrell,

2   Blackwell, and Boykin filed their Amended Consolidated Class Action Complaint (*Pepper* Action,

3   ECF No. 81);

4   WHEREAS, on August 15, 2013, the Court granted Apple's motion to dismiss the

5   Amended Consolidated Class Acton Complaint, with leave to amend, holding that Plaintiffs had

6   not established Article III standing (*Pepper* Action, ECF No. 108);

7   WHEREAS, on September 5, 2013, Plaintiffs Pepper, Schwartz, Hayter, and Terrell filed a

8   Second Amended Consolidated Class Action Complaint ("SAC," *Pepper* Action, ECF No. 111);

9   WHEREAS, on December 2, 2013, the District Court dismissed the SAC with prejudice on

10  the ground that the Plaintiffs lacked standing as direct purchasers under *Illinois Brick Co. v.*

11  *Illinois*, 431 U.S. 720 (1977) (*Pepper* Action, ECF No. 124);

12  WHEREAS, on January 12, 2017, the Ninth Circuit reversed the District Court's dismissal

13  on the ground that, *inter alia*, the plaintiffs were direct and not indirect purchasers and therefore

14  had standing to bring their claims;

15  WHEREAS, on May 13, 2019, the Supreme Court affirmed the decision of the Ninth

16  Circuit Court of Appeals;

17  WHEREAS, on May 23, 2019, Plaintiff Edward Lawrence filed a complaint against Apple

18  in the Northern District of California, Case No. 19-cv-02852 (the "*Lawrence* Action"), asserting

19  substantially similar facts and the same claims as the *Pepper* Action (*Lawrence* Action, ECF

20  No. 1);

21  WHEREAS, on June 12, 2019, the Court issued an order finding that the *Lawrence* Action

22  was related to the *Pepper* Action (*Pepper* Action, ECF No. 145);

23  WHEREAS, on July 30, 2019, Apple answered the SAC (*Pepper* Action, ECF No. 166);

24  WHEREAS, on August 19, 2019, Apple filed its answer in the *Lawrence* Action

25  (*Lawrence* Action, ECF No. 21);

26  WHEREAS, on October 29, 2019, the Court consolidated the *Lawrence* Action, for all

27  purposes, including pretrial proceedings and trial, with and into the *Pepper* Action (*Peppe*r

28  Action, ECF No. 183);

WHEREAS, on June 3, 2020, Consumer Plaintiffs provided Apple with a Proposed Third Amended Consolidated Class Action Complaint that would amend their allegations to include within the relevant market:  (1) all iOS applications, including those made for iPhone, iPad, and iPod touch; and (2) all purchases made through Apple's iOS "App Store," including apps purchases and purchases for additional app features and subscriptions ("in-app purchases"); and to add Plaintiff Lawrence as a named Plaintiff;

WHEREAS, on July 1, 2020, Consumer Plaintiffs provided Apple with a revised Proposed Third Amended Consolidated Class Action Complaint ("TAC") that would amend their allegations in all of the ways specified in the previous paragraph and also appears to add allegations concerning Apple's $x.99 pricing;

WHEREAS, Defendant believes, and Consumer Plaintiffs do not agree, that Consumer Plaintiffs have not been diligent in pursuing claims for purchases made on the iPod touch or iPad, for in-app purchases, or for the App Store's $x.99 pricing because the iPod touch was introduced in September 2007, the iPad was introduced in April 2010, in-app purchasing was introduced in June 2009, and the App Store has had $x.99 pricing in the United States since it opened in July 2008; thus these products and features of the App Store were all introduced well before Consumer Plaintiffs Pepper, Schwartz and Hayter filed their lawsuit in December 2011 and before Consumer Plaintiff Lawrence filed his lawsuit in May 2019, and were also known to Consumer Plaintiffs Pepper, Schwartz and Hayter at the time of their prior amendments;

WHEREAS, Defendant believes, and Consumer Plaintiffs do not agree, that Consumer Plaintiff Lawrence has not been diligent in pursuing claims for purchases made on the iPod touch or iPad, for in-app purchases, or for the App Store's $x.99 pricing because Lawrence was fully aware, when he filed his complaint in May 2019, that the SAC did not include claims for purchases made on the iPod touch or iPad, for in-app purchases, or for the App Store's $x.99 pricing;

WHEREAS, Defendant believes, and Consumer Plaintiffs disagree, that Consumer Plaintiffs have not been diligent in pursuing claims for purchases made on the iPod touch or iPad or for in-app purchases because Consumer Plaintiffs represented to Defendant in December 2019

that "the operative complaint does not currently concern anything other than iPhone apps purchases";

WHEREAS, Defendant believes, and Consumer Plaintiffs disagree, that Consumer Plaintiffs have not been diligent in pursuing claims for purchases made on the iPod touch or iPad, for in-app purchases, or for the App Store's $x.99 pricing because Consumer Plaintiffs indicated in a case management conference statement filed on September 30, 2019 that they did not "anticipate amending the pleadings at this time" (*Pepper* Action, ECF No. 174), a position that "remained unchanged" in the case management conference statement filed on January 6, 2020 (*Peppe*r Action, ECF No. 196);

WHEREAS, Defendant believes, and Consumer Plaintiffs disagree, that Consumer Plaintiffs' amendments are barred or limited in whole or part by applicable statutes of limitations or laches, including because (1) new claims by Consumer Plaintiffs Pepper, Schwartz and Hayter do not relate back to their 2013 SAC and the new claims of Consumer Plaintiff Lawrence do not relate back to his 2019 complaint under Federal Rule of Civil Procedure 15, (2) under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the applicable statute of limitations or laches is not tolled with respect to claims set forth in the TAC for any putative class member who was not within the class definition alleged in the SAC, and (3) no member of the putative TAC classes has preserved any right to sue as to alleged claims arising from purchases on iPads or iPod touch devices, in-app purchases, or the App Store's $x.99 pricing;

WHEREAS, Defendant further believes, and Consumer Plaintiffs disagree, that the amended allegations of the TAC disclose that certain other defenses arise to defeat claims in the TAC, including defenses of ratification, agreement, acquiescence, authorization, and/or consent to the conduct complained of, waiver or estoppel, and/or agreed limitations to Defendant's liability;

WHEREAS, Defendant further believes, and Consumer Plaintiffs disagree, that the expanded classes alleged in the TAC are not properly maintainable as class actions;

WHEREAS, Defendant further believes, and Consumer Plaintiffs disagree, that Plaintiffs' amendments are deficient as a matter of law because the TAC persists in alleging a single-sided market despite recent controlling Supreme Court precedent compelling, as a matter of law, that in

cases involving two-sided transaction platforms, such as the App Store, only one relevant market should be defined that includes both sides of the platform, i.e., consumers and developers, and that must be analyzed as a whole (*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286-87 (2018));

WHEREAS, the parties agree that this amendment does not alter the existing discovery schedule in the case and, accordingly, Apple has no obligation to supplement its document production in response to Consumer Plaintiffs' Request for Production, Set No. 1 based solely on this amendment and has no duty to provide any additional discovery with respect to allegations newly added by amendment absent a targeted request propounded by Plaintiffs in accordance with the Federal Rules of Civil Procedure and the currently existing case schedule; Plaintiffs otherwise reserve all of their rights to propound discovery and to seek court orders compelling Apple to comply with its discovery obligations;

WHEREAS, Defendant wishes to preserve and not waive any defenses available to it, including the foregoing; and

WHEREAS, the Parties agree that nothing in the proposed TAC should be construed to expand the negotiated scope of Apple's response to Consumer Plaintiffs' Request for Production, Set No. 1, served on October 10, 2019.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED among the Parties, through their respective counsel, and subject to approval by the Court, to the entry of an Order providing that:

1. Leave to file the TAC is granted as of the date of the Court's approval of this Stipulation and [Proposed] Order.  A true and correct copy of the TAC is attached to this Stipulation as Exhibit A.

2. The TAC shall be deemed filed as of the date of the Court's approval of this Stipulation and [Proposed] Order.

3. Defendant shall answer the TAC by filing an Amended Answer within thirty days of the Court's approval of this Stipulation and [Proposed] Order.

1    DATED:  September 11, 2020              By:    /s/ Rachele R. Byrd

2                                           **WOLF HALDENSTEIN ADLER**
                                              **FREEMAN & HERZ LLP**
3                                           BETSY C. MANIFOLD
                                            RACHELE R. BYRD
4                                           MARISA C. LIVESAY
                                            BRITTANY N. DEJONG
5                                           750 B Street, Suite 1820
                                            San Diego, CA 92101
6                                           Telephone:  619/239-4599
                                            Facsimile:   619/234-4599
7
8                                           **WOLF HALDENSTEIN ADLER**
                                              **FREEMAN & HERZ LLP**
9                                           MARK C. RIFKIN
10                                          MATTHEW M. GUINEY
                                            270 Madison Avenue
11                                          New York, New York 10016
                                            Telephone:  212/545-4600
12                                          Facsimile:   212/545-4677

13
                                            *Plaintiffs' Interim Class Counsel for*
14
15   DATED:  September 11, 2020              By:    /s/ Cynthia E. Richman

16                                          **GIBSON, DUNN & CRUTCHER LLP**
                                            THEODORE J. BOUTROUS JR. (SBN 132099)
17                                          tboutrous@gibsondunn.com
                                            RICHARD J. DOREN (SBN 124666)
18                                          rdoren@gibsondunn.com
                                            DANIEL G. SWANSON (SBN 116556)
19                                          dswanson@gibsondunn.com
                                            333 South Grand Avenue
20                                          Los Angeles, CA 90071-3197
                                            Telephone:  213.229.7000
21                                          Facsimile:  213.229.7520
22
23                                          **GIBSON, DUNN & CRUTCHER LLP**
                                            CYNTHIA E. RICHMAN (D.C. Bar No. 492089;
24                                          appearance *pro hac vice*)
                                            crichman@gibsondunn.com
25                                          1050 Connecticut Avenue, N.W.
                                            Washington, DC  20036-5306
26                                          Telephone:  202.955.8234
27                                          Facsimile:  202.530.9691
28

---

STIPULATION AND [PROPOSED] ORDER FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT – C 11-06714 YGR

**GIBSON, DUNN & CRUTCHER LLP**
VERONICA S. LEWIS (Texas Bar No. 24000092;
appearance *pro hac vice*)
vlewis@gibsondunn.com
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone:  214.698.3100
Facsimile:  214.571.2900

**GIBSON, DUNN & CRUTCHER LLP**
ETHAN DETTMER, SBN 196046
edettmer@gibsondunn.com
ELI M. LAZARUS, SBN 284082
elazarus@gibsondunn.com
555 Mission Street
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Apple Inc.*

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED:_____          _____

THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

APPLE2/26537v8

STIPULATION AND [PROPOSED] ORDER FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT – C 11-06714 YGR

## DECLARATION REGARDING CONCURRENCE

I, Rachele R. Byrd, am the ECF user whose identification and password are being used to file this STIPULATION AND [PROPOSED] ORDER FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all of the signatories listed above have concurred in this filing.

DATED:  September 11, 2020                 **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

                                                                    */s/Rachele R. Byrd*
                                                                    RACHELE R. BYRD

STIPULATION AND [PROPOSED] ORDER FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – C 11-06714 YGR
- 8 -

# EXHIBIT A

BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITANY N. DeJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
MATTHEW M. GUINEY (*pro hac vice*)
guiney@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653

*Plaintiffs' Interim Class Counsel*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | Case No. C 11-06714-YGR |
| | **[PROPOSED] THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

1    Plaintiffs Stephen H. Schwartz, Edward W. Hayter, Robert Pepper and Edward Lawrence

2  ("Plaintiffs"), for their class action complaint, allege upon personal knowledge as to themselves

3  and their own actions, and upon information and belief, including the investigation of counsel, as

4  follows:

5                                    **NATURE OF ACTION**

6    1.    This is an antitrust class action pursuant to Section 2 of the Sherman Antitrust Act

7  of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), brought by Plaintiffs on their own behalf and

8  on behalf of a class of persons similarly situated, those being persons who purchased software

9  applications or licenses for software applications from the "iTunes" site or "App Store" owned and

10  operated by Defendant Apple Inc. ("Apple"), or who made in-app purchases (defined herein)

11  through such applications, for use on one or more Apple iPhones, iPads, or iPod Touches ("iOS

12  Devices") between December 29, 2007 and the present (the "Class Period").[1]

13  **A.   Summary Of Material Facts**

14    2.    With great fanfare, Apple launched its first iPhone, called the iPhone 2G, on June

15  29, 2007.  Prior to and after its launch, Apple hailed the iPhone as a revolutionary, "breakthrough"

16  "smartphone" that functioned like a mobile computer with desktop-class email and other Internet

17  communications capability.  Apple built the iPhone's operating system, known as "iOS," to enable

18  iPhone users to download and run computer-like software programs (called "applications" or

19  "apps") to browse the Internet, transform music into cell phone ringtones, take photos, play games

20  and engage in other functions typically performed on desktop or laptop computers.

21    3.    Shortly thereafter, on September 14, 2007, Apple introduced the first iPod Touch, a

22  hand-held computer similar to the iPhone which operates on the iOS system and can run apps that

23  run on the iPhone. On April 3, 2010, Apple introduced the first iPad, a tablet computer with a

24  touch screen interface, utilizing, like the iPhone and the iPod Touch, the iOS operating system,

25  and able to run apps that function on those devices.

26

27  ---

[1]    The term "iPad" as used herein includes all iPad Pro, iPad Mini and iPad Air models as
28  well as standard iPads.

4.      Unbeknownst to iOS Device consumers, however, from the time it launched the iPhone through the present date, Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iOS applications (including purchases made within applications, such as payment for additional application features, full versions of games, and subscriptions for renewable access to content and memberships (*e.g.*, Hulu and Spotify) ("in-app purchases")) in order to control and derive supracompetitive profits from the distribution of iOS apps worldwide.[2] As a result of its scheme, Apple has, from introduction of the iPhone 2G in 2007, when the only apps available were those that came with the iPhone, through the present, cornered 100% of the worldwide distribution market for iOS applications.

5.      Apple has succeeded in totally eliminating any and all competition in that multi-billion dollar market.  Apple's App Store is the only store in the entire world – online or off-line – where the tens of millions of U.S.-based iOS Device owners (and the many tens of millions of iOS Device owners worldwide) can buy an iOS app, and Apple's unlawful monopolization of the apps market has enabled Apple to charge and collect a supracompetitive 30% fee from iOS Device consumers for each and every one of the billions of iOS apps they have bought since the iPhone's launch thirteen years ago.  Consequently, iOS Device consumers nationwide have paid hundreds of millions of dollars more for iOS apps than they would have paid in a competitive market.

6.      Unlike traditional desktop or laptop computer manufacturers, whose computers' operating systems allow consumers to buy software applications from any and all competing software distributors, Apple's iOS system prohibits iOS Device consumers from buying software applications from anyone other than Apple.

7.      Even Apple's own iMac and MacBook desktop and laptop computers' operating systems – from which the iOS operating system was derived – allow consumers to buy software from whatever source they like and to pay the software manufacturer or distributor directly without having to pay an additional fee to Apple.  There is no legitimate basis for Apple to treat its

---

[2]      Herein, references to the market for iOS applications include the market for in-app purchases.

iOS Devices customers any differently than it treats its iMac or MacBook customers, or to charge its iOS Devices customers a 30% mark-up for any and all software they buy for their iOS Devices.

8.   But when Apple developed its unique iPhone, Apple took advantage of the heavy demand for its novel product to equip it with an operating system that foreclosed iPhone consumers from buying software from any source other than Apple.  When Apple subsequently introduced the iPad and the iPod Touch, it placed the same software constraints on them.  Apple thus forced those foreclosed iOS Devices consumers to pay Apple a 30% fee for each and every iOS app they buy.  Stated in antitrust terminology, Apple improperly exploited its relationships with customers who purchased Apple's highly desirable and expensive iOS Devices by locking them in, without their knowledge or consent, into an aftermarket for iOS apps that was monopolized by Apple.

9.   In addition to exerting anticompetitive control through the direct purchase of apps on the App Store, Apple also controls and receives supracompetitive profits on in-app purchases, including but not limited to subscriptions.

10.   Apple's contracts with all developers offering content for iOS devices provide that Apple obtains 30% of the amount consumers pay for virtually all types of in-app purchases and subscriptions.  The sole exception to this rule is that for long term subscriptions lasting over a year, Apple's fee is 30% during the first year but goes down to 15% after the first year.

11.   Apple also controls what prices developers can charge.  It exercises that control by insisting that every paid app be priced in dollar increments at $0.99, $1.99, $2.99, and so forth.

12.   Apple's motive for its anticompetitive conduct was simple: Apple did not want its iOS Device-related revenue stream to end when a consumer bought an iOS Device, like it generally does when consumers purchase iMac and MacBook computers.  So Apple concocted and maintained a plan to continue generating additional revenues over the entire useful life of every iOS Device it sold by cornering the distribution market for iOS applications and charging consumers an extra 30% for every app.  Through this scheme Apple would profit not only from the sales of tens of millions of iOS Devices, it would also profit from each and every one of the billions of future apps sales made to Apple's iOS Devices customers.

13.     Apple's anticompetitive scheme has generated enormous supracompetitive profits for Apple.  Apple now offers more than 1.85 million apps in the App Store,[3] and iOS Device consumers worldwide have downloaded apps more than 200 billion times since July 2008. According to Sensor Tower, the provider of a leading app analytics platform that aggregates data about consumer app downloads and purchases for use by developers, in 2019, the average annual in-app spending per active iPhone in the United States reached $100.[4]  iOS Devices consumers have been overcharged hundreds of millions of dollars for paid apps and in-app purchases during the Class Period as a result of Apple's anticompetitive conduct.

14.     That Apple has engaged in unlawful monopolistic behavior with respect to iOS apps is perfectly consistent with Apple's attitude towards antitrust compliance generally.  A federal district court judge who observed Apple's attitude towards antitrust compliance during a recent trial found that Apple had unlawfully fixed e-book prices and concluded that Apple as an institution simply "does not want to engage in retail price competition" – indeed, "one of its principal goals was the elimination of all retail price competition," and "it was happy if a result of that … was an increases in prices" that "the consumer had to pay."[5]

15.     That district court further stated that "[t]he record at trial demonstrated a blatant and aggressive disregard at Apple for the requirements of the law," (Hr'g Tr. 17:1-2) even among "Apple lawyers and its highest executives," (*id.* at 17:5-6) and concluded that an injunction was needed to ensure that a "comprehensive and effective" (*id.* at 19:18) antitrust compliance training program would be undertaken by "each of Apple's officers and directors engaged in whole or in part in activities relating to the supply of content," including "apps" (*id.* at 13:18-20).  "Neither Mr. [Eddy] Cue," the Apple executive responsible for  Apple's App Store, nor "his assigned in-house counsel, could remember [having] any training on antitrust issues," and "[t]hey and those on

---

[3]     *See* https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/ (last viewed June 2, 2020).

[4]     *See* https://sensortower.com/blog/revenue-per-iphone-2019 (last viewed June 2, 2020).

[5]     Hearing Transcript ("Hr'g Tr.") at 11:4-5, 33:10-13, *U. S. v. Apple Inc.*, No. 12 Civ. 2826 (S.D.N.Y. Aug. 27, 2013).

1  their teams need to understand what the law requires and how to conform their business practices

2  to the law."[6]

3      16.    Apple's unlawful monopolization of the iOS applications aftermarket from July

4  2007 through the present is a direct reflection of Apple's goal of "eliminating all retail price

5  competition" and its culture of disdaining antitrust compliance in order to increase the prices its

6  customers pay.  Through its actions, Apple has unlawfully stifled competition by erecting

7  impenetrable barriers to entry to would-be distributors of iOS apps, reduced consumer choice in

8  what would otherwise be a robust and competitive iOS software applications marketplace, and

9  artificially increased prices for iOS software applications to supracompetitive levels.

10      17.    Apple's illegal iOS apps monopoly should be enjoined and dismantled, and

11  Plaintiffs and the tens of millions of nationwide iOS Devices consumers they seek to represent

12  should be reimbursed by Apple for the hundreds of millions of dollars they have been

13  overcharged.

14  **B.**    **<u>Summary Of Claims</u>**

15      18.    In pursuit and furtherance of its unlawful anticompetitive activities, Apple:

16  (a) failed to obtain iOS Devices consumers' contractual consent to Apple's monopolization of the

17  iOS applications aftermarket, the effect of which was to lock consumers into buying apps only

18  from Apple and paying Apple's 30% fee, even if they wished to buy apps elsewhere or pay less;

19  and (b) failed to obtain iOS Devices consumers' contractual consent to having their iOS Devices

20  "locked" to prohibit them from using any app that was not approved or sold by Apple, thereby

21  preventing iOS Devices purchasers from downloading  and using other apps, called "Third Party

22  Apps."

23      19.    Apple violated Section 2 of the Sherman Act by monopolizing or attempting to

24  monopolize the iOS Devices aftermarket in a manner that harmed competition and injured iOS

25  apps consumers by reducing output and consumer choice, and by increasing prices for iOS apps to

26  supracompetitive levels.

27  

28  [6]    Hr'g Tr. at 18:11-13.

20.     Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees.  As for equitable relief, Plaintiffs seek an order restraining Apple from selling iOS Devices that are programmed in any way to prevent or hinder consumers from downloading Third Party Apps, or minimally, restraining Apple from selling or distributing iOS Devices without first obtaining the consumers' express contractual consent to (a) buying apps only from Apple and (b) having their iOS Devices locked to accept only apps purchased from Apple.

## THE PARTIES

21.     Plaintiff Stephen H. Schwartz is an individual residing in White Plains, New York who purchased iPhones, including, but not limited to, in October 2010, and on or about September 12, 2014.  Plaintiff Schwartz purchased iPads, including, but not limited to, on or about August 12, 2019.   Plaintiff Schwartz paid Apple for iOS apps, in-app purchases and/or subscriptions during the Class Period.

22.     Plaintiff Edward W. Hayter is an individual residing in Brooklyn, New York who purchased iPhones, including, but not limited to, in March 2008.  Upon information and belief, Plaintiff Hayter purchased iPads including, but not limited to, in 2013.  Plaintiff Hayter paid Apple for iOS apps, in-app purchases and/or subscriptions during the Class Period.

23.     Plaintiff Robert Pepper is an individual residing in Chicago, Illinois who purchased iPhones, including, but not limited to, on or about June 29, 2007, and October 26, 2018.  Plaintiff Pepper purchased iPads, including, but not limited to, on or about December 13, 2014, and purchased iPod Touches, including, but not limited to, on or about September 13, 2014.  Plaintiff Pepper paid Apple for iOS apps, in-app purchases and/or subscriptions during the Class Period.

24.     Plaintiff Edward Lawrence is an individual residing in Tiburon, California who purchased iPhones in 2010, 2012, 2015 and 2019 and purchased an iPad in 2012.  Plaintiff Lawrence paid Apple for iOS apps, in-app purchases and/or subscriptions during the Class Period.

25.     Defendant Apple is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014.  Apple regularly conducts and transacts business in this District, as well as throughout Illinois, New York and elsewhere in the United States.  Apple manufactures, markets, and sells the iOS Devices, including the iPhone, iPad and

iPod Touch, among other electronic devices.

## JURISDICTION AND VENUE

26.     This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

27.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because some Plaintiffs purchased iPhones in this District, Apple has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and Apple is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

29.     Each Plaintiff and member of the Class, in order to purchase an iOS app or make in-app purchases, was required to accept Apple's iTunes terms of service which required lawsuits to be filed in courts in the State of California.

## FACTUAL ALLEGATIONS

**A.     Apple's Anticompetitive Conduct**

30.     In Spring 2007, Apple began a massive advertising campaign to market its new wireless communication device, the iPhone. The iPhone was advertised as a combined mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability. The iPhone was, in effect, the world's first mobile computer. The iPhone shifted the paradigm for smartphones, and it changed the entire cell phone manufacturing industry.

31.     Having designed and manufactured a highly advanced and desirable new product, Apple profited handsomely from selling its revolutionary new handset. The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag, consumers waited in line to get their

1   hands on one.[7]

2         32.    Shortly after it introduced the iPhone, in September 2007, Apple introduced the
3   iPod Touch. The prices for those devices ranged between $299 to $399.  In March 2010, it
4   introduced its first iPad, which sold at prices of $499 to $699.  The prices for each of these devices
5   varied depending on how many gigabytes of storage they included.

6         33.    2.2 billion iPhones have been sold worldwide since the product was introduced, as
7   well as more than 350 million iPads and well over 100 million iPod Touch devices.[8]  Apple has
8   rightfully earned hundreds of billions of dollars in revenue from selling its iOS Devices.

9         34.    But Apple wanted more.  It did not want to limit its revenues to what consumers
10   were willing to pay for the iOS Devices themselves.  Apple wanted a substantial piece of every
11   dollar that would ever be paid to buy any kind of software for any iOS Device at any time
12   anywhere in the world.

13         35.    To achieve that end, Apple embarked on a scheme to monopolize the aftermarket
14   for iOS applications and to foreclose and protect Apple against any and all competition it might
15   face in the distribution of iOS applications.  In contrast to the robust competition Apple faces in
16   the software aftermarket for its desktop and laptop computers, Apple wanted the entire iOS Device
17   software aftermarket for itself.  Apple achieved its unlawful goal, through a series of actions.

18         36.    Apple at all times retained exclusive control over the design, features and operating
19   software for the iPhone, iPad and iPod Touch, known as iOS, which is based on the same
20   technologies that are used in Apple's desktop and laptop computers' operating systems, known as
21   OS X.  Although Apple has always maintained OS X as an "open" system that allows iMac and
22   MacBook consumers to run software manufactured or sold by any distributor, Apple modified its

23

---

24   [7]    Apple has since released numerous models of iPhone, iPad and iPod, with prices for high
25   end models of iPhone and iPad Pro often ranging above $1000, and iPod Touches currently
    ranging between $199 and $399.

26   [8]    *See*   https://kommandotech.com/statistics/how-many-iphones-have-been-sold-worldwide/
27   (last viewed June 2, 2020); https://www.statista.com/statistics/269915/global-apple-ipad-sales-
    since-q3-2010/ (last viewed June 2, 2020); https://en.wikipedia.org/wiki/IPod_Touch (last viewed
28   June 2, 2020).

iOS version to be a "closed" system by installing "security measures" or "program locks" designed to prevent iPhone consumers from installing and running apps that were not sold or approved by Apple.

37.     Apple did not close the iOS system for the purpose of protecting its proprietary right to own, sell or license iOS.  Apple closed the iOS system for the specific purpose, and with the specific intent, of foreclosing competition from other potential iPhone software manufacturers and distributors so that Apple could monopolize and derive monopoly profits from the iOS apps aftermarket.

38.     After Apple launched its iPhone 2G in June 2007, Apple enhanced its iPhone-related revenues either by developing its own apps for ringtones, instant messaging, Internet access, gaming, entertainment, video and photography or by enabling "approved" third party manufacturers to develop iOS apps.  Apple always conditioned its "approval" of such apps on the third party's agreement to give Apple a share of the third party's sales proceeds.

39.     However, because Apple's OS X and iOS operating systems were based on the widely available Unix platform and included technologies and services that were based on other open software systems, Apple's initial program locks designed to eliminate Third Party Apps proved ineffective, as clever third party programmers quickly circumvented Apple's security measures and made non-Apple approved iOS apps available for sale on the Internet.

40.     Almost immediately after the iPhone's launch, unapproved Third Party Apps started to appear and threatened to compete with Apple in the iOS apps aftermarket.  For example, Mobile Chat and FlickIM gave iPhone users access to instant messaging programs from which Apple derived no revenues.  Apple responded to these threats by updating its iOS to eliminate iPhone consumers' ability to use these Third Party Apps and by warning its iPhone customers that using Third Party Apps would nullify Apple's iPhone warranty.

41.     Apple also faced threatened competition for iPhone ringtones.  When a customer purchased a song for $1 from the Apple iTunes store, Apple charged the customer an additional 99 cents to convert any portion of that song into a ringtone.  A number of competing programmers promptly offered a variety of ringtone programs that enabled iPhone consumers to download both

1    songs and ringtones for free.  Some of these programs allowed customers to use samples of

2    popular songs lawfully downloaded from Apple's iTunes store as a ringtone.  Other programs,

3    such as I-Toner from Ambrosia Software and iPhone RingToneMaker from Efiko software,

4    allowed customers to "clip" portions of songs purchased by them from iTunes for use as ringtones.

5         42.    Since many of these programs used songs downloaded from iTunes, Apple initially

6    sought to block the use of those songs as ringtones by updating the iTunes software to install

7    program locks that would interfere with such use.  However, those efforts were all quickly

8    defeated by third party programmers, sometimes within hours of the release of the update.  So

9    Apple again responded to these threats by updating its iOS to eliminate iPhone consumers' ability

10   to use these Third Party Apps and by voiding the warranties of iPhone customers who used them.

11        43.    Ultimately, Apple eliminated the threat of competition from unapproved apps

12   developers by conceiving and implementing the App Store in order to become the exclusive

13   distributor of iOS apps, and by thereafter rigorously enforcing and maintaining its monopoly.

14        44.    Apple laid the groundwork for its App Store in March 2008, when Apple released a

15   "software development kit" ("SDK") for the stated purpose of enabling independent software

16   developers to design applications for use on the iPhone and iPod Touch.  For an annual fee of $99,

17   the SDK allows developers to supply apps to Apple for distribution through Apple's App Store.

18        45.    Apple opened its App Store in July 2008.  Apple owns 100% of the App Store,

19   maintains and operates the App Store with Apple employees or agents, and controls all of the App

20   Store sales, revenue collections and other business operations.

21        46.    Apple informs its prospective apps developers (though not its iOS Device

22   consumers) that the developers' apps cannot be sold anywhere except in the App Store.  Apple

23   also informs its developers (but does not make clear to its iOS Devices customers ) that Apple will

24   charge iOS Device consumers a 30% commission for any non-free app sold in the App Store.

25   Apple recently changed its website, shortly after the United States Supreme Court ruled in

26   Plaintiffs' favor in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), to disclose that Apple "collects a

27

28

30% commission" on paid apps, subscription sales for the first year of the subscriptions (and 15% thereafter) and 30% on other in-app purchases.[9]

47.     Consequently, the prices for apps available in Apple's App Store include the developers' price plus Apple's 30% mark-up.  When an iOS Device customer buys an app from Apple, it pays the full purchase price, including Apple's 30% commission, directly to Apple. Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the developer.  Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale.  The developers at no time directly sell the apps or licenses to iOS Devices customers or collect payments from the customers.

48.     On information and belief, throughout the Class Period, Apple threatened to terminate any developer that made its apps available on its own website or through a distributor other than Apple, and Apple continued to discourage iOS Devices customers from downloading Third Party Apps by telling customers that Apple would void and refuse to honor the iOS Devices warranties of any customer who downloaded a Third Party App.

49.     In addition to the sales of applications themselves, Apple's contracts with its developers provide for Apple to obtain a 30% commission for almost every type of in-app purchase.[10]  Subscriptions are recurring purchases that allow consumers to obtain access to content for a period of time, and many subscriptions renew automatically unless the consumer proactively terminates them.

50.     Apple also requires developers to select prices for their apps that end in "99 cents," meaning that developers are required to increase prices in one-dollar increments ($0.99, $1.99, $2.99, and so forth).  As a practical matter, that allows only for very blunt price adjustments

---

[9]     *See* https://www.apple.com/ios/app-store/principles-practices/ (last viewed June 2, 2020).

[10]     As set forth *supra*, subscriptions after the first year are the only exception to Apple's 30% charge to developers.  For these, after one year, Apple takes 15%.

because "[t]he vast majority of [paid] apps are priced at 99 cents."[11]  Thus, a developer wishing to set a price lower than the Apple-mandated minimum price point must give away the app for free; one wishing to price above that point must at least double the $0.99 price.

51.     By designing iOS as a closed system, installing security measures and program locks to prevent Third Party App downloads, establishing the App Store as the exclusive worldwide distributor of iOS apps, enforcing the App Store's exclusive distributor status by terminating apps developers who sold apps in competition with Apple, voiding the warranties of iOS Devices consumers who bought competing apps, and denying authorization of apps with in-app purchasing features that do not meet Apple's payment requirements, Apple has since June 2007 willfully acquired and maintained a monopoly in the iOS apps aftermarket and has positioned itself as the one and only distributor of iOS apps on the entire planet.  Apple has no competition in the multi-billion dollar iOS apps aftermarket, domestically or abroad, whatsoever.

52.     Prior to Plaintiffs' purchases of their iOS Devices, Apple had not even disclosed – much less obtained the Plaintiffs' contractual consent to – either (a) Apple's monopolization of and collection of monopoly profits from the iOS applications aftermarket, or (b) having their iOS Devices locked to prohibit Plaintiffs from using any app that was not approved or sold by Apple. Absent obtaining Plaintiffs' contractual consent, Apple's monopolization of the iOS applications aftermarket constitutes an antitrust violation under Section 2 of the Sherman Act.

**B.     Plaintiffs' Injuries**

53.     Plaintiffs have been injured by Apple's anticompetitive conduct because they paid more for their iOS apps than they would have paid in a competitive market.  Plaintiffs have also been injured because Apple's unlawful monopolization of the iOS apps aftermarket has extinguished Plaintiffs' freedom of choosing between Apple's App Store and lower cost market alternatives that would have been available had Apple not monopolized the market.  Plaintiffs have also been injured because Apple's establishment and maintenance of monopoly pricing has

---

[11]     Tim   Kridel,   Pricing   Strategies   for   Your   App,   Digital   Innovation   Gazette, https://www.digitalinnovationgazette.com/dollars-and-distribution/pricing-strategies-for-your-app/index.php (last visited June 30, 2020).

1  caused a reduction in the output and supply of iOS apps, which would have been more abundantly

2  available in a competitive market.

3  54.     That Plaintiffs have paid supracompetitive prices is obvious for several reasons.

4  Under basic and fundamental economic principles, the absence of competition leads to increased

5  prices, and increased competition leads to lower prices.  In a competitive market, an economically

6  rational manufacturer or distributor will sell its products at prices equal to their cost plus a

7  reasonable marginal rate of return (profit) dictated by the market environment.   But an

8  economically rational monopolist that is unconstrained by the downward pricing pressures of a

9  competitive market will charge the highest price it can in light of the demand for its products; the

10  greater the demand, the higher the profits.   Indeed, it is hornbook economics that commercial

11  entities strive to acquire and maintain monopoly power precisely because they want to reap the

12  monopoly profits that market domination typically generates.

13  55.     Apple and the iOS apps aftermarket are not immune from these presumptively

14  valid economic principles.   Indeed, as shown above, the generation of monopoly profits was

15  exactly why Apple chose to monopolize the iOS apps aftermarket.

16  56.     That Apple's 30% fee is a monopoly price is also obvious from Apple's cost

17  structure.  Each developer's $99 annual fee covers most or all of Apple's costs of reviewing that

18  developer's apps and the related proportional costs of operating and maintaining the App Store,

19  even if the developer submits several apps annually.   As to successive sales of that developer's

20  apps, therefore, Apple's 30% fee constitutes virtually pure profit for Apple.   In a competitive

21  environment, where developers could sell their apps on their own websites without charging

22  Apple's 30% mark-up and discount retailers could obtain volume discounts and sell for far less

23  than a 30% profit, Apple would be under considerable pressure to substantially lower its 30%

24  profit margin because, otherwise, its App Store would be priced out of the market and lose

25  substantial market share.   In a truly competitive iOS apps distribution environment, Apple's 30%

26  margin would be simply unsustainable.[12]

27  _____

[12]     While, as set forth *supra*, the fee goes down to 15% for subscription purchases only, after

28  one year, that too would be unsustainable in a truly competitive environment.

57.     A truly competitive iOS apps distribution market would also give Plaintiffs and other iOS Devices customers the freedom to choose between Apple's high-priced App Store and less costly alternatives, such as buying direct from apps developers or volume-driven and other software discounters.  Plaintiffs' freedom to choose between these market alternatives has been eliminated by Apple's monopolistic conduct, and Plaintiffs have been forced to pay supracompetitive prices to Apple as a result.

58.     The lack of a truly competitive environment has also led to reduced output and supply of iOS apps because developers are barred from selling apps at prices below Apple's inflated 30% marked-up price.  Under basic economic principles, lower prices would generate both increased demand and increased supply to meet that demand in the iOS apps aftermarket as a whole.  Apple's unlawful monopoly naturally restricts both supply and demand.

**C.     <u>Injury To Competition</u>**

59.     The same conditions – the existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output and supply – demonstrate that Apple's monopolistic conduct has likewise injured competition generally in the iOS apps aftermarket.

60.     The iOS apps market is not remotely like the genuinely competitive personal computer software market, where computer hardware manufacturers – including Apple itself – do not control or have a financial stake in every sale of software that is downloaded on the computers they make.  In the aftermarkets for desktop and laptop computer software, the software developers can offer products directly to consumers or through discounters without having to gain the computer manufacturer's approval and without the software customers paying the manufacturer a penny.  Consequently, there is an abundant supply of competing software applications, and consumers can shop among multiple vendors without paying above market prices.

61.     The iOS apps market lacks all of these indicia of competitiveness.  Because Apple has unlawfully cornered the nationwide (and, indeed, worldwide) distribution market for iOS apps, the iOS apps aftermarket has been harmed generally by Apple's anticompetitive conduct, which is precisely the type of harm the antitrust laws were enacted to remedy.

**<u>CLASS ALLEGATIONS</u>**

62.     Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed class (the "Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following Class comprised of:

**All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased an iOS application or application license from Apple, or who made an in-app purchase, including, but not limited to, a subscription purchase, through such an application, for use on an iOS Device at any time from December 29, 2007 through the present.**

63.     The Class for whose benefit this action is brought is so numerous that joinder of all members is impractical.

64.     Plaintiffs are unable to state the exact number of Class members without discovery of Apple's records but, on information and belief, state that billions of iOS apps or licenses for apps were purchased during the Class Period.

65.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual members including, among others, (1) whether Apple violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the aftermarket for iOS Device software applications; (2) whether Apple's violation caused harm to the relevant market generally and to Plaintiffs and the Class specifically; and (3) whether Apple should be enjoined from continuing its monopolistic practices and from continuing to monopolize and charge monopoly prices in the iOS apps aftermarket without first obtaining iOS Devices consumers' contractual consent.

66.     The common questions of law and fact are identical for each and every member of the Class.

67.     Plaintiffs are members of the Class they seek to represent, and their claims arise from the same factual and legal bases as those of the Class; they assert the same legal theories as do all Class members.

68.     Plaintiffs will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent them and those similarly situated.

69.     The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and cause needless expenditure of judicial resources.

70.     Plaintiffs are typical of the Class in that their claims, like those of the Class, are based on the same anticompetitive business practices and the same legal theories.

71.     Apple has acted on grounds generally applicable to the Class.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

**RELEVANT MARKET ALLEGATIONS**

73.     The iOS Devices are a unique, premium-priced product group that generates a unique aftermarket for software applications that can be used only on iOS Devices.  During at least the Class Period, the price of iOS Devices was not responsive to an increase in iOS application prices because Apple did not obtain iOS Devices customers' knowledgeable contractual consent to Apple's monopolization of and monopoly pricing in the apps aftermarket. Consequently, (a) consumers who purchased iOS Devices could not, at the point of sale, reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iOS Device's lifetime); and (b) consumers were "locked into" the iOS Device due to its high price tag and would incur significant costs to switch to another handset.  The aftermarket for iOS applications is thus an economically distinct product market, and the applications that are distributed within that market have no acceptable substitutes.

74.     The existence of competition in the mobile device market between Apple's iPhone, iPod Touch and iPad and the makers of competing handsets such as Google's Android phones, and Samsung's Galaxy Tab tablets is irrelevant to the relevant market analysis in a Section 2 Sherman Act aftermarket monopolization case, in which the existence or lack of competition in the aftermarket at issue is the only economically meaningful inquiry.  The existence of Android mobile devices applications and applications geared toward other mobile device brands is likewise

irrelevant because those applications are technologically incompatible with the iPhone and, therefore, are not reasonably interchangeable substitutes for iOS apps.  Even if those other mobile device apps were technologically compatible, Apple's exclusionary and monopolistic conduct would bar such apps from being sold in competition with Apple for the same reasons and in the same manner that Apple has foreclosed such competition for iOS Device Third Party Apps generally.

75.    The geographic scope of the iOS applications aftermarket is national.

76.    The aftermarket for iOS applications includes the market for distributing software applications that can be downloaded on iOS Devices for managing such functions as ringtones, instant messaging, photographic and video capability, gaming and other entertainment, Internet applications, and any other downloadable software-driven functions, and also includes the market for in-app purchases for iOS Devices such as additional app features, in-game currency, and subscriptions for access to content, services, games or platforms and similar purchases which can be made by a user from within an application.

77.    The applications aftermarket came into existence immediately upon the sale of the first iPhones because: (a) the applications aftermarket for iOS Devices is derivative of the iPhone; and (b) no Plaintiff or member of the Class agreed to any restrictions on their ability to access a competitive iPhone applications aftermarket.

**COUNT I**
**Unlawful Monopolization Of The Applications Aftermarket**
**In Violation Of Section 2 Of The Sherman Act**
**(Seeking Damages And Equitable Relief)**

78.    Plaintiffs reallege and incorporate paragraphs 1 through 75 above as if set forth fully herein.

79.    Apple has acquired monopoly power in the iOS applications aftermarket through unlawful, willful acquisition and maintenance of that power.  Specifically, Apple has unlawfully acquired monopoly power by:  (a) designing the iOS Devices operating system as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of

iOS apps; and (c) enforcing the App Store's monopoly status by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iOS Devices consumers who buy competing apps.

80.     Apple's unlawful acquisition of monopoly power has reduced output and competition and resulted in increased, supracompetitive prices for products sold in the iOS applications aftermarket and, thus, harms competition generally in that market.

81.     Plaintiffs have been injured in fact by Apple's unlawful monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supracompetitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

82.     Apple's unlawful monopolization of the iOS applications aftermarket violates Section 2 of the Sherman Act, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

**COUNT II**
**Attempted Monopolization Of The Applications Aftermarket In**
**Violation Of Section 2 Of The Sherman Act**
**(Seeking Damages And Equitable Relief)**

83.     Plaintiffs reallege and incorporate paragraphs 1 through 80 above as if set forth fully herein.

84.     Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iOS applications aftermarket.  Specifically, Apple has attempted unlawfully to acquire monopoly power by: (a) designing the iOS Devices operating system as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iOS apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate apps developers who sell apps in competition with Apple and by voiding the warranties of iOS Devices consumers who buy competing apps.

85.     Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the applications aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

86.     Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased, supracompetitive prices for products sold in the iOS applications aftermarket and, thus, harms competition generally in that market.

87.     Plaintiffs have been injured in fact by Apple's attempted monopolization because they have been: (a) deprived of lower cost alternatives for apps; (b) forced to pay supracompetitive prices for apps; and/or (c) subjected to a lower output and supply of apps.

88.     Apple's attempted monopolization of the iOS applications aftermarket violates Section 2 of the Sherman Act, and its anticompetitive practices are continuing and will continue unless they are permanently enjoined.   Plaintiffs and members of the Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Apple as follows:

a.     Permanently enjoining Apple from monopolizing or attempting to monopolize the iOS applications aftermarket or, minimally, restraining Apple from selling or distributing iOS Devices without first obtaining the consumers' express contractual consent to (a) Apple's monopolization of and charging of monopoly prices in the iOS apps aftermarket, and (b) having their iOS Devices locked to accept only apps or purchased from Apple;

b.     Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's violations of the federal antitrust laws;

c.     Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

1        d.    Granting such other and further relief as the Court may deem just and proper.

2    **DEMAND FOR TRIAL BY JURY**

3        Plaintiffs hereby demand a trial by jury.

4    DATED:  September 11 2020,        **WOLF HALDENSTEIN ADLER**
                            **FREEMAN & HERZ LLP**

6                          _____*/s/ Rachele R. Byrd*_____
                            RACHELE R. BYRD

7                          BETSY C. MANIFOLD

8                          RACHELE R. BYRD
                      MARISA C. LIVESAY

9                          BRITANY N. DeJONG
                      manifold@whafh.com

10                         byrd@whafh.com
                      livesay@whafh.com

11                         dejong@whafh.com
                      750 B Street, Suite 1820

12                         San Diego, CA 92101
                      Telephone: 619/239-4599

13                         Facsimile:  619/234-4599

14                         **WOLF HALDENSTEIN ADLER**
                        **FREEMAN & HERZ LLP**

15                         MARK C. RIFKIN

16                         MATTHEW M. GUINEY
                      rifkin@whafh.com

17                         guiney@whafh.com
                      270 Madison Avenue

18                         New York, New York 10016
                      Telephone:  212/545-4600

19                         Facsimile:   212/545-4677

20                         *Plaintiffs' Interim Class Counsel*

21                         **CALCATERRA POLLACK LLP**

22                         MICHAEL LISKOW
                      mliskow@calcaterrapollack.com

23                         1140 Avenue of the Americas, 9th Floor
                      New York, NY 10036-5803

24                         Telephone: (212) 899-1761
                      Facsimile: (332) 206-2073

25

26                         *Counsel for Plaintiff Robert Pepper*

27   APPLE2/26561

28