```
                                              Pages 1 - 15

             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Judge

IN RE: APPLE IPHONE ANTITRUST  )  NO. 11-06714-YGR
LITIGATION,                    )      19-03074-YGR
                               )      20-05640-YGR
_____)

                                San Francisco, California
                                Friday, January 8, 2021
```

**TRANSCRIPT OF REMOTE VIDEO PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom teleconference.)

For Consumer Plaintiffs:
        WOLF, HALDENSTEIN, ADLER, FREEMAN
         & HERZ LLP
        Symphony Towers
        750 B Street - Suite 1820
        San Diego, California 92101
  BY: **RACHELE R. BYRD**
      **ATTORNEY AT LAW**

For Developer Plaintiffs:
        HAGENS BERMAN SOBOL SHAPIRO LLP
        1301 Second Avenue - Suite 2000
        Seattle, Washington 98101
  BY: **ROBERT F. LOPEZ**
      **BENJAMIN J. SIEGEL**
      **ATTORNEYS AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

```
 1   APPEARANCES:  (CONTINUED)

 2   For Epic Games:
                              CRAVATH SWAINE MOORE, LLP
 3                            825 Eighth Avenue
                              New York, New York 10019
 4                       BY:  LAUREN ANN MOSCOWITZ
                              ATTORNEY AT LAW
 5
     For Apple, Inc.:
 6                            GIBSON, DUNN & CRUTCHER LLP
                              333 South Grand Avenue
 7                            Los Angeles, California 90071
                         BY:  JAGANNATHAN SRINIVASAN
 8                            ATTORNEY AT LAW
```

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | **Friday - January 8, 2021**                      **9:00 a.m.**   |
| 2  | P R O C E E D I N G S                                              |
| 3  | ---o0o---                                                          |

1  **Friday - January 8, 2021**                                        **9:00 a.m.**

2                          P R O C E E D I N G S

3                                ---o0o---

4       **THE CLERK:** Good morning, everyone. We're here in

5  Civil Action 11-6714, In Re: Apple iPhone Antitrust Litigation;

6  and we're here in Civil Action 19-3074, Cameron, et al. versus

7  Apple, Inc.; and the last one is 20-5640, Epic Games Inc.

8  versus Apple Inc. The Honorable Thomas S. Hixson presiding.

9       Counsel, please state your appearances. Let's start with

10  the plaintiffs and go down to the defendants.

11       **MS. BYRD:** Good morning, Your Honor. Rachele Byrd of

12  Wolf Haldenstein on behalf of the consumer plaintiffs.

13       **THE COURT:** Good morning.

14       **MR. LOPEZ:** Good morning. Rob Lopez and my colleague,

15  Ben Siegel, Hagens Berman, for the developer plaintiffs.

16       **THE COURT:** Good morning.

17       **MR. SIEGEL:** Good morning, Your Honor.

18       **MS. MOSKOWITZ:** Good morning, Your Honor. Lauren

19  Moscowitz from Cravath Swain and Moore on behalf of Epic Games.

20       **THE COURT:** Good morning.

21       **MR. SRINIVASAN:** Good morning, Your Honor.

22  Jay Srinivasan of Gibson Dunn for Apple.

23       **THE COURT:** Good morning.

24       So I have some questions, and I think the one I would like

25  to start out with is to the consumer plaintiffs, that when I

1   read through the second amended complaint and I look at the
2   specific theories of injury to consumers and injury to
3   competition that are alleged, it seems to me that they all
4   arise from the absence of alternatives to Apple's App Store;
5   that there is an injury of paying too much for apps because
6   there aren't other app stores available; there is an injury of
7   not having more apps to be able to buy because there aren't
8   alternatives to Apple's App Store.
9       And it seems like that's what all the injuries are.  And
10  then I'm looking at the declaration you've submitted and the
11  theory of relevance for the revenue that developers earn, that
12  seems to be more about the quality of what's delivered through
13  Apple's App Store.  And I don't know that that has anything to
14  do with the antitrust injuries that you've pleaded.
15      So can you speak to that issue?
16          **MS. BYRD:**  Yes, Your Honor.  First, I just want to
17  clarify that there is a third amended complaint that we filed,
18  I think, in October, but it --
19          **THE COURT:**  Oh.  That's a good point.  Thank you.
20          **MS. BYRD:**  It was attached to a stipulation, so it
21  wasn't independently filed on the docket; so it's easy to miss.
22          **THE COURT:**  So October is the time frame?
23          **MS. BYRD:**  You know, I -- I believe it was in October,
24  yes.
25          **THE COURT:**  Okay.

1   **MS. BYRD:** It was an Exhibit A to a stipulation and
2   proposed order allowing the amendment, and then
3   Judge Gonzalez Rogers granted the stip; then it became
4   effective.
5   **THE COURT:** Okay. Then I do need to read through your
6   third amended complaint.
7      Do you do think that that changed the nature of your
8   injuries?
9   **MS. BYRD:** No, Your Honor. I think the theory of
10  injury is still the same. We just added the aftermarket for
11  iPads, iPod Touches, and we included in-app purchases as part
12  of the market.
13  **THE COURT:** Okay.
14  **MS. BYRD:** And we alleged that Apple requires
15  developers to price their apps ending in 99 cents as part of --
16  **THE COURT:** Oh, that's right. Okay. Now this is
17  sounding familiar. Thank you.
18  **MS. BYRD:** Okay. So to answer your question: Yes,
19  Your Honor. The impact to consumers is as a result of being
20  locked in and not being able to purchase apps for their iOS
21  devices from anywhere else, other than the App Store.
22     The impact, the analysis of how this impacts consumers
23  involves looking at the tax incidents as, you know, Dr. Sunding
24  explained, because the commission affects both consumers and
25  the producers of the apps. And in order to get -- gain a more

1  complete picture of how the monopoly affects consumers, we need
2  to look at global revenues because that has an impact on
3  profits; which determines the choices that are made with
4  respect to pricing, with respect to investment in new apps; to
5  enhancing of current apps; creating new features.  So all of
6  these things impact consumers.
7      Pricing, choices -- because they can't go outside the
8  App Store, they are stuck with whatever is in the App Store.
9  And what's in the App Store is determined by the developers'
10 choices of what they are going to create, enhance.  It
11 determines how much competition there is.
12     It determines what prices the developers decide to set an
13 app at.  Because they are constrained by this 99-cent pricing
14 structure, the anticipation of profits informs that decision.
15 If they are not going to make enough at 99 cents for the app,
16 because of their fixed costs, they are going to, you know,
17 likely choose a higher price or decide not to spend as much on
18 creating the app.
19     So all of these things come into play.  And it's not about
20 liability.  It's not about proving a global market.  It's not
21 about even modeling a but-for world in a foreign market.  It's
22 about getting a complete picture of the decisions that go into
23 making an app and pricing an app and how that impacts the
24 consumer.
25     **THE COURT:**  So maybe if I -- let me see if I can tease

1  it out.  The antitrust -- the injury to competition stems from
2  there are no alternatives to the App Store, and that means
3  customers are stuck with whatever is in the App Store.  And so
4  this is evidence about what's in or likely to be in the
5  App Store, and why it's not good enough.  And that may not be
6  the central, most relevant thing in the case, but it's within
7  the scope of relevance because you're painting the full picture
8  of what is available to consumers in the absence of competition
9  to the App Store.
10      Is that kind of the idea?
11      **MS. BYRD:**  That's right.  And our expert is looking
12  at, you know, every impact that this could have, this monopoly
13  could have on consumers, pricing, and choices.
14      And it all stems back to profits.  And a developer is not
15  going to look at its U.S. profits when it decides whether to
16  invest or how to price the app.  It's going to look at global
17  revenues.  And its costs are fixed.  They're not -- they are
18  incremental at best when expanding globally.  But revenues
19  increase.  You know, the more countries that a developer can
20  sell the app -- his app in, the more profits he will make.  And
21  minus fixed costs, minus the Apple tax, is profit.
22      **THE COURT:**  Right.  So would you agree that the way
23  that the developer plaintiffs plead antitrust injury, that even
24  though this information is relevant to your claims, it seems
25  like it's a bit more central to their claims.

1  **MS. BYRD:** I would not disagree with that. And I
2  don't think developers are saying they don't want this data.
3  They're just phasing it differently than we are.
4  **THE COURT:** Okay. That brings me to the coordination
5  order, which is that Judge Gonzalez Rogers had wanted the two
6  plaintiff classes to work together.
7  And you saw this in my prior order, that I'm kind of
8  struggling with, well, if they're the ones -- it's really more
9  central to their case -- and they are willing to wait and work
10 cooperatively and you're pushing ahead, I felt like there was
11 some tension with the coordination orders.
12 Maybe you could speak to that issue.
13 **MS. BYRD:** Your Honor, the coordination order is
14 intended to create efficiencies where possible. It's not
15 intended to, you know, hinder our case. They are different
16 cases. We have different experts. Our experts are not working
17 together to formulate the same kind of models. They may have
18 entirely different models and theories of impact. The markets
19 are different.
20 So what developers have decided to do does not -- should
21 not hinder consumers from what they are trying to do to prove
22 common impact and damages.
23 **THE COURT:** The argument that you made to me last time
24 was that you need this evidence for your class certification
25 motion. Or you didn't say "need," because you never want to

1  concede that you absolutely need something for the motion, but
2  that you wanted it for the class certification motion.  But the
3  developers don't seem to feel that they need to have it before
4  the motion.
5     So, then, why do you need it?
6        **MS. BYRD:**  I -- developers can probably speak to this
7  better than I can, but my understanding, from what little I
8  know about their anticipated motion, is that the models are
9  likely to be different.
10    And I don't think that -- it doesn't sound like they are
11 going to rely on this in -- global revenues data.  Or maybe
12 they have enough data from the -- from themselves to
13 extrapolate from.  I don't know.  But their expert seems to be
14 doing a different approach -- doing a different model and
15 taking a different approach than ours.
16       **THE COURT:**  Okay.  And fair enough that you can't know
17 what they are planning, their work product that's in process,
18 you may not have access to.
19       **MS. BYRD:**  Right.
20       **THE COURT:**  Okay.  Well, I would like to hear from
21 Apple.
22       **MR. SRINIVASAN:**  Sure.  Thank you, Your Honor.
23    You know, I don't know which to address first.  I mean, as
24 far as relevance goes, you know, as you saw in our brief, we
25 don't believe this is relevant, this information about foreign

1  revenues, period.  And we haven't -- as you pointed out, their
2  theory of injury is -- stems from the App Store being the only
3  place you can buy apps, and their alleged harms from there;
4  and/or the amount of the commission.  It's not clear that they
5  picked one or the other, but neither of those relates to --
6  really what they are saying here is an injury that stems from a
7  lack of reinvestment of foreign revenue into U.S. domestic
8  sales.  That is, you know, not part of their complaint, nor
9  does this data get them there.
10     I think, as we laid out in our papers, this is a small
11 sliver of information that we think is irrelevant and from
12 which you can't extrapolate anything.  In other words, you
13 mentioned complete picture, and Ms. Byrd talked about the
14 complete picture, this would not give them the complete
15 picture.
16     In other words, if you're looking at a developer, the iOS
17 revenue in other countries is a very small piece of the
18 picture.  What are their revenues from Android?  What are their
19 revenues from other platforms?  They will have costs in other
20 countries.  They will have marketing costs.  They may have
21 other costs.  They may have cost development in particular
22 languages.
23     And therefore, this data -- you know, to me, it does
24 remind me of the Watch and the AirPod issue we had last time;
25 that to actually be able to draw any conclusions from

1  reinvestment in the U.S., you would need a lot more
2  information, including some of things I mentioned.
3       And also you would have to have somebody explain why
4  somebody would take significant foreign revenues, if that's the
5  point, when they're doing well in another country, why would
6  that revenue be used to reinvest in the U.S. when their success
7  is elsewhere.
8       So this doesn't really provide much more to the picture,
9  which is why we have consistently said it's irrelevant.  In
10 fact, I can maybe address a couple of things that will help
11 plaintiffs in the sense that they say in their brief, in their
12 letter brief on the last page, something about Apple will
13 undoubtedly seek to exclude their model if it doesn't include
14 global revenues.
15      Well, that's not true; we won't.  We don't believe it's
16 relevant.  Our experts aren't looking at this.  Our experts
17 aren't relying on it.  They don't have it, meaning this global
18 storefront data.  We don't have it, as the lawyers.  There is
19 no plan to rely on it.  There is no plan here to object on the
20 basis of:  This is not part of their model.
21      So we think it's not relevant, period.
22      On your second point, shouldn't they wait, I do believe
23 this is very derivative of the developers' needs on this, the
24 developers themselves.  They have not agreed that it's not
25 relevant, but we have agreed to table the issue because it's

1  not relevant; or certainly they don't think it's necessary for
2  the current class certification briefing.  At a minimum, for
3  the coordination order, the consumer plaintiffs should also
4  wait until that time to raise these arguments again.  But we do
5  believe that the coordination order compels that.
6      The last thing I'll say is Ms. Byrd suggested that perhaps
7  developers have this information because, you know, they are
8  the developer class.  Well, you know, at a minimum, we think
9  they should then ask the developers.  If the developers do, in
10 fact, have this data that they have been able to put together
11 through some of their class members, it would seem that, at a
12 minimum, the consumer class should ask them for that, if they
13 truly have it.
14      **THE COURT:**  Well, maybe.  Surely Apple is a more
15 complete source than whatever the developer class reps have
16 been able to put together.
17      **MR. SRINIVASAN:**  Understood, Your Honor.  I'm just
18 saying if there is something where they think the developers
19 have an edge and are able to address class certification
20 because they have access to something that they have already
21 put together, that would certainly be a less burdensome way to
22 go right now.
23      I mean, and I haven't addressed burden, but I'm happy to
24 do that, because it is enormously burdensome, and will take
25 quite a bit of time.

1    As we talked about, it took weeks, just once we pushed the
2 button to get the U.S. storefront data.  Even on an aggregated
3 bases for the foreign material, it will take a similar amount
4 of time, well past when the class certification briefing is
5 currently due.
6    **THE COURT:**  Okay.  Ms. Byrd, any rebuttal comments?
7    **MS. BYRD:**  Yes, Your Honor.
8    As to my comment earlier about developers maybe have some
9 information that we don't have access to, of course we will get
10 the same documents from them as Apple is getting from them, and
11 we will take a look at their documents and data.  They may not
12 be producing the top -- you know, apps that are in the top
13 100 --
14    **THE COURT:**  It's going to be scattershot, what they
15 happen to have.
16    **MS. BYRD:**  Right.  Right.  I didn't mean to imply that
17 that would be complete or satisfy our needs for our models.
18    But in terms of Counsel's argument about the -- you know,
19 consumer plaintiffs making this about a lack of reinvestment of
20 foreign revenues, that's not the point of seeking this.  We
21 just want a complete picture of total revenues because it
22 impacts the model of how those -- how the monopoly in the U.S.
23 by Apple affects U.S. consumers, period.  So. . .
24    **THE COURT:**  Okay.  And I realize that this is
25 essentially a two-party discovery dispute between Apple and the

1  consumer plaintiffs, but as long as we have the other
2  plaintiffs here, do the developer plaintiffs have any comments
3  you would like to make?
4      **MR. LOPEZ:**  So, your Honor, this is Rob Lopez for the
5  developers.
6      And we are proceeding along the lines of what
7  Mr. Srinivasan said, that, in Apple's view, this is not
8  relevant to class certification proceedings, whether it's the
9  consumer or the developers.  He has indicated their experts
10 don't have the foreign data, and essentially that they are not
11 going to use this against the class plaintiffs, and that would
12 include the developer plaintiffs.
13     And so with that understanding, then, as the Court knows,
14 we're working with Apple to see if we can defer discovery on
15 this.  But, again, we don't agree with the proposition that
16 Apple has advanced throughout the case, that foreign data has
17 no relevance.  It's just, as the Court has indicated, and as
18 Mr. Srinivasan has indicated, we have agreed to tried to work
19 on deferring -- on acquisition of this data until, hopefully,
20 phase two of the case.
21     **THE COURT:**  All right.  Thank you.
22     And, Epic Games, you don't need to weigh in on this
23 dispute if you don't want to, but you can.
24     **MS. MOSKOWITZ:**  No, thank you, Your Honor.
25     **THE COURT:**  All right.

1   Thank you, Counsel.  I will take a look at the third
2   amended complaint.
3   Thank you for directing that to my attention, Ms. Byrd.
4   And I'll take this under submission and hopefully get out
5   a written order within the next few days.
6   Thank you all.  Have a nice day.
7   **MS. BYRD:**  Thank you very much, Your Honor.
8   **MR. SRINIVASAN:**  Thank you.
9   **THE CLERK:**  Thank you, everyone.  We're off the
10  record.  Court is in recess.
11          (Proceedings adjourned at 9:17 a.m.)
12                  ---o0o---
13              **CERTIFICATE OF REPORTER**
14  I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.
16
17  DATE:   Friday, January 8, 2021
18
19
20
21
22  _____
23      Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
        Official Reporter, U.S. District Court
24
25