Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant*
*Epic Games, Inc.*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE &**
**REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>　　　　*Plaintiff, Counter-defendant,*<br><br>　　　v.<br><br>APPLE INC.,<br><br>　　　　*Defendant, Counterclaimant.* | Case No. 4:20-cv-05640-YGR-TSH |
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Case No. 4:11-cv-06714-YGR-TSH |
| DONALD R. CAMERON, *et al.*,<br><br>　　　　　　*Plaintiffs,*<br><br>　　　v.<br><br>APPLE INC.,<br><br>　　　　　　*Defendant.* | Case No. 4:19-cv-03074-YGR-TSH<br><br>**UNSEALED EXHIBITS TO JOINT DISCOVERY LETTER BRIEFS REGARDING COOK, CUE, AND FEDERIGHI** |

Pursuant to the Court's Order re: Motions to Seal (Case No. 4:20-cv-5640 ECF No. 290; Case No. 4:11-cv-6714 ECF No. 391; Case No. 4:19-cv-3074 ECF No. 263), Plaintiff Epic Games, Inc. hereby files the attached Supporting Exhibits 2 to 7 to the Joint Discovery Letter Brief Regarding Cue and Federighi (Case No. 11-cv-6714 ECF No. 371; Case No. 19-cv-3074 ECF No. 241; Case No. 20-cv-5640 ECF No. 261) and the attached Supporting Exhibits A and B to the Joint Discovery Letter Brief Regarding Cook (Case No. 11-cv-6714 ECF No. 378; Case No. 19-cv-3074 ECF No. 249; Case No. 20-cv-5640 ECF No. 271) in the public record.

DATED:  February 5, 2021             By      */s/ Lauren A. Moskowitz*

**FAEGRE DRINKER BIDDLE & REATH LLP**
Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**
Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*

# Exhibit 2

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1648

WRITER'S EMAIL ADDRESS
lmoskowitz@cravath.com

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

SPECIAL COUNSEL
SAMUEL C. BUTLER

———

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

December 20, 2020

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH (N.D. Cal.);
*Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR-TSH (N.D. Cal);
*In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR-TSH (N.D. Cal)

Dear Jay:

I write on behalf of the plaintiffs in the above-referenced matters ("Plaintiffs") regarding depositions of current and former Apple employees.

As you know, Plaintiffs currently intend to depose (or have deposed) the following 16 Apple witnesses: Tim Cook, Eddy Cue, Craig Federighi, Matthew Fischer, Scott Forstall, Eric Freidman, Eric Gray, Mark Grimm, C.K. Haun, Trystan Kosmynka, Ron Okamoto, Carson Oliver, Shaan Pruden, Philip Schiller, Mike Schmid, and Phillip Shoemaker.

The parties already know they may be at impasse as to Messrs. Cue and Federighi, and there is a schedule for briefing that issue if not otherwise resolved. Apple already has agreed to depositions of Messrs. Okamoto (which has already taken place) and Fischer (which is ongoing). Apple has objected to the length of the deposition of Mr. Cook, but not to him being deposed; that dispute will be briefed at the same time as the Cue and Federighi depositions issue. We also understand that you have agreed to offer Messrs. Forstall and Freidman for deposition. (12/15/20 Hr'g Tr. at 24:3-5.) Please promptly indicate whether Apple objects to depositions of any of the remaining eight Apple employees on Plaintiffs' list, and the grounds for any such objections.[1]

---

[1] Mr. Shoemaker is not represented by Apple counsel, and therefore Plaintiffs do not seek Apple's agreement to that deposition. Plaintiffs had previously proposed December 21 for that deposition, but Apple stated that it will not be available at that date. (Apple's 12/10/20 Email.) Plaintiffs then offered to Apple to take the deposition on December 28, 29, 30 or 31 or on January 4 or 5. Defendants requested several times that Apple confirm deposition dates for

There is a separate but related issue about Apple's document production. Plaintiffs require a reasonable period of time with each deponent's documents prior to his or her deposition. It is unacceptable for Apple to produce over 1,000 text messages/iChats from a witness's files less than 48 hours before the witness's deposition, as Apple did before Mr. Fischer's deposition. To that end, and to assist the parties in scheduling these depositions, Plaintiffs request that for each of the 16 witnesses on Plaintiffs' list, please indicate (i) when Apple will complete production of documents from each of their files, and (ii) how many documents remain to be produced from each of their files.

Plaintiffs also request dates for depositions of the following witnesses during the periods below:

| December 30, 2020 to January 16, 2021 | Friedman, Gray, Haun, Oliver |
| January 17, 2021 to January 23, 2021 | Kosmynka, Schiller |
| January 24, 2021 to January 30, 2021 | Cook, Forstall |

Plaintiffs have selected these periods based in part on the expected availability of documents from each deponent's files. If Apple would prefer that certain depositions occur before the January 19, 2021 deadline for briefing apex issues, Plaintiffs are available to meet and confer. At minimum, Plaintiffs would require that Apple complete production from the files of those deponents at least 14 days prior to their depositions.

Finally, please confirm that Apple agrees that any witness identified by any party as a trial witness who has not already been deposed shall be made available for deposition by the other parties in advance of trial. Apple first suggested this comprise during the parties' meet and confer on December 12, 2020, and Plaintiffs believe it to be prudent.

Consistent with parties' agreement, Plaintiffs reserve their rights to serve Rule 30(b)(6) topics on Apple promptly and to depose third parties.

---

Mr. Shoemaker (most recently in Amal El-Bakhar's email of December 17). On the evening of December 20, Apple responded by email, stating that it was not available for any of Plaintiffs' proposed dates and suggested other dates that "may work". Plaintiffs are evaluating Apple's December 20 email and will respond as soon as possible.

Sincerely,


s/ Lauren A. Moskowitz


Jay P. Srinivasan
GIBSON, DUNN & CRUTCHER LLP
jsrinivasan@gibsondunn.com
AppleAppStoreDiscovery@gibsondunn.com

E. Joshua Rosenkranz
William F. Stute
ORRICK, HERRINGTON & SUTCLIFFE LLP
jrosenkranz@orrick.com
    wstute@orrick.com

Steve W. Berman
Robert F. Lopez
Shana E. Scarlett
Ben Siegel
Ted Wojcik
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
    robl@hbsslaw.com
        shanas@hbsslaw.com
            bens@hbsslaw.com
                tedw@hbsslaw.com

Mark C. Rifkin
Rachele R. Byrd
Matthew M. Guiney
Brittany N. DeJong
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
rifkin@whafh.com
    byrd@whafh.com
        guiney@whafh.com
            dejong@whafh.com

BY EMAIL

# Exhibit 3

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Ethan Dettmer
Direct: +1 415.393.8292
Fax: +1 415.374.8444
EDettmer@gibsondunn.com

Client: 03290-00146

December 26, 2020


VIA ELECTRONIC MAIL


Yonatan Even
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Re:     *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal.)

Dear Yonatan:

I write in response to your December 23 letter regarding the parties' December 22 meet and confer on, *inter alia*, Epic's December 9, 2020 and December 15, 2020 letters regarding its Requests for Production.  Apple is encouraged that the parties generally appear to be aligned.  We address Epic's RFPs first and then the broader issues after that.

## Epic's RFPs

- **Epic RFP Nos. 3 and 4 regarding revenue, costs, expenses and profits for certain Apple products**.  With respect to RFP 3, Apple has already agreed to produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden, relating to the products at issue—iPhone, iPad, and iPod Touch.  Apple has already produced non-privileged, non-custodial data responsive to this request for the iPhone, iPad, and iPod touch.  Apple will not produce documents responsive to this request for Apple Watches or AirPods or Apple Accessory Products.  You asked us to identify the Bates numbers for this data and agreed that Epic would likewise provide Bates numbers upon request for data in its own production.  Apple has produced at APL-APPSTORE_08822222 the sales in units, revenue, and standard costs for iPhone, iPad, and iPod Touch.  Please provide Bates numbers for Epic's cost and revenue data requested in Apple's Interrogatory Nos. 1, 3, and 4.  *See* Dec. 21, 2020 Ltr. from J. Srinivasan to L. Moskowitz.

- **Epic RFP Nos. 5 and 6 regarding revenue, costs, expenses and profits for Apple's IAP.**  We have previously explained that Epic's RFP Nos. 5-6, which seek cost and revenue data "earned by and/or attributed to, Apple's IAP" yields no responsive

**GIBSON DUNN**

Yonatan Even
December 26, 2020
Page 2

documents as written because IAP is a functionality of the App Store and not a product that "earn[s]" or is "attributed" any costs or revenue.  It thus makes no sense to attribute revenues from app and in-app purchases to IAP or to think of app reviewer compensation and marketing cost data as costs attributable to IAP.  That said, Apple is producing transactional data that captures the revenue for the iOS App Store for the U.S. storefront.

- **Epic RFP Nos. 7 and 8 regarding revenue, costs, expenses, investments and profits for Apple's macOS App Store and iOS App Store, respectively.**  Apple explained that while the costs and investments in the macOS App store and iOS App Store are not allocated or tracked separately, Apple is currently searching for this information in reasonably accessible non-custodial sources, and will produce responsive, non-privileged documents to the extent they exist for the U.S. storefront.  Moreover, as we pointed out on the call, these Requests overlap with Apple's ongoing investigation to identify underlying data supporting certain Profits & Loss data already produced to plaintiffs pursuant to Magistrate Judge Hixson's Order.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.  Finally, as you know, Apple is already producing transactional data that captures the revenue for the iOS App Store for the U.S. storefront.

- **Epic RFP No. 9 and 53 regarding financial documents for certain developer tools.**  Apple explained that while it has not identified documents in existence that track specifically and separately Apple's financial investments in "Xcode, Metal, SDKs, APIs and all other developer tools for iOS that Apple makes available for use by third-party Developers," Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP No. 10 regarding Apple's app review employees.**  Apple has produced anonymized data from a non-custodial repository containing information regarding salary, wages, and bonuses related to App Reviewers.  *See* APL-APPSTORE_09814097.  This is the only non-custodial source we are aware of that contains responsive data.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP No. 11 regarding usage metrics.**  To the extent this Request overlaps with Consumer Plaintiffs' RFP No. 48, Apple is already investigating whether it can produce responsive, non-privileged documents without undue burden.  To the extent the Request does not overlap with Consumer Plaintiffs RFP No. 48, Apple is currently searching for

**GIBSON DUNN**

Yonatan Even
December 26, 2020
Page 3

and investigating whether it can produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP Nos. 12, 13, and 14 regarding customer lifetime value or lifespan of Apple products.**  Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP Nos. 15-17 regarding developer agreements.**  Apple confirms that it will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP Nos. 18-19 regarding third-party payment providers.**  Apple confirms that it will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP Nos. 25 and 31 regarding "active use" and Apple's "installed based."**  Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP Nos. 26, 27, and 28 regarding consumers that own certain multiple Apple products or use certain Apple services.**  Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

**GIBSON DUNN**

Yonatan Even
December 26, 2020
Page 4

- **Epic RFP Nos. 29 and 51 regarding use of Apple ID for transactions.**  To the extent the Request overlaps with plaintiffs' requests for certain structured transactional data, Apple agrees to produce responsive, non-privileged material related to the U.S. storefront.  As explained on the call, Apple is aware that Apple ID can be used as a login for certain third-party websites and applications.  But we are not aware that Apple ID can be used to conduct transactions on these third-party platforms.  On our call, you were not able to provide any instances of such transactions either.  To the extent Epic is able to identify such transactions, Apple is willing to investigate.

- **Epic RFP No. 30 regarding spending and earnings through IAP.**  As noted above, Apple's IAP is a functionality of the App Store and not a product that "earn[s]."  As noted above, Apple is already producing transactional data that captures the revenue for the iOS App Store for the U.S. storefront.

- **Epic RFP No. 52 regarding communications concerning commissions for in-app purchasing on competitor marketplaces.**  Apple agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP No. 54 regarding business and strategic plans related to competition.**  Apple confirms that it will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP No. 67 regarding "hotfixes."**  Apple explained that its issue with Epic's "hotfix" was, as the Court recognized, not that it was a "hotfix" *per se* but the specific nature of Epic's "hotfix," which carried out a severe breach of Epic's contracts with Apple and Apple's App Review Guidelines.  Nonetheless, Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible custodial sources.

- **Epic RFP No. 79 regarding Small Business Developer Program.**  Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

- **Epic RFP No. 81 regarding Amazon "hotfix."**  As explained above, Apple's issue with Epic's "hotfix" was, as the Court recognized, not that it was a "hotfix" *per se* but the specific nature of Epic's "hotfix," which carried out a severe breach of Epic's contracts

# GIBSON DUNN

Yonatan Even
December 26, 2020
Page 5

with Apple and Apple's App Review Guidelines.  Nonetheless, Apple is currently searching for and will produce responsive, non-privileged documents, to the extent they exist, that are locatable through a search of reasonably accessible non-custodial sources, and can be produced without undue burden.  Apple further agrees to produce responsive, non-privileged documents to the extent they exist in the custodians' files.

## Epic's "Non-Data" Requests

With respect to the issues labeled as "*first*" through "*seventh*" on pages 1-2 of your letter, the *third, sixth* and *seventh* issues are addressed above.  Regarding the *first* issue, Apple confirms that Epic's requests for production is being and will be included in the scope of responsiveness for the review of the class production.  Regarding the *fifth* issue, Apple confirms that its search includes Apple affiliates to the extent the contracting party to a responsive agreement or similar document is an Apple affiliate.  That leaves the *second* (non-U.S. materials) and *fourth* (extending time period) issues, which are each addressed below.

## Documents Outside of the U.S.

With respect to Epic's request for documents outside of the U.S., we explained on the call that to the extent the document addresses non-U.S. <u>and</u> U.S. storefronts, or global information, and is otherwise not privileged and responsive, the document will be produced.  Moreover, if the document implicates Epic in any reasonably apparent way, including discussing Epic's games such as Fortnite, and is otherwise not privileged and responsive, the document will be produced regardless of whether the document is discussing a non-U.S. storefront.  If, however, the document does not appear to implicate Epic or its products, and only discusses a non-U.S. storefront, the document would not be marked as responsive.  For example, documents reflecting issues faced by a Japanese developer selling an app exclusively on the Japanese storefront that do not implicate Epic would be marked as not responsive as the document is not reasonably related to the claims that are in the case.

Similarly, with respect to Epic's request for cost, revenue, expenses and investment data from outside of the U.S., we reiterated on the call that such data is beyond the proper scope of discovery in light of the Foreign Trade Antitrust Improvements Act (FTAIA), which "removes from the reach of the antitrust laws" commercial activities abroad, subject to a few exceptions inapplicable here.  *United States v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015).  Documents and data regarding activities outside of the U.S. cannot form the basis for liability in this case, and therefore discovery regarding such data is neither relevant nor proportional to the needs of the case.  That Epic has made conclusory allegations of a worldwide market has no bearing on the application of the FTAIA here.

**GIBSON DUNN**

Yonatan Even
December 26, 2020
Page 6

As for Epic's Request Nos. 3, 30 (transactions and sales), Epic contends that Apple should not limit its production to sales in the United States. Epic still has not explained why device sales outside of the U.S. are relevant to Epic's U.S. antitrust claims.

As for Epic's Request No. 18 (settlement providers), Epic has not articulated any relevancy of the Request with regard to settlement providers worldwide. The fact that Apple makes payment processing convenient for developers around the world has nothing to do with the relevancy and proportionality of a request to identify every payment settlement provider or other entity Apple engaged in connection with IAP throughout the world. Those identities do not bear on the strength of any claims or defenses at issue. But even assuming arguendo that this information is relevant (it is not), the burden of producing documents responsive to this Request for activity outside of the United States would greatly outweigh any marginal benefit in this case.

As for Epic's Request Nos. 56-58 and 60 (studies, analyses, surveys relating to competition and consumer demand), the relevant competition in this case is in the U.S. market—even though it is certainly true that Apple faces fierce competition globally.

As for Epic's Request Nos. 61-63 (security and privacy studies, analyses, and surveys), again, what is relevant in this case is Apple's security practices in the United States. Epic has not articulated why the fact that Apple also has important security practices worldwide is relevant to the matter.

**Date Ranges for the Parties' Productions**

In addition, Epic has requested that Apple expand the time period of collection for documents responsive to Epic's Request Nos. 1-2, 15-18, 32-38, 43-44, 54, 64, and 65-70. Apple has likewise requested that Epic collect documents from January 1, 2010 through August 13, 2020 for its designated custodians. The parties should meet and confer further to determine if they can reach agreement on these reciprocal requests.

*       *       *       *

Apple emphasizes that it was Epic that sought an aggressive discovery schedule based on its representations to the Court that Epic would seek only "limited targeted additional discovery" from Apple. Aug. 24, 2020 Hr'g Tr. at 5:21-22. And Apple is already providing a tremendous amount of discovery to Epic and working diligently to continue to produce responsive material on the expedited discovery schedule. Apple provided Epic the millions of documents already produced to the class plaintiffs, including documents from Apple's existing 15 custodians. Apple also began updating its collection and production of documents from two Apple witnesses, and collecting and producing documents from

**GIBSON DUNN**

Yonatan Even
December 26, 2020
Page 7

additional Epic-specific custodians.  And while Apple has a longstanding tradition of shutting down most of its operations for approximately two weeks before and immediately after New Year's Day, Apple is nonetheless continuing to diligently prepare documents for production and investigate additional non-custodial repositories to accommodate Epic's numerous requests by January 6, 2021.  However, Apple is constrained by what physically can be accomplished on the aggressive timeline requested by Epic and granted by the Court.

Sincerely,

Ethan Dettmer

EDD/bxy

cc: epic-mobileapps@cravath.com
steve@hbsslaw.com
robl@hbsslaw.com
shanas@hbsslaw.com
bens@hbsslaw.com
rifkin@whafh.com
byrd@whafh.com
guiney@whafh.com
dejong@whafh.com
appleappstorediscovery@gibsondunn.com

Exhibit 4

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Jay P. Srinivasan
Direct: +1 213.229.7296
Fax: +1 213.229.6296
JSrinivasan@gibsondunn.com

December 29, 2020

VIA ELECTRONIC MAIL

Lauren Moskowitz
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Re:     *Epic Games, Inc. v. Apple Inc*., No. 4:20-cv-05640-YGR-TSH (N.D. Cal.)

Dear Lauren:

I write on behalf of Apple Inc. ("Apple") in response to your letter of December 20, 2020 regarding the depositions of Apple witnesses.  First, Apple has no current objection to Epic taking the deposition of any of the 16 individuals identified in Epic's letter except for Messrs. Cue and Federighi, and over the length of Mr. Cook's deposition.  As we stated in the hearing, Apple reserves its right to object to any of these depositions if it believes it is cumulative of those already taken.  With respect to the depositions of C.K. Haun, Eric Friedman, Carson Oliver, and Trystan Kosmynka, Apple is prepared to make them available on the following dates:

- January 13, 2021:  C.K. Haun
- January 21, 2021:  Eric Friedman
- January 26, 2021:  Carson Oliver
- January 27, 2021:  Trystan Kosmynka

Apple will provide dates for the other Apple employees raised by Plaintiffs as soon as possible.  But as we repeatedly informed you over the past several weeks, Apple is shut down through January 4, 2021, making it difficult, if not impossible, to respond immediately to your requests.

In addition, Apple has repeatedly requested—including in letters dated December 7, 2020 and December 11, 2020—that Plaintiffs serve their joint 30(b)(6) notice with all desired topics as soon as possible, so we can ensure coordination with individual 30(b)(1) depositions.  Apple received no response until Christmas Eve—at which point developer plaintiffs alone sent a list of forty 30(b)(6) topics.  Epic and consumer plaintiffs neither joined that request nor otherwise responded to Apple.

Under the Coordination Order, Plaintiffs must "coordinate discovery efforts to minimize expenses and facilitate the orderly and efficient progress of the Related App Store Actions."  Additionally, the Coordination Order specifies that "[w]itnesses should only be

# GIBSON DUNN

Lauren Moskowitz
December 29, 2020
Page 2

deposed once."  Plaintiffs' piecemeal approach to 30(b)(6) depositions fails to comply with these provisions of the Coordination Order.  Please confirm immediately whether the 30(b)(6) topics sent by developer plaintiffs on December 24, 2020 are the complete list of topics sought by Plaintiffs.  As we stated in our December 7, 2020 letter—and as specified in the Coordination Order—Apple will make each person available to be deposed once.  If Plaintiffs delay in serving their joint 30(b)(6) topics, Plaintiffs will lose their ability to obtain PMK testimony on subjects for which the PMK has already been deposed in his or her individual capacity—including as to each of the witnesses listed above.

With respect to the production of additional witness files, Apple is currently reviewing the issue and will respond once we have determined whether Plaintiff's suggestion is feasible.

Finally, Apple agrees that any witness identified by any party as a trial witness who has not already been deposed shall be made available for deposition by the other parties in advance of trial.

Sincerely,

*/s/ Jay P. Srinivasan*

Jay P. Srinivasan

JPS/ab

cc: Rachele Byrd
    Benjamin J. Siegel

# Exhibit 5

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1648

WRITER'S EMAIL ADDRESS
lmoskowitz@cravath.com

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

January 1, 2021

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH (N.D. Cal.)

Dear Jay:

I write regarding Apple Inc.'s ("Apple") December 11, 2020 Objections and Responses (the "Objections and Responses") to Epic Games, Inc.'s ("Epic") First Set of Interrogatories (the "Interrogatories").

## I.   Apple's General Objections

*First*, Apple objected to the Interrogatories "to the extent that they seek discovery from any parent, subsidiary, or affiliate of Apple" and stated that it "is responding only on behalf of itself and not on behalf of any parent, affiliate, or subsidiary".  (Objections and Responses, General Objections ¶ 11; *see also* Objections to Definitions ¶ 4.)  For the same reasons outlined in Epic's December 15, 2020 letter in response to Apple's Objections and Responses to Epic's First Set of Requests for Production of Documents ("Epic's RFPs"), limiting the definition of "Apple" to "Apple Inc." is inappropriate.  Apple ultimately conceded this point with respect to Epic's document requests.  (*See* Apple's December 26, 2020 Letter at 5 ("Apple confirms that its search includes Apple affiliates to the extent the contracting party to a responsive agreement or similar document is an Apple affiliate.").)  Please confirm that Apple has not withheld any information based on this objection, or withdraw this objection and amend Apple's responses.

*Second*, Apple objected to the Interrogatories "to the extent that they seek identification of persons employed by or working at the direction of third parties".  (Objections and Responses, General Objections ¶ 12.)  There is a protective order in this action that protects such purportedly sensitive information.  (*See* Dkt. 112.)  Please confirm that Apple is not withholding the identification of persons based on this improper objection in response to Epic's Interrogatories, including those that ask for identities (*see, e.g.*, Interrogatory No. 12), or withdraw this objection and amend Apple's responses.

*Third*, Apple objected to "[n]umerous of the Interrogatories" on the ground that they "contain many discrete subparts" that "introduce separate and distinct lines of inquiry that

are not logically and factually subsumed within and necessarily related to the Interrogatory's primary question". (Objections and Responses, General Objections ¶ 17.)

It is not clear whether Apple has withheld any information on the basis of this objection, but it would not be proper to do so. As a starting point, generally objecting on the basis of discrete subparts, without explaining why specific subparts of specific interrogatories are discrete, is improper. *United States ex rel. Amphastar Pharm., Inc. v. Aventis Pharma S.A.*, 2013 WL 12138605, at *7 (C.D. Cal. Aug. 9, 2013) (overruling an objection to discrete subparts where "Defendants fail[ed] to specify how the Interrogatory is compound or comprises discrete subparts").

As for the Interrogatories to which Apple specifically objected on this basis— again without explanation as to why specific subparts are discrete—each subpart of those Interrogatories is "logically or factually subsumed within and necessarily related to the primary question", so each of the Interrogatories (including all subparts thereof) should "be counted as one interrogatory". *Trevino v. ACB Am., Inc.*, 232 F.R.D. 612, 614 (N.D. Cal. 2006). For example, Interrogatory No. 3 concerns only Apple's statements about integration of the iOS App Store, Apple's IAP, or Apple's StoreKit APIs; Interrogatory No. 6 concerns only Apple's contention that the iOS App Store is safer than other app stores; Interrogatory No. 8 concerns only the steps in Apple's app review process; Interrogatory No. 11 concerns only persons involved in modifications and exceptions to Apple's developer agreements and guidelines; and Interrogatory No. 12 concerns only developers who have requested or been granted those modifications or exceptions.

The cases on which Apple relies for this objection are inapposite. In both cases, the Court ruled that interrogatories contained discrete subparts because they sought facts, persons and documents within the same interrogatory. *See Hasan v. Johnson*, 2012 WL 569370, at *5 (E.D. Cal. Feb. 21, 2012) (denying pro se plaintiff's motion to compel on 30 interrogatories— facially over the federal limit—in part because they "contain[ed] four distinct subparts with different themes: (1) facts . . . , (2) identity of persons who have knowledge of facts, (3) documents . . . , and (4) persons who have possession, control of, or dominion over documents"); *Superior Commc'ns v. Earhugger, Inc.*, 257 F.R.D. 215, 218 (C.D. Cal. 2009) (denying motion to compel because the interrogatories contained "at least three discrete subparts: facts; persons; and documents"). Epic's Interrogatories do not seek facts, persons and documents within the same Interrogatory. Therefore, this objection is unfounded as to all of Epic's Interrogatories.

Independently, where a contention interrogatory asks for information "relating to one subject or contention, the court will count it as one interrogatory". *Synopsys, Inc. v. ATopTech, Inc*, 319 F.R.D. 293, 297 (N.D. Cal. 2016). Each of Epic's contention Interrogatories

CONTAINS INFORMATION DESIGNATED CONFIDENTIAL

concerns one subject or contention.  (*See* Interrogatory Nos. 1-7, 9.)  Thus, this objection is unfounded for this additional reason as to these Interrogatories.

Please confirm that Apple has not withheld any information based on this objection, or withdraw this objection and amend Apple's responses.

## II.    Apple's Objections to Definitions

Apple objected to Epic's definition of "State the Factual Basis" to the extent that it sought "each and every fact" because, according to Apple, "'[e]ach and every fact' interrogatories pose problems for a responding party and a reviewing court.  Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories." (Objections and Responses, Objections to Definitions ¶ 11 (quoting *Tubbs v. Sacramento Cty. Jail*, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008)).)  But *Tubbs* makes clear that "each and every fact" interrogatories concerning *general* interrogatories are "facially overbroad".  *Id.*  "On the other hand, if an interrogatory is specific and calls for facts related to a specific factual assertion, e.g., each and every fact demonstrating that the cell phone was in use", the interrogatory is proper and "the response must be correspondingly more specific, and facts related to use of the cell phone, e.g., a summary of phone records, an eyewitness observation would have to be disclosed".  *Id.*

Epic's Interrogatories that ask Apple to "State the Factual Basis" are highly specific.  (*See, e.g.*, Interrogatory No. 3 (specific to Apple's statements about integration of the iOS App Store, Apple's IAP, or Apple's StoreKit APIs); Interrogatory No. 6 (specific to Apple's contention that the iOS App Store is safer than other app stores).)  Please confirm that Apple has not withheld any facts based on its objection to the definition of "State the Factual Basis", or withdraw this objection and amend Apple's responses.

## III.   Apple's Objections to Instructions

*First*, Apple objected to Epic's Instruction No. 1 because an unlimited timeframe "is overbroad, unduly burdensome, calls for information that is not related to the claims or defenses in this action, and imposes a burden on Apple disproportionate to the needs of this case".  (Objections and Responses, Objections to Instructions ¶ 1.)  Epic disagrees.  The timeframe is naturally limited by the scope of each Interrogatory.  For example, certain Interrogatories are limited by the inception of the iOS App Store or IAP.  (*See, e.g.*, Interrogatory Nos. 1, 3, 6-8, 10, 12.)  This objection is also improper because Apple has not stated what timeframe it did apply in its responses.  If Apple has a more specific burden objection, Epic is available to meet and confer.  Otherwise, please confirm that Apple has not withheld any information based on this objection, or withdraw this objection and amend Apple's responses.

*Second*, Apple objected to Epic's Instruction No. 2 "regarding the 'worldwide' 'geographic scope' of the Interrogatories" because "it is overly broad, unduly burdensome, not relevant to the claims or defenses in this action, or otherwise outside the proper scope of discovery in accordance with the Foreign Trade Antitrust Improvement Act, 15 U.S.C. § 6a". (*Id.* ¶ 2.)  As you know, Epic disagrees with this objection.  Information related to "transactions, conduct, or activity taking place outside of the United States" (*id.*) may be highly relevant to the

claims and defenses in this case.  For example, Interrogatory No. 12 asks that Apple identify developers who, among other things, have requested exceptions to Apple's requirement to use IAP.  This evidence would prove that developers demand payment processing separate from app distribution and therefore establish that payment processing and app distribution are separate products for purposes of Epic's tying claim.  The relevance of this information does not hinge on the physical locations of these developers.  Similarly, non-U.S. information would be relevant to Interrogatory Nos. 1 (Apple's legitimate business justifications defense), 6 (methods, processes, and/or protocols through which iOS App Store is safer than non-iOS App Stores), 8 (steps in App Review process), 10 (App Store costs and methodologies), and 11 (persons involved in exceptions to developer agreements and guidelines).  Please confirm that Apple has not withheld any information based on this objection in responding to these Interrogatories, or withdraw this objection and amend Apple's responses.

## IV.   Apple's Specific Objections and Responses

Interrogatory No. 1 (legitimate business justifications):  This Interrogatory seeks the factual basis for one of Apple's affirmative defenses.  Apple's response addresses this defense only "[w]ith respect to Counts 6 and 9 in Epic's Complaint".  If Apple intends to raise this affirmative defense with respect to any other counts, then this limitation is improper.  Please confirm whether Apple intends to assert this affirmative defense with respect to any counts other than Counts 6 and 9.

Further, even as to Counts 6 and 9, Apple's response was admittedly incomplete, as Apple stated that its "affirmative defense of Legitimate Business Justifications is outlined, *in part*", in materials that were filed on the public docket.  (Objections and Responses at 10 (emphasis added).)  Apple did not otherwise substantively respond to this Interrogatory.  At a minimum, Apple must explain the reasons why "its conduct was reasonable and that its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition" (Answer, Dkt. 66, at 36), and what evidence Apple will use to support its reasons.

Interrogatory No. 3 (integration of the iOS App Store, Apple's IAP or Apple's StoreKit APIs):  Apple objected to this Interrogatory because "the undefined term 'integrated' . . . prevents Apple from responding in any meaningful way and without accepting Plaintiffs' improper characterizations".  (Objections and Responses at 17.)  But "integrated" is *Apple's* term, and Apple presumably had a factual basis for using it as well as a meaning in mind.  (*See* Interrogatory No. 3 (quoting Apple's portion of Joint Case Management Statement (Dkt. 120) at 5; Defendant Apple Inc.'s Opposition to Epic Games, Inc.'s Motion for a Preliminary Injunction (Dkt. 73) at 19-21).)  Apple's objection is thus disingenuous and improper.

Apple's objection is particularly unreasonable given Apple's previous suggestion that Epic serve an interrogatory on this precise topic.  When Epic sought the production of "[d]ocuments sufficient to show all the ways in which the iOS App Store and/or Apple's IAP are 'integrated' into the 'iOS infrastructure'" (Epic's RFP No. 20), Apple objected because "the Request is inappropriate as drafted as a request for production, rather than as an interrogatory".  (Apple's Objections and Responses to Epic's RFPs, Response No. 20.)  Now that Epic has

served that Interrogatory, Apple provided only citations to public filings that characterize the iOS App Store, Apple's IAP or Apple's StoreKit APIs as integrated, or citations about the purported benefits of that integration.  But those are not responsive to Epic's Interrogatory, which seeks Apple's factual basis for asserting that the iOS App Store, Apple's IAP or Apple's StoreKit APIs are integrated.  Please supplement your answer to this Interrogatory to explain how the iOS App Store, Apple's IAP or Apple's StoreKit APIs are "integrated" into each other, the "iOS infrastructure" or the "App Store software platform".

    Interrogatory No. 6 (methods, processes, and/or protocols through which iOS App Store is safer than non-iOS App Stores):  Apple has objected to this Interrogatory on the ground that it seeks "Apple's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Apple and risks to Apple users' security and privacy if disclosed".  (Objections and Responses at 23.)  That objection is improper given that there is a protective order (Dkt. 112) in this action.  *See Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 6653583, at *14 (C.D. Cal. Jan. 2, 2020) (granting motion to compel responses to interrogatories seeking "protected information, confidential and proprietary in nature" because "the Court already approved and implemented a stipulated protective order; thus, insofar as any augmented responses might proffer protected materials, such information is subject to the protective order").  Please confirm that Apple has not withheld any information based on this objection, or withdraw this objection and amend Apple's responses.

    Interrogatory No. 8 (steps in App Review process):  Apple objected to this Interrogatory on the ground that it seeks "Apple's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Apple and risks to Apple users' security and privacy if disclosed".  (Objections and Responses at 27.)  That objection is improper, as explained above.  Please confirm that Apple has not withheld any information based on this objection, or withdraw this objection and amend Apple's responses.  In particular, Epic notes that Apple has not identified any automated or mechanized steps and tools utilized in the App Review process, as the Interrogatory requests.  Please identify such information or confirm that there are no such automated or mechanized steps and tools.

    Epic also notes that Apple responded to Interrogatory No. 8 in part by referring to "an extensive number of documents from the agreed custodians reflecting Apple's app review process".  (Objections and Responses at 28.)  Please identify by Bates number Apple's training protocols, manuals or guides for app reviewers.  (*See, e.g.*, APL-APPSTORE_09410635 at '0635 ("Wiki Table of Contents" including "Training" and "Process & Procedures" tagged "app review, general how to, new hire"); APL-APPSTORE_01979480 at '9480 (referencing language from the "Current Optimization Cheat Sheet wording" for app reviewers).)

    Interrogatory No. 10 (App Store costs and methodologies):  This Interrogatory asks Apple to identify how "Apple estimates costs allocated to the App Store" and "Apple's 'methodology' for generating App Store-specific financial information".  Although these phrases are direct quotes from one of Apple's own filings with the Court (*Pepper*, Dkt. 273-2 at 6 & n.9), Apple objects to its own language as vague and ambiguous.  Then, rather than provide any substantive response, Apple denies the existence of "profit and loss ledgers for the App Store", which is a materially narrower category of information than requested by the Interrogatory.  Whether or not there are "profit and loss ledgers for the App Store", Apple has in the past

generated App Store-specific financial information, including by allocating costs, and Epic is entitled to a substantive response as to how that information was generated.  Instead, Apple's response contains only vague references to "certain assumptions" about "certain corporate costs" that are allocated in some way "from time to time" by unnamed individuals in "Apple's Finance Department".  This is insufficient.  The Court has recognized that the "methodology by which" Apple's "App Store-specific profit and loss and gross margin information" was generated is highly relevant.  (Dkt. 192 at 6-7.)  Epic is entitled to a real response to this critical Interrogatory.

Apple also objected to this Interrogatory because "answering it would require Apple to furnish information that is not available to it and/or cannot be given without undue labor and expense".  (Objections and Responses at 30.)  But the Interrogatory seeks information about *Apple's* methodology; it should not be burdensome for Apple to describe its own methodology, and Apple certainly has the requisite information available.  Similarly, Apple objected to this Interrogatory because it purportedly seeks information that "is the province of expert testimony".  That objection is unfounded.  The Interrogatory seeks factual information about methodologies that Apple has actually used in the past to estimate costs allocated to the App Store and to generate App Store-specific information.

Please withdraw these objections and amend Apple's response.

Finally, Epic notes that Apple asserted that "the requested information is available in documents that Apple has produced in response to requests from Epic and class plaintiffs in the related App Store antitrust litigation".  (Objections and Responses at 30.)  Please identify by Bates number the documents to which Apple is referring that purportedly explain how Apple estimates costs allocated to the App Store and Apple's methodologies for generating App Store-specific financial information.

* * *

Epic is available to meet and confer with Apple on any of the above-referenced requests, including Interrogatory No. 12, for which Apple specifically stated in its response that it is available to meet and confer.  Please advise as to Apple's availability to meet and confer on Tuesday, January 5, 2021.

Epic reserves all rights, including the right to raise additional issues with Apple's Objections and Responses.

Sincerely,


s/ Lauren A. Moskowitz

Jay P. Srinivasan
GIBSON, DUNN & CRUTCHER LLP
jsrinivasan@gibsondunn.com
AppleAppStoreDiscovery@gibsondunn.com

CONTAINS INFORMATION DESIGNATED CONFIDENTIAL

E. Joshua Rosenkranz
William F. Stute
ORRICK, HERRINGTON & SUTCLIFFE LLP
jrosenkranz@orrick.com
    wstute@orrick.com

Steve W. Berman
Robert F. Lopez
Shana E. Scarlett
Ben Siegel
Ted Wojcik
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
    robl@hbsslaw.com
        shanas@hbsslaw.com
            bens@hbsslaw.com
                tedw@hbsslaw.com

Mark C. Rifkin
Rachele R. Byrd
Matthew M. Guiney
Brittany N. DeJong
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
rifkin@whafh.com
    byrd@whafh.com
        guiney@whafh.com
            dejong@whafh.com

BY EMAIL

# Exhibit 6

| | |
|---|---|
| **From:** | John Karin |
| **Sent:** | Saturday, January 9, 2021 4:38 PM |
| **To:** | Lazarus, Eli M. |
| **Cc:** | Mihanovic, Ana; *** GDC EpicLitTeam; Ben Harrington; bens@hbsslaw.com; brianm@hbsslaw.com; Yang, Betty X.; byrd@whafh.com; Richman, Cynthia; Craig, Dana Lynn; dejong@whafh.com; Swanson, Daniel G.; Dettmer, Ethan; Epic Mobile Apps; Bracht, Jennifer K.; Dansey, Lauren; Lauren Moskowitz; Perry, Mark A.; robl@hbsslaw.com; ronnie@hbsslaw.com; shanas@hbsslaw.com; steve@hbsslaw.com; Moyé, Veronica S. |
| **Subject:** | RE: Apple App Cases -- Apple Depositions |

Apple Counsel,

In the interests of accommodating Mr. Friedman, Plaintiffs accept February 1, 2021 for his deposition date, subject to the same reservations of rights set out in my email below.

Plaintiffs reiterate their request that Apple provide deposition dates for Messrs. Schiller, Gray, Forstall, and Cook. This request has been outstanding for nearly three weeks, and Apple's letter of yesterday does not commit to any deadline by which Apple will provide these dates.

Plaintiffs also reiterate their request that Apple please confirm whether the depositions of Haun, Friedman, Oliver and Kosmynka will be completed on one day each. If not, please provide additional dates for them.

Plaintiffs will respond separately to Apple's letter of yesterday regarding their request for 15 hours for the depositions of Messrs. Schiller, Kosmynka, and Forstall.

Thank you.


John I. Karin
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1122 (direct)
(212) 474-3700 (fax)



From:       "Lazarus, Eli M." <ELazarus@gibsondunn.com>
To:         "Yang, Betty X." <BYang@gibsondunn.com>, "John Karin" <jkarin@cravath.com>, "*** GDC EpicLitTeam" <AppleAppStoreDiscovery@gibsondunn.com>
Cc:         "Mihanovic, Ana" <AMihanovic@gibsondunn.com>, "Ben Harrington" <benh@hbsslaw.com>, "bens@hbsslaw.com" <bens@hbsslaw.com>, "brianm@hbsslaw.com" <brianm@hbsslaw.com>, "byrd@whafh.com" <byrd@whafh.com>, "Richman, Cynthia" <CRichman@gibsondunn.com>, "Craig, Dana Lynn" <DCraig@gibsondunn.com>, "dejong@whafh.com" <dejong@whafh.com>, "Swanson, Daniel G." <DSwanson@gibsondunn.com>, "Dettmer, Ethan" <EDettmer@gibsondunn.com>, "epic-mobileapps@cravath.com" <epic-mobileapps@cravath.com>, "Bracht, Jennifer K." <JBracht@gibsondunn.com>, "Dansey, Lauren" <LDansey@gibsondunn.com>, "LMoskowitz@cravath.com" <LMoskowitz@cravath.com>, "Perry, Mark A." <MPerry@gibsondunn.com>, "robl@hbsslaw.com" <robl@hbsslaw.com>, "ronnie@hbsslaw.com" <ronnie@hbsslaw.com>, "shanas@hbsslaw.com" <shanas@hbsslaw.com>, "steve@hbsslaw.com" <steve@hbsslaw.com>, "Moyé, Veronica S." <VMoye@gibsondunn.com>
Date:       01/08/2021 03:17 PM
Subject:    RE: Apple App Cases -- Apple Depositions

■External (elazarus@gibsondunn.com)

Report This Email   FAQ

Counsel, please see the attached correspondence.
Regards,
Eli

**Eli Lazarus**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8340 • Fax +1 415.374.8496
ELazarus@gibsondunn.com • www.gibsondunn.com

**From:** Yang, Betty X.
**Sent:** Wednesday, January 6, 2021 12:34 PM
**To:** John Karin <jkarin@cravath.com>; Lazarus, Eli M. <ELazarus@gibsondunn.com>; *** GDC EpicLitTeam <AppleAppStoreDiscovery@gibsondunn.com>
**Cc:** Mihanovic, Ana <AMihanovic@gibsondunn.com>; Ben Harrington <benh@hbsslaw.com>; bens@hbsslaw.com; brianm@hbsslaw.com; byrd@whafh.com; Richman, Cynthia <CRichman@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; dejong@whafh.com; Swanson, Daniel G. <DSwanson@gibsondunn.com>; Dettmer, Ethan <EDettmer@gibsondunn.com>; epic-mobileapps@cravath.com; Bracht, Jennifer K. <JBracht@gibsondunn.com>; Dansey, Lauren <LDansey@gibsondunn.com>; LMoskowitz@cravath.com; Perry, Mark A. <MPerry@gibsondunn.com>; robl@hbsslaw.com; ronnie@hbsslaw.com; shanas@hbsslaw.com; steve@hbsslaw.com; Moyé, Veronica S. <VMoye@gibsondunn.com>
**Subject:** RE: Apple App Cases -- Apple Depositions

Counsel,

We will respond separately by letter to the questions in your email.  In the meantime, however, Mr. Friedman requested that his deposition be moved to February 1.  Please let us know if you will agree to this alternate deposition date for the convenience of the witness.

Thank you,
**Betty X. Yang**
Of Counsel

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3226 • Fax +1 214.571.2968
BYang@gibsondunn.com • www.gibsondunn.com

**From:** John Karin <jkarin@cravath.com>
**Sent:** Sunday, January 3, 2021 5:42 PM
**To:** Lazarus, Eli M. <ELazarus@gibsondunn.com>; *** GDC EpicLitTeam <AppleAppStoreDiscovery@gibsondunn.com>
**Cc:** Mihanovic, Ana <AMihanovic@gibsondunn.com>; Ben Harrington <benh@hbsslaw.com>; bens@hbsslaw.com; brianm@hbsslaw.com; byrd@whafh.com; Richman, Cynthia <CRichman@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; dejong@whafh.com; Swanson, Daniel G. <DSwanson@gibsondunn.com>; Dettmer, Ethan

<EDettmer@gibsondunn.com>; epic-mobileapps@cravath.com; Bracht, Jennifer K. <JBracht@gibsondunn.com>;
Dansey, Lauren <LDansey@gibsondunn.com>; LMoskowitz@cravath.com; Perry, Mark A. <MPerry@gibsondunn.com>;
robl@hbsslaw.com; ronnie@hbsslaw.com; shanas@hbsslaw.com; steve@hbsslaw.com; Moyé, Veronica S.
<VMoye@gibsondunn.com>
**Subject:** Apple App Cases -- Apple Depositions

[External Email]
Apple Counsel,

I write on behalf of Epic, Developers and Consumers ("Plaintiffs") regarding Apple's letters of December 29, 2020 and
January 1, 2021 concerning Apple depositions.  Plaintiffs accept Apple's proposed dates for depositions of Haun,
Friedman, Oliver and Kosmynka.  However, Plaintiffs reserve their rights to request other dates for these depositions
depending on (a) completion of production from the relevant witness's files and (b) the scheduling of other depositions,
including the four other witnesses whose dates we requested on December 20 (Schiller, Gray, Forstall, and
Cook).  Plaintiffs request that no later than Tuesday, January 5 Apple propose deposition dates for these witnesses.

For Haun, Friedman, Oliver and Kosmynka, could Apple please confirm whether the depositions will be completed on the
dates in Apple's December 29 letter, or provide additional dates?  Plaintiffs reserve their rights to seek additional dates for
these witnesses if their depositions cannot be completed in one day by a reasonable time.

For Apple's planning purposes, Plaintiffs believe that 15 hours will be required for the depositions of Schiller, Kosmynka
and Forstall in their individual capacities, given their centrality to these cases.  Could you please confirm that Apple does
not object to this request?  At this time, Plaintiffs do not intend to seek more than 10 hours with respect to Apple's other
witnesses who are deposed solely in their individual capacities, but reserve their rights to do so.

Finally, Plaintiffs disagree with Apple's positions that, among other things, the Coordination Order requires Plaintiffs to
serve a single "joint 30(b)(6) notice with all desired topics", and that "Plaintiffs will lose their ability to obtain PMK
testimony on subjects for which the PMK has already been deposed in his or her individual capacity".  In any event, Epic
and the Consumer Plaintiffs will serve 30(b)(6) topics promptly.

Thank you.


John I. Karin
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1122 (direct)
(212) 474-3700 (fax)



From:      "Lazarus, Eli M." <ELazarus@gibsondunn.com>
To:        "Ben Harrington" <benh@hbsslaw.com>, "Dettmer, Ethan" <EDettmer@gibsondunn.com>, "Richman, Cynthia"
<CRichman@gibsondunn.com>, "Perry, Mark A." <MPerry@gibsondunn.com>, "Swanson, Daniel G." <DSwanson@gibsondunn.com>,
"Moyé, Veronica S." <VMoye@gibsondunn.com>, "Craig, Dana Lynn" <DCraig@gibsondunn.com>, "Bracht, Jennifer K."
<JBracht@gibsondunn.com>, "Dansey, Lauren" <LDansey@gibsondunn.com>, "Mihanovic, Ana" <AMihanovic@gibsondunn.com>
Cc:        "byrd@whafh.com" <byrd@whafh.com>, "dejong@whafh.com" <dejong@whafh.com>, "robl@hbsslaw.com"
<robl@hbsslaw.com>, "bens@hbsslaw.com" <bens@hbsslaw.com>, "shanas@hbsslaw.com" <shanas@hbsslaw.com>,
"steve@hbsslaw.com" <steve@hbsslaw.com>, "brianm@hbsslaw.com" <brianm@hbsslaw.com>, "ronnie@hbsslaw.com"
<ronnie@hbsslaw.com>, "epic-mobileapps@cravath.com" <epic-mobileapps@cravath.com>, "LMoskowitz@cravath.com"
<LMoskowitz@cravath.com>
Date:      01/01/2021 02:35 PM
Subject:      RE: Apple - 30(b)(6) Deposition


Counsel, please see the attached correspondence.

Regards,
Eli

**Eli Lazarus**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
555 Mission Street, San Francisco, CA 94105-0921
Tel +1 415.393.8340 • Fax +1 415.374.8496
ELazarus@gibsondunn.com • www.gibsondunn.com

**From:** Ben Harrington <benh@hbsslaw.com>
**Sent:** Thursday, December 24, 2020 3:21 PM
**To:** Dettmer, Ethan <EDettmer@gibsondunn.com>; Richman, Cynthia <CRichman@gibsondunn.com>; Perry, Mark A. <MPerry@gibsondunn.com>; Swanson, Daniel G. <DSwanson@gibsondunn.com>; Lewis, Veronica S. <VLewis@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; Bracht, Jennifer K. <JBracht@gibsondunn.com>; Dansey, Lauren <LDansey@gibsondunn.com>; Mihanovic, Ana <AMihanovic@gibsondunn.com>; Lazarus, Eli M. <ELazarus@gibsondunn.com>
**Cc:** byrd@whafh.com; dejong@whafh.com; robl@hbsslaw.com; bens@hbsslaw.com; shanas@hbsslaw.com; steve@hbsslaw.com; brianm@hbsslaw.com; benh@hbsslaw.com; ronnie@hbsslaw.com; epic-mobileapps@cravath.com; LMoskowitz@cravath.com
**Subject:** Apple - 30(b)(6) Deposition

[External Email]
Counsel—Please see the attached letter and enclosure.

Best wishes and happy holidays.

Ben

**Ben Harrington** | Associate
**Hagens Berman Sobol Shapiro LLP**

Direct: (510) 725-3034
BenH@hbsslaw.com | www.hbsslaw.com

Firm News | Cases | Twitter | Facebook

Named 2019 Mass Tort Elite Trial Lawyers by the *National Law Journal* and honored by the American Antitrust Institute for Outstanding Antitrust Litigation also in 2019

---

PRIVILEGED & CONFIDENTIAL: This e-mail message (and any attachments) is for the exclusive use of the intended recipient(s) and likely contains confidential and privileged information. It is the property of the law firm Hagens Berman Sobol Shapiro LLP. Do not disseminate this email, its content, or any attachments without approval of Hagens Berman. If you are not the intended recipient, please do not read, distribute, or take any other action in reliance upon this message. If you have received this email in error, please notify the sender immediately by return e-mail and promptly delete this message and its attachments from your computer system. Be advised that no privileges are waived by the transmission of this message.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy. [attachment "2021-01-01 E. Dettmer letter to R. Lopez re 30(b)(6) deposition.pdf" deleted by John Karin/NYC/Cravath]

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy. [attachment "2021-01-08 Letter from J. Srinivasan to J. Karin (Apple depositions).pdf" deleted by John Karin/NYC/Cravath]

---

# Exhibit 7

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1648

WRITER'S EMAIL ADDRESS
lmoskowitz@cravath.com

STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN M. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN

MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

PARTNER EMERITUS
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

January 16, 2021

_Epic Games, Inc. v. Apple Inc._, No. 4:20-cv-05640-YGR-TSH (N.D. Cal.)

Dear Jay:

I write on behalf of Epic regarding the deposition of Phil Schiller, Apple's "designated . . . lead witness on App Store issues".  (Dkt. 173-3, 12/7/20 Joint Letter Brief at 6.)

On December 20, 2020, Plaintiffs requested to depose Mr. Schiller between January 17, 2021 and January 23, 2021.  Plaintiffs followed up on a number of occasions since then, to no avail.  During yesterday's meet and confer, Apple finally offered a date for his deposition, February 15, 2021.  February 15, 2021 is the deadline to complete fact discovery and is also the same day that opening expert reports are due in the _Epic_ action.

Mr. Schiller's deposition cannot take place on February 15, 2021.  As an initial matter, it will be impossible to finish Mr. Schiller's deposition during the fact discovery period if it starts on February 15, 2021.  During yesterday's meet and confer, Apple stated its intention to designate Mr. Schiller for between 5 and 12 Rule 30(b)(6) topics, and acknowledged that his deposition may go up at least 14 to 15 hours.[1]  Thus, it is apparent that his deposition would have to continue beyond February 15, 2021, which is after the close of fact discovery.

More importantly, Epic's expert reports are due on February 15, 2021.  Epic needs Mr. Schiller's testimony and the Rule 30(b)(6) testimony it is seeking in time to incorporate the testimony into the expert reports.  Apple's proposed date for Mr. Schiller's deposition not only would prevent that from happening, it would permit _Mr. Schiller_ to incorporate Epic's expert reports into _his_ testimony because his deposition would continue after Apple receives those reports.

By January 18, 2021, please (i) provide two dates between January 31, 2021 and

---

[1] As discussed, Plaintiffs cannot agree to limit his deposition to 15 hours before Apple identifies the topics for which he will be designated.

February 6, 2021 for Mr. Schiller's deposition, and (ii) confirm when Apple will complete its production of his documents, which must be sufficiently in advance of his deposition.

Sincerely,


s/ Lauren A. Moskowitz

Jay P. Srinivasan
GIBSON, DUNN & CRUTCHER LLP
jsrinivasan@gibsondunn.com
AppleAppStoreDiscovery@gibsondunn.com

E. Joshua Rosenkranz
William F. Stute
ORRICK, HERRINGTON & SUTCLIFFE LLP
jrosenkranz@orrick.com
    wstute@orrick.com

Steve W. Berman
Robert F. Lopez
Shana E. Scarlett
Ben Siegel
Ted Wojcik
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
    robl@hbsslaw.com
        shanas@hbsslaw.com
            bens@hbsslaw.com
                tedw@hbsslaw.com

Mark C. Rifkin
Rachele R. Byrd
Matthew M. Guiney
Brittany N. DeJong
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
rifkin@whafh.com
    byrd@whafh.com
        guiney@whafh.com
            dejong@whafh.com

BY EMAIL

# Exhibit A

C Corrected Transcript

23-Jul-2013

# Apple, Inc. (AAPL)

Q3 2013 Earnings Call

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

Corrected Transcript
23-Jul-2013

# CORPORATE PARTICIPANTS

**Nancy Paxton**
*Senior Director, Investor Relations, Apple, Inc.*

**Peter Oppenheimer**
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*

# OTHER PARTICIPANTS

**Katy Huberty**
*Analyst, Morgan Stanley & Co. LLC*

**Bill C. Shope**
*Analyst, Goldman Sachs & Co.*

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*

**Ben A. Reitzes**
*Analyst, Barclays Capital, Inc.*

**Gene E. Munster**
*Analyst, Piper Jaffray, Inc.*

**Shannon S. Cross**
*Analyst, Cross Research LLC*

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*

**Keith F. Bachman**
*Analyst, BMO Capital Markets (United States)*

**Tavis C. McCourt**
*Analyst, Raymond James & Associates, Inc.*

# MANAGEMENT DISCUSSION SECTION

**Operator**: Please stand by. We're about to begin. Good day, everyone, and welcome to this Apple, Incorporated third quarter fiscal year 2013 earnings release conference call. Today's call is being recorded. At this time, for opening remarks and introductions, I would like to turn the call over to Nancy Paxton, Senior Director of Investor Relations. Please go ahead, ma'am.

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you. Good afternoon and thanks to everyone for joining us. Speaking first today is Apple's CFO, Peter Oppenheimer, and he'll be joined by CEO, Tim Cook; and Treasurer, Gary Wipfler, for the Q&A session with analysts.

Please note that some of the information you'll hear during our discussion today will consist of forward-looking statements, including, without limitation, those regarding revenue, gross margin, operating expenses, other income and expense, stock-based compensation expense, taxes and future products. Actual results or trends could differ materially from our forecasts.

For more information, please refer to the risk factors discussed in Apple Form 10-K for 2012, the Forms 10-Q for the first and second quarters of 2013 and the Form 8-K filed with the SEC today along with the associated press



Copyright © 2001-2013 FactSet CallStreet, LLC

2

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call


Corrected Transcript
23-Jul-2013

release. Apple assumes no obligation to update any forward-looking statements or information, which speak as of their respective dates.

I'd now like to turn the call over to Peter Oppenheimer for introductory remarks.

## Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

Thank you, Nancy.

We're pleased to report the results of our third fiscal quarter. We established a new June quarter record for iPhone sales, driving Apple's strongest June quarter revenue ever. Revenue for the quarter was $35.3 billion, up $300 million or 1% from the year-ago quarter and at the high end of our guidance range. Gross margin was 36.9%, also at the high end of our guidance range, and operating margin was $9.2 billion, representing 26% of revenue. Net income was $6.9 billion, translating to diluted earnings per share of $7.47.

Channel inventories declined sequentially by $1 billion during the June quarter this year, meaning that sell-through was $36.3 billion. In contrast, channel inventory increased $700 million from the beginning to the end of the June quarter last year, meaning that sell-through was $34.3 billion in that quarter. As such, our June quarter sell-through increased by $2 billion or 6% year-over-year, ahead of our 1% sell-in revenue growth.

As for the details of the quarter, I'd like to begin with iPhone. We sold 31.2 million iPhones compared to 26 million in the year-ago quarter, an increase of 5.2 million or 20%. We had a sequential decrease of about 600,000 iPhones in channel inventory in the June quarter, translating to iPhone sell-through of about 31.8 million units. iPhone sales were ahead of our expectations and we were particularly pleased with very strong year-over-year growth in iPhone sales in a number of both developed and emerging markets, including the U.S., the U.K., Japan, Brazil, Russia, India, Thailand and Singapore. iPhone 5 remains by far the most popular iPhone, but we were also very happy with sales of iPhone 4 and 4S.

We exited the quarter with about 11 million units of total iPhones in channel inventory and ended within our target range of four to six weeks of iPhone channel inventory. iPhone unit sales in the U.S. increased 51% compared to the year-ago quarter and based on research recently published by comScore, iPhone once again achieved the number one spot in U.S. smartphone market for the three-month period ending in May with over 39% share.

iPhone sales were also very strong in Japan, growing 66% year-over-year. iPhone is the top selling smartphone in Japan based on the latest published quarterly data from IDC and Apple is the number one or number two selling smartphone manufacturer in most markets IDC tracks, including North America, Western Europe, Russia, Turkey, Australia, Hong Kong, Thailand, Malaysia and Singapore. The most recently published study by Kantar measured a 93% loyalty rate among iPhone owners, significantly higher than our competitors and iPhone continues to lead in terms of customer experience.

Not only has iPhone earned the top spot in customer satisfaction from J.D. Power and Associates an unprecedented nine consecutive times; it has also received the top customer satisfaction ranking in a number of surveys, including the recent Quality Insights survey of smartphone customers in South Korea.

iPhone also continues to be the smartphone of choice for business. Given the security and stability of iOS, enterprise and government customers around the world continue to deploy iPhone on their networks in ways that



Copyright © 2001-2013 FactSet CallStreet, LLC

3

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call


Corrected Transcript
23-Jul-2013

go far beyond personal productivity. Companies have built tens of thousands of custom apps to improve every aspect of their business.

Global companies, including American Airlines, Cisco, General Electric, Roche and SAP have deployed more than 25,000 iPhones each across their organizations. U.S. government organizations, such as NASA's Jet Propulsion Lab, the National Oceanic Atmospheric Administration, the ATF and the National Geospatial Intelligence Agency are supporting and managing thousands of iPhones on their networks and continue to create both customer-facing and internal iOS apps. And just this past quarter, iOS 6 was granted FIPS 140-2 validation by the U.S. federal government and approval by the U.S. Department of Defense to connect to their networks.

Combining sales to business, government and education customers, iPhone holds a 62.5% share of the U.S. commercial market based on the latest quarterly data published by IDC.

Turning to iPad, we sold 14.6 million iPads during the quarter, compared to 17 million in the year-ago quarter. The tough year-over-year comparison was driven by both a significant channel inventory increase and the first full quarter of the availability of the third-generation iPad in the year-ago quarter. We built 1.2 million units of iPad channel inventory in the June quarter last year, whereas we reduced channel inventory by 700,000 units in the June quarter this year. Factoring in this 1.9 million unit channel inventory swing, iPad unit sell-through was down 3% year-over-year. We exited the quarter with about 4.1 million units of iPad channel inventory, within our target range of four to six weeks.

Customers continue to love their iPads. For the second consecutive time in the two-year history of the survey, iPad ranked number one in the 2013 U.S. Tablet Satisfaction Survey by J.D. Power & Associates. And again in its latest study published today, Chitika reported that iPad accounted for 84.3% share of tablet web usage by customers in the U.S. and Canada, its highest level this year.

In every major industry around the world, companies are developing, deploying and supporting apps for iPad. Government organizations, as well as global enterprise companies across diverse fields, including automotive, insurance, energy services and healthcare are using iPad and custom apps to create unique, meaningful experiences for their employees, partners and customers.

The USDA's National Agricultural Statistics Service has deployed thousands of iPads to in-person interviewers resulting in higher response rates and decreased costs. And companies, including Eli Lilly, Novartis, Cathay Life, Roche and SAP have developed over 20,000 – have deployed over 20,000 iPads each across their organizations.

Turning to Mac, we are pleased with sales of 3.8 million Macs which is a 7% decline from the year-ago quarter, but higher than our expectations. IDC estimates that the global personal computer market contracted by 11% during the June quarter indicating that Macs gained share.

In June, we introduced two new versions of MacBook Air and customer response has been great. Wired Magazine described the new 13-inch MacBook Air as nearly flawless citing its phenomenal battery life, processing performance, feather-light chassis and super-fast Wi-Fi.

Additionally last month, we provided a sneak peek at a next-generation Mac Pro engineered around workstation graphics with dual GPUs, PCI Express-based flash storage, high-performance Thunderbolt 2, next-generation Xeon processors, ultrafast memory and support for 4k video. The new state-of-the-art Mac Pro will be assembled in the U.S. and will be available later this year.



Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call



Corrected Transcript
23-Jul-2013

We were excited to release a developer preview of OS X Mavericks last month. More than 200 new features – OS – with more than 200 new features, OS X Mavericks brings maps and iBooks to the Mac, introduces finder tags and tabs, enhances multi-display support for power users, delivers new core technologies for breakthrough power efficiency and performance and includes an all new version of Safari. OS X Mavericks will be available to customers in the fall. We ended the quarter with just below our four to five week target range of Mac channel inventory.

Our U.S. Education Institution business had a great quarter generating its highest quarterly revenue ever. The results were fueled by all-time record quarterly iPad sales of 1.1 million units, in addition to strong June quarter Mac sales.

The State of Maine's Learning Technology Initiative, which provides the state's middle school and high school students and teachers with personal computing solutions, allows individual school districts to choose which products to purchase rather than standardize on a single state-wide solution. We're very proud that an estimated 94% of the 69,000 total units selected this year were Apple products and we're extremely pleased to have received the Los Angeles School Board of Education's unanimous approval to begin the first phase of a massive rollout of iPads to students across the district starting this fall. The district is the second largest in the United States and plans to equip every one of its 660,000 students with a tablet by 2014.

We continue to be very pleased with the growth and strength of the Apple ecosystem. With the broadest geographic reach and depth of content in the industry, our iTunes store has generated record billings of $4.3 billion in the June quarter, culminating in our best month and best week ever for app store billings at the very end of the quarter. The quarter's iTunes billings translated to quarterly revenue of $2.4 billion, up 29% from the year-ago quarter with strong growth in revenue from both content and apps. The continued strong iTunes sales, combined with other software and service revenue, resulted in total quarterly revenue of $4 billion from iTunes software and services.

We added some great new video content to iTunes and Apple TV. Last month, we announced HBO GO and WatchESPN are now available directly on Apple TV joining programming from Hulu Plus, Netflix's streaming catalog, live sports from MLB, NBA and NHL, as well as internet content from Vivo, YouTube and Flickr. Sky News, Crunchyroll and Quello are offering live news, sports and current TV programming. Apple TV users can now choose from a broad selection of programming, including over 60,000 movies and over 230,000 TV episodes, as well as the world's largest collection of music on the iTunes store.

iTunes users have downloaded more than 1 billion TV episodes and 390 million movies from iTunes to date and they are purchasing over 800,000 TV episodes and over 350,000 movies per day. We recently celebrated the five-year anniversary of our amazing App Store. Our developers have now created more than 900,000 iOS apps, including 375,000 apps made for iPad. The popularity of these apps remains incredibly strong. Cumulative app downloads have surpassed 50 billion and app developers have made over $11 billion from their sales through the App Store, half of which was earned in the last four quarters.

Our vibrant ecosystem continues to drive tremendous user engagement with our devices and services. We now have over 320 million iCloud accounts and 240 million Game Center accounts and our customers have sent almost 900 billion iMessages, uploaded over 125 billion photos and received over 8 trillion Push notifications. And thanks to the stability and security and popularity of the iOS platform, the iOS devices continue to have a strong lead over Android in the enterprise.

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call


Corrected Transcript
23-Jul-2013

In its most recently published Quarterly Enterprise Device Activations Report, Good Technologies found that among its corporate clients, iPhone 5 was by far the most frequently activated device of any kind and iPads represented 88% of all tablet activations.

We're continuing to invest in software and services to make the ecosystem and user experience even richer. This fall, we release a beta version of iWork for iCloud, bringing Pages, Numbers and Keynotes to the web. With iWork for iCloud, users will be able to create great looking letters, reports and flyers, generate complex, yet beautiful spreadsheets and develop and deliver beautiful presentations with powerful graphics and special effects, all from within a web browser. And we're extremely excited about the fall launch of iOS 7 with its stunning new user interface and many great new features, including Control Center, AirDrop and iTunes Radio, smarter multitasking and enhancements to Notification Center, Photos, Safari and Siri.

I'd now like to turn to the Apple retail stores. Revenue for the quarter was $4.1 billion, approximately equal to the year-ago quarter. The stores experienced strong growth in iPhone sales and had their most successful MacBook Air launch to date.

We opened six new stores across five countries during the quarter and ended the quarter with a total of 408 stores including 156 outside the United States. We expect to open 9 new stores in the September quarter bringing us to a total of 27 new store openings in fiscal 2013. We also relocated 4 stores in the June quarter that had outgrown their former space and we expect to complete a total of 23 such relocations in fiscal 2013.

With an average of 405 stores open in the June quarter, average revenue per store was $10.1 million compared to $11.1 million in the year-ago quarter. Retail segment income was $667 million. We hosted 84 million visitors to our stores during the quarter which translates to 16,000 visitors per store per week. Operating expenses were $3.8 billion and included $488 million in stock-based compensation expense. OI&E was $234 million and the tax rate for the quarter 26.9%.

And turning to our cash, we ended the quarter with $146.6 billion in cash, plus short-term and long-term marketable securities compared to $144.7 billion at the end of the March quarter, a sequential increase of $1.9 billion. $106 billion of our total cash was offshore at the end of the June quarter and cash flow from operations was $7.8 billion.

In early April, we concluded the $1.95 billion accelerated share repurchase program that we initiated in the December quarter resulting in cumulative retirement of over 4 million shares of Apple stock under that program. In late April, we executed a very successful debt offering issuing $17 billion of debt across 3, 5, 10 and 30 -year maturities. We paid $2.8 billion in dividends in the quarter and we also utilized a total of $16 billio n in cash on share repurchase activity through a combination of a new accelerated share repurchase program and open market purchases.

$12 billion of the $16 billion was utilized under a new ASR program initiated with two financial institutions in April. An initial delivery of 23.5 million shares was made under this program with the final number of shares delivered and average price per share to be determined at the conclusion of the program based on the volume weighted-average purchase price of Apple stock over the program period which will conclude in fiscal 2014.

In addition to the new ASR, we executed $4 billion of open market share repurchases resulting in the retirement of 9 million additional shares. Our Board of Directors has declared a dividend of $3.05 per common share payable on August 15, 2013, to shareholders of record as of the close of business on August 12, 2013.



Copyright © 2001-2013 FactSet CallStreet, LLC

6

**Apple, Inc.** *(AAPL)*
Q3 2013 Earnings Call


Corrected Transcript
23-Jul-2013

Now as we move ahead into the March quarter, I'd like to review our outlook which includes the types of forward-looking information that Nancy referred to at the beginning of the call. We expect revenue to be between $34 billion and $37 billion compared to $36 billion in the year-ago quarter. We expect gross margin to be between 36% and 37% reflecting approximately $90 million related to stock-based compensation expense. We expect OpEx to be between $3.9 billion and $3.95 billion including about $495 million related to stock-based compensation. We expect OI&E to be about $200 million and we expect the tax rate to be about 26.5%.

In closing, we're pleased with our record June quarter iPhone sales, the strong growth in revenue from iTunes software and services, and the continued enhancement and popularity of our tremendously vibrant ecosystem. We are very excited about the upcoming releases of the stunning new iOS 7 and OS X Mavericks and we are very hard at work on some amazing new products that we will introduce in the fall and across 2014.

And with that, I'd like to open the call to questions.

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you, Peter. And we ask that you limit yourself to one question and one follow-up. Operator, may we have the first question, please.

---

# QUESTION AND ANSWER SECTION

**Operator**: [Operator Instructions] Your first question will come from Katy Huberty with Morgan Stanley.

---

### Katy Huberty
*Analyst, Morgan Stanley & Co. LLC*

Q

Yes. Thanks. Peter, as you mentioned in the press release today, new products will ship this fall and historically gross margins do come down in a product transition quarter, but that's not reflected in your outlook. So can you talk about why this product cycle might be different?

---

### Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

A

Katy, as I said in my prepared remarks, we expect our gross margins to be between 36% and 37%, which is consistent with what we expected in the June quarter. And on a sequential basis, that would mean that gross margin would be largely flat to slightly down. We are on track to have a very busy fall. I'd like to leave it there and go into more detail in October.

---

### Katy Huberty
*Analyst, Morgan Stanley & Co. LLC*

Q

Okay. As a follow-up, can you talk about why you think channel inventory came down more than seasonally this quarter and also inventory on your balance sheet was up significantly? Is that a direct result of the channel wanting to hold less inventory?

---

### Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

A

---


1-877-FACTSET    www.callstreet.com

Copyright © 2001-2013 FactSet CallStreet, LLC

# Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call



Corrected Transcript
23-Jul-2013

Katy, I'll take the balance sheet part of your question and Tim, can talk about the channel. The inventory on the balance sheet was really up for two reasons. First, we've got more stores this year than we had last, so our finished goods inventory was a part of the inventory increase. And then our components inventory was up as well.

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

**A**

Katy, it's Tim. From an iPad point of view or iPad and iPhone, we reduced inventory and reduced it fairly significantly. iPad was down over 700,000 units from the beginning of the quarter and iPhone was down over 600. As you know from working with us over several quarters, we typically don't like to have any more inventory then we need, and so if we can find a way to reduce, we do so, and we've done that in both of these cases. We also had slight decreases in the Macintosh area and on iPod.

---

### Katy Huberty
*Analyst, Morgan Stanley & Co. LLC*

**Q**

Okay. Thank you.

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

**A**

Thanks, Katy. Can we have the next question, please?

---

**Operator**: From Goldman Sachs, we'll go to Bill Shope.

---

### Bill C. Shope
*Analyst, Goldman Sachs & Co.*

**Q**

Okay, great. Thanks. I have a bit of a longer-term question. Despite the fairly substantial iPhone upside this quarter, there's been increasing concerns that the high end of the smartphone market is reaching saturation point and that growth may be harder to come by for really for all vendors. What's your perspective on that and the current industry dynamics? And Tim, do you think there are new innovations and services in the pipeline that can reinvigorate the premium segment of the market, after what's obviously been a bit of a tough 2013 for that segment for the industry?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

**A**

From a growth point of view for Apple, our key catalyst will always will be new products and new services. And these are both in existing categories that we're in and in new categories. In addition to this, we have opportunities in distribution from carrier relationships to expanding our retail stores, expanding our online store and continuing to expand the indirect channel. And we also have a market expansion opportunity.

Peter mentioned enterprise in his comments and the share positions that we have there, over 60% in both iPad and iPhone and I think we're at the very front-end of that, and so I think we have lots of growth opportunities. And I don't subscribe to the common view that the higher-end, if you will, the smartphone market has hit its peak. I don't believe that, but we'll see and we'll report our results as we go along.

---

### Bill C. Shope
*Analyst, Goldman Sachs & Co.*

**Q**

---

## Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

 Corrected Transcript
23-Jul-2013

Okay, great. And then on the iPad side of the equation, looking at the sell-through decline this quarter, obviously ex-the channel inventory dynamics, should we think of this as more of a pause within your customer base ahead of your next refresh as we've seen in the past? Or is there a broader industry dynamic at play within tablets that could contribute to that?

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

For us, if you look year-over-year, we had a 2.4 million unit decline, but 80% of that or 1.9 million units were just due to changes in channel inventory. As I think Peter referenced earlier, we reduced by over 700 in the current quarter and the year-ago quarter had an increase of 1.2, and so the underlying sell-through declined by just 3%. If you look at the situation that we were in, in the year-ago quarter, we had just announced the third-generation iPad which was our first iPad with a Retina display. We'd announced in March and so that was our first full quarter. And so from what Peter and I expected 90 days ago, we hit within the midpoint of the range that we expected to hit in on iPad unit sales and so it was not a surprise to us.

In terms of how other people are doing? I don't know. What I can tell you is the most recent data I've gotten, which actually just came out I believe this morning, is that the iPad web share data shows that through the quarter, we accelerated further and are now – iPad accounts for 84% of the web traffic from tablets, which is absolutely incredible. And so if there are lots of other tablets selling, I don't know what they're being used for because that's a pretty basic function is web browsing.

### Bill C. Shope
*Analyst, Goldman Sachs & Co.*

Q

Okay. Thank you.

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

We feel good about where we are. We had – as Peter had mentioned earlier, we had an incredible quarter in U.S. education setting a new record for iPad. We're really happy to be selected for the first phase of the 660,000-unit rollout at LA Unified and a really bold move that they're making to change teaching and learning. And we had double-digit unit growth in China for iPad, in Japan, in Canada, in Latin America, in Russia, in the Middle East and in India, and so we're really happy with what we saw.

### Bill C. Shope
*Analyst, Goldman Sachs & Co.*

Q

Okay. Thanks, Tim.

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah.

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thanks, Bill. Could we have the next question, please.

**Operator**: From Sanford Bernstein, we'll go to Toni Sacconaghi.



Toni M. Sacconaghi **Q**
*Analyst, Sanford C. Bernstein & Co. LLC*

Yes. Thank you. I was wondering if you could provide some kind of gross margin bridge sequentially? I think last quarter you had about a 90 basis point one-time impact from the China warranty accrual, so if we adjust for that, gross margins were down about 150 basis points sequentially and the mix of products was relatively similar to last quarter. Given that you're also riding the experience curve in these products, I was surprised given the mix that gross margins were as down as much sequentially as they were. Can you provide a bridge on a sequential basis on what happened with gross margins?

Peter Oppenheimer **A**
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

Sure. First of all let me say, we're very pleased with gross margin in the quarter at 36.9% it was at really the high end of the range that we provided of 36% to 37%. And the sequential decline was not a surprise to us. We understood the warranty effects in March, and as I said on last quarter's call, we expected our margins to be down sequentially, primarily for two reasons. The first is a lower sequential revenue, so we lost leverage going from March to June, and we expected a different product mix, and as you can see, we reported very near the top end of it and feel good.

Toni M. Sacconaghi **Q**
*Analyst, Sanford C. Bernstein & Co. LLC*

All right, but Peter the mix ultimately was not that different. I think iPhones were 52.5%, last quarter they were 51.5%. So it actually seems like your mix was perhaps better than you had anticipated, so I appreciate the volume revenue mix, but was your mix exactly in line with what you expected?

Peter Oppenheimer **A**
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

We had some puts and takes within the quarter, but it was ultimately ended up within the range that we thought it would be, and we hit the high end.

Toni M. Sacconaghi **Q**
*Analyst, Sanford C. Bernstein & Co. LLC*

The second one I was wondering whether you could comment on was, just iPhone ASPs. They were down about 5% sequentially or down about 10% over the last two quarters. I presume that's principally due to a higher mix of 4s and 4Ss but I was wondering if you could comment on what's driving that change in ASP, and whether it's more pronounced in certain geographies versus others.

Peter Oppenheimer **A**
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

We were down 4% year-over-year on the iPhone ASP, about the $27. And that was primarily due to the mix of the product that we're selling, and FX headwinds. As we anticipated iPhone 4 sales accelerated as we offered more affordable pricing in emerging and other markets. So that's on a year-over-year basis. And then sequentially it was down about $32, and again, that was driven by mix as well, in part iPhone 4.

Tim, do you want to make comments about what we may have seen in the regions?

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

<span style="float:right">Corrected Transcript
23-Jul-2013</span>

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah, sure. From an iPhone point of view, Toni, with the moves that we made on 4 and with iPhones 5 continuing to be the most popular model, we saw very strong sales in several of the emerging markets or prepaid markets. India was up over 400%, Turkey and Poland were both up over 60%, Philippines were up about 140%. And these were, in addition, we saw very strong iPhone sales in several of the developed markets. For example, U.S. was up over 50%, Japan up over 60%, the U.K. about 50%. So we had several regions where iPhone growth actually accelerated from the previous quarter, which is an unusual pattern for us. We were very, very happy with this.

### Toni M. Sacconaghi
*Analyst, Sanford C. Bernstein & Co. LLC*

Q

And notably absent from that list was China. Was your pricing how you treated to change pricing this quarter relative to previous quarters any different in China than the rest of the world?

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

China was weaker in the quarter, although the data sheet that obviously focuses on revenue doesn't really tell the complete story here. If you look at sell-through, as we mentioned earlier with the inventory changes, it's important to do that. And so our sell-through in China was only down 4% from the year-ago quarter when you normalize for channel inventory. Hong Kong was actually down more significantly than that. Mainland China was actually up year-over-year. It was up 5%. But that is a lower growth rate than we have been seeing, and I attribute it to many things, including the economy there clearly doesn't help us nor others.

In Hong Kong, Hong Kong is an international shopping haven, as you know, for not only tourists, but also some resellers and we saw a more dramatic downturn there. It's not totally clear exactly why that occurred, but it was down on a sell-through basis by about 20%, and so that weighed greater China down as you can see on your datasheet.

### Toni M. Sacconaghi
*Analyst, Sanford C. Bernstein & Co. LLC*

Q

Thank you.

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thank you, Toni. Could we have the next question, please?

**Operator**: Ben Reitzes with Barclays.

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Okay. I've got four too. Kidding. The question that I wanted to ask was with regard to – there's been a lot of talk about a trade-in program that you guys are going to start even doing on your own with regard to iPhones. Is there any update on that? And if so, is that something that could help margins and help expand your emerging market sales? And how's that going to work? Thanks.

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Ben, we haven't announced anything relative to a trade-in program, so what you've seen is rumor oriented. There are a number of channels that do trade-in programs now, not only in the U.S., but in different regions. And the reason that it's so attractive around iPhones is that the residual value of an iPhone stays so high and there's so much demand for it. And so that makes the trade-in programs more lucrative to – or win-win from many points of view. But we haven't announced anything that we're – about us or anything.

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Are you opposed to it?

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

I – no, I'm not opposed to it. I see channels doing it and I like the environmental aspects of it, and so that part of it really is encouraging to me.

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Oh, okay. And then really quick on China, you answered some of it in the question before, but how do we turn it around here? China and other APAC, what can we do to make it turn? And there's been some press in China that obviously you had to deal with and when do we see that market turning? And you know that investors are very worried about it from a secular point of view as well, as well as the economy there?

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

I think it's important to put it in perspective. If you combine the results that we have in greater China, our revenues, they were $4.9 billion for the quarter, and so that's about 14% of the company which is very significant. And a few years ago, that was in the hundreds of millions, and so we've grown our business there significantly. We have a very strong market there and in the last 12 months, we've done $27 billion on a trailing basis, so it's a huge business for us.

Under the – underlying the results are – if you look at iPad, sell-through in greater China was up 8%, but sell-through in Mainland China was up 37%, and so iPad's doing remarkably well. The latest share numbers we've seen for iPad for the tablet market is over 50%. And year-to-date, iPad units are up 48% year-over-year, so there've been great growth there.

From an ecosystem point of view, we continue to attract a lot of developers from China. We now have about 0.5 million developers in China that are working on iOS apps and that's up almost 70% year-over-year and so I think that's fantastic, not only for China, but for outside of China as many offer their apps through – in different stores around the world.

We're obviously paying developers quite a bit, and so that's furthering the advance of the ecosystem of developers. We're continuing to invest in distribution. We're going to double the number of retail stores there over the next two years and we're continuing to list iPhone point-of-sales and iPads unit sales, both of which are currently lower than where we would like them or need them to be. But we're doing that very cautiously because we want to do it

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

**C** Corrected Transcript
23-Jul-2013

with great quality. And so I continue to believe that in the arc of time here, China is a huge opportunity for Apple. And I don't get discouraged over a 90-day kind of cycle that can have economic factors and other things in it.

---

**Ben A. Reitzes**       Q
*Analyst, Barclays Capital, Inc.*

Thank you.

---

**Nancy Paxton**       A
*Senior Director, Investor Relations, Apple, Inc.*

Thanks, Ben. Can we have the next question, please?

---

**Operator**: From Piper Jaffray, we'll hear from Gene Munster.

---

**Gene E. Munster**       Q
*Analyst, Piper Jaffray, Inc.*

Hey. Good afternoon. You talked about more affordable pricing and, Peter, can you just confirm that, that was just with the iPhone 4? And separately, as you think about the growth that you've had in some of these emerging markets, it sounds like some more recently has come from affordable pricing, but also, you potentially could address those markets with products that are more appropriate for those markets. And maybe can you just talk from a very high level of just how you think about, are those both levers that you potentially could use or do feel that pricing is the lever? Then a follow-up question.

---

**Timothy D. Cook**       A
*Chief Executive Officer & Director, Apple, Inc.*

Gene, it's Tim. The reference that Peter made earlier was to the iPhone 4, and what we've seen is that the number of first-time smartphone buyers that the iPhone 4 is attracting is very, very impressive. And we want to attract as many of these buyers as we can. And we saw that beginning to happen toward the end of the Q2 timeframe, as I referenced on last quarter's call, and we did that on a wider spread basis, offered more affordable pricing on a wider scale basis this quarter and continued to be very happy with what we saw. And where iPhone 5 continues to be the most popular iPhone by far, we're really happy to provide an incredible, high-quality product with iPhone 4 running iOS 6 to as many first-time smartphone buyers as we can. And I think it's proven to be exactly a great product for that buyer.

---

**Gene E. Munster**       Q
*Analyst, Piper Jaffray, Inc.*

Do you think there are more weapons that you could use in these markets to continue the pace that you have?

---

**Timothy D. Cook**       A
*Chief Executive Officer & Director, Apple, Inc.*

There's always more weapons. And we have more than one tool in the toolbox, but yeah, it's a great way for a buyer to get into the iOS ecosystem, and the customer sat ratings that we have with iOS 6 and the stickiness of the platform is huge. And so it's great for customers and we're very glad to offer it.

---

**Gene E. Munster**       Q
*Analyst, Piper Jaffray, Inc.*

---





Okay. And then my final question is, just in terms of the growth question that some investors have about how you keep such a high revenue growth number moving. Last quarter, you referred to new product categories and this time, you referred to more products over the next few years. Are there product categories out there that are big enough to move the needle for Apple?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

We'll see, Gene. We're working on some stuff that we're really proud of and we'll see how it does. And we'll announce things when we're ready.

---

### Gene E. Munster
*Analyst, Piper Jaffray, Inc.*

Q

Thank you.

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thanks, Gene, thank you. Could we have the next question, please?

---

**Operator**: From Cross Research, we'll go to Shannon Cross.

---

### Shannon S. Cross
*Analyst, Cross Research LLC*

Q

Thank you. Tim, can you talk broadly about your discussions with both existing and potential carrier partners? I would think the 66% growth in Japan might prod one in particular to be interested in some of the coming products. And then also, there's been some comments about Russia and just concerns in general about pricing in that. So sort of in general, how have your discussions with your carrier partners been?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

I would classify them as being good. The press I've seen on Russia probably needs some color. The articles I've seen suggested that we are not selling iPhone through carrier-owned stores, if that's the one that you're referencing. If you look at the Russian market, over 80% of smartphones are sold in retail. They're outside of carrier-owned stores, and we sell through a number of national chains there, and in fact, our activations in Russia for iPhone set a record last quarter. It was our highest quarter in Russia ever and so we're really happy with how we're doing there.

We do continue to sell through some carrier-owned stores as well, but obviously the contribution is much less than the retail organizations, and so forth. And so I think that's probably not well-understood there. We're continually looking for other relationships to both add and enhance the ones we've got, and I do think there's some opportunities there for us.

---

### Shannon S. Cross
*Analyst, Cross Research LLC*

Q

Okay, great. And then can you talk a bit about commodities, just in terms of pricing of some of your key commodities, ability to procure them, and how some of, I guess your supply chain is working these days?

---

# Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

**Corrected Transcript**
23-Jul-2013

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah. Sure. We certainly have no problem procuring them. In terms of where we see pricing headed, and this would have been factored into the gross margin guidance that Peter gave earlier. Despite the very, very weak PC market, DRAM pricing has actually increased, and we see continued upward pressure in this area. NAND pricing is fairly stable and it's following seasonal trends as we would expect. Both LCDs and HDDs, the prices have fallen and we would expect further reductions in these areas. And if you look at other commodities, they appear to be in a supply/demand balance so we would expect the pricing to decline on these at sort of historical levels.

---

### Shannon S. Cross
*Analyst, Cross Research LLC*

Q

Thank you.

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thanks, Shannon. Can we have the next question please?

---

**Operator**: From UBS we'll go to Steve Milunovich.

---

### Steven M. Milunovich
*Analyst, UBS Securities LLC*

Q

Thank you. Peter, first could you clarify whether in your fiscal fourth quarter guidance you have any of these new products assumed shipping in the quarter?

---

### Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

A

Steve that's not something that I can comment on.

---

### Steven M. Milunovich
*Analyst, UBS Securities LLC*

Q

Okay. And then, Tim, kind of a philosophical question but whenever you talk about what's important to the company it always comes back to great products, better being more important than more. Wall Street's kind of in the more business. So I just wonder – kind of talk about your philosophy, and if you could come up with a couple really great products, maybe they provide enough growth, maybe they don't. But you don't seem as focused on financial metrics and growth projections as a lot of companies are. Maybe tie that a little bit into your functional organization. Does that limit how many products you can actually take to market over time?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Steve, I think about it differently than that. The way I think about it is, we're here to make great products, and we think that if we focus on that and do that really, really well, that the financial metrics will also come and so we don't see those two things being mutually exclusive. We see them having great overlap. I think if you look at how the company's executed over many years, it would suggest that, that's possible.

---

Copyright © 2001-2013 FactSet CallStreet, LLC

### Steven M. Milunovich
*Analyst, UBS Securities LLC*

Q

But you don't go into it saying, we need to get x% growth, what do we need to do from a product standpoint? It sounds like you go the opposite, what are some really great products we can do, and if we do that, the metrics take care of themselves.

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

We start at the product, because we believe that the most important thing is that our customers love the products and want them. If you don't start at that level you can wind up creating things that people don't want. So we try very hard to focus on products and customers, enriching customers and making great products.

### Steven M. Milunovich
*Analyst, UBS Securities LLC*

Q

Thank you.

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thanks, Steve. Can we have the next question, please?

**Operator**: And we'll go to Keith Bachman with Bank of Montreal.

### Keith F. Bachman
*Analyst, BMO Capital Markets (United States)*

Q

Hi. Thank you. I have two, also. Tim, I'm going to start with you, if I can. To Bill's earlier question, Bill Shope's, on you don't think the high end is saturated, and yet ASPs have come down quite a bit on iPhones. I was wondering if you could speak philosophically. Is the current mix what we should be thinking about for iPhones? And more specifically, would you anticipate that ASPs would continue to trend lower in iPhones or stay where they are at least directionally?

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Keith, in terms of – we don't project ASPs. We do give guidance, so we have an assumption on the ASP for the current quarter in our guidance obviously to come up with the numbers that Peter talked about earlier. If you look underneath the iPhone numbers, as I think Peter alluded to earlier, we saw significant growth, clearly, in the lower price point year-over-year, which for us is iPhone 4. Still a great product and that was one of the things and the iPhone 5 doing well, that allowed us to significantly beat what I think was probably the vast majority of expectations out there for iPhone sales.

And so honestly if we do a lot better at the low-end and we sell more of those and the mix changed. It has changed across the last year. If you look at 3GS last year, which was in a comparable position as our entry product, we're selling a lot more 4s than 3GS's. I think we both understand the market much better and have our fingers on the pulse of distribution in different countries and so forth this year. I'm sure that we'll get better and better at that over time, and how that will change mix, I don't know.



**Apple, Inc.** *(AAPL)*
Q3 2013 Earnings Call



Corrected Transcript
23-Jul-2013

Typically for us, a product has the highest mix during its initial few months of sales. And so, you'd have a natural kind of seasonal decline over time of the product cycle. That generally happens on iPhone, it generally happens on iPad, we've seen that happen on the Mac over many years. And so, I don't see anything that fundamentally would change that. But again, we're going to look at this thing quarter by quarter and tell you how we look at the quarter, and give you guidance for it as we go.

### Keith F. Bachman                                                                 Q
*Analyst, BMO Capital Markets (United States)*

Okay, all right. And then Peter, for you, there's been a few comments on gross margins and I wanted to try to broad it out a bit. In the past, as you look at the one-quarter forward, which would be the September quarter, you've given us some of the puts and takes to think about. There's been a couple specific questions asked about, but I wanted to broad it out and see if you could just highlight what you think are the puts and takes in the September quarter as you see them today, particularly with reference to the quarter you just reported. Thank you.

### Peter Oppenheimer                                                             A
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

Sure. I'm going to keep my comments limited, but I'll give you a put and a take.

### Keith F. Bachman                                                                 Q
*Analyst, BMO Capital Markets (United States)*

Okay.

### Peter Oppenheimer                                                             A
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

And I think – or I guess the tailwind we would expect are component costs to be favorable in the quarter.

### Keith F. Bachman                                                                 Q
*Analyst, BMO Capital Markets (United States)*

Okay.

### Peter Oppenheimer                                                             A
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

Adversely, we would expect some FX pressure in the quarter given the strengthening of the dollar, particularly against the yen.

### Keith F. Bachman                                                                 Q
*Analyst, BMO Capital Markets (United States)*

Okay. Thanks, guys.

### Nancy Paxton                                                                     A
*Senior Director, Investor Relations, Apple, Inc.*

Thanks, Keith. Could we have the next question, please?

**Operator**: And from Raymond James, we'll hear from Tavis McCourt.

Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

**C** Corrected Transcript
23-Jul-2013

---

### Tavis C. McCourt
*Analyst, Raymond James & Associates, Inc.*

**Q**

Thanks for taking my question. Peter, first, a clarification on the share buyback. Can you tell us what the ending basic share count was in the third quarter?

---

### Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

**A**

Let me – well, the – all of that is on the income statement, so you've got the ending, basic and diluted.

---

### Tavis C. McCourt
*Analyst, Raymond James & Associates, Inc.*

**Q**

Okay.

---

### Peter Oppenheimer
*Chief Financial Officer & Senior Vice President, Apple, Inc.*

**A**

But let me give you a couple of points that I think could be helpful for you. During the June quarter, we concluded the first $4 billion – or I'm sorry, $2 billion ASR program that we started in December, and then we – so we got the final shares in on those. And we did our second ASR program of $12 billion. That started at the end of April, and we received 23.5 million shares in initially on that. And as I went through in my prepared remarks, at some point during fiscal 2014 that program will close and we'll get the final number of shares.

We also bought back $4 billion of stock in the open market during the June quarter, and received about 9 million shares. So the impact of those in the June quarter lowered our diluted share count in the quarter by about 22.9 million shares. And as you look forward into the September quarter, before any further buybacks or any issuance to employees, we would expect to see an additional approximate 11 million-share benefit from the things that occurred during the June quarter.

---

### Tavis C. McCourt
*Analyst, Raymond James & Associates, Inc.*

**Q**

Great, thanks. And one for you, Tim. One of the comments out of the developers conference was iOS will be, I guess, in 12 different car manufacturer models next year. I was wondering if you could talk a little bit about that opportunity, whether it's a licensed opportunity, what's the strategic relevance of that, if you're willing to. Thanks.

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

**A**

I'm sorry, I couldn't hear that question.

---

### Tavis C. McCourt
*Analyst, Raymond James & Associates, Inc.*

**Q**

I think at the developers conference, there was a comment about iOS being built into a number of car manufacturer models for next year. And so, I wondered if you could talk about kind of the strategic relevance for that, or what the business model might be for that for Apple.

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

**A**

---

# Apple, Inc. *(AAPL)*
Q3 2013 Earnings Call

 **Corrected Transcript**
23-Jul-2013

It's – I see it as very important. It is a part of the ecosystem. And so, just like the App Store is a key part of the ecosystem and iTunes and all of our content are key, and the services we provide from Messaging to Siri and so forth, having something in the automobile is very, very important. It's something that people want, and I think that Apple can do this in a unique way and better than anyone else. So it's a key focus for us.

## Tavis C. McCourt
*Analyst, Raymond James & Associates, Inc.*

Q

Okay. Thank you.

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you, Tavis. A replay of today's call will be available for two weeks as a podcast on the iTunes store, as webcast on Apple.com/investor and via telephone. And the numbers for the telephone replay are 888-203-1112 or 719-457-0820. Please enter confirmation code 7156020. And these replays will be available by approximately 5 p.m. Pacific Time today.

Members of the press with additional questions can contact Steve Dowling at 408-974-1896, and financial analysts can contact Joan Hoover or me with additional questions. Joan is at 408-974-4570, and I'm at 408-974-5420.

Thanks again for joining us.

**Operator**: Ladies and gentlemen, that does conclude today's presentation. We do thank everyone for your participation.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CALLSTREET, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2013 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.



# Exhibit B



22-Jul-2014

# Apple, Inc. (AAPL)

Q3 2014 Earnings Call

Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

Corrected Transcript
22-Jul-2014

# CORPORATE PARTICIPANTS

**Nancy Paxton**
*Senior Director, Investor Relations, Apple, Inc.*

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*

**Luca Maestri**
*Vice President & Corporate Controller, Apple, Inc.*

# OTHER PARTICIPANTS

**Kathryn Huberty**
*Analyst, Morgan Stanley & Co. LLC*

**Bill C. Shope**
*Analyst, Goldman Sachs & Co.*

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*

**Kulbinder S. Garcha**
*Analyst, Credit Suisse Securities (USA) LLC (Broker)*

**Ben A. Reitzes**
*Analyst, Barclays Capital, Inc.*

**Ben Schachter**
*Analyst, Macquarie Capital (USA), Inc.*

# MANAGEMENT DISCUSSION SECTION

**Operator**: Good day, everyone, and welcome to this Apple Incorporated third quarter fiscal year 2014 earnings release conference call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Nancy Paxton, Senior Director of Investor Relations. Please go ahead.

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you. Good afternoon, and thanks, everyone for joining us today. Speaking first is Apple's CEO Tim Cook, and he'll be followed by CFO Luca Maestri, and then we'll open the call to questions from analysts.

Please note that some of the information you'll hear during our discussion today will consist of forward-looking statements, including without limitation those regarding revenue, gross margins, operating expenses, other income and expense, taxes, and future products. Actual results or trends could differ materially from our forecast. For more information, please refer to the risk factors discussed in Apple's Form 10-K for 2013, the Form 10-Q for the first two quarters of fiscal 2014, and the Form 8-K filed with the SEC today along with the associated press release.

Apple assumes no obligation to update any forward-looking statements or information which speak as of their respective dates. I'd now like to turn the call over to Tim for introductory remarks.



# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call


Corrected Transcript
22-Jul-2014

## Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

Thank you, Nancy and good afternoon, everyone.

It's been a very busy and exciting time at Apple, and I'd like to review some of the highlights of our June quarter. We hosted our best-ever Worldwide Developers Conference last month with over 20 million people from around the world watching our keynote session, which is a new record. We've had overwhelming response from customers and developers to the new features we previewed in OS X Yosemite and iOS 8. Yosemite has been redesigned with a fresh look and powerful new apps and iOS 8 is the biggest release since the launch of the App Store.

With powerful continuity features, these upcoming releases will allow Macs and iOS devices to work together in even smarter ways. Customers can start an activity like writing an e-mail on one device and pass it to another, picking up where they left off without missing a beat. They'll even be able to make and receive iPhone calls on their Mac with just a click. These are features that only Apple can deliver.

With iOS 8, we've opened over 4,000 APIs, providing more flexibility and opportunity for developers than ever before. iOS 8 provides developers with amazing new frameworks, enables wider use of touch ID to securely authenticate users within apps, and lets developers further customize the user experience with major extensibility features such as third party keyboards.

We've also introduced Swift, an innovative new programming language for both iOS and OS X. Swift is the result of the latest research on programming languages combined with decades of experience within building Apple platforms. It makes writing code interactive and fun, eliminates entire classes of unsafe code, and generates apps that run lightning fast. It's easy to learn, allowing even more people to dream big and create whole new categories of apps. We believe our new OS releases combined with Swift will result in a huge leap forward for the Apple ecosystem and we can't wait to see what developers will create with Yosemite, iOS 8 and Swift.

When we introduced iOS 7 years ago, it was a revolutionary operating system for iPhones. Over the years, we've extended it to the iPod family with iPod Touch and later to a tablet form factor with iPad. An explosion of apps, accessories, and services for these devices has created an incredibly vibrant ecosystem. We're extending iOS in even more dimensions as customers around the world make iPhones and iPads an essential part of their lives at home, at school, at work, and on the go. We're putting a huge effort into delivering the best experience for our customers wherever they use iOS.

That includes a safe and intuitive user interface while driving called CarPlay, which is being integrated by 29 major car brands including Audi, BMW, Ford, General Motors, Honda, Hyundai, Mercedes, Toyota and Volvo; and aftermarket systems like Pioneer and Alpine. We have created a new tool for developers called Health Kit, which lets health and fitness apps work together and empowers customers to choose what health data they share. We're taking the first steps in this area in collaboration with the Mayo Clinic, whose new apps can automatically receive data from a blood pressure app, for example, and share it with a physician, or a nutrition app can inform fitness apps how many calories are being consumed each day. Our own health app will provide an easy-to-read dashboard of all health and fitness data.

We're enabling new ways to control lights and doors and thermostats and other connected devices around the house using Siri with the Home Kit feature of iOS 8. And in the enterprise, we're including new security, productivity, and device management features in iOS 8. We've forged a relationship with IBM to deliver a new class of mobile business solutions to enterprise customers around the world. We're working together to provide companies access to the power of big data analytics right on every employee's iPhone or iPad. Using Swift, we'll

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call


Corrected Transcript
22-Jul-2014

collaborate to bring over 100 mobile-first apps to enterprise clients, each addressing a specific industry need or opportunity.

This is a radical step for enterprise and it opens up a large market opportunity for Apple. But more importantly, it's great for productivity and creativity of our enterprise customers. From the pocket to the car to the workplace, home and gym, we have a very large vision of what iOS can be, and we're incredibly excited about our plans.

Turning to our financial results, today we're reporting record June quarter revenue thanks to the very strong performance of iPhone, Mac, and the continued growth of revenue from the Apple ecosystem. Our teams executed brilliantly during the quarter with earnings per share up 20% year-over-year, our highest growth rate in seven quarters. We sold over 35 million iPhones, setting a new third quarter record. We generated healthy growth in our entry-price, mid-tier and lead iPhone categories. I'm especially happy about our progress in the BRIC countries where iPhone sales were up a very strong 55% year-over-year.

We also had a record June quarter for Mac sales, with growth of 18% year-over-year in a market that is shrinking by 2% according to IDC's latest estimate. Demand has been very strong for our portables in particular, and we've had a great customer response to the new higher-performance, lower-priced MacBook Air. It was another strong performance for the App Store and the other services contributing to the thriving Apple ecosystem.

In fact, for the first nine months of this fiscal year, the line item that we call iTunes Software and Services has been the fastest growing part of our business. iTunes billings grew 25% year-over-year in the June quarter and reached an all-time quarterly high, thanks to the very strong results from the App Store. We're continuing to invest in our incredible ecosystem, which is a huge asset for Apple and a very important differentiator of our customer experience.

iPad sales met our expectations, but we realize they didn't meet many of yours. Our sales were gated in part by a reduction in channel inventory and in part by market softness in certain parts of the world. For example, IDC's latest estimate indicates a 5% overall decline in the U.S. Tablet market as well as a decline in the Western European Tablet market in the June quarter. But what's most important to us is that customers are enjoying their iPads and using them heavily. In a survey conducted in May by ChangeWave, iPad Air registered a 98% customer satisfaction rate while iPad Mini with Retina Display received an astonishing 100% customer satisfaction rate.

The survey also found that among people planning to purchase a tablet within 90 days, 63% plan to buy an iPad, and our own data indicates that more than half of customers purchasing an iPad are buying their very first iPad. Another recent study by Custora found that iPad accounts for 80% of all U.S. tablet-based e-commerce purchases.

We're very bullish about the future of the tablet market, and we're confident that we can continue to bring significant innovation to this category through hardware, software and services. We think our partnership with IBM, providing a new generation of mobile enterprise applications designed with iPad's legendary ease of use and backed by IBM's Cloud Services and Data Analytics, will be one such catalyst for future iPad growth.

Looking ahead, we are very excited about our agreement to purchase Beats Electronics and Beats Music. Music is part of Apple's DNA, and we think the addition of the Beats team will be great for music lovers. Beats provides Apple with a fantastic subscription music service, access to rare talent, and a fast-growing lineup of products that we can build upon.

Not counting Beats, we have completed 29 acquisitions since the beginning of fiscal year 2013, including five since the end of the March quarter, and we've brought some incredible technology, and more importantly some incredible talent, into Apple in the process. We're hard at work and investing heavily on exciting opportunities

Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call


Corrected Transcript
22-Jul-2014

across our business, and we have an incredible pipeline of new products and services that we can't wait to show you.

With that, I'd like to turn the call over to Luca to discuss our Q3 results in more detail.

## Luca Maestri
*Vice President & Corporate Controller, Apple, Inc.*

Thank you, Tim, and good afternoon, everyone.

We set a new June quarter record for revenue, at $37.4 billion, up $2.1 billion or 6% year-over-year. This result was towards the high end of our guidance range, despite a reduction in channel inventory for both iPhone and iPad. The revenue growth was driven by strong sales of iPhones and Macs as well as the continued great performance of iTunes Software and Services. Gross margin was 39.4%, above our guidance range, and operating margin was $10.3 billion, representing 27.5% of revenue. Net income was $7.7 billion, translating to diluted earnings per share of $1.28, a 20% year-over-year increase.

For details by product, I'd like to start with iPhone. We sold 35.2 million iPhones, an increase of 4 million over last year, representing 13% growth. As Tim mentioned, iPhone sales grew well across all three of our entry price, mid-tier, and lead product categories. In the U.S., iPhone accounts for 41.9% of the smartphone subscriber base according to the latest data from comScore, up from 41.3% in the previous measurement period. Also, based on the latest survey by ChangeWave, iPhone earned a 97% customer satisfaction rate, and among responders planning to purchase a smartphone within 90 days, 50% plan to purchase an iPhone, up from 42% in the March quarter and 44% a year ago.

iPhone sales were at the high end of our expectations despite new product rumors that we believe resulted in purchase delay. In addition, tax increases and the regulatory environment in Japan affected smartphone sales in what has been one of iPhone's fastest-growing markets in recent quarters. Considering these factors, the performance of iPhone was even more impressive in the June quarter, and it boosts our confidence for the future. We reduced iPhone channel inventory by about 150,000 from the end of the March quarter, leaving us within our target range of four to six weeks.

Apple continues to innovate through hardware, software and services to make iPhone the best smartphone for business. Today companies have equipped millions of employees with iPhones and are seeing tremendous benefits in productivity, employee satisfaction, and profitability.

For instance, medical device leader Medtronic has developed over 175 internal iOS apps for over 16,500 iPhones used by its employees to facilitate sales, improve productivity, and assure that essential marketing materials are up-to-date. Throughout the global offices of Nestlé, the largest food company in the world, over 25,000 iPhones are accessing corporate networks, improving communication, and connecting employees to critical internal resources. And at NASA, over 26,000 iPhones are in use by scientists, flight crew members, technicians, and researchers.

Turning to iPad, we sold 15.3 million units compared to 14.6 million in the June quarter last year. iPad sales grew overall in the developing markets, with particularly strong year-over-year growth in the Middle East where iPad sales were up 64%, in China where they grew 51%, and in India where they were up 45%. This growth was more than offset by lower sales in more mature markets. We reduced iPad channel inventory by 500,000 from the end of the March quarter, which left us within our target range of four to six weeks.



Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call


Corrected Transcript
22-Jul-2014

In the enterprise, global companies are using iPad to improve customer service, boost worker productivity, and enhance critical processes. iPad continues to be the standard for teams across the airline industry. Qantas Airline has over 15,000 iPads deployed to pilots as well as cabin, customer service and ground crews to enhance key processes across their daily operations. And governments are deploying thousands of iPads worldwide. One of the largest examples is Sweden where over 100,000 iPads are being used by local government offices across the country.

In education, iPad remains the tablet of choice with 85% share of the U.S. education tablet market, according to the latest published estimate from IDC. We have now sold 13 million iPads to education customers globally. We're bringing teachers and students great new tools to build and experience educational content on the iPad. As of this month, teachers using the free iTunes U app can create, edit, and manage entire courses directly on iPad for the first time and students can discover new ways to collaborate including the ability to start class discussions and ask questions right from their iPad.

Next I'd like to talk about the Mac. We sold 4.4 million Macs compared to under 3.8 million in the year ago quarter, an increase of 18% year-over-year, and a new June quarter record. The increase was driven by portables, thanks to very strong growth of MacBook Air. We achieved strong double-digit Mac growth across many countries, including the U.S., Canada, Mexico, the U.K., Germany, France, Australia, China, India and the Middle East. This growth is particularly impressive given the contraction of the overall PC market. Macs have now gained global market share for 32 of the last 33 quarters.

Macs performed well in the U.S. education buying season with double-digit growth in the K to 12 market, driven primarily by large deployments of MacBook Air. The Shawnee Mission School District in Kansas chose Apple to provide an entire solution that will equip every teacher with a MacBook Air and an iPad Air, every high school student with a MacBook Air, and every middle school and elementary student with an iPad. The Rowan-Salisbury School System in North Carolina is deploying thousands of MacBook Airs to students and teachers in grades 9 through 12 as part of the district's digital learning initiatives.

We ended the quarter with Mac channel inventories slightly below our four to five-week target range.

The Apple ecosystem continues to grow and thrive. Total revenue from iTunes Software and Services was $4.5 billion, an increase of 12% year-over-year. Our iTunes store generated all-time record billings of $5.4 billion in the June quarter, up 25% year-over-year, driven by very strong growth in App Store sales. These iTunes billings translated to quarterly iTunes revenue of almost $2.6 billion, up 8% from the year-ago quarter. Software and Services revenue was $1.9 billion, up 19% from a year ago.

App Store momentum remains very strong, and cumulative app downloads have topped 75 billion. We continue to be amazed by our vibrant and diverse developer community and we're extremely proud that our developers have now earned over $20 billion from sales of their apps through the App Store, nearly half of which have been earned in the past 12 months. This number truly stands out among our competition as our developers continue to benefit from the broad reach and thoughtful design of the App Store coupled with Apple's large, loyal, and very engaged customer base.

Let me now turn to our cash position. We ended the quarter with $164.5 billion in cash plus marketable securities, a sequential increase of $13.9 billion. Our domestic cash was $26.8 billion at the end of the June quarter, a sequential increase of $8.3 billion, and $137.7 billion or 84% of our total cash was offshore. Cash flow from operations was $10.3 billion.



# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

 Corrected Transcript
22-Jul-2014

We executed another very successful debt offering in April, issuing a total of $12 billion in notes across 3, 5, 7, 10 and 30 year maturities. In addition, during the quarter we entered the commercial paper market for the first time with $2 billion in short-term obligations outstanding as of the end of June.

We also continue to execute our shareholder return program, with $8.3 billion of capital returned to investors during the June quarter. We spent $5 billion to repurchase 59 million Apple shares through open market transactions. We paid almost $2.9 billion in dividends and equivalents and utilized over $400 million to [indiscernible] (19:49) vesting employees RSUs. We've now taken action on over $74 billion of our $130 billion capital return program, including $51 billion in share repurchases, with six quarters remaining to its completion. And finally, our Board has declared a dividend of $0.47 per common share payable on August 14, 2014, to shareholders of record as of August 11, 2014.

Now as we move ahead into the September quarter, I'd like to review our outlook which includes the types of forward-looking information that Nancy referred to at the beginning of the call. We expect revenue to be between $37 billion and $40 billion compared to $37.5 billion in the year-ago quarter. We expect gross margin to be between 37% and 38%. We expect OpEx to be between $4.75 billion and $4.85 billion. We expect OI&E to be about $250 million, and we expect the tax rate to be about 26.1%. Finally, we expect the Beats transaction to close this quarter, and we expect the acquisition to be accretive to our earnings in our fiscal 2015.

With that, let me open the call to questions.

...................................................................................................................................................................

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you, Luca. And we ask that you limit yourself to one one-part question and one follow-up, please. Operator, may we have the first question?

# QUESTION AND ANSWER SECTION

**Operator**: [Operator Instructions] And your first question will come from Katy Huberty with Morgan Stanley.

**Kathryn Huberty**                                                             Q
*Analyst, Morgan Stanley & Co. LLC*

Yes. Thanks. Luca, this is the third quarter in a row that gross margin came in above your guidance. Can you talk about what is driving that gap, and why you expect the margin to come down sequentially in the September quarter?

**Luca Maestri**                                                               A
*Vice President & Corporate Controller, Apple, Inc.*

Yes, Katy. It was obviously a surprise also to us. We were expecting, obviously, a loss in leverage from the sequential decline in revenue, which obviously happened. We also expected some unfavorable mix, which also happened. It's typical as we move away from the launch quarter. And we were expecting some cost improvements. These cost improvements came in. They came in stronger than we were anticipating. The commodity markets continue to be favorable. The product quality continues to be excellent. Our teams executed really, really well. And all these things came together at the same time, and it was a very nice surprise for us.

As we look forward into Q4, yes, we've guided to 37% to 38%. Again, the mix is the normal mix that we see as we continue to move through the product cycle. And obviously in Q4, we've got some transition costs, because we're expecting a very busy fall. We're very excited about what we've got in the pipeline, and that's the reason why we guide to that range.

**Kathryn Huberty**                                                             Q
*Analyst, Morgan Stanley & Co. LLC*

And then just a follow-up on that last point, Luca. In the press release, you reference excitement about new products and services. Can you remind us of your guidance philosophy as it relates to product cycles? Do you embed assumptions around the contribution from new products, and if so, do those tend to be more conservative than for products that already ship today?

**Luca Maestri**                                                               A
*Vice President & Corporate Controller, Apple, Inc.*

So our guidance, Katy, is that we put out numbers that we believe at this point in time, with all the information that is available to us, we're going to land within. Okay? So we take into account the fact that we've seen some purchase delays already during Q3. But we see in some states trends in certain geographies that, that continues to happen. And what you see this quarter is that our guidance range is $3 billion as opposed to $2 billion during the third quarter, just to take into fact – into account the fact that we've got many moving pieces.

**Kathryn Huberty**                                                             Q
*Analyst, Morgan Stanley & Co. LLC*

Okay. Thank you.

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

**C** Corrected Transcript
22-Jul-2014

---

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*                                        A

Thank you, Katy. Could we have the next question, please?

---

**Operator**: From Goldman Sachs, we'll hear from Bill Shope.

---

## Bill C. Shope
*Analyst, Goldman Sachs & Co.*                                                           Q

Okay, great. Thank you. With the pockets of market weakness you noted for tablets, could you give us some more detail on how you're thinking about the category longer-term? In particular, in the context of your usage comments, how are you thinking about the competitive landscape now and how that may evolve? And then I guess related to that, what do you think will be the next driver of renewed growth for the category?

---

## Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*                                        A

Hi, Bill. It's Tim. If you back up from the category that we created, which has just been a little over four years, we have now sold 225 million iPads, which is, I think probably a larger number than anyone would have predicted at the time, including ourselves, quite frankly. We still feel the category as a whole is in its early days and that there's also significant innovation that can be brought to the iPad and we plan on doing that.

When I look at the top-level numbers, I get really excited when I see that more than 50% of the iPads that we're selling are going to someone who is a first-time tablet buyer. I get excited when I see that the retail share according to NPD in the month of June was 59% of units and over 70% in terms of dollars. And of course, Luca had mentioned in his preamble that our education share is 85%.

We also are in virtually all Fortune 500 companies – we're in 99% of them to be exact – and 93% of the Global 500. However, when we dig into the business market deeper, though our market share in the U.S. in the Commercial sector is good, it's 76%, this is according to IDC – the penetration in business is low, it's only 20%. And to put that in some kind of context, if you looked at penetration of notebooks in business it would be over 60%. And so we think that there's a substantial upside in business and this was one of the thinkings behind the partnership with IBM that we announced last week.

We think that the core thing that unleashes this is a better go-to-market, which IBM clearly brings to the table, but even more importantly, apps that are written with mobile first in mind. Many of the – not all, but many of the enterprise apps that have been written for iPad have been essentially ports from a desktop arrangement and haven't taken full advantage of mobile. And so we're excited about bringing that to business along with partnering with IBM, which we think is a first-class company and seeing what that can do to sales in business, which I honestly believe the opportunity is huge.

The market is still predicted in 2018 – I think these are Gartner numbers – to be about 350 million in size, and to put that in some context, I think the PC market right now is about 315 million. And so I think our theory that has been there honestly since the first time that we shipped iPad that the tablet market would eventually surpass the PC market. That theory is still intact. I just think we have to do, you know, some more things to get the Business side of it moving in a faster trajectory and I think we're now onto something that can really do that. So as I looked at it and sort of back up from the 90-day clock kind of thing, I'm incredibly excited, I'm excited about the plans that we have on the product side and also on the go-to-market side in the – in particular the IBM announcement.

---

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call



Corrected Transcript
22-Jul-2014

One other point I might add on this, because I think this is interesting, I don't think it came out in our commentary so far – the market's very bifurcated on iPad. In the BRIC countries, iPad did extremely well. The growth was very high. Like in China it was in the 50s, in the Middle East it was in the 60s. Luca may have mentioned those numbers. In the developed countries like the U.S. the market is clearly weaker there. It's interesting to note, however, that the U.S., as an example, we had a very, very strong Macintosh market in the U.S. And so there's probably a bit of Higher Ed kind of stuff beginning to play out, too, where Higher Ed is clearly still very much notebook oriented. K-12, on the other hand, we sell two and a half iPads for every Mac into K-12. And so we're headed – we're clearly headed into that season now, and it typically starts in graduation timeframe in the fiscal Q3 for us. And so I think that's probably another thing that we're seeing.

---

**Bill C. Shope** $\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ Q
*Analyst, Goldman Sachs & Co.*

Okay, that's helpful. Thank you. One more question, if I could. You had obviously great performance in the BRIC countries, and you touched on China for a few categories. Can you talk about the overall demand environment you saw for China in the quarter? Obviously there's some seasonal factors to consider, but how should we think about your performance versus your expectations and how you're thinking about it the rest of the calendar year?

---

**Timothy D. Cook** $\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ A
*Chief Executive Officer & Director, Apple, Inc.*

China, honestly, was surprising to us that it was – we thought it would be strong, but it well went past what we thought. We came in at 26% of revenue growth including our retail. And if you look at the units, the unit growth was really off the charts across the board. iPhone 48% off, that compares to a market estimate of 24%, so growing at two times the market. iPad was up as well, as I've mentioned before. The Mac was up 39%, and that's versus a market in China that's also contracting along with markets in most parts of the world. And in China, it was projected to contract by 5%.

And so we're seeing some substantial strength there. And the thing that's actually growing the most is the iTunes Software and Services category which has the App Store in it, et cetera, and that area is almost doubling year-over-year. And so it's very, very exciting what we're seeing there. We are still in the process of rolling out, along with our partner China Mobile, the TD-LTE into more cities, and so that – we're still in the early going on that. That just started in January, as you know. And my understanding is that later this year, there will be a license for the other operators to begin shipping FDD-LTE, which I think is another big opportunity in China.

---

**Bill C. Shope** $\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ Q
*Analyst, Goldman Sachs & Co.*

Okay, great. Thanks, Tim.

---

**Timothy D. Cook** $\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ A
*Chief Executive Officer & Director, Apple, Inc.*

Yeah.

---

**Nancy Paxton** $\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ A
*Senior Director, Investor Relations, Apple, Inc.*

Thank you, Bill. Could we have the next question, please?

---

**Operator**: Next we'll go to Toni Sacconaghi with Sanford Bernstein.

---



# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

**C** Corrected Transcript
22-Jul-2014

---

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*

**Q**

Yes. Thank you. I have one for Luca and one for Tim, please. Luca, I wanted to revisit the gross margin question. You've talked about guidance for next quarter, the drivers of the sequential decline being a normal mix through the cycle and transition costs. Your guidance to the midpoint is down 190 basis points in gross margin. Last year in Q4, gross margins were up 10 basis points sequentially in fiscal Q4, and the product transition issues or cycle issues that you allude to seem essentially identical. So I'd like to try and understand what might make this Q4 different, let's say, than last Q4.

---

**Luca Maestri**
*Vice President & Corporate Controller, Apple, Inc.*

**A**

Yes, I understand this on the question. Also, when you look at it in terms of absolute levels of gross margin, last year it was 37% so our range is above that level. There's obviously many, many things that affect us in different ways from one year to the other. Foreign exchange is a case where a lot of the emerging market currencies and the yen and the Australian dollar and the Canadian dollar have been weaker against the U.S. dollar, that has an impact on margin. And also when you think about our product cycle, I think we don't get into the specifics, but you know that this is not exactly the same cycle as we've had a year ago.

---

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*

**Q**

I mean, is it better? I mean, if we looked back two years to the iPhone 5, your product margins were down 260 basis points sequentially. So is the reference there that we should be thinking in terms of changes that are more akin to what we saw two years ago rather than to this year?

---

**Luca Maestri**
*Vice President & Corporate Controller, Apple, Inc.*

**A**

I wouldn't necessarily draw that analogy. I think we need to start thinking from the fact that we had a very, very strong Q3. A lot of things came together extremely well. 37% to 38% is a range that we think is very good. And that's where we are right now, and we still have several weeks in the quarter.

---

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*

**Q**

Okay. Thank you. Tim, I wanted to get your input on the impact of trade-in programs for the iPhone, particularly in mature markets where they're most prevalent. As best I can tell, if I look at the last four quarters, they're not hyper-focused on 90 days. It looks like the iPhone's been about flat in unit terms in the Americas, and up low single digits in Europe. And I think Europe includes India, which is obviously very fast-growing, so perhaps low single digits in Europe.

So if we look at those Western geographies, we've seen relatively flattish iPhone unit sales over the last year, I know you don't report it, but just sort of based on overall revenue reporting. I'm wondering if you can comment on what you're seeing in terms of iPhone trade-in programs. And this is four quarters, so over a complete cycle, whether you think they're elongating or shrinking, and what impact these very prevalent, increasingly prevalent trade-in programs might be having on them, and what impact your pricing of older generation devices might be having on them.

---

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call



**Corrected Transcript**
22-Jul-2014

---

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*                                                                 A

Yeah. The theory that you have, Toni, is not precisely correct. Like, if I look at Europe, the operating segment of Europe for quarter- or year-to-date for 2014 versus the same period last year, iPhone units were actually up 10%.

Your more macro question or what I understand to be your more macro question of, do I think there's some sort of cannibalization going on of trade-in programs on new product sales. What I think is happening in the aggregate if you look across the world is that, trade-ins are actually hugely beneficial for our ecosystem, because people wind up – we have more people that are able to join the party when we have a trade-in, because in essence it winds up being used by – in the – probably the prime example, someone else within the family, or in the example that has become more common in the last year, someone trades it in and then that goes to either someone – somebody else in that country that is very price-sensitive, or somebody in a different country. And I see all of this as good.

In looking at how much of it cannibalizes, it is very hard to answer that question with any degree of preciseness, but my gut is that the cannibalization factor is low, because you wind up having – you wind up attracting people that are much more price-sensitive in there. I think the great thing is, our products command a much higher resale value than others do, and so that leads to a larger trade-in. And from my perspective, that means a larger ecosystem, more people that wind up getting an iPhone and, as you know from following us for quite some time, if we get somebody to try an Apple product and then buy an Apple product, the likelihood that they begin buying other Apple products that may be in different categories, or upgrading to one in that category in the future, is very high. And so net-net, I view it to be positive. It's very difficult to quantify with certainty.

---

**Toni M. Sacconaghi**
*Analyst, Sanford C. Bernstein & Co. LLC*                                                                           Q

Thank you.

---

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*                                                                 A

Yeah.

---

**Nancy Paxton**
*Senior Director, Investor Relations, Apple, Inc.*                                                                A

Thank you, Toni. Could we have the next question, please?

---

**Operator**: From UBS, we'll hear from Steve Milunovich.

---

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*                                                                                          Q

Thank you.

---

**Nancy Paxton**
*Senior Director, Investor Relations, Apple, Inc.*                                                                A

Steve, we lost you.

---

Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

Corrected Transcript
22-Jul-2014

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*

A

Steve, are you there?

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*

Q

Yes.

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*

A

Okay. Go ahead.

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*

Q

Okay. Thanks. Tim, you mentioned that Japan was fairly flat due to regulations and taxes. Could you elaborate on that and what kind of comparisons perhaps you see going forward?

**Timothy D. Cook**
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah. It was actually Luca, but I can comment on it. VAT was increased from 5% to 8% at close to the beginning of the quarter. I think it was actually April 1 or so. That was the first planned VAT increase. There are other, or at least one additional planned VAT increase in the future. This was a part of the overall tax reform package in Japan.

Secondly, the carriers received some guidance from the regulators to essentially stop incenting people to transfer from another carrier at a higher amount than they were incenting retaining their own customers. And so it appears that the combination of these two things dampened the whole market for smartphones in Japan. We haven't been able to get very detailed data on share, but my expectation is we're not going to see very much of a share change. And we're beginning to see some coming back of that market as we step into this quarter, maybe not back to the level that it was previously, but you can begin to see the market growing again, which we view as very positive.

In the past when we have seen these types of things, tax changes, et cetera, there's usually a rush to buy before the tax increase, a pause that happens thereafter, and then the market eventually goes back to some kind of steady state that may not be exactly where it was but it nears it. And so I think that's likely our guess, or that's what happens on the VAT side. The other piece is a little harder to conclude what will happen in terms of that guidance and how long that might be in place. I don't know that part.

**Steven M. Milunovich**
*Analyst, UBS Securities LLC*

Q

Okay. That's very helpful. And then, you talked about your three tiers of iPhones. I wonder if you'd be willing to break out in any more detail the growth and particularly defend the 5C in the mid-tier. I know our surveys continue to find in the U.S. that it's falling a little bit as a percentage of business but you seem to believe it's doing exactly what you expected it to do.

## Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

**Corrected Transcript**
22-Jul-2014

---

**Timothy D. Cook**    A
*Chief Executive Officer & Director, Apple, Inc.*

I can tell you this, that if you look at the growth rates, we don't divide out each one, but if you look at year-over-year growth rates, and so this would be comparing the 5C to last year. It would be comparing the 4S, which was in the mid-tier. The growth in that sector was the highest growth during the quarter we just finished.

---

**Steven M. Milunovich**    Q
*Analyst, UBS Securities LLC*

Of the three tiers?

---

**Timothy D. Cook**    A
*Chief Executive Officer & Director, Apple, Inc.*

Of the three tiers. And so we're extremely happy with how it performed last quarter.

---

**Steven M. Milunovich**    Q
*Analyst, UBS Securities LLC*

Thank you.

---

**Nancy Paxton**    A
*Senior Director, Investor Relations, Apple, Inc.*

Thanks, Steve. Can we have the next question, please?

---

**Operator**: Kulbinder Garcha with Credit Suisse.

---

**Kulbinder S. Garcha**    Q
*Analyst, Credit Suisse Securities (USA) LLC (Broker)*

Thanks. I have just one question for Luca and one for Tim. For Luca, you mentioned that commodity pricing I guess the environment was good for you. Is it your working assumption in your guidance that that continues and continues to be favorable and a tailwind for you?

And then my question for Tim is that with the installment plans being introduced in the U.S., I imagine that given that increases the flexibility for people to upgrade faster, would you expect that to happen for – are you seeing any evidence of that as these contracts come up, as we've had them out now for several months, and how do you see that impacting your business because obviously the U.S. iPhone part of your business is still very significant and it could be quite a big catalyst for your iPhone business going forward, I would imagine. Or would you be more tentative as to how you see that playing out?

---

**Timothy D. Cook**    
*Chief Executive Officer & Director, Apple, Inc.*

I'll take both of these. This is Tim. On the component question, what we saw in the June quarter was that NAND, mobile DRAM, and LCD, the pricing on all of those declined, while PC DRAM increased despite the market for PCs contracting. In the September quarter, what is factored in our guidance is that LCDs and mobile DRAM continue to decline, that NAND pricing remains essentially flat from last quarter, and that PC DRAM has a slight price increase. And in terms of other commodities that I didn't talk about, we have assumed that they would decline at historical rates. And so that's factored into the gross margin guidance that Luca gave you.

---

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

 Corrected Transcript
22-Jul-2014

In terms of the installment plans that you mentioned in the U.S. relative to iPhone, there's a lot of different models that are being tried in the U.S. and throughout the world. And actually last quarter, as we estimate it, and this is subject to estimating error, but we estimate that less than one out of four iPhones were sold on a traditional subsidy plan. And so that number is markedly different than it would have been two years ago.

The installment plans that you're speaking about which gives the customer the right to upgrade fast or faster than the usual two-year cycle, we think that that plays to our customer base in a large way and so that makes us incredibly bullish that customers on those plans would be very likely to upgrade when we announce a new product.

---

### Kulbinder S. Garcha
*Analyst, Credit Suisse Securities (USA) LLC (Broker)*

Q

Thank you. Very helpful

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thank you, Kulbinder. May we have the next question, please?

---

**Operator**: Next, we'll hear from Ben Reitzes with Barclays.

---

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Hey, thanks a lot. Tim, my question is for you. I guess during the quarter you did two very big things in our opinion obviously buying Beats, biggest acquisition in your history, and you also did this IBM deal which, you know, obviously wasn't this quarter, but since the last call. And that was very interesting obviously, really collaborating with another huge company to get further into the enterprise. And I was just wondering what are you seeing in Apple that's changing? You know, these seem like big deals that change your direction a bit, something that you wouldn't have done in the past. And do you see a lot more partnerships and larger acquisitions on the horizon to grow your TAM in various markets?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Well, I think we have a lot of really great people, Ben, and I think we have the capability, as I've said before, I think we have the capability to acquire a sizable company and manage it. And relative to IBM, I feel the same way. I think you can only do so many partnerships well, and so it's unusual that we enter into a partnership. But in this particular case, I think arguably the companies are so complementary, and I've gotten to know Ginni fairly well over the last couple of years, and I think we see the importance of the customer a lot of the same way and both feel that mobile in enterprise is just an enormous opportunity.

And we're not competing with each other. So I think a partnership in that case is particularly great. Would we do more of either of the things we did? We're always looking in the acquisition space but we don't let our money burn a hole in our pocket, and we don't do things that aren't strategic. And so with Beats, we felt we were getting an incredible subscription service, a very rare set of talent that we think can do great things at Apple, and access to a very fast-growing business in their headphone and earphone space. And so, culturally we felt there was a match, and music has been deeply embedded in Apple's DNA for many, many years.

---

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

 Corrected Transcript
22-Jul-2014

And so it was a great marriage, and I think the partnership with IBM is a great marriage as well. If more like that presented themselves then, you know, I think we can manage more things. I think we have a very, very strong executive team, and can do that. But you know, it's not my goal to acquire a certain number of companies or to spend a certain amount of money. We want to do things that help us make great products that are great for our customers and so forth, and that's...

---

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Just really – I'm sorry – just really quick on the IBM, are you – yeah, does this say something about Apple doing more in big data and taking a cut maybe of some of the analytics opportunities as well?

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah, we didn't talk about the – how the business model is going to work. But generally speaking, I think that each of us has revenue streams in the enterprise, and each of us win from having those revenue streams. And so that's how I look at that. And we win if we can drive that penetration number I spoke about from 20 to 60, that would be incredibly exciting here, the walls would shake, and so that's what I hope for.

---

### Ben A. Reitzes
*Analyst, Barclays Capital, Inc.*

Q

Thanks a lot.

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

Yeah.

---

### Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

A

Thank you, Ben. Can we have the next question, please.

---

**Operator**: We'll hear from Ben Schachter with Macquarie.

---

### Ben Schachter
*Analyst, Macquarie Capital (USA), Inc.*

Q

Thanks. Tim, I just want to talk about the app market for enterprise. Right now I believe that app developers can sell to the enterprise directly, and therefore that they can bypass the – the sharing revenue from these app sales with Apple. Is Apple going to allow that to continue, and can you also just more broadly discuss how Apple thinks about the opportunity to sell apps directly to the enterprise? Thanks.

---

### Timothy D. Cook
*Chief Executive Officer & Director, Apple, Inc.*

A

We've had no plans to change the rules with enterprise. Some enterprises like proprietary apps, that they do not want to offer to others, and so we obviously have a way for them to distribute those into their enterprise or just the employees that they want to. And so, I'm not worried about changing that. We're all for taking friction out of the system and not adding it. Again, the big thing for us is that – is, getting the penetration number up and getting our

---

# Apple, Inc. *(AAPL)*
Q3 2014 Earnings Call

 Corrected Transcript
22-Jul-2014

product, iPhones and iPads and Macs, in more people's hands. And we think there's a huge opportunity in enterprise to do that.

## Nancy Paxton
*Senior Director, Investor Relations, Apple, Inc.*

Thank you, Ben.

A replay of today's call will be available for two weeks as a podcast on the iTunes store, as a webcast on apple.com/investor, and via telephone. And the numbers for the telephone replay are 888-203-1112 or 719-457-0820, and please enter confirmation code 7618258. These replays will be available by approximately 5:00 p.m. Pacific Time today.

Members of the press with additional questions can contact Steve Dowling at 408-974-1896, and financial analysts can contact Joan Hoover or me with additional questions. Joan is 408-974-4570. I'm at 408-974-5420. And thanks again to everyone for joining us.

**Operator**: And ladies and gentlemen, that does conclude today's presentation. We do thank everyone for your participation.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FACTSET CALLSTREET, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2014 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

