BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
BRITTANY N. DEJONG (258766)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>DATE:   Nov. 16, 2021<br>TIME:   10:00 a.m.<br>CTROOM:   1, 4th Floor<br>JUDGE:   Hon. Yvonne Gonzalez Rogers |

**DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(b)**

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that on November 16, 2021, at 10:00 a.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully move this Court for an order:

1.   certifying the following Class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period");

2.   appointing Plaintiffs as Class Representatives; and

3.   appointing Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") as Co-Class Counsel.

All the prerequisites and requirements for class certification are met and therefore certification is warranted. Plaintiffs base their Motion for Class Certification on: the Memorandum of Points and Authorities filed in support of this Motion; the Declaration of Rachele R. Byrd and its exhibits; the Declarations of Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence; the Expert Report of Daniel L. McFadden; all other records and papers on file in this action; any oral argument and evidence that may be presented at the hearing on this Motion; and all other matters properly before the Court.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:   */s/ Rachele R. Byrd*
RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

1

manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed
Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

**TABLE OF CONTENTS**

PAGE

I.      STATEMENT OF ISSUES TO BE DECIDED ....................................................1

II.     INTRODUCTION ...........................................................................................1

III.    STATEMENT OF FACTS ...............................................................................2

        A.      Relevant Background .......................................................................... 2

        B.      Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market.................... 4

        C.      Apple's Market Power is Largely Derived from Significant Switching Costs and Imperfect Information ................................................................ 6

        D.      Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins ....................................... 7

        E.      Apple's Purported Business Justification Is Pretextual .......................... 8

        F.      Class Members Have Been Uniformly Impacted and Suffered Damages........... 10

IV.     ARGUMENT ...............................................................................................11

        A.      Standards for Class Certification ...................................................... 11

        B.      The Four Prerequisites of Rule 23(a) Are Satisfied........................... 12

                1.      The Class Is Undoubtedly Numerous ...................................... 12

                2.      Class Members Share Common Questions of Law and Fact.................. 12

                3.      Plaintiffs Are Typical................................................................ 13

                4.      Plaintiffs Are Adequate............................................................ 14

        C.      The Requirements of Rule 23(b)(3) Are Satisfied.............................. 15

                1.      Common Questions of Law and Fact Predominate ................. 16

                        a.      Common Evidence Will Prove the Relevant Market and Apple's Power in That Market........................................ 17

                        b.      Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power.......................... 18

c.    Common Evidence Will Prove Apple's Anticompetitive Conduct ........................................................................ 19

d.    Common Evidence Will Prove Causal Antitrust Impact ............. 19

e.    The Damages Will Be Estimated Using a Common Method ....... 21

2.    Superiority ......................................................................................... 24

D.    Appointment of Class Counsel ......................................................................... 25

V.    CONCLUSION .......................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

<u>**Cases**</u>

4
*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) .......................................................................... 12, 15, 16, 24

5

6
*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  568 U.S. 455 (2013) ........................................................................... 11, 12

7
*Apple Inc. v. Pepper,*
  139 S. Ct. 1514 (2019) ........................................................................ *passim*

8

9
*Apple iPod iTunes Antitrust Litig.,*
  2008 U.S. Dist. LEXIS 107127
10  (N.D. Cal. Dec. 22, 2008) ................................................................ 12, 13, 15, 24

11
*Bafus v. Aspen Realty, Inc.,*
12  236 F.R.D. 652 (D. Idaho 2008) ......................................................... 20

13
*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ............................................................. 12, 14
14

15
*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982) ........................................................................... 20

16
*Bogosian v. Gulf Oil Corp.,*
17  561 F.2d 434 (3rd Cir. 1977) ............................................................. 20

18
*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.,*
19  611 F.3d 495 (9th Cir. 2010) ............................................................. 16

20
*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................. 23
21

22
*Cummings v. Connell,*
  316 F.3d 886 (9th Cir. 2003) ............................................................. 14
23

24
*Dilts v. Penske Logistics, LLC,*
  2013 U.S. Dist. LEXIS 192323
25  (S.D. Cal. Jan. 17, 2013) ................................................................... 11

26
*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) ........................................................................... 17

27

28
*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ............................................................. 16

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  563 U.S. 804 (2011) ............................................................................. 16

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) .............................................................. 16

*Giuliano v. Sandisk Corp.,*
  2015 U.S. Dist. LEXIS 193817
  (N.D. Cal. May 14, 2015) ............................................................ 18, 19

*Glictronix Corp. v. Am. Tel. & Tel. Co.,*
  603 F. Supp. 552 (D.N.J. 1984) ......................................................... 20

*Gonzales v. Free Speech Coal.,*
  408 F.3d 613 (9th Cir. 2005) .............................................................. 13

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .............................................. 13, 14, 15

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) .............................................................. 14

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972) ............................................................................. 11

*Hunt v. Check Recovery Sys., Inc.,*
  241 F.R.D. 505 (N.D. Cal. 2007) ....................................................... 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) ............................................................ 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  1994 U.S. Dist. LEXIS 12652
  (N.D. Cal. Aug. 31 1994) ................................................................... 24

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
  276 F.R.D. 364 (C.D. Cal. 2011) ....................................................... 23

*In re Apple & AT&TM Antitrust Litig.,*
  569 F. Supp. 2d 1288 (N.D. Cal. 2008) ............................................ 17

*In re Blood Reagents Antitrust Litig.,*
  2015 U.S. Dist. LEXIS 141909
  (E.D. Pa. Oct. 19, 2015) ..................................................................... 23

*In re Capacitors Antitrust Litig. (No. III),*
  2018 U.S. Dist. LEXIS 195310
  (N.D. Cal. Nov. 14, 2018) .................................................................. 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ........................................................................... 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2006 U.S. Dist. LEXIS 39841
    (N.D. Cal. June 5, 2006) ................................................................................... *passim*

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) ........................................................................... 16

*In re High-Tech Emp. Antitrust Litig.*,
    289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................... 20

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................................... 13, 23, 24

*In re Korean Ramen Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 7756
    (N.D. Cal. Jan. 19, 2017) ........................................................................................ 23

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ....................................................................................... 20

*In re Qualcomm Antitrust Litig.*,
    328 F.R.D. 280 (N.D. Cal. 2018) ........................................................................... 13

*In re Rubber Chemicals Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ................................................................ 11, 21, 25

*In re Static Random Access (SRAM) Antitrust Litig.*,
    2008 U.S. Dist. LEXIS 107523
    (N.D. Cal. Sept. 29, 2008) ...................................................................................... 12

*In re Static Random Access Memory Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................... 23

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007).................................................... 12, 15, 16, 23, 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) ..................................................................... 16, 20

*In re TFT-LCD Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................... 23

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) ............................................................................... 16

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
  2009 U.S. Dist. LEXIS 122807
  (D. Ariz. July 14, 2009) .......................................................................................... 23

*Kanawi v. Bechtel Corp.*,
  254 F.R.D. 102 (N.D. Cal. 2008) ............................................................................. 19

*Leyva v. Medline Indus., Inc.*,
  716 F.3d 510 (9th Cir. 2013) .................................................................................... 21

*Little Caesar Enters. Inc. v. Smith*,
  172 F.R.D. 236 (E.D. Mich. 1996) ........................................................................... 22

*Moore v. Jas. H. Matthews & Co.*,
  682 F.2d 830 (9th Cir. 1982) .................................................................................... 21

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................ 13, 17

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (9th Cir. 2016) ................................................................................. 14

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ........................................................................................ 17, 18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  2019 U.S. Dist. LEXIS 169446
  (N.D. Cal. Sep. 20, 2019) ......................................................................................... 23

*Pecover v. Elec. Arts, Inc.*,
  2010 U.S. Dist. LEXIS 140632
  (N.D. Cal. Dec. 21, 2010) ......................................................................................... 14

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) .................................................................................................. 11

*Ruiz v. XPO Last Mile, Inc.*,
  2016 U.S. Dist. LEXIS 152095
  (S.D. Cal. Feb. 1, 2016) ............................................................................................ 11

*Shaffer v. Cont'l Cas. Co.*,
  2007 U.S. Dist. LEXIS 96189
  (C.D. Cal. Jan. 26, 2007) .......................................................................................... 19

*Stockwell v. City and County of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) ...................................................................... 11, 12, 16

*Sullivan v. Nat'l Football League,*
  34 F.3d 1091 (1st Cir. 1994) ................................................................. 20

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D. 159 (C.D. Cal. 2002) ........................................................... 14

*Thompson v. Clear Channel Commc'ns, Inc.* (*In re Live Concert Antitrust Litig.*),
  247 F.R.D. 98 (C.D. Cal. 2007) ..................................................... *passim*

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) ................................................................. 24

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ............................................................... 11, 12, 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  395 U.S. 100 (1969) ............................................................................. 20

### Statutes

15 U.S.C. § 2 ........................................................................................ 1, 13

### Other Authorities

6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002) ........... 11, 12, 14, 17, 22

### Rules

Federal Rules of Civil Procedure ("FRCP") 23 .................................................. *passim*

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  **STATEMENT OF ISSUES TO BE DECIDED**

    a)    Whether the Court should certify the Class pursuant to the Federal Rules of Civil Procedure ("FRCP") 23(a) & (b);

    b)    Whether the Court should appoint Plaintiffs Class Representatives; and

    c)    Whether the Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

II.  **INTRODUCTION**

Plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (the "Sherman Act"), on their own behalf and on behalf of persons who bought software applications ("apps") or licenses for apps from Apple or paid Apple for in-app purchases,[1] including subscription purchases, on the "App Store," which is entirely owned and operated by Apple, for use on one or more iPhones, iPads, or iPod Touches ("iOS Devices"), at any time since the App Store opened on July 10, 2008. TAC ¶ 1.[2]  Plaintiffs allege that Apple unlawfully monopolizes the retail market for the sale of apps, including IAP, and uses its monopoly power to charge consumers supra-competitive prices for apps and IAP. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518 (2019). This "is a classic antitrust claim." *Id.* at 1519.

Plaintiffs challenge Apple's decision to ***require*** its customers to buy apps and pay for IAP for their iOS Devices ***only*** from Apple, which monopolizes the aftermarket for iOS apps and IAP. Eddy Cue, a senior Apple executive admitted that Apple tries ███████████████████ ████████" Byrd Decl., Ex. B (emphasis added). Apple's CEO, Tim Cook, recently admitted that Apple tries to avoid competition from developers and other app stores: if other app stores were allowed to compete with its App Store, Apple would "have to differentiate [its App Store] in some

---

[1] "In-app purchases" ("IAPs") are purchases made within applications, such as payment for additional application features, full versions of games, and subscriptions for access to content and membership. Third Amended Complaint ("TAC"), ¶ 4.

[2] "iPads" include all iPad Pro, iPad Mini and iPad Air models as well as standard iPads. TAC, ¶ 1, n.1. ███████████████████████████. Declaration of Rachele R. Byrd in Support of Plaintiffs' Motion for Class Certification ("Byrd Decl."), Ex. A, 315:21-316:18. Both iPadOS and the operating system used on iPhones and iPod Touch will be referred to as "iOS" because there are no relevant differences between iOS and iPadOS.

way." *Id.*, Ex. C, 3934:23-3935:1.

Plaintiffs now seek certification under FRCP 23(a) and (b)(3) on behalf of the following Class of consumers:

> All persons in the United States, exclusive of Apple and its employees, agents, and affiliates, and the Court and its employees, who purchased one or more iOS apps or app licenses from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008.

The case easily meets all the requirements for class certification. The Class consists of millions of Apple customers; Plaintiffs' claims are typical for all other Class members; Plaintiffs are adequate class representatives; and Class members share many common questions of law and fact. The overwhelming predominant common questions in this case include: (1) whether the aftermarket for iOS apps and IAP is a relevant market and whether Apple has power in that market; (2) whether Apple willfully acquired or maintained monopoly power in that market; (3) whether Apple has engaged in anticompetitive conduct; (4) whether Apple's monopoly has caused antitrust injury to Plaintiffs and all other members of the Class; and (5) if so, what measure of damages is proper.

## III.    STATEMENT OF FACTS

### A.    Relevant Background

Apple launched the iPhone in June 2007. It designed and built the iPhone's operating system, known as "iOS," to enable iPhone users to send and receive calls; download, install, and run computer-like software programs (called "applications" or "apps") to browse the Internet; transform music into cell phone ringtones; take photos; play games; and engage in other functions typically performed on desktop or laptop computers. TAC, ¶ 2. On September 14, 2007, Apple introduced the iPod Touch, a device similar to the iPhone without telephony, which also operates on iOS and runs apps that also run on the iPhone. *Id.*, ¶ 3. On April 3, 2010, Apple introduced the iPad, a tablet computer with a touch screen interface, utilizing the same iOS as the iPhone and iPod Touch and able to run apps that function on those devices as well. *Id.*

Apple designed iOS to be a "closed" system. *Id.*, ¶ 36. Unlike traditional desktop or laptop computers, whose operating systems allow consumers to buy software applications from

competing software distributors, the iOS prevents iOS Device customers from buying software

applications from anyone other than Apple. *Id.*, ¶ 6. Apple's operating system for desktop and

laptop computer operating system, called "macOS," from which Apple derived the iOS, allows

consumers to buy software from non-Apple vendors and to pay such vendors directly without

having to pay an additional fee to Apple. *Id.*, ¶ 7. An iOS Device customer does not agree to buy

apps or pay for IAP only on the App Store. *Id.*, ¶ 18. Apple forces that upon them to keep them

████████████████████████████ Byrd Decl., Ex. B, and to avoid having to compete with

developers or other app stores to sell apps or IAP.

Apple has owned and operated 100% of the App Store since its launch on July 10, 2008.

Apple employees staff the App Store, and Apple controls all its revenue and business operations.

TAC, ¶ 45. ██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ Byrd Decl., Ex. D, 278:1-279:17.

Apple *uniformly* charges a 30% commission on the amount its customers pay for virtually

all paid apps and IAP through the App Store—which has not changed since the launch of the App

Store. The *same* commissions have been charged on billions of transactions for paid apps and IAP.

Apple now charges a reduced commission of 15% in limited circumstances, which has little effect

on its overall business. In 2016, Apple reduced its commission from 30% to 15% for *all*

subscription renewals after the first year of a subscription. TAC, ¶ 10. Additionally, in late 2020,

in response to the adverse publicity and pressure from regulators and litigants (including this and

related litigation) about Apple's App Store monopoly and supra-competitive commissions, Apple

announced the App Store Small Business Program, beginning in January 2021, in which existing

developers that earned less than $1 million in total proceeds (net of Apple's commission and some

taxes and adjustments) in the prior calendar year pay a reduced commission of 15%. *See*

https://developer.apple.com/app-store/small-business-program/ (last visited May 31, 2021).

At either 30% or 15%, ██████████████████████████████████

██████████████████████████████████████████████. Byrd Decl., Ex.

1   E, 86:10-87:3. Apple permits no individually negotiated commissions or prices for paid apps or

2   for IAP.

3       Apple also controls the prices developers can charge for their apps. ████████████

4   ████████████████████████████████████████████████████████████████████████

5   ██████, TAC, ¶ 50; Byrd Decl., Ex. D, 265:6-11, 266:12-15, 268:2-270:11. Apple eliminates more

6   than 99% of the price points that developers may charge to Apple's customers for all paid apps

7   and IAP.[3]

8       Just prior to the launch of the App Store, Steve Jobs falsely claimed that Apple did not

9   ████████████████████████████████████████████████████████████████████████

10   ██████████████████ *Id.*, Ex. G at '81. ████████

11   ███████, *See id.*, Ex. H ████████████████████ Ex. I, 89:13-90:7, 90:9-91:13.

12   The App Store has ████████████████████████ just covering costs. *Id.*, Ex. J, 175:11-25.

13   Apple gets its enormous profit because it ensures that its App Store is the ***only*** store in the world

14   where the tens of millions of U.S.-based iOS Device owners (and many millions more worldwide)

15   can buy an iOS app or pay for IAP. TAC, ¶ 5.

16     **B.**     **Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market**

17       Sales of iOS apps and IAP is a type of relevant antitrust market known as an "aftermarket."

18   *See* Byrd Decl., Ex. K, ¶ 43. In the primary market, consumers choose a mobile device with OS

19   pre-installed, such as iOS or Android. *Id.*, ¶ 44. All iOS Devices come pre-loaded with the iOS

20   and cannot be used without it, and the iOS cannot be used on non-Apple devices. *Id.* ██████

21   ██████████████████████████████████████████████████████████████████████.

22   *Id.*, Ex. E, 98:2-11; Ex. A, 224:6-13. ████████████████████████████████

23   ██████████████████████████████████████████████████████████████████████

24   ██████████████████ *Id.*, Ex. D, 278:1-8; Ex. C, 3863:18-3864:2 ("If not for IAP, we would have

25  

26   [3] █████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████████
      *Id.*, at 270:2-25; Ex. F.

1   to come up with another system to invoice developers").

2        Most important, apps compatible with non-iOS mobile devices are not reasonable

3   substitutes for iOS apps.  Non-iOS apps cannot be installed or operated on iOS devices, and *vice*

4   *versa*. In addition, consumers face various types of costs if they attempt to switch to alternative

5   mobile platforms—for example, from iOS to Android—called "switching costs." Byrd Decl., Ex.

6   K, ¶ 66. Therefore, the prices of apps on non-iOS platforms, including on Android, websites, or

7   consoles, do not affect or constrain the commission that Apple charges on the sale of apps and IAP

8   through its App Store.

9        Apple further protects its App Store from competition from other platforms by enforcing

10  the "anti-steering" policy – prohibiting app developers from informing iOS users, inside the app

11  or in the App Store, of the availability of their app and in-app purchases on other platforms. *See*

12  Byrd Decl., Ex. L, § 2.3.10 ("[D]on't include names, icons, or imagery of other mobile platforms

13  in your app or metadata, unless there is a specific, approved interactive functionality"); *id.* at §

14  3.1.1 ("Apps and their metadata may not include buttons, external links, or other calls to action

15  that direct customers to purchasing mechanisms other than in-app purchase."); Ex. M, 117:20-22



16

17

18

19  *Id.*, Ex. K, ¶¶ 48-58; Ex. I, 47:20-22.

20  . *Id.*, Ex. J, 81:2-84:6; Ex. N.

21

22

23  *Id.*, Ex. J, 81:17-24, 83:8-17; Ex. M,

24  249:13-18; Ex. O, 254:1-15, 258:18-259:19.

25

26  . *Id.*, Ex.

27  K, ¶ 51; Ex. P, 145:1-7, 146:1-11; Ex. I, 175:12-21.

28

1    *Id.*, Ex. P, 141:3-15.

2    **C.    Apple's Market Power is Largely Derived from Significant Switching Costs
3    and Imperfect Information**

4    Apple enjoys market power in the iOS aftermarket thanks to their locked-in consumers,

5    who have relatively inelastic demand and face high switching costs, which helps Apple set and

6    maintain the supra-competitive App Store commission. Byrd Decl., Ex. K, ¶ 98-101. Switching

7    costs include: (1) the equipment costs of switching which typically requires switching multiple

8    devices (*e.g.*, iPhones, iPads, Macs, AppleTV, watches); (2) the cost of re-purchasing apps because

9    apps purchased on iOS are not compatible with non-iOS devices; (3) the loss of data stored on iOS

10   apps not easily transferable to outside iOS, including various user account information and auto-

11   generated random passwords; and (4) the loss of "ecosystem integration" with other Apple devices

12   including iPhones, iPads, Apple TV, Apple Watch, and Macs. *Id.*, ¶¶ 70-75.

13

14   *Id.*, Ex. Q, 152:2-11.

15   Apple purposefully exploits the high switching costs. As Eddy Cue, a senior Apple

16   executive, explained:

17

18

19

20   *Id.*, Ex. B (emphasis added); Ex. I, 67:13-19, 68:1-13, 69:1-5. In an agenda for a 2010 executive

21   team meeting, Steve Jobs wrote that he wanted to

22                                                                          *Id.*, Ex. R (emphasis added); Ex. J, 248:25-249:1, 249:18-

23   23.

24   Apple leverages the high switching costs by withholding information in the primary and

25   secondary markets about future market conditions or alternatives, substantially enhancing its

26   market power in the iOS apps and IAP aftermarket. Byrd Decl., Ex. K, ¶ 98. Competition in the

27   primary market for iOS Devices does not constrain Apple in the aftermarket because consumers

28   lack sufficient information about the features and costs of the aftermarket when they make their

-6-

choice in the primary market.[4] When buying an iOS Device, consumers lack sufficient information to accurately predict how they will use their iOS Device, what apps and in-app content will be available, and how much they will spend on apps, in-app content, and other complementary products. *Id.*, ¶ 103.[5]

█████████████████████████████████████████████

██████ *Id.*, Ex. C, 3864:21-23; Ex. L §§ 2.3.10, 3.1.1; Ex. M, 117:1-2. These factors all contribute to Apple's near-complete monopoly power in the aftermarket for paid iOS apps and IAP.

### D.    Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins

The App Store is the only place where Apple's iOS Device customers can buy apps and pay for IAP. Apple has cornered virtually 100% of the worldwide multi-billion-dollar market for iOS apps and IAP by eliminating all competition. Byrd Decl., Ex. K, ¶ 108; TAC, ¶ 51. ████

████. Byrd Decl., Ex. U, 133:20-135:17; Ex. E, 72:8-12; Ex. D, 143:5-13; Ex. C, 3932:11-13.

█████████████████████████████████████████████

███████████████████████████████████████. *Id.*, Ex. V at '99, § 7.3.

█████████████████████████████████████████████

████████. *Id.*, Ex. K, ¶ 116. ████████████████████████

████████████████████████████████████████████.

---

[4] █████████████████████████████████████████ *Id.*, Ex. S; Ex. T, 308:13-20.

[5] ████████████████████████. *Id.*, Ex. D, 133:2-11, 136:9-17; Ex. I, 188:2-189:5, 189:18-22. ███. *Id.*, Ex. M, 144:10-23 ████████████████ It never disclosed the 30% commission on paid apps and IAP before the Supreme Court's 2019 ruling in Plaintiffs' favor. *Pepper*, 139 S. Ct. 1514. ████████████████████████████████. Byrd Decl., Ex. D, 132:20-24, 134:6-21.



1   *Id.*, Ex. W; Ex. X; Ex. Y, 56:6-8, 97:3-7, 234:12-21.

2

3

4                                    *Id.*, Ex. X at '6318; Ex. K, ¶ 117.

5

6        . *Id.*, Ex. X at '6318; Ex. K, ¶ 118.

7

8

9            . *Id.*, Ex. I, 137:13-138:3, 138:9-14, 140:10-141:10.

10

11

12        *Id.*, 135:8-136:14, 137:13-138:3, 138:9-14.

13

14

15                                            *Id.*, Ex. Z;

16   Ex. I, 143:25-144:6, 145:6-13.

17

18                                    *Id.*, Ex. Z; Ex. I,

19   143:25-144:6; 145:6-13.

20

21

22        . *Id.*, Ex. X at '318.

23        *Id.*, Ex. I, 140:10-141:10. As a monopolist, Apple is

24   able to set prices arbitrarily and without considering costs.

25       **E.    Apple's Purported Business Justification Is Pretextual**

26            Apple's purported business justification for forbidding sales of iOS apps outside the App

27   Store—alleged security and privacy concerns—is pretextual. Apple's choice for the App Store to

28   be the only market for iOS apps and IAP payments was a business decision; it was not necessary

1  to ensure the iOS ecosystem's security.[6]

3  Byrd Decl., Ex. KK, at '311, Ex. BB,

4  322:10-19, 323:25-324:13; Ex. CC, 2556:9-22. Apple easily could implement features to support

5  app purchases and payment for IAP without forcing iOS Device customers to shop and pay on the

6  App Store, just as it does with macOS.[7] Apple allows developers to sell apps to Mac users outside

7  of Apple's Mac app store.

8  . See id., Ex. A, 207:24-208:1; Ex. BB, 321:3-19. Apple has no genuine

9  security reason for restricting iOS app distribution to the App Store because the App Store itself

10  provides little if any extra security beyond what is provided by iOS

12  . Id., Ex. CC, 2569:12-20; 2571:17; Ex.

13  J, 127:9-22, 129:5-18. And, of course, requiring IAP payment processing on the App Store does

14  not advance security—that payment structure merely empowers Apple to take its cut from

15  consumers before remitting developer proceeds. Id., Ex. C, 3863:18-3864:2.

---

[6] . Byrd Decl., Ex. AA; Ex. J, 108:22-24, 109:18-110:4.

Id.,
129:19-130:19 (emphasis added).

[7] Id., Ex. DD, at '383. See also id. Ex. A, 207:24-208:1.

[8] . Id., Ex. EE; Ex. BB,
140:15-141:12.

Id., Ex. E, 200:4-11.
(id., Ex. FF, 94:9-23),
Id., Ex. M, 214:23-215:23.

Id., Ex. I, 169:1-9.
Id., Ex. FF, 121:19-23.

**F.      Class Members Have Been Uniformly Impacted and Suffered Damages**

Apple's unlawful and anticompetitive exclusivity scheme has generated enormous supra-competitive profits for Apple. Since 2008, Apple has collected more ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. K, ¶ 25; Ex. X, at '317. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.*, Ex. E, 86:10-87:3. And Apple's customers pay ***uniform prices*** for each app and for IAP. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. D, 265:6-11, 266:12-15, 268:2-270:25. Customers do not separately negotiate prices.

Apple's conduct increases the prices of apps and IAP paid by consumers. *Id.*, Ex. K, ¶ 131. Consumers bear a large portion of Apple's 30% commission. Specifically, anyone who buys apps or pays for IAP is impacted by Apple's supra-competitive App Store commissions because they lead directly to increased prices for apps and IAPs in the App Store. *Id.*[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. T, 177:19-178:2; Ex. D, 94:6-11; *see also id.*, Ex. II ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. JJ, at '680; Ex. T, 177:2-17, 178:10-21, 179:5-9. Apple has overcharged Class members by ▮▮▮▮▮ of dollars for paid apps and IAP during the Class Period as a result of its anti-competitive conduct. *Id.*, Ex. K, ¶¶ 236, 239.[10]

---

[9] Apple's conduct also harms innovation by preventing new and innovative app stores on iOS and app development that could benefit consumers. *See id.*, Ex. K, ¶ 243; Ex. HH (Apple said reduced commissions of Small Business Program would enhance innovation).

[10] But for Apple's conduct, competing app stores would have entered the iOS apps and IAP aftermarket, alongside the option of direct distribution of apps and IAP payment, offering competitive alternatives to the App Store. *See, e.g., id.*, Ex. A, 72:5-12, 74:6-9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-10-

1    **IV.    ARGUMENT**

2        **A.    Standards for Class Certification**

3        Antitrust class actions play an integral role in the private enforcement of antitrust laws. *See*

4    *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S.

5    251, 266 (1972); *see generally* 6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS, § 18:1,

6    at 3-6 (4th ed. 2002) ("NEWBERG"). Courts should "'resolve doubts in these actions in favor of

7    certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D.

8    Cal. 2015) (quoting *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal.

9    2005)); *Dilts v. Penske Logistics, LLC*, 2013 U.S. Dist. LEXIS 192323, at *5 (S.D. Cal. Jan. 17,

10   2013) ("doubts regarding the propriety of class certification should be resolved in favor of

11   certification").

12       Rule 23 permits class certification where: "(1) the class is so numerous that joinder of all

13   members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims

14   or defenses of the representative parties are typical of the claims or defenses of the class; and (4)

15   the representative parties will fairly and adequately protect the interest of the class." *Ruiz v. XPO*

16   *Last Mile, Inc.*, 2016 U.S. Dist. LEXIS 152095, at *14 (S.D. Cal. Feb. 1, 2016). Further, the party

17   seeking class certification only needs to satisfy the requirements of one of the subsections of Rule

18   23(b). *Id.* at *13. Class actions for money damages proceed under Rule 23(b)(3), which

19   additionally requires that "the questions of law or fact common to the class members predominate

20   over any questions affecting only individual members, and that a class action is superior to other

21   available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b)(3). The

22   Court may certify a class action if, after "rigorous analysis," it determines that Plaintiffs have met

23   their burden. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

24       While the class certification analysis must be rigorous, a motion for class certification does

25   not require "free-ranging merits inquiries." *Stockwell v. City and County of San Francisco*, 749

26   F.3d 1107, 1111-12 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568

27   U.S. 455, 466 (2013)). "Rule 23(b)(3) requires a showing that ***questions*** common to the class

28   predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*

*Inc.*, 568 U.S. at 459. *See also Stockwell*, 749 F.3d at 1112 ("demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies"). The Court may consider the merits only to the extent the class determination involves considerations enmeshed in the factual and legal issues comprising Plaintiffs' causes of action. *See Dukes*, 564 U.S. at 351. Moreover, the Court is "bound to take the substantive allegations of the complaint as true." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("*Tableware*") (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

Antitrust actions are well-suited for class-wide resolution. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Like other antitrust claims, Plaintiffs' claims against Apple rest on evidence and economic analysis common to all iOS Device customers.  Plaintiffs will prove that sales of iOS apps and IAP is a properly defined relevant antitrust market; Apple has monopoly power in that market; Apple willfully acquired or maintained that power; and its conduct caused antitrust injury and damages to the Class. In addition, as set forth in the Expert Report of Daniel L. McFadden, established and reliable econometric models are available to quantify the antitrust impact and damages caused by Apple's alleged anticompetitive conduct on a class-wide basis.

### B.    The Four Prerequisites of Rule 23(a) Are Satisfied

#### 1.    The Class Is Undoubtedly Numerous

Rule 23(a)(1) provides that a class should be certified if "the class is so numerous that joinder of all members is impracticable." Because millions of Apple customers bought iOS apps or paid for IAP throughout the U.S., numerosity is easily satisfied. *See Apple iPod iTunes Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107127, at *8-9 (N.D. Cal. Dec. 22, 2008) ("*iTunes*"), *amended by* 2009 U.S. Dist. LEXIS 10755 (N.D. Cal. Jan. 15, 2009); *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107523, at *37 (N.D. Cal. Sept. 29, 2008) (Where the precise size of the class is unknown, but "'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'") (quoting NEWBERG, § 3:3).

#### 2.    Class Members Share Common Questions of Law and Fact

Rule 23(a)(2) requires "questions of law or fact common to the class." The commonality requirement is satisfied if a classwide proceeding has the "capacity . . . to generate common

answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations and quotations omitted). "Antitrust liability alone constitutes a common question." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("*High-Tech II*"). *See also In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (commonality satisfied where plaintiff questions whether defendant's business practices are anticompetitive and whether each class member suffered the same injury as a result of defendant's anticompetitive conduct).

To begin, Plaintiffs must prove both that a "'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). Additionally, questions surrounding "the willfulness of Apple's behavior" and "questions of antitrust injury" will be integral to Plaintiffs' success on their monopolization and attempted monopolization claims and are common to the Class. *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *14-15. Those quintessential common questions are shared by each Class member. Even if each Class member were forced to proceed individually on their antitrust claims, each would have to prove market and market power as foundational elements of their own cases. The "questions of market definition, market share, and market power are common to all members of the proposed class." *Id.*, at *12.

In addition to common factual issues, Class members also share the legal issue of whether Apple violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing the aftermarket for iOS apps and IAP. Whether Apple violated the antitrust laws is a common legal issue. *See Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005); *Thompson v. Clear Channel Commc'ns, Inc.* (*In re Live Concert Antitrust Litig.*), 247 F.R.D. 98, 113 (C.D. Cal. 2007) ("*Live Concert*").

### 3.  Plaintiffs Are Typical

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." FRCP 23(a) (3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct

which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotations and citation omitted). In antitrust cases like this, typicality "will be established by plaintiffs and all class members alleging the same antitrust violations." *Pecover v. Elec. Arts, Inc.*, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec. 21, 2010) (quotations and citation omitted). Moreover, the typicality requirement is "liberally construed." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002).

Plaintiffs allege the same antitrust claims as all other members of the Class. Each Plaintiff (and Class member) purchased an iOS Device and then bought an app from Apple or paid for IAP through the App Store during the Class Period, and each was injured by paying the supra-competitive prices for the apps and IAP. *See* Byrd Decl., Exs. LL-OO; *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (9th Cir. 2016) ("all class members were injured by the same alleged antitrust conspiracy and incurred the same alleged injury – suppressed compensation caused by Defendants' single antitrust conspiracy.") These common facts give rise to common claims by Plaintiffs and all other Class members for the same antitrust violations by Apple – monopolization and attempted monopolization of the aftermarket for apps and IAP.

### 4. Plaintiffs Are Adequate

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a) (4).  Adequacy under Rule 23(a)(4) turns on two basic questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

To disqualify either class representatives or class counsel, perceived conflicts of interest must "relat[e] to the subject matter of the suit" (Newberg, §18:14, at 40-41; *see also Blackie*, 524 F.2d at 909) and must be actual, not hypothetical. Mere potential conflicts are not sufficient to defeat class certification. *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("this circuit does not favor denial of class certification on the basis of speculative conflicts"). Here, the interests of Plaintiffs and the rest of the Class are entirely aligned. As direct consumers of iOS apps and in-

app content during the Class Period, they all share the same interest in determining: (1) whether Apple monopolized the iOS apps aftermarket; and (2) whether they paid supra-competitive prices for apps and in-app content as a result. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 U.S. Dist. LEXIS 39841, at *36 (N.D. Cal. June 5, 2006) ("*DRAM*") (adequacy of representation met because "the named plaintiffs allege that all members of the proposed class paid artificially inflated prices as a result of defendants' [antitrust violation] during the relevant class period, that all suffered similar injury as a consequence of the conspiracy, and that all seek the same relief"). Under these circumstances, no conflicts preclude class certification. *See Tableware*, 241 F.R.D. at 649.

Plaintiffs are motivated advocates for the Class. They have retained legal counsel with considerable experience in the prosecution of major class and antitrust litigation.   Plaintiffs have produced documents, provided declarations and/or sat for depositions. *See* Byrd Decl., Exs. LL-OO. Plaintiffs are committed to the prosecution of this action on behalf of the Class. *Id*. They easily meet the adequacy requirement, and the Court should appoint them Class Representatives.

### C.      The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) is satisfied when "questions of law or fact common to the class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). When "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022; *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *22.

To determine whether a class action is superior to individual actions, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *iTunes*, 2008 U.S. Dist. LEXIS 107127 at *22 (citing *Amchem*, 521 U.S. at 615, and *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007)).

The "predominance" and "superiority" factors are closely related: when common issues predominate, class actions achieve economy and efficiency by minimizing costs and avoiding the confusion that would result from inconsistent outcomes. *See Tableware*, 241 F.R.D. at 651.

### 1.    Common Questions of Law and Fact Predominate

Predominance is satisfied where the elements of class claims are subject to generalized, as opposed to individualized, proof. *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *38; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010). "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625. "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Plaintiffs will use generalized proof for each element of their claims.

To prove their Sherman Act section 2 monopolization claim, Plaintiffs will need to prove: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). For Plaintiffs to prove their claim for attempted monopolization, they will need to prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (internal quotation marks omitted). These standard "common questions" will predominate here. "[T]he state of the market and [Apple's] use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

Moreover, under Rule 23 (b)(3) courts should not evaluate merits issues, but should "focus[] on whether the questions presented, whether meritorious or not, were common to the members of the putative class." *Stockwell*, 749 F.3d at 1113-14; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 & n.8 (9th Cir. 2011) (district court resolves "factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a*

-16-

*whol*e" but "not to determine whether class members could actually prevail on the merits of their claims") (emphasis in original).

As Prof. McFadden confirmed, each element of Plaintiffs' monopolization and attempted monopolization claims can and will be proved with evidence common to all Class members. *See Live Concert*, 247 F.R.D. at 149; Newberg, § 18.25 at 84 ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

### a. Common Evidence Will Prove the Relevant Market and Apple's Power in That Market

The two predominant issues here will be the definition of the relevant market (*i.e.*, the aftermarket for iOS apps and IAP) and whether Apple possesses monopoly power in that market. *See Live Concert*, 247 F.R.D. at 147 (regardless of the merits of parties' positions, market definition and market power were predominant common issues supporting class certification). To state a valid claim under the Sherman Act, a plaintiff "must allege that the defendant has market power within a 'relevant market.'" *Newcal*, 513 F.3d at 1044 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)). "The relevant market is the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

In *In re Apple & AT&TM Antitrust Litig.*, the plaintiffs alleged a substantially identical "aftermarket for iPhone applications that 'would not exist without' the primary market for iPhones, and is thus 'wholly derivative from and depend[e]nt on the primary market.'" *Id.,* 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008) (quoting *Newcal*, 513 F.3d at 1049). This Court held that "[t]he allegations in the Complaint recite[d] facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in *Newcal*." *Id*. Here, Plaintiffs allege a nearly identical aftermarket: for iOS applications and IAP that would not exist without the primary market for iOS Devices.

The market in this case is different from the two-sided transaction platform at issue in *Ohio v. Am. Express Co*., 138 S. Ct. 2274 (2018) ("*Am. Ex.*"). There, the Supreme Court described a two-sided transaction platform as one "supplying only *one* product – *transactions* – which is

-17-

jointly consumed" by the parties on both sides of the platform. *Id*. at 2286 n.8 (emphasis added). In contrast, the Supreme Court explained in this case that Apple's App Store is an "electronic store where iPhone owners can ***purchase iPhone applications from Apple***." *Pepper*, 139 S. Ct. at 1518 (emphasis added). Apple does ***not*** sell apps or IAP to developers.[11] The Supreme Court did not identify the App Store as a two-sided transaction platform because it does not sell only one product jointly consumed by parties on both sides of the transaction the way ancillary credit card transactions were sold to both parties in *Am. Ex.*[12]

Moreover, Plaintiffs will use common evidence to demonstrate that Apple has power in that aftermarket. Plaintiffs have offered the economic analysis of Prof. McFadden regarding market power. Prof. McFadden's expert report opines that evidence common to every member of the Class — such as evidence of Apple's near 100% share of the market, evidence of Apple's ████████████████, and evidence that Apple prevents distribution of iOS apps outside the App Store – demonstrates Apple's market power in the relevant market. Byrd Decl., Ex. K, ¶¶ 108-122. *See Giuliano v. Sandisk Corp.*, 2015 U.S. Dist. LEXIS 193817, at *53 (N.D. Cal. May 14, 2015) ("economic analysis . . . offered a plausible class-wide methodology to establish market power.")

### b.   Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power

Plaintiffs also will use common evidence to demonstrate that Apple willfully acquired and maintained its monopoly power in the iOS apps and IAP aftermarket. *First*, Apple designed iOS to be a "closed" system to prevent iOS Device consumers from installing and running apps that

---

[11] *AmEx* is also distinguishable because American Express's anti-steering provisions sought to level the playing field with its competitors, other credit card companies, whereas Apple's anti-steering provisions empty the playing field of competition and allow Apple to maintain its near-100% monopoly over the relevant market. *Am. Ex.*, 138 S. Ct. at 2280.

[12] The App Store does not become a two-sided transaction platform merely because Apple's customers and app developers have each asserted antitrust claims against Apple. "Multiple suits are not atypical when the intermediary in a distribution chain is a bottleneck monopolist or monopsonist (or both) between the manufacturer on the one end and the consumer on the other end. A retailer who is both a monopolist and a monopsonist may be liable to different classes of plaintiffs—both to downstream consumers and to upstream suppliers—when the retailer's unlawful conduct affects both the downstream and upstream markets." *Pepper*, 139 S. Ct. at 1525. Of course, whether the App Store is or is not a two-sided market is *itself* a common question.

1  they did not obtain from Apple. TAC, ¶ 36. █████████████████████████████

2  ███████████████████████████████████████████. Byrd Decl., Ex. U, 133:20-

3  135:17, Ex. E, 72:8-12; Ex. D, 143:5-13; 247:15-22; Ex. C, 3932:11-13. ████████

4  ██████████████████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████████████████

6  ██████. *See id.*, Ex. L, §§ 2.3.10, 3.1.1; Ex. M, 117:20-22. This evidence of willful acquisition

7  and maintenance of monopoly power is common to all Class members and will predominate over

8  any individualized issues. "The question of whether there has been an antitrust violation is a

9  common issue rather than an individual one. In no event will the individual circumstances of

10  particular class members be relevant to the inquiry of whether such a violation has occurred."

11  *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *52.

12          c.      **Common Evidence Will Prove Apple's Anticompetitive**
                    **Conduct**

13

14          Apple's anticompetitive conduct is common to all Class members and is not in any way

15  individualized. Apple locked all iOS Devices to prevent all Class members from downloading

16  native apps from, or paying for IAP through, anywhere but the App Store. Plaintiffs will therefore

17  use class-wide proof of Apple's anticompetitive conduct in proving their monopolization and

18  attempted monopolization claims. *See Id.* at *53 ("Plaintiffs will rely on common evidence to

19  establish an antitrust violation, *i.e.*, to show that the Disputed Patents were fraudulently procured

20  and used by SanDisk to acquire and maintain monopoly power in the final flash product market.")

21          Apple's pretextual business justifications are affirmative defenses that are insufficient to

22  defeat a motion for class certification. *See Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (N.D.

23  Cal. 2008) (affirmative defense "must be proven, and is not an appropriate basis to deny class

24  certification."); *Shaffer v. Cont'l Cas. Co.*, 2007 U.S. Dist. LEXIS 96189, at *15 (C.D. Cal. Jan.

25  26, 2007) ("Court is not convinced that issues of damages or affirmative defenses preclude class

26  certification"). In any event, evidence tending to prove or disprove Apple's purported business

27  justifications likewise will be common to all Class members.

28          d.      **Common Evidence Will Prove Causal Antitrust Impact**

        "Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results

1   from a violation of the antitrust laws." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *40. "It is the

2   causal link between the antitrust violation and the damages sought by plaintiffs." *In re New Motor*

3   *Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008) (citing *Sullivan v.*

4   *Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994)). Thus, Plaintiffs here "must be able to

5   establish, predominantly with generalized evidence, that all (or nearly all) members of the class

6   suffered damage as a result of [Apple's] alleged anti-competitive conduct." *In re High-Tech Emp.*

7   *Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) ("*High-Tech I*") (quoting *In re TFT-LCD*,

8   267 F.R.D. at 311).

9          To demonstrate antitrust injury at trial, Plaintiffs need only show some damage suffered

10   because of the alleged anticompetitive behavior. *See Zenith Radio Corp. v. Hazeltine Research,*

11   *Inc.*, 395 U.S. 100, 114 n.9 (1969) ("burden of proving the fact of damage . . . is satisfied by . . .

12   proof of *some* damage flowing from the unlawful [conduct]; inquiry beyond this minimum point

13   goes only to the amount and not the fact of damage"). At the class certification stage, Plaintiffs

14   "need only advance a plausible methodology to demonstrate that antitrust injury can be proven on

15   a class-wide basis." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *45. Antitrust injury "flows from

16   that which makes defendants' acts unlawful." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484

17   (1982). Proof of such antitrust impact can be "made on a common basis so long as the common

18   proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561

19   F.2d 434, 454 (3rd Cir. 1977). Antitrust "[i]mpact is a distinct element of liability, independent of

20   proof of a violation and independent of the matter of individual damages." *Glictronix Corp. v. Am.*

21   *Tel. & Tel. Co.*, 603 F. Supp. 552, 588 (D.N.J. 1984).

22          Plaintiffs typically establish antitrust injury or impact for class certification through expert

23   testimony that generally accepted economic methodologies are available to demonstrate such

24   impact and to reasonably calculate damages on a class-wide basis. *See e.g.*, *Live Concert*, 247

25   F.R.D. at 144; *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *44-45; *Bafus v. Aspen Realty, Inc.*, 236

26   F.R.D. 652, 658 (D. Idaho 2008) (expert declaration described what appeared to the court to be a

27   viable method for determining economic effect on a class basis). Plaintiffs have submitted the

28

1   Expert Report of Dr. Daniel L. McFadden in support of their motion for class certification.[13]  *See*

2   Byrd Decl., Ex. K. Prof. McFadden has conducted a sophisticated, two-step analysis, first

3   estimating Apple's but-for commission structure and then estimating the effect of Apple's but-for

4   commission on the prices for apps and IAP in the BFW. To conduct that analysis, Prof. McFadden

5   used a combination of multivariable regression model (estimating consumer demand) and a

6   structural model (using profit maximization conditions to estimate developer costs and but-for

7   prices). The two-step analysis and the econometric methodology as applied by Prof. McFadden

8   are widely accepted by economists to determine and measure the effects of anticompetitive

9   conduct on market prices. Prof. McFadden's work on the data he has received to date establishes

10  that the analysis and methodology satisfactorily determine and measure by common means the

11  effect of Apple's anticompetitive conduct on app and IAP prices.

12      Whether consumers paid to subscribe to music streaming services or purchased 100 virtual

13  tokens in a game app, their transactions were subject to higher prices because of Apple's App Store

14  supra-competitive commissions, as a result of which app developers inflated the price of apps and

15  IAPs above a competitive level. *Id.*, ¶ 131. App Store commissions increased app developers'

16  effective operating costs, and app developers set higher prices to offset some of the increased cost.

17  Prof. McFadden's methodologies and conclusions are fully consistent with Plaintiffs' aftermarket

18  antitrust theory and with the Supreme Court's decision in *Pepper*. This evidence of antitrust impact

19  will be common to all members of the Class and will predominate over any individualized issues.

20          e.      **The Damages Will Be Estimated Using a Common Method**

21      Once antitrust injury is established, the overall burden of proving damages is eased

22  significantly under Section 2 of the Sherman Act. *See Moore v. Jas. H. Matthews & Co.*, 682 F.2d

23  830, 836 (9th Cir. 1982); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48. Individual damages issues

24  are thus generally no bar to certification of antitrust claims. *See Live Concert*, 247 F.R.D. at 133-

25  34; *Rubber Chems.*, 232 F.R.D. at 354; *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir.

26

27  _____

28  [13]Among his many qualifications, Prof. McFadden is the E. Morris Cox Professor Emeritus of
    Economics at the University of California at Berkeley and Nobel Laureate in Economics for his
    work on discrete choice modeling. *See* Byrd Decl., Ex. K, ¶ 1, 2.

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

1   2013) (plaintiffs need only propose a valid method for calculating class-wide damages, not an

2   actual calculation of damages); *see generally* NEWBERG, §18:27.

3        Here again, the quantification of damages reinforces predominance because Plaintiffs will

4   calculate damages on a class-wide basis, based upon one or more well-established and reliable

5   damages methodologies. *See, e.g., Little Caesar Enters. Inc. v. Smith*, 172 F.R.D. 236, 267 (E.D.

6   Mich. 1996); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48-50. In this case, Plaintiffs will establish

7   damages for all iOS apps customers pursuant to a common methodology, which Prof. McFadden

8   has formulated.

9        *First*, Prof. McFadden investigated what app store commission rates Apple would have

10  charged in a competitive but-for world ("BFW"). But for Apple's anticompetitive conduct, there

11  would have been non-Apple iOS app stores, against which Apple's App Store would have had to

12  compete to sell apps and IAP to iOS device consumers; as a result, Apple would have charged

13  lower, competitive commission rates. Prof. McFadden has determined that the BFW commission

14  rate would have ranged from 10% to 12%. Prof. McFadden based this range on various benchmark

15  analyses he performed as well as his analysis of Apple's App Store profit margin. Byrd Decl., Ex.

16  K, ¶ 136.

17       *Second*, based upon Apple's transactional data (through September 30, 2019), data

18  produced by App Annie, an app market analytics firm, and app developers' cost data produced in

19  discovery to date, Prof. McFadden estimated a model of consumer demand and app developer

20  costs to calibrate app and in-app content prices in the competitive BFW. This model consists of

21  (1) consumer demand for apps and IAP, (2) app developers' cost of supplying apps and in-app

22  content, *i.e.*, app developers' supply function, and (3) app developers' pricing decisions. Prof.

23  McFadden estimated this model of demand and supply, given Apple's real world app store

24  commissions, and then used the estimate to calibrate the app and in-app content prices that iOS

25  device consumers would have paid if Apple had charged competitive commissions. *Id.*, ¶¶ 137,

26  138.

27       Courts repeatedly have acknowledged similar methodologies as accepted means of

28  calculating class-wide damages in antitrust cases. Multiple regression analysis of the kind Prof.

McFadden used here is commonly used at class certification. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 260 (3rd ed. 2011), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf; *see also, e.g., In re TFT-LCD Antitrust Litig*., 267 F.R.D. 583, 606 (N.D. Cal. 2010) ("courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis"); *High-Tech II*, 985 F. Supp. 2d at 1212; *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 371-73 (C.D. Cal. 2011); *In re Capacitors Antitrust Litig. (No. III)*, 2018 U.S. Dist. LEXIS 195310, *56 (N.D. Cal. Nov. 14, 2018); *In re Korean Ramen Antitrust Litig.*, 2017 U.S. Dist. LEXIS 7756, *33-37 (N.D. Cal. Jan. 19, 2017). Moreover, use of a structural model, as Prof. McFadden has done, is also an accepted methodology. *See*, *e.g.*, *In re Static Random Access Memory Antitrust Litig*., 264 F.R.D. 603, 615 (N.D. Cal. 2009) (structural model was a "plausible methodolog[y] … to demonstrate class-wide injury"); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co*., 2019 U.S. Dist. LEXIS 169446, at *13-15 (N.D. Cal. Sep. 20, 2019). Finally, use of a benchmark is "a generally accepted methodology for proving antitrust impact and damages." *In re Blood Reagents Antitrust Litig*., 2015 U.S. Dist. LEXIS 141909, at *29 n.9 (E.D. Pa. Oct. 19, 2015); *see also Johnson v. Ariz. Hosp. & Healthcare Ass'n*, 2009 U.S. Dist. LEXIS 122807, at *38 (D. Ariz. July 14, 2009).

Apple may challenge Prof. McFadden's application of these accepted methodologies for calculating class-wide damages, but this is not the time or place to resolve any battle of experts. "It is not necessary that plaintiffs show that their expert's methods will work with certainty at this time. Rather, plaintiffs' burden is to present the court with a likely method for determining class damages." *Tableware*, 241 F.R.D. at 652; *Live Concert*, 247 F.R.D. at 110 ("district court is not permitted to discount the testimony of a plaintiff expert merely because the defendant has challenged some aspect of the expert's opinion"). Prof. McFadden's damages model is consistent with Plaintiffs' theory — and the Supreme Court's view – of the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("'plaintiff's damages case must be consistent with its liability case'") (citation omitted); *Pepper*, 139 S. Ct. at 1518.

## 2.     Superiority

Superiority under Rule 23(b)(3) is demonstrated where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism in resolving the antitrust claims asserted against it here. Litigating the monopolization and attempted monopolization claims of each iOS Device customer on an individual basis, even if it were practically feasible, is plainly not the preferable alternative. *See*, *e.g.*, *High-Tech II*, 985 F. Supp. 2d at 1228 (class action superior where "Plaintiffs case rises and falls with their common evidence"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 1994 U.S. Dist. LEXIS 12652, at *9-10 (N.D. Cal. Aug. 31 1994) (finding class action superior method because, "[d]espite the complexity of determining individual damages, other methods of adjudicating this controversy would appear to be even more complex and less efficient."); *Live Concert*, 247 F.R.D. at 148 (class mechanism clearly superior way to resolve antitrust claims, even if individualized damages analysis assumed to be required); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *51 ("unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to each class member").

Indeed, class certification is nothing less than essential if the private antitrust enforcement mechanism is to function at all. As the court held in *Tableware*: "The modest amount at stake for individual plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial economy, it represents plaintiffs['] only chance for adjudication." *Id.*, 241 F.R.D. at 652 (citing *Amchem*, 521 U.S. at 616). A class action is the superior means of resolving cases such as this, where individual claims are too small to be litigated individually but which involve large damages in the aggregate. *See Id.,* at 617. In *iTunes*, this Court certified an antitrust class action that "involves potentially millions of class members," where individual recoveries "would likely be no more than several hundred dollars," finding that "there would be little incentive for an individual iPod purchaser to take on a factually complex antitrust case such as this one." *Id.*, 2008 U.S. Dist. LEXIS 107127, at *23. The Court's analysis applies with identical force to this case as well.

**D.     Appointment of Class Counsel**

The Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel. Rule 23 requires the Court to appoint counsel to represent the interests of the Class. *See* FRCP 23(g)(1); *Rubber Chems.*, 232 F.R.D. at 355. For the reasons stated above in connection with the adequacy requirements of Rule 23(a) (4), and Wolf Haldenstein has demonstrated thus far in its role as Interim Class Counsel in this litigation, Wolf Haldenstein has served as lead counsel throughout this litigation and undoubtedly is "well equipped" to vigorously represent the proposed Class. *See* Byrd Decl., Ex PP.  Moreover, Kellogg Hansen is a preeminent law firm representing both plaintiffs and defendants in complex trial and appellate matters.  With more than 90 attorneys, Kellogg Hansen boasts an extensive record of success before the Supreme Court and in Courts of Appeals and District Courts throughout the United States. *See* Byrd Decl., Ex. QQ. Kellogg Hansen successfully briefed and argued the appeal before the Supreme Court in *Pepper*.  The Court should accordingly appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

**V.     CONCLUSION**

Accordingly, this case easily meets all the requirements of Rules 23(a) and 23(b)(3) for class certification. Plaintiffs therefore request that the Court grant their motion to certify the class action, to appoint Plaintiffs as Class Representatives, and to appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**

By:___*/s/ Rachele R. Byrd*_____
        RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN

MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &**
  **FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed Co-Class Counsel*

272950v13

-26-