# EXHIBIT 22

VOLUME 1

Pages 1 - 214

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | |
|---|---|
| EPIC GAMES, INC., Plaintiff, vs. APPLE, INC., Defendant. | NO. C-20-5640 YGR<br>Monday, May 3, 2021<br>Oakland, California<br>BENCH TRIAL |
| APPLE, INC., Counterclaimant, vs. EPIC GAMES, Inc., Counter-Defendant. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff: CRAVATH, SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
**BY: KATHERINE B. FORREST, ESQUIRE**
**GARY A. BORNSTEIN, ESQUIRE**
**YONATAN EVEN, ESQUIRE**

(Appearances continued.)

Reported By: Diane E. Skillman, CSR 4909, RPR, FCRR
Official Court Reporter

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff: CRAVATH, SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
**BY: LAUREN A. MOSKOWITZ, ESQUIRE**
**JUSTIN C. CLARKE, ESQUIRE**
**M. BRENT BYARS, ESQUIRE**

For Defendant: GIBSON, DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, California 90071
**BY: RICHARD J. DOREN, ESQUIRE**
**DAN SWANSON, ESQUIRE**
**CYNTHIA RICHMAN, ESQUIRE**

GIBSON, DUNN & CRUTCHER, LLP
2001 Ross Avenue, Suite 1100
Dallas, Texas 75201
**BY: VERONICA S. MOYE, ESQUIRE**

PAUL WEISS RIFKIND
WHARTON & GARRISON LLP
2001 K STREET, NW
Washington, DC 20006
**BY: KAREN DUNN, ESQUIRE**
**JESSICA E. PHILLIPS, ESQUIRE**

models to Apple. The Court wanted to assess whether there would be serious ramifications for those businesses as well.

Well, the evidence will show that there would be. We asked Mr. Sweeney if he thought that console manufacturers were monopolists in their own product, and he said yes. And it is true.

If Epic can prevail on its theory, there will be nothing to distinguish any of these transaction platforms. They all charge the same commission. They nearly all prohibit sideloading or third party app stores or both, and they all facilitate in-app purchases.

Mr. Sweeney's personal preference that all platforms be open is directly contrary to what the antitrust laws say is procompetitive. And the law protects Apple's choice to have an integrated system, just like it protects Sony and Nintendo.

And so at the end of the day, Your Honor, to win this case, Epic is going to have to convince this Court of so many things that don't make any sense; that the same games being played by the same people at the same time should not be grouped together, that a business model praised just last year by Epic's lead economist should be invalidated based on the testimony from that same economist, and that Apple's brand of defining commitment to safety, security, reliability, and quality are all just a big pretext.

But the most dangerous thing that Epic is going to try to

sell the Court is the idea that consumers would be better off if Epic had its way. Nothing could be further from the truth. Epic speculates about a world where Apple was a different company and is asking this Court to make a big bet that that world is a better world than the one we live in. It isn't.

The result for consumers and developers will be less security, less privacy, less reliability, lower quality and less choice. And those are the very things that the antitrust laws seek to protect.

Your Honor, we look forward to presenting our case to you.

**THE COURT:** All right. Thank you, Ms. Dunn.

Ms. Forrest, your first witness.

**MS. FORREST:** Thank you, Your Honor --

**THE COURT:** Ms. Forrest, just give me a moment.

Ms. Forrest.

(Pause in the proceedings.)

**THE CLERK:** Okay.

**MS. FORREST:** Epic calls Mr. Timothy Sweeney.

**THE COURT:** Good afternoon, Mr. Sweeney.

**THE WITNESS:** Good afternoon.

**THE CLERK:** All right.

(**TIMOTHY SWEENEY**, called as a witness for the Plaintiff, having been duly sworn, testified as follows:)

**THE WITNESS:** I do.

**THE CLERK:** Please state your full name and spell

your last name.

**THE WITNESS:** Timothy Dean Sweeney.

**THE CLERK:** I am sorry. You can be seated to do that, into the mic.

**THE WITNESS:** Timothy Dean Sweeney. S-W-E-E --

**THE CLERK:** Let me turn on your mic.

**THE COURT:** Now, let's try.

**THE WITNESS:** Timothy Dean Sweeney. S-W-E-E-N-E-Y.

**THE COURT:** We heard you, but --

**THE CLERK:** Wrong mic. Sorry.

**THE WITNESS:** I'm Timothy Dean Sweeney. S-W-E-E-N-E-Y.

**THE COURT:** All right. Thank you. You may proceed.

**DIRECT EXAMINATION**

**BY MS. FORREST:**

**Q.** Good morning, Mr. Sweeney. Where do you live, sir?

**A.** I live in Cary, North Carolina.

**Q.** And by whom are you employed?

**A.** I work with Epic Games Incorporated.

**Q.** And what is your position with Epic?

**A.** I am the CEO and founder of the company.

**Q.** And did you have anything to do with the decision by Epic to sue Apple in the case that has brought us here to trial today?

**A.** Yes, as the CEO of Epic, it was my decision.

**Q.** Have you ever heard of the term "special deal"?
**A.** Yes.
**Q.** Is Epic seeking a special deal from Apple in connection with the filing of this lawsuit?
**A.** No, the remedies of it that we are seeking here are the changes to Apple's behavior that would affect the entire market, and all participants in it.
**Q.** Is there any portion of the remedy that Epic is seeking that is asking for app review to go away?
**A.** No. With respect to apps distributed through the iOS App Store, I'm a supporter of Apple's freedom to review apps.
**Q.** And is there any portion of the remedy that Epic is seeking that is seeking to have Apple's In-App Purchase functionality go away?
**A.** No. I support Apple's right to offer a purchasing system to developers that they may use with consumers. Epic is simply seeking the ability for other payment systems to compete with among iOS so that developers can choose freely among them.
**Q.** All right. And we are going to turn for a moment to Epic's business.
Can you describe for the Court as of today what is Epic's business?
**A.** Epic is in a variety of businesses all tied to the common theme of building and supporting real-time 3D content, both

through consumer products and to developers, and to other -- and other services that socially connect users together. The three major areas of our business are consumer products, such as *Fortnite*, *Rocket League* and *Houseparty*.

Product team directed at developers which enabled them to develop their own apps or games, such as *Unreal Engine* and Epic Online Services. And we also operate a digital store that connects developers with PC and Mac games to consumers on the PC and Mac platform called the Epic Games Store.

**Q.** All right. We will come back to some of these in a moment. But can you describe generally who some of Epic's competitors are in its various lines of business?

**A.** Certainly.

In the area of our consumer apps, our competitors range from other social ecosystem companies, such as Facebook or Roblox, to other game developers such as Activision or Electronic Arts.

In our business targeting developer tools, our *Unreal Engine* business, and Epic Online Services business, our competitors include Unity, a maker of another 3D engine, and Microsoft and Amazon who build similar online service, SDKs.

And with respect to the Epic Games Store and the PC and Mac market, our competitors include stores that publish games for many publishers. Stores that distribute games for many publishers, such as Steam and Good Old Games, to proprietary

stores run by publishers themselves, such as Electronic Arts' origin service, and Activision's Blizzard service.

**Q.** Is Apple a competitor of Epic in any way?

**A.** Apple is a competitor of Epic in a number of businesses in various ways.

**Q.** And can you describe some of those please?

**A.** Certainly.

Apple has an expanded role in publishing and distributing iOS games to Apple --

**Q.** Did you say "publishing industry"?

**A.** Sorry. Apple operates Apple Arcade, a subscription game service, which to some extent competes with Epic's products.

Apple provides SDKs of various sorts, such as sign in with Apple, which to some extent competes with Epic's account system.

**Q.** All right. And in terms of the distribution of apps, is there any competition between Epic and Apple?

**A.** There is not, because Apple bars us from operating a store, a digital app store that could operate on the iOS platform.

**Q.** Now --

**A.** I am sorry. Can I correct?

However, Apple also operates the Mac App Store. And the Epic Games Store is, to some extent, in competition with the Mac App Store in that we both sell products to the same game

distributed through the Epic Games Store?
**A.** Yes. There are several.
**Q.** Can you name them and the type of app they are, for the Court?
**A.** Certainly.
There's the Brave web browser. There's KenShape, a creation tool for artists. There is Itch, I-T-C-H, dot IO, a third party store hosted by our store.
**Q.** Does the Epic Games Store charge developers a commission for the apps that it distributes?
**A.** Epic charges a commission to developers who use our payment method, which we provide them as an option.
**Q.** If a developer does not use the payment method that EGS provides, does Epic charge a commission in any other way?
**A.** Epic charges no commission when developers use their own payment method for in-app purchases. I should note that the only way to distribute a paid game in the Epic Games Store currently is with the initial paid transaction occurring using Epic's payment method.
**Q.** All right. So there are two different types of commissions; is that right, through the Epic Games Store?
**A.** Well, there's a commission on the initial sales of an app if it's not free, if -- which is mandatory. And then there is a commission on in-app purchases, which is only charged when a developer uses our payment processing method.

**Q.** How did Epic -- what is the commission rate that is charged by the Epic Games Store for the initial purchase of an app?
**A.** It's 12 percent of gross revenue.
**Q.** And how much is the commission rate for -- that Epic charges for an in-app purchase?
**A.** 12 percent when our payment processing is used.
**Q.** And what does the 12 percent cover?
**A.** 12 percent is intended to cover all Epic's variable operating costs. The cost of processing an additional transaction.
**Q.** And does Epic make a profit with its 12 percent commission? And let's focus on in-app purchases.
**A.** Epic makes a gross profit on the variable cost associated with a new purchase. We make more money from the 12 percent than it typically costs us to cover the cost of that additional purchase, but that does not account for all of the storage costs, such as marketing and exclusive products.
**Q.** Is the Epic Games Store currently profitable?
**A.** No. When you consider all of the costs of the Epic Games Store, it's hundreds of millions of dollars short of being profitable because of the upfront investments we've made in the store.
**Q.** And is that also true also in August of 2020, was the Epic Games Store profitable at that time?

**A.** It was not profitable then.
**Q.** Is there any projection that you have as to when the Epic Games Store will achieve profitability?
**A.** I don't have detailed financial projections for long-term, but we have a general expectation of becoming profitable within three or four years, apparently.
**Q.** Is the Epic Games Store currently available on iOS?
**A.** No.
**Q.** Why not?
**A.** Apple does not allow third parties to distribute stores for iOS.
**Q.** You mentioned a moment ago that Epic has a payment processing system. Is there a name for that?
**A.** We are nowadays calling it Epic Direct Payment.
**Q.** All right. Where is Epic Direct Payment used?
**A.** It's used as the default payment method in the Epic Games Store for Windows and Mac, and it is the payment service that we enter when we launched *Fortnite* on iOS -- I'm sorry, *Fortnite* -- when we launched *Fortnite's* direct payment service on iOS.
**Q.** And for third-party developers whose apps are distributed through the Epic Games Store, do they have to use the Epic Direct Payment system?
**A.** No, they are not required to.
**Q.** Prior to August 2020, had the Epic Direct Payment system

processed any transactions on any platform?
**A.** Yes.
**Q.** Prior to August of 2020 approximately what was the volume of transactions that the Epic Direct Payment system had processed?
**A.** Between *Fortnite* on open platforms and the Epic Games Store, we had processed over a billion dollars of financial transactions.
**Q.** And are you aware of any security issues introduced on to any devices as a result of the use of the Epic Direct Payment system?
**A.** No.
**Q.** Does Epic have any plans for Epic Direct Payment on iOS?
**A.** Yes. So Epic introduced Epic Direct Payment into *Fortnite* on iOS. And it is a general service that we would like to make available to other developers in the future if we were allowed to.
**Q.** Are there any benefits that Epic believes it derives from the use of the Epic Direct Payment system?
**A.** Yes.
**Q.** And can you describe those for us?
**A.** When a customer contacts us for support, if we process that customer's payment directly, we have far more knowledge about the details of the payment and far more control over issuing refunds or partial refunds or investigating anything

by selling kind of thematic cosmetics to go along with the concerts; correct?

**A.** Yes.

**Q.** What is the price range in real money for items that can be purchased with V-Bucks?

**A.** My understanding is they will be between like $1 and $20 for stand-alone items. Then we have -- sometimes have bundles of multiple items which can go up to, I believe, 30 or $40. I am not certain about all of the offers we've ever had.

**Q.** Some may have been more?

**A.** Possibly.

**Q.** What does it cost to Epic to generate a V-Buck, minting a V-Buck?

**A.** There is no cost to a V-Buck. There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.

**Q.** And who sets the prices for the skins and cosmetics in bundles?

**A.** The *Fortnite* team in general.

**Q.** In terms of roles, who's involved in that task?

**A.** Nowadays it's under the general responsibility of Epic President Adam Sussman. And then we have a team of -- a business team who works on individual pricing of individual items.

**Q.** So in your testimony, you discussed how prices had risen

over the years as a result of this 30 percent commission.
Do you recall that topic generally?
**A.** Yes.
**Q.** The commission has remained the same over the years; correct?
**A.** 30 percent is still 30 percent.
**Q.** 30 percent has been 30 percent as really the industry standard from 2010 and before until today; correct?
**A.** 30 percent is most the prevalent rate charged by the stores, and it was then and it is now.
**Q.** So when we talk about the costs of cosmetics and skins and bundles rising, we are talking about pricing decisions made by the Epic team; correct?
**A.** Yes.
**Q.** Not any rising commission pressure from any of the platforms, much less iOS. True?
**A.** Correct.
With respect to these 30 percent commissions.
**Q.** Now, there was some discussion about cross-progression earlier. And just to make sure we have all of our different cross-disciplines well-defined here, cross-progression, as I understand it, is when a player plays on, for example, an iOS device and then later fires up *Fortnite* on their PC, and there they will find that their game progression and their identities and their purchases will all be there waiting for

them even though they are on a different device.

Do I have that right?

**A.** Yes.

**Q.** And cross-progression is important to Epic because a significant percentage of *Fortnite* players play *Fortnite* on more than one type of device; correct?

**A.** I'm not sure of the percentage of *Fortnite* players who play on multiple devices.

**Q.** You know it's a significant fraction, don't you?

**A.** I don't know what fraction it is.

**Q.** Well, why don't we take a look -- let me ask you a couple more questions first, actually.

You mentioned in your testimony the analytics group?

**A.** Yes.

**Q.** And what does the analytics group or team do for Epic?

**A.** They track the usage of our products through a variety of metrics such as, in the case of *Fortnite*, play time, spending dozens of others' statistics that help with development.

**Q.** And does that -- and you mentioned that that group circulates periodic reports and updates, that sort of thing?

**A.** Yes.

**Q.** Do they use the Epic *Fortnite* user data in part to generate those reports?

**A.** These are the result of aggregate data on usage only. We -- our general philosophy is to track as little personal

data about our users as we absolutely need to run our business.

**Q.** Because privacy is important to you.

**A.** Yes.

**Q.** And you don't want to do anything that will put your users' privacy in peril; correct?

**A.** Yes.

**Q.** That is a personal concern of yours?

**A.** Yes.

**Q.** What I would like to do, sir, if I may, Your Honor, is hand up a binder with some exhibits in it and then walk through a few of them.

**THE COURT:** Can you give me the numbers, Mr. Doren?

**MR. DOREN:** Yes, Your Honor.

DX5535, Your Honor.

**BY MR. DOREN:**

**Q.** Mr. Sweeney, if you could please look at the tab for DX5535, I think you will find these documents are in number order.

**THE COURT:** Are you bringing it on the screen?

**MR. DOREN:** Yes.

Not that that's done us a lot of any good, Your Honor. We will try to enlarge it on the screen.

**BY MR. DOREN:**

**Q.** Mr. Sweeney, do you have Exhibit 5535 in front of you?

**THE COURT:** Ms. Forrest, do you have an objection to this document?

**MS. FORREST:** Your Honor, yes. Foundation.

**THE COURT:** All right. Go ahead.

**MR. DOREN:** Thank you, Your Honor.

**BY MR. DOREN:**

**Q.** Mr. Sweeney, you have this exhibit in front of you?

**A.** Yes.

**Q.** And do you recognize it as an Analytics Inside Weekly Report from internally at Epic Games?

**A.** Yes.

**Q.** And what is an Analytics Inside Weekly Report at Epic?

**A.** This is a status report from the Analytics Team reporting findings about various products.

**MR. DOREN:** Your Honor, I would move Exhibit 5535 into evidence.

**MS. FORREST:** No objection.

**THE COURT:** Admitted.

(Defendant's Exhibit 5535 received in evidence)

**BY MR. DOREN:**

**Q.** Mr. Sweeney, directing your attention to key insights from analytics the past week at the very top.

Do you see that?

**A.** Yes.

**Q.** This is for the week of February 4, 2020; correct?

**A.** Yes.
**Q.** So this was a time when *Fortnite* was on iOS; correct?
**A.** Yes.
**Q.** And it was on Android but only through sideloading; correct?
**A.** I'm not certain as of this date. We went into Google Play at some point in early 2020, but I'm not sure when.
**Q.** Fair enough.
And the analytics group states in the first bullet point -- sorry, the second bullet point: The *Fortnite* players who play on mobile are the most likely to play on other platforms.
First of all, do you agree with that statement?
**A.** I don't have any independent understanding of it.
**Q.** Okay.
And your analytics group reported for the week -- on February 4, 2020 that *Fortnite* players who play on mobile are the most likely to play on other platforms then (approximately 38 percent).
Do you see that?
**A.** Yes.
**Q.** And would you expect your analytics group to be circulating accurate information to you and others?
**A.** I'm not sure if this is circulated to me, but generally I would, but I don't know the nature of this statistic.

**CERTIFICATE OF REPORTER**

I, Diane E. Skillman, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

______________________________

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

Monday, May 3, 2021

PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

CHRISTINE A. VARNEY (*pro hac vice*)
cvarney@cravath.com
KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*

[Additional counsel appear on signature page]

THEODORE J. BOUTROUS JR. (SBN 132099)
tboutrous@gibsondunn.com
RICHARD J. DOREN (SBN 124666)
rdoren@gibsondunn.com
DANIEL G. SWANSON (SBN 116556)
dswanson@gibsondunn.com
JAY P. SRINIVASAN (SBN 181471)
jsrinivasan@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYE (*pro hac vice*)
vlewis@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

CYNTHIA E. RICHMAN (*pro hac vice*)
crichman@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant and Counterclaimant Apple Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

EPIC GAMES, INC.,

*Plaintiff, Counter-defendant,*

vs.

APPLE INC.,

*Defendant, Counterclaimant.*

No. 4:20-CV-05640-YGR-TSH

**TRIAL TRANSCRIPT ERRATA**

Trial Date: May 3, 2021
Courtroom: 1, 4th Floor
Judge: Hon. Yvonne Gonzalez Rogers

Case 1:16-cv-1456 ... Document 475-25 Filed 08/11/21 Page 2 of 27

Pursuant to the parties' discussion with the Court on Friday, May 21, 2021, and the parties' subsequent conferral, the parties submit the below list of errata to the daily trial transcripts.

| Trial Day (Date) | Page | Line | Original | Correction | Witness |
|---|---|---|---|---|---|
| Day 1 (5/3) | 94 | 5' | "enabled" | "enables" | Sweeney |
| Day 1 (5/3) | 108 | 18' | "game in which" | "game, which" | Sweeney |
| Day 2 (5/4) | 307 | 15' | "is" | "as" | Sweeney |
| Day 2 (5/4) | 427 | 8' | "Mac PC" | "Mac or PC" | Patel |
| Day 2 (5/4) | 427 | 12' | "access play games" | "access to play games" | Patel |
| Day 2 (5/4) | 433 | 20' | "destroying" | "displaying" | Patel |
| Day 2 (5/4) | 434 | 2' | "natural effects" | "network effects" | Patel |
| Day 2 (5/4) | 434 | 11-12' | "natural effects" | "network effects" | Patel |
| Day 2 (5/4) | 446 | 3' | "I've seen that as on some providers' websites." | "I've see that on some providers' websites." | Patel |
| Day 2 (5/4) | 453 | 8-10' | "I have retweeted others on what the complete text of that tweet was." | "I have retweeted others. I'd have to look what the complete text of that tweet was." | Patel |
| Day 2 (5/4) | 456 | 12' | "process" | "processing" | Patel |
| Day 2 (5/4) | 461 | 18' | "relation's" | "relations" | Patel |
| Day 2 (5/4) | 462 | 4' | "Rainbow Seat 6" | "Rainbow Six Siege" | Patel |
| Day 2 (5/4) | 467 | 9' | "games" | "gamers" | Patel |
| Day 2 (5/4) | 469 | 22' | "substantive" | "subset of" | Patel |
| Day 2 (5/4) | 470 | 6' | "matrix" | "metrics" | Patel |
| Day 2 (5/4) | 474 | 16' | "services" | "service is" | Patel |
| Day 2 (5/4) | 475 | 9' | "in-App purchase" | "the browser" | Patel |

Dated: June 11, 2021

CRAVATH, SWAINE & MOORE LLP
Christine A. Varney (*pro hac vice*)
Katherine B. Forrest (*pro hac vice*)
Gary A. Bornstein (*pro hac vice*)
Yonatan Even (*pro hac vice*)
Lauren A. Moskowitz (*pro hac vice*)
M. Brent Byars (*pro hac vice*)

FAEGRE DRINKER RIDDLE & REATH LLP
Paul J. Riehle

By: /s/ *Katherine B. Forrest*
Katherine B. Forrest
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Mark A. Perry
Veronica S. Moye

/s/ *Mark A. Perry*
Mark A. Perry
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 887-3667

*Attorneys for Defendant and Counterclaimint Apple Inc.*

VOLUME 2

Pages 215 - 480

UNDER SEAL PAGES 481 - 486

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | |
|---|---|
| EPIC GAMES, INC., Plaintiff, vs. APPLE, INC., Defendant. | NO. C-20-5640 YGR<br>Tuesday, May 4, 2021<br>Oakland, California<br>BENCH TRIAL |
| APPLE, INC., Counterclaimant, vs. EPIC GAMES, Inc., Counter-Defendant. | Pages 481 - 486 (Under Seal) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff: CRAVATH, SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
**BY: KATHERINE B. FORREST, ESQUIRE**
**GARY A. BORNSTEIN, ESQUIRE**
**YONATAN EVEN, ESQUIRE**

(Appearances continued.)

Reported By: Diane E. Skillman, CSR 4909, RPR, FCRR
Official Court Reporter

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

For Plaintiff: CRAVATH, SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
**BY: LAUREN A. MOSKOWITZ, ESQUIRE**
**JUSTIN C. CLARKE, ESQUIRE**
**W. WES EARNHARDT, ESQUIRE**
**BRENDAN BLAKE, ESQUIRE**
**JIN NIU, ESQUIRE**

For Defendant: GIBSON, DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, California 90071
**BY: RICHARD J. DOREN, ESQUIRE**
**DAN SWANSON, ESQUIRE**
**CYNTHIA RICHMAN, ESQUIRE**
**RACHEL BRASS, ESQUIRE**

GIBSON, DUNN & CRUTCHER, LLP
2001 Ross Avenue, Suite 1100
Dallas, Texas 75201
**BY: VERONICA S. MOYE, ESQUIRE**

PAUL WEISS RIFKIND
WHARTON & GARRISON LLP
2001 K STREET, NW
Washington, DC 20006
**BY: KAREN DUNN, ESQUIRE**
**JESSICA E. PHILLIPS, ESQUIRE**

For Defendant: PAUL WEISS RIFKIND
WHARTON & GARRISON LLP
943 Steiner Street
San Francisco, California 94117
**BY: MEREDITH DEARBORN, ESQUIRE**

**Q.** Now, prior to itch.io, Epic had never had a store within its store, correct?
**A.** That's true with respect to software stores. One might consider Spotify a music store.
**Q.** Okay. Now -- and now you are back to Spotify, right?
**A.** Yes.
**Q.** And next on this opening graphic, was iHeart. The iHeart was also added around April 22nd, correct?
**A.** Yes.
**Q.** After you arrived in California for this trial, correct?
**A.** Yes.
**Q.** And KenShape, that, too, was launched or on the Epic Games Store around April 22, 2021?
**A.** Yes.
**Q.** And Krita was also placed on the Epic Games Store on April 22, 2021, correct?
**A.** Yes.
**Q.** And Brave was also placed on the App Store on April 22, 2021, correct?
**A.** Yes.
**Q.** And it was important to you to get all of these transactions completed before this trial started, right?
**A.** Yes. That was one of my motivations, to lead by example.
**Q.** Because you wanted to be able to have this slide shown in your opening statement, true?

**A.** It was not about a slide at that point.
**Q.** Just to be able to present this evidence to this Court, right?
**A.** I wanted to -- for Epic to demonstrate that we welcomed apps and other stores on our store.
**Q.** Mr. Sweeney, do you have any plans to change the name of the Epic Games Store to something other than the Games Store?
**A.** No. Epic Games is the name of our company. I don't plan to change it to something else.
**Q.** You testified yesterday that you expect the Epic Games Store to be profitable in three to four years. Do you remember that testimony generally?
**A.** Yes.
**Q.** Now when you say profitable within three to four years, you don't mean to suggest that the amount the company has invested in minimum guarantees to various game developers will have been paid off, do you?
**A.** That is not what I had in mind. I was thinking of turning an operating profit year -- year by year.
**Q.** Because you actually expect to never recoup hundreds of millions of dollars of those minimum guarantees, correct?
**A.** I don't know if that is quite right. I don't expect to recoup those minimum guarantees from the sales of the games where we made the guarantees, but we might recoup them there other profits later.

**Q.** Okay. But, sir, you expect to lose some hundreds of millions of dollars relative to the amount of minimum guarantees, correct?

**A.** Yes.

**Q.** If you could please turn to the Exhibit 3818.

(Pause in the proceedings.)

**MS. FORREST:** Your Honor, there is an issue with confidential material from third parties that we have been alerted to in DX3818. And what I would ask is, to the extent the document cannot be published, but can be used right now with Mr. Sweeney, and if he can be pointed to certain information. And perhaps Mr. Doren and I could talk afterwards about the specific information.

I think that the questioning can proceed if Mr. Doren can just point Mr. Sweeney to the information, have him talk about it here in open court, and then we can work out the additional sort of publication of the document and release of the document publicly outside of this setting.

**MR. DOREN:** And I assume I can read the document out loud?

**MS. FORREST:** There are certain portions, Your Honor, that I pointed to for Mr. Doren that I would rather not be read out loud, but he can certainly talk to Mr. Sweeney about it and point the Court to those portions by referring to a particular paragraph number, and, in fact, the first word.

Do you see that?
**A.** Yes, yes.
**Q.** Thank you.
I understand the issue with trying to find your way through these emails.
Mr. Sweeney, Mr. Wallerstein stated, of course, reviewing this request would be helpful if reviewed in the context of an overall financial model and strategic plan for EGS that shows how the large minimum guarantee outlays drive the business.
Do you see that?
**A.** Yes.
**Q.** And then up at the top of that same page, he says, the focus below feels a bit more about the likelihood to recoup the minimum guarantee only, but we should also confirm the overall financial impact to Epic to service this relationship and, of course, the forecasted revenues and additional users that can come to Epic.
Do you see that?
**A.** I heard it, but I am sorry --
**Q.** The top of page 3, Friday the 13th, 2019. From Mr. Wallerstein. Thanks for the background.
**A.** Okay. I see. Sorry.
**Q.** And you agree this is a statement from Mr. Wallerstein on September 13, 2019?
**A.** Yes.

**Q.** And then please turn to page 1. And this is where you weigh in, correct, on September 14th?
**A.** Yes.
**Q.** A little before 6:00 in the morning Eastern, correct?
**A.** Yes.
**Q.** And you state in the second paragraph of your email, Obviously the direct ROI -- is that return on investment?
**A.** Yes.
**Q.** Obviously the direct ROI scenario here is super crappy. The long-term value is in bringing consumers into Epic's multigame, multiplatform, social, and ecommerce system.
Was that your view on the purpose of these minimum guarantees back in September of 2019?
**A.** Yes.
**Q.** Does that remain your view today?
**A.** Yes.
**Q.** And then going down into the next paragraph you say, the complete future value of these deals is a function of new user LTV -- is that lifetime value?
**A.** Yes.
**Q.** -- comma, of the effect of new exclusive and nonexclusives on reengaging lap store users, an extent to which third-party games drive *Fortnite* and vice versa.
And then you say, of the extent to which Epic strategy can drive business model competition across platforms to benefit

our own games and leverage the disruption to establish the leading cross-platform social ecosystem for gaming.

And is that one of the main reasons why you've entered into these minimum guarantees?

**A.** Yes.

**Q.** And is that one of the main reasons why you opened the Epic Games Store in the first place?

**A.** Yes. We aspire to have a store on many platforms.

**Q.** Then you refer to Xbox Live, PlayStation, and Steam. And you state that these platforms are all locked games -- are all locked to one platform in those entities; is that right?

**A.** Yes.

**Q.** If I could ask you, please, sir, to look at Exhibit 4361.

Tell me when you have that.

**A.** I'm there.

**Q.** Excellent. Do you recognize this to be an Epic Games Store deck regarding a review of performance and strategy for the store that was created for a presentation on October 25, 2019?

**A.** Yes.

**Q.** And if you could please turn, sir, to page .020. Page 20.

**A.** Yes.

**Q.** And this shows a five-year P&L and user forecast, correct?

**A.** Yes.

**Q.** And this is a five-year forecast as of October 2019,

correct?
**A.** This is with multiple versions of forecasts.
**Q.** One being an aggressive pursuit model, correct?
**A.** Yes.
**Q.** And what is an aggressive pursuit model?
**A.** This was Epic very heavily investing in the business to promote growth.
**Q.** And the other being the winding-down model, correct?
**A.** Yes. This was looking at the worst-case scenario where the store fails, and we just have to pay out minimum guarantees despite that.
**Q.** All right. So why -- let's look first at the aggressive pursuit model. And I will drive straight to the bottom line here.
If we look down to the --
**THE COURT:** Mr. Doren, I'm going to stop you for a moment. I don't have that document. Let me get it.
**MR. DOREN:** Thank you, Your Honor.
**THE COURT:** You said 4361?
**MR. DOREN:** We can hand one up if you like.
**THE COURT:** Is it PX or DX?
**MR. DOREN:** DX3461.
**THE COURT:** Okay I have it.
You may proceed.
**MR. DOREN:** Thank you, Your Honor.

**BY MR. DOREN:**

**Q.** Mr. Sweeney, on page .020 of Exhibit 4361, I would ask you to look, please, at the EBIT lines for these two scenarios.

Do you see those lines?

**A.** Yes.

**Q.** And what is EBIT?

**A.** Earnings before interest and corporate tax.

**Q.** Okay. And this shows -- this tracks -- this tracks earnings, if you will, these estimated earnings, both on an annual basis across these years from 2019 to 2027, and on a cumulative projected basis, correct?

**A.** Yes.

**Q.** So in other words, how the company -- the store is projected to do each year, and then how the store is projected to have done taken together over the years, correct?

**A.** Yes.

**Q.** And if we look at those lines, we see that when we get out to 2024, under the aggressive pursuit model, that is the first year where a profit is projected, correct?

**A.** Yes.

**Q.** And -- but the cumulative -- that is a profit of -- is that $15 million?

**A.** Yes.

**Q.** But it was also projected that as of 2024, the cumulative earnings of the company would be a negative 854 million?

**A.** Yes, that's a cumulative earnings of the store.

**Q.** The cumulative earnings will be negative $854 million, correct?

**A.** Yes.

**Q.** And if we then track out what is called here as the flow from prior years to 2025, 2026, and 2027, by 2027 the store is still estimated to be in a cumulative negative state of a loss of $719 million, correct?

**A.** Yes.

**Q.** And the estimated earnings for that year, for that year standing alone, is only $5 million, correct?

**A.** Yes.

**Q.** And then if we look over at the winding down model, we see that if we go out to 2024, that is the first year where there is a projected profit, a positive amount of money for operations for that year alone, correct?

**A.** Yes.

**Q.** And that's $36 million?

**A.** Yes.

**Q.** And there would still be a cumulative loss under the winding-down model of $654 million, correct?

**A.** Yes.

**Q.** And if we go out to 2027, we see that the cumulative loss would be $642 million, correct?

**A.** Yes.

**Q.** And, of course, these numbers don't include any of the unallocated costs and expenses we talked about before, correct?

For example, any of the shared technology development that may benefit the store.

**A.** I need a minute.

(Pause in the proceedings.)

**THE WITNESS:** I am not sure that is correct. There is a people cost running into the tens of millions of dollars in this model. So I think the finance team may have attempted to do some cost attribution.

**BY MR. DOREN:**

**Q.** So, Mr. Sweeney, are you saying that there may be a head count costs in here?

**A.** Yes.

**Q.** Okay.

**A.** A line called People.

**Q.** So among the expenses that are included in these forecasts are the head count expenses specific to the store, correct?

**A.** I don't know what the finance team was referring to when they wrote "People" here.

**Q.** But there are no engineering costs in here anywhere, are there?

**A.** I don't know whether engineering costs are included in People.

**THE COURT:** Hearing no objection --

**MS. FORREST:** Well, let me just -- I am sorry, Your Honor. 37 --

**THE COURT:** 74.

**MS. FORREST:** -- 74, we have -- there is one word that I want to talk to Mr. Doren about -- just literally one word -- that -- before it goes up in the box, I would like to ask if he and I could agree that it gets blacked out. But we have no objection to the document otherwise being received into evidence.

**MR. DOREN:** Your Honor, I ask we handle this the same way as the other document: Admit it now. We will confer and the Court can decide.

**THE COURT:** That's fine. 3774 is admitted with that reservation.

(Defendant's Exhibit 3774 received in evidence)

3724?

**MS. FORREST:** No objection, Your Honor.

**THE COURT:** That's admitted.

(Defendant's Exhibit 3724 received in evidence)

**MS. FORREST:** Same issue with the 3774, that it won't go up to the box until we have conferred. Thank you.

**THE COURT:** Again, I need to know by lunch.

**MS. FORREST:** Yes, Your Honor.

**BY MR. DOREN:**

**Q.** Mr. Sweeney, you use an iPhone, correct?
**A.** Yes.
**Q.** People have given you -- particularly I would think a person in your position, people have given you Android devices, correct?
**A.** Yes.
**Q.** And you've given those away, right?
**A.** I have.
**Q.** You prefer the iPhone?
**A.** Yes.
**Q.** You love the aesthetics of the hardware, true?
**A.** Yes.
**Q.** You like the operating system, correct?
**A.** I like many aspects of the operating system.
**Q.** And you believe that the iPhone is a premium product, correct?
**A.** Yes.
**Q.** And you understand that user privacy and security are fundamental competitive differentiators for Apple, correct?
**A.** Yes.
**Q.** And you personally prefer to use iPhone because Apple's approach to maintaining your privacy, Mr. Sweeney, is superior to Google's, correct?
**A.** That's among the reasons.

**Q.** And among the reasons that you use an iPhone is because Apple's approach to customer data security is superior to Google's as well, correct?

**A.** Yes.

**Q.** And when I say "Google," you understand I'm referring generally to the Android devices, correct?

**A.** Yes.

**Q.** And you value those qualities, the safeguarding of your privacy and your data, true?

**A.** Yes.

**Q.** And if Apple were to compromise those fundamental differentiators, it would lose a significant competitive advantage over Android devices, wouldn't it?

**A.** I think I would need to know about specific changes it would make to judge whether they would make the platform more or less competitive.

**MR. DOREN:** Thank you, Your Honor. I pass the witness.

**THE COURT:** Okay. Redirect.

We will go, Ms. Forrest, for another eight minutes before our break.

**MS. FORREST:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. FORREST:**

**Q.** Good morning, Mr. Sweeney.

**CERTIFICATE OF REPORTER**

I, Diane E. Skillman, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

Wednesday, May 5, 2021