# EXHIBIT 26

VOLUME 15

Pages 3827 - 4052

Under Seal Pages 3998 - 4014

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | |
|---|---|
| EPIC GAMES, INC., | |
| Plaintiff, | NO. C-20-5640 YGR |
| vs. | Friday, May 21, 2021 |
| APPLE, INC., | Oakland, California |
| Defendant. | BENCH TRIAL |
| APPLE, INC., | |
| Counterclaimant, | |
| vs. | |
| EPIC GAMES, Inc., | |
| Counter-Defendant. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff: CRAVATH, SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
**BY: KATHERINE B. FORREST, ESQUIRE**
**GARY A. BORNSTEIN, ESQUIRE**
**YONATAN EVEN, ESQUIRE**

(Appearances continued.)

Reported By: Diane E. Skillman, CSR 4909, RPR, FCRR
Pamela Batalo-Hebel, CSR 3593, RMR, FCRR
Raynee Mercado, CSR 8258 RMR, CRR, FCRR

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

not for me, although I wore a nice coat today.

**THE CLERK:** It's now back on.

**THE COURT:** It's now back on.

Mr. Cook, come on up, please.

**MS. MOYÉ:** Thank you, Your Honor. Apple calls Mr. Tim Cook.

**THE CLERK:** I will have you remain standing. I will swear you in.

**TIMOTHY COOK**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE CLERK:** Please be seated.

**THE WITNESS:** Thank you.

**THE CLERK:** And then would you just be sure that mic is kind of pointed under the shield, your face shield, and then please state your full name and spell your last name.

**THE WITNESS:** Timothy Donald Cook, C-O-O-K.

**THE COURT:** Okay, Mr. Cook, we can't hear you yet.

**THE CLERK:** Let me turn on your mic.

Okay. Now your mic is on. Sorry.

**THE COURT:** Go ahead.

**THE WITNESS:** Timothy Donald Cook, C-O-O-K.

**THE COURT:** Good morning, sir.

**THE WITNESS:** Good morning.

profitability trends over -- over time.
**Q.** Were you attempting to compare the relative profitability of your products and services in this document?
**A.** Well, we didn't try to allocate costs, as you can probably tell from the document itself. It's -- later in the document, it makes it clear that that was not done. And so it has a limited use to it.
**Q.** And you mentioned it was used to look at trends.
Can you explain that to the Court?
**A.** Well, if you -- if you don't allocate, like we don't, and you compare the numbers year to year to year to year, you can draw certain inferences to those, as long as that allocation methodology is the same.
**Q.** Were documents like this PX2385 routinely prepared at Apple?
**A.** This is the only one that I recall.
**Q.** And what is the date of this document?
**A.** It is September of 2019.
**Q.** Does this document include an assessment of the App Store's profitability, sir?
**A.** No. Again, we don't do profitability at that level.
**Q.** And Epic's expert, Mr. Barnes, testified that it showed operating margins -- fully burdened operating margins for the App Store.
Is that correct, sir?

**A.** No.

**Q.** Let's look specifically at page .8.

**A.** Yes.

**Q.** Without going into any of the specifics, sir, I would just like you to explain what is on this page.

Starting first with just the number -- the revenue caption, what is captured there, again without going into the detail for the document?

**A.** Right. It -- it shows a revenue by product and some of the services and then sort of a -- catch-all categories, I guess.

**Q.** And the gross margin?

**A.** Same thing, but -- but at the gross margin level.

**Q.** What about opex?

**A.** It shows an opex for the company that's in the -- sort of the total, and then it shows only sort of an unallocated opex methodology under it.

**Q.** Does the number for the App Store in the "opex" column include all of the expenses associated with the App Store?

**A.** No, not at all.

**Q.** Do you have an understanding of, in a general sense, which categories of expenses are included in the opex as reflected here?

**A.** This would only be some of the very direct kind of costs. Like app review would be in here, as an example.

**Q.** Operating margin on this document --
**A.** Is just the simple arithmetic of gross margin minus opex.
**Q.** Does this document convey an operating margin for the App Store on a fully burdened basis after taking account of all of its costs?
**A.** It does not.
**Q.** Let's look at page .24 in the document.
Does this page, sir, in your opinion, relate to the allocation issue we were just discussing?
**A.** It does. You can see here clearly that the R&D and SG&A allocation to services is very, very small. And so it -- it's just a reminder that this -- that's not the purpose of the analysis.
**Q.** And is there an entry in this document for the overall opex for the App Store?
**A.** There's not.
**Q.** And on this opex product allocation page, is there an entry for opex to the App Store?
**A.** There is not.
**Q.** Who reviewed this document, sir?
**A.** It was a limited audience. My recollection is it would have been -- and if I look at the -- what reminds me is looking at the distribution list of this document. It was the CFO and I and some of the CFO staff.
**Q.** Did you share this document with any of the business unit

leaders?

**A.** No. Again, it -- it has a limited purpose to it, so I don't believe any business leaders saw it.

**Q.** Did you use the information in this document to make any business decisions?

**A.** No.

**Q.** Let's look at two more pages of the document. Let's look at page .13.

Do you see a reference to the App Store there?

**A.** I do.

**Q.** Are the operating margin numbers reported there fully burdened operating margins for the App Store as if it were a stand-alone business unit?

**A.** They are not.

**Q.** Do the margins that are reported here for the App Store refer to the iPhone App Store as well as the Mac App Store?

**A.** They do.

**Q.** Now, let's look at another document the Court has heard some testimony about. This is PX2392.

**MS. MOYÉ:** This is similar, Your Honor. It's been sealed, and I just want to ask some general questions about it.

**THE COURT:** Proceed.

**MS. MOYÉ:** I believe it has been admitted also, Your Honor.

**THE COURT:** It has.

**BY MS. MOYÉ:**

**Q.** Sir, can you explain what this document is?

**A.** It is a -- appears to be, like, a benchmarking exercise from looking at reported operating margins from companies that -- that would report for their full company, and then -- and then overlaying that to this unallocated view of OP margin for Apple.

**Q.** Does this document contain information about the App Store's profitability?

**A.** It does not.

**Q.** And what are the margins referenced for the App Store in this document?

**A.** They are arrived at, I believe, by just taking the sum of the direct opex and subtracting that from gross margin. So it's a very -- it's not fully loaded, as you point out.

**Q.** Is the operating margin reported here higher than it would be if there had been a fully loaded exercise?

**A.** Yes, definitely.

**Q.** Let's look at page 2392.3. And, again, just some general questions about it.

You mentioned that there is a comparison of margins for other companies, and I see companies like Netflix there.

Are the margins for a company like Netflix directly comparable to the margins for a business like the App Store?

**BY MR. BORNSTEIN:**

**Q.** Do you have an understanding, sir, of the order of magnitude of the iOS App Store versus the Mac App Store revenues?

**A.** The iOS would be larger.

**Q.** How much larger, sir?

**A.** A lot larger.

**MR. BORNSTEIN:** Okay. We'll try and do the rest under seal. I don't want to trip over anything.

**BY MR. BORNSTEIN:**

**Q.** Take a look -- let's go back to that chart, the wave chart, as you called it, on .24 of this one-off presentation.

Now, you were talking with Ms. Moyé about the R&D numbers in your -- in your 10-K earlier.

Do you recall that?

**A.** Yes.

**Q.** Now, those R&D numbers were for the company as a whole; is that right?

**A.** That's correct.

**Q.** The allocation document here that we're looking at at .24 shows how at least your corporate financial planning and analysis group allocated those R&D numbers to different products within the company; correct?

**A.** For purposes of this analysis.

**Q.** Yes.

And so for purposes of this analysis, they sat down and they actually allocated the R&D to different products within the company; correct?

**A.** They did something --

**Q.** That's what they did. They -- it's on the page; right, sir?

**A.** On the direct basis. On some of the direct costs, to be clear.

**Q.** Okay.

So they allocated direct costs based on the top portion of the document here and then they allocated shared costs and they allocated allocated costs.

Do you see that?

**A.** I see the document, yes.

**Q.** All right. And I am correct in describing it that they allocated not just direct R&D, but shared and allocated R&D, as well; correct?

**A.** Shared for purposes of this analysis.

**Q.** And they went through and they did this work for you; correct? It's here.

**A.** They did the work for me, yes.

**Q.** And in doing that work, sir, they have allocated a total amount of R&D for the "rest of services" product that appears on the bottom of the page that, as you said, is a very, very, very small little purple sliver; is that right?

**A.** Yes.

**Q.** And "rest of services" is where the App Store lives; correct?

**A.** For this chart, yes.

**Q.** Okay. At this meeting that you had with Mr. Maestri and Ms. Casey, you had some discussion about this document, sir; correct?

**A.** We had a meeting about it, yes.

**Q.** And you or Mr. Maestri had some follow-up questions about this, did you not?

**A.** I don't recall that.

**Q.** Well, take a look at the first page of the document, the email from Ms. Casey. And she says, "Hi, Tim, Luca. Please find below the three follow-up items from the profitability meeting."

Do you see that?

**A.** I do.

**Q.** And she refers -- and I'm not going to read numbers here -- but she refers -- in the first item, which refers to iPhone profit, she says, "As discussed," and then she proceeds to give some information.

Do you see that?

**A.** Yes, I see it.

**Q.** Okay.

And then she provides two other topics, followed by, "Any

**A.** I think some developers -- do love the way it is today.
**Q.** And there are --
**A.** And then you obviously have one that doesn't.
**Q.** More than one, sir; isn't that right?
**A.** There's a few.
**Q.** Just a few? That's -- that's your understanding? There are just a few developers who don't like the current system?
**A.** That's the only ones that I know, yes.
**Q.** Okay. Well, how many developers, sir, have come in to testify on Apple's behalf in this trial?
**A.** I don't know.
**Q.** Okay. Would it surprise you to hear the answer is zero?
**A.** No, it wouldn't surprise me. I don't see that it would be -- that there's a natural way to include them.
**Q.** Okay. Fortunately, we -- you have excellent counsel, sir, who I'm sure could figure that out if there were developers who were interested in supporting the system.
But as it stands, there's nobody else who has ever been able to provide an app store on the iPhone and there's no way to know, other than your business judgment, whether somebody could do as good a job. Fair?
**A.** No. I disagree.
**Q.** Okay. Let's turn --
**A.** I disagree because --
(Simultaneous colloquy.)

**Q.** Let's turn to privacy, sir.

You can explain this to Ms. Moyé. She will give you the opportunity.

Let's turn to privacy which you've talked about a fair bit today. And you've said that Apple -- or you consider it one of the most important issues of the century, correct?

**A.** Yes.

**Q.** And you said in other contexts -- I don't think you said it today -- that Apple believes privacy is a basic human right.

**A.** Yes.

**Q.** Okay. Is it also the case that Apple believes that its stance on privacy is a differentiator in the market for its products?

**A.** I think we're on an island on this one. I think we care more than others do.

**Q.** And -- and do you think that helps you sell iPhones and other products to consumers?

**A.** I think there's some people that really want that and therefore buy an iPhone because of it.

**Q.** Right. And it's -- and it's something that you at Apple market to people to say, hey, we offer better privacy than some of our competitors and that's a reason you should prefer our device; isn't that right?

**A.** For people that want privacy.

**Q.** Yeah.
There are other app stores that could make a similar commitment to privacy. Fair?
**A.** I haven't seen any that do.
**Q.** That wasn't the question.
There are other people who could, right? There's no monopoly on privacy on Apple's part, correct?
**A.** I don't know that anybody would. They haven't thus far.
**Q.** Apple doesn't have a unique ability to safeguard privacy, does it?
**A.** Sure, it does.
**Q.** Apple doesn't have a unique ability to decide, other than through its control of the system, which apps and which apps are not safe and protective of user data and privacy, does it?
**A.** We reject 40,000 a week. And so there's a lot of work that goes on in terms of doing that and there's a lot of expertise that you build up over numerous years.
**Q.** The 40,000 that you reject each week, they're not all on privacy grounds, are they?
**A.** No. They would be for various different grounds.
**Q.** They're on a variety of grounds.
And people who, if they had a choice, who value privacy could decide to choose Apple because they value it, or they could decide to choose somebody else's app store if they thought somebody else was doing a better job, correct?

**A.** (Reviewing document.)
**Q.** If you can recall.
**A.** I don't recall this exact meeting. But, generally, this would have a broader audience to it than the other one.
**Q.** Thank you, sir.
And there was questioning about whether 2385 and 2392 were regular presentations. Do you recall that?
**A.** Yes.
**Q.** Are there any other presentations like that that you're aware of?
**A.** I don't recall any. I think it was the first time that it happened.
**Q.** And both of those were dated in September 2019?
**A.** I think so, yes.
**Q.** And have you seen any documents like that since September 2019?
**A.** I don't recall.
**Q.** Mr. Bornstein asked you a lot of questions about whether you understood what Epic's expert, Mr. Ned Barnes, had done in his expert work. Do you recall that?
**A.** Yes.
**Q.** Did Mr. Ned Barnes work at Apple in the 2019 time period?
**A.** Not to my knowledge.
**Q.** Did Mr. Ned Barnes provide any input into the three profitability documents we looked at, 2385, 2391, and 2392?

**A.** No.
**Q.** Who, sir, do you believe is in a better position to give truthful testimony to the Court on the meaning of those three documents, you or Mr. Ned Barnes?
**A.** I -- I am. I was in the meeting.
**Q.** Do those documents contain fully burdened P&L information for the App Store as a stand-alone business unit?
**A.** They do not.
**Q.** And are you concerned at all that Mr. Ned Barnes came in and said that he could compare some numbers in at least two of those documents, 2385 and 2392, to publicly reported documents?
**A.** I don't see how that would be possible because the publicly reported numbers are more of gross margin at the services level, not operating margin per service type.
**Q.** You were asked also some questions about offering Epic the ability to come back into the App Store after it deliberately breached its agreements with Apple. Do you recall that testimony?
**A.** Yes.
**Q.** And I believe you explained that you considered that conduct to be malicious; is that right, sir?
**A.** That's correct.
**Q.** Do you still consider it to be malicious?
**A.** I do.

**Q.** Why did Apple offer Epic the opportunity to come back into the store?

**A.** Because we thought it would be the right thing for the user and that the user was being put in the middle here of a business dispute, and the -- that was a terrible thing to do from the -- from the beginning.

And so we thought the business dispute should be settled in -- in court, if it had to, like we've wound up, but not have the user suffer from that.

**Q.** Was the offer that -- that was made to Epic, "Epic, you can come back into the App Store but continue malicious conduct"?

**A.** No, of course not. They would have to commit to abiding by the rules.

**Q.** You were asked some questions about a Schedule 2 to the developer program license agreement. I think it's number 2943. Do you remember that? It's in the big Epic binder.

**A.** 29 -- let me just make sure of the -- I recall it correctly.

Oh, this is the one I was asked questions about termination?

(Reviewing document.)

**Q.** Correct.

**A.** Yeah, I have it in front of me.

**Q.** Do you know whether or not Japanese law required the

**THE COURT:** But if they wanted to go and get a cheaper Battle Pack or cheaper V-Bucks, and they don't know that they've got that option, what is the problem with Apple giving them that option?

**THE WITNESS:** You mean in terms --

**THE COURT:** At least that information that they can go and have a -- you know, a different option for -- for making purchases.

**THE WITNESS:** If we allowed people to link out like that, we would in essence give up the -- our total return on our IP.

**THE COURT:** Right, but you --

**THE WITNESS:** Or --

**THE COURT:** But you could also monetize it a different way, couldn't you? I mean, that is, the gaming industry seems to be generating a disproportionate amount of money relative to the IP that you're giving them and everybody else. In a sense, it's almost as if they're subsidizing everybody else.

**THE WITNESS:** The -- the bulk of the apps on the App Store are free.

**THE COURT:** That's right.

**THE WITNESS:** And so you're right, there is some sort of subsidy there. However, the way that I look at that, Your Honor, is that by having such a large number of apps that are

free on the store, it increases the traffic to the store dramatically.

And so the benefit somebody gets that's charging is they get a much higher audience to -- to sell to than they would otherwise if there weren't free apps there.

**THE COURT:** So your logic, then, is that they don't get the customer base so -- it's more of a customer base, not an IP then?

**THE WITNESS:** It's both. Because we -- we need a return on our IP. I mean, we have a 150,000 API's to create and maintain and numerous developer tools, and the customer service piece of -- of dealing with all these transactions. And so there's a lot of --

**THE COURT:** Right, but let me ask you.

**THE WITNESS:** Sure.

**THE COURT:** So banking apps. Wells Fargo is based here. I have a -- I have multiple banking apps. I haven't paid for them. But I suspect, what, other than the $99, you don't charge Wells Fargo, right?

**THE WITNESS:** That's correct.

**THE COURT:** Or Bank of America?

**THE WITNESS:** That's correct.

**THE COURT:** But you're charging the gamers to subsidize Wells Fargo.

**THE WITNESS:** Well, in the gamer's example, they're

transacting on our platform.

**THE COURT:** People are doing lots of things on your platform. So -- so --

**THE WITNESS:** But this is a digital transaction with a observable change in -- in currency.

**THE COURT:** It's just -- it's just a choice of a model.

**THE WITNESS:** We've -- we've made a choice, yeah. There are -- there are clearly other ways to monetize and we chose this one because we think this one overall is the best way.

**THE COURT:** Well, it's quite lucrative. But it seems to be lucrative and -- and focused on -- on purchases that are being made frankly on an impulse basis -- that's a totally different question about whether that's a good thing or not, not really ripe for antitrust law. But it does appear to be disproportionate.

I understand this notion that somehow Apple is bringing the customer to the gamers. Right? The users.

But after that first time, after that first interaction, the gamers are keeping the customer with the games, that is, the developers of games are keeping their customers. Apple is just profiting off that, it seems to me.

**THE WITNESS:** I view it differently than you do, Your Honor.

**CERTIFICATE OF REPORTERS**

We, Diane E. Skillman, Pamela Batalo-Hebel, and Raynee Mercado certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. We further certify that we are neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that we are not financially nor otherwise interested in the outcome of the action.

_______/S/DIANE E. SKILLMAN______

Diane E. Skillman, CSR, RPR, FCRR

_________/S/ PAMELA BATALO-HEBEL__________

Pamela Batalo-Hebel, CSR, RMR, FCRR

________/s/ Raynee Mercado__________

Raynee Mercado, CSR, RMR, FCRR

Friday, May 21, 2021