1  BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
2  **WOLF HALDENSTEIN ADLER**
     **FREEMAN & HERZ LLP**
3  750 B Street, Suite 1820
   San Diego, CA  92101
4  Telephone: (619) 239-4599
   Facsimile: (619) 234-4599
5  manifold@whafh.com
   byrd@whafh.com
6
   MARK C. RIFKIN (*pro hac vice*)
7  MATTHEW M. GUINEY (*pro hac vice*)
   **WOLF HALDENSTEIN ADLER**
8    **FREEMAN & HERZ LLP**
   270 Madison Ave
9  New York, NY 10016
   Telephone: (212) 545-4600
10 Facsimile: (212) 686-0114
   rifkin@whafh.com
11 guiney@whafh.com

12 *Interim Class Counsel and Proposed Co-Class Counsel*

13 [Additional Counsel Appear on Signature Page]

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                           OAKLAND DIVISION

17

18 | IN RE APPLE IPHONE ANTITRUST | No. 4:11-cv-06714-YGR |
   | LITIGATION | |
19
   | | **[REDACTED VERSION OF** |
20 | | **DOCUMENT SOUGHT TO BE SEALED]** |

21 | | **PLAINTIFFS' OPPOSITION TO** |
   | | **DEFENDANT APPLE INC.'S** *DAUBERT* |
22 | | **MOTION TO EXCLUDE REPLY** |
   | | **TESTIMONY OF PROFESSOR DANIEL** |
23 | | **L. MCFADDEN** |

24 | | DATE:        December 14, 2021 |
   | | TIME:        10:00 a.m. |
25 | | CTROOM:   1, 4th Floor |
   | | JUDGE:      Hon. Yvonne Gonzalez Rogers |
26

27      **DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(b)**

28

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................... 1

II.    STATEMENT OF THE RELEVANT PROCEDURAL HISTORY ...................... 2

III.   ARGUMENT ........................................................................................... 3

       A.    Professor McFadden's Model Will Accurately Identify Injured Class Member
             Accounts and Calculate Damages at Trial ............................................. 3

             1.    Accounts Switching Between Prof. Prince's Samples Merely Demonstrate
                   the Standard Error in Any Statistical Analysis ............................... 3

             2.    Plaintiffs Are Not Required to Calculate Hundreds of Thousands
                   of Individual Class Member Losses Now or at Trial ...................... 6

             3.    Apple IDs Can and Will Be Linked to Class Members ..................... 9

       B.    Professor McFadden's Econometric Model is Scientifically Sound ................... 14

       C.    Professor McFadden's Model is Reliable ............................................... 15

             1.    Negative Log-Download Coefficients Are Not Illogical ..................... 15

             2.    Prof. Prince's Sports Genre Analysis Is Incomplete ........................ 16

       D.    Plaintiffs are Not Required to Prove Aggregate Damages at This Stage ............ 17

       E.    Professor McFadden's Benchmark Analysis is Reliable ............................... 18

       F.    Professor McFadden Accounts for Indirect Network Effects .......................... 25

IV.    CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ................................................................................... 7

*Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) ......................................................................................... 15, 25

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946) ............................................................................................. 7, 20

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   152 F.3d 588 (7th Cir. 1998) ...................................................................................... 25

*Blue Cross & Blue Shield v. AstraZeneca Pharm. LP*
*(In re Pharm. Indus. Average Wholesale Price Litig.)*,
   582 F.3d 156 (1st Cir. 2009) ........................................................................................ 6

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ...................................................................................... 6

*Brunswick v. Pueblo Bowl-O-Mat*,
   429 U.S. 477 (1977) .................................................................................................... 11

*Buxton v. Lil' Drug Store Prod., Inc.*,
   2007 U.S. Dist. LEXIS 56263 (S.D. Miss. Aug. 1, 2007) ........................................... 6

*Carroll v. SGS Auto. Svc.*,
   2020 US Dist. LEXIS 223676 (M.D. La. Nov. 30, 2020) .......................................... 12

*CollegeNET, Inc. v. The Common Application, Inc.*,
   711 Fed. Appx. 405 (9th Cir. 2017) ........................................................................... 12

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ............................................................................................... 11

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) .................................................................................... 24

*DSU Med. Corp. v. JMS Co.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...................................................................... 25

*Epic Games, Inc. v. Apple Inc.*,
   2021 U.S. Dist. LEXIS 172303 (N.D. Cal. Sep. 10, 2021) ........................... 18, 24, 25

-ii-

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
 352 F.3d 367 (9th Cir. 2003) ................................................................... 12

*Haller v. Astrazeneca Pharms. LP*,
 598 F. Supp. 2d 1271 (M.D. Fla. 2009) ..................................................... 6

*Hyland v. HomeServices of Am., Inc.*,
 2012 U.S. Dist. LEXIS 207531 (W.D. Ky. July 3, 2012) ......................... 24

*In re Air Cargo Shipping Servs. Antitrust Litigation*,
 2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014) ......................... 8

*In re Aluminum Phosphide Antitrust Litig.*,
 893 F. Supp. 1497 (D. Kans. 1995) ......................................................... 25

*In re C.R. Bard, Inc.*,
 948 F. Supp. 2d 589 (S.D.W. Va. 2013) .................................................... 5

*In re Capacitors Antitrust Litig. (No. III)*,
 2018 U.S. Dist. LEXIS 195310 (N.D. Cal. Nov. 14, 2018) ........................ 8

*In re Cardizem CD Antitrust Litigation*,
 200 F.R.D. 297 (E.D. Mich. 2001) ............................................................ 7

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp.*,
 984 F. Supp. 2d 1021 (C.D. Cal. 2013) ..................................................... 4

*In re Graphics Processing Units Antitrust Litig.*,
 253 F.R.D. 478 (N.D. Cal. 2008)............................................................. 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018)...................................................... 16

*In re Lidoderm Antitrust Litigation*,
 2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017) .......................... 8

*In re Linerboard Antitrust Litig.*,
 305 F.3d 145 (3d Cir. 2002)................................................................... 18

*In re Live Concert Antitrust Litig.*,
 2011 U.S. Dist. LEXIS 161362 (C.D. Cal. Jan. 4, 2011) .......................... 7

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
 169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................. 7

-iii-

*In re Nexium (Esomeprazole) Antitrust Litig.,*
777 F.3d 9 (1st Cir. 2016) ........................................................................................... 12, 13

*In re Online DVD Rental Antitrust Litig.,*
2010 U.S. Dist. LEXIS 138558 (N.D. Cal. Dec. 23, 2010) ...................................................... 24

*In re Optical Disk Drive Antitrust Litig.,*
2017 WL 11513318 (N.D. Cal. Dec. 18, 2017) ............................................................... 20, 24

*In re Scrap Metal Antitrust Litig.,*
527 F.3d 517 (6th Cir. 2008) ......................................................................................... 7

*In re TFT-LCD Antitrust Litig.,*
2012 U.S. Dist. LEXIS 9449 (N.D. Cal. Jan. 26, 2012) ............................................................ 6

*Kim v. Crocs, Inc.,*
2019 U.S. Dist. LEXIS 29131 (D. Haw. Feb. 25, 2019) ...................................................... 5, 6

*Leyva v. Medline Indus.,*
716 F.3d 510 (9th Cir. 2013) ....................................................................................... 11

*Lithium Ion Batteries Antitrust Litig.,*
2018 U.S. Dist. LEXIS 35744 (N.D. Cal. March 5, 2018) ...................................................... 15

*Patt v. Antech Diagnostics,*
2020 U.S. Dist. LEXIS 160220 (C.D. Cal. May 18, 2020) ...................................................... 12

*Price v. City of Seattle,*
2006 U.S. Dist. LEXIS 71041 (W.D. Wash. Sep. 19, 2006) ...................................................... 6

*Reed Const. Data Inc. v. McGraw-Hill Co.,*
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ............................................................................... 16

*Ruiz Torres v. Mercer Canyons Inc.,*
835 F.3d 1125 (9th Cir. 2016) ....................................................................................... 5

*Snyder v. Bank of Am., N.A.,*
2020 U.S. Dist. LEXIS 206437 (N.D. Cal. Nov. 3, 2020) .................................................. 21, 22

*Syufy Enterprises v. American Multicinema, Inc.,*
793 F.2d 990 (9th Cir. 1986) ....................................................................................... 19

*Takeguma v. Freedom of Expression LLC,*
2021 U.S. Dist. LEXIS 25834 (D. Ariz. Feb. 10, 2021) ...................................................... 21

-iv-

*Trotter Overhead Door, Inc. v. Trotter Doors, LLC*,
    2013 U.S. Dist. LEXIS 120815 (W.D. Okla. Aug. 26, 2013) .................................................. 17

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................................... 11

*United Food & Commer. Workers Unions & Emplrs. Midwest Health Bens. Fund v.
    Warner Chilcott Lted. (In re Asacol Antitrust Litig.)*,
    907 F.3d 42 (1st Cir. 2018) ............................................................................................... 12, 13

*United States v. Adams*,
    444 F. Supp. 3d 1248 (D. Or. 2020) ..................................................................................... 22

*Vaquero v. Ashley Furniture Indus.*,
    824 F.3d 1150 (9th Cir. 2016) ............................................................................................... 11

*Ward v. Apple Inc.*,
    2018 U.S. Dist. LEXIS 26040 (N.D. Cal. Feb. 16, 2018) ..................................................... 17

**Other Authorities**

Chetty, Raj, et al., *How Does Your Kindergarten Classroom Affect Your Earnings?
    Evidence from Project STAR* (March 2011) ........................................................................... 9

Daniel L. Rubinfeld, "Antitrust Damages,"
    *Research Handbook on the Economics of Antitrust Law*,
    ed. E. Elhague, (Elgar, 2012) ................................................................................................ 20

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (4th ed. 2002)
    § 10:5 ...................................................................................................................................
    § 10:7 ...................................................................................................................................... 8

**Rules**

Civil Local Rule 7-4(a)(3) ............................................................................................................. 1

Federal Rules of Civil Procedure, rule 702 ................................................................................. 22

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| *Daubert* Opp. | Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Daniel L. McFadden, filed on August 25, 2021 at ECF No. 497-4. |
| Epic Tr. | Trial transcript in *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-5640 YGR. |
| Ex. | Exhibit to the Declaration of Rachele R. Byrd in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed concurrently. |
| McFadden Reply | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 and filed as Exhibit 1 to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Motion for Class Certification at ECF No. 554-5. |
| McFadden Report | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at ECF No. 442-11. |
| McFadden Tr. | Transcript of the Deposition of Professor Daniel L. McFadden taken on November 5, 2021. |
| Motion or Mot. | Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed November 9, 2021 at ECF No. 581-4. |
| Prince Decl. | Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated and filed November 9, 2021 at ECF No. 581-5. |
| Prince Report | Expert Report and Declaration of Jeffrey T. Prince, Ph. D., dated and filed on August 10, 2021 at ECF No. 476-6. |
| Prince Tr. | Transcript of the Deposition of Professor Jeffrey Thomas Prince taken on October 4, 2021. |
| Reply | Plaintiffs' Reply Memorandum in Further Support of Motion for Class Certification, filed October 19, 2021 at ECF No. 554-4. |
| Rollins Decl. | Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motions & Briefs in Opposition to Class Certification, dated August 10, 2021 and filed August 11, 2021 at ECF No. 476-12. |

-vi-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**Statement of the Issues to be Decided:**[1] Whether Apple's Motion should be denied on its merits because: (1) Defendant's challenges go to the weight, not the admissibility, of Prof. McFadden's opinions; and (2) Prof. McFadden's opinions are relevant and reliable and therefore admissible.

## I.    INTRODUCTION

Using a well-established regression methodology, Prof. McFadden has created a reliable statistical model that demonstrates impact and injury on a classwide basis using common evidence. His model calculates *aggregate* Class damages, it permits *individual* damages calculations, and it *identifies* any potentially uninjured Class members by Apple ID. In its second *Daubert* motion attacking Plaintiffs' expert, Apple once again criticizes the correctness of Prof. McFadden's conclusions rather than the soundness of his methodology. But challenges that one methodology is better than another go to *weight* of the evidence, not its admissibility. Apple's attacks are more appropriately left for cross-examination at trial, where the jury will determine the correctness of Prof. McFadden's conclusions.

Apple's argument that Prof. McFadden's model cannot reliably determine which Apple ID accounts are injured is based upon its unreasonable insistence on a 100% confidence level that is inconsistent with sound economic and econometric principles. Furthermore, Apple argues that Prof. McFadden's model does not calculate individual Class member damages, but Plaintiffs are not required to calculate individual Class member losses at class certification—or even at trial. Plaintiffs are only required to present—at the merits phase—an *aggregate* damages calculation. Thereafter, Apple IDs can and will be linked to Class members using Apple's own records. Apple cannot withhold Class member identifiers from its data before production and then fault Plaintiffs for not linking anonymized IDs to Class members.

Apple's argument concerning supposed negative IAP prices in the But-For World mischaracterizes Prof. McFadden's model, which calculates prices for IAP at the app level instead of the unit level because IAP prices are *set at the app level* and they are never negative. The so-

---

[1]    Apple's Motion once again violates Civil Local Rule 7-4(a)(3) because it does not include a statement of the issues to be decided.

called absurd results Prof. Prince points to are a product of his mistaken extrapolation of pricing from the app level to individual items purchased. Furthermore, Apple's new argument regarding focal point pricing is simply an assertion that developers would impose their own, voluntary price tiers. However, whether compelled by Apple or voluntarily chosen by developers, focal pricing causes aggregate damages to *increase*, and therefore Prof. McFadden's model is conservative.

Apple also makes an unfounded assertion that Prof. McFadden's model produces illogical results because of the relationship between IAP and downloads. Since the log-download relationship is not statistically significant, it is *the same as zero*, and substituting zero for the statistically insignificant result is sound econometrics and produces sensible and reliable results. Prof. Prince also purports to analyze the Sports genre of apps, but he failed to construct margin bounds, so it is not surprising that he has produced irrational results.

Apple's criticism of the comparators Prof. McFadden used in his benchmark analysis is not a basis for exclusion. It, too, goes to the weight of his opinions, not its admissibility. In setting the 10-12% benchmark for Apple's commission in the But-For World, Prof. McFadden had a sound basis for selecting the comparators he used. He used the commission rates those companies charge in their more competitive app stores, and he tested those commission rates against the upper and lower bounds he set for Apple's own commission rate in the But-For World to satisfy himself that the benchmark rate was reasonable and reliable.

Finally, Prof. McFadden did not fail to consider both sides of the App Store as Apple contends because his methodologies *do* account for the effects of Apple's misconduct on both iOS device consumers and app developers.

## II.    STATEMENT OF THE RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their Motion for Class Certification on June 1, 2021, and submitted the expert report of Professor Daniel L. McFadden, Ph. D., winner of the Nobel Prize in Economics and the John Bates Clark Medal. Apple took Prof. McFadden's deposition on August 3, 2021, and on August 10, 2021, Apple filed its opposition to Plaintiffs' motion along with seven rebuttal expert reports and a *Daubert* motion to exclude Professor McFadden's opinions (ECF No. 474).

1   Plaintiffs filed an administrative motion to strike Apple's *Daubert* motion on August 16, 2021

2   (ECF No. 486),[2] and an opposition to the *Daubert* motion on August 25, 2021 (ECF No. 498).

3   Plaintiffs filed a reply in further support of class certification on October 19, 2921 (ECF No. 555),

4   including the Reply Report of Daniel L. McFadden (ECF No. 554-5). Apple took Prof.

5   McFadden's deposition a second time on November 5, 2021, filed a second *Daubert* motion on

6   November 9, 2021 (ECF No. 581-4), and filed the Prince Declaration (ECF No. 581-5), which the

7   Court should strike as an improper sur-rebuttal report.

## III.    ARGUMENT[3]

### A.    Professor McFadden's Model Will Accurately Identify Injured Class Member Accounts and Calculate Damages at Trial

Apple's argument that Prof. McFadden's model cannot reliably determine the number of injured Apple ID accounts or whether any given Class member was injured is based upon its unreasonable expectations that are inconsistent with sound economic and econometric principles. The argument also assumes an incorrect legal standard that would require Plaintiffs to calculate hundreds of thousands of individual Class member losses, which they need not do at class certification to demonstrate that impact and injury may be proven on a classwide basis with common evidence, or even at trial.

#### 1.    Accounts Switching Between Prof. Prince's Samples Merely Demonstrate the Standard Error in Any Statistical Analysis

*First*, Apple touts Prof. Prince's technique of running 25 samples as though the reasonable expectation is that no one account appearing in multiple samples should have a different result in each. In fact, econometrically, this is an unreasonable expectation. Prof. Prince came close to admitting this in his deposition. As a matter of fundamental statistical principles, no two (randomly dranw) samples will yield identical coefficient estimates for each genre's price sensitivity:

- The population of users of common apps will vary just slightly from sample to sample. If

---

[2]    Plaintiffs have not withdrawn the administrative motion to strike and do not waive any of the arguments contained therein.

[3]    Plaintiffs included the legal standards applicable to a *Daubert* motion in their opposition to Apple's first *Daubert* motion and will not unduly burden the Court, which is familiar with the applicable legal standards, by repeating them again here. *See Daubert* Opp. at 7-8.

40% of all users have the most popular video streaming app, that share may be 39.5% in one random sample and 40.5% in another. That will affect, ***in trivial amounts***, the coefficients yielded for each sample. Prof. Prince admitted this was true. Ex. A [Prince Tr.] 88:3-20, 90:11-23.

- For less popular apps, there is a "tail," meaning a list of apps downloaded by a few or one account in the sample. Apps that one or two users may have in one sample are likely to be absent in a different sample, and apps that are absent in the first sample may be present in very small numbers in another sample. Those trivial differences also will have a ***very small effect*** on the coefficients. Prof. Prince also admitted this was true. *Id*. 89:22-90:23.

All this really expresses is standard error present in any statistical analysis.[4] As Prof. McFadden explains, Prof. Prince's 25 sample analysis is an un-conventional way of calculating standard errors.[5] McFadden Reply, ¶ 175. Prof. Prince admitted during his deposition that if he were to run Prof. McFadden's model over the entirety of the transaction data, and then also over a 0.1% sample, the estimation of the accounts could differ between the two. *Id*. 91:17-92:20. Prof. Prince's argument is a classic straw man. His observation of tiny changes would only be absent if Prof. McFadden's regression analysis had a 100% confidence level. But a 100% confidence level does not exist in statistics, even if one measures an entire population (because of rounding error at extreme decimal points), and certainly not when a regression is performed from a sample of less than the entire population. *See In re Countrywide*, 984 F. Supp. 2d at 1034-35 ("a 95 percent confidence level with a ±10 percentage point maximum margin of error comports with scientific standards.").

Moreover, the number of accounts overlapping between any 0.1% sample will be small.

---

[4]    The standard error determines the margin of error. *See* https://www.statology.org/margin-of-error-vs-standard-error-whats-the-difference/ (last visited Nov. 23, 2021). "In statistics, the margin of error is used to express the amount of error that results from using a sample smaller than the whole population to draw conclusions about the whole." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp*., 984 F. Supp. 2d 1021, 1033 (C.D. Cal. 2013).

[5]    Prof. McFadden calculates standard errors using "bootstrapped" samples. He estimates his econometric model with each of the bootstrapped samples and calculates standard errors using the coefficients obtained from these samples. McFadden Report, Appendix E.2.

-4-

The average number of IDs present in Prof. McFadden's sample that are also present in any one of Prof. Prince's 25 samples is approximately 90 of approximately 100,000. McFadden Reply, ¶ 179. Of those, Prof. Prince discarded nine of his own samples because they exhibited a negative log-download, as discussed above. *Id*., ¶ 178. For his 16 remaining samples that did not produce a negative coefficient for log-download, there were a total of 1,481 instances of overlapping accounts between Prof. McFadden's sample and one of Prince's remaining 16 samples. *Id*., ¶ 185. Of those 1,481 overlapping accounts, there were only 61 accounts harmed in Prof. McFadden's sample that were unharmed in any one of Prof. Prince's or vice versa. *Id.*, ¶¶ 178-79. What it actually shows is that for any particular account, the *a priori* chance that it will appear in two samples, and injured in one but not in the other, is well under 5%, meaning a confidence well above the 95% threshold. When Prof. McFadden's statistical model identifies an account as injured, the confidence level of that determination is quite high. Apple is arguing for a requirement that switchers be entirely absent, which is an unwarranted – and unprecedented – bar.[6]

Moreover, as Plaintiffs demonstrated in their class certification reply, Apple's argument that the number of uninjured Class members is too high for common issues to predominate fails to distinguish between cases where a large number of ***both uninjured and unidentifiable*** class members defeated predominance and this case, where the small number of ***potentially*** uninjured Class members can be ***identified and excluded***. *See* Reply at 16-17 (citing *Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1136-38 (9th Cir. 2016)). As the Ninth Circuit held in *Torres*, 835 F.3d at 1137, "fortuitous non-injury to a subset of class members does not necessarily defeat certification." More importantly, McFadden showed that whatever their number, such uninjured class members can be identified and excluded.[7]

---

[6]    In fact, because most of the so-called "switching" between injured and uninjured occurs when a class member has damages that are close to zero, it is not surprising that those Class members "switch" based on small changes in the coefficients. Such margins of error are completely consistent with reliable statistical methods.

[7]    Apple's cases are distinguishable. The opinion of one of the plaintiffs' experts in *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 606 (S.D.W. Va. 2013), was excluded because it had "no basis in any reliable methodology," which clearly is not applicable to Prof. McFadden's opinions here, which are based upon sound and reliable econometric principles. Further, in *Kim v. Crocs, Inc.*,

2.      **Plaintiffs Are Not Required to Calculate Hundreds of Thousands of Individual Class Member Losses Now or at Trial**

Apple's argument that Prof. McFadden cannot compute injury without linking Apple ID accounts to actual customers is a make-believe issue that invites the Court to misapply relevant law. At trial, Plaintiffs will ***not*** be required to calculate individual Class member losses; instead, they will need to prove the Class's ***aggregate*** losses. *See*, *e.g.*, *Price v. City of Seattle*, 2006 U.S. Dist. LEXIS 71041, at *9 (W.D. Wash. Sep. 19, 2006) ("After the jury determines an aggregate amount of damages for redemption fees, individual class members may be required to submit proof of claim forms through a claims administration process."); *In re TFT-LCD Antitrust Litig.*, 2012 U.S. Dist. LEXIS 9449, at *48 (N.D. Cal. Jan. 26, 2012) ("[T]he use of aggregate damages in antitrust cases has been approved numerous times.").[8]

At trial, Plaintiffs' damages expert will testify as to the ***aggregate*** damages suffered by all Class members, netting out the so-called "negative damages" for a small number of Class members (or Apple IDs) against the overwhelming percentage of Class members (or Apple IDs) that have suffered "positive damages." The use of "aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful

---

2019 U.S. Dist. LEXIS 29131, at *25 (D. Haw. Feb. 25, 2019), the expert's opinion was based upon data that indisputably "rife with errors," which is clearly not applicable here. *Haller v. Astrazeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1295-96 (M.D. Fla. 2009) is similarly inapplicable as it concerned an expert who merely "skimmed" the plaintiff's medical records to conclude that the subject drug had caused his weight gain and lead to his diabetes, ignoring other common sense factors that could have caused the weight gain. And *Buxton v. Lil' Drug Store Prod., Inc.*, 2007 U.S. Dist. LEXIS 56263, at *44 (S.D. Miss. Aug. 1, 2007), is inapposite because plaintiff's expert opined that the plaintiff had suffered a stroke without citing any supporting facts in the record.

[8]      "Defendants will have … opportunities to individually challenge the claims of absent class members if and when they file claims for damages. At the claims administration stage, parties have long relied on 'claim administrators . . . and other techniques tailored by the parties and the court' to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (citation omitted).

1  and proper."); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008)

2  ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis.

3  …") (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996)).

4      In *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D.

5  Cal. 2007), the Central District explained:

6      It has become routine for courts in antitrust class actions to rely on class-
       wide, aggregate techniques to calculate individual damage awards. *See*, *e.g.*, *In re*
7      *Cardizem CD Antitrust Litigation,* 200 F.R.D. 297, 324 (E.D. Mich. 2001) (finding
       that the use of an aggregate approach to measure class-wide damages is
8      appropriate). Where, as here, an antitrust action is brought on behalf of consumers
       alleging that a challenged activity artificially maintained prices above competitive
9      levels, the plaintiffs may prove class-wide damages in the same manner as class-
       wide impact; by comparing prices during the period of challenged activity to prices
10     as they would have been without the unlawful conduct, and arriving at a
       total damages figure for the class . . . .
11

12  *Id*. at 175 & n.26 (citations omitted).

13      Again in *In re Live Concert Antitrust Litig.*, 2011 U.S. Dist. LEXIS 161362 (C.D. Cal. Jan.

14  4, 2011), the Central District noted it "'has become routine for courts in antitrust class actions to

15  rely on class-wide, aggregate techniques to calculate individual damages.'" *Id*. at *11 (quoting

16  *Allied Orthopedic*, 247 F.R.D. at 166, 175).[9]

17      In *NASDAQ*, the Southern District of New York held that aggregate damages may be

18  awarded in an antitrust class action on a classwide basis "where the computerized records of the

19  particular industry, supplemented by claims forms, provide a means to distribute damages to

20  injured class members in the amount of their respective damages." *Id*., 169 F.R.D. at 526. In that

21  regard, it is important to note that Apple's comprehensive App Store records will provide a means

22  to distribute damages to injured members of the Class in the amount of their respective damages

23  by matching Apple IDs to each Class member and then netting out the "negative damages" from

24  the "positive damages" for each Class member.[10]

25  _____

26  [9]    In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946), the Supreme Court held that
       in antitrust cases, a reasonable estimate of damages is sufficient.
27  [10]   The aggregate amount of damages suffered by the Class is the exact same whether
       "negative damages" are netted against "positive damages" for all Apple IDs or are first netted for
28

-7-

A leading treatise on class actions, *Newberg on Class Actions*, similarly notes that "damages in antitrust class actions may be determined on a class-wide, or aggregate basis . . . where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:7 (4th ed.) ("Newberg"). The treatise also notes, "Antitrust class actions are particularly well suited to proof of total class damages, because damages in an antitrust suit need not be proved with common law precision . . . [and] . . . antitrust violations typically involve relatively small injuries to an extremely large number of people"). *Newberg*, § 18:53.

In *In re Capacitors Antitrust Litig. (No. III)*, 2018 U.S. Dist. LEXIS 195310 (N.D. Cal. Nov. 14, 2018), the Court recently noted that "a variety of tools can be used to address damages," including "the appointment of a magistrate judge or special master to preside over individual damages proceedings [or] altering or amending the class definition in response to developments at trial." *Id*. at *65 (citing *In re Air Cargo Shipping Servs. Antitrust Litigation*, 2014 U.S. Dist. LEXIS 180914, at *279 (E.D.N.Y. Oct. 15, 2014)). The Court also noted that it could "call for a trial plan . . . that addresses how the aggregate damages estimated from [the plaintiffs'] expert's report can then be apportioned among the class members." *Id*. (citing *In re Lidoderm Antitrust Litigation*, 2017 U.S. Dist. LEXIS 24097, at *63 (N.D. Cal. Feb. 21, 2017)). Significantly, the Court held that issues regarding how to apportion aggregate damages among class members "do not warrant a denial of class certification." *Id*.

Therefore, it is irrelevant now—***and will also be irrelevant at trial***—whether Prof. McFadden's model is capable of calculating ***individual*** Class member damages as opposed to Apple ID damages. The discovery cut-off has not yet passed, and Plaintiffs do not yet know when it will be. *See* ECF No. 209 at 4 (discovery cut-off will be 60 days after the Court issues its decision on class certification). Similarly, the parties have not yet exchanged expert merits reports, as they

---

each individual Apple ID and then the net damages for all the Apple IDs are summed together. This is due to the commutative property of addition, which means that when two or more numbers (whether positive or negative) are added in any order, the sum always remains the same.

are not due until 60 days after the Court's decision on class certification. *Id*. at 5. At that time, Plaintiffs will provide Apple with its class damages calculation. But that information is not necessary for the Court to certify the class. *See* ECF No. 330 at 2 ("Given that a full merit analysis is not required at class certification, the Court has granted such motions when plaintiffs can demonstrate how the elements are satisfied even though more work remains to be done.").

Furthermore, Plaintiffs have demonstrated that Professor McFadden's impact and damages model can and does calculate damages for each of the approximately 400 million Apple IDs and also aggregate Class damages by netting out the negative and positive losses of each Apple ID account. McFadden Report, ¶¶ 135, 137, 150, 221, 239, 241 & n.309. Indeed, the *same* total damages number can be arrived at by netting out either the negative and positive losses of each Apple ID account *or* by netting out the negative and positive losses of each Class member because of the commutative property of addition. Once the Court has entered a judgment against Apple for an aggregate damages number, either the Court can order Apple to produce the non-anonymized data in its possession so that Prof. McFadden can identify *individual Class member losses*, or it can order Apple to do the calculation.[11] But, in neither event will Plaintiffs need to prove individualized Class member losses at trial.

### 3.    Apple IDs Can and Will Be Linked to Class Members

Apple argues that there is no basis to suggest Apple might use its own records to link accounts. However, Apple has all the information it needs to link IDs with people. This information includes their names, physical addresses, email addresses (or Apple ID), purchase dates, items purchased, Order IDs, amounts of purchases, types of purchases, sellers, payment types, and last four digits of the payment cards used. *See* Rollins Decl., Ex. 1. Any Class member, using her Apple ID, can retrieve from Apple's website a detailed record of *every* app she ever purchased, every IAP she ever made, and all of her subscriptions.

---

[11]    Economists often merge different data sets based on the string value of only a few variables. *See, e.g.*, Chetty, Raj, et al., *How Does Your Kindergarten Classroom Affect Your Earnings? Evidence from Project STAR*, at 6 & App'x A (March 2011), available at: http://www.rajchetty.com/chettyfiles/STAR.pdf (last visited Nov. 22, 2021).

Plaintiffs cannot currently calculate individual Class member damages because Apple insisted upon anonymizing the data before producing it to Plaintiffs in discovery to protect consumers' privacy. Apple omitted the fields containing identifying information such as name, address, and phone number, and it anonymized the Apple IDs (which are email addresses) using an algorithm before it produced part of its transactional database to Plaintiffs. *See* Ex. B [9/10/20 email from E. Lazarus at 2] ("[F]or privacy purposes, Apple has anonymized the Consumer ID data that you see in the sample production by assigning each unique Consumer ID a unique hash value. Accordingly, each consumer account can still be tracked by a unique number, it will simply be a different number than the one that Apple uses internally and in dealings with the given customer. Accordingly, this hashing will have no effect on the ability of plaintiffs, Apple, and their consultants to analyze the data."). Apple cannot blame Plaintiffs or Prof. McFadden for failing to calculate damages for individual Class members as opposed to individual Apple IDs. But Apple clearly has the information necessary to do so. The Court should not countenance Apple's use of a shield of its own creation. It would be a perverse result for any class action defendant to withhold information needed to identify individual class members and then oppose class certification on the basis that the plaintiff failed to identify individual class members.

Plaintiffs proposed yet another method of matching Apple IDs to consumers: by obtaining a list of Apple IDs from each Class member. Because this is a simple, objective fact within each Class member's knowledge, it presents no bar to certification. The carefully worded Rollins Declaration (notably, dated after his deposition was taken on February 11, 2021), does not compel a different conclusion. Rollins's language was circumspect. He admits that each Apple ID is linked to a specific "first and last name, email address, birthdate, and telephone number" that Apple maintains. Rollins Decl., ¶ 2. Rollins concedes that "payment methods for purchases from the App Store can include but are not limited to credit cards and gift cards, which can be 'linked' to a person's or entity's Apple ID(s)." *Id*., ¶ 4. Rollins asserts that Apple does not verify birthdates or home addresses (*id*., ¶ 2), and that different accounts held by the same person may be linked to different payment cards (*id*., ¶ 4). But he gives no indication of how frequently the latter occurs;

-10-

for all the Rollins Declaration tells us, it may apply to fewer than 1% of all Apple IDs because the Declaration is silent on this matter. Rollins's conclusion is that "Apple does not have the ability to establish or verify each or every Apple ID for a particular person or entity based on email, birthdate, phone number, payment method, or other information a person or entity provides for an Apple ID." *Id.*, ¶ 5. But given his admission of what Apple does maintain, and the absence of any quantification of particular matching methods, the words "verify" and "each or every" in this sentence appear to bear tremendous weight. Matching email addresses using names and home addresses is the simplest and most obvious tool, and while it may not "verify each and every" set of IDs belonging to the same consumer, Rollins's declaration provides no reason to reject it as a screening tool. It might well match with ninety or ninety-five percent confidence all the accounts opened by a particular consumer. Layering the use of payment method on top of this will certainly improve the matching process, and while Rollins's declares that this method cannot "verify each and every" account, he provides no insight into how successful such a technique would be when combined with other tools. Plaintiffs could quantify these matching methods, if Apple had not refused to turn over the necessary data for them to do so.

Finally, even if everything Apple argues about the inability to calculate individual Class member damages were true (it is not), this would not be a basis upon which to deny class certification. In the Ninth Circuit, "the rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016)). *See also Leyva v. Medline Indus.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (reaffirming, after *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), that need for individualized damages determinations after liability has been adjudicated does not preclude class certification).

Apple cites cases, principally *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977), for the proposition that injury is an element of a Sherman Act claim. This is not in dispute.[12] But

---

[12] *Brunswick* rejected a competitor's claim that increased competition was antitrust injury, not a purchaser claim for output restriction or reduced choice. *Id.* at 488-89.

Apple fails to effectively rebut Plaintiffs' showing that every Class member was injured by the loss of choice due to Apple's requirement that they find apps and make IAP only on its App Store. *See Epic Games, Inc. v. Apple Inc*., No. 4:20-cv-05640-YGR (N.D. Cal. Nov. 9, 2021), ECF No. 830 at 4. Every class member suffered reduced choices, and while such injury cannot be quantified, it is a classwide injury within the meaning of both Article III injury and antitrust injury. *See CollegeNET, Inc. v. The Common Application, Inc*., 711 Fed. Appx. 405 (9th Cir. 2017) (reversing District Court's dismissal of antitrust claim for reduced choice and reduced innovation, holding that consumers' theory was viable where challenged conduct left "one dominant provider offering inferior products and services."). Where one provider stifles rival channels and reduces the availability of innovation and alternative apps, as Prof. McFadden opines Apple does, this is cognizable antitrust injury. *See, e.g., Patt v. Antech Diagnostics*, 2020 U.S. Dist. LEXIS 160220, at *18 (C.D. Cal. May 18, 2020) (one form "of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'") (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 374 (9th Cir. 2003)).

Apple also cites *Carroll v. SGS Auto. Svc*., 2020 US Dist. LEXIS 223676 (M.D. La. Nov. 30, 2020), as an example of a flawed methodology for matching numbers to accounts. In that case the proposal was simply to start with a list of numbers, and then find the names to attach them to in a dataset. This raised issues with either related or unrelated people with the same name, and the expert did not provide any way to solve that problem. *Id*. at *17-*20. The proposed method here is nearly precisely the reverse: each Class member will submit Apple IDs, and each Apple ID can be verified in the database. The model's calculation of damages for each Apple ID can then be netted based on the Class members' own assertion of ownership of that account.

Moreover, Apple misapprehends the importance of *United Food & Commer. Workers Unions & Emplrs. Midwest Health Bens. Fund v. Warner Chilcott Lted. (In re Asacol Antitrust Litig.)*, 907 F.3d 42 (1st Cir. 2018), a First Circuit case on which it significantly relies. In fact, read together with another First Circuit decision, *In re Nexium (Esomeprazole) Antitrust Litig*., 777 F.3d 9 (1st Cir. 2016), the two cases demonstrate why Prof. McFadden's proposed method is

-12-

entirely workable. In *Nexium*, the defendant argued that the presence of uninjured plaintiffs who would not have switched to a generic drug even if it had become available defeated class. The First Circuit held that this did ***not*** defeat certification as long as the court was satisfied that "prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." *Id*. at 19. The requirement for this method was that it be "administratively feasible." *Id*. In *Nexium*, the District Court accepted that class member testimony "in the form of an affidavit or declaration would be sufficient in a class action." *Id*. at 20.

The First Circuit distinguished *Asacol* from *Nexium* on the ground that the defendants in *Asacol* "expressly stated their intention to challenge any affidavits that might be gathered. Nor do plaintiffs point to any basis in the record for deeming all such challenges to be so implausible as to warrant a finding that we can consider the issue to be uncontested." *Id*. at 52-53. Accordingly, the First Circuit held in *Asacol* that it would be necessary to take the testimony of each class member to determine whether he or she would have switched to a generic were it available, a class member-by-class member inquiry that was inconsistent with predominance.

The need to ask every class member their subjective intentions made class treatment inappropriate in *Asacol*. Here, the ***objective and verifiable facts*** that each Class member must provide are both more peripheral and less contestable than the expressions of subjective intent in *Asacol*. A Class member's past Apple IDs, which are simply past email addresses each Class member used to sign in to Apple, is an objective fact. It is not an intention, it is not subject to cross-examination, it is not ripe for misrepresentation, and most importantly, it can be verified. If a Class member asserts on a form that she has used the address (to use a simple example) jane.q.public.23@gmail.com in the past, that email either shows up as an Apple ID (with all transaction records) in the database or it does not. Making one up will not help a Class member, and no Class member would deliberately omit an Apple ID to increase his or her recovery. Class members need only supply a list of their past emails that are, or even might be, past Apple IDs.

The question of intention to switch to a generic was dispositive of the class member's claim in both *Nexium* and *Asacol*, but here the fact at issue is only of second order importance. To have

-13-

measurable damages, a Class member must first have an Apple ID with measurable damages. The sole importance of the match between an Apple ID and the consumer attached to the account is to net out the damages calculations across multiple accounts held by the same consumer, such that a consumer whose measured damages in one account is small may be reduced to zero combining the transactions across all that user's accounts. In that sense, netting is just a culling mechanism to weed out consumers with no measurable damages from among those with measurable damages. While Apple maintains that it cannot mechanically, reliably match Apple IDs to consumers, it has never claimed that upon receiving that information it is unable to verify it. In fact, Apple assuredly can do so, as it did with the Plaintiffs' own records.

**B.    Professor McFadden's Econometric Model is Scientifically Sound**

Apple's argument (Motion at 10-11) concerning supposed negative prices mischaracterizes Prof. McFadden's model. Professor McFadden calculates prices for IAP at the app level instead of the unit level because IAP prices are set ***at the app level***. Ex. C [McFadden Tr.] 93:1-23, 94:1-10, 122:8-18; McFadden Decl., ¶ 2. The alternative assumption, that a manager would price, for example, 800 Robux and 400 Robux differently, is the unrealistic assumption. Ex. C [McFadden Tr.] 101:13-23.

Because IAP prices are made at the app level, they are never negative. McFadden Decl., ¶ 5. This is the calculation that determines the aggregate damages (*id*., ¶ 4), and Apple does not challenge it. The so-called "absurd results" Prof. Prince points to are a product of his mistaken extrapolation of pricing from the app level to individual items purchased. *See* McFadden Reply, ¶ 209; Prince Decl., ¶ 48. Prof. McFadden has never advocated for interpreting the per-unit IAP calculations as resulting in negative prices; in fact, he expressly disclaimed this interpretation. McFadden Decl., ¶ 10; Ex. C [McFadden Tr.] 84:11-85:15. Prof. McFadden adopted the percentage method in his Reply Report. McFadden Reply, ¶ 209; *see also* McFadden Decl., ¶ 10; Ex. C [McFadden Tr.] 123:8-13.

Apple also argues that Prof. McFadden's model is fatally defective because it does not include the effect of focal point pricing, or pricing that concentrates at numbers that end in 9. This

-14-

1    is an extension of the unsubstantiated argument Apple raised in opposing class certification that

2    leaving price tiers intact would reduce or eliminate the effect of a commission rate reduction on

3    consumer prices. To the contrary, as Prof. McFadden demonstrated in his Reply Report, including

4    price tiers in the model actually *increases* aggregate consumer damages. McFadden Reply, ¶ 117.

5          Apple's new argument, focal point pricing, is simply an assertion that developers would

6    impose their own, voluntary price tiers. Prof. McFadden explained at his deposition that his model

7    predicts rational, profit-maximizing prices, but some developers may disregard those prices to

8    match focal points. Ex. C [McFadden Tr.] 153:21-154:4. However, the directional effect of any

9    such pricing behavior is known: distorting the profit-maximizing price to match price tiers causes

10   aggregate damages to rise. While fewer developers pricing to existing price tiers or more granular

11   focal points might reduce the *magnitude* of the downward effect on consumer prices, the ***direction***

12   of the effect has been established, and Apple has not shown otherwise.[13]

13        **C.**     **Professor McFadden's Model is Reliable**

14            **1.**     **Negative Log-Download Coefficients Are Not Illogical**

15         Apple's assertion that Prof. McFadden's model produces illogical results because of the

16   relationship between IAP and downloads is simply wrong. This is the cornerstone of Prof. Prince's

17   argument that the model "fails." Prince Report at ¶ 114; Ex. A [Prince Tr.] 67:4-21. In fact, that

18   relationship simply is ***not*** strong. That relationship (called, variously, "log-download," or "beta-

19   q," the beta of quantity) is weak and often statistically insignificant for the Music and

20   Entertainment genres, something readily apparent from Prof. McFadden's standard errors,

21   reported in his Original Report. *See* McFadden Report at 102, Fig. 15 (Log Download standard

22   error, shown in parentheses, is ▮▮▮▮).

23

---

24   [13]     This case is not like *Lithium Ion Batteries Antitrust Litig.*, 2018 U.S. Dist. LEXIS 35744

25   (N.D. Cal. March 5, 2018), where the indirect purchasers needed to trace the overcharge on a
     component through the chain of commerce into finished products, and the expert's purported

26   method of doing so depended on the proposition that quality adjustments accounted for the pass-
     through of component cost overcharges. *Id.* at *39-*42. Here, as the Supreme Court held in *Apple*

27   *Inc. v. Pepper*, 139 S. Ct. 1514, 1511 (2019), consumers are ***direct*** purchasers, and Prof.
     McFadden's model does not depend on adjustments to quality to explain price.

28

-15-

1    This is not a mere matter of technical measurement. Fundamentally, while people must

2  download an app to then buy its IAP, there are apps where many people use the free version; there

3  are apps where many people use a free trial for one or two months; there are apps where people

4  buy the game, play for a while, and then download paid content. The pattern is strongest for

5  Entertainment and Music apps, where negative log-download coefficients account for eight of nine

6  negative coefficients in Prof. Prince's analysis. This reflects that there is a life cycle to app use

7  where the relationship of downloads to IAP is neither immediate nor constant. Prof. McFadden

8  has explained, in plain English and in common sense, that these negative coefficients are neither

9  surprising nor illuminating. *See* McFadden Reply, ¶¶ 174-75. Prof. Prince did not profess any

10  understanding of these purchasing patterns and did not take issue with the standard errors Prof.

11  McFadden has measured. Ex. A [Prince Tr.] 79:1-80:22. Since the log-download relationship is

12  ***not statistically significant***, it is the same as zero. Substituting with zero is something Apple

13  rebukes as unacceptably rigging the model, but in fact it is widely accepted econometric practice,

14  and does not change the damages in any meaningful way. McFadden Reply, ¶ 177 and Fig.4.[14]

15    Prof. Prince feels no need to be intellectually evenhanded about this: when he claimed to

16  find a negative log-download coefficient in Prof. McFadden's work, Prof. Prince declared that it

17  was an irrational result and reflected "model failure." Prince Report, ¶ 114. But when Prof. Prince's

18  own work showed a negative coefficient, as it did in some of his manipulations of Prof.

19  McFadden's model, he did not say his own model had "failed." Ex. A [Prince Tr.] 67:23-68:12.[15]

20                  **2.       Prof. Prince's Sports Genre Analysis Is Incomplete**

21

22  ────────────────

[14]     The logical explanation for log-download relationships that are not statistically significant

23  (and therefore sometimes appear as negative coefficients) differentiates this case from *Reed Const.*

*Data Inc. v. McGraw-Hill Co.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014), where the irrational result

24  defied explanation:  there, the model showed a price effect without a corresponding quantity effect,

which means a perfectly inelastic good, which only exists in certain well-known economic thought

25  experiments.  *Id.* at 402.

[15]     *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 501 (S.D.N.Y.

26  2018) is inapposite.  In that case, the expert was tasked with finding the days on which the LIBOR

27  interest rate was manipulated, but the resulting model found far more supposedly manipulative

submissions in the period before the conspiracy than in the conspiracy period.  *Id.*

28

1    Prof. Prince asserts (Prince Decl. at ¶ 21) that he analyzed the Sports genre of apps.

2    However, by his own admission, he did not construct margin bounds. Ex. A [Prince Tr.] 11:18-

3    13:12. Since the margin bounds applied to a genre are constructed from real-world data to ground

4    the analysis in the realities of the market (McFadden Reply, ¶¶ 149-53), it is not surprising that by

5    dispensing with this important step in model expression, Prof. Prince has produced irrational

6    results. Prof. Prince replicated the Music genre and produced results that he declined to report and

7    said he did not recall (Ex. A [Prince Tr.] 14:17-16:2), and when he attempted to replicate the

8    Entertainment genre, he accidentally applied the wrong margin bounds, taken from the Games

9    genre (*id*. 18:11-20:16). *See* McFadden Reply, ¶ 194. Only in the Sports genre, where he omitted

10   the step of applying margin bounds at all, did he produce a result that he was able to call irrational.

11   That result merely indicates the incompleteness of Prof. Prince's own procedure.

12   **D.    Plaintiffs are Not Required to Prove Aggregate Damages at This Stage**

13   At class certification, Plaintiffs are not required to present a final and complete damages

14   model that calculates aggregate damages; Plaintiffs are only required to "'provide a ***viable method***

15   for demonstrating class-wide antitrust injury based on common proof.'" *In re Graphics Processing*

16   *Units Antitrust Litig*., 253 F.R.D. 478, 497 (N.D. Cal. 2008) (emphasis added). As discussed,

17   *supra*, Plaintiffs will present Prof. McFadden's merits damages report on a date yet to be set by

18   the Court and for use at trial on the merits. Therefore, Apple's criticisms of Prof. McFadden, that

19   his model doesn't "measure total damages" let alone "quantif[y] the precision of his damages

20   estimate," are entirely misplaced, as is its citation to *Ward v. Apple Inc.*, 2018 U.S. Dist. LEXIS

21   26040 (N.D. Cal. Feb. 16, 2018). In *Ward*, this court found that the plaintiffs had not presented

22   any functioning, data-driven model. *Id*. at *8-*9. That is clearly not the case here. Nor is this case

23   like *Trotter Overhead Door, Inc. v. Trotter Doors, LLC*, 2013 U.S. Dist. LEXIS 120815, at *7-8

24   (W.D. Okla. Aug. 26, 2013), where the expert failed to "provide any meaningful guidance as to

25   how he reached [his] particular conclusions."

26   Moreover, Apple's argument that Prof. McFadden doesn't know whether his model works

27   for the entire data set, which includes the other 24 app genres, ignores his testimony. As Prof.

28

-17-

McFadden explained in his Opening Report, he is able to scale up the estimation results for the whole data "without much difficulty" by "estimate[ing]" demand for apps and in-app content that were not included in the 0.1 percent sample. McFadden Report, ¶ 221. Since the sample provides estimates that are statistically representative of estimates that would be obtained from the full data, it is reasonable to assume the omitted apps have the same percentage overcharge as the average for the included apps. *Id.* Alternatively, he can use the estimated coefficients of the demand equation and conduct the same simulation exercise for the 0.1 percent subsample to find the profit-maximizing But-For app and IAP prices for a given But-For commission rate. *Id.*, ¶¶ 222-23. For either method, he would apply them to Apple IDs based upon the apps and IAP content purchased during the Class Period. *Id.*, ¶ 224. *See also* McFadden Reply, ¶ 210 (Prof. Prince "simply ignores the explanation in my Opening Report of how I would scale up the damages calculation.").

### E.    Professor McFadden's Benchmark Analysis is Reliable

It is beyond dispute that Apple's 30% headline rate is supracompetitive and has generated huge supracompetitive profits for it since the App Store was launched in 2008. *See Epic Games, Inc. v. Apple Inc.*, 2021 U.S. Dist. LEXIS 172303, at *158 (N.D. Cal. Sep. 10, 2021) ("Apple's initial rate of 30%, although set by historic gamble, has apparently allowed it to reap supracompetitive operating margins."). Benchmarking "uses competitive prices for other comparable products to estimate the pattern of prices but-for the alleged misconduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002). Apple does not dispute that benchmarking is a generally accepted and widely used methodology for determining the competitive commission a seller would charge in the But-For World.[16] As discussed below, Prof. McFadden used sound economic analysis to identify as comparators the commission rates charged

---

[16]     Benchmarking is the process of comparing business metrics and practices within a business or against competitors, peers, or industry standards "to understand how and where the organization needs to change in order to improve performance." *Source*: https://www.apqc.org/blog/what-are-four-types-benchmarking (last visited November 23, 2021). There are four main types of benchmarking: performance (gathering and comparing quantitative date), practice (gathering and comparing qualitative data), internal (comparing metrics between areas within a single organization), and external (comparing metrics with one or more other organizations). *Id.*

by relevant and comparable companies in a more competitive market – the market for PC game app stores – that was most similar to how the market for iOS apps and IAP would have looked with competition.[17] Also as discussed below, Prof. McFadden then confirmed the reliability of the benchmark with an appropriate mathematical analysis of Apple's profit margins.

Nonetheless, Apple argues that Prof. McFadden's benchmark analysis is flawed because he supposedly cherry-picked a commission rate out of thin air and not based upon any quantitative analysis. Apple's argument is both legally and factually flawed and should be rejected.

*First*, as a matter of law, there is no hard and fast rule that an expert's choice of an appropriate benchmark must be based on a mathematical formula. Plaintiffs are unaware of any 9th Circuit jurisprudence that ***requires*** a mathematical formula or any specific methodology to select an appropriate benchmark. The Ninth Circuit has held that "[c]omparability is a question of fact." *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986). The caselaw shows that an expert's choice of a benchmark need only pass a threshold of reasonable reliability for the analysis to be accepted. If the choice of a benchmark meets that threshold of reasonable reliability, then an attack that the benchmark is flawed goes to weight, rather than the admissibility, of the analysis.

Apple does not challenge benchmarking *per se*, but instead uses the supposed absence of any computational support for Prof. McFadden's determination of the 10-12% benchmark for Apple's commission in the But-For World, claiming the supposed absence of a quantitative "methodology" as a shibboleth in its *Daubert* motion. As discussed in detail below, Prof. McFadden had a sound basis for selecting the comparators he used, he used the commission rates those companies charge in their app stores, and he tested those commission rates against upper and

---

[17]    *See* McFadden Report, ¶ 154 ("In the But-For world where the Apple App Store competes with non-Apple app stores or app developers selling iOS apps and in-app content on the iOS devices, the force of competition would bring down the commission rate. If Apple engaged in no anti-competitive acts, then the commission rate should be either the rate established in competition between rival app stores, or a 'limit price' set by Apple that is low enough to deter entry."). Therefore, Apple's argument that Prof. McFadden "makes no predictions about the competitive environment that would have ensued in the but-for-world" is baseless. Motion at 18.

-19-

1  lower bounds he set for Apple's own commission rate in the But-For World to satisfy himself that

2  the benchmark rate was reasonable and reliable.[18]

3  In *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 11513318, at *3 (N.D. Cal. Dec. 18,

4  2017), an antitrust case much like this one, the Court permitted the defendant's expert to testify

5  using "target prices as benchmarks," without using any particular formula to generate the

6  benchmarks, because the plaintiff had not shown that the benchmarks were "economically

7  improper or unreliable." Here, Apple contests Prof. McFadden's use of 10-12% as a benchmark

8  because he supposedly did no mathematical analysis to determine the commission rate, but it offers

9  no evidence whatsoever that 10-12% is "economically improper or unreliable."[19] Indeed, Google,

10  which is defending its own app store against antitrust claims, recently cut its commission rate in

11  half.[20] Together with Prof. McFadden's three other comparators, Google's rate cut strongly

12  suggests that Prof. McFadden's benchmark is economically proper and reliable.[21]

---

[18]  Apple's argument that there is no basis to assume a uniform commission rate ignores Supreme Court authority and well-established principles Prof. McFadden relies upon. "'[D]amages are measured by obtaining a 'but-for-price' from a market (the "comparable market") that closely approximates he market in which the violation occurred. The "but-for-price" is a measure of what the price of the product would be if the wrongful behavior had not occurred,' noting that the approach was first cited by the Supreme Court in 1946." McFadden Reply, ¶ 41 (quoting Daniel L. Rubinfeld, "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law*, ed. E. Elhague, (Elgar, 2012): 378-93 at 380 and citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, *rehearing denied*, 327 U.S. 817 (1946)).

[19]  This But-For commission rate is quite similar to the But-For commission rates Prof. Economides, one of the Developer Plaintiffs' experts, estimated using a sales-weighted average of Windows PC stores commission rates. *See* McFadden Reply, ¶ 50 (citing Expert Class Certification Report of Professor Nicholas Economides, *Cameron et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR, June 1, 2021, § II.C.1.)

[20]  Following an announcement by Google in March 2021 of an interim commission reduction, the company announced on October 21, 2021, that it is cutting its commission on all Google Play app subscriptions from 30% to 15%. *Source*: https://www.bloomberg.com/news/articles/2021-10-21/google-to-slash-the-fee-it-takes-from-subscriptions-on-app-store (last visited Nov. 23, 2021).

[21]  Apple criticizes Prof. McFadden for purportedly "ignoring" Android stores. Motion at 19. However, as Prof. McFadden explained in his Reply Report, "The anti-competitive claims against Google and its Play Store undermine the reliability of other Android app stores as appropriate benchmarks, due to Google's close relationship to the Android operating system. For instance, Google owns the 'Android' trademark, and only devices that meet Google's criteria for being an 'Android-compatible device' can use the 'Android' trademark." McFadden Reply, ¶ 44 & n.72.

-20-

As Professor McFadden explained in his Reply Report, console gaming participants do not provide a proper benchmark because their business model is significantly different from Apple's business model. McFadden Reply, ¶ 44; *see also* Ex. C [McFadden Tr.] 179: 8-10. Moreover, it is no objection to Prof. McFadden's use of Epic's 12% commission as one of his comparators to argue that Epic is unprofitable at that commission rate. To the contrary, Epic's CEO, Tim Sweeney, testified that Epic in fact earns a profit at that commission rate (*i.e.*, its revenues exceed associated costs) but, as a nascent entrant in the mobile game distribution market, it must offer exclusivity incentives that then make it unprofitable in the short-term. Ex. D [Epic Tr.] 126:1-127:6. *See also* Ex. C [McFadden Tr.] 180:18 – 181:3. It is unlikely that Apple, as the behemoth incumbent in a market it created, would need to offer any incentives to retain business in the But-For World if it lowers its headline commission from a supracompetitive rate to a competitive one. As discussed below, given Apple's market share and profit margins, Prof. McFadden has calculated Apple's "break-even" commission to be just ███, so the 12% commission rate is neither economically improper nor unreliable.

Likewise, in *Takeguma v. Freedom of Expression LLC*, 2021 U.S. Dist. LEXIS 25834, at *18-24 (D. Ariz. Feb. 10, 2021), the District of Arizona recently rejected a similar challenge to a benchmark analysis where the plaintiff's expert picked a benchmark after reviewing modeling contracts from similar cases and performing an internet search of corresponding rates paid for the use of images and likenesses. There was no evidence that the plaintiff's expert used any type of mathematical formula to determine the benchmark.

Prof. McFadden identified comparators from the market for PC game app stores, a more competitive market, to estimate how the market for iOS apps and IAP would have looked if Apple faced competition. He confirmed the reliability of the benchmark with an appropriate mathematical analysis of Apple's profit margins. Those cases in which an expert's benchmark analysis were excluded are bereft of any such analysis. They are helpful to understand why Prof. McFadden's benchmark analysis easily satisfies the *Daubert* threshold.

For example, in *Snyder v. Bank of Am., N.A.*, 2020 U.S. Dist. LEXIS 206437, at *20 (N.D.

-21-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

Cal. Nov. 3, 2020), the Court excluded a benchmark analysis where the plaintiff's expert provided "no explanation" for why he chose the benchmark he did, other an interview with plaintiff himself. Thus, the Court had no way to determine that it was not merely an arbitrary number. *Id*. Here, by contrast, Prof. McFadden explains that his choice of the benchmark commission rate of 10-12% is based upon his consideration of commission rates charged by three comparators doing business in a more competitive market.

In *United States v. Adams*, 444 F. Supp. 3d 1248, 1260-61 (D. Or. 2020), the District of Oregon refused to permit an expert witness to use a benchmark to compare the markings on a shell to a firearm because the "benchmark" he used was merely a number "in his head." The district court found that the expert failed to "express ***any objective benchmark*** at any point during his testimony," which would prohibit any replication of his work. *Id*. at 1261 (emphasis added). The case law underscores that while an expert must offer a reasoned explanation for his benchmark, Rule 702 and *Daubert* do not require any specific methodology for selecting a benchmark. Here, Prof. McFadden expressed an objective benchmark (10-12%) as well as the basis for his determination of the benchmark (by comparison to the commissions charged by Microsoft, Epic, and Discord on their app stores) – not simply a number he had in mind – such that any other expert could replicate his work or dispute the similarity and appropriateness of the comparators he used to determine the benchmark commission rate.

*Second*, Prof. McFadden did perform quantitative analysis to support the appropriateness of his selected benchmark. Specifically, he computed Apple's "break-even" commission rate at ███% and explained that a ███% commission would be sufficient to allow Apple to earn a healthy ███% net profit margin. McFadden Report, ¶ 161. That mathematical analysis confirms that Prof. McFadden's But-For commissions of 10-12% were economically reasonable and reliable.

Prof. McFadden describes the reasons why he considers the commission rates charged by Microsoft, Epic, and Discord on their app stores to be reasonable comparators for Apple in the But-For World in his external benchmark analysis.[22] He addresses not only the competitive

---

[22] An external benchmark analysis compares the metrics or practices of one organization

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

1    environment, but also factors such as the history of their commissions. For example, Prof.

2    McFadden notes that Epic announced its 12% commission when it entered the market in December

3    2018, and that Steam cut its commission rate twice – from 30% to 25% and then to 20% – in

4    response to competition from Epic's entry in the market. McFadden Report, ¶¶ 156-57. Prof.

5    McFadden notes that Discord likewise dropped its commission from 30% to 10% in anticipation

6    of Epic's entry into the mobile game distribution market. *Id*., ¶ 160. And Prof. McFadden notes

7    that when Microsoft announced that it would reduce its commission from 30% to 12%, it was

8    reported that it did so to compete on price with Steam. *Id*. at ¶ 158.

9        Prof. McFadden did not end his analysis there. After collecting comparative data from

10   those three companies for the external bechmark analysis – which indicated a range of 10-12% for

11   Apple's commission in the But-For World – Prof. McFadden considered the effect of competition

12   on Apple's commission, noting that competition "drives down price." McFadden Report, ¶ 161,

13   n.235. This well-documented phenomenon – that competition would force Apple to cut its

14   commission in the But-For World – supports a finding that Prof. McFadden's benchmark range of

15   10-12% is both reasonable and reliable.[23]

16       And Prof. McFadden did not stop his analysis there. Once he was satisfied that the external

17   benchmarks were sensible indicators of Apple's response in the competitive But-For World, Prof.

18   McFadden determined both upper and lower bounds for the predicted commission. For the upper

19   bound, Prof. McFadden considered Apple's own recent history of cutting commissions to 15% in

20   a kind of internal benchmarking.[24] McFadden Reply, ¶ 161. Importantly, Prof. McFadden noted

21

22   (here, Apple) to those of one or more other companies (here, Microsoft, Epic, and Discord).
     *Source*: https://www.apqc.org/blog/what-are-four-types-benchmarking.

23   [23]    It would not be reasonable or reliable to use a benchmark that was ***above*** Apple's 30%

24   headline rate – which the Court has already found to be supracompetitive. Nor would it be
     reasonable and reliable to assume that Apple's 30% commission rate ***would not change*** in the face

25   of competition in the But-For World, as Apple stubbornly – and illogically insists would be the
     case. *See* Reply at 10-12.

26   [24]    In internal benchmarking, a compares its own metrics or practices across units, product

27   lines, departments, programs, or otherwise. *Source*: https://www.apqc.org/blog/what-are-four-
     types-benchmarking.

28                                              -23-

1  that 15% was not a rate that Apple offered in response to competition. *Id*. (citing Tim Cook's

2  testimony in *Epic v. Apple*). From that, Prof. McFadden concluded that 15% was an appropriate

3  upper bound for Apple's commission rate in a competitive market environment. *Id*.

4      For the lower bound, Prof. McFadden computed ██% as the commission rate that would

5  make Apple's net margin close to zero – in other words, the break-even commission rate above

6  which the App Store would be profitable and below which it would be unprofitable. McFadden

7  Report, ¶ 161. He did so by analyzing Apple's internal documents showing its net margins, P&L,

8  COGS, and OPEX. *Id*. Prof. McFadden noted that ██████████████████████████ was

9  higher than Apple's break-even commission rate (██%), which likewise supports the

10 reasonableness and reliability of his benchmark analysis. *Id*.

11     A margin analysis is entirely appropriate to demonstrate the reliability of the benchmark.

12 For example, in *Optical Disk*, the Court noted that the defendant's expert performed a similar

13 operating margin analysis to confirm the reasonableness of his benchmark rate. 2017 WL

14 11513318 at *3 (citing *In re Online DVD Rental Antitrust Litig.*, 2010 U.S. Dist. LEXIS 138558,

15 at *60 (N.D. Cal. Dec. 23, 2010) (noting that "cost-margin analysis" approach is "well-

16 established" and "find[s] support in the economic literature")).

17     Thus, Prof. McFadden's benchmark analysis easily meets the threshold of reasonable

18 reliability for admissibility under *Daubert*. Benchmarking is a widely accepted methodology for

19 estimating Apple's commission rate in the But-For World. Prof. McFadden derives and describes

20 an objectively determined benchmark – not simply a number he had in his head – which easily

21 permits replication of his work. His benchmark commission is neither economically improper nor

22 unreliable. Any attack on Prof. McFadden's benchmark analysis goes to its weight, not its

23 admissibility.[25]

24

25  [25]    Apple's cases are distinguishable. The expert's opinions in *Hyland v. HomeServices of
    *Am., Inc*., 2012 U.S. Dist. LEXIS 207531 (W.D. Ky. July 3, 2012) were excluded because he
26  "failed to identify a sufficiently comparable market against which he can measure Plaintiffs'
    damages." Here, in contrast, Prof. McFadden's benchmark analysis identified the PC games stores
27  market as comparable. *Concord Boat Corp. v. Brunswick Corp*., 207 F.3d 1039, 1056 (8th Cir.
    2000) is similarly inapposite because the expert failed to incorporate all relevant circumstances

28

### F.    Professor McFadden Accounts for Indirect Network Effects

Apple once again challenges Prof. McFadden's market definition analysis because it purportedly fails to consider "both sides of the App Store" even though it is consistent with the Supreme Court's analysis in *Pepper*, 139 S. Ct. at 1519-21, which held that **to consumers** Apple acts as a retailer. As Prof. McFadden explains, Apple's criticisms are flawed for multiple reasons and are ultimately a matter of terminology and not of substance. *See* McFadden Reply, ¶¶ 257-64.

Importantly, Apple ignores that Prof. McFadden's methodologies *do* account for the effects of Apple's misconduct on both iOS device consumers and app developers. His model explicitly determines the price effects of a lower commission rate (the price charged by the platform, Apple) by modeling the decision of developers (one side of the platform), who observe and react to the commission based on consumer demand parameters (the other side of the platform). *Id.*, ¶ 261. In *Epic Games*, 2021 U.S. Dist. LEXIS 172303 this court found that Dr. Evans's SSNIP test was lacking because he did not "perform any actual SSNIP calculations testing both sides of the market simultaneously." *Id.* at *101. Prof. McFadden, however, does account for both sides of the market.

## IV.    CONCLUSION

For all these reasons, Plaintiffs request that the Court deny Apple's Motion.

DATED: November 23, 2021              By:    */s/ Rachele R. Byrd*
                                              RACHELE R. BYRD

into his "method of analysis related to antitrust liability" and failed to "account for market events that both sides agreed were not related to any anticompetitive conduct." There are no similar contentions here. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) did not examine a benchmark analysis or apply *Daubert* as the standard for reviewing the expert testimony, and rejected a statistical study which failed to adjust for any other factor that could have affected the independent variable, price in clinical services, except for one, thus effectively attributing the "entire difference [in price] . . . to the [anticompetitive conduct]." No such failure occurred here. Further, in *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1157-59 (N.D. Cal. 2003), a patent infringement case, the court excluded opinion of a reconstructed market that failed to include multiple market substitutes and provided no explanation for use of terms in a hypothetical contract that the party had rejected in negotiations and were out of line with prior agreements. And the expert in *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1506 (D. Kans. 1995) was not called upon to "supply specialized knowledge, but to plug evidentiary holes in plaintiffs' case, to speculate, and to surmise." That is clearly not the case here.

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and*
*Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
**KELLOGG, HANSEN, TODD, FIGEL &**
**FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Plaintiffs and Proposed*
*Co-Class Counsel*

**CALCATERRA POLLACK LLP**
MICHAEL LISKOW
mliskow@calcaterrapollack.com
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073

*Counsel for Plaintiff Robert Pepper*

27848v4

-26-