United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE APPLE IPHONE ANTITRUST LITIGATION

CASE NO.  11-cv-6714-YGR

ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION WITHOUT PREJUDICE; GRANTING IN PART AND DENYING IN PART APPLE'S *DAUBERT* MOTIONS TO EXCLUDE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN

Re: Dkt. Nos. 441, 479, 486, 578, and 604

Pending before this Court is a motion for class certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("Consumer Plaintiffs"), two *Daubert*[1] motions filed by Apple, Inc., an administrative motion to strike one of Apple's *Daubert* motions filed by Consumer Plaintiffs,[2] an administrative motion to strike the reply testimony of Professor Daniel L. McFadden filed by Apple, and numerous motions to seal which will be addressed by separate order.

As set forth below, while Consumer Plaintiffs satisfy most of the requirements for class certification under Rule 23, the motion must be denied, without prejudice, so that they can address the deficiencies identified herein.  As described in the *Daubert* portion of this order, Professor McFadden and his team made unjustifiable assumptions regarding the commission rate upon which much of their analysis rests, and several other aspects of the proffered model are flawed. That said, many of Apple's arguments are not well-taken.  The Court anticipates that the

---

[1]  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (*Daubert I*).

[2] Consumer Plaintiffs move to strike one of Apple's *Daubert* motions, arguing that Apple was required to seek leave before filing it. (Dkt. No. 486.)  Plaintiffs also argue that Apple's *Daubert* motion improperly circumvents the page limits set for opposing class certification. Neither argument persuades.  The Court finds Apple's *Daubert* motions procedurally proper given the practice in this District. Thus, plaintiffs' motion to strike is DENIED.

deficiencies can be addressed, but where an argument has been analyzed and rejected, Apple shall not re-argue the issue on the anticipated next round of briefing.

## I.   RELEVANT BACKGROUND

The facts of the case are well known to the parties and counsel of record. The background relevant to the instant motion is summarized as follows: Consumer Plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased an iOS application or application license from Apple, or who made an in-app purchase, including, but not limited to, a subscription purchase, through such an application, for use on an iOS Device at any time from December 29, 2007 through the present.

(Dkt. No. 228, Third Amended Complaint, "TAC", ¶ 62.) Consumer Plaintiffs' theory of the case is that Apple charges developers on the App Store supracompetitive commissions, which the developers then pass to consumers in the form of increased prices for app downloads or subscriptions.  (*Id*. at ¶ 47.) Consumer Plaintiffs allege that this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps, including in-app purchases ("IAP").

Consumer Plaintiffs bring two causes of action against Apple based on this alleged conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. at ¶¶ 78–88.)

## II.   *DAUBERT* MOTIONS

The Court's analysis begins with the *Daubert* motions as they inform the balance of this Order.

### A.   Legal Framework

The legal standard is not in dispute. In short, Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and, based upon that qualification, the witness's opinion is relevant and reliable.  An expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the subject matter of the opinion.  Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with

United States District Court
Northern District of California

United States District Court
Northern District of California

Rule 702.  Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence."  *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020).  For scientific opinions, they must be based on scientifically valid principles.  *Daubert*, 509 U.S. at 589. Experts assist the fact finder in their own evaluation of the evidence by providing the fact finder with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

**B.**    **Challenged Opinions**

Consumer Plaintiffs rely primarily on the econometric opinions and method of Professor McFadden in support of their motion for class certification.  Apple challenges several aspects of McFadden's opinions and model.  The Court examines the challenges systematically.

**1.**    **Overall Model – Motion Denied**

Apple challenges the overarching model which Professor McFadden used.  More specifically, Apple claims that McFadden "designed his model not to test whether Apple's conduct had common impact on putative class members, but to prove it."[3] In this regard, Apple argues that the opinions are not "based on principles of hypothesis generation, scrupulous study design, meticulous data collection, and objective interpretation of experimental results," but on achieving a desired, preconceived outcome.  Federal Judicial Center, Reference Manual on Scientific Evidence xiii (3d ed. 2011).

Professor McFadden opines that the commission charged to the developers serves effectively as a "tax."  He asserts that both consumers and developers share the burden of the commission or tax which evidences common impact.  From there, McFadden built a model to assess and quantify common impact within the App Store.  McFadden's opinion that the

_____

[3] *See* Dkt. No. 479, (Motion to Exclude Testimony, "*Daubert* Motion I"), at 7; Dkt. No. 477-17, (Deposition of McFadden, "McFadden's Nov. Depo."), at 181:5–6 (purpose of model was "to find a common effect"); *id*. at 26:4–6 (task was "establishing that there was common evidence"); *id.* at 26:9–13 (instructed to "pay attention to the commonality of the effects on the class"); and *id.* at 232:20–23 ("[Y]ou want the model to do the best job you can of reflecting the common effect").

commission serves as a "tax" is grounded in economic principles and literature. The effect of a sales tax on consumer prices is well-documented and explained in McFadden's report. McFadden's report shows that he relied on numerous scientific articles and economic texts describing the effects of taxes on consumers and suppliers in assessing whether common impact exists amongst the proposed class members.  (*See* Dkt. No. 443-14, McFadden's Opening Report, ¶¶ 143–147.) Thus, his theory is scientifically sound.  While Apple's experts disagree with McFadden's assessment and quantification of common impact, none dispute the fundamentals of his tax methodology.

Accordingly, the motion on this ground is **DENIED**.

### 2. Market Definition – Motion Denied

Apple also challenges Professor McFadden's opinion on market definition. McFadden opines that a single relevant aftermarket for the sale of iOS apps and in-app content to consumers exists. (McFadden's Opening Report, ¶¶ 42–43.) The foremarket consists of "OS installed mobile devices such as iOS mobile devices or Android devices." (*Id.* at ¶ 44.) Apple challenges Professor McFadden's definition of the relevant market, arguing that he ignores the two-sidedness of the App Store.

In opining on the relevant market definition, Professor McFadden considered potential substitutes for downloading and installing iOS apps and making in app purchases through the App Store, including the use of Web apps, jailbreaking, enterprise software installed on iOS devices, apps compatible with non-iOS devices, and purchasing in-app content outside the App Store. Without deciding the merits of Professor McFadden's market definition, the Court finds such considerations sound in rendering an expert opinion on the market definition.

Beyond this initial assessment, the Court is not inclined to address the market definition at this juncture. Ultimately, the issue is a merits decision not required at the class certification stage.

### 3. Professor McFadden's Three – Step Impact and Damages Model

The Court now reviews each of the individual steps Professor McFadden conducted in his econometric model; each of which Apple also challenges. With respect to step one, the Court examines McFadden's "benchmark analysis" where he identifies the but-for commission rate.

United States District Court
Northern District of California

Next, the Court examines step two of the model which uses the but-for commission rate from step one to generate "but-for pricing." The but-for pricing is then used to calculate the overage charge in step two.  Finally, the Court examines step three which is meant to link accounts to class members and identify harmed members from unharmed members. Step three is also intended to calculate individual damages.

### a.        Step One: "Benchmark Analysis" – Motion Granted

In his model, Professor McFadden first identifies a but-for commission rate.  Here, Professor McFadden, "with the help of his staff," claimed to use a "benchmark analysis" to find a "but-for" commission rate of 10-12% for the period of 2008 to the present.  However, as shown below, no analysis was actually conducted.  Rather, the rate was cherry-picked from a few data points, many of which McFadden conveniently dismissed.  The Court excludes this opinion as it is arbitrary and not based on any legitimate scientific, economic, or mathematic principle.

In his report, Professor McFadden states simply: "I use 10-12 percent as the But-For commission rates." (McFadden's Opening Report, ¶ 166.) There is no mathematical equation or analysis to justify these findings.  How Professor McFadden arrives at this conclusion remains a mystery.  He is not an expert in app development, app pricing, IAP transactions, or payment processing, nor does he rely on any expert in these fields.  That he is a Nobel laureate is laudable but not relevant to these industries.  Again, without any relevant expertise, specifically as to this issue, the basis of his opinion eludes.  At best, the report merely provides some descriptive clues, but none are sufficient.

The following examples illustrate the cherry picking:

Professor McFadden says he relies on the 12% rate set by the Epic Games Store but ignores the rates set by Apple and Google. (*Id.* at ¶¶ 156–161).  Without more, any use of rates from Epic Games must at least consider the context of their litigation strategy.  Uncontroverted evidence shows that because of this litigation decision, the Epic Games Store will and is operating at a loss for the foreseeable future.  (*See Epic Games, Inc. v. Apple Inc.*, 4:20-cv-5640-YGR, Dkt.

No. 812, Rule 52 Order After Trial on the Merits, "Rule 52 Order," at §§ I.B.3.a-b.)[4] Professor McFadden ignores this commercial reality and remains silent as to how he evaluated this consideration or why this known unprofitable rate should be at the *top* of his range.  As noted, he is not an expert in the relevant industry.

Similarly, McFadden references Steam's commission rates which decreased in November 2018 from a standard rate of 30% to 20% on sales above $50 million and 25% on game sales above $10 million.  (McFadden's Opening Report, ¶ 157).  Steam is not litigation-driven and is the "largest PC games store."  (*Id*.)  Professor McFadden never explains why his rate should be a fraction of these commercial rates.

In 2021, Microsoft did announce a 12% rate which was to become effective on August 1, 2021.  The market realities of this rate remain unknown, but Professor McFadden never explains why his range uses 12% as a ceiling, rather than a floor.

Remarkably, Professor McFadden relies on a failed platform, Discord, which in March 2019 decided to reduce their rates from 30% to 10%.  (McFadden's Opening Report, ¶ 160.)  Yet, he fails to disclose, consider, or explain the use of this metric given that Discord closed its doors less than a year later.

Next, rather than use 15% as a data point, which is the subscription rate that Apple implemented in 2016, Professor McFadden states that he uses the rate as an "upper bound" for "sensitivity checks" along with the 15% used for the Small Business Program.  (*Id*. at ¶ 161.) Again, Professor McFadden conveniently omits any analysis regarding the subscription rates by claiming that this "discounted rate [was] not the result of competition," citing to Tim Cook's trial testimony in *Epic Games, Inc. v. Apple, Inc*.  While the Court found that the decreased rate associated with the Small Business Program was not the result of competition, it did not make the

---

[4]   The Consumer Plaintiffs' motion for class certification and Apple's first *Daubert* motion were filed before the Court issued its 184-page Rule 52 Order. While the content of the order has been referenced in numerous arguments and subsequent filings, the parties are reminded that the Court's factual judicial findings in the Rule 52 Order are not admissible evidence should this case proceed to trial.  The factual issues here shall be determined by a jury.  The references to the order made here are merely to the underlying evidence exchanged in this parallel action.

United States District Court
Northern District of California

same conclusion with respect to subscriptions, nor did Mr. Cook suggest otherwise.  In fact, it is quite possible that the 15% was the result of competition and negotiation.

The lack of foundation and analysis demonstrate that the opinion is outcome determinative.[5]  Why not 12-15% as a range?  Why not a baseline of 13% or 14%?  At most, the 10% is cherry picked from a failed company.  It is not logical that a but-for world would generate market rates which do not anticipate any profit in the foreseeable future. If they did, it would require an explanation.  Further, it is not as if a logical analysis is impossible.  Professor Economides provided an analysis using multiple data points and math to reach his estimate for the Developer Class. (*See Cameron et al. v. Apple, Inc.*, 4:19-cv-3074-YGR, Dkt. No. 331-5, Expert Class Certification Report of Professor Nicholas Economides at ¶¶ 25-62.)

Thus, the motion on this ground is **GRANTED**. Accordingly, the Court excludes Professor McFadden's opinion on the but-for commission rate as lacking foundation.

### b.   Step Two: Pricing Model – Motion Granted in Part, Denied in Part

The second step of Professor McFadden's model requires estimation of the app and in-app prices that consumers would have paid in the but-for world. This allows for the calculation of the overage, which determines whether there is antitrust injury. To do so, Professor McFadden created an econometric model that estimates iOS aftermarket consumer demand and developer costs and calibrates the but-for pricing based on the but-for commission rate (as noted above 10-12%).  The Court finds several problems with McFadden's pricing model, each discussed in detail below.

### i.   Calculation Data and Model Errors – Motion Granted

The Court notes, and Professor McFadden concedes, that the original proffered pricing

---

[5]  Further, he states that "markets that have similar characteristics but are more competitive can provide useful benchmarks" (*id.* at ¶ 155) and, when convenient, references all the benchmarks from the gaming industry, (*id.* at ¶¶ 156–160), but then does not consider all the evidence from the gaming industry (*see* Rule 52 Order at §§ II). He alludes to a study that "IAP transactions [are] not different from payment processing" and payment processors "rarely charge higher than 5 percent," (McFadden's Opening Report, ¶ 155), yet has no expertise in this area, does not rely on someone who is an expert, and does nothing to analyze this key data point or show how it applies in this particular circumstance.

United States District Court
Northern District of California

United States District Court
Northern District of California

model included several errors which undermined the precision of the proffered conclusions. The opening report stated that the model forecasted that approximately 5.8% of the accounts were uninjured.[6] (McFadden's Opening Report, ¶ 241.) However, over the course of class certification briefing, Professor McFadden's estimation of "unharmed accounts" continued to increase, largely in part due to correcting errors identified by Apple's experts. Professor McFadden now agrees that with the corrections, the model forecasts that 14.6 % of accounts are uninjured.

The Court recounts the primary set of retractions and errors:

First, Professor McFadden originally defined a member as uninjured "only if all they had purchased are those [apps] for which the But-for price is higher than the As-is price." *Id.* In his reply report, Professor McFadden revised the opinion to define "uninjured accounts" as those with no "net harm." That is, the revised opinion provided that to determine harm is to consider the total cost of all the purchases an account makes in both the actual world and the but-for world, thus finding the *net harm* of the account. In accounting for net harm, Professor McFadden's uninjured estimate increased from 5.8% to 7.7%. (*See* McFadden's Reply Report, ¶ 200.)

Next, the calculations contained data errors. Professor McFadden acknowledges that his original estimate included a computational error which dropped apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year. (*See id.* at ¶ 202.) Once corrected, McFadden admits that the number of uninjured accounts increases to 14.6%. (*id.* at n.371; McFadden's Nov. Depo., 138:21–139:18.)

---

[6] Steps one and two of Professor McFadden's model focuses not on people or consumers but on their *accounts*. Step three would address the actual consumers.

Professor McFadden used the phrase "class members" in his opening report when discussing his estimation of noninjury. *See* McFadden's Opening Report, ¶ 241 ("I estimate that approximately 5.8 percent of the Consumer Class members spent money on only those apps and in-app content items whose But-for prices are higher at the 12 percent But-for commission rate."). However, in his reply report, he refers to the 5.8 percent as referring to the number of uninjured accounts. *See* McFadden's Reply Report, ¶ 200 ("Using this method, the percentage of (net) unharmed Apple IDs is 7.7 percent as opposed to 5.8 percent of unharmed IDs reported in my Opening Report."). In his second deposition, McFadden clarifies that his estimation relates to accounts and not members. *See* McFadden's Nov. Depo., at 136:23–137:9 (explaining that uninjured injury refers to accounts and that the percentage of uninjured class members will be determined at the claims process).

Third, Professor McFadden again concedes that in calculating individual damages, the model should have used a percentage calculation rather than a fixed dollar calculation method to determine net harm. The fixed dollar method assumes that developers adjust all in-app purchases in a single app by the same dollar amount.  Apparently unaware that his team created a model which relied on the fixed dollar method, Professor McFadden essentially rejected this method in his deposition. He testified that "the percentage method [was his] proposal for the best way to do individual damage calculations" because it is a better depiction of "what developers would do in the but-for world than the [] fixed dollar method." (McFadden's Nov. Depo., 123:9–13.) Professor McFadden also testified that the "percentage adjustment is more economically sensible and the proper scientific protocol would be that [he] adopt the more sensible method." (*Id.* at 106:11–19.)  Professor McFadden confirmed that his model continues to rely on the fixed dollar method and has not yet implemented the percentage method.  (*See id.* at 123:1–8.)[7]

Apple presents evidence that Professor McFadden's fixed dollar method leads to absurd results, including accounts having larger damages than their actual spend in the but-for world and negative pricing. While McFadden disputes the extent of the impact on his results, he acknowledges that application of the method "makes some difference" in the percentage of unharmed consumers (*id.* at 105:1-6) and that the percentage method was a more "sensible method" for determining individual damages. Professor McFadden did not elaborate on the extent of impact.  Thus, the extent and impact of these issues is unclear to the Court. Without revised analysis and clarity, the Court does not find Professor McFadden's pricing model to be reliable as a means for determining antitrust injury or damages.

---

[7] However, in a subsequent declaration submitted by Professor McFadden, he stated that his model used the percentage method rather than the fixed dollar method.  (*See* Dkt. No. 602, Declaration of Daniel L. McFadden in Support of Opposition to Motion to Strike).  Apple moved to strike this supplemental declaration on several grounds, one being that it contained information that contradicted McFadden's previous testimony on the same subject. (*See* Dkt. No. 604, Administrative Motion to Strike or Exclude Reply Testimony of Professor Daniel L. McFadden.) The Court Grants Apple's motion to strike McFadden's supplemental declaration on the grounds that it contradicts McFadden's prior deposition testimony. *See Jones v. City of McMinnville*, 244 F. App'x 755, 759 (9th Cir. 2007) (unpublished) (finding that district court did not abuse its discretion in striking affidavit that was inconsistent with prior deposition testimony).

United States District Court
Northern District of California

1    Accordingly, the motion on this ground is **Granted**.

2                    **ii.**        **Negative But-For Pricing Issue – Motion Denied**

3    Apple next challenges the reliability of step two on the grounds that it generated what

4    Apple calls "negative but-for pricing" when estimating but-for pricing for in-app purchases.

5    Consumer Plaintiffs counter that this is a red herring, as it is merely a product of Professor Jeffrey

6    Prince's attempt to price items from the app level to individual items.  The Court agrees.

7    Professor McFadden structured his model to price at the "app level" rather than the

8    "individual in app purchase level."  Professor McFadden used this structure because he opined that

9    estimating developers' costs was best done at the app level.   (McFadden's Reply Report, ¶ 142.)

10   Professor McFadden also opined that developers consider costs at the app level when setting

11   prices.  (*Id*. at ¶¶ 142–144.)[8]  More specifically, in setting his estimates at the app level, Professor

12   McFadden aggregated all in app purchases for a particular app, per month, per Apple ID.  He then

13   calculated an average to determine the as-is price for that app and used that as-is price in

14   calculating the but-for pricing. In explaining how but-for prices are calculated, McFadden

15   explained that the but-for equation is written as a function of price, reduced by Apple's

16   commission, minus costs, multiplied by the quantity. In Appendix E.4. of McFadden's Opening

17   Report, he explained that calculating the but-for pricing requires plugging the demand parameter

18   and variable cost estimates into the developer's profit-maximizing equation. The profit-

19   maximizing equations requires replacing the as-is commission rate with the but-for commission

20   before solving for the but-for pricing. (McFadden's Opening Report, Appendix E.4., ¶¶ 39–45.)

21   Apple disagrees with pricing at the app level. Professor Prince opines that pricing at the

22   app level "obscures an area where differences in impact are likely." (Dkt. No. 476-6, Prince's

23

24        ───────────────────
          [8]  At oral argument the parties discussed Professor McFadden's opinions with respect to
25   developer costs. During argument, it became apparent that the parties were relying on unfiled
     "workpapers." The Court ordered the parties to submit a joint set of "workpapers" so the Court
26   could get a better sense of the data upon which Professor McFadden relied. They complied. (Dkt.
     No. 624, Joint Administrative Motion to File Under Seal Expert Workpapers). After reviewing the
27   workpapers, the Court notes that the data is not fulsome. While it appears that Professor
     McFadden analyzed the financial records of six developers, the Court would expect a more
28   fulsome analysis or reliance on an industry expert for purposes of trial.

United States District Court
Northern District of California

Opening Report, ¶ 74.) Professor Prince ultimately thinks that but-for pricing should be determined for each individual in-app purchase item, rather than an aggregate, because "whether a given individual is harmed [depends] on the but-for prices of that individual's purchases—specific in-app purchases, not an abstract conglomerate of all in-app purchases available for a given app." (Dkt. No. 581-5, Prince's Reply Report, ¶ 49.)

In Professor Prince's reply report, he attempts to calculate the but-for pricing of each individual in-app purchase. In doing so, he takes what Professor McFadden calculates as the overage/change, which was calculated at the app level, and then subtracts that number from the individual item's as-is price. (*Id.* at ¶¶ 47–49.) Professor Prince then calls that number the but-for price.[9]

Ultimately the issue here is negative damages, not but-for pricing. The parties do not dispute that Professor McFadden's model generates negative damages for some transactions. Nor do they dispute that applying the percentage method instead of the fixed-dollar method to the calculation of individual damages eliminates the negative damages issue.

Thus, the Court **DENIES** the motion to the extent Apple argues that the model generates negative but-for pricing.

### iii.     Focal Pricing and Pricing Tiers – Motion Granted

Professor McFadden's pricing model ignores Apple's focal-point pricing and pricing tiers in calibrating but-for pricing. Under Consumer Plaintiffs' theory of the case, such pricing tiers policies are anticompetitive in a world of increased competition and would not exist. (McFadden's Opening Report, ¶ 162.) However, Professor McFadden's opinion lacks foundation and ignores overwhelming evidence to the contrary.

First, with respect to focal-point pricing, overwhelming evidence suggests that developers would choose to price their apps at focal points ending in 99 cents. (Prince's Opening Report, ¶

---

[9] Professor Prince calls the calculated number the but-for price but calculates the number using Professor McFadden's change/overage number, which already includes McFadden's calculated but-for price.

58.)  Apple cites to evidence amongst app stores, including many of the same stores included in Professor McFadden's benchmark analysis, in support of his opinions. (Dkt. No. 476-8, Richard Schmalensee's Opening Report, ¶ 211.)  For instance, though Google Play does not impose 99 cent pricing for its store, of its top 100 paid apps, 83 have prices ending in 99 cents. (*Id.*)  Likewise, for Steam, Amazon App Store, and the Microsoft Store, at least the top 75 apps for those stores have prices ending in .99, even though none of these stores impose the .99-tiered pricing. (*Id.*)

In fact, during his second deposition, Professor McFadden testified that "focal point pricing is common" and that he would expect to see it in a but-for world. (McFadden's Nov. Depo., 152:1–13.) Yet, again, the proffered model fails to incorporate such pricing.  Having failed to use or address the issue, the model does not provide a reliable method for determining but-for pricing in the presence of focal pricing.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3–5 (N.D. Cal. Mar. 5, 2018).

Second, with respect to pricing tiers, the issue is similar.  Professor McFadden cites to no evidence, or any other subject matter expert, to justify his opinion that pricing tiers would not exist absent anticompetitive conduct.  Without foundation, the opinion cannot stand.

Thus, the motion is **GRANTED** on this ground.

### iv.     Sample Size and Robustness – Granted in Part, Denied in Part

Apple next challenges the "robustness" of the model on several grounds:  One, the sample size is too small. Two, the model allows for accounts to easily flip from harmed to unharmed. Three, it estimates a wide variation of the percentage of unharmed accounts depending on the sample size used.  The Court addresses each argument.

Apple argues vociferously that Professor McFadden's use of a 0.1% sample size is insufficient.  Professor McFadden provides evidence that such sample size is widely accepted in economics, as well as surveys conducted by the government.  (*See* McFadden Reply Report, ¶ 171; s*ee also* U.S. Bureau of Labor Statistics, "Consumer Expenditure Surveys," August 30, 2016, available at, https://www.bls.gov/cex/csxovr.htm, last accessed March 8, 2022) (explaining that

survey covered 7,000 sample households which was approximately 0.005 percent of the households in the United States).  Further, Apple's expert, Itamar Simonson, appears to rely on a smaller sample size of consumers when conducting the consumer surveys included with his report. (*See* Dkt. No. 476-9, Simonson's Opening Report, ¶¶ 16, 30) (explaining that he relied on 3,600 participants from a nationwide group of individuals 16 and over). Given Professor McFadden has identified sufficient foundation for his opinion, the issue is one of weight not admissibility. Apple's argument in this regard fails.

As to Apple's other arguments, Professor McFadden does not dispute that his model allows for Apple IDs to switch between harmed and unharmed and can increase the percentage of unharmed accounts depending on the sample used. (McFadden's Nov. Depo., 205:24–206:8) ("the identity or the number of unharmed is determined at a [margin]" and are not "necessarily tightly determined" under the sample size his model used).  Professor McFadden attributes these changes to differences in samples, noting that they are changes you would expect to see in any statistical model that does not have a 100% confidence level. [10] Given that the model requires adjustment, the motion is **GRANTED** on this ground without prejudice to the Consumer Plaintiffs to address the topic in the next round.

### v.        Free Apps – Motion Denied

Apple challenges Professor McFadden's assumption to exclude free apps that have no IAPs in his demand estimates as ignoring market realities.  Specifically, Apple argues that had Professor McFadden considered the effect of Apple's policies on free apps with no IAP in the but-for world, he would have discovered that some free app developers would have increased their prices in the but-for world due to the decrease in commission rates.  Professor McFadden explains that he did not include those apps because they are not subject to the App Store commission rate. (*See* McFadden's Opening Report, ¶ 184.)  Consumers who only downloaded such apps are not part of Professor McFadden's quantification of common impact.  Nor are they included in the proposed class definition.  (*See* Dkt. No. 441, Motion for Class Certification, "Mot.", at 2).  Thus,

---

[10] The parties disagree about the model's confidence level. This should be clarified on the next round. McFadden's Nov. Depo., 202:10–207:14.

United States District Court
Northern District of California

1  Professor McFadden's exclusion of free apps with no IAP is consistent with Consumer Plaintiffs'

2  theory of the case.

3        Accordingly, the motion is **DENIED** on this ground.

4              **c.**    **Step Three: Identification of Unharmed Class Members**

5        Professor McFadden proposes a third step to his model which is meant to identify harmed

6  class members from unharmed class members. Professor McFadden suggests that harmed class

7  members can be identified through a claims administration process, using claim submission forms,

8  Apple IDs, and Apple's internal records. (McFadden's Reply Report, ¶¶ 10–12.) Apple challenges

9  the overall process, arguing that the process is outside of Professor McFadden's expertise and

10  based on insufficient data.

11        The Court finds Professor McFadden's proposed method for identifying unharmed class

12  members reasonably objective. It is not uncommon for class members to be identified using such

13  means in class actions. With respect to Apple's argument that insufficient data exists to make this

14  proposed step reliable, the Court is not convinced. In Mark Rollins' declaration, he admits that

15  each Apple ID is linked to a specific "first and last name, email address, birthdate, and telephone

16  number" that Apple maintains. (Dkt. No. 476-12, Declaration of Mark Rollins, ¶ 2.)

17        Thus, the motion is **DENIED** on this ground. That said, issues remain with respect to the

18  timing of step three as discussed below. (*See infra* Section III.C.1.)

19        In summary, the Court finds that Professor McFadden's current model is unreliable for

20  determining class wide impact or damages. Until these errors are resolved, and the new opinions

21  established, the Court is not willing to merely rubberstamp some future set of opinions.

22        Accordingly, the current version of the model is excluded under the *Daubert* standard.

23  **III.**   **CLASS CERTIFICATION**

24        Consumer Plaintiffs move for class certification under Rules 23(a) and 23(b)(3) based on

25  Apple's alleged anticompetitive conduct with respect to Apple's operation of the App Store. The

26  exclusion of Professor McFadden's model is fatal to Consumer Plaintiffs' current motion for class

27  certification. As discussed in more detail below, without the methodology, Consumer Plaintiffs are

28  unable to meet the requirements of Rule 23(b)(3).

### A.     Legal Standard

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011).  A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted).

The party moving for certification first must show that the four requirements of Rule 23(a) are met.  Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  Relevant here, certification under Rule (b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### B.     Rule 23(a)

#### 1.     Numerosity

The numerosity element requires that the class be so numerous that joinder of all members individually would be impracticable.  Fed. R. Civ. P. 23(a)(1). Consumer Plaintiffs aver that this requirement is easily satisfied because millions of Apple customers bought iOS apps or paid for IAP throughout the United States.  Apple does not dispute this estimate.  Accordingly, the Court

concludes that Consumer Plaintiffs have satisfied the numerosity requirement.

### 2. Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, the common question must be of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do."  *Id.* at 359 (internal quotations and brackets omitted). The requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *Ellis*, 657 F.3d at 981 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). A district court must analyze the persuasiveness of the evidence submitted to establish the commonality requirement and may not simply conclude that the commonality requirement is met on the basis that the plaintiff's evidence in support of that requirement is admissible. *See Grodzitsky*, 957 F.3d at 986 (holding that "[a] district court errs when it 'limit[s] its analysis of whether there was commonality to a determination of whether Plaintiffs' evidence on that point was admissible" and that a "district court must engage in a 'rigorous analysis' of commonality, rather than 'merely conclud[ing] that, because . . . evidence was admissible, a finding of commonality was appropriate' ") (quoting *Ellis*, 657 F.3d at 984).

Here, Consumer Plaintiffs argue that the commonality requirement is met because at least five common questions can be resolved with common proof, namely: (1) whether a relevant market exists; (2) Apple's power within that market; (3) questions regarding the willfulness of Apple's behavior; (4) questions about antitrust injury; and (5) whether Apple has violated Section 2 the Sherman Act, 15 U.S.C. § 2, by monopolizing the aftermarket for iOS apps and IAP.  (*See* Mot. at 13.)  Consumer Plaintiffs submit that the following constitutes common evidence capable of answering the common questions identified above:

First, with respect to the question of whether a relevant market exists, Consumer Plaintiffs proffer Professor McFadden's opinion on that issue.  Professor McFadden opines that the relevant

United States District Court
Northern District of California

market here is the single aftermarket of the sale of iOS apps and in-app content.  (McFadden's Opening Report, ¶¶ 43–45.)  The foremarket consists of "OS installed mobile devices such as iOS mobile devices or Android devices. (*Id.* at ¶ 44.) Professor McFadden further opines that consumers choose apps based on their needs and not on whether the app supports in app purchases. Professor McFadden points to the way in which Apple chooses to categorize its apps on the App Store, including the bundling of both paid download apps and free download IAP apps in the same category, to support his opinion of a single aftermarket. Professor McFadden also examines potential aftermarket substitutes, including web apps, jail broken apps, enterprise apps, and whether apps that are compatible with non-iOS devices are suitable substitutes. (*See* McFadden's Opening Report, Section III.)  He opines that such alternatives are not reasonable substitutes.

While Apple heavily criticizes Professor McFadden's definition of the relevant market, given the various other common questions and common proof that Consumer Plaintiffs proffer, the Court need not decide the merits of the proffered market definition to determine whether the requirements of Rule 23 are met. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013). For purposes of class certification, the Court finds that Professor McFadden's opinion on market definition constitutes common proof that could resolve whether a relevant market exists.

Next, with respect to Apple's power in the relevant market, Consumer Plaintiffs proffer Professor McFadden's opinion that Apple's share in the relevant market is nearly 100 percent and therefore monopoly power exists.  (McFadden's Opening Report, ¶ 108.) He opines that common evidence exists as to Apple's power.  Even though he is not an expert in the field, nor does he rely on an industry expert, Professor McFadden points to evidence of high switching costs as common evidence to show the source of Apple's power. (*Id.* at ¶¶ 99–107.) He also points to Apple's iPhone Developer Program License Agreement and profit margin as evidence of Apple's power in the market.  Admissible evidence on these topics is sufficient common proof that could resolve the question of Apple's power within the relevant market.

Third, with respect to whether Apple willfully acquired and maintained its monopoly power in the distribution of iOS apps and IAP aftermarket, Consumer Plaintiffs aver that common evidence exists to show that Apple intended to design a closed platform that prevented consumers from installing and running apps that were not downloaded from the App Store. Consumer Plaintiffs point to evidence that Apple prohibits developers from informing consumers of alternative ways to download their apps outside of the App Store.  This is sufficient common proof that can resolve the question of Apple's willfulness.

Fourth, with respect to the issue of common impact, Consumer Plaintiffs proffer Professor McFadden's three-step methodology. Given the Court's exclusion of the methodology as unreliable in the Court's *Daubert* analysis, *see supra* Section II.B.3, the Court finds the evidence insufficient, at this juncture, as common proof of antitrust injury.

Finally, with respect to questions regarding the anticompetitiveness of Apple's conduct, Consumer Plaintiffs offer Professor McFadden's opinions about behaviors that would be absent in a competitive world as compared to Apple's alleged conduct.  He acknowledges that much of the common proof of anticompetitive conduct will be factual and opines that Apple's practice of restricting how iOS consumers download and install apps and make in-app purchases are anticompetitive.  He points to Apple's Developer Agreement, the recent *Epic v. Apple* trial, the European Commission's 2020 investigation into Apple's App Store rules, and the UK's Competition and Markets Authority's 2021 investigation into Apple's alleged anticompetitive conduct as common proof of Apple's anticompetitive conduct.   (*Id.* at ¶¶ 123–127.) Professor McFadden also points to Apple's pricing tiers as anticompetitive conduct.  (*Id.* at ¶ 128.) The Court finds that admissible evidence of these topics would be sufficient common proof that can resolve the question of whether Apple's conduct violates antitrust laws.

In light of the above, the Court finds that four out of the proffered five common questions exist in this action as to satisfy the commonality requirement.

### 3.      Typicality and Adequacy

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*,

617 F.3d 1168, 1175 (9th Cir. 2010).  "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted).  Typicality may be lacking "if 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.'" *Id.* (citation omitted).

The requirement of adequate representation requires a showing that the representative parties "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether the plaintiff and its counsel have any conflicts of interest with other class members, and whether the plaintiff and its counsel will prosecute the action vigorously on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Consumer Plaintiffs argue that this requirement is satisfied because:

> Plaintiffs allege the same antitrust claims as all other members of the Class. Each plaintiff (and Class member) purchased an iOS Device and then bought an app from Apple or paid for IAP through the App Store during the Class Period, and each was injured by paying the supra-competitive prices for the apps and IAP.

(Mot. at 14.)  Apple disagrees, asserting that the claims and experiences of Consumer Plaintiffs are not typical of the class because they have differing views on security and privacy.  Consumer Plaintiffs argue that their differing views do not make it such that typicality and adequacy is destroyed.  The Court agrees.

While plaintiff Stephen Schwartz prefers the ability to download third party apps from other sources without Apple's intervention, and 73.8% of surveyed consumers consider malware protection a must-have feature, the difference in preferences is not enough to defeat typicality. (*See* Dkt. No. 477–14, Excerpts from Stephen Schwartz's Deposition, 141:3–18; Simonson's Opening Report, ¶ 57.) Nor is plaintiff Edward Lawrence's belief that nothing is truly private, while 87.2% of consumers consider privacy features a must-have. (Dkt. No. 477-16, Excerpts

United States District Court
Northern District of California

1    from Edward Lawrence's Deposition, 183:17–184:4.)

2    While there are some differences, similarities amongst Consumer Plaintiffs and the class

3    members do exist.  Indeed, plaintiffs Robert Pepper and Edward Hayter share, and value privacy,

4    as do the consumers cited in the surveys. (*See* Dkt. No. 477-15, Excerpts from Robert Pepper's

5    Deposition, 146:16–20, 146:21–147:12; Dkt. No. 477-13, Excerpts from Edward Hayter's

6    Deposition, 159:7–10.)  Nothing about the Consumer Plaintiffs' expressed preferences and views

7    concerns the Court as it relates to their typicality and adequacy.

8    Moreover, the Court finds that Consumer Plaintiffs' claims and defenses are typical of the

9    class members.  Consumer Plaintiffs allege that their experience is substantially similar to the

10   members of this proposed class, as they have all purchased an iOS Device and used it to buy either

11   an app directly from the App Store or paid for IAP through the App Store. (TAC ¶¶ 21–24.) In

12   doing so, Consumer Plaintiffs suffered harm similar to the class members.

13   Accordingly, the Court finds that Consumer Plaintiffs satisfy the adequacy and typicality

14   requirements.[11]

15   In sum, plaintiffs satisfy all of the requirements under Rule 23(a). The Court next

16   addresses the Rule 23(b)(3) requirements.

17   **C.      Rule 23(b)(3)**

18   Next, the Court examines whether Rule 23(b)(3) is satisfied.  Under Rule 23(b)(3), a

19   plaintiff must show that "the questions of law or fact common to class members predominate over

20   any questions affecting only individual members, and that a class action is superior to other

21   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

22   23(b)(3).

23   **1.      Predominance**

24   Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to

25

26   _____

27      [11]  Apple does not dispute the adequacy of Wolf Haldenstein and Kellogg Hansen to serve
     as co-class counsel for the proposed class.  Because the Court has no concerns regarding the
     adequacy of counsel, it finds the adequacy-of-representation requirement satisfied with respect to
28   them.

class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' " *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed.)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011) (citation omitted). Here, Consumer Plaintiffs bring two claims under the Sherman Act against Apple: Section 2 monopolization and attempted monopolization of an aftermarket. To prevail on the monopolization claim at trial, Consumer Plaintiffs will have to prove the following elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; (3) antitrust injury; and (4) anticompetitive conduct. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). As for their attempted monopolization claim, they will need to prove: (1) that Apple has engaged in predatory or anticompetitive conduct; (2) with a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). However, at the class certification stage, Consumer Plaintiffs' burden is different. They must only show that the elements of their claims are capable of proof at trial

United States District Court
Northern District of California

1  through evidence that is common to the class rather than to its individual members. *Tyson Foods,*

2  *Inc.*, 577 U.S. at 453.

3      Here, Consumer Plaintiffs argue that the predominance requirement is satisfied with

4  respect to both of their claims, specifically with respect to: (a) the relevant market; (b) Apple's

5  market power in the relevant market; (c) Apple's willful acquisition and maintenance of monopoly

6  of power; (d) Apple's anticompetitive conduct; (e) class wide antitrust injury; and (f) estimation of

7  damages.

8      Apple asserts that Consumer Plaintiffs have failed to show that antitrust injury can be

9  proven on a class wide basis and therefore failed to satisfy the predominance requirement. While

10  not expressly discussed in Apple's opposition to class certification briefing, the Court also

11  addresses Consumer Plaintiffs' argument that damages can be proved by a common method.

12                    **a.      Class Wide Impact**

13      In order to prove class wide impact, Consumer Plaintiffs must "establish, predominantly

14  with generalized evidence, that all (or nearly all) members of the class suffered damage as a result

15  of defendants' alleged anti-competitive conduct." *In re High-Tech Emp. Antitrust Litig.*, 289

16  F.R.D. 555, 567 (N.D. Cal. 2013) (internal quotation marks omitted) (modifications in original).

17  Proof of such antitrust impact can be "made on a common basis so long as the common proof

18  adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d

19  434, 454 (3d Cir. 1977). Some courts have stated that a court's inquiry on class certification

20  should be limited to whether plaintiffs merely "intend" to present "generalized" evidence of

21  antitrust impact. *See, e.g, In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M

22  02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006). However, in  *In re Graphics

23  Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), the court explained that even

24  under a plausible methodology standard, "certification [should not be] automatic every time

25  counsel dazzle the courtroom with graphs and tables." *Id.* at 491. "[C]onducting a thorough review

26  of Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a

27  'rigorous analysis' to ensure that the predominance requirement is met." *In re High-Tech

28  Employee Antitrust Litigation*, 289 F.R.D. at 567 (citing *Comcast Corp.*, 133 S. Ct. at 1431).

1    No one disputes that in the antitrust class action context, to satisfy the predominance

2    requirement, proof of "antitrust impact and damages . . . on a class wide basis" must exist. *See In*

3    *re Lithium, Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420-YGR, 2018 WL 1156797, at

4    *3.  Class certification is precluded where plaintiffs have not shown that the antitrust injury

5    element can be proven for all class members with common evidence. *See Ward v. Apple Inc.*, No.

6    12-CV-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018), *aff'd*, 784 F. App'x 539

7    (9th Cir. 2019).  If injury cannot be proven on a class wide basis, an individualized analysis is

8    required, and such analysis will defeat predominance.  *Mazza*, 666 F.3d at 595–96; *In re New*

9    *Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008).

10    Consumer Plaintiffs proffer, and Apple challenges, McFadden's three-step methodology as

11    a viable method for demonstrating class wide injury based on common proof. As explained in the

12    *Daubert* section of this order, the first step of Professor McFadden's method requires determining

13    the but-for commission rate using a benchmark analysis. (McFadden's Opening Report, ¶ 136.)

14    Once the but-for commission rate is determined, the next step is quantifying impact, comparing

15    app prices in the as-is and but-for worlds. This is where the calculation of overcharges happens.

16    (*Id.* at ¶ 137.)   Once the overage is calculated, the last step includes determining which class

17    members are harmed or unharmed.  (McFadden's Reply Report, ¶ 11.)

18    The Court incorporates herein, but does not repeat, its analysis from the *Daubert* motions.

19    Rather, it focuses on issues specific to the predominance element.  When considering if

20    predominance has been met, a key factual determination courts must make is whether the

21    plaintiffs' statistical evidence sweeps in uninjured class members.  If a substantial number of class

22    members "in fact suffered no injury," the need to identify those individuals will predominate.  *See*

23    *Mazza*, 666 F.3d at 595–96.

24    As demonstrated above, Professor McFadden ultimately conceded that his model includes

25    an estimated 14.6% of uninjured accounts.  (McFadden's Reply Report, ¶¶ 202, 208, n. 371,

26    Fig.8.) In the context of this case, 14.6 percent is approximately 30 million accounts.  (*See*

27    Prince's Report, ¶ 8.)

28    Consumer Plaintiffs rely on *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

Cir. 2016) to argue that the number of anticipated uninjured class members does not defeat predominance. In *Torres*, a class of workers sued their employer for violation of state and federal law because of a common policy of "failing to inform domestic farm workers of the availability of H-2A work that paid $12 per hour." *Id.* at 1130. The *Torres* plaintiffs moved to certify a Rule 23(b)(3) class of workers who were not informed of the H-2A work. *Id.* at 1131–32. In opposition to the motion, defendant argued that the proposed class included uninjured workers, thus destroying predominance.  Defendant argued that although none of the workers received the required notice as required by law, the presence of some workers who were not looking for jobs at the time, and thus would not have benefitted had they received notice, were uninjured.  Defendant argued that predominance did not exist because of the uninjured workers. Notably, the class at issue only contained approximately 600 people. *Id.* at 1132.

The Ninth Circuit rejected the defendant's argument, noting that the "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." *Id.* at 1137.

Apple relies on a handful of cases for the opposite proposition. (*See* Dkt. No. 480-3, Apple's Opposition to Motion for Class Certification, at 19-20.) Specifically, Apple cites to three circuit decisions:  the D.C. Circuit's decision in *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019) (holding 5-6 percent was the outer limit of non-injured class members); the First Circuit's decision in *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018) (finding 10% of non-injured class members defeated predominance); and the Eighth Circuit's decision in *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (explaining the general proposition that a class action cannot contain class members who have not suffered injury).  The Ninth Circuit has not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance.

On the one hand, like the plaintiffs in *Torres*, and given Consumer Plaintiffs' theory of the case, all unharmed class members were exposed to Apple's alleged anticompetitive policies and conduct by way of using the App Store. While some class members may not have been harmed by

the increase in app or in-app content prices, "because [Apple] had exposed every class member to unlawful conduct," (*id.* at 1136), one might consider the lack of injury as to some, "fortuitous." On the other hand, whether *Torres* was intended to be stretched from its impact on a few hundred people to 30 million accounts is far from certain. Moreover, three circuits have taken a position on the topic, and none have sanctioned a proposed class which included 14.6 percent, much less of unharmed "accounts." Rather, the other circuits all require a smaller showing of non-injury and speak in terms of actual people.

Nonetheless, given the Court's ruling on the *Daubert* motions, Consumer Plaintiffs cannot meet their predominance burden because they rely on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured, as common proof of class wide impact. *See Grodzitsky*, 957 F.3d at 986 (no class certification because plaintiffs offered inadmissible expert opinion of alleged class wide defect).

Accordingly, the Court finds that at this juncture individual issues will predominate with respect to injury.

### b. Class Wide Damages

In addition to class wide injury, Consumer Plaintiffs must also prove that damages are measurable. *Comcast Corp.*, 569 U.S. at 35. At the class certification stage, plaintiffs may rely on aggregate damage estimates, but must also establish that "there is a method, common across the class, for arriving at individual damages" to survive the predominance inquiry. *See* William R. Rubenstein, Newberg on Class Actions, Antitrust Class Actions, Section 20:62 (Damages at class certification). In relying on aggregate damages, antitrust plaintiffs may not need to establish the amount of damages with the degree of certainty required in other areas of the law but aggregate damages cannot be speculative. *See, e.g.*, *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88–89 (2d Cir. 2000) (noting that the plaintiff's "burden of proving antitrust damages is not as rigorous as in other types of cases"); *See* William R. Rubenstein, Newberg on Class Actions, Antitrust Class Actions, Section 20:60 (Damages in antitrust cases); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) (explaining that speculation has its place in estimating damages but rejected damages model that was based on pure speculation and which

United States District Court
Northern District of California

ignore economic reality).

Here, Consumer Plaintiffs proffer Professor McFadden's methodology as common proof of calculating individual damages. In addition to the issues addressed in the *Daubert* section of this order, there are several issues with the damages model. First, while step three of McFadden's methodology offers a process for identifying and excluding uninjured class members, it does not attempt to do so until *after judgment* is rendered.  More specifically, Consumer Plaintiffs have indicated that they did not intend to actually *run* the model until *after* trial.  Instead, their plan is to argue to the jury, that damages range between $7 billion and $10 billion, then run the model afterwards to determine the distribution amounts. (Hearing Transcript (November 16, 2021) 74:2–22). Given the three-billion-dollar range and the concession that the model includes 14.6% of accounts with no harm, the current model produces results which are too speculative.

Second, assuming the model's deficiencies are resolved, the notion that Consumer Plaintiffs could proceed to trial without running the model in advance of trial is, at best, novel. Consumer Plaintiffs do not adequately explain their rationale.  The proffered model appears rational where the class has entered into a settlement and a mechanism is needed to distribute an agreed-upon amount based on the net damage to each individual customer, but Consumer Plaintiffs are not representing a settlement class.  The Court agrees that the model need not be run for class certification purposes, but trial evidence is evaluated differently.

Accordingly, the Court finds that Consumer Plaintiffs have failed to establish that Professor McFadden's current damages model is a reliable means of assessing class-wide damages.  Thus, without a common approach to measuring damages, individual damages calculations would predominate.

The Court notes that given the complexities and nuances of the damages issue in this case, class certification as to liability only under Fed. R. Civ. P. 23(c)(4) may be warranted. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular

issues."); William R. Rubenstein, Newberg on Class Actions, Section 12:4.  Thus, if liability is established, it is possible that damages could be resolved expeditiously.

**IV.    CONCLUSION**

For the foregoing reasons, plaintiffs' motion for class certification is **DENIED WITHOUT PREJUDICE**. The Court sets a case management conference for April 11, 2022 at 2:00 p.m.  Parties shall meet and confer on a schedule for the balance of the action and file a statement with respect to scheduling no later than April 4, 2022.  If sufficient, the Court will issue a scheduling order without a conference unless requested.

This Order terminates Docket Nos. 441, 479, 486, 578, and 604.

**IT IS SO ORDERED.**

Dated: March 29, 2022

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**