UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION, | ) ) ) | No. 11-cv-6714-YGR<br>Oakland, California |

Monday, April 11, 2022

**TRANSCRIPT OF PROCEEDINGS**

**FROM THE OFFICIAL ELECTRONIC SOUND RECORDING**

**2:03 P.M to 2:39 P.M.**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:
                WOLF HALDENSTEIN ADLER
                  FREEMAN & HERZ LLP
                750 B Street
                Suite 1820
                San Diego, California  92101
      **BY:  MARK C. RIFKIN, ESQ.**

For Defendant:
                GIBSON, DUNN & CRUTCHER
                333 South Grand Avenue
                Los Angeles, California  90071
      **BY:  DANIEL G. SWANSON, ESQ.**

Transcribed By:  **BELLE BALL, CSR 8785, CRR, RDR**
                Official Reporter, U.S. District Court

<u>Monday - April 11, 2022</u>                              <u>2:03 p.m.</u>

P R O C E E D I N G S

**THE COURTROOM DEPUTY:**  Now calling Civil Case 11-6714-YGR In re Apple iPhone Antitrust Litigation.

Counsel, starting with the plaintiff, please state your appearances for the record.

**MR. RIFKIN:**  Good afternoon, Your Honor.  Mark Rifkin from Wolf Haldenstein, on behalf of the plaintiffs.

**THE COURT:**  Good afternoon, Mr. Rifkin.

**MR. SWANSON:**  And good afternoon again, Your Honor. Dan Swanson for Apple.

**THE COURT:**  Okay.  Good afternoon.  All right.

So, there are a few disagreements.  Where would you like to start, Mr. Rifkin?

**MR. RIFKIN:**  Your Honor, I would like to start on the first area of disagreement, which is the -- the date for the plaintiffs to submit their revised motion for class certification.  And in particular, the revised expert report.

The parties are two months apart in their proposal in litigation that is now longer than ten years old.  And the extra time that we asked for is driven not by our need to address the issues in brief, but by our expert's need to address the issues that Your Honor identified in the order.

And I'd like to go through some those issues and explain in particular why we think the extra couple of months is

1   warranted, and why we think the time we asked for is a
2   reasonable period of time.  And I'll touch on them in the order
3   in which they appear, but not necessarily in the order in which
4   they are most important.
5       The first one is the benchmark analysis that Your Honor
6   commented upon in your class certification decision.  We intend
7   to have Professor McFadden or another expert from Brattle
8   perform a different kind of quantitative benchmark analysis
9   along the lines that you referred to on Page 7 of your opinion
10  when you mentioned the analysis that Professor Economides had
11  done.
12      We expect to have both the -- the quantitative benchmark
13  analysis that was done already, but add to it a quantitative
14  benchmark analysis so that Your Honor's concern about the need
15  for a quantitative assessment is fully addressed.  That will
16  take some time, but it is by no means the most time-consuming
17  part of the process.
18      The next area of work that I would like to address has to
19  do with three adjustments that are going to be made to the
20  computational part of this.  The first is the 99-cent pricing
21  issue.  The second is the use of a percentage calculation
22  rather than a fixed dollar amount.  And the third is the
23  question of focal point pricing.
24      As Your Honor is aware, all three of those adjustments
25  will require that some additional econometric modeling be done.

1    The experts from Brattle assure us that they are able to make

2    those adjustments and do that renewed econometric modeling.

3         In the focal point pricing analysis in particular,

4    Your Honor referred to the question of the need for another

5    subject matter expert regarding pricing tiers.

6         We would like -- again, we would like to include an

7    analysis that addresses both focal point pricing and also a

8    model that eliminates the focal point pricing, because the

9    plaintiffs claim the focal point pricing is anti-competitive.

10        And we want to have the option to be able to have

11   Professor McFadden run an econometric model that eliminates

12   focal point pricing if the plaintiffs prevail on their claim

13   that focal point pricing is anti-competitive, but that also

14   addresses focal point pricing because we want to make sure we

15   address the Court's concern that that may be a natural

16   clustering of prices in the but-for world.

17        And so to do that, we think we need to have some

18   additional time for an additional expert, as the Court suggests

19   in the opinion, and for that modeling to be done.

20        The next set of issues that I would like to discuss are

21   somewhat related to the question of either uninjured or --

22   uninjured class members or flippers.

23        And Your Honor has made several points about them in the

24   -- in the opinion, all of which we think will be addressed to

25   one degree or another when we net out the accounts that are

attributable to class members.  And Your Honor addressed that in the opinion, as well.

You may recall that Apple had insisted that it did not have sufficient information to allow the plaintiffs or the Court or anyone else to identify which accounts belong to which class members.

And Your Honor, on Page 14 of the opinion, referred to Mark Rollins's testimony that, in fact, Apple does maintain that information.

We've asked did Apple for it.  We've explained that we believe that identifying accounts to specific class members will let us address the question of netting harm, it will allow us to address the question of flippers, and it will also allow us to address the question of uninjured class members.

And the reason that I say that is this.  The -- the folks from Brattle who have been through the data in excruciating detail tell us that a very, very large number of the so-called uninjured class members -- or accounts, I should say.  I'm sorry.  Let me back up and be clear about that.

A very large number of the so-called uninjured accounts, as well as a very large number of the so-called flipper accounts -- because that's all we have been able to deal with right now, is accounts, not class members -- they will fall out once we net the accounts to particular class members.

And the reason for that is simply this.  Many of the

1   multiple accounts are those that the experts believe will have

2   one account that's a primary account, and then two or three or

3   four secondary accounts where there's very little activity that

4   takes place.

5       The experts tell us that most of the so-called flipping

6   between injured and uninjured and most of the accounts that

7   appear to be uninjured are those where there's very little

8   activity in an account.

9       Let's take a simple example.  If I have two accounts, one

10  of which has 90 percent of my purchases, and I buy hundreds and

11  hundreds and hundreds of dollars of apps or IAP in it, and a

12  second account that has only one or two transactions, that's

13  two accounts.  And if all we have are account-specific

14  information, they are looked at equally.

15      And so if one -- if the small account with very little

16  activity is an uninjured account or a flipper account, that

17  looks the same, right now, as my other account where I've got

18  99 percent of my economic activity.

19      When those two accounts are identified to me and netted

20  out, then the likelihood that I'm either a flipper or uninjured

21  will be greatly reduced.

22      We think that the ability to do that is something that the

23  Court's opinion addresses in a number of different ways,

24  including the Court's concern about the timing for when we

25  would do this.

1    And I do want to clarify for the Court now what either I

2    misstated or the Court misunderstood during class

3    certification.  We're not asking the Court to reconsider the

4    class certification decision.

5    I want to be absolutely clear on the record about that.

6    We are not asking the Court to reconsider the decision at all.

7    But I want to make sure the Court understands something.

8    And that's the timing of when we intend for Professor McFadden

9    to run his model.

10    And if I didn't say it before, and if we didn't say it

11    clearly enough in the submission, I want to say it clearly now,

12    on the record.  We intend that the model, once it is accepted

13    and approved, will be run against all of the data from Apple.

14    Now, Apple has produced transactional data through April

15    of 2021.  Before trial, Apple's going to have to produce data

16    between April of 2021 and whenever we have the trial.  But at

17    that point, before our expert submits his final report, which

18    is, by definition, before the trial, the expert is going to run

19    the full damages model against the full set of Apple

20    transactional data.  That will yield 400 million results for

21    400 million Apple IDs.

22    Now, we've talked at length before, and I'm not going to

23    burden the Court with it again.  The aggregate amount of

24    damages is the result of adding up all of those 400 million

25    individual ID-specific sums of damages.  Some of them will be

positive damages.  Some of them will be so-called negative damages, which, again, Your Honor has addressed in your class certification opinion.

I won't ask the Court to reconsider it.  I agree that we need to net out the positive and negative damages.  But we will have the tool to do that, because we will have 400 million individual computations as a result of the experts' modeling that will be run against the full set of data that Apple produces.

If the Court understood the plaintiffs to say before that we did not intend to run the data -- to run the model against all the data, and did not intend to have 400 million results until after the trial, I take responsibility for that misunderstanding, and I want to clarify it now.  We are not going to do this after the trial.  It will be done before the expert's final report.

What I intended to say was that we would not present the jury with 400 million numbers.  It would take a lifetime for us to offer that evidence in the record.  But I did not mean to say that we would not have those 400 million calculations until after the trial.  That is why we described to you our intention to proceed on an aggregate basis at trial.  But that aggregate basis is the aggregate of 400 million separate calculations that will be done long before trial.

And the process of collecting those aggregate calculations

and then assigning the 400 million accounts to roughly

150 million account owners will be done in -- number one, will

be done, we believe appropriately, as early as possible now if

we can get the data from Apple, but certainly, during the

process of allocating the aggregate damages to the individual

class members.

Your Honor, in your opinion, has suggested that the need

to do that runs the risk of predominating over common issues.

The need to allocate the aggregate damages to individual class

members runs the risk of predominating over the common issues

that the Court identified in Your Honor's opinion.

We want to be able to do that now, to demonstrate that it

will not predominate.  That it will, in fact, be a ministerial

function, and it will not predominate any more than it

predominates because Professor McFadden has to make 400 million

calculations when he runs his model against the universe of

transactional data.

We've asked Apple for the identifying information so that

we can demonstrate to the Court that this is a ministerial

function, that it will not predominate over any common issues.

And Apple is refusing.

That process is going to take some time, because in the

first instance, we have to work out with Apple whether they

will agree or not.

If they don't, we have to bring on a motion.  If the Court

grants that motion, we then have to go back and get the data

from Apple.

Once we get the data from Apple, we then have to run it

against the 400 million individual calculations that Professor

McFadden's regression modeling will yield.  And (Inaudible)

them to 150 million or so class members.

We believe that the time necessary to do that is subsumed

within the two months that we asked for in addition to the time

that Apple thinks is necessary to do this work.  But as

Your Honor can see, it's a relatively small amount of time,

compared to the enormous amount of time the parties have

invested in this case, the lawyers have invested in this case,

the Court has invested in this case.

And so in order to be able to do the job adequately, to

address all of the issues the Court has identified in the class

certification decision, including this question of netting

harm, including the question of flippers, and including the

question of potentially uninjured class members, to satisfy the

Court as to, number one, the true number of uninjured class

members that may be out there, and number two, to satisfy the

Court that identifying those uninjured class members will not

be a predominating individual issue, we believe the time to do

that is now so that the Court can make a fully-informed final

class certification decision, particularly now that we have

guidance from the Ninth Circuit in the *Olean* case, which as

1    Your Honor knows, came out only a few days ago.

2        So for all those reasons, we believe that the prudent

3    thing to do is to give the experts the time that they tell us

4    they need to be able to accomplish this work, get it done,

5    answer the Court's questions, satisfy the Court's concerns,

6    present the class-certification motion in a way that fully

7    informs the Court, and allows the Court to make a decision

8    reflecting the corrections that Your Honor took the time to

9    identify for the parties and for counsel.

10        **THE COURT:**  Mr. Swanson?

11        **MR. SWANSON:**  Your Honor, there are a number of things

12    that Mr. Rifkin said that I would take issue with, but I think

13    we're really focusing on the scheduling right now, so I'm not

14    going to go through the merits of all of the points he's

15    raised, at least until the point comes up that Your Honor wants

16    to hear about them.  All of them, or some of them.

17        I think the fundamental issue from our standpoint is this

18    is not supposed to be a rerun of class certification.  We went

19    through a lengthy period to do that.  The plaintiff made a

20    strategic decision to advance their case based on a single

21    expert and his model.  Your Honor has heard out the issues; we

22    raised the issues.  They've been aware of them since August,

23    and could have been working to deal with them since then.

24        I think the basic reason why we think five months is not

25    required is five months isn't required to address the issues

Your Honor has identified with respect to Professor McFadden's model.  I don't think we think they will be remedied.  But if they can be, they can be dealt with in the next 90 days.

Adding multiple new experts, raising issues that have already been dealt with in Your Honor's order -- for example, focal point pricing -- we understood that we can't reraise things that we didn't prevail on.  We assume that that is symmetric, that we're not going to be having the plaintiffs revisit things that they lost.

And so, Your Honor, I think 90 days is perfectly reasonable.  It's the time that we're allowed to respond under either schedule.  That's what's been proposed.  They haven't proposed to add any extra time now to deal with three or four experts, new experts, added on top of Professor McFadden.

On the data issues, we, I think, agree to disagree with Mr. Rifkin.  No -- no request has been propounded.  Mr. Rifkin is talking about the most sensitive conceivable data that Apple maintains.  The data that links individuals to their app download and app transactions, that is at the core of Apple's guardianship of consumer privacy.  What Mr. Rifkin seems to be asking for -- although I'm not sure because we have yet to meet and confer about what they think they really need -- but, seems to be asking for data that would identify who downloaded each and every app.  You recall from the *Epic* trial how much sensitivity there was, alone, about the dating apps.

1        What Mr. Rifkin is asking about as to have data that would

2    be taken out of Apple's custody, out of Apple's cyber security

3    protection, multiple layers of protections that would indicate

4    who is engaged in every one of those transactions.  Who's

5    downloaded those apps, and much, much more.  That's just an

6    example.  So that is going to have to be dealt with, if that is

7    something that the plaintiffs pursue at the class certification

8    stage.  But we don't think that actually is a pertinent issue

9    at this stage for class certification.

10       We were the ones who raised the issue of linkage.  Our

11   argument was that the plaintiffs did not have a reliable method

12   to link Apple ideas.  We didn't prevail on that for class

13   certification purposes, Your Honor.  So again, I don't think

14   this is a situation where plaintiffs should be allowed to

15   revisit these issues when we have our hands tied behind our

16   back on that.

17       I think the facts would show that it is not going to be

18   reliable -- it won't be a reliable method match these up.  But

19   that no longer seems to be an issue for class certification, so

20   it's not an excuse to take five months instead of getting this

21   done in the next 90 days.

22       So that's it in a nutshell, Your Honor.  Five months,

23   we're going to have a redo with multiple experts, new experts.

24   Three months, they'll be focused on what they really need to

25   do.

**THE COURT:**  So let me ask this, Mr. Rifkin.

**MR. RIFKIN:**  Yes, Your Honor.

**THE COURT:**  Why is it that you should be allowed a do-over?  As you said, this case has been going on ten years.

Why -- why should I -- why should I not hold you to a standard of having done your best, and, you know, for whatever reason, you made a decision not to do your best?

**MR. RIFKIN:**  Well, Your Honor, I disagree with that characterization.

But the answer is implied by Your Honor's decision, which begins on Page 1 by indicating that the decision is being denied in certain respects without prejudice.  And, and you say that the Court anticipates that the deficiencies that are identified in the order can be addressed.  And, and that's what we're trying to do.  We're not doing anything improper.

**THE COURT:**  I also said that perhaps this is a case where you should only be focused on liability before you get into damages.  And why shouldn't -- And why shouldn't I hold you to that as well?  Because you, you failed.  There are security issues.

And, why shouldn't I hold you to that standard?

**MR. RIFKIN:**  Well, Your Honor, I do want to comment on that.  And again, I -- perhaps I should be taking the responsibility for this misunderstanding on the Court's part.  And I want to make it clear --

1       **THE COURT:** There was no misunderstanding. You may

2 want to revise the record, now. But I looked at the

3 transcript.

4       **MR. RIFKIN:** Your Honor --

5       **THE COURT:** And --

6       **MR. RIFKIN:** -- you said --

7       **THE COURT:** You said specifically, you know, this was

8 to be done after trial.

9       **MR. RIFKIN:** Your Honor, I -- I respectfully --

10       **THE COURT:** (Inaudible)

11       **MR. RIFKIN:** I respectfully disagree. But if I did,

12 I'm taking the responsibility for having misstated that. I'm

13 not suggesting that the Court didn't understand what I was

14 saying. If I misspoke, the time to correct that is now. And

15 I'm doing that.

16    But the point that I just tried to answer had to do with

17 Your Honor's point about a liability-only trial. And Your

18 Honor made that comment after, after noting that we had given a

19 damages range of between 7 and $10 billion, and then running

20 the model afterward to determine the distribution amounts.

21 Which, which you said was too great a range, and at least in

22 your mind, led to the view that the current model produced

23 results which were too speculative.

24    Now, again, Your Honor asked me at the last hearing

25 whether the experts had run the model and computed damages.

1    And I answered yes.  And Your Honor asked at the last hearing,

2    well, what's the result?  What are the damages?  And I said a

3    range of 7 to $10 billion.

4        Let me explain the reason for that.  If you look at the

5    expert's report, there are two separate damages numbers that

6    appear in the report.  The first one appears in Paragraph 236.

7    And it's the number of $6.6 billion, which the expert says

8    represents the consumer class damages attributable to the games

9    category.  It's a single number.  $6.6 billion, attributable to

10   the games category.

11       The expert then says in Paragraph 239 of his report

12   (As read):

13       "I estimate that the consumer class damages

14       attributable to the entertainment and music categories

15       is $0.6 billion."

16       So he gives two very specific numbers, one for games and

17   one for entertainment and music.

18       I added them up.  And the total is $7.2 billion.  That was

19   the lower range of the estimate that I gave to you of 7 to

20   10 billion.

21       The reason that I gave a range is not because the experts

22   were uncertain, but it's because the three genres of apps that

23   the experts addressed in the report -- games, entertainment and

24   music -- represent only 79 percent of the commerce on the App

25   Store.

1    The remaining 30 percent -- I'm sorry -- 21 percent of

2    commerce on the App Store is what accounts for the range.  When

3    one unpacks the $7.2 billion number to represent the entire App

4    Store -- which the experts haven't done yet, so I didn't want

5    to say they gave that number -- that's $10 billion.  That's not

6    $7.2 billion.  That's $10 billion.

7    If I led the Court to understand that the experts couldn't

8    calculate anything more than a range, which Your Honor said in

9    the class certification opinion was all it intended to prove at

10   trial, then I take responsibility for not being clear enough at

11   the hearing so that Your Honor could make an informed decision.

12   We want to be as precise as we can be.  We want to answer

13   exactly the concerns the Court has, and the concerns the Court

14   expressed, and the concerns the Court says can be addressed.

15   We agree.  These concerns can be addressed.  And all we're

16   trying to do is address them.  But addressing them requires

17   that we go back and do some additional work.

18   Now, Mr. Swanson wants to call that a redo.  But that's in

19   the nature of a denial of a motion without prejudice.  It is

20   exactly what we're trying to do.  We are trying to correct the

21   deficiencies the Court said it anticipates we will address in

22   the next round.

23   I can't imagine that anyone thought that we wouldn't fix

24   the problems that led to the Court excluding the expert report,

25   in the first place.  But to do that, it's going to require not

1  three months of work, but five months of work.  And that's not

2  doing this case over.

3      **THE COURT:**  Well, it kind of is.  But I think I'm

4  going to let you do it.  And I --

5      **MR. RIFKIN:**  Well, thank you.

6      **THE COURT:**  -- sometimes do, and I sometimes don't.

7  But it is a redo.

8      Let me be clear.  I don't know why it is that you took the

9  approach that you did.  But I'm not going to have this case go

10  up to the Ninth Circuit only to come back in three years, and

11  have to give you an opportunity to do it again.

12      All right.  So plaintiffs' schedule -- we'll go with

13  plaintiff's schedule.  Motion to be filed August 26th.

14      Opposition -- I think it's a little harsh to have

15  Mr. Swanson file the day after Thanksgiving.  So I'm not going

16  to do that, Mr. Rifkin.

17      **MR. RIFKIN:**  We're perfectly happy to have him take

18  all the time he needs.  We didn't mean to impose that on

19  Mr. Swanson at all.

20      **THE COURT:**  Mr. Swanson.

21      **MR. SWANSON:**  Um, can we do it a week after that,

22  then?

23      **THE COURT:**  Okay.  That would be December 2nd?

24      **MR. SWANSON:**  Yeah.  I don't know if this will mess up

25  other days, though.  But in the abstract, that would be better.

1      **THE COURT:**  Okay.  And then the reply.  Right now you

2  have January 13th.  Do you want the extra week, Mr. Rifkin?

3  January 20th?

4      **MR. RIFKIN:**  If we could have it, if we could have it,

5  yes.  Please.

6      **THE COURT:**  All right.  January 20th.

7      March 1st is a Wednesday, not a Tuesday.  But let's go

8  ahead and set it for March 1st, specially set, which is a

9  Wednesday, 2:00 p.m.  That'll be in person.

10      It looks like you -- the deadline to complete fact

11  discovery, you both want 60 days after the decision on class

12  cert?

13      **MR. SWANSON:**  Yes, Your Honor.

14      **MR. RIFKIN:**  Correct.

15      **THE COURT:**  So, that's fine.  Last day to file

16  discovery motions, 30 days -- effectively, 30 days after the

17  decision of class cert, so that's fine.  You disagree on these

18  -- I take it that the next set of expert reports are final

19  reports?

20      **MR. SWANSON:**  Right.

21      **MR. RIFKIN:**  Correct, Your Honor.  These would be the

22  expert -- the merits reports.

23      And the reason for the difference in time is simply

24  because in the intervening months, we will expect to receive

25  literally billions of transactions.  Data from literally

1   billions of additional transactions.

2       As -- as the --

3       **THE COURT:**  All of that -- why isn't all of that being

4   disclosed in advance?  I mean, when I do the MDLs, all of the

5   data upon which the -- upon which the expert reports are being

6   used for purposes of class certification have to be disclosed

7   at the time that the motion is filed.  That's what we did in

8   the batteries case.  And I don't see any reason not to do that

9   here.

10      In the batteries case, we had tons of expert reports, and

11  everything was done in advance, so that you were looking at 30

12  days later, or at most, 60 days later, so that -- these were

13  just to -- these were just to tweak things.  Because it should

14  all be done.  We shouldn't be doing more, once we get past

15  that.

16      **MR. SWANSON:**  And Your Honor, if the plaintiffs run

17  the whole model, for purposes of class certification, it would

18  make it very easy to do a short re-up at that point.  I don't

19  understand why Mr. Rifkin wants to defer that.  He's only run

20  it on three genres.

21      We're going to get 27 genres, like, two months later?  Why

22  not see this at class cert?

23      **MR. RIFKIN:**  No.  Because -- that's not -- that's not

24  what I'm addressing.  And again, what I'm talking about is

25  this.

1    We have data, we have transactional data from Apple

2    through April of 2021.  We're a year later now.  There's

3    billions of transactions that have taken place in the

4    intervening year.  We don't have that transactional data yet

5    from Apple.  Apple hasn't produced it.

6           **MR. SWANSON:**  We haven't --

7           **MR. RIFKIN:**  If it produces it, we'll run a model on

8    it.

9           **MR. SWANSON:**  Sorry.

10          **MR. RIFKIN:**  Okay?  But at some point in time Apple is

11   going to have to produce updated transactional data, which the

12   -- which the experts will have to run their model against.

13       All they're doing is developing a model.  Once they have

14   the model, they will run it.

15          **THE COURT:**  Right.  You said it's mechanical.  So you

16   don't need four months.  I'll give you 60 days.  That's it.

17   Then 45 days for rebuttal --

18          **MR. RIFKIN:**  Fine, Your Honor.

19          **THE COURT:**  -- and 30 days after that.  Again, I -- I

20   don't -- I don't under- -- I don't think that you all need this

21   much time.  But you've agreed, so I'll give it to you.

22       Dispositive motions and *Dauberts*, 45 days after that is

23   fine.

24       Then oppositions, 45 days; replies, 30 days.  Both of

25   those are fine.

1    I haven't calculated out -- certainly we aren't in 2022 at

2    this point; we're in 2023.  So -- and I -- I have to tell you,

3    I've got a 55-defendant Nuestra Familia prison case, that I'm

4    going to have to try, a number of them.  They will take

5    priority.

6        So when we get to your next class cert motion, maybe I

7    will have a better sense of how much I will be in criminal

8    trial, as opposed to -- and when I will free up for a civil

9    trial.  So I'll give that to you -- um, I'll give that to you

10   later.

11           MR. RIFKIN:  Very well.

12           THE COURT:  But I think that's as far as we are going

13   to get today.

14       Mr. Rifkin, you -- I didn't see you at the antitrust

15   conference.  I was on the dais with Ms. Sweeney and

16   Mr. Swanson.  And I will say to you what I said to them:  Be

17   very careful with your *Daubert* motions.  We generally think, on

18   both sides, that they are over-used.

19       So if I have a Nobel laureate, as long as he's opining on

20   something upon which he is a laureate, I would expect

21   Mr. Swanson not to see a *Daubert*.  Okay?

22       All right.

23           MR. SWANSON:  All right, Your Honor.

24           THE COURT:  I will see you all --

25           MR. RIFKIN:  Thank you, Your Honor.

1          THE COURT:  -- in a few months.

2      We're adjourned on your case.

3      Can someone please send me an editable version of that

4  document so we can get your scheduling order out?

5          MR. SWANSON:  Your Honor, I'm sorry; is the date okay

6  for dealing with the sealing issues?  I know my colleague --

7          THE COURT:  That's fine.

8          MR. RIFKIN:  The 27th?

9          MR. SWANSON:  Yeah.

10         THE COURT:  Yes.  That -- March 29th is what you've

11  put here?

12         MR. SWANSON:  I think it was April, maybe April --

13         THE COURT:  April --

14         MR. SWANSON:  April 27th.

15         THE COURT:  April 27th is fine.  That works.

16         MR. SWANSON:  Thank you.

17         MR. RIFKIN:  Your Honor, we'll submit a Word version

18  of the case management scheduling conference statement to your

19  chambers.

20         THE COURT:  Okay.

21         MR. RIFKIN:  Is that how you'd like it done?

22         THE COURT:  Just the proposed-order mailbox.

23         MR. RIFKIN:  Yes.  We will do so.

24         THE COURT:  Okay.  All right.

25         MR. RIFKIN:  Okay.

1      **THE COURT:** All right.  Thank you all.

2      **MR. RIFKIN:**  Thank Your Honor.

3      **MR. SWANSON:**  Thank you, Your Honor.

4      **MR. RIFKIN:** Bye-bye.

5    (Proceedings concluded)

CERTIFICATE OF TRANSCRIBER

I, BELLE BALL, CSR 8785, CRR, RDR, hereby certify that the foregoing is a correct transcript, transcribed to the best of my ability from the official electronic sound recording of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, April 13, 2022