# Exhibit 1

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S NOTICE OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:       Nov. 16, 2021<br>Time:      10:00 a.m.<br>Courtroom: 1, 4th Floor |

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 16, 2021 at 10:00 a.m. before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. will and hereby does move this Court to exclude the testimony of the named plaintiffs' expert, Professor Daniel L. McFadden, in support of their Motion for Class Certification, on the grounds that his report and the related opinions therein are unreliable, speculative, and irrelevant under Federal Rules of Evidence 401, 403, and 702 as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and related authorities.

This motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, all accompanying Declarations and Exhibits, other documents on file in this or related actions, oral argument of counsel, witness testimony, and any other matters of which the Court may take judicial notice.

Apple further respectfully requests that prior to the consideration of the opinions of Prof. McFadden, an evidentiary hearing should be held to determine whether its *Daubert* and Rule 702 objections should be sustained.

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Mark A. Perry*

Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Jay P. Srinivasan
Mark A. Perry
Cynthia E. Richman
Veronica S. Moyé
Ethan D. Dettmer
Rachel S. Brass
Caeli A. Higney

*Attorneys for Defendant Apple Inc.*

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................. 1

II.  RELEVANT BACKGROUND ........................................................................... 2

    A.  Prof. McFadden's Opinions Regarding Apple's "But-For" Commission Rate ........... 3

    B.  Prof. McFadden's Opinions Regarding Developers' But-For Prices ......................... 4

    C.  Prof. McFadden's Opinions Regarding Market Definition ......................... 5

III.  LEGAL STANDARD ......................................................................................... 6

IV.  ARGUMENT ...................................................................................................... 6

    A.  Prof. McFadden's Decision To Build A Model To Prove Rather Than Test Common Effect Renders It Unreliable ......................... 7

    B.  Prof. McFadden's Opinions Regarding Classwide Injury Rest Upon An Unreliable And Untenable But-For World ......................... 7

        1.  Prof. McFadden Engineers Classwide Injury By Resting His Analysis On An  Unscientific Benchmark "Analysis" ......................... 7

        2.  Prof. McFadden's Methodology Assumes Unrealistic Conditions In The But-For World, Including A Uniform Commission Rate Across The Entire Class Period ......................... 14

        3.  Prof. McFadden's Profit Margin Analyses Are Based On Unreliable Methods ......................... 15

    C.  Prof. McFadden's App-Pricing Model Is Wholly Unreliable and Comprehensively  Insufficient To Assess Common Impact ......................... 16

        1.  Prof. McFadden's Data Error Results In Gross Exaggeration Of Injury ........ 17

        2.  Prof. McFadden's Model Fails Basic Tests For Robustness ......................... 17

        3.  Prof. McFadden's Model Ignores Market Realities To Achieve Common Impact ......................... 20

    D.  The Court Should Exclude Prof. McFadden's Opinion On Market Definition ......... 22

        1.  Prof. McFadden Ignores the App Store's Two-Sidedness ......................... 23

        2.  Prof. McFadden Improperly Clusters All App Transactions Together Without Any Economic Analysis ......................... 24

V.  CONCLUSION ................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

3  **CASES**

4  *Abarca v. Franklin County Water Dist.*,
5  761 F. Supp. 2d 1007 (E.D. Cal. 2011)...................................................................................22

6  *Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) ..........................................................................................................21

7
8  *Estate of Barabin v. AstenJohnson, Inc.*,
   740 F.3d 457 (9th Cir. 2014)...................................................................................................6

9  *Bazemore v. Friday*,
10  478 U.S. 385 (1986) ...............................................................................................................11

11  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998)....................................................................................................9

12  *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
13  923 F. Supp. 2d 1245 (S.D. Cal. 2013) .................................................................................16

14  *Brown Shoe Co. v. United States*,
15  370 U.S. 294 (1962) ...............................................................................................................24

16  *Claar v. Burlington R.R.*,
    29 F.3d 499 (9th Cir. 1994).......................................................................................................6

17  *Crowley v. EpiCept Corp.*,
18  2015 WL 13827908 (S.D. Cal. Mar. 11, 2015) .....................................................................23

19  *Daubert v. Merrell Dow Pharm., Inc.*,
20  43 F.3d 1311 (9th Cir. 1995).....................................................................................................6

21  *Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)..............................................................................................................6, 7

22  *Domingo ex rel. Domingo v. T.K.*,
23  289 F.3d 600 (9th Cir. 2002)....................................................................................................9

24  *DSU Med. Corp. v. JMS Co.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ..............................................................................9, 10

25
26  *Freeland v. AT & T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................................................11

27  *FTC v. Staples*,
28  190 F. Supp. 3d 100 (D.D.C. 2016) .......................................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES (*continued*)

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001) ............................................................................................... 9

*In re High-Tech Empl. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................................ 18

*In Lithium Ion Batteries Antitrust Litig.*,
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ...................................................................... 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................................................. 6

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ............................................................................................... 21

*Laumann v. NHL*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ................................................................................ 19

*LeClercq v. The Lockformer Co.*,
2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ..................................................................... 12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) .......................................................................... 19, 20

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................ 6, 11

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
89 F.3d 594 (9th Cir. 1996) .................................................................................................. 6

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
877 F.2d 1333 (7th Cir. 1989) ............................................................................................ 16

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ........................................................................................................ 23

*Ollier v. Sweetwater Union High Sch. Dist.*,
267 F.R.D. 339 (S.D. Cal. 2010) ........................................................................................ 22

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) .............................................................................................. 14

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) .............................................................................................. 25

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ............................................................................................................ 18

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) .................................................................................................24

*In re Wholesale Grocery Prod. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019)................................................................................8, 9, 14

*C.W. ex rel. Wood v. Textron, Inc.*,
807 F.3d 827 (7th Cir. 2015)................................................................................19

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012).................................................................................8

OTHER AUTHORITIES

Ars Techica, April 29, 2021, *available at* https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pcgame-sales-to-12/...............................................................................11

Fed. Jud. Ctr., Ref. Manual on Scientific Evid. 432 (3d ed. 2011).......................................9

RULES

Fed. R. Evid. 702 .................................................................................................6, 15

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Cons. Opp. __** | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, filed concurrently. |
| **Dev. Opp. __** | Apple Inc.'s Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, filed concurrently in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR. |
| **Mot. __** | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| **[Name] Dep. __** | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Trial Tr. __** | Transcript of the trial held in *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR-TSH, from May 3, 2021 to May 24, 2021, in Oakland, CA. |
| **Hitt ¶ __** | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Malackowski ¶ __** | Expert Report and Declaration of James E. Malackowski, dated August 10, 2021 and filed concurrently. |
| **Prince ¶ __** | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Rubin ¶ __** | Expert Report and Declaration of Aviel D. Rubin, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Schmalensee ¶ __** | Expert Report and Declaration of Richard Schmalensee, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Simonson ¶ __** | Expert Report and Declaration of Itamar Simonson, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Willig ¶ __** | Expert Report and Declaration of Robert D. Willig, dated August 10, 2021 and filed concurrently. |
| **McFadden ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at Dkt. 442-11. |
| **Economides ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Nicholas Economides, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-1. |
| **Elhauge ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Einer Elhauge, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-2. |
| **Tregellis ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Christian Tregillis, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-3. |

# I. INTRODUCTION

The four named plaintiffs are asking this Court to certify a class of millions of consumers seeking billions of dollars in damages. In support of this audacious request, they rely on a single expert, Professor Daniel L. McFadden, who offers a series of opinions about a "but-for world" that he readily admits are based on results-driven assumptions, engineered to show common impact. These opinions—including about the commissions that Apple would charge in a "competitive" market, and the prices that developers would charge in the "but-for world"—are not the product of reliable economic analysis or modeling and should be excluded.

The central assumption underlying all of Prof. McFadden's opinions is that "[i]n the But-For world where the Apple App Store competes with non-Apple app stores or app developers selling iOS apps and in-app content on the iOS devices, the force of competition would bring down the commission rate." McFadden ¶ 154. But he did not apply scientific rigor or economic expertise to model the but-for world, instead choosing to rely on mere "commonsense judgment." Ex. 17 (McFadden Dep.) 135:12-13. In fact, Prof. McFadden's "commonsense judgment" that Apple would have uniformly charged all developers a 10-12% commission since 2008 is based on a "benchmark analysis" of four cherry-picked "PC game app stores" *identified by his litigation support staff*. McFadden ¶ 136; Ex. 17 (McFadden Dep.) 135:20-136:9. But one of those four (Epic) is not just Apple's litigation adversary but unprofitable by hundreds of millions of dollars, the second (Discord) shut down *two years ago*, the third (Steam) subjects all apps to a 30% commission rate on their first $10 million in sales, and the fourth (Microsoft) likewise charged a 30% headline commission rate at the time of Prof. McFadden's declaration. Meanwhile, Prof. McFadden excludes from his "benchmark analysis" a number of other app stores that charge 30% commission rates, including the Mac App Store—which faces the very competitive conditions that he hypothesizes for his "but-for world." In fact, Prof. McFadden has not identified a single app store that has ever charged a 10-12% headline commission rate and remained profitable. Given that Prof. McFadden admittedly outsourced this part of his report, it is perhaps unsurprising that when confronted with these problems, he made almost no effort to defend his benchmark analysis. Yet, *all* of his opinions on impact and damages flow from it.

From there, Prof. McFadden constructs a model to estimate "how app developers would have

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN      NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

changed their app and in-app content prices" under his implausible commission rate (McFadden ¶ 137), and finds (contrary to the developer plaintiffs' experts) that consumers bear the brunt of the overcharge. *Id.* ¶ 235.  But this model is comprehensively defective.  Despite having access to data involving *billions* of transactions, from both *millions* of user accounts and over ███████ paid apps and ███████ total apps, Prof. McFadden limited his analysis to a small subset of apps—only 1,806—within only 3 (of 27) app genres.  Prince ¶ 20, 24-25, 108-09.  The results of this unreliable approach fail basic tests for robustness, rendering them useless to the Court.  Moreover, Prof. McFadden admitted that he designed the model not to test the question of uniformity but to prove it.  *See* Ex. 17 (McFadden Dep.) 181:5-6 (explaining "the purpose of the model, which is to find a common effect").  But the model does not actually show common impact:  When the same model is applied to different genres of apps (Prince ¶¶ 120-22), free apps (*id.* ¶¶ 56), or even just a different random sample (*id.* ¶¶ 113-15), the common impact Prof. McFadden claims to prove drops precipitously—if the model does not break down altogether—leaving not only a materially larger percentage of the class unharmed (and the quantum of harm lower), but demonstrating wide variability in impact across the putative class (*id.* ¶ 35, Ex. 1).

As explained further below, each and every opinion Prof. McFadden offers, and the only model he builds, are untethered to competitive reality and unreliable.  They should be excluded.

## II.     RELEVANT BACKGROUND

The named plaintiffs' claims are based on the theory that Apple charges developers on the App Store supracompetitive commissions, which those developers passed on to consumers in the form of higher prices.  Mot. 10, 21.  Plaintiffs contend that, but for Apple's purported monopoly, (1) Apple would have adopted a lower commission rate, (2) developers would have passed most (82%) of any savings along to consumers, and (3) consumer prices would have fallen.  *Id.* at 20-21.  In support of their class certification motion, Plaintiffs rely exclusively on Prof. McFadden to show that impact and damages can be litigated on a classwide basis using common evidence.  *Id.* at 20-23.

Prof. McFadden attempts to demonstrate common economic proof of impact and damages through a two-step analysis.  McFadden ¶¶ 136-37.  First, based on his litigation support staff's identification of commissions charged by four "PC game app stores" (since 2018), he opines on "what App

Store commission rates Apple would have charged" (since 2008) in what he calls "a competitive 'But-For' world" devoid of "conduct by Apple that the complaint in this case alleges to be anti-competitive." *Id.* ¶¶ 11, 136. Second, he (1) "estimate[s] how app developers would have changed their app and in-app content prices at the But-For commission rates," and then (2) he uses "these But-For app and in-app content prices" to calculate alleged "overcharges as well as damages for the Consumer Class." *Id.* ¶ 137. Each of these opinions is tethered to Prof. McFadden's determination that Apple does not compete with other app platforms; rather, it operates in a single-brand market.

## A.   Prof. McFadden's Opinions Regarding Apple's "But-For" Commission Rate

Prof. McFadden opines that "the 'But-For' commission" Apple would have charged developers in a but-for world devoid of Apple's alleged anticompetitive policies "would have ranged between 10 and 12 percent" since 2008. McFadden ¶¶ 13, 161, 229. During his deposition, Prof. McFadden summarized the "benchmark analysis" he offers in support of this opinion as follows:

> I did not, myself, look individually at benchmarks. I simply asked the team to look for market situations in which rough -- roughly comparable business models for developers -- roughly comparable for decisions for consumers and some degree of competition among -- among the platforms for getting the apps delivered, and I told them to exclude situations in which there was a clear claim of noncompetitive conduct, which is, I understand, to be the case for the Google Store. And also I asked them to exclude game -- game devices because I -- I believe that's a different business model.

Ex. 17 (McFadden Dep.) 135:22-136:9.

The "benchmark analysis" considers the commission rates of four PC game app stores, starting with rates announced in late 2018. McFadden ¶¶ 156-61. One of those stores (Valve's Steam) predominantly charges the same 30% rate that the named plaintiffs contend is anticompetitive; another (Microsoft Store for Windows) did not implement the rate Prof. McFadden attributes to it until after his report; another (Epic Games Store) adopted its rate as part of its litigation strategy against Apple and Google and operates at a net loss; and the last (Discord) briefly used the attributed rate and then *shut down*. *Id.* ¶¶ 156-60; *infra* § IV.B.1.4. Relying only on these examples (and ignoring numerous app stores, including the Mac App Store, that charge a 30% commission), Prof. McFadden selects his 10-12% range based on the lowest commissions represented (*i.e.*, Epic and Discord). McFadden ¶¶ 156, 159, 161; Ex. 17 (McFadden Dep.) 148:21-149:2, 153:20-154:4.

Prof. McFadden does not attempt to determine whether and how Apple's commission might

have changed throughout the approximately 13-year class period.  And he has no opinion on what commission Apple would have charged even in its earliest days.  Ex. 17 (McFadden Dep.) 215:5-14.  Rather, focusing on a "recent increase in competition" since 2018 (McFadden ¶ 136), he simply assumes the 10-12% rate would have uniformly applied since the App Store launched in 2008.  Ex. 17 (McFadden Dep.) 156:8-14.  He does not attempt to model competition, such as by determining when competitors might have entered the market and how commission rates would have changed over time in response to competition.  *Id.* 133:14-134:12.

As to Apple's own willingness to charge the lower commission rate, Prof. McFadden contends that a 10% commission range would still permit Apple to earn an approximately "25 percent net margin at the current cost structure."  McFadden ¶ 161.  He does not base his conclusions regarding the App Store's purported profit margins on any accounting expertise (*see* Ex. 17 (McFadden Dep.) 103:22-24 ("I'm not an accountant.")), but rather primarily upon what he calls "internal P&L statements for the App Store," McFadden ¶ 121, adopting interpretations of those documents that Tim Cook testified in *Epic* were wrong.  *See* Ex. 26 (Trial Tr. (Cook)) 3879:18-3880:24, 3881:11-17, 3903:1-9, 3967:6-15.

## B.    Prof. McFadden's Opinions Regarding Developers' But-For Prices

Prof. McFadden opines that although "the extent of the harm to each class member will depend on their individual purchases, common economic evidence demonstrates a quantifiable pattern of impact on all class members," such that "[t]he same methodologies … can be used to quantify the amount that each class member would likely have paid in the But-For world."  McFadden ¶¶ 14-15.  Using an econometric model, Prof. McFadden purports to "estimate iOS aftermarket consumer demand and app developer costs," and to use those estimates to "calibrate app and in-app content prices that the Consumer Class would have paid in the competitive But-For world."  *Id.* ¶ 137.  His model begins with data for Apple ID accounts—not consumers.[1]  *Id.* n.199, ¶ 218.  Then, rather than use data from all genres of apps, or all apps including free apps, he uses a fractional subset of consumer accounts—a 0.1% sample of paid transactions.  *Id.* ¶¶ 184, 218.  He further narrows that sample, focusing on three app genres—Games, Music, and Entertainment, and then funneling further, with only apps that account

---

[1]  Apple records App Store transactions by each Apple ID account, not by each individual user, who may have more than one account.  *See* Rollins Decl. ¶¶ 2-6.

for the top 70% of revenue. *Id*. n.297. Ultimately, this winnowing brings him from over 4.5 million total apps to a sample of 1,806 apps from just three genres. Ex. 17 (McFadden Dep.) 206:13-207:3; Prince ¶ 108. Prof. McFadden's report acknowledges that his model predicts that 5.8% of user accounts suffered no harm. McFadden ¶ 241. In his deposition, he admitted that this figure was an underesti-mate, because it did not measure net harm across a given account's purchases. Ex. 17 (McFadden Dep.) 208:5-25; *id.* 201:12-21; McFadden n.198. When applying the proper net harm measure using Prof. McFadden's computer code, the model predicts that 7.7% of user accounts—almost 15.7 mil-lion—suffered no economic impact. Prince ¶ 31. And when a bug in Prof. McFadden's code is fixed, that figure rises to an astounding 14.6% or nearly 30 million accounts. Prince ¶ 32. Nevertheless, Prof. McFadden opines that "all or nearly all" of the putative class has been injured. McFadden ¶ 13.

**C.     Prof. McFadden's Opinions Regarding Market Definition**

Prof. McFadden opines that "the sale and purchase of native iOS applications ('apps') and in-app content to users of iPhones, iPads, and other mobile devices sold by Apple that use its proprietary iOS operating system constitute a distinct economic antitrust market, commonly referred to as an af-termarket . . . ." McFadden ¶ 12. In this market as defined by Prof. McFadden, Apple is not a two-sided transaction platform (as accepted by all experts so far in these related cases), but rather "a retailer that sells iOS apps and in-app content" to consumers for "retail prices." *Id.* ¶ 42. Developers, mean-while, are "suppliers that 'manufacture'" apps and supply them through Apple. *Id.*

Prof. McFadden does not consider whether the apps "retail[ed]" on the App Store—such as games, news apps, or social media apps, and the paid or free content offered therein—are substitutable for one another. *See* McFadden ¶¶ 42-47. Nor (with one exception) does he analyze whether non-iOS apps on other electronic devices are reasonable substitutes for native iOS apps. *See id.* ¶¶ 47-97. Prof. McFadden defines the "iOS apps and in-app content" as an "aftermarket" because consumers "are economically locked into purchasing apps and in-app content" for their iOS mobile devices (*id.* ¶ 12), yet he fails to consider not only that consumers with multiple devices can access the same and different apps without actually "switching" devices, *see id.* ¶¶ 67-79, but also the experience of lead plaintiff Robert Pepper, who during the course of this litigation moved from Apple to Android and back again (Ex. 15 (Pepper Dep.) 67:5-17)—just like millions of other consumers.

### III.   LEGAL STANDARD

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony … is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)); *see also Daubert*, 509 U.S. at 589, 597.  Relevancy or "fit" requires that an expert's testimony be "relevant to the task at hand," *i.e.*, "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*).  For expert testimony to be sufficiently reliable, there must be "good grounds" for the testimony—it cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589.  Reliability thus turns not on "the correctness of the expert's conclusions," but on "the soundness of his methodology." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotation marks omitted).  In antitrust cases, the reliability of an expert's opinion "hinge[s] on careful statistical analysis, reasonable assumptions, reliable data, and the robustness of the results." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973-74 (C.D. Cal. 2012) (citation omitted).  If "any of these areas" are flawed, "then the analysis could provide faulty conclusions as to the existence or the amount of damages." *Id.* (citation omitted).  Thus, before admitting expert testimony, the Court is "obligated to scrutinize carefully the reasoning and methodology underlying" it. *Claar v. Burlington R.R.*, 29 F.3d 499, 501 (9th Cir. 1994).  The "proponent of the expert" carries "the burden of proving admissibility" of the expert testimony. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *Daubert II*, 43 F.3d at 1319 n.11 (same).

### IV.   ARGUMENT

Prof. McFadden's economic analyses are unscientific and unsound and thus do not support his opinions.  Most critically, he proffers a hypothetical but-for commission rate, which he admits having no role in creating, and that ignores more than a decade of evidence regarding commission rates charged by profitable non-monopolist competitors.  He then constructs a model for but-for app prices based on cherry-picked data that when scrutinized and tested shows a profusion of uninjured class members and a manifest lack of common impact.  Finally, his market-definition opinion not only fails to engage in a robust substitutability analysis, but impermissibly ignores key economic realities—like the App Store's

two-sidedness—that place Prof. McFadden at odds with every other economist to offer an opinion on the subject.

## A.   Prof. McFadden's Decision To Build A Model To Prove Rather Than Test Common Effect Renders It Unreliable

Prof. McFadden's opinions fail at the threshold, because he did not approach his opinions scientifically.  During his deposition, Prof. McFadden candidly testified that "***the purpose of the model … is to find a common effect***."  Ex. 17 (McFadden Dep.) 181:5-6 (emphasis added); *see also id.* 232:20-23 ("You -- you want the model to do the best job you can of reflecting the common effect, given -- given the information that you have.").  When asked whether the named plaintiffs' counsel provided "any assumptions that [he] relied on in forming [his] opinions," he further offered that he was assigned "the task of establishing that there was common evidence across the class."  *Id.* 26:4-9.  Likewise, "a primary instruction that [he] received" from his "team" was "that it was important to pay attention to the commonality of the effects on the class and [his] report."  *Id.* 26:9-13.

Thus, by his own words, in constructing his model, Prof. McFadden fell short of the most rudimentary characteristic of proper and admissible expert opinion testimony.  As the Supreme Court explained in *Daubert*, "[s]cientific methodology today is based on generating hypotheses and *testing them to see if they can be falsified*; indeed, *this methodology is what distinguishes science from other fields of human inquiry*."  509 U.S. at 593 (quotations and citations omitted) (emphasis added).  Constructing a model to "find" or "capture" an effect or "do the best job you can of reflecting the common effect" (Ex. 17 (McFadden Dep.) 181:5-6, 231:19-232:23) is not a test; it is accepting a litigant's desired outcome, and hardwiring a model to achieve it.  This approach taints all of Prof. McFadden's conclusions and requires excluding his opinions in full.

## B.   Prof. McFadden's Opinions Regarding Classwide Injury Rest Upon An Unreliable And Untenable But-For World

Prof. McFadden uses a "benchmark" approach to suggest that as a non-monopolist Apple would charge developers a 10-12% commission rate.  That hypothetical "but-for world" is the product of ignoring competitive realities in the actual world.  It is unreliable and should be excluded.

### 1.   Prof. McFadden Engineers Classwide Injury By Resting His Analysis On An Unscientific Benchmark "Analysis"

Opinion testimony should be excluded where the expert constructs a but-for world using a "benchmark model" that has "too great an analytical gap between the facts of the case." *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (affirming exclusion where expert created but-for world relying on "profit and volume projections without knowing the circumstances under which [they] were created or the assumptions on which they were based"). Likewise, to be admissible, expert opinions must be based on an adequate analysis of the evidence. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (excluding testimony based on "superficial inspections" of the evidence). In *Wholesale Grocery*, for example, the district court excluded expert testimony as unreliable "because it was premised on what the district court found to be an unfounded assumption"—namely, that another company's (Stop & Shop's) practices in the but-for world would "follow[] the same pattern as" the defendant's (Village Market's). 946 F.3d at 1000-01. Although the expert had constructed a notionally sophisticated damages model, the Eighth Circuit held that "the core assumption of the analysis"—that Stop & Shop was sufficiently comparable to Village Market to justify its use as a benchmark— "was by the *ipse dixit* of" the expert, and was properly excluded. *Id.* at 1002.

Prof. McFadden's benchmark analysis—"the first step of [his] methodologies for quantifying common economic impact" (McFadden ¶ 153)—suffers from the same foundational flaw. He did *not* apply any rigorous methodology to analyze the commission level in the but-for world. *See* Ex. 17 (McFadden Dep.) 134:7-134:12 ("Q. And you haven't made any mathematical model or statistical model of the but-for commission, have you? A. No. I mean, obviously, an economist could do that, and I'm aware that that could be done, but I have not done it in this case."). Instead of drawing upon scientific expertise, Prof. McFadden assessed benchmarks based on what he termed "***commonsense judgment***." *Id.* 135:12-13 (emphasis added); *see also id.* 135:1-4 ("Q. My question is: How do you determine whether a benchmark market has similar characteristics? A. Well, I think it's largely common sense."). Specifically, he concluded that absent Apple's alleged monopoly, *all* but-for commission rates would have been 10-12% for the *entire* consumer class period—*i.e.*, since 2008—based on a cursory review of commission rates charged by a small, non-representative set of "PC game app stores" offered by Epic Games, Microsoft, Valve, and Discord during a discrete time period "after a

Gibson, Dunn & Crutcher LLP

recent increase in competition" beginning in 2018.  McFadden ¶¶ 136, 153-61.  In other words, he did not engage in *any* meaningful economic analysis whatsoever, *see* Ex. 17 (McFadden Dep.) 133:14-134:12 (admitting he has not designed any model to determine the but-for commission), acknowledging, for example, that he has "no opinion" on key issues like the number of App Store competitors that might exist in his but-for world, or Apple's market share within it, *id.* 130:17-132:5 (suggesting Apple's market share could be as high as 100%).  This lack of methodological rigor compels exclusion.  *See Wholesale Grocery*, 946 F.3d 995, 1002; *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (rejecting model that failed "to make a responsible estimate of the prices that [plaintiff] would have paid" absent alleged anticompetitive conduct); Fed. Jud. Ctr., Ref. Manual on Scientific Evid. 432 (3d ed. 2011) (reliable damages model depends on a "proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value").

There is no basis to assume that *all* iOS developers would have been charged a 10-12% commission—from 2008 to the present—in a world without the challenged App Store practices.  To the contrary, Prof. McFadden's but-for commission rate is disproved by observable real-world evidence, as 30% remains the predominant headline commission rate offered by most transaction platforms, including those (like the Samsung and Google Android app stores) that exhibit the key features of Prof. McFadden's "but-for" iOS world—namely, sideloading and competing stores on the same device.  *See* Hitt ¶ 80 & Fig. 20.  Apple's own Mac App Store is subject to those very constraints, and still charges a 30% commission rate, yet Prof. McFadden didn't even "look[] at it" and doesn't "know how it works."  *See* Ex. 17 (McFadden Dep.) 137:5-10 ("Q. Do you know if that was excluded as a benchmark? A. … I don't recall it being brought up as a -- as a candidate for inclusion."), 137:11-14 ("Q. Well, do you consider the Mac app environment to be competitive? A. I don't -- I don't know. I haven't -- I haven't looked at it."), 137:21-24 ("I actually have no idea what's in the Mac store in terms of what's native to the IS [*sic*] operating system and what's -- what's Web-based."), 138:21-22 ("I don't know how it works.").  Prof. McFadden's failure to even consider these observable economic realities renders his opinion unreliable.  *See, e.g.*, *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606-07 (9th Cir. 2002) (opinion properly excluded where insufficiently supported by facts); *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831-32 (9th Cir. 2001) (same); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp.

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

2d 1140, 1158-59 (N.D. Cal. 2003) (excluding opinion as "speculation" for failure to account for relevant "market circumstances" and "economic reality").

Both the platforms Prof. McFadden selectively highlights and those he inexplicably excludes reveal the unreliability of his but-for world. Prof. McFadden did not use his own "common sense," but rather relied entirely on his litigation support staff to select the comparators. *See* Ex. 17 (McFadden Dep.) 135:22-136:9. Prof. McFadden's staff limited the inputs into his benchmark to four cherry-picked examples of PC digital game transaction platforms—which he deemed to be "more competitive" than iOS and therefore "particularly relevant" as a benchmark for commission rates in the but-for world. McFadden ¶¶ 155-56. In fact, neither of those criteria is satisfied by his staff's choice of inputs.

1. **Steam**. Prof. McFadden's staff selected Steam because its "new commission structure" purportedly shows that a 30% rate is not competitive. McFadden ¶ 157. But that is not true—the new structure for game sales *above $10 million* (25% commission) and *above $50 million* (20% commission)███████████████████████, as Prof. McFadden now acknowledges. *See* Ex. 17 (McFadden Dep.) 148:14-20 ("clearly the 10-million- and 50-million-dollar thresholds are limiting you to large -- fairly large apps, so there are not -- there are not so many of those"); *see also* Hitt § 5.5.2.1 & ¶¶ 91-92 (███████████████████ Steam has almost 50,000 apps as of August 2021). ███████████ developers continue to pay a 30% commission on all Steam transactions. *See id.* And because Steam's reduced tiered-commission structure is triggered only on revenues above threshold amounts, ██████████████ who benefit from reduced rates still pay a 30% commission on pre-threshold sales. Hitt ¶¶ 91-92. That means Prof. McFadden's baseline data is wrong. Worse, even he concedes that through 2018 "Steam had charged a constant 30 percent commission rate on [*all*] game revenues," McFadden ¶ 157, yet he ignores the implications of this fact for his but-for world—*i.e.*, that despite facing the very same competitive conditions as Apple from 2008-2018, Steam maintained a 30% commission, which it *continues to charge to* ███████████ *of the titles on the platform*. Hitt ¶¶ 91-92.

2. **Microsoft**. Prof. McFadden uses a then-announced but not-yet-effective commission rate for games as his Microsoft input. McFadden ¶ 158. In so doing, he again ignores that up to the day Prof. McFadden submitted his declaration the Microsoft Store for Windows charged a 30% headline

rate for games.  *See* Ex. 17 (McFadden Dep.) 151:14-152:10 (agreeing Microsoft charged a 30% commission for game apps "from the beginning of time until the day before yesterday").  Nor does he offer any reason why commission rates effective in August 2021 are probative of the but-for world from 2008 to the date of his declaration.  And while he claims "the force of competition" over commissions "would bring down the [but-for] commission rate" to 10-12%, he impermissibly ignores the *quality* dimension of competition, unjustifiably assuming that all competing app stores are created equal and would therefore command the same commission.  *See, e.g., Live Concert*, 863 F. Supp. 2d at 975 ("fail[ure] to account for differences in artist quality/popularity" in damages model related to concert ticket sales rendered model "'so incomplete as to be inadmissible as irrelevant'") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)); *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 149 (S.D.N.Y. 2006) (excluding antitrust damages model as "essentially worthless," noting failure "to include an independent variable for quality in an investigation of price changes" was "especially remarkable").  That analytical gap is particularly fraught given Prof. McFadden's reliance on press coverage that highlights "the poor experience for end users" of Microsoft's PC store (McFadden n.227 (quoting *The Verge* article)), and noting the "platform's selection of games is currently dominated by a lot of lowest-common-denominator shovelware."[2]

   3. **Epic Games Store (EGS)**.  Prof. McFadden's reliance on the EGS commission is similarly problematic.  While he emphasizes that EGS "charge[s] developers a 12 percent commission fee on sales" (McFadden ¶ 156), Prof. McFadden ignores testimony from Epic executives establishing that EGS is not profitable and will not be profitable for at least several more years, if ever.  Ex. 17 (McFadden Dep.) 149:20-150:2 ("I don't even know if I have general access to the company's books so that - - total cost and profits are available to me only from firms that are publicly listed. I don't even know if Epic is publicly listed."); *see* Ex. 27 (Sweeney Dep.) 208:22-209:5; Ex. 22 (Trial Tr. (Sweeney)) 126:19-127:6; Ex. 23 (Trial Tr. (Allison)) 1230:3-8; 1231:15-19; Ex. 28 (Kreiner Dep). 244:2-5, 256:12-16.  Indeed, Epic lost around $181 million on EGS in 2019, Ex. 5 at 20, and it projected *those*

---

[2]  *See* Kyle Orland, "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%." Ars Techica, April 29, 2021, *available at* https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pcgame-sales-to-12/, last accessed Aug. 10, 2021 (cited at McFadden n.225). Given the role that Microsoft has played (and continues to play) in Epic's litigation strategy, it is not surprising that Microsoft followed Epic's lead on commission rates.

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

*losses would grow to* around $273 million in 2020, Ex. 8 at 2; *see also* Ex. 5 at 20 (estimating $139 loss in 2021).  Epic's CEO, Tim Sweeney, testified in May 2021 that he expected EGS to be profitable in three to four years, Ex. 22 (Trial Tr.) 266:10-19, but admitted that EGS was projected to lose an additional $854 million in the meantime.  *Id.* 276:17-277:4; Ex. 5 at 20.  Prof. McFadden provides no reason why Apple, which unlike Epic is a publicly traded company with shareholder obligations, would adopt these money-losing approaches in the but-for world.  Nor can the EGS commission rate be divorced from Epic's "Project Liberty" campaign, including its litigation against Apple.

There is more.  Even with its below-cost commission, EGS can only attract developers with a spate of incentives, like minimum guarantees, such that Epic's 12% commission does not accurately reflect its pricing.  Specifically, Epic had $1 billion in minimum guarantees for its exclusivity agreements, of which it estimated it would recoup about 60-70%.  Ex. 8 at 2; *see also* Ex. 23 (Trial Tr. (Allison)) 1217:25-1218:5, Ex. 9 at 6.  These incentives and investments made in an attempt to grow EGS will result in "unrecouped costs," Ex. 7 at 4, and the direct return on such investments—in Mr. Sweeney's words—is "super crappy."  Ex. 22 (Trial Tr.) 273:9-16; Ex. 4 at 1; Ex. 23 (Trial Tr. (Allison)) 1262:4-12.  Prof. McFadden did not "stud[y]" this either, Ex. 17 (McFadden Dep.) 150:3-7, nor explain why Apple would adopt the money-losing strategy adopted as part of Epic's "Project Liberty" campaign against Apple (and Google), not an effort to establish a "competitive" commission rate.

4. **Discord**.  Finally, Prof. McFadden highlights Discord.  His staff selected Discord based on the company's December 2018 announcement "that it was moving to a 10 percent commission fee on sales using its store" (McFadden ¶ 160), apparently wholly unaware that the company shut down its game store less than a year later.  Ex. 17 (McFadden Dep.) 154:5-13; *see also* Hitt ¶¶ 80, 102, 178-79.  It can hardly be considered a reasonable but-for Apple business model at any point in time, much less for the entire 13-year class period.

Prof. McFadden's opinion fails to "discuss the import of, or even mention, these material facts." *LeClercq v. The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding as unreliable opinion that cherry-picked facts and disregarded relevant data).  That alone justifies its exclusion; a more comprehensive review of commission rates across other app stores not only underscores that error but reveals that Apple's 30% headline rate is actually competitive.

For example, Prof. McFadden's "benchmark analysis" ignores the *entire* Android ecosystem, *see* Ex. 17 (McFadden Dep.) 135:14-136:25, despite the fact that Android is a mobile environment and exhibits many of the features of Prof. McFadden's but-for iOS world.  Take Google Play, which has charged a headline 30% commission on app sales and in-app purchases during the entire class period, despite competition from Android app stores run by Samsung, Amazon, and others, as well as direct distribution from developers like Epic.  *See* Hitt ¶¶ 83-89, 199-205, Fig. 19; Schmalensee Ex. 4.C.  And yet Prof. McFadden excluded it from his benchmark analysis simply because there are "claim[s] of noncompetitive conduct" against it.  Ex. 17 (McFadden Dep.) 135:23-136:9; *see also id.* 136:17-25 (noting his "instructions" to "exclude situations where there is already an allegation of … monopoly or there's clearly a different business model").  Likewise, Prof. McFadden did not even consider the Samsung Galaxy Store, *id.* 135:20-22 ("I don't recall looking at the Samsung Store."), despite Samsung's default 30% commission on app sales, *see* Hitt ¶ 87.  Amazon's Appstore is similarly excluded, even though it also charges a 30% commission on paid mobile apps and in-app purchases other than movie and TV subscriptions, *see id.* ¶¶ 88-90. ███████████████████████████

██████████████████████████████████████████████████████████

███████████     ██████████████████████████████████████████

████████████████████, 30% is the most prevalent rate paid by app developers in the Android environment, despite their competing directly in the manner in which Prof. McFadden imagines for iOS in his but-for world.  *See id.* ¶¶ 199-205.

The 30% commission rate also prevails in other digital environments.  Apple's Mac App Store, which the named plaintiffs admit permits "multiple third-party app stores" (Mot. 10 n.10), has sustained a 30% commission since it opened.  *See* Hitt ¶¶ 94-96, 206-09.  And even developers as successful as Epic pay a 30% commission to the three major game console platforms—Sony, Nintendo, and Microsoft Xbox.  *See* Ex. 27 (Sweeney Dep.) 94:3-99:14.  Likewise, Facebook charges 30% for games sold on its Oculus VR platform.  *See* Schmalensee Ex. 1.  And platforms for ebooks, audiobooks, and video streaming charge commissions at or above 30% too.  *See* Ex. 2 at 8.

Just like these platforms, the App Store has maintained a headline 30% commission rate since it opened (while adopting lower rates for various categories of apps and app developers over time).

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN         NO. 4:11-cv-06714-YGR

Prof. McFadden does not and cannot explain why Apple would abandon this pricing strategy in the but-for world—and apparently eliminate the 15% commission tier as well—when such pricing is well within the mainstream offered by digital platforms that operate in precisely the type of "competitive" environment Prof. McFadden's but-for world envisions.  He instead appears to assume that Apple would have consistently charged only one *uniform* 10-12% commission in the but-for world for *all* paid app transactions since the App Store launched in 2008.  Ex. 17 (McFadden Dep.) 156:8-14; McFadden ¶ 161.  As in *Wholesale Grocery*, there is "too great an analytical gap between the facts of the case and the benchmark chosen." 946 F.3d at 1002; *see also Ollier*, 768 F.3d at 861 (similar).  For this reason, Prof. McFadden's commission rate benchmark is unreliable and should be excluded.

### 2.   Prof. McFadden's Methodology Assumes Unrealistic Conditions In The But-For World, Including A Uniform Commission Rate Across The Entire Class Period.

Prof. McFadden's but-for commission is also tainted by his failure to account for the dynamic state of competition since the 2008 App Store launch.  He concedes, for example, that his model cannot account for how developers might choose "where to place their apps" in a but-for world in which "Apple and competing iOS app stores charged *different* commissions." Ex. 17 (McFadden Dep.) 160:6-18 (emphasis added).  So Prof. McFadden simply assumes a single, *uniform*, unrealistic (10-12%) rate, *id.* 156:8-14, rather than analyze competition over the 13-year period since the App Store's launch.  The resulting calculation of classwide damages is simple, yet economically unsupportable.

There is no economic basis to assume, as Prof. McFadden does, that competition is a constant throughout the but-for world.  As he admits, in that but-for world, multiple iOS transaction platforms would compete to distribute apps.  Ex. 17 (McFadden Dep.) 152:22-153:8.  Logically, assuming the named plaintiffs' theories of liability are correct, these firms would no doubt employ a variety of business models, and charge developers a range of commissions not only over time, but at any given point in time.  *See* Schmalensee Ex. 5; Hitt ¶¶ 288-293 .  Some stores would likely charge a non-negotiable 30% commission rate, like Apple's Mac App Store does today.  Hitt.¶¶ 95-96.  Others might take Epic's approach of attempting to grow their market share with a below-cost headline rate, exclusivity arrangements, or cash incentives.  Still others may emulate Steam and charge tiered commissions anchored off 30% with lower rates (above certain sale thresholds) related to the most lucrative apps.  And, although

Gibson, Dunn &
Crutcher LLP

Prof. McFadden's benchmark analysis makes no mention of sideloading, some developers would eschew a commission-based business model by selling directly to consumers, as large developers do in the PC and Mac environments. *Id* ¶ 108, 294-305 (describing direct distribution by large game developers); *cf.* Cons. Compl. ¶ 57 ("competitive iOS apps distribution market" would involve "buying directly from app developers"). Still others would avoid app stores altogether, and compete through web apps. *See* Ex. 25 (Trial Tr. (Kosmynka)) 1046:4-14; Ex. 24 (Trial Tr. (Schiller)) 2727:23-2728:4; *see also* Ex. 29 (Schiller Dep.) 105:11-25; Ex. 30 (Kosmynka Dep.) 275:7-25. Prof. McFadden's model ignores this complexity entirely.

Nor does Prof. McFadden model when or how this consumer-facing competition would change (Ex. 17 (McFadden Dep.) 111:9-112:15); how app stores would differentiate themselves to attract customers (*id.* 159:16-160:5); how consumers or developers would decide where to engage in transactions (*id.* 165:23-166:6); how app stores set their commissions and other fees (*id.* 156:8-157:9, 157:25-159:15); or how much time it would take before competition would lead Apple to charge the 10-12% benchmark rate (*id.* 151:1-13). These, he testifies, are "difficult calculation[s] for … economists." *Id.* 151:7-8. Thus he merely begins with the Epic Games Store's money-losing commission rates, which were announced by a multi-billion-dollar privately held litigation adversary nearly 11 years after the launch of the App Store (and still stand alone), and inexplicably assumes that Apple would have followed the same strategy a decade ago. That simply defies reality.

Finally, Prof. McFadden fails to take into account any changes to app quality, including privacy and security in his but-for world (Ex. 17 (McFadden Dep.) 159:16-160:5 ("implicit assumption" of but-for world is that "nothing else" changes besides "reduction in the Apple Store commission")), or to address changes in other fees to developers (*id.* 158:4-13 ("model is … mute on that issue")), such as those related to Apple's intellectual property (Willig ¶¶ 189-207; Malackowski ¶¶ 176-78, 182-86, 188-90). As such, Prof. McFadden's opinions cannot be considered the "product of reliable principles and methods" or a reliable application of "the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). They should therefore be excluded.

### 3.   Prof. McFadden's Profit Margin Analyses Are Based On Unreliable Methods

Prof. McFadden also attempts to justify his "but-for" commission rate based on an "analysis of

Gibson, Dunn & Crutcher LLP

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

Apple's App Store profit margin" (McFadden ¶ 136), which he computes as between ███████ based on a review of what he calls "internal P&L statements for the App Store." *See id.* ¶ 115-22. When pressed on this opinion, and asked to explain how a firm can sell a product at retail, pay a wholesale price that is ███ of the retail price, and have a ███ margin, Prof. McFadden could not explain it: "[T]he numbers in my report are based on Apple accounting numbers, pure and simple. . . . I'm not an accountant. And this is the way they keep their -- their records." Ex. 17 (McFadden Dep.) 103:3-25.

Prof. McFadden is, as he testifies, not an accountant, unlike those who prepared Apple's actual financial reports. In other words, Prof. McFadden admits this opinion is pure "ukase in the guise of expertise." *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (excluding expert's opinion who failed to conduct any economic study and instead "examined materials produced in discovery and drew inferences from the record"). Moreover, his reading of the documents directly contradicts undisputed testimony of Apple executives indicating that Apple does not estimate or publicly disclose financial data for its operating segments or components on a standalone basis.[3] *See* Ex. 31 (Rollins Dep.) 78:8-79:19; Malackowski ¶ 233-38, 253-68, 273. As a result, any calculations of margins based on these documents are not based on Generally Accepted Accounting Principles. This is no surprise; as Prof. McFadden admits, he is not an accountant. He has no basis to offer accounting opinions, and those he offers contradict both fact and reliable accounting methodologies. *See Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1254 (S.D. Cal. 2013) (excluding expert testimony for not adhering to "tried and true" accounting methods).

## C. Prof. McFadden's App-Pricing Model Is Wholly Unreliable and Comprehensively Insufficient To Assess Common Impact

---

[3] As Apple's CEO Tim Cook testified in the *Epic* trial, documents like those Prof. McFadden relies upon are not fully-loaded accounting statements. *See* Ex. 26 (Trial Tr. (Cook)) 3879:18-3880:24, 3881:11-17, 3903:1-9, 3967:6-15 (indirect costs, including those related to R&D, are omitted); Ex. 24 (Trial Tr. (Schiller)) 2732:25-2733:5, 2765:18-2767:7, 2791:2-10, 2884:25-2885:6 (cost to develop APIs for developers, WWDC, the Developers Center, the Developer Accelerators, the IAP APIs and tools, and other things are not charged to the App Store); *see also* Ex. 31 (Rollins Dep.) 42:14-19. Whether these "high-level calculations" may be used internally to identify periodic trends or for other planning purposes, using them "to allocate joint expenses in a cross-functional ecosystem such as Apple's is arbitrary and unreliable given the inherent inseparable nature of the costs." Malackowski ¶ 262; *see also id.* ¶¶ 253-68, 273. This absence of fully-burdened P&Ls cannot be remedied by tying total operating margin of operating components to enterprise-level performance; ultimately, "the consistent application of *any* allocation method for expenses incurred outside of the operating categories would result in a consolidated total equal to that of the enterprise." *Id.* ¶ 265 (emphasis in original).

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

Those economic analyses that Prof. McFadden performs to attempt to estimate but-for app prices are unsound and cannot support his opinions of common impact.  His model cannot reliably measure the impact of Apple's App Store policies and practices on consumers, as is required to support class certification or to be used at trial, because it (1) generates a vast number of uninjured class members—far more than Prof. McFadden's report acknowledges; (2) rests upon a demonstrably unrepresentative sample of apps; and (3) ignores critical market realities that, when taken into account, produce dramatically different results, including even more uninjured user accounts.

### 1.    Prof. McFadden's Data Error Results In Gross Exaggeration Of Injury

As already noted, Prof. McFadden admitted in his report that his model estimated that 5.8% of class members were uninjured, a number he dismissed as "relatively small."  McFadden ¶¶ 226, 241.  But that "small" number grew to 7.7% when the proper measure of net harm—conceded by Prof. McFadden—was applied.  Moreover, that figure itself rests on the computer code that Prof. McFadden used for his modeling.  Prof. McFadden spliced the data input into his computer program in multiple ways.  One way was to drop apps in any year that do not have the same price in all months.  In making that cut, however, a bug was introduced into his program, and he eliminated apps that have the same price in all months in the real world, and different prices in different months only as a matter of computer computation.  Prince ¶ 32.  For example, his program would treat a $0.99 app as having different prices in different months if the data were $0.99000000 in one month and $0.99000001 in another month of the same year.  *Id.*  This is obviously wrong.  And because so many erroneously dropped apps in the data set are for popular apps priced at $0.99, the magnitude of this error is significant.  *Id.*  Correcting this error and making no other changes yields a near doubling of the number of uninjured accounts—14.6% or nearly 30 million accounts.  *Id.*  This extraordinary result in itself warrants exclusion of Prof. McFadden's defective model and his unreliable opinions on classwide injury.[4]

### 2.    Prof. McFadden's Model Fails Basic Tests For Robustness

Prof. McFadden claims to find classwide harm to millions of putative class members based on

---

[4]  Prof. McFadden's computer code error was discovered on the eve of this filing and affects many of the assessments of other errors in Prof. McFadden's work.  Because of the time needed to implement proper coding and re-run the requisite analyses, many of the results included in the concurrently-filed (and cited herein) expert report of Jeff Prince, Ph.D. understate the extent of the flaws in Prof. McFadden's opinions and results.

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

a sampling approach that he says achieves "representative" results. McFadden ¶ 221. But basic robustness checks prove the opposite—that Prof. McFadden's approach is not only unrepresentative, but cannot reliably be replicated and injects error and bias across his conclusions.

Despite having access to data on more than 64 billion transactions involving the full panoply of 4.5 million apps in the database, Prof. McFadden chose to estimate but-for prices for only 1,806 apps. Ex. 17 (McFadden Dep.) 220:10-14 (admitting he modeled prices for "somewhat less than 2,000 apps"); Prince ¶ 108. To winnow the entire universe of apps to this tiny subset, Prof. McFadden first took the apps used by his 0.1% sample of user accounts. Prince ¶ 108. He then chopped further, completely excluding free apps and then excluding apps from all but three genres—Games, Music, and Entertainment. *Id.* He restricted his analysis still further to only apps comprising the top 70% revenue-generators in each genre—just over 1,800 apps—meaning that all told, he studies fewer than 0.4% of paid apps in even these three genres, and just over 0.1% of paid apps overall. *Id.* Yet despite this, Prof. McFadden plans to use these findings to estimate prices for tens of thousands of other paid apps—and ultimately calculate injury and damages for millions of consumer class members—by "assuming" that his findings would "also appl[y] to the ... uncovered apps." Ex. 17 (McFadden Dep.) 218:6-24; *see also id.* 220:15-18 ("Q. So first you would scale up the results from the 2,000 apps to the full 150,000 apps in your 1/10th-of-1-percent sample, right? A. That's basically what I just described."). This is problematic and inadequate across multiple dimensions.

First, Prof. McFadden's sampling approach fails the test for representative samples established by the Supreme Court in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016) (evidence is representative if "each class member could have relied on [it] ... to establish liability if he or she had brought an individual action"). Over three quarters of the accounts in Prof. McFadden's 0.1% sample made a (non-free) transaction for an app outside the 1,806 that Prof. McFadden modeled. Prince ¶ 118. And ▮▮▮▮▮▮▮ made *only* such transactions. *Id.* ¶ 119. Prof. McFadden makes no assessment at all regarding whether these accounts were harmed or not—and in fact, his model is incapable of doing so. *Id.* That alone demonstrates that his sample is not representative. *See Tyson Foods*, 577 U.S. at 454; *cf. In re High-Tech Empl. Antitrust Litig.*, 289 F.R.D. 555, 578 (N.D. Cal. 2013) (denying class certification where expert examined data for a "small fraction of the total class" that was not representative).

Second, subjecting Prof. McFadden's sampling approach to scrutiny reveals it is flawed even by his own measure. A model's robustness can be tested by "applying [the] methodology to different data or with different assumptions and examining the results produced by the methodology so applied." *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018). Prof. McFadden agrees that if his sample were representative, as he asserts, running the model on a different randomly drawn sample should yield similar results. *See* Ex. 17 (McFadden Dep.) 211:9-212:3 ("it would be shocking to me if [results from a different sample] turned out to be … economically or legally significant"); *id.* 190:14-191:12 ("there should be absolutely no defection in the statistical sample"). Had Prof. McFadden run those tests, he would know the opposite is true with his model. *Id.* 212:4-12 (acknowledging failure to test model). Prof. Prince did run Prof. McFadden's model on 25 other 0.1% samples and found that in many cases, the number of uninjured accounts changes, sometimes more than doubling from one sample to another. Prince ¶¶ 114-15 (between ▮▮▮▮ and ▮▮▮▮ of accounts uninjured depending on the sample). Prof. McFadden's model "fail[ed] altogether" and produced "economically incoherent results" on nine of the 25 random 0.1% samples, vividly illustrating its unreliability. *Id.* ¶ 114. More damning, Prof. McFadden's model finds that the same account is injured when using one sample, but uninjured when using another. *Id.* ¶ 115. In other words, Prof. McFadden's model does not reliably identify which accounts, or how many, are harmed.

Prof. McFadden's failure to use a representative sample is also underscored by testing apps from outside the three genres he used. Prof. McFadden conceded during his deposition that he has not applied his model to *any* of the other 24 genres on the App Store, and conceded that he "can't make [a] judgment" on how it would apply. *See* Ex. 17 (McFadden Dep.) 191:13-192:17. Prof. Prince did so, and finds that testing Prof. McFadden's model on a different genre, Sports, estimates *an upward sloping demand curve* for in-app purchases, meaning there are more transactions as prices increase. Prince ¶ 120. That is not only nonsense, but another example of how and why Prof. McFadden's model cannot prove anything on a common basis. In short, "[t]here is simply too great an analytical gap between the data"—fewer than ▮▮▮▮ out of ▮▮▮▮—"and the opinion proffered" by Prof. McFadden regarding classwide impact. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015); *see also Laumann v. NHL*, 117 F. Supp. 3d 299, 319 (S.D.N.Y. 2015) (excluding structural damages model

1   "based on insufficient facts and data").

2   **3.     Prof. McFadden's Model Ignores Market Realities To Achieve Common Impact**

3   As with his but-for commission rate, Prof. McFadden's app-pricing model ignores critical mar-

4   ket realities thereby biasing his model in favor of showing impact.  *See, e.g.*, *LIBOR*, 299 F. Supp. 3d

5   at 560 (excluding damages model where it implausibly "fail[ed] to consider important aspects of the

6   but-for world" and therefore had not been "constructed in a reasonable way such that a reasonable

7   approximation of damages may be made").  That is no accident.  As noted above, Prof. McFadden's

8   very assignment was to "establish[] that there was common evidence across the class."  Ex. 17 (McFad-

9   den Dep.) 26:8-9.  Again and again, he chose convenience over complexity to maximize impact.

10   **Free Apps**.  Prof. McFadden's decision to exclude free-to-download apps that do not offer in-

11   app purchases—███ of apps in his sample, and ███ of all apps in the data (Prince ¶ 51)—is particu-

12   larly misleading.  Had Prof. McFadden considered the effect of Apple's policies on free apps like

13   Google Maps, Uber, and Amazon, he would have known his model predicts *higher* prices for many

14   free apps in the but-for world.  *Id.* ¶ 52.  That isn't surprising: when faced with a lower commission

15   (especially a reduction as great as Prof. McFadden unrealistically assumes), some free app developers

16   would likely choose to raise their price by, for instance, monetizing through in-app purchases rather

17   than advertising.  *Id.* ¶¶ 53-54; *cf.* Willig ¶¶ 215-35 (subscription apps with advertising would *raise*

18   prices at lower commission rate).  As Prof. Prince shows, allowing zero-price apps to begin charging

19   in response to a significantly reduced commission results in ████████—*or* ██████—of

20   the accounts uninjured under Prof. McFadden's model.  Prince ¶ 56.  Plus, ██████████ of the

21   accounts in his sample change from harmed to unharmed.  *Id.*  These findings further show that Prof.

22   McFadden's model cannot meaningfully determine impact, and instead describes common impact

23   where in fact differences among class members exist.

24   **In-App Purchases**.  Likewise, Prof. McFadden's approach to in-app purchase price masks im-

25   portant differences and disparate effects.  Apps commonly contain multiple in-app purchases at differ-

26   ent price points, which would likely change by different amounts in response to a different commission.

27   *See* Prince ¶¶ 73-75 (noting Roblox prices between $0.99 and $49.99).  But Prof. McFadden's model

28   assumes they would change all prices by the same *dollar* amount—in other words, a $0.99 in-app

Gibson, Dunn &
Crutcher LLP

purchase item would increase by the same dollar amount as one priced at $29.99.  Prince ¶¶ 73-76 & Exh. 8 (showing that all Roblox prices decrease by $1.47 in Prof. McFadden's model).  This is clearly wrong, and obscures the fact that in the but-for world, consumers who make different in-app purchases would face different overcharges.  *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) ("the District Court abused its discretion when it assumed, absent a rigorous analysis, that averages are acceptable" for analyzing predominance of common issues).  Prof. Prince shows that even allowing just *one game* (Roblox) in Prof. McFadden's model to vary its approach in the but-for world to in-app purchase prices can increase the fraction of that game's customers who are injured from less than zero to almost 15%.  Prince ¶¶ 76-79.

**Price Tiers.**  Finally,[5] Prof. McFadden assumes away Apple's price tiers and focal-point pricing more generally in a way that drives classwide impact.  As Justice Gorsuch observed in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), Apple's price tiers strongly disincentivize developers from passing on a commission overcharge and impacting consumers.  *Id.* at 1528 (Gorsuch, J., dissenting) ("[I]f the developer [of a $0.99 app] wants to pass on the commission to consumers, it has to more than double its price to $ 1.99 (doubling the commission in the process), which could significantly affect its sales.").  Here too, Prof. McFadden fails to test this assumption, *see* Ex. 17 (McFadden Dep.) 176:16-177:6, but Prof. Prince did so—and when Apple's price tiers are applied within Prof. McFadden's model, developers are ███████████ as likely to lower their prices in Prof. McFadden's model.  Prince ¶ 61.

Prof. McFadden testified that Apple's $0.99 price tiers should be omitted from his but-for world on the basis that "Apple's 99-cent price-tier structure is anticompetitive."  Ex. 17 (McFadden Dep.) 122:10-13; *see also id.* 124:4-12.  But this opinion is not only absent from Prof. McFadden's report but at odds with the evidence, developer plaintiffs' experts, and his own admissions.  As Prof. Elhauge testified, "[a] lot of markets have price tiers" in which they are "not anticompetitively imposed."  Ex.

---

[5] Prof. Prince details other ways that Prof. McFadden's model departs from reality and creates unreliable results.  For instance, Prof. McFadden's model relies on accurately estimating developers' marginal costs to predict app prices; but Prof. McFadden routinely overestimates these costs—predicting, for instance, that *Fortnite*'s marginal cost for each V-Bucks sale was more than $20, despite Epic CEO Tim Sweeney's testimony that "V-Bucks themselves don't have a marginal cost."  Ex. 22 (Trial Tr.) 190:12-16; Prince ¶¶ 82-86.  Prof Prince also shows that by assuming all apps in the same genre have the same price sensitivity, Prof. McFadden masks wide variability in but-for app prices within genres, *id.* ¶¶ 66-72., and that Prof. Prince's price estimates are primarily driven by margin constraints based on cost data from an unrepresentative set of six large developers.  *Id.* ¶¶ 90-106.

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN        NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

18 (Elhauge Dep.) 255:2-11; *see also* Schmalensee ¶ 212 (describing efficiencies of price tiers).  And Prof. McFadden effectively admitted that price tiers benefit consumers by preventing developers from raising prices.  Ex. 17 (McFadden Dep.) 125:1-15 ("[W]hether the tier is higher or lower than the optimum price -- I think the answer is it could easily go either way.").

Moreover, even if price tiers were not required, many developers would freely choose to price at 99-cent points, *see* Schmalensee ¶ 211; Hitt ¶ 366 (noting prevalence of 99-cent price points on app transaction platforms without price tiers), and such "focal point pricing affects the pass-through rate." *In Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *4-5 (N.D. Cal. Mar. 5, 2018) (Gonzalez Rogers, J.) (striking unreliable expert testimony and denying class certification where expert "failed to provide an explanation for the effect of focal point pricing on the pass-through analysis").  Prof. McFadden once again unreliably ignored market evidence in order to find common effect.  *See* Ex. 17 (McFadden Dep.) 180:9-181:6 (explaining that focal price effects are "very hard to systematize and quantify" and therefore could "misleading[ly] deviat[e] from the purpose of the model, which is to find a common effect"); *id.* 182:10-18 (professing no knowledge of 99-cent prices on Google Play).

**D.     The Court Should Exclude Prof. McFadden's Opinion On Market Definition**

Prof. McFadden asserts that "[c]ommon economic evidence" supports his conclusion that there exists a single, "relevant antitrust market for selling consumers iOS apps and in-app content."  McFadden ¶ 42.  But in rendering his opinions, he fails to acknowledge the two-sided nature of the App Store transaction platform, which has important implications for understanding the platform's pricing, conduct, and the effect of such pricing and conduct on competition.  What's more, Prof. McFadden fails to consider whether the products in his proffered market definition are "reasonably interchangeable," such that they can properly be included in a single market (they cannot), or whether—if the products are not reasonably interchangeable—market "clustering" is justifiable (it is not).

Prof. McFadden's failure to substantively engage in these analyses results in a flawed market definition, and his opinions should be excluded.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 342 (S.D. Cal. 2010) (rejecting expert opinion "based on … personal opinions and speculation rather than on a systematic assessment"), *aff'd*, 768 F.3d 843 (9th Cir. 2014); *Abarca v. Franklin County Water Dist.*, 761 F. Supp. 2d 1007, 1023 (E.D. Cal. 2011) ("an expert opinion cannot be based

on assumptions of fact without evidentiary support, or on speculative or conjectural factors" (internal quotation omitted)); *Crowley v. EpiCept Corp.*, 2015 WL 13827908, *5 (S.D. Cal. Mar. 11, 2015) (excluding expert testimony regarding market share that was based upon unfounded assumptions).

### 1.    Prof. McFadden Ignores the App Store's Two-Sidedness

In contrast to every other economist who has offered an opinion on the market definition in this and related cases, *see, e.g.*, Elhauge ¶¶ 40-43; Schmalensee ¶¶ 9-12; Ex. 32 (Trial Tr. (Cragg)) 2295:22-24; Ex. 33 (Trial Tr. (Evans)) 1612:7-9, Prof. McFadden fails to account in his report for the two-sided nature of the App Store.  There, rather than performing economic analysis to support his single-sided approach, Prof. McFadden simply cites the *Pepper* decision and proclaims that: "Consumers who have iOS mobile devices … are consumers of [his defined relevant] market, Apple is a retailer that sells iOS apps and in-app content, and app developers are suppliers that 'manufacture' apps and in-app content and supply them through Apple."  McFadden ¶ 42.  But at his deposition, he tried to have it both ways. In one breath, Prof. McFadden acknowledged that "the appropriate market and the appropriate analysis is going to take into account both the upstream and the downstream sides" of the App Store transaction platform.  Ex. 17 (McFadden Dep.) 33:25-34:20.  Yet, moments later he testified that the approach is single-sided, "very much like a traditional retailer."  *Id.* 63:24-64:7.  Whatever lip service Prof. McFad-den tried to pay at his deposition to the notion that "both sides" "have to be considered together" (*id.* 32:22-33:7), he admitted that he does not do so in his report.  *Id.* 33:12-24 ("Q. And can you tell me where you say that in your report, that your market definition applies to both sides? … [A.] Well, I don't say it in the report . . . .").  His actual analysis ignores that the App Store is a two-sided platform serving "two different groups"—consumers and developers—"who both depend on the platform to intermediate between them."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018); Schmalensee ¶ 26.

Prof. McFadden's failure to consider the App Store's two-sidedness—and his disregard of the developer side of the platform—renders his market definition analysis unreliable.  He begins his anal-ysis from a set of legally flawed premises.  *Compare, e.g.*, *Amex*, 138 S. Ct. at 2278 (two-sided markets "are best understood as supplying only one product—the transaction") *with* Ex. 17 (McFadden Dep.) 50:21-51:20 ("Q. Do you agree that two-sided transaction platforms are best understood as supplying

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

only one product; namely, transactions? A. No, I don't agree."); *Amex*, 138 S. Ct. at 2280 ("[A] two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them.") *with* Ex. 17 (McFadden Dep.) 45:16-46:1 ("[Q.] … [A]s an economist, do you agree that a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them? A. … I have not heard that definition before, and I'm not sure that would characterize my understanding of a platform.").

This is problematic, as the Supreme Court has cautioned, because failure to recognize two sid-edness will inevitably lead to failure to properly account for indirect network effects, which in turn is likely to lead to "mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect." *Amex*, 138 S. Ct. at 2287 (internal quotations omitted).  Considering only the consumer side will tend to lead to an overly narrow market definition that overstates market power, for instance.  Schmalensee ¶ 44, 70.  Moreover, because as here transaction platforms often charge one side "a below-cost (or even negative) price" to encourage participation, *Amex*, 138 S. Ct. at 2281, Prof. McFadden's exclusion of free app transactions from his market definition is especially untenable. More than 80% of apps in the App Store are free (Hitt App'x E ¶ 7) and—as the named plaintiffs testified—free transactions constitute an important part of the store's output.  Ex. 16 (Lawrence Dep.) 142:5-13, 151:6-10, 162:12-163:20; Ex. 13 (Hayter Dep.) 173:12-174:5.  Any analysis of Apple's App Store pricing must account for the impact of free downloads that do not incur a commission—which Prof. McFadden fails to do.  Schmalensee ¶ 170 ("[P]laintiffs' neglect of both free apps and advertising is a particularly serious flaw in their analysis.").  In short, Prof. McFadden's failure to account for the App Store's two-sided nature leads him to "conclusions that are fundamentally unreliable." *Id.* ¶ 31.

**2.      Prof. McFadden Improperly Clusters All App Transactions Together Without Any Economic Analysis**

Prof. McFadden's approach to defining his single antitrust market is likewise unmoored from legally or economically recognized approaches to market definition.  The key inquiry in defining a relevant market is whether a product is "reasonably interchangeable" with another product.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (identifying factors).  In rare instances where disparate products that are not

reasonably interchangeable "are subject to the same competitive conditions," they may be aggregated into a "cluster market." *FTC v. Staples*, 190 F. Supp. 3d 100, 125 (D.D.C. 2016) (describing cluster markets); *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014) (clustering involves analyzing two distinct product markets together as a matter of "administrative convenience" when those markets face similar "competitive conditions"); *see* Willig ¶¶ 15, 20, 80-89.

As Prof. McFadden's deposition testimony makes clear, he has not reliably applied the required principles for defining a relevant market to the evidence in this case:

> Q.  Are you familiar with the concept of cluster markets?
> A.  No, I'm not.
> Q.  Does your relevant market definition group together different app genres that are not substitutes for each other?
> A.  I would say that it does, yes.

Ex. 17 (McFadden Dep.) 68:3-9; *see also id.* 54:24-55:8 ("I recognize that certainly different app genres are accessed for different reasons by consumers and are treated in the App Store and by developers as being somewhat separate kinds of beasts. . . . I suppose for some purposes one might say, for example, talk about the submarket for game apps, iOS game apps."); *id.* 68:23-69:15 ("[I]t may be that … game markets are a -- a distinct market for some purposes").

Rather than defining the relevant market by reference to economic principles of reasonable substitutability, Prof. McFadden again engaged in result-driven analysis, and testified that he created a "practical market definition" crafted to accommodate "the complaint and purposes of this case." Ex. 17 (McFadden Dep.) 68:23-69:15. In fact, he acknowledged that, in contrast to the market definition provided for this case, "if for other economic purposes you want to define the market narrowly to limit it to close substitutes, then … submarkets may … be important for that purpose," but that "one should not get too focused on the definition of the market." *Id.* 69:9-21. Prof. McFadden thus effectively skipped the foundational step for defining the relevant market or sub-markets. *Spectrum Sports, Inc. v. McQuillian*, 506 U.S. 447, 455, 459 (1993) (Section 2 "require[s] a definition of the relevant market and examination of market power."). His market definition is thus unreliable and should be excluded.

## V.   CONCLUSION

For the foregoing reasons, Prof. McFadden's expert opinions in support of the named plaintiffs' Motion for Class Certification are unreliable and should be excluded.

Gibson, Dunn & Crutcher LLP

APPLE'S *DAUBERT* MOT. TO EXCLUDE TESTIMONY OF DANIEL L. MCFADDEN          NO. 4:11-cv-06714-YGR

DATED:  August 10, 2021                    GIBSON, DUNN & CRUTCHER LLP


                                           By: */s/ Mark A. Perry*


                                               Theodore J. Boutrous Jr.
                                               Richard J. Doren
                                               Daniel G. Swanson
                                               Jay P. Srinivasan
                                               Mark A. Perry
                                               Cynthia E. Richman
                                               Veronica S. Moyé
                                               Ethan D. Dettmer
                                               Rachel S. Brass
                                               Caeli A. Higney

                                               *Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP