# Exhibit 2

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant APPLE INC.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR |
| | **DEFENDANT APPLE INC.'S OPPOSITION TO NAMED CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:        Nov. 16, 2021<br>Time:       10:00 a.m.<br>Courtroom: 1, 4th Floor |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 1

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.  The Commonality Requirement Is Not Satisfied ................................. 5

II.  The Typicality and Adequacy Requirements Are Not Satisfied ................................. 10

III.  The Predominance Requirement Is Not Satisfied ................................. 12

    A.  Named Plaintiffs' Theory of Classwide Impact Rests on Unsupported Assumptions About But-For Commission Levels ........................................... 13

        1. *McFadden's 10-12% but-for commission rate ignores reality.* ................. 14

        2. *McFadden's uniform, but-for rate ignores the complexity of the competitive landscape.* ......................................... 15

        3. *The App Store has other features for which consumers would pay a higher rate.* ......................................... 16

        4. *App developers would face other costs in the but-for world.* .................... 17

    B.  Named Plaintiffs' Theory of Classwide Impact Rests on an Unreliable Model of But-For App Prices ........................................... 18

        1. *McFadden's econometric model assumes uniformity and generates unreliable app prices.* ......................................... 18

        2. *Even with its untenable assumptions, McFadden's model yields more than a* de minimis *number of uninjured class members.* ........... 19

        3. *Adjusting McFadden's flawed assumptions yields even larger numbers of uninjured class members.* ......................................... 20

        4. *Named plaintiffs cannot salvage McFadden's model by removing uninjured members from the class.* ......................................... 22

IV.  The Superiority Requirement Is Not Satisfied ......................................... 23

    A.  A Class Trial Would Be Unmanageable ......................................... 24

    B.  Named Plaintiffs and the Named Developers Damages Models Are Irreconcilable ......................................... 25

CONCLUSION ......................................... 25

1

# TABLE OF ABBREVIATIONS

2

3

4

**CASES**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
   247 F.R.D. 156 (C.D. Cal. 2007) ..................................................................11

*Am. Express Co. v. Italian Colors Rest.,*
   570 U.S. 228 (2013) ...........................................................................................5

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) .........................................................................................12

*Andrews v. Plains All Am. Pipeline,*
   777 F. App'x 889 (9th Cir. 2019) ...................................................................19

*Apple Inc. v. Pepper,*
   139 S. Ct. 1514 (2019) ...............................................................................21, 25

*Apple, Inc. v. Psystar Corp.,*
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...........................................................8

*In re Asacol Antitrust Litig.,*
   907 F.3d 42 (1st Cir. 2018) ...........................................................19, 20, 22, 23

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ...........................................................................................7

*Brown v. Electrolux Home Prods., Inc.,*
   817 F.3d 1225 (11th Cir. 2016) ........................................................................5

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
   141 F.R.D. 144 (N.D. Cal. 1991) .....................................................................7

*Carrera v. Bayer Corp.,*
   727 F.3d 300 (3d Cir. 2013) ...........................................................................23

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013) ...........................................................................1, 4, 5, 12, 20

*In re Digital Music Antitrust Litig.,*
   321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................24

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ...........................................................4, 5, 12, 20, 24

*Epic Games, Inc. v. Apple Inc.,*
   493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) ....................................................8

Gibson, Dunn &
Crutcher LLP

ii

## TABLE OF AUTHORITIES (*continued*)

Page(s)

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004)........................................................................................7

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..........................................................................................9

*Fishman v. Est. of Wirtz*,
    807 F.2d 520 (7th Cir. 1986)........................................................................................11

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
    326 F.R.D. 592 (N.D. Cal. 2018)...................................................................................4

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 (N.D. Cal. 2019).................................................................................17

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012)..........................................................................................6

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982).....................................................................................................10

*Graphic Prods. Distribs. v. ITEK Corp.*,
    717 F.2d 1560 (11th Cir. 1983)....................................................................................11

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008).................................................................................20

*Grodzitsky v. Am. Honda Motor Co.*,
    957 F.3d 979 (9th Cir. 2020)........................................................................................23

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)........................................................................................10

*Henry v. Assoc. Home Equity Servs., Inc.*,
    272 B.R. 266 (C.D. Cal. Jan. 7, 2002) ........................................................................11

*In re High Tech Emp. Antitrust Litig.*,
    289 F.R.D. 555 (N.D. Cal. 2013)...........................................................................12, 25

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974)..........................................................................................24

*In re Intuniv Antitrust Litig.*,
    2019 WL 3947262 (D. Mass. Aug. 21, 2019)........................................................22, 23

*Kottaras v. Whole Foods Market, Inc.*,
    281 F.R.D. 16 (D.D.C. 2012).......................................................................................25

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*L.A. Mem'l Coliseum Comm'n v. NFL,*
791 F.2d 1356 (9th Cir. 1986)................................................................24

*Leegin Creative Leather Prod. v. PSKS,*
551 U.S. 877 (2007) .............................................................................17

*Lithium Ion Batteries Antitrust Litig.,*
2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ...............................................13

*In re Lithium Ion Batteries Antitrust Litig.,*
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018)...................................1, 12, 22

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.,*
700 F.2d 785 (2d Cir. 1983)...................................................................11

*In re Live Concert Antitrust Litig.,*
247 F.R.D. 98 (C.D. Cal. 2007) ...............................................................5

*New York v. Facebook, Inc.,*
2021 WL 2643724 (D.D.C. June 28, 2021) ..................................................9

*In re Niaspan Antitrust Litig.,*
464 F. Supp. 3d 678 (E.D. Pa. 2020) ..................................................20, 24

*Ohio v. Am. Express Co. ("Amex"),*
138 S. Ct. 2274 (2018).......................................................................6, 17

*In re Optical Disk Drive Antitrust Litig.,*
303 F.R.D. 311 (N.D. Cal. 2014) ............................................................13

*Pierce v. Ramsey Winch Co.,*
753 F.2d 416 (5th Cir. 1985)..................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
292 F. Supp. 3d 14 (D.D.C. 2017) .....................................................19, 20

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
725 F.3d 244 (D.C. Cir. 2013) ...............................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
934 F.3d 619 (D.C. Cir. 2019) .......................................................19, 20, 22

*Sidibe v. Sutter Health,*
333 F.R.D. 463 (N.D. Cal. 2019) ............................................................12

*Spectrum Sports, Inc. v. McQuillan,*
506 U.S. 459 (1993)..............................................................................7

Gibson, Dunn & Crutcher LLP

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*In re Tableware Antitrust Litigation*,
241 F.R.D. 644 (N.D. Cal. 2007) ................................................................. 5

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ................................................................ 19

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ................................................................................. 7

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ................................................................................. 9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................... 1, 4, 5, 6, 12

*Ward v. Apple Inc.*,
2018 WL 934544 (N.D. Cal., Feb. 16, 2018), *aff'd*, 784 F. App'x 539 (9th Cir. 2019) ..... 12, 19, 20

*Williams v. Apple*,
--- F.R.D.---, 2021 WL 2186223 (N.D. Cal. 2021) ................................. 23

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001), *op'n amended on denial of reh'g*,
273 F.3d 1266 (9th Cir. 2001) ............................................................. 4, 24

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ............................................................... 19

**RULES**

Fed. R. Civ. P. 23(a)(3-4) ........................................................................ 10

Fed. R. Civ. P. 23(b)(3) ........................................................................... 24

Gibson, Dunn &
Crutcher LLP

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Dev. Opp. __** | Apple Inc.'s Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, filed concurrently in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR. |
| **Mot. __** | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| **Mot. to Excl. __** | Defendant Apple Inc.'s *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Mot. Tr. Plan __** | Defendant Apple Inc.'s Notice of Motion and Motion to Compel Plaintiffs to Submit Trial Plan; Memorandum of Points and Authorities, filed concurrently. |
| **[Name] Dep. __** | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Trial Tr. __** | Transcript of the trial held in *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR-TSH, from May 3, 2021 to May 22, 2021, in Oakland, CA. |
| **Hitt ¶ __** | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Malackowski ¶ __** | Expert Report and Declaration of James E. Malackowski, dated August 10, 2021 and filed concurrently. |
| **Prince ¶ __** | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Rubin ¶ __** | Expert Report and Declaration of Aviel D. Rubin, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Schmalensee ¶ __** | Expert Report and Declaration of Richard Schmalensee, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Simonson ¶ __** | Expert Report and Declaration of Itamar Simonson, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Willig ¶ __** | Expert Report and Declaration of Robert D. Willig, dated August 10, 2021 and filed concurrently. |
| **McFadden ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at Dkt. 442-11. |
| **Economides ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Nicholas Economides, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-1. |
| **Elhauge ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Einer Elhague, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-2. |
| **Tregillis ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Christian Tregillis, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-3. |

### INTRODUCTION

As the Court is well aware, class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted), and a class may be certified only if the Court is "satisfied, after a rigorous analysis" that Rule 23's requirements are met, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). To satisfy the predominance requirement, for example, antitrust plaintiffs must show that they can prove "antitrust impact and damages . . . on a class-wide basis." *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (Gonzalez Rogers, J.).

The Consumer Plaintiffs' sole expert testified that "the purpose of [his] model" was "to find common effect." Ex. 17, McFadden Dep. 181:5-6. In other words: "You -- you want the model to do the best job you can of reflecting the common effect, given -- given the information that you have." *Id.* 232:19-23. Rather than modeling the real world (or even a realistic but-for world), Prof. Daniel McFadden designed his model to meet the certification standard. For that reason, among others, his opinions should be excluded. *See* Mot. to Excl. § IV.A-D. But even if the Court were to consider McFadden's opinions, they cannot be taken at face value—this Court, unlike McFadden, cannot simply *assume* uniformity. Rather, this Court has to make *findings* regarding commonality, typicality, and predominance; and in so doing, the Court has to weigh McFadden's opinions (to the extent admitted) against the evidence of individualized issues. As explained below, the named plaintiffs have not carried their burden of proof on the disputed Rule 23 prerequisites.

### FACTUAL BACKGROUND

Four individuals—plaintiffs Robert Pepper, Stephen Schwartz, Edward Hayter, and Edward Lawrence—ask this Court to certify a class that includes every U.S. consumer who has ever paid for an app download or in-app purchase on any iOS device "at any time since July 10, 2008." Mot. 2. They assert that this putative class contains "millions of Apple customers" (Mot. 12)—and likely scores of millions[1]—all with their unique preferences, spending habits, and mix of apps and purchases from

---

[1]   The named plaintiffs do not analyze data by reference to putative class members, but rather by Apple IDs. While roughly 204 million Apple IDs have made app-related purchases on the U.S. storefront since July 10, 2008, some consumers have multiple Apple IDs, and some share devices and Apple IDs with others. Rollins Decl. ¶¶ 3, 6. Even among named plaintiffs, Hayter admits that he has

Gibson, Dunn &
Crutcher LLP

more than 25 different categories in the App Store—including games, news, medical, shopping, productivity, weather, navigation, lifestyle, social networking, and magazines and newspapers.  *See* Hitt ¶¶ 24, 70-77 (describing App Store consumers).  It includes ███████████ that virtually never pay for apps, and more than ████████ that spent a considerable amount.  Hitt ¶ 74, *see also* Fig. 15.  It contains ████████████ that have *only* ever spent money on games, and ████████████ of consumers who have never played a mobile game in their life.  Hitt ¶ 77; *see also id.* ¶ 76, Fig. 17. And it covers ████████████ that have not transacted through the App Store since around October 2017.  *See* Hitt ¶ 216.

The named plaintiffs contend that each of these millions of people were "uniformly impacted" by Apple's alleged conduct.  Mot. 21.  This assertion is implausible on its face, and belied by the named plaintiffs' own varied experiences:

**Edward Hayter**, for example, purchased only one paid app for approximately $2 and spent $17 on in-app purchases during the entire class period, but has downloaded 128 free apps.  *See* Ex. 10 (purchases).  Even if the named plaintiffs could show that the $19 Hayter spent on the App Store was inflated by a few cents, the evidence shows that he received far more net benefit from the store.  *See* Ex. 13, Hayter Dep. 172:25-174:5 (the apps he regularly uses do not involve payment of commissions to Apple).  In fact, when asked if he felt "like [he] paid too much for [his] apps," Hayter responded: "No."  *Id.* at 260:16-18.  Further, virtually all Hayter's digital transactions occurred *outside* the App Store, including the "thousands of dollars" he paid his cable company to view content on his iPhone. Hayter used apps from the App Store to enjoy that content, but the apps were free and Apple received no money for the transactions.  *Id.* at 206:11-22.

**Robert Pepper** testified that he benefits from the secure iOS environment, his iOS devices are more reliable than his non-iOS devices, and he does not need antivirus software for his iOS devices. *See* Ex. 15, Pepper Dep. 202:23-203:6 (agreeing that "Apple's found a way to do pretty good with respect to the security of its devices without having to resort to antivirus software").  In fact, Pepper

---

three or more Apple accounts, and Schwarz shares an account with his wife.  Ex. 13, Hayter Dep. 25:10-17; Ex. 14, Schwarz Dep. 126:11-17.  The named plaintiffs present no way to identify proposed class members, and their expert testified it is "beyond the reach" of *either* party to identify which *people*—as opposed to Apple IDs—are in the class and suffered injury.  Ex. 17, 226:7-227:24; *see also* McFadden ¶ 132 n.199.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

1   testified that he would be concerned about "opening up iOS to additional app stores" if "it made it more

2   likely that [his] phone could be infected with malware or a virus." *Id.* at 146:21-147:12.

3       Pepper switched from an iPhone to an Android device during the class period, but his Android

4   experienced "glitches" and "would freeze." *Id.* 47:3-18, 62:25-63:8.  He then switched *back* to an

5   iPhone in 2012 or 2013, with full knowledge of Apple's 30% commission and policies. *Id.* at 47:3-22,

6   89:22-90:8.  Pepper has had fewer glitches with his iPhone than he experienced with his Android.  *Id.*

7   62:25-63:8.  Pepper agreed it was not "difficult or challenging" to switch between devices. *Id.* 69:10-

8   13.  Hayter likewise has had no issues switching between devices. *See* Ex. 13, 87:18-25 ("I have owned

9   more than one phone personally at any given time, okay? I have owned a Samsung. I have owned a

10  Blackberry, okay?  But I've always owned an iPhone. . . . It's like having five cars and your favorite is

11  the Mercedes, and the iPhone is my Mercedes.").

12      **Edward Lawrence** admits that free apps have improved his life. Ex. 16, Lawrence Dep. 151:6-

13  10; *see also id.* 142:5-13, 141:12-21 (uses Pandora and YouTube "daily").  Lawrence views the App

14  Store's malware vetting as "a good thing":  "I have a Windows computer, and I had to buy a third-

15  party device . . . to keep viruses away. I don't have to do that on my iOS accounts, either on the iPad

16  or the iPhone." *Id.* at 175:23-176:4, 178:24-179:8.

17      **Edward Schwartz**, on the other hand, purchased an atypically high percentage of paid apps, at

18  17%.  Ex. 11.  But unlike other named plaintiffs, he wants to gut the iPhone's secure environment—

19  he believes in caveat emptor and would prefer the ability to download iOS apps from other sources

20  even if it put him at risk of malware or malfunctions.  As he stated, an app store should leave it "up to

21  the buyer, you know, to look at what he is downloading and to say this is unsafe." Ex. 14, Schwartz

22  Dep. 141:3-18.  That said, Schwartz is loyal to Apple and would never consider switching to Android.

23  *Id.* at 53:23-54:1.  As he explained, "Apple has a terrific public reputation. . . . I think it is a great

24  company," and "Apple has a reputation for being particularly secure." *Id.* at 92:7-93:1.

25      Although the four named plaintiffs seek to represent millions of **absent putative class**

26  **members**, they do not provide the Court with any information about those individuals.  Apple, in

27  contrast, commissioned a survey of consumers regarding the issues presented by plaintiffs' claims.  The

28  survey results show that consumers have widely varying preferences regarding the App Store's

Gibson, Dunn &
Crutcher LLP

3

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.          CASE NO. 4:11-cv-06714-YGR

features.   When asked to allocate "points" to various features—from availability of free apps, to parental controls, to privacy—for instance, respondents' dispersions of those points varied from each other's.   Some, for example, allocated zero points to the "number of free apps" available in an App Store, while some allocated 100 points; over half of the respondents allocated zero points to "parental controls," while at least one allocated 50 points.   Simonson ¶¶ 56-58 & Ex. 6

Respondents similarly differ in terms of which of these features they consider "must-haves." *Id.*   Indeed, the only thing a great majority of the putative absent class members share is the high value they place on the App Store's privacy, security, and app quality and variety.   Simonson ¶ 63 & Ex. 6; *see also, e.g.*, Ex. 16, Lawrence Dep. at 175:23-176:4; Ex. 14, Schwartz Dep. 92:7-93:1; Ex. 15, Pepper Dep. 202:23-203:6; Rubin ¶¶ 55-107 (describing App Store and app distribution protections).   For the majority of consumers, privacy and malware protection are considered "must-have" features: 87.2% and 73.8%, respectively.   Simonson ¶ 57.   If an app store does not offer privacy or malware protection—or offers unsatisfactory privacy or malware protection—consumers would likely reject the store for that reason alone, regardless of price.   *See id.* at ¶¶57, 63.   In fact, the majority of consumers would not switch away from the App Store when presented with alternative, hypothetical iOS app stores that have lower prices but greater uncertainty surrounding those features.   Simonson ¶ 19; *see also* Rubin ¶¶ 20, 126-66 (describing impact of changing App Store and app distribution protections).

## LEGAL STANDARD

Under Rule 23(a), the named plaintiffs must prove by a preponderance of the evidence: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.   *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).   The named plaintiffs also must satisfy Rule 23(b)(3)'s heightened burden of showing that any common questions predominate over individual ones, *Comcast*, 569 U.S. at 33, and that a class action is the superior method of adjudication, *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), *op'n amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).   Rule 23 "does not set forth a mere pleading standard"; a "party seeking class certification must affirmatively demonstrate his compliance with" Rule 23.   *Dukes*, 564 U.S. at 350.   Courts "must perform a 'rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'"   *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011)   (quoting

1  *Dukes*, 564 U.S. at 350-51).  "Frequently that 'rigorous analysis' will entail some overlap with the

2  merits of the plaintiff's underlying claim," which "cannot be helped" because "[t]he class determination

3  generally involves considerations that are enmeshed in the factual and legal issues comprising the

4  plaintiff's cause of action."  *Dukes*, 564 U.S. at 351 (citation omitted).  Because Rule 23 "imposes

5  stringent requirements for certification that in practice exclude most claims," *Am. Express Co. v. Italian*

6  *Colors Rest.*, 570 U.S. 228, 234 (2013), "doubts about whether the requirements … have been met"

7  should be resolved against class certification.  *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225,

8  1233-34 (11th Cir. 2016) (internal quotation marks and citation omitted).

9  **ARGUMENT**

10      The motion for class certification is riddled with legal error, demonstrating that the named

11  plaintiffs (and their lawyers) know that the putative class cannot be certified under the proper standards.

12  For example, they cite *In re Tableware Antitrust Litigation*, 241 F.R.D. 644, 648 (N.D. Cal. 2007), for

13  the notion that courts are "bound to take the substantive allegations of the complaint as true" (Mot. 12);

14  but that approach was later *rejected* by the Supreme Court in *Dukes*, 564 U.S. at 350.  As another

15  example, they assert that "this is not the time or place to resolve a battle of experts" (Mot. 23, citing *In*

16  *re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007)), but that approach was *rejected* by

17  the Supreme Court in *Comcast*.  569 U.S. at 34 ("By refusing to entertain arguments against

18  respondents' damages model that bore on the propriety of class certification, simply because those

19  arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our

20  precedents requiring precisely that inquiry.").  Instead, as the Ninth Circuit has emphasized, failure to

21  resolve "critical factual disputes," including those presented in a "battle of the experts," is grounds for

22  reversal.  *Ellis*, 657 F.3d at 982, 984.  To grant the named plaintiffs' motion, the Court would have to

23  contravene settled precedent from the Supreme Court and the Ninth Circuit.  Following that precedent,

24  in contrast, requires denying their motion.

25  **I.      The Commonality Requirement Is Not Satisfied**

26      The named plaintiffs contend that "[w]hether Apple violated the antitrust laws is a common . . .

27  issue." Mot. 13.  That is like saying that whether Wal-Mart violated Title VII was a common question,

28  a proposition the Supreme Court squarely rejected in *Dukes*.  564 U.S. at 350 ("any competently crafted

class complaint literally raises 'common questions'").  Under binding precedent, the named plaintiffs bore the burden of identifying a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  The named plaintiffs make no effort to comply.

In a scant paragraph citing no evidence, the named plaintiffs assert that this case presents the "quintessential common questions" of market definition, market power, and anticompetitive conduct; and that these questions "are shared by each [putative] Class member."  Mot. 13.  But all of plaintiffs' common questions depend on three critical assumptions:

(1) that a *single*, relevant market applies to all putative class members;

(2) that market conditions can be *averaged* for the entire 13-year class period, such that they can be treated as *static*; and

(3) that Apple's conduct applied *uniformly* to all putative class members—i.e., tens of millions of iOS customers.

If any of these assumptions is wrong, the named plaintiffs' commonality argument crumbles. That is because plaintiffs' "questions" are common only if they can be answered by the same facts and evidence.  If, instead, putative class members participated in different markets, featuring different market conditions and conduct, then their claims do not actually turn on common issues and evidence. Here, the evidence disproves all three assumptions underlying plaintiffs' commonality argument.

*First*, the named plaintiffs cannot satisfy commonalty by simply *asking* whether their market definition is correct.  Mot. 13.  Rather, an "accurate definition of the relevant market" is necessary to establish every element of an antitrust claim.  *Ohio v. Am. Express Co. ("Amex")*, 138 S. Ct. 2274, 2285 (2018).  Accordingly, the Court must assess the merits of a plaintiff's proposed market where, as here, it is relevant to class certification.  *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012) ("factual determinations" pertaining to market definition "were necessary for the district court to decide whether to certify a class").

Here, the named plaintiffs, relying solely on their expert's report, propose a single market consisting of all "sales of iOS apps and [in-app purchases]."  Mot. 4.  As Apple's experts show, however, in reality Apple competes in multiple relevant markets in which different developers and

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.          CASE NO. 4:11-cv-06714-YGR

consumers transact.  *See* Hitt ¶¶ 33-34, 229-231, 249-269; Willig ¶¶ 16-19, 113-152.  Even the named plaintiffs' expert, Prof. Daniel McFadden, admits that his market definition likely encompasses discrete markets, such as the market for game apps.  Ex. 17, 55:7-8, 69:9-15; *see also* Hitt ¶¶ 34, 252-59; Willig ¶¶ 17, 116-35 (the game-app transactions market is a distinct market).

A relevant market should be defined to include only products that are "reasonably interchangeable."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Here, many iOS app transactions are not reasonably interchangeable.  For example, game-app transactions are not reasonably interchangeable with dating-app or business-app transactions.  *See* Schmalensee ¶ 59.  McFadden admits that his market definition includes non-substitutable products.  Ex. 17, 55:9-56:2, 65:17-68:8;  Conversely, McFadden uniformly excludes all free app transactions despite the fact that they are often a substitute for paid transactions.  *Id.* at 67:18, 72:6-24 (admitting that developers switch between paid and free apps for various business reasons); Schmalensee ¶ 52.

Because, as Professor Willig explains, consumers "differ according to the relevant app transaction markets in which they" participate (Willig ¶ 19), a proper interchangeability analysis dooms consumer plaintiffs' proposed market definition.  Apparently recognizing this, McFadden argues that "if the conduct of a defendant is to monopolize …, that is functionally what matters" and "that is more important than … what market definitions might be in terms of … substitution."  Ex. 17, 69:3-70:25 ("one should not get too focused on the definition of the market").  The Supreme Court, however, says otherwise.  *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 459 (1993) (in all Section 2 cases, relevant markets must be defined and market power cannot be inferred from conduct).  And the correct market definition is highly consequential for class certification here.  Indeed, if members of the putative class participate in different markets, then the evidence in one market cannot be common proof of monopolization of distinct market.  *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (denying class certification where, *inter alia*, there were significant differences in the products purchased); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("Common proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise they could not be affected in a common manner by the

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.        CASE NO. 4:11-cv-06714-YGR

challenged conduct."). Here, many putative class members spent money on only a single category of apps—for example, games. *See* Hitt ¶ 77. Many other putative class members spent little-to-no money on games. *Id*. ¶ 74; Pepper Dep. 58:9 ("I'm not really a game person"). The named plaintiffs cannot certify a class based on the bare assumption that all of those consumers were in the same market and can use common evidence to prove their claims. *See* Willig ¶ 152.

Named plaintiffs' market definition also improperly excludes non-iOS platforms. "Single-brand markets are, at a minimum, extremely rare" (*Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) (quoting *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008))), and the named plaintiffs and McFadden have not shown that this rare circumstance applies here. Indeed, McFadden did not even analyze gaming transactions outside the iOS environment. *See*, *e.g.*, Ex. 17, 78:8-10 ("I don't know anything about the details of that market and whether -- what games are available exclusively on one device or another."). Yet, Apple's experts show that consumers can make purchases through game consoles, personal computers, and other mobile devices. *See* Hitt ¶¶ 252-259. Likewise, video-streaming app users engage in transactions for content on other platforms, such as tablets, laptops, smart TVs, and streaming sticks. *See* Hitt ¶¶ 260-66 (defining market for video steaming app transactions). The named plaintiffs have not carried their burden of demonstrating that they can define a relevant market with common evidence—and this alone defeats commonality.

*Second*, the named plaintiffs try to manufacture commonality by assuming that their single iOS transaction market was uniform and static since 2008. Specifically, McFadden admits that he "average[d]" the market conditions across the 13-year class period, instead of assessing changes to the market and Apple's alleged market power over each point in the class period. Ex. 17, 92:1-94:18 ("I haven't set out to test" whether Apple had monopoly power in any specific period, and "have no evidence one way or the other" if Apple had such power in the first two years). Further, McFadden did not consider the evolution of app transactions over the past 13 years, changes in consumer preferences, or the quantity and quality of potential market entrants throughout that time period. Indeed, McFadden admitted that he knew virtually nothing about the evolution of app transactions, and all of his opinions are based on a few cherry-picked observations over the past 2-3 years. *Id*. 94:9-18, 98:6-8, 140:1-142:12. By holding the world of app transactions static over the past 13 years, McFadden

Gibson, Dunn &
Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

is able to assume that Apple's policies and prices also would have been static over that time period, and that if a consumer overpaid for a game-app transaction in 2008, a different consumer would have similarly overpaid for a dating-app transaction in 2021.  McFadden conducted no analysis to support that opinion—rather, he simply assumed the commonality he was supposed to demonstrate.

In the real world, app stores have not remained static for more than a decade.  Hitt ¶¶ 51-55, 78-106, Figs. 19-21.  The App Store itself has offered numerous rate structures—including the Video Partner Program, the Reader Rule, special rates for subscriptions, and most recently the Small Business Program.  *Id.* ¶ 52.  Other app stores have also had dynamic pricing structures.  *Id.* Fig. 19-21.  Because the putative class made different purchases, at different times, subject to different conditions and policies, McFadden's assumption of a static market defies reality and assumes classwide impact.

*Third*, the named plaintiffs claim there is a common question regarding Apple's alleged anticompetitive conduct, because Apple "designed iOS to be a 'closed' system" and had a single policy of "prohibiting app developers from informing iOS users … of the availability of their apps or IAP on other platforms."  Mot. 18-19.  But that common question fails because it misapprehends the law.  An alleged "monopolist has no duty to deal with its competitors, and a refusal to do so is generally lawful*."  New York v. Facebook, Inc.,* 2021 WL 2643724, at *12 (D.D.C. June 28, 2021) (citing *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)); *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]").  "It follows that a firm's merely announcing its choice not to deal with competitors, whatever the motivation for doing so, cannot violate Section 2."  *Facebook*, 2021 WL 2643724, at *12.  Rather, a Section 2 claim must turn on analysis of "specific instances in which that policy was enforced."  *Id*.

Here, the named plaintiffs rely entirely on an announced "policy"—a legally invalid basis for a Section 2 claim.  McFadden's report purports to identify "specific instances" of Apple allegedly refusing to deal with app developers or putative app stores, McFadden ¶ 125 (Epic, Spotify, Telegram, and Kobo), but he admitted at his deposition that the *only* instance he is aware of in which Apple declined to allow a competing app store involves Epic in 2020-2021.  Ex. 17, 114:16-117:24.  A consumer who purchased a news subscription in 2015 cannot be harmed by Apple's purported refusal

to deal with Epic in 2020, and even a game app purchaser cannot suffer antitrust injury unless the refusal was unlawful and the transaction occurred after Apple's refusal and after, in the but-for world, the price paid would have dropped due to competition with an Epic store.  Accepting McFadden's cursory references to other alleged refusals in his report does not solve this problem, but would create additional questions that apply differently to different putative class members.  Thus, these alleged "specific instances" do not implicate or impact every member of the class in common.

The named plaintiffs did not satisfy commonality, because they simply reframed the elements of their claims as questions, and they simply assumed—instead of proved—that they could use common evidence to generate common answers that will drive this litigation.[2]

## II.     The Typicality and Adequacy Requirements Are Not Satisfied

"The purpose of the typicality requirement is to assure that the interest[s] of the named representative[s] align[] with the interests of the class," including "whether the action is based on conduct which is not unique to the named plaintiffs."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "[C]lass certification is inappropriate" here, where the named plaintiffs seek changes to the App Store that would harm millions of putative members, and are "subject to unique defenses which threaten to become the focus of the litigation."  *Id.*; *see also* Fed. R. Civ. P. 23(a)(3-4); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (commonality and typicality "tend to merge" with each other and with adequacy).

While the named plaintiffs' failure to prove (or even meaningfully address) typicality masks conflicts within the putative class, several are apparent.  Schwartz's stance on security—wishing to gut the iPhone's secure environment and make every consumer responsible for ensuring they do not download dangerous apps (Ex. 14, 141:3-18), and Lawrence's stance on privacy—casting aside personal privacy when purchasing apps because he believes nothing is private (Ex. 16, 183:17-19, 184:7-185:4), for example, pit each of them against the putative class, 73.8% of whom consider

---

[2]     The named plaintiffs' attempt to establish market-power commonality by pointing to "the App Store's extremely high gross and net margins," Mot. 7, cannot solve the problem of non-commonality injected by multiple relevant markets, as evidence of profit can only be used to assess market power *within* a relevant market.  In any event, their profit-margin evidence is unreliable.  *See* Mot. to Excl. § IV.B.3.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.        CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

malware protection a "must-have" feature, and 87.2% of whom say the same for privacy.  Simonson ¶ 57; *see also* Ex. 27, Trial Tr. 193:3-4, 302:19-25 (absent class member Tim Sweeney); Rubin ¶¶ 20, 127-37.  *Henry v. Assoc. Home Equity Servs., Inc.*, 272 B.R. 266, 279 (C.D. Cal., Jan. 7, 2002) (typicality and adequacy not satisfied where "[p]laintiffs are challenging [conduct] that many class members may view as a benefit").  Schwartz's and Lawrence's extreme stances also conflict with the other named plaintiffs, who admitted benefiting from the App Store's security measures.  *See* Pepper Dep. 146:16-20, 146:21-14712 (he would be concerned about "opening up iOS to additional app stores" if "it made it more likely that [his] phone could be infected with malware or a virus"); Ex. 13, Hayter Dep. 251:17-25 (iPhone never broke due to malware: "It's important").  *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (no typicality where "[e]ven as between" the "named Plaintiffs there is sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged").

Moreover, Pepper's experience switching from an Android device and app store (which frequently experienced "glitches" and "crashed") to an iPhone during the litigation and with full knowledge of Apple's 30% commission (Pepper Dep. at 47:3-22, 89:22-90) subjects him to an individualized defense given his pre-purchase knowledge of App Store policies and prices.  *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436 (5th Cir. 1985) ("[A]n antitrust plaintiff, like other injured parties, must mitigate damages."); *Fishman v. Est. of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 820 (2d Cir. 1983); *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1583 (11th Cir. 1983); *see also* Lawrence Dep. 55:12-13 (Lawrence "kn[ew] about Apple and their practices for a long time" before filing suit, subjecting him to similar individualized defense).  Pepper's switching also undercuts the named plaintiffs' "aftermarket" theory—that device-switching costs are prohibitively high and therefore "lock" consumers into the App Store.  Mot. 6.  Many survey respondents did not mention difficulty in switching devices as a reason for not switching.  Simonson Rpt. ¶ 24.  And a majority of consumers stated that they would not switch away from the App Store, when they were presented with an alternative app store that had lower prices but was less protective of their privacy and security.  *Id.* ¶ 19.

Apple is entitled to assert such defenses not just against the named plaintiffs, but as to other

would-be class members. *See Dukes*, 564 U.S. at 367 ("Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims." (citations omitted)). Apple cannot litigate these defenses on a classwide basis.

## III.   The Predominance Requirement Is Not Satisfied

"Even if Rule 23(a)'s commonality requirement may be satisfied"—and it is not here—"the predominance criterion [under Rule 23(b)] is far more demanding." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). To satisfy predominance, antitrust plaintiffs must show they can prove "antitrust impact and damages . . . on a class-wide basis." *Lithium Ion*, 2018 WL 1156797, at *3; *see also In re High Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) ("in antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof"). And they must do so in a way that conforms to their liability theory. *Comcast*, 569 U.S. at 35.

Named plaintiffs invite the Court to commit error by again relying on outdated and overruled case law to suggest that they need only offer a "plausible methodology" to prove classwide impact. In fact, antitrust plaintiffs bear the "burden . . . to provide a viable method for *demonstrating* class-wide antitrust injury based on common proof." *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal., Feb. 16, 2018), *aff'd*, 784 F. App'x 539, 540 (9th Cir. 2019) (Gonzalez Rogers, J.) (emphasis added); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 493 (N.D. Cal. 2019) ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it."). A "rigorous analysis" of predominance entails not just an assessment of plausibility but "judging the persuasiveness of the evidence presented" for and against certification. *Ellis*, 657 F.3d at 982 (vacating class certification because the district court "confused the *Daubert* standard" for admissibility of expert evidence "with the 'rigorous analysis' standard to be applied when analyzing" the Rule 23 factors).

Here, the named plaintiffs fall far short of their burden. They rely on an antitrust impact methodology created by Prof. McFadden. But McFadden never analyzed the evidence in this case (in fact, he knew nothing about the named plaintiffs, other devices that consumers use for app transactions, or significant platforms like the Mac App Store) to determine *whether* a common methodology was

appropriate.  Ex. 17, 23:13-21, 79:24-81:13, 98:3-17, 137:1-139:12.  Instead, by his admission, his objective was to assume commonality as a "starting point" and create a model that generated a "common effect."  *Id.* 174:15-22, 180:24-181:6, 232:20-23 ("[Y]ou want the model to do the best job you can of reflecting the common effect, given -- given the information that you have.").  That type of expert analysis is improper at class certification.  *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 320–21 (N.D. Cal. 2014) (concluding that expert's "model makes no attempt to establish, but instead simply assumes, class-wide impact" where it assumed overcharge was "the same for all purchasers across all models of [optical disk drives] and throughout the entire class period"); *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *1 (N.D. Cal. Apr. 12, 2017) (Gonzalez Rogers, J.) (denying class certification when plaintiff's impact methodology failed to "account for the decision-making of a variety of resellers and manufacturers in an intricate distribution chain").

Driven by that objective, McFadden proceeded in two steps.  First, McFadden purported to identify the commission rate(s) Apple would have charged the a but-for world.  Second, McFadden created an econometric model of consumer prices in the but-for world.  But as Apple's experts explain, both steps in McFadden's analysis are unreliable and, at crucial junctures, assume commonality instead of proving it.  Schmalensee ¶¶ 197-214; Hitt ¶¶ 172-183.  However, as McFadden himself admitted, his own model estimates many millions of uninjured consumer accounts, an amount that he deems "relatively small."  McFadden ¶ 226.  In reality, as detailed by Prof. Prince, the but-for world would teem with uninjured class members.

### A.   Named Plaintiffs' Theory of Classwide Impact Rests on Unsupported Assumptions About But-For Commission Levels

McFadden admits that, rather than applying any economic expertise, he used "commonsense judgment" to identify the but-for commission rates in the first step of his analysis.  McFadden testified that an expert could have performed this work, but he did not.  Ex. 17, 134:7-135:13 (admitting "an economist could" build "a mathematical model or statistical model of the but-for world commission," but he did not "do[] so in this case").  Instead, litigation consultants assisting McFadden cherry-picked commission rates for four PC game-store apps, and then McFadden adopted the "commonsense" conclusion that Apple would have charged a 10-12% commission rate in the but-for world, across every app category and the entire 13-year class period.  This is facially implausible, not "commonsense."  As

Gibson, Dunn & Crutcher LLP

1   Professors Hitt and Schmalensee explain, all evidence suggests that in the but-for world, Apple would

2   most likely charge the same 30% headline rate as it does today.  Hitt ¶¶ 29, 194-98; Schmalensee ¶¶ 20,

3   133-42.   McFadden's opinion is unreliable, not the product of any type of scientific analysis, and

4   contrary to real-world evidence.  *See* Mot. to Excl. § IV.B.

5        ***1. McFadden's 10-12% but-for commission rate ignores reality.***  It was named plaintiffs'

6   burden to put forth a reliable methodology for determining Apple's commission rate(s) in the but-for

7   world.   Instead, McFadden conducted an unscientific "benchmark analysis," which consisted of

8   litigation consultants selecting four PC game-app stores that allegedly operate in competitive markets

9   (Valve's Steam store, the Microsoft store, the Epic store, and Discord).  McFadden then looked at the

10  lowest commission rates charged by those four stores, and concluded that Apple would have charged

11  a 10-12% commission rate in the but-for world.  McFadden ¶¶ 136, 153-161.

12       Apple's *Daubert* motion identifies numerous flaws in McFadden's benchmark analysis.  *See*

13  Mot. to Excl. § IV.B.  Among them, McFadden purports to rely on Valve's Steam store, "the largest

14  PC game store by registered users" (McFadden ¶ 156).  But, as Prof. Hitt explains, Steam has charged

15  a 30% headline commission for virtually all app purchases since it began distributing third-party games

16  in 2005.  Hitt ¶¶ 91-92; (at most 302 titles qualified for lower commission tiers in 2019).  Similarly,

17  McFadden relies on the Microsoft Store, which has charged a 30% headline rate for most games for

18  most of its existence, including at the time McFadden submitted his expert report.  *See* McFadden ¶ 158

19  (relying on Microsoft commission rates that become effective in August 2021); McFadden Dep.

20  152:03-21 (admitting that Microsoft "apparently" charged a 30% commission on game apps "from the

21  beginning of time until the day before yesterday"); Hitt ¶¶ 97-99 & Fig. 20.  McFadden also relies on

22  the Epic Games Store's 12% rate, but he was unaware that Epic set prices below actual cost in order to

23  generate critical mass for its store, or that Epic provides developers with costly minimum-guarantees.

24  Ex. 17, 148:21-149:2, 149:10-150:7; Ex. 21, Allison Dep. 89:22-90:3, 129:19-24; Ex. 28, Kreiner Dep.

25  244:2-5, 256:12-16; Ex. 23, Trial Tr. 1232:14-17 (Allison); Hitt ¶ 80.  McFadden also purports to rely

26  on the 10% commission rate charged by Discord, but he did not know that store shut down only months

27  after announcing that rate.  Ex. 17, 153:16-154:13; Hitt ¶ 80, 102.

28       McFadden's benchmark analysis also ignored every other app store that has charged a 30%

commission rate—including the Samsung Galaxy and Google Play Android app stores that face sideloading and competing stores on the same device, Hitt ¶¶ 83-90, 199-200 (describing Android app store models), and Apple's Mac App Store, which named plaintiffs admit permits "multiple third-party app stores," Mot. 10 n.10; *see also* Hitt ¶¶ 94-96.  Indeed, McFadden did no work to determine whether the Mac App Store was a reasonable benchmark that undermined his 10-12% but-for rate.  Ex. 17, 137:11-14 ("Q.  [D]o you consider the Mac app environment to be competitive? A. I don't . . . know I haven't looked at it."), *id.* 138:14-139:12 (does not know whether Mac users can buy apps from other stores—his sole knowledge comes from seeing "an Apple App Store icon" on his wife's computer).

Just like these platforms, the App Store has maintained a headline 30% commission rate since it opened.  At the same time, Apple continues to charge nothing for distributing free apps, and introduced lower rates—such as the 15% commission for subscriptions, certain video content, and developers earning less than $1 million per year.  *See* Ex. 24, Trial Tr. 2740:3-2742:5, 2805:2-11, 2806:5-21, 2810:16-23 (Schiller); Ex. 1.  McFadden fails to explain why, in the but-for world, Apple would have abandoned those rates and done something that no company has *ever* done profitably and successfully in the real world:  offer a single-tier 10-12% commission for all apps.

**2.  *McFadden's uniform, but-for rate ignores the complexity of the competitive landscape.***
McFadden's 10-12% but-for commission also ignores the dynamic competitive landscape among app platforms.  *See* Mot. to Excl. § IV.B.2.  As Apple's experts demonstrate, just like the world in which McFadden drew his "benchmarks," any but-for world would likely contain competing app stores differentiated along multiple dimensions, and developers would pay non-uniform commissions.  *See* Schmalensee ¶¶ 138-142; Hitt § 8.1.  Some stores would likely charge a non-negotiable 30% commission rate, as the Mac App Store does currently.  ██████████████████ ██████████████████████████████████████████████████████████  Other entrants might take Epic's approach of charging a lower headline rate and offering exclusive (minimum guarantee) deals to attract developers and (through indirect network effects) consumers.  *See* Ex. 6 (Media analysis of Epic Games Store commission rate).  Still others may emulate Steam and charge tiered commissions anchored off 30% with lower rates for the most lucrative games.  Hitt ¶ 92.  And, although McFadden's benchmark

analysis makes no mention of sideloading, some developers would choose to sell directly to a consumer, as some large developers do in the PC and Android environments.  Hitt ¶ 108, 296 (describing direct distribution by large game developers); *cf.* Compl. ¶ 57 ("competitive iOS apps distribution market" would involve "buying directly from app developers").  These market realities mean that assessing consumer injury requires knowing where developers would sell, where consumers would buy, and the prices developers and consumers would pay.  Schmalensee ¶ 139, Hitt ¶ 37, 277, 321-23.  McFadden ignores this complexity.

McFadden also leaves no room for marketplace changes over time because such "calculation[s]" are "difficult . . . for economists."  Ex. 17, 151:1-13.  He assumes Apple would have charged a static 10-12% commission in the but-for world without taking into account, for example, *when* the first iOS app store competitor entered the market, *what* its starting rate would have been, and *how* it would have affected the App Store's commission rates.  *See* Mot. to Excl. § IV.B.2.  As Professors Hitt and Schmalensee explain, other app platforms have changed commissions over time since 2008.  Schmalensee ¶ 135 & Ex. 4; Hitt Figs. 19-21.

*3. The App Store has other features for which consumers would pay a higher rate.*  No evidence suggests that in a but-for world, Apple would abandon its commitment to the privacy, security, and user experience that defines its brand.  Ex. 26, Trial Tr. 3937:8-11 (Cook) (agreeing that "Apple believes privacy is a basic human right" and a "key differentiator in the market for its products"); *see also* Ex. 27, Trial Tr. 193:3-4, 302:19-25 (Epic CEO—and putative class member— Tim Sweeney testifying he values privacy); Ex. 13, Hayter Dep. 159:7-9 (similar).  McFadden himself makes the "implicit assumption" that, aside from the commission, "nothing else is changing" in the but-for world, including the App Store's security and privacy features.  McFadden Dep. 159:16-160:05.  Even in the but-for world, Apple would continue to review every app submitted to ensure it meets high privacy-protection standards and does not contain malware or offensive content.  Ex. 25, Trial Tr. 1183:12-1184:6, 1185:15-1186:20 (Kosmynka); *see also* Rubin ¶¶ 59-80.  This, coupled with the fact that iOS users value these App Store features, and most would *not* shift purchases to less reputable

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.        CASE NO. 4:11-cv-06714-YGR

stores even at a discount, Simonson ¶ 63,[3] means Apple could charge a higher commission in the but-for world than McFadden allows. Hitt ¶¶ 30, 198, 314-20. *See Leegin Creative Leather Prod. v. PSKS*, 551 U.S. 877, 896-97 (2007) (quality can increase consumer demand despite higher prices); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 147-49 (N.D. Cal. 2019) (rejecting plaintiffs' impact model for ignoring effect of product quality on price).

Further, as Prof. Schmalensee explains, in the but-for world, the App Store also would benefit from indirect network effects that increase demand for its store. Schmalensee ¶¶ 124, 131, 136. In a two-sided platform, "the value of the services that [the] platform provides increases as the number of participants on both sides of the platform increases." *Amex*, 138 S. Ct. at 2281. A developer values— and pays a premium for—a platform that provides a bigger and broader audience. Hitt ¶¶ 311-313 & Fig. 33 (developers transact through Steam despite availability of lower rates from other stores). Consumers, likewise, value platforms with greater choice and diversity of apps. *See* Ex. 15, Pepper Dep. 69:14-17, 76:3-7 (never searched for an app and been unable to find it on App Store). McFadden makes no assumption that the App Store would have a small market share, and indeed does not rule out a share approaching 100%. McFadden Dep. 130:17-132:05. As such, he fails to account for this two-sided nature of the market, Schmalensee ¶¶ 36-39, and the ensuing value to both sides.

*4. App developers would face other costs in the but-for world.* McFadden ignores the likelihood that in the but-for world, Apple would monetize its IP differently, and developers could pass that added cost onto individual consumers. The technologies Apple licenses developers to build iOS apps are subject to various intellectual property protections that stem from $100 billion in R&D over the past 15 years. Malackowski ¶¶ 19-21, 82-127, 143-65; Ex. 26, Trial Tr. 3989:9-11 (Tim Cook explaining that Apple "need[s] a return on our IP . . . [W]e have 150,000 API's to create and maintain and numerous developer tools."). McFadden's model implausibly assumes that Apple would reduce its commission by more than half without any offsetting increase in other fees to compensate for developers' use of its intellectual property. But Apple likely would monetize the technology it

---

[3]   The named plaintiffs testified that Apple has a superior reputation, and they value App Store features. *See* Ex. 15, Pepper Dep. 154:10-13 (reliable performance of iPhone important); Ex. 16, Lawrence Dep. 246:6-10, 247:14-16 ("much easier" to buy on App Store compared to Windows; App Store has "improved" his mobile phone experience); *id.* 179:3-13 ("environment where the apps that are available to you are vetted" is an "advantage" and "good thing"); Ex. 14, Schwartz Dep. 92:7-93:1.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

licenses—including through various other models, like increased annual developer fees, a royalty on developer profits, charging for app review, or licensing specific technologies for a fee. Ex. 17, McFadden Dep. 159:7-15 (admitting his "model does not take into account payments that developers make other than by other commission" or potential "royalties"); *see* Malackowski ¶¶ 196-207 (potential alternative monetization options); Schmalensee ¶¶ 143-60 & Ex. 5; Willig ¶¶ 189-214; Hitt ¶¶ 324-43.

In short, McFadden's 10-12% uniform commission rate is based on an arbitrary benchmark analysis, as opposed to any sort of rigorous scientific assessment of what Apple would have actually charged in the but-for world. No reasonable fact-finder could rely on McFadden's opinion, in view of all the evidence, to conclude that the App Store would have had a uniform 10-12% commission from 2008 to present in the but-for world. Thus, even if the Court does not exclude his testimony entirely, McFadden's testimony cannot support a finding of predominance. The Consumer Plaintiffs chose to stake their entire bid for certification on McFadden, and McFadden chose to premise all of his opinions on the but-for commission. Because his assumption is false, none of his conclusions follow.

## B.   Named Plaintiffs' Theory of Classwide Impact Rests on an Unreliable Model of But-For App Prices

The second step in McFadden's methodology is equally unreliable, but for different reasons. Whereas McFadden's first step fails because he essentially picked a commission percentage out of thin air without any economic analysis, his second step features a complex econometric model that seeks to estimate prices of selected apps and in-app purchases in the but-for world. But McFadden's econometric model is riddled with flaws.

One extraordinary defect that alone precludes class certification is that McFadden's model estimates vastly more than a *de minimis* number of uninjured class members—14.6% of user accounts, totaling nearly 30 million. Prince ¶ 10, 32. And as Prof. Prince explains, this is just the model's base case, since the number of uninjured people is far higher after correcting for the numerous flaws in McFadden's model. *Id*. ¶¶ 7, 10, 35. The named plaintiffs have presented no way to identify and extract uninjured people from the class, which means their motion for class certification must be denied.

### 1.  *McFadden's econometric model assumes uniformity and generates unreliable app prices.*

As explained in more detail in Apple's *Daubert* motion, McFadden's opinions on app and in-app purchase prices in the but-for world are unreliable and should be excluded. Mot. to Excl. § IV.C.

18

Gibson, Dunn & Crutcher LLP

McFadden did not approach his opinions scientifically, to assess *whether* there is a common effect, but instead designed his model to "find a common effect" (Ex. 17, 180:24-181:6), treating common impact as a "modeling assumption" rather than one of several possible results. *Id.* 174:15-22; Mot. to Excl. § IV.A.   Further, McFadden's model rests upon a tiny and demonstrably unrepresentative sample of apps—just over 1,800—which includes apps from only three of 27 app genres, and fails when run on other genres.  Mot. to Excl. § IV.C; Prince ¶¶ 116-23.   Worse still, McFadden's model fails basic robustness checks, rendering them useless to the Court.  Mot. to Excl. § IV.C.2.  Because McFadden's opinions are inadmissible—or at a minimum, not credible—the named plaintiffs cannot meet their burden of showing impact on a predominantly common basis. *Ward*, 2018 WL 934544, at *3 (plaintiffs bear the "burden . . . to provide a viable method for demonstrating class-wide antitrust injury based on common proof" (citation omitted)).

    ***2. Even with its untenable assumptions, McFadden's model yields more than a* de minimis *number of uninjured class members.***  Even under his own methodology, however, McFadden admits there are a substantial number of "class members who show no damages."  McFadden ¶ 227.  Classes may not be certified containing "a great number" of uninjured class members.  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016).  If a large number of class members "in fact suffered no injury," the "need to identify those individuals will predominate and render an adjudication unmanageable."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011)).  Cases "involving uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a *de minimis* number.'"  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (citation omitted); *see also Andrews v. Plains All Am. Pipeline*, 777 F. App'x 889, 892-93 (9th Cir. 2019) (denying class certification when plaintiffs' expert's model indicates that many employees within the class likely were not injured); *Asacol*, 907 F.3d at 47 (no predominance where approximately 10% of the class was uninjured); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017).

    Here, McFadden's model results in more than a *de minimis* number of uninjured class members. Despite claiming his model can show that "all or nearly all consumers" would have paid lower prices for their digital transactions (McFadden ¶ 13), McFadden admitted in his report that his own

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.       CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

1    calculations for the three largest categories of apps show that "approximately 5.8% of the Consumer

2    Class members" are uninjured, a number he dismissed as "relatively small." *Id*. ¶ 226, 241.  In his

3    deposition, he admitted that this figure was an underestimate, because it did not measure net harm

4    across a given account's purchases.  Ex. 17, 208:5-25; *id*. 201:12-21; McFadden Rpt. n.198.  When

5    applying the proper net harm measure using McFadden's computer code, the model predicts that 7.7%

6    of user accounts—almost 15.7 million—suffered no economic impact.  Prince ¶ 31.  When a technical

7    bug in McFadden's computer code is fixed, however, that figure rises to an astounding 14.6% or almost

8    30 million accounts.   Prince ¶ 32.  Nevertheless, Prof. McFadden opines that "all or nearly all" of the

9    putative class has been injured.  McFadden ¶ 13.

10        These facts alone preclude certification, as they establish that the percentage of uninjured class

11   members exceeds the "the outer limits of a *de minimis* number," *Rail Freight*, 292 F. Supp. 3d. at 137,

12   and the sheer quantity of uninjured class members is enormous, *see In re Niaspan Antitrust Litig.*, 464

13   F. Supp. 3d 678, 718 (E.D. Pa. 2020).  Courts have rejected classes with far fewer uninjured class

14   members.  *Rail Freight*, 934 F.3d at 627 (rejecting class containing 2,037 uninjured class members);

15   *Asacol*, 907 F.3d at 53-54 (rejecting class where "apparently thousands . . . in fact suffered no injury").

16       ***3.  Adjusting McFadden's flawed assumptions yields even larger numbers of uninjured class***

17   ***members.***  Even if the Court were willing (and able) to sort out the millions of uninjured class members

18   McFadden admits are included in named plaintiffs' putative class, to find that common issues would

19   predominate, the Court would still be required to resolve factual disputes regarding the merits of

20   McFadden's model, including the legitimacy of the model's underlying assumptions.  *See Comcast*,

21   569 U.S. at 34; *Ellis*, 657 F.3d at 982, 984 (courts must resolve factual questions relevant to class

22   certification); *Asacol*, 907 F.3d at 47; *see also Ward*, 2018 WL 934544, at *3 ("[C]ertification [should

23   not be] automatic every time counsel dazzle the courtroom with graphs and tables." (quoting *In re

24   Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008))).

25       Changing McFadden's unrealistic assumptions reveals that far more than 30 million accounts

26   are uninjured.  For example, applying but-for commission rates that, unlike McFadden's, account for

27   the prevalence of 30% headline commission rates throughout the class period yields many more

28   millions of uninjured accounts.  Prince shows that if Apple, for instance, implemented McFadden's

1    implausible 12% uniform rate in November 2018—around the time the first of the lower rates in

2    McFadden's benchmark analysis were implemented—65% of accounts (or 132.2 million) would be

3    uninjured.  Prince ¶¶ 43-44, 46.[4]  Similarly, if Apple, like Steam, charged 30% on the first $10 million

4    followed by reduced rates for additional sales, more than 21% of accounts (43.1 million total) would

5    be unharmed.  *Id*. ¶ 47.  Additionally, if (as McFadden's model predicts) a 12% but-for commission

6    rate would attract some developers to change their monetization strategy and begin charging for

7    formerly free (zero-charge) apps (which are 72% of apps in the App Store over the class period), more

8    than 33.4% of accounts (68 million total) would be uninjured.  *Id*. ¶¶ 51-56.  Such vast numbers of

9    uninjured class members clearly defeat predominance.

10          Even these numbers understate the number of uninjured class members.[5]  For instance, if—

11   contrary to McFadden's assumption—$0.99 pricing tiers (or their equivalent in the form of "focal"

12   pricing) would remain in the but-for world, more than half of apps would not change their but-for

13   prices.  Prince ¶¶ 122-124; *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1528 (2019) (Gorsuch, J., dissenting)

14   ("because Apple's 99-cent rule creates a strong disincentive for developers to raise their prices, it makes

15   plaintiffs' pass-on theory of injury even harder to prove.").  McFadden's model cannot assess the

16   number of uninjured accounts to the extent that focal point (0.99) pricing was common in the but-for

17   world.  Prince ¶¶ 57-59, 61.  In fact, McFadden did not do any study of focal-point pricing.  *See* Ex.

18   17, 125:1-11, 182:6-9.  He just assumed that Apple's price tiers would disappear in the but-for world,

19   and built his model with that assumption as a given.  But focal-point pricing is commonplace in

20   competitive markets, including the PC store market that McFadden holds out as a competitive

21   benchmark.  Schmalensee ¶¶ 211-12  (explaining that focal point pricing would prevail in the but-for

22   world); Mot. to Excl. § IV.C.3; *see also Lithium Ion*, 2018 WL 1156797, at *5 ("Having failed to

23   provide an explanation for the effect of focal point pricing on the pass-through analysis previously

24   calculated, the Court cannot find that the antitrust injury to the class can be determined on a common

---

[4]  And these totals do not account for the data error noted previously, which Prof. Prince discovered on the eve of finalizing his report.  *See* Prince ¶ 33.  So they likely understate the true number.

[5]  McFadden has many other unsupported assumptions that exaggerate impact.  For example, he assumes apps will not compete with one another in the but-for world (Prince ¶¶ 62-65); and consumers have the same price sensitivity for all apps in the same genre (*id*. ¶¶ 66-72).  He also applies arbitrary, unrepresentative, and incorrectly calculated constraints on developers' profit margins and, when removed, leave more than 18% of accounts (36.6 million) unharmed.  *Id*. ¶¶ 90-106.

1  basis as to the putative class.").  And, as explained above, it is most likely that Apple would continue

2  to charge a 30% commission rate in the but-for world, meaning that consumers who made purchases

3  through the App Store would pay the same prices under McFadden's model.  Prince ¶ 45.  That would

4  include the substantial number of iOS users who would continue to obtain apps exclusively through

5  the App Store rather than patronizing alternative options offering less curation, increased search costs,

6  lower privacy, and a higher risk of malware.  Simonson ¶ 63.  "Identifying [these] uninjured consumers

7  with any degree of confidence would require an assessment of individual-specific facts" such as the

8  individual's risk appetite, privacy preferences, and price sensitivity.  *In re Intuniv Antitrust Litig.*, 2019

9  WL 3947262, at *8 (D. Mass. Aug. 21, 2019); *see also Asacol*, 907 F.3d at 51.

10  Because the evidence reveals that, after correcting the erroneous assumptions built into

11  McFadden's model, there would be many millions more uninjured accounts beyond the 30 million that

12  even McFadden acknowledges, individualized inquiries would predominate over common ones.

13  ***4.  Named plaintiffs cannot salvage McFadden's model by removing uninjured members***

14  ***from the class.***  McFadden also does not present "a reasonable and workable plan" for the Court to

15  winnow out uninjured consumers.  *Rail Freight*, 934 F.3d at 625 (denying certification when plaintiffs

16  proposed "no further way—short of full-blown individual trials—to reduce this number and segregate

17  the uninjured from the truly injured" (citation omitted)).  Instead, McFadden states—with no

18  elaboration—that he can "identify [uninjured] Class members individually" because "App Store

19  transactions data provide detailed transaction-level information."  McFadden ¶ 241.  But the numbers

20  of uninjured plaintiffs vary widely depending on what assumptions are adjusted.  Plus, each of these

21  changes alters which accounts are injured.  *See* Prince ¶ 56 (over 26% of accounts changed from

22  harmed to unharmed, or vice-versa, when free apps are factored in).  In short, "this is a case in which

23  any class member may be uninjured, and there are apparently [millions] who in fact suffered no injury,"

24  *Asacol*, 907 F.3d at 53, and McFadden's model provides no mechanism—let alone a "reasonable and

25  workable" one—to weed them out, *see Intuniv*, 2019 WL 3947262, at *7 (winnowing mechanism must

26  "allow [Apple] to challenge class members' individual, purported injury").

27  Even if McFadden's model could reliably identify which accounts, and how many, were injured

28  (and it cannot), Plaintiffs still could not establish classwide injury.  McFadden suggests he can identify

each affected consumer and determine injury and damages "based on Apple ID's."  McFadden ¶ 132 & n.199.  Yet he also concedes that "it is not possible to link different ID's held by the same person, or determine when more than one person shares an ID."  *Id*. ¶ 132 n.199.  Apple's Finance Manager Mark Rollins, confirms this is the case. Rollins Decl ¶¶ 1-7.[6]  As named plaintiffs' own experience shows, it is not uncommon for iOS users to own multiple accounts or share accounts.  Accordingly, McFadden cannot say what any given consumer purchased and therefore whether they would have paid more or less for those purchases in the but-for world.  Ex. 17, 227:4-24.  Indeed, McFadden has not even tried to identify the four named plaintiffs' various Apple IDs to determine whether any of them were injured under his model, and that such a task is "challenging," if not "impossible."  *Id.* 227:25-228:12.   Even taking McFadden's model as given, these "gaps in the record" make it "infeasible" to identify the potentially millions of uninjured class members.  *Williams v. Apple*, --- F.R.D.---, 2021 WL 2186223, at *8-9, *25 (N.D. Cal. 2021) (partially denying class certification when "not only is it likely that the putative class contains many members who never suffered the alleged contractual breach, but also it is infeasible to determine who those injured class members are").

*     *     *

The named plaintiffs cannot meet their predominance burden because they rely on unsound expert opinions regarding classwide impact.  *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 986 (9th Cir. 2020) (no class certification because plaintiffs offered inadmissible expert opinion of alleged classwide defect).  Even if the Court finds that any of McFadden's opinions are *admissible*, that is insufficient to carry their Rule 23 burden.  *Id.* (requiring more than mere admissibility).  McFadden's opinions are also *unpersuasive*—particularly in light of the competing, reliable opinions offered by Apple's experts—which defeats the named plaintiffs' motion.  *Ellis*, 657 F.3d at 982, 984.

## IV.   The Superiority Requirement Is Not Satisfied

The named plaintiffs also have not proved that a class action provides the superior method of adjudicating this dispute.  Fed. R. Civ. P. 23(b)(3).  The named plaintiffs' proposed class action would devolve into a morass of individualized inquiries, and the consumer and developer plaintiffs have failed

---

[6]   This also has import for ascertainability.  *See Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (plaintiff must prove that the class is "readily ascertainable based on objective criteria").

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

to present a manageable trial plan that would avoid duplicative damages.  *See Zinser*, 253 F.3d at 1192 (not superior if "each class member has to litigate numerous and substantial separate issues").

## A.      A Class Trial Would Be Unmanageable

A proper inquiry into the elements of a monopolization claim, including particularly antitrust injury, would require extensive analysis of each putative class member's transaction history, use of the App Store, and benefits conferred.  *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 95, 98 (S.D.N.Y. 2017) (individualized inquiries to determine whether alleged unlawful price fixing would be offset by illegal free downloads would predominate over common issues).  That is because "[a]n antitrust plaintiff may recover only to the 'net' extent of its injury," taking into account "amounts a plaintiff would have expended in the absence of the [alleged] violation."  *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1367 (9th Cir. 1986).

Such an individualized analysis would be a massive and inefficient undertaking.  In *Epic*, for example, a three-week trial was needed just to develop facts related to *one* specific developer and one primary app.  Here, the enormous burden of the individualized inquiries is only amplified by the breathtaking scale of the putative class—at least scores of millions of consumers.  As the Ninth Circuit has observed in a case involving a putative class a fraction of the size of the possible class here:

> In a class of forty million, assuming only ten percent of these unknown class members came forward with claims, and assuming the proof of each claim required only ten minutes, approximately one hundred years would yet be required to adjudicate the claims. Unless the court is to allow the procedural device of the class action to wear away the substantive requirements to maintain a private antitrust cause of action, this suit raises far too many individual questions to qualify for class action treatment.

*In re Hotel Tel. Charges*, 500 F.2d 86, 89-90, 92 (9th Cir. 1974) (reversing class certification and explaining that actions have been dismissed due to manageability alone, "particularly in cases involving large numbers of plaintiff class members"); *Niaspan*, 464 F. Supp. 3d at 718 ("[E]ven if only a small percentage of consumers were uninjured . . . the sheer class size creates significant difficulties" for manageability.)[7]  The Court would need to devote a vast majority of time to "mini-trials" for each putative class member here to cover *at least* (1) what apps a consumer downloaded; (2) the consumer's

---

[7]    The named plaintiffs' bare assertion that individual claims may be "insufficiently large to warrant individual action" does not change this result.  *See In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 583–84 (N.D. Cal. 2013) (declining to certify class despite small individual claims).

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.        CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

actual use and the value derived from those apps; (3) whether, for each app a consumer used, in the but-for world the developer would have passed on alleged savings (or conversely potential price increases) to consumers and, if so, when and to what extent;[8] (4) whether each consumer would have actually used an alternative to the iOS App Store in the but-for world; and (5) whether, on balance, the consumer has benefitted from or been harmed by Apple's App Store policies. *See* Hitt ¶¶ 277. Resolving these complex evidentiary questions for each member of a purported multi-million member class would be extremely burdensome. *E.g.*, *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (individualized inquiries to determine whether shoppers paid higher or lower prices would predominate and render class litigation unmanageable).

### B. Named Plaintiffs and the Named Developers Damages Models Are Irreconcilable

Class certification would also be improper because the injury and damages models proffered by the consumer plaintiffs and the parallel developer plaintiffs are irreconcilable. The Supreme Court has already recognized that Apple could be subject to "multiple suits" brought by both upstream app developers (who set app prices) and downstream consumers (who directly purchase apps) only because consumers could "seek damages based on the difference between the price they paid [for the apps] and the competitive price" (or "the *full amount* of the unlawful overcharge"), while developers would merely "seek lost profits [for offering apps and services] that they could have earned in a competitive retail market." *Pepper*, 139 S. Ct. at 1525. But plaintiffs failed to heed the Supreme Court's guidance, and put Apple (and the Court) in an untenable position by seeking duplicative damages. *See id.* at 1529 (Gorsuch, J., dissenting). As Apple has elsewhere explained, plaintiffs should at minimum be required to address these issues before the Court rules on the certification motions. *See generally* Mot. Tr. Plan. To the extent they are unwilling or unable to do so, that will be yet another reason to deny certification.[9]

### CONCLUSION

For the foregoing reasons, the Court should deny the motion for class certification.

---

[8] This also requires resolving complex individualized issues at the developer level, as the fact-finder would need to determine the competitive conditions that each developer would have faced in the but-for world and how their prices would have changed over time as a result. *See* Dev. Opp. § II.C.

[9] Business practices in the innovative and rapidly changing technology industries also militate against certification. Dev. Opp. § III.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

1

DATED:  August 10, 2021                      GIBSON, DUNN & CRUTCHER LLP

2

3                                                    By: */s/ Mark A. Perry*

4                                                    Theodore J. Boutrous Jr.
                                                     Daniel G. Swanson
5                                                    Mark A. Perry
                                                     Cynthia E. Richman
6                                                    Rachel S. Brass
                                                     Caeli Higney
7

8                                                    *Attorneys for Defendant Apple Inc.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.        CASE NO. 4:11-cv-06714-YGR