# Exhibit 3

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR<br><br>**REPLY IN SUPPORT OF DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE REPLY TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:       Dec. 14, 2021<br>Time:       10:00 a.m.<br>Courtroom: 1, 4th Floor |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ....................................................................................................... 1

    A.    Prof. McFadden's Model and Methods Are Unreliable Whether as Measures of Individual Impact or Aggregate Damage .......................................... 1

    B.    Prof. McFadden's "First Step" But-For Commission Rate Is Unreliable ................... 6

    C.    Prof. McFadden's Model Fails at His "Second Step" ................................................ 11

        1.    Prof. McFadden's Shifting Opinions Cannot Conceal his Model's Fundamental Unreliability and Lack of Fit with Reality ................................ 11

        2.    Prof. McFadden's Econometric Model Is Comprehensively Unreliable ........ 14

    D.    Prof. McFadden's Market Definition Analysis Remains Unreliable ......................... 15

III.    CONCLUSION .................................................................................................... 15

Gibson, Dunn &
Crutcher LLP

i

1

# TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
5        247 F.R.D. 156 (C.D. Cal. 2007) ....................................................................3

6

*Andrews v. Plains All Am. Pipeline, L.P.*,
7        777 F. App'x 889 (9th Cir. 2019) ..................................................................9

8

*Apple v. Pepper*,
9        139 S.Ct. 1514 ..............................................................................................3

10

*In re Asacol Antitrust Litig.*,
        907 F.3d 42 (1st Cir. 2018) ...............................................................2, 3, 4, 5

11

*Atlantic Richfield Co. v. USA Petroleum Co.*,
12        495 U.S. 328 (1990) .......................................................................................3

13

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
        524 F. Supp. 2d 1166 (N.D. Cal. 2007) .........................................................8

14

*Brantley v. NBC Universal, Inc.*,
15        675 F.3d 1192 (9th Cir. 2012) ........................................................................3

16

*Brunswick v. Pueblo Bowl-O-Mat*,
17        429 U.S. 477 (1977) .......................................................................................6

18

*Buxton v. Lil' Drug Store Prods., Inc.*,
        2007 WL 2254492 (S.D. Miss. Aug. 1, 2007) .............................................11

19

*CDW LLC v. NETech Corp.*,
20        2014 WL 272167 (S.D. Ind. Jan. 24, 2014) ..................................................6

21

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
22        773 F.2d 1506 (9th Cir. 1985) ........................................................................8

23

*E.E.O.C. v. Freeman*,
        778 F.3d 463 (4th Cir. 2015) ..........................................................................8

24

*Ellis v. Costco Wholesale Corp.*,
25        657 F.3d 970 (9th Cir. 2011) .....................................................................9, 13

26

*FTC v. Qualcomm Inc.*,
27        969 F.3d 974 (9th Cir. 2020) ..........................................................................3

28

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
        695 F.3d 330 (5th Cir. 2012) ........................................................................15

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF ABBREVIATIONS** *(continued)*

2

3

*In re Graphics Processing Units Antitrust Litig.*,
4
   253 F.R.D. 478 (N.D. Cal. 2008) ..................................................................14

5
*Haller v. AstraZeneca Pharms. LP*,
   598 F. Supp. 2d 1271 (M.D. Fla. 2009) ........................................................11

6
*In re High-Tech Emp. Antitrust Litig.*,
7
   289 F.R.D. 555 (N.D. Cal. 2013) ..................................................................1

8
*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008).........................................................................3
9
*In re Lamictal Direct Purchaser Antitrust Litig.*,
10
   957 F.3d 184 (3d Cir. 2020).........................................................................2

11
*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II)*,
12
   892 F.3d 624 (4th Cir. 2018).......................................................................8

13
*In re Lithium Ion Batteries Antitrust Litig. (Lithium Ion I)*,
   2017 WL 1391491 (N.D. Cal. April 12, 2017) ..............................................13
14
*In re Lithium Ion Batteries Antitrust Litig. (Lithium Ion II)*,
15
   2018 WL 1156797 (N.D. Cal. March 5, 2018) ........................................2, 11

16
*In re Live Concert Antitrust Litig.*,
17
   863 F. Supp. 2d 966 (C.D. Cal. 2012)...........................................................9

18
*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996).........................................................................13
19

20
*Muffett v. City of Yakima*,
   2012 WL 12827492 (E.D. Wash. July 20, 2012)............................................6

21
*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
22
   27 ITRD 1388 (N.D. Ill. 2004) .....................................................................9

23
*Shannon v. Crowley*,
   538 F. Supp. 476 (N.D. Cal. 1981) ...............................................1, 6, 9, 11
24

25
*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016)......................................................................2

26
*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).....................................................................................6
27

28

**TABLE OF ABBREVIATIONS** *(continued)*

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Analysis* ..................................................................9

https://www.bloomberg.com/news/articles/2021-10-21/google-to-slash-the-fee-it-takes-from-subscriptions-on-app-store ..........................................................................................................10

**RULES**

Fed. R. Evid. 702(c)-(d) ............................................................................................................6

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Mot. __** | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| **McFadden ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated June 1, 2021 and filed at Dkt. 442-11. |
| **Class Cert. Opp. at __** | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, filed August 11, 2021 at Dkt. 476-3. |
| **Hitt ¶ __** | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed at Dkt. 476-4. |
| **Prince ¶ __** | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed at Dkt. 476-6. |
| **Schmalensee ¶ __** | Expert Report and Declaration of Richard Schmalensee, Ph.D., dated August 10, 2021 and filed at Dkt. 476-8. |
| **First Mot. to Exclude at __** | Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Daniel L. McFadden, filed Aug. 11, 2021 at Dkt. 476-11. |
| **McFadden Reply ¶ __** | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 and filed at Dkt. 554-5. |
| **McFadden Dep. __** | Transcript of the August 3, 2021 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 574-4. |
| **McFadden Reply Dep. __** | Transcript of the November 5, 2021 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 581-3. |
| **Second Mot. to Exclude at __** | Defendant Apple Inc.'s Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed November 14, 2021 at Dkt. 581-4. |
| **Prince Decl. ¶ __** | Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 9, 2021 and filed at Dkt. 581-5. |
| **Opp. Br. at __** | Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed November 23, 2021 at Dkt. 600. |
| **McFadden Decl. ¶ __** | Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021 and filed at Dkt. 602. |

Gibson, Dunn &
Crutcher LLP

v

**TABLE OF ABBREVIATIONS** *(continued)*

| Abbreviation | Referenced Document |
|---|---|
| **Nov. 16, 2021 Hr'g Tr. at __** | Transcript of Proceedings before the Honorable Yvonne Gonzalez Rogers on Plaintiffs' Motion for Class Certification and Apple's Motion to Strike or Exclude Testimony of Professor Daniel L. McFadden, held November 16, 2021 and filed at Dkt. 606. |
| **Hayter Dep. __** | Transcript of the May 22, 2020 deposition of Edward W. Hayter, noticed and taken in this matter and filed concurrently as an exhibit to the Declaration of Caeli A. Higney in Support of Defendant Apple's Reply. |
| **Lazarus Decl. ¶ __** | Declaration of Eli M. Lazarus in Support of Defendant Apple Inc.'s Reply in Support of Its Daubert Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 30, 2021 and filed concurrently. |
| **Prince Supp. Decl. ¶ __** | Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 30, 2021 and filed concurrently. |
| **Rollins Supp. Decl. ¶ __** | Supplemental Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated Nov. 30, 2021 and filed concurrently. |

Gibson, Dunn & Crutcher LLP

## I.  INTRODUCTION

Prof. McFadden's opinions continue to be a moving target.  Plaintiffs' justifications for those opinions have shifted as well.  But Prof. McFadden's contradictory opinions and refusal to acknowledge his model's many flaws only underscore its fundamental unreliability.  *See Shannon v. Crowley*, 538 F. Supp. 476, 482 & n.20 (N.D. Cal. 1981) (Orrick, J., criticizing Prof. McFadden's recurring "contradictory testimony").  Confronted with overwhelming evidence that their putative class contains a great many uninjured class members and that Prof. McFadden's model cannot reliably prove classwide impact, Plaintiffs now (incorrectly) claim that they need only establish aggregate damages.  But untethering the model from individual injury compounds its lack of reliability and adds an incurable problem of fit to the reasons for excluding the model.  Plaintiffs' efforts to salvage Prof. McFadden's cherry-picked but-for commission rate are also transparent post-hoc rationalizations that do nothing to impart a reliable basis for his conclusions.  Finally, Prof. McFadden's model produces absurd, unrealistic and unreliable aggregate and individual results, including, just as one example, negative but-for-world prices.  These negative prices are pervasive, affecting over 40 percent of accounts in the proposed class, and over a quarter of in-app purchase transactions.  Prince Supp. Decl. ¶ 6.  The model must be excluded.

## II.  ARGUMENT

### A.  Prof. McFadden's Model and Methods Are Unreliable Whether as Measures of Individual Impact or Aggregate Damage

From the start, Plaintiffs assured the Court that the "overwhelming predominant common questions in this case include … whether Apple's monopoly has caused antitrust injury to *Plaintiffs and all other members of the Class*."  Mot. at 2 (emphasis added).  Plaintiffs admitted that "here [they] 'must be able to establish, predominantly with generalized evidence, that *all (or nearly all) members of the class suffered damage* as a result of [Apple's] alleged anticompetitive conduct.'"  *Id.* at 20 (emphasis added) (quoting *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013)).  Plaintiffs undertook to "establish antitrust injury or impact for class certification through expert testimony that generally accepted economic methodologies are available to demonstrate such impact … *on a class-wide basis*."  *Id.* (emphasis added).  In particular, plaintiffs relied on Prof. McFadden, whose

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

primary expert assignment was "to demonstrate whether Apple's misconduct related to the Apple App Store *caused harm to all or virtually all members of the Consumer Class.*"  McFadden ¶ 10 (emphasis added).

But Prof. McFadden's model failed to show injury to all or nearly all class members, or even that there are fewer than "a great number" of uninjured class members.  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016).  Prof. McFadden initially estimated that "approximately 5.8 per-cent of the Consumer Class members" fell into the category he deemed to be "uninjured," McFadden ¶ 241, and opined that he did "not expect [his] assessment of the size of the uninjured Class members to change significantly."  *Id*. ¶ 241 n. 310.  His 5.8% calculation, however, evaporated once he cor-rected for his coding errors and his concededly flawed definition of injury.  His baseline modeling now shows that a *bedrock minimum* of 15% of accounts (almost 30 million) are unharmed, McFadden Reply ¶ 209; Prince Decl. ¶¶ 19, 45 & Fig. 1, and Prof. Prince's analyses show that the actual number of uninjured accounts is most likely *far higher* and potentially over 55%.  Prince Decl. ¶¶ 4, 8, 19; *see also* Prince Supp. Decl. ¶¶ 34-35.

Rather than acknowledging these damning facts, Plaintiffs abandon or ignore their prior repre-sentations about the requirements of the law, now claiming that Prof. McFadden's opinions pass *Daub-ert* scrutiny *regardless* of whether his methods can reliably show classwide impact.  Plaintiffs assert that their expert need do no more than "testify as to the *aggregate* damages suffered by all [sic] Class members."  Opp. Br. at 6 (emphasis omitted).  But reliance on aggregate damage modeling in such circumstances to show classwide injury would be "demonstrably wrong."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 54 (1st Cir. 2018); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194-95 (3d Cir. 2020) (error to merge standards for proof of classwide injury with proof of damages).  "At class certification, 'the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of expert testimony in light of the criteria for class certification … '"  *In re Lithium Ion Batteries Antitrust Litig. (Lithium Ion II)*, 2018 WL 1156797 (N.D. Cal. March 5, 2018).  As plaintiffs them-selves conceded, *see* Mot. at 2, 20, the criteria for class certification compel them to tender reliable

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO                                    NO. 4:11-cv-06714-YGR
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

expert evidence showing that *all or nearly all members of the class* suffered antitrust injury.[1]

"[I]ndividual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). Prof. McFadden's aggregate damage calculations, however, cannot show that all or virtually all class members were injured.[2] This is beyond rational dispute. That the class will *necessarily* include many uninjured class members is not some kind of "fortuity" but rather a consequence of undeniable features of the real world.[3] Despite ignoring or minimizing most of these features, Prof. McFadden's model and methods still generate *tens of millions* of uninjured Apple ID accounts.

Plaintiffs assert nonetheless that they "will *not* be required to calculate individual Class member losses," and that Prof. McFadden's aggregate damage estimate can be justified on the basis that it will "net[] out" any "negative damages" against "positive damages." Opp. Br. at 6 (emphasis omitted); *see also id.* at 7-9. Not so. In this case, aggregate damages are not "independent of the number and identity

---

[1]   Plaintiffs' authorities regarding "'class-wide, aggregate techniques to calculate *individual damage awards*'" are irrelevant. Opp. Br. at 7 (emphasis added) (quoting *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 175 (C.D. Cal. 2007)). Although *Allied Orthopedic* acknowledged that using "aggregate techniques" for "individual damage awards" was "routine," the court denied certification because, inter alia, plaintiffs failed to "show[] a viable way that common evidence could prove *antitrust injury*." 247 F.R.D. at 175 (emphasis added).

[2]   Nor can plaintiffs fall back on the assertion that "[e]very class member suffered reduced choices." Opp. Br. at 12. In the first place, plaintiffs have always relied on Prof. McFadden's opinions to show classwide injury. *See* Mot. at 12, 19-21. Regardless, the Supreme Court has flatly rejected the theory that the antitrust injury requirement can be satisfied when the "removal of some elements of price competition distorts the markets" and thereby "harms all the participants." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990). "Every antitrust violation can be assumed to 'disrupt' or 'distort' competition," but the "antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity." *Id.* Similarly, "[a]llegations that conduct 'has the effect of reducing consumers' choices or increasing prices to consumers do[ ] not sufficiently allege an injury to competition ... [because] [b]oth effects are fully consistent with a free, competitive market.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (citations omitted)).

[3]   Examples of these features include .99 pricing (*see Apple v. Pepper*, 139 S.Ct. 1514, 1528 (Gorsuch, dissenting) (such pricing "creates a strong disincentive for developers to raise their prices"); developers with zero variable costs (*see* McFadden ¶ 225 n. 295 ("the app download price would not change when the App Store commission changes if the variable cost is zero")); developers that monetize via advertising (*see id.* ¶ 225 ("this app developer may increase its IAP price at a lower commission rate")); consumers who would transact through the App Store even at a higher commission rate (*see* Hitt ¶ 320 ("Many proposed consumer class members would thus likely continue to transact through the App Store in the but-for world, even if the App Store maintained its current commission rates in the but-for world")); and special pricing for subscription apps (*see* Prince Supp. Decl. ¶¶ 30-32).

Gibson, Dunn &
Crutcher LLP

of people harmed." *In re Asacol*, 907 F.3d at 55.  When properly calculated, "the aggregate damage amount is the sum of damages suffered by a number of individuals, such that proving that the defendant is not liable to a particular individual because that individual suffered no injury reduces the amount of the possible total damages." *Id.*  Prof. McFadden's model, however, is not constructed in this way and generates aggregate damages by including fictional injuries that class members have not suffered, such as damages due to negative but-for prices.  Thus, when directly asked by the Court to address "the specific topic" of whether the model overstates damages because Prof. McFadden's "dollar amount" assumption generates negative prices, Plaintiffs' counsel confirmed that "[Prof. McFadden] calculated the change in in-app purchases on a dollar amount.  And it's correct, that . . . some of the amounts [of in-app purchases] in the but-for world turn negative."  Nov. 16, 2021 Hr'g Tr. at 10:11-21.  Indeed, almost 10% of the class accounts *are harmed by more than their total real-world spending*.  Prince Decl. ¶ 50.  As another example of how his aggregate calculations ignore individual damages, Prof. McFadden proposes to ignore .99 pricing of in-app purchases, on the basis that his approach is "conservative" and that accounting for such pricing would increase total damages.  But this is not correct.  If focal-point pricing were applied to *both* app downloads and in-app purchases in Prof. McFadden's model, a full 23.1% of class accounts would be uninjured and damages would fall by hundreds of millions of dollars.  *See* Prince Supp. Decl. ¶¶ 35-36; *infra* § II.C.1.

Plaintiffs' position that Prof. McFadden's method passes *Daubert* muster because "Prof. McFadden can identify individual Class member losses" after the "Court has entered a judgment against Apple for an aggregate damages number," Opp. Br. at 9 (emphasis omitted), is untenable.  Setting aside the legal bar to placing the damages cart before the injury horse, plaintiffs' approach ignores the inability of Prof. McFadden's models and methods to reliably and consistently identify uninjured class members even when yielding similar aggregate results.  As Prof. McFadden himself admitted, "it's quite easy for individuals to flip from injured to uninjured" and there is "shuffling in and out" of accounts from the harmed to unharmed and *vice versa*.  McFadden Reply Dep. at 141:25, 205:24-206:8.  This problem is even more pronounced under Prof. McFadden's so-called "all apps" model, which generates between 13.3 and 24.7 percent in uninjured class accounts when run across 75 random samples.  Prince Supp. Decl. ¶ 21.

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

1   Further, as discussed below and in Prof. Prince's declarations, there are a multitude of assump-

2   tions and modeling choices made by Prof. McFadden that are unrealistic or otherwise unjustified and

3   that lead to large swings in the total damages estimate—and those swings lead to vast gyrations in the

4   number of unharmed class members.  Prof. McFadden's model is a black box and the jury will be at

5   sea when it comes to any determination of how aggregate damages relate to the damages of injured

6   class members.  Prince Supp. Decl. ¶ 17.  And the task can hardly be left to a claims administrator.  *In*

7   *re Asacol Antitrust Litig.*, 907 F.3d at 52 ("One can only guess what data and documentation may be

8   deemed necessary, what the formula will be, and how the claims administrator will decide who suffered

9   no injury.").

10   All of this will be made even more unreliable by the need to link hundreds of millions of Apple

11   IDs together, so that the predicate determination of *impact* can be made at the actual class member

12   level.  As an initial matter, Plaintiffs' inability to link multiple Apple IDs to any individual class mem-

13   ber has nothing to do with Apple's anonymization of the Consumer ID variable—which Plaintiffs ex-

14   plicitly "d[id] not object to." Lazarus Decl. ¶ 10.[4]  Far from seeking to use this as a "shield," Apple

15   flagged this issue for the consumer plaintiffs in response to their interrogatories, but plaintiffs *never*

16   *sought* un-anonymized Consumer IDs nor any other information that would allow them to link Apple

17   IDs to individual consumers.  *Id.* ¶¶ 14-18.  The only way to perform the "matching" that plaintiffs

18   now suggest is through manual, one-by-one queries of individual transaction histories, Rollins Supp.

19   Decl. ¶¶ 5-7—a process that is simply not feasible to undertake for the many hundreds of millions of

20   Apple ID accounts with paid app downloads or in-app purchases during the class period.  Moreover,

21   the same issue would exist even if Apple had produced data with un-anonymized Apple ID account

22   information, because consumers may have used different contact information and billing methods for

23   different Apple ID accounts over the course of the last thirteen years.  *See id.* ¶¶ 7-9.[5]  Named Plaintiff

24   Lawrence's Apple ID records demonstrate as much.  *Id.* ¶¶ 10-13.

---

25   [4]   The only objection Plaintiffs voiced was to the use of a hash value for the anonymized Con-
sumer IDs that they thought was too long.  Lazarus Decl. ¶¶ 10-11.

26   [5]   Plaintiffs criticize Mr. Rollins for not being able to quantify precisely how often this occurs,
27   Opp. Br. at 11, but such quantification would require the same manual review of individual transaction
histories described above.  Rollins Supp. Decl. ¶ 14.  As Mr. Rollins explains, he has no reason to
28   believe it would not occur in a significant number of cases given the way in which the information is
collected (without any verification required by Apple).  *Id.* ¶ 15.

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO                        NO. 4:11-cv-06714-YGR
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

Plaintiffs argue that they could alternatively match Apple IDs to consumers "by obtaining a list of Apple IDs from each Class member." Opp. Br. at 10. But there is likewise no evidence that this would be a feasible or reliable methodology. Indeed, even when presented with a list of possible Apple IDs associated with his name, named Plaintiff Edward Hayter could not confirm whether or not they belonged to him. Hayter Dep. 71:22-73:15 ("I can't remember all of the I.D.s and what have you"). There is no reason to believe the same would not be true for millions of other putative class members. Certifying the proposed class on the speculative basis that individuals could identify all of their Apple IDs *after* a trial on liability would ignore the requirement that each class member prove they suffered antitrust injury as part of the liability determination, *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977), and deprive Apple of its ability to "litigate its statutory defenses to individual claims," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

**B.     Prof. McFadden's "First Step" But-For Commission Rate Is Unreliable**

Prof. McFadden's entire model of injury and damages rests on his opinion that Apple would have charged a 10 or 12% uniform commission on the App Store from its inception in 2008 through the present had it faced additional competition. But he ignored the most relevant comparators, including most prominently the Mac App Store, while cherry-picking—without methodological support, mathematical or otherwise—the commission rates based on a *small subset* of non-comparable competitors over a *limited period of time*. Because his opinion is not based on a reliably implemented methodology, it must be excluded. Fed. R. Evid. 702(c)-(d).

**1.  Prof. McFadden does not use a reliable market-based benchmark.** Here, the question is what competitive conditions (e.g., commission rates) would have looked like absent Apple's alleged conduct. Thus, the appropriate benchmark is a competitive *market* price (here, commission rate) absent the alleged conduct, not what a particular competitor charged. *See Shannon*, 538 F. Supp. at 480-81 (describing the appropriate measure of damages as based on "an objective indicium of the competitive price level" in the market); *see also Muffett v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012) (excluding yardstick analysis as unreliable where expert failed to consider potential differences between comparator markets); *CDW LLC v. NETech Corp.*, 2014 WL 272167, at *3 (S.D. Ind. Jan. 24, 2014) (excluding yardstick analysis where expert failed to consider whether "market

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

forces" were similar between comparators).  Recognizing this, Plaintiffs claim that Prof. McFadden used the "*market* for PC game app stores" as his benchmark.  Opp. Br. at 19 (emphasis added); *see also* Nov. 16, 2021 Hr'g Tr. at 28:12-16 (defining "benchmark" as "an appropriate comparator to the effective *market* that is free of the … anti-competitive conduct or other distortion that has affected the pricing in that *market*.") (emphasis added).  In reality, however, Prof. McFadden now admits he used just three PC game app stores—Microsoft, Epic, and Discord, *see* McFadden Reply ¶ 41—none of which is an "appropriate comparator" to the App Store, and which together certainly are not representative of the "market for PC game app stores" since 2008.

If Prof. McFadden had actually undertaken a benchmark study of the "market for PC game app stores" since 2008, a different picture would have emerged:  In a "competitive" PC game app store market, marked by multiple competitors (and entry and exit both before and after the entrance of the Epic Games Store), the vast majority of developers paid 30% commissions for the vast majority of the class period.  For example, Valve's Steam, which Prof. McFadden previously recognized as a relevant data point (McFadden ¶¶ 156-157), charges a headline 30% commission rate, with only a small fraction of developers qualifying for the reduced 25% or 20% rates.[6]  Hitt ¶¶ 91-92 & Fig. 20.  Microsoft charged 30% for game apps until just recently (nearly three years after the launch of the Epic Games Store).  Hitt Fig. 20.  GOG—a PC games store McFadden does not mention—charges a 30-40% commission rate.  *Id.*  And the most apt indicator of what *Apple* would do when faced with competing commission rates, the Mac App Store, has, prior to and throughout the existence of the Epic Games Store, charged a 30% headline commission, including for game apps sold there.  *Id.*  Likewise, Prof. McFadden ignores all Android app stores, which had 30% headline commission rates.[7]  Instead, Prof. McFadden relied upon a brand-new lower commission rate from Microsoft (not effective until August 1, 2021) and two platforms—Epic Games Store and Discord—that charge lower commission rates but either went out of business after a few months (Discord) or are not profitable (Epic Games Store).

[6]    Plaintiffs claim that Steam cut its rates from 30% to 25% to 20% in response to Epic's entry. Opp. Br. at 23.  In fact, Steam maintains a 30% commission rate for nearly all developers, and only a small number of very large games receive a lower commission rate based on their total sales.  Hitt ¶ 92.

[7]    Plaintiffs argue that this omission is justified by the fact that Epic and others have sued Google for allegedly violating the antitrust laws.  Opp. Br. at 20 n. 21.  But there is no allegation that Samsung and Amazon were engaged in similar conduct.  Regardless, if involvement in litigation is sufficient to render a comparator inapt, then Epic and Microsoft would have to be excluded too.

McFadden Reply ¶ 41; *see also* Hitt ¶¶ 100, 102 & Fig. 20.

A reliable implementation of benchmarking does not involve cherry-picking, but that is exactly what Prof. McFadden has done. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1512 (9th Cir. 1985) ("[T]he burden of anticipating this hypothetical market is appropriately placed on antitrust plaintiffs" and  "antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market.").  Indeed, "courts have consistently excluded expert testimony that 'cherry-picks' relevant data." *E.E.O.C. v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (collecting cases); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II)*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the sci-entific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert testimony for "cherry-picking").  Here, Prof. McFad-den ignores the obvious differences between his selected comparators and "PC games app store market" in which those stores competed—not to mention the differences between an app store like Discord and Apple's App Store.  *See* First Mot. to Exclude at 10-12.

Prof. McFadden's cherry-picking is not limited to his selection of comparators—it also extends to his opinion regarding *when* Apple would have implemented the 10 or 12% commission rate.  Based on commissions *now* (or recently, in the case of the defunct Discord) charged by Epic, Discord, and Microsoft, Prof. McFadden opines that the App Store commission rate would have dropped to 10 or 12% in *2008*, when Apple first opened the App Store.  But two of his three comparators (Epic and Discord) did not even exist at that time, and the third (Microsoft) charged 30% at that time.  In essence, Prof. McFadden assumes that the App Store, immediately upon entry, would have matched the *lowest* commission charged by a firm in the PC game app store market *ever*.  He offers *no* support—mathe-matical or otherwise—for this assumption.

Because he offers no valid reasoning or discernable methodology for choosing to benchmark the App Store to commission rates charged by a small, unrepresentative portion of the PC game app store market from a small slice of time, and for choosing to apply that benchmark *uniformly* to all App Store transactions over the course of the App Store's entire history, Prof. McFadden's implementation

is "unreliably implemented"—leading to speculative results and necessitating exclusion.[8]   Areeda &

Hovenkamp, *Antitrust Analysis* ¶ 399b.  Indeed, the use of benchmark analyses is frequently a ground

for exclusion, and Prof. McFadden's opinions have been excluded on these grounds before.  *Shannon*,

538 F. Supp. at 481 (excluding Prof. McFadden's benchmark analysis where his opinions failed to

account for important aspects of the benchmark market); *see also In re Live Concert Antitrust Litig.*,

863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (excluding expert's opinions using yardstick methodology

where expert failed to account for key differences between allegedly anticompetitive ticket prices (for

rock concerts promoted by Defendants) and the yardstick ticket prices (for rock concerts promoted by

others), such as "venue size []or artist popularity, or any other variable"); *R.J. Reynolds Tobacco Co.*

*v. Premium Tobacco Stores, Inc.*, 27 ITRD 1388 (N.D. Ill. 2004) (excluding expert's benchmark anal-

ysis where the resultant numbers were "not derived from any valid reasoning or methodology. Rather,

they are conjured virtually out of thin air.").

**2. Plaintiffs cannot salvage Prof. McFadden's unreliable methodology with reference to**
**other irrelevant facts and other analyses not relied upon by Prof. McFadden.**  Plaintiffs now at-

tempt to point to Google's recent announcement that it would cut its commission on Google Play app

subscriptions from 30% to 15%, stating that it "strongly suggests that Prof. McFadden's benchmark is

economically reasonable."  Opp. Br. at 20.  But Prof. McFadden did not actually consider Google.  In

fact, he rebuked it as a possible comparator.  McFadden Reply ¶ 44 & n.72.  Plaintiffs cannot salvage

Prof. McFadden's lack of analysis by citing a datapoint he overtly rejected.  Even if it were relevant,

however, it does not justify Prof. McFadden's 10-12% rate.  Google's change is not an across-the-

---

[8]     Even if the Court concludes that Prof. McFadden's cherry-picking of a commission rate does
not render his opinions inadmissible, the Court must still determine whether they are sufficient to cred-
ibly show that individualized questions would not predominate.  *See Ellis v. Costco Wholesale Corp.*,
657 F.3d 970, 984 (9th Cir. 2011) ("Instead of examining the merits to decide this issue, it appears the
district court merely concluded that, because both Plaintiffs' and Costco's evidence was admissible, a
finding of commonality was appropriate.  The district court applied an impermissible legal criteria, and
failed to resolve the critical factual disputes." (citation omitted)); *Andrews v. Plains All Am. Pipeline,*
*L.P.*, 777 F. App'x 889, 892 (9th Cir. 2019) ("The district court abused its discretion by failing to
'judg[e] the persuasiveness of Rupert's model and by failing to 'resolve [the] factual disputes neces-
sary' to determine whether the model provided common proof.").  Indeed, Prof. McFadden's arbitrary
commission rate results in at least 15% (and approximately 30 million) uninjured accounts, and if the
Court does not accept Prof. McFadden's uniform commission rate from 2008 to present, Plaintiffs have
not provided sufficient evidence for the Court to make a finding about how many *more* unharmed
accounts would result from employing more plausible commission rates.

*(Cont'd on next page)*

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

board one, as Plaintiffs imply, but instead applies *only to subscriptions*.  Other transactions remain subject to Google's 30% commission.[9]  Further, Plaintiffs do not explain why a change in a commission rate in 2021 is relevant to the price Apple would have set in 2008, and ignore that Apple adopted a 15% commission rate for subscription renewals well before Google changed its rate, and also charges 15% for developers who qualify for its Video Partner Program and small business developers.  *See* Hitt Fig. 19.  This highlights yet another flaw in Prof. McFadden's model, which is constructed to find common impact, not to determine scientifically whether it exists: His model is not capable of accounting for a change like the one Google made—lowering the commission only for subscriptions.[10]  Prince Supp. Decl. ¶¶ 30-32.

Finally, Plaintiffs attempt to point repeatedly to Prof. McFadden's "mathematical analysis of Apple's profit margins," which is the only facet of Prof. McFadden's benchmark analysis that used math.  Opp. Br. at 21; *see also id.* at 18-19, 22, 24.  But that "analysis" does not make his selection of a 10 or 12% rate from the purported benchmark market any less arbitrary—according to his math *all* of the alternative commission rates would have been *more* profitable per transaction, and Prof. McFadden acknowledges in other contexts that any firm would select a "profit-maximizing price."  *See, e.g.*, McFadden Reply ¶ 71; *id.* ¶¶ 37, 57, 81.  Plaintiffs claim that Prof. McFadden's chosen commission rate is "reasonable and reliable" because it is "sufficient to allow Apple to earn a healthy 25% net profit margin."  Opp. at 22.  But Prof. McFadden does not actually opine that a 25% commission rate is "healthy" (*see* McFadden ¶ 161), has provided no evidentiary basis for such a conclusion, and does not establish what a normal profit margin in the industry would be.  Both the commission rate itself and a determination of what profit margin would be acceptable are based—circularly—on Prof. McFadden's own arbitrary preferences and conclusions, not on actual evidence.  But in any case, Prof. McFadden's profit margin analysis is itself unreliable.  First Mot. to Exclude at 15-16.

---

[9]   https://www.bloomberg.com/news/articles/2021-10-21/google-to-slash-the-fee-it-takes-from-subscriptions-on-app-store (article Plaintiffs themselves rely on).

[10]   Similarly, Plaintiffs' reliance on developer plaintiffs' expert Prof. Economides's selection of a 15% rate does not salvage Prof. McFadden's lack of analysis.  To the contrary, Prof. Economides's methodology highlights Prof. McFadden's lack of reliable analysis, as Prof. Economides attempted to use quantitative analysis to determine the but-for commission rate, in contrast to Prof. McFadden.  But even so, Prof. Economides's analysis was riddled with flaws, and should not be credited.  *See* Hitt ¶¶ 136-171, 375-387.

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

## C.     Prof. McFadden's Model Fails at His "Second Step"

Regardless of the reliability of Prof. McFadden's but-for commission methodology at the "first step" of his model, his failures at the next step—employing ever-shifting assumptions, generating unrealistic or absurd results, embracing statistically indefensible estimates—independently warrant exclusion.  See First Mot. to Exclude at 16-22.

### 1.     Prof. McFadden's Shifting Opinions Cannot Conceal his Model's Fundamental Unreliability and Lack of Fit with Reality

Prof. McFadden's model has repeatedly changed as Apple has identified flaws in it.  We are now left—at the end of expert discovery—not even knowing what methods Prof. McFadden intends to rely on to prove classwide injury and damages.[11]  This is not the first case in which Prof. McFadden has offered inconsistent opinions.  The late Judge Orrick previously excluded Prof. McFadden's testimony in part because he repeatedly contradicted himself, noting that, although a credibility determination was not "necessary to [the court's] disposition, . . such contradictory testimony from an expert witness might result in jury confusion were it to be presented at trial."  *Shannon*, 538 F. Supp. at 482 & n. 20.

*First*, as described above, Prof. McFadden fails to model the reality of .99 pricing, despite his own acknowledgment that many apps would use such pricing.[12]  *See* McFadden Reply Dep. at 152:1-154:4; *supra* § II.A.  He acknowledges that "the percentage of unharmed Apple IDs *increases* … with price tiers," McFadden Reply ¶ 117 (emphasis added), yet because some injured accounts would supposedly have even higher damages in the but-for world, Plaintiffs claim that the net result overall is

---

[11]     Plaintiffs do not dispute the basic principle that "shifting statements underscore the lack of reliability of [an expert's] opinion," though they attempt to distinguish the cases Apple cited for this proposition on their facts.  *Buxton v. Lil' Drug Store Prods., Inc.*, 2007 WL 2254492, at *14 (S.D. Miss. Aug. 1, 2007); *see also Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1296 (M.D. Fla. 2009) ("[W]hat is most troubling is that the underpinnings of [the expert's] opinions have changed in direct response to [the defendant's] motion practice.").

[12]     Contrary to Plaintiffs' assertion, this is not a "new argument."  See Opp. Br. at 15; Class Cert. Opp. at 21 (arguing that focal-point pricing would not "disappear in the but-for world" because it "is common-place in competitive markets").  Plaintiffs attempt to distinguish the Court's denial of class certification where the plaintiffs' expert failed to properly model focal-point pricing in *Lithium Ion II*, 2018 WL 1156797, at *3-5, on the ground that the plaintiffs in that case were indirect purchasers. But there is no dispute that Plaintiffs' damages claims are functionally identical to those in *Lithium Ion II*: they claim third parties (developers) passed through an alleged overcharge.

that modeling price tiers "causes aggregate damages to rise" and that ignoring focal pricing is "conservative." Opp. Br. at 2, 15. But this is based on an analysis of download prices only and as Prof. Prince shows, the approach is not conservative in the least since actually accounting for .99 pricing for all prices including in-app purchases *reduces* aggregate damages by hundreds of millions of dollars. Prince Decl. ¶ 55; Prince Supp. Decl. ¶ 34. There is simply no defense for Prof. McFadden's damage model's treatment of millions of accounts that would *not* be harmed in the presence of .99 pricing as (falsely) injured accounts.

*Second*, although he has twice (incorrectly) denied it in deposition before later purporting to correct his testimony, Prof. McFadden's model predicts that prices for over a quarter of in-app purchases in the but-for world would be negative. Prince Decl. ¶¶ 47-51; McFadden Reply Dep. at 120:22-124:01. This is because the model aggregates all in-app purchases for a particular app in the but-for world, then adjusts them downward by a fixed dollar amount. Prince Decl. ¶ 47. Plaintiffs confirmed this in open court, as noted above. Nov. 16, 2021 Hr'g Tr. at 10:18-21. Yet Prof. McFadden once again baldly claims that he scaled but-for prices for in-app purchases down by a percentage amount instead of a fixed dollar amount in his opening report, and that "[n]one of the But-For prices used in the[] calculations" in his Opening Report "is negative." McFadden Decl. ¶ 5; *id.* at ¶¶ 6, 11. If Prof. McFadden is redefining the term "but-for price" to suit his current story, then his denial is Orwellian.[13] And there is no doubt that he is contradicting his own most recent deposition testimony. McFadden Reply Dep. At 122:19-123:8 ("In my first deposition, I already stated in error that it was a percentage adjustment, and then I corrected that . . . [n]ow, in the reply report, all the calculations continue to use the dollar method . . . .).

Prof. McFadden has never run a model with the "percentage method," so his actual opinions—upon which Plaintiffs request class certification—are based on analyses that he now purports to reject.

---

[13]   In-app purchase prices are not set "at the app level," as Prof. McFadden and Plaintiffs contend, Opp. Br. at 14 (emphasis omitted), but are rather set individually, resulting in different prices for different items within the same app. Prince Supp. Decl. ¶ 26-29. Apple has repeatedly challenged the contention that it is reasonable to assume that all purchase prices for a given app would be priced uniformly, contrary to Plaintiffs' assertion that Apple "does not challenge this assumption." *See* Opp. Br. at 14; Prince Decl. ¶¶ 47-49 ("one must predict the but-for prices" for individual purchases, not "an abstract conglomerate of all in-app purchases available for a given app"); Schmalensee ¶ 207; Prince ¶¶ 73-81. Indeed, "Prof. McFadden's simplistic assumption does not make any economic sense." Prince Supp. Decl. ¶ 29.

*See* McFadden Decl. ¶ 11; Prince Decl. ¶ 52; Prince Supp. Decl. ¶ 8.  But while the dollar method produces preposterous negative prices, the new percentage method set forth in Prof. McFadden's declaration is incompatible with the way in which he computes total damages.  Applying this "percentage method" results in a sum of individual damages that is roughly half the aggregate damages produced by his model.  Prince Supp. Decl. ¶ 8-10.  Moreover, the percentage method, no matter how it is implemented, would not be consistent with .99 pricing in the but-for world.  *Id.* ¶ 11.  And it would still produce a vast number of uninjured accounts, while purporting to solve for (and yet not solving) that very problem.  Prince ¶¶ 20 n.40, 22 n.42, 26 n.55, 34 n.81, 36 n.84, 46 n.121; Prince Supp. Decl. ¶ 8.

*Third*, Prof. McFadden's opposition declaration appears to revert to several aspects of his original model and damages calculations that he has subsequently acknowledged were incorrect, leaving it unclear which version of his model he now relies upon.  *See* Prince Supp. Decl. ¶¶ 12-16.

*Fourth*, Prof. McFadden has failed to provide any guidance on how his model should be applied to the 24 app genres in the App Store besides games, music, and entertainment, apparently intending to perform that analysis at a later date.  *See* Second Mot. to Exclude at 15; *see also In re Lithium Ion Batteries Antitrust Litig. (Lithium Ion I)*, 2017 WL 1391491, *17 (N.D. Cal. April 12, 2017) (rejecting class certification model that was "insufficient to run an analysis as to . . . other product[] types covered by the class definition").  Plaintiffs' only response to this criticism is that *Apple's* expert, Prof. Prince, has failed to adequately extend Prof. McFadden's model.  Opp. Br. at 17.  But it is *Plaintiffs'* burden to put forth a model that can reliably determine injury and damages for all consumers, and Prof. McFadden has failed to explain how his model should be extended to other app genres.  *See Ellis*, 657 F.3d at 979-80; *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); Prince Supp. Decl. ¶ 21.

*Fifth*, Prof. McFadden has oscillated on how to model the relationship between the number of times an app is downloaded and the prices of in-app purchases, proposing to simply remove the coefficient expressing that relationship from part of his model following Apple's critique.  McFadden Reply ¶¶ 174, 177; Prince Decl. ¶¶ 12, 41-46.  Plaintiffs defend this choice by asserting that the relationship between the two is not statistically significant.  Opp. Br. at 15-16.  But this defies logic, begs the question of why the coefficient remains present elsewhere in the model, and leaves it entirely unclear

Gibson, Dunn & Crutcher LLP

how or whether Prof. McFadden plans to model this relationship in the 24 remaining app genres.  Prince Supp. Decl. ¶ 37-41.  This is not an inconsequential issue: removing this variable entirely from the model reduces damages by over $1 billion.  *Id.* ¶ 38.

While Plaintiffs argue that Prof. McFadden need not "present a final and complete damages model" at the class certification stage, Opp. Br. at 17, they do need to show that they have a "viable method for demonstrating class-wide antitrust injury based on common proof."  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 497 (N.D. Cal. 2008).  The internal inconsistency and lack of connection with reality exhibited by Prof. McFadden's opinions, not to mention the vagueness in what those opinions even are, mean that Plaintiffs have failed to make this showing.

### 2.    Prof. McFadden's Econometric Model Is Comprehensively Unreliable

Nowhere is the inconsistency and unreliability of Prof. McFadden's model more apparent than in the fact that it produces widely divergent results when applied to different random samples.  Prof. Prince demonstrated this using Prof. McFadden's original model, *see* Prince Decl. ¶¶ 33-40, and has now run Prof. McFadden's "refined" "all apps" model on 75 random samples.[14]   After adjusting for Prof. McFadden's data-processing error, Prof. Prince finds that the proportion of uninjured accounts varies from 13.3 percent to 24.7 percent.  Prince Supp. Decl. ¶ 21.  Plaintiffs attempt to brush aside the statistical flaws in Prof. McFadden's model by asserting that, "whatever their number, [any] uninjured class members can be identified and excluded."  Opp. Br. at 5.  But as Prof. Prince explains:

> Any reliable method applied to two different but statistically representative, large samples should yield similar results. That is not the case with Professor McFadden's method. Furthermore, under his method, it would not be clear which accounts to exclude as unharmed because the number of unharmed accounts vary widely across samples. How would the jury determine which accounts are harmed? Which sample should be used to determine harm? Professor McFadden cannot argue that his first sample is the "right one"—any sample is equally valid.

Prince Supp. Decl. ¶ 25.

In his initial Declaration, Prof. Prince identified the fundamental econometric error—employing what statisticians call "weak instruments"—that vitiates Prof. McFadden's model and makes it

---

[14]    In another Orwellian touch, Prof. McFadden's "all apps" model actually estimates prices for only about 80,000 of the ███ apps with a paid transaction in the Games, Music and Entertainment genres.  Prince Supp. Decl. ¶ 21.

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR

susceptible to generating wildly varying results.  Prince Decl. ¶¶ 33-40.  Prof. Prince applied the tests that are "standard professional practice for econometricians to test whether their instruments are weak" and concludes as a result that "when instruments are this weak, the final results are strongly driven by random chance."  *Id*. ¶¶ 38-40; *see also* Prince Supp. Decl. ¶ 23.  Tellingly, Prof. McFadden offers not one word of contradiction.  For their part, Plaintiffs argue that the variation between random samples is instead a result of "standard error," Opp. Br. at 3-5, but no expert has sworn to that and Prof. Prince explains why it is not correct.  Prince Supp. Decl. ¶¶ 22-24.  The Court should not rely on Plaintiffs' unsupported assertions that Prof. McFadden's methods are reliable.

## D.    Prof. McFadden's Market Definition Analysis Remains Unreliable

Prof. McFadden's approach to market definition remains inherently flawed.[15]  *See Coronavirus Reporter v. Apple Inc.*, No. 21-cv-05567-EMC, Dkt. 85 at 21 (N.D. Cal. Nov. 30, 2021) ("Plaintiffs' failure to allege relevant markets that encompass or even address the two-sided nature of the iOS App market renders their market definitions insufficient as a matter of law.").  Plaintiffs suggest that he actually embraces a two-sided market definition, but Prof. McFadden has never said this in any report.  *See* McFadden Dep. at 33:12-17 ("Q. And can you tell me where you say that in your report, that your market definition applies to both sides? … [A.] Well, I don't say it in the report….").  Indeed, in his reply report he opined that his damages are "conservative" because he has not followed a two-sided market framework.  McFadden Reply ¶ 263.  And contrary to the claims of Plaintiffs, Prof. McFadden's aftermarket theory is at odds with the Court's finding in *Epic* that there has been "no material change in the conditions for accessing the App Store for either side of the platform" since the launch of the iPhone—a finding that is dispositive on the issue of whether the App Store is a cognizable aftermarket, and that applies equally to the facts here.  2021 WL 4128925, at *89; *see also* McFadden Reply ¶¶ 216-229.

## III.    CONCLUSION

For the foregoing reasons, Prof. McFadden's reply opinions in support of Named Plaintiffs' Motion for Class Certification are unreliable and should be excluded.

---

[15]    Plaintiffs must reliably establish the market at issue at the class certification stage to enable the Court to properly assess whether common issues in that market predominate.  *See Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 349 (5th Cir. 2012).

DATED:  November 30, 2021

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Mark A. Perry*

Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Jay P. Srinivasan
Mark A. Perry
Cynthia E. Richman
Veronica S. Moyé
Ethan D. Dettmer
Rachel S. Brass
Caeli A. Higney

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY IN SUPPORT OF *DAUBERT* MOT. TO
EXCLUDE REPLY TESTIMONY OF DANIEL L. MCFADDEN

NO. 4:11-cv-06714-YGR