# Exhibit 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |
| DONALD R. CAMERON, et al.<br><br>*Plaintiffs*,<br>v.<br><br>APPLE INC.,<br>*Defendant,* | Civil Action No. 4:19-cv-03074-YGR |

# EXPERT REPORT AND DECLARATION OF ROBERT D. WILLIG

August 10, 2021

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

II.   Assignment and Summary of Conclusions ............................................................... 5

    II.B.   Summary of Conclusions ............................................................ 5

IV.   An Overview of Market-Definition Methodology ............................................... 16
V.    The App Store Is a Two-Sided Transaction Platform, Both Sides of Which Must Be
      Included in the Relevant Market ...................................................................... 19
VI.   Plaintiffs' Experts Are Incorrect to Cluster All iOS App Transactions into a Single
      Relevant Market ............................................................................................ 22

    VI.A.   Products that are not close substitutes can sometimes be aggregated into a
            "cluster market" for analytical convenience, but only when the competitive
            conditions under which the constituent products are sold are sufficiently
            similar   ........................................................................................ 22

    VI.B.   Plaintiffs' experts fail to perform any reliable analysis to support their claim
            that all iOS apps can be clustered in the same relevant antitrust market ......... 24

VII.  Market Definition Is Not a Common Issue Because App Transaction Services Span
      Multiple Relevant Markets ............................................................................. 32

    VII.A.  There is no singular app transaction market ................................................ 32
            VII.A.1. Digital game transactions comprise a distinct relevant app transaction
                     market ....................................................................................... 33

VII.A.2. TV and video streaming app transactions comprise a distinct relevant app transaction market .................................................................. 37

VII.B.   Market definition is not a common issue because class members differ according to the relevant app transaction markets in which they purchase or sell   ...................................................................................................... 41

VIII. Plaintiffs' Experts' Market Power Opinions Are Unreliable ................................ 41

VIII.A. Assessing market power ............................................................................... 41

VIII.B. Plaintiffs' experts' improperly-defined relevant markets corrupt their market power opinions .............................................................................................. 42

IX.   Plaintiffs' Experts' Single-Brand Relevant Market Based on an Aftermarket Paradigm Is Inappropriate ..................................................................................................... 44

IX.A.   The foremarket/aftermarket approach is fundamentally inapplicable in this case   ............................................................................................................... 44

IX.B.   The economic relationship between sales of iOS devices and conduct toward the App Store is another reason why there is no relevant aftermarket............. 46

IX.C.   In fact, Apple has not exercised any market power in its conduct towards the App Store ......................................................................................................... 49

X.   Plaintiffs' Experts' Conclusions that Impact and Damages Can Be Determined on a Classwide Basis Are Fatally Flawed Because They Ignore that in the But-For World Apple Would Have the Incentive to Monetize its IP in Alternative Ways .................... 50

X.A.   All developers must license Apple's intellectual property, including in Plaintiffs' but-for world ................................................................................................. 50

X.B.   In the but-for world, Apple would have a strong economic incentive to choose to monetize its IP in ways that do not rely on iOS app transactions occurring on the App Store .......................................................................................... 51

X.C.   Alternative monetization mechanisms in the but-for world would make some members of the proposed Developer class worse off compared to the actual world ............................................................................................................... 55

XI.   Consumers that Purchased only (a) Zero–Marginal Cost Apps or (b) Subscription Apps with Advertising Are Uninjured or Benefited by the Challenged Conduct, Compared to the But-For World ........................................................................................ 56

XI.A.   Individual inquiry is necessary because consumers of apps where the developer does not incur a fixed-dollar marginal cost are uninjured ..................................... 57

XI.B.   Individual inquiry is necessary because consumers of subscription apps with advertising (e.g., newspaper apps) benefitted from the challenged conduct .... 58

XII.   Technical Appendix ................................................................................................. 61

## II.B.    Summary of Conclusions

### Market definition principles

12.    **Opinion 1.** The App Store is a two-sided transaction platform that facilitates transactions between two distinct groups of customers—in this case, app developers and app users. An owner of a transaction platform, in order to maximize its profit and the value of the platform, must carefully balance the prices and other terms that apply to the customers on each side. The two-sidedness of a transaction platform must inform the definition of any relevant market in which that platform competes. In particular, because of the linkages between the two groups of customers, any changes in price or other terms by the platform owner toward the customers on one side can affect the demand for the platform's services from customers on the other side. (See section V.)

13.    **Opinion 2.** The relevant market must include the sources of the competitive constraints on the challenged behavior of a firm. Thus, because each side of a two-sided transaction platform influences the impact on the platform of actions targeted at the other side, delineating the relevant market for a two-sided transaction platform must include analysis of both sides of the platform—here, the app developers and app consumers—

and evaluation of the demand substitution opportunities of each. Restricting attention to the customers on only one side of the transaction platform would render the resulting market definition unreliable because its scope would exclude a significant competitive constraint, viz., the customers on the omitted side of the platform. (See section IV.)

14.   **Opinion 3.** When evaluating market power,
    for market definition, in a two-sided market, it is analytically incorrect to consider only a price on one side of the market. These analyses should be conducted using a two-sided price that accounts for the costs and benefits to both side of the platform. (See sections V

15.   **Opinion 4.** Diverse, non-substitutable products can be validly clustered into a single relevant market only when the competitive conditions for each product in the cluster are the same. (See section VI.A.)

## Market definition in this case

16.   **Opinion 5.** There is no singular app transaction market. As Professor Hitt has demonstrated, there are at least two groups of iOS app transactions that face distinctly different competitive conditions than other app transactions.

17.   **Opinion 6.** Digital game transactions comprise a distinct relevant app transaction market. Digital game transactions face a unique set of competitive conditions because many iOS users can and do consummate digital game transactions on a unique set of other transaction platforms in lieu of the App Store. Moreover, developers can and do substitute digital app transactions away from the App Store to other digital game transaction platforms. (See section VII.A.1.)

18.   **Opinion 7.** TV and video streaming app transactions comprise a distinct relevant app transaction market. TV and video streaming app transactions face a unique set of competitive conditions because iOS users can and do consummate video streaming transactions on a unique set of other transaction platforms in lieu of the App Store. Moreover, developers can and do substitute video streaming app transactions away from the App Store to other transaction platforms. (See section VII.A.2.)

19.   **Opinion 8.** Market definition is not a common issue because class members differ according to the relevant app transaction markets in which they purchase or sell. (See section VII.B.)

## Plaintiffs' experts are wrong to cluster all iOS app transactions into a single relevant market

20.   **Opinion 9.** Plaintiffs' experts are incorrect to cluster all iOS app transactions into a single relevant market. Clustering multiple products not substitutable for each other into the same relevant market can be valid only when the competitive conditions for each product in the cluster are the same. Plaintiffs' experts have not analyzed whether the competitive conditions for all app transactions are the same, have not shown that they are, and cannot show that they are, because such a proposition is demonstrably untrue. (See section VI.)

### Plaintiffs' experts' single-brand relevant market based on an aftermarket paradigm is inappropriate

23.  **Opinion 12.** Plaintiffs' experts are incorrect in claiming that iOS apps and in-app content is an aftermarket. Many iOS users can consummate app transactions with developers on transaction platforms other than the App Store. Thus, because consumers and developers can substitute across transaction platforms without requiring substitution in the foremarket, the aftermarket framework does not apply. Moreover, Plaintiffs' experts fail to demonstrate that Apple has an incentive to treat the purported aftermarket for iOS app transactions as a separate independent avenue for profit maximization, rather than respecting the linkage of the vitality of the iOS app ecosystem as a crucial driver of its overall iPhone business. (See section IX.)

### Plaintiffs' experts' market power opinions are unreliable

24.  **Opinion 13.** Plaintiffs' experts fail to reliably address issues of market power because they rely on only improperly defined relevant markets. To reliably analyze allegations of monopolization, questions of market power must be asked with respect to properly defined relevant markets. This failure cannot be rectified by appeal to arguments about Apple's profitability. (See section VIII.)

### Apple would still have the incentive to monetize its IP in alternative ways in the but-for world

25.  **Opinion 14.** Plaintiffs' experts essentially ignore that all developers must license Apple's intellectual property to create iOS apps in both the actual world and in their proposed but-for world. In a but-for world where Apple could no longer require that the App Store be the exclusive platform for transacting in iOS apps, Apple would have the economic incentive to monetize its IP in alternative ways, rather than allow developers to use and profit from Apple's IP for nothing more than the current $99 per year developer fee. (See section X.B.)

26. **Opinion 15.** Alternative IP monetization mechanisms would have differential impacts on purported class members. If Apple employed real world examples of other software IP monetization strategies in the but-for world, such as the ad valorem royalty rate model employed by Epic's Unreal Engine, or the tiered fixed-fee royalty model employed by Unity, individual inquiry into each developer would be required to determine which developers were damaged and which benefitted from the alleged anti-competitive conduct. (See section X.C.)

### Consumers of certain types of apps were uninjured by the challenged conduct

27. **Opinion 16.** For many apps, an additional purchase of the app does not generate any material incremental fixed-dollar marginal cost to the developer. For such zero-marginal cost apps, economic principles demonstrate that a reduction in commission rates would have no impact on the developer's choice of price. Thus, consumers that purchased only these types of apps are uninjured (i.e., they would have paid the same price for an app in the actual and but-for world). (See section XI.A.)

28. **Opinion 17.** Some apps (such as a newspaper app like the New York Times) monetize through a combination of in-app advertising revenue and subscription fees. Economic principles demonstrate that these apps are a special case where a decrease in the commission rate charged on in-app subscription purchases will result in a profit motivation for the developer to increase the subscription price. Thus, consumers that purchased only these types of apps benefitted from the alleged anti-competitive conduct (i.e., they would have likely paid more for an app in the but-for world than in the actual world). (See section XI.B.)

# IV.    An Overview of Market-Definition Methodology

51.    The delineation of one or more relevant markets is an important tool for assessing issues concerning competition and antitrust. Properly defined relevant markets facilitate the analyses of products, services, suppliers, and platforms that place significant competitive constraints on the challenged behavior of a firm. Such a competitive constraint often takes the form of a customer's ability to substitute to a different product or service. Hence market definition focuses on demand substitution. The suppliers who can satisfy those demands are the participants in the relevant market.

52.    Because the definition of relevant markets addresses competitive constraints on the challenged behavior of a firm, the identification of the relevant market is not just a function of the defendant's industry or product; it must be specific to the allegations and theory of harm.

53.    Delineating the relevant market(s) is frequently the first step in the process of determining whether a firm possesses significant market power. This market-power inquiry is a critical threshold step—a screen—in determining whether challenged business practices of that firm are anticompetitive.

54.    In its role in the analysis of market power, product market definition asks: to what products or services would customers be able and willing to turn if the prices of the relevant products/services increased (or their qualities decreased)? Thus, market definition focuses on demand substitution to identify a set of "reasonably interchangeable" products. This fundamental precept is set out plainly in the U.S. antitrust agencies' Horizontal Merger Guidelines.[50] While the Horizontal Merger Guidelines directly address methodologies and standards for the analysis of horizontal mergers, analytic practices concerning other antitrust issues commonly and appropriately draw on their content. This is particularly the case for market definition and for the Hypothetical Monopolist Test and other techniques for market definition explicated in the Horizontal Merger Guidelines. These have officially been adopted for the U.S. antitrust agencies' analyses of vertical mergers,[51] and they are also the standard of analysis for issues that arise in the context of concerns over monopolization, with variations as appropriate.

---

[50]    "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010 (hereafter "Horizontal Merger Guidelines"), at (a) § 4 ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.") and (b) § 4.1.1 ("The Agencies use the hypothetical monopolist test to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms.").

[51]    See, e.g., Vertical Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, June 30, 2020, https://www.justice.gov/atr/page/file/1290686/download, at page 3. ("In any merger enforcement action involving a vertical merger, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition. Many of the general purposes and limitations of market definition described in Section 4 of the Horizontal Merger Guidelines are also relevant when the Agencies define markets for vertical mergers, and the Agencies generally use the methodology set forth in Sections 4.1 and 4.2 of the Horizontal Merger Guidelines to define relevant markets for vertical mergers.")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

59.   Market definition ultimately should reflect best pertinent evidence, both quantitative and qualitative. Market delineation can be informed by whether the industry or the public recognizes a set of products or services as a meaningful economic grouping, the unique ways in which the products or services are used, how they are produced, who their customers are, and whether they are sold through specialized vendors. Such evidence can be indicative of substitution opportunities and realities.

61.   If (a) the relevant market in which the challenged practices occur is robustly competitive, or (b) the challenged firm itself does not have (and is unlikely to acquire) significant market power in the relevant market or (c) the challenged practices are not a cause of whatever market power the challenged firm has, it is warranted to conclude that the challenged practices are not anticompetitive.

62.   If these conditions fail to hold, the inquiry regarding effects of the challenged practices on competition continues. In any case, if the challenged practices do not significantly diminish the strength of the competitive process in the relevant market, it is warranted to conclude that those practices are not anticompetitive.

63.   In addition to its role in questions of market power, the delineation of the relevant market informs analyses of anticompetitive effects, business justifications, antitrust injury, and damages.

64.   Antitrust analysis may go dangerously astray if it is conducted within the confines of a purported relevant market that is misdrawn, whether too narrowly, too broadly, or a combination of both. If too narrow, the purported relevant market could omit significant market forces and sources of competitive discipline. If too broad, the analysis risks, among other things, conflating into a single market products and services that in

---

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

fact represent very different competitive circumstances and impacts, and thus require instead analysis in multiple, more refined markets.

65.    As I explain below, Plaintiffs' experts' market definition makes both the too-narrow and too-broad errors simultaneously: their market definition is too narrow in that it focuses on only iOS platforms and it is too broad in that it aggregates all app transactions into a single relevant market.

# V.    The App Store Is a Two-Sided Transaction Platform, Both Sides of Which Must Be Included in the Relevant Market

66.    Professor Schmalensee's report discusses in detail two-sided platforms, indirect network effects, and that transaction platforms are a special case of two-sided platforms.[60] Professor Schmalensee's report also discusses Apple's business model for its App Store to demonstrate that the App Store is a two-sided transaction platform.[61]

68.    Professor McFadden's market definition adopts the paradigm of a one-sided retailer,[65] which does not appear to take into account the interdependence of the two groups of customers—consumers and developers—served by the App Store.[66]

69.    A two-sided transaction platform facilitates transactions between two distinct groups of customers—in this case, app developers and app users. The demand of customers on one side of the platform creates a "network externality" for those customers on the other

---

[60]    Expert Declaration of Richard Schmalensee, Ph.D., August 10, 2021, at § VII.A and § VII.B.
[61]    Id., at § VII.C and § VII.D.

[65]    McFadden Report, at ¶ 42. ("Consumers who have iOS mobile devices … are consumers of this market, Apple is a retailer that sells iOS apps and in-app content, and app developers are suppliers that 'manufacture' apps and in-app content and supply them through Apple. Apple, as the retailer, sets the App Store commission, which when paid by developers leads to the determination of the retail prices paid by consumers and the wholesale prices received by developers.")
[66]    See section V, where I explain the need to take both sides into account in market definition in the context of two-sided app transaction platforms.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

side: The value that customers on one side gain from their participation in the two-sided platform increases with (a) the number of customers on the other side and (b) the intensity of usage of the platform by customers on the other side.

70. The transaction platform owner, in order to maximize its profit and the value of the platform, must carefully balance the prices and other terms that apply to the customers on each side. A change meant to encourage greater participation on one side can have the effect of discouraging participation on the other. Because the relevant product is a transaction, excess demand on one side (i.e., more willingness to transact on one side than on the other) is squandered because transactions will be consummated only to the extent the levels of willingness to transact on the two sides are in balance.

71. The two-sidedness of a transaction platform must inform the definition of any relevant market in which that platform competes. In particular, because of the linkages between the two groups of customers, any changes in price or other terms by the platform owner toward the customers on one side can affect the demand for the platform's services from customers on the other side. The reactions of the customers on the other side can have a disciplining effect on the platform owner.

72. As I explained in section IV, the relevant market must include the sources of the competitive constraints on the challenged behavior of a firm. Thus, because each side of the two-sided transaction platform influences the impact on the platform of actions targeted at the other side, delineating the relevant market for a two-sided app transaction platform must include analysis of both sides of the platform—here, the app developers and app consumers—and evaluation of the demand substitution opportunities of each.[67]

73. Restricting attention to the customers on only one side of the transaction platform would render the resulting market definition unreliable because its scope would exclude a significant competitive constraint, viz., the customers on the omitted side of the platform. Although the one-sided approach could incorporate the initial, direct response of that side, the analysis would be prematurely truncated and miss the follow-on indirect effect from the excluded side.[68]

---

[67] To say that (a) a relevant market in which a two-sided transaction platform competes must span both sides of the platform is *not* to say that (b) a two-sided transaction platform necessarily competes in exactly one relevant market.

[68] See, e.g., Lapo Filistrucchi, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, 10(2), 2014, 293–339, at 330–331. ("Considering a two-sided platform with sides $A$ and $B$ linked by positive indirect network effects, the application of a one-sided SSNIP test on side $A$ would only account for the direct effect that a price increase will have on the demand and profits of side $A$. It will not account for the fact that a reduction of the number of customers on side $A$ is likely to lead to a reduction of the number of customers on side $B$ such that, if the price on side $B$ is kept constant, there would be a loss in profits also on side $B$. It would also

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

74.  As an example from the payment card industry, suppose the Discover credit card network were to contemplate an increase in the transaction fees it charges merchants. The direct effect of such an increase would likely be that some marginal merchants (i.e., Discover-accepting merchants that were close to indifferent between accepting and not accepting Discover) would choose to drop their acceptance of Discover cards. This would cause Discover to lose the charge volume at those no-longer-accepting merchants and to lose the profit margin associated with that charge volume. On the other hand, Discover's margin on the charge volume at all merchants that continued to accept Discover would increase.

75.  In calculating only the direct effect of the contemplated fee increase, Discover would weigh (a) the loss in profit associated with the lost charge volume at no-longer-accepting merchants against (b) the increased profit at remaining Discover-accepting merchants. If Discover were to forecast the direct loss to be smaller in magnitude than the direct gain, this partial, truncated analysis would suggest that the fee increase would be profitable for Discover.

76.  But that analysis would be unreliable because it leaves out the concomitant indirect effect of Discover's merchant-fee increase on the consumers that carry Discover cards. These consumers carry and present Discover cards because those cards are accepted at many merchants. The fewer merchants that carry Discover, the smaller a consumer's incentive to carry a Discover card. The increase in Discover's merchant fees would cause some marginal merchants to stop accepting Discover and this decrease in merchant coverage would cause some marginal Discover-carrying consumers to either cancel or stop carrying their Discover cards altogether or to be less likely to present those cards for payment at the remaining Discover-accepting merchants. This would cause Discover to lose additional charge volume, and its associated profit, from transactions at merchants that *did* acquiesce to the fee increase. Incorporating this indirect negative effect on Discover's profit from the contemplated fee increase could reverse a favorable conclusion reached after the truncated, one-sided analysis. In other words, the loss of profit from the direct and indirect effects combined could be greater in magnitude than the increase in profit margin at the inframarginal merchants and, thus, the contemplated fee increase would be unprofitable rather than profitable.

77.  The prospect that incorporating the indirect effects of a platform's action would be pivotal in determining whether that action is optimal for the platform warrants requiring the incorporation of both sides of the platform in such an analysis.

78.  This initial added layer of incorporating indirect effects on consumers of a fee hike to merchants does not, however, exhaust the indirect effects that need to be considered. The consumers that stop using, or reduce their use of, Discover cards would negatively affect the remaining Discover-accepting merchants' incentives to continue accepting. If, as a result, more merchants were to stop accepting Discover, then additional consumers

---

not envisage the fact that the smaller number of customers on side *B* will in turn reduce the demand of side *A*, and so on. Hence, it would also underestimate the loss in profits on side *A*.")

would stop using, or further reduce their use of, Discover cards, etc., and this process could result in a downward spiral.[69]

79.   Thus, a one-sided approach to market definition in the context of two-sided transaction platforms will tend to understate the disincentive to a platform from raising price or otherwise disadvantaging one side. This understatement then results in a bias towards an overly narrow relevant market because the HMT's analytic process would end prematurely.[70]

# VI.   Plaintiffs' Experts Are Incorrect to Cluster All iOS App Transactions into a Single Relevant Market

## VI.A.   Products that are not close substitutes can sometimes be aggregated into a "cluster market" for analytical convenience, but only when the competitive conditions under which the constituent products are sold are sufficiently similar

80.   As I explained in section IV, a relevant product market contains only products that are reasonably interchangeable, i.e., products that are substitutes for one another.

81.   Nevertheless, it is sometimes valid and convenient to group numerous non-substitutes into a single "cluster market," but only when the competitive conditions for each product in the cluster are the same.[71,72]

82.   For example, in connection with the Federal Trade Commission's challenge of the proposed merger of Staples and Office Depot, Professor Shapiro explained the use of a cluster market in that case.[73] First, Professor Shapiro observed that "[v]irtually each type

---

[69]   The Supreme Court took note of this economic principle about two-sided transaction markets in *Ohio, et al. v. American Express Co.*, et al., 138 S. Ct. 2274 2018 (hereafter "Ohio v. Amex"). ("Two-sided platforms must take these effects into account before making a change in price on either side, or they risk creating a feedback loop of declining demand.")

[70]   See also Lapo Filistrucchi, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, 10(2), 2014, 293–339, at 331. ("Positive indirect network effects between the different sides of the platform reduce the profitability of any price increase. As there is always at least one positive indirect network effect, the risk of applying a standard SSNIP test, which does not account for feedback effects, is that in such cases the market will be defined too narrowly.")

[71]   See, e.g., ABA, *Market Power Handbook: Competition Law and Economic Foundations*, 2005, at 112. ("[C]ommentators and economists criticize the cluster approach as inconsistent with the demand-side focus of market definition. Nonetheless, some critics acknowledge that cluster markets can be used for convenience when market participants, concentration and entry conditions are similar across the product markets so that the competitive effects analysis for each market would likely be consistent.")

[72]   See, e.g., Jonathan B. Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74, 2007, 129–173, at 158. (A cluster market "can be defended as a matter of analytical convenience: there is no need to define separate markets for a large number of individual hospital services, for example, when market shares and entry conditions are similar for each, or when data limitations will effectively require that the same proxy (such as the number of hospital beds) be employed to estimate the market share for each individual service.")

[73]   Professor Carl Shapiro, "Staples-Office Depot Merger Analysis," Charles River Associates, April 7, 2016, redacted public version, Case 1:15-cv-02115-EGS, PX06500-001 – 082 (hereafter "Shapiro Testimony"),

---

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

of product is a distinct relevant market [because they are] [n]ot functionally interchangeable," giving the example of pens and binders. There are thousands of SKUs purchased by large customers.[74] Professor Shapiro noted that is "[i]mpractical to analyze each separately." However, "[i]f competitive conditions are similar across different product types, [it is] [a]ppropriate to use [a] cluster market [to] [a]ggregate distinct product markets into a single market for purposes of competitive analysis."[75,76]

83. While the cluster market in the Staples/Office Depot case included most products sold by the two firms because those products faced similar competitive conditions, the court excluded ink and toner because of the different competitive conditions defining sales of those products.[77] Specifically, the court found that large business customers purchased ink and toner from not only office supply stores like Staples and Office Depot, but also from printer and copier manufacturers pursuant to certain contractual arrangements in which customers purchased printers and copiers together with maintenance services and ink and toner.[78] Since printer and copier manufacturers that sold ink and toner did not sell other office products, like pens and binders, ink and toner sales were determined not to face the same set of competitive conditions and were excluded from the cluster market.[79]

84. In summary, a cluster market is valid only when there is a basis to know—prior to performing the cluster-market analysis—that separate analyses of each of the clustered products would arrive at the same answer as that obtained for the cluster.

85. A proposed cluster market is *not* valid if it combines products that are not substitutable for each other and that face different competitive conditions. In particular, a proposed

---

[ ] at 014,
<https://www.ftc.gov/system/files/documents/cases/170216staples_redacted_shapiro_demonstrative.p
df>, accessed on August 4, 2021.

[74] Shapiro Testimony, at 015.

[75] Shapiro Testimony, at 014.

[76] See also FTC, et al. v. Staples, Inc., et al., 190 F. Supp. 3d 100, 2016, United States District Court, District of Columbia (hereafter "FTC v. Staples"), citing the expert report of Carl Shapiro. ("Although a pen is not a functional substitute for a paperclip, it is possible to cluster consumable office supplies into one market for analytical convenience. … Defining the market as a cluster market is justified in this case because 'market shares and competitive conditions are likely to be similar for the distribution of pens to large customers and the distribution of binder clips to large customers.' Shapiro Report at 007.")

[77] Federal Trade Commission v. Staples, Inc., 190 F. Supp. 3d 100, May 10, 2016, United States District Court District of Columbia, <https://casetext.com/case/fed-trade-commn-v-staples-inc-4>, accessed on August 9, 2021 (hereafter "Federal Trade Commission v. Staples, Inc."), at 123–125. ("Defendants' argument for inclusion of ink and toner fails because they are not subject to the same competitive conditions as general office supplies.")

[78] Federal Trade Commission v. Staples, Inc., at 123. ("Competition for the sale of ink and toner has increased due to the 'recent and rapid' rise of Managed Print Services ('MPS'). ... MPS vendors like Xerox, Hewlett-Packard, Lexmark, and Ricoh provide a bundle of services that includes sale of ink and toner in addition to service and maintenance of printers and copiers. ... There is ample record evidence to show that ink, toner, and other adjacent BOSS items are properly excluded from the relevant market because they are subject to distinct competitive conditions. For example, some large companies are shifting all of their ink and toner business to an MPS.")

[79] Krisha A. Cerilli, "Staples/Office Depot: Clarifying Cluster Markets," *Competition Policy International*, August 15, 2016, 1–10, at 5. ("Those printer and copier manufacturers generally did not sell other consumable office products. As such, ink and toner failed the similar competitive conditions test for inclusion in the proposed cluster market.")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

cluster market is not valid if it combines non-substitutes that are provided by materially different sets of alternative suppliers.

86.   As I explain below, this is the case for Plaintiffs' experts' purported market for iOS app transactions. iOS app transactions cannot be clustered into a single market because different app transactions face substantially different competitive conditions.

### VI.B.   Plaintiffs' experts fail to perform any reliable analysis to support their claim that all iOS apps can be clustered in the same relevant antitrust market

87.   Although Plaintiffs' experts aggregate all iOS transactions together into a single relevant market, none of them has performed any analysis that demonstrates that all iOS app transactions face the same competitive conditions such that they can be properly clustered together. The failure of their analyses to address this issue renders their market definition opinions unreliable.

88.   In fact, Professor McFadden does not mention cluster markets at all in his report.

89.   Indeed, as I explain in section VII.A.1, game app transactions face competitive conditions—for both the developers of games and for the consumers that play games— that are demonstrably different from the competitive conditions faced by other, non-game app transactions. I do not offer the illustration of game app transactions to exhaust the set of app transactions that face differently situated competitive conditions; rather I offer game app transactions as a single example of this, albeit a very material one. The fact that game transactions face different competitive conditions than non-game app transactions makes it inappropriate to combine (a) transactions for game apps and (b) transactions for non-game apps into a single relevant market. That Plaintiffs' experts have done so renders their market definition opinions unreliable.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# VII.   Market Definition Is Not a Common Issue Because App Transaction Services Span Multiple Relevant Markets

## VII.A.   There is no singular app transaction market

113. Clustering or otherwise aggregating all app transaction services is inappropriate in this case because the competitive conditions in which app transactions take place vary among the apps being transacted. In particular, the set of transaction platforms to which an end-user and a developer can substitute to consummate a transaction for app $X$ can be significantly different than the set of transaction platforms to which an end-user and a developer can substitute to consummate a transaction for a different app $Y$.

114. I illustrate this with two examples of types of app transactions where both consumers and developers face distinctly different substitution opportunities than for other types

of app transactions: (a) game app transactions and (b) TV and video streaming app transactions (hereafter "video streaming app transactions"). A key differentiator for each of these two types of app transactions is the set of transactions platforms with which the App Store competes for the provision of these transactions. For both sets of app transactions, iOS-using consumers and app developers can and do choose to transact for the app on non-iOS transaction platforms. Moreover, both iOS-using consumers and app developers can substitute away from effectuating the transaction on the App Store to consummating the transaction on a non-iOS app transaction platform.

115.  I refer to and rely on the discussion and analysis of the record evidence performed by Professor Hitt.

### VII.A.1.  Digital game transactions comprise a distinct relevant app transaction market

116.  One such example of a distinct relevant market in which the App Store competes is the market for digital game transactions. Professor Hitt shows that there are many types of devices on which these games can be played and many digital game transaction platforms where game-playing consumers and game-creating developers can transact.

117.  Professor Hitt presents several analyses that demonstrate that digital game transaction platforms provide services that are close substitutes—both for the same game as well as across games—whether one adopts the perspective of the game-playing consumer or that of the game-creating developer.

118.  Professor Hitt documents that developers choose the devices for which to create their games and the digital game transaction platforms on which to offer their games to consumers. Game developers can and do write their games to be played on mobile devices, personal computers, and consoles. Developers can take advantage of cross-platform "game engines" to ease targeting a game to multiple devices.[112]

119.  Game developers can and do choose to offer their games to consumers on any subset or all of numerous digital game transaction platforms, including those for mobile devices (e.g., the App Store, Google Play, the Samsung Galaxy Store, and the Amazon Appstore), for Windows and Mac personal computers (e.g., the Mac App Store, the Epic Games Store, Steam, and the Microsoft Store for PCs), and for consoles (e.g., the PlayStation Store, Nintendo eShop, and the Microsoft Store for Xbox).

120.  For example, Professor Hitt analyzes data from App Annie that identifies the top games, by number of downloads and by app-store revenue, on the App Store and on Google Play as of December 31, 2019. Professor Hitt's analysis finds that (a) 99.0% of the Top 100 grossing games on the App Store are also available on Google Play and (b) 100.0% of the Top 100 grossing games on Google Play are available on the App Store.

---

[112]  Expert Declaration of Lorin Hitt, Ph.D., August 10, 2021, market-definition appendix (hereafter "Hitt market-definition appendix"), at ¶ 18 ("[D]evelopers are able to choose from a variety of game developer engines—such as Unity, Unreal Engine, CryEngine, GameMaker Studio, and more—that offer similar capabilities for distributing across platforms.")

121. Professor Hitt also cites the example of Minecraft, a top-selling game, that is available at numerous transaction platforms including the App Store, Google Play, Microsoft Store, Amazon Appstore, Nintendo eShop, and PlayStation Store, as well as directly from Minecraft's website.[113]

███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████[114]

122. Another example is provided by information from Roblox, a highly popular game that had 150 million Monthly Active Users ("MAUs") in May 2020.[115] Professor Hitt reported the distribution of Roblox MAUs across types of devices for the first nine months of 2020: Android (49.2%) had nearly half of MAUs, desktop (25.8%) had approximately one quarter, iOS had 21.9%, and Xbox had 3.0%.[116]

123. Professor Hitt presents analyses of data that show that many iOS-using game-playing consumers use, own, or can access multiple types of non-iOS devices for which developers have created games. For example, Professor Hitt cites to a survey of iPhone owners in July 2020 that found that 55 percent owned a Windows PC (i.e., desktop or laptop), 44 percent owned a Mac personal computer, 30 percent owned a gaming console, and 21 percent owned a non-iPad tablet.[117] Professor Hitt also cited a survey performed by Professor Dominque Hanssens of users of the App Store. Professor Hanssens found that 81 percent of App Store users regularly used a non-iOS device (non-iOS smartphone; non-iOS tablet; laptop; desktop; gaming console; or gaming-specific handheld device). This result also showed that 71 percent regularly use a laptop, 48 percent regularly use a desktop, 41 percent regularly use a gaming console or handheld gaming device, 27 percent regularly use a non-iOS smartphone, and 23 percent regularly use a non-iOS tablet.[118]

124. The opportunity to play digital games on all these different platforms also goes along with the opportunity to effectuate transactions for the purchase of game apps and/or game in-app purchase transactions on all these different platforms.

125. Game developers have many options for monetizing their games. They can choose to have paid apps, free apps with in-app advertising, free-to-download apps with in-app purchases, and subscriptions.[119]

126. A game developer can offer purchases through the App Store, or outside their iOS app on another transaction platform or on their own website where the user can consume the purchased content within the iOS app.[120] This can be implemented through the use

---

[113] Hitt market-definition appendix, at ¶ 8. ("Minecraft, one of the best-selling video games of all time, is available through many different transaction platforms including the App Store, Google Play, Microsoft Store, Amazon Appstore, Nintendo eShop, and PlayStation Store, as well as directly from Minecraft's website.")
[114] Hitt market-definition appendix, Figure 3.
[115] Hitt market-definition appendix, at ¶ 9.
[116] Hitt market-definition appendix, Figure 4.
[117] Hitt market-definition appendix, at ¶ 29.
[118] Hitt market-definition appendix, at ¶ 30. See also ibid., Figure 6.
[119] Hitt market-definition appendix, ¶ 2.
[120] Hitt market-definition appendix, ¶ 21.

of common user account or "single sign-on" service. This also allows the user to switch playing to a different platform while retaining the user's game progression (the state of the game) as well as the user's inventory of purchased game assets.[121] This capability is used by many game developers, such as Epic Games for Fortnite (in conjunction with the virtual currency V-bucks), Roblox (in conjunction with the virtual currency Robux), and King for Candy Crush Saga (in conjunction with the virtual currency "gold bars").[122]

127. Accordingly, transactions for purchasing a game and/or in-app content for a game on any other of the platforms on which the game is available are close substitutes for the corresponding transactions on the App Store. These alternative transactions are readily available to most users of the App Store, as shown by the consumer multihoming data above. These alternative transactions have the same functionality as their counterparts on the App Store. The alternative transactions are offered to consumers by the developers who evidently find that their own multihoming and openness to consumer multihoming are a strategy that is net profitable, no doubt fostered by their network effects.

128. All of these characteristics of the game app transactions implemented on the App Store that can also be implemented on alternative game transaction platforms imply that game app transactions constitute a distinct relevant market. The competing participants in this relevant market are the game transaction platforms that enable the closely substitutable transactions themselves. The relevant market of game app transactions is distinct because this set of market participants and their competitive interactions are significantly different than those that relate to other groups of apps.

129. Data are not generally available to implement a quantitative HMT of the digital game transaction market. Although data are also not available to track individual consumers' substitution from one digital game transaction platform to another, Professor Hitt was able to utilize three analytic opportunities to assess whether iOS-using game-playing consumers did in fact substitute from transacting for digital games on the App Store to instead effectuating those transactions on a non-iOS digital game transaction platform. Each of these three analyses demonstrated such substitution.

130. First, Professor Hitt analyzed App Store data to detect when an iOS user downloaded an iOS "companion app" for a game console, which would likely be associated with that user newly acquiring, or newly intending to play games on, the associated console.[123] His analysis found that game spending on the App Store by the companion-app group grew more slowly following the download of the companion app compared to the growth in game spending on the App Store by a control group (i.e., that did not download such a companion app). The difference in growth rates (measured over the three-year period FY2017–FY2019) between the two groups is ▮ percentage points.[124]

---

[121]   Hitt market-definition appendix, ¶ 22.
[122]   Hitt market-definition appendix, ¶ 23.)
[123]   Hitt market-definition appendix, ¶ 48.
[124]   The average user spend growth rate over the three-year period for the control group was approximately ▮; the rate for the companion-app group was approximately ▮. There were ▮ in the control group; there were ▮ in the treatment group. Hitt market-definition appendix, § 1.9.1, ¶ 49 and Figure 11.

131. Professor Hitt interprets this slower growth in game spending on the App Store by the companion-app iOS users as likely reflecting these users diverting game expenditures that otherwise would have been transacted on the App Store to other digital game transaction platforms associated with the console game.[125]

132. Second, Professor Hitt studied the launch of Fortnite on the Nintendo Switch device by Epic Games in June 2018. Professor Hitt analyzed Fortnite data produced by Epic that allowed him to track each Fortnite player's playing time and Fortnite expenditures—over time and by platform. Professor Hitt took advantage of the launch of Fortnite on the Nintendo Switch to assess whether this event affected the playing and spending patterns of iOS Fortnite players. He focused on iOS users that accessed Fortnite on both iOS and Nintendo Switch in June 2018. He found that in subsequent months, this group played Fortnite less on iOS relative to their baseline, and spent less on Fortnite on iOS relative to their baseline, than did a control group (that played Fortnite on iOS but not Nintendo Switch in June 2018).[126,127] Professor Hitt interprets this analysis to indicate that iOS Fortnite users substituted their Fortnite transactions from the App Store to Nintendo eShop, i.e., to another digital game transaction platform.

133. Third, Professor Hitt again analyzed Fortnite data produced by Epic, this time investigating the effect of Fortnite's removal from the App Store in August 2020 (corresponding to Epic's "Hotfix"[128]) on iOS users' Fortnite expenditures. If iOS users had been unable or unwilling to substitute their Fortnite play and transactions to other devices and digital game transaction platforms, Epic would have seen a sharp decline in the Fortnite expenditures of iOS players (compared to the alternative where Fortnite remained available on the App Store). Instead, Professor Hitt's analysis found that, from the pre-Hotfix point in time July 2020 to the month following the Hotfix, September 2020, Epic retained the vast majority (81.1%) of the revenue that Epic would have expected to receive from iOS Fortnite players on all non-Google platforms, if Fortnite

---

[125] Hitt market-definition appendix, at ¶ 49. ("The decline in relative spending for users who downloaded a companion app could reflect both shifting of transactions from the App Store to a competing platform for the same game the user would have purchased through the App Store or the user's choice to purchase an entirely different game.")

[126] The control group has 13.2 million users who accessed Fortnite on iOS in June 2018 but did not access Fortnite on Nintendo Switch between June 2018 and March 2019. The treatment group had 457K members that accessed Fortnite on both iOS and Nintendo Switch in June 2018. For the difference between these two groups' behavior over time (measured in (a) time spent playing Fortnite on iOS and (b) Fortnite revenue on iOS), see Hitt market-definition appendix, Figures 12 and 13, respectively.

[127] Prior to the launch of Fortnite on Nintendo Switch, both groups had similar growth rates in playing time on iOS and Fortnite expenditures on iOS. (Hitt market-definition appendix, at ¶ 55.)

[128] Rebuttal Expert Report of Lorin Hitt, Ph.D., March 15, 2021, (*Epic v. Apple*), at ¶ 35. "On August 13, 2020, Epic implemented a 'Hotfix' update on its iOS Fortnite app that allowed customers to bypass Apple's in-app payment functionality and instead directly purchase V-bucks in the app from Epic. On the same day, Epic implemented a similar update on its Fortnite app for Android on Google Play, allowing customers to bypass Google Play's in-app payment functionality. Apple subsequently removed Fortnite from the App Store, preventing new consumers from downloading the app or existing users from downloading updates until Epic updates the app to bring it back into compliance with the App Store rules. However, iOS users who had already downloaded Fortnite remained able to play it."

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

had not been removed from the App Store, after accounting for general market and usage trends.[129],[130],[131]

134. Professor Hitt interprets this result as indicating that iOS Fortnite users (both those that "single home" on iOS and those that "multihome" on iOS and other platforms) switched a significant part of their pre-Hotfix Fortnite spending to non-iOS and non-Google digital game transaction platforms.

135. These three analyses demonstrate iOS users' and game developers' substitution away from their digital game transactions on the App Store to competing digital game transaction platforms. This quantitative evidence confirms my conclusion articulated above that there is a distinct relevant market for game app transactions substantially beyond those implemented on iOS platforms.

### VII.A.2. TV and video streaming app transactions comprise a distinct relevant app transaction market

136. A second example of a distinct relevant market in which the App Store competes is the market for TV and video streaming app transactions. Among iOS apps, these apps are a subset of the "Entertainment" genre. Professor Hitt does not attempt to identify all video streaming apps; to do so would require an app by app inquiry. Professor Hitt does identify the top 14 video streaming apps ranked by downloads and App Store revenue. The video-streaming apps Professor Hitt identifies for his analyses are Amazon Prime Video, Disney+, HBO Max, Hulu, Netflix, Paramount+, Peacock, Philo, Pluto TV, Roku, SHOWTIME, STARZ, Tubi, and YouTube TV. Professor Hitt documents that many of the firms providing these video-streaming apps recognize several of the others as competitors in public filings.[132]

137. Professor Hitt presents industry facts, data, and analysis that demonstrate that video-streaming transaction platforms provide services that are close substitutes—whether one adopts the perspective of the consumer or that of the developer.

138. Professor Hitt documents that video-streaming app transactions are recognized as comprising a well-defined market by its participants and analysts.[133] He finds that the 14

---

[129] Hitt market-definition appendix §1.9.3 and Figure 14. See also Supplement to Rebuttal Expert Report of Lorin Hitt, Ph.D., March 17, 2021 (*Epic*), at Exhibit 6, Note 1: "The percent of pre-Hotfix revenue retained for all iOS users is calculated as the total iOS user revenue on all "platforms" in the specified month divided by the expected 2020 retention dollar amount on all "platforms" in that month, i.e. monthly revenue that would be expected from all iOS users in September – December, if Fortnite were not removed from the App Store in August 2020 after accounting for general market and usage trends. All 'platforms' excludes Google."

[130] Professor Hitt found even larger fractions of retained revenue when the final month of the comparison window was extended to October (84.9%), to November (87.7%), and to December (86.2%). Supplement to Rebuttal Expert Report of Lorin Hitt, Ph.D., March 17, 2021, in Epic v. Apple, at § 2.1, at Exhibit 6.

[131] For additional detail on Professor Hitt's analysis, see Supplement to Rebuttal Expert Report of Lorin Hitt, Ph.D., March 17, 2021, in *Epic v. Apple*, at § 2.1.

[132] See Hitt market-definition appendix, at Figure 16. This figure summarizes the extent to which the identified video-streaming apps acknowledge, in their 2020 Forms 10-K, others of the identified video-streaming apps as their competitors. For example, Hulu, Paramount+, Peacock, SHOWTIME, STARZ, and YouTube TV recognize as their competitors Amazon Prime, Disney+, HBO Max, Hulu, Netflix, and Paramount+.

[133] Hitt market-definition appendix at ¶ 69.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

video-streaming apps he considers generated over $1 billion through the App Store's U.S. storefront in calendar year 2020 from app downloads and in-app purchases.[134] Professor Hitt determined that these apps were associated with 84.3 million accounts, of which 15.5 million accounts spent money on these apps through the App Store's U.S. storefront in calendar year 2020.[135]

139.   Professor Hitt documents that there are multiple types of devices on which video-streaming developers can choose to make their apps available, and on which consumers can consume the provided video content. These devices include mobile devices (i.e., smartphones and tablets), personal computers, some game consoles, media players (such as the Roku), and Smart TVs. Developers can and do also offer their content—and consumers can view that content—directly on the web through a browser.

140.   Professor Hitt shows that there is a multiplicity of transaction platforms on which video-streaming developers and consumers can meet to consummate transactions. Professor Hitt documents that all of the top video-steaming apps he considers are available on several alternative transaction platforms. In particular, all fourteen of the video-streaming apps he identifies are available on all of the following platforms: App Store, Google Play, Amazon Appstore, Smart TVs, Roku (device), and Fire TV, as well are available on websites.[136]

141.   Professor Hitt presents data showing that iOS users own multiple devices that can be used for viewing the content of video-streaming apps and transacting for these services. For example, Professor Hitt cites to a survey of iPhone owners in July 2020 that found that ▮ percent owned a Windows PC personal computer (i.e., desktop or laptop), ▮ percent owned a Mac personal computer, ▮ percent owned a Smart TV, ▮ percent owned a gaming console, and ▮ percent owned a non-iPad tablet.[137] As discussed above, Professor Hitt also cited survey data by Professor Hanssens showing that ▮ percent of App Store users regularly used a non-iOS device (non-iOS smartphone; non-iOS tablet; laptop; desktop; gaming console; or gaming-specific handheld device).

142.   The opportunity to download video-streaming apps, and view their content, on these different platforms that are generally available to iOS consumers also goes along with the opportunity to effectuate transactions for subscriptions to, and any other purchases from, these video-streaming apps. Professor Hitt documents that video-streaming apps share a common business model, typically monetizing their service through subscription transactions across multiple platforms as well as through web browsers. Developers typically allow their subscribers to maintain a device-agnostic user account, and this facilitates subscribers' use of the service across devices, while choosing whatever platform to implement their subscription transactions.

143.   Because most iOS users have access to non-iOS devices, they have the ready ability to implement video-streaming transactions through transaction platforms other than the App Store. Moreover, all iOS users can consummate video-streaming transactions on

---

[134]   Hitt market-definition appendix at ¶ 69.
[135]   Hitt market-definition appendix at ¶ 69.
[136]   See Hitt market-definition appendix, Figure 17.
[137]   Hitt market-definition appendix, § 1.6, citing Apple Market Research and Analysis, "iPhone Owner Study," October 2020, APL-EG_06596359 – 62 at APL-EG 06596361–2.

their iPhones but outside the App Store since all of the leading video-streaming app developers allow transactions on their websites, and all iOS devices allow access to a web browser. On iOS, these video-streaming apps are eligible for the "reader rule," which allows the developer and consumer to transact outside of the App Store for content that the consumer can view within the iOS video-streaming app.[138] Thus, non-iOS transaction platforms and websites accessed through iOS devices or any other platform are substitutes for the App Store for video-streaming transactions. These transactions can and do take place on transaction platforms associated with the various non-iOS devices as well as the developers' websites accessed in any fashion..

144. Accordingly, transactions for subscribing to, or otherwise purchasing content from, a video-streaming app on any other of the platforms or websites on which the app is available are close substitutes for the corresponding transactions on the App Store. These alternative transactions are readily available to users of the App Store, as shown by the consumer multihoming data above and the universal availability of a web browser to iOS users. These alternative transactions have the same functionality as their counterparts on the App Store. The alternative transactions are offered to consumers by the developers who evidently find that their own multihoming and openness to consumer multihoming are a strategy that is net profitable.

145. These characteristics of the video-streaming app transactions implemented on the App Store that can also be implemented on all the alternative video-streaming app transaction platforms imply that video-streaming app transactions constitute a relevant market. The competing participants in this relevant market are the video-streaming transaction platforms that enable the closely substitutable transactions themselves.

146. The relevant market of video-streaming app transactions is distinct because this set of market participants and their competitive interactions are significantly different from those that relate to other groups of apps. For example, the set of devices on which video-streaming app transactions can take place is not the same as the set of devices on which digital game transactions can take place, although there is overlap (mobile devices and some consoles). Some digital game transaction platforms do not offer video-streaming apps, e.g., the Epic Games Store and the Steam Store. Obversely, some devices and platforms for video-streaming app transactions (e.g., Smart TVs and media players, like a Roku) do not typically provide digital game transactions.[139] Video-streaming apps closely compete with each other, as do competing game developers, without any

---

[138] The Reader Rule "allow[s] a user to access previously purchased content or content subscriptions (specifically: magazines, newspapers, books, audio, music, and video)" on "Reader Apps" without having to make the digital good available for purchase through the App Store. (App Store Review Guidelines, at § 3.1.3(a)); Reader Apps are "apps where users exclusively purchase or subscribe to content outside the app, but enjoy access to that content inside the app on their Apple devices. Examples include books, music, and video apps. In these cases, developers receive all of the revenue they generate from bringing the customer to their app. Apple receives no commission from supporting, hosting, and distributing these apps." ("Principles and Practices," App Store, <https://www.apple.com/uz/ios/app-store/principles-practices/>, accessed on August 9, 2021.) Examples of reader apps include Kindle, Netflix, and Dropbox. This rule enables both the Netflix and the YouTube TV apps to not permit transactions through the App Store but rather require that consumers transact through another platform. Once the subscriber purchases through another mechanism (such as via a web browser), the consumer can view the video service on the iOS app.

[139] Hitt market-power appendix, ¶ 73.

evidence of correspondingly direct competition between the two genres of entertainment. Video-streaming apps exhibit a common subscription-oriented business model for their monetization, which stands in stark contrast to the approach by game app developers for whom the vast majority of paid game transactions are *non*-subscription in-app purchases.[140]

147.  Thus, the available evidence shows that video-streaming app transactions constitute a distinct relevant market. Data are not generally available to implement a quantitative HMT of the video-streaming app transactions market, and data are not generally available to track individual consumers' substitution from one video-streaming transaction platform to another. However, Professor Hitt was able to assess the substitution of iOS-using consumers to video-streaming transactions away from the App Store that resulted from a change in policy by Netflix. His analysis demonstrates significant substitution.

148.  Prior to December 2018, Netflix belonged to Apple's Video Partner Program and permitted iOS users to subscribe to Netflix through the Netflix iOS app.[141] In December 2018, Netflix decided to no longer allow any paid transactions through the App Store. iOS users that wanted to initiate a subscription to Netflix could not do so from within the Netflix iOS app; instead they would need to sign up for a Netflix subscription on another transaction platform or from Netflix's website—at which point they, and all legacy iOS subscribers, could view Netflix's content via the Netflix iOS app.

149.  Professor Hitt analyzed App Store data and data reported by Netflix to assess what effect Netflix's policy change had on iOS consumers' new subscriptions to Netflix. If iOS consumers were unable or unwilling to substitute their video-streaming transactions away from iOS to other transaction platforms (or to video-streaming providers' websites), Netflix would have seen a sharp decrease in the rate of new subscriptions by iOS users. Professor Hitt's analysis, however, shows that this did not happen. His analysis indicated that Netflix's App Store revenue declined after the change.[142] However, Professor Hitt's analysis showed that Netflix's reported number of paid memberships grew at an approximately steady pace both before and after Netflix stopped accepting new subscriptions through the App Store. Professor Hitt concluded that Netflix's policy change did not lead to a decrease in the number of initial downloads of the Netflix iOS app.

150.  Professor Hitt's interpretation of his analysis is that, following the change in Netflix's policy, Netflix and iOS users both substituted video-streaming transactions that would have occurred on iOS onto non-iOS transaction platforms. The analysis is evidence that iOS users and video-streaming developers can substitute their video-streaming transactions away from the App Store to competing transaction platforms.

---

[140]  Hitt *Epic* Rebuttal, ¶ 183, Exhibits 25 and 26. See also Hitt market-definition appendix, ¶ 79.

[141]  Juli Clover, "Netflix No Longer Offering In-App Subscription Options on iOS Devices," MacRumors, December 28, 2018, <https://www.macrumors.com/2018/12/28/netflix-no-more-itunes-billing-options/>, accessed on August 9, 2021.

[142]  Legacy iOS subscribers were still permitted to renew their subscriptions through the App Store. Thus, Netflix's App Store revenue did not decline to zero.

151.  This quantitative evidence of substitution confirms my conclusion articulated above that there is a distinct relevant market for video-streaming app transactions, and that the relevant transactions extend far beyond the confines of iOS.

### VII.B.   Market definition is not a common issue because class members differ according to the relevant app transaction markets in which they purchase or sell

152.  Plaintiffs' experts completely fail to distinguish these different groups of app transactions by ignoring the different competitive conditions they face. Moreover, because there are multiple relevant app transaction markets, (a) the relevant market(s) in which any given consumer participated would be different than the relevant market(s) in which some other consumers participated[143] and (b) the relevant market(s) in which any given developer participated would be different than the relevant market(s) in which some other developers participated.[144] Thus, antitrust issues that depend on market definition are not common to all class members.

# VIII.  Plaintiffs' Experts' Market Power Opinions Are Unreliable

### VIII.A.  Assessing market power

153.  A firm has significant market power if it is able to profitably raise price substantially above (or depress quality below) what it would be in a competitive market for a sustained period of time. As I explained in section IV, determining whether a firm has significant market power is a critical threshold step in any inquiry about whether the challenged business practices of that firm are anticompetitive.

154.  Evidence of significant market power can be provided via an evaluation of market structure (i.e., market concentration, the number of market participants, and their dynamics) and market outcomes (i.e., quantity, quality, price, and their causal factors). However, such analyses need to be carried out and interpreted with care.

155.  Evaluating market structure is an indirect way to assess market power. This evidence may be consistent with a conclusion about market power, but can be particularly misleading if markets are not defined properly. Moreover, while unconcentrated markets with many small players are commonly considered to be competitive, the reverse fails to hold. Concentrated markets do not necessarily indicate a lack of competition and the

---

[143]  Some consumers purchased games while other consumers purchased no games. See Expert Report and Declaration of Lorin Hitt Ph.D., Figure 18, showing that 72.3 percent have purchased games, and 27.3 percent purchased no games.

[144]  See Expert Report and Declaration of Lorin Hitt Ph.D., Figure 28 and ¶ 242. ("Figure 28 shows the proportion of developers that offer apps in a particular genre that *only* offer apps in that genre. For example, out of the 21,102 developers in the proposed class that made transactions for a game app on the App Store in the class period, 46 percent offered *only* game apps.  Moreover, 12 percent of developers that offered more than one app through the App Store offered *only* game apps.  Developers of apps in other app genres, such as health and fitness, magazines and newspapers, stickers, and sports, are similarly concentrated in individual app genres and do not develop apps for other genres.")

existence of market power. Establishing market concentration is merely a first step in assessing market power.

156. Evaluating market outcomes such as price-cost margins, for example, may be a more direct way of evaluating market power, but such analysis must proceed with appropriate caution. For one, products are typically differentiated, and consumers care about both quality and price. Thus, focusing only on nominal price, rather than quality-adjusted price can lead to misleading conclusions. Moreover, as explained below, high margins may reflect the presence of large fixed costs or substantial investment risks, or risky competitive entrepreneurship that turned out well, and not market power.

157. Furthermore, market outcomes are interrelated, so price, quality, and quantity must be evaluated in tandem. For instance, price increases that are associated with increases in quality and quantity may likely be the result of procompetitive behavior, rather than an exercise of market power. Price increases are more likely to be associated with anticompetitive behavior if they are associated with declines in quality and/or quantity.

158. Finally, when assessing market power, it is important to recognize that the delineation of a relevant market can leave out substitutes that fall outside of the bounds of the defined market, but nonetheless provide competitive constraints on participants within the relevant market. Such competitive constraints would include both: (a) products that are less interchangeable for most consumers in the relevant market, but still could serve as substitutes for some consumers when faced with changes in price or quality; and (b) market entry from either new competitors or incumbent firms that would respond competitively to changes in price or quality by a firm attempting to exercise market power.

## VIII.B.  Plaintiffs' experts' improperly-defined relevant markets corrupt their market power opinions

159. To reliably analyze allegations of monopolization, questions of market power must be asked with respect to properly defined relevant markets. Although a finding that a firm has market power in some relevant market does not by itself imply that any business practice of the firm is anticompetitive, a finding that the firm does not have significant market power in the relevant market is sufficient to warrant a conclusion that the challenged practices are not anticompetitive.

160. Plaintiffs' experts have failed to reliably address issues of market power because they have relied on only improperly defined relevant markets.

161. For example, it is plain that any view of market position or market power in a relevant market is closely related to the appeal of the products to the actual and potential customers, the comparison between that appeal and the appeal of alternatives available to the customers, and thus the range and variety of the alternative substitutes in the relevant market. As detailed above, as well as in the Hitt report, the digital transactions related to different categories of apps have distinctly different sets of alternatives and rivals to those transactions implemented in the App Store. Accordingly, any assertions about Apple's market power over digital app transactions cannot be reliable or

demonstrated to be valid without analyses that deal with the different relevant markets in which such transactions can occur. The Plaintiffs' experts have not done so at all.

162. This failure by Plaintiffs' experts cannot be rectified by appeal to arguments about Apple's profitability generally or in any other narrower accounting categories. Professor Schmalensee's report discusses the implications of the two-sided nature of the transaction platform for the assessment of market power,[145] so I will just make a few observations:

163. Dynamic industries, such as Apple's, are characterized by repeated, large, sunk investments and high ongoing fixed costs.[146] Prices at or close to marginal cost are not "competitive prices" because the margins they generate are too small to cover the fixed costs or pay a return on the sunk investments.[147]

164. Even persistently high profits are consistent with competitive markets that perform well for consumer welfare and social welfare; thus, high profits do not imply a firm has antitrust market power. Firms may earn economic profits for many reasons, for example because they are more efficient, more innovative, or more entrepreneurial than their competitors. They may have taken on large risks, or may have accumulated valuable intangible assets or intellectual property that allows their products to enjoy enhanced demand. High accounting profits may in fact reflect normal returns on the value of such intangible assets.[148,149]

165. Accounting measures of the App Store's profitability also do not establish the existence of antitrust market power because of the difficulty of separating out the costs and profits of the App Store with the costs and profits arising from iPhone and iOS development generally. As explained in Mr. Malackowski's report, Plaintiffs' experts' profitability analyses are flawed because they "rely on economically arbitrary methods to allocate

---

[145] Expert Declaration of Richard Schmalensee, Ph.D., August 10, 2021, at § VII.

[146] See, e.g., Expert Declaration of James E. Malackowski, August 10, 2021, at ¶¶ 118–125.

[147] See, e.g., (a) William J. Baumol and Daniel G. Swanson, "The New Economy and Ubiquitous *Competitive Price Discrimination: Identifying Defensible Criteria of Market Power.*" *Antitrust Law Journal*, 70(3), 2003, 661–685, at 661 ("The industries that are the hallmark of the 'new economy' are characterized by … sunk outlays that are large and must be incurred over and over again, but the marginal cost—the cost of serving an additional customer—is virtually negligible. As economists are well aware, this is only a special case of a more general circumstance, the case of scale economies, where the prices of a firm's products, if set equal to the corresponding marginal costs, will condemn the enterprise to losses.") and (b) David S. Evans and A. Jorge Padilla, "Excessive Prices: Using Economics to Define Administrable Legal Rules," *Journal of Competition Law and Economics,* 1(1), 2005, 97–122 (hereafter "Evans and Padilla (2005)"), at footnote 23 ("Consider an industry where production involves significant fixed costs. In that case the equilibrium prices of the goods and services that are commercialized in that industry cannot equal their marginal costs of production; at those prices, firms could not recover their fixed costs and sooner or later would exit the market. Instead, the equilibrium prices will be above the marginal costs of production so as to cover the fixed costs of production.").

[148] See, e.g., Franklin M. Fisher and John J. McGowan, "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits," *American Economic Review*, 73(1), March 1983, 82–97.

[149] See, e.g., Evans and Padilla (2005), at page 102 ("These problems [of using accounting data] become particularly severe in industries where firms invest and innovate regularly. In those industries, a few companies succeed but the winners typically obtain enormous profits. Those profits would appear excessive *ex post*, when the innovations are commercialized. However, from an *ex-ante* perspective and once the cost of capital is adequately adjusted for risk, competitors may earn normal profits; the huge profits earned by the winner(s) may just compensate for the huge losses made by all those who fail.")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

inseparable joint costs."[150] This conclusion is not surprising in light of the academic literature and the testimony of Apple executives.[151,152]

166. Inasmuch as Plaintiffs link their claims of Apple market power to their claims that Apple's App Store practices are anticompetitive, it is important to test that linkage against the surrounding history. When Apple first launched iOS-based devices and the App Store, back in 2007 and 2008, there could be no allegations of market power based on marketplace success that had yet to occur. Apple adopted many of the App Store policies that Plaintiffs challenged at the start (and they have only evolved in a manner more favorable to developers) deliberately to foster the appeal of the entire iOS platform for consumers and thus to developers, by assuring the security and reliability of the protected system.[153] Now that the iOS platform with its App Store practices has proven to be a dramatic success, Plaintiffs try to turn that success into proof of market power linked to the asserted anticompetitive interpretation of the App Store practices.

## IX. Plaintiffs' Experts' Single-Brand Relevant Market Based on an Aftermarket Paradigm Is Inappropriate

### IX.A. The foremarket/aftermarket approach is fundamentally inapplicable in this case

167. Single brands generally are not considered to constitute their own antitrust markets. This is because most markets involve differentiated products that are substitutable for one another. Confining a relevant market to a single brand requires more than simply pointing out that the App Store and iOS devices are differentiated from the Google Play Store and Android devices.

168. Professor McFadden, however, does just this, claiming the "relevant iOS apps and in-app content market" is an aftermarket, where, in the foremarket, consumers choose "OS installed mobile devices such as iOS mobile devices or Android mobile devices," and in the aftermarket consumers download and install apps specific to the OS on their mobile

---

[150] Expert Declaration of James E. Malackowski, August 10, 2021, at ¶ 226.

[151] See, e.g., (a) William J. Baumol, "Predation and the Logic of the Average Variable Cost Test," *Journal of Law and Economics*, 39(1), April 1996, 49–72, at 59 ("[A]ll multiproduct firms have fixed costs incurred in common on behalf of two or more of their products. There is, however, no economically defensible way of dividing such costs up among the firm's various products. As is well known, all methods for the allocation of common fixed costs are arbitrary."); and (b) Franklin M. Fisher and John J. McGowan, "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits," *American Economic Review*, 73(1), March 1983, 82–97, at 82 ("[A]ccounting rates of return… provide almost no information about economic rates of return. … [T]he economic rate of return is the only correct measure of the profit rate for purposes of economic analysis.").

[152] Neither Apple nor Epic allocate development costs.  See Transcript of Proceedings, Volume 11, May 17, 2021, Epic Games, Inc. vs. Apple, Inc., No. C-20-5640 YGR, Testimony of Philip Schiller, at 2731–2372 ("Q. And was the cost of that development work allocated to the App Store in any way?  A. No.  Q. Has it—has the cost of developing APIs ever been allocated to the App Store specifically? A. No."); and Transcript of Proceedings, Volume 2, May 4, 2021, Epic Games, Inc. vs. Apple, Inc., No. C-20-5640 YGR, Testimony of Tim Sweeney, at 228 ("Q. I would like to talk for just a moment about how Epic accounts for its development expenses.  And isn't it correct that Epic has no—makes no systematic effort to allocate its development costs among different projects?  A. Yes.")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

device.[154] In this context, an "aftermarket product" is one (a) used together with a "primary product," which is sold in a "primary market" or "foremarket," and (b) purchased after the primary product is purchased.[155] Professor McFadden identifies the primary market as one for "iOS-installed devices."[156]

169. Professor McFadden claims this aftermarket framework in iOS apps is applicable just because "Apple does not permit other app stores to be available for iOS device consumers" and because "apps compatible with non-iOS devices do not function properly (or at all) on iOS devices."[158] Professor McFadden states that these restrictions "make the iOS aftermarket a proprietary aftermarket."[159]

170. Both Professor McFadden's and Professor Elhauge's aftermarket arguments are premised on their untested "proprietary aftermarket" assumption that an iOS user that wants to use a particular app has no choice but to transact for that app on the App Store. However, as I discussed in section VII.A, many iOS users multihome on other devices on which they can transact for apps and in-app content that they want to enjoy. For many apps, and their associated in-app content, consumers can transact for those apps and in-app content on any of multiple types of non-iOS devices to which they have access. Similarly, developers can and do make their apps available on multiple platforms. That consumers and developers both can and do multihome creates opportunities for substitution across transaction platforms, by participants on both sides of the platform, without requiring substitution in devices, i.e., in the purported foremarket.

171. Professor McFadden asserts that "*common economic evidence* supports the conclusion that iOS-installed devices belong to the primary market, and the sales of iOS apps and in-app content constitute an aftermarket for the purpose of the market definition

---

[154]   McFadden Report, (a) at ¶ 43 ("The relevant iOS apps and in-app content market is commonly referred to as an 'aftermarket.'") and (b) at ¶ 44 ("In the primary market, consumers choose OS installed mobile devices such as iOS mobile devices or Android mobile devices.").

[155]   See, e.g., Carl Shapiro and David J. Teece, "Systems competition and aftermarkets: an economic analysis of *Kodak*," *The Antitrust Bulletin*, 39(1), Spring 1994, 135–162, at page 139 ("We define an 'aftermarket transaction' to be any transaction with two characteristics: (1) the aftermarket product or service is *used together with a primary product*, and (2) the aftermarket product or service is *purchased after the primary product*." Emphasis in original.)

[156]   McFadden Report, at ¶ 23. ("[C]ommon economic evidence supports the conclusion that iOS-installed devices belong to the primary market.")

[158]   McFadden Report, at ¶ 45. ("Apple does not permit other app stores to be available for iOS device consumers to use to download and install iOS apps and pay for in-app purchases. Also, apps compatible with non- iOS devices do not function properly (or at all) on iOS devices.")

[159]   McFadden Report, at ¶ 45. ("These restrictions make the iOS aftermarket a proprietary aftermarket in which only iOS device consumers can participate.")

analysis."[161]

172.   Because consumers can multihome for the purpose of app transactions, and the ability to do so varies over both consumers and apps, and therefore over developers, the examination of market power is not a common question within either purported class.

173.   Thus, because consumers and developers can substitute across transaction platforms without requiring substitution in the foremarket, the aftermarket framework does not apply. And any valid debate over this empirical conclusion is not remotely common across either putative class because the specific substitution opportunities for individual consumers and individual developers are markedly different.

### IX.B.   The economic relationship between sales of iOS devices and conduct toward the App Store is another reason why there is no relevant aftermarket

174.   The economic relationship between sales of iOS devices and conduct toward the App Store is another reason why there is no valid relevant aftermarket applicable in this case. As explained in this section, inasmuch as Apple's incentives with regard to its conduct towards the App Store are significantly intertwined with the impacts on its sales of iOS devices, it follows that there is no validity to the claim of a separate relevant market confined to the iOS App Store.

175.   Apple's incentives towards the App Store are tightly related to their anticipated impacts on sales of iPhones. This is the case because (a) consumers would soon learn of any diminution in the value of the iOS app ecosystem and (b) consumers have non-iOS device choices to which they could turn, whether for a first purchase of a smartphone or for a replacement or upgrade. These incentives are additive to those arising from the ability of developers and consumers to substitute away from the App Store for their app transactions, as discussed above.

---

[161]   McFadden Report, at ¶ 23. (Emphasis added.)

176. Although Apple does not set the prices of apps and in-app content, its innovations, investments, and policies have a significant impact on the value of the iOS app ecosystem to iPhone users. (The quality and value of the iOS app ecosystem to consumers corresponds to the role that prices of later-purchased products and services play in traditional aftermarket analyses.) The economic evidence shows that consumers have access to sufficient relevant information to be well able to judge the value to them of the iOS app ecosystem before they purchase an iOS device, and to compare that with the value of the app ecosystem available on competing devices. Smartphones are a very popular product category. [166] As ownership of smartphones approaches ubiquity, consumers making decisions about what smartphone to purchase are likely to have no shortage of friends or family from whom they can get firsthand information about the many choices available to them. There is a torrent of journalistic and other content in the form of blogs, podcasts, YouTube videos, social media, and product reviews that cover the smartphone space. [167] If Apple did anything—whether by disadvantaging developers or in any other way—that had the effect of reducing the number, variety, quality, security, usability, or affordability of apps and in-app content, such news would likely get out fast to Apple's existing and potential customers.

177. Moreover, Apple's existing and potential customers have many non-Apple choices from which to pick a smartphone, including numerous models from manufacturers such as Samsung, LG, Motorola, and Google. [168] There is intense rivalry among smartphone manufacturers that takes the form of price competition, as well as rapid innovation and improvement in smartphone capabilities and features in many dimensions, such as cameras (both forward-facing and rear-facing, including resolution, number and focal length of lenses, lowlight performance, and onboard signal processing), display type and quality (including resolution, refresh rate, and dynamic range), battery life, selection of form factors, authentication mechanism (e.g., fingerprint or facial recognition), processor and GPU speeds (including frames per seconds for gaming), storage, and others.

178. Given the above landscape, Plaintiffs' experts have failed to demonstrate how Apple could have an incentive to treat the purported aftermarket as a separate relevant market for independent profit maximization, rather than respecting the linkage of the vitality of the iOS app ecosystem as a crucial driver of its overall iPhone business.

179. In theory, adverse changes to conduct over later-purchased products or services that exploits an installed base of consumers typically would make sense only when the manufacturer has essentially given up on its reputation and its primary-market product because the product is at a technological dead end or the demand for its capabilities is sufficiently declining. In such a case, there are little or no future sales of the primary-

---

[166] As of February 2021, approximately 85 percent of US adults owned a smartphone. ("Mobile Fact Sheet," Pew Research Center, <https://www.pewresearch.org/internet/fact-sheet/mobile/>, at chart "Mobile phone ownership over time," accessed on August 4, 2021.

[167] See, e.g., (a) "Top 60 Essential Smartphone Blogs," Wilson Signal Booster, 2021, <https://www.wilsonsignalbooster.com/blog/top-60-essential-smartphone-blogs/>, accessed on August 7, 2021, and (b) "Top 45 Smartphone Blogs and Websites to Follow in 2021," Feedspot, August 6, 2021, <https://blog.feedspot.com/smartphone_blogs/>, accessed on August 7, 2021.

[168] See, e.g., Mark Spoonauer, "Best phones in 2021: The top smartphones rated," Tom's Guide, August 2, 2021, <https://www.tomsguide.com/best-picks/best-phones>, accessed on August 4, 2021.

market product at risk. Then it can be profitable for the manufacturer to "harvest the installed base" by treating the aftermarket as a separate market with no significant linkages to the primary-market product.

180.   Such an end-of-life scenario is the opposite of the iPhone circumstances. For example, in 2019, Apple's annual unit sales in the United States of iPhones and iPads combined was near an all-time high,[169] comprised of 68.3 million iPhones and 17.3 million iPads.[170] From 2012 through 2018 (the last year for which I have data), the number of iPhone users in the United States had grown each year, reaching 101.9 million in 2018.[171]

181.   Plaintiffs' experts assert that there are substantial switching costs that lock iPhone users into the iOS platform.

        Professor McFadden states that "[c]ommon evidence supports the conclusion that mobile device users, and particularly iOS device consumers, have high costs of switching to a device with a different OS installed."[173]

182.   If Plaintiffs' experts were correct and their purported aftermarket were indeed a properly defined relevant market, their switching-cost claims would imply that Apple has had, for some long period of time, the incentive to take steps to greatly increase the cost of apps to iPhone users, because those users are—according to Plaintiffs' experts—so locked in they would have no choice but to acquiesce to app-price increases.[174] However, the fact that Apple has *not* hugely increased its commission rate—in fact, has not increased its commission rate at all at any point since the App Store opened and in some contexts decreased it—is plain evidence that Plaintiffs' experts have not properly modeled Apple's incentives.

---

[169]   APL_APPSTORE_08822222.xlsx. According to APL_APPSTORE_08822222.xlsx, 2019's total units sold for iPhone and iPhone is 96.9% of the highest year's units sold.

[170]   Expert Declaration of Lorin Hitt, Ph.D., August 10, 2021, market-power appendix (hereafter "Hitt market-power appendix"), at ¶ 17. See also Rebuttal Expert Report of Lorin Hitt, Ph.D., March 15, 2021 (hereafter "Hitt Rebuttal Report (*Epic*)"), at ¶ 367 and Exhibit 59; APL_APPSTORE_08822222.xlsx.

[171]   Hitt market-power appendix, at ¶ 18 and Exhibit 10; see also Hitt Rebuttal Report (*Epic*), at ¶ 368 and Exhibit 60.

[173]   McFadden Report, at ¶ 67.

[174]   For example, Professor Elhauge calculates that Apple could increase its commission rate by 5 percent (not 5 percentage points) and increase costs to each of a supermajority of iPhone users by only 26¢ over the lifespan of her device, assuming the commission-rate increase was fully passed on to consumers. Professor Elhauge observes that 26¢ is much less than his estimated cost of switching from iPhone to Android of $138–$155. (Elhauge Report, at ¶ 7.E.c. See also id., at ¶ 231.)

[175]   See Hitt Rebuttal Report (*Epic*), at ¶ 368 and Exhibit 60.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### IX.C.     In fact, Apple has not exercised any market power in its conduct towards the App Store.

186.    The restrictions on the distribution of iOS apps about which Plaintiffs complain have been in place since the App Store was first announced and before a single third-party iOS app had been distributed. To the extent Apple's terms have changed, they have become more favorable to developers.

187.    Thus, there has been no adverse surprise to developers and, therefore, no indirect adverse surprise to consumers therefrom. Similarly, the restriction on iPhone users that they cannot obtain native iOS apps from either third-party app stores or via sideloading —i.e., they may purchase only from the App Store—is as old as the iPhone itself; thus there has been no direct adverse surprise to consumers either.

_____

188.   Therefore, as a matter of fact, there has not been an exploitation by Apple of its installed base.

# X.   Plaintiffs' Experts' Conclusions that Impact and Damages Can Be Determined on a Classwide Basis Are Fatally Flawed Because They Ignore that in the But-For World Apple Would Have the Incentive to Monetize its IP in Alternative Ways

## X.A.   All developers must license Apple's intellectual property, including in Plaintiffs' but-for world

189.   Intellectual property "bestows on the owners of intellectual property certain rights to exclude others. These rights help the owners to profit from their use of the property."[179] Although Apple could have chosen to be the exclusive developer of iOS native apps, it decided instead to offer a license to third-party developers to enable the procompetitive benefits from combining complementary factors of production.

190.   Apple currently requires all developers to license its intellectual property through the Developer Program License Agreement ("DPLA") before they may distribute an app through the App Store.[180] In exchange for this license, developers pay Apple both a fixed $99 annual fee as well as the commission rates that Plaintiffs challenge in this matter.[181]

191.   In the but-for world, developers selling through the App Store would continue to require a license to Apple's intellectual property.[182] In addition, to the extent that the but-for world contemplates app distribution through alternative channels, such apps would also still require Apple IP and a new licensing arrangement.[183] All developers in the proposed Developer class have agreed to the DPLA and would be required to license Apple's IP in the but-for world.

192.   Plaintiffs' experts, however, essentially ignore Apple's IP rights. Professor McFadden acknowledges that Apple charges developers a fee for its Apple Developer Program and its Apple Developer Enterprise Program, but he does not acknowledge that Apple has intellectual property that is accessed by developers through these programs.[184] Professor Elhauge mentions intellectual property only as a "significant barrier[] to entry and

---

[179]   "Antitrust Guidelines for the Licensing of Intellectual Property," U.S. Department of Justice and the Federal Trade Commission, January 12, 2017 (hereafter "IP Guidelines"), at § 2.1, citing to *Trinko*. (Emphasis added.)

[180]   See section III.A.

[181]   Developers' Complaint, at ¶¶ 3–4.

[182]   I.e., the need for the license is not limited to distributing iOS apps on the App Store. The license is required for developing and distributing an iOS app generally (e.g., by using Xcode) and many apps are highly reliant on advanced APIs that Apple has incorporated into iOS (e.g., Metal).

[183]   See, e.g., Expert Declaration of James E. Malackowski, August 10, 2021, at ¶¶ 188–201.

[184]   McFadden Report, at ¶ 35. ("Apple collects a relatively small amount of revenue from a fixed $99 annual fee charged to developers for its Apple Developer Program. Apple charges organizations seeking to deploy internal-use apps $299 per year for its Apple Developer Enterprise Program.") See also id., at ¶ 36, where Professor McFadden estimates that the Developer Program $99-fee revenues are about ■ of the App Store commissions.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

expansion in the U.S. smartphone and tablet market"[185] and, pointing to Apple's IP specifically, as an obstacle developers need to invent around.[186] Professor Economides does not acknowledge Apple's IP explicitly, while acknowledging that Apple charges developers a fee for the Apple Developer Program.[187]

## X.B.   In the but-for world, Apple would have a strong economic incentive to choose to monetize its IP in ways that do not rely on iOS app transactions occurring on the App Store

193.   Implicit within Plaintiffs' experts' reports (and explicitly stated in Economides expert report) is the assumption that, in the but-for world, developers would continue to have access to the same Apple IP they currently do today under the DPLA for the current $99 annual fee.[188,189]

194.   As explained in Mr. Malackowski's report, as an IP owner, Apple can monetize its IP in any of multiple different ways, as do many other IP owners.[190] At least until the present, one way that Apple has monetized its IP is through the commission it charges developers on certain classes of App Store transactions.[191]

---

[185]   Elhauge Report, at ¶ 220.

[186]   Elhauge Report, at ¶ 220. ("One of Apple's experts in the related *Epic v. Apple* litigation acknowledged that Apple uses 'its IP as a tool to prevent competitors from either copying existing technologies or bringing Apple's "original" ideas to fruition first.' Potential rivals must invent around this intellectual property, and researching and developing new technology in this industry is incredibly expensive; as evinced by Apple spending over $18 billion in R&D in just the last fiscal year.")

[187]   See Economides Report, at (a) ¶ 69 ("Just like these other OS owners, Apple also offers resources for potential developers, in order to get more developers on board. The Apple Developer Program is offered by Apple to anyone who wants to create software for Apple operating systems, including iOS, macOS, watchOS, and tvOS. Apple offers some tools for free, but charges $99 per year for its SDK. Apps are available through the Apple App Store, which includes the iOS, Mac, iWatch, and Apple TV stores.") and (b) ¶ 70 ("I assume that, in the but for world, competition from other distribution methods would not reduce Apple's pricing of its Developer Program, and moreover that developers using other distribution channels would nevertheless value the tools, SDK, and testing provided through the program and would continue to pay the $99 annually.")

[188]   See, e.g., (a) Economides Report, at ¶ 70 ("I expect that in the but-for world, Apple will provide the Apple Developer program to all potential iOS programmers. … [who] would continue to pay the $99 annually."; and (b) Zoom Deposition of Nicholas Economides, August 4, 2021, at 112:16 – 113:1 (Q: "And is it your opinion in the scenario when the Court has Apple reviewing the apps that are going to be sold only in nonapple app stores in – in that scenario which I identified, that Apple would not charge anything beyond the $99 that it charges developers currently for making apps available in the Apple App Store?" A: "Yes, broadly I would say, yes. I mean, the $99 is the present standard fee, and I would expect it to stay the same."); and (c) Zoom Deposition of Einer Elhauge, July 30, 2021, at 97:2 – 97:5 (Q: "Right. And then there's an annual fee for developers you mentioned of $99?" Q: "Yeah. I haven't made any assumption about that changing.").

[189]   See also Expert Declaration of James E. Malackowski, August 10, 2021 at ¶¶ 177–200.

[190]   Expert Declaration of James E. Malackowski, August 10, 2021 at ¶¶ 60–61, 197–208.

[191]   Expert Declaration of James E. Malackowski, August 10, 2021 at ¶ 199 ("Tim Cook's testimony made clear that the entire current compensation structure, including the commissions, is how Apple generates a return on its ecosystem of R&D and IP rights. Specifically, Mr. Cook states, 'The commission is for a number of different things, from developer tools to the APIs and to the customer service that's provided,' and 'Yes. [The commission] provides a return on our – our investment,' and 'If we allowed people to link out like that, we would in essence give up the – our total return on our IP.'")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

195. I understand that, in Plaintiffs' but-for world, Apple could no longer require that the App Store be the exclusive platform for transacting native iOS apps, and that third-party app stores would be freely permitted and consumers could sideload native iOS apps directly onto their iPhones.

196. In that but-for world—with alternative third-party iOS app stores and sideloading—developers could choose to circumvent to varying degrees transacting on the App Store and thus circumvent paying Apple a commission for the use of its IP (beyond the $99 Apple Developer Program fee).

197. In response to such a loss of revenue in the but-for world, Apple would have a strong economic incentive to choose among multiple feasible mechanisms to monetize its IP that do not rely on iOS native app transactions occurring on the App Store.

198. One way in which Apple could monetize its IP in the but-for world is to—alternatively or additionally—choose to implement an ad valorem royalty (i.e., a royalty based on a percentage of revenue) on certain classes of developers and/or apps. This would differ from the current system in that the developer's obligation to pay this new royalty would not be tied to App Store transactions. Rather, the developer's use of Apple's IP in certain fields of use that Apple specifies would trigger the obligation to pay.

199. With this type of ad valorem monetization model, Apple could decide that the scope of value creation covered by its royalty would be both broader in some respects and narrower in some respects than the current scope of the commission requirement.

200. For example, Apple could choose to monetize in-app advertising, which is not currently covered by Apple's commission. Apple might also have incentives to monetize other types of transactions currently exempted from the commission requirement, such as requiring a royalty on transactions facilitated by the app but where the product or service was delivered outside of the app.

201. Simultaneously, Apple could decide to exempt entirely certain developers from the obligation to pay a royalty. For example, Apple could exempt entirely all developers whose annual transaction volumes fall below a certain dollar threshold. As yet another alternative, Apple could adopt tiered programs based on any number of factors.

202. Moreover, to better target such new IP licensing obligations to just the set of developers that choose to utilize Apple's IP without effectively paying for it via commissions on App Store transactions, Apple could be incentivized to provide an offsetting credit or rebate against such new IP licensing obligations to developers that continue to use the App Store and continue to incur commission on App Store transactions in the but-for world. (As noted below, such a rebate mechanism is used in Epic's Unreal Engine license.).

203. Ad valorem licensing regimes are common in many IP licensing settings, and one prominent real-world example exists for Epic Games' software IP. Epic Games offers developers an "End User License Agreement for Publishing" to Epic's Unreal

Engine.[192,193] This agreement charges developers a 5 percent royalty on all worldwide gross revenue in excess of the first $1 million in lifetime gross revenue for each product created with the Epic Unreal Engine software.[194] The reach of the royalty requirement is comprehensive, including (a) "any and all sales of a Product to end users through any and all media, including but not limited to digital and retail"; (b) "any and all in-app purchases, downloadable content, microtransactions, subscriptions, sale, transfer, or exchange of content created by end users for use with a Product, or redemption of virtual currency, either within a Product or made externally but which directly affect the operation of the Product"; (c) "revenue from in-app advertising"; and the catch-all (d) "Revenue in any other form actually attributable to a Product (unless excluded below)."[195]

204. Another way in which Apple could monetize its IP in the but-for world is by increasing the fixed fees for use of its IP.[196] Apple already has two fixed fees associated with access to its IP: (a) the Apple Developer Program ($99/year) and (b) the Apple Developer Enterprise Program ($299/year).[197] To monetize its IP in the but-for world, Apple would have the economic incentives to elaborate on this fixed-fee structure by adding additional categories and tiers based on various criteria, such as which bundles of tools or functionality the developer uses, the types of apps the developer creates, whether the developer offers free or paid apps (or in-app purchases), or the total annual volume of

---

[192] See "Frequently Asked Questions (FAQ)," Unreal Engine, 2021, <https://www.unrealengine.com/en-US/faq>, accessed on August 4, 2021. ("Unreal Engine (UE4) is a complete suite of creation tools for game development, architectural and automotive visualization, linear film and television content creation, broadcast and live event production, training and simulation, and other real-time applications."). See also "Overview of Unreal Engine," Packt, <https://hub.packtpub.com/overview-unreal-engine/>, accessed on August 5, 2021. ("Unreal Engine is a game engine that helps you make games. The Unreal Engine is made up of several components that work together to drive the game. Its massive system of tools and editors allows you to organize your assets and manipulate them to create the gameplay for your game. Unreal Engine components include a sound engine, physics engine, graphics engine, input and the Gameplay framework, and online module.")

[193] See (a) "Unreal® Engine End User License Agreement for Publishing," Unreal Engine, (hereafter "Unreal Engine EULA for Publishing"), <https://cdn2.unrealengine.com/Unreal+Engine%2Ffaq%2FUnrealEngineEULA_for_Publishing_v15-b9955ec2954f0e09fade11b2d9acecfe65cb6ab1.pdf>, accessed on August 4, 2021; (b) "Frequently Asked Questions (FAQ)," Unreal Engine, <https://www.unrealengine.com/en-US/faq>, accessed on August 4, 2021; and (c) "Licensing Options," Unreal Engine, <https://www.unrealengine.com/en-US/download>, accessed on August 4, 2021.

[194] Unreal Engine EULA for Publishing, at § 5 ("Royalty"). ("However, no royalty is owned on the following forms of revenue: 1. The first $1,000,000 in lifetime gross revenue for each Product; 2. Gross revenue attributable to a Product from a calendar quarter during which the gross revenue for such Product is less than $10,000; 3. The first $5,000,000 in gross revenue for each Product from the Oculus Store; …." There are additional exemptions.)

[195] Unreal Engine EULA for Publishing, at § 5 ("Royalty").

[196] See, e.g., Malcolm Owen, "Epic versus Apple: What's at stake if Apple loses," Apple Insider, May 16, 2021, https://appleinsider.com/articles/21/05/16/epic-versus-apple-whats-at-stake-if-apple-loses, accessed on August 4, 2021. ("It is unlikely that Apple would pass on the cost of running the App Store onto consumers directly, but if it is forced to recover its costs somehow, this could be in the form of other fees to developers. … Apple may try to recoup in ways that may be challenging to developers. This could be service charges for hosting files in the App Store, or even higher fees for becoming an Apple Developer in the first place.")

[197] "How the Program Works," Apple Developer, 2021, <https://developer.apple.com/programs/how-it-works>, accessed on August 5, 2021; "Apple Developer Enterprise Program," Apple Developer, 2021, <https://developer.apple.com/programs/enterprise/>, accessed on August 4, 2021.

---

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the developer's transactions. Apple would be incentivized to set its price for each category and tier of these programs in order to earn an adequate return on its IP.

205.  Moreover, like the ad valorem licensing regime discussed above, Apple could decide that the scope of value creation covered by a fixed-fee licensing regime would be both broader in some respects and narrower in some respects than the current scope of the commission requirement.

206.  Unity Software ("Unity") provides a real-world example of exactly this kind of fixed-fee monetization model. Unity Software "is the world's leading platform for creating and operating interactive, real-time 3D content."[198] According to the company, "in the fourth quarter of 2020, 71% of the top 1,000 mobile games were made with Unity."[199] Unity provides access to its proprietary IP through a tiered fixed-fee monetization model. These four tiers are as follows, with each tier providing access to additional tools and functionality:[200]

- Personal tier: This tier is free, and requires revenue or funding of less than $100,000 in the last 12 months.

- Plus tier: This tier costs $399 per year per user license, and requires revenue or funding of less than $200,000 in the last 12 months.

- Pro tier: This tier costs $1,800 per year per user license, and either this tier or the Enterprise tier is required if revenue or funding is more than $200,000 in the last 12 months.

- Enterprise tier: This tier costs $4,000 per month for every 20 user licenses, and either this tier or the Pro tier is required if revenue or funding is more than $200,000 in the last 12 months.

207.  In addition to these two possible IP monetization models that Apple could choose between in the but-for world, Mr. Malackowski's report discusses a number of other possible IP monetization models.[201] Because Plaintiffs' experts completely ignore the role and value of Apple's proprietary IP, they fail to properly evaluate the but-for world that follows from Plaintiffs' claims, and as explained below, fail to recognize that alternative IP monetization models would have different impacts on different members of the proposed Developer class.

---

[198]  Unity Software Inc. Form 10-K for the fiscal year ended December 31, 2020, at page 1 (PDF page 9).

[199]  Unity Software Inc. Form 10-K for the fiscal year ended December 31, 2020, at page 1 (PDF page 9).

[200]  "Choose the plan that is right for you," Unity, <https://store.unity.com/compare-plans>, accessed on August 4, 2021; "Unity Software Additional Terms," Unity, July 15, 2021, <https://unity3d.com/legal/terms-of-service/software>, accessed on August 5, 2021.

[201]  Expert Declaration of James E. Malackowski, August 10, 2021 at ¶¶ 201–208.

### X.C.    Alternative monetization mechanisms in the but-for world would make some members of the proposed Developer class worse off compared to the actual world

208.  Different IP monetization mechanisms that Apple would have the economic incentive to pursue in the but-for world would have differential impacts on members of the proposed Developer class.

209.  To the extent Apple seeks to monetize its IP by instituting an ad valorem royalty similar to that delineated in the Epic Unreal Engine license agreement, some developers could be worse off in the but-for world than in the actual world. As an example, consider developers that have apps that are monetized primarily via in-app advertising and only to a small extent by in app purchases. If Apple charged a 5 percent royalty on all revenue, whether generated from app downloads, in-app purchases, or from advertising, the increased royalty obligation on advertising revenue (5 percent in this but-for world versus nothing in the actual world) could easily swamp the decreased royalty obligation from lower royalty obligations on in-app purchases (5 percent in this but-for world versus a 30 percent commission in the actual world).

210.  Further, developers, such as those who offer only free apps with no in-app purchases, who are not members of the proposed Developer class—and thus not represented in this litigation—could be harmed by the Plaintiffs' desired remedy. For example, developers that rely entirely on in-app advertising, and thus have no paid apps or in-app purchases, would be worse off if Apple applied a royalty to in-app advertising. Any imagined responses in the but-for world by app developers that might change their own business strategies would require individual inquiries inconsistent with the commonality associated with an appropriate class.

211.  Alternatively, to the extent Apple expands the scope of its IP royalty requirement (relative to the current scope of the commission requirement) by instituting a tiered fixed-fee structure like that of Unity, once again some developers could be worse off in the but-for world than in the actual world. For instance, consider a developer that primarily monetizes from in-app advertising (earning annual ad revenue of, say, $1,000, but also earns small amounts of revenue from in-app purchases (e.g., $200 per year). If that developer chose to license Apple's IP in the but-for world to gain access to a bundle of functionality and features in a fixed-fee tier akin to Unity's Plus tier—assuming Apple charges the same $399 for a license in the but-for world that Unity charges—the developer would be worse off in the but-for world. Specifically, in the but-for world, this developer would have to pay $399 per year for the license (not counting any possible additional commission on its $200 of in-app purchases) as compared to the $159 the developer now pays in the actual world (= current $99 developer fee + 30% x $200 of in-app purchases).

212.  Further, a tiered fixed-fee monetization model that could result from Plaintiffs' desired remedy would harm developers who are not members of the proposed Developer class—and thus not represented in this litigation. For example, developers that rely entirely on in-app advertising, and thus have no paid apps or in-app purchases, would be worse off if Apple instituted fixed-fee royalty obligations akin to the tiered fixed-fee licensing structure utilized by Unity. Such developers could go from paying nothing

more than the $99 per year developer fee in the actual world to paying something like $2,400 per year per user license for a Unity-like Enterprise tier license in the but-for world (or be forced to change their monetization strategy entirely or exit the marketplace).[202]

213. Likewise, other IP monetization models, like those delineated in Mr. Malackowski's report, would result in certain members of the Developer class being worse off in the but-for world as compared to the commission requirements of the actual world.[203]

214. Thus, determining which developers would be better off in this but-for world, which might be worse off, and the degree to which that is the case, would require individual inquiry into the monetization economics of each developer and the motivated changes of Apple's monetization of its IP in the but-for world.

## XI. Consumers that Purchased only (a) Zero–Marginal Cost Apps or (b) Subscription Apps with Advertising Are Uninjured or Benefited by the Challenged Conduct, Compared to the But-For World

215. In this section, I identify two significant groups of apps whose prices in the but-for world (in which Plaintiffs' experts allege commission rates would be lower) would either be unchanged or higher: (1) apps where the developer does not incur a fixed-dollar cost with each purchase and (2) subscription apps with advertising and no fixed-dollar incremental cost (or with advertising revenue that exceeds the incremental cost).

216. Consumers that purchased only these types of apps (or a mixture of the two types) are therefore uninjured by the alleged anticompetitive conduct (i.e., they would be either no better off or would be worse off in the but-for world).

217. Determining which apps falls into these two categories would require individualized inquiry at the app level. Determining which consumers are uninjured due to their exclusively purchasing one or both of these two types of apps would require individualized inquiry at the consumer level coupled with the individualized inquiries at the app level.

---

[202] See "Choose the plan that is right for you," Unity, <https://store.unity.com/compare-plans>, accessed on August 4, 2021; "Unity Software Additional Terms," Unity, July 15, 2021, <https://unity3d.com/legal/terms-of-service/software>, accessed on August 5, 2021.

[203] Expert Declaration of James E. Malackowski, August 10, 2021, at ¶¶ 201–218. (Mr. Malackowski explains that Apple could use other IP monetization models in the but-for world, such as "charg[ing] a fee for the use of each specific API, developer tool, or software package;" "charg[ing] separately for bundles of developer tools or functionality;" "rais[ing] the developer license fee generally;" "introduc[ing] a developer revenue-based royalty;" "implement[ing] a tiered structure of developer licenses;" or "vary[ing] fee terms based on the size or other characteristics of a particular developer." He discusses that such alternative monetization methods would affect different Developers differently, including that: "Developers might abandon iOS;" "Developers might cease use of beneficial Apple tools, IP, and APIs;" "Developer innovation might wane;" "Developers might raise prices;" "Developers might charge for currently free applications;" "Developers might introduce advertising in currently ad-free applications;" "[s]mall [D]evelopers might be disadvantaged;" "[l]arge [D]evelopers might be advantaged or disadvantaged;" and "Developers might face higher financial risk when developing for iOS.")

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## XI.A.   Individual inquiry is necessary because consumers of apps where the developer does not incur a fixed-dollar marginal cost are uninjured

218.   For many apps, an additional purchase of that app or in-app content likely does not generate a material incremental fixed-dollar cost to the developer. For example, many apps provide functionality that is provided entirely from the code in the app; e.g., a calculator app, a text editor, a single-player game. Thus, the developer incurs no additional cost when an end-user purchases the app or in-app content.[204]

219.   The price the developer sets for the app (or in-app content) determines the revenue generated by the app on the App Store. This is the number of downloads multiplied by the price the consumer pays for each download.

220.   When the developer does not experience a fixed-dollar per purchase marginal cost from an app download or the purchase of in-app content, the only deduction made from the purchase price before the developer calculates its profit is the commission itself. Thus, the developer's profit from the app net of sunk costs is simply a given fraction of the revenue the app generated on the App Store.[205] For example, if the purchases of the app are assessed a 30 percent commission by Apple; the developer retains 70 percent of the revenue generated from the app on the App Store; alternatively, if the purchases are assessed a 15 percent commission, the developer retains 85 percent of that revenue.

221.   The key insight that applies in this zero–marginal cost case is that the developer's profit-maximizing choice of price does not depend on the level of Apple's commission. Regardless of what fractional slice of the purchase price the developer receives, the developer's incentive is to pick the purchase price that maximizes the revenue the app generates on the App Store.[206] (See the Technical Appendix (section XII) for the proof and an illustration.)

222.   Thus, when an app transaction has zero marginal cost to the developer, changes in the commission rate do not pass through to consumers. Consumers that purchase only such apps are uninjured by allegedly excessively high commission rates.

223.   Many apps have zero incremental costs to the developer. However, there can be exceptions for numerous reasons, for example when the app uses some intellectual

---

[204]   Professor Elhauge appears to agree that many apps have de minimis marginal costs. See Elhauge Deposition, at 40:9 − 40:12 (Q: "Is it your opinion personally that marginal costs for Apple developers are very small?" A: "Yes, generally, yes."); and 41:1 − 41:6 ("But – but I am not relying on [Professor McFadden] for any assessment that marginal costs are generally small. I'm relying on my own understanding of, you know, … that there's not much marginal cost to just, once you have the app, giving somebody another copy of the app.").

[205]   Here I exclude the developer's sunk costs, e.g., of developing the app in the first place and joining Apple's Developer Program. These sunk costs have no effect on the developer's profit-maximizing price.

[206]   This principle holds as well if the developer is contractually obligated to compensate an input to the app on an ad valorem basis, e.g., if the developer compensates a rights holder (of music used in the app, for example) based on a percentage of the app's revenue. The ad valorem payment to the rights holder is equivalent in its impact on the incentives for the choice of price to an increase in the commission rate. Because the developer's choice of profit-maximizing price is independent of the magnitude of the commission rate, it is also independent of any other ad valorem payments made by the developer.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

property for which the developer has contracted to pay on a fixed-dollar per transaction basis (rather than an ad valorem basis).[207]

224. Consumers that purchase only apps with no incremental costs to the developer are uninjured because the developers of these apps would have no economic incentive to lower the prices of these apps in the but-for world.

225. Determining which apps have zero marginal costs versus positive fixed-dollar marginal costs would require individualized inquiries at the app level. Likewise, determining which consumers purchased only these zero marginal cost apps versus apps with positive fixed-dollar marginal costs would require individualized inquiries at the consumer level.

## XI.B.   Individual inquiry is necessary because consumers of subscription apps with advertising (e.g., newspaper apps) benefitted from the challenged conduct

226. Now I consider a subscription app that also earns in-app advertising revenue for the developer. This advertising revenue is not currently subject to an App Store commission.[208]

227. I have identified several iOS newspaper/magazine apps that charge a subscription fee and display ads in the app to their subscribers. These include the New York Times, the Wall Street Journal, The Economist, The New Yorker, and Wired.[209] This list is not the result of an exhaustive or systematic search. Identifying all such apps would require an app-by-app inquiry.[210]

228. The New York Times earned more revenues from digital advertising ($229 million) than from print advertising ($164 million) in 2020. The New York Times' digital advertising revenues were also substantial relative to its revenues from digital-only newspaper subscriptions ($544 million) in 2020.[211] Dow Jones (the publisher of the Wall Street Journal) earned $165 million in digital advertising revenues in 2020 – not much less than

---

[207] Nevertheless, with a continuing discrete pricing grid (allowed prices are at $1 intervals), a small amount of positive marginal cost would not be sufficient to motivate a developer to pass along a lower commission by dropping the price by an entire dollar. More generally: consumers that purchased only 99¢ apps would be uninjured if that continued to be the lowest allowed positive price. Therefore any reduction in the commission in the but-for world would not lower the developer's price.

[208] While this analysis is cast in terms of newspapers and magazines, the same analysis applies to other apps that earn revenue from both subscriptions and ads to which the users are exposed. Professor Hitt identifies video-streaming apps that are monetized by both subscriptions and ads, for example Amazon Prime Video, Hulu, Paramount+, Peacock TV, and YouTube TV. (Hitt market-definition appendix, Figure 20.)

[209] I provide screenshots in my report backup documenting the appearance of advertisements displayed within these apps to a user with an active subscription.

[210] Each of the publications listed is highly ranked (according to number of digital subscribers) on the 2020Q4 Update of the Global Digital Subscription Snapshot, produced by FIPP and CeleraOne, ("Global Digital Subscription Snapshot," Q4 2020 Update, FIPP and CeleraOne, 2020, <https://www.fipp.com/wp-content/uploads/2020/12/FIPP_GDS_Snapshot_2020_Q4_V1.pdf>, accessed on August 9, 2021). The New York Times is ranked number 1 with 6.1 million subscribers. The Wall Street Journal is ranked number 3, with 2.35 million subscribers. The Economist is ranked number 9 with 516K subscribers. The New Yorker is ranked number 25 with 240K subscribers. Wired is ranked number 31 with 142K subscribers.

[211] The New York Times Company, 2020 Annual Report, at 35–39, <https://nytco-assets.nytimes.com/2021/03/Final-NYT-2020-Annual-Report.pdf>, accessed on August 8, 2021.

its print advertising revenues ($194 million) in that year. Dow Jones' digital advertising revenues were also substantial relative to Dow Jones' revenues in 2020 from digital-only subscriptions ($429 million).[212]

229. Although subscribers will vary in how much they will use the app over a month, and thus will vary in how many in-app advertisements they will view and/or click on, the developer can calculate a per-subscriber average of its advertising revenue per month from the app. To the developer, this average advertising revenue per subscriber appears as a positive incremental benefit or a *negative* marginal cost because, for each incremental subscription, the developer anticipates on average receiving this much ad revenue (over and above the subscription revenue).

230. When there is per-subscriber advertising revenue, a developer's profit is not just the after-commission share of the revenue the app generates from the App Store. The developer's profit also reflects the positive contribution of that per-subscriber advertising revenue multiplied by the number of subscribers.

231. In this circumstance, a lower commission rate would give the developer an incentive to *increase* its subscription price. In other words, consumers would pay more in the but-for world for subscription apps that generate revenue from in-app advertising. (See the Technical Appendix (section XII) for a proof and illustration of the phenomenon.)

232. The economic intuition is that given any particular commission rate, the developer sets the subscription price to balance the after-commission revenue increasing effects of a higher subscription price against its negative effects on the number of subscribers and therefore on the ad revenue. A declining commission rate elevates the relative importance of subscription revenues in the total earnings of the app, and so the profit maximizing reaction is to shift the subscription price upward to raise subscription revenues at the expense of some ad revenues.

233. The direction the app price responds to a decrease in the commission rate depends on the algebraic sign of the effective marginal cost (i.e., whether it is positive, zero, or negative). Advertising revenue is a negative effective marginal cost, so when there is zero marginal cost but positive advertising revenue, the effective marginal cost is negative; and subscribers of the New York Times, and similar apps, are better off in the actual world than in the but-for world.

234. Thus, consumers that purchased only subscriptions apps with advertising and (e.g., the New York Times app) would be uninjured. The developers of these subscription-with-advertising apps would have the economic incentive to increase the apps' prices in the but-for world.

235. This result amplifies the conclusions of the prior section—that consumers who purchased exclusively zero-marginal cost apps are uninjured by Apple's challenged actions. In addition to those consumers, consumers that exclusively subscribe to apps that carry advertising would be injured by moving to the Plaintiffs' but-for world. It is

---

[212] Revenues are calculated based on figures in News Corp, 2020 Annual Report, at 48–50, <https://newscorp.com/wp-content/uploads/2020/10/news-corp-2020-annual-report.pdf>, accessed on August 8, 2021. Details of the calculations are included in Publications_Calculations.xlsx.

impossible that common evidence could show classwide adverse impact from the challenged conduct.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# XII.   Technical Appendix

## XII.A.   When the developer does not incur a fixed-dollar marginal cost

236.   When the developer does not experience a fixed-dollar per purchase marginal cost from an app download or the purchase of in-app content, the developer's profit from the app net of fixed and sunk costs is simply a given fraction of the revenue the app generated on the App Store.

237.   The key insight that applies in this zero–marginal cost case is that the developer's profit-maximizing choice of price does not depend on the level of Apple's commission. Regardless of what fractional slice of the purchase price the developer receives, the developer's incentive is to pick the purchase price that maximizes the revenue the app generates on the App Store.

238.   This principle is illustrated in Figure 1, which shows two post-commission net revenue curves for a developer. The demand for the app is assumed to be the linear demand function $D(p) = 20 - p$. The fundamental result of this example does not depend on either (a) the particular parameters of the linear-demand function or (b) that the demand function is linear.

239.   The lower (red) curve is the developer's ultimate net revenue after Apple deducts its 30 percent commission from the total revenue generated by the app at the App Store. The higher (blue) curve is the developer's ultimate net revenue if instead Apple deducted only a 10 percent commission.

240.   In each scenario, the developer would choose the price for the app (represented on the horizontal axis) that maximizes the developer's net revenue (i.e., after the commission is deducted). In this example, when the commission rate is 30 percent, the developer's profit-maximizing price is $10, because that is the price that corresponds to the highest point on the red net-revenue curve. (See the red triangle.) Moreover, when the commission rate is lower, here 10 percent, the developer's profit-maximizing price is still $10, because that corresponds to the highest point on the blue curve. (See the blue triangle.)

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



**Figure 1: Example illustrating that a developer's choice of profit-maximizing price is independent of the commission rate when the marginal cost of the app to the developer is zero**

## XII.B.   Subscription apps with advertising revenue

241. Now consider a subscription app that also earns in-app advertising revenue for the developer. This advertising revenue is not currently subject to an App Store commission.

242. In this circumstance, a lower commission rate would give the developer an incentive to *increase* its subscription price. In other words, consumers would pay more in the but-for world for subscription apps that generate revenue from in-app advertising.

243. This phenomenon is illustrated in Figure 2, which assumes the same demand curve used in Figure 1. The only difference in this example is the assumption that the developer receives $5 of advertising revenue per subscriber over the subscription period. (The red and blue dashed curves in Figure 2 are what were the solid red and blue net-revenue curves in Figure 1.)



**Figure 2: For a subscription app with advertising revenue, a decrease in the App Store commission rate would lead the developer to *increase* the price of the subscription**

244. In Figure 2, the solid red curve is the developer's profit when the subscription is subject to a 30 percent commission. Note that it is higher than the dashed red curve that corresponds to net-revenue from the App Store for the same commission rate. This reflects that the developer receives the additional source of revenue from advertising. The developer's profit-maximizing subscription price when the commission rate is 30 percent is $6.43, which is the price (along the horizontal axis) that corresponds to the red triangle at the highest point on the solid red curve.

245. The solid blue curve is the developer's profit when the subscription is subject to a 10 percent commission. The developer's profit-maximizing subscription price when the commission rate is 10 percent is $7.22, which is the price (along the horizontal axis) that corresponds to the blue triangle at the highest point on the solid blue curve.

246. First, to confirm what is likely to be a popular intuition: For a given commission rate, a developer that receives ad revenue in addition to subscription revenue will set a lower price than it would if the app earned only subscription revenue. This reflects the developer's added incentive to enlarge the user base in order to earn more ad revenues. Recall from Figure 1 that, when the developer received no advertising revenue, the developer's profit-maximizing price was $10, regardless of the commission rate. In

Figure 2, the developer's profit-maximizing price is lower than $10 both (a) for the 30 percent commission rate (the subscription price is $6.43 rather than $10.00) and (b) for the 10 percent commission rate (the subscription price is $7.22 rather than $10.00). See Table 1, which summarizes the developer's profit-maximizing choices of subscription price based on (a) the commission rate and (b) the per-subscriber ad revenue per subscription period.

247. Figure 2 illustrates the general fact proven in the technical appendix the effect of a lower commission rate on the developer's profit-maximizing subscription price. When the developer earns ad revenue, the lower the commission rate, the *greater* is the developer's profit-maximizing choice of subscription price. This is shown in the bottom row of Table 1: when the commission rate decreases from 30 percent to 10 percent, the developer's profit-maximizing choice of subscription price *increases* from $6.43 to $7.22.

**Table 1: Comparing a developer's profit-maximizing price by (a) per-subscriber ad revenue and (b) commission rate**

| Commission rate | 30% | 10% |
| --- | --- | --- |
| No ad revenue | $10.00 | $10.00 |
| $5/sub/period | $6.43 | $7.22 |

## XII.C.   Derivation

248. See following pages.

**TABLE 1:**   Summary of key symbols in model

| Symbol | Meaning |
|---|---|
| *Choice variable* | |
| $p$ | Price of downloading app (alternatively in-app purchase), charged to end-user. |
| *Consumer demand* | |
| $D(p)$ | Demand function for app. Number of units downloaded at price $p$. |
| *App store's economics* | |
| $\gamma \in [0,1)$ | Commission (percentage) deducted from purchase price $p$ by app store prior to remitting the balance to developer. |
| *Developer's app economics* | |
| $c$ | Marginal cost (e.g., \$/unit) to developer resulting from additional unit of the app. |
| $\alpha$ | Advertising revenue (e.g., \$/unit) for developer resulting from additional unit of the app. |
| $\kappa \in [0,1]$ | Ad valorem cost (percentage of price $p$) to developer resulting from additional unit of the app. |
| *Additional assumption about parameters* | |
| $\kappa + \gamma \le 1$ | Ensures that developer has nonnegative revenue after the app store and its input suppliers take their ad valorem cuts. (This does not address whether the developer's *profit* is nonnegative because it does not address $\alpha$ and $c$.) |

# I   Introduction

This analysis considers a developer of an app that sells the app through an app store that acts as the agent in the sense that ⓐ the developer has the authority to choose the price $p$ at which the app is sold and ⓑ the app store acts as the developer's agent to sell the app at the price the developer chooses.

See Table 1 for a summary of key symbols.

The app store charges the developer a commission $\gamma \in [0,1)$, which the app store deducts from the sale proceeds before remitting the balance to the developer.

The developer may incur a marginal cost $c$ (\$/unit) for each unit of the app sold. For example, the developer may have agreed, as part of a risk-sharing arrangement, to pay the programmer a fixed dollar amount for each app downloaded; or the developer may compensate a rights

holder for a graphical, musical, or other element on the basis of a fixed dollar amount for each app download.

Alternatively the developer may compensate a party based not on the number of downloads but rather as a fraction $\kappa$ of the developer's (pre-commission) unit sales revenue $p$.

The developer may realize a marginal dollar-denominated *benefit* $\alpha$ for each unit of the app sold. This models the added revenue from in-app advertising earned per additional subscriber to the app.

# II   General specification of demand

## II.A   The developer's profit

The developer's profit, as a function of the price $p$ it chooses, is:

$$\pi(p) = \big[ \big( 1 - \kappa - \gamma \big) \, p + (\alpha - c) \big] \, D(p). \tag{1}$$

which reflects that, out of the $p$ gross sales revenue per unit, ① the app store takes $\gamma p$ as a commission and ② the developer pays rights holders and/or other input suppliers an amount $\kappa p$.

## II.B   The first-order condition for choosing price to maximize profit

The derivative of the developer's profit with respect to $p$ is:

$$\frac{\partial \pi}{\partial p} = \big( 1 - \kappa - \gamma \big) \big[ p D'(p) + D(p) \big] + (\alpha - c) \, D'(p). \tag{2}$$

The first-order condition for choosing the price $p^*$ to maximize profit is:

$$\frac{\partial \pi}{\partial p}(p^*(\gamma); \gamma) = 0, \tag{3}$$

where the $\gamma$ argument of the $p^*$ function indicates that the profit-maximizing price $p^*$ is a function of the app-store commission rate $\gamma$.

## II.C   Computing the sign of the derivative of $p^*$ with respect to the app-store commission rate $\gamma$

Total differentiation of equation (3) with respect to $p$ and $\gamma$ and the Implicit Function Theorem yield:

$$\frac{dp^*}{d\gamma}(\gamma)\frac{\partial^2\pi}{\partial p^2}\left(p^*(\gamma);\gamma\right) + \frac{\partial^2\pi}{\partial p\partial\gamma}\left(p^*(\gamma);\gamma\right) = 0, \qquad (4)$$

so that:

$$\frac{dp^*}{d\gamma}(\gamma) = -\frac{\dfrac{\partial^2\pi}{\partial p\partial\gamma}\left(p^*(\gamma);\gamma\right)}{\dfrac{\partial^2\pi}{\partial p^2}\left(p^*(\gamma);\gamma\right)}. \qquad (5)$$

The denominator of the right-hand side of equation (5) is negative in at least a neighborhood of $\left(p^*(\gamma);\gamma\right)$ because that is the second-order condition for a local profit maximum. Thus the sign of the left-hand side is equal to the sign of the numerator of the right-hand side:

$$\text{sgn}\left(\frac{dp^*}{d\gamma}(\gamma)\right) = \text{sgn}\left(\frac{\partial^2\pi}{\partial p\partial\gamma}\left(p^*(\gamma);\gamma\right)\right).$$

Differentiating equation (2) with respect to $\gamma$:

$$\frac{\partial^2\pi}{\partial p\partial\gamma} = -\left[D(p) + pD'(p)\right], \text{which by (3) is}$$

$$= \frac{(\alpha - c)\,D'(p)}{(1 - \kappa - \gamma)}.$$

Thus, the sign of $\partial p^*/\partial\gamma$ is the negative of the sign of $\alpha - c$, because $D'(p) < 0$:

$$\text{sgn}\left(\frac{dp^*}{d\gamma}(\gamma)\right) = -\text{sgn}\left(\alpha - c\right). \qquad (6)$$

## III  General Conclusions

Thus when per-unit advertising revenue dominates marginal cost, this sign is negative:

- an increase in the commission rate would lead to lower app prices;

- a decrease in the commission rate would lead to higher app prices.


Also, with no advertising revenues and no marginal costs,

- the profit-maximizing choice of the app price is not affected by the commission rate.

Highly Confidential
Attorneys' Eyes Only