# Exhibit 11

## Part One

```
 1            UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3                 OAKLAND DIVISION
 4
 5   IN RE APPLE IPHONE
     ANTITUST LITIGATION,        Case No. 11-cv-06714
 6   _____        YGR (TSH)
 7   DONALD R. CAMERON, et al.,
 8        Plaintiffs,
 9             vs.                Case No. 19-cv-03074
                                         YGR (TSH)
10   Apple Inc.,
11        Defendant.
     _____
12
13                **CONFIDENTIAL**
14       ZOOM DEPOSITION OF NICHOLAS ECONOMIDES
15   (Reported Remotely via Video & Web Videoconference)
16    San Francisco, California (Deponent's location)
17             Wednesday, August 4, 2021
18                   Volume I
19
20
     STENOGRAPHICALLY REPORTED BY:
21   REBECCA L. ROMANO, RPR, CSR, CCR
     California CSR No. 12546
22   Nevada CCR No. 827
     Oregon CSR No. 20-0466
23   Washington CCR No. 3491
24   JOB NO. 4737876
25   PAGES 1 - 277
```

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5    IN RE APPLE IPHONE

     ANTITUST LITIGATION,        Case No. 11-cv-06714

6    _____        YGR (TSH)

7    DONALD R. CAMERON, et al.,

8         Plaintiffs,

9              vs.               Case No. 19-cv-03074

                                        YGR (TSH)

10   Apple Inc.,

11        Defendant.

     _____

12

13

14

15

16          ZOOM DEPOSITION OF EINER ELHAUGE, taken

17   on behalf of the Defendant, with the deponent

18   located in San Francisco, California, commencing at

19   9:33 a.m., Wednesday, August 4, 2021, remotely

20   reported via Video & Web videoconference before

21   REBECCA L. ROMANO, a Registered Professional

22   Reporter, Certified Shorthand Reporter, Certified

23   Court Reporter.

24

25

                                        Page 2

```
 1              APPEARANCES OF COUNSEL

 2   (All parties appearing via Web videoconference)

 3

 4   For the Developer Plaintiffs:

 5        HAGENS BERMAN SOBOL SHAPIRO LLP

 6        BY:  BEN HARRINGTON

 7        Attorneys at Law

 8        715 Hearst Avenue

 9        Suite 202

10        Berkeley, California 94710

11        (510) 725-3000

12        benh@hbsslaw.com

13   and

14        BY:  ROBERT F. LOPEZ

15        BY:  STEVE W. BERMAN

16        BY:  TED WOJCIK

17        Attorneys at Law

18        1301 Second Avenue

19        Suite 2000

20        Seattle, Washington 98101

21        (206) 623-7292

22        robl@hbsslaw.com

23        steve@hbsslaw.com

24        tedw@hbsslaw.com

25   /////
```

                                      Page  3

**CONFIDENTIAL**

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2    (All parties appearing via Web videoconference)

 3

 4   For the Consumer Plaintiffs:

 5        WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

 6        BY:  THOMAS H. BURT

 7        Attorney at Law

 8        270 Madison Avenue

 9        New York, New York 10016

10        (212) 545-4600

11        burt@whafh.com

12

13   For the Defendant:

14        GIBSON, DUNN & CRUTCHER LLP

15        BY:  DANIEL G. SWANSON

16        Attorney at Law

17        333 South Grand Avenue

18        Los Angeles, California 90071-3197

19        (213) 229-7430

20        dswanson@gibsondunn.com

21

22

23

24

25   /////
```

```
1              APPEARANCES OF COUNSEL(cont'd)

2     (All parties appearing via Web videoconference)

3

4    For the Defendant:

5          GIBSON, DUNN & CRUTCHER LLP

6          BY:  CAELI A. HIGNEY

7          Attorney at Law

8          555 Mission Street

9          Suite 3000

10         San Francisco, California 94105-0921

11         (415) 393-8248

12   and

13         BY:  HARRY R. S. PHILLIPS

14         Attorney at Law

15         1050 Connecticut Avenue, N.W.

16         Washington, DC 20036-5306

17         (202) 887-3706

18         hphillips2@gibsondunn.com

19

20

21

22

23

24

25   /////
```

Page 5

**CONFIDENTIAL**

```
 1              APPEARANCES(cont'd)
 2    (All parties appearing via Web videoconference)
 3
 4    ALSO PRESENT:
 5         Todd Kumler, Ph.D., Cornerstone Research
 6         Luke Martin, Executive Director at Legal
 7    Economics LLC
 8         Scott B. Murray, Director, Commercial
 9    Litigation at Apple
10         Carissa Narcisco, Concierge Technician
11         Terry Weiss, Videographer
12         Kristof Zetenyi, Ph.D., Analysis Group
13
14
15
16
17
18
19
20
21
22
23
24
25    /////
```

Veritext Legal Solutions
866 299-5127

```
1                    I N D E X

2   DEPONENT                          EXAMINATION

3   NICHOLAS ECONOMIDES                     PAGE

    VOLUME I

4

5                 BY MR. SWANSON              12

6

7

8              E X H I B I T S

9   NUMBER                              PAGE

10            DESCRIPTION

11  Exhibit 29  Expert Class Certification   16

12            Report of Professor Nicholas

13            Economides;

14

15  Exhibit 30  Further Errata Regarding     18

16            Expert Class Certification

17            Report of Professor Nicholas

18            Economides;

19

20  Exhibit 31  Documents Relied Upon for    19

21            Expert Class Certification

22            Report of Professor Nicholas

23            Economides (June 1, 2021);

24

25  /////
```

Veritext Legal Solutions
866 299-5127

**CONFIDENTIAL**

```
 1              E X H I B I T S(cont'd)

 2   NUMBER                                     PAGE

 3                  DESCRIPTION

 4   Exhibit 32   Errata Regarding Expert Class    120

 5                Certification Report of

 6                Professor Nicholas

 7                Economides;

 8

 9   Exhibit 33   CY2019 Game Industry Profit      179

10                Gaming Business Planning &

11                Strategy Team May 2020.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   /////
```

Page 8

```
 1              San Francisco, California;

 2              Wednesday, August 4, 2021

 3                    9:33 a.m.

 4                   ---o0o---

 5

 6          THE VIDEOGRAPHER:  Good morning.  We're

 7  on the record at 9:33 a.m. on August 4th, 2021.

 8          Audio and video recording will continue

 9  to take place unless all parties agree to go off

10  the record.                                    09:33:24

11          This is the video -- video-recorded

12  deposition of Nicholas Economides in the matter of

13  Donald Cameron versus Apple Inc. filed in the

14  United States District Court,

15  Northern District of California,              09:33:36

16  Case No. 411-CV-06714-YGR.

17          This deposition is being held via Zoom

18  Remote Meetings.  My name is Terry Weiss from the

19  firm of Veritext Legal Solutions and I'm your

20  videographer.  Our court reporter today is       09:33:54

21  Rebecca Romano from the firm of

22  Veritext Legal Solutions.

23          I am not related to any party in this

24  action nor am I financially interested in the

25  outcome.                                       09:34:05
```

**CONFIDENTIAL**

```
 1              Counsel and everyone attending remotely        09:34:06

 2      will now state their appearances and affiliations

 3      for the record.

 4              If there are any objections to

 5      proceeding, please state them at the time of your    09:34:13

 6      appearance, beginning with the noticing attorney.

 7              MR. SWANSON:  Dan Swanson, Gibson Dunn,

 8      representing Apple Inc.

 9              MR. HARRINGTON:  Ben Harrington,

10      Hagens Berman, representing the Developer            09:34:26

11      Plaintiffs.

12              And I'm joined by Steve Berman, Rob

13      Lopez, Ted Wojcik, also of Hagens Berman.  And also

14      present is Luke Martin of Legal Economics, a

15      colleague of Professor Economides.                  09:34:40

16              MR. BURT:  Thomas Burt, Wolf Haldenstein,

17      Consumer Plaintiffs.

18              MR. PHILLIPS:  I'm Harry Phillips from

19      Gibson, Dunn for Apple.  And we have with us

20      Scott Murray, director of commercial litigation at  09:34:52

21      Apple.

22              THE VIDEOGRAPHER:  And we have Kristof,

23      right?

24              We have two more, don't we?

25              MR. PHILLIPS:  I'll introduce them.          09:35:13
```

Page 10

| | | |
|---|---|---|
| 1 | Yes, we also have Kristof Zetenyi from | 09:35:13 |
| 2 | Analysis Group and Todd Kumler from Cornerstone | |
| 3 | Research. | |
| 4 | THE VIDEOGRAPHER:  And Caeli Higney. | |
| 5 | MS. HIGNEY:  Yes.  We have Caeli Higney | 09:35:25 |
| 6 | from Gibson Dunn, representing Apple Inc. | |
| 7 | THE VIDEOGRAPHER:  Thank you. | |
| 8 | Would the court reporter please swear in | |
| 9 | the witness. | |
| 10 | THE COURT REPORTER:  If you could raise | 09:35:34 |
| 11 | your right hand for me, please. | |
| 12 | THE DEPONENT:  (Complies.) | |
| 13 | THE COURT REPORTER:  You do solemnly | |
| 14 | state, under penalty of perjury, that the testimony | |
| 15 | you are about to give in this deposition shall be | 09:35:34 |
| 16 | the truth, the whole truth and nothing but the | |
| 17 | truth? | |
| 18 | THE DEPONENT:  I do. | |
| 19 | | |
| 20 | | 09:35:34 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | ///// | 09:35:48 |

Page 11

```
 1                    NICHOLAS ECONOMIDES,                09:35:49

 2      having been administered an oath, was examined and

 3      testified as follows:

 4

 5                    EXAMINATION                          09:35:49

 6      BY MR. SWANSON:

 7           Q.   Good morning, Professor Economides.

 8           A.   Good morning.

 9           Q.   As you heard, I'm Dan Swanson and I'll be

10      asking the questions today on behalf of Apple.     09:35:57

11                To start with, would you please state

12      your full name for the record?

13           A.   Yes.  My name is Nicholas Economides.

14           Q.   And what is your business address?

15           A.   Well, I mean, I'm a professor at the     09:36:13

16      Stern School of Business, New York University,

17      ███████████████████████, New York, New York 10012.

18           Q.   And I take it you have been deposed

19      before?

20           A.   Yes.                                     09:36:29

21           Q.   Have you experienced a video -- a virtual

22      deposition before?

23           A.   No.

24           Q.   All right.  Are -- all right.  Do you

25      feel you're familiar with the procedures for the   09:36:39
```

Page 12

```
1    video deposition today?                              09:36:42

2         A.   I'm learning.

3         Q.   All right.  Well, if -- we're -- we're

4    all learning together in this difficult season.

5              But if you need to pause at any point, if  09:36:53

6    you're having any difficulties with your equipment,

7    please -- please let us know.  And we'll take

8    regular breaks throughout the day as well, but if

9    at any point in time you'd like to take a break,

10   please just ask and we'll do it.                     09:37:07

11        A.   Thank you.

12        Q.   Is there any reason that we can't go

13   forward with the deposition today, Professor?

14        A.   I -- I don't know any reason.

15        Q.   Okay.  To your knowledge, has a Court      09:37:22

16   ever excluded any of your opinions or testimony?

17        A.   I do not believe so.

18        Q.   Okay.  To your knowledge, has a Court

19   ever expressed disagreement with any of your

20   opinions?                                            09:37:43

21        A.   I -- I don't recall.

22        Q.   Your billing rate is $900 an hour?

23        A.   Correct.

24        Q.   Do you have an estimate of how many hours

25   you've spent on the case to date?                    09:37:52
```

Page 13

1        A.   It's -- no, I don't have a good estimate.        09:37:55

2        Q.   Did -- do you -- do you feel that there

3   is some minimum amount of time you spent on the

4   case?

5        A.   It's -- it's difficult for me to compute.        09:38:06

6   If it's important, I will try to look at my records

7   and let you know.

8        Q.   Well, do you think you spent more than

9   100 hours so far on the case?

10        A.   I think so, yes.        09:38:17

11        Q.   Okay.  Do you think you've spent a great

12   deal more than that?

13        A.   Probably more than that.  I'm not sure

14   exactly how much.

15        Q.   Okay.  You refer to your staff at various        09:38:29

16   points in your report.

17             Is that staff from Legal Economics?

18        A.   Correct.

19        Q.   Okay.  And I gather Luke Martin is -- is

20   one among your staff?        09:38:44

21        A.   Correct.

22        Q.   And what role has he played in assisting

23   you?

24        A.   The staff of Legal Economics has

25   generally played a role in creating the report        09:38:57

                                              Page 14

```
 1    together with me in going back and forth with --        09:39:02

 2    not only the background but also drafting some part

 3    of the report which I supervise them.  And I went

 4    back and kind of finalized.  Make sure that

 5    everything that was in the report was 100 percent        09:39:18

 6    my opinion.

 7         Q.   Okay.  So Mr. Martin and the staff at

 8    Legal Economics helped you draft your expert

 9    report; is that fair to say?

10         A.   It's fair -- fair to say that I have           09:39:32

11    received help from them.  But the -- the way the

12    report is right now, the final report is

13    100 percent my opinion and -- yes, that's all.

14         Q.   Has anyone else from Legal Economics

15    assisted, in addition to Mr. Martin?                     09:39:50

16         A.   Thor Sletten, S-L-E-T-T-E-N.  And people

17    under him.

18         Q.   Any -- any names that you recall?

19         A.   I -- I would say Rajat, R-A-J-A-T,

20    Krishna.  Probably others as well.  I wouldn't be        09:40:20

21    able to say everybody's name.

22         Q.   You're affiliated with Legal Economics?

23         A.   I'm not affiliated with Legal Economics.

24         Q.   And Legal Economics is an entity that

25    Professor Elhauge owns, I gather?                        09:40:42
```

Page 15

**CONFIDENTIAL**

```
 1        A.   Yeah, I -- I believe he's the president.      09:40:46

 2   I'm not sure -- I'm not sure of the ownership

 3   structure.

 4        Q.   And what are the -- the arrangements for

 5   compensation with respect to your work on this          09:40:57

 6   case?

 7             Do you -- do you receive a portion of

 8   your $900 an hour, or all of it?

 9        A.   All of it.

10        Q.   Okay.  Do you receive a portion of the        09:41:08

11   billings of Legal Economics?

12        A.   I do.

13             MR. SWANSON:  Okay.  Let's -- we'll spend

14   a lot of time with your report.  Let's start up by

15   marking it as an exhibit.                               09:41:26

16             (Exhibit 29 was marked for identification

17   by the court reporter and is attached hereto.)

18             MR. SWANSON:  It will take a moment to

19   appear on the Exhibit Share as they always -- it

20   always seems to be the case.  But in the meantime,      09:41:35

21   I will describe it for the record.

22             We're having marked as -- I believe the

23   next in order would be Exhibit 28.  This is, I

24   think, Tab 1 from our -- our group of documents.

25   But it is a document, the first page of which bears     09:41:53
```

Page 16

1    the title "Expert Class Certification Report of          09:41:58

2    Professor Nicholas Economides."

3          It -- it is relatively voluminous.  We

4    don't have a page count on it.  But once it pops up

5    on the screen, Professor, if you could verify that    09:42:17

6    this is, indeed, your expert report.

7          I will, by the way, mark next your errata

8    just so you know that.  We'll get to that in a

9    moment.

10          MR. PHILLIPS:  And the report should be        09:42:33

11   up now.

12          THE DEPONENT:  Yeah.  I wonder if -- if

13   it's okay for you to have an unmarked hard copy

14   next to me and look at that more carefully.

15          Q.   (By Mr. Swanson)  Oh, yes, of course.     09:42:46

16   All -- all we need for the record is for you to

17   take a look at the version online and just make

18   sure that that is the right document, and then

19   you're perfectly free to work with the hard copy.

20          A.   Yeah, one minute.  I am trying to see the  09:43:08

21   whole thing.

22          Yes, it seems to be the right document.

23          Q.   Okay.  Great.

24          And I take it you do have a hard copy you

25   can work with?                                         09:43:40

                                                            Page 17

```
 1        A.   Correct.                                    09:43:41

 2             MR. SWANSON:  Good.  Okay.

 3             Well, while we're at it, let's have

 4   marked as Exhibit 29, a document -- the title of

 5   which is "Further Errata Regarding Expert Class      09:43:52

 6   Certification Report of Professor

 7   Nicholas Economides."

 8             (Discussion off the stenographic record.)

 9             (Exhibit 30 was marked for identification

10   by the court reporter and is attached hereto.)       09:43:59

11             MR. PHILLIPS:  And that should be up as

12   well, too.

13        Q.   (By Mr. Swanson)  Let us know if that is

14   the errata that I believe was filed yesterday,

15   Professor?                                           09:44:44

16        A.   Yes, that's correct.

17        Q.   So with respect to your report, we'll --

18   we'll refer to Exhibit 29, of which you have a hard

19   copy.  If there is any issue that relates to an

20   errata, we can go -- we can go there.                09:45:04

21             But I take it from your earlier testimony

22   that you feel comfortable saying that you drafted

23   the entirety of your expert report?

24        A.   Correct.

25        Q.   All right.  And you drafted your erratas?  09:45:24
```

Page 18

**CONFIDENTIAL**

1        A.   Uh-huh, that's correct.                    09:45:26

2        Q.   Have you had any communications about

3    Apple with any governmental agency or regulator,

4    whether U.S. or foreign?

5        A.   I -- I have not.                            09:45:40

6        Q.   Let's also, while we're at it, mark the

7    document in which you listed your relied-upon

8    materials.  That also will show up electronically.

9             (Exhibit 31 was marked for identification

10   by the court reporter and is attached hereto.)       09:46:00

11            MR. SWANSON:  We'll have it marked as

12   Exhibit 31.  It's a document title which is

13   "Documents Relied Upon for Expert Class

14   Certification Report of Professor

15   Nicholas Economides, June 1, 2021."                  09:46:09

16       Q.   (By Mr. Swanson)  So when that pops up on

17   the screen, if you can just confirm that that is

18   what it appears to be.

19       A.   Yes, that's correct.

20       Q.   Okay.  With respect to this document,       09:46:32

21   Exhibit 31, to the best of your knowledge, does

22   this set forth all documents and information that

23   you relied on in connection with forming the

24   opinions in your expert report?

25       A.   That's correct.                             09:46:47

                                            Page 19

1     Q.   Okay.  And on the first page of          09:46:48

2  Exhibit 31, you list five depositions.

3          Do you -- do you see that?

4     A.   Uh-huh, yes, I see that.

5     Q.   Are -- are these the only depositions    09:47:01

6  that you rely on in connection with your opinions?

7     A.   I believe so.  I mean, if there is a

8  error, I will try to fix it in the future.

9     Q.   Okay.  You note that you relied on the

10  deposition of Ned Barnes.  Are you aware that he     09:47:22

11  gave trial testimony in the Epic case?

12     A.   Yes, I'm aware of it.

13     Q.   Do you rely on that?

14     A.   I only rely on the stuff that I -- that

15  is in the list.  I believe I have glanced at his     09:47:37

16  trial testimony as well, but I rely -- the

17  documents I relied are written in -- in that list.

18     Q.   Did you review and rely on any written or

19  oral testimony from the Epic trial, setting aside

20  that of Mr. Barnes?                                  09:48:04

21     A.   Say that again.  I didn't hear you

22  100 percent.

23     Q.   Sure.

24          Did you review and rely on any written or

25  oral testimony from the Epic trial, setting aside    09:48:14

Page 20

1    Mr. Barnes?                                        09:48:18

2        A.   I have glanced at the transcript of the

3    proceedings, but I have not relied on them.

4        Q.   Did you consider it to be unimportant to

5    review more thoroughly the proceedings in the Epic    09:48:35

6    trial?

7             MR. HARRINGTON:  Objection to form.

8             THE DEPONENT:  Well, the -- the trial was

9    not 100 percent on the issue that we are discussing

10   today.  So I -- I looked at some of the proceedings   09:48:52

11   to understand better that issue, but I wouldn't say

12   it's unimportant, but at the same time, I put

13   forward the materials I relied on.

14       Q.   (By Mr. Swanson)  Okay.  And you rely on

15   the reports of Professor Elhauge and Mr. Tregillis;   09:49:20

16   is that correct?

17       A.   That's correct.

18       Q.   I take it you're relying on their final

19   reports, not any intermediate drafts?

20       A.   Correct.                                    09:49:38

21       Q.   Are you relying on any expert reports or

22   testimony of Dr. Evans?

23       A.   I'm not relying on any specific testimony

24   from Dr. Evans.  I have looked at his report as

25   well.                                                09:50:00

                                                    Page 21

```
1          Q.    Okay.                                    09:50:00

2          A.    His reports, I should say that plural.

3          Q.    Yes.  There were a number.

4                You do, in your own expert report, at

5    page 29, paragraph -- paragraph 55, refer to an       09:50:12

6    analysis presented by Dr. Evans.

7                Do you -- do you see that in your report?

8          A.    Yes.

9          Q.    Do you recall where that analysis

10   appeared?                                             09:50:33

11         A.    Do I recall?  Say it again.

12         Q.    Do you recall where exactly that analysis

13   appeared?  Was it in one of his expert reports?

14         A.    I believe so.

15         Q.    Okay.  And are you relying on that         09:50:46

16   analysis of Dr. Evans?

17         A.    I'm not relying on that analysis.  I'm --

18   if you -- if you see carefully the paragraph 55, it

19   notes -- it notes the differences between my

20   analysis and the analysis presented by Dr. Evans.     09:51:08

21         Q.    Okay.  Are you relying on any expert

22   reports or testimony of any expert in the Epic

23   case, setting aside Dr. Evans?

24         A.    No, I am not.

25         Q.    In your -- in your relied-upon list,       09:51:34
```

Page 22

| | | |
|---|---|---|
| 1 | Exhibit 31, you list some Bates-numbered documents. | 09:51:36 |
| 2 | Those would appear starting on page 6, page 6 and | |
| 3 | page 7. | |
| 4 | Did -- did you review all those | |
| 5 | documents? | 09:51:54 |
| 6 | A.   I am trying to find them.  You said it's | |
| 7 | on page 6? | |
| 8 | Q.   Yes, page 6, and I think there's one on | |
| 9 | the top of page 7. | |
| 10 | A.   Uh-huh.  I -- I believe I have read most | 09:52:10 |
| 11 | of the documents.  Sometimes there may have been | |
| 12 | summaries presented -- created by the staff on -- | |
| 13 | on those documents that I have read. | |
| 14 | Q.   All right.  And then did you rely on any | |
| 15 | findings of government investigations?  There's a | 09:52:32 |
| 16 | reference to that in paragraph 8 of your report. | |
| 17 | A.   I have not relied on the government | |
| 18 | investigations, but I'm aware of them. | |
| 19 | Q.   And which investigations are you | |
| 20 | referring to? | 09:53:04 |
| 21 | A.   I believe there is an investigation in | |
| 22 | the European Union that crosses my mind at this | |
| 23 | point.  It's conceivable there were others that | |
| 24 | I -- that I don't remember at this point. | |
| 25 | Q.   Okay.  And are you relying on public | 09:53:17 |

Page 23

**CONFIDENTIAL**

| | | |
|---|---|---|
| 1 | reports of any investigation? | 09:53:26 |
| 2 | A.   No. | |
| 3 | Q.   What -- what sorts of information do you | |
| 4 | have about any investigations then, if not public | |
| 5 | reports? | 09:53:34 |
| 6 | A.   Well, the source would be that, but as I | |
| 7 | said, I'm not relying on them. | |
| 8 | Q.   Okay.  Fair enough.  Understood. | |
| 9 | Do you rely on any interviews with any of | |
| 10 | the named plaintiffs in the developer class? | 09:53:50 |
| 11 | A.   No. | |
| 12 | Q.   Have you communicated with any of them? | |
| 13 | A.   No. | |
| 14 | Q.   Do you know who they are? | |
| 15 | A.   Well, I've seen some names, but I | 09:54:05 |
| 16 | don't -- I -- I don't know them personally.  I -- | |
| 17 | I -- I don't know -- I know them just as named | |
| 18 | plaintiffs on the class. | |
| 19 | Q.   Okay.  Have you interviewed any other | |
| 20 | developers in connection with forming your opinions | 09:54:21 |
| 21 | in the case? | |
| 22 | A.   I -- I haven't interviewed any | |
| 23 | developers. | |
| 24 | Q.   Did you interview anyone at all in | |
| 25 | connection with the case? | 09:54:34 |

Page 24

**CONFIDENTIAL**

```
 1          A.   I don't think -- I don't believe so, no.        09:54:37

 2          Q.   Okay.  Did counsel provide any

 3     assumptions that you relied on in forming your

 4     opinions?

 5          A.   No, counsel did not instruct me to do          09:54:51

 6     something, so not do other things in terms of

 7     assumptions in the economic models.

 8          Q.   Have you been retained as an expert in

 9     any other cases involving apps or app stores or

10     operating systems?                                       09:55:10

11          A.   I don't believe so, no.

12          Q.   Okay.  When were you retained on behalf

13     of the developer class?

14          A.   Did you say "when"?

15          Q.   Yes.  I said "when."                           09:55:25

16          A.   Okay.  I believe about a year ago.

17          Q.   Would it have been sometime around

18     December?

19          A.   You mean -- I -- I don't remember

20     exactly, to tell you the truth.  I mean, I just --       09:55:44

21     I -- I don't recall exactly when I -- I would say

22     about a year ago.

23          Q.   Okay.  And who -- who retained you?

24          A.   Hagens Berman.

25          Q.   Okay.  And who -- who did you deal with        09:56:00
```

Page 25

| | | |
|---|---|---|
| 1 | at Hagens Berman? | 09:56:02 |
| 2 | A.   At the very earliest stage; is that what | |
| 3 | you're asking? | |
| 4 | Q.   Yes. | |
| 5 | A.   I believe I talked to Rob Lopez. | 09:56:13 |
| 6 | Q.   Uh-huh.   Anyone else? | |
| 7 | A.   I also believe I -- I talked to Ben | |
| 8 | Siegel and later on to other people at | |
| 9 | Hagens Berman. | |
| 10 | Q.   Okay.   What -- what assignment were you | 09:56:34 |
| 11 | given when you were retained? | |
| 12 | A.   I think this is in paragraph 8, which is, | |
| 13 | "I have been asked to determine, taking the | |
| 14 | defendants' antitrust liability as given, whether | |
| 15 | damages to the plaintiffs in the class in this case | 09:56:56 |
| 16 | can be accurately determined using common evidence | |
| 17 | and common methodology.   To answer these questions, | |
| 18 | I have analyzed documents and data produced by the | |
| 19 | defendants, as well as deposition testimony, | |
| 20 | industry studies, economic literature, the findings | 09:57:10 |
| 21 | of governmental investigations, and other publicly | |
| 22 | available information." | |
| 23 | Q.   Are there any additional assignments that | |
| 24 | you've taken on beyond what you've just recited | |
| 25 | from paragraph 8 of your report? | 09:57:24 |

Page 26

**CONFIDENTIAL**

| | | |
|---|---|---|
| 1 | A.   I don't believe so. | 09:57:27 |
| 2 | Q.   What do you understand "taking the | |
| 3 | defendants' liability as given" to mean? | |
| 4 | A.   Well, that is in paragraph 7.  "The | |
| 5 | plaintiffs allege that Apple excluded all other | 09:57:47 |
| 6 | firms from distributing apps and related digital | |
| 7 | products to the U.S. owners of its iOS devices, | |
| 8 | and as a result, Apple charged supracompetitive | |
| 9 | commissions to developers for the sale of paid apps | |
| 10 | and in-app products." | 09:58:07 |
| 11 | Okay.  And that's the anticompetitive | |
| 12 | action. | |
| 13 | Q.   So when you're assuming Apple's | |
| 14 | liability, you're assuming that those allegations | |
| 15 | are true and correct? | 09:58:24 |
| 16 | A.   Yes, that was my assignment. | |
| 17 | Q.   As of what date are you assuming Apple is | |
| 18 | liable in terms of the date of Apple's conduct? | |
| 19 | A.   Well, I -- I -- assuming from the time of | |
| 20 | the beginning of the class action, which was | 09:58:45 |
| 21 | June 4th, 2015. | |
| 22 | Q.   Okay.  Have you been asked to determine | |
| 23 | whether Apple's alleged conduct injured every | |
| 24 | developer in the class from that time forward? | |
| 25 | A.   Yes. | 09:59:06 |

Page 27

**CONFIDENTIAL**

1        Q.   Are you assuming that Apple's conduct has          09:59:07

2    injured the named plaintiffs?

3        A.   Yes.

4        Q.   Are you assuming that Apple has injured

5    any other specific developer?                                09:59:20

6        A.   I'm assuming that the developers in the

7    class all got injured.

8        Q.   Are you assuming that Apple's conduct has

9    had anticompetitive effects?

10       A.   Yes.                                                09:59:43

11       Q.   Are you assuming that Apple's conduct

12   lacks any procompetitive justifications?

13       A.   Yeah, that's correct.  I mean, I have,

14   you know, relied on -- on Professor Elhauge's

15   report on -- on those issues.                                10:00:03

16       Q.   Are you assuming that anticompetitive

17   effects outweigh any procompetitive justifications?

18       A.   Again, I have relied on

19   Professor Elhauge's analysis of this issue.

20       Q.   Okay.  Looking at paragraph 7, which you           10:00:24

21   mentioned a moment ago.

22            What is your understanding of the means

23   by which, as plaintiffs allege, Apple excluded all

24   other firms from distributing iOS apps?

25       A.   Well, I think there were various means.            10:00:48

                                                      Page 28

```
 1    The developers are not able to distribute an app        10:00:51

 2    unless it's done through the Apple Store.

 3    Otherwise, they get excluded.  They cannot do it,

 4    for example.

 5         Q.   Are you -- I'm sorry.                          10:01:25

 6              Do you understand plaintiffs to be

 7    alleging that Apple excluded competition by

 8    requiring developers to submit their iOS apps to

 9    the App Store for review?

10         A.   I don't think it's just a matter of            10:01:39

11    review for whatever other reason.  They -- the

12    problem is that the developers found out that

13    unless they pay this hefty commissions to -- to

14    Apple, they are not allowed to distribute their

15    apps.                                                    10:01:57

16         Q.   Do you understand plaintiffs to be

17    alleging that Apple excluded competition by

18    requiring the use of its in-app payment

19    functionality?

20         A.   That was part of it.                           10:02:11

21         Q.   Are -- are you assuming that Apple is

22    liable for such conduct?

23         A.   I have said that my assumption on

24    liability is based on Professor Elhauge's report

25    and I rely on that -- on that report.                    10:02:27
```

                                                      Page 29

1     Q.   Do you understand plaintiffs to be          10:02:34

2   alleging that Apple excluded competition by

3   prohibiting developers from telling consumers

4   inside their apps, that they can pay for in-app

5   digital products outside the app?                   10:02:44

6     A.   I -- I think that was one of the

7   allegations, yes.

8     Q.   Okay.  And you're assuming that Apple is

9   liable for such conduct?

10     A.   Again, I -- I'm relying on                 10:02:54

11   Professor Elhauge's report for the findings of

12   liability.

13     Q.   When you say you're relying on

14   Professor Elhauge, are you saying that you are

15   accepting induction for his conclusions, or are you  10:03:13

16   saying you just assume that what he says is

17   correct?

18         MR. HARRINGTON:  Objection to form.

19         THE DEPONENT:  Can you repeat that,

20   please.                                            10:03:26

21     Q.   (By Mr. Swanson)  Sure.  I'll try it

22   again.

23         You've indicated in paragraph 8 of your

24   report that you've been asked to take Apple's

25   antitrust liability as given, right?                10:03:40

Page 30

```
 1        A.   Yes.  Correct.                          10:03:43

 2        Q.   You're assuming Apple is liable, correct?

 3        A.   Yes.  Yes.

 4        Q.   And you say that you're relying on

 5   Professor Elhauge's report.                       10:03:59

 6             Are you instead saying that you actually

 7   have concluded that Apple is liable for

 8   anticompetitive conduct, or are you just saying

 9   that you're assuming Professor Elhauge is right?

10             MR. HARRINGTON:  Objection to form.      10:04:12

11             THE DEPONENT:  Well, I -- my task was --

12   is to assume liability for Apple and then go on

13   from there.

14             Now, the specific liability of Apple is

15   explained in detail in Professor Elhauge's report.  10:04:27

16   I did not replicate his report.  I did not go into

17   every line of his analysis and say, well, that's

18   correct.

19             So I understand that his report

20   establishes liability and I go on from there.       10:04:55

21        Q.   (By Mr. Swanson)  Okay.  Do you

22   understand plaintiffs to be alleging that Apple

23   excluded competition by requiring developers to

24   price their paid digital products using 99-cent

25   price tiers?                                        10:05:10
```

1        A.   I'm sorry.  I -- I have to hear this        10:05:17

2    again.  Sorry.

3        Q.   That's all right.

4            Do you understand plaintiffs to be

5    alleging that Apple excluded competition by         10:05:23

6    requiring developers to price their paid digital

7    products using 99-cent price tiers?

8        A.   Well, I believe that this is one of the

9    allegations in -- in the -- in the complaint.  But

10   if I remember correctly, Professor Elhauge's report  10:05:43

11   did not focus on that issue.

12       Q.   Well, are -- are you assuming that Apple

13   is liable for such 99-cent price-tiering conduct?

14       A.   I -- I am assuming the liability, as

15   explained in Professor Elhauge's report.  And my    10:06:11

16   recollection is that this wasn't a specific issue

17   analyzed in that report.

18       Q.   So there are allegations in the complaint

19   that you are not assuming Apple is liable for; is

20   that correct?                                        10:06:31

21       A.   You mean -- I'm not sure which one you

22   mean.  I mean, I'm not sure.

23       Q.   Well -- well, it's not --

24       A.   I'm not sure I understand your question,

25   let's -- let's put it that way.                      10:06:43

                                                    Page 32

1      Q.   Yeah.                                          10:06:45

2           You -- you understand that the plaintiffs

3      allege that 99-cent price tiering by Apple is

4      anticompetitive, correct?

5      A.   This is one of the allegations in the        10:06:55

6      complaint, yes.

7      Q.   But you're not assuming, for purposes of

8      your opinions, that Apple is liable for such

9      conduct, correct?

10     A.   I think the -- the -- the important thing    10:07:12

11     here is that I'm -- I'm taking Professor Elhauge's

12     report on liability as the guide for the

13     anticompetitive behavior of Apple.  And I do not

14     believe that this 99 cents issue was important or

15     crucial in the Einer Elhauge -- Professor Elhauge's  10:07:45

16     report.  So in that sense, I am not focusing on

17     that issue.

18     Q.   Well, do you assume that 99-cent price

19     tiers will continue to exist in the but-for world?

20     A.   Well, given the way that                      10:08:12

21     Professor Elhauge's report is written, it is

22     possible that they will continue, and it's possible

23     they wouldn't.  I am, to -- to a significant

24     extent, agnostic on this.

25     Q.   Well, your -- your but-for world either       10:08:36

Page 33

```
 1    assumes that they exist or they don't, right?          10:08:42

 2         A.   Well, my job was to calculate damages.

 3    And the calculation of damages that I have done

 4    does not depend in a crucial way on this issue.

 5         Q.   So you've only focused on aspects of the      10:09:04

 6    but-for world that will affect damages in a crucial

 7    way; is that your testimony?

 8              MR. HARRINGTON:  Objection to form.

 9              THE DEPONENT:  I -- I -- I don't think I

10    said that.  I mean, I'm saying -- maybe we can         10:09:15

11    reread my answer.  But I'm -- but I'm -- I'm saying

12    that the calculation of damages I have done does

13    not depend on the 99-cent issue.  Okay.  And -- and

14    that's an absolute statement.  Not crucial.  Not

15    anything.                                              10:09:37

16         Q.   (By Mr. Swanson)  So your opinions would

17    not change if the finder of fact determined that

18    Apple's 99-cent price tiers were perfectly lawful

19    and were not anticompetitive?

20         A.   My calculation of damages would still        10:09:53

21    stand the same way.

22         Q.   And if the finder of fact determined that

23    the 99-cent price tiers indeed were anticompetitive

24    and, therefore, would be absent from the but-for

25    world, your opinions would remain exactly the same?    10:10:09
```

Page 34

**CONFIDENTIAL**

```
 1        A.   That's correct.                          10:10:14

 2        Q.   Is it your opinion that there is common

 3   impact on the class from the conduct at issue?

 4        A.   Yes.

 5        Q.   You're offering the opinion that Apple's   10:10:29

 6   alleged conduct injured 100 percent of developers

 7   in the class?

 8        A.   That is correct.

 9        Q.   So you're -- you're not offering a lesser

10   opinion, that Apple's conduct injured virtually all  10:10:44

11   members, but not all members of the class?

12             MR. HARRINGTON:  Objection to form.

13             THE DEPONENT:  My opinion is that it

14   injured all members of the class.

15        Q.   (By Mr. Swanson) Okay.  Have you           10:10:58

16   quantified any minimum amount of injury that every

17   developer has incurred?

18        A.   I -- I have -- I have quantified the --

19   the average industry -- I'm sorry -- injury in --

20   in -- for every member of the class.  But I also     10:11:15

21   have expressed the opinion that every member of the

22   class has been harmed.

23        Q.   Okay.  And -- and have you quantified a

24   minimum amount of harm that every member of the

25   class has experienced?                               10:11:31
```

Page 35

**CONFIDENTIAL**

```
 1        A.   I -- I think I answered that question.        10:11:35

 2        Q.   I think you said you calculated an

 3   average and that you've opine that every developer

 4   was injured.

 5             I'm asking you, what minimum amount of       10:11:45

 6   injury you've calculated, if any?

 7        A.   Well, when we say we -- everyone was

 8   injured, that means everyone was injured some

 9   amount of money, like at least 1 cent, you know.

10             If you're asking me does a calculation       10:11:59

11   say it's exactly 1 cent or 10 cents, or something

12   like that, the answer is no.  But the fact that

13   everyone was injured is there, in my economic

14   opinion.

15        Q.   Yeah.                                         10:12:14

16             I'm asking the question of what the

17   minimum is.

18             Is it 1 cent?  Is that all you can say?

19        A.   Yes.

20        Q.   Okay.  Do you understand                      10:12:20

21   Professor Elhauge to offer the opinion that Apple's

22   conduct injured 100 percent of the members of the

23   alleged developer class?

24        A.   Yes.

25        Q.   Do you rely on Professor Elhauge's            10:12:37
```

Page 36

**CONFIDENTIAL**

1    opinion on that point?                              10:12:40

2        A.   No.  I -- I rely on my own analysis and

3    my economic analysis for that very similar

4    statement or same statement.

5        Q.   If Professor Elhauge turns out to be        10:12:51

6    incorrect in his opinion on class by injury, would

7    you still hold your own opinion?

8        A.   If he turns out to be wrong on what

9    opinion?

10       Q.   His opinion that 100 percent of class       10:13:08

11   members have been injured by Apple's conduct.

12       A.   Yes, of course, I will stay with my

13   opinion because my opinion is independently derived

14   and it's reliable.  It's done through the usual,

15   well-established economic methods.  And I would      10:13:28

16   rely on my opinion as an economist, not on

17   Professor Elhauge's opinion that you mentioned.

18       Q.   So is it -- is it your understanding that

19   you and Professor Elhauge have used different

20   methods to reach the same conclusion?                10:13:47

21       A.   I -- I'm -- now you're -- you're

22   stretching my memory to -- to -- to remember

23   exactly what method Professor Elhauge used.

24            I know my own method very well and I am

25   very confident in it.  And, again, it's a reliable   10:14:02

                                                          Page 37

```
 1    economic standard, economic method to reach those        10:14:09

 2    conclusions.

 3        Q.   Do you -- do you know if

 4    Professor Elhauge used standard economic methods to

 5    reach his conclusion that 100 percent of the class      10:14:22

 6    members have been injured by Apple's alleged

 7    conduct?

 8        A.   I expect so.

 9        Q.   Do you and Professor Elhauge use the same

10    measure of harm?                                        10:14:36

11        A.   I'm not sure what you mean.

12             MR. HARRINGTON:  Objection.  Form.

13        Q.   (By Mr. Swanson)  Well, are you working

14    with an economic measure of harm in this case?

15        A.   Sure.  I calculate damages, correct.           10:14:54

16        Q.   What -- what is your measure of harm?

17        A.   Well, I -- I am calculating, you know,

18    very briefly the average price that would exist in

19    the but-for world and compare it with the fees, the

20    commissions, that Apple charges in the present          10:15:18

21    world, in the actual world.

22        Q.   Is that an -- an overcharge measure of

23    harm?

24        A.   You can call it an overcharge measure of

25    harm.  Yes, you can.                                    10:15:31
```

Page 38

**CONFIDENTIAL**

1      Q.   Is it -- is it a lost profits measure of          10:15:34

2  harm?

3      A.   It can also be thought of as a lost

4  profits measure of harm because the way I do the

5  calculation, it takes into account costs or              10:15:45

6  variable costs of the developers.  And, therefore,

7  if the fixed costs were the same, the overcharge

8  would translate to lost profits.

9      Q.   Is the overcharge that you measure the

10  entirety of the lost profits of the developers in       10:16:09

11  the class?

12      A.   It's a conservative measure of the -- of

13  the profits for -- I'm sorry, of the lost profits

14  for every member in the class.  So this is

15  explained in more detail in paragraph 64, and,          10:16:29

16  yeah, that the -- that every member of the class

17  would have lost the amount that I calculate.

18      Q.   Okay.  We'll come back to paragraph 64.

19          Are you familiar with the term

20  "sideloading"?                                           10:17:00

21      A.   Yes.

22      Q.   Are plaintiffs alleging that Apple

23  excluded competition by not designing iOS devices

24  to allow sideloading?

25      A.   I -- I think sideloading might be a            10:17:13

Page 39

```
 1    pejorative term, but I think that what you are          10:17:19

 2    asking is whether Apple allowed a program by the

 3    developer, an app by a developer, that didn't go

 4    through the App Store to be functional to -- to

 5    work on an Apple device, and the answer is yes,        10:17:42

 6    Apple stopped such programs from being functional.

 7         Q.   And are you assuming that Apple is liable

 8    for such conduct?

 9         A.   Well, Apple has restricted all

10    competition for distribution, and part of the          10:18:13

11    competition of distribution would be from stores,

12    like the Apple Store, but stores written -- I mean,

13    sorry, stores set up by others, and some of the

14    competition would be from individual developers who

15    would distribute directly to consumers and in the      10:18:38

16    words -- in your words, sideloading.

17              So Apple has restricted competition from

18    all sides in the distribution, and -- and that's

19    anticompetitive, and in the but-for world, those

20    types of distribution, independent stores and          10:19:00

21    developers selling directly to the public, would be

22    allowed.

23         Q.   And just -- just so that we've got a good

24    record on this.  I think we've both been using the

25    term "but-for world."  What -- what do you mean by     10:19:19
```

Page 40

**CONFIDENTIAL**

```
1      the term "but-for world"?                          10:19:22

2           A.   A but-for world would be a world without

3      the anticompetitive actions of Apple, without the

4      restrictions that we just discussed.

5           Q.   And what is the time frame of your        10:19:32

6      but-for world?

7           A.   Well, the time frame for -- for this

8      report is from the beginning of the class action

9      that is from June 4th, 2015.

10          Q.   Okay.  And what's the first event in the  10:19:48

11     but-for world that differs from the actual world?

12               MR. HARRINGTON:  Objection to form.

13               THE DEPONENT:  I'm -- can you rephrase

14     this.  I -- I don't understand what the first --

15     you know, tell me again.  I don't know -- ask       10:20:01

16     again, please.

17          Q.   (By Mr. Swanson)  Okay.  Well, the

18     but-for world is different from the actual world,

19     right?

20          A.   Correct.                                  10:20:08

21          Q.   What's the first thing that is different

22     in the but-for world in -- in time?

23               MR. HARRINGTON:  Objection to form.

24          Q.   (By Mr. Swanson)  What's the earliest

25     difference between the two worlds?                  10:20:18
```

                                                   Page 41

```
 1            MR. HARRINGTON:  Same objection.              10:20:20

 2            THE DEPONENT:  I -- I -- I -- I have a

 3     hard time answering that question because the

 4     but-for world is a world without restrictions.  I'm

 5     not sure what exactly you're asking.                10:20:32

 6        Q.   (By Mr. Swanson)  Well, what --

 7        A.   You're asking -- yeah, go ahead.

 8        Q.   In the but-for world, what happens on

 9     June 4th, 2015?  What -- what changes in Apple's

10     behavior occur on that day?                         10:20:45

11            MR. HARRINGTON:  Objection to form.

12            THE DEPONENT:  Well, what I'm asking --

13     what I'm considering is the world without

14     restrictions on June 4th, 2015.  Whether the

15     but-for world was exist -- preexistent on June 3rd, 10:20:57

16     2015 or not, I don't consider.  This is not my

17     issue.

18        Q.   (By Mr. Swanson)  All right.  So what are

19     you assuming is different on June 4th, 2015, that

20     is your issue?                                      10:21:12

21        A.   That there is no anticompetitive actions

22     of Apple and that there is distribution through --

23     the unencumbered distribution through stores by

24     other parties.  And also through direct downloads

25     from developers.                                    10:21:33
```

Page 42

1      Q.   So is it your opinion that on June 4,          10:21:36

2   2015, multiple competitors all of a sudden appear

3   and compete with Apple?

4      A.   Well --

5          MR. HARRINGTON:  Objection to form.           10:21:45

6          THE DEPONENT:  Well, I mean, what did I

7   say, Mr. Swanson?  I already said that I don't

8   discuss the regime of June the 3rd.

9          Therefore, this kind of discussion of how

10  June 4th happen -- change from June 3rd doesn't        10:21:59

11  really make sense to me.  It's not part of what my

12  report is.

13     Q.   (By Mr. Swanson)  How long does it take a

14  competitor to enter in the relevant market?

15     A.   Well, that's a good question.  A              10:22:15

16  competitor might be a store, and then it would be

17  to create demand on both sides of the market, that

18  is, developers coming to the store, customers

19  coming to the store.

20         Or it could be direct distribution.  Now,      10:22:45

21  direct distribution happens without any

22  restrictions.  But the other one, the setting up

23  the store takes -- might take some time because of

24  the -- of the -- of bringing in both sides of the

25  market.                                                10:23:01

Page 43

```
 1        Q.    Does your but-for world involve any          10:23:03

 2   redesign of the iPhone or the iPad?

 3        A.    I don't believe so.

 4        Q.    Does your but-for world involve any

 5   changes to the iOS operating system?                    10:23:16

 6        A.    The "ilS" means?

 7        Q.    iOS operating system.

 8        A.    I'm sorry, "iOS."  Sorry, sometimes

 9   I -- I -- maybe it's the Zoom connection, I miss

10   what you're saying, so if you can try to say it         10:23:27

11   slightly slower, then for sure I will -- I will get

12   it.

13        Q.    Okay.  Does your but-for world involve

14   any changes to the iOS operating system?

15        A.    I -- I'm not sure I completely understand    10:23:47

16   your question.  The -- the operating system does a

17   lot of things.  It -- my but-for world would

18   require that stores are allowed.  That probably

19   would -- would mean that in some way, the -- the

20   Apple operating system would allow them to exist.       10:24:13

21             So, that slight change would be

22   necessary, and also the -- that the possibility for

23   self-distributing apps to work with the iOS

24   should be there.

25        Q.    In your but-for world, do any companies      10:24:32
```

Page 44

```
 1    other than Apple make and sell iPhones?              10:24:36

 2        A.   No.

 3        Q.   So your but-for world assumes Apple is

 4    the exclusive producer of the iPhone, correct?

 5        A.   Yes, my but-for world is only about         10:24:52

 6    distribution of apps.  It doesn't -- it doesn't

 7    talk about competition between iOS devices and

 8    other devices.

 9        Q.   Do you have an opinion as to whether

10    there's anything anticompetitive about Apple being   10:25:11

11    the exclusive maker and seller of iPhones?

12        A.   I'm not sure I understand the question.

13    Apple is, by definition, the -- the -- the provider

14    of these phones.  That by itself is not

15    anticompetitive.                                     10:25:32

16        Q.   Why -- why is it, by definition, the

17    provider of the phones?

18        A.   Well, because when you get these phones,

19    they say Apple own them.  They are -- they are the

20    main product of -- of the Apple Corporation.         10:25:43

21        Q.   But what prevents another company from

22    making an identical phone?

23        A.   Well, there are similar phones, but

24    identical in the sense of having the name Apple on

25    them, you know, they would -- they would have        10:26:02
```

Page 45

```
 1    intellectual property issues.                    10:26:08

 2        Q.   Does Apple have intellectual property

 3    rights in the iOS operating system?

 4        A.   I'm sure they do.

 5        Q.   You're not assuming that any of Apple's   10:26:19

 6    intellectual property rights with respect to the

 7    operating system are invalid, are you?

 8        A.   No, I'm not.

 9        Q.   Please turn to paragraph 10 of your

10    report.                                          10:26:37

11        A.   Yes, thank you.

12        Q.   I'm focusing on a sentence maybe two or

13    three sentences in, that reads, "Economic logic and

14    the evidence in this case indicate that the Apple

15    App Store would have faced substantial competition   10:27:06

16    in the but-for world."

17             Do you see that?

18        A.   I think we might not be in paragraph 10.

19    I think you're in paragraph 9.

20        Q.   No, page 5, toward the middle of          10:27:21

21    paragraph 10.  Maybe -- maybe the sentence appears

22    twice.

23        A.   Let me read more carefully, thank you.

24             Yes, I see.  "Economic logic and the

25    evidence in this case indicate that the Apple       10:27:45
```

 1     App Store would have faced substantial competition          10:27:47

 2     in the but-for world."

 3          Q.   Okay.  Is it your view that even in the

 4     light of economic logic and the evidence in the

 5     case, that there is no way to know which specific          10:28:03

 6     companies would have entered the iOS app

 7     distribution market by launching app stores, in the

 8     but-for world?

 9          A.   That's correct, uh-huh, yes.

10          Q.   Okay.  And you agree that there is no way          10:28:16

11     to know which specific companies would have entered

12     the iOS app distribution market by

13     self-distributing apps in the but-for world?

14          A.   Yes, unfortunately there was no period in

15     which competition in the app distribution existed          10:28:31

16     in the App Store except for those kind of isolated

17     event of Cydia, so we don't have an earlier period

18     to use as a benchmark for these comparisons.  So

19     the only possibility is to use yardsticks from

20     other markets.                                             10:29:05

21          Q.   In paragraph 11, which is further down on

22     page 5, you state that, "There are several

23     companies that have the organizational and

24     technical capabilities to enter the iOS app

25     distribution market."                                      10:29:22

                                                        Page 47

```
 1              Do you see that?                      10:29:25

 2        A.   Yes, that's correct.

 3        Q.   What -- what organizational and technical

 4   capabilities are required to enter the iOS app

 5   distribution market, in your opinion?            10:29:32

 6        A.   Well, I mean, for example, in one of the

 7   yardstick I -- yardsticks I use, I use app stores

 8   in the PC world distribution, and these app stores

 9   have been organized and existed for a number of

10   years in this app -- PC app distribution world.   10:29:55

11             So clearly they have managed to surpass

12   the technical hurdles of having an app store and

13   the various other business hurdles that they might

14   have in having an app store.

15        Q.   And what -- what particular companies     10:30:21

16   have had app stores for several years?

17        A.   Well, if -- if you go to my first

18   yardstick, there is a -- there is a list of stores,

19   for example Steam, Epic, Blizzard Activision,

20   Microsoft Excel, and so on.                        10:30:44

21        Q.   And let's focus on Epic.  When Epic

22   entered the PC store, it had no history of having

23   operated -- having operated a store before that,

24   correct?

25        A.   Yes, as far as I remember.               10:31:04
```

Page 48

1     Q.   Okay.  So what -- what technical and          10:31:08

2    organizational capabilities did Epic have that

3    allowed it to open up an App Store?

4     A.   Well, you know, you get a number of the

5    stores.  For example, Steam has been there a large   10:31:25

6    number of years.  Epic.  Blizzard.  Origin and so

7    on.

8          These companies, by the fact that they're

9    there, seem to have sold this kind of

10   organizational type of issues of how to set up       10:31:42

11   themselves as distributors.

12    Q.   Are there any other organizational or

13   technical capabilities that you can think of that

14   are necessary to enter the but-for world for market

15   in this case?                                        10:32:13

16          MR. HARRINGTON:  Objection to form.

17          THE DEPONENT:  I am not sure I -- I

18   understand 100 percent your question.

19          What I'm saying is that these stores that

20   I have, for example, in table 4 of my report seem    10:32:25

21   to have solved the issue of setting up a store and

22   distributing apps for the P -- the Windows PC world

23   so they could can easily take that capability and

24   use it in a different market; for example, the

25   iOS market.  So -- because the issues are going to   10:32:53

                                                          Page 49

| | | |
|---|---|---|
| 1 | be -- the various organizations that set up issues | 10:32:58 |
| 2 | are going to be similar. | |
| 3 | Q.   (By Mr. Swanson)  You know, I -- I | |
| 4 | understand you're saying that they -- they've | |
| 5 | solved -- I'm just asking you what those | 10:33:07 |
| 6 | capabilities are. | |
| 7 | What -- what are the technical | |
| 8 | capabilities? | |
| 9 | A.   I'm not sure I understand 100 percent | |
| 10 | your -- your -- your question. | 10:33:18 |
| 11 | I assume that some store like Steam or -- | |
| 12 | or Epic has the possibility of talking to the | |
| 13 | developers, bringing in the -- the -- the app, | |
| 14 | setting up a system to download a system, setting | |
| 15 | up a system for payment.  It's pretty normal stuff. | 10:33:40 |
| 16 | And they -- they have been able to do them in the | |
| 17 | PC -- in the Windows PC world.  They should be able | |
| 18 | to do them in the iOS world. | |
| 19 | Q.   In paragraph 11, at the bottom of | |
| 20 | page 5 -- it's actually a part of the sentence that | 10:33:57 |
| 21 | carries over to the top of page 6 -- but you say at | |
| 22 | least one of those companies has asked Apple to | |
| 23 | allow it to enter the iOS app distribution | |
| 24 | market. | |
| 25 | Which company you are referring to? | 10:34:13 |

Page 50

```
 1        A.   This is in footnote 6.  It's described       10:34:14

 2   there.

 3           "(email from Tim Sweeney [CEO of

 4   Epic Games] to Tim Cook [CEO of Apple] asking Apple

 5   to allow a 'competing Epic Games Store app           10:34:28

 6   available through the iOS App Store' among other

 7   features)."

 8        Q.   Okay.  And that was on June 30, 2020?

 9        A.   That's what -- yeah, that is what is

10   written on footnote 6, yes.                          10:34:42

11        Q.   Okay.  And are you aware of any company

12   that had asked Apple to allow it to enter the iOS

13   app distribution market before June 30, 2020?

14        A.   Well, I'm not sure if Cydia had formally

15   asked.  But definitely Cydia had existed early on    10:35:04

16   as an -- as an app store even before the App Store

17   of Apple.

18        Q.   Okay.  Aside from the possible -- the

19   possibility of Cydia, is there any other entity

20   that you're aware of that asked Apple to allow it    10:35:23

21   to enter the iOS app distribution market before

22   June 30, 2020?

23        A.   I'm -- I'm not aware.  But -- but -- it

24   might have happened, but I'm not aware of it.

25        Q.   Okay.  When -- when would Epic have        10:35:38
```

Page 51

**CONFIDENTIAL**

| | | |
|---|---|---|
| 1 | entered the but-for marketplace, in your opinion? | 10:35:44 |
| 2 | MR. HARRINGTON:  Objection to form. | |
| 3 | THE DEPONENT:  Well, we had this | |
| 4 | discussion a few minutes ago. | |
| 5 | There is -- the but-for world that I'm | 10:36:05 |
| 6 | examining starts on -- I believe it was 2015, | |
| 7 | June 4th.  I'm not claiming that before | |
| 8 | June 4th, 2015, the world was different and the | |
| 9 | but-for world didn't exist.  So this kind of | |
| 10 | temporal questions you're asking are -- are missing | 10:36:29 |
| 11 | the point. | |
| 12 | I'm not talking about a transition.  So | |
| 13 | I'm talking about a description of the but-for | |
| 14 | world.  But for my purposes and my analysis of this | |
| 15 | report, this -- this description of the but-for | 10:36:44 |
| 16 | world is from June 4th, 2015.  I'm not claiming | |
| 17 | that before that the world was different. | |
| 18 | And -- and, therefore, this kind of | |
| 19 | questions when -- what happened on June 3rd -- I | |
| 20 | mean, don't make so much sense to me. | 10:37:00 |
| 21 | MR. SWANSON:  We've been going for a | |
| 22 | little bit over an hour. | |
| 23 | Should we take a break? | |
| 24 | THE DEPONENT:  Sure.  Thank you. | |
| 25 | MR. HARRINGTON:  Good with me. | 10:37:12 |

Page 52

```
 1            MR. SWANSON:  Back in ten?              10:37:13

 2            THE DEPONENT:  Yeah.  Sure.

 3            THE VIDEOGRAPHER:  We are now going off

 4    the record.  The time is 10:37.

 5            (Recess taken.)                         10:37:21

 6            THE VIDEOGRAPHER:  We're now back on the

 7    record.  The time is 10:47.

 8       Q.   (By Mr. Swanson)  Professor, could you

 9    turn to paragraph 14 of your report, please, on

10    page 7.                                          10:47:40

11       A.   Yes.

12       Q.   Here you state that "If Apple were to

13    allow alternative app stores on iOS, there are

14    several firms well-positioned to enter the market,

15    some of whom have even asked Apple to allow them to  10:47:56

16    operate an app store."

17            Is this a reference again to Epic?

18       A.   I don't recall other companies having

19    asked.  But that's something that I am not

20    100 percent sure so maybe it's further to          10:48:18

21    subject -- it's subject for further investigation.

22       Q.   Okay.  But as you sit here, you're not

23    aware of any -- any firm, other than Epic, that has

24    asked Apple to allow them to operate an App Store?

25       A.   As I sit here, that's correct.            10:48:39
```

                                        Page 53

```
 1        Q.   Okay.  Now, in paragraph 14, you refer to      10:48:40

 2   some others beyond Epic.

 3             You refer to Amazon, Samsung, Aptoide,

 4   and you refer to "other smaller firms that already

 5   operate about your Android App Stores."              10:49:01

 6             As far as you know, none of those asked

 7   Apple to allow them to operate an App Store on

 8   iOS?

 9        A.   As far as I know, they haven't asked.

10        Q.   Okay.  And you also refer in paragraph 14      10:49:12

11   to Steam, Microsoft, and Blizzard and Activision.

12             Did -- did any of those firms ask Apple

13   to allow them to --

14        A.   I don't think --

15             (Simultaneously speaking.)               10:49:27

16        Q.   (By Mr. Swanson)  -- to open an iOS App

17   Store?

18        A.   I'm -- I'm sorry.  Sorry I interrupted

19   you.

20             I mean, I don't believe that they have      10:49:32

21   asked.  But at the same time, Apple has set up

22   rules that -- from the beginning of the app -- of

23   the Apple App Store have said that nobody else

24   can -- can have an app store.  So I'm -- it's kind

25   of not surprising that they haven't asked.  Because      10:49:58
```

Page 54

1   they probably already know the answer.                    10:49:59

2       Q.   Could you turn to -- to paragraph 11?

3       A.   Yes.  Thank you.

4       Q.   Let me find my reference here.

5            You indicate here that "the history of        10:50:30

6   the iOS app distribution market indicates that

7   from the beginning there were firms that could have

8   entered the market (and even did operate without

9   Apple's acceptance)."

10           What do you mean by "from the beginning"?     10:50:47

11      A.   From the beginning means from even before

12  the existence of the App Store, the Apple

13  App Store, there was this company, Cydia, that was

14  operating a store.  So that's what I mean.

15      Q.   And is Cydia the -- the entity that was      10:51:11

16  operating without Apple's acceptance?

17      A.   Yes.

18      Q.   Okay.  And you refer to Cydia in your

19  paragraph 12; is that -- is that correct?

20      A.   Correct.                                      10:51:30

21      Q.   And you indicate that "Cydia, had until

22  2018 been offering apps for free and paid

23  distribution for iOS devices since the first iPhone

24  was released through a process called

25  'jailbreaking'"?                                        10:51:44

                                                    Page 55

1        A.   Yes.   That's what is written there, yes.        10:51:47

2        Q.   What -- what -- what were Cydia's terms

3   for paid distribution?

4        A.   I -- I -- I do not recall.

5        Q.   Okay.   In your opinion, would               10:51:56

6   jailbreaking be a characteristic of the relevant

7   market in the but-for world?

8             MR. HARRINGTON:   Objection.   Outside the

9   scope of the opinions the professor has offered.

10             THE DEPONENT:   The way that I have          10:52:12

11   calculated damages was for stores and individual

12   developers selling apps without jailbreaking,

13   without having to alter the operating system of

14   the -- the iOS operating system.

15        Q.   (By Mr. Swanson)   In your opinion, in the   10:52:44

16   but-for world, will Apple block jailbreak methods

17   as part of operating system updates?

18        A.   Sorry.   I -- I missed this.   You have to

19   speak slightly slower because of Zoom.

20        Q.   I'll -- I'll repeat it.   No problem.        10:52:58

21             In your opinion, in the but-for world,

22   will Apple block jailbreak methods as part of

23   operating system updates?

24        A.   Most likely.

25        Q.   In paragraph 13 of your report, you state    10:53:16

                                                            Page 56

```
 1    that Apple never allowed Cydia "to compete on the        10:53:23

 2    merits."

 3          Do you see that?

 4    A.    Yes.

 5    Q.    What do you mean by "compete on the                10:53:31

 6    merits"?

 7    A.    Well, Cydia could not have legitimate

 8    within the rules of -- of -- of Apple Store --

 9    could not set up an app distribution store because

10    Apple claimed exclusivity on this.  That only Apple       10:53:57

11    could distribute the apps.

12          So that means that Cydia was

13    disadvantaged and the only way they could -- it

14    could distribute apps was through jailbreaking,

15    which had various other security and other kind of        10:54:19

16    issues.  So in that way Cydia was significantly

17    disadvantaged.

18    Q.    Well, is it your opinion that Cydia

19    wanted to only distribute apps that functioned on

20    an unaltered iOS operating system?                        10:54:38

21    A.    I -- I wouldn't be able to answer that

22    question.

23    Q.    Do you know that Cydia distributed apps

24    that actually altered the operating system's

25    characteristics, don't you?                               10:54:51
```

Page 57

```
 1        A.    I do.                                    10:54:53

 2        Q.    Wasn't that Cydia's business method?

 3        A.    Well, maybe that was Cydia's business

 4   method under the constraints imposed on it by Apple

 5   not allowing it to distribute in a straightforward    10:55:04

 6   legitimate way without jailbreaking.

 7            We really don't know what the world would

 8   have been if Apple had allowed Cydia to operate a

 9   competing store without jailbreaking a competing

10   store to the -- to the Apple App Store.             10:55:25

11        Q.    On page 6 of your report, your

12   heading 1 reads "Early App Stores Were Successful

13   Despite Technical Barriers."

14            Are you referring to Cydia?

15        A.    Yes.                                      10:55:46

16        Q.    Are you referring to any other early

17   App Store?

18        A.    Not that I can recall at this point.

19        Q.    Okay.  Are you saying here that Cydia was

20   successful?                                          10:55:55

21        A.    Well, at some point in time, in its early

22   days.  I -- I have read the -- the statistic that

23   Cydia was used by over 5 percent of the -- of the

24   owners of iPhones.  So that, I would say, is

25   successful.                                          10:56:24
```

Page 58

1      Q.   Was Cydia profitable?                  10:56:25

2      A.   I do not know that.

3      Q.   Okay.  Do you know if Cydia was

4  attempting to be profitable?

5      A.   I'm not sure I understand the question.   10:56:33

6  Every company attempts to be profitable.

7      Q.   Well, nonprofit companies don't attempt

8  to be profitable, do they?

9      A.   I -- I'm not sure.  I -- I wouldn't be

10  able to answer that -- that question.  I mean, this   10:56:46

11  wasn't crucial for my -- for my work.

12      Q.   Please turn to paragraph 15 of your

13  report on page 8.

14      A.   Yes.

15      Q.   You state here that, "There are a wide   10:57:13

16  variety of developers of PC apps that

17  self-distribute their apps."

18           Do you see that?

19      A.   Yes.

20      Q.   What -- what do you mean by             10:57:24

21  "self-distribution"?

22      A.   "Self-distribution" means they have a

23  site in which individuals like you and me can

24  download the programs and install them on a PC.

25      Q.   So does self-distribution in the context   10:57:53

                                        Page 59

1   of iOS mean a developer would make its iOS app          10:57:56

2   available for download from its own website?

3        A.   It -- you know, it could be its own

4   website or it could be a store in -- an app store

5   for iOS, but as we have already said, these          10:58:21

6   stores don't exist right now, so we're talking

7   about the but-for world in which the -- the

8   companies could set up stores, and some of the

9   stores might sell a whole bunch of different apps

10  and some stores might sell the specific app of that   10:58:37

11  company.  And -- or at least start with that and

12  see what happens by attracting other -- other --

13  other -- other apps.

14       Q.   I'm just trying to understand what --

15  what you mean by the term "self-distribution."       10:58:59

16            So that term at least includes a

17  developer making an iOS app available for

18  download from its own website?

19       A.   It can include that, but it doesn't have

20  to be that.  It could be also -- how can I call       10:59:16

21  it -- small store of that company in -- if -- if

22  and when app stores are allowed, competing app

23  stores to Apple, are allowed for the Apple iOS.

24       Q.   Does self-distribution as you use the

25  term include a developer allowing consumers to       10:59:42

```
 1    purchase digital content from its own website that        10:59:45

 2    can be consumed in the developers's iOS app?

 3         A.   Could I hear it one more time.

 4         Q.   Sure.

 5              Does self-distribution as you use the           10:59:58

 6    term include an iOS developer allowing consumers

 7    to purchase digital content from its own website

 8    that can be consumed in the developers's iOS app?

 9         A.   Yes, it can include that.

10         Q.   Okay.  You are aware that happens in the        11:00:15

11    actual world?

12         A.   It happens with some restrictions.  There

13    are restrictions the way that -- that that happens

14    in the actual world.

15         Q.   Does self-distribution generate the same        11:00:32

16    services for a developer as inclusion in the

17    App Store?

18         A.   Well, that's a good question, because I

19    think a lot depends on whether we're talking about

20    the actual world right now versus the but-for          11:00:57

21    world.

22              In a but-for world in which there could

23    be a number of competitors, another -- a number of

24    competing stores towards Apple, then typically a

25    company might want to distribute through all of        11:01:22
```

Page 61

**CONFIDENTIAL**

```
 1    these stores.                                      11:01:26

 2            So if, for example, Steam and Epic had a

 3    store in Apple -- in the Apple iOS, then my app,

 4    third-party app, might be interested to list itself

 5    in each one of these stores.                        11:01:51

 6            So it could list itself with Epic, it

 7    could list itself with Steam, it could list itself

 8    with Apple.  And I expect many of -- of the

 9    third-party apps could do something like that.

10    And, of course, they can have their own             11:02:08

11    self-distribution.

12        Q.   When -- when in the but-for world

13    developer self-distributes, does it incur costs

14    that a developer transacting solely through a

15    third-party platform does not incur?                11:02:26

16        A.   Well, it will have to set up its own

17    distribution setup, that is, have a -- the software

18    doing that, have the bandwidth required to be able

19    to -- to down -- for the -- for the customers to

20    download the app, and would have to -- have to set  11:02:56

21    up some payment system.

22            Now, all these are almost easy -- easily

23    to do off the shelf.  I mean, it's not like you

24    have to invent a new payment system.  It's not like

25    you have to invent a new bandwidth kind of          11:03:11
```

Page 62

```
 1    distribution and so on.  But there are going to be        11:03:17

 2    these kind of costs, and later on we -- when I

 3    present the -- the -- the self- -- the

 4    self-distribution possibility, I do consider the

 5    costs for self-distribution.                              11:03:34

 6         Q.   And you consider what the fixed costs are

 7    and what the variable costs are?

 8         A.   Correct.

 9         Q.   In -- can you take a look at footnote 3

10    on page 5 of your report?                                 11:03:49

11         A.   Yes.

12         Q.   You don't consider Web apps in your

13    report, correct?

14         A.   I'm not sure what you mean by that?

15         Q.   Well, you define the term "application"        11:04:14

16    to exclude Web apps, correct?

17         A.   If you mean by Web apps things that don't

18    require the iOS -- they're not native -- native

19    applications but they are running on the Web?

20    That's correct.                                           11:04:36

21         Q.   Okay.  Do you exclude Web apps as a means

22    of self-distribution by a distributor -- or a

23    developer, I'm sorry?

24         A.   Yeah, I'm -- I'm talking about the apps

25    which can run directly on iOS, not through the           11:04:52
```

                                                        Page 63

```
 1    Internet.  So we're talking about native apps.          11:05:01

 2         Q.   Back -- back in paragraph 15, page 8.

 3    You refer to, "The small developers such as Subset

 4    Games and Almost Human self-distribute their apps

 5    using the Humble Widget combined with Steam keys"?      11:05:30

 6         A.   Yes, I -- you could say that.

 7         Q.   This would be an -- an example of a

 8    developer transacting through a third-party

 9    platform?

10         A.   Yes.                                          11:05:54

11         Q.   So is this really an example of

12    self-distribution?

13         A.   Well, I mean, it's kind of -- kind of

14    hybrid in the sense that, you know, this is a --

15    the Humble Widget allows the -- the developer to --   11:06:18

16    to self-distribute, and then there is this kind of

17    detailed mechanism, which is explained in

18    footnote 25, of how the Steam keys are used for --

19    for payment.

20         Q.   Well, in these instances, the developer      11:06:44

21    itself is not engaging in the distribution

22    function, right?

23         A.   Well, yes and no.  I mean, in -- in some

24    way, the -- the Humble Widget is supposed to allow

25    the -- the developer to self-distribute but in --      11:07:06
```

Page 64

**CONFIDENTIAL**

```
 1    in this very particular way that is described in          11:07:12

 2    paragraph 15 in footnote 25.

 3         Q.   What is your definition of a small

 4    developer?  You used the term "small developer"

 5    such as Subset Games and Almost Human.                    11:07:28

 6         A.   Well, you know, I haven't -- I do not

 7    have a specific definition.  But, you know,

 8    we're -- we're talking about relatively small

 9    developers with small sales.  We're not talking

10    somebody like Epic or Steam that has significant          11:07:48

11    sales of its own products.

12         Q.   What proportion of the class would you

13    consider to be all developers in this sense of the

14    term that you use in paragraph 15?

15         A.   I do not recall exactly how many.  But I        11:08:11

16    would expect that a lot of the class are relatively

17    small.

18         Q.   When did Steam first allow developers to

19    use Steam keys for distribution?

20         A.   I do not recall.  I can find out.               11:08:30

21         Q.   When did the Humble Widget first become

22    available?

23         A.   I do not remember exactly unless it's

24    written in some of the -- the footnotes here.

25         Q.   Are you aware --                                11:08:47
```

Page 65

```
 1        A.   It's probably around 2015 or something of      11:08:50

 2   that sort.

 3        Q.   But you're not sure?

 4        A.   I'm not sure, no.  Well, there is a

 5   footnote 56, which is an article from 2015, showing      11:08:58

 6   that the Humble Widget -- Humble launches Humble

 7   Widget, so it seems like it was there from about

 8   that time.

 9        Q.   2016?

10        A.   2015.                                          11:09:13

11        Q.   I'm sorry, 2015 or 2016?

12        A.   2015.

13        Q.   Okay.  And are you aware that developers

14   with total billings below $250 received nothing

15   from Humble Widget?                                      11:09:25

16        A.   I'm not sure if this is factually

17   correct.

18        Q.   Did you -- did you look into the Humble

19   Widget's terms of distribution?

20        A.   I think I have looked at it at some point      11:09:39

21   in time, but I am not sure if your statement is

22   correct and if the $250 doesn't get returned

23   eventually.

24        Q.   Do you know how many developers in the

25   class had total revenues of $250 or less?              11:09:51
```

Page 66

**CONFIDENTIAL**

```
1        A.   I do not recall off the top of my head.        11:09:59

2        Q.   Okay.  Are there not many thousands?

3        A.   There are probably thousands, correct.

4   But I wouldn't be able to swear to a specific

5   number.                                                  11:10:12

6        Q.   Okay.  You indicate that many developers

7   distribute their apps through multiple stores

8   and/or self-distribution, referring to PC

9   developers?

10       A.   That's correct.                                11:10:24

11       Q.   What percentage of PC developers

12  distribute through multiple stores?

13       A.   I wouldn't be able to -- to -- to give

14  you a number off top of my head -- on top of my

15  head at this point.                                      11:10:38

16       Q.   Do you know if it's more than 10 percent?

17       A.   As I said, I wouldn't be able to -- to

18  give you a number.

19       Q.   Again, I'm asking for a magnitude, not a

20  number.                                                  11:10:49

21       A.   Well, I do not recall so I wouldn't be

22  able to answer that question.

23       Q.   What percentage of developers on the PC

24  platform self-distribute their apps?

25       A.   I believe a large number, but I wouldn't       11:11:13
```

Page 67

**CONFIDENTIAL**

```
 1    be able to say exactly how many.                 11:11:15

 2        Q.   With respect to the but-for world, do you

 3    have any methodology to identify iOS distributors

 4    who can profitably self-distribute?

 5            MR. HARRINGTON:  Objection to form.       11:11:29

 6            THE DEPONENT:  Sure.  I mean, this is

 7    outlined in the report.  We can go to specific

 8    sections.

 9        Q.   (By Mr. Swanson)  And where is it

10    outlined in the report?                           11:11:40

11        A.   Well, I mean, for -- for example, when we

12    talk about the various yardsticks, in the first

13    yardstick on the Windows PC stores, which is

14    which are outlined in table 4, the    the -- the

15    calculation there is that -- shows that the --     11:12:02

16    these companies are -- are profitable in the

17    distribution in Windows PCs, and when I talk later

18    on about the profit yardstick, also I have specific

19    calculation of profits, making sure that they

20    are -- they are able to do this profitable --      11:12:28

21    profitably.  They are able to end up profitably.

22        Q.   Okay.  So -- so using your methodology,

23    you can identify which of the roughly

24    60,000 developers in the class could profitably

25    self-distribute in the but-for world?              11:12:47
```

Page 68

```
 1        A.   I -- I'm not sure this was the previous          11:12:50

 2   question.  I -- in -- in my examination of this,

 3   it -- I show that in the but-for world, there would

 4   be third-party stores and there would be

 5   self-distribution, too.                                    11:13:10

 6             So everyone -- every developer would have

 7   the option to participate in the various stores and

 8   in self-distribution.  And I wouldn't be surprised

 9   if a number of developers, or most of them,

10   participate in all venues of distribution.                11:13:29

11        Q.   So is it your opinion that in a but-for

12   world almost every developer would find it

13   profitable to self-distribute?

14        A.   I don't think I can say that.  I think

15   that a lot of developers will self-distribute and          11:13:48

16   there are going to be others who are going to use

17   the third-party stores.

18        Q.   And when you say "a lot of developers in

19   the but-for world will self-distribute," what

20   fraction of the 60,000?                                    11:14:07

21        A.   You know, it's -- you know, we -- we

22   are -- we are    we're talking about a but-for

23   world and the    unfortunately, through the

24   anticompetitive actions of Apple, we don't even

25   have one single period of a competitive world to be       11:14:21
```

                                                    Page 69

**CONFIDENTIAL**

```
 1    able to learn from it.                              11:14:28

 2           So we are kind of limited in the

 3    predictions that we're going to say -- that I'm

 4    going to say.  But I -- but I believe that a lot of

 5    developers will find a way to distribute through    11:14:44

 6    third-party stores.  And some of them are going to

 7    distribute individually.  And possibly the same

 8    developer is going to -- is going to distribute in

 9    both ways.

10       Q.   Are you offering any opinion as to          11:15:01

11    whether Apple has monopoly power in any relevant

12    market?

13       A.   I -- I rely on Professor Elhauge's

14    opinion.

15       Q.   Okay.  So if Professor Elhauge is wrong,    11:15:12

16    then you will accept that Apple has no monopoly

17    power?

18       A.   Well, I accept here as a premise, as an

19    assumption, antitrust liability.  So I'm starting

20    from there.  So I'm not going to make a judgment on  11:15:31

21    monopoly power and antitrust liability.  I accept

22    it as -- as -- as an assumption.

23       Q.   How do you define "monopoly power"?

24       A.   I not use this in my report.

25       Q.   I'm asking you, as an economist, how do     11:15:50
```

Page 70

**CONFIDENTIAL**

| | | |
|---|---|---|
| 1 | you define "monopoly power"? | 11:15:52 |
| 2 | A. You mean in principle? | |
| 3 | Q. You're an economist, correct? | |
| 4 | A. I'm an economist, yes. | |
| 5 | Q. Okay. And as an economist, how do you | 11:16:01 |
| 6 | define "monopoly power"? | |
| 7 | A. Well, it's the power to -- to affect | |
| 8 | price or restrict competition. | |
| 9 | Q. Would you agree that it is the power to | |
| 10 | raise price profitably by restricting output? | 11:16:24 |
| 11 | A. That might be one way. There could be | |
| 12 | others. | |
| 13 | Q. Are you aware that the plaintiffs allege, | |
| 14 | in the alternative, that Apple has abused monopsony | |
| 15 | power as a bottleneck retailer? | 11:16:42 |
| 16 | A. I -- I do not recall the monopsony | |
| 17 | discussion. | |
| 18 | Q. How do you define "monopsony power" as an | |
| 19 | economist? | |
| 20 | A. Very similar to monopoly power, but from | 11:16:52 |
| 21 | the side of the -- of the buyer. | |
| 22 | Q. Are you assuming that Apple is a | |
| 23 | monopsonist? | |
| 24 | MR. HARRINGTON: Objection to form. | |
| 25 | THE DEPONENT: I -- I do not use this | 11:17:05 |

Page 71

**CONFIDENTIAL**

```
 1    analysis in my -- I -- I have not used that in my        11:17:09

 2    analysis.

 3         Q.   (By Mr. Swanson)  Are you assuming that

 4    Apple is a bottleneck retailer in your analysis?

 5         A.   I'm not completely sure I understand your     11:17:19

 6    question.

 7         Q.   All I can do is repeat it.

 8              Are you assuming that Apple is a

 9    bottleneck retailer in your analysis?

10              MR. HARRINGTON:  Objection to form.  And      11:17:36

11    also beyond the scope of the opinions he's

12    offering.

13              MR. SWANSON:  You know, that's a speaking

14    objection.  So if that's going to continue, perhaps

15    we should have a discussion about it.                   11:17:45

16              MR. HARRINGTON:  Beyond -- which portion

17    of the objection do you think was a speaking

18    objection?

19              Beyond the scope?

20              MR. SWANSON:  Well, yes.                       11:17:54

21              MR. HARRINGTON:  Okay.

22              THE DEPONENT:  So -- I mean, to -- to --

23    to be -- to be fair to you -- I mean, I'm not

24    sure -- completely sure what you mean by -- by --

25    by these -- by these terms.                             11:18:07
```

Page 72

**CONFIDENTIAL**

```
 1              What Apple has done is allowed              11:18:09
 2    distribution of apps to happen only through its
 3    App Store.  And the but-for world I describe and
 4    the damages I calculate are going away from that
 5    and allowing multiple app stores and              11:18:26
 6    self-distribution.
 7         Q.   (By Mr. Swanson)  In your opinion, is
 8    Apple a retailer of apps?
 9              MR. HARRINGTON:  Objection.
10              THE DEPONENT:  Well, Apple right now does   11:18:44
11    the distribution of -- of apps.
12              Now, whether we call it retailer, which
13    might have a specific meaning for some people or
14    not, I don't care.  I don't think that's crucial
15    for the calculation of damages that I do.          11:19:01
16         Q.   (By Mr. Swanson)  Are you aware -- well,
17    have you reviewed Professor McFadden's report in
18    the consumer case?
19         A.   I -- I have glanced through it.
20         Q.   Are you aware that Professor McFadden has   11:19:17
21    the opinion that Apple is a retailer of apps, as an
22    economic matter?
23              MR. BURT:  Objection.  Form.
24              THE DEPONENT:  You are asking me to
25    comment on Professor McFadden's report?            11:19:31
```

Page 73

**CONFIDENTIAL**

```
 1         Q.   (By Mr. Swanson)  My question to you was        11:19:35

 2    about your awareness.

 3              Are you aware of that?

 4              MR. BURT:  Same objection.

 5              THE DEPONENT:  I do not recall it              11:19:41

 6    100 percent, but I must have read it.

 7         Q.   (By Mr. Swanson)  Okay.  If you must have

 8    read it, do you agree with it or disagree with it?

 9              MR. HARRINGTON:  Objection.

10              THE DEPONENT:  I think, again, we're          11:19:54

11    getting into word definition here -- word

12    definitions.

13              Traditionally, a retailer is somebody who

14    gets a product, puts it on his shelf, and then

15    resells it.  That's what traditionally retailing      11:20:09

16    means.

17              Now, Apple doesn't seem to be doing that,

18    you know.  It doesn't take possession of the

19    product.  It acts as an intermediary through the

20    App Store and brings together the -- the buyers and   11:20:25

21    the -- and the sellers.  So that's why I think the

22    discussion on retailing and so on is a bit off the

23    subject.

24         Q.   (By Mr. Swanson)  Professor, are the

25    opinions that you provide in your report valid        11:20:39
```

Page 74

```
 1    under both a monopoly theory of harm and a              11:20:45

 2    monopsony theory of harm?

 3         A.   I am using the theory of harm, the

 4    anticompetitive effects as explained by

 5    Professor Elhauge and that's the crucial thing.  I       11:21:02

 6    mean, you can call it whatever you want.

 7    "Monopoly," "monopsony," whatever.

 8              The bottom line is that in the but-for

 9    world, there would have been much more distribution

10    and people would have paid much less.  And that's        11:21:18

11    what I'm calculating.

12         Q.   So is it your opinion that damages would

13    be the same whether the theory of harm is a

14    monopoly theory or a monopsony theory?

15         A.   I'm using the -- the theory of harm that       11:21:32

16    was developed by Professor Elhauge, and I start

17    from that.  If there was some alternative theory of

18    harm, I wouldn't be able to say.  I mean, I -- I

19    haven't done that, based on alternative theories of

20    harm.                                                    11:21:47

21         Q.   And your understanding is that the

22    Professor Elhauge has offered a -- a monopoly

23    theory of harm?

24         A.   Yes.

25         Q.   Do you agree that Apple's App Store is a       11:21:58
```

Page 75

```
 1    two-sided platform?                              11:22:03

 2         A.    The Apple App Store, as it is right now,

 3    yes, it acts as a two-sided platform, correct.

 4         Q.    And do you agree that it would be a

 5    two-sided platform in the but-for world as well?  11:22:17

 6         A.    Well, as a store like -- like Apple.  So

 7    it could be Epic's or Steam's would act as a

 8    two-sided platform.

 9         Q.    Do you agree that a two-sided platform

10    offers different products or services to two       11:22:39

11    different groups who both depend on the platform to

12    intermediate between them?

13         A.    Yes, I agree.

14         Q.    Do you agree that the platform services

15    that Apple provides to developers and the services  11:22:54

16    it provides to consumers are not complements?

17         A.    "Are not complements," you said?

18         Q.    Correct.

19         A.    I'm not sure I agree with that.  I'm not

20    sure I understand what -- what you're talking       11:23:10

21    about.

22         Q.    Well, as an economist, do you have an

23    understanding of the term "complements"?

24         A.    Absolutely.

25         Q.    What is your understanding?             11:23:21
```

Page 76

| | | |
|---|---|---|
| 1 | A.   My understanding is a "complement" is -- | 11:23:23 |
| 2 | is a good that enhances -- is a good B, let's say, | |
| 3 | that enhances what good A provides to a consumer. | |
| 4 | Q.   And how would you express that as an | |
| 5 | economist in terms of cross-elasticity demand? | 11:23:39 |
| 6 | A.   Well, I mean, economies tend to see | |
| 7 | cross-elasticity of demand and tend to try to | |
| 8 | understand what's the impact of changing the price | |
| 9 | of one good on -- on the price of another. | |
| 10 | So for example, if I was looking for the | 11:24:00 |
| 11 | cross-elasticity of demand between Diet Coke and | |
| 12 | Diet Pepsi, I would say, well, suppose that | |
| 13 | Diet Coke's price went up.  Will the sales of | |
| 14 | Diet Pepsi go up? | |
| 15 | And if that turns out to be positive, | 11:24:19 |
| 16 | then we could call Diet Coke and Diet Pepsi | |
| 17 | substitutes.  Otherwise we would call them | |
| 18 | complements. | |
| 19 | So, again, it's -- if -- if they are | |
| 20 | substitutes, this cross-elasticity of demand is | 11:24:34 |
| 21 | positive.  Otherwise, for complements, it's | |
| 22 | negative. | |
| 23 | Q.   Okay.  So using that definition, do you | |
| 24 | agree that the platform services that Apple | |
| 25 | provides to developers and the services it provides | 11:24:45 |

Page 77

```
 1    to consumers are not complements?                    11:24:47

 2         A.   Well, I'm not completely sure what you

 3    mean by the App Store services.

 4              Is that your -- your -- your question is

 5    about the App Store or Apple, in general?            11:24:59

 6         Q.   Well, you -- unless I misheard you, you

 7    just agreed that a two-sided platform offers

 8    different products or services to -- to two

 9    different groups.

10         A.   Right.                                     11:25:12

11         Q.   So do you understand the App Store to

12    offer two different groups different products or

13    services?

14         A.   Well, you know, what does the -- a store

15    do in -- in -- kind of a digital electronic store    11:25:28

16    like -- like Apple's App Store do.  It brings

17    together a seller, the -- the developer and a

18    buyer, the customer and brings them together.

19              Now, you said the -- the -- the services

20    that it provides to the developer.  Well, what are   11:25:51

21    these services.  I mean -- main services, list

22    them.  The service that it provides to -- there

23    might be other ones.  I'm not going to go into the

24    detail of that.  But the main service it provides

25    to the -- to the customer is facilitating the        11:26:09
```

Page 78

1    transaction, being able to pay.                    11:26:11

2         Now, these, to me, look complementary.

3    So I'm not completely sure why you say they

4    wouldn't be complementary.

5         Q.   Your answer is very clear.             11:26:22

6         Do you agree that to optimize sales the

7    App Store must find a balance in pricing that

8    encourages the greatest number of matches between

9    consumers and developers?

10        A.   Well, an app store in general would like   11:26:35

11   to be able to do that to become profitable, to get

12   a -- lot of developers get listed, and get a lot of

13   customers so that they can make transactions.

14        So there is a -- an incentive for an

15   app store owner to bring in both sides of the      11:26:58

16   market.

17        Q.   Do you agree that Apple's App Store is a

18   two-sided transaction platform?

19        A.   Yes, a transaction platform in the sense

20   that it facilitates transactions between the       11:27:13

21   third-party developer and a customer.

22        Q.   Do you agree that because transaction

23   platforms can't make a sale unless both sides of

24   the platform simultaneously agree to use their

25   services, that two-sided transaction platforms     11:27:34

                                                    Page 79

1    exhibit strong indirect network effects?            11:27:38

2        A.   In principle, yes.

3        Q.   Do you agree that the Apple App Store

4    exhibits strong indirect network effects?

5        A.   Yes.                                        11:27:54

6        Q.   You agree that transaction platforms are

7    best understood as supplying only one product,

8    namely transactions?

9        A.   Well, I should say that when we talk

10   about the indirect network effects, I should be --   11:28:06

11   I should have qualified the previous answer that

12   we're talking about network effects between the

13   developers and the customers, just to be sure

14   because there might be network effects floating

15   around for other reasons.                            11:28:20

16          So these are what we're talking about.

17   Let me hear your second question -- your last

18   question again.  Sorry.

19       Q.   Okay.

20          Do you agree that transaction platforms      11:28:29

21   are best understood as supplying only one product,

22   namely transactions?

23       A.   Well, that's the -- the objective is

24   transactions.  But the actual thing that happens is

25   distribution.  Right.  People would not pay unless   11:28:52

Page 80

```
 1    they're -- they're getting something.                11:28:55

 2           So it would be misleading to just focus

 3    on transactions and don't talk about distribution

 4    because the function of each one of these stores,

 5    Apple or a different one in the but-for world, is    11:29:12

 6    distribution.

 7        Q.   So as an economist, you distinguish

 8    between transactions and distribution?

 9           MR. HARRINGTON:  Objection.

10           THE DEPONENT:  Well, you know,                11:29:25

11    transactions can happen without distribution,

12    right?  I mean, for example, you pay with

13    American Express.  Then the merchant accepts your

14    payment.  That's a transaction, right?

15           The distribution is some -- someone else,     11:29:43

16    right?  I mean, it's not the same thing as -- as a

17    transaction.  Transaction is -- a transaction is

18    what the companies want -- they want to make

19    themselves profitable as stores, so they like

20    transactions.                                        11:29:58

21           But the customer needs something to -- to

22    pay.  Otherwise they wouldn't pay, and that

23    something is something that gets distributed.  So

24    we shouldn't -- we shouldn't discount the fact that

25    behind the transaction, there is distribution.      11:30:17
```

Veritext Legal Solutions
866 299-5127

**CONFIDENTIAL**

```
 1        Q.   (By Mr. Swanson)  So -- so are there        11:30:20

 2   separate markets for transactions and for

 3   distribution services?

 4             MR. HARRINGTON:  Objection.

 5             THE DEPONENT:  I didn't say anything like     11:30:27

 6   that.  I'm sorry, that's kind of misquoting me.  I

 7   don't think I say anything of that sort.  I'm

 8   saying --

 9        Q.   (By Mr. Swanson)  Okay.

10        A.   -- the function of the store is             11:30:35

11   distribution.  And it happens people pay through

12   these transactions.

13        Q.   Well, I'm asking you a question.  Are you

14   of the opinion, as an economist, that there are

15   separate markets for transactions and for            11:30:51

16   distribution services?

17             MR. HARRINGTON:  Same objection.

18             THE DEPONENT:  No.  Distribution really

19   happens to be paid through the transactions.

20        Q.   (By Mr. Swanson)  So distribution is an     11:31:10

21   input into providing transactions; is that correct?

22             MR. HARRINGTON:  Objection.

23             THE DEPONENT:  You might think of it that

24   way as -- as an input, but I would say it's the

25   actual thing.  This is what people pay for.          11:31:21
```

Page 82

```
 1          Q.    (By Mr. Swanson)  Well, what is the        11:31:25

 2    product in the relevant market?  Is it --

 3          A.    What -- hold on.  What relevant market?

 4    I mean, I'm -- I'm not sure I understand.

 5          Q.    Well, there is a relevant market that      11:31:35

 6    you're assuming in this case, correct?

 7          A.    Well, I am not defining a relevant market

 8    in the terms of traditional antitrust.  I'm taking

 9    the antitrust liability as given, and I'm using the

10    market to calculate damages.                           11:31:55

11          Q.    Well, you're using the same relevant

12    market to calculate damage that plaintiffs allege

13    and Professor Elhauge opines about, are you not?

14          A.    Yes, but I'm -- but I'm saying is that

15    I'm not using the word "relevant market" in the        11:32:13

16    antitrust terms.  I'm using the word "market" as

17    economists would use in general.

18          Q.    That's perfectly fine, but I'm asking you

19    a question about the relevant market.  What do you

20    understand the product in the relevant market is?      11:32:30

21          A.    I haven't defined relevant markets.

22          Q.    So you have no idea what the product in

23    the relevant market is?

24                MR. HARRINGTON:  Objection.

25                THE DEPONENT:  Well, I mean, I don't know   11:32:42
```

Page 83

| | | |
|---|---|---|
| 1 | if you want to insult me; I mean, you can.  But the | 11:32:44 |
| 2 | point is that I -- I have not defined relevant | |
| 3 | markets.  I have used the market, as I understand | |
| 4 | it, to calculate damages. | |
| 5 | Q.   (By Mr. Swanson)  What's the product that | 11:32:58 |
| 6 | you're calculating damages for? | |
| 7 | A.   We are discussing the distribution of | |
| 8 | apps through the -- exclusively the App Store in | |
| 9 | the present world compared to the but-for world in | |
| 10 | which there could be a number of different stores | 11:33:18 |
| 11 | and self-distribution. | |
| 12 | Q.   So the -- is -- is the product for which | |
| 13 | you're calculating damages transactions? | |
| 14 | A.   The product is distribution.  Now, it's | |
| 15 | paid through transactions. | 11:33:38 |
| 16 | Q.   So you draw a distinction in terms of | |
| 17 | calculating damages between distribution and | |
| 18 | transactions; is that what you're saying? | |
| 19 | MR. HARRINGTON:  Objection. | |
| 20 | THE DEPONENT:  Well, what -- I -- I said | 11:33:55 |
| 21 | it more than once.  I mean, the product is | |
| 22 | distribution.  It's paid through transactions. | |
| 23 | We're talking about the present world in | |
| 24 | which distribution is exclusively done through | |
| 25 | Apple from the Apple Store or the Apple App Store, | 11:34:11 |

Page 84

1    and Apple charges a certain price, and we're          11:34:15

2    talking about the but-for world in which we have a

3    number of stores and then we have a different price

4    and we compare them.

5          So when we compare them, of course we          11:34:25

6    compare the -- the prices and -- and the amounts

7    and the -- that correspond to the transactions.

8          But to try to talk about transactions in

9    some strange abstraction without the -- the actual

10   thing that happens, which is distribution, doesn't      11:34:39

11   make sense.

12   Q.   (By Mr. Swanson)  Are -- are you, as an

13   economist, assuming that the but-for world involves

14   a single-sided market for distribution?

15   A.   Well, the way distribution happens is          11:34:59

16   either through a store or through self-distribution

17   by a developer.  So if we're talking about a store,

18   then we're talking about a two-sided -- two-sided

19   transaction market.

20          If we're talking about self-distribution,     11:35:28

21   that happens directly from the developer to the

22   consumer.  And both of these are avenues in which

23   the product gets distributed in the but-for world.

24   Q.   Do you agree that only other two-sided

25   platforms can compete with a two-sided platform for    11:35:48

                                                     Page 85

```
 1    transactions?                                        11:35:54

 2           MR. HARRINGTON:  Objection.

 3           THE DEPONENT:  In principle, no.

 4      Q.   (By Mr. Swanson)  Do you agree that the

 5    relevant market or markets in this case are          11:36:00

 6    two-sided transaction markets?

 7      A.   Well, I'm not sure I understand again the

 8    relevant antitrust definition of a market, which I

 9    didn't do, and I only calculated damages for the

10    market.                                              11:36:23

11           Now, this market is a market for

12    distribution.  So right now, the way it's done

13    under Apple, there is only one store.  It's

14    two-sided, that's fine.

15           If we had the but-for world, then there       11:36:37

16    would be more than one stores, and there would be

17    self-distribution.  So both the effects of the

18    extra stores and the self-distribution should be

19    taken into consideration in calculating damages,

20    and that's what I do.                                11:36:57

21      Q.   Is your calculation of damages

22    independent of the definition of the relevant

23    market?

24      A.   My calculation of the relevant damages is

25    based on an antitrust finding of liability, and      11:37:13
```

Page 86

1    that's the simple -- simple story here.                11:37:21

2        Q.   If the finder of fact determines that

3    there are half a dozen different relevant markets

4    at issue in this case, would that affect your

5    conclusion about damages?                              11:37:34

6        A.   If the finder of fact finds antitrust

7    liability, that -- especially the way that

8    Professor Elhauge outlined, then my calculation

9    would stand.

10            If the finder of fact finds something       11:37:55

11   completely different, then I would have to redo my

12   calculation.

13       Q.   And are you saying if the finder of fact

14   finds liability in something other than a single

15   relevant market, that you'll have to redo your       11:38:13

16   calculations?

17       A.   Well, now we're talking hypothetically.

18   I mean -- well, you can stretch the hypotheticals

19   up to a point.

20            I'm not sure what -- you know, if -- if      11:38:25

21   we -- the finder of fact finds something far away

22   from the finding of liability that I have assumed I

23   will have to redo my calculations.  That's simple.

24            MR. SWANSON:  Okay.  Well, we've been

25   going, I think, for an hour, maybe a tiny bit         11:38:47

                                                          Page 87

| | | |
|---|---|---|
| 1 | beyond that.  Shall we take another morning break? | 11:38:50 |
| 2 | THE DEPONENT:  Thank you. | |
| 3 | MR. SWANSON:  Okay. | |
| 4 | MR. HARRINGTON:  That's fine here. | |
| 5 | Ten minutes? | 11:38:55 |
| 6 | MR. SWANSON:  Yeah. | |
| 7 | THE VIDEOGRAPHER:  We're now -- we're now | |
| 8 | going off the record.  The time is 11:39. | |
| 9 | (Recess taken.) | |
| 10 | THE VIDEOGRAPHER:  We're now back on the | 11:49:55 |
| 11 | record.  The time is 11:50. | |
| 12 | Q.  (By Mr. Swanson)  Professor, how -- how | |
| 13 | do you measure price in a two-sided transaction | |
| 14 | market? | |
| 15 | A.  We would look at the total price of -- of | 11:50:12 |
| 16 | the two sides participating in the transaction. | |
| 17 | Q.  And what -- what would the total price be | |
| 18 | in the context of the App Store? | |
| 19 | A.  Well, it would be what the -- what the | |
| 20 | consumers pay plus what the developers receive, or | 11:50:56 |
| 21 | minus, whatever you -- however you calculate. | |
| 22 | Q.  Well, how -- could you give me an example | |
| 23 | of an app that is sold for 9.99, what would be the | |
| 24 | relevant two-sided transaction price? | |
| 25 | A.  Well, the app is 9.99, so if there is | 11:51:24 |

Page 88

```
1    something that the consumer gets, we can subtract        11:51:29

2    that, and that would be the total price in the

3    market.

4            Now, besides that, there is Apple that

5    has already taken its 30 percent.  So that's            11:51:40

6    something to keep in mind.

7        Q.   Well, what is the price that you refer to

8    that the consumer is paying?

9        A.   The consumer pays 9.99.

10       Q.   And so is there a price that the               11:51:58

11   developer pays?

12       A.   Well, the -- the developer pays to Apple

13   30 percent.

14       Q.   So on a 9.99 transaction that would be

15   $3?                                                      11:52:20

16       A.   Approximately, yes.

17       Q.   So would you add 9.99 and $3 to get the

18   total price of the two-sided transaction?

19           MR. HARRINGTON:  Objection.  Form.

20           THE DEPONENT:  I'm -- I'm not sure I -- I        11:52:33

21   understand that -- that kind of a reasoning.

22           The whole thing is set up so that

23   transactions happen with -- already paid 30 percent

24   to Apple.

25           So the -- the -- the consumer -- the --         11:52:51
```

Page 89

```
 1    the -- the producer -- the -- the developer pays --        11:52:55

 2    I'm sorry -- collects 9.99.  And the customer pays

 3    9.99.

 4            So in this world, the -- the developer

 5    gets paid exactly what the -- the consumer pays,           11:53:17

 6    right.  And then the developer has to pay

 7    30 percent of that to -- to Apple.

 8            So in fact, the developer ends up with

 9    not 9.99.  But 6.99, let's say.

10       Q.   (By Mr. Swanson)  So which --                      11:53:44

11       A.   So that would be the trans- -- the final

12    transaction price.

13       Q.   So is 6.99 the price of the product in

14    the relevant market in that example?

15            MR. HARRINGTON:  Objection.  Form.                 11:53:53

16            THE DEPONENT:  Well, again, I didn't

17    define the relevant markets.  But in -- in that

18    setup, the -- the developer gets paid only 6.99

19    while the -- the customer is -- gets paid 9.99.

20            So we're talking about a but-for world in          11:54:12

21    which even if the developer still collects 9.99,

22    the -- Apple collects less than $3.  So the

23    developer is going to be better off in the but-for

24    world.

25       Q.   (By Mr. Swanson)  Could you turn to               11:54:35
```

Page 90

1    paragraph 10 on page 5?                          11:54:36

2        A.   Yes.

3        Q.   You state that you "understand that

4    Prof. Elhauge has opined that the relevant market

5    in this case is the market for domestic iOS app and   11:55:02

6    digital in-app purchase (IAP) distribution

7    services, including all the ways the developers can

8    distribute native apps to users of iOS devices in

9    the United States.  For the purposes of brevity,

10   throughout this report I will refer to the market    11:55:21

11   as the 'iOS app distribution' market, but I mean

12   this term to include initial purchases,

13   subscriptions, and IAP."

14       So when you use the term "iOS app

15   distribution" in your report, you're referring to   11:55:35

16   Professor Elhauge's relevant market, correct?

17       A.   Well, we're referring to initial

18   purchases, subscriptions and IAP, besides --

19   you know, the -- you know, all of these three

20   things.                                          11:55:52

21       Q.   And those three things are in

22   Professor Elhauge's relevant market, correct?

23       A.   Yes.

24       Q.   And you say "I have read his market

25   definition analysis and find that his conclusions    11:56:00

Page 91

1    are sound."                                          11:56:03

2         So you're making a substantive statement

3    there that you believe Professor Elhauge's

4    conclusions about the relevant market are sound,

5    correct?                                             11:56:13

6              MR. HARRINGTON:  Objection.

7              THE DEPONENT:  Correct.

8         Q.   (By Mr. Swanson)  And you say "In this

9    section, I analyze the characteristics of this

10   relevant market in the but-for world," right?       11:56:20

11        Are you changing that opinion?

12        A.   No.

13        Q.   So you know what the relevant market is,

14   do you not?

15        A.   Well, it was defined by Professor Elhauge  11:56:31

16   and I -- I say that it was sound.

17        Q.   And every time you refer to the market in

18   this report, you're referring to that relevant

19   market, are you not?

20        A.   Well, in the -- the -- the -- the market   11:56:44

21   for iOS app distribution, right, which includes

22   initial purchase, subscription, IAP.  But from my

23   understanding and from my calculation of damages,

24   it includes self-distribution as well.

25        I mean, it's not in the -- I'm -- I'm          11:57:04

                                                 Page 92

1   sure that it's clear that one cannot exclude                    11:57:07

2   self-distribution from the possibility that exists

3   in the but-for world.

4           Q.   Does Professor Elhauge exclude

5   self-distribution from the relevant market?                    11:57:21

6           A.   I don't think so.

7           Q.   Okay.  So when you refer to the market in

8   your report, you're referring to

9   Professor Elhauge's definition of the relevant

10  market; is that correct?                                       11:57:32

11          MR. HARRINGTON:  Objection.

12          THE DEPONENT:  Well -- but, again, I'm

13  trying not to discuss the relevant market in the

14  antitrust sense, but a market in the plain

15  economist sense, in which I'm going to say here is            11:57:45

16  what we have in the but-for world.  Here is what we

17  have in the -- in the -- in the but-for world -- in

18  the but-for world versus the actual world.

19          Q.   (By Mr. Swanson)  Well, I'm just trying

20  to understand what your opinions are.                          11:57:59

21          Are you saying that when you use the term

22  "market" in your report, you're using it in a sense

23  different than the market definition that

24  Professor Elhauge has supplied and that you

25  indicate is sound?                                             11:58:11

                                                                  Page 93

```
 1              MR. HARRINGTON:  Objection.              11:58:13

 2              THE DEPONENT:  No.  I'm not -- I'm not

 3   saying I'm using it differently.  I'm just saying

 4   that to be clear, that I have not defined an

 5   antitrust market in my report.  Whatever is done    11:58:21

 6   was done by Elhauge -- that Professor Elhauge.  And

 7   I take the antitrust liability as given and go on

 8   from there to look at this market and seeing how it

 9   would be in the but-for world.

10       Q.   (By Mr. Swanson)  Well, what -- what do    11:58:40

11   you mean then when you say you find his conclusions

12   are sound?

13       A.   Meaning, I -- what it says.  That I -- I

14   don't have any -- I -- I think that he -- he did a

15   good job, and I don't have any real disagreement    11:58:54

16   with him.

17       Q.   Okay.  Is the percentage commission for a

18   given App Store transaction the price of that

19   transaction in the relevant market?

20              MR. HARRINGTON:  Objection.              11:59:16

21              THE DEPONENT:  Can you say it one more

22   time just to be sure.

23       Q.   (By Mr. Swanson)  Uh-huh.

24              Is the percentage commission for a given

25   transaction in the App Store the price of that      11:59:25
```

Page 94

```
 1    transaction in the relevant market?                    11:59:30

 2            MR. HARRINGTON:  Same objection.

 3            THE DEPONENT:  Well, let's to be -- to be

 4    sure we understand we're on the same page.

 5            There is something that the developer         11:59:37

 6    collects.  Then that fee -- let's say, the

 7    30 percent fee that Apple collects -- let's say

 8    it's $3 -- is, in fact, the -- the price that Apple

 9    collects for distribution.

10            So that's the -- the crucial number that      12:00:04

11    I think -- and I show -- is going to be different

12    in the but-for world.

13        Q.   (By Mr. Swanson)  In the but-for world,

14    you talk about percentage commissions, correct?

15        A.   Correct.                                     12:00:19

16        Q.   So is it your view that the percentage is

17    the relevant price, or is it the absolute dollar

18    amount in each case that's the relevant price?

19        A.   It's the -- it's the commission.  It's

20    the commission percentage.  So Apple collects 30      12:00:31

21    and for some categories 15.  And in the but-for

22    world, these commissions would be different by

23    market participants.

24        Q.   Do you agree that Apple's average

25    commission has decreased at least 10 percent since    12:00:52
```

                                                            Page 95

```
 1    2015?                                                12:00:55

 2         A.   Well, I -- I don't -- I have to see the

 3    actual numbers.  But if for whatever reason Apple's

 4    commission has decreased, it must be because of a

 5    change in the mix of the things getting distributed   12:01:14

 6    and the small business product -- program that was

 7    announced by Mr. Cook and discussed in the trial.

 8         Q.   Well, is the average commission rate of

 9    any economic meaning to you in forming your

10    opinions in this case?                                12:01:38

11         A.   Of course.

12         Q.   Okay.  So by definition, the average is

13    going to be affected by the mix, correct?

14              (Technical difficulties; Court Reporter

15    asks for clarification.)                              12:01:49

16         Q.   (By Mr. Swanson)  Oh, I said, by

17    definition, the average is going to be affected by

18    the mix?  I believe --

19         A.   The answer is yes.

20         Q.   Could you turn to page -- to table 8 on     12:02:07

21    table 38 of your report?

22         A.   I'm sorry.  You said table 8?

23         Q.   Table 8.

24         A.   Yes.

25         Q.   You calculated average commission rates     12:02:32
```

Page 96

```
 1    by year for the App Store, correct?              12:02:34

 2         A.   That's correct.  And I have to say that

 3    this is before some extra data came -- some extra

 4    data -- data came after the report was published.

 5    So we don't go to 2020.                           12:02:51

 6         Q.   But as far as you know, are the entries

 7    up through 2018 the same?

 8         A.   Yes.

 9         Q.   Okay.  And is it your understanding that

10    the number or the average for 2019 may change given  12:03:08

11    the extra data?

12         A.   The hour -- the number for 2019.  And, of

13    course, there's going to be a number for 2020, yes.

14         Q.   Okay.  Have you made those calculations?

15         A.   My -- my staff is in the process of       12:03:22

16    making the calculations.  I -- I haven't seen the

17    final results.

18         Q.   Okay.  And then we'll just look at 2018.
```

12:03:56

Page 97

**CONFIDENTIAL**

14        Q.   Is it your opinion that when a two-sided

15   transaction platform sells transactions, that all          12:04:39

16   transactions sold on the platform necessarily

17   belong in the same product market?

18             MR. HARRINGTON:  Objection.

19             THE DEPONENT:  All right.  I need to hear

20   this again, please.                                         12:04:51

21        Q.   (By Mr. Swanson)  Is it your opinion that

22   when a transaction platform, a two-sided

23   transaction platform sells transactions, that all

24   transactions sold on the platform necessarily

25   belong in the same product market?                          12:05:05

                                                      Page 98

**CONFIDENTIAL**

```
 1            MR. HARRINGTON:  Same objection.              12:05:07

 2            THE DEPONENT:  Well, this seems to be a

 3     hypothetical, and I'm not sure I can answer in --

 4     in abstraction.

 5        Q.   (By Mr. Swanson)  You can't answer that      12:05:24

 6     question?

 7        A.   Well, I already said it's a hypothetical

 8     question about the hypothetical two-sided market,

 9     and I'm not sure which one you're talking about.

10     And therefore, I wouldn't be able to say they        12:05:38

11     belong to the same market.  They might not.

12        Q.   Okay.  Well, let's take a specific

13     example.  Is it your opinion that when the

14     App Store sells transactions, that all transactions

15     sold on the App Store platform are necessarily in    12:05:56

16     the same product market?

17            MR. HARRINGTON:  Objection.

18            THE DEPONENT:  Well, first of all, I -- I

19     disagree with the words "sells transactions."  I

20     mean, nobody sells transactions.  People sell        12:06:11

21     services, people sell goods, people sell something

22     that people are willing to pay.  Transaction is

23     what consummates the sale.

24            The -- we're not selling transactions,

25     right?  We're selling distribution in the -- in      12:06:24
```

Page 99

```
 1    the -- in the App Store.                        12:06:26

 2         So if you're telling me the App Store is

 3    selling distribution, could it be selling something

 4    else?  Not as far as I can see.

 5         Q.   (By Mr. Swanson)  Do you know if you and   12:06:41

 6    Professor Elhauge have the same opinion on what the

 7    relevant product is in the relevant product market?

 8         A.   The same opinion as?

 9         Q.   To what the relevant product is in the

10    relevant product market.                        12:06:53

11         A.   You mean -- I'm not sure what the

12    question is, comparing Elhauge to -- to what?

13    Comparing what Elhauge says to me?  To what I just

14    said?

15         Q.   Yes.                                  12:07:10

16         A.   Well, I don't know how he phrased it

17    exactly.  But the transactions is what consummates

18    the sale.  You know, it would be great if you and I

19    can start selling transactions and make money just

20    by selling transactions, but it's not realistic,   12:07:30

21    right?

22         I mean, what's happening behind the

23    scenes is that Apple is distributing products.

24    They're distributing apps, and people are willing

25    to pay for the -- for this distribution through the   12:07:42
```

Page 100

```
 1    transactions.                                      12:07:44

 2        Q.   Can you identify any other economist,

 3    aside from Professor McFadden, who believes that

 4    the products sold by the App Store is not

 5    transactions?                                      12:08:01

 6            MR. HARRINGTON:  Objection.

 7            THE DEPONENT:  Well, I -- first of all, I

 8    mean, I -- I have to be careful about this.  I

 9    haven't read what every other economist has said

10    about the Apple Store, and you can understand that  12:08:15

11    I cannot really answer that question, given --

12    given that.

13            But what -- again, coming back to your

14    premise, the store consummates transactions.  It

15    doesn't sell transactions.  It sells distribution   12:08:31

16    services, and these are consummated in

17    transactions.

18        Q.   (By Mr. Swanson)  And that is the

19    fundamental basis for your opinions in your report,

20    that understanding of what the market is and how it  12:08:45

21    operates?

22            MR. HARRINGTON:  Objection.

23            THE DEPONENT:  Well, I mean, it's -- it's

24    one of the crucial understandings of what --

25    what -- what the market is, what -- how            12:08:56
```

Page 101

**CONFIDENTIAL**

```
 1   distribution happens, and how distribution can        12:09:01

 2   happen in alternative ways, in the but-for world.

 3        Q.   (By Mr. Swanson)  Could you turn to

 4   paragraph 26 in your report on page 15.

 5        A.   Yes.                                          12:09:29

 6        Q.   You state that, "The PC app distribution

 7   market is not exactly the same as the iOS app

 8   distribution market"?

 9        A.   I'm sorry, are we on 26?

10        Q.   Yeah, the very bottom of page 15, that --     12:09:41

11   that sentence that carries over.  Although --

12        A.   Hold on -- hold on one second.  Yeah.

13        Q.   Paragraph 26, please.

14        A.   Yeah, right.

15             Yes, I can see that.                          12:10:02

16        Q.   Okay.  What -- what is the PC app

17   distribution market?

18        A.   It's distributing apps for the PC

19   Microsoft operating system, Windows.

20        Q.   And are you defining on -- a PC app           12:10:15

21   distribution market based on principles of

22   substitution, cross elasticity of demand?

23             MR. HARRINGTON:  Objection.  Form.

24             THE DEPONENT:  Well, I don't think we --

25   I -- I need to do that, but I could if -- if you        12:10:30
```

Page 102

**CONFIDENTIAL**

```
 1    wanted.                                              12:10:33

 2            I mean, the point is that we all know

 3    what -- what we're talking about.  We are talking

 4    about apps that run on Windows, and we're talking

 5    about the stores that are distributing them and      12:10:48

 6    self-distribution.

 7        Q.   (By Mr. Swanson)  Are you limiting the PC

 8    app distribution market to distribution on Windows

 9    devices?

10        A.   Well, I do not recall 100 percent how       12:11:09

11    exactly the numbers we used are, but I believe so.

12    I could be wrong.  I better check it and get back

13    to you on this.

14        Q.   Do you include, in the PC app

15    distribution market, apps that are distributed by    12:11:35

16    platforms on the Mac?

17        A.   No.

18        Q.   Are you aware that Steam is available on

19    the Mac?

20        A.   Uh-huh, yes.                                12:11:49

21        Q.   So it is your opinion that Steam on a

22    Windows PC is in a different market that Steam on a

23    Mac?

24            MR. HARRINGTON:  Objection.

25            THE DEPONENT:  Well, that's a kind of a       12:12:00
```

Page 103

| | | |
|---|---|---|
| 1 | broad question, and it has to do with substitution | 12:12:04 |
| 2 | between Macs and PCs. | |
| 3 | In the past, let's say in the major | |
| 4 | antitrust case of the government against Microsoft, | |
| 5 | the government did not include the Mac as a | 12:12:24 |
| 6 | substitute for the PC and went on to win the case | |
| 7 | based on that understanding. | |
| 8 | So I do not want to get into the | |
| 9 | discussion about the substitutability between the | |
| 10 | Mac and the -- and -- and the PC -- and the PCs. | 12:12:52 |
| 11 | Most people, I think, believe that the | |
| 12 | Mac setup is pretty far away from the PC setup.  So | |
| 13 | I wouldn't put -- I mean, for example, in -- in an | |
| 14 | app that runs on PC cannot run on a Mac unless it's | |
| 15 | rewritten from scratch.  So to try to talk about | 12:13:17 |
| 16 | distribution as if Mac and PC are interchangeable | |
| 17 | would be -- would be foolish. | |
| 18 | Q.   (By Mr. Swanson)  So your use of the term | |
| 19 | "PC app distribution market" excludes any app | |
| 20 | distribution through identical platforms on the | 12:13:38 |
| 21 | Mac? | |
| 22 | A.   Well, as -- as I -- as I said, there | |
| 23 | could be platforms that distribute on the Mac, but | |
| 24 | the idea that the same kind of app is going to run | |
| 25 | well on both systems, both the PC and a Mac, | 12:14:00 |

Page 104

```
 1    doesn't really make sense.  It's not really true.        12:14:04

 2           So even though the same company might

 3    have a store for the Mac and a store for the PC, it

 4    doesn't mean that what it's selling is

 5    interchangeable between the two operating systems.       12:14:22

 6        Q.   When the Epic Games store opened up, did

 7    it open up on the Mac as well as the Windows

 8    platform?

 9        A.   I don't recall if Epic opened on the Mac.

10    I mean, I haven't examined that.                         12:14:44

11        Q.   Okay.  Have you looked at app

12    distribution on the Mac at all?

13        A.   I have not, because I excluded the Mac

14    as -- as a comparable yardstick because of the

15    specific policy of Apple to have the same              12:15:02

16    pricing -- the same fees, the same commission

17    pricing, for iOS and Mac.

18           And, therefore, it made little sense for

19    me, no sense, to use the Mac as a comparator, and,

20    therefore, I didn't go further in examining the       12:15:25

21    distribution of apps in the Mac.

22        Q.   Is -- is your PC app distribution market

23    a two-sided market?

24        A.   Well, again, some of these stores are

25    going to be two-sided when they are distributing      12:15:44
```

Page 105

1    third-party apps.  Like if you see in Table 4,          12:15:50

2    page 22, the -- we have -- I have Steam as a third

3    party, so much sales and so on.  Steam's own sales

4    so much and so on.

5            So for Steam, for example, there is a          12:16:08

6    store where third parties participated --

7    participate, and that you can think of as

8    two-sided, but also Steam is distributing, through

9    itself, the own products, the own sales, and that

10   you can think of as one-sided, directly selling to    12:16:35

11   consumers.

12       Q.   So you are not defining the PC app

13   distribution market as a two-sided transaction

14   market; is that correct?

15       A.   Well, as far as the -- the third parties      12:16:50

16   are -- the third-party distribution's concerned,

17   that's -- that's correct, it's two-sided

18   distribution.

19            But there is also a substitution in the

20   market from own distribution, own product            12:17:04

21   distribution, which cannot be ignored.  And it's

22   taken into consideration.  It's a substitution that

23   cannot be ignored.

24       Q.   Do you include substitution through sales

25   of physical media?                                    12:17:21

                                          Page 106

 1      A.   I -- I don't think these are -- in any of      12:17:25

 2   these in Table 4 were -- were -- were dealing with

 3   physical media.

 4      Q.   Okay.  So you exclude that from your PC

 5   app distribution market?                               12:17:36

 6      A.   I believe so.

 7      Q.   Do you know the relative scale of

 8   physical distribution during the class period in

 9   the PC app world compared to digital distribution?

10      A.   I -- I -- I wouldn't be able to say a          12:17:55

11   number off top of my head.

12      Q.   Could you turn to page 9, paragraph 17,

13   please.

14      A.   Yes.

15      Q.   Okay.  You state that, "Importantly, this      12:18:24

16   implies that from an economic point of view,

17   opening up competition in app distribution does not

18   require a specific approach to security and

19   certification."

20           Have you made an assumption or reached a       12:18:40

21   conclusion about whether the iOS app environment

22   in the but-for world would be more secure, less

23   secure, or equally secure than the actual world?

24           MR. HARRINGTON:  Objection.

25      A.   Well, I have not made a -- a finding           12:19:04

Page 107

1    on -- on -- on that.  But let me explain that I               12:19:07

2    allow for two possibilities, depending on what the

3    Court says.

4           The Court might say, Well, we won in the

5    but-for world.  Even though there is going to be           12:19:27

6    competition and various stores and

7    self-distribution and all that, we want Apple to

8    maintain the right to control which apps are

9    allowed to operate on the operating system.

10          So that's one possibility.  And I allow            12:19:44

11   for that possibility.

12          But it could be that the Court would say,

13   Well, you know, we think that the world should be

14   much more open, and, therefore, let the various

15   stores create their own certification and security        12:19:59

16   and so on for whatever they're selling.

17          So I see this as a possibility for -- if

18   that -- if the finder of facts goes in that

19   direction, I would see that there's a possibility

20   for Apple -- Apple Store and alternative stores, to        12:20:23

21   compete in this dimension, the dimension of

22   security and certification.

23          So my but-for world allows for both of

24   these possibilities.

25          Q.   Your calculation of damages in the            12:20:45

Page 108

1    but-for world does not change at all depending on          12:20:48

2    which of these two alternatives the finder of fact

3    accepts, correct?

4        A.   That's correct.

5        Q.   If Apple retains the right to control           12:21:01

6    what apps are allowed, according to a finding by

7    the finder of fact, what fees do you assume it

8    would apply for that -- for that service to other

9    app stores?

10           MR. HARRINGTON:  Objection.  Form.              12:21:22

11           THE DEPONENT:  Well, the -- the service

12   is not provided to other app stores.  It's provided

13   to the -- to the developer.  And right now, Apple

14   charges $99 per year or 299 for the Enterprise

15   product program, so I assume that this would remain     12:21:44

16   the same.

17       Q.   (By Mr. Swanson)  Are you assuming that

18   alternative iOS app stores in the but-for world

19   will not need a license from Apple to use Apple's

20   intellectual property?                                  12:21:59

21       A.   I am not completely sure what you mean by

22   that.  What kind of intellectual property are we

23   talking about?

24       Q.   Well, can -- is it -- is it your

25   assumption that Steam or Epic or any other entity       12:22:14

Page 109

1    could run a store and sell iOS apps without                12:22:21

2    having a license from Apple for using Apple's

3    computer code?

4         A.   Well, there has to be some connection

5    with the Apple operating system.  The same way        12:22:41

6    as -- in the PC, there has to be an -- an

7    application product interface, an API, which would

8    allow the, let's say, Epic store to run and provide

9    products for -- for -- for the Microsoft PC.

10           So that kind of connection will be             12:23:09

11   required.  Otherwise the -- the -- the stores will

12   not be able to work.

13           And, of course, additionally, the -- the

14   distribution, the direct distribution, should also

15   be allowed.                                            12:23:28

16           So if you want to call this an imposition

17   on -- on the intellectual property of Apple, you

18   can call it, but in some way, this is kind of

19   normal type of business for interconnecting

20   products.  It's not something unique.  And it's not   12:23:47

21   something abnormal.  So I would say this would be

22   required, but I don't see it as -- as a severe

23   imposition on the intellectual property of Apple.

24        Q.   Well, it's a normal thing for a company

25   to charge some fee for the use of its intellectual    12:24:04

                                                    Page 110

1    property; is that not --                          12:24:10

2        A.   Well -- well, if you really think that

3    Apple will end up saying, I will only give you the

4    API if you give me $10, I mean, I -- I don't know.

5    I mean, that sounds to me unlikely.                 12:24:22

6             I mean, either the finder of fact is

7    going to say, Look, you have to open the markets

8    and you have to provide the APIs to -- to the

9    stores or -- or not.

10            I mean, the idea that somehow Apple has    12:24:37

11   to be specifically compensating for opening an API,

12   I guess it's conceivable, but I find it unlikely.

13       Q.   Well, your -- your calculations do not

14   include any payment whatsoever for the use of

15   Apple's APIs by any rival App Store, correct?       12:24:57

16       A.   My -- I do not -- let me put it in a

17   positive way.  I did not set up any additional fees

18   to Apple in the but-for world besides the -- the

19   commission fee, which I calculate.

20       Q.   So you understand that in the but-for      12:25:27

21   world, it is possible that some developers will

22   only sell their apps through nonApple means,

23   otherwise --

24            MR. HARRINGTON:  Objection.

25       Q.   (By Mr. Swanson)  -- otherwise than        12:25:44

                                                    Page 111

```
 1    through the App Store?  Do you agree with that?        12:25:46

 2              MR. HARRINGTON:  Sorry to interrupt.

 3    Objection.

 4              THE DEPONENT:  Sorry, I -- you cut off

 5    for a minute so I -- I didn't hear the whole thing.    12:25:52

 6       Q.   (By Mr. Swanson)  Sure.  I'll start over.

 7              Would you agree that your but-for world

 8    includes scenarios where developers choose not to

 9    sell their apps, their iOS apps, through the

10    Apple App Store but instead sell their iOS apps        12:26:07

11    through rival app stores?

12       A.   Yes, of course that can happen, or it can

13    happen also they can sell them through multiple

14    stores, including the Apple Store, but it can

15    happen that they -- some might not.                    12:26:24

16       Q.   And is it your opinion in the scenario

17    when the Court has Apple reviewing the apps that

18    are going to be sold only in nonApple app stores

19    in -- in that scenario which I identified, that

20    Apple would not charge anything beyond the $99 that    12:26:45

21    it charges developers currently for making apps

22    available in the Apple App Store?

23              MR. HARRINGTON:  Objection to form.

24              THE DEPONENT:  Yes, broadly I would say,

25    yes.  I mean, the $99 is the present standard fee,     12:27:06
```

Veritext Legal Solutions
866 299-5127

```
1    and I would expect it to stay the same.              12:27:12

2         Q.   (By Mr. Swanson)  If -- if your

3    assumption is incorrect and, for example, Apple was

4    to charge $299 to developers who were having Apple

5    review their apps but were choosing to sell those    12:27:31

6    apps outside the Apple App Store, would that change

7    any of your opinions?

8         A.   Well, I think it -- it depends on what

9    but-for world we are -- we're talking about.  If

10   the finder of fact says, You -- you, third-party     12:27:47

11   store, any developer who sells through you has to

12   pay whatever this number is that you just mentioned

13   to Apple for certification, then I'll have to take

14   that into consideration and alter the amount of

15   damages in my report.                                12:28:07

16        But on the other hand, if the finder of

17   fact says, Look, if you want, you can pay Apple 299

18   and -- and get certified, but if you don't want to

19   pay 299, go through a third party which maybe has

20   Symantec or McAfee or who knows who, who is          12:28:31

21   certifying the security of the app, and the Court

22   might say, Well, that's fine, let competition

23   happen between Apple and the rest of the stores

24   on -- on certification.

25        So that can also happen, and then -- then       12:28:49
```

Page 113

**CONFIDENTIAL**

```
 1    the issue doesn't arise so -- doesn't arise.           12:28:52

 2          Q.    Could you please turn to page 11.  I

 3    wanted to ask you a question about figure 1.

 4          A.    Yes.
```

23          Q.    Now, on page 10, Table 1, you represent

24    that the operating margin for the App Store in 2019

25    was 76.6 percent, correct?                              12:30:11

**CONFIDENTIAL**

```
 1        A.    2015, you said?                          12:30:15

 2        Q.    2019.

 3        A.    76.6, yes.

 4        Q.    Uh-huh.  In your opinion, would Apple

 5   have had higher overall company operating margin if   12:30:25

 6   it had sold the iPad business?

 7        A.    I -- I have not examined that.

 8        Q.    Well, can you do the math?

 9        A.    No.  I mean, I -- you are asking me

10   something that I haven't examined.  I'm not going      12:30:41

11   to start offering opinions under oath here on

12   something of that sort.

13        Q.    Okay.  So you   that's not an opinion as

14   an economist that you can -- that you can provide?

15        A.    Look, as an economist, in this particular  12:30:53

16   proceeding, there's some things I have worked on

17   and these is what I'm talking about.

18             Telling me, Well, what if a line of

19   business of Apple were changed, well, I haven't

20   examined that.  I mean, you know, it's not a fair      12:31:11

21   question for an economist that has been -- has been

22   asked to offer opinion on -- on a very specific

23   type of issue on the App Store.

24        Q.    Well, if an economist knows that the

25   entire company's operating margin is ██████████,      12:31:26
```

Page 115

```
 1    and that one piece of that company's operating        12:31:31

 2    margin is ██ percent.  If you were to exclude the

 3    piece that has a ██ percent operating margin, what

 4    do you think would happen to the overall operating

 5    margin?                                               12:31:48

 6              MR. HARRINGTON:  Objection.

 7              THE DEPONENT:  If -- if -- if your

 8    question really means suppose that this thing

 9    wasn't there and that we somehow -- I -- I don't

10    know.  It's very hard to do this kind of              12:32:05

11    hypothetical.

12              And I -- I wouldn't want to be in the

13    position of Mr. Cook.  I mean, that's the guy who

14    is making these decisions about what to include in

15    his -- in the bundle of products that Apple offers.   12:32:21

16              I think it's a bit too -- how can I

17    say -- superficial for us to come out and say,

18    Well, what if they threw away this division, what

19    would happen to the margin?  I mean, it's not

20    something that I feel comfortable discussing.         12:32:35

21        Q.   (By Mr. Swanson)  Would you feel

22    comfortable discussing whether or not you have the

23    opinion that the App Store would have a

24    76.6 percent margin if it was operated by a third

25    party?                                                12:32:52
```

Page 116

**CONFIDENTIAL**

```
 1              MR. HARRINGTON:  Objection.              12:32:53

 2              THE DEPONENT:  You mean if the present

 3      conditions of exclusivity remain and it was

 4      operated by third party?

 5          Q.   (By Mr. Swanson)  Everything is the same   12:33:06

 6      but it's operated by a third party.

 7          A.   Well, that's a kind of an interesting

 8      question that I haven't really examined, but it's

 9      an interesting question:  Does -- does Apple do

10      things internally better than outsourcing them?    12:33:22

11      It's an interesting question.  But I haven't

12      examined it, and, therefore, I'm not going to offer

13      an opinion.

14          Q.   Do you have an understanding as to what

15      the operating margin was for the iPhone, iPad and   12:33:37

16      App Store taken together?

17          A.   Well, I mean, we have to look at -- more

18      carefully at the -- at the numbers.  I -- I

19      haven't -- I don't have it on top of my head.

20          Q.   Okay.  Well, do you believe it's higher   12:33:53

21      than 25 percent?

22          A.   I'm sorry, say again the categories?

23          Q.   If you were to combine the iPhone, iPad

24      and App Store businesses together, do you know what

25      the operating margin would be for that combined     12:34:07
```

**CONFIDENTIAL**

```
 1    business?                                          12:34:10

 2         A.   No, I wouldn't be able to do that, and I

 3    don't think I'm so good in doing math in -- under

 4    oath in front of the camera, so I wouldn't -- I

 5    would venture not to -- not -- not to say yes or no   12:34:21

 6    to that.

 7         Q.   Okay.  Well, do you have an understanding

 8    as to whether that combined operating margin would

 9    be closer to the ███percent overall company

10    margin, or would it be closer to the 76.6 percent    12:34:34

11    margin that you report in Table 1?

12         A.   Well, I -- I already said that I -- I

13    don't think it's a good idea for us here.  But just

14    looking at the margins without volumes and so on,

15    to try to create an actual calculation of -- of      12:34:52

16    that sort, I mean, it's not -- it's speculative.

17         Q.   Well, if you assumed that the margin of

18    those three businesses combined was less than

19    30 percent, would that affect any of your opinions

20    in your report?                                      12:35:15

21              MR. HARRINGTON:  Objection.

22              THE DEPONENT:  Not as far as I can see.

23              MR. HARRINGTON:  Mr. Swanson, I don't

24    know what your thoughts were for lunch or whether

25    you're at a stopping point but --                    12:35:32
```

| | | |
|---|---|---|
| 1 | MR. SWANSON:  No, it's a good -- I was | 12:35:34 |
| 2 | just going to raise that, so I'm -- whatever -- my | |
| 3 | rule is the witness and the court reporter can | |
| 4 | decide. | |
| 5 | MR. HARRINGTON:  I like that. | 12:35:42 |
| 6 | MR. SWANSON:  Yeah. | |
| 7 | THE DEPONENT:  Well, it's 12:35.  We can | |
| 8 | give it 40 minutes.  Would -- you guys are okay | |
| 9 | with that? | |
| 10 | MR. HARRINGTON:  Okay for the | 12:35:55 |
| 11 | court reporter and videographer? | |
| 12 | THE COURT REPORTER:  That's fine. | |
| 13 | THE VIDEOGRAPHER:  Fine with me. | |
| 14 | THE DEPONENT:  40 minutes, so that would | |
| 15 | make it -- go ahead, you -- you say that area | 12:36:06 |
| 16 | what -- how -- how -- when we restart. | |
| 17 | MR. HARRINGTON:  It's a math question, | |
| 18 | isn't it? | |
| 19 | MR. SWANSON:  Yes. | |
| 20 | THE DEPONENT:  Yeah. | 12:36:10 |
| 21 | THE VIDEOGRAPHER:  Are we ready go off | |
| 22 | the record? | |
| 23 | MR. SWANSON:  Yes. | |
| 24 | THE VIDEOGRAPHER:  We are now going off | |
| 25 | the record.  The time is 12:36. | 12:36:18 |

Page 119

**CONFIDENTIAL**

```
1              (Recess taken.)                          12:36:20

2              THE VIDEOGRAPHER:  We are now back on the

3      record.  The time is 1:17.

4         Q.   (By Mr. Swanson)  Professor, it was

5      brought to my attention that I omitted to mark as    01:17:16

6      an exhibit one more errata sheet relating to your

7      report, so let me make sure to have a full record

8      here.

9              (Exhibit 32 was marked for identification

10     by the court reporter and is attached hereto.)       01:17:28

11        Q.   (By Mr. Swanson)  So we put this document

12     into the marked exhibits as Exhibit 32.  It is a

13     document entitled "Errata Regarding Expert Class

14     Certification Report of Professor Nicholas

15     Economides."                                         01:17:45

16             Take a look at that and confirm that that

17     was the -- the initial errata sheet that you

18     submitted.

19        A.   Yes, that's correct.

20        Q.   Okay.                                        01:17:56

21        A.   Thank you.

22        Q.   Thanks.

23             So back to Exhibit 29.  Could you please

24     turn to paragraph 30.

25        A.   Yes.                                         01:18:25
```

Page 120

**CONFIDENTIAL**

```
 1        Q.   You state here that two potential        01:18:25
 2   yardsticks are available that allow you to estimate
 3   what the prevailing commission rate for the iOS
 4   app distribution market would be in the but-for
 5   world.                                             01:18:37
 6            Are you relying on any yardsticks in
 7   support of your opinions other than the two
 8   referenced here?
 9        A.   No.   These are the ones that I'm relying
10   on.                                                01:18:50
11        Q.   Okay.   How do you determine whether a
12   yardstick is reliable?
13        A.   Well, you -- for the first yardstick, we
14   look for a distribution market that has similar
15   features, and we find that the Windows PC app      01:19:06
16   distribution market has similar features to the
17   iOS app distribution market.
18            Now, the second one, the -- the profit
19   yardstick is from a different set of firms that are
20   also running marketplaces, and we -- I mean, I can 01:19:31
21   go in more detail there about the -- the
22   requirements that I have imposed on that further
23   on.
24        Q.   Is it important, when determining whether
25   a yardstick is reliable, to make sure that it      01:19:51
```

Page 121

**CONFIDENTIAL**

1    pertains to the same geographic market as the          01:19:57

2    relevant market in the case?

3         A.   To the extent possible.

4         Q.   For a yardstick to be reliable, is it

5    important for it to be comparable to the market in     01:20:09

6    question over the whole class period?

7         A.   Yes, to the extent possible again.

8         Q.   For a yardstick to be reliable, is it

9    important for the source of your data about the

10   yardstick to be reliable?                              01:20:25

11        A.   Yes.

12        Q.   And did you take steps to ensure the

13   reliability of the data you used for your yardstick

14   estimates?

15        A.   Yes, I believe so.                           01:20:40

16        Q.   Could you please turn to page 20 of your

17   report.

18        A.   Yes.

19        Q.   I wanted to ask you a question about the

20   bottom bullet point there.  This is all part of       01:21:05

21   paragraph 37.  You -- you're discussing digital

22   content platforms in this bullet point.

23             Do you see?

24        A.   Uh-huh.

25        Q.   You state that "Although these platforms     01:21:19

                                                             Page 122

| | | |
|---|---|---|
| 1 | may advertise a typical commission rate, they may | 01:21:22 |
| 2 | also provide special deals to certain customers, | |
| 3 | and there is generally no way to know without their | |
| 4 | sales data or more -- or other detailed discovery | |
| 5 | what their effective commission rate is." | 01:21:34 |
| 6 | Do you see that? | |
| 7 | A.   Yes. | |
| 8 | Q.   In your opinion, if there are special | |
| 9 | deals for certain customers or if the commission | |
| 10 | rate varies, does that -- from the advertised rate, | 01:21:48 |
| 11 | does that disqualify a platform from being a | |
| 12 | yardstick? | |
| 13 | MR. HARRINGTON:  Objection.  Form. | |
| 14 | THE DEPONENT:  Well, not necessarily.  I | |
| 15 | have two different approaches.  One, the yardstick | 01:22:02 |
| 16 | for the PC app distribution market and rejecting | |
| 17 | the -- the macOS, the video game platforms, the | |
| 18 | digital -- digital content platforms, and so on, | |
| 19 | because of the reasons I -- I state. | |
| 20 | Then I look for the other yardstick, | 01:22:30 |
| 21 | which is for what -- what I call the rival profit | |
| 22 | yardstick, where I am not looking at the fees but | |
| 23 | I'm looking at profits in general, and then -- we | |
| 24 | can talk about it in a bit mere detail if you want. | |
| 25 | Q.   (By Mr. Swanson)  Are your yardsticks | 01:22:59 |

Page 123

```
 1    taken from two-sided transaction markets?              01:23:01

 2         A.   They are taken from marketplaces, I mean,

 3    to the extent that that's -- that's typically a

 4    two-sided transaction market.

 5         Q.   Back in paragraph 30 on page 17, you          01:23:20

 6    indicate that -- again this -- I think what we were

 7    looking at that earlier, that there are two

 8    potential yardsticks available that allow you to

 9    estimate what the prevailing commission rate would

10    be in the but-for world.                               01:23:39

11              What do you mean by "prevailing"?

12         A.   "Prevailing"?

13         Q.   Yes.

14         A.   Means what the commission rate would have

15    been in the but-for world.                             01:23:48

16         Q.   Okay.  Is -- is that -- is that different

17    from the average commission rate?

18         A.   I wouldn't say it's different.

19         Q.   Okay.  So -- so when you use the term

20    "prevailing," you mean average?                        01:24:03

21         A.   Well, in the context that you were --

22    were saying here, we're trying to find the average

23    commission rate in the but-for world, and you can

24    add the word "prevailing" too.  I mean, I don't see

25    anything wrong with that.                              01:24:18
```

Page 124

**CONFIDENTIAL**

```
 1        Q.   Well, we talked before about a mix of      01:24:20

 2   rates.  Is the prevailing rate the modal rate?

 3        A.   I didn't hear the last word.  At what

 4   rate?

 5        Q.   Is the prevail -- the prevailing rate      01:24:34

 6   the -- the -- the mode among the rates?

 7        A.   The way I calculate it, and I invite you

 8   to see more carefully about how exactly I -- I

 9   calculated it, is the -- for the PC stores, it's

10   the weighted average of the commission of the        01:24:54

11   stores I mentioned, Steam, Epic, Blizzard, Origin,

12   WeGame and Microsoft.

13        Q.   Is this a weighted average over the class

14   period?

15        A.   Yes.  Well, I mean, I -- I believe so,     01:25:12

16   but -- although the numbers that are presented are

17   for 2019.

18        Q.   Okay.  But -- but your view is --

19        A.   I -- sorry, go ahead.

20        Q.   Your view is that that would be            01:25:28

21   representative of the weighted average commission

22   charged by those PC stores for the entire class

23   period?

24        A.   I think for the earlier part of the

25   period, they might have been -- I -- I've seen data   01:25:41
```

Page 125

**CONFIDENTIAL**

```
 1    that says they were charging more.  So the actual        01:25:44

 2    2019 number is defendant friendly.  It's kind of a

 3    bit lower than earlier years.

 4         Q.   In -- well, do you know how much lower it

 5    is?  Have you calculated them?                           01:26:04

 6         A.   I probably have, but I don't have it in

 7    front of me.  I can -- can I pick up a -- another

 8    document which is -- what is it?  Some backup

 9    document.

10         Q.   Sure.                                          01:26:18

11         A.   Yeah.  Hold on.  Let me see.

12              Yeah, I have here a document that was

13    part of the backup, and it's the -- Valve effective

14    rate, and it shows that in 2015, it was

15    29.98 percent, and then it kept decreasing and          01:26:45

16    reached, in 2019, 25.63.  And then in 2020 and '21,

17    it was even smaller.

18              So this is in the backup.  I'm sorry, I

19    don't have an easy way to show it to you.  But it's

20    in -- it's under -- it's named under the Valve for      01:27:05

21    backup.  So this is just one indication of the

22    effective commission rate being lower in 2019

23    compared to earlier years.

24         Q.   And the backup you're referring to is a

25    spreadsheet with -- with the Steam -- Steam            01:27:22
```

Page 126

 1   commission rate?                                01:27:27

 2        A.   Exactly, Steam Valve.  I'm not sure if

 3   the -- it's named Steam or Valve.  It might be

 4   called Valve.

 5        Q.   I think -- I think Valve is the parent   01:27:34

 6   owner company; does that sound right?

 7        A.   That's right, yeah.

 8        Q.   Okay.  In -- in paragraph 30, you state

 9   that if you were asked to construct a yardstick in

10   a case brought by a single developer, you would    01:27:49

11   conduct the same market-wide analysis to determine

12   an appropriate yardstick for that developer.

13             Were -- were you asked to conduct an

14   analysis of the appropriate yardstick for

15   Donald Cameron?                                    01:28:05

16        A.   I have constructed the analysis for

17   Donald Cameron, but it's not in the report.

18        Q.   And is there a reason why it's not in the

19   report?

20        A.   It's not in the report because I did it   01:28:19

21   after -- after the deadline of the report.  But

22   I -- I thought it might be a relevant issue, so I

23   have -- I have done it, yes.

24        Q.   And -- and what's your opinion as to the

25   relevant yardstick for Mr. Cameron?                01:28:33

                                                   Page 127

**CONFIDENTIAL**

```
 1        A.   The relevant yardstick works fine.  It         01:28:38

 2   allocates a specific amount for every year of the

 3   class period to Donald Cameron.

 4        Q.   Okay.  And -- and which yardstick is

 5   that?                                                     01:28:50

 6        A.   Well, I mean, it has three numbers --

 7             (Brief interruption.)

 8             (Discussion off the stenographic record.)

 9             THE DEPONENT:  All right.  So it has --

10   your question was, which fee did I apply.  And the        01:29:19

11   answer is I applied the -- all three different

12   fees, the 14 and a half, the 13, and the 14.8, and

13   you can see the small differences in what

14   Mr. Cameron would get in the but-for world, the

15   damages that he would get.                                01:29:41

16        Q.   (By Mr. Swanson)  I see.  So you

17   calculated Mr. Cameron's damages; is that what

18   you're saying?

19        A.   Yes.  It's pretty similar.  I mean, if

20   you -- if -- I mean, just to -- to be sure we             01:29:52

21   are -- we're talking about the same -- the same

22   thing.  I mean, if -- if you -- if you see kind of

23   the -- the -- the -- let me see where I have --

24   it's very similar to the across-the-board

25   calculations, yeah, I don't know where it is.             01:30:09
```

Page 128

**CONFIDENTIAL**

```
 1        Q.   You're using the same yardstick        01:30:12

 2   commissions, but you're just applying it to his

 3   particular sales; is that correct?

 4        A.   Exactly, yeah.  Exactly.

 5        Q.   And did you analyze how Mr. Cameron would    01:30:23

 6   distribute his app in the but-for world?

 7        A.   Well, I -- I gave him the average

 8   overcharge so, you know -- and I'm not -- I

 9   wouldn't be able to say exactly how he's going to

10   distribute it in the but-for world.  But I -- I    01:30:54

11   assume he would use the various marketplaces that

12   would be in the but-for world, including possibly

13   Apple.

14        Q.   Are you familiar with Mr. Cameron's app?

15        A.   Not really, no.                        01:31:10

16        Q.   Did you examine whether Mr. Cameron has

17   competitors for his app?

18        A.   No, I haven't examined.

19        Q.   That wasn't important to you?

20        MR. HARRINGTON:  Objection.                 01:31:27

21        THE DEPONENT:  Well, it's not crucial.  I

22   mean, you know, the -- there -- there are lots

23   of -- of these developers.  Most of them have

24   competitors.

25            The fact they have competitors is not the    01:31:33
```

Page 129

**CONFIDENTIAL**

```
 1    main question here.  The main question is, what are        01:31:36

 2    they overcharged by -- by Apple and how much more

 3    they were overcharged.

 4         Q.   (By Mr. Swanson)  Did -- did you also

 5    conduct an analysis of damages for Pure Sweat          01:31:49

 6    Basketball?

 7         A.   I don't believe so.

 8         Q.   Okay.  Have you examined the history of

 9    Pure Sweat's app or apps?

10         A.   Oh, I'm sorry.                               01:32:08

11         Did you say Pure Sweat?

12         Q.   Yes.

13         A.   Yeah.  I -- I have done that, yes.  I

14    have seen these numbers as well, yeah.

15         Q.   Okay.  Are you aware that there was a        01:32:15

16    period of time when Pure Sweat's app was entirely

17    free with no in-app purchase?

18         A.   No.

19         Q.   Okay.  Well, if you assume that before

20    2019, Pure Sweat's app was entirely free, there was    01:32:31

21    no in-app purchase and no commission paid by

22    Pure Sweat, did you calculate any damages before

23    2019?

24         A.   I don't think so.  But I don't quite

25    recall because I don't have it in front of me.         01:32:50
```

Page 130

**CONFIDENTIAL**

```
 1          Q.   Okay.  Are you aware that Pure Sweat,       01:32:52

 2     before 2019, sold a subscription to its app through

 3     its website?

 4          A.   No, I'm not.  I don't remember that.

 5          Q.   Okay.  Are you aware that in 2019           01:33:06

 6     Pure Sweat changed the way it collected money for

 7     its subscription by discontinuing the Web -- Web

 8     subscription and adopting in-app purchase in its

 9     iOS app?

10          A.   I -- I do not recall.                       01:33:24

11          Q.   Okay.  What would you expect happened to

12     the price of Pure Sweat's subscription when it

13     changed from charging for the subscription on --

14     only on its website to charging for its

15     subscription only through its iOS app?               01:33:40

16               Do you think the price went up or down,

17     or stayed the same?

18          A.   I -- I would have to examine it in -- in

19     some detail.  I haven't done that.

20          Q.   Can you rule out any particular change?     01:33:52

21               Can you say there is -- there's no way

22     that the price would have gone down?

23          A.   Well, I would have to look at it more

24     carefully before I -- I say something.

25          Q.   Okay.  Is that true for any given app?      01:34:05
```

Page 131

```
 1            MR. HARRINGTON:  Objection to form.        01:34:10

 2            THE DEPONENT:  Well, every given app

 3    didn't -- didn't do the change that you're

 4    proposing, that you went to -- from subscription

 5    to -- to IAP.  So I don't see the relevance of the   01:34:21

 6    question.

 7        Q.   (By Mr. Swanson)  Well, you -- you

 8    studied apps that went from IAP to Web subscription

 9    only, correct?

10        A.   No, I have not studied specific apps for    01:34:31

11    that.

12        Q.   Have you looked at Netflix?

13        A.   I have looked at Netflix, but not in

14    extreme detail.

15        Q.   Do you understand that Netflix went from    01:34:43

16    IAP to Web subscription only?

17        A.   Yes.

18        Q.   Okay.  Do you know what happened to its

19    Web subscription price after it did that?

20        A.   I have not examined that.                   01:34:58

21        Q.   Okay.  In -- well, can you move to

22    paragraph 33 of your report -- I'm sorry.

23            Did I say 33?  31.

24        A.   Yes.

25        Q.   So here you say that "One potential         01:35:20
```

Page 132

```
 1    yardstick for the commission rate that would have        01:35:24

 2    prevailed is the commission rate charged in other,

 3    similar markets that are not contaminated by"

 4    anti- -- "anticompetitive conduct."

 5           What do you mean, "contaminated by            01:35:38

 6    anticompetitive conduct"?

 7       A.   Well, there is a extensive discussion

 8    in the -- in the -- in the next page about the

 9    Android app distribution market, which you might

10    think would be the right comparator, the right      01:35:57

11    yardstick.

12           But then we look at the Android app

13    distribution market and we see that there is

14    anticompetitive conduct there by -- by Google.  And

15    this is discussed in -- in detail in paragraph 33.  01:36:12

16       Q.   Uh-huh.

17           Is exclusive dealing conduct

18    anticompetitive?

19       A.   It could be.

20       Q.   Is below-cost pricing anticompetitive?      01:36:26

21       A.   It could be as well.

22       Q.   Have you analyzed whether the Epic Games

23    store was engaged in anticompetitive conduct?

24       A.   That was not my assignment.

25       Q.   Okay.  So you've assumed that the           01:36:39
```

Page 133

**CONFIDENTIAL**

```
 1    Epic Games store is not tainting your yardstick      01:36:42

 2    with anticompetitive conduct?

 3        A.   I have made the calculations for the --

 4    the cost of Epic.  So even though they are not

 5    necessarily covering all their costs right now,      01:37:04

 6    they're definitely covering variable costs.  So

 7    that I have seen.  And there is another part of the

 8    report that we can go to that, if you want.

 9        Q.   I'd like to ask you now about

10    paragraph 33.  I think you referenced that a moment  01:37:21

11    ago.

12             You state here that "Android app

13    distribution appears to be tainted by

14    anticompetitive conduct that renders it unfit as a

15    yardstick for competitive rates in the but-for       01:37:32

16    world."

17             Are you offering an opinion as to whether

18    Android app distribution is tainted by

19    anticompetitive conduct, or just appears to be?

20        A.   Well, from -- the way I -- I see it, it     01:37:56

21    looks like it's tainted by anticompetitive

22    conduct -- con- -- sorry -- anticompetitive

23    actions.

24             And there is tying of the global mobile

25    services with -- within the -- a group of services,  01:38:19
```

Page 134

1    including the Play Store service -- are imposed on          01:38:24

2    competitors on the take it or leave -- I'm sorry --

3    on OEMs, on a take-it-or-leave-it setup.

4          There is exclusivity.  And in some cases,

5    Google has paid for exclusivity that they -- that          01:38:47

6    -- what exclusivity do I mean?  I mean that the

7    Play Store would be the only one installed on an

8    Android device and that would be displayed in a

9    specific way prominently and -- and so on.

10          There are issues with Chrome, which is          01:39:09

11    also part of the -- of the bundle, in terms of the

12    way it's installed.

13          And additionally, the -- the Android OS

14    makes it difficult for people to install --

15    consumers to install directly apps and gives          01:39:32

16    various warnings against it.

17          So these are very serious problems.  They

18    are outlined in detail in Professor Elhauge's

19    report, and I believe it's -- it's correct that the

20    creator attained it -- a yardstick.  So it          01:39:56

21    shouldn't be using the Android app distribution

22    market as a yardstick for competitive rates in the

23    but-for world for iOS.

24    Q.    And -- and when you're talking about this

25    anticompetitive conduct, are you indicating that          01:40:16

Page 135

**CONFIDENTIAL**

```
 1    the entity that engaged in the conduct is Google?     01:40:19

 2         A.   Yes.

 3         Q.   Okay.  Are you offering the independent

 4    opinion that Google has, in fact, engaged in

 5    anticompetitive conduct in an Android app               01:40:33

 6    distribution market, or are -- are you relying on

 7    Professor Elhauge for that?

 8         A.   Well, Professor Elhauge has -- has

 9    explained it in some detail.  But at the same time,

10    to me, it looks like Google has significantly          01:40:54

11    restrained the -- the distribution, the -- the

12    the alternative stores that -- that exist in    in

13    Android and has imposed itself as -- as -- how can

14    I say -- as a primary dominant distribution store

15    in the Android market.                                  01:41:27

16         Q.   Is Google a member of the alleged class

17    here?

18         A.   I -- I -- I do not recall.

19         Q.   Have you looked at the list of the very

20    largest class members?                                  01:41:48

21         A.   Well, there's 60,000 of them.  But -- no,

22    I have    I don't recall whether Google is -- is --

23    is one of them.
```

01:41:59

Page 136

**CONFIDENTIAL**

```
 3        Q.   Okay.  And your testimony is that your
```
```
 4    yardstick applies equally to Donald Cameron and to
```
```
 5    those seven developers?                          01:42:19
```
```
 6        A.   Yes, because the -- the average fees in
```
```
 7    the but-for world would -- are calculated
```
```
 8    classwide, marketwide.
```
```
 9        Q.   So does that mean that large developers
```
```
10    who might get bigger discounts in the but-for world  01:42:41
```
```
11    are going to earn less in damages than
```
```
12    Donald Cameron, who would not get a discounted rate
```
```
13    in the but-for world?
```
```
14            MR. HARRINGTON:  Objection.  Form.
```
```
15            THE DEPONENT:  No.  I mean, I haven't    01:42:56
```
```
16    said anything about discounts that you -- your --
```
```
17    your premise is -- is -- you know, it's not what I
```
```
18    have said.
```
```
19        Q.   (By Mr. Swanson)  Well, can you answer
```
```
20    the question, whatever my premise is?            01:43:07
```
```
21        A.   Well, okay.  So let's hear it again.
```
```
22        Q.   Okay.  So you said that -- your testimony
```
```
23    is that the yardstick applies equally to
```
```
24    Donald Cameron ███████████████████████
```
```
                                                      01:43:26
```
```
                                              Page 137
```

**CONFIDENTIAL**

| | | |
|---|---|---|
| 1 | because the average is calculated classwide, | 01:43:35 |
| 2 | marketwide.  And I'm probing what you mean by the | |
| 3 | average. | |
| 4 | Are you saying that the yardstick is the | |
| 5 | same because large developers and small developers | 01:43:48 |
| 6 | will have their commissions averaged out in your | |
| 7 | but-for world? | |
| 8 | MR. HARRINGTON:  Objection.  Form. | |
| 9 | THE DEPONENT:  Well, what I'm saying is | |
| 10 | that I have calculated a yardstick that allows me | 01:44:00 |
| 11 | to find the average commission in the but-for world | |
| 12 | and this would apply to everyone, to small | |
| 13 | developers and to large developers. | |
| 14 | And that's what I have.  And that's what | |
| 15 | I have done.  And that's -- that's the way it is. | 01:44:25 |
| 16 | Now, you are presuming that somehow large | |
| 17 | developers are going to get some discounts.  I | |
| 18 | don't know what that is.  But in any case, that's | |
| 19 | not my model.  That's not my testimony. | |
| 20 | Q.   (By Mr. Swanson)  Is -- isn't it true | 01:44:47 |
| 21 | that the Samsung Galaxy Store charges a default | |
| 22 | 30 percent commission rate? | |
| 23 | A.   That, I think, is correct as a default, | |
| 24 | although they -- it gives other discounts and so | |
| 25 | on. | 01:45:06 |

Page 138