# Exhibit 12

## Part Two

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    get to their critical mass.                     02:57:36

 2        Q.  (By Mr. Swanson)  How long would it take

 3    an entrant to attain critical mass in the relevant

 4    market you've defined?

 5            MR. LOPEZ:  Objection.                   02:57:43

 6            THE DEPONENT:  I have not reached a

 7    conclusion about that.

 8        Q.  (By Mr. Swanson)  Do you have an opinion

 9    as to when the App Store -- Apple's App Store

10    attained critical mass?                         02:57:56

11            MS. MANIFOLD:  Objection.

12            THE DEPONENT:  I -- I haven't reached a

13    conclusion about that.

14        Q.  (By Mr. Swanson)  Is it your opinion that

15    it happened instantly?                          02:58:04

16            MS. MANIFOLD:  Objection.

17            THE DEPONENT:  I'd have to investigate,

18    but my recollection was it was quite rapid, that

19    the iPhone was out and there was very quickly lots

20    and lots of apps on it and that there was no other  02:58:18

21    real game in town at the time.  They were,

22    you know, the market leader in developing this

23    whole -- this kind of smartphone with all these

24    apps on it.  So, you know, I think in some ways it

25    was easier in their day because they were the --  02:58:38
```

Page 163

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    they had the first mover advantage.                02:58:42

 2         Q.   (By Mr. Swanson)  Do you think Apple

 3    attained critical mass with 500 apps on the

 4    App Store?

 5         A.   I think it was certainly enough at the   02:58:50

 6    time to be able to offer it.  I mean, they -- they

 7    did offer it and the device was quite profitable

 8    from the get-go.  So -- I mean, I think critical

 9    mass, not necessarily an abstract number that

10    applies no matter what.  It may depend upon who     02:59:09

11    your rivals are.

12              So, you know, today to have 500 apps when

13    there's a million apps out there may not be enough,

14    but when you have the first 500 apps, then it could

15    be more than enough.                                02:59:25

16         Q.   Well, at what point did Apple and

17    Google Play have the same number of apps on their

18    respective app stores?

19              MR. LOPEZ:  Objection.

20              THE DEPONENT:  I -- I don't know that      02:59:38

21    they have exactly the same number of apps on their

22    two app stores.  I haven't calculated that.

23         Q.   (By Mr. Swanson)  So you don't know

24    when -- when they each had the same number of apps

25    on their app stores?                                02:59:53
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          MR. LOPEZ:  Objection.                    02:59:55

 2          THE DEPONENT:  You're having -- I guess

 3     you're testifying what's an factual premise that at

 4     some point they had exactly the same number of

 5     apps.  I haven't investigated to see whether that's  03:00:03

 6     true or not or -- and I don't really see the

 7     economic relevance to this case of it.

 8          Q.  (By Mr. Swanson)  Do you have an opinion

 9     as to whether the App Store attained critical mass

10     before or after it attained monopoly power?        03:00:17

11          A.  No.  I think -- I think for the

12     monopolist, you're the first mover, you have as

13     much mass as is going to be there.  So I think you

14     still had a monopoly over the product and I think

15     it's just a matter of building it up over time to   03:00:45

16     be sustainable.  But they -- they didn't really

17     have any competition in the very early days for

18     these developers.

19          Q.  When -- when, in your opinion, did Apple

20     first have competition for the developers?          03:01:02

21          A.  Well, there's never been any competition

22     for the developers on the iOS devices because

23     they had exclusivity from the very beginning, but

24     there could have been.  And I guess in the early

25     days, despite the restraints, Cydia was able to     03:01:18
```

Page 165

1    sell to jailbroken phones.  So they had some            03:01:23

2    competition there, but it was always dwarfed by

3    Apple.

4        Q.   And so your opinion is that Apple and

5    Google were never in competition for developers,        03:01:37

6    even back in the beginning?

7        A.   I think so, because developers could

8    always sell apps on both.  They -- they reach a

9    distinct and separate group of consumers.  So as I

10   explained in my report, it is an economic error to      03:01:56

11   confuse multihoming use of both of them with

12   competition between them or -- because there's

13   not -- they don't indicate substitution.  So if I'm

14   a developer and I offer an app on the

15   Google Play Store, it's not going to take away          03:02:12

16   sales from the iOS App Store because a very small

17   number of people even have both phones and probably

18   a lot -- lot of them are using them for different

19   purposes anyway.

20       Q.   In the but-for world, is it your opinion        03:02:30

21   that any rival app store will be preinstalled on

22   iOS devices?

23       A.   I -- I haven't reached a conclusion about

24   whether they would be preinstalled or just

25   something that could be installed later.                 03:02:49

                                              Page 166

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1          Q.   Well, in your but-for world, does every        03:02:53

2     rival app store get downloaded by a consumer onto

3     their iPhone?

4          A.   Not necessarily.  I think it could be

5     some consumers would prefer to just stick with the        03:03:10

6     Apple App Store.  And that's fine.  That -- that

7     would be their competitive choice.

8          Q.   Do you have an opinion as to what

9     percentage of consumers in the but-for world will

10    choose to remain with the Apple App Store and not        03:03:24

11    download an alternative app store?

12              MS. MANIFOLD:  Objection.

13              THE DEPONENT:  Yeah, I -- I don't.  As I

14    say in my report, the -- the -- the harm remains

15    common no matter what the particular consumers or        03:03:39

16    developers would do.

17         Q.   (By Mr. Swanson)  Well, if a consumer

18    doesn't download an alternative store, then a

19    developer can't reach that iOS consumer, can

20    they?                                                    03:03:54

21              MR. LOPEZ:  Objection.

22              THE DEPONENT:  Well, they might be able

23    to reach them outside the OS -- iOS device and

24    then they could copy over the iOS app into their

25    iOS device.  So that's one possibility.  But also        03:04:11
```

Page 167

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the mere existence of a competitive constraint | 03:04:13 |
| 2 | would lower commissions.  And -- and that, as I | |
| 3 | point out, would likely mean that developers would | |
| 4 | offer higher quality apps.  So those consumers | |
| 5 | would be harmed for that reason as well. | 03:04:32 |
| 6 |     Q.   (By Mr. Swanson)  Well, if, in the | |
| 7 | but-for world, 65 percent of consumers don't | |
| 8 | download -- don't download an alternative app store | |
| 9 | and 35 percent download alternative app stores and | |
| 10 | only patronize those stores, will there be | 03:04:50 |
| 11 | competition for developers between those various | |
| 12 | stores? | |
| 13 |         MR. LOPEZ:  Objection and object to the | |
| 14 | form. | |
| 15 |         THE DEPONENT:  I mean, yeah, I think the | 03:05:06 |
| 16 | distributors would still -- well, they could | |
| 17 | compete.  I mean, it -- it would seem to me if | |
| 18 | that's the case, it would be logical for developers | |
| 19 | just distribute to the both of them.  You don't | |
| 20 | have to choose one or the other.  Just the | 03:05:21 |
| 21 | consumers may choose one or the other if they want, | |
| 22 | but you want to reach both sets of customers.  So I | |
| 23 | would think that the developers would distribute | |
| 24 | both ways. | |
| 25 |     Q.   (By Mr. Swanson)  And that's just like | 03:05:33 |

Page 168

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   Apple and Google right now, correct, in your view?      03:05:34

 2          MR. LOPEZ:  Objection.

 3          THE DEPONENT:  No, I don't think so,

 4   because there's not the same potential.  You can't

 5   run an iOS app on the Android device and you          03:05:41

 6   can't run an Android app on the iOS devices.

 7       Q.  (By Mr. Swanson)  But you can run the

 8   functionally identical app on either device if

 9   you're a developer, correct?

10          MR. LOPEZ:  Objection.                         03:05:54

11          THE DEPONENT:  Well, sometimes it's a

12   different app, though, on -- on the other device.

13   And while its consumers could switch back and forth

14   in this hypothetical world, they could just

15   download the other app distributor rather than the   03:06:07

16   one you hypothesize they pick.

17          You can't just -- you know, unless you

18   have both sorts of smartphones, you can't just

19   switch back and forth.  And, you know, only

20   2 percent of people who own an iPhone also own an    03:06:21

21   Android, a smartphone.  And of those, some of them

22   at least are probably using them for personal

23   versus work use.  So it's not clear even they can

24   substitute usage for the same kind of apps.

25       Q.  (By Mr. Swanson)  Are you aware that the     03:06:39
```

Page 169

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    developer plaintiffs here allege that Apple has            03:06:41

2    abused monopsony power as a bottleneck retailer as

3    an alternative allegation?

4         A.   I -- I'm not sure -- I -- I -- I don't

5    recall that.  I'm not quite sure what that means.           03:06:58

6         Q.   Have you analyzed whether Apple possesses

7    monopsony power?

8         A.   I -- I have not.  I think -- if I recall

9    correctly -- now, it's been a while since I looked

10   at this -- this is an alternative market definition         03:07:16

11   if you define market differently than one for app

12   distribution and an iOS app distribution and

13   in-app purchases, if you saw them instead as a

14   purchaser.  But I -- I conclude it's a two-sided

15   market for transactions, and so I think it's --            03:07:35

16   given that, it's more natural just to think of them

17   as -- as purchasers and, therefore, Apple as a

18   monopolist.  But I guess you could have, you know,

19   alternative market definitions where you view them

20   as a monopsonist who is purchasing developer apps          03:07:54

21   to distribute.  That's just not my view of the --

22   of the right two-sided market definition here

23   though.

24        Q.   Are the opinions provided in your report

25   valid under both a monopoly theory of harm and a           03:08:10
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    monopsony theory of harm?                             03:08:13

 2            MR. LOPEZ:  Objection.

 3            THE DEPONENT:  I -- I -- I think so.

 4    If -- I mean, I may need to hear more about what,

 5    you know, the details are about the monopsony        03:08:22

 6    theory.  But generally, you know, the fact that you

 7    could frame things an alternative way doesn't

 8    really change the economic conclusion that they're

 9    just flip sides of each other and -- so either way,

10    it's an exercise of power that is raising your        03:08:36

11    overall take of Apple and all these transactions

12    and whether you view them as increasing your take

13    as a purchaser or as a seller I don't think really

14    changes much.

15            Q.   (By Mr. Swanson)  What is the time frame  03:08:56

16    of your but-for world?  Is it 2015 forward?

17            A.   Yes.

18            Q.   What's the first event in the but-for

19    world that differs from the actual world?

20            A.   Well, I mean, we -- we don't have this    03:09:12

21    exclusivity restraint and -- so therefore, we have

22    competition now.  I think the competition would

23    exist from the beginning because the constraint

24    lasted, you know, earlier than that.  The class

25    period, as I understand it, is just defined this      03:09:24
```

Page 171

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    way because of statute of limitations purposes.          03:09:26

2          So as I understand, you can't go further

3    back in terms of harm and everything.  But I think

4    there wouldn't have been these exclusivity

5    restraints for years before either.  All I'm just    03:09:39

6    saying is at least by June 2015, we would have had

7    meaningful competition and there would have been

8    lower commissions as a result.

9          Q.   Well, when are you assuming that

10   commissions are lower than if it's before the start  03:09:59

11   of the class period?

12         A.   In terms of the commissions being lower,

13   I'm saying that's true from at least June 2015 on.

14   I'm -- I'm not -- not necessary for me to reach any

15   conclusion before then because that's not something  03:10:17

16   being covered by this lawsuit.

17         Q.   Does your but-for world involve any

18   redesign of the iPhone or any other iOS device?

19         A.   No, I don't think so.  I think to the

20   contrary, I offer the conclusion that there would    03:10:37

21   be no reason to think that the absence of this

22   exclusivity restraint would lower the amount that

23   Apple invested in its devices.

24         Q.   So the identical devices would exist in

25   the actual -- in the but-for world; is that what     03:10:57

                                              Page 172

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    you're saying?                                    03:11:00

 2        A.   Yeah, I think the devices would be the

 3    same.  If anything, I think the difference might

 4    just be they'd invest it -- with competition they

 5    have more incentives to invest in better app review  03:11:10

 6    and do a better job of screening out malicious

 7    apps.  So I think it would be -- the app store part

 8    would be better, but the devices, it seems -- the

 9    evidence indicates that firms that have no

10    exclusivity in app distribution like, say, Samsung   03:11:29

11    or Apple itself in the Mac market, they invest very

12    similarly in those devices.

13        Q.   Would the iOS operating system be any

14    different in the but-for world compared to the

15    actual world?                                        03:11:46

16            MR. LOPEZ:  Objection.

17            THE DEPONENT:  I think only in the sense

18    if you couldn't condition it in this

19    anticompetitive way on exclusivity, but I don't

20    think that makes -- means that the iOS itself        03:11:58

21    would be any different.

22        Q.   (By Mr. Swanson)  Would there be any

23    change in the computer code to permit sideloading?

24            MR. LOPEZ:  Objection.

25            THE DEPONENT:  So that you have to ask a      03:12:10
```

Page 173

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   technical expert whether you need to change that        03:12:12

 2   code in order to allow installation of rival app

 3   distribution or not.  I think, you know, Apple

 4   excludes in part through various technical ways,

 5   but in part through a lot of exclusionary             03:12:26

 6   agreements, as I mention in part 3 of the report.

 7   Whether those technical ways count as part of the

 8   iOS code or not is something you would have to ask

 9   a -- a computer expert.

10        Q.   (By Mr. Swanson)  Well, what -- what       03:12:42

11   technical ways, to use your term, would be absent

12   in the but-for world?

13        A.   Let's see.  Well, so for example, in

14   paragraph 251, in explaining how they extend the

15   restraint to in-app purchases and that the other     03:13:47

16   requirement is that developers have to incorporate

17   Apple's IAP/API into programming code in a way that

18   makes the app request that Apple initiate an in-app

19   purchase transaction whenever the user selects a

20   digital good to purchase.  So that's a requirement   03:14:05

21   that's causing a technical change in programming

22   code for the developer.

23        Then another example -- I'm not finding

24   the detail, but there was various technological

25   restraints that basically make certain apps expire  03:14:54
```

Page 174

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    after -- like one that says seven days -- here,          03:14:59

 2    paragraph 273, the technical restraints for free

 3    Xcode provisioning make it expire after seven days.

 4    So that's a technical restraint that is reinforcing

 5    a bunch of contractual restraints.                       03:15:14

 6              And for -- I can't remember -- one of the

 7    other ones had a different length of exclusionary

 8    period.  And then there are -- yes.  To get access

 9    to the Xcode that they need in order to write and

10    create new native iOS apps, they have to sign           03:15:37

11    with these Xcode agreements.  So they're using

12    their -- you know, control over the Xcode in order

13    to impose that restraint.  And the limitations on

14    jailbreaking itself are, you know, in -- in part

15    technological and they've increased the difficulty     03:15:57

16    of jailbreaking over time by how they design the

17    iOS devices and iOS operating system as I talk

18    about in paragraph 280.

19        Q.   And in your but-for world, jailbreaking

20    is something that is easy to do?                        03:16:17

21              MR. LOPEZ:  Objection.

22              THE DEPONENT:  Well, in the but-for

23    world, I think -- I think it would have to alter --

24    you could jailbreak it -- well, either it -- it

25    would have to be designed -- essentially you            03:16:34
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    shouldn't have to jailbreak it to download a rival      03:16:35

 2    app.  Actually I think that requiring people to do

 3    that itself is a -- a restraint.  So I don't --

 4    I -- I don't think there would be a need to

 5    jailbreak for this particular reason.                    03:16:50

 6              And I'm not saying there would be a

 7    general ability in a but-for world to do any sort

 8    of jailbreaking you want on -- on your phone, but

 9    I'm just saying that this -- this technical

10    restraint on actual jailbreaking was being used to      03:17:00

11    reinforce the exclusivity restraints in the actual

12    case.

13        Q.   (By Mr. Swanson)  So in your opinion,

14    Apple would need to realize some amount of its

15    computer code in the but-for world; is that             03:17:17

16    correct?

17        A.   Yeah, the code that it's using to exclude

18    rivals, yes.  It couldn't -- to the extent it's

19    using those as a way to condition exclusivity, that

20    would have to be modified.                               03:17:29

21        Q.   And -- and would any of the programming

22    of any of the chips on the iOS devices need to be

23    changed in the but-for world?

24              MR. LOPEZ:  Objection.

25              THE DEPONENT:  I -- I don't believe so,        03:17:44
```

Page 176

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    but you'd have to ask a -- a computer expert that.    03:17:48

 2         Q.   (By Mr. Swanson)  You don't rule that

 3    out?

 4         A.   I -- I don't --

 5              MR. LOPEZ:  Objection.                       03:17:54

 6              THE DEPONENT:  -- rule that out.  I -- I

 7    haven't investigated that and it's not my area of

 8    expertise.

 9         Q.   (By Mr. Swanson)  Could you turn to

10    paragraph 343 of your report.  It's on page 180.      03:18:05

11         A.   Okay.

12         Q.   The -- the report here says that there

13    are a little over 1.2 million developers in Apple's

14    currently produced transaction data, but only a

15    little more than 59,000 are class members.            03:18:32

16              Do you see that?

17         A.   Yes.

18         Q.   So the class includes less than 5 percent

19    of the developers in the transactional data, right?

20         A.   Yes.                                         03:18:49

21         Q.   And there are over a quarter million U.S.

22    developers who are not included in the class,

23    right?

24         A.   Could you say that question again.

25         Q.   There are over a quarter million U.S.       03:19:07
```

Page 177

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    developers excluded from the class?                03:19:10

2              MR. LOPEZ:  Objection.

3              THE DEPONENT:  Well, they're -- they're

4    not excluded from the class.  They're -- they're

5    not   they never paid a commission, so they're not    03:19:18

6    in the class.

7         Q.   (By Mr. Swanson)  Um-hmm.  Out of that

8    quarter million, didn't most use the App Store for

9    free apps?

10             MR. LOPEZ:  Objection.                 03:19:28

11             THE DEPONENT:  I -- I assume so.

12   Otherwise, they would have paid a commission.

13        Q.   (By Mr. Swanson)  In your opinion, do

14   those quarter million U.S. developers have any

15   economic interests that conflict with those of the    03:19:44

16   class members with regard to the remedies sought in

17   this case?

18             MR. LOPEZ:  Objection.  Calls for a legal

19   conclusion.

20             THE DEPONENT:  I don't think so.  I think   03:19:56

21   they're going to pay zero commission either way in

22   the but-for world.  And as I said before, I    I

23   think they're in a -- a -- a separate market.

24        Q.   (By Mr. Swanson)  Well, as you indicated,

25   you hadn't given that any thought before this         03:20:11

                                                Page 178

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    deposition, so how do you know they'll pay a            03:20:14

 2    zero -- you said zero commission, I believe.  How

 3    do you know they'll pay a zero commission in the

 4    but-for world?

 5         A.   Oh, well, I mean, it's just been -- I         03:20:24

 6    guess a consistent business policy is to charge,

 7    you know, commissions as a percentage of price and

 8    that's by Apple and just by every other successful

 9    app distributor.  So I don't think there's any

10    reason to think that would be any different in the    03:20:40

11    but-for world and there'd be no reason to think

12    that the developers who find a price of zero to be

13    optimal for their apps, no reason to think why they

14    would not behave any differently in the but-for

15    world.                                                 03:20:58

16         Q.   Thank you.

17              Could you turn to page 14 of your report,

18    paragraph 15.  Tell me when you're there.

19         A.   Okay.  Yeah.

20         Q.   I'm looking at the very end of that          03:21:27

21    paragraph where you say that "anticompetitively

22    inflating the average App Store profit-maximizing

23    commission harmed 100 percent of class members."

24              Do you see that?

25         A.   Yes.                                         03:21:40
```

Page 179

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      Q.   Are you offering the opinion in this case          03:21:41

2   that Apple's alleged conduct injured every single

3   developer in the class?

4      A.   Yes.

5      Q.   What do you mean by "average App Store          03:21:51

6   profit-maximizing commission"?

7      A.   Well, what I say in here is the next

8   section, that the previous section said that the

9   average commission was increased.  The subs- -- the

10  reason the subsequent section was a -- that          03:22:06

11  increase in the average harmed everybody because in

12  the but-for world, they would have reduced both of

13  the only two tiers that they used.

14     Q.   I'm just asking what that specific term

15  means, to have a lot of bona fiders "average          03:22:20

16  App Store profit-maximizing commission" is -- is

17  that different from the average App Store

18  commission?

19     A.   No.  It's the average that they -- they

20  charged.  I'm -- I -- I call it the          03:22:38

21  profit-maximizing one because this section is

22  relying on economic analysis to show it would have

23  been profit-maximizing for them to charge a lower

24  price in the but-for world.  So, you know, as an

25  economist, that's what I can offer an opinion          03:22:54

Page 180

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    about, that it would have been profit-maximizing          03:22:56

2    and, therefore, you would expect it as a matter of

3    economics.

4         Q.   You would expect that the compensation

5    that Apple sought or would seek in the but-for            03:23:04

6    world would be the compensation that would maximize

7    its profits; is that correct?

8         A.   Yes, and in the actual world.  But the --

9    the key is it would be lower in the but-for world.

10        Q.   Have you quantified the minimum amount of       03:23:19

11   harm or injury that you contend every developer has

12   occurred?

13        A.    No.  I just -- I just calculate -- I just

14   conclude that it is -- would be some reduction with

15   an increased competition.  Now, if you -- you know,       03:23:38

16   if you adopt one of the methods, say, of

17   Professor Economides, you can then figure out what

18   the minimum harm would be.  It would be the

19   difference between the actual commission rate and

20   the but-for commission rate.  That would be the           03:23:52

21   minimum amount of harm multiplied by the sales of

22   every individual developer.

23            But I myself haven't made that

24   quantification.  My opinion is just that all of

25   them were harmed to some extent.                          03:24:05
```

1      Q.   And "to some extent" would be a minimum          03:24:09

2   amount, so are you saying all of them were harmed

3   by at least a penny?

4      A.   They're certainly all harmed by at least

5   a -- a -- a penny and I just haven't quantified it.      03:24:22

6   I -- I would expect much more than a penny.  I

7   mean, all the evidence on what competitive markets

8   look like indicate that there's prices, you know,

9   well below 30 percent typically.  So it's -- it's

10  generally not just a -- a penny.                         03:24:38

11     Q.   Well, are you opining that each developer

12  was harmed by more than a dollar?

13     A.   I haven't quantified, but I'm sure it's

14  more than a dollar.  It's going to -- there would

15  be some percentage reduction.                            03:24:54

16          And so, you know, there -- if I said

17  it -- even if it's a 1 percent change, you would

18  have to be a developer who only sells $100 worth of

19  goods to be harmed by only a dollar.

20          So -- but here it seemed like from          03:25:09

21  Professor Economides, it's going to be generally

22  about 14 to 15 percent.  So multiply that times

23  their -- their sales and their harm, to some

24  degree -- however -- however much they sold.

25          Now, some developers may have sold very     03:25:26

Page 182

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    little.  And I guess, you know, maybe you'd have to          03:25:28

2    look and see.  And I haven't looked at the data to

3    see which of the minimum amount of total sales by

4    any member of the class.  I guess that could give

5    you a bound on the lower -- lowest possible amount          03:25:39

6    of harm.

7         Q.   Are -- are you equating harm with a loss

8    of profits?

9         A.   Harm is any monetary harm to them.  So,

10   you know, I think, at a minimum, is that they                03:25:56

11   suffered the overcharge on the commission.  But if

12   in the but-for world rather than exclusively buy

13   through Apple, they would have preferred to add or

14   substitute two rival distributors, it would have --

15   that -- that must have been even more profitable            03:26:15

16   for them.  So I think they would also be harmed by

17   those additional lost profits.

18        Q.   Is it your opinion that Apple's alleged

19   conduct caused each developer in the class to lose

20   some amount of profit?                                       03:26:28

21        A.   Yes, because their -- their -- at a

22   minimum, they are -- they suffered the commission

23   overcharge and they would have paid less.

24        Q.   On paragraph 16, on page 14, you state

25   that "Evidence common to the class indicates that           03:26:48

Page 183

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    all class members paid an anticompetitively          03:26:51

 2    inflated commissions" -- or am I getting that

 3    right?

 4         A.   I think that's a typo.  It should be --

 5         Q.   Yes.  Yeah.  That's what --                 03:27:02

 6    "anticompetitively inflated commissions to Apple

 7    during the class period"?

 8         A.   Yes.

 9         Q.   Does payment of an anticompetitively

10    inflated commission in the actual world necessarily   03:27:17

11    mean that a developer had lower profits in the

12    but-for world?

13              MS. MANIFOLD:  Objection.

14         Q.   (By Mr. Swanson)  Let me rephrase that.

15         A.   Yeah.                                       03:27:27

16         Q.   Does payment of an anticompetitively

17    inflated commission in the actual world necessarily

18    mean that a developer would have higher profits in

19    the but-for world?

20              MS. MANIFOLD:  Objection.                   03:27:37

21              THE DEPONENT:  Yes.  I think so.

22              MR. LOPEZ:  Join.

23         Q.   (By Mr. Swanson)  So the mere fact that

24    Apple's average commission would have been lower in

25    the but-for world, in your view, implies that all     03:27:53
```

Page 184

1      class members were injured; is that correct?          03:27:58

2          A.   No.   I added this whole section after

3      that.   That's a gross mischaracterization of my

4      testimony and of my report.

5          Q.   Okay.  Does your opinion on 100 percent        03:28:09

6      classwide impact depend on all of the Apple conduct

7      alleged in the complaint being found to be

8      anticompetitive?

9          A.   No.   I think it's enough that there was

10     exclusivity restraints that prevented competition,      03:28:24

11     and meaningful compensation, that would have

12     lowered commissions.   So whether they needed all of

13     those exclusivity restraints to do so, I don't

14     think they probably needed every single one of

15     them, but -- but that we had all of them in the         03:28:40

16     actual world.

17         Q.   Does your opinion on 100 percent

18     classwide impact depend on Apple being liable for

19     all of the conduct that you deem anticompetitive --

20     anticompetitive in part III of your report?             03:28:54

21         A.   No, I don't think so.   It doesn't depend

22     on any of it being, I guess.   If -- if some minor

23     features of it were not deemed to be violations, I

24     still think the overall effect was to exclude all

25     rival competition and they would have -- one would      03:29:15

Page 185

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | expect a lot more competition in the but-for world | 03:29:18 |
| 2 | for the reasons that I mentioned in parts IV and V. | |
| 3 | Q.   Does your opinion on 100 percent | |
| 4 | classwide impact depend on Apple being found liable | |
| 5 | for allegedly restraining direct distribution or | 03:29:31 |
| 6 | sideloading of iOS apps? | |
| 7 | A.   I -- it depends upon restraining rival | |
| 8 | distribution methods.  I have not reached an | |
| 9 | opinion whether in the but-for world how important | |
| 10 | sideloading would be to that and whether other | 03:30:02 |
| 11 | methods of rival app distribution might be equally | |
| 12 | effective, since we can't really observe that | |
| 13 | difference in the actual world because Apple has | |
| 14 | squelched all of them. | |
| 15 | Q.   If the finder of fact determines that | 03:30:16 |
| 16 | Apple was fully justified in designing the iPhone | |
| 17 | without sideloading and that such conduct was not | |
| 18 | anticompetitive, would that affect your opinion | |
| 19 | about 100 percent classwide impact? | |
| 20 | MR. LOPEZ:  Objection. | 03:30:29 |
| 21 | THE DEPONENT:  I -- I don't think so. | |
| 22 | Because they still have a lot of other exclusivity | |
| 23 | restraints, and they have prevented any competition | |
| 24 | at all.  I would expect to see more competition in | |
| 25 | the but-for world. | 03:30:46 |

Page 186

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.    (By Mr. Swanson)  So your opinion about        03:30:48
 2   100 percent classwide impact does not depend on
 3   whether or not sideloading exists in the but-for
 4   world; is that correct?
 5        A.    Yeah.  I think either way there would be        03:31:02
 6   common impact.
 7        Q.    Does your opinion on 100 percent
 8   classwide impact depend on Apple being found liable
 9   for having antisteering rules in its App Review
10   guidelines?                                                03:31:16
11        A.    I don't think so.  I -- I -- to me the
12   antisteering rules are a way of reinforcing the
13   restraint on in-app purchases, but they're not
14   necessary for it.
15        Q.    So is your opinion on 100 percent              03:31:35
16   classwide impact consistent with Apple maintaining
17   the antisteering rules in its App Review guidelines
18   in a but-for world?
19             MR. LOPEZ:  Object to form.
20             THE DEPONENT:  Can you say that again.          03:31:52
21        Q.    (By Mr. Swanson)  Is your opinion on
22   100 percent classwide impact consistent with Apple
23   retaining the antisteering rules in its App Review
24   guidelines in the but-for world?
25             MR. LOPEZ:  Objection.  Form.                   03:32:07
```

```
 1              THE DEPONENT:  I would still find         03:32:08

 2    100 percent impact without it.  But my -- my

 3    conclusion is that they were part of the

 4    anticompetitive exclusionary restraint.  So they do

 5    worsen things.                                      03:32:22

 6              So my -- my opinion would be that they

 7    shouldn't exist in the but-for world.  But if they

 8    did exist in the but-for world, I don't think that

 9    would alter the conclusion if there's 100 percent

10    injury to the class from all the other exclusivity  03:32:34

11    restraints.

12         Q.   (By Mr. Swanson)  Well, excepting

13    sideloading, right, because your opinion doesn't

14    depend on that, right?

15         A.   Well, these are all incremental ways of   03:32:47

16    exacerbating exclusive -- the restraint.  But even

17    without them there would remain all kinds of other

18    exclusivity restraints.

19         Q.   Does your opinion on 100 percent

20    classwide impact depend on Apple being found liable 03:33:01

21    for foreclosing iOS app distribution on

22    jailbroken iOS devices?

23         A.   Foreclosing iOS -- no.  I guess I --

24    again, that's -- you know, jailbroken phones are a

25    very minor part of the market.  So I wouldn't       03:33:23
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    expect that to change much.                          03:33:27

2           But it does, you know -- it does show the

3    extent to which they're imposing really very

4    absolute exclusivity restraints.

5           But -- but jailbreaking has become very       03:33:36

6    rare.  So I think even without the particular

7    restraints on use of rival app distribution on

8    jailbroken phones, we would still have very similar

9    foreclosure and very similar prevention of

10   competition by rival app distributors.               03:33:54

11       Q.   Does your opinion on 100 percent

12   classwide impact depend on Apple being found liable

13   for an anticompetitive tie between iOS

14   smartphones and tablets and iOS app distribution?

15       A.   No.  I think that tie reinforces -- as I     03:34:11

16   say, in my report, that's just -- I think it's part

17   of the way that they reinforce their exclusivity

18   restraints.

19          But even without that tie to see

20   imposition of a one product exclusivity restraint    03:34:25

21   would still have the same anticompetitive effects.

22       Q.   Do your opinions about classified injury

23   depend on the class prevailing on all claims?

24       A.   On all claims?

25       Q.   Uh-huh.                                      03:34:42
```

Page 189

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1           MR. LOPEZ:  Object to form.                03:34:45

 2           THE DEPONENT:  I don't know what you

 3      mean.  There's a -- what are the -- what's the

 4      difference in claims.  There's a monopolization

 5      claim.  I don't remember...                      03:34:51

 6           Q.   (By Mr. Swanson)  Well, in your -- in

 7      your opinion, does the same 100 percent classwide

 8      impact exist under the attempted monopolization

 9      claim as the actual monopolization claim?

10           A.   I -- I think so.  I don't think in terms 03:35:06

11      of a fact there's any difference between those

12      claims.  I think they're just, you know, different

13      legal conditions for proving liability.  But I

14      think in terms of the commonality of the effect on

15      the class, it would be the same.                 03:35:21

16           Q.   If the finder of fact found attempted but

17      not actual monopolization, would your conclusion

18      about 100 percent classwide impact remain the same?

19           A.   Yes, I think so.

20           MR. LOPEZ:  Objection.                       03:35:36

21           Q.   (By Mr. Swanson)  Does your report

22      address whether there is classwide impact under the

23      California unfair competition law claim?

24           A.   I -- I don't analyze any of the legal

25      claims.  I just -- I'm just talking about the      03:35:49
```

Page 190

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    effects of the conduct.  So if it's the same          03:35:51

 2    conduct in that claim as in the other claims, then

 3    my conclusions would apply to it.

 4        Q.   Let me ask you to flip to page 183.

 5             THE DEPONENT:  Is it about time for           03:36:10

 6    another break?  We've been going for about another

 7    hour.

 8             MR. SWANSON:  Okay.  We can -- we can do

 9    that.

10             MR. LOPEZ:  Very good.                        03:36:19

11             MR. SWANSON:  All right.

12             MR. LOPEZ:  And do you mind if we take,

13    14 minutes time this before we come back, and the

14    only reason I ask is because it's lunch time in the

15    West Coast and I'm going to grab something really     03:36:19

16    quick.

17             MR. SWANSON:  Okay.  Yeah.  Perfectly

18    fine with me.

19             THE DEPONENT:  All right.  So 3:50 my

20    time?                                                 03:36:19

21             MR. LOPEZ:  Yes.  And what's our total

22    elapsed time?

23             THE VIDEOGRAPHER:  Hold on one second.

24             THE COURT REPORTER:  Can we go off the

25    record.                                               03:36:33
```

Page 191

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE VIDEOGRAPHER:  We are going off the      03:36:37

 2    record at time 3:36 p.m.  This is the end of

 3    media 4.

 4              (Recess taken.)

 5              THE VIDEOGRAPHER:  We're on the record at    03:52:46

 6    3:52 p.m.  This is the beginning of media 5 in the

 7    deposition of Einer Elhauge.

 8         Q.   (By Mr. Swanson)  All right.  Back --

 9    back to the grindstone.

10              In your opinion, Professor, does the         03:53:03

11    evidence in the Epic case establish that

12    100 percent of class members were injured by

13    Apple's alleged anticompetitive conduct?

14         A.   I haven't based any conclusions on

15    whether the evidence in the Epic case alone would     03:53:21

16    establish that.  I relied on my own analysis in my

17    report.

18         Q.   Okay.  If your analysis and the opinions

19    you've expressed in your report are correct, would

20    it not be your expectation that the Epic case         03:53:32

21    evidence would establish that 100 percent of class

22    members were injured?

23              MR. LOPEZ:  Objection.

24              THE DEPONENT:  I think in the Epic case

25    it's different.  There's one individual plaintiff     03:53:46
```

Page 192

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    trying to establish their own case with -- I mean,         03:53:49

 2    slightly different theories, perhaps, or a tying

 3    claim that I didn't reach.  And they -- from what

 4    you said, some different conclusions about some

 5    other matters, too.                                        03:54:08

 6              So I -- I don't know.  I -- I - the

 7    only -- the only thing I relied on, I think, for

 8    the Epic case was the testimony of Tim Cook because

 9    I couldn't find that anywhere else.

10              But I haven't reached any assessment of          03:54:21

11    whether the other evidence in the Epic trial itself

12    would have sufficed to show the classified injury

13    that I -- that I find here.

14         Q.   (By Mr. Swanson)  Okay.  Thank you.

15              Now, before we broke, I was directing you        03:54:38

16    to page 183.  I don't know if you've got that in

17    front of you.

18         A.   Not yet.

19         Q.   Okay.  Paragraph 350.

20         A.   Okay.                                            03:54:59

21         Q.   In the last sentence of paragraph 350,

22    you state that "even if Apple would have reduced

23    only its default 30% commission in the but-for

24    world, then 99.99% of the class members that appear

25    in Apple's currently produced data were still             03:55:11
```

Page 193

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    harmed."                                          03:55:15

 2          Does your opinion on classified impact

 3    depend on Apple reducing its default commission

 4    rate below 30 percent in the but-for world?

 5       A.   Yes.  My -- yeah.  I offered the opinion   03:55:37

 6    that they would off- -- lower both the 30 and the

 7    15 percent and -- and the 15 percent commission.

 8    And I use that for my 100 percent conclusion.

 9          The 350 -- this -- this paragraph 350 is

10    just saying, in the alternative, even if you only   03:55:50

11    thought they would lower the 30 percent one, we

12    still have 99.99 percent of the class members

13    injured.

14       Q.   If Apple charges a default 30 percent

15    commission rate in the but-for world, would fewer   03:56:02

16    than 99.99 percent of class members be harmed?

17          MR. LOPEZ:  Objection.  Form.

18          THE DEPONENT:  Could you say that again.

19       Q.   (By Mr. Swanson)  If Apple charges a

20    default 30 percent commission rate in the but-for   03:56:18

21    world, would fewer than 99.99 percent of class

22    members be harmed?

23       A.   I don't know.  I haven't quantified

24    what -- which percentage would be harmed.  We

25    wouldn't have evidence that they paid -- that --    03:56:42
```

Page 194

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    that most of -- that a lot of the -- for a lot of          03:56:43

2    transactions, we wouldn't have evidence that they

3    paid a higher commission.  But they might be harmed

4    just by lacking access to other distributors and

5    being able to pay other distributors a lower          03:56:56

6    commission as well.

7          That just wasn't the basis that I used

8    for my conclusion that at least 99.99 percent were

9    harmed.  But I wouldn't say that the absence of

10   that shows necessarily that less than 99.99 percent      03:57:10

11   were harmed.

12       Q.  Well, have you made any estimate of

13   injury based on the assumption that in the but-for

14   world Apple continues to use a 30 percent default

15   commission rate?          03:57:24

16       A.   No.  My analysis concludes that Apple

17   would have lowered that commission rate, and that

18   that's a methodology that we can use to show that

19   there was a classified injury.  That doesn't

20   preclude the possibility there would be other          03:57:36

21   theories of harm, which you could also show

22   classified injury.  It's just not the mechanism

23   that I use to -- to show that.

24       Q.   If one made the assumption that in the

25   but-for world Apple continued to use a 30 percent          03:57:54

Page 195

1    default commission rate, how would you calculate          03:57:57

2    whether a given developer was injured?

3        A.   I didn't offer an opinion on that in the

4    report because that's not -- like I said, my

5    methodology was to show that they would lower the          03:58:10

6    default commission to 30 percent and what the

7    implications were.

8            I could -- I could talk about, off the

9    top of my head, various ways you might look at it.

10   But that's not the methodology that I used.                03:58:25

11       Q.   Do you have an opinion on whether fewer

12   than 99.99 percent of class members would be harmed

13   if Apple charged a default 30 percent commission

14   rate in the but-for world up until 2018?

15       A.   I haven't -- I haven't made that                  03:59:01

16   calculation using this method, you know.  I -- I

17   think we -- we could figure out, if you assume just

18   that, how many class members at least had at least

19   one transaction from Apple over that time period.

20           So that might -- you might be able to               03:59:19

21   calculate a minimum percentage of class members

22   injured.  But in the but-for world, they could also

23   use rival distributors.  So this measure, in some

24   way, is conservative because often they would find

25   that attractive as either an addition or instead of       03:59:35

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    using Apple.  So it could be more that would be                03:59:39

2    injured than that.

3         Q.   Well, if more than 23 percent of class

4    members paid no commissions in the real world after

5    2017, would 23 percent of class members be                      03:59:57

6    uninjured if Apple maintained a default commission

7    rate at 30 percent until 2018 in the but-for world?

8              MR. LOPEZ:  Objection.

9              THE DEPONENT:  I don't think so, no.  It

10   doesn't improve that, for the reasons I mentioned              04:00:22

11   before.

12        Q.   (By Mr. Swanson)  And the reason you

13   mentioned before is that even if Apple was charging

14   a 30 percent commission rate in the but-for world

15   for some period of time, a given developer might               04:00:35

16   choose to go to a different App Store that charges,

17   I presume, a lower commission rate; is that -- is

18   that your position?

19        A.   Well, either a lower commission rate or

20   services that they must find more profitable than             04:00:48

21   using Apple.  Or the most likely is using both of

22   them and gaining more profits by having multiple

23   outlets for -- for distribution.

24              So I don't think -- there's no particular

25   reason to assume that in the world with multiple              04:01:05

                                                    Page 197

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    distributors developers would only choose one        04:01:08

 2    distributor.

 3         Q.   And how -- how would you go about

 4    determining whether a specific member of the class

 5    would choose multiple distributors in a but-for      04:01:17

 6    world where Apple continues to choose 30 percent --

 7    continues to charge a 30 percent default

 8    commission?

 9         A.   I don't know.  I haven't investigated

10    that because that wasn't my methodology.  I was      04:01:29

11    just answering your question about whether the

12    evidence you hypothesize would show that a fewer

13    percentage of class members were injured.  I would

14    say no.

15              There's other ways they could be injured.  04:01:40

16    But I haven't tried to calculate the percentage of

17    injury in that way.  Since, in fact, I find that

18    Apple would charge below 30 percent commission

19    throughout this period.  And, therefore, it's very

20    easy to find 99.99 percent.  And that would also     04:01:53

21    leave -- the 15 percent would be lower as well, we

22    have to take into account.

23         Q.   If Apple adopted Steam's 30, 25, 20

24    commission structure in the but-for world, would

25    fewer than 99.99 percent of class members be         04:02:12
```

Page 198

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    harmed?                                            04:02:15

 2           MR. LOPEZ:  Objection.

 3           THE DEPONENT:  Well, this particular

 4    methodology would no longer apply.  Again, I

 5    wouldn't -- I wouldn't say that we know that fewer   04:02:28

 6    of them would be injured.  They would have options

 7    to try different distributors.

 8           But I would disagree with the premise

 9    because Apple has had a very strong policy against

10    disfavoring small developers, and the Steam method   04:02:39

11    does disfavor small developers.

12           So that's one of the reasons why I

13    conclude that they would lower both tiers.  I don't

14    think they would adopt anything like the Steam

15    policy.  But even if they did, you know, in a       04:02:56

16    but-for world people could choose Steam, could

17    choose others.  And if they found it better to

18    choose the others, then it must be more profitable

19    or -- or they would just use both, which they might

20    find more profitable.                               04:03:14

21       Q.   (By Mr. Swanson)  If Steam opened a

22    rival iOS App Store in the but-for world, would

23    it charge its 30, 25, 20 commission structure?

24           MR. LOPEZ:  Objection.

25           THE DEPONENT:  Maybe.  I mean, it is what    04:03:33
```

Page 199

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    it charges in -- you know, obviously in the markets      04:03:34

 2    it now operates in.  Whether competitive pressure

 3    lowering Apple's prices might cause them to lower

 4    their top price or not, I'm not -- I'm not sure.  I

 5    haven't reached a conclusion about Steam's but-for       04:03:51

 6    commission in the iOS app market.

 7         Q.   (By Mr. Swanson)  If, in the but-for

 8    world, the average but-for commission on the

 9    App Store would decline slowly downward from

10    29.5 percent in 2015, would fewer than                   04:04:08

11    99.99 percent of the class members be harmed?

12         A.   Could you repeat that question.

13         Q.   Well, let's start with one premise.

14              Are -- are you -- do you agree that the

15    average commission in the App Store, as calculated       04:04:27

16    by Professor Economides, is 29.5 percent in 2015?

17         A.   I -- I just don't recall that number.

18    If -- if you want to show it to me, it might

19    refresh my recollection, but --

20         Q.   Well, let's just use that as part of the       04:04:43

21    question.  It's -- the record is what it is.

22              But if, in the but-for world, the average

23    commission on the App Store would decline slowly

24    downward from 29.5 percent in 2015, would fewer

25    than 99.99 percent of class members be harmed?           04:05:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. LOPEZ:  Objection.                    04:05:08

 2              THE DEPONENT:  So in the but-for world,

 3    the average would decline slowly.  But at -- with

 4    your -- the measurement you're talking about, the

 5    average commission, the -- in the actual world, the   04:05:17

 6    average commission declines slowly.

 7              So we -- we'd have to compare the average

 8    commission to the but-for commission in order to

 9    figure that out or -- or look at the two tiers

10    separately as -- as I do.                            04:05:32

11              But if the top tier would have been

12    29.5 percent from June 2015 and gotten lower over

13    time, then I think it would still be 99.99 percent

14    at least were injured.

15       Q.   (By Mr. Swanson)  If the but-for world       04:05:52

16    was the same as the actual world, up to the date

17    that Epic requested that Apple allow it to open an

18    iOS store, would fewer than 99.99 percent of class

19    members be harmed?

20              MR. LOPEZ:  Objection.                     04:06:07

21              THE DEPONENT:  Again, I don't know.  I

22    mean, this particular methodology would not apply,

23    but -- well, actually, 100 percent of the people

24    would be injured because after that period Apple

25    would have lowered both tiers.  So I don't think it   04:06:27
```

Page 201

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    matters whether you paid the top tier or not, if          04:06:31

2    I'm understanding your hypothetical correctly.

3         Q.   (By Mr. Swanson)  Well, do you have an

4    understanding as to when Epic requested that Apple

5    allow it to open an iOS store?                             04:06:41

6         A.   Sometime after June 2015.  So then I

7    thought for your hypothetical it didn't really

8    matter what the precise date is.

9              I don't recall the date.  It seemed --

10   I -- I think it was relatively recent, last year or       04:06:53

11   two, but I'm -- I don't remember the date.

12        Q.   Yeah, go ahead and assume it's 2020.

13             So if the but-for world was the same as

14   the actual world, up to the date that Epic

15   requested that Apple allow it to open an iOS              04:07:08

16   store, would fewer than 99.99 percent of class

17   members be harmed?

18        A.   Well, I guess we'd have to investigate

19   how -- I -- I don't know how many have transactions

20   over the relevant period then because -- but if all       04:07:26

21   of them have some transactions, whether it's

22   30 percent or not, then 100 percent would be

23   injured because both of the tiers would have been

24   lower in the but-for world after whatever date in

25   2020 that you're talking about under your                 04:07:43
```

Page 202

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1     hypothetical.  But I didn't investigate that since        04:07:48

 2     it doesn't really have any bearing on the actual

 3     difference between the actual but-for world.

 4          Q.   If, in the but-for world, the App Store

 5     commission would be different for game and nongame        04:08:05

 6     app transactions, would fewer than 99.9 percent of

 7     class members be harmed?

 8          A.   Well, again, like I said, I -- I would

 9     disagree with the premise, given my conclusion that

10     there -- there was no price discrimination between       04:08:22

11     games and nongames in the actual world and wouldn't

12     be in the but-for world since they use the same

13     structure.

14              So I guess it would have to depend upon

15     more detail about what -- what your but-for world        04:08:34

16     looks like and why, in order to try to figure out

17     the -- this calculation.

18          Q.   What if, in the but-for world, Apple

19     charged a 50 percent commission for game

20     transactions and a zero commission or zero price         04:08:53

21     for nongame app transactions, would 100 percent of

22     the class members be harmed in that case?

23              MR. LOPEZ:  Objection.

24          Q.   (By Mr. Swanson)  Or -- or 99.99?

25          A.   So you charge 50, 5-0 percent?                  04:09:13
```

Page 203

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.    50.                                    04:09:16

 2        A.    50 percent.

 3              MR. LOPEZ:  Objection.

 4              THE DEPONENT:  Well, certainly this

 5     methodology wouldn't -- that I am using would not  04:09:19

 6     apply in that case, and we'd have to have some

 7     other methodology to figure out what would happen

 8     to all these class members.

 9              Obviously, if you're selling game apps,

10     if you stuck with Apple exclusively, your         04:09:35

11     commission rate would be going up.  But I would

12     imagine in that but-for world very few people would

13     stick with Apple exclusively.

14              And so maybe 100 percent of them would

15     switch to other app distributors and 100 percent of  04:09:50

16     them might be harmed.  But that wouldn't -- it

17     would be a different methodology than what I used,

18     and certainly a very different conclusion about the

19     but-for world than I used.

20        Q.    (By Mr. Swanson)  Are you aware that     04:10:05

21     Android app stores in China charge game app

22     developers a 50 percent commission?

23              MR. LOPEZ:  Objection.

24              THE DEPONENT:  I'm not aware of any

25     evidence to support that conclusion.            04:10:18
```

                                                    Page 204

1      Q.   (By Mr. Swanson)  That's something you've      04:10:20

2    never heard before?

3      A.   I have not, no.

4      Q.   And that's something -- have you analyzed

5    what Android app stores charge game developers by      04:10:26

6    way of commission in China?

7      A.   No.  My -- evidence I have seen indicates

8    that -- I don't think that I've looked at China

9    specific evident, but that they don't discriminate

10   by genre here in the domestic market.  Android       04:10:42

11   doesn't.  Google doesn't.  And the relevant market

12   here is the U.S. market.  So that seems to me far

13   more relevant here.

14        And also, you know, as I mentioned in

15   detail in the appendix, it's hard to use any          04:10:58

16   Android market as a competitive benchmark since

17   it's got its own anticompetitive restraints that

18   are distorting that market as well.

19     Q.   Well, does Google Play operate in China?

20     A.   I don't know how they're distributing in       04:11:17

21   China.  I believe -- I -- I don't know.  I just

22   looked at the -- their operations here

23   domestically.

24        I know that sometimes there are stats

25   about their market share and they exclude China.      04:11:31

Page 205

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    Whether that's because the Chinese have excluded        04:11:34

 2    Google in China or not, I -- I don't recall.

 3         Q.   So you're not aware that Google Play does

 4    not operate in China, I take it?

 5         A.   I haven't investigated that, no.  I          04:11:47

 6    looked at the -- their domestic share.

 7         Q.   And you're not aware that there are a

 8    multiplicity of different Android app stores in

 9    China?

10         A.   No.  I haven't investigated the Chinese      04:11:59

11    market.

12         Q.   You don't think that would be a good

13    yardstick for determining what a but-for world

14    commission would be in -- in this case?

15         A.   I -- I'd be happy to look at it, but I       04:12:13

16    haven't investigated it.  I don't know whether it's

17    competitive, whether it's constrained regulatorily

18    by the Chinese.  Whether it has its own

19    anticompetitive restraints.  Can we get good data

20    there.                                                 04:12:28

21              I guess if somebody has some good data on

22    it, I'd be happy to look at it.  But it is -- it's

23    a totally different geographic market, and they

24    have totally different market conditions.  So I

25    wouldn't leap to the conclusion that that's a         04:12:39
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    better benchmark than the ones that I used.                    04:12:42

2         Q.   You -- you didn't read that portion of

3    Dr. Evans' report in the Epic case about the

4    Android App Store market in China?

5         A.   I don't recall it.  I maybe recall some              04:12:59

6    discussion about China, but I -- I -- I don't

7    recall what the evidence looked like on whether it

8    was a good benchmark or not.

9              But I think -- I think I recall hearing

10   something about it in the Epic case, but I              04:13:18

11   didn't -- that was just -- I didn't read the

12   transcript and -- and follow the details of what

13   the arguments were in the Epic case about that.

14        Q.   You're -- you're aware that Apple charges

15   a 30 percent commission in the App Store in China,              04:13:30

16   correct?

17        A.   They charge it globally.  So I guess

18   they -- they would charge it there as well.

19        Q.   Would it surprise you if competing

20   Android app stores in China charged 50 percent              04:13:42

21   commission on game app transactions?

22        A.   I think you already asked me that.  I

23   just haven't investigated that.  I don't know -- I

24   don't know if that's true or not.

25        Q.   Yeah, that's not my question.              04:13:56

                                              Page 207

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              If you assumed it was true, would it        04:13:57

 2   surprise you, as an economist?

 3        A.   I'd have to know more about what the

 4   conditions were that -- that were resulting in that

 5   kind of commission rate and what the conditions of    04:14:10

 6   those particular distributors are.

 7              I mean, I think sometimes, you know,

 8   firms use a razor -- as in razors blades --

 9   strategy to -- you know, where you subsidize the --

10   the game console, say, and you instead charge a lot   04:14:28

11   more per game distributed, or something like that.

12              So maybe that's what's going on.  I -- I

13   just haven't investigated the Chinese market enough

14   to know whether to be surprised or not.

15        Q.   Do you think that Amazon would be a         04:14:46

16   likely entrant in the but-for world?

17        A.   Yes.

18        Q.   And do you think that Amazon would set a

19   commission rate for purposes of effecting its

20   business in other markets?                            04:15:03

21              MR. LOPEZ:  Objection.

22              THE DEPONENT:  I don't know what you mean

23   by that.

24        Q.   (By Mr. Swanson)  Well, would Amazon set

25   a rate to incentivize iOS users to switch to          04:15:13
```

Page 208

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    Kindle -- Kindle devices?                        04:15:21

2              MR. LOPEZ:  Objection.

3              THE DEPONENT:  I'm still not following

4    the point.

5              They're already on the Kindle device on   04:15:37

6    iOS, so I'm not sure what you're hypothesizing.

7         Q.  (By Mr. Swanson)  All right.  In your

8    report you indicate that 99.99 percent of all class

9    members appearing in the data produced by Apple

10   paid Apple's default 30 percent commission on at    04:16:02

11   least one transaction.

12             That -- that's your understanding?

13        A.  Yes.  I think that's that paragraph we

14   were just looking at.  Let me see.

15        Q.  Yeah, I think -- I think it's the same     04:16:17

16   one.

17        A.  Paragraph 350, yes.

18        Q.  Yeah.

19             Do you agree that there are many

20   developers with just a few paid transactions, but   04:16:24

21   with millions of free iOS app downloads?

22        A.  It could be.  I -- I have not run that

23   particular calculation.
```

████████████████████████████████████████████

█████████████████████████████████████         04:16:44

Page 209

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

███████████████████████████████                    04:16:48

2        A.   I'm not aware of -- of that evidence.

3        Q.   Well, if that's correct, those figures,

4    was Paramount injured by Apple's alleged conduct,

5    in your opinion?                                   04:17:02

6             MR. LOPEZ:  Objection.

████████████████████████████████████

████████████████████  Yeah, because they would have paid

9    less for those in the but-for world.  And they

10   would have also had the option of -- of            04:17:14

11   distributing their product through more

12   distributors, then they might have preferred that.

13        Q.   (By Mr. Swanson)  If an iOS developer has

14   one 99 cent paid app for which there is a single

15   purchase over the class period, and a second free   04:17:30

16   app that has been downloaded 10 million times, is

17   that developer injured by Apple's alleged conduct,

18   in your opinion?

19        A.   Yes.

20             MR. LOPEZ:  Objection.                    04:17:42

21        Q.   (By Mr. Swanson)  Are developers who have

22   free apps in the App Store, but who do not use

23   in-app purchase or charge a download price members

24   of the class?

25        A.   I'm sorry.  Say that again.               04:17:55

Page 210

```
 1         Q.   Are developers who have free apps in the        04:17:56

 2    App Store, but who do not use in-app purchase or

 3    charge a download price members of the class?

 4         A.   I -- I believe not by definition, right.

 5    The -- the -- the class is defined as people who        04:18:09

 6    paid a commission.

 7              And if I'm understanding your question

 8    correctly, you're talking about people who never

 9    paid a commission to Apple during the class period.

10         Q.   Do you have an -- do you have an opinion        04:18:21

11    as to whether such developers are injured by

12    Apple's alleged conduct?

13         A.   If they never paid a commission, they

14    might be by the lack of choice, I suppose, because

15    the exclusivity restraint does apply to them.        04:18:39

16              It's just not the part that I analyzed.

17    I analyzed the harm to class members in -- in the

18    paid commission portion of the market.

19         Q.   So when you say the exclusivity restraint

20    applies to them, are you saying the conduct is the        04:18:55

21    same with respect --

22         A.   Yeah.

23         Q.   -- with --

24         A.   Yeah, the conduct is -- I mean -- yeah,

25    there's an exclusivity -- sort of like what I said        04:19:04
```

Page 211

```
 1    about doesn't really matter whether you divide up       04:19:06

 2    the tying markets.

 3              Here the exclusivity restraint does

 4    exclude rivals from distributing even free,

 5    you know, iOS apps.  So in the free portion of          04:19:13

 6    the market, for free apps, it is the case that

 7    Apple would be deprived.

 8              It wouldn't -- the harm wouldn't be

 9    higher commissions.  But it would be depriving them

10    of a freedom of choice to pick a different              04:19:32

11    distributor, who they might prefer, to pick

12    multiple distributors to increase their sales.

13        Q.   So in your opinion, the -- the conduct

14    can be the same -- the anticompetitive conduct, in

15    your view, can be the same, but it can affect two       04:19:57

16    separate markets?

17        A.   Yes.  Yeah.  So I -- I mean, that's --

18    it's -- it's -- I specifically say that for -- even

19    if you define the separate market for iOS app

20    distribution versus iOS IAPs, the exclusivity           04:20:14

21    restraints apply to both and even have competitive

22    effects on both, so even if you thought they were

23    separate markets.

24              Like right here, even though I think

25    there's a separate market for the -- you know,          04:20:26
```

Page 212

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    distributing paid apps and -- and slash IAPs versus        04:20:29

 2    the ones that are free, the exclusivity restraints

 3    do apply to both.  They -- and I think they have --

 4    would have distinctive anticompetitive effects on

 5    both.  But they certainly would cause                      04:20:44

 6    anticompetitive effects to both markets, if you

 7    define them separately.

 8         Q.   Well, you're leaning toward defining

 9    those separately, right?

10         A.   Yes.  I think particularly the -- I mean,         04:20:55

11    even though the distribution -- some mechanisms are

12    the same, the -- the fact that it's -- you could

13    definitely find a different price discrimination

14    market there makes me think that they were separate

15    markets.  I'm thinking about the price                     04:21:15

16    discrimination portion of my analysis and applying

17    it to that.

18         Q.   Have you assessed the impact of Apple's

19    conduct only on U.S. developers?

20         A.   The impact -- in terms of classwideness,          04:21:28

21    I do.  But the overall impact really is on the

22    overall market.  They've inflated commissions

23    worldwide.  So I think that commission structure

24    would continue to apply worldwide.  So -- so it

25    would also harm foreign developers.                        04:21:44
```

Page 213

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   How do you determine if a developer is a        04:21:50

 2   U.S. developer?

 3        A.   I define them as a developer residing in

 4   the United States if the country code equals USA,

 5   or PRI for Puerto Rico, in Apple's content provider    04:22:03

 6   lookup table, as I talk about in footnote 518 of my

 7   report.

 8        Q.   Is TikTok a U.S. developer?

 9        A.   I -- I don't know.  I don't -- I have not

10   memorized where every single developer is in terms      04:22:23

11   of how they're coded in Apple's transactional

12   database.

13        Q.   Is Tencent a foreign developer?

14        A.   Again, I don't -- it would depend on how

15   Apple categorized them in the database.  I -- I        04:22:37

16   cannot remember each and every developer, how they

17   were coded.

18        Q.   You -- you don't determine who is a U.S.

19   developer based on whether or not the -- their

20   parent company is a U.S. company?                      04:22:54

21        A.   I just followed Apple's own

22   categorization.  If Apple's categorization is

23   wrong, in the database that it gave me, then -- for

24   any reason, then I guess my analysis would have

25   adopted the same assumption.                           04:23:17
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              But, you know, if Apple wants to correct      04:23:18

 2   the database, I'm happy to look into it to see

 3   whether that would alter the analysis.

 4              I didn't make -- I didn't make any of my

 5   own assumptions about who is a U.S. company or not.     04:23:29

 6   I relied on Apple's own database.

 7         Q.   Well, is it your understanding Apple

 8   makes the determination or just enters the

 9   developer's determination in Apple's database?

10         A.   I -- I don't know if we got any detail        04:23:50

11   about how exactly Apple arrived at how they put the

12   country code in its database.

13              I assume they use a reliable methodology

14   of -- of some sort.  But if there was evidence

15   about precisely how they did it, I have -- I have       04:24:11

16   not seen it.

17         Q.   Well, did you ask either of the two named

18   plaintiffs whether they designated their own

19   country code?

20         A.   I did not ask them that, no.                  04:24:21

21              MR. LOPEZ:  I guess I'm going to move to

22   strike that on the basis of the expert discovery

23   order.

24         Q.   (By Mr. Swanson)  Okay.  Professor, in

25   the but-for world, could Apple adjust its               04:24:41
```

Page 215

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    commission structure without lowering its default       04:24:45

 2    30 percent commission?

 3        A.   I -- I concluded it would economically

 4    not profitable for it to do so.  I mean, if you say

 5    it could, anything -- you could do anything.  But      04:25:03

 6    in terms of the economics, the same economics that

 7    drive having a -- the two tiers would apply and

 8    they would have to compete for all the developers.

 9    So I conclude that they would find it

10    profit-maximizing to lower both of the tiers.          04:25:18

11        Q.   What -- what rule of economics requires

12    Apple to lower its 30 percent default commission

13    rate in response to the entry of alternative iOS

14    app stores and sideloading?

15        A.   Well, I mean, it's a logic that I offer       04:25:34

16    in -- in part V, which is, because of the increased

17    competition, they're going to have to lower their

18    average commission because the increased

19    competition applies to all -- for all the

20    distribution of all developers.  It's not unique to    04:25:52

21    some versus others.

22           You would expect them to lower both the

23    commission rates to respond to the competition.

24    And because the -- what drives the 30 versus

25    15 percent difference is the need to incentivize       04:26:10
```

Page 216

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    investment in video integration or in subscriber        04:26:17

 2    retention.  Those incentives would also exist in

 3    the but-for world.  And Apple's whole policy of

 4    having a very rigid pricing structure that doesn't

 5    deviate from -- with only two tiers, with no            04:26:31

 6    individual negotiation, would also be what you

 7    would expect would be their business strategy in

 8    the but-for world because there's no reason to

 9    think it would be otherwise.

10          So that combination of factors leads me          04:26:43

11    to the conclusion that it would lower both of the

12    tiers.

13       Q.   Well, in the but-for world is the gap

14    between the higher and the lower tier commission

15    more than 15 percent in -- in commission points?       04:26:55

16          In other words, is it like 27, 12, 25,

17    10, or more?

18       A.   Yeah.  I don't offer a conclusion about

19    exactly what the levels they would choose for the

20    two lower rates, just that the -- the goals,            04:27:17

21    you know, given their business strategy to date,

22    would be to, you know -- they would maintain it --

23    the structure.  Have enough of a difference to

24    incentivize this behavior, but also now compete

25    with rivals.  So there -- there might be some           04:27:38
```

Page 217

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   tradeoff there about the optimal differential          04:27:42

 2   versus, you know, meeting competition.

 3          So I'm not exactly -- I -- I've not

 4   said -- offered an opinion about exactly what the

 5   two but-for commissions rates would be.  Just that      04:27:55

 6   they would both be lower in order to satisfy this

 7   twin goals.

 8       Q.   Well, currently, the gap between the two

 9   is 15 percentage points, right?

10       A.   Yes.                                           04:28:13

11       Q.   And if in the but-for world the gap was

12   lower than that, there would be a lesser incentive

13   by your logic, would there not?

14       A.   Yes, but they might need to compete more

15   for some of these developers charging 30 percent.      04:28:30

16   So that might be the tradeoff that I'm talking

17   about.  It might be better, you know, maybe to cut

18   them both in half or something and make it be

19   15 percent, 7-1/2 percent, for example.

20          I -- you know, I'm not picking a              04:28:44

21   particular but-for commission levels of the two

22   tiers.  Just that they would want to maintain the

23   differential and they would have to meet

24   competition so you would expect -- it's going to

25   have to meet a competitive constraint that would      04:28:59
```

Page 218

1    not -- does not apply now.  So I would predict that        04:29:02

2    both of those tiers would go down to some extent.

3         Q.   Well, if the lower tier went down to

4    10 percent and the higher tier stayed at 30, that

5    would be an even higher incentive than in -- in the        04:29:12

6    current world, correct?

7         A.   That would.  But that wouldn't satisfy

8    the meeting a new competitive constraint problem.

9         Q.   Well, is there -- your 15 percent,

10   7-1/2 percent presents only half of the incentive          04:29:27

11   in the current world, correct?

12        A.   Yeah.  I'm not saying that's a particular

13   one they'd pick.  I'm just saying that's if --

14   if -- you know, they could pick all kinds of

15   different things.                                          04:29:42

16             They would maintain some incentive, but

17   it would be a different incentive, obviously, than

18   the incentive that they -- that they now have.  But

19   it would meet competition.

20             So they've got the twin goals.  So I             04:29:57

21   think all I can say for sure is that they would

22   lower both of them somewhat.  I -- I haven't

23   offered an opinion about what the particular levels

24   would be.

25        Q.   Well, the incentive to have a big gap            04:30:07

Page 219

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    between the top and the -- the lower tier is a          04:30:09

2    factor that actually urges Apple to keep the upper

3    tier high, is it not?

4         A.   I think they would want to maintain a

5    differential.  It doesn't have to keep it high.          04:30:22

6    Because if they lower the bottom tier, you can

7    maintain the incentive while lowering both of them.

8    For example, you could make it 25, 10 percent.

9              It would still be 15 percent, if that's

10   the dominant factor maintaining exactly the same         04:30:34

11   incentive and -- while meeting competition in a

12   more effective way.

13        Q.   Well, you couldn't have a upper tier that

14   was lower than 15 percent, could you, and maintain

15   the real world percent differential?                     04:30:58

16        A.   I guess it wouldn't be a 15 percent

17   differential where if you lower the top one below

18   15 percent.  But I don't think anything -- I mean,

19   that -- that would make the average commission a

20   lot lower.                                                04:31:07

21             But there would be other incentives then

22   at that point, right.  So, you know, if you're

23   paying a 0 percent commission in the video partner

24   program, even though the differential isn't that

25   high, that's just a very attractive option.  So you      04:31:21

                                                      Page 220

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    might expect just the sheer attractiveness of it to      04:31:27

2    increase investment of the video partners as well.

3    So I think the differential is a big factor, but

4    the absolute level is also a factor.

5         Q.   You're familiar with the change in            04:31:42

6    commission structure that Steam adopted in late

7    2018, correct?

8         A.   No.  I'm not sure what you're referring

9    to.

10        Q.   Well, are you aware that Steam changed          04:31:58

11   its commission structure in late 2018 in the PC,

12   Windows and other device arenas where Steam is

13   available?

14        A.   No, I -- I don't recall that.

15        Q.   Are you aware that this happened shortly        04:32:17

16   after Epic Games Store entered?

17        A.   I'm -- I'm not -- I don't -- I'm not

18   recalling that evidence if -- if it's in the

19   record.

20        Q.   Are -- are -- are you aware that Steam          04:32:37

21   currently has a 30, 25, 20 commission structure?

22        A.   Yes.

23        Q.   Okay.  And -- and you don't know when or

24   why it adopted that?

25        A.   I -- I don't know about the timing of it,       04:32:52
```

Page 221

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    no.  And I -- and like I say, I don't have -- I        04:32:54

2    don't know of any statement about what -- what it

3    said motivated that particular structure.

4         Q.   Okay.  That's not something you studied?

5         A.   Not so far, no.                              04:33:06

6         Q.   But you do understand that Steam changed

7    its structure at some point?

8         A.   As I said, I'm not recalling that

9    evidence.

10        Q.   Okay.  Well, if Steam, before 2018,          04:33:19

11   charged the default 30 percent commission for all

12   app developers, and then after 2018 moved to a 30,

13   25, 20 percent commission structure, would that

14   have any significance for your opinions in this

15   case?                                                  04:33:42

16        A.   I don't think it would alter my

17   conclusions, but I -- I may have to look to see

18   more about what exactly the conditions were for

19   the -- the prior policy.

20        Q.   In your -- well, one last question on        04:34:01

21   Steam.

22             Do you understand that Steam today

23   imposes a 30 percent commission on every developer

24   in its store for some -- for some part of the

25   developer's revenue?                                   04:34:25
```

Page 222

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   Oh, I guess for the first 10 million, I      04:34:27

2   think, is 30 percent, yes.

3        Q.   All right.  And do you know how many

4   developers are on Steam's store?

5        A.   I -- I don't know the number offhand, no.    04:34:37

6        Q.   Do you have an understanding it's in the

7   thousands?

8        A.   I -- I don't know the -- the number.

9   I -- I think they have a pretty good market share

10  in the Windows app market, as I recall.               04:34:48

11       Q.   Okay.  Do you know the percentage of

12  developers on Steam who pay less than a 30 percent

13  commission?

14       A.   I -- I don't know that stat, no.

15       Q.   Okay.  Let me ask you to turn to page 192    04:35:10

16  of your report, paragraph 372.

17            Are you there?

18       A.   You said -- you said page 192?

19       Q.   192, paragraph 372.

20       A.   372.  Okay.                                  04:35:38

21       Q.   So here you say "Apple would be unlikely

22  to create additional commission tiers in the

23  but-for world given that it has repeatedly decided

24  not to add additional commission tiers in the

25  actual world."                                        04:35:50
```

Page 223

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              Are you saying here that Apple has          04:35:53

 2    repeatedly assessed its commission tiers and

 3    decided not to abandon the 30 percent tier?

 4         A.   No, it has -- the -- the two tiers are

 5    30 and 15 percent, and it always chose one of the    04:36:03

 6    two.  It didn't -- it never wanted to pick a third

 7    tier or to have something more complicated, like

 8    discussed in paragraph 374, where they made the

 9    commission vary with, you know, the royalty --

10    total royalties to developers.                       04:36:25

11         Q.   In -- in all the times since the

12    App Store opened, has Apple had a single tier for

13    longer than it's had two tiers?

14         A.   I don't know.  I haven't investigated

15    that question.                                       04:36:44

16         Q.   Do you know -- do you know how long Apple

17    had only a 30 percent tier?

18         A.   Let's see, maybe we can figure it out

19    from the dates here.

20              I think they started the 15 percent in --  04:36:54

21    in 2015.  So that's been six-plus years.  And

22    the -- and they had a 30 percent tier -- I -- I

23    thought it might be 2009.  You were saying 2008.

24    So I'd have to look at that particular year and --

25    if it's 2008 to 2015, it would be slightly longer    04:37:22
```

Page 224

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    with the -- the 30 percent for everybody than the        04:37:25

 2    two tiers that they've had since March 2015.

 3         Q.   What was Apple's default commission in

 4    2015, at the start of the class period?

 5         A.   The default was 30 percent.  But they had       04:37:41

 6    some people under the video partner program where

 7    they were charging 15 percent.

 8         Q.   And what percentage of class members were

 9    eligible for that 15 percent tier in 2015?

10         A.   The data produced to me, as of the time         04:37:57

11    of this report, did not allow me to calculate that.

12         Q.   Okay.  Are you -- are you aware that it

13    was less than a tenth of a percent of the members

14    of the class?

15         A.   Since Apple did not produce evidence from       04:38:17

16    which I could investigate that at the time, I -- I

17    can't give you an answer to that.  I think there's

18    new production that Apple has produced.  We haven't

19    yet had a chance to analyze it.  And I believe we

20    have some questions about certain aspects of the       04:38:36

21    data that I believe the plaintiff's lawyers have

22    asked you about in interrogatories.

23              So I would -- I would anticipate being

24    able to answer that once we get clarification on

25    the data, because there's -- there's supposed to be    04:38:52
```

Page 225

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1   more identifiers about the -- who was in the video          04:38:55

2   partner program.

3           But as of so far, I haven't gotten the

4   Apple data that would allow me to calculate that,

5   and certainly didn't have it at the time of my          04:39:05

6   report.

7       Q.   Okay.  Did Microsoft charge a 30 percent

8   commission at some point in its store -- its

9   Microsoft store for Windows?

10      A.   Yes, it had, and been notably          04:39:25

11  unsuccessful.

12      Q.   How long did Microsoft charge a

13  30 percent commission in its Windows store?

14      A.   I don't know the precise time they

15  charged 30 percent.  And then it lowered it to          04:39:39

16  15 percent for nongame apps, and then I think

17  12 percent now for game apps.

18          But I think -- I -- well, my -- my

19  conclusion would be Apple would be very unlikely to

20  adopt that same 30 percent commission because          04:39:56

21  Microsoft only got 2 percent of the Windows app

22  distribution market.  So it was obviously a very

23  unsuccessful strategy and Microsoft itself is

24  changing it now.

25      Q.   And was 30 percent an unsuccessful          04:40:11

                                            Page 226

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    strategy for Steam?                                04:40:15

 2        A.   Steam was pretty successful.

 3             Now, the one thing I -- I haven't quite

 4    unpacked is that Steam seems to allow some

 5    self-distribution via the Steam platform.  So that 04:40:27

 6    may mean that the nominal 30 percent is not a real

 7    30 percent, to the extent you can use the Steam

 8    piece to do self-distribution for free via the

 9    Steam platform.

10             So I -- I haven't yet figured out whether 04:40:44

11    we can calculate some alternative effective

12    commission from that.  But it is a complicating

13    factor.  And I -- I just don't know enough about

14    its early period, whether the 30 percent was a real

15    30 percent or whether it's like some other         04:41:00

16    developer, I think GOG, or something, that was

17    30 percent, but only presumptively.  But they

18    didn't individually negotiate.

19             Was that the case at Steam, I don't know.

20    I'd have to look at whatever your evidence is about 04:41:18

21    Steam's 30 percent commission period to see how

22    uniform that was.

23        Q.   You -- you haven't looked at that -- you

24    haven't looked at the evidence about Steam's

25    transactions that was produced by Steam?           04:41:34
```

Page 227

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      A.   My staff looked through any evidence that        04:41:41

2   was produced.  I myself have not looked at the

3   Steam transaction database.

4      Q.   Did -- did you read Professor Economides'

5   conclusions about the Steam average commission           04:41:52

6   rate?

7      A.   I did look at that.  I'm -- I'm not

8   recalling what he said about Steam's average

9   commission rate before 2018.

10     Q.   Did -- do you -- you believe that              04:42:08

11  Professor Economides calculated that average

12  commission rate properly?

13     A.   I would assume so.  I think he's a very

14  good expert, but I -- I haven't checked or tried to

15  independently validate it.                             04:42:20

16     Q.   In your opinion, as a matter of

17  economics, what's the relevant measure of damages

18  for an individual developer in this case?

19     A.   Well, I'm not opining on damages.  That's

20  Professor Economides' job.  But I think the            04:42:36

21  damages -- as I understand, looking at his report,

22  he adopts the conservative measure of the

23  difference between the commission that they

24  actually paid Apple and the but-for commission.

25     Q.   And that is an overcharge measure of          04:42:58

Page 228

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   damages, correct?                                    04:43:01

 2      A.   Yes.

 3           MS. MANIFOLD:  Objection.

 4           Excuse me.  I'm sorry.

 5           Objection.                                    04:43:06

 6      Q.   (By Mr. Swanson)  Do you agree that an

 7   overcharge measure of damages is appropriate, as

 8   distinct from a lost profits measure of damages in

 9   this case?

10           MR. LOPEZ:  Objection.  Calls for a legal     04:43:22

11   conclusion.

12           THE DEPONENT:  I think that the

13   overcharge is a lost profit as a conservative

14   measure of their profit loss.

15      Q.   (By Mr. Swanson)  So is it your opinion,      04:43:34

16   as an economist, that the -- that every class

17   member lost more profits than the amount of the

18   overcharge that Professor Economides would

19   calculate for them?

20           MS. MANIFOLD:  Objection.                     04:43:54

21           THE DEPONENT:  No, I didn't say that they

22   all lost more than that.  I said that it's a

23   conservative measure, that it's a floor.  I

24   think at a -- at a minimum, they lost that much.

25   So it -- it's an -- if, in a but-for world -- well,   04:44:04
```

Page 229

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1      it's -- let me put it this way.                    04:44:10

 2              In the but-for world, every developer

 3      would have had two choices.  It could have stuck to

 4      buying exclusively from -- via Apple distribution

 5      services, in which case their injury would be the   04:44:22

 6      difference in commissions.

 7              Or they could, you know, buy through

 8      Apple and others.  And I think they would -- if

 9      they're going to choose the others and they would

10      find some other benefits other than commission     04:44:40

11      benefits from doing so, then I think their injury

12      is even higher from -- from the activity.

13              Likewise, I think they --

14      Professor Economides takes into account whether or

15      not they would have adjusted their price.  And he   04:44:59

16      says, well -- I think correctly, that if -- they

17      had two options.

18              They could have either just taken the

19      difference in commissions and paid -- and charged

20      the same app price, in which case his measure is a  04:45:12

21      minimum amount of harm, or they could have decided

22      it's more profitable actually to -- given the lower

23      commission, lower app price will make even more

24      money by expanding sales, in which case they would

25      have lost even more.                                04:45:28
```

Page 230

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              So that's why I think the methodology        04:45:29

 2     Professor Economides uses is offering a

 3     conservative floor on the lost profits of every

 4     developer.

 5          Q.   (By Mr. Swanson)  Well, is it              04:45:41

 6     conservative or is it inaccurate?

 7          A.   No, it's -- it's conservative.  It -- it

 8     established a uniform floor on the injury to each

 9     class member.

10          Q.   Well, as you indicated,                    04:45:54

11     Professor Economides is doing something different

12     from you.  He's calculating the damages of each

13     class member.

14              Shouldn't a calculation of damages

15     properly estimate the full amount of damages?       04:46:07

16              MR. LOPEZ:  Objection.

17              THE DEPONENT:  It seems to me very common

18     in antitrust cases to pick something that is

19     conservative.  I -- I -- I've picked exactly the

20     same thing in cases involving individual plaintiffs 04:46:24

21     where it is, you know, too difficult to

22     persuasively establish exactly what the price

23     response would be and you just -- you adopt a

24     conservative assumption that prices wouldn't change

25     and then show what the injury would have been.      04:46:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              So I think that is a perfectly          04:46:45

 2    appropriate method myself.

 3         Q.   (By Mr. Swanson)  Well, is this one of

 4    those cases where it's two difficult to show what

 5    each developer's actual lost profits would be?     04:46:54

 6         A.   I -- I don't -- it's not difficult to put

 7    a floor on it.  I think Professor Economides

 8    correctly does so.

 9              I think it would be more difficult to say

10    for each, you know, would you alter your price at   04:47:07

11    all.  I mean, I think, no, given the evidence that

12    I talked about.  So -- I mean, that basically is

13    his assumption.

14              But, you know, as -- as I mentioned, I --

15    I don't think there would be any pass-through here  04:47:26

16    because of the combination of the pricing tiers and

17    the -- the fact that there's -- there's economic

18    incentives not to pass on much of the commission

19    difference given low marginal costs.

20         Q.   Well, if a developer brought their own    04:47:45

21    separate case, wouldn't they want to prove the full

22    extent of their damages, just as an economic

23    matter?

24              MR. LOPEZ:  Objection.

25              THE DEPONENT:  Well, so one, I don't       04:47:56
```

Page 232

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    think they would be different for the reasons I          04:47:58

2    just mentioned.  And two, to the extent you thought

3    there was some difference, I think it would be

4    difficult to establish in an antitrust case.

5         So as I say, I've been an expert for              04:48:19

6    individual firms and -- and other exclusive dealing

7    cases and have made the same kind of assumption

8    myself.

9         It's not -- not at all unusual because,

10   you know, on the one hand, you'd like to make sure      04:48:35

11   everything is compensated, but you have to prove it

12   in a way that's convincing.  So often conservative

13   measures are used in order to calculate damages.

14        Q.   (By Mr. Swanson)  Well, how -- how

15   conservative is this -- is the approach that             04:48:55

16   Professor Economides is taking resulting in many

17   class members losing a percentage of the damages

18   they could prove up individually?

19             MR. LOPEZ:  Objection.

20             THE DEPONENT:  So I don't think so, no.         04:49:10

21   Because, as I mentioned, you know, I -- I think

22   for -- for this case, I'm assuming the pricing

23   tiers remain, unlike in the consumer class action.

24        So if you assume there's still 99 cent

25   price tiers, and you also take into the account the       04:49:26

Page 233

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    incentives to pass a percentage-based commission          04:49:31

 2    difference, in a market like this, given low

 3    marginal costs, I think you would have to be a

 4    very, very expensive app, like on the order of $40

 5    or more per app to -- for a firm to, you know, want    04:49:45

 6    to change a pricing tier in response to a

 7    15 percent commission change.  So I think that

 8    would be very unlikely to be the case, even if you

 9    assumed that you could prove it.

10         Q.   (By Mr. Swanson)  Well -- well, how is        04:50:10

11    Professor Economides' approach conservative if an

12    individual developer would use the same approach

13    and not claim or be able to prove any higher

14    damages?

15         A.   Well, conservative -- an individual           04:50:29

16    wouldn't be conservative, too, because there's --

17    you know, there -- there's a possibility they're

18    trying to prove this additional lost profits from

19    being able to adjust your prices.  It's just very

20    hard to prove.  So it's conservative to put that       04:50:45

21    possibility aside.

22              I'm just saying that not only is it

23    conservative whenever it applies, I just don't

24    think -- I think it's very unlikely to actually

25    come up.                                                04:50:58
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1          Q.   Are your opinions on classified impact          04:51:03

2     independent of Professor Economides' opinions on

3     developer damages?

4          A.   Yes.

5          Q.   Are -- are your opinions on classwide           04:51:12

6     impact based on different evidence or reasoning

7     than Professor Economides' opinions?

8          A.   Well, there are some parts in which I

9     cite things from Professor Economides, but I think

10    mainly for certain portions of the market             04:51:26

11    definition.

12              But ultimately, my conclusions on market

13    definition don't depend on Professor Economides.

14    And none of my conclusions on classwide effect on

15    Apple -- Apple's commissions are dependent upon       04:51:42

16    Professor Economides' conclusions.

17         Q.   If Professor Economides' opinions on

18    damages are wrong, are your opinions still valid?

19         A.   Yes.  I think nothing that I say that

20    would not continue to be true.  I mean, I do make     04:52:03

21    one conditional opinion.  It depends upon his

22    analysis being reliable.

23              So if, in your hypothetical, the portion

24    of his opinions that are wrong includes the part

25    that I used there, then the condition would no        04:52:17

                                                 Page 235

1    longer apply.  But nothing would change in terms          04:52:20

2    of what my conclusion was, which was, if that's

3    reliable, it's yet another piece of

4    strong evidence -- actually independently strong

5    evidence to prove market definition.                      04:52:35

6         Q.   Have you made any calculation or

7    computation of damages for the class, or any member

8    thereof?

9         A.   No.

10             MR. LOPEZ:  We've been going about an            04:52:46

11   hour, Mr. Swanson.

12             MR. SWANSON:  Why don't we take a break.

13             MR. LOPEZ:  Ten minutes?

14             MR. SWANSON:  Ten minutes.

15             MR. LOPEZ:  Great.  Thank you.                   04:52:54

16             THE VIDEOGRAPHER:  Going off the record

17   at 4:52 p.m.  This is the end of media 5.

18             (Recess taken.)

19             THE VIDEOGRAPHER:  We're on the record at

20   5:05 p.m.  This is the beginning of media 6 in the         05:05:40

21   deposition of Einer Elhauge.

22        Q.   (By Mr. Swanson)  All right, Professor.

23             We spoke earlier about

24   Professor Economides' yardstick analyses.

25             Do you -- do you recall his -- his              05:06:02

Page 236

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    yardstick opinions?                               05:06:05

 2         Is that a "yes," or are you looking at

 3    something?

 4         A.   I don't have my microphone in front of me

 5    so I can't hear what you said.                    05:06:24

 6         Q.   Oh, okay.  There we go.

 7         A.   Yes.

 8         Q.   Okay.  Have you identified any different

 9    yardsticks than Professor Economides'?

10         A.   No.                                     05:06:35

11         Q.   Okay.  And you also referenced in your

12    report a yardstick -- or a but-for yardstick

13    calculation by Dr. Evans.

14         Have you identified any yardsticks that

15    Dr. Evans hasn't identified?                      05:06:50

16         MR. SWANSON:  What's that?

17         THE COURT REPORTER:  I'm sorry.  What was

18    that?  Was that an objection?

19         MR. SWANSON:  I'm assuming that was an

20    objection.                                        05:07:09

21         THE DEPONENT:  Okay.  So I -- I was just

22    stumbling over the word "yardstick" because that

23    would mean -- I usually think of that as when you

24    use a different market, and I thought

25    Professor Evans was a but-for analysis in this    05:07:17
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   market.                                          05:07:20

 2        So I don't remember him using a yardstick

 3   of a different market.  Perhaps I've forgotten it.

 4        But -- but, yes, I -- Professor Evans

 5   uses a but-for yardstick, but-for metric -- metric   05:07:31

 6   as well.  And Professor Economides uses a but-for

 7   benchmark.  And I did not identify a separate

 8   but-for benchmark from the ones that they did.

 9        Q.   (By Mr. Swanson)  Okay.  Do you have an

10   opinion as to whether Donald Cameron was injured as  05:07:49

11   a result of Apple's alleged conduct?

12        A.   Yes.  He was a member of the class.  So,

13   therefore, I concluded he was injured.

14        Q.   Okay.  Do you have an opinion as to when

15   he was first injured?                                05:08:00

16        A.   I would have to go look at his

17   transactional data, I think, to see.

18        Q.   Do you have an opinion as to whether

19   Pure Sweat, the other named plaintiff, was injured

20   as a result of Apple's alleged conduct?             05:08:16

21        A.   Yes.

22        Q.   And what's your opinion?

23        A.   That if he's a member of the class, he

24   would have been injured, since 100 percent were

25   injured.                                            05:08:26
```

                                                    Page 238

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1       Q.   Okay.  And when was Pure Sweat first         05:08:27

2    injured, in your opinion?

3       A.   I -- I don't know exactly when his

4    transactions occurred either.  I'd have to look at

5    his -- the database.                                 05:08:38

6       Q.   Would Pure Sweat have been injured before

7    the time of its first transactions when it was

8    offering a free app with no in-app purchase?

9       A.   I suppose it's possible.  It wouldn't be

10   injury by the metric that I use to establish         05:09:02

11   100 percent injury, but might have been harmed by

12   the lack of choice and inability to choose multiple

13   app distributors.

14      Q.   Did that injury -- is that injury

15   compensable in money?                                05:09:20

16          Is -- is it something you can, as an

17   economist, estimate in dollar terms?

18      A.   I -- I haven't investigated it.  But as I

19   sit here today, I don't have a method to do that.

20   It's not the method that I use.  I -- I focused on   05:09:32

21   the commission difference.

22      Q.   Do you know if Professor Economides is

23   calculating any damage for any such injury, if it

24   exists?

25          MR. LOPEZ:  Objection.  Form.                 05:09:45

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  I -- I don't know whether      05:09:50
 2    he is.  I was just answering your question, whether
 3    they could have been injured before.  Yes, they
 4    could be, but that's not the method I used.
 5         Q.  (By Mr. Swanson)  Okay.  So you don't         05:09:57
 6    have an opinion on that, whether Pure Sweat was
 7    injured for its first paid in-app purchase?
 8         A.   I don't.  I haven't investigated that
 9    question.
10         Q.  Do you have an opinion as to how             05:10:10
11    Mr. Cameron would have distributed his app in the
12    but-for world?
13              MR. LOPEZ:  Objection.
14              THE DEPONENT:  I don't have an opinion
15    how he specifically would have distributed his own   05:10:23
16    app.
17         Q.  (By Mr. Swanson)  Do you have an opinion
18    as to whether Mr. Cameron likely would have used
19    the App Store as his only iOS distribution channel?
20         A.   I don't know.  Either way he would have    05:10:36
21    been injured, so I didn't break that down.
22         Q.  Do you have an opinion as to whether
23    Mr. Cameron would have self-distributed his app?
24              MR. LOPEZ:  Objection.
25              THE DEPONENT:  If he would have, then his   05:10:50
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    injury would be even greater than I'm assuming.        05:10:52

2         Q.   (By Mr. Swanson)  Do you have --

3         A.   Again, I haven't reached an opinion about

4    what exactly he would have done.

5         Q.   Okay.  Do you have an understanding as to    05:11:01

6    whether he self-distributed the content of his app

7    in the actual world?

8         A.   I do not.

9              MR. LOPEZ:  Objection.

10        Q.   (By Mr. Swanson)  Are you familiar with      05:11:14

11   the economic concept of passing through cost

12   changes or passing on sometimes referred to?

13        A.   Yes.

14        Q.   Okay.  What's your understanding?

15        A.   Well, I think the understanding is that      05:11:27

16   sometimes an increase in costs, such as from an

17   overcharge, might get passed on downstream in some

18   markets.

19        Q.   Okay.  And when, in that sense, someone

20   passes on a cost increase, do their profits          05:11:51

21   increase, typically?

22        A.   Do their profits increase?

23             MR. LOPEZ:  Objection.  Form.

24             THE DEPONENT:  Well, I think they're --

25   they're -- they're still harmed.  I don't know what   05:12:08
```

Page 241

```
 1    you mean by "do their profits."              05:12:10

 2            No, I've -- I've -- the -- the fact that

 3    you may have passed something through doesn't alter

 4    the fact that your profits went down.  And in -- in

 5    this particular case, if you -- they changed their   05:12:23

 6    price would have -- would have changed their price

 7    in a but-for world, that actually indicates even

 8    greater anticompetitive harm for reasons we've

 9    discussed.

10        Q.   (By Mr. Swanson)  Well, I'm -- I'm just    05:12:35

11    asking now, generally, in terms of economic theory.

12    So let's say a variable cost increases for a

13    company.

14            What are the other circumstances under

15    which it will change the price of its product as a   05:12:51

16    result of that variable cost change?

17        A.   It'll -- it'll depend upon, you know,

18    its -- you have to figure out what its

19    profit-maximizing price is with the two cost points

20    in order to figure out what, if any, portion of      05:13:12

21    that increase in cost gets passed on.

22        Q.   And suppose that its profit-maximizing

23    decision is to pass on some of that cost increase.

24            What does that do to that entity's

25    profits?                                             05:13:36
```

Page 242

```
 1              MR. LOPEZ:  Objection.                    05:13:42

 2              THE DEPONENT:  It will have two effects.

 3      It's -- it's passing some of it on.  It's

 4      reducing its volume of sales.  And, thus, losing

 5      additional profits, although it's passing on some  05:13:55

 6      of the overcharge on the unchanged portion of their

 7      sales.

 8              So -- but if they -- if they find it more

 9      profitable to pass through, then I think

10      Professor Economides is right, that their injury    05:14:17

11      would be even higher than the raw overcharge.

12          Q.  (By Mr. Swanson)  Again, I'm talking

13      about economic theory in general.  So I understand

14      you want to take it back to this case, which is

15      fine.  We'll certainly do that.  But I'm -- I'm     05:14:27

16      focusing on economic theory.

17              So does economic theory predict that

18      after a cost increase, a company's profits will be

19      higher, lower, or the same after it passes -- makes

20      its passing-through decision?                       05:14:49

21              MR. LOPEZ:  Objection.

22              MS. MANIFOLD:  Objection.

23              THE DEPONENT:  Its profit will be less

24      because...

25          Q.  (By Mr. Swanson)  Are there circumstances   05:14:55
```

Page 243

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    where its profit will be the same?                    05:14:56

 2         A.    I don't think so.   Even if it passes

 3    through 100 percent, which I think is very

 4    implausible, the price is now higher.  It's just

 5    selling less quantity.                                05:15:13

 6              So everybody is injured even -- even

 7    whether pass-through is 0 percent to 100 percent,

 8    there's still the fact of injury to everybody in

 9    that market who pays the overcharge.

10         Q.    And -- and my question was about profits.   05:15:31

11              So you're saying that there is no

12    possibility, in theory, that a company could pass

13    on a cost increase and thereby maintain its

14    profitability at the same level?

15              MS. MANIFOLD:  Objection.                    05:15:47

16              THE DEPONENT:  I don't think so because

17    it would -- it would have less quantity.  So lose

18    profits for whatever, you know.  It might be able

19    to maintain the same profit markup, I guess, a

20    markup per unit.  But it would sell fewer units,     05:16:00

21    therefore, its prices and its profits would go

22    down.

23         Q.    (By Mr. Swanson)  And -- and, again, just

24    looking at this from the standpoint of abstract

25    economic theory, if a company's variable costs go    05:16:10
```

1    down, under what circumstances would pass through          05:16:15

2    that cost reduction?

3              MR. LOPEZ:  Objection.

4              THE DEPONENT:  I think it's -- it's just

5    the same formula in reverse, only now you're going         05:16:25

6    down that way.  But the difference, I think, would

7    be the same.

8         Q.  (By Mr. Swanson)  All right.  And -- and

9    under what circumstances would the company reduce

10   its price -- when would it be profit maximizing for        05:16:38

11   it to reduce its price?

12        A.   Well, I mean, I think it all depends on

13   the particular profit function in a particular

14   market and the way in which these marginal costs

15   are -- you know, are they flat, are they                   05:16:56

16   percentage-based, as in this case.  Do they have

17   pricing tiers, as in this case.  So maybe you need

18   to specify more about your hypothetical.

19              I mean, I did the analysis thinking the

20   actual circumstances of this case.  And I guess if         05:17:14

21   it wasn't this case, you'd have to think about what

22   exactly you're going to specify by all these other

23   factors.

24        Q.   If there was an increase in the

25   commission charged to app developers, in your             05:17:31

                                                              Page 245

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    opinion, would that lead some developers to raise        05:17:35

 2    the price of apps and in-app products?

 3         A.   Well, my opinion is that -- as I offered

 4    in the report, is just that they would suffer an

 5    injury whether or not they would pass on anything       05:17:49

 6    between zero to 100 percent of that.  If they pass

 7    on none of it, clearly they're injured by the

 8    overcharge.  If they would pass on it 100 percent,

 9    they're injured by reduced profits because they

10    lose quantity.                                           05:18:04

11         But if you wanted to ask me, do I also

12    think they're likely to pass it on, no, for the

13    reasons I mentioned before, which is because the

14    cost increase here would not be a -- sort of a flat

15    increase in marginal cost, but rather in a              05:18:24

16    percentage-based commission, when you -- when you

17    work through the -- what the -- that means for the

18    economics, it means that the -- the -- the

19    pass-through is going to be proportional to the

20    marginal costs, which are very low in this              05:18:39

21    particular industry.

22         So it would be a low percentage

23    pass-through.  And when you combine that with the

24    pricing tier, my opinion is they're very unlikely

25    to pass it through.                                      05:18:51
```

Page 246

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1     Q.   You agree that it's a theoretical          05:18:55

2     possibility that a developer might pass on a

3     portion of the commission increase to consumers in

4     the form of higher app prices?

5          MR. LOPEZ:  Objection.                      05:19:04

6     Q.   (By Mr. Swanson)  Is that correct?

7     A.   Well, the opinion I offer is that the --

8     the -- that there's the fact of injury regardless.

9          I think it's unlikely.  But there is a

10    theoretical possibility that if their marginal      05:19:15

11    costs were unusually high and their app prices were

12    unusually high, maybe some of them would pass it on

13    despite the basic economics of percentage-based

14    commissions and the -- the -- the price tiering.

15    But it seems quite unlikely to me.                  05:19:39

16    Q.   Well, is it your opinion that 100 percent

17    of class members in the but-for world would not

18    lower their app prices or in-app product prices

19    compared to the actual world?

20         MS. MANIFOLD:  Objection.                    05:20:02

21         THE DEPONENT:  No.  It's -- the opinion I

22    offer is just that 100 percent of them were injured

23    regardless of the extent to which they would do so.

24         As I've already said, if you pass on

25    100 percent of it, they're still injured because    05:20:11

Page 247

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    they have a lower quantity.  So it was not              05:20:14

2    necessary for me to reach any calculation about how

3    many might have had some pass-through.

4            I also think, for reasons mentioned by

5    Professor Economides, that if they would pass           05:20:26

6    through their injuries -- even higher, actually.

7    So he's got a good conservative floor using his

8    method.  But I also say I -- I don't know of

9    anybody who would have passed through, given the

10   evidence I have seen in the pricing tiers.              05:20:41

11           Maybe there is some conceivable case.

12   We'd have to work through their particular marginal

13   cost, their particular price structure, and figure

14   out what their given -- the -- the

15   profit-maximizing function -- would there be           05:20:57

16   pass-through despite the pricing tiers.

17       Q.   (By Mr. Swanson)  Well, I mean, I

18   understand your opinion on impact.  But I'd like to

19   test that by understanding whether you have an

20   opinion on what percentage of app transactions,        05:21:14

21   whether paid downloads or in-app purchases, would

22   have been at a lower price in the but-for world.

23           Are you saying most of them would have

24   been at the same price --

25           MS. MANIFOLD:  Objection.                       05:21:36
```

                                                Page 248

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Swanson)  -- or do you just not         05:21:37

 2    have an opinion?

 3        A.   So -- I mean -- but then your premise was

 4    that this would test it.  And what -- what I'm

 5    saying, my opinion is this is actually not a test        05:21:44

 6    of whether there were uniform injury regardless

 7    of -- whatever you assume about the pass-through

 8    rate, anything from zero to 100 percent, you know,

 9    the whole range of possibilities, it's still

10    100 percent injury to everybody.  And                    05:21:58

11    Professor Economides still has a conservative

12    measure of the amount of damages to everybody.

13             But if you want me to answer the question

14    even though it's irrelevant to classify damage --

15    injuries and the minimum amount of damages, I would      05:22:10

16    say very few class members would pass on some of

17    this, given the combination of percentage-based

18    commissions, low marginal costs and these pricing

19    tiers.

20             I have not quantified just how few.  I'm        05:22:28

21    not even sure there are any.  I haven't seen

22    somebody who would fit the bill that could go

23    through -- could go through a calculation and say,

24    oh, yeah, for them, it would be -- it would be

25    worth changing the pricing tier.  But I just think       05:22:41
```

Page 249

```
1    it would be very unlikely.                      05:22:46

2        Q.   Is it -- is it your opinion then that

3    Apple's conduct that you consider to be

4    anticompetitive adversely affected the developer's

5    side of the market, but not the consumer side of   05:23:03

6    the market?

7            MS. MANIFOLD:  Objection.

8            THE DEPONENT:  Oh, not at all.  I have a

9    whole section about how it harms the consumer side

10   of the market.  Even if there's no pass-through, as  05:23:11

11   I explain, it would reduce consumer choice, which

12   itself is a harm.  It would reduce, you know,

13   the -- the -- the quality of apps that they see in

14   the marketplace, you know, regardless.

15           And if there's any pass-through, that's     05:23:31

16   just even more injury.  But the -- as I say in my

17   last section, it doesn't at all -- like none of my

18   conclusions depend upon any pass-through to

19   consumers.

20       Q.   (By Mr. Swanson)  So in your view,         05:23:43

21   consumers have less choice in the but-for world,

22   but all prices are essentially the same for all the

23   same apps and in-app products; is that correct?

24           MS. MANIFOLD:  Objection.

25           THE DEPONENT:  I -- I -- I think almost      05:23:57
```

Page 250

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    all prices for apps would be the same.  But the        05:24:00

 2    quality would be adversely affected because the

 3    developers are lowering -- again, it's lower rate

 4    of return on the apps and that that's an injury to

 5    the consumers as well.                                 05:24:13

 6         Q.   (By Mr. Swanson)  So in your opinion, all

 7    consumers in the but-for world would be injured

 8    because in the -- I'm sorry.

 9              In your opinion, all consumers would be

10    injured because in the but-for world all apps and      05:24:28

11    in-app products would be higher quality, but they

12    would be exactly the same prices they are in the

13    actual world?

14         A.   Well, I -- I don't offer an opinion about

15    whether they would be injured or not, you know.        05:24:41

16    In -- in their case, they have a totally different

17    premise, which is the pricing tiers would go away.

18    And if you don't have the pricing tiers, then even

19    though it's a small pass-through, you know,

20    incentive, it would -- it would happen, and I          05:24:55

21    think, you know, that Professor McFadden

22    calculates.  So they've got their own theory.

23              But I'm just saying, based upon the

24    anticompetitive conduct alleged in this case, it

25    would harm them all regardless of whether it had       05:25:07
```

Page 251

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    any effect on their prices.  And, you know, none of          05:25:11

2    my conclusions in my report depend upon anything

3    about the pass-through rate.

4              The higher the pass-through rate, there

5    even -- there's an additional harm to consumers of          05:25:21

6    higher prices.  But even with zero pass-through

7    rate, they're injured by reducing, you know, the

8    quantity and quality of apps and reducing

9    their consumer choice.

10             So my approach, you know, is -- basically          05:25:36

11   shows anything from zero to 100 percent

12   pass-through harms both all the developers and all

13   the consumers, which is I -- I feel all I have

14   to -- I need to reach my conclusions that there was

15   classified injury and -- as well as anticompetitive          05:25:56

16   harm to both sides of the market.

17       Q.   Where -- where do you find the basis for

18   your assumption that the developers are not

19   challenging the 99 cent price tiers?

20       A.   Oh, the developers are not.  I didn't see          05:26:12

21   any challenge by the developers to the 99 cent

22   price tiers in the complaint.

23             So as far as I'm aware, they're not being

24   challenged and -- so I was assuming that they would

25   exist in the but-for world.                                  05:26:28

Page 252

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              Did I -- let's see, I have some sort of       05:26:34
 2     footnote that discusses that.  Maybe -- let's see
 3     if I -- I don't know where it is, but...
 4         Q.   Well, if -- if you're wrong and it is in
 5     the complaint, do you need to assume in the but-for    05:26:47
 6     world that the 99 cent price tiers are absent?
 7              MR. LOPEZ:  Objection.
 8              MS. MANIFOLD:  Objection.
 9              THE DEPONENT:  Do I need to assume in the
10     but -- I don't assume that in the but-for world.       05:26:59
11     My -- my analysis doesn't depend any -- either way
12     whatever the pass-through is.
13              The only reason I'm -- I discuss the
14     99 cent price tiers is to say, if -- if you thought
15     there was some pass-through and that the amount of     05:27:15
16     pass-through mattered, which I don't think does to
17     classified injury, then the existence of pricing
18     tiers in the but-for world would affect the extent
19     of pass-through that you would see.
20         Q.   (By Mr. Swanson)  Well, isn't -- aren't       05:27:27
21     the 99 cent tiers now a critical assumption of
22     yours for the but-for world to support your view
23     that there is no pass-through?
24              MS. MANIFOLD:  Objection.
25              THE DEPONENT:  No, that's the opposite of     05:27:39
```

Page 253

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    what I said.                                    05:27:40

 2           I -- I -- I said that whatever the

 3    pass-through rate is, zero to 100 percent, all

 4    developers are injured in the class.  Consumers are

 5    also injured.  So nothing depends on pass-through.   05:27:53

 6           The minimum damages that

 7    Professor Economides calculates do not depend on

 8    the pass-through rate, if you assume more

 9    pass-throughs and even more injury.  If you ignore

10    both those facts and those economic realities and   05:28:06

11    nonetheless want to know how often there would be

12    some pass-through, then you would have to ask about

13    the pricing tier.

14           And, you know, as far as I'm aware, the

15    developers are not challenging the pricing tier,     05:28:22

16    whether it's -- I don't know -- in the complaint or

17    not now, I -- I don't know.  I -- I certainly -- I

18    don't recall anything in the class cert brief about

19    it either.

20           So at any rate, my understanding is it's      05:28:33

21    not being challenged.  But to that subsidiary

22    issue, that you only reach if you ignore the first

23    two more important points, then you'd have to know

24    is there a pricing tier or not in order to figure

25    out how many developers might pass through some      05:28:51
```

Page 254

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   portion.                                        05:28:53

 2       Q.  (By Mr. Swanson)  Is it your opinion that

 3   the price tiers are not anticompetitive?

 4          MS. MANIFOLD:  Objection.

 5          THE DEPONENT:  I -- I haven't            05:29:02

 6   independently analyzed that, you know.  A lot of

 7   markets have price tiers.  Sometimes they're not

 8   anticompetitively imposed.  You know, what the net

 9   effects of Apple's price tier to tier, I don't

10   know.  I haven't investigated that since I didn't  05:29:21

11   think it was part of the developer's allegations.

12       Q.  (By Mr. Swanson)  Well, if it is part of

13   the developer's allegations, do you have an opinion

14   that supports a claim that the price tiers are

15   anticompetitive?                                05:29:37

16          MS. MANIFOLD:  Objection.

17          THE DEPONENT:  I -- I mean, it's a

18   restraint on pricing.  But, you know, I -- I'd --

19   I'd have to do more work to see what -- what would

20   but-for prices have looked like and -- without the  05:29:54

21   pricing tiers.  And I just haven't investigated

22   that issue to determine whether the pricing tiers

23   would be expected to have a net anticompetitive

24   effect on pricing.

25       Q.  (By Mr. Swanson)  Do you agree that      05:30:14
```

Page 255

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    economic logic and the evidence in this case          05:30:15

2    suggest that we should expect a modest amount of

3    entry into the iOS app distribution market in the

4    but-for world?

5         A.   Yeah.  I only -- I mean, I'm --I'm          05:30:29

6    thinking maybe five firms is what I think is

7    likely, which I would say -- you know, that's

8    relatively modest.  It's not a huge number.  I'm

9    not saying there's going to be 10 or 20 major

10   distributors.                                          05:30:43

11        Q.   How firm is your opinion that there would

12   be five entrants in the but-for world?

13        A.   I think that's likely.  As I say in my

14   analysis, there is five very prominent likely

15   candidates and there would be very high profits.       05:31:03

16   There would be a lot of incentive thus to enter

17   into the market.

18             So that -- that -- my prediction is that

19   they -- they would end up entering.  So we would

20   end up with, you know, like six distributors in        05:31:15

21   this market, which corresponds to the number of

22   distributors that we see for the macOS market and

23   the -- the Windows distribution market.

24        Q.   Do you agree that if only one firm were

25   to enter the iOS app distribution market in the        05:31:33
```

Page 256

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    but-for world, 35 percent is the single entrant        05:31:36

2    market share that is best supported by the

3    evidence?

4         A.   I haven't investigated that.  I mean, I

5    understand some of the models look at single --         05:31:46

6    single entry or two entrants -- I -- I can't

7    remember -- as a conservative assumption.  But I --

8    I haven't myself determined what the market share

9    would be with a limited number of entrants.

10        Q.   Do you have any opinion as to what            05:32:08

11   Apple's App Store's market share would be in the

12   but-for world?

13        A.   I don't.  I don't have an opinion on

14   that.

15        Q.   So you have no opinion in -- as to            05:32:22

16   whether it would be more or less than 65 percent?

17        A.   I do not.

18        Q.   Based on economic logic and the evidence

19   in this case, would it be correct, in your opinion,

20   to assume that all firms in the iOS app                 05:32:39

21   distribution market in the but-for world would

22   charge the same commission rate to developers?

23        A.   No.

24        Q.   And why not?

25        A.   Well, I think probably the reason I talk      05:32:57
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    about the oligopoly pricing is hard to maintain in        05:32:59

 2    this market because the products are very

 3    differentiated -- the distributors are

 4    differentiated and a lot of the pricing is not

 5    transparent.  And, in fact, in other competitive         05:33:13

 6    markets for app distribution, we don't see,

 7    you know, parallel pricing.

 8         Q.   Let me ask you to turn to page 196 of

 9    your report and paragraph 384.

10              Let me know when you are there.                 05:33:54

11         A.   I'm there, yeah.

12         Q.   Okay.  You state that "Charging less than

13    a 15% commission for some transactions is clearly

14    plausible given the several other app distributors

15    already do so."                                           05:34:06

16              And then you have a variety of bullets

17    there, which I'll go through in a moment.

18              But is, in your opinion, what is

19    plausible for the but-for world in this case

20    measured by looking at the markets that you               05:34:24

21    consider these entities to operate in?

22         A.   I -- I mean, to figure out what's

23    plausible, the whole section has evidence besides

24    them.  It's Apple itself's marginal costs.  So it's

25    plausible to charge more than your marginal costs.        05:34:45
```

Page 258

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          So I'm just trying to rebut the claim        05:34:48

 2   that, oh, you can never charge less than

 3   15 percent.  It wouldn't be profitable.

 4          And then these other markets, it's not so

 5   much that the market is the benchmark.  It's just   05:34:59

 6   that these distributors found it profitable to

 7   offer a profit -- a commission rate like this.  So

 8   they must have found it profitable as well.  So

 9   it's profitable enough to be plausible as a but-for

10   price.                                              05:35:18

11      Q.   So looking first at Epic Games Store, you

12   note that Epic Games Store charges at most

13   12 percent commission for any transaction.

14          Do you consider the Epic Games Store an

15   appropriate yardstick for the commission or         05:35:35

16   commissions Apple would charge in the but-for

17   world?

18      A.   I -- I'm not using it as a yardstick

19   here.  So I haven't second-guessed or, you know,

20   tried to independently validate the yardstick that  05:35:50

21   Professor Economides uses.

22          So I think for app -- I wouldn't say --

23   for a yardstick is usually a yardstick market

24   rather than an individual firm.  So that seems to

25   me the Windows app distribution market does seem    05:36:04
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    like a -- a better yardstick.  But you want to          05:36:08

2    consider all distributors in that market rather

3    than just one producer.

4           Here -- here I'm saying it just in the

5    fact that charging less than 15 percent has been        05:36:18

6    profitable for some firms and, thus, is clearly a

7    plausible price for Apple to have for its low tier.

8       Q.   Is the Windows market that you're

9    referring to a two-sided transaction market?

10      A.   Yes.                                             05:36:41

11      Q.   And so only two-sided platforms can

12   compete in that market for transactions, correct?

13      A.   I believe so, yes.

14      Q.   Okay.  So self-distribution in that

15   market is not a competitor of a two-sided platform      05:36:59

16   like Epic Games?

17      A.   Well, I'm sorry.  Say that question

18   again.

19      Q.   I said, so self-distribution is not a

20   competitor of a two-sided platform like the             05:37:17

21   Epic Games Store.

22           Would you agree with that?

23      A.   No, I think self-distribution is a

24   competitor and that their part of the market is

25   there would be self-distribution of iOS apps.           05:37:28

Page 260

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.  Well, how is self-distribution two-sided          05:37:35

 2   competition for transactions?

 3        A.  Well, it competes with two-sided -- it

 4   competes with independent distributors, but there

 5   the -- the transaction is being mediated by the          05:37:50

 6   distributor themselves.  But it's still affecting

 7   both the distributor -- I mean, the app developer

 8   and the consumer.

 9            They're just providing distribution

10   themselves.  But they would do so, in part, by          05:38:03

11   looking at the alternative of other methods of,

12   you know, doing transactions.

13            So I don't know.  I have a Best Buy

14   credit card.  It's offered by Best Buy itself.  And

15   I bought something at Best Buy, that doesn't mean          05:38:24

16   that they're not in a credit card market and that

17   the -- their willingness to offer that and the

18   terms they offer aren't influenced by what

19   independent competing credit cards offer.

20        Q.  Well, I'm -- I'm just trying to          05:38:37

21   understand your earlier testimony that only

22   two-sided transaction platforms can compete for

23   transactions with other two-sided platforms in a

24   transaction market.

25            Are you -- are you moderating that          05:38:51
```

Page 261

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    opinion?                                          05:38:54

 2         A.   I guess if -- if you're -- if you meant

 3    by that -- I didn't understand your meaning.

 4              If you meant by that to exclude

 5    self-distribution, yes, because my -- my market    05:39:01

 6    definition clearly does include self-distribution

 7    of iOS apps.

 8         Q.   Well, self-distribution is just a single

 9    developer selling its products in its own store,

10    correct?                                           05:39:18

11              MR. LOPEZ:  Objection.

12              THE DEPONENT:  Well, yeah.  And through

13    some form, whether it's one store or multiple,

14    you know, websites.  It may depend on the

15    particular distributor.  And some self-distribute,  05:39:30

16    but also distribute other people's as well, as like

17    the Epic Games Store.

18         Q.   (By Mr. Swanson)  Well, in that case, is

19    it only when a self-distributor offers its own

20    multisided platform that it's a competitor of a    05:39:49

21    two-sided transaction platform?

22         A.   No, I don't think so.  No.

23         Q.   So you think single-sided competition

24    exists in two-sided transaction markets?

25         A.   I -- I just disagree with your premise    05:40:10
```

Page 262

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    that it's single-sided just because they're         05:40:12

 2    doing -- providing the platform themselves.

 3         Q.   Well, what -- what do you consider --

 4    what -- what's your definition of single-sided

 5    competition?                                         05:40:21

 6         A.   Well, it's -- it's -- we're not in a

 7    market where because of simultaneous transactions

 8    one has to take into account the effects on both

 9    sides.  I think here you do have to take into

10    account affect on both developers and 'consumers of 05:40:41

11    Apple's anticompetitive exclusion and to properly

12    measure it.

13              I think you have to also take into

14    account that some of the competition they're

15    excluding would be in the form of self-distribution 05:40:54

16    in a --

17         Q.   What --

18         A.   -- but-for world, yeah.

19         Q.   Yes.

20              What's your definition of a single-sided  05:41:02

21    competitor -- or feel free to give an example, if

22    you have one.

23         A.   Well, I mean, I think the -- for example,

24    the sale of the app itself rather than the

25    distribution services, or the sale of a car is a    05:41:18
```

Page 263

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    single-sided market.                                05:41:27

2            But I -- it seems to me that the -- this

3    self-distribution is clearly a substitute for the

4    transactions that are provided by the App Store.

5    So since it substitutes for that transaction, you   05:41:42

6    would have to include it in the same market

7    definition.

8        Q.   Are you saying that all

9    self-distribution -- all self-distribution is

10   accomplished through a multi-sided transaction      05:41:56

11   platform?

12       A.   I'm not saying it's a substitute for it.

13   So if you're -- if we've defined a two-sided market

14   for app distribution, as I agree, along with all

15   the experts on both sides in the Epic case, one has  05:42:11

16   to consider all substitutes that constrain it.  And

17   self-distribution of apps would be a -- a

18   constraint in the but-for world and, thus, should

19   be included.

20       Q.   With respect to Epic Games, did the         05:42:29

21   Epic Games Store exist before 2018?

22       A.   I don't know the year in which the

23   Epic Games Store was created.

24       Q.   Do you know if the Epic Games Store has

25   ever been profitable?                               05:42:49
```

Page 264

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   I -- I don't know.                      05:42:51

2        Q.   Do you know if the commission rate that

3   Epic charges is below Epic's average total cost?

4        A.   I -- I have not investigated that.

5        Q.   Do you know if Epic charges a uniform   05:43:10

6   12 percent commission to all developers on the

7   Epic Games Store?

8        A.   I think the source just said at -- at

9   most 12 percent.  Whether they charge some

10  sometimes less, I don't know.                     05:43:23

11       Q.   Does Epic offer discounts?

12       A.   On a commission?  I -- I'm -- I'm not

13  positive.  The commission they're charging -- yeah,

14  on -- on distribution -- particularly for others --

15  of course, for their own games, it's complicated by  05:43:42

16  the fact that they're gaining a price for the game

17  itself.

18       Q.   And do you have an understanding as to

19  whether Epic offers minimum guarantee deals to

20  distributors?                                     05:43:58

21       A.   I'm not aware of any evidence to support

22  that.

23       Q.   In what market does the Epic Games Store

24  compete in?

25       A.   They compete in the market for app      05:44:11
```

Page 265

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    distribution in -- for the distribution of macOS          05:44:13

2    apps and for Windows apps.

3         Q.   Are -- are -- are those two separate

4    markets?

5         A.   Yes, I think so.                                 05:44:26

6         Q.   And that's your opinion as an economist,

7    that they're completely separate markets?

8         A.   For the app distribution, I think so,

9    yes.

10        Q.   Does -- well, strike that.                        05:44:41

11             You mention in paragraph 384, in the next

12   bullet, that Microsoft has announced that it will

13   "reduce its commission for Windows games to 12% in

14   August 2021."

15        A.   Yeah, I think tomorrow, in fact.                  05:44:58

16        Q.   So what commission rate is in effect

17   today for Windows games?

18        A.   For games today, I think it's 30 percent.

19        Q.   Okay.  Is a commission change that

20   Microsoft will implement for the first time           05:45:16

21   tomorrow an appropriate comparison for what Apple

22   might have done in the face of entry in 2015?

23        A.   You -- you keep acting like this

24   paragraph -- or you keep mischaracterizing this

25   paragraph as a yardstick paragraph.                    05:45:32
```

Page 266

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              This is a paragraph, as I said, that's        05:45:34

 2    simply showing that it's plausible to charge below

 3    15 percent.  So the basis for saying Apple charges

 4    below 15 percent is not a yardstick, based on this

 5    paragraph.                                              05:45:45

 6              This paragraph is just showing firms have

 7    found it profitable and attractive to charge,

 8    you know, lower commissions than 15 percent.  So

 9    it's plausible that -- that Apple would do so as

10    well.                                                   05:46:00

11       Q.   Well, Microsoft and Samsung have found it

12    plausible, and Google on the top of the next page,

13    have found it plausible to charge 30 percent

14    commissions, correct -- or profitable --

15              (Simultaneously speaking.)                    05:46:20

16              THE DEPONENT:  7.5 percent, it says at

17    the top of the next page.  I'm sorry.

18       Q.   (By Mr. Swanson)  You mean where the --

19    sorry.

20              Go ahead.                                     05:46:25

21       A.   Oh, you know, higher math.  I thought you

22    just said at the top of the next page it says

23    Google charged 30 percent.

24              I mean, I think that's their top rate.

25    But their lowest rate is 7-1/2 percent.                05:46:33
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   Right.                                    05:46:37

2        A.   So for the purposes of this, we're just

3    saying it is plausible to charge less than

4    15 percent.  That's the fact that is relevant to

5    this point.                                        05:46:43

6        Q.   Well, is the fact that Google and Samsung

7    and Microsoft have all for many, many, many years

8    charged 30 percent make it plausible that Apple

9    would charge 30 percent in the but-for world?

10       A.   Well, as I detail in the appendix, I      05:46:57

11   think the trouble is that the Android market is not

12   a good yardstick for that because it has

13   anticompetitively constrained itself through

14   different ways that -- and I think the commission

15   rates there would also be lower in the but-for     05:47:14

16   world, if they didn't use those anticompetitive

17   constraints.

18            So you can't use a yardstick that is

19   itself tainted by anticompetitive conduct.

20       Q.   Well, do you agree that the Samsung       05:47:29

21   Galaxy Store charges a default 30 percent

22   commission rate?

23       A.   I believe so.  As I say here, sometimes

24   they charge less.  So they -- they do vary.  And

25   Samsung has been willing to basically individually 05:47:41
```

Page 268

1    negotiate, unlike Apple.                          05:47:45

2        Q.   Well, how many developers can you point

3    to who Samsung Galaxy Store has been willing to

4    individually negotiate with?

5        A.   I -- I can't -- as I sit here today, I    05:48:00

6    know this example because it's right in front of

7    me.  But I don't know the other example.

8             But clearly this indicates that at least

9    one example of individual negotiation, based upon

10   the app where the evidence shows that Apple never   05:48:11

11   did that, only negotiate -- only set different

12   tiers based upon, you know, the -- certain

13   categorical approaches.  But never -- never by

14   individually negotiating with a particular

15   developer.                                          05:48:28

16       Q.   Well, are you testifying that you're

17   aware of a second developer that Samsung has

18   negotiated a lower rate than 30 percent with?

19       A.   I -- I can't recall right now.  I -- I

20   thought there was more than one example.  But there  05:48:40

21   is at least this one example, which my refreshed --

22   recollection is refreshed by seeing it right in

23   front of me.  But I'd have to look through and see

24   if I can find another one.  I can't recall right

25   now.                                                05:48:54

Page 269

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   You note here in paragraph 384 that        05:48:56

2   "Developers who use the Humble Bundle widget to

3   sell games effectively pay a 10% commission" rate.

4           Do you see that?

5        A.   Yes.                                        05:49:08

6        Q.   What is the Humble Bundle widget?

7        A.   I don't recall exactly what this --

8   particular characteristics of that are.  I was just

9   looking at it to see -- well, what if somebody was

10  charging a commission lower than 10 percent.  But     05:49:29

11  I -- I don't know what's distinctive about the --

12  their distribution.

13       Q.   When did the Humble Bundle widget first

14  become available?

15       A.   I'm -- I'm not sure.                        05:49:42

16       Q.   Are you aware that developers with total

17  billings below $250 receive nothing out of their

18  earnings from app sales from the Humble Bundle

19  widget?

20           MR. LOPEZ:  Objection.                       05:50:01

21           THE DEPONENT:  I'm not aware of that, no.

22       Q.   (By Mr. Swanson)  Do you know how many

23  developers in the class have made $250 or less in

24  sales of their apps or in-app products?

25       A.   I -- I don't know -- have that statistic    05:50:16
```

Page 270

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    in -- in my -- I -- I would have to look up that in      05:50:18

 2    the data to calculate that statistic.

 3         Q.   You've -- you've looked at the data,

 4    though.

 5              You -- you know that's a substantial           05:50:27

 6    proportion, don't you?

 7         A.   I know that a --

 8              MR. LOPEZ:  Objection.

 9              THE DEPONENT:  -- lot of the class

10    members don't sell that much in apps.  But what the      05:50:37

11    exact quantity is, I -- I do not recall.

12         Q.   (By Mr. Swanson)  Now, I don't want to

13    refer to the number at the top of page 197, since I

14    believe that is confidential.  We have some folks

15    who are not entitled to learn that.                      05:50:59

16              But referring to that part of your

17    report, do you know how many developers that

18    particular level applies to?

19         A.   I don't.

20         Q.   Do you know how many commission tiers         05:51:26

21    Google has?

22         A.   I can't recall, as I sit here today.

23         Q.   Is it more than two?

24         A.   I don't know.  I'm -- I'm not sure.

25         Q.   Would you expect that Google would be          05:51:42
```

Page 271

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    like Apple in only having two commission tiers?        05:51:44

2            MR. LOPEZ:  Objection.

3            THE DEPONENT:  I -- I don't know.  I have

4    not -- I don't recall what their commission tiers

5    were.  And I don't have any particular expectation     05:51:58

6    about what they would be.

7        Q.  (By Mr. Swanson)  Well, it's your opinion

8    that it is profit-maximizing for Apple to have two

9    tiers in the actual world and in the but-for world,

10   correct?                                               05:52:09

11       A.   Yes.

12       Q.   Is there some reason why you would expect

13   that Google would have a different number of

14   commission tiers?

15           MR. LOPEZ:  Object to the form.             05:52:21

16           THE DEPONENT:  Well, I -- Apple -- for

17   Apple, I've investigated and they have a very

18   consistent policy based upon particular grounds and

19   so the -- and I conclude there's nothing about the

20   but-for world which would result in those basic     05:52:33

21   policy decisions being different.  I haven't

22   investigated the same thing in Google Play Store.

23   So I wouldn't venture an opinion about it.

24       Q.  (By Mr. Swanson)  Are you familiar with

25   the Discord store?                                  05:52:49

                                                         Page 272

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   The Discord store?                      05:52:54

 2        Q.   Yes.

 3        A.   I don't think so.

 4             How are you spelling that?

 5        Q.   D-I-S-C-O-R-D.                           05:53:01

 6        A.   No, I'm not -- I don't think so.

 7        Q.   Have you heard of that before?

 8        A.   Not that I can recall.

 9             MR. SWANSON:  Okay.  Have -- well, are we

10   at an hour at this point?                          05:53:17

11             Mr. Lopez is my reliable timekeeper.

12             MR. LOPEZ:  Not quite.  But if you want

13   to take a break now, I think we're probably nearing

14   about six hours total.

15             MR. SWANSON:  Okay.  Yeah.  That would be  05:53:28

16   a -- that would actually be a decent time to take a

17   break.

18             THE VIDEOGRAPHER:  So we are going off

19   the record at 5:53 p.m.  This is the end of

20   media 6.                                           05:53:35

21             (Recess taken.)

22             THE VIDEOGRAPHER:  We are back on the

23   record at 6:06 p.m.

24             This is the beginning of media 7 in the

25   deposition of Einer Elhauge.                       06:06:35
```

Page 273

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Q.   (By Mr. Swanson)  Professor, do you agree       06:06:39

2    that as a matter of antitrust economics a company

3    should generally not be required to assist its

4    competitors?

5         MR. LOPEZ:  Objection to form.               06:06:48

6         Also calls for a legal conclusion.

7         THE DEPONENT:  I -- I think -- I don't

8    know.  I can't recall any -- it does sound like

9    more of a legal question than an antitrust

10   economics question that it should be required to do   06:07:05

11   something.

12        I think -- I think what antitrust

13   economics could tell you is what the effects would

14   be of certain kinds of requirements and so -- and a

15   lot may turn on what you're defining as assistance.   06:07:17

16   Like is not cutting somebody off from supply

17   assisting them.

18        So I think I need to know more -- more

19   clarification about your question to be able to

20   answer it and -- and -- and what normative premises   06:07:37

21   are in your word "should" in that sentence as well.

22        Q.   (By Mr. Swanson)  Well, what -- what are

23   the requirements for concluding, as a matter of

24   antitrust economics, that it would be welfare

25   improving for a firm to assist a rival?              06:07:54

Page 274

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   What are you defining "assistance" to be        06:07:59

 2   to a rival?

 3        Q.   Can you answer the question generally?

 4        A.   I --

 5             MR. LOPEZ:  Object to form.                      06:08:07

 6             THE DEPONENT:  Not without clarification

 7   of what "assistance" means.  It's such a vague

 8   term.

 9             If assistance includes not charging

10   predatory prices to them or, you know, as you             06:08:15

11   earlier suggested, it's -- it's assistance to

12   license IP to somebody without exclusionary

13   conditions, then I have a very different answer

14   than if the assistance is instead, you know,

15   sending people checks, or something like that.            06:08:30

16             So I think without clarification what

17   "assistance" means, I can't really answer your

18   question.

19        Q.   (By Mr. Swanson)  Well, what other

20   requirements for concluding, as a matter of              06:08:43

21   antitrust economics, that it would be welfare

22   enhancing for a firm to license intellectual

23   property to a rival?

24        A.   Okay.  So that's a particular conduct

25   and -- say the first part of the question.                06:08:56
```

Page 275

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1              MR. SWANSON:  Let's have the            06:09:01

2    court reporter read it back.  I'm getting a little

3    tired of rereading questions.

4              (Record read as follows:

5              "QUESTION:  Well, what other             06:09:28

6              requirements for concluding, as a

7              matter of antitrust economics, that

8              it would be welfare enhancing for a

9              firm to license intellectual property

10             to a rival?")                            06:09:28

11             MR. LOPEZ:  Object to the form.

12             THE DEPONENT:  I -- I didn't understand

13   that question.

14             So what other matters would conclude the

15   matter to -- I -- I have some conduct, but I don't  06:09:34

16   really have a -- I don't understand what the

17   question is about that conduct.

18        Q.   (By Mr. Swanson)  Then I will reread it.

19             What are the requirements for concluding,

20   as a matter of antitrust economics, that it would   06:09:45

21   be welfare enhancing for a firm to license

22   intellectual property to a rival?

23             MR. LOPEZ:  Objection.

24             THE DEPONENT:  Whether it would be

25   welfare enhancing.                                  06:09:58
```

Page 276

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              Well -- I mean, if we're limiting it to        06:10:00
 2    that, the -- the effects of licensing a rival's
 3    intellectual property would almost always
 4    be welfare enhancing because you're disseminating
 5    on intellectual property and, thus, allowing more      06:10:14
 6    competition for it.
 7              So, you know, there's ex ante effects of
 8    not having protections might be problematic, but it
 9    would always be welfare enhancing, once
10    intellectual property exists, to have it licensed.     06:10:29
11       Q.   (By Mr. Swanson)  Are you familiar with
12    the DOJ, FTC intellectual property guidelines?
13       A.   Yes.
14       Q.   And are you familiar with the guidelines
15    principle that the agencies ordinarily will not        06:10:44
16    require the owner of intellectual property to
17    create competition in its own technology?
18       A.   I don't remember that particular phrase,
19    but I understand the -- the -- the policy stated,
20    yeah.                                                  06:11:04
21       Q.   As an economist, do you agree with that
22    policy?
23              MR. LOPEZ:  Objection.
24              THE DEPONENT:  I think the intellectual
25    property right is correctly defined.  Then, yes,       06:11:15
```

Page 277

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    the whole point is to give extra returns from the          06:11:19

2    intellectual property in order to incentivize the

3    creation -- the ex ante creation of the

4    intellectual property.

5            So there shouldn't be a general                    06:11:34

6    obligation to use your IP rights to create

7    competition, but that's very different from saying

8    that you have a -- that the greater power to set a

9    price or -- nondiscriminatory price for your IP

10   includes the lesser power to condition it on           06:11:50

11   exclusivity constraints that eliminate competition

12   in related markets.

13       Q.   (By Mr. Swanson)  Is it your opinion that

14   a would-be iOS distributor could compete with

15   Apple absent access to Apple's intellectual          06:12:07

16   property?

17           MR. LOPEZ:  Objection.

18           THE DEPONENT:  I -- I don't have any --

19   we've already talked about I don't have any opinion

20   about the scope of other intellectual property.      06:12:17

21           I think it's a -- whatever the mech- --

22   the technical mechanism is, Apple is able to

23   condition access to its iOS devices -- developer

24   access to iOS devices on them satisfying these

25   exclusionary constraints.                              06:12:41

                                                    Page 278

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              Whether it involves the exercise of        06:12:41

 2      intellectual property or not wouldn't alter any of

 3      my conclusions about that.

 4          Q.   (By Mr. Swanson)  You're not assuming

 5      that any of Apple's intellectual property rights    06:12:55

 6      related to iOS or the iPhone or the app store

 7      are invalid, are you?

 8          A.   I am not making the assumption about

 9      that, no.

10          Q.   In your but-for world, you indicate that   06:13:16

11      Apple could still determine, through App Review,

12      which apps to approve to run iOS, but any

13      approved app could be distributed by other app

14      distributors as well; is that a fair statement?

15          A.   Yes.                                       06:13:34

16          Q.   Is it your opinion that in the but-for

17      world, Apple could require that all iOS apps go

18      through Apple's App Review process before

19      distribution by any channel?

20          A.   Yes.                                       06:13:48

21          Q.   Okay.  And in the but-for world, in your

22      opinion, if that were the case, would Apple charge

23      for reviewing apps distributed through stores,

24      other than the app store?

25              MR. LOPEZ:  Objection.                      06:14:03
```

Page 279

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  No.  I think the -- the       06:14:05

 2    App Review is to whether or not to approve it to

 3    run on the iOS.  It's not specific to the

 4    distribution.

 5         Q.   (By Mr. Swanson)  Well, in the but-for       06:14:15

 6    world, some apps would run on iOS after being

 7    distributed through Apple's App Store.  Some would

 8    run after being distributed through a nonApple

 9    channel, correct?

10         A.   Yeah.  But the App Review in the but-for     06:14:32

11    world would simply be for whether or not the app

12    was approved to run iOS.  It's not whether it's

13    approved for distribution.  It's just it can't run

14    without approval by the App Review.

15         Q.   And --                                       06:14:44

16         A.   So that -- that approval would apply --

17    the whole point is it would -- the approval would

18    be neutral to the method of distribution.

19         Q.   And so would Apple review apps in the

20    same way that it does today in the but-for world?      06:14:59

21              MR. LOPEZ:  Object to the form.

22              THE DEPONENT:  It -- it could.  I think

23    if that's the most efficient way of reviewing apps,

24    it could do so, with the exception that right now

25    the App Review includes review to make sure that      06:15:13
```

                                                  Page 280

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    the exclusionary restraints are being complied          06:15:18

2    with.

3              So they could no longer say we're not

4    going to approve your app because you're not

5    exclusively distributing to us, not exclusively          06:15:26

6    allowing us to do the IAP transactions.

7        Q.   (By Mr. Swanson)  So if Apple were to

8    disapprove an app because it did not comply with

9    Apple's privacy guidelines, would it be, in your

10   view, possible for Apple in the but-for world to          06:15:46

11   reject that app even though the -- the developer

12   wished to have it distributed through a Google

13   iOS App Store which does not respect those privacy

14   rights?

15       A.   Yeah.  And I think the -- the App Review          06:16:03

16   would be about protecting the iOS device in the

17   environment -- iOS device environment.  It's not

18   about the -- the distribution is how you get onto

19   it, but it would be neutral as to the method of

20   distribution.                                            06:16:20

21             So as long as it's the same privacy

22   principle being applied to all apps, regardless of

23   how they're distributed, then I think that is

24   neutral and would be a much better fit with their

25   alleged procompetitive justification of maintaining          06:16:37

Page 281

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    a walled garden to preserve the quality of the        06:16:40

 2    experience of using the iOS device.

 3         Q.   So if Apple, through App Review, in that

 4    neutral sense that you've described, was to

 5    effectively establish standards for what apps could   06:17:02

 6    do with respect to privacy, in your opinion, would

 7    Apple be able to prevent sideloading of apps that

 8    did not comply with those privacy policies?

 9         A.   Yeah.  I think it would be a lot like

10    what they already do now with macOS, where they       06:17:20

11    allow competing distributors and self-distribution.

12    But you still need to get approved to run on the

13    operating system.

14         Q.   Well, it's your understanding that Apple

15    reviews apps for privacy issues on macOS?             06:17:33

16         A.   Well, I don't know what they review them

17    for, but they review them.  They've -- they have a

18    quality review, and I think they could review for

19    privacy if they wanted.

20              Let me see if my paragraph details...        06:17:47

21              So they -- well, they -- they scan the

22    apps for malicious content.  Whether malicious

23    content is defined to include breaches of privacy,

24    I don't know.  I'd have to investigate that

25    further.  But it certainly could, if they wanted      06:18:10
```

Page 282

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    to.                                                 06:18:13

 2             So all I'm saying is they have a method

 3    to review apps for running on an OS, and it is

 4    independent of whether there's exclusive

 5    distribution.  So it's clearly possible to separate  06:18:23

 6    out the two.

 7        Q.   Is -- is it -- well, first of all, is it

 8    your understanding on the Mac with macOS that Apple

 9    reviews all macOS apps for -- for bugs?

10             MR. LOPEZ:  Object to the form.            06:18:46

11             THE DEPONENT:  I don't know what their --

12    all the stuff they're reviewing for.  The stuff I

13    have quoted is -- the only specific example I cite

14    here is malicious content.

15             And as I said, I don't know exactly how    06:19:03

16    they're defining malicious content, whether that

17    would include bugs or not.  And the -- so I -- I

18    don't know whether the mechanical automatic part of

19    the review that they use is different from that on

20    the App Store App Review, but it certainly could be  06:19:24

21    the same.  There's no obstacle to it.

22        Q.   (By Mr. Swanson)  If in the but-for

23    world, Apple was reviewing apps for all apps that

24    would be available for distribution, whether or not

25    through the Apple App Store, in your view, could     06:19:47
```

Page 283

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    Apple impose a neutral fee for that, that applied      06:19:52

2    to every app?

3         A.   I think so.  And I think -- I mean, they

4    already do have this -- the flat fee part that they

5    charge the developers.                                  06:20:06

6              So I -- I think to the extent, you know,

7    they're -- they're trying to compensate for

8    App Review costs, maybe they could charge a

9    separate price for that in the but-for world,

10   although I guess I'd have to look more what -- what     06:20:22

11   do competitive markets do.

12             Like in the macOS market, I don't think

13   that they charge for the App Review there and

14   instead they profit by being able to charge more

15   for the operating system for their devices because      06:20:38

16   they're safer and sounder.

17             So I guess I'm not -- I'm not sure that

18   App Review would be something that would be

19   separately charged for in the but-for world or not.

20        Q.   In the but-for world, would iOS devices       06:20:54

21   cost less than in the actual world or cost more?

22             Do you have an opinion?

23        A.   What's that?

24        Q.   In the but-for world, would there be any

25   change in the price of Apple iPhones and iPads          06:21:09
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    compared to the actual world?                    06:21:14

 2           MR. LOPEZ:  Objection.

 3           THE DEPONENT:  I don't -- I don't believe

 4    so, no.

 5       Q.   (By Mr. Swanson)  So you're not assuming  06:21:21

 6    in the but-for world that Apple would recoup any

 7    additional costs by raising the price of iOS

 8    devices?

 9       A.   No.  I -- I don't see what the additional

10    cost would be.  They're -- that's   they're       06:21:37

11    already doing the App Review now.  It would be

12    somewhat less costly.  They would no longer have to

13    review apps for compliance with these exclusivity

14    restraints.  So that would actually lower the

15    implementation costs; they wouldn't increase them. 06:21:51

16       Q.   But your opinion is that Apple would make

17    a great deal less in profits in the but-for world,

18    correct?

19       A.   Well, it would make less profits on the

20    App Store, yes.                                    06:22:08

21       Q.   Okay.

22    ████ ████████████████████████████████████████████

23    ████████████████████

24       Q.   And -- and you're assuming that there

25    will be no increase in device price in the but-for  06:22:16
```

Page 285

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    world, correct?                                    06:22:20

 2        A.    I don't think there would be.  None of my

 3    analysis depends upon an assumption that there

 4    would be no in- -- change in price.

 5        Q.    So in -- in your but-for world, Apple's    06:22:30

 6    reduction in profits in the App Store is a

 7    reduction to the entire company's profitability,

 8    correct?

 9            MR. LOPEZ:  Objection.

10            THE DEPONENT:  Well, I mean, it's a          06:22:44

11    reduction in profits.  And the company is one

12    entity, but it's -- it's a reduction in profits

13    from its App Store.

14        Q.    (By Mr. Swanson)  Well, you're not

15    claiming that Apple would have any other way to      06:22:54

16    recoup reduced profits in the but-for world, are

17    you?

18        A.    I -- I don't know why you're assuming

19    some right to recoup anticompetitive -- lost

20    anticompetitive profits. I just -- any --            06:23:08

21        Q.    I'm -- I'm asking you -- I'm asking you a

22    factual, or at least a hypothetical question, about

23    a but-for world that you've constructed.

24            So if you can answer it, fine.

25        A.    Well --                                    06:23:21
```

                                                    Page 286

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    But if you can't, that's fine, too. | 06:23:21 |
| 2 | A.    Well, you're using the word "recoup," | |
| 3 | though -- | |
| 4 | Q.    Okay. | |
| 5 | A.    -- which implies some -- I -- I don't | 06:23:27 |
| 6 | know.  There's no recoupment.  There's just they | |
| 7 | wouldn't make anticompetitive profits.  That's the | |
| 8 | whole point of banning anticompetitive conduct. | |
| 9 | Q.    Well, if you're bothered by the term | |
| 10 | "recoupment," I can certainly use a neutral -- an | 06:23:37 |
| 11 | equivalent term. | |
| 12 |         In your opinion, is there any other means | |
| 13 | that Apple could pursue in your but-for world to | |
| 14 | earn some or all of the reduced profits in the | |
| 15 | App Store that would accrue in the but-for world | 06:24:03 |
| 16 | compared to the actual world? | |
| 17 |         MR. LOPEZ:  Objection. | |
| 18 |         THE DEPONENT:  No, I -- I don't think so. | |
| 19 | They'd -- they'd lose the anticompetitive profits. | |
| 20 | You can't just make that up.  In the other markets, | 06:24:14 |
| 21 | they have whatever profits they have, given their | |
| 22 | level of market competition that they operate in. | |
| 23 |         And as I note in my report, this -- the | |
| 24 | App Review cost is like ███ percent of their | |
| 25 | marginal profits.  So it's not like this -- the -- | 06:24:30 |

Page 287

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    that the -- that the -- the process of App Review        06:24:37

 2    is really depending upon all these profits from the

 3    App Store.

 4         Q.   (By Mr. Swanson)  In -- in -- in your

 5    opinion, would there be more output in the but-for        06:24:43

 6    world?

 7         A.   Yes.  I think that with lower commissions

 8    there would be more investments in apps and, thus,

 9    a greater quantity of apps made and distributed in

10    the iOS app market.                                       06:25:10

11         Q.   And -- and in your but-for world, Apple

12    would be reviewing that greater quantity of apps?

13         A.   Yes.  And as I said, they could continue

14    to charge $99 a year they already charge.  And this

15    human review process is about 6 to 12 minutes an         06:25:32

16    app, so I don't -- I -- I don't see that as a

17    difficulty.

18         Q.   Do you agree that there is no way to know

19    which specific companies would have entered the

20    iOS app distribution market by launching app             06:25:45

21    stores in the but-for world?

22         A.   I think we can make judgments about

23    what's likely, and I identify who I think are the

24    five most likely -- that are five likely candidates

25    to have done so.                                          06:26:01
```

Page 288

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              But, yeah, you can't be absolutely        06:26:02

 2    certain about what would have happened in the

 3    but-for world because you can't directly observe it

 4    in the same kind of way you can observe, you know,

 5    actual life.                                         06:26:14

 6        Q.   You indicate in your report that Epic,

 7    Google, Amazon and Valve would be the most likely

 8    to enter the iOS app distribution market in the

 9    but-for world; is that correct?

10        A.   Yeah.  And I think -- Cydia, I think, was   06:26:30

11    the other one I mentioned.

12              Let's see.

13        Q.   Would Cydia enter distribution of iOS

14    apps in a world where Apple reviews all apps?

15        A.   Sure.  I don't know why not.               06:26:51

16        Q.   Well, isn't Cydia's business model to

17    carry a wide variety of apps that do not meet Apple

18    standards?

19        A.    Well, they wouldn't be able to sell those

20    apps if they don't meet Apple standards.  I -- and  06:27:07

21    I don't know if that's -- what would be their -- I

22    don't know if that's accurate.

23              But also, in the but-for world, it would

24    be a very different situation.  In -- in the actual

25    world, they're restrained.  And the only way for    06:27:19
```

Page 289

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    them to distribute at all is on jailbroken phones,        06:27:20

 2    iPhones.

 3            So that, I think, forces them into a

 4    certain kind of app distribution.  But in the

 5    but-for world, they'd be free to pick apps that           06:27:33

 6    didn't have any problems and that met App Review.

 7        Q.   Do -- do you know if Cydia ever reached

 8    out to Apple to ask for the ability to operate an

 9    iOS App Store?

10        A.   I don't know that they ever did, no.            06:27:55

11        Q.   Do you know if Google ever made such a

12    request of Apple?

13        A.   No, I don't know if they ever made such a

14    request.

15        Q.   When do you think Google would have done        06:28:08

16    so in the but-for world?

17            MR. LOPEZ:  Objection.

18            THE DEPONENT:  Well, in a but-for world,

19    they wouldn't have to ask for permission.  It would

20    be an unforeclosed market.                                06:28:15

21        Q.   (By Mr. Swanson)  Well, this goes back to

22    something we talked about before.

23            But are you assuming that a distributor

24    of iOS apps can just sashay into that -- that

25    business without obtaining any type of license from       06:28:32
```

Page 290

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   Apple first?                                          06:28:34

 2       A.   Well, I mean, I think if they're going to

 3   do it on the iOS device itself, they're going to

 4   need an app on that device.  So that's going to

 5   have to get approved.                                 06:28:44

 6            But if they're distributing it outside of

 7   the iOS device, no, they wouldn't need that.  They

 8   would just distribute it outside the iOS device

 9   and it could be copied and ported over into the

10   iOS device.                                           06:28:57

11       Q.   And how -- how does the store sell -- is

12   it your assumption that in the but-for world

13   developers would put stores within the App Store?

14       A.   Stores within the App Store?

15       Q.   Yes.                                         06:29:16

16       A.   Yeah.  So if it's an app, I guess you

17   need some way to get it on.  At first -- as with

18   the -- there was only -- the -- only App Store

19   comes with it right now.

20            So at first, you'd have -- to get there,     06:29:27

21   you'd have to get an app -- yes.  Oh, maybe you

22   could bring it -- well, you might be able to get it

23   through a website, say, and then download it from

24   there without going to the App Store.

25            And maybe even on the -- a website           06:29:43
```

Page 291

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    through Safari, I suppose, and just allow            06:29:45

 2    installation in that way.  But, you know, Apple

 3    would have to allow that.

 4         Q.   Well, are -- are you assuming -- so

 5    are -- you are assuming that in the but-for world    06:29:58

 6    one of the five most likely iOS app stores would

 7    be stores that are distributed through the

 8    App Store?

 9         A.   I didn't reach a particular opinion about

10    how exactly the app for the distributor would be     06:30:19

11    distributed.  But I -- I do think that it would

12    have been five entrants into the market, and then I

13    identified the five likely entrants.

14         Q.   You think it would not be the case in

15    the but-for world that Apple could reject stores     06:30:41

16    within its store?

17         A.   I think it would have to do so on some

18    neutral principle.  So if it is the case that there

19    is some app -- an app for an App Store itself, a

20    rival app store that is violating privacy or has     06:30:54

21    malicious content, or is very buggy in some way

22    that -- that makes their device break down, I think

23    they could reject that under App Review, as with

24    any app.

25              But if they're rejecting it on the basis   06:31:09
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | of they don't like competition from a rival | 06:31:09 |
| 2 | App Store, then that would be a violation because | |
| 3 | that would be just a de facto exclusivity | |
| 4 | restraint. | |
| 5 | Q.  Do you know whether Epic made a request | 06:31:28 |
| 6 | of Apple to be a store within the App Store or a | |
| 7 | store outside the App Store? | |
| 8 | For both or neither. | |
| 9 | A.  I'm not sure. | |
| 10 | Q.  Do you know if Amazon has ever made a | 06:31:51 |
| 11 | request to Apple to operate an iOS App Store? | |
| 12 | A.  I don't know if they ever made a request | |
| 13 | to Apple, no. | |
| 14 | But the policy of Apple is very | |
| 15 | well-known, though.  So I -- I wouldn't expect | 06:32:03 |
| 16 | people to make futile requests. | |
| 17 | Q.  Your opinion is that Apple's policy is | |
| 18 | anticompetitive conduct? | |
| 19 | MR. LOPEZ:  Objection. | |
| 20 | THE DEPONENT:  Well, which policy are you | 06:32:21 |
| 21 | talking about? | |
| 22 | Q.  (By Mr. Swanson)  Policy of not having | |
| 23 | app stores within the App Store, for example. | |
| 24 | A.  No, I'm saying it's -- it's exclusivity | |
| 25 | restraints.  All the exclusivity restraints I | 06:32:28 |

Page 293

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    describe are anticompetitive.  And they're          06:32:32

 2    well-known that Apple has a policy of imposing

 3    those exclusivity restraints that it feels it

 4    should have -- be the only app distributor of iOS

 5    apps.                                               06:32:44

 6         Q.   Has Valve ever made a request to Apple to

 7    operate an iOS App Store?

 8         A.   I'm -- I'm not sure.  But, again, I think

 9    everybody would know it would be futile to ask.

10    You'd have to -- you know, unless you're going to   06:32:58

11    sue to try to break it open and change their

12    exclusivity restraints, they've already got very

13    firm restraints against such a possibility.

14         Q.   Let me ask you some questions about your

15    appendix A, which I believe starts at page 224.     06:33:17

16         Actually, why don't we start at page 228,

17    paragraph 453.

18         Let me know when you're there.

19         A.   Okay.

20         Q.   Okay.  You indicate here that "Google       06:33:55

21    anticompetitively restrained competition in the

22    domestic Android app distribution market."

23         You're aware that Google is a member of

24    the class in this case?

25         A.   I -- I haven't checked that out.  If it     06:34:16
```

                                                     Page 294

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    sells an app for which it charges a fee, it would        06:34:18

2    be.  I can't offhand think of such an app.  But if

3    so, they would be part of the class, yeah.

4         MR. LOPEZ:  Calls for a legal conclusion.

5    Objection.                                               06:34:33

6         Q.  (By Mr. Swanson)  Isn't it a fact that

7    Google, if not the largest class member, is one of

8    the top two or three?

9         A.  I'm unaware of evidence to support that

10   statement.                                               06:34:49

11        MR. LOPEZ:  Objection.

12        Q.  (By Mr. Swanson)  Is it your opinion that

13   Google has been injured by Apple's alleged conduct?

14        A.  Yeah.  I mean -- well, if they are in the

15   class, yes.                                              06:35:01

16        Q.  And I apologize.  I think I asked you

17   this earlier.

18        But are you aware that Google has been

19   sued by Pure Sweat for monopolizing Android app

20   distribution market?                                     06:35:22

21        I can't remember -- I know I asked.  I

22   can't remember.  You said you didn't know or you

23   didn't --

24        A.  I'm not -- I don't know.

25        Q.  Okay.  Do you agree that the Android app      06:35:29

                                                    Page 295

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    distribution market is similar to the iOS app          06:35:36

 2    distribution market?

 3              MR. LOPEZ:  Object to the form.

 4              THE DEPONENT:  It's got some

 5    similarities, but a lot of differences as well.        06:35:42

 6         Q.   (By Mr. Swanson)  Is it your opinion that

 7    the domestic Android app distribution market is

 8    more competitive than the domestic iOS app

 9    distribution market?

10              MR. LOPEZ:  Objection.                        06:35:56

11              THE DEPONENT:  So the question was,

12    domestic Android app distribution compared to

13    distribution iOS app distribution?

14         Q.   (By Mr. Swanson)  Uh-huh.

15         A.   It's a more competitive -- I don't --        06:36:05

16    it's different.  It's got different anticompetitive

17    constraints.  It does -- it does allow multiple app

18    distributors.  But then it's got a lot of

19    anticompetitive restraints to prevent competition

20    between them.                                          06:36:21

21              So I don't know.  I would say -- I would

22    say it's a different mix of -- of them.  And I

23    suppose it's -- it's less absolute than the

24    exclusivity restraints imposed by Apple.

25         Q.   Would you say it is slightly more            06:36:38
```

Page 296

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    competitive than the domestic iOS app distribution          06:36:41

2    market?

3         A.   I -- I don't know.  I mean, it's very

4    anticompetitive, but it's maybe slightly.  There

5    is -- there is at least some rivals.  Whereas,          06:36:53

6    you know, Apple has effec- -- effectively

7    foreclosed 100 percent of the market.  So I guess

8    it is a -- a slight difference.

9         Q.   I take it that you have not evaluated

10   whether the Android app distribution market in          06:37:22

11   China is tainted by anticompetitive conduct?

12        A.   I haven't investigated the market in

13   China, no.

14        Q.   Okay.  And you don't know whether that

15   market is similar to the iOS app distribution          06:37:36

16   market?

17        A.   I -- since I haven't investigated it, I

18   wouldn't know.

19        Q.   Okay.  In -- in your view, is the

20   domestic Android app distribution market less          06:37:50

21   similar to the iOS app distribution market than

22   either the Windows or macOS app distribution

23   markets?

24             MR. LOPEZ:  Objection.

25             THE DEPONENT:  Okay.  Say that all again.          06:38:02

                                                        Page 297

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    That was quite a compound --                          06:38:02

2         Q.   (By Mr. Swanson)  I know -- I know you're

3    good at math and logic.

4         A.   Yeah.

5         Q.   In your view, is the domestic Android app    06:38:10

6    distribution market less similar to the iOS app

7    distribution market than either the Windows or the

8    macOS app distribution markets?

9              MR. LOPEZ:  Object to form.

10             THE DEPONENT:  No, I don't think it's         06:38:25

11   less.  Is it -- is it less similar.  It is -- no,

12   it's not less similar.  It's more similar.  Because

13   it's more anticompetitive.  It's anticompetitively

14   constrained far more than the Microsoft -- or I

15   mean, the Windows or Mac markets.                       06:38:49

16        Q.   (By Mr. Swanson)  In your opinion, has

17   Samsung engaged in any anticompetitive conduct in

18   the Android app distribution market?

19             MR. LOPEZ:  Objection.

20             THE DEPONENT:  I don't think that I           06:39:02

21   investigated that.

22        Q.   (By Mr. Swanson)  So if you haven't

23   investigated it, you have not, therefore, concluded

24   that Samsung has engaged in any anticompetitive

25   conduct in that market, correct?                        06:39:15

                                                    Page 298

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   Correct.                                    06:39:18

2        Q.   You agree that the Samsung Galaxy Store

3   is available on every Samsung phone sold in the

4   U.S.?

5        A.   Yes.                                         06:39:27

6        Q.   And that was true during the entire class

7   period?

8        A.   I have not specifically investigated

9   that, so I couldn't testify to it.

10       Q.   Do you understand that the -- the           06:39:39

11  Samsung Galaxy Store is preinstalled on the Samsung

12  devices?

13       A.   I believe so, yes.

14       Q.   So Samsung phone users don't need to

15  download the Samsung Galaxy Store, correct?         06:39:49

16            MR. LOPEZ:  Objection.

17            THE DEPONENT:  I believe so, yes.

18       Q.   (By Mr. Swanson)  Do you believe that the

19  Samsung Galaxy Store is not prominently displayed

20  on every Samsung phone -- phone sold in the U.S.?   06:40:02

21            MR. LOPEZ:  Objection.

22            THE DEPONENT:  I -- I haven't

23  investigated prominence of display of the

24  Samsung App Store.  I -- I still focus on various

25  other anticompetitive constraints.                  06:40:22
```

Page 299

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      Q.   (By Mr. Swanson)  Well, are you aware if        06:40:27

2   Samsung has any Google Play Store revenue-sharing

3   agreement with Google?

4      A.   I -- I'm not sure.

5      Q.   Well, do you think Samsung has such an         06:40:41

6   agreement?

7           MR. LOPEZ:  Objection.

8           THE DEPONENT:  I -- I wouldn't want to

9   testify to it without the -- investigating.  I may

10  have covered that in this last section, but I am      06:40:50

11  forgetting, as I sit here today.

12     Q.   (By Mr. Swanson)  Well, I'll tell you, I

13  didn't see any indication there that you have

14  evidence that Samsung has any Google Play Store

15  revenue-sharing agreement with Google.                06:41:04

16          So you tell me if there is, you believe,

17  such evidence.

18     A.   Not that I'm aware of, as I sit here

19  today.

20     Q.   Okay.  And if -- if you had such            06:41:13

21  evidence, you would have put it in your -- in your

22  report, correct?

23     A.   I'm not sure.  I would have had to reach

24  a conclusion about whether it merited conclusion,

25  whether -- how significant it was.  And, you know,    06:41:28

Page 300

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    at some point, in a 249-page report, you do have to        06:41:31

2    leave some things out.  So I'd have to think about

3    what the significance of that would be.

4         Q.   Are you aware if Samsung has any

5    agreement that is -- with Google that is               06:41:43

6    conditioned on Samsung not preinstalling rival

7    Android app stores?

8         A.   Am I aware?

9              I'm sorry.  I do -- I do not track that.

10        Q.   Are you aware of any agreement that         06:42:02

11   Samsung has with Google that is conditioned on

12   Samsung not preinstalling rival Android app stores?

13        A.   Ahh.  I don't know.  I have a section on

14   them reaching agreements with various smartphone

15   makers.  It does not specify the names of them,       06:42:44

16   though, in paragraph 453.  So whether one of them

17   was Samsung or not, I'm not sure.

18        Q.   Well, do you have any evidence of such an

19   agreement with Samsung?

20        A.   I -- I don't know.  I'd have to look at     06:42:59

21   the sources to see whether they name the

22   manufacturers and whether any of them are Samsung.

23        Q.   Well, were you trying to convey that

24   Google has such an agreement with Samsung here?

25        A.   I -- no, it doesn't say that one way or     06:43:15

Page 301

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    the other.  It just says they enter agreements with        06:43:20

2    OEMs that make smartphones to exclude rival Android

3    app distributors.

4          Q.   And which paragraph?

5          A.   It's paragraph 453.                              06:43:32

6          Q.   Well, what -- what -- so you -- you

7    don't -- do you know what evidence you're referring

8    to here?

9          A.   I would have to look back at these

10   footnotes and look at the -- the sources.  I just          06:43:49

11   don't recall, as I sit here today, what -- what

12   OEMs these particular documents referenced.

13         Q.   Well, what about the top of page 229,

14   doesn't that list the OEMs that you're talking

15   about?                                                      06:44:04

16         A.   It lists -- that -- that sentence just

17   lists the ones that are -- were alleged by Epic,

18   and it says it's consistent with that.  It doesn't

19   say that they are an exclusive list of every OEM

20   that reached such an agreement with Google.                 06:44:20

21         Q.   Okay.  Well, as you sit here, are you

22   contending that Google and Samsung have such an

23   agreement with respect to preinstallation?

24              MR. LOPEZ:  Objection.

25              THE DEPONENT:  Preinstallation of rival          06:44:36

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Android apps, not -- not of Samsung, right?                06:44:38

2        Q.   (By Mr. Swanson)  Correct.

3        A.   Yeah.  I -- I'm not sure.  And I -- and I

4    guess if you look at these sources, you would find

5    out, but -- whether they included Samsung or not,        06:44:45

6    but I -- I can't recall that, as I sit here today.

7        Q.   Do warnings in Google's Chrome browser

8    against installing APK files prevent Samsung users

9    from downloading apps from the

10   Samsung Galaxy Store?                                     06:45:09

11       A.   No.  I think this only applies for app

12   distributors who are not preinstalled.

13       Q.   Okay.  In paragraph 459, you talk about

14   the steps necessary to install an Android app from

15   a source other than a preinstalled Android app           06:45:40

16   distributor.

17            So these are not steps that apply to apps

18   downloaded from the Samsung Galaxy Store, correct?

19       A.   Correct.

20       Q.   Do you -- do you have an Android phone?          06:46:04

21       A.   I do not.

22       Q.   Do you have an iPhone?

23       A.   Yes.

24       Q.   Have you ever had a Samsung phone?

25       A.   No.                                              06:46:18

                                                         Page 303

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Q.   Have you investigated the extent to which    06:46:21

2  Samsung phone users in the United States are aware

3  that they can download apps from a

4  Samsung Galaxy Store?

5    A.   I have not investigated their awareness.    06:46:37

6    Q.   Why do you think that Samsung Galaxy

7  phone user -- I'm sorry -- Samsung phone users do

8  not download more apps from the Samsung

9  Galaxy Store?

10         MR. LOPEZ:  Objection.    06:47:00

11         THE DEPONENT:  I am not sure.

12    Q.   (By Mr. Swanson)  Are you offering an

13  opinion that the Samsung Galaxy Store does not

14  compete with Google Play in the U.S. market?

15    A.   No.    06:47:21

16    Q.   Do you have an understanding or opinion

17  as to the average commission rate on the

18  Samsung Galaxy Store?

19    A.   I -- I don't know what the average is,

20  no.    06:47:33

21    Q.   Do you have any basis to conclude that

22  the average commission on the Samsung Galaxy Store

23  is lower than the average commission on Apple's

24  App Store?

25    A.   Can you say that again?    06:47:45

Page 304

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          Q.   Do you have any basis to conclude that        06:47:46

 2     the average commission on the Samsung Galaxy Store

 3     is lower than the average commission on Apple's

 4     App Store?

 5          A.   I   I don't know what the average is so        06:47:58

 6     I haven't -- I haven't -- I don't have the data to

 7     answer   well, I -- I haven't investigated that

 8     issue.  So I can't give you -- testify to an answer

 9     on that.

10          Q.   Okay.  Do you know how many commission         06:48:10

11     tiers Samsung uses in its store?

12          A.   I don't know.

13          Q.   If you could turn to paragraph -- we can

14     move away from appendix A, but back to the body of

15     the report -- page 107, paragraph 205, if you could    06:48:33

16     turn to that.

17          A.   Okay.

18          Q.   Okay.  Let me know when you're there.

19          A.   I'm there.

20          Q.   Okay.  You write here that the enormous       06:48:52

21     profit margins -- "The above enormous profit

22     margins indicate a monopoly power to raise price

23     above competitive"   "above competitive levels

24     regardless of how the market is defined."

25               Is evidence of a defendant's                  06:49:10
```

Page 305

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    profitability outside the relevant market evidence          06:49:12

2    of monopoly power within the relevant market?

3         A.   Well, I think -- not if it's outside,

4    yes.  But here the profits are on the App Store

5    itself.  So I'm saying however you define that            06:49:38

6    market, you can define it more broadly, they must

7    have monopoly power to have such enormous profit

8    margins.

9         Q.   Well, it -- I'm sorry.

10        A.   The accepted method to infer the power --        06:49:50

11   from the power of a price itself without

12   necessarily defining a market and calculating

13   market shares.

14        Q.   Well, if the App Store, contrary to your

15   opinion, competes in multiple relevant markets, how       06:50:03

16   would you determine the store's profitability in

17   each market?

18             MR. LOPEZ:  Objection.

19             THE DEPONENT:  Well, they would -- if you

20   took the incorrect counterfactual that they're           06:50:19

21   competing in the multiple markets that you

22   mentioned, but they have enormous profits, then

23   that would indicate that they must have monopoly

24   power in at least some of those, if not all of

25   them, to explain those high profits.                     06:50:34

                                                           Page 306

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      Q.   (By Mr. Swanson)  Are -- are you familiar          06:50:39

2    with the concept of economic profits?

3      A.   Yes.

4      Q.   How do economics profits differ from

5    accounting profits, as a general matter?                  06:50:49

6      A.   Well, the accountants have their own set

7    of rules for what counts as a cost.  As a matter of

8    economics, I try here to focus much more on what --

9    either marginal costs or a measure that includes

10   recurring fixed costs.  But you -- you can't, for          06:51:04

11   example -- for the economics, you wouldn't be

12   amortizing sunken costs, for example.  Where in

13   accounting, sometimes one does.

14     Q.   Is it your testimony that your opinions

15   based on Apple's profitability are based on                06:51:25

16   economic profits?

17     A.   Yes.

18     Q.   And is it your testimony that you

19   calculated accurately Apple's economic profits?

20     A.   Yes.                                                06:51:42

21     Q.   You indicate that you're relying on

22   several Apple documents showing App Store revenues

23   and costs during the class period.

24          Do you recall that --

25     A.   Yes.                                                06:51:55

                                                        Page 307

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1          Q.    -- in paragraph 202?                        06:51:56

2               Did you review any testimony from the

3     Epic trial about those documents?

4          A.    I believe my staff did.  I myself did not

5     review the testimony in the Epic case about this.    06:52:12

6          Q.    Okay.  So does that mean you are or are

7     not relying on that testimony about those

8     documents?

9          A.    I'm not.  I'm relying on the sources I

10    cite here for the various categories of cost.        06:52:29

11         Q.    Okay.  So do you know how the Apple

12    figures in those documents were calculated?

13         A.    I -- I don't know the methodology that I

14    used to calculate them.  I'm relying here on their

15    own description of what they are.                    06:52:52

16         Q.    Are you familiar with the economic

17    concept of joint costs?

18         A.    Yes.

19         Q.    What's the economic definition of a joint

20    cost?                                                06:53:05

21         A.    It's a cost that helps support the supply

22    of two different products.

23         Q.    Does Apple incur any costs that are joint

24    costs of the App Store and the iOS operating

25    system?                                              06:53:21

                                                    Page 308

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1            MR. LOPEZ:  Objection.                    06:53:22

 2            THE DEPONENT:  I don't think -- I mean,

 3     they might have incurred some.  But I don't think,

 4     as are included here in the categories, I include

 5     for marginal and recurring fixed costs.           06:53:34

 6        Q.   (By Mr. Swanson)  Does Apple incur any

 7     costs that are joint costs of the App Store and the

 8     iPhone business?

 9            MR. LOPEZ:  Objection.

10            THE DEPONENT:  Sorry.  Say that again.      06:53:47

11        Q.   (By Mr. Swanson)  Does Apple incur any

12     costs that are joint costs of the App Store and the

13     iPhone business?

14        A.   Well, this -- it looks like maybe part of

15     these OPEX costs are a mixture of some separate     06:54:07

16     expenses and some overhead expenses, and that they

17     are allocated in proportion to revenue.  But these

18     are the general overhead expenses.  To the extent

19     that's part of it would be a joint cost, I think.

20        Q.   As a matter of economics, is it possible   06:54:28

21     to allocate joint costs other than on an arbitrary

22     basis?

23            MR. LOPEZ:  Objection.

24            THE DEPONENT:  It is.  I mean, it's

25     possible.  And I think to put it in proportion to   06:54:43
```

Page 309

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    revenue is -- is very common.  It is -- it is          06:54:47

 2    difficult sometimes because you could allocate the

 3    cost in a -- a different way.

 4         Q.   (By Mr. Swanson)  Well, as a matter of

 5    economics, is there any way to allo- -- any way to      06:55:05

 6    allocate joint costs that is not arbitrary?

 7              MR. LOPEZ:  Objection.

 8              THE DEPONENT:  I think it may depend on a

 9    particular market and whether you could figure out,

10    if they're operated separately, what sort of costs      06:55:19

11    would be borne.

12              Here, I think none of that affects the

13    marginal cost measure.  But I do assume for the

14    alternative occurring fixed cost measure that it is

15    proportionate to revenue.                               06:55:38

16         Q.   (By Mr. Swanson)  Do you agree that

17    Apple's investments in the iOS operating system

18    and iOS device hardware increase consumer demand

19    for iOS devices?

20              MR. LOPEZ:  Objection.                        06:55:51

21              THE DEPONENT:  Say it again.

22         Q.   (By Mr. Swanson)  Do you agree that

23    Apple's investments in the iOS operating system

24    and iOS device hardware increase consumer demand

25    for iOS devices?                                        06:56:02
```

Page 310

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      A.   Yes.                                          06:56:04

2      Q.   Would you expect an increase in consumer

3   demand for iOS devices to increase or decrease

4   developer demand for iOS app distribution?

5      A.   I would expect it to increase.               06:56:16

6      Q.   In your opinion, are there any economic

7   benefits to Apple of owning the App Store in the

8   sense of economies of scope or scale?

9      A.   Yes, I think there's a lot of economic

10  benefits to owning it.  I mean, just a -- it's a     06:56:39

11  very profitable business.  But also I think there

12  are economies of -- of scale from having such a

13  large App Store.

14     Q.   How about economies of scope?

15     A.   Yeah.  I'd -- I'd have to see more about      06:56:59

16  what the alleged economies of scope would be,

17  what's the other product that you're alleging that

18  they have economies of scope with.

19     Q.   iPhones, iOS devices.

20     A.   I didn't see any evidence of economies of     06:57:12

21  scope there to the contrary, as I conclude.

22  There's no good procompetitive justification for

23  forcing them to be together, which is one of the

24  reasons I conclude that it's a anticompetitive tie

25  to force them to be together.                        06:57:30

                                                 Page 311

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Okay.  In your opinion, are there any         06:57:33

 2   economic benefits to Sony of owning the online

 3   PlayStation store?

 4             MR. LOPEZ:  Objection.

 5             THE DEPONENT:  I -- I assume there must        06:57:46

 6   be economic benefits otherwise it wouldn't own the

 7   store.

 8        Q.   (By Mr. Swanson)  If Sony sold the online

 9   PlayStation store to a third party, do you expect

10   that that would impact adversely Sony's other          06:57:59

11   PlayStation business?

12             MR. LOPEZ:  Objection.

13             THE DEPONENT:  I -- I don't know.  I

14   guess it would depend upon whether there's any

15   difference in policy of the new owner versus what      06:58:15

16   Sony did with its PlayStation store.

17             MR. SWANSON:  Can we -- I think I may be

18   just about finished.  Can we take a short break to

19   facilitate my reaching that conclusion.  I know

20   we're almost out of time in any event.                 06:58:33

21             MR. LOPEZ:  Sure.

22             MR. SWANSON:  Okay.

23             THE VIDEOGRAPHER:  We're going off the

24   record.  It's 6:58 p.m.  This is the end of

25   media 7.                                               06:58:41
```

                                              Page 312

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              (Recess taken.)                    07:04:29

 2              THE VIDEOGRAPHER:  We are on the record

 3      at 7:04 p.m.  This is the beginning of media 8 in

 4      the deposition of Einer Elhauge.

 5              MR. SWANSON:  May be the end of media 8    07:05:03

 6      because I have no -- no further questions.  And

 7      thank you, Professor, for all the time today.

 8              MR. LOPEZ:  And I wanted to note on the

 9      record that the Professor reserves review and

10      signature of his transcript.                      07:05:15

11              MS. MANIFOLD:  And I actually have

12      approximately maybe even less than five minutes of

13      questions.  And I appreciate the Professor's

14      indulgence, and I will try and be as brief and as

15      efficient as possible.                            07:05:29

16                      EXAMINATION

17      BY MS. MANIFOLD:

18          Q.  And let me just quickly reintroduce

19      myself.  My name is Betsy Manifold.  I'm an

20      attorney on behalf of the consumer plaintiffs.    07:05:35

21              I know it's been a long day for you, so

22      I'm just quickly going to go through a couple of

23      questions and try to be even shorter than five

24      minutes, if possible.  So thank you.

25              Professor, based on the economic evidence  07:05:48
```

Page 313

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    that you reviewed, you determined that Apple's          07:05:52

 2    challenged conduct harmed the consumers -- and when

 3    I say "consumers," I mean iOS mobile device

 4    owners -- is based on the iOS apps and IAP; is

 5    that fair to say?                                        07:06:08

 6         A.   Yes.

 7         Q.   And based on the economic evidence that

 8    you reviewed, you concluded that consumers suffered

 9    anticompetitive harm; is that fair to say?

10         A.   Yes.                                           07:06:24

11         Q.   And I think you repeatedly told

12    Mr. Swanson that you didn't opine as to the actual

13    damages in this case; is that fair to say?

14         A.   Yes.

15         Q.   And that you did not opine as to the          07:06:41

16    calculation of any damages in this case; is that

17    fair to say?

18         A.   Yes.

19         Q.   And you didn't opine as to the

20    calculation of any price impact with regard to          07:06:51

21    Apple's alleged conduct; is that fair to say?

22              MR. LOPEZ:  Objection.

23              MR. SWANSON:  Objection.  I'll join in

24    that objection by my friend, Mr. Lopez.

25              THE DEPONENT:  I would just say -- just        07:07:07
```

Page 314

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    on the fact of an impact.  But I didn't quantify          07:07:08

2    the magnitude of the impact on commissions.

3         Q.   (By Ms. Manifold)  Correct.

4              And what type -- oh, strike that.

5              Do you agree with the statement that            07:07:33

6    profit-maximizing prices decrease when rivals enter

7    a market?

8         A.   Generally, yes, unless of the unusual

9    case of perfect price coordination, which I

10   conclude is not plausible here.                           07:07:49

11        Q.   And do you agree with economists that

12   eliminating rival -- a rival anticompetitive

13   inflates prices?

14        A.   Eliminating a rival anticompetitive --

15   what was the -- there's a noun missing.                   07:08:09

16        Q.   Yeah, there could be.  It's late for all

17   of us, right.

18              Do you agree that eliminating a rival

19   anticompetitively inflates prices?

20        A.   Oh, anticompetitively.  It certainly can,       07:08:25

21   and I think it -- eliminating rivals here did.  I

22   guess I can imagine cases where one eliminates only

23   one rival out of hundreds and it doesn't affect

24   prices.

25              But, in general, that -- the direction of      07:08:39

Page 315

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    the effect would be making prices worse, to the         07:08:42

 2    extent it has any effect on prices.

 3          Q.   And I'm assuming, based on your answer,

 4    that you would agree that Apple succeeded in

 5    eliminating every significant rival with regard to      07:08:55

 6    the App Store?

 7               MR. SWANSON:  Object to the form.

 8               THE DEPONENT:  Yes, except there were

 9    some -- there were some fringe ones that had some

10    paltry amount of -- of sales in the market              07:09:05

11    by violating various contractual conditions.

12          Q.   (By Ms. Manifold)  And would you agree

13    that when consumers purchased iOS mobile devices

14    that they became locked into using the iOS

15    platform for downloading native iOS apps?               07:09:21

16               MR. SWANSON:  Objection --

17               THE DEPONENT:  Yes.

18               MR. SWANSON:  -- to form.

19               THE DEPONENT:  Oh, sorry.

20               Yes, I do.                                    07:09:27

21          Q.   (By Ms. Manifold)  And would you agree,

22    with limited exception, consumers can only install

23    an iOS native app through the App Store?

24          A.   Yes.  And to go -- I go a little further

25    and say then the limited exceptions really allow        07:09:43
```

Page 316

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | rival app distribution or would be any constraint | 07:09:45 |
| 2 | on Apple's commissions. | |
| 3 | Q.   And in the App Store, in terms of | |
| 4 | function, consumers pay Apple for the right to | |
| 5 | install an app on her mobile device; is that fair | 07:09:58 |
| 6 | to say? | |
| 7 | A.   Well, for the right to -- I know what you | |
| 8 | mean.  When they -- they pay for the device, | |
| 9 | depending upon the app, they may have to pay for | |
| 10 | the app or not.  So some apps are free.  But if | 07:10:16 |
| 11 | they have to pay for the app, if the payment does | |
| 12 | go to Apple. | |
| 13 | Q.   Okay.  And do you have any understanding | |
| 14 | that if consumers want to refund, who they go to? | |
| 15 | A.   I think to Apple as well. | 07:10:35 |
| 16 | Q.   And if there's any fraud involved with | |
| 17 | the functioning of the -- the credit card payment, | |
| 18 | or in the functioning of the payment, do you know | |
| 19 | who bears the loss of that fraud? | |
| 20 | MR. LOPEZ:  Objection. | 07:10:52 |
| 21 | THE DEPONENT:  I -- I'm not sure. | |
| 22 | Q.   (By Ms. Manifold)  In terms of the | |
| 23 | economic evidence that you reviewed, did you review | |
| 24 | any individual financial information of your class | |
| 25 | members? | 07:11:06 |

Page 317

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        A.    No.                                        07:11:07

2        Q.    And so it would be fair to say that you

3   didn't do any actual calculation of marginal costs

4   for any specific developer?

5        A.    Correct.                                   07:11:19

6        Q.    And were you asked to do a marginal cost

7   analysis for any specific developer?

8              MR. LOPEZ:  Objection.

9              THE DEPONENT:  No, I was not.

10       Q.    (By Ms. Manifold)  Were you asked to do a  07:11:34

11  marginal cost analysis for your class members?

12             MR. LOPEZ:  I'm going to object and

13  instruct not to answer.

14             THE DEPONENT:  Oh...

15             MS. MANIFOLD:  Okay.  I think that's the   07:11:41

16  last of my questions anyway, Rob.  So your

17  instruction comes at a perfect time.

18             And I want to thank the Professor for his

19  time.  And thank you, Rob, for allowing my few

20  minutes of questions.                                 07:11:57

21             MR. LOPEZ:  Sure.

22             MR. SWANSON:  Are we done?

23             MR. LOPEZ:  No questions.

24             MS. MANIFOLD:  I have completed.

25             MR. SWANSON:  Okay.  All right.            07:12:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1              THE VIDEOGRAPHER:   Okay.  So we are going          07:12:05

2    off the record at 7:12 p.m. and this concludes

3    today's testimony given by Einer Elhauge.

4              The total number of media units used was

5    eight and will be retained by Veritext.               07:12:14

6              (TIME NOTED:  7:12 P.M.)

7

8

9

10                      ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 319

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          I, EINER ELHAUGE, do hereby declare under

 2    penalty of perjury that I have read the foregoing

 3    transcript; that I have made any corrections as

 4    appear notes; that my testimony as contained

 5    herein, as corrected, is true and correct.

 6          Executed this ____ day of _____,

 7    2021, at  _____,_____.

 8

 9

10

11                     _____

                       EINER ELHAUGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 320

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1        I, Rebecca L. Romano, a Registered

2   Professional Reporter, Certified Shorthand

3   Reporter, Certified Court Reporter, do hereby

4   certify:

5        That the foregoing proceedings were taken

6   before me remotely at the time and place herein set

7   forth; that any deponents in the foregoing

8   proceedings, prior to testifying, were administered

9   an oath; that a record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; that the foregoing

12  transcript is true record of the testimony given.

13       Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review

16  of the transcript [ ] was [X] was not requested.

17       I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20       IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22

23  Dated: August 1, 2021

24                     Rebecca L. Romano, RPR, CCR

25                     CSR. No 12546

                                            Page 321

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   DANIEL G. SWANSON

 2   dswanson@gibsondunn.com

 3                                    August 1, 2021

 4   RE: CAMERON VS. APPLE INC.

 5   JULY 30, 2021, EINER ELHAUGE, JOB NO. 4731140

 6   The above-referenced transcript has been

 7   completed by Veritext Legal Solutions and

 8   review of the transcript is being handled as follows:

 9   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1   __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, notating the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9   _X_Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    RE: CAMERON VS. APPLE INC.

 2    EINER ELHAUGE, JOB NO. 4731140

 3                    E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    WITNESS                                Date

25


                                              Page 324
```