# Exhibit 18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

# SUPPLEMENTAL DECLARATION OF JEFFREY T. PRINCE, PH.D., IN SUPPORT OF APPLE'S MOTION TO EXCLUDE REPLY TESTIMONY OF PROFESSOR MCFADDEN

November 30, 2021

I.     Introduction

1.     I make this Declaration in support of Apple's Motion to Exclude the Reply Opinions of Daniel L. McFadden.

2.     I previously submitted an Expert Report and Declaration in this matter on August 10, 2021, and another Declaration on November 9, 2021.[1] My qualifications, CV, the list of prior matters in which I have provided testimony, and the list of materials I relied upon in reaching my conclusions were provided in that report.

3.     I have been asked by counsel for Apple to analyze Plaintiffs' Opposition and the declaration submitted by Professor Daniel L. McFadden on November 23, 2021 and assess the methods and methodologies proposed therein.[2] Specifically, I was asked to evaluate the reliability as a matter of economics and econometrics of Professor McFadden's methods, models, and methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct in light of Plaintiffs' Opposition to Apple's motion and Professor McFadden's Declaration. As part of that evaluation, I also reviewed the transcript of the oral argument before the Court on November 16, 2021.[3] I reserve the right to update or supplement my opinions as further information is made available to me.

II.    **Professor McFadden's new approach for calculating individual damages is incompatible with his total damages calculation**

4.     As noted in both my Report and prior Declaration, Professor McFadden has previously shifted his position regarding whether the prices of all in-app purchase items for the same app change by the same dollar amount (the "dollar method") or the same percentage amount (the

---

[1] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated August 10, 2021 ("Prince Report"). Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 9, 2021 ("Prince Declaration").
[2] Plaintiffs' Opposition to Defendant Apple Inc.'s Daubert Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021 ("Plaintiffs' Opposition"). Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s Daubert Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021 ("McFadden Declaration").
[3] Transcript of Zoom Webinar Proceedings, Motion for Class Certification and Motion to Strike or Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, dated November 16, 2021 ("November 16 Hearing").

"percentage method") in the but-for world.[4] It is not clear which method he really endorses, but both are wrong for different reasons.

5.  As discussed in my previous Declaration, the dollar method—the only method used, to this point, by Professor McFadden—produces absurd predictions.[5] In particular, but-for prices for many in-app purchases are negative under the dollar method. Such an outcome is clearly not possible in reality, and when Professor McFadden unrealistically allows these negative prices, his model overstates damages. In fact, these negative but-for prices are so common as a result of the dollar method that his model yields the result that almost one-tenth of the proposed class is harmed by more than their total spending in these genres.[6]

6.  Plaintiffs and Professor McFadden downplay these absurd results by essentially arguing that item-level prices do not matter, even though they clearly do. During the hearing on Apple's first motion to exclude Professor McFadden held on November 16, 2021 ("November 16 Hearing"), Plaintiffs' counsel agreed that Professor McFadden's model yields negative prices, but downplayed the phenomenon, claiming that it is "just computational choice."[7] This is wrong. A "computational choice" is some aspect of a computer program that can be changed to speed up the analysis, run it on different hardware, use alternative software packages, etc.—but, importantly, *without changing any results.* These negative prices are results of Professor McFadden's model, not incidental, intermediate computations. They affect damages at the individual level. They are pervasive, affecting over 40 percent of accounts in the proposed class, over a quarter of apps, and over a quarter of in-app purchase transactions.[8] Any alteration to the model that avoids these negative prices is not merely a "computational choice," but an alteration to the substance of the model. And as I show next, the alternative Plaintiffs' counsel provides—"run[ning] the model using percentages"—yields outcomes that are materially different and incompatible with Professor McFadden's claimed aggregate damages.[9]

---

[4] Prince Report, n. 81; Prince Declaration, ¶ 52.
[5] Prince Declaration, ¶ 52.
[6] Prince Declaration, ¶ 61.
[7] November 16 Hearing, 10:14–23.
[8] Prince Declaration, ¶¶ 49–50.
[9] November 16 Hearing, 10:22–23.

7.  Meanwhile, Professor McFadden, in his Declaration, argues that his model simply does not have negative prices, because he does not predict prices at the item level—only the app level.[10] This is also wrong. In order to calculate net harm to an account—the definition both Professor McFadden and I agree is appropriate for determining whether an account is harmed—one must calculate but-for prices for all transactions made by that account. Accounts do not purchase a "portfolio" of in-app purchase items associated with an app (language used by Professor McFadden[11]); they purchase specific items. In essence, item-level but-for prices matter because when Professor McFadden calculates net harm to an account, he necessarily must calculate but-for prices for each item purchased by the account. And, using the dollar method, many of those are negative.

8.  Due to the economically incoherent results produced by the dollar method, it appears that Professor McFadden currently favors the percentage method.[12] In ¶ 11 of his Declaration, Professor McFadden provides, for the first time, details regarding how he thinks the percentage method ought to be implemented. However, regardless of which method he uses, his model still yields a substantial number of unharmed consumers.[13] Furthermore, this percentage approach is incompatible with his total damages calculation. Because Professor McFadden does not compute average prices using a weighted average, the sum of individual damages under this new approach does not equal his total damages. Indeed, on Professor McFadden's 0.1 percent sample, Professor McFadden calculates aggregate consumer damages of $9.6 million. Using the dollar method, the sum of individual damages for the accounts in this sample is similar, at $9.5 million.[14] But using the percentage method as specified by Professor McFadden in his Declaration, the sum of individual damages falls by almost half, to $4.9 million.[15]

---

[10] McFadden Declaration, ¶¶ 2, 10.

[11] Deposition of Daniel L. McFadden, dated November 5, 2021 ("Second McFadden Deposition"), 91:9–21.

[12] McFadden Declaration, ¶ 11.

[13] Prince Report, n. 40, 42, 55, 81, 84, and 121. As detailed in my Report, the findings regarding unharmed accounts are qualitatively similar. To be clear, I do not and have not endorsed this method, but have applied it as a sensitivity.

[14] The slight discrepancy is primarily caused by the removal of free transactions for otherwise non-free items (perhaps resulting from short-run promotions) when calculating individual damages; such removal is not possible after transactions have been aggregated, and so these transactions are not removed when calculating aggregate damages. Workpaper 1.

[15] Workpaper 1.

9.  The reason for the discrepancy between the aggregate and the sum of individual damages under Professor McFadden's percentage method is intuitive: When calculating the app-level but-for price and the aggregate damages, Professor McFadden overweights less popular in-app purchase items and underweights more popular in-app purchase items, because he weights all such items equally. Since the most popular in-app purchase items tend to be the cheapest, this means that he overstates the actual world price of in-app purchase items, the amount by which the price would fall in the but-for world, and the aggregate damages.[16]

10. The wide discrepancy shows the problems with Professor McFadden's and Plaintiffs' recent emphasis on aggregate damages. The question of aggregate damages cannot be easily divorced from the question of individual damages.[17] For Professor McFadden's results to be reliable, this discrepancy between the sum of individual damages and calculated aggregate damages must be resolved, which will necessarily involve precisely pinning down how individual damages should be calculated, and verifying that such a method is consistent with his aggregate damages results. The only two methods so far proposed—the dollar method and the percentage method—are each fatally flawed in different ways. The dollar method yields absurd results (negative prices), and the percentage method generates results that are fundamentally inconsistent with the aggregate damages number Professor McFadden claims. Any unresolved questions regarding in-app purchase pricing in the but-for world are particularly consequential

---

[16] For a more technical, mathematical explanation of the phenomenon, consider a simplified example. Suppose there are 100 individuals in a given year, each making 10 purchases per month of a $0.99 item and 1 purchase per month of a $19.99 item. Based on his methodology, Professor McFadden would calculate an average price of $10.49 (($0.99 + $19.99) / 2 = $10.49, i.e., the simple average of $0.99 and $19.99, irrespective of the number of purchases at each price point) in the actual world. In short, this simple average sums the observed price points and divides by the number of different observed price points. (The calculation would be slightly more complex if the set of items purchased changed from month to month, but the general idea would be the same.) Now suppose that he estimates a but-for price—at the overall app level, the only level at which he claims it is appropriate to estimate marginal costs and but-for prices—of $8.49. Per ¶ 4 of the McFadden Declaration, the aggregate damages in this scenario would be ($10.49 - $8.49) × (11 purchases per individual per month) × (12 months per year) × 100 individuals = $26,400.

Now consider individual harm, calculated per ¶ 11 of the McFadden Declaration, assuming a 30 percent commission. Following his formula, Professor McFadden would compute : $r_j = \frac{(\$10.49 - \$8.49) \times 13200}{0.3 \times \$10.49 \times 13200} = \frac{2.0}{3.147} = 0.6355$. Then he would apply this fraction to each individual; harm for an individual $i$ would then be $r_j \times Spend_{i,j} \times Commission_{i,j} = 0.6355 \times (120 \times \$0.99 + 12 \times \$19.99) \times 0.3 = \$68.39$. Adding this up across the 100 individuals yields a total of $6,839—far less than the $26,400 aggregate damages he would calculate.

[17] In recent documents, Professor McFadden and Plaintiffs have moved toward the position that aggregate damages are the only important result, and claim that individual damages may never need to be computed, even at trial. Plaintiffs' Opposition, p. 6 ("At trial, Plaintiffs will *not* be required to calculate individual Class member losses; instead, they will need to prove the Class's *aggregate* losses.").

because in-app purchases account for the vast majority—over 99 percent—of Professor McFadden's damages.[18]

11.     It is important to note that Professor McFadden continues to ignore Apple's price tiers (i.e., 99-cent pricing) under the percentage method. In fact, the percentage method is fundamentally incompatible with 99-cent pricing: If an app has $2.99 and $6.99 in-app purchase items (for example), then there is no common percentage reduction in price that will leave both prices at 99-cent points.

### III.     Professor McFadden's shifting position on the right approach to determine damages highlights the unreliable nature of his analysis

12.     In his work to date, Professor McFadden has not clearly set forth his methodology to determine damages for the purported class; the above discussion of the dollar method versus the percentage method is just the first of many such ambiguities.

13.     As a second example, Professor McFadden continues to shift between his proposed "all apps" method in his Reply Report and his original method (where he considered only apps comprising the top 70 percent of revenue) for calculating total damages.[19] Given that he invokes both approaches at different junctures, it is unclear which method he is really endorsing.

14.     Third, Professor McFadden appears to resurrect his old (and incorrect) definition of whether an account is harmed—i.e. whether the account made *any* transaction that would have been cheaper in the but-for world.[20] In fact, he only mentions the (correct) "net harm" calculation as something that I have proposed—despite his previous deposition testimony that he agrees with me that "net harm" is the correct approach.[21]

---

[18] Workpaper 1.

[19] Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated June 1, 2021 ("McFadden Opening Report"), Appendix E, ¶ 24; Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 ("McFadden Reply Report"), ¶ 208.

[20] Prince Report, ¶ 30.

[21] McFadden Declaration, ¶ 7; Deposition of Daniel L. McFadden, dated August 3, 2021 ("McFadden Deposition"), 201:22–202:3. Professor McFadden also invokes a "net harm" definition in his Reply Report (¶¶ 12.e–14).

15.     Fourth, as I pointed out in my previous Declaration, Professor McFadden specifically argued for the inclusion of Log Downloads as an explanatory variable in his Opening Report—in particular, arguing that the coefficient should be positive.[22] Later, he argued that the variable can be dropped because Log Downloads in a month might not have any relationship with quantity of in-app purchases demanded in that same month, while also providing an explanation for why the relationship might be negative.[23] Professor McFadden has not articulated whether he intends to keep or remove the variable when finally calculating damages.

16.     In summary, Professor McFadden proposes a growing list of alterations to his model to address a growing list of concerns with it, but does not consistently employ any of those alterations moving forward. Instead, his approach appears to be "fail-safe"—to wait for others to identify which attributes of the model are concerning, and only then to propose a modified version of his model to address those concerns. Even then, he retains substantial ambiguity as to which model version he endorses as proof of class wide impact and damages.

17.     Furthermore, merely determining an aggregate damages number, and then scaling up or down all of Professor McFadden's individual damages calculations, will not be sufficient. It has already been shown that alternative assumptions can yield similar aggregate damages numbers but different results regarding which individuals are harmed.[24] Thus, in order to divvy up any aggregate damages number, the Finder of Fact will also need to sort out without any guideposts or reliable guidance the many open questions regarding the inner workings of Professor McFadden's model.

### IV.    The results of applying Professor McFadden's model to different random samples indicate a comprehensively unreliable econometric model

18.     As I have previously noted, while sampling can be part of a reliable method, reliable results should not depend strongly on the exact sample drawn.[25] I have previously shown that

---

[22] Prince Declaration, ¶ 43; McFadden Opening Report, ¶ 231.

[23] McFadden Reply Report, ¶¶ 175, 177.

[24] *See, e.g.*, the price tier analysis at Workpaper 2; and fixing Professor McFadden's data processing error at Second McFadden Deposition, 147:15–23. Professor McFadden makes the same argument regarding alternative random samples. *See*, Second McFadden Deposition, 205:24–206:11.

[25] Prince Report, ¶ 110.

Professor McFadden's model and sampling fail this standard; the identity and number of unharmed accounts under Professor McFadden's model depends on the random sample selected and varies widely across 75 random samples.[26] Thus, it is clear that Professor McFadden has not offered a reliable way to identify who is harmed. The shortcoming flows primarily from Professor McFadden selecting weak instruments.

19.  Plaintiffs and Professor McFadden have repeatedly dismissed this finding, arguing at various times that (a) the variation is "tiny;" (b) the sampling is innocuous and, in the end, will only affect the demand estimates; (c) the variation is not concerning because there is a 95 percent confidence level regarding which accounts are harmed; (d) the instruments are not weak because the standard errors are small; and most recently (e) my approach of analyzing additional samples is unconventional.[27] Each of these arguments is demonstrably incorrect.

20.  First, the variation in unharmed accounts is not tiny. The original analysis found that the fraction of unharmed accounts varied between 5.5 percent and 13.6 percent across 75 random samples.[28] I have updated this analysis in response to some of Professor McFadden's proposed alterations to his model (see below), and the results show even wider variation.

21.  Second, Professor McFadden has still not performed the full analysis for which he claims the results will not meaningfully depend on the sample drawn. The "All Apps" analysis in his Reply Report estimates prices for only about 80,000 of the more than ▮▮▮▮▮ apps in Games, Music, and Entertainment with a paid transaction.[29] Nonetheless, I have replicated the 75-sample analysis using this "All Apps" approach (and have also fixed Professor McFadden's data processing error), which I could not complete and present in my prior Declaration due to insufficient time. I find that the fraction of unharmed accounts, using Professor McFadden's "All

---

[26] The numbers range from 5.5 percent to 12.7 percent across my original 25 samples (Prince Report, ¶ 115). The numbers range from 6.3 percent to 13.6 percent across Professor McFadden's subsequent 50 samples (Prince Declaration, ¶ 31 (as corrected in the Errata to Prince Declaration, dated November 19, 2021)).

[27] Plaintiffs' Opposition, p. 4; Second McFadden Deposition, 204:15–206:11; Plaintiffs' Opposition, p. 5; Second McFadden Deposition, 216:10–19; Plaintiffs' Opposition, p. 4.

[28] Prince Declaration, ¶ 31.

[29] Prince Report, n. 123; Prince Declaration, ¶ 18.

Apps" approach and fixing his data processing error, now varies from 13.3 percent to 24.7 percent across the 75 random samples.[30] Again, this variation is not tiny.

22.   Third, while Plaintiffs' Opposition provides a long discussion of standard errors in sampling in an attempt to demonstrate a degree of confidence in the identity of unharmed accounts, it fails to use accepted techniques to quantify such confidence. Plaintiffs' Opposition asserts that the number of switchers (between harmed and unharmed or vice-versa) across samples is sufficiently small to imply that Professor McFadden has more than 95% confidence about whether any individual is harmed.[31] But this is not the correct way to determine statistical confidence. Doing so would require calculating standard errors around the quantities that actually matter—aggregate damages and/or net damages for any individual account. There are standard methods for performing this calculation,[32] and Professor McFadden himself uses some of those methods to calculate standard errors for his intermediate results, but neither Professor McFadden nor Plaintiffs' Counsel has used them to calculate standard errors or confidence for Professor McFadden's final results. Instead, Professor McFadden only calculates standard errors for intermediate results—his demand coefficients—and Plaintiffs' counsel offers only an unconventional, informal, and ultimately incorrect argument for why his final results are sufficiently precise. Professor McFadden did not endorse this argument in his Declaration, and in fact did not address this topic in any way in his Declaration.

23.   Fourth, Professor McFadden and Plaintiffs refuse to engage with the underlying reason for the variation in results across samples—weak instruments. While Professor McFadden was given ample opportunity to discuss the strength of his instruments during his second deposition, he simply repeated his unfounded assertion that he "do[es] not have a weak instruments pro[blem]," arguing that the "proof of the pudding is the precision with which you can estimate the coefficients of interest"—i.e., that his results are sufficiently precise, according to his reported standard errors, that the instruments must be strong enough.[33] But the variation in

---

[30] Workpaper 3.
[31] Plaintiffs' Opposition, p. 5.
[32] *See, e.g.*, Jack Johnston and John DiNardo, "*Econometric Methods*," Fourth Edition, (New York, NY: McGraw-Hill, 1997), Section 11.3.
[33] Second McFadden Deposition, 217:3–12, 219:5–18.

results across different samples clearly shows that this is not the case, regardless of the standard errors he reported in his Opening Report; indeed, unreliable standard errors are a well-known consequence of weak instruments. Rather, the "proof of the pudding" is that his results are *not* sufficiently precise. Similarly, neither during the November 16 Hearing nor in Plaintiffs' Opposition did Plaintiffs' counsel address the topic of weak instruments.[34] Therefore, to date, neither Plaintiffs nor Professor McFadden has offered any substantive rebuttal to this fundamental criticism.

24.     Finally, Plaintiffs' Opposition called my analysis of 25 samples "un-conventional,"[35] but in fact there is nothing unconventional about this analysis except that in many cases it is not possible to do due to data limitations. My analysis *directly* measures the degree of sampling error by drawing alternative samples from the *full data*. Meanwhile, the bootstrap method that Professor McFadden employs to calculate standard errors for his coefficients (but not for his final results, such as total harm in aggregate or for an individual account) *indirectly approximates* the degree of sampling error by drawing new samples from the *sample* (known as "resampling"). In most cases, my approach is not feasible because the full data are not available, so one must settle for the bootstrap. But this does not make my approach unconventional or incorrect.

25.     Thus, my analysis continues to demonstrate serious concerns regarding the reliability of Professor McFadden's entire approach. Any reliable method applied to two different but statistically representative, large samples should yield similar results. That is not the case with Professor McFadden's method. Furthermore, under his method, it would not be clear which accounts to exclude as unharmed because the number of unharmed accounts vary widely across samples. How would the jury determine which accounts are harmed? Which sample should be used to determine harm? Professor McFadden cannot argue that his first sample is the "right one"—any sample is equally valid.

---

[34] November 16 Hearing.
[35] Plaintiffs' Opposition, p. 4.

## V. Professor McFadden's treatment of in-app purchase prices does not make economic sense

26. Plaintiffs' Opposition states, "IAP prices are made at the app level."[36] It also states that I mistakenly extrapolate "pricing from the app level to individual items purchased."[37] Plaintiffs are wrong.

27. As explained in his Opening Report, Professor McFadden averages IAP prices at the app-year level.[38] This modeling choice reduces the wide menu of in-app purchases to a single "portfolio" with a single "average" price.[39] In particular, this portfolio is a simple average that neither distinguishes between subscription and non-subscription in-app purchases nor weights the average price by the number of IAP purchases at a given price. For example, if an app in the data were to have 1,000 $0.99 purchases, 12 $9.99 subscription purchases, and 1 $49.99 purchase in a given year, the average IAP price would be ($0.99 + $9.99 + $49.99) ÷ 3 = $20.32.[40]

28. As he confirmed in deposition, Professor McFadden assumes that developers adjust prices of all in-app purchases, including subscription and non-subscription purchases, in lockstep.[41] Plaintiffs' counsel has also agreed that Professor McFadden makes this assumption.[42] However, as noted in both my Report and previous Declaration, Professor McFadden has been shifting his position regarding whether all the prices change by the same dollar amount or the same percentage amount.[43] In either case, Professor McFadden assumes that the exercise can be reduced to choosing a single overall price level, and then adjusting the prices of all individual items according to a simple rule. In other words, it is Professor McFadden's contention that prices can be extrapolated from the app level to the individual items purchased, not mine.

---

[36] Plaintiffs' Opposition, p. 14.
[37] Plaintiffs' Opposition, p. 14.
[38] McFadden Opening Report, Appendix E, ¶ 27.
[39] Second McFadden Deposition, 91:9–21, 92:8–18.
[40] This calculation assumes all purchases were made in the same month. The calculation becomes more complex when there is variation across months, but the general observation holds that the average is not weighted by number of transactions.
[41] Second McFadden Deposition, 94:7–24.
[42] Plaintiffs' Opposition, p. 14.
[43] Prince Report, footnote 81; Prince Declaration, ¶ 52.

29. Professor McFadden has provided no evidence of this extrapolation being accurate—or, in fact, of any specific pattern or rule for the pricing of numerous in-app purchase items. Optimally pricing numerous items on a menu is a complex exercise. A developer would choose prices jointly to maximize profits. Instead of setting a single price at the level of the app, a developer will take into account the demand for different in-app purchases—and consumers' willingness to substitute across those purchases—in setting the price of each item. Prices for different in-app purchase items of the same app, therefore, can follow different patterns. For example, the prices for several skin packs for Minecraft (e.g., City Folk, Town Folk, Halloween Skin Pack) increased from $0.99 to $1.99 in the year of 2016, while the prices for some other skin packs for Minecraft (e.g., Biome Settlers, Holiday 2015 Skin Packs) stayed the same—direct evidence contrary to Professor McFadden's assumption of lockstep price changes.[44] As another example, Professor McFadden ignores the fact that certain in-app purchases may reflect quantity discounts (such as Fitbod offering an annual subscription of "Log unlimited workouts" for $49.99 to $59.99 versus a monthly subscription for $7.99 to $9.99[45]), and that demand for subscription purchases, which may auto-renew, may follow different patterns from demand for non-subscription purchases. Professor McFadden's simplistic assumption does not make any economic sense.

VI. **Professor McFadden's benchmark commission rate is unfounded, and his model cannot account for differences between subscription and non-subscription in-app purchases**

30. Plaintiffs' Opposition refers to Google's recent reduction of the subscription commission rate from 30 percent to 15 percent as evidence that Professor McFadden's use of a uniform commission rate of 10 percent to 12 percent is "economically proper and reliable."[46] However, the Google reduction only applies to subscription purchases.[47] Plaintiffs ignore the fact that

---

[44] Workpaper 4.

[45] Apple, "App Store Preview: Fitbod Workout & Fitness Plans," available at https://apps.apple.com/us/app/fitbod-workout-fitness-plans/id1041517543, accessed on November 30, 2021.

[46] Plaintiffs' Opposition, p. 20.

[47] Plaintiffs' Opposition, p. 20, n. 20.

Google's headline rate remains 30% and that Professor McFadden's model aggregates subscription and non-subscription in-app purchases.[48]

31.     First, Professor McFadden's model *does not* separate subscriptions from non-subscriptions. Indeed, in Professor McFadden's benchmark analysis, he assumes a uniform but-for commission even though Apple offers a lower commission on subscriptions—15 percent for every year past the first—compared to other purchases.[49]

32.     Second, Professor McFadden's model *cannot* account for how pricing for subscription and non-subscription purchases may differ. As discussed above, his model aggregates all in-app purchases for an app—whether subscription or otherwise—into a single "portfolio."[50] By averaging all in-app purchase items into a single "portfolio," his model has no way to disentangle changes in the commission rate—and therefore changes in prices—to reliably determine damages for subscriptions versus non-subscriptions. In the event the Court rules that different commissions would apply in the but-for world (as they do in the real world) to subscriptions and non-subscription in-app purchases, Professor McFadden's model will be completely incapable of determining either aggregate or individual damages.

### VII.    Professor McFadden makes incorrect claims about the impact of focal pricing on damages

33.     Despite agreeing that focal pricing exists, Professor McFadden has not yet provided any valid method to account for this widespread real world practice in his model. Plaintiffs' Opposition claims that aggregate damages increase when focal pricing is considered and that ignoring focal pricing is therefore conservative.[51] However, this is incorrect for at least three reasons.

---

[48] Bloomberg, "Google to Slash Fee It Takes From App Subscriptions in Half," available at https://www.bloomberg.com/news/articles/2021-10-21/google-to-slash-the-fee-it-takes-from-subscriptions-on-app-store, accessed on November 30, 2021.
[49] Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated August 10, 2021 ("Hitt Report"), ¶ 52.
[50] McFadden Opening Report, Appendix E, ¶ 27; Second McFadden Deposition, 91:9–21, 92:8–18.
[51] Plaintiffs' Opposition, pp. 14–15.

34.     First, as I explained in my previous Declaration, the analysis provided by Professor McFadden only considered focal pricing for paid downloads. He ignored focal pricing for in-app purchases that account for the vast majority of spending.[52] I have since had the opportunity to extend Professor McFadden's analysis to in-app purchases. I did so conservatively, by assuming that the change in price must be a whole number of dollars.[53] I find that total damages for Games, Music, and Entertainment—scaled up using Professor McFadden's method from his Opening Report—decrease rather than increase under this approach—from $7.2 billion to $7.0 billion.[54]

35.     Second, the number of unharmed accounts is a critical statistic, and on this metric, ignoring focal pricing is not conservative. In Professor McFadden's version of the analysis, which ignores in-app purchases, the number of unharmed accounts substantially rises—from 14.6 percent (or 29.8 million) to 17.5 percent (or 35.7 million) when focal pricing for downloads is taken into account. The increase becomes even more dramatic—to 23.1 percent (or 47.1 million)—if focal pricing is applied to in-app purchases as well.[55]

36.     Third, even conceptually, Professor McFadden's disregard of focal pricing is not conservative. As discussed above, if we consider focal pricing only for paid downloads (and not in-app purchases), the number of unharmed accounts predicted by Professor McFadden's model increases from 14.6 percent (or 29.8 million) to 17.5 percent (or 35.7 million).[56] This means that Professor McFadden's original damages estimate of $7.2 billion includes positive damages erroneously attributed to some 6.8 million accounts that were actually unharmed.[57] It is not conservative to ignore the overestimation of damages for accounts that were actually unharmed. This problem would become even more severe if focal pricing for in-app purchases were considered; in that case, the number of unharmed accounts rises further to 23.1 percent (or 47.1

---

[52] Prince Declaration, ¶ 55.

[53] In fact, the percentage method Professor McFadden appears to be endorsing now is incompatible with focal pricing, as discussed above. Even using the dollar method would be more restrictive than my approach here, as not every whole dollar increment is available on the tier schedule; sometimes the increment is $5 or larger. There are a small number of in-app purchase prices; Professor Hitt finds that, among transactions involving the proposed developer class, about 0.27 percent do not end in 99 cents. Thus, it seems reasonable to exclude that possibility. See, Hitt Report, Figure 36.

[54] Workpaper 2.

[55] Workpaper 2.

[56] Workpaper 2.

[57] Workpaper 2.

million), demonstrating that Professor McFadden's original damages estimate of $7.2 billion includes positive damages attributed to some 18.8 million accounts that were actually unharmed.[58]

### VIII. Contrary to the claims made in Plaintiffs' Opposition, Professor McFadden's log-download coefficients are illogical and his analysis is unreliable

37.   Plaintiffs' Opposition asserts that a negative Log Downloads coefficient is not a problem because it makes economic sense and is not statistically significant, so it can be dropped.[59] Plaintiffs are wrong. Professor McFadden's insignificant estimates of the coefficient indicate that his method cannot reliably determine the relationship between the economic variables, but it does not mean that the Log Downloads variable is not important or that simply dropping this variable corrects the underlying issue.

38.   First, the Log Downloads variable is quantitatively important. Dropping the variable meaningfully reduces total damages for the Games genre. As discussed in my declaration, if Log Downloads is dropped for both the Music and Entertainment category and the Games category, total damages fall to ███████, compared with ███████ when Log Downloads is included for both categories.[60]

39.   Second, in his opening report, McFadden explicitly included the Log Downloads variable in his model to account for proper developer price setting. He even argued that the coefficient should be positive.[61] Now that he has an inconvenient result (i.e., a negative coefficient for Log Downloads), he offers two explanations—one explaining why the variable might be irrelevant, and one justifying the negative coefficient—and recommends dropping the variable from his model, but only for Music and Entertainment.[62] Professor McFadden has provided no economic explanation for why we should expect the variable to behave differently across the two categories and, therefore, it is appropriate to either include it for both, or drop it for both.

---

[58] Workpaper 2.
[59] Plaintiffs' Opposition, pp. 15–16.
[60] Prince Declaration, ¶ 26. These figures do not correct for Professor McFadden's data processing error to facilitate comparison to the numbers in Professor McFadden's report.
[61] McFadden Opening Report, ¶¶ 179, 231.
[62] McFadden Reply Report, ¶¶ 174–175, 177.

Professor McFadden's opinions are thus inconsistent over time and across genres, and he has not provided any guidance on how he intends to treat this variable for other app genres he did not model.

40. Third, a negative Log Downloads coefficient is fundamentally inconsistent with observed developer behavior and profit maximization. If this coefficient were truly negative (a possibility for which Professor McFadden provides a potential economic explanation[63]), developers would set infinite download prices to maximize profits;[64] this is clearly not what developers do in the actual world, which makes it impossible to compute marginal costs and but-for prices. Therefore, his own justification for the negative coefficient means that his model would not be able to predict but-for prices.

41. Finally, Professor McFadden has not discussed how the Log Downloads variable might differentially affect subscriptions and non-subscription in-app purchases.

### IX. Plaintiffs do not explain how to apply Professor McFadden's method to the Sports genre

42. Plaintiffs' Opposition asserts that my analysis of the Sports genre is incomplete. In particular, Plaintiffs state that I "did not construct margin bounds" for my analysis of this genre.[65] However, the burden is on Plaintiffs and Professor McFadden to propose a complete approach, and they have not done so.

43. Despite Professor McFadden's claim that one could derive the appropriate margin constraints "with minimal efforts,"[66] he does not know what bounds would be appropriate for other genres, including Sports.[67] Determining these bounds is not straightforward; Professor McFadden conceded in his deposition that the process would not be "mechanical."[68] Professor McFadden's construction of the margin bounds relies on financial information for firms that

---

[63] Plaintiffs' Opposition, p. 16.
[64] Prince Report, ¶ 114.
[65] Plaintiffs' Opposition, pp. 16–17.
[66] McFadden Reply Report, ¶ 191.
[67] Second McFadden Deposition, 220:22–221:9.
[68] Second McFadden Deposition, 142:11–143:3.

should be representative of the genre. Even supposing these data were available, Professor McFadden must appropriately determine variables costs—which he has not[69]—and ensure representativeness—which he has also not.[70]

44. Further, Professor McFadden has not determined which instruments would be appropriate for each genre in his analysis.[71] In particular, he has not provided any information ensuring that such instruments would not be weak. As discussed in my first Declaration, weak instruments can lead to biased estimates and misleading statistical inference of the precision of the estimates based on standard errors.[72] For both the Games and Music and Entertainment genres, Professor McFadden's instruments for in-app purchases are weak.[73] As such, neither Plaintiffs nor Professor McFadden explain how to apply Professor McFadden's method to the Sports or any other genres.

### X. Professor McFadden has not yet demonstrated that he can calculate damages for all class members even with his flawed model

45. Professor McFadden has not yet demonstrated that he can calculate damages for all class members. Setting aside the flaws that I have already identified, and the general unreliability of the method evidenced by the varying results across random samples, there are a number of steps that he still needs to undertake to calculate damages even with his flawed model:

- Determine which genres to treat separately or combine, as well as which subsets of genres require their own analyses.[74]
- Determine profit margin constraints for each genre other than Games, Music, and Entertainment.[75]

---

[69] Prince Report, §7.2.
[70] Prince Report, ¶ 98.
[71] Second McFadden Deposition, 220:22–221:9.
[72] Prince Declaration, ¶ 37.
[73] Prince Declaration, ¶¶ 38–40, Figure 2.
[74] I previously showed that separating Music and Entertainment can lead the model to fail. *See*, Prince Report, ¶ 122. Professor Hitt shows that "TV and video streaming app transactions" constitute their own, separate market. *See*, Hitt Report, §7.2.2.
[75] I discuss this in more detail above in the context of the Sports genre.

- Determine which variables should be included in his demand model for each genre (including Games, Music, and Entertainment).[76]
- Determine which instruments to use for each genre other than Games, Music, and Entertainment.[77]
- Predict but-for prices for *all* apps within Games, Music, and Entertainment, but also all other genres.[78]
- Determine which accounts belong to each consumer.[79]

46. Given my previous findings regarding the sensitivity of Professor McFadden's results to the inner workings of his model, it is critical that each of these steps actually be undertaken, and any details of their implementation be sorted out. Only then can one address whether Professor McFadden is actually offering a method that can reliably determine total damages, or damages to any member of the proposed class.

## XI. Conclusions

47. Nothing in Professor McFadden's Declaration or Plaintiffs' Opposition changes my overall conclusion that Professor's McFadden's proposed methodology is incapable of proving with common evidence that all or nearly all members of the proposed consumer class have been harmed, determining which members of the proposed class have not been harmed, or calculating their damages in a reliable manner.

---

[76] As discussed above, Professor McFadden has been inconsistent regarding whether Log Downloads should be included, even in the Games, Music, and Entertainment genres he has already considered. And to the extent that the variables included depend on statistical significance, he cannot be sure which variables will be statistically significant for any other genre. *See*, Second McFadden Deposition, 219:24–221:20. He has already run the model on the largest genres, increasing the likelihood that *none* of the variables are significant for other genres. *See*, McFadden Opening Report, ¶ 229.

[77] Professor McFadden is not sure which instruments would be appropriate for each genre. *See*, Second McFadden Deposition, 220:22–221:9. He does use different instruments for his two categories already analyzed (Games and Music and Entertainment). And I have already discussed above the fact that these instruments are weak, which suggests that he may choose weak instruments for other genres as well.

[78] Professor McFadden has repeatedly said that, in a final analysis, he would calculate but-for prices for all apps, rather than relying on a scaling up methodology. *See, e.g.,* Second McFadden Deposition, 136:6–22. But to date, he has still not done so. Furthermore, one cannot "scale up" across genres at all, even accepting his flawed methods.

[79] This has been extensively discussed, but Professor McFadden has still offered no evidence that he can determine which accounts belong to the same consumer.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of November, 2021, in Bloomington, IN.

_____