# Exhibit 21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-CV-06714-YGR |
| DONALD R. CAMERON, et al., <br><br> *Plaintiffs*, <br><br> vs. <br><br> APPLE INC., <br><br> *Defendant.* | Civil Action No. 4:19-CV-03074-YGR |

**EXPERT REPORT AND DECLARATION OF AVIEL D. RUBIN, PH.D.**

# CONFIDENTIAL DOCUMENT
## Lodged Pursuant to Local Rule 79-5(c)-(d)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

# CONTENTS

I.     INTRODUCTION .................................................................................................................3

II.    BACKGROUND AND QUALIFICATIONS .........................................................................4

    A.   Education and Industry Experience ...............................................................................4
    B.   Patents, Congressional Testimony, and Publications ...................................................6
    C.   Previous Expert Witness Experience .............................................................................7
    D.   Curriculum Vitae ...........................................................................................................7

III.   MATERIALS RELIED UPON ..........................................................................................7

IV.   SUMMARY OF PRINCIPAL CONCLUSIONS ...............................................................8

V.    OVERVIEW OF SECURITY AND APP DISTRIBUTION ............................................13

    A.   Security Encompasses Safety, Privacy, Trustworthiness, Piracy, Objectionable Content, and Reliability ...............................................................................................................13
    B.   Security Requires Consideration of the Threat Model ................................................18
    C.   Models of App Distribution .........................................................................................22

VI.   OVERVIEW OF IOS PROTECTIONS ..........................................................................29

    A.   iOS Faces a Heightened Threat Model .......................................................................29
    B.   iOS Security Protections .............................................................................................31
        1.   Apple's App Review Process and Centralized App Distribution ..........................33
        2.   Apple's On-Device Runtime Security Protections ...............................................43

VII.   IOS IS SAFER THAN OTHER OPERATING SYSTEM PLATFORMS ........................44

    A.   Apple's "Defense in Depth" Provides Significant Security Protections .....................44
    B.   Third-Party Analyses Demonstrate that iOS Is Safer than Other Platforms...............49
    C.   macOS Does Not Prove that the iOS App Distribution Model Is Not Needed.............56
    D.   The Enterprise and Testing Programs Do Not Demonstrate that App Review Is Not Needed ....61

VIII.  CHANGING THE CENTRALIZED DISTRIBUTION MODEL WOULD DECREASE THE SECURITY, SAFETY, RELIABILITY, AND TRUSTWORTHINESS OF THE IOS PLATFORM ...............63

    A.   Apple's Policies Impact Consumers and Developers in a Non-Uniform Way ..................64
    B.   Existing Third-party Stores Are Known to Provide Lower Security than the Apple App Store 67
    C.   Users Have Limited Ability to "Choose" between Safe and Unsafe Third-Party Stores.............70
    D.   iOS Security Would Be Impaired if Even One Third-Party App Store Does Not, or Chooses Not to, Maintain Strong Security Measures ...........................................................................71
    E.   The Case Study of the Android Marketplace in China Demonstrates the Security Problems that Arise From Fragmentation .................................................................................................74
    F.   Flaws in Dr. Elhauge's Proposal that Apple Review All Apps for Distribution through Third-party Stores ..................................................................................................................76

IX.   DIVERSIFYING IN-APP PURCHASE CHANNELS COULD INHIBIT APPLE'S  ANTI-FRAUD ABILITIES................................................................................................................80

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

## I.     INTRODUCTION

1.      I, Aviel D. Rubin, Ph.D., declare as follows:

2.      I make this declaration in support of Apple's Opposition to Developer Plaintiffs'
Motion for Class Certification; Apple's Opposition to Consumer Plaintiffs' Motion for Class
Certification; Apple's Motion to Exclude the Testimony of Einer Elhauge, Nicholas Economides,
and Christian Tregellis; and Apple's Motion to Exclude the Testimony of Daniel McFadden.

3.      I have been retained by counsel for Apple Inc. ("Apple") as an expert in this
litigation to provide opinions regarding the security, privacy, and reliability of Apple's App Store,
including the means by which Apple's app review process ensures and enhances the security,
privacy, and reliability of the apps distributed through the App Store as well as how Apple's review
procedures compare to those employed on other mobile platforms.  I also have been asked to
review and provide opinions regarding certain of the opinions provided by Einer Elhauge, Nicholas
Economides, and Daniel McFadden on behalf of the proposed consumer and developer classes.  If
an expert provides analysis or offers opinions regarding the subject of my declaration and/or
opinions in this matter, or a fact witness provides evidence regarding issues I have addressed, I
will review those analyses, opinions, and/or testimony and prepare a response as appropriate.  If
requested to testify at trial or at a hearing, I expect to testify regarding the matters set forth in this
report and declaration, if asked about those matters by the Judge or the parties' attorneys.

4.      I consult through the company Harbor Labs. Harbor Labs is compensated at the rate
of $775 per hour for my time. Research and analysis for this report was also performed by Harbor
Labs personnel under my direction and guidance. Rates for other staff working on this matter range
from $375 to $485 per hour. Neither my compensation nor that of Harbor Labs is contingent upon
my findings, the testimony I may give, or the outcome of this litigation.

5.      In forming my opinions, I have relied on my knowledge and experience in computer
science, networking, network security, hardware, software, and the documents and information
described below.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

## II.   BACKGROUND AND QUALIFICATIONS

### A.   Education and Industry Experience

6.     I have 30 years of experience in the field of computer science, and specifically in Internet and computer security.  Virtually my entire professional career has been dedicated to issues relating to software, networks, and computer systems more generally.

7.     I received my Ph.D. in Computer Science and Engineering from the University of Michigan, Ann Arbor, in 1994, with a specialty in computer security and cryptographic protocols. My thesis was entitled "Nonmonotonic Cryptographic Protocols" and concerned authentication in long-running networking operations.

8.     I am a Professor of Computer Science at Johns Hopkins University (the "University"), where I perform research, teach graduate and undergraduate courses in computer science and related subjects, advise undergraduate and Masters students, and supervise the research of Ph.D. candidates and other students. I have taught courses including Networking, Security and Privacy in Computing, and Advanced Topics in Computer Security. I joined the University in 2003 and was promoted to full professor with tenure in April 2004.  I am also the Technical Director of the Johns Hopkins University Information Security Institute—the University's focal point for research and education in information security, assurance, and privacy. The University, through the Information Security Institute's leadership, has been designated as a Center of Academic Excellence in Information Assurance by the National Security Agency and leading experts in the field.  Prior to the University, from 1995 through 1999 I served as Adjunct Professor at New York University, where I taught undergraduate classes on computer, network, and Internet security issues.

9.     I also have significant industry experience.  I am currently the founder and chief scientist of Harbor Labs, a software and networking consulting firm specializing in medical device security and privacy of healthcare data.  Previously, from 2005 to 2011, I served as the founder and President of Independent Security Evaluators ("ISE"), a computer security consulting firm.  In

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

that capacity, I guided ISE through the qualification process to become an independent testing laboratory for Consumer Union, which produces the Consumer Reports magazine. As an independent testing laboratory for Consumer Union, I managed an annual project where we tested popular anti-virus products. Our results were published in Consumer Reports each year for three consecutive years.

10. In addition, I came to the University from AT&T Labs, Secure Systems Research and Department, where I spent six years focused on Internet and computer security. Prior to AT&T Labs, I spent two years at Bellcore in its Cryptography and Network Security Research group, also focusing on Internet and computer security issues. I also interned at IBM in 1989. During my time there, I worked on the IBM System/360 family of mainframe computer systems.

11. I serve, or have served, on several technical and editorial advisory boards. For example, I served on the Editorial and Advisory Board for the International Journal of Information and Computer Security. I also served on the Editorial Board for the Journal of Privacy Technology. In addition, I have been Associate Editor of the Institute of Electrical and Electronics Engineers' ("IEEE") Security and Privacy Magazine and served as Associate Editor of the Association for Computing Machinery's ("ACM") Transactions on Internet Technology. I also served as Associate Editor of the journal Communications of the ACM, and I was an Advisory Board Member of Springer's Information Security and Cryptography Book Series. I also have served in the past as a member of the Defense Advanced Research Projects Agency's Information Science and Technology Study Group, a member of the Government Infosec Science and Technology Study Group of Malicious Code, a member of the AT&T Intellectual Property Review Team, Associate Editor of the Electronic Commerce Research Journal, Co-editor of the Electronic Newsletter of the IEEE Technical Committee on Security and Privacy, a member of the board of directors of the USENIX Association (the leading academic computing systems society), and a member of the editorial board of the Bellcore Security Update Newsletter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

12.     I have spoken on information security and electronic privacy issues at more than 50 seminars and symposia. For example, I presented keynote addresses on the topics "Security of Electronic Voting" at Computer Security 2004 Mexico in Mexico City, Mexico, in May 2004; "Electronic Voting" to the Secure Trusted Systems Consortium 5th Annual Symposium in Washington, D.C., in December 2003; "Security Problems on the Web" to the AT&T EUA Customer Conference in March 2000; and "Security on the Internet" to the AT&T Security Workshop in June 1997. I also presented a talk about hacking devices at the TEDx conference in October 2011 and another TEDx talk on the same topic in September 2015.

### B.     Patents, Congressional Testimony, and Publications

13.     I am a named inventor on ten United States patents. The patent numbers and titles as well as my co-inventors are listed on the attached curriculum vitae.

14.     In March 2004, I was asked by the Federal Trade Commission to submit a report commenting on the viability and usefulness of a national Do Not E-mail Registry. I submitted my report entitled "A Report to the Federal Trade Commission on Responses to Their Request for Information on Establishing a National Do Not E-mail Registry" on May 10, 2004.

15.     I have also testified before Congress regarding security issues with electronic voting machines, as well as in the United States Senate on the issue of censorship. Further, on November 19, 2013, I testified in Congress about security issues related to the government's Healthcare.gov website. It was my opinion that Healthcare.gov did not incorporate adequate security measures and that its poor architectural design allowed for potential compromises of private enrollment information. I recommended several approaches for securing Healthcare.gov, one of which included a recurring security review to check for standard vulnerabilities such as structured query language ("SQL") injections.

16.     I am the author or co-author of five books regarding information security issues: *Brave New Ballot*, Random House, 2006; *Firewalls and Internet Security* (second edition), Addison Wesley, 2003; *White-Hat Security Arsenal*, Addison Wesley, 2001; *Peer-to-Peer*,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

O'Reilly, 2001; and *Web Security Sourcebook*, John Wiley & Sons, 1997. I am also the author of numerous journal and conference publications.

### C. Previous Expert Witness Experience

17.    I began providing expert testimony to both commercial companies and governing bodies in 2004. Since then, I have provided expert testimony to Congress and state governing bodies.  My testimonials have covered a number of topics including electronic voting, computer security and transparency, security features of connected devices, and embedded devices. Furthermore, I have provided expert testimony for multiple commercial litigation matters; during those cases I have testified in deposition, hearings, trial, and arbitration, as well as provided courtroom tutorials, as set forth in my Curriculum Vitae. My testimonies have covered a range of technical and legal matters including patent infringement, patent invalidity, code copying, copyright, and contract disputes.

### D. Curriculum Vitae

18.    Additional details of my education and employment history, recent professional service, patents, publications, and other testimonies are set forth in my current curriculum vitae, attached to this report as **Exhibit 1**.

## III.    MATERIALS RELIED UPON

19.    In forming my opinions, I have also relied upon, in addition to my knowledge and experience noted above, the documents and materials cited herein and listed in **Exhibit 2** to this report. I reserve the right to review other materials throughout this case, including any other documents or testimony that may emerge in this case. Those materials may affect my opinions in this matter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

## IV.   SUMMARY OF PRINCIPAL CONCLUSIONS

20.    My analysis in this matter focuses on the security, privacy, and reliability of iOS, and particularly the question of whether Apple's App Review process and App Store distribution of apps provide and enhance the security, privacy, and reliability of iOS.  It is my overall conclusion that Apple's App Review and App Store distribution provide significant security benefits that meaningfully contribute to iOS being a safer and more trustworthy platform than others.  Allowing alternative app stores for iOS would prevent or weaken Apple's App Review and App Store distribution protections, even where Apple conducts a review of apps distributed through those alternative app stores, and would, in turn, weaken iOS and open it to new threats. This overall conclusion is based on the opinions set forth below:

a.   **Opinion 1.**  Security for computing devices includes detecting and preventing malware. But it encompasses additional considerations such as ensuring user privacy, preventing scams, ensuring device reliability, and protecting developers and consumers from software piracy.  *See* pp. 13-18.

b.   **Opinion 2.**  Security assessments of app distribution must consider the threat model, which is an analysis of factors including who wants to attack the device / user, how many devices / users would be affected, how frequently such attacks are likely to occur, what attack surfaces attackers could try to exploit, and what the consequences are (for the attacker and the victim) of a successful attack.  There are multiple ways of distributing apps, which pose different security considerations.  *See* pp. 18-29.

c.   **Opinion 3.**  With over 1 billion active devices that are almost constantly on and connected to the Internet, a userbase that frequently downloads apps and engages in transactions involving financial, medical, and private information on the device, camera, microphone, and GPS hardware that follows owners nearly everywhere they go, and nearly two million apps available for download, the iOS platform—including Apple iOS devices such as the iPhone and iPad—is faced with an extraordinary threat

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

model.  The portability and accessibility of these devices has facilitated their use for daily and critical tasks such as navigation, conducting transactions, and placing emergency calls, but this also means that they are at a higher risk of being misplaced or stolen, which places the contents of that device at even greater risk.  *See* pp. 29-31.

d.  **Opinion 4.**  Cybersecurity best practices call for layered defenses.  This means that there are multiple defenses in place for each of the multiple types of threats that the device is likely to face.  iOS layers defenses by combining on-device protections, such as access controls to limit the exposure of data and functionality, with additional review or verification mechanisms.  Each layer of protection strengthens the overall security posture of the system by decreasing the likelihood of untrustworthy or malicious apps reaching an iOS device and by reducing the impact of such apps should they make it to the device.  *See* pp. 31-44.

e.  **Opinion 5.**  In many instances, cybersecurity cannot rely on users to make well-thought-out, optimal security decisions.  For example, social engineering attacks, which are on the rise, are exploits specifically designed to manipulate users into taking actions that disable or circumvent existing on-device security or other affirmative protections.  Social engineering attacks that lead to users downloading malicious apps, or downloading from malicious stores, are considerable security concerns for mobile platforms.  *See* pp. 44-45.

f.  **Opinion 6.**  Apple's App Review and accompanying centralized app distribution model is one of the defense layers that Apple has employed to protect iOS devices and users.  Using a combination of human reviewers and sophisticated computer analytical tools, the App Review process provides significant security and non-security benefits by screening apps for a variety of potential problems including scams, privacy intrusions, piracy, and objectionable content, as well as problems with crashing and other reliability issues.  By positioning itself as the sole source of app distribution, Apple

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

prevents users from unintentionally or unknowingly downloading apps that would have failed the App Review process, and Apple also prevents apps that fail the App Review process from simply relocating to another store with lower (or no) standards. *See* pp. 45-49.

g.  **Opinion 7.**  The App Review process, combined with other protective layers employed by Apple, has resulted in iOS being safer than other platforms, facing fewer attacks and malware infections than other platforms.  For example, studies have found that Android devices are fifty times more likely to be infected with malware when compared to iOS and made up 26.64% of infected devices in 2020 (as opposed to iPhones, which accounted for only 1.72% of infected devices).  Apple has achieved this result in spite of the extraordinary threat model that iOS faces. *See* pp. 49-62.

h.  **Opinion 8.**  Apple's policies impact developers and consumers in very different ways. There are many developers who submit apps to the App Store, ranging from developers of educational apps for kids to developers who seek to distribute apps that broadcast illicit and pornographic content, facilitate drug purchasing, or seek the acquisition of user data in violation of privacy guidelines.  These developers are affected by Apple's policies differently, where the latter developers are more likely to see their apps rejected for violating the App Store Review Guidelines, and, by the same token, are more likely to benefit from loosening of Apple's App Review and app distribution protections than developers of educational apps for kids.  Similarly, Apple's current policies protecting against copycat apps protects developers of legitimate apps from developers who seek to distribute copycat apps; changes to those policies would affect the two groups of developers differently.  This non-uniformity of impact extends to consumers, where different groups of consumers may prioritize the safety, reliability, and privacy of the App Store distribution mechanism differently than the ability to download apps available through third-party distribution channels (regardless of the

Case No. 4:11-CV-06714                              Expert Report and Declaration of
Case No. 4:19-CV-03074                                        Aviel D. Rubin, Ph.D.

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

increased security vulnerabilities they may face in the latter situation). These differences in impact upon distributors and consumers are compounded by the fact that not all third-party stores necessarily share the same policies, goals, or resources as Apple, and therefore will not apply the same protections and safeguards that currently exist. *See* pp. 63-67.

i. **Opinion 9.** Outside of the App Store, there are multiple stores with greater rates of malware, privacy violations, and less stringent app review. For example, there exist stores that primarily traffic in adult content, malware, and/or pirated software. Moreover, even distribution sources that demonstrate a commitment to security and privacy do not necessarily match the standards of Apple's App Review. For example, the amount of resources held by an app store operator can affect the level and quality of app review and security that is provided; Apple has devoted a significant amount of resources to the development of its various review and security tools and technology as well as the training of its reviewers. It also should be noted that even well-meaning stores have chosen to adopt lower security or privacy standards than those of Apple. For example, some stores may utilize a revenue model that is dependent upon less protective privacy measures, such as an ad revenue-based model where revenue is based on the ability of advertisers to target and know intimate details about end users. And finally, all other distribution sources will lack Apple's internal knowledge of iOS and iPhone hardware and their security vulnerabilities, as well as the extensive body of knowledge that Apple has accumulated from more than a decade of app review and analysis of threats posed by apps. Providing that internal knowledge of iOS and iPhone architecture to third parties would open up potential associated security threats. *See* pp. 67-69.

j. **Opinion 10.** Apple recognizes its unique role in protecting the security of the iOS platform and its role in providing a safe and trustworthy app distribution mechanism.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

Permitting alternative distribution channels, such as third-party app stores, on iOS
devices would jeopardize the security, safety, and trustworthiness of the iOS platform
and erode Apple's ability to curate apps on the iOS platform to best maintain a safe and
trustworthy experience for its users. *See* pp. 70-71.

k. **Opinion 11.** The fragmentation of app distribution and review would undermine
security. The security of an app platform is only as strong as the weakest link; where
multiple app stores are available, a bad actor could seek out the option that is least
likely to protect against malicious or otherwise problematic apps and the entirety of the
app platform would be vulnerable to attack. It would also undermine the knowledge
and related benefits that Apple's App Review receives from conducting a holistic
review across its platform. *See* pp. 71-74.

l. **Opinion 12.** The current Android marketplace in China demonstrates the problems
with fragmentation. In China, where Google's Play Store is banned, numerous third-
party app stores operate in its stead. Google has little control over the various Android
app stores, which are known to host a higher prevalence of fake, cloned, and malicious
apps than the Google Play store for which Google conducts app review. In fact, China
hosts the top three stores from which users are most likely to download malware—
Xiaomi, Baidu, and Pconline—and more generally, nearly 35 percent of Android apps
distributed from third-party app stores in China were found to secretly steal user data
unrelated to the app's functionality. The multitude of app stores in China has thus led
to generally looser security standards, numerous stores that violate security and privacy
regulations, and, consequently, a proliferation of malicious apps in China's Android
market. *See* pp. 74-75.

m. **Opinion 13.** Changing the app distribution model on iOS would open iOS up to new
threats and create negative security implications. The Class Plaintiffs' experts propose

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

a hypothetical world with significant negative security implications and the creation of new systemic burdens that they have not fully assessed.  *See* pp. 76-79.

n.  **Opinion 14.**  Diversifying In-App Purchase ("IAP") channels would inhibit Apple's anti-fraud abilities.  The App Store's requirement for use of IAP enhances user security, including by use of Apple's cryptographic hardware.  *See* pp. 80-81.

## V.   OVERVIEW OF SECURITY AND APP DISTRIBUTION

### A.   Security Encompasses Safety, Privacy, Trustworthiness, Piracy, Objectionable Content, and Reliability

21.   Computer systems can be targeted by a wide variety of threats, and there are many different ways to defend against such threats.  While the definition will vary depending on the context, **security** generally refers to protecting a system against an adversary that intends harm. This includes the process of protecting data as well as device and system functionality, by, for example, preventing unauthorized third-party access to protected data and privileged device (or more generally, system) functionality, protecting against malware and data breaches, and developing exploit resistance.

22.   **Malware** is typically defined as software designed to disrupt, damage, or gain unauthorized access to a system.  In other words, it is software created and distributed for malicious purposes, such as invading computer systems in the form of viruses, worms, or innocent-seeming plug-ins and extensions that mask other destructive capabilities.  Malware is also referred to as "malicious software."[1]  **Clickware/clickfraud**, for example, is a subset of malware that repeatedly clicks on an advertisement to drive up revenue for the host site or to drain revenue from the advertiser.[2]  A **virus** is an intrusive program that infects executable computer files by inserting copies of itself into those files. The copies of the virus are usually executed when the infected file is loaded into memory and executes itself, allowing the virus to infect other files, and so on. Viruses

---

[1]   Microsoft Computer Dictionary, fifth edition.

[2]   https://aori.com/blog/click-fraud.

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074                                        Expert Report and Declaration of
                                                             Aviel D. Rubin, Ph.D.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

often have damaging side effects—sometimes intentionally, sometimes not. For example, some viruses can destroy files on a computer's hard disk or take up memory space that could otherwise be used by programs.[3]  A **Data breach** is an occasion when private information can be seen by people who should not be able to see it.[4]  **Exploit resistance** is a system's ability to enforce the security measures in place (e.g., having a non-executable stack to avoid malicious code from running, even if malicious code had arrived on the target machine, breaking other anti-malware measures).

23.     Security also encompasses issues including **privacy**, **trustworthiness,** and **reliability.**  For example, if an app is targeted to young children, and asks the user to enter her age and home address, that is a potential security concern.  If an app says that it is a program that allows a user to play Tic-Tac-Toe against the device, but it wants to access the device's microphone and camera for reasons entirely unrelated to Tic-Tac-Toe, that is a potential security concern.  If an app developer scams users by falsely describing the application as one that can detect a stroke, or by artificially inflating an app's reviews to entice customers to purchase the app, those also are potential security concerns.

24.     **Privacy** relates to protecting data from unauthorized access or disclosure, and is intertwined with security: security and privacy are two sides of the same coin, where security controls dictate the level of privacy enforced, and privacy technologies can guarantee a higher degree of security.  For these reasons, the principles of consent and transparency are critical to privacy, as well as the concept of "data minimization," or requiring access to only the minimum amount of data needed to do the work at issue.

25.     **Unreliable** apps also expand the **attack surface**, or different points of entry by which security can be attacked.  Apps are more and more frequently used in the management of daily life and home, and unsafe or unreliable apps could have physical security implications.

---

[3]  Microsoft Computer Dictionary, fifth edition.

[4]  https://dictionary.cambridge.org/us/dictionary/english/data-breach.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

Reliability and security are intertwined, because **reliability** refers to the concept that a system should consistently operate as expected (and that security controls work as expected).  Reliability ensures that a user is able to access data and functionality without issue or interruption.  Decreases in security and reliability thus likely coincide.  For example, a software crash could indicate that a threat has been embedded in an app's code, or otherwise create an opening for an attacker to take advantage of the cause of that crash to, for example, transmit a custom input that redirects the app to a location containing a virus or other malware.

26.     Reviewing apps for legal compliance likewise aids in protecting security.  For example, **piracy**, or the unauthorized distribution and use of a computer program,[5] is a security risk, not just a content moderation issue.  Pirated apps threaten users because they are known to often contain malicious functionality.  And pirated apps threaten developers because the download of pirated apps reduces the revenue stream for the legitimate version of those apps.[6]  Other illegal apps pose similar threats.  Apps that, for example, enable illegal gambling could exploit user information or wealth.[7]

27.     For similar reasons, reviewing for **objectionable content** can contribute to security. For example, objectionable content such as pornography is frequently associated with malware. Kaspersky, a global cybersecurity company that provides antivirus and other cybersecurity products, found that over 25% of malware attacks on Android mobile devices in 2017 came from porn-related malware.[8]  This arises in part because apps and sites distributing pornography have fewer traditional revenue mechanisms available to them, and thus have been found to be more likely to partner with malicious actors in their efforts to monetize their sites.[9]  All of these examples

---

[5]   Microsoft Computer Dictionary, fifth edition.

[6]   https://www.forbes.com/sites/johnkoetsier/2018/02/02/app-publishers-lost-17-5b-to-piracy-in-the-last-5-years-says-tapcore/?sh=4a8443f07413.

[7]   Yuhao Gao et al., "Demystifying Illegal Mobile Gambling Apps," In Proceedings of the Web Conference 2021, pp. 1447–1458, *available at* https://doi.org/10.1145/3442381.3449932.

[8]   https://www.kaspersky.com/blog/porn-related-android-threats/20891/.

[9]   https://www.komando.com/security-privacy/porn-site-malware/757172/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

illustrate the broader point that security is not limited to just anti-virus scanning and exploit resistance mechanisms.

28.     There are a variety of ways to detect and mitigate security threats.  Analyzing and scanning software, source code, and/or an application binary via static, dynamic, and/or manual analysis are common ways of doing so.

29.     **Static analysis** is the practice of taking software or a library (which is a collection of code, possibly in compiled form, used by a program) and running it through a scanning program called a static analyzer. Static analyzers look for common issues related to programming errors, but they can also look for security vulnerabilities. When a static analyzer is analyzing an application, it will ingest the application source code or binary and look for any known vulnerabilities. Static analysis can assist in the review process by finding vulnerabilities or malware that would be difficult to detect when performing dynamic or manual analysis.  Static analysis is, however, subject to the "halting problem."  The halting problem is an issue in computing that states that one program is unable to determine when another program will terminate. As such, it is impossible to make a program like a static analyzer that perfectly predicts how a target program is going to function. The output of a static analyzer is not perfect and will not always perfectly capture the true nature of all programs.

30.     **Dynamic analysis** is the computer analysis of software that is performed while a program is executing. Dynamic analysis can be used to discover security issues that might not be detected by static analysis, including unexpected network traffic, malicious content and functionalities, or reliability problems.

31.     Static and dynamic analysis can be thought of as part of a "cat and mouse game." If a new type of malicious signature or behavior is identified, the analyzer can be configured to detect that signature or behavior in the future. However, malware developers are constantly modifying their code and developing new exploits to evade the detection of analyzers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

32.     **Manual analysis (sometimes referred to as human review)** involves a human reviewer manually reviewing the source code, binary, or other information related to an app, as well as (or alternatively) observing the execution of a program.  A human reviewer might notice suspicious-looking components that would be missed by static and dynamic analysis.

33.     Source code and an application binary are different**.  Source code** is understood to be human-readable program statements written by a programmer or developer in a high-level or assembly language that are not directly readable by a computer. Source code needs to be compiled into object code before it can be executed by a computer.[10]  By contrast, an **application binary,** or **binary code,** comprises a file, or files, consisting of a sequence of 8-bit data or executable code, as distinguished from files consisting of human-readable ASCII text representing programming statements.  Binary files are usually in a form readable only by a program, often compressed or structured in a way that is easy for a particular program to read.[11]

34.     In addition to taking steps to scan and/or review software to identify threats, users and companies may implement additional protections to protect data privacy and security. **Cryptography**, for example, is a different type of technique that can be used to prevent an attacker from gaining access to protected data.  Cryptography is the study of how to hide information.  It is often used to secure or protect electronic communication between entities. Cryptography includes two methods for altering the readability of information: encryption and decryption. Encryption is the practice of converting readable information into unreadable information through use of a key; decryption is the inverse. Those skilled in the art refer to readable information as plaintext and encrypted information as ciphertext. In theory, by encrypting private data, an attacker without the decryption key will only have access to the ciphertext, which does not leak any data, thus keeping the data confidential.

---

[10]   Microsoft Computer Dictionary, fifth edition.

[11]   *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

35.     A somewhat related concept is called authorization. **Authorization** is the concept of using mechanisms to permit specific users access to protected data and functionality, while at the same time preventing unauthorized users from accessing those resources. A typical example of authorization is the use of a passcode that must be entered to gain access to a user's smartphone. If the owner of the phone is the only party with knowledge of the passcode, then they are the only authorized individual.

36.     Aside from cryptography and authorization, companies can also implement platform-specific protections to further protect a user's privacy.  Further, even within a platform there are various controls that can be configured to change depending on convenience, security, and privacy.

##### B.        Security Requires Consideration of the Threat Model

37.     When considering a system's security, it is critical to consider multiple factors in its threat model: the vulnerabilities, weaknesses, and defects of the system, the risk of defects if exploited by an attacker, and the impact of exploitation.  It is not enough to simply enumerate the security controls in place. For instance, one must consider how users use the system and the number of devices running that system.[12]  These all can influence the value of access to that system. The context of a system's use can greatly influence the answers to these questions as one context may be grossly insecure compared to another.  For example, a security analysis of a smartphone or a laptop requires an understanding of how the system is accessed, who accesses it, when and where they access it, and how and where data is stored. These details give insight into the threat model.

38.     A threat model also requires consideration of attackers in terms of goals, capabilities, and return on investment. How might an attacker recover private data from a smartphone, and why would they want to do that? Does an attack require sophisticated hardware?

---

[12]  Trial Transcript in Epic v. Apple ("Epic Tr. Transcript") (Federighi) at 3360:20-25 ("A common way when considering security is to think about the threat model, who are the threat actors, what are they trying to do, what are their motivations, what are their means of attack, and then consider what sort of countermeasures or obstacles can be created to frustrate that attack or make that attack economically inviable for them.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

What information would be accessible and how many users would be impacted? And is it costly? The motivations and resources of potential attackers therefore must also be considered, particularly because it has been observed that malware developers and other malicious actors continue to become more sophisticated and expend significant resources to build malicious and other ill-intentioned software, including apps for mobile devices, particularly as the value of such access increases.

39.     Cybersecurity cannot be static, because malicious actors are always seeking out new vulnerabilities in systems and ways to circumvent and evade anti-malware and other security mechanisms.  These types of attacks can manifest in the mobile app landscape in multiple ways. There are many different tools and techniques that malicious app developers use today in their efforts to infect user devices.

40.     For example, malware developers continue to build malware that is able to circumvent and evade anti-malware software and other security mechanisms.  Purplesec, a cybersecurity company, observed in a report published in 2020, that the total malware infection growth rate has been increasing by hundreds of millions every year (812.67 million infections reported in 2018, a significant increase from 702.06 million reported in 2017).[13]

41.     Among the better-resourced are private spyware companies and Advanced Persistent Threat ("APT") groups, which are often directed and supported by established nation-states to conduct cyberattacks on government, industry, and infrastructure targets for political or economic agendas.  APT groups are typically extremely well-funded and often use zero-day exploits to cause long-term critical damage on critical assets, including through, for example, spyware that collects recordings, locations, messages, and call logs from infected users.  While such attacks are typically directed towards high-profile victims and critical assets, not the average iOS or smartphone user, and are usually less frequent than traditional mass economic-motivated

---

[13]   https://purplesec.us/resources/cyber-security-statistics/.

Case No. 4:11-CV-06714                          Expert Report and Declaration of
Case No. 4:19-CV-03074                                    Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

malware,[14] they nonetheless demonstrate the extent to which the value of the target and the threat

model can affect the security analysis.

## Attack Trends



42.   Social engineering attacks are also on the rise—at a presentation given by
KnowBe4, a cybersecurity company that focuses on social engineering, it was stated that 98% of
cyberattacks relied on social engineering in 2018.[15]   Social engineering attacks are exploit
problems designed to manipulate users into taking actions that disable or circumvent existing on-
device security or other affirmative protections.   An example of a social engineering attack is
presented by the "Update your Adobe Flash plugin" pop-up scam, where multiple malicious
websites relied upon general familiarity with the "Adobe Flash Player" program to disguise
malware in a pop-up advertised as an Adobe Flash Player update.[16]   Users who thought they were
agreeing to update their Flash Player were instead unwittingly installing adware (malware that

---

[14]   Epic Tr. Transcript (Federighi) at 3402:6-3403:16.

[15]   https://purplesec.us/resources/cyber-security-statistics/; Stu Sjouwerman, "Phishing and Social Engineering in 2018: Is the Worst Yet to Come?," KnowBe4, *available at*
https://www.knowbe4.com/hubfs/PhishingandSocialEngineeringin2018.pdf.

[16]   https://www.bleepingcomputer.com/news/security/warning-google-alerts-abused-to-push-fake-adobe-flash-updater; https://blog.malwarebytes.com/awareness/2021/01/adobe-flash-player-reaches-end-of-life/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

would hide on their device, show unwanted advertisements, and/or track user behavior) or worse. As another example, even iOS app developers with a considerable amount of technical sophistication fell victim to the XcodeGhost malware discovered in 2015.  A number of iOS app developers in China downloaded and utilized XcodeGhost software thinking that it was Xcode (Apple-provided software used to develop apps), not realizing that XcodeGhost had malicious code embedded in its files.[17]  Scams and phishing campaigns do not directly subvert on-device security measures, but instead exploit the (misplaced) trust between the user and the vehicle through which a user would download the software or app.

43.     A threat model formalizes the security risks faced by a system in order to facilitate consideration in developing what security requirements and controls will be put in place to address those risks.   Understanding the threat model, including the identity of the bad actors, their motivation, means of attack, and what roadblocks can successfully obstruct their attacks, is critical to building the necessary security and defense mechanisms to protect users from potential attackers.[18]

44.     An important step in a security analysis is the construction of a set of security requirements. These policy invariants describe how the system is supposed to function as envisioned by its creators and stakeholders.  In other words, security requirements prescribe how a device should operate in the face of the risks identified in the threat model. Typical security requirements include policies related to the use of access controls to limit the exposure of data and functionality and the use of standardized cryptographic algorithms and protocols to protect data at rest and in transit via a network.

---

[17]  https://unit42.paloaltonetworks.com/novel-malware-xcodeghost-modifies-xcode-infects-apple-ios-apps-and-hits-app-store/.

[18]  Epic Tr. Transcript (Federighi) at 3360:20-25 ("A common way when considering security is to think about the threat model, who are the threat actors, what are they trying to do, what are their motivations, what are their means of attack, and then consider what sort of countermeasures or obstacles can be created to frustrate that attack or make that attack economically inviable for them.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

45.     Different platforms can have different threat models and/or different security requirements because they can face different customer expectations and needs for security and privacy.  This is true both at a platform philosophy level as well as at a configurability level.  For example, certain platforms, such as Android, allow more device customization than others.  Users can change out a variety of system components including the dialer and default SMS-handling application.  Similarly, Android permits users to sideload packages onto the device, including packages that perform sensitive functions, while other platforms adopt a more secured manner of distribution.

46.     In view of the wide variety of potential attacks, and the attack mechanisms that can be used, computing security best practices calls for the employment of layered defenses.  The concept of **layered defenses** is based on the understanding that the more layers of protection that a system has, the harder the system is to exploit.  Each additional layer of protection enhances the overall security posture of the overall system.  In computer systems generally, layered security combines access controls to limit the exposure of data and functionality with additional security review or verification mechanisms.

### C.     Models of App Distribution

47.     **App distribution** generally refers to the way in which apps are distributed, or made available, from the app developers to user devices.  There are multiple models of app distribution, each of which face different security and device configuration considerations.

48.     First, in the direct distribution model, users obtain apps directly from the developers who wrote those apps.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

## Direct Distribution



## Direct Distribution



A user may, for example, find an app on a developer's website and download that app directly

onto their device.  Typically, in this model, the user must rely upon the developer's commitment

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

to security and is solely responsible for vetting the security and privacy implications of the app that they seek to download.  Because the user's device must be configured in a way that apps may be received and downloaded from varying sources (with varying security protocols and protections), if a developer has written—deliberately or inadvertently—a malicious app, the user could download that malicious app directly from the developer as well as pass the infected app to other users whose devices are similarly configured to directly receive and download apps.

49.     Second, in the multiple app store distribution model, apps would be distributed through app stores, which would act as locations through which developers could provide and publish their apps.



In a multiple app store distribution model, developers could choose which app store (or app stores) to utilize, and whether they would choose to distribute their apps exclusively through one store or multiple stores.  In the multiple app store distribution model, the likelihood of a malicious app being distributed by at least one of the app stores increases, as different app stores may have different security or privacy policies, resources, and/or protection and policy enforcement abilities.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

Some app stores may perform security checks, but others might not.[19]  An app store thus might distribute a malicious app inadvertently because they are unable to identify an app as malicious, or because it does not even scan or otherwise review apps for malicious intent or behavior.





---

[19]   https://www.digitaltrends.com/mobile/android-app-stores/.

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

50.     Even if the vast majority of app stores have adopted strict security policies and enforcement mechanisms, the multiple app store distribution model creates significant security vulnerabilities if apps can also be downloaded through at least one store with less strict security policies and enforcement mechanisms.  In this instance, security is only as strong as the weakest link.  Thus, for example, a malicious app developer could seek to exploit the multiple app store distribution model by, for example, utilizing multiple listings, or in other words, submitting their malicious apps to more than one store in order to increase the chance that at least one app store will accept and publish those apps to users.  Malicious app developers also may leverage multiple app stores by creating two versions of an app, where one is benign and the other malicious or otherwise contains problematic functionality. The developer may list the benign version first, typically in an app store with a high profile and perhaps a reputation for strict screening of apps. Once the benign version of the app has gained popularity, the developer then distributes the alternative version of the app through an app store with less strict security policies and enforcement mechanisms (or directly), where that app is expected to have the benign properties of the alternative version available through the safer store.  A malicious developer also might modify the multiple listing attack by placing the malicious behavior in a later-provided update to the app that would be available only through app stores that do not review app updates (or that are less secure). This essentially converts an originally benign app into a malicious app.

51.     The multiple app store distribution model is also vulnerable to other social engineering attacks such as imposter stores and imposter apps.  Imposter stores are created by attackers to have the same look and feel as a better-known app store, with similar apps as the better-known app store.  Ultimately, however, the imposter app store will take advantage of its imposter status to distribute apps that are perceived as safe, but are in fact themselves malicious or imposters.  Imposter apps, like imposter app stores, are apps that are intended to resemble a well-known app so a user believes they are downloading the well-known app, not the imposter

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

(also known as a copycat app).  Malicious actors often conceal malicious behavior in imposter apps, because users do not scrutinize as heavily an app that they believe they recognize. For example, an "Update WhatsApp Messenger" Android app, posing as the legitimate WhatsApp app, was downloaded by more than 1 million Android users before Google removed it from the Google Play Store.[20]  An empirical study in 2017 also demonstrates that the presence of alternative app stores correlates with the distribution of imposter Android apps that "piggyback" on legitimate, renowned apps. The study found that piggybacked apps were likely to be uploaded onto *different* markets than where the original app could be found. A large number of imposter apps were found on alternative markets in the Android distribution model, such as anzhi (71%) and appChina (14%), while only 2.2% of imposter apps were found on the Google Play Store, the default app store for the majority of Android devices.[21]

52.     As in the direct distribution model, the multiple app store distribution model creates additional security vulnerabilities because a user device will be configured to accept apps that are received and downloaded from varying sources (with varying security protocols and protections)—and therefore could be more vulnerable to attacks from these various angles.

53.     Third, in the centralized distribution model, as the one employed for iOS all apps are distributed through one app store.  Both developers and users would utilize that same app store.

---

[20]   https://thehackernews.com/2017/11/fake-whatsapp-android.html.

[21]   Li Li et al., "Understanding Android App Piggybacking: A Systematic Study of Malicious Code Grafting," IEEE Transactions on Information Forensics and Security, June 2017 *available at* https://lilicoding.github.io/papers/li2017understanding.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

## Centralized Distribution



In a centralized distribution model, devices are configured to receive and download apps only from the designated app store, and therefore are tailored to the security settings of that app store. Moreover, the same security policy can be applied to all apps that are submitted and distributed through this single designated app store. If the app store in question has a strong security policy and does a good job of reviewing apps, then the centralized distribution model would protect

## Centralized Distribution



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

against malware and other malicious apps that might otherwise be distributed to user devices in the multiple app store distribution model where developers may, deliberately or inadvertently, send their apps to an app store that is less secure.

54.     Furthermore, where it is discovered that malicious apps have nonetheless made it onto a user device, the centralized distribution model is more efficient at preventing those malicious apps, and apps similar to the discovered malicious apps, from remaining available for download onto user devices.  The centralized distribution model provides greater platform security because it enables a dynamic review process applied to all apps that could be downloaded onto a user device, where the review process adjusts itself to information learned from, and because of, malicious apps that previously made it through an app review process.  By contrast, in a multiple app store distribution model, one or more of the app stores may not know to, may not be able to, or may not choose to block discovered malicious apps.

## VI.     OVERVIEW OF IOS PROTECTIONS

### A.     iOS Faces a Heightened Threat Model

55.     Any evaluation of the security of iOS must consider its threat model: its context, objectives, potential attackers, and the manner in which users use their systems.  Because of all of these factors, iOS faces an extraordinary threat model.

56.     iOS has over 1 billion active devices,[22] an App Store that hosts almost 2 million apps that have been downloaded over 180 billion times, a user base that frequently downloads apps and engages in financial transactions on the device, a camera, a microphone, and GPS hardware that follows users nearly everywhere they go.[23]  The Apple App Store receives on average approximately one hundred thousand submissions of new apps and app updates per week (and millions per year).[24]  iOS devices are small, portable, typically on at all times and kept close at hand by users for critical tasks such as navigation and emergency calls.  They are very likely to

---

[22]   https://www.theverge.com/2021/1/27/22253162/iphone-users-total-number-billion-apple-tim-cook-q1-2021.

[23]   *See* Epic Tr. Transcript (Federighi) at 3363:16-20, 3365:2-3.

[24]   Epic Tr. Transcript (Kosmynka) at 1040:22-1042:9, 1083:12-14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

hold a user's financial information, personally identifiable information ("PII"), protected health information ("PHI"), and location information.  Additionally, they might be misplaced, lost, or stolen at a higher frequency than other types of computer systems.  The convenience of iOS devices has led users to store more private information on them, and users rely on their functionality.[25]  As Craig Federighi, Apple's Senior Vice President of Software Engineering, testified, Apple recognizes that the number of iOS devices, the number of app downloads, and value of access alone make iOS devices rewarding, high-value targets to attackers, which increases the number of risks that iOS devices face.[26]

57.     Threats facing iOS can take a variety of forms.  For example, scam software typically misrepresents itself and claims to offer something that it does not actually deliver.[27]  This could include software that indicates that it will provide access to a video or discounted software in exchange for money, but instead provides nothing once the money is paid.  On the other hand, the software might cause damage in the form of destroying data or critical system files, or otherwise using computer system controls to wreak havoc.[28]  The software also might take the form of spyware or ransomware and take advantage of its access to the device. Spyware, or surveillanceware, could, for example, utilize access to a device's microphone to listen in on the user's conversations, or utilize a keylogger to record all of the user's passwords and account numbers as they are typed.  Ransomware typically utilizes its access to the device to steal data or lock a user out and then demand something, often money, in exchange for not releasing the stolen private data or for restoring the user's access to their device.[29]

58.     Take, for example, a Tic-Tac-Toe app that seeks an entitlement (which is the access sought by an app to certain functionality or data on a device) that gives it access to an iPhone's

---

[25]   Epic Tr. Transcript (Federighi) at 3362:20-3363:7.

[26]   *Id.* at 3365:2-3, 3362:20-3363:7.

[27]   *Id.* at 3365:23-3366:3.

[28]   *Id.* at 3366:6-17.

[29]   *Id.* at 3366:19-3368:8.

Case No. 4:11-CV-06714                                    Expert Report and Declaration of
Case No. 4:19-CV-03074                                           Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

microphone.  Theoretically, if the entitlement were granted, a malicious actor could use that app to listen in on the user's private conversations and potentially obtain information that could be leveraged against the user.  Furthermore, if the Tic-Tac-Toe app also requests Bluetooth access, the app could be used to alert the malicious actor whenever the user was (a) far enough away from their home that their house was vulnerable to burglary or (b) in a particular location and personally vulnerable to attack or pickpocketing.  For these reasons, additional security review and verification mechanisms can be tasked to evaluate what types of access an app is seeking as well as whether the motivations for that access are malicious or otherwise do not have a legitimate reason.

### B.    iOS Security Protections

59.    I understand that Apple views security as the process of protecting both the users' data and the control over their devices from bad actors.[30]  Mr. Federighi has explained: "Security, as a discipline for us, means protecting users' data and protecting their control over the device, making sure that what happens on their device is what the user intended and isn't being manipulated by a bad actor."[31]  He further confirmed that, for Apple, security encompasses and is a foundation of privacy, explaining: "If an attacker could access all of your data without your control, well, then all bets are off."[32]  Phil Schiller, an Apple Fellow responsible for leading the App Store, explained: "the iPhone is a phone that you're carrying around and you need [it] to work for you as a phone and we care deeply that the security of that device protected you so that it would be more reliable than PCs . . . so we had to create something that had technologies and capabilities that made it more secure [] and more protected from those malware and instability issues and quality issues that the PC world was used to."[33]  Tim Cook, Apple's Chief Executive Officer,

---

[30]  *Id.* at 3358:5-8

[31]  *Id.*

[32]  *Id.* at 3406:8-10.

[33]  Deposition of Philip Schiller, Feb. 11, 2021 at 57:5-14.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

testified during deposition: "Security and privacy are, you know, very important" and "[i]t is something that we believe we're better at than others. And so we pride ourselves in it."[34]

60.     Apple has taken steps at the outset to implement stringent security measures that are tailored to the particular threat model and user expectations for iOS.  Apple's security measures and goals are evident in its approach to the App Store, which Apple seeks to make a "safe and trusted place to discover and download apps."[35]  Apple states: It is "more than just a storefront – it's an innovative destination focused on bringing you amazing experiences.  And a big part of those experiences is ensuring that the apps we offer are held to the highest standards for privacy, security, and content.  Because we offer nearly two million apps – and we want you to feel good about using every single one of them."[36]

61.     Apple employs a variety of measures to ensure a safe and smooth user experience for iOS device owners, which includes a holistic and layered security approach that combines on-device security with additional protections.[37]  In iOS, layered security combines access controls to limit the exposure of data and functionality with additional security review or verification mechanisms.  I understand that Apple uses the term "defense in depth" to refer to this concept of providing many layers of protection so that if any one of those layers is temporarily circumvented, other layers of protection exist.[38]  Layered security, or defense in depth, is intended to lower the risk of unwanted apps ever reaching an iOS device and users being confronted with social engineering attacks, as well as reducing the impact of unwanted apps should they be able to make it to the device.  Layers of security, in the aggregate, also create difficulty and economic disincentive to a malicious actor by creating additional barriers to fight through and therefore

---

[34]  Deposition of Tim Cook, Feb. 12, 2021 at 105:22-106:10.

[35]  https://www.apple.com/app-store/; Epic Tr. Transcript (Kosmynka) at 1085:1-12.

[36]  https://www.apple.com/app-store/.

[37]  *See* Deposition of Craig Federighi, Feb. 10, 2021 at 319:4-17 (agreeing that "Apple frequently gets requests from developers for specific terms or support.  We listen to these requests and accommodate them if we can, consistent with our values of safety, security, and privacy.").

[38]  Epic Tr. Transcript (Federighi) at 3372:10-13.

*(Cont'd on next page)*

Case No. 4:11-CV-06714                        Expert Report and Declaration of
Case No. 4:19-CV-03074                                    Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

increasing the costs compared to the potential return.[39]  For iOS, Apple's layers of security include its manual and automated App Review process, certificate validation and code-signing, and identity verification of developers in a centralized app distribution model as well as on-device runtime security protections.

### 1.    Apple's App Review Process and Centralized App Distribution

62.    iOS utilizes a centralized app distribution model, in which all apps and app updates are submitted to and distributed through Apple's App Store.  This creates a single point of enforcement as well as a single location for obtaining apps, which Apple ensures are reviewed according to its rigorous review process.

63.    Apple has a comprehensive manual and automated app review process for all apps and app updates submitted to the iOS App Store – which average approximately a hundred thousand per week.[40]  This App Review process, which is intended to make the App Store "a great place for customers to find safe and trusted apps and a great opportunity for all developers,"[41] benefits from over a decade of improvements and innovations in response to the discovery and evolution of new safety threats.[42]  As part of this process, Apple has developed sophisticated machine learning tools and a custom app review environment that automatically surfaces relevant and important facts and presents them to a human for review.  Apple's App Review "is an essential line of defense" that significantly contributes to iOS's security.[43]  In 2020, for example, Apple's App Review rejected more than 215,000 apps for privacy violations (such as asking for more user data than the app needs or mishandling the data that the app collects), 48,000 apps for containing hidden or undocumented features, more than 150,000 apps because they were found to be spam,

---

[39]  *Id.* at 3372:14-18.

[40]  Epic Tr. Transcript (Kosmynka) at 1083:12-14.

[41]  *Id.* at 1085:1-12.

[42]  *Id.* at 1112:16-25.

[43]  https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/

*(Cont'd on next page)*

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

copycats, or misleading to users in ways that manipulated them into making a purchase, and more than 95,000 apps for fraudulent "bait and switch" maneuvers that fundamentally change how an app works after review.[44]

64.     The Apple App Store Review Guidelines guide the review process, where the Guidelines are intended to create a "great place for customers to find safe and trusted apps and a great opportunity for all developers."[45]  To accomplish these ends, the Guidelines require, for example, that "[a]pps should not include content that is offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy."[46]  The Guidelines also include safety Guidelines for apps designed for children, such as Guideline 1.3 (addressing apps in the Kids category), as well as Guidelines such as Guideline 1.4, which is intended to protect against apps that would "behave[] in a way that risks physical harm."[47]  Trystan Kosmynka, the head of Apple's App Review, and Mr. Federighi testified that apps rejected under these Guidelines have included a "Challenge App" that paid users to participate in dare challenges (such as daring someone to jump off a bridge on video) and a "speed test" app that tested how fast a user's car was going in a competition with their friends.[48]

65.     The App Store Review Guidelines also include Guidelines intended to ensure that apps perform the way that they are described as performing; developers are cautioned: "Don't include any hidden, dormant, or undocumented features in your app; your apps' functionality should be clear to end users and App Review."[49]  This Guideline is intended to protect against, for

---

[44]  https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/; Epic Tr. Transcript (Kosmynka) at 1119:2-12.

[45]  Epic Tr. Transcript (Kosmynka) at 1084:12-1085:18.

[46]  App Store Review Guidelines, 1.1; Epic Tr. Transcript (Kosmynka) at 1085:19-1086:12.

[47]  App Store Review Guidelines, 1.3, 1.4; Epic Tr. Transcript (Kosmynka) at 1086:14-1088:9.

[48]  Epic Tr. Transcript (Kosmynka) at 1087:9-1088:4; Epic Tr. Transcript (Federighi) at 3387:5-15.

[49]  Epic Tr. Transcript (Kosmynka) at 1088:19-1089:13; App Store Review Guideline 2.3.1.

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

example, an app that appears benign during review because it looks like it manages wallpapers, but then changes to a gambling app or a pornography app after it is approved to the App Store.[50]

66.     Privacy is also a focal point of the App Store Review Guidelines.  Mr. Kosmynka explained that apps are commonly rejected for violating the privacy Guidelines because they "try to request too much information or information that is irrelevant to their core functionality."[51] Apple requires apps to provide "informed transparency," where the customers know what data they are being asked to provide and the customers must provide consent for the app to access the data.[52]  Apple also enforces "data minimization," where "[a]pps should only request access to data relevant to the core functionality of the app and should only collect and use data that is required to accomplish the relevant task."[53]  Apple also requires that apps should "not attempt to manipulate, trick, or force people to consent to unnecessary data access."[54]  Under this Guideline, Apple has rejected apps that "hold users hostage and require that they provide consent before they will [] provide the functionality that, say, the user paid for."[55]

67.     In a similar vein, Apple rolled out a policy called app privacy labels, colloquially referred to as nutrition labels, that serves the same purpose that, for example, a nutrition summary information serves on the side of a box of cereal.  Mr. Federighi explained: "With privacy labels, we seek to do the same thing, have developers submit accurate information to a set of coherent categories that we can then represent to the user in a way they can understand so that before they

---

[50]  Epic Tr. Transcript (Kosmynka) at 1088:19-1089:13.

[51]  *Id.* at 1091:2-9.

[52]  *Id.* at 1091:10-24; Epic Tr. Transcript (Federighi) at 3408:3-6; App Store Review Guideline 5.1.1.

[53]  Epic Tr. Transcript (Kosmynka) at 1092:6-20:1; Epic Trial Transcript (Federighi) at 3406:11-25; App Store Review Guideline 5.1.1(iii).

[54]  Epic Tr. Transcript (Kosmynka) at 1092:21-1093:21:1; Tr. Testimony (Federighi) at 3407:9-12, 3411:7-11; App Store Review Guideline 5.1.1(iv).

[55]  Epic Tr. Transcript (Kosmynka) 1093:2-5.

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

make the decision to download an app, they have some understanding about how that app treats their data."[56]

68.     The App Store Review Guidelines also include a Guideline that protects against copycat apps, which benefits developers as well.[57] Mr. Kosmynka explained that, under this Guideline, Apple has rejected apps that try to, for example, capitalize upon the name of popular apps and leverage their popularity and names.  Some apps try to trick customers into thinking that they have official affiliation with that popular app; other apps steal the artwork, screenshots, icons, and names.[58]  The App Store Review Guidelines would prevent apps like the "Update WhatsApp Messenger" app that I discussed in Section V.C from being uploaded to the App Store.

69.     To conduct its review and enforce the App Store Review Guidelines, Apple has developed proprietary machine learning tools that are used in conjunction with years of accumulated internal knowledge of iOS and Apple's visibility into all parts of the iOS ecosystem.[59] These tools leverage machine learning and heuristics based on Apple's insight into developers and past experiences to quickly extract large volumes of relevant information and subsequently present this information clearly and concisely to a human reviewer in order to facilitate the expedient and accurate review of apps.[60]  For example, Apple can codify information gained during review of malicious or otherwise problematic apps into rules that will proactively detect similar apps during future review.[61]  This occurred where Apple received a report of an app that was collecting location data and sending that location data to data brokers without user consent.  Apple used its tools to track this behavior to a third-party developer SDK and then identify other apps using that SDK.[62]

---

[56]  Epic Tr. Transcript (Federighi) at 3408:18-23.

[57]  Epic Tr. Transcript (Kosmynka) at 1089:14-1090:16; App Store Review Guideline 4.1.

[58]  Epic Tr. Transcript (Kosmynka) at 1089:14-1090:16.

[59]  *Id.* at 1036:6-12.

[60]  *Id.* at 1108:20-1109:11, 1118:8-22.

[61]  *Id.* at 1108:20-1109:11.

[62]  *Id.* at 1120:24-1122:4.

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

In addition, Apple's App Review team includes a Projects and Infrastructure team that is dedicated to making sure that App Review, as an organization, is ready to perform in view of the new needs that arise with new releases of Apple operating systems and hardware.[63]  Apple's App Review further benefits from its own specialized knowledge of its own hardware and software.[64]  These techniques and knowledge cannot be easily replicated outside of Apple. These tools also enable Apple to provide extremely fast and efficient app review without facing the same extent of the accuracy tradeoff that third parties would generally have to make.  I understand that Mr. Kosmynka believes that Apple's employees, investments, and infrastructure are critical to the App Review process.[65]

70.     For example, Apple utilizes a suite of automated tools for detecting malware, unauthorized private API usage, unintended use, and other potentially suspicious activity.  Apple has been able to utilize over a decade of data to train machine learning algorithms to help identify malicious apps that require human review that might otherwise not be detected.[66]  Machine learning is not only used to help determine an app's permissibility into the App Store, but also to expedite the app review process itself.  Apple invests substantial resources to optimize the review process through the use of machine learning and other advanced technologies.[67]

71.     Many of Apple's automated tools conduct static and dynamic analysis on the app package submitted by a developer.[68]  This includes, for example, conducting analysis of configuration files, instructions included with the app binary that describe how an app should behave, as well as images and icons that are provided by the developers.[69]  Static analysis is

---

[63]  *Id.* at 1082:4-10, 1122:22-1123:6.

[64]  *Id.* at 1122:13-1123:13.

[65]  *Id.* at 1122:13-1123:21.

[66]  *Id.* at 1108:20-1109:11, 1118:8-22.

[67]  *See id.*

[68]  *See id.* at 1095:19-1104:12.

[69]  *Id.* at 1116:1-9.

*(Cont'd on next page)*

Case No. 4:11-CV-06714                     Expert Report and Declaration of
Case No. 4:19-CV-03074                                     Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

performed on the compiled binary, or computer software, and the package that the developer submitted to Apple, without actually executing the binary.[70]  Dynamic analysis, by contrast, involves analysis of the app as it is executed, or run.[71]  The tools used during static and dynamic analysis include Z Strings, App Similarity, App Transparency, DT App Analyzer (DTAA), and Mercury, which have been developed and maintained in confidence by Apple.[72]  Mr. Kosmynka has explained that these tools perform various functions in order to determine whether an app may have potential malicious behavior, may not behave the way its developer says it should, seeks overly broad entitlements, seeks access to data or functions, such as health records or a device's microphone, or otherwise acts contrary to the App Store Review Guidelines.[73]  Both static and dynamic analysis (as well as human review), for example, look for potential entitlement issues.[74]  As another example, Z Strings assesses a compiled binary to determine whether a developer utilizes "variables that are strings . . . [that] include things like URLs, IP addresses, information that could also be used to link and identify potential malicious behavior."[75]  App Similarity assists in identifying copycat apps, by looking at "the machine language of the app and provid[ing] a signature, and that signature will be used as a way to find whether or not there are clones of this particular binary."[76]  App Transparency helps identify "whether or not there [are] obfuscated API calls and [whether] they may be [hiding] methods or classes that would have otherwise statically been undetectable."[77]

---

[70]  *Id.* at 1096:12-23.

[71]  *Id.* at 1096:23-1097:1.

[72]  *See id.* at 1097:2-1104:12.

[73]  *See id.*

[74]  *See id.* at 1102:10-1104:12.

[75]  *Id.* at 1098:8-13.

[76]  *Id.* at 1098:2-7.

[77]  *Id.* at 1098:14-25.

*(Cont'd on next page)*
Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

72.     DTAA and Mercury both identify information about the developer's submission; DTAA, for example, scans a developer's submission and identifies the "frameworks that the app uses, classes, and methods that the app has available to it" while Mercury is a grid of devices that "grab facts about the submission such that [Apple] can inform [its] tools and inform [its] reviewers."[78]  Some of the information extracted by DTAA and Mercury, for example, could include private APIs identified by DTAA or URLs that are discovered when Mercury executes, launches, and attempts to navigate to an app.[79]  This information helps inform human reviewers about the likelihood of security or reliability concerns, etc., with apps.  APIs, for example, are interfaces through which an app can access system functions.  Apple has created a list of private APIs and has determined that they should be used by Apple only for its internal purposes. However, as recognized by Dr. Elhauge in his testimony, some of Apple's private APIs need to be made available for third-party distributors, if alternative distribution methods are to be implemented.[80] Disclosure of confidential and proprietary information about iOS and iPhone hardware can create significant security and reliability risks.  Preventing third-party developers from accessing Apple's private APIs helps ensure that apps cannot interfere with the core functions and stability of iOS.

73.     Mercury monitors for problematic apps; it can, for example, seek to detect malicious apps such as "backdoor switch" or "bait and switch apps," which appear benign during app review but act maliciously once they are uploaded to the App Store and downloaded onto user devices.[81]  Mercury is able to capture video and network traffic of an app operating during the automated review process (for humans to review later), and it also automatically captures videos

---

[78]  Tr. Testimony (Kosmynka) 1097:22-1098:1, 1099:2-6.

[79]  Tr. Testimony (Kosmynka) 1099:25-1100:8, 1101:15-1102:8.

[80]  Deposition of Einer Elhauge, July 30, 2021 at 86:15-19 ("Q. Is it your opinion that a rival iOS distributor could use any of Apple's iOS code? A. Well, I think they'd have to get access to the IA – the A – APIs in order to run on the operating system.").

[81]  *Id.* at 1120:18-23.

*(Cont'd on next page)*

Case No. 4:11-CV-06714                                          Expert Report and Declaration of
Case No. 4:19-CV-03074                                                  Aviel D. Rubin, Ph.D.

39

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

of the app in operation after the app is approved.[82]  Apple uses Mercury to rerun approved apps at different intervals to determine whether unreviewed content or functionality has been added to apps that have been uploaded to the App Store.[83]

74.     Information gathered during static and dynamic analysis are moved into the complex MOZART system, which contains a rules engine that permits codification of scenarios that have been seen historically.[84]  Human reviewers then, utilizing the Magellan tool developed by Apple, review the app submission, including inspecting the metadata and app history of the submission.[85]  The human review phase, which includes, for example, additional review for entitlement issues and offensive content, also detects new threats.[86]

75.     Apple's App Review team includes approximately 500 experts, which include the Policy Escalations and Notables team of specialist, senior reviewers that are familiar with complexities of apps that could have large negative impacts, the App Review Compliance ("ARC") team that receives information from customer reports and public channels, as well as other teams at Apple, to identify and track potential review violations, the Technical Investigations team that investigates apps that may have a more deep-rooted technical challenge with an app, and the App Store Improvements team that engages in an ongoing process to continuously clean and curate live apps on the App Store.[87]  The App Review team also includes the Expedites team and Developer Advocates team, which work with developers during the review process to, for example, help chaperone apps that developers have sought to expedite. These two teams seek to overcome potential communication challenges arising with developers.[88]  The App Review team

---

[82]   *See id.* at 1099:1-1100:8.

[83]   *See id.*

[84]   *Id.* at 1104:14-1105:6.

[85]   *Id.* at 1105:8-1106:7.

[86]   *Id.* at 1106:20-1109:11.

[87]   *See id.* at 1077:21-1079:15.

[88]   *Id.* at 1079:17-1080:5.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

also includes functions for ongoing training and improvement: a dedicated training function that focuses on training new hires within App Review as well as uptraining existing reviewers, a Content and Communication function that works on ensuring that policies and workflows are clearly documented for reviewers, and a Business Excellence function that works as a quality and auditing organization in order to conduct root-cause analysis and make necessary improvements, whether to tools or performance management of reviewers .[89]

76.     The Apple App Review process also implements malware scanning.  Malicious actors are constantly writing new malware and creating new exploits, and an integral part of the app review process is updating malware definitions whenever new malware is discovered and applying that during the review of every app and app update submitted to the App Store. Vulnerabilities in iOS that are discovered during the app review process can also be communicated through internal channels to engineering teams, who can patch the vulnerabilities before hackers find ways to exploit them.  Through its various tools, Apple takes information about malicious apps and incorporates the data into its scanners so that they can detect malicious apps with higher accuracy in the future. This method of malware scanning prevents many malicious apps from entering the App Store.

77.     The app review process also can detect when an app is using an outdated version of the iOS Software Development Kit (SDK).[90] By using the iOS SDK, developers can ensure that their apps will run on the newest iOS devices with the most recent security updates.[91] Apple also has requested that developers use an updated SDK; in April 2020, Apple announced that all iPhone apps submitted to the App Store must be built with the iOS 13 SDK or later, since iOS 13 was running on 77% of all iOS devices introduced in the prior four years, worldwide.[92]  This SDK

---

[89]   *Id.* at 1080:9-1082:3.

[90]   Deposition of Trystan Kosmynka, Feb. 2, 2021 at 122:20-123:8.

[91]   *See* Deposition of Philip Schiller, Feb. 11, 2021 at 182:21-23.

[92]   https://developer.apple.com/news/?id=03042020b.

*(Cont'd on next page)*

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

*Expert Report and Declaration of
Aviel D. Rubin, Ph.D.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

update can, among other improvements, improve security for apps that implement machine learning by making iOS handle the encryption and key management for the developer.[93]

78.     In addition, the iOS SDK is only released through Apple. In order to download the SDK, each developer must first be authenticated with a valid Apple Developer Program identity.[94] There are numerous security benefits associated with Apple's centralized SDK distribution.  First, Apple Developers are always able to acquire the most up-to-date SDK versions issued by Apple. As a result, Apple Developers do not have to resort to third-party SDKs that are potentially outdated, insecure, or even embedded with malware.  Second, by having a centralized distribution channel, it is easier for Apple's latest SDK updates and bug fixes to be communicated to Apple Developers.  Third, Apple can provide technical support for developers using the official iOS SDK. In the past, there have been malicious apps associated with the use of infected third-party SDKs[95] obtained through illegitimate channels.  Further, there have been third-party SDKs associated with specific functionality that have violated Apple's policies.

79.     Apple also takes steps to prevent repeated instances of bad behavior. Developers who flout Apple's Guidelines, including by submitting known malware, may have their Apple Developer accounts or Apple Developer Enterprise Program accounts frozen or terminated.[96]  For example, according to the Apple Developer Program License Agreement, Apple reserves the right to terminate Apple Developer accounts and licenses if certain developers "engage, or encourage others to engage, in any misleading, fraudulent, improper, unlawful or dishonest act . . ., including, but not limited to, misrepresenting the nature of Your submitted Application (e.g., hiding or trying to hide functionality from Apple's review)."[97]  For most good-willed individual developers, such

---

[93]   https://developer.apple.com/ios/whats-new/.

[94]   https://developer.apple.com/ios/; https://developer.apple.com/develop/.

[95]   Note that these third-party SDKs are typically related to a single set of functionalities and are distinct from the iOS SDK that Apple provides to access the vast majority of features on an iOS device.

[96]   Apple Developer Program License Agreement, 3.3.21, 11.2; Apple Developer Enterprise Program License Agreement, 3.3.21, 11.2.

[97]   Apple Developer Program License Agreement, 11.2.f.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

requirements serve as deterrence against the violation of app review requirements.  However, bad actors have sought to avoid Apple's rejection or account termination by acquiring multiple Apple Developer Program accounts.

80.    Apple also requires verification of developers' identity when developers enroll in the Apple Developer Program, Apple Developer Enterprise Program, or iOS Developer University Program.[98]   This identity verification involves verification of individual photo IDs or an organization's identity and legal entity status.[99]   Verification of identity is *mandatory* for developers to acquire Apple-issued certificates for code signing, which is a required prerequisite for app distribution.  Identity verification is an important security deterrent to prevent fraud, to hinder arbitrary distribution of malicious or inappropriate content, and to ensure methods of attribution when apps violate App Store Review Guidelines or other app regulations, or when certificates are being abused.

### 2.    Apple's On-Device Runtime Security Protections

81.    Apple has developed and implemented robust mechanisms to help ensure that software being run by the operating system does not do anything that the user has not authorized.[100] Apple's on-device runtime security protections include, for example, sandboxing.  Sandboxing isolates apps from critical system resources and from other apps.[101]  All third-party apps running on iOS are sandboxed, so that they cannot access or modify system files, system resources, and files and data belonging to other apps.  iOS also utilizes digitally signed entitlements, which are key-value pairs that grant an app permission to perform specific privileged operations.

82.    Many of Apple's on-device security protections are built into its device hardware. For example, Apple iOS utilizes a Secure Enclave, which is a dedicated secure subsystem

---

[98]   https://developer.apple.com/support/identity-verification/.

[99]   https://developer.apple.com/support/app-account/.

[100]   Epic Tr. Transcript (Federighi) at 3375:20-22.

[101]   *Id.* at 3375:11-13, 3377:11-14.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

integrated into Apple's chip hardware; it is isolated from the main processor to provide an extra layer of security that keeps sensitive data secure even if an Application Processor kernel becomes compromised.[102]   The Secure Enclave also includes a unique ID ("UID") root cryptographic key that is unique to each individual device.   The UID is randomly generated and fused into the device's Systems on Chip ("SoC") at manufacturing time and utilized to protect device-specific secrets.[103]   Apple also utilizes kernel integrity protection in order to protect against attacks.   The operating system kernel is a foundational part of the operating system, which enforces many of the on-device protections such as code-signing and sandboxing.   Kernel integrity protection is intended to block tampering with the kernel, by locking down the kernel and preventing its basic data structure from being modifiable once it has started up.[104]

83.     In addition, Apple utilizes Address Space Layout Randomization ("ASLR") as another of a broad class of anti-exploitation techniques that try to make it difficult for an attacker's app to execute malicious code.[105]   For example, an attack could involve inserting malicious code into a particular location in the operating system routine and then executing.   To do that, the attacker needs to know the address of the operating system routine where their code will execute.   ASLR is intended to prevent attackers from being able to identify and locate the addresses of the operating system routines where their attack will occur.

## VII.   IOS IS SAFER THAN OTHER OPERATING SYSTEM PLATFORMS

### A.     Apple's "Defense in Depth" Provides Significant Security Protections

84.     Apple recognized the importance of layered security in designing its security architecture to meet dual goals.   First, the App Review and centralized app distribution process seeks to prevent unsafe apps from ever reaching user devices in the first place if threats and

---

[102]   https://support.apple.com/guide/security/secure-enclave-sec59b0b31ff/web.

[103]   *Id.*

[104]   Epic Tr. Transcript (Federighi) at 3378:15-3379:7.

[105]   *Id.* at 3376:4-3377:8.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

vulnerabilities are detected. Second, Apple's on-device security seeks to protect against and limit any damage that can be inflicted by an app that is installed on a device.  The combination of these security layers is critical to the strength of iOS security.[106]

85.     It is generally unwise to *first* trust users to download malicious apps, and *then* try to subsequently detect malicious apps and deny giving malicious apps the permissions they might request.   Given the unpredictability of user behaviors that may lead to vulnerabilities and exploitations, users might keep or run malware even though anti-malware software identifies it, or they might send the malware to other users without running it.  It is better to prevent user devices from ever being infected with, or even downloading, malware—as Apple endeavors to do with iOS—rather than use on-device solutions to attempt to identify and remove malware once it already resides on a device.

86.     Moreover, even with strong on-device protections like those that Apple has implemented, there are attacks that those on-device protections are less adept at protecting against, but other layers of Apple's layered security are.  For example, social engineering attacks are designed to manipulate users into taking actions that avoid on-device protections.  Consider a game app that, while being run, instructs a user to enter their social security number to proceed to the next level.  Here, all the app did was display some text content.  This would not likely be caught by on-device security, because showing text to a user is not inherently malicious, but it would likely be detected by Apple's App Review process because human reviewers could accurately read the text and understand what it is asking the user to do.  A social engineering attack might also instruct a user to deliberately provide a Tic-Tac-Toe app access to the device's microphone, camera, sensitive data, or other resources outside the app's sandbox by requesting entitlements.[107] Since the app requests access to data and functionality legitimately via entitlements, it is unlikely that on-device security would prevent this from happening.  However, a human reviewer would

---

[106]   *Id.* at 3501:16-18 ("I have a very strong view that centralized distribution and app review are critical to the safety of our users.").

[107]   *See id.* at 3379:10-3380:13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

likely decide that a Tic-Tac-Toe app would not need such high levels of access, meaning that the app may be malicious or poorly programmed.

87.     App Review is better positioned than on-device security mechanisms to evaluate user-generated content and determine whether entitlement access is being requested for a legitimate or ulterior motive. App Review also is better positioned to determine whether an app contains hidden and undisclosed behavior, or will do everything it promises to do.  It is difficult for a machine to know whether an app that describes itself as showing Renaissance art to users actually contains such content.

88.     Apple's App Review security layer is a necessary complement to on-device protections such as sandboxing to prevent apps from accessing data and functionality that they should not be permitted to access. App Review checks an app to make sure it is not requesting unnecessary entitlements (or special access rights to hardware or software on an iOS device), which is often an indication of malicious behavior.  Sandboxing then enforces these entitlements, only allowing apps access to data and functionality that the user permits the app to have. Sandboxing also prevents apps from accessing and modifying data that is written by other apps.

89.     Apple's use of the App Store as the single app distribution mechanism adds a protective layer for iOS devices.  Apple currently conducts reviews on every app and app update distributed through the App Store using a combination of computer automated and manual human review.  By centralizing the distribution of apps and prohibiting the distribution of apps outside of the App Store, Apple forces any would-be attacker to navigate this additional layer of defense. Without centralized app distribution, apps could bypass the App Review layer of defense and, as Mr. Federighi explained: "No human policy review could be enforced, because if software could be signed by people and downloaded directly . . . you could put an unsafe app up and no one would have checked that policy.  You could misrepresent [apps to be apps that they are not so users] think [they are] downloading legitimate software [when] in fact, [they] are downloading a trojan."[108]

---

[108]   *Id.* at 3388:24-3389:12.

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074                                    Expert Report and Declaration of
                                                          Aviel D. Rubin, Ph.D.

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

90.     Moreover, Apple's centralized app distribution model provides additional protections even if App Review does not catch a breach in the first instance.  Where apps are all distributed through the App Store, if an untrustworthy or malicious app is identified, Apple can pull this app (as well as other similar ones) from the App Store to stop further distribution, or, as Steve Jobs put it, "turn off the spigot" so no more people can download that app (or similar ones).  Centralized distribution therefore uniquely positions Apple to learn and put additional improvements in place when new untrustworthy or malicious apps are identified, to prevent attackers from repeating such attacks.[109]  This can provide deterrence benefits in addition to its enforcement benefits; Mr. Federighi testified, for example: "If attackers can't make a consistent business out of attacking the platform, they are less likely to ever mount the attacks in the first place.  And that is one of the reasons there is just less malware ever presented to iOS users."[110]  He further explained: "The most important deterrent is that the developer knows that if they do manage to do this, they won't be able to do it for very long . . . the problem will get identified, the app will be pulled down, and that the App Store human review process will be updated to . . . be on the lookout for copycats."[111]  By contrast, in a multiple app store or direct distribution model, a developer might be able to slightly modify their malicious app in order to bypass on-device protections such as malware scanning and repeat its attack.[112]

91.     The human review component of Apple's App Review is critical; its combination with the static and dynamic analysis performed by Apple's proprietary computer systems differentiates and strengthens iOS security.[113]  Human reviewers are better able than computers to accurately assess, for example, whether user-generated content is offensive, violates restrictions

---

[109]   *Id.* at 3392:4-11.

[110]   *Id.* at 3392:24-3393:3.

[111]   *Id.* at 3509:10-15.

[112]   *Id.* at 3509:16-24.

[113]   *See id.* at 1106:20-1109:11.

*(Cont'd on next page)*

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

on content in apps for children, constitutes false or misleading content, or seeks information in violation of privacy guidelines.[114]  Human review is also critical in light of the "halting problem" faced by computer tools, where it is difficult for computer programs to determine when earlier programs will "halt," or terminate.  Apps are comprised of multiple computer programs, where each program will be "called" to run in turn.  But the next-in-line program does not know when it will begin to operate until it is called; that program is not, unlike a human, able to take a global look at the overall app architecture or predict future behavior.  For this reason, computer tools may have a more difficult time determining whether an app has hidden a problematic feature in a program, especially when the malicious components had not been previously identified.  For example, in the game app I mentioned earlier, users were instructed to enter their social security number in a malicious game app.  If the malicious component is novel or obfuscated and hidden in a certain way, App Review computer tools or on-device protections might not detect it.  By contrast, human reviewers might detect the issue because they would see the text content as part of the app's overall media content.

92.    Humans are also better equipped to evaluate the motivations for an app that instructs its users to actively restart their device or disable device security features, which, in turn, could expose users to uncontrolled or untrusted apps and code or permit a device to run undisclosed operations in the background.  An example of this type of threat is cryptojacking malware, or malware that harnesses a compromised device's resources to run background operations that mine cryptocurrency.[115]  The question of whether cryptomining is authorized can be context-dependent, which makes it difficult for traditional anti-malware to determine whether an app mining cryptocurrency is doing so with the user's consent and knowledge, or as a result of cryptojacking.  Absent Apple's App Review process, it would be up to the users to decide whether to grant potentially malicious apps access to the camera, network, microphone, etc., or decide whether to

---

[114]  *Id.* at 1085:19-1094:1.

[115]  https://securelist.com/pocket-cryptofarms/85137/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

disable certain on-device security features that the app claims will affect its operation.  App Review is critical to maintaining the users' sense of trust and preventing users from having to make difficult cybersecurity-based decisions.

93.     App Review's human review component also means that it is better positioned than on-device mechanisms to detect new types of issues and threats.   Computer tools rely upon heuristics—or algorithms that are written by humans to define patterns or other indicia of potentially unsafe activity—but are also fundamentally limited by that reliance.  Heuristics are well-suited for identifying already-known threats and performing repetitive analysis, but are less able to detect something that was not previously known and therefore not addressed in the existing algorithms.

94.     Permitting alternative app distribution mechanisms, such as third-party app stores or direct distribution, would increase instabilities and security risks for iOS.  As explained below, alternative platforms that permit apps to be downloaded outside a reviewed distribution channel have demonstrably greater security vulnerabilities and concerns.  Also instructive are the limited scenarios in which Apple permits apps to be downloaded outside of the App Store; Apple has observed efforts to take advantage of those scenarios to circumvent security requirements.

**B.     Third-Party Analyses Demonstrate that iOS Is Safer than Other Platforms**

95.     Non-iOS mobile devices historically have been the victims of malware far more often than iOS devices.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE PROTECTIVE ORDER

## Infections by Device



**Total infections between various devices (2020)**

96.     For example, in a study conducted by Nokia in 2020 to measure instances of malware infection in approximately 200 million devices, Nokia found that 26.64% of infected devices ran an Android-based mobile operating system.[116]  These statistics stand in comparison to those for iPhone, which accounted for only 1.72% of infected devices in 2020.  This ratio of infections on iOS versus Android devices is inconsistent with the overall percentage of iOS to Android devices available in the world.  The report attributes the greater percentage of Android device infections to the fact that Android permits the distribution of apps through third-party stores. In contrast to the centralized app distribution for iPhones, Android users can download apps from a variety of app stores: the Google Play Store overseen by Google, app stores developed by the original equipment manufacturers ("OEMs") of the various Android devices (such as the Samsung Galaxy Store), app stores operated by various third parties unaffiliated with Google or Android device OEMs.  The degree to which pre-distribution app review is performed by these various app stores varies.  Nokia observed: "[T]he fact that Android applications can be downloaded from just

---

[116]   Nokia Threat Intelligence Report, 2020, *available at* https://onestore.nokia.com/asset/210088.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

about anywhere still represents a huge problem, as users are free to download apps from third-party app stores, where many of the applications, while functional, are Trojanized."[117]

97.     Android has been found to be targeted by malware more frequently than iOS; a report from the Purplesec cybersecurity company reports that 98% of mobile malware target Android devices.[118]  Android and third-party app stores also have been found to host "blacklisted apps," or apps publicly known to be suspicious or malicious, with significantly greater frequency than the Apple App Store.  Blacklisted apps include malware, adware, phishing apps that look like legitimate brands, and apps that perform suspicious activities such as overcharging users through fraudulent trials.

98.     A 2020 study by the RiskIQ security company looked at malware scan data across many different mobile app stores, in an effort to identify blacklisted apps and other mobile app threats.[119]  The study found that the Google Play Store was the most prolific store of blacklisted apps in 2020, hosting 10,292 malicious apps.[120]  The study also found that the five stores found to have the highest concentration of blacklisted apps were Android app stores.[121]  By contrast, Apple's App Store, although the sixth most prolific store of newly observed apps in 2020, was described as "Fort Knox" because it so rarely hosts dangerous apps.[122]  In general, iOS consistently scores higher than Android on metrics of perceived platform quality and user satisfaction because of Apple's diligence in ensuring app quality.

99.     The Windows/PC platform also faces more vulnerabilities than iOS.  In Nokia's 2020 study, for example, Windows/PC devices accounted for an even higher percentage of infected

---

[117]  *Id.*

[118]  https://purplesec.us/resources/cyber-security-statistics/.

[119]  RiskIQ, 2020 Mobile App Threat Landscape Report, *available at* https://www.riskiq.com/wpcontent/uploads/2021/01/RiskIQ-2020-Mobile-App-Threat-Landscape-Report.pdf.

[120]  *Id.*

[121]  *Id.*

[122]  *Id.*

*(Cont'd on next page)*

Case No. 4:11-CV-06714                          Expert Report and Declaration of
Case No. 4:19-CV-03074                                      Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

devices than Android, at 38.92% in 2020.[123]  Windows also has a history of falling victim to very damaging malware attacks.  In 2017, for example, the NotPetya ransomware caused an estimated $10 billion in damages and disrupted the global supply chain by decommissioning a significant percentage of shipping ports employed by a certain shipping entity.[124]

100.    The results of these third-party studies are consistent with and reinforce my conclusion that the iOS's layered defenses, and particularly its inclusion of the App Review layer and centralized distribution, make iOS a safer and less vulnerable platform than competitor platforms.  Windows, Android, and non-Android variants of Linux (shortened as "Linux") have much more lenient app distribution models, and depend on on-device security and third-party anti-malware solutions to then find solutions for the malware once it is already on device.

101.    The Google Play Store, and the Android mobile platform more generally, provide a particularly instructive comparison because they permit multiple ways to circumvent any app review like Apple's App Review process.  Unlike iOS, Android permits the installation of apps from multiple sources, including third-party stores, sideloading, and preloading by OEMs. Android also maintains fewer authorization mechanisms; it does not, for example, require apps to be signed with certificates obtained from Google or another principal authority.  Android's official documentation recognizes third-party stores and sideloading as legitimate "[a]lternative distribution options."[125]  As such, the developer identities associated with sideloaded apps are not checked so that there is no deterrence for malicious Android app distribution via sideloading. Sideloading introduces security risks to users: it allows the installation of unreviewed apps that might install malware or otherwise might grant themselves entitlements (without requesting consent from the user) to a broad array of hardware and software in order to, for example, access privileged functionality without alerting the user.  These unreviewed apps also could be pirated or otherwise contain intellectual property violations.  In addition, additional security risks can be

---

[123]  Nokia Threat Intelligence Report, 2020, *available at* https://onestore.nokia.com/asset/210088.

[124]  https://www.wired.com/story/notpetya-cyberattack-ukraine-russia-code-crashed-the-world/.

[125]  https://developer.android.com/distribute/marketing-tools/alternative-distribution.

Case No. 4:11-CV-06714                                    Expert Report and Declaration of
Case No. 4:19-CV-03074                                       Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

posed in a direct distribution model where an already-identified malicious or vulnerable app can be downloaded through such a wide variety of means.  It also is difficult to keep sideloaded apps up-to-date and secure.

102.    These design choices stand in stark contrast to Apple's App Review and centralized app distribution security layers and, as I just explained, lead to significantly more infections in Android than in iOS.  Apps that are sideloaded onto an Android device may undergo no app review at all and, for this reason, could contain any manner of malware or spyware.  This happened in 2019, for example, when spyware was distributed through sideloaded Android apps that advertised themselves as Evernote, Google Play, and other massively popular apps, but instead were "fake apps" that performed eavesdropping, screen recording, and password collection from user devices.[126]   The presence of third-party app stores containing unreviewed apps thus has the potential to significantly diminish the overall security of a platform.  This applies not just to pre-distribution app review, but also to apps after they become available for distribution in a store.  Apple continues its App Review process even after an app becomes available for distribution in the App Store and will take action against apps that exhibit malicious or user-unfriendly behaviors after they have become available in the App Store.  Apple is able to do all of these things because of its App Review and control of all aspects of its platform.  Android, however, does not and cannot perform these actions.  iOS's ban on the installation of unsigned, untrusted apps enhances iOS security relative to Android.

103.    It is not just the use of any app review, moreover, that makes iOS safer.  It is also the specific process used by Apple in its App Review.  Even where Google performs app review, as it does for the Google Play Store, the differences between Google's review and Apple's App Review demonstrate why Apple's human review component is particularly designed to protect against safety and trustworthiness threats.  Google introduced human review into its previously

---

[126]  https://www.forbes.com/sites/thomasbrewster/2019/07/24/warning-android-malware-masquerading-as-pornhub-google-and-evernote-is-actually-a-russian-spy-operation/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

entirely automated review, but only for some, not all, apps submitted to the Google Play Store in 2015, and later increased review times for new developers in 2019.  Unlike Apple's App Review process, which performs human review for every app and app update approved for distribution through the App Store. ███████████████████████████████████████████████

█████████████████████████████████████████████████████ ██ ████████

█████████████████████████████████████████████████████████████████

████████████████████ Google stated, for example, that it understands that "lots of bad stuff gets through" its review process.[128]  An internal Google presentation given in January 2019 stated that Google's review process "miss[ed] 55% of abuse (3.8% of total submission)."[129]  Additionally, of the 69.6% of submissions that were auto-approved by the machine learning classifier without human review, 4.7% were later identified to be malicious.[130] ██████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████ ██ The Google Play Store, which utilizes a less stringent and less comprehensive review process, stands in stark contrast to the App Store.

104.    This manifests in multiple examples of malicious or otherwise problematic apps becoming available on the Google Play Store that would have been rejected during Apple's App Review process.  For example, Mr. Kosmynka testified that App Review had rejected a challenge app, which paid people to participate in dare challenges under, Guideline 1.4, which protects against apps that would risk physical harm.[132]  One of the dares in the app was, for example, that someone jump off a bridge on video.  Marketing images and video for the app showed a male

---

[127]   GOOG_APPL_00106362–450.

[128]   GOOG-APPL-00113901–986 at -927.

[129]   GOOG-APPL-00114735–781 at -771.

[130]   *Id.*

[131]   *Id.*

[132]   Epic Tr. Transcript (Kosmynka) at 1087:9-1088:12.

*(Cont'd on next page)*

Case No. 4:11-CV-06714                     Expert Report and Declaration of
Case No. 4:19-CV-03074                                    Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

putting an inflated condom over his head or a woman putting whipped cream on her chest.  Mr. Kosmynka also testified that he had seen the challenge app available on the Google Play Store.[133] Apple's combination of human review with static and dynamic computer review that uses Apple's proprietary tools, for every app and app update distributed through the App Store, uniquely differentiates Apple's industry-leading process.

105.    iOS's security advantage also can be directly attributed to the Guidelines for Apple's App Review, which enhance security and promote a high-quality experience for the user.  Although Google is gradually adopting more restrictive security policies similar to those in Apple's App Store Review Guidelines, the Google Play Store's Developer Program Policy is generally less restrictive than Apple's Guidelines.  For example, Apple's App Store Review Guidelines require that apps should not encourage a user to actively restart their device, or to disable device security features—and Apple App Review checks for this.  Google, in comparison, has policies limiting deceptive device settings changes, but does not include requirements relating to preserving on-device security settings.  Apple's Guidelines also require apps to use only certain background services (VoIP, audio playback, location, task completion, among others) for their intended purposes.  Google's policy does not, and thus even its human reviewers may not review for a Tic-Tac-Toe app that conducts continuous recording through background operations.  Google's policy also does not restrict the use of call and SMS-centric apps for user data collection or spam, unlike Apple's Guidelines.

106.    Windows similarly demonstrates the heightened security risks in the absence of app review.  Windows has three main issues not present on iOS that hurt its overall security posture.  First, a sizeable portion of Windows computers do not have hardware-backed cryptographic modules and thus Windows OS cannot use these mechanisms for secure key storage and disk encryption across large swaths of its user base.  Second, Windows allows for installation of device drivers to allow the operating system to interface with a wide variety of hardware.  Malicious or

---

[133]  *Id.*

Case No. 4:11-CV-06714                     Expert Report and Declaration of
Case No. 4:19-CV-03074                     Aviel D. Rubin, Ph.D.

55

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

vulnerable device drivers can be used to subvert sandboxing and also to perform other malicious behavior with elevated privileges.   Third, Windows supports the installation of software applications from untrusted sources.   This has resulted in many malware attacks. In a common scenario, a user receives a malicious email attachment or file download.   They execute it and ignore warnings from User Account Control ("UAC").   The user's computer is then infected with malware.  In the Windows Vista operating system, it became common that users would arbitrarily run malicious programs with administrator privileges using UAC.

107.    Microsoft has recognized and warned users about such UAC-related security risks.[134]  But iOS, in contrast to Windows, can do more than warn users that using administrative credentials to run an unknown program could render a computer vulnerable to attack.  App Review specifically checks for and will reject apps that maliciously request elevated privileges.

### C.    macOS Does Not Prove that the iOS App Distribution Model Is Not Needed

108.    Dr. Elhauge points to macOS to argue that the way that Apple permits app distribution on macOS computers shows that the centralized app distribution model of iOS is not necessary for meeting Apple's safety standards.[135]  I disagree with this argument for all of the reasons explained above, regarding why and how a centralized distribution model provides more security.

109.    The security layer provided by centralized distribution on iOS is made more critical in light of the very different threat models that face iOS and macOS.  iOS, quite simply, faces an extraordinary threat model that is different from—and poses a greater spectrum of risks than—macOS.[136]  The threat model is critical for assessing security for a computing system, and I

---

[134]   https://support.microsoft.com/en-us/topic/how-to-use-user-account-control-uac-in-windows-vista-33b5a65e-4238-397e-d1b4-c502ee0f473e.

[135]   Elhauge Report ¶ 402.

[136]   Epic Tr. Transcript (Federighi) at 3362:2-3363:7, 3365:2-3.

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

understand that Apple intentionally designed the iOS security architecture with its differing threat model in mind.[137]

110.     For example, there are significantly fewer Macs than iOS devices – less than one tenth – rendering iOS a more attractive market from an attacker's point of view.[138]  Mac users also download fewer applications, and less frequently, than iOS users, again decreasing their attractiveness to attackers.[139]  In addition, iOS devices contain highly sensitive personal information—often more sensitive than that stored on a computer.  iOS devices, unlike macOS devices, have sensor hardware—such as GPS hardware and Apple's Ultra-Wideband (U1) chips for spatial awareness—that detects their users' location. Additionally, tokens used for two-factor authentication are oftentimes provided to user's iOS devices via text message or mobile application. iOS devices holding this sensitive data, including financial and health data, are smaller than macOS devices and—with their microphones and cameras—are more likely than macOS devices to be with their users at all times.[140]  And for iOS devices, an unstable app that causes an iPhone to crash could have devastating consequences; picture, for example, an app that causes a user's iPhone to crash, rendering the device unable to make phone calls when the user gets a flat tire in the middle of the night.  Heightened security systems—and particularly one that includes App Review's review for entitlements, hidden features, requests to access sensitive hardware that are unconnected to the app's purpose, and other threats that could cause an iPhone to crash, among other things—are thus reasonable and necessitated for iOS in a way that they are not for macOS.

111.     In the opposite direction, macOS users may expect and require greater access privileges than iOS users.  As Mr. Federighi explained: "Mac users also expect a degree of flexibility that is useful to what they do.  Some of them are software developers, some of them are

---

[137]   *Id.* at 3359:11-3360:2.

[138]   *Id.* at 3363:16-20.

[139]   *Id.* at 3360:7-14, 3363:24-3364:13.

[140]   *Id.* at 3364:18-3365:1.

*(Cont'd on next page)*

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

pros running very unique tools, and having that power is part of it."[141]  Historically, computer users have held a higher level of privilege in order to perform a variety of activities, like system/network administration tasks, virtualization, and software development (including for software that will interact with peripherals such as USB devices), all of which are much less likely to occur on a mobile device.

112.    The balance between security, privacy, and functionality can provide insight into the difference in consumer expectations between computers and mobile devices.  For decades, consumers have used computers for software development, system administration, etc., all of which require high access levels. However, if a computing system gives users access to privileged functionality, this functionality is also accessible by malware.  For example, if a user installs a malicious device driver on his or her computer, the driver can perform any number of malicious kernel-level functions.

113.    On the other hand, mobile devices do not provide users with elevated privilege levels. This is because the majority of users usually do not expect their mobile device to provide them with the functionality usually associated with high levels of privilege, such as driver installation mentioned above. As a result, mobile devices have a different attack surface than computers; while mobile user operations are more limited, privileged functionalities are less likely to be subverted by malicious mobile applications.

114.    For similar reasons, Mac devices are better positioned to conduct on-device anti-malware scanning than iOS devices.  For example, anti-malware technologies on general-purpose computers usually contain a real-time scanner, which continually monitors system activities for the presence of malware, and an on-demand scanner.  A hook to the operating system alerts the real-time scanner when a file is executed, allowing the scanner to check a file for malware signatures or behaviors.  An anti-malware scanner usually also contains an on-demand scanner, which can be run by the device user at a specified time or interval to check an arbitrary storage

---

[141]  *Id.* at 3393:14-17.

Case No. 4:11-CV-06714                         Expert Report and Declaration of
Case No. 4:19-CV-03074                         Aviel D. Rubin, Ph.D.

58

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

location for malware. The arbitrary location may include certain files, folders, or the contents of an entire hard drive.

115.    Anti-malware software is able to operate on macOS because macOS generally provides its users with the elevated privileges needed to perform malware scanning.  In iOS, those privileges are limited for the reasons explained above, such as sandboxing protections and restrictions on entitlements and data access. These protections would prevent anti-malware from operating on apps distributed by third-party app stores.[142]  It is for these reasons that Apple currently relies on a preemptive automated scanning process during the App Review process in order to detect whether iOS apps are harmful before they become available for distribution through the App Store.  Apple also continues to scan apps that have already been uploaded to the App Store and will remove them if malware is detected.

116.    Even if anti-malware scanning could occur on iOS, it could be less effective against the types of threats that are prevalent on mobile devices.  In an industry study of threats to mobile devices, adware was identified as the most prevalent threat to mobile devices, at appx. 44.82-48.02%, and riskware the second most prevalent, at appx. 20.14-33.54%.[143]  Riskware is defined as a legitimate program that poses a potential risk due to a security vulnerability, software incompatibility, or legal violation, where malicious actors can take advantage of the program to access and steal sensitive data or admin-level processes.[144]  By contrast, and for context, adware and riskware only make up 7.7% and 3.8% of portable executable threats on the Windows operating system.[145]  Even if current anti-malware would *hypothetically* be applied to iOS, the efficacy could not be determined.

117.    The problems that would arise if iOS adopted a "macOS app distribution model" can be previewed by examination of cases of jailbroken iOS devices.  Jailbroken iOS devices allow

---

[142]  *Id.* at 3379:16-21.

[143]  https://securelist.com/it-threat-evolution-q3-2020-mobile-statistics/99461/.

[144]  https://usa.kaspersky.com/resource-center/threats/riskware

[145]  https://www.avira.com/en/blog/q4-and-2020-malware-threat-report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

for the download of apps outside the App Store.  Jailbreaking refers to a process that modifies Apple's iOS to enable the installation of unauthorized software, including applications from third parties, that is not approved by an app review process (like sideloading).  It has been well-documented, however, that jailbroken iOS devices suffer from more malware than non-jailbroken iOS devices.[146]  Malware can be distributed via unreviewed apps and, moreover, can use elevated privilege levels possessed in light of their lack of review to perform malicious activity.

118.    Moreover, these problems likely cannot be solved through notarization, as Dr. Elhauge suggests.[147]  As explained above, centralized distribution positions Apple to learn from and put additional protections in place in response to new attacks.  In particular, centralized distribution on iOS permits Apple to block not just the old malware, but also new iterations of that malware (identified with the critical assistance of human review).[148]  But as Mr. Federighi explained: "This is dramatically different than what we see on the Mac, unfortunately, without centralized distribution.  So on the Mac, we see an attack, we block that malware, and before we have even finished blocking the old malware, they have mutated their malware into a different piece of malware and started distributing that one instead… Our problem on the Mac is when we see one instance of this and we block it at the code-signing level, the developer simply slightly modifies the app and submits it again and again and again through the notarization server.  And without human review, our malware [scanner] can't spot it, and so the developer is undeterred."[149]

119.    Mr. Federighi also explained other difficulties that would arise if human review were simply added to the notarization protections as Dr. Elhauge appears to suggest.[150]  Mr. Federighi explained: "The expectation and scale around notarization is very high.  Part of what developers expect if they're distributing themselves is they may want to put out a patch in the

---

[146]   https://unit42.paloaltonetworks.com/keyraider-ios-malware-steals-over-225000-apple-accounts-to-create-free-app-utopia.

[147]   Elhauge Report ¶¶ 405-06.

[148]   Epic Tr. Transcript (Federighi) at 3509:10-24

[149]   *Id.* at 3392:12-20, 3509:16-21.

[150]   Elhauge Report ¶¶ 405-06.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

middle of the night, and they found a bug and they want to drive it through the system.  The notarization service on macOS does provide that ability, because it's purely an automated scan, but the result is the per-developer or per-app average submission rate to the service is dramatically higher than the number of comparable submissions to, say, the iOS App Store on a per-app basis, because these developers are just driving these through at a very high rate.  If you were to take the kind of human review process that goes into the App Store and submit it to the kind of volume, the multiplier, that we see on the notarization service, the human cost would be tremendous and we wouldn't be able to achieve the kinds of latencies that macOS developers, for instance, expect from the notarization service."[151]

### D.    The Enterprise and Testing Programs Do Not Demonstrate that App Review Is Not Needed

120.    Dr. Elhauge also suggests that, because Apple provides other distribution options through which apps may not be reviewed by Apple's App Review, "Apple already has the technological infrastructure in place that would allow users to make their iOS devices 'trust' certain developers and install apps with those developers' digital signatures."[152]  These alternative distribution options include the Enterprise Program and mechanisms intended to permit developers to test their apps.  I disagree with Dr. Elhauge for several reasons.

121.    First, Dr. Elhauge's argument ignores the most important aspect of the Enterprise Program: it is intended for use only for company-specific apps.  As the name implies, the Enterprise program allows a business enterprise to distribute apps to the company's employees.  The fact that the apps are created by an employer, and distributed to employees (typically for free), creates a specific security context that does not exist when third parties are providing apps to strangers (sometimes for money) with whom they have had no prior or existing relationship.  The

---

[151]   Epic Tr. Transcript (Federighi) at 3502:23-3503:15.

[152]   Elhauge Report ¶¶ 258, 271.

Case No. 4:11-CV-06714
Case No. 4:19-CV-03074                                          Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

61

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

Enterprise Program merely demonstrates that when there is a relationship such that an employee trusts his or her employer, Apple permits apps from that employer to bypass App Review.

122.    This similarly applies to Xcode provisioning and Ad Hoc distribution, which are intended to permit developers to test their apps. Ad Hoc distribution, for example, allows a developer to test an app on up to 100 devices per device family, such as 100 iPhone and 100 iPad installations.  This program allows a developer to test an app on different devices (e.g., iPad Air, iPhone X, and iPhone 12) and on different versions of Apple's iOS operating system to ensure compatibility.[153]  Before apps can run via Ad Hoc distribution, their developer must select a valid provisioning profile and compile the app through Xcode.  The provisioning profile includes a development certificate used to sign the app.[154]  Similarly, to run an in-development app on a developer's devices, the app needs to run on the developer's device with a provisioning profile downloaded through the developer's Apple Developer account, which also includes a development certificate used for code signing.

123.    In short, the distribution scales in both circumstances are extremely limited. Enterprise apps are intended for distribution only to users affiliated with their enterprise, and Ad Hoc distribution is limited to up to several hundred devices of different types that must be specifically identified and registered.

124.    Second, despite the limited distribution and the different security context in which these programs operate, there have been several well-known problematic apps distributed through non-reviewed channels, including malware by eSurv and Hacking Team.[155]  There are entities that

---

[153]  https://developer.apple.com/programs/whats-included/.

[154]  https://developer.apple.com/documentation/appstoreconnectapi/certificates.

[155]  *See e.g.*, https://blog.lookout.com/esurv-research.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

have been revealed as attempting to deliberately utilize the Enterprise program to distribute apps that would violate Apple's App Store Review Guidelines.

125.    Notably, the breaches identified above occurred when the distribution was *not* between an employer and employee, nor from an app developer to a small group of testers.  Instead, they occurred when developers attempted to distribute and obtain apps outside of the App Review process on a broader basis.  In other words, they occurred when developers attempted to use the Enterprise Program to bypass App Review for broad distribution.

126.    In addition, even if developers are well-intentioned, if certain quality checks are not performed because the app has not undergone App Review, broken or unintended functionality can result.

## VIII.   CHANGING THE CENTRALIZED DISTRIBUTION MODEL WOULD DECREASE THE SECURITY, SAFETY, RELIABILITY, AND TRUSTWORTHINESS OF THE IOS PLATFORM

127.    Introducing third-party app stores on iOS would decrease iOS security, safety, and trustworthiness, as evidenced by the cases of Google and statistics indicating that third-party app stores host 99.9% of discovered mobile malware.[156]  Irrespective of whether they would be able to or intend to achieve the same security goals, the reality is that they could not.  Moreover, there is no guarantee that all, or even most, third-party app stores would commit to upholding user security and privacy and intend to achieve such security goals, particularly if those standards come at the expense of efficiency and revenue.  As such, plaintiff expert Professor Economides's proposal for third-party app review poses significant security issues.

---

[156]   https://purplesec.us/resources/cyber-security-statistics/; https://us.norton.com/internetsecurity-emerging-threats-10-facts-about-todays-cybersecurity-landscape-that-you-should-know.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

A.      **Apple's Policies Impact Consumers and Developers in a Non-Uniform Way**

128.    Having been in the security industry and analyzed both security policies and their impact, it is my opinion that Apple's policies and guidelines – although applied in a relatively consistent manner – impact different developers and consumers in vastly different ways.

129.    Take for example, Apple's policy against "overtly sexual or pornographic material." I understand from my experience in the field and the testimony from Trystan Kosmynka and Craig Federighi that there are a number of developers who do not violate this prohibition, and who likely benefit from this prohibition. For example, a number of developers focus specifically on developing content for children, and market themselves as creating content for children. Nickelodeon, for example, makes available a number of apps targeted at young children, including apps based on their television series such as PAW Patrol (about six heroic rescue dogs). PBS Kids makes available apps such as Play and Learn Engineering, targeted for preschool children.

130.    Other developers want to develop and distribute "apps that switch[] functionality to become real-money gambling apps, predatory loan issuers, and pornography hubs; use[] in-game signals to facilitate drug purchasing; and reward[] users for broadcasting illicit and pornographic content via videochat." We know that these developers exist and have sought to distribute their apps on the App Store because they have submitted them to Apple and Apple has rejected or removed those apps from the App Store.[157] For example, Apple has frequently had to apply its Guideline prohibiting overtly sexual or pornographic material.[158] Mr. Kosmynka testified that Apple applied the Guideline to reject the "Paca Girls" app, which appeared to depict a rape scene and women in compromising situations.[159] Apple also has applied its Guidelines for "Safety in the Kids Category" to reject apps that are offensive and manipulative towards children such as plastic surgery games marketed towards children.[160] While Apple applied its Guidelines to prevent

---

[157] https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/

[158] Epic Tr. Testimony (Kosmynka) 1085:19-1086:13.

[159] Epic Tr. Testimony (Kosmynka) 1085:19-1086:13.

[160] Epic Tr. Testimony (Kosmynka) 1086:14-1087:8.

Case No. 4:11-CV-06714                                    Expert Report and Declaration of
Case No. 4:19-CV-03074                                              Aviel D. Rubin, Ph.D.
                                    64

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

these apps from becoming available on the App Store, however, these apps could be available
through alternative options, such as any number of existing third-party app stores accessible on
non-iOS platforms.

131.   Entities that create apps that do not adhere to the App Store Review Guidelines,
and malicious actors who wish to develop and distribute malware via apps or create apps that
financially scam individuals, are all app developers (or would-be developers).  Some of these
malicious actors are criminals while others are sponsored by foreign states who wish to do harm
either to entire populations (because they view other nations or organizations as an enemy) or
specific segments of the population (because they bear hatred for certain minority groups).  These
developers are in no doubt impacted by Apple's Guidelines in a very different way from
Nickelodeon.

132.   Other developers may, at any given time, be impacted by the same guideline in
different ways.  For example, a single developer may develop and seek to release different types
of apps: a communication app that purports to encrypt communications as well as another app in
which the user's activity is tracked for purposes of maximizing ad revenues.  Each of these apps
may be impacted differently by Apple's privacy policies and disclosure requirements.

133.   In some cases, Apple's Guidelines will put different developers directly at odds
with each other.  Guideline 4.1, for example, bars "copycats," or apps that simply "copy the latest
popular app on the App Store."  Such a rule helps to protect the rights of hardworking developers,
and from a security perspective, it also helps to prevent malware and scams that often hide within
copycat apps.  But on the flip side, I know from experience that there are developers out there
whose primary purpose is to create copycat apps.

134.   Compounding this situation, and as I will explain in greater detail in Section VIII.B
below, not all third-party stores necessarily share the same goals or resources as Apple, nor do
they all have goals or priorities necessarily aligned with those of Apple.  Certain stores specifically
traffic in copycat and pirated apps, or are open to providing apps with adult content, while others

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

are not.  Some stores cater their app review and policies towards developers and users who prefer higher standards of security, privacy, and reliability, while other stores may cater to those preferring lower standards.  And even stores that have the same priorities will not have the same resources to enforce those priorities.  Permitting third-party app stores on iOS thus would benefit that group of developers who voice disagreement with certain rules in the Developer Program License Agreement, and who have attempted to flout or sneak past Apple's App Store Review Guidelines with, for example, apps containing hidden or undocumented features, or apps that switch functionality after initial review[161]—but it will not benefit those who do currently follow the Guidelines.

135.   The non-uniformity of the impact extends to consumers as well.  I am aware from my professional work and from information at Apple that a number of consumers purport to choose iOS products because of Apple's commitment to safety, privacy, reliability, and ease of use.  There are consumers, myself among them, who have no desire to sideload apps or otherwise obtain apps from sources other than the App Store, particularly if opening the door to those other sources will negatively impact the reliability and safety of the iOS device and the apps that run on the iOS device.  For example, a named plaintiff in the putative consumer class testified that "opening up iOS to additional app stores" that would make "it more likely that [his] phone could be infected with malware or a virus" would matter to him.[162]  Indeed, this same individual testified that he has had an Android device on which he experienced "glitches" and "crashe[s];" he further testified that the vetting performed by Apple's App Store is "pretty good."[163]

136.   On the other hand, another named plaintiff of the consumer class, however, testified that he would prefer it to be "up to the buyer . . . to look at what he is downloading and to say [an

---

[161]  *See, e.g.*, Tr. Testimony (Kosmynka) 1107:4-1108:19; 1121:11-17;
https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/.

[162]  Deposition of Robert Pepper, June 14, 2021 at 146:21-147:12.

[163]  *See id.* at 47:3-22, 62:25-63:8, 89:22-90, 202:23-203:6; *see also* Deposition of Edward Lawrence, July 23, 2020 at 179:3-8 (Another named plaintiff views the App Store's malware vetting as "a good thing.").

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

app] is unsafe," and to still be able to download iOS apps from other sources even though it puts
him at risk of malware or malfunctions.[164]  The named plaintiffs in these cases demonstrate that
there are some consumers who take a different view with respect to security, ease of use, and
reliability.  They apparently believe that the benefits of being able to go to and download apps
from third-party stores outweigh the benefits of safety, privacy, ease of use, and reliability.

137.    All of this is to say that security policies have a tendency to impact all developers
and consumers, but to impact them in different ways.  As I describe elsewhere in this report,
Apple's current policies and guidelines are a benefit to those who wish for iOS devices to be safe,
easy to use, and reliable.  But they hinder those who wish for iOS devices to be something other
than what they are today.

138.    At the same time, and as I describe below, Plaintiffs' proposed changes to the iOS
Guidelines and policies will impact all developers and consumers, but these changes would impact
developers and consumers in very different ways.  Those who distribute objectionable content may
be more favorably disposed towards the changes that the Plaintiffs propose than those who wish
to provide iOS devices to their children.

**B.      Existing Third-party Stores Are Known to Provide Lower Security than the
Apple App Store**

139.    Outside of the iOS platform, there currently are distribution sites that specifically
traffic in the types of apps—such as pirated apps—that Apple prohibits.[165]  There is no indication
that these third-party stores would duplicate Apple's App Review efforts.  Even third parties that
don't explicitly traffic in illegal and malicious content are unlikely to match Apple's App Review
efforts for several reasons.

140.    First, and as affirmed by Mr. Federighi and Mr. Kosmynka, Apple holds a very
significant and unique commitment to protecting the security and privacy of its iOS platform.  As

---

[164]  Deposition of Stephen Schwartz, June 16, 2021 at 141:3-18.

[165]  For example: a Google search for "Spotify++ iOS" yields many results claiming that users can download a
pirated version of Spotify premium from their website without the user needing to jailbreak their device.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

Mr. Federighi explained: "[I]t's completely central to what we do. We -- I think when users buy an Apple device, they're buying it because they've chosen an intuitive consistent user experience that's – that's safe, that they can trust. And those are -- those are things we've invested tremendously in creating and maintaining and that has great value to the differentiation of our product. If -- I don't think anyone else cares as much about maintaining those -- those assets or that user promise as Apple does for our customers."[166]  Mr. Federighi also affirmed why Apple is uniquely positioned to best protect the security of iOS: "I think that there are parts of our security stack that is integrated in a way end to end, really, from silicon and operating system up through our code signing, our services, and our review. It would be difficult to accomplish with an entity outside of Apple effectively."[167]

141.    Mr. Federighi also explained the significance of app distribution security: "One of the great things about – we think about the App Store is it's a trusted source of apps. And because of that trust and that confidence that users have, they are very free about trying out new software, about trying new apps, about downloading lots of things. And that's helped build this really unprecedented scale of activity for developers, of opportunity for developers, on the App Store. If they become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users."[168]

142.    Apple thus takes the responsibility to eliminate "weakest links" for iOS app security and app distribution to better protect its users, instead of forcing individual users to identify secure, trustworthy app marketplaces on their own, just to protect themselves. I understand that Apple does so with the understanding that approving low-quality apps that pose security risks would, for

---

[166]  Epic Tr. Transcript (Federighi) at 3423:16-3424:2.

[167]  *Id.* at 3422:12-16.

[168]  Epic Tr. Transcript (Federighi) at 3421:19-3422:7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

example, degrade iOS users' experience and likely cause a loss of goodwill with respect to users and, ultimately, the attractiveness of Apple's app experience to developers.

143.    Second, and by contrast, third-party stores can and have deliberately chosen to adopt lower security and privacy standards than Apple.  For example, certain large companies are heavily dependent on ad revenue, which in turn, is heavily dependent on the ability of an app to track user behavior.[169]  Other app stores maintained by large companies with enormous resources, such as Google's Google Play Store, have adopted less stringent standards than described in Apple's App Store Review Guidelines, as mentioned earlier.  For example, Apple's App Store Review Guidelines reject apps that alter or disable standard device inputs like device volume buttons, but the Google Play Store's Developer Program Policy does not have a similar requirement.  Returning to the Tic-Tac-Toe app example, if the app also included an instruction to users to reconfigure their devices to raise the volume on the speaker to enhance listening sensitivity, Google might allow that app for distribution via the Google Play Store where Apple might not.  As mentioned earlier, Google similarly does not have guidelines pertinent to privacy protection such as the Apple App Store Review Guidelines that limit background activity to specific functions and restrict the calling of and collection of SMS data.

144.    Third, many third-party stores, including those that target niche markets, lack the resources or commitment to review apps in the way that Apple does.  Apple has outpaced its competitors in protecting user privacy.  As noted above, Apple's process is a comprehensive one that includes not only human reviewers, but teams of dedicated engineers who create tools, including machine-learning tools, specifically to help Apple combat efforts to subvert the app review process.

145.    Fourth, even if a third-party store has the best of intents, practical consequences such as meeting a deadline to release a product may result in them permitting an app to "bypass" certain review guidelines on a one-off basis.  For example, the videogame Cyberpunk 2077

---

[169]   https://www.wsj.com/articles/facebook-fb-1q-earnings-report-2021-11619610405.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

recently was released with a considerable number of bugs and glitches.  Sony had to pull Cyberpunk 2077 from the PlayStation Store and offer users full refunds because the game was unplayable on certain PlayStation consoles.[170]  Cyberpunk 2077 is an example of a game that was released at full price before it had been sufficiently debugged, and it demonstrates how developers may prioritize profit over reliability, and how some stores are willing to let users download unreliable apps and games.  I raise this example not to impugn this specific product, but to suggest that when companies are faced with deadlines and marketing campaigns, those pressures may be at odds with even well-intentioned developers, stores, and app review guidelines.

## C.    Users Have Limited Ability to "Choose" between Safe and Unsafe Third-Party Stores

146.    Even where users may have a certain degree of technical sophistication, it cannot be assumed that they would be able to make informed decisions that permit them to avoid app distribution stores with lower (or no) security standards.

147.    First, the general user population may lack the security-oriented technical understanding—and the incentive to gain such understanding—needed to make accurate decisions regarding security and privacy.  For these reasons, social engineering attacks, spyware operating in the background, and cryptojacking—particularly those that circumvent app review channels— have been particularly successful.  Purplesec's 2020 report indicates that "98% of cyber-attacks rely on social engineering" and that the total malware infection growth rate has been increasing by hundreds of millions every year (812.67 million infections reported in 2018, a significant increase from 702.06 million reported in 2017).[171]

148.    Even where users have some certain degree of technical sophistication, it can sometimes still be very hard for them to identify that they are under attack, let alone perform

---

[170] https://www.cnbc.com/2020/12/18/sony-pulls-cyberpunk-2077-from-playstation-store-after-backlash.html.

[171] https://purplesec.us/resources/cyber-security-statistics/; Stu Sjouwerman, "Phishing and Social Engineering in 2018: Is the Worst Yet to Come?," KnowBe4, *available at* https://www.knowbe4.com/hubfs/PhishingandSocialEngineeringin2018.pdf.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

attribution, particularly given the increasing sophistication of the attacks.[172]  After all, one goal of attackers is to keep the victim from realizing that an attack has occurred; this allows the attacker to maximize the number of victims as well as the "payout" before the attack is discovered and perhaps shut down.  The Windows platform is also instructive; despite Microsoft's efforts to improve its on-device security protections, it remains a platform subject to a very significant level of attack.[173]  As mentioned earlier, in Nokia's 2020 study, Windows/PC devices accounted for 38.92% of infected devices in 2020.[174]

149.   It also should be noted that a belief that a user may choose which store to patronize relies upon the assumption that a user has a realistic choice among multiple app stores.  As the PC and Chinese Android marketplaces show, this is not a realistic assumption outside of the iOS App Store.  Users may not always have control over what software they install, and if the software is not available in the App Store, users may have to go to a less secure app store in order to obtain that software.[175]  Moreover, a third-party app store may choose to provide exclusive content that is only available in its store, thus forcing users to use that store regardless of whether it is secure or reliable.  I am aware, for example, that the Epic Games Store has utilized exclusivity as a business strategy.  This would open up iOS to the "weakest link" and make iOS users less secure.

**D.    iOS Security Would Be Impaired if Even One Third-Party App Store Does Not, or Chooses Not to, Maintain Strong Security Measures**

150.   The presence of third-party app stores thus has the potential to significantly diminish the overall security of Apple's App Store (and the iOS platform).  In Apple's centralized

---

[172]  Yanick Fratantonio et al., "Cloak and Dagger: From Two Permissions to Complete Control of the UI Feedback Loop," 2017 IEEE Symposium on Security and Privacy, *available at* https://iisp.gatech.edu/sites/default/files/documents/ieee_sp17_cloak_and_dagger_final.pdf ("The subjects involved in our study have a variety of different backgrounds, ranging from doctoral students, post-doctoral researchers, and personnel involved in the administration . . . none of the 20 human subjects even realized they were attacked.").

[173]  Epic Tr. Transcript (Federighi) at 3418:19-3419:4.

[174]  Nokia Threat Intelligence Report, 2020, *available at* https://onestore.nokia.com/asset/210088.

[175]  Epic Tr. Transcript (Federighi) at 3417:8-3418:1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

distribution model for iOS, when Apple discovers malicious apps that have successfully circumvented the App Store review process, it adjusts the review process to prevent such apps from successfully being approved in the future.  If Apple discovers apps that have not circumvented the App Store review process per se but that are exhibiting malicious or user-unfriendly behaviors *after* installation, Apple similarly adjusts its processes to prevent this from reoccurring.  If Apple discovers new malware on the iOS platform, it can explicitly adjust its custom-written malware scanners to both scan apps already on the App Store and to detect such malware in the future.  Apple is able to do all of these things because it controls all aspects of its platform.

151.    Moving from a centralized distribution model to an alternate distribution model that permits app distribution from other sources, such as the multiple app store distribution model or a direct distribution model (or a combination of the two), would create a fragmented distribution landscape in which security is only as strong as the weakest link.  It would expose the iOS platform to the threats that face multiple app store distribution models, explained above in Section V.C. What this means is that, in a fragmented distribution landscape, bad apps need to find only one app store with less than adequate security measures in order to jeopardize the overall safety of iOS and infiltrate the iOS ecosystem.  If there were nine stores, an attacker could simply submit their app to all nine stores, and as long as one store were to accept the app, it would then become available to the public. The scenario is not limited to intentional attacks.  If an app unintentionally contains a bug that causes it to crash, it also would be available to the public as long as one of the stores accepted the app.  Third-party app stores thus would increase the attack surface of iOS and weaken its overall security.

152.    The situation becomes more dire when one considers the existing and potentially new third-party stores containing high numbers of "blacklisted apps" and otherwise utilizing lower security and privacy standards than the Apple App Store.  Stores referred to as "rogue app stores" are known to deliberately host and distribute pirated content, apps containing malware, and apps

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

that engage in user data theft.  In China, Android app stores are known to violate security and privacy regulations, with nearly 35 percent of Android apps secretly stealing user data unrelated to their functionality.[176]  These third-party stores either choose not to or are not capable of enforcing security and privacy guidelines like Apple's, and the presence of even one such store on iOS could significantly diminish iOS's overall security.

153.    Furthermore, a fragmented app distribution landscape would limit Apple's ability to deter or otherwise take action against such attackers.  Where Apple's App Store acts as the only way to distribute apps, Apple can freeze or terminate an attacker's account in order to prevent them from any further legitimate distribution of apps and app updates that violate Apple's Guidelines, as well as check for similar issues in other apps.  Without centralized distribution, iOS would, like Android, no longer have a single "spigot" of app distribution and would therefore be less able to prevent the distribution of known malicious apps on iOS.

154.    Apple's catalog of historic review decisions, made with respect to tens of millions of app submissions and used to continually update the App Review process, also would see reduced effectiveness if third-party app stores were allowed to approve and distribute their apps on iOS. In a centralized app distribution model where all apps are reviewed by Apple for distribution through the App Store, Apple is able to catalog, detect, and block each instance of apps containing functionality that has been identified as malicious or otherwise objectionable.  Where, however, third-party app stores also could distribute their apps on iOS, the likelihood increases that one or more of those other app stores might not block an app with that functionality, perhaps because the third-party app store has not been able to identify or catalog all of the indicia of that malicious functionality.  This would be a problem for website addresses linked to malware, new types of malware, new trends in malicious apps, new methods of social engineering attacks, and other red flag information that might not make it into the databases for Apple and all other third-party app stores distributing apps on iOS.

---

[176]  https://techcrunch.com/2013/03/14/dcci-report/.

Case No. 4:11-CV-06714                          Expert Report and Declaration of
Case No. 4:19-CV-03074                          Aviel D. Rubin, Ph.D.

73

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

155.    This could pose problems not just for Apple's App Review, but for all third-party stores endeavoring to enforce security guidelines on iOS.  This would effectively render all app review conducted by all of the app stores less useful over time.  With multiple third-party app stores, the Apple App Store, and each third-party app store, would see only a subset of all existing data—such as a subset of malware signatures—resulting from the malicious apps that were caught in their respective app review process.  By allowing multiple app stores, the app stores all would become less effective as key information becomes decentralized, leaving app stores with fragmented knowledge of how the iOS platform is operating.  Whether Apple was able to enforce security standards or not, and even where security breaches occurred because of a third-party app store's ineffective review process, users might attribute those security breaches to the iOS platform, and, by consequence, Apple.  This ultimately would risk users' safety and erode the trust of the iOS platform.

### E.    The Case Study of the Android Marketplace in China Demonstrates the Security Problems that Arise From Fragmentation

156.    The various concerns I raise here are not merely theoretical.  The Android marketplace in China illustrates the real-life consequences of fragmentation of app distribution.

157.    Although Google operates the Google Play store for the Android mobile platform as a store through which many developers choose to distribute their Android apps, the Google Play Store is banned in China.  In place of a centralized Google Play Store, a variety of other app distribution stores have popped up instead.  The multitude of Android app stores in China has not improved Android security in that country.  To the contrary, China faces a very significant and frequent risk of malware arising from the numerous Android app stores that are available to Chinese users—and the multitude of those app stores has facilitated that frequency.

158.    As seen in RiskIQ's 2020 Mobile App Threat Landscape Report, the top three stores (Xiaomi, Baidu, and Pconline) where users were most likely to download malware are all

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

from China and heavily used by Chinese users.[177]  This has translated to Chinese users facing increasing security risks when obtaining apps from these app stores.  As far back as 2013, studies have shown that the fragmentation in China's Android market has resulted in "nearly 35 percent of the Android apps . . . secretly stealing user data unrelated to the app's functionality."[178]  Within a single month in 2021, 157 apps on China's Android app stores were discovered by China's Ministry of Industry and Information Technology to be violating security and privacy regulations; these included widely-used apps from large corporations, such as apps developed by Tencent.[179]

159.   The proliferation of malicious apps in China's Android market is largely attributed to looser security standards that accompany the multitude of app stores distributing apps.  In a 2018 study analyzing over 6 million Android apps obtained from 16 Chinese Android app stores and Google Play, the Chinese Android app market was found to have a higher prevalence of fake, cloned, and malicious apps in Chinese stores than in Google Play, possibly due to market operators indulgently oversighting copyright and security checks of the apps.[180]  As found in a 2018 study, various Android apps distributed by Chinese app stores require more default permissions than their counterparts distributed through Google Play.[181]  The default permissions in Android requests users to grant access to certain types of data (e.g., access to external storage) and functionalities (e.g., access to contacts, camera, microphone).  In this case, Chinese users not only face looser security

---

[177]   RiskIQ, 2020 Mobile App Threat Landscape Report, *available at* https://www.riskiq.com/wpcontent/uploads/2021/01/RiskIQ-2020-Mobile-App-Threat-Landscape-Report.pdf.

[178]   APL-APPSTORE_04690096–097.

[179]   https://www.miit.gov.cn/jgsj/xgj/fwjd/art/2021/art_3af78b9a329f432f96e7c14d689dfe32.html. An attachment to a press release from the Ministry of Industry and Information Technology of the People's Republic of China, entitled "Announcement about Apps Violating User Rights and Interests (1st batch in 2021 out of 10 batches in total)," contains 157 apps with violations, including multiple apps released in Tencent, Xiaomi, OPPO, and Huawei-related app stores. The 157 apps are identified in addition to the previous press release on the same topic, released in 2020.12.21. *See also*, https://www.miit.gov.cn/jgsj/xgj/fwjd/art/2020/art_887f74d6dae544c992b957caa7bd529e.html.

[180]   Haoyu Wang et al., "Beyond Google Play: A Large-Scale Comparative Study of Chinese Android App Markets," Proceedings of the Internet Measurement Conference 2018, *available at* https://arxiv.org/pdf/1810.07780.pdf.

[181]   *Id.*

*(Cont'd on next page)*

Expert Report and Declaration of
Aviel D. Rubin, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

standards, they are also left at their discretion to make cybersecurity-related decisions such as whether to change authorization permissions or privacy settings. As I discussed above, not forcing users to make those types of decisions facilitates a much safer mobile app distribution ecosystem.

### F.  Flaws in Dr. Elhauge's Proposal that Apple Review All Apps for Distribution through Third-party Stores

160.  Dr. Elhauge proposes that the security benefits of centralized app distribution would not be lost if Apple first reviewed all apps being distributed through alternative distribution channels such as third-party app stores.[182]  I disagree.

161.  As an initial matter, Dr. Elhauge provides little information about how his proposal would be accomplished.  In his report, Dr. Elhauge states: "Apple could use notarization (or a similar method) to prevent the installation of an undesirable app on iOS without requiring developers to distribute the Apple-approved apps exclusively through Apple."[183]  During deposition, Dr. Elhauge suggested that "all iOS apps go through Apple's App Review process before distribution by any channel," where review would be "neutral" to whether the app were to ultimately be distributed through the Apple App Store or a third-party app store.[184]  Dr. Elhauge does not, however, appear to address the question of the actual logistics of such review and distribution.  For example, when asked whether Apple could prevent sideloading of apps that do not comply with Apple's privacy policies, Dr. Elhauge appears to respond that iOS could act like macOS, which he describes as "allow[ing] competing distributors and self-distribution [but] you still need to get approved to run on the operating system."[185]  He did not, however, appear to have a technical understanding of what Apple currently reviews for on the macOS platform or how macOS permits the installation of apps that are distributed outside of the Mac App Store and,

---

[182]  Elhauge Report ¶ 402.

[183]  *Id.* ¶ 406.

[184]  Deposition of Einer Elhauge, July 30, 2021 at 279:16-280:18.

[185]  *Id.* at 282:9-13.

*(Cont'd on next page)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

consistently, his proposal lacks the technical detail needed to analyze the full impact that it would have on the security of iOS.[186]

162.     For example, Dr. Elhauge's proposal does not address how apps, regardless of whether they have been reviewed or notarized by Apple, could be downloaded and installed from outside the Apple App Store.  Apple employs significant on-device security protections on iOS, some of which have been built into iOS device hardware and are intended to enforce sandboxing, code signing, and protections against execution of unknown code.  These protections in iOS software and hardware, however, were specifically designed in view of iOS's centralized distribution model, and they would have to be modified if the current system were changed to permit distribution of apps outside of Apple's App Store (noting, of course, that the particular modifications to be made would depend upon the particular way in which third-party app distribution is to be implemented).

163.     Dr. Elhauge also does not recognize, or fails to distinguish, the differences that exist between the existing iOS and macOS app distribution models, and the security mechanisms they use.  These include, for example, the differences between using code signing and notarization.  Neither does he recognize that replacing existing iOS security protections with notarization technology creates additional threats and negative security impacts,[187] and would require significant changes to iOS and iOS devices.  Dr. Elhauge's proposal appears to contemplate a scenario where Apple would review an app and, if the app passes review, Apple would "generate[] a ticket for [the developer] to staple to [the app]."[188]  That app, when presented to the iOS operating system, would presumably be installed if the "ticket" were attached.  However, Dr. Elhauge fails to describe any details about the mechanism that would implement this ticketing system, including whether he is contemplating the use of notarization or code signing – and whether, for the stated "ticket," if that ticket would be cryptographically unforgeable, how the ticket would be attached

---

[186]   *Id.* at 282:14-283:21.

[187]   Epic Tr. Transcript (Federighi) at 3400:10-21.

[188]   Elhauge Report ¶ 406.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

to an app, and whether that ticket would be revocable and/or expire.  Dr. Elhauge also does not provide any insight into how tickets would be managed in his proposed system, or whether he wants to adopt wholesale the macOS app distribution process.  All of these questions must be considered when assessing the security of Dr. Elhauge's proposed third-party distribution model.  Dr. Elhauge's failure to do so demonstrates his failure to describe a valid, practical alternative to the current system employed by iOS.

164.    Dr. Elhauge appears to try to fill in the holes in his proposal by referring to "firms that have no exclusivity in app distribution like, say, Samsung or Apple itself in the Mac market, they invent very similarly in those devices," and then assuming that iOS devices "would be the same" without changes.[189]  But what he ignores is that iOS does not currently utilize a notarization workflow like that of macOS: iOS does not currently utilize a process to generate, recognize, and revoke notarization "tickets" that are included with apps when downloaded onto a device.  Instead, iOS utilizes Digital Rights Management (DRM) technology with encryption and code signing to verify apps upon download and installation.[190]  It is thus internally inconsistent to opine that iOS devices will still remain "the same" when his proposal would require numerous technical adjustments.

165.    Dr. Elhauge's proposal also ignores the burden of creating a systematic review mechanism.  He notes an average review time in his report, as well as certain dollar costs.[191]  And in his deposition, he suggests that Apple could charge a fee for its review of all apps.[192]  These comments suggest, however, that Dr. Elhauge is ignoring the new systemic burdens on security that would need to be created by his proposal that Apple review all apps, including those distributed by third-party stores.

---

[189]  Deposition of Einer Elhauge, July 30, 2021 at 173:2-12.

[190]  Marwin Baumann and Leandro Velasco, "Automated embedding of dynamic libraries into iOS applications from GNU/Linux" (2017).

[191]  Elhauge Report ¶¶ 407-08.

[192]  Deposition of Einer Elhauge, July 30, 2021 at 284:6-11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

166.    According to Dr. Elhauge, the security flaws of third-party distribution can be addressed by having Apple conduct App Review on every app, regardless of how the app is distributed.  But this assumes, for example, that Apple would continue to maintain security protections that are inherent in a centralized distribution model, such as the ability to block apps that have been found to have malicious functionality or are similar to ones that do, as well as the ability to remove such apps if they have already been made available in the App Store.  Dr. Elhauge's proposal, however, does not make clear whether Apple would in fact be able to maintain those security protections.  For example, if Apple is not permitted to revoke the "tickets" for apps that have been distributed by third-party stores, the strength of protection provided by Apple App Review would decrease.  And even if Apple is permitted to revoke those tickets, Dr. Elhauge does not address the burden of creating a system where Apple would need to monitor every third-party app store as well as maintain ongoing communications with those stores in order to learn about and/or enforce the removal of apps later found to be malicious.  He also does not address the significant costs that Apple could have to incur in order to develop a system that monitors apps made available through a multitude of distribution channels in order to, for example, detect bait and switch activity in apps once they have been reviewed by Apple or otherwise to try to identify problematic apps that must be removed.

167.    These costs could be particularly pronounced in a scenario where third-party stores are not required to share information with Apple about their security findings once apps have been published to their stores, which Dr. Elhauge's proposal does not address one way or the other. And even if third-party stores do have to share information, it is unclear whether they would share all necessary information and in a timely manner.  It has to be noted that there is competition among app distributors (including competition between third-party app distributors and the App Store).  Such competition might inhibit certain parties' intention to share negative information that might impact user desire to download from their store.  These scenarios, and many others, would lead to diminished effects from Apple's protective mechanisms, forcing Apple, its developers, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

its users to face additional costs and risks.  This would compromise the integrity of the iOS platform as well as ultimately put app users in harm's way.

## IX.   DIVERSIFYING IN-APP PURCHASE CHANNELS COULD INHIBIT APPLE'S ANTI-FRAUD ABILITIES

168.   IAP is a single, secure, and efficient solution that consumers have learned to trust. The IAP functionality provided by Apple aids in protecting security and privacy in the iOS platform, including through sophisticated fraud detection.  These benefits are shared by consumers, developers, and Apple itself.

169.   Allowing third-party payment systems, similar to allowing third-party app distribution mechanisms, could lead to less secure payment mechanisms and differing security standards that would facilitate bad acts.  Apple has developed significant and extensive security protections, including the use of cryptographically signed attestations, tamper-resistant Hardware Security Modules ("HSMs"), and other mechanisms for safeguarding user data.  IAP protects the privacy and security of iOS users by withholding their private information from developers as well as Apple employees.  Users' different payment methods and payment details are stored in the tamper resistant HSM on a server, so even Apple employees do not have access to them.  Thus, when a customer wants to make an in-app purchase, once the user is authenticated, the transaction can happen seamlessly and securely.  Apple also provides cryptographically signed attestations that tie an application's state to a particular device.  This allows a developer to have the assurance that customers are not cheating their application with multiple devices that are shared by different users. This proprietary functionality enables IAP to benefit from the ability to utilize such features as the on-device store kit, which can be used to verify whether a receipt for a purchase is authentic.

170.   Third parties, however, may be unable to, or choose not to, use Apple's proprietary on-device cryptographic hardware, hardware-based attestations, or IAP APIs, which Apple maintains confidentiality of in order to protect the PII of Apple's customers.  Where multiple parties are processing payments of digital goods in apps, a fraudster could choose one payment

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY SUBJECT TO THE
PROTECTIVE ORDER

method that is easier to exploit, or bounce between payment methods and payment processors to avoid detection.  Breach of a third-party payment system would potentially expose private data, including financial information and PII, to attackers.

171.    Allowing third-party payment systems also would curtail Apple's ability to monitor and detect fraud and abuse.  Use of Apple's IAP functionality centralizes the purchase of digital goods and services in apps with IAP, safeguards user data, and maintains visibility into the entire payment process.  For example, Apple checks that a developer server has confirmed receipt and that the customer has in fact purchased the content before it is delivered to the customer.  This maintains the integrity and traceability of the transaction and confirms developer's receipt of transaction, and the delivery of digital goods to appropriate customers.  It also enables Apple's fraud algorithms to process as much information as possible across all the transactions.  Apple uses this deep learning system to determine whether an account has been compromised.  These types of learning techniques are more accurate when more data points are available.  IAP fraud protection is enhanced by the very fact that it operates in a centralized system for the entire iOS ecosystem.  The balkanization of in-app payment processing systems thus would limit the amount of data that Apple can aggregate and analyze overall—and consequently, the fraud algorithms that rely upon this data.  Apple's fraud detection could therefore become less effective if it is only receiving a skewed subset of all IAP data.

**Signature**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 10, 2021.

_Aviel D. Rubin_

_____

Aviel D. Rubin