**ATTACHMENT J**

Page 1

1   ** HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER **
2
3              UNITED STATES DISTRICT COURT
4        FOR THE NORTHERN DISTRICT OF CALIFORNIA
5                    OAKLAND DIVISION
6
7   _____
                                           )
8                                          )
    IN RE APPLE iPHONE ANTITRUST           ) Civil Action No.
9   LITIGATION                             ) 4:11-cv-06715YGR
                                           )
10                                         )
11
12
13              ZOOM VIDEOTAPED DEPOSITION OF
14                SCOTT FORSTALL, VOLUME I
15           (Location of witness not disclosed)
16                Monday, March 8, 2021
17
18
19
20
21
22
23  Reported by:
    LORI M. BARKLEY, CSR No. 6426
24
25  PAGES 1 - 224

Page 81

1  BY MR. EVEN:
2      Q.   And you believed that native apps are going
3  to, as you say here, provide a better experience for
4  iPhone users, correct?
5      A.   Correct.
6      Q.   And looking back 15 years later, do you have
7  any doubt that you were right at the time?
8      A.   No.
9      Q.   And why did you think that native apps will
10 provide a better experience?
11     A.   There are many, many reasons.  If you build
12 a native app, you get to use the built-in frameworks
13 as they were intended, as they were designed for a
14 touch interface.  You have all the facilities we
15 built to quickly build, iterate, debug these native
16 applications.
17          I mean, I can go on and on and on for the
18 benefits of native application versus a web
19 application, and they are voluminous.  They -- they
20 are faster.  They use less memory.  They can take
21 advantage of the native graphics, libraries, in a way
22 that is either not available or would have to be
23 shoehorned in for a web app or a different kind of
24 application.
25          So you can go -- you can go through and we

Page 83

1  third party could have built when we shipped.
2          And, in fact, in January of 2007 when we had
3  the keynote and launched the iPhone, those were
4  web-based apps at the time of that launch, and they
5  did not perform well.  We could tell using it that
6  they were not as good as performing as the built-in
7  apps.
8          Now, you can always through software start
9  to try to improve things, make its launch a little
10 better, use a little less memory, get a faster
11 processor, get more memory in the next iteration of
12 the iPhone.  You can do things to try to make it can
13 better.
14         But because of the architecture, it sits as
15 an extra layer on top of the native layer, and
16 therefore, it's never going to be faster than the
17 native layer.  There might be some advantages about
18 how the code loads in a modular fashion or something
19 else.  But it just, for us, it wasn't as good as the
20 native ones.
21         And therefore, after we announced the iPhone
22 and demonstrated the iPhone between that and June 29,
23 we rewrote all those apps as native apps and they --
24 they shipped as native apps on the first version of
25 the iPhone.

Page 108

1  switch from like let's not do it at all, then he
2  switched to, okay, let's do it before Christmas and
3  here now he is appearing to agree.  Well, we can't
4  get it done before Christmas so let's get it done
5  right after Christmas.
6       Q.   So this is maybe the fourth e-mail about
7  the --
8       A.   Yeah --
9       Q.   -- rather than the first.
10           And the first bullet point that Mr. Serlet
11 talks about is (as read):
12           Let's protect the user, by
13           keeping control of which entities
14           can distribute apps (implies:
15           Signing infrastructure).
16           Do you see -- do you see that?
17      A.   I do.
18      Q.   And is that the same signing that you
19 mentioned the day before that if we sign apps, this
20 is what we'll need to think about, right?
21      A.   Correct.
22      Q.   Let me now mark Exhibit 875, APL-EG_0098292.
23           (Exhibit 875 was marked for identification
24      and is attached hereto.)
25

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 109

1  BY MR. EVEN:
2      Q.   You'll see this is going a couple of weeks
3  forward to October 14th and this is a document named:
4  Application Distribution and Deployment of MacOS X
5  Embedded.
6           And my first question is, is this a document
7  that you have received out of the ordinary course of
8  your work at Apple at the time?
9           My first question for you is what is "MacOS
10 X Embedded" or what is "MacOS 10 Embedded"?
11     A.   Okay.  Sorry, was your first question?
12     Q.   First question was, what is "MacOS X
13 Embedded"?
14     A.   I think the authors of this document took it
15 to mean iPhone OS which would be used on the iPhone
16 and it was to be used to iPod Touch at the time, but
17 I think they're taking it to mean the same thing.
18     Q.   Okay.  And is this a document you had
19 received in the ordinary course of your work at
20 Apple?
21     A.   Likely.  I mean, I don't see a e-mail trail
22 anything, but this -- I would have expected to have
23 received this document.
24     Q.   Well, let's put it like this, the document
25 is marked:  Apple Need to Know Confidential.

Page 110

1           Do you see that?
2      A.   I do.
3      Q.   Were you one of the people who needed to
4  know about what's in this document at the time?
5           MS. MOYE:  Objection to the form.
6           THE WITNESS:  Yes.
7  BY MR. EVEN:
8      Q.   And the document is prepared by three
9  people, Mitch Adler, John Wright, and Dallas
10 De Atley.
11          Do you see that?
12     A.   Well, it says "et al."  So it's prepared by
13 more than just them, but three named authors.
14     Q.   Fair enough.  And were these three
15 individuals reporting to you at the time directly or
16 indirectly?
17     A.   So again, we had this functional
18 organization, whether or not in an org chart they
19 were directed to me or they were dotted lines
20 responsible for this technology that was directing,
21 I -- I don't remember for all three of them.
22          I think these three were direct line
23 reporting to people who reported to me.
24     Q.   And they certainly functionally reported to
25 you; is that right?

Page 127

1  document and some of the heading, etc.
2      A.   Okay.
3      Q.   And this, too, came from your files, fair to
4  assume that this, too, is a document that you would
5  have received back in 2007?
6      A.   If you're correct about the date it was
7  created, I would have received it sometime around
8  when it was created, I'll expect.
9      Q.   And so if you go under assumptions here, you
10 see that we have some movement on the signing issue
11 and it says (as read):
12          All code running on the device
13          will be signed using an asymmetric
14          key pair.
15          Do you see that?
16     A.   Yes.
17     Q.   And then they say in the next -- below that
18 they say (as read):
19          We intend to sign all
20          applications that run on the device.
21          This includes Apple binaries that
22          ship with the operating system.  By
23          signing every binary, we can
24          uniquely identify running code.  We
25          will know who created it and will

Page 129

1   or do you think that's the only one?
2        Q.   Not that I'm aware of, but if I see
3   something, I'll let you know.  I'm not trying to trip
4   you up or anything like that.
5             Going further below you see that sandboxing
6   is still one of the assumptions here, correct?
7        A.   Yes.
8        Q.   Under Distribution Method, on page 2 you see
9   that it says (as read):
10                We will distribute third party
11                applications through the iTunes
12                Music Store.  However, our model
13                will allow for third parties to
14                distribute their own applications
15                and for enterprise customers to
16                deploy to their own devices.
17                Do you see that?
18        A.   I do.
19        Q.   And do you recall that there was a time
20   around October or November of -- of 2007, sorry,
21   where that was the plan of record at Apple, that
22   third parties could sign their applications as we've
23   seen before and then distribute as they wish, as this
24   last document we saw --
25        A.   So there's two things you're conflating

Page 130

1  here --
2         MS. MOYE:  Hold on.  Just objection to the
3  form.
4         Go ahead.  I'm sorry.  You can answer.
5         THE WITNESS:  Let me start with the first.
6  This statement says (as read):
7             We will distribute third party
8             applications through the iTunes
9             Music Store.
10        Okay.  Second sentence says (as read):
11            However, our model will allow for
12            third parties to distribute their
13            own applications ...
14        It does not say our policy is to allow that.
15 This is a technical document from a technical team
16 who is building the security infrastructure, and so
17 their statement here is that the model -- the
18 technical infrastructure they're building will allow
19 for other distribution mechanisms.
20 BY MR. EVEN:
21    Q.   Good.  Thank you.
22        And then it goes -- if you go further below,
23 do you see it says (as read):
24            Signing does not imply a specific
25            distribution method, and it's left

1   to the conclusion that Apple has not kept Mr. Jobs'
2   promise in this response, correct?
3           MS. MOYE:  Object to the form.
4           THE WITNESS:  No.  I would not say that that
5   way.
6   BY MR. EVEN:
7      Q.   I didn't ask if you see it that way.  I
8   asked if you understand how a developer might feel
9   that the promise was not kept?
10          MS. MOYE:  Objection to the form.
11          THE WITNESS:  I would say that at the time
12  we had a tiny, tiny number of users out there and our
13  goal was to super charge the development environment
14  and develop a world, and I personally was a
15  developer.  I wanted to see developers out there
16  thrive, from small companies to big companies, and
17  our goal in this was to make developers very
18  successful.
19          And at the time, the 30 percent was
20  hopefully going to pay for a whole lot of engineering
21  work and equipment and network bandwidth expenses and
22  everything else.  That was absolutely the goal and
23  the hope at the time, is that it would pay for
24  itself.  It's obviously done far, far better than
25  that.

Page 224

```
 1   STATE OF CALIFORNIA        ) ss.
 2   COUNTY OF LOS ANGELES      )
 3
 4          I, Lori M. Barkley, CSR No. 6426, do hereby
 5   certify:
 6          That the foregoing deposition testimony
 7   taken before me at the time and place therein set
 8   forth and at which time the witness was administered
 9   the oath;
10          That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me, and
13   were thereafter transcribed under my direction and
14   supervision, and that the foregoing pages contain a
15   full, true and accurate record of all proceedings and
16   testimony to the best of my skill and ability.
17          I further certify that I am neither counsel
18   for any party to said action, nor am I related to any
19   party to said action, nor am I in any way interested
20   in the outcome thereof.
21          IN WITNESS WHEREOF, I have subscribed my
22   name this 9th day of March, 2021.
23
24                    _____
25                     LORI M. BARKLEY, CSR No. 6426
```

Page 225

1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3   IN RE APPLE iPHONE ANTITRUST   )   Civil Action No.
    LITIGATION                     )   4:11-CV-06715 YGR
4                                  )
5
6
7
8
9
10
11
12
13       HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER
14      REMOTE VIDEOTAPED DEPOSITION OF SCOTT FORSTALL
15          (Location of witness not disclosed)
16                 Monday, March 8, 2021
17                      Volume II
18
19
20
21
22
    Reported stenographically via videoconference by:
23  LYDIA ZINN
    RPR, FCRR, CSR No. 9223
24  Job No. NY 4486201
25  PAGES 225 - 300

Page 248

1  Q.   Did Apple ever consider offering to Amazon some
2  revenue split, where Apple would receive some portion
3  of Amazon's sales of physical goods?
4           MS. MOYE:  Object to the form.
5           THE WITNESS:  Not that I remember.
6  BY MR. EVEN:
7  Q.   Did there come a time when Apple decided to offer
8  its own cloud service to users?
9  A.   That's a very broad statement.  What do you mean
10 by "cloud service"?
11 Q.   Do you recall that Apple at some point internally
12 dubbed 2011 as the "Year of the Cloud"?
13 A.   I remember discussions about more cloud offerings.
14 Q.   About?  Sorry.  I didn't get that.
15 A.   About more cloud offerings.
16 Q.   And what were the additional offerings that Apple
17 launched as part of -- in the context of cloud services
18 back in 2011?
19 A.   I don't remember it was offered that year.  And
20 before -- we had email before.  And we had different
21 cloud offerings.  We had .Mac.  I don't remember what
22 the 2011 feature set was.
23 (Deposition Exhibit 892 marked for identification.)
24 BY MR. EVEN:
25 Q.   Okay.  If you can open Exhibit 892, this is a

Page 249

1  document Bates stamped APL-EG_00985738.
2           MS. MOYE:  You said 892, not 891?
3           MR. EVEN:  I said 892.
4  Q.   Do you see that this is a meeting invite from
5  Mr. Jobs -- or meeting agenda for Mr. Jobs?  Sorry.
6  "Subject:  Top 100-A."  Do you see that?
7           MS. MOYE:  Object to the form.
8           THE WITNESS:  It was an email from Steve to
9  the executive team.  It looks like it's a proposed
10 agenda for a meeting.
11 BY MR. EVEN:
12 Q.   And the subject is Top 100-A.  Correct?
13 A.   Correct.
14 Q.   What's Top 100-A?
15 A.   Top 100 was what he referred to; an off-site we
16 would do every year or so with about a hundred Apple
17 employees.
18 Q.   Okay.  And did you receive this email at the time:
19 October 24th, 2010?
20 A.   It looks like it.
21 Q.   And are these your notes on the bottom right of
22 the first page?
23 A.   It looked like my same terrible handwriting.
24 Q.   Under "2011 Strategy - SJ," do you see, going down
25 to 2011, the last 2011 bullet point says "Year of the

Page 300

1    I, the undersigned, a Certified
2    Shorthand Reporter of the State of California, do
3    hereby certify:
4        That the foregoing proceedings were taken before
5    me at the time and place herein set forth; that any
6    witnesses in the foregoing proceedings, prior to
7    testifying, were placed under oath; that a verbatim
8    record of the proceedings was made by me using machine
9    shorthand which was thereafter transcribed under my
10   direction; further, that the foregoing is an accurate
11   transcription thereof.
12       I further certify that I am neither financially
13   interested in the action nor a relative or employee of
14   any attorney or any of the parties.
15       IN WITNESS WHEREOF, I have this date subscribed my
16   name.
17
18   Dated:  3/9/2021
19
20
21   _____
22
23   LYDIA ZINN, RPR, FCRR
24   CSR No. 9223
25