# ATTACHMENT K

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR**<br><br><br>**Hon. Yvonne Gonzalez Rogers** |

EXPERT REPORT OF

## DANIEL L. MCFADDEN

IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**JUNE 1, 2021**

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

CONTENTS

**I.   Introduction**..................................................................................................**1**
   A.   Qualifications ................................................................................................1
   B.   Assignment ...................................................................................................3
   C.   Summary of Opinions...................................................................................4

**II.  Industry Background** ......................................................................................**6**
   A.   iOS-Installed Mobile Devices ......................................................................6
   B.   Apps and In-App Content ...........................................................................10
   C.   Apple App Store .........................................................................................15
      1.   Apple's App Store Commission...........................................................15
      2.   Apple's Other App Store Revenues: Developer Fee and Search Ads.....17
      3.   Apple's App Store Business is Highly Profitable .................................20

**III. The Relevant Antitrust Market** ....................................................................**20**
   A.   Common Evidence Supports the Conclusion that the Sales of iOS Apps and In-App Content Constitute a Relevant Antitrust Market ........................................21
   B.   Common Evidence Supports the Conclusion that Web Apps Are Not Reasonable Substitutes for Native Apps...............................................................................23
   C.   Common Evidence Supports the Conclusion that "Jailbreaking" Is Not a Reasonable Substitute for Installing Apps and Purchasing In-App Content Through the App Store 30
   D.   Common Evidence Supports the Conclusion that Enterprise Software Installed on iOS Devices Is Not a Reasonable Substitute for iOS Apps and In-App Content..................32
   E.   Common Evidence Supports the Conclusion that Apps Compatible with Non-iOS Devices Are Not Reasonable Substitutes for iOS Apps.............................................33
      1.   Common Evidence Supports the Conclusion that Consumers Face Significant Switching Costs if they Attempt to Switch to an Alternative Mobile OS Device ...34
      2.   Common Evidence Supports the Conclusion that Software Applications Developed For Personal Computers or Gaming Consoles Are Not Part of The Relevant Market ........................................................................................................40
      3.   Dr. Evans' Analysis of Fortnite Usage Shows that Consumers Do Not Readily Switch from iOS Devices to Non-iOS Devices ....................................42
   F.   Common Evidence Supports the Conclusion that Purchasing In-app Content Outside the App Store Is Not a Reasonable Substitute for Purchasing it Through the App Store.....45

**IV. Apple's Market Power in the iOS Aftermarket**............................................**49**
   A.   Source of Apple's Market Power Common to All Class Members in the iOS AfterMarket ..................................................................................................49
      1.   High Switching Costs ..............................................................................49

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

2.   Common Evidence Supports the Conclusion that Consumers Lack Sufficient Information to Make Life-cycle Cost Calculations ...................................................51

B.   Common Evidence of Apple's Market Power in the Relevant Market ..........................53

1.   Common Evidence Supports the Conclusion that Apple's Share in the iOS Aftermarket is Almost 100 Percent ................................................................................53

2.   Common Evidence Supports the Conclusion that Entry Into the iOS App and In-App Content Aftermarket Is Not Possible ..................................................................53

3.   Common Evidence Supports the Conclusion that Apple's App Store Profit Margin Is Substantial ................................................................................................................56

V.   Common Economic Evidence of Apple's Anticompetitive Conduct .................................59

VI.   Methodologies for Assessing Common Economic Proof of Impact ..................................62

A.   Common Economic Impact of the App Store Commission .............................................62

B.   Economic Principles of App Store Commission .............................................................66

C.   But-For Commission Rates .............................................................................................71

D.   iOS Aftermarket Demand and Supply and App Developers' Profit Maximization Conditions ........................................................................................................................76

1.   Profit Maximization Conditions for App Developers ............................................77

2.   Consumer Demand for Apps and IAPs ..................................................................80

3.   App Developers' Costs ...........................................................................................82

E.   Estimation Procedure ......................................................................................................93

F.   Scaling Up Calculations of Common Impact ..................................................................97

VII.   Common Proof of Damages .............................................................................................99

Appendix A Curriculum Vitae of Daniel McFadden ..........................................................108

Appendix B Materials Relied Upon .....................................................................................125

Appendix C Apple App Store Transactions Data ................................................................144

Appendix D Consumer Utility Maximization ......................................................................151

D.1 App Download Demand ..................................................................................................151

D.2 In-app Purchase Demand ...............................................................................................152

Appendix E Quantifying Common Economic Impact: Technical Details ...........................153

E.1 Data Preparation for Estimation .....................................................................................153

E.2 Model Estimation ...........................................................................................................156

E.3 Estimation Results ..........................................................................................................159

E.4 But-for World Simulations .............................................................................................161

Appendix F Profit Maximization Conditions Under the Pricing Tier Policies ...................168

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Figure 1: US Smartphone Shares of iOS and Android ..................................................... 8

Figure 2: US Tablet Shares of iOS and Android ............................................................ 9

Figure 3: Evolution of iOS App Monetization: App Store RevenueS ........................................ 13

Figure 4 Evolution of iOS App Monetization: Share of App Store Revenues ............................ 14

Figure 5 U.S. App STORe Commission Revenues ........................................................ 17

Figure 6 AppLE's Revenues attributable to Developer Fees ............................................... 18

Figure 7 Number of Apps iOS Consumers Spent Money on ................................................. 52

Figure 8 App Store Profit Margin in FY2019 .............................................................. 57

Figure 9: Apple's App Store Gross and Contribution Margins ............................................ 58

Figure 10. App Store Gross Margin, 2015 – 2019 ......................................................... 59

Figure 11. Effects of Tax on Consumers and Suppliers ................................................... 67

Figure 12. Effects of commission on consumers and app developers ..................................... 69

Figure 13: Pocket Gems, monthly ua vs. gross bookings, ios ............................................. 89

Figure 14: Pocket Gems, monthly server costs vs. gross bookings, ios .................................. 92

Figure 15 Estimation Results ............................................................................ 102

Figure 16 Summary of estimated price effects: games .................................................... 103

Figure 17 Summary of Estimated Price Effects: Entertainment and Music .............................. 105

Figure 18: Description of variables Analyzed in my analysis ............................................. 144

Figure 19: Sample and Full Data Comparison: Observations ............................................. 146

Figure 20: Sample and Full Data Comparison: Spending .................................................. 146

Figure 21: Sample and full Data Comparison: Content Type .............................................. 147

Figure 22: Sample and full Data Comparison: Genre (App Category) .................................... 148

Figure 23: Sample and full Data Comparison: Platform .................................................. 149

Figure 24: Sample and full Data Comparison: Posting Reason ........................................... 149

Figure 25: Sample and full Data Comparison: Content Type .............................................. 150

Figure 26: Sample and Full data Comparison: Sap_line_item_type ...................................... 150

Figure 27: Share of Transactions by Price, Transaction Type, and App Type .......................... 155

Figure 28: Summary of Estimation Results: Games ....................................................... 160

Figure 29: Summary of Estimation Results: Music and Entertainment ................................... 161

Figure 30: Summary of Estimated Price Effects: Games .................................................. 164

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Figure 31: Summary of Estimated Price Effects: Music and Entertainment ............................ 164

Figure 32: Summary of Estimated Price Effects: Games .......................................................... 165

Figure 33: Summary of Estimated Price Effects: Music and Entertainment ............................ 166

Figure 34: Summary of Estimated Price Effects: Games .......................................................... 166

Figure 35: Summary of Estimated Price Effects: Music and Entertainment ............................ 167

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## I.  INTRODUCTION

### A.  QUALIFICATIONS

1. My name is Daniel McFadden. I am the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and also the Presidential Professor of Health Economics and Policy Emeritus at the University of Southern California. My office is located in Evans Hall at the Department of Economics, 508-1 Evans Hall #3880, University of California, Berkeley, CA. Previously, I was the James R. Killian Professor of Economics at MIT. I received my Ph.D. in Economics from the University of Minnesota in 1962. I am also a Principal of the Brattle Group (Brattle), an economics and financial consulting firm.

2. Throughout the course of my career, I have published more than one hundred peer-reviewed articles and have written or edited several academic books and monographs on economic modeling. In 2000, I was awarded the Nobel Memorial Prize in Economics for my work on discrete choice modeling.[1] The discrete choice models that I developed are used extensively by economists and statisticians to explain or predict a choice between two or more discrete (i.e., distinct and mutually exclusive) alternatives. For example, such models are used to explain the factors that will cause a consumer to purchase one brand of car versus another.[2]

3. Many of my publications over the last thirty years have focused on econometric methods for analysis of consumer market behavior and welfare, including use of transactions databases on consumers' choices, natural experiments in which external events allow identification and estimation of consumer behavior without confounding by overall market variations, and designed

---

[1]  In particular, I received this award for showing "how to statistically handle fundamental aspects of microdata, namely data on the most important decisions we make in life: the choice of education, occupation, place of residence, marital status, number of children, so called discrete choices." Nobel Media AB 2014, "Daniel L. McFadden – Facts," *Nobelprize.org,* May 25, 2021, available at, https://old.nobelprize.org/nobel_prizes/economic-sciences/laureates/2000/mcfadden-facts.html, last accessed May 29, 2021.

[2]  Note that in a seminal paper, Berry, Levinsohn, and Pakes estimate market equilibrium prices in the automobile industry using demand data derived from a discrete choice model, citing heavily to my work. *See* Berry, Steven, James Levinsohn, and Ariel Pakes, "Automobiles Prices in Market Equilibrium," *Econometrica* 63(4) (July 1995): 841-890.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

experiments and choice-based conjoint surveys that provide information on consumer perceptions and intentions.

4. I have also served as an expert in several high-profile matters, including class action matters, in which I testified on economically sound methods for assessing common impact and calculating market prices given discrete choice demand.[3] Finally, I have continued to publish on survey-related topics throughout my career, including in my 2019 book, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-Based Conjoint Analysis* (with Moshe Ben-Akiva and Kenneth Train),[4] as well as many other studies.

5. In addition to the Nobel Prize, I have received numerous other fellowships and honors over the course of my career. In 1975, I was awarded the John Bates Clark Medal by the American Economic Association, given to the economist under 40 who has made the most significant contribution to economics. I have been awarded the Frisch medal, the Nemmers Prize, and the Laffont Prize for my contributions to economics, and have been awarded more than 20 honorary degrees, including J.D. D. Sc., and PhD. I have served as the Chair of the National Academy of Science section on Economic Sciences and am on the Advisory Committee for the Journal of Applied Econometrics. I have previously served as an editor of several other peer-reviewed academic journals, and I am past-president of the American Economic Association, the Econometric Society, and the Western Economics Association International.

6. My curriculum vitae, which provides a more detailed summary of my qualifications, including a list of my publications and a list of my previous expert testimony within the last four years, is attached as Appendix A. Appendix B lists the documents that I relied upon in preparing this report.

7. Brattle charges $1100 per hour for my services. Several Brattle colleagues have helped me in preparing the analyses I used to establish my conclusions in this matter. Brattle charges between

---

[3] *See e.g., In Re: General Motors LLC Ignition Switch Litig*ation, United States District Court for the Southern District of New York, Case No. 14-MD-2543; and *Laumann et al. v National Hockey League et al.*, 12-cv-1817 and *Garber et al. v. Office of the Commissioner of Baseball et al.*, 12-cv-3704, S.D.N.Y.

[4] Ben-Akiva, M., D. McFadden, and K. Train, "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis," in *Foundations and Trends® in Econometrics* 10 (1-2) (2019).

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

$195 and $800 per hour for these staff members. Our compensation is not contingent on my findings or on the result of this proceeding.

## B.   ASSIGNMENT

8. According to Counsel for Consumer Plaintiffs, the Consumer Class is defined as all persons in the United States who purchased one or more iOS applications or application licenses from Apple, or who paid Apple for one or more in-app purchases (defined below), including, but not limited to, any subscription purchase, for use on an iOS device at any time since July 10, 2008 (the "Class Period").[5] Consumer Plaintiffs allege that Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iOS applications and in-app purchases throughout the Class Period.

9. Consumer Plaintiffs allege that Apple monopolized the aftermarket by equipping iOS mobile devices with an operating system that forecloses iOS device users from buying iOS applications from any source other than Apple and from paying for certain in-app purchases except to Apple, and thus forces iOS device users to pay Apple a 30 percent fee for buying iOS applications and making those in-app purchases.[6] Consumer Plaintiffs also allege that Apple controls what prices developers can charge and "exercises that control by insisting that every paid app be priced in dollar increments at $0.99, $1.99, $2.99, and so forth."[7]

10. I have been asked by counsel for Consumer Plaintiffs to assess economic evidence relevant to the theory of the case, summarized above, and determine whether the economic evidence is common to the Consumer Class and can be used to support their claims. I have been also asked by counsel to address (1) the availability of methods and evidence, common to the Consumer Class, to demonstrate whether Apple's misconduct related to the Apple App Store caused harm to all or virtually all members of the Consumer Class, and (2) whether common methods and

---

[5]   The Consumer Class excludes Apple and its employees, agents and affiliates, and the Court and its employees.

[6]   *In re Apple iPhone Antitrust Litigation*, Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, No. C 11-06714-YGR, September 11, 2020, ("Third Amended Complaint"), ¶¶ 8-12.

[7]   Third Amended Complaint, ¶ 11.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

evidence can be used to quantify the damages to the members of the Consumer Class caused by Apple's alleged misconduct.

11.    Throughout this report, I will use the terms "As-Is" or  "As-Is world" to refer to the economic conditions consumers actually faced during the alleged damage period; the terms "But-For" or "But-For world" to refer to the economic conditions that consumers would have faced but for the conduct by Apple that the complaint in this case alleges to be anti-competitive; the term "in-app content" to refer to digital content such as content subscriptions or game artifacts provided by iOS applications, the term "in-app purchases" to refer to the purchases of in-app content made by iOS device users with iOS applications; the term "In-App Purchase" to refer to Apple's In-App Purchase method which uses Apple's payment solution for in-app purchases; the term "the App Store revenues" to refer to the dollar amount spent on the App Store for purchases of apps and in-app content; the term "the App Store commission revenues" to refer to Apple's revenues from the App Store commission; the term "retail price" to refer to the price seen and paid by iOS device users for an app or in-app content; the term "commission" to refer to the share of the retail price of an app or in-app purchase retained by the Apple App Store; the term "wholesale price" to refer to the revenue per transaction received by the app developer from a transaction, equal to non-commission share of the retail price; the term "excess commission" to refer to the difference between the Apple App Store commission in the As-Is world and the But-For world; and the term "overcharge" to refer to the difference between the As-Is and the But-for retail price for a transaction.

### C.    SUMMARY OF OPINIONS

12.    The economic evidence as to the core aspects of liability—market definition, market power, entry barriers, and misconduct—is common to all Consumer Class members. Common economic evidence supports the conclusion that the sale and purchase of native iOS applications ("apps") and in-app content to users of iPhones, iPads, and other mobile devices sold by Apple that use its proprietary iOS operating system constitute a distinct economic antitrust market, commonly referred to as an aftermarket—i.e., a market derived from the fact that purchasers of iOS mobile devices are economically locked into purchasing apps and in-app content specifically for those devices. Common economic evidence supports the conclusion that there are no reasonable

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

substitutes for those device-specific content purchases and that barriers to entry by other sellers are extremely high. Common economic evidence also supports the conclusion that Apple's conduct—in particular, its exclusive control of sales through the Apple App Store—ensures that Apple has a (near) 100 percent share of the sale of the iOS apps and in-app content in the relevant iOS aftermarket, which also is reflected in the Apple App Store's relatively high margins.

13. Common economic evidence supports the conclusion that, absent the alleged misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower prices for their purchases. Common economic evidence first supports the conclusion that, absent the misconduct, the marketplace for the sale of iOS apps and in-app content would have been competitively structured, which would have driven down the commissions that Apple extracts from consumer purchases of apps and in-app content. I currently calculate that the "As-Is" commission has been near 30 percent, and the "But-For" commission would have ranged between 10 and 12 percent.

14. Common economic evidence, in turn, supports the conclusion that the elevated commissions in the As-Is world compared to the But-For world functioned as a tax levied on app developers. As a matter of long-standing and fundamental economic principles and evidence, this tax on app developers harmed both developers and consumers. App developers set "wholesale" prices that maximize their profits, accounting for the Apple commission they have to pay and the effect of "retail" prices on consumer demand for their products. As a result, retail prices are elevated, and consumers effectively pay part of the Apple commission. In other words, the Apple commission creates a wedge between wholesale price and retail price, and both developers and consumers share the "burden" of the Apple tax. Consumers cannot individually bargain over prices for iOS apps or in-app content. While the extent of the harm to each class member will depend on their individual purchases, common economic evidence demonstrates a quantifiable pattern of impact on all class members.

15. Common economic evidence can also be used to show the extent of damages to all or nearly all class members. The same methodologies used for demonstrating impact through common

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

economic proof can be used to quantify the amount that each class member would likely have paid in the But-For world.

## II.   INDUSTRY BACKGROUND[8]

### A.   IOS-INSTALLED MOBILE DEVICES

16.   Apple mobile devices relevant for this matter are the iPhone, iPad, and iPod Touch ("iOS mobile devices" hereafter).[9] All of these iOS mobile devices run on Apple's proprietary iOS operating system. These devices cannot use a different operating system ("OS"), and iOS is only available on Apple's mobile devices. Also, apps developed for non-iOS devices cannot be used on Apple's iOS mobile devices.

17.   The iPhone has been the central device of the iOS mobile devices since its introduction in 2007 with ▮▮▮▮▮▮ of the U.S. Apple IDs registered with the iPhone, according to the App Store transactions data Apple produced in this matter.[10] ▮▮▮▮▮ of the App Store revenues are attributable to the iPhone from July 2008 to September 2019, the whole period covered by the produced App Store transactions data.[11] The iPad is ▮▮▮▮▮▮▮▮▮▮▮▮▮, accounting for ▮▮▮▮▮ of the App Store revenues during the same period. The iPod Touch makes up only a relatively minor part of the iOS mobile devices historically. Its relative share of

---

[8]   I note that all of this background information will be offered through common evidence from various sources, but have not repeated that verbiage throughout this section.

[9]   Third Amended Complaint, ¶ 1.

[10]   Apple Transactions data produced via hard drive January 15, 2021, APL-APPSTORE_10334265 ("App Store transactions data"). The App Store transactions data contains data for all Apple IDs that downloaded apps or in-app content through the App Store, including those users who didn't spend any money. Appendix C provides a summary of the App Store transactions data and explains how the data were processed.

[11]   Calculated based on the App Store transactions data. The App Store transactions data Apple produced for this matter thus far covers up to the end of September 2019. Appendix C provides a summary of the produced App Store transactions data.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

the App Store transactions among the iOS mobile devices ████████ , accounting for ██

████ of the App Store revenues at the time, ███████████████████

18.   Nearly all smartphone users in the U.S. use iOS- or Android-installed mobile devices.[12] As of January 2021, 99.5 percent of smartphone subscribers used one of the two operating systems, with respective shares of 52.4 percent for iOS and 47.1 percent for Android.[13] As Figure 1 shows, the combined share of iOS and Android has been at least 90 percent since 2013, and over 95 percent since 2015.

---

[12]   The Android operating system is an open-source mobile operating system supported by Google, though an Android smartphone need not technically be integrated with the Google mobile ecosystem, which includes the Google Play Store. However, in practice, effectively all Android smartphones in the US are part of the Google ecosystem. Michael Muchmore, "Android vs. iOS: Which Mobile OS Is Best?," *PCMag*, October 2, 2020, available at, https://www.pcmag.com/comparisons/android-vs-ios-which-mobile-os-is-best, last accessed May 19, 2021.

[13]   comScore, "Subscriber share held by smartphone operating systems in the United States from 2012 to 2021," Chart, April 9, 2021, *Statista*, available at, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/, last accessed April 27, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 1: US SMARTPHONE SHARES OF IOS AND ANDROID**



Source: comScore, "Subscriber share held by smartphone operating systems in the United States from 2012 to 2021," Chart, April 9, 2021, *Statista*, available at, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/, last accessed April 27, 2021.

19. Similarly, nearly all tablets have either iOS or Android installed as the OS. As of February 2021, 99.9 percent of tablet subscribers used one of the two operating systems, with respective shares of 61.3 percent for iOS and 38.6 percent for Android.[14] As Figure 2 shows, the combined share of iOS and Android has remained above 99 percent since 2017.

---

[14]   comScore, "Tablet operating systems market share in the United States from 2016 to 2021," Chart, March 22, 2021, *Statista*, available at, https://www.statista.com/statistics/271293/market-share-held-by-tablet-os-us/, last accessed April 27, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 2: US TABLET SHARES OF IOS AND ANDROID**



Source: comScore, "Tablet operating systems market share in the United States from 2016 to 2021," Chart, March 22, 2021, *Statista*, available at, https://www.statista.com/statistics/271293/market-share-held-by-tablet-os-us/, last accessed April 27, 2021.

20.  Only a small portion of iOS device users switch away to non-iOS devices.[15] A number of factors contribute to create the high switching costs that lock consumers into iOS devices. First, consumers infrequently purchase new mobile devices due to high equipment costs. Second, all apps purchased on iOS must be re-purchased on non-iOS, and some apps may only be available on iOS. Third, it is complicated and time-consuming to transfer app-related data, accounts, and settings from an iOS device to a non-iOS device, including in-app purchases, some of which may not be feasibly transferrable. Finally, several features introduced by Apple, while they may provide value to iOS users, have the effect of raising switching costs.  These factors create high

---

[15]   See Section III.E.1 for details.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

switching costs that lock in users to Apple's iOS devices. I examine the common economic evidence addressing these factors in detail in Section III.E.

### B.    APPS AND IN-APP CONTENT

21.    Apple launched the App Store on July 10, 2008, one year after the iPhone's release. The App Store allows users to search for and download "native" applications made for the iOS mobile devices from third-party developers. Native applications are applications that interface directly with a device's operating system, as opposed to requiring some form of middleware that acts as an intermediary between the application and the operating system.[16] These applications allow users to fully realize the potential of smartphones over traditional cellphones. In my report, I use the term "apps" to refer to native apps.[17]

22.    Initially, Apple did not allow third-party native apps on the iPhone.[18] Instead of native apps, Apple intended for developers to create web-based apps ("web apps") that would be accessed via iOS's web browser, Safari.[19] However, Apple abandoned this policy[20] as native apps offer clear benefits to developers and consumers in terms of functionality and performance.[21] In Section III.C of this report, I explain that common economic evidence provides strong support that web apps are not reasonable substitutes for native apps.

---

[16]    Jonathan Tarud, "Mobile Apps vs Web Apps: What's The Difference?," *Koombea*, April 19, 2021, available at, https://www.koombea.com/blog/difference-between-mobile-apps-and-web-apps/, last accessed May 17, 2021.

[17]    For iOS devices, native apps include all apps preinstalled or downloaded from the Apple App Store.

[18]    Stephen Silver, "Apple details history of App Store on its 10th anniversary," *AppleInsider*, July 5, 2018, available at, https://appleinsider.com/articles/18/07/05/apple-details-history-of-app-store-on-its-10th-anniversary, last accessed May 19, 2021.

[19]    Ryan Christoffel, "Before the App Store: the "Sweet Solution" of Web Apps and Developers' Relentless Passion," *MacStories*, July 9, 2018, available at, https://www.macstories.net/stories/before-the-app-store-the-sweet-solution-of-web-apps-and-developers-relentless-passion/, last accessed May 17, 2021.

[20]    APL-EG_01832041; APL-EG_00483489.

[21]    Deposition of Scott Forstall, Volume 1, *In Re Apple iPhone Antitrust Litigation*, March 8, 2021, 83:2-84:6. *See e.g.* an explanation of the benefits of native applications from Clearbridge Mobile, a mobile app developer that has worked with a number of Fortune 500 companies. Clearbridge Mobile, "5 Key Benefits of Native Mobile App Development," available at, https://clearbridgemobile.com/benefits-of-native-mobile-app-development/, last accessed May 19, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

23. iOS device users cannot download and install apps made for non-Apple mobile devices such as Android apps on their iOS devices. I refer to native apps iOS device users download and install through the App Store as iOS apps. iOS apps as well as additional app features and subscriptions, i.e., in-app content, are aftermarket products that iOS device users "consume." As I explain in Section III.A, common economic evidence supports the conclusion that iOS-installed devices belong to the primary market, and the sales of iOS apps and in-app content constitute an aftermarket for the purpose of the market definition analysis.

24. For iOS device users to download and purchase apps and in-app content through the App Store, they must set up an Apple ID, a central account that connects all of a user's Apple-provided services. Apple requires that iOS users only be able to download apps for their iOS devices through the App Store,[22] with narrow exceptions granted for enterprise apps intended only for internal use by an organization's employees,[23] and for developers engaged in beta testing of their apps, allowing a limited number of testers to use an app while it is still in the development process.[24] In Section III.D of this report, I explain, through common economic evidence, why the enterprise apps are not reasonable substitutes for native apps. Developers must submit their apps to Apple for approval before being distributed to iOS device users through the App Store.[25]

25. The number of apps available to users in the App Store increased quickly after the launch of the App Store, peaking at over 2.3 million in 2017 before declining in recent years.[26] Revenues from purchases of apps and in-app content, i.e., the App Store revenues, ███████████████████ ████████████████████████████████████████████████████████ ██████████████

---

[22]   Deposition of Ron Okamoto, Volume 1, *In Re Apple iPhone Antitrust Litigation*, December 16, 2020, 71:22-72:12.

[23]   *See* Apple, "Apple Developer Enterprise Program," available at, https://developer.apple.com/programs/enterprise/, last accessed May 19, 2021.

[24]   Apple, "Beta Testing Made Simple with Testflight," available at, https://developer.apple.com/testflight/, last accessed May 19, 2021.

[25]   Deposition of Ron Okamoto, Volume 1, *In Re Apple iPhone Antitrust Litigation*, December 16, 2020 at 75:5-15.

[26]   Based on calculations using the Apple transactions data. An app is counted as "available" if it recorded at least one initial download or in-app transaction in a year.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

26. App developers monetize their apps using a variety of business models. A large number of apps are free and offer no in-app content for sale via the App Store. These apps may rely solely on advertising for revenue (like some social networking apps), enable the sale of "real-world" goods and services (like the ride-hailing app Lyft, the food delivery app DoorDash, or the online marketplace eBay), or they may be ancillary to the app provider's main business (for instance, apps provided by banks that allow customers to access services on their phone).[27]

27. App developers can monetize their apps directly through the App Store by charging an upfront price to download the app, or by selling in-app content to users who have already downloaded and installed their apps. When the App Store first launched in July 2008, in-app purchases were not supported for free-to-download apps.[28] Apple changed its policy to allow in-app purchases in free apps in late 2009;[29] since then, free apps with paid in-app content have become the overwhelmingly dominant business model in terms of revenue derived from the App Store, accounting for ▮▮▮▮▮ of all-time revenue within the App Store.

28. Figure 3 and Figure 4 show the evolution of the ways in which app developers have monetized their apps in the U.S. from July 2008 to 2019. Throughout this report, I group apps in three business models based on how app developers monetize. I call paid apps without in-app purchase functionalities "Paid Download" apps, free apps with in-app purchase functionalities "Free Download IAP" apps, and paid apps with in-app purchase functionalities "Paid Download IAP" apps. Subscription apps that are free to download are part of Free Download IAP apps. These two figures show that Free Download IAP apps have been the main source of the App Store revenues since 2012.

---

27   If iOS device users downloaded and used apps that are free and offer no in-app content for sale via the App Store, they are not part of the Consumer Class. See Section I.B for the definition of the Consumer Class.

28   APL-EG_09249976; *See also* Chris Foresman, "Apple opens in-app purchasing for free iPhone apps," *arsTechnica*, October 15, 2009, available at, https://arstechnica.com/gadgets/2009/10/apple-opens-in-app-purchasing-for-free-iphone-apps/, last accessed May 18, 2021.

29   *Ibid.*

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

### FIGURE 3: EVOLUTION OF IOS APP MONETIZATION: APP STORE REVENUES



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on full data. *The data ends on 09/30/2019, and the 2019 value is annualized. "Revenue" refers to App Store revenues.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 4 EVOLUTION OF IOS APP MONETIZATION: SHARE OF APP STORE REVENUES**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on full data. *The data ends on 09/30/2019, and the 2019 value is annualized. "Revenue" refers to App Store revenues.

29. The in-app content that iOS device users can purchase varies according to the type of app. The most important distinction Apple makes is between subscriptions and other in-app purchases. Subscriptions are recurring, periodic purchases that repeat automatically until cancelled by the consumer.[30] As defined in Section I.B, I use the terms in-app purchases to refer to both subscription and non-subscription in-app purchases.

---

[30]   Apple, "Auto-renewable Subscriptions," available at, https://developer.apple.com/app-store/subscriptions/, last accessed May 18, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

C.    APPLE APP STORE

### 1.    Apple's App Store Commission

30.  Apple's primary source of revenue from the App Store is a commission it charges on all purchases of apps and in-app content.[31] The App Store is the only viable venue through which iOS device users can download and install iOS apps. All in-app purchases (made with iOS apps) must be made using Apple's In-App Purchase (IAP) method through the App Store.

31.  Generally, Apple collects 30 percent of every app purchase or IAP transaction, with a few exceptions. In June 2016, Apple altered its commission fee structure for subscriptions, dropping the commission to 15 percent on subscription renewals after one year.[32]

32.  As of January 2021, small developers with annual App Store post-commission revenues below $1 million also pay a reduced commission fee of 15 percent.[33] The change was characterized by Apple CEO Tim Cook as being motivated by a concern for small businesses, and that while it was spurred by the COVID-19 pandemic, Apple leadership decided to make the change permanent.[34] These small developers account for a small fraction of overall App Store revenues.

---

[31]  Apple's IAP revenue is ████████ of App Store revenue. APL-EG-05464015; Apple, "App Store Review Guidelines," Section 3.1.1, available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 21, 2021.  "If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase."

[32]  Roger Fingas, "Apple announces it will offer App Store subscriptions to all apps, take smaller 15% cut," *AppleInsider*, June 8, 2016, available at, https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut, last accessed May 25, 2021; *See* Apple, "App Store Review Guidelines," Sections 3.2.1(ii) and 3.2.2(i), available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 21, 2021.

[33]  *See* Apple, "Apple announces App Store Small Business Program," November 18, 2020, available at, https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/, last accessed May 18, 2021

[34]  Trial Testimony of Tim Cook, *Epic Games, Inc. v. Apple, Inc.*, No. C-20-5640 YGR, May 21, 2021, 3992:4-17:

   THE COURT: The issue with the $1 million Small Business Program, at least from what I've seen thus far, that really wasn't the result of competition. That seemed to be a result of the pressure that you're feeling from investigations, from lawsuits, not competition.

   THE WITNESS: It was the result of -- of feeling like we should do from a COVID point of view, and then electing to, instead of doing something very temporary, just do something permanent.  And of course we had those things -- the lawsuits and all the rest of the stuff in the back of my head, but the thing that triggered it was we were very worried about small business.

   THE COURT: Okay. But it wasn't competition.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Using Apple's App Store transactions data from October 2018 to September 2019, I estimate that developers with less than $1 million in revenue accounted for ███████ of total App Store revenues.[35]

33.  Apple's App Store commission applies to upfront app purchases, and all "digital goods and services" sold through apps,[36] though Apple has applied seemingly contradictory exceptions for certain large app providers. For example, Apple allows some "premium subscription video entertainment providers" a bypass of the App Store's In-App Purchase system, and thus its commission fee. In April 2020, Amazon Prime Video began allowing users to purchase or rent content through its iOS app.[37] Previously, Prime Video subscribers could only access the free content included with their subscription via the app, or any paid content they had paid for outside of the app.

34.  Figure 5 shows the revenues Apple made from the App Store commissions in the U.S. from July 2008 to 2019. Apple's internal documents use the term "billings" to refer to the App Store revenues and "commission" or "revenue" to refer to the App Store commission revenues.[38]

---

[35]  Based on calculations using the Apple transactions data produced via hard drive January 15, 2021; APL-APPSTORE_10334265.

[36]  The commission does not apply to purchases of "real-world" goods and services or revenue from advertising, "such as an Uber ride or shoes bought in the Amazon app." Jack Nicas, "Apple Halves Its App Store Fee for the Smaller Companies," *New York Times*, November 18, 2020, available at, https://www.nytimes.com/2020/11/18/technology/apple-app-store-fee.html, last accessed May 18, 2021.

[37]  Nick Statt, "Apple now lets some video streaming apps bypass the App Store cut," *The Verge*, April 1, 2020, available at, https://www.theverge.com/2020/4/1/21203630/apple-amazon-prime-video-ios-app-store-cut-exempt-program-deal, last accessed May 3, 2021.

[38]  APL-APPSTORE_09958590.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 5 U.S. APP STORE COMMISSION REVENUES**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on full data. *The data ends on 09/30/2019, and the 2019 value is annualized.

### 2.    Apple's Other App Store Revenues: Developer Fee and Search Ads

35.  Apple collects a relatively small amount of revenue from a fixed $99 annual fee charged to developers for its Apple Developer Program.[39] Apple charges organizations seeking to deploy internal-use apps $299 per year for its Apple Developer Enterprise Program.[40]

---

[39]   "Membership includes access to beta OS releases, advanced app capabilities, and tools needed to develop, test, and distribute apps and Safari Extensions." Apple, "Choosing a Membership," available at, https://developer.apple.com/support/compare-memberships/, last accessed May 21, 2021.

[40]   Apple, "Apple Developer Enterprise Program," available at, https://developer.apple.com/programs/enterprise/, last accessed May 19, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

36. I have not found documents providing information on Apple's revenues attributable to the fixed annual fee separately from the App Store commissions,[41] but I can estimate them by multiplying $99 by the number of app developers included in the App Store transactions data.[42] Figure 6 shows my estimates of Apple's revenues attributable to the annual developer fees in the U.S. from July 2008 to September 2019. I estimate that they are equal to ▮▮▮▮▮ of the App Store commission revenues during this period.



FIGURE 6 APPLE'S REVENUES ATTRIBUTABLE TO DEVELOPER FEES

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on full data. The data ends on 09/30/2019. Data for 2019 is not annualized.

---

[41]  I understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

[42]  App developers are identified by ▮▮▮▮▮▮▮▮ in the App Store transactions data. Note that developers associated with a "nonprofit, educational institution, or government entity may be eligible for a fee waiver." Apple, "Choosing a Membership," available at https://developer.apple.com/support/compare-memberships/, last accessed May 21, 2021. However, there ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

37.  Apple also collects revenues from the App Store through its Search Ads system. Introduced in 2016, Search Ads allows developers to pay to have their apps listed at the top of the results when a user searches for certain terms in the App Store.[43] Developers pay a certain amount each time a user clicked on one of these ads ("per-click").

38.  More recently, Apple introduced the option to pay each time a user installed their app after clicking on the ad ("per-install").[44] As of December 2017, there are two versions of Search Ads available to developers: Search Ads Advanced and Search Ads Basic.[45] In Search Ads Advanced, developers select search keywords and audiences and place a bid of the highest "cost-per-tap" (CPT) value they would be willing to pay each time an App Store user taps on their sponsored ad.[46] ██████████████████████████████████████████ ████████████.[47] Search Ads Basic is a simplified, largely automated version of Search Ads aimed at smaller developers. Developers enter a maximum "cost-per-install" (CPI) they are willing to pay, and "[i]ntelligent automation matches your ad to interested users and maximizes your results."[48] ███████████████████████████████████████ ████████████████████████.[49]

39.  Apple tracks the performance of its Search Ads business in weekly summary reports circulated internally.[50] According to these reports, Search Ads revenues in the US were approximately

---

[43]  APL-APPSTORE_10195170; *See also* Tim Hardwick, "Ads Now Appearing in App Store Search Results for U.S. Users," *MacRumors*, October 6, 2016, available at, https://www.macrumors.com/2016/10/06/ads-appearing-app-store-search-results/, last accessed May 21, 2021.

[44]  *See* APL-APPSTORE_05442596; and Sarah Perez, " Apple's Search Ads expand to six more markets in Europe and Asia," *TechCrunch*, July 25, 2018, available at, https://techcrunch.com/2018/07/25/apples-search-ads-expand-to-six-more-markets-in-europe-and-asia/, last accessed May 18, 2021.

[45]  Apple, "Introducing Search Ads Basic," December 5, 2017, available at, https://developer.apple.com/news/?id=12052017a, last accessed May 21, 2021; Sarah Perez, "Apple introduces a new pay-per-install ad product called Search Ads Basic," *TechCrunch*, December 5, 2017, available at, https://techcrunch.com/2017/12/05/apple-introduces-a-new-pay-per-install-ad-product-called-search-ads-basic/, last accessed May 21, 2021.

[46]  APL-APPSTORE_10175693 at 677-698.

[47]  APL-APPSTORE_10175693 at 698.

[48]  APL-APPSTORE_10175693 at 677-698.

[49]  APL-APPSTORE_10175693 at 697.

[50]  *See, e.g.* APL-APPSTORE_09530758, the "Search Ads Weekly Business Review" for week 13 of Apple's fiscal fourth quarter of 2018.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

$483 million in Apple's fiscal year of 2018, equal to 14 percent of Apple's revenues from the App Store commissions over the same timeframe.[51]

### 3.    Apple's App Store Business is Highly Profitable

40.   Apple's internal documents show that the App Store business is highly profitable. For example, an October 2019 internal Apple presentation titled, "App Store Business Management FY20 Overview," ███████████████████████████████████████████ ████████████████████████.[52] According to this document, the App Store's revenues were ████████████████████████████████████████████. ████████████████████████████████.[53] Apple's gross margin and net margin estimates are ████████████████████████████████████ which estimated ██████████████████████████ net margins of 72 percent to 76 percent during fiscal years 2013 through 2015.[54] I provide more details on the App Store margins in Section IV.B.3.

### III.    THE RELEVANT ANTITRUST MARKET

41.   In this section I demonstrate that common economic evidence supports the antitrust market alleged by Consumer Plaintiffs. Defining relevant markets allows for identification of market participants and calculation of market shares, which assists the analysis of market power. Defining relevant markets is also important for assessing common impact and calculating

---

[51]   Search Ads revenues from APL-APPSTORE_09653606; APL-APPSTORE_09654412; APL-APPSTORE_09530080; APL-APPSTORE_09530758.  The report APL-APPSTORE_09530080 is from week 5 of Q3, and so only reports the estimated revenue for the quarter.  All others are from the final week of the quarter, and so I use the actual revenue as reported. App Store commission revenue are calculated from the Apple transactions data produced via hard drive January 15, 2021, APL-APPSTORE_10334265, for the months October 2017 through to September 2018, aligning with Apple's fiscal year.

[52]   APL-APPSTORE_10176241 at 318. App Store financials include the App Store on iOS devices and Mac devices and the iOS App Store accounted for ██████████ of billings from the iOS and Mac App Stores in 2019, APL-APPSTORE_08883133 at 309.

[53]   ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

[54]   APL-APPSTORE_04685286, "iTunes Baseline" tab.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

damages because it helps identify the boundaries in which the harm to competition from alleged conduct should be assessed.

A.   COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT THE SALES OF IOS APPS AND IN-APP CONTENT CONSTITUTE A RELEVANT ANTITRUST MARKET

42.   Common economic evidence supports the conclusion that there exists a relevant antitrust market for selling consumers iOS apps and in-app content, which are relevant products in this market. Consumers who have iOS mobile devices ("iOS device consumers" hereafter) are consumers of this market, Apple is a retailer that sells iOS apps and in-app content, and app developers are suppliers that "manufacture" apps and in-app content and supply them through Apple.[55] Apple, as the retailer, sets the App Store commission, which when paid by developers leads to the determination of the retail prices paid by consumers and the wholesale prices received by developers.[56]

43.   The relevant iOS apps and in-app content market is commonly referred to as an "aftermarket."[57] The term aftermarket refers to the market for the secondary follow-on product, which is derivative from and dependent on the primary market. Well-understood aftermarkets range widely, and include consumables such as printer toners and razor blades, spare or upgrade parts for any complex machine, and other examples.

44.   In the primary market, consumers choose OS installed mobile devices such as iOS mobile devices or Android mobile devices.[58] A mobile device and its OS are sold as a bundle. The iPhone, iPad, and iPod Touch all come loaded with the iOS operating system and cannot be used without it, and the iOS operating system cannot be used on non-Apple devices. The device and

---

[55]   *Apple Inc. v. Pepper, et al.*, 139 S. Ct. 1514 (2019), p. 1, available at, https://www.supremecourt.gov/opinions/18pdf/17-204_bq7d.pdf, last accessed May 17, 2021.

[56]   I explain how Apple's commission sets both downstream retail and upstream wholesale prices in Section VI.B.

[57]   See for example, Severin Borenstein, Jeffrey K. MacKie-Mason, and Janet Netz, "Antitrust Policy in Aftermarkets," *Antitrust Law Journal* 63(2) (Winter 1995): 455-482. *See also*, Igal Hendel and Alessandro Lizzeri, "Interfering with Secondary Markets," *Rand Journal of Economics* 30(1) (Spring 1999): 1-21.

[58]   I do not perform a rigorous market definition analysis on the primary market because Apple's alleged anticompetitive conduct in this case relates only to the aftermarket.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

OS a consumer has determines the OS-specific apps that consumers can utilize with their mobile devices. The relevant iOS apps and in-app content market is the aftermarket derived from this primary market.

45. Apple does not permit other app stores to be available for iOS device consumers to use to download and install iOS apps and pay for in-app purchases.[59] Also, apps compatible with non-iOS devices do not function properly (or at all) on iOS devices. These restrictions make the iOS aftermarket a proprietary aftermarket in which only iOS device consumers can participate.

46. I note that common economic evidence supports the conclusion that app downloads and in-app purchases are part of a single aftermarket for *iOS device consumers* as they choose apps based on their needs, not based on whether apps are IAP apps or not. The app categories on the Apple Store group apps based on consumers' needs. Apple advises app developers to "choose the most accurate and effective categories for [their] app" because the app categories "help users discover new apps to fit their needs."[60] A given app category, however, typically includes both Paid Download apps, which do not require in-app purchases, and Free Download IAP apps, which are free to download. There are also Paid Download IAP apps which iOS device consumers need to pay to download before making IAPs. As explained in Section II, the main distinction between these three types of apps is based on how app developers monetize their apps. Common economic evidence supports the conclusion that iOS device consumers choose apps based on their needs, not based on how app developers monetize their apps.

47. Next, I consider potential substitutes for downloading and installing iOS apps and making in-app purchases through the Apple App Store and explain that common economic evidence confirms that they are properly excluded from the relevant market. First, I explain that common economic

---

[59] The App Store is the only avenue between businesses that have iOS apps and consumers who have iPhones. *See* APL-APPSTORE_09811613 at 624-5. Apple makes a certain limited exceptions for: "Ad Hoc Distribution" for limited distribution with an organization; "Custom App Distribution" for apps that are customized for businesses and educational institutions; "TestFlight" for beta testing of apps; and Apple's Developer Enterprise Program for internal apps distributed to employees of large organization. *See* EPIC_00579538, at Sections 1.1, 3.2(g), 7.3, 7.4; Apple, "Apple Developer Enterprise Program," available at, https://developer.apple.com/programs/enterprise/, last accessed May 30, 2021. These exceptions do not allow for the distribution of apps to the broad base of iOS users.

[60] Apple, "Choosing a Category," available at, https://developer.apple.com/app-store/categories/, last accessed May 30, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

evidence supports that web apps cannot substitute for apps installed through the Apple App Store, i.e., native apps. Second, I explain that common economic evidence supports that installing apps through "jailbreaking" is not a reasonable substitute for installing apps through the Apple App Store.[61] Third, I explain that common economic evidence supports that enterprise apps are not relevant products. Fourth, I explain that common economic evidence supports that apps compatible with other mobile OSs are not part of the relevant market. Last, I explain that common economic evidence supports that purchasing in-app content outside the App Store is not a reasonable substitute for purchasing it through the App Store.

### B.   COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT WEB APPS ARE NOT REASONABLE SUBSTITUTES FOR NATIVE APPS

48. A web-based app is hosted through the internet and accessed through a browser on a mobile device, as opposed to a native app that is built for a specific platform such as an iOS or Android, and uses code libraries to access hardware features such as a camera or GPS.[62]

49. Common economic evidence supports the conclusion that web apps are not reasonable substitutes for native apps. First, because web apps rely on internet connectivity, users are not able to use their iOS devices to accomplish a particular task at a particular time without Wi-Fi or mobile connectivity. One example of this would be a consumer trying to use the web-based app Google Docs to quickly update a file while traveling for work. The consumer would not be able to access Google Docs if her device has no internet connection. Even when Wi-Fi is available, web apps typically do not allow for the optimal user experience as native apps are much faster

---

[61]   Jailbreaking is the process of exploiting the flaws of a locked-down electronic device – such as in an iOS mobile device – to remove software restrictions imposed by the operating system. See Section III.C for details.

[62]   Michael Montecuollo, "Native or Web-Based? Selecting the Right Approach for Your Mobile App," *UX Magazine*, January 29, 2014, available at, https://uxmag.com/articles/native-or-web-based-selecting-the-right-approach-for-your-mobile-app, last accessed May 21, 2021; Jonathan Tarud, "Mobile Apps vs Web Apps: What's The Difference?," *Koombea*, April 19, 2021, available at, https://www.koombea.com/blog/difference-between-mobile-apps-and-web-apps/, last accessed May 17, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

than web apps. For example, when Facebook replaced its "buggy and slow" iOS web app with a native app that was twice as fast,[63] the user experience was greatly improved.[64]

50. Second, web apps have no ability to use certain features that are uniquely or conveniently available on iOS devices such as integrated cameras, GPS, Bluetooth, Touch ID, Face ID, and Siri integration, to name a few.[65] Many popular native apps rely on a device's integrated features such as the camera and GPS. Two examples of this are Pokémon Go and Snapchat. Pokémon Go utilizes the GPS and camera of a phone alongside its augmented reality technology "which heightens the enjoyment" as players "catch wild Pokémon."[66] Snapchat, which is "one of the most popular social media apps," also utilizes a device's camera to allow users to take and send photos or videos of themselves to friends and GPS for its Snap Map feature.[67] A web app version of Pokémon Go or Snapchat would not be able to access the integrated features of a device

---

[63] Taylor Casti, "The Evolution of Facebook Mobile," *Mashable*, August 1, 2013, slides 6 and 12, available at, https://mashable.com/2013/08/01/facebook-mobile-evolution/, last accessed May 21, 2021.

[64] Matt Brian, "Facebook launches native app for iPhone and iPad, rebuilt from ground up to be twice as fast," *The Next Web*, August 23, 2012, available at, https://thenextweb.com/apple/2012/08/23/facebook-2/, last accessed May 21, 2021, "For the longest time, Facebook's iOS [web] apps have been terrible. On the iPhone and iPad, the app utilised a UIWebView interface, taking longer than it should to load, notifications were intermittent and the app crashed frequently. However, that's all about to change with launch of version 5.0 for iOS, which is now available on the App Store....The app does away with the web views that have plagued the app from day one, causing it to perform worse than comparable apps."; Josh Constine, "Facebook For iOS App Is Now 2X Faster: Quicker Launch, Photos, Feed, And Built-In Messenger," *TechCrunch*, August 23, 2012, available at, https://techcrunch.com/2012/08/23/facebook-for-ios-faster/, last accessed May 21, 2021, "[T]he real win is in the user experience. Facebook for iOS is so responsive you feel physically in touch with the interface. One step closer to being with friends in person."; and KS Sandhya Iyer, "Revamped Facebook app for iOS: Review," *Gadgets360*, August 24, 2012, available at, https://gadgets.ndtv.com/apps/reviews/revamped-facebook-app-for-ios-review-258817, last accessed May 21, 2021, "[Facebook] updated its iOS client to version 5, which has bid adieu to HTML 5 and says hello to Objective-C....Now when you launch the app, it opens in the blink of an eye as opposed to earlier when you would continue to stare at the logo for a couple of seconds at least. It directly opens into the News Feed, which is more responsive and speedier than before...There's no doubt that the speedier app will be highly appreciated by millions of Facebook users. In case you've been neglecting the app for its painfully slow load times and crippled speed, we suggest you befriend Facebook in its all new faster native iOS avatar."

[65] Maxilmiliano Firtman, "Progressive Web Apps on iOS are here," *Medium*, March 30, 2018, available at, https://medium.com/@firt/progressive-web-apps-on-ios-are-here-d00430dee3a7, last accessed May 21, 2021.

[66] Alex Clough, "The technology behind Pokémon Go," *16i*, July 22, 2016, available at, https://www.16i.co.uk/m-journal/the-technology-behind-pokemon-go/, last accessed May 21, 2021.

[67] Christine Elgersma, "Everything you need to know about Snapchat," *phys.org*, June 18, 2018, available at, https://phys.org/news/2018-06-snapchat.html, last accessed May 21, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

which would significantly impair the functionality of the app and therefore a consumer's enjoyment of it.[68]

51. Third, as web apps are required to utilize Apple's Webkit browser framework,[69] web apps are capped at about 50Mb in size,[70] and iOS deletes the web apps' stored data after seven days.[71] This means that "[o]nce seven days has passed and users [have] not interacted with a specific site in that period of time, Safari will delete all the script-writeable storage for it[,]" requiring apps to "keep the data on a server, or they risk losing it all."[72] Developers have criticised these policies and "fear it could kill offline web apps" because it "could stop offline web apps from working reliably."[73]

52. Scott Forstall, former Senior Vice President of iPhone Software, testified that the benefits of native apps over web apps are voluminous.

> Q. And why did you think that native apps will provide a better experience?

---

68  *See* Bridget Poetker, "Native vs Mobile Apps: Which is the Better Option?," *Learn Hub*, February 25, 2019, available at, https://learn.g2.com/web-apps-vs-mobile-apps, last accessed May 21, 2021.
   "If your app will need access to the device's camera or GPS, you should highly consider making a native mobile app. While a hybrid mobile app does allow you to utilize some of these features, it probably won't be the best experience for your user. Pokémon Go is a native app, utilizing both the camera and GPS functions of the smart device, combined with augmented reality software."

69  Apple, "App Store Review Guidelines," Section 2.5.6, available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 21, 2021.

70  Dieter Bohn and Tom Warren, "Why the bad iPhone web app experience keeps coming up in Epic v. Apple," The Verge, May 6, 2021, available at, https://www.theverge.com/2021/5/6/22421912/iphone-web-app-pwa-cloud-gaming-epic-v-apple-safari, last accessed May 30, 2021.

71  Juha Saarinen, "Apple cops flak for deleting local browser storage after 7 days," *iTnews*, March 26, 2020, available at, https://www.itnews.com.au/news/apple-cops-flak-for-deleting-local-browser-storage-after-7-days-539833, last accessed May 21, 2021.

72  Juha Saarinen, "Apple cops flak for deleting local browser storage after 7 days," *iTnews*, March 26, 2020, available at, https://www.itnews.com.au/news/apple-cops-flak-for-deleting-local-browser-storage-after-7-days-539833, last accessed May 21, 2021.

73  Juha Saarinen, "Apple cops flak for deleting local browser storage after 7 days," *iTnews*, March 26, 2020, available at, https://www.itnews.com.au/news/apple-cops-flak-for-deleting-local-browser-storage-after-7-days-539833, last accessed May 21, 2021.; *See also* Aral Balkan, "Apple just killed Offline Web Apps while purporting to protect your privacy: why that's A Bad Thing and why you should care," March 25, 2020, available at, https://ar.al/2020/03/25/apple-just-killed-offline-web-apps-while-purporting-to-protect-your-privacy-why-thats-a-bad-thing-and-why-you-should-care/, last accessed May 21, 2021.

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

> A. There are many, many reasons. If you build a native app, you get to use the built-in frameworks as they were intended, as they were designed for a touch interface…. I mean, I can go on and on and on for the benefits of native application versus a web application, and they are voluminous.
>
> …
>
> And, in fact, in January of 2007 when we had the keynote and launched the iPhone, those were web-based apps at the time of that launch, and they did not perform well. We could tell using it that they were not as good as performing as the built-in apps.[74]

53. According to Mr. Forstall and other industry experts, some of the benefits of native apps over web apps include the following:[75]

- "[T]hey are faster."[76]

- "They load quickly."[77]

- "They use less memory."[78]

- They allow users to "switch between applications quickly."[79]

---

[74] Deposition of Scott Forstall, *In Re Apple iPhone Antitrust Litigation*, Volume 1, March 8, 2021, ("Forstall Deposition"), 83:2-7.

[75] Forstall Deposition, 81:9-82:9.

[76] Forstall Deposition, 81:19-20. *See also* Forstall Deposition, 83:2-17, "[I]n January of 2007 when we had the keynote and launched the iPhone, those were web-based apps at the time of that launch, and they did not perform well. We could tell using it that they were not as good as performing as the built-in apps. Now, you can always through software start to try to improve things, make its launch a little better, use a little less memory, get a faster processor, get more memory in the next iteration of the iPhone. You can do things to try to make it can better. But because of the architecture, it sits as an extra layer on top of the native layer, and therefore, it's never going to be faster than the native layer." And  Bridget Poetker, "Native vs Mobile Apps: Which is the Better Option?," *Learn Hub*, February 25, 2019, available at, https://learn.g2.com/web-apps-vs-mobile-apps, last accessed May 21, 2021.

[77] Forstall Deposition, 82:7.

[78] Forstall Deposition, 81:20.

[79] Forstall Deposition, 82:7-8.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

- They are more stable as they are created with "code that uses the native elements of iOS" and "the facilities [Apple] built to quickly build, iterate, debug these native applications."[80]

- "They can take advantage of the native graphics, libraries, in a way that is either not available or would have to be shoehorned in for a web app or a different kind of application."[81]

- The "integrated device functionality" allows native apps to access to iPhone hardware, such as the camera, microphone, and GPS.[82]

54.  There are well known examples of app developers that developed a web app but later converted to a native app because web apps provide a sub-optimal user experience, or sometimes no appropriate experience at all.[83] For example, Facebook initially launched what was functionally a web app designed to work on any platform in the App Store in 2010.[84] Facebook replaced the web app with a native app in August 2012 because the functionality available through a web app

---

[80]   Matt Brian, "Facebook launches native app for iPhone and iPad, rebuilt from ground up to be twice as fast," The Next Web, August 23, 2012, available at https://thenextweb.com/apple/2012/08/23/facebook-2/, last accessed May 18, 2021; Forstall Deposition, 81:14-16.

[81]   Forstall Deposition, 81:20-24; *See also* Facebook Developers, "Introducing the Mobile W3C Community Group," February 27, 2012, available at, https://web.archive.org/web/20120511110804/http://developers.facebook.com/html5/blog/post/2012/02/27/introducing-the-mobile-w3c-community-group/, last accessed May 18, 2021, "[Web apps have] two major issues; performance and feature set. Poor canvas performance [functionality that allows an app to render graphics dynamically], for example, is inhibiting game developers from building on the mobile web."

[82]   Bridget Poetker, "Native vs Mobile Apps: Which is the Better Option?," *Learn Hub*, February 25, 2019, available at, https://learn.g2.com/web-apps-vs-mobile-apps, last accessed May 21, 2021. *See also* Facebook Developers, "Introducing the Mobile W3C Community Group," February 27, 2012, available at, https://web.archive.org/web/20120511110804/http://developers.facebook.com/html5/blog/post/2012/02/27/introducing-the-mobile-w3c-community-group/, last accessed May 18, 2021, "[Web apps have] two major issues; performance and feature set… limited feature sets prevent app developers from competing with native applications. Not being able, for example, to use camera functionality in an HTML5 app can result in a sub-optimal user experience—or sometimes no appropriate experience at all."

[83]   Facebook Developers, "Introducing the Mobile W3C Community Group," February 27, 2012, available at, https://web.archive.org/web/20120511110804/http://developers.facebook.com/html5/blog/post/2012/02/27/introducing-the-mobile-w3c-community-group/, last accessed May 21, 2021.

[84]   Taylor Casti, "The Evolution of Facebook Mobile," *Mashable*, slide 6, August 1, 2013, available at, https://mashable.com/2013/08/01/facebook-mobile-evolution/, last accessed May 18, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

was inferior.[85]  In February 2012, Facebook explained that deficiencies in web app functionality prevented web apps from competing with native apps.[86]

55.   When Facebook launched its native app, industry experts noted that, because of the superior functionality available in a native app, the new Facebook app was substantially faster and provided better user experiences. For example, an industry expert noted:

> For the longest time, Facebook's iOS [web] apps have been terrible. On the iPhone and iPad, the app utilized a UIWebView interface, taking longer than it should to load, notifications were intermittent and the app crashed frequently. However, that's all about to change with launch of version 5.0 for iOS, which is now available on the App Store.…The app does away with the web views that have plagued the app from day one, causing it to perform worse than comparable apps. They have been replaced by code that uses the native elements of iOS instead. As a result, scrolling through your News Feed will be buttery smooth and you can interact with photos instantly, using gestures to open and close.[87]

---

[85]   Matt Brian, "Facebook launches native app for iPhone and iPad, rebuilt from ground up to be twice as fast," *The Next Web*, August 23, 2012, available at https://thenextweb.com/apple/2012/08/23/facebook-2/, last accessed May 21, 2021.

[86]   "[Web apps have] two major issues; performance and feature set. Poor canvas performance [functionality that allows an app to render graphics dynamically], for example, is inhibiting game developers from building on the mobile web. And limited feature sets prevent app developers from competing with native applications. Not being able, for example, to use camera functionality in an HTML5 app can result in a sub-optimal user experience—or sometimes no appropriate experience at all." Facebook Developers, "Introducing the Mobile W3C Community Group," February 27, 2012, available at, https://web.archive.org/web/20120511110804/http://developers.facebook.com/html5/blog/post/2012/02/27/introducing-the-mobile-w3c-community-group/, last accessed May 18, 2021.

[87]   Matt Brian, "Facebook launches native app for iPhone and iPad, rebuilt from ground up to be twice as fast," The Next Web, August 23, 2012, available at https://thenextweb.com/apple/2012/08/23/facebook-2/, last accessed May 18, 2021. Another industry expert noted, "[Facebook] updated its iOS client to version 5, which has bid adieu to HTML 5 and says hello to Objective-C.…Now when you launch the app, it opens in the blink of an eye as opposed to earlier when you would continue to stare at the logo for a couple of seconds at least. It

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

56. Financial Times, as an app developer, provides another example. Financial Times offered its readers a web app instead of a native app, starting in 2011. In 2017, it also gave up on its web app and developed a native iOS app because it concluded that native apps provide a superior user experience for media because native apps provide better functionality such as rich notifications, automatic reinstalls, allowing users to easily remain logged in to their accounts, better experience viewing videos, and the ability to share articles more seamlessly.[88]

57. Some app developers offered web apps not because they preferred web apps to native apps but because Apple did not approve their native apps for the Apple App Store. For example, Nvidia, an app developer that developed a cloud gaming service called GeForce Now, turned to a web app because Apple did not approve the native iOS app that Nvidia had developed.[89] Mr. Patel, Director of Product Management at Nvidia, testified that Nvidia would have preferred to offer its cloud gaming app as a native app rather than as a web app because "[i]t would provide us a lot of control and get a better user experience."[90] He testified that a native app provides lower latency, which matters a lot for streaming games when users need to respond quickly to action in the game.[91] He also stated that a native app provides better video quality because the app, rather than the web browser, is in control of the video decoding and can optimize for the needs of the game, including making adjustment for changes in network quality.[92]

58. ComScore, a U.S. media measurement and analytics company, reports that native apps on smartphones dominate time spent with any digital media in the U.S., including desktops, tablets,

---

directly opens into the News Feed, which is more responsive and speedier than before…There's no doubt that the speedier app will be highly appreciated by millions of Facebook users. In case you've been neglecting the app for its painfully slow load times and crippled speed, we suggest you befriend Facebook in its all new faster native iOS avatar." KS Sandhya Iyer, "Revamped Facebook app for iOS: Review," *Gadgets360*, August 24, 2012, available at https://gadgets.ndtv.com/apps/reviews/revamped-facebook-app-for-ios-review-258817, last accessed May 18, 2021.

[88]   Jack Marshall, "Financial Times Returns to Apple's App Store After Six-Year Hiatus," *The Wall Street Journal*, August 7, 2017, available at https://www.wsj.com/articles/financial-times-returns-to-apples-app-store-after-six-year-hiatus-1502092855, last accessed May 18, 2021; Financial Times, "FT iOS app returns to the Apple App Store," August 17, 2017, available at https://aboutus.ft.com/en-gb/announcements/ft-ios-app-returns-to-the-apple-app-store/, last accessed May 18, 2021.

[89]   Deposition of Aashish Patel, *In Re Apple iPhone Antitrust Litigation*, February 11, 2021, ("Patel Deposition"), 148:20-150:2.

[90]   Patel Deposition, 149:23-150:2.

[91]   Patel Deposition, 145:14-146:3.

[92]   Patel Deposition, 146:4-21.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

and mobile apps. In 2019, 77 percent of US consumers' digital media time was spent on smartphones or tablets, while the other 23 percent was spent on desktops.[93] Among U.S. smartphone users, their time spent on the mobile web is only about 11 percent of the time spent on native apps.[94] These results are not surprising given the inferior quality of web apps.

### C.   COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT "JAILBREAKING" IS NOT A REASONABLE SUBSTITUTE FOR INSTALLING APPS AND PURCHASING IN-APP CONTENT THROUGH THE APP STORE

59.   Jailbreaking is the process of exploiting the flaws of a locked-down electronic device – such as in an iOS mobile device – to remove software restrictions imposed by the operating system. Jailbreaking, which involves a series of kernel patches, permits root access within the operating system and provides the opportunity to install software not available through the iOS App Store.[95] Mr. Forstall describes jailbreaking as "a very broad term, which encompasses multiple things, but the process of jailbreaking does include running non-Apple signed code."[96]

60.   Common economic evidence supports that installing apps through jailbreaking is not a reasonable substitute for installing iOS apps or making IAPs on iOS devices. First, Apple prohibits unauthorized modifications to iOS (i.e., jailbreaking) in the iOS end-user software license agreement and denies any customer services, including warranty and OS updates, for iOS mobile devices that have installed any unauthorized software. The Apple website states that:

> Apple strongly cautions against installing any software that hacks iOS. It is also important to note that unauthorized modification of iOS is a violation of the iOS end-user software license agreement

---

93    comScore, "Global State of Mobile," 2019, at p. 9.

94    comScore, "Global State of Mobile," 2019, at p. 7.

95    Subho Halder, "Here's How iOS Jailbreak Really Works," *appknox*, June 24, 2018, available at https://www.appknox.com/blog/how-does-jailbreak-work, last accessed May 17, 2021.

96    Deposition of Scott Forstall, *In Re Apple iPhone Antitrust Litigation*, Volume 1, March 8, 2021, 68:6-9.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

> and because of this, Apple may deny service for an iPhone, iPad,
> or iPod touch that has installed any unauthorized software.[97]

61. Second, jailbreaking is technically very difficult and Apple's iOS security updates will attempt to include patches to fix vulnerabilities that could allow jailbreaking. Given the technical difficulties, the ability to jailbreak an iOS device has become very rare. In early 2013, reporting indicated less than 5 percent of the 500 million iOS devices sold up to that date were jailbroken.[98] Since then, jailbreaking iOS devices has become less attractive as apple incorporates more desirable features and more difficult as Apple increases its security.[99]In August of 2019, Wired magazine described an iOS vulnerability that could facilitate jailbreaking as very unusual 'gaffe' by Apple stating:

> Apple has locked iOS down enough that a full jailbreak—
> unlocking a device to install whatever you want on it—of current
> releases is extremely rare. When such a capability does exist, it's
> usually kept quiet and sold for millions of dollars by exploit
> brokers. But now, thanks to an apparent Apple gaffe, the latest

---

[97]   Apple, "Unauthorized modification of iOS can cause security vulnerabilities, instability, shortened battery life, and other issues," June 15, 2018, available at, https://support.apple.com/en-us/HT201954, last accessed May 18, 2021.

[98]   *See* Sarah Perez, "'Evasi0n' Overloads Servers As Over 270,000 People Download The New Jailbreak For iOS 6.0/6.1 Devices, Including iPhone 5," TechCrunch, February 4, 2013, available at, https://techcrunch.com/2013/02/04/jailbreaking-is-back-new-evasi0n-software-works-on-most-ios-6-06-1-devices-including-iphone-5/, last accessed May 26, 2021; and Dylan Love, "The Latest Jailbreak Statistics Are Jaw-Dropping," *Business Insider*, March 2, 2013, available at, https://www.businessinsider.com/jailbreak-statistics-2013-3, last accessed May 26, 2021.

[99]   Mike Peterson, "Jailbreak Pioneers Say Jailbreaking Is Officially Dead," iDropNews, September 7, 2017, available at, https://www.idropnews.com/news/jailbreak-pioneers-say-jailbreaking-officially-dead/48867/, last accessed May 26, 2021; JC Torres, "iOS jailbreaking is nearly dead and Apple wants it to stay that way," Slash Gear, June 25, 2018, available at, https://www.slashgear.com/ios-jailbreaking-is-nearly-dead-and-apple-wants-it-to-stay-that-way-25535385/, last accessed May 26, 2021, "Apple constantly moves to plug up such [vulnerabilities], making it harder to jailbreak each new iOS update."

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

> version of iOS can be jailbroken at this very moment. There's even
> code to do it on Github.[100]

Within days of discovery Apple issued another iOS version, iOS 12.4.1, which removed this vulnerability.[101]

62. Third, even if iOS device consumers install apps through jailbreaking, such apps "break" with every iOS update. According to Jay Freeman, creator of Cydia – an app store for jailbroken devices, "[w]hen Apple updates iOS almost everything breaks. Every time Apple puts out an update we spend a week of our lives in order to find out how to get an icon back on the screen."[102]

### D.   COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT ENTERPRISE SOFTWARE INSTALLED ON IOS DEVICES IS NOT A REASONABLE SUBSTITUTE FOR IOS APPS AND IN-APP CONTENT

63. I understand some iOS device consumers, especially employees of some companies, can have certain enterprise software installed on their company iOS devices, and such enterprise software is not available on the Apple App Store for iOS device consumers general. According to Mr. Forstall,

> [Apple] had a program for companies to install applications they
> built for their own intranet that they wouldn't want to place on an
> App Store, but would still want to run on their company iPhone.
> So, for example, let's say you have a Genentech, and Genentech

---

[100] Lily Hay Newman, "You Can Jailbreak Your iPhone Again (But Maybe You Shouldn't): Apple reintroduced a previously fixed bug in iOS 12.4, which has led to a jailbreak revival," *Wired*, August 19, 2021, available at, https://www.wired.com/story/ios-jailbreak-new/, last accessed May 18, 2021.

[101] Apple, "About the security content of iOS 12.4.1" August 26, 2019, available at, https://support.apple.com/en-us/HT210549, last accessed May 18, 2021; Lily Hay Newman, "You Can Jailbreak Your iPhone Again (But Maybe You Shouldn't): Apple reintroduced a previously fixed bug in iOS 12.4, which has led to a jailbreak revival," *Wired*, August 19, 2021, available at, https://www.wired.com/story/ios-jailbreak-new/, last accessed May 18, 2021.

[102] Joshua Sherman, "Meet the man running the jailbreaking market Apple doesn't want you to use," *Digital Trends*, April 11, 2013, available at, https://www.digitaltrends.com/mobile/the-man-who-helped-jailbreaking-jay-freeman/, last accessed May 18, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

> wants to have an internal piece of software for their scientists. There's a way … where they could build such an application, have it signed in such a way that it was authorized to run on the iPhones of Genentech employees, and potentially a unique subset of Genentech employees, but not by all Genentech employees, nor by the population at large, and that application or those applications would not need to come from Apple.[103]

64. Common economic evidence supports that such enterprise apps are not reasonable substitutes for iOS apps and in-app content and not part of the relevant market I analyze in this report. First, and foremost, the enterprise apps are typically available to only a small subset of iOS device consumers, as Mr. Forstall explained. If you are not a Genentech employee, you cannot use Genentech's enterprise apps. That is, most iOS device consumers do not and cannot consider installing enterprise apps on their iOS devices.

65. Second, enterprise apps serve functions specifically tied to employees' jobs, so even if an iOS device consumer has enterprise apps installed on his iOS device, he is very unlikely to use them as substitutes for native apps he could install through the Apple App Store. For example, Genentech scientists who have access to Genentech's enterprise apps are unlikely to use them as substitutes for native iOS apps they typically or likely install on their iOS devices. Put differently, these scientists will not likely substitute enterprise apps for iOS apps if the prices of all iOS apps and in-app content increase by 10 percent.

E.   COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT APPS COMPATIBLE WITH NON-IOS DEVICES ARE NOT REASONABLE SUBSTITUTES FOR IOS APPS

66. Because the iOS app and in-app content market is the aftermarket derived from the iOS device primary market, I also ask how likely it is that iOS device consumers would switch to non-iOS

---

[103] Deposition of Scott Forstall, *In Re Apple iPhone Antitrust Litigation*, Volume 1, March 8, 2021, 69:10-24.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

devices, mobile and non-mobile, in the presence of a small but significant and non-transitory price increase for all iOS apps and in-app content.[104] I explain below that common economic evidence supports the conclusion that iOS device consumers face high costs of switching from their iOS devices to non-iOS devices, which makes them unlikely switch at a meaningful rate when experiencing such a price increase. A recent experience with Fortnite players after Apple blocked it from the Apple App Store also provides strong support to the switching costs being significant. Such common evidence provides support that apps or software compatible with non-iOS devices are not reasonable substitutes for iOS apps.

1.   **Common Evidence Supports the Conclusion that Consumers Face Significant Switching Costs if they Attempt to Switch to an Alternative Mobile OS Device**

67.   Common evidence supports the conclusion that mobile device users, and particularly iOS device consumers, have high costs of switching to a device with a different OS installed. Several factors, common to all class members, contribute to create the high switching costs. First, the costs of hardware devices are significant, and as a result, device purchases are infrequent. An internal Apple market research presentation presents survey data showing that on average, ███████████████████████████████████ to replace their smartphone.███████████████ publicly-reported results from another survey.[105] In a 2019 letter to investors, Apple CEO Tim Cook attributed lower-than-expected iPhone revenues in part to increasing times between upgrades.[106]

---

[104]   U.S. Department of Justice and the Federal Trade Commission "Horizontal Merger Guidelines," August 19, 2010, at § 4.1: Market Definition, available at, https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, last accessed May 30, 2021; Jonathan Baker, "Market Definition: An Analytical Overview" Antitrust Law Journal 74(1) (2007): 129-173.

[105]   APL-EG_06596363 at 397.  Data presented are the "[a]verage length of ownership of previous smartphone [a]mong smartphone owners who changed to another smartphone each 12 m/e quarter," and values are presented for the last two calendar quarters of 2019 and the first three of 2020. *See also* Abigail Ng, "Smartphone users are waiting longer before upgrading — here's why." *CNBC*, May 17, 2019, available at, https://www.cnbc.com/2019/05/17/smartphone-users-are-waiting-longer-before-upgrading-heres-why.html#:~:text=In%20the%20U.S.%20and%20Europe%2C%20especially%2C%20the%20life%20cycle%20of,number%20had%20increased%20to%2024.7, last accessed May 17, 2021, citing data from Kantar Worldpanel, a market research firm.

[106]   Apple, "Letter from Tim Cook to Apple investors," press release, January 2, 2019, available at https://www.apple.com/newsroom/2019/01/letter-from-tim-cook-to-apple-investors/, last accessed May 24, 2021. ("While Greater China and other emerging markets accounted for the vast majority of the year-over-year

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

68. I use data presented in an internal Apple market research presentation from May 2020 to calculate that on average, ▮▮▮ of US iPhone users who replaced their iPhone replaced it with another iPhone from 2016Q4 to 2020Q1.[107]  Coupled with the small number of users who replace their device each quarter, I calculate that ▮▮ percent of the installed base of iPhone users switched to a non-iOS phone over the average three-month period.[108]

69. The equipment costs of switching are not limited to simply a single iOS device. Because Apple has designed its various devices (e.g., iPhones, iPads, Mac laptops and personal computers, Apple TV, Apple Watches, AirPods) to work better together than with similar products offered by rivals, switching hardware will typically require switching multiple devices or foregoing some of the networking functions enjoyed between Apple devices.[109] Equipment-related switching costs include the costs associated with creating a comparable hardware bundle as well as the cost of any foregone functions that cannot be replicated outside the Apple ecosystem.[110]

70. Second, apps purchased on iOS are not transferrable to non-iOS devices, and must be re-purchased on non-iOS. For apps that are available on the Android system, the cost of

---

iPhone revenue decline, in some developed markets, iPhone upgrades also were not as strong as we thought they would be. While macroeconomic challenges in some markets were a key contributor to this trend, we believe there are other factors broadly impacting our iPhone performance, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some customers taking advantage of significantly reduced pricing for iPhone battery replacements.")

[107] Dates are calendar quarters. APL-EG_05451569 at 577. APL-EG_05451577 presents the percentage of those users who bought another iPhone ("% of iPhone owners who acquired another iPhone when they changed their device in that time period"). ▮▮▮ is the average across all the quarters in the presentation.

[108] Dates are calendar quarters. APL-EG_05451569 at 576 and 577. APL-EG_05451576 reports the percentage of iPhone users buying a new device ("% iPhone installed base changing their device in each quarter"), while APL-EG_05451577 presents the percentage of those users who bought another iPhone ("% of iPhone owners who acquired another iPhone when they changed their device in that time period"). Therefore, the percentage of the iPhone installed base switching away is just the former multiplied by one minus the latter. ▮▮▮ is the average of this calculation across all the quarters in the presentation.

[109] Deposition of Timothy Cook, Volume 1, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021, 71:15-72:6. In the context of discussing Apple devices and the iOS ecosystem, Mr. Cook states: "And the fact is that they [Apple's devices] work together seamlessly. That's always our objective, is to make them work together."

[110] *See* Joseph Farrell and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects" in *Handbook of Industrial Organization, Volume 3,* eds. Mark Armstrong and Robert H. Porter (Elsevier, 2007), at p. 1971: "Switching costs arise if a consumer wants a group, or especially a series, of his own purchases to be compatible with one another: this creates economies of scope among his purchases from a single firm."

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 35 of 169

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

repurchasing the app for the new OS is an explicit, out-of-pocket switching cost.[111] Tim Cook, Apple's CEO, testified:

> Q. … If I am an iPhone owner and I spend 2.99 on a paid app and then I decide to transfer to Android phone and I go through this process that you've just described, wouldn't it still be the case that I'd have to pay 2.99 at the Google Play Store to buy that app again?
>
> A. I think so.[112]

71.  Some of a user's purchased or free apps may only be available on iOS. A 2013 Goldman Sachs report found that 13 percent of iOS apps in their sample of 98 apps could not be replicated on an Android phone using exact or near-exact replicas.[113]

72.  Third, even where apps are available on both iOS and non-iOS devices, in-app purchases may not be transferrable, and it can be complicated and time-consuming to move data, accounts and settings from an iOS to a non-iOS device. In some cases, in-app purchases may not be transferrable.[114] In-app purchases may be transferrable if they are linked to a user's separate user account with the app developer, but even then there may be issues. For example, the customer support website for the dating app Tinder offers the following recommendation to user's who are unable to restore their subscription: "If you've changed mobile platforms from iOS to Android or

---

[111]  The high explicit cost of switching was referenced in a 2013 email from Eddy Cue to Phil Schiller and Tim Cook: "Who is going to buy a Samsung phone if they have apps, movies, et cetera, already purchased? They now need to spend hundreds more to get where they are today" APL-EG_06358327.

[112]  Deposition of Timothy Cook, Volume 1, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021, 214:1-7.

[113]  APL-APPSTORE_06492312 at 321.

Further, the New York Times' Wirecutter, a tech-focused product review website, notes in its guide to choosing between iOS and Android "[b]y now, most popular apps and games are available on both iOS and Android (though you may have to repurchase them when you switch), *but specialty apps like audio, video, or image editors are more likely to be iOS-only*." [Emphasis added] Andrew Cunningham, "iPhone vs. Android: Which Is Better for You?" *New York Times* (Updated January 21, 2021) Available at https://www.nytimes.com/wirecutter/reviews/ios-vs-android/, last accessed May 24, 2021.

[114]  The support website for the guitar-tuning app GuitarTuna provides an answer the following FAQ: "[Q:] Can I transfer in-app purchase from iOS to Android or vice versa? [A:] Unfortunately, cross-platform transfer is not available for GuitarTuna." Yousician, "Can I transfer in-app purchase from iOS to Android or vice versa?," available at, https://support.yousician.com/hc/en-us/articles/202815362-Can-I-transfer-in-app-purchase-from-iOS-to-Android-or-vice-versa-, last accessed May 24, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

vice versa, we suggest that you cancel your current subscription and subscribe again on your new mobile device."[115]

73.  In any event, even a straightforward transition from an iOS to a non-iOS device would require a user creating or verifying that they have an account for each desired app for which this is possible, then re-entering their login credentials for each app on their new device. Users also have to take multiple steps to move over information like their contacts, calendars and photos.[116] iOS users may also have to take non-obvious actions like deactivating Apple's messaging service iMessage, as otherwise they may not receive text messages from iPhone users.[117] All of the foregoing, along with smaller differences in design and customizability, combine to create a challenging switching process described as "reasonably frustrating" for "a normal consumer."[118]

74.  Last, Apple has introduced several features to its iOS ecosystem that have had the effect of raising the costs of switching to another mobile OS. Related to the above costs of moving data from an iOS device to another, many iOS users use iCloud to store their personal data such as photos, calendars, and emails, as Apple automatically offers iOS users a basic amount of iCloud storage.[119]  Relatedly, many iPhone users enjoy "ecosystem integration" with other Apple devices including iPhones, iPads, Apple TV, Apple Watch, and Macs. Complementarities between these products, such as seamless sharing of data through iCloud, location tracking, or

---

[115]  Tinder, "Can't restore my purchase," available at, https://www.help.tinder.com/hc/en-us/articles/115004703743-Can-t-restore-my-purchase, last accessed May 30, 2021.

[116]  Carrie Marshall, "How to switch from iPhone to Android," *TechRadar*, April 2021, available at, https://www.techradar.com/how-to/how-to-switch-from-iphone-to-android, last accessed May 24, 2021.

[117]  Chris Hoffman, "What to Do If You Can't Receive Text Messages From iPhone Users," *How-To Geek*, July 11, 2017, available at, https://www.howtogeek.com/252100/what-to-do-if-you-cant-receive-text-messages-from-iphone-users/, last accessed May 24, 2021; Apple, "Deregister iMessage on your iPhone or online," available at, https://support.apple.com/en-us/HT203042, last accessed May 24, 2021.

[118]  "Switching phone operating systems should in theory be simple. […] But as I learned, many things can go wrong, and my experience is not unusual. 'You're going to have to go through the things that are most valuable to you and make sure it's all there,' said Jonathan S. Geller, editor in chief of BGR, a tech news site that reviews phones and writes frequently about switching. 'For a normal consumer, it's reasonably frustrating.'" Vindu Goel, "How to Switch to iPhone From Android: Patience and Persistence" *New York Times,* April 6, 2016, available at, https://www.nytimes.com/2016/04/07/technology/personaltech/how-to-switch-to-iphone-from-android-patience-and-persistence.html, last accessed May 24, 2021.

[119]  Apple, "iCloud," available at, https://www.apple.com/icloud/, last accessed May 24, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Find My iPhone, are lost if a user switches from an iOS device.[120] As another example, Apple recently introduced the "password manager" iCloud Keychain service to iOS, which automatically creates a cryptographically strong password when, for instance, a user is signing up for a new service on their iOS device.[121] This password is then saved and associated with the user's Apple ID, and can be automatically filled in when the user accesses the service on an iOS device. If, however, they want to log in to that service on a non-Apple device, they would have to retrieve and manually enter the automatically-generated password from their Apple ID settings.[122] While this feature does provide value to the user in terms of increased password security, it also adds switching costs by forcing users to reset or manually copy all of their automatically-generated passwords when switching away from iOS devices.

75. The nexus between switching costs and consumers being 'locked-in' to a particular system is nicely summarized in a 2021 New York Times column:

> When buying a phone, we generally recommend sticking with the same platform your current phone uses. At a minimum, switching entails learning the quirks of a new interface and potentially losing access to purchased apps, app-specific data, or even photo and data services… We generally recommend against [switching smartphone operating systems], though. By the time you've used a phone for a couple of years, you've spent a lot of time learning its quirks, and you've probably invested a decent amount of money

---

[120] *See* Alonzo Canada, "Take A Lesson from Apple: A Strategy to Keep Customers in Your Ecosystem," *Forbes,*s November 12, 2012, available at, https://www.forbes.com/sites/jump/2012/11/12/take-a-lesson-from-apple-a-strategy-to-keep-customers-in-your-ecosystem/?sh=4f5613f13de8, last accessed May 18, 2021.

[121] Hallei Halter, "How to Use iCloud Keychain to Create Unique, Strong Passwords for All Your Accounts," February 1, 2021, available at, https://www.iphonelife.com/content/how-to-eliminate-duplicate-passwords-apples-password-manager, last accessed June 1, 2021; APL-EG_08240013 at 091.

[122] Apple, "How to find saved passwords on your iPhone," available at, https://support.apple.com/en-us/HT211146, last accessed May 18, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

> into apps, games, music, or videos that you may have to rebuy if
> you switch.[123]

76. Multiple industry reports have documented that iOS device consumers' costs of switching to non-iOS devices are substantial. Goldman Sachs, for example, conducted an extensive consumer survey of over 1,000 respondents to understand iOS device consumers' switching costs.[124] 21 percent of respondents said "there isn't a discount that would make it worthwhile" to leave the iOS platform.[125] The study reports that "of those who would consider switching, more than half said they would require a discount greater than 30 percent."[126] The Goldman Sachs study estimates the average discount required to induce iOS device consumers to switch to non-iOS devices to be 49 percent.[127]

77. A second Goldman Sachs' study evaluated the cost of switching a long-time iPhone user (the lead author of the study) to a Samsung Galaxy S4 Smartphone with the goal of "replicating the content on the user's iPhone, including apps, music, video, photos, contacts, and the calendar, as closely as possible"[128] and finds that the explicit, out-of-pocket switching costs totaled $79.85. The study notes that this cost, while significant, does not account for the inability to transfer all of the apps and media. Nor does it account for the "significant amount of time required to complete the switch."[129]

78. Recent studies of smartphone consumer switching are consistent with the evidence that significant switching costs exist and that these costs curb consumers' ability to switch to alternative platforms in response to iOS price increases. For example, a 2017 Morgan Stanley survey found that 92 percent of iPhone owners "somewhat or extremely likely" to upgrade

---

[123] Andrew Cunningham, "iPhone vs. Android: Which Is Better for You?" *The New York Times*, January 27, 2021, available at https://www.nytimes.com/wirecutter/reviews/ios-vs-android/, last accessed May 21, 2021.
[124] APL-EG_07245574.
[125] APL-EG_07245574 at 574.
[126] APL-EG_07245574 at 574.
[127] APL-EG_07245574 at 587.
[128] APL-APPSTORE_06492312 at 315.
[129] APL-APPSTORE_06492312 at 312.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

within the next year indicated they would stick to an iOS device.[130] Similarly, a 2019 study by Consumer Intelligence Research Partners "found that iOS loyalty was at 91 percent, while Android was slightly higher at 92 percent. Android has historically been higher – likely due to the wide choice of handsets available."[131]

79.   Apple too acknowledges the continued significance switching costs play in impeding iOS users from switching to the Android platform. For example, in discussing Google's Google Play Points royalty program launch in Japan, Carson Oliver, Director of Business Management—App Store, states, "I'm not sure we have the same switching risks as Android so [sic] potentially harder to justify the cost of a loyalty program in that regard."[132]

## 2.   Common Evidence Supports the Conclusion that Software Applications Developed For Personal Computers or Gaming Consoles Are Not Part of The Relevant Market

80.   Common evidence supports the conclusion that smartphones and mobile devices, including iOS devices, have the distinguishing features of mobility and convergences of multiple functions that non-mobile devices such as personal computers and gaming consoles do not provide.

81.   While it was not the first smartphone, the iPhone started a new phase of technological convergence by integrating effective web navigation and a media player with high-resolution touch screens.[133] Technological convergence, in general, refers to "the trend or phenomenon where two or more independent technologies integrate and form a new outcome."[134] The

---

[130]   Gordon Gottsegen, "Almost all iPhone users will buy another iPhone, says survey," *C|net*, May 18, 2017, available at, https://www.cnet.com/news/apple-iphone-92-percent-retention-morgan-stanley-survey/, last accessed May 21, 2021. *See also* Paul Hernandez, "Apple has a huge advantage over its rivals ahead of the iPhone 8 release (AAPL)," *Markets Insider*, May 18, 2017, available at, https://markets.businessinsider.com/news/stocks/apple-stock-price-morgan-stanley-note-2017-5-1002022779-1002022779, last accessed May 21, 2021.

[131]   *See* Ben Lovejoy, "iOS and Android loyalty levels higher than ever; Android just ahead for now," *9To9Mac*, January 29, 2019, available at https://9to5mac.com/2019/01/28/ios-android-loyalty/, last accessed May 19, 2021.

[132]   APL-APPSTORE_06901903 at 903.

[133]   Steven Levy, "First Look: Test Driving the iPhone," *Newsweek*, June 25, 2007, available at https://www.newsweek.com/first-look-test-driving-iphone-102625, last accessed May 21, 2021.

[134]   Suzy E. Park, "Technological Convergence: Regulatory, Digital Privacy, and Data Security Issues," *Congressional Research Service*, May 30, 2019, available at

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

smartphone is considered as one of the most prominent example of technological convergence. For example, a Congressional Research Service report explains that the smartphone "integrated several independent technologies–such as telephone, computer, camera, music player, television (TV), and geolocation and navigation tool–into a single device. The smartphone has become its own, identifiable category of technology[.]"[135] Upon its release, a contemporary review of the iPhone noted, "The iPhone is the rare convergence device where things actually converge."[136]

82.  Personal computers may have the ability to provide multiple functions, but lack the scope and convergence of technologies that iOS devices provide.[137] Because many of the standard hardware capabilities included on iOS devices are not present on personal computers, iOS apps that take advantage of these device features in a complementary fashion are not possible with applications run on a personal computer. For example, personal computers typically lack text messaging, GPS, and altimeter capabilities. While personal computers include cameras, the Windows operating system does not facilitate the integration of camera capabilities into software as seamlessly as the iOS. The benefits of the integration of multiple functions into an iOS app are evident when you consider an example such as Uber. Using an iOS or Android app, a user can review the pricing and characteristics for potential Uber rides, book a ride with a driver, monitor the pickup status of the scheduled ride in real time, communicate with the driver via phone, pay for the ride, and rate the driver experience, all within the Uber app.

83.  Similarly, common evidence supports the conclusion that gaming consoles, including handheld gaming consoles, do not provide the same technology, functionality, and convenience as iOS devices. While a gaming console may have some of the capabilities of an iOS device such as internet connectivity, a camera, and a microphone, it is not easily or conveniently portable and is intended for home use. A handheld gaming console, while portable, does not provide the other

---

https://www.everycrsreport.com/files/20190530_R45746_461fe45bf0ce4a3f25e8d1a507c308fee4d5bfd4.pdf, last accessed May 21, 2021.

[135]  Suzy E. Park, "Technological Convergence: Regulatory, Digital Privacy, and Data Security Issues," *Congressional Research Service*, May 30, 2019, available at https://www.everycrsreport.com/files/20190530_R45746_461fe45bf0ce4a3f25e8d1a507c308fee4d5bfd4.pdf, last accessed May 21, 2021.

[136]  Steven Levy, "First Look: Test Driving the iPhone," *Newsweek*, June 25, 2007, available at First Look: Test Driving the iPhone (newsweek.com), last accessed May 21, 2021.

[137]  See the discussion of technological convergence in Section II.A.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

features and conveniences of iOS devices. For example, a consumer with a Nintendo Switch would not be able to use it to post pictures or videos to social media, order a ride, or shop online. Even for its intended purpose of gaming, consoles, even portable ones, do not provide as many options as an iOS device because many of the games developed for mobile devices are not available on gaming consoles.[138] Additionally, some games, like Pokémon Go, as described in Section III.B are designed to work with the integrated features of a smartphone and are not suitable for use on gaming consoles.[139]

84. Software designed for personal computers or gaming consoles is not capable of offering these types of complementary services within a single convenient application. Moreover, to the extent that applications designed for personal computers can mimic the functionality of iOS apps, personal computers cannot offer these functions in the convenience that the mobility of iOS devices afford.

### 3.   Dr. Evans' Analysis of Fortnite Usage Shows that Consumers Do Not Readily Switch from iOS Devices to Non-iOS Devices

85. Section V.D.2 of the Expert Report of Dr. David S. Evans in the case of *Epic Games, Inc. v. Apple Inc*. describes an empirical analysis of whether users found alternative channels to play Epic's game Fortnite after it was blocked from the Apple App Store.[140] He looked at the amount of money and time spent on the game to see if Fortnite players "readily switched" from playing on their iPhones to other non-iOS devices like game consoles or personal computers. The results of this empirical study show most users did not switch to other channels to play Fortnite after it was no longer available through the Apple App Store. I have received this work and results and find them reliable.

---

[138] "[O]f the top 20 freemium games currently listed on the App Store, only 4 are available on gaming consoles (Roblox, Among Us, Call of Duty, and Genshin Impact). Based on the top 20 freemium games in the App Store on February 10, 2021." Expert Report of Dr. David S. Evans, *Epic Games, Inc. v. Apple Inc*., February 16, 2021, (the "Evans Report"), footnote 611.

[139] Pokémon Go is only available on Android and iOS devices. *See* Pokémon Go, "Pokémon Go Homepage," available at https://www.pokemongo.com/en-us/, last accessed May 17, 2021.

[140] Evans Report Section V.D.2.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

86. Dr. Evans received data from Epic Games for a random subset of all user accounts created between July 2, 2017[141] and October 21, 2020, which included the number of minutes spent playing Fortnite by day and platform and the USD price of all purchases by day and platform.[142] The platforms considered are iOS (Fortnite played via the Apple App Store app), non-iOS mobile (Fortnite played on devices using the Android OS), gaming consoles, and personal computers. This data revealed that most Fortnite players spend all, or nearly all, of their game minutes on a single platform.[143] For accounts using iOS as their primary platform, "90.9 percent have only used iOS; 91.8 percent have used iOS for more than 99 percent of their lifetime Fortnite game minutes; and 93.2 percent have used iOS for more than 95 percent of their lifetime Fortnite game minutes."[144]

87. Dr. Evans identified the accounts that spent money only on Fortnite in the iOS app and not in any other platform, then compared their spending per week over the ten weeks prior to August 13, 2020 to the time period after Epic's developer account was terminated (which he calls the "pre-period" and "post-period," respectively). He found that most of the revenue Fortnite received from iOS purchases came from users who only ever played Fortnite via the iOS app,[145] and concluded these users are "therefore unlikely to switch to another platform to play Fortnite" if it were no longer offered as an iOS app.[146] During the pre-period accounts playing Fortnite only through the iOS spent an average of ▆▆ per week entirely on iOS, and during the post-period these same accounts spent an average of ▆▆ per week on iOS and an average of ▆▆ per week on other platforms. This was a reduction of ▆▆ percent on all platforms, and only ▆▆ percent of the lost iOS spending was replaced with spending on other platforms.[147] Dr. Evans

---

141 This was the launch date of Fortnite. Evans Report, ¶ 462.

142 Evans Report, ¶ 462.

143 "Of the accounts with positive all-time game minutes, 82.7 percent have played Fortnite games on only a single platform, 87.6 percent have used their primary platform for more than 99 percent of their lifetime Fortnite game minutes, and 91.4 percent have used their primary platform for more than 95 percent of their lifetime Fortnite game minutes." Evans Report, ¶ 463.

144 Evans Report, ¶ 464.

145 "The iOS-only accounts accounted for 60.8 percent of all Fortnite spending on the iOS platform over the pre-period." Evans Report, ¶ 465.

146 Evans Report, ¶ 465.

147 "The decline in iOS spending is thus ▆▆ per week ▆▆▆▆▆▆ and the increase in non-iOS spending was ▆▆ per week ▆▆▆▆▆ This means that ▆▆ percent of the lost iOS spending was replaced by non-iOS spending ▆▆▆▆ Evans Report, ¶ 466.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

therefore concluded, "[e]ven if there was 100 percent replacement of iOS spending by accounts that were not iOS-only, the overall replacement rate can be no more than ▮▮ percent."[148]

88. An analogous calculation was performed for the minutes per week data comparing the time users who only played Fortnite via iOS spent in the game throughout the pre-period to the time they spent playing Fortnite over the post-period. Dr. Evans found that most of the time spent playing Fortnite on iOS devices was by users that played exclusively on iOS.[149] An average of ▮▮ minutes per week were spent playing Fortnite by accounts only using iOS during the pre-period. These same accounts spent an average of ▮▮ minutes per week playing Fortnite on the iOS platform and an average of ▮▮ minutes per week on non-iOS platforms during the post-period. This was a reduction of ▮▮ percent of average minutes per week on all platforms, and ▮▮ percent of the lost time spent on the iOS platform was replaced by time spent on alternative platforms.[150] Dr. Evans concluded "[e]ven if there was 100 percent replacement of iOS spending by accounts that were not iOS-only, the overall replacement rate can be no more than ▮▮ percent."[151]

89. Dr. Evans' finding that most users did not switch from their iOS devices to non-iOS devices to play Fortnight after it ceased to be available on the Apple App Store is consistent with apps compatible with non-iOS devices not being reasonable substitutes for iOS apps. Again, all of these would be offered as common economic evidence.

---

[148] Evans Report, ¶ 466.

[149] "iOS-only accounts accounted for ▮▮ percent of all Fortnite game minutes on the iOS platform over the pre-period." Evans Report, ¶ 467.

[150] "The decline in iOS Fortnite game minutes is thus ▮▮ minutes per week ▮▮▮▮▮ and the increase in non-iOS Fortnite game minutes was ▮▮ minutes per week ▮▮▮▮▮ This means that ▮▮ percent of the lost iOS spending was replaced by non-iOS spending ▮▮▮▮ Evans Report, ¶ 468.

[151] Evans Report, ¶ 468.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

F.  COMMON EVIDENCE SUPPORTS THE CONCLUSION THAT PURCHASING IN-APP CONTENT OUTSIDE THE APP STORE IS NOT A REASONABLE SUBSTITUTE FOR PURCHASING IT THROUGH THE APP STORE

90.  Common economic evidence supports the conclusion that purchasing in-app content outside the App Store is not a reasonable substitute for purchasing it through the App Store. In order for purchase channels outside of the App Store to be reasonable substitutes to making purchases within the App Store, those options should be available, consumers need to be aware of them, and they should provide similar quality and convenience.

91.  However, common evidence supports the conclusion that Apple's own policies and actions limit the existence of these options for many apps. For example, Apple's App Store Review Guidelines specify that app developers must use Apple's In-App Purchase system to provide in-app content functionalities such as subscriptions, in-game currencies, access to premium content, which makes all in-app content sales subject to the App Store commission.[152]

92.  Common evidence also supports the conclusion that Apple's own policies and actions prohibit developers from informing consumers about the existence of these options if they do exist. The App Store Review Guidelines specify that "Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [Apple's In-App Purchase system]."[153] Those apps that are granted a limited exception to use other purchase methods "cannot, either within the app or through communications sent to points of contact obtained from account registration within the app (like email or text), encourage users to use a purchasing method other than [Apple's In-App Purchase system]."[154]

---

[152]  Apple, "App Store Review Guidelines," Section 3.1.1 In-App Purchase, available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 23, 2021,  "If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, etc."

[153]  Apple, App Store Review Guidelines, 3.1.1 In-App Purchase, available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 23, 2021.

[154]  Apple, App Store Review Guidelines, 3.1.3 Other Purchase Methods, available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 23, 2021, "The following apps may use purchase methods other than in-app purchase. Apps in this section cannot, either within the app or through

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

93. The European Commission attributes higher consumer prices to these "anti-steering provisions" in its Statement of Objections arising from its current investigation of Apple's App Store conduct specifically relating to music streaming services.[155] In a statement summarizing their preliminary conclusions, the Commission states "[o]ur second concern is about the so-called "anti-steering provisions." They limit the ability of app developers to inform iPhone or iPad users of alternative, cheaper subscriptions available elsewhere. […] And Apple's anti-steering rules limit the ability of music streaming providers to inform their users in different ways. Not only are they not allowed to mention their websites or any link to them in their own apps. They are also not allowed to send e-mails to users that created an account in the app in order to inform them about cheaper alternatives. So Apple device users pay significantly higher prices for their music services."[156]

94. Apple rejected an update to Spotify's iOS app in 2016, after Spotify removed the ability for new users to subscribe via Apple's In-App Purchase system and attempted to direct users to sign up via the web.[157]  In an email to Spotify explaining the reasoning for the rejection, Ron Okamoto, then VP of Developer Relations, provides a summary of Apple's rules regarding efforts by developers to alert users to alternative methods for purchasing in-app content, and the limited intended scope for the exception allowing individuals to access content subscribed to elsewhere on iOS devices:

> "The principle here is simple: we operate the App Store for our customers and the platform, and we earn a fee from sales to those customers for software and services. Spotify is welcome to have an app on our App Store and use our payment system to acquire

---

communications sent to points of contact obtained from account registration within the app (like email or text), encourage users to use a purchasing method other than in-app purchase."

[155] European Commission – Speech, "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093, available at, https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093 , last accessed May 25, 2021.

[156] European Commission – Speech, "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093, available at, https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093 , last accessed May 25, 2021.

[157] APL-APPSTORE_00045455.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

customers and generate revenue, as are all developers, as long as it follows the App Store rules and pays the required 30% commission on in-app purchase sales (now 15% for paid subscriptions lasting more than 1 year).

Recognizing, however, that some customers may have already purchased or subscribed to content on the web or elsewhere, we created a carve-out that lets the customer access their content without requiring any additional fee to be paid to Apple. But our rules are clear, both in spirit and in letter, that developers may not attempt to divert in-app purchase sales to other payment mechanisms simply to avoid Apple's commission, such as by linking out to a website. Spotify's recent actions clearly violate these rules: it is using the free player app to solicit and sign up new App Store customers and direct them—during and immediately after a free trial period—to sign up for a Spotify subscription on the web."[158]

95. Other examples provide a sense of the extent of the restrictions. Later in 2016, Netflix was required to change the webpage users were directed to when trying to manage their accounts, as that page, if the user clicked through several more pages, eventually led to a page that allowed

---

[158]  APL-APPSTORE_00045455.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

users to add a payment method directly with Netflix.[159] In 2020, the email app Hey was blocked from the App Store for not offering the option to purchase its services using In-App Purchase.[160]

96. For many apps, particularly games, in-app purchases are made frequently and in the course of gameplay.[161] Developers of these apps are required to offer content as in-app purchases using Apple's IAP system, cannot direct users to or advertise alternative payment channels, and even if such channels exist, they are only available at considerable relative inconvenience to the consumer.

97. Match Group, the parent company of the popular dating app Tinder, produced data that can shed light on the extent to which iOS device consumers make in-app purchases outside the App Store.[162] Match Group reports the number of unique Tinder accounts who have accessed the iOS Tinder app and purchased digital products through the app, through the Tinder website, or both.[163] Match Group estimates that there were about ▮▮▮▮▮ U.S. Tinder accounts that accessed the iOS app in 2019. ▮▮▮▮ percent of those accounts purchased digital products in 2019, ▮▮▮▮ percent of those accounts made their purchases exclusively through the app. The percentage of app-only purchasers is likewise above ▮ percent for all other years since 2017, when Tinder first became available via the web. Two of Match Group's other apps for which data was produced see a similarly high proportion of app-only purchasers. An average of ▮▮▮

---

[159]   APL-APPSTORE_09704302-303. The notes in the request for review explain the procedure: "When users tap "Account" from the app, they are linked out to Safari, even if the user has purchased their subscription via In-App-Purchase. From the "Plan Details" section of the Safari page, users can tap "Change Plan" to adjust the subscription type. This page has an "Add Payment Method" page where users can add a credit card for payment instead of using iTunes. There is no mechanism in the app that prevents users who have purchased their subscription via iTunes from being directed to this page."

[160]   Matthew Panzarino, "Interview: Apple's Schiller says position on Hey app is unchanged and no rules changes are imminent," *TechCrunch*, June 18, 2020, available at https://techcrunch.com/2020/06/18/interview-apples-schiller-says-position-on-hey-app-is-unchanged-and-no-rules-changes-are-imminent/?tpcc=ECTW2020, last accessed May 28, 2021.

[161]   An example is Clash of Clans, where players make purchases to replenish key gameplay resources that allow them to continue playing. As an article in *The New Yorker* on the appeal of such games explains, "[o]ften, just when things are going really great for the clan, resources run out; then players have to wait a few hours while the game slowly regenerates gold and elixir, or they can spend four dollars and ninety-nine cents to buy in-game currency and keep playing right away." Casey Johnston, "Clash of Clans Proves That Our Impatience Is Worth Billions," *The New Yorker,* June 24, 2016, available at https://www.newyorker.com/business/currency/clash-of-clans-proves-that-our-impatience-is-worth-billions, last accessed May 29, 2021.

[162]   MATCH-00000001; MATCH-00000008; MATCH-00000015; MATCH-00000024; and MATCH-00000039.

[163]   MATCH-00000024, "iOS Account Digital Products" tab.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

percent and ▮▮ percent of OkCupid and Plenty of Fish iOS app users that made purchases exclusively bought through the app.[164] The exception, Match.com, only saw ▮▮ percent of iOS purchasers exclusively spending via the app; however, as the name suggests, Match.com began as a web-based service in 1995.[165] Even so, the proportion of Match.com iOS users exclusively making purchases through the iOS app has increased considerably over time, from ▮▮ percent in 2013 to ▮▮ percent in 2020, despite its long history as a web-based service and generally having higher prices on iOS.[166] While the preceding is suggestive that there is little substitution away from iOS to web-based purchase channels, assessing whether Match Group's customers treat the web channel as a reasonable substitute would require more in-depth analysis, as the data presented here cannot distinguish between changes due to substitution versus changes due to the composition of the user base between web- and iOS-purchasing users.

## IV.   APPLE'S MARKET POWER IN THE IOS AFTERMARKET

### A.   SOURCE OF APPLE'S MARKET POWER COMMON TO ALL CLASS MEMBERS IN THE IOS AFTERMARKET

98.   Common economic evidence supports the conclusion that Apple's market power in the iOS aftermarket is largely derived from two interrelated sources – significant switching costs and imperfect information.

#### 1.   High Switching Costs

99.   In general, switching costs measure the extent of a consumer's lock-in to a product or brand.[167] The higher the consumers' costs of switching from their iOS devices to non-iOS devices, the more consumers are locked-in to their iOS devices. In Section III.E.1, I discussed the common

---

[164]   Values are the weighted-average percentage, weighted by the total number of iOS users.

[165]   MATCH-00000031 ["Match Web Launch Date: April 21, 1995"].

[166]   Deposition of Adrian Ong, *In Re Apple iPhone Antitrust Litigation*, February 24, 2021, 72:17-25. ["Q. With respect to all of Match Group's brands, are the subscription prices different between mobile apps versus websites? A. Across all of the brands? Q. Yeah. Generally speaking, if there's a simple answer to that question. [...] A. Yes, for the main brands, we price lower on the web versus the apps."]

[167]   *See, for example,* Carl Shapiro and Hal R. Varian, *Information Rules: A Strategic Guide to the Network Economy*, (Boston, Massachusetts: Harvard Business School Press, 1990), pp. 11-12.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

evidence related to the sources, magnitude, and significance of the costs iOS device consumers must incur to switch away from their iOS devices.

100.  Firms can draw market power from high switching costs as they typically render consumer demand less elastic. Economists have long recognized the relationship between switching costs and market power. For example, Joseph Farrell, former Chief Economist at the Federal Communications Commission and former Deputy Assistant Attorney General for Economics at the Antitrust Division of the US Department of Justice, and Paul Klemperer, former member of the UK Competition Commission, describe switching costs as a source of market power as follows:

> Switching costs and network effects bind customers to vendors if products are incompatible, locking customers or even markets in to early choices. Lock-in hinders customers from changing suppliers in response to (predictable or unpredictable) changes in efficiency, and gives vendors lucrative ex post market power – over the same buyer in the case of switching costs (or brand loyalty)[168]

101.  As explained in Section III.E.1, common evidence supports the conclusion that iOS device consumers are locked in to the iOS devices and apps because of high switching costs. Common economic evidence provides strong support that Apple enjoys market power in the iOS aftermarket thanks to its locked-in consumers. Once iOS device consumers are locked in to the iOS devices and apps, they are less likely to switch to non-iOS devices when the price of their favorite apps' in-app content increases or the next generation iPhone or iPad becomes more expensive than the previous one. This means that the locked-in consumers have relatively less elastic demand, which helps Apple set and maintain the supra-competitive App Store commission. Furthermore, when high switching costs are coupled with lack of information about future market conditions, Apple's market power in the iOS aftermarket is substantially enhanced. I turn to this topic in the next section.

---

[168]   Joseph Farrell and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects" in *Handbook of Industrial Organization, Volume 3,* eds. Mark Armstrong and Robert H. Porter (Elsevier, 2007), at p. 1970.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## 2.   Common Evidence Supports the Conclusion that Consumers Lack Sufficient Information to Make Life-cycle Cost Calculations

102.   Common evidence supports the conclusion that the choice to purchase an iOS device creates a commitment to iOS apps because once a device is purchased, the cost of switching to alternative OS apps becomes substantially high. As they purchase more iOS apps and make in-app purchases, iOS consumers become even more committed to the iOS devices and apps for future purchases. As discussed above, this commitment creates a lock in that increases the switching cost in the primary mobile device market.

103.   Becoming locked-in can harm consumers more if they were not sufficiently informed about the future benefits and costs of using an iOS device and iOS apps and in-app content.169 Moreover, common economic evidence supports the conclusion that at the time of purchasing an iOS device, consumers lack sufficient information to accurately predict how they will use their iOS device, what apps and in-app content will be available, and how much they will spend on apps, in-app content, and other complementary products. At best, common economic evidence supports the conclusion that consumers have an imperfect expectation of their life-time value of the iOS device, apps and in-app content relative to non-iOS alternatives at the time of adoption.

104.   According to Mr. Forstall, Apple's senior executives, including Apple's co-founder, did not predict how the iOS aftermarket would evolve and what types of apps would be available:

> I think it's hard for anyone to imagine something as big as it's become."… "And at the beginning we hoped for hundreds [of apps]. At some point, I started -- Steve [Jobs] started asking me to build things and I kept saying, well, there's an app for that. We don't have to build that, there's an app for that. And -- and the fact that there are so many apps for so many things now is -- is truly fantastic.170

---

169   *See, for example*, Severin Borenstein, Jeffrey K. MacKie-Mason, and Janet S. Netz, "Antitrust Policy in Aftermarkets," *Antitrust Law Journal*, Vol. 63, No. 2 (Winter 1995), pp. 455-482.

170   Deposition of Scott Forstall, *In Re Apple iPhone Antitrust Litigation*, Volume 1, March 8, 2021, 124:17-125:7.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

105.  It is unreasonable to expect that consumers should have any better ability to anticipate what apps would be available in the future and how they would affect their expenditures and, thus, their switching costs. Figure 7 shows the number of iOS apps that iOS device consumers spent money on, either for downloading or for in-app purchases, increased from under 100,000 in 2009 to close to 500,000 in 2016, an over fivefold increase over 7 years, before it went down to about 360,000 in 2018.

**FIGURE 7 NUMBER OF APPS IOS CONSUMERS SPENT MONEY ON**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on full data. The data ends on 09/30/2019. Data for 2019 is not annualized.

106.  With imperfect information on the pricing and availability of future apps and in-app content, iOS device consumers would not know at the time of purchase what apps they are going to install after purchasing their iOS devices and, thus, what their costs of switching away from iOS at a future time would be.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

107. Finally, common evidence supports the conclusion that it is unlikely that iOS device consumers have sufficient information to compare prices for their bundle of iOS apps and in-app content to those of equivalent apps and in-app content on non-iOS devices. Thus, iOS device consumers likely cannot distinguish an increase in app or in-app purchase prices induced by Apple, thus limited to iOS device consumers, from price increases common to all mobile device users. Not until the Supreme Court's 2019 ruling in Plaintiffs' favor, concluding that iPhone users are direct purchasers of Apple apps and content, did Apple disclose the 30 percent commission collected on paid apps and in-app content. It is very unlikely that iOS device consumers would have found out the influence Apple had on the prices they paid for iOS apps and in-app purchases from app developers or elsewhere.

### B.   COMMON EVIDENCE OF APPLE'S MARKET POWER IN THE RELEVANT MARKET

#### 1.   Common Evidence Supports the Conclusion that Apple's Share in the iOS Aftermarket is Almost 100 Percent

108. Common economic evidence supports the conclusion that Apple has used its (aftermarket) market power to restrict the sale of iOS apps and in-app content outside of the App Store. The App Store is the only place on the iOS devices where iOS device consumers can purchase apps and in-app content. As a result of Apple's restrictions, (almost) 100 percent of iOS apps are purchased from Apple's App Store, and I explained in Section III that common economic evidence supports that iOS device consumers have no reasonable substitute for installing apps and making IAPs through the App Store.

#### 2.   Common Evidence Supports the Conclusion that Entry Into the iOS App and In-App Content Aftermarket Is Not Possible

109. A condition of Apple's iPhone Developer Program License Agreement is that developers can distribute their apps solely through the App Store and not through any third-party app stores.[171]

---

[171]   APL-APPSTORE_09811613 at 624-5.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Exceptions to this condition are restricted to the limited non-public distribution of apps under development for testing purposes and the non-public distribution of apps within an organization.

110. Apple allows iOS app developers to distribute apps that are under development outside of the App Store with limitations. These exceptions, which are intended for testing purposes (i.e., Beta testing), prior to public distribution through the App Store, are facilitated by Apple's Ad Hoc Distribution process and through a program called TestFlight. Ad Hoc Distribution authorizes iOS developers enrolled in the Standard Program to distribute an app outside of the App Store on up to 100 different devices for testing purposes only.[172] TestFlight allows developers to Beta test apps to a broader audience of up to 10,000 testers before they are distributed publicly through the App Store.[173]

111. The Apple Developer Enterprise Program allows a limited exception to distribution through the App Store for apps that are not being Beta tested. The program allows for the distribution of qualified proprietary apps within an organization by employees. The eligibility requirements for such private use apps are described in the Apple Developer Enterprise Program that Apple developed for "specific use cases that require private distribution directly to employees using secure internal systems or through a Mobile Device Management solution."[174] The Developer Enterprise Program does not permit public distribution of iOS apps.

112. Apple states that it authenticates the applicant's organization information, validates the intended use of the program, and ensures that the App Store, Apple Business Manager, Ad Hoc distribution, or TestFlight would not adequately meet your needs.[175]

---

[172] *See* Apple "iOS Team Administration Guide: Distributing an App," available at, https://developer.apple.com/library/archive/documentation/ToolsLanguages/Conceptual/DevPortalGuide/DistributinganApp/DistributinganApp.html, last accessed May 21, 2021.

[173] *See* Apple,"Beta Testing Made Simple with TestFlight," available at, https://developer.apple.com/testflight/, last accessed May 21, 2021.

[174] Apple, "Apple Developer Enterprise Program," available at https://developer.apple.com/programs/enterprise/, last accessed May 21, 2021.

[175] Apple, "Apple Developer Enterprise Program," available at https://developer.apple.com/programs/enterprise/, last accessed May 21, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

113.  Finally, Apple permits private companies to distribute certain proprietary apps to partners and clients outside of the App Store through a program called the Apple Business Manager. Similarly, educational institutions can distribute proprietary apps for internal use through a program called the Apple School Manager. However, both of these exceptions to the App Store still require apps be distributed from through Apple. For example, qualifying Apple Business Manager apps are distributed through the Apple Business Manager or through Mobile Device Management. Qualifying Apple School Manager apps are distributed through the App Store or through the Apple School Manager.[176]

114.  Epic Games' failed attempt to distribute its game Fortnite to iOS device consumers without paying a 30 percent commission to Google or Apple supports the conclusion that entry into the iOS aftermarket is not possible without Apple's permission. On August 13, 2020, Epic Games began offering Apple and Android mobile device users a 20 percent discount for Fortnite in-app purchases not made through the App Store or the Google Play Store but through its alternative in-app payment system.[177] The promotion was a permanent 20 percent discount applicable to mobile app purchases made via Epic's new direct payment option as well as purchases made in the PC and console versions of the game.[178] In-app purchases could still be made using the standard Apple and Google payment options, but the discount would not apply. Epic stated "Currently, there are no savings if players use Apple and Google payment options, where Apple and Google collect an exorbitant 30 percent fee on all payments. If Apple and Google lower their fees on payments, Epic will pass along the savings to players."[179] Within hours, both Apple and Google removed Fortnite from their storefronts.[180] The same day, Epic Games filed lawsuits

---

[176]  Apple, "Distributing Custom Apps," available at https://developer.apple.com/custom-apps/, last accessed May 21, 2021.

[177]  Andrew Webster, "Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees," *The Verge*, August 13, 2020, available at, https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android, last accessed May 26, 2021.

[178]  Andrew Webster, "Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees," *The Verge*, August 13, 2020, available at, https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android, last accessed May 26, 2021.

[179]  Andrew Webster, "Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees," *The Verge*, August 13, 2020, available at, https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android, last accessed May 26, 2021.

[180]  Nick Statt, "Apple just kicked Fortnite off the App Store," The Verge, August 13, 2020, available at https://www.theverge.com/2020/8/13/21366438/apple-fortnite-ios-app-store-violations-epic-payments, last

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

against both Apple and Google alleging violation of antitrust laws for requiring developers to use their payment systems and charging a 30 percent commission on all in-app purchases.[181]

### 3. Common Evidence Supports the Conclusion that Apple's App Store Profit Margin Is Substantial

115. Courts and competition authorities typically evaluate market share and barriers to entry to assess market power.[182] Apple's near 100 percent market share, the entry restrictions created by its restrictions on iOS app distribution, and the absence of meaningful entry events all provide strong support for Apple's market power in the iOS aftermarket, and this supporting economic evidence is common to all Consumer Class members.

116. Beyond these indicia, profit margins can also provide useful insights on market power. In this section, I show that common economic evidence supports that the Apple App Store enjoys a substantially high level of both gross and net margins.

117. An October 2019 internal Apple presentation titled, "App Store Business Management FY20 Overview," contains a Profit & Loss (P&L) reports of the App Store. Figure 8, copied from this presentation, shows App Store's gross and net margins for fiscal year 2019 and projected gross and net margins for fiscal year 2020.[183] Apple's internal App Store P&L shows FY2019 revenues of ████████. Apple's P&L indicates that the App Store earned a gross margin of ████████ on these sales, and its net margin, which nets out "OPEX," was ████████

118. This same internal October 2019 P&L presentation projected that FY2020 App Store gross margins were expected to increase to ████████ and the forecast net margins were expected to increase to ████████

---

accessed May 24, 2021; Dieter Bohn, "Fortnite for Android has also been kicked off the Google Play Store," The Verge, August 13, 2020, available at https://www.theverge.com/2020/8/13/21368079/fortnite-epic-android-banned-google-play-app-store-rule-violation, last accessed May 24, 2021.

[181] Jack Nicas, Kellen Browning, and Erin Griffith, "Fortnite Creator Sues Apple and Google After Ban From App Stores," *The New York Times*, August 13, 2020, available at, https://www.nytimes.com/2020/08/13/technology/apple-fortnite-ban.html, last accessed May 24, 2021.

[182] Organisation For Economic Co-operation and Development (OECD), *Techniques and Evidentiary Issues in Proving Dominance/Monopoly Power* (2006), available at, www.oecd.org/competition/abuse/41651328.pdf, last accessed May 21, 2021.

[183] APL-APPSTORE_10176241 at 318.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

119.  The observed gross margin and net margin increases from FY2019 to FY2020 are also reflected in Apple's presenter notes appearing below this table, which read "█████████████████████ ██████████████████████████████████████████████████."



**FIGURE 8 APP STORE PROFIT MARGIN IN FY2019**

Source: APL-APPSTORE_10176241 at 318.

120.  Apple's financial data provide more granular information on the difference between the gross margin and the net margin. According to Apple's "iTunes" business P&L data, the operating expense (OPEX) category includes expenses related to sales, marketing & distribution, reorganization, G&A, and R&D.[184] An Apple financial analysis and planning presentation from September 2019 shows that ████████████████████████████████████████████████████ ████████████████.[185]

---

[184]  APL-APPSTORE_10332891, "SAP-NC Post 2011" tab.
[185]  *See* APL-EG_08926412 at 430.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

121. Apple also prepared internal P&L statements for the App Store for earlier periods. These earlier P&L statements show that the App Store's gross and net profit margins have been significant for many years. Specifically, Tim Billups, WW Controller of Services and Infrastructure at Apple, prepared internal P&L statements for the Apple's Internet Software and Services operation.[186] These P&Ls, prepared at the request of Luca Maestri, Chief Financial Officer at Apple, were provided in an Excel spreadsheet.[187] The P&Ls for Apps were broken out within a tab of this spreadsheet named "iTunes Baseline." The P&L for Apps indicates that Apple enjoyed gross margin percentages of 91 percent and 90 percent on App sales in fiscal years 2013 and 2014, respectively, and contribution margins of 76 percent in each of these years. The App P&L also shows that Apple anticipated earning a similar gross margin percentage (91 percent) and a slightly lower contribution margin (72 percent) in FY2015. Apple's App P&L is summarized in Figure 9.[188]

**FIGURE 9: APPLE'S APP STORE GROSS AND CONTRIBUTION MARGINS**

|                      | 2013    | 2014    | 2015    |
|----------------------|---------|---------|---------|
| Net Revenue          | $2,373  | $3,629  | $4,912  |
| COGS                 | $50     | $83     | $38     |
| OCOGS                | $168    | $269    | $413    |
| Gross Margin         | $2,154  | $3,277  | $4,461  |
| *GM%*                | *90.8%* | *90.3%* | *90.8%* |
| OPEX w/SBC           | $361    | $515    | $908    |
| Contribution Margin  | $1,793  | $2,762  | $3,554  |
| *CM%*                | *75.6%* | *76.1%* | *72.3%* |

Sources: APL-APPSTORE_04685286, "iTunes Baseline" tab.

---

[186] *See* APL-APPSTORE_04685284.

[187] APL-APPSTORE_04685286, "iTunes Baseline" tab.

[188] These margins are consistent with information provided in other Apple documents for other periods. For example, a September 2019 Apple financial analysis and planning presentation shows the App Store earned annual gross margins of ███████████████████ from FY2016 through FY2020 and earned operating margins from ███████████████ over the same period. APL-EG_08926412 at 424.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

122. Figure 10 shows Apple's internally reported App Store gross margin percentages for FY2015 through FY2019. The App Store's gross margin percentages ranged from 85 percent to ▮ percent over the period.[189]

**FIGURE 10. APP STORE GROSS MARGIN, 2015 – 2019**

|  | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|---|---|
| Net Revenue | $5,079,804,210 | $6,990,924,570 | $9,568,996,660 | $11,585,924,760 | ▮ |
| Standard Cost | $80,763,340 | $19,618,100 | $32,754,130 | $55,791,740 | ▮ |
| Standard Margin | $4,999,040,870 | $6,971,306,470 | $9,536,242,530 | $11,530,133,020 | ▮ |
| *Standard Margin (%)* | *98.41%* | *99.72%* | *99.66%* | *99.52%* | ▮ |
| OCOGS | $688,603,050 | $850,972,220 | $1,014,145,430 | $1,279,473,550 | ▮ |
| Gross Margin | $4,310,437,820 | $6,120,334,250 | $8,522,097,100 | $10,250,659,470 | ▮ |
| *Gross Margin (%)* | *84.85%* | *87.55%* | *89.06%* | *88.48%* | ▮ |

Sources: APL-APPSTORE_08856864, "WW App Store Gross Margin" tab.

Notes: Standard Cost includes gift card production.

OCOGS includes credit card chargebacks, editorial content, and localization.

## V.   COMMON ECONOMIC EVIDENCE OF APPLE'S ANTICOMPETITIVE CONDUCT

123. In this section I briefly describe Apple's anticompetitive conduct in the iOS aftermarket alleged by Consumer Plaintiffs. While I recognize that much of the common proof of anticompetitive conduct will be factual, and not necessarily economic, it is important to my analysis to consider what behavior would not be present in the But-For world. I focus on two main allegations and common economic evidence supporting the allegations.

124. First, Consumer Plaintiffs allege that Apple has engaged in conduct to monopolize the aftermarket for iOS app and in-app purchases, which resulted in iOS device consumers having paid substantially more for iOS apps and in-app content than what they would have paid in a competitive market.[190] Assessing that effect, of course, is a part of common proof of impact and damages, addressed below.

---

[189]   APL-APPSTORE_08856864.

[190]   Third Amended Complaint, ¶¶ 4-5; 8-13.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

125.  Common economic evidence supports the conclusion that Apple allegedly maintained its monopoly by restricting ways in which iOS device consumers download and install apps and make in-app purchases. Apple's Developer Agreement, which app developers must enter before selling apps, forbids them from selling apps to iOS device consumers outside the App Store or creating competing app stores.[191] Common economic evidence supports the conclusion that there have been multiple attempts by app developers to diversify the means of distributing iOS apps and in-app content, but Apple shut down those attempts, which prompted antitrust authorities' investigations and private litigations. In addition to Epic Games that filed lawsuits against Apple alleging violation of antitrust laws, some app developers including Spotify, Telegram, and Kobo filed antitrust complaints in the European Union against Apple related to Apple's restrictive App Store practices. According to Spotify CEO, Daniel Ek:

> Apple has introduced rules to the App Store that purposely limit choice and stifle innovation at the expense of the user experience.[192]

126.  In June 2020, the European Commission opened an investigation into Apple's practices regarding Apple App Store rules.[193] In March 2021, the UK's CMA announced it would investigate, among other things, if "Apple imposes unfair or anti-competitive terms on developers using the App Store, ultimately resulting in users having less choice or paying higher prices for apps and add-ons."[194]

---

[191]  APL-APPSTORE_09811613, at 624-5; *See also* Apple, "App Store Review Guidelines," Sections 3.2.1(ii) and 3.2.2(i), available at, https://developer.apple.com/app-store/review/guidelines/, last accessed May 19, 2021.

[192]  Hamza Shaban, "Spotify accuses Apple of abusing its power over the App Store," *The Washington Post*, March 13, 2019, available at, https://www.washingtonpost.com/technology/2019/03/13/uk-panel-calls-new-antitrust-regulator-targeting-giant-tech-platforms/, last accessed May 21, 2021.

[193]  The Commission's investigation is focused on two restrictions imposed by Apple with iOS developers–(1) the mandatory use of Apple's own proprietary in-app purchase system "IAP" for the distribution of paid digital content and (2) restrictions on the ability of developers to inform users of alternative purchasing possibilities outside of apps. European Commission, "Antitrust: Commission opens investigations into Apple's App Store rules," June 16, 2020, available at, https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1073, last accessed May 21, 2021.

[194]  Competition and Markets Authority, "CMA investigates Apple over suspected anti-competitive behaviour," Press Release, Match 4, 2021, available at, https://www.gov.uk/government/news/cma-investigates-apple-over-suspected-anti-competitive-behaviour, last accessed May 21, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

127. As explained in Section III.F, several app developers, most prominently Spotify and Netflix, have removed the option for users to subscribe using In-App Purchase, instead leaving users only with the option of subscribing via the web. The loss of this more convenient option of subscribing within the app can also be a source of consumer harm in addition to higher prices. A press release regarding the European Commission's Statement of Objections to Apple's App Store practices as they apply to music streaming apps notes that "[t]he Commission is concerned that users of Apple devices pay significantly higher prices for their music subscription services *or they are prevented from buying certain subscriptions directly in their apps*." [Emphasis added][195]

128. Second, common economic evidence supports the allegation that Apple has been controlling what prices developers can charge. It exercises this control by setting a pricing tier for apps and in-app content rather than letting app developers set the price of their products.[196] Apple App Store's pricing tier for apps ranges from $0.99 to $999.99 with dollar increments up to $49.99, five-dollar increments from $54.99 to $99.99, ten-dollar increments from $109.99 to $249.99, fifty-dollar increments from $299.99 to $499.99, and hundred-dollar increments from $599.99 to $999.99.[197] App developers choose a price point from this tier rather than choosing the price they would like to charge.

129. Common economic evidence also provides support to the conclusion that Apple's restricted pricing policies hinder competition among app developers by limiting the force of competition to drive down prices. Economic principles teach us that competition drives down price. Consider a paid app sold at $59.99. The next price point it can move down to is $54.99. In a competitive market without Apple's pricing tier, it would not require fierce competition to drive down its price below $59.99. But in the current iOS aftermarket, the degree of competition that drives down the price of this app by $1 or $2 in a normal competitive market would not be enough to push down the price below $59.99.

---

[195] European Commission – Press Release, "Antitrust: Commission sends Statement of Objections to Apple on App Store rules for music streaming providers," Press Release (Brussels, April 30, 2021) SPEECH/21/2093, available at, https://ec.europa.eu/commission/presscorner/detail/en/ip_21_2061, last accessed May 28, 2021.

[196] Third Amended Complaint, ¶ 11.

[197] APL-APPSTORE_10199030; Leap Motion, "App Store Pricing Matrix," available at https://warehouse.leapmotion.com/price_tiers, last accessed May 21, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

130. Common economic evidence likewise provides support to the conclusion that Apple's restricted pricing policies also hinder the app developer competition by limiting app developers' ability to offer temporary price discounts. An app developer of a $1.99 app cannot offer a 20 percent or 30 percent temporary price discount to boost its app sales. Its only choice is to give a 50 percent price discount. An app developer of a $0.99 app is even more constrained. It cannot offer any price discount.

## VI.   METHODOLOGIES FOR ASSESSING COMMON ECONOMIC PROOF OF IMPACT

### A.   COMMON ECONOMIC IMPACT OF THE APP STORE COMMISSION

131. Any consumer who spent money on apps and in-app content has been impacted by Apple's App Store commission in excess of competitive levels, or "excess commission", if it resulted in app developers increasing the retail price of apps and in-app content. If consumers paid to subscribe to music streaming services or purchased 100 virtual tokens in a game app, their transactions were subject to Apple's App Store commissions. If as a result of anti-competitive acts by Apple, commissions exceeded competitive levels, and the price consumers paid was inflated as a result, consumers were overcharged for these digital products.[198] In general, affected consumers are identified by their Apple account ID's.[199]

132. The underlying economic principles are straightforward. The App Store commission is a component of app developers' effective operating cost. Profit-maximizing app developers' prices increase when marginal operating costs increase. This phenomenon is not unique to the Apple App Store. The App Store commission works the same way as sales or ad valorem tax, a tax of a fixed percentage of the sales price. When firms pay a certain percentage of their revenue to a

---

[198]  The basis of the complaint in this case is the allegation that excess commissions are generally positive for all class members, but the definition of "excess commissions" does not exclude the possibility that they could be negative for some transactions, that it is necessary in calculating harm to a consumer to net out the impacts of positive and negative excess commissions on this consumer's various transactions, and that a small share of identifiable class members suffered no net harm from their transactions.

[199]  I understand that it is not possible to link different ID's held by the same person, or to determine when more than one person shares an ID. Consequently, all determination of harm and formulas for allocation of damages are based on Apple ID's.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

retailer or distributor, they offset an increase in this component of marginal costs by raising prices. How much they increase prices depends on the impact of the commission on their marginal costs and on the price elasticity of their consumers, but the common economic impact is that consumers pay higher prices as a result of an increased commission.[200]

133. These economic principles can be applied to all iOS device consumers who spent money on the App Store during the Class Period, i.e., the Consumer Class, and all app developers who are subject to the App Store commission. The Consumer Class spent money on a variety of apps during the Class Period, but the app variety does not negate the commonality of economic impact because all app developers selling apps and in-app content through the App Store were bound by Apple's alleged anticompetitive iOS aftermarket restrictions during the Class Period.

134. Likewise, the consumer preferences that led the Consumer Class members to purchase different apps and in-app content do not affect the commonality of economic impact. Each purchaser of a given app or in-app content paid the same price in a given period, and was overcharged by the amount of Apple's excessive commission that was not "absorbed" by app developers. App developer do not and cannot price discriminate based on the consumer preferences. If an app developer charges a 9 percent higher price for its Paid Download app because of the App Store's excessive commission, every iOS device consumer must pay that price to purchase the app. Therefore, I can apply the economic principles of the App Store commission and other restrictions to all consumers who spent money on apps and in-app content subject to Apple's anticompetitive conduct.

135. Of course, the degree of the common economic impact, and thus the amount of damages, differs depending on which apps and in-app content the Consumer Class members spent money on.[201] However, my model for assessing common economic impact can be used to quantify the amount of damages that individual class members incurred through their particular choice of apps and in-app content purchased during the Class Period.

---

[200] Theoretically, if consumer demand is perfectly elastic, meaning that the price elasticity of demand is infinitely high, a tax increase does not result in increasing consumer prices. However, such a situation is rare in the real world.

[201] In some cases, the amount of damages may differ depending on when the Consumer Class members spent money if app developers offer temporary price discounts.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

136. I quantify the common economic impact on the Consumer Class in two steps. First, I investigate what App Store commission rates Apple would have charged in a competitive "But-For" world. But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores or in-app purchase payment processing systems, which Apple's App Store would have had to compete against to sell apps and in-app content to iOS device consumers, and as a result, Apple would have charged lower, competitive commission rates. I determine that the But-For commission rate would have ranged from 10 to 12 percent. This range is based on a benchmark analysis examining the commission rates of PC game app stores after a recent increase in competition, as well as analysis of Apple's App Store profit margin.

137. Second, I estimate how app developers would have changed their app and in-app content prices at the But-For commission rates. I model app developers as profit-maximizing firms that set prices given demand and their operating costs in the iOS aftermarket. That firms maximize profits is one of the most fundamental principles of economics. Because app developers' profit maximizing prices are based on demand and marginal operating costs, I estimate iOS aftermarket consumer demand and app developer costs. I use app developers' profit maximization conditions and the estimated demand and supply (costs) to calibrate app and in-app content prices that the Consumer Class would have paid in the competitive But-For world. Then, I use these But-For app and in-app content prices to calculate overcharges as well as damages for the Consumer Class.

138. I use the Apple App Store transactions data Apple produced for this matter as the main data source to estimate the iOS aftermarket demand and supply. The App Store transactions data are comprehensive in the sense that it records all transactions made through the App Store from the start of the Class Period until the end of September 2019.[202] The data provides information on each Apple ID's app download and IAP transactions, for both free and paid transactions, as well as information on the characteristics of apps and in-app content, including the product name, the app developer name, the app categories the App Store uses to categorize apps for iOS device consumers, the price iOS device consumers paid, the date of transactions, Apple's payments to

---

[202] I understand that Apple will produce the App Store transactions data that cover the period post September 2019. I reserve the right to supplement my report as additional App Store transactions data are available.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

app developers, among others.[203] I provide more details on the App Store transactions data in Appendix C.

139.   The level of detail of the App Store transactions data allows me to identify iOS device consumers who spent money on apps and in-app content through the App Store during the Class Period, i.e., the Consumer Class members. It also allows me to identify the apps and in-app content purchased in each Apple ID account, and how much commission Apple retained during the Class Period, which is particularly important for incorporating different App Commission levels Apple applies to a subset of apps and in-app content such as renewed subscriptions and the Small Developer Program.[204]

140.   I also use some app developers' cost information as a *supplemental* data source. I emphasize app developers' cost information is supplemental because I employ econometric methods widely used in the economic literature to estimate app developers' cost functions jointly with consumer demand and app developers' profit maximization conditions. These methods are based on the basic economic principle that the profit-maximizing firm's variable margin is the inverse of the price elasticity of demand, meaning that the profit-maximizing firm sets a higher markup when consumer demand is less elastic.[205] In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can use this principle and observed market equilibrium prices to impute firms' variable margins.[206]

141.   Nevertheless, information on firms' costs and variable margin is helpful in estimating demand and costs. By reversing the mechanism of imputing firms' variable margins, firms' cost data can be used to estimate consumer demand more accurately. I provide details on how I use app developers' cost data in estimation in Section VI.E.

---

[203]   Apple anonymized Apple IDs by randomly generating 32 character hexadecimal string for each Apple ID.

[204]   In fact, because I can calculate the commission rate for each transaction, I do not need to know which app developers are qualified for the discounted rates.

[205]   Jean Tirole, *The Theory of Industrial Organization*, (Cambridge, Massachusetts: The MIT Press, 1988), at Section 1.1.1.1 p. 66 and Section 3.2.1 p. 137.

[206]   Steven Berry, James Levinsohn, and Ariel Pakes, "Automobiles Prices in Market Equilibrium," *Econometrica* 63(4) (July 1995): 841-890; Aviv Nevo, "Measuring market power in the ready-to-eat cereal industry," *Econometrica*, 69(2) (March 2001): 307-342.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

142. It is important to understand that although I use app developers' cost information as supplemental data in estimating demand and supply, and additional cost data can help to refine and sharpen estimates, I do not need every app developer's cost in order to assess common economic impact. Although there is a variety of apps supplied by many app developers on the App Store, I (or any economist) can use consumer demand and app developers' profit maximization conditions to estimate app developers' costs without cost data from each of these app developers.[207]

### B.   ECONOMIC PRINCIPLES OF APP STORE COMMISSION

143. Before delving into details of my methodologies for quantifying common economic impact, I explain the economic principles of the App Store commission in this section. These principles clarify how the App Store commission levied on app developers results in higher app and in-app content prices for the Consumer Class and why I use the two-step methodologies outlined above to quantify the common impact of Apple's anticompetitive conduct.

144. Economists have long understood the effects of sales or ad valorem taxes. Whether the tax is levied on suppliers (app developers) or consumers (the Consumer Class), both consumers and suppliers share the burden of tax, meaning that consumers pay more than what they would pay and suppliers receive less than what they would receive in the absence of tax. These well-understood principles of tax incidence allow a calculation of the portions of an anticompetitive excess commission borne by the Consumer Class and by app developers.

145. Figure 11, copied from an undergraduate economics textbook, illustrates how consumers and suppliers share the burden of tax.[208] In the absence of tax, consumers pay $1.50 to buy a gallon of gasoline and suppliers receive the same price from selling it, as shown on the graph on the left panel of the figure. When a 50¢ per gallon tax is imposed on suppliers, the supply curve shifts upward from $S_1$ to $S_2$. Professor Jonathan Gruber, the author of this textbook, explains that this

---

[207]   Economists estimate demand by imposing constraints based on observed data. *See, for example*, Matthew Gentzkow, Jesse M. Shapiro, and Michael Sinkinson, "Competition and Ideological Diversity: Historical Evidence from US Newspapers," *American Economic Review*, 104(10) (2014): 3073-3114.

[208]   Jonathan Gruber, *Public Finance and Public Policy*, 5th edition, (New York: Worth Publishers, 2016), p. 588.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

tax is "equivalent to a 50¢ per gallon increase in marginal cost … Because the tax acts like an increase in marginal cost, the entire supply curve shifts upward by 50¢ from $S_1$ to $S_2$ and the supply of gas falls."[209]

146.  The graph on the right panel of Figure 11 shows how consumers and suppliers share the burden of this tax. The 50¢ per gallon tax results in consumers paying $1.80 and suppliers receiving $1.30 after paying the 50¢ per gallon tax. Professor Gruber explains, "The real burden of the tax is borne primarily by consumers, who pay 30¢ of the tax through higher prices, leaving producers to bear only 20¢ of the tax."[210]

### FIGURE 11. EFFECTS OF TAX ON CONSUMERS AND SUPPLIERS



**Statutory Burdens Are Not Real Burdens •** Panel (a) shows the equilibrium in the gas market before taxation (point A). A 50¢ tax levied on gas producers (the statutory burden) in panel (b) leads to a decrease in supply from $S_1$ to $S_2$ and to a 30¢ rise in the price of gas from $P_1$ to $P_3$ (point D). The real burden of the tax is borne primarily by consumers, who pay 30¢ of the tax through higher prices, leaving producers to bear only 20¢ of the tax.

Source: Jonathan Gruber, *Public Finance and Public Policy*, 5th edition, (New York: Worth Publishers, 2016), p. 588.

147.  This textbook example is based on an excise tax, a tax of a fixed amount, but the same principle can be applied to ad valorem taxes, a tax of a fixed percentage of the sales price. Professor

---

[209]  Jonathan Gruber, *Public Finance and Public Policy*, 5th edition, (New York: Worth Publishers, 2016), p. 588.

[210]  Jonathan Gruber, *Public Finance and Public Policy*, 5th edition, (New York: Worth Publishers, 2016), p. 588.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Gruber explains that "[a]ll of the lessons [about tax incidence] drawn here apply equally to both types of taxes; the major difference with ad valorem incidence analysis is that taxes shift the … supply curve proportionally … rather than by fixed amounts …"[211]

148. Apple's commission on app and in-app content purchases is an ad valorem tax that Apple levies on app developers on the Apple App Store. Figure 12 applies the principles of tax incidence to the Apple App Store commission. In this figure, $S$ represents the app developer's supply curve at the "wholesale" price net of Apple's commission that it receives, and $D$ represents the consumer's demand curve at the "retail" price including Apple's commission that he or she pays. In the "As-Is" world, Apple sets a commission rate $\tau_{AI}$, resulting in market equilibrium $E_{AI}$ where the price to consumers is $P_{AI}$, the price to developers is $P_{AI}(1 - \tau_{AI})$, and the quantity purchased is $Q_{AI}$. In the But-For world, Apple has a lower commission rate $\tau_{BF}$, resulting in a market equilibrium $E_{BF}$ where the price to consumers is $P_{BF}$, the price to developers is $P_{BF}(1 - \tau_{BF})$, and quantity purchased is $Q_{BF}$.[212] Consumers are overcharged by the amount of the shaded rectangular area, the quantity $Q_{AI}$ times the As-Is and But-For price difference $(P_{AI} - P_{BF})$. App developers are overcharged by the amount of the checkered rectangular area, the quantity $Q_{AI}$ times the difference in the As-Is and But-For whole prices they receive, $P_{BF}(1 - \tau_{BF}) - P_{AI}(1 - \tau_{AI})$. The total overcharge, and its allocation between consumers and developers depends on the slopes of $S$ and $D$. If as in Figure 11, supply is plotted as a function of retail price rather than wholesale price, then $S_1$ represents app developers' supply curve in the As-Is world, and $S_2$ represents app developers' supply curve in the But-For world where Apple's commission is at a competitive level.

---

[211]   Jonathan Gruber, *Public Finance and Public Policy*, 5th edition, (New York: Worth Publishers, 2016), p. 587.

[212]   In the As-Is world, app developers pay Apple $\tau P_1$ and keep $(1 - \tau)P_1$, where $\tau$ is the App Store commission. In the But-For world, app developers would have paid Apple $\tau' P_2$, and kept $(1 - \tau')P_2$, where $\tau'$ is lower than $\tau$.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

### FIGURE 12. EFFECTS OF COMMISSION ON CONSUMERS AND APP DEVELOPERS



149. The real world is more complicated than Figure 12, but the fundamental economic principles are the same. That is, Apple's App Store excess commission is an ad valorem tax levied on app developers in the iOS aftermarket, and both the Consumer Class members and app developers share its burden, which results in the Consumer Class members paying more than what they would have paid in the But-For world.

150. Putting my methodologies for assessing common impact in the framework of Figure 12, I use the real-world data to estimate $D$ and $S_1$ and find $E_{AI}$. Then I use the estimated demand and supply "curves" and app developers' profit maximization conditions to find $E_{BF}$ for a given But-For App Store commission rate. The overcharge is the difference between $P_{AI}$ and $P_{BF}$ and the Consumer Class damages are the overcharge multiplied by $Q_{AI}$, i.e., the upper shaded area. One of the complications I need to account for is that app developers are not price takers as in Figure 11 or Figure 12 but able to set prices for their products. Thus, rather than finding a point where the demand curve intersects with the supply curve, I need to use app developers' profit

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

maximization conditions, together with the estimated demand and app developers' variable costs, to find $E_{AI}$ and $E_{BF}$.

151. There are real-world examples of apps that charge differential prices due to Apple's App Store commission. For instance, according to a July 2016 email exchange addressed in the deposition of Eric Gray, CBS All-Access charged $6.99 per month for its subscription service on iOS, but $5.99 on Apple TV, where it was only changed a flat 15 percent commission rate, regardless of the length of time the user had been subscribed.[213] The $1 price difference was characterized as being intended to offset the different commission rate.[214] Using a 30 percent commission rate for iOS, as is done in the email in question, consumers would bear 83 percent of the "burden" of the App Store commission.

152. The burden of the App Store commission borne by consumers has also been assessed in an antitrust investigation by the European Commission. I understand that the Commission is currently investigating Apple's conduct regarding the App Store, specifically regarding the impact of Apple's conduct on music streaming apps. The Commission's "preliminary conclusion is that Apple abused its dominant position for the distribution of music streaming apps through its App Store and distorted competition in the music streaming market."[215] The Commission concluded that the App Store commission fee resulted in higher prices for consumers of music streaming services: "Our investigation showed that this fee was passed on to end users by raising prices, typically from 9.99 to 12.99 Euros."[216] If I assume a 30 percent commission rate on the

---

[213] Deposition of Eric Gray, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021, 174:15-178:2; APL-APPSTORE_09924671. The change to subscription services on iOS that lowered the commission rate to 15 percent on renewals after one year came into effect on June 13, 2016. Roger Fingas, "Apple announces it will offer App Store subscriptions to all apps, take smaller 15% cut," *AppleInsider*, June 8, 2016, available at, https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut, last accessed May 25, 2021.

[214] Deposition of Eric Gray, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021, 177:10-178:2; APL-APPSTORE_09924671.

[215] European Commission – Speech, "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093. Available at, https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093 , last accessed May 25, 2021.

[216] European Commission – Speech, "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093, available at, https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093 , last accessed May 25, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

App Store price and 0 percent on the non-App Store price, the prices stated by the Commission would imply that consumers bear 77 percent of the burden. The prices stated by the Commission would imply a higher share for consumers if the average commission rate is lower as a result of the reduced 15 percent rate for renewed subscriptions.[217]

### C.   BUT-FOR COMMISSION RATES

153. In this section I describe the competitive But-For world and explain what commission rates Apple would have charged in the But-For world. This is the first step of my methodologies for quantifying common economic impact. In the next section, I explain how I model iOS aftermarket consumer demand and app developer cost functions and how I use them to quantify the App Store overcharges and damages for the Consumer Class.

154. The App Store commission is effectively the "price" that Apple charges for selling iOS apps and in-app content, and the As-Is App Store commission rate is the price set in a market where there is no competing app store for the iOS apps and in-app content. In the But-For world where the Apple App Store competes with non-Apple app stores or app developers selling iOS apps and in-app content on the iOS devices, the force of competition would bring down the commission rate. If Apple engaged in no anti-competitive acts, then the commission rate should be either the rate established in competition between rival app stores, or a "limit price" set by Apple that is low enough to deter entry.

155. When estimating competitive But-For prices for a market that has never experienced competition, as in the case at hand, markets that have similar characteristics but are more competitive can provide useful benchmarks. For example, commentators observe that what the

---

[217] For example, if renewed subscriptions account for 40 percent of total subscriptions, the average commission rate would be $(0.4 \times 15\%) + (0.6 \times 30\%) = 24\%$. Then, the 3 Euro difference would imply consumers bear 96 percent of the burden of the App Store commission.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

App Store does in regards to IAP transactions is no different from payment processing.[218] However, payment processors rarely charge higher than 5 percent.[219]

156. What has happened to games app stores on the PC platform in the last few years is particularly relevant. Industry experts explain that the PC game app stores operate the same way as the App Store.[220] Epic's Epic Games Store was publicly announced on December 4th, 2018, and went live two days later on December 6th, 2018.[221] Per the announcement, the Epic Games Store would charge developers a 12 percent commission fee on sales made through the store.

157. At the time, Valve's Steam store was reported to be the largest PC game store by registered users.[222] Just days before the Epic Game Store announcement, Steam announced that it was reducing its commission rate for high-revenue games.[223]  Previously, Steam had charged a constant 30 percent commission rate on game revenues. Under Steam's new commission structure, the commission rate paid to Steam would fall to 25 percent on a game's sales above

---

[218] Damien Geradin and Dimitrios Katsifis, "The antitrust case against the Apple App Store," TILEC Discussion Paper No. DP2020-039, April 22, 2020, p. 37, available at, https://ssrn.com/abstract=3583029, last accessed May 30, 2021.

[219] *See, for example*, Visa charges a rate of  0.05% + $0.21 to 3.15% + $0.20 for interchange reimbursement fees as transfer fees between acquiring banks and issuing banks for each Visa card transaction; Visa, "Visa USA Interchange Reimbursement Fees," April 16, 2021, available at, https://usa.visa.com/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf, last accessed May 25, 2021; Mastercard charges a rate of 0.00% + 0.10 to 3.30% + 0.10; Mastercard, "Mastercard 2019–2020,  U.S. Region Interchange Programs and Rates," October 18, 2019, available at, https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/merchant-rates-2019-2020-oct-2019.pdf, last accessed May 25, 2021; and PayPal charges a range of 1.90-5.00% plus a fixed fee for domestic transactions, and an additional 1.50% for international commercial transactions. PayPal, "PayPal Merchant Fees," March 11, 2021, available at https://www.paypal.com/us/webapps/mpp/merchant-fees, last accessed May 25, 2021.

[220] *See, for example*, Evans Report, Section II.C.

[221] Tim Sweeney, "Announcing the Epic Games store," *Unreal Engine*, December 4, 2018,available at, https://www.unrealengine.com/en-US/blog/announcing-the-epic-games-store, last accessed May 31, 2021; Epic Games, "The Epic Games store is now live," December 6, 2018, available at, https://www.epicgames.com/store/en-US/news/the-epic-games-store-is-now-live, last accessed May 31, 2021.

[222] "Although it remains the biggest PC game marketplace, with more than 150 million registered users, the company clearly recognizes that it can't rest on its laurels." Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers" *The Verge,* November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition, last accessed May 31, 2021.

[223] Steam, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838, last accessed May 30, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

$10 million, and decrease again to 20 percent on sales above $50 million. An equity research report at the time noted that Steam's reduction was "likely in anticipation of Epic's announcement."[224]

158. On April 29, 2021, Microsoft announced that it would reduce the commission charged on its Microsoft Store for PCs from 30 percent to 12 percent for game developers beginning August 1st, 2021.[225] Press coverage characterized the commission drop as "a clear bid to compete with Steam and entice developers and studios to bring more PC games to its Microsoft Store." [226] The coverage also noted that the commission change was coincident with non-price efforts by Microsoft to improve the Microsoft Store.[227]

159. Around the time Epic launched its store, Discord, a popular chat platform, also launched a game store. Discord is "a PC gaming-centric application that combines voice and text chat with a robust platform for third-party integrations."[228] The Discord game store initially launched in a

---

[224]   APL-EG_09289728.

[225]   Kyle Orland, "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%." *Ars Techica,* April 29, 2021, available at, https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pc-game-sales-to-12/, last accessed May 31, 2021.

[226]   Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge,* April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/, last accessed May 31, 2021.

[227]   "The 12 percent cut might tempt more developers into listing their games in Microsoft's store, particularly if the company can improve the poor experience for end users. Booty [Matt Booty, head of Xbox Game Studios at Microsoft] is promising just that, with "improved install reliability and faster download speeds over the next few months." Microsoft is also reportedly working on an overhaul to its Windows store that could pave the way for developers to be able to submit any Windows application to the store — including browsers like Chrome or Firefox. These store improvements may even allow third-party commerce platforms in apps, which would be a big shift alongside this 12 percent cut." Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge,* April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/, last accessed May 31, 2021.

[228]   Nick Statt, "Discord's game store launches globally today with indie gems like Hollow Knight and Dead Cells," *The Verge,* October 16, 2018, available at, https://www.theverge.com/2018/10/16/17980810/discord-digital-game-distribution-store-steam-competitor-nitro-subscription-service , last accessed May 30, 2021.

*See also* Michael Andronico, "Discord is the one app you need to be using — here's what you need to know" *CNN,* January 28, 2021, available at, https://www.cnn.com/2021/01/28/cnn-underscored/discord-app/index.html, last accessed May 30, 2021, ("Discord first launched in 2015 as a means for people to easily communicate while playing PC games together. The service allows users to create servers, which can consist of a variety of text and voice channels.").

---

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

small trial in August 2018, and expanded globally in October 2018.[229] The store was initially intended to offer a curated selection of independent games.[230] Along with the launch of the store, Discord also introduced a "universal library feature that will let you launch a game from within the Discord app, regardless of where it was purchased."[231]

160.  Shortly after the launch of the Epic Games Store in December 2018, Discord announced that it was moving to a 10 percent commission fee on sales using its store.[232] In March 2019, Discord changed its model from a centralized store to allowing developers to create their own storefronts within their dedicated Discord servers, still charging a 10 percent commission on sales.[233] Discord provides tools for selling games and in-app purchases, analytics tools for tracking performance, and developer tools for integrating Discord's voice chat features, quickly updating games, and managing backend functionality, among others.[234]

161.  I use 10-12 percent as the But-For commission rates.[235] I also use 5.2 percent and 15 percent as the upper and lower bounds for sensitivity checks. The 15 percent is the rate that Apple applies

---

[229]  Nick Statt, "Discord's game store launches globally today with indie gems like Hollow Knight and Dead Cells," *The Verge*, October 16, 2018, available at, https://www.theverge.com/2018/10/16/17980810/discord-digital-game-distribution-store-steam-competitor-nitro-subscription-service, last accessed May 30, 2021.

[230]  Discord blog, "The Discord Store Beta," August. 9, 2018, available at, https://blog.discord.com/the-discord-store-beta-9a35596fdd4, last accessed May 30, 2021.

[231]  Nick Statt, "Discord's game store launches globally today with indie gems like Hollow Knight and Dead Cells," *The Verge* (Oct. 16, 2018) Available at https://www.theverge.com/2018/10/16/17980810/discord-digital-game-distribution-store-steam-competitor-nitro-subscription-service , last accessed May 30, 2021.

[232]  "Turns out, it does not cost 30% to distribute games in 2018. After doing some research, we discovered that we can build amazing developer tools, run them, and give developers the majority of the revenue share. So, starting in 2019, we are going to extend access to the Discord store and our extremely efficient game patcher by releasing a self-serve game publishing platform. No matter what size, from AAA to single person teams, developers will be able to self publish on the Discord store with 90% revenue share going to the developer. The remaining 10% covers our operating costs, and we'll explore lowering it by optimizing our tech and making things more efficient." Discord Blog, "Why not 90/10?," December 14, 2018, available at, https://blog.discord.com/why-not-90-10-3761ebef4eab, last accessed May 30, 2021.

[233]  "We've learned that devs want to avoid the friction and cost of a traditional storefront by selling directly to their community. So, you can now create a store channel within your server where anyone can get your game." Discord Blog, "Empowering Developers with Community and Commerce," March 14, 2019, available at, https://blog.discord.com/empowering-developers-with-community-and-commerce-68d9c0712662, last accessed May 30, 2021.

[234]  Discord, "Sell Your Game," available at, https://discord.com/sell-your-game, last accessed May 30, 2021.

[235]  It has been well documented in the academic literature that entry or threat of entry drives down price. *See, for example,* Austan Goolsbee and Chad Syverson "How Do Incumbents Respond to the Threat of Entry? Evidence from the Major Airlines," *The Quarterly Journal of Economics* 123(4) (2008): 1611-1633.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

to app developers qualified for the Small Business Program[236] and subscription renewals after 12 months.[237] I understand that the discounted rate is not a result of competition, as Apple's CEO testified during the Epic v Apple trial, so it could provide a reasonable upper bound for the competitive But-For commission rate. The ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

162.  Furthermore, in the But-For world where the Apple App Store is not the only app store selling iOS apps and in-app content, Apple would not impose the pricing tier policies on app developers. Apple's pricing tier system interferes with app developers' ability to compete. Price cutting should balance loss of revenue from the established customer base against potential revenue gain from new customers. Incremental price drops can "test the waters" to see if profits increase and rivals respond. Dropping a full tier risks a substantial loss and makes response by rivals more likely. It is only logical that Apple's pricing tier policies interfere with app developers' ability to compete. The Apple App Store, and other competing app stores, would have difficulty retaining or attracting app developers with such policies in place in the competitive But-For world.[239]

---

[236]  On January 1, 2021 Apple began charging a 15 percent commission for developers who made less than $1 million in proceeds in the previous calendar year. *See* Apple, "Apple announces App Store Small Business Program," November 18, 2020, available at, https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/, last accessed May 29, 2021; APL-APPSTORE_10170515.

[237]  APL-APPSTORE_10305331, at 334-5.

[238]  If the App Store commission rate is ████████, Apple's App Store revenue would be ████████ of the revenues it would earn with the 30 percent commission rate.

[239]  Matthew Fischer testified that Apple had been asked by developers to have more flexibility to charge different prices for in-app purchases. Deposition of Matthew Fischer, Volume II, *In Re Apple iPhone Antitrust Litigation*, December 18, 2020, 266:12-24.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

### D.   IOS AFTERMARKET DEMAND AND SUPPLY AND APP DEVELOPERS' PROFIT MAXIMIZATION CONDITIONS

163.   The second step of my methodologies for quantifying the common economic impact of Apple's anticompetitive conduct is to calibrate the app and in-app content prices that would have prevailed at the But-For commission rates described in Section VI.C. The difference between the As-Is app and in-app content prices and the But-For app and in-app content prices can be used to estimate the overcharge the Consumer Class paid.

164.   In this section I first explain how I model app developers' profit maximization pricing strategies. The common impact of the App Store commission stems from the economic principle that the commission increases app developers' variable costs and, as a result, app developers offset the increased costs by raising prices. Therefore, I need to model how app developers would set app and in-app content prices when facing different commission rates.

165.   I model app developers as firms that set prices to maximize profits, given demand conditions and costs. Profit maximization is a basic principle in modeling firm behavior in economics. Depending on what types of apps they sell, app developers decide how much to charge for initial downloads, subscriptions, or non-subscription in-app content, but they all follow the same economic principles applied to profit maximizing firms.[240]

166.   After explaining how I model app developers' price setting behavior, I explain how I estimate consumer demand for apps and in-app content and app developers' costs. Because app developers, as profit maximizing firms, set prices given demand and supply conditions, I need to estimate consumer demand for apps and in-app content and app developers' costs. With the demand and cost functions estimated, I can estimate how app developers would change their app and in-app content prices at lower, competitive commission rates.

---

[240]   The academic literature models app developers as profit maximizing firms that set app prices to maximize profits given demand and cost conditions. *See, for example*, Anindya Ghose and Sang Pil Han "Estimating Demand for Mobile Applications in the New Economy," *Management Science* 60(6) (2014): 1351-1616.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

### 1.    Profit Maximization Conditions for App Developers

167.   I model app developers' price setting strategies as profit-maximizing firms' pricing decision, which is a standard way to model firms in economics.[241] When a firm increases its price, it will lose some consumers who are more price sensitive than others, but it can make more money from consumers who continue to buy its product. But the firm does not want to continue to raise its price because the extra money earned from consumers who stay with it becomes smaller than the money it loses at some point. In economic terms, the profit-maximizing firm sets price at a level where the marginal revenue equals the marginal cost. The marginal revenue is determined by consumer demand, while the marginal cost is determined by the cost function.

168.   Estimating app developers' price setting behavior is equivalent to estimating their profit functions and applying the profit maximizing rules to them, i.e., the profit maximization conditions. The consumer demand and app developer cost functions are part of this pricing model because they dictate how the marginal revenue and margin cost change as app developers change prices.

169.   Once I estimate app developers' pricing decision model, I can use it to estimate app and in-app content prices at lower, competitive But-For commission rates.[242] If the commission rate is lower, app developers will lower their app and in-app content prices because the extra sales they make by cutting prices are more profitable than before. But app developers will stop lowering the prices at some point because they have to sell *every* unit at lower prices and it is not worth selling more units when the prices are below some threshold. The pricing model would allow me to estimate the level at which app developers stop lowering their app and in-app content prices for a given But-For commission rate.

170.   Consider an app developer supplying the App Store a paid-to-download app that has an in-app content product, i.e., a Paid Download IAP app with one IAP item. This app developer's profit function for time period $t$ can be written as

$$(1) \qquad \pi_t(p_t^d, p_t^{IAP}) = \left((1-\tau)p_t^d - c_t^d\right) Q_t + \omega_t\left((1-\tau)p_t^{IAP} - c_t^{IAP}\right)$$

---

[241]   App developers do not price discriminate, meaning that they set a single price for a given product.

[242]   I explain in Section VI.C why the But-For commission rates should be lower than the As-Is commission rates.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

where $p_t^d$ denotes the download price, $p_t^{IAP}$ the in-app content price (the IAP price hereafter),[243] $Q_t$ the number of downloads, $\omega_t$ the number of IAP transactions,[244] $c_t^d$ the variable cost the app developer incurs per download, $c_t^{IAP}$ the variable cost the app developer incurs per IAP transaction, and $\tau$ the App Store commission.[245] These variables all have subscript $t$ except for the App Store commission to indicate they take different values depending on the demand and cost conditions of a given time period.[246]

171. This app developer sets two prices, the download price $p_t^d$ and the IAP price $p_t^{IAP}$, to maximize its profit. When it sets these two prices, it accounts for their effects on the number of downloads $Q_t$ and the number of IAP transactions $\omega_t$ such that the effect of an incremental price change on the profit is zero. The following two equations are the profit maximization conditions the app developer satisfies in setting the two prices:[247]

$$(2) \qquad \frac{\partial \pi_t}{\partial p_t^d} = (1-\tau)Q_t + \frac{\partial Q_t}{\partial p_t^d}\left((1-\tau)p_t^d - c_t^d\right) + \frac{\partial \omega_t}{\partial p_t^d}\left((1-\tau)p_t^{IAP} - c_t^{IAP}\right) = 0$$

$$(3) \qquad \frac{\partial \pi_t}{\partial p_t^{IAP}} = \frac{\partial \omega_t}{\partial p_t^{IAP}}\left((1-\tau)p_t^{IAP} - c_t^{IAP}\right) + \omega_t(1-\tau) = 0$$

172. Equations (2) and (3) show that the app developer's pricing decision depends on the app and in-app content demand ($Q_t$, $\omega_t$, $\frac{\partial Q_t}{\partial p_t^d}$, $\frac{\partial \omega_t}{\partial p_t^d}$, $\frac{\partial \omega_t}{\partial p_t^{IAP}}$), the app developers' costs ($c_t^d$, $c_t^{IAP}$), and the App Store commission ($\tau$). I provide more details on the demand and cost functions I estimate in the next two sections (Sections VI.D.2 and VI.D.3).

---

[243] The IAP price in my model refers to the price iOS device consumers pay when they purchase in-app content through iOS apps on their iOS devices. In the As-Is world, all IAP transactions are processed through Apple's In-App Purchase system (through the App Store), but in the But-For world, app developers can sell in-app content without using Apple's In-App Purchase system.

[244] In my model, IAP transactions refer to sales of in-app content through iOS apps. As for the IAP price, IAP transactions occur only through the App Store in the As-Is world but can occur through other app stores or payment processing systems in the But-For world.

[245] I understand that some app developers have other revenues sources such as advertising. In the absence of detailed revenue data for app developers, $c_t^d$ and $c_t^{IAP}$ may capture part of the additional revenues as a negative component.

[246] I recognize that Apple could change the commission rate. Apple changed the commission rate for subscription renewals after 1 year in 2016 and for the Small Developer Program in 2021. Apple could change the commission rate more frequently if relevant demand and supply conditions change.

[247] The app download demand equation specified later does not have $Q_t$ depend on either $p_t^{IAP}$ or $\omega_t$.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

173. Consider now another app developer supplying a paid-to-download app that has no IAP, i.e., a Paid Download app. This app developer's profit function is just the first part of equation (1) such that:

$$(4) \qquad \pi_t(p_t^d) = \left((1-\tau)p_t^d - c_t^d\right)Q_t$$

This app developer sets the download price to maximize its profit, and the profit maximization condition in this case is the same as the first two terms of equation (2):

$$(5) \qquad \frac{\partial \pi_t}{\partial p_t^d} = (1-\tau)Q_t + \frac{\partial Q_t}{\partial p_t^d}\left((1-\tau)p_t^d - c_t^d\right) = 0$$

174. Finally, consider an app developer who lets iOS device consumers download its app for free but makes money out of IAPs, i.e., a Free Download IAP app. The following equation is such an app developer's profit function, which is just the second part of equation (1):

$$(6) \qquad \pi_t(p_t^{IAP}) = \omega_t\left((1-\tau)p_t^{IAP} - c_t^{IAP}\right)$$

The profit maximization condition for this app developer is given as:

$$(7) \qquad \frac{\partial \pi_t}{\partial p_t^{IAP}} = \frac{\partial \omega_t}{\partial p_t^{IAP}}\left((1-\tau)p_t^{IAP} - c_t^{IAP}\right) + \omega_t(1-\tau) = 0$$

which is the same as equation (3).

175. Although there is a variety of apps and in-app content available on the App Store, these three sets of the profit maximization conditions, the last two of which are special cases of the first set, cover the pricing decisions for all the apps and in-app content products the Consumer Class spent money on.

176. The app developers' profit maximization conditions, expressed in equations (2), (3), (5), and (7), show that the App Store commission ($\tau$) affects the equilibrium app and IAP prices. For example, suppose an app developer sets the price for its Paid Download for given demand and cost conditions and a given commission rate. The app developer will set the download price such that equation (5) is satisfied. Now suppose the App Store commission rate decreases. Equation (5) is no longer satisfied, so the app developer will change its download price to make equation

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

(5) satisfied again. In fact, it is straightforward to show that the download price always decreases to satisfy equation (5) again when the App Store commission decreases as long as the demand curve has a negative slope and the variable cost is positive.[248]

## 2.    Consumer Demand for Apps and IAPs

177.    The key element of consumer demand I need to estimate for the purpose of quantifying the common economic impact of Apple's anticompetitive conduct is consumers' sensitivity to price changes. Whether an app developer sets the download price for a dictionary app or the IAP price for a music streaming app, its pricing decision will depend on how price sensitive the iOS device consumers are.

178.    One may think estimating consumers' price sensitivity requires estimating each individual consumer's price sensitivity. But that is not necessary in the case at hand because app developers set the same price for all consumers for a given product in a give period. That is, app developers cannot price discriminate. Hence, they only account for how a price change affects the number of units sold, not which consumers are affected by it, in their pricing decision.

179.    I estimate demand for app downloads and demand for IAPs separately while accounting for their interrelations. Consider a Paid Download IAP app. Suppose its download price decreases for all else equal. One effect is that more consumers will download this app because it is cheaper. Another effect of it is that demand for its IAPs will increase because more consumers have this app on their iOS devices. This interrelation between app downloads and IAP spending implies that when an app developer sets a download price, it accounts for its impact on both app downloads and IAP spending. In other words, $\frac{\partial \omega_t}{\partial p_t^d}$ in the app developer profit maximization conditions (i.e., equation (2)) is not zero.

180.    I estimate the following two regression equations for consumer demand for apps and IAPs:

---

[248]    In equilibrium, the download price should satisfy $p_{jt}^d = -Q_{jt} \left( \frac{\partial Q_{jt}}{\partial p_{jt}^d} \right)^{-1} + \frac{c_{jt}^d}{(1-\tau)}$. Thus, the equilibrium download price moves in the same direction as the App Store commission as long as $\frac{\partial Q_{jt}}{\partial p_{jt}^d} < 0$ (the downward sloping demand curve) and $c_{jt}^d > 0$.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

(8)     $log(Q_{jt}) = \alpha^d p_{jt}^d + \boldsymbol{X}_{jt}^d \boldsymbol{\gamma}^d + u_{jt}^d$

(9)     $log(\omega_{jkt}) = \alpha^{IAP} p_{jkt}^{IAP} + \beta^Q log(Q_{jt}) + \boldsymbol{X}_{jkt}^{IAP} \boldsymbol{\gamma}^{IAP} + u_{jkt}^{IAP}$

Equation (8) represents demand for app $j$, where $Q_{jt}$ denotes the number of downloads for app $j$ in period $t$, $p_{jt}^d$ app $j$'s download price in period $t$, $\boldsymbol{X}_{jt}^d$ app characteristics such as the app fixed effects and time fixed effects, and $u_{jt}^d$ the residual term. Equation (9) represents demand for app $j$'s IAPs, where subscript $k$ denotes IAP items offered by app $j$, $\omega_{jkt}$ the number of transactions for IAP item $k$, $p_{jkt}^{IAP}$ the price of IAP item $k$, $\boldsymbol{X}_{jkt}^{IAP}$ the characteristics of IAPs such as the IAP item fixed effects and time fixed effects among other things, and $u_{jkt}^{IAP}$ the residual term. In Appendix D, I explain how these equations approximate consumer demand based on consumer utility maximization.

181.  The coefficient $\alpha^d$ captures consumers' price sensitivity with respect to app downloads, while $\alpha^{IAP}$ captures the price sensitivity with respect to IAPs. The coefficient $\beta^Q$ captures how app downloads affect IAP transactions.

182.  The regression equation for consumer demand for Free Download IAP apps is the same as equation (8) except that the value of the app download price is zero for such apps. Consumers may download these apps more readily because they are free to download. Thus, the download demand and IAP spending are still interrelated for these apps in the same way represented by equations (8) and (9).

183.  Consumer demand for Paid Download apps is relatively simple. Consumers' decision to download a Paid Download app depends on the app quality and the price she has to pay to download it. For these apps I only estimate equation (8).

184.  I explain how I estimate equations (8) and (9) in Section VI.E. I do not include free apps that have no IAPs in my demand estimation because they are not subject to the App Store commission. Thus, iOS device consumers who only downloaded such apps during the Class Period are not part of my quantification of common economic impact. However, it does not mean that they are not harmed by Apple's anticompetitive conduct related to the App Store. If

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

the App Store commission had been set at a competitive level, they would have had additional opportunities to download attractively-priced paid apps or make in-app purchases.

### 3.   App Developers' Costs

185.   The app developer costs relevant to estimating common economic impact are developer's *variable* costs.[249] A variable cost is a firm expense that varies in proportion to production output.[250] A good example of a variable cost faced by certain app developers are the royalty payments paid by music streaming service providers such as Pandora.[251] These royalty payments, paid to the rights-holders of the music offered by the service, can be considered a variable cost because the royalty payments increase as more consumers download and use their app to stream music. When Apple takes 30 percent of Pandora's revenue, it reduces Pandora's revenue while Pandora's variable cost remains the same. As explained above, economic principles teach us that in such situations, firms will increase price to offset the decreased revenue. How much they will increase price will depend on the shape of demand function and on their costs.

186.   As explained in Section VI.A, I do not need every app developer's costs to assess common economic impact because I use consumer demand and app developers' profit maximization conditions to estimate app developers' costs. The cost information produced by some app

---

[249]   As noted by Prof. Lafontaine in her Rebuttal Expert Report in *Epic Games. v. Apple*, variable costs are often used as proxies for the marginal costs of a firm, the costs denoted $c_t^d$ and $c_t^{IAP}$ in equation (1) in Section VI.D.1 of this report. Rebuttal Expert Report of Francine Lafontaine, Ph.D. *Epic Games, Inc. v. Apple Inc*., March 15, 2021, at ¶ 248.

[250]   "Variable costs are costs that change with the level of output [..]. Associated with the concepts of total cost and variable cost is marginal cost, which is the *increment,* or addition, to cost that results from producing one more unit of output. Because fixed cost does not change as output increases, the increase in total cost when output increases is identical to the corresponding increase in variable cost." Dennis W Carlton and Jeffrey M Perloff, *Modern Industrial Organization, 4th ed.* (Pearson, 2015) at 53-54.

[251]   Pandora either pays a negotiated amount, which may be per-performance, per-subscriber, or a percentage of revenue, or a per-performance royalty rate statutorily set by the Copyright Review Board, which differs depending on whether a user is a subscriber or free user. In 2016, the rate was set at $0.0022 per performance for commercial subscription services and $0.0017 per performance for commercial non-subscription services. Pandora, Form 10-K, Annual Report for the Year Ending Dec. 31, 2017, p 6 available at, https://www.sec.gov/Archives/edgar/data/1230276/000123027618000019/p-12312017x10k.htm, last accessed May 31, 2021; Federal Register, *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, No. 14-CRB-0001-WR (2016-2020), available at, https://www.govinfo.gov/content/pkg/FR-2016-05-02/pdf/2016-09707.pdf, last accessed May 31, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

developers for this matter can still improve my estimates of demand and costs. I provide more details on how I use the available cost data in model estimation in Section VI.E.

187.   In this section, I summarize my analysis of app developers' costs, based on documents and data produced for this matter and their publicly-available financial statements. The app developers' costs data and financial statements I reviewed, as well as industry reports and various documents, support the conclusion that app developers incur variable costs. For some types of apps such as music and video streaming apps, the variable cost can be significant.

188.   The app developers who have produced cost data have only done so in May 2021, and so I have not had the time or opportunity to perform a thorough analysis of all of the data provided or to obtain supplemental information regarding more details of the data from those app developers. I reserve the right to supplement my report as additional information comes to my attention.

*a.    Examples of App Developers' Gross Margin*

189.   Epic Games' financial data produced in this matter show that Epic's gross margin was 66.7 percent in 2018.[252] The largest item included in Cost of Sales is "1st Party Platform Royalties," which I understand refers to the commissions it paid Apple, Google, and other platforms and accounts for 25.6 percent of Total Gross Revenue.[253] The second and third largest cost items under Epic's Cost of Sales are Hosting and UA (short for "User Acquisition"), accounting for 3.5 percent and 2.6 percent of Total Gross Revenue respectively.[254] Epic Games' gross margin net of the 1st Party Platform Royalties was 92.2 percent in 2018.[255] Its gross margin net of platform royalties was 68.4 percent in 2019, though much of the difference is due to costs attributed to the Epic Games Store; excluding those costs from the calculation yields a gross margin of 79.5 percent for 2019.[256]

---

[252]   EPIC_03349875 at -879.

[253]   Calculated using figures from EPIC_03349875 at -879.

[254]   Calculated using figures from EPIC_03349875 at 879.

[255]   Calculated using figures from EPIC_03349875 at 879. I calculate the gross margin net of the 1st Party Platform Royalties as revenues minus Cost of Sales plus 1st Party Platform Royalties, divided by revenues.

[256]   Calculated using figures from EPIC_02030347 at 351.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

190. 

191. Using data from production and public financial statements, I estimate the gross margin of Playtika, the developer of the "social casino" game Slotomania among others, to have ranged

192. Among non-game apps, gross margins are considerably lower for Spotify and Pandora, prominent apps in the Music category. I understand that music streaming services pay a significant percentage of their revenues in royalty payments to rights-holders of the music provided to listeners via their app, which are calculated as the larger of a percentage of revenues

---

257  Averages are the weighted average, weighting by gross bookings. I identify user acquisition costs as the data from a table labelled "Advertising Media Buys (User Acquisition) - Apple iOS Games," where the metric is labelled "Advertising Expense – Performance." I understand that performance advertising refers to advertising where payment by the advertiser is determined by the occurrence of a defined action, as explained later in this section. Gross bookings from PG 000039 at 046-055; user acquisition costs from PG 000124 at 131-141; server costs from Req 5&6_PG Server Costs_05.10.21.xlsx.

258  I estimate this by using data on revenue by platform reported in Playtika, "69,500,000 Shares, Common Stock," Prospectus, January 14, 2021, and data on commissions and payment processing fees paid on Slotomania's US revenues from 2018-2020 produced for this matter PLAYTIKA_000007. The Playtika Prospectus provides revenues from 3rd-party platforms and internal (web-based) proprietary platforms, as well as cost of revenue, which includes platform commissions as well as "payment processing fees, customer support, hosting fees and depreciation and amortization expenses associated with assets directly involved in the generation of revenues, primarily servers."

The data indicate that Playtika paid a 30 percent commission to all non-proprietary platforms on revenue for Slotomania. I calculate the weighted average payment processing fee on revenue from non-3rd-party platforms, and multiply that by internal-plaform revenue to adjust for payment processing fees in cost of revenues for the firm as a whole. I assume that this figure for Slotomania is sufficiently representative for my illustrative purposes here.

259  I calculate user acquisition fees using data from production for Slotomania in the US for 2018 through 2020. PLAYTIKA_000004, tabs "9d" and "9e".  The production provides Slotomania app revenue and UA costs. ████████████████████████████████████████████████████████  Again, I assume that the average across this time period for Slotomania is sufficiently representative for my illustrative purposes here.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

or a per-user amount (in the case of Spotify), or an amount based on the number of times songs are streamed (in the case of Pandora).

193. I use data from Spotify's public financial statements from 2017 to 2019, and I calculate Spotify's yearly gross margin for the premium segment excluding App Store commissions[260] to be between 22.1 percent and 26.6 percent.[261] Spotify reports that the Cost of Revenue is "predominantly" made up of royalty payments, and also includes "credit card and payment processing fees for subscription revenue, customer service, certain employee compensation and benefits, cloud computing, streaming, facility, and equipment costs, as well as amounts incurred to produce content for our Service," and some costs associated with offering discounted trials to customers.[262]

194. I use data provided by Pandora[263] to calculate their gross margin for the subscription segment by subtracting licensing costs from revenues. Between 2013 and 2016, I calculate that Pandora's

---

[260] I do not adjust my calculations for Spotify to account for app store commissions, as documents indicate that such commissions were a small and declining portion of Spotify's costs from 2017 onward. In May 2016, Spotify removed the ability for new subscribers to purchase their subscription through its iOS app, meaning that they would only pay commission on pre-existing subscriptions made via the App Store. An internal Spotify presentation indicates that they projected the number of these subscribers would fall by half by the end of 2016, to 1.4 million. In its financial statements, Spotify reported having 48 million premium subscribers total at the end of 2016. Spotify also bypasses app store fees on Android devices. SPOT-APPLE-00000008; Spotify Technology S.A., Form 20-F, Annual Report for the year ended December 31, 2018 at p. 47; Daisuke Wakabayashi, "Google Demands 30% Cut From App Developers in Its Play Store," *The New York Times*, September 28, 2020, available at, https://www.nytimes.com/2020/09/28/technology/google-play-store-30-percent.html, last accessed June 1, 2021.

[261] I use data from Bloomberg on Spotify's worldwide quarterly revenues and cost of revenues from the premium segment from all platforms. *See* Bloomberg, "Spotify Technology SA (SPOT US) - By Segment, Q1 2016 – Q4 2020", last accessed on June 1, 2021. I do not use data for 2020 as the 2020Q4 value for cost of revenue is much higher than in 2020Q3 and it is inconsistent with the reported gross margin for 2020Q4. I compute the yearly gross margin as the difference between the sum of revenues and the sum of cost of revenues which, then, I divide by the sum of revenues. I compute that the yearly gross margin between 2017 and 2019 ranges from 22.1 percent to 26.6 percent with a weighted average of 25.4 percent. I compute that the yearly gross margin between 2016 and 2019 ranges from 16.4 percent to 26.6 percent with a weighted average of 24 percent.

[262] Spotify Technology S.A., Form 20-F, Annual Report for the year ended December 31, 2018, p. 45, available at, https://investors.spotify.com/financials/default.aspx, last accessed June 1, 2021. In addition, Spotify provided quarterly data on the cloud computing costs that make up part of their Cost of Revenue on May 27, 2021. SPOT-APPLE-00000015. I have not had a chance to review this data carefully, but it shows Spotify incurs non negligible cloud computing costs.

[263] PANDORA_000001, at 001-112.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

yearly gross margin per thousand listener hours ranged from 40.8 percent to 55.7 percent,[264] while between 2017 and 2019, their yearly gross margin per paying user ranged from 31.5 percent to 38.6 percent.[265] Pandora reports additional cost items which are not broken down between the ad and subscription segments. First, Pandora incurs "cost of revenue-other",[266] which represents 7.2 percent of total revenues[267] and consists primarily of ad and music serving costs (for example, advertisements through third-party ad servers), but also employee-related, facilities cost, equipment cost, and other costs of ad sales. Second, Pandora sustains "transmission costs",[268] which represent on average 3.4 percent of total revenues,[269] and relate to content streaming, advertisement expenses and other costs for maintaining their radio and on-demand services. Finally, Pandora incurs sales and marketing costs which among other expenses include "transaction processing commissions" on purchases via mobile app stores, sales, marketing and advertising costs, such as "marketing campaigns" to "expand costumer awareness".[270]

195. Netflix, the largest app by revenue in the Entertainment category, realizes a gross margin similar to that of the Music streaming apps, due similarly to costs relating to the content provided to users and the mechanics of delivering it to them. Using data from their public financial statements on the domestic streaming segment,[271] I calculate their gross margin as the difference between revenues and cost of revenues, divided by revenues.[272] Between 2017 and 2019, I

---

[264]  The 2013 yearly gross margins refers to the period from February to December, as specified in PANDORA_000001, at 003, while the 2016 margin refers to the period from January to September. *See* PANDORA_000001, at 033.

[265]  Similarly, the yearly gross margin per paying user from 2017 to 2020 ranges from 31.5 percent to 38.8 percent.

[266]  PANDORA_000001, at 010.

[267]  Weighted average computed as sum of "cost of revenue-other" from 2013 to 2017 divided by sum of total revenues from 2013 to 2017.

[268]  PANDORA_000001, at 083.

[269]  Weighted average computed as sum of "transmission costs" from 2019 to 2020 divided by sum of total revenues from 2019 to 2020.

[270]  PANDORA_000001, at 012.

[271]  Netflix defines the domestic streaming as the US streaming segment. See Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2017, p.1 available at, https://ir.netflix.net/financials/sec-filings/default.aspx, last accessed June 1, 2021.

[272]  I use Netflix' 10-K with data on annual revenues and cost of revenues from the domestic streaming segment between 2012 and 2019. *See* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2012, table 40. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2013, table 44. *See*

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

calculate that their gross margin ranges from 46.1 percent to 47.3 percent.[273] Netflix's public financial statements specify that "[a]moritization of streaming content assets" represent the "majority" of their Cost of Revenues while the remainder are made up of ."[e]xpenses associated with the acquisition, licensing and production of streaming content […], streaming delivery costs and other operations costs"[274] They note that their subscriptions are linked to the "overall mix" of content available on their service.[275]

196.   The examples of gross margins I discussed above are not intended to be precise estimates of the firms' variable margin but provide evidence that app developers incur substantial operating costs that depend on the number of users or the app's usage.

---

*also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2014, table 35. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2015, table 35. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2016, table 33. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2017, table 33. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2018, table 34. *See also* Netflix, Inc., Form 10-K, Annual Report for the year ended December 31, 2019, table 19. All Netflix, Inc. 10-K reports are available at, https://ir.netflix.net/financials/sec-filings/default.aspx, last accessed June 1, 2021.

[273]   I compute the yearly gross margin as the difference between the sum revenues and the sum of cost of revenues which, then, I divide by the sum revenues. I compute that the yearly gross margin between 2017 and 2019 ranges from 46.1% to 47.3% with a weighted average of 46.9%. I compute that the yearly gross margin between 2012 and 2019 ranges from 28.7% to 47.3% with a weighted average of 43%.

[274]   Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2019, p. 22, available at, https://ir.netflix.net/financials/sec-filings/default.aspx, last accessed May 31, 2021.

"Streaming delivery costs" include expenses related to Netflix's own global content delivery network ("Open Connect") and "all third-party costs, such as cloud computing costs, associated with delivering streaming content over the internet." *Ibid.*

App store commissions are also included in "other operations costs." Netflix removed the option for new customers to pay through the App Store in December 2018, and since then incurs App Store commissions only on pre-existing subscriptions. One would expect that similarly to Spotify, this would lead to a decrease in the proportion of revenues subject to the App Store commission. Despite that, I compute that its yearly gross margin between 2018 and 2019 only marginally changed from 47.2 percent to 47.3 percent. In conjunction with Netflix's description of its costs, it is reasonable to assume that app store commissions are not a sufficiently large component of Netflix's costs of revenues to affect the illustrative value of their gross margin between 2017 and 2019. *See* Chris Welch, "Netflix stops offering in-app subscriptions for new and returning customers on iOS," *The Verge*, December 28, 2018, available at, https://www.theverge.com/2018/12/28/18159373/netflix-in-app-subscriptions-iphone-ipad-ios-apple, last accessed May 31, 2021.

[275]   They state that they are "focused on programming an overall mix of content that delights our members in a cost efficient manner. […] If we do not maintain a compelling mix of content, our membership acquisition and retention may be adversely affected." Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2019, p. 4, available at, https://ir.netflix.net/financials/sec-filings/default.aspx, last accessed May 31, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

b.    *Examples of Variable Costs*

197. One key set of variable costs are often referred to as *user acquisition* costs, or "UA costs" for short. UA costs include the payments app developers make for measurable, performance-based advertising, where payments are directly determined by a measurable metric like the number of individuals who installed the developer's app after clicking on an ad, or some similar metric.[276] While as the name suggests, these costs are often incurred in acquiring *new* users, they can also be incurred when ads are used to direct lapsed users back to an app.[277]

198. ████████████████████████████████████████

---

[276] For instance, a 2014 email from Apple's Kim Martinsen includes benchmarks from Ad Colony, "one of the top two video ad networks based in the US." APL-APPSTORE_06199518. Ad Colony charges either on a "Cost-per-completed-view" or a "cost-per-install" basis. APL-APPSTORE_06199519. An accompanying slide deck explains how Ad Colony's video ads end with a prompt linking directly to the App Store page to download the advertised app. APL-APPSTORE_06199520 at 526.

Developer's payments to Apple's own Search Ads are based on either a "cost-per-tap" or "cost-per-install" rate. APL-APPSTORE_10175693 at 698.

[277] For instance, the firm Adikteev specializes in "retargeting" advertising, which aims to increase in-app spending by existing users or bring back those that have stopped using the app. Their website even touts how their "fully transparent incrementality measurement capabilities can show you the actual incremental value of any of these campaigns on your audience." Adikteev, "Home Page," available at https://www.adikteev.com/, last accessed May 29, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.



199. Public financial documents from app developers provide commentary supporting the importance of UA costs to their operational results. For example, Rovio, the developer of the popular *Angry Birds* franchise, states in its 2017 Annual Report: "Game development studios continuously improve their games to increase their monetization and player retention. At the same time, we try

---

278   For instance, Rovio, the developer of the popular game series *Angry Birds*, explain: "Gross bookings represent in-app purchases and in-app advertising sales in the given calendar month, reported on the basis of the date of purchase/sale. […] Gross bookings are used as the base for calculating certain key operational metrics […] as they give a more accurate view of Rovio's operating performance than revenue at a specific point in time." Rovio, Annual Report 2017, p. 65, available at, <u>rovio-annual-report-2017.pdf</u>, last accessed June 1, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

to lower the cost per install by optimizing user acquisition and leveraging the high visibility of our brand."[279]

200. An internal email among App Store employees succinctly captures the close relationship between UA costs and revenues for game app developers. Responding to news that MZ, developers of the blockbuster game Game of War among others, was limiting its UA efforts, Matthew Fischer, Vice President for the App Store, writes: "Why are they pulling back on UA? Since their billings are dependent on new users, are they basically giving up on mobile?"[280]

201. Common evidence supports the conclusion that hosting or cloud computing costs are another key variable cost common to a wide range of app developers. Costs that fall within this category are referred to by a wide range of terms, including "server costs"[281] or "streaming" costs, [282] among others. All of these costs refer to the ongoing costs of providing the content or services used and purchased in-app by consumers. Whether streaming music from Pandora or movies from Netflix, competing against other players or buying outfits in Fortnite, or swiping through profiles on Tinder, app users are constantly interacting with the app developer's online services. App developers incur cloud computing costs to ensure consumers can use and make purchases in their app.

202. Many app developers purchase cloud computing services from leading providers like Amazon Web Services ("AWS") or Google Cloud. AWS's website features customer case studies on Supercell, the developer of several blockbuster games including Clash of Clans, Netflix, Epic Games, and many other app developers.[283] Google Cloud likewise features case studies of

---

[279] Rovio, Annual Report 2017, p. 13, available at, rovio-annual-report-2017.pdf, last accessed June 1, 2021.

[280] APL-APPSTORE_02021805.

[281] ██████████████████████

[282] Spotify, Form 10-K, Annual Report for the year ended December 31, 2018, p. 45, available at https://investors.spotify.com/financials/default.aspx, last accessed June 1, 2021.

[283] Amazon Web Services, "Supercell Case Study." Available at https://aws.amazon.com/solutions/case-studies/supercell/, last accessed June 1, 2021; Amazon Web Services, "Netflix on AWS." Available at https://aws.amazon.com/solutions/case-studies/netflix/, last accessed June 1, 2021; Amazon Web Services, "Epic Games Delivers Entertainment Experiences at Global Scale on AWS," available at, https://aws.amazon.com/solutions/case-studies/epic-games/?did=cr_card&trk=cr_card, last accessed June 1, 2021; Amazon Web Services, "Wildlife Studios Optimizes for Cloud Cost Efficiency, Gaining Competitive Advantage in Gaming Industry," available at, https://aws.amazon.com/solutions/case-studies/wildlife-studios-cost-management/?did=cr_card&trk=cr_card, last accessed May 20, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Spotify, King, the developers of Candy Crush and many other games, and the New York Times.[284]

203.  To understand why these cloud computing costs can be considered variable (or partially variable) costs, an example from AWS's service called GameLift for videogame developers is illustrative.[285] Servers are critical to how multiplayer games work: they provide the central coordination, communication, and processing that enables players to actually play with each other. A single server can support a certain number of players, depending on the specifications of the server and the requirements of the game; in the example provided by AWS, one server can support 40 players simultaneously. GameLift allows developers to adapt their server usage to respond to demand by renting servers on a per-*hour* basis and provides services to assist in managing this process.

204.  Servers are also not the only element of hosting or cloud computing costs. Developers also pay for data transferred from AWS to users on a per-gigabyte basis; in the GameLift example, data transfer is more expensive than the cheapest scenario provided for sever costs.[286] This example shows how hosting and cloud computing costs can be closely tied to the month-to-month (or even hour-to-hour) fluctuations in consumer usage, making them more accurately described as variable costs.

205.  ██████████████████████████████████████████████████
      ██████████████████████████████████████████████████
      ████████████████████████████████████

---

[284]  Google Cloud, "Spotify: The future of audio. Putting data to work, one listener at a time," available at, https://cloud.google.com/customers/spotify, last accessed May 31, 2021; Google Cloud, "King: Playing to win with Google Cloud Platform," available at, https://cloud.google.com/customers/king, last accessed May 31, 2021; Ed Podojil, "The evolution of data architecture at The New York Times," *Google* Cloud (Blog), January 27, 2021, available at, https://cloud.google.com/blog/products/data-analytics/how-the-new-york-times-build-an-end-to-end-cloud-data-platform, last accessed May 31, 2021.

[285]  Amazon Web Services, "Amazon GameLift Pricing," available at, https://aws.amazon.com/gamelift/pricing/, last accessed May 26, 2021.

[286]  In their example, the cheapest server scenario involves meeting all of their server needs using a spot market for available servers, which leads to savings by taking on greater uncertainty of price and availability. That option for the example provided would cost $5,430 per month, while data transfer would be $6,776 per month. *Ibid.*

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.



206.  Another general grouping of variable costs relating to usage comprises the direct costs of content provided in an app, including the royalty payments for music streaming apps discussed above. Licensing royalties are well-defined variable costs for Music apps, but can also be significant costs for other categories of apps. Some game app developers such as Glu Mobile, a developer of several successful games, have engaged in licensing agreements with celebrities or major brands for some of its games. As explained in their annual financial statements, the licensing fees are paid as a percentage of revenues, similar to Spotify's payments to music rights-holders:

   a.  "For games based on or significantly incorporating licensed brands, properties or other content, we share a portion of our revenue with the respective licensors. The average royalty rate that we paid on games based on licensed content (such as *Kim Kardashian: Hollywood* and *Restaurant Dash with Gordon Ramsay*) or significantly incorporating licensed content

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

(such as *MLB Tap Sports Baseball 2019*) was approximately 20.5 percent of gross revenue in 2019, 20.2 percent in 2018, and 18.2 percent in 2017."[287]

207.    As I note earlier, I have not had sufficient time to thoroughly analyze the data that has been produced by app developers, and additional data may yet be produced. Moreover, I have not had the opportunity to ask follow up questions regarding their productions. Thus, the preceding is not intended to be a comprehensive taxonomy of the variable costs faced by app developers.

208.    As I have repeatedly mentioned, costs like UA and cloud computing appear to be at least *in part* variable costs; it is possible that some of the various expenses attributed to these items by developers are more properly considered fixed costs. Similarly, as I have discussed, there are likely other costs faced by developers that can be considered to be variable costs. With additional data and analyses, I can use well-established techniques like regression analyses to more precisely characterize the variable profit margins of app developers.

### E.    ESTIMATION PROCEDURE

209.    In this section I outline the estimation procedure. I estimate the consumer demand for iOS apps and IAPs, the app developer cost, and app developers' profit function and profit maximization conditions together as they are closely linked to each other. Appendix E provides further details.

210.    I make one modification in the regression equations for consumer demand for apps and IAPs. Rather than letting all apps and IAP items have the same coefficients, I let apps that belong to different app categories have different coefficients such that equations (8) and (9) become:

(10)    $log(Q_{jt}) = \alpha_c^d p_{jt}^d + \boldsymbol{X}_{jt}^d \boldsymbol{\gamma}_c^d + u_{cjt}^d$

(11)    $log(\omega_{jkt}) = \alpha_c^{IAP} p_{jkt}^{IAP} + \beta_c^Q log(Q_{jt}) + \boldsymbol{X}_{jkt}^{IAP} \boldsymbol{\gamma}_c^{IAP} + u_{cjkt}^{IAP}$

---

[287]    Glu Mobile Inc., Form 10-K, Annual Report for the year ended December 31, 2019, p. 10, available at, https://sec.report/Document/1366246/000155837020001804/gluu-20191231x10kf63199.htm, last accessed May 31, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

where subscript $c$ added to $\alpha^d$, $\alpha^d$, $\beta^v$, and $\beta^Q$ denotes the app categories on the App Store. The app categories are used by iOS device users to find apps to fit their needs, and Apple advises app developers to choose the most accurate and effective categories for their apps.[288] The App Store transactions data provides information on which category each app belongs to. According to the App Store transactions data, the Games category is the biggest category, accounting for ▮▮▮ ▮▮▮▮▮ of App Store transactions. The Entertainment category is the second largest category, accounting for ▮▮▮▮▮▮ of transactions, followed by the Music category, which accounts for ▮ ▮▮▮▮ of transactions. A full list of the app categories is provided in Figure 22 in Appendix C.

211. This modification allows the estimated model to reflect the demand and supply conditions that are specific to each app category. For example, iOS device consumers who purchased apps belonging to the Games category may have a different degree of price sensitivity, on average, from those who purchased apps belonging to the Music category.

212. As explained above, a few app developers have produced cost data with several more app developers in the process of producing it. I incorporate these app developers' variable margin in estimating equations (10) and (11). Consider a Paid Download app. The profit maximization condition (equation (5)) shows that this app's variable margin should satisfy the following relationship:

$$\frac{\left((1-\tau)p_t^d - c_t^d\right)}{(1-\tau)p_t^d} = \frac{Q_t}{p_t^d}\left(\frac{\partial Q_t}{\partial p_t^d}\right)^{-1}$$

where the left-hand side of the equation represents the variable profit margin net of the App Store commission and the right-hand side represents the inverse of price elasticity, a value

---

[288]   Apple, "Choosing a Category," available at, https://developer.apple.com/app-store/categories/, last accessed May 30, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

determined by the estimated demand.[289, 290] This relationship shows that the variable margin of Paid Download apps can be estimated using only demand estimates if the variable margin is unknown. This relationship also shows that information on the variable margin, if available, can help estimate demand.

213.



---

[289] By differentiating the app developer's profit function, $\pi_t = ( (1-\tau)p_t^d - c_t^d)Q_t$, with respect to $p_t^d$, one obtains the following condition $\frac{\partial \pi_t}{\partial p_t^d} = (1-\tau)Q_t + \frac{\partial Q_t}{\partial p_t^d} ( (1-\tau)p_t^d - c_t^d) = 0$. This equation can be re-arranged as $( (1-\tau)p_t^d - c_t^d) = (1-\tau)Q_t \left( \frac{\partial Q_t}{\partial p_t^d} \right)^{-1}$. By dividing both sides by$(1-\tau)p_t^d$, one can obtain $\left( \frac{(1-\tau)p_t^d - c_t^d}{(1-\tau)p_t^d} \right) = \frac{Q_t}{p_t^d} \left( \frac{\partial Q_t}{\partial p_t^d} \right)^{-1}$. This equation represents the profit maximization condition as long as the second derivative of the profit function evaluated at the solution to the equation is negative, $\frac{\partial^2 \pi_t}{\left( \partial p_t^d \right)^2} < 0$.

[290] The profit maximization condition implies that what the app developer receives after paying the commission, $(1-\tau)p_t^d$, should be larger than the cost, $c_t^d$, for its app business to make profits.

[291] Economists use sampling processes, economic principles, or auxiliary data as constraints in estimation. *See, for example*, Charles F. Manski, "Nonparametric Bounds on Treatment Effect," *American Economic Review*, 80(2) (1990): 319-323; Federico Ciliberto and Elie Tamer, "Market Structure and Multiple Equilibria in Airline Markets," *Econometrica*, 77(6) (November 2009): 1791-1828; Che-Lin Su and Kenneth L. Judd, "Constrained Optimization Approaches to Estimation of Structural Models," Econometrica 80(5) (September 2012): 2213-2230.

[292] Because the app developer cost information is generally for more recent periods, I only apply the margin constraints on apps for 2017 to 2019. Full details on the margin constraints can be found in Appendix E.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

215. It is important to note that because I use the average margin as constraints, the estimated variable margins for individual apps can be different from the estimated average margin and can vary widely. Also, I do not impose the margin constraints on the app developers or apps for which I have cost information to analyze. I use the app developers' cost information only to learn about a range of variable margins for each app category. Thus, the estimated variable margins for these app developers can lie outside the range specified in the constraints if their margins are not close to the app category average margin.[293]

216. One complication in using the profit maximization conditions to infer the variable margin is that app developers are somewhat constrained in setting the profit maximizing price due to the App Store pricing tier policies. When the profit maximizing price for a Paid Download app is $3.50, for example, an app developer can only choose between $2.99 and $3.99. When this app developer is observed to charge $3.99, the cost inferred based on the profit maximizing condition would be different from the cost inferred when the app developer charges $3.5.

217. However, because I use the margin range as constraints, as opposed to using an exact margin level as constraints, the profit maximization conditions do not have to be precise. In Appendix F I explain using a range of the margin as constraints is conceptually not much different from using an exact margin level as constraints and the profit maximization conditions that account for Apple's pricing tier policies.

218. Because the produced App Store transactions data includes over 64 billion transactions, it is not practical to use the whole data in estimation. Thus, I use a randomly drawn subsample to estimate equations (10) and (11). Statistical principles teach us that a subsample of data is representative of the whole data if it is randomly drawn. Because Apple randomly anonymized

---

[293] The estimated margin and my preliminary calculation of the gross margin can be different for a given app developer due to the variable costs I did not identify or the fixed costs I could not separate from other costs in my cost data analysis.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

the Apple IDs (the "person_id" field), I randomly select a subset of the Apple IDs and extract all transactions associated with them.[294] After comparing subsamples of different sizes extracted using this sampling method, I conclude that a subsample extracted based on randomly selected 0.1 percent of the Apple IDs are representative of the information of key variables contained in the full data. Appendix C provides the comparison of the summary statistics of key variables between the full data and the 0.1 percent subsample used in estimating common impact. I conclude that the 0.1 percent sample provides estimates of the models that are statistically representative of estimates that would be obtained from the full data. If at some point in the future, a question arises that the currently fitted models cannot resolve with sufficient reliability, the estimation methods I have employed could be repeated on a larger sample.

219.  At the end of the estimation process for a given app category, I estimate equations (10) and (11) and the variable costs associated with app downloads and IAP transactions for all apps in a given app category, whether I have their cost information or not. With these demand and cost estimates, app developers' profit functions and as well as the profit maximization conditions are also estimated.

220.  Once all parameters are estimated, the But-For commission rates are plugged in the app developers' profit maximization conditions to find the But-For app and IAP prices.

## F.    SCALING UP CALCULATIONS OF COMMON IMPACT

221.  Although I use a random subsample to estimate common economic impact, i.e., the Consumer Class damages, I can scale up the estimation results for the whole data (that is, for every single App Store transaction) without much difficulty. Scaling up can be done in two steps. First, I need to "estimate" demand for apps and in-app content that are not included in the 0.1 percent



294

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

subsample. Since the 0.1 percent sample provides estimates that are statistically representative of estimates that would be obtained from the full data, it is reasonable to assume the omitted apps have the same percentage overcharge as the average for the included apps.

222. Alternatively, I can be more precise by using the estimated coefficients of the demand equations to calibrate demand for these apps and in-app-content. For app $m$ in category $c$ (that is not included in the 0.1 percent sample), I know the number of its app downloads and IAP transactions as well as the download and IAP prices for each period from the App Store transactions data. I can use this data and the estimated price coefficients, $\hat{\alpha}^d$ and $\hat{\alpha}^{IAP}$, to calibrate the rest of the demand functions as follows:

$$\hat{R}^d{}_{cmt} = \hat{X}^d_{mt}\hat{\gamma}_c{}^d + \hat{u}^d_{cmt} = log(Q_{mt}) - \hat{\alpha}^d p^d_{mt}$$

$$\hat{R}^{IAP}{}_{cmt} = \hat{X}^{IAP}_{mkt}\hat{\gamma}_c{}^{IAP} + \hat{u}^{IAP}_{cmkt} = log(\omega_{jkt}) - \hat{\alpha}^{IAP}_c p^{IAP}_{jkt} - \hat{\beta}^Q_c log(Q_{jt})$$

223. Once the download and IAP demand is constructed for these apps and in-app content, I can estimate their costs, $c^d_{mt}$ and $c^{IAP}_{mt}$, using the profit maximization conditions. Then, given the estimated demand and costs, I can do the same simulation exercise I do for the 0.1 percent subsample to find the profit-maximizing But-For app and IAP prices for a given But-For commission rate.

224. Second, at the end of the first step, I obtain the But-For app and IAP prices for a given But-For commission rate for *all* (paid) apps and in-app content included in the App Store transactions data. Because app developers do not price discriminate or iOS device consumers cannot individually bargain over prices for iOS apps or in-app content, I can apply these But-For app and IAP prices to the Consumer Class members who are not selected in the random sampling based on the apps and in-app content they spent money on during the Class Period.

225. There could be cases in which an app developer's cost structure or market conditions are such that some Consumer Class members are estimated to be not harmed by Apple's alleged anticompetitive conduct. For example, some app developers may not account for the App Store

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

commission in their pricing decision because they incur no variable costs.[295] If an app developer selling a Free Download IAP app relies on other revenue sources such as advertising, because it cannot break even at the 30 percent commission, this app developer may increase its IAP price at a lower commission rate. In my model, such cases would be identified by zero or negative cost estimates.

226. My methodologies can determine such cases and identify *un*-impacted Consumer Class members from those cases. I can first identify apps and IAPs for which the But-For prices do not decrease at lower App Store commission rates and then identify Consumer Class members who purchased only those apps and IAPs since July 10, 2008 to the present from the App Store transactions data. As explained in Section VI.A, Apple tracks all app and IAP transactions of each individual Apple ID made through the App Store since the App Store was launch in July 10, 2008. The App Store transactions data provides information on each Apple ID's app download and IAP transactions, for both free and paid transactions, as well as information on the product name, the app developer name, the app categories, the price iOS device consumers paid, the date of transactions, Apple's payments to app developers, among others. In the next section I show that the number of such Class members is likely relatively small.

## VII.   COMMON PROOF OF DAMAGES

227. Common economic proof of the extent of damages for each class member here is not difficult to establish, as it flows from the same methodology, described above, to demonstrate common impact. As I describe by way of example below, data in this case that currently exists—and should be supplemented as the matter proceeds—allows for the determination of how the alleged misconduct harmed individual Class members, by grouping or on an individual basis. As I also describe, while there may be a small number of Class members who show no damage under this methodology, they are easily identified and therefore do not undermine the common

---

[295] As explained in Section VI.D the download price of Paid Download apps always decreases when the App Store commission decreases as long as the demand curve has a negative slope and the variable cost is positive. That means the app download price would not change when the App Store commission changes if the variable cost is zero.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

methodology applicable to the Consumer Class for showing the extent of damages to Class members.

228. I also note that at the time of drafting this report, Apple had produced the App Store transactions data from July 2008, when the App Store was launched, through the end of September 2019.[296] My calculations summarized in this section are based on this data. I understand that Apple will produce the App Store transactions data for more recent periods, and I reserve my right to update my calculations when such data become available.

229. To illustrate, by way of example, the methodology for quantifying the extent of damages here, I will focus on the three largest app categories, Games, Entertainment, and Music. I use the 0.1 percent random subsample (discussed above) to estimate equations (10) and (11)—the demand equations for Games and then, separately, for the Entertainment and Music categories combined.[297] The Games category is the largest app category, both in terms of the App Store revenues. From July 2008 to September 2019, the App Store revenues from the Games category amounted to ███████, accounting for ███████ of the total App Store revenues. The Entertainment category is the second largest app category in terms of the App Store revenue, closely followed by the Music category. However, the App Store revenues from these two categories amounted to ██████, accounting for █████ of the total App Store revenues during the same period. Applying my quantification methodologies to the other app categories is straightforward.

230. ████████████████████████████████████████████
████████████████████████████████████████████

---

[296] The produced App Store transactions data records the time of transactions in Epoch & Unix timestamp, i.e., seconds since January 1, 1970 in Universal Time Coordinated (UTC). All transactions occurred before October 1, 2019 in Pacific Standard Time except for some transactions that occurred in April 2020. I excluded the April 2020 transactions from my analysis and calculations.

[297] For the results presented in this section, I limit the data to the apps that were ever in the list of apps sorted by revenue that comprise 70 percent of revenue in a given category and year. So if an app was part of the top 70 percent revenue apps in one year, I include this app in all years. The 0.1 percent sample includes 78,509 apps in the Games, Entertainment, and Music categories that the Consumer Class in the 0.1 percent sample ever spent money on. Out of those apps, 1,926 are included in the estimation sample by satisfying this criteria.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.



231. Figure 15 summarizes demand estimates for the price coefficients and the effect of app downloads on IAP transactions for these two sets of app categories.[300] For the Games category, I estimate ████████████████████████ ████████████████ the app download and the IAP demand equations. I estimate the effect of ████████████████████ ██ ████████████████ ████████████████████ that more app downloads likely lead to more IAP transactions.

---



298 ████████████████████████████████████████████████

299 Pandora's gross margin ranged from 32 percent to 39 percent between 2017 and 2019, but the range was much wider, 32 percent to 56 percent, for 2013–2019.

300 ████████████████████████████████████████████████

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 15 ESTIMATION RESULTS**

| | Games | | Music and Entertainment | |
| --- | --- | --- | --- | --- |
| | Downloads | IAP | Downloads | IAP |
| Download Price | | | | |
| IAP Price | | | | |
| Log Downloads | | | | |
| Year-Month FEs | x | x | x | x |
| App FEs | x | | x | |
| IAP FEs | | x | | x |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Bootstrapping standard errors are reported in parenthesis. The app fixed effects and the year-month fixed effects are included as explanatory variables in the app download demand. The IAP-item fixed effects and the year-month fixed effects are included as explanatory variables in the IAP demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of IAP transactions in other genres for users who made an IAP transaction is included in as an explanatory variable in the IAP regression.

232. For the Entertainment and Music categories, I estimate the price coefficient to be negative and statistically significant at a 1 percent significance level for both the app download and the IAP demand equations. I estimate the effect of app downloads on IAP transactions, $\beta^Q$, to be positive but not statistically significant at a 10 percent significance level. Variable cost and margin estimates implied by the demand parameter estimates are summarized in Appendix E.2.

233. I then use the demand and cost estimates and the profit maximization conditions to estimate the But-For app and IAP prices that the Consumer Class would have paid at lower But-For commission rates. I apply a given But-For commission rate to each app developer's profit maximization conditions to find the But-For app and IAP prices that satisfy their profit maximization conditions at the new (But-For) commission rate. As explained in Section VI.D.1,

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

when the commission rate changes, app developers will change their app and in-app content prices because their current prices are no longer the profit maximizing prices. I use the estimated demand and costs and the profit maximization conditions to find their new prices that satisfy the profit maximization conditions. I summarize results for the 12 percent But-For commission rate here. Results for other But-For commission rates are summarized in Appendix E.4.

234. Figure 16 summarizes the estimated price effects ▆▆▆▆▆▆ But-For commission rate for the Games category. The figure shows that, generally, the Consumer Class would have paid lower retail prices and app developers would have received higher wholesale prices for the Games category in the But-For world. The median retail price difference (for the Consumer Class) ▆▆▆▆▆▆ for app downloads ▆▆▆▆▆▆ for IAPs. The median wholesale price difference (for app developers) ▆▆▆▆▆▆ for app downloads ▆▆▆▆▆▆ for IAPs.

**FIGURE 16 SUMMARY OF ESTIMATED PRICE EFFECTS: GAMES**

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Downloads* | | | | | |
| Retail Price (% Change) | | | | | |
| Wholesale Price (% Change) | | | | | |
| *In-App Purchases* | | | | | |
| Retail Price (% Change) | | | | | |
| Wholesale Price (% Change) | | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

235. Based on the estimated price effects, I estimate ▆▆▆▆▆▆ of the excessive App Store commission from the Games category was borne by the Consumer Class, while ▆▆▆▆▆▆ was borne by app developers.[301] In other words, the Consumer Class ▆▆▆▆▆▆ of

---

[301] The excessive App Store commission is the difference between the Apple App Store commission in the As-Is world and the But-For world. The proportion of the excessive App Store commission borne by the Consumer Class is estimated as the difference between As-Is and But-For consumer spending at As-Is world quantities of downloads and IAPs divided by the excessive App Store commission. Similarly, the proportion borne by app developers is the difference between But-For and As-Is developer revenue net commission at As-Is quantities of downloads and IAPs divided by the excessive App Store commission.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

the burden of the App Store commission from the Games category, while app developers bore the ▮▮▮▮▮▮▮▮▮▮ of the burden.[302]

236. The amount that the Consumer Class overpaid for the Games category from July 2008 to September 2019 is estimated ▮▮▮▮▮▮▮▮ of the App Store's *total* commission revenues earned in this category in the 0.1 percent subsample.[303] Given that the App Store's total commission revenues from the Games category amount ▮▮▮▮▮▮▮▮ this period,[304] I estimate that the Consumer Class damages attributable to the Games category ▮▮▮▮▮ ▮▮▮▮▮.

237. Figure 17 summarizes the estimated price effects of the 12 percent But-For commission rate for the Entertainment and Music category. The figure shows that, generally, the Consumer Class would have paid lower retail prices and app developers would have received higher wholesale prices for the Entertainment and Music categories in the But-For world. The median retail price difference (for the Consumer Class) is -10.6 percent for app downloads and -9.6 percent for IAPs. The median wholesale price difference (for app developers) is 11.8 percent for app downloads and 11.2 percent for IAPs.

238. Based on the estimated price effects, I estimate that the Consumer Class bore 81.9 percent of the burden of the App Store commission from the Entertainment and Music categories, while app developers bore the remaining 18.1 percent of the burden.

---

[302] This estimated incidence of the burden of the App Store commission is very similar to the real-world examples discussed in Section VI.B above: I calculated that 83 percent of the burden is borne by consumers in the example of CBS All-Access pricing $1 more on iOS vs. Apple TV, where they faced a flat 15 percent commission. I also calculated that 77 percent (or higher) of the burden is borne in the European Commission's stated finding for music streaming services, where the EC found prices were typically 12.99 on iOS versus 9.99 in channels without the commission.

[303] The amount that the Consumer Class overpaid is calculated by multiplying the difference between the As-Is price and the But-For price by the number of paid downloads and IAP transactions.

[304] The App Store's total commission revenues from the Games category is calculated as the difference between total App Store revenues and total royalties paid to app developers, using the App Store transactions data. See workpapers.

[305] I can also estimate the Consumer Class damages more precisely using the methodologies described in Section VI.F.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 17 SUMMARY OF ESTIMATED PRICE EFFECTS: ENTERTAINMENT AND MUSIC**

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Downloads* | | | | | |
| Retail Price (% Change) | -9.4% | 7.5% | -15.5% | -10.6% | -1.1% |
| Wholesale Price (% Change) | 13.2% | 9.0% | 6.0% | 11.8% | 23.1% |
| *In-App Purchases* | | | | | |
| Retail Price (% Change) | -6.3% | 11.8% | -14.3% | -9.6% | -2.3% |
| Wholesale Price (% Change) | 15.8% | 15.2% | 5.6% | 11.2% | 22.2% |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

239.  The amount that the Consumer Class overpaid for the Entertainment and Music categories from July 2008 to September 2019 is estimated to be 42.4 percent of the App Store's total commission revenues earned in these two categories.[306] Given that the App Store's total commission revenues from these categories amount to ▮▮▮▮▮ for this period,[307] I estimate that the Consumer Class damages attributable to the Entertainment and Music categories to be ▮▮▮ ▮▮▮.[308]

240.  I note that there are a relatively small number of apps for which either download or IAP prices are estimated to increase somewhat in the But-For world. These are mostly low price apps and in-app purchases. This is because the As-Is price they charge is "too low" for the estimated price elasticities, meaning that they could have made more money by charging higher prices but they did not. This could happen if they have other revenue sources such as advertising. In such cases, their variable cost estimates would be negative as they include the omitted revenues. These instances are easily identifiable from the cost estimates.

---

[306]  The amount that the Consumer Class overpaid is calculated by multiplying the difference between the As-Is price and the But-For price by the number of paid downloads and IAP transactions.

[307]  The App Store's total commission revenues from the Entertainment and Music categories is calculated as the difference between total App Store revenues and total royalties paid to app developers, using the App Store transactions data. See workpapers,

[308]  I can also estimate the Consumer Class damages more precisely using the methodologies described in Section VI.F.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

241. Importantly, however, the Consumer Class members typically purchased multiple apps, so they would be "uninjured" *only* if all they purchased are those for which the But-For price is higher than the As-Is price.[309] Because the App Store transactions data provide detailed transaction-level information, I can identify such Class members individually. Limiting my analysis to the sample used in simulating the But-For world for the Games, Entertainment, and Music categories, I estimate that ███████████████████ of the Consumer Class members spent money on only those apps and in-app content items whose But-For prices are higher at ██████ ██████ But-For commission rate.[310] However, these Consumer Class members could have spent money on apps in other categories that I have not analyzed. If they spent money on apps in these categories whose But-For price is estimated to be lower, they could be still injured by Apple's misconduct. More importantly, this estimation is limited to the App Store data that ends in September 2019. If these Consumer Class members spent money on apps whose But-For price is lower in the post September 2019 period, they could be still injured.

242. I limit my damages calculation to the Consumer Class, although non-Class members, iOS device consumers who never paid to download apps or make IAPs, are also harmed by the supra-competitive App Store commission. If the App Store commission had been set at a competitive level, the price of app and in-app content would have been lower, and some iOS device consumers who never paid to download apps or make IAPs at their historical prices would have downloaded some paid apps or made IAPs at the reduced But-For prices. Thus, my damages estimates are conservative.

243. My damages estimates are conservative in another respect. In addition to the harm resulting from the App Store commission elevating app and IAP prices above the competitive level, Apple harms consumers by suppressing output of apps and in-app content. First, the Apple App Store is the only app store, which makes it hard for iOS device consumers to discover apps. In a

---

[309] If a consumer spent money on an app whose But-For price is lower and another app whose But-For price is higher, I can calculate the net impact of these two apps.

[310] ████████████ of the Consumer Class accounts ████████████ of the App Store revenues attributable to the Consumer Class included in the But-For simulation analysis. As explained above, the sample used in estimating the model is limited to the top 70 percent revenue apps, but it is unlikely that But-For simulation results significantly differ if the sample includes the bottom 30 percent revenue apps. The price distribution is similar between the top 70 percent revenue apps and the bottom 30 percent revenue apps, as shown in Figure 27. Given that the But-For price increase is associated with low price apps and in-app purchases, I do not expect my assessment of the size of the uninjured Class members to change significantly.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

competitive But-For world, there could be app stores specialized in certain categories, e.g., games and music, helping iOS device consumers find apps they need. Second, Apple's commission shrinks app developers' profits, which makes it harder for some app developers to have viable businesses. In a competitive But-For world, there would be more apps available for iOS device consumers.

244. I do not include these additional harms in my damages model at this time. I limit my analysis to damages incurred due to overcharges on historically observed purchases. It is challenging to extend the analysis to include additional output effects without information showing how app developers make decisions regarding research and development (R&D) and product introductions, or information on how consumers would behave in a world with additional app products and innovations. I reserve the right to supplement my report if additional information comes to my attention that allows reliable analysis of these additional damage components.

June 1, 2021

I declare under penalty of perjury that the foregoing is true and correct

_Daniel McFadden_

_____

Daniel McFadden

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX A CURRICULUM VITAE OF DANIEL MCFADDEN

**Professor Daniel McFadden** is a Principal with The Brattle Group, which provides consulting services and expert testimony on economic, finance, regulatory and strategic issues to corporations, law firms and public agencies worldwide.

Professor Daniel McFadden, recipient of the 2000 Nobel Prize in Economics, is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the founding director of its Econometrics Laboratory. He is also the Presidential Professor of Health Economics at the University of Southern California, where he has joint appointments at the USC Sol Price School of Public Policy and the Department of Economics at USC Dornsife College. Previously, he was the James R. Killian Professor of Economics at MIT, the Irving Fisher Research Professor at Yale University, and the Fairchild Distinguished Scholar at the California Institute of Technology. He was awarded the Nobel Prize for his numerous contributions to quantitative economic science and, in particular, his pioneering theoretical, methodological, and empirical work in the analyses of discrete choices. Dr. McFadden has received numerous other awards including the John Bates Clark Medal given every two years to the American economist under the age of forty who has made the most outstanding contribution to the field of economic science. Dr. McFadden received his Ph.D. in Economics from the University of Minnesota in 1962. There he also earned his B.S. in Physics, with high distinction, in 1957.

Dr. McFadden has also held the following academic appointments:

| | |
|---|---|
| 2014- | Presidential Professor of Health Economics, University of Southern California |
| 1996- | Director, Econometrics Laboratory, University of California, Berkeley |
| 1995-1996 | Chair, Department of Economics, University of California, Berkeley |
| 1991-1995 | Director, Econometrics Laboratory, University of California, Berkeley |
| 1990- | E. Morris Cox Chair, University of California, Berkeley |
| 1990- | Professor of Economics, University of California, Berkeley |
| 1990 | Sherman Fairchild Distinguished Scholar, California Institute of Technology |
| 1986-1991 | Director, Statistics Center, Massachusetts Institute of Technology |
| 1984-1991 | James R. Killian Chair, Massachusetts Institute of Technology |
| 1978-1991 | Professor of Economics, Massachusetts Institute of Technology |
| 1977-1978 | Irving Fisher Research Professor, Yale University |
| 1968-1979 | Professor of Economics, University of California, Berkeley |

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

| | |
|---|---|
| 1966-1967 | Visiting Associate Professor, University of Chicago |
| 1966-1968 | Associate Professor of Economics, University of California, Berkeley |
| 1963-1966 | Assistant Professor of Economics, University of California, Berkeley |
| 1962-1963 | Assistant Professor of Economics, University of Pittsburgh |
| 1961-1962 | Instructor, Economics, University of Minnesota |
| 1959-1960 | Research Assistant, Social Psychology, University of Minnesota |
| 1957-1958 | Instructor, Physics, University of Minnesota |

## Experience

Dr. McFadden has had a varied background in professional and public service.  Among his achievements are:

President, American Economic Association (AEA) (2005)

Chair, National Academy of Science (NAS) Section 54 Economic Sciences (2003- )

Chair, NAS Committee on Methods of Forecasting Demand and Supply of Doctoral Scientists and Engineers (1997-2000)

Advisory Committee, Journal of Applied Economics (1996- )

NAS Commission on Science, Engineering, and Public Policy (1995- )

Chair, AEA Committee on Electronic Publication (1994- )

Vice President, American Economics Association (1994)

NAS Committee on Behavioral and Social Sciences and Education (1989-1994)

Panel Study of Income Dynamics, Advisory Board (1988-1991)

Executive Committee, American Economics Association (1985-1987)

President, Econometric Society (1985)

Executive Committee, Econometric Society (1983-1986)

Council of the Econometric Society (1983-1986)

Vice President, Econometric Society (1983-1984)

NAS Committee on Energy Demand Modeling (1983-1984)

NAS Committee, Basic Research in the Social Sciences (1982-1987)

Chair, AEA Awards Committee (1981-1984)

Board of Directors, National Bureau of Economic Research (1980-1983)

Editor, Econometric Society Monographs (1980-1983)

Review Committee, California Energy Commission (1979)

Sloan Foundation Book Committee (1977-1979)

Executive Committee, Econometric Society (1978-1980)

Board of Editors, Transportation Research (1978-1980)

Associate Editor, Journal of Econometrics (1977-1978)

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Board of Directors, National Bureau of Economic Research (1976-1977)

Executive Committee, Transportation Research Board (1975-1978)

City of Berkeley, Coordinated Transit Project (1975-1976)

Advisory Committee on Transportation Models, Metropolitan Transportation Commission (1975)

Council of the Econometric Society (1974-1980)

Elected Member, Universities National Bureau (1974-1977)

Board of Editors, Journal of Mathematical Economics (1973-1977)

Board of Editors, American Economic Review (1971-1974)

Chair, NSF-NBER Conference, Economics of Uncertainty (1970- )

Economics Advisory Panel, National Science Foundation (1969-1971)

Editor, Journal of Statistical Physics (1968-1970)

**MIT - Related**

Committee on Curricula, 1990-91

Killian Award Committee, 1984

Center for Energy Policy Research, Program Board, 1983-84

Engineering Dean Search Committee, 1980-81

Provost's Committee on Statistics, 1979-80

CTS Advisory Board, 1978-79

**Berkeley – Related**

Director of Graduate Studies, 1994-95

IBER Advisory Committee, 1993-95 (Chair, 1994-95)

## Professional Affiliations

American Economics Association

The Econometric Society

American Statistical Association

Mathematical Association of America

Transportation Research Board

## Fellowships, Scholarships, Honors, and Awards

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Honorary Degree, University of Montreal (2004)

Honorary Degree, University College London (2003)

Richard Stone Prize in Applied Econometrics (2000-2001)

Nobel Prize in Economics (Joint Recipient) (2000)

Nemmers Prize in Economics, Northwestern University (2000)

American Agricultural Economics Association, Best Paper Prize (1994)

University of Chicago, LLD (1992)

Frisch Medal, Econometric Society (1986)

Elected to National Academy of Science (1981)

Outstanding Teacher Award, MIT (1981)

Fisher-Schultz Lecture, Econometrics Society (1979)

Elected to American Academy of Arts and Sciences (1977)

John Bates Clark Medal, American Economics Association (1975)

Elected Fellow, Econometrics Society (1969)

Ford Faculty Research Fellow (1966-1967)

Mellon Post-Doctoral Fellow (1962-1963)

Earhart Fellow (1960-1961)

Ford Foundation Behavioral Science Fellow (1958-1962)

## Publications

### Books and Monographs

Essays on Economic Behavior Under Uncertainty, with M. Balch and S. Wu (eds.), North Holland: Amsterdam, 1974.

Urban Travel Demand: A Behavioral Analysis, with T. Domencich, North Holland: Amsterdam, 1975. Reprinted by The Blackstone Company: Mount Pleasant, MI, 1996.

Production Economics: A Dual Approach to Theory and Applications, with M. Fuss (eds.), North Holland: Amsterdam, 1978.

Structural Analysis of Discrete Data with Econometric Applications, with C.F. Manski (eds.), MIT Press: Cambridge, MA, 1981.

Microeconomic Modeling and Policy Analysis: Studies in Residential Energy Demand, with T. Cowing, Academic Press: New York, 1984.

Preferences, Uncertainty, and Optimality: Essays in Honor of Leonid Hurwicz, with J. Chipman and M.K. Richter (eds.), Westview Press: Boulder, CO, 1990.

Handbook of Econometrics Vol IV, with R. Engle (eds.), North Holland: Amsterdam, 1994. Statistical Tools, manuscript in preparation.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Rationality and equilibrium, a symposium in honor of Marcel K. Richter, series: <u>Studies in Economic Theory</u>, vol. 26, with C.D Aliprantis, R.L. Matzkin, J.C. Moore,  N.C. Yannelis, (Eds.), Springer-Verlag: Berlin Heidelberg 2006.

"Contingent Valuation of Environmental Goods," with Kenneth Train, Elgar, 2017.

"Foundations of Stated Preference Elicitation," with M. Ben-Akiva and K. Train, NOW Press, April 2019.

## Articles

### Production Theory

"Constant Elasticity of Substitution Production Functions," Review of Economic Studies, 1963.

"A Review of 'Manufacturing Production Functions in the U.S., 1957: An Interindustry and Interstate Comparison of Productivity'," Journal of the American Statistical Association, March 1967.

"Cost, Revenue, and Profit Functions," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

" A Survey of Functional Forms in the Economic Analysis of Production," with M. Fuss and Y. Mundlak, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, Vol. I, 219-268, North Holland: Amsterdam, 1978.

"The General Linear Profit Function," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Flexibility Versus Efficiency in Ex Ante Plant Design," with M. Fuss, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Estimation Techniques for the Elasticity of Substitution and Other Production Parameters," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Measurement of the Elasticity of Factor Substitution and Bias of Technical Change," with P. Diamond and M. Rodriguez, in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Joint Estimation of Freight Transportation Decisions Under Nonrandom Sampling," with C. Winston and A. Boersch-Supan, in A. Daugherty (ed.), Analytical Studies in Transport Economics, 137-157, Cambridge University Press: Cambridge, 1985.

### Econometrics

"Conditional Logit Analysis of Qualitative Choice Behavior," in P. Zarembka (ed.), Frontiers in Econometrics, 105-142, Academic Press: New York, 1973.

"Comments on 'Estimation of a Stochastic Model of Reproduction: An Econometric Approach'," in N. Terleckyj (ed.), Household Production and Consumption, 139-145, National Bureau of Economic Research: New York, 1975.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"The Revealed Preferences of a Government Bureaucracy: Theory," The Bell Journal of Economics and Management Science, Autumn 1975.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," The Bell Journal of Economics and Management Science, No. 1, 55-72, Spring 1976.

"A Comment on Discriminant Analysis 'Versus 'Logit Analysis," Annals of Economic and Social Measurement, 1976.

"Quantal Choice Analysis: A Survey," Annals of Economic and Social Measurement, 1976.
" Econometric Models for Probabilistic Choice Among Products," The Journal of Business, 1980.

"Econometric Models of Probabilistic Choice," in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications, 198-272, MIT Press: Cambridge, MA, 1981.

"Alternative Estimators and Sample Designs for Discrete Choice Analysis," with C.F. Manski, in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications. 2-50, MIT Press: Cambridge, MA, 1981.

"Qualitative Response Models," in W. Hildenbrand (ed.), Advances in Econometrics: Invited Papers for the Fourth World Congress of the Econometric Society, Econometric Society Monograph, 1-37, Cambridge University Press: Cambridge, 1982.

"Specification Tests for the Multinomial Logit Model," with J. Hausman, Econometrica, September 1984.

"Econometric Analysis of Qualitative Response Models," in Z. Griliches and M. Intrilligator (eds.), Handbook of Econometrics, Elsevier: Amsterdam, 1984.

"Comment on Technical Problems in Social Experimentation: Cost versus Ease of Analysis," in J.A. Hausman and D.A. Wise (eds.), Social Experimentation, 214-219, National Bureau of Economic Research: Chicago, 1985.

"The Choice Theory Approach to Market Research," Marketing Science, Fall 1986.

"The Demand for Local Telephone Service: A Fully Discrete Model of Residential Calling Patterns and Service Choices," with K. Train and M. Ben-Akiva, The Rand Journal of Economics, Spring 1987.

"Regression-Based Specification Tests for the Multinomial Logit Model," Journal of Econometrics, 1987.

"What do Microeconometricians Really Do?" Proceedings of the American Statistical Association, 402-405, Business Statistics Section, 1987.

"Comment on Joel Horowitz and George Neumann, Semiparametric Estimation of Employment Duration Models," with A. Han, Econometric Reviews, 1987/1988.

"Econometric Modeling of Locational Behavior," Annals of Operations Research: Facility Location Analysis: Theory and Applications, 1989.

"A Method of Simulated Moments for Estimation of Discrete Response Models Without Numerical Integration," Econometrica, September 1989.

"Testing for Stochastic Dominance," in T. Formby and T.K. Seo (eds.), Studies in the Economics of Uncertainty, 113-134, Springer: New York, 1989.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Micro-simulation of Local Residential Telephone Demand Under Alternative Service Options and Rate Structures," with T. Atherton, M. Ben-Akiva, and K. Train, in A. de Fontenay, M. Shugard, and D. Sibley (eds.), Telecommunications Demand Modelling, 137-163, Elsevier: Amsterdam, 1990.

"Advances in Computation, Statistical Methods, and Testing of Discrete Choice Models," Marketing Letters, 1991.

"Efficient Estimation by Multinomial Approximation and Sequential Simulation," with W. Beckert and A. Eymann, Working Paper, July 1994.

"Large Sample Estimation and Hypothesis Testing," with W. Newey, in R. Engle and D. McFadden, (eds.) Handbook of Econometrics, North Holland: Amsterdam, 1994.

"Estimation by Simulation," with P. Ruud, The Review of Economics and Statistics, November 1994.

"Simulation of Multivariate Normal Rectangle Probabilities and Their Derivatives: Theoretical and Computational Results," with V. Hajivassiliou and P. Ruud, Journal of Econometrics, May-June 1996.

"Lectures on Simulation-Assisted Statistical Inference," presented at the EC-squared Conference, Florence, Italy, December 12, 1996.

"Estimation of Some Partially Specified Nonlinear Models," with C. Ai, Journal of Econometrics, January-February 1997.

"Modeling Methods for Discrete Choice Analysis," with M. Ben-Akiva, et al., Marketing Letters, July 1997.

"The Method of Simulated Scores with Application to Models of External Debt Crises," with V. Hajivassiliou, Econometrica, July 1998.

"Estimating Features of a Distribution from Binomial Data," with A. Lewbel, Working Paper, May 1997.

"Mixed MNL Models for Discrete Response," with K. Train, Working Paper, December 1996, revised November 1998.

"On Selecting Regression Variables to Maximize Their Significance," Working Paper, July 1998.

"Economic Choices," Nobel Lecture, December 2000.  American Economic Review, June 2001.

"Observational Studies: Choice-based sampling," forthcoming in International Encyclopedia of Social and Behavior Sciences, Vol. 2.1, Article 92, Elsevier Science: Amsterdam, 2001.

"Discrete Choice Models Incorporating Revealed Preferences and Psychometric Data," with T. Morikawa and M. Ben-Akiva, Econometric Models In Marketing, Vol. 16, 27-53, Elsevier Science: Oxford, 2002.

"Characteristics of Generalized Extreme Value Distributions," with M. Bielaire and D. Bolduc, Working Paper, April, 2003.

"Structural Simulation of Facility Sharing: Unbundling Policies and Investment Strategy in Local Exchange Markets," by Nauman Ilias, Paul C. Liu, Daniel L. McFadden, Lisa Wood, Glenn A. Woroch & William P. Zarakas, 2005.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Statistical Analysis of Choice Experiments and Surveys" with A. Bemmaor, F. Caro, J. Dominitz, B. Jun, A. Lewbel, R. Matzkin, F. Molinari, N. Schwarz, R. Willis and J. Winter, Marketing Letters, 16:3/4, 183-196, December 2005.

"Free Markets and Fettered Consumers". American Economic Research, 96:1, March 2006.

"The estimation of generalized extreme value models from choice-based samples", Transportation Research Part B: Methodological, Vol. 42, 4, 381-394, May 2008.

"Risk, Uncertainty and Discrete Choice Models", with A. de Palma, M. Ben-Akiva, D. Brownstone, C. Holt, T. Magnac, P. Moffatt, N. Picard, K. Train, P. Wakker, J. Walker, Marketing Letters, 19:3/4, 269-285, July 2008.

"Semiparametric Analysis", Quantile, no. 5, pp. 29-40, September 2008.

"Conditional Logit Analysis of Qualitative Choice Behavior", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 337-374, 2009.

"Maximal Uniform Convergence Rates in Parametric Estimation Problems", with Walter Beckert, Econometric Theory, Vol. 26, Issue 2, 469-500, April 2010.

"Choice probability generating functions", with M. Fosgerau and M. Bierlaire, Working Paper, August 2010.

"Estimating Features of a Distribution from Binomial Data" with Lewbel, A., Linton, O., Journal of Econometrics, Vol. 162, No. 2, pp. 170-88, June 2, 2011.

"Economic Juries and Public Project Provision," Journal of Econometrics, Vol. 166, No. 1, pp. 116-126, January 2012.

**Transportation**

"The Measurement of Urban Travel Demand," Journal of Public Economics, 303-328, 1974.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, Transportation Research Record: Travel Behavior and Values, No. 534, 24-37, 1975.

"The Mathematical Theory of Demand Models," in P. Stopher and A. Meyburg (eds.), Behavioral Travel-demand Models, 305-314, D.C. Heath and Co.: Lexington, MA, 1976.

"Demand Model Estimation and Validation," with A.P. Talvitie and Associates, Urban Travel Demand Forecasting Project, Final Report, Volume V, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Demographic Data and Policy Analysis," with S. Cosslett, G. Duguay, and W. Jung, Urban Travel Demand Forecasting Project, Final Report, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Quantitative Methods for Analyzing Travel Behaviour of Individuals: Some Recent Developments," in D. Hensher and P. Stopher (eds.), Behavioural Travel Modelling, 279-318, Croom Helm London: London, 1978.

"An Application of Diagnostic Tests for the Independence from Irrelevant Alternatives Property of the Multinomial Logit Model," with W. Tye and K. Train, Transportation Research Record: Forecasting Passenger and Freight Travel, No. 637, 39-46, Transportation Research Board, 1978.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Modelling the Choice of Residential Location," in A. Karlqvist, L. Lundqvist, F. Snickars, and J. Weibull (eds.), Spatial Interaction Theory and Planning Models, 75-96, North Holland: Amsterdam, 1978. Reprinted in J. Quigley (ed.), The Economics of Housing, Edward Elgar: London, 1997.

"The Goods/Leisure Tradeoff and Disaggregate Work Trip Mode Choice Models," with K. Train, Transportation Research, February 1978.

"The Theory and Practice of Disaggregate Demand Forecasting for Various Modes of Urban Transportation," in Emerging Transportation Planning Methods, U.S. Department of Transportation DOT-RSPA-DPB-50-78-2, August 1978. Reprinted in T.H. Oum, et al. (eds.), Transport Economics: Selected Readings, 51-80, Seoul Press: Seoul, 1995.

"Overview and Summary: Urban Travel Demand Forecasting Project," with F. Reid, A. Talvitie, M. Johnson, and Associates, The Urban Travel Demand Forecasting Project, Final Report, Volume I, Institute of Transportation Studies, University of California, Berkeley, June 1979.

"Measuring Willingness-to-Pay for Transportation Improvements" in T. Gärling, T. Laitila, and K. Westin (eds.) Theoretical Foundations of Travel Choice Modeling, 339-364, Elsevier Science: Amsterdam, 1998.

"Disaggregate Behavioral Travel Demand's RUM Side: A 30-Year Retrospective," forthcoming in The Leading Edge of Travel Behavior Research, Davide Heshner and J. King (eds.) Pergamon Press: Oxford, 2002.

"Interstate Wine Shipments and E-Commerce," Journal of Wine Economics, Vol. 1, No. 1, May 2006, pp. 3-6.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models", with F. Reid, Elgar Reference Collection. Classics in Planning Series, Vol. 2, pp. 191-204, 2006.

"The behavioral science of transportation", Transport Policy Volume 14, Issue 4, 269274, July 2007.

"The Measurement of Urban Travel", Classics in Planning, Vol. 7, pp. 69-94, 2007.

"Modelling the Choice of Residential Location", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 409-430, 2009.

"Is Vehicle Depreciation a Component of Marginal Travel Cost?" with D. Hang and K. Train, Journal of Transportation Economics and Policy, April 2016.

**Economic Growth and Development**

"Comment on 'An Optimum Fiscal Policy in an Aggregate Model of Economic Growth'," in I. Adelman and E. Thorbecke (eds.), The Theory and Design of Economic Development, 140-146, Johns Hopkins Press: Baltimore, MD, 1966.

"The Evaluation of Development Programmes," The Review of Economic Studies, 1967.

"On the Existence of Optimal Development Plans," in H. Kuhn (ed.) Proceedings of the Sixth Princeton Symposium on Mathematical Programming, 403-427, Princeton University Press: Princeton, NJ, 1970.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Criteria for Public Investment: Comment," The Journal of Political Economy, November/December 1972.

"On the Existence of Optimal Development Programmes in Infinite-Horizon Economies," in J. Mirrlees and N.H. Stern (eds.), Models of Economic Growth, 260-282, Macmillan: Great Britain, 1973.

"Is There Life After Debt? An Econometric Analysis of the Creditworthiness of Developing Countries," with R. Eckaus, G. Feder, V. Hajivassiliou, and S. O'Connell, in J. Cuddington and G. Smith, International Debt and the Developing Countries, 179-209, International Bank for Reconstruction and Development/The World Bank: Washington, D.C., 1985.

"Hot Money and Cold Comfort: Global Capital Movement and Financial Crises in Emerging Economies", Lecture, Latin American and Caribbean Economics Association ANEC Conference on Globalization and Development, 2004.

"Free Markets and Fettered Consumers", American Economic Review, Vol. 96, pp. 5-29, March 2006.

"100 Years of the American Economic Review: The Top 20 Articles", with K. Arrow, B. Bernheim, M. Feldstein, J. Poterba, R. Solow, American Economic Review, Vol. 101, pp. 1-8, February 2011.

## Economic Theory and Mathematical Economics

"On Hicksian Stability," in J.N. Wolfe (ed.), Value, Capital, and Growth, 329-351, University Press: Edinburgh, 1969.

"On the Controllability of Decentralized Macroeconomic Systems: The Assignment Problem," in H.E. Kuhn and P. Szego (eds.), Mathematical Systems Theory and Economics 1, 221-239, Springer-Verlag: New York, 1969.

"A Simple Remark on the Second Best Pareto Optimality of Market Equilibria" Journal of Economic Theory, June 1969.

"A Technical Note on Classical Gains from Trade," with J.M. Grandmont, Journal of International Economics, 1972.

"On Some Facets of Betting: Comments," in M.S. Balch, D. McFadden, and S.Y. Wu (eds.), Essays on Economic Behavior Under Uncertainty, 126-137, North-Holland: Amsterdam, 1974.

"Some Uses of the Expenditure Function in Public Finance," with P.A. Diamond, Journal of Public Economics, 1974.  Reprinted in J. Creedy (ed.), Measuring Welfare Changes and Tax Burdens, Edward Elgar: London, September 1998.

"A Characterization of Community Excess Demand Functions," with R. Mantel, A. Mas-Colell, and M.K. Richter, Journal of Economic Theory, 1974.

"An Example of the Non-Existence of Malinvaud Prices in a Tight Economy," Journal of Mathematical Economics, 1975.

"Tchebyscheff Bounds for the Space of Agent Characteristics," Journal of Mathematical Economics, 1975.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"On Efficiency and Pareto Optimality of Competitive Programs in Closed Multisector Models," with M. Majumdar and T. Mitra, Journal of Economic Theory, August 1976.

"Definite Quadratic Forms Subject to Constraint," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North-Holland: Amsterdam, 1978.

"Necessary and Sufficient Conditions for the Classical Programming Problem," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Convex Analysis," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"A Note on the Computability of Tests of the Strong Axiom of Revealed Preference," Journal of Mathematical Economics, 1979.

"Pareto Optimality and Competitive Equilibrium in Infinite Horizon Economies," with M. Majumdar and T. Mitra, Journal of Mathematical Economics, 1980.

"Welfare Analysis of Incomplete Adjustment to Climatic Change," in V.K. Smith and A. White (eds.), Advances in Applied Micro-economics, JAI Press: Greenwich, CT, 1984.

"Stochastic Rationality and Revealed Stochastic Preference," with M.K. Richter, in J. Chipman, D. McFadden, and M.K. Richter (eds.), Preferences, Uncertainty, and Optimality, Essays in Honor of Leo Hurwicz, 161-186, Westview Press: Boulder, CO, 1990.

"Consumers 'Evaluation of New Products: Learning from Self and Others," with K. Train, Journal of Political Economy, 1996.

"Economic Choice Behavior: Psychological Foundations and the Contributions of Amos Tversky," Working Paper, August 1996.

"Rationality for Economists," Working Paper presented at the NSF Symposium on Eliciting Preferences, July 1997. Forthcoming in Journal of Risk and Uncertainty, December 1999.

"Extended Framework for Modeling Choice Behavior," with M. Ben-Akiva, et al. Marketing Letters, Vol. 10, Issue 3, Kluwer, 187-203, August 1999.

"Pricing in a Competitive Market with a Common Network Resource," Working Paper, April 2003.

"Hybrid Choice Models: Progress and Challenges," with M. Ben-Akiva et. Al., Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Epilogue," Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Revealed Stochastic Preference: A Synthesis," Economic Theory, Springer, vol. 26(2), pages 245264, August 2005.

"Welfare Economics at the Extensive Margin Giving Gorman Polar Consumers Some Latitude," Working Paper, June 2004.

"The Misuse of Econometrics in Litigation," by Susan J. Guthrie, Paul C. Liu, Daniel L. McFadden and Kenneth T. Wise, ABA Monograph on Econometrics, Forthcoming, 2005.

"The Misuse of Econometrics in Estimating Damages," with Kenneth T. Wise, et. al. ABA monograph on Econometrics, 2005.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"The Browser War - Econometric Analysis of Markov Perfect Equilibrium in Markets with Network Effects," with Mark Jenkins et. al.  Presented at the American Economic Association Annual Meeting.  7-9 January 2005.  Philadelphia, PA.

"The Science of Pleasure: The Measurement of Consumer Welfare," Frisch Memorial Lecture, Plenary Session at the Econometric Society World Congress, upcoming, 19-24 August 2005, University College London.

"Rationality and Equilibrium: A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzkin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. viii, 252, April 2006

"Revealed Stochastic Preference: A Synthesis", Studies in Economic Theory, No. 26, pp. 1-20, 2006.

Foreward to '"Rationality and Equilibrium – 'A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. v-vi, 2006.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, vol. 30, no. 3, 379-85, Fall 2008.

"The Revealed Preferences of a Government Bureaucracy: Theory", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 375-390, 2009.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 391-408, 2009.

"100 Years of the American Economic Review: The Top 20 Articles," Arrow, K.J., Bernheim, B.D., Feldstein, M.S., Poterba, J. M., Solow, R.M., American Economic Review, Vol. 101, No. 1, pp. 1-8, February 2011.

"Choice Probability Generating Functions", Bierlaire, M., Fogerau, M., NBER Working Paper Series, No. 17970, 2012.

## Energy

"Forecasting the Impacts of Alternative Electricity Rate Structures: A Feasibility Study," Final Report, California Energy Commission, 1976.

"Determinants of the Long-Run Demand for Electricity," with C. Puig and D. Kirshner, Proceedings of the American Statistical Association, 1978.

"A Two-Level Electricity Demand Model," with J. Hausman and M. Kinnucan, Journal of Econometrics, 1979.

"Residential Energy Demand Modeling and the NIECS Data Base: An Evaluation," with T. Cowing and J. Dubin, Report No. MIT-EL-82-009, MIT Energy Laboratory, January 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The ORNL Model," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-032WP, MIT Energy Laboratory, April 1982.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The REEPS Model," with T. Cowing, Discussion Paper No. MIT-EL 82-057WP, MIT Energy Laboratory, April 1982.

"An Evaluation of the ORNL Residential Energy Use Model," EPRI Report EA-2442, Electronic Research Institute: Palo Alto, June 1982.

"The NIECS Data Base and Its Use in Residential Energy Demand Modeling," with T. Cowing and J. Dubin, Discussion Paper No. MIT-EL-82-041WP, MIT Energy Laboratory, June 1982.

"A Thermal Model for Single-Family Owner-Occupied Detached Dwellings in NIECS," with J. Dubin, Discussion Paper No. MIT-EL-040WP, MIT Energy Laboratory, June 1982.

"A Comparative Evaluation of the ORNL and REEPS Models of Residential Energy Demand for Forecasting Residential Energy Policy Impacts," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-061WP, MIT Energy Laboratory, July 1982.

"Residential End-Use Energy Planning System (REEPS)," with A. Goett, EPRI Report EA-2512, Electronic Power Research Institute: Palo Alto, July 1982.

"An Econometric Analysis of Residential Electric Appliance Holdings and Consumption," with J. Dubin, Econometrica, March 1984.

"The Residential End-Use Energy Planning System: Simulation Model Structure and Empirical Analysis," with A. Goett, in J. Moroney (ed.), Advances in the Economics of Energy and Resources, JAI Press: Greenwich, CT, 1984.

"Consumer Attitudes and Voluntary Rate Schedules for Public Utilities," with K. Train and A. Goett, the Review of Economics and Statistics, August 1987.

"Estimating Household Value of Electric Service Reliability with Market Research Data," with A. Goett and C-K. Woo, Energy Journal: Special Electricity Reliability Issue, 1988.

"A theory of the perturbed consumer with general budgets", with M. Fogeraru, NBER Working Paper Series, No. 17953, 2012.

## Health Economics

"Estimation of Response Probabilities from Augmented Retrospective Observations," with D. Hsieh and C. Manski, Journal of the American Statistical Association, No. 391, 651-662, September 1985.

"The Dynamics of Housing Demand by the Elderly: Wealth, Cash Flow, and Demographic Effects," with J. Feinstein, in D. Wise (ed), The Economics of Aging, 55-91, University of Chicago Press: Chicago, 1989.

"The Dynamics of Housing Demand by the Elderly: User Cost Effects," with C. Ai, J. Feinstein, and H. Pollakowski, in D. Wise (ed.), Issues in the Economics of Aging, 33-87, University of Chicago Press: Chicago, 1990.

"Problems of Housing the Elderly in the United States and Japan," in Y. Noguchi and D. Wise (eds.), Aging in the United States and Japan, 109-137, University of Chicago Press: Chicago, 1994.

"Demographics, the Housing Market, and the Welfare of the Elderly," in D. Wise (ed.), Studies in the Economics of Aging, 225-285, University of Chicago Press: Chicago, 1994.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Living Arrangements: Health and Wealth Effects," with A. Boersh-Supan and R. Schnabel, in D. Wise (ed.), Advances in the Economics of Aging, 193-216, University of Chicago Press: Chicago, 1996.

"Comment on 'Elderly Health, Housing, and Mobility'," in D. Wise (ed.), Advances in the Economics of Aging, 317-320, University of Chicago Press: Chicago, 1996.

"The Impact of Demographics on Housing and Nonhousing Wealth in the United States," with H. Hoynes, in M. Hurd and N. Yashiro (Eds.), The Economic Effects of Aging in the United States and Japan, 153-194, University of Chicago Press: Chicago, 1997.

"Subjective Survival Curves and Life Cycle Behavior," with M. Hurd and L. Gan, in D. Wise (ed.), Inquiries in the Economics of Aging, 259-305, University of Chicago Press: Chicago, 1998.

"Consumption and Savings Balances of the Elderly: Experimental Evidence on Survey Response Bias," with M. Hurd, et al., in D. Wise (ed.), Frontiers in the Economics of Aging, 353-387, University of Chicago Press: Chicago, 1998.

"Healthy, Wealthy, and Wise? Socioeconomic Status, Morbidity, and Mortality among the Elderly," with M. Hurd and A. Merrill, Working Paper, April 1998.

"Predictors of Mortality Among the Elderly," with M. Hurd and A. Merill, working paper, December 1999.  Forthcoming in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

"Comment on Incentive Effects of Social Security Under an Uncertain Disability Option," in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

"Response Behavior in Surveys of the Elderly: Experimental Evidence from Internet Surveys" with Joachim Winter, Conference Draft, March 2001.

"Healthy, Wealthy, and Wise? Tests for Direct Causal Paths between Health and Socioeconomic Status", with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal of Econometrics, Vol 112, Issue 1, 3-56, 2003.

"Response," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal Of Econometrics, Vol 112, Issue 1, 129-133, 2003.

"Individual Subjective Survival Curves", with L. Gan and M. Hurd, NBER Working Paper No. 9480, January 2003.

"Subjective Mortality Risk and Bequests", with L. Gan, G. Gong and M. Hurd, NBER Working Paper No. 10789, September 2004.

"Broken Down by Work and Sex: How Our Health Declines: Comment, Analyses in the Economics of Aging, pp. 205-12, 2005.

"Medicare prescription drug coverage: Consumer information and preferences", with  J. Winter, R. Balza, F. Caro, F. Heiss, B. Jun and R. Matzkin, Proceedings of the National Academy of Sciences, May 2006.

"Who Failed to Enroll in Medicare Part D, and Why? Early Results", with J. Winter and F. Heiss. Health Affairs, doi: 10.1377/hlthaff.25.w344, August 2006.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with J. Winter and F. Heiss, Working Paper, November, 2007.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"ConsumerDirected Health Care: Can Consumers Look After Themselves?", with J. Winter and F. Heiss, Swiss Journal of Economics and Statistics, 144(3), 285307 July, 2008.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, Vol. 30, Issue 3, pp. 379-385, October 2008.

"Want to Monitor Medicare's New Drug Benefit Program? Start by Sending a Check for $120,000", Economists 'Voices, vol. 5, no. 4, 2008.

"The Human Side of Mechanism Design, A Tribute to Leo Hurwicz and JeanJacque Laffont," Review of Economic Design, 13, (1), 77-100 & 377, 2009.

"Regulation of private health insurance markets: Lessons from enrollment, plan type choice, and adverse selection in Medicare Part D", with J. Winter and F. Heiss, NBER Working Paper 15392, October 2009.

"The Impact of Employer Matching on Savings Plan Participation under Automatic Enrollment: Comment, Research Findings" in The Economics of Aging, pp. 327-35, 2010.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with F. Heiss, J. Winter, Research Findings in the Economics on Aging, pp. 413-481, 2010.

"Healthy, Wealthy and Wise?" Revisited: An Analysis of the Causal Pathways from Socio-economic Status to Health," with Stowasser, T., Heiss, F., Winter, J., National Bureau of Economic Research, Inc, NBER Working Papers: 17273, 2011.

"Remedies for Sick Insurance", with C. Noton, P. Olivella, **SERIEs** Vol. 6, Iss. 3, (August 2015): 247-278.

"Plan Selection in Medicare Part D: Evidence from Administrative Data", with F. Heiss, A, Leive, J. Winter, NBER Working Paper Series, No. 18166, 2012.

"The New Science of Pleasure", NBER Working Paper Series, No. 18687, 2013.

**Environmental Economics**

"Assessing Use Value Losses Caused by Natural Resource Injury," with J.A. Hausman and G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 341-363, North Holland: Amsterdam, 1993.

"Issues in the Contingent Valuation of Environmental Goods: Methodologies for Data Collection and Analysis," with G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 165-208, North Holland: Amsterdam, 1993.

"Contingent Valuation and Social Choice," American Journal of Agricultural Economics, November 1994.

"A Utility-consistent, Combined Discrete Choice and Count Data Model Assessing Recreational Use Losses Due to Natural Resource Damage," with J. Hausman and G. Leonard, Journal of Political Economics, 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation, " by Susan J. Guthrie, Daniel L. McFadden and Kenneth T. Wise, at the 88th Annual Meeting of the Air and Waste Management Association, 1995.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

"Why is Natural Resource Damage Assessment So Hard?," Hibbard Lecture, Agricultural and Resource Economics, University of Wisconsin, Madison, May, 1996.

"Measuring Environmental Injury in the Presence of Confounding Risks," Working Paper, May 1996.

"On the Analysis of Endogenously Recruited Panels," Working Paper, February 1997.

"Can Meta-analyses of CV Studies Determine Their Reliability?" Working Paper, October 1997.

"Referendum Contingent Valuation, Anchoring, and Willingness to Pay for Public Goods," with D. Green, K. Jacowitz, and D. Kahneman, Resource and Energy Economics, 1998.

"Computing Willingness-to-Pay in Random Utility Models," in J. Moore, R. Riezman, and J. Melvin (eds.), Trade, Theory and Econometrics: Essays in Honour of John S. Chipman, Routledge, forthcoming January 1999.

"Comment on Discussion of Morey and Waldman's 'Measurement Error in Recreation Demand Models,'" with K. Train and R. Johnson, Journal of Environmental Economics and Management, Vol. 40, pp. 76-81 (2000).


## Expert Testimony and Consulting (2017-Present)

I submitted an expert report (August 14, 2017), and a supplemental report (September 22, 2017) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (March 1, 2018) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (April 10, 2018) on behalf of General Motors, Inc., In Re: General Motors LLC, Ignition Switch Litigation, United States District Court for the Southern District of New York, Case No. 14-MD-2543 (JMF).

I was retained for a class of insurance subscribers who allege an antitrust injury by a consortium of insurers who maintain horizontal agreements that allocate markets and limit competition.

I submitted expert reports on behalf of defendant Polaris Industries Inc. in the matter of Riley Johanssohn et al. v. Polaris Industries No. 0:16-cv-03348-PJS-LIB on January 31, 2019, April 25, 2019 and August 1, 2019.

I was deposed (February 25, 2019 and May 22, 2019) on behalf of Polaris.

I submitted an expert reports on behalf of the Consumer Financial Protection Bureau in the matter of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on August 15, 2019, and November 14, 2019.

I was deposed on behalf of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on February 4, 2020.

I submitted an expert report and testified on behalf of a class of European air freight shippers in an anti-trust matter involving overcharges by airlines serving European markets, June 2020.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

I submitted an expert report on behalf of Mondelez and was deposed in a matter involving deceptive labeling, in the case of McMorrow v. Mondelez, July 2020.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX B MATERIALS RELIED UPON

**Case Materials**

*In re Apple iPhone Antitrust Litigation*, Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, No. C 11-06714-YGR, September 11, 2020.

Deposition of Aashish Patel, *In Re Apple iPhone Antitrust Litigation*, February 11, 2021.

Deposition of Adrian Ong, *In Re Apple iPhone Antitrust Litigation*, February 24, 2021.

Despositon of Eric Gray, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021.

Deposition of Mark Rollins, *In Re Apple iPhone Antitrust Litigation*, February 11, 2021.

Deposition of Matthew Fischer, Volume II, *In Re Apple iPhone Antitrust Litigation*, December 18, 2020.

Deposition of Ron Okamoto, Volume 1, *In Re Apple iPhone Antitrust Litigation*, December 16, 2020.

Deposition of Scott Forstall, Volume 1, *In Re Apple iPhone Antitrust Litigation*, March 8, 2021.

Deposition of Timothy Cook, Volume 1, *In Re Apple iPhone Antitrust Litigation*, February 12, 2021.

Trial Testimony of Timothy Cook, *Epic Games, Inc. v. Apple, Inc*., No. C-20-5640 YGR, May 21, 2021.

Expert Report of Dr. David S. Evans, *Epic Games, Inc. v. Apple Inc*., February 16, 2021.

Rebuttal Expert Report of Francine Lafontaine, Ph.D. *Epic Games, Inc. v. Apple Inc*., March 15, 2021.

Letter from Ethan Dettmer to Class Plaintiffs, "Re: *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.)," May 5, 2021.

Letter from Eli Lazarus to Class Plaintiffs, "Re: *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR Data Discovery," October 12, 2020, and its attachment "App Store Antitrust -- Transactional Data Value Descriptions.pdf".

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**Produced Documents**

APL-APPSTORE_00045455

APL-APPSTORE_02021805

APL-APPSTORE_04685284

APL-APPSTORE_04685286

APL-APPSTORE_05442596

APL-APPSTORE_06199518

APL-APPSTORE_06199519

APL-APPSTORE_06199520

APL-APPSTORE_06492312

APL-APPSTORE_06901903

APL-APPSTORE_08856864

APL-APPSTORE_08883133

APL-APPSTORE_09530080

APL-APPSTORE_09530758

APL-APPSTORE_09653606

APL-APPSTORE_09654412

APL-APPSTORE_09704302

APL-APPSTORE_09811613

APL-APPSTORE_09924671

APL-APPSTORE_09958590

APL-APPSTORE_10170515

APL-APPSTORE_10175693

APL-APPSTORE_10176241

APL-APPSTORE_10195170

APL-APPSTORE_10199030

APL-APPSTORE_10305331

APL-APPSTORE_10332891

APL-APPSTORE_10334265

APL-EG_05451569

APL-EG-05464015

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

APL-EG_06358327

APL-EG_06596363

APL-EG_07245574

APL-EG_08240013

APL-EG_08926412

APL-EG_09249976

APL-EG_09289728

APL-EG_01832041

APL-EG_00483489

EPIC_00579538

EPIC_02030347

EPIC_03349875

MATCH-00000001

MATCH-00000008

MATCH-00000015

MATCH-00000024

MATCH-00000031

MATCH-00000039

PANDORA_000001

PG 000039-PG 000055

PG 000124-PG 000201

Req 5&6_PG Server Costs_05.10.21.xlsx

PLAYTIKA_000007

PLAYTIKA_000004

SPOT-APPLE-00000008

SPOT-APPLE-00000015


**Publicly Available**

Abigail Ng. "Smartphone users are waiting longer before upgrading — here's why." *CNBC*. Accessed May 17, 2021. https://www.cnbc.com/2019/05/17/smartphone-users-are-waiting-

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

longer-before-upgrading-heres-why.html#:~:text=In%20the%20U.S.%20and%20Europe%2C%20especially%2C%20the%20life%20cycle%20of,number%20had%20increased%20to%202024.7.

Adikteev "Home Page" Accessed May 29, 2021. https://www.adikteev.com/.

Alex Clough. "The technology behind Pokémon Go." *16i*. July 22, 2016. Accessed May 21, 2021. https://www.16i.co.uk/m-journal/the-technology-behind-pokemon-go/.

Amazon Web Services. "Epic Games Delivers Entertainment Experiences at Global Scale on AWS." Accessed May 29, 2021. https://aws.amazon.com/solutions/case-studies/epic-games/?did=cr_card&trk=cr_card.

Amazon Web Services. "Netflix on AWS." Accessed May 29, 2021. https://aws.amazon.com/solutions/case-studies/netflix/.

Amazon Web Services. "Supercell Case Study." Accessed May 29, 2021. https://aws.amazon.com/solutions/case-studies/supercell/.

Amazon Web Services. "Wildlife Studios Optimizes for Cloud Cost Efficiency, Gaining Competitive Advantage in Gaming Industry." Accessed May 29, 2021. https://aws.amazon.com/solutions/case-studies/wildlife-studios-cost-management/?did=cr_card&trk=cr_card.

Andrew Cunningham. "iPhone vs. Android: Which Is Better for You?." *New York Times*. Updated January 21, 2021. Accessed May 24, 2021. https://www.nytimes.com/wirecutter/reviews/ios-vs-android/.

Andrew Webster. "Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees." *The Verge*. August 13, 2020. Accessed May 26, 2021. https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android.

Anindya Ghose and Sang Pil Han. "Estimating Demand for Mobile Applications in the New Economy." *Management Science* 60(6) (2014): 1351-1616.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Apple. "About the security content of iOS 12.4.1." August 26, 2019. Accessed May 18, 2021. https://support.apple.com/en-us/HT210549.

Apple. "Apple announces App Store Small Business Program." November 18, 2020. Accessed May 18, 2021. https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.

Apple. "Apple Developer Enterprise Program." Accessed May 18, 2021, https://developer.apple.com/programs/enterprise/.

Apple. "App Store Review Guidelines." Accessed May 21, 2021. https://developer.apple.com/app-store/review/guidelines/.

Apple. "Auto-renewable Subscriptions." Accessed May 18, 2021. https://developer.apple.com/app-store/subscriptions/.

Apple. "Beta Testing Made Simple with Testflight." Accessed May 18, 2021. https://developer.apple.com/testflight/.

Apple. "Choosing a Category." Accessed May 30, 2021. https://developer.apple.com/app-store/categories/.

Apple. "Choosing a Membership." Accessed May 21, 2021. https://developer.apple.com/support/compare-memberships/.

Apple. "Deregister iMessage on your iPhone or online." Accessed May 24, 2021. https://support.apple.com/en-us/HT203042.

Apple. "Distributing Custom Apps." Accessed May 24, 2021. https://developer.apple.com/custom-apps/.

Apple. "How to find saved passwords on your iPhone." Accessed May 18, 2021. https://support.apple.com/en-us/HT211146.

Apple. "iCloud." Accessed May 24, 2021. https://www.apple.com/icloud/.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Apple. "Introducing Search Ads Basic." December 5, 2017. Accessed May 21, 2021. https://developer.apple.com/news/?id=12052017a.

Apple. "iOS Team Administration Guide: Distributing an App." Accessed May 21, 2021. https://developer.apple.com/library/archive/documentation/ToolsLanguages/Conceptual/DevPortalGuide/DistributinganApp/DistributinganApp.html.

Apple. "Letter from Tim Cook to Apple investors." press release. January 2, 2019. Accessed May 24, 2021. https://www.apple.com/newsroom/2019/01/letter-from-tim-cook-to-apple-investors/.

Apple. "Unauthorized modification of iOS can cause security vulnerabilities, instability, shortened battery life, and other issues." June 15, 2018. Accessed May 18, 2021. https://support.apple.com/en-us/HT201954.

Apple Inc. v. Pepper, et al. 139 S. Ct. 1514 (2019). Accessed May 17, 2021. https://www.supremecourt.gov/opinions/18pdf/17-204_bq7d.pdf.

Alonzo Canada. "Take A Lesson from Apple: A Strategy to Keep Customers in Your Ecosystem." Forbes. November 12, 2012. Accessed May 18, 2021. https://www.forbes.com/sites/jump/2012/11/12/take-a-lesson-from-apple-a-strategy-to-keep-customers-in-your-ecosystem/?sh=4f5613f13de8.

Amazon Web Services. "Amazon GameLift Pricing." Accessed May 29, 2021. https://aws.amazon.com/gamelift/pricing/.

Aral Balkan. "Apple just killed Offline Web Apps while purporting to protect your privacy: why that's A Bad Thing and why you should care." March 25, 2020. Accessed May 21, 2021. https://ar.al/2020/03/25/apple-just-killed-offline-web-apps-while-purporting-to-protect-your-privacy-why-thats-a-bad-thing-and-why-you-should-care/.

Austan Goolsbee and Chad Syverson. "How Do Incumbents Respond to the Threat of Entry? Evidence from the Major Airlines." The Quarterly Journal of Economics 123(4) (2008): 1611-1633.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Aviv Nevo. "Measuring market power in the ready-to-eat cereal industry." *Econometrica*. 69(2) (March 2001): 307-342.

Ben Lovejoy. "iOS and Android loyalty levels higher than ever; Android just ahead for now." *9To9Mac*. January 29, 2019. Accessed May 19, 2021. https://9to5mac.com/2019/01/28/ios-android-loyalty/.

Bloomberg. "Spotify Technology SA (SPOT US) - By Segment, Q1 2016 – Q4 2020."

Bridget Poetker. "Native vs Mobile Apps: Which is the Better Option?." *Learn Hub*. February 25, 2019. Accessed May 21, 2021. https://learn.g2.com/web-apps-vs-mobile-apps.

Carrie Marshall. "How to switch from iPhone to Android." *TechRadar*. April 2021. Accessed May 24, 2021. https://www.techradar.com/how-to/how-to-switch-from-iphone-to-android.

Casey Johnston. "Clash of Clans Proves That Our Impatience Is Worth Billions." *The New Yorker*. June 24, 2016. Accessed May 29, 2021. https://www.newyorker.com/business/currency/clash-of-clans-proves-that-our-impatience-is-worth-billions.

Chris Foresman. "Apple opens in-app purchasing for free iPhone apps." *arsTechnica*. October 15, 2009. Accessed May 18, 2021. https://arstechnica.com/gadgets/2009/10/apple-opens-in-app-purchasing-for-free-iphone-apps/.

Chris Hoffman. "What to Do If You Can't Receive Text Messages From iPhone Users." *How-To Geek*. July 11, 2017. Accessed May 24, 2021. https://www.howtogeek.com/252100/what-to-do-if-you-cant-receive-text-messages-from-iphone-users/.

Chris Welch. "Netflix stops offering in-app subscriptions for new and returning customers on iOS." *The Verge*. December 28, 2018. Accessed May 31, 2021. https://www.theverge.com/2018/12/28/18159373/netflix-in-app-subscriptions-iphone-ipad-ios-apple.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Christine Elgersma. "Everything you need to know about Snapchat." *phys.org*. June 18, 2018. Accessed May 21, 2021. https://phys.org/news/2018-06-snapchat.html.

Clearbridge Mobile. "5 Key Benefits of Native Mobile App Development." Accessed May 19, 2021. https://clearbridgemobile.com/benefits-of-native-mobile-app-development/.

Competition and Markets Authority. "CMA investigates Apple over suspected anti-competitive behaviour." Press Release. March 4, 2021. Accessed May 21, 2021. https://www.gov.uk/government/news/cma-investigates-apple-over-suspected-anti-competitive-behaviour.

comScore. "Global State of Mobile." 2019.

comScore. "Subscriber share held by smartphone operating systems in the United States from 2012 to 2021." Chart. April 9, 2021. *Statista*. Accessed April 27, 2021. https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

comScore. "Tablet operating systems market share in the United States from 2016 to 2021." Chart. March 22, 2021. *Statista*. Accessed April 27, 2021. https://www.statista.com/statistics/271293/market-share-held-by-tablet-os-us/.

Daisuke Wakabayashi. "Google Demands 30% Cut From App Developers in Its Play Store." *The New York Times*. September 28, 2020. Accessed June 1, 2021. https://www.nytimes.com/2020/09/28/technology/google-play-store-30-percent.html.

Damien Geradin and Dimitrios Katsifis. "The antitrust case against the Apple App Store." TILEC Discussion Paper No. DP2020-039, April 22, 2020. Accessed May 30, 2021. https://ssrn.com/abstract=3583029.

Dieter Bohn. "Fortnite for Android has also been kicked off the Google Play Store." *The Verge*. August 13, 2020. Accessed May 24, 2021. https://www.theverge.com/2020/8/13/21368079/fortnite-epic-android-banned-google-play-app-store-rule-violation.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Dieter Bohn and Tom Warren. "Why the bad iPhone web app experience keeps coming up in Epic v. Apple." *The Verge*. May 6, 2021. Accessed May 30, 2021. https://www.theverge.com/2021/5/6/22421912/iphone-web-app-pwa-cloud-gaming-epic-v-apple-safari.

Discord. "Sell Your Game." Accessed May 30, 2021. https://discord.com/sell-your-game.

Discord Blog. "Empowering Developers with Community and Commerce." March 14, 2019. Accessed May 30, 2021. https://blog.discord.com/empowering-developers-with-community-and-commerce-68d9c0712662.

Discord blog. "The Discord Store Beta." August. 9, 2018. Accessed May 30, 2021. https://blog.discord.com/the-discord-store-beta-9a35596fdd4.

Discord Blog. "Why not 90/10?." December 14, 2018. Accessed May 30, 2021. https://blog.discord.com/why-not-90-10-3761ebef4eab.

Dylan Love. "The Latest Jailbreak Statistics Are Jaw-Dropping." *Business Insider*. March 2, 2013. Accessed May 26, 2021. https://www.businessinsider.com/jailbreak-statistics-2013-3.

Ed Podojil. "The evolution of data architecture at The New York Times." *Google Cloud (Blog),* January 27, 2021. Accessed May 29, 2021.   https://cloud.google.com/blog/products/data-analytics/how-the-new-york-times-build-an-end-to-end-cloud-data-platform.

Epic Games. "The Epic Games store is now live." December 6, 2018. Accessed May 30, 2021. https://www.epicgames.com/store/en-US/news/the-epic-games-store-is-now-live.

European Commission. "Antitrust: Commission opens investigations into Apple's App Store rules." June 16, 2020. Accessed May 21 2021. https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1073.

European Commission – Press Release. "Antitrust: Commission sends Statement of Objections to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093. Accessed May 28, 2021. https://ec.europa.eu/commission/presscorner/detail/en/ip_21_2061.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

European Commission – Speech. "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021) SPEECH/21/2093. Accessed May 25, 2021. https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093.

Facebook Developers. "Introducing the Mobile W3C Community Group." February 27, 2012. Accessed May 21, 2021. https://web.archive.org/web/20120511110804/http://developers.facebook.com/html5/blog/post/2012/02/27/introducing-the-mobile-w3c-community-group/.

Federal Register. *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, No. 14-CRB-0001-WR (2016-2020). Accessed May 31, 2021. https://www.govinfo.gov/content/pkg/FR-2016-05-02/pdf/2016-09707.pdf.

Financial Times. "FT iOS app returns to the Apple App Store." August 17, 2017. Accessed May 18, 2021. https://aboutus.ft.com/press_release/ft-ios-app-returns-to-the-apple-app-store.

Glu Mobile Inc. Form 10-K, Annual Report for the year ended December 31, 2019. Accessed May 31, 2021. https://sec.report/Document/1366246/000155837020001804/gluu-20191231x10kf63199.htm.

Google Cloud. "King: Playing to win with Google Cloud Platform." Accessed May 29, 2021. https://cloud.google.com/customers/king.

Google Cloud. "Spotify: The future of audio. Putting data to work, one listener at a time." Accessed May 29, 2021. https://cloud.google.com/customers/spotify.

Gordon Gottsegen. "Almost all iPhone users will buy another iPhone, says survey." *C|net*. May 18, 2017. Accessed May 21, 2021. https://www.cnet.com/news/apple-iphone-92-percent-retention-morgan-stanley-survey/.

Hallei Halter. "How to Use iCloud Keychain to Create Unique, Strong Passwords for All Your Accounts." February 1, 2021. Accessed June 1, 2021. https://www.iphonelife.com/content/how-to-eliminate-duplicate-passwords-apples-password-manager.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Hamza Shaban. "Spotify accuses Apple of abusing its power over the App Store." *The Washington Post*. March 13, 2019. Accessed May 21, 2021. https://www.washingtonpost.com/technology/2019/03/13/uk-panel-calls-new-antitrust-regulator-targeting-giant-tech-platforms/.

Igal Hendel and Alessandro Lizzeri. "Interfering with Secondary Markets." *Rand Journal of Economics* 30(1) (Spring 1999): 1-21.

*In Re: General Motors LLC Ignition Switch Litigation*. United States District Court for the Southern District of New York. Case No. 14-MD-2543.

Jack Marshall. "Financial Times Returns to Apple's App Store After Six-Year Hiatus." *The Wall Street Journal*. August 7, 2017. Accessed May 18, 2021. https://www.wsj.com/articles/financial-times-returns-to-apples-app-store-after-six-year-hiatus-1502092855.

Jack Nicas. "Apple Halves Its App Store Fee for the Smaller Companies." *New York Times*. November 18, 2020. Accessed May 18, 2021. https://www.nytimes.com/2020/11/18/technology/apple-app-store-fee.html.

Jack Nicas, Kellen Browning, and Erin Griffith. "Fortnite Creator Sues Apple and Google After Ban From App Stores." *The New York Times*. August 13, 2020. Accessed May 24, 2021. https://www.nytimes.com/2020/08/13/technology/apple-fortnite-ban.html.

JC Torres. "iOS jailbreaking is nearly dead and Apple wants it to stay that way." *Slash Gear*. June 25, 2018. Accessed May 26, 2021. https://www.slashgear.com/ios-jailbreaking-is-nearly-dead-and-apple-wants-it-to-stay-that-way-25535385/.

Jonathan Baker. "Market Definition: An Analytical Overview." *Antitrust Law Journal* 74(1) (2007): 129-173.

Jonathan Tarud. "Mobile Apps vs Web Apps: What's The Difference?." *Koombea*. April 19, 2021. Accessed May 17, 2021. https://www.koombea.com/blog/difference-between-mobile-apps-and-web-apps/.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Josh Constine. "Facebook For iOS App Is Now 2X Faster: Quicker Launch, Photos, Feed, And Built-In Messenger." *TechCrunch*. August 23, 2012. Accessed May 21, 2021. https://techcrunch.com/2012/08/23/facebook-for-ios-faster/.

Joshua Sherman. "Meet the man running the jailbreaking market Apple doesn't want you to use." *Digital Trends*. April 11, 2013. Accessed May 18, 2021. https://www.digitaltrends.com/mobile/the-man-who-helped-jailbreaking-jay-freeman/.

Juha Saarinen. "Apple cops flak for deleting local browser storage after 7 days." *iTnews*. March 26, 2020. Accessed May 21, 2021. https://www.itnews.com.au/news/apple-cops-flak-for-deleting-local-browser-storage-after-7-days-539833.

KS Sandhya Iyer. "Revamped Facebook app for iOS: Review." *Gadgets360*. August 24, 2012. Accessed May 21, 2021. https://gadgets.ndtv.com/apps/reviews/revamped-facebook-app-for-ios-review-258817.

Kyle Orland. "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%." *Ars Techica.* April 29, 2021. Accessed May 30, 2021. https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pc-game-sales-to-12/.

*Laumann et al. v. National Hockey League et al*. 12-cv-1817 and *Garber et al. v. Office of the Commissioner of Baseball et al*. 12-cv-3704, S.D.N.Y.

Leap Motion. "App Store Pricing Matrix." Accessed May 21, 2021. https://warehouse.leapmotion.com/price_tiers.

Lily Hay Newman. "You Can Jailbreak Your iPhone Again (But Maybe You Shouldn't): Apple reintroduced a previously fixed bug in iOS 12.4, which has led to a jailbreak revival." *Wired*. August 19, 2021. Accessed May 18, 2021. https://www.wired.com/story/ios-jailbreak-new/.

Mastercard. "Mastercard 2019–2020, U.S. Region Interchange Programs and Rates." October 18, 2019. Accessed May 25, 2021. https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/merchant-rates-2019-2020-oct-2019.pdf.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Matt Brian. "Facebook launches native app for iPhone and iPad, rebuilt from ground up to be twice as fast." *The Next Web*. August 23, 2012. Accessed May 21, 2021. https://thenextweb.com/apple/2012/08/23/facebook-2/.

Matthew Gentzkow, Jesse M. Shapiro, and Michael Sinkinson. "Competition and Ideological Diversity: Historical Evidence from US Newspapers." *American Economic Review*. 104(10) (2014): 3073-3114.

Matthew Panzarino, "Interview: Apple's Schiller says position on Hey app is unchanged and no rules changes are imminent," *TechCrunch*, June 18, 2020, Accessed May 28, 2021. https://techcrunch.com/2020/06/18/interview-apples-schiller-says-position-on-hey-app-is-unchanged-and-no-rules-changes-are-imminent/?tpcc=ECTW2020.

Maximiliano Firtman. "Progressive Web Apps on iOS are here." *Medium*. March 30, 2018. Accessed May 21, 2021. https://medium.com/@firt/progressive-web-apps-on-ios-are-here-d00430dee3a7.

Michael Andronico. "Discord is the one app you need to be using — here's what you need to know." *CNN*. January 28, 2021. Accessed May 30, 2021. https://www.cnn.com/2021/01/28/cnn-underscored/discord-app/index.html.

Michael Montecuollo. "Native or Web-Based? Selecting the Right Approach for Your Mobile App." *UX Magazine*. January 29, 2014. Accessed May 21, 2021. https://uxmag.com/articles/native-or-web-based-selecting-the-right-approach-for-your-mobile-app.

Michael Muchmore. "Android vs. iOS: Which Mobile OS Is Best?." *PCMag*. October 2, 2020. Accessed May 19, 2021. https://www.pcmag.com/comparisons/android-vs-ios-which-mobile-os-is-best.

Mike Peterson. "Jailbreak Pioneers Say Jailbreaking Is Officially Dead." *iDropNews*. September 7, 2017. Accessed May 26, 2021. https://www.idropnews.com/news/jailbreak-pioneers-say-jailbreaking-officially-dead/48867/.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2012. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2013. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2014. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2015. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2016. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K. Annual Report for the year ended December 31, 2017. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2018. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Netflix, Inc. Form 10-K, Annual Report for the year ended December 31, 2019. Accessed June 1, 2021. https://ir.netflix.net/financials/sec-filings/default.aspx.

Nick Statt. "Apple just kicked Fortnite off the App Store." *The Verge*. August 13, 2020. Accessed May 24, 2021. https://www.theverge.com/2020/8/13/21366438/apple-fortnite-ios-app-store-violations-epic-payments.

Nick Statt. "Apple now lets some video streaming apps bypass the App Store cut." *The Verge*. April 1, 2020. Accessed May 3, 2021. https://www.theverge.com/2020/4/1/21203630/apple-amazon-prime-video-ios-app-store-cut-exempt-program-deal.

Nick Statt. "Discord's game store launches globally today with indie gems like Hollow Knight and Dead Cells." *The Verge*. October 16, 2018. Accessed May 30, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

https://www.theverge.com/2018/10/16/17980810/discord-digital-game-distribution-store-steam-competitor-nitro-subscription-service.

Nick Statt. "Valve's new Steam revenue agreement gives more money to game developers." *The Verge.* November 30, 2018. Accessed May 31, 2021.
https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

Nobel Media AB 2014. "Daniel L. McFadden – Facts." *Nobelprize.org.* May 25, 2021. Accessed May 29, 2021. https://old.nobelprize.org/nobel_prizes/economic-sciences/laureates/2000/mcfadden-facts.html.

Organisation For Economic Co-operation and Development (OECD). *Techniques and Evidentiary Issues in Proving Dominance/Monopoly Power.* (2006). Accessed May 21, 2021. www.oecd.org/competition/abuse/41651328.pdf.

Pandora. Form 10-K, Annual Report for the Year Ending Dec. 31, 2017. Accessed May 31, 2021. https://www.sec.gov/Archives/edgar/data/1230276/000123027618000019/p-12312017x10k.htm.

Paul Hernandez. "Apple has a huge advantage over its rivals ahead of the iPhone 8 release (AAPL)." *Markets Insider*. May 18, 2017. Accessed May 21, 2021.
https://markets.businessinsider.com/news/stocks/apple-stock-price-morgan-stanley-note-2017-5-1002022779-1002022779.

PayPal. "PayPal Merchant Fees." March 11, 2021. Accessed May 25, 2021.
https://www.paypal.com/us/webapps/mpp/merchant-fees.

Playtika. "69,500,000 Shares, Common Stock." Prospectus. January 14, 2021.

Pokémon Go. "Pokémon Go Homepage." Accessed May 17, 2021.
https://www.pokemongo.com/en-us/.

Roger Fingas. "Apple announces it will offer App Store subscriptions to all apps, take smaller 15% cut." *AppleInsider*. June 8, 2016. Accessed May 25, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut.

Rovio. Annual Report 2017. Accessed June 1, 2021. rovio-annual-report-2017.pdf.

Ryan Christoffel. "Before the App Store: the "Sweet Solution" of Web Apps and Developers' Relentless Passion." *MacStories*. July 9, 2018. Accessed May 17, 2021. https://www.macstories.net/stories/before-the-app-store-the-sweet-solution-of-web-apps-and-developers-relentless-passion/.

Sarah Perez. "Apple introduces a new pay-per-install ad product called Search Ads Basic." *TechCrunch*. December 5, 2017. Accessed May 21, 2021. https://techcrunch.com/2017/12/05/apple-introduces-a-new-pay-per-install-ad-product-called-search-ads-basic/.

Sarah Perez. "Apple's Search Ads expand to six more markets in Europe and Asia." *TechCrunch.* July 25, 2018. Accessed May 18, 2021. https://techcrunch.com/2018/07/25/apples-search-ads-expand-to-six-more-markets-in-europe-and-asia/.

Sarah Perez. "'Evasi0n' Overloads Servers As Over 270,000 People Download The New Jailbreak For iOS 6.0/6.1 Devices, Including iPhone 5." *TechCrunch*. February 4, 2013. Accessed May 26, 2021. https://techcrunch.com/2013/02/04/jailbreaking-is-back-new-evasi0n-software-works-on-most-ios-6-06-1-devices-including-iphone-5/.

Severin Borenstein, Jeffrey K. MacKie-Mason, and Janet Netz. "Antitrust Policy in Aftermarkets." *Antitrust Law Journal* 63(2) (Winter 1995): 455-482.

Spotify Technology S.A. Form 20-F, Annual Report for the year ended December 31, 2018. Accessed June 1, 2021. https://investors.spotify.com/financials/default.aspx.

Steam. "New Revenue Share Tiers and other updates to the Steam Distribution Agreement." November 30, 2018. Accessed May 30, 2021. https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Steven Berry, James Levinsohn, and Ariel Pakes. "Automobiles Prices in Market Equilibrium." *Econometrica* 63(4) (July 1995): 841-890.

Steven Levy. "First Look: Test Driving the iPhone." *Newsweek*. June 25, 2007. Accessed May 21, 2021. https://www.newsweek.com/first-look-test-driving-iphone-102625.

Stephen Silver. "Apple details history of App Store on its 10th anniversary." *AppleInsider*. July 5, 2018. Accessed May 19, 2021.  https://appleinsider.com/articles/18/07/05/apple-details-history-of-app-store-on-its-10th-anniversary.

Subho Halder. "Here's How iOS Jailbreak Really Works." *Appknox*. June 24, 2018. Accessed May 17, 2021.https://www.appknox.com/blog/how-does-jailbreak-work.

Suzy E. Park. "Technological Convergence: Regulatory, Digital Privacy, and Data Security Issues." *Congressional Research Service*. May 30, 2019. Accessed May 21, 2021. https://www.everycrsreport.com/files/20190530_R45746_461fe45bf0ce4a3f25e8d1a507c308fee4d5bfd4.pdf.

Taylor Casti. "The Evolution of Facebook Mobile." *Mashable*. August 1, 2013. Accessed May 21, 2021. https://mashable.com/2013/08/01/facebook-mobile-evolution/.

Tim Hardwick. "Ads Now Appearing in App Store Search Results for U.S. Users." *MacRumors*. October 6, 2016. Accessed May 21, 2021. https://www.macrumors.com/2016/10/06/ads-appearing-app-store-search-results/.

Tim Sweeney. "Announcing the Epic Games store." *Unreal Engine*. December 4, 2018. Accessed May 31, 2021. https://www.unrealengine.com/en-US/blog/announcing-the-epic-games-store.

Tinder. "Can't restore my purchase." Accessed May 30, 2021. https://www.help.tinder.com/hc/en-us/articles/115004703743-Can-t-restore-my-purchase.

Tom Warren. "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent." *The Verge.* April 29, 2021. Accessed May 30, 2021.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent.

U.S. Department of Justice and the Federal Trade Commission. "Horizontal Merger Guidelines." August 19, 2010. Accessed May 30, 2021. https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

Vindu Goel. "How to Switch to iPhone From Android: Patience and Persistence." *New York Times.* April 6, 2016. Accessed May 24, 2021. https://www.nytimes.com/2016/04/07/technology/personaltech/how-to-switch-to-iphone-from-android-patience-and-persistence.html.

Visa. "Visa USA Interchange Reimbursement Fees." April 16, 2021. Accessed May 35, 2021. https://usa.visa.com/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf.

Yousician. "Can I transfer in-app purchase from iOS to Android or vice versa?." Accessed May 24, 2021. https://support.yousician.com/hc/en-us/articles/202815362-Can-I-transfer-in-app-purchase-from-iOS-to-Android-or-vice-versa-.

**Textbooks**

Shapiro, Carl and Hal R. Varian. *Information Rules: A Strategic Guide to the Network Economy*. (Boston, Massachusetts: Harvard Business School Press, 1990).

Carlton, Dennis W. and Jeffrey M Perloff. *Modern Industrial Organization, 4th ed.* (Pearson, 2015).

Ben-Akiva, M., D. McFadden, and K. Train. "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis." in *Foundations and Trends® in Econometrics* 10 (1-2) (2019).

Tirole, Jean. *The Theory of Industrial Organization*. (Cambridge, Massachusetts: The MIT Press, 1988).

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Gruber, Jonathan *Public Finance and Public Policy, 5th ed.* (New York: Worth Publishers, 2016).

Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects" in *Handbook of Industrial Organization, Volume 3,* eds. Mark Armstrong and Robert H. Porter (Elsevier, 2007).

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX C  APPLE APP STORE TRANSACTIONS DATA

1.  My analysis uses the App Store transactions data produced by Apple.[311] This data covers all U.S. App Store transactions, including free and paid app downloads as well as IAPs, from July 10, 2008 to September 30, 2019. Each row represents a transaction, and the columns contain relevant information regarding the transactions including purchaser IDs (Apple IDs), purchased item IDs, the method of purchase, and time of the purchase. Figure 18 shows a list of the variables used in my analysis.

**FIGURE 18: DESCRIPTION OF VARIABLES ANALYZED IN MY ANALYSIS**

| Variable | Description |
| --- | --- |
| [1] | [2] |



Sources: Deposition of Mark Rollins, In Re Apple iPhone Antitrust Litigation, February 11, 2021; Letter from Eli Lazarus to Class Plaintiffs, "Re: *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR Data Discovery," October 12, 2020, and its attachment "App Store Antitrust -- Transactional Data Value Descriptions.pdf".

---

[311]   Apple Transactions data produced via hard drive January 15, 2021, APL-APPSTORE_10334265.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

2. I remove four sets of transactions from the data that are irrelevant to the Consumer Class:

   a.  I exclude transactions that are not from iOS-installed mobile devices according to the ███████████ field.

   b.  I exclude transactions that are labelled as "invalid" in the █████████████ field.

   c.  I exclude transactions from apps that are developed by Apple based on the ████████████ and ████████████ fields.

   d.  I exclude enterprise and volume transactions based on the ███████████████ field.

3. Because of the scale of the full transactions dataset, which includes over 64 billion individual transactions, even simple tasks require extraordinary computational resources. Thus, I used a subsample of the data for the empirical analyses in Sections VI and VII. This subsample includes all transactions from a randomly selected subset of Apple IDs.

4. My sampling methodology takes advantage of the fact that each Apple ID is a randomly generated 32 character hexadecimal string.[312] I filter the Apple IDs based on their first three hexadecimal characters to randomly select approximately 1/1024, or about 0.1 percent, of Apple IDs.[313]

5. Figure 19 – Figure 26 compare the distribution of key variables in the full data and the 0.1% subsample. These figures show the distributions of the key variables in the 0.1% sample are nearly identical to those of the full data.

6. I also extracted all transactions from randomly selecting 0.39 percent, and 6.25 percent of Apple IDs to compare with the 0.1 percent subsample. I do not report the comparison results here given that the 0.1 percent sample is representative of the full data.

---

[312] "Apple generated random universally unique identifiers (UUIDs) and mapped them on a one-to-one basis to consumer identification values used internally at Apple." *See* Defendant Apple Inc.'s Responses and Objections to Consumer Plaintiff's Second Set of Interrogatories, Received April 6, 2021, at page 6.

[313] We limit to person ids that begin with "aaa", "aab", "aac", or "aad". For a sample of 1/4096, one could limit to the ids that begin with "aaa" only. Similar subsamples of approximately 1/1024 of the person_ids could be constructed using "111", "112", "113", and "114", or any other grouping of 4 unique 3 hexidecimal strings.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 19: SAMPLE AND FULL DATA COMPARISON: OBSERVATIONS**

| Variable | Full Data | Sample | Ratio |
|---|---|---|---|
| [1] | [2] | [3] | [4] |
| person_id | ███████ | ██████ | 0.0010 |
| Transactions | ███████ | ██████ | 0.0010 |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Transactions refers to the number of rows in the dataset.

[4]: [3] / [2].


**FIGURE 20: SAMPLE AND FULL DATA COMPARISON: SPENDING**

| Variable | Unit | Mean | | Mode (excluding 0) | |
|---|---|---|---|---|---|
| | | Full Data | Sample | Full Data | Sample |
| [1] | | [2] | [3] | [4] | [5] |
| ████ | █ | ████ | ████ | ███ | ███ |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Total Spent is each customer's total actl_amt.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 21: SAMPLE AND FULL DATA COMPARISON:
CONTENT TYPE**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 22: SAMPLE AND FULL DATA COMPARISON:
GENRE (APP CATEGORY)**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 23: SAMPLE AND FULL DATA COMPARISON:
PLATFORM**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

**FIGURE 24: SAMPLE AND FULL DATA COMPARISON:
POSTING REASON**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 25: SAMPLE AND FULL DATA COMPARISON:**
**CONTENT TYPE**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

**FIGURE 26: SAMPLE AND FULL DATA COMPARISON:**
**SAP_LINE_ITEM_TYPE**

| sap_line_item_type_id | sap_line_item_type_name | Number of transactions | | Percent of transactions | |
|---|---|---|---|---|---|
| | | Full Data | Sample | Full Data | Sample |
| [1] | [2] | [3] | [4] | [5] | [6] |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX D CONSUMER UTILITY MAXIMIZATION

7. In this section I explain how the app download and IAP demand equations I estimate (equations (8) and (9)) approximate consumer demand based on consumer utility maximization.

### D.1    APP DOWNLOAD DEMAND

8. Consumer $i$'s utility conditional on downloading app $j$ can be specified as (omitting the category subscript $c$):

$$u_{ijt} = \boldsymbol{\beta}^x \boldsymbol{x_{jt}} - \alpha p_{jt}^d + \xi_{jt} + \varepsilon_{ijt},$$

where $\boldsymbol{x_{jt}}$ are app $j$ characteristics, $p_{jt}^d$ is the download price, $\xi_{jt}$ is a scalar unobservable demand shock for the app, and $\varepsilon_{ijt}$ is an i.i.d. taste shock distributed Type I extreme value. Consumer $i$ has the outside option of not downloading any apps. The utility of the outside option is normalized to $u_{i0t} = \varepsilon_{i0t}$.

9. The probability that an individual will download app $j$ on an occasion can be written as

$$P_{ijt} = \frac{\exp(\boldsymbol{\beta}^x \boldsymbol{x_{jt}} + \alpha^d p_{jt}^d + \xi_{jt})}{1 + \sum_k \exp(\boldsymbol{\beta}^x \boldsymbol{x_{kt}} + \alpha^d p_{kt}^d + \xi_{kt})}$$

10. If there are $N$ consumers, the expected number of downloads of app $j$ is

$$\sum_{i=1}^{N} P_{ijt} = \exp(\boldsymbol{\beta}^x \boldsymbol{x_{jt}} + \alpha^d p_{jt}^d + \xi_{jt}) \cdot \sum_{i=1}^{N} P_{i0t}$$

11. This equation can be approximated by

$$\sum_{i=1}^{N} P_{ijt} \approx N \cdot \exp(\boldsymbol{\beta}^x \boldsymbol{x_{jt}} + \alpha^d p_{jt}^d + \xi_{jt})$$

where the approximation is reasonable when all of the probabilities of downloading nothing are near one. By taking the log of both sides of the equation,

$$log\left(\sum_{i=1}^{N} P_{ijt}\right) \approx log(N) + \boldsymbol{\beta}^x \boldsymbol{x_{jt}} + \alpha^d p_{jt}^d + \xi_{jt}$$

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

12. Since $\sum_{i=1}^{N} P_{ijt}$ can be measured by $Q_{jt}$ and $log(N)$ can be absorbed by the time fixed effects, which is part of $x_{jt}$, equation (8) approximates consumers' utility maximization when a large fraction of iOS device users download no app in a given time.

### D.2     IN-APP PURCHASE DEMAND

13. The log linear model specified for the IAP demand, equation (9), is a widely used specification for consumer demand, especially for demand derived from non-discrete choice problems.

14. The utility maximization problem for such demand can be described as maximizing

$$U(\omega, Y) = a\omega - b\omega^2 + tY$$

subject to the budget constraint

$$p^{IAP}\omega + Y = M$$

where $Y$ represents the numeraire and $M$ income.

15. By using the standard constrained maximization, one can show that

$$\omega = \frac{a}{2b} - \frac{t}{2b}p^{IAP}$$

16. Thus, equation (9) can be interpreted as a log linear approximation of the utility maximizing consumption of in-app purchases.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX E QUANTIFYING COMMON ECONOMIC IMPACT: TECHNICAL DETAILS

### E.1     DATA PREPARATION FOR ESTIMATION

17.  To prepare the 0.1% sample data for estimation and damages calculations, I perform additional cleaning steps and aggregate the data to the month-item level, where each item is either an app download or in-app purchase. I then construct additional variables for estimation.

18.  I classify transactions as downloads based on the ██████████████' field.

19.  I remove four types of transactions from the data: refunds, refunded transactions, non-initial downloads, and pre-download in-app purchase transactions.

   a.  I identify refunds as any transactions with negative values in the ████████ or '████████' fields.

   b.  I identify refunded transactions by subtracting the refunds from preceding original transactions in reverse chronological by person and item. I denote the transactions that are completely offset by subsequent refunds as refunded transactions, and I also record the residual sales for partially refunded transactions. I perform this process for ████████ and ████████ separately.

   c.  I identify non-initial downloads as all download transactions that occur after an individual's initial download. Removing these ensures that each ████████ has exactly one download per app.[314]

   d.  I identify all in-app purchase transactions that occur before an initial download as pre-download IAP transactions.[315]

---

[314]  For the rare cases where multiple downloads happen simultaneously, I consider the most expensive download to be the initial download. For the two download transactions that have a ████████ value greater than one, I set the ████████ to one. See workpapers.

[315]  ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

20. For each app, I construct an app level genre (app category) variable based on the genre of the app's first download.

21. I then reshape and aggregate the transactions data for my estimation, with observations for each month for every item from its first appearance until September 2019.

22. Because IAPs and apps are sometimes discontinued or removed from the App store, I drop IAP-years with no transactions, and I drop app-years with no downloads or associated IAP transactions.

23. I add the variables necessary for my modeling to this item-month level dataset:

    a. For each item-month, I calculate the total count of transactions, list spending (ignoring partial returns), net-spending (accounting for partial returns), royalty paid, and average price.  When an IAP or app has no transactions in a month, I report zero for the count, list spending, net spending, and royalty, and I report the most recent non-missing average price.

    b. If there are multiple developers associated with an app in one month, I identify the month's primary developer. The primary developer is first determined by the number of downloads, then number of total transactions from downloads and IAPs, and, lastly, chronologically so that the most recent developer is considered primary.

    c. For each IAP, I calculate the IAP spenders' average number of transactions in other genres (categories). For each app, I calculate the downloaders' average number of downloads in other genres. I replace missing values of these variables with zero.

    d. For each app, I calculate the number of downloads, the average download price, the summed price of all IAPs, total IAP transactions, total IAP spending, and the number of IAPs.

    e. For each app, I calculate the number and average price of downloads for apps in other genres. I also calculate the number of IAP transactions and number of downloads for apps in other genres from the same provider. I replace missing values for other genre download prices with zero.

24. I limit the data to the apps that were ever a part of the top 70 percent of any year-genre's revenue, meaning the list of apps sorted by revenue that comprise 70 percent of revenue in a

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

given category and year. So if an app was part of the top 70 percent revenue apps in one year, I include this app in all years. The 0.1 percent sample includes 186,122 apps that iOS device users in the 0.1 percent sample ever spent money on. Out of those apps, 8,993 are a part of the top 70 percent revenue apps in at least one year. These 8,993 apps, about 5 percent of 186,122, comprise 79 percent of the App Store revenues. Figure 27 shows that the distribution of the download and IAP prices is not significantly different between the top 70 percent revenue apps and the other apps.

**FIGURE 27: SHARE OF TRANSACTIONS BY PRICE, TRANSACTION TYPE, AND APP TYPE**

| Price | Download Price Shares | | In-App Purchase Price Shares | |
|---|---|---|---|---|
| | Top 70% Apps | Non-Top 70% Apps | Top 70% Apps | Non-Top 70% Apps |
| | [1] | [2] | [3] | [4] |
| *Paid Download IAP* | | | | |
| $0.99 | | | | |
| $1.99 | | | | |
| $2.99 | | | | |
| $3.99 | | | | |
| $6.99 | | | | |
| $9.99 | | | | |
| $12.99 | | | | |
| Other | | | | |
| *Paid Download Only* | | | | |
| $0.99 | | | | |
| $1.99 | | | | |
| $2.99 | | | | |
| $3.99 | | | | |
| $6.99 | | | | |
| $9.99 | | | | |
| $12.99 | | | | |
| Other | | | | |
| *Free Download IAP* | | | | |
| $0.99 | | | | |
| $1.99 | | | | |
| $2.99 | | | | |
| $3.99 | | | | |
| $6.99 | | | | |
| $9.99 | | | | |
| $12.99 | | | | |
| Other | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Free transactions are excluded.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

25. My estimation uses 3 datasets: IAP-month data, app-month data, and app-year data. I prepare these datasets for two genre groupings: Games, and Music & Entertainment.

26. To prepare the month level datasets, I take the logs of IAP transactions and downloads.[316] I then construct month-year indicator variables and demean all numeric variables.[317] I also add the one month lag of each app's download price for the app-month data.[318]

27. To prepare the app-year level data, I calculate the annual commission, average download price, average IAP price, and total downloads and IAP transactions. I designate each app's business (monetization) model at the year level as one of "Paid Download Only", "Paid Download IAP", or "Free Download IAP" based on sources of revenue. App-years with no spending are dropped, as well as app-years with a change in the download price within the year. The latter is done to avoid having download prices significantly lower than the App Store's pricing grid minimum of 99 cents. Finally, I also drop Paid Download IAP apps with zero downloads.

28. I calculate standard errors for my estimates using bootstrap. One hundred fifty bootstrap data sets are created where I sample with replacement at the app-IAP-month level, and then create the three datasets described above with the sampled app-IAP-month level data.

### E.2     MODEL ESTIMATION

29. I specify the app download demand function as:

$$log(Q_{jt}) = \alpha^d p_{jt}^d + X_{jt}^d \gamma^d + u_{jt}^d$$

where $Q_{jt}$ denotes the number of downloads for app $j$ in period $t$, $p_{jt}^d$ app $j$'s download price in period $t$, $X_{jt}^d$ app characteristics, and $u_{jt}^d$ the residual term. $X_{jt}^d$ includes app fixed effects, time fixed effects, and the average number of downloads in other genres by users who downloaded app $j$ in time $t$, which reflects the propensity of those users to download apps in general.

30. I specify the IAP demand function as:

---

[316] Logs are taken as ln(x+1) to prevent the removal of zeros.

[317] The IAP-month data is demeaned at the IAP item level, while the app-month data is demeaned at the app level.

[318] Months with missing lagged values are dropped.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

$$log(\omega_{jkt}) = \alpha^{IAP} p_{jkt}^{IAP} + \beta^Q log(Q_{jt}) + \boldsymbol{X}_{jkt}^{IAP} \boldsymbol{\gamma}^{IAP} + u_{jkt}^{IAP}$$

where subscript $k$ denotes IAP products offered by app $j$, $\omega_{jkt}$ the number of transactions for IAP product $k$, $p_{jkt}^{IAP}$ the price of IAP product $k$, $\boldsymbol{X}_{jkt}^{IAP}$ the characteristics of IAP items, and $u_{jkt}^{IAP}$ the residual term. $\boldsymbol{X}_{jkt}^{IAP}$ includes item fixed effects, time fixed effects, and the average number of IAP transactions in other genres by users who made IAP transactions for item $k$ in app $j$ at time $t$, which reflects the propensity of those users to make IAPs in general.

31. To estimate the model, I use an econometric technique called the generalized method of moments, commonly abbreviated as "GMM". GMM obtains parameter estimates by minimizing the GMM criterion function, which summarizes the distance between model-predicted moments and the data. The GMM criterion function $f$ is the following:

$$f = f^d + f^{IAP}$$

where

$$f^d = u^{d\prime} Z^d \left(Z^{d\prime} Z^d\right)^{-1} Z^{d\prime} u^d$$
$$f^{IAP} = u^{IAP\prime} Z^{IAP} (Z^{IAP\prime} Z^{IAP})^{-1} Z^{IAP\prime} u^{IAP}$$

$Z^d$ and $Z^{IAP}$ are matrices of exogenous variables and instruments for download and IAP models respectively, and $u^d$ and $u^{IAP}$ are the corresponding vectors of error terms in the download and IAP models respectively.

32. I incorporate the developer margin information as follows. Based on the observed variable margins for app developers, I impose the constraint that the average economic margin must be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for game apps, and 20 and 60 percent for Music and Entertainment apps. I only apply these margin constraints for years 2017 to 2019 since the observed variable margins in general are for the past few years, and only apply the constraints to Paid Download and Free Download IAP apps since these apps are enough to give identifying variation for $\alpha^d$ and $\alpha^{IAP}$. I obtain estimates of the demand parameters by using an algorithm that seeks to minimize the GMM criterion function described above, subject to this constraint.

33. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.



34. The algorithm uses the objects calculated above to check the GMM criterion function value as well as whether the average margin constraints are satisfied. The algorithm continues over its search over $(\alpha^d, \alpha^{IAP}, \beta^Q)$ to find the values of the parameter estimates that minimize $f$ and satisfy the margin constraints. I implement this algorithm using MATLAB's $fmincon$ command. I run the estimation algorithm once for apps in the Games category, and another time for apps in the Music and Entertainment category.

35. I calculate standard errors via bootstrap. I create 150 sets of data files where I sample from the data with replacement, and then I run the estimation algorithm for each of the 150 datasets. Then, I keep only the estimates where the GMM estimation algorithm converged and the margin constraints are satisfied. Then, of the remaining $B$ estimates I calculate standard errors with the formula

$$se\left(\hat{\theta}\right) = \sqrt{\frac{1}{B-1}\sum_{b=1}^{B}\left(\widehat{\theta_b} - \bar{\theta}\right)^2}$$

$$\bar{\theta} = \frac{1}{B}\sum_{b=1}^{B}\widehat{\theta_b}$$

I calculate standard errors using the method above for $\hat{\alpha}^d$, $\hat{\alpha}^{IAP}$, and $\hat{\beta}^Q$.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

36. After demand parameters are estimated, I obtain the estimated marginal costs with the following equations. For Paid Download,

$$c_{jt}^d = (1 - \tau)\left(\frac{1}{\alpha^d} + p_{jt}^d\right)$$

For Paid Download IAP

$$c_{jt}^d = (1 - \tau)\left(\frac{1}{\alpha^d} - \frac{\beta^Q \omega_{jt}}{\alpha^{IAP} Q_{jt}} + p_{jt}^d\right)$$

$$c_{jt}^{IAP} = (1 - \tau)\left(\frac{1}{\alpha^{IAP}} + p_{jt}^{IAP}\right)$$

For Free Download IAP

$$c_{jt}^{IAP} = (1 - \tau)\left(\frac{1}{\alpha^{IAP}} + p_{jt}^{IAP}\right)$$

### E.3    ESTIMATION RESULTS

37. Figure 28 and Figure 29 summarize estimated variable costs and app margins. Per business model, it shows prices, quantities, estimated costs, and estimated margins for the app-year level data used in the But-For simulation.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

### FIGURE 28: SUMMARY OF ESTIMATION RESULTS: GAMES

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Paid Download IAP* | | | | | |
| Download Price | | | | | |
| Download Transactions | | | | | |
| Download Cost* | | | | | |
| IAP Price | | | | | |
| IAP Transactions | | | | | |
| IAP Cost* | | | | | |
| **App Margin*** | | | | | |
| *Paid Download Only* | | | | | |
| Download Price | | | | | |
| Download Transactions | | | | | |
| Download Cost* | | | | | |
| **App Margin*** | | | | | |
| *Free Download IAP* | | | | | |
| IAP Price | | | | | |
| IAP Transactions | | | | | |
| IAP Cost* | | | | | |
| **App Margin*** | | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Rows with "*" are estimated.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 29: SUMMARY OF ESTIMATION RESULTS: MUSIC AND ENTERTAINMENT**

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Paid Download IAP* | | | | | |
| Download Price | | | | | |
| Download Transactions | | | | | |
| Download Cost* | | | | | |
| IAP Price | | | | | |
| IAP Transactions | | | | | |
| IAP Cost* | | | | | |
| **App Margin*** | | | | | |
| *Paid Download Only* | | | | | |
| Download Price | | | | | |
| Download Transactions | | | | | |
| Download Cost* | | | | | |
| **App Margin*** | | | | | |
| *Free Download IAP* | | | | | |
| IAP Price | | | | | |
| IAP Transactions | | | | | |
| IAP Cost* | | | | | |
| **App Margin*** | | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Rows with "*" are estimated.

### E.4   BUT-FOR WORLD SIMULATIONS

38. Before I calculate the prices of apps and in-app purchases in the But-For world, I convert the estimated IAP-item level demand equation into the IAP-level demand equation under the assumption that app developers change IAP-item prices by the same amount for a given app:

$$log(\omega_{jt}) = \hat{\alpha}^{IAP} p_{jt}^{IAP} + \hat{\beta}^{Q} log(Q_{jt}) + X_{jt}^{IAP} \hat{\gamma}^{IAP} + \hat{u}_{jt}^{IAP}$$

39. To calculate the prices of apps and in-app purchases in the But-For world, I plug the demand parameter and variable cost estimates into the app-developers' profit-maximizing first-order condition equations. I replace the As-Is commission rate with the But-For commission rate. I then solve for the app-developers' profit maximizing prices at the But-For commission rate. I apply this calculation to each observation in the app-year level data.

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

40. I omit all app-year observations for which the download price changed during the observation year. I also omit Paid Download IAP app-year observations for which the app had zero downloads in the observation year, even if it did complete IAP transaction.

41. Each of the three app business models has a unique profit function, and I calculate the But-For prices for each model accordingly. For Paid Download apps, I plug the estimated price coefficient for downloads ($\hat{\alpha}_c^d$), the estimated variable cost per download ($\hat{c}_{jt}^d$), and the But-For commission rate ($\tau^{BF}$) into the app-developer's first-order condition, and calculate the But-For price ($p_{jt}^{d\,BF}$) for each app-year observation according to the following equation.

$$p_{jt}^{d\,BF} = -\frac{1}{\hat{\alpha}_c^d} + \frac{\hat{c}_{jt}^d}{(1 - \tau^{BF})}$$

42. Similarly, for Free Download IAP apps, I plug the estimated price coefficient for in-app purchases ($\hat{\alpha}_c^{IAP}$), the estimated variable cost per in-app purchase ($\hat{c}_{jt}^{IAP}$), and the But-For commission rate ($\tau^{BF}$) into the app-developer's first-order condition, and calculate the But-For price ($p_{jt}^{IAP\,BF}$) for each app-year observation according to the following equation.

$$p_{jt}^{IAP\,BF} = -\frac{1}{\hat{\alpha}_c^{IAP}} + \frac{\hat{c}_{jt}^{IAP}}{(1 - \tau^{BF})}$$

43. For Paid Download IAP apps, the equation for the But-For price of in-app purchases is identical to the But-For price equation for Free Download IAP apps, shown above. However, because the download price indirectly influences demand for in-app purchases within these apps through the number of downloads, calculating the But-For price of downloads is more complicated. Plugging the demand equations and derivatives into the first-order condition with respect to the download price yields a non-linear equation in the price of downloads.

44. For these apps, I solve for the But-For download price numerically. I code the demand and profit functions into MATLAB, and plug in the estimated demand parameters ($\hat{\alpha}_c^d$, $\hat{\beta}_c^Q$, and $\hat{\alpha}_c^{IAP}$), along with the estimated demand control and residual terms ($(X_{jt}^d \widehat{\gamma_c^d} + u_{jt}^d)$ and

$(\boldsymbol{X}_{jt}^{IAP}\boldsymbol{\gamma}_{c}^{\widehat{IAP}} + u_{jt}^{IAP})$),[319] the variable cost estimates ($\hat{c}_{jt}^{d}$ and $\hat{c}_{jt}^{IAP}$), the But-For commission rate ($\tau^{BF}$), and the But-For price of in-app purchases ($p_{jt}^{IAP^{BF}}$).

45. I then use MATLAB's *fminsearch* function to find the download price that leads to the highest possible app-developer profits. The solution is the But-For download price ($p_{jt}^{d\,BF}$). I repeat this process for each Paid Download IAP app-year observation.

46. Once I have calculated But-For prices for all observations in the app-year level data, I calculate damages for each app-year as the difference between what consumers paid for their downloads and in-app purchases, and what they would have paid for the same quantity of downloads and in-app purchases in the But-For world.

$$Damages_{jt} = \left(p_{jt}^{d\,BF} - p_{jt}^{d}\right)Q_{jt} + \left(p_{jt}^{IAP^{BF}} - p_{jt}^{IAP}\right)\omega_{jt}$$

47. Then I calculate the ratio of the sum of each app-year damages to the (As-Is) App Store commission revenues for a given app category:

$$r = \frac{\sum_{t}\sum_{j}\left(\left(p_{jt}^{d\,BF} - p_{jt}^{d}\right)Q_{jt} + \left(p_{jt}^{IAP^{BF}} - p_{jt}^{IAP}\right)\omega_{jt}\right)}{\tau\sum_{t}\sum_{j}\left(p_{jt}^{d}Q_{jt} + p_{jt}^{IAP}\omega_{jt}\right)}$$

48. This ratio can be used to scale up the damages calculated with the estimation sample to cover the entire Consumer Class as demonstrated in Section VII.

49. Figure 30 summarizes the estimated price effects of ███████████ But-For commission rate for the Games category. Based on the estimated price effects, I estimate that the Consumer Class ████████████ of the burden of the App Store commission from the Games category, while app developers bore the ████████████████ of the burden. The amount that the Consumer

---

[319] I back out values for these demand control and residual terms from the As-Is prices and quantities and the demand parameter estimates, according to the formulas below. These values differ from the fitted values from the demand estimation, because in the estimation I added one to the As-Is quantities but do not do so here. Further, I use a single app-year level equation for in-app purchase demand, rather than a separate demand equation for each in-app item. The parameter estimates from the app-item-year level regression are applicable to app-year level demand, under the assumption that app developers would make marginal price adjustments by changing the prices of all in-app items by the same amount.

$\boldsymbol{X}_{jt}^{d}\boldsymbol{\gamma}_{c}^{\widehat{d}} + u_{jt}^{d} = \log Q_{jt} - \hat{\alpha}_{c}^{d}p_{jt}^{d}$

$\boldsymbol{X}_{jt}^{IAP}\boldsymbol{\gamma}_{c}^{\widehat{IAP}} + u_{jt}^{IAP} = \log \omega_{jt} - \hat{\alpha}_{c}^{IAP}p_{jt}^{IAP} - \beta_{c}^{Q}\log Q_{jt}$

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

Class overpaid for the Games category from ███████████████████████████ ██████ of the App Store's total commission revenues earned in this category.

### FIGURE 30: SUMMARY OF ESTIMATED PRICE EFFECTS: GAMES

|  | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
|  | [1] | [2] | [3] | [4] | [5] |
| *Downloads* |  |  |  |  |  |
| Retail Price (% Change) |  |  |  |  |  |
| Wholesale Price (% Change) |  |  |  |  |  |
| *In-App Purchases* |  |  |  |  |  |
| Retail Price (% Change) |  |  |  |  |  |
| Wholesale Price (% Change) |  |  |  |  |  |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the 15 percent But-For commission rate.

50. Figure 31 summarizes the estimated price effects of the 15 percent But-For commission rate for the Entertainment and Music categories combined. Based on the estimated price effects, I estimate that the Consumer Class bore 81.9 percent of the burden of the App Store commission from the Entertainment and Music categories, while app developers bore the remaining 18.1 percent of the burden. The amount that the Consumer Class overpaid for the Entertainment and Music categories from July 2008 to September 2019 is estimated to be 31.1 percent of the App Store's total commission revenues earned in these two categories.

### FIGURE 31: SUMMARY OF ESTIMATED PRICE EFFECTS: MUSIC AND ENTERTAINMENT

|  | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
|  | [1] | [2] | [3] | [4] | [5] |
| *Downloads* |  |  |  |  |  |
| Retail Price (% Change) | -8.0% | 6.5% | -13.4% | -9.1% | -0.9% |
| Wholesale Price (% Change) | 11.0% | 7.4% | 5.0% | 9.8% | 19.1% |
| *In-App Purchases* |  |  |  |  |  |
| Retail Price (% Change) | -5.3% | 10.2% | -12.4% | -8.2% | -1.9% |
| Wholesale Price (% Change) | 13.0% | 12.6% | 4.7% | 9.3% | 18.5% |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the 15 percent But-For commission rate.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

51. Figure 32 summarizes the estimated price effects ███████ But-For commission rate for the Games category. Based on the estimated price effects, I estimate that the Consumer Class ██████████ of the burden of the App Store commission from the Games category, while app developers bore the ████████████████ of the burden. The amount that the Consumer Class overpaid for the Games category from July 2008 to September 2019 is estimated ██████ ██████ of the App Store's total commission revenues earned in this category.

**FIGURE 32: SUMMARY OF ESTIMATED PRICE EFFECTS: GAMES**



| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Downloads* | | | | | |
| Retail Price (% Change) | | | | | |
| Wholesale Price (% Change) | | | | | |
| *In-App Purchases* | | | | | |
| Retail Price (% Change) | | | | | |
| Wholesale Price (% Change) | | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the 10 percent But-For commission rate.

52. Figure 33 summarizes the estimated price effects of the 10 percent But-For commission rate for the Entertainment and Music categories combined. Based on the estimated price effects, I estimate that the Consumer Class bore 81.8 percent of the burden of the App Store commission from the Entertainment and Music categories, while app developers bore the remaining 18.2 percent of the burden. The amount that the Consumer Class overpaid for the Entertainment and Music categories from July 2008 to September 2019 is estimated to be 49.5 percent of the App Store's total commission revenues earned in these two categories.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

**FIGURE 33: SUMMARY OF ESTIMATED PRICE EFFECTS: MUSIC AND ENTERTAINMENT**

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Downloads* | | | | | |
| Retail Price (% Change) | -10.2% | 8.2% | -16.9% | -11.6% | -1.2% |
| Wholesale Price (% Change) | 14.8% | 10.1% | 6.6% | 13.1% | 25.8% |
| *In-App Purchases* | | | | | |
| Retail Price (% Change) | -7.0% | 12.8% | -15.6% | -10.6% | -2.5% |
| Wholesale Price (% Change) | 17.6% | 16.9% | 6.3% | 12.5% | 24.8% |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the 10 percent But-For commission rate.

53.   Figure 34 summarizes the estimated price effects of the ▮▮▮▮▮▮ But-For commission rate for the Games category. Based on the estimated price effects, I estimate that the Consumer Class bore 80.7 percent of the burden of the App Store commission from the Games category, while app developers bore the remaining 19.3 percent of the burden. The amount that the Consumer Class overpaid for the Games category from July 2008 to September 2019 is estimated to be 69.6 percent of the App Store's total commission revenues earned in this category.

**FIGURE 34: SUMMARY OF ESTIMATED PRICE EFFECTS: GAMES**

| | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| *Downloads* | | | | | |
| Retail Price (% Change) | -3.6% | 16.5% | -17.4% | -11.6% | 16.8% |
| Wholesale Price (% Change) | 29.8% | 21.8% | 11.6% | 19.3% | 56.6% |
| *In-App Purchases* | | | | | |
| Retail Price (% Change) | -9.1% | 24.7% | -21.7% | -17.9% | -8.2% |
| Wholesale Price (% Change) | 22.8% | 33.0% | 5.9% | 10.9% | 24.0% |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the ▮▮▮▮▮ But-For commission rate.

54.   Figure 35 summarizes the estimated price effects of the ▮▮▮▮▮▮ But-For commission rate for the Entertainment and Music categories combined. Based on the estimated price effects, I estimate that the Consumer Class bore 81.3 percent of the burden of the App Store commission from the Entertainment and Music categories, while app developers bore the remaining 18.7

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

percent of the burden. The amount that the Consumer Class overpaid for the Entertainment and Music categories from July 2008 to September 2019 is estimated to be 65.3 percent of the App Store's total commission revenues earned in these two categories.

**FIGURE 35: SUMMARY OF ESTIMATED PRICE EFFECTS: MUSIC AND ENTERTAINMENT**

|  | Mean | Std. Deviation | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|---|---|
|  | [1] | [2] | [3] | [4] | [5] |
| *Downloads* |  |  |  |  |  |
| Retail Price (% Change) | -12.0% | 9.7% | -19.9% | -13.7% | -1.4% |
| Wholesale Price (% Change) | 18.4% | 12.7% | 8.2% | 16.3% | 32.2% |
| *In-App Purchases* |  |  |  |  |  |
| Retail Price (% Change) | -8.4% | 15.2% | -18.5% | -12.7% | -2.9% |
| Wholesale Price (% Change) | 21.9% | 21.0% | 7.9% | 15.5% | 30.8% |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Results are for the ███████ But-For commission rate.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

## APPENDIX F PROFIT MAXIMIZATION CONDITIONS UNDER THE PRICING TIER POLICIES

55. In this section I explain estimation demand for apps using a range of the variable margin as constraints is conceptually not much different from using an exact variable margin level as constraints and the profit maximization conditions that account for Apple's pricing tier policies.

56. By way of example, consider an app developer (app developer $j$) setting a price for its paid-to-download app without Apple's pricing tier policies. Equations (4) and (5) in Section VI.D, copied below, represent the profit function and the profit maximization condition for setting the download price:

$$\pi_{jt} = \left((1-\tau)p_{jt}^d - c_{jt}^d\right)Q_{jt}$$

$$\frac{\partial \pi_{jt}}{\partial p_{jt}^d} = (1-\tau)Q_{jt} + \frac{\partial Q_{jt}}{\partial p_{jt}^d}\left((1-\tau)p_{jt}^d - c_{jt}^d\right) = 0$$

57. Given the app download demand equation given by equation (8) in Section VI.D, copied below,

$$log(Q_{jt}) = \alpha^d p_{jt}^d + \boldsymbol{X}_{jt}^d \boldsymbol{\gamma}^d + u_{jt}^d$$

the app developer sets the download price as follows:

$$p_{jt}^d = \frac{c_{jt}^d}{(1-\tau)} - \frac{1}{\alpha^d}$$

58. Using this condition and the estimated price coefficient $\hat{\alpha}^d$, I can estimate the app developer's variable cost as

$$c_{jt}^d = (1-\tau)\left(p_{jt}^d + \frac{1}{\hat{\alpha}^d}\right)$$

59. Suppose one wants to estimate demand for Paid Download apps with the constraint that app developer $j$'s variable margin, $m_j$, should be between $\underline{m}$ percent and $\overline{m}$ percent. This constraint will bound the price coefficient such that the $c_{jt}^d$ implied by the demand estimates is bounded in a certain range.

Non-Party Highly Confidential—Outside Counsel Eyes Only

PRIVILEGED AND CONFIDENTIAL. PREPARED AT THE REQUEST OF COUNSEL.

60. Now consider the same app developer setting the download price under Apple's pricing tier policies. Because the app developer chooses from a grid of discrete price points, the profit maximization condition is modified as

$$\left((1-\tau)p^d - c^d\right)Q(p^d) > \left((1-\tau)(p^d + \Delta p^d) - c^d\right)Q(p^d + \Delta p^d)$$

$$\left((1-\tau)p^d - c^d\right)Q(p^d) > \left((1-\tau)(p^d - \Delta p^d) - c^d\right)Q(p^d - \Delta p^d)$$

where $\Delta p^d$ denotes the difference between $p^d$ and the price point adjacent to $p^d$ that the app developer can choose. Subscripts are omitted to be concise, and $Q(p^d)$ indicates the download demand is a function of $p^d$. Note that $Q(p^d + \Delta p^d) < Q(p^d) < Q(p^d - \Delta p^d)$ as long as $\alpha^d < 0$, meaning that the demand function is downward sloping. For simplicity, I assume the equal distance between price points on the price grid, i.e., $Q(p^d - \Delta p^d) - Q(p^d) = Q(p^d) - Q(p^d + \Delta p^d)$

61. After going through some algebra, one can obtain

$$p^d > \frac{c^d}{(1-\tau)} + \frac{\Delta p^d}{\Delta Q}Q(p^d + \Delta p^d)$$

$$p^d < \frac{c^d}{(1-\tau)} + \frac{\Delta p^d}{\Delta Q}Q(p^d - \Delta p^d)$$

where $\Delta Q = Q(p^d - \Delta p^d) - Q(p^d) = Q(p^d) - Q(p^d + \Delta p^d)$. Note that as $\Delta p^d$ becomes smaller, $\frac{\Delta p^d}{\Delta Q}Q(p^d + \Delta p^d)$ and $\frac{\Delta p^d}{\Delta Q}Q(p^d - \Delta p^d)$ become closer to $\frac{\partial p^d}{\partial Q}Q$ and the upper and lower bounds of $p^d$ approaches $\frac{c^d_{jt}}{(1-\tau)} - \frac{1}{\alpha^d}$.

62. The two inequality conditions above set the upper and lower bounds on $c^d$ as follows:

$$(1-\tau)\left(p^d - \frac{\Delta p^d}{\Delta Q}Q(p^d - \Delta p^d)\right) < c^d < (1-\tau)\left(p^d - \frac{\Delta p^d}{\Delta Q}Q(p^d + \Delta p^d)\right)$$

Non-Party Highly Confidential—Outside Counsel Eyes Only