# ATTACHMENT GG

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
BRITTANY N. DEJONG (258766)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**<br><br><br>DATE:     Nov. 16, 2021<br>TIME:     10:00 a.m.<br>CTROOM:  1, 4th Floor<br>JUDGE:    Hon. Yvonne Gonzalez Rogers |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    APPLE'S MOTION TO EXCLUDE PROF. MCFADDEN'S TESTIMONY

       IS IMPROPER ................................................................................................... 5

III.   PROF. MCFADDEN'S TESTIMONY SATISFIES THE *DAUBERT*

       ADMISSIBILITY STANDARD .......................................................................... 7

   A.  Legal Standards ................................................................................................ 7

   B.  Prof. McFadden is Indisputably Qualified .................................................. 8

   C.  Defendant's *Daubert* Challenge Ignores Voluminous Case Law

       Rejecting Similar Efforts to Exclude Expert Testimony............................ 9

   D.  Prof. McFadden's Opinions Withstand Apple's Misguided Criticisms............... 13

       1.  Benchmark Methodology .......................................................................... 13

       2.  Uniform Commission in the But-For World ................................................ 21

       3.  Reliability of the App-Pricing Model........................................................... 21

       4.  Relevant Market Definition ....................................................................... 23

IV.    CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abarca v. Franklin County Water Dist.*,
  761 F. Supp. 2d 1007 (E.D. Cal. 2011)..................................................23

*Aberin v. Am. Honda Motor Co.*,
  No. 16-cv-04384-JST, 2021 U.S. Dist. LEXIS 71680
  (N.D. Cal. Mar. 23, 2021)..................................................8

*Aircraft Tech. Publishers v. Avantext, Inc.*,
  No. C 07-4154 SBA, 2009 U.S. Dist. LEXIS 106526
  (N.D. Cal. Nov. 16, 2009)..................................................7

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) ..................................................1, 5

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)..................................................10

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)..................................................4

*Apple, Inc. v. Samsung Elecs. Co.*,
  2011 U.S. Dist. LEXIS 139049, 2011 WL 7036077
  (N.D. Cal. Dec. 2, 2011)..................................................6

*B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*,
  No. 17-CV-02738 (MKB) (JO), 2020 U.S. Dist. LEXIS 248650
  (E.D.N.Y. Aug. 28, 2020)..................................................12

*Bally v. State Farm Life Ins. Co.*,
  335 F.R.D. 288 (N.D. Cal. 2020)..................................................8

*Bazemore v. Friday*,
  478 U.S. 385 (1986)..................................................9

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
  772 F. Supp. 2d 1111 (N.D. Cal. 2011)..................................................6

*Beltran v. InterExchange, Inc.*,
  No. 14-cv-03074-CMA-KMT, 2018 U.S. Dist. LEXIS 11474
  (D. Colo. Jan. 24, 2018)..................................................11

*Bess v. Ocwen Loan Servicing LLC*,
  334 F.R.D. 432 (W.D. Wash. 2020) ..................................................8

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
  No. 5:15-cv-01370-EJD, 2018 U.S. Dist. LEXIS 57730
  (N.D. Cal. Mar. 30, 2018)..................................................4, 14

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic,*
    152 F.3d 588 (7th Cir. 1998) ............................................................................... 19

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.,*
    923 F. Supp. 2d 1245 (S.D. Cal. 2013) ............................................................... 18

*Brown Shoe Co. v. U.S.,*
    370 U.S. 294 (1962) ........................................................................................ 5, 25

*C.W. ex rel. Wood v. Textron, Inc.,*
    807 F.3d 827 (7th Cir. 2015) ............................................................................... 23

*California v. Infineon Technologies AG,*
    No. C 06-4333 PJH, 2008 U.S. Dist. LEXIS 81251
    (N.D. Cal. 2008) ................................................................................................... 21

*Campbell v. City of Los Angeles,*
    903 F.3d 1090 (9th Cir. 2018) ............................................................................... 6

*Children's Broad. Corp. v. Walt Disney Co.,*
    357 F.3d 860 (8th Cir. 2004) ................................................................................. 8

*Christian v. Mattel, Inc.,*
    286 F.3d 1118, 1129 (9th Cir. 2002) ..................................................................... 6

*Comcast v. Behrend,*
    569 U.S. 27 (2013) ............................................................................................... 23

*Crowley v. EpiCept Corp.,*
    No. 09-CV-0641-L(BGS), 2015 U.S. Dist. LEXIS 195024
    (S.D. Cal. Mar. 11, 2015) ............................................................................... 23, 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) .......................................................................................... 1, 2

*Dial Corp. v. News Corp.,*
    314 F.R.D. 108 (S.D.N.Y. 2015) ......................................................................... 10

*Domingo ex rel. Domingo v. T.K.,*
    289 F.3d 600 (9th Cir. 2002) ............................................................................... 19

*DSU Med. Corp. v. JMS Co.,*
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) .............................................................. 19

*Dukes v. Wal-Mart, Inc.,*
    222 F.R.D. 189 (N.D. Cal. 2004) ........................................................................... 8

*Eastman Kodak Co. v. Image Tech. Servs.,*
    504 U.S. 451 (1992) ............................................................................................. 24

*Edwards v. Nat'l Milk Producers Fed'n,*
    No. C 11-04766 JSW, 2014 U.S. Dist. LEXIS 130621, 2014 WL 4643639
    (N.D. Cal. Sept. 16, 2014) ..................................................................................... 6

*Falise v. Am. Tobacco Co.*,
   258 F. Supp. 2d 63 (E.D.N.Y. 2000) ..................................................................20

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) ...........................................................4, 10

*Freeland v. AT & T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006) .......................................................................16

*Giuliano v. Sandisk Corp.*,
   No. C 10-02787 (SBA), 2015 U.S. Dist. LEXIS 193817
   (N.D. Cal. May 14, 2015) ..............................................................................4, 21

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
   No. 5:11-CV-03613-EJD, 2015 U.S. Dist. LEXIS 9362
   (N.D. Cal. Jan. 27, 2015) .....................................................................................5

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) .............................................................................19

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ...............................................................................5

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) .............................................................................9

*Huawei Techs., Co v. Samsung Elecs. Co*,
   340 F. Supp. 3d 934 (N.D. Cal. 2018) ...............................................................14

*Huezo v. L.A. Cmty. College Dist.*,
   No. CV 04-9772 MMM (JWJx), 2007 U.S. Dist. LEXIS 100116
   (C.D. Cal. Feb. 26, 2007) ...................................................................................14

*Hughes v. The Ester C. Co.*,
   317 F.R.D. 333 (S.D.N.Y. Sept. 30, 2016) ........................................................12

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 U.S. Dist. LEXIS 180914
   (E.D.N.Y. Oct. 15, 2014),
   *aff'd*, 2015 U.S. Dist. LEXIS 90402 (E.D.N.Y. July 10, 2015) ....................12, 20

*In re Apple Inc. Device Performance Litig.*,
   386 F. Supp. 3d 1155 (N.D. Cal. 2019)................................................................7

*In re Blood Reagents Antitrust Litig.*,
   MDL No. 09-2081, 2015 U.S. Dist. LEXIS 141909
   (E.D. Pa. Oct. 19, 2015)......................................................................................10

*In re Capacitors Antitrust Litig.*,
   No. 14-cv-03264-JD, 2020 U.S. Dist. LEXIS 32282
   (N.D. Cal. Feb. 21, 2020)................................................................................1, 11

*In re Capacitors Antitrust Litigation,*
  No. 17-md-2801-JD, 2018 WL 5980139
  (N.D. Cal. Nov. 14, 2018) .................................................................................................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
  308 F.R.D. 606
  (N.D. Cal. July 8, 2015) ..................................................................................................20

*In re Chocolate Confectionary Antitrust Litig.,*
  289 F.R.D. 200 (M.D. Pa. 2012) ....................................................................................12

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.,*
  No. 17-md-2785-DDC-TJJ, 2021 U.S. Dist. LEXIS 116919
  (D. Kan. June 23, 2021) ..................................................................................................11

*In re High-Tech Emp. Antitrust Litig.,*
  289 F.R.D. 555 (N.D. Cal. 2013) ....................................................................................12

*In re High-Tech Emp. Antitrust Litig.,*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..........................................................................20

*In re Lamictal Direct Purchaser Antitrust Litig.,*
  957 F.3d 184 (3d Cir. 2020) ............................................................................................23

*In re Lithium Ion Batteries Antitrust Litig.,*
  No. 13-MD-2420 YGR, 2018 U.S. Dist. LEXIS 35744
  (N.D. Cal. Mar. 5, 2018) .................................................................................................23

*In re Live Concert Antitrust Litig.,*
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................16

*In re Mushroom Direct Purchaser Antitrust Litig.,*
  No. 06-0620, 2015 U.S. Dist. LEXIS 120892
  (E.D. Pa. July 29, 2015) .................................................................................................13

*In re Online DVD Rental Antitrust Litig,*
  No. M 09-2029 PJH, 2010 U.S. Dist. LEXIS 138558
  (N.D. Cal. Dec. 23, 2010) .................................................................................................4

*In re Packaged Seafood Prods. Antitrust Litig.,*
  No. 15-MD-2670 JLS (MDD), 2020 U.S. Dist. LEXIS 175784, 2020 WL 5739316
  (S.D. Cal. Sept. 24, 2020) ...............................................................................................22

*In re Qualcomm Antitrust Litig.,*
  328 F.R.D. 280 (N.D. Cal. 2018) ......................................................................................5

*In re Urethane Antitrust Litig.,*
  No. 04-1616-JWL, 2012 U.S. Dist. LEXIS 181506
  (D. Kan. Dec. 21, 2012) ..................................................................................................11

*In re Wholesale Grocery Prod. Antitrust Litig.,*
  946 F.3d 995 (8th Cir. 2019) ....................................................................................18, 19

*Johnson v. Arizona Hosp. & Healthcare Ass'n*,
No. CV07-1292-PHX-SRB, 2009 U.S. Dist. LEXIS 122807
(D. Ariz. July 14, 2009) ..................................................................................................11

*Laumann v. NHL*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ............................................................................23

*LeClerca v. Lockformer Co.*,
No. 00 C 7164. 2005 U.S. Dist. LEXIS 7602
(N.D. Ill. Apr. 28, 2005) ...........................................................................................16, 17

*Maitland v. Univ. of Minn.*,
155 F.3d 1013 (8th Cir. 1998) .........................................................................................10

*Marmo v. Tyson Fresh Meats. Inc.*,
457 F.3d 748, 758 (8th Cir. 2006) ..................................................................................19

*McDonough v. Toys R Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009) ..............................................................................10

*McMorrow v. Mondelēz Int'l, Inc.*,
No. 17-cv-2327-BAS-JLB, 2021 U.S. Dist. LEXIS 42885
(S.D. Cal. Mar. 8, 2021)....................................................................................................1

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
877 F.2d 1333 (7th Cir. 1989) .........................................................................................18

*Nevarez v. Forty Niners Football Co., LLC*,
326 F.R.D. 562 (N.D. Cal. 2018) ......................................................................................6

*Nucci v. Rite Aid Corp.*,
No. No. 19-CV-01434-LHK, 2020 U.S. Dist. LEXIS 104164
(N.D. Cal. June 14, 2020) ......................................................................................6, 8, 11

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ...........................................................................................10

*ODD 2*,
No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899
(N.D. Cal. Feb. 8, 2016)...................................................................................................20

*Ogden v. Bumble Bee Foods, LLC*,
No. 5:12-CV-01828-LHK, 2014 U.S. Dist. LEXIS 565
(N.D. Cal. Jan. 2, 2014) .....................................................................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ...........................................................................................17

*Prentice v. Amtrak*,
No. 12-cv05856-MEJ, 2014 U.S. Dist. LEXIS 108585
(N.D. Cal. Aug. 6, 2014).....................................................................................................6

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ................................................................................. 8, 12

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) .......................................................................................... 8

*Shaw v. AMN Healthcare, Inc.*,
   326 F.R.D. 247 (N.D. Cal. 2018) .................................................................................. 6

*State of Utah, et al., v. Google LLC*,
   Case No. 3:21-cv-05227 (N.D. Cal.) ........................................................................... 15

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
   No. C 08-04166 SI, 2009 U.S. Dist. LEXIS 106687
   (N.D. Cal. Nov. 16, 2009) ............................................................................................ 7

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*,
   209 F.R.D. 159 (C.D. Cal. 2002) .................................................................................. 8

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .................................................................................................... 24

*United States v. H & R Block, Inc.*,
   833 F. Supp. 2d 36 (2011) .......................................................................................... 25

*Vasquez v. Leprino Foods Co.*,
   No. 17-cv-00796-AWI-BAM, 2020 U.S. Dist. LEXIS 56425, 2020 WL 1527922,
   (E.D. Cal. Mar. 31, 2020) ............................................................................................ 8

*Washington v. Kellwood Co.*,
   105 F. Supp. 3d 293 (S.D.N.Y. 2015) ......................................................................... 10

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ................................................................................... 10

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................................................ 17

**STATEMENT OF ISSUES TO BE DECIDED PER L.R. 7-4(a)(3)**

1. Whether Apple's Motion to Exclude should be summarily denied for violating Local Rule 7-3(a) in that it makes additional arguments on the question of class certification outside of its 25-page opposition;

2. Whether Apple's Motion to Exclude should be denied on its merits because:

   a. Defendant's challenges go to the weight, not the admissibility, of the opinions of Prof. McFadden, which are more properly considered by a jury at trial under Fed. R. of Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) ("*Daubert*"); *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013); *In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2020 U.S. Dist. LEXIS 32282, at *4 (N.D. Cal. Feb. 21, 2020);

   b. Prof. McFadden's opinions are relevant and reliable, and therefore admissible, given that his two-step analysis and econometric methodology are widely accepted by economists to determine and measure the effects of anticompetitive conduct on market prices.

**I.     INTRODUCTION**

Plaintiffs moved for class certification on June 1, 2021 (ECF No. 441). As part of the evidence submitted in support of that motion, Plaintiffs offered the Expert Report of Dr. Daniel L. McFadden, Ph.D. ("McFadden Report" at ECF No. 442-11), winner of the Nobel Prize in Economics and the John Bates Clark Medal, whose opinions have been accepted in a number of courts. *See, e.g., McMorrow v. Mondelēz Int'l, Inc.*, No. 17-cv-2327-BAS-JLB, 2021 U.S. Dist. LEXIS 42885, at *29 (S.D. Cal. Mar. 8, 2021). Plaintiffs retained Prof. McFadden to assess the relevant economic evidence in the case to determine if such evidence was common to consumers, could be used to support their claims, and if the antitrust impact and damages caused by Apple's alleged anticompetitive conduct could be proven with common evidence on a class-wide basis. McFadden Report, ¶ 10. To do so, Prof. McFadden conducted a two-step analysis: he first estimated Apple's but-for commission structure; and he then estimated the effect of Apple's but-for

commission on the prices for apps and in-app purchases ("IAP") in the "but-for world,"[1] using a combination of a multivariable regression model (estimating consumer demand) and a structural model (using profit maximization conditions to estimate developer costs and but-for prices). In their certification motion, Plaintiffs cite the McFadden Report for the proposition that his analysis and methodology can satisfactorily determine and measure by common means the effect of Apple's anticompetitive conduct on app and IAP prices on a classwide basis,  ECF No. 441 at 21, as Prof. McFadden found that consumer transactions were subject to higher prices because of Apple's App Store supra-competitive commissions, resulting in app developers inflating the price of apps and IAPs above a competitive level. McFadden Report, ¶ 131.

Concurrently with its 25-page opposition to Plaintiffs' certification motion (ECF No. 473), Apple filed a separate "*Daubert* Motion to Exclude" Prof. McFadden's testimony and opinions (ECF No. 474).  Notwithstanding the rhetorical flurry, the motion is nothing more than a thinly disguised ploy to make additional arguments opposing class certification.[2]  Indeed, Apple pays mere lip service to *Daubert*, 509 U.S. 579 (*see* Motion at 6, 7), never zeroing in on the purported flaws that would render Prof. McFadden's methodology and testimony "fundamentally unreliable."

Apple seeks to exclude several different parts of Prof. McFadden's testimony for different alleged failings, and to make that argument it cherry picks statements from his expert report and deposition testimony that are both out of context and unrepresentative of his opinions.  Even at that, the reasons Apple gives for the exclusion of Prof. McFadden's opinions are just reiterations of its arguments opposing class certification. This improper doubling of Apple's opposition page count patently violates Local Civil Rule 7-3(a), which requires that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum,"[3] and alone warrants

---

[1]     The "but-for world" or "BFW" is one in which the Apple App Store competes with non-Apple app stores or app developers selling iOS apps and in-app content on the iOS devices. McFadden Report, ¶ 154.

[2]     As part of its scorched-earth litigation strategy, Apple has unleashed a barrage of *Daubert* motions alongside its lengthy class certification opposition briefs, seeking to strike *every* expert put forth by both plaintiff groups in these related cases. According to Apple, all *four* of those experts are each methodologically flawed and their opinions are all unreliable.

[3]     The Motion also fails to include a statement of issues to be decided as required by L.R. 7-4(a)(3).

1   the Motion being summarily denied.

2        At best, Apple offers scattershot criticisms arguing that: (1) Prof. McFadden's benchmark

3   analysis is unreliable because comparators were chosen with the assistance of support staff—a

4   common practice—and used different comparators than what Apple prefers, which Apple calls

5   "ignoring competitive realities"; (2) his allegedly "defective" model relies only on select data and

6   assumes a uniform commission structure that is historically consistent for Apple but which Apple

7   insists is illogical; and (3) his market definition is improper.  Examined under the *Daubert* standard,

8   none of Apple's challenges has merit.

9        *First*, Prof. McFadden employed two methodologies to arrive at a benchmark for the iOS

10  App Store, each roughly consonant in its results with independent analyses by other economists in

11  the two related cases. Along with disputing the results of Prof. McFadden's benchmark analysis,

12  Apple focuses on his comparison to other online software retailers and the chosen conditions for

13  benchmarks, which is not a criticism of the benchmark methodology but instead is a mere difference

14  in judgment over which benchmarks are proper. Apple also takes the bold position that Prof.

15  McFadden may not use Apple's internal documents setting forth App Store costs and profit. To be

16  sure, Apple may attack *its own internal calculations* and may offer explanations why its own profit

17  and loss statements are not complete, but surely it may not prevent an expert from using them in

18  forming his opinions.

19       Apple also quibbles with Prof. McFadden for using supervised support staff for routine data

20  gathering, despite the fact that he personally made the top-level judgments and decisions, such as

21  (1) excluding markets where there were credible allegations of anticompetitive behavior, and (2)

22  excluding markets where the business model was too different, such as gaming consoles where

23  cross-subsidization is more of a factor.  *See* Decl. of Rachele R. Byrd in support of Plaintiffs' Opp.

24  to Def. Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden

25  ("Byrd Decl."), Ex. A (McFadden Tr.) at 135:14-136:25; *see also id*. at 76:9-78:24. At no point did

26  Prof. McFadden say the benchmarks were not his own or that his support staff picked the companies

27  used in them. To the contrary, Prof. McFadden clearly said the benchmarks were *his*. *See* McFadden

28  Report, ¶¶ 13, 161.   No one seriously expects a Nobel Prize-winning economist of Prof.

1    McFadden's eminent stature to spend much time collecting data.  As is standard procedure for

2    expert analyses, he assigned that mundane work to his staff by directing them what to select, and

3    they did the groundwork and submitted companies for Prof. McFadden to review. This is well

4    within the confines of Federal Rules of Evidence, rule 702.  *See BladeRoom Grp. Ltd. v. Facebook,*

5    *Inc.*, No. 5:15-cv-01370-EJD, 2018 U.S. Dist. LEXIS 57730, at \*12 (N.D. Cal. Mar. 30, 2018).

6         *Second*, Apple criticizes Prof. McFadden's conclusion that Apple's commission structure

7    would be uniform instead of stepped in the but-for world, despite its long-term use of a uniform

8    30% commission until quite recently.  Again, such criticism of his conclusions about price-structure

9    in the BFW goes to Prof. McFadden's qualitative judgments, not the reliability of his methodology,

10   as other courts in this district have established:

11        Disputes over the results reached and assumptions made with respect to competing
          methodologies are issues to be decided by the trier of fact.  *In re Online DVD Rental*
12        *Antitrust Litig*, No. M 09-2029 PJH, 2010 U.S. Dist. LEXIS 138558, at \*10 (N.D.
          Cal. Dec. 23, 2010).  At the class certification stage, the issue is not which expert
13        is the most credible, or the most accurate modeler, but rather whether the plaintiffs
          have advanced a plausible methodology to demonstrate that antitrust injury can be
14        proved on a class-wide basis. *Id.*

15   *Giuliano v. Sandisk Corp.*, No. C 10-02787 (SBA), 2015 U.S. Dist. LEXIS 193817, at \*30-31 (N.D.

16   Cal. May 14, 2015).  "Differences in expert opinion as to which benchmark is more reliable does

17   not render [an expert's] opinions unreliable.  Instead Defendants will have the opportunity to cross-

18   examine [the expert] at trial as to the effects of state specific factors and the jury will be able to

19   assign the appropriate weight to the expert's opinions."  *Fleischman v. Albany Med. Ctr.*, 728 F.

20   Supp. 2d 130, 150 (N.D.N.Y. 2010).

21        *Third*, Apple challenges Prof. McFadden's reliance on the market definition expressly

22   endorsed by the Supreme Court in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), arguing that his

23   failure to consider its two-sidedness, and whether dissimilar apps can be in the same aftermarket

24   without being interchangeable, render his opinions flawed and unreliable.  Motion at 22-23.  Apart

25   from being a pure merits dispute, Prof. McFadden can hardly be criticized for rendering opinions

26   based upon the Supreme Court's decision rather than *Apple's* own strained interpretation of the

27   relevant market.  Prof. McFadden's analysis is straightforward and relies on the evidentiary record

28

1   in the case as well as economic evidence such as industry reports, analytics, and market analyses,

2   all indicia consistent with *Apple v. Pepper* and in line with *Brown Shoe Co. v. U.S.*, 370 U.S. 294,

3   325 (1962).  But, most importantly, the evidence he relies upon for this merits issue is common to

4   the Class.

5           In any event, numerous courts have confronted—and rejected—arguments like Apple's,

6   finding that they fail to justify excluding such expert opinions because "[t]hey all go to the weight

7   of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 970

8   (affirming trial court's decision to allow plaintiffs' damages expert to testify regarding past and

9   future lost profits); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613-EJD,

10  2015 U.S. Dist. LEXIS 9362, at *4 (N.D. Cal. Jan. 27, 2015) (quoting *Hangarter v. Provident Life*

11  *& Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("[Q]uestions regarding the nature of [an

12  expert witness'] evidence [go] more to the 'weight' of his testimony—an issue properly explored

13  during direct and cross-examination.")).

14          At bottom, Prof. McFadden's two-step analysis and the econometric methodology he

15  applied are widely accepted by economists to determine and measure the effects of anticompetitive

16  conduct on market prices, making his Report and testimony relevant, reliable, and admissible.  *In*

17  *re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 305 (N.D. Cal. 2018) ("courts regularly recognize

18  that hedonic regression is a widely accepted econometric methodology that satisfies the four

19  *Daubert* factors of testability, peer review and publication, measurable error rate, and general

20  acceptance"). Apple's motion to exclude his testimony should be rejected.

21  **II.    APPLE'S MOTION TO EXCLUDE PROF. MCFADDEN'S TESTIMONY IS**
22  **        IMPROPER**

23          Apple's Motion is, in form and substance, an evidentiary objection to Prof. McFadden's

24  expert report in support of Plaintiffs' certification motion, filed without authorization in the case

25  schedule or pursuant to any request for leave. Apple was required to make any objection within its

26  opposition brief pursuant to Local Rule 7-3(a), not as a separate document but has failed to do so.

27  Local Rule 7-3(a) mandates, in plain terms, that "[a]ny evidentiary and procedural objections to the

28  motion must be contained within the brief or memorandum. Pursuant to Civil L.R. 7-4(b), such

brief or memorandum may not exceed 25 pages of text." *See also* Standing Order in Civil Cases, ¶ 1 ("Parties are expected to consult and comply with all provisions in the Local Rules" and failure to comply is grounds for "appropriate sanctions."). *Daubert* motions are no exception to Local Rule 7-3(a). Nor does the case schedule permit filing of separate *Daubert* motions on class certification (unlike the provision therefor in conjunctions with dispositive motions). ECF No. 198.

Courts in this district routinely strike such motions filed as a freestanding submission without leave. For example, in *Nucci v. Rite Aid Corp.*, No. No. 19-CV-01434-LHK, 2020 U.S. Dist. LEXIS 104164, at *21-22 (N.D. Cal. June 14, 2020), the Court denied a *Daubert* motion for noncompliance."[4] Apple itself has taken advantage of this rule. *See Apple, Inc. v. Samsung Elecs. Co.*, 2011 U.S. Dist. LEXIS 139049, 2011 WL 7036077, at *3 (N.D. Cal. Dec. 2, 2011) (Samsung's motion denied for noncompliance). Yet Apple flouts that rule now.

Enforcement of the local rule is appropriate for the additional reason that Apple devotes much of its Motion to Exclude to reiterating its class certification arguments. For example, Apple argues that Plaintiffs' showing classwide injury is marred by the number of uninjured class members. ECF No. 473 at 7-17. These arguments—which address the merits of class certification, not any *Daubert* issue—are an improper attempt to skirt Local Rule 7-3(b), which limits the opposition brief to 25 pages. Trial courts enjoy "considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing" because "[a]t some point, enough is enough." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002). This includes inherent authority to strike any supplemental filing or other creative device that, in effect, evades the page limits set by local rule. *See also Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No.

---

[4]    *See also Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 591 (N.D. Cal. 2018); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011), abrogated on other grounds by *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018) (court struck collateral motions and "only address[ed] the evidentiary arguments . . . raised in the parties' briefs"); *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 255 (N.D. Cal. 2018) (striking *Daubert* motion pursuant to Local Civil Rule 7-3(a)); *Prentice v. Amtrak*, No. 12-cv05856-MEJ, 2014 U.S. Dist. LEXIS 108585 at *14 (N.D. Cal. Aug. 6, 2014) (same); *Ogden v. Bumble Bee Foods, LLC*, No. 5:12-CV-01828-LHK, 2014 U.S. Dist. LEXIS 565, at *60 (N.D. Cal. Jan. 2, 2014) (same); *Edwards v. Nat'l Milk Producers Fed'n*, No. C 11-04766 JSW, 2014 U.S. Dist. LEXIS 130621, 2014 WL 4643639, at *1 (N.D. Cal. Sept. 16, 2014) (same).

C 08-04166 SI, 2009 U.S. Dist. LEXIS 106687, at *21 (N.D. Cal. Nov. 16, 2009) (striking exhibit with attorney argument because "counsel was required to include all argument within the text of the reply brief"); *Aircraft Tech. Publishers v. Avantext, Inc.*, No. C 07-4154 SBA, 2009 U.S. Dist. LEXIS 106526, at *4 (N.D. Cal. Nov. 16, 2009) (striking multiple summary judgment motions because collectively they exceeded twenty-five pages and noting that "[j]udicial economy and concise argument are purposes of the page limit."). Apple knows this as well, having moved successfully in prior cases to exclude supplemental filings that "attempt to evade the page limits." *See In re Apple Inc. Device Performance Litig.*, Case No. 18-md-2827 (N.D. Cal. Sept. 14, 2018), ECF No. 197 at n.21; *In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1162 (N.D. Cal. 2019) (agreeing with Apple and excluding supplemental filing).

Nearly every page of Apple's class certification opposition brief criticizes the opinions offered by Prof. McFadden. In that brief Apple *cross-references the entire argument section of its Daubert motion*, where it devotes nineteen *additional* pages to the issues. *See* ECF No. 474 at 7-25. Apple uses its separate *Daubert* motion to *double* the 25-page limit for its opposition brief to which the parties stipulated and which the Court ordered. This is precisely what Rule 7-3(a) prohibits. If Apple believed it required fifty pages to oppose class certification, it should have sought a modification to the briefing schedule. By noticing a separate *Daubert* motion, Apple has side-stepped the case schedule and modified it unilaterally, without the required showing of good cause and without giving Plaintiffs an opportunity to seek similar relief. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

Accordingly, Apple's motion should be summarily denied on this basis alone.

## III.   PROF. MCFADDEN'S TESTIMONY SATISFIES THE *DAUBERT* ADMISSIBILITY STANDARD

### A.   Legal Standards

The Ninth Circuit's policy on the admissibility of expert testimony under Fed. R. Evid. 702 to "assist the trier of fact . . . to understand the evidence . . . [or] determine a fact in issue" is liberal:

> The requirement that the opinion testimony "assist the trier of fact" "goes primarily to relevance." For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer

1    reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky
     but admissible evidence is to be attacked by cross examination, contrary evidence,
2    and attention to the burden of proof, not exclusion. … "[T]he test under *Daubert* is
     not the correctness of the expert's conclusions but the soundness of his
3    methodology." Under *Daubert*, the district judge is "a gatekeeper, not a fact finder."

4    *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (footnotes omitted).

5          "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the

6    admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-

7    examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no

8    assistance to the jury must such testimony be excluded." *Children's Broad. Corp. v. Walt Disney*

9    *Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (internal quotations omitted). Furthermore, as another court

10   in this District recently emphasized in denying a similar motion to strike expert testimony:

11         "Inadmissibility alone is not a proper basis to reject evidence submitted in support
           of class certification." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir.
12         2018).  Rather than the *Daubert* "gatekeeper" standard, "a lower *Daubert* standard
           should be employed at this [class certification] stage of the proceedings." *Dukes v.*
13         *Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004) (quoting *Thomas & Thomas*
           *Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 162-
14         63 (C.D. Cal. 2002)).  "[T]he question is whether the expert evidence is sufficiently
           probative to be useful in evaluating whether class certification requirements have
15         been met." *Id*.  "[A]n inquiry into the evidence's ultimate admissibility should go
           to the weight that evidence is given at the class certification stage." *Sali*, 909 F.3d
16         at 1006.

17

18   *Aberin v. Am. Honda Motor Co.*, No. 16-cv-04384-JST, 2021 U.S. Dist. LEXIS 71680, at *12 (N.D.

19   Cal. Mar. 23, 2021) (collecting cases).[5]  *See also Nucci*, 2020 U.S. Dist. LEXIS 104164, at * 25

20   (challenges that one methodology is better than another "go to weight and not admissibility")

21   (citation omitted).

22         **B.    Prof. McFadden is Indisputably Qualified**

23         Apple does not dispute Prof. McFadden's qualifications. His standing as a preeminent

24   _____

25   [5]     Citing *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 297 (N.D. Cal. 2020) (denying
     motion to strike expert testimony because *Sali* "explicitly instruct[s] that a *Daubert* analysis alone,
26   while relevant, should not prevent a court from considering expert testimony at the class
     certification stage"); *Bess v. Ocwen Loan Servicing LLC*, 334 F.R.D. 432, 437, 440 (W.D. Wash.
27   2020) (finding that an expert's methodology had "little or no persuasive value" but denying motion
     to exclude pursuant to *Sali*); *Vasquez v. Leprino Foods Co.*, No. 17-cv-00796-AWI-BAM, 2020
28   U.S. Dist. LEXIS 56425, 2020 WL 1527922, at *8 (E.D. Cal. Mar. 31, 2020) (applying *Sali* to
     "expert testimony that supports class certification").

economist is beyond dispute.  *See* ECF No. 66 at 36:12-15 (The Court: "*Daubert* motions are there to attack the ability of the person who is given the opinion to opine on that topic. It is not an opportunity to say that you object with that person's opinion.").  Prof. McFadden has won two of the most prestigious awards an economist can receive:  the Nobel Prize in Economics in 2000 for his role in creating the field of discrete choice modeling; and the John Bates Clark Medal in 1975, awarded to the American economist under 40 who has made a significant contribution to the field. McFadden Report, App'x A.  He received his Ph.D. in Economics in 1962 from the University of Minnesota and, in addition to serving as Principal of the Brattle Group, Prof. McFadden is currently the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the Presidential Professor of Health Economics and Policy Emeritus at the University of Southern California.  *Id.*  He has held numerous other academic appointments and has served as a testifying expert for more than 30 years. *Id.*

### C.    Defendant's *Daubert* Challenge Ignores Voluminous Case Law Rejecting Similar Efforts to Exclude Expert Testimony

Most of Apple's complaints here fall into the classic "weight not admissibility" area, in that it asserts that Prof. McFadden has omitted or ignored a variable or factor that Apple regards as important. In doing so, Apple ignores abundant case law confirming that similar disputes about modeling go to the testimony's weight, not its admissibility.  *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (inadequacies in the variables in a model "affect the analysis' probativeness, not its admissibility"); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility"); *In re Capacitors Antitrust Litigation*, No. 17-md-2801-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018) (challenges to the variables in a regression analysis model "do not go to the admissibility of his opinions, but rather to matters of weight and probative value for a jury to evaluate.").

As the Ninth Circuit held in reversing the district court's exclusion of a regression analysis because "objections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence, and should be addressed by rebuttal, not exclusion'":

> [A]nalysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented.... [I]t is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results....

*Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) (quoting *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998)).

So too, a "benchmark need not be perfect to allow for [a] reasonable estimate of damages." *Fleischman*, 728 F. Supp. 2d at 150 (citing *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 491 (E.D. Pa. 2009)).  Indeed, motions to exclude based on challenges to a benchmark period are frequently rejected as it "implicates the weight a jury may give [an expert's] testimony, not its admissibility."  *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 U.S. Dist. LEXIS 141909, at *35 (E.D. Pa. Oct. 19, 2015).  *See also id.* at *68 n.18 ("Many courts . . . have held that the question whether plaintiffs have met their burden of proving comparability should be left to the trier of fact to resolve because comparability challenges generally involve weighing facts.").[6]

This is particularly true where, as here, Apple's long-standing anticompetitive conduct has rendered selection of a perfectly comparable benchmark difficult or impossible. For example, in *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118-19 (S.D.N.Y. 2015), the court held that arguments regarding suitability of selected benchmarks go to the weight of the analysis, not its admissibility, because the defendant "allegedly maintained a monopoly in the market . . . since at least 2000," thus "creating a benchmark using [the defendant's] prices during a time of 'robust competition' is not feasible" and "the selection of perfectly comparable benchmark firms aside from [the defendant] is impossible where [the defendant's] alleged monopoly prevents comparable firms from operating within its market").  *See also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) ("while the evidence underlying [the expert's] Yardstick analysis may, in defendant's view,

---

[6]     Apple is no stranger to this concept, having benefited from this when, as the plaintiff in a different case, its own expert's benchmark analysis was challenged as in inaccurate.  *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014) (reversing lower court's exclusion of Apple's expert and holding that if a benchmark is inaccurate, "[defendant] is free to challenge the benchmark or argue for a more accurate benchmark.  But such an argument goes to evidentiary weight, not admissibility"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc).

be thin, questionable, or self-servingly selective, our role as gatekeeper is not to divest defendant
of the task of challenging the weight of such evidence before the trier of fact"); *In re Urethane
Antitrust Litig*., No. 04-1616-JWL, 2012 U.S. Dist. LEXIS 181506, at *42 (D. Kan. Dec. 21, 2012)
(Criticisms of an expert's selection of "benchmark years go to the weight of his opinions and not
their admissibility."); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust
Litig*., No. 17-md-2785-DDC-TJJ, 2021 U.S. Dist. LEXIS 116919, at *146 (D. Kan. June 23, 2021)
(same); *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292-PHX-SRB, 2009 U.S. Dist.
LEXIS 122807, at *10 (D. Ariz. July 14, 2009) (even where benchmark model "not fully fleshed
out in [expert's] report," court was "satisfied that it could be used to provide an estimate, [which]
the Court [could] revisit . . . if it becomes clear at a later point in the litigation that the benchmark
method is flawed"); *Beltran v. InterExchange, Inc*., No. 14-cv-03074-CMA-KMT, 2018 U.S. Dist.
LEXIS 11474, at *26 (D. Colo. Jan. 24, 2018) (denying motion to strike expert testimony because
"an over-technical application of *Daubert* is inappropriate"; even where benchmark model does not
include all potential factors, it "does not render the Model insufficient or unscientific at this stage").

Here, Apple has foreclosed virtually all competition for the sale of iOS apps and IAP—
which have occurred only through the App Store since 2008—for more than 13 years.  The success
of Apple's monopoly renders selection of a perfectly comparable benchmark difficult or
impossible.  That is not to say that Apple gets a free pass from antitrust liability to injured consumers
because of the challenges its longstanding monopoly pose.  Nor is it a basis on which to preclude
the Consumer Plaintiffs' expert, Prof. McFadden, from opining that recent developments in the PC
gaming market better reflect a yardstick for a competitive App Store than Apple's preferred
comparators, the Google Play store or gaming consoles.  Such opinions are admissible under
*Daubert* and should be presented to the jury for their consideration.

The law permits Apple to cross-examine Prof. McFadden because "[w]hat [an expert] did
or didn't take into account in constructing his analysis 'may be grist for a good cross-examination
at trial, but they do not play a material role in deciding whether [the expert's] work should be
admitted under Rule 702.'"  *Nucci*, 2020 U.S. Dist. LEXIS 104164, at *26 (quoting *Capacitors*,
2020 U.S. Dist. LEXIS 32282, at *4 (N.D. Cal. Feb. 21, 2020).  *See id.* at *6 ("Learned professionals

can have strong disagreements about their analyses of facts, and the strength of their disagreement does not mean that one or the other must be dismissed as a quack."); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 586 (N.D. Cal. 2013) (denying defendant's *Daubert* motion because challenge to the probativeness of statistical evidence in a regression model does not render it "so methodologically flawed as to warrant exclusion. Rather, this evidence is of the type to be 'attacked by cross examination, contrary evidence, and attention to the burden of proof.'") (quoting *Primiano*, 598 F.3d at 564).

One of Apple's parade of competing experts[7] – Dr. Prince – disagrees with some of Prof. McFadden's conclusions, but that does not render his testimony inadmissible. Antitrust defendants routinely challenge the reliability of a plaintiff's economists' opinions, yet courts do not find such attacks "fatal to admissibility under Rule 702." *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 211-13 (M.D. Pa. 2012) (while plaintiffs' expert's analysis was limited, Defendants' expert's criticism "goes only to the weight" of such analysis). *See also B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*, No. 17-CV-02738 (MKB) (JO), 2020 U.S. Dist. LEXIS 248650, at *32 (E.D.N.Y. Aug. 28, 2020) ("While other experts in the field might ultimately disagree as to the similarity between the two markets, [plaintiff's expert] relies on established and reliable methods in the field of economics to reach his conclusions and applies them in a reliable way to the facts of this case.") (citing *Hughes v. The Ester C. Co.*, 317 F.R.D. 333, 341 (S.D.N.Y. Sept. 30, 2016) ("Deference to experts is particularly appropriate when expert testimony concerns soft sciences like economics.")).

Economics and statistics "require the use of professional judgment, [such that] expert testimony [in those fields] is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 U.S. Dist. LEXIS 180914, at *117 (E.D.N.Y. Oct. 15, 2014),

---

[7]     Apple relies upon a bevy of experts in its barrage of motion practice, but only the Expert Report of Jeffrey T. Prince, Ph.D. ("Prince Report") is targeted at Prof. McFadden's work alone. The expert reports from Apple's remaining experts take issue with the experts in both class actions and address only a few specific portions of Prof. McFadden's analysis or testimony, all of which will be addressed in Plaintiffs' Reply in Support of Class Certification.

*aff'd*, 2015 U.S. Dist. LEXIS 90402 (E.D.N.Y. July 10, 2015). This is so because:

> As a general matter, "[m]odels are not the real world; rather, such models are a reasoned and educated attempt to describe reality by accepted methods of statistical analysis using available real world observations, data, and knowledge. The process is not like a Pythagorean demonstration of a mathematical truth that can be revealed indisputably. Neither is it simple 'numbers crunching.'" Indeed, "[e]ven if the data relied on by the expert is 'imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.'"

*In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 U.S. Dist. LEXIS 120892, at *52 (E.D. Pa. July 29, 2015) (internal citations omitted); *see also id.* at *46 ("benchmark determinations need not be perfect, indeed they could even be 'shaky' but 'admissible' under *Daubert*").

### D.   Prof. McFadden's Opinions Withstand Apple's Misguided Criticisms

#### 1.   Benchmark Methodology

Prof. McFadden employed two methodologies to arrive at a benchmark for the iOS App Store, each of which is roughly consonant in its results with independent analyses from other economists for both the Developers and Epic.  To the extent Apple's quarrel is with something other than his results, it is that Prof. McFadden's first method, his comparison to other online software retailers, is qualitative instead of quantitative.

Prof. McFadden's first method for assessing the commission in the But-For world is to study "markets that have similar characteristics but are more competitive."  McFadden Report, ¶ 155. After studying the underlying data, Prof. McFadden selected the comparative benchmark he believed was the most appropriate for constructing the BFW: the market in which stores and distributors sell PC games, and particularly as it has evolved in recent years.  McFadden Report, ¶¶ 154-62.  Prof. McFadden clearly expressed *his own judgment* as to the suitability of those benchmarks.  *Id.* at ¶¶ 13, 161.

Unsurprisingly, to select the benchmarks, Prof. McFadden relied on his research staff to cast a wide net for *possible* comparators, with instructions for what candidates to exclude.  Byrd Decl., Ex. A (McFadden Tr.) at 135:23-136:25.  Such involvement is contemplated by Federal Rule of

Evidence 703, which "explicitly permits an expert to rely on facts or data provided by others." *BladeRoom*, 2018 U.S. Dist. LEXIS 57730, at *12.  The "'facts and data' upon which an expert bases his opinions do not have to be personally known to him, but may instead be 'made known' to him by 'presentation . . . outside of court and other than by his own perception.'"  *Huezo v. L.A. Cmty. College Dist.*, No. CV 04-9772 MMM (JWJx), 2007 U.S. Dist. LEXIS 100116, at *12 n.18 (C.D. Cal. Feb. 26, 2007) (citing Fed. R. Evid. 703 & Advisory Committee Notes).  An expert may rely upon "'facts and data' gathered by his associates" and then give "competent expert testimony." *Id*. (rejecting argument that expert's testimony was inadmissible because he relied upon data gathered by staff).

Likewise, in *Huawei Techs., Co v. Samsung Elecs. Co*, 340 F. Supp. 3d 934, 994-95 (N.D. Cal. 2018), the Court rejected claims that an expert's use of data prepared by a team working under him was unreliable without his direct involvement in the bulk of the work done. As the court held, the database collected by staff "is not an 'opinion,' it is data from which [the expert] forms his opinions." *Id*. at 995.

Prof. McFadden, as the testifying expert, arrived at two key guides for the analysis. *First*, no market was an acceptable benchmark if there was a credible allegation that it was tainted with anticompetitive conduct. *See* Byrd Decl., Ex. A (McFadden Tr.) at 136:4-7. *Second*, no market was an acceptable comparator if the business model was too different from the iOS App Store. *Id*. This second criterion particularly applied to Apple's preferred comparator, the console gaming market, where cross-subsidization of hardware by the makers is common and longstanding.

Apple complains that Prof. McFadden did not do his own work, or that he did not do *any* work, to set the conditions for selecting the benchmarks. That is not so. As Prof. McFadden clearly stated: "*I* currently calculate that … the 'But-For' commission would have ranged between 10 and 12 percent," McFadden Report, ¶ 13; *see also id*., ¶ 161 ("*I* use 10-12 percent as the But-For commission rates. *I* also use ███████ and 15 percent as the upper and lower bounds for sensitivity checks.") (emphasis added).  Apple cites no authority—and Consumer Plaintiffs are not aware of any—barring an expert from using support staff to supply information to consider on the way to reaching his own opinion, as Prof. McFadden did here.  Apple may dispute Prof.

McFadden's conclusion because he rejected many of Apple's preferred comparators, but Apple's dissatisfaction with his conclusion is not a valid basis on which to exclude his testimony.

Apple posits that Google Play and the Sony game store are better comparators. Google, like Apple, runs an app store for mobile devices. While Google's exclusionary policies are less complete and its share of mobile device sales is slightly lower than Apple's, Google is facing a suit by the majority of State Attorneys General alleging monopolization and asserting that its commission is anticompetitive. *State of Utah, et al., v. Google LLC*, Case No. 3:21-cv-05227 (N.D. Cal.). Likewise, Sony's PlayStation game store is frequently touted by Apple as supporting its high commission rate, but the console gaming industry has a long history of cross-subsidizing game consoles to encourage sales in the console market and increase game sales in the aftermarket. *See* Byrd Decl., Ex. A (McFadden Tr.) at 76-80. While Sony may make a profit on the current generation of consoles, the deep history of cross-subsidization has set a pattern of commission structures in that market that, in Prof. McFadden's considered judgment, make it unsuitable as a benchmark.

Having rejected the benchmarks that Apple prefers for reasons grounded in sound economic logic, Prof. McFadden reasons that the next closest analogue is the PC game store market. Dr. Evans, testifying for Epic in the *Epic v. Apple* trial, also believed that the PC game store market was an edifying comparator. *See* McFadden Report, ¶ 156 n.220. Dr. Evans's testimony was admitted in the *Epic v. Apple* trial, and Prof. McFadden's opinion should be admitted here as well.

Prof. McFadden's analysis examines a trend: "[W]hat has happened to games app stores on the PC platform in the last few years." McFadden Report, ¶ 156. He considered a number of developments reported in trade media in examining the history of the Epic store launch, Steam's subsequent changes to its commission rates, the launch of Discord's game store and subsequent commission reduction, and Microsoft's recent (but pre-announced) commission reduction.

Apple argues that Prof. McFadden's analysis fails to address the difference it perceives in the "quality dimension of competition" in the app store market. Motion at 11. Fearing the very competition it touts, and unwilling to compete on quality, Apple has *eliminated* that factor by monopolizing the entire market for iOS apps and IAP for thirteen years. When Apple's CEO, Tim

1    Cook was asked during the *Epic v. Apple* trial how Apple might compete with another app store,

2    Cook admitted he did not "know what [it] would do" to differentiate itself.  Byrd Decl., Ex. B (*Epic*

3    Tr.) at 3934:23-3935:2.  When then asked if Apple' monopoly made it impossible for a competing

4    app store to do as good a job as Apple's App Store, Cook said, "It's an experiment I wouldn't want

5    to run."  *Id.* at 3935:11-13.  By Cook's admission, Apple's assertion of better quality than a

6    hypothetical competitor is purely speculative, and its criticism of Prof. McFadden's analysis is

7    disingenuous at best.

8         So, too, Apple's reliance on *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976

9    (C.D. Cal. 2012), misses the mark.  In that case, the expert failed to include any explanatory

10   variables except the one being tested, and thus attributed the entire price effect to that single

11   explanatory variable.  *Id.* at 976.  The purported—hypothetical—difference in the quality of app

12   stores is not demonstrably the primary driver of commissions in the app market.  It is merely a

13   hypothetical factor that Apple speculates might have some effect, if it faced competition, depending

14   on how Apple might respond to such competition, which Cook admits he cannot foresee.  This case

15   and *Live Concert* are not alike.

16        Likewise, in *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 144 (S.D.N.Y. 2006), the expert

17   relied upon a single variable in examining electronic goods price indices while ignoring "crucial

18   variables" of price differences related to the switch from analog to digital phones and the

19   incorporation of cameras into phones).  Apple has not demonstrated that app store "quality" is a

20   "crucial variable" in the app market in the face of competition, and even Apple's CEO cannot say

21   that it would be, much less is it a factor that Prof. McFadden was required to include.

22        Apple makes much of the fact that Discord has closed its storefront.  However, Discord as

23   *not* stopped distributing apps.  As Prof. McFadden (Report at n.233 & n.234) notes, it continues to

24   distribute apps as a distribution partner for developers and it still follows the model described in his

25   benchmark analysis.[8]  In any event, Apple's attempt to draw a parallel to *LeClercq v. Lockformer*

26   *Co.*, No. 00 C 7164, 2005 U.S. Dist. LEXIS 7602, at *14-15 (N.D. Ill. Apr. 28, 2005), in which

---

[8]   *See*  https://productmint.com/the-discord-business-model-how-does-discord-make-money/
(explaining that Discord "partners up with game developers that sell games exclusively on their
servers").

the expert ignored 17 data samples that were "clearly material" to his hydrogeological analysis but contradicted his opinion, misses the mark.  Motion at 12.  There, the court held that the expert's "failure to discuss the import of, or even mention, these contrary material facts in his reports amounts to 'cherry-picking the facts'" and barred that expert from testifying (but denied the motion as to two other experts).  *Id*.  But variable selection and industry benchmarks are quite different.  Here, Apple has *not* identified *any* purported "contrary" material facts that Prof. McFadden supposedly has ignored.  Thus, *LeClercq* is inapposite.  Moreover, Prof. McFadden's analysis is based on a trend in the highly competitive PC game store market, so that the exit of any competitor bears more on the quality of competition than the calculation of the sustainable rate.

Having examined a series of developments in the PC game market, Prof. McFadden then turned to different, quantitative methods as cross-checks.  Prof. McFadden examined the profit margin of the iOS App Store in his section on monopoly power.  McFadden Report, ¶¶ 115-22. He then used Apple's own internal documents to derive App Store expenses and profits.  Apple continues to deny that any of its own documents show its App Store cost, or even that it ever analyzes such a thing (*see, e.g.*, Byrd Decl., Ex. B (*Epic* Tr.) at 3892).  But as the Court is well-aware from extensive testimony in the *Epic v. Apple* trial, Prof. McFadden uses Apple's own documents that, *on their face*, show App Store cost and profit figures.[9]

Apple argues that Prof. McFadden may not use its internal profit and loss documents because he is not an accountant and does not understand the accounting judgments those documents reflect.  Motion at 15-16.  At most, that argument goes to the weight of his testimony, not its admissibility, and Apple's contrary citations are unsupportive.  For example, *Mid-State Fertilizer*

---

[9]      Apple's citation to *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), is thus distinguishable because the expert "relied on a *one-page* set of profit and volume projections" to calculate damages, *id.* at 292 (emphasis added), and no benchmark was involved. Prof. McFadden utilized Apple's own internal profit and loss documents (not projections) from 2013 to 2019.  *See, e.g.*, McFadden Report, ¶¶ 40, 117. *Cf. ZF Meritor,* 696 F.3d at 292 ("Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections."). *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) is similarly inapposite as it dealt with Title IX where defendant's expert was an assistant principal at a different high school and former softball coach testifying about the "unique nature of high school softball" after a cursory on-site visit, which the court found speculative, inherently unreliable and unsupported by the facts. *Id.*

*Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989), involved a seven-sentence-long expert affidavit submitted on summary judgment, devoid of any factual references or reasoning.  By contrast, Prof. McFadden's report is 99 pages long, and every conclusion in it is drawn with reference to specific facts or explanations.  It explains precisely what he reviewed and the bases for his opinions.  Similarly, in *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1254 (S.D. Cal. 2013), the expert calculated damages based on the defendant's profits rather than plaintiff's lost sales data, which violated established law.  *Id.* at 1257.  That is not at all what Prof. McFadden has done here; he has not mixed apples and oranges.  Rather, he used *Apple's* own profit and loss documents to represent *Apple's* costs and profits, from which he opines that even at a commission rate of ▮▮, the App Store would still be profitable for Apple. McFadden Report, ¶ 161.  In a transparent attempt to walk away from evidence of its enormous App Store profit, Apple may attack the accuracy of its *own* profit and loss calculations, but it may not prevent an expert from using them in forming his opinions.

Prof. McFadden further examines Apple's changes to its commissions and notes its recent reductions in commission for both later-year subscriptions and small developers, which are both at 15%, and concludes that this large and profitable commission represents the upper bound for what Apple could command in a competitive market.  *Id.* at ¶ 161.  Having calculated upper and lower bounds from Apple's own behavior, commissions and profit margins, Prof. McFadden concludes that the observed low commissions evolving in the PC game market fall within these bounds, and competitive pressures would have, but for its monopoly conduct, settled Apple into a commission in the middle of this range, or 10-12%.  *Id.* at ¶¶ 160-61.

Despite this thorough methodology, Apple contends that Prof. McFadden's opinion should be excluded due to what it calls an "unscientific" benchmark analysis (Motion at 8-9), relying predominantly on inapposite, out of circuit authority.  For example, the court's opinion on summary judgment in *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) examined a regression model, not a benchmark analysis, that failed to control for non-conspiratorial factors and was based on "an unfounded assumption that independent retailers' charges . . . followed the same pattern as [the benchmark] absent the [purported conspiracy agreement]." *Id.* at

999.  The expert's be            ark selection was not challenged.  Even so, the Eight Circuit recognized that doubts about an expert's opinion should be resolved in favor of admissibility because "rejection of expert testimony is the exception rather than the rule." *Id.* at 1001 (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006)).  Another summary judgment decision, *Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998), did not examine a benchmark analysis or apply *Daubert* as the standard for reviewing the expert testimony, and rejected a statistical study which failed to adjust for any other factor that could have affected the independent variable, price in clinical services, except for one, thus effectively attributing the "entire difference [in price] . . . to the [anticompetitive conduct]." 152 F.3d at 593. In contrast, Prof. McFadden's regression model spans the start of the class period (July 10, 2008) through the end of September 2019 based on the transactional data produced by Apple (*see* McFadden Report, ¶¶ 8, 138), separates and accounts for variables unrelated to Plaintiffs' theory of liability (*e.g.*, removing from the data transactions not from iOS-installed devices, apps developed by Apple, and enterprise transactions, *id.*, App'x C at ¶ 2), and utilizes variable (marginal) cost information to ensure consistency.

Apple also takes issue with Prof. McFadden's use of a single commission rate structure in the But-For world.[10]  Apple complains that because Steam applies its lowest commission rate to ▌▌▌▌▌▌▌▌▌ developers, "Prof. McFadden's baseline data is wrong." Motion at 10.  It means no such thing.  Steam lowered its commission rate for ▌▌▌▌▌▌▌ of its largest and best selling games and, more importantly, on those games that drive its revenue.  Prof. McFadden believes that the commission reduction reflected Steam's need to respond to the prices of Discord and Epic, and that the reduction in commission rate, even though not uniform, tells the story of a necessary

---

[10]      Apple's cases are distinguishable.  *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 603 (9th Cir. 2002) involved medical testimony regarding causation of injury on summary judgment; *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) excluded on summary judgment an expert opinion that a train lookout should have been able to see a track separation when there was no evidence that a track separation, or any other visible tract defect, as based on pure speculation; and in *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1158-59 (N.D. Cal. 2003), a patent infringement case, the court excluded opinion of a reconstructed market that failed to include multiple market substitutes and provided no explanation for use of terms in a hypothetical contract that the party had rejected in negotiations and were out of line with prior agreements.

response to competition in the competitive PC game market.  McFadden Report, ¶¶ 154-60.  Having made those judgments, Prof. McFadden then utilized the rates adopted by Steam's competitors as benchmark rates rather than those of Steam, because Steam's reduction was itself a reaction to the competitive pressure of Discord and Epic.  McFadden Report, ¶ 157.  Valve, the incumbent there, also faces legal challenges.[11]  Moreover, Steam's discounted commission for app developers with more than $10 million in sales was a reaction to competition from other app stores like Epic and Discord.  Steam's commission rate may go down further for a larger set of app developers, depending on how the market evolves.  McFadden Report, ¶ 157 n.222.

Prof. McFadden's thoughtful analysis constitutes an economic judgment, which Apple's seven experts are free to (and do) contest, but it is *not* a data error.  "The results of a court's *Daubert* inquiries in cases involving statistical modeling need not be precisely quantifiable in a way all experts would unanimously agree upon."  *Falise v. Am. Tobacco Co*., 258 F. Supp. 2d 63, 68 (E.D.N.Y. 2000) (citing Fed. R. Evid. 703).  As other courts have outlined:

> [T]he task presented by a "battle of the experts" in the Rule 23(b)(3) context is one of determining whether the plaintiff's expert testimony is evidence that is (1) common to the class; (2) methodologically capable of addressing the question it seeks to answer; and (3) substantially probative of the issue, enough so that a reasonable factfinder could rely on it in part to resolve the case on the merits. The testimony need not be flawless or impenetrable—indeed, almost no testimony ever is—and the factfinder will ultimately weight the testimony accordingly. At the class certification stage, however, the expert testimony must simply provide a reliable basis upon which to determine that the putative class's claims are best served by class treatment.

*In re Air Cargo*, 2014 U.S. Dist. LEXIS 180914, at *211-12 (citing *In re High-Tech Emp. Antitrust Litig*., 985 F. Supp. 2d 1167, 1184 (N.D. Cal. 2013)).

None of Apple's arguments suggests that Prof. McFadden's modeling is so fundamentally flawed that it warrants exclusion under *Daubert*.  This is not a case with a "glaring error," *see In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 629 (N.D. Cal. July 8, 2015), or "so lacking in substance as to permit rejection at the certification stage," *ODD 2*, No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899, at *37 (N.D. Cal. Feb. 8, 2016).  "[T]he relevant question is

---

[11]    *See also* https://www.pcgamer.com/lawsuit-claims-valve-is-abusing-its-market-dominance-to-keep-prices-high/;    https://www.pcgamer.com/overgrowth-developer-wolfire-games-files-antitrust-lawsuit-against-valve/.

whether Plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury and damages can be proven on a class-wide basis through the use of a common methodology," and Plaintiffs have more than done so in reliance on Prof. McFadden's analysis. *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *56 (citing *California v. Infineon Technologies AG*, No. C 06-4333 PJH, 2008 U.S. Dist. LEXIS 81251, at *9 (N.D. Cal. 2008)).

### 2.    Uniform Commission in the But-For World

Apple separately takes issue with Prof. McFadden's conclusion that Apple's commission structure would be uniform (like Epic and Discord, and within the range they have set) instead of stepped in a But-For world.  This argument contradicts Apple's own dogged insistence that it is inappropriate to back-cast present circumstances in any benchmark to thirteen years of the App Store's operation.  *See* Motion at 14.  Apple arbitrarily picked 30% as its commission rate at the inception of the App Store and, except for a discount commission on subscription renewals adopted in 2016, it kept 30% as the commission rate from 2008 until November of 2020, *after* Consumer Plaintiffs prevailed in the Supreme Court and after Developers commenced their class action challenging the App Store commission.  Prof. McFadden's analysis is premised on a But-For world in which Apple faced competition over the *entire history* of the App Store.  *Id.*  For Apple to insist it would have varied its commission structure over time or used a complex commission structure in the face of competition all along, even though it used a single commission rate for almost the App Store's entire existence, is a convenient assertion rather than a fact.  At best, the economists for both parties will offer competing opinions based upon the judgments they make after examining the relevant behavior in comparable competitive markets.  Apple's experts may reach different conclusions than Prof. McFadden and they may criticize Prof. McFadden for using a single commission structure, but disagreements over outcomes are simply matters of expert judgment, not over the admissibility of the opinions.

### 3.    Reliability of the App-Pricing Model

Apple argues that Prof. McFadden's model contains econometric or data coding errors. Motion at 17-19.  This argument puts great weight on an untested assertion by one of Apple's own experts, Dr. Prince, that criticizes the data sampling methodology Prof. McFadden used to manage

1    the analysis of a database comprising more than 60 billion transaction records.  While Dr. Prince

2    claims that Prof. McFadden's sampling is unreliable, Dr. Prince's work cannot be replicated and

3    any possible sampling error cannot be addressed.  Dr. Prince's back-up materials showed that he

4    used a separate cloud database, which Apple has not turned over to Plaintiffs, and Apple now

5    acknowledges that its code must be edited to replicate Prince's work due to errors in the backup

6    materials.   Plaintiffs have addressed these deficiencies with Apple's counsel, but they are

7    unresolved, and Apple's explanations require Plaintiffs' expert to do additional work to make

8    replication possible that could not be completed in time for this filing.   Byrd Decl., Ex. C

9    (Declaration of Minjae Song).  For Apple to tout Dr. Prince's unverifiable results as proof that Prof.

10   McFadden has made a sampling error before Apple completes its discovery obligations regarding

11   this work is premature at best.  The remaining arguments in this section go to the ability of the

12   model to demonstrate classwide injury, an issue for class certification but not an issue of *Daubert*

13   admissibility.  Apple's argument regarding the reliability of Prof. McFadden's model should be

14   rejected.

15          Apple also argues that Prof. McFadden's model is inadmissible as "ignor[ing] market

16   realities."  Motion at 20-21.  The "market realities" to which Apple refers are either those which

17   exist in the monopolized market or which Apple urges as part of its defense.  For example, Apple

18   insists that Prof. McFadden should have included free apps in the model, which Apple hypothesizes

19   might have been paid apps if Apple had lowered its commission.  Motion at 20.  There is no rule

20   that an expert must consider every argument, let alone defendants' speculative or illogical

21   assertions:  at best, "those are grounds for cross-examination."  *In re Packaged Seafood Prods.*

22   *Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2020 U.S. Dist. LEXIS 175784, 2020 WL 5739316,

23   at *4 (S.D. Cal. Sept. 24, 2020).  Moreover, Apple has not explained how or why competition in

24   the App Store market would have made developers change their business model from free apps to

25   paid apps.

26          Apple separately argues that the price tiers Apple has maintained in its monopoly App Store

27   would preclude adjustments to the consumer prices.  Plaintiffs challenge these price tiers as

28   anticompetitive and predict their absence in the But-For world.  Apple's argument here depends on

the *Apple v. Pepper* dissent (Motion at 21), and proceeds from the assumption that the Consumer

Plaintiffs will lose, *on the merits*, the issue of whether Apple's price tiers are anticompetitive.  Prof.

McFadden has aligned his methodology with Plaintiffs' theory.  *See generally Comcast v. Behrend*,

569 U.S. 27 (2013).  Apple in effect now asks that Prof. McFadden be disqualified on a *Daubert*

motion for not assuming that Apple will defeat part of the Consumer Plaintiffs' case.

Apple's authority on this point is either unsupportive or distinguishable because none of

them requires plaintiffs' expert to assume the truth of a defendant's tendentious or disputed

assertions of fact as "market reality."  *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837

(7th Cir. 2015) (experts failed to causally connect studies to the plaintiffs' illnesses); *Laumann v.

NHL*, 117 F. Supp. 3d 299, 315-19 (S.D.N.Y. 2015) (expert's model lacked grounding in sports

fan's actual behavior as expressed in any empirical source).  *In re Lamictal Direct Purchaser

Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020), was decided on class certification and did not

involve a *Daubert* issue.  *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018

U.S. Dist. LEXIS 35744, at *4-5 (N.D. Cal. Mar. 5, 2018), involved focal point pricing by non-

defendants in an indirect purchaser, pass-through impact assessment.  Here, Apple argues that its

own price tiering would reduce or eliminate impact on consumer prices (Motion at 21-22), but

Apple is the defendant, and its price tiering is challenged as anticompetitive conduct. McFadden

Report, ¶¶ 128-29; Third Amended Consolidated Class Action Complaint, ECF No. 229, Ex. A,

¶¶ 11, 50.

### 4.    Relevant Market Definition

In an afterthought argument, Apple questions Prof. McFadden's use of a single sided

aftermarket, ignoring that Prof. McFadden has *acknowledged both the upstream and downstream

nature of the App Store*.  Motion at 22-23.[12]  Apple argues that Prof. McFadden "tried to have it

---

[12]    Apple's authority is wholly distinguishable.  *Abarca v. Franklin County Water Dist.*, 761 F.
Supp. 2d 1007, 1023 (E.D. Cal. 2011) is another summary judgment where the court *denied* the
motion to exclude the testimony of an air model expert who applied generally accepted standards
and found the reliability of the field data was a "scientific factual dispute" to be weighed by the
trier of fact.  *Id.* at 1071.  *Crowley v. EpiCept Corp.*, No. 09-CV-0641-L(BGS), 2015 U.S. Dist.
LEXIS 195024 (S.D. Cal. Mar. 11, 2015) involved an expert who had no FDA experience or
expertise, yet rendered an opinion on the value of a drug patent that rested entirely on the

both ways" (Motion at 23), yet his analysis is straightforward.  Prof. McFadden begins from a premise consistent with the Supreme Court's holding in *Apple v. Pepper*: to *consumers*, Apple acts as a retailer.  McFadden Report, ¶ 42 n.55.  But Prof. McFadden did *not* stop there; he also considers the effect of that retail market *on the developers* and considers their perspective in his analysis.  *See* McFadden Report at ¶ 14 ("elevated commissions in the As-Is world compared to the But-For world functioned as a tax levied on app developers"); *id.*, ¶¶ 91-95 (Apple's policies limit options for apps by restricting developers' payment mechanisms); *id.*, ¶ 109 (Apple limits developer distribution of apps).  In doing so, he reviewed the evidentiary record, including deposition testimony by Apple witnesses and Apple's business records, as well as economic evidence such as industry reports, analytics, and market analyses on matters such as software and app categories, types, and features, customers, device ownership and pricing data, and switching costs.  *See id.,* Appx. B.  Apple conveniently ignores this.

Apple also argues that Prof. McFadden failed to use reasonable substitutability in his market definition.  Motion at 24-25.  In doing so, Apple looks beyond the scope of the relevant market, and with a laser focus on app genres, gets caught up in the interchangeability of the apps themselves.  Here, the relevant market is the aftermarket for sales of iOS apps and IAPs for those apps, making the key question with respect to the market definition whether there are reasonable substitute channels through which *iOS device consumers* can buy *iOS apps and IAPs*.  Much like a market for grocery shopping, where if one were to examine the relevant market in which grocery stores compete, the question would be whether other grocery stores are substitutes, not whether products within those stores, like milk and eggs, are substitutes for each other.  As the Supreme Court has frequently held, where one brand of a product can constitute a separate market, the proper market definition "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).

In the Ninth Circuit, the boundaries of a relevant product market for antitrust purposes "may

---

assumption that there was "*zero* risk of obtaining FDA approval" without any basis, making it unreliable.  *Id.* at *9-10, *13.  That is not an issue here.

1  be determined by examining such practical indicia as industry or public recognition of the

2  submarket as a separate economic entity, product's peculiar characteristics and uses, unique

3  production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

4  vendors," as set out in *Brown Shoe Co.*, 370 U.S. at 325. *See also United States v. H & R Block,*

5  *Inc.*, 833 F. Supp. 2d 36, 51 (2011) (market definition focuses on substitutability).

6       The practical sort of indicia identified in *Brown Shoe* and *H & R Block* are exactly the type

7  of indicia that Prof. McFadden reviewed in support of his market definition opinion:  for example,

8  the relationship of the primary and aftermarket (McFadden Report, ¶¶ 44-46), substitutability of

9  web applications (*id.*, ¶¶ 48-58), jailbreaking (*id.*, ¶¶ 59-62), other alternative app sources (*id.*,

10  ¶¶ 63-66), the impact of lock-in and switching costs (*id.*, ¶¶ 67-79), differences to personal

11  computers and game consoles (*id.*, ¶¶ 80-84), and the limited relevance of multihoming for game

12  users (*id.*, ¶¶ 85-89).

13       Taken altogether, Apple's attempts to exclude Prof. McFadden's testimony on the basis that

14  he relied on speculation and assumptions in defining a "relevant product market" have no basis.

15  **IV.   CONCLUSION**

16       For the foregoing reasons, Defendant's Motion to Exclude should be denied in its entirety.

17  DATED: August 25, 2021                **WOLF HALDENSTEIN ADLER**
                                          **FREEMAN & HERZ LLP**
18

19                                        By:   */s/ Rachele R. Byrd*
20                                              RACHELE R. BYRD

21                                        BETSY C. MANIFOLD
                                          RACHELE R. BYRD
22                                        BRITTANY N. DEJONG
                                          750 B Street, Suite 1820
23                                        San Diego, CA  92101
                                          Telephone: (619) 239-4599
24                                        Facsimile: (619) 234-4599
                                          manifold@whafh.com
25                                        byrd@whafh.com
                                          dejong@whafh.com
26

27                                        MARK C. RIFKIN
                                          MATTHEW M. GUINEY
28                                        **WOLF HALDENSTEIN ADLER**
                                          **FREEMAN & HERZ LLP**

---

270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed*
*Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &**
   **FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed*
*Co-Class Counsel*

27586