# ATTACHMENT II

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
MARISA C. LIVESAY (223247)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | DATE:          Nov. 16, 2021<br>TIME:          10:00 a.m.<br>CTROOM:   1, 4th Floor<br>JUDGE:       Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     PLAINTIFFS PROPERLY STATED THE STANDARDS FOR CLASS
        CERTIFICATION ..................................................................................................2

III.    THE PREREQUISITES OF RULE 23(a) ARE SATISFIED.................................3

        A.      Class Members Share Common Questions of Law and Fact................................3

                1.      Market Definition.................................................................. 4

                2.      Apple's Anticompetitive Conduct ......................................... 6

        B.      Plaintiffs Meet the Typicality and Adequacy Requirements ................................. 7

IV.     THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED .........................9

        A.      Common Questions of Law and Fact Predominate ........................... 9

                1.      Prof. McFadden's Model and But-For Commission Levels .................... 10

                2.      Prof. McFadden's Model is Reliable ................................... 14

                        a.      Prof. McFadden Does Not "Assume" Commonality.................... 15

                        b.      Prof. McFadden's Sample Size Was Sufficient ........................... 15

                        c.      Prof. Prince's Analyses Are Flawed ................................... 15

                        d.      Uninjured Class Members Are Identifiable and
                                Do Not Defeat Predominance. ....................................... 16

                        e.      Prof. McFadden Properly Removed Pricing Tiers
                                in the But-For World........................................ 18

                        f.      Apple Misrepresents the Effects of Competition.......................... 18

        B.      A Class Action is Superior to Individual Litigation .............................19

VI.     CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*ABS Global, Inc. v. Inguran*, LLC,
 2019 U.S. Dist. LEXIS 143581
 (W.D. Wis. Aug. 23, 2019) ............................................................................. 14

*Allergan Sales, LLC v. UCB, Inc.*,
 2016 U.S. Dist. LEXIS 191853
 (E.D. Tex. Nov. 7, 2016) ................................................................................ 13

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
 247 F.R.D. 156 (C.D. Cal. 2007) ...................................................................... 8

*Andrews v. Plains All Am. Pipeline*,
 777 F. App'x 889 (9th Cir. 2019) .................................................................... 17

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019) ................................................................... 10, 18, 20

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
 141 F.R.D. 144 (N.D. Cal. 1991) ...................................................................... 5

*Caredx, Inc. v. Natera, Inc.*,
 2021 U.S. Dist. LEXIS 87736
 (D. Del. May 7, 2021) ..................................................................................... 13

*Comcast v. Behrend*,
 569 U.S. 27 (2013) ................................................................................. 3, 18

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*,
 2014 U.S. Dist. LEXIS 107612
 (E.D. Tex. Jul. 23, 2014) ................................................................................ 13

*Eastman Kodak Co. v. Image Tech. Servs.*,
 504 U.S. 451 (1992) .................................................................................. 4, 6

*Epic Games, Inc. v. Apple Inc.*,
 2021 U.S. Dist. LEXIS 172303
 (N.D. Cal. Sep. 10, 2021) ......................................................................... *passim*

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
 223 F.R.D. 506 (S.D. Ill. 2004) ........................................................................ 5

*Fishman v. Est. of Wirtz*,
 807 F.2d 520 (7th Cir. 1986) ............................................................................ 9

*Freeland v. AT & T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................. 13

*Funeral Consumers All. Inc. v. Serv. Corp. Int'l*,
   695 F3d 330 (5th Cir. 2012) ........................................................................ 4

*Guiliano v. Sandisk Corp.*,
   2015 U.S. Dist. LEXIS 193817
   (N.D. Cal. May 14, 2015) ........................................................................ 3, 10

*Graphic Prods. Distribs. v. ITEK Corp.*,
   717 F.2d 1560 (11th Cir. 1983) ................................................................... 9

*Grodzitsky v. Am. Honda Motor Co.*,
   957 F.3d 979 (9th Cir. 2020) ..................................................................... 19

*Harper v. C.R. Eng., Inc.*,
   746 F. App'x 712 (10th Cir. 2018) ............................................................... 3

*Henry v. Assoc. Home Equity Servs., Inc.*,
   272 B.R. 266 (C.D. Cal., Jan. 7, 2002) ....................................................... 8

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011) ................................................................ 2

*In re Air Cargo Shipping Servs. Antitrust Litig*,
   2014 U.S. Dist. LEXIS 180914
   (E.D.N.Y. Oct. 15, 2014) ............................................................................ 3

*In re Apple & AT&TM Antitrust Litig.*,
   569 F. Supp. 2d 1288 (N.D. Cal. 2008) ...................................................... 6

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ....................................................................... 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015) ................................................................ 4

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ................................................................. 20

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) .............................................................. 10

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................................. 3

*In re Hotel Tel. Charges*,
  500 F.2d 86 (9th Cir. 1974) ................................................................................... 20

*In re Intuniv Antitrust Litig.*,
  2019 U.S. Dist. LEXIS 141643
  (D. Mass. Aug. 21, 2019)....................................................................................... 17

*In re Lithium Ion Batteries Antitrust Litig.*,
  2017 U.S. Dist. LEXIS 57340
  (N.D. Cal. Apr. 12, 2017) ...................................................................................... 10

*In re Lithium Ion Batteries Antitrust Litig.*,
  2018 U.S. Dist. LEXIS 35744
  (N.D. Cal. Mar. 5, 2018)........................................................................................ 18

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016)............................................................................... 4

*In re Niaspan Antitrust Litig.*,
  464 F. Supp. 3d 678 (E.D. Pa. 2020) ..................................................................... 20

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014)............................................................................ 10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019)................................................................................ 17

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  2006 U.S. Dist. LEXIS 30219
  (S.D.N.Y. May 19, 2006)........................................................................................ 14

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ............................................................................... 20

*Leegin Creative Leather Prod. v. PSKS*,
  551 U.S. 877 (2007)................................................................................................ 12

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
  700 F.2d 785 (2d Cir. 1983).................................................................................... 9

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012)) ................................................................................ 17

-iv-

*Morley v. Square, Inc.*,
   2016 U.S. Dist. LEXIS 56983
   (E.D. Mo. Apr. 29, 2016) ................................................................................. 14

*New York v. Facebook, Inc.*,
   2021 U.S. Dist. LEXIS 127227
   (D.D.C. June 28, 2021) ....................................................................................... 7

*Ohio v. Am. Express Co.*,
   138 S.Ct. 2274 (2018) ......................................................................................... 4

*Oracle Am., Inc. v. Google Inc.*,
   2016 U.S. Dist. LEXIS 58819
   (N.D. Cal. May 3, 2016) .................................................................................... 14

*Pierce v. Ramsey Winch Co.*,
   753 F.2d 416 (5th Cir. 1985) .............................................................................. 9

*Plexxikon Inc v. Novartis Pharms. Corp.*,
   2021 U.S. Dist. LEXIS 5996
   (N.D. Cal. Jan. 12, 2021) .................................................................................. 14

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   2013 U.S. Dist. LEXIS 170543
   (N.D. Cal. Nov. 26, 2013) ................................................................................. 14

*Prism Techs. LLC v. AT&T Mobility, LLC*,
   2014 U.S. Dist. LEXIS 132619
   (D. Neb. Sept. 22, 2014) ................................................................................... 14

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   2014 U.S. Dist. LEXIS 184499
   (E.D. Va. May 6, 2014) ..................................................................................... 14

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   22 F. Supp. 3d 585 (E.D. Va. 2013) ................................................................. 14

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) .......................................................................... 17

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) .................................................................................. 3

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................................ 2

-v-

*Williams v. Apple, Inc.*, 2021
   U.S. Dist. LEXIS 101771
   (N.D. Cal. May 28, 2021) ................................................................................................ 17

**Rules**

Federal Rules of Civil Procedure 23 ........................................................................................ 1, 20

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. ___** | Exhibit to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Motion for Class Certification, filed concurrently. |
| **[Name] Dep. _____** | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Motion for Class Certification, filed concurrently. |
| **Hitt ___** | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated and filed August 10, 2021 at ECF No. 473-1. |
| **McFadden Report ___ or Opening Report __** | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at ECF No. 442-11. |
| **McFadden Reply ___** | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 and filed concurrently as Exhibit 1 to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Motion for Class Certification. |
| **Mot. ___** | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at ECF No. 441. |
| **Opp. ___** | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, dated and filed August 10, 2021 at ECF No. 473. |
| **Prince ___** | Expert Report and Declaration of Jeffrey T. Prince, dated and filed August 10, 2021 at ECF No. 473-3. |
| **Simonson _____** | Expert Report and Declaration of Itamar Simonson, Ph. D., dated and filed August 10, 2021 at ECF No. 473-6. |
| **Willig ____** | Expert Report and Declaration of Robert D. Willig, dated and filed August 10, 2021 at ECF No. 473-7. |

**Statement of Issues to be Decided:**  Whether the Court should:  (1) certify the Class pursuant to Fed. R. Civ. P. 23(a) & (b); (2) appoint Plaintiffs Class Representatives; and (3) appoint Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. Co-Class Counsel.

## I.   INTRODUCTION

Plaintiffs demonstrated in their opening memorandum that this lawsuit is well-suited for class certification because it meets each of the requirements of Fed. R. Civ. P 23. Apple's attempt to demonstrate otherwise, while enthusiastic (after all, it retained *seven* experts), ultimately is not persuasive.

Common issues suitable for class treatment predominate in this lawsuit.  The arguments Apple raises in its opposition against Plaintiffs' liability and damages theories present merits issues that will be decided on a classwide basis.  The appropriate market definition in this aftermarket antitrust case is a merits issue to be decided for all Class members based upon common evidence. Similarly, whether Apple has engaged in anticompetitive conduct will be determined based upon evidence common to every member of the Class because Apple treats them all uniformly: they all were and are forced to purchase apps and IAP for their iOS devices through the App Store, all of their transactions were and are subject to a uniform—and supracompetitive—30% (or, more recently, 15%) commission, and, therefore, they all paid supracompetitive prices to Apple, which has earned supracompetitive profits from the App Store since its inception.

Furthermore, Plaintiffs' claims are typical of the Class, and they will represent the class adequately. Apple's attempt to raise questions about typicality and adequacy based on Plaintiffs' opinions about the importance of privacy and security are baseless. Plaintiffs do not challenge Apple's security and privacy practices and are not attempting to "gut" the iPhone's allegedly secure environment. Plaintiffs challenge Apple's anticompetitive App Store sales practices that deny consumers any choice of where to purchase iOS apps and the lack of any competition whatsoever in the iOS apps market. Apple's arguments rely on the unfounded assumption that any competing iOS apps store would be less secure and less protective of privacy and security. That itself is a common question.

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

Apple's experts complain about the level or structure of Prof. McFadden's But-For commission rates and suggest their own But-For commission rates, but most of them do not argue that individual inquiry is required to compute competitive But-For commission rates. Importantly, this Court already has found in the related *Epic Games* action that Apple's 30% commission is supracompetitive. *See Epic Games, Inc. v. Apple Inc.*, 2021 U.S. Dist. LEXIS 172303, at *158 (N.D. Cal. Sep. 10, 2021) ("Apple's initial rate of 30%, although set by historic gamble, has apparently allowed it to reap supracompetitive operating margins."). The Court made this finding based upon evidence that will be common to all Class members. Some of Apple's experts ignore the Court's finding, and others simply disagree with it.

Moreover, Prof. McFadden's robust and stable impact and damages model demonstrates that Plaintiffs will prove antitrust impact throughout the App Store based upon common evidence and provides a method for calculating individual damages. In its attempts to discredit Prof. McFadden's work, Apple primarily relies upon the opinions of Prof. Prince, whose methodologies and analyses are flawed and misleading. *See infra*, Section IV.A.2.c.

Finally, Apple's arguments for why a class action is not superior or manageable here, while meritless, are also now moot because of the settlement in the related developer case.

## II.   PLAINTIFFS PROPERLY STATED THE STANDARDS FOR CLASS CERTIFICATION

Contrary to Apple's bold accusations, Plaintiffs' motion is not "riddled" with legal error. On a motion for class certification, the Court is bound to take the substantive allegations of the Complaint as true. The Court may consider evidence which goes to the requirements of Rule 23 even though it may also relate to the underlying merits of the case. This legal principle was not "rejected" by the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), which merely held that courts sometimes must probe behind the pleadings when the required "rigorous analysis" overlaps with the merits of plaintiff's underlying claims. *Id.* at 350-51. Indeed, many courts since *Dukes* have reiterated this standard and often in connection with citations to *Dukes*.[1]

---

[1]    *See, e.g.*, *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 367 (C.D. Cal. 2011) (stating that "the court must take the substantive allegations of the complaint as true" and discussing *Dukes*); *Harper v. C.R. Eng., Inc.*, 746 F. App'x 712, 719 (10th Cir. 2018)

-2-

Moreover, at the class certification stage, "the issue is not which expert is the most credible, or the most accurate modeler, but rather whether the plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proved on a class-wide basis." *Giuliano v. Sandisk Corp.*, 2015 U.S. Dist. LEXIS 193817, at *30-31 (N.D. Cal. May 14, 2015) (citation omitted.) "Disputes over the results reached and assumptions made with respect to competing methodologies are issues to be decided by the trier of fact." *Id.* at *30.[2] This approach was not "rejected" by *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), as Apple claims. *Comcast* held merely that the Court of Appeals erred in "refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination." Plaintiffs are not arguing that the Court should do that here.

### III.   THE PREREQUISITES OF RULE 23(a) ARE SATISFIED[3]

#### A.   Class Members Share Common Questions of Law and Fact

In their opening brief, Plaintiffs identified five questions of fact and law that are common to the entire Class. *See* Mot. at 12-13. In response, Apple challenges only whether market definition and Apple's anticompetitive conduct are common questions. *See* Opp. 5-10.

Contrary to Apple's argument, Class members **all** participate in the same market—the aftermarket for iOS apps and IAP—and they **all** experience the *same* market conditions and conduct by Apple in that market because Apple monopolizes the App Store—the only place consumers can purchase iOS apps and IAP—and charges the ***same*** supracompetitive 30% (or, more recently, 15%) commission storewide. Plaintiffs will prove these facts using evidence

---

("'a district court must generally accept the substantive, non-conclusory allegations of the complaint as true'") (citation omitted); *Waggoner v. Barclays PLC*, 875 F.3d 79, 85 n.5 (2d Cir. 2017) ("we rely in part on the allegations of the Plaintiffs' operative second amended complaint, which we accept as true").

[2]     *See also In re Air Cargo Shipping Servs. Antitrust Litig*, 2014 U.S. Dist. LEXIS 180914, at *211-12 (E.D.N.Y. Oct. 15, 2014) ("[T]he expert testimony must simply provide a reliable basis upon which to determine that the putative class's claims are best served by class treatment.") (citing *In re High-Tech Emp. Antitrust Litig*., 985 F. Supp. 2d 1167, 1184 (N.D. Cal. 2013)). Plaintiffs' expert has advanced such a methodology.

[3]     Apple does not dispute that the Class meets the numerosity requirement.

common to the Class.

1.      **Market Definition**. Contrary to Apple's claim, the Court need not "assess the merits" of Plaintiffs' proposed market because, from an economic perspective, the market definition, regardless of the outcome, is a common question to be addressed with common evidence. *See* McFadden Reply, ¶ 299; *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 197 (E.D. Pa. 2016) (granting class certification and finding that the definition of the relevant market is a question which "applies to the claims of all class members"). If a genre or other subset of apps is properly defined as constituting a distinct market, then that finding is inherently relevant to all other Class members as that genre or subset will then be properly excluded from any other market. *See* McFadden Reply, ¶¶ 253-54.[4]

Even if the Court were to assess the merits of Plaintiff's market definition, however, the relevant market is where iOS device consumers purchase iOS Apps and IAP. Currently, the only place to do that is in the App Store. *See* McFadden Reply, § V.A. Apple's claim that ***it*** competes in multiple relevant markets in which different developers and consumers transact (Opp. 6-7), even if true, is not relevant. What is relevant is what market ***consumers*** participate in when they purchase iOS apps and IAP. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992) ("The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners"). By Apple's design, the *only* place consumers are able to purchase iOS apps and IAP is in Apple's App Store. Moreover, there exist for consumers no reasonably interchangeable substitutes for the apps and IAP sold in the App Store because Android apps will not operate on iOS devices. *See id.* at 481-82 ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the

---

[4]      *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2285 (2018), was not a class action and that opinion was rendered after a 7-week trial. Moreover, in *Funeral Consumers All. Inc. v. Serv. Corp. Int'l*, 695 F3d 330, 348 (5th Cir. 2012) the court found that individualized issues predominated "given the lack of a national market or a nationwide conspiracy." Here, there is *no* claim by Apple that the market is *not* a nationwide one (as it plainly is). *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 626 (N.D. Cal. 2015) ("a proper understanding of *Funeral Consumers* is that in determining predominance, individualized issues take on greater force where there is no national market or nationwide conspiracy.").

Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.").

Furthermore, as Prof. McFadden explained in his Opening Report, "[c]ommon evidence supports the conclusion that mobile device users, and particularly iOS device consumers, have high costs of switching to a device with a different OS installed[,]" (McFadden Report, ¶ 67), and therefore Android app stores are not reasonable substitutes for the App Store. *See also* McFadden Reply, ¶¶ 216-29.

None of Apple's experts provide compelling arguments against the commonality of this market definition. Apple's attempt to divide the market into submarkets, such as the game app market, arguing that game apps are not reasonably interchangeable with dating apps or business transactions apps, is not supported by any evidence.[5] Apple relies on Prof. Willig to support its argument that "consumers 'differ according to the relevant app transaction markets in which they' participate." Opp. 7 (citing Willig, ¶ 19). But Prof. Willig's single paragraph on this cites in turn to Prof. Hitt's report, which merely purports to show that "72.3 percent [of consumer accounts] have purchased games, and 27.3 percent purchased no games" Willig, ¶ 152 n.143 (citing Hitt, Figure 18), proving nothing. In contrast, Prof. McFadden demonstrates that the vast majority of Class accounts in any genre also make purchases in other genres.  McFadden Reply, ¶ 254.[6]

---

[5]     The fact that **developers** may switch between paid and free apps for various business reasons says nothing about whether these apps are reasonably interchangeable to **consumers**. Moreover, Prof. McFadden corrected his testimony, quoted by Apple (Opp. 7), to explain that "one should not get too focused on the definition of the **market abstracted from the competitive constraints on the firm's conduct**, and should concentrate more on the … conduct and the arena in which it's economically appropriate to assess that conduct." Ex. 3 (correcting 69:18-21).

[6]     *Burkhalter Travel Agency v. MacFarms Int'l, Inc*., 141 F.R.D. 144, 154 (N.D. Cal. 1991) was a price fixing case in which the court denied certification because:  (1) "there are significant differences between the markets for macadamia nuts on Hawaii and on the mainland, between large and small purchasers, and between bulk and retail purchasers;" (2) "[i]n these different markets, defendants price nuts in different ways and purchasers have varying degrees of leverage over defendants," and (3) there were "crucial differences in how defendants set prices for different purchasers." Similarly, in *Exhaust Unlimited, Inc. v. Cintas Corp*., 223 F.R.D. 506, 513 (S.D. Ill. 2004), the potential class members were "in many locations across the country and geographically diverse and, consequently, in various 'relevant' markets." Those problems do not exist here because all Class members purchased apps and IAP in the App Store, and one defendant, Apple, treated all consumers uniformly and set uniform commissions for all apps and IAP in its App Store.

Given the technological and contractual constraints Apple imposes on consumers and developers, the relevant inquiry is whether there is a reasonable substitute for the App Store itself—there is none—not whether apps and IAP sold in the App Store have close substitutes.

Apple's criticism that Plaintiffs' market definition does not include non-iOS platforms is akin to Kodak's argument that the plaintiff's market definition in that case did not include other manufacturers' service and parts which were not interchangeable with service and parts for Kodak equipment. The Supreme Court rejected that argument. *See Eastman Kodak Co.*, 504 U.S. at 482. Because iOS device owners cannot run non-iOS apps on their iOS devices, it is inappropriate to include non-iOS platforms in Plaintiffs' market definition. *See In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008) (this Court held that a substantially identical "aftermarket for iPhone applications that 'would not exist without' the primary market for iPhones, and is thus 'wholly derivative from and depend[e]nt on the primary market" was a proper "aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in *Newcal* [*Indus. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008)].").

**2.    Apple's Anticompetitive Conduct.** Evidence of Apple's anticompetitive conduct is common to all Class members since Apple has ***always*** treated *all* iOS device consumers uniformly. Apple designed a closed system that prevents Class members from downloading iOS apps and making in-app purchases from anywhere but the App Store, and it implemented anticompetitive policies for running the App Store that it enforces uniformly.

Apple argues that Plaintiffs merely assume the market was "uniform and static since 2008." But Apple does not dispute that ***never***, in the history of the App Store, has a consumer been able to download a non-iOS app to their iOS device (without jailbreaking the device and voiding the warranty) or buy iOS apps from anywhere other than the App Store. In other words, Apple's monopolistic conduct began no later than the beginning of the App Store in 2008, and has never stopped.[7] Apple arbitrarily picked 30% as its commission rate at the inception of the App Store

---

[7]    Apple has never seriously disputed that it "has maintained control of its own operating system for mobile devices, called iOS, since its inception in 2007." *Epic Games*, 2021 U.S. Dist. LEXIS 172303, at *14.

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

1    and, except for a discount commission on subscription renewals adopted in 2016, it kept 30% as

2    its commission rate from 2008 until November of 2020, after Plaintiffs prevailed in the Supreme

3    Court and after Developers commenced their class action challenging the App Store commission.

4    Prof. McFadden's analysis is premised on a But-For world in which Apple faced competition over

5    the entire history of the App Store. For Apple to insist it would have varied its commission

6    structure over time or used a complex commission structure in the face of competition all along,

7    even though it used a single commission rate for almost the App Store's entire existence, is a

8    convenient **assertion** that flies in the face of these historical **facts**.

9         Apple next argues that its anticompetitive conduct is not a common question because it

10   does not have a duty to deal with its competitors—a non sequitur. Whether Apple's conduct was

11   unlawful (as Plaintiffs contend) or lawful (as Apple contends) will be proven with common

12   evidence of Apple's conduct, not individualized evidence unique to any individual Class member.

13   Moreover, contrary to Apple's argument, Plaintiffs do far more than merely rely on an announced

14   "policy." Plaintiffs rely on Apple's historical **conduct**. *See* Mot. 18-19.[8]

15        **B.  Plaintiffs Meet the Typicality and Adequacy Requirements**

16        Apple attempts to rebut Plaintiffs' showing that they are typical and adequate by making

17   false claims about what changes Plaintiffs seek and then manufacturing defenses that it claims are

18   unique to Plaintiffs and that it argues create conflicts with the Class. Neither of these arguments

19   are valid.[9]

20        Apple misrepresents Plaintiffs' deposition testimony to claim they "seek changes to the

21   App Store that would harm millions of putative class members," such as gutting the iPhone's

22   secure environment and making every consumer responsible for ensuring they do not download

23   dangerous apps. But Plaintiffs are not challenging Apple's security and privacy practices; Plaintiffs

24   are challenging Apple's practices that strip consumers of any choice of where to buy iOS apps and

---

[8]      The refusal-to-deal-with-competitors cases Apple relies upon are too different to be illuminating. *See* Opp. 9. Of note, however, is that even in such cases the defendant's "implementation" of its refusal to deal policy may violate Section 2. *New York v. Facebook, Inc.*, 2021 U.S. Dist. LEXIS 127227, at *11 (D.D.C. June 28, 2021).

[9]      Apple does not dispute the adequacy of Proposed Co-Class Counsel.

eliminate all competition in the iOS apps and IAP market. For example, Mr. Schwartz testified that he would like to have the ability to download an app from somewhere other than the App Store and that the choice of whether to trust that an application downloaded elsewhere is safe should be up to the buyer. *See* Ex. 4, Schwartz Dep. 141:3-18. He did ***not*** testify that he wants to "gut" the iPhone's secure environment. Opp. 10. Nor does his desire for consumer choice "pit[] him" against the rest of the Class, even if they do enjoy malware protection and privacy.[10] Of course, whether the "choice" that Mr. Schwartz seeks for all iOS consumers will ***actually*** threaten security and privacy for iOS consumers is itself a common question of fact.

Nor are Plaintiffs subject to unique defenses that threaten to become the focus of the litigation. Mr. Lawrence did not testify, as Apple claims, that he "cast[s] aside personal privacy when purchasing apps." Opp. 10. To the contrary, he testified that he "object[s] generally to people having [his] information that have no business owning it" and it is important to him that his bank account number is "not available to the public." Ex. 5, Lawrence Dep. 183:8-9; 184:7-12. Mr. Lawrence's belief that there really is no such thing as a secure ecosystem does not create a unique defense or a conflict between Mr. Lawrence and the rest of the Class, including Mr. Pepper and Mr. Hayter, simply because they believe they benefit from security measures. Apple's arguments rely on the unfounded assumption that any competing iOS apps store would be less secure and less protective of privacy and security.[11] Indeed, the Court recognized in *Epic* that app stores "could compete on . . . security." *Epic Games,* 2021 U.S. Dist. LEXIS 172303, at *256.

---

[10]     *Henry v. Assoc. Home Equity Servs., Inc*., 272 B.R. 266, 278 (C.D. Cal., Jan. 7, 2002) is distinguishable because in that case the plaintiffs' clams differed from those of debtors who made up a large portion of the class and were not similarly situated. There are no such conflicts here. Moreover, the plaintiffs in *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P*., 247 F.R.D. 156, 178 (C.D. Cal. 2007) "operated under materially different contract terms." Here, all of the Plaintiffs purchased apps and/or IAP for their iOS devices through the App Store and are therefore similarly situated to each other and typical of the other members of the Class.

[11]     Mr. Pepper's anecdotal switching from Apple to Android does not mean device-switching costs are not high and do not serve to "lock" consumers into the App Store. Plaintiffs have never claimed that no one ever switches. And Apple's vague argument that "many" survey respondents did not mention difficulty in switching as a reason for not doing it, again, does not prove that switching costs are not high. The focus of the market definition inquiry should be on the discipline that marginal customers impose on the hypothetical monopolist. McFadden Reply, ¶ 228.

Finally, Apple's argument that Mr. Pepper (and other Class members) is subject to individualized defenses because he failed to mitigate his damages and instead switched from an Android device and app store to an iPhone during the litigation with knowledge of Apple's 30% commission is unsupported.[12] Apple fails to cite a case that holds that a consumer has a duty to mitigate by refusing to purchase the product at issue unless they purchased in ignorance. Such a holding would graft a reliance element onto the Sherman Act, which does not exist.[13] Plaintiffs are typical and adequate and should be appointed Class Representatives.

## IV. THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED

### A. Common Questions of Law and Fact Predominate

Plaintiffs' expert Prof. McFadden, a Nobel Prize winning economist, convincingly demonstrated in his Opening Report, using a robust and stable impact and damages model, that Plaintiffs will be able to prove impact and damages at trial using generalized, as opposed to individualized, proof. Apple attacks Prof. McFadden by claiming he did not analyze the evidence to determine whether a common methodology was appropriate, but rather assumed commonality as a starting point and created a model that generated a common effect. This grossly mischaracterizes Prof. McFadden's work. As he explained, the App Store commission operates as a sales or ad valorem tax. "When firms pay a certain percentage of their revenue to a retailer or distributor, they offset an increase in this component of marginal costs by raising prices." McFadden Report, ¶ 132.  In turn, how much they increase prices "depends on the impact of the commission on their marginal costs and on the price elasticity of their consumers, but the common

---

[12]    Mr. Pepper testified that he switched back to iOS because his wife wanted him to be able to use FaceTime with her, a product that Apple refuses to open up to Android users, thereby locking in the family members of iOS owners.  Ex. 6, Pepper Dep. 61:19-62:5.

[13]    None of the cases Apple cites are pertinent to its mitigation argument. *Pierce v. Ramsey Winch Co*., 753 F.2d 416, 436 (5th Cir. 1985), is an inapposite dealer termination case and holds that defendants have the burden to show failure to mitigate. *Fishman v. Est. of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986), concerns the failure to lease a stadium to the new Chicago Bulls owner and the mitigation was the opportunity cost of the money tied up in the deal. The court in *Litton Sys., Inc. v. Am. Tel. & Tel. Co*., 700 F.2d 785, 820 (2d Cir. 1983), rejected AT&T's mitigation argument. *Graphic Prods. Distribs. v. ITEK Corp*., 717 F.2d 1560, 1583 (11th Cir. 1983), is an inapposite distributor termination case, and the court found that the defendant had failed to rebut the plaintiff's evidence that it had mitigated.

economic impact is that consumers pay higher prices as a result of an increased commission." *Id*. Apple's own internal documents show its awareness of such effects of the App Store commission on the (retail) price of apps and in-app content, and the European Commission concluded that the App Store commission fee resulted in higher prices for consumers of music streaming services. *See id.*, ¶ 151. Therefore, Prof. McFadden did not assume common impact; he used straightforward economic principles to assess a common economic impact of the App Store commission. McFadden Reply, ¶¶ 21-23.

Most of Apple's experts' complaints are about how Prof. McFadden estimates the model or the particulars of his But-For simulation, not about using the two-step methodology. *See* McFadden Reply, ¶ 24. "[T]he relevant question is whether Plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury and damages can be proven on a class-wide basis through the use of a common methodology," and Plaintiffs have more than done so here. *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *56.[14] *See also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008) (econometric formulas or other statistical analyses used to show class-wide impact, "where plausibly reliable, should be allowed as a means of common proof. To rule otherwise would allow antitrust violators a free pass in many industries.") Prof. McFadden's methodology easily does so here.

### 1. Prof. McFadden's Model and But-For Commission Levels

Apple's experts complain about the level or structure of Prof. McFadden's But-For commission rates and suggest their own But-For commission rates, but most of them do not argue that individual inquiry is required to establish competitive But-For commission rates. *See*

---

[14]    This case is not like *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) where the conspiracy was directed only at large OEMs and plaintiffs' expert argued that bid-rigging *affected* prices paid by other purchasers, based on correlation, and broadly applying an average. Here, Prof. McFadden calculates the overcharge for each Class member account using well-established economic principles, and every developer paid a uniform 30% or 15% commission throughout the class period. Similarly, *In re Lithium Ion Batteries Antitrust Litig.*, 2017 U.S. Dist. LEXIS 57340, at *89-*90 (N.D. Cal. Apr. 12, 2017), is specific to the "intricate distribution chain" faced by indirect purchasers. Here, consumers are direct purchasers. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). Prof. McFadden's methodology suffers from none of these deficiencies.

1   McFadden Reply, ¶¶ 24-26. Apple's criticisms of Prof. McFadden's estimation of the But-For

2   commission rates are therefore merits arguments that do not bear on the predominance of common

3   issues. Whether Plaintiffs are correct that the But-For commission ranges from 10% to 12%, or

4   whether Apple is correct that it is 30% or some other rate, that question will be settled at trial with

5   evidence common to the Class.

6        Apple's criticisms of Prof. McFadden's estimation of the But-For commission rates are

7   also unfounded. Importantly, this Court already found in *Epic Games* that Apple's 30%

8   commission is supracompetitive. *Epic Games*, 2021 U.S. Dist. LEXIS 172303, at *158 ("Apple's

9   initial rate of 30%, although set by historic gamble, has apparently allowed it to reap

10  supracompetitive operating margins."). Apple's counterfactual argument that it would continue to

11  charge the same commission in the competitive But-For world is not supported by the evidence.

12       Apple's complaint about Prof. McFadden's reliance on Steam as a benchmark because it

13  kept a 30% headline commission ignores that Steam actually **lowered** its commission for hundreds

14  of popular games that drive its revenue. Steam's reduction in commission rate, while not uniform,

15  reflects a necessary response to competition in the competitive PC game market. *See* McFadden

16  Report, ¶ 157. Steam's commission rate may go down further for a larger set of app developers,

17  depending on how the market evolves. *See id.*, n.222. Moreover, Apple does not dispute that

18  Microsoft recently lowered its commission rate to 12%. Finally, while Discord has closed its

19  storefront, it has *not* stopped distributing apps. As Prof. McFadden (Opening Report, n.233 &

20  n.234) notes, Discord continues to distribute apps as a distribution partner for developers and it

21  still follows the model described in his benchmark analysis.[15] Prof. McFadden's analysis is based

22  on a trend in the highly competitive PC game store market, so that the exit of any particular

23  competitor bears more on the quality of competition than the calculation of the sustainable rate.[16]

24
25  [15]      *See* https://productmint.com/the-discord-business-model-how-does-discord-make-money/
        (Discord partners "with game developers that sell games exclusively on their servers").

26  [16]      Prof. McFadden testified that he did not consider the Google Play Store for his benchmark
        analysis because it is facing a claim of noncompetitive conduct. *See* Ex. 2, McFadden Dep. 135:14-

27      136:7. *See also* McFadden Reply, ¶ 44. Apple's own Mac Store, which charges a 30% commission,
        is similarly not an appropriate benchmark because Apple is motivated to sacrifice its Mac App

28      Store in order to preserve its headline rate in the App Store.

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

1    Apple's argument that any But-For world would likely contain competing app stores

2    differentiated along multiple dimensions and developers would pay non-uniform commissions

3    demonstrates a remarkable misunderstanding of the proper use of a benchmark analysis. Rather

4    than **literal** application of the commission rates from the chosen comparison markets, a benchmark

5    analysis looks for real-world examples from analogous markets that have exhibited more rigorous

6    competition as evidence of what equilibrium competitive pricing may be. *See* McFadden Reply,

7    ¶ 49. That is exactly what Prof. McFadden has done here.

8    Relying upon Prof. Hitt's assertions, which in turn rely upon Prof. Simonson's survey

9    results,[17] Apple irrationally argues that the App Store has features like security and privacy that

10   would cause consumers to pay a higher rate in the But-For world. However, Prof. Simonson's

11   surveys are predicated on Prof. Simonson's assumption that alternative app stores would have

12   "lower" or "unknown" features while the Apple App store receives "high" marks across all

13   features, and he presents no empirical evidence to that effect. *See* McFadden Reply, ¶ 56. As with

14   any profit-maximizing firm, economists would expect effective competing app stores to account

15   for these preferences in determining their competitive strategy. *Id.*, ¶ 57. Moreover, at a

16   fundamental level, Apple's assertions misrepresent the effects of competition, leading to an absurd

17   conclusion regarding how damages resulting from anticompetitive conduct are calculated.

18   Determining what consumers would have chosen in the But-For world is illogical and unnecessary.

19   *See id.*, ¶ 53. Damages accrue for what consumers chose in the *actual* world. Plaintiffs are entitled

20   to the presumption that their welfare was reduced by the difference between the competitive price

21   and what they actually paid. *Id.* It is thoroughly reasonable (and conservative) to estimate those

22   damages by assuming the competitive equilibrium price.[18] *Id.*, ¶¶ 49, 87.

23   _____

24   [17]    Prof. Simonson's surveys did not measure consumer response to a competing app store that
     had the same level of security and privacy as the App Store. Ex. 7, Simonson Dep. 126:14-18
25   (hypothetical alternate App Store B used in all surveys); *id.* 164:19-25 (App Store B had "unknown
     malware protection, unknown privacy, and so on"); McFadden Reply, ¶ 56.
26   [18]    *Leegin Creative Leather Prod. v. PSKS*, 551 U.S. 877 (2007) is inapposite because it
     concerned retail price maintenance, which is not at issue here. Furthermore, in *Freeland v. AT&T*
27   *Corp.*, 238 F.R.D. 130, 144 (S.D.N.Y. 2006), the expert relied upon a single variable in examining
28   electronic goods price indices while ignoring "crucial variables" of price differences related to the

-12-

Next, Apple questions Prof. McFadden's use of a single sided aftermarket, ignoring that Prof. McFadden has acknowledged **both** the upstream and downstream nature of the App Store. Prof. McFadden properly begins from a premise consistent with the Supreme Court's holding in *Apple Inc. v. Pepper*:  to consumers, Apple acts as a retailer. *See* McFadden Report, ¶ 42 n.55. But Prof. McFadden also considers the effect of the retail market on developers in his analysis. *Id.*, ¶ 14 ("elevated commissions in the As-Is world compared to the But-For world functioned as a tax levied on app developers"); *id.*, ¶¶ 91-95 (Apple's policies limit options for apps by restricting developers' payment mechanisms); *id.*, ¶ 109 (Apple limits developer distribution of apps).[19] He reviewed the record, including Apple employees' testimony and documents, as well as economic evidence such as industry reports, analytics, and market analyses on matters such as software and app categories, types, and features, customers, device ownership and pricing data, and switching costs. *See id.*, Appx. B. Apple conveniently ignores this.

Finally, Apple's argument, relying upon Mr. Malackowski, that in a But-For world it could monetize its IP differently (*see* Opp. 17-18), is entirely speculative[20] and unconnected to economic principles.[21]  Apple assumes that in the But-For world, Apple's incentives to invest in and provide

---

switch from analog to digital phones and the incorporation of cameras into phones. Apple has not demonstrated that app store "quality" is a "crucial variable" in the app market in the face of competition, and even Apple's CEO cannot say that it would be, much less is it a factor that Prof. McFadden was required to include.

[19]   Prof. Schmalensee acknowledged in his deposition that Prof. McFadden does apportion damages between consumers and developers and does not double count damages. Ex. 8, Schmalensee Dep. 92:23-93:4; 93:21-93:25.

[20]   Mr. Malackowski testified that he intentionally used the word "could" rather than "would" throughout his report with respect to Apple's alternative monetization strategies in the But-For world and that he made **no probability assessments**. Ex. 9, Malackowski Dep. 106:3-108:18; 138:1-5.

[21]   The Court should exclude or attribute little weight to Mr. Malackowski's testimony as other courts have done on at least **twelve** occasions. *See Allergan Sales, LLC v. UCB, Inc.*, 2016 U.S. Dist. LEXIS 191853, *7 (E.D. Tex. Nov. 7, 2016) (excluded as "being contrary to law," "not helpful to the trier of fact," and "irrelevant"); *Caredx, Inc. v. Natera, Inc.*, 2021 U.S. Dist. LEXIS 87736, *7-*9 (D. Del. May 7, 2021) (excluded as failing to "contain specialized knowledge outside a juror's common understanding," "not reliable," and "unfairly prejudicial"); *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*, 2014 U.S. Dist. LEXIS 107612, *22-*29 (E.D. Tex. Jul. 23, 2014) (attributing "little weight to [Mr. Malackowski's] damages model" because of its "numerous shortfalls" rendering it "unreliable"); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006

IP to developers would change without first establishing any causal link between those changes and the removal of the challenged conduct. McFadden Reply, ¶ 65. Mr. Malackowski fails to even address why Apple does not already employ these alternative monetization strategies today. *Id.*, ¶ 67. As this Court found in *Epic*, there is no evidence that Apple considered or presently considers compensation for its IP in setting its commission rate. *Epic Games*, 2021 U.S. Dist. LEXIS 172303, at *65 (Apple does not "specifically justify its 30% commission based on the value of the intellectual property. It only assumes it justifies the rate.") (citing Mr. Malackowski's report which notes "that the intellectual property has value, but not providing any numerical value"); *see also id.* at *195 ("the record is devoid of evidence that Apple set its 30% commission rate as a calculation related to the value of its intellectual property rights"); *id.* at *161 ("Apple has actually never correlated the value of its intellectual property to the commission it charges"). Plaintiffs do not claim that Apple should not be compensated; with a breakeven level of ██ (*see* McFadden Report, ¶ 161; McFadden Reply, ¶ 69), Apple would be well compensated at 10-12%.

## 2. Prof. McFadden's Model is Reliable

Plaintiffs have advanced a viable methodology to demonstrate that antitrust injury and damages can be proven on a class-wide basis using a common methodology. Apple's expert Prof. Prince offers work that is beset with many serious errors and fails to discredit Prof. McFadden.

U.S. Dist. LEXIS 30219, *10-*11 (S.D.N.Y. May 19, 2006) (precluding testimony regarding a reasonable royalty rate due to "speculative nature of his calculations" and a "factual deficiency"); *Morley v. Square, Inc.*, 2016 U.S. Dist. LEXIS 56983, *8-*9 (E.D. Mo. Apr. 29, 2016) (excluded in part as "improper," "unnecessary," "not helpful," and "unduly prejudicial"); *Oracle Am., Inc. v. Google Inc.*, 2016 U.S. Dist. LEXIS 58819, *5-*6, *25-*27 (N.D. Cal. May 3, 2016) (excluded in part because his calculation "suffers from several serious flaws"); *Plexxikon Inc v. Novartis Pharms. Corp.*, 2021 U.S. Dist. LEXIS 5996, *20-*21 (N.D. Cal. Jan. 12, 2021) (excluded as unduly prejudicial); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2013 U.S. Dist. LEXIS 170543, *6-*7 (N.D. Cal. Nov. 26, 2013) (excluded in part because "methodology employed is insufficient to meet the requirements of Rule 702 and Daubert"); *Prism Techs. LLC v. AT&T Mobility, LLC*, 2014 U.S. Dist. LEXIS 132619, *19-*22 (D. Neb. Sept. 22, 2014) (excluded as "conclusory" and "unsound"); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594-97 (E.D. Va. 2013) (excluded as flawed and unreliable for failure to apportion properly and his "methodology is suspect"); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 2014 U.S. Dist. LEXIS 184499, *3-*7 (E.D. Va. May 6, 2014) (finding theory of damages "fatally flawed"); *ABS Global, Inc. v. Inguran*, LLC, 2019 U.S. Dist. LEXIS 143581, *6-*9 (W.D. Wis. Aug. 23, 2019) (excluded as unreliable).

a.      **Prof. McFadden Does Not "Assume" Commonality**. As discussed *supra*, Apple's argument that Prof. McFadden did not approach his opinions scientifically but instead assumed commonality mischaracterizes his econometric model. The effect of a sales or ad valorem tax is well-documented and carefully explained in Prof. McFadden's Opening Report. *See* McFadden Report, ¶ 132. Namely, firms facing such a tax offset some of their costs by raising prices charged to consumers. The degree to which firms raise prices depends upon their consumers' price sensitivity. Still, all consumers face the higher price so long as firms cannot price discriminate. *See* McFadden Reply, ¶¶ 22, 126, 136.

b.      **Prof. McFadden's Sample Size Was Sufficient.** Apple's argument that Prof. McFadden's model utilized a sample that was too small is not credible. *See* Opp. 19. Prof. McFadden's 0.1 percent sample size is no smaller than the sample size of the survey studies that the U.S. government conducts regularly, and a 0.1 percent sample size is also widely accepted and used in academic literature. *See* McFadden Reply, ¶ 162. In addition, Prof. McFadden also extracted transactions for randomly selected 0.39 percent and 6.25 percent of Apple IDs and confirmed that the 0.1 percent sample represents the full data as well as these 0.39 percent or 6.25 percent samples. *See* McFadden Report, Appx. C ¶ 6; McFadden Reply, ¶ 172.[22]

c.      **Prof. Prince's Analyses Are Flawed.** Ironically, Prof. Prince's criticisms of Prof. McFadden's model are based upon flaws in his own methodology and analyses.

*First*, Prof. Prince's claim that Prof. McFadden's model "fails" basic robustness checks is based upon Prof. Prince's own statistically insignificant estimation results, which he does not disclose in his report but were found in replication. As Prof. McFadden reported in his Opening Report, the relationship between app downloads and IAP transactions is not statistically significant.  McFadden Report, ¶ 232; McFadden Reply, ¶ 137. Therefore, the results Prof. Prince presents should come as no surprise to him, or anyone else; instead he misleadingly asserts it shows

---

[22]      Indeed, Prof. Simonson used *smaller* sample sizes for his surveys than Prof. McFadden's 0.1% sample, and he testified that those smaller samples were representative and obtained reliable results. *See* Simonson, Ex. 1 at 1, Ex. 17 at 1, Ex. 28 at 1, Ex. 51 at 1, Ex. 60 at 1, Ex. 69 at 1 (sample sizes ranging from 478 to 683); Ex. 7, Simonson Dep. 90:20-93:21; McFadden Reply, ¶ 173.

that Prof. McFadden's model "fails." *See* McFadden Reply, ¶ 175 & n.330.[23] *Second*, Apple's arguments that many more Apple ID accounts are uninjured than estimated by Prof. McFadden are the result of Prof. Prince's faulty analysis due to his flawed But-For world benchmarks. *See id.*, ¶¶ 41-59.[24] *Third*, to argue that different apps within the same genre face different price sensitivities, and therefore different levels of competition, Prof. Prince divided apps within a genre into high revenue and low revenue apps and estimated Prof. McFadden's model. Prince, ¶ 70. But economists divide samples by predetermined ***characteristics***, whereas revenue is an ***outcome***, which is a fatal error in Prof. Prince's work. McFadden Reply, ¶ 132.[25] *Fourth*, Apple's argument that Prof. McFadden applies the wrong constraints on developers' profit margins is based upon Prof. Prince's faulty placebo analysis. *See Id.*, ¶¶ 161-64.[26]

> **d.      Uninjured Class Members Are Identifiable and Do Not Defeat Predominance.** Apple's argument that the number of uninjured Class members is too high for common issues to predominate fails to distinguish between cases where a large number of ***both***

---

[23]      Prof. Prince reported that he estimated the relationship between app downloads and IAP transactions ($\beta Q$) to be negative in nine of his 25 samples. However, his own coding error means that his sample draw cannot be replicated. Further, Prof. McFadden reported that the $\beta Q$ variable was not statistically significant, meaning that its standard error was too large to make it statistically meaningful, or not statistically different from zero. Accordingly, Prof. Prince's result is meaningless. McFadden Reply, ¶¶ 137, 174.

[24]      Nevertheless, Prof. Prince's analyses calculating the share of uninjured Apple IDs under various But-For commission structures demonstrates that Plaintiffs' model can flexibly accommodate different But-For worlds.  McFadden Reply, ¶ 48.

[25]      Prof. Prince's high-revenue vs. low-revenue analysis highlights an inconsistency in his approach because he points out that Prof. McFadden's model "fails … to predict any but-for prices" because he obtained a negative estimate for the coefficient on log downloads, yet in his placebo analysis he obtain a negative estimate for the same coefficient in both the Games and the Music and Entertainment categories, but raises no concern.  McFadden Reply, ¶ 163.

[26]      Prof. Prince's opinions are unreliable. *First*, for the Music & Entertainment genre he reports no results for music and his entertainment results are not reliable because he used the wrong margin constraints. McFadden Reply, ¶¶ 188, 190. *Second*, for his free app calculation, his equation uses Tau .3 instead of Tau Equals Zero for free apps. *Id.*, ¶¶ 108-10, n.203; Ex. 10, Prince Dep. 108:7-111:21. *Third*, his 25 samples are not replicable, and Plaintiffs therefore cannot verify that Prof. Prince did not cherry pick them; using Prof. Prince's computer code to draw 25 random samples results in 25 different sets of Apple IDs and, more importantly, qualitatively different results, namely fewer negative coefficients and fewer switchers. McFadden Reply, ¶¶ 169, 178-86.

1   ***uninjured and unidentifiable*** class members defeated predominance and this case, where the

2   small number of potentially uninjured Class members can be identified and excluded. In *Ruiz*

3   *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-38 (9th Cir. 2016), the Ninth Circuit

4   distinguished between the inherently uninjured, where a class is defined so broadly as to include a

5   great number of members who for some reason ***could not have been harmed*** by a defendant's

6   allegedly unlawful conduct (citing, *e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 597 (9th

7   Cir. 2012)), and the fortuitously uninjured in cases, such as this one, where "fortuitous non-injury

8   to a subset of class members does not necessarily defeat certification of the entire class, particularly

9   as the district court is well situated to winnow out those non-injured members at the damages phase

10  of the litigation, or to refine the class definition." *Id.* at 1137.

11          In this case, Prof. McFadden's sampling analysis suggests that the percentage of uninjured

12  class members is relatively small, at 5.8%.  More importantly, McFadden showed that whatever

13  their number, such uninjured class members could be identified and excluded from the Class.[27]

14  Apple's argument that it is not possible to link different Apple IDs held by the same person or

15  determine when more than one person shares an ID is belied by Prof. Prince's ability to identify

16  the harm status of the four named Plaintiffs. Ex. 10, Prince Dep. 33:2-6; 34:23-35:4. Presumably,

17  Apple provided Prof. Prince with Plaintiffs' Apple IDs, which Plaintiffs provided to Apple in

18  discovery. Class members who file claims for their share of any recovery will provide all of their

---

27          Apple's other cases are also distinguishable. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018) and *In re Intuniv Antitrust Litig.*, 2019 U.S. Dist. LEXIS 141643, *26 (D. Mass. Aug. 21, 2019), both involved inherently uninjured class members (because they would not have purchased a generic drug had one been available) and the plaintiffs did not propose a method for identifying them. In *Andrews v. Plains All Am. Pipeline*, 777 F. App'x 889, 892-93 (9th Cir. 2019), "class members were subject to varying economic factors that could have caused their economic injury," and the expert's model did "not address whether businesses within the class suffered any economic injury or whether the shutdown [of defendant's pipeline] caused that injury." In *Williams v. Apple, Inc.*, 2021 U.S. Dist. LEXIS 101771, *23-*27 (N.D. Cal. May 28, 2021), for a portion of the class period, plaintiffs were unable to demonstrate that (inherently) uninjured class members, those who had their objects stored on iCloud as opposed to third party servers, could be identified. Here, Plaintiffs can identify any uninjured Class members. Finally, in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 621-24 (D.C. Cir. 2019), pre-conspiracy, individually negotiated class member contracts and individualized pricing required individualized inquiries. No such facts are present here.

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

1   Apple IDs, as Plaintiffs have done, and Prof. McFadden will calculate, using his damages model,

2   the net harm to each Class member claimant from their Apple IDs. The small percentage of Class

3   members who are fortuitously uninjured will have zero damages and will not participate in the

4   recovery. *See* McFadden Reply, § II.A.

5           **e.**    **Prof. McFadden Properly Removed Pricing Tiers in the But-For**

6   **World.** Apple separately argues that the price tiers Apple has maintained in its monopoly App

7   Store would preclude adjustments to the consumer prices. But Plaintiffs challenge these price tiers

8   as anticompetitive and predict their absence in the But-For world. Apple's argument here depends

9   on the dissent in *Apple Inc. v. Pepper* (Opp. 21), and proceeds from the assumption that Plaintiffs

10  will lose, ***on the merits***, the issue of whether Apple's price tiers are anticompetitive. Prof.

11  McFadden has aligned his methodology with Plaintiffs' theory. *See Comcast v. Behrend*, 569 U.S.

12  27 (2013).[28] Moreover, in Prof. Prince's price tier analysis, overall damages ***increase*** because

13  some app prices are reduced more with pricing tiers than without them. *See* McFadden Reply,

14  ¶ 117. Therefore, Prof. McFadden's model is conservative.

15          **f.**    **Apple Misrepresents the Effects of Competition.** Apple's

16  argument that it "most likely" would continue to charge the same 30% headline commission in the

17  But-For world (Opp. 22) is entirely speculative and fundamentally misrepresents the effects of

18  competition, leading to an absurd conclusion regarding how damages stemming from

19  anticompetitive conduct are calculated. McFadden Reply, ¶ 53. Competition results in lower

20  prices, improved quality, and more choices for consumers. *Id.*, ¶ 53 n.85. Prof. Simonson's survey

21  results merely establish the grounds for competition with the App Store; they show that consumers

22  have preferences for security, privacy, and app quality control. *Id.*, ¶ 57. Competitors will account

23  for those preferences in competing with the App Store. *Id. See also Epic Games*, 2021 U.S. Dist.

24

25  [28]    *In re Lithium Ion Batteries Antitrust Litig.*, 2018 U.S. Dist. LEXIS 35744, at *4-5 (N.D.

26  Cal. Mar. 5, 2018), involved focal point pricing by non-defendants in an indirect purchaser, pass-through impact assessment. Here, Apple argues that its own price tiering would reduce or eliminate

27  impact on consumer prices (Opp. 21), but Apple is the defendant, and its price tiering is challenged as anticompetitive conduct. McFadden Report, ¶¶ 128-29; Third Amended Consolidated Class

28  Action Complaint, ECF No. 229, Ex. A, ¶¶ 11, 50.

-18-

1  LEXIS 172303, at *256 (competing app stores "could compete on . . . security.") Furthermore,

2  given the supracompetitive profits it has earned year-after-year, the evidence simply does not

3  support the proposition that Apple can only maintain the App Store's current level of quality at a

4  30% commission rate, nor does the evidence show that the current level of quality is sufficient.

5  *See* McFadden Reply, ¶¶ 57-58; *Epic Games*, 2021 U.S. Dist. LEXIS 172303, at *173 ("Apple is

6  not moving quickly to address developer concerns or dedicating sufficient resources to their issues.

7  Innovators do not rest on laurels.").

8        Finally, as discussed *supra*, determining what consumers would have chosen in the But-

9  For world is unnecessary because damages accrue for what they chose in the As-Is world.

10  McFadden Reply, ¶ 53.[29]

11  **B.  A Class Action is Superior to Individual Litigation**

12        Apple's contention that a class action is not the superior method for adjudicating Plaintiffs'

13  and the Class' claims is primarily based upon the faulty premise that individualized inquiries will

14  predominate. But, as demonstrated above, Apple's contention is unfounded. In light of Prof.

15  McFadden's impact and damages model, mini-trials will not be required as Apple argues. Apple

16  already has records of **every** app downloaded and **every** IAP transaction by **every** Class member

17  during the **entire** Class Period. Apple does not explain why the Court would need to know Class

18  members' actual use and value derived from each app, which are not part of any damages

19  calculation. Furthermore, Prof. McFadden's model will determine, for each app purchased or IAP

20  the price the Class member would have paid in the But-For world and whether each Class member

21  has suffered a net harm or (in very few cases) a net gain.[30] Moreover, as explained *supra*, there is

22

23  [29]    It is nonsensical for Apple to claim that "the but-for world would teem with uninjured class members." Opp. 13. The But-For world has no uninjured class members because it is a world with robust competition; it is simply used as a measuring stick to determine who in the As-Is world has been injured by a defendant's conduct.  Moreover, Prof. McFadden's opinion suffers from none of the defects at issue in *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985-86 (9th Cir. 2020), where plaintiffs' expert failed to cite industry standards or peer-reviewed literature or test a statistically significant number of regulators; nor did he articulate any scientific basis for his observations, and the only testing he performed was not designed to identify any defects, let alone a common defect.

28  [30]    Therefore, Prof. McFadden's model will allow Plaintiffs to fully satisfy the directive in

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR

no need to determine whether each Class member would have used an alternative to the App Store in the But-For World. These determinations will be made on a classwide basis and not individually.

Apple's second argument, that consumer and developer plaintiffs have failed to present a manageable trial plan that would avoid duplicative damages, is not only similarly meritless, but is also now moot given the settlement in the developer case. Apple is correct that the Supreme Court recognized the possibility (now a reality) that Apple could be subject to suit by both consumers and developers. *Apple Inc. v. Pepper*, 139 S. Ct. at 1525. That does not mean Apple will be exposed to duplicative damages.[31] Indeed, Prof. McFadden's model specifically identifies the amount of the overcharge borne by consumers versus developers, so there will be no duplication. A class action is the superior method for adjudicating these claims.

## V.    CONCLUSION

This case easily meets all the requirements of Rules 23(a) and 23(b)(3) for class certification. Plaintiffs therefore request that the Court grant their motion for class certification in its entirety.

DATED: October 19, 2021

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    */s/ Rachele R. Byrd*
RACHELE R. BYRD

---

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986) that in order "to put the plaintiff into the position it would have been, absent the defendant's antitrust violation, benefits that would not have been received by the plaintiff had there been no violation, . . . must be offset against the gross relief awarded." Moreover, there are no individualized affirmative defenses in this case like the unclean hands defense in *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 98 (S.D.N.Y. 2017), where "a significant percentage of the proposed class members engaged in illegal [music] downloading" and the court held that "individual damage calculations would rapidly become the focus of this litigation" if certified. *In re Hotel Tel. Charges*, 500 F.2d 86, 89-90, 92 (9th Cir. 1974) is distinguishable as the court made no mention of experts, models or methodologies to demonstrate common impact and calculate damages, and there were hundreds of defendant hotels that imposed surcharges that varied by hotel. *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 718 (E.D. Pa. 2020) is also distinguishable because plaintiffs in that case failed to "identify a non-individualized means of addressing uninjured consumers due to coupon use."

[31]    Apple relies on the *dissenting opinion* for its argument. Opp. 25.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BETSY C. MANIFOLD
RACHELE R. BYRD
MARISA C. LIVESAY
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and*
*Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
**KELLOGG, HANSEN, TODD, FIGEL &**
 **FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Plaintiffs and Proposed*
*Co-Class Counsel*

**CALCATERRA POLLACK LLP**
MICHAEL LISKOW
mliskow@calcaterrapollack.com
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073

*Counsel for Plaintiff Robert Pepper*

27625v7

PLTFS' REPLY MEMO IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. 11-cv-06714-YGR