BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |
| | **PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | DATE: April 4, 2023<br>TIME: 2:00 p.m.<br>CTROOM: 1, 4th Floor<br>JUDGE: Hon. Yvonne Gonzalez Rogers |

**DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(b)**

**NOTICE OF MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that on April 4, 2023, at 2:00 p.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully renew their motion for an Order:

1. certifying the following Class:

All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS applications and in-app purchases from any one Apple ID account;

2. appointing Plaintiffs as Class Representatives; and

3. appointing Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. as Co-Class Counsel.

All the prerequisites and requirements for class certification are met and therefore certification is warranted. Plaintiffs base their Renewed Motion for Class Certification on:

1. the Court's March 29, 2022, Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden (ECF No. 630);

2. the Memorandum of Points and Authorities filed in support of this Motion, appended hereto;

3. the Declaration of Rachele R. Byrd and its exhibits: (a) the Expert Report of Rosa M. Abrantes-Metz, Ph.D.; and (b) the Supplemental Expert Report of Daniel L. McFadden;

4. all other records and papers on file in this action;

5. any oral argument and evidence that may be presented at the hearing on this Motion; and

6. all other matters properly before the Court.

DATED: September 26, 2022

1

2

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**

By: /s/ Rachele R. Byrd

BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
DANIEL V. DORRIS
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

*Counsel for Plaintiff Robert Pepper*

**TABLE OF CONTENTS**

PAGE

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................1

II.   INTRODUCTION ...............................................................................1

III.  BACKGROUND ................................................................................2

      A.    The *Daubert* Motions.................................................................2

      B.    The Class Certification Motion..........................................................4

IV.   ARGUMENT ....................................................................................5

      A.    Common Questions of Law and Fact Predominate ...................................5

            1.    Step One: Calculating Apple's But-For Commission Rate ......................5

            2.    Step Two: Pricing Model ...........................................................8

            3.    Step Three: Identification of Undamaged Class Members ....................11

      B.    A Class Action is Superior...............................................................19

      C.    Appointment of Class Counsel and Class Representatives...........................20

V.    CONCLUSION..................................................................................20

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Abdeljalil v. GE Capital Corp.*,
  306 F.R.D. 303 (S.D. Cal. 2015) ................................................................. 15

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ................................................................ 17

*Apple ipod itunes Antitrust Litig.*,
  No. C 05-00037 JW, 2008 U.S. Dist. LEXIS 107127
  (N.D. Cal. Dec. 22, 2008) .......................................................................... 20

*Blue Cross & Blue Shield v. AstraZeneca Pharm. LP*
  *(In re Pharm. Indus. Average Wholesale Price Litig.)*,
  582 F.3d 156 (1st Cir. 2009) ...................................................................... 17

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .................................................................... 18

*Gold v. Lumber Liquidators, Inc.*,
  No. 14-cv-05373-TEH, 2017 U.S. Dist. LEXIS 96724
  (N.D. Cal. June 22, 2017) ..................................................................... 15, 16

*Hawkins v. Kroger Co.*,
  337 F.R.D. 518 (S.D. Cal. 2020) ................................................................ 16

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
  No. C 87-1686, 1994 U.S. Dist. LEXIS 12652
  (N.D. Cal. Aug. 31, 1994) .......................................................................... 19

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1175 (JG) (VVP), 2014 U.S. Dist. LEXIS 180914
  (E.D.N.Y. Oct. 15, 2014) ............................................................................ 18

*In re Capacitors Antitrust Litig. (No. III)*,
  No. 17-md-02801-JD, 2018 U.S. Dist. LEXIS 195310
  (N.D. Cal. Nov. 14, 2018) ........................................................................... 18

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ............................................................. 17

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
  270 F.R.D. 521 (N.D. Cal. 2010) ............................................................... 16

*In re Dynamic Random Access Memory Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841
  (N.D. Cal. June 5, 2006) ............................................................................................ 19

*In re High-Tech Emple. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................................... 19

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097
  (N.D. Cal. Feb. 21, 2017)........................................................................................... 18

*In re Live Concert Antitrust Litig.*,
  No. 2:06 ML 01745-SVW-RCx, 2011 U.S. Dist. LEXIS 161362
  (C.D. Cal. Jan. 4, 2011) ............................................................................................. 17

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493, 526 (S.D.N.Y. 1996) ................................................................. 17, 18

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ............................................................................... 20

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ..................................................................................... 17

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007)................................................................................ 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ............................................................................... 16

*Jammeh v. HNN Assocs., LLC*,
  No. C19-0620JLR, 2020 U.S. Dist. LEXIS 164281
  (W.D. Wa. Sept. 9, 2020)............................................................................................ 16

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ................................................................................ 12, 15

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)................................................................................................... 6

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ........................................................................... 12, 14, 15

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125, 1137 (9th Cir. 2016) .................................................................... 12, 13

*Sandoval v. Cnty. of Sonoma*,
   No. 11-cv-05817-TEH, 2015 U.S. Dist. LEXIS 55571
   (N.D. Cal. Apr. 27, 2015) ............................................................................. 15

*Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*,
   247 F.R.D. 98 (C.D. Cal. 2007) ...................................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................................................ 12

*US Airways, Inc. v. Sabre Holdings Corp.*,
   No. 11 Civ. 2725 (LGS), 2022 U.S. Dist. LEXIS 53622
   (S.D.N.Y. Mar. 24, 2022) ................................................................................. 6

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ......................................................................... 19

*Wolf v. Hewlett Packard Co.*,
   No. CV 15-01221 BRO (GJSx), 2016 U.S. Dist. LEXIS 181822
   (C.D. Cal. Sept. 1, 2016) ................................................................................. 16

*Zaklit v. Nationstar Mortg. LLC*,
   No. 5:15-cv-2190-CAS (KKx), 2017 U.S. Dist. LEXIS 117341
   (C.D. Cal. July 24, 2017) ................................................................................ 15

**Rules**

Fed. R. Civ. P. 23(b)(3) .................................................................................... 19
Fed. R. Civ. P. 23(g)(1) .................................................................................... 20

**Other Authorities**

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5 (4th ed. 2002) ............. 17

32B AM. JUR. 2D Federal Courts § 1600 ................................................................. 16

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **STATEMENT OF ISSUES TO BE DECIDED**

    a)    Whether the Court should certify the Class pursuant to Federal Rules of Civil Procedure 23(a) and (b);

    b)    Whether the Court should appoint Plaintiffs Class Representatives; and

    c)    Whether the Court should appoint Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. as Co-Class Counsel.

II. **INTRODUCTION**

Plaintiffs bring this Renewed Motion for Class Certification pursuant to the Court's March 29, 2022, Order Denying Plaintiffs' Motion for Class Certification Without Prejudice and Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden (ECF No. 630) (the "March 29 Order"). The Court found that Plaintiffs satisfied most of the requirements for class certification under Rule 23, but denied the motion without prejudice due to specific noted deficiencies in Prof. McFadden's benchmarking and econometric modeling. March 29 Order at 1.

In its March 29 Order, the Court stated that it anticipated the deficiencies in Plaintiffs' initial motion for class certification "can be addressed" and directed that "where an argument has been analyzed and rejected, Apple shall not re-argue the issue on the anticipated next round of briefing." March 29 Order at 2.

Plaintiffs have resolved all the deficiencies previously identified by the Court. As discussed thoroughly below, Plaintiffs' experts (Prof. McFadden and a new expert on software, transaction platform, and payment system pricing, Rosa M. Abrantes-Metz, Ph.D.) have corrected all the deficiencies noted in the March 29 Order. Plaintiffs' experts have (i) mathematically computed Apple's but-for commission rate of ██ percent using economic modeling and has used benchmarking only as a robustness check, (ii) with which they then performed even more rigorous econometric modeling (after correcting the computational errors noted in the March 29 Order) using 75 random samples of Apple IDs to derive a robust damages model, (iii) which they have run against *every* transaction in the Games and Music & Entertainment genres from the *entire* App

1  Store database, (iv) to compute an exact damages estimate for **all** Apple IDs through common

2  class-wide proof, aggregating to ▮▮▮▮▮▮▮▮ for the Games and Music & Entertainment

3  transactions alone, (v) at a 95 percent confidence level.

4  For all these reasons, Plaintiffs' renewed class certification motion should be granted.

5  **III.   BACKGROUND**

6  The Court addressed both the *Daubert* motions directed at Plaintiffs' class damages expert

7  Daniel L. McFadden, Ph.D., and the class certification motion in its March 29 Order.

8  **A.   The *Daubert* Motions**

9  *First*, the Court specifically rejected Apple's challenge to the "overarching model which

10  Professor McFadden used." March 29 Order at 3. The Court found Prof. McFadden's hypothesis

11  that "the commission charged to the developers serves effectively as a 'tax'" was "scientifically

12  sound." *Id.* at 3-4.

13  *Second*, the Court rejected Apple's challenge to Prof. McFadden's market definition of a

14  "single  relevant aftermarket for the sale of iOS apps and in-app content to customers." *Id.* at 4.

15  Regarding the relevant market definition, the Court found that his considerations of potential

16  substitutes were "sound in rendering an expert opinion on the market definition." *Id*.

17  *Third*, the Court addressed Prof. McFadden's three-step impact and damages model. As to

18  step one – his benchmark analysis – the Court excluded Prof. McFadden's benchmark opinion

19  because "he is not an expert in app development, app pricing, IAP transactions, or payment

20  processing, nor does he rely on any expert in these fields." March 29 Order at 5. The Court also

21  found that Prof. McFadden's but-for commission rate was "cherry-picked from a few data points"

22  and was "arbitrary and not based on any legitimate scientific, economic, or mathematic principle."

23  *Id*. To address these deficiencies, Plaintiffs submit the expert opinion of Dr. Abrantes-Metz with

24  their renewed class certification motion. *See* Declaration of Rachele R. Byrd ("Byrd Decl."), Ex.

25  A. Dr. Abrantes-Metz has extensive expertise in econometrics, statistics, and monetary and

26  financial economics, including the economics of multisided platforms. *Id*., ¶ 1. Most importantly,

27  she has considerable expertise in software and transaction platform pricing, as well as payment

28  system pricing, which the Court found that Prof. McFadden lacked. *Id*., ¶¶ 8-9; March 29 Order at

5.

Using widely accepted scientific, economic, and mathematic principles, Dr. Abrantes-Metz has mathematically calculated Apple's but-for commission rate by performing economic modeling of Apple's App Store effective commission in a competitive market for iOS app distribution and IAP transactions. Dr. Abrantes-Metz then verified the accuracy of her mathematical calculation of the but-for commission rate by performing a more comprehensive and rigorous benchmark analysis than the one previously submitted by Prof. McFadden.

As to step two – Prof. McFadden's econometric price modeling – the Court has rejected Apple's argument that his model was unreliable because it generated negative but-for pricing for a small fraction of transactions. March 29 Order at 11. The Court also has rejected Apple's challenge to Prof. McFadden's decision to exclude from his analysis free apps that have no IAPs. *Id.* at 13-14. The Court explained that excluding free apps was consistent with Plaintiffs' theory of the case because those apps are not subject to Apple's commission rate and because consumers who downloaded only free apps are not part of the Class. *Id*.

However, the Court identified certain computational errors that made the model Prof. McFadden used to determine the prices for apps and IAP that would have prevailed absent Apple's anticompetitive conduct unreliable. Prof. McFadden corrected some of those computational errors during class certification discovery, including counting an account as not suffering monetary damages where there was no "net harm" and correcting a data error which inadvertently caused certain apps to be excluded from the analysis. *See* March 29 Order at 8. The Court identified one other computational error: Prof. McFadden's use of the fixed-dollar method instead of the percentage method to reduce prices in the but-for world. *Id.* at 9. Because the "extent and impact" of that error was "unclear," the Court determined it could not find his original model reliable. *Id.*

The Court also found that Prof. McFadden's prior model was unreliable because he did not consider the possibility that focal-point pricing and pricing tiers would exist even absent Apple's anticompetitive conduct. March 29 Order at 11-12. Finally, in response to Apple's argument that Prof. McFadden's original sampling methodology allowed for a very few number of accounts to switch from being damaged in one sample to undamaged in another sample, the Court directed

1   Plaintiffs to address the issue in their renewed class certification motion. *Id*. at 12-13.[1]

2   As to step three – identifying actual Class members who suffered monetary harm as well

3   as those who did not from their Apple IDs – the Court found that Professor McFadden's proposed

4   method for identifying undamaged Class members was reasonably objective. March 29 Order at

5   14.

6   **B.   The Class Certification Motion**

7   In the March 29 Order, the Court found that Plaintiffs have satisfied all the requirements

8   of Rule 23(a) because: (1) the class is sufficiently numerous (*id*. at 15-16); (2) four core common

9   questions exist to satisfy the commonality requirement (*id*. at 16-18); and (3) Plaintiffs satisfy the

10  adequacy and typicality requirements (*id*. at 18-20).

11  As to Rule 23(b)(3), Plaintiffs argued that the predominance requirement was satisfied with

12  respect to: (a) the relevant market; (b) Apple's market power in the relevant market; (c) Apple's

13  willful acquisition and maintenance of monopoly of power; (d) Apple's anticompetitive conduct;

14  (e) class wide antitrust injury; and (f) estimation of damages. *Id*. at 22. Apple responded that

15  Plaintiffs had failed to demonstrate that antitrust injury can be proven on a class-wide basis. *Id*.

16  Apple did not dispute that predominance is otherwise satisfied with respect to the other elements

17  of Plaintiffs' claims.

18  The Court has found that Professor McFadden's impact and damages model is "grounded

19  in economic principles and literature" and that "his theory is scientifically sound." March 29 Order

20  at 4. However, the Court concluded that Plaintiffs did not meet their predominance burden as to

21  class-wide antitrust injury "because they rel[ied] on an unsound methodology, which cannot

22  reliably demonstrate which members, and how many, were injured, as common proof of class wide

23  impact" and, therefore, "at this juncture individual issues will predominate with respect to injury."

24  *Id*. at 25. As to class-wide damages, the Court found "that Consumer Plaintiffs have failed to

25  establish that Professor McFadden's current damages model is a reliable means of assessing class-

26  wide damages." *Id*. at 26. This finding was based upon (1) the issues the Court identified in the

27

28  _____

[1]      The Court rejected the argument that sampling was inherently unreliable, finding that to be
an issue "of weight not admissibility." March 29 Order at 13.

*Daubert* section of the March 29 Order; and (2) a belief that Plaintiffs did not intend to run the damages model until after trial.[2] *Id.* at 26.

The Court did not make findings on superiority, nor did it appoint Plaintiffs as Class Representatives or their counsel as Co-Class Counsel.

## IV.    ARGUMENT

### A.    Common Questions of Law and Fact Predominate

In its March 29 Order, the Court concluded that, in light of its rulings on the *Daubert* motions, Plaintiffs had not met their predominance burden by proving class-wide impact and damages. March 29 Order at 25-27. The Court accepted certain aspects of Prof. McFadden's three-step model as sound and reliable – which remain unchanged in his Supplemental Report – but excluded other portions of his opinions and gave Plaintiffs an opportunity to cure the deficiencies and errors that the Court identified. As explained below, Prof. McFadden and Dr. Abrantes-Metz have now corrected all those deficiencies and errors.

### 1.    Step One: Calculating Apple's But-For Commission Rate

The Court excluded Prof. McFadden's benchmark analysis because he "is not an expert in app development, app pricing, IAP transactions, or payment processing, nor does he rely on any expert in these fields." March 29 Order at 5. The Court also found that his benchmark analysis was "cherry-picked from a few data points" and was "arbitrary and not based on any legitimate scientific, economic, or mathematic principle." *Id.*

---

[2]    Plaintiffs always have intended to ***run the damages model before trial*** once the Court accepts Prof. McFadden's econometric model. *See* Nov. 16, 2021 Hrg. Tr. (ECF No. 606) 74:5-21 (MR. RIFKIN: ". . . When … we present this case at trial … Professor McFadden will testify, this is my methodology for calculating the damages for each and every Apple ID, for all 400 million of them, and I've done that calculation. Here it is . . . . And the net effect of all of that will be a – an aggregate number the sums … all the positive damages and all the negative damages that are calculated from his model, period, end of stop. There's going to be a number at the end of the day, and it's going to net out all the IDs. THE COURT: And when do I get the number? MR. RIFKIN: When we present our damages at trial, and you get it from Professor McFadden on the witness stand."); Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden filed Nov. 23, 2021 (ECF Nos. 598-3, 598-4) at 6-9; Dec. 14, 2021 Hrg. Tr. (ECF No. 627) 10:5-7. It is only the matching of Apple ID accounts to actual people that will take place after trial as part of the notice and claims administration process.

Plaintiffs have resolved the Court's criticism of Prof. McFadden's benchmark analysis by submitting the expert mathematical computation of Apple's effective but-for commission rate performed by Dr. Abrantes-Metz. *See* Byrd Decl., Ex. A. Dr. Abrantes-Metz holds a Ph.D. and a Masters in Economics from the University of Chicago. She also holds a Masters in Economics from the Universitat Pompeu Fabra in Barcelona, Spain, and a *Licenciatura* in Economics from Universidade Católica Portuguesa. *Id.*, ¶ 2. Dr. Abrantes-Metz has more than two decades of experience specializing in antitrust, securities, and financial regulation. Her main areas of specialization are econometrics and statistics, industrial organization, and monetary and financial economics. *Id.*, ¶ 1. Most pertinent to her work in this case, Dr. Abrantes-Metz has wide experience in technology and software industries and, in particular, expertise in software, transaction platform, and payment system pricing. *Id.*, ¶¶ 8, 9. Dr. Abrantes-Metz has provided testimony on damages, liability, class certification and plans of allocation for classes related to collusion and monopolization involving multisided platforms in various industries including payments systems. *Id.* For example, Dr. Abrantes-Metz provided trial testimony on behalf of the plaintiff airline in *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS) (S.D.N.Y. 2022), which Plaintiffs believe is the first case to be tried to a jury using a two-sided platform damages model following the Supreme Court's decision in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018). *See* Byrd Decl., Ex. A, ¶ 9 and Appendix A.

Dr. Abrantes-Metz investigated what commission rate Apple would have charged in the App Store in a competitive but-for world ("BFW"). But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores, against which Apple's App Store would have had to compete to sell apps and IAP to iOS device consumers; as a result, Apple would have charged lower, competitive commission rates.

Dr. Abrantes-Metz developed an economic model for iOS app stores to mathematically calculate what Apple's App Store effective commission rate would have been absent its anticompetitive conduct. *Id.*, ¶¶ 26-29. The economic model relies upon a fundamental economic relationship between app store profit margin, costs, and prices (commission rates) and allows Apple's BFW commission rate to be calculated mathematically consistent with the market shares

1   and profit margins that would likely be seen in a competitive BFW. Using that economic model,

2   Dr. Abrantes-Metz mathematically calculated that a commission rate of ███ percent would have

3   prevailed absent Apple's anticompetitive conduct. *Id.*, ¶¶ 18, 23, 59.

4       The economic model Dr. Abrantes-Metz uses to calculate the App Store's effective

5   commission rate is widely accepted and used (including on many occasions by Dr. Abrantez-Metz

6   herself), and is based upon sound scientific principles. Byrd Decl., Ex. A, ¶ 21. The model Dr.

7   Abrantes-Metz used to compute Apple's BFW commission rate is substantially similar to the one

8   used by Prof. Economides in the Developer Plaintiffs' case in his "Rival Profit Yardstick" analysis

9   to which the Court referred in the March 29 Order. Byrd Decl., Ex. A, ¶ 25; March 29 Order at 7.

10  Prof. Economides relied upon the same fundamental economic relationship between app store

11  profit margin, costs, and prices but relied on different data and documents for the model's inputs

12  to conclude that the prevailing commission rate would have been approximately 13.0 percent in a

13  BFW where Apple faces two rivals, and 14.8 percent in a BFW where Apple faces one rival. Byrd

14  Decl., Ex. A, ¶ 25. The only pertinent differences between Dr. Abrantes-Metz's and Dr.

15  Economides's models are that Dr. Abrantes-Metz used (i) more conservative assumptions (a

16  single-rival world rather than the two-rival world analyzed by Prof. Economides), and (ii) better

17  data (including data from Apple's own survey expert, Prof. Itmar Simonson, Ph.D.[3]). *Id.*, ¶¶ 25,

18  29, 37-42. Dr. Abrantes-Metz calculates the but-for commission rate of ███ percent, which is

19  similar to the results reached by Dr. Economides. *Id.*, ¶¶ 18, 23, 25, 59.

20      Dr. Abrantes-Metz then performed a robustness check of her mathematical computation of

21  Apple's but-for commission rate using economic modeling by analyzing the average commission

22  rates observed in the sale of Windows PC games as a benchmark. Byrd Decl., Ex. A, ¶ 63. Notably,

23  Dr. Abrantes-Metz relies on this comparative analysis only as a robustness check, not to determine

24  Apple's but-for commission rate. Moreover, her comparative analysis differs from Prof.

25  McFadden's prior analysis in two important respects. *First*, Dr. Abrantes-Metz includes more –

26  and different – benchmark companies in her robustness analysis than Prof. McFadden used in his

27

28  [3]   *See* Expert Report and Declaration of Itamar Simonson, Ph.D., filed August 11, 2021 (ECF No. 476-9) ("Simonson Report"), Ex. 22.

benchmark analysis. *Id.*, ¶ 120 & Figure 1. *Second*, Dr. Abrantes-Metz has sufficient expertise in the software industry to offer the opinion that the app stores she used in her robustness analysis are appropriate comparators. *Id.*, ¶ 9.

Finally, Dr. Abrantes-Metz determines that with a commission rate of ███ percent, Apple would still achieve an operating margin of ███ percent on the App Store in the BFW, which is significantly ███ than the Windows Store's profit margin of █ percent from Windows PC game apps sales. Byrd Decl., Ex. A, ¶¶ 23, 60.

### 2.    Step Two: Pricing Model

**Calculation Data and Model Errors**: Plaintiffs have addressed each of the calculation data and model errors identified by the Court in its prior order. Two of those issues – determining whether an account suffered monetary damages on a "net" basis and a computational error that excluded certain apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year – were previously resolved in Prof. McFadden's reply report submitted during briefing on the original class certification motion. *See* Reply Report of Daniel L. McFadden, filed Oct. 19, 2021 (ECF No. 554-5), ¶¶ 200-02; March 29 Order at 8. Those corrections have been incorporated in Prof. McFadden's Supplemental Report and no longer affect his results. Byrd Decl., Ex. B, ¶¶ 10, 13, 70.

As to the third computational issue, concerning the use of either the fixed-dollar method or the percentage-method in his computation of but for prices, Prof. McFadden now uses the percentage method *exclusively*, consistent with his testimony that this is "the best way to do individual damage calculations." March 29 Order at 9. The Court's concern over whether Prof. McFadden used the fixed-dollar or percentage method has been resolved.

As discussed below, although he is not required to do so at the class certification stage, Prof. McFadden now has *run the model* on *all* the transactional data for the Games and Music & Entertainment genres[4] in the *full App Store data* to calculate damages for the entire Class by

---

[4]    In preparing his Supplemental Report, Prof. McFadden has not had sufficient time for the computer to process the massive database for the other app genres, in part because of time lost when Apple produced defective transactional data for a portion of the Class Period (which Apple did not correct until July 11, 2022). In any event, the "Court agree[d] that the model need not be

computing individual damages for each unique Apple ID (*i.e.*, account-by-account) and then aggregating the account-level damages to compute a single estimate of class-wide damages. Byrd Decl., Ex. B, ¶¶ 29, 64-66. This is not an approximation, but rather an **exact** summation of **all** individual account damages for those genres, eliminating any debate over the best method for **estimating** class-wide damages. *Id.*, ¶¶ 36, 64-66.

**Focal Pricing and Pricing Tiers**: Plaintiffs also have resolved the Court's concern regarding the possibility that focal-point pricing and pricing tiers would exist even absent Apple's anticompetitive conduct by proposing a revised model that allows for focal-point pricing and pricing tiers. *See* March 29 Order at 11-12. Consistent with Plaintiffs' claim that Apple's pricing tiers are anticompetitive, Prof. McFadden again computes damages **without** pricing tiers in the BFW. Byrd Decl., Ex. B, ¶ 85. However, Prof. McFadden also demonstrates in his Supplemental Report that his model is able to show class-wide impact and compute account-level damages, and identify undamaged accounts with complete precision, even **with** price tier restrictions or voluntary focal pricing in the BFW. *Id.*, ¶¶ 85-96 & Figure 7. He runs his model allowing for focal-point pricing and pricing tiers – specifically using the 750 price points that Apple agreed to in its settlement with the developers.[5] The results are similar (less than one percent difference in class-wide damages) to the results he obtained running the model without focal-point pricing and pricing tiers. *Id.*, ¶¶ 85-96 & Figure 7.[6] Because Prof. McFadden has incorporated focal-point pricing and pricing tiers into his analysis and because that modeling change has not materially altered the

run for class certification purposes." March 29 Order at 26. But to reiterate, Plaintiffs' expert **will run the econometric model against the entire database of App Store transactions before trial**.

[5]    As part of its settlement with the developer class, Apple proposed to implement by March 2023 a price tier menu with 750 price points. Byrd Decl., Ex. B, ¶ 94; Administrative Motion for Approval of Extension of Time Relating to Settlement Agreement Provision 5.1.4, *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR, filed May 31, 2022 (ECF No. 476), 1:14-27.

[6]    Prof. McFadden estimated class-wide damages using price tiers and focal pricing using a single 0.1 percent sample. *See* Byrd Dec., Ex. B, ¶ 86 and Appendix B. Due to the limited time allotted by the Court to incorporate Apple's revised data production, and the computational intensity of this analysis, Prof. McFadden did not have sufficient time to perform the tier and focal pricing analysis using the mean coefficients applied to the full Apple transactions data for this report. However, the underlying methodology he applies to the 0.1 percent sample may also be applied to the full data using the mean coefficients. *Id.*, ¶ 88, n.101.

results, there is no longer any viable challenge to the reliability of Prof. McFadden's model on this basis.

**Robustness**: Plaintiffs have resolved the Court's concern over the model's robustness – specifically, the possibility that an account might or might not show monetary harm depending on which 0.1 percent random sample[7] is used (so-called "switcher accounts") (*see* March 29 Order at 13 & n.10) – by drastically increasing the number of samples used in the revised model.

In his Supplemental Report, Prof. McFadden explains that the existence of "switchers," *i.e.*, the same account can be "damaged" in one 0.1 percent random sample while being "undamaged" in another 0.1 percent random sample, is not a problem with the methodology of his report but is an ordinary and expected consequence of sampling. Byrd Decl., Ex. B, ¶¶ 47-48. He explains that "switchers" existed for two reasons: (1) because of miniscule differences in the estimated coefficients (the value of the estimated coefficients can differ depending on which 0.1 percent sample is used); and (2) because each 0.1 percent sample contains slightly different sets of apps and slightly different transactions. *Id.*, ¶¶ 50-51. The exact percentage of undamaged accounts varies across different random samples for the same reasons. *Id.*, ¶ 52.

Prof. McFadden has addressed the issue in his Supplemental Report by: (1) running his model with 75 separate and independent 0.1 percent samples (as opposed to just one 0.1 percent sample) to estimate 75 sets of coefficients (one set for each sample) in the revised model; and (2) applying the average of those 75 sets of coefficients ***to the full set of App Store transactions data for the Music & Entertainment and Games genres,*** the approximately [redacted] transactions in those genres produced to date, to calculate damages, eliminating any variation in which apps or transactions he includes in the damages calculation. Byrd Decl., Ex. B, ¶¶ 53-57.[8] By increasing the number of samples 75-fold, Prof. McFadden has drastically reduced the likelihood that small

---

[7] The Court has rejected Apple's argument that a 0.1 percent sample is too small to produce reliable results. March 29 Order at 13 ("the issue is one of weight not admissibility").

[8] The percentage of unharmed accounts also varies across different random samples for the same reasons that cause the switchers. Prof. McFadden eliminates this variation by applying the average value of 75 sets of the coefficients to the full transactions data in calculating account-level damages. Byrd Decl., Ex. B, ¶ 55.

differences in estimated coefficients may result in "switcher accounts" (the first source of "switchers"). *Id.* at ¶ 56. And by running the model against the ***full App Store data for the Music & Entertainment and Games genres***, he has entirely eliminated the possibility that small differences in the sets of included apps across different samples may result in any "switcher accounts." *Id.*

As with the other refinements to his econometric model, these changes have enhanced the reliability of the model without materially altering the results. This process results in total class-wide damages for the Games and the Music & Entertainment genres of ████████ Byrd Decl., Ex. B, ¶ 65 & Figure 4. The revised econometric modeling reliably produces this result at a 95 percent confidence level. *Id.*, ¶¶ 60-61.[9]

### 3.    Step Three: Identification of Undamaged Class Members

The Court has accepted Prof. McFadden's proposed methodology for identifying damaged and undamaged Class members through a claims administration process, using claim submission forms, Apple IDs, and Apple's internal records. March 29 Order at 14 ("It is not uncommon for class members to be identified using such means in class actions.").

**Percentage of Accounts with No Monetary Damages:** The Court has expressed concern that Plaintiffs could not "reliably demonstrate which members, and how many, were injured." March 29 Order at 25. As an initial matter, Plaintiffs believe all Class members have suffered antitrust injury because they each purchased apps or made in-app transactions that were distorted by Apple's anticompetitive conduct – including being subject to reductions in output or quality. Plaintiffs, however, pursue only the remedy of monetary overcharge damages. As to those damages, Plaintiffs have endeavored to identify using McFadden's revised methodology which Class members suffered damages and by how much.

When this Court previously ruled that Plaintiffs had not reliably identified which Class members had monetary damages, it noted that the Ninth Circuit had "not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance." *Id.* at

---

[9]    The Court directed the parties to clarify the confidence level on the renewed motion. March 29 Order at 13 n.10.

24.

Since then, the Ninth Circuit, sitting *en banc*, decided *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), where it squarely rejected the argument "that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." *Id*. at 669. *See also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) ("the district court is well situated to winnow out" a fortuitously non-injured subset of class members)).[10]

Professor McFadden's revised methodology easily meets the Ninth Circuit's requirement for class certification announced in *Olean* and easily "demonstrate[s] which members, and how many, were injured." March 29 Order at 25. He has now **run the revised model on all Games and the Music & Entertainment transactions from the entire App Store transactions database**. The revised model computes ***exactly*** which accounts suffered monetary damages from those transactions and which accounts did not. Byrd Decl., Ex. B, ¶¶ 72-73. This expert analysis is more than sufficient to carry Plaintiffs' burden of providing common evidence capable of proving damages because it is common evidence that each Class member could and would use to prove their own individual claims. *See Olean*, 31 F.4th at 667 (Supreme Court established in *Tyson Foods* "that if 'each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action,' and the evidence 'could have sustained a reasonable jury finding' on the merits of a common question,' … then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common

---

[10]     Plaintiffs' burden is to demonstrate the existence of common evidence that can establish whether specific Class members have been injured (and by how much). The common evidence – here, Prof. McFadden's econometric modeling – need not demonstrate that each Class member was damaged. His methodology can serve as common evidence of impact and injury even if it shows that certain Class members (whether a *de minimis* amount or more) suffered no monetary damage. *Olean,* 31 F.4th at 669; *see also Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 823 (7th Cir. 2012) ("[T]hat some class members' claims will fail on the merits if and when damages are decided [is] a fact generally irrelevant to the district court's decision on class certification").

1    question of law or fact") (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).[11]

2    Because Prof. McFadden has now run the model on the ***entire App Store transactions***

3    ***database*** (at least for Music & Entertainment and Games), his damages computation identifies,

4    through common mathematical proof, precisely which accounts (and how many) have damages

5    and which accounts (and how many) have no damages. Byrd Decl., Ex. B, ¶¶ 72-73. Therefore,

6    Prof. McFadden's methodology identifies the total number and percentage of undamaged

7    accounts. His computation of damages will be easily repeated ***before trial*** for all the App Store

8    genres once Apple makes its final, up-to-date pre-trial production of all App Store transactional

9    data.

10   Prior to trial, the parties and the Court will know ***exactly*** which accounts (by unique Apple

11   ID) have and which accounts have not been damaged for all App Store transactions in the Class

12   Period.[12] ***All*** those undamaged accounts identified mathematically by the final computations Prof.

13   McFadden will perform ***before trial*** can easily be eliminated from the Class. The process of

14   eliminating undamaged accounts can be done ***before trial*** and will not pose any difficulty at trial.

15   Once the Apple ID accounts are linked to Class members (*see* discussion *infra.*) and

16   damages are netted on a per Class member basis, Plaintiffs expect the number of actual Class

17   ***members*** (as opposed to Apple IDs) with zero damages to be fewer than the number of accounts

18   with zero damages because many accounts have very little spend and likely reflect the secondary

19   or tertiary accounts of users with multiple Apple IDs. But importantly, now that Prof. McFadden

20   has run his econometric model against the entire App Store transaction database, all the

---

21   [11]   To be clear, Plaintiffs will rely solely on Prof. McFadden's analysis to identify those
22   accounts that suffered monetary harm. For those accounts that Prof. McFadden's analysis shows
      suffered no monetary harm, Plaintiffs will not seek to introduce any individualized evidence of
23   monetary damages and will not seek any damages on behalf of those accounts. Eliminating the
      undamaged accounts has no effect on the aggregate damages, which the model computes as the
24   sum of all account damages (those without monetary damages are netted out against those with
25   monetary damages).

26   [12]   Accordingly, Prof. McFadden's methodology for matching Apple ID accounts to Class
      members will identify, through common proof, precisely which Class members (and how many
27   and) have damages and which Class members (and how many) have no damages. Matching Apple
      ID accounts to Class members will also compute the individual damages for all Class members
28   with damages. March 29 Order at 14.

---

fortuitously undamaged accounts **can be and have now been identified** before trial with precision and certainty and can be winnowed out.[13] As the Ninth Circuit held in *Ruiz Torres*, 835 F.3d at 1137, "fortuitous non-injury to a subset of class members does not necessarily defeat certification."

To address any additional concerns the Court may have regarding the portion of Class members for whose accounts Prof. McFadden's model shows no monetary injury, Plaintiffs also offer an amended class definition to alleviate any potential overbreadth issue. *See Olean*, 31 F.4th at 669 n.14 ("court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad"). As an initial matter, there is no overbreadth issue with the original class definition. Each person in the original class definition is appropriately a Class member because each suffered antitrust injury by being forced to use an App Store subject to anticompetitive policies that reduced output (quality and quantity). *See* March 29 Order at 24 ("all unharmed class members were exposed to Apple's alleged anticompetitive policies and conduct by way of using the App Store").

To be sure, Prof. McFadden's analysis shows that up to approximately ▮ percent of the accounts have not suffered monetary injury in the form of an overcharge. Byrd Decl., Ex. B, ¶¶ 16, 68, 75, Figure 1 & Figure 6. But even that number standing alone lacks important context. Because there are far more unique Apple ID accounts than individual Class members,[14] and most of the undamaged accounts have little App Store spending,[15] it is very likely that undamaged accounts are secondary or tertiary accounts. Once Apple IDs are matched to actual Class members, the number and percentage of undamaged Class members is likely to be significantly lower than the number and percentage of undamaged accounts. Plaintiffs expect that after all the accounts are

---

[13]    Plaintiffs will, before trial, run the model again on updated data which will include transactions that have occurred and will occur between April 26, 2022, and trial.

[14]    There are ▮ million unique accounts in the App Store transactional database with at least $0.99 in spending on apps or IAP. Byrd Decl., Ex. B, ¶ 15. However, there are fewer than 120 million iPhone users in the United States, some number of whom have no App Store spending and are not even in the Class. *See Number of iPhone users in the United States from 2012 to 2022*, STATISTA.COM, https://www.statista.com/statistics/232790/forecast-of-apple-users-in-the-us/ (last visited Sept. 25, 2022). Therefore, the average App Store customer has multiple accounts with unique Apple IDs.

[15]    *See* Byrd Decl., Ex. B, ¶ 76 & Figure 5.

matched to actual **people**, the number and percentage of undamaged **Class members** will be significantly lower than the number and percentage of undamaged accounts. Plaintiffs therefore submit that the ██ percent of accounts suffering no monetary injury does not reflect an overbroad class definition.

However, to remedy any remaining overbreadth concerns, Plaintiffs propose a narrowed class definition consisting only of persons who possessed an account that spent more than $10 on apps and IAP transactions. Most of the undamaged **accounts** spent less than $10 (and many accounts spent much less than that) on Music & Entertainment and Games app purchases and IAP combined. Prof. McFadden has considered the impact of excluding from the class definition accounts with less than $10 in spending and has determined that the proposed $10 threshold will reduce the number and percentage of undamaged accounts (*id.*, ¶¶ 16, 69, 77, 79, Figures 1 & 6), and Plaintiffs believe it will likewise further reduce the number and percentage of undamaged Class members. The undamaged accounts that spent $10 or less made only slight use of the App Store and thus suffered *de minimis* adverse financial effects from the challenged App Store policies. They added little or nothing to the overall damages. Indeed, the econometric modeling nets out all the undamaged accounts against the damaged accounts. Byrd Decl., Ex. B, ¶ 13. This is not a situation where the defendant may be prejudiced by an overbroad class that expands the threat of potential liability. *See Messner*, 669 F.3d at 825 (explaining class overbreadth concerns are animated by the "*in terrorem* character of a class action" (internal quotations and citation omitted)).

This narrowed class definition reduces the percentage of **accounts** with no damages by approximately ██ percent, from ██ percent to just ██ percent. Byrd Decl., Ex. B, ¶¶ 16, 78 & Figures 1 & 6. *See Olean*, 31 F.4th at 669 n.14 (problem of "potentially 'over-inclusive' class 'can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis'"). "[C]ourts routinely permit plaintiffs to *narrow* the scope of their class at the certification stage." *Zaklit v. Nationstar Mortg. LLC*, No. 5:15-cv-2190-CAS (KKx), 2017 U.S. Dist. LEXIS 117341, at *21 (C.D. Cal. July 24, 2017); *see also Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-TEH, 2017 U.S. Dist. LEXIS 96724, at *13 n.4 (N.D. Cal. June 22, 2017)

(same); *Sandoval v. Cnty. of Sonoma*, No. 11-cv-05817-TEH, 2015 U.S. Dist. LEXIS 55571, at *6-*7 (N.D. Cal. Apr. 27, 2015) (amending complaint to refine proposed class definition "unnecessary as the class definition is established, if at all, in the order certifying the class"); *Abdeljalil v. GE Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (narrower definition at class certification is "allowable"); *In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D. Cal. 2010) (same); *Wolf v. Hewlett Packard Co.*, No. CV 15-01221 BRO (GJSx), 2016 U.S. Dist. LEXIS 181822, at *22 n. 4 (C.D. Cal. Sept. 1, 2016) (same).[16] Further, "'the basic responsibility for determining the extent of a class membership falls upon the trial judge,' and a plaintiff's own narrowing of a class definition helps the judge ensure 'the class feature of the litigation [is] within reasonably manageable proportions and bounds.'" *Gold*, 2017 U.S. Dist. LEXIS 96724, at *13-*14 (quoting 32B AM. JUR. 2D Federal Courts § 1600) (footnotes omitted).

Because many of the economically unharmed accounts are secondary or tertiary accounts with few App Store transactions, matching the Apple IDs to Class members likely will further reduce the number and percentage of Class members with no damages.

**Plaintiffs Will Run the Damages Model Before Trial:** The Court also found "that Consumer Plaintiffs have failed to establish that Professor McFadden's current damages model is a reliable means of assessing class-wide damages." March 29 Order at 26. That finding was based upon: (1) the issues the Court identified in the *Daubert* section of the March 29 Order concerning the reliability of the model (addressed *supra*); and (2) the Court's belief that Plaintiffs did not intend to run the damages model until after trial. *Id.*

In the March 29 Order, the Court held that "plaintiffs may rely on aggregate damage estimates" at the class certification stage, but added that they must "establish that 'there is a

---

[16]   *See also Hawkins v. Kroger Co.*, 337 F.R.D. 518, 526 (S.D. Cal. 2020) (plaintiffs may narrow class definition without seeking leave to amend); *Jammeh v. HNN Assocs., LLC*, No. C19-0620JLR, 2020 U.S. Dist. LEXIS 164281, at *24-*26 (W.D. Wa. Sept. 9, 2020) (permitting modifications to class definition because they were minor, required no additional discovery, and caused no prejudice to defendants); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590-91 (N.D. Cal. 2010) (same).

method, common across the class, for arriving at individual damages' to survive the predominance inquiry." *Id*. at 25 (citation omitted). Prof. McFadden has done just that with the data he has been provided to date. As Plaintiffs previously explained, once they receive the then-current App Store transactional data and the Court has accepted Prof. McFadden's damages model, Prof. McFadden will ***run the damages model before trial on the entire database of App Store transactions*** to calculate and present an ***aggregate*** damages figure for ***every*** Apple ID account to the jury. *See* note 2, *supra*. To avoid any doubt on this important issue, even though he is not required to do so at this stage, Prof. McFadden now has ***run the model on all the transactions in the Games and Music & Entertainment genres*** using App Store data complete through April 25, 2022. Byrd Decl., Ex. B, ¶¶ 6, 15, 65, Figures 1 & 4.

At trial, Prof. McFadden will testify as to the ***aggregate*** damages suffered by all Class members, netting out any so-called "negative damages" for a small percentage of Apple ID accounts against the overwhelming percentage of accounts that have suffered "positive damages."[17] Furthermore, Plaintiffs have demonstrated that Prof. McFadden's impact and damages model calculates damages for ***all*** of the approximately ⬛⬛⬛ unique accounts and also aggregates Class damages by netting out the positive and negative losses of ***each*** account. Byrd Decl., Ex. B, ¶¶ 29, 41, 44, 64 & Figure 4.[18]

---

[17] The aggregate amount of damages suffered by the Class is the exact same whether "negative damages" are netted against "positive damages" for all Apple IDs or are first netted for each individual Apple ID and then the net damages for all the Apple IDs are summed together. This is due to the commutative property of addition, which means that when two or more numbers (whether positive or negative) are added in any order, the sum always remains the same.

[18] Plaintiffs previously showed that "proof of aggregate damages calculations [at trial] is well established in federal court and implied by the very existence of the class action mechanism itself." *Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper.")); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis. …") (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996)). *See also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 175 (C.D. Cal. 2007) ("routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damage awards"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) (finding "aggregate approach to measure class-

---

1    Now that Prof. McFadden has calculated each account's damages across all of the Class,

2    only matching Apple ID accounts to actual Class members will take place after trial as part of the

3    notice and claims administration process, using claim submission forms, Apple IDs, and Apple's

4    internal records.[19] *See* March 29 Order at 14 (rejecting Apple's argument that Apple IDs could not

5    be matched to individual Class members and finding Prof. McFadden's "proposed method for

6    identifying unharmed class members reasonably objective"). In *NASDAQ*, the Southern District of

7    New York held that aggregate damages may be awarded in an antitrust class action on a class-

8    wide basis "where the computerized records of the particular industry, supplemented by claims

9    forms, provide a means to distribute damages to injured class members in the amount of their

10   respective damages." *Id.*, 169 F.R.D. at 526. In that regard, Apple's comprehensive App Store

11   records will provide a means to distribute damages to all injured Class members in proportion to

12   their respective damages by matching Apple IDs to each Class member and then netting out the

13   "negative damages" from the "positive damages" for each individual Class member.

14   In *In re Capacitors Antitrust Litigation (No. III)*, No. 17-md-02801-JD, 2018 U.S. Dist.

15   LEXIS 195310 (N.D. Cal. Nov. 14, 2018), the Court recently noted that "a variety of tools can be

16   used to address damages," including "the appointment of a magistrate judge or special master to

17   preside over individual damages proceedings [or] altering or amending the class definition in

18   response to developments at trial." *Id.* at *65 (citing *In re Air Cargo Shipping

19   Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 U.S. Dist. LEXIS 180914, at *279

20   (E.D.N.Y. Oct. 15, 2014)). The Court also noted that it could "call for a trial plan . . . that addresses

21   how the aggregate damages estimated from [the plaintiffs'] expert's report can then be apportioned

22

23   wide damage[s] appropriate"); *In re Live Concert Antitrust Litig.*, No. 2:06 ML 01745-SVW-RCx,
24   2011 U.S. Dist. LEXIS 161362, *11 (C.D. Cal. Jan. 4, 2011) ("'routine for courts
     in antitrust class actions to    rely    on class-wide, aggregate techniques    to    calculate
25   individual damages'") (quoting *Allied Orthopedic*, 247 F.R.D. at 166, 175)).

26   [19]    "Defendants will have … opportunities to individually challenge the claims of absent class
     members if and when they file claims for damages. At the claims administration stage, parties have
27   long relied on 'claim administrators . . . and other techniques tailored by the parties and the court'
     to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (citation
28   omitted).

among the class members." *Id.* (citing *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *63 (N.D. Cal. Feb. 21, 2017)). Significantly, the Court held that issues regarding how to apportion aggregate damages among class members "do not warrant a denial of class certification." *Id*

### B.     A Class Action is Superior

Because Plaintiffs' experts have corrected all the deficiencies noted in the March 29 Order, the superiority requirement is easily met. Superiority under Rule 23(b)(3) is met where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism for resolving the antitrust claims asserted against it here. Litigating the monopolization and attempted monopolization claims of each iOS Device customer on an individual basis, even if it were practically feasible, is plainly not the preferable alternative. *See, e.g.*, *In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1128 (N.D. Cal. 2013) (class action superior where "Plaintiffs case rises and falls with their common evidence"); *Image Technical Servs., Inc. v. Eastman Kodak Co.*, No. C 87-1686, 1994 U.S. Dist. LEXIS 12652, at *9 (N.D. Cal. Aug. 31, 1994) (finding class action superior method because, "[d]espite the complexity of determining individual damages, other methods of adjudicating this controversy would appear to be even more complex and less efficient."); *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*, 247 F.R.D. 98, 148 (C.D. Cal. 2007) (class mechanism clearly superior way to resolve antitrust claims, even if individualized damages analysis assumed to be required); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841, at *51 (N.D. Cal. June 5, 2006) ("unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to each class member").

Indeed, class certification is nothing less than essential if the private antitrust enforcement mechanism is to function at all. "The modest amount at stake for individual plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial economy, it represents plaintiffs['] only chance for adjudication." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997)). A class

1  action is the superior means of resolving cases such as this, where individual claims are too small

2  to be litigated individually but which involve large damages in the aggregate. *See Amchem Prods.*,

3  521 U.S. at 617. In *iTunes*, this Court certified an antitrust class action that "involves potentially

4  millions of class members," where individual recoveries "would likely be no more than several

5  hundred dollars," finding that "there would be little incentive for an individual iPod purchaser to

6  take on a factually complex antitrust case such as this one." *Apple ipod itunes Antitrust Litig.*, No.

7  C 05-00037 JW, 2008 U.S. Dist. LEXIS 107127, at *23 (N.D. Cal. Dec. 22, 2008). The Court's

8  analysis applies with identical force to this case as well.

9     **C. Appointment of Class Counsel and Class Representatives**

10     Rule 23 requires the Court to appoint counsel to represent the interests of the Class. *See*

11  Fed. R. Civ. P. 23(g)(1); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 355 (N.D. Cal.

12  2005). The Court had "no concerns" regarding the adequacy of Wolf Haldenstein Adler Freeman

13  & Herz LLP ("Wolf Haldenstein") and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.

14  ("Kellogg Hansen") to serve as Co-Class Counsel. March 29 Order at 20, n.11. The Court should

15  appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

16     The Court also found that Plaintiffs are adequate (March 29 Order at 20), and should

17  therefore also appoint Plaintiffs as Class Representatives.

18  **V. CONCLUSION**

19     Accordingly, this case meets all the requirements of Rules 23(a) and 23(b)(3) for class

20  certification. Plaintiffs therefore request that the Court grant their renewed motion to certify the

21  class action, to appoint Plaintiffs as Class Representatives, and to appoint Wolf Haldenstein and

22  Kellogg Hansen as Co-Class Counsel.

23  DATED: September 26, 2022   **WOLF HALDENSTEIN ADLER**
            **FREEMAN & HERZ LLP**

24

25          By: */s/ Rachele R. Byrd*
        BETSY C. MANIFOLD

26          RACHELE R. BYRD
        750 B Street, Suite 1820

27          San Diego, CA 92101
        Telephone: (619) 239-4599

28          Facsimile: (619) 234-4599
        manifold@whafh.com

byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
DANIEL V. DORRIS
**KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

*Counsel for Plaintiff Robert Pepper*

28704v8