BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**[REDACTED PUBLIC VERSION]**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN AND DR. ROSA ABRANTES-METZ**<br><br>DATE:    June 23, 2023<br>TIME:    10:00 a.m.<br>CTROOM: 1, 4th Floor<br>JUDGE:   Hon. Yvonne Gonzalez Rogers |

**DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(b)**

1

## TABLE OF CONTENTS

PAGE

2

INTRODUCTION.................................................................................................1

3

BACKGROUND................................................................................................1

4

LEGAL STANDARD........................................................................................5

5

ARGUMENT....................................................................................................6

6

I.      PROF. MCFADDEN'S MODEL IS RELIABLE.......................................... 6

7

        A.      Prof. McFadden's Model Properly Finds Marginal Costs ..................... 6

8

        B.      App-Month Spending for IAP is the Correct Analysis ........................ 10

9

        C.      Prof. McFadden Demonstrates that His Model Can Accommodate Both Price

10

                Tiers and Focal Point Pricing.......................................................... 122

11

                1.      Prof. McFadden's Price Tier Simulation is Appropriate and Reliable ... 122

12

                2.      The Simulation Also Simulates Focal Pricing ....................................... 144

13

                3.      The Existence of Price Tiers Does Not Distort the Model ...................... 14

14

                4.      Apple's Inter-App Competition Argument is Stale and Incorrect ........... 15

15

        D.      The Court Already Rejected Apple's Insufficient Data Argument ..................... 16

16

17

        E.      Prof. McFadden's Model Is Reliable, Robust, and Capable of Identifying

18

                Harmed Accounts............................................................................ 19

19

        F.      The Federal Rules Permit Prof. McFadden to Rely Upon Dr. Abrantes-Metz's

20

                But-For Commission Rate ................................................................. 20

21

II.     DR. ABRANTES-METZ'S BUT-FOR COMMISSION ANALYSIS IS

        RELIABLE.................................................................................... 211

22

        A.      Dr. Abrantes-Metz Uses Widely Accepted Scientific, Economic and

23

                Mathematic Principles ..................................................................... 22

24

        B.      Dr. Abrantes-Metz Consistently Uses Conservative Assumptions...................... 25

25

        C.      Dr. Abrantes-Metz Reliably Uses Real-World Inputs for Her Modeling............. 27

26

        D.      Dr. Abrantes-Metz's Use of Benchmarking to Validate the Results of Her

27

                Modeling was Fulsome and Reliable ................................................... 29

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONCLUSION……………………………………………………………………..30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Aberin v. Am. Honda Motor Co.*,
  No. 16-cv-04384-JST, 2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ...................................... 6

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) ..............................................................................................19

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ...................................................................................20, 21

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................................13

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................................. *passim*

*Elosu v. Middlefork Ranch Inc.*,
  26 F.4th 1017 (9th Cir. 2022) ............................................................................................ 8

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ............................................................................................ 20

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ....................................................................24, 25, 26

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ................................21

*In re Korean Ramen Antitrust Litig.*,
  No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756 (N.D. Cal. Jan. 19, 2017) ..............20

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018), ................................. 12

*In re Elec. Books Antitrust Litig.*,
  No. 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 42537 (S.D.N.Y. Mar. 28, 2014) .............. 11

*Kim v. Benihana, Inc.*,
  No. 5:19-cv-02196-JWH-KKx, 2022 WL 1601393 (C.D. Cal. Mar. 25, 2022) ..................... 21

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) .............................................................................................5

*Rai v. Santa Clara Valley Transp. Auth.*,
  308 F.R.D. 245 (N.D. Cal. 2015) ..........................................................................................5

*Sali v. Corona Reg'l Med. Ctr.,*
    909 F.3d 996 (9th Cir. 2018) ......................................................................... 5

*S.F. Baykeeper v. City of Sunnyvale,*
    2022 WL 4133299  (N.D. Cal. Sept. 12, 2022)......................................................21

*Sloan Valve Co. v. Zurn Indus., Inc.*
    33 F. Supp. 3d 984 (N.D. Ill. 2014).................................................................24

*Southwire Co. v. J.P. Morgan Chase & Co.,*
    528 F. Supp. 2d 908 (W.D. Wis. 2007) ........................................................... 17

*United States v. Vallejo,*
    237 F.3d 1008 (9th Cir. 2001) ...................................................................... 5

*United States v. W. R. Grace,*
    504 F.3d 745 (9th Cir. 2007) ........................................................................ 17

*Wendell v. GlaxoSmithKline LLC,*
    858 F.3d 1227 (9th Cir. 2017)..........................................................................5

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012).......................................................................... 21

**RULES**

Federal Rule of Evidence
    Rule 702 ……………………………………………………………..…………5, 17, 21
    Rule 703…………………………………………………………………………   20, 21

1

## TABLE OF ABBREVIATIONS

| Abbreviation | Referenced Document |
|---|---|
| Abrantes-Metz ___ | Expert Report of Rosa M. Abrantes-Metz, Ph.D. in Support of Plaintiffs' Motion for Class Certification, dated and filed Sept. 26, 2022 at ECF No. 666-2. |
| Abrantes-Metz Dep. ___ | Deposition transcript of the December 15, 2022 deposition of Rosa Abrantes-Metz, Ph.D., attached as Exhibit 11 to the Declaration of Caeli A. Higney in Support of Defendant Apple Inc.'s Opposition to Plaintiffs' Renewed Motion for Class Certification and *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz, filed on March 10, 2023 at ECF No. 691. |
| Apple 2021 Opp. | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, filed Aug. 10, 2021 at ECF No. 473. |
| Aug. 2021 *Daubert* Mot. ___ or Aug. 2021 *Daubert* Motion | Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden; Memorandum of Points and Authorities, filed August 10, 2021 at ECF No. ___. |
| Berger ___ | Expert Report and Declaration of Jonah Berger, Ph. D., dated and filed March 10, 2023 at ECF No. 688-7. |
| Developer Case | *Cameron v. Apple, Inc.*, No. 4:19-cv-03074-YGR (N.D. Cal.) |
| Ex. ___ | Exhibit to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude the Testimony of Prof. Daniel L. McFadden and Dr. Rosa M. Abrantes-Metz ("Byrd Decl."). |
| Hitt ___ | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated and filed March 10, 2023 at ECF No. 688-3. |
| Hitt 2021 Dep. ____ | Deposition transcript of Lorin M. Hitt dated October 11, 2021 and attached as Exhibit L to the Byrd Decl. |
| Hitt 2023 Dep. ___ | Deposition transcript of Lorin Hitt dated April 14, 2023 and attached as Exhibit E to the Byrd Decl. |
| March 29 Order ___ | Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, filed March 29, 2022 at ECF No. 630. |
| Mot. ___ or Motion to Exclude | Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; Memorandum of Points and Authorities, filed March 10, 2023 at ECF No. 690 |
| McFadden Opening Rpt. ___ | Expert Report of Daniel L. McFadden in Support of |

| Abbreviation | Referenced Document |
|---|---|
| or Opening Report | Plaintiffs' Motion for Class Certification, dated and filed June 1, 2021 at ECF No. 443-14. |
| McFadden 2021 Reply Rpt. ___ or Reply Report | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated and filed October 19, 2021 at ECF No. 554-5. |
| McFadden 1st Dep. _____ | Deposition transcript of Daniel L. McFadden dated Aug. 3, 2021and attached as Exhibit G to the Byrd Decl. |
| Nov. 2021 *Daubert* Mot. ___ or Nov. 2021 *Daubert* Motion | Defendant Apple's Notice of *Daubert* Motion and *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed Nov. 9, 2021 at ECF No. 581-4. |
| Prince ___ | Expert Report and Declaration of Jeffrey T. Prince, dated and filed March 10, 2023 at ECF No. 688-5. |
| Prince 2023 Dep. ____ | Deposition Transcript of Jeffrey T. Prince dated April 12, 2023 and attached to the Byrd Decl. as Ex. F. |
| Rev. McFadden Supp. ___ or Revised Supplemental Report | Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification dated January 19, 2023 and attached as Exhibit A to Plaintiffs' Notice of Filing of Second Revised Supplemental Expert Report of Daniel L. McFadden, filed January 19, 2023 at ECF No. 680. |
| Schmalensee ___ | Expert Report and Declaration of Richard Schmalensee, Ph.D., dated and filed March 10, 2023 at ECF No. 688-4. |
| Schmalensee 2023 Dep. ____ | Deposition transcript of Richard Schmalensee, Ph.D., dated April 4, 2023 and attached to the Byrd Decl. as Ex. I. |
| Simonson _____ | Expert Report and Declaration of Itamar Simonson, Ph. D., dated and filed March 10, 2023 at ECF No. 688-8. |
| Simonson 2023 Dep. _____ | Deposition Transcript of Itamar Simonson, Ph.D., dated April 6, 2023 and attached to the Byrd Decl. as Ex. K. |
| Watson ____ | Expert Report and Declaration of Mark Watson, Ph.D., dated and filed March 10, 2023 at ECF No. 388-6. |
| Watson Dep. _____ | Deposition Transcript of Mark Watson, Ph.D., dated April 10, 2023 and attached to the Byrd Decl. as Ex. H. |

**INTRODUCTION**

In the Court's March 29, 2022 Order denying class certification without prejudice, the Court rejected Prof. McFadden's benchmark analysis and identified several concerns over certain flaws in Prof. McFadden's original damages model. The Court granted Plaintiffs leave to address those issues, "anticipat[ing] that the deficiencies can be addressed," and directed Apple not to repeat arguments that were "analyzed and rejected" in the first round of class certification briefing.

Apple has submitted a sprawling *Daubert* motion, relying on ***eight*** experts, that frequently contradicts the Court's instruction not to re-argue previously decided issues[1] and resurrects (or reframes) many meritless arguments from the first round of *Daubert* briefing.[2] As explained in detail below, Plaintiffs have substituted a data-driven computation of the but-for commission rate performed by Dr. Abrantes-Metz, an expert with relevant expertise in transaction pricing and payment processing that the Court found Prof. McFadden lacked, for Prof. McFadden's benchmarking. In addition, Plaintiffs have addressed all of the Court's specific concerns with Prof. McFadden's damages model. Nowhere does Apple or its army of experts say that Prof. McFadden and Dr. Abrantes-Metz have not adequately addressed ***any*** of those deficiencies.

Apple's *Daubert* motion is without merit, and its additional flyspecking at most highlights disputes between the parties' experts that a jury must resolve. The Court should accept the but-for commission rate computed by Dr. Abrantes-Metz using the same methodology she has used in other matters (and that Prof. Economides used in the Developer Case). Likewise, the Court should accept the revised damages model constructed by Prof. McFadden following the Court's specific directions in its March 29 Order.

**BACKGROUND**

The Court is thoroughly familiar with the facts. The Court denied class certification *without*

---

[1]     *Compare* Mot. at 22 (arguing that Prof. McFadden incorrectly "assumes the App Store is a single-sided retailer") *with* March 29 Order at 4 (denying Apple's Aug. 2021 *Daubert* Motion and Nov. 2021 *Daubert* Motion on the same ground).

[2]     *Compare* Mot. at 14 (objecting to Prof. McFadden having run his model on "just three of 27 app genres") *with* Aug. 2021 *Daubert* Mot. at 19 (same). For a complete catalogue of these impermissible arguments, *see* Ex. A.

prejudice, identifying specific concerns with Prof. McFadden's original damages model:

- Prof. McFadden's Step One benchmark analysis, calculating a but-for commission rate, lacked a "scientific, economic, or mathematic principle" (March 29 Order at 5-7), which Plaintiffs address by offering the *economic modeling* of Dr. Rosa Abrantes-Metz;

- Prof. McFadden's original Step Two damages model had three data errors: (i) it inconsistently defined "uninjured" accounts, which Prof. McFadden has resolved; (ii) it erroneously omitted apps whose monthly minimum and maximum prices were effectively the same over a given year, which he has now resolved; and (iii) it used the fixed-dollar method for determining net harm, which is no longer the case (*id.* at 7-10);

- the original damages model did not factor in focal pricing and pricing tiers in calculating but-for pricing (*id.* at 11-12), which Prof. McFadden's model now accommodates;

- the original model permitted some "Apple IDs to switch between harmed and unharmed . . . depending on the sample used" (*id.* at 12-13), which Prof. McFadden has resolved by performing *seventy-five* separate regression calculations and using the *average* of those results to construct his econometric model; and

- the Court was concerned that Prof. McFadden would not run his damages model before trial (*id.* at 26), which Plaintiffs clarify by confirming that the damages model will be run against the full data set ***before trial***.

The Court was just as clear that "many of Apple's arguments [were] not well-taken":

- Prof. McFadden's overall theory that Apple's commission operates as a "tax" was "scientifically sound" and "grounded in economic principles and literature" (March 29 Order at 3-4);

- Prof. McFadden's market definition was "sound," which it was not inclined to address at the class certification stage (*id.* at 4);

- Prof. McFadden's opinions regarding developer costs were based on sufficient data at the class certification stage (*id.* at 10 n.8);

- structuring the model at the app level, rather than estimating but-for prices for each individual in-app purchase ("IAP"), was not objectionable to the extent that doing so "generates negative but-for pricing" (*id.* at 10-11);

- there was a "sufficient foundation" for the model's reliance on 0.1 percent random samples (*id.* at 12-13); and

- the model's exclusion of free apps with no IAPs was both sound and "consistent with Consumer Plaintiffs' theory of the case" (*id.* at 13-14).

By methodically identifying the precise issues that Prof. McFadden needed to remedy, the Court set the parties on course for an efficient resolution of Plaintiffs' Renewed Motion for Class Certification. Guiding the parties further, the Court admonished Apple: "[W]here an argument has been analyzed and rejected, Apple shall not re-argue the issue on the anticipated next round of

briefing." *Id.* at 2. With that roadmap, Plaintiffs set out to remedy all of the Court's concerns, and Plaintiffs have done just that.

*First*, many of Apple's arguments, like its meritless free apps and its equally meritless margin bounds arguments, are retreads of arguments the Court considered and rejected before. The Court should reject them again. But to be complete, they are answered a second time below and in the declarations of Prof. McFadden and Dr. Abrantes-Metz.

*Second*, Apple's newly-minted "natural experiments" argument is based upon incomplete flawed, unsound, and unreliable economic analysis. As shown below, one of Apple's army of experts, Prof. Watson, dismissed the simplistic "before and after" price comparisons conducted under the guise of natural experiments by another of Apple's experts, Prof. Hitt, as fundamentally unsound. Prof. Hitt's other natural experiment, the so-called comparative "difference-in-differences" regression analysis, is entirely unreliable because Prof. Hitt does not "rely" on any standard test to validate its results, one of which he claims to have performed but admits he neither presented anywhere in his 344-page report or even included in his voluminous work papers. Because the reliability of the difference-in-differences analysis is unverified, it must be rejected.

*Third*, to address the Court's concern, Prof. McFadden has modeled the But-For world both **with** and **without** focal pricing. He explains in detail in his supplemental report how he has modeled prices to account for both focal point prices and tiered prices. Rev. McFadden Supp. ¶ 81. Prof. McFadden first modeled developer pricing under the assumption that developers would choose but-for app download and IAP prices in accordance with Apple's current price tier schedule. *Id.* ¶ 87. Then he altered the model to integrate a focal point pricing structure that *mirrors* what Apple has proposed to implement as part of its settlement in the Developer Case. *Id.* ¶¶ 93-94. Both changes yielded damages estimates that were *less than one percent different* than that produced without either accommodation. *Id.* ¶ 96 fig.7. Apple's response consists mostly of a dispute between experts over whether Prof. McFadden's model, which uses monthly average app-level costs to calculate but-for pricing, **adequately** incorporates focal pricing. However, none of Apple's eight experts points to any authoritative literature that they say Prof. McFadden has ignored or misapplied in doing so, and none of them offers any alternative methodology. This is

1    simply a dispute over the results of Prof. McFadden's focal pricing analysis, which is not properly

2    the subject of a *Daubert* motion.

3         *Fourth*, Plaintiffs retained Dr. Abrantes-Metz, an expert in econometrics, statistics, and

4    most pertinent here, *transaction pricing and payment processing*, to calculate Apple's but-for

5    commission rate by economically modeling empirical inputs from the As-Is world. Apple's experts

6    criticize Dr. Abrantes-Metz's work primarily on two equally baseless grounds: (1) that her

7    modeling is merely an accounting equation that allegedly lacks "predictive" power; and (2) that

8    she neglected to consider the indirect network effects of Apple's App Store as a two-sided

9    platform. Regarding the use of an accounting equation, all of Apple's experts have **admitted** that

10   the equation Dr. Abrantes-Metz used **applies** to the App Store and to the But-For world she

11   modeled. Dr. Abrantes-Metz used the empirical data of "the market share and operating profit

12   margin characteristic of a moderately competitive market as inputs to find the commission rate

13   that would prevail in such a market." Abrantes-Metz ¶ 22. As part of her data-driven mathematical

14   analysis, she first estimated a rival app store's costs using Apple's **own** data. *Id.* ¶¶ 30-34. She

15   estimated the size of the overall market using **actual** data on iOS app billings. *Id.* ¶ 56 & n.47.

16   Next, she estimated its market share using a survey conducted by Prof. Itamar Simonson, one of

17   Apple's own experts. *Id.* ¶¶ 35-42. Then, Dr. Abrantes-Metz estimated its operating profit margin

18   by adopting that of the Microsoft Store, "the third largest third-party PC game app store[] by global

19   sales," which she explains is the most reasonable competitive comparator. *Id.* ¶¶ 43-54. Using

20   these empirical inputs, Dr. Abrantes-Metz determined that in a competitive But-For world with

21   "only one rival competing against the Apple App Store," Apple would charge a ▮▮ percent

22   commission. *Id.* ¶¶ 55-59. That commission would allow Apple to "achieve an operating profit

23   margin of ▮▮ percent," which she noted is "significantly higher" than other firms that Apple itself

24   considers comparable to its App Store in internal documents. *Id.* ¶ 60.[3]

25        Regarding Apple's network effects argument, the Court already has determined that the

26   two-sidedness of the App Store is a merits question not ripe for determination at the class

27   ───────────────

28   [3]     Separately, Dr. Abrantes-Metz confirmed the accuracy of her mathematical calculation
     through a comprehensive and rigorous standalone benchmark analysis. *Id.* ¶¶ 81-120.

certification stage. March 29 Order at 4 (rejecting Apple's argument that Prof. McFadden "ignores the two-sidedness of the App Store"). The Court should not permit Apple resurrect that argument now. Nonetheless, Dr. Abrantes-Metz **did**, in fact, consider the indirect network effects of the App Store as a two-sided platform but concluded an extensive analysis of indirect network effects was unnecessary for her opinions in light of several pertinent facts, most notably the absence of either consumer fees or consumer subsidy payments in the Windows PC game apps marketplace, and the absence of any evidence that Apple would pay consumers a subsidy in the But-For world. Abrantes-Metz Decl. ¶¶ 23-35. None of Apple's phalanx of experts has presented any such evidence, and none of them has presented a contrary conclusion regarding indirect network effects. They simply parrot Apple's mistaken argument that Dr. Abrantes-Metz failed to consider them.

## LEGAL STANDARD

Federal Rule of Evidence 702 requires the district court to ensure that expert evidence is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). Expert testimony is relevant if it "'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citation omitted). It is reliable "'if the principles and methodology used by [the] expert are grounded in the methods of science.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). "The focus of the district court's [reliability] analysis 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Wendell*, 858 F.3d at 1232 (quoting *Daubert*, 509 U.S. at 595). The reliability inquiry is "flexible . . . with a 'liberal thrust' favoring admission." *Id.* (internal citations omitted).

Importantly, at class certification, the "'inquiry is a **tailored** *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." March 29 Order at 3 (emphasis added) (quoting *Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015)). As the Ninth Circuit has made clear, "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018). "Rather than the *Daubert* 'gatekeeper' standard, 'a lower *Daubert* standard should be employed at this [class

certification] stage of the proceedings.' '[T]he question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met.'" *Aberin v. Am. Honda Motor Co.*, No. 16-cv-04384-JST, 2021 WL 1320773, at *4 (N.D. Cal. Mar. 23, 2021) (alteration in original) (citations omitted).

## ARGUMENT

### I. PROF. MCFADDEN'S MODEL IS RELIABLE

#### A. Prof. McFadden's Model Properly Finds Marginal Costs

Apple's first meritless argument is that Prof. McFadden's model does not "accurately infer marginal costs" because marginal costs of digital goods are typically low. Mot. at 8. Apple argues that Prof. McFadden's model finds marginal costs only because it is "mathematically engineered" to do so. Mot. at 9. That is untrue. App developers must earn a profit at the enterprise level and, therefore, marginal costs are those variable costs that come from the app developers' iOS app business. McFadden 2021 Reply Rpt. ¶ 74; McFadden Decl. ¶ 5. These variable costs properly include usage and user acquisition costs. McFadden Decl. ¶ 5; McFadden Opening Rpt. § VI.D.3. In other words, the relevant margin for purposes of analyzing the app developers' pricing decisions should include *all* relevant costs associated with selling their digital goods (whether apps or IAP), which, at a minimum, includes app-level usage and user acquisition costs. McFadden Decl. ¶ 5; McFadden 2021 Reply Rpt. ¶ 74.[4] Two of Apple's experts, Professors Hitt and Prince, agree that developers incur operational costs, including with respect to the sales of in-app currencies, that are variable or that scale with the number of users, usage, or program size. Hitt 2021 Dep. 20:19-21:14; Prince 2023 Dep. 63:22-65:20. Their insistence that the only relevant marginal costs are at the *transaction* level implies that app developers would not take into account the enterprise level marginal costs when setting prices, which is at odds with reality. No developer could afford to implement a program without planning for the costs of running it. McFadden Decl. ¶ 7.

This is no different from the prior dispute among the experts over whether Prof. McFadden properly constructed his model to price at the app level rather than the individual in-app purchase

---

[4]   Prof. Hitt admits that developers pay "any number" of marginal costs, such as royalties and licensing fees. Hitt 2023 Dep. 21:18-22:9.

level. The Court rejected Apple's *Daubert* challenge on that basis during the first round of class certification briefing. March 29 Order at 11. It should do so again. At most, this is a classic dispute between experts that is *not* the proper subject of a *Daubert* challenge, but that a jury should resolve.

No one seriously disputes that a digital **product** may have little or no marginal cost. Apple's own example of intra-game currency example (Prince ¶ 69) bears this out. Manufacturing a penny has a marginal cost in the metal used in each piece, the cost of operating the machinery to produce the penny, the wear and tear on the tooling, the labor of the workers running the press and doing quality control, the packing materials and shipping. It is easy to see which of these do not apply to the digital, in-game equivalent. But Prof. Prince and Apple ignore the costs that app developers do incur. Each time the developer sells virtual in-app currency, it has more currency in circulation. That leads to more purchase transactions for which it must create and administer in-game content, which it must quality control. The more currency it floats and the more users transact, the more coding and labor it must deploy in running its virtual economy, including expanded customer support to manage and correct transactions and adjudicate disputes. The system is *not* cost-free, and critically, it is *not* truly fixed. The cost of the program *scales* with the size of the program. Costs grow as the virtual business gets bigger. *See* McFadden Decl. ¶¶ 5-7.

Apple ignores this distinction entirely, relying instead on mere conventional wisdom (that each identical copy of a digital product costs little or nothing to reproduce) and oversimplified misdirection (that this means there is no marginal costs to the developer who sells digital products). Prof. Prince in his most recent deposition admitted to not having "thought about that distinction." Prince 2023 Dep. 70:10-70:16; 74:22-75:20.[5]

Apple deploys Prof. Prince (¶¶ 78-82) to argue that "every Game in-app purchase priced at $4.64 or above" produces a positive marginal cost. But this is an attack on the **results** of Prof. McFadden's econometric modeling, not his methodology. As Prof. McFadden testified, the model is *not* pre-programmed or constrained to find positive marginal costs. McFadden 1st Dep. 243:16-

---

[5]     In the music and entertainment genres, Apple's argument has even less force. Those developers face clear marginal costs from licensed content, which scales directly, and for that reason their margins are normed to a more modest ████ based on developer data. McFadden Opening Rpt. ¶¶ 192-95, 206.

20. Positive marginal costs result from the interaction of the actual purchase data with the equations he has derived from economic principles widely accepted in the academic literature. "Ultimately, 'the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Daubert*, 43 F.3d at 1318. Apple takes offense that Prof. McFadden did not expressly model the sources of alternative revenue that explain negative marginal costs. In fact, this is Apple's attempt to revisit and repackage a lost argument. In the Aug. 2021 *Daubert* Motion, Apple argued that newspapers would raise prices in the But-For world. That argument fell apart: internal complimentary effects make newspapers more profitable with each subscriber due to advertising. After Prof. McFadden successfully explained this phenomenon (McFadden 2021 Reply Rpt. ¶¶ 86-94), Apple changed its position, now insisting that Prof. McFadden, instead of being wrong about this, was right but should have modeled it. Prince ¶ 73. Despite insisting that this exercise should have been done, Apple has not shown that doing so would alter the results or affect whether any account is harmed.

Apple also relies on Prof. Hitt's "natural experiment evidence" to support its marginal cost argument. Mot. at 9. However, Hitt's natural experiments are fatally flawed and his conclusions are therefore unreliable. *First*, Prof. Hitt fails to establish what factors are driving the results of his natural experiments that he claims contradict the predictions of Prof. McFadden's model; his list of potential reasons that may drive his empirical observations are pure speculation. McFadden Decl. ¶ 26; Hitt 2023 Dep. 128:14-129:14, 143:9-145:18, 151:6-21, 152:14-153:7, 154:19-155:3, 157:4-160:4. For example, Hitt never determined through any rigorous data-driven analysis, the effect of Apple's price tiers on app and IAP costs in any of his "natural experiments." Hitt 2023 Dep. 143:9-145:18. It is hardly surprising that many developers did not respond to the limited changes in Apple's commission rates when their price choices were as heavily constrained as they are in the As-Is world in which Prof. Hitt conducted his natural experiments.

*Second*, Prof. Hitt's analyses of the prices for products before and after implementation of the Small Business Program ("SBP") and Auto-Renewable Subscription Policy ("ARS") "fails to follow standard economic techniques required for a natural experiment analysis to meet

professional standards." McFadden Decl. ¶ 11. Prof. Hitt does not include any econometric controls in his analysis, nor does he compare the treatment group (those impacted by Apple's programs) to a control group (those not impacted by Apple's programs). McFadden Decl. ¶ 13; *see also* Hitt 2023 Dep. 105:21-106:6. Indeed, Apple's own expert, Prof. Watson, *agrees* that a simplistic "before and after" test is useless: "In all cases in which you are thinking about the causal effect of one variable X on another variable Y, one worries – absent a randomized control experiment, one worries there might be confounding factors." Watson Dep. 45:1-8. In other words, "[a]n economist couldn't just look at before and after" the commission rate change because, "there is a worry that that difference may be *contaminated with other factors that went on*" that skew, blur, or obscure the effects being considered. *Id.* 41:25-42:11 (emphasis added).

*Third*, Prof. Hitt's attempts at a regression analysis relating to his natural experiments, his difference-in-differences ("DiD") regressions, for the SBP and ARS suffer from several flaws, rendering his analysis and results unreliable. Hitt ¶¶ 15-28, 71, 86 & App'x 5; McFadden Decl. ¶¶ 15-22. Prof. Hitt's regression fails to account for self-selection bias even though Prof. Hitt admitted in his deposition that voluntary enrollment in the SBP is a source of self-selection bias. Hitt 2023 Dep. 90:22-92:5; 93:7-95:5.[6] Prof. Hitt also fails to conduct any analysis of his choice of control groups for either his SBP or ARS regressions. McFadden Decl. ¶ 19. His own academic work acknowledges, and he admitted in his deposition, that examining the representativeness of control groups against the treatment group is essential to rendering any DiD regression analysis reliable. Hitt 2023 Dep. 51:13-22. *See also* McFadden Decl. ¶ 19 n.48 (citing Hitt's work).

For example, Prof. Hitt admitted in his deposition that a parallel trends analysis[7] was a

---

[6]    According to Prof. Hitt's own data, as of the treatment date, less than half of all developers who would eventually join the SBP were at the time enrolled. McFadden Decl. ¶ 18. And although Prof. Hitt claims to have accounted for the selection bias through the inclusion of "inverse propensity score weighting," he only applies that weighting to one of his two control groups, and therefore his coefficient estimates are inherently biased and unreliable. *Id.*

[7]    One basic condition the DiD regression should satisfy is the parallel trends, which requires that but for the treatment, the control group and treatment group are the same and follow the same trends. Parallel trends require that in the pre-program implementation period, time trends in the outcome of interest are the same in treatment and control groups. McFadden Decl. ¶ 19.

basic validation step. Hitt 2023 Dep. 116:14-117:10. He claims to have performed such a test, but he omitted any discussion or analysis of the test results in his report and he omitted all related work from his backup materials. Hitt 2023 Dep. 116:21-117:4. Apple's counsel later asserted in an email that Prof. Hitt did not "rely" upon the parallel trends tests for the regressions he performed. Ex. D. This is a blatant failure of professional standards and renders his natural experiments analysis unverified and unreliable. McFadden Decl. ¶ 20; *see also* Watson Dep. 41:25-42:11; 45:1-5. When Prof. McFadden performed his own placebo tests, the results indicated that the events Prof. Hitt analyzed are not "natural experiments," making his analysis invalid and unreliable. *See* McFadden Decl. ¶¶ 21-25 figs.1, 2. Therefore, the Court should disregard Prof. Hitt's flawed natural experiment analysis. Those flawed and incomplete "experiments" hardly form the basis for rejecting Prof. McFadden's econometric modeling.

**B.    App-Month Spending for IAP is the Correct Analysis**

The Court already considered Apple's criticism that Prof. McFadden used a monthly per-app spend instead of individual IAP menu items as his unit of analysis for IAP. March 29 Order at 11. As Prof. McFadden previously explained, the ***app level*** is "the most reasonable level at which app developers' variable costs can be estimated." McFadden 2021 Reply Rpt. ¶ 142; *see also* McFadden Decl. ¶ 29. The Court concluded, correctly, that this was a proper choice. March 29 Order at 11. Now, however, Apple stubbornly argues that both the Court and Prof. McFadden got it wrong, and that the model must predict prices at the IAP-item level. Mot. at 11.

Prof. McFadden models developers' pricing decisions at the ***app level*** and estimates but-for prices at the ***app level.*** McFadden Decl. ¶ 34. Apple's experts misleadingly portray their imposition of item level prices and even item-level marginal costs as applications of Prof. McFadden's methodology, but their calculations are based upon their own ***modifications*** to the model. *Id*. Apple's experts' use of Prof. McFadden's ***app level*** calculations are not appropriate for their ***IAP-item-level analysis***. *Id*. ¶ 35.

Prof. Prince also haphazardly switches between two methods of calculating item-level IAP prices: for several of his analyses he uses a simple arithmetic method (*see* Prince ¶ 107 n.183), but in other analyses, he uses Prof. McFadden's app-level demand parameter estimates to infer the

IAP-item-level marginal costs. *See* Prince ¶128, Ex. 14. In his deposition, Prof. Prince forgot that he had done this, instead believing he used the former method for all of his analyses.[8] Leaving apart whether demand should be estimated at the app level or the item level, it is disturbing (to say the least) that Prof. Prince was unaware that he used two different methodologies to critique Prof. McFadden's rigorous analysis.

Apple's language is misleading. Apple says "McFadden assigns each item a price of $5.49 …" Mot. at 11. In fact, what Apple means is that in its artificial thought experiment of one $0.99 IAP purchase and one for $9.99, the total is $10.98 and the average is $5.49, and did not "assign" a number, but uses this average. Economists routinely average price and product data to estimate demand. McFadden Decl. ¶ 36.[9] For example, in any game, one may buy items with in-game currency, some of which affect game play and some of which are merely cosmetic, such as a fancy skin (a graphic overlay for all or part of the player's character). It matters not whether the developer prices this at one, one hundred, or one million virtual in-game credits. While the developer may need to maintain some internal relationship within the game, Prof. McFadden says it is not necessary to account for this relationship in modeling how developers would change their app prices with respect to changes in the App Store commission.

It is for this reason that Apple is wrong, and the Court was correct. In order to recover costs and make margins, the developer must and does think of IAP in terms of how much the player spends per month. *See generally In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 42537, at *92-3 (S.D.N.Y. Mar. 28, 2014) (rejecting argument that averages were an impermissible "fictional composite").

Apple's remaining argument about what it calls Prof. McFadden's "percentage method" (Mot at 13-14) is simply a repackaging of the arguments it (and Prof. Prince) made during the last

[8]    Prof. Prince lost track of how he calculated item-level prices. He first explained that his Exhibits 15 and 16 rely on the arithmetic method (the first method) when in fact he used the method where he estimates item-level marginal costs (the second method). He corrected his initial error after a break. *See* Prince 2023 Dep. 116:21-124:18, 131:22-132:17.

[9]    This is not new ground. The Court already considered – and rejected – Apple's identical argument regarding the use of average prices at the app level. *See* March 29 Order at 10-11.

round of class certification and *Daubert* briefing. *See* McFadden Decl. ¶¶ 37-40. The argument also rests on the flawed analysis that takes place at the ***IAP-item level*** and which is not relevant for assessing the soundness of Prof. McFadden's model. *Id*. ¶ 40.

### C. Prof. McFadden Demonstrates that His Model Can Accommodate Both Price Tiers and Focal Point Pricing

#### 1. Prof. McFadden's Price Tier Simulation is Appropriate and Reliable

The Court found Prof. McFadden's model "does not provide a reliable method for determining but-for pricing in the presence of focal pricing" or price tiers. March 29 Order at 12. Prof. McFadden addressed this issue and demonstrates that his model "is capable of calculating class-wide impact, account-level damages, and identifying uninjured accounts with precision, even in the presence of price tier restrictions or voluntary focal pricing." Rev. McFadden Supp. ¶ 81.[10]

On May 31, 2022, Apple indicated in the Developer Case that it was working on "increasing the choice of price points to more than 750." Developer Case, May 31, 2022, ECF No. 476 at 1. Prof. McFadden's price tier simulation incorporated a similar 750 price point scheme.[11] Apple now complains that this simulation is useless because it does not use Apple's ***old*** system of prices locked at dollar intervals even in the face of a rival app store, though Apple itself has abandoned that $.99 scheme. Apple cannot be supposed to cling doggedly to the $.99 ending in the But-For world when it has already abandoned it, right now, in the as-is world. By predicting Apple's announced new arrangement (*see* Rev. McFadden Supp. ¶ 17 and n.28) with reasonable assumptions, Prof. McFadden has conformed his simulation to the real world.[12]

---

[10]    In *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3-5 (N.D. Cal. Mar. 5, 2018), the Court struck an expert who did not incorporate focal-point pricing in his econometric modeling. Apart from being an indirect consumer case, what sets *Lithium Ion Batteries* apart from this case is the fact that there was focal-point pricing in the as-is world there, whereas Apple's mandatory price tiers, in which developers are forced to set prices at pre-determined prices picked by Apple, ***preclude*** focal-point pricing. However, the difference is immaterial because, as discussed below, Prof. McFadden has restructured his model to compute but-for prices using Apple's price tiers as well as its announced expansion of those price tiers to include more obvious focal price points, thus showing he can model damages on a common, classwide basis both ***with or without price tiers and with or without focal-point pricing***.

[11]    Rev. McFadden Supp. ¶ 94, fig.7 (simulation was a reasonable guess at what Apple's new 750 price points would look like).

[12]    Prof. McFadden's tier/focal pricing simulation is conservative, because even if Apple can

---

1    The reason many of Prof. McFadden's but-for prices do not end in 99 cents is the but-for

2    prices he estimates are the average of multiple item prices. McFadden Decl. ¶ 44. Again, Prof.

3    McFadden models developers' pricing decisions at the app level and estimates but-for prices at the

4    app level; therefore he uses the app-level average price as the as-is and the but-for price for IAP

5    apps. *Id.*[13] Prof. McFadden simulated the But-For world by restricting the average IAP prices to

6    change in fixed increments consistent with the size of the increments on Apple's tier schedule

7    using the *same model as Prof. Prince used*. *Id.* ¶ 45 and n.99.

8    Now, however, Prof. Prince runs away from his prior methodology and, incredibly,

9    changed Prof. McFadden's methodology to perform a price-tier simulation *at the item level*.

10   McFadden Decl. ¶ 46. Prof. Prince's analysis is incorrect because: (1) that is not Prof. McFadden's

11   methodology nor the appropriate level at which to estimate marginal costs; and (2) it

12   inappropriately uses Prof. McFadden's estimated demand coefficients, which are conditional on

13   app developers setting prices at the ***app*** level, in estimating ***item-level*** marginal costs. *Id.* ¶ 47.

14   ***Prof. Prince testified at his deposition that he himself does not opine his item-level marginal***

15   ***cost estimates are correct***. Prince 2023 Dep. 102:21-103:1; 103:24-104:8. The Court already

16   considered and rejected Apple's argument that Prof. McFadden must model each IAP item

17   separately instead of taking a monthly average spend. March 29 Order at 10-11. The Court should

18   reject it again.

19   Finally, Prof. McFadden's price tier simulation is separate from his model for an obvious

20   reason: Plaintiffs' case includes a challenge to price tiers. Under *Comcast Corp. v. Behrend*, 569

21   U.S. 27 (2013), plaintiffs' damages model must match plaintiffs' theory of liability. If Plaintiffs

22   prevail on the issue of price tiers, the main model addresses this state. If Apple prevails on the

23   permissibility of a tier system, the tier simulation.

24

25   _____

26   legally maintain price tiers in their own Apple Store, it has not been established that they could
     impose these price tiers on other but-for channels for acquiring apps and content, or sustain their
27   tier system in the presence of off-tier prices offered through rival channels in a but-for market.

28   [13]    Apple's experts' own reports show that an average for IAPs need not fall on Apple's price
     tiers, even if the individual item prices do fall on the tiers. *See* McFadden Decl. ¶ 44 n.96.

1

### 2.    The Simulation Also Simulates Focal Pricing

2        Contrary to Apple's argument that Prof. McFadden "makes no attempt" at focal point

3   pricing," he has shown methods applicable to ***both*** tier pricing ***and*** focal pricing scenarios. Rev.

4   McFadden Supp. ¶¶ 85-96; *see also supra*, n.10. Indeed, nothing in Prof. McFadden's price tier

5   simulation specifies whether the pricing constraints are imposed by Apple's rules, or by

6   developers' focal pricing. Rev. McFadden Supp. ¶ 86 n.97. Prof. Prince essentially admits that this

7   is the same as Apple's price tier argument. Prince ¶ 150 ("has qualitatively similar consequences").

8   Prof. Hitt agreed in his deposition that Apple's price tiers are designed to fall on focal prices. Hitt

9   2023 Dep. 141:16-142:9. Accordingly, the simulation demonstrates how developers would price

10  in a world where Apple adopted ten-cent increments or one where developers elect focal prices.

11       Here, Apple performs sleight-of-hand, insinuating that Prof. McFadden agreed that prices

12  would cluster at exactly $.99 in the But-For world, when he conceded only that one would expect

13  to see focal point pricing. *See* Prince ¶ 146. In fact, while the "left hand digit" phenomenon (Berger

14  Section VI.B.) is real, it is not powerful enough to pull the majority of the world's retail pricing to

15  $.99 endings. Prof. McFadden already cited literature for the proposition that most prices do ***not***

16  end in nine-cent amounts, let alone ninety-nine cent amounts (Rev. McFadden Supp. ¶ 83), and

17  that the world's largest retailer does ***not*** use prices ending in nines. But to the extent prices ending

18  in nine cent amounts would assert themselves, this reality is reflected in Prof. McFadden's tiered

19  simulation. Apple has not demonstrated otherwise.

20

### 3.    The Existence of Price Tiers Does Not Distort the Model

21       Apple's final attempt to use its mandatory (and anticompetitive) price tiers to invalidate

22  Prof. McFadden's model is to argue that price tiers make it impossible to estimate consumer

23  demand. *See* Mot. at 17-18; Prince ¶¶ 136-144. Apple's argument is that, because developers must

24  conform to price tiers, the prices they use are not profit maximizing. There are several problems

25  with this argument, not the least that it is unsupported by any economic literature. Price tiers are

26  not rare in the real world, and economists who are not litigation consultants, when they study

27  markets with price tiers, do not make adjustments of the kind Apple suggests. *See* McFadden Decl.

28  ¶ 51 ("my approach to incorporating focal pricing into a supply-and-demand model is grounded in

the academic literature cited by Apple's own experts"). Prof. McFadden used the transactions data that reflected Apple's price tiers, correctly reflecting the as-is world. He has explained that developers have the ability, knowing the price tiers in advance, to craft their pricing to best maximize their profit while conforming to the tiers. McFadden Decl. ¶ 58. This does not mean Apple's restrictive pricing policies do not hinder competition among app developers. *Id.* The degree of competition that drives down the price of an app sold at $59.99 by $1 or $2 in a normal competitive market would not be enough to push down the price below $59.99 in the presence of Apple's price tiers, where the next lower available price is $54.99. *Id.* & n.111; McFadden Opening Rpt. ¶ 129. Apple's price tiers also hinder app developer competition by limiting their ability to offer temporary price discounts, regardless of app product designs. McFadden Decl. ¶ 58; McFadden Opening Rpt. ¶ 130.

Download prices lack the complete pricing freedom of internal currencies, but Apple's argument here is at odds with literature. Economists studying price-tiered markets proceed largely as Prof. McFadden has, assuming profit maximization despite the constraints of price tiers. There is no literature or well-understood methodology to make an adjustment to a price tiered market, and Apple's army of experts cites to none. While claiming that Prof. McFadden is not employing sound methodology, Apple and its experts also demand that he invent a methodology to account for an effect that academic economists do not see a need to correct for. That creative (but unsupported) argument is not an appropriate basis on which to exclude sound economic modeling.

At bottom, Apple's argument that price tiers distort profit maximization is an at-the-margins argument and a triable issue, through cross-examination and Apple's own experts. It is not a gatekeeping issue appropriate for a *Daubert* motion.

### 4.    Apple's Inter-App Competition Argument is Stale and Incorrect

Apple argues again[14] that Prof. McFadden's model "still assumes that developers price like monopolists." Mot at 18.

Apple is again wrong. Prof. McFadden's model properly reflects the degree of

---

[14]    *See* Mot. at 5:9-11; Apple 2021 Opp. at 21 n.5. Though raised and briefed by the parties before, it was not among the issues the Court directed Plaintiffs to address

1    competitiveness through the price sensitivity of demand, which captures how readily consumers

2    switch to other apps when an app raises its price. McFadden Decl. ¶ 62; McFadden 2021 Reply

3    Rpt. ¶ 120. Apple's argument, that Prof. McFadden treats each app as a monopolist, is an invention

4    of Prof. Prince. *See*, *e.g.*, Prince ¶¶ 191-92. In Prof. McFadden's model, each app has its own

5    transaction data, which incorporates the realities of its own competitive environment. Apps that

6    face little competition express that in the frequency and size of their transactions, while apps that

7    face substantial competition charge less or surrender volume. Prof. McFadden's model reflects the

8    degree of competitiveness through the price sensitivity of demand.

9        Moreover, Prof. McFadden has previously analyzed whether apps and other non-digital

10    content that do not pay commissions to the App Store "impose competitive constraints" on the

11    apps that do. McFadden Decl. ¶ 63; McFadden 2021 Reply Rpt. §§ III.A, V; McFadden Opening

12    Rpt. §§ III.B-III.F. Prof. Hitt provides no evidence and he performed no quantitative analysis of

13    off-platform substitution. Hitt 2023 Dep. 149:25-150:5, 153:8-15; 157:20-23. Instead, he relies

14    upon his flawed natural experiment analyses, which, as explained above, are unreliable and do not

15    identify any set of potential "rivals." McFadden Decl. ¶ 64. Moreover, he has not investigated the

16    plausibility that these unidentified "rivals" impose "competitive constraints," as he admitted

17    during deposition. Hitt 2023 Dep. 153:8-15.[15]

18        **D.    The Court Already Rejected Apple's Insufficient Data Argument**

19        Apple expends the most fire attacking Prof. McFadden's margin bounds. This argument

20    failed before. Prof. McFadden's methodology of calculating the marginal costs of developers is

21    based on sound economic methodology and uses real-world data. The process uses Apple's own

22    transactions, normalizing it with actual profit margin data obtained from an array of developers.

23    The methodology has proved both effective and reliable. *See* Order at 10 n.8.

24        To make this argument, Apple pretends that Prof. McFadden applied margin bounds in a

25

26    [15]    Apple also raises again the argument that Prof. McFadden is ignoring the effect of Apple's
       commissions on the price of free apps. Mot at 19 n.10. Prof. McFadden did not address in his
27    Revised Supplemental Report his decision not to include free apps because the Court accepted
       Prof. McFadden's opinion on market definition and did not identify this as a deficiency that needed
28    to be corrected. McFadden Decl. ¶¶ 65-66.

*two-step* process, saying he first estimated consumer demand for iOS apps and then imposed margin bounds to modify his results in a later step. That is not what Prof. McFadden did. *See* McFadden 2021 Reply Rept. ¶¶ 148-49; Rev. McFadden Supp. ¶ 19. Apple's experts agree with Prof. McFadden that he used margin bounds in an integrated process – the "same estimation structure" – "done simultaneously," ***not*** in separate steps as Apple imagines. Hitt 2023 Dep. 80:7-25. *See also* Watson Dep. 18:15-20:19; 22:15-21 (acknowledging single integrated process).

While the Court indicated several areas of concern that Plaintiffs were directed to correct, the margin bounds methodology was ***not*** one of them. The Court accepted the data as adequate for class certification purposes, noting in a footnote that, ***at trial***, it would expect a "more fulsome" analysis or reliance on an industry expert. Order at 10 n.8. Since then, more developers have provided their margin data, and Prof. McFadden will incorporate the additional margin data in his modeling at the merits stage. For now, however, it is sufficient that he has demonstrated his methodology can be used to calculate damages. McFadden Decl. ¶ 85; Order at 10 n.8.

Apple again criticizes Prof. McFadden's methodology, saying that if his margin bounds did not exist, then his results would be different.[16] This is a meaningless tautology: margin bounds constrain diffuse real-world data. Surely, if the data is different, the results are different as well.

More importantly, there is no case law suggesting that the Court may pull apart an expert's methodology and determine in isolation that one part of a complex process is by itself incomplete or produces bad results. Rule 702 requires a "holistic focus on an expert's testimony." *United States v. W. R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007). To peel apart Prof. McFadden's equation to separate out the evidence-derived margin bounds from the transaction data, as Apple asks the Court to do, is contrary to that approach. *See id.* (instructing district courts to analyze an expert's "methodology as a whole"); *see also Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d

---

[16]    Among Apple's army of experts, only Prof. Watson disagrees with Prof. McFadden's methodology. But, by his own admission, the difference between Prof. Watson's results and Prof. McFadden's results "wasn't particularly large." Watson Dep. 46:7-10. He then attempts to exaggerate the difference by rewriting Prof. McFadden's code to remove the margin bounds, Waston Dep. 24:14-25:8, which generates a partial result that of course looks very different. *See* Watson Ex.9 p. 41. This is merely a classic disagreement between experts as to which of two widely accepted methodologies should be used. It is ***not*** a proper *Daubert* challenge.

908, 928-29 (W.D. Wis. 2007) (composite method with an error correction component was permissible; disagreement over the correction was a matter for cross-examination).

The weakness of Apple's argument is typified by Apple's own expert, Prof. Prince, at Exhibit 23 of his new report. He purports to show that the margins of game app developers individually are different from the accounting profits used for these companies to set the ▇▇ to ▇▇ average margin. But each of the three companies reports a single margin or tight range of margins for all or nearly all of their game apps.[17] It should be obvious that, when using the actual game-by-game transactions, the implied customer demand for each game will vary from other offerings by the same maker. This is why the actual data is used. This variation is to be expected, and in fact it would be odd (or at least coincidental) if each game, by itself, equaled the enterprise-wide margin cost that the business reports for all of its business.

Nor can it be argued that Prof. McFadden has used bad data for this purpose. Prof. McFadden uses both actual transactions data and app developers' cost data. McFadden Decl. ¶ 53. The margin bounds are set using data from actual firms in the field (*see* Prince Ex. 23, listing 49 games with margins between approximately ▇▇▇▇▇). This information is scarce. Typically in economics, margins must be inferred from other data rather than input as known figures, in part because firms do not typically disclose them. McFadden Decl. ¶ 83. In this case, a few such margins are available from relevant developers, which only improves the reliability of the demand estimation. *Id*. By *supplementing* the transactions data with developers' cost data, Prof. McFadden uses *more data* than is typically used. *Id*. ¶ 80. Apple's experts, by removing Prof. McFadden's margin constraints, change both the data used and the method. *Id*.

Apple argues next that the selection of margin bounds is unscientific, having "no objective methodology." Mot. at 21. But Apple's expert admits that the lowest margin observed among Prof. McFadden's game developers is ▇▇, and the highest is ▇▇. Watson ¶ 61, Prince Ex. 23 (listing 49 games); *see also* Watson ¶ 62 (music and entertainment observations between ▇▇ and ▇▇, rounded to ▇▇.) The methodology to set the range is simple rounding, and Apple cites

---

[17]    Of the 49 games listed in Exhibit 23, only Epic's Battle Breakers has a separate accounting margin listed. The remainder are grouped with the developer's other offerings.

no case or academic literature that rounding observed figures is methodologically impermissible. Apple may, of course, address the impact of the rounding at trial. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968-70 (9th Cir. 2013) (criticism of Alamo as a comparator firm, e.g., went to weight, not admissibility).

### E.    Prof. McFadden's Model Is Reliable, Robust, and Capable of Identifying Harmed Accounts

Apple's argument that Prof. McFadden has not enhanced the robustness of his model are misleading. *See* Mot. at 22-24. Prof. McFadden addressed the "switcher" problem discussed by the Court in its class certification decision, where an individual account appearing in more than one random sample can "switch" from being injured to being uninjured depending on which sample is used, by performing regressions on 75 purely random samples and averaging the results of all 75 regressions to derive his final regression coefficients. Rev. McFadden Supp. ¶¶ 54-63. Prof. McFadden has used an appropriate methodology to do so.[18] Instead, Apple now complains that changes in the data used for the regressions cause changes to the model's results, which it now calls "switchers." That is to be expected. "When data changes, econometric models should produce different results." McFadden Decl. ¶ 89. Apple complains that after Prof. McFadden updated the genre classifications more than 1 million accounts switched between harmed and unharmed. However, 1 million accounts is less than one percent of the total number of accounts for which Prof. McFadden estimates damages. *Id.* ¶ 90. And his damages estimate changed by less than one percent. *Id.* Moreover, Apple's use of "switchers" is misleading because it is using the term differently than it was used in the prior briefing and in the Court's March 29 Order. The "switchers" that existed previously were due to a different *sample* used to estimate the model. The "switchers" Apple refers to now are accounts that switch from harmed to unharmed after the *data* has changed. McFadden Decl. ¶ 90. The switching Apple is focused on now is due to the slight differences in the estimated demand coefficients between Prof. Watson's and Prof. McFadden's

---

[18]    Notably, Prof. Watson attempts to disguise the lack of real effect of pooling versus averaging by reporting an apples-to-oranges comparison where he rewrites the code to remove the margin bounds (Watson Dep. 24:14-25:8) and then generates a partial result, which of course looks very different (Watson at 41, Ex. 9).

estimations and because Prof. Watson's sample is an econometrically different sample. *Id*. ¶¶ 90-92.

Apple repeats a prior argument (*see* Nov. 2021 *Daubert* Mot. at 14) that Prof. McFadden's instrumental variables are weak. This argument is unavailing for two reasons: first, Apple expressly raised it before, and the Court tacitly rejected it by not asking Plaintiffs to correct it. Second, margin bounds constrain the average using real-world data, correcting for some imprecision in variables. Prof. McFadden's Reply Report gives an explanation in response to the first challenge to his instrumental variables. McFadden 2021 Reply Rpt. 174-77 & fig.4. *See also* McFadden Decl. ¶¶ 97-98.

Moreover, the selection of variables is a well-worn area in *Daubert* motions. The selection goes to the weight rather than the sufficiency of the evidence, *see e.g. In re Korean Ramen Antitrust Litig*., No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756, at *39-40 (N.D. Cal. Jan. 19, 2017) unless the factor excluded is so important as to render the whole model detached from reality.

### F. The Federal Rules Permit Prof. McFadden to Rely Upon Dr. Abrantes-Metz's But-For Commission Rate

Apple's final challenge to Prof. McFadden's model is narrow. It does not contest Dr. Abrantes-Metz's qualifications to opine on the proper but-for commission rate. Nor does it dispute that Dr. Abrantes-Metz's opinion is the kind of evidence that a damages expert like Prof. McFadden would ordinarily rely on in crafting an antitrust damages model. Instead, Apple simply claims that Prof. McFadden's *entire* model must be cast aside because he did not read her report. The law says otherwise.

Federal Rule of Evidence 703 expressly permits an expert to base his opinion on "facts or data" that he has simply "been made aware of." Indeed, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (Posner, J.). And Apple knows as much: it once persuaded the Federal Circuit to reverse a district court's acceptance of the very argument it now makes. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1320-22 (Fed. Cir. 2014) ("A rule that would exclude Apple's damages [expert's] evidence simply because it relies upon information from an Apple technical

expert is unreasonable and contrary to Rules 702 and 703 and controlling precedent.").

Similarly, here, Plaintiffs retained Dr. Abrantes-Metz—who undisputedly has the expertise that Prof. McFadden lacks, *see* March 29 Order at 5—to prove a precise but-for commission rate to use in his damages model. Courts in this District routinely endorse this practice. *See, e.g.*, *S.F. Baykeeper v. City of Sunnyvale*, 2022 WL 4133299, at *9-10 (N.D. Cal. Sept. 12, 2022) ("permissible" for an expert to "rely[] on admissible expert opinions" if he is "not merely copying [those other] opinions and offering them as his own"); *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *11 (N.D. Cal. Jan. 5, 2008) (expert properly relied on engineering opinion outside his field). This Court should do the same.

Apple's cases do not compel a different result. In both, the expert made a methodological flaw in choosing the data that would form his opinion. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291-92 (3d Cir. 2012) (damages expert used a one-page summary of financial data prepared by a company instead of the raw financial data to "construct" the but-for world); *Kim v. Benihana, Inc.*, No. 5:19-cv-02196-JWH-KKx, 2022 WL 1601393, at *7-8 (C.D. Cal. Mar. 25, 2022) (an economics expert could rely on a survey expert's raw data, but not the survey expert's one-page summary of that data). That is not the case here, because Dr. Abrantes-Metz's calculation of the but-for commission rate played *no role* in how Prof. McFadden chose to "construct" his damages model. *ZF Meritor*, 696 F.3d at 292. Prof. McFadden has opined that "[c]ommon evidence can also be used to show the extent of damages to all or nearly all class members," and part of his methodology to reach that conclusion was deciding that, to show harm on a class-wide basis, he needed to account for what commission Apple would charge in the But-For world and deciding what *role* it would play in his model. Precisely *what* that rate is had no bearing on Prof. McFadden's decision to include it as an input in his regression model. And crucially, Apple can no longer challenge that methodology given the Court's ruling that his overall model is "scientifically sound." March 29 Order at 4. This claim must therefore be rejected.

## II.    DR. ABRANTES-METZ'S BUT-FOR COMMISSION ANALYSIS IS RELIABLE

Using widely accepted scientific, economic, and mathematic principles, Dr. Abrantes-Metz has calculated Apple's but-for commission rate with an economic modeling of the commission in

a competitive market for iOS app distribution and IAP transactions. Dr. Abrantes-Metz then verified her but-for commission rate with a more comprehensive and rigorous benchmark analysis than the one previously offered by Prof. McFadden.

Apple's argument that Dr. Abrantes-Metz simply uses an "accounting equation," not an "economic model," relies on assumptions with no support. Apple also cherry-picks unreliable evidence of comparable companies to criticize her benchmark robustness check. Those arguments are misguided, but also largely go to the weight of her testimony, not its admissibility.

## A.    Dr. Abrantes-Metz Uses Widely Accepted Scientific, Economic and Mathematic Principles

Apple and its experts insist that Dr. Abrantes-Metz has not predicted a but-for commission but simply relies on an "accounting identity" – by which they mean an "accounting equation" – to compute the competitive commission rate. That is not so. None of Apple's experts denies that Dr. Abrantes-Metz's accounting equation is valid for economists to rely upon; or that it applies to the App Store; or that it applies to the But-For world. Indeed, Prof. Schmalensee and Prof. Hitt admit that it is a useful equation for economists that does all those things. Schmalensee 2023 Dep. 101:9-21, 119:10-19; Hitt 2023 Dep. 167:19-23, 169:3-9.

Nor do Apple's experts identify *any* academic literature that challenges or refutes Dr. Abrantes-Metz's use of the equation for her computation of the but-for commission rate. None of Apple's experts offers *any* opinion as to the "right" way her to have modeled the but-for commission rate; they simply echo one another saying she got it "wrong." That sort of unfounded criticism is hardly the basis for a *Daubert* challenge.

Apple argues that Dr. Abrantes-Metz has "abandon[ed]" her platform expertise by ignoring indirect network effects. Mot. at 25-26. She did not; she testified that indirect network effects are inconsequential here. Abrantes-Metz Dep. 155:8-19. Far from abandoning her plentiful platform expertise, Dr. Abrantes-Metz *exercised* her expertise to conclude it was unnecessary for her to account for any indirect network effects in this case. Abrantes-Metz Dep. 156:3-14 ("there is evidence that showed me that the lock-in theory, if it was occurring, was happening in a different way, and I didn't have to engage in determining whether … consumers were being heavily subsidized to be locked in, because I knew they were not … and there was no evidence they would

1    be … in the But-For world, they just weren't in the Windows PC digital world, so I didn't have to

2    embark in that type of analysis").

3    The Court previously accepted Prof. McFadden's definition of the relevant market and

4    rejected the exact same argument that he "ignore[d] the two-sidedness of the App Store." March

5    29 Order at 4. The Court deferred deciding the two-sidedness of the App Store "at this juncture"

6    because "the issue is a merits decision not required at the class certification stage." *Id*. Apple and

7    its army of experts should not have made the same argument against Dr. Abrantes-Metz.

8    In any event, Apple's argument is simply wrong. Dr. Abrantes-Metz considered the

9    relevant facts – the lock-in, the absence of a subsidy in the as-is world, and the absence of any

10   evidence that Apple would pay subsidies to users in the But-For world. Abrantes-Metz Dep. 156:3-

11   14. She also has available a close, reasonably competitive comparator – the Microsoft Store.

12   Abrantes-Metz Decl. ¶¶ 29-32. Considering all those pertinent facts, Dr. Abrantes-Metz

13   determined that ***no consumer subsidy would be paid*** to consumers in the But-For world. Abrantes-

14   Metz Decl. ¶ 24. It was then unnecessary for her to perform detailed analysis of any indirect

15   network effects, as they would not influence the allocation of a commission reduction between

16   developers and consumers: the developers pay the ***entire*** commission and consumers receive no

17   subsidies from Apple to offset the higher prices they pay. *Id*. ¶¶ 23-25. None of Apple's experts

18   contradicts any of the facts Dr. Abrantes-Metz relied upon in exercising her considerable – and

19   undisputed – expertise and in performing her calculations. Abrantes-Metz Decl. App'x B (C.V.).

20   Moreover, as Dr. Abrantes-Metz explained at her deposition, her methodology "is

21   applicable" "whether or not the market is a one-sided or two-sided market." Abrantes-Metz Dep.

22   167:14-168:2 (noting that Prof. Economides used a similar model even though he has stated that

23   the App Store is a multi-sided platform and so "he must also be convinced that the same

24   methodology applies in the multisided context as in the single-sided context.").

25   Apple's conclusion that Dr. Abrantes-Metz has calculated a but-for commission rate based

26   upon the mathematical relationship between the inputs and ultimate outputs of her formula is again

27   simply a criticism that she improperly ignored indirect network effects. Mot. at 25 (citing

28   Schmalensee ¶¶ 10, 53-55). Schmalensee states at ¶ 56: "There is not a trace of the *economic*

1   analysis that would be necessary to show the economic consistency for a marketplace in which

2   indirect network effects are important." This argument relies on the incorrect ***assumption*** that an

3   extensive analysis of indirect network effects is required here. It is not, and none of Apple's experts

4   explains why it is. As Dr. Abrantes-Metz testified, because consumers are locked-in when they

5   purchase their iOS devices, she did not have to engage in an extensive data analysis to determine

6   whether consumers were being heavily subsidized by Apple in their purchases of apps and IAP in

7   the as-is world because she knew they were not. Abrantes-Metz Dep. 154:10-155:7; 156:3-14.[19]

8   Nor, as stated above, was she required to do so to determine whether they would be in the But-For

9   world. Abrantes-Metz Decl. ¶¶ 23-35.

10      Prof. Schmalensee challenges Dr. Abrantes-Metz's opinion by arguing that "her premise

11  that consumers are locked is not supported by the evidence that Apple faces fierce competition in

12  the sales of smartphone devices, and is at odds with factual findings in the *Epic Games v. Apple*

13  litigation." Schmalensee ¶ 71 (footnotes omitted). But the relevant market here is ***not*** the

14  foremarket for smartphone devices; it is the aftermarket for the sale of iOS apps and in-app content.

15  The Court accepted that definition of the relevant market in ***this*** case. March 29 Order at 4. As the

16  Court knows, the mobile gaming transactions market in the *Epic* litigation was ***not the same***

17  ***market*** as here. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 921 (N.D. Cal. 2021). Dr.

18  Abrantes-Metz addressed the correct market but Prof. Schmalensee does not.

19      Prof. Schmalensee also argues that "Dr. Abrantes-Metz has not provided any analyses to

20  show that platforms such as the App Store or Windows PC stores do not provide meaningful

21  subsidies to consumers." Schmalensee ¶ 71. However, Schmalensee presents neither evidence nor

22  analysis that they do. Schmalensee 2023 Dep. 155:1-3, 155:17-156:13, 178:5-179:5, 182:5-13.

23  Apple's citation to *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 1001 (N.D. Ill. 2014),

24  is misplaced because in that case the expert's methodology squarely contradicted his own

25  scholarship, but Apple has not identified any such contradiction.[20]

26  _____

27  [19]     Free apps, to the extent they are a subsidy at all, subsidize the sale of iOS devices. They do
     not subsidize the sale of apps or IAP in any way. Thus, free apps as a subsidy are irrelevant to Dr.

28  Abrantes-Metz's computation of the but-for commission rate on the sale of apps and IAP.

    [20]     Prof. Schmalensee argues that Dr. Abrantes-Metz "takes the market shares of both app

1    Schmalensee states "Apple has historically demonstrated that it takes into consideration

2    indirect network effects when allocating its fee to the two sides of its platform" (Schmalensee ¶

3    64), but Apple doesn't allocate its fee to the two sides—it charges developers the fee. He also

4    states (¶ 66): "Despite Epic's very aggressive strategy, Steam as the leading incumbent did not

5    change its headline commission rate in response to Epic Games Store's lower commission rate."

6    This is factually wrong. "[A] week before Epic's entry in late 2018, Steam announced new revenue

7    share tiers with commission rates ranging from 20 percent to 30 percent." Abrantes-Metz, ¶ 83;

8    Schmalensee ¶ 66 n.77 ("Steam did start providing discounts for large developers"). Steam did

9    react to new competition.[21]

10    **B.    Dr. Abrantes-Metz Consistently Uses Conservative Assumptions**

11    Apple and its phalanx of experts next argue that Dr. Abrantes-Metz has based her

12    computation on unjustified assumptions that: (1) there will be only one competitor to the App

13    Store; (2) both app stores would provide identical terms and services; and (3) both app stores would

14    charge a single, identical commission rate. Their arguments are differences in judgment that do

15    not require the exclusion of Dr. Abrantes-Metz's well-founded opinions.

16    *First*, ***none*** of Apple's experts claims the assumption of a single competing app store – a

17    duopoly – is inconsistent with academic literature. Rather, they dispute whether Dr. Abrantes-

18    Metz's assumption is a reasonable one. She has explained repeatedly that she conservatively

19    assumed a duopoly because, as academic literature confirms, more entrants causes lower prices.

20    The literature predicts that the but-for commission would be ***lower*** if Dr. Abrantes-Metz assumed

21    more rivals in the But-For world. Abrantes-Metz ¶¶ 57-58; Abrantes-Metz Decl. ¶¶ 42-50.

---

stores as given" and she "ignores the fact that platform size and profits would change with the
commission rate and one cannot simply assume pre-determined values for them and calculate the
commission rate based on her accounting identity." Schmalensee ¶ 68. But this criticism ignores
that Dr. Abrantes-Metz calculated the market shares of both But-For world app stores using Dr.
Simonson's own surveys. Abrantes-Metz ¶¶ 29, 35, & 37-42.

[21]    Nor is this Court's finding in *Epic Games,* 559 F. Supp. 3d at 964 that Dr. Evans' SSNIP
test calculations were "unpersuasive of substitution" in his market definition analysis applicable
here since the market definition in *Epic Games,* digital mobile gaming transactions, was different
from Plaintiffs' market definition here: the iOS apps aftermarket, which the Court has already
accepted for purposes of class certification. March 29 Order at 4.

1    One or two economists explain that price sometimes rises with additional entrants in a

2 competitive marketplace (*see, e.g.*, Schmalensee ¶¶ 73-74 and nn.96, 98 (citing articles by Tan &

3 Zhou and Correia-da-Silva)), but their literature is confined to the unusual – and counterfactual –

4 instance when consumers "single-home." Apple's experts concede that single-homing would not

5 apply in the But-For world. *See, e.g.*, Schmalensee 2023 Dep. 147:16-148:8. In other words, they

6 admit that their criticism is built upon a ***false premise***.

7    *Second*, Dr. Abrantes-Metz assumed that the rival app store would have entered the market

8 at the start. Abrantes-Metz ¶¶ 59-60. This is a fact-based assumption. Apple's App Store was ***not***

9 the first app store selling iOS apps. An app store called Cydia began selling apps to jail-broken

10 iPhone owners ***before the App Store opened***. Abrantes-Metz Decl. ¶ 60. Remarkably, Prof.

11 Schmalensee, who criticized this assumption, was unaware of Cydia. Schmalensee 2023 Dep.

12 123:20-23. Cydia (which Apple throttled) supports Dr. Abrantes-Metz's reasonable assumption

13 that a rival would always exist alongside the Apple App Store in a competitive But-For world.

14    *Third*, consistent with well-established academic literature, Dr. Abrantes-Metz assumed

15 that the App Store and its rival would offer the same terms and services. Abrantes-Metz ¶ 28;

16 Abrantes-Metz Decl. ¶¶ 62, 67. Apple's experts cite the same academic literature as she does, but

17 disagree with her decision to follow it. Schmalensee ¶¶ 73-74 nn.96, 98; Hitt ¶ 270. n.346. The

18 assumption that both app stores would offer the same terms and services is relevant to the

19 allocation of market share. Abrantes-Metz Decl. ¶¶ 88-89. Dr. Abrantes-Metz's allocation of a far

20 greater market share to the Apple App Store (████) than to its rival (████,) was ***conservative***.[22]

21 Abrantes-Metz ¶ 89. Had she allocated equal 50/50 shares to both app stores, she would have

22 computed a ***lower*** but-for commission rate. None of Apple's army of experts says otherwise or

23 suggest a different methodology or market share allocation.[23]

---

24    [22]    *See* § II.C below for a discussion of Dr. Abrantes-Metz's calculation of the market shares.

25    [23]    The higher market share that Dr. Abrantes-Metz allocated to the App Store in the But-For

26 world results in a ***higher*** but-for commission rate, making her allocation of market share

27 conservative. As it is, the ████ share pushes the limit of what she could have allocated to the

28 App Store without raising antitrust concerns. Even a "conservative" approach suggests monopoly
power at a market of 70%. *See Epic Games*, 559 F. Supp. 3d at 1029 (citation omitted). The market
share that Dr. Abrantes-Metz computed is near the upper bound of the range she could have

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    Dr. Abrantes-Metz Reliably Uses Real-World Inputs for Her Modeling

Apple also criticizes Dr. Abrantes-Metz for using flawed and unreliable inputs in her modeling. Their criticisms are misplaced and at least one is a shameless fabrication of the facts.

Apple claims that Dr. Abrantes-Metz "assume[d] that the market was at all times the same size as it was in 2019." Mot. at 28 (citing Hitt ¶ 300).[24] *She did no such thing*. Dr. Abrantes-Metz used ***profit margin data*** from 2019, but has made no assumption that app ***billings***—meaning the size of the market—are constant for all years in the But-For world. Abrantes-Metz Decl. ¶ 81. Apple should not have made this irresponsible, counter-factual argument.

Next, Apple and its experts criticize Dr. Abrantes-Metz for using the profit margin from "only one platform – the Microsoft Store" to compute profit margin. They complain that the Microsoft Store is "widely viewed as a low-quality platform" with low margins. There are at least two fundamental problems with that criticism. *First*, none of Apple's experts were aware that the same "low-quality" features they attributed to the Microsoft Store, including the risk of malware and scams, also have been attributed to the App Store from time to time. None of Apple's experts performed any quantitative analysis to measure the effect, if any, of the Microsoft Store's supposed "low quality" on its profit margin, either in absolute or relative terms.

*Second*, Apple's experts suggest that Dr. Abrantes-Metz improperly used the profit margin from the Microsoft Store without considering profit margins of competitors. Mot. at 28. But Dr. Abrantes-Metz selected the Microsoft Store through a sound process of elimination that Apple's experts cannot dispute. She used profit margin information from an internal Microsoft document. Abrantes-Metz ¶ 47. That document also included profit margins for other PC game platforms, which Prof. Hitt cites to criticize Dr. Abrantes-Metz's analysis, but he does not suggest how she should have used the ***other*** data, nor does he cite any authoritative literature compelling her to do so, and he performed no such analysis himself.[25] Hitt 2023 Dep. 265:18-266:17, 267:25-268:5.

---

assigned to the App Store in the But-For world without raising antitrust concerns. Abrantes-Metz Decl. ¶ 113.

[24]    In his deposition, Prof. Hitt reluctantly admitted under oath that Dr. Abrantes-Metz ***did not assume any profit margin***. Hitt 2023, 171:25-172:5.

[25]    As Dr. Abrantes-Metz notes, economists often use profit equations to perform the kind of

Dr. Abrantes-Metz excluded many of the other profit margins appearing in the Microsoft document for sound reasons that Prof. Hitt does not dispute. For example, she excluded console stores because they have entirely different business models.[26] She also excluded Steam because it enjoys a counter-factual incumbency advantage, it has a much larger market share than the rival would have here, and because of credible allegations that it has extracted supracompetitive profits through anticompetitive practices. Abrantes-Metz ¶ 48. And she excluded Epic because of its *negative* profit margin. *Id*. ¶ 49.

Apple complains that Prof. Abrantes-Metz has improperly used survey data performed by one of Apple's *own* experts, Prof. Simonson. Among other things, Prof, Simonson asked consumers to rank the likelihood they would use the App Store or a rival to buy apps and IAP, giving them six choices: (1) download/purchase all paid apps and IAPs from the App Store, (2) download/purchase most paid apps and IAPs from the App Store, (3) download/purchase paid apps and IAPs from both stores about equally, (4) download/purchase most paid apps and IAPs from App Store B, (5) download/purchase all paid apps and IAPs from App Store B, and (6) no opinion or response. Abrantes-Metz Decl. ¶ 39. Consistent with widely accepted practice by economists, Dr. Abrantes-Metz assigned numerical values to the first five responses, ignoring the last category, which she used to compute market share between Apple and its rival. Abrantes-Metz ¶ 41; Abrantes-Metz Decl. ¶ 93 & n.193. None of Apple's experts, including Prof. Simonson himself,

---

econometric analysis she did here. Abrantes-Metz Decl. ¶ 7. Apple's army of experts do not dispute that. The availability of reliable profit margin information for a reasonable competitive comparator (the Microsoft Store) enhances the reliability of Dr. Abrantes-Metz's computation of the but-for commission rate here. *Id*. ¶ 125 & n.267.

[26]    Microsoft's internal document, MSFT_ EPIC_00000093 is reliable primary evidence of its own profit margins, but it is unreliable secondary or tertiary evidence of others' profit margins. While it is reasonable to rely upon a *Microsoft* document for information about *Microsoft's* own profit margins, Prof. Hitt relies on it for other companies' profit margins. In particular, the Microsoft document includes a grossly inflated profit margin (███) for the Epic Games Store even though Prof. Hitt knows that Epic loses money on the app store. Hitt 2023 Dep. 214:22-215:2. He uses an inaccurate profit margin ███) for the Apple App Store, which is far lower than Apple's actual profit margin from the App Store. In the *Epic* case, for example, Apple's own internal documents showed a fully burdened profit margin for the App Store in the range of ███%. *See* 20-cv-05640-YGR, ECF No. 812 at 41-42. This is an obvious misuse of the *Microsoft* document.

1    cites any academic literature that they say Dr. Abrantes-Metz ignored or violated in using the

2    survey results this way. And none of them suggests either a different weight to place on those

3    responses or an alternative methodology for doing so.

4         Prof. Simonson resists the use of his survey results against his client, but he agrees with

5    most of the numerical values that Dr. Abrantes-Metz has assigned to the responses. He agrees that

6    "all purchases" corresponds to 100% for the chosen store and 0% for the unchosen store, and that

7    "about equally" corresponds to 50% for each store. Abrantes-Metz ¶ 89; Simonson 2023 Dep.

8    63:6-65:10. And he does not dispute that it was proper to exclude the no opinion or response

9    category of answers. *See* Simonson ¶¶ 16, 37-38. He claims, however, that no value can be given

10   to the "download/purchase most paid apps and IPA from the App Store" response, although he

11   agrees that the value would be somewhere between 50% and 100%. Simonson 2023 Dep. 66:7-17.

12   He cites no academic literature to support his argument that no value can be given to such a survey

13   response. Simonson ¶¶ 16, 37-38. And he ignores the widely accepted use of certainty equivalents

14   in economic modeling in the manner Dr. Abrantes-Metz did here to estimate 75% for the "usually"

15   response. Abrantes-Metz Decl. ¶ 91.[27] At most, this is simply a disagreement over reasonable

16   expert judgment. It is not a basis to exclude Dr. Abrantes-Metz's opinion.

17        **D.    Dr. Abrantes-Metz's Use of Benchmarking to Validate the Results of Her
               Modeling was Fulsome and Reliable**

18
          In a stand-alone analysis, Dr. Abrantes-Metz performed a benchmark analysis to confirm
19
     the reasonableness of the results of her economic modeling. Dr. Abrantes-Metz used different
20
     inputs for her benchmark analysis than Prof. McFadden used for his, and she relies on the results
21
     only to confirm the results of her computations. Abrantes-Metz ¶ 19.
22
          None of Apple's eight experts disputes that the PC Windows game app distribution market
23
     is a suitable benchmark market. Abrantes-Metz Decl. ¶ 138. And, contrary to the arguments from
24
     Apple's experts, Dr. Abrantes-Metz in fact considered ***all*** the participants in that market. *Id*. ¶ 139.
25
     She did ***not*** exclude Steam from her analysis. *Id*. While she explained why Steam should be
26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [27]    Substituting different inputs into her model to produce ***absurd*** results, as Prof. Hitt did, is
28   not a valid criticism of ***any*** expert's modeling. It merely demonstrates that Dr. Abrantes-Metz's
     mathematical model is sensitive to inputs, a feature of ***every*** mathematical model ever used.

1  excluded, she in fact presented results that ***include*** Steam, which ranged from ▮▮% to ▮▮%.

2  Including Steam in her model resulted in a ***higher*** but-for commission rate than had she excluded

3  it, as Apple's experts falsely accuse her of doing. *Id*.

4      Dr. Abrantes-Metz did reject the marketplace for the distribution of Android apps because

5  she regarded that marketplace as inappropriate. She has provided several reasons for doing so,

6  including that the Android apps market is dominated by Google, against which credible allegations

7  of anticompetitive conduct have been made. *Id*. ¶ 142. She also rejected the market for game

8  consoles and the Mac App Store as potential benchmarks for equally sound reasons. Console

9  makers follow a different business model and unique pricing considerations. *Id*. ¶ 143. The Mac

10 App Store commission rate is set to equal the Apple App Store as-is commission, and therefore

11 pricing on the Mac App Store reflects the challenged conduct in the Apple App Store. *Id*.

12     Again, as with much of Apple's other criticisms of Dr. Abrantes-Metz's thorough and

13 thoughtful work, their dispute here is a question of expert ***judgment***, not a defect in methodology.

14 As such, it is not suitable for a *Daubert* challenge.

15     Ironically, Apple's experts now advocate for cherry-picking storefronts in Dr. Abrantes-

16 Metz's benchmark analysis. Prof. Schmalensee argues that direct-to-consumer stores are ***different***

17 from two-sided platforms and should therefore be excluded. Prof. Hitt, on the other hand, argues

18 that direct-to-consumer stores ***compete*** against two-sided platforms, and should be excluded for

19 that ***different*** reason. Inconsistency aside, their argument is meritless cherry-picking. She included

20 direct-to-consumer stores for valid reasons, including the fact that they do provide benefits and

21 services to their users and that a benchmark analysis should not include only comparators with

22 higher costs. Abrantes-Metz ¶ 141; Abrantes-Metz Decl. ¶ 145. The mere fact that direct-to-

23 consumer stores do not charge a "commission rate" *per se* for self-distribution does not mean that

24 they have no distribution costs. Abrantes-Metz ¶ 142; Abrantes-Metz Decl. ¶ 147.

25                              **CONCLUSION**

26     Apple has not identified a single valid basis for excluding the testimony of either Prof.

27 McFadden or Dr. Abrantes-Metz and the Court should therefore deny Apple's *Daubert* motion.

28 DATED: April 21, 2023                    **WOLF HALDENSTEIN ADLER**

**FREEMAN & HERZ LLP**

By: ___/s/ Rachele R. Byrd___
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
KYLE M. WOOD* (*pro hac vice forthcoming*)
  (*Admitted only in Maryland.  Not admitted in the District of Columbia.  Practice supervised by members of the Firm.)
**KELLOGG, HANSEN, TODD, FIGEL &**
  **FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
kwood@kellogghansen.com

*Counsel for Plaintiffs and Proposed Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761

---

1

Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

2

*Counsel for Plaintiff Robert Pepper*

3

29319v7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28