1  BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
2  **WOLF HALDENSTEIN ADLER**
     **FREEMAN & HERZ LLP**
3  750 B Street, Suite 1820
   San Diego, CA 92101
4  Telephone: (619) 239-4599
   Facsimile: (619) 234-4599
5  manifold@whafh.com
   byrd@whafh.com
6
7  MARK C. RIFKIN (*pro hac vice*)
   MATTHEW M. GUINEY (*pro hac vice*)
8  THOMAS H. BURT (*pro hac vice*)
   **WOLF HALDENSTEIN ADLER**
9    **FREEMAN & HERZ LLP**
   270 Madison Ave
10 New York, NY 10016
   Telephone: (212) 545-4600
11 Facsimile: (212) 686-0114
   rifkin@whafh.com
12 guiney@whafh.com
   burt@whafh.com
13
   *Interim Class Counsel and Proposed Co-Class Counsel*
14
15 [Additional Counsel Appear on Signature Page]

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18                  OAKLAND DIVISION

19 IN RE APPLE IPHONE ANTITRUST      No. 4:11-cv-06714-YGR
   LITIGATION
20
                                     **[REDACTED PUBLIC VERSION]**
21
                                     **REPLY MEMORANDUM IN FURTHER**
22                                   **SUPPORT OF PLAINTIFFS' RENEWED**
                                     **MOTION FOR CLASS CERTIFICATION**
23
24                                   DATE:      June 23, 2023
                                     TIME:      10:00 a.m.
25                                   CTROOM:    1, 4th Floor
                                     JUDGE:     Hon. Yvonne Gonzalez Rogers
26

27       **DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(b)**

28

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ......................................................................................................................... 2

I.  THE PRESENCE OF UNINJURED CLASS MEMBERS DOES NOT DEFEAT
    CLASS CERTIFICATION .......................................................................................... 2

    A.  The Presence of Uninjured Class Members Does Not Mean the Class
        Definition is Fatally Overbroad, No Matter How Many There Might Be .... 2

    B.  Fortuitously Uninjured Class Members Can be Winnowed Easily ............. 4

    C.  Prof. Hitt's "Natural Experiments" are Unreliable and Unscientific ........... 7

II. PROF. MCFADDEN'S MODEL DOES NOT SUFFER FROM THE
    "ADDITIONAL DEFECTS" APPLE CLAIMS ........................................................ 9

    A.  Mcfadden's "Modeling Choices" ................................................................. 9

    B.  Apple's Modification of the Model and Data, and the Resulting
        Changes in Outcome, is Not Surprising and is Not a Valid Robustness
        Check ......................................................................................................... 10

III. DR. ABRANTES-METZ'S MATHEMATICAL COMPUTATION OF THE
     BUT-FOR COMMISSION RATE IS RELIABLE .............................................. 11

IV. THE PROPOSED $10 CUT-OFF FURTHER REDUCES THE NUMBER
    AND PERCENTAGE OF UNINJURED CLASS MEMBERS ............................ 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ........................................................... 4

*Bowerman v. Field Asset Servs., Inc.*,
   60 F.4th 459 (9th Cir. 2023) ................................................................ 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................... 3

*Harding v. Tambrands Inc.*,
   165 F.R.D. 623 (D. Kan. 1996) ............................................................ 15

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ............................................................... 9

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) .......................................................... 3, 4, 15

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ......................................................... 11

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ........................................................... 10

*In re Google Play Store Antitrust Litig.*,
   No. 21-md-02891-JD, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) .................................... 1

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ........................................................... 4

*In re NJOY, Inc. Consumer Class Action Litig., Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ................................................ 10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) ..................................................... 3, 4, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ......................................................... 14

*J.L. v. Cissna*,
   No. 18-cv-04914-NC, 2019 WL 415579 (N.D. Cal. Feb. 1, 2019) .......................................... 14

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ................................................................................................ 2

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022), *cert denied*, 143 S. Ct. 424 (2022) ..................................... *passim*

*Ruiz Torres v. Mercer Canyons, Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ....................................................................................... 2, 3, 15

*TransUnion LLC v. Ramirez*,
  141 S.Ct. 2190 (2021) .......................................................................................................... 15

*Wal-Mart v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................................. 15

*Wetzel v. CertainTeed Corp.*,
  No. C16-1160JLR, 2019 WL 3976204 (W.D. Wa. Mar. 25, 2019) ......................................... 3

*Zinser v. Accufix Research Inst., Inc.*,
  53 F.3d 1180 (9th Cir. 2001) ............................................................................................... 15

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................................... 1
Fed. R. Civ. P. 23(b)(3) ........................................................................................................... 1, 4

1
2

**TABLE OF ABBREVIATIONS**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Abbreviation | Referenced Document |
|---|---|
| Abrantes-Metz ____ | Expert Report of Rosa M. Abrantes-Metz, Ph.D. in Support of Plaintiffs' Motion for Class Certification, dated and filed Sept. 26, 2022 at ECF No. 666-2. |
| Abrantes-Metz Dep. ____ | Deposition transcript of the December 15, 2022 deposition of Rosa Abrantes-Metz, Ph.D., attached as Exhibit 11 to the Declaration of Caeli A. Higney in Support of Defendant Apple Inc.'s Opposition to Plaintiffs' Renewed Motion for Class Certification and *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz, filed on March 10, 2023 at ECF No. 691. |
| Abrantes-Metz Reply Rpt. | Reply Report of Rosa Abrantes-Metz, Ph.D. in Support of Plaintiffs' Renewed Motion for Class Certification, dated April 28, 2023 and filed concurrently herewith. |
| *Daubert* Mot. ____ or *Daubert* Motion | Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; Memorandum of Points and Authorities, filed March 10, 2023 at ECF No. 690. |
| *Daubert* Opp. or *Daubert* Opposition | [Corrected] Opposition to Apple's *Daubert* Motion to Exclude the Testimony of Prof. Daniel L. McFadden and Dr. Rosa Abrantes-Metz (ECF No. 705-1). |
| Ex. D | Exhibit D to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude the Testimony of Prof. Daniel L. McFadden and Dr. Rosa M. Abrantes-Metz ("Byrd Decl."), ECF No. 701-5. |
| Hitt ____ | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated and filed March 10, 2023 at ECF No. 688-3. |
| Hitt 2023 Dep. ____ | Deposition transcript of Lorin Hitt dated April 14, 2023 and attached as Exhibit E to the Byrd Decl., ECF No. 702-4. |
| March 29 Order ____ | Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, filed March 29, 2022 at ECF No. 630. |
| McFadden Opening Rpt. ____ or Opening Report | Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated and filed June 1, 2021 at ECF No. 443-14. |
| McFadden 2021 Reply Rpt. ____ or McFadden Reply | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated and filed |

| Abbreviation | Referenced Document |
|---|---|
| Report | October 19, 2021 at ECF No. 554-5. |
| McFadden 2023 Reply Rpt. __ | Reply Report of Daniel L. McFadden, Ph.D. in Support of Plaintiffs' Renewed Motion for Class Certification, dated April 28, 2023 and filed concurrently herewith. |
| Opp. | Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Renewed Motion for Class Certification, filed March 12, 2023 at ECF No. 688-1. |
| Prince ___ | Expert Report and Declaration of Jeffrey T. Prince, dated and filed March 10, 2023 at ECF No. 688-5. |
| Renewed Mot. | Plaintiffs' Notice of Motion and Renewed Motion for Class Certification; Memorandum of Points and Authorities, filed Sept. 26, 202 at ECF No. 666-1. |
| Rev. McFadden Supp. ___ | Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification dated January 19, 2023 and attached as Exhibit A to Plaintiffs' Notice of Filing of Second Revised Supplemental Expert Report of Daniel L. McFadden, filed January 19, 2023 at ECF No. 680. |
| Schmalensee 2023 Dep. ____ | Deposition transcript of Richard Schmalensee, Ph.D., dated April 4, 2023 and attached to the Byrd Decl. as Ex. I, ECF No. 702-8. |
| Watson Dep. _____ | Deposition Transcript of Mark Watson, Ph.D., dated April 10, 2023 and attached to the Byrd Decl. as Ex. H, ECF No. 702-7. |

**INTRODUCTION**

Plaintiffs established three points in their opening class certification motion papers. *First*, they showed that, with Prof. McFadden's refinements to his damages model (as supplemented by Dr. Abrantes-Metz), Plaintiffs now have common evidence with which they can reliably prove class-wide impact and damages ***before trial begins***. Renewed Mot. at 5-19. *Second*, they again showed that a class action is superior to millions of individual actions against Apple. *Id.* at 19-20. And *third*, they reiterated that Plaintiffs and Co-Class Counsel will adequately represent the Class. *Id.* at 20. Apple does not dispute the latter two points, focusing solely on whether common questions of law and fact predominate. *See* Fed. R. Civ. P. 23(a)(2), (b)(3).

The Court's prior conclusion that common issues did not predominate flowed from its concerns with Prof. McFadden's original damages model. Prof. McFadden and Dr. Abrantes-Metz now have resolved all the Court's concerns. Tellingly, in Apple's opposition to Plaintiffs' renewed class certification motion and its concurrent *Daubert* motion, Apple ignores most of those corrective amendments. Apple does not dispute that Prof. McFadden corrected the three data and modeling errors originally present in his Step Two analysis. *See* Renewed Mot. at 8-9; March 29 Order at 7-10. Likewise, Apple does not dispute the merit of Prof. McFadden's new sampling methodology, by which he addressed the Court's concern for "switchers" who were present in successive samples under his original model. *See* Renewed Mot. at 10-11; Opp. at 18-19. Instead, Apple argues issues of its own creation, parading *eight* different experts before the Court. None of those experts' claims withstands scrutiny. Many of Apple's arguments echo those recently considered and rejected by Judge Donato in *In re Google Play Store Antitrust Litig.*, No. 21-md-02891-JD, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022).

Now that Plaintiffs have shown they can prove class-wide impact and damages with reliable common evidence, only one question remains: can the Class be certified even though it is possible that Prof. McFadden's damages model might show at trial that some Class members fortuitously did not suffer any measurable monetary harm? Under the Ninth Circuit's recent *en banc* decision in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) **(en banc), cert denied,** 143 S. Ct. 424 (2022), the answer is a resounding "yes."

Thus, Plaintiffs' renewed class certification motion must be granted.

## BACKGROUND

Plaintiffs adopt by reference the background recitations in their renewed class certification motion (ECF No. 666-1) and their opposition to Apple's *Daubert* motion (ECF No. 705-1).

## ARGUMENT

## I.    THE PRESENCE OF UNINJURED CLASS MEMBERS DOES NOT DEFEAT CLASS CERTIFICATION

### A.    The Presence of Uninjured Class Members Does Not Mean the Class Definition is Fatally Overbroad, No Matter How Many There Might Be

In *Olean*, the Ninth Circuit clarified that there is no hard cap on the number or percentage of uninjured class members, holding that the presence of uninjured class members defeats class certification ***only*** when "individual inquiries about such matters would predominate over common questions." 31 F.4th at 668. The Ninth Circuit expressly refused to impose a standard of *de minimis* non-injury within a class. *See Olean* at 669. Apple's arguments regarding the number of unharmed Class members are therefore legally irrelevant.

Resisting that straightforward holding in *Olean*, Apple falls back on the already-discredited argument that, at some point, the sheer number of uninjured accounts must be so high that the Class is mis-defined. Opp. at 4. This, too, misreads the cases. A class is not "fatally overbroad" simply because it includes some number or percentage of class members who eventually are proven to be uninjured. A class is "fatally overbroad" only when it includes too many members who could not possibly have been harmed by the alleged wrongdoing. *Olean* at 669 n.14 (citing *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 824 (7th Cir. 2012)).

Class members who "could not have been harmed" means those who, for example, never saw a misleading advertisement, *see Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) (citing *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 597 (9th Cir. 2012)), or in this case, those who did not buy any apps or pay for any IAP purchases. However, as the Class is defined here, it does ***not*** include any iOS customers who never paid for apps or IAP. Those exposed to Apple's unlawful conduct, as ***all*** Class members were here, but have individual damages that calculate to zero because factors that happen to shield them from measurable

---

economic injury (such as purchasing only a small number of apps or only apps that would not have changed price in the But-For world), are merely "fortuitously non-injured." *Olean* at 669 (citing *Ruiz Torres* at 1137). Regardless of their number, the presence of fortuitously uninjured Class members is not troubling here because a method exists to winnow them out the identification process will not "overwhelm common [issues] and render class certification inappropriate." *Olean* at 669 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)).

Apple's argument ultimately boils down to a dispute over the number of Class members that were ***actually*** harmed. Such "a merits dispute about the scope of [Apple's] liability . . . is not appropriate for resolution at the class certification stage." *Ruiz Torres*, 835 F.3d at 1137. Indeed, *Olean* made clear that district courts ***cannot*** "create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th at 669 n.14 (quoting *Ruiz Torres*, 835 F.3d at 1138 n.7). Defining the Class as Apple's argument suggests is impermissible. The Court must reject Apple's invitation to do that which *Olean* proscribed.

Having lost the ability to argue for a numerical cut-off, Apple re-introduces its previously-rejected (and mistaken) interpretation of two out-of-circuit cases, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) and *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018). As the Ninth Circuit explained in *Olean*, rejecting a *de minimis* standard did not create a split in the circuits, because an argument that either *Asacol* or *Rail Freight* had imposed such a rule, as Apple makes here, misreads those cases. *See Olean* at 669 n.13. In *Asacol*, for example, it was not the number of uninjured class members that decided the issue, but rather that the only way to sort out the subjective question of whether class member would have switched to a generic drug was through the testimony of 100% of the class members, and "a trial in which thousands of class members testify" is inconsistent with the class action process. *Asacol*, 907 F.3d at 57-58.[1]

---

[1]    *Accord Rail Freight* (no way "other than full-blown individual trials" to resolve question of injury) (cited by *Olean*, 31 F.4th at 669 n.13); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (reliance on omissions about sweetener not amenable to objective winnowing); *Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL 3976204 (W.D. Wa. Mar. 25, 2019)

*Asacol* and *Rail Freight* simply hold that putting every class member on the stand to resolve whether they have suffered injury is inconsistent with Rule 23(b)(3). No such prospect presents itself here, where identifying which accounts (and eventually which Class members) have suffered injury or not will be ***determined objectively by a mathematical equation before trial***. Apple argues that the precise number of uninjured accounts might be slightly different than what Prof. McFadden has calculated, but *Olean* makes clear that the difference between, say, fourteen percent and seventeen percent or even more, is irrelevant. Here, unlike in *Rail Freight* or *Asacol*, the method of identifying uninjured accounts is a "straightforward," ***single mathematical calculation*** that eliminates "the complexity of damages calculations [that] would defeat predominance." *Olean*, 31 F.4th at 681-82 & n.31.

Apple's remaining authorities are easily dispensed with. Unlike this case, *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), was an indirect purchaser case. In contrast to the facts in *Olean* (and in contrast to the facts here), the retail prices paid for cars in *In re New Motor Vehicle* were individually negotiated, and the expert had proposed no class-wide model to demonstrate that individual retail price negotiations were affected by the wholesale overcharge. *Id*. at 28-29.[2] That complication has no relevance here because neither the commission Apple charges developers nor the prices for apps and IAP are individually negotiated.

### B.    Fortuitously Uninjured Class Members Can be Winnowed Easily

In their renewed class certification motion, Plaintiffs have clarified that they will ***run the full damages model against all App Store data before trial***. *See* Renewed Mot. at 5 n.2, 9 n.4, 13-14 & n.13, 16-17. They explained that once they receive the then-current App Store transactional

---

(reliance and manifestation of defect "raises serious concerns about the need for mini-trials").

[2]    *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), was not only an indirect purchaser case, but one where a price-fixed component was included in a more complex product. The Court rejected injury not at the pass-through level, but at the wholesale level, where individualized negotiations between makers and OEMs complicated overcharge. *See Id*. at 480-81, 496. No individual negotiations are at issue here. In *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), highly individualized contract terms, including bulk and exclusivity clauses, meant that small hospitals and those with diverse equipment inventories may never have been able to do better in the but-for world, and plaintiff proposed no way to measure those effects. *Id*. at 166-69.

---

data, Prof. McFadden will run the approved damages model *before trial* on the *entire database* of App Store transactions to calculate and present an *aggregate* damages figure for every Apple ID account to the jury. To avoid any doubt on this important issue, even though he is not required to do so at this stage, Prof. McFadden already has run the model on all the transactions in the Games and Music & Entertainment genres using App Store data complete through April 25, 2022.[3] Rev. McFadden Supp. ¶¶ 6, 15, 65, figs.1, 4. Once that is done, the parties and their counsel will know, *before trial*, which accounts were injured and by how much they were injured. They will also know precisely which accounts were uninjured. *It will take no trial time to do so*.

Apple does not deny that Plaintiffs will run the damages model *before trial*. Instead, after claiming (falsely) that it was impossible to match Apple IDs to individual Class members, Apple now argues that Plaintiffs intend to link injured accounts to Class members only *after* trial. Opp. at 1, 24. However, after rejecting Apple's prior (false) claim, the Court accepted Prof. McFadden's proposed methodology for identifying Class members through a claims administration process, using claim submission forms, Apple IDs, and Apple's comprehensive internal records. March 29 Order at 14 ("It is not uncommon for class members to be identified using such means in class actions."). Apple ignores the Court's holding and its instruction not to repeat arguments already rejected by the Court. The Court should reject this repetitive argument again.

Apple next argues that Plaintiffs have not made any showing that any particular Class *member* suffered net harm, citing the Court's March 29 Order at 8 (citing McFadden Reply Rpt. ¶ 200), and are speculating that there are fewer unharmed Class *members* than accounts. This is irrelevant. Even if the matching process does not reduce the proportion of unharmed Class members, which is highly implausible since there are approximately three times as many accounts as there are iOS consumers, those Class members who are fortuitously unaffected by higher priced apps and IAP can and will be identified.

Apple also argues that uninjured Class members are not fortuitously uninjured, but instead

---

[3]    The exercise Prof. McFadden undertook covers approximately ▮▮ of all the commerce on the App Store through April 25, 2022. The success of his model on nearly ▮▮▮▮▮ of all App Store commerce overwhelmingly demonstrates that the econometric model is fully capable of proving both impact and damages on a class-wide basis using common proof.

says they are necessarily uninjured by economic forces that will occur in the But-For world. That argument contorts the meaning of "fortuitously uninjured" beyond recognition. Because the Class includes only those iOS device owners who paid for apps or IAP through the App Store, *all* Class members were exposed to Apple's anticompetitive conduct to one degree or another. Whether a particular Class member suffered measurable harm is merely a coincidence of several factors in combination – not just which apps or IAP they bought, but also how much they spent on them.

Apple's attack on Prof. McFadden's econometric model does not change how uninjured Class members are to be characterized under *Ruiz-Torres* and *Olean*. It is irrelevant, for example, that app developers have low marginal costs, as Prof. McFadden's model predicts that even many of those developers will charge lower prices in response to a lower commission in the But-For world. Whether a particular Class member buys a sufficient quantity of such apps or IAP, or also buys other apps and IAP, to suffer measurable damages under the model is simply a *fortuity*.

Likewise, whether the prices paid by iOS consumers for particular apps and IAP will fall in the But-For world even in the presence of price tiers or focal pricing is equally irrelevant to the question whether they are fortuitously or necessarily uninjured. Again, Prof. McFadden's econometric model predicts that developers would cut prices in response to a lower commission, even in the presence of price tiers or focal pricing. Again, whether a particular Class member buys a sufficient quantity of such apps or IAP, or other apps and IAP, to suffer measurable damages under the model is simply a *fortuity*.

Apple's other arguments for why Class members are not fortuitously uninjured are equally baseless and unpersuasive. Prof. McFadden's econometric model easily accommodates in-app advertising and competition among developers to predict accurately which consumers would pay lower prices for apps and IAP in the But-For world, and Apple and its army of experts have not shown otherwise. McFadden 2023 Reply Rpt. § IV.D & ¶ 81; McFadden Opening Rpt. ¶ 225.

It is simply untrue that Plaintiffs have proposed no way to identify and exclude fortuitously uninjured Class members. To the contrary, Plaintiffs explain above that all uninjured accounts will be identified automatically when Prof. McFadden runs his econometric model against the full set of App Store transactions prior to trial, leaving only the mechanical step of matching Apple IDs to

Class members using Apple's own comprehensive database. Despite Apple's stubborn insistence that that exercise is impossible, the Court already has accepted Prof. McFadden's proposed methodology for doing so. March 29 Order at 14.

### C.    Prof. Hitt's "Natural Experiments" are Unreliable and Unscientific

Apple relies on Prof. Hitt's "natural experiments" for its meritless argument that Plaintiffs' method of common proof "produces consistent false positives" because Prof. McFadden's model estimates injuries to Class members from price reductions that Apple says would not actually happen in the But-For world. Far from demonstrating that Prof. McFadden's model produces "false positives," Prof. Hitt's "natural experiments" are themselves fatally flawed and his conclusions are therefore unreliable. Plaintiffs address the many flaws in Prof. Hitt's "natural experiments" in their *Daubert* Opposition (at 8-10) and only summarize them here.

*First*, Prof. Hitt fails to establish what factors are driving the results of his natural experiments that he claims contradict the predictions of Prof. McFadden's model. His list of potential reasons that may drive his empirical observations are pure speculation. McFadden 2023 Reply Rpt. ¶¶ 82-99; Hitt 2023 Dep. 128:14-129:14, 143:9-145:18, 151:6-21, 152:14-153:7, 154:19-155:3, 157:4-160:4. For example, he never determined through any rigorous data-driven analysis, the effect of Apple's price tiers on app and IAP costs in any of his "natural experiments." Hitt 2023 Dep. 143:9-145:18. It is hardly surprising that many developers did not respond to the limited changes in Apple's commission rates when their price choices were as heavily constrained as they are in the As-Is world in which Prof. Hitt conducted his so-called "natural experiments."

*Second*, Prof. Hitt's review of app and IAP prices before and after implementation of the Small Business Program ("SBP") and Auto-Renewable Subscription Policy ("ARS") "fails to follow standard economic techniques required for a natural experiment analysis to meet professional standards." McFadden 2023 Reply Rpt. ¶ 85. Prof. Hitt does not include any econometric controls in his simplistic review, nor does he compare the treatment group (those impacted by Apple's programs) to a control group (those not impacted by Apple's programs). *Id*. ¶ 89; *see also* Hitt 2023 Dep. 105:21-106:6. Indeed, Apple's own expert, Prof. Watson, ***agrees*** that a simplistic "before and after" test is useless: "In all cases in which you are thinking about the

causal effect of one variable X on another variable Y, one worries – absent a randomized control experiment, one worries there might be confounding factors." Watson Dep. 45:1-8. In other words, "[a]n economist couldn't just look at before and after" the commission rate change because, "there is a worry that that difference may be ***contaminated with other factors that went on***" that skew, blur, or obscure the effects being considered. *Id*. 41:25-42:11 (emphasis added).

*Third*, Prof. Hitt's attempts at a regression analysis relating to his natural experiments, his difference-in-differences ("DiD") regressions, for the SBP and ARS suffer from several flaws, rendering his analysis and results unreliable. Hitt ¶¶ 71, 86 & App'x 5; McFadden 2023 Reply Rpt. ¶¶ 91-96. Prof. Hitt's regression fails to account for self-selection bias even though Prof. Hitt admitted in his deposition that voluntary enrollment in the SBP is a source of self-selection bias. Hitt 2023 Dep. 90:22-92:5; 93:7-95:5.[4] Prof. Hitt also fails to conduct any analysis of his choice of control groups for either regression. McFadden 2023 Reply Rpt. ¶ 93. His own academic work acknowledges, and he admitted in his deposition, that examining the representativeness of control groups is essential to rendering any DiD regression analysis reliable. Hitt 2023 Dep. 51:13-22. *See also* McFadden 2023 Reply Rpt. ¶ 93 n.232 (citing Hitt's work).

For example, Prof. Hitt admitted in his deposition that a parallel trends analysis[5] was a basic validation step. Hitt 2023 Dep. 116:14-117:10. He claims to have performed such a test, but he omitted any discussion or analysis of the test results in his report and omitted all related work from his backup materials. *Id*. 116:21-117:4. Apple's counsel later asserted in an email that Prof. Hitt did not "rely" upon the parallel trends tests for the regressions he performed. Ex. D. This is a blatant failure of professional standards, which renders his natural experiments analysis unverified

---

[4]    According to Prof. Hitt's own data, as of the treatment date, less than half of all developers who eventually joined the SBP were enrolled. McFadden 2023 Reply Rpt. ¶ 92. And although Prof. Hitt claims to have accounted for that selection bias through the inclusion of "inverse propensity score weighting," he only applies that weighting to one of his two control groups, and therefore his coefficient estimates are inherently biased and unreliable. *Id*.

[5]    One basic condition the DiD regression should satisfy is parallel trends, which requires that but for the treatment, the control group and treatment group are the same and follow the same trends. Parallel trends require that in the pre-program implementation period, time trends in the outcome of interest are the same in treatment and control groups. McFadden 2023 Reply Rpt. ¶ 93.

and unreliable. McFadden 2023 Reply Rpt. ¶ 95; *see also* Watson Dep. 41:25-42:11; 45:1-5. When Prof. McFadden performed his own placebo tests, the results indicated that the events Prof. Hitt analyzed are not "natural experiments" at all, making his DiD analysis invalid and unreliable. *See* McFadden 2023 Reply Rpt. ¶¶ 97-17 figs.1, 2. Therefore, the Court should disregard Prof. Hitt's flawed "natural experiments" analysis. Those flawed and incomplete "experiments" hardly form the basis for rejecting Prof. McFadden's econometric modeling.[6]

## II.    PROF. MCFADDEN'S MODEL DOES NOT SUFFER FROM THE "ADDITIONAL DEFECTS" APPLE CLAIMS

Apple next argues that making only small adjustments to Plaintiffs' model to correct supposed errors or account for supposed market realities drives up the number of uninjured to astonishing levels—as much as 27.7% of the redefined class—and creates attendant swings in damages measured in billions of dollars. Prince ¶¶ 108–10, Ex. 10. Apple's argument–which relies on *manipulating* Prof. McFadden's methodology and *altering* the data–is unfounded.

### A.    McFadden's "Modeling Choices"

As Apple argued in its *Daubert* motion, Apple here too claims that Prof. McFadden uses unrepresentative developer profit margins and overstates marginal costs. For the reasons articulated in Plaintiffs' *Daubert* Opp., Apple is wrong. *See Daubert* Opp. at § I.A.

Apple once again criticizes Prof. McFadden for using monthly per-app spend instead of individual IAP item prices as his unit of analysis for IAP. As Prof. McFadden previously explained, the *app level* is "the most reasonable level at which app developers' variable costs can be estimated." McFadden 2021 Reply Rpt. ¶ 142; *see also* McFadden 2023 Reply Rpt. ¶ 103. The

---

[6]    In *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020), the court held that an expert model that measures harm not attributable to the alleged conspiracy, yields false positives, masks uninjured class members, or fails to demonstrate class-wide impact with scientific rigor will not support class certification. Whether the model measures harm attributed to the alleged harm is a *Comcast* problem. Apple and its experts do not argue that Prof. McFadden's model measures harm that is inconsistent with Plaintiff's claim that Apple completely monopolizes the aftermarket for iOS apps and IAP. Nor do they argue that his model "masks uninjured class members." To the contrary, as Plaintiffs explain in their opposition to Apple's *Daubert* motion and above, the model will show before trial exactly which specific accounts have suffered no measurable economic harm. Likewise, they have demonstrated that Prof. McFadden's revised econometric model reliably demonstrates class-wide impact with sufficient scientific rigor.

Court found that this was a proper choice. March 29 Order at 11. Prof. McFadden models developers' pricing decisions at the app level and estimates but-for prices at the app level. McFadden 2023 Reply Rpt. ¶ 108. For this reason, and for the reasons articulated in Plaintiffs' opposition to Apple's *Daubert* motion, Apple's repeat argument remains incorrect and should again be rejected. *See Daubert* Opp. § I.B.[7]

Finally, Apple makes the same meritless argument as it did in its *Daubert* motion that Prof. McFadden failed to account for price tiers and focal-point pricing. For the reasons explained in Plaintiffs' *Daubert* Opp., Apple is again wrong. *See Daubert* Opp. § I.C.

### B. Apple's Modification of the Model and Data, and the Resulting Changes in Outcome, is Not Surprising and is Not a Valid Robustness Check

As Plaintiffs explained in their opening memorandum, they addressed the "switchers" issue by running the model on 75 samples instead of one. Apple does not dispute the appropriateness of that methodology. Instead, it argues that because Plaintiffs allegedly have "done nothing" to resolve the prior flaws in Prof. McFadden's methodology, running the model on 75 samples is no more reliable than doing so on one sample. Opp. at 18. Instead of dealing with the resolution of the "switcher" issue, Apple tries to change the subject. Apple is wrong. *See Daubert* Opp. at § I.E.

Moreover, Apple's argument that the class cannot be certified because Plaintiffs have not run the model on *all* apps and IAP is meritless. This is just a new spin on an old argument. Plaintiffs are not required to prove their case at class certification; they only need to demonstrate that their impact and damages model works and is reliable. At the class certification stage, "it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff[s'] claim." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1081 (C.D. Cal. 2015)

---

[7]     In *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 92 (S.D.N.Y. 2017), the plaintiffs alleged an unlawful price-fixing conspiracy among multiple sellers of digital music in which all parties submitted competing estimates of the prices that consumers would have paid for digital music in a but-for world without the alleged conspiracy, from which the court concluded that a purchase-by-purchase comparison was required to determine whether consumers were, in fact, injured. Here, of course, none of Apple's eight experts has computed *any* But-For prices to challenge Prof. McFadden's computations. They merely theorize that some consumers may have been unharmed in the But-For world, but they offer *no data-driven analysis* to support their absurd and counter-intuitive hypothesis that some app developers might have charged *higher* prices for apps and IAP if they had to pay a *lower* commission to Apple.

---

(quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014)). As the Ninth Circuit held in *Olean*, at the class certification stage, Plaintiffs need only show that impact and damages "are ***capable*** of being established through a common body of evidence, applicable to the whole class." 31 F.4th at 666 (citations omitted).

Indeed, the "Court agree[d] that the model ***need not be run*** for class certification purposes." March 29 Order at 26 (emphasis added). However, to prove that Prof. McFadden's econometric model is capable of proving impact and damages through a common body of evidence applicable to the entire Class, he has run the model successfully for approximately ██ of all the commerce on the App Store through April 25, 2022. The success of Prof. McFadden's model on nearly three-fourths of all App Store commerce to date is more than sufficient to demonstrate that Plaintiffs can prove impact and damages on a class-wide basis with common proof. Apple's argument that Prof. McFadden has not run the model for ***all*** apps and IAP ignores this well-settled precedent and also ignores the Court's March 29 Order.

## III.    DR. ABRANTES-METZ'S MATHEMATICAL COMPUTATION OF THE BUT-FOR COMMISSION RATE IS RELIABLE

As it does in its *Daubert* motion, Apple also argues here that Dr. Abrantes-Metz has not "modeled" a but-for commission but simply relies on an "accounting identity" to compute the competitive commission rate. As Plaintiffs explained in opposing Apple's *Daubert* motion, that argument is unfounded. None of Apple's eight experts denies that the accounting equation Dr. Abrantes-Metz used to compute the commission rate is valid for economists to rely upon; or that it applies to the App Store; or that it applies to the But-For world she modeled. Indeed, Prof. Schmalensee and Prof. Hitt admit it is a useful equation for economists that does all those things. Schmalensee 2023 Dep. 101:9-21, 119:10-19; Hitt 2023 Dep. 167:13-23, 169:3-9. Nor do any of Apple's experts cite ***any*** academic literature that challenges or refutes Dr. Abrantes-Metz's use of the equation to compute the but-for commission rate. None of Apple's experts offers ***any*** opinion as to the "right" way she should have modeled the but-for commission rate; they simply echo one another saying she got it "wrong."

Apple's argument is again simply a criticism that Dr. Abrantes-Metz improperly ignored indirect network effects. She did not. She considered several facts – including the customer lock-

in, the absence of a subsidy in the as-is world, the absence of any evidence that Apple would pay subsidies to users in the But-For world, and the availability of a close, reasonably competitive comparator (the Windows PC game apps market). Dr. Abrantes-Metz then exercised her acknowledged platform expertise to determine that *no consumer subsidy would be paid* to consumers in the But-For world. Abrantes-Metz Reply Rpt. ¶¶ 28, 33-39. That determination made it unnecessary for her to perform a detailed analysis of indirect network effects, as they would not influence the allocation of a commission reduction between developers and consumers: the developers pay the *entire* commission and consumers receive no subsidy payments from Apple to offset the higher prices they pay. *Id*. ¶ 28.[8] For this reason, her methodology is applicable "whether or not the market is a one-sided or two-sided market." Abrantes-Metz Dep. 167:14-168:2.

Apple also repeats its argument that Dr. Abrantes-Metz based her calculation on three other unreasonable assumptions. None of those assumptions was improper. *First*, regarding her assumption of a single competing app store (*i.e.*, a duopoly), none of Apple's experts identifies any contrary relevant academic literature to dispute her duopoly assumption. Dr. Abrantes-Metz's assumption was *conservative* because the academic literature predicts that the commission would be *lower* if she assumed *more* rivals in the But-For world. Abrantes-Metz ¶¶ 57-58; Abrantes-Metz Reply Rpt. ¶¶ 46-47. One of Apple's experts, Prof. Schmalensee, cites certain literature that predicts the possibility that prices might rise with more entrants in the relevant market, but that literature concerned markets with single homing, which he admits would *not* apply to the But-For world she modeled. Abrantes-Metz Reply Rpt. ¶ 50; Schmalensee 2023 Dep. 147:16-20.

*Second*, Dr. Abrantes-Metz reasonably assumed that the rival app store would have entered the market at the start. Apple's App Store was *not* the first app store selling iOS apps. An app store called Cydia (which Apple quickly throttled) began selling apps to jail-broken iPhone owners *before the App Store opened*. Abrantes-Metz Reply Rpt. ¶ 81. Cydia's entry as an app store easily supports her assumption that a rival would always exist alongside the App Store.

*Third*, consistent with well-established academic literature, Dr. Abrantes-Metz assumed

---

[8]    None of Apple's eight experts challenged Dr. Abrantes-Metz's expertise or contradicted any of the facts she relied upon in performing her calculations.

that the App Store and its rival would offer the same terms and services. Abrantes-Metz ¶ 28; Abrantes-Metz Reply Rpt. ¶¶ 83. Her assumption implies that both app stores would capture 50% of the market. Abrantes-Metz Reply Rpt. ¶¶ 114-16. However, her decision to allocate a far greater market share to the Apple App Store (████) than to its rival (████) was ***conservative***. *Id.* ¶ 114. Had she allocated equal 50/50 shares to both app stores, she would have computed a ***lower*** but-for commission rate. *Id.* ¶ 115. None of Apple's army of experts says otherwise or suggests a different methodology or market share allocation.

Prof. Hitt also argues that Dr. Abrantes-Metz treated the market as if it were always the size it was in 2019. ***She did no such thing***.[9] Dr. Abrantes-Metz used ***profit margin data*** from 2019, but she made no assumption that app ***billings***—meaning the size of the market—were constant. Abrantes-Metz Reply Rpt. ¶ 106. After making that fabricated accusation, Prof. Hitt then ***altered*** her model to yield a higher but-for commission rate. However, he rested on unreasonable and counter-factual assumptions of his own, most notably that other rivals would face the same annual fixed costs (fixed at the 2019 level) to serve a ***fraction*** of the market that Apple paid to serve the ***entire*** market, and that those fixed costs would have been identical year after year, even when the entire market was a ***fraction*** of its size in 2019. *Id.* ¶¶ 108-12. Dr. Abrantes-Metz's Benchmark Review was Not "Cherry-Picked"

Apple also criticizes Dr. Abrantes-Metz for "cherry-picking" the benchmark review she performed to confirm the results of her mathematical calculation of the but-for commission. Apple's Goldilocks arguments strain credibility to the breaking point.

Apple first criticizes Dr. Abrantes-Metz for ***excluding*** Google's ***as-is*** commission rate from her benchmark review. Opp. at 21. Apple cannot dispute her reason for doing so: significant allegations of anticompetitive conduct against Google, tainting its ***as-is*** commission rate. Instead, Apple gratuitously argues that the plaintiffs in that case "have estimated a 22.8% ***but-for*** commission rate" in that ***different*** market, which it notes is "far above [Dr.] Abrantes-Metz's claim here." *Id.* The fact that ***other*** plaintiffs in a ***different case*** predict a ***different but-for commission***

---

[9]     In his deposition, Prof. Hitt reluctantly admitted under oath that Dr. Abrantes-Metz ***did not assume any profit margin***. Hitt 2023 Dep. 171:25-172:5.

*rate* in a ***different market*** is hardly informative, and it has no relevance to whether Dr. Abrantes-Metz properly rejected Google's ***tainted as-is commission rate*** from her benchmark review.

Next, Apple criticizes Dr. Abrantes-Metz for ***including*** direct-to-consumer app stores in her benchmark review. Oddly, Apple's experts cannot agree on why those stores should have been excluded. Prof. Hitt argues that direct-to-consumer stores should have been excluded because they ***compete*** against two-sided platforms. Prof. Schmalensee, on the other hand, argues that direct-to-consumer stores are ***different*** from two-sided platforms (*i.e.*, the do ***not*** compete) and should be excluded for ***that*** reason. Leaving that inconsistency aside, Dr. Abrantes-Metz included direct-to-consumer stores for valid reasons, including the fact that direct-to-consumer stores do provide benefits and services to their users and that a benchmark review should not include only comparators with higher costs. Abrantes-Metz § III.B.2; Abrantes-Metz Reply Rpt. ¶¶ 183-87. The mere fact that direct-to-consumer stores do not charge a "commission rate" *per se* does not mean that they have no distribution costs. Abrantes-Metz Reply Rpt. ¶ 186.

## IV.    THE PROPOSED $10 CUT-OFF FURTHER REDUCES THE NUMBER AND PERCENTAGE OF UNINJURED CLASS MEMBERS

As Apple's experts concede, uninjured Class members (actually, uninjured accounts) are "cluster[ed] … among the lowest spenders." Opp. at 24. Accordingly, the proposed $10 spending cut-off is prudential and conservative: it dramatically lowers the number of uninjured accounts (and, after matching, Class members), while preserving the claims of Class members who were more significantly harmed. The overall impact of the $10 cut-off on total damages is just ███████████████████████), indicating that the Class as a whole is giving up very little by this exclusion. *See* Rev. McFadden Supp. at fig.1.

Apple does not cite any authority for its argument that the Plaintiffs may not narrow the class they seek to represent in this way. Indeed, Apple ignores many cases in this District and Circuit ***permitting*** such narrowing at class certification. *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 590 (N.D. Cal. 2010) (modification in class certification briefing permitted); *J.L. v. Cissna,* No. 18-cv-04914-NC, 2019 WL 415579 at *5 (N.D. Cal. Feb. 1, 2019) (allowing modification, collecting cases)

Lacking authority on point, Apple instead cites *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 471 (9th Cir. 2023), an employment misclassification case, where each individual worker's testimony was necessary to establish damages, reminiscent of *Asacol*, discussed above. Indeed, the first bellwether trial saw eleven plaintiffs take the stand, in a process "messier than promised by plaintiffs' counsel." *Id.* at 466. *Bowerman* does not address narrowing the class.[10]

Finally, Apple argues that a winnowing process that can only be applied at or after trial comes too late. Apple fishes for authority in *Wal-Mart v. Dukes*, 564 U.S. 338 (2011), and *Rail Freight*, which do not directly address winnowing processes. However, both the Supreme Court and the Ninth Circuit have spoken on this. *Ruiz Torres* expressly permits winnowing after certification. *Id.* at 1137 (cited with approval in *Olean*, 31 F.4th at 669). And in *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021), the Supreme Court considered a class that, at trial, proved to have nearly 80% of its members with no cognizable injury and therefore no Article III standing. The Supreme Court did not say that a class with so many uninjured could not exist, but instead remanded that question to the lower courts. 141 S.Ct. at 2214. Where a formulaic method exists to remove uninjured class members, as it does here, Apple cites no authority requiring that method to be not only developed but applied at class certification.[11]

## CONCLUSION

For all of the reasons given above and in Plaintiffs' opening memorandum, Plaintiffs request that the Court grant their renewed motion to certify the class action, appoint Plaintiffs as Class Representatives, and appoint Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. as Co-Class Counsel.

---

[10]    Apple's other authority is *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). The injury was fractured pacemaker wires, and each patient's implantation raised an individual causation issue. *Id.* at 1192. That case did not address narrowing of a class definition.

[11]    *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 632 (D. Kan. 1996), is inapposite as the legal standards governing the common issues in that products liability case were not the same throughout the country. "The court would be required to apply the substantive law of the state where the claim of each class member arose, and not Kansas substantive law." *Id.* at 629. That is not an issue in this case.

DATED: April 28, 2023

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: ___/s/ Rachele R. Byrd_____
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
KYLE M. WOOD* (*pro hac vice*)
   (*Admitted only in Maryland. Not admitted in the District of Columbia. Practice supervised by members of the Firm.)
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kelloghansen.com
apanner@kelloghansen.com
kwood@kelloghansen.com

*Counsel for Plaintiffs and Proposed Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803

Telephone: (212) 899-1761
Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

*Counsel for Plaintiff Robert Pepper*

29479v9