**Pages 1 - 102**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
                              )
                              )
                              )
In Re Apple iPhone Antitrust  )     NO. CV 11-06714-YGR
Litigation                    )
                              )
                              )
                              )
_____)
```

Oakland, California
Friday, June 23, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

>WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
>270 Madison Avenue
>New York, NY 10016
>BY: **MARK RIFKIN, ESQUIRE**

>WOLF HALDENSTEIN ADLER FREEMAN & HERZ, LLP
>Symphony Towers
>750 B Street, Suite 1820
>San Diego, CA  92101
>BY: **RACHELE R. BRYD, ESQUIRE**
>**BETSY MANIFOLD, ESQUIRE**

>KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
>1615 M Street, N.W., Suite 400
>Washington, D.C.  20036
>BY: **DAVID C. FREDERICK, ESQUIRE**
>**KYLE M. WOOD, ESQUIRE**

Reported By:            Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                        Official Reporter

**APPEARANCES CONTINUED:**


For Defendants:

                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, N.W.
                    Washington, DC 20036
      BY:  **CYNTHIA RICHMAN, ESQUIRE**

                    GIBSON, DUNN & CRUTCHER LLP
                    333 South Grand Avenue
                    Los Angeles, CA 90071
      BY:  **DANIEL SWANSON, ESQUIRE**

                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street
                    San Francisco, CA  94105
      BY:  **JULIAN KLEINBRODT, ESQUIRE**
             **CAELI A. HIGNEY, ESQUIRE**

<u>**Friday - June 23, 2023**</u>                                    **8:51 a.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Your Honor, calling CV 11-6714-YGR, In re Apple iPhone Antitrust Litigation.

Parties, please state your appearances for the record.

**MR. RIFKIN:**  Good morning, Your Honor.  Mark Rifkin for --

**THE COURT:**  Mr. Rifkin, at a microphone.

**MR. RIFKIN:**  Oh, I'm sorry.

**THE COURT:**  People have forgotten how to be in federal court.

**MR. RIFKIN:**  Well, so many of us are used to doing this by Zoom, but I do apologize, Your Honor.

Good morning.  Mark Rifkin from Wolf Haldenstein on behalf of the plaintiffs.

**THE COURT:**  Good morning.

**MR. RIFKIN:**  And with me are my partners Betsy Manifold and Rachele Byrd.

**THE COURT:**  Okay.  Hold on just a minute.

**MS. MANIFOLD:**  Betsy Manifold.  Good morning, Your Honor.

**THE COURT:**  Good morning.

And then Ms. Byrd.

**MS. BYRD:**  Good morning, Your Honor.  Rachele Byrd.

1          **THE COURT:**  Okay.  And I have who else?

2          **MR. FREDERICK:**  David Frederick from Kellogg Hansen

3    and my colleague, Kyle Wood.

4          **THE COURT:**  Okay.

5          **MR. WOOD:**  Good morning, Your Honor.  Kyle Wood.

6          **THE COURT:**  Good morning.

7       Now for the Defense.

8          **MS. RICHMAN:**  Good morning, Your Honor.  Cynthia

9    Richman for Apple.

10          **THE COURT:**  Good morning.

11          **MS. RICHMAN:**  One thing, we are joined by Jen Brown,

12    who I think you've met before.  She is the director of

13    commercial litigation at Apple.

14          **THE COURT:**  Okay.  Good morning.

15          **MR. SWANSON:**  Good morning, Your Honor.  Dan Swanson

16    for Apple.

17          **THE COURT:**  Mr. Swanson, good morning.

18          **MS. HIGNEY:**  Good morning, Your Honor.  Caeli Higney

19    for Apple.

20          **THE COURT:**  Higney.  Okay.  Good morning.

21          **MR. KLEINBRODT:**  Good morning, Your Honor.  Julian

22    Kleinbrodt, also for Apple.

23          **THE COURT:**  Okay.  Good morning.  Got it.

24       Okay.  And who is arguing and which issues?  If you've

25    divided them, I would like to know in advance.

1          **MR. RIFKIN:**  Good morning again, Your Honor.  Mark

2    Rifkin.  I will be arguing for the plaintiffs.

3          **THE COURT:**  All issues?

4          **MR. RIFKIN:**  Yes, Your Honor.

5          **THE COURT:**  Okay.

6          **MS. RICHMAN:**  Your Honor, I will be arguing for Apple

7    on the class certification.  I understand you took the *Daubert*

8    off the calendar for today, but if we were to address issues

9    related to that, Mr. Swanson will tackle those.

10          **THE COURT:**  All right.  Well, I probably will.

11       All right.  Let's go.  At the mics on the class

12    certification.

13       Let me ask, Mr. Rifkin, are you prepared -- well, I will

14    have -- I will hear argument on the *Daubert*.  I'm assuming that

15    you're prepared to do that?

16          **MR. RIFKIN:**  We are prepared to address those issues,

17    yes, Your Honor.

18          **THE COURT:**  Let's start with the *Daubert* then.  And

19    I'm assuming that -- no.  Stay at the mic -- I'm assuming that

20    because the class certification issues dovetail with the

21    *Daubert*.

22       It's your motion, Mr. Swanson.  Go ahead.

23          **MR. SWANSON:**  Your Honor, thank you.

24       One thing we would ask is that we get the opportunity to

25    file our reply brief.

1          **THE COURT:**  Your request is noted.  I'll decide later.

2          **MR. SWANSON:**  All right.  I just wanted to note that

3     my remarks today will be a poor substitute for a written

4     response.

5          So it's -- it's a very broad-ranging motion that touches

6     on a lot of different points.  It's a very complicated model.

7     What I would like to do is focus on what I think of as the kind

8     of the top five points that distill a great deal of what is

9     wrong and unreliable with the plaintiffs' expert evidence.

10         Four of the points relate to Professor McFadden's model.

11     The fifth point represents to Dr.Abrantes-Metz's calculation of

12     the but-for commission rate.

13         So what are the four points?  First Pams, the McFadden

14     model still lacks foundation because it's not calibrated to

15     account for 99-cent pricing, whether price tiers or focal point

16     prices.  And those prices, those 99-cent prices, are an

17     incredibly important constraint that prevents injury in this

18     case, and failing to account for them results in a vast

19     inflation of damages and overestimate of the incidence of

20     injury.  So that's point one.

21         Second point is there is an actual direct and I think

22     scientifically proper way to test a model as complicated as

23     this, and that is to look to see whether it generates correct

24     predictions about the real world.  And Apple has, on numerous

25     occasions, dropped the commission rate from 30 percent to 15

1    percent.  I know you're well aware of that, Your Honor.  It

2    happened first back with the Renewing Subscription Program.

3    It's happened with the Small Business Program.  It's happened

4    with another program that perhaps has been discussed less, the

5    Video Partner Program.  All of those are programs where the

6    commission was cut in half.  And we can actually see what

7    happened to prices for consumers in the wake of those

8    commission cuts.

9        And the question is what does Professor McFadden's model

10   predict about those exact apps in those exact circumstances,

11   and, in fact, those predictions are shown to be false.  His

12   model predicts lower prices.  The real world does not show that

13   prices get lowered in those circumstances.  So that's the

14   second critique.

15       The third is -- and these are all interrelated -- the

16   third is another reason in addition to price tiers why

17   Professor McFadden's model actually delivers those false

18   positives, and that is because of the way he treats costs in

19   the model.

20       Costs are critically important because his model, through

21   its plumbing, infers marginal cost, and the way it works, the

22   higher the marginal cost, the higher the damages.  The higher

23   the -- the lower the price will be in the but-for world, the

24   higher the damages.

25       He sets his model up mathematically rigidly without any

1    empirical evidentiary basis to essentially force marginal costs

2    that have a certain pattern, and that pattern has very

3    important implications for the way his model estimates damages.

4    It essentially skews the marginal cost upward and therefore

5    inflates damages.

6        He also uses, under the rubric of "cost," the so-called

7    margin constraints, and this is another way in which he puts a

8    thumb on the scale and forces a marginal cost to be higher than

9    they otherwise would, and he bases that on data from just six

10   developers.

11       The fourth issue is the switcher problem.  There was a

12   switcher problem before.  The model continues to have a

13   switcher problem.  The model generates results that make

14   uninjured accounts ping-pong upon or injured accounts ping-pong

15   back and forth to lack of injury by the millions every time you

16   make a small change in the sample or in the model itself.  So

17   those are all flaws of Professor McFadden's model.

18       Then there is the but-for commission rate that gets input

19   into the model that has now been outsourced to

20   Dr. Abrantes-Metz.

21       **THE COURT:**  Let me stop you.  Let's remain focused for

22   right now on McFadden.  Do have you more to say on each of

23   these or were you just outlining?

24       **MR. SWANSON:**  I was just outlining, I'm afraid.

25       **THE COURT:**  That's all right.  Let's go ahead and

1    focus on the first issue, the lack of -- or at least what I

2    heard you say, the lack of analysis on focal point.  I will

3    hear what you have to say and then I'll hear from Mr. Rifkin.

4    **MR. SWANSON:**  Okay.  So the prices in the but-for

5    world are what drive damages.  That's the case -- that's true

6    of any overcharge case.  And we focus particularly on the

7    in-app purchase prices.  Those in-app purchases -- those

8    transactions generate 99 percent of the damages that

9    Professor McFadden calculates.  And all of those transactions

10   take place at prices that are on tier; that means, they're

11   basically, roughly speaking, all or mostly all at 99 cents.

12   In the but-for world, they would be at 99 cents as well.

13   They would be at 99 cents if there were no price tiers.  I

14   think in the last go-around, the evidence was effectively

15   undisputed that developers would choose 99-cent focal prices in

16   the absence of any mandate to conform to price tiers.

17   We have, in this round, submitted a report by

18   Professor Berger, who is a true subject matter expert in this

19   area, and he expands the evidentiary range to show that this

20   remains true across virtually all digital platforms, and it's

21   not limited to the digital world certainly, but I think the

22   evidence is overwhelming that in the absence of price tiers,

23   99-cent pricing would still be the way that developers price in

24   the but-for world.

25   Now, the plaintiffs, we submit, have no admissible expert

1    evidence to claim that price tiers would even be absent from

2    the but-for world.  Professor McFadden's opinion in the last

3    round to that effect was excluded as lacking any foundation.

4    They haven't tried to resurrect that opinion.  He hasn't tried

5    to -- they haven't submitted a subject matter expert.  And the

6    opinions of all of Apple's experts are uniform -- Professor

7    Berger, Professor Hitt, Professor Schmalensee, Professor

8    Prince -- that prices tiers are not only not anticompetitive,

9    they have a very important pro-competitive effect, and that is

10    the effect that Justice Gorsuch had noted in this case when it

11    was before the Supreme Court where he observed, in something of

12    a warning shot across the bow for the plaintiffs at this stage,

13    that 99-cent prices, quote, create a strong disincentive for

14    developers to raise their prices.

15        Now, Professor Prince, Professor Hitt, you know, they've

16    all addressed how vitally important it is to take account of

17    that constraint in analyzing the extent to which there is

18    injury and damage.  Professor Hitt, Professor Prince, they've

19    shown that there is a vast inflation of damages and injury.

20        By the way, Professor McFadden deals with the but-for

21    pricing issue in neglecting to truly take account of price

22    tiers and focal point pricing.

23        Why does he not take account of 99-cent pricing?  His

24    model before is the same as his model now.  He hasn't changed

25    it.  It's still -- the model itself only looks at an aggregated

1    but-for -- or it looks at an aggregated price for in-app

2    purchases.

3        So as I know you know well, an app may have a multitude of

4    in-app purchases.  I think Fortnite from our prior experience

5    had four levels of in-app currency possibilities at different

6    tranches ranging from somewhere around 7.99 to like 79.99.

7    Fortnite also has battle passes.  Other apps offer

8    subscriptions that range from a week to a month to six months

9    to a year.

10       All of these things have prices that vary potentially by a

11   factor of 10.  Sometimes the subscription in-app purchases vary

12   by a factor of 40 or 50, depending if you're looking at a

13   weekly or a yearly subscription.  They're just all kinds of

14   different in-app purchase options that are in the same app.

15   And Professor McFadden adds them all up.  He aggregates them,

16   and that's the level at which his model deals.

17       But price tiers don't operate at the aggregate level.  In

18   order for his model to be reliable, he needs to -- in order for

19   it to calibrate two price tiers to 99-cent pricing, it needs

20   some way to translate from that aggregate level to the

21   individual item level, and the model just doesn't do that.

22       You will recall the last time we were here, we were

23   fighting about whether or not his model used the fixed-dollar

24   method, and the fixed-dollar method actually does predict

25   individual item prices, but it had the problem of predicting

1   some absurd stuff as well, like negative prices.  And that was

2   the thing where Professor McFadden kept flip-flopping.  He said

3   that was not his method.  It turns out his staff had actually

4   implemented the fixed-dollar method.  But at any rate,

5   ultimately he said the right thing to do is the percentage

6   method.  So that is where we were in the last round.

7       The percentage method we thought was his way of

8   translating the aggregate down to the individual in-app

9   purchase items, but in deposing him, he said no, that's not the

10  case.  He said something that I think is fairly pivotal for

11  purposes of this part of the motion, and that is he said that

12  his model is completely silent about the in-app purchase items.

13  He said that's true even when the app has only one in-app

14  purchase item.

15      His model actually makes a prediction of that very price

16  if there's only one because he doesn't have anything else to

17  aggregate with it.  But what he said, which is kind of

18  stunning, is, quote -- when he is asked, you know, "What about

19  those apps with only one in-app purchase?  You know, does your

20  model predict reliably what that price will be in the but-for

21  world," he says, quote, I do not know what would happen,

22  unquote.  He says, "The model is silent.  Even if the developer

23  has a single IAP item in the as-is world, I do not model, nor

24  am I predicting, what their menu would be -- would look like in

25  the but-for world."

1    So if his model can't predict, is silent about what

2    individual item prices are, then there is no way he can tell us

3    what the price tier price would be because price tiers are only

4    about item prices.  They have nothing to do with his

5    aggregates.

6    And I asked him in his deposition, "How can you implement

7    price tiers in your model if your model can't predict

8    individual in-app purchase item prices?"  And he had no answer.

9    The only thing he says is, "Well, Professor Prince uses a

10   method," and that's the method of taking the aggregate price

11   and moving it in 99-cent intervals so you get an aggregate

12   price that has nothing to do with price tier prices and you

13   move it a dollar one way or the other and figure out which one,

14   according to Professor McFadden's model, is optimal.

15   Professor Prince addresses that in paragraph 134 in

16   Appendix E of his latest report.  Professor Prince points out

17   "That's not my method."  Professor Prince used that to test

18   Professor McFadden's original model, the one that had the

19   fixed-dollar method.

20   The fixed-dollar method actually does pretty much conform

21   to 99-cent pricing because that method actually predicted item

22   prices.  But it, again, had the vice of predicting negative

23   prices, too, which is why Professor McFadden walked away from

24   it.

25   So Professor Prince is not the one who substantiates what

1    Professor McFadden is doing now in his simulations.  His

2    simulations are just moving a number around that has, according

3    to Professor McFadden, no information about what those item

4    prices that are key should be.  It does not take account of the

5    constraining effect of price tiers which operate at the item

6    level.

7        So what's the upshot of that?  Professor Hitt and

8    Professor Prince show that if you actually apply

9    Professor McFadden's model at the item level, the number of

10   uninjured basically doubles.  Aggregate damages move by

11   billions of dollars.  So it's an enormously important

12   consideration.

13       Now, the plaintiffs say, Oh, you can't apply it at the

14   item level, but how else are we to do what we're supposed to do

15   in testing supposedly scientific models other than seeing how

16   they operate under different assumptions.  And, at any rate,

17   his model is silent on the prices that are critical for

18   purposes of calibrating to 99-cent pricing.

19       One final point and then I'll turn it over to Mr. Rifkin,

20   and that is there's another critically important flaw in the

21   way that he treats or does not account for 99-cent pricing, and

22   that is this.  His model rests on the assumption, this critical

23   assumption, that every price in the real world is a

24   profit-maximizing price for the developer, profit maximizing in

25   the sense of his model, in the sense of marginal costs being

1    equated with the appropriate mathematical figure.  And that's a

2    model that doesn't account for what Professor Berger explains

3    is the behavioral aspects of 99-cent prices, how they affect

4    demand.

5         So Professor McFadden says, My model, which doesn't

6    account for this stuff, is going to assume that every price in

7    the real world is profit maximizing.  The problem with that is

8    all those are 99-cent prices, and it gets plaintiffs twisted up

9    in knots to some degree because on the one hand they say, Well,

10   we allege that these price tiers are anticompetitive.

11   Developers wouldn't price at these tiers unless they were

12   forced to.  At the same time, you've got Professor McFadden

13   saying, My model only operates if I assume all of these prices

14   in the real world are prices that developers would set because

15   they're profit maximizing.

16        You can't reconcile those two things.  Abraham Lincoln

17   said you shouldn't be in favor of and against something at the

18   same time, and that is where I think they end up.

19        So thanks for hearing me out, Your Honor.  Those are my

20   points on price tiers.

21             **THE COURT:**  Mr. Rifkin.

22        **MR. RIFKIN:**  Thank you, Your Honor.

23        To accommodate the Court's concern that was expressed in

24   the order denying the motion without prejudice,

25   Professor McFadden has now modeled developer pricing under the

1    assumption that developers would choose but-for app download

2    and IAP prices first in accordance with Apple's original rigid

3    price tier schedule which, by and large, was in dollar

4    increments for most prices.  It was a little bit smaller in

5    some instances and a little bit bigger in other instances.

6        He then also modeled prices under a focal pricing

7    structure that resembles almost exactly the pricing structure

8    that Apple has now implemented following the settlement in the

9    developer case.

10        Both of those changes yield damages estimates that were

11   different than his original damages estimate but less than one

12   percent different than the results that were achieved without

13   either accommodation.

14            **THE COURT:**  All right.  So could you tell me what

15   paragraphs of the report you're referring to?

16            **MR. RIFKIN:**  So I am, in particular, referring to --

17            **THE COURT:**  And I'm looking at -- unfortunately I

18   don't have ECF numbers in the courtesy copy that was sent.  So

19   I have -- I'm assuming we're talking -- well, you tell me --

20            **MR. RIFKIN:**  Sure.

21            **THE COURT:**  -- which particular of these reports I'm

22   supposed to be looking at.

23            **MR. RIFKIN:**  So if you look at Professor McFadden's

24   original report, I'm referring now in particular to paragraphs

25   45 and 46 --

1          **THE COURT:**  Give me the date so I make sure I'm

2     looking at the right one because we've got many, many reports

3     in this case.

4          **MR. RIFKIN:**  The date is January 19th, Your Honor.

5          **THE COURT:**  What year?

6          **MR. RIFKIN:**  2022.

7          **MS. BYRD:**  '23.

8          **MR. RIFKIN:**  I'm sorry, 2023.  Forgive me.

9          **THE COURT:**  Hold on.  I had his September 26th.

10    So January 23rd, 2023.  Okay.  I have in my binder that

11    was given -- I've got the September 26th, the April 28th --

12    well, September 26th, '22; April 28th, 2023 -- hold on because

13    I'm not seeing --

14          **MR. RIFKIN:**  Sure.

15          **THE COURT:**  I have to pull it up.  I don't have a full

16    copy.  It was not provided to me as a courtesy.  All right.

17    Docket number, please.

18          **MR. RIFKIN:**  I'm sorry?

19          **THE COURT:**  The docket number where I can find it.

20          **MR. RIFKIN:**  I'm told it's Docket No. 679, Your Honor.

21    Yes.  And I'm told that's the version that's under seal.

22          **THE COURT:**  Okay.  I now -- I now have it, and if

23    someone on the plaintiffs' side would please send me a courtesy

24    copy.

25          The reason that I ask for courtesy copies is that it takes

1   our printers here, when we've got color, a long time to print

2   these things, so I'd appreciate a courtesy copy.

3           **MR. RIFKIN:**  A hard copy, Your Honor, yes.

4           **THE COURT:**  Yes.  A hard copy.

5       I am still -- I try to go electronic but still a little

6   old school having to mark things up.

7           **MR. RIFKIN:**  Not a problem, Your Honor.

8           **THE COURT:**  So what paragraphs am I supposed to be

9   looking at?

10          **MR. RIFKIN:**  So I believe that the paragraphs that I'm

11  referring to are paragraphs 44 and 45 of that document, and

12  then he continues on to address Professor Prince's analysis in

13  paragraphs 46 and 47.

14      The debate that Apple was referring to here is largely one

15  of whether the methodology Professor McFadden used adequately

16  incorporates focal pricing or price tiers.

17      If you recall from the original class certification

18  motion, Apple objected to Professor McFadden's modeling of

19  but-for prices at the app level and insisted instead that

20  but-for prices had to be modeled at the individual item level.

21  The Court rejected that argument in the first go-around, and

22  this new debate relates directly to the issue that the Court

23  addressed, which is that Professor McFadden has imposed price

24  tiers and focal pricing by changing the increments with which

25  the average prices can move to simulate the effect of either

1    the price tiers or the focal prices.

2    So, in other words, the results that Professor McFadden

3    generates do not necessarily fall either in a 99-cent price or

4    on a price ending in 9 simply because they reflect the averages

5    of many different prices.  They may be 99-cent prices if, in

6    fact, there is only one app or one IAP item, and in that case,

7    the average will be the same as the individual item.

8    But if there are two items that are priced at 99-cent

9    prices, the average is going to be a 48-cent average, and

10    that -- obviously that doesn't fit either the price tier

11    constraint, the rigid price tier constraint, or the more

12    flexible focal pricing constraints that Apple has since

13    imposed.

14    But if the averages are confined, as he has done, and they

15    move in lockstep with either the 99-cent prices, so they'll

16    move in one-dollar increments, or if he applies the more

17    flexible pricing schedule, the focal pricing schedule that

18    Apple has now implemented in the real world, then they'll move

19    at smaller increments, but if the averages are moving in those

20    increments, Professor McFadden says that mirrors the effect of

21    the price constraints that the Court has directed him to

22    address.

23    The issue here is essentially no different than the issue

24    the Court decided in the *Lithium Ion Batteries* case in the

25    first opinion on class certification in 2017 where Your Honor

again noted that "The use of averages in econometric modeling is common if not unavoidable," and it does not hide the effects of, for example, in that case, individual price negotiations, nor did it mask the fact that some individual class members in that case suffered no overcharge.

The same thing is true here.  The use of averages does not mask, hide, or in any way hinder Professor McFadden's ability to incorporate price tiers or focal pricing in his analysis.

In the *Lithium Ion Batteries* case, Your Honor said, "The use of averages goes to the weight of the expert opinion not its admissibility."  And the exact same thing is true here.

There is no dispute that Professor McFadden did impose price constraints to reflect both the price tiers that Apple originally imposed and then the more flexible price points that Apple has since implemented.

The question is whether --

**THE COURT:**  I don't think in Batteries, right -- in Batteries we didn't have the same kind of error rate that we have here.

**MR. RIFKIN:**  I'm not sure what you mean when you refer to "error rate."

**THE COURT:**  We didn't have the same number or percentage of unharmed accounts in Batteries as exists here.

**MR. RIFKIN:**  That is certainly true.

**THE COURT:**  And so an economic analysis must -- is

1    specific to the facts, so less of a concern in Batteries where

2    you don't have a problem of identifying unharmed accounts.

3    Here I have that problem, so how does averages address that

4    issue?

5         **MR. RIFKIN:**  Well, the averages -- as you said in

6    *Lithium Ion Batteries*, "The use of averages does not" --

7         **THE COURT:**  I'm not suggesting that in some instances

8    it's not appropriate, as it was there.  My question is more

9    specific to this case.  The Ninth Circuit instructs me that I

10   have to look at each case on a case-by-case basis.

11        So you all cite to me, as you well know -- and you're good

12   lawyers -- quotes from lots of different -- from lots of

13   different antitrust opinions; right?  I get them on both sides.

14   It's like patent cases.  I could have a construction on the use

15   of the word "protocol" that are entirely different based upon

16   two different opinions.  That's not the issue.

17        So I understand the basics that any opinion is going to

18   cite.  My question is specific to this case, which I have an

19   obligation to address.

20        **MR. RIFKIN:**  Yes, Your Honor.  And to be more specific

21   in the answer, once Professor McFadden imposes the price

22   constraints, be they the price tiers or the focal price

23   constraints -- doesn't matter -- there will be a computation of

24   the individual impact on each individual account in the Apple

25   universe, and we've talked about this before.  Your Honor has

1    already decided this issue.

2        Professor McFadden also proposes a methodology for

3    aggregating those accounts to unique Apple customers.

4    Your Honor is aware that there are three or four times as many

5    individual unique Apple IDs as there are customers, and

6    Your Honor already decided that the methodology for matching

7    accounts to users is readily available and a reliable method

8    for doing so.

9        I want to make clear that Professor McFadden's model will

10    predict impact and damages on the account level.  The

11    granularity of Professor McFadden's calculation is the account

12    level.  It is based upon an averaging methodology, which the

13    Court has already approved.  It is based upon prices that are

14    analyzed at the app level rather than the item level, which the

15    Court has already approved.

16        To simulate the effect of either price tiers or focal

17    pricing, Professor McFadden constrains the movement of those

18    averages, which he has said is the same thing as imposing price

19    tiers on an item level in terms of addressing -- in terms of

20    addressing the effective price tiers or focal pricing on his

21    modeling.  But once the model is run, it yields results at the

22    app -- I'm sorry -- at the Apple ID level for each and every

23    one of the 400 million accounts that are in the class.  There

24    is no debate about that.

25        **THE COURT:**  All right.  Okay.  Keep going.  Sorry.

1          **MR. RIFKIN:**  Okay.  And so what we have here is a

2     dispute between two renowned experts on whether one methodology

3     is appropriate or a different methodology is appropriate.

4          Professor McFadden's methodology is based upon the same

5     methodology that he employed originally.  Obviously he's had to

6     correct the various issues the Court had with the detailed

7     implementation of his overall model, but the Court previously

8     accepted that Professor McFadden could model price effects at

9     the app level and could do so using averages.

10         He has done that, and because he has not changed that

11    methodology, the way he imposed price tiers is by moving the

12    averages -- by confining the averages to move in accordance

13    with those -- with those intervals, whether they're the

14    original price tiers or the subsequent 750 price points.  But

15    he has addressed the Court's concerns consistent with the

16    Court's direction and consistent with the Court's prior ruling

17    on class certification.

18         Professor -- excuse -- I'm sorry.  Excuse me.  Apple's

19    experts now change slightly, and so what they argue is that if

20    one were to take the methodology that Professor McFadden has

21    used priced at the app level and using those averages and

22    instead impose that methodology on individual items that are

23    purchased, whether they be individual apps or, more

24    particularly, individual items of in-app purchases, that

25    distorts the results.  But Professor Prince needs to change the

1    methodology in order to do that, and so he takes

2    Professor McFadden's methodology and performs a price tier

3    simulation at the app level, which is not the way the model was

4    constructed, in order to conclude that Professor McFadden's

5    analysis was not correct.

6         Regardless, we have two recognized experts who disagree

7    about the proper way for price tiers or price -- focal pricing

8    constraints to be imposed on the model.  This is -- as the

9    Court said in the *Lithium Ion Batteries* case, this is a

10   quintessential dispute between experts that goes to the weight

11   of the evidence, not its admissibility.

12        **THE COURT:**  Between when I wrote that decision and

13   now, what happened in between at the Ninth Circuit?  You tell

14   me.

15        **MR. RIFKIN:**  Well, *Olean* on was decided.

16        **THE COURT:**  Exactly.  Exactly.

17        **MR. RIFKIN:**  But *Olean* doesn't --

18        **THE COURT:**  So I just want you -- look, it doesn't --

19   reciting *Lithium* back to me repeatedly doesn't necessarily help

20   you.  That's my point.  Argue your case, not *Lithium*.

21        **MR. RIFKIN:**  I'm not arguing *Lithium Ion* at all, but

22   *Olean* doesn't change that.  *Olean* is completely consistent with

23   the idea that a dispute over a battle of experts, as it were,

24   is a question that goes to the weight of the evidence, not its

25   admissibility.

 1          **THE COURT:**  In that case, there was an evidentiary

 2    hearing; right?

 3          **MR. RIFKIN:**  Correct.

 4          **THE COURT:**  There was an evidentiary hearing, and the

 5    court had to -- and the court was affirmed, which is great.  I

 6    always like it when the Ninth Circuit affirms me and my

 7    colleagues.

 8        We have to get into the nitty-gritty.  That's my point.

 9          **MR. RIFKIN:**  And I have tried to do just that by

10    explaining what Professor McFadden did, how Professor McFadden

11    did it, what Professor Prince did to criticize it, that is, to

12    distort it --

13          **THE COURT:**  Well, he changed it.  He changed the

14    methodology to create or to suggest a distortion.

15          **MR. RIFKIN:**  Correct.  Okay.  He applied the

16    methodology in a way it was never intend to be applied by

17    running the simulation at a different level than it was

18    constructed to suggest that Professor McFadden's methodology is

19    inadequate.

20          **THE COURT:**  Okay.  Any response?  And then we can move

21    to the second.

22          **MR. SWANSON:**  Yes, Your Honor.  My response really

23    focuses on your question, which I think gets to the heart of

24    it, which is, is it okay to use that aggregated average in a

25    case like this one, and I think the answer is absolutely not,

for at least two reasons.

One, it's not your average average.  This isn't like asking what the average price of a half gallon of milk is in a particular region because that's asking the average of a given product.

What Professor McFadden does is take in-app purchase items --

**THE COURT:**  What McFadden's model does is take it to a level that is logical and that has a baseline price.  Taking it down to the app level creates all sorts of unintended complications.

**MR. SWANSON:**  Well, I would say taking it up -- he says he does it at the app level; right?  Not at the -- the item level would be the individual prices which are --

**THE COURT:**  I would consider the item level to be a higher level of detail than the app level.

**MR. SWANSON:**  Yes.  Absolutely.

**THE COURT:**  And so trying to do this from the item level seems to me to impose a significantly higher level of complication that may not be necessary for purposes of trying to figure out aggregate damages.

**MR. SWANSON:**  And that's the question.  Absolutely agree that's the question.  And the question is, is it necessary, and the answer is that's where 99-cent pricing operates.

1       If you don't have an average that tells you something

2  about those item prices, you're not going to be able to tell

3  whether price tiers actually keep developers from moving those

4  granular item prices.  That's exactly where it operates.

5       And so that's why -- he's got an average that is not your

6  typical average.  It's a wide variety of things that have a

7  vast array of differing prices.  It's not the average of a

8  price of, you know, half gallon of milk that might vary by 25

9  cents.

10        **THE COURT:**  But I hear the plaintiff saying -- and,

11  again, I will get into the nitty-gritty of this, but what I

12  hear the plaintiff saying is that McFadden has created a

13  construct that puts constraints on the movement, and if you're

14  putting constraints on the movement, then that addresses some

15  of the concerns, at least from their perspective.

16        **MR. SWANSON:**  But if you're -- that average has to say

17  something about the item prices, you know.  The cases where

18  averages have been used, the experts have said the average is a

19  good representative for what will happen in the individual

20  transaction.

21        **THE COURT:**  Do you have any -- I don't think *Lithium*

22  is the best -- is the best analogy here.  In fact, I don't know

23  that there is a good analogy.

24        **MR. SWANSON:**  I don't know that there is.

25        **THE COURT:**  Do you have an analogy?

1          **MR. SWANSON:**  No.  I think this is a platform case.  I

2   think you once said we are in the Wild West.  It's a platform

3   case.  One of the more complicated cases.  Brand new Supreme

4   Court opinions.  We're all studying the opinion in the *Epic*

5   case.

6          No.  I mean, this is --

7          **THE COURT:**  I would have thought you would have

8   studied that already.

9          **MR. SWANSON:**  Oh, I have been studying it every day.

10          **MR. RIFKIN:**  Yeah.

11          **MR. SWANSON:**  And I would like to comment on it in our

12   reply brief, too.

13          But --

14          **THE COURT:**  All right.  Let's --

15          **MR. SWANSON:**  -- the point is this last -- if I could

16   say the last thing.

17          Professor McFadden is the one who doesn't say what the

18   expert normally says.  The expert normally says the average

19   tells you something about the individual transactions.

20   Professor McFadden says it says zero about the individual

21   transactions.  He says it's silent.  He says, "I have no

22   idea" --

23          **THE COURT:**  But in some ways doesn't that -- logically

24   speaking, it would seem to me the damages would be greater if

25   we got down to the item level.

1          **MR. SWANSON:**  Maybe in a case that doesn't have price

2     tiers.

3          **THE COURT:**  I don't know about that.  I don't know

4     about that.  All I know is that we would have more consumers,

5     right -- the gateway is the app level.  That's the gateway.

6     And so all they're doing is talking about damages at the

7     gateway.

8          If we go down one level, then what we are talking about is

9     a significantly more -- is significantly more money being spent

10    by consumers who are potentially being harmed.  So all it

11    does -- I mean, it's a nice theoretical argument, and I get it,

12    but all it does, it seems to me, is, if you get past the

13    gateway, is increase damages.  So in a sense -- and I'll --

14    I'll go again and look, but in a sense, it seems to me to be a

15    conservative approach.

16         **MR. SWANSON:**  I mean, I don't think so, again, because

17    if the tears, which operate only at the item level, do

18    constrain developers either from raising or lowering a price,

19    they keep prices stable, then that is going to be a factor that

20    actually reduces damage.

21         And my next point is really a way to get the real-world

22    test on that, which is --

23         **THE COURT:**  Well, let's move to point 2.

24         **MR. SWANSON:**  Yes.  So if his model -- not just a

25    question of price tiers because there are other issues that I

1   get to, but if his model really does incorporate price tiers,

2   if it's an effective -- and his model doesn't.  It's the

3   simulations that purport to.

4        But in any event, if that's right, then his model should

5   make accurate predictions when we actually see the commission

6   decreased, the commission decreased by a very substantial

7   amount, by 50 percent, from 30 down to 15 percent in --

8                  **THE COURT:**  Where is that?

9             **MR. SWANSON:**  That is in Professor Hitt's report in

10  Section 6 and Section 7.

11       So there is the Auto-Renewing Subscription Program that

12  went into effect, I think, in 2016 where developers were given

13  a lower commission rate when their subscriptions renewed, from

14  30 down to 15 percent.

15       There is the Small Business Program where developers who

16  had less than a million dollars in billings got a 15-percent

17  commission.

18       There is also the Video Partner Program where

19  participating video developers got 30 percent down to 15

20  percent for their subscriptions.

21       Those three programs collectively account for about a

22  third of all spending since the App Store opened.  So there is

23  a lot of data out there from which one can test --

24                  **THE COURT:**  And you produced it all to them?

25                  **MR. SWANSON:**  Yes.  Absolutely.

1          **THE COURT:**  All right.  Keep going.

2          **MR. SWANSON:**  They've had it all.

3      Once we did the updated production of data, they had more

4  data, we all had more data about the Small Business Program

5  also.

6          So what we submitted reflects many years of data.  And as

7  I say, it applies to an enormous amount of spending on the App

8  Store.

9      So what --

10         **THE COURT:**  Was this data -- did McFadden ask for this

11  data and was it provided?

12         **MR. SWANSON:**  Yes.  Well, he -- we gave it to him.

13  This is just all the transactional data.  Every single

14  transaction --

15         **THE COURT:**  I'm assuming you gave it to the lawyers.

16  That does not always mean that it makes its way down to an

17  expert.  That's the question I'm asking.

18         **MR. SWANSON:**  Yeah.  I mean, he had all those data --

19  to run his model, he had to have all those data.  But did he

20  ever test his predictions against what happened in the real

21  world?  No.  Not a word in his reports about that.

22      So what Professor Hitt did -- he did two things.  In

23  Section 6 of his latest report, he said, I'll take all those

24  apps that are subject to these programs, and I'll look at the

25  price before and I'll look at the price after, and he did

1    different bands of time, I think going up to six months, maybe

2    a little longer -- a little shorter.

3         And then he did a second set of tests that's in Section 7

4    of his report.  He said, Professor McFadden makes a prediction

5    for these apps that are subject to these programs, so I'm going

6    to take Professor McFadden's model, and I'm going to look at

7    it.  He did it -- he did it including this aggregated average.

8    He looked at it that way, too, as well as by looking at

9    individual IAP predictions, so he did it the way

10   Professor McFadden likes as well as the way he doesn't like,

11   but he looked at the same apps at the same time plugging in the

12   same 15 percent new commission rate and plugging in all the

13   factors that Professor McFadden plugs into his model.

14        So both of those tests came back showing that developers

15   by and large don't drop their prices -- they didn't drop their

16   prices when the commission level dropped substantially.

17   Professor McFadden's model makes an enormous number of false

18   predictions, false positives.  His model, to take an example,

19   says -- looking at subscription apps, his model says --

20   predicts that close to a hundred percent of them should lower

21   their price as a result of these policies that reduce the

22   commission.

23        In reality, the real number was closer to zero than it was

24   to a hundred.  I'm not using the specific numbers because I

25   think we've got protective order issues, but they're in

1    Section -- this is in Section 7 of Professor Hitt's report.

2        The model --

3        **THE COURT:**  Do I have a rebuttal report from McFadden?

4    And what is --

5        **MR. RIFKIN:**  I'm sorry?

6        **THE COURT:**  Do I have a rebuttal report from McFadden

7    on Hitt?

8        **MR. RIFKIN:**  Yes.

9        **THE COURT:**  And where is this addressed in the

10    rebuttal report from McFadden?  I also, again, because I have

11    so many reports from him, I would need a -- I want to make sure

12    I have the right -- and, again, I don't have dates on anything.

13        **MR. RIFKIN:**  Your Honor, if I may, let me see if I can

14    help.  The ECF number is --

15        **THE COURT:**  Which one are you giving me?

16        **MR. RIFKIN:**  So this is the rebuttal report.

17        **THE COURT:**  Okay.

18        **MR. RIFKIN:**  In which he -- in which he addresses

19    Professor Hitt's natural experiments, and it's No. 708-2, is

20    the ECF number.

21        **THE COURT:**  Okay.

22        **MR. RIFKIN:**  And his response to Professor Hitt's

23    natural experiments begin at paragraph 82.  There's a heading

24    there.  It says "B, Hitt's Natural Experiments."

25        **THE COURT:**  Okay.  And Hitt's report -- again, I have

1    your reports.  I don't have ECF numbers on anything.  So what

2    is the ECF number so I make sure I'm looking -- because my

3    notes -- well, I guess I only have one Hitt report.

4            **MR. SWANSON:**  Right.

5            **THE COURT:**  I've got nine expert reports.  I think I

6    only have one Hitt report; is that right?

7            **MR. SWANSON:**  It's 688.

8            **THE COURT:**  Okay.  Section 6 and 7.

9        All right.  So what does McFadden say at 708 on this

10    topic?

11            **MR. RIFKIN:**  So Professor McFadden's observations

12    about Professor Hitt's report and his natural experiments are

13    essentially twofold.

14        One is to point out that this is essentially a

15    disagreement between two experts as to whether

16    Professor McFadden's conclusions are right or wrong.

17            **THE COURT:**  Did he do -- did he do -- does he say

18    whether or not the math behind Hitt's analysis is accurate or

19    not accurate?

20            **MR. RIFKIN:**  He can't opine on the accuracy of it

21    because Professor Hitt -- and I was going to address this --

22    never provided one critical piece of data and that is any

23    validation of the second natural experiment.

24        Professor Hitt conducted two natural experiments.  One of

25    them is what's called a simple before-and-after test.  And in

it, he claimed to look at prices that developers charged before

Apple implemented the two price reductions, the Small Developer

Program and the Auto-Renewal Program, and then prices that

those same developers charged after the implementation of those

programs.

Professor Watson, one of Apple's other experts, says

exactly what we say, which is that the so-called

before-and-after test is simply too simplistic to yield useful

results.  Apple's own expert, Professor Watson, does our job

for us.  He says, You cannot rely on a simple before-and-after

comparison because it doesn't account for a myriad of factors

that might influence a developer's pricing decisions.

So Professor McFadden's agrees completely with Professor

Watson and believes that the simple before-and-after test

that's done is completely useless.

Now, we had some technical debates with Professor Hitt

about the particular dates he used for his before-and-after

studies, but it doesn't really matter because the bottom line

is that the -- that natural experiment is too simplistic to

serve any useful purpose here.

The second natural experiment that Professor Hitt

performed is a so-called difference in differences test where

he has to perform a regression analysis to compare differences

in the way the two groups -- supposedly control group and then

a tested group -- respond to prices in relation to Apple's

announcements of the Small Developer Program and the -- and the
Auto-Renewal Program.

In order for those results, for the difference in
differences analysis to be valid, Professor Hitt was required
by accepted science to perform some validating test on the
results.  And one of those issues that arises that needs to be
validated is whether there is some extraneous impact on either
the control group or the tested group that is skewing results.

And there are any one of a number of tests that can be
performed, one of which Professor Hitt said in his deposition
he relied on or at least he said he used.

Now, the results of that test, which he calls "the
parallel trends test" -- and the purpose of that test is to
make sure that the two groups which are tested so that you can
accurately measure the difference in differences in the
responses between the two groups -- whether they are valid and
have otherwise parallel trends in them or there is something
about the groups that's skewing your result.

And Professor Hitt said in his deposition that he did that
test, but he admitted that he has never discussed that test in
his report, he never addressed it, he never disclosed that he
did it, and he never produced a single piece of data on the
only verification test he claims to have run.

THE COURT:  Why is that?  Is he accurate, that, one,
Hitt said that and --

1          **MR. SWANSON:**  Hitt ran --

2          **THE COURT:**  Go ahead.

3          **MR. SWANSON:**  Hitt ran 50-plus regressions to show

4     that he had control groups for his before-and-after tests.

5     We're just talking about the before-and-after tests.  I can't

6     wait until we hear about the false positives, which

7     Professor McFadden doesn't address.

8          But Professor Hitt did run over 50 regressions.  He used

9     multiple control groups.

10          **THE COURT:**  Okay.  So I want to make sure that we're

11     talking about the same thing.

12          **MR. SWANSON:**  Yeah.  The only thing --

13          **THE COURT:**  That there is the two natural experiments,

14     which is the way Mr. Rifkin described them.

15          **MR. SWANSON:**  There are -- there are two experiments,

16     two tests.  One is before-and-after --

17          **THE COURT:**  Right.

18          **MR. SWANSON:**  -- which was --

19          **THE COURT:**  So now we're talking -- let's --

20          **MR. SWANSON:**  Before-and-after is -- but what he calls

21     two things are both about the before-and-after, and then there

22     is the comparing McFadden's own predictions against what

23     happened to the exact same apps.

24          **THE COURT:**  So I want to make sure that we're all

25     talking -- I was going to apples and apples, but let's -- the

1    so-called difference and differences test.

2              MR. RIFKIN:  "Difference in," I-N.  Difference in

3    differences where the analysis compares the difference between

4    the price reactions of two different groups.

5              THE COURT:  So we are going to call that Experiment

6    No. 2.

7              MR. RIFKIN:  Right.

8              THE COURT:  And in Experiment No. 2, I am being told

9    by Mr. Rifkin that Professor Hitt said he relied on a

10   validation test, but in his deposition, he admitted that he

11   never produced it, he never discussed it in his report, none of

12   that happened.

13        First of all, is that an accurate representation of what

14   Professor Hitt said?

15             MR. SWANSON:  No.  What -- what -- again, these two

16   things that he's calling "two things" are all about the same

17   thing, they're about the before-and-after.  So to make sure --

18   and Professor Watson didn't say what Mr. Rifkin said.  You can

19   look at the deposition.

20        But, yes to look at a before-and-after test, you need to

21   make sure that you've got the right control group.  That's why

22   Professor Hitt ran 50 regressions of these difference in

23   differences to make sure that that before-and-after wasn't the

24   result of some confounding factor.  And so he turned all of

25   those over.

1          Now, what they're saying is, Oh, there's another test

2     called "parallel trends" that can be run as well.  And Hitt

3     said, Yeah, I ran that, too, in the deposition.  I wasn't

4     relying on it.  And so we're happy -- we'll turn it over.  If

5     they want it, we'll do it in the reply brief.  They can look at

6     it to their heart's content.

7          Professor McFadden could run it.  He didn't say anything

8     about what the results were in his declaration because the

9     parallel trends are there.  It's reflected in the 50-plus

10    difference in difference regressions.  So that's all about the

11    before-and-after.

12         But what about the false positives with

13    Professor McFadden's own model?

14              MR. RIFKIN:  Your Honor, would you like me to respond

15    now and address some of the Court's questions and then try to

16    respond to Mr. Swanson's challenge?

17              THE COURT:  Well, I will probably need -- to make sure

18    that I am following you all, I may need to have kind of a clear

19    articulation from the plaintiff in terms of the identification

20    of the experts, the notion that in deposition, you know --

21    deposition transcript -- unless you already have it for me in

22    all of this paper where you say that he doesn't do something.

23         So I just don't have cites for what it is that you're

24    saying to me.

25              MR. RIFKIN:  I'm happy to provide them right now.

1          **THE COURT:**  Go ahead.

2          **MR. RIFKIN:**  Okay.  So first with respect to Professor

3     Watson's testimony, it is -- what's the -- what's the document

4     number?

5          It's ECF No. 701-9.  And regarding his statement that the

6     before-and-after test, what he says is an economist couldn't

7     just look at before and after because some other uncontrolled

8     factor might cause changes, and the specific example was

9     minimum wage employment increase.  But he goes on to discuss

10    the fact that before-and-after tests are statistically invalid.

11         And then he raises the difference in differences analysis

12    as one way to address the question of the inadequacy of the

13    before-and-after test.

14         And so now I can give you the cite to Professor Hitt's

15    deposition testimony, and that is ECF No. 701-6, and this is --

16    this is where Professor Hitt told us about the tests he

17    performed.

18         He claims to have done a number of validation tests.  He

19    admits that he doesn't provide any results in his report, and

20    he admits that he didn't provide any of these results in his

21    work papers.  And that begins on page 114 of 701-6.

22         And in particular with regard to the only result he claims

23    to have relied on, the parallel trends analysis, he says,

24    "Yes."  And now I'm reading from page 7 -- 116 of

25    Exhibit 701-6.  "Yes.  In the process of preparing this, we did

1    look at parallel trends."

2         And then he refers to something called "time-fixed

3    effects," and then he says, "So a lot of that would wash out."

4    This is his testimony.

5         And I asked him, "Do you present the results of any

6    parallel trends analysis in your report," and he says, "No, I

7    don't think we put those in the report, but it was something we

8    did along the way."  And I say to him, "Is it in your work

9    papers?"  And he says, "I don't believe so.  I don't believe

10   that we put it anywhere here because I don't think a

11   reference -- I don't think I referenced that in the report,

12   but, yeah, that's a normal thing" -- and unfortunately the

13   transcript has a typographical error.  He says, "That's a

14   normal thing to do along the way, and we did that."

15        **THE COURT:**  Did McFadden test his model against real

16   data in any way, shape, or form?

17        **MR. RIFKIN:**  McFadden did not because he doesn't

18   believe it's either necessary or appropriate to do so.  And the

19   simple reason for that is Professor Hitt conducts his natural

20   experiments in the real world, and Professor McFadden is

21   modeling results in the but-for world.  And Professor Hitt

22   admitted that in the real world, he did nothing to eliminate

23   the confounding effects of Apple's rigid price trends -- price

24   tiers -- I'm sorry -- price tiers on the ability of developers

25   to respond to a change in the commission from 30 percent to 15

1    percent.

2        **THE COURT:**  Is there any case law that either of you

3    are aware of which suggests that when we have new, kind of,

4    cutting edge economic theories, that experts should be or are

5    required to test but-for models with real world data?

6        **MR. SWANSON:**  There is a case before the Ninth Circuit

7    right now.  That's Judge Donato's certification of a class in

8    the Google Play class action, and these very issues -- the same

9    evidence is in the Google Play case.

10        **THE COURT:**  But he certified the class.

11        **MR. SWANSON:**  He did certify it.  The Ninth Circuit

12    took it on a 23(f).  It's being briefed right now.

13      Focal point pricing and the fact that -- same thing

14    happened with Google Play.  When they also reduced commissions,

15    prices didn't drop.  And they had -- and that's a focal point

16    pricing, not -- that's a focal point pricing issue, which would

17    be in the but-for world.  So Ninth Circuit is going to confront

18    that.

19        **THE COURT:**  Okay.  Any other one that you're aware of?

20    No?

21        **MR. RIFKIN:**  (Mr. Rifkin shakes head.)

22        **MR. SWANSON:**  No.

23        **MR. RIFKIN:**  Not that I'm aware of.

24        **THE COURT:**  I just wanted to make sure, Mr. Rifkin,

25    that your "no" was on the record since --

1        **MR. RIFKIN:**  No.  Not that we're aware of, Your Honor.

2        **THE COURT:**  She won't take down the nod of your head.

3    Let's go on.  Then I think the third issue that was raised

4    are price tiers.

5        **MR. SWANSON:**  Well, could I just make one last point

6    on the prior one because I think it's important because all

7    this statistical mumbo jumbo -- I will confess, I didn't do

8    great in econometrics, but it can be --

9        **THE COURT:**  Well, but have you been doing this for a

10   long time so that's no excuse at this point.

11       **MR. SWANSON:**  I know a lot of econometricians.  And

12   Professor McFadden is -- I know.  But it can be boiled down to

13   a very simple logical proposition, and that goes to the false

14   positives.

15   If there is some confounding factor that could explain why

16   prices didn't drop when the commission dropped, it should be in

17   Professor McFadden's model.  If it's not in his model, it's not

18   reliable.  If it is in his model, then his model shouldn't be

19   generating false positives.

20   And, in any event, he should be testing that, and he never

21   did.  And there's a good reason for that because it fails the

22   test.  It fails one of the most critical tests for a *Daubert*,

23   which is can the model be falsified.  Yes, it can, and this one

24   was.

25   So thank you for letting me --

 1              **THE COURT:**  So let's deal with that, false positives.

 2          **MR. RIFKIN:**  Yes.  Well, false positives is the

 3     ultimate conclusion of the rightness or wrongness of

 4     Professor McFadden's conclusions, and we've already discussed

 5     why we think Professor Hitt's natural experiments are

 6     unreliable to demonstrate false positives at all, period, plain

 7     and simple.

 8          But the most important defect is the one that Mr. Swanson

 9     just mentioned, and that's --

10              **THE COURT:**  The most important defect of --

11          **MR. RIFKIN:**  In Professor Hitt's --

12              **THE COURT:**  No.  I want to focus first on McFadden's

13     because you have the burden.

14          **MR. RIFKIN:**  Yes.

15              **THE COURT:**  All right.  So what about the false

16     positives that are being generated by his model?

17          **MR. RIFKIN:**  Well, Professor McFadden doesn't agree

18     that there are any false positives generated by the model.  You

19     asked us in the --

20              **THE COURT:**  I thought we were still looking at some

21     percentage because at some point, we're going to get to

22     *de minimis*, whether or not it's *de minimis*.

23          **MR. RIFKIN:**  Your Honor, if I can step back for just a

24     moment.

25          In the original class certification decision, you asked us

1    to set out the confidence interval for the Court.  We did.

2    Professor McFadden says in his report -- and I believe it's

3    paragraph 60 -- that he's expressing his opinion to a

4    95-percent degree of certainty.  He does not believe that there

5    are any false positives generated by his report at all and by

6    his econometric modeling.

7        He rejects the notion that Professor Hitt's natural

8    experiments demonstrate false positives because he believes

9    that Professor Hitt has not explained what confounding factors

10   have influenced his natural experiments, nor has Professor Hitt

11   or any of Apple's seven other experts identified any

12   confounding factors which they believe are skewing

13   Professor McFadden's conclusion.

14       I've identified one important one that's obviously skewing

15   Professor Hitt's natural experiment, and that is the -- the

16   rigid price tiers that Apple imposes that constrain the ability

17   of developers to respond to certain price -- certain commission

18   changes.  But Professor McFadden does not believe his model

19   demonstrates any false positives.

20       We are going to talk about --

21       **THE COURT:**  I think I had asked you to run it against

22   the named plaintiffs.  Was that done?

23       **MR. RIFKIN:**  I don't believe Your Honor did ask that.

24   Am I correct?

25       Your Honor, I don't believe --

1          **THE COURT:**  Did you run it against the named

2     plaintiffs?

3          **MR. RIFKIN:**  It has been run against the individual

4     accounts of all the class members, the named plaintiffs

5     included.

6          **THE COURT:**  And was it successful in 95 percent of

7     the -- 95 percent of the time?

8          **MR. RIFKIN:**  It's successful to a 95-percent

9     certainty.

10         **THE COURT:**  I want to know with respect to real

11    people --

12         **MR. RIFKIN:**  Yes.

13         **THE COURT:**  -- and real accounts --

14         **MR. RIFKIN:**  Yes.

15         **THE COURT:**  -- was the model run against the accounts

16    of the named plaintiffs --

17         **MR. RIFKIN:**  Yes.

18         **THE COURT:**  -- and did it accurately predict with

19    respect to their accounts?

20         **MR. RIFKIN:**  Well, it predicts effects that take place

21    in a world that doesn't exist, so there is no way to know for

22    certainty whether it's accurate or not.  We don't -- we don't

23    have the ability to say, Well, now Apple has reduced its

24    commission to what Professor -- to what Dr. Abrantes-Metz says

25    it should do because Apple never has, and we don't know what

1   the effect of that would be in a competitive world where there

2   is a competitor of Apple offering a similar service at a

3   different price.  We just don't know that because it's the

4   but-for world.

5       These are all -- by their nature, they are hypothetical

6   simulations of what is likely to happen.  And

7   Professor McFadden has expressed his opinion to a 95-percent

8   confidence level.  That's all he can do because he doesn't have

9   the ability to change the real world and make it into the

10  but-for world.

11      Professor Hitt's natural experiments took place in the

12  as-is world, and Professor Hitt is saying that that is what the

13  but-for world would look like but doesn't give us any reason

14  why we should believe Professor Hitt any more than we believe

15  Professor McFadden.

16          **THE COURT:**  All right.  Let's move on.

17          **MR. SWANSON:**  All right.  Well, we've offered one --

18  already one factor that would explain why the commission

19  reductions which actually happened in the real world -- that's

20  the only place you can test things -- didn't result in lower

21  prices --

22          **THE COURT:**  That's why there is so many economists'

23  jokes out there about solving problems in the but-for world;

24  right?  The three people on the island just believe there's a

25  boat.

1          **MR. SWANSON:**  Just assume.  Just assume.

2          **MR. RIFKIN:**  Assume there's a boat.

3          **MR. SWANSON:**  That's the usual punch line.

4      But here we're going to assume that the model can't be

5  falsified, which is not about *Daubert*.  It has to be

6  falsifiable or it's not a scientific model.

7      So what is it that's creating these false positives?

8  Well, I have already talked about one thing.  His model doesn't

9  take account of the constraining effect of price tiers or focal

10  pricing.

11      Another thing is the way his model treats costs, which is

12  driven by a set of assumptions which are not substantiated, not

13  tested, and a set of constraints which are based on almost no

14  data at all, certainly not representative data.  And that will

15  take us ultimately to this confidence level issue, but that's

16  my fourth point.

17      So there is violent agreement -- maybe the only thing in

18  this case that we can agree on -- it's a matter of economics

19  that if marginal costs are zero, then the commission won't

20  affect the price.  There will be no injury.  There will be no

21  damage.  If the marginal cost of an app transaction is zero,

22  then there will be no damage.  Professor McFadden agrees with

23  that.  Plaintiffs don't take issue with it.

24      And if there is any academic consensus about the

25  particular part of the world we're talking about, which is the

1    digital world, it is that in the digital world where products

2    are made out of electrons, marginal costs are negligible or

3    zero.  That is not something that Professor Prince or

4    Professor Hitt made up.  That is a proposition that has wide

5    acceptance.  It had wide acceptance in the Microsoft case

6    decades ago.  The D.C. Circuit said, and I quote, "The cost of

7    producing software are almost exclusively in its design, and

8    therefore marginal production costs are virtually zero."

9        Virtual currencies are a great example of that.  Tim

10   Sweeney testified in this courtroom that the marginal costs of

11   V-Bucks is zero.  Dr. Evans agreed.  Every economist for the

12   developer plaintiffs in their class action now settled said

13   that marginal costs are basically zero.  Those are the

14   developers.  They know.

15       But in Professor McFadden's model, virtual currencies --

16       **THE COURT:**  Let me, before you go there -- as an

17   academic proposition, do all your experts agree, as

18   Mr. Swanson's arguing, that if marginal cost is zero, damage is

19   zero?  Do they agree?  As an academic matter, if I put them on

20   the stand, would they say, Well, yes, of course?

21       **MR. RIFKIN:**  Yes, with one caveat, and I'll address

22   this more fully when I get a chance to speak, but it has -- it

23   has to do with where those marginal costs are calculated.  It's

24   the difference between calculating them at the app level, which

25   you know we've had quite a bit of extensive discussion about

1    where Professor McFadden believes it's appropriate to calculate

2    them, or at the item level, which is where the defendant and

3    its experts insist on calculating them.

4         **THE COURT:**  All right.  And so -- and that kind of

5    distinction I understand, but the basic --

6         **MR. RIFKIN:**  Yes.

7         **THE COURT:**  -- but the basic premise people agree on.

8         **MR. RIFKIN:**  Yes.

9         **THE COURT:**  All right.

10        Keep going, Mr. Swanson.

11        **MR. SWANSON:**  Okay.  So I've said that his assumptions

12   drive a lot of the results, so one of my -- what am I saying

13   there?

14        What Professor McFadden does in setting up is model, to

15   set up his model he needs to set like a mathematical equation

16   that then he fits the data to.  So that equation is rigid.  It

17   says, The data have to behave like I say they behave.  And what

18   he does is very important from this marginal cost perspective.

19   He says that, "There is only one price point where marginal

20   costs can be zero."  So I'll just pick out an example.  It may

21   be close to one of the illustrations, but say a dollar

22   sixty-four.  If an app at the app level is priced at a dollar

23   sixty-four, that's the only time marginal cost is going to be

24   zero.  Anything above that will have a positive marginal cost.

25   It will keep getting higher, the higher up you go on that line.

1          Interestingly, he said below that point, marginal costs
2     will be negative, which is absurd, but he does have lots of
3     negative marginal costs in his model.

4          But he has zero.  Once he runs the model, nothing ever
5     hits that price point.  He's got zero instances of marginal
6     costs at zero.  He has got very, very few instances where it's
7     small, and a whole lot of instances where it is big.

8          What's the point of that?  Big marginal costs are what
9     drive damages in this model.  And he has created that by an
10    assumption, not by an actual evaluation of what developers'
11    marginal costs are.

12         In his aggregation, you know, what Mr. Rifkin calls the
13    averaging, adding all of these different individual items
14    in-app together, that also pushes the price up which by dint of
15    his assumptions pushes the marginal cost up which pushes
16    damages up.  These are all assumptions.  And it bears emphasis
17    that Professor McFadden didn't test them against real-world
18    data.

19         When I asked him in his deposition if he had done any
20    analysis, any testing to confirm whether the marginal cost that
21    is his model generates are actually correct and accurate,
22    Professor McFadden's answer was, quote, The answer is no.

23              **THE COURT:**  Well, again, did that -- do you know of
24    experts in these kinds of circumstance -- are they required to
25    do it?  Back to the *Google* case, which I have not looked at my

1    colleague's decision nor any of the expert reports.  Was it

2    done there?

3         **MR. SWANSON:**  The issue was raised.  Judge Donato's

4    reaction -- I mean, part of this is just reading the

5    transcript.  Judge Donato's reaction was, Well, nothing is

6    zero.  That's he was said.  And, you know, we're not saying

7    every app has to be zero.  Certainly not saying that at all.

8         We're saying that there is no reason why you can reject

9    the proposition that a lot of them will be at zero --

10        **THE COURT:**  My question is a little bit different,

11   which is, again, given the kinds of issues that we are dealing

12   with in this particular case -- and Google is probably the

13   closest analogy where class certification was granted -- did

14   the experts on the plaintiffs' side -- did they test these

15   kinds of assumptions for marginal cost against real-world

16   circumstances?

17        **MR. SWANSON:**  I mean, I -- I think it has been done

18   before.  I mean --

19        **THE COURT:**  Was it done there where class cert was

20   granted?

21        **MR. SWANSON:**  I'm thinking of predatory pricing cases

22   where marginal cost is the critical issue, and there have been

23   a lot of those.  I've been through a number of trial of those.

24        Yes, the experts look at the costs.  We've had more than a

25   hundred subpoenas of developers in this case to get their cost

1    data.  Professor McFadden looked at the six that we'll talk

2    about because I'll talk next about the margin constraints.

3    Last time I deposed him, asked him have you looked at any of

4    the other developer cost data.  He said no.  He doesn't look at

5    data.  He doesn't compare his assumptions to the real world.

6    That's what -- that is what *Daubert* is supposed to be about.

7        And so I think, yes, he -- he should -- if he's going to

8    make an assumption that has such momentous consequences -- I

9    mean, for example, he should look, you know, if item prices

10   move together.  That -- you know, he's got this percentage

11   method.  Shouldn't item prices move together if this

12   aggregation makes any sense?  They don't.  Professor Hitt

13   looked at it, they don't move together.  They move often in

14   opposite directions.

15       So the empirical testing is important, and that's what

16   Professor Hitt has done, that's what Professor Prince has done.

17   That was not a *Daubert* issue, but in *Olean*, you know, I mean,

18   there was a whole back and forth.  The expert -- the defense

19   expert said, Here is the problem.  Plaintiffs expert said,

20   Yeah, okay, I looked at that.  Here's my response.  Here's how

21   I tested that.

22           **THE COURT:**  And in *Olean*, was the -- were the

23   plaintiffs' experts testing only in the but-for world or did

24   they also test in the real world?

25           **MR. SWANSON:**  I mean, I don't even understand that.

1    Every case -- every damage case is about the but-for world, so

2    we now have an immunity from testing --

3              THE COURT:  That's why I'm asking the question,

4    Mr. Swanson.   That's why I'm asking the question.

5              MR. SWANSON:  Yeah.  I don't -- what -- I don't

6    understand it because all you can do is look at the real world.

7    If you have --

8              THE COURT:  So did it happen in *Olean*, was my

9    question?

10             MR. SWANSON:  Oh, I mean, I think no one even -- no

11   one raised that argument because it was all about what the data

12   in the real world showed.

13             THE COURT:  That was a real world case.

14             MR. SWANSON:  Yes.  So is this.

15             THE COURT:  Well, I -- I --

16             MR. SWANSON:  I mean, there are --

17             THE COURT:  Look, the reason that I'm asking these

18   questions is because the rules in these kinds of cases are not

19   set.

20             MR. SWANSON:  Right.  I understand.

21             THE COURT:  And I'm trying to understand the extent to

22   which the industry is in fact engaging on these issues in a way

23   that's either consistent with the plaintiffs or whether

24   everyone else is doing both, that is, having the but-for

25   analysis and doing the -- the natural world -- you know, you

1    could say that -- a lodestar check or something, you know,

2    real-world check against what it is they're trying to do.

3        That's the question that I'm asking.  I'm trying to

4    understand what is going on in the antitrust cases generally.

5        **MR. SWANSON:**  Absolutely.  I mean, so-called natural

6    experiments.  And experiments where you can falsify an

7    econometric model are the gold, you know -- the gold standard

8    if you can do it, if you have the data.

9        And so, yes, I mean, I think that by -- I don't doubt that

10   was done in *Olean*.  You know, the regression was run in

11   different ways, the plaintiffs' regression.

12       He is talking about the but-for world as though it's the

13   nether region that we can't reach.  We have a --

14       **THE COURT:**  I mean, the damages here are estimated to

15   be $10 billion; right?

16       **MR. SWANSON:**  Right.

17       **THE COURT:**  $10 billion is a lot of money.  It would

18   seem to me that we could have some, you know, analysis, if

19   we're talking about that kind of thing, to understand how these

20   kinds of cases where that much money is at stake should be

21   litigated.  And I don't understand, given that we are talking

22   about $10 billion, why Professor McFadden would not look at

23   real data as a check on his theory.

24       **MR. RIFKIN:**  Are you asking that rhetorically or do

25   you want --

1        **THE COURT:**  I am.

2        **MR. RIFKIN:**  All right.  So Professor McFadden

3  constructed his model from real-world data.  It's an argument

4  that Apple has made, but it's not true.  He constructs his

5  model from real-world data.

6        The answer to the question why he didn't perform this

7  so-called natural experiments validation test is that it's

8  simply not required nor is it routinely done.  Apple has not

9  suggested that it is --

10        **THE COURT:**  Okay.  So here's the thing, again.

11        So you're saying that it's not required, and that -- and

12  by that I mean that no circuit court has ever required it so

13  okay, and you don't disagree with that.

14        **MR. SWANSON:**  I mean, I haven't looked at it.  I'm

15  sure.  *Daubert* is all about falsifying tests, so I think there

16  are a thousand cases that involve falsification of a model's

17  predictions in the real world.

18        **THE COURT:**  Okay.  So --

19        **MR. SWANSON:**  The *Daubert* factor.

20        **THE COURT:**  -- not routinely done.  So what is --

21        **MR. RIFKIN:**  Your Honor, if I can answer the questions

22  that you asked of Mr. Swanson which he didn't answer, I would

23  like to tell you now that it was not done in *Olean* and was not

24  done in *Google*.  It couldn't be done in *Google* because

25  Professor Fisher in that case constructs his damages model at

1    the market level, macroeconomically, and so there was no basis

2    on which you could do that testing.

3        But the simple answer is no, it wasn't --

4        **THE COURT:**  What was the class?  How is the class

5    defined in *Google*?

6        **MR. RIFKIN:**  In the *Google* case, it was all those

7    people who purchased apps or made IAP on the Google Play Store.

8    It's a similar construct to what we have here.

9        **THE COURT:**  All right.  Go ahead.

10        **MR. RIFKIN:**  But the model -- and if we want to talk

11    about *Google*, I'm happy to explain it in a little bit more

12    detail, but essentially the difference is that Professor Fisher

13    in the *Google* case constructed his model at the -- at the level

14    of the Google Play Store as a simple unified economic entity.

15    And Professor McFadden constructs his model with far more

16    granularity at the app level, which is why Professor McFadden's

17    model is able to identify individual damages for each and every

18    account.

19        One of the issues that's being litigated in the Ninth

20    Circuit right now is that Professor Fisher's model does not

21    allow that because it's constructed at the app level, and they

22    say in their --

23        **THE COURT:**  Are they only asking for injunctive

24    relief?

25        **MR. RIFKIN:**  No.  There are -- there are monetary

1   damages claims and injunctive relief claims, but what Google

2   says in its appeal is one of the weaknesses of Professor

3   Fisher's model -- I express no opinion on it, but I'm repeating

4   Google's argument.

5       Google says that one of the weaknesses in

6   Professor Fisher's argument, unlike Professor McFadden's model

7   in the *Apple* case, is that you cannot use Professor Fisher's

8   model to identify which accounts have been harmed and which

9   accounts have not been harmed.  That's an issue that I thought

10  Your Honor was asking a question about a few moments ago when

11  you were talking to me about the number of unharmed accounts.

12      Professor McFadden's model is going to identify all of

13  them.  For the data he has run, he has already identified all

14  of the unharmed accounts and all of the harmed accounts.

15  Professor Fisher's model, because it's constructed

16  macroeconomically, not microeconomically, cannot do that, and

17  for that reason could not do the kind of testing that we're

18  talking about now.

19      In *Olean*, although the model was constructed more like

20  Professor McFadden's model than Professor Fisher's model, the

21  answer to Your Honor's question was the test was not done and

22  there was no issue made about it.  And the test was not done

23  because not only is there no case that says it must be, but

24  more importantly for the experts, there is no academic

25  literature that says it must be.

1    None of Apple's expert has identified a single

2  authoritative text that says you must validate your results

3  from your regression analysis by running a simulation against

4  as-is data.  It simply is not in the academic literature.

5          **THE COURT:**  Okay.

6          **MR. RIFKIN:**  Okay.

7    And that's -- the same thing is true of any computation

8  that takes place at the -- at the individual account basis,

9  including this question of marginal costs, which I don't want

10 to interfere with Mr. Swanson's discussion, but I'll explain

11 shortly why marginal costs were not an issue in the *Google* case

12 either.

13         **THE COURT:**  Go ahead.

14         **MR. RIFKIN:**  Okay.  So the whole business about

15 marginal costs is, to a great extent, a dispute again, an

16 ongoing dispute about whether apps should be modeled at the app

17 level or at the individual item level.

18    When Apple and its experts say that some apps have zero

19 marginal cost or some IAP has zero marginal cost, what they

20 mean is that some items of IAP have zero marginal cost, and

21 the -- and the example they give almost all the time is the

22 cost of minting virtual currency.  And by that, what they're

23 talking about is the cost of issuing an item of virtual

24 currency, whether it's V-Bucks or something else, it's an item

25 of virtual currency.

1      We have already explained -- and I think Your Honor

2  understands it so I won't belabor the point -- why

3  Professor McFadden strongly believes pricing items at the

4  item -- pricing -- modeling price reactions at the item level

5  is the wrong level to do this at.

6      And so when we talk about zero marginal costs, what

7  Apple's experts mean is that some IAP has zero marginal cost at

8  the item level, but they don't debate and they don't dispute

9  and they don't deny that at the -- at the app level, there are

10  marginal costs.

11      So, for example, if we were to look at an app that sells

12  V-Bucks, for example, they don't dispute that if -- if more

13  products are generated that provide for V-Bucks or that V-Bucks

14  are bought by more consumers and more users, that there is a

15  scale issue, and they don't dispute that at the app level where

16  Professor McFadden constructs his model, those scale issues

17  translate into marginal costs.  There is no way they can

18  dispute it because in fact it happens.

19      So instead, they turn the tables and say, We need to look

20  at the individual item level.

21      I'm not going to say anything more about it.

22          **THE COURT:**  We don't need to.

23          **MR. RIFKIN:**  Okay.

24      Now, in addition to that, it is a fallacy that Apple

25  repeats constantly that Professor McFadden did not have

real-world data on which to model marginal costs.  The irony is

that the experts agree that most times when an econometric

analysis like this is done, the economists do not have any

real-world marginal cost data.

Here, when Professor McFadden submitted his most recent

report, he had real-world marginal cost data from a small

number of developers.  And Your Honor addressed this in the

original class certification decision where Your Honor said you

understood that for purposes of class certification, he relied

only on marginal cost data from six developers.  And Your Honor

said in a footnote in the opinion that you thought that that

was not a class certification issue but would expect that

before trial, more fulsome data would be used.  And I'm looking

for the footnote.  I believe it is Footnote 10 --

**THE COURT:**  When I say things like that, I'm just

making work for myself because then it ensures that I get a

motion for decertification.  But go ahead.  I hear what you're

saying.

**MR. RIFKIN:**  It is Footnote 8, Your Honor, on page 10.

"The Court notes that the data is not fulsome.  While it

appears that Professor McFadden analyzed the financial records

of six developers, the Court would expect a more fulsome

analysis or reliance on an industry expert for purposes of

trial."

This is a rehash of the same argument we heard before

1    dressed in slightly different clothes.  Okay?

2              **THE COURT:**  I understand.

3              **MR. RIFKIN:**  And since -- since the time -- just to

4    complete the picture -- since the time that Professor McFadden

5    prepared his most recent report, as Your Honor is aware, we

6    have been, and I think Mr. Swanson referred to it -- we have

7    been subpoenaing cost data from more and more and more

8    developers.  And we collect more and more data.  And Professor

9    McFadden will incorporate that data into the final analysis

10   that he runs before trial begins.  But we can only run the

11   model on the data we have, which admittedly is more robust than

12   the data that economists usually have in most cases.

13        And so when Professor McFadden constructed his econometric

14   model, he used the real-world data he had for the three genres

15   that he studied -- Games, Music and Entertainment -- and he

16   imposed what are called "margin bounds" on the diffuse data.

17   It's a recognized technique.  Nobody says it runs afoul of any

18   accepted authoritative literature.  They disagree about how it

19   was implemented, but mostly they disagree about when it was

20   implemented.

21        Apple's experts say, or at least some of them do --

22   Apple's experts say that Professor McFadden used the data he

23   had to construct the model, and then when he was unhappy with

24   the results he obtained, he re-ran the model imposing margin

25   bounds on -- on the -- on the marginal cost data that he had.

1        But that's not what happened, and two of Apple's experts

2   admitted as much.  And so what actually happened, according to

3   Professor Hitt and, I believe, Professor Watson, is that

4   Professor McFadden imposed the margin bounds first before he

5   ran the econometric modeling.  And they quibble about whether

6   the margin bounds were appropriately set or not, but whether

7   they were supposed to be set at 60 to 90 percent or 64 to 92

8   percent or some other level, these are matters that are mere

9   differences of opinion between experts that go to the weight of

10  the expert's opinion, not its admissibility.  And whether

11  Professor McFadden ultimately uses the same margin bounds in

12  his final analysis once we've received all the data from Apple

13  and all the data from the additional developers, whom we

14  continue to receive data from -- once he does that before

15  trial, it may be that the margin bounds are the same that he's

16  already constructed.  It may be that they're different margin

17  bounds, but they will be tethered to the data that is collected

18  in the real world; not what Apple says, but data that

19  Professor McFadden has available to him from the real world.

20        **THE COURT:**  All right.  Last topic, and then we'll

21  take a short break.

22        **MR. RIFKIN:**  Okay.

23        **THE COURT:**  Your last topic is the switcher problem.

24        **MR. SWANSON:**  And that requires some discussion of

25  this margin-bounds issue.  And if I could say one thing about

marginal cost?

   **THE COURT:**  Quickly.  And by "quickly," I don't mean speak faster.

   **MR. SWANSON:**  I'm sorry?

   **THE COURT:**  Be efficient, Mr. Swanson.

   **MR. SWANSON:**  Yeah.  Okay.

 Marginal costs -- we don't agree with the things he said.  We agree with marginal costs has the same definition it had in the *Microsoft* case.  It has the same definition Professor McFadden gave it.  It's the cost of one more unit of output.  That's hitting the "buy" button.  If the individual items have zero marginal cost, when you add them up --

   **THE COURT:**  We've had this discussion before.  Move on.

   **MS. HIGNEY:**  I'm done with that.

 Margin constraints, these are the things that he imposes based on the six developers.  That's not a sample.  That's not a scientific sample.  Yes, they've had a lot more data.  Professor Hitt looked at it.  He discussed it in his report.  He said it's not going to rescue these margin bounds.

 Professor McFadden, when I deposed him, years after he first chose these six developers, he said, "I haven't looked at anything more."  So we have no idea what, again, more data will show.

 We know Professor Watson has looked at what was done here.

1  What Professor McFadden said was, "Well, you know, I used

2  billions of data points to estimate my model, and then I make

3  it even more accurate by adding these margin constraints."  So

4  it makes it sound like the margin constraints aren't that

5  important; they just make it more accurate.

6      What Professor Watson did was say, "Well, what happens to

7  the model if you don't have the margin constraints?"  And the

8  model spits out nonsense results.  Those billions of data

9  points -- they run 75 samples, they average them together.

10  Those billions of data points, when you run it through the 75

11  samples, say crazy things like "demand curve slope upward,"

12  "the model predicts that" -- or "the regressions predict that

13  consumers would like higher prices, not lower prices."  That is

14  crazy.  That's nonsense.

15      Those samples vary from each other sometimes by a factor

16  of a trillion with a "T."  So the results of the underlying

17  regressions are not good.  And Professor Watson explains

18  statistically what the problems are that make them very

19  unreliable.

20      So the margin constraints are critical because the margin

21  constraints actually substitute for the data.  Instead of

22  getting results that are dictated by billions of data points,

23  you end up getting results that are dictated by six

24  unrepresented developers out of hundreds of thousands, and

25  that's not a proper sample.  That's taking his work from where

1   he claims he uses an enormous sample of accounts to basically

2   basing his results on what he interprets, and even there, it's

3   unclear how he comes from those numbers to his margin bounds

4   from what he interprets from just six unrepresentative

5   developers.  By the way, Epic is one of them.

6       And so what are these margin constraints?  They control --

7   once again, they control what marginal cost can be in his

8   model.  The margin constraints for Games say that on average,

9   marginal cost has to be 10 to 40 percent of price.  That's his

10  constraint.  So that's not near zero.  That's not small.

11  That's not negligible.  That's not what all the academics say

12  about marginal cost in the digital world.  He constrains the

13  average to be from 10 to 40 percent.

14      Professor Watson shows if you move those constraints

15  around just by a little bit, the whole model goes crazy.  The

16  damages change.  They shift by billions of dollars.  The number

17  of uninjured move up substantially.  And that goes to the

18  reliability of the model.  He still has a switcher problem.  He

19  has a switcher problem because he's got an unrepresentative

20  sample from which he draws the margin constraints which control

21  the results which will change massively, will flip millions,

22  tens of millions of accounts from one status to the other

23  depending on how the margin constraints change.

24      And we have no idea, yes, that's right.  But we're

25  supposedly supposed to wait for trial to see if this is a

1  reliable model.  Now is the time.  They have the burden.  And

2  Professor McFadden hasn't bothered to look at anything more

3  than data from six developers.

4  　　　There are --

5  　　　　　　THE COURT:  Okay.  Response.

6  　　　　　　MR. RIFKIN:  Yes, Your Honor.  A couple of responses.

7  　　　First on the question of switchers, which is what I

8  thought we were addressing, Apple's original argument, if you

9  will recall, had been that if you -- if you drew 25 random .1

10  percent samples from the full database, that some accounts

11  would appear in more than one of those samples.  And that

12  because those samples all generated ever so slightly different

13  coefficients from the regression, because the populations were

14  not identical, some accounts that appeared in more than one

15  sample would switch from being ever so slightly harmed under

16  one regression to ever so slightly unharmed in another

17  regression.

18  　　　Everybody agrees that the effect of switching from harm to

19  unharmed accounts is simply the manifestation of where within

20  the confidence interval those particular results fall.  Nobody

21  has suggested that they fall outside the 95-percent confidence

22  interval.  And, in fact, Apple's experts all conceded that the

23  accounts that switched were accounts where there was varying

24  little commerce conducted on the App Store.

25  　　　To correct that problem, as the Court asked

1   Professor McFadden to do, Professor McFadden, instead of

2   drawing a single .1 percent sample -- which, by the way, the

3   Court said in the original class certification decision was

4   appropriate, the appropriate sample size -- Professor McFadden

5   ran 75 separate regressions using 75 independent 0.1 percent

6   samples, returning the samples, you know, the accounts to the

7   pool of accounts in each instance so that there was no

8   elimination of any accounts in any of the samples, and he had

9   75 regression results.

10      He then averaged the 75 regression coefficients to derive

11  a single model with average coefficients that were produced

12  from 75 samples.  So there now is only one model.  And with

13  only one model, there can't be any switching.

14      Apple's experts at one point said that it would have been

15  better to run a single regression using a sample of 7.5 percent

16  instead of 75 regressions of 0.1 percent.  So that's a bit of a

17  challenge to the Court's decision already, but, nonetheless, no

18  expert from Apple has said that if you ran the sample that way,

19  a 7.5 percent sample against the entire regression versus the

20  average of 75 0.1 percent samples, that you get any materially

21  different results.

22      This was a distinction with no difference at all.  And so

23  the whole point about switching simply disappeared.  But

24  instead of conceding that, Apple changes the definition of

25  "switchers."  And what it now says and what Mr. Swanson just

1    argued is that if you change the parameters of the model ever

2    so slightly -- and he's referring then to the margin bounds

3    that Professor McFadden imposed -- if you change the data

4    inputs from which the margin -- from which the model is

5    derived, you get vastly different results.

6         That's a tautology with which no economist and no

7    statistician would disagree.  It's also a tautology that has

8    absolutely no meaning because no one says that a model is

9    supposed to be so reliable that it will withstand changes in

10   data inputs and yield the exact same results.

11        If it did, if a model produced the same results from of

12   different datasets, it's because the model itself is flawed and

13   doesn't respond to the data.

14        The only thing that Apple's experts demonstrated is that

15   Professor McFadden's model responds to the data that it is

16   built on.  And if they had asked us that, we would have

17   stipulated to it.  We could have saved a lot of time and a lot

18   of money.  But it doesn't invalidate the model.  It doesn't

19   invalidate the results, and it never should have been done.

20        **THE COURT:**  Okay.  We are going to take a break.

21   Let's do 10 minutes.

22                  (Recess taken at 10:33 a.m.)

23                  (Proceedings resumed at 10:44 a.m.)

24        **THE COURT:**  We're back on the record.  The record will

25   reflect the parties are present.

1          Okay.  Do you want -- I think you have one more argument.

2               MR. SWANSON:  Can I --

3               THE COURT:  And then we'll move over to the class

4     cert.

5               MR. SWANSON:  -- make an efficient response to the

6     last?

7               THE COURT:  Go ahead.

8               MR. SWANSON:  My efficient response would be Professor

9     Watson -- Section 5 of his report addresses the claim that the

10    model is 95 percent -- in the 95-percent confidence interval.

11    He says that the margin constraints drawn from a sample of six

12    developers makes that -- makes a mockery of that claim.  It

13    isn't true.

14         Professor Watson in Section 6.2 of his report talks about

15    the test that Mr. Rifkin was alluding to.  This is the

16    switchers that result from changing the -- not the sample of

17    developers for the margin costs but the sample of accounts for

18    running the model.  And what Professor Watson found, when he

19    took the 75 samples and he added them all together, so you had

20    exactly the same accounts, and he ran the model on that, the

21    exact same model, four million -- four million accounts

22    switched from harmed to unharmed.  That's a switcher problem,

23    and that's in Section 6.2 of Professor Watson's report.

24         The last point I was going to make was about

25    Dr. Abrantes-Metz's but-for commission rate.  She was engaged

1    as a replacement for Professor McFadden's efforts in that area,

2    and -- but she feeds a single number into Professor McFadden's

3    model.

4        Professor McFadden, by the way, hasn't read her report,

5    interestingly, but he rigorously applies her number in his

6    model.  His model doesn't work unless you got a single number

7    to plug into it.

8             THE COURT:  Right.

9             MR. SWANSON:  And she, who takes an approach using an

10   accounting identity, not an economic model, comes up again with

11   a single number, even though --

12            THE COURT:  My memory of the arguments here is that

13   she used the same method as was used in the related case; is

14   that right?

15            MR. SWANSON:  You're talking about Professor

16   Economides?

17            THE COURT:  I don't.  There is so many professors --

18            MR. SWANSON:  I understand.  I think it was

19   Professor Economides who did something similar, but even

20   Professor Economides said Apple has a two-part -- two-tiered

21   commission structure so he came up with two tiers, so I think

22   she didn't do the same thing that he did.  He used different

23   data.  But, yes, there was a similarity in approach.

24        One thing, again, that -- ask one more time if we can file

25   a reply brief because we've got new evidence.  One of the data

1    points she uses -- this is new evidence that came in from

2    Microsoft that belatedly produced something that's very

3    critical.  One of her data points, critical data points in her

4    calculation of the but-for commission is taken from a Microsoft

5    document.  It's a Microsoft ordinary course of business report

6    that reports a profit figure for their store.  I'm not going to

7    say what it is --

8              **THE COURT:**  This came in after she did her analysis?

9          **MR. SWANSON:**  Well, what happened after she did her

10   analysis was we got from Microsoft the next years' -- the two

11   years after that, and those numbers are very different.

12             **THE COURT:**  Okay.  But they came in after her report?

13         **MR. SWANSON:**  Yes, yes, yes.  She knows -- I mean,

14   plaintiffs know that.  Plaintiffs got the same production that

15   we got.  She hasn't revised her opinions, but if you plug the

16   new numbers in or if you average them together, you get a

17   significantly higher but-for commission rate and, of course,

18   everything that goes with that:  Enormously higher amount of

19   uninjured accounts shifts from harmed to unharmed; lower

20   damages; the whole nine yards.

21        So we'd like to submit that to you, Your Honor, in

22   conjunction with our reply so that you can actually see, once

23   again, testing these assumptions by real-world data.  Is she

24   using a number that is reliable?  Is it a number that stays the

25   same over time?  Because that's what she's doing, she is

modeling what would happen from the beginning of the App Store

to today, I mean, well over a decade. So her numbers need to

be robust, and they can't be cherry-picked so that they just

happen to generate a number which, you know, isn't so high that

it's over 15 percent and isn't so low that they're not going to

be able to get their $10 million in damages.

        **THE COURT:** Response?

        **MR. RIFKIN:** Yes, Your Honor.

    First, on this question of 7.5 percent versus 75 times 0.1

percent, the four million accounts that Mr. Swanson just

referred to are those accounts that fall within the -- the

5-percent interval that is the result of the 95-percent

confidence level. It's not a challenge to the 95-percent

confidence level. It's just where within that 95-percent

confidence level any one individual account might fall.

    And the aggregate number, which is the number to which

Professor McFadden will testify at trial, is materially the

same whether you do a 7.5 percent sample or 75 -- or the

average of 75 0.1 percent samples.

    But if the Court accepts Professor McFadden's model as

accurate and reliable, because it hasn't been demonstrated

otherwise, then when he runs his damages model before trial --

now, he already has run his damages model for the Music, Games

and Entertainment genres -- 70 percent of the commerce on the

App Store using all transactional data, billions of

1    transactions through August of 2022 -- when he runs the damages

2    model against the entire database of all the transactions for

3    all of the app genres that Apple will have to produce before

4    trial, when it supplements his -- his -- when Apple supplements

5    its document production and he runs his model against that

6    database, which he will do before trial, we will have a final

7    list of all those accounts that are harmed, all those accounts

8    that are unharmed, and then as the Court has already said,

9    Professor McFadden has proposed -- and that's using a common

10   method of identifying harmed and unharmed accounts that's

11   applicable to all the accounts in the database.  And then as

12   the Court has already recognized, Professor McFadden has

13   proposed a reliable methodology for tracing those individual

14   accounts and aggregating them to specific class members so that

15   we will automatically be able to identify class member by class

16   member not only which class members have been harmed in the

17   aggregate but also by how much.

18              **THE COURT:**  Okay.

19              **MR. RIFKIN:**  So if I can now --

20              **THE COURT:**  So let me --

21              **MR. RIFKIN:**  I'm sorry.  Did you have a question,

22   Your Honor?

23              **THE COURT:**  No.  I wanted to move on.

24              **MR. RIFKIN:**  Yes.  I was about now to move on to the

25   question of Dr. Abrantes-Metz.

1          And so the Court said in its original decision that

2     Professor McFadden lacked the requisite expertise in

3     transaction pricing and in platform economics to be able to

4     render a reliable opinion on the but-for commission rate, and

5     so we've substituted Dr. Abrantes-Metz, whom no one debates has

6     the exact expertise in transaction platforms -- transaction

7     pricing and platform economics.

8          She has used an economic equation to construct the but-for

9     commission rate that every one of Apple's experts has agreed is

10    useful as a tool for economists, applies fully to the App

11    Store, and applies fully to the but-for world.  They disagree

12    about its reliability for predicting what the but-for

13    commission rate would be, but no expert has identified any

14    authoritative text that says it can't be used.

15         So this is a quintessential difference of opinion between

16    sets of experts as to whether the economic modeling

17    Dr. Abrantes-Metz has done is or is not -- does or does not

18    yield results that are reliable.

19         The issue about the Microsoft margin costs is one that I

20    was glad to address, and I'm thankful that Mr. Swanson raised

21    it.

22         Dr. Metz had available to her an internal Microsoft

23    document that was produced during the litigation before she

24    rendered her opinion.  And in it, it reported a number of

25    marginal cost data.

1          One was the marginal cost data for the Microsoft Store,

2     and then there were marginal cost numbers that were included in

3     the Microsoft internal document for dozens of other companies,

4     including Epic and Apple.

5          And Dr. Metz had that real-world data available to her,

6     and she constructed her model from the marginal costs that the

7     Microsoft Store reported for itself.  And when she was asked to

8     explain why she used that, she gave a number of cogent reasons,

9     one of which was she believed it was a close competitor in the

10    sense that it resembled what she believed a real-world

11    competitive environment would look like for the Apple App

12    Store.  And she also explained that she trusted Microsoft to

13    know and accurately report its own marginal cost data.

14         Now, you may recall from before we took the break, I made

15    the point that in most cases, economists don't have real-world

16    marginal cost data.  They have to estimate it.  Here, we

17    actually had at least some data, and the data that we had that

18    Dr. Metz believed was most reliable was the Microsoft data.

19         She chose not to use any marginal cost data that was

20    included in the Microsoft internal report for companies other

21    than Microsoft for the very cogent reason that she believed

22    that Microsoft did not have sufficient knowledge to know the

23    marginal costs of other app stores reliably, and, in fact, she

24    even pointed to some as examples.  One was Epic.

25         The marginal cost reported by Microsoft for Epic in its

report was something on the order of 20 or 30 percent, but we knew from the Epic trial and from Your Honor's 200-page decision in that case that Epic had a negative marginal cost. And so she knew that that was not reliable.

The Microsoft document also included margin information for the App Store, and I believe -- and I don't have the number directly in front of me -- but I believe that they used approximately 47 percent, something like that for the margin in the App Store. But we know from the Epic trial that Apple's real margin on the App Store was much greater than that.

And so Dr. Metz prudently said, "I can rely on this as data we don't usually have. I'm glad to have it, but I can't rely on more than the Microsoft data because the rest of it is knowingly unreliable. I know it to be incorrect."

Mr. Swanson said -- and, by the way, Your Honor, yes, Professor Metz -- Dr. Metz -- I keep making the same mistake -- Dr. Metz used essentially the same methodology to calculate the but-for commission rate in the App Store that Professor Economides used to calculate the commission rates in the developer case. There is -- I don't think there is any debate about that.

Professor Economides had a slightly different task in front of him than professor -- than Dr. Metz. Mr. Swanson said that Professor Economides modeled two tiers of commission rates because Apple has two tiers in its App Store. I think he made

1    a misstatement.  I don't believe he intended to, but that's not

2    what Professor Economides did.

3        He modeled different rates for apps and for IAP because he

4    believed they would be priced differently, not because Apple

5    charges different commission rates for apps than it charges for

6    IAP.  It really is -- again, it's a point that's hardly worth

7    mentioning, but I wanted to make sure the Court understood that

8    Professor Economides was not modeling two tiers of prices

9    because Apple charges two tiers of commissions.  It's simply

10   because he believed that there would be two different prices,

11   one for apps and one for IAP.

12       **THE COURT:**  Okay.

13       **MR. RIFKIN:**  That's all I have to says unless

14   Your Honor has any more questions on Dr. Abrantes-Metz.

15       **THE COURT:**  No.  We are going to move to the class

16   certain.

17       **MR. RIFKIN:**  Okay.

18       **THE COURT:**  Ms. Richman.

19       **MR. RIFKIN:**  Your Honor, did you want to hear the

20   other side first?  Or did you -- well, I guess I'm staying so

21   it doesn't matter.

22       **THE COURT:**  You're staying so it doesn't matter.

23   Ms. Richman is arguing the class cert.

24       **MR. SWANSON:**  Can I just make one clarification -- no.

25   Okay.

1          **THE COURT:**  Ms. Richman, come on forward.

2          **MS. RICHMAN:**  Thank you, Your Honor.

3          **THE COURT:**  So, look, I've already done one round of

4     this.  I have zero interest in hearing argument on things that

5     I've already addressed.

6          I started with the *Dauberts* because these kinds of cases,

7     as we all know, are expert-heavy and the objections to the

8     revised expert opinions are the focus, it seems to me, of any

9     class certification.

10         So what else, then -- and I'm not -- I'm not going to

11    spend a ton of time.  I have a patent trial conference after

12    you all, so I want to make sure to give you some time to argue,

13    but what is the -- you know, if you had to make three points,

14    what is it that you want to make in terms of opposing the

15    motion, given that I've already -- you know, each of the

16    components -- many of these things aren't really disputable.

17         **MS. RICHMAN:**  Yes, Your Honor.  Thank you.

18         I think, as you noted, Mr. Swanson did a lot of the heavy

19    lifting today.  I would just say, though, that even if

20    Professor McFadden's model is determined to be admissible as

21    *Olean* said, not all admissible expert evidence is capable of

22    resolving classwide issues in one stroke, which is the law in

23    the Ninth Circuit.  And *Olean* noted that courts have frequently

24    found that expert evidence, while otherwise admissible under

25    *Daubert*, was inadequate to satisfy the prerequisites of Rule 23

1    for, among other reasons, where the evidence contained

2    unsupported assumptions or where the evidence --

3         **THE COURT:**  That all goes to the *Daubert*, it seems to

4    me.

5         **MS. RICHMAN:**  Your Honor, my point is just that even

6    if it's admissible, you can still consider these arguments in

7    connection with Rule 23.  That's Footnote 9 of *Olean*.

8         But I think --

9         **THE COURT:**  Okay.  That's a stretch today in this

10   case, but go ahead.

11        **MS. RICHMAN:**  Well, Your Honor, I think the elephant

12   in the room here, the thing that hasn't been discussed that you

13   mentioned from -- at the outset is the fact that the putative

14   class contains a great number of uninjured class members, and,

15   therefore, individual issues will predominate.

16        This is an --

17        **THE COURT:**  So what is -- so let's make sure we're

18   talking about the same thing.

19        The defendant -- or the plaintiffs say what, Mr. Rifkin?

20   I thought you said that this approach, you have 95 percent

21   confidence.  That would suggest 5 percent non-confidence.

22        **MR. RIFKIN:**  Well, what -- what the 95 percent --

23        **THE COURT:**  So a 5 percent error rate.

24        **MR. RIFKIN:**  The 95-percent confidence level is the

25   gold standard of statistical analysis --

1          **THE COURT:**  5 percent error rate.  No?

2          **MR. RIFKIN:**  Well --

3          **THE COURT:**  95 is not 100.

4          **MR. RIFKIN:**  It doesn't actually -- technically that's

5     whatnot the 95-percent confidence level means.  It doesn't talk

6     about error rates.

7          **MS. RICHMAN:**  Your Honor --

8          **MR. RIFKIN:**  It talks about -- okay.  I'll -- I'll

9     stop there.  It's --

10         **THE COURT:**  He's not a hundred percent confident.  He

11    cannot come in here and tell me that he is 100-percent

12    confident that when he runs the entire model with all the data

13    that you just said he going to do before trial, that 100

14    percent of those accounts are going to be -- are going to have

15    damages.

16         **MR. RIFKIN:**  Correct.

17         **THE COURT:**  Okay.  So that's all I'm saying,

18    Mr. Rifkin.

19         **MR. RIFKIN:**  I'm sorry.  I misunderstood your

20    question.

21       Yes.  That's correct.

22         **MS. RICHMAN:**  But I think, Your Honor, we're actually

23    talking about two different things because Professor McFadden,

24    under his confidence intervals, he predicts that between 17 to

25    20 percent of Apple ID accounts are uninjured.

1          **THE COURT:**  Okay.  So let's --

2          **MS. RICHMAN:**  So this is a different issue.

3          **THE COURT:**  Let's talk about that.  17 -- and I wanted

4    to make sure I had the correct number, which is what I thought

5    I was asking but perhaps not.  17 to 20 percent, you agree

6    that's what his prediction is.

7          **MR. RIFKIN:**  No.

8          **THE COURT:**  No?

9          **MR. RIFKIN:**  No.

10         **THE COURT:**  How can this not be something that is

11   knowable?  Give me a paragraph number of the report where he

12   says 17 to 20 percent.

13         **MS. RICHMAN:**  McFadden says in his supplemental

14   declaration in Figures 6 and 7 that over 30 million accounts,

15   between 17 to 20 percent --

16         **THE COURT:**  I want to get this, Ms. Richman.  I mean,

17   we cannot be -- this can't be a disputable fact.  We may not

18   agree --

19         **MS. RICHMAN:**  Your Honor --

20         **THE COURT:**  I'm looking at 679-1.  Is that what I'm

21   supposed to look at, his revised supplemental report dated

22   January 19th?

23         **MS. RICHMAN:**  Yes, Your Honor, at Figure 6 and 7.

24         **THE COURT:**  What page, ECF page?

25         And can you tell me the green that's on here, Mr. Rifkin,

1    what does the green highlight represent?  Changes to the

2    report?

3              **MR. RIFKIN:**  Yes, Your Honor, that's correct.

4              **MS. RICHMAN:**  Is that changes, Mr. Rifkin, or is that

5    the confidential information?

6              **THE COURT:**  Is the blue confidential?

7              **MR. RIFKIN:**  Just a moment, Your Honor.  We'll confirm

8    that.

9              **THE COURT:**  All right.  And what ECF page am I looking

10   for?

11             **MS. RICHMAN:**  Your Honor, I think page 32.

12             **THE COURT:**  Page 32.

13             **MS. RICHMAN:**  Figure 6.

14             **THE COURT:**  Page 32 of 80?

15             **MS. RICHMAN:**  Of 73 on my version, which is the one

16   that was originally filed with his report.

17             **THE COURT:**  Okay.  Are you looking at an ECF number or

18   a page number of the report?

19             **MS. RICHMAN:**  I'm looking at a page number.

20             **THE COURT:**  All right.  Hold on.

21             **MR. RIFKIN:**  Your Honor, it's just -- I think you're

22   referring to the ECF number.  It's page 39 of 80.

23             **THE COURT:**  Correct.  I have it now.

24             **MR. RIFKIN:**  There is a table at the top.

25             **THE COURT:**  All right.  So he says -- and this is from

1  him?

2          **MR. RIFKIN:**  Correct.

3          **THE COURT:**  That without the $10 spending cutoff,

4  unharmed IDs are 17.8 percent.  You're not disputing that.

5          **MR. RIFKIN:**  No.  That's what he says.

6          **THE COURT:**  But with the $10 spending cutoff, we cut

7  that down to 7.9 percent.

8          **MR. RIFKIN:**  And that's what I meant when I said "no."

9          **THE COURT:**  Okay.

10          **MR. RIFKIN:**  Because that's the proposed class, is --

11          **THE COURT:**  Is the 7.9.  So that's the focus.

12          **MR. RIFKIN:**  Correct.

13          **THE COURT:**  Let's focus on 7.9.

14      Go ahead, Ms. Richman.

15          **MS. RICHMAN:**  Well, Your Honor, I think there is a

16  question as to whether the $10 cutoff is being applied.  The

17  plaintiffs do persist in arguing that even as originally

18  defined --

19          **THE COURT:**  I don't understand that the class that

20  they are asking me to -- I understood the class that they are

21  asking me to certify are those that do not include that anybody

22  with -- who are under the $10 spending cutoff.  That was my

23  understanding.

24      So lines 4, 5, and 6 of Figure 6, that's what I'm looking

25  at.  So I don't know why I would talk about the 17.8 at all.

1    It's not an issue.

2            **MS. RICHMAN:**  Well, Your Honor, that wasn't entirely

3    clear test, I would say, because they also say --

4            **THE COURT:**  Ms. Richman, stop.

5        Yes, am I right or am I wrong?

6            **MR. RIFKIN:**  Yes, you are right.

7            **THE COURT:**  All right.

8            **MS. RICHMAN:**  Okay.

9            **THE COURT:**  All of that is no longer an issue, and

10   it's what I understood.  Okay.

11       7.9 percent.  You can proceed with that as the common

12   understanding of what the unharmed accounts are.

13       And, again, as I understand it, by the time we go to

14   trial, there will be -- that 7.9 percent will be eliminated

15   once all of the -- once everything is run.  Again, that's my

16   understanding.  Am I wrong?

17           **MR. RIFKIN:**  No, Your Honor, you are correct.

18           **THE COURT:**  Okay.

19           **MS. RICHMAN:**  That is a perplexing statement to me,

20   Your Honor, because, first of all, we don't know how many

21   uninjured will be when the model is run across the entire

22   class.  There are 23 genres that we don't even know the margin.

23           **THE COURT:**  That's why I am sure I will see another

24   motion, Ms. Richman, but right now what I have sitting in front

25   of me today is an analysis which indicates that under this

1    model, unharmed accounts are 7.9 percent.

2         MS. RICHMAN:  Yes, Your Honor.  And that equates to

3    over 10 million accounts.

4         THE COURT:  But there is nothing in -- predominance

5    doesn't look at -- well, go ahead.  Make the argument.

6         MS. RICHMAN:  Thank you, Your Honor.

7       I think what you were going to say is predominance doesn't

8    necessarily turn on the number of uninjured accounts.  There is

9    no *de minimis* threshold.  The Ninth Circuit rejected that in

10   *Olean*.  And so what the analysis is, though, under *Olean* is

11   whether the individual issues are going to predominate.

12        THE COURT:  Right.  And they're going to predominate,

13   at least under this, for 91 percent.  91 percent.  That's not a

14   bad percentage in terms of predominance, with the understanding

15   that it's going to get even more certain before trial.

16        MS. RICHMAN:  Well, Your Honor, I don't think that's

17   true at all.

18        THE COURT:  Well, then I guess --

19        MS. RICHMAN:  I think what they are saying is they

20   want to expunge the uninjured from the class, expunge the

21   uninjured accounts, which is basically creating a failsafe

22   class.  It's not possible --

23        THE COURT:  That could be a problem --

24        MS. RICHMAN:  -- under *Olean*.

25        THE COURT:  That could be a problem, too.

1          **MS. RICHMAN:**  I think no matter how you slice it, 10

2     million accounts, 7.9 percent uninjured is astonishingly high.

3     I'm not aware of any case where the plaintiffs have conceded

4     injury of at least 7.9 -- non-injury of at least 7.9 percent

5     and a class has been certified.

6          There are certainly cases where there has been dispute

7     between the parties, like in *Olean*, like in *Google* where the

8     dispute is that plaintiffs come forward and they say a hundred

9     percent is injured --

10         **THE COURT:**  How is it -- I mean, in some ways what

11    you're arguing is that, you know -- is that Apple's too big to

12    be held accountable, and that I don't buy as a perspective.

13    It's only that big because you're big, because you're so many

14    customers.

15         **MS. RICHMAN:**  Yes, Your Honor.  And I don't think

16    that's the argument that we're making.

17         This is kind of the same issue that's on appeal in the

18    *Google Play* case where there are, you know, tens of millions of

19    potentially uninjured there.

20         The question that the Court needs to focus on is, you

21    know, what is the trial going to be like.  Are individual

22    issues going to predominate.  And what we've heard during the

23    last hearing and today is that there is no intention to

24    identify injured and uninjured individuals before the -- before

25    trial.  That's something that is going to be shunted to a

1   post-liability phase.

2          **THE COURT:**  I -- we have -- okay.  Let's be -- let's

3   walk through this because I thought I made very clear that that

4   would not be tolerated, and I thought that Mr. Rifkin tried to

5   address that topic and has told me that the model is being run

6   in advance.  So let me ask this question.

7          Assuming, for purposes of argument, that a class is

8   certified, you all have talked about that you're getting

9   additional discovery.  When are you finished?  How much more

10  time do you need?  This case is on my very old records report.

11         **MS. RICHMAN:**  I think, Your Honor -- I don't recall

12  the exact window, but I think it's sometime 60 days to 90 days

13  after you issue your class certification.

14         **THE COURT:**  I looked.  I don't have an order in this

15  case.

16         **MR. RIFKIN:**  We believe that Ms. Richman is correct.

17  We understand that fact discovery is cut off 60 days after --

18         **THE COURT:**  Give me an order number or a case number.

19         **MR. RIFKIN:**  It's Document No. 640.

20         **THE COURT:**  640.

21         **MR. RIFKIN:**  And --

22         **THE COURT:**  Hold on.  Let me get it.

23         **MR. RIFKIN:**  Yeah.  Of course.

24         **THE COURT:**  Okay.  So final reports 60 days after the

25  decision --

1          **MR. RIFKIN:**  I'm talking about -- it's line 23 on the

2     numbered lines.

3          **THE COURT:**  But final reports -- two lines down.  So

4     you have 60 days to complete fact discovery after class cert.

5     But also you have to have your final reports done 60 days after

6     a decision on class cert.

7          **MR. RIFKIN:**  That's correct, Your Honor.

8          **THE COURT:**  And then -- so I am assuming -- let's say,

9     for purposes of argument, I issued this decision on July 1st,

10    which, by the way, that will not happen, but just letting --

11    just for purposes of argument.  That means that -- and, again,

12    assuming 30 days approximately, that between that day and

13    September 1st, this entire model is going to be run and a new

14    report is going to issue and you are going to tell me exactly

15    who is in the class and who's not in the class.

16         In this expert report, I would expect an updated report.

17    I would expect that all of these developers from whom you're

18    getting information, all of that is going to be incorporated

19    into all of these reports.  All of these things are going to

20    happen in 60 days.

21         Then you get -- 45 days after that rebuttals, 30 days to

22    take your depositions, and then I get the final round of

23    dispositive and *Daubert* motions.  And if it doesn't -- if it

24    did not satisfy, I'm assuming that I would also get a motion to

25    decertify.

1       **MR. RIFKIN:**  Right.  And, Your Honor, yes that's what

2   the order says, but I -- I have -- my paper copy has this big

3   blue sticky on it, and it very pleadingly says "please get more

4   time."  And I would like to explain the reason for that, if I

5   may.

6       We have learned since Your Honor set this schedule and

7   since we began the process of doing all the revised

8   calculations to generate these updated reports that the

9   computer processing time for the database we already have is

10  something on the order of several weeks, not several days and

11  certainly not several hours.  It literally takes the computer

12  two or three weeks to run the regression on the database

13  because the database is so massive.

14      Apple needs to update the data that it has provided to us

15  to account for the year that has transpired since it last

16  produced data.

17      Once we get that data, we will conduct the analysis for

18  the entire class, and we will do so before trial, but it cannot

19  be done --

20      **THE COURT:**  Well, you have to do so, not before trial,

21  but for purposes of these reports because if it is not in the

22  report, you do not get to put it on at trial.

23      **MR. RIFKIN:**  We agree and we recognize that and we --

24  and we will abide by it, except I'm asking the Court to give us

25  some extra time between when fact discovery ends and when

1    these -- when these final reports are due because this -- this

2    provided that they would be due at the same time.  That's

3    unworkable.

4        And what we would like is we would like a 90-day interval

5    between when fact discovery is over and when the expert reports

6    have to be delivered.  That's purely -- it's purely a function

7    of the computer processing time that's necessary --

8        **THE COURT:**  How long does it take?

9        **MR. RIFKIN:**  Literally two or three weeks to run the

10    data.  And that's on the dataset as it exists now.

11        The dataset that will be the final dataset based upon the

12    supplemental data that Apple will have to produce to us before

13    the discovery cutoff will be even larger and so it will take

14    even longer.

15        And then there is a process of quality control that we

16    have to undertake, and unfortunately that, too, takes computer

17    time.  It's not even human time.  It's machine time to process

18    billions and billions and billions of calculations.

19        And so what we would ask for is to have discovery -- fact

20    discovery cutoff 60 days after the decision on class

21    certification and then to have our expert report due 90 days

22    after the close of fact discovery.

23        We believe that is a workable timeline, and we believe

24    that although it's 90 days later than what this order

25    contemplates, given the reality of the analysis that needs to

1   be done, it's certainly a reasonable amount of time.

2           **THE COURT:**  Ms. Richman.

3           **MS. RICHMAN:**  Your Honor, I'd like to return to the

4   issue at hand, which is whether the class should be certified.

5   And one thing that Mr.--

6           **THE COURT:**  The question we were having -- you were

7   making some assertions about what I would know and what I --

8           **MS. RICHMAN:**  Well, I'm going to read to you from

9   their -- their class certification motion.  "Now that" --

10          **THE COURT:**  Hold on.  Let me get it.  Give me a page

11  and line number.

12          **MS. RICHMAN:**  Page 18, line 1.

13          **THE COURT:**  Hold on.  All right.

14       Do you have that in front of you, Mr. Rifkin?

15          **MR. RIFKIN:**  No, I do not.

16          **THE COURT:**  Lines 1 through 4.

17          **MR. RIFKIN:**  I have it now.

18          **THE COURT:**  Read lines 1 through 4.

19          **MR. RIFKIN:**  Correct.  Correct.  I've read them.

20          **THE COURT:**  Okay.  So what do you mean when you say

21  that these -- "matching will take place after trial"?

22          **MR. RIFKIN:**  So the regression model calculates

23  damages on the individual Apple ID basis account by account,

24  apple ID by Apple ID by Apple ID.  Those accounts need to be

25  matched to individual class members, people, so the IDs need to

1    be matched to people, and we know that there are three or four

2    times as many accounts as there are people, so about 130 or so

3    million people and there are about 400 or 427 or so million

4    Apple IDs.  So we need to match those accounts to people and

5    net out the -- the accounts that have damages and the accounts

6    that don't have damages per person.

7         And we addressed this at the original round of class

8    certification, and we explained to the Court that that's how we

9    would do it, and we understood that the Court was satisfied

10   with that.  If the Court wants us to do that matching before

11   trial, we'll do that matching before trial.  That is a -- that

12   is a simple mechanical process that will aggregate the accounts

13   and match them to individual class members.

14        All we need from Apple is the data that first they said

15   didn't exist but Your Honor found that it did, and then we need

16   them to produce it because they refused to produce it.

17        So those two things have to happen before we can do that

18   mechanical process.  First they have to produce the data they

19   said doesn't exist and then we have to run the mechanical

20   matching to do.

21        It.  We're happy to do that whenever the Court wants it

22   done.  If Your Honor wants it done before trial, we will do it

23   before trial because we will have done the damages calculation

24   account by account by account before trial.  And that's the

25   basis on which the matching will be done.

1     If the Court wants that done before trial, then we will

2  need a little bit more time to produce the expert report.

3  Your Honor, if you want it in the expert report, then as I

4  said, we need two things:  We need the data from Apple and a

5  little bit more time to do that matching.  But all that is is

6  mechanical computations.

7          **THE COURT:**  Ms. Richman.

8          **MS. RICHMAN:**  Your Honor, it's not mechanical

9  computations.  This is an issue that has been briefed in the

10 current round.

11     What we understood Your Honor to have held in your order

12 is that the process for linking accounts -- you refused to

13 exclude that on *Daubert* grounds but that you were reserving on

14 the question of trial.

15     I don't understand how we can certify a class when we

16 actually have no idea at this point how many individuals are

17 injured and how many are not.

18          **THE COURT:**  This is a new world and I have one more

19 round to go.

20          **MS. RICHMAN:**  Yes, Your Honor.

21          **THE COURT:**  So listen to me, Ms. Richman.  It is a new

22 world.  And I do try these cases.  And it seems to me the

23 logical way to proceed is that if everything else is

24 appropriate and I can certify a class, then I intend to do so,

25 and then they are going to have to spend the money and you are

1    going to have to give them that additional data, and they are

2    going to -- and they are going to have to run all these things.

3    And then I'm going to have to look at it again and decide

4    whether it's sufficient or not.  And if it's not, the class

5    will be decertified.

6         **MS. RICHMAN:**  Your Honor, who is the class notice

7    being sent to in this case?  We don't know individuals who are

8    in the class.  We know that there are --

9         **THE COURT:**  They are going to be individuals -- we

10   never send notices in these kinds of cases to Ms. Richman,

11   Mr. Swanson, Mr. Rifkin.  We never do that.  What are we going

12   to do?  We're going to have notices that go out in banners, in

13   platforms, in all sorts of appropriate ways to let people know

14   that they are potentially a member of a class.  We're going to

15   do it the way we always do it, every single class.  We are

16   going to do it that way.

17        **MS. RICHMAN:**  Your Honor, we'll have to do that in

18   connection with the accounts, and some of those accounts, 20

19   percent --

20        **THE COURT:**  Do it globally.  We will do it globally.

21        **MS. RICHMAN:**  So for accounts that have zero or

22   negative damages --

23        **THE COURT:**  We always say "you may" or "you may not."

24   So I can tell you, I am not going to be a member of this

25   class even though I have an iPhone.  Why?  Because I don't

1    spend a dollar, not a single dollar.  So I'm going to be

2    underneath that $10 limit.

3        **MS. RICHMAN:**  I understand, Your Honor.

4        You know, it doesn't solve the question, I think, of

5    whether common issues predominate here --

6        **THE COURT:**  But predominate is an issue and a function

7    under *Olean* of -- right now the question to me is I am looking

8    at a model -- and, again, I still have to go back, I have to

9    consider everything that Mr. Swanson argued.  But assuming for

10   purposes of argument as we stand here, I'm looking at a model

11   that says 7.9 percent, and I am being told that by the time I

12   get to trial, that number is going to be closer to zero --

13       **MS. RICHMAN:**  Your Honor, there is no evidence of

14   that.  We have no idea.  If anything, it's going to grow

15   between now and trial.

16       **THE COURT:**  Then I guess that's the point of the next

17   round, isn't it?

18       **MS. RICHMAN:**  No.  No, Your Honor.  It's the point of

19   this round.  It's the district court's obligation to resolve

20   disputed -- disputed expert evidence and conduct --

21       **THE COURT:**  Right.  And 7.9 -- 91 percent, 91 percent

22   of -- I would say at 91 percent, you know, there's a pretty

23   good argument that predominance is satisfied.

24       **MS. RICHMAN:**  That would be unprecedented, Your Honor,

25   to certify --

1        **THE COURT:**  You have no cases given this context

2   that -- give me cases.

3        **MS. RICHMAN:**  Well, we'll find out soon enough when

4   the Ninth Circuit evaluates the *Google* decision.  But the Ninth

5   Circuit in the *Van* case just five weeks ago decertified a class

6   where there was evidence that 18 of 13,680 discounts --

7        **THE COURT:**  What's the percentage?

8        **MS. RICHMAN:**  0.13 percent.

9        **THE COURT:**  Okay.  Give me that case.

10       **MS. RICHMAN:**  It's *Van vs. LLR* -- we submitted a

11  letter --

12       **THE COURT:**  This will be better.  This is what I want

13  from you all.

14       I want a brief that has zero argument.  Zero.  Do you

15  understand me?  Zero argument.  I want case names and

16  parentheticals identifying either the percentage where class is

17  not certified or where class is certified; right?  I'm trying

18  to figure out what does *de minimis* mean.  So you can give me in

19  a parenthetical percentage numbers or you can give me, you

20  know, fixed numbers, right, actual numbers.

21       **MS. RICHMAN:**  Yes, Your Honor.  We'd be happy to do

22  that.  And I do have the Westlaw cite for the *Van* case if you

23  would like that now.

24       **THE COURT:**  No.  I want it in a brief.

25       So what did I say?  How many pages do you get?  No more

1  than five pages.

2          MS. RICHMAN:  That sounds fine, Your Honor.

3          THE COURT:  So I want you to do my research for me

4  because you have many more lawyers than I have.

5          MS. RICHMAN:  That's our job.

6          THE COURT:  So all I'm looking for are percentages on

7  either side of the -- of the analysis in terms of certification

8  versus non-certification.

9      Ninth Circuit cases, I can tell you right now, have the

10  most weight or Supreme Court.  Circuit courts and district

11  courts -- other circuit courts and district courts can be

12  identified but are not, obviously, binding.

13      All class certification motions.

14          MS. RICHMAN:  Thank you for that opportunity,

15  Your Honor.

16          THE COURT:  But, in my view, that's, you know -- the

17  only way I know to be fair to the process is to let the process

18  work, and there is a lot of money on the line and a lot of

19  money that the plaintiffs' lawyers, you know, will have to

20  spend to get to a point before it ever gets to -- before it

21  ever gets to trial.  But there's no point in them spending that

22  money if I'm going to throw it out; right?  There's no point in

23  them spending that money if I'm not going to certify in the

24  first instance.

25      So it is a half step, as far as I'm concerned, because

1    there's one more step to go, but I don't know that I can just

2    ignore the -- and I don't think I can.  I have to let this play

3    out; at least, that's where my head is.

4        So other things you want to argue?

5        **MR. RIFKIN:**  Your Honor, I just very briefly wanted to

6    point you to another page in the Professor McFadden's report.

7    And I'm trying to look for the exhibit number.

8        I'm sorry.  The number -- it's Figure 7?  What's the ECF

9    number?  I think it's 706-1.  679.

10       Your Honor, in Exhibit 679, Figure 7, also presents the

11   percentages of uninjured with the imposition of price tiers and

12   focal pricing.  I wanted to make sure Your Honor had that in

13   front of you so that you know the full dataset.  I didn't get a

14   chance to mention it earlier.  I wanted to do that.

15       We will -- we believe we have and we believe we can adhere

16   to the Ninth Circuit -- to the Ninth Circuit's standard which

17   requires a reliable method to identify who the -- who the

18   uninjured class members are.  I've already explained how and

19   why.  I've asked the Court if the Court wants it all done, not

20   just the uninjured accounts but also the uninjured class

21   members, I've also explained that we need a little bit more

22   time to do that.  And I will briefly mention two cases that

23   will be on our list.  One is *Olean*, where 5.2 percent --

24       **THE COURT:**  Well, I've already read *Olean*.

25       **MR. RIFKIN:**  Okay.  So Your Honor knows that 5.2

1    percent of the class members were uninjured in that case, but

2    that did not -- certainly did not stop the court from

3    certifying.

4         **THE COURT:**  But we also didn't have millions of

5    potential -- right?  This is a different case, Mr. Rifkin, and

6    you need to remember that.  This is a different kind of case.

7         **MR. RIFKIN:**  Your Honor, it was the purchasers of tuna

8    fish.  There were hundreds of millions of purchasers of tuna

9    fish in the *Olean* case.

10        And, in any event, we will comply with Your Honor's

11   direction to provide the authority that you've asked for.

12   That's certainly one of them.

13        **MS. RICHMAN:**  Your Honor, at the risk of trying your

14   patience, which I fear is already tried, in *Olean* the

15   plaintiffs' experts offered a model that showed injury to a

16   hundred percent of all the classes.  There were robustness

17   checks conducted that showed some diminishment in those

18   numbers, but the plaintiffs were proffering the opinion that

19   all or nearly all of the members of the class were injured.

20        This is a very different case where off the bat, we're

21   talking a minimum of 7.9 percent, and that's before we even get

22   to adjustments related to the -- all the failures with

23   Professor McFadden's model that Mr. Swanson identified.

24        **THE COURT:**  Well, I don't know that I agree with all

25   of Mr. Swanson's arguments.  I know that that upsets him.  As

1    you said, maybe he'll want to cry.

2          **MS. RICHMAN:**  I know.  I know.  I think I'm going to

3    owe him a drink after today.

4       But, Your Honor, just to follow up on one of the requests

5    that Mr. Swanson made -- and perhaps you need some time to

6    think about this -- but does Apple have leave to file its

7    reply, its *Daubert* reply brief?

8          **THE COURT:**  All right.  You may.

9          **MS. RICHMAN:**  Thank you, Your Honor.

10          **MR. RIFKIN:**  Your Honor, to the extent that Apple

11    intends to raise new arguments or new evidence, we would

12    certainly like the opportunity to ask for permission to file a

13    short surreply.

14          **THE COURT:**  You can ask.

15          **MR. RIFKIN:**  Yes.  I understand you haven't granted

16    that permission yet.  Thank you.

17          **THE COURT:**  Does Apple want to be heard on the timing

18    issues that Mr. Rifkin has raised in terms of my last

19    scheduling order?

20          **MS. RICHMAN:**  Your Honor, I think it may make sense

21    for the parties to confer separately on a schedule for moving

22    forward.

23          **THE COURT:**  I'd like you to confer now.

24          **MS. RICHMAN:**  Okay.

25          **THE COURT:**  So I'll give you a week.

1          **MS. RICHMAN:**  Oh, I'm sorry.  I thought you meant for

2     the duration of the case.

3          **THE COURT:**  I am talking about the duration of the

4     case.  And I'd like you to -- just like this order, you know,

5     had deadlines that were teed off a decision, this controls

6     unless I have something else.  So they have asked for more

7     time.  You can assume, for purposes of argument, if a class is

8     certified, I'm going to want everything done, including the

9     identified -- the identification of those individuals.

10         **MR. RIFKIN:**  Yes, Your Honor.  Thank you for the

11    guidance.

12         **THE COURT:**  All right.

13         **MS. RICHMAN:**  A week is fine, Your Honor.

14       And did you set a deadline -- I'm sorry if I missed it --

15    for the supplemental class certification summary of the cases?

16         **THE COURT:**  I think a week as well.

17         **MS. RICHMAN:**  That's fine.  Thank you.

18         **THE COURT:**  You probably already have it written.  I

19    could say Monday; right?  Let's not.

20         **MS. RICHMAN:**  Thank you.

21         **THE COURT:**  All right.  We're adjourned.  Thank you.

22              (Proceedings adjourned at 11:34 a.m.)

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, June 26, 2023

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25