THEODORE J. BOUTROUS JR. (SBN 132099)
  tboutrous@gibsondunn.com
DANIEL G. SWANSON (SBN 116556)
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY (SBN 268644)
  CHigney@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
  JKleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS (D.C. Bar No.
1617356; *pro hac vice*)
  hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

**PUBLIC VERSION OF DOCUMENT
FILED UNDER SEAL**

**Attorneys for Defendant APPLE INC.**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR |
| | **DEFENDANT APPLE INC.'S REPLY BRIEF IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN AND DR. ROSA ABRANTES-METZ** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:        June 23, 2023 |
| | Time:        10:00 a.m. |
| | Courtroom: 1, 4th Floor |

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY          CASE NO. 4:11-cv-06714-YGR
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ

1

## **TABLE OF CONTENTS**

2

INTRODUCTION ............................................................................................................ 1

3

ARGUMENT .................................................................................................................. 1

4

I.       PLAINTIFFS' EVIDENCE IS INCOMPLETE AND INADEQUATE................................ 1

5

II.      MCFADDEN'S OPINIONS SHOULD BE EXCLUDED ...................................................... 2

6

         A.       McFadden's Model Cannot Reliably Estimate But-For Prices.................................... 2

7

                  1.       McFadden's model's price predictions are riddled with false positives .......... 3

8

                  2.       McFadden's "simulations" do not properly account for price tiers or
9
                          focal-point pricing.............................................................................. 6

10

                  3.       McFadden's model cannot reliably measure marginal costs ......................... 10

11
         B.       McFadden's Model Lacks Statistical Reliability ....................................................... 13

III.     ABRANTES-METZ'S OPINIONS SHOULD BE EXCLUDED ........................................ 17

12
         A.       Abrantes-Metz's 13.63% Commission Depends On "Just So" Inputs ...................... 17

13
         B.       Plaintiffs Fail To Defend Abrantes-Metz's Use Of An Accounting Equation .......... 18

14
         C.       Plaintiffs Fail To Defend Abrantes-Metz's Untenable Assumptions ........................ 19

15
         D.       Plaintiffs Fail To Defend Abrantes-Metz's Benchmark Analysis ............................. 20

16

CONCLUSION ............................................................................................................... 20

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

CASES

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019) ................................................................................................3, 11

*Apple Inc. v. Samsung Elecs. Co.*,
 2018 WL 1586276 (N.D. Cal. Apr. 2, 2018) .............................................................18

*Ayers v. Robinson*,
 887 F. Supp. 1049 (N.D. Ill. 1995) ............................................................................20

*In re Blood Reagents Antitrust Litig.*,
 783 F.3d 183 (3d Cir. 2015) .........................................................................................1

*Cambridge University Press v. Albert*,
 906 F. 3d 1290 (11th Cir. 2018) .................................................................................12

*Cooper v. Brown*,
 510 F.3d 870 (9th Cir. 2007) ......................................................................................17

*Daubert v. Merrell Dow. Pharmas., Inc.*,
 509 U.S. 579 (1993) ........................................................................................1, 3, 6, 13

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) ........................................................................................1

*Epic Games, Inc. v. Apple Inc.*,
 559 F. Supp. 3d 898 (N.D. Cal. 2021) .......................................................................19

*Epic Games, Inc. v. Apple Inc.*,
 67 F.4th 946 (9th Cir. 2023) ................................................................................19, 20

*Grodzitsky v. Am. Honda Motor Co.*,
 957 F.3d 979 (9th Cir. 2020) ........................................................................................1

*In re Hydrogen Peroxide Antitrust Litig.*,
 552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ......................................1, 2

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977). ...................................................................................................10

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999) ......................................................................................................4

*Laumann v. Nat'l Hockey League*,
 117 F. Supp. 3d 299 (S.D.N.Y. 2015) ........................................................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................................13, 16

*Lust By and Through Lust v. Merrell Dow Pharms.*,
    89 F.3d 594 (9th Cir. 2006)................................................................17

*Nadell v. Las Vegas Metro. Police Dep't*,
    268 F.3d 924 (9th Cir. 2001)................................................................4

*Nelson v. Matrixx Initiatives*,
    2012 WL 3627399 (N.D. Cal. Aug. 21, 2012)................................................20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) ...............................................1, 3, 6, 9, 10

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    2019 WL 4780183 (N.D. Cal. Sept. 30, 2019) ...............................................15

*Oracle Am., Inc. v. Google Inc.*,
    2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ................................................19

*In re Pork Antitrust Litig.*,
    2023 WL 2696497 (D. Minn. Mar. 29, 2023) ................................................15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ................................................................4

*Reed Const. Data Inc. v. McGraw-Hill Co.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)........................................................................1

*United States v. Chavez*,
    2021 WL 5882466 (N.D. Cal. Dec. 13, 2021) ................................................3

*United States v. Microsoft Corp.*,
    147 F. 3d 935 (D.C. Cir. 1998) ............................................................12

*United States v. Microsoft Corp.*,
    56 F. 3d 1448 (D.C. Cir. 1995)........................................................11, 12

*United States v. Rosacker*,
    314 F.3d 422 (9th Cir. 2002)..............................................................20

*Vallario v. Vandehey*,
    554 F.3d 1259 (10th Cir. 2009)............................................................1

*Wallace v. Int'l Bus. Machines Corp.*,
    467 F. 3d 1104 (7th Cir. 2006)............................................................12

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011)..............................................................1

**RULES**

Fed. R. Evid. 702 ..............................................................................................................1, 17, 19

**TREATISES**

5 Moore's Federal Practice § 23.80[2]...........................................................................................2

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Abrantes-Metz Decl. __** | Declaration of Rosa Abrantes-Metz in Support of Plaintiffs' Opposition to Apple Inc.'s *Daubert* Motion to Exclude, dated April 21, 2023, and filed at Dkt. 702-3 |
| **Abrantes-Metz Dep. __** | Transcript of the December 15, 2022 deposition of Rosa Abrantes-Metz, noticed and taken in this matter and filed at Dkt. 688-12 |
| **Abrantes-Metz Reply __** | Reply Report of Rosa Abrantes-Metz in Support of Plaintiffs' Renewed Motion for Class Certification, dated April 28, 2023, and filed at Dkt. 708-3 |
| **Berger __** | Expert Report and Declaration of Jonah Berger, dated March 10, 2023, and filed at Dkt. 688-7 |
| **Class Cert. Mot. __** | Plaintiffs' Renewed Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed September 26, 2022, at Dkt. 666-1 |
| **Class Cert. Opp. __** | Apple's Opposition to Plaintiffs' Renewed Motion for Class Certification, filed March 10, 2023, at Dkt. 688-2 |
| ***Daubert* Mot. __** | Apple's Notice of Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; Memorandum of Points and Authorities, dated March 10, 2023, and filed at Dkt. 688-1 |
| **Hitt __** | Expert Report and Declaration of Lorin M. Hitt, dated March 10, 2023, and filed at Dkt. 688-3 |
| **Hitt Dep. __** | Transcript of the April 14, 2023 deposition of Lorin M. Hitt, noticed and taken in this matter and filed at Dkt. 702-4 |
| **Hitt Reply __** | Reply Declaration of Lorin M. Hitt in Support of Apple's *Daubert* Motion, attached as Exhibit 1 to the Declaration of Caeli A. Higney and filed concurrently |
| **McFadden Decl. __** | Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Apple Inc.'s *Daubert* Motion to Exclude, dated April 21, 2023, and filed at Dkt. 702-2 |
| **McFadden 1st Dep. __** | Transcript of the August 3, 2021 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 477-17 |
| **McFadden 2d Dep. __** | Transcript of the November 5, 2021 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 581-3 |
| **McFadden 3d Dep. __** | Transcript of the December 5, 2022 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 688-11 |
| **McFadden 4th Dep. __** | Transcript of the February 17, 2023 deposition of Daniel L. McFadden, noticed and taken in this matter and filed at Dkt. 688-12 |
| **McFadden Op. __** | Expert Class Certification Report of Daniel L. McFadden, dated June 1, 2021, and filed at Dkt. 442-11 |
| **McFadden 2d Reply __** | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Renewed Motion for Class Cert., dated April 28, 2023, and filed at Dkt. 708-2 |
| **McFadden Supp. __** | Revised Supplemental Report of Daniel L. McFadden, dated January 19, 2023, and filed at Dkt. 679-1 |

| Abbreviation | Referenced Document |
|---|---|
| **Opp. __** | Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Rosa Abrantes-Metz, filed April 21, 2023, at Dkt. 701 |
| **Order __** | The Court's Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, dated March 29, 2022, and filed at Dkt. 630 |
| **Prince __** | Expert Report and Declaration of Jeffrey Prince, dated March 10, 2023, and filed at Dkt. 688-5 |
| **Prince 2d Decl. __** | Supplemental Declaration of Jeffrey T. Prince in Support of Apple's Motion to Exclude Reply Testimony of Professor McFadden, dated November 30, 2021 and filed at Dkt. 613-8 |
| **Prince Reply __** | Reply Declaration of Jeffrey Prince in Support of Apple's *Daubert* Motion, attached as Exhibit 2 to the Declaration of Caeli A. Higney and filed concurrently |
| **Schmalensee __** | Expert Report and Declaration of Richard Schmalensee, dated March 10, 2023, and filed at Dkt. 688-4 |
| **Schmalensee Dep. __** | Transcript of the April 4, 2023 deposition of Richard Schmalensee, noticed and taken in this matter and filed at Dkt. 702-8 |
| **Schmalensee 1st Rep. __** | Expert Report and Declaration of Richard Schmalensee, Ph.D, dated August 10, 2021, and filed at Dkt. 476-8 |
| **Watson __** | Expert Report and Declaration of Mark Watson, dated March 10, 2023, and filed at Dkt. 688-6 |

1

## INTRODUCTION

Class certification and an alleged $10 billion damages claim rest entirely on Plaintiffs' expert testimony, which must meet "the requirements of admissibility" under Federal Rule of Evidence 702. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  But Plaintiffs' expert evidence is not "the product of reliable principles and methods," "based on sufficient facts and data," or sufficiently "tested" to support class certification.  Fed. R. Evid. 702 (b), (c); *Daubert v. Merrell Dow. Pharmas., Inc.*, 509 U.S. 579, 593 (1993).  It should be excluded.[1]

## ARGUMENT

## I.   PLAINTIFFS' EVIDENCE IS INCOMPLETE AND INADEQUATE

Scrutinizing the reliability of expert evidence is a critical part of the Court's "gatekeeper" function—and doubly important where, as here, certification is staked entirely upon such evidence. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 983-86 (9th Cir. 2020).  After all, "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied."  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).  And "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 319, 321 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (Rule 23 "reject[s] tentative decisions on certification and encourage[s] development of a record sufficient for informed analysis"); *accord Vallario v. Vandehey*, 554 F.3d 1259, 1269 (10th Cir. 2009).

In conducting this analysis, the Court scrutinizes "the reliability of the expert testimony in light of the criteria for class certification," *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613, 614 (8th Cir. 2011)—namely, Plaintiffs' obligation to show common questions "can be determined in one stroke" and will "predominate over individualized ones," *Olean*, 31 F.4th at 664.  Plaintiffs' own briefs highlight that their experts' analyses are incapable of meeting that challenge.  *See* Fed. R. Evid. 704 adv. comm. n. (expert evidence must be "helpful to the trier of fact" to be admissible).  That is

---

[1] Apple's *Daubert* motion encompasses the opinions restated in Prof. McFadden's and Dr. Abrantes-Metz's reply reports (Dkts. 708-2 and 708-3).  *See* Dkt. 721.

because McFadden's results, even accepted in full, model injury for *only accounts* across *just three* genres—without even attempting to show how he would isolate and remove millions of uninjured members from the class before trial. Indeed, over 83% of accounts belonging to putative class members have made paid transactions in genres that McFadden has not even attempted to model yet, and *21 million accounts* (12.7%) have purchases *only* in those unstudied genres. Prince Reply Ex. 2.

Before Plaintiffs can attempt to demonstrate they will have adequate classwide proof, McFadden must devise a way to adapt his model to other genres—including fashioning 24 sets of instrumental variables and margin constraints. *See* Prince ¶¶ 184-88; Watson ¶ 86 & App'x G; Class Cert. Repl. 10-11. McFadden offers no guarantee that, in doing so, he will identify reliable instruments, use a representative sample of developer data, or improve on his "ad hoc" approach to constraints. Hitt ¶¶ 159–60; Prince ¶ 88; Watson, App'x G. Regardless, McFadden then needs to run the revised model against the full transactional dataset. Class Cert. Mot. 13. He will also need to run the "simulations" using his 75 samples, not just the one he has used to date. *See* McFadden Supp. ¶ 218 & n.294; McFadden 4th Dep. 99:2-20. McFadden (or yet-undisclosed "other experts," McFadden 3d Dep. 239:10-18) then must link accounts to individuals, net out estimated damages, and apply the $10 cutoff—a process that inevitably would affect the status of an indeterminate (but almost certainly large) number of accounts. Class Cert. Mot. 13 & n.12. Then, McFadden must weed out the millions of individuals that Plaintiffs concede are not in fact injured. *Id.* at 13.

Plaintiffs have demonstrated no ability to do all of these things. And it is no answer to say McFadden "intends or plans" to do so later. *In re Hydrogen Peroxide*, 552 F.3d at 318. To the contrary, "courts should not grant certification except after searching inquiry, and … should not rely on later developments to determine whether certification is appropriate." 5 Moore's Federal Practice § 23.80[2]. Once again, the Court should not be "willing to merely rubberstamp some future set of opinions." Order at 14.

## II.    MCFADDEN'S OPINIONS SHOULD BE EXCLUDED

### A.    McFadden's Model Cannot Reliably Estimate But-For Prices

The Supreme Court recognized that "[P]laintiffs' damages will be zero … if [Apple's] conduct has not caused the consumer to pay a higher-than-competitive price" for apps and in-app purchases due

to a supracompetitive commission rate. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1523 (2019). Thus, reliably predicting but-for prices is essential for any expert model to show whether injury has occurred. As explained below, McFadden's model is unreliable: it flunks the test of accuracy when measured against real-world data, and it does so because McFadden's model doesn't properly account for real-world phenomena such as 99-cent pricing and the low marginal costs characteristic of digital products.

### 1. McFadden's model's price predictions are riddled with false positives

To calculate how tens of millions of putative class members were impacted by Apple's alleged conduct, McFadden hypothesized that developers would "reduce their prices" in response to a commission reduction, McFadden 3d Dep. 192:10-2, and then built a model to purportedly predict that effect. Yet his central hypothesis is a *testable* proposition; Apple's three policy changes—the Small Business Program ("SBP"), the Video Partner Program, and the auto-renewing subscription reduction—provide *direct evidence* of how app developers responded to substantially reduced commission rates (from 30% to 15%). Hitt Reply ¶¶ 6-10. And the effect of these rate cuts on actual prices bears *no* resemblance to McFadden's predictions. McFadden admits he did not even *consider* these events, much less use them to verify his model's reliability. This is part of a larger pattern: McFadden did not test his model *against real data in any way, shape, or form* because he doesn't believe it is necessary or appropriate to do so. This is fatal.

As the Supreme Court has explained, "[a] key question to be answered in determining whether a theory or technique" is admissible is "whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593. That is because "[s]cientific methodology" itself "is based on generating hypotheses and testing them to see if they can be falsified." *Id.* Accordingly, "nonsensical outputs such as false positives" may "undercut [a] model's reliability." *Olean*, 31 F.4th at 683; *see also United States v. Chavez*, 2021 WL 5882466, at *3-4 (N.D. Cal. Dec. 13, 2021) ("false positive rate" is a "focal point" of *Daubert*'s error-rate inquiry). Econometricians therefore routinely test their models' predictions with observable data. *See* Hitt Reply ¶¶ 4-5 & nn.7-8, Prince ¶ 167 n.267 (collecting academic sources).

McFadden did not do this. Despite having available data, he admits that he did not once look at the "dynamics of the [price] response" to Apple's three commission rate changes, McFadden 3d Dep. 160:22-161:9—a clear failure on McFadden's part to "emplo[y] in the courtroom the same level

of intellectual rigor that characterizes [his] practice … in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Hitt, however, conducted several analyses of the real-world commission changes.[2] In Section 6 of his report (Hitt ¶¶ 51-101), Hitt analyzed the evidence from the three "natural experiments," which involve policies affecting apps that make up almost a third of consumer spending. Hitt ¶¶ 52-53; Hitt Reply ¶¶ 8-9 & n.9. He examined prices before and after the commission rate changes and confirmed that his results—that developers do not generally reduce price—were reliable by means of numerous robustness tests, including difference-in-difference regressions. Hitt ¶¶ 54-97, App'x 5 ¶¶ 15-28. These analyses were conducted at the individual "item level" as well as using McFadden's "app-level" composite price constructs, and they involved apps of multiple genres, not just the three that McFadden has modeled. *See, e.g.*, Hitt ¶¶ 72, 87.

Plaintiffs and McFadden respond to Hitt's Section 6 "natural experiments," but they are tellingly silent when it comes to Hitt's separate tests of McFadden's predictions in Section 7 of his report. Hitt ¶¶ 102-29. There, Hitt conducted a "truly apples-to-apples" comparison—testing McFadden's model's predictions against real-world prices (again including the composite in-app purchase constructs) for the same game, music and entertainment apps, experiencing the same rate reduction, at the same point in time. Hitt Reply ¶¶ 10-14. Hitt's Section 7 tests reveal false positives—predictions of price reductions when in fact none occurred—on a massive scale, providing definitive proof that McFadden's model is unreliable. *Id.* ¶ 7. For example, McFadden's model predicts that 60.5% of SBP apps with in-app purchases would set lower composite prices, while 0.5% would keep prices the same. *Id.* ¶ 11 & Fig. 1. But in reality ███████ of composite in-app purchase prices fell, and ██████████ stayed the same. *Id.* The results for subscription apps are even more damning: McFadden predicts that *89%* of such apps would reduce prices, but in reality ███████████ *Id.* ¶ 12 & Fig. 2. This is not just far from a 95% confidence level, it simply does not accord with reality. *E.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-54 (D.C. Cir. 2013) (model that predicted injury for uninjured class members "shred[ded] the plaintiffs' case for certification" as "there exist[ed] no reliable means of proving classwide injury"); *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 928 (9th Cir. 2001) (evidence "tend[ing] to produce 'false

---

[2] Plaintiffs withdrew their plan to raise a *Daubert* challenge to Hitt's evidence. *See* Dkt. 712.

positives'" properly excluded), *abrogated on other grounds*, *Beck v. City of Upland*, 527 F.3d 853, 862 n.8 (9th Cir. 2008).

Plaintiffs believe that McFadden's model is immune from testing against real-world results because it is used to predict but-for prices. *See* Opp. 8. McFadden's model, however, professes to estimate *real-world* consumer demand using *real-world* data. Prince ¶ 27. The model's predictions are adjusted to the but-for world only insofar as the commission rate is changed from the actual level to a hypothetical but-for level.[3] Plaintiffs claim that the model is completely reliable when it predicts that developer X would reduce the composite price for its in-app purchases from (say) $26.21 to (say) $21.94 if the commission rate dropped to 13.63%. But if the model is truly reliable for a commission reduction from 30% to 13.63%, it should be no less reliable for a commission reduction from 30% to 15%. And that can be tested using real-world data. Hitt ¶ 106. When it is tested, as shown in Section 7 of Hitt's Report, McFadden's model makes *comprehensively false predictions*—such as predicting that a commission drop to 15% would cause the composite in-app price for an app to fall *below* $26.21 when in the real world *that price does not change or even increase*s. *See* Hitt ¶¶ 114-15, 123-24.

In short, the model falsely predicts damage where there is none. Plaintiffs do not dispute that "many developers did not respond" when Apple cut the commission in half, asserting instead that "their price choices were heavily constrained [by price tiers] in the As-Is world." Opp. at 8. But as McFadden admits, these "results extend to the But-For world" if 99-cent pricing would arise in that world, McFadden Decl. ¶ 27, which it would. *See* Daubert Mot. 14-15; Order at 11 (excluding McFadden's prior opinion that "pric[e] tiers would not exist absent [Apple's] anticompetitive conduct"); *see also infra* § II.A.2 (explaining how McFadden's "simulations" do not fix the problem of false predictions).

Neither McFadden nor Plaintiffs dispute this fundamental conflict between the model's predictions and real-world outcomes. In contesting Hitt's (Section 6) natural experiments, Plaintiffs and McFadden conjure unidentified "confounding factors" to explain why prices generally did not fall when the commission rate dropped. McFadden Decl. ¶¶ 12-13; Opp. 9. Setting aside that Hitt's extensive robustness testing ruled out this possibility, McFadden makes no claim that his own model incorporates and accounts for any such "confounding factors." Hitt Reply ¶¶ 25-27. Plaintiffs hint at

---

[3] McFadden *did not even read* the Abrantes-Metz report that postulates the nature and attributes of competition in Plaintiffs' but-for world. McFadden 3d Dep. 195:20-21.

the role of price tiers as a confounding factor, Opp. 8, but McFadden's treatment of price tiers does not remedy the false-prediction problem. *See infra* § II.A.2. Thus, "[e]ither there are no confounding factors, and [Hitt's] analysis therefore demonstrates that [McFadden's] model delivers false positives, or there are confounding factors, but [McFadden] failed to incorporate them into his model. Either way, his model is unreliable." Hitt Reply ¶ 27. This stands in stark contrast to the expert in *Olean*, who "explained" why his regression model did not actually "yield[] false positives" with reference to "economic observation[s]" and market evidence. *Olean*, 31 F.4th at 674-76.

Regardless, Plaintiffs' and McFadden's attacks on Hitt's Section 6 analyses are dishonest distractions. Plaintiffs and McFadden claim Hitt failed to test his before-and-after results by "compar[ing] the treatment group (those impacted by Apple's programs) to a control group (those not impacted by Apple's programs)." Opp. 9; McFadden Decl. ¶ 13. But Hitt did exactly what Plaintiffs say he should have done, conducting *more than 50 regressions* using *six different control groups* for precisely that purpose. Hitt ¶¶ 71 (SBP) & 86 (subscription policy); *see* Hitt Reply ¶¶ 23-24, 28-30. And Plaintiffs and McFadden know this because they criticize those very same regressions. *See* Opp. 9; McFadden Decl. ¶¶ 14-15. As Hitt explains, their claims do not undermine his methods. Hitt testified that there was no issue of any lack of "parallel trends" infecting his results; if there were such an issue, Plaintiffs would readily be able to *demonstrate* it as McFadden "could have run such tests himself." Hitt Reply ¶¶ 29-34. That McFadden did not do so speaks volumes.[4] In any event, Hitt has produced the dozens of parallel trends checks that were run, Hitt Reply ¶¶ 29, 33-37 & App'x A, and his results also mirrored expert analysis of the effects from similar commission changes in the Google Play store (which does not impose price tiers). Hitt ¶ 98. In short, McFadden's model has not survived gold standard testing and has an unacceptably high "rate of error." *Daubert*, 509 U.S. at 593-94.

### 2. McFadden's "simulations" do not properly account for price tiers or focal-point pricing

The false positives shown by Hitt establish that McFadden has failed to model reality. One critical area where his model falls short is with regard to 99-cent pricing. Plaintiffs claim that McFadden's model can identify "uninjured accounts with precision, even in the presence of price tier

---

[4] McFadden's "placebo test" does not test for parallel trends; it shows "that prices do not generally decline when there is no commission rate decrease," consistent with Hitt's finding that prices also generally do not decline when the commission *does* decrease. Hitt Reply ¶¶ 38-43.

restrictions or voluntary focal pricing." Opp. 12 (quoting McFadden Supp. ¶ 81). For that to be true, McFadden's model needs to predict *individual* prices—and not just for app downloads but for all in-app item purchases, which account for 99% of Plaintiffs' $10 billion damage claim. Prince ¶ 123. Price tiers and focal pricing by definition occur at the individual (item) level. But McFadden does not profess to model or "simulate" individual item prices of in-app purchases at all, much less reliably.[5]

An illustration of the model's operations prepared by Prof. Berger is instructive:



Berger ¶ 123 & Ex. 21. As this depiction shows, McFadden takes a given app, which may have multiple in-app purchase items at distinct prices, and converts the item prices into a single composite number by simply averaging the prices together (with each price unrealistically given equal weight regardless of whether an item is a popular or unpopular choice)—here the nine items, which range in price from 99 cents to $99.99, are assigned a composite price of $26.21. McFadden assumes that $26.21 is a profit-maximizing "price" in the real world and then uses his model (which "has no feature which gives rise to focal-point pricing," Prince ¶ 42) to calculate based on that assumption that $21.94 would be the profit-maximizing composite price in the but-for world. McFadden uses the "percentage method" to

---

[5] To be clear, McFadden models the but-for prices of app downloads separately from the but-for prices of in-app purchases. Plaintiffs calculate damages for each and then add them together. References to McFadden's "app-level" or composite pricing herein refer to his method of estimating damages only for in-app purchase pricing. References to McFadden's "silence" on modeling in-app *item-level* but-for prices refer to the fact that he only claims to model *composite* but-for prices for in-app purchases, not that McFadden and Plaintiffs fail to assert damages for in-app purchases.

calculate damages—the $4.27 difference in composite prices is a 16.3% reduction—which results in implied prices for each of the individual purchase items that are lower by the same percentage (as shown in Berger's Exhibit 20).  *See* Berger ¶¶ 111-18 & Ex. 20.

McFadden denies that these implied prices are meaningful based on his *ipse dixit* that his model "is silent on the pricing of individual [in-app purchase] items" in the but-for world.  McFadden 3d Dep. 134:12-19; *see id.* 112:22-114:6; *see also Daubert* Mot. 11-13.[6]  But the implied prices generate McFadden's damage figures *exactly*, Prince ¶ 98; Berger ¶ 117, so the "silence" is rhetorical rather than mathematical.  McFadden's assertion of "silence" is flatly inconsistent with his "modeling method, his own calculation of damages, and his own computer code."  Prince ¶ 105.  Put simply, McFadden cannot be "silent" on but-for item-level prices for in-app purchases while calculating damages using those but-for item-level prices.

Because the percentage method does not generate 99-cent prices, Berger ¶ 117; Prince ¶ 134, McFadden adds "simulations."  McFadden Supp. ¶ 87 & n.98.  As depicted above, McFadden takes the as-is composite price ($26.21) and has his model search among the $1 increments around that price to determine which is profit-maximizing (again, using his model that "has no feature which gives rise to focal-point pricing," Prince ¶ 42)—in this example, choosing the "simulated" composite price of $22.21, which amounts to a percentage change of 15.26%.  Berger ¶¶ 122-23 & Ex. 21.  The implied items prices, once again, do not fall on any price tier or focal points; again, even though the implied item prices accord with his damages, McFadden asserts that the simulations are "silent" as to those prices.  McFadden 3d Dep. 134:12-19.

Apple's experts have explained at length why price tiers (or focal pricing) have a constraining effect that makes injury and damage far less likely to occur.  *See* Hitt ¶¶ 184-90; Schmalensee 1st Rep. ¶ 212.  For example ███████ *accounts* spent money *only* on low-priced items ($4.99 or less) that are unlikely to drop down a full tier even if the commission rate dropped to 13.63%.  Hitt ¶¶ 195-96.  Similarly, *almost* ███████ *accounts* made purchases at prices already subject to a 15% commission

---

[6] Even for apps with only one in-app purchase, McFadden testified that "I do not know what would happen" to the but-for price for that item.  *See* McFadden 3d Dep. 112:22-114:6 ("[T]he model is silent …. Even if … a developer has a single IAP item in the as-is world, I do not model nor am I predicting what their menu would look like in the but-for world.").

rate. *Id.*, Fig. 21.  Even Plaintiffs now seem to concede that price tiers prevent injury.  Opp. 8 ("Apple's price tiers" make it "hardly surprising that many developers did not respond to" Apple's commission reductions); *see* Hitt Reply ¶¶ 17-18.  Yet McFadden's "simulations" have virtually no impact on the damages he calculates.  McFadden Supp., Fig. 7; Opp. 3.  And Plaintiffs make no argument that the "simulations" resolve the false predictions that afflict McFadden's model.

This is clear proof that the "simulation" approach of moving a fictional composite price by dollar increments does not reflect the reality of 99-cent pricing.  Berger, who unlike McFadden *is* a subject matter expert, confirms that McFadden's "simulations" "do not account for pricing patterns exhibited in the real world."  Berger ¶ 101.  And when McFadden was asked "[h]ow you can implement price tiers in your model if your model can't predict individual IAP item prices," he had no answer (as none exists) other than to claim that his "simulations" used Prince's method.  McFadden 3d Dep. at 134:20-135:6.  But Prince never "endorse[d] that analysis as a way to properly account for price tiers for in-app purchases."  Prince ¶ 134.  Prince used it only to demonstrate failings in McFadden's *fixed-dollar method*, the predecessor to McFadden's percentage method, which the Court excluded for generating "absurd" results.  Order at 9.[7]

In any event, Plaintiffs admit that McFadden's methodology can stand only if his composite price modeling is a routine use of "average price and product data to estimate demand."  Opp. 11.  It is not, and *no empirical evidence* shows that it is.  In *Olean*, where the expert's pooled regression model was similarly questioned for improper averaging assumptions, the expert actually rebutted these challenges by "perform[ing] several tests (which he referred to as 'robustness checks') to confirm that his regression model was an appropriate tool."  31 F.4th at 672.  These robustness checks included "chang[ing] the model" to evaluate overcharges "specific to each individual defendant," "specific to certain products with different characteristics," and "based on customer types."  *Id.*  The expert also "performed a pricing correlation test, which demonstrated that prices … moved up or down together regardless of product or customer type."  *Id.* at 671.  By contrast, McFadden has run *no robustness checks*, has denied that any are necessary, has declared that his model is *unchangeable*, and has invoked

---

[7] The fixed-dollar method generated 99-cent item price points, *see* Prince ¶ 134 & App'x E, but it also generated negative prices, which led McFadden to turn to the percentage method.  Prince has always opined that the percentage method is incompatible with 99-cent pricing.  Prince 2d Decl. ¶ 11.

Gibson, Dunn & Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY   CASE NO. 4:11-cv-06714-YGR
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ                                                     -9-

"silen[ce]" to evade the embarrassment that his methods don't imply 99-cent prices.  *See* McFadden Decl. ¶¶ 34, 89; McFadden 3d Dep. 61:14-20, 79:4-9, 134:12-19; 160:22-161:9, 174:13-20.  This is no foundation for admissibility, particularly when Prince and Hitt performed the requisite robustness tests and the model flunked them.  Examining the empirical evidence, as Hitt and Prince did, shows that developers do *not* set in-app pricing at the "app level."  Hitt, App'x 4 (developers change item prices individually); Prince ¶¶ 116-18 & Ex. 12 (item prices do not move together).  And running McFadden's model on in-app purchase items alone doubles the number of unharmed accounts—demonstrating that McFadden's modeling and "simulations" are not accurate.  Prince ¶ 132.

Plaintiffs nonetheless ask the Court to ignore any analyses that "modif[y] the model."[8]  Opp. 10.  But, as in *Olean*, "chang[ing] the model" is one important way to test its robustness, 31 F.4th at 672, and McFadden offers no alternative robustness test.[9]  And the model itself—modified or not—rests on quicksand because it provides usable estimates only when McFadden assumes (absent any evidence at all) that observed prices, which necessarily are *tier* prices, are *exactly* profit-maximizing.  McFadden 3d Dep. 148:3-7.   Absent this unsubstantiated assumption, McFadden's model generates a vast, speculative damages range.  *See* Daubert Mot. 17-18; Prince ¶¶ 135-44; Schmalensee ¶ 128.[10]  In short, McFadden still effectively "ignores Apple's focal-point pricing and pricing tiers in calibrating but-for pricing," Order at 11, and his opinions accordingly still lack foundation.

### 3.     McFadden's model cannot reliably measure marginal costs

McFadden's treatment of costs in his modeling is another prime candidate for explaining why

---

[8] Plaintiffs say that Apple's experts "inappropriately use[] Prof. McFadden's estimated demand coefficients, which are conditional on app developers setting prices at the *app* level," Opp. 13, but the latter is a mere modeling *assumption* and, in any event, when McFadden estimates demand, he actually "conducts his analysis for each item—that is, he keeps data separate for each of the in-app purchase items offered for a given app."  Prince ¶ 27; *see also id*. ¶ 38; Prince Reply ¶ 4.

[9] Plaintiffs wrongly assert that the Court validated McFadden's "app level" analysis.  Opp. 10-11 & n.9.  In fact, the Court rejected Apple's arguments about in-app item pricing only "*to the extent* Apple argues that the model generates *negative* but-for [item] pricing."   Order 11 (emphases added).  Meanwhile, the Court *excluded* McFadden's model for "ignor[ing] … focal-point pricing and pricing tiers," which by definition apply to item prices.

[10] Plaintiffs and McFadden tie themselves in knots over this point, at once trying to bolster the assumption that as-is prices are optimal via McFadden's fact-free musing that "developers have designed their apps with price tiers in mind," while claiming in stark contradiction (and based on no admissible evidence) that removing the tiers would lead profit-maximizing developers to lower prices.  McFadden Decl. ¶ 58; Opp. 15.

---

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY        CASE NO. 4:11-cv-06714-YGR
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ                                -10-

he falsely predicts that lower commissions yield lower prices.[11]  Just like 99-cent pricing, developers' marginal costs have an enormous impact on whether consumers would pay less if commissions dropped.  Plaintiffs don't dispute that "if marginal cost … is zero," then "a change in the commission rate will have no impact on but-for price."  McFadden 3d Dep. 193:7-11; *see Pepper*, 139 S. Ct. at 1523 ("consumers' damages would presumably be zero" if "consumers would pay the same retail price regardless of whether Apple's commission was 10 percent or 30 percent").  And Plaintiffs do not "seriously disput[e] that a digital product may have little or no marginal cost," or that (for example) "intra-game currency … bears … out" this reality.  Opp. 7.  This is because "the costs of producing software are almost exclusively in its design," and therefore "marginal production costs are 'virtually zero.'"  *United States v. Microsoft Corp.*, 56 F. 3d 1448, 1452 (D.C. Cir. 1995).  *Any transaction* for a zero-marginal-cost product—like the virtual currencies that account for billions in spending, *see* Hitt ¶¶ 144-47, Fig. 17—would *cost exactly the same* in Plaintiffs' but-for world, leaving potentially millions of putative class members uninjured.  *See* Hitt ¶¶ 152-54 (more than ███ accounts purchased virtual currency).  Even when a developer's marginal costs are not zero, but relatively "little," Opp. 7, market realities like price tiers and focal-point pricing reinforce developers' incentive to keep prices the same in the face of commission variations, Hitt ¶¶ 139, 188-89.

But McFadden's model does not fit a digital world where marginal costs are low.  Prince computed the marginal costs that are generated by McFadden's model (using McFadden's composite pricing approach for in-app purchase items), which paints a picture of a world where marginal cost is never zero and rarely small (but sometimes absurdly negative):

---

[11] McFadden's model has other defects.  *See* Hitt ¶¶ 133-135.  For instance, a "tax incidence" model like McFadden's must account for the fact that "[o]vercharged direct purchasers … often compete with other sellers that have not been subject to the overcharge."  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977).  App developers indisputably face competition *within the App Store* from apps that pay no commission, Hitt ¶¶ 204-12, but McFadden ignores this, assuming that developers price like monopolists.  *See* Daubert Mot. 18-19.  McFadden also doesn't account for in-app advertising revenues despite admitting that such revenues may cause developers to *raise prices* in response to a commission reduction.  *See* Hitt ¶¶ 226-45; McFadden Op. ¶¶ 225, 240; Opp. 8 (McFadden "did not expressly model" advertising).

Prince Ex. 5.  In fact, McFadden predicts *more than* ████ of transactions have marginal costs above $10.  Prince ¶ 71 & Ex. 5.  This flies in the face of the widespread scientific consensus that marginal costs are nil in the digital realm,[12] and clashes with judicial experience, developer testimony, and the opinions of developers' experts.[13]

When asked if he had done "any analysis, any testing, to confirm whether the … marginal costs that [his] model generates … are actually correct and accurate," McFadden said:  "The answer is no."[14] McFadden 3d Dep. 174:14-20.  Instead, McFadden makes modeling assumptions that have *no empirical basis*.  McFadden 3d Dep. 76:11-77:14.  McFadden's model *assumes* that as app and in-app

---

[12] *See* Hitt ¶ 143 nn.154 & 155, Prince ¶ 36 n.65 (compiling academic literature recognizing that zero or very low marginal costs are a defining feature of digital goods).

[13] **Precedent:** *Wallace v. Int'l Bus. Machines Corp.*, 467 F. 3d 1104, 1107 (7th Cir. 2006) ("[T]he marginal cost of an additional user [of intellectual property] is zero."); *United States v. Microsoft Corp.*, 147 F. 3d 935, 939 (D.C. Cir. 1998) ("[M]arginal production costs [of software] are negligible"); *Microsoft*, 56 F.3d at 1452 (similar); *Cambridge University Press v. Albert*, 906 F. 3d 1290, 1301 (11th Cir. 2018) ("[I]t is *always* the case that a publisher's 'marginal cost for authorizing digital copies would be virtually nil, and would not vary no matter how many digital copies were authorized.'").  **Developers:** Ex. 4 (Sweeney Trial Tr.) 190:12-16 ("There is no cost to a V-Buck.  There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.").  **Developer Experts:** Dkt. 642-13 (Elhauge Dep.) 40:9-41:6; Dkt. 642-12 (Economides Dep.) 241:12-242:14, Ex. 5 (Evans Trial Tr.) 1692:10-12.

[14] This means there is no empirical support for Plaintiffs' argument that McFadden's implausibly high marginal costs can be justified because Apple and its experts consider only "marginal costs … at the transaction level," and ignore "variable costs" like usage and user acquisition costs.  Opp. 6.  McFadden merely *assumes* without evidence that these are marginal costs.  McFadden 3d Dep. 158:13-159:15 (failing to cite "any evidence" for this "assumption").  And marginal cost is defined (by McFadden himself) as "the increment[al] addition to cost that results from producing *one more unit of output*." McFadden 3d Dep. 153:4-7 (emphasis added); *id.* 156:17-25.  Here, one more unit of output is one more purchase transaction.  *Id.* at 153:18-154:17.  Plaintiffs speculate about costs of "coding" and "labor," Opp. 7, but neither those costs nor user acquisition costs (like advertising) increase with each click of the buy button.  *See* Hitt ¶¶ 161-62, App'x 6 ¶¶ 36-41.

purchase prices increase, marginal costs *must* do so too.[15]  *See Daubert* Mot. 10-11; Prince ¶¶ 20-23. Indeed, McFadden's model outright "forbids [the] possibility … that high prices could also be associated with low or even zero marginal costs." *Id.* ¶ 75.  McFadden allows only one (composite) price point where marginal cost can even be zero. *Id.* ¶¶ 75-78.  As Prince's results show, in reality "it is impossible for Professor McFadden to find a marginal cost close to zero, let alone exactly zero." *Id.* ¶ 80.  As if that were not enough, in the course of estimating his assumption-driven model, McFadden imposes "margin constraints" that further skew his results against finding low marginal costs.  For example, he constrains marginal costs for games to average 10 to 40% of price—far above zero.  *Id.* ¶ 89.  All of his rigid assumptions and constraints hardwire his model to allow *only* the lowest-priced transactions to generate no harm.[16]  *Id.* ¶¶ 79-84 (showing relationship between as-is price, but-for price, and overcharge); *Daubert* Mot. 10.  "[E]ven though most transactions are for low-priced items, Professor McFadden's model guarantees large amounts of total harm and few unharmed consumers by replacing individual item prices with composite in-app purchase prices."  Prince ¶ 81.

McFadden's "modeling assumption[s]" about marginal cost are "not borne out in actual real-world data." Hitt ¶ 180.  As McFadden himself has previously urged, a model "depend[ing] on overly simplistic marginal cost assumptions that have no economic or factual bases" should be excluded.  Ex. 3 (*Laumann* Decl.) at 15; *see id.* ¶¶ 7, 32-35.  McFadden's model in this case is exactly such a model.

### B.   McFadden's Model Lacks Statistical Reliability

The Court has sought clarification on McFadden's "model's confidence level" given that it excluded the model because it "allow[ed] for accounts to easily flip from harmed to unharmed."  Order at 13 & n.10.  Plaintiffs assert that McFadden has "addressed" this "switcher problem," Opp. 19, but they do not repeat their earlier assertion (Class Cert. Mot. 11) that his model's results are reliable "at a 95 percent confidence level."  In fact, they provide no evidence to suggest that the "identity or number of unharmed" accounts—which has now ballooned to more than 10 million (7.9% of the putative class after the $10 cutoff), *see* McFadden Supp Figs. 6 & 7; Prince ¶¶ 56–58 & Ex. 4—is any more "tightly determined," Order at 13, than McFadden's previous failed efforts.  This is very much due to the

---

[15] Apple's experts ran empirical robustness checks showing that this assumption is false.  Hitt ¶¶ 180-83; Prince ¶¶ 88-90, 179-82.

[16] Since his marginal cost estimates are never zero, these low-priced transactions (including *any* 99-cent download) must (absurdly) bear a *negative* marginal cost.  Prince ¶¶ 14, 17, 35, 73, 80 & Ex. 7.

Gibson, Dunn &
Crutcher LLP

model's infirmities that leave it without statistical robustness—such that small changes in his samples, data or assumptions lead millions and millions of accounts to ping pong back and forth between harmed and unharmed status.[17]

   *First*, any claim of high statistical confidence for McFadden's modeling is laughable in view of his pervasive false predictions. *See supra* § II.A.  Regardless, Watson comprehensively dismantled any notion of statistical reliability by showing that McFadden's results are determined in almost every instance by a "sample" of margin data from *just six developers*.  *See Daubert* Mot. 19-22.  Like McFadden, Plaintiffs do not contest that these six developers are wholly "unrepresentative of the broad array of different apps in the games, music, and entertainment genres."[18] Hitt ¶ 164; *see Daubert* Mot. 21; McFadden 3d Dep. 173:17-174:4.  Reliability requires data "from a large representative sample." Watson ¶ 29; *see id.* ¶ 65; Order at 12-13 (citing samples of 3600-7000).  But by treating margin ranges from just six developers as if they are "known with certainty," *id.* ¶¶ 72-75, McFadden's methods "lead[] directly to uncertainty or margin of error regarding which accounts are harmed" regardless of whether he runs his model on one sample, 75 samples, or the full transactional database, *id.* ¶¶ 77-81 (showing that different margin ranges beget entirely different results).  Plaintiffs have no response to this damning critique.[19]

   Expert testimony must be "based on sufficient facts or data."  Fed. R. Evid. 702.  Plaintiffs vaunt McFadden's use of data from "approximately ████████ transactions" to estimate consumer demand, Class Cert. Mot. 10, which they say he "*supplement[s]*… with developers' cost data" and thus "improves the reliability of the demand estimation" by "us[ing] *more data* than is typically used."  Opp.

---

[17] "[T]he issue of robustness—whether regression results are sensitive to slight modifications in assumptions … is of vital importance" to assessing a model's reliability. Daniel L. Rubinfeld, Reference Guide on Multiple Regressions, in Reference Manual on Scientific Evidence 322 (Fed. Jud. Ctr. ed., 2011).  Accordingly, "robustness and sensitivity testing relates directly to two of the Daubert factors articulated by the Supreme Court: whether the methodology 'can be (and has been) tested' and the methodology's 'known or potential rate of error.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018) (quoting *Daubert*, 509 U.S. at 594).

[18] Despite previously claiming that it would be "appropriate" to "adjust [his] bounds" as "additional data became available," McFadden 1st Dep. 186:13-187:8, McFadden has not looked at a single iota of additional data in the more than two years since he filed his Opening Report.  McFadden 3d Dep. 171:20-172:11.  Apple's experts, on the other hand, have reviewed the data produced and found that none of it would cure the flaws in McFadden's analysis. Hitt ¶ 172.

[19] Moreover, McFadden has not even attempted to define the margin constraints for the 24 genres he is yet to model, which means it is entirely unclear whether a vast number of consumers will be in or out of the class when Plaintiffs ultimately try to model injury and damages on a classwide basis.

18 (emphases in original); *see* McFadden Decl. ¶ 80. But the unrefuted findings of Apple's experts prove otherwise. Where McFadden *does* use the billions of transactional data points, it is in a "grossly imprecise" regression analysis that yields "nonsensical results," including *positive* price sensitivity coefficients (absurdly signifying that consumers prefer *higher* prices) for more than two-thirds of his samples. Watson ¶¶ 17, 83-89; *see Daubert* Mot. 23-24. And far from "correcting for some imprecision in variables," Opp. 20, his developer margin constraints—drawn arbitrarily from just six developers in three genres—do not "supplement" but *supplant* those unreliable estimates more than 96% of the time, thus determining almost every penny of the $10 billion in damages that McFadden calculates. Watson ¶¶ 16, 34-51, Exs. 2 & 4; *Daubert* Mot. 19-21.[20]

Plaintiffs dispute none of this. Instead, they spend much of their opposition chastising Apple's experts for "peel[ing] apart [McFadden's] equation to separate out the evidence-derived margin bounds from the transaction data," Opp. 17—in other words, for running McFadden's model without the margin constraints in place. *See* McFadden Decl. ¶ 80 (criticizing Apple's experts for "implementing an estimation methodology" that he "never used in [his] reports"). But "a structural model is only as reliable as its component parts." *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 316 (S.D.N.Y. 2015). "Peeling apart" McFadden's model is precisely what Apple's experts (and the Court) *need* to do in order to test the claim that the transactions data is the "main data source" for McFadden's analysis, McFadden Op. ¶ 138, and that the margin constraints merely "correct[] for some imprecision in variables," Opp. 20. *See Laumann*, 117 F. Supp. 3d at 315-16; Rubinfeld, *supra*, at 327 (a "useful diagnostic technique" for the robustness of a model "is to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample"); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183, at *7 (N.D. Cal. Sept. 30, 2019) (rebuttal expert's robustness testing that applied an affirmative expert's "methodology to different data or with different assumptions" was directly relevant to *Daubert*). Such testing is also necessary to check McFadden's claim that his model would "give roughly similar results … with different bounds drawn." McFadden 1st Dep. 184:1-10. Watson disproves this claim too: slight adjustments to McFadden's

---

[20] Plaintiffs perform interpretive gymnastics to argue that the Court "already rejected Apple's insufficient data argument." Opp. 16-17. Far from it. If anything, the Court agreed with Apple; it found after reviewing McFadden's workpapers on its own initiative that "the data" underlying his "opinions with respect to developer costs" were "not fulsome." Order 10 n.8.

margin ranges cause *millions* of accounts to switch from harmed to unharmed, Watson ¶¶ 52-58—a sure sign that McFadden's "model is insufficiently robust to withstand the scrutiny of Rule 702," *Reed Const. Data Inc. v. McGraw-Hill Co.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) (excluding model where "very minor changes in arbitrarily selected model parameters can entirely alter [its] conclusions").

**Second**, McFadden's model is still exquisitely "sensitive to small changes," a hallmark of an unrobust model. *In re Pork Antitrust Litig.*, 2023 WL 2696497, at *12 (D. Minn. Mar. 29, 2023); *see also* Rubinfeld, *supra*, at 322 ("[W]hether regression results are sensitive to slight modifications in assumptions … is of vital importance"). The smallest tweaks—such as a genre change for a few apps in his data, or running his model on a combined pool of the exact same accounts in his 75 samples— can cause *millions* of class accounts to ricochet between harmed and unharmed. *Daubert* Mot. 22. These are "switchers" in the same sense as in the Court's Order: accounts "switched between harmed and unharmed … depending on the sample used." Order at 13; Prince ¶¶ 50-54. Indeed, in the second example, *almost four million accounts* switched when the model was run on *the exact same set of user accounts*, Watson ¶¶ 97-100 (running model on pooled sample)—an "internally inconsistent result[]" that "seriously undermine[s] [the model's] reliability." *In re LIBOR*, 299 F. Supp. 3d at 478. Plaintiffs and McFadden try to downplay these examples as affecting a small percentage of accounts, McFadden Decl. ¶ 90, or deriving from "slight differences in the estimated demand coefficients," Opp. 19. But such handwaving ignores the key point that tiny changes in the model's inputs can cause enormous differences in results relative to the size of the adjustment, *see* Watson ¶ 70—a fact made clear by Apple's experts' findings (again, in analysis that is *undisputed*) that a shift of just *seven* apps in and out of *just one* of McFadden's 75 samples following his genre reclassification caused more than *one million* accounts to switch from harmed to unharmed. Prince ¶ 155; Watson App'x H ¶ 32; *see also* McFadden 4th Dep. 68:3-20 ("outlier[]" coefficients can "hav[e] excessive weight").

McFadden's maxim that "[w]hen data changes, econometric models should produce different results," McFadden Decl. ¶ 89, only highlights the scale of the problem. McFadden must still model more than 60% of apps with paid transactions in the 24 genres he hasn't yet touched. Prince ¶¶ 183-84, 188; *see supra* § I. But these robustness checks show that, whether this model is run now, tomorrow,

1   or before trial, determining whether any account was truly harmed or benefited from Apple's conduct—

2   and how many millions of accounts fall in either category—is anybody's guess.  The model's lack of

3   "robustness" and nonexistent "confidence level" preclude its admission.  Order at 12-13 & n.10.

4   **III.    ABRANTES-METZ'S OPINIONS SHOULD BE EXCLUDED**

5          The but-for commission rate has an enormous impact on injury and damages: using a 15% but-

6   for rate (instead of Abrantes-Metz's estimated 13.63% rate) would almost double the percentage of

7   uninjured accounts.  Prince, Ex. 21.  Plaintiffs argue that "academic literature" does not contradict

8   Abrantes-Metz's 13.63% but-for rate opinion, faulting Apple's experts for not blueprinting "the 'right'

9   way" to conduct her analyses.  Opp. 22, 25, 29.  But "the proponent of the expert … has the burden of

10  proving admissibility." *Lust By and Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir.

11  2006); *accord Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  Critically, Microsoft recently

12  produced documents that undermine Abrantes-Metz's core assumptions—swinging *tens of millions* of

13  accounts between injury and no injury.

14         **A.    Abrantes-Metz's 13.63% Commission Depends On "Just So" Inputs**

15         Abrantes-Metz agrees that the reliability of her "model" turns on "the quality of the inputs."

16  Abrantes-Metz Decl. ¶ 9; *see also* Fed. R. Evid. 702, 2000 adv. comm. n. ("[A]ny step that renders the

17  analysis unreliable … renders the expert's testimony inadmissible.").  But her "real-world inputs,"

18  Opp. 27, are nothing more than cherry-picked selections to make McFadden's model generate the

19  desired results.  A prime example is Abrantes-Metz's use of the Microsoft Store as the lone comparator

20  for a but-for profit margin, where she relies on a single report produced by Microsoft.  Regardless,

21  Abrantes-Metz testified that "if [she] had more data [she] would certainly want to use it."  Abrantes-

22  Metz Dep. 181:17-19.  Now there is more data, and it dismantles any notion that her inputs are reliable.

23         Where Abrantes-Metz relied on Microsoft's report of a ▆▆▆ operating margin in 2019,

24  Microsoft has now produced subsequent reports with a ▆▆▆ margin in 2020 and ▆▆▆ margin in 2021.

25  *See* Hitt Reply ¶ 44.  This new evidence is, in Plaintiffs' words, "reliable primary evidence" of

26  Microsoft's margin.  Opp. 27-28 & n.26.  When those margins are considered, Abrantes-Metz's "just

27  so" house of cards collapses.  Changing nothing else in her analyses, using Microsoft's now-produced

28  2021 profit figure—which is essentially identical to the figure used by developers' expert, Prof.

1   Economides, in his single-entrant scenario,[21] *see* Dkt. 352-1 ¶¶ 49-50 & Table 6

2   ████████████████████████████ *Id.* ¶ 44 & Fig. 3.  The 2020 profit figure

3   *Id.*  Using an average puts the commission between ████████████ and ████ *Id.*

4   With Plaintiffs' proposed $10 cutoff, this leaves as many as ████ of accounts

5   uninjured.  *Id.* ¶¶ 45-46 & Fig. 4; *see also* Prince Reply Ex. 1.

6          This is not the only flawed input used by Abrantes-Metz.[22]  But this new evidence reveals that

7   there is no reliable justification for selecting Microsoft as the only benchmark.  Hitt Reply ¶¶ 44-51 &

8   Fig. 3. ████████████████████████████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████ Abrantes-Metz also rejected the

13  Samsung Galaxy Store because "Google is alleged" to have offered it an anticompetitive agreement,

14  *id.* ¶ 117, even though no one claims Samsung accepted.  And she rejected the Amazon App Store

15  because "Google is alleged to have interfered with the Amazon Appstore's ability to compete," *id.*,

16  even though the same could be said for the Microsoft Store at the hands of Steam.  Precedent demands

17  that Abrantes-Metz use explicable, not merely expedient, methods.  *See Apple Inc. v. Samsung Elecs.*

18  *Co.*, 2018 WL 1586276, at *22 (N.D. Cal. Apr. 2, 2018) (opinions inadmissible when "a foundational

19  assumption" is unsupported by "sound economic reasoning").  This alone is fatal.

20  **B.     Plaintiffs Fail To Defend Abrantes-Metz's Use Of An Accounting Equation**

21          To try to rehabilitate Abrantes-Metz's accounting equation, Plaintiffs splice together testimony

22  from Profs. Hitt and Schmalensee to garble what each said.  Opp. 22.  They in fact explained that

23  accounting identities can be *part of* an economic model, but Abrantes-Metz's equation does not model

24

25  [21] He also estimated a two-tiered commission structure.  Dkt. 352-1 ¶ 56 & Table 7.

26  [22] Plaintiffs also dispute Abrantes-Metz's assumption that "the market was at all times the same size as
    it was in 2019."  Opp. 27.  But that is what she does.  She calculates a single but-for commission by

27  "set[ting] the market size … equal to [the] total [of] App Store billings for 2019."  Hitt ¶ 300.  She then
    applies the calculated figure across all years, ignoring dramatic changes in app billings since 2008.  *See*

28  *id.*  Plaintiffs do not dispute this artifice's effect: using billings from other years, the number of
    uninjured accounts ranges from 7.7% to 42.7% with the $10 cutoff.  Hitt ¶ 301 & Fig. 29.

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY          CASE NO. 4:11-cv-06714-YGR
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ                                                -18-

1   economic behavior.   Hitt Dep. 167:13-169:15; Schmalensee Dep. 101:17-21.   Abrantes-Metz's

2   accounting identity is merely "a definition" producing a but-for commission from an assumed

3   relationship between certain inputs—indifferent to any proven economic relationship.   Hitt

4   Dep. 167:13-174:21; Hitt ¶¶ 253, 260-65; Schmalensee Dep. 117:6-119:8; Schmalensee ¶¶ 11, 53-56.

5   As Schmalensee explains, this is no more "a model of the commission rate" than calculating average

6   car mileage is "a model of driving behavior."   *Id.* ¶ 54.

7          Plaintiffs also argue that the Court already approved Abrantes-Metz's disregard of indirect

8   network effects, Opp. 4-5, 23, but the cited discussion about market definition did not even mention

9   them.   *See* Order at 4.   Moreover, Abrantes-Metz's defense—that indirect network effects need not be

10   studied because consumers are not subsidized—is contradicted not only by the App Store's legion of

11   free apps and her own scholarship, Schmalensee ¶¶ 64–65, but also this Court's now-affirmed finding

12   of strong indirect network effects.   *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 964, 994, 1007

13   (N.D. Cal. 2021); *see also Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 984 (9th Cir. 2023).

14          **C.          Plaintiffs Fail To Defend Abrantes-Metz's Untenable Assumptions**

15          Plaintiffs' attempts to recast Abrantes-Metz's unsupported assumptions as "conservative"

16   differences of opinion also fail.   Opp. 25.   Plaintiffs first argue that assuming a single competing app

17   store is not "inconsistent with academic literature."   *Id.*   Setting aside that Plaintiffs point to no literature

18   in their favor, Federal Rule 702 does not condone supplanting "real-world behavior" with "artificially-

19   selected features."   *Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012).

20   Here, multiple app stores populate not only Android, but also the asserted "Windows PC game apps"

21   market that Abrantes-Metz insists is the "most comparable benchmark."   *Daubert* Mot. 26-27; *see*

22   Abrantes-Metz Decl. ¶ 29.   Indeed, Plaintiffs do not even try to rehabilitate Abrantes-Metz's admitted

23   inability to substantiate her assumption with any evidence.   Abrantes-Metz Dep. 31:2-8.

24          Abrantes-Metz's next assumption—that the two app stores in her but-for world would offer

25   identical terms, services, and commission rates—is equally unsupported.   Opp. 25-26.   This assumption

26   is not conservatism, *id.* at 26, but a necessity given McFadden's admission that his model "assume[s] …

27   a uniform but-for commission rate," McFadden 2d Dep. 159:7-15.   Plaintiffs do not explain how it is

28   "consistent with well-established academic literature," Opp. 26, leaving the Court with only Abrantes-

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY          CASE NO. 4:11-cv-06714-YGR
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ                              -19-

Metz's assurance that "[w]hile it is possible that one store may attempt to differentiate itself from the other, there is no reason to believe that they necessarily or likely would," Abrantes-Metz Decl. ¶ 67. This is conjecture ungrounded in economic facts as nobody disputes there is intense differentiation, including on price, in the real world (including, again, among the PC games stores that Abrantes-Metz insists is the most comparable benchmark). *See* Hitt ¶¶ 266-76; Schmalensee ¶¶ 76-80.  And the Ninth Circuit has recognized that "basic economic[s]" suggest that "without Apple's restrictions … would-be [App Store] competitors … would *differentiate themselves from the App Store on price*." *Epic*, 67 F.4th at 985; *id.* at 987 (app-transaction platform market is "*heterogenous*" (emphases added)).

Nor can Plaintiffs rebrand these assumptions as "conservative." Opp. 25-26.  An unjustifiable, conservative assumption is still unjustifiable.  *United States v. Rosacker*, 314 F.3d 422, 426 (9th Cir. 2002); *see also Ayers v. Robinson*, 887 F. Supp. 1049, 1060-61 (N.D. Ill. 1995) ("[A] conservative opinion … does not equate to a scientific one.").  Regardless, Plaintiffs have no rejoinder to Hitt's demonstration that adding an additional rival substantially boosts the but-for commission rate.  Hitt ¶¶ 292-99.  Plaintiffs complain that Apple did not "suggest a different methodology," Opp. 26, but it is Plaintiffs' burden, not Apple's, to offer reliable classwide evidence, and it was Plaintiffs' decision, not Apple's, to again build their case on an assumed pricing framework that is incompatible with reality.

### D.    Plaintiffs Fail To Defend Abrantes-Metz's Benchmark Analysis

Plaintiffs also fail to establish that Abrantes-Metz's "benchmark analysis" is reliable.  Opp. 29-30.  They suggest that her refusal to consider obvious comparators and inclusion of dissimilar benchmarks is "a question of expert judgment," Opp. 30, but the invocation of "judgment" cannot insulate an arbitrary opinion from review.  *E.g.*, *Nelson v. Matrixx Initiatives*, 2012 WL 3627399, at *12 (N.D. Cal. Aug. 21, 2012).  As the Court observed, cherry-picking benchmarks—excluding those inconvenient for Plaintiffs' case—is an unreliable departure from commercial reality.  Order at 5-7.

### <u>CONCLUSION</u>

The Court should hold an evidentiary *Daubert* hearing and grant Apple's motion.


DATED:  June 30, 2023                            GIBSON, DUNN & CRUTCHER LLP

                                                 By: */s/ Daniel G. Swanson*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Theodore J. Boutrous Jr.
Daniel G. Swanson
Cynthia E. Richman
Caeli A. Higney
Julian W. Kleinbrodt
Harry R. S. Phillips

*Attorneys for Defendant Apple Inc.*

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE TESTIMONY
OF DANIEL L. MCFADDEN AND ROSA ABRANTES-METZ

CASE NO. 4:11-cv-06714-YGR
-21-