**EXHIBIT 2**

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3          Before The Honorable Thomas S. Hixson, Magistrate Judge

 4

 5   IN RE:                        )  Case No. C 11-06714-YGR
                                   )
 6   APPLE iPHONE ANTITRUST        )
     LITIGATION                    )
 7   _____)

 8                                    San Francisco, California
                                      Monday, June 17, 2024
 9

10     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
               RECORDING 10:03 - 11:01 = 58 minutes
11
     APPEARANCES:
12
     For Plaintiff:
13                                    Wolf Haldenstein Adler Freeman
                                        & Hertz
14                                    270 Madison Avenue
                                      New York, New York 10016
15                                    (212) 545-4600
                                 BY:  THOMAS H. BURT, ESQ.
16
     For Defendant:
17                                    Gibson Dunn & Crutcher, LLP
                                      One Embarcadero Center
18                                    Suite 2600
                                      San Francisco, California
19                                      94111
                                 BY:  CAELI A. HIGNEY, ESQ.
20
     Transcribed by:                  Echo Reporting, Inc.
21                                    Contracted Court Reporter/
                                      Transcriber
22                                    echoreporting@yahoo.com

23

24

25
```

2

Monday, June 17, 2024                              10:03 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  All right, everyone.  Good morning.
We're here in Civil Action 11-6714, In Re iPhone Antitrust
Litigation, the Honorable Thomas S. Hixson presiding.

Counsel, please state your appearances for the record.
Let's start with Plaintiff's counsel.

MR. BURT (via Zoom):  Thomas Burt, Wolf
Haldenstein Alder Freeman and Herz, LLP, for the certified
class.  Thank you for your time and patience this morning,
your Honor.

THE COURT:  Good morning.

MS. HIGNEY (via Zoom):  And Caeli Higney of
Gibson, Dunn and Crutcher, for Apple, Inc.

THE COURT:  Good morning.

MS. HIGNEY:  Good morning, your Honor.

THE COURT:  At Apple's request and pursuant to the
stipulation between the parties, the Court has sealed this
hearing today.  We have a number of other individuals whose
names are appearing but have their video turned off, Kyle
Wood, Kelley Schiffman, Ashle Holman, Dave Grothouse, Eli
Vazerus (phonetic), Anna Link, Ramona Lin.

Do Plaintiffs and Apple recognize these as additional
counsel for Plaintiffs and Apple?  Mr. Burt?

3

1          MR. BURT:  I do, your Honor.  I recognize every
2    name the Court listed as either counsel for Apple or the --
3    for Plaintiffs or for Gibson Dunn except Mr. Grothouse, who
4    I understand to be with Apple.
5          THE COURT:  And, Ms. Higney, is this correct?
6          MS. HIGNEY:  That is correct, your Honor.
7          THE COURT:  And do you also recognize the names?
8          MS. HIGNEY:  I do.
9          THE COURT:  Great.
10         MS. HIGNEY:  And I recognize Plaintiff's counsel's
11   names and my colleagues at Gibson and Mr. Grothouse, who is
12   in house counsel at Apple.
13         THE COURT:  Okay.  Thank you.  I just wanted to
14   confirm that.
15      Let me turn, Mr. Burt, to you.  It looks like from the
16   parties' filing at ECF Number 877 the meeting and conferring
17   has gotten bogged down, but it's been a little while since
18   that document was filed.  So, maybe I could turn to you
19   first for a status update.
20         MR. BURT:  Your Honor, we -- we did speak after
21   the filing of our status update with Apple's counsel on the
22   issue of the -- of the linking data or unique transaction
23   identifier that we had discussed and for which there was a
24   concern about its unavailability due to automatic deletion
25   for dates prior to sometime in the spring of 2014.

4

1    Apple has advised us -- and they can speak for

2  themselves if I in some way get this wrong.  Apple has

3  advised us that after looking around the teams internally

4  that might use this information, ████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████

7  ██████████████████████████████  through their --

8  the concern that we have been discussing lately was in part

9  that that number had not been maintained and was no longer

10 usable.  That means that, as we understand it, ████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ██████████████  , and that -- that at least takes away one thing

14 that was a very significant live concern to us.

15    So, in our view, that does advance the ball from where

16 we were at the time of the status update, though, of course,

17 we still need to have something we need to talk to the Court

18 about.

19        THE COURT:  Right.  Okay.  So, my understanding is

20 that you're referring to the issue of pre-2014 data that was

21 described in at least a couple of the filings.  Is it your

22 understanding that that data issue has been resolved?

23        MR. BURT:  It's my understanding, your Honor, that

24 they have -- that there's ██████████████████████████████████

25 ██████  ████████████████████  ████████████████████  ████████████████████

5

1 ███████████████████████████.  We're just talking

2 about what needs to be turned over.

3          THE COURT:  And, Ms. Higney, let me turn to you.

4 Does Apple agree that there's no longer a problem of missing

5 data from before 2014?

6          MS. HIGNEY:  That's correct, your Honor.  As -- as

7 Mr. Burt said, █████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 That's the linking or the key that has been discussed in the

11 parties' other filings.  Now, we don't -- there's -- there

12 might be a current dispute over, you know, what data we need

13 to turn over to Plaintiff still.  We thought we had agreed

14 upon a sampling proposal that Plaintiffs have now walked

15 back from, but there's no longer an issue about data

16 deletion.  That's correct.

17          THE COURT:  Okay.  Thank you.  I appreciate that

18 update.

19      Well, then, Mr. Burt, let me turn to you.  There was a

20 discussion in the most recent filing about Apple producing a

21 sample of data and then Plaintiffs working with their claims

22 administrator and their expert to determine if that sample

23 would be sufficient, but it sounded like until you had the

24 chance to review that sample, you didn't want to commit the

25 sample would be the only thing that you would receive.  Is

6

1  that correct?

2      MR. BURT:  That's correct, your Honor.  I might be

3  able to illuminate this a little bit.  And I think, you

4  know, we are -- I'm surprised -- well, Ms. Higney

5  characterized it as from Apple's point of view, Plaintiffs

6  walking back an agreement we made, and I don't want to make

7  this any more adversarial than it needs to be.  We -- that's

8  not what we think we did.  We think there's been a

9  miscommunication about what we agreed to.  I could

10  characterize it as we think that Apple moved the gold post,

11  but that's not useful.  I don't want to litigate who agreed

12  to what.  I want to litigate what we get because of what we

13  need.

14      Your Honor, what we need is to identify who the class

15  members are and then have the transactions attached to them

16  and have that go in some form that anonymizes the payors,

17  but have that go as a -- a set of transactions attached to a

18  payor as a set to our economists, right, that we had always

19  envisioned that JND, who holds other Apple data and we have

20  agreed to protocols for security, that --

21      THE COURT:  Sorry to interrupt, but can you just

22  -- what does JND stand for?

23      MR. BURT:  Oh, JND is the claims administrator,

24  and it's literally -- I happen to know it's literally the

25  names of -- the first initials of the three founders, but

7

1  JND is JND --

2          THE COURT:  Okay.  It's the claims administrator,

3  is that right?

4          MR. BURT:  The claims administrator.

5          THE COURT:  Okay.  Thank you.

6          MR. BURT:  So, we have security protocols in

7  place.  We're using JND which holds other very similar data

8  for Apple in two other cases and has already been vetted.

9  We've agreed to a special securities protocol, a special

10 securities protocol that involves -- and your Honor's seen

11 the specific protective order that covers this material.  We

12 proposed a sample so that JND could look at the data and --

13 and make sure that the methodology of matching the account

14 holders and -- and payors to produce a list of class

15 members, excuse me, and then subsequently tie that up with

16 -- with the transactions would work, and then we had always

17 envisioned that JND would do the generation of a class

18 member list for everyone, and we thought that Apple

19 understood that too, and I refer the Court back to ECF

20 Number 815, the April status report at page -- ECF page

21 five, but page four denominated on the bottom of the

22 document, where Apple said that they agreed with us that

23 they were going to produce the identifying information for

24 all of the U.S. payors.  We thought we all got that.

25          THE COURT:  Let me just pause you there if you

8

1  don't mind.  Suppose Apple gives you the sample and JND

2  looks at the sample and -- and determines it's good,

3  determines that it's usable and workable.  It's still only a

4  sample.  If the sample is good, in your opinion, what would

5  be the next step?

6          MR. BURT:  Here's what we envision, your Honor.

7  Since Apple's expressed concern was that the -- the

8  transaction data and the identifiable payors not be in one

9  place at one time, at least not the whole thing, the

10 sampling proposal gets us out of that.  It means that JND

11 only ever looks at a small set of transactions.  If the

12 sample works, JND then gets the identifying information for

13 the payors and accounts and generates a class member list

14 but doesn't have to touch transaction data again.

15     We then turn over to Apple the list of class members

16 and say, Here you go.  You, please append the transactions

17 to each of those folks so it can be turned over to -- to

18 Braddle (phonetic) to do the economics work, and that -- of

19 course, at that point, the -- the payors can be anonymized

20 the same way they've anonymized the account holder data each

21 of the four times that it's been turned over.

22          THE COURT:  I see.  So --

23          MR. BURT:  Does that answer the Court's question?

24          THE COURT:  I think so, yes.  Let me just make

25 sure, repeat it back to you to see if I understood it

9

1  correctly.

2      So, Apple provides the sample to JND, and we're going

3  to address the hypothetical that the sample is good.  JND

4  analyzes it and determines that it's good.  Then JND would

5  turn back to Apple a list of class members.  Apple would

6  then line up class members to transactions.

7      But is it the case that in what Apple produces to

8  Braddle, the expert, the -- the names of the class members

9  would be anonymized, but there would be some -- some

10 anonymized marker instead, but ████████████████████████

11 ████████████?

12         MR. BURT:  Yes.  And I just want to make sure

13 because either I -- I missed a step or I -- I think I

14 missed.  They look at the sample.  JND gets -- if it works,

15 JND gets all of the payor information but not with the

16 transactions, and generates the list of class members.  The

17 list of class members goes to Apple.  Apple appends the

18 transactions but then anonymizes who the class members are

19 so that when Braddle gets the data, Braddle doesn't know who

20 the class members are -- there are -- there are a string of

21 digits -- but has each of the transactions grouped by payor

22 to do their work.

23         THE COURT:  How will -- is the class defined as

24 people who pay more than $10 or at least $10?

25         Since we're going to have a transcript, why don't

10

1  you answer audibly.

2          MR. BURT:  Yes, your Honor.

3          THE COURT:  Okay.  How will JND tell Apple who all

4  the class members are?  How will the sample enable them to

5  do that?

6          MR. BURT:  The sample allows JND to -- to create

7  their methodology to -- to make sure that it's possible to

8  match the payor data to where -- where there are multiple

9  payors in a -- for an account or where there are multiple

10 Apple ID's for a payor.  They've got to look at the sample

11 and figure out how to do it.  Then they can apply it to the

12 entire database.  The reason they need a set of transaction

13 data -- and it's a small subset.  It's only 50,000 of the

14 one million accounts -- they need the transactions because

15 it is -- it's entirely conceivable that it's important to

16 crosscheck or look at transaction data to make sure that

17 it's working right.  Once they know it's working right, the

18 hope is they'll be able to say, Okay.  We will simply take

19 all of the payor data and account data but without the

20 transactions, and then we will tell you -- we, JND, will

21 tell you Apple, who all the class members are.

22         THE COURT:  Let me see if I understand.  Apple

23 provides the sample to JND.  The sample contains

24 transactional data linked with some identifying information.

25 JND then uses the sample to devise a methodology or to see

11

1  if it can devise a methodology by which it can look at

2  transactional data and determine that these people do or

3  don't satisfy the class.  Then JND goes to the complete

4  transactional set, the anonymized transactional set that

5  Apple has previously produced, and JND applies its

6  methodology to the complete transactional set and then --

7  no?  You're shaking your head.

8         MR. BURT:  No.  I'm -- I'm shaking my -- sort --

9  sort of the other way around.  The sample is ████████

10 randomly selected accounts and payor data, but for randomly

11 selected, ██████ of those, so a very small subset, ████████

12 ████████████████████████████, right.  JND is

13 primarily working with JND are the claims administrators,

14 not the economists, right.  JND are working primarily with

15 creating lists of class members from account and payor

16 identifying data, right, but may need to resort to -- in

17 making sure their protocol for doing this works, may need to

18 resort to the transactions to crosscheck and understand what

19 they're looking at.

20      If the sample works, then they can role that through

21 not to the transaction set but to the set of identifiable

22 information for payors and account holders, look at the

23 whole thing, come up with a list of class members, and turn

24 over a list of people, list of class members, to Apple.

25 From then on, JD -- JND should never have to look at

12

1  transactions again.  Apple will get a list of people and

2  then append the transactions, anonymize the people and give

3  the list to the economists.

4          THE COURT:  Okay.  Thank you.  Now I believe I

5  understand.  Do you -- do you still want -- would it still

6  be useful to you to receive the sample?  Do you think

7  there's enough time left?

8          MR. BURT:  Yes, it is useful to receive the

9  sample.  We would like that as quickly as we can get it.  It

10  -- working out the methodology of the -- of the account, of

11  the class member identification is a necessary step, and we

12  still need to do that.

13      In terms of how much time is left, I am going to flag

14  for the Court that having tried to resolve this dispute with

15  a great deal of effort, as the Court see now for several

16  months, the dates that we told Judge Gonzalez Rogers we

17  could do, we don't believe we can now do because we have to

18  first turn over a full set of class members back to Apple,

19  have a full set of transaction data with anonymized class

20  member identifiers turned over to our economists, and then

21  our economists will need weeks to attach the model work they

22  are doing to the -- ████████████████████████████

23  ████████████████  to calculate which of those proposed class

24  members do or don't have the -- have or have met the $10

25  cutoff.

13

1    So, in terms of whether we can still make the schedule,

2  we are not optimistic.  Realistically, we're in schedule

3  trouble.  In terms of whether we have to blow this thing up

4  -- and we're not talking about sample anymore -- because of

5  the timing, that is not our view.  We worked very hard to

6  come up with a proposal that -- that streamlines how this

7  works and to be sensitive to Apple's stated concerns to

8  minimize where that transaction data goes.

9    It is still a good idea.  We don't believe we're

10 walking back what we negotiated.  We believe we're adhering

11 to what we negotiated, and we still want to do it that way.

12         THE COURT:  Thank you.  If you need any

13 adjustments to be made to the case schedule, then, as you

14 know, you'll need to take that up with Judge Gonzalez

15 Rogers.

16         MR. BURT:  Yes, your Honor.

17         THE COURT:  Ms. Higney, let me turn to you to hear

18 your arguments.  In the course of presenting your arguments,

19 I want you to be sure to touch on two subjects.  First, if

20 you disagree with Mr. Burt's description of how the sampling

21 would work, meaning what information goes where and what the

22 results would be, and then, second, please discuss whether

23 Apple is willing to provide the sample, recognizing that if

24 the sample is not good or usable in JND's perspective, then

25 the sample alone might not be the end of the story.  But if

14

1  it is good or usable from JND's perspective, then it might

2  be sufficient.   But let me turn the floor over to you.

3        MS. HIGNEY:  Sure.  Thank you, your Honor.  I do

4  want to correct a couple of things I think Mr. Burt said

5  that I don't think accord with our understanding of how the

6  sampling will work.

7        you know, what Apple agreed to do was to produce a

8  -- to produce a sample of payors' identifying information

9  for one million Apple ID's, like you said, and then to

10  produce 50,000 -- for 50,000 of those randomly selected

11 accounts, the transaction data, so two separate things,

12 right?  There's the payor identifying information that we're

13 producing for a million accounts, and then there's the

14 transaction data for 50,000.

15     Our understanding is that JND's work really is only

16 occurring with the payor identifying information.  That is,

17 they need to match up if a John Smith, who has a, you know,

18 ████████████████  associated with a certain Mastercard is

19 the same as a J.T. Smith who has ███████████████████████

20 ██ associated with a different payment method, right?  They

21 want to determine if those two people who have ███████████

22 ████████████████████ who are separately in Apple's database

23 as separate payors are actually the same individual.  That's

24 the matching that JND needs to do.

25     And then there's the separate step of then mapping on

15

1  those ████████████████ to the transaction data to marry

2  up, okay, it was, you know, J.T. Smith who made these

3  transactions. ████████████████████████████████

4  ████████████████ ████████████████████████████

5  ████████████████

6  They -- that's not -- there's no real matching or

7  methodology involved in that second step I'm talking about.

8  That's just a one-to-one match.  The methodology that needs

9  to be developed is for identifying which, you know, ██████

10 ████████████████ belong to the same person, you know, if a

11 John Smith is the same as a J.T. Smith because they entered

12 their name differently when they were setting up, you know,

13 ████████████████████████████

14  So, that's the methodology, the matching, that we

15 understand that JND needs to conduct, and we've been willing

16 to provide the, you know, million sample for them to conduct

17 that.

18  Now, our give here in the give and take was we didn't

19 think Plaintiffs needed any transactional data that had this

20 ████████████████ because we had real security concerns

21 about having that data out there in the world, allowing

22 someone to see, Oh, J.T. Smith made all of these specific

23 transactions, right?  That's really personal information,

24 their App Store transaction history.  So, we didn't want any

25 of that transaction data that has the ████████████████████

1 ████████████████████████████████████████

2 ████████████████████████

3      But in the give and take, we agreed to the sample,

4 understanding that we would provide not all payor

5 identifying information, and in exchange, we would give

6 Plaintiffs, you know, 50,000 of these transactional, you

7 know, data records so they could see how that would work.

8 Understanding is like JND doesn't -- again, need to apply a

9 methodology there.  The methodology is with respect to

10 matching individual payors.  And then, you know, Apple --

11 they would provide Apple with that protocol.  If the sample

12 is good, if the sample works, they'll provide Apple with

13 that protocol for that matching.  We will apply it, and then

14 we will give back, and then we will perform the marrying of

15 the profiles with the transaction data, and then we will

16 produce that in an anonymized way to their economist so they

17 can say, Okay, here are all the transactions associated with

18 this person that, you know, Plaintiff claims the -- is a

19 single individual, you know, that might have multiple payor

20 accounts.

21      Your Honor asked whether Apple's willing to provide

22 that sample.  We are, and we have been willing to provide it

23 since back in May.  Where our hesitancy came in was

24 Plaintiffs came back to us at the end of May as we were

25 literally preparing the logistics of the sample.  We were on

1  the phone with JND saying, We're ready to get this hard
2  drive with the data to you.  How are we going to do it?
3  We're walking through the protocol for doing so.  And JND
4  said, Oh, well, we were expecting to get the full payor
5  identifying set.  We don't want to turn over our code, our
6  methodology to Apple, because that's proprietary.  And that
7  was the first we had heard of it.  I mean, you know, it had
8  always been the parties' understanding that Plaintiffs were
9  going to provide a protocol.  They said that in writing to
10 us.  They understood the goal was for JND to provide a
11 matching protocol to Apple.  And, so, that's why we hit
12 pause.  We're still willing today to provide the protocol,
13 and if it doesn't work, as your Honor said, then we're
14 willing to revisit whether they need more payor identifying
15 information or whatnot, but we've been ready and still are
16 ready today to produce the sample data.
17         THE COURT:  Thank you.  To make sure that I
18 understand the dispute between the parties, Ms. Higney, do
19 you disagree with Mr. Burt about what will be in the sample
20 or is there a shared understanding of what the sample would
21 be?
22         MS. HIGNEY:  There's the shared understanding of
23 what the sample will be.
24         THE COURT:  Mr. Burt, do you agree with that?
25         MR. BURT:  I think we both have the same

18

1 understanding about what the sample is, your Honor.

2          THE COURT:  Okay.  Well, then, Ms. Higney, my --

3 my thought is Apple should go ahead and  produce the sample,

4 and if JND is able to do what they want to do with it, that

5 should get things going.

6      Does Apple have any objection to doing that?

7          MS. HIGNEY:  No, we have no objection to producing

8 a sample, and -- and we understand that if JND's able to do

9 what they're -- they want with it, as Mr. Burt put it, I

10 think develop a methodology, we would submit that then they

11 could give that methodology to Apple and we could apply it

12 across the full dataset.

13          THE COURT:  So, you're talking about getting

14 output from JND to Apple being a methodology whereas Mr.

15 Burt was saying it was a list of names.  Can you -- Ms.

16 Higney, can you tell me more about -- sounds like there's a

17 difference of opinion about what JND would turn over to

18 Apple.

19          MS. HIGNEY:  Sure.  What we understood, you know,

20 that, again, the sample would allow them to do is develop a

21 methodology or a protocol for, like I was saying before,

22 trying to determine if, you know, a certain individual who

23 has a payor profile associated with them, say it's John

24 Smith with a Mastercard ending in 1234, is the same as John

25 Smith with a Visa ending in 5678, right, because maybe they

19

1  have the same address or telephone number or whatnot.  So,

2  what Plaintiffs need to do, again, it's my understanding, is

3  they want to determine if those two people, those two █████

4  ████  are the same person and link them up together.  So,

5  there's 500 million account ID, you know, profiles -- over

6  500 million in  Apple's database.  They're going to have to

7  develop some kind of protocol to match people, right?  They

8  can't go individually line by line to determine whether, you

9  know, two individuals in the data are the same.  They're

10 going to develop some kind of code or protocol.  And that's

11 what we would submit that they then turn over to us after

12 they develop that protocol using the sample.  And then we

13 apply it across the full dataset.

14     If it's just a list of names from the sample, that only

15 provides us with names from the sample.  If you -- you know,

16 like we can't -- we can't really do anything with the names

17 in the sample to then expand that out to the full dataset,

18 if that makes sense.  We need -- we need the code or the

19 methodology for doing so, and I'd submit that they're going

20 to have to turn that over regardless pursuant to, you know,

21 expert disclosures here.  We're going to have to see how

22 they're purporting to link up individuals.  You know,

23 regardless of whether we give them the full dataset or not,

24 we're going to need to see their underlying methodology so

25 we can make arguments about whether or not it was reliable.

20

1          THE COURT:  Well, I don't want to address the

2   expert disclosure issue that you raised today.  I see the

3   issue.  I see that you've raised it.  You're arguing that

4   under Rule 26, Plaintiffs have to disclose to you the

5   methodology JND uses to come up with the class members.  I

6   don't want to address that today.  Today I want to deal with

7   the data or document production issue.

8      Mr. Burt, let me turn to you.  Maybe I misunderstood,

9   but when you were speaking, I understood that the output

10  from JND to Apple would be a list of class member names

11  rather than a methodology.  Did I misunderstand you?

12          MR. BURT:  You did not misunderstand, your Honor.

13  I think the -- the misunderstanding is between us and Apple.

14  Apple has gotten this impression that at some -- that we had

15  envisioned turning over the Apple a method of identifying

16  potential class members for the entire class from the

17  sample.  That's just a miscommunication.  We had envisioned

18  that the -- that the matching of the transactions to those

19  people was more complicated than it turns out it is,

20  frankly, that -- I don't mean to -- I don't -- I don't want

21  to litigate the negotiations, but in order to be understood,

22  I just want to back up and say we were unaware -- as of the

23  time of our April 12 status report, we were unaware that

24  there was already ████████████████████████████████

25  ██████████████████████████████████████████████████

21

1 ▉▉▉▉   We thought that that had to be generated or appended

2 somehow, which is why we're a little worried about the

3 process of matching the payor, the -- the transactions to

4 the payors, but we were -- we were always willing to let

5 Apple do the matching of the transactions to the payors.

6    Apple thinks that at some point we were saying that the

7 identification of the class members beyond the sample was

8 something we wanted them to do or were okay with them doing.

9 From our perspective, when they said that that was their --

10 their understanding on the logistics meeting with JND, we

11 were hearing that for the first time.  We think we were just

12 talking past each other, and they came up with an

13 interpretation of what we said that was different than what

14 we had intended.

15    THE COURT:  Let me just ask you a question.  Do

16 you -- in order for JND to turn around a list of all the

17 class members to Apple, it would seem like JND would have to

18 have the names of every Apple customer.  Does it have that?

19    MR. BURT:  It does not now have that, and we

20 envision that JND, once -- once it's got the methodology

21 done from the sample, would need all of the names but,

22 importantly, not all of the transactions and not the key

23 that makes it possible to link the two datasets.

24    THE COURT:  So, you don't need just the sample

25 from Apple.  You would need the sample, and then you would

22

1  also need Apple to provide you all of the -- the names of

2  their customers.  Is that right?

3          MR. BURT:  Yes, that's correct, your Honor.

4          THE COURT:  I see.  Well, Ms. Higney, let me turn

5  to you.  It sounds like there was a difference of opinion

6  about what the parties were thinking.  What are your

7  thoughts on this -- what Mr. Burt has just said?

8          MS. HIGNEY:  Yes.  Well, two things, one, your

9  Honor, just at the outset, we've been talking about a list

10 of class members, and I just want to be clear that that's

11 not what -- that's not what JND will be providing.  It's --

12 if anything, it's a list of potential class members, just so

13 we're on the same page there.  It's not actual class

14 members.  It's just, like I said, these individual payors

15 who they believe are the same person.  And then, you know --

16         THE COURT:  (Zoom glitch) also going to do the $10

17 threshold, is that not correct?

18         MS. HIGNEY:  That is not my understanding, your

19 Honor.  But Mr. --

20         THE COURT:  Mr. Burt, let me turn back to you.

21         MR. BURT:  Your Honor, the $10 threshold can only

22 be done by the economists.  So, they can -- they're going to

23 have to do that on an anonymized potential class member

24 basis.  Only -- only the model calculation can do that.

25 So --

1       THE COURT:  So, then, let me be sure I understand.

2 If Apple gives you the sample and gives you the names of all

3 of the Apple customers, is JND -- is their methodology just

4 to say these people are the same person, and those people

5 over there, those are different people?  Is that what

6 they're doing?

7       MR. BURT:  Yes.

8       THE COURT:  Okay.  Thank you.  And then JND won't

9 do the $10 threshold.  That would be the economist?

10       MR. BURT:  That is correct, your Honor.

11       THE COURT:  Okay.  Thank you.

12   Well, Ms. Higney, thank you for --

13       MS. HIGNEY:  Yes.

14       THE COURT:  (Zoom glitch.)

15       MS. HIGNEY:  And then going back to, your Honor,

16 the -- the disagreement between the parties, we do have a

17 different interpretation of the history here, and we think

18 it's laid out pretty clearly, and our understanding is laid

19 out pretty clearly in Mr. Burt's email of May 1st, which is

20 attached as Exhibit 4 to ECF 877 where he said explicitly --

21 so, again, Apple -- sorry.  I'll take a step back.

22   Apple had agreed in its original. April submission,

23 we'd agreed we'll produce all payor PII information.  We

24 agreed to do that but said we will not be producing any

25 information that links payor PII to the transactions, and

24

1  that's where the parties' dispute was at that time.  And

2  then Plaintiffs came to Apple and said, Well, we have a

3  proposal to you.  What if we just do a sample instead?

4  That's the sample we're talking about now.  We took that

5  proposal back.  We agreed to it.  We agreed to it

6  explicitly, though, conditioned on the idea that that is all

7  we would be producing.  We would be producing the million

8  accounts, the, you know, PII associated with a million Apple

9  ID accounts and then 50 -- from 50,000 of those accounts,

10  transactional data.

11      Plaintiffs in their -- again, in Mr. Burt's email of

12  May 1st, he said --

13          THE COURT:  Understanding --

14          MS. HIGNEY:  -- that condition --

15          THE COURT:  But I have a question, which is --

16          MS. HIGNEY:  Sure.

17          THE COURT:  -- if the parties do it your way, then

18  how will Plaintiffs know that Apple implemented JND's

19  methodology correctly?

20          MS. HIGNEY:  So, as we understand it, it can be --

21  they will be -- it will be like a code, and we can run the

22  code against the full -- the full payor database and output

23  it.  And, of course, if they have questions or, you know --

24  we're open to discussing that, right.  Like, if they have

25  questions about it, they want to talk to the person in Apple

25

1  who ran it to make sure it was run correctly or if they're

2  seeing anomalies that make them question whether it was run

3  correctly, happy to discuss that.  We're not going to like,

4  you know, close the blinds, shut the door entirely, say you

5  can't peek behind the curtain at all.

6      What we're saying, though, is, you know, this is a ton

7  of personal identifying information that we just don't think

8  need to be or should be put out there in the world when a

9  sample might suffice.  So, we think we should provide the

10 sample.  They figure out their protocol.  They give it back

11 to Apple.  We apply it.  We produce the output.  You know,

12 we -- we then marry that up with the transaction data.  We

13 anonymize it.  We produce it to Braddle, the economist, who

14 can then -- who can then apply the $10 cutoff.  And, again,

15 if they see anything that they think is amiss, we're happy

16 to discuss that.  But, like, it should just be a very simple

17 kind of mechanical exercise, if you will, like no discretion

18 involved on Apple's part.

19      THE COURT:  Let me turn, Mr. Burt, back to you.

20 Is it correct that you want JND both to develop their

21 methodology and to apply it?

22      MR. BURT:  Yes, that's correct, your Honor.  I

23 think I -- I see where Ms. -- I don't mean to litigate the -

24 - the memories.

25      THE COURT:  Okay.  Well, Ms. Higney, let me turn t

26

1  you.  Normally, the Plaintiff develops their expert

2  methodology and then also implements it.  I realize that

3  because they're Apple's privacy concerns, at least at their

4  second step, when they turn over potential class member

5  names and then Apple links up the transactional data, you

6  will effectively be implementing part of their expert

7  methodology.  But if all they do is give you a list of

8  names, then that seems relatively ministerial, and

9  Plaintiffs are willing to let Apple do that.  So, if they're

10  willing to let Apple do that, then that seems fine.  But

11  when it comes to identifying the -- the names, they're not

12  willing to let Apple do that.  They want to have JND do

13  that.  What's wrong with having JND implement its own

14  methodology to come up with potential class member names?

15          MS. HIGNEY:  Our concern there is just the -- the

16  volume of very personal sensitive information that we have

17  to turn over to JND to do that.  And, again, our

18  understanding was with Plaintiffs that we'd be producing a

19  subset of that data in exchange for giving them this ████

20  ██████████████  if you will, and that ameliorated our

21  concerns with having to turn over, you know, personal

22  identifying information for 500 million plus accounts, some

23  of whom, many of whom might not even be actual class members

24  here.  So, that data -- I mean, that's our main concern with

25  it.  And we think, again, if Plaintiffs are developing a

1 protocol and it's a ministerial protocol that we can apply

2 across the full payor dataset, we think that should suffice

3 or at least they should be able to see if they can do it

4 with the payor data, the sample payor data, and then, if

5 they can't, we're willing to entertain further discussions.

6 Or if they decide they want a bigger sample of the payor

7 identifying information, we're willing to entertain that.

8      I think what we were hoping to get to was a place where

9 we didn't have to turn over that volume of really sensitive

10 data.

11          THE COURT:  Let me turn to you, Mr. Burt.  What

12 are the concerns or reasons why you want JND to apply its

13 methodology over the complete list of Apple customers rather

14 than having Apple do it?

15          MR. BURT:  Because Apple already said they

16 couldn't do it.  When we -- when we took the deposition of

17 Mark Rollins in 2021, essentially he said, We don't have a

18 way to do that.  We can't.  And I'm paraphrasing, of course.

19 We don't have a way to do that.  We -- we can't

20 dispositively identify who the payor behind an account

21 holder is.

22      And we litigated that issue in front of Judge Gonzalez

23 Rogers, and she sided with us.  She also in February of this

24 year, refused to order any relief for Apple on -- on the

25 issue of turning over the data necessary to identify

28

 1   potential class members -- potential meaning subject to the

 2   cutoff -- unless Apple could identify a specific concern

 3   about this data.

 4        And what I've heard from Ms. Higney -- and not for the

 5   first time but again and again -- is that Apple considers

 6   this -- this data serious, and there's a lot of it.  And

 7   we're -- we have not been unsensitive to that.  We've agreed

 8   to a special protective order and some very stringent

 9   protocols for how this material is handled.  We're using a

10   vendor that has in two other litigations handled similar

11   data from Apple, specifically from this client.  We -- we

12   have -- they've already been vetted by Apple, had Apple's

13   personnel in their facility.  We've agreed to air gapping.

14   So, Ms. -- Ms. Higney used the term "out in the world".  But

15   this data is not out in the world.  This data is on an air

16   gapped system, quarantined from the entire universe in -- in

17   access controlled areas with only specific personnel allowed

18   to even enter the area.  So, we think that with -- without

19   an articulation of what the concern is other than it's just

20   very sensitive data and there's a lot of it, we think we've

21   done more than is required to deal with the sensitivity of

22   the data as it is, and we think that -- we think that we --

23   we've -- we've recognized that concern but that we have

24   dealt with it, and that's no longer a trenchant answer to

25   why can't the Plaintiffs do the thing that they say they can

1  do that Apple said it could not?

2        THE COURT:  Well, Ms. Higney, let me turn to you.

3  I do think that Plaintiffs make a persuasive argument that

4  while this is sensitive data, they've taken important steps

5  to safeguard it, and once the personally identifying

6  information is disconnected from transactions, then this PII

7  would be a list of Apple customers, and I understand that's

8  sensitive and confidential information, but it's not

9  connected to things that they did.

10       And, in terms how expert work is normally done, usually

11  the expert comes up with a methodology and applies it.  So,

12  it seems to make sense to me that Apple should produce the

13  sample to JND and then produce the -- the larger set of the

14  names of Apple's customers.  And then it sounds like JND has

15  taken appropriate security steps, and then they should come

16  back and turn over the list of potential class members to

17  Apple, assuming that the -- the sample works in the way that

18  JND is hopeful.  So, why shouldn't I tell Apple that that's

19  how we're going to proceed?

20       MS. HIGNEY:  Two things, your Honor.  First, I --

21  I don't think it's fair to say that Apple can't be trusted

22  to apply JND's protocol simply because we question the

23  reliability of being able to match up individual names, you

24  know, individuals within the database.  Again, that was us

25  saying we don't know if there's a reliable methodology that

30

1  can be developed here.  But JND will develop one, you know.

2  And this is -- so, separate and apart from disputing the

3  reliability of that methodology, JND will develop a

4  methodology.  Apple can faithfully apply it.  There's

5  nothing that Mr. Burt said that I think draws into question

6  Apple's ability.  So, again, it will be a very ministerial

7  applying of code across the full database.  We can do that.

8  Setting aside any arguments we might have or make down the

9  road about whether that was reliable, we can certainly do

10 it.  And, indeed, I think, you know, we won't say it was

11 applied by Apple wrong, right?  It will be a question of how

12 the methodology was developed by JND.  I think it can be

13 applied in a ministerial fashion.  So, that's the first

14 thing.

15      The second thing, your Honor, is that it isn't just

16 names that we're turning over, right?  it is billing info.

17 It is addresses, telephone numbers.  It is personal

18 information associated with -- with each of these █████

19 ████████    And it's for 500 million plus App Store

20 customers.  Huge amount of data, many of whom might not even

21 be actual class members.  And, so, that is our concern

22 there, is that kind of data subject to a data breach?

23 Really significant concerns.  We'd have to -- we would have

24 to notify half a billion people that their personal

25 identifying information had potentially been breached, and

31

we have heard from Plaintiffs and appreciate their

willingness to enter into a supplemental protective order

which your Honor entered that we think does provide an

additional layer of security for this data.  But, as we all

know, you know, breaches happen.  And, so, it is possible

that data is breached and there are serious consequences

associated with it.  And at this phase of the litigation,

particularly given the fact that we're willing to do the

sample, we're willing to apply the methodology, it's just

not clear to us that it's reasonable and proportionate with

the needs of the case to order us to produce all PII now.

THE COURT:  Since you don't know what the

methodology is and you haven't seen it and Apple may

conclude the methodology is no good or is indeterminate or

can't be applied reliably, what's your basis for saying that

Apple will be able to apply the methodology?

MS. HIGNEY:  That's a fair question, your Honor.

I mean, as we understood, again, it was going to be a code

that's run across the database.  And let's go back to the

question of whether they can develop a methodology based on

the sample itself.  And if they can't, then I think the

parties all need to go back to the drawing board.  But,

assuming they can develop some kind of protocol that can be

applied, you know, a code that can be run, a processing

database, I don't see any reason why Apple or Apple's

32

1    experts couldn't run the code in the same way that JND
2    could.

3            THE COURT:  Mr. Burt, let me turn to you.  Since
4    JND hasn't had the sample yet and hasn't created a
5    methodology, we don't really know what the methodology will
6    be, do we?

7            MR. BURT:  Not with real specificity, your Honor.
8    I -- so, we -- we had always envisioned that there were two
9    stages, that there's the -- the matching of the -- the
10   account holder and payor information to figure out who the
11   potential class member was and then there was matching to
12   transactions.  It -- your Honor's been directed to Exhibit 4
13   to the most recent submission a few times.  That's my email
14   of May 1st.  I commend the Court's attention to the
15   paragraph on the page of that email that starts, "Third, we
16   understand".  If your Honor -- if your Honor wants to
17   understand where -- where the dispute's coming from over
18   what we -- we're agreeing to and what Apple was agreeing to,
19   I think it's -- it's just a different reading of that
20   paragraph.  Excuse me.  My throat is suddenly dry.

21       And, your Honor, I think Apple thinks that -- that at
22   some point we were proposing to turn over a code used to
23   pair people up, and we never said that.  I -- I think the
24   first time the idea that there would be simply a code that
25   could be run across the entire database in a ministerial way

33

1 for potential class member identification rather than for

2 transaction identification I think was when Apple's counsel

3 talked to JND, and I think it comes from their

4 misunderstanding of that paragraph I just pointed your Honor

5 to.  Excuse me for my throat, your Honor.

6      I believe that when -- when Apple says that, they had

7 -- when -- they understood what we were talking about to

8 separate the transactions from the people, which we always

9 understood to be their principal concern and which we -- we

10 were always open to an idea to avoid having to do outside of

11 their control.  I think they somehow interpreted that as

12 meaning that we thought that the process of matching people

13 could be the same kind of a code process.  We don't know

14 that it is.  We're going to have to get a sample, and we

15 proposed the sampling idea, and we specified the sample

16 based on what JND told us it needed so that we could figure

17 out how it is, looking at Apple's data, which they have and

18 we don't.  We -- we could create the potential class member

19 list from the payor data, right?

20      So, we don't know exactly how that works.  We don't

21 know exactly how apple would run it.  And, ultimately, we're

22 the ones who'd need it to work, and Apple are the ones who

23 need it not to, right?  Ms. Higney has already reserved the

24 right to say Apple may attack it and may say that it's not

25 reliable, may say that you did it wrong, may say that

34

there's something flawed either in your methodology or your

output, and that's litigation.  But since we're the ones

that have to do that, to do the class member identification

at the merits stage now that we have our certified class, we

should be the ones that get to look at the data and do it

because we're the ones that have to make it work.

THE COURT:  I see.  Well, let me -- just thinking

out loud, is there any utility to doing this in steps, for

example, first Apple produces the sample?  There is the

problem or the potential problem that the sample might not

be useful, right, JND might be able to do nothing with it,

and you might have to go back to the drawing board.  So,

that's one possibility.  A more hopeful possibility is that

the sample is useful and JND is able to come up with a

methodology, but at that point I wonder if it's useful, JND

might have an opinion, Oh, our methodology is great and it's

really ministerial.  JND might think, of course, Apple can

process, as anyone could, or maybe JND would say, Actually

it's a little complicated and maybe a bit more nuanced.  We

really have to run this.  But they haven't seen the sample.

They don't have any methodology.

Do you think there's any utility in taking this in

steps where first Apple produces the sample, JND figures out

if the sample is usable at all, and if it is, comes up with

a methodology, and then we might have more focused arguments

35

1 at that point about whether JND needs to -- to run that

2 against the whole list of Apple customers.

3     What do you think about that?

4         MR. BURT:  Your Honor, in what may be a triumph of

5 optimism over -- over the -- the mistrust that sometimes

6 sets in in litigation, I'm going to say that I think it is

7 sensible to do this stepwise, get the sample, see how it

8 works, and then -- and then resolve the rest of this

9 dispute.  I do think that makes sense.  And I say that

10 knowing that it's at least a possibility that as soon as we

11 try to talk about -- as soon as we say, Okay, JND has their

12 method down, here's where we think we go from there, we'll

13 again get bogged down and have difficulty working it out.  I

14 know that's a possibility.  But your Honor asked if I think

15 there's any utility in taking it stepwise, and I -- I do.

16 It's possible that we will -- we will make progress and be

17 able to work this out once we have the sample.

18         THE COURT:  Ms. Higney, what do you think about

19 doing it stepwise?  That first Apple produces the sample,

20 then we see if it's usable, and if it is, we see what JND's

21 methodology is, and then we should all come back and talk

22 about what the next step is.  Do you think that makes sense?

23         MS. HIGNEY:  It does, your Honor.  And -- and

24 Apple is willing to proceed in a stepwise way here.

25         THE COURT:  Okay.  Well, thank you.

36

1      How long does Apple need to get the sample to JND?

2          MS. HIGNEY:  Your -- your Honor, we've been ready

3  to produce a sample I think since the end of May.  So, we

4  literally have it loaded, ready to go.  However, there is a

5  -- so, we can produce that -- I mean, it's the -- ████

6  ██████████████████████████████████████  So, we ████████

7  █████████████████████████████████████████████████████████

8  ███████████████████  but it could be done quite quickly.

9      That said -- and the parties were discussing this on

10  Friday, and I don't know that we've reached resolution on

11  this.  There is a question pending about the pre-2014 data

12  because that sample was -- was prepared before Apple had

13  identified the alternative source for the linking data for

14  the pre-2014 data.  So, our sample does not include pre-2014

15  data, and I understand Plaintiffs -- they were going to

16  discuss this with JND, but they might want that pre-2014

17  data.  If that's the case and we need to go repull the

18  sample, it will take a little more time but can probably be

19  done in -- in about two weeks.

20          THE COURT:  Mr. Burt, let me guess here.  Do you

21  want the pre-2014 data in the sample?

22          MR. BURT:  So, your Honor, we -- we talked about

23  this, and we had one tremendous disadvantage, which is that

24  until just now, I had not heard from Apple how long it would

25  take them to include the 2014 data.  With where we are in

37

1  time now, knowing that they should be able to include the

2  2014 -- pre-2014 transactions in two weeks, as much as I

3  hate to lose in two weeks, I hate more to not have a

4  complete dataset of the -- the pared-down sample we agreed

5  to.  Therefore, at this time, I think the sensible thing is

6  to have Apple repull their sample, including the 2014 --

7  three 2014 transactions, so that JND has all of what they

8  said they needed.

9            THE COURT:  Okay.  Ms. Higney, it sounds like

10  Plaintiffs want you to -- to redo the samples so you can

11  include some pre-2014 data.  Can Apple do that in about two

12  weeks do you think?

13            MS. HIGNEY:  I think so, your Honor.  I mean, the

14  other thing I would throw out to -- to Mr. Burt, and, again,

15  the parties just met and conferred on this on this on

16  Friday.  And, so, we hadn't had a chance to talk further,

17  but if Plaintiffs wanted to take the current sample as is

18  and we pull more personal identifying information from pre-

19  2014, we can do that as well.  Like, again, stepwise, we

20  don't want to produce more ███████████████ because,

21  again, our -- our sensitivity over that.  But if you wanted

22  additional pre-2014 payor identifying information, we can

23  produce that in a second wave after producing the sample

24  that's ready now.

25            THE COURT:  Mr. Burt, do you want things in waves

38

1   or do you want one sample that covers the entire time frame

2   so you know what that looks like?

3           MR. BURT:  The answer to your question, your

4   Honor, is we want -- it is better to get it all at once.

5   The -- the subhead to that is that Apple has -- has offered

6   in a few times in a few ways more PII but for -- but less

7   transactional data.  The transactional data is just a subset

8   of the PII in the sample in order -- in order to allow JND

9   to fully vet and develop its own methodology.  I don't feel

10  like I'm free to trade any of that away, which is why I'm

11  saying we need the pre-2014 transaction data as soon as

12  Apple can provide it.

13      I think we would probably -- if -- if we get things in

14  waves, we may end up losing time, and Ms. Higney's kind

15  offer to produce more PII for the earlier period I don't

16  think works for that reason.  We need what we asked for in

17  its complete array, and all at one shot is probably the most

18  efficient way to do that.

19          THE COURT:  Well, Ms. Higney, there you go.  They

20  want one sample, including pre-2014 and then put it all

21  together in one shot.

22      Is that doable within a couple of weeks?

23          MS. HIGNEY:  I think it should be, your Honor.

24          THE COURT:  Okay.  Then I'm thinking I should

25  order Apple to produce the sample, and then we should set

39

another date on our calendars to come back and -- and talk
about things further.  I don't know if we should set it far
enough out that JND has completed its methodology.

Mr. Burt, why don't we turn to you.  What are your
thoughts on when we should come back and have a further
hearing?

MR. BURT:  Well, your Honor, I almost answered
let's do it a month from today, but I will in -- in all
likelihood actually be in trial in the Southern District of
California then.  If we can set it -- we won't set Fridays.
If we can set -- I'm thinking -- the short answer, your
Honor, is I'm thinking four to five weeks is probably right,
and if it makes sense to kick it out a week or two at that
point, we can always do that by agreement, but I -- I know
that when that happens, unless we settle, I will be in
trial.  So, I would ask that we -- we try to work those
dates so that I'll -- I'll be able to.

THE COURT:  Ms. Higney, what do you think?  Should
they come back in four to five weeks?

MS. HIGNEY:  That sounds agreeable to Apple.

THE COURT:  Okay.  Let's all look at our calendars
so we can set another hearing now.  And then, as counsel
said, if we get close to that day and the parties would like
to move the hearing out, you can always just file a
stipulation and proposed order, and I'll be happy to move

40

1 | it.

2 |     Today is June 17th.  Four weeks would be about -- would

3 | be mid July.  In July I'm on criminal duty.  So, the

4 | hearings would need to be in the afternoon, say at 2:00 or

5 | 3:00 p.m., because I'll have a calendar in the morning.  But

6 | my schedule looks pretty open in those afternoons.

7 |     Mr. Burt, is there a particular day you'd recommend?

8 |         MR. BURT:  Could I ask your Honor for July 19?

9 | That's a Friday.  And if I'm in trial, we won't be sitting.

10 |         THE COURT:  Ms. Higney, does that date work for

11 | you?

12 |         MS. HIGNEY:  It does, your Honor.

13 |         THE COURT:  All right.  Let's do July 19th at 2:00

14 | p.m.  We'll do it on Zoom.  And then, if the parties or if

15 | Apple believe that the subject matter that the parties will

16 | be discussing requires the Court to be sealed, then please

17 | proceed as you did before this hearing and file a motion and

18 | a stipulation explaining the reasons for that.  And if it

19 | doesn't have to be sealed, then we -- we won't seal it.  But

20 | we'll schedule this -- the next hearing for July 19th at

21 | 2:00 p.m. for status concerning Plaintiff's RFP Number 55.

22 | And in the meantime, I am ordering Apple to produce the

23 | sample to Plaintiffs as we discussed.  I'm not going to

24 | issue a written order.  I don't think that's necessary.

25 | I've stated my order on the record.

41

1      Mr. Burt, are there any additional issues that you

2  would like to raise at this hearing today?

3            MR. BURT:  Not in this hearing, your Honor.

4            THE COURT:  And, Ms. Higney, how about you?

5            MS. HIGNEY:  No, your Honor.  Thank you for your

6  time this morning.

7            THE COURT:  All right.  Thank you, Counsel.  Apple

8  is going to produce the sample to -- to JND, and then we're

9  going to come back for a further status hearing on July 19th

10 at 2:00 p.m.  And with that, we're adjourned for the day.

11      (Proceedings adjourned at 11:01 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

CERTIFICATE OF TRANSCRIBER

1

2

3       I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17              Saturday, June 22, 2024

18

19

20

21

22

23

24

25