# WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

MARK C. RIFKIN
DIRECT DIAL: 212-545-4762
rifkin@whafh.com

July 14, 2025

VIA ECF
Hon. Yvonne Gonzalez Rogers
U.S. District Court for the Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street Oakland, CA 94612

Re:     *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)

Dear Judge Gonzalez Rogers:

The yellow highlighting in this document represents the redactions initially applied when the document was filed on the public docket but which the Parties no longer seek to maintain under seal. Apple's sealing requests are in green highlighting.

We represent Plaintiffs in the above-referenced action and submit this letter in response to Apple's request for permission to file *Daubert* motions to exclude the testimony of Prof. Alan MacCormack and Mr. Darryl Thompson. Each of Apple's arguments lacks merit.

**1.** The Court should deny Apple leave to move to exclude Prof. MacCormack's opinions. Using third-party data from developers and his own considerable industry expertise – which Apple does not dispute – Prof. MacCormack estimated developer marginal costs that Prof. McFadden and Dr. Song use for setting their margin bounds. Apple has no experts of its own to offer different margin estimates. Instead, it seeks to preclude Prof. MacCormack from testifying.

Prof. MacCormack's genre gross margins are based on sufficient data under Fed. R. Evid. 702(b). Prof. MacCormack's analysis uses financial data from 68 subpoenaed App Store developers. Fifty-eight of the 68 developers have apps in the Top 100 Apps ranked by revenue from July 2008 to February 2024, indicating that most of the sample is drawn from the most commercially successful developers in their genres. This demonstrates that the data reflects the financial realities of apps with high transactions volumes. Where the developer information was incomplete, Prof. MacCormack supplemented the subpoenaed data with information from public sources such as 10-K filings, resulting in a dataset with 762 unique cost and revenue data points. *See* MacCormack Opening Rep. ¶ 11. Prof. MacCormack tested his results by measuring whether the reported developer costs increase with revenue. *See* MacCormack Rebuttal Rep. § III.B.2. The results show strong and statistically significant correlations across the variable cost categories, which provide additional support that the developer cost dataset is reliable. Prof. MacCormack testified that "this is a strong dataset," and "[m]y two highest citation papers were based upon [a] considerably lower number of observations." MacCormack 5/23/25 Dep. Tr. 264:9-10; 156:18-20. Indeed, as the Court will recall from the extensive class certification proceedings, experts rarely have much margin data from third parties with which to estimate such costs. McFadden Reply Rep. ¶¶ 148, 150 (Oct. 19, 2021).

Apple faults Prof. MacCormack (at 3) because he "extrapolates" from 68 developers to create his genre gross margins, but "[t]rained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Prof. MacCormack testified that in his field, he "do[es not] often have access to" the "granular data" represented in the developer cost data set. MacCormack 6/19/25 Dep. Tr. 63:17. The Court also recognized that reality with respect to Prof. McFadden's model: "[E]conomists often infer costs, rather than inputting actual cost data . . . because firms do not typically disclose their costs," and inputting any actual app developer costs "increases the model's reliability." ECF No. 789 at 14. Apple thus lacks a basis to challenge the sufficiency of the developer cost data Prof. MacCormack used to calculate genre gross margins.

Prof. MacCormack's genre gross margins are appropriate inputs into Prof. McFadden's damages model. Apple incorrectly argues (at 3) that Prof. MacCormack's opinions are not

Hon. Gonzalez Rogers
Page 2 of 4

"relevant to the task at hand" because his genre gross margins are based on developers' costs per user rather than costs per transaction. Dr. Song testified that, for purposes of Prof. McFadden's model, the "distinction is not critical" between measuring costs per transaction or per user, although the number of transactions and the number of users is likely to be highly correlated. Song 6/4/25 Dep. Tr. 221:7-8; 222:14-17. Prof. McFadden has explained that "in my model marginal costs represent all of the different variable costs that come along with app developers' iOS app monetization business," McFadden Reply Rep. ¶ 78 (Apr. 18, 2023), which is precisely what Prof. MacCormack's genre gross margins capture. Prof. MacCormack's calculations comprise four categories of variable costs that developers incur during the lifecycle of an app – royalties, user acquisition and retention costs, infrastructure costs, and maintenance and support costs. *See* MacCormack Opening Rep. ¶¶ 9-10. Because Prof. McCormack's genre gross margins are expressed as percentages rather than dollar values per user or per transaction, calculating marginal cost per user does not impact the applicability of the profit margin percentage.

Apple argues (at 3) that the margin bounds produce a minimum of $16 billion in damages. In fact, the damages are primarily the result of the enormous amount of App Store commerce (███████) over the Class Period and the size of Apple's effective commission overcharge (approximately 14% above the calculated But-For commission rate), which yields total over-charges to consumers and developers of ███████. Prof. McFadden's damages model allocates the harm between consumers and developers based on computed supply and demand curves. It was not engineered to yield any minimum amount of damages. Nor are Prof. MacCormack's estimates a "dominant input" in the damages model. Prof. MacCormack independently estimated the margin bounds without knowing how Prof. McFadden's damages model worked. *See* MacCormack 5/23/25 Dep. Tr. 149:11-150:3. Prof. MacCormack established a lower bound on his genre gross margins to ensure that the ranges he estimated constrained app developers to be profitable over the long term, but it was impossible for him to set the margin bounds to produce a specific (or even minimum) result. Apple has no contrary evidence. Apple claims that its expert obtained the same damages estimate as Dr. Song by using randomized transactions, but that is incorrect. Prof. Watson only randomized part of the data set used to estimate the demand parameters, then applied his demand parameter estimate to actual App Store transactions. Prof. Watson ultimately obtained a similar damages estimate to Dr. Song's because he calculates damages for the same set of transactions, rather than a random number of transactions.

**2.** The Court should also deny Apple leave to move to exclude Mr. Thompson's testimony. Apple offers a distorted history of the disclosure of Mr. Thompson's report but that has no bearing on the soundness of his methodology. The law makes clear that each of the substantive points Apple raises lacks merit and those issues are best left for trial.

Apple first claims (at 1-2) Mr. Thompson "cites no literature and ignores widely accepted scientific methods for data cleansing and deduplication." But an expert's methods need not be subject to peer review or publication to be reliable. An expert's knowledge and experience can suffice. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) (publication "is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability"); *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) ("The *Daubert* factors . . . simply are not applicable [to experts] whose reliability depends heavily on the [expert's] knowledge and experience[.]"). Apple ignores Mr. Thompson's thirty years of experience deduplicating datasets exactly like Apple's. That is a valid basis for reliable expert testimony. *See Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *7-8 (N.D. Cal. Aug. 3, 2018) (Gonzales Rogers, J.)

Hon. Gonzalez Rogers
Page 3 of 4

(denying *Daubert* motion directed at a class action administration firm's COO because the expert "faithfully applied" methods based on "her knowledge [] and experience").

Apple next erroneously claims (at 1-2) Mr. Thompson's methods are unreliable because they are not replicable. That is untrue and Apple ignores on-point precedent from this Court, and others, holding an expert's methods need not be replicable to be considered reliable. In *Perez v. Rash Curtis Associates*, the defendant moved to exclude an expert whose analysis involved "identifying class members, tabulating class size, and estimating damages," arguing that the expert's methods were unreliable because they were "not testable" and "based on other blackbox information and unobservable, proprietary processes." 2019 WL 1491694, at *2-5 (N.D. Cal. Apr. 4, 2019) (Gonzales Rogers, J.) (cleaned up). This Court rejected that argument as going only "to the weight, not the admissibility, of [the expert's] opinion." *Id.* at *5; *see also Rooter & Plumbing*, 2018 WL 3707283, at *7 (similar). Instead, the proper inquiry is "whether the expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *In re Google RTB Cons. Privacy Litig.*, 2024 WL 2242690, at *4 (N.D. Cal. Apr. 4, 2024) (Gonzales Rogers, J.) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)). Mr. Thompson's thirty years of experience providing deduplication work in thousands of cases meets that threshold.

Apple alleges (at 2) a few "mistakes" in Mr. Thompson's results—one impacting ███████ %) of records, a second one involving a single named Plaintiff, and a third one involving Ms. Richman. Taken at face value, they do not spoil the other ███████ % of Mr. Thompson's reliable work. *See, e.g.*, *Smith v. City of Oakland*, 2025 WL 490474, at *1 (N.D. Cal. Feb. 13, 2025) ("The question 'is not the correctness of the expert's conclusions but the soundness of his methodology.'" (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995))). But even Apple's featured "flaw" (42,000 mismatched "Kims") is merely a technical issue caused by Apple's failure to perform any routine data maintenance. Apple allows users creating Apple IDs to submit, among others, dummy phone numbers and addresses. Mr. Thompson discovered and accounted for this. A minor data cleansing error, however, led to these "Kims" matching because they all had the same first name (Kim), address (Apple's business address in Cupertino) and phone number (the same dummy phone number). It can be easily fixed.

Finally, Apple's claim (at 2) that Mr. Thompson "used the wrong definition of payor" fails for two reasons. *First*, Mr. Thompson identified, as Apple admits (at 1), "whether (for example) 'Jon Smith' in one payor record is the same person as 'Jonathan Smith' in another but not 'Jon R. Smith' in a third." Whether an individual used their own credit card or someone else's, they still "pay" for (i.e., "give in return for goods") apps or in-app content themselves through their own Apple ID. Paid, *Webster's Third New Int'l Dictionary* (1993); *see* Song Opening Rep. ¶¶ 68-74. The downstream effect on the aggregate damages award from this is trivial, at most. Ultimately, the best forum to resolve whether one payor used another's credit card is the claims administration process first proposed by Prof. McFadden in 2021 and approved by the Court in 2022. *See* ECF No. 630 at 14. After all, it is quite possible, for instance, that two different credit cards belong to one Class member given the length of the Class Period; Plaintiffs cannot know for sure without a more fulsome verification through claims processing. *Second*, Plaintiffs lack access to the same information Apple has to know for sure if one person used another's credit card. Apple only produced to Plaintiffs a hashed data field reflecting the credit card's last four digits, which is orders of magnitude less reliable as a matching criteria than a full credit card number.

* * *

The Court should deny Apple leave to file its proposed *Daubert* motions.

████████████████████████

Hon. Gonzalez Rogers
Page 4 of 4

Respectfully yours,

Mark C. Rifkin

cc:    All Counsel (via ECF)