THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted *pro hac vice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |
| | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:          October 14, 2025 |
| | Time:          2:00 p.m. |
| | Courtroom:  1, 4th Floor |

Gibson, Dunn &
Crutcher LLP

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2    PLEASE TAKE NOTICE that on October 14, 2025 at 2:00 p.m. before the Honorable Yvonne

3    Gonzalez Rogers, in Courtroom 1 of the United States District Court for the Northern District of

4    California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. ("Apple") will and

5    hereby does move this Court to grant Apple's Motion for Summary Judgment, on the ground that

6    Plaintiffs, including the named plaintiffs and class members, cannot establish multiple essential

7    elements of their Sherman Act claims.  In moving for summary judgment, Apple does not waive any

8    arguments regarding one-way intervention with respect to Plaintiffs' delay in issuing class notice.

9    This motion is based on this Notice and Motion, the accompanying Memorandum of Points and

10   Authorities, the concurrently filed Declarations and Exhibits, other documents on file in this or related

11   actions, oral argument of counsel, witness testimony, and any other matters of which the Court may

12   take judicial notice.

13

14   Dated: August 4, 2025                              GIBSON, DUNN & CRUTCHER LLP

15

16                                                      By:  */s/ Cynthia E. Richman*

17                                                          Theodore J. Boutrous Jr.
18                                                          Daniel G. Swanson
                                                            Cynthia E. Richman
19                                                          Caeli A. Higney
                                                            Julian W. Kleinbrodt
20                                                          Dana L. Craig
                                                            Eli M. Lazarus
21                                                          Harry R. S. Phillips

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

**STATEMENT OF ISSUES TO BE DECIDED**

2    Whether Apple is entitled to summary judgment on Plaintiffs' Sherman Act Section 2 claims under

3    Federal Rule of Civil Procedure 56 because:

4    1.  Plaintiffs misdefine the relevant market as a single one-sided market including all genres of

5        iOS apps and in-app items.

6    2.  Plaintiffs' claims based on lawful refusals to deal are foreclosed as a matter of law.

7    3.  Plaintiffs' claims based on Apple's lawful design of iOS software as a closed and secure

8        platform (in and after 2007) are foreclosed as a matter of law.

9    4.  Plaintiffs' challenges to Apple's in-app payment system and former anti-steering rule are absent

10       from the operative complaint, and in any event, are barred by the refusal-to-deal doctrine and/or

11       Plaintiffs' lack of standing.

12   5.  Plaintiffs' purported claims for alleged in-app purchase injuries and damages are barred as

13       untimely in whole or in part.

14   6.  Plaintiffs have failed to prove injury and nonspeculative damages because (A) the flawed

15       opinions of Darryl Thompson and Prof. MacCormack render the McFadden-Song model

16       unreliable; (B) the model is unable to account for lawful conduct in any event; and (C) Edward

17       Hayter lacks any injury or damage according to the model.

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION ................................................................................................... 1

3   II.     UNDISPUTED FACTS ......................................................................................... 2

4   III.    LEGAL STANDARD ............................................................................................ 5

5   IV.     ARGUMENT ......................................................................................................... 5

6           A.      Plaintiffs' One-Sided Consumer Aftermarket Fails As A Matter Of Law ................... 5

7           B.      Apple's Restrictions On Rival App Distributors Are Lawful Refusals To Deal. ......... 9

8           C.      Apple's Technical Design Of iOS Is Lawful Product Design. ................................... 13

9           D.      Plaintiffs' Unpled IAP And Anti-Steering Theories Fail On The Undisputed
                    Record For Multiple Reasons. ...................................................................................... 16

10
11                 1.      Plaintiffs Cannot Introduce New, Unpled Theories At This Stage. ............... 16

12                 2.      Apple's IAP And Former Anti-Steering Rule Are Lawful Refusals To
                           Deal. ................................................................................................................ 18

13                 3.      Plaintiffs Lack Antitrust Standing To Challenge The Former Anti-
14                         Steering Rule. .................................................................................................. 19

15          E.      Plaintiffs' In-App Purchasing Theories Are Largely Time-Barred. .......................... 21

            F.      Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims. ............ 22

16  V.      CONCLUSION ..................................................................................................... 25

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

1

**TABLE OF AUTHORITIES**

2

**PAGES**

3  **CASES**

4  *In re Adderall XR Antitrust Litig.,*
        754 F.3d 135 (2d Cir. 2014)....................................................................................11

5

6  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
        836 F.3d 1171 (9th Cir. 2016)................................................................................10

7  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
        592 F.3d 991 (9th Cir. 2010)............................................................................14, 16

8

9  *Apple Inc. v. Pepper,*
        587 U.S. 273 (2019) ..........................................................................1, 5, 20, 22

10  *In re Apple iPhone Antitrust Litig.,*
        2013 WL 6253147 (N.D. Cal. Dec. 2, 2013) ............................................................1

11

12  *In re Apple iPhone Antitrust Litig.,*
        2022 WL 1284104 (N.D. Cal. Mar. 29, 2022)......................................................1, 6

13  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
        472 U.S. 585 (1985)......................................................................................11, 18

14

15  *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,*
        459 U.S. 519 (1983)......................................................................................19, 21

16  *Bakay v. Apple Inc.,*
        2024 WL 3381034 (N.D. Cal. July 11, 2024)........................................................20

17

18  *BankAmerica Pension Plan v. McMath,*
        206 F.3d 821 (9th Cir. 2000).................................................................................15

19  *Berkey Photo, Inc. v. Eastman Kodak Co.,*
        603 F.2d 263 (2d Cir. 1979)..................................................................................14

20

21  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
        509 U.S. 209 (1993)..............................................................................................25

22  *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.,*
        613 F.2d 727 (9th Cir. 1979).......................................................................14, 15, 16

23

24  *Celotex Corp. v. Catrett,*
        477 U.S. 317 (1986)................................................................................................5

25  *City of Oakland v. Oakland Raiders,*
        20 F.4th 441 (9th Cir. 2021)..................................................................................19

26

27  *City of Vernon v. S. Cal. Edison Co.,*
        955 F.2d 1361 (9th Cir. 1992)................................................................................23

28  *Comcast Corp. v. Behend,*
        569 U.S. 27 (2013)................................................................................................23

# TABLE OF AUTHORITIES

**PAGES**

*Coronavirus Rep. v. Apple Inc.*,
  85 F.4th 948 (9th Cir. 2023)....................................................................................5

*Dreamstime.com, LLC v. Google LLC*,
  54 F. 4th 1130 (9th Cir. 2022).................................................................................6

*Eagle v. Star-Kist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987)......................................................................19, 20, 21

*Echlin v. PeaceHealth*,
  887 F.3d 967 (9th Cir. 2018)..................................................................................22

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) .............................3, 4, 5, 8, 9, 11, 13, 15, 16, 18, 19, 20, 21

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................................20

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983)..................................................................................13

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020).....................................................................9, 10, 11, 12

*In re Google Play Store Antitrust Litig.*,
  2025 WL 2167402 (9th Cir. July 31, 2025).....................................1, 6, 8, 9, 12, 13, 14

*Grace v. Apple Inc.*,
  328 F.R.D. 320 (N.D. Cal. 2018) ...........................................................................14

*HDC Med., Inc. v. Minntech Corp.*,
  474 F.3d 543 (8th Cir. 2007)..................................................................................16

*Hogan v. Amazon.com, Inc.*,
  2024 WL 1091671 (W.D. Wash. Mar. 13, 2024) .....................................................6

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)..............................................................................2, 13

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
  146 F. Supp. 3d 1217 (S.D. Cal. 2015) ..................................................................11

*Jacobson v. Rose*,
  592 F.2d 515 (9th Cir. 1978)..................................................................................18

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006).............................................................................20, 21

*Laydon v. Cooperatieve Rabobank U.A.*,
  55 F.4th 86 (2d Cir. 2022)......................................................................................21

*Lorenzo v. Qualcomm Inc.*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009) ..................................................................20

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015)................................................................................23

**TABLE OF AUTHORITIES**

**PAGES**

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008)............................................................................17

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
994 F.3d 1166 (10th Cir. 2021).........................................................................11

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021).............................................................11, 12, 19

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023).................................................................10, 12, 19

*Noohi v. Johnson & Johnson Consumer Inc.*,
2025 WL 2089582 (9th Cir. July 25, 2025)......................................................23, 24

*Novell, Inc. v. Microsoft Corp.*
731 F.3d 1064 (10th Cir. 2013)...............................................................10, 11, 12

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)...................................................................................1, 6, 7, 9

*Olean v. Wholesale Grocery Coop.*,
31 F.4th 651 (9th Cir. 2022)...............................................................................22

*Oliver v. Ralphs Grocery Co.*,
654 F.3d 903 (9th Cir. 2011)..........................................................................17, 18

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014)............................................................................21

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2015)..........................................................................17, 25

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)........................................................................................9, 10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022)....................................................8

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022).................................................................................9

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*,
371 F. App'x 719 (9th Cir. 2010)........................................................................5

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)............................................................................5, 6

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022)..............................................................6

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
556 F. Supp. 825 (D.D.C. 1982).........................................................................24

Gibson, Dunn & Crutcher LLP

**TABLE OF AUTHORITIES**

**PAGES**

*SaurikIT, LLC v. Apple Inc.*,
  2023 WL 8946200 (9th Cir. Dec. 28, 2023) .................................................21

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
  841 F.3d 827 (10th Cir. 2016) .........................................................10, 13

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) ........................................................6, 11, 19

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) .......................................................................17

*Teradata Corp. v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024) ...............................................................8

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) .............................................................5, 8

*Tri-Valley Cares v. U.S. Dep't of Energy*,
  2010 WL 11530284 (N.D. Cal. Sept. 30, 2010) .................................................18

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ...........................................................1, 6, 7, 8

*United States v. Apple Inc.*,
  2025 WL 1829127 (D.N.J. June 30, 2025) ......................................................10

*United States v. Sabre Corp.*,
  452 F. Supp. 3d 97 (D. Del. 2020) ............................................................7

*United States v. Various Slot Machines on Guam*,
  658 F.2d 697 (9th Cir. 1981) ................................................................25

*United Wisconsin Grain Prods. LLC v. Archer Daniels Midland Co.*,
  2025 WL 2017271 (7th Cir. July 18, 2025) .....................................................9

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ....................................................................10, 18

*Villa v. San Francisco Forty-Niners, Ltd.*,
  104 F. Supp. 3d 1017 (N.D. Cal. 2015) ........................................................5

*Virginia Panel Corp. v. MAC Panel Co.*,
  133 F.3d 860 (Fed. Cir. 1997) ...............................................................16

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ................................................................17

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) ...............................................................22

**STATUTES**

15 U.S.C. § 2 ................................................................................4

15 U.S.C. § 15b ............................................................................22

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**

**PAGES**

**OTHER AUTHORITIES**

Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683 (2020)...................................11

Gibson, Dunn &
Crutcher LLP

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex.__ | Exhibits to the Declaration of Cynthia E. Richman in Support of Defendant Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson and Prof. Alan MacCormack |
| [Name] Dep. | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Defendant Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson and Prof. Alan MacCormack |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025 |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025 |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025 |
| Hitt Reb. Rep. | Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated June 13, 2025 |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025 |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025 |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025 |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025 |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025 |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025 |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025 |
| Watson Reb. Rep. | Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., dated June 13, 2025 |

# I.    INTRODUCTION

This case should not go to trial.  The Third Amended Consolidated Class Action Complaint challenges Apple's policy of refusing to permit competing distribution of native iOS apps and the technical measures encoded into iOS software that maintain a securely closed platform.  These claims, raised solely under Section 2 of the Sherman Act, rest on legal theories that the Supreme Court and Ninth Circuit have rejected.  After nearly fourteen years of litigation, the undisputed record confirms that Apple's policies reflect protected choices about product design and whom to do business with— not anticompetitive conduct.  Moreover, Plaintiffs cannot prove that they paid "a higher-than-competitive price" for apps and in-app purchases, as required for this case to proceed.  *Apple Inc. v. Pepper*, 587 U.S. 273, 284 (2019).

Plaintiffs' claims fail at the threshold because they are premised on a legally untenable one-sided market definition.  The Court has "decline[d] to address" market definition in prior decisions, *In re Apple iPhone Antitrust Litig.*, 2013 WL 6253147, at *6 (N.D. Cal. Dec. 2, 2013), reserving the issue for the "merits," 2022 WL 1284104, at *3 (N.D. Cal. Mar. 29, 2022).  The issue is now ripe, and beyond dispute.  This Court, the Ninth Circuit, and other courts have recognized that the App Store must be analyzed as a two-sided transaction platform that facilitates simultaneous transactions between developers and consumers.  Just last week, the Ninth Circuit reaffirmed that app marketplaces compete in "two-sided markets," where users and developers "rely on the platform as an intermediary for user-developer transactions," and the "platform benefits from significant network effects."  *In re Google Play Store Antitrust Litig.* ("*Google Play*"), 2025 WL 2167402, at *3 (9th Cir. July 31, 2025) (citing *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 535 (2018)).  Plaintiffs' insistence on a one-sided consumer aftermarket disregards the "important" differences between one- and two-sided markets, including the factfinder's obligation to "evaluat[e] both sides" of a two-sided transaction platform "to accurately assess competition."  *Amex*, 585 U.S. at 535, 546.  If indulged, Plaintiffs' legal error will squander the time and resources of the Court, jury, and parties—just as it has in other cases challenging two-sided transaction platforms that have gone to trial on one-sided theories.  *See, e.g.*, *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57–58 (2d Cir. 2019) (vacating jury verdict).

Plaintiffs' liability theories also fail as a matter of law.  Plaintiffs challenge Apple's decision to

distribute apps developed with Apple's own iOS software for its own iOS devices through its own App Store. But under settled precedent, Apple may lawfully refuse to deal with rivals or would-be rivals; Apple need not, as Plaintiffs urge, provide proprietary tools, technologies, and services to developers to allow them to distribute native iOS apps in direct competition with Apple on Apple's own platform.[1] Nor can Plaintiffs challenge Apple's "design[]" of "the iOS Devices operating system as a closed system [with] security measures and program locks," Dkt. 229, Third Am. Compl. ("TAC") ¶¶ 79, 84, a core product-design innovation that benefits consumers and precludes Section 2 liability. And while Plaintiffs have impermissibly sought to reach beyond the operative complaint through unpled expert accusations about Apple's in-app payment system and former anti-steering rule, the conduct is lawful under Section 2, and Plaintiffs' challenge is time-barred.

Finally, Plaintiffs cannot establish injury or measurable damages. Plaintiffs rest on an unreliable model that, even if admitted (despite its many defects), fails if *any* of Apple's challenged conduct is deemed lawful because the model assumes *all* challenged conduct is unlawful and offers no way to disaggregate impact among Apple's alleged acts. This violates the principle that an antitrust plaintiff "must segregate damages attributable to lawful competition from damages attributable to . . . monopolizing conduct." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). And named plaintiff Hayter has no damages even accepting the model's calculations.

The record leaves no triable issue. Apple did exactly what the antitrust laws permit: It built an innovative platform that consumers and developers value. The Court should grant summary judgment.

## II.    UNDISPUTED FACTS

In 2007, Apple revolutionized the mobile-device industry with the iPhone and its novel iOS operating system. Statement of Undisputed Material Facts ("SUF") 1. Initially, iPhones could run only applications that Apple itself preinstalled. SUF 1. But Apple soon decided to open iOS to third-party developers and help them create iOS apps. SUF 1. To support that shift, Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to consumers. SUF 2.

From the outset, Apple emphasized the tension between openness and security. As Steve Jobs said at the App Store's launch, Apple was "trying to do two diametrically opposed things at once—

---

[1] All mentions in this brief of "iOS apps" refer to native iOS apps.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc." SUF 6. To achieve that balance, Apple adopted a closed-system model for distributing iOS apps. SUF 7. This arrangement enabled developers to build native apps using Apple's proprietary software and tools, rather than relying solely on browser-based web apps, while allowing Apple to maintain a secure, curated environment for users. SUF 4, 7.

Under its closed model, Apple has from the beginning required developers who wish to distribute iOS apps to join the Apple Developer Program. SUF 8, 9. To do so, developers enter into the Developer Program License Agreement and abide by the App Review Guidelines. SUF 8, 9. By enrolling in the Apple Developer Program, developers receive access to Apple's proprietary software-development tools, now including over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits, in exchange for a $99 annual fee and a commission on paid apps and digital in-app products. SUF 8, 9. The standard commission rate is 30%, but lower rates apply to small businesses and certain categories of in-app purchases of digital goods. SUF 10. As of 2023, roughly 95% of apps on the App Store were free to download and incurred no commission on the download. SUF 11. Apple designed its platform so that developers could offer, and consumers could download, iOS apps—paid or free—through the App Store alone. SUF 2, 7, 11, 15.[2] With foreign exceptions not relevant here, Apple does not allow alternative app marketplaces. SUF 17.

Apple reviews each app and app update submitted to the App Store through a multilayered process known as App Review. SUF 12. Using a combination of proprietary automated tools and human reviewers, Apple evaluates apps against the App Review Guidelines and rejects those that fail review. SUF 12. Apple has applied app-review criteria since the App Store's launch, and in 2010, it formalized this process in the Guidelines. SUF 13, 16; *see Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 949 (N.D. Cal. 2021), *aff'd in part*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681–82 (2024). As this Court found, App Review "helps protect against fraud, privacy intrusion, and objectionable content beyond levels achievable by purely technical measures," and "may also provide some benefit against novel and well-hidden malware attacks." *Epic*, 559 F. Supp. 3d at 1004 n.523,

---

[2] In 2010, Apple launched iPad, a tablet device. SUF 14. iPad ran on iOS until 2019, when Apple launched iPadOS. *Id.* As with iPhone, Apple requires native iPad apps to be submitted to App Review and be distributed through the App Store. *Id.*

1038; *see also* SUF 12, 13.

In addition to App Review, Apple built technical safeguards into iOS to prevent unauthorized app distribution.  SUF 20.  Apple's technical design includes system-level software protections that prevent "sideloading"—the installation of native apps from outside the App Store—and that block removing built-in security features.  SUF 18–20.  Such protections serve as "another line of defense against harmful software."  SUF 20.

The App Store operates in a two-sided marketplace.  Android smartphones—which run a competing mobile operating system—support multiple rival app marketplaces, including the Google Play Store, Samsung Galaxy Store, and Amazon Appstore.  *Epic*, 559 F. Supp. 3d at 968; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122.  Developers also can distribute apps and digital content through web apps and websites, including their own websites, and other app-transaction platforms.  SUF 4.  Much of this content is cross-platform: A consumer who plays the video game Roblox, for instance, can download and use the app on a non-iOS platform, purchase in-app currency (Robux) on that alternative platform, and then use Robux on iOS or another platform.  SUF 5.  Alternative platforms have been available since the App Store's launch.  SUF 2, 4.

This case was filed on December 29, 2011.  Dkt. 1.  In the operative complaint, Plaintiffs Robert Pepper, Stephen Schwartz, Edward Hayter, and Edward Lawrence assert two claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, on behalf of a class of consumers: for monopolization and attempted monopolization of an alleged "iOS applications aftermarket."  TAC ¶¶ 78–88.  Their claims rest on theories that Apple acquired or attempted to acquire monopoly power by: "(a) designing the iOS Devices operating system as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iOS apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate app[] developers who sell apps in competition with Apple and by voiding the warranties of iOS Devices consumers who buy competing apps."  *Id.* ¶¶ 79, 84.  Plaintiffs sought leave to file a Fourth Amended Consolidated Complaint in light of *Epic*, but the Court rejected their tardy request to add a claim under California's Unfair Competition Law challenging Apple's former anti-steering provisions.  Dkt. 573 at 6–7.  The Court also

subsequently dismissed with prejudice claims arising from App Store transactions on iPod touch. Dkt. 981 at 1.

## III.   LEGAL STANDARD

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.   ARGUMENT

Summary judgment is warranted. Plaintiffs' one-sided consumer aftermarket theory falters as a matter of law (§ IV.A). Their two pleaded theories of exclusionary conduct also fail: Apple's restrictions on rival app distributors are lawful refusals to deal (§ IV.B), and its design of iOS is protected product innovation (§ IV.C). Plaintiffs' attempt to challenge Apple's in-app purchase ("IAP") mandate and former anti-steering rule—unpled theories advanced in expert reports—fares no better (§§ IV.D & IV.E). Nor can Plaintiffs prove causal injury or nonspeculative damages (§ IV.F).[3]

### A.   Plaintiffs' One-Sided Consumer Aftermarket Fails As A Matter Of Law.

Proof of a relevant market is essential in Section 2 cases. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373–74 (9th Cir. 1989). Plaintiffs alleged that the relevant market here is "the retail market for the sale of [iOS] apps," which they contend is a one-sided aftermarket for all iOS apps of every genre. *Apple Inc. v. Pepper*, 587 U.S. 273, 278 (2019). That may have sufficed as a pleading matter, but when a plaintiff "cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995); *see, e.g.*, *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010) (affirming summary judgment on Section 2 claim due to untenable market). A one-sided market definition *cannot* sustain a jury verdict here. Every court to confront the question has found the App Store to be a platform for "app transactions that Apple offers in a two-sided market." *Epic*, 67 F.4th at 1000–01; *see Coronavirus Rep. v. Apple Inc.*, 85 F.4th 948, 956–57 (9th Cir. 2023)

---

[3] Apple does not waive protections against one-way intervention, *see Villa v. San Francisco Forty-Niners, Ltd.*, 104 F. Supp. 3d 1017, 1021 (N.D. Cal. 2015), and requests that this Court rule on summary judgment only after class notice has gone out and the opt-out period has expired (if the class is not decertified).

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

(observing that market must encompass "a category of transactions between developers and consumers on a two-sided platform"); *Hogan v. Amazon.com, Inc.*, 2024 WL 1091671, at *3 (W.D. Wash. Mar. 13, 2024) (recognizing *Epic* "h[eld] that Apple's App Store is a two-sided transaction market"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 n.3 (N.D. Cal. 2022) (noting App Store's "two-sided nature").

Plaintiffs' one-sided theory is thus wrong as a matter of law.  As the Ninth Circuit held in *Google Play*, the two-sided market definition in *Epic v. Apple* was driven by "commercial realities" and "theories of harm"—realities and theories that are the same here.  *Google Play*, 2025 WL 2167402, at *7; *see Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021) (requiring an "extraordinary difference" to find claims do not "fail as a matter of law" where they challenge the "same practices" as an earlier lawsuit).  And summary judgment is particularly appropriate because Plaintiffs have been on notice of this issue for years, *see In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *3, yet "expressly chose to maintain [their] theory of the case" without proposing any alternative two-sided market definition, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022) (affirming dismissal with prejudice); *see also Rebel Oil*, 51 F.3d at 1437 (plaintiff saved from summary judgment by asserting viable alternative definition).

It is settled precedent that a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."  *Amex*, 585 U.S. at 545.  Because such platforms "cannot make a sale unless both sides of the platform simultaneously agree," they are best "understood as supplying only one product—transactions."  *Id.* (quotation marks omitted).  Two-sided transaction platforms, by their nature, exhibit "more pronounced indirect network effects": "Raising the price on side A risks losing participation on that side, which decreases the value of the platform to side B."  *Id.* at 536, 545.  Any market analysis that fails to account for how changes on one side of the platform affect the other side therefore "misses the mark."  *Id.* at 547.

In the first major case applying *Amex*, the plaintiff (like Plaintiffs here) retained Prof. Stiglitz to advance a theory that the relevant market was one-sided because of a purported lack of indirect network effects.  *U.S. Airways*, 938 F.3d at 58.  Stiglitz's opinions amounted to advocacy for positions he had unsuccessfully advanced in an amicus brief for the plaintiffs in *Amex*.  *See* Ex. 73 (Stiglitz Project Syndicate June 29, 2018 Article) ("As I pointed out in an amicus brief to the Court, AmEx's

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

arguments in defense of its anti-competitive practices were totally specious"; contending that *Amex* was an "egregious decision" that "betrayed a deep misunderstanding of economics"); *see* Ex. 101 (Amicus Br. for Profs. Connor, McFadden, Stiglitz, et al., in *Amex*).  The Second Circuit held that Stiglitz's opinions injected error into the trial: A jury cannot hear evidence that a market might be one-sided (or evidence predicated on such a theory), the court reasoned, where the relevant transaction platform market was "two-sided as a matter of law." *U.S. Airways*, 938 F.3d at 58.  Because allowing that theory to proceed was "wrong as a matter of law," the court vacated the jury verdict. *Id.* at 58–59; *see also United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 138 (D. Del. 2020) (failure to properly define two-sided transaction platform foreclosed antitrust claim "as a matter of law").

Plaintiffs try to sidestep this overwhelming precedent and argue that Apple sells two distinct products in different one-sided markets—"apps and in-app content to consumers" and "distribution services to developers." Dkt. 991-1 at 1; *see also* Dkt. 626 at 58:7–19 (arguing "there are two different markets here").  But that ignores the App Store's status as a transaction platform and walks back into the precedent that Plaintiffs disregard. *Amex* "concluded . . . that a business is a transaction platform if it (1) offers different products or services, (2) to different groups of customers, (3) whom the platform connects, (4) in simultaneous transactions." *U.S. Airways*, 938 F.2d at 58 (cleaned up).  That describes the App Store exactly. Ex. 21 (Jin Rep.) ¶ 60; *see* Ex. 22 (Sundararajan Rep.) ¶ 144.  The App Store offers developers and consumers different services on a platform that connects the two groups and facilitates simultaneous app (and in-app content) transactions. *See* SUF 3.  Disinterested academic studies corroborate this. *See* Ex. 27 (Sundararajan Reb. Rep.) App'x Ex. C.1 (listing examples). Plaintiffs' economists make a weak effort to distract from this reality by suggesting that the App Store offers some services that are not simultaneous. Ex. 14 (May 30, 2025 Stiglitz Dep.) 179:4–22.  But only the transactions linking the sides need to occur simultaneously. *Amex*, 585 U.S. at 535 ("The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other.").[4]  What matters, and what creates pronounced indirect network effects, is that both platform sides participate in transactions in "direct[] proportion[]" to each

---

[4] For example, credit-card platforms offer services that may occur at different times, such as consumer rewards that are enjoyed after merchants obtain quick, guaranteed payment. *Amex*, 585 U.S. at 534. These "separate but interrelated services" facilitate simultaneous transactions on the platform. *Id.*

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

other. *Id.* at 545. That much is undisputed here. *See* Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; *see also* Ex. 14 (May 30, 2025 Stiglitz Dep.) 183:1–4.

Plaintiffs cannot proceed under some alternative two-sided theory they have neither pled nor proved. *See* Dkt. 991-1 at 1. It is Plaintiffs' burden to define a relevant market, *see Thurman Indus.*, 875 F.2d at 1373–74, but neither they nor their experts define any two-sided market, focusing solely on a consumer-side aftermarket for *all* app genres. Stiglitz simply ignores the developer half of the equation, Ex. 17 (June 25, 2025 Stiglitz Dep.) 290:17–291:16 (no market defined for developer side of platform), meaning that his market-power analysis also ignores the different market realities for different types of app developers, *see* Ex. 26 (Hitt Reb. Rep.) ¶ 127. That *Apple's* experts have defined a two-sided game-transaction market and a two-sided video-streaming transaction market illustrates that no *single* two-sided market can be defined here, given that the two-sided "competitive conditions for transactions vary significantly across different app genres." Ex. 19 (Hitt Rep.) ¶¶ 90, 96–97; *see also* Ex. 21 (Jin Rep.) ¶¶ 91–93 (same); Ex. 26 (Hitt Reb. Rep.) ¶ 299 (same); Ex. 27 (Sundararajan Reb. Rep.) ¶ 261 (same). In the game and video-streaming transactions markets, for example, developers have several (varying) alternatives to selling iOS in-app content to consumers and regularly make use of them. Ex. 19 (Hitt Rep.) ¶¶ 124–38, 240; *see also Epic*, 67 F.4th at 973 (affirming two-sided mobile-game transactions market). Further, Plaintiffs' "market definition must be relevant to the theory of harm at issue," *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024) (quotation marks omitted); *accord Google Play*, 2025 WL 2167402, at *7, which would require any two-sided alternative to cover all 26 app genres included in their case. But no expert or party defines a single two-sided market encompassing all iOS transactions in all genres, leaving no framework to analyze Plaintiffs' case and "no way to measure" alleged harm to competition. *Amex*, 585 U.S. at 543.

Finally, Plaintiffs cannot rely on Stiglitz's effort to recycle overruled opinions because even dissenting economists must respect precedent, including precedent they view as "specious," (Ex. 73 (Stiglitz Project Syndicate Article)). Courts have disregarded Stiglitz's opinions as "contrary to controlling law." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *53 (E.D.N.Y. Oct. 26, 2022); *accord U.S. Airways*, 938 F.3d at 59; *see also* Ex. 74 at 30–31 (article published by Plaintiffs' experts Rosa Abrantes-Metz and Minjae Song recognizing that

the law requires treating transaction platforms as single two-sided markets for transactions). Thus, Stiglitz cannot assert from thin air that his conclusions are impervious here to changes in market definition, another of his rejected *Amex* workarounds. *See* Stiglitz et al., Amicus Br. in *Amex*, at 4 ("assuming Amex is a two-sided platform" is "certainly not a sufficient basis to change established antitrust analysis"). Aside from being facially implausible, this *ipse dixit* opinion rests on ignoring the "more pronounced indirect network effects," *Amex*, 585 U.S. at 545, that are a core feature of two-sided transaction platforms, as the Ninth Circuit underscored in *Google Play*, 2025 WL 2167402, at *19. *See* Ex. 31 (Stiglitz Rep.) ¶¶ 372–78 (insisting the purported "lack of competition" on the App Store "limits the significance of indirect network effects"). Indeed, the damages model on which Stiglitz expressly relies for the assertion that his analysis would be unchanged in a two-sided market, Ex. 31 (Stiglitz Rep.) ¶ 378, also disregards indirect network effects, *see* Ex. 32 (Abrantes-Metz Rep.) ¶¶ 42–44; *see also* Ex. 18 (July 11, 2025 Abrantes-Metz Dep.) 253:11–23 (Abrantes-Metz conceding she did not even consider whether the App Store was a two-sided transaction platform as discussed in *Amex*). While a plaintiff can *allege* anticompetitive effects in alternative one-sided or two-sided markets, *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022), circular reasoning cannot stave off summary judgment. Plaintiffs fail to adduce the necessary proof of a two-sided market in which they can establish the other elements of their case. Summary judgment is thus warranted.

## B. Apple's Restrictions On Rival App Distributors Are Lawful Refusals To Deal.

Plaintiffs' core liability theory—which alleges that Apple has a policy of operating a "closed" platform and "terminating or threatening to terminate apps developers who sell apps in competition with" Apple's "exclusive" App Store, TAC ¶¶ 79, 84—fails because Apple has "no antitrust duty to deal with its competitors," *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).[5]

There can be no genuine dispute that this is a refusal-to-deal claim. For example, Plaintiffs'

---

[5] Although Apple repeatedly asserted the refusal-to-deal doctrine in *Epic*, the Court did not address that issue or other Section 2–specific conduct arguments because the failure of Epic's Section 1 claims doomed its Section 2 claims without further analysis. *See* 559 F. Supp. 3d at 1044 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991–92 (9th Cir. 2020)). Here, however, Plaintiffs bring *only* Section 2 claims, making the refusal-to-deal doctrine directly applicable (and dispositive). *See United Wisconsin Grain Prods. LLC v. Archer Daniels Midland Co.*, 2025 WL 2017271, at *6 (7th Cir. July 18, 2025) ("[T]he acts of a single firm are judged by a different standard under § 2.").

liability expert recognizes the core conduct in the case is Apple's general "policy of not allowing app stores in its own App Store," Ex. 17 (June 25, 2025 Stiglitz Dep.) 226:24–227:11, and its "refus[al] to deal with developers who sell iOS apps outside the App Store," Ex. 14 (May 30, 2025 Stiglitz Dep.) 114:23–115:2.  Refusing to enable third parties to function as competing "alternatives for distributing iOS apps to consumers," Ex. 31 (Stiglitz Rep.) ¶ 71, is the epitome of a "refusal to cooperate with rivals," *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see also Qualcomm*, 969 F.3d at 994 (refusal to license rival chip makers).  Indeed, courts have consistently applied refusal-to-deal precedent to cases where defendants refuse to enable competition by software developers.  *See, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) (Gorsuch, J.) (termination of competing developer's advance access to platform APIs); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016) (iPad app developer refused to provide rival with software toolkit after agreeing to do so); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303, 305 (D.C. Cir. 2023) (prohibition of platform access by developers with apps that competed with Facebook or linked to competitors).  This case thus falls squarely within the traditional Section 2 rule that a defendant may refuse to deal with rivals.  *See Trinko*, 540 U.S. at 407–08; *linkLine*, 555 U.S. at 448; *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

Plaintiffs do not deny that Apple's conduct is a refusal to deal with developers.  Dkt. 991-1 at 1–2.  Rather, they say that developers are not rivals, relying on *United States v. Apple Inc.*, 2025 WL 1829127, at *11–12 (D.N.J. June 30, 2025).  But in that case, the court concluded, at the pleading stage, that the alleged conduct vis-à-vis app developers was not a refusal to deal *with smartphone competitors*, who are the rivals in the Government's alleged "smartphone and performance smartphone markets." *Id.* at *8, *12.  Here, Plaintiffs expressly assert that Apple has refused to deal with "developers who sell [or would sell] apps in competition with Apple" in the alleged "iOS applications aftermarket." TAC ¶¶ 79, 84.  Nor can Plaintiffs evade refusal-to-deal precedent by arguing that Apple imposes "restrictions" or "conditions" on dealing.[6]  *Novell*, 731 F.3d at 1079 ("Whether one chooses to call a

---

[6] Plaintiffs cite Stiglitz's effort to reframe the case through a pseudo-tying theory, *see* Dkt. 991-1 at 2, but no tying claim was ever pled or certified in this case.  Moreover, Stiglitz applies his so-called "lens of tying" to the consumer side only, Ex. 31 (Stiglitz Rep.) ¶ 362, not to developers, and admits there is no tying agreement between Apple and consumers, Ex. 14 (May 30, 2025 Stiglitz Dep.) 168:1–13.

Gibson, Dunn &
Crutcher LLP

monopolist's refusal to deal with a rival an act or omission, interference or withdrawal of assistance, the substance is the same and it must be analyzed under the [refusal-to-deal] test."); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31 (D.D.C. 2021) (rejecting attempt to "reframe [refusals] as offers to deal only on the condition that the third party refrains from competing" because *Trinko* encompasses "refusals conditioned on a firm's status that cannot readily be changed," such as where a firm "agrees to sell to noncompetitors but not competitors" (cleaned up) (citing Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683, 1697 (2020))).

The only exception to the refusal-to-deal doctrine is the "narrow-eyed needle," *Novell*, 731 F.3d at 1074, described in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). It requires Plaintiffs to prove that (1) Apple "unilaterally terminate[d] a voluntary and profitable course of dealing," (2) "the only conceivable rationale or purpose [was] to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," and (3) "the refusal to deal involves products that [Apple] already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993–94 (cleaned up). Plaintiffs fail at each of these steps.

*First*, Apple has never voluntarily permitted developers to sideload apps or offer third-party app marketplaces in the App Store in the United States. SUF 17. Plaintiffs have no evidence of a prior course of dealing, which is fatal here. *See In re Adderall XR Antitrust Litig.*, 754 F.3d 135, 135 (2d Cir. 2014) (no refusal-to-deal claim where defendant "did not terminate any [profitable] prior course of dealing"); *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1172 (10th Cir. 2021) (similar); *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1235 (S.D. Cal. 2015) (similar).

*Second*, Apple has a clear, non-pretextual "conceivable rationale" for its policy that does not rely on excluding long-term competition by sacrificing short-term profits. *Qualcomm*, 969 F.3d at 993. This Court credited Apple's privacy, security, and other justifications on a full record in *Epic*, 559 F. Supp. 3d at 1002–10, and the Ninth Circuit affirmed, *Epic*, 67 F.4th at 985–89. Accordingly, no *reasonable* jury could conclude that Apple's longstanding policy is "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075. And at any rate, given that Plaintiffs and their experts concede that Apple's policy served its interest in "greater profits in both the short *and* long

Gibson, Dunn & Crutcher LLP

terms," *Qualcomm*, 969 F.3d at 994 (emphasis added); *see* Ex. 31 (Stiglitz Rep.) ¶ 98; TAC ¶ 37, no evidence exists that Apple "sacrificed short-term profits to further an anticompetitive agenda," meaning that Plaintiffs "cannot prevail," *Novell*, 731 F.2d at 1080 n.5.

*Third*, Apple's policy applies uniformly to all prospective rival app marketplaces.  SUF 7, 9, 17, 20.  This case is not about products that Apple already sells in the existing market to other similarly situated developers.  *Qualcomm*, 969 F.3d at 994.

Under this binding precedent, efforts to impose a duty on technology platforms to assist developers in competing with the platform have been roundly rejected.  In *New York v. Facebook, Inc.*, for example, the court considered a policy virtually identical to Apple's here—"Facebook's general policy of withholding API access from competitors."  549 F. Supp. 3d at 28.  Like Apple's ability to remove third-party app marketplaces for violating Apple's policies, Facebook's terms permitted it to "block[] the API access of Vine, a new app it viewed as a competitor, mere hours after its launch," *Facebook*, 549 F. Supp. 3d at 28.  As the D.C. Circuit explained, such a policy restricts rivals from conscripting the incumbent's own platform for competitive gain as even a "dominant firm" need not "lend its facilities to its potential competitors."  *Meta*, 66 F.4th at 305.  In other words, it was "plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing."  *Facebook*, 549 F. Supp. 3d at 28.  So too here.

The district court in *Google Play* likewise held that the refusal-to-deal doctrine barred a claim that Google unlawfully prohibited rival app marketplaces on its own Google Play store.  *See* Order at 1, Dkt. No. 491, *In re Google Play Store Antitrust Litig.*, No. 20-cv-5671 (N.D. Cal. Oct. 20, 2023).  While other theories, including a sideloading theory, went to trial, that reflected different commercial realities and theories of harm: Google has an "'open distribution' approach" (*i.e.*, a prior course of dealing with rival developers) that is "markedly different" from Apple's closed approach, and Epic brought "theories of harm against Google that were not brought against Apple," including Section 1 challenges to agreements Google made with Android phone manufacturers.  *Google Play*, 2025 WL 2167402, at *7.  Relevant here is the uncontested decision that Google's unilateral restrictions on the "distribution of other app stores through the Google Play Store" were "not unlawful."  *Google Play*, 2024 WL 3302068, at *6.  No less is true here.

Plaintiffs' theory fails for the additional reason that it would compel Apple to license its intellectual property.[7]  Courts may not "impose[] antitrust liability for a unilateral refusal to sell or license" intellectual property with would-be competitors absent a separate showing of "pretext" or that the intellectual property rights were acquired "in an unlawful manner."  *Kodak*, 125 F.3d at 1216, 1219; *accord SOLIDFX*, 841 F.3d at 843.  Plaintiffs have made no such showing.  This Court has already expressed skepticism of a theory that would have required Apple to license its intellectual property on terms preferred by third-party developers, noting that Apple's contrary argument "appears meritorious."  *Epic*, 559 F. Supp. 3d at 1050 n.626.  The relevant facts are no different here, SUF 4–7, 17, 20, and the Court should again conclude that Apple is not required to license IP rights that developers would need to compete on Apple's proprietary platform.

## C. Apple's Technical Design Of iOS Is Lawful Product Design.

While Epic wisely "disclaim[ed]" any challenge to Apple's product-design decisions in its suit, *Epic*, 559 F. Supp. 3d at 1034 n.599, Plaintiffs place Apple's "design" of iOS at the center of their case, TAC ¶¶ 36, 40, 51.  They challenge Apple's foundational decision to employ technical safeguards like "security measures" or "program locks" that make iOS a "closed" platform.  TAC ¶¶ 36, 40, 51; *see* SUF 7, 20.  Apple is able to unilaterally design such technical measures into iOS because it "manufactures its own phones."  *Google Play*, 2025 WL 2167402, at *7.  This theory falls within the ambit of the refusal-to-deal doctrine discussed above.  But Plaintiffs' theory also independently fails as a matter of law because it challenges lawful product design.

In promoting competition, the antitrust laws protect the right to innovate: "A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits, and any success it may achieve through the process of invention and innovation is necessarily tolerated by the antitrust laws."  *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544–45 (9th Cir. 1983).  That includes a company's right to launch products "whenever and however it chooses," *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979), and to design

---

[7] Plaintiffs' liability expert opines that Apple would license a broader scope of its rights to developers in the but-for world, Ex. 14 (May 30, 2025 Stiglitz Dep.) 117:24–118:05, and that consumers would be able to make "unauthorized modifications to iOS," Ex. 31 (Stiglitz Rep.) ¶ 42.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

or "redesign its products to make them more attractive to buyers," *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.* ("*CalComp*"), 613 F.2d 727, 744 (9th Cir. 1979). The Ninth Circuit has drawn a clear line: Product-design decisions that "provid[e] a new benefit to consumers" are not actionable under Section 2; such innovations are "necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998, 1000 (9th Cir. 2010) (cleaned up).

Plaintiffs challenge pro-consumer technological innovation here—technical features hardcoded into iOS. TAC ¶ 36. "Apple's iOS system . . . is designed to prevent independent modification, creating a 'walled garden.'" *Google Play*, 2025 WL 2167402, at *2. "Apple's on-device protections," including "sandboxing and enforcement of code signing and entitlements," are "an essential part of iOS's approach to security." Ex. 20 (Halderman Rep.) ¶¶ 14, 15(i); *see* SUF 21. Mandatory code signing "ensure[s] that all apps come from a known and approved source." Ex. 20 (Halderman Rep.) ¶ 93; *see* SUF 22. Entitlements are designed to prevent unauthorized access to system components and capabilities, including attacks by malicious code. Ex. 20 (Halderman Rep.) ¶ 97; *see* SUF 23. These technical features also guard against threats arising from removing security measures from devices, including through jailbreaking.[8] *See* Ex. 20 (Halderman Rep.) ¶ 108; SUF 19, 20, 24. Jailbroken phones with security measures removed are far more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data, as jailbreaking modifies iOS's built-in security and integrity protections. SUF 19, 20, 24. These and other technical safeguards have significant security benefits and help create a safer user environment than competing systems like Android. *See* SUF 20, 23, 24, 26; *Google Play*, 2025 WL 2167402, at *7. Consumers value Apple's security approach, ranking "malware protection" and "privacy" as the most important features—"must-have[s]"—of the App Store. SUF 26. This is all consistent with what the Ninth Circuit has recognized: that "device security and user privacy" both "enhance[e] consumer appeal and differentiat[e] iOS devices and the App Store from those products' respective competitors." *Epic*, 67 F.4th at 986.

---

[8] "[T]o 'jailbreak' an iPhone is to remove programmed limitations in order to enlarge the iPhone's functionality, run unauthorized applications, or otherwise change the iPhone's performance." *Grace v. Apple Inc.*, 328 F.R.D. 320, 333 (N.D. Cal. 2018). The concept of jailbreaking—bypassing Apple's security measures—exists *because* of the protections built into iOS, not the other way around.

Technical safeguards of this sort were integrated into iOS beginning with the release of iPhone in 2007—belying any claim that they were adopted solely to prevent competition with the App Store, which opened in 2008. SUF 1, 2, 7, 20. While Plaintiffs' operative complaint alleges that iOS's closed design has violated Section 2 "since June 2007," TAC ¶¶ 16, 31, 51, Plaintiffs have effectively acknowledged the implausibility of such a theory, having "abandon[ed]" all claims arising before July 10, 2008—the class start date. *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000). Summary judgment is warranted on those pre–App Store claims for this reason alone.

Plaintiffs' experts *confirm* that Apple's technical restrictions bestow consumer benefits. Dr. Kohno concedes that the technical design of the "iOS operating system" promotes "security for iOS devices." Ex. 83 (Kohno Rep.) ¶ 86. As to the risks of the process of jailbreaking in particular, he testified that he "personally . . . would not jailbreak [his] own phone" because he would not "have confidence in it being as secure." Ex. 100 (June 25, 2025 Kohno Dep.) 177:5–15. Stiglitz admitted that he does not know whether jailbreaking poses security and privacy risks, and acknowledged that "[i]f there were security risks, the security risk would obviously open up privacy risks" that could harm consumers. Ex. 14 (May 30, 2025 Stiglitz Dep.) 142:25–143:20. McFadden affirmed that "protection of a consumer's security" and "privacy" are "benefit[s] to a consumer." Ex. 11 (May 14, 2025 McFadden Dep.) 105:6–11. MacCormack agreed that adopting a "closed architecture" can be a "valid strategy" for a company. Ex. 102 (June 16, 2025 MacCormack Dep.) 49:22–50:11. The challenged technical restrictions thus undisputedly offer consumer benefits and are protected by the antitrust laws.

Plaintiffs' central objection is that Apple's technical restrictions do not permit "sideloading," which would allow third parties to distribute native iOS apps outside the App Store. TAC ¶¶ 51, 79, 84; *see* SUF 18. But as the Ninth Circuit has repeatedly recognized, product design that provides benefits to consumers is lawful even if it limits or eliminates interoperability. In *CalComp*, for instance, the court upheld IBM's redesign of its computers even though the change disrupted compatibility with rivals' components. *See* 613 F.2d at 743–44. And *Allied Orthopedic* similarly held that Tyco could lawfully introduce a new, improved sensor system, even though it was incompatible with rivals' sensors. *See* 592 F.3d at 1000–01. In the same way, Apple's technical restrictions here have obvious, recognized, and undisputed "benefit[s] to consumers" no matter their effect on rival app distributors.

*Id.* at 1000. Because the analysis admits "no room . . . for balancing the benefits or worth of a product improvement against its anticompetitive effects," and companies have "no duty to help [their] competitors survive or expand," Apple's conduct is lawful under Section 2 unless Plaintiffs can show "some associated anticompetitive conduct." *Id.* at 999–1000, 1002.

Plaintiffs' allegations about Apple's warranty terms, TAC ¶¶ 79, 84, Ex. 31 (Stiglitz Rep.) ¶ 72, are not "associated" anticompetitive conduct. As an initial matter, the record lacks *any* evidence that Apple "void[s] the warranties of iOS Devices consumers who buy competing apps." TAC ¶ 79; *see* SUF 25. Rather, the contention is that "Apple *may* deny customer service—including warranty—for jailbroken devices." Ex. 31 (Stiglitz Rep.) ¶ 72 (emphasis added). But as Stiglitz conceded, it is not "anticompetitive for Apple to make the customer pay for the consequences [of] deciding to jailbreak." Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. And as already explained, jailbreaking an iOS device and bypassing Apple's closed system opens the device up to myriad security risks that could damage it for reasons beyond Apple's control. Apple's warranty terms simply reflect its "unwillingness to extend free repair or replacement services to usage of its product that it cannot control," "protecting the integrity" of Apple's system—a "legitimate business purpose." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 871 (Fed. Cir. 1997); *see HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549–50 (8th Cir. 2007) (accepting business justification that defendant "could not feasibly warrant the performance of the product" if third-party solutions were used). In sum, because the antitrust laws do not compel a firm to "constrict[] its product development so as to facilitate sales of rival products," *CalComp*, 613 F.2d at 744, Plaintiffs' claims fail as a matter of law.

### D. Plaintiffs' Unpled IAP And Anti-Steering Theories Fail On The Undisputed Record For Multiple Reasons.

Through their expert reports, Plaintiffs attempt to broaden their case beyond the theories pleaded, challenging Apple's IAP mandate and former anti-steering rule. Borrowed from *Epic* and omitted from the TAC's charging counts, these new theories fail procedurally (§ IV.D.1) and have no merit (§ IV.D.2). Plaintiffs also lack antitrust standing to challenge the anti-steering rule (§ IV.D.3).

#### 1. Plaintiffs Cannot Introduce New, Unpled Theories At This Stage.

The Court should reject Plaintiffs' attempt to assert, on the eve of trial, claims they did not

allege in the last fourteen years.  The operative complaint alleges that Apple acquired or attempted to acquire monopoly power "[s]pecifically" by (a) designing iOS as a closed system with security measures to block third-party app downloads; (b) making the App Store the exclusive global distributor of iOS apps; and (c) threatening developers "who sell apps in competition with Apple" and penalizing consumers who use them.  TAC ¶¶ 79, 84.  Yet Plaintiffs now seek to broaden their case beyond the pleadings, introducing theories from *Epic* through their expert reports that aim at (1) "Apple's mandate that developers must use Apple's own proprietary in-app payment system ('IAP') for the sale of in-app content"; and (2) "Apple's antisteering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."  *See* Ex. 31 (Stiglitz Rep.) ¶ 63; Ex. 34 (Song Rep.) ¶ 45; Ex. 33 (McFadden Rep.) ¶¶ 15–16.  This improper gambit should be rejected.

As a matter of law, the operative complaint defines the boundaries of Plaintiffs' claims.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  Plaintiffs' attempt to veer away from their pleading thus violates settled Ninth Circuit law.  *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 (9th Cir. 2011) (plaintiffs cannot rely on unpled theories "identified only in [their] expert report[s]"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 n.3 (9th Cir. 2015) (plaintiffs cannot raise "new, unpled liability theories" at summary judgment or trial).  "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings."  *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006); *accord Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).  And that is particularly true here because the Court already denied their "belated request to reopen the pleadings": The Court held that their "argument that they intend to pursue the same claim decided in the Epic Games/Apple case is not consistent with their [then] proposed complaint which does not address any of those factual issues at all" and made clear that the "scope" of the case was locked and could not be "widen[ed]."  Dkt. 573 at 6–7.

Plaintiffs cannot escape this settled rule by pointing to scattered passing references in briefs or discovery.  *See* Dkt. 991-1 at 2.  A "plaintiff must identify" the "grounds" for its claims "in the complaint itself"; "a defendant is not deemed to have fair notice of [grounds] identified elsewhere."  *Oliver*, 654 F.3d at 909; *see Tri-Valley Cares v. U.S. Dep't of Energy*, 2010 WL 11530284, at *7–8 (N.D. Cal. Sept. 30, 2010) (granting summary judgment where claim was "not alleged" in complaint

and thus was "not properly before the Court").  That Plaintiffs referenced anti-steering in a class-certification brief, *see* Dkt. 643-1 at 5, *after* the Court had already rejected their effort to expand their complaint to add *Epic* theories, cannot somehow amend their pleadings to include those very theories.  Nor can Plaintiffs rely on *Apple's* expert testimony to expand their claims.  *See* Dkt. 991-1 at 2.  Although Apple protected its rights by adducing some rebuttal evidence to counter these unpled theories, that does not revise Plaintiffs' pleadings.  *Oliver*, 654 F.3d at 908–09.  Moreover, one of the individual plaintiffs has conceded that "open[ing] up" iOS devices to "other stores" would "satisf[y]" him that the conduct he was challenging had been fully "remedied," leaving no room for an IAP or anti-steering challenge.  Ex. 7 (May 22, 2020 Hayter Dep.) 164:19–165:25.

It would also be inappropriate (and prejudicial to Apple) for the Court to amend the pleadings at trial, as Plaintiffs have suggested.  *See* Dkt. 991-1 at 3.  Such amendments are disfavored in this context where there are no "newly-revealed material facts" nor any basis for Plaintiffs' failure to plead these theories years ago when this case began.  *Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978).

### 2.  Apple's IAP And Former Anti-Steering Rule Are Lawful Refusals To Deal.

Plaintiffs' new theories, even if properly raised, fail on the merits.  Apple's restrictions on third-party payment processing and its former anti-steering rule are lawful refusals to deal.  Start with IAP, which Apple introduced in 2009.  SUF 27, 28.  IAP is a commerce functionality integrated within iOS that allows developers to sell digital content within their apps.  SUF 27, 28.  Apple requires developers to use IAP for in-app purchases of digital goods.  SUF 28.  Apple has always *enforced* its IAP requirements, including the immediate removal of the Fortnite app for permitting "players to choose a direct pay option that would circumvent Apple's IAP system."  *Epic*, 559 F. Supp. 3d at 940.  Refusing to deal with developers who compete with Apple and capture the same transactions "in replacement of . . . Apple's IAP," Ex. 31 (Stiglitz Rep.) ¶ 85, is a textbook refusal to deal.  *See Trinko*, 540 U.S. at 407 (defendant "denied interconnection services to rivals"); *Aspen Skiing*, 472 U.S. at 594 (defendant refused to accept rival's alternative payment product).  So too for Apple's former anti-steering guideline.  Apple declined to approve apps that used Apple's platform to divert transactions.  SUF 29, 30.  That steering is a means of routing transactions away from Apple to a developer's competing channel is not reasonably in dispute.

Gibson, Dunn &
Crutcher LLP

Plaintiffs must but cannot satisfy the narrow *Aspen Skiing* exception.  Apple had no prior course of dealing with developers who displaced or circumvented IAP when it adopted the policies in question.  *See Qualcomm*, 969 F.3d at 993–94.  It maintained consistent IAP and anti-steering policies and did not sacrifice short-term profits by doing so.[9]  SUF 27–30.  And the policies applied uniformly.  *Qualcomm*, 969 F.3d at 995–96.  Apple was entitled under the antitrust laws to refuse to allow developers to bypass IAP in their apps or use Apple's platform to steer to rival channels—even if doing so supposedly "cut off" competitors from "access[ing]" Apple's "immensely valuable network."  *Meta*, 66 F.4th at 305.  While this Court enjoined the former steering provisions under state law, it held that they did not violate Section 2.  *See Epic*, 559 F. Supp. 3d at 1055.  For good reason: Antitrust law does not require Apple to host a competitive end-run on its own platform.  *See Facebook*, 549 F. Supp. 3d at 27, 33 (prohibition on "apps . . . providing a link to a different social-networking platform" was lawful withholding of "access to competitors").

### 3.  Plaintiffs Lack Antitrust Standing To Challenge The Former Anti-Steering Rule.

In any event, Plaintiffs lack antitrust standing to challenge Apple's former anti-steering rule.  The doctrine of antitrust standing "limit[s]" the "class of persons entitled to obtain [private] damages," even assuming an antitrust violation.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987).  In assessing whether a plaintiff has antitrust standing, courts balance several factors, including the existence of an "antitrust injury," "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages."  *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455–56 (9th Cir. 2021).  Even assuming that Plaintiffs could show antitrust injury (*but see infra* IV.F), every other factor cuts decisively against standing here.

*Directness of the injury and speculative measure of harm*.  Antitrust standing requires that the asserted harm be proximate to—the "first step" removed from—the challenged conduct.  *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983).  But Apple's refusal to allow developers to steer did not "lead *directly* to" Plaintiffs as the

---

[9] In a class settlement with developers in 2021, Apple revised its guidelines to "[p]ermit all U.S. developers to communicate with their customers via email and other communication services *outside their app* about purchasing methods other than in-app purchase."  *Cameron v. Apple Inc.*, No. 19-cv-3074 (N.D. Cal.), Dkt. 451 at 13 (emphasis added).

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

*immediate* victims." *Eagle*, 812 F.2d at 541 (emphases added). Plaintiffs' theory of harm instead relies on a series of contingent events: As the Ninth Circuit explained in *Epic*, "[c]alculating the damages caused by the anti-steering provision" for developers alone "would require a protracted and speculative inquiry into" the "availability" of substitute platforms, the number and tendencies of multi-homing users, and the "substitution rate" among those users. 67 F.4th at 1003. The next step (in this case) would be to determine what damages were passed on to class members, compounding the speculation. *See id.* at 1003 (damage calculations based on steering theories would be pure speculation); Ex. 24 (Watson Reb. Rep.) ¶¶ 15–16. That is not proximate harm. *See, e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *5–6 (N.D. Cal. July 11, 2024) (holding consumer plaintiffs lacked standing as a matter of law because of the attenuated causal chain connecting the challenged App Review Guideline to the alleged overcharge).

Plaintiffs are incorrect that the Supreme Court's earlier decision in this case dictates otherwise. *See* Dkt. 991-1 at 2–3. Looking only to the pleadings, the Court there considered Plaintiffs' claims concerning paid app downloads. *See Pepper*, 587 U.S. at 277. Anti-steering was not a part of this case at that time even arguably. *See supra* IV.D.1. And the Supreme Court held only that consumers could sue Apple as a "retailer" under *Illinois Brick* because they allegedly purchased apps directly from Apple and "pa[id] the alleged overcharge directly to Apple." *Pepper*, 587 U.S. at 281. This does not dictate the result at summary judgment under *AGC*. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1023–28 (N.D. Cal. 2015); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300–01 (S.D. Cal. 2009).

*Risk of duplicative recovery and complexity in apportioning damages.* Antitrust standing also guards against "the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 543–44. These risks are present here. "[I]ndirect and imprecise" theories of liability like Plaintiffs' new anti-steering challenge make "apportionment of any damages" extremely "difficult" and "risk . . . duplicative recovery." *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022). That is especially true given that Apple is currently litigating (and has litigated) overlapping cases by app developers challenging the exact same conduct and has also previously settled similar claims with a broad class of developers. *See Epic*, 559 F. Supp. 3d at 923 (discussing pending lawsuits by developers); *see also*, *e.g.*, *Korean Publishers*

Gibson, Dunn &
Crutcher LLP

*Assoc. v. Apple Inc.*, No. 4:25-cv-4438 (N.D. Cal.). A large class of them already litigated an anti-steering case against Apple to settlement. *See Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal., filed June 4, 2019); *see id.* Dkt. 451-1 (Settlement Agreement). Denying standing to indirect consumers is thus "not likely to leave a significant antitrust violation undetected or unremedied." *AGC*, 459 U.S. at 542; *see also Kloth v. Microsoft Corp.*, 444 F.3d 312, 317, 321–22 (4th Cir. 2006) (denying standing to consumer purchasers while recognizing that intermediaries—original equipment manufacturers and retailers—had standing to sue Microsoft). But allowing Plaintiffs to proceed here would invite double counting and confusion, requiring the Court to disentangle overlapping theories, separate developer and consumer harms, and allocate damages across an enormous and diffuse population. *See Eagle*, 812 F.2d at 542–43. Antitrust standing exists to prevent exactly this kind of claim. *See AGC*, 459 U.S. at 538–45.

**E. Plaintiffs' In-App Purchasing Theories Are Largely Time-Barred.**

Plaintiffs may not recover damages for any theories based on in-app purchasing. In-app purchases were introduced in 2009, yet Plaintiffs omitted any mention of them from their original Complaint (filed December 2011), Consolidated Complaint (filed March 2012), Amended Consolidated Complaint (filed September 2012), and Second Amended Consolidated Complaint (filed September 2013). *See* Dkt. 1, 26, 81, 111; *see also* SUF 27, 33. The first mention of in-app purchases came in Plaintiffs' TAC, filed on September 17, 2020. *See* Dkt. 229; *see also* SUF 34, 35. Because Plaintiffs have not alleged any "new and independent" overt act separate from the introduction of IAP itself in 2009 that "inflicts new and accumulating injury," any in-app purchasing claims are time-barred in their entirety. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (cleaned up); *cf. SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (affirming dismissal of claims "based on conduct that occurred in 2008" and that had not "changed since"). At minimum, Plaintiffs' damages on such theories—if any—must be limited to the four-year period preceding the filing of the TAC, that is, those occurring since September 17, 2016. *See* 15 U.S.C. § 15b.

Plaintiffs cannot get around this time-bar by claiming that in-app purchasing theories "relate back" to any earlier complaint. *See* Dkt. 228 (objecting that any "in-app purchase[]" theories are time-barred). Claims relate back to an earlier complaint (and thus get the benefit of that complaint's

1    limitations period) if they "share a common core of operative facts" with the earlier claims, "such that

2    the plaintiff will rely on the same evidence to prove each claim." *Williams v. Boeing Co.*, 517 F.3d

3    1120, 1133 (9th Cir. 2008).  But the Second Amended Consolidated Complaint does not mention in-

4    app purchases at all, much less Apple's policies concerning them.  *See* Dkt. 111.  In-app purchases

5    involve discrete technology and rules, implicate distinct competitive concerns and analysis (including

6    because they are typically for digital content accessible across platforms), and have been treated as a

7    separate issue by Plaintiffs' own experts.  *See* Ex. 31 (Stiglitz Rep.) ¶¶ 63, 80; Ex. 34 (Song Rep.) ¶

8    45; Ex. 33 (McFadden Rep.) ¶¶ 15–16.  Because in-app purchasing theories therefore would "not rely

9    on all the same facts and evidence" as the original claims, they do not relate back.  *Echlin v.*

10    *PeaceHealth*, 887 F.3d 967, 978 (9th Cir. 2018).

11    **F.  Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims.**

12         Apart from their failure to prove a violation of Section 2, Plaintiffs cannot satisfy two

13    independent "essential elements" of their claims: (1) "antitrust injury or impact flowing from that

14    violation" and (2) "measurable damages."  *Olean v. Wholesale Grocery Coop.*, 31 F.4th 651, 666 (9th

15    Cir. 2022) (en banc) (quotation marks omitted).  Either deficiency is fatal.

16         First, Plaintiffs have no admissible evidence establishing injury.  As explained in Apple's

17    concurrent decertification and *Daubert* motions, Plaintiffs rely exclusively on the McFadden-Song

18    model for the "complex inquiry into how Apple's conduct affected [developers'] pricing decisions,"

19    *Pepper*, 587 U.S. at 292 (Gorsuch, J., dissenting), that their commission overcharge theory requires to

20    show individual and classwide injury.  That model, in turn, relies on Thompson's unreliable methods

21    for assigning transactions to class members, and on MacCormack's inadmissible and results-driven

22    opinions about developers' average profit margins.  *See generally* Mot. to Decertify the Class; *Daubert*

23    Mot. to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack.  If either

24    Thompson's or MacCormack's opinions are excluded, Plaintiffs will have no evidence at trial to

25    establish whether any, much less every, class member was injured.  That warrants summary judgment

26    on all claims.  *See Noohi v. Johnson & Johnson Consumer Inc.*, 2025 WL 2089582, at *7 (9th Cir. July

27    25, 2025) (failures of injury/damage models fully implemented after class certification may be

28    "explore[d]" at summary judgment).

For similar reasons, summary judgment should be granted on Hayter's individual claim. Plaintiffs' model calculates that Hayter benefited monetarily from the challenged conduct, SUF 31, and he thus cannot show injury or measurable damages.  Given that a substantial percentage of class members are similarly (and concededly) uninjured under Plaintiffs' model, Apple's arguments apply with the same force to those class members' claims.  But they cannot be reliably identified due to Mr. Thompson's defective methodology (even taking the McFadden-Song model as admissible).  Hayter can be identified as an uninjured class member, however.  Plaintiffs' claims to the contrary, *see* Dkt. 991-1 at 3, are incorrect.  Plaintiffs produced to Apple records of all of Hayter's App Store transactions, and Apple has identified Hayter's Apple IDs (as they appear in the transactional data) for Plaintiffs, *see* Ex. 55 (Feb. 27, 2023 Letter from D. Swanson).  Plaintiffs have everything they need to "confirm or deny" Apple's argument.  Dkt. 991-1 at 3.

Second, Plaintiffs' expert evidence cannot serve as "proper proof" of measurable damages if the Court agrees with Apple on any liability issue in this motion.  *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992).  A valid damages model must "segregate the losses caused by acts which were not antitrust violations from those that were."  *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir. 2015).  If, instead, the "only possibly admissible damage study" simply assumes that *all* challenged conduct is unlawful, there is "no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful." *City of Vernon*, 955 F.2d at 1372 (quotation marks omitted).  In that context, there is "no proper proof of damages at all" and summary judgment is appropriate.  *Id.* at 1372–73; *see also Comcast Corp. v. Behend*, 569 U.S. 27, 36–37 (2013) (rejecting model because it "assumed the validity of all four theories of antitrust impact" and "did not attribute damages to any one particular theory").

For example, if the Court agrees that Apple's policy barring third-party app marketplaces is a lawful refusal to deal, then Plaintiffs' damage model cannot disaggregate that conduct from the *other* restrictions they challenge.  The foundation of Plaintiffs' unified model is Abrantes-Metz's calculation of a 13.63% commission rate.  Ex. 32 (Abrantes-Metz Rep.) ¶¶ 21, 23.  She claims that rate would prevail for all digital content—app sales and in-app purchases—in a but-for world where *none* of the challenged restrictions exists—that is, a world with sideloading, steering, and the displacement of

Gibson, Dunn &
Crutcher LLP

Apple's IAP, in addition to third-party app marketplaces, cloud streaming games, and "super apps" in the App Store. *See id.;* Ex. 31 (Stiglitz Rep.) ¶ 116. Plaintiffs' other experts, McFadden and Song, do not purport to quantify damages for any specific conduct by Apple; rather, they merely plug the 13.63% rate into their model of developer pass-through to compute damages. Ex. 33 (McFadden Rep.) ¶ 19; *see* Ex. 34 (Song Rep.) ¶ 61 & n.97.[10] Plaintiffs thus aggregate Apple's conduct for damage-estimation purposes. Ex. 11 (May 14, 2025 McFadden Dep.) 92:24–93:3; *see* Ex. 33 (McFadden Rep.) ¶ 19.

As such, the McFadden-Song model does not allow a factfinder to assess "whether each of the particular actions alleged to form an antitrust violation 'materially contributed' to plaintiffs' injury" or "filter[] out" "other causes of plaintiffs' injury." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1090 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984). That is because the model does not "apportion harm[] to any particular type of challenged conduct" and would "give the same result" regardless of which policies are found unlawful. Ex. 98 (Prince Reb. Rep.) ¶ 53. Plaintiffs' model improperly attributes harm to Apple's conduct collectively with no mechanism to untangle one policy from another. As the Ninth Circuit has underscored: "The concern in *Comcast* was not only that the damages model there proposed to measure damages not associated with the plaintiffs' theory of harm, but also that the model was incapable of separating out those damages from damages tied to the plaintiff's theory." *Noohi*, 2025 WL 2089582, at *6.

The model cannot be salvaged by Abrantes-Metz's conclusory assertions that it does not matter *which* of Apple's challenged conduct was absent (or continued) in the but-for world. *See* Ex. 12 (May 23, 2025 Abrantes-Metz Dep.) 53:3–10 (stating that her commission rate would be the same in "every situation and combination" even if only "some, but not all, of [Apple's] conduct is found to be unlawful"). Abrantes-Metz's 13.63% commission rate is based entirely on her say-so about a scenario in which "a single rival third-party app store competes against the Apple App Store." Ex. 32 (Abrantes-Metz Rep.) ¶ 23. But she has offered no analytical basis for that assertion, and no other expert has supplied it. *See* Ex. 11 (May 14, 2025 McFadden Dep.) 87:24–88:6 (explaining that the but-for

---

[10] They do purport to account for price-tier conduct through a simulated add-on to the damage model that otherwise assumes the absence of all the other challenged conduct, so that the damages in this simulation scenario remain fundamentally based on aggregated conduct. *See* Ex. 34 (Song Rep.) ¶ 84 & Fig. 13. If anything, the price-tier-free simulation shows that Plaintiffs *could have* tried to model other specific conduct but chose not to do so.

Gibson, Dunn &
Crutcher LLP

commission rate "doesn't directly depend on what the nature of the offending conduct is"); Ex. 14 (May 30, 2025 Stiglitz Dep.) 172:10–17 (admitting he "didn't do any independent estimate" of the but-for commission rate "independent of Dr. Abrantes-Metz's conclusion"). In fact, it defies economic logic that the rate Apple would charge in a counterfactual market would remain fixed at precisely 13.63% regardless of what conduct is found unlawful and what type of competition Apple faces in the but-for world. If only the IAP mandate or former anti-steering rule were found anticompetitive, for instance, then it is logically impossible for Abrantes-Metz's but-for commission rate to have obtained in the period from 2008 to 2009 *before* those policies were introduced.

"[A]n expert must back up [her] opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981). Courts have accordingly made clear that *ipse dixit* like Abrantes-Metz's, "not supported by sufficient facts[,] . . . cannot support a jury's verdict" and thus cannot create a genuine dispute of material fact. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 924 ("[T]he mere proffering of unsupported expert testimony does not create a triable issue."). Plaintiffs' entire damages case turns on a single model, tied to a single rate, grounded in a singular assumption that all of Apple's conduct is unlawful. If that assumption fails in any part, the model fails in whole, and summary judgment for Apple is warranted.

## V.   CONCLUSION

Because Plaintiffs' claims fail as a matter of law for multiple reasons, Apple respectfully requests that the Court grant its motion for summary judgment.

DATED:  August 4, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By:   */s/ Cynthia E. Richman*
      CYNTHIA E. RICHMAN

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone:  202.955.8234
Facsimile:  202.530.9691

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn & Crutcher LLP