THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile:  415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted pro hac vice

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR<br><br>**SUPPORTING SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:           October 14, 2025<br>Time:          2:00 p.m.<br>Courtroom:  1, 4th Floor |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex.__ | Exhibits to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| [Date] [Name] Dep. | Deposition transcript of named witness, each attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025. |
| Abrantes-Metz Reb. Rep. | Reply Report of Rosa M. Abrantes-Metz, Ph.D., dated June 13, 2025. |
| *Epic* Trial Tr. | Transcript from the trial held in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, from May 3, 2021 to May 24, 2021. |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025. |
| Halderman Reb. Rep. | Rebuttal Expert Report and Declaration of J. Alex Halderman, Ph.D., dated June 13, 2025. |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025. |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025. |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025. |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025. |
| Simonson Rep. | Opening Expert Report and Declaration of Itamar Simonson, Ph.D., dated March 7, 2025. |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025. |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025. |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025. |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025. |
| Schiller Decl. | Declaration of Philip W. Schiller ISO Apple's Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. 74, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on September 15, 2020. |
| Kosmynka Decl. | Declaration of Trystan Kosmynka, Dkt. 821-10, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on October 8, 2021. |

Pursuant to the Court's Standing Order in Civil Cases, Defendant Apple Inc. ("Apple") hereby submits the following Supporting Separate Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| Issue 1 (Market Definition)<br><br>Issue 3 (iOS Design) | **Fact 1:** Apple released iPhone in 2007. Initially, iPhone could run only applications that were preinstalled by Apple. In October 2007, Apple announced that it would allow third-party developers to create native iOS apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 135:18–22, 136:5–17, 138:19–24, 146:1–19, 248:5–11; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 22:4–6; Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 2:** Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to iPhone users. At launch, the App Store included 538 third-party applications. By 2023, the U.S. App Store had over 1.6 million apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 146:1–19; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 224:5–18; Ex. 19 (Hitt Rep.) ¶ 46(a); Ex. 80 (Schiller Decl.) ¶ 3. | |
| Issue 1 (Market Definition) | **Fact 3:** The App Store facilitates simultaneous transactions between consumers, on the one hand, and developers, on the other.<br><br>Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; Ex. 22 (Sundararajan Rep.) ¶¶ 153–164; Ex. 105 (Apple Inc., *Apple Developer Program*, Apple Developer) ("Join the Apple Developer Program to reach customers around the world on the App Store for all Apple platforms."). | |

---

[1] Issue numbers correspond with the issues listed in the Statement of Issues to be Decided in Apple's concurrently filed Motion for Summary Judgment. *See* Mot. for Summary Judgment at ii.

| | | |
|---|---|---|
| Issue 1 (Market Definition) | **Fact 4:** In addition to the App Store, developers can distribute their apps and digital content through web apps, their own websites, and other app transaction platforms.<br><br>Ex. 4 (Feb. 15, 2021 Schiller Dep.) 426:2–13; Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 76:6–9, 98:2–11; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122. | |
| Issue 1 (Market Definition) | **Fact 5:** Apple allows users of apps that operate across multiple platforms to access content, subscriptions, or features they have acquired in the app on other platforms or the developer's website, including consumable items in multi-platform games, provided the content, subscriptions, and features are also available as in-app purchases within the app (unless the app qualifies as a "reader" app, in which case users can access previously purchased content or subscriptions that are not available to purchase within the app).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) at § 3.1.3 (a)–(b) at 26 ("'Reader' Apps" and "Multiplatform Services"); Ex. 19 (Hitt Rep.) ¶¶ 122–133, 136, 140, 141; *see, e.g.,* Ex. 53 (Roblox Corp., *Roblox*, Apple App Store) (explaining that Roblox on iOS "features full cross-platform support, meaning you can join your friends and millions of other people on their computers, mobile devices, Xbox One, or VR headsets.") *and* Ex. 72 (Nia, *Is Roblox Cross-Platform Enabled? Everything to Know*, PlaySwap, Dec. 24, 2024) (similar). | |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 6:** At the App Store's launch, Steve Jobs stated that Apple was "trying to do two diametrically opposed things at once—provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc."<br><br>Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | |

| | | |
|---|---|---|
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 7:** From the App Store's inception, Apple adopted a closed and secure platform model for distributing native iOS apps, which enables developers to build those apps using Apple's proprietary software and tools such that developers could offer iOS apps (paid or free) through the App Store alone.<br><br>Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 73:10–74:8; Ex. 43 (APL-APPSTORE_00000055) at 081; *see* Ex. 4 (Feb. 11, 2021 Schiller Dep.) 69:1–9, 217:18–25, 292:2–17, 306:8–307:13; Ex. 20 (Halderman Rep.) ¶ 84; Ex. 80 (Schiller Decl.) ¶¶ 3, 4, 10–14, 24, 25. | |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal) | **Fact 8:** Developers can join the Apple Developer Program to obtain a license to use and gain access to Apple's proprietary software development tools and technology in order to develop iOS apps for distribution through the App Store. These tools include over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits ("SDKs").<br><br>Ex. 50 (Apple Developer Program License Agreement, June 9, 2025 ("DPLA")) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."); Ex. 5 (Feb. 12, 2021 Cook Dep.) 251:5–10; Ex. 68 (Jessica Burley, *The Apple Ecosystem in the US*, May 2025) at 11 ("Apple has released over 250,000 APIs[.]"); Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14. | |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal)<br><br>Issue 5 (Untimely Claims) | **Fact 9:** Since its launch in 2008, developers who want to distribute apps on the App Store to iPhone users must (i) sign the Developer Program License Agreement, which sets out Apple's terms and conditions, (ii) abide by the App Review Guidelines, and (iii) pay a $99 annual fee.<br><br>Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14; Ex. 82 (*Epic* Trial Tr.) 2742:6–2743:10 (Schiller); *see* Ex. 50 (DPLA) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."). | |

| | | |
|---|---|---|
| Issue 1 (Market Definition) | **Fact 10:** Apple applies a headline commission rate of 30% to digital good purchases made in the App Store.  Apple has never increased this headline commission rate.  On the contrary, Apple has lowered the commission in multiple instances, including: (1) in 2016, Apple reduced its commission rate to 15% for all subscription renewals after the first year; (2) in 2021, Apple introduced the Small Business Program which offers a reduced rate of 15% to small business developers, who comprise more than 90% of all developers on the App Store; (3) in 2016 and 2021, respectively, Apple also introduced the Video Partner Program and News Partner Program, which reduced the commission rate to 15% for participating developers.<br><br>Ex. 82 (*Epic* Trial Tr.) 2740:3–15, 2804:18–2805:11 (Schiller); Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 86:10–87:2; Ex. 5 (Feb. 12, 2021 Cook Dep.) 24:12–21; Ex. 64 (Apple Inc., *Small developers on the App Store grew revenue by 71 percent over the past two years*, Apple Newsroom, May 11, 2023); Ex. 84 (Apple Inc., *Apple introduces the News Partner Program*, Apple Newsroom, Aug. 26, 2021); Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer); Ex. 80 (Schiller Decl.) ¶ 7. | |
| Issue 1 (Market Definition) | **Fact 11:** As of 2023, 95% of the apps on the U.S. Storefront were free to download and incurred no commission on the download, and 82.4% were both free to download and did not offer in-app purchases of digital goods and services.<br><br>Ex. 19 (Hitt Rep.) ¶¶ 46 (c), 47 (Exhibit 1), 259 n.420. | |

| | | |
|---|---|---|
| Issue 2 (Refusal to Deal) | **Fact 12:** Apple reviews each app and app update that is submitted to the App Store in a process known as App Review, which uses a combination of automated tools and human reviewers to evaluate apps against the App Review Guidelines, and rejects those apps and app updates that fail review.<br><br>Ex. 81 (Kosmynka Decl.) ¶ 2; Ex. 80 (Schiller Decl.) ¶¶ 19, 26; Ex. 2 (Feb. 2–3, 2021 Kosmynka Dep.) 112:1–12, 238:14–239:2, 243:9–20; *see* Ex. 49 (App Review Guidelines, June 9, 2025) at 1 ("[E]very app is reviewed by experts . . . We also scan each app for malware and other software that may impact user safety, security, and privacy."). | |
| Issue 2 (Refusal to Deal)<br><br>Issue 5 (Untimely Claims) | **Fact 13:** Apple has applied some kind of app-review criteria since the App Store's launch, and in 2010, it formalized this process in the App Review Guidelines. Apple has never permitted third-party app marketplaces on iOS for app distribution in the United States.<br><br>Ex. 43 (APL-APPSTORE_00000055) at 080; *see* Ex. 2 (Feb. 2, 2021 Kosmynka Dep.) 197:6–14; *see* Ex. 106 (APL-APPSTORE_03238239) (App Store Review Guidelines, 2010) at 248; Ex. 49 (App Review Guidelines, June 9, 2025) §§ 2.5.2, 4.7 at 16–17, 37. | |
| Issue 2 (Refusal to Deal)<br><br>Issue 5 (Untimely Claims) | **Fact 14:** In 2010, Apple launched iPad, a tablet. iPad ran on iOS until 2019, when Apple launched iPadOS. iPad has an App Store where users can purchase and download apps. As with iPhone, Apple requires native iPad apps to be submitted through App Review and distributed through the App Store.<br><br>Ex. 63 (Apple Inc., *Apple Launches iPad*, Apple Newsroom, Jan. 27, 2010); Ex. 88 (Apple Inc.*, The new iPadOS powers unique experiences designed for iPad*, Apple Newsroom, June 3, 2019). | |

| | | |
|---|---|---|
| Issue 1 (Market Definition) | **Fact 15:** Developers set prices for their app downloads and in-app digital content and they can currently choose among over 800 price tiers.<br><br>Ex. 50 (DPLA), Schedule 2, §3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool[.]"); Ex. 58 (Apple Inc., *App Store Connect Help: Manage app pricing - Set a price,* Apple Developer) ("You'll need to set pricing for your app before you submit it for review. Choose from up to 800 price points by default, and request to access an additional 100 higher price points (up to $10,000)."); *see* Ex. 54 (Apple Inc., *App Store Connect Help: Reference - Pricing and Availability*, Apple Developer) ("The price you choose for the in-app purchases . . . determines both the customer price and your proceeds."); *see also* Ex. 43 (APL-APPSTORE_00000055) at 075 ("Now, we talk about the 70/30 revenue split but the developer gets to pick the price . . ."). | |
| Issue 1 (Market Definition) | **Fact 16:** The App Store provides developers with guidance on how to create app descriptions, how to choose app names, and how to select the best app genre.<br><br>*See* Ex. 59 (Apple Inc., *App Store: Creating your product page,* Apple Developer); *see also* Ex. 22 (Sundararajan Rep.) ¶ 155. | |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 17:** Apple has never permitted sideloading on iOS for app distribution in the United States.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 133 ("Unlike other mobile platforms, iOS, iPadOS, and visionOS don't allow users to install potentially malicious unsigned apps from websites or to run untrusted apps. Instead . . . all apps must be downloaded from the App Store."); Ex. 82 (*Epic* Trial Tr.) 2738:12–14 (Schiller); Ex. 43 (APL-APPSTORE_00000055) at 075. | |

| | | |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 18:** "Sideloading" refers to the ability to install apps to devices via third-party app marketplaces or direct downloads. For iOS, this refers to the installation of native apps from outside the App Store.<br><br>Ex. 3 (Feb. 10, 2021 Federighi Dep.) 303:12–17; *see* Ex. 20 (Halderman Rep.) ¶ 112. | |
| Issue 3 (iOS Design) | **Fact 19:** "Jailbreaking" refers to a process of effectively removing the security protections of a device to modify the device's behavior. For iOS, this is a process that deliberately bypasses various security features of iOS.<br><br>Ex. 3 (Feb. 10, 2021 Federighi Dep.) 288:6–13; Ex. 20 (Halderman Rep.) ¶¶ 15(j), 105. | |
| Issue 3 (iOS Design) | **Fact 20:** Apple's technical safeguards include system-level software protections that prevent "sideloading" (outside of limited app-testing contexts) and guard against threats arising from removing security measures from devices, including through "jailbreaking." These protections serve as "another line of defense against harmful software." Technical restrictions of this sort were integrated into iOS beginning with the release of iPhone in 2007.<br><br>Ex. 20 (Halderman Rep.) ¶ 92, *see id.* ¶¶ 93, 96, 105, 112; Ex. 3 (Feb. 10, 2021 Federighi Dep.) 224:19–225:15, 227:21–228:21, 289:9–21; Ex. 43 (APL-APPSTORE_00000055) at 080; Ex. 6 (March 8, 2021 Forstall Dep.) 71:9–72:15. | |
| Issue 3 (iOS Design) | **Fact 21:** Providing on-device protections, including sandboxing, code signing, and entitlements are "an essential part of iOS's approach to security."<br><br>Ex. 20 (Halderman Rep.) ¶¶ 14; *see id.* ¶¶ 15(i), 93, 97, 106–108, 110, 143–49; *see also* Ex. 3 (Feb. 10, 12, 2021 Federighi Dep.) 78:15–20, 201:13–204:10, 356:19–22, 360:19–24, 363:12–18; 364:12–20. | |

| | | |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 22:** Mandatory code signing is a process where devices verify that any third-party code has been electronically signed by a specific entity. On iOS, Apple requires that a developer who is a member of the Apple Developer Program sign their code for their app before submitting it for distribution via the App Store. iOS will not run unsigned apps.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 131 ("To help ensure that all apps come from a known and approved source and haven't been tampered with, these operating systems require that all executable code be signed using an Apple-issued certificate."); *see* Ex. 20 (Halderman Rep.) ¶ 93. | |
| Issue 3 (iOS Design) | **Fact 23:** Apple built entitlements—controls on which operating system resources may be accessed by certain apps or other software—into iOS. Entitlements are designed to prevent unauthorized access to device features and data, including access by malicious code.<br><br>*See* Ex. 57 (Apple Inc., *Documentation: Bundle Resources - Entitlements*) ("An *entitlement* is a right or privilege that grants particular capabilities to an executable."); Ex. 20 (Halderman Rep.) ¶ 97; *see also* Ex. 90 (*Epic* Trial Tr.) 1102:9–17 (Kosmynka) ("[A]n entitlement gives an app a particular permission to a set of resources of APIs on the . . . user's device."); Ex. 91 (*Epic* Trial Tr.) 3386:20–3387:4 (Federighi). | |
| Issue 3 (iOS Design) | **Fact 24:** Jailbroken phones are more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data as the process relies on vulnerabilities that have not been resolved. Entitlements are critical to mitigate vulnerabilities.<br><br>*See* Ex. 20 (Halderman Rep.) ¶¶ 106, 107, 110; Ex. 3 (Feb. 10 2021 Federighi Dep.) 291:4–8. | |

| | | |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 25:** Apple's warranty "does not apply" to claims for warranty services made with respect to "an Apple Product that has been modified to alter functionality or capability without the written permission of Apple[.]" There is no evidence in the record that Apple's warranty policies are anticompetitive.<br><br>Ex. 97 (iPhone hardware warranty, current) at 2; *see* Ex. 45 (APL_APPSTORE_06928901) (pre-2011 iPhone hardware warranty) at 902; *see* Ex. 11 (May 14, 2025 McFadden Dep.) 98:20–24 ("Q. Do you have any understanding or opinion as to whether Apple voids the warranties of iOS device consumers who buy competing apps? A. Actually, I don't know whether it actually does."); *see* Ex. 28 (Halderman Reb. Rep.) ¶¶ 237–38, 242–43; *see* Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. | |
| Issue 3 (iOS Design) | **Fact 26:** Survey data has shown that consumers have ranked "malware protection" and "privacy" as the most important features in Apple's App Store. An Apple survey in 2023 found that 81% of iPhone buyers in the U.S. were satisfied with their devices. An Apple-conducted survey in 2020 found 93% of iPad owners in the U.S. were satisfied with their device. Another Apple-conducted survey concluded that consumers distinguish iOS from Google's Android system by Apple's security and privacy features.<br><br>*See* Ex. 23 (Simonson Rep.) ¶¶ 57–58 ("[P]rivacy, malware protection, and app description details were identified as 'must-have' by the greatest number of respondents[.]"), ¶¶ 92, 103; Ex. 107 (APL-APPSTORE_11425222) (iPhone Buyer FY 23-Q4 Full Report) at 304 (iPhone consumer satisfaction rate); Ex. 92 (APL-APPSTORE_11029055) (iPad Buyer FY20-Q2 Full Report) at 086 (iPad consumer satisfaction rate); Ex. 65 (APL-APPSTORE_11425412) (Q2 2021 Privacy & Security) at 430, 435, 460–61 (showing consumers value privacy and associate Apple with better security and privacy features compared with Android). | |

| | |
|---|---|
| Issue 1 (Market Definition)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 27:** Apple introduced In-App Purchase ("IAP") in 2009, which is a commerce functionality integrated within iOS. IAP is not bought or sold directly to or by consumers. IAP processes payments, deducts Apple's commission, and remits the remainder to the developer.<br><br>Ex. 48 (APL-APPSTORE_00000004) at 006–007 ("I'm happy to say that we are supporting all of these additional purchasing models in iPhone 3.0 and we are doing it with what we call 'in-app purchase.'); *see* Ex. 50 (DPLA) § 1.2 at 8 (IAP API definition), Attachment 2 ("Additional Terms for Use of the In-App Purchase API") at 88–93; *see also* Ex. 80 (Schiller Decl.) ¶¶ 32–34, 38, 40. |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 28:** Since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital products. Apple has never allowed apps in the App Store that are selling digital goods or services to use third-party payment processors on iOS in the United States (other than as part of the Video Partner Program, which requires integration with a number of Apple technologies).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) § 3.1.1 at 20 ("If you want to unlock features or functionality within your app . . . you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, cryptocurrencies and cryptocurrency wallets, etc."); Ex. 81 (Kosmynka Decl.) ¶ 15; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 37:18–38:4, 121:21–122:2; Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer). |

| | | |
|---|---|---|
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 29:** Until October 2021, Apple's App Review Guidelines prohibited developers from using information obtained within the app to target individual users outside of the app to use purchasing methods other than in-app purchase. Apple applied these written policies uniformly to U.S. developers.<br><br>*See* Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) § 3.1.3 at 350; Ex. 95 (App Review Guidelines, Oct. 22, 2021) § 3.1.3 at 12; Ex. 87 (Apple Inc., *News: App Store Review Guideline updates now available*, Apple Developer, Oct. 22, 2021); Ex. 4 (Feb. 11, 2021 Schiller Dep.) 156:2–8, 162:6–8. | |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 30:** The App Review Guidelines previously barred developers from including links, buttons, or using other methods to direct users to external payment mechanisms. These provisions were modified in January 2024 and April 2025.<br><br>Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) §§ 3.1.1, 3.1.3 at 348, 350; Ex. 89 (App Review Guidelines, Jan. 16, 2024) § 3.1.1(a) at 11; Ex. 103 (App Review Guidelines, Apr. 30, 2025) § 3.1.1(a) at 22; Ex. 108 (Apple Inc., *News: Updated guidelines now available*, Apple Developer, May 1, 2025). | |
| Issue 6 (Proof of Damages and Injury) | **Fact 31:** Plaintiffs' own damages model calculates that named plaintiff Hayter benefited monetarily from the challenged conduct.<br><br>Ex. 98 (Prince Reb. Rep.) ¶ 38. | |
| Issue 6 (Proof of Damages and Injury) | **Fact 32:** The McFadden-Song model is the sole proof that Plaintiffs suffered monetary injury and quantified damages.[2]<br><br>Ex. 98 (Prince Reb. Rep.) ¶¶ 9–12. | |

---

[2] Points relating to the flaws and assumptions of the McFadden-Song model, which pertain to issue number 6 regarding failure to prove injury and damages, are not included in this Statement because they are not questions of fact. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

| Issue 5 (Untimely Claims) | **Fact 33:** Plaintiffs' original Complaint (filed in Dec. 2011), Consolidated Complaint (filed in March 2021), Amended Complaint (filed in September 2012), and Second Amended Consolidated Complaint (filed in September 2013) did not mention in-app purchases.<br><br>Dkt. 1, 26, 81, 111. | |
|---|---|---|
| Issue 5 (Untimely Claims) | **Fact 34:** Plaintiffs' Third Amended Consolidated Complaint ("TAC") was filed on September 17, 2020, over 8 years from the filing of their original Complaint.<br><br>Dkt. 1, 229. | |
| Issue 5 (Untimely Claims) | **Fact 35:** Plaintiffs did not include in-app purchases as part of the alleged iOS market until they filed their TAC on September 17, 2020.<br><br>*Compare* Dkt. 229 *with* Dkt. 1, 81, 111. | |

## ATTESTATION

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

By: */s/ Cynthia E. Richman*
Cynthia E. Richman

DATED: August 4, 2025         **GIBSON, DUNN & CRUTCHER LLP**

By:  */s/ Cynthia E. Richman*
Cynthia E. Richman

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*