THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted *pro hac vice*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |
| | **APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE EXPERT OPINIONS OF JAMES E. MALACKOWSKI, CPA, ARUN SUNDARARAJAN, Ph.D., AND JONAH BERGER, Ph.D.** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:         October 7, 2025 |
| | Time:         2:00 p.m. |
| | Courtroom:  1, 4th Floor |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD ............................................................................................................. 2

I.    MR. MALACKOWSKI'S OPINIONS ARE ADMISSIBLE ....................................... 2

    A.    Factual Background ........................................................................................ 4

    B.    Argument ........................................................................................................ 6

        1.    Malackowski Is Qualified To Opine On Accounting Measures And IP-Protected Innovations ............................................................................. 6

        2.    Malackowski's Opinions Are Reliable And Will Assist The Jury ................. 8

        3.    Malackowski's Citation To Third-Party Brand Valuation Reports Is Reliable ................................................................................................. 12

        4.    Malackowski Provides Context, Not Legal Conclusions............................ 13

II.   PROF. SUNDARARAJAN'S OPINIONS ARE ADMISSIBLE ................................. 14

    A.    Factual Background ...................................................................................... 15

    B.    Argument ...................................................................................................... 17

        1.    Sundararajan Is Qualified As An Expert Under Rule 702 ........................... 18

        2.    Sundararajan's Opinions Are Reliable And Relevant.................................. 24

            a)    Sundararajan's methods are sound................................................ 24

            b)    Sundararajan's opinions are not speculative ....................................... 27

            c)    Sundararajan offers independent analysis ........................................... 28

            d)    Sundararajan may set forth the factual background for his opinions ................................................................................................. 29

            e)    Sundararajan's opinions are a natural outgrowth of his career-long research ........................................................................................... 30

III.  PROF. BERGER'S OPINIONS ARE ADMISSIBLE.................................................. 31

    A.    Factual Background ...................................................................................... 32

    B.    Argument ...................................................................................................... 34

        1.    Berger Is Qualified As An Expert Under Rule 702 ..................................... 34

        2.    Berger's Rebuttal Opinions Are Reliable And Helpful To The Jury............. 37

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Cases**

*Allergan Sales, LLC v. UCB, Inc.*,
  2016 U.S. Dist. LEXIS 191853 (E.D. Tex. Nov. 7, 2016)................................................8

*Aloe Vera of Am. Inc. v. United States*,
  2014 WL 3072981 (D. Ariz. July 7, 2014) ...................................................................25

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................................24

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
  2022 WL 2643583 (N.D.N.Y. July 8, 2022)..................................................................25

*Brown v. Google, LLC*,
  2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) .............................................................24

*Citigroup Inc. v. Cap. City Bank Grp., Inc.*,
  637 F.3d 1344 (Fed. Cir. 2011) ...................................................................................13

*Corcoran v. CVS Health*,
  2017 WL 1065135 (N.D. Cal. Mar. 21, 2017)..............................................31, 35, 36, 38

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995)...................................................................................2, 20

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .....................................................................................................2

*Deutsch v. Novartis Pharm. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ..........................................................................22

*Doe v. Trs. of Dartmouth Coll.*,
  699 F. Supp. 3d 171 (D.N.H. 2023) .............................................................................20

*Dubey v. Concentric Healthcare Sols. LLC*,
  2025 WL 1663836 ......................................................................................................19

*Edwards Lifescis. Corp. v. Meril Lifescis. Pvt. Ltd.*,
  2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ...................................................................8

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................................4, 11, 24, 25, 26

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023)...................................................................................26, 33

*FTC v. Qualcomm Inc.*,
  2018 WL 6615050 (N.D. Cal. Dec. 17, 2018) ...............................................................25

*In re Google Play Store Antitrust Litig.*,
  __ F.4th __, 2025 WL 2167402 (9th Cir. July 31, 2025)..................................................12

Gibson, Dunn &
Crutcher LLP

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020)................................................................2

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004)...............................................................13

*Highfields Capital I, LP v. SeaWorld Ent., Inc.*,
2022 WL 1037210 (S.D. Cal. Apr. 6, 2022)........................................12

*Howard v. Tanium, Inc.*,
2025 WL 1906659 (N.D. Cal. July 10, 2025)......................................39

*Hyer v. City & Cnty. of Honolulu*,
118 F.4th 1044 (9th Cir. 2024).............................................................11

*Hynix Semiconductor Inc. v. Rambus Inc.*,
2008 WL 73689 (N.D. Cal. Jan. 5, 2008).......................................28, 29

*Intel Corp. v. Tela Innovations, Inc.*,
2021 WL 1222622 (N.D. Cal. Feb. 11, 2021).......................................10

*It's My Party, Inc. v. Live Nat., Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015)..................................................18, 19

*Johnson v. Nissan N. Am., Inc.*,
2022 WL 2869528 (N.D. Cal. July 21, 2022).........................................8

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025)..................................................28

*In re Korean Ramen Antitrust Litig.*,
281 F. Supp. 3d 892 (N.D. Cal. 2017).............................................11, 13

*Krause-Pettai v. Unilever United States*,
696 F. Supp. 3d 916 (S.D. Cal. 2023)..................................................35

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................15, 25

*Lewert v. Boiron, Inc.*,
212 F. Supp. 3d 917 (C.D. Cal. 2016)..................................................19

*In re MacBook Keyboard Litig.*,
2021 WL 1250378 (N.D. Cal. Apr. 5, 2021)........................................27

*Maldonado v. Apple Inc.*,
2021 WL 1947512 (N.D. Cal. May 14, 2021)......................................19

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
2014 WL 971765 (N.D. Cal. Mar. 5, 2014)..........................18, 28, 29, 30

*Messick v. Novartis Pharm. Corp.*,
747 F.3d 1193 (9th Cir. 2014)................................................................2

*Mitcheson v. El Antro LLC*,
2020 WL 7075239 (D. Ariz. 2020)......................................................22

iii

Gibson, Dunn & Crutcher LLP

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   2015 WL 5767415 (E.D. Pa. July 29, 2015) ............................................................19

*In re Myford Touch Consumer Litig.*,
   2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ..........................................................35

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
   2009 WL 3053855 (D. Mass. Sept. 21, 2009) ..........................................................23

*In re NFL's "Sunday Ticket" Antitrust Litig.*,
   2024 WL 2075942 (C.D. Cal. May 7, 2024) ...............................................................7

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) .................................................................................................25

*Otto v. LeMahieu*,
   2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ..........................................................28

*Palantir Techs., Inc. v. Abramowitz*,
   2022 WL 22913842 (N.D. Cal. Nov. 3, 2022) ..........................................................12

*PECO Pallet, Inc. v. Nw. Pallet Supply Co.*,
   2018 WL 10602201 (N.D. Ill. Oct. 25, 2018) ..........................................................24

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
   2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) ..........................................................34

*Plexxikon Inc. v. Novartis Pharm. Corp.*,
   2021 WL 2340144 (N.D. Cal. June 8, 2021) ............................................................20

*Pogorzelska v. VanderCook Coll. of Music*,
   2023 WL 3819025 (N.D. Ill. June 5, 2023) ..............................................................22

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.*,
   2013 U.S. Dist. LEXIS 170543 (N.D. Cal. Nov. 26, 2013) .......................................8

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .....................................................................................2

*Ramirez v. City of Los Angeles*,
   2016 WL 11758444 (C.D. Cal. Oct. 3, 2016) .............................................................8

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
   2022 WL 19408080 (N.D. Fla. Feb. 7, 2022) ..........................................................24

*In re Ripple Labs, Inc. Litig.*,
   2024 WL 4583525 (N.D. Cal. Oct. 24, 2024) .....................................................37, 39

*Rolls-Royce Corp. v. Heros, Inc.*,
   2010 WL 184313 (N.D. Tex. Jan. 14, 2010) ............................................................20

*Shafer v. C.R. Bard, Inc.*,
   2021 WL 4305216 (W.D. Wash. Sept. 22, 2021) .....................................................38

*In re Silicone Gel Breasts Implants Prods. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) .....................................................................35

*Slovak v. Golf Course Villas Homeowners Ass'n*,
  2019 WL 12372104 (D. Nev. Jan. 15, 2019) ........................................................................37

*Smith v. City of Oakland*,
  2025 WL 1725004 (N.D. Cal. June 20, 2025) ......................................................................19

*Smith v. City of Oakland*,
  2025 WL 490474 (N.D. Cal. Feb. 13, 2025).........................................................................19

*Smith v. Ford Motor Co.*,
  215 F.3d 713 (7th Cir. 2000)................................................................................................18

*Stender v. Lucky Stores, Inc.*,
  803 F. Supp. 259 (N.D. Cal. 1992) .......................................................................................20

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  2021 WL 662292 (E.D. Pa. Feb. 19, 2021)..........................................................................23

*Sumotext Corp. v. Zoove, Inc.*,
  2020 WL 264701 (N.D. Cal. Jan. 17, 2020) .........................................................................27

*Sumotext Corp. v. Zoove, Inc.*,
  2020 WL 533006 (N.D. Cal. Feb. 3, 2020)...........................................................................35

*Sun Microsys. Inc. v. Hynix Semiconductor Inc.*,
  608 F. Supp. 2d 1166 (N.D. Cal. 2009) ................................................................................11

*Synnex Corp. v. Axis Ins. Co.*,
  2023 WL 2530930 (N.D. Cal. Mar. 15, 2023) ................................................................14, 18

*Teradata Corp. v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024)...............................................................................................12

*Thomas v. Newton Int'l Enters.*,
  42 F.3d 1266 (9th Cir. 1994)............................................................................................2, 35

*In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Pracs., & Prods. Liab. Litig.*,
  978 F. Supp. 2d 1053 (C.D. Cal. 2013).................................................................................39

*Tressler v. BNSF Ry. Co.*,
  2012 WL 315402 (E.D. Wash. Feb. 1, 2012) .......................................................................38

*Tsatas v. Airborne Wireless Network, Inc.*,
  2025 WL 973840 (D. Nev. Mar. 31, 2025)...........................................................................37

*United States v. 4.0 Acres of Land*,
  175 F.3d 1133 (9th Cir. 1999)..........................................................................................32, 39

*United States v. Bilson*,
  648 F.2d 1238 (9th Cir. 1981)...............................................................................................19

*United States v. Garcia*,
  7 F.3d 885 (9th Cir. 1993)................................................................................................23, 35

*United States v. Sanchez-Birruetta*,
  128 Fed. App'x 571 (9th Cir. 2005).................................................................................8

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017).......................................................................3, 13, 31, 35

*Wijesinha v. BlueGreen Vacations Unlimited, Inc.*,
  2019 WL 13260541 (S.D. Fla. July 11, 2019) ............................................................22

*Zeiger v. WellPet LLC*,
  526 F. Supp. 3d 652 (N.D. Cal. 2021) ...........................................................................6

**Other Authorities**

A. Filippas, S. Jagabathula & A. Sundararajan, *The Limits of Centralized Pricing in
  Online Markets and the Value of User Control*, 69 Mgmt. Sci. 7202 (2023)................17

A. Ghose & A. Sundararajan, *Evaluating Pricing Strategy Using Ecommerce Data:
  Evidence and Estimation Challenges*, 21 Statistical Sci. 131 (2006) ...........................17

A. Sela & J. Berger, *Decision Quicksand: How Trivial Choice Suck Us In*, 39(2)
  Journal of Consumer Research 360 (2012)....................................................................36

A. Sela & J. Berger, *How Attribute Quantity Influences Option Choice*, 49 Journal of
  Marketing Research 942 (2012).....................................................................................36

Alvin Roth, *Stanford Profiles*, https://profiles.stanford.edu/alvin-roth ................................18

Brand Finance, *Brand Valuation Methodology*, https://brandirectory.com/methodology...................13

Daniel Kahneman, Wikipedia, https://en.wikipedia.org/wiki/Daniel_Kahneman (all
  last visited Aug. 26, 2025) ............................................................................................18

Daniel L. McFadden, The Nobel Prize, https://www.nobelprize.org/prizes/economic-
  sciences/2000/mcfadden/biographical/ (last visited Aug. 26, 2025) ............................19

Elinor Ostrom, Wikipedia, https://en.wikipedia.org/wiki/Elinor_Ostrom..............................18

Forbes, *The World's Most Valuable Brands*, https://www.forbes.com/the-worlds-most-
  valuable-brands/#30b6e8e5119c ...................................................................................13

G. Oestreicher-Singer & A. Sundararajan, *The Visible Hand? Demand Effects of
  Recommendation Networks in Electronic Markets*, 58 Mgmt. Sci. 1963 (2012) ...........17

Interbrand, *Best Global Brands* 36–43 (2024), https://learn.interbrand.com/hubfs/Best-
  Global-Brands-2024-Report.pdf ....................................................................................10

Interbrand, *Best Global Brands* 62 (2024), https://learn.interbrand.com/hubfs/Best-
  Global-Brands-2024-Report.pdf ....................................................................................13

K. Huang & A. Sundararajan, *Pricing Digital Goods: Discontinuous Costs and Shared
  Infrastructures*, 22 Info. Sys. Res. 712 (2011)..............................................................17

Lloyd S. Shapley, *Princeton Alumni Weekly*,
  https://paw.princeton.edu/memorial/lloyd-s-shapley-53...............................................18

Gibson, Dunn &
Crutcher LLP

M. Rocklage & J. Berger, *The Trajectory of Confidence: Experience, Certainty, and Consumer Choice*, Journal of Marketing Research (2025) (Conditionally Accepted) ............................................................................................................36

M. Xin & A. Sundararajan, *Nonlinear Pricing of Software with Local Demand Inelasticity*, 31 Info. Sys. Res. 1224 (2020) ..............................................17

R. Radner, A. Radusnksaya & A. Sundararajan, *Dynamic Pricing of Network Goods with Boundedly Rational Consumers*, 111 Proc. of the Nat'l Acad. of Sci, 99-104 (2014) ............................................................................................................17

Rui Alexandre R. Pires & João J. Ferreira, *Bridging Innovation Strategies & Intellectual Property: A Systematic Review-Based Conceptual Framework & a Roadmap for Future Research*, 144 Technovation 1, 9-16 (June 2025), https://doi.org/10.1016/j.technovation.2025.103243 ...................................14

Steve Lohr, *Can A.I. Invent?*, N.Y. Times (July 15, 2023)....................................14

World Economic Forum, *World Economic Forum Annual Meeting: A New Platform for the Digital Economy*, Jan. 21, 2016...........................................................17

**Rules**

Fed. R. Evid. 602 ................................................................................................30

Fed. R. Evid. 702 ..............................................................................2, 18, 20, 25

Fed. R. Evid. 703 ......................................................................................3, 12, 13

Fed. R. Civ. P. 26 ........................................................................................32, 37

**Treatises**

Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6264.1 (2d ed. 2025)................18

Michael H. Graham, 5 Handbook of Fed. Evid. § 702:1 (7th ed.).......................18

Gibson, Dunn & Crutcher LLP

**PRELIMINARY STATEMENT**

Plaintiffs' effort to exclude the testimony of Mr. James Malackowski, Prof. Arun Sundararajan, and Prof. Jonah Berger violates this Court's guidance that *Daubert* motions should "be used sparingly," Dkt. 715, and not attack "issues going to the weight and credibility" of their opinions, Standing Order in Civil Cases ¶ 11. Whereas Apple's motion against Mr. Darryl Thompson's opinions and certain of Prof. Alan MacCormack's (Dkt. 1002-1) strikes at specific flaws in potentially case-dispositive opinions, Plaintiffs sling mud in all directions. Across 31 pages, Plaintiffs launch attack after attack on the credentials and expertise of three qualified experts, impugning almost every opinion they offer, and even mounting broadsides against the qualifications of "world-renowned" experts—an endeavor of the type this Court has previously derided as "absurd." Ex. 1 (Oct. 7, 2019 Hrg Tr.) at 36:2–37:1.

Plaintiffs' *Daubert* arguments are baseless. Plaintiffs assert that an accountant (Mr. Malackowski) cannot opine on how accounting metrics are used by an economist because he is not also an economist. They argue that a tenured NYU professor with an award-winning book about the economics of multisided platforms, who teaches economics to Ph.D. students, and publishes peer-reviewed economic literature (Prof. Sundararajan) is not qualified to opine about the economics of multi-sided platforms at all because he earned a Ph.D. in business administration. And they claim that the rebuttal opinions of a consumer-behavior expert (Prof. Berger) violate *Daubert* for employing the exact same methodology as Plaintiffs' consumer-behavior expert whom he is rebutting. None of these or Plaintiffs' other arguments comes close to justifying the exclusion of Apple's experts under Rule 702. Indeed, Plaintiffs' own experts—at least six of whom have "never testified" at trial or "echo" other experts' opinions, Dkt. 1000-1 ("Mot.") 11, 16, 24–25—cannot meet the artificial standards Plaintiffs invent here.

Plaintiffs' motion is at best misguided and at worst misdirection designed to divert attention from the profound deficiencies in their own experts' work. Apple's experts are well qualified and offer reliable testimony supported by decades of expertise and a thorough review of the record. Their testimony will help the jury in understanding and deciding the complex financial, economic, and behavioral questions in this case. This Court should deny Plaintiffs' motion.

Gibson, Dunn &
Crutcher LLP

**LEGAL STANDARD**

Under Federal Rule 702's "broad conception of expert qualifications . . . an expert may be qualified either by 'knowledge, skill, experience, training, or education.'" *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (quoting Fed. R. Evid. 702). Rule 702 requires the Court to "ensure that all admitted expert testimony is both relevant and reliable." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020). Relevancy or "fit" requires that an expert's testimony be "relevant to the task at hand"—i.e., it must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1313, 1315 (9th Cir. 1995) (*Daubert II*) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "[E]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Reliability turns on "the soundness of [the expert's] methodology" considering "such criteria as testability, publication in peer reviewed literature, and general acceptance." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

## I. MR. MALACKOWSKI'S OPINIONS ARE ADMISSIBLE

Plaintiffs challenge Mr. James Malackowski's opinions about whether Apple continues to innovate and whether Plaintiffs' but-for world fails to account for such innovation, and in particular the tools, technologies, and services that Apple provides to developers and consumers and the intellectual property ("IP") rights that underpin them. As a recognized IP strategist and Certified Public Accountant ("CPA") with extensive experience in evaluating innovation and IP rights, Malackowski is well-positioned to address these issues and uses reliable methods to do so. First, he undermines Plaintiffs' accusation that Apple has somehow ceased to innovate: By tracking Apple's R&D over 19 years—in terms of expenditures, technology development, publicly known IP, and third-party, independent assessments of Apple's brand as an innovator—Malackowski demonstrates with data that Apple's innovation is far from stagnant. Second, Malackowski shows, more broadly, that Plaintiffs' experts have failed to meaningfully consider Apple's innovation as it is reflected in the tools, technologies, and services it makes available to developers and consumers relating to the App Store, iOS apps, and the iPhone—or the IP rights that secure them. *See* Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 20–34, 108–19.

Plaintiffs first insist that Malackowski is unqualified because of opinions he has rendered in other cases. But Plaintiffs merely list irrelevant cases in which they claim other courts have excluded Malackowski's opinions. Plaintiffs also argue that Malackowski cannot opine on certain of Plaintiffs' experts because those experts are economists and Malackowski is not. Mot. 2 & n.2, 9–11. That ignores Malackowski's clear qualification and expertise to provide the particular opinions here: He is an accountant critiquing Plaintiffs' experts' (including their accounting expert's) use of accounting metrics, and he is an IP licensing professional critiquing Plaintiffs' experts' failure to consider Apple's innovation or any of the IP securing it in the but-for world.

Plaintiffs then caricature Malackowski's conclusions and oversimplify his methods. But even Plaintiffs' characterization of Malackowski's analysis ultimately concedes that he did what Plaintiffs claim he did not. For example, Plaintiffs claim Malackowski "merely repeated Apple's global R&D expense" and that his analysis lacks a benchmark or context such that it is "impossible to interpret or to deploy" Malackowski's data. Mot. 3. But on the same page, Plaintiffs concede that Malackowski did not *merely* repeat Apple's R&D expense; he considered those expenses in connection with indicia of productivity and innovation, including "Apple's patent, copyright, and trademark grants." *Id.* Then, while Plaintiffs claim at one point that Malackowski "made no effort" to benchmark and thus "fails to set [his] results in any competitive or industry context," they also acknowledge Malackowski performed his analysis over a "19-year period" that spans a time without the iPhone or the App Store, thus providing a benchmark for an analysis of Apple's innovation. *Id.*

Plaintiffs' other arguments fare no better. Plaintiffs allege that it was inappropriate for Malackowski to rely upon third-party sources to discuss Apple's brand value. But courts routinely accept such evidence; indeed, expert reliance upon such sources is expressly permitted by the Federal Rules of Evidence. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017); Fed. R. Evid. 703. Nor does Malackowski offer legal opinions. His opinion that Plaintiffs' experts ignore key aspects of how Apple's IP relates to Apple's tools, technologies, and services is based on his decades of experience in how companies value their innovation and the IP protecting it, not an attempt to interpret the IP laws. The Court should deny Plaintiffs' motion.

## A.    Factual Background

Malackowski is a registered CPA, Certified Licensing Professional, and a recognized leader in IP analysis and strategy.  Dkt. 1000-3 (Malackowski Rep.) ¶¶ 2, 4, 7.  He has served as president of the Licensing Executives Society ("LES") International, was selected by the World Economic Forum as a member of the Network of Global Agenda Councils to focus on questions of IP policy, has received the LES International Gold Medal, and has been inducted into the IP Hall of Fame.  *Id.* ¶¶ 4, 6.  Through his company, Ocean Tomo, Malackowski conducts transactions involving protected innovations, technology, and IP, including helping companies package and then buy and sell portfolios of IP rights. Dkt. 1000-3 (Malackowski Rep.) ¶ 1.  Among other things, Ocean Tomo has advised on and brokered the placement of over $1.5 billion into IP investments.  *See* Ex. 2 (Ocean Tomo).[1]  The firm has consulted on over 1,000 engagements involving IP or intangible assets valued at over $10 billion.  *Id.*

Malackowski's assignment in this case was to identify and provide an overview of Apple's innovation associated with iOS and the App Store—in particular, as it is reflected in the tools, technologies, and services that Apple creates and makes available to developers—and various IP that protects that innovation.  Dkt. 1000-3 (Malackowski Rep.) ¶ 15.  That is the same assignment for which he was qualified as an expert by this Court in the *Epic Games* litigation.  *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 972 & n.333 (N.D. Cal. 2021) (citing Malackowski's trial testimony); Ex. 3 (*Epic* Trial Tr. (Malackowski)) at 3610:10–3611:15 (summarizing opinions).  To conduct this work, as in *Epic*, Malackowski used his expertise both as a CPA and licensing professional to perform a rigorous, multi-step analysis.  He examined Apple's R&D investments—over $210 billion since FY 2005—as well as evidence of Apple's tools, technologies, and services, along with Apple's publicly disclosed patents, copyrights, and trademarks.  Based on this extensive investigation, he then identified and mapped various IP assets to tools, technologies, and services relevant to iOS and the App Store.  This included spending hundreds of hours reviewing Apple's technologies and IP assets on an "asset-by-asset" basis. Ex. 4 (Malackowski Dep.) 30:4–24.  He applied the knowledge gained from that review, along with his review of the record in this case, to identify and document the patents, copyrights, and

---

[1] "Ex._" citations are to the concurrently filed Declaration of Cynthia Richman.

Gibson, Dunn & Crutcher LLP

trademarks within Apple's IP portfolio that have particular relevance to the App Store, iOS, and iOS apps. *See, e.g.*, Dkt. 1000-3 (Malackowski Rep.) ¶¶ 166, 169–77, App'x C (discussing findings).

For the patent component of his IP-asset evaluation, Malackowski identified exemplary categories of search terms representing patent-protected technologies Apple has created and offers to developers, *id.* ¶¶ 166, 167, & Schedules 3.0, 3.1, 3.3, reviewed and tested the results of each search in the U.S. Patent and Trademark Office ("PTO") database by manually reviewing a selection of grants and applications, Dkt. 1000-3 (Malackowski Rep.) ¶ 169, and refined and repeated the searches as needed to ensure the results were relevant to the App Store, *id.*; *see also id.* Schedule 3.4. In the end, Malackowski and his team "manually reviewed each and every patent to confirm that it was relevant to [their] search criteria." Ex. 3 (Epic Trial Tr. (Malackowski)) 3616:11–3617:23 (describing research process for *Epic*); Ex. 4 (Malackowski Dep.) 48:5–6 (having reviewed "hundreds of patents in this case"). Only after this assessment did Malackowski identify a specific number of patent grants and applications protecting tools, technologies, and services offered in connection with the App Store, including commonly used APIs, connectivity APIs, APIs providing monetization options, graphics/multimedia APIs, gaming APIs, and AR/Machine Learning APIs (among others). Dkt. 1000-3 (Malackowski Rep.) ¶¶ 168–71, Schedule 3.3 (results by category); Ex. 4 (Malackowski Dep.) 108:8–110:5 (discussing patents related to in-app purchases).

After identifying these IP assets, Malackowski further investigated and explained how specific IP that he identified supports the App Store and benefits developers and consumers. Dkt. 1000-3 (Malackowski Rep.) ¶¶ 148–65 (discussing benefits to consumers and developers), ¶¶ 170–71 (exemplary developer tools and technology), ¶¶ 185–97 (exemplary trademarks and copyrights). He also provided an overview of the agreement framework in which Apple makes those IP-protected tools, technologies, and services available to developers. *Id.* ¶¶ 51–55 (generally), ¶¶ 84–112 (developer program agreements). And in his rebuttal report, Malackowski elaborated on why Plaintiffs' theory of the case cannot be—and has not been—reconciled with the realities of Apple's innovation, the IP securing it, and the rights Apple may exercise with respect to that IP. Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 35–42.

**B.    Argument**

Malackowski is qualified to opine on Apple's R&D investments, as well as the innovation that results from those investments and the IP assets that secure them.  And having helped over a thousand companies buy, sell, and license technology and other IP assets, he is also qualified to explain that Plaintiffs' entire case simply ignores Apple's valuable innovations, the IP rights that protect them, and the exclusionary rights conferred to Apple.

**1.    Malackowski Is Qualified To Opine On Accounting Measures And IP-Protected Innovations**

Plaintiffs claim Malackowski is unqualified as an expert first because he lacks economic expertise to critique Plaintiffs' expert Prof. Joseph Stiglitz's use of certain accounting calculations or their expert Dr. Rosa Abrantes-Metz's failure to account for Apple's IP-protected innovations in computing her but-for commission rate.  Second, they say, his opinions have been "excluded or limited" in previous, unrelated cases.  Both arguments fail.

*First*, Plaintiffs both misstate the law and misrepresent the scope of Malackowski's rebuttal when they attack his ability to respond to Stiglitz and Abrantes-Metz.  Plaintiffs argue that only an economist can criticize another economist, but that is wrong on the law: The Ninth Circuit has repeatedly held that expert qualification turns on whether the witness has sufficient specialized knowledge, skill, experience, training, or education to assist the jury—not on holding a particular academic degree.  *See Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 669–70 (N.D. Cal. 2021).  Indeed, Plaintiffs' own experts offer critiques of experts not in their respective fields.  *See, e.g.*, Ex. 5 (Abrantes-Metz Reb. Rep.) ¶¶ 1 (describing herself as an economist), 3.c (summarizing critique of Apple's security expert Prof. Halderman), 70 (noting Halderman is "Apple's expert in computer science and engineering").

The two areas in which Malackowski opines—accounting measures and consideration of IP-protected innovation—are in his core competencies.  *See supra* § I.  Malackowski explains why the accounting analyses performed by Plaintiffs' accountant, Mr. Ned Barnes, are flawed, and, furthermore, why Stiglitz's reliance upon those analyses is flawed.  Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 84–94.  As Malackowski explains, Barnes calculated purported figures for Apple's return on capital

employed ("ROCE") and weighted average cost of capital ("WACC").  *Id.*  These are accounting metrics designed to measure profit, *id.* ¶¶ 94–100, and Malackowski explains in detail the problems with Barnes's calculations and the considerations to be taken into account when using such metrics. *Id.* ¶¶ 87–99.  Because Stiglitz relies on Barnes's calculations, Ex. 6 (Stiglitz Rep.) ¶¶ 246–47, Malackowski also opines that Stiglitz's derivative conclusions about market power and competitive effects are "overstated."  Dkt. 1000-4 (Malackowski Reb. Rep.) ¶ 89.  It is entirely appropriate for Malackowski to apply his decades of accounting expertise to rebut Professor Stiglitz's use of *another accountant's* ROCE-WACC comparison based on its shortcomings and limitations *from an accounting perspective*.  *See id.* ¶¶ 84–99.

Contrary to Plaintiffs' suggestion, Malackowski's criticisms are rooted firmly in Plaintiffs' experts' misuse of accounting metrics.  To complement Malackowski's critiques about the shortcomings of Barnes's opinions from an accounting perspective, Apple offers its own economist, Dr. Adrian Majumdar, who critiques the economic aspects of Stiglitz's use of ROCE and WACC—and whose opinion Plaintiffs do not challenge.  *See, e.g.*, Ex. 7 (Majumdar Reb. Rep.) ¶¶ 145–64, 186–88. It is Majumdar, not Malackowski, who opines that Stiglitz's use of Barnes's ROCE figures to draw conclusions about market power is improper from an economic perspective.  *See, e.g., id.* ¶¶ 101–04. At bottom, Plaintiffs cannot present an accountant's accounting calculations, upon which economists rely to draw economic conclusions, and protest when Apple offers both an accountant and an economist in rebuttal.

Plaintiffs similarly accuse Malackowski of improper economic analysis because he points out that Abrantes-Metz's accounting identity does not adequately account for the role of innovation and the IP rights that secure innovations in the but-for world.  Mot. 10–11.  Malackowski's experience in technology and IP-asset valuation qualifies him to do just that.  *See, e.g.*, Dkt. 1000-4 (Malackowski Reb. Rep.) ¶ 1.  As he observes, Plaintiffs' complete disregard of IP effectively assumes that a rival app marketplace, developers, and consumers could all freely exploit Apple's tools, technologies, and services—that is,that Apple would not be able to decide whether to allow their use, and if so, to set the terms of such use, including appropriate compensation.  *See id.* ¶¶ 22–23, 32–42, 108–19; Ex. 4 (Malackowski Dep.) 94:7–95:23, 98:10–24.  That is a significant and relevant critique of Plaintiffs'

but-for world, and it is one that benefits from Malackowski's specialized knowledge. *See In re NFL's "Sunday Ticket" Antitrust Litig.*, 2024 WL 2075942, at *4–5 (C.D. Cal. May 7, 2024) (rejecting argument that expert should be excluded for failure to "quantify the effects of [defendants'] procompetitive rationale" and holding the expert's proffered justifications were "helpful to the jury's fact-specific assessment of the [alleged] restraints' effect on competition because they [bore] directly" on the rule of reason analysis). If there is a shortcoming here, it is that Plaintiffs' economists did not consult an innovation and IP expert to account for the role of innovation and IP; it is not that an IP expert pointed out their failure to analyze the issue.

*Second*, Plaintiffs' references to other courts' decisions limiting or excluding Malackowski's testimony are irrelevant. *See* Mot. 2–3 & n.2. Those cases are inapposite, addressing different case-specific concerns and involving damages methodologies with no relevance here. *See, e.g.*, *Allergan Sales, LLC v. UCB, Inc.*, 2016 U.S. Dist. LEXIS 191853, at *2–3 (E.D. Tex. Nov. 7, 2016); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.*, 2013 U.S. Dist. LEXIS 170543, at *6–7 (N.D. Cal. Nov. 26, 2013). Moreover, Plaintiffs ignore the over 100 occasions in which Malackowski has been qualified as an expert to testify, including on issues of IP and accounting. *See* Dkt. 1000-3 (Malackowski Rep.) App'x A (Malackowski CV). Plaintiffs did not identify a single case in which a court has held Malackowski unqualified to opine about the use of accounting metrics like ROCE and WACC or about the significance of IP-protected technology. *See* Mot. 2–3 & n.2. Regardless, this Court's *Daubert* analysis must be "focuse[d] on the particular opinions offered by the expert[] on the[] specific facts" of this case, not unrelated rulings from other cases. *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *6 n.1 (N.D. Cal. July 21, 2022) ("Nor does it matter that [the experts] have sometimes been excluded by other courts in other cases"); *United States v. Sanchez-Birruetta*, 128 Fed. App'x 571, 573 (9th Cir. 2005) (similar); *Edwards Lifescis. Corp. v. Meril Lifescis. Pvt. Ltd.*, 2022 WL 254348, at *6 (N.D. Cal. Jan. 27, 2022) (similar); *Ramirez v. City of Los Angeles*, 2016 WL 11758444, at *2 (C.D. Cal. Oct. 3, 2016) (similar).

### 2. Malackowski's Opinions Are Reliable And Will Assist The Jury

Plaintiffs' attacks on Malackowski's opinions fare no better than those on his qualifications. Plaintiffs assert Malackowski's innovation and IP analysis consists of little more than tallying Apple's

patent, copyright, and trademark grants and merely "add[ing] up" Apple's R&D spending (Mot. 3–5), but Plaintiffs ignore critical components of his methodology and oversimplify those that they discuss.

*First*, Malackowski's opinions are the product of a rigorous evaluation of Apple's innovations and IP portfolio, and they directly undermine Plaintiffs' allegation that Apple has ceased to innovate. Malackowski did more than simply look at the total amount of Apple's R&D spend; rather, he considered the amount and trend of those investments and then situated those investments in the context of his investigation of Apple's innovation over a 19-year period. This included examining evidence of the tools, technologies, and services that Apple has created and offers to consumers and developers; reviewing Apple's publicly disclosed patents, copyrights, and trademarks on an asset-by-asset basis; and considering the history of the App Store, including the apps that have been created by developers and are distributed through the App Store. Ex. 4 (Malackowski Dep.) 30:4–24; *see, e.g.*, Dkt. 1000-3 (Malackowski Rep.) ¶¶ 56–79 (iOS history), ¶¶ 113–18 (IP history), ¶¶ 148–65 (describing tools, technologies, and services), ¶¶ 166, 169–77 (overview of asset review), App'x C (findings). Far from simply focusing on the fact that Apple's R&D investments have increased every year since FY2005, *id.* Fig. 2, Malackowski considers Apple's innovation in specific areas such as user privacy, security, 3D tools, and graphics. *Id.* ¶¶ 75–79, 148, 157–64, 176. He then shows that those investments have paid dividends, whether one measures trademarks (¶ 189), APIs (¶ 181), available apps and cumulative downloads (Fig. 5), the introduction of specific innovations such as Apple Health technologies (¶ 76), copyrighted sample software code (¶ 88), consumer dollars protected from fraudulent transactions (¶ 78), advancements in mobile-gaming technology (¶¶ 153–63), or the patent grants and applications that secure Apple's innovations (Fig. 1). This analysis thus proves that, contrary to Plaintiffs' complaints, Malackowski conducts analyses and provides data demonstrating that Apple's investments specifically have resulted in innovation reflected in the IP-protected tools, technologies, and services that it provides to third-party developers.

Malackowski further explains why attempting to apportion Apple's R&D investment to App Store-specific IP assets would yield myopic and arbitrary results. Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 54–63. Based on his review of Apple's innovation and development process, its management structure, his knowledge of generally accepted accounting principles (GAAP), and the fact that Apple

does not allocate such costs internally in its GAAP-compliant, audited financials, *id.* ¶¶ 47–63; Ex. 8 (Cook Dep.) 163:20–23, Malackowski concludes that any attempt to apportion R&D by revenue or other metrics would be arbitrary and not properly reflective of how Apple manages its business.  Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 62–63, 70–71; Ex. 4 (Malackowski Dep.) 80:23–84:1. Malackowski also applies his accounting expertise to evaluate and address why the *ad hoc* financial documents considered by Plaintiffs' experts are not useful bases on which to extrapolate measures of Apple's revenue or costs by product line.  *See* Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 64–83.  Courts have found that analyses of R&D investments "necessarily involve an element of approximation and uncertainty" and that challenges to the expert's judgment decisions are best addressed through cross-examination.  *See Intel Corp. v. Tela Innovations, Inc.*, 2021 WL 1222622, at *38–39 (N.D. Cal. Feb. 11, 2021).

*Second*, Plaintiffs miss the mark in arguing that Malackowski's analysis should be excluded because he does not directly quantify the relationship between Apple's R&D investments and the specific level of its App Store commission.  Mot. 3–7.  Plaintiffs' theory, reflected in their expert Mr. Jonathan Putnam's rebuttal of Malackowski, *see, e.g.*, Ex. 9 (Putnam Reb. Rep.) § 5.5, assumes that the output of Apple's R&D is the IP rights themselves (e.g., patents)—when in fact, the goal of Apple's R&D investment is *innovation*, of which Apple's IP assets are mere indicia.  *See, e.g.*, Dkt. 1000-3 (Malackowski Rep.) ¶¶ 59–62; Ex. 8 (Cook Dep.) 209:17–20, 79:17–20; Ex. 28 (Schiller Dep.) 91:18–92:2; Interbrand, *Best Global Brands* 36–43 (2024), https://learn.interbrand.com/hubfs/Best-Global-Brands-2024-Report.pdf.  Furthermore, Plaintiffs assume, as reflected in Abrantes-Metz's analysis, that any but-for world need not consider Apple's IP-protected tools, technologies, and services or the IP rights protecting them.  *See* Dkt. 1000-4 (Malackowski Reb. Rep.) ¶ 22.  Malackowski's analysis is rooted in this key fact about Apple that Putnam, Abrantes-Metz, and Plaintiffs' other experts do not acknowledge.  *Id.* ¶¶ 20–27; Dkt. 1000-3 (Malackowski Rep.) ¶¶ 116–17; Ex. 29 (Putnam Dep.) 75:6–14 (presenting "no evidence" that "Apple's investment decisions conform to the principles set forth" in Putnam's formula).  As noted above, Malackowski's opinions provide the jury with a specialized and substantive assessment of Apple's R&D investment and the resulting innovation, Apple's portfolio of IP that evidences and protects Apple's innovations in connection with the App Store and iOS, and

Gibson, Dunn &
Crutcher LLP

how the IP-protected tools, technologies, and services that Apple has created are made available to, and ultimately benefit, developers and consumers.  Ex. 4 (Malackowski Dep.) 70:12–23.  Malackowski then concludes, as this Court did, that "Apple is entitled to *some* compensation for use of its IP"—and conversely, that Plaintiffs' analysis must consider Apple's IP when calculating their but-for world. *Epic*, 559 F. Supp. 3d at 1042 (emphasis in original); Dkt. 1000-4 (Malackowski Reb. Rep.) ¶ 37. Malackowski also offers the jury valuable context to determine whether Apple's alleged market position has resulted in stagnation (as Plaintiffs argue) or whether Apple has continued to innovate and invest (as Apple maintains).  Dkt. 1000-3 (Malackowski Rep.) ¶ 149; Ex. 4 (Malackowski Dep.) 113:5–11, 121:6–122:11.

    *Third*, Plaintiffs are wrong that Malackowski fails to provide a proper benchmark.  *See* Mot. 3, 6.  Setting aside Plaintiffs' failure to cite any rule that the absence of a benchmark is disqualifying in this context, Malackowski *has* a benchmark: He compares data about Apple's innovation during the period of the alleged monopoly against data about the period indisputably preceding it (i.e., before the iPhone and the App Store were even introduced).  *See* Dkt. 1000-3 (Malackowski Rep.) Figs. 1, 2, 5, 7, 13–16, ¶¶ 56–59, 64–72, 118–19, 153–55, 159, 175; *see also* Ex. 7 (Majumdar Reb. Rep.) ¶¶ 191–202 (explaining why similar benchmark is appropriate).  It is standard for an expert to use the period preceding alleged anticompetitive conduct as a benchmark.  *See, e.g.*, *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 918 (N.D. Cal. 2017) (experts' analysis using period preceding alleged conduct as benchmark "strengthen[ed]" court's conclusion that "enough evidence" had been presented to survive summary judgment on the issue).  Plaintiffs can quibble over the propriety of that benchmark, but that is no grounds for exclusion.  *See Sun Microsys. Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1207–09 (N.D. Cal. 2009) (challenges to "accuracy or propriety" of benchmarks "[went] to the weight, rather than the admissibility" of expert's testimony); *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1057–59 (9th Cir. 2024) (excluding expert was abuse of discretion when court "fixated on evidence not offered" while "ignoring the evidence advanced" by the expert, who had "provide[d] the factual foundation for his opinions").  Moreover, Malackowski explained that he disagrees with Plaintiffs' experts' chosen benchmarks (including Google Play), in part because Plaintiffs' experts did not consider the extent to which there may be material differences between Apple and those other

1  companies, such as Apple's production of its own hardware and operating system, the security of its

2  platform, and the efficiency of the code it provides to developers.  Ex. 4 (Malackowski Dep.) 40:13–

3  17, 43:14–20; Dkt. 1000-4 (Malackowski Reb. Rep.) ¶¶ 100–07; *see, e.g.*, *In re Google Play Store*

4  *Antitrust Litig.*, __ F.4th __, 2025 WL 2167402, at *7 (9th Cir. July 31, 2025) (noting the "meaningfully

5  different commercial realities" between Apple and Google).

6      *Fourth*, Plaintiffs contend that Malackowski's methodology is unreliable because he does not

7  adequately quantify his findings.  Mot. 3, 5–6.  But Malackowski's opinions are almost entirely

8  quantitative and data-driven.  His rigorous documentation of App Store and iOS-related patents, for

9  example, "provides grounding for" the qualitative aspects of his opinions, which should "assur[e]" the

10  Court this his opinion is "not based on mere subjective belief or unsupported speculation."  *Teradata*

11  *Corp. v. SAP SE*, 124 F.4th 555, 567–68 (9th Cir. 2024); *see supra* § I.A.  And Malackowski's

12  qualitative opinions are "sufficiently intuitive" and rooted in his reasoned, fact-based analysis to be

13  reliable.  *Id.* at 567; *see also Palantir Techs., Inc. v. Abramowitz*, 2022 WL 22913842, at *2 (N.D. Cal.

14  Nov. 3, 2022) (rejecting argument that expert did not show revenue "was related specifically to the

15  trade secrets" because a "fail[ure] to consider certain facts" did not require exclusion).

16      **3.    Malackowski's Citation To Third-Party Brand Valuation Reports Is Reliable**

17      Malackowski's use of independent and reliable third-party brand valuation reports to

18  supplement his analysis was also proper and entirely consistent with accepted expert practice.  Fed. R.

19  Evid. 703; *see, e.g.*, *Highfields Capital I, LP v. SeaWorld Ent., Inc.*, 2022 WL 1037210, at *16 (S.D.

20  Cal. Apr. 6, 2022) (holding that expert's testimony on brand value helped jurors understand its

21  significance in business, a subject outside common knowledge); *see* Dkt. 1000-3 (Malackowski Rep.)

22  ¶¶ 145–47, Fig. 11.  Plaintiffs' argument that Malackowski could not use such reports unless he

23  replicated those analyses himself rests on a mischaracterization of the methodologies underlying the

24  reports and the applicable legal standards.  Indeed, Plaintiffs' experts themselves rely on third-party

25  analyses to support much more substantial components of their opinions.  Barnes, for example, relies

26  on a third-party source based in the United Kingdom to support his choice of the ROCE metric for

27  assessing Apple's profitability. Ex. 10 (Barnes Rep.) ¶¶ 12–13 & n.21–25 (citing U.K. Competition &

28  Market Authority).

It is well established that experts may choose not to undertake independent research considering particular facts of a case, as long as they can present "objective, verifiable evidence that the testimony is based on scientifically valid principles." *Wendell*, 858 F.3d at 1235 (internal citation omitted); Fed. R. Evid. 703. Each of the reports utilized by Malackowski—from Brand Finance, Interbrand, and Forbes—employs a comprehensive and verifiable methodology that considers factors such as familiarity, loyalty, comparable license agreements, external economic factors, direction, alignment, empathy, agility, distinctiveness, coherence, participation, presence, trust, affinity, and the role the brand plays in their respective industry—not just "profitability and revenue," as Plaintiffs contend. *Compare* Mot. 3–4 *with* Interbrand, *Best Global Brands* 62 (2024), https://learn.interbrand.com/hubfs/Best-Global-Brands-2024-Report.pdf; Brand Finance, *Brand Valuation Methodology*, https://brandirectory.com/methodology; Forbes, *The World's Most Valuable Brands*, https://www.forbes.com/the-worlds-most-valuable-brands/#30b6e8e5119c; *see also Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1348 (Fed. Cir. 2011) ("Third-party brand valuation surveys, including by Interbrand . . . indicate[d] that the [plaintiff's] brand [was] one of the most valuable brands in the world."). In the context of this inquiry into Apple's brand value, reliance on evaluations from credible third-party sources will be particularly helpful to the jury. By definition, brand value is evaluated from the perspective of third parties, not the brand itself. Plaintiffs' suggestion that Malackowski or Apple should just self-declare the value of the Apple brand flips the concept on its head.

### 4.       Malackowski Provides Context, Not Legal Conclusions

Finally, Malackowski does not offer legal conclusions as to IP law. Rather, he references legal frameworks and the existence of legal rights as part of his analysis, as experts are permitted to do, so long as they do not usurp the court's role in defining the law. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d at 933. In particular, Malackowski provides an overview of IP law as the backdrop to his opinions that Apple's innovation—reflected in its IP-protected tools, technologies, and services—plays an integral role in iOS and the App Store. Dkt. 1000-3 (Malackowski Rep.) ¶¶ 59–60, 74–79, 115–20. This includes Malackowski's explanation that the ability to determine whether to allow the use of those

tools, technologies, and services, and if so, on what terms, is a fundamental incentive for innovation. *Id.* ¶¶ 51–55, 150.

That is not a legal conclusion but rather an explanation of an issue informed by Malackowski's experience evaluating companies' technology and IP portfolios—and regularly studied in academia, popular media, and business. *See, e.g.*, Rui Alexandre R. Pires & João J. Ferreira, *Bridging Innovation Strategies & Intellectual Property: A Systematic Review-Based Conceptual Framework & a Roadmap for Future Research*, 144 Technovation 1, 9–16 (June 2025), https://doi.org/10.1016/j.technovation.2025.103243 (surveying academic research); Steve Lohr, *Can A.I. Invent?*, N.Y. Times (July 15, 2023) (in the context of artificial intelligence, discussing the importance of patent protection to innovation). Indeed, Malackowski does not himself interpret or purport to opine on the exact contours of the legal rights; he instead indicates that these rights exist and how that can, in his experience, affect a company's incentives to innovate and to share such innovation (and if so, the terms pursuant to which that innovation may be accessed by third parties). Dkt. 1000-3 (Malackowski Rep.) ¶¶ 38–43, 51–55 (discussing incentive effect of IP). Plaintiffs' experts do not meaningfully confront this reality, which is critical to understanding the real world and any but-for world, as well as the competitive dynamics at issue. *See* Ex. 11 (Dec. 15, 2022 Abrantes-Metz Dep.) 194:17–197:11; Ex. 12 (Stiglitz Dep.) 133:24–135:2; Ex. 13 (Song Dep.) 119:13–120:6; Ex. 14 (McFadden Dep.) 113:11–114:7.

## II.    PROF. SUNDARARAJAN'S OPINIONS ARE ADMISSIBLE

Plaintiffs' motion to exclude Prof. Arun Sundararajan, the Harold Price Professor of Entrepreneurship and Professor of Technology, Operations and Statistics at NYU's Stern School of Business, is built on a mischaracterization of his expertise and misapplication of Rule 702. Plaintiffs' overwrought assault largely amounts to an observation that his academic chair and Ph.D. are not in "economics." Mot. 11–18. But "Rule 702 does not require an expert to hold specific credentials or qualifications." *Synnex Corp. v. Axis Ins. Co.*, 2023 WL 2530930, at *6 (N.D. Cal. Mar. 15, 2023). Plaintiffs ignore Sundararajan's interdisciplinary expertise in economics, business, and technology, which has made him a leading scholar on platform economics. Not only has he authored an award-winning book on the subject, but he also teaches graduate-level economics courses. He is more than

qualified to analyze the economics of two-sided transaction platforms like the App Store.

Sundararajan's opinions are also reliable and will be helpful to the jury. Sundararajan's opinion that the App Store is a two-sided transaction platform is not a "novel" invention (Mot. 21) but a concept grounded in extensive, peer-reviewed literature and previously recognized by this Court and the Ninth Circuit. His use of words like "may" or "could" does not diminish his thorough analyses into improper speculation; it reflects care and intellectual honesty. Plaintiffs insist that only a quantitative analysis is a reliable methodology, but the law requires an expert to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)—which, in economics, often includes qualitative analyses, as various courts have recognized. Nor does Sundararajan merely "parrot[]" Apple's other experts, as his thorough independent analysis based on extensive record evidence shows. And finally, his opinions are a direct application of his career-long research, not something improperly developed for purposes of testifying. Because Sundararajan is qualified and his methods are reliable, Plaintiffs' motion to exclude his opinions should be denied.

### A. Factual Background

Apple retained Sundararajan to analyze Plaintiffs' allegations within the established economic framework of two-sided platforms. Ex. 15 (Sundararajan Dep.) 12:24–13:15; *see* Dkt. 1000-8 (Sundararajan Rep.) ¶ 12. Plaintiffs dismiss Sundararajan as a "catch-all expert" and try to splinter his reports into "25 diverse topics." Mot. 11. In fact, he addresses core economic questions in this matter: Is the App Store a two-sided transaction platform, and what implications flow from that finding for analyzing the competitive effects of, and justifications for, the challenged conduct?

In his opening report, Sundararajan first establishes the foundational economic theory and analytical framework for two-sided platforms. *See* Dkt. 1000-8 (Sundararajan Rep.) § IV. Second, he examines the App Store's origin, evolution, and business practices. *Id.* § V.A. Third, he applies the economic framework to the App Store's specific facts to conclude that it operates as a two-sided transaction platform and should be analyzed as such. *Id.* §§ V.B–C. Finally, he analyzes the procompetitive justifications for Apple's challenged conduct given the App Store's two-sided nature and its need to balance participation by both consumers and developers. *Id.* § VI. Sundararajan's

rebuttal report then addresses Plaintiffs' experts' opinions through the same lens, explaining how Stiglitz, Abrantes-Metz, and others failed to consider the App Store's two-sided nature and indirect network effects in their opinions about the relevant market, Apple's but-for commission rate, and the effects of Apple's conduct on competition. Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 8–27.

Sundararajan undertook this assignment based on years of education, research, teaching and training in economics in general, and the economics of platforms in particular. Sundararajan has an undergraduate degree in Electrical Engineering from the Indian Institute of Technology in Madras, an M.S. in Business Administration with a concentration in Management Science, and a Ph.D. in Business Administration from Simon Business School at the University of Rochester. Dkt. 1000-8 (Sundararajan Rep.) ¶ 2. As Sundararajan explains in his declaration, his Ph.D. program was interdisciplinary and included a strong foundation in economics and statistics. Declaration of Arun Sundararajan ("Sundararajan Decl.") ¶¶ 4–7; Ex. 15 (Sundararajan Dep.) at 20:2–15; *see also* Ex. 16 (Univ. of Rochester, Simon Business School's Ph.D. Program). That included several graduate-level economics courses—including the full requirements for a master's degree in applied economics. Sundararajan Decl. ¶¶ 4–7; Ex. 15 (Sundararajan Dep.) at 45:6–23; Dkt. 1000-8 (Sundararajan Rep.) App'x A, A-1.

Sundararajan is now the Harold Price Professor of Entrepreneurship and Professor of Technology, Operations and Statistics at the Stern School of Business at New York University ("NYU"), where he also was a Director at the NYU Stern Center for Digital Economy Research for seven years, and he now serves as Director of the Fubon Center for Technology, Business, and Innovation. Dkt. 1000-8 (Sundararajan Rep.) ¶ 1, App'x A, A-2. At NYU, he has taught several economics courses, including a Ph.D. course in "Digital Economics" as well as graduate-level courses in microeconomics, digital business strategies, platform technologies, and network markets. Sundararajan Decl. ¶¶ 8, 13–17; *see* Ex. 15 (Sundararajan Dep.) at 40:14–18; 65:25–66:5.

Sundararajan's research focuses on the economics of digital technologies and two-sided platforms—an interdisciplinary area of economics, technology, and business. *See* Dkt. 1000-8 (Sundararajan Rep.) ¶ 2; Sundararajan Decl. ¶¶ 10–11. For over 20 years, he has published peer-reviewed economics papers in leading journals relating to competition, including about digital markets,

network effects, and platform pricing. *See* Sundararajan Decl. ¶¶ 10–11; Ex. 15 (Sundararajan Dep.) at 99:6–100:20. That includes, for example, peer-reviewed papers on pricing structure, market power, and consumer welfare effects—many involving the use of econometric methods and models. *See* Sundararajan Decl. ¶¶ 9–10.[2] Sundararajan also authored *The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism*, which won Axiom Business's 2017 book award in the "Economics" category. Dkt. 1000-8 (Sundararajan Rep.) ¶ 3; Ex. 17 (*The Sharing Economy*); Ex. 15(Sundararajan Dep.) 68:11–18; *see* Ex. 18 (MIT Press Release). Published by MIT Press, the book describes the economics of two-sided platforms and analyzes several case studies, including assessing "two-sided network effects" associated with Airbnb, Etsy, and Uber's platforms. Ex. 15 (Sundararajan Dep.) at 125:2–7; *see* Ex. 17 (*The Sharing Economy*) at 26–27, 38–44, 69–84, 117–21.

In addition, Sundararajan is a member of the American Economic Association, presents at economics conferences, and has testified or spoken before Congress, the Federal Trade Commission, and the World Economic Forum. Sundararajan Decl. ¶¶ 18, 20 ; Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 4–5; Ex. 19 (World Economic Forum, *World Economic Forum Annual Meeting: A New Platform for the Digital Economy*, Jan. 21, 2016). He also has previously been retained as an expert in litigation, offering expert opinions about the economics of two-sided transaction platforms. Ex. 15 (Sundararajan Dep.) 8:23–9:21.

## B.    Argument

Plaintiffs' motion to exclude Sundararajan is meritless and should be denied. First, Plaintiffs' attack on Sundararajan's qualifications rests on the flawed premise that Rule 702 requires a specific degree title, ignoring that his extensive expertise and scholarship in digital economics and two-sided platforms provide him with the precise economic tools necessary to analyze the App Store. Second,

---

[2] *See* A. Filippas, S. Jagabathula & A. Sundararajan, *The Limits of Centralized Pricing in Online Markets and the Value of User Control*, 69 Mgmt. Sci. 7202 (2023); M. Xin & A. Sundararajan, *Nonlinear Pricing of Software with Local Demand Inelasticity*, 31 Info. Sys. Res. 1224 (2020); G. Oestreicher-Singer & A. Sundararajan, *The Visible Hand? Demand Effects of Recommendation Networks in Electronic Markets*, 58 Mgmt. Sci. 1963 (2012); K. Huang & A. Sundararajan, *Pricing Digital Goods: Discontinuous Costs and Shared Infrastructures*, 22 Info. Sys. Res. 712 (2011); A. Ghose & A. Sundararajan, *Evaluating Pricing Strategy Using Ecommerce Data: Evidence and Estimation Challenges*, 21 Statistical Sci. 131 (2006); R. Radner, A. Radusnksaya & A. Sundararajan, *Dynamic Pricing of Network Goods with Boundedly Rational Consumers*, 111 Proc. of the Nat'l Acad. of Sci. 99 (2014).

Gibson, Dunn & Crutcher LLP

their challenges to his methodology are equally unfounded.  His opinions are the product of a sound, qualitative analysis that properly applies established economic principles to the factual record.

### 1.    Sundararajan Is Qualified As An Expert Under Rule 702

Under Rule 702, an expert may be qualified on the basis of "either knowledge, skill, experience, training, or education or a combination thereof." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765, at *1 (N.D. Cal. Mar. 5, 2014) (quoting Michael H. Graham, 5 Handbook of Fed. Evid. § 702:1 (7th ed.)).  The qualification inquiry is holistic, requiring courts to consider "a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see* Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6264.1 (2d ed. 2025) (courts consider "the totality of a witness's background").  Rule 702 does not require any "specific credentials or qualifications in the relevant subject matter," *Synnex*, 2023 WL 2530930, at *6, so long as the expert has the requisite "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  The Court should deny Plaintiffs' motion because Sundararajan is highly qualified under Rule 702 to offer his opinions in this case.

**a.**  Plaintiffs first fixate on nomenclature, arguing that Sundararajan is unqualified because his formal title is not a "Professor of Economics" and his Ph.D. was accordingly not granted in "economics.".  Mot. 14.  But one does not need to be a professor in an economics department to testify as an economics expert.  *See, e.g.*, *It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 485 (D. Md. 2015) (finding a law professor qualified to testify as economics expert).  Nor does one need a Ph.D. in economics to render opinions on economic topics—as the many Nobel Laureates in Economic Sciences who lacked a formal degree in economics could attest.[3]

---

[3] For example, the former President of the American Economic Association and the 2012 Nobel Laureate Alvin E. Roth had degrees in engineering and operations research; Lloyd Shapley, who won the award in the same year, had degrees in mathematics; the 2009 Nobel Laureate Elinor Ostrom earned degrees in political science (after being rejected from an economics Ph.D. program); and the 2002 Nobel Laureate Daniel Kahneman had degrees in mathematics and psychology.  *See* Alvin Roth, *Stanford Profiles*, https://profiles.stanford.edu/alvin-roth; Lloyd S. Shapley, *Princeton Alumni Weekly*, https://paw.princeton.edu/memorial/lloyd-s-shapley-53; Elinor Ostrom, *Wikipedia*, https://en.wikipedia.org/wiki/Elinor_Ostrom; Daniel Kahneman, *Wikipedia*, https://en.wikipedia.org/wiki/Daniel_Kahneman (all last visited Aug. 26, 2025).

What matters instead is whether Sundararajan's "knowledge, skill, experience, training, or education," taken together, "qualif[y] [him] as an expert." Fed. R. Evid. 702. His bonafides are unimpeachable. He received an interdisciplinary Ph.D. that included the equivalent of a graduate-level education in economics[4] and has spent more than 20 years since studying and teaching the economics of digital platforms and technologies. *See supra* § II.A; Sundararajan Decl. ¶¶ 4–7, 10. He is a leading expert on multisided platforms, with an award-winning book on the subject. *Id.* It is simply false to suggest (as Plaintiffs do) that Sundararajan's C.V. lacks "evidence of economic expertise." Mot. 14.

Plaintiffs ignore all this. But courts routinely qualify experts with far less illustrious economic credentials. In *Dubey v. Concentric Healthcare Sols. LLC*, for instance, the court found an MBA and a Bachelor's in Business Ecology sufficed to "meet the minimum threshold to be qualified under Rule 702" as an expert economist. 2025 WL 1663836, at *3–5 (D. Ariz. June 12, 2025). In *It's My Party*, the court found a law professor qualified as an economics expert, noting that "[a]lthough lacking a formal economics degree, [the expert] has a law degree, and he has taken relevant courses in economics, statistics and economic analysis of law." 88 F. Supp. 3d at 485; *see also In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *3 (E.D. Pa. July 29, 2015) (same). So too in other disciplines. *See, e.g.*, *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 928 (C.D. Cal. 2016) (non-practicing physician qualified to opine on clinical studies due to his "years of experience in laboratory research and scientific publication" and experience teaching "how to evaluate clinical studies"); *United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir. 1981) (per curiam) (doctor qualified as psychiatric expert despite lacking a "specialty degree in psychology"). Tellingly, Plaintiffs cite no case excluding an expert for insufficient "expertise in economics" with anything approaching Sundararajan's credentials. Mot. 11.[5]

---

[4] Plaintiffs' economic expert Prof. Daniel McFadden also earned a cross-disciplinary Ph.D. (in behavioral sciences) that included courses in economics. *See* Daniel L. McFadden, The Nobel Prize, https://www.nobelprize.org/prizes/economic-sciences/2000/mcfadden/biographical/ (last visited Aug. 26, 2025).

[5] *Smith v. City of Oakland*, 2025 WL 1725004 (N.D. Cal. June 20, 2025), does not support Plaintiffs' argument. Mot. 14. The expert in *Smith* was a real-estate consultant with "no post-secondary training in economics." *Smith v. City of Oakland*, 2025 WL 490474, at *2 (N.D. Cal. Feb. 13, 2025). Likewise in *Maldonado v. Apple Inc.*, 2021 WL 1947512, at *26 (N.D. Cal. May 14, 2021), the expert was a survey expert and market research professor, not an economist. Sundararajan, by contrast, is a tenured professor whose life's work has involved studying the economics of two-sided businesses.

Gibson, Dunn & Crutcher LLP

To be sure, Sundararajan has never testified at a trial. But contrary to Plaintiffs' suggestion (Mot. 15), Sundararajan's primary job as a professor at NYU is not disqualifying. An expert's "'normal workplace' is not 'the courtroom or the lawyer's office.'" *Plexxikon Inc. v. Novartis Pharm. Corp.*, 2021 WL 2340144, at *2 (N.D. Cal. June 8, 2021) (quoting *Daubert II*, 43 F.3d at 1317). Courts regularly find that an expert's "lack of experience as an expert witness is no bar to [their] testimony." *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *5 (N.D. Tex. Jan. 14, 2010); *see also, e.g.*, *Doe v. Trs. of Dartmouth Coll.*, 699 F. Supp. 3d 171, 176 (D.N.H. 2023) (rejecting motion to exclude an economics expert on the basis that "she has never before been qualified as an expert in a similar case"); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 301 (N.D. Cal. 1992) (similar); *Plexxikon*, 2021 WL 2340144, at *2 (similar). Were it otherwise, no first-time witness would ever qualify—including several of Plaintiffs' proffered experts. *See* Ex. 13 (Song Dep.) at 42:2–12; Ex. 20 (Chen Dep.) at 10:16–18.

**b.** With no basis to attack Sundararajan's "skill, experience, training, or education," Plaintiffs attack his "knowledge," Fed. R. Evid. 702—claiming he "knows little of economics." Mot. 15. That notion is dispelled both by his qualifications, *see supra* § II.A, and a cursory review of how he applies economic expertise in his reports. In his opening report, he articulates the pricing dynamics of two-sided transaction platforms; relies on his previous work on the sharing economy to dissect the economic challenge of market failure in the platform context; explains the significance of network effects to platform businesses; and explains the importance of governance mechanisms given the economics of indirect network effects. Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 37–43, 45–106. In his rebuttal report, Sundararajan similarly applies his knowledge to critique (among other things) Abrantes-Metz's failure to consider the incentives and objectives of developers and consumers in a two-sided market, as well as Stiglitz's flawed SSNIP test, which ignores indirect network effects. Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 66–68, 200–08. Throughout both reports, Sundararajan's analyses draw from extensive academic literature, citing over 40 scholarly articles and publications on multi-sided markets and network effects—in stark contrast to Plaintiffs' expert, Stiglitz, whose seven-paragraph platform opinions rely on just five articles. *See* Dkt. 1000-8 (Sundararajan Rep.) App'x B; Ex. 6 (Stiglitz Rep) ¶¶ 372–78.

1    Sundararajan demonstrated a similarly deep understanding of economics during his deposition.

2    He articulated the defining characteristics of a two-sided transaction platform. Ex. 15 (Sundararajan

3    Dep.) 112:5–113:5. He detailed his experience using contract theory (a field of industrial organization

4    economics) to study the pricing of informational goods—to illustrate the fact that digital products often

5    have low or zero variable costs. *Id.* at 84:5–17. He also provided a clear explanation of the Bertrand

6    competition model, identifying the model's core assumption of identical products, its textbook

7    prediction, and Abrantes-Metz's flawed application of it. *Id.* at 291:12–299:10.

8    To suggest otherwise, Plaintiffs misquote Sundararajan's deposition to distort his testimony.

9    *See* Mot. 15. In context, each excerpt refutes Plaintiffs' claim that Sundararajan is unqualified:

10   • Plaintiffs claim that Sundararajan "could not recall describing or using the Bertrand Model in

11   'any of [his] papers.'" Mot. 15. Yet in the prior sentence, Sundararajan explained that it was

12   "hard for [him] to answer that affirmatively or in the negative" because he "[has] done a lot of

13   work" on such topics. Ex. 15 (Sundararajan Dep.) at 288:20–23. Sundararajan knows what a

14   Bertrand model is and how to design and evaluate them. *Id.* at 291:12–292:3.

15   • Plaintiffs claim that Sundararajan could not "point to any particular thing that promotes [him]

16   specifically as an expert in competition." Mot. 15. How one is "promote[d]" has no bearing

17   on qualifications, and, even if it did, Plaintiffs acknowledge that Sundararajan holds himself

18   out as an economist. Mot. 14; *see* Ex. 15 (Sundararajan Dep.) 53:4–20. Moreover,

19   Sundararajan testified that he has "published a lot of papers that speak to different aspects of

20   pricing, competition, network effects[.]" *Id.* at 75:21–76:3.

21   • Plaintiffs claim that Sundararajan was "unfamiliar" with the term "competition economics."

22   Mot. 15. Yet his next answer explains that he identifies industrial organization as the field of

23   economics that "focuses primarily on competition," Ex. 15 (Sundararajan Dep.) at 22:10–19,

24   and Plaintiffs do not challenge his expertise in industrial organization. *See, e.g., id.* at 84:5–17.

25   • Plaintiffs claim that Sundararajan admitted not understanding "how a sales tax works." Mot.

26   15. That was Sundararajan's response to Plaintiffs' sweeping hypothetical about whether

27   governmental imposition of sales taxes on the seller of a product would "generally" result "in

28   a higher price of the product." Ex. 15 (Sundararajan Dep.) at 324:22–325: 5. That Sundararajan

understands how transactional fees impact a market is self-evident from his analysis in this case. None of this is disqualifying, as "soundbites in a deposition taken out of context do not provide a basis for barring expert testimony." *Pogorzelska v. VanderCook Coll. of Music*, 2023 WL 3819025, at *9 (N.D. Ill. June 5, 2023); *see, e.g.*, *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 444 (E.D.N.Y. 2011) (rejecting attacks on expert's qualification based on "the artful citing of deposition testimony . . . taken out of context"); *Wijesinha v. BlueGreen Vacations Unlimited, Inc.*, 2019 WL 13260541, at *4 (S.D. Fla. July 11, 2019) (same).

**c.**  As a final assay, Plaintiffs seek to atomize Sundararajan's opinions and claim he lacks experience in the niches they invent.  Mot. 11, 15–18.  Each of those attempts fails.

*First*, Plaintiffs argue that Apple has identified Sundararajan as an expert on "no fewer than 25 diverse topics," including "indirect network effects," "market failure," "governance mechanisms on app platforms," "procompetitive benefits," "technology ethics," "app reliability," and "proposed substitutes of the App Store."  Mot. 11.  But this is an artificial attempt to invent specific areas of expertise.  For example, Plaintiffs offer Stiglitz as an expert in "industrial organization" (plus seemingly irrelevant topics like "monetary theory," "rural organization," and "income and wealth distribution").  Ex. 21 at 1 (Plaintiffs' Disclosure of Expert Witnesses).  They do not offer him as an expert on mobile devices, search ads, price tiers, digital sales channels, payment processing solutions, contract interpretation, App Review Guidelines, third-party app marketplaces, sideloading, steering, commission rates, cloud streaming, super apps, jailbreaking, warranty restrictions, profitability analyses, barriers to entry, life-cycle cost estimations, the evolution of apps and in-app content, analysis of switching costs, single-brand aftermarkets, natural experiments, pricing behavior, or alternative business models for transaction platforms, even though his report discusses each of these topics.  *See* Ex. 6 (Stiglitz Rep.) ¶¶ 29–40, 51–62, 67–74, 80, 87–95, 100–01, 116–20, 139, 148–51, 162–89, 216–20, 236–46, 299, 311, 350.  Sundararajan describes the economics of two-sided transaction platforms, explains how the App Store is such a platform, and analyzes the challenged conduct within the paradigm of a two-sided transaction platform—the precise subject in which he possesses deep and specialized expertise.  Dkt. 1000-8 (Sundararajan Rep.) §§ IV, V, VI; *see also supra* § II.A.

Courts have rejected attempts like Plaintiffs' to exclude economists by inventing sub-issues in

which they supposedly lack experience.  Economists "may be permitted to testify in cases where they lack experience in the narrower industry at issue when they have relevant experience."  *Mitcheson v. El Antro LLC*, 2020 WL 7075239, at *2 (D. Ariz. 2020) (collecting cases).  And in antitrust cases, courts routinely admit economist expert opinions pertaining to particularized antitrust issues without requiring them to show narrow expertise.  *See, e.g.*, *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 2009 WL 3053855, at *3 (D. Mass. Sept. 21, 2009) (finding antitrust law professor with no econometrics expertise "qualified to perform regressions and other technical statistical analyses"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2021 WL 662292, at *15 (E.D. Pa. Feb. 19, 2021) (finding health economist qualified and noting no legal authority "suggesting that an economics expert in an antitrust case requires particularized antitrust expertise in order to render an opinion as to what effect certain alleged conduct has on the economics of a particular market").

Plaintiffs can cross-examine Sundararajan at trial on his supposed "lack of particularized expertise," which "goes to the weight accorded [his] testimony, not to the admissibility."  *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993).  But such a critique has no force in any event.  Plaintiffs claim that Sundararajan lacks expertise in "two-sided platforms" and "indirect network effect," yet he is the author of an award-winning book dedicated to that exact subject.  Mot. 11, 17; s*ee supra* § II.A.  They similarly claim that he knows little of "antitrust economics" and is "not an econometrician," Mot. 15, 17; but he has published many peer-reviewed papers on topics relating to competition, market power, and consumer welfare effects—including papers involving the use of econometric methods and models.  *See supra* § II.A; Sundararajan Decl. ¶¶ 9–10.

*Second*, Plaintiffs claim that Sundararajan "has no expertise in how transactions work on the App Store" and therefore cannot opine that the App Store is a two-sided transaction platform.  Mot. 19–20.  But Sundararajan is offered as an expert on the economics of two-sided platforms to analyze the economic substance of the App Store business model, not a software engineer offered to explain the technical execution of transactions.  This Court admitted multiple experts in the *Epic* case who opined on the same subject without requiring them to show expertise in understanding how app transactions work at a technical level.  Sundararajan is allowed to rely on the extensive record in this case about the workings of the App Store—and the technical work of other experts—and to apply his

expertise in platform economics to those facts. *See, e.g.*, Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 148–64, 208–10, 217–22. While Plaintiffs criticize him for failing to offer technical explanation to substantiate the fact that "iOS users buy apps directly from developers," Mot. 19–20, the Court has recognized that "both users and developers consume App Store transactions." *Epic*, 559 F. Supp. 3d at 1017. Sundararajan's extensive teaching, writing, and research "qualif[y] him to apply economic principles" to the facts of the case. *PECO Pallet, Inc. v. Nw. Pallet Supply Co.*, 2018 WL 10602201, at *3 (N.D. Ill. Oct. 25, 2018); *see Brown v. Google, LLC*, 2022 WL 17961497, at *13 (N.D. Cal. Dec. 12, 2022) (finding expert entitled to provide "general opinions about Google's service" when the opinions "[were] tied to documents and/or discovery relevant to this case").

*Third*, Plaintiffs argue that Sundararajan lacks expertise in privacy and security. Mot. 18–19. This argument similarly mischaracterizes his testimony. Sundararajan is not opining on whether Apple's privacy or security features are technically superior. He instead observes, as an economic principle, that "successful two-sided transaction platforms adopt services and governance mechanisms that mitigate the potential sources of market failure . . . while also attracting and retaining participants on both sides." Dkt. 1000-8 (Sundararajan Rep.) ¶ 71. He then opines that Apple's privacy and security features are a direct application of this framework, explaining how centralized distribution "facilitates trusted and safe interactions between consumers and developers" and thus mitigates market failure. *See* Dkt. 1000-8 (Sundararajan Rep.) § VI.C. Economists can "assess the economic incentives and rationales" of market participants. *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 31 (S.D.N.Y. 2020); *see Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *6 (N.D. Fla. Feb. 7, 2022) (admitting an economist's opinion relating to patient safety because her opinion is about "how the market might respond," not whether the products were "actually safe").

### 2. Sundararajan's Opinions Are Reliable And Relevant

Plaintiffs' scattershot attacks on the reliability of Sundararajan's opinions (Mot. 20–26) fare no better than their challenges to his qualifications.

### a) Sundararajan's methods are sound

Plaintiffs claim that Sundararajan "do[es] not apply any methodology" to offer opinions about the App Store's indirect network effects, platform competition among different app marketplaces, and

Apple's reduced incentive to invest in the App Store in the but-for world. Mot. 20–21. Each of these critiques is misplaced and ignores the straightforward and transparent analytical process laid out in his report. Sundararajan's analysis unfolds in a clear, logical progression—from theory, to facts, to application, to analysis. *See supra* § II.A. This embodies Rule 702's prescription that an expert apply reliable "principles and methods to the facts of the case." Fed. R. Evid. 702(d).

   **i.** Plaintiffs first argue that Sundararajan must conduct an "econometric exercise," Mot. 20–21, to opine (as he does in his report) that the "App Store displays indirect network effects"—whereby "an increase in participation by developers increases the quantity and variety of available third-party iOS apps, which increases value for consumers," and, "[s]ymmetrically, an increase in participation by consumers benefits developers by increasing the number of potential users of a developer's app." Dkt. 1000-8 (Sundararajan Rep.) ¶ 146.[6] But Sundararajan's primary assignment was to answer a fundamentally qualitative question: Whether the App Store, based on its characteristics and function, operates as a two-sided transaction platform. *See* Dkt. 1000-8 (Sundararajan Rep.) ¶ 12. A qualitative question can be answered by a qualitative analysis. *See FTC v. Qualcomm Inc.*, 2018 WL 6615050, at *3–4 (N.D. Cal. Dec. 17, 2018) (finding an economist's qualitative methodology reliable); *Aloe Vera of Am. Inc. v. United States*, 2014 WL 3072981, at *4 (D. Ariz. July 7, 2014) (same); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2022 WL 2643583, at *6 (N.D.N.Y. July 8, 2022) (same). And while various methods have been proposed to quantify network effects in the right circumstances, Plaintiffs cite no authority suggesting qualitative analysis of platform economics is inherently unreliable. Mot. 20–21. To the contrary, this Court in *Epic* admitted testimony about indirect network effects—and found them to be present—based on qualitative analyses alone. *See Epic*, 559 F. Supp. 3d at 1007; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 545 (2018) (noting two-sided transaction platforms exhibit "more pronounced" indirect network effects based on qualitative analyses). Rule 702 does not require one methodology over another—only one of the "intellectual rigor that characterizes the practice of an

---

[6] Plaintiffs mischaracterize Prof. Sundararajan's opinion, claiming he opines "that the App Store exhibits 'strong indirect network effects' and is therefore best viewed as a two-sided platform." Mot. 20. Prof. Sundararajan's actual opinion is that "two-sided transaction platforms display indirect network effects, a point also noted by the Supreme Court in *Amex*," and the "App Store displaying indirect network effects is consistent with it being a two-sided transaction platform." *See* Dkt. 1000-8 (Sundararajan Rep.) ¶ 146.

expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also, e.g.*, Dkt. 1000-8 (Sundararajan Rep.) ¶ 32 n.16 (citing literature finding indirect network effects without econometric analysis).

In any event, Plaintiffs are wrong to suggest that Sundararajan's opinion includes no quantitative analysis. He relies on peer-reviewed econometric studies that directly measure the indirect network effects on the App Store. For example, he relies on 2021 research finding that on average across the App Store and Google Play platforms, a one percent increase in the number of apps offered by developers leads to a one-and-a-half percent increase in consumer smartphone purchases (i.e., consumers for the app marketplaces). *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶ 225. Another study Sundararajan relies on found that an increase in the stock of iPhones in consumer hands is associated with an increase in developer app submissions, and vice versa. *Id.* ¶ 226. He also discusses several studies that assess indirect network effects on other two-sided transaction platforms, including Taobao, Grubhub, and gaming consoles. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 227–29. This again is in contrast to Plaintiffs' experts, who opine about indirect network effects without attempting any "standard econometric exercise" or even citing a single study specific to the App Store. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 41–45, 232–33.

**ii.** Plaintiffs claim that Sundararajan "invents a novel market definition" based only on subjective beliefs. Mot. 21. But Sundararajan is not offering an affirmative market definition. *See* Dkt. 1000-8 (Sundararajan Rep.) § III. His affirmative opinion is that the App Store is a two-sided transaction platform and exhibits the economic features of one. And Sundararajan certainly did not "invent" the concept that the App Store is a two-sided transaction platform—that has been found by this Court, affirmed by the Ninth Circuit, and is well established in economics literature. *See Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1000–01 (9th Cir. 2023); Dkt. 1000-9 (Sundararajan Reb. Rep.) App'x Ex. C.1.

Sundararajan addresses market definition in his rebuttal report to demonstrate the flaws in Stiglitz's analysis. He explains that Stiglitz's proffered definition is inaccurate because it is based on a one-sided paradigm when the App Store is in fact a two-sided transaction platform. Dkt. 1000-9 (Sundararajan Reb. Rep.) §§ IV.B.2–3; *see Epic*, 559 F. Supp. 3d at 964 (rejecting SSNIP test that failed to account for relevant market's two-sidedness). This leads Stiglitz to erroneously dismiss

substitutes for App Store transactions that exist outside the App Store. *See* Ex. 6 (Stiglitz Rep.) ¶ 152; *see also* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶ 56. In doing so, Sundararajan is not attempting to define a different market by himself. Rather, he identifies substitutes that Stiglitz disregards because of Plaintiffs' erroneous blindness to the App Store's two-sidedness. *See, e.g.*, Dkt. 1000-8 (Sundararajan Rep.) ¶ 145; Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 50–53. Because this critique attacks the very premise of Stiglitz's analysis—but does not purport to define the precise boundaries of a particular market—formal tools like a SSNIP test are unnecessary. *See Sumotext Corp. v. Zoove, Inc.*, 2020 WL 264701, at *3 (N.D. Cal. Jan. 17, 2020) (expert may rebut proposed market definition without "offer[ing] her own market definitions in order to" criticize plaintiff's market definitions).

**iii.** Plaintiffs also attack Sundararajan's opinion that Apple's economic incentives to invest in developer tools, technologies, and services would be lower in the but-for world where Apple maintains its current pricing structure but with diminished ability to seek compensation in the App Store. *See* Mot. 21–22. But their claim that this opinion was made "[w]ithout any methodology, documentary evidence, or any reference to economic literature" is demonstrably false. Mot. 21. Sundararajan's conclusion is a direct application of the well-recognized principle that "an IP owner is incentivized to invest in innovation by receiving compensation for use of their IP." Dkt. 1000-8 (Sundararajan Rep.) ¶ 189. And his report explicitly grounds this analysis in established economic literature, including a congressional report by the Antitrust Modernization Commission, which notes that "forced dealing could discourage investment and welfare." *Id.* & n.392; *see In re MacBook Keyboard Litig.*, 2021 WL 1250378, at *5 (N.D. Cal. Apr. 5, 2021) (finding expert's methodology reliable because it was "supported by legitimate economic literature").

### b) Sundararajan's opinions are not speculative

Plaintiffs also seek to exclude various opinions because Sundararajan used the words "may," "can," "could," or "possible" in articulating them. Mot. 22–23. Plaintiffs claim that these words make these statements "baseless speculation." Mot. 22. But a review of Plaintiffs' list suggests otherwise. For example, Sundararajan explains that an indirect network effect "*can* . . . accelerate a platform's decline" because of a feedback loop. Mot. 22; *see* Dkt. 1000-8 (Sundararajan Rep.) ¶ 36 (emphasis added). In support, he cites literature which itself uses cautious phrasing, noting that a good or service

Gibson, Dunn & Crutcher LLP

"*may* fall into a 'death spiral' and ultimately disappear." *Id.* ¶ 36 & n.27 (emphasis added). This shows that Sundararajan's choice of words is not speculation but correctly reflects the inherent degree of uncertainty in such economic opinions, which are intended to suggest what can or may happen, not to state a forgone conclusion. Furthermore, many of the challenged opinions involve Sundararajan's analysis of the hypothetical but-for world—economic analysis of which is, by its very nature, a predictive exercise that cannot be conducted with certainty. *See, e.g.*, Mot. 23–24.

Plaintiffs' argument misapprehends the legal standard in any event. An expert's testimony is speculative when it is "untethered to and unsupported by any facts in the record," not when an expert calibrates his certitude. *Otto v. LeMahieu*, 2021 WL 1615311, at \*4 (N.D. Cal. Apr. 26, 2021). Again, many of Plaintiffs' experts' opinions would be excluded under their invented standard as their reports have plenty of examples where they use "may," "can," "could," "potential," "likely," or "possible." *See, e.g.*, Ex. 6 (Stiglitz Rep.) ¶¶ 166, 168, 183, 185, 188, 189, 241, 244, 276, 278, 302; Dkt. 1003-31 (MacCormack Rep.) ¶¶ 30, 78, 84, 104, 202, 301, 330; Ex. 22 (Chen Rep.) ¶¶ 133, 163, 170, 229.[7]

### c) Sundararajan offers independent analysis

Plaintiffs argue that the Court should exclude Sundararajan's testimony that "merely restates opinions from Apple's other experts." Mot. 24. This is meritless. "[E]xperts can rely upon the opinions of other experts." *MediaTek*, 2014 WL 971765, at \*1 (collecting cases). Because an expert "cannot be an expert in all fields," it is "reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion." *Id.* Doing so does not amount to impermissible "parrot[ing]." Mot. 24; *see Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, at \*11 (N.D. Cal. Jan. 5, 2008) (finding expert on market power may properly rely on manufacturers' engineering experts without needing to "independently analyze[] whether the alternative technologies were viable"). And this Court has recognized as much, rejecting as "specious"

---

[7] *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025), provides no basis to exclude Prof. Sundararajan's opinions. There, the court's observation that "may" and "might" connoted speculation was directed at the authors of literature the expert cited, not the expert's own testimony. *Id.* at 964. *Klein* stands for the unremarkable proposition that an expert cannot overstate the certainty of the literature they cite, and not that an expert's own cautious phrasing is a basis for exclusion. *See id.* ("It also bears mention that the literature Dr. Economides cites with respect to online services is far less compelling than he acknowledges.").

and "disingenuous" the very arguments Plaintiffs now assert against Apple's experts. Dkt. 789 at 16 n.10.

Sundararajan does precisely what the Federal Rules allow. He properly relies on the empirical findings of Prof. Lorin Hitt's studies of Apple's commission rate adjustments to inform his own economic critique of Plaintiffs' damages model. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 268–70. And he incorporates the technical findings of Prof. Alex Halderman regarding App Review into his broader economic analysis of the platform's procompetitive justifications. *See id.* ¶ 127. In neither situation is he merely restating those experts' conclusions as his own. He is instead reciting their findings and then offering additional opinions, informed by his platform expertise, that address the difficult questions that would be put to the jury. Because his conclusions are within his own expertise and a product of independent analysis, "it is irrelevant" whether he "independently analyzed" the underlying evidence that other experts relied on for their opinions. *Hynix*, 2008 WL 73689, at *11.

Here again, Plaintiffs attack Sundararajan for a practice that their own experts employ far more extensively. Stiglitz's report, for instance, is replete with citations to nearly every other expert in the case, including opinions by Abrantes-Metz, Hoyer, Kohno, Martin, Chen, McFadden, Barnes and Song. *See, e.g.*, Ex. 6 (Stiglitz Rep.) ¶¶ 79, 101, 311. For example, Stiglitz did nothing to verify the accuracy of Barnes's profit calculations, nor did Barnes provide him with any information about them. Ex. 12 (Stiglitz Dep.) at 82:3–83:12. Yet Plaintiffs tacitly admit that Stiglitz may nonetheless use those calculations to inform his opinions about market power. *See, e.g.*, Ex. 6 (Stiglitz Rep.) ¶¶ 246–50. As but one more example, Abrantes-Metz testified that she relied on Stiglitz for the definition of the relevant market and did not conduct her own analysis. *See* Ex. 23 (May 23, 2025 Abrantes-Metz Dep.) 28:18–29:6. If the Court excludes Sundararajan for relying on the conclusions of others—none of which are challenged by Plaintiffs—then almost all of Plaintiffs' experts' economic opinions about market power, economic effects, and damages must go too.

### d) Sundararajan may set forth the factual background for his opinions

Plaintiffs next seek to eliminate the section of Sundararajan's report discussing the App Store's history, contending it is an improper "factual narrative." Mot. 25. This Court has already rejected this type of argument, noting that it "fundamentally misunderstands the nature of expert testimony at trial."

*See MediaTek*, 2014 WL 971765, at *2 (rejecting request to exclude background sections).  As the Court noted in *MediaTek*, experts "routinely opine based upon a hypothetical or a set of factual assumptions given to them" and they need not have "personal knowledge of the factual background in the case."  *Id.*  Accordingly, Sundararajan is entitled to rely on the factual record to form the basis for his opinions.  At trial, percipient witnesses and documentary evidence will establish historical facts. *See* Fed. R. Evid. 602; *see also MediaTek*, 2014 WL 971765, at *2 ("[U]sually a seasoned trial attorney will not even attempt to call an expert to opine at trial until the evidence underlying the opinion has actually been admitted.").  And if those facts are not proven up, Plaintiffs may attack any analysis by Sundararajan that relies on them—just as their own experts will be susceptible for their reliance on lengthy recitations of facts that may not be proven.  *See, e.g.*, Ex. 6 (Stiglitz Rep.) ¶¶ 29–62 (describing the "Industry Background," dating back to Apple's development of the iPhone and iOS in 2007).

### e)    Sundararajan's opinions are a natural outgrowth of his career-long research

Finally, Plaintiffs seek to exclude Sundararajan's opinions that were purportedly developed "only . . . for the purposes of testifying in this matter," claiming he has never "researched, written about, or testified as an expert" about "market power, the relevant antitrust market, foremarkets and aftermarkets, anti-competitive tying, damages, indirect network effects, two-sided transaction markets, digital privacy, security, and privacy on the App Store."  Mot. 25–26.  Quite the opposite. Sundararajan's testimony is a clear outgrowth of his decades of research and scholarship.  *See supra* § II.A.  In fact, many of the core concepts and examples discussed in his reports can be found in his 2016 book, *The Sharing Economy*.  For instance, his book analyzes many of the same two-sided platforms he discusses in his report, including Uber, Lyft, Airbnb, eBay, and TaskRabbit.  *See supra* § II.A; *see, e.g.*, Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 81, 95, 98.  It also provides detailed explanations of the same core economic principles he applies here, such as indirect network effects and market failures for two-sided transaction platforms.  *See* Ex. 17 (*The Sharing Economy*) at 119–20 (explaining "two-sided network effect"); *id.* at 139–40 (explaining information asymmetry as a cause of market failure for two-sided transaction market); Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 32–36, 58–63.

This intellectual through-line is even more apparent in the development of his specific opinions.

Gibson, Dunn &
Crutcher LLP

For example, in his book, Sundararajan explained the general principle that platforms are economically incentivized to "mak[e] sure that [its providers] are protected, secure, and thus more focused on their provision activities" in order to offer "a branded service experience of consistently high quality" and thus attract customers. *See* Ex. 17 (*The Sharing Economy*) at 190–91. In his opening report in this case, he develops this foundational idea further, applying it to the App Store to explain the procompetitive, economic rationale for its specific rules and pricing structure. Dkt. 1000-8 (Sundararajan Rep.) ¶¶ 177, 188.

Plaintiffs rely on *Wendell v. GlaxoSmithKline LLC*, but the Ninth Circuit there explained that "whether experts are testifying 'about matters growing naturally' out of their own independent research" is just "one factor" in the *Daubert* calculus. 858 F.3d at 1232–33. And the Ninth Circuit in fact *reversed* the district court's exclusion of expert testimony for putting too much weight on this factor because experts can (and there had) "present 'other objective, verifiable evidence'" showing "the testimony is based on 'scientifically valid principles.'" *Id.* at 1235. If the opinions in *Wendell* were sufficiently reliable, then Sundararajan's are too. *See id.* As detailed extensively above, Sundararajan has sufficient experience and expertise in platform economics to testify about how to analyze the competitive aspects of platforms. His analysis in this case relies on "objective, verifiable evidence" and "scientifically valid principles." *Wendell*, 858 F.3d at 1235. It is admissible.

## III.    PROF. BERGER'S OPINIONS ARE ADMISSIBLE

Plaintiffs' request to exclude Prof. Jonah Berger from offering testimony rebutting Plaintiffs' expert Prof. M. Keith Chen's opinions on non-monetary switching costs and life-cycle costs is baseless and should be denied. Plaintiffs cannot seriously contest that Berger—a preeminent scholar in the fields of consumer behavior, digital marketing, social influence, and technology who has spent "over 20 years studying how consumers make purchase decisions and how firms communicate with and influence consumers"—has sufficient knowledge, skill, experience, and training in the field to offer his consumer behavior-related rebuttal opinions. Dkt. 1000-12 ¶ 2 (Berger Rep.). They are therefore left arguing that Berger is unqualified because he has not published academic articles or previously testified on the precise non-monetary switching costs and life-cycle costs at issue here. Mot. 28. That is the wrong legal test. As this Court has found, a "lack of particularized expertise goes to the weight

accorded [an expert's] testimony, not to the admissibility." *Corcoran v. CVS Health*, 2017 WL 1065135, at *11 (N.D. Cal. Mar. 21, 2017). Regardless, Berger's prior academic work and teaching experience cover these topics. Plaintiffs' follow-up argument that Berger did not "conduct[] actual analysis of his own" or follow "any particular methodology" is nonsensical. Mot. 30. Berger's literature review mirrors the one performed by Plaintiffs' expert Chen and "expose[d] flaws" in Chen's own analysis. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999). That is paradigmatic rebuttal, *see* Fed. R. Civ. P. 26(a)(2)(D), and if the literature review that Chen conducted is an unreliable methodology, then it is Chen's opinions that should be excluded.

### A.    Factual Background

Berger is a recognized authority on consumer behavior with over two decades of experience in the field. He earned a B.A. in Human Judgment and Decision Making and a Ph.D. in Marketing, both from Stanford University. Dkt. 1000-12 (Berger Rep.) ¶ 1. Berger currently works as a tenured Associate Professor of Marketing at the Wharton School at the University of Pennsylvania where he teaches graduate level courses focused on "understanding theoretical and methodological approaches to various aspects of consumer behavior." *Id.*; *see also* Ex. 24 (Univ. of Pennsylvania, Wharton School Marketing Department Course List) at 3. He has published over 75 peer-reviewed articles in top-tier academic journals on marketing, consumer psychology, and other disciplines and written four best-selling books that cover topics of consumer choice. Dkt. 1000-12 (Berger Rep.) ¶ 2. He also has received numerous awards for this research and writing, including being a finalist for best article published in the Journal of Consumer Research and being recognized by the American Marketing Association as a top 10 most productive researcher in marketing every year from 2013 to 2024 (the most recent year of the award). *Id.* ¶ 3.

Berger has served as an expert for Apple in this matter since 2023 and has submitted three expert reports based on his expertise in the field of consumer behavior. Apple first offered Berger to rebut Plaintiffs' experts' opinions concerning Apple's price tiers and focal point pricing strategy at the class-certification stage. *See* Mot. 27; Dkt. 688-7 (Berger Class Cert. Rep.). Plaintiffs did not challenge Berger's qualifications there, even though Berger had never testified or published academic work focused on price tiers or focal point pricing. Earlier this year, Berger submitted an opening merits

expert report again focused on Apple's price tiers and focal point pricing. *See* Dkt. 1000-12 (Berger Rep.). Plaintiffs do not challenge this report under *Daubert* either.

On March 7, 2025, Plaintiffs served an expert report from Prof. M. Keith Chen who opines that consumers do not fully consider the life-cycle costs of using Apple's iOS devices when making their purchase decisions, the non-monetary switching costs of switching away from iOS mobile devices are significant, and consumers are not aware of Apple's alleged aftermarket restrictions when purchasing iOS devices. *See generally* Ex. 22 (Chen Rep.). This was Chen's first submission in this case and appears designed to support the factors a plaintiff must show to establish a single-brand aftermarket. *See Epic*, 67 F.4th at 977 (listing aftermarket factors). Berger submitted a rebuttal report responding to Plaintiffs' experts' opinions regarding Apple's price tiers and Chen's opinions on the aftermarket factors. *See* Dkt. 1000-14 (Berger Reb. Rep.).

Plaintiffs challenge only Berger's rebuttal of Chen's opinions regarding (1) "whether iOS device purchasers consider or attempt to estimate the lifecycle costs of apps and in-app purchase" and (2) "the non-monetary costs of switching away from iOS mobile devices." Mot. 27.[8] These opinions are tied directly to Chen's opinions and are based on Berger's consumer behavior expertise. First, Berger rebuts Chen's non-monetary switching costs analysis, arguing that Chen fails to account for brand loyalty and customer satisfaction—topics on which Berger teaches and covers extensively in his academic work. Dkt. 1000-14 (Berger Reb. Rep.) § V; *see also id.* ¶ 10 (Opinion 4). Second, Berger uses his expertise in consumer behavior to opine that Chen's life-cycle cost analysis ignores evidence that many consumers do attempt to calculate the future costs of apps and that some consumers may do so accurately, particularly consumers who engage more with in-app purchases or have previously bought an iPhone or iPad. *Id.* § VI; *see also id.* ¶ 11 (Opinion 5). To reach these opinions, Berger, like Chen, conducted a literature review. *See generally id.*; *see also id.* ¶¶ 76–77, 105. Berger covered the same sources cited by Chen as well as related literature and case materials that Chen ignored. *Id.*; *see also* Mot. 30 (describing this process).

---

[8] Plaintiffs do not challenge Berger's rebuttal opinions on price tiers (Dkt. 1000-14 (Berger Reb. Rep.) § IV) or his opinions rebutting Chen's claims that consumers are unaware of Apple's alleged aftermarket restrictions (*id.* § VII).

Gibson, Dunn &
Crutcher LLP

1

### B.  Argument

2

Plaintiffs' motion to exclude Berger's rebuttal opinions concerning non-monetary switching

3

costs and life-cycle costs should be denied. First, Berger, a nationally recognized professor, scholar,

4

and consultant on consumer behavior, is eminently qualified to offer rebuttal opinions about how and

5

why consumers make certain choices regarding their mobile devices and apps. Second, Berger's

6

replication of Chen's literature review is a reliable rebuttal methodology that will assist the jury in

7

assessing the reliability of Chen's opinions. And if it is not, Chen's opinions, too, must be excluded.

8

### 1.  Berger Is Qualified As An Expert Under Rule 702

9

Plaintiffs cannot demonstrate Berger is unqualified because his challenged opinions are, at their

10

core, opinions about consumer behavior and well within his expertise. Plaintiffs' expert Chen

11

repeatedly asserted in his expert report that non-monetary switching costs and life-cycle costs are topics

12

within the field of how consumers make decisions. *See, e.g.*, Ex. 22 (Chen Rep.) ¶¶ 33, 52, 59, 158–

13

62 (citing consumer behavior and behavioral choice literature to support his opinions); *see also id.* ¶ 36

14

(calculating life-cycle costs depends on each consumer's "broad behavioral patterns" and "ability to

15

accurately predict future events"); *id.* § IV.A.1 (analyzing effect of consumer behavior on non-

16

monetary switching costs). Plaintiffs do not argue otherwise in their motion. *See* Mot. 26.

17

Berger's credentials in that field—consumer behavior—far exceed the required level of

18

"knowledge, skill, and experience" for a qualified expert. *PixArt Imaging, Inc. v. Avago Tech. Gen. IP*

19

*(Singapore) Pte. Ltd.*, 2011 WL 5417090, at *4 (N.D. Cal. Oct. 27, 2011). He has the education and

20

training to offer expert opinions on consumer behavior. Dkt. 1000-14 (Berger Reb. Rep.) ¶ 1. And he

21

also has extensive, relevant experience, having spent over two decades "studying how consumers make

22

purchase decisions and how firms communicate with and influence consumers" with over 75 peer-

23

reviewed articles and four bestselling books to his name on consumer choice behavior. Dkt. 1000-12

24

(Berger Rep.) ¶ 2. In fact, Berger has both published in and served as an editor and reviewer for

25

numerous journals in the field of consumer behavior cited by Chen in his literature review, including

26

the *Journal of Economic Psychology*, *Journal of Marketing*, and *Management Science*. Dkt. 1000-14

27

(Berger Reb. Rep.) App'x A (Berger CV); *see also* Ex. 22 (Chen Rep.) App'x B (materials relied upon).

28

Because of this expertise, Berger is entrusted to both consult on and teach graduate student courses on

issues of consumer behavior.  Dkt. 1000-12 (Berger Rep.) ¶ 4.  Plaintiffs do not (and cannot) meaningfully dispute this expertise, conceding that Berger is "a Marketing professor at the University of Pennsylvania who conducts research on consumer behavior, digital marketing, social influence, and technology."  Mot. 27.  That more than suffices under Rule 702.  *See Newton Int'l Enters.*, 42 F.3d at 1269 ("Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.").

Plaintiffs nevertheless criticize Berger because he "has not published any papers on lifecycle costs or non-monetary switching costs and has not conducted any research on present bias or the default effect, which are behavioral biases that Plaintiffs' behavioral economics expert, Prof. Chen, analyzes." Mot. 28.  That argument invites legal error.  The Ninth Circuit has long held that "lack of particularized expertise goes to the weight accorded [expert] testimony, not to the admissibility."  *Garcia*, 7 F.3d at 890.  Therefore, "[a] court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified."  *In re Silicone Gel Breasts Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004); *see also Wendell*, 858 F.3d at 1232 (district court erred in excluding expert testimony because it "ignored the experts' experience, reliance on a variety of literature and studies, and review of [the record]").  Plaintiffs offer nothing to the contrary: The one case they cite, *Krause-Pettai v. Unilever United States*, did not address qualifications at all.  *See* 696 F. Supp. 3d 916, 926 (S.D. Cal. 2023).

This Court's opinion in *Corcoran v. CVS Health* is instructive.  There, the Court rejected the argument that an expert witness with decades of experience in the pharmaceutical industry was unqualified because he lacked "specific experience concerning pharmacy membership programs and [] pricing" at issue because that "level of specificity not required by the law."  2017 WL 1065135, at *11 ("lack of particularized expertise goes to the weight accorded [expert's] testimony, not to the admissibility"); *see also In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *5 (N.D. Cal. Sept. 14, 2016) ("Although he has not worked specifically with automobiles," expert's testimony concerning Ford vehicles fell within his "broad engineering and human factors expertise"); *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *10 (N.D. Cal. Feb. 3, 2020) (similar).  So too here.  Berger has sufficient expertise to offer the challenged opinions in this case because he utilized his general

expertise in "how consumers make purchase decisions" (Dkt. 1000-12 (Berger Rep.) ¶ 2) to rebut Chen's opinions concerning topics within that area of expertise—namely, the factors consumers consider when switching between firms and consumer estimates of the life-cycle price of purchased goods. *See* 1000-14 (Berger Reb. Rep.) §§ V–VI. Berger's general knowledge about how consumers make choices provides "the foundational background upon which to draw conclusions from relevant data and documents" concerning Chen's opinions about non-monetary switching costs and life-cycle costs. *Corcoran,* 2017 WL 1065135, at *11.

Even if particularized expertise was required by Rule 702 (and it is not), Berger has that expertise in spades. Berger has written extensively about the consumer choice topics at issue here, including smartphone purchases, switching costs, brand loyalty, and the effort consumers put into making decisions. *See* Dkt. 1000-14 (Berger Reb. Rep.) App'x A (Berger CV).[9] Plaintiffs' argument to the contrary (Mot. 28–29) relies on cherry-picked deposition snippets.

- Plaintiffs claim that Berger is unqualified because he has not "encountered [the term non-monetary switching costs] in his academic work" and "could not even provide a definition" of the term (Mot. 28), but Berger testified that he relied on Chen's definition to provide his rebuttal opinions and is "quite familiar" with the topics that Chen groups under that umbrella term. Ex. 25 (Berger Dep.) 44:15–24, 49:7–20.

- Plaintiffs claim that Berger did not conduct research on the present bias or default effect. Mot. 28. Yet, Berger testified that those are topics he is "quite familiar with and may cite in some of [his] work, may teach in classes" and are generally "areas of literature [he] know[s] quite well." Ex. 25 (Berger Dep.) 68:11–69:19.

- Plaintiffs claim that Berger does not have the "specialized knowledge" to rebut Chen's opinions concerning status quo bias (Mot. 29), but that too is a topic Berger has studied in multiple contexts and with which he is "well familiar." Ex. 25 (Berger Dep.) 93:8–25.

---

[9] These papers include: A. Sela & J. Berger, *How Attribute Quantity Influences Option Choice*, 49 Journal of Marketing Research 942 (2012); M. Rocklage & J. Berger, *The Trajectory of Confidence: Experience, Certainty, and Consumer Choice*, Journal of Marketing Research (2025) (Conditionally Accepted); A. Sela & J. Berger, *Decision Quicksand: How Trivial Choice Suck Us In*, 39(2) Journal of Consumer Research 360 (2012).

APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE EXPERT OPINIONS
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

- Plaintiffs claim that Berger "lacks any professional work experience related to switching costs." Mot. 29. This is simply wrong: For example, his book *The Catalyst: How to Change Anyone's Mind* discusses switching costs—along with other topics such as inertia, status quo bias, and loss aversion in which Plaintiffs also (incorrectly) claim Berger lacks expertise. Ex. 26 (*The Catalyst*) at 61–83, 133–169; Ex. 25 (Berger Dep.) 44:15–24.

This is nothing like the cases on which Plaintiffs rely, where the expert had no training, experience, or skill in the relevant field. *See Slovak v. Golf Course Villas Homeowners Ass'n*, 2019 WL 12372104, at *8 (D. Nev. Jan. 15, 2019) (finding purported expert in forensic document examination unqualified because he had "no special education, training, skill or experience related to any type of forensic document analysis").

Nor is Berger unqualified because he "develop[ed] [his opinions] for the purposes of testifying in this matter." Mot. 28. This is, at most, a complaint that Berger offered a rebuttal opinion. *See Tsatas v. Airborne Wireless Network, Inc.*, 2025 WL 973840, at *16 (D. Nev. Mar. 31, 2025) ("The report largely consists of identified flaws in Engel's analysis, which is proper rebuttal testimony."). Berger is entitled to rely on his knowledge of consumer behavior to develop specific opinions rebutting Chen's analysis in the context of this litigation. That is the defined role of a rebuttal expert. *See* Fed. R. Civ. P. 26(a)(2)(D). Plaintiffs' critique that Berger did not offer opinions on non-monetary switching costs and life-cycle costs until the rebuttal report deadline (Mot. 27) is absurd. Again, Berger is being offered as a rebuttal expert on these topics; before Chen's opening expert report, there was nothing to rebut.

### 2.    Berger's Rebuttal Opinions Are Reliable And Helpful To The Jury

Unable to establish that Berger lacks the qualifications to offer the rebuttal opinions at issue here, Plaintiffs also argue the Berger's testimony is not reliable because he did not "conduct[] any actual analysis of his own" or follow "any particular methodology." Mot. 30. Not so. Berger conducted his own analysis—reviewing the very literature and case materials Chen cited and, where needed, additional sources to reach his conclusion that Chen's opinions are unreliable. It is well-established that an expert's methodology is reliable if it applies the opposing expert's "own

methodology in order to opine that a different conclusion should be reached." *See In re Ripple Labs, Inc. Litig.*, 2024 WL 4583525, at *4 (N.D. Cal. Oct. 24, 2024). That is precisely what Berger did here.

Plaintiffs' claim that Berger did not follow "any actual methodology" (Mot. 30) is wrong and, if credited, only serves as an indictment of their own expert. Berger used his expertise in consumer behavior to conduct a targeted literature review and analysis based on Chen's own literature review. Courts routinely hold that literature reviews are a reliable methodology. *See, e.g.*, *Tressler v. BNSF Ry. Co.*, 2012 WL 315402, at *6 (E.D. Wash. Feb. 1, 2012). Plaintiffs cite no authority suggesting otherwise; nor could they seriously contest this because Chen's opinions similarly rest on a literature review. Ex. 22 (Chen Rep.) ¶ 12 (opinions are based on Chen's "review and analysis of the data and documents provided in this matter, academic literature, publicly available information, and [his] education training, and experience").

Here, Berger canvassed the very academic literature and case materials Chen cited, Dkt. 1000-14 (Berger Reb. Rep.) ¶¶ 76–77, 105, and also reviewed additional academic sources and case materials—analyzing over a dozen sources ignored by Chen. *See id.* App'x C (materials relied upon); *see, e.g.*, *id.* ¶¶ 93, 121 (reliance on additional academic literature). Berger then explained the deficiencies in Chen's analysis based on both the materials Chen relied upon and the other literature Chen ignored. For example, Berger opines that Chen's analysis of non-monetary switching costs is unreliable because Chen failed to consider the impact of customer satisfaction on consumers' decisions to continue purchasing iOS devices. *See id.* ¶ 10 & § V. Berger cites academic literature omitted by Chen, including a 2012 textbook titled *Consumer Behavior* authored by one of Plaintiffs' other experts (Prof. Wayne Hoyer), which notes that "the iPhone was a runaway hit because Apple is a special brand that has earned unusual brand loyalty." *Id.* ¶ 93; *see also* Ex. 27 (*Consumer Behavior*) at 455. As to life-cycle costs, Berger cites academic literature and case materials cited (and omitted) by Chen, *see, e.g.*, Dkt. 1000-14 (Berger Reb. Rep.) ¶¶ 115–23, to support his opinion that Chen's analysis of life-cycle costs ignores that consumers who engage with app, in-app, and subscription purchases and repeat Apple customers may be more likely to accurately calculate life-cycle pricing. *See also id.* ¶ 11 & § VI. This is a reliable methodology, *see Shafer v. C.R. Bard, Inc.*, 2021 WL 4305216, at *3 (W.D. Wash. Sept. 22, 2021) (denying methodological challenge where the expert relied on his own

experience, literature, and case materials), and nothing like the cases Plaintiffs cite where the challenged experts provided no basis for their opinions, *see Corcoran*, 2017 WL 1065135, at *12 (excluding expert testimony where expert provided no "external sources and references to support his opinions").

Plaintiffs' related claim that Berger's methodology is lacking because it was based on Chen's instead of an "independent analysis," Mot. 30, is likewise baseless. Plaintiffs ask the Court to find Berger's methodology unreliable because he used his expertise in consumer behavior to offer the opinion that the very sources Chen relies upon do not support Chen's opinions. *Id.* As Berger explained at his deposition, "[i]f even the articles Professor Chen cites to make this point undermine his own conclusions, I'm not sure why one needs to look further than that." Ex. 25 (Berger Dep.) 138:22–139:16. Berger's process of "read[ing] the opening report of Prof. Chen, review[ing] the academic literature cited therein, and cit[ing] other literature that he argues contradicts Prof. Chen's opinions" (Mot. 30) is "sufficiently reliable in that [Berger] applies [Chen's] own methodology in order to opine that a different conclusion should be reached." *In re Ripple Labs, Inc. Litig.*, 2024 WL 4583525, at *4. Such opinions do not "invade[] the province of the jury" as Plaintiffs' claim. Mot. 31. Rebuttal experts "expose flaws" in other expert's methodology, *4.0 Acres of Land*, 175 F.3d at 1141, and rebuttal testimony is admissible where it "falls within [the expert's] expertise [] and will be helpful to jurors assessing the credibility of [the opposing expert's] report," *Howard v. Tanium, Inc.*, 2025 WL 1906659, at *11 (N.D. Cal. July 10, 2025); *see also In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) (a rebuttal expert "may rely largely on other expert reports . . . and point out flaws in their methodologies or conclusions"). Berger's opinions will be helpful to the jury unless Chen's opinions are also excluded. *Howard*, 2025 WL 1906659, at *11.

## CONCLUSION

The Court should deny Plaintiffs' motion to preclude the testimony of Mr. Malackowski, Prof. Sundararajan, and Prof. Berger.

DATED: August 26, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: _/s/ Cynthia E. Richman_
      Cynthia E. Richman

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE EXPERT OPINIONS
CASE NO. 4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP