BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:          October 14, 2025<br>TIME:          2:00 p.m.<br>COURTROOM:  1, 4th Floor<br><br>The Honorable Yvonne Gonzalez Rogers |

[REDACTED VERSION]

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

III.    LEGAL STANDARD.............................................................................................3

IV.     ARGUMENT ..........................................................................................................4

   A.   Plaintiffs Have Evidence of Anticompetitive Harm in the "Market as a Whole" ..............4

      1.   Market definition is a disputed fact issue ........................................................4

      2.   Apple's unfounded factual disputes with Plaintiffs' experts are premature ..................6

   B.   Apple's Distribution Restrictions Are Not Categorically Lawful Refusals to Deal ...........9

      1.   Ninth Circuit precedent defeats Apple's refusal-to-deal argument................................9

      2.   Apple's anticompetitive conduct is not a lawful refusal to deal ...................................11

   C.   Apple's Technical Restrictions Are Part of An Anticompetitive Course of Conduct .......15

   D.   Apple's Baseless Procedural Arguments Fail....................................................................17

      1.   Apple had fair notice of Plaintiffs' IAP and anti-steering allegations ..........................17

      2.   Plaintiffs have antitrust standing to challenge all of Apple's restrictions .......................19

      3.   The challenge to Apple's in-app purchasing restrictions is not time barred....................22

   E.   The fact finder should evaluate Plaintiffs' damages model................................................24

V.      CONCLUSION.....................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*Advanced Thermal Scis. Corp v. Applied Materials Inc.*,
5     2009 WL 10672954 (C.D. Cal. Oct. 6, 2009)..................................................... 19

6

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
7     592 F.3d 991 (9th Cir. 2010) ................................................. 1, 15, 16, 17

8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ..................................................... 20

9

*In re Apple & AT&TM Antitrust Litig.*,
10     596 F. Supp. 2d 1288 (N.D. Cal 2008) ..................................................... 11

11

*In re Apple iPod iTunes Anti-Tr. Litig.*,
12     2010 WL 2629907 (N.D. Cal. June 29, 2010) ..................................................... 3-4

13

*Apple Inc. v. Pepper*,
14     587 U.S. 273 (2019)..................................................... 5-6, 8, 20, 21

15

*Apple, Inc. v. Psystar Corp.*,
16     586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................... 13

17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters.*,
    459 U.S. 519 (1983)..................................................... 20

18

*Bakay v. Apple Inc.*,
19     2024 WL 3381034 (N.D. Cal. July 11, 2024)..................................................... 22

20

*Belodoff v. Netlist, Inc.*,
21     2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ..................................................... 23

22

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
23     603 F.2d 263 (2d Cir. 1979)..................................................... 16

24

*Cal. Comp. v. Int'l Bus. Machs. Corp.*,
25     613 F.2d 727 (9th Cir. 1979) ..................................................... 16

26

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..................................................... 20

27

*City of Oakland v. Oakland Raiders*,
28     20 F.4th 441 (9th Cir. 2021) ..................................................... 21

*City of Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ........................................................................... 24

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ..................................................................... 23, 24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................................ 24

*Coronavirus Rep. v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ............................................................................... 7

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
   141 F.4th 1075 (9th Cir. 2025) ......................................................... 1, 9, 10, 11, 15

*Crull v. GEM Ins. Co.*,
   58 F.3d 1386 (9th Cir.1995) ............................................................................. 18

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
   885 F.2d 1392 (9th Cir. 1989) .......................................................................... 23

*Eagle v .Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ............................................................................ 21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .......................................................................................... 12

*Echlin v. PeaceHealth*,
   887 F.3d 967 (9th Cir. 2018) ............................................................................ 23

*Epic Games, Inc. v. Apple, Inc.*,
   559 F. Supp.3d 898 (N.D. Cal. 2022) ............................................. 1, 4, 9, 10, 11, 15

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ..................................................................... passim

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) .............................................................. 21

*Finkelstein v. Prudential Ins. Co. of Am.*,
   709 F. Supp. 3d 828 (D. Ariz. 2024) ............................................................... 18

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................... 20

-iv-

*Foremost Pro Color, Inc. v. Eastman Kodak* Co.,
   703 F.2d 534 (9th Cir. 1983) ................................................................ 16

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................... 12

*FTC v. Ivy Cap., Inc.*,
   616 F. App'x 360 (9th Cir. 2015) .......................................................... 18

*In re Google Play Store Antitrust Litig.*,
   2025 WL 2167402 (9th Cir. July 31, 2025) ................................... 7, 8, 14

*Hibbs-Rines v. Seagate Techs., LLC*,
   2009 WL 513496 (N.D. Cal. Mar. 2, 2009) ............................................ 18

*Hogan v. Amazon.com, Inc.*,
   2024 WL 1091671 (W.D. Wash. Mar. 13, 2024) ...................................... 7

*Hughes v. Gen. Motors Corp.*,
   35 F.3d 571 (9th Cir. 1994) ................................................................... 25

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ........................................................ 4, 15

*Jasper v. C.R. England, Inc.*,
   2013 WL 12138579 (C.D. Cal. June 27, 2013) ................................. 23, 24

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) .................................................................................. 12

*Johnson v. Mateer*,
   625 F.2d 240 (9th Cir. 1980) ................................................................. 18

*Klein v. Meta Platforms, Inc.*,
   2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) ................................... 22, 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) .................................................... 16

*Lambrix v. Tesla, Inc.*,
   737 F. Supp. 3d 822 (N.D. Cal. 2024) ................................................... 11

*Laydon v. Coöperatieve Rabobank U.A.*,
   55 F.4th 86 (2d Cir. 2022) ............................................................... 21, 22

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)..................................................................................... 25

*In re Lithium Ion Batteries Antitrust Litig.,*
    2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)............................................................ 20

*Lorain Journal Co. v. United States,*
    342 U.S. 143 (1951)........................................................................................... 13, 14

*Lorenzo v. Qualcomm Inc.,*
    603 F. Supp. 2d 1291 (S.D. Cal. 2009)................................................................... 21

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
    801 F.3d 1150 (9th Cir. 2015) ................................................................................ 24

*MCI Commc'ns v. Am. Tel. & Tel.,*
    708 F.2d 1081 (7th Cir. 1983) ................................................................................ 25

*Meta Platforms, Inc. v. BrandTotal Ltd.,*
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................. 11

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ................................................................................ 19

*New York v. Meta Platforms, Inc.,*
    66 F.4th 288 (D.C. Cir. 2023)................................................................................. 13

*Northrop Corp. v. McDonnell Douglas Corp.,*
    705 F.2d 1030 (9th Cir. 1983) .................................................................................. 4

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) .............................................................. 9, 10, 13, 14

*Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018)....................................................................................... 4, 5, 6, 8

*Oliver v. Ralphs Grocery Co.,*
    654 F.3d 903 (9th Cir. 2011) .................................................................................. 19

*Oliver v. SD-3C LLC,*
    751 F.3d 1081 (9th Cir. 2014) ................................................................................ 22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ........................................................ 8

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ........................................................................ 5, 8

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*,
    699 F.2d 1292 (9th Cir. 1983) ........................................................................ 25

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ........................................................ 7, 8

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    556 F. Supp. 825 (D.D.C. 1982) .................................................................... 24

*Safeway, Inc. v Abbott, Lab'ys*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) ...................................................... 18, 19

*Salveson v. JPMorgan Chase & Co.*,
    860 F. App'x 207 (2d Cir. 2021) ...................................................................... 8

*SaurikIT, LLC v. Apple, Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) .................................................. 22

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    2020 WL 2097611 (N.D. Cal. May 1, 2020) .................................................... 7

*Smith v. eBay Corp.*,
    2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ...................................................... 13

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
    841 F.3d 827 (10th Cir. 2016) ........................................................................ 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 6148677 (N.D. Cal. Dec. 7, 2011) .................................................. 20

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) ............................................................................ 6

*Tri-Valley Cares v. United States Dep't of Energy*,
    2010 WL 11530284 (N.D. Cal. Sept. 30, 2010) ............................................ 19

*United States v. Apple, Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025) ................................... 11, 15, 16, 17

*United States v. Google LLC*,
    778 F. Supp. 3d 797 (E.D. Va. Apr. 17, 2025) ..................................... 11, 12, 15, 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Griffith*,
    334 U.S. 100 (1948) ................................................................................. 9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................ 10, 15, 16

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ..................................................................... 8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko*,
    540 U.S. 398 (2004) ............................................................................... 14

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .............................................................. 13

*Virtusio v. Fin. Indust. Regul. Auth. Long Term Disability Income Plan*,
    2012 WL 5389918 (N.D. Cal. Nov. 5, 2012) ............................... 18

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006) .............................................................. 19

*Williams v. Boeing Co.*,
    517 F.3d 1120 (9th Cir. 2008) ............................................................ 23

*Wormuth v. Lammersville Union Sch. Dist.*,
    305 F. Supp. 3d 1108 (E.D. Cal. 2018) ............................................ 18

**RULES**

Fed. R. Civ. P. 8 .......................................................................... 17, 18

Fed. R. Civ. P. 8(a)(2) ......................................................................... 18

Fed. R. Civ. P. 15(a) ............................................................................ 23

Fed. R. Civ. P. 15(b) ............................................................................ 18

Fed. R. Civ. P. 15(b)(1) .................................................................. 18, 19

Fed. R. Civ. P. 15(c) ...................................................................... 22, 23

Fed. R. Civ. P. 15(C)(1)(B) ................................................................ 22

Fed. R. Civ. P. 56(c) .............................................................................. 4

## I.     INTRODUCTION

Apple's summary judgment motion fails under *Epic Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) ("*Epic*") and *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ("*Epic I*"); established precedent and authorities; and basic civil procedure principles.

*First*, Apple's claim that Plaintiffs have not accounted for two-sided app distribution mimics the argument *Epic I* rejected that evidence of Apple's anticompetitive effects failed because of the "two-sided" market: "Apple's argument falls short both legally and factually." 67 F.4th at 985. Here, Plaintiffs show "anticompetitive impact on the 'market as a whole,'" *id.*, with evidence of harm to developers and consumers. Any market definition dispute is for the jury.

*Second*, Apple's claim that its restrictions are categorically lawful "refusals to deal" contradicts prior determinations that such restrictions are subject to rule-of-reason scrutiny. In *Epic*, this Court analyzed the facts underlying Apple's "app distribution restrictions" to evaluate their "anticompetitive effects, procompetitive rationales, and less restrictive alternatives." 559 F. Supp. 3d at 1036; *see also Epic I*, 67 F.4th at 983. Apple's only response is that the Epic litigation concerned Section 1 rather than Section 2. But such conduct also violates Section 2 if undertaken by a monopolist. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1086 (9th Cir. 2025). Courts reject efforts to transform the refusal-to-deal doctrine into immunity for restricting dealings with third parties.

*Third*, Apple's argument that its conduct is a lawful design choice immune from scrutiny also repeats an argument rejected in *Epic* and *Epic I* under the rule of reason. Product design is not *immune* from scrutiny where, as here, there is "associated anticompetitive conduct." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99 (9th Cir. 2010).

*Fourth*, Apple erroneously asserts that Plaintiffs' claims were inadequately pleaded or time-barred. Plaintiffs disclosed the grounds for their claims in the operative complaint and through discovery. Plaintiffs' damages model is consistent with those allegations.

## II.     STATEMENT OF FACTS

Apple controls all sales of iOS apps and in-app purchases. Through this control it imposes a 30% commission, earning App Store operating margins of ▮▮▮▮▮▮▮ Facts 60-61. These are

1   not the fruits of competition on the merits.  Instead, Apple takes advantage of its dominance in the

2   device markets, and device owner lock-in, to leave consumers no choice but to bear the costs (more

3   than $20 billion as of February 2024) of higher app prices caused by Apple's supracompetitive

4   commissions.  Facts 56-68; Ex. 40 (Song Rep.) ¶¶ 79-85.[1]

5          Apple has market power in the U.S. markets for smartphones and tablets.  Fact 56.  Apple

6   has long controlled more than ▮▮▮▮ of the U.S. smartphone market by revenue; competitors

7   struggle to enter.  Facts 57-58.  Apple has enjoyed substantial margins and excessive rates of return

8   on iPhones.  Fact 60.  A similar pattern exists for iPads.  Ex. 41 (Stiglitz Rep.) ¶¶ 282-305; Facts

9   57-58.  The dominance in iPhones and iPads is mutually reinforcing, with high rates of co-

10  ownership and purchase of one device often leading to purchase of the other.  Fact 59.

11         Consumers who buy an iPhone or iPad encounter ▮▮▮▮▮▮▮▮▮▮ Ex. 69 (APL-

12  EG_10018126) at -145; Ex. 82 (APL-EG_10018066) at -066.  Consumers often purchase these

13  devices without considering their app purchasing options.  Fact 66.  Awareness of Apple's 30%

14  commission rate is even lower.  Fact 65 (2%).  Difficulties predicting App Store spending over

15  time – e.g., because of the rapidly evolving app landscape – further blunt purchasers' ability to

16  make informed choices.  Fact 66.  Consumers have no way of knowing how much of their App

17  Store spending is due to Apple's supracompetitive commission.  Fact 65.  Once consumers buy an

18  iPhone or iPad, they quickly become locked-in to the "iOS ecosystem."  Ex. 41 (Stiglitz Rep.)

19  ¶¶ 162-95.  Fear of losing device interoperability, the expense and hassle of transferring or losing

20  device content, and the cost of new devices are significant factors that deter switching.  Fact

21  67. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fact 68.

22         Apple takes advantage of its market power and product stickiness to actively constrain

23  device owners' buying options for app and in-app purchases.  Through its Developer Program

24  License Agreement ("DPLA") and App Store Review Guidelines ("Guidelines"), Apple

25  conditions developer access to iOS tools and consumers on exclusive distribution through the App

26  Store.  Facts 30, 47-51.  Under the Guidelines, Apple has also prohibited developers from creating

27  store-like apps, using apps to direct consumers to other platforms, informing customers about

28

---

[1] All exhibits cited in Plaintiffs' opposition are in the contemporaneously filed Byrd Declaration.

Apple's 30% commission, employing a payment solution other than Apple's In-App Purchase ("IAP"), or (with limited exceptions) creating apps that access content purchased on other platforms unless the content is also sold in-app. Fact 5 Resp.; Facts 30, 49-51. Apple reinforces these restrictions through its "walled garden" and voids the warranties of consumers who circumvent it. Facts 53-55.

Apple uses these restrictions to interfere with dealings between consumers and developers.

Ex. 41 (Stiglitz Rep.) ¶ 73; Ex. 87 (APL-EG_01895633) at -635; Fact 2 Resp.

Fact 51; Ex. 60 (APL-APPSTORE_09869802) at -803.

Fact 49.

Ex. 7 (Patel (NVIDIA) Dep.) at 150:22-152:1; Ex. 41 (Stiglitz Rep.) ¶¶ 70, 149 (listing other examples).

Consumers have suffered from Apple's monopoly. Competition would drive down Apple's commission rate by roughly half. Fact 62. That difference has caused over $20 billion in consumer losses. Ex. 40 (Song. Rep.) ¶¶ 79-85. Apple's monopoly has also decreased app output, restricted availability of in-app purchases, and reduced quality and innovation in the App Store and among apps (e.g., cloud streaming and "super" apps). Fact 75; Fact 32 Resp. Plaintiffs represent a class of nearly ▮▮▮▮▮▮ consumers injured by these effects. Ex. 40 (Song Rep.) at figs. 24-25.

## III.    LEGAL STANDARD

Apple's bid for summary judgment must be denied if a reasonable jury drawing "all reasonable inferences" in Plaintiffs' favor "might" render a Plaintiffs' verdict. *In re Apple iPod iTunes Anti-Tr. Litig.*, 2010 WL 2629907, at *2 (N.D. Cal. June 29, 2010); *see* Fed. R. Civ. P. 56(c) (movant has burden to show no genuine dispute as to any material fact). Accordingly, "it is appropriate to bear in mind the admonition that summary judgment[]" is "most disfavored" in

1    antitrust cases like this one where "motive and intent play leading roles." *Northrop Corp. v.*

2    *McDonnell Douglas Corp.*, 705 F.2d 1030, 1057 (9th Cir. 1983) (citation omitted).

3    **IV.    ARGUMENT**

4    **A.    Plaintiffs Have Evidence of Anticompetitive Harm in the "Market as a Whole"**

5         Apple mischaracterizes Plaintiffs' claimed market and their experts' opinions in attempting

6    (at 5-9) to stop the fact finder from resolving a dispute between experts over the boundaries of the

7    relevant market. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th

8    Cir. 1997) ("relevant market is a factual determination for the jury.").

9         **1.    Market definition is a disputed fact issue**

10        Whether and how the App Store should be analyzed as "two-sided" is a dispute between

11   the experts over how to evaluate the competitive *effects* of Apple's conduct. Despite Apple's

12   argument, Plaintiffs' experts *have* considered how Apple's conduct affects *both* consumers *and*

13   developers. Facts 43-44. Apple's experts claim Plaintiffs' experts do not adequately account for

14   the two-sided nature of the App Store, but that disagreement raises a factual dispute over how to

15   assess competitive effects – a quintessential jury question. *See* Jury Instruction No. 23, *Epic*

16   *Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal Dec. 6, 2023), Dkt. 592 ("In

17   evaluating alleged harm in a market that you have found to be two-sided, you must consider

18   whether there is harm to the two-sided market as a whole."). The purpose of defining the relevant

19   market is to provide the fact finder a way "to measure the defendant's ability to lessen or destroy

20   competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("*Amex*") (cleaned up). How

21   the jury should evaluate those effects is a trial dispute.

22        *Epic* and *Epic I* foreclose Apple's argument (at 5-9) that this disputed issue is resolvable

23   as a matter of law. *Epic I* upheld this Court's determination that Apple's ability to "extract[] a

24   supracompetitive commission" and reap "'extraordinarily high' operating margins" is "direct

25   evidence" of anticompetitive effects. 67 F.4th at 984. Apple argued on appeal that this Court's

26   finding "fail[ed] as a matter of law because *Amex* require[d] Epic to establish anticompetitive

27   effects on both sides of the two-sided market . . . (developers and users)." *Id.* at 985. The Ninth

28   Circuit rejected the argument as "legally and factually" incorrect: "*Amex* does not require a

plaintiff to [show] harm to participants on both sides of the market. **All *Amex* held is that to establish that a practice is anticompetitive *in certain* two-sided markets, the plaintiff must establish an anticompetitive impact on the 'market as a whole.'**" *Id.* (emphasis added) (quoting *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022)). The *Epic I* court found an impact on developers *and* consumers "when those costs are passed on." *Id.*

Like Epic, Plaintiffs have evidence of impact on the market as a whole: Apple is the only retailer of iOS apps and charges developers a supracompetitive commission that causes Plaintiffs to pay supracompetitive prices for apps and in-app content purchased through the App Store. Fact 62; Ex. 40 (Song Rep.) ¶¶ 79-85. Although Apple argues (at 9) Plaintiffs' experts have failed to account for indirect network effects,[2] Plaintiffs' experts found no evidence of significant indirect network effects that would affect the evaluation of harm to consumers. Fact 39.

*Amex* is inapposite for reasons that defang Apple's claim (at 6-7) that the decision forecloses those expert opinions as a matter of law. The dispute there was whether the government proved – at trial – "that Amex's antisteering provisions have an anticompetitive effect" in the market for credit card transactions. *Amex*, 585 U.S. at 542. The government argued it was sufficient to show Amex had increased "merchant fees." *Id.* at 547. But the alleged market was the market for transactions, and Plaintiffs failed to show the overall transaction price had increased. *See id.* The government did *not* contend credit card users were worse off because merchant fees were higher. In fact, those fees funded the benefits cardholders enjoyed. *Id.* at 536-37. By contrast, Plaintiffs here have evidence that elevated commissions charged to developers lead to elevated prices for users; *both* developers *and* iOS users are worse off because of Apple's commissions. *See, e.g.*, Ex. 38 (McFadden Rep.) ¶¶ 21, 35; Facts 46-51.

Further, the App Store (unlike an American Express card) is analogous to a "retailer" with an "upstream" arrangement with manufacturers while consumers purchase "directly from the retailer." *Apple Inc. v. Pepper*, 587 U.S. 273, 283-84 (2019). Plaintiffs' experts agree this retail model is the right way to think about the App Store's competitive effects. Facts 41-42. Accordingly, while Prof. Stiglitz acknowledges the App Store, like most retailers, has two sides –

---

[2] Apple's experts do not quantify the strength of their claimed indirect network effects. Fact 38.

a developer (supplier) and a consumer side – he opines the App Store is not a two-sided *transaction* platform in the *Amex* sense. Fact 36-37, 41-42; Fact 3 Resp. The market here is different: in contrast to a business that sells simultaneous transactions (like a credit card), "the strength of indirect network effects and the difference in demand elasticities between the two groups" do not require one to quantify harm on both sides to conclude Apple exercises monopoly power over consumers, causing anticompetitive effects. Ex. 41 (Stiglitz Rep.) ¶ 374; Facts 39, 46. Apple's attack on the market definition endorsed by Plaintiffs' experts cannot nullify Plaintiffs' proof or justify summary judgment. *See Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact[.]").

### 2. Apple's unfounded factual disputes with Plaintiffs' experts are premature

a.   Apple erroneously contends (at 6) Plaintiffs' experts offer a "one-sided theory."[3] Instead, Plaintiffs' experts opine that the fact finder can adequately assess the competitive effects of Apple's conduct by assessing how Apple's supracompetitive commissions affect consumer prices in the *two-sided* market. Fact 37. As Professor Stiglitz explains, an *Amex*-like analysis is unnecessary because no evidence demonstrates any "substantial indirect network effects [that] both affect pricing and constrain the relevant exercise of market power." Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 57; *see also id.* (noting the absence of the sort of "feedback loop" found in *Amex*); *Amex*, 585 U.S. at 535 ("two-sided platforms *often*" – not always – "exhibit what economists call 'indirect network effects.'") (emphasis added); Facts 38-39.

In any event, Plaintiffs' experts analyze both sides of the App Store. Facts 43-45. Prof. Stiglitz opines that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████" Ex. 41 (Stiglitz Rep.) ¶ 28; Facts 43, 52. Prof. McFadden opines that "███████████████████████████████████████████████████ ████████████████████████████████ Ex. 14 (Nov. 5, 2021 McFadden Dep.)

---

[3] Apple cites (at 8) one passage from Prof. Stiglitz's deposition. But his testimony *contradicts* Apple's position. He explained he had not defined a market "for the developer side of the platform," i.e., he did not define a single-sided developer market. Ex. 26 (June 25, 2025 Stiglitz Dep.) at 290:17-291:16.

at 233:7-10; Fact 44. ██████████████████████████████████████████████████.

Ex. 22 (June 4, 2025 Song Dep.) at 56:22-57:6; Fact 44. ████████████████████

████████████████████████████████████ Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.)

at 112:2-13, ███████████████████████████████████████████████████████████

████████████████████████" *id.* 104:7-12. Fact 45.  Plaintiffs' experts do not ignore the two

sides of the market, they simply reach different conclusions than Apple's experts.  Because

Plaintiffs' experts consider both sides, Apple's argument provides no basis for judgment as a

matter of law.  *See Epic I*, 67 F.4th at 985; *SC Innovations, Inc. v. Uber Techs., Inc.*, 2020 WL

2097611, at *9 (N.D. Cal. May 1, 2020) (rejecting similar attempt to leverage *Amex* where

plaintiffs "addressed both sides of the market").

      Apple also alludes (at 8) to its experts' testimony that Plaintiffs' market definition does not

account for differences in competitive conditions across app genres.  But Prof. Stiglitz disputes

this conclusion, *see* Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 34-42, raising a factual dispute for the jury.

      **b.**    Apple's argument (at 6-7) that the App Store is a "two-sided transaction platform"

as a "matter of law" is baseless.  Apple identifies no case holding that the App Store is a two-sided

*transaction* platform – rather than a two-sided business like a retail store – let alone one holding

this issue can be decided *as a matter of law* (*Sabre*, *Amex*, and *Epic* were decided after a trial).

Facts 36-42, 52 (collecting facts showing disputed issues).  The district court cases Apple cites

(at 5-6) instead confirm the opposite.  *Cf. Hogan v. Amazon.com, Inc.*, 2024 WL 1091671, at *3

(W.D. Wash. Mar. 13, 2024) (*Amex* applies only to "*some* two-sided markets").  In *Coronavirus

Reporter v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023), the Ninth Circuit acknowledged that

plaintiffs *could* allege that "the Apple App Store's Apps" constituted a "single-brand market,"

foreclosing the argument that it must be treated as two-sided. [4]  Apple also cites *In re Google Play

Store Antitrust Litigation*, 2025 WL 2167402 (9th Cir. July 31, 2025), where the Ninth Circuit

---

[4] Apple also cites (at 6) *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 n.3 (N.D. Cal. 2022).  But
that decision does not support Apple because the court rejected a one-sided market due to plaintiff
not alleging "an aftermarket," and then advised in dicta – on an argument "Apple does not
advance" – that an amended complaint must "allege a relevant market … that addresses the two-
sided nature" of the App Store, as Plaintiffs have here.  *Id.* at 1107–08, 1111 & n.3.

1    reaffirmed "it is well established that the relevant market can be determined only after a factual

2    inquiry into the commercial realities faced by consumers." *Id.* at *7 (cleaned up) (holding that

3    issue preclusion – not sought here – did not determine market definition).

4        Apple's resort (at 6-7) to *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir.

5    2019) – decided years before *Epic I* and *PLS.com* – is similarly misplaced.[5]  The error in *Sabre*

6    concerned a jury instruction given at trial.  938 F.3d at 59.  The Second Circuit held that the

7    instruction contravened the subsequent decision in *Amex* "that a business is a transaction platform

8    if it '(1) offer[s] different products or services, (2) to different groups of customers, (3) whom the

9    "platform" connects, (4) in simultaneous transactions.' " *Id.* at 58 (quoting *Amex*, 585 U.S. at 566

10   (Breyer, J., dissenting)); *see also id.* at 56 (confirming "two-sided transaction platform is a subset"

11   of "a two-sided platform").  In such a case, "the jury *must* be instructed to consider both sides of

12   the platform being evaluated" for "a transaction platform like Sabre." *Id.* at 58.  Apple asserts

13   (at 7) that *Sabre* held a jury cannot hear evidence that a market is one-sided – an opinion Plaintiffs'

14   experts do not express – where it is "two-sided as a matter of law."  That contorts the holding.  The

15   Second Circuit rejected an alternative verdict that lacked the foregoing jury instruction despite

16   evidence establishing the predicate fact that Sabre was "a *transaction* platform." *Id.* (emphasis

17   added) (explaining why "GDSs" like Sabre "meet all four requirements" of a *transaction* platform

18   specifically).[6]  Here, where the predicate fact is disputed, the Court can instruct the jury to

19   determine whether the App Store "is a transaction platform" like that in *Amex*, and, *if so*, to

20   consider both sides of the platform, just as in the *Google* trial instructions.

21

22   _____

23   [5]After *Sabre*, the Second Circuit contrasted *Amex* with *Apple v. Pepper*, explaining that "the *Apple*
     decision turned on the basic fact that the iPhone owner plaintiffs . . . purchased the apps directly

24   from Apple, and thus paid the allegedly supracompetitive price directly to Apple," whereas credit
     card holders do not "pay the interchange fee directly to the defendant banks." *Salveson v.*

25   *JPMorgan Chase & Co.*, 860 F. App'x 207, 209–10 (2d Cir. 2021).

26   [6] Apple's citation (at 8) to *In re Payment Card Interchange Fee & Merchant Discount Antitrust*
     *Litigation*, 2022 WL 15053250, at *53 (E.D.N.Y. Oct. 26, 2022) is also inapposite.  There, the

27   court excluded under *Daubert* Prof. Stiglitz's opinions distinguishing Visa and Mastercard from
     American Express for purpose of *Amex*.  The court concluding *Amex* governs all "members of

28   the credit card market." *Id.*  The App Store is not a credit card, nor similar to one.

**B. Apple's Distribution Restrictions Are Not Categorically Lawful Refusals to Deal**

Plaintiffs do not bring a refusal-to-deal claim. Instead, they allege that Apple has long imposed restrictions on both app developers and iOS device consumers that block their voluntary dealings with each other. Apple's efforts (at 9-13, 18-19) to portray that conduct as a mere lawful refusal to deal runs contrary to established Ninth Circuit precedent and multiple decisions from just this year. The refusal-to-deal doctrine applies to simple refusals to make proprietary resources available to rivals, not to measures, like Apple's contractual and technical restrictions, that interfere with dealing among third parties and rivals. *See CoStar Grp.*, 141 F.4th at 1090 ("A monopolist's efforts 'to limit the abilities *of third parties* to deal with rivals' is . . . not a refusal to deal with the monopolist's competitors.") (emphasis added) (citation omitted)).

**1. Ninth Circuit precedent defeats Apple's refusal-to-deal argument**

In *Epic*, this Court analyzed the types of "app distribution restrictions" at issue here under the rule of reason, examining "their anticompetitive effects, procompetitive rationales, and less restrictive alternatives." 559 F. Supp. 3d at 1036. The Ninth Circuit agreed that DPLA restrictions are subject to rule-of-reason scrutiny. *See Epic I*, 67 F.4th at 983. By invoking the rule of reason, both this Court and the Ninth Circuit rejected Apple's refusal-to-deal arguments.[7] Refusals to deal are not governed by the rule of reason; instead, they have a "presumption of legality" unless the "narrow" *Aspen Skiing* exception is satisfied, as Apple argued in *Epic* and *Epic I*. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073–74 (10th Cir. 2013). These decisions foreclose Apple's refusal-to-deal argument.[8]

---

[7] *See Epic*, Apple's Proposed Findings of Fact and Conclusions of Law at ¶¶ 263-83 (refusal to deal); 249-55 (product design), No. 4:20-cv-05460 (N.D. Cal. May 28, 2021), Dkt. 779-1; *Epic I*, Principle and Resp. Br. for Appellee/Cross-Appellant Apple Inc. at 62-66, Nos. 21-16506 & 21-16695 (9th Cir. Mar. 24, 2022), Dkts. 93 & 80.

[8] Apple cannot avoid this binding precedent by arguing (at 9 n.5) that Plaintiffs' claims arise under Section 2 while Epic's arose under Section 1. Conduct that unreasonably restrains trade under Section 1 also violates Section 2 if it helps to create or maintain a monopoly. *See, e.g.*, *United States v. Griffith*, 334 U.S. 100, 106 (1948) (monopolization through conduct violative of Section 1 also violates Section 2); *CoStar Grp.*, 141 F.4th at 1086 ("[A] monopolist that wields exclusive agreements to foreclose competition violates both §§ 1 and 2[.]"); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("*Microsoft*") ("[T]he analysis under section 2 is similar to that under section 1 regardless whether the rule of reason label is applied."); Jury

---

1      Apple's argument also runs afoul of the Ninth Circuit's recent decision in *CoStar Group*,

2   which rejected application of the "refusal-to-deal framework" to a platform's efforts to block its

3   own customers from dealing with rivals.  141 F.4th at 1090.  The dispute in that case was between

4   two "online platforms" – CoStar and CREXi – "that compete for brokers in the commercial real

5   estate listing, information, and auction markets."  *Id.* at 1082.  CREXi (a "recent entrant") alleged

6   that CoStar (the "industry leader") "engaged in anticompetitive conduct by entering exclusive

7   deals with brokers and imposing technological barriers, which prevent[ed] brokers from working

8   with" CREXi.  *Id.*  The district court analyzed these allegations as a refusal to deal even though

9   that was "not [Plaintiff's] theory of liability under § 2."  *Id.* at 1090.  The Ninth Circuit reversed,

10  holding that the refusal-to-deal doctrine did not apply because "CoStar's exclusionary practices

11  kept CoStar's broker customers—not CoStar itself—from dealing with CREXi."  *Id.*  "A

12  monopolist's efforts 'to limit the abilities of third parties to deal with rivals' is a matter of exclusive

13  dealing with the monopolist's customers, not a refusal to deal with the monopolist's competitors."

14  *Id.* (citing *Novell*, 731 F.3d at 1072).

15      As in *Epic* and *CoStar*, Plaintiffs allege Apple uses its DPLA and Guidelines to actively

16  interfere with dealings between iOS device owners and iOS app developers.  Specifically, the

17  DPLA and Guidelines condition developers' access to the App Store and iOS software developer

18  kits on developers' agreement to deal exclusively with the App Store and use only Apple's IAP

19  payment mechanism for in-app purchases.  Facts 47-49, 51; *see also Epic I*, 67 F.4th at 996 n.20

20  ("[T]he DPLA essentially provides:  'Apple will sell you app-distribution transactions only if you

21  buy your in-app-purchase-processing *requirements* from Apple.'").  Apple similarly restricts

22  users, including by voiding device warranties if users circumvent Apple's restrictions.  Facts 53-

23  54.[9]  These restrictions preclude consumers from purchasing apps through alternative app

24

25  Instructions, *Innovative Health LLC v. Biosense Webster Inc.*, No. 19-cv-01984 (C.D. Cal. Apr.
14, 2025), Dkt. 521 (no refusal to deal instruction for Section 2 claim that involved same tying

26  conduct as Section 1 claim).  That Epic's Section 1 claim failed on the record also does not justify
ignoring the Ninth Circuit's analysis because the record here is distinct.

27  [9] Contrary to Apple (at 16), the threat of terminating a customer warranty can be anticompetitive.

28  *See Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 849 (N.D. Cal. 2024) (threat to "void warranties"
coerces customers); *accord In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1313

distribution channels or taking advantage of alternative in-app purchase solutions, despite consumer demand for other options.  Fact 64; Fact 26 Resp.  Apple also restricts developers' ability to redirect their customers to other platforms where they could buy in-app content more cheaply, or even to tell their customers about Apple's 30% commission.  Fact 4, 5 Resps.; Facts 30, 50.  As a result, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████  Ex.

41 (Stiglitz Rep.) ¶ 21.  Because Apple achieved this dominance by interfering with the relationship between device customers and app developers, the refusal-to-deal doctrine does not apply and the fact finder should, as in *Epic*, evaluate the restrictions under the "fact-intensive" rule of reason.  *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1248 (N.D. Cal. 2022).

    **2.  Apple's anticompetitive conduct is not a lawful refusal to deal**

        **a.**      The Ninth Circuit's analyses in *Epic I* and *CoStar* are consistent with other recent decisions and established precedent.  Most directly, a district court denied Apple's motion to dismiss the DOJ's antitrust suit challenging Apple's monopolization of the smartphone market. *See United States v. Apple, Inc.*, 2025 WL 1829127, at *17 (D.N.J. June 30, 2025).  Although that case involves a different alleged market, much of the alleged conduct is the same or related.  *See id.* at *2, *11.  Apple moved to dismiss, claiming DOJ was challenging its lawful refusal to deal. *See id.* at *12.  The court rejected that argument, holding that instead of refusing to deal, Apple is actively "imposing restrictions on developers and smartphone users.'"  *Id.*  The same is true here.

    A district court also rejected Google's similar argument in *United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025).  There, plaintiffs challenged Google's "integrated ad tech infrastructure, including the tying of [two Google advertising services] and the subsequent use of that tie to preference Google products over rival products."  *Id.* at 865.  The court found such conduct was not a legitimate refusal to deal – despite Google's argument that decoupling the

---

(N.D. Cal 2008) (Apple threat to void warranty fell within anti-tying provision of Magnuson–Moss Warranty Act).  Apple's argument (at 16) that its warranty policy supports device security and protects Apple's repair services is a procompetitive justification to be weighed by the fact finder under the rule of reason, as in the two cases Apple cites in support.  *See also* Fact 25 Resp.

services would require sharing information with rivals – because Google placed the restrictions "on its customers, as opposed to its competitors," and "engaged in tying that effectively has compelled its publisher customers to use [both Google advertising services]." *Id.* at 866–67.

That principle follows established precedent. In *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), the Court held Kodak could not defend against a claim of unlawful conduct by arguing it had no duty to sell spare parts to independent service companies. Even on the assumption "Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal," Kodak could nevertheless be held liable for "its alleged sale of parts to third parties on condition that they buy service from Kodak." *Id.* at 463 n.8. That conduct parallels a tying arrangement, where a "defendant 'exploit[s] . . . its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'" *Epic I*, 67 F.4th at 982 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)). "The key fact distinguishing" a firm's tying conduct from "a standard refusal to deal" is that the former actively "interferes with the relationship" between the firm's customers and its rivals, by "leveraging the [firm's] power in the 'tying' product market to harm its competitors (who lose access to customers) in the 'tied' product market." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 28 (D.D.C. 2021).

Plaintiffs have provided evidence Apple unlawfully deployed existing market power to interfere in dealings between third parties and customers. Ample evidence shows Apple has market power in the smartphone and tablet markets. Facts 56-62. As Professor Stiglitz explains, ███████████████████████████████████████████████████████████████████ ██████████████████████ Ex. 41 (Stiglitz Rep.) ¶ 363; Fact 63. It uses contractual and technological restrictions to give iOS mobile device consumers no choice but to purchase iOS apps and in-app purchases through the App Store. Fact 5 Resp.; Facts 30, 47-51. Further, customer lock-in prevents customers from pursuing alternatives to this anticompetitive conduct, Facts 65-68, resulting in Apple earning extraordinary App Store profits at consumers' expense, Fact 61. A reasonable jury could find Apple's App Store restrictions are not a privileged refusal to deal, but an abuse of market power in mobile devices to control sales of iOS apps and in-app purchases.

1      Apple's objection (at 10 n.6) that "no tying claim was ever pled or certified in this case,"
2 carries no force because Plaintiffs are not pursuing a Section 1 tying claim but a Section 2 claim
3 (properly pleaded and certified) based on monopoly maintenance conduct analogous to tying.
4 Plaintiffs presented ample evidence that the anticompetitive conduct underlying Apple's unlawful
5 monopolization involves Apple compelling customers to use the App Store and IAP once they
6 have an iPhone or iPad. *See supra* Part II.  Courts routinely allow Section 2 cases to proceed on
7 similar theories.  *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 474 (7th Cir. 2020)
8 (recognizing tying as Section 2 theory); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196
9 n.2 (N.D. Cal. 2008) (same); *Novell*, 731 F.3d at 1072 (same); *Microsoft*, 253 F.3d at 84 (tying
10 conduct challenged under Section 1 and Section 2); *Smith v. eBay Corp.*, 2012 WL 27718, at *5
11 (N.D. Cal. Jan. 5, 2012) (same).

12     **b.**    Apple's cited cases (at 10-12) are readily distinguishable.  In *New York v. Meta*
13 *Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), the court of appeals affirmed the dismissal of a
14 complaint challenging two policies limiting access to Meta's platform.  One policy left developers
15 free to develop apps on other social networks but stopped them from exporting Facebook's data to
16 do so.  *See id.* at 304.  The court analyzed this policy using exclusive dealing law, not refusal to
17 deal.  *See id.*  But it rejected the claim after finding it was "nothing like the exclusive dealing from
18 *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)," where a monopolist "newspaper
19 prohibited its advertising customers from also advertising on the local radio station."  *Id.*  The
20 newspaper's use of monopoly power interfered with independent dealing between customers and
21 a rival.  Similarly, Apple's policies provide, as a condition of App Store access, that developers
22 may not distribute iOS apps to iOS users through any channels other than the App Store.

23     Meta also adopted a policy that barred developers from using the Facebook Platform "to
24 promote, or to export user data to, a product or service that replicates a core Facebook product or
25 service without [its] permission."  *Id.* at 305.  The court affirmed dismissal of a claim based on
26 that policy, finding it fell within the rule that a firm generally has no obligation to "lend its facilities
27 to its potential competitors."  *Id.*  But the distribution restrictions at issue in this case are challenged
28 not because they target smartphone or operating system rivals – the analogy to the "core Facebook

product" – but because they instead preclude iOS developers and iOS users from *avoiding* Apple's App Store distribution platform. *Id.* The distinction between declining to assist a rival and affirmatively suppressing competition (as in *Lorain Journal*) is fundamental.

Nor is Apple's citation to *Novell* on point. Novell made WordPerfect, the then-leading rival to Microsoft's Word. It sought to force Microsoft to share software code used by Microsoft Word to avoid the delay of having to "reverse engineer Microsoft's handiwork" and "write its own replacement computer code" after release of Microsoft's product. *Novell*, 731 F.3d at 1069. By contrast, Plaintiffs here allege that Apple's restrictions have interfered with their ability to choose other app distribution and payment processing options, affirmatively interfering with their dealings with app developers. *Novell* recognizes that exclusive dealing, tying, and other "assay[s] by the monopolist into the marketplace" are not refusals to deal. *Id.* at 1072.

Apple also cites (at 12) the *Google Play* ruling that *Trinko* barred any challenge to the prohibition in Google's Developer Distribution Agreement ("DDA") on the distribution of alternative app stores on Google Play. But the district court's decision – which consists of a single, two-sentence paragraph citing only *Trinko* – is not authoritative because the Court understood the parties to agree (unlike here) that *Trinko* foreclosed the relevant claim. *See* Tr. of Proceedings at 5, *Epic Games v. Google*, No. 20-cv-5671 (N.D. Cal. Oct. 19, 2023), Dkt. 707. Moreover, Google's lead argument was that the DDA constituted a unilateral refusal to deal because it is a "unilateral policy" not an "agreement" between Google and developers. *See id.*, Mot. for Partial Summ. J. at 6-9, (Apr. 20. 2023), Dkt. 407. The Ninth Circuit subsequently rejected Apple's identical argument that its DPLA is unilaterally imposed. *See Epic I*, 67 F.4th at 981-82.[10]

**c.** Apple's final errant argument (at 13) is that liability would force it to license its intellectual property. The Court, however, has foreclosed injunctive relief. *See* Dkt. 981. In any event, the Ninth Circuit has recently clarified that "antitrust remedies . . . often must proscribe otherwise lawful conduct to unwind and further prevent violators' anticompetitive activity." *Google Play*, 2025 WL 2167402, at *17 (9th Cir. July 31, 2025). Mere invocation of a right to

---

[10] *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016) is also distinguishable. Plaintiff brought a refusal to deal *claim* but could not satisfy *Aspen Skiing*.

1   exclude does not immunize all actions taken to leverage intellectual property.  *See Image Tech.*

2   *Servs.*, 125 F.3d at 1215 ("[N]either patent nor copyright holders are immune from antitrust

3   liability"); *Microsoft*, 253 F.3d at 63 ("Intellectual property rights do not confer a privilege to

4   violate the antitrust laws." (citation omitted)).

5   **C.  Apple's Technical Restrictions Are Part of An Anticompetitive Course of Conduct**

6        Apple's argument (at 13-16) that its App Store restrictions reflect "product design" cannot

7   eliminate the factual dispute over whether Apple has engaged in unlawful conduct.  Plaintiffs have

8   presented evidence that Apple's technological restrictions are part of an anticompetitive scheme,

9   beyond a mere design choice.  Fact 55.  At most, Apple's argument foreshadows a defense at trial;

10  it is not a basis for avoiding one.  The Court should reject Apple's argument – repeated from *Epic*

11  (see *supra* n.7) – and allow the jury to analyze Apple's restrictions under the rule of reason.  *See*

12  *Epic I*, 67 F.4th at 994–95 ("The Rule of Reason applies to the tie involved here" which arises

13  because "Apple's design of the iOS ecosystem . . . ties the App Store and IAP together.").

14       "Courts have found technological barriers to constitute anticompetitive conduct."  *Apple,*

15  *Inc.*, 2025 WL 1829127, at *12–13 (citing *Microsoft*, 253 F.3d at 64); *see also CoStar*, 141 F.4th

16  at 1092–93 (finding technological barriers anticompetitive).  "Judicial deference to product

17  innovation . . . does not mean that a monopolist's product design decisions are per se lawful."

18  *Microsoft*, 253 F.3d at 65; *see also Allied Orthopedic*, 592 F.3d at 998 ("[C]hanges in product

19  design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful

20  means of maintaining a monopoly under Section 2.").  Indeed, monopolists' product design

21  frequently comes under antitrust scrutiny when there is "associated anticompetitive conduct."

22  *Allied Orthopedic*, 592 F.3d at 998–99.  For example, the district court in *Google* recently rejected

23  the "overarching argument" that Google's "integrated ad tech infrastructure" was "shielded from

24  antitrust liability because [its product and policy changes] involved product design choices."  778

25  F. Supp. 3d at 865, 871.  The court found that Google's "campaign of exclusionary conduct . . . is

26  not properly characterized as a series of product design choices" and thus evaluated the conduct

27  using rule-of-reason principles.  *Id.* at 867–71.

28       Like Google's monopoly over digital-advertising markets, Apple has created and

maintained a monopoly over the sale of iOS apps and in-app purchases through restrictions that leverage monopoly power to foreclose competition.  This allows Apple to "coerce[] consumers" and developers into conducting business with each other through only the App Store, thereby "imped[ing] competition."  *Id.* at 871 (citation omitted); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) (rejecting "product design" defense where the defendant's restrictions had the "overall effect" of "coerc[ing] consumers to purchase [from Keurig], rather than to compete on the merits").

Similarly, in *Microsoft*, the D.C. Circuit considered Microsoft's practice of "[t]echnologically binding" Internet Explorer to Windows, which forced consumers to take both. 253 F.3d at 64–67.  The court determined that the "integration" of Internet Explorer and Windows could constitute a Section 2 violation and a tying arrangement that should be analyzed under the fact-intensive rule of reason.  *Id.* at 64–71, 84–96; *accord Allied Orthopedic*, 592 F.3d at 998 (citing *Microsoft* with approval).  Substantial evidence here would support a jury finding of anticompetitive conduct through Apple's technological and contractual "binding" of iOS mobile devices to exclusive use of the App Store and IAP.  *Cf. Apple Inc.*, 2025 WL 1829127, at *12–13 (finding government's antitrust suit against Apple successfully alleged several "technological barricades that constitute anticompetitive conduct," including certain barricades at issue here).

Apple cites (at 13-14) inapposite cases about *changes* in product design.  In each, a court rejected a competitor's challenge to a beneficial product change that collaterally rendered the competitor's previously compatible product suddenly incompatible with the defendant's own product.  *See Cal. Comp. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 735–44 (9th Cir. 1979) (improved CPU performance); *Foremost Pro Color, Inc. v. Eastman Kodak* Co., 703 F.2d 534, 543–46 (9th Cir. 1983) (new line of cameras and film); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) (same).  The Ninth Circuit's *Allied Orthopedic* decision cites these cases with approval for the proposition that "a design *change* that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct."  592 F.3d at 998-99 (emphasis added).  Apple highlights no comparable design change, while Plaintiffs present substantial evidence that Apple's technical restrictions have

operated as anticompetitive *limitations* on innovation and new product offerings.  Facts 47-55, 75.

Any product-design justification by Apple raises a jury question regarding whether associated "anticompetitive conduct" outweighs it.  *See Epic Games I*, 67 F.4th at 983–94 (applying rule of reason); *Apple Inc.*, 2025 WL 1829127 at *14 ("factual dispute" whether Apple has good reason for technical restrictions).  Indeed, Apple's argument relies (at 14) on disputed factual assertions about consumer appeal and supposed security risks.  *Cf.* Facts 26, 69–74; Fact 7 Resp.  That Apple's security features were embedded in iOS in 2007 only supports Plaintiffs' argument that Apple device security derives from iOS – not the App Store or App Review.  Fact 69.

## D.  Apple's Baseless Procedural Arguments Fail

### 1.  Apple had fair notice of Plaintiffs' IAP and anti-steering allegations

Apple incorrectly argues (at 17-18) Plaintiffs' IAP and anti-steering evidence exceeds the scope of the complaint; IAP and Apple's anti-steering have long been a part of this case.

As Apple concedes (at 21), the operative complaint contains allegations related to in-app purchases.  It alleges "Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iOS applications," including "in-app purchases." Dkt. 229 ¶¶ 4-5; *see also id.* ¶ 9 (Apple "controls and receives supracompetitive profits on in-app purchases").  It alleges Apple locked consumers "into an aftermarket for iOS apps [and in-app purchases][11] that was monopolized by Apple." *Id.* ¶ 8; *see also id.* ¶¶ 62, 76 (defining class and relevant market to include in-app purchases).  And it alleges Apple did so by "denying authorization of apps with in-app purchasing features that do not meet Apple's payment requirements." *Id.* ¶ 51; *see also id.* ¶¶ 48-49 (noting contractual restrictions as to both app sales and in-app purchases); *id.* ¶¶ 79, 84 (Apple threatens to terminate developers who sell in competition with Apple).

These allegations more than satisfy Rule 8's requirement of a "short and plain statement," Fed. R. Civ. P. 8(a)(2), that gives Apple "fair notice of the claim and the grounds upon which it rests." *Virtusio v. Fin. Indus. Regul. Auth. Long Term Disability Income Plan*, 2012 WL 5389918,

---

[11]  The Complaint states:  "Herein, *references to the market for iOS applications include the market for in-app purchases*."  Dkt. 229 n.2 (emphasis added).

*4 (N.D. Cal. Nov. 5, 2012) (citation omitted).  Because the complaint alleges that Apple used contractual restriction, including "payment requirements," to control in-app purchases, Dkt. 229 ¶ 51, Plaintiffs' specific evidence related to Apple's use of contractual IAP and anti-steering restrictions for that purpose do not "exceed[] the complaint's scope and the limits of discovery such that defendants could not fairly anticipate it," *Wormuth v. Lammersville Union School District*, 305 F. Supp. 3d 1108, 1118 (E.D. Cal. 2018); *see also Safeway, Inc. v Abbott Lab'ys*, 761 F. Supp. 2d 874, 890–91 (N.D. Cal. 2011) (Section 2 plaintiff could rely on predatory pricing theory at summary judgment because defendant received adequate notice based on allegations in complaint that its pricing excluded "equally efficient producers").  Indeed, at the class certification stage, Apple engaged at length with Plaintiffs' IAP and anti-steering allegations, never questioning their relationship to the complaint.  *See generally* Dkts. 478, 689.  Apple has always been "well aware of what is at issue in this case."  *Safeway*, 761 F. Supp. 2d at 891.

Apple's contrary argument misunderstands notice pleading.  Under Rule 8, "pleadings need not identify any particular legal theory under which recovery is sought."  *FTC. v. Ivy Cap., Inc.*, 616 F. App'x 360, 361–62 (9th Cir. 2015) (quoting *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995)).  Similarly, parties "may rely on additional facts not included in the complaint, but which support the same theory of liability alleged in the complaint, when responding to summary judgment."  *Finkelstein v. Prudential Ins. Co. of Am.*, 709 F. Supp. 3d 828, 837 (D. Ariz. 2024) (citation omitted).  In fact, "[p]arties are expected to use discovery, not the pleadings, to learn the specifics of the claims being asserted."  *Hibbs-Rines v. Seagate Techs., LLC*, 2009 WL 513496, at *3 (N.D. Cal. Mar. 2, 2009) (citation omitted).  Here, that purpose was served when Plaintiffs responded to Apple's interrogatories.  *See* Ex. 92 (Objs. & Resps. to Apple's First Interrogs.); Ex. 93 (Am. Objs. & Resps. to Apple's First Interrogs.).[12]

Apple cannot argue prejudice from Plaintiffs' IAP and anti-steering allegations.  Plaintiffs'

---

[12] Further, even where post-discovery allegations diverge enough from the complaint to require amendment, Rule 15(b) allows amendment through trial, where no prejudice results to defendant. *See* Fed. R. Civ. P. 15(b)(1); *see also Johnson v. Mateer*, 625 F.2d 240, 242 (9th Cir. 1980) (where issues raised against motion for summary judgment were outside scope of complaint, "[t]he district court should have construed [it] as a request [to amend] pursuant to rule 15(b).").

evidence on Apple's IAP and anti-steering restrictions is not part of a "surprise theory of liability and did not require the development of new defenses." *Advanced Thermal Scis. Corp v. Applied Materials Inc.*, 2009 WL 10672954, at *4 (C.D. Cal. Oct. 6, 2009).  Apple instead concedes (at 18) it addressed the IAP and anti-steering allegations during discovery and in its expert reports. Apple offered its own merits expert report disputing the IAP and anti-steering allegations, *see* Ex. 42 (Sundararajan Rep.) ¶ 10, and examined Plaintiffs' experts on that topic, *see, e.g.*, Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 18:18-19:13; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 29:3-13; Ex. 26 (June 25, 2025 Stiglitz Dep.) at 227:3-11, 271:4-11.

The cases Apple cites are distinguishable.  In *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011), an ADA plaintiff sought to introduce new allegations of discrimination by identifying, through an expert report, "architectural barriers" it had not previously identified.  This violated the Ninth Circuit's rule that "[w]here the claim is one of discrimination under the ADA due to the presence of architectural barriers," the "grounds" for the claim – which must be identified in the complaint – "are the allegedly non-compliant architectural features at the facility." *Id.* at 908.  There is no similar requirement that all forms of anticompetitive conduct supporting a Section 2 claim be enumerated with precision.  *See Safeway*, 761 F. Supp. 2d at 890-91.

Similarly, in *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 990–92 (9th Cir. 2006), the plaintiff opposed a statute-of-limitations argument at summary judgment by introducing allegations of civil conspiracy without specific allegations that satisfied Rule 9(b).  In *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1079 (9th Cir. 2008), and *Tri-Valley Cares v. United States Department of Energy*, 2010 WL 11530284, at *7 (N.D. Cal. Sept. 30, 2010), the plaintiffs tried to introduce entirely new *claims* at summary judgment.  Plaintiffs here have consistently pressed Section 2 claims for (attempted) monopolization.[13]

### 2.  Plaintiffs have antitrust standing to challenge all of Apple's restrictions

Apple's standing argument (at 19-21) flouts the Supreme Court's holding in *Pepper* that "iPhone owners are direct purchasers from Apple and are proper plaintiffs to maintain this antitrust

---

[13] For the same reason, the Court's denial of Plaintiffs' most recent motion to amend is irrelevant, as that was a request to add a "distinctly different claim" under the UCL.  *See* Dkt. 573 at 7.

suit." 587 U.S. at 281. That holding applies equally to in-app purchases. Just as with app purchases, consumers make in-app purchases "directly from the retailer Apple" and "pay the alleged overcharge directly to Apple" through Apple's IAP. *Id.* Plaintiffs therefore have direct-purchaser standing to challenge Apple's monopolization of the market for the sale of iOS apps and in-app purchases. That includes alleging that Apple's anti-steering restrictions – along with its other anticompetitive conduct – " ██████████████████████████████████ ██████████████ ████████████ Ex. 41 (Stiglitz Rep.) ¶ 21.

Apple seeks to draw support from *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*"). But courts in this district have repeatedly found *AGC* satisfied for *indirect* purchasers – i.e., purchasers further down the supply chain – even though they are significantly more removed from the anticompetitive conduct than the direct-purchaser Plaintiffs here, and even though their claims overlap with those of direct purchasers. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 6148677, at *2 (N.D. Cal. Dec. 7, 2011); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *11 (N.D. Cal. Oct. 2, 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) ; *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1133, 1156 (N.D. Cal. 2009). If these indirect purchaser injuries are sufficiently direct and non-speculative to sustain antitrust standing, then so are Plaintiffs' harms from their in-app purchases directly from Apple.

Nor, contrary to Apple (at 20-21), is there any issue with apportionment of damages or duplicative recovery. Prof. McFadden's model assesses the amount of overpayment from Apple's supracompetitive commission and apportions it between consumers and developers. *See* Ex. 38 (McFadden Rep.) ¶¶ 20-34. Plaintiffs have thus provided substantial evidence that the class's injury is direct, non-speculative, capable of apportionment, and non-duplicative. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054–55 (9th Cir. 1999).

Nothing about Plaintiffs' anti-steering allegations undermines that conclusion. Apple has achieved its monopoly, which has directly injured the consumer Plaintiffs, through overlapping contractual and technical restrictions, including its anti-steering rule. ████████████████ █████████████████████████████████████████████████████████████

1   ████████████████████████ Ex. 41 (Stiglitz Rep.) ¶¶ 21, 66.[14]  Apple argues (at 19-

2   20) that any damages from anti-steering would be "speculative."  But that ignores how the damages

3   model works.   Dr. Abrantes-Metz estimates Apple's but-for commission rate in the face of

4   competition by modeling a world in which Apple faces competition from an alternative app store.

5   *See* Ex. 33 (Abrantes-Metz Rep.) ¶ 23.   Any additional competitive pressures (e.g., from

6   elimination of anti-steering or addition of other app stores) would only drive the commission rate

7   lower.  *See* Ex. 33 (Abrantes-Metz Rep.) ¶ 47; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 51-52;

8   Fact 77.  Thus, far from being speculative, Plaintiffs' damages model is conservative.  *See id.*

9          Apple's argument (at 20-21) that Plaintiffs' anti-steering allegations risk duplication

10  likewise lacks merit.  The "mere fact that an antitrust violation produces two different classes of

11  victims hardly entails that their injuries are duplicative of one another."  *Pepper*, 587 U.S. at 287

12  (quoting 2A Areeda & Hovenkamp ¶ 339d, at 136).  No "double counting" or "confusion" results

13  because Plaintiffs' damages model properly determines the overcharges consumers paid *to Apple*

14  for apps and IAP.  *Contra* Mot. at 21; *see* Ex. 18 (May 14, 2025 McFadden Dep.) at 55:3-11.

15         The cases Apple cites are inapposite.  In *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541

16  (9th Cir. 1987), plaintiffs were "neither consumers nor competitors in the relevant market."  The

17  same is true for *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015) and

18  *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300–01 (S.D. Cal. 2009).  In *City of Oakland*

19  *v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021), the court held the city's claim that it would

20  still have a football team but for the NFL's horizontal price-fixing was "too speculative" because

21  of the impossibility of modeling what would have occurred in a competitive marketplace.  In *Bakay*

22  *v. Apple Inc.*, 2024 WL 3381034, at *5 (N.D. Cal. July 11, 2024), there were "eight steps between

23  [defendant's] alleged misconduct and Plaintiffs' injury" – here, Apple's anti-steering directly

24  stopped developers from directing customers to other platforms.  And in *Laydon v. Coöperatieve*

25

26  ─────────────

    [14] Apple's anti-steering restrictions also undermine Apple's argument that Plaintiffs' market

27  definition is "too narrow" because it excludes purchases of in-app content on other platforms.  *See*
    Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 50-51; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 51-52.

28  Allowing Apple to argue that the market includes cross-platform purchases, without allowing
    Plaintiffs to argue anti-steering, would provide a distorted picture to the jury.

*Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022), "Plaintiff had no direct dealings with Defendants," and damages were "calculated based on specific transactions between third parties that were indirectly impacted by Defendants' alleged manipulation of [foreign currency] benchmark rates." Those cases are simply off-point.

### 3.  The challenge to Apple's in-app purchasing restrictions is not time barred

Apple erroneously argues (at 21) Plaintiffs' "in-app purchasing claims" are "[l]argely" time-barred. But Plaintiffs' original complaint, filed in 2011, put Apple on notice of claims for monopolization and attempted monopolization, each based on allegations Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket." Dkt. No. 1, at ¶¶ 87, 93 (emphasis added); Fact 33, 35 Resps. The allegations regarding in-app purchases in the Third Amended Complaint ("TAC"), filed in 2020, "simply add detail to the prior ones; they are not radical changes or entirely new topics." *Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022) (rejecting antitrust defendant's argument that "new allegations" in amended complaint were untimely).

Apple concedes (at 21) the TAC contains allegations about in-app purchases and disputes only whether the TAC "relates back" to the original complaint. Fed. R. Civ. P. 15(C)(1)(B) (amendment relates back when it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading").[15] The law in this Circuit is clear:  "[C]ourts should apply the relation back doctrine of Rule 15(c) liberally," and this is "particularly" true in "antitrust suits where there is ample opportunity for discovery and other pretrial procedures." *E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1396 (9th Cir. 1989) (quoting *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n.29 (9th Cir. 1982)).  In *E.W. French*, the Ninth Circuit held that a "price-fixing claim" in

---

[15] After conceding the TAC "mention[s]" in-app purchases, Apple baselessly argues (at 21) those allegations are nonetheless "time-barred in their entirety" because Plaintiffs have not alleged "any 'new and independent' overt act" separate from the start of in-app purchasing in 2009 to restart the statute-of-limitations clock. But even if it were necessary to restart the clock, every "sale [to direct purchasers, like Plaintiffs here] constitutes a new overt act . . . and the statute of limitations runs from the date of the act." *Oliver v. SD-3C LLC*, 751 F.3d 1086, 1086 (9th Cir. 2014). Apple's citation to *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023), is off-point; that case dealt with claims based on Apple's "warranty agreements." *Id.* at *1.

1    an amended pleading related back to a claim about a "different" conspiracy involving different

2    conspirators.  *Id.* at 1394–96.  In *Clipper Exxpress*, the Ninth Circuit held a fraud claim related

3    back to antitrust claims challenging the same course of conduct.  *See* 690 F.2d at 1259 n.29.

4         Applying Rule 15(c) is even more straightforward here.  Plaintiffs' allegations regarding

5    in-app purchases do not state a separate claim (they undergird the same Section 2 claims) and they

6    regardless "derive naturally from Plaintiffs' original allegations."  *Jasper v. C.R. England, Inc.*,

7    2013 WL 12138579, at *7 (C.D. Cal. June 27, 2013).  The original complaint's allegations

8    "regarding products sold in the iPhone Applications Aftermarket," including in-app purchases,

9    e.g., Dkt. 1, at ¶¶ 87-88, 93-94, gave Apple "adequate notice" of the "general fact situation" being

10   challenged.  *Jasper*, 2013 WL 12138579, at *7 (cleaned up).  The TAC's allegations about in-app

11   purchases simply "refine[] . . .  the previously alleged facts" and "relate to the same time frame

12   and similar activities conducted by" Apple.  *Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *14

13   (C.D. Cal. Apr. 17, 2009) (allegations satisfied Rule 15(c) because they were not "so distinct as

14   Defendants would claim").

15        Apple nitpicks (at 22) at differences between app purchases and in-app purchases, but that

16   misses the point.  Rule 15(a) requires fair notice of the "general fact situation"; it does not require

17   a perfect match between new and old allegations.  Apple's favored cases (at 22) do not say

18   otherwise.  For example, in *Echlin v. PeaceHealth*, 887 F.3d 967 (9th Cir. 2018), the plaintiff's

19   new claim did not relate back because it pleaded a "critical" fact "*directly contradictory* to the

20   [original complaint's] allegations" and would have required defendant to "pursue[] a different

21   litigation strategy" to defend against.  *Id.* at 978–79 (emphasis added); *cf. also Williams v. Boeing

22   Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008) ("no common core of operative facts" between plaintiff's

23   compensation discrimination claim and hostile work environment claims).  Here, by contrast, the

24   in-app purchasing allegations "simply add detail" – they are not "radical changes" from the app-

25   purchasing allegations – and so Apple "has not demonstrated that a relation back will unfairly

26   prejudice it in any way."  *Klein*, 2022 WL 17477101, at *2; *see also Clipper Exxpress*, 690 F.2d

27   at 1259 n.29 ("no reason to find [new claim] time barred" in "absence of any evidence of prejudice

28   to defendants"); *Jasper*, 2013 WL 12138579, at *7 (defendant on notice of allegations refined

1    through "discovery and successive class certification motions").

2    **E.  The fact finder should evaluate Plaintiffs' damages model**

3           Apple argues (at 22) Plaintiffs have no admissible evidence of injury.  But that argument

4    turns entirely on Apple's meritless *Daubert* challenges to Prof. Alan MacCormack and Mr. Darryl

5    Thompson.  Moreover, Apple incorrectly asserts (at 22) that Prof. McFadden's model relies on

6    Mr. Thompson's identification of Apple customers.  The model measures overcharges for every

7    transaction, regardless of who made the purchase.  *See* Ex. 40 (Song Rep.) ¶ 61 ████████

8    ███████████████████████ *id.* ¶ 65.  Assigning transactions to people or Apple IDs are just

9    different methods to aggregate those transaction-level calculations. *See id.* ¶ 67.  Plaintiffs' ability

10   to show antitrust injury and compute total aggregate damages is thus independent of Mr.

11   Thompson's analysis. *See* Fact 76; Decertification Opp. at 17-19.[16]

12          Lastly, Apple objects (at 23) that Plaintiffs' damages model does not allow for adequate

13   disaggregation of Apple's alleged anticompetitive acts.  But that argument is premature.  In the

14   cases Apple cites, courts rejected a damages model for failure to disaggregate conduct *after*

15   determining, at class certification or summary judgment, that some alleged conduct was lawful.

16   *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992) ("many of [the

17   alleged] acts were proper"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 31, 37–38 (2013) (model

18   presumed four anticompetitive acts, but only one survived in the case).[17]  Here, in contrast,

19   Plaintiffs have raised a genuine dispute of material fact as to each alleged anticompetitive act.  That

20   conduct – and the damages model – therefore should be assessed by the jury.

21          Apple's disaggregation argument also misconstrues Plaintiffs' liability theory and damages

22   model.  Plaintiffs allege Apple monopolized the market for the sale of iOS apps and in-app

23   purchases through overlapping technical and contractual restrictions.  *See supra* Dkt. 229 ¶ 51.  If

24   the jury finds for Plaintiffs, "the *amount* of damages may be determined by a just and reasonable

25   _____

26   [16] Apple incorrectly argues (at 23) Mr. Hayter has no damages. He will have damages if the jury
     finds Apple violated Section 2 but that price tiers are lawful. Song Decl. ¶¶ 3-5; Fact 31 Resp.

27   [17] In *Magnetar Technologies Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir. 2015) and
28   *Southern Pacific Communications Co. v. American Telephone & Telegraph Co.*, 556 F. Supp. 825,
     1092 (D.D.C. 1982), the model failed to separate business losses from anticompetitive losses.

1    estimate as long as the jury verdict is not the product of speculation or guess work." *Hughes v.*
2    *Gen. Motors Corp.*, 35 F.3d 571, at *2 (9th Cir. 1994) (table) (citing *MCI Comm'cns v. Am. Tel.*
3    *& Tel.*, 708 F.2d 1081, 1161 (7th Cir. 1983)); *see also Reid Bros. Logging Co. v. Ketchikan Pulp*
4    *Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983) ("[A] lightened burden of proof is imposed on a plaintiff
5    seeking to prove antitrust damages" once violations of law is established."). Plaintiffs can provide
6    reasonable damages estimates without disentangling the effects of the overlapping restrictions
7    enabling the monopoly. *See LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) (no need to
8    "segregate and attribute a fixed amount of damages to any one act"); *MCI*, 708 F.2d at 1161 ("Not
9    requiring strict disaggregation of damages among the various unlawful acts . . . makes sense when
10   damages arise from a series of unlawful acts intertwined with one another.").

11        Apple specifically challenges (at 23) Dr. Abrantes-Metz's model, arguing it assumes a
12   "but-for world where *none* of the challenged restrictions exist." But that misconstrues her model.
13   Dr. Abrantes-Metz estimates the difference between Apple's actual commission rate and a
14   competitive rate by making reasonable modeling decisions, such as assuming the existence of an
15   alternative iOS App Store. *See* Ex. 33 (Abrantes-Metz Rep.) ¶¶ 15, 23. This is a conservative
16   estimate. Any additional competition or further lifting of restrictions would exert more downward
17   pressure on the commission rate. *See id.* ¶ 19 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Dr. Abrantes-Metz has explained
19   her model accounts for entry of competition, however achieved. Fact 77; Ex. 45 (Abrantes-Metz
20   Rebuttal Rep.) ¶¶ 57-59 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, her
23   model is not dependent on Plaintiffs' ultimate success in proving *every* theory of unlawful conduct.

24   **V.    CONCLUSION**
25        The Court should deny Apple's motion for summary judgment.
26
27
28

| | |
|---|---|
| 1 | DATED:  September 2, 2025 |

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK. P.L.L.C.**

By: _David C. Frederick_
       DAVID C. FREDERICK

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES WEBSTER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com

---

PLAINTIFFS' OPP. TO APPLE INC.'S MOT. FOR SUMMARY JUDGMENT
Case No. 11-cv-06714-YGR
-26-

apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Class Counsel for Plaintiffs*