BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |
| | **RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:           October 14, 2025 |
| | Time:           2:00 p.m. |
| | Courtroom:    1, 4th Floor |

[REDACTED VERSION]

## APPLE'S TABLE OF ABBREVIATIONS

| Abbreviation | Referenced Document |
|---|---|
| Ex.___ | Exhibits to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| [Date] [Name] Dep. | Deposition transcript of named witness, each attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025. |
| Abrantes-Metz Reb. Rep. | Reply Report of Rosa M. Abrantes-Metz, Ph.D., dated June 13, 2025. |
| *Epic* Trial Tr. | Transcript from the trial held in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, from May 3, 2021 to May 24, 2021. |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025. |
| Halderman Reb. Rep. | Rebuttal Expert Report and Declaration of J. Alex Halderman, Ph.D., dated June 13, 2025. |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025. |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025. |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025. |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025. |
| Simonson Rep. | Opening Expert Report and Declaration of Itamar Simonson, Ph.D., dated March 7, 2025. |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025. |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025. |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025. |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025. |
| Schiller Decl. | Declaration of Philip W. Schiller ISO Apple's Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. 74, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on September 15, 2020. |
| Kosmynka Decl. | Declaration of Trystan Kosmynka, Dkt. 821-10, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on October 8, 2021. |

Pursuant to the Court's Standing Order in Civil Cases, Defendant Apple Inc. ("Apple") hereby submits the following Supporting Separate Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Definition)<br><br>Issue 3 (iOS Design) | **Fact 1:** Apple released iPhone in 2007. Initially, iPhone could run only applications that were preinstalled by Apple. In October 2007, Apple announced that it would allow third-party developers to create native iOS apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 135:18–22, 136:5–17, 138:19–24, 146:1–19, 248:5–11; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 22:4–6; Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. Initially, iPhone could run only **native** applications that were preinstalled by Apple and Steve Jobs advised developers to create web-based applications that would work through the Safari browser. *See* Ex. 41 (Stiglitz Rep.) ¶ 38.[2] Apple changed course after " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " Ex. 10 (Forstall Dep.) at 84:1–85:9. |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 2:** Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to iPhone users. At launch, the App Store included 538 third-party applications. By 2023, the U.S. App Store had over 1.6 million apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 146:1–19; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 224:5–18; Ex. 19 (Hitt Rep.) ¶ 46(a); Ex. 80 (Schiller Decl.) ¶ 3. | Disputed. At least one competitor, Cydia, launched a third-party app store in 2008 that was available to iOS device users even before Apple introduced its App Store. *See* Ex. 41 (Stiglitz Rep.) ¶ 73; Ex. 33 (Abrantes-Metz Rep.) ¶¶ 89, 107; Ex. 3 (Shoemaker Dep.) at 316:22–24; Ex. 6 (Federighi Dep.) at 296:5-11; Ex. 12 (Elhauge Dep.) at 160:6-23; Ex. 30 (July 11, 2025 Abrantes-Metz Dep.) at 201:16-202:4.<br><br>Apple prevented iOS users from purchasing native apps and in-app digital content from Cydia and other potential competitors through technological and contractual restrictions that made the App Store the exclusive source for iOS apps and in-app digital content. *See* Ex. 21 (May 30, 2025 Stiglitz Dep.) at 116:14-119:22; Ex. 41 (Stiglitz Rep.) ¶¶ 64, 67-79; Ex. 33 (Abrantes-Metz Rep.) ¶ 89; Ex. 38 (McFadden Rep.) ¶ 14; Ex. 87 (APL- |

---

[1] Issue numbers correspond with the issues listed in the Statement of Issues to be Decided in Apple's concurrently filed Motion for Summary Judgment. *See* Mot. for Summary Judgment at ii.

[2] All exhibits referenced in Plaintiffs' responses or affirmative material facts are attached to the contemporaneously filed Byrd Declaration.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | EG_01895633) at -635 (Apple "█████████████████████████████████████ ██████████████████████████"); Ex. 60 (APL-APPSTORE_09869802) at -803 (Facebook); Ex. 66 (APL-APPSTORE_06587460) at -460 (Facebook); Ex. 7 (Patel (NVIDIA) Dep.) at 150:22-152:1. |
| Issue 1 (Market Definition) | **Fact 3:** The App Store facilitates simultaneous transactions between consumers, on the one hand, and developers, on the other.<br><br>Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; Ex. 22 (Sundararajan Rep.) ¶¶ 153–164; Ex. 105 (Apple Inc., *Apple Developer Program*, Apple Developer) ("Join the Apple Developer Program to reach customers around the world on the App Store for all Apple platforms."). | Disputed. The App Store sells apps and in-app digital content directly to consumers. Separately, and at a different time, the App Store sells app and in-app digital content distribution services to developers while retaining sole discretion to make apps and in-app digital content available to consumers. The App Store does not connect consumers to developers to transact with each other. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:19-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296 (Apple Developer Program License Agreement stating app "████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████████."). |
| Issue 1 (Market Definition) | **Fact 4:** In addition to the App Store, developers can distribute their apps and digital content through web apps, their own websites, and other app transaction platforms.<br><br>Ex. 4 (Feb. 15, 2021 Schiller Dep.) 426:2–13; Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 76:6–9, 98:2–11; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122. | Disputed. Apple substantially limits the distribution of iOS apps and in-app digital content. Developers are prohibited from distributing iOS apps through any other platform, and Apple imposes restrictions, including anti-steering rules, that severely limit developers from distributing in-app content outside of the iOS platform. Likewise, iOS users cannot obtain developer content through any app store or in-app purchasing system other than Apple's App Store and its "IAP" system. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 22-23, 27, 67-95, 100-04; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 28:24-29:9; Ex. 15 (Dec. 5, 2022 McFadden Dep.) at 187:3-17; Ex. 3 (Shoemaker Dep.) at |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 277:12-23; Ex. 2 (Fischer Dep.) at 292:5-12; Ex. 28 (Jin Dep.) at 137:16-138:3; Ex. 11 (Rubinfeld Dep.) at 64:12-23; Ex. 63 (APL-APPSTORE_00318230) at -260, -263. |
| Issue 1 (Market Definition) | **Fact 5:** Apple allows users of apps that operate across multiple platforms to access content, subscriptions, or features they have acquired in the app on other platforms or the developer's website, including consumable items in multi-platform games, provided the content, subscriptions, and features are also available as in-app purchases within the app (unless the app qualifies as a "reader" app, in which case users can access previously purchased content or subscriptions that are not available to purchase within the app).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) at § 3.1.3 (a)–(b) at 26 ("'Reader' Apps" and "Multiplatform Services"); Ex. 19 (Hitt Rep.) ¶¶ 122–133, 136, 140, 141; *see, e.g.,* Ex. 53 (Roblox Corp., *Roblox*, Apple App Store) (explaining that Roblox on iOS "features full cross-platform support, meaning you can join your friends and millions of other people on their computers, mobile devices, Xbox One, or VR headsets.") *and* Ex. 72 (Nia, *Is Roblox Cross-Platform Enabled? Everything to Know*, PlaySwap, Dec. 24, 2024) (similar). | Disputed as incomplete.  Under the App Store Review Guidelines, Apple prohibited app developers from directing or informing iOS users of availability of apps and in-app purchases on other platforms.  *See* Ex. 63 (APL-APPSTORE_00318230) at -260, -263; Ex. 41 (Stiglitz Rep.) ¶ 87-95; *see also* Ex. 4 (Haun Dep.) at 87:17-89:4; Ex. 3 (Shoemaker Dep.) at 117:20-22; Ex. 5 (Kosmynka Dep. & Errata) at 52:17-24.<br><br>For example, throughout the Class Period, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.,* Ex. 41 (Stiglitz Rep.) ¶ 89-95; Ex. 5 (Kosmynka Dep.) at 98:6-100:9; Ex. 4 (Haun Dep.) at 172:16-173:19; Ex. 1 (Okamoto Dep.) at 371:1-373:14. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 6:** At the App Store's launch, Steve Jobs stated that Apple was "trying to do two diametrically opposed things at once—provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc."<br><br>Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Richman Decl. Ex. 61 (Dkt. 1003-62).  Further, Jobs gives the example of Nokia, which "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 2. ▮▮▮▮▮▮▮▮▮. *See* Ex. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 79 (APL-APPSTORE_10888329) at -349. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 7:** From the App Store's inception, Apple adopted a closed and secure platform model for distributing native iOS apps, which enables developers to build those apps using Apple's proprietary software and tools such that developers could offer iOS apps (paid or free) through the App Store alone.<br><br>Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 73:10–74:8; Ex. 43 (APL-APPSTORE_00000055) at 081; *see* Ex. 4 (Feb. 11, 2021 Schiller Dep.) 69:1–9, 217:18–25, 292:2–17, 306:8–307:13; Ex. 20 (Halderman Rep.) ¶ 84; Ex. 80 (Schiller Decl.) ¶¶ 3, 4, 10–14, 24, 25. | Disputed. Apple's App Review process suffers from several known weaknesses and has been unable to prevent apps that may compromise device security or user data from being distributed on the App Store.<br><br>*See* Ex. 43 (Kohno Rep.) ¶¶ 148-70; Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 136-78; Ex. 65 (APL-EG_04107164) at -164 ("█████ ████████████████████████████ ████████████████████████████████ █████████████████████████"). |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal) | **Fact 8:** Developers can join the Apple Developer Program to obtain a license to use and gain access to Apple's proprietary software development tools and technology in order to develop iOS apps for distribution through the App Store. These tools include over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits ("SDKs").<br><br>Ex. 50 (Apple Developer Program License Agreement, June 9, 2025 ("DPLA")) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."); Ex. 5 (Feb. 12, 2021 Cook Dep.) 251:5–10; Ex. 68 (Jessica Burley, *The Apple Ecosystem in the US*, May 2025) at 11 ("Apple has released over 250,000 APIs[.]"); Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14. | Disputed. Incomplete and misleading. The DPLA says "█████████████ ████████████████████████████ ██████████████. Richman Decl. Ex. 50 (Dkt. 1003-51) at 1. But all this means is that Apple charges and collects from developers a $99 annual fee and imposes a set of terms and conditions on developers for access to its APIs and SDKs. *See* Fact 9. |
| Issue 1 (Market Definition) | **Fact 9:** Since its launch in 2008, developers who want to distribute apps on the App Store to iPhone users must (i) sign the Developer Program License | Undisputed. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (Refusal to Deal)<br><br>Issue 5 (Untimely Claims) | Agreement, which sets out Apple's terms and conditions, (ii) abide by the App Review Guidelines, and (iii) pay a $99 annual fee.<br><br>Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14; Ex. 82 (*Epic* Trial Tr.) 2742:6–2743:10 (Schiller); *see* Ex. 50 (DPLA) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."). | |
| Issue 1 (Market Definition) | **Fact 10:** Apple applies a headline commission rate of 30% to digital good purchases made in the App Store. Apple has never increased this headline commission rate. On the contrary, Apple has lowered the commission in multiple instances, including: (1) in 2016, Apple reduced its commission rate to 15% for all subscription renewals after the first year; (2) in 2021, Apple introduced the Small Business Program which offers a reduced rate of 15% to small business developers, who comprise more than 90% of all developers on the App Store; (3) in 2016 and 2021, respectively, Apple also introduced the Video Partner Program and News Partner Program, which reduced the commission rate to 15% for participating developers.<br><br>Ex. 82 (*Epic* Trial Tr.) 2740:3–15, 2804:18–2805:11 (Schiller); Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 86:10–87:2; Ex. 5 (Feb. 12, 2021 Cook Dep.) 24:12–21; Ex. 64 (Apple Inc., *Small developers on the App Store grew revenue by 71 percent over the past two years*, Apple Newsroom, May 11, 2023); Ex. 84 (Apple Inc., *Apple introduces the News Partner Program*, Apple Newsroom, Aug. 26, 2021); Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer); Ex. | Disputed. Misleading and incomplete. Apple did not introduce the Small Business Program in response to competition; rather, Apple CEO Tim Cook characterized the initially temporary program as motivated by a concern for small businesses, especially in the context of the COVID-19 pandemic. *See* Ex. 41 (Stiglitz Rep.) ¶ 44 & n.63; *see also* Ex. 94 (May 21, 2021 Trial Testimony of Tim Cook, *Epic Games, Inc. v. Apple, Inc.*, No. C-20-5640 YGR) at 3992:4-17. Apple only continued the Small Business Program because it was ██████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████" Ex. 84 (APL-APPSTORE_10871989) at -995. Moreover, Apple viewed its Video Partner Program, News Partner Program, and subscription programs as a ███████ ████████████████████████████ ████" *Id.*<br><br>The Video Partner Program is a self-promotional tool that only provides eligibility to developers that agree to integrate with Apple TV and other Apple features, *see* Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 37-38, and "██████████ ████████████████████████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | 80 (Schiller Decl.) ¶ 7. | ██████." Ex. 54 (APL-APPSTORE_ 09980457) at -457; *see* Ex. 41 (Stiglitz Rep.) ¶ 44.  The News Partner Program likewise is a self-promotional tool that requires that news apps provide their content to Apple News while allowing "██████████████████████████ ██████████████████████" Ex. 86 (APL-APPSTORE_11289619) at -619; *see* Ex. 41 (Stiglitz Rep.) ¶ 44. |
| Issue 1 (Market Definition) | **Fact 11:** As of 2023, 95% of the apps on the U.S. Storefront were free to download and incurred no commission on the download, and 82.4% were both free to download and did not offer in-app purchases of digital goods and services.  Ex. 19 (Hitt Rep.) ¶¶ 46 (c), 47 (Exhibit 1), 259 n.420. | Undisputed. |
| Issue 2 (Refusal to Deal) | **Fact 12:** Apple reviews each app and app update that is submitted to the App Store in a process known as App Review, which uses a combination of automated tools and human reviewers to evaluate apps against the App Review Guidelines, and rejects those apps and app updates that fail review.  Ex. 81 (Kosmynka Decl.) ¶ 2; Ex. 80 (Schiller Decl.) ¶¶ 19, 26; Ex. 2 (Feb. 2–3, 2021 Kosmynka Dep.) 112:1–12, 238:14–239:2, 243:9–20; *see* Ex. 49 (App Review Guidelines, June 9, 2025) at 1 ("[E]very app is reviewed by experts . . . We also scan each app for malware and other software that may impact user safety, security, and privacy."). | Disputed.  Apple purports to do this.  All apps and app updates go through App Review, but both the human and automated processes have significant flaws, and apps that should fail get through.  *See* Ex. 43 (Kohno Rep.) ¶ 115 ("████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████.."); *id.* ¶ 189 ("████████████████████████████ ████████████████████████████ ██████████████"); Ex. 47 (Kohono Rebuttal Rep.) ¶¶ 136-78; Ex. 67 (APL-APPSTORE_02921977) at -977 ("████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████"); Ex. 58 (APL-APPSTORE_09166610) at -610 ("████████████████████████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | ").|
| Issue 2 (Refusal to Deal) Issue 5 (Untimely Claims) | **Fact 13:** Apple has applied some kind of app-review criteria since the App Store's launch, and in 2010, it formalized this process in the App Review Guidelines. Apple has never permitted third-party app marketplaces on iOS for app distribution in the United States. Ex. 43 (APL-APPSTORE_00000055) at 080; *see* Ex. 2 (Feb. 2, 2021 Kosmynka Dep.) 197:6–14; *see* Ex. 106 (APL-APPSTORE_03238239) (App Store Review Guidelines, 2010) at 248; Ex. 49 (App Review Guidelines, June 9, 2025) §§ 2.5.2, 4.7 at 16–17, 37. | Disputed. The App Review Guidelines did not formalize the App Review process. The App Review Guidelines are guidance for the developer that neither fully explain the review process, nor are applied mechanically or consistently. *See* Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 111-32 (outlining the inconsistencies in how Apple treats different categories of apps during App Review). |
| Issue 2 (Refusal to Deal) Issue 5 (Untimely Claims) | **Fact 14:** In 2010, Apple launched iPad, a tablet. iPad ran on iOS until 2019, when Apple launched iPadOS. iPad has an App Store where users can purchase and download apps. As with iPhone, Apple requires native iPad apps to be submitted through App Review and distributed through the App Store. Ex. 63 (Apple Inc., *Apple Launches iPad*, Apple Newsroom, Jan. 27, 2010); Ex. 88 (Apple Inc., *The new iPadOS powers unique experiences designed for iPad*, Apple Newsroom, June 3, 2019). | Undisputed. |
| Issue 1 (Market Definition) | **Fact 15:** Developers set prices for their app downloads and in-app digital content and they can currently choose among over 800 price tiers. Ex. 50 (DPLA), Schedule 2, §3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool[.]"); Ex. 58 (Apple Inc., *App Store Connect Help: Manage app pricing - Set a price,* | Disputed. Incomplete and misleading. Apple's price tiers constrain developers in their pricing choices, for example, by limiting options for bundling and contingent pricing. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 121-37; Ex. 72 (APL-APPSTORE_10342115) at -159. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple Developer) ("You'll need to set pricing for your app before you submit it for review. Choose from up to 800 price points by default, and request to access an additional 100 higher price points (up to $10,000)."); *see* Ex. 54 (Apple Inc., *App Store Connect Help: Reference - Pricing and Availability*, Apple Developer) ("The price you choose for the in-app purchases . . . determines both the customer price and your proceeds."); *see also* Ex. 43 (APL-APPSTORE_00000055) at 075 ("we talk about the 70/30 revenue split but the developer gets to pick the price . . .") | |
| Issue 1 (Market Definition) | **Fact 16:** The App Store provides developers with guidance on how to create app descriptions, how to choose app names, and how to select the best app genre.<br><br>*See* Ex. 59 (Apple Inc., *App Store: Creating your product page,* Apple Developer); *see also* Ex. 22 (Sundararajan Rep.) ¶ 155. | Undisputed. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 17:** Apple has never permitted sideloading on iOS for app distribution in the United States.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 133 ("Unlike other mobile platforms, iOS, iPadOS, and visionOS don't allow users to install potentially malicious unsigned apps from websites or to run untrusted apps. Instead . . . all apps must be downloaded from the App Store."); Ex. 82 (*Epic* Trial Tr.) 2738:12–14 (Schiller); Ex. 43 (APL-APPSTORE_00000055) at 075. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 18:** "Sideloading" refers to the ability to install apps to devices via third-party app marketplaces or direct downloads. For iOS, this refers to the installation of native apps from outside the App Store. | Disputed. There is no widely accepted definition of "sideloading." Professor Stiglitz defines it as "█████ ████████████████████████ ████████████████████████ █████████" Ex. 41 (Stiglitz Rep.) ¶ 74. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Ex. 3 (Feb. 10, 2021 Federighi Dep.) 303:12–17; *see* Ex. 20 (Halderman Rep.) ¶ 112. | |
| Issue 3 (iOS Design) | **Fact 19:** "Jailbreaking" refers to a process of effectively removing the security protections of a device to modify the device's behavior.  For iOS, this is a process that deliberately bypasses various security features of iOS.<br><br>Ex. 3 (Feb. 10, 2021 Federighi Dep.) 288:6–13; Ex. 20 (Halderman Rep.) ¶¶ 15(j), 105. | Disputed.  Apple's definition is overbroad.  "Jailbreaking" refers to the process by which iOS devices users can access and unlock the iOS operating system to "███████████████ ███████████████████████ ███████████████" Ex. 64 (APL-EG_ 02273420) at -465; Ex. 41 (Stiglitz Rep.) ¶ 72. |
| Issue 3 (iOS Design) | **Fact 20:** Apple's technical safeguards include system-level software protections that prevent "sideloading" (outside of limited app-testing contexts) and guard against threats arising from removing security measures from devices, including through "jailbreaking."  These protections serve as "another line of defense against harmful software."  Technical restrictions of this sort were integrated into iOS beginning with the release of iPhone in 2007.<br><br>Ex. 20 (Halderman Rep.) ¶ 92, *see id.* ¶¶ 93, 96, 105, 112; Ex. 3 (Feb. 10, 2021 Federighi Dep.) 224:19–225:15, 227:21–228:21, 289:9–21; Ex. 43 (APL-APPSTORE_00000055) at 080; Ex. 6 (March 8, 2021 Forstall Dep.) 71:9–72:15. | Disputed.  Vague and misleading.  Apple's iOS software, which was implemented on the iPhone in 2007, prevents use of apps not downloaded through the App Store by requiring a "digital signature" or "certificate" that can only be obtained through the App Store.  *See* Ex. 41 (Stiglitz Rep.) ¶ 74 ("███████████████████████ █████████████████████ ███████"); Ex. 6 (Federighi Dep.) at 224:19-225:15, 227:21-228:21, 288:6-13, 289:10-21.  Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers can distribute their apps through alternative distribution methods.  *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77. |
| Issue 3 (iOS Design) | **Fact 21:** Providing on-device protections, including sandboxing, code signing, and entitlements are "an essential part of iOS's approach to security."<br><br>Ex. 20 (Halderman Rep.) ¶¶ 14; *see id.* ¶¶ 15(i), 93, 97, 106–108, 110, 143–49; *see also* Ex. 3 (Feb. 10, 12, 2021 Federighi Dep.) 78:15–20, 201:13–204:10, 356:19–22, 360:19–24, 363:12–18; 364:12–20. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 22:** Mandatory code signing is a process where devices verify that any third-party code has been electronically signed by a specific entity.  On iOS, | Disputed as misleading.  Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple requires that a developer who is a member of the Apple Developer Program sign their code for their app before submitting it for distribution via the App Store. iOS will not run unsigned apps.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 131 ("To help ensure that all apps come from a known and approved source and haven't been tampered with, these operating systems require that all executable code be signed using an Apple-issued certificate."); *see* Ex. 20 (Halderman Rep.) ¶ 93. | can distribute their apps through alternative distribution methods. *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77; *id.* ¶ 276 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "). |
| Issue 3 (iOS Design) | **Fact 23:** Apple built entitlements—controls on which operating system resources may be accessed by certain apps or other software—into iOS. Entitlements are designed to prevent unauthorized access to device features and data, including access by malicious code.<br><br>*See* Ex. 57 (Apple Inc., *Documentation: Bundle Resources - Entitlements*) ("An *entitlement* is a right or privilege that grants particular capabilities to an executable."); Ex. 20 (Halderman Rep.) ¶ 97; *see also* Ex. 90 (*Epic* Trial Tr.) 1102:9–17 (Kosmynka) ("[A]n entitlement gives an app a particular permission to a set of resources of APIs on the . . . user's device."); Ex. 91 (*Epic* Trial Tr.) 3386:20–3387:4 (Federighi). | Undisputed. |
| Issue 3 (iOS Design) | **Fact 24:** Jailbroken phones are more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data as the process relies on vulnerabilities that have not been resolved. Entitlements are critical to mitigate vulnerabilities. | Disputed. Misleading and vague. Phones that are jailbroken in the sense defined by Prof. Stiglitz – *see* Fact 19 – in theory have more vulnerabilities because jailbreaking bypasses iOS's sandboxing requirement. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | *See* Ex. 20 (Halderman Rep.) ¶¶ 106, 107, 110; Ex. 3 (Feb. 10 2021 Federighi Dep.) 291:4–8. | ▉▉▉. *See* Ex. 5 (Kosmynka Dep.) at 30:18-31:5; Ex. 10 (Forstall Dep.) at 290:22-25; Ex. 8 (Schiller Dep.) at 168:21-169:7. ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉. *See* Ex. 10 (Forstall Dep.) at 268:14-269:6; Ex. 90 (APL-EG_00875856) at -858.  None of Apple's cited evidence explains how entitlements, specifically, are critical to preventing jailbreaking or mitigating the dangers, if any, posed by apps downloaded via an app store accessed on a jailbroken phone. ▉▉▉▉▉▉ ▉▉▉▉▉. *See* Ex. 6 (Federighi Dep.) at 291:1-293:6. |
| Issue 3 (iOS Design) | **Fact 25:** Apple's warranty "does not apply" to claims for warranty services made with respect to "an Apple Product that has been modified to alter functionality or capability without the written permission of Apple[.]"  There is no evidence in the record that Apple's warranty policies are anticompetitive.<br><br>Ex. 97 (iPhone hardware warranty, current) at 2; *see* Ex. 45 (APL_APPSTORE_06928901) (pre-2011 iPhone hardware warranty) at 902; *see* Ex. 11 (May 14, 2025 McFadden Dep.) 98:20–24 ("Q. Do you have any understanding or opinion as to whether Apple voids the warranties of iOS device consumers who buy competing apps?  A. Actually, I don't know whether it actually does."); *see* Ex. 28 (Halderman Reb. Rep.) ¶¶ 237–38, 242–43; *see* Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. | Disputed.  Apple's warranty policies are anticompetitive because those policies (in conjunction with other end-user agreements), the contractual restrictions placed on developers, and the technical "walled garden" make the App Store "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" Ex. 41 (Stiglitz Rep.) ¶ 42; Ex. 1 (Okamoto Dep.) at 278:10-12 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉"); Richman Decl. Ex. 45 (Dkt. 1003-46) (warranty); Ex. 68 (APL-EG_07832391) at -392 ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉"); Ex. 76 (APL-EG_09483903) at -903 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉). |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 26:** Survey data has shown that consumers have ranked "malware protection" and "privacy" as the most important features in Apple's App Store. An Apple survey in 2023 found that 81% of iPhone buyers in the U.S. were satisfied with their devices. An Apple-conducted survey in 2020 found 93% of iPad owners in the U.S. were satisfied with their device. Another Apple-conducted survey concluded that consumers distinguish iOS from Google's Android system by Apple's security and privacy features.<br><br>*See* Ex. 23 (Simonson Rep.) ¶¶ 57–58 ("[P]rivacy, malware protection, and app description details were identified as 'must-have' by the greatest number of respondents[.]"), ¶¶ 92, 103; Ex. 107 (APL-APPSTORE_11425222) (iPhone Buyer FY 23-Q4 Full Report) at 304 (iPhone consumer satisfaction rate); Ex. 92 (APL-APPSTORE_11029055) (iPad Buyer FY20-Q2 Full Report) at 086 (iPad consumer satisfaction rate); Ex. 65 (APL-APPSTORE_11425412) (Q2 2021 Privacy & Security) at 430, 435, 460–61 (showing consumers value privacy and associate Apple with better security and privacy features compared with Android). | Disputed as incomplete and misleading. ████████████ *See* Ex. 39 (Simonson Rep.) ¶¶ 79-82. ████████████ *See* Ex. 49 (Hoyer Rebuttal Rep.) ¶¶ 35-38 (███ █████). Neither of Apple's ████████ And APL-APPSTORE 11425412 ████████. ████████ *See* Ex. 36 (Hoyer Rep.) ¶ 73. |
| Issue 1 (Market Definition)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 27:** Apple introduced In-App Purchase ("IAP") in 2009, which is a commerce functionality integrated within iOS. IAP is not bought or sold directly to or by consumers. IAP processes payments, deducts Apple's commission, and remits the remainder to the developer.<br><br>Ex. 48 (APL-APPSTORE_00000004) at 006–007 ("I'm happy to say that we are supporting all of these additional purchasing models in iPhone 3.0 and we are doing it with what we call 'in-app purchase.'); *see* Ex. 50 (DPLA) § 1.2 at 8 (IAP API definition), Attachment 2 | Disputed. IAP is "Apple's in-app payment processor." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023); Ex. 41 (Stiglitz Rep.) ¶ 43 (███ ████████ It was introduced in 2009. *See* Ex. 91 (APL-APPSTORE_ 00207407) at -407 ("██████ ████"). It is little, if anything, more than an interface with a consumer's underlying payment source, such as a credit or debit card. With IAP "████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | ("Additional Terms for Use of the In-App Purchase API") at 88–93; *see also* Ex. 80 (Schiller Decl.) ¶¶ 32–34, 38, 40. | ███████████████████████ " Ex. 41 (Stiglitz Rep.) ¶ 43. " ███████████████████████ " *Id.* But all iOS app developers may only use IAP as their payment processor. *See* Ex. 89 (APL-APPSTORE_10745991) at -6000 ("█████ ██████████████"); Ex. 41 (Stiglitz Rep.) ¶ 43. |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 28:** Since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital products. Apple has never allowed apps in the App Store that are selling digital goods or services to use third-party payment processors on iOS in the United States (other than as part of the Video Partner Program, which requires integration with a number of Apple technologies).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) § 3.1.1 at 20 ("If you want to unlock features or functionality within your app . . . you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, cryptocurrencies and cryptocurrency wallets, etc."); Ex. 81 (Kosmynka Decl.) ¶ 15; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 37:18–38:4, 121:21–122:2; Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer). | Undisputed. |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing) | **Fact 29:** Until October 2021, Apple's App Review Guidelines prohibited developers from using information obtained within the app to target individual users outside of the app to use purchasing methods other than in-app purchase. Apple applied these written policies uniformly to U.S. developers. | Disputed as misleading. Apple changed this guideline only because of the settlement in *Cameron et al v. Apple. See* Ex. 56 (Aug. 26, 2021 news article); Ex. 83 (APL-APPSTORE_11453959) at -962 ("████████████████████████ ████████████████████████ ██████████"). |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 5 (Untimely Claims) | *See* Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) § 3.1.3 at 350; Ex. 95 (App Review Guidelines, Oct. 22, 2021) § 3.1.3 at 12; Ex. 87 (Apple Inc., *News: App Store Review Guideline updates now available*, Apple Developer, Oct. 22, 2021); Ex. 4 (Feb. 11, 2021 Schiller Dep.) 156:2–8, 162:6–8. | |
| Issue 2 (Refusal to Deal) <br><br> Issue 4 (Scope of Pleading and Standing) <br><br> Issue 5 (Untimely Claims) | **Fact 30:** The App Review Guidelines previously barred developers from including links, buttons, or using other methods to direct users to external payment mechanisms. These provisions were modified in January 2024 and April 2025. <br><br> Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) §§ 3.1.1, 3.1.3 at 348, 350; Ex. 89 (App Review Guidelines, Jan. 16, 2024) § 3.1.1(a) at 11; Ex. 103 (App Review Guidelines, Apr. 30, 2025) § 3.1.1(a) at 22; Ex. 108 (Apple Inc., *News: Updated guidelines now available*, Apple Developer, May 1, 2025). | Disputed as incomplete. The *Epic* injunction required Apple to change its anti-steering policies. *See* Permanent Injunction, *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR (N.D. Cal. Sept. 10, 2021) Dkt. 813. Apple's efforts to "thwart[] the Injunction's goals" throughout the Class Period resulted in a contempt order. Order at 2, *Epic Games*, (N.D. Cal. Apr. 30, 2025) Dkt. 1508. |
| Issue 6 (Proof of Damages and Injury) | **Fact 31:** Plaintiffs' own damages model calculates that named plaintiff Hayter benefited monetarily from the challenged conduct. <br><br> Ex. 98 (Prince Reb. Rep.) ¶ 38. | Disputed. Mr. Hayter has damages under Plaintiffs' "Price Tier" model. Song Decl. ¶ 5. Apple's conduct also harmed Mr. Hayter and other Plaintiffs by reducing app output, diminishing quality, and stifling innovation within the iOS ecosystem. *See* Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 18 (May 14, 2025 McFadden Dep.) at 13:22-15:25, 74:2-12; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11; Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120. |
| Issue 6 (Proof of Damages | **Fact 32:** The McFadden-Song model is the sole proof that Plaintiffs suffered monetary injury and quantified damages.[3] | Disputed. Misleading as to injury. In addition to supracompetitive prices, all consumers are injured by having only one |

[3] Points relating to the flaws and assumptions of the McFadden-Song model, which pertain to issue number 6 regarding failure to prove injury and damages, are not included in this Statement because they are not questions of fact. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile

*(Cont'd on next page)*

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| and Injury) | Ex. 98 (Prince Reb. Rep.) ¶¶ 9–12. | iOS app distribution and in-app purchase option. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 100-04. Decreased output, quality, and innovation on the App Store are also anticompetitive harms. *See id.* at ¶¶ 109-120. |
| Issue 5 (Untimely Claims) | **Fact 33:** Plaintiffs' original Complaint (filed in Dec. 2011), Consolidated Complaint (filed in March 2021), Amended Complaint (filed in September 2012), and Second Amended Consolidated Complaint (filed in September 2013) did not mention in-app purchases.<br><br>Dkt. 1, 26, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |
| Issue 5 (Untimely Claims) | **Fact 34:** Plaintiffs' Third Amended Consolidated Complaint ("TAC") was filed on September 17, 2020, over 8 years from the filing of their original Complaint.<br><br>Dkt. 1, 229. | Undisputed. |
| Issue 5 (Untimely Claims) | **Fact 35:** Plaintiffs did not include in-app purchases as part of the alleged iOS market until they filed their TAC on September 17, 2020.<br><br>*Compare* Dkt. 229 *with* Dkt. 1, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |

the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

## OPPOSING PARTY'S ADDITIONAL MATERIAL FACTS

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Def) | **Additional Fact 36:** A market having two sides is not always a two-sided *transaction* platform. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 101:11-16, 121:10-14; Ex. 22 (June 4, 2025 Song Dep.) at 92:4-19; Ex. 37 (Jin Rep.) ¶ 59; Ex. 28 (Jin Dep.) at 87:21-88:9, 101:12-102:4, 103:3-15. | |
| Issue 1 (Market Def) | **Additional Fact 37:** Two-sided markets that do not facilitate simultaneous transactions or sell the same product to both sides can be analyzed as one-sided if their indirect network effects are weak, because such analyses still capture all anticompetitive effects. *See* Ex. 26 (June 25, 2025 Stiglitz Dep.) at 290:2-7; Ex. 41 (Stiglitz Rep.) ¶ 373-74; Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 57. | |
| Issue 1 (Market Def) | **Additional Fact 38:** Apple's experts do not quantify the strength of App Store indirect network effects. *See* Ex. 25 (June 25, 2025 Sundararajan Dep.) at 174:19-25; Ex. 28 (Jin Dep.) at 99:11-21; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54 n.100, 57-60, 65. | |
| Issue 1 (Market Def) | **Additional Fact 39:** There is no evidence the App Store exhibits significant indirect network effects. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-76; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 57-60; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 61-68; Ex. 22 (June 4, 2025 Song Dep.) at 93:6-22; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 182:14-25; Ex. 26 (June 25, 2025 Stiglitz Dep & Errata) at 288:18-289:6. | |
| Issue 1 (Market Def) | **Additional Fact 40:** Apple's experts do not point to any study showing the App Store is a two-sided *transaction* platform or facilitates *simultaneous* transactions. *See* Ex. 48 (Sundararajan Rebuttal Rep.) App. Ex. C.1; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 146:20-25; Ex. 37 (Jin Rep.) ¶ 60 n.110. | |
| Issue 1 (Market Def) | **Additional Fact 41:** The App Store does not connect parties on both sides to transact directly. Rather, it sells distribution services to app developers while retaining discretion to make their apps available to device users separately and at a different time. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:21-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 121:10-14. | |
| Issue 1 (Market Def) | **Additional Fact 42:** Like a customer at a traditional retailer, iOS users purchase apps directly from Apple through its App Store and IAP system. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 9 (Feb. 12, 2021 Cook Dep.) at 227:10-25; Ex. 22 (June 4, 2025 Song Dep.) at 114:21-115:3; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 110:18-21; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 29:18-22. Apple prevents iOS users from buying apps directly from developers and significantly constrains their other options for | |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | buying in-app digital content. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 87-95; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 59 (APL-APPSTORE_11045202) at -204; Ex. 61 (APL-APPSTORE_06713744) at -744; Ex. 77 (APL-APPSTORE_10890472) at -478. | |
| Issue 1 (Market Def) | **Additional Fact 43:** Plaintiffs' market definition accounts for how Apple's conduct affects both consumers *and* developers. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-378; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54-65; Ex 21 (May 30, 2025 Stiglitz Dep.) at 183:6-7; Ex. 26 (June 25, 2025 Stiglitz Dep.) at 286:8-14, 290:17-291:16; Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:13-18. | |
| Issue 1 (Market Def) | **Additional Fact 44:** Plaintiffs' damages model accounts for both sides of the App Store. *See* Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2 ("███████████"); Ex. 18 (May 14, 2025 McFadden Dep.) at 55:3-11; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 233:7-10; Ex. 40 (Song Rep.) ¶ 8; Ex. 22 (June 4, 2021 Song Dep.) at 56:22-57:6; Ex. 41 (Stiglitz Rep.) ¶ 378. | |
| Issue 1 (Market Def) | **Additional Fact 45:** Plaintiffs' but-for commission rate accounts for both iOS users and developers, and the method works whether or not the App Store is a two-sided platform. *See* Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 104:7-12, 112:2-5; Ex. 20 (May 23, 2025 Abrantes-Metz Dep. & Errata ) at 26:3-13. | |
| Issue 1 (Market Def) | **Additional Fact 46:** Apple has monopolized both sides of the App Store. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 28, 377. | |
| Issue 2 (refusal to deal)[4] | **Additional Fact 47:** The DPLA "conditions" developer access to iOS developer tools on agreement to only distribute apps through the App Store. *See* Ex. 70 (APL-APPSTORE_10429513) at -513, -547, -549; Ex. 41 (Stiglitz Rep.) ¶¶ 43, 68-71, 75. | |
| Issue 2 (refusal to deal) | **Additional Fact 48:** The DPLA "conditions" developer access to the App Store on their agreement to use Apple's IAP for all App Store in-app purchases. *See* Ex. 100 (APL-APPSTORE_10859338) at -348 (§3.1.1); Ex. 41 (Stiglitz Rep.) ¶¶ 43, 80-86. | |
| Issue 2 (refusal to deal) | **Additional Fact 49:** Apple has rejected requests from app developers to offer alternative payment solutions to customers. *See* Ex. 88 (APL-APPSTORE_10991276) at -276 (Spotify); Ex. 81 (APL-APPSTORE_10871795) (Amazon) ("███████████"); Ex. 41 (Stiglitz Rep.) ¶ 81 (Epic). | |

---

[4] All Issue 2 citations are relevant to Issue 3 given Apple's argument that its design-choice argument "falls within the ambit of the refusal-to-deal doctrine." Mot. for Summary Judgment at 13.

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (refusal to deal) | **Additional Fact 50**: Developers may not mention the 30% commission paid to Apple. *See* Ex. 3 (Shoemaker Dep.) at 144:10-23 ("███████████████████████████████ ███████████████████"). | |
| Issue 2 (refusal to deal) | **Additional Fact 51**: Developers may not create apps "similar to the App Store." *See* Ex. 100 (APL-APPSTORE_10859338) at -353; Ex. 66 (APL-APPSTORE _06587460) at -460-61 (████ ███████████████████); Ex. 41 (Stiglitz Rep.) ¶¶ 69-70. | |
| Issue 2 (refusal to deal) | **Additional Fact 52**: Under Schedule 2 of the DPLA, Developers must agree to set their prices in designated price tiers and pay Apple its 30% commission (or other applicable rate). *See* Ex. 80 (APL-APPSTORE_11288950) at -952 (§ 3.1 - tiers) & -953 (§ 3.4 -commission). Developers must also cede control of their apps to Apple, which exercises sole discretion to provide certain services, including "hosting services." *See id.* at -950 (§§ 1.1-1.2) | |
| Issue 2 (refusal to deal) | **Additional Fact 53**: Apple's warranty policy "██████ ██████████████████████████████████████ ██████████████████████." *See* Ex. 73 (APL-APPSTORE_06928875) at -876 (warranty); Ex. 1 (Okamoto Dep.) at 278:7-12. | |
| Issue 2 (refusal to deal) | **Additional Fact 54**: Apple's end-user agreements prohibit circumventing Apple's technological "walled garden." *See* Ex. 62 (Software License Agreement for iOS) at 13 (prohibiting "jailbreaking"); Ex. 55 (Apple Media Services Terms and Conditions) at 3-4 ("You may not tamper with or circumvent any security technology included with the Services or Content"); Ex. 41 (Stiglitz Rep.) ¶ 42 and nn.50-51. | |
| Issue 2 (refusal to deal) | **Additional Fact 55**: Apple's technical design reinforces its contractual restrictions in making the App Store the only source for apps and in-app purchases. *See* Ex. 41 (Stiglitz Rep.) ¶ 74 (DPLA and Apple's certificate/code-signing technology work together to make sideloading of iOS apps impossible); *id.* at ¶ 73 (Apple has used its tech to make jailbreaking virtually impossible); Ex. 6 (Federighi Dep.) at 294:17-22. | |
| Issue 2 (refusal to deal) | **Additional Fact 56**: Apple has market power in the markets for smartphones and tablets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-305. | |
| Issue 2 (refusal to deal) | **Additional Fact 57**: ████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ *See* Ex. 41 (Stiglitz Rep.) ¶¶ 273, 274 (Figs. 7,8), 280, 301 (Fig. 9), 302. | |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 *(refusal to deal)* | **Additional Fact 58**: There are significant barriers to entry into both the smartphone and tablets markets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 277-81, 303-05. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 59**: There are high rates of co-ownership of iPhones and iPads and purchase of one device often leads to purchase of the other. *See* Ex. 98 (APL-EG_06218185) at -185; Ex. 99 (APL-APPSTORE_11109932) at -976; Ex. 57 (APL-EG_09278862) at -905; Ex. 41 (Stiglitz Rep.) ¶¶ 35, 170, 182; Ex. 97 (APL-APPSTORE_10339734) at -953. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 60**: ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ . *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-50; Ex. 34 (Barnes Rep.) ¶¶ 55-63 & Exs. 5-12; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 89:18-90:2. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 61**: The App Store has "extraordinarily high operating margins." *Epic Games v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023); *see also* Ex. 34 (Barnes Rep.) ¶¶ 5-6, 23-54. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 62**: Apple's commission rate is supra-competitive. *See* Ex. 33 (Abrantes-Metz Rep.) ¶ 21 (modeling competitive rate at 13.6%); Ex. 41 (Stiglitz Rep.) ¶¶ 145-47. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 63**: "▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ " Ex. 41 (Stiglitz Rep.) ¶¶ 363-71. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 64**: There is considerable consumer demand for alternative app stores and alternative in-app purchase solutions. *See* Ex. 49 (Hoyer Rebuttal Rep.) ¶ 36. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 65**: Consumers have no way of knowing how much of their App Store spending is due to Apple's commission. *See* Ex. 36 (Hoyer Rep.) ¶ 84, fig. 15 (▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋); *id.* at ¶¶ 80-84 (majority of iOS mobile device users do not have any knowledge of Apple's requirements on app developers); Ex. 35 (Chen Rep.) ¶¶ 51-67. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 66**: Consumers often purchase iPhones and iPads without considering their app purchasing options or their app store spending over time. *See* Ex. 36 (Hoyer Rep.) ¶¶ 70-73, 78, 87; Ex. 35 (Chen Rep.) ¶¶ 32-35. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 67**: Significant switching costs include losing device familiarity, Ex. 35 (Chen Rep.) ¶¶ 166-69; 214-29, and interoperability, *id.* at ¶¶ 181-200, the expense of transferring or losing device content, *id.* at ¶¶ 201-213, and the cost of a new device. Ex. 41 (Stiglitz Rep.) ¶¶ 170, 172, 174-77. | |
| Issue 2 *(refusal to deal)* | **Additional Fact 68**: Data shows switching away from iOS is limited. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 197-200 ("▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋"); Ex. 39 (Simonson Rep.) ¶ 166 (▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋). | |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 3 (iOS design) | **Additional Fact 69**: ███████████████████████ ███████. *See* Ex. 43 (Kohno Rep.) ¶¶ 70-94, 242-49. | |
| Issue 3 (iOS design) | **Additional Fact 70**: ████████████████████████ █████████. *See* Ex. 43 (Kohno Rep.) ¶¶ 242-45, 264-90. | |
| Issue 3 (iOS design) | **Additional Fact 71**: █████████████████████ ████████████████████████████ █████████████████. *See* Ex. 43 (Kohno Rep.) ¶ 264-80; Ex. 79 (APL-APPSTORE_10888329) at -348. | |
| Issue 3 (iOS design) | **Additional Fact 72**: ████████████████████ ████████████████████████████ ██████████████. *See* Ex. 43 (Kohno Rep.) ¶ 280; Ex. 85 (APL-APPSTORE_11433454) at -457. | |
| Issue 3 (iOS design) | **Additional Fact 73**: ████████████████████. *See* Ex. 85 (APL-APPSTORE_11433454) at -457 (" ████████████████████"); Ex. 43 (Kohno Rep.) ¶ 265. | |
| Issue 3 (iOS design) | **Additional Fact 74**: █████████████████████ ████████████████████████████ ██████████. *See* Ex. 43 (Kohno Rep.) ¶ 277. | |
| Issue 6 (Damages /Injury) | **Additional Fact 75**: Apple's conduct has reduced app output, quality, and innovation for iOS developers, while insulating Apple from competitive pressure to enhance its services or develop new apps. Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11. ████████████████ ████████. Ex. 78 (APL-APPSTORE_10908929) at -935; Ex. 74 (APL-APPSTORE_10767225) at -227; Ex. 75 (APL-APPSTORE_10929194) at -245. | |
| Issue 6 (Damages /Injury) | **Additional Fact 76**: McFadden's damages model does not depend on Thompson's work linking transactions to payors because the model measures monetary harm at the transaction level. *See* Ex. 40 (Song Rep.) ¶¶ 61, 65-67; Ex. 29 (July 3, 2025 Song Dep.) at 13:15-22; Ex. 38 (McFadden Rep.) ¶¶ 49, 56. | |
| Issue 6 (Damages /Injury) | **Additional Fact 77**: Dr. Abrantes-Metz's model assumes, as a conservative modeling choice, that there would be another app store; the results do not depend on Plaintiffs prevailing on each alleged theory of anticompetitive conduct. Ex. 33 (Abrantes-Metz Rep.) ¶¶ 19, 23; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 57-59. | |

**ATTESTATION**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED: September 2, 2025

By: _____
       DAVID C. FREDERICK

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
JAMES M. WEBSTER, III (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY GUTMAN (*pro hac vice*)

**KELLOGG, HANSEN, TODD, FIGEL &**
   **FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**
RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER**

**FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

*Class Counsel for Plaintiffs*