BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS** |
| | DATE: October 14, 2025<br>TIME: 2:00 p.m.<br>COURTROOM: 1, 4th Floor |
| | The Honorable Yvonne Gonzalez Rogers |

[REDACTED VERSION]

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ........................................................................................ vii

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND ................................................................................................. 3

III.  LEGAL STANDARD .......................................................................................... 5

IV.   ARGUMENT ....................................................................................................... 6

    A.  Common Issues Still Predominate Over Individualized Issues ...................... 6

        1.  The Percentage of Economically Uninjured Class Members Has *Not* Increased ...... 8

        2.  Plaintiffs Have Matched Transactions to People and Identified the Economically Uninjured Class Members and Accounts ........................... 9

        3.  The Presence of Uninjured Class Members Does Not Mean the Class Definition Is Overbroad ............................................................. 14

        4.  The Presence of Economically Uninjured Class Members Does Not Undermine the Antitrust Injury Requirement ......................................... 17

    B.  A Class Action is Still Superior, and the Class Representatives Still Adequate .......... 19

        1.  Superiority ................................................................................................. 19

        2.  Adequacy ................................................................................................... 21

    C.  Plaintiffs' Damages Model Is Still Reliable and Its Assumptions Sound ..................... 22

V.    CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**<u>CASES</u>**                                                                                                                   **<u>Page(s)</u>**

*Abante Rooter & Plumbing*,
2017 WL 4073792 (N.D. Cal. Sept. 14, 2017) ...........................................................................21

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019)...................................................................................................................10

*In re Apple iPod iTunes Antitrust Litig.*,
2014 WL 6783763 (N.D. Cal. Nov. 25, 2014) .......................................................................5, 20

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ..................................................................................................16

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018)..................................................................................................15, 16

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...................................................................................................................18

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ...................................................................................................18

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ...................................................................................................13

*Chartis Specialty Ins. Co. v. Queen Anne HS, LLC*,
867 F. Supp. 2d 1111 (W.D. Wash. 2012)................................................................................11

*China Agritech v. Michael H. Resh*,
584 U.S. 732 (2018)...................................................................................................................20

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................................................................22, 23

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
270 F.R.D. 521 (N.D. Cal. 2010)...............................................................................................22

*Dairy, LLC v. Milk Moovement, Inc.*,
2023 WL 3437426 (E.D. Cal. May 12, 2023) ...........................................................................17

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024),
and *cert. denied*, 144 S. Ct. 682 (2024) ....................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Epic Games, Inc. v. Apple, Inc.*,
No. 4:20–cv–05640-YGR, Order Granting Epic Games, Inc.'s Motion to
Enforce Injunction (N.D. Cal. Apr. 30, 2025) ...................................................................21

*Estrella v. Freedom Fin. Network, LLC*,
2012 WL 214856 (N.D. Cal. Jan. 24, 2012) ........................................................................6

*Garon v. eBay, Inc.*,
2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) ...................................................................11

*Glen Holly Ent't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ....................................................................................14, 17

*Huckaby v. CRST Expedited, Inc.*,
2025 WL 987195 (C.D. Cal. Apr. 1, 2025) ...................................................................6, 20

*I.B. by & through Bohannon v. Facebook, Inc.*,
82 F. Supp. 3d 1115 (N.D. Cal. 2015) ...............................................................................11

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .....................................................................................................10, 11

*Jensen v. Natrol, LLC*,
2020 WL 416420 (N.D. Cal. Jan. 27, 2020) .....................................................................21

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) ...................................................................12

*Klein v. Facebook, Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) ...............................................................................17

*Knutson v. Schwan's Home Serv., Inc.*,
2013 WL 3746118 (S.D. Cal. July 15, 2013) ....................................................................12

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ..............................................................................................15

*In re Korean Ramen Antitrust Litig.*,
2018 WL 1456618 (N.D. Cal. Mar. 23, 2018) ....................................................................6

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .....................................................................19

*In re Lithium Ion Batteries Antitrust Litig.*,
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) .....................................................................24

*Macarz v. Transworld Sys., Inc.*,
 193 F.R.D. 46 (D. Conn. 2000)................................................................................................12

*Mays v. Tennessee Valley Auth.*,
 274 F.R.D. 614 (E.D. Tenn. 2011)...........................................................................................22

*Mr. Dee's Inc. v. Inmar, Inc.*,
 127 F.4th 925 (4th Cir. 2025) ..................................................................................................20

*In re MultiPlan Health Ins. Provider Litig.*,
 2025 WL 1567835 (N.D. Ill. June 3, 2025).............................................................................10

*In re Niaspan Antitrust Litig.*,
 67 F.4th 118 (3d Cir. 2023) .....................................................................................................13

*Noohi v. Johnson & Johnson Consumer Inc.*,
 146 F.4th 854 (9th Cir. 2025) ..................................................................................................23

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
 31 F.4th 651 (9th Cir. 2022) ............................................................................................ *passim*

*In re Optical Disk Drive Antitrust Litig.*,
 2017 WL 6448192 (N.D. Cal. Dec. 18, 2017)........................................................................5, 6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 934 F.3d 619 (D.C. Cir. 2019) ....................................................................................15, 16, 24

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
 49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................................................23

*Ruiz Torres v. Mercer Canyons, Inc.*,
 835 F.3d 1125 (9th Cir. 2016) ..................................................................................14, 15, 21, 24

*Sherman v. Yahoo! Inc.*,
 2015 WL 5604400 (S.D. Cal. Sept. 23, 2015).........................................................................13

*In re Stec Inc. Sec. Litig.*,
 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012)............................................................................22

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
 308 F.R.D. 630 (N.D. Cal. 2015)..............................................................................................22

*Valentino v. Carter-Wallace, Inc.*,
 97 F.3d 1227 (9th Cir. 1996) .................................................................................................2, 19

*Victorino v. FCA US LLC*,
   2020 WL 2306609 (S.D. Cal. May 8, 2020) ................................................................13

*Ward v. Apple Inc.*,
   2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ..............................................................24

*Weiner v. Ocwen Fin. Corp.*,
   343 F.R.D. 628 (E.D. Cal. 2023) ................................................................................13

*Wetzel v. CertainTeed Corp.*,
   2019 WL 3976204 (W.D. Wash. Mar. 25, 2019) ......................................................22

*Williams v. Apple Inc.*,
   338 F.R.D. 629 (N.D. Cal. 2021) ...............................................................................18

*Woe by Woe v. Cuomo*,
   729 F.2d 96 (2d Cir. 1984) .........................................................................................13

## **STATUTES & RULES**

Fed. R. Civ. P. 23 ......................................................................................2, 5, 6, 8, 9
Fed. R. Civ. P. 23(b)(3) ....................................................................................16, 19
Fed. R. Civ. P. 23(c)(1)(C) .........................................................................................5
Fed. R. Civ. P. 23(f) ...........................................................................................20, 22

## **OTHER AUTHORITIES**

3G Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 391e (May 2025 update) .....................................................................17

Black's Law Dictionary (12th ed. 2024) ...................................................................11

1

**TABLE OF ABBREVIATIONS**

2

| Abbreviation | Meaning/Source |
|---|---|
| Apple | Apple Inc. |
| Byrd Decl. | Declaration of Rachele R. Byrd in Support of Plaintiffs' Oppositions to Defendant Apple Inc.'s Motion for Summary Judgment, *Daubert* Motion, and Motion to Decertify the Class |
| Class (Former) | All persons in the United States, exclusive of Apple and its employees, agents, and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application[s] and in-app purchases from any one Apple ID account. Dkt. No. 789 at 2. |
| Class (Current) | All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an ***iPhone or iPad ("iOS Device")*** at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account. *See* Dkt. No. 981 at 1 (emphasis added). |
| Class Order | Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification. Dkt. No. 789. |
| Class Period | July 10, 2008, to February 2, 2024 |
| *Daubert* Opp. | Plaintiffs' Opposition to Apple Inc.'s *Daubert* Motion |
| Defendant | Apple Inc. |
| Ex. __ | Byrd Decl. Exhibit __ |
| JND | JND Legal Administration |
| Motion or Mot. | Defendant Apple Inc.'s Motion to Decertify the Class. Dkt. No. 1006-1. |
| Rule 23(f) Petition | Petition for Permission to Appeal Under Rule 23(f), *Pepper, et al. v. Apple Inc.*, No. 24-00875 (9th Cir. Feb. 20, 2024). Dkt. No. 1.1. |
| Thompson Decl. | Declaration of Darryl Thompson in Support of Plaintiffs' Oppositions to Apple Inc.'s *Daubert* and Decertification Motions |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.    **INTRODUCTION**

This Court properly certified this class action on February 2, 2024. Dkt. No. 789. Apple now asks this Court to reverse its Class Order, but its motion to decertify identifies no material intervening developments that warrant decertification. Apple instead recycles arguments this Court and the Ninth Circuit already have rejected and relies on incorrect and distorted assertions of both fact and law. Plaintiffs will prove at trial through common evidence that Apple's monopoly over the sale of iOS apps and in-app content has harmed ███████ consumers since 2008 to the tune of over $20 billion. The vast majority of class members have quantifiable damages, and the damages owed to each class member can be determined through a common methodology. That is exactly what the Court recognized when it relied on *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) ("*Olean*"), to certify the Class. *See* Dkt. No. 789 at 25.

What was true then remains true. Plaintiffs' experts have (1) identified individual Apple customers using data Apple collects in the ordinary course, (2) estimated which of those people are members of the class, and (3) computed individual damages, both by person and Apple ID. Furthermore, Plaintiffs' experts have now shown, again using common proof, how ***all*** Class members—even ones that incurred no economic damages—suffered antitrust injury. Ex. 41 (Stiglitz Rep.), ¶¶ 21-22, 99-104, 109-20; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 18 (May 14, 2025 McFadden Dep.) at 13:22-15:25, 74:2-12. Simply put, no individual inquiries into antitrust injury or damages will predominate at trial. *See Olean*, 31 F.4th at 668.

During certification, after the Court approved the $10 spending threshold, the percentage of unharmed ***Apple IDs*** was 7.9%. Dkt. No. 789 at 25. The Court expressed concern about the number of "unharmed"[1] Apple ID accounts, but accepted Plaintiffs' representation that "once the model is fully run, that number will be reduced." *Id*. at 26. Despite Apple's misdirection, that is what happened. When calculating individual damages by customer ("payor") and when flexible

---

[1] For simplicity and convenience, Apple IDs and payors with no measurable monetary damages are sometimes referred to as "undamaged" or "unharmed." However, they were all exposed to Apple's unlawful monopoly misconduct and all suffered antitrust injury even if they sustained no damages. Ex. 41 (Stiglitz Rep.), § IV.

1    pricing is used, just 5.2% of Class members are undamaged; 5.9% are undamaged when Apple's

2    price tiers are preserved. When individual damages are calculated by Apple ID, the percentages

3    fall to just 5.1% and 5.8%, respectively. Those percentages are ***significantly lower*** than the

4    percentages of unharmed Apple ID accounts presented at class certification (*see* App. A) and prove

5    that the presently defined Class continues to satisfy Rule 23 and *Olean*.

6        Apple disputes that Plaintiffs' experts have reliably identified economically harmed and

7    unharmed Class members by attacking the cleaning and deduplication work done by Mr. Darryl

8    Thompson of JND. As described in Plaintiffs' opposition to Apple's *Daubert* motion to exclude

9    Mr. Thompson's opinions, he used the same reliable methods he has used for over 27 years to

10   clean and deduplicate Apple's customer (or "payor") data. That work converted ▉▉▉▉▉ payor

11   records to approximately ▉▉▉▉▉▉ unique individuals—an ***85%*** reduction. Apple then

12   matched those ▉▉▉▉▉ customer records to transactions, which another of Plaintiffs' experts,

13   Dr. Minjae Song, used to identify the economically harmed and unharmed Class members. The

14   insignificant anomalies that Apple nitpicks do not undermine Mr. Thompson's deduplication work.

15       Contrary to Apple's arguments, litigating this case as a class action instead of millions of

16   separate cases will "reduce litigation costs and promote greater efficiency," and is thus superior.

17   *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple argues that the $10

18   threshold is a "change," but the $10 threshold was introduced during class certification and is part

19   of the certified Class definition. Dkt. No. 789 at 2. That individuals falling below the $10 lifetime

20   spending threshold may theoretically sue Apple in their individual capacity for much less than $10

21   in damages, unlikely as it is, remains irrelevant to the superiority analysis. The only new

22   development Apple cites is the Court's recent dismissal with prejudice of claims relating to App

23   Store purchases made on iPod Touches. *See* Dkt. No. 981. That changes nothing. It presents no

24   adequacy problem. It is not a breach of Plaintiffs' or Class Counsel's fiduciary duty to modify the

25   class definition to make the case stronger and to benefit the Class as a whole. On the contrary,

26   Plaintiffs are permitted to press a theory of liability that affords them the best chance of success

27   on behalf of the Class. That is why the Court dismissed the iPod Touch claims from the case.

28       Finally, Plaintiffs' damages model is still reliable and its assumptions are still sound. The

1    Court should deny Apple's motion to decertify the class despite Apple's meritless *Daubert*

2    challenges to Mr. Thompson's and Prof. MacCormack's work.

3    **II.    BACKGROUND**

4         Plaintiffs filed their Renewed Motion for Class Certification on September 26, 2022. Dkt.

5    No. 666-1. In support, Plaintiffs' experts computed Apple's but-for commission rate and

6    performed econometric modeling to create a damages model that they ran against App Store

7    transactions from a portion of the Class Period in only three genres—Games, Music, and

8    Entertainment—to demonstrate their ability to prove class-wide impact and estimate damages for

9    all Apple ID accounts through common proof. *Id.* at 1-2. Prof. Daniel L. McFadden estimated that

10   approximately 17.8% of Apple ID accounts in the class were uninjured. Dkt. No. 679-1 (Second

11   Revised Supplemental Rep. of Daniel L. McFadden), ¶ 16 & fig. 1. At the time, Plaintiffs said that

12   the percentage of uninjured ***accounts*** likely overstated the percentage of unharmed ***class members***

13   because many App Store customers have multiple Apple ID accounts. Dkt. No. 666-1 (Plaintiffs'

14   Renewed Motion for Class Certification) at 14-15 & n.14.

15        To reduce the number and percentage of Apple ID accounts without measurable economic

16   damages, Plaintiffs proposed a $10 lifetime spending cutoff in any one Apple ID account. *Id.* at

17   15. This cutoff decreased the percentage of economically unharmed Apple ID accounts from

18   17.8% to 7.9% (or approximately 10 million accounts). Dkt. No. 679-1 (Second Rev. Suppl. Rep.

19   of Daniel L. McFadden), ¶ 16 & fig. 1. Prof. McFadden's econometric model satisfied *Olean*'s

20   standard for class certification because it could determine exactly which Apple ID accounts

21   suffered monetary damages and which did not. Dkt. No. 666-1 (Plaintiffs' Renewed Motion for

22   Class Certification) at 12. Plaintiffs assured the Court that they would run the model before trial

23   on the full set of App Store transactions, match Apple IDs to individual Class members, and

24   identify all Class members who suffered no economic loss. *Id.* at 13.[2]

25        On January 16, 2024, the Court requested supplemental information providing "greater

26   ───────────────

27   [2] Apple's assertion (at 4) that, as of June 23, 2023, Plaintiffs had not yet sought the payor data, is
     false. In fact, Plaintiffs sought the data more than a year earlier. On April 12, 2022, Plaintiffs

28   propounded a request for "[a]ll DOCUMENTS CONCERNING the identity of each and every
     member of the CLASS." Dkt. No. 815, Ex. A at 5 (Request No. 55).

1    detail of the calculations of unharmed accounts." Dkt. No. 784. Dr. Song submitted a declaration

2    explaining that with the $10 spending threshold applied, 7.9% of Apple ID accounts are unharmed,

3    and that the threshold could be adjusted up or down. Dkt. No. 786-1, ¶¶ 10-12.

4            On February 2, 2024, the Court granted Plaintiffs' Renewed Motion for Class Certification.

5    Dkt. No. 789 at 2. The Court found that Plaintiffs' claims met the *Olean* predominance requirement

6    and that Prof. McFadden's model was capable of showing both impact and damages from Apple's

7    anticompetitive conduct using common proof across all Class members. *Id*. at 26.

8            When it certified the Class, the Court accepted Plaintiffs' representation that their experts

9    could, at some later point, "(i) match the Apple identification numbers . . . with *actual consumers*

10   to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by

11   the narrowed class definition." Dkt. No. 789 at 1. The Court indicated that if Plaintiffs failed to do

12   *both*, the Court would consider whether modification of the class definition or decertification is

13   appropriate "for all or part of the class." *Id*. (citing *City of Los Angeles, Harbor Division v. Santa*

14   *Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001)). In fact, Plaintiffs' experts have now

15   ascertained the Class members and reduced the percentage of "unharmed" Class members.

16           Plaintiffs conducted additional discovery after class certification, and Dr. Song then ran

17   the damages model on *all* App Store transactions for the entire Class Period. Ex. 40 (Song Rep.),

18   ¶¶ 11, 68-74 & App. C ¶ 106. Separately, JND deduplicated Apple's payor data and reduced the

19   number of *potential* Class members from approximately ███████ payor records to

20   approximately ██████ unique individuals. *Id*. ¶ 70. Using the results from JND, Apple then

21   matched ██████ App Store transactions to those ██████ payors and sent *its* results to

22   Plaintiffs. Plaintiffs' damages experts applied the $10 spending cutoff to Apple's results and

23   identified ██████ unique payors who met the $10 spending cutoff in any Apple ID and are

24   members of the Class. *Id*. & fig. 24. Plaintiffs' experts computed monetary damages for each of

25   them, transaction by transaction. Based on those calculations, *only 5.2%* of Class members

26   (approximately ██████) had no measurable monetary damages with flexible pricing and

27   *just 5.9%* of Class members (approximately ██████) had no measurable monetary

28   damages with Apple's price tiers in place. *Id*. figs. 24 & 25.

On April 15, 2025, in light of evidentiary developments, Plaintiffs moved to modify the Class definition in two respects: *first*, to limit qualifying foremarket purchases to iPhones and iPads only (eliminating iPod Touch foremarket purchases); and *second*, to impose the $10 lifetime spending threshold to Class members rather than Apple IDs. Dkt. No. 951. On June 11, 2025, the Court granted Plaintiffs' first request (dismissing the iPod Touch claims with prejudice), but deferred ruling on the second.[3] Dkt. No. 981.

After the Court deferred deciding whether to apply the $10 spending cutoff at the payor level, Dr. Song then identified and quantified the ***Apple ID accounts*** with more than $10 in total spending and classified them as harmed or "unharmed." Ex. 52 (Song Suppl. Rep.), ¶¶ 3-5 & fig. 1. After Dr. Song ran the damages model on all App Store transactions for the entire Class Period, the percentage of unharmed Apple IDs also has ***significantly declined***. He determined that ▮▮▮▮▮ Apple ID accounts meet the $10 spending threshold, of which only ***5.1%*** ▮▮▮▮ ▮▮▮▮ suffered no measurable monetary harm without Apple's restrictive pricing tiers. *Id*. ¶ 5 & fig. 1. With Apple's restrictive pricing tiers in place, only ***5.8 %*** of accounts ▮▮▮▮ suffered no measurable monetary harm. *Id*. ¶ 5 & fig. 1; *see also* App. A.

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 23(c)(1)(C), an order certifying a class "may be altered or amended before final judgment." "The standard for decertification is the same as it is for class certification: whether the requirements of Federal Rule of Civil Procedure 23 are met." *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6448192, at *1 (N.D. Cal. Dec. 18, 2017). The burden is on the "defendant, in moving for decertification," to "show that the class no longer meets Rule 23's certification requirements," because decertification is only proper "***after some change, unforeseen at the time*** of the class certification, that makes alteration of the initial certification decision necessary." *In re Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (N.D. Cal. Nov. 25, 2014) (Gonzalez Rogers, J.) (internal quotations omitted; emphasis added); *see also In re Korean Ramen Antitrust Litig.*, 2018 WL 1456618, at *2 (N.D. Cal. Mar. 23, 2018)

---

[3] Plaintiffs withdraw their request to modify the Class definition to impose the $10 lifetime spending threshold on payors rather than Apple ID accounts.

1  ("burden . . . falls squarely on the shoulders of defendants"); *see also Huckaby v. CRST Expedited,*

2  *Inc.*, 2025 WL 987195, at *10 (C.D. Cal. Apr. 1, 2025) ("motion for decertification should not be

3  granted except for good cause, such as discovery of ***new facts or changes*** in the parties or in the

4  substantive or procedural law" (internal quotations omitted; emphasis added)). This is a heavy

5  burden because "'doubts regarding the propriety of class certification should be resolved in favor

6  of certification.'" *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6448192, at *1 (quoting

7  *Gonzalez v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)); *see also Estrella*

8  *v. Freedom Fin. Network, LLC*, 2012 WL 214856, at *4 (N.D. Cal. Jan. 24, 2012) (same).

9  **IV.    ARGUMENT**

10       Apple does not dispute that the action still satisfies Rule 23's numerosity, commonality,

11  and typicality requirements. Citing no changed circumstances, Apple argues only (at 9-22) that

12  common issues no longer predominate, that a class action is no longer superior, and that Plaintiffs

13  are no longer adequate representatives. Each argument lacks merit.

14       **A.    Common Issues Still Predominate Over Individualized Issues**

15       When the Court certified the Class, it relied on the Ninth Circuit's *en banc* opinion in

16  *Olean*, rejecting Apple's "argument that 'Rule 23 does not permit the certification of a class that

17  potentially includes more than a de minimis number of uninjured class members.'" Dkt. No. 789

18  at 25 (quoting *Olean*, 31 F.4th at 669). In *Olean*, the Ninth Circuit clarified that there is no hard

19  cap on the number or percentage of uninjured class members, holding that the presence of

20  uninjured class members defeats class certification ***only*** when "individualized inquiries about such

21  matters would predominate over common questions" at trial. 31 F.4th at 668. The Ninth Circuit

22  refused to impose a cap on non-injury within a class. *Id.* at 669. *Olean* is still controlling law.

23       When certifying the Class, this Court found that common issues predominate because

24  "Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct

25  across all class members . . . and can compute which Apple accounts suffered damages and which

26  did not." Dkt. No. 789 at 26. "The model, once run, will answer the common question of whether

27  Apple's conduct caused class members to suffer an antitrust injury." *Id*. at 27. Prof. McFadden's

28  damages model has done just that.

1    Apple argues (at 9) that common issues do not predominate because "Plaintiffs cannot

2    reliably distinguish between the injured and uninjured and have failed to reduce the number of

3    uninjured class members." Apple is wrong on both counts. After running the model on all the Class

4    Period transactions, Plaintiffs' experts have reliably determined the percentage of unharmed Class

5    members and the percentage of unharmed accounts, and they are both *lower* than the percentage

6    of unharmed accounts at class certification.

7    One of Plaintiffs' damages experts, Dr. Song, ran Prof. McFadden's damages model on the

8    full set of App Store transactions (████████ transactions) during the entire Class Period. JND

9    cleaned and deduplicated the payor data that Apple produced, and Apple matched all those

10   transactions to the deduplicated payor data. As a result, Dr. Song determined the number of

11   "unharmed" *class members* without Apple's pricing tiers in the but-for world is *only 5.2%* ██████

12   ████████████████████████████████████, and *only 5.9%* with the pricing tiers in place in

13   the but-for world ████████████████████████. Ex. 40 (Song Rep.), figs. 24, 25.

14   Dr. Song also separately identified and quantified the number of Apple ID accounts with more

15   than $10 in total spending and classified them as harmed or unharmed. Ex. 52 (Song Suppl. Rep.),

16   ¶¶ 3-5 & fig. 1. He determined there are ██████████ Apple ID accounts that meet the $10

17   spending threshold and that without Apple's restrictive pricing tiers, only *5.1%* ████████ of

18   those accounts suffered no monetary harm. *Id*. ¶ 5 & fig. 1.[4] All these percentages of undamaged

19   payors and Apple IDs are materially *lower* than at class certification.

20   Common issues still predominate because Plaintiffs can still show (and have now shown)

21   impact and damages through common proof. Plaintiffs also can calculate (and have calculated)

22   total damages, damages for each Apple ID account, and damages for each Class member. In

23   addition, Plaintiffs can identify those accounts and Class members that suffered no monetary harm.

24   And all of this is before the claims administration process, when class members will receive notice

25   of any recovery and the damages each is due. In no scenario will "the need to identify uninjured

26   class members . . . predominate and render an adjudication unmanageable." *Olean*, 31 F.4th at 669

---

[4] When keeping Apple's restrictive pricing tiers in place, *only 5.8%* ██████████ of those
accounts suffered no monetary harm. Ex. 40 (Song Suppl. Rep.) ¶ 5 & fig. 1.

n.13 (cleaned up). Class certification remains as proper now as it did in February 2024.

### 1.    The Percentage of Economically Uninjured Class Members Has *Not* Increased

Apple incorrectly argues (at 9) that Plaintiffs have "failed to reduce the number of uninjured class members [and] . . . [t]he number of uninjured class members has only ***increased*** since Plaintiffs' attempted matching."

First, Plaintiffs did ***not*** present the number of uninjured ***Class members*** at class certification, so Apple has no basis to argue that the number has increased. At class certification, Plaintiffs estimated damages for Apple IDs using only three genres (Music, Entertainment, and Games) and identified the number of Apple ID ***accounts***, not ***Class members***, that were economically uninjured when applying a $10 spending threshold at the account level: 7.9% of the accounts. Now, as discussed above, having run the damages model on all App Store transactions for the entire Class Period, while the number of accounts and payors have increased because many more transactions were included in the computation, the ***percentage*** of undamaged Class members is ***significantly lower*** than the 7.9% of undamaged Apple IDs during class certification—and even the ***percentage*** of undamaged Apple IDs has ***dropped significantly***. *See* App. A.

As the Court recognized when it certified the Class, "The Ninth Circuit in *Olean* . . . rejected the argument that Rule 23 has an uninjured class member cutoff beyond which class certification is impermissible. That position is 'inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions.'" Dkt. No. 789 at 27 (quoting *Olean,* 31 F.4th at 669). The Court found that "Plaintiffs' damages model answers the common question of whether Apple's conduct caused class members to suffer an antitrust injury." Dkt. No. 789 at 27. The law remains the same, and Plaintiffs' damages model still answers this common question in the affirmative.

### 2.    Plaintiffs Have Matched Transactions to People and Identified the Economically Uninjured Class Members and Accounts

Apple also (at 4) is incorrect when it argues that there is "no reliable way of telling who [the] uninjured [Class] members [] are." One of Plaintiffs' damages experts, Dr. Song, used a

1  supplemental data set Apple produced **after** class certification that identified all the transactions

2  associated with each **person** over the entire Class period. Ex. 40 (Song Rep.), ¶¶ 11, 68-74 & App.

3  C at ¶ 106. Using that information from Apple, Dr. Song identified which individuals met the $10

4  spending threshold for Class membership and also determined which Class members incurred

5  monetary harm and which did not. *Id.* ¶ 104, fig. 24.

6       In support of its argument, Apple (at 6) points to purported errors in Mr. Thompson's

7  deduplication work. But, as described at length in Plaintiffs' opposition to Apple's *Daubert*

8  motion, Mr. Thompson's deduplication work is relevant, his methods are reliable, and he reliably

9  applied those methods. The anomalies Apple nitpicks—which, in one instance, concerns 0.01% of

10  all customer records, and in another involves 0.003% of identified customers—do not require

11  exclusion of Mr. Thompson's deduplication results. *See Daubert* Opp. at 27; Thompson Decl., ¶

12  38. And none of the circumstances present in the cases identified in *Olean*—where expert evidence

13  was inadequate for one reason or another to satisfy the prerequisites of Rule 23—is present in this

14  case. *Olean*, 31 F.4th at 666 n.9. Plaintiffs have not "failed" at matching transactions to people.

15  Mr. Thompson cleaned and deduplicated Apple's payor data, Apple matched the transactions to

16  those deduplicated payor records, and Dr. Song identified, based upon that matching, which Class

17  members and accounts were economically harmed and which were unharmed. The insignificant

18  errors that Apple complains about in Mr. Thompson's deduplication work do not make the

19  damages model unreliable for demonstrating class-wide impact and damages.[5]

20       Apple (at 12) also faults Mr. Thompson for identifying the "payor" as the person whose

21  name was on the associated payor record rather than the person who "actually" paid for each

22  transaction. For example, Apple argues that when a child pays for an app or makes an in-app

23  purchase, that child cannot be the "payor" if she uses her parent's credit card to pay for the

---

[5] Apple characterizes (at 14) what Mr. Thompson did as a "matching exercise" to give the false impression that Mr. Thompson matched payors with their transactions or with their Apple ID accounts, but he did neither. Mr. Thompson cleaned and deduplicated Apple's payor data, as notice and claims administrators typically do (*see* Ex. 44 (Thompson Suppl. Rep.), ¶ 10 ("applying well-accepted methods of consolidating contact data in the claims administration field")), and **Apple** matched the deduplicated payor records to transactions. Dr. Song used Apple's matching to identify economically harmed and unharmed Class members and Apple ID accounts.

transaction. *Id*. Apple's argument fails for at least two reasons.

*First*, as the Supreme Court has explained, direct purchasers are "the immediate buyers from the alleged antitrust violators." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019). "It is undisputed" that iPhone and iPad users "bought [] apps directly from Apple." *Id.* at 278. "Therefore, under *Illinois Brick*," those users "were direct purchasers who may sue Apple for alleged monopolization." *Id.* at 279. Apple has produced its records of the contact and payment information for every "customer" that made app and in-app content purchases. *See* Byrd Dec., Ex. 96 (July 10, 2024 Ltr. from E. Lazarus to R. Byrd & K. Wood). Apple itself calls those customers "payors." Mot. at 4 (describing the "actual consumers who paid for transactions on the App Store" as "payors"). Based on this information, Mr. Thompson has identified the correct direct purchasers: "individuals that purchase[d] apps and in-app content on Apple iPhones and iPads" between July 2008 and February 2024. Ex. 44 (Thompson Suppl. Rep.) ¶ 8; *see also Pepper*, 587 U.S. at 280 ("the straightforward rule of *Illinois Brick*" is that if "retailer B sells to customer C, then . . . C may sue B if B is an antitrust violator").

By Apple's logic, no class could ever be certified when some payments are made with a credit card—true in nearly every case—because no one has any way to look behind the credit card purchases to see who eventually pays those bills. It cites no case, and Plaintiffs are unaware of any, adopting such a standard. The cases Apple cites do not support its strained interpretation that the payor is the person who may be funding the transaction. *In re MultiPlan Health Ins. Provider Litig.*, 2025 WL 1567835 (N.D. Ill. June 3, 2025), for example, does not answer whether a child who purchases and consumes a product using a parent's money is the purchaser. *Id.* at *9. There, the defendant third-party payors of healthcare services argued they were not the true "payors" for those services because it was the patients, and not they, who received the services. The court stated, "The defendants seemingly argue that a purchaser must use the product being purchased to be in the market for that product. By that logic, parents who buy a chocolate bar for a child would not be in the market for chocolate bars, as only the child consumes the chocolate." *Id*. But the court did not say that a child who *purchases and consumes* the chocolate bar is not the purchaser if the child's parent gave them the money for the purchase, which is Apple's argument. Here, the direct

purchasers of iOS apps and in-app content are those who make purchases through their Apple ID accounts, regardless of their age or payment method. *Cf. I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1126 (N.D. Cal. 2015) (class of minors was not overbroad because Facebook could "ascertain, through its records, whether a purchase was made from the minor's account, or whether an account was registered to a minor at the time the purchase was made").[6]

*Second*, the Class definition forecloses Apple's argument that the Class member is not necessarily the registered account holder who made the purchase. The Class definition requires only that the payment come "from [an] Apple ID account," and is agnostic to whether the credit card used for the payment was owned by the Apple ID registrant.

The word "paid" cannot be read in this context to mean the person to whom the credit card belonged, because if the credit card was borrowed, the owner of the credit card is not paying "from any one Apple ID account." The purchaser—the registrant of the Apple ID account—is paying for the app or in-app content. The ordinary meaning of the word "pay"—the present-tense form of the word "paid"—is "[t]o give money for a good or service that one buys; to make satisfaction." *Pay*, Black's Law Dictionary (12th ed. 2024); *accord Chartis Specialty Ins. Co. v. Queen Anne HS, LLC*, 867 F. Supp. 2d 1111, 1119 (W.D. Wash. 2012) ("To 'pay' means 'to satisfy (someone) for services rendered or property delivered,' to 'discharge an obligation to,' 'to give in return for goods or service,' or 'to discharge indebtedness for.'" (quoting *Webster's Third New Int'l Dictionary* 1659 (2002))). Consistent with *Illinois Brick*, the Class definition focuses on only whether someone gave money to Apple in exchange for an app or in-app content. If an iPhone owner clicked "purchase" on an app, they are the direct purchaser. And if they spent at least $10 from any one Apple ID, they are a Class member. That ends the inquiry.

Apple also makes (at 14) an ascertainability argument (without explicitly saying so) that Class membership cannot be determined without relating app transactions to payors. "'A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common

---

[6] *Garon v. eBay, Inc.* is inapposite because in that case the plaintiffs "[did] not allege . . . that any of them actually paid supra-competitive fees." 2011 WL 6329089, at *5 (N.D. Cal. Nov. 30, 2011). Here, Plaintiffs do allege that they paid supra-competitive prices for apps and in-app content because of Apple's anticompetitive conduct.

characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description.'" *Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 3746118, at *5 (S.D. Cal. July 15, 2013) (quoting *Thomasson v. GC Services Ltd. P'ship*, 275 F.R.D. 309, 313 (S.D. Cal. 2011)). The Class definition meets that standard, because one's membership can be defined through objective and verifiable criteria. If someone spent at least $10 on iOS apps or in-app content during the defined Class Period, they are a member and will be bound by whatever verdict the jury reaches.

Plaintiffs are not required to identify (especially the way Apple demands) every Class member. *See Knutson*, 2013 WL 3746118, at *5 ("Class certification hinges on whether the identity of the putative class members can be objectively ascertained; ***the ascertaining of their actual identities is not required***.") (emphasis added); *see also Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *11 (N.D. Cal. June 13, 2014) ("lack of ascertainability alone will generally not scuttle class certification") (internal quotation omitted). Here, though, Plaintiffs have identified the Class members. The fact that Apple's poorly maintained data and its refusal to provide additional customer identification data might have prevented Mr. Thompson from identifying Class members with 100% precision before trial does not prevent the Court from certifying the Class, where his deduplication has resulted in errors measured in ***thousandths of a percent***. *Daubert* Opp. at 26-27; s*ee, e.g.*, *Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000) (finding a class was ascertainable despite the defendant's claims that it was "impossib[le]" to identify class members from its ordinary course records; "[s]hould a debt collection company as large and as sophisticated as Transworld be able to avoid class action liability by mere fact of inadequate record-keeping, the Congressional purpose behind the statute would indeed be thwarted").

The impact of Mr. Thompson's work on absent Class members' claims therefore is null. The granularity in his continued work—which does not affect aggregate damages—will be especially relevant in the administration process ***after*** trial, if Plaintiffs prevail. Mr. Thompson's pre-trial identification of unique Apple customers will be verified and, if needed, corrected, through post-trial claims administration that presumably will include information (*e.g.*, credit card

and telephone numbers) that Apple has not yet made available to Plaintiffs. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131–33 (9th Cir. 2017) ("At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims. Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability." (citations and internal quotations omitted)); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3–4 (S.D. Cal. May 8, 2020) ("determination of class membership and protecting the defendant's due process rights can be done during the claims administration process"); *Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628, 633 (E.D. Cal. 2023) ("class members who did not pay the valuation fee—may be weeded out at the claims phase, preventing any individuals without standing from 'recover[ing] individual damages' just as *TransUnion* envisioned" (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))).

Thus, there is no genuine ascertainability problem. *See Woe by Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) ("it is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can easily be created").[7]

### 3. The Presence of Uninjured Class Members Does Not Mean the Class Definition Is Overbroad

Apple again argues that the sheer number of uninjured Class members is "intolerably high" and that "the presence of *any* uninjured class member is ground to decertify." Mot. at 16 (citing the *dissenting* opinion in *Lab. Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1609 (2025)). These arguments are inconsistent with *Olean*, in which the Ninth Circuit clarified that there is no

---

[7] Apple's cases (at 15) are inapt. In *Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *6, 7, 10 (S.D. Cal. Sept. 23, 2015), essential information (e.g., names) was missing from the data the plaintiffs proposed to use to identify the class members, and the plaintiffs' proposal "to cross reference" that data with "massive amounts of [other] data" (which plaintiffs had failed to obtain in discovery) as a workaround, if possible at all, would still yield "a data set of questionable reliability that covered only some unknown fraction of the putative class." There are no such "holes" to fill here. *Id.* at *7, 10. Likewise, in *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137-38 (3d Cir. 2023), the plaintiffs' proposed method for identifying class members yielded incorrect results in *half* of the example cases and further required an analysis of "the underlying contractual relationships of each transaction to distinguish between class members and mere intermediaries." Those issues are not present here.

hard cap on the number or percentage of undamaged class members. The presence of undamaged class members defeats class certification **only** when "individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668. The Ninth Circuit expressly refused to impose a standard of *de minimis* non-injury within a class. *See id.* at 669 (confirming that the presence of **some** class members who cannot prove damages does not defeat class certification).

Resisting that straightforward holding in *Olean*, Apple falls back (at 16) on the already-discredited argument that, at some point, the sheer number of uninjured accounts must be so high that the Class is mis-defined. This, too, misreads the case law. A class is not "fatally overbroad" simply because it includes some number or percentage of class members who eventually are proven to lack damages. A class is "fatally overbroad" only when it includes too many members who could not possibly have been harmed by the alleged wrongdoing. *Olean*, 31 F.4th at 669 n.14 (citing *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 824 (7th Cir. 2012)).

Class members who "could not have been harmed" means those who, for example, never saw a misleading advertisement, *see Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1137-38 (9th Cir. 2016) (citing *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 597 (9th Cir. 2012)), or in this case, those who did not buy any apps or pay for any in-app purchases. However, the Class does **not** include any iOS customers who never bought apps or made in-app purchases. Here, **all** Class members were exposed to Apple's unlawful conduct, Ex. 41 (Stiglitz Rep.), § IV, even if they have no measurable monetary damages. *See Glen Holly Ent't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (plaintiffs had adequately alleged an antitrust injury because an agreement between two companies "detrimentally changed the market make-up and limited consumers' choices to one source of output."); *see also infra* § IV.A.4. The fact that other factors shielded them from measurable economic injury (such as purchasing only a small number of apps or only apps that would not have changed price in the but-for world), only means they were "fortuitously non-injured." *Olean*, 31 F.4th at 669 (citing *Ruiz Torres,* 835 F.3d at 1137).

The presence of fortuitously uninjured Class members is not troubling here because their number has been winnowed through the $10 spending threshold, and the identification process

does not "overwhelm common [issues] and render class certification inappropriate." *Id.* at 669 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (recognizing that "a class will often include persons who have not been injured by the defendant's conduct," but that "[s]uch a possibility or indeed inevitability does not preclude class certification").[8]

Having lost the ability to argue for a numerical cut-off, Apple (at 17) recycles its previously rejected (and mistaken) interpretation of two out-of-circuit cases, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019), and *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018). As the Ninth Circuit explained in *Olean*, rejecting a *de minimis* standard did not create a split in the circuits, because an argument that either *Asacol* or *Rail Freight* had imposed such a rule, as Apple makes here, misreads those cases. *See Olean*, 31 F.4th at 669 n.13.

In *Asacol*, for example, the problem was that the only way to sort out whether class members would have switched to a generic drug was through the testimony of 100% of the class members, and "a trial in which thousands of class members testify" is inconsistent with the class action process. *Asacol*, 907 F.3d at 57–58; *see also Rail Freight*, 934 F.3d at 625 (no way "short of full-blown individual trials" to resolve question of injury) (cited by *Olean*, 31 F.4th at 669 n.13). That problem is not present here, due to the economic modeling and identification procedures that can identify every Class member who has suffered damages.

*Asacol* and *Rail Freight* simply hold that putting every class member on the stand to resolve whether they have suffered injury is inconsistent with Rule 23(b)(3). There is no such prospect here, where Plaintiffs' experts have identified which accounts and which Class members have suffered economic injury or not—using a common (class-wide) model. Apple argues that the precise number of uninjured accounts might be slightly different than what Dr. Song has

---

[8] Apple argues (at 11) that the economically undamaged Class members are not fortuitously uninjured but that their negative damages are "inherent in Plaintiffs' chosen model and economic analysis." Apple misunderstands fortuitous non-injury, which the Ninth Circuit described as "unlawful conduct in the absence of harm." *Ruiz Torres*, 835 F.3d at 1137. The entire Class was subjected to Apple's unlawful conduct when they purchased apps or in-app content from the App Store. The fact that a small subset of them suffered zero or negative monetary damages is what the Ninth Circuit calls "fortuitous non-injury." *Id.*

calculated, but *Olean* makes clear that any such differences are irrelevant. Here, unlike in *Rail Freight* or *Asacol*, the means of identifying uninjured accounts and Class members are "straightforward," **mathematical calculations** that eliminate "the complexity of damages calculations [that] would defeat predominance." *Olean*, 31 F.4th at 681–82 & n.31.

Apple also recycles arguments (at 15) that this Court has already considered and rejected, such as Apple's claim that Plaintiffs' damages model is "volatile" and therefore unreliable simply because a tiny percentage of Apple ID accounts switch from harmed to unharmed or *vice versa* when Apple's experts **changed** the damages model's inputs, data, or designs. In a new version of an old argument, Apple argues that excluding iPod Touch transactions causes 300,000 payors to switch from "harmed" to "unharmed" and vice versa, and therefore the model is unreliable. Mot. at 15 (citing Prince Rebuttal Rep., ¶ 27). But as Plaintiffs have already explained, Dkt. No. 701 at 19, it is not surprising that Apple's experts find different results when changing the designs or inputs of the model, as Prof. Prince has done. Dkt. No. 962-2 (May 6, 2025 Song Decl.), ¶ 10; Dkt. No. 789 at 14 ("If the inputs change, then the results **should** change as well."). Indeed, in addressing the exact same argument before, the Court noted the fact that accounts switch when inputs are changed "does not shake Prof. McFadden's 95% confidence interval but **instead serves to confirm it**." Dkt. No. 789 at 15 (emphasis added). Conversely, in *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020), the court found, unlike here, that the "models [we]re repeatedly *insensitive*" to changes in inputs (emphasis added).

Finally, Apple suggests (at 17) that the massive scale of the App Store means the absolute number of "uninjured" Class members may be "more than the number courts have found unacceptably high in other cases." In other words, Apple is too big to face antitrust scrutiny via class action—a through-the-looking-glass defense. This Court told Apple's counsel at the May 30, 2025 hearing, however, "the fact that [Apple] is so large that the small percentage here impacts millions of people is a function of the fact that they are humongous. But that doesn't undermine the fact that there are common questions which predominate for ███████ people, according to [Prof. McFadden's] model." Dkt. No. 980 at 13:16-21.

**4.     The Presence of Economically Uninjured Class Members Does Not**

**Undermine the Antitrust Injury Requirement**

Apple erroneously contends (at 10-11, 18-19) that the existence of economically undamaged Class members means the antitrust injury requirement is not satisfied. This conflates injury and damages. *Olean* recognized that some number of class members may be fortuitously undamaged in the economic sense, and the Ninth Circuit has long held that requiring a plaintiff to prove economic damages to satisfy the antitrust injury requirement "is too restrictive." *Glen Holly,* 352 F.3d at 374 (plaintiffs adequately alleged an antitrust injury because an agreement between two companies "detrimentally changed the market make-up and limited consumers' choices to one source of output"); *see also Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 804 (N.D. Cal. 2022) ("[C]onsumers have suffered an injury because Facebook 'detrimentally changed the market make-up and limited consumers' choice to one source of output.'" (citation omitted)).

Plaintiffs have set forth a common, class-wide theory of harm sufficient to satisfy the antitrust injury requirement: Apple's restrictions have "foreclose[d] nearly all alternative channels of iOS app sales" and thereby decreased app output, reduced app quality, and limited innovation. *See* Ex. 41 (Stiglitz Rep.), §§ III, IV. This "limited consumers' choice to one source" of apps and in-app content, the Apple App Store, and "prevent[ed] [consumers] from making free choices between market alternatives." *Glen Holly*, 352 F.3d at 374 (quotation and citation omitted). Antitrust courts have long recognized these forms of harm as antitrust injuries. *See Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426, at *11 (E.D. Cal. May 12, 2023) ("Courts have recognized various types of antitrust injuries, including limiting consumer choice, reducing output and innovation, and increasing prices for lower quality and fewer services." (collecting cases)); 3G Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 391e (May 2025 update) ("If an incumbent monopolist takes steps to maintain its monopoly by foreclosing a would-be rival from entering, . . . [c]onsumers are [] injured because they do not get the benefit of the competition that would have accompanied entry.").

Apple's conduct in monopolizing the relevant market and limiting consumer choice was done at the market level and harmed the Class by limiting choice of app stores from which to purchase iOS apps and in-app content. *See* Ex. 41 (Stiglitz Rep.), ¶¶ 21-22, 99-104, 109-20; Ex.

38 (McFadden Rep.), ¶¶ 17, 19; Ex. 18 (May 14, 2025 McFadden Dep.) at 13:22-15:25, 74:2-12.

Conversely, the plaintiffs in Apple's cited cases (at 10-11, 18) sustained no injury because there was no anticompetitive conduct. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (rejecting plaintiff's argument that "it has suffered antitrust injury even if [defendant's] pricing was not predatory"); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199, 1201-02 (9th Cir. 2012) (alleged tying agreement was not anticompetitive). *Brantley* expressly *rejected* Apple's argument here, stressing that "[h]ad the plaintiffs succeeded in pleading an injury to competition, the complaint's allegations of reduced choice . . . and increased prices *would* sufficiently plead . . . that they had been harmed by the challenged injury to competition." 675 F.3d at 1202 (emphasis added). And in *Williams v. Apple Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021), the court did not address the issue of "antitrust" standing at all. *See id.* at 643 (determining whether class members were injured required "individualized inquiry" because plaintiffs' *contract* claim asserted a breach based on Apple sharing plaintiffs' data with third parties and not based on "mere *exposure* to Apple's storage *algorithm*"). The existence of some Class members without economic damages does not undermine the existence of antitrust injury or the class's definition. Plaintiffs have the means to identify damaged Class members on an individual and aggregate basis, and at claims administration (when Apple provides additional information) to make specific payments to individual Class members who suffered economic damages.

There is similarly no authority for Apple's assertion (at 19) that Plaintiffs are required to assess positive benefits, such as privacy and security, for Class members on an individualized basis. To the extent Apple can show that its restraints enhance the privacy or security of its products (and that such claims are not pretexts for the profits that Apple reaps through its anticompetitive conduct), Apple will have to make that showing in defending against liability, not in showing how particular customers were affected. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024) ("If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to 'show a procompetitive rationale for the restraint[s].'" (citation omitted)). If Apple is liable and a class member paid an overcharge, the

1    class member is entitled to recover those damages, irrespective of the value the class member

2    places on particular product characteristics. *Cf. In re Lidoderm Antitrust Litig.*, 2017 WL 679367,

3    at *21 (N.D. Cal. Feb. 21, 2017) (recognizing that "one overcharge" establishes an injury "even if

4    the anticompetitive conduct at issue also results in offsetting benefits" (citation omitted)).

**B.    A Class Action is Still Superior, and the Class Representatives Still Adequate**

6    **1.    Superiority:**    Rule 23(b)(3)'s superiority requirement is met where

7    "classwide litigation of common issues will reduce litigation costs and promote greater efficiency."

8    *Valentino*, 97 F.3d at 1234. Apple cannot seriously dispute that a class action is a superior

9    mechanism for resolving Plaintiffs' claims. Apple complains (at 19) that the Court's order

10   adopting Plaintiffs' proposed $10 lifetime spending threshold to reduce the number of

11   economically undamaged class members is "arbitrary," and—using raw numbers rather than

12   percentages to distort the impact—removed more injured class members than uninjured ones. The

13   Ninth Circuit already considered and rejected this argument. *See* Dkt. No. 793-1 (Rule 23(f)

14   Petition) at 18-19. And as Plaintiffs' expert, Dr. Song, has already explained, the $10 spending

15   cutoff removed a far greater proportion of unharmed accounts than harmed accounts. Dkt. No.

16   962-2 (May 6, 2025 Song Decl.), ¶ 13.

17   The Court's Order adopting Plaintiffs' $10 lifetime spending threshold reduced the number

18   of unharmed Apple ID accounts from 17.8% to 7.9%. *See* Dkt. No. 789 at 26 ("Acknowledging

19   that an estimated 17.8% of accounts in Prof. McFadden's model are uninjured, plaintiffs have

20   revised their class definition to limit the number of uninjured class members."). The undamaged

21   are now about 5%, regardless of how transactions are assigned. *See* App. A.

22   In adopting Plaintiffs' Class definition, the Court did not "excis[e]" "a large share of

23   potential claimants from the proposed class," like the plaintiffs in *Mr. Dee's Inc. v. Inmar, Inc.*,

24   127 F.4th 925, 932 (4th Cir. 2025). There, the Fourth Circuit affirmed the district court's denial of

25   class certification because plaintiffs' proposed class consisted of 3,219 injured manufacturers and

26   65 uninjured manufacturers but excluded more than 2,000 manufacturers that were victims of the

27   same violation. *Id*. The percentage of people removed from the Class here does not come anywhere

28   close to the nearly 40% of potential class members excluded in *Mr. Dee's* putative class.

Apple's primary complaint (at 20) about the $10 lifetime spending threshold is that it "may soon be facing yet another class action, with ███████ users or more, over the same alleged conduct and supra-competitive commission—just like in the developer cases." Mot. at 20. That argument, if it had any merit, existed when the Class was originally certified ***with the $10 threshold***. Dkt. No. 789 at 2. Thus, the $10 issue is legally insufficient for decertification. *See Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (decertification proper only "***after some change, unforeseen at the time***" of certification, making class no longer certifiable (emphasis added)); *Huckaby*, 2025 WL 987195, at *10 (decertification improper absent new facts or changes in the parties or in the substantive or procedural law). There have been no such changes since the Ninth Circuit refused to grant Rule 23(f) review of the Court's certification decision.

In any event, the argument is irrelevant to the superiority analysis and is misleading. Any Class member excluded by virtue of the $10 spending threshold has only an ***individual*** claim. *See China Agritech v. Michael H. Resh*, 584 U.S. 732, 736 (2018) (tolling limited to ***individual*** claims). No one affected by the $10 spending threshold could or would incur tens of millions of dollars in expenses to bring an individual antitrust claim to recover even less than $10 in damages against a corporate giant like Apple. Additionally, by agreement between the parties, the Class Period ended on February 2, 2024, the date of the Class Certification Order. Yet Apple has continued to do the same bad things—like charging the same supracompetitive commissions, requiring the use of its IAP, and imposing the same anticompetitive anti-steering rules—since then. If Apple is exposed to the risk of another class action, ***it is its own fault***, not the result of the $10 spending cutoff.

*Cameron v. Apple Inc.* is not a useful counterexample. There, Apple settled only with ***small*** developers, knowing that ***large*** developers originally in the developer class could sue it. *See* No. 4:19-cv-03074-YGR, Dkt. No. 396 at 1. The follow-on cases Apple cites are similarly distinguishable, and belie Apple's argument that the $10 threshold is a reason to decertify.[9]

[9] *Korean Publishers Assoc. v. Apple Inc.*, No. 4:25-cv-4438 (N.D. Cal.), includes a class of developers domiciled in ***Korea*** (Dkt. No. 1 at 8, ¶ 32, Dkt. No. 44 at 12 ¶ 54), and a class of developers who sold apps through Apple's ***Japanese*** App Store (Dkt. No. 44 at 13 ¶ 55), neither of which were ever part of the *Cameron* case (No. 4:19-cv-03074, Dkt. No. 53 at 35-36 ¶ 113). Furthermore, *Pure Sweat Basketball, Inc. v. Apple Inc.*, No. 4:25-cv-03858 (N.D. Cal.), concerns Apple's violation of this Court's injunction in *Epic Games v. Apple Inc.*, No. 4:20–cv–5640 (N.D.

*Olean* allows the Court to modify the class definition to cure a potential overbreadth problem, which the Court already did when it certified the Class nearly 18 months ago. Dkt. No. 789 at 25. As the Court discussed in the Class Order, *Olean* gives it broad discretion to "refin[e] the class definition" to address such problems "rather than . . . flatly denying class certification." *Id*. (citing *Olean*, 31 F.4th at 669 n.14). Nothing has changed about this to warrant decertification.

*Abante Rooter & Plumbing*, 2017 WL 4073792, at *2–3 (N.D. Cal. Sept. 14, 2017), is distinguishable because there the plaintiffs' basis for excluding certain potential class members was that they lacked "readily available data" to identify them, which is what the court found to be "arbitrar[y]" about the plaintiffs' proposed mechanism for eliminating class members. That problem does not exist here. *Jensen v. Natrol, LLC*, 2020 WL 416420, at *1 (N.D. Cal. Jan. 27, 2020), is also distinguishable. There, the proposed class did not include the fortuitously uninjured but rather had a "distinct subset of members who were not misled, who were not injured, who could not possibly recover, and who would be easy to weed out at the front end." That problem does not exist here, where plaintiffs' class definition is "reasonably co-extensive" with their "theory of liability" and it is entirely "possible that each class member suffered an injury at the hands of the defendant." *Id*. (citing *Ruiz Torres*, 835 F.3d at 1137 n.6).

     **2.**     **Adequacy:** Three years after Plaintiffs offered their amended Class definition, *see* Dkt. No. 665, Apple now argues for the first time (at 21-22) that the $10 spending threshold is evidence that Plaintiffs are not adequately protecting the Class's interests. This argument fails for two reasons. First, it relies on no new facts. Apple could have raised this adequacy claim when opposing class certification or seeking Rule 23(f) review, but it did not. *See* Dkt. No. 689 at 29-31 (raising no adequacy issue); Dkt. No. 793-1 (Rule 23(f) Petition) at 23-25 (same). Second, on the merits, it contradicts *Olean*. The Ninth Circuit made clear that "refining the class definition" to mitigate concerns "of a potentially 'over-inclusive' class"—which is what the $10 spending threshold does—is preferable to "flatly denying class certification." *Olean*, 31 F.4th at 669 n.14; *see also In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270

Cal.), Dkt. No. 1508, and has a ***different class period*** than *Cameron* (January 17, 2024 through the date Apple complies with this Court's injunction).

F.R.D. 521, 532 (N.D. Cal. 2010) ("Plaintiffs are permitted to press a theory of contract liability that affords them the best chance of certification and of success on behalf of the class.").

Apple makes the same adequacy claim (at 21-22) regarding the removal of iPod Touch transactions from the Class. Those claims were removed because they lacked merit. None of Apple's cited authority suggests that Plaintiffs and their counsel have breached any fiduciary duty to Class members by dropping claims that would not prevail at trial.[10]

### C.     Plaintiffs' Damages Model Is Still Reliable and Its Assumptions Sound

Nothing has changed since the Class Order held that Prof. McFadden's model "can show the impact of Apple's allegedly anticompetitive conduct across all class members" and "under *Olean*, the predominance requirement is met." Dkt. No. 789 at 26:4-18. Apple's argument is improper for multiple reasons. First, it is procedurally backwards, asking the Court to play a guessing game. Using the word "if" more than a dozen times, Apple asks the Court (at 22-25) to forecast potential *Comcast* problems (*i.e.*, the damages measurement does not match the theory of liability, *Comcast Corp. v. Behrend*, 569 U.S. 27, 37-38 (2013)) in light of dismissals on motions that are not even fully briefed, let alone decided. Neither the Court nor Plaintiffs should be in the position of speculating about the effect of dismissed conduct on damages before it happens; no case Apple cites says otherwise.[11] Second, Dr. Abrantes-Metz makes clear that her but-for commission rate measures any set of unlawful conduct except one in which only the price tiers are

---

[10] *See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 641 (N.D. Cal. 2015) (plaintiffs abandoned several types of damages that were "likely to exceed by many times" the one category of damages that remained); *Wetzel v. CertainTeed Corp.*, 2019 WL 3976204, at *13–14 (W.D. Wash. Mar. 25, 2019) (plaintiff was not adequate where "a substantial number of putative class members have made warranty claims and signed release agreements with [defendant]."); *In re Stec Inc. Sec. Litig.*, 2012 WL 6965372, at *7 (C.D. Cal. Mar. 7, 2012) (plaintiffs inadequate "because they seek to certify a Class that includes individuals who may have claims under the Securities Act, but the[y] . . . do not have standing to bring those claims."); *Mays v. Tennessee Valley Auth.*, 274 F.R.D. 614, 622–24 (E.D. Tenn. 2011) (plaintiffs inadequate where they abandoned claims for medical monitoring, emotional distress, and personal injury, which all potentially had *res judicata* effect).

[11] Only the Summary Judgment motions even potentially raise a *Comcast* issue. There is no *Daubert* motion as to the damages experts (Drs. Abrantes-Metz, McFadden and Song), and the pending *Daubert* motions as to Dr. MacCormack and Mr. Thompson do not even potentially create a situation where some but not other kinds of challenged conduct survive summary judgment.

1    anticompetitive. Lastly, Apple should not prevail on any of its summary judgment theories.

2          The cases Apple cites (at 22-25) support Plaintiffs' conclusion that Apple is procedurally

3    out of order. *Comcast* rejected a damages model for failure to disaggregate conduct **after** it was

4    determined that only the overbuilder theory was capable of class-wide proof. *Comcast*, 569 U.S.

5    at 37–38 (model presumed four anticompetitive acts, but only one survived in the case). Here, the

6    Court has **not** excluded (at any stage of this proceeding) any theory of anticompetitive conduct

7    proffered by Plaintiffs. *Comcast* does not apply here.

8          In *Noohi v. Johnson & Johnson Consumer Inc.*, the Ninth Circuit explained that under

9    *Comcast*, the key inquiry at the class certification stage—applicable here too at decertification—

10   is whether the plaintiff has demonstrated a nexus between her legal theory and her damages model.

11   146 F.4th 854, 867 (9th Cir. 2025) (class certification affirmed). The Court previously found this

12   nexus at the class certification stage. Dkt. No. 789 at 26-27. **Nothing** has changed to warrant

13   decertification. As *Noohi* noted, any failures in the model can be explored at trial. *Noohi*, 146 F.4th

14   at 867.

15         Apple argues speculatively (at 23) that summary judgment in its favor on **any** theory of

16   liability "dooms [the Plaintiffs'] entire case." Apple's argument is premature.[12] At this time, **all** of

17   Plaintiffs' theories of liability are intact.

18         Apple's contention also ignores Dr. Abrantes-Metz's explanation about how her model

19   easily copes with the *possibility* that the jury *may* find that some but not all of Apple's conduct is

20   unlawful. She ████████████████████████████████████████████████████

21   ████████████████████████████████. Ex. 20 (May 23, 2025 Abrantes-Metz Dep.) at

22   34:4-35:12. As she repeatedly said, her conservative estimate of the but-for commission rate of

23   13.63% applies ███████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████████

25   ███████████. *Id.* at 39:13-23; 48:6-17.

26

27   ───────────────
     [12] Apple's reliance on *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385 (S.D.N.Y.
28   2014), similarly is misplaced. In that case the district court excluded the expert because arbitrarily
     selected parameters entirely altered the model's conclusions.

1
2
3
4
5
6
7
8

Apple's other cases (at 15, 22, and 25) are either helpful to Plaintiffs or simply inapplicable.[13] For example, *Ruiz-Torres*, also referenced by the Court in its Class Order (Dkt. No. 630 at 24:12-15), holds that the "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class." *Ruiz Torres*, 835 F.3d at 1137. In *Lithium Ion Batteries Antitrust Litigation*, this Court denied a renewed motion for class certification with respect to the expert's focal point pricing analysis because the expert failed to link such pricing on pass-through effects for the indirect purchaser class. *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *5 (N.D. Cal. Mar. 5, 2018).

9
10
11
12
13
14
15

By contrast, the Class Order in this case notes that Prof. McFadden "created two models, one without price tiers and one which incorporated tier and focal pricing." Dkt. No. 789 at 10:27-28. The Court found this simulation to be "sufficiently reliable." *Id.* at 10. Apple's motion offers no contrary evidence. In *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018) (Mot. at 22:24), class certification was denied based on the expert's lack "of data-driven analysis," but the Court found here that Apple "misconstrued the model" and that the model's data-driven analysis was "sufficient at this stage." Dkt. No. 789 at 13-14.

16    **V.    CONCLUSION**

17

For these reasons, the Court should deny Defendant's Motion to Decertify the Class.

18
19

DATED: September 2, 2025

**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP**

20

By:   */s/Rachele R. Byrd*
      RACHELE R. BYRD

21
22
23
24

RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599

25
26
27
28

---

[13] Apple's reliance (at 23) on *Rail Freight*, 934 F.3d 619 (measured negative damages for 2,000 individuals) is misplaced because the Ninth Circuit declined to extend *Rail Freight's* analysis of uninjured class members in *Olean*, 31 F.4th 651. *See also* Order Denying Class Certification (Dkt. No. 630) at 24:24-25 (rejecting Apple's *Rail Freight* argument, finding "the Ninth Circuit has not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance.").

Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES WEBSTER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Class Counsel for Plaintiffs*



**APPENDIX A**

| Stage | Data Through | Genres | With or Without Pricing Tiers | Lifetime Spending Threshold Applied | # of Unharmed Accounts | # of Unharmed Class Members | % | Source |
|---|---|---|---|---|---|---|---|---|
| Class Certification | 4/25/22 | Music, Ent. and Games | Without | n/a | | | 17.8% | Dkt. No. 679-1, ¶ 16 & fig. 1. |
| Class Certification | 4/25/22 | Music, Ent. and Games | Without | $10.00 in any one Apple ID Account | 10.3 million | | 7.9% | Dkt. No. 679-1, ¶ 16 & fig. 1, 786-1, ¶¶ 10-12 |
| Merits | 2/4/24 | All Genres | Without | $10.00 in any one Apple ID Account | | ██████ | 5.2% | Ex. 40 (Song Expert Rep.), fig. 24 |
| Merits | 2/4/24 | All Genres | With | $10.00 in any one Apple ID Account | | ██████ | 5.9% | Ex. 40 (Song Expert Rep.), fig. 25 |
| Merits | 2/4/24 | All Genres | Without | $10.00 in every Apple ID Account | ██████ | | 5.1% | Ex. 52 (Song Suppl. Expert Rep.), ¶ 5 & fig. 1 |
| Merits | 2/4/24 | All Genres | With | $10.00 in every Apple ID Account | ██████ | | 5.8% | Ex. 52 (Song Suppl. Expert Rep.), ¶ 5 & fig. 1 |