1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

OAKLAND DIVISION

12

| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
|---|---|
| | **[PROPOSED] ORDER DENYING DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS** |
| | CTROOM:    1, 4th Floor<br>JUDGE:      Hon. Yvonne Gonzalez Rogers |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Before the Court is Defendant Apple Inc.'s ("Apple" or "Defendant") Motion to Decertify the Class. Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward Hayter and Edward Lawrence ("Plaintiffs") opposed the motion. For the reasons set forth below, Apple's motion is **DENIED**.

## I.     BACKGROUND

Plaintiffs filed their Renewed Motion for Class Certification on September 26, 2022. Dkt. No. 666-1. In support, Plaintiffs' experts computed Apple's but-for commission rate and performed econometric modeling to create a damages model that they ran against App Store transactions from a portion of the Class Period in only three genres—Games, Music, and Entertainment—to demonstrate their ability to prove class-wide impact and estimate damages for all Apple ID accounts through common proof. *Id*. at 1-2. Prof. Daniel L. McFadden estimated that approximately 17.8% uninjured Apple ID accounts were in the class. Dkt. No. 679-1 (Second Revised Supplemental Report of Daniel L. McFadden), ¶ 16 & Fig. 1. At the time, Plaintiffs said that the percentage of uninjured ***accounts*** likely overstated the percentage of unharmed ***class members*** because many App Store customers have multiple Apple ID accounts. Dkt. No. 666-1 (Plaintiffs' Renewed Motion for Class Certification) at 14-15 & n.14.

To reduce the number and percentage of Apple ID accounts without measurable economic damages, Plaintiffs proposed a $10 lifetime spending cutoff in any one Apple ID account. *Id*. at 15. This cutoff decreased the percentage of economically unharmed Apple ID accounts from 17.8% to 7.9% (or approximately 10 million accounts). Dkt. No. 679-1 (Second Revised Supplemental Report of Daniel L. McFadden), ¶ 16 & Fig. 1. Prof. McFadden's econometric model satisfied the standard for class certification in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc) ("*Olean*"), because it could determine exactly which Apple ID accounts suffered monetary damages and which did not. Dkt. No. 666-1 (Plaintiffs' Renewed Motion for Class Certification) at 12. Plaintiffs assured the Court that they would run the model before trial on the full set of App Store transactions, match Apple IDs to individual Class members, and identify all Class members who suffered no economic loss.

*Id.* at 13.[1]

On January 16, 2024, the Court requested supplemental information providing "greater detail of the calculations of unharmed accounts." Dkt. No. 784. Dr. Song submitted a declaration explaining that with the $10 spending threshold applied, 7.9% of Apple ID accounts are unharmed, and that the threshold could be adjusted up or down. Dkt. No. 786-1, ¶¶ 10-12.

On February 2, 2024, the Court granted Plaintiffs' Renewed Motion for Class Certification. Dkt. No. 789 at 2. The Court found that Plaintiffs' claims met the *Olean* predominance requirement and that Prof. McFadden's model was capable of showing both impact and damages from Apple's anticompetitive conduct using common proof across all Class members. *Id.* at 26.

When it certified the Class, the Court accepted Plaintiffs' representation that their experts could, at some later point, "(i) match the Apple identification numbers . . . with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition." Dkt. No. 789 at 1. The Court indicated that if Plaintiffs failed to do *both*, the Court would consider whether modification of the class definition or decertification is appropriate "for all or part of the class." *Id.* (citing *City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001)). Plaintiffs' experts have now ascertained the Class members and reduced the percentage of "unharmed" Class members.

Plaintiffs conducted additional discovery after class certification, and Dr. Song then ran the damages model on *all* App Store transactions for the entire Class Period. Declaration of Rachele R. Byrd ("Byrd Decl."), Ex. 40 (Song Expert Report), ¶¶ 11, 68-74 & Appendix C at ¶ 106. Separately, JND deduplicated Apple's payor data and reduced the number of *potential* Class members. *Id.* ¶ 70. Using the results from JND, Apple then matched the App Store transactions to those payors and sent its results to Plaintiffs. Plaintiffs' damages experts applied the $10 spending cutoff to Apple's results and identified 185.4 million unique payors who met the $10 spending cutoff in any Apple ID and are members of the Class. *Id.* & Fig. 24. Plaintiffs' experts computed

---

[1] Apple asserts (at 4) that, as of June 23, 2023, Plaintiffs had not yet sought the payor data, but Plaintiffs sought the data more than a year earlier. On April 12, 2022, Plaintiffs propounded a request for "[a]ll DOCUMENTS CONCERNING the identity of each and every member of the CLASS." Dkt. No. 815, Byrd Decl., Ex. A at 5 (Request No. 55).

1    monetary damages for each of them, transaction by transaction. Based on those calculations, only
2    5.2% of Class members had no measurable monetary damages with flexible pricing and 5.9% of
3    Class members had no measurable monetary damages with Apple's price tiers in place. *Id*. Figs.
4    24 & 25.

5         On April 15, 2025, in light of evidentiary developments, Plaintiffs moved to modify the
6    Class definition in two respects: *first*, to limit qualifying foremarket purchases to iPhones and
7    iPads only (eliminating iPod Touch foremarket purchases); and *second*, to impose the $10 lifetime
8    spending threshold to Class members rather than Apple IDs. Dkt. No. 951. On June 11, 2025, the
9    Court granted Plaintiffs' first request (dismissing the iPod Touch claims with prejudice), but
10   deferred ruling on the second.[2] Dkt. No. 981.

11        After the Court deferred deciding whether to apply the $10 spending cutoff at the payor
12   level, Dr. Song then identified and quantified the Apple ID accounts with more than $10 in total
13   spending and classified them as harmed or "unharmed." Byrd Decl., Ex. 52 (Song Suppl. Expert
14   Report), ¶¶ 3-5 & Fig. 1. After Dr. Song ran the damages model on all App Store transactions for
15   the entire Class Period, the percentage of unharmed Apple IDs also has significantly declined. He
16   determined only 5.1% of all accounts suffered no measurable monetary harm without Apple's
17   restrictive pricing tiers. *Id*. ¶ 5 & Fig. 1. With Apple's restrictive pricing tiers in place, 5.8 % of
18   accounts suffered no measurable monetary harm. *Id*. ¶ 5 & Fig. 1.

19   **II.    LEGAL STANDARD**

20        Pursuant to Federal Rule of Civil Procedure 23(c)(1)(C), an order certifying a class "may
21   be altered or amended before final judgment." "The standard for decertification is the same as it is
22   for class certification: whether the requirements of Federal Rule of Civil Procedure 23 are met."
23   *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6448192, at *1 (N.D. Cal. Dec. 18, 2017). The
24   burden is on the "defendant, in moving for decertification," to "show that the class no longer meets
25   Rule 23's certification requirements," because decertification is only proper "*after some change,*
26   *unforeseen at the time* of the class certification, that makes alteration of the initial certification

27
28   _____
[2] Plaintiffs withdraw their request to modify the Class definition to impose the $10 lifetime spending threshold on payors rather than Apple ID accounts.

decision necessary." *In re Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (N.D. Cal. Nov. 25, 2014) (Gonzalez Rogers, J.) (internal quotations omitted; emphasis added); *see also In re Korean Ramen Antitrust Litig.*, 2018 WL 1456618, at *2 (N.D. Cal. Mar. 23, 2018) ("burden . . . falls squarely on the shoulders of defendants"); *see also Huckaby v. CRST Expedited, Inc.*, 2025 WL 987195, at *10 (C.D. Cal. Apr. 1, 2025) ("motion for decertification should not be granted except for good cause, such as discovery of *new facts or changes* in the parties or in the substantive or procedural law" (internal quotations omitted; emphasis added)). This is a heavy burden because "'doubts regarding the propriety of class certification should be resolved in favor of certification.'" *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6448192, at *1 (quoting *Gonzalez v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)); *see also Estrella v. Freedom Fin. Network, LLC*, 2012 WL 214856, at *4 (N.D. Cal. Jan. 24, 2012) (same).

## III.    DISCUSSION

Apple does not dispute that the action still satisfies Rule 23's numerosity, commonality, and typicality requirements. Citing no changed circumstances, Apple argues only (at 9-22) that common issues no longer predominate, that a class action is no longer superior, and that Plaintiffs are no longer adequate representatives. Each argument lacks merit.

### A.    Common Issues Still Predominate Over Individualized Issues

When the Court certified the Class, it relied on the Ninth Circuit's *en banc* opinion in *Olean*, rejecting Apple's "argument that 'Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.'" Dkt. No. 789 at 25 (quoting *Olean*, 31 F.4th at 669). In *Olean*, the Ninth Circuit clarified that there is no hard cap on the number or percentage of uninjured class members, holding that the presence of uninjured class members defeats class certification *only* when "individualized inquiries about such matters would predominate over common questions" at trial. 31 F.4th at 668. The Ninth Circuit refused to impose a cap on non-injury within a class. *Id.* at 669. *Olean* is still controlling law.

When certifying the Class, this Court found that common issues predominate because "Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members . . . and can compute which Apple accounts suffered damages and which

did not." Dkt. No. 789 at 26. "The model, once run, will answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury." *Id*. at 27. Prof. McFadden's damages model has done just that.

Apple argues (at 9) that common issues do not predominate because "Plaintiffs cannot reliably distinguish between the injured and uninjured and have failed to reduce the number of uninjured class members." Apple is wrong on both counts. After running the model on all the Class Period transactions, Plaintiffs' experts have reliably determined the percentage of unharmed Class members and the percentage of unharmed accounts, and they are both *lower* than the percentage of unharmed accounts at class certification.

One of Plaintiffs' damages experts, Dr. Song, ran Prof. McFadden's damages model on the full set of App Store transactions during the entire Class Period. JND cleaned and deduplicated the payor data that Apple produced, and Apple matched all those transactions to the deduplicated payor data. As a result, Dr. Song determined the number of "unharmed" *Class members* without Apple's pricing tiers in the but-for world is 5.2% and 5.9% with the pricing tiers in place in the but-for world. Byrd Decl., Ex. 40 (Song Expert Report), Figs. 24, 25. Dr. Song also separately identified and quantified the number of Apple ID accounts with more than $10 in total spending and classified them as harmed or unharmed. *Id*., Ex. 52 (Song Suppl. Expert Report), ¶¶ 3-5 & Fig. 1. He determined that without Apple's restrictive pricing tiers, 5.1% of the accounts suffered no monetary harm. *Id*. ¶ 5 & Fig. 1.[3] All these percentages of undamaged payors and Apple IDs are materially lower than at class certification.

Common issues still predominate because Plaintiffs can still show (and have now shown) impact and damages through common proof. Plaintiffs also can calculate (and have calculated) total damages, damages for each Apple ID account, and damages for each Class member. In addition, Plaintiffs can identify those accounts and Class members that suffered no monetary harm. And all of this is before the claims administration process, when class members will receive notice of any recovery and the damages each is due. In no scenario will "the need to identify uninjured

---

[3] When keeping Apple's restrictive pricing tiers in place, *only 5.8%* of those accounts suffered no monetary harm. *Id*.

class members . . . predominate and render an adjudication unmanageable." *Olean*, 31 F.4th at 669 n.13 (cleaned up). Class certification remains as proper now as it did in February 2024.

Apple (at 6) points to purported errors in Mr. Thompson's deduplication work. But, Mr. Thompson's deduplication work is relevant, his methods are reliable, and he reliably applied those methods. The anomalies Apple nitpicks—which, in one instance, concerns 0.01% of all customer records, and in another involves 0.003% of identified customers—do not require exclusion of Mr. Thompson's deduplication results. *See* Plaintiffs' *Daubert* Opp. at 9; Thompson Decl., ¶ 38. And none of the circumstances present in the cases identified in *Olean*—where expert evidence was inadequate for one reason or another to satisfy the prerequisites of Rule 23—is present in this case. *Olean*, 31 F.4th at 666 n.9. Plaintiffs have not "failed" at matching transactions to people. Mr. Thompson cleaned and deduplicated Apple's payor data, Apple matched the transactions to those deduplicated payor records, and Dr. Song identified, based upon that matching, which Class members and accounts were economically harmed and which were unharmed. The insignificant errors that Apple complains about in Mr. Thompson's deduplication work do not make the damages model unreliable for demonstrating class-wide impact and damages.

Apple (at 12) also faults Mr. Thompson for identifying the "payor" as the person whose name was on the associated payor record rather than the person who "actually" paid for each transaction. For example, Apple argues that when a child pays for an app or makes an in-app purchase, that child cannot be the "payor" if she uses her parent's credit card to pay for the transaction. *Id*. Apple's argument fails for at least two reasons.

*First*, as the Supreme Court has explained, direct purchasers are "the immediate buyers from the alleged antitrust violators." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019). "It is undisputed" that iPhone and iPad users "bought [] apps directly from Apple." *Id.* at 278. "Therefore, under *Illinois Brick*," those users "were direct purchasers who may sue Apple for alleged monopolization." *Id.* at 279. Apple has produced its records of the contact and payment information for every "customer" that made app and in-app content purchases. *See* Byrd Dec., Ex. 96 (July 10, 2024 Ltr. from E. Lazarus to R. Byrd & K. Wood). Apple itself calls those customers "payors." Defendant Apple Inc.'s Motion to Decertify the Class ("Mot.") at 4 (describing the

"actual consumers who paid for transactions on the App Store" as "payors"). Based on this information, Mr. Thompson has identified the correct direct purchasers: "individuals that purchase[d] apps and in-app content on Apple iPhones and iPads" between July 2008 and February 2024. Thompson Suppl. Report ¶ 8; *see also Pepper*, 587 U.S. at 280 ("the straightforward rule of *Illinois Brick*" is that if "retailer B sells to customer C, then . . . C may sue B if B is an antitrust violator").

By Apple's logic, no class could ever be certified when some payments are made with a credit card—true in nearly every case—because no one has any way to look behind the credit card purchases to see who eventually pays those bills. It cites no case, and Plaintiffs are unaware of any, adopting such a standard. The cases Apple cites do not support its strained interpretation that the payor is the person who may be funding the transaction. *In re MultiPlan Health Ins. Provider Litig.*, 2025 WL 1567835, at *9 (N.D. Ill. June 3, 2025), for example, does not answer whether a child who purchases and consumes a product using a parent's money is the purchaser. There, the defendant third-party payors of healthcare services argued they were not the true "payors" for those services because it was the patients, and not they, who received the services. The court stated, "The defendants seemingly argue that a purchaser must use the product being purchased to be in the market for that product. By that logic, parents who buy a chocolate bar for a child would not be in the market for chocolate bars, as only the child consumes the chocolate." *Id*. But the court did not say that a child who *purchases and consumes* the chocolate bar is not the purchaser if the child's parent gave them the money for the purchase, which is Apple's argument. Here, the direct purchasers of iOS apps and in-app content are those who make purchases through their Apple ID accounts, regardless of their age or payment method. *Cf. I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1126 (N.D. Cal. 2015) (class of minors was not overbroad because Facebook could "ascertain, through its records, whether a purchase was made from the minor's account, or whether an account was registered to a minor at the time the purchase was made").[4]

---

[4] *Garon v. eBay, Inc.* is inapposite because in that case the plaintiffs "[did] not allege . . . that any of them actually paid supra-competitive fees." 2011 WL 6329089, at *5 (N.D. Cal. Nov. 30, 2011). Here, Plaintiffs do allege that they paid supra-competitive prices for apps and in-app content because of Apple's anticompetitive conduct.

*Second*, the Class definition forecloses Apple's argument that the Class member is not necessarily the registered account holder who made the purchase. The Class definition requires only that the payment come "from [an] Apple ID account," and is agnostic to whether the credit card used for the payment was owned by the Apple ID registrant.

The word "paid" cannot be read in this context to mean the person to whom the credit card belonged, because if the credit card was borrowed, the owner of the credit card is not paying "from any one Apple ID account." The purchaser—the registrant of the Apple ID account—is paying for the app or in-app content. The ordinary meaning of the word "pay"—the present-tense form of the word "paid"—is "[t]o give money for a good or service that one buys; to make satisfaction." *Pay*, Black's Law Dictionary (12th ed. 2024); *accord Chartis Specialty Ins. Co. v. Queen Anne HS, LLC*, 867 F. Supp. 2d 1111, 1119 (W.D. Wash. 2012) ("To 'pay' means 'to satisfy (someone) for services rendered or property delivered,' to 'discharge an obligation to,' 'to give in return for goods or service,' or 'to discharge indebtedness for.'" (quoting *Webster's Third New Int'l Dictionary* 1659 (2002))). Consistent with *Illinois Brick*, the Class definition focuses on only whether someone gave money to Apple in exchange for an app or in-app content. If an iPhone owner clicked "purchase" on an app, they are the direct purchaser. And if they spent $10 from any one Apple ID, they are a Class member. That ends the inquiry.

Apple also makes (at 14) an ascertainability argument (without explicitly saying so) that Class membership cannot be determined without relating app transactions to payors. "'A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description.'" *Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 3746118, at *5 (S.D. Cal. July 15, 2013) (quoting *Thomasson v. GC Services Ltd. P'ship*, 275 F.R.D. 309, 313 (S.D. Cal. 2011)). The Class definition meets that standard, because one's membership can be defined through objective and verifiable criteria. If someone spent at least $10 on iOS apps or in-app content during the defined Class Period, they are a member and will be bound by whatever verdict the jury reaches.

Plaintiffs are not required to identify (especially the way Apple demands) every Class

member. *See Knutson*, 2013 WL 3746118, at *5 ("Class certification hinges on whether the identity of the putative class members can be objectively ascertained; *the ascertaining of their actual identities is not required*.") (emphasis added); *see also Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *11 (N.D. Cal. June 13, 2014) ("lack of ascertainability alone will generally not scuttle class certification") (internal quotation omitted). Here, though, Plaintiffs have identified the Class members. The fact that Apple's poorly maintained data and its refusal to provide additional customer identification data might have prevented Mr. Thompson from identifying Class members with 100% precision before trial does not prevent the Court from certifying the Class, where his deduplication has resulted in errors measured in *thousandths of a percent*. *See, e.g., Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000) (finding a class was ascertainable despite the defendant's claims that it was "impossib[le]" to identify class members from its ordinary course records; "[s]hould a debt collection company as large and as sophisticated as Transword be able to avoid class action liability by mere fact of inadequate record-keeping, the Congressional purpose behind the statute would indeed be thwarted").

The impact of Mr. Thompson's work on absent Class members' claims therefore is null. The granularity in his continued work—which does not affect aggregate damages—will be especially relevant in the administration process *after* trial, if Plaintiffs prevail. Mr. Thompson's pre-trial identification of unique Apple customers will be verified and, if needed, corrected, through post-trial claims administration that presumably will include information (*e.g.*, credit card and telephone numbers) that Apple has not yet made available to Plaintiffs. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131-33 (9th Cir. 2017) ("At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims. Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability." (citations and internal quotations omitted)); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3-4 (S.D. Cal. May 8, 2020) ("determination of class membership and protecting the defendant's due process rights can be done during the claims administration process"); *Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628, 633

MOTION TO DECERTIFY THE CLASS
Case No. 11-cv-06714-YGR
-9-

(E.D. Cal. 2023) ("class members who did not pay the valuation fee—may be weeded out at the claims phase, preventing any individuals without standing from 'recover[ing] individual damages' just as *TransUnion* envisioned" (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))).

Thus, there is no genuine ascertainability problem. *See Woe by Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) ("it is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can easily be created").[5]

Apple again argues that the sheer number of uninjured Class members is "intolerably high" and that "the presence of *any* uninjured class member is ground to decertify." Mot. at 16 (citing the *dissenting* opinion in *Lab. Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1609 (2025)). These arguments are inconsistent with *Olean*, in which the Ninth Circuit clarified that there is no hard cap on the number or percentage of undamaged class members. The presence of undamaged class members defeats class certification *only* when "individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668. The Ninth Circuit expressly refused to impose a standard of *de minimis* non-injury within a class. *See id.* at 669 (confirming that the presence of *some* class members who cannot prove damages does not defeat class certification).

Resisting that straightforward holding in *Olean*, Apple argues (at 16) that, at some point, the sheer number of uninjured accounts must be so high that the Class is mis-defined. This, too, misreads the case law. A class is not "fatally overbroad" simply because it includes some number or percentage of class members who eventually are proven to lack damages. A class is "fatally

---

[5] Apple's cases (at 15) are inapt. In *Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *6, 7, 10 (S.D. Cal. Sept. 23, 2015), essential information (e.g., names) was missing from the data the plaintiffs proposed to use to identify the class members, and the plaintiffs' proposal "to cross reference" that data with "massive amounts of [other] data" (which plaintiffs had failed to obtain in discovery) as a workaround, if possible at all, would still yield "a data set of questionable reliability that covered only some unknown fraction of the putative class." There are no such "holes" to fill here. *Id.* at *7, 10. Likewise, in *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137-38 (3d Cir. 2023), the plaintiffs' proposed method for identifying class members yielded incorrect results in *half* of the example cases and further required an analysis of "the underlying contractual relationships of each transaction to distinguish between class members and mere intermediaries." Those issues are not present here.

overbroad" only when it includes too many members who could not possibly have been harmed by the alleged wrongdoing. *Olean*, 31 F.4th at 669 n.14 (citing *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 824 (7th Cir. 2012)).

Class members who "could not have been harmed" means those who, for example, never saw a misleading advertisement, *see Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1137-38 (9th Cir. 2016) (citing *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 597 (9th Cir. 2012)), or in this case, those who did not buy any apps or pay for any in-app purchases. However, the Class does *not* include any iOS customers who never bought apps or made in-app purchases. Here, *all* Class members were exposed to Apple's unlawful conduct, Byrd Decl., Ex. 41 (Stiglitz Opening Report), § IV, even if they have no measurable monetary damages. *See Glen Holly Ent't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (plaintiffs had adequately alleged an antitrust injury because an agreement between two companies "detrimentally changed the market make-up and limited consumers' choices to one source of output."). The fact that other factors shielded them from measurable economic injury (such as purchasing only a small number of apps or only apps that would not have changed price in the but-for world), only means they were "fortuitously non-injured." *Olean*, 31 F.4th at 669 (citing *Ruiz Torres,* 835 F.3d at 1137).

The presence of fortuitously uninjured Class members is not troubling here because their number has been winnowed through the $10 spending threshold, and the identification process does not "overwhelm common [issues] and render class certification inappropriate." *Id.* at 669 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (recognizing that "a class will often include persons who have not been injured by the defendant's conduct," but that "[s]uch a possibility or indeed inevitability does not preclude class certification").[6]

---

[6] Apple argues (at 11) that the economically undamaged Class members are not fortuitously uninjured but that their negative damages are "inherent in Plaintiffs' chosen model and economic analysis." Apple misunderstands fortuitous non-injury, which the Ninth Circuit described as "unlawful conduct in the absence of harm." *Ruiz Torres*, 835 F.3d at 1137. The entire Class was subjected to Apple's unlawful conduct when they purchased apps or in-app content from the App Store. The fact that a small subset of them suffered zero or negative monetary damages is what the Ninth Circuit calls "fortuitous non-injury." *Id.*

Apple (at 17) recycles its previously rejected (and mistaken) interpretation of two out-of-circuit cases, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019), and *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018). As the Ninth Circuit explained in *Olean*, rejecting a *de minimis* standard did not create a split in the circuits, because an argument that either *Asacol* or *Rail Freight* had imposed such a rule, as Apple makes here, misreads those cases. *See Olean*, 31 F.4th at 669 n.13.

In *Asacol*, for example, the problem was that the only way to sort out whether class members would have switched to a generic drug was through the testimony of 100% of the class members, and "a trial in which thousands of class members testify" is inconsistent with the class action process. *Asacol*, 907 F.3d at 57-58; *see also Rail Freight*, 934 F.3d at 625 (no way "short of full-blown individual trials" to resolve question of injury) (cited by *Olean*, 31 F.4th at 669 n.13). That problem is not present here, due to the economic modeling and identification procedures that can identify every Class Member who has suffered damages.

*Asacol* and *Rail Freight* simply hold that putting every class member on the stand to resolve whether they have suffered injury is inconsistent with Rule 23(b)(3). There is no such prospect here, where Plaintiffs' experts have identified which accounts and which Class members have suffered economic injury or not—using a common (classwide) model. Apple argues that the precise number of uninjured accounts might be slightly different than what Dr. Song has calculated, but *Olean* makes clear that any such differences are irrelevant. Here, unlike in *Rail Freight* or *Asacol*, the means of identifying uninjured accounts and Class members are "straightforward," **mathematical calculations** that eliminate "the complexity of damages calculations [that] would defeat predominance." *Olean*, 31 F.4th at 681-82 & n.31.

Apple also recycles arguments (at 15) that this Court has already considered and rejected, such as Apple's claim that Plaintiffs' damages model is "volatile" and therefore unreliable simply because a tiny percentage of Apple ID accounts switch from harmed to unharmed or *vice versa* when Apple's experts *changed* the damages model's inputs, data, or designs. In a new version of an old argument, Apple argues that excluding iPod Touch transactions causes 300,000 payors to switch from "harmed" to "unharmed" and vice versa, and therefore the model is unreliable. Mot.

at 15 (citing Prince Rebuttal Report, ¶ 27). But as this Court has already found, if the inputs change, then the results *should* change as well. Indeed, in addressing the exact same argument before, the Court noted the fact that accounts switch when inputs are changed "does not shake Prof. McFadden's 95% confidence interval but ***instead serves to confirm it***." Dkt. No. 789 at 15 (emphasis added). Conversely, in *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020), the court found, unlike here, that the "models [we]re repeatedly *insensitive*" to changes in inputs (emphasis added).

Finally, Apple suggests (at 17) that the massive scale of the App Store means the absolute number of "uninjured" Class members may be "more than the number courts have found unacceptably high in other cases." In other words, Apple is too big to face antitrust scrutiny via class action—a through-the-looking-glass defense. This Court told Apple's counsel at the May 30, 2025 hearing, however, "the fact that [Apple] is so large that the small percentage here impacts millions of people is a function of the fact that they are humongous. But that doesn't undermine the fact that there are common questions which predominate for 186 million people, according to [Prof. McFadden's] model." Dkt. No. 980 at 13:16-21.

Apple erroneously contends (at 10-11, 18-19) that the existence of economically undamaged Class members means the antitrust injury requirement is not satisfied. But this conflates injury and damages. *Olean* recognized that some number of class members may be fortuitously undamaged in the economic sense, and the Ninth Circuit has long held that requiring a plaintiff to prove economic damages to satisfy the antitrust injury requirement "is too restrictive." *Glen Holly,* 352 F.3d at 374 (plaintiffs adequately alleged an antitrust injury because an agreement between two companies "detrimentally changed the market make-up and limited consumers' choices to one source of output"); *see also*, *e.g.*, *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 804 (N.D. Cal. 2022) ("[C]onsumers have suffered an injury because Facebook 'detrimentally changed the market make-up and limited consumers' choice to one source of output.'" (citation omitted)).

Plaintiffs have set forth a common, class-wide theory of harm sufficient to satisfy the antitrust injury requirement: Apple's restrictions have "foreclose[d] nearly all alternative channels of iOS app sales" and thereby decreased app output, reduced app quality, and limited innovation.

1    *See* Byrd Decl., Ex. 41 (Stiglitz Opening Report), §§ III, IV. This "limited consumers' choice to

2    one source" of apps and in-app content, the Apple App Store, and "prevent[ed] [consumers] from

3    making free choices between market alternatives." *Glen Holly*, 352 F.3d at 374 (quotation and

4    citation omitted). Antitrust courts have long recognized these forms of harm as antitrust injuries.

5    *See Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426, at *11 (E.D. Cal. May 12, 2023)

6    ("Courts have recognized various types of antitrust injuries, including limiting consumer choice,

7    reducing output and innovation, and increasing prices for lower quality and fewer services."

8    (collecting cases)); 3G Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles*

9    *and Their Application* ¶ 391e (May 2025 update) ("If an incumbent monopolist takes steps to

10   maintain its monopoly by foreclosing a would-be rival from entering, . . . [c]onsumers are [] injured

11   because they do not get the benefit of the competition that would have accompanied entry.").

12        Apple's conduct in monopolizing the relevant market and limiting consumer choice was

13   done at the market level and harmed the Class by limiting choice of app stores from which to

14   purchase iOS apps and in-app content. *See* Byrd Decl., Ex. 41 (Stiglitz Opening Report), ¶¶ 21-

15   22, 99-104, 109-20; *id.*, Ex. 38 (McFadden Report) ¶¶ 17, 19; *id.*, Ex. 18 (May 14, 2025 McFadden

16   Dep.) at 13:22-15:25, 74:2-12.

17        Conversely, the plaintiffs in Apple's cited cases (at 10-11, 18) sustained no injury because

18   there was no anticompetitive conduct. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S.

19   328, 339 (1990) (rejecting plaintiff's argument that "it has suffered antitrust injury even if

20   [defendant's] pricing was not predatory"); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199,

21   1201-02 (9th Cir. 2012) (alleged tying agreement was not anticompetitive). *Brantley* expressly

22   *rejected* Apple's argument here, stressing that "[h]ad the plaintiffs succeeded in pleading an injury

23   to competition, the complaint's allegations of reduced choice . . . and increased prices *would*

24   sufficiently plead . . . that they had been harmed by the challenged injury to competition." 675

25   F.3d at 1202 (emphasis added). And in *Williams v. Apple Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021),

26   the court did not address the issue of "antitrust" standing at all. *See id.* at 643 (determining whether

27   class members were injured required "individualized inquiry" because plaintiffs' *contract* claim

28   asserted a breach based on Apple sharing plaintiffs' data with third parties and not based on

"mere *exposure* to Apple's storage *algorithm*"). The existence of some Class members without economic damages does not undermine the existence of antitrust injury or the class's definition. Plaintiffs have the means to identify damaged Class members on an individual and aggregate basis, and at claims administration (when Apple provides additional information) to make specific payments to individual Class members who suffered economic damages.

There is similarly no authority for Apple's assertion (at 19) that Plaintiffs are required to assess positive benefits, such as privacy and security, for Class members on an individualized basis. To the extent Apple can show that its restraints enhance the privacy or security of its products (and that such claims are not pretexts for the profits that Apple reaps through its anticompetitive conduct), Apple will have to make that showing in defending against liability, not in showing how particular customers were affected. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024) ("If a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to 'show a procompetitive rationale for the restraint[s].'" (citation omitted)). If Apple is liable and a class member paid an overcharge, the class member is entitled to recover those damages, irrespective of the value the class member places on particular product characteristics. *Cf. In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *21 (N.D. Cal. Feb. 21, 2017) (recognizing that "one overcharge" establishes an injury "even if the anticompetitive conduct at issue also results in offsetting benefits" (citation omitted)).

**B.      A Class Action is Still Superior, and the Class Representatives Still Adequate**

**1.      Superiority:**      Rule 23(b)(3)'s superiority requirement is met where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously dispute that a class action is a superior mechanism for resolving Plaintiffs' claims. Apple complains (at 19) that the Court's order adopting Plaintiffs' proposed $10 lifetime spending threshold to reduce the number of economically undamaged class members is "arbitrary," and—using raw numbers rather than percentages to distort the impact—removed more injured class members than uninjured ones. The Ninth Circuit already considered and rejected this argument. *See* Dkt. No. 793-1 (Rule 23(f)

Petition) at 18-19. And as Plaintiffs' expert, Dr. Song, has already explained, the $10 spending cutoff removed a far greater proportion of unharmed accounts than harmed accounts. Dkt. No. 962-2 (May 6, 2025 Song Decl.), ¶ 13.

The Court's Order adopting Plaintiffs' $10 lifetime spending threshold reduced the number of unharmed Apple ID accounts from 17.8% to 7.9%. *See* Dkt. No. 789 at 26 ("Acknowledging that an estimated 17.8% of accounts in Prof. McFadden's model are uninjured, plaintiffs have revised their class definition to limit the number of uninjured class members."). It worked. The undamaged are now about 5%, regardless of how transactions are assigned. *See* App'x A.

In adopting Plaintiffs' Class definition, the Court did not "excis[e]" "a large share of potential claimants from the proposed class," like the plaintiffs in *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 932 (4th Cir. 2025). There, the Fourth Circuit affirmed the district court's denial of class certification because plaintiffs' proposed class consisted of 3,219 injured manufacturers and 65 uninjured manufacturers but excluded more than 2,000 manufacturers who were victims of the same violation. *Id.* The percentage of people removed from the Class here does not come anywhere close to the nearly 40% of potential class members excluded in *Mr. Dee's* putative class.

Apple's primary complaint about the $10 lifetime spending threshold is that it "may soon be facing yet another class action, with millions of users or more, over the same alleged conduct and supra-competitive commission—just like in the developer cases." Mot. at 20. That argument, if it had any merit, existed when the Class was originally certified *with the $10 threshold*. Dkt. No. 789 at 2. Thus, the $10 issue is legally insufficient for decertification. *See Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (decertification proper only "*after some change, unforeseen at the time*" of certification, making class no longer certifiable (emphasis added)); *Huckaby*, 2025 WL 987195, at *10 (decertification improper absent new facts or changes in the parties or in the substantive or procedural law). There have been no such changes since the Ninth Circuit refused to grant Rule 23(f) review of the Court's certification decision.

In any event, the argument is irrelevant to the superiority analysis. Any Class member excluded by virtue of the $10 spending threshold has only an *individual* claim. *See China Agritech v. Michael H. Resh*, 584 U.S. 732, 736 (2018) (tolling limited to *individual* claims). No one

1  affected by the $10 spending threshold could or would incur tens of millions of dollars in expenses

2  to bring an individual antitrust claim to recover even less than $10 in damages against a corporate

3  giant like Apple. Additionally, by agreement between the parties, the Class Period ended on

4  February 2, 2024, the date of the Class Certification Order. Yet Apple has continued to charge the

5  same supracompetitive commissions, require the use of its IAP, and impose the same

6  anticompetitive anti-steering rules. If Apple is exposed to the risk of another class action, *it is its

7  own fault*, not the result of the $10 spending cutoff.

8      *Cameron v. Apple Inc.* is not a useful counterexample. There, Apple settled only with *small*

9  developers, knowing that *large* developers originally in the developer class could sue it. *See* No.

10  4:19-cv-03074-YGR, Dkt. No. 396 at 1. The follow-on cases Apple cites are similarly

11  distinguishable, and belie Apple's argument that the $10 threshold is a reason to decertify.[7]

12      *Olean* allows the Court to modify the class definition to cure a potential overbreadth

13  problem, which the Court already did when it certified the Class nearly 18 months ago. Dkt. No.

14  789 at 25. As the Court discussed in the Class Order, *Olean* gives it broad discretion to "refin[e]

15  the class definition" to address such problems "rather than . . . flatly denying class certification."

16  *Id*. (citing *Olean*, 31 F.4th at 669 n.14). Nothing has changed about this to warrant decertification.

17      *Abante Rooter & Plumbing*, 2017 WL 4073792, at *2-3 (N.D. Cal. Sept. 14, 2017), is

18  distinguishable because there the plaintiffs' basis for excluding certain potential class members

19  was that they lacked "readily available data" to identify them, which is what the court found to be

20  "arbitrar[y]" about the plaintiffs' proposed mechanism for eliminating class members. That

21  problem does not exist here. *Jensen v. Natrol, LLC*, 2020 WL 416420, at *1 (N.D. Cal. Jan. 27,

22  2020), is also distinguishable. There, the proposed class did not include the fortuitously uninjured,

23

24  [7] *Korean Publishers Assoc. v. Apple Inc.*, No. 4:25-cv-4438 (N.D. Cal.), includes a class of
developers domiciled in *Korea* (Dkt. No. 1 at 8, ¶ 32, Dkt. No. 44 at 12 ¶ 54), and a class of
25  developers who sold apps through Apple's *Japanese* App Store (Dkt. No. 44 at 13 ¶ 55), neither
of which were ever part of the *Cameron* case (No. 4:19-cv-03074, Dkt. No. 53 at 35-36 ¶ 113).
26  Furthermore, *Pure Sweat Basketball, Inc. v. Apple Inc*., No. 4:25-cv-03858 (N.D. Cal.), concerns
Apple's violation of this Court's injunction in *Epic Games v. Apple Inc*., No. 4:20–cv–5640 (N.D.
27  Cal.), Dkt. No. 1508, and has a *different class period* than *Cameron* (January 17, 2024 through the
date Apple complies with this Court's injunction).
28

but rather had a "distinct subset of members who were not misled, who were not injured, who could not possibly recover, and who would be easy to weed out at the front end." That problem does not exist here, where plaintiffs' class definition is "reasonably co-extensive" with their "theory of liability" and it is entirely "possible that each class member suffered an injury at the hands of the defendant." *Id.* (citing *Ruiz Torres*, 835 F.3d at 1137 n.6).

   **2.**  **Adequacy:** Three years after Plaintiffs offered their amended Class definition, *see* Dkt. No. 665, Apple now argues for the first time (at 21-22) that the $10 spending threshold is evidence that Plaintiffs are not adequately protecting the Class's interests. This argument fails for two reasons. First, it relies on no new facts. Apple could have raised this adequacy claim when opposing class certification or seeking Rule 23(f) review, but it did not. *See* Dkt. No. 689 at 29-31 (raising no adequacy issue); Dkt. No. 793-1 (Rule 23(f) Petition) at 23-25 (same). Second, on the merits, it contradicts *Olean*. The Ninth Circuit made clear that "refining the class definition" to mitigate concerns "of a potentially 'over-inclusive' class"—which is what the $10 spending threshold does—is preferable to "flatly denying class certification." *Olean*, 31 F.4th at 669 n.14; *see also In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 532 (N.D. Cal. 2010) ("Plaintiffs are permitted to press a theory of contract liability that affords them the best chance of certification and of success on behalf of the class.").

   Apple makes the same adequacy claim (at 21-22) regarding the removal of iPod Touch transactions from the Class. Those claims were removed because they lacked merit. None of Apple's cited authority suggests that Plaintiffs and their counsel have breached any fiduciary duty

to Class members by dropping claims that would not prevail at trial.[8]

### C. Plaintiffs' Damages Model Is Still Reliable and Its Assumptions Sound

Nothing has changed since the Class Order held that Prof. McFadden's model "can show the impact of Apple's allegedly anticompetitive conduct across all class members" and "under *Olean*, the predominance requirement is met." Dkt. No. 789 at 26:4-18. Apple's argument is improper for multiple reasons. First, it is procedurally backwards, asking the Court to play a guessing game. Using the word "if" more than a dozen times (at 22-25), Apple asks the court to forecast potential *Comcast* problems (*i.e.* the damages measurement does not match the theory of liability, *Comcast Corp. v. Behrend*, 569 U.S. 27, 37-38 (2013)) in light of dismissals on motions that are not even fully briefed, let alone decided. Neither the Court nor Plaintiffs should be in the position of speculating about the effect of dismissed conduct on damages before it happens; no case Apple cites says otherwise.[9] Second, Dr. Abrantes-Metz makes clear that her but-for commission rate measures any set of unlawful conduct except one in which only the price tiers are anticompetitive. Lastly, Apple should not prevail on any of its summary judgment theories.

The cases Apple cites support Plaintiffs' conclusion that Apple is procedurally out of order. *Comcast* rejected a damages model for failure to disaggregate conduct ***after*** it was determined that only the overbuilder theory was capable of class-wide proof. *Comcast*, 569 U.S. at 37–38 (model presumed four anticompetitive acts, but only one survived in the case). *See* Mot. at 22-25 (multiple

---

[8] *See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 641 (N.D. Cal. 2015) (plaintiffs abandoned several types of damages that were "likely to exceed by many times" the one category of damages that remained); *Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL 3976204, at *13-14 (W.D. Wash. Mar. 25, 2019) (plaintiff was not adequate where "a substantial number of putative class members have made warranty claims and signed release agreements with [defendant]."); *In re Stec Inc. Sec. Litig.*, No. SACV 09–01304–JVS (MLGx), 2012 WL 6965372, at *7 (C.D. Cal. Mar. 7, 2012) (plaintiffs inadequate "because they seek to certify a Class that includes individuals who may have claims under the Securities Act, but the[y] … do not have standing to bring those claims."); *Mays v. Tennessee Valley Auth.*, 274 F.R.D. 614, 622-24 (E.D. Tenn. 2011) (plaintiffs inadequate where they abandoned claims for medical monitoring, emotional distress, and personal injury, which all potentially had *res judicata* effect).

[9] Only the Summary Judgment motions even potentially raise a *Comcast* issue. There is no *Daubert* motion as to the damages experts (Drs. Abrantes-Metz, McFadden and Song), and the pending *Daubert* motions as to Dr. MacCormack and Mr. Thompson do not even potentially create a situation where some but not other kinds of challenged conduct survive summary judgment.

citations). Here, the Court has *not* excluded (at any stage of this proceeding) any theory of anticompetitive conduct proffered by Plaintiffs. *Comcast* does not apply here.

In *Noohi v. Johnson & Johnson Consumer Inc.*, the Ninth Circuit explained that under *Comcast*, the key inquiry at the class certification stage—applicable here too at decertification—is whether the plaintiff has demonstrated a nexus between her legal theory and her damages model. 146 F.4th 854, 867 (9th Cir. 2025) (class certification affirmed). The Court previously found this nexus at the class certification stage. Dkt. No. 789 at 26-27. Nothing has changed to warrant decertification. As *Noohi* noted, any failures in the model can be explored at trial. *Noohi*, 146 F.4th at 867.

Apple argues speculatively that summary judgment in its favor on *any* theory of liability "dooms [the Plaintiffs'] entire case." Mot. at 23:1. Apple's argument is premature.[10] At this time, all of Plaintiffs' theories of liability are intact.

Apple's contention also ignores Dr. Abrantes-Metz's explanation about how her model easily copes with the *possibility* that the jury *may* find that some but not all of Apple's conduct is unlawful. She modeled the impact of competition, not a particular form of competitor, so that her model works when competitive pressure exists. Byrd Decl., Ex. 20 (May 2025 Abrantes-Metz Dep.) at 34:4-35:12. As she repeatedly said, her conservative estimate of the but-for commission rate of 13.63% applies if the jury finds that *any* of the three major areas of anticompetitive conduct (monopolizing app distribution, monopolizing payment for in-app purchases, and anti-steering) are unlawful. *Id*. at 39:13-23; 48:6-17.

Apple's other cases are either helpful to Plaintiffs or simply inapplicable.[11] For example,

---

[10] Apple's reliance on *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014), similarly is misplaced. In that case the district court excluded the expert because arbitrarily selected parameters entirely altered the model's conclusions.

[11] Apple's reliance on *Rail Freight*, 934 F.3d 619 (measured negative damages for 2,000 individuals) is misplaced because the Ninth Circuit declined to extend *Rail Freight's* analysis of uninjured class members in *Olean*, 31 F.4th 651. *See also* Order Denying Class Certification (Dkt. No. 630) at 24:24-25 (rejecting Apple's *Rail Freight* argument, "the Ninth Circuit has not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance.").

1  *Ruiz-Torres*, also referenced by the Court in its Class Order (Dkt. No. 630 at 24:12-15), holds that

2  the "fortuitous non-injury to a subset of class members does not necessarily defeat certification of

3  the entire class." *Ruiz Torres*, 835 F.3d at 1137. In *Lithium Ion Batteries Antitrust Litigation*, this

4  Court denied a renewed motion for class certification with respect to the expert's focal point

5  pricing analysis because the expert failed to link such pricing on pass-through effects for the

6  indirect purchaser class. *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *5 (N.D.

7  Cal. Mar. 5, 2018); Mot. at 22.

8          By contrast, the Class Order in this case notes that Prof. McFadden "created two models,

9  one without price tiers and one which incorporated tier and focal pricing." Dkt. No. 789 at 10:27-

10  28. The Court found this simulation to be "sufficiently reliable." *Id.* at 10. Apple's motion offers

11  no contrary evidence. In *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018)

12  (Mot. at 22:24), class certification was denied based on the expert's lack "of data-driven analysis,"

13  but the Court found here that Apple "misconstrued the model" and that the model's data-driven

14  analysis was "sufficient at this stage." Dkt. No. 789 at 13-14.

15  **IV.     CONCLUSION**

16          Apple's Motion to Decertify the Class is therefore **DENIED** in full.

17

18          **IT IS SO ORDERED.**

19

20    DATED: _____, 2025

21

22

23                                                    _____

24                                                    The Honorable Yvonne Gonzalez Rogers
                                                      United States District Judge

25

26

27

28