UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**[PROPOSED] ORDER DENYING DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK**<br><br>DATE: October 14, 2025<br>TIME: 2:00 p.m.<br>CRTRM: 1, 4th Floor<br>JUDGE: Hon. Yvonne Gonzalez Rogers |
|---|---|

Defendant Apple Inc. brought a motion to preclude Plaintiffs' witnesses, Mr. Darryl Thompson and Prof. Alan D. MacCormack, from testifying as experts at trial (the "Motion"). For the reasons set forth below, Apple's Motion is **DENIED**.

## I.  BACKGROUND

Plaintiffs seek damages under Section 2 of the Sherman Act, 15 U.S.C. § 2, for Apple's alleged monopolization of the sale of iOS apps and in-app purchases. Plaintiffs allege that Apple, through contractual and technological restrictions, has constrained iPhone and iPad users to purchasing iOS apps and in-app purchases through the Apple App Store, allowing Apple to monopolize that market and impose a supracompetitive 30% commission on those sales.

On February 2, 2024, the Court granted Plaintiffs' motion for class certification and denied Apple's *Daubert* challenges to the expert testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz. The parties subsequently exchanged opening and rebuttal expert reports on all core aspects of the case including market definition/market power, aftermarket lock-in, anticompetitive conduct/effects, purported procompetitive rationales, and damages. Expert discovery closed on July 17, 2025.

The Court authorized the parties to file select *Daubert* motions. *See* Dkt. No. 994. Apple moves for the exclusion of testimony from Mr. Thompson, who has identified millions of potential Class members from a large record dataset that Apple keeps in the ordinary course of business; and Prof. MacCormack, who deduced from third-party app developer cost data "Genre Gross Margins" that "quantif[y] the difference between revenues and variable costs for all [app] developers within a genre . . . as a percentage of their revenue." Declaration of Rachele R. Byrd ("Byrd Decl."), Ex. 32 (MacCormack Rep.) ¶ 10.[1] Trial is set for February 2, 2026. *See* Dkt. No. 1010.

## II.  LEGAL STANDARD

Trial courts are the gatekeepers of expert testimony, ensuring that all opinions are "based on sufficient facts or data," are "the product of reliable principles and methods," and "reflect[] a

---

[1] For ease of reference, all Exhibit references are to those accompanying the Declaration of Rachele R. Byrd filed in support of Plaintiffs' Opposition to Apple's summary judgment, *Daubert*, and decertification motions.

reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). But "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). Instead, the court evaluates whether "the knowledge underlying [an expert's opinion] has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013). The question "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility." *Elosu*, 26 F.4th at 1024 (cleaned up).

### III.   DISCUSSION

#### A.   Mr. Thompson's Expert Testimony Satisfies Rule 702

Having reviewed the Parties' briefs, the accompanying exhibits, and the Declaration that Mr. Thompson authored in support of Plaintiffs' opposition brief, the Court finds that Mr. Thompson is qualified as an expert in data deduplication; his opinions are relevant to this case; his data deduplication methodology is reliable; and that he reliably applied those methods in this case. For these reasons and the reasons that follow, Apple's *Daubert* motion to preclude him from testifying is denied.

*First*, Mr. Thompson is qualified to offer expert testimony. Rule 702 "contemplates a broad conception of expert qualifications," *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), which include the expert's "knowledge, skill, experience, training, or education," Fed. R. Evid. 702. Here, Mr. Thompson's experience and knowledge as a data specialist qualify him as an expert in data deduplication. In his current role, Mr. Thompson oversees JND's "entire IT organization" and "the operations organization." Byrd Decl., Ex. 23 (Thompson Dep.) at 24:19-24. In roughly 50 to 70 percent of JND's cases, Mr. Thompson personally oversees his team's data deduplication projects. *Id.* at 25:5-15, 210:9-211:2. He teaches his team the data deduplication methods he has learned and developed. *Id.* at 211:3-9; Thompson Decl. ¶¶ 13, 15.

In fact, many of the data specialists he taught are now teaching others how to deduplicate data. Byrd Decl., Ex. 23 (Thompson Dep.) at 211:10-13. Mr. Thompson also has an active data deduplication workload, particularly "for [JND's] most complex cases." *Id.* at 25:5-15; *see* Byrd Decl., Ex. 44 (Thompson Suppl. Rep.) ¶ 4. This experience "[c]learly . . . lays at least the minimal foundation of knowledge, skill, and experience required on order to give 'expert' testimony" regarding data deduplication. *Thomas*, 42 F.3d at 1269-70; *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (expert qualified to testify "about claims adjustment standards in the context of an insurance bad faith claim" based on his "twenty-five years' [worth of] experience working for insurance companies and as an independent consultant"); *In re PFA Ins. Mkt'g Litig.*, 2022 WL 3146557, at *2 (N.D. Cal. June 15, 2022) (Gonzalez-Rogers, J.) (similar).

*Second*, Mr. Thompson offers relevant expert testimony. The population he identified—those who made purchases of iOS apps and in-app content during the Class Period—has "a valid connection" to Plaintiffs' liability theory. *Alaska Rent-A-Car*, 738 F.3d at 969. Because Plaintiffs represent a class of direct purchasers, those with antitrust standing to sue are "the immediate buyers from the alleged antitrust violators." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019). "It is undisputed" that iPhone and iPad users "bought . . . apps directly from Apple." *Id.* at 278. "Therefore, under *Illinois Brick*," those users "were direct purchasers who may sue Apple for alleged monopolization." *Id.* at 278–79. Apple eventually produced records of the contact and payment information for every customer that purchased apps and in-app content. Mr. Thompson has thus identified the correct group of direct purchasers from that dataset: "individuals that purchase[d] apps and in-app content on Apple iPhones and iPads" between July 2008 and February 2024. Byrd Decl., Ex. 44 (Thompson Suppl. Rep.) ¶ 8.

*Third*, Mr. Thompson's methods "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Elosu*, 26 F.4th at 1024 (cleaned up). Mr. Thompson's methods are the culmination of continual assessment and refinement over a career spent analyzing datasets containing millions of oftentimes user-generated data, with over 14 years spent applying those methods in the legal administration field. "[T]he application of [that] extensive experience is a

'method' that can reliably support expert testimony." *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022). And, after reviewing his expert report and declaration, the Court is satisfied that his methods were disclosed in sufficient detail to permit Apple to engage in a fulsome cross examination at trial. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046–47 (9th Cir. 2014); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021).

Apple makes several challenges to Mr. Thompson's methods, but none justify excluding Mr. Thompson's testimony. First, that Apple's expert, Prof. Victoria Stodden, could not precisely replicate Mr. Thompson's output goes to the weight. *See Optronic Techs.*, 2019 WL 4780183, at *3 (expert's methods were reliable, even though his "analysis [was] not subject to peer review or exact replication," because he "provide[d] a sufficient basis for understanding how he reached his opinions and to show that they are supported"); *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2024 WL 5483606, at *7 (N.D. Cal. Oct. 22, 2024) (similar). The same is true regarding Apple's assertions that Mr. Thompson did not subject his methods to peer review or scrutiny from the scientific community. *See United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000); *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) (expert testimony "based on the application of extensive experience . . . is the product of the expert's experience—not science"); *Blockchain Innovation*, 2024 WL 5483606, at *7 ("[T]he fact that an expert's analysis 'is not subject to peer review . . . is not disqualifying.'" (quoting *Optronic Techs.*, 2019 WL 4780183, at *3)). Indeed, it is unsurprising that Mr. Thompson did not disclose his methods to the community writ large since it would irreparably damage his firm's competitive advantage. Thompson Decl. ¶¶ 13, 15. Nor is the Court convinced that the absence of an error rate from Mr. Thompson's report requires excluding his opinions; Apple has not shown how an error rate would be calculated "in a meaningful way" here. *Zetz v. Boston Sci. Corp.*, 644 F. Supp. 3d 684, 713 (E.D. Cal. 2022).

*Fourth*, Mr. Thompson has applied his methods reliably to Apple's customer data. The so-called "errors" isolated by Apple in its briefing are driven by poor data quality that *Apple* chooses to keep in the ordinary course. Further, to the extent that Mr. Thompson's work contains some

improperly rolled-up records, the Court is convinced that those improper roll-ups impact an infinitesimally insignificant portion of potential Class members. Apple is free to cross examine Mr. Thompson about these issues, but Apple has not shown how any of them "affect the substance of [Mr. Thompson's] opinions" such that they compel exclusion of his testimony in its entirety. *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1314 (N.D. Cal. 2022); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (even "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion" (cleaned up)). Apple overlooks that the deduplication process fulfills the Court's request for Plaintiffs to identify actual consumers with and without damages, the full implementation of which will only become necessary after trial during Class administration. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131–33 (9th Cir. 2017) ("At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims. Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability." (cleaned up)); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3-4 (S.D. Cal. May 8, 2020) ("[T]he determination of class membership and protecting the defendant's due process rights can be done during the claims administration process."). To the extent any errors are present in Mr. Thompson's work, those can be addressed and corrected during post-trial claims administration (assuming Plaintiffs prevail on the merits).

Accordingly, Apple's motion to preclude Mr. Thompson's testimony is **DENIED**.

### B.    Prof. MacCormack's Testimony is Admissible

When Plaintiffs first moved for class certification, Prof. McFadden used data from six app developers to construct the margin bounds necessary for his damages model. The Court denied that first motion, stating it "would expect a more fulsome analysis or reliance on an industry expert for purposes of trial." Dkt. No. 630 at 10 n.8. The Court subsequently took notice of Plaintiffs' statement that "they will receive profit data from significantly more [app] developers and Professor McFadden will correspondingly update his estimated coefficients." Dkt. No. 789 at 13. Since

then, Plaintiffs retained a software development industry expert, Prof. Alan MacCormack, and they obtained margin data from a total of 71 apps from 68 developers, which Prof. MacCormack also supplemented with publicly-available margin data and his own experience to provide the margin inputs used in Prof. McFadden's model.

Apple's argument (at 29-34) that Prof. MacCormack lacked sufficient data for his margin analysis is untenable. Nowhere does Apple dispute that Prof. MacCormack worked from a dataset that is very large by the standards of his academic discipline, and, indeed, significantly larger than the dataset he used for his most-cited academic paper. Byrd Decl., Ex. 19 (May 23, 2025 MacCormack Dep.) at 156:15-23. Specifically, here, Prof. MacCormack used four datasets, the first and largest of which was real-world developer cost data produced pursuant to subpoenas. Byrd Decl., Ex. 32 (MacCormack Rep.) ¶ 97. Then, Prof. MacCormack supplemented that data with publicly reported costs from app developers where available. *Id.* Next, he used commission and revenue data provided by The Brattle Group. *Id.* Finally, Prof. MacCormack used a list of the largest app developers to compare app developers and apps to assess genre margin groupings. *Id.*

Plaintiffs' counsel began issuing subpoenas in 2021 and continued collecting subpoenaed data through late 2024, *id.* ¶ 192, eventually receiving 114 substantive responses. *Id.* ¶ 99. All responses were turned over to Prof. MacCormack, who assessed them for usability and eliminated produced data only for specific, objective reasons. *Id.* ¶ 193. After removing the unusable data, there remained usable margin observations across multiple years for 71 apps, sold by 68 app developers. *Id.* ¶ 193.

Prof. MacCormack grouped costs into four categories based on his observations and his vast industry experience: Royalties; User Acquisition and Retention ("UAR"); Infrastructure; and Maintenance. He examined the data from each app developer category-by-category for usability for each year. In total, Prof. MacCormack had hundreds of data points (covering cost, category, and year). *Id. Id.* at p. 82 tbl. 10.

Prof. MacCormack has testified that this number of margin data points is exceptionally large for his field. Prof. MacCormack also testified that the app developer cost data available to

him was sufficient for his analyses. For each genre or group of genres, Prof. MacCormack calculated interquartile ranges for the data, a standard statistical method of data visualization sometimes called a "box-and-whisker plot." Statisticians treat the bottom quartile and top quartile of the observations (top and bottom "whiskers") as outliers, while the middle two quartiles form a box of prominent observations. Apple's own data expert concedes this is a recognized and accepted methodology. Byrd Decl., Ex. 31 (Stodden Dep.) at 183:23-184:2. Using the box-and-whisker plots for each genre group, Prof. MacCormack assessed whether the data within each of the four cost categories varied meaningfully between genres. Ex. 32 (MacCormack Rep.) ¶¶ 130; *see also id.* ¶¶ 131-190.

Observing this, Prof. MacCormack used all the available data points for infrastructure and for maintenance to create estimated ranges for each to be applied to every genre. Then, he turned to the cost categories that vary between genres. Here, he again had over hundreds of app-year data points for UAR. Royalty data proved the most difficult because these agreements, the rates, and structures are often closely guarded secrets. In this sense, royalties are especially emblematic of the problem at the center of industrial organizations economics, because companies do not readily supply academics with any reliable cost data. Thus, deriving costs from other information is normal and working with real cost data is the exception. Dkt. No. 789 at 13-14 (citing McFadden Reply ¶ 148). Here, despite this difficulty, Prof. MacCormack had sufficient real-world royalty observations to work with.

For each cost category, Prof. MacCormack first observed the interquartile range for each set of costs, and then applied his doctorate in business administration, experience in the industry, and 25 years of teaching software development at Harvard Business School.

In a few instances, public data sources prompted a slight adjustment to the range suggested by the interquartile analysis, and each such instance is described in his report. Apple is free to question him about that at trial, but these adjustments are typical aspects of his methodology. Most notably, there is a known relationship between royalties and UAR: a company using recognized intellectual property, for which it typically must pay royalties, also buys in part the pre-existing audience for these stories or characters, reducing its cost to attract customers. Prof. MacCormack

found in the literature a measurement of this effect; it is well-studied and robust. Therefore, he implemented a technique to embody this relationship in his analysis of cost.

After he processed those hundreds of usable app developer data points into a four-category analysis, determined where the categories varied by genre, and identified where a relationship between the categories had to be accounted for, Prof. MacCormack then used the cost data to construct a single combined range for each genre group: a range within which a software industry expert (such as Prof. MacCormack) would expect the range of the average app developer's costs in that genre. Importantly, apart from a dispute over the proper unit of measure for marginal cost that the Court has already considered and rejected, no Apple expert has disputed Prof. MacCormack's calculations or offered different ranges for his genre groupings.

### 1. Apple Imposes Data Requirements of Its Own Invention

Apple argues (at 31-33) that because Prof. MacCormack did not select the subpoenaed app developers himself and the selection did not produce a random sample of results, his analysis is infirm. These are requirements for which Apple offers no persuasive authority or argument. Indeed, "[d]istrict courts within . . . this district have often concluded that experts' decision about what data to use in their analysis bear on the weight, not the admissibility, or expert testimony." *United States ex rel. Bergeletric v. Sauer*, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) (quoting *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 305 (N.D. Cal. 2018)).

Prof. MacCormack did not select the subpoenaed entities because a full-blown third-party subpoena campaign in a case of this magnitude and complexity is a years-long endeavor. But an expert may rely on data that others collected. *Id.*; *see also Safeco Inc. Co. of Am. v. Cty. of San Bernardino*, 347 F. App'x 315, 317 (9th Cir. 2009). Here, that data collection effort began in 2021. Increasingly common in data-intensive, complex litigation, plaintiffs must send dozens or even hundreds of subpoenas for highly sensitive financial data for analysis by a testifying expert who does not work for them (or may even work for a competitor). Understandably, this tends to require a prolonged negotiation, litigation with recalcitrant subpoena recipients, and use of whatever data the subpoenaed companies have, in whatever form it is kept. Many recipients do not have what is needed in usable form. This imposes a substantial burden on the non-parties. *See*

[PROPOSED] ORDER DENYING DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK

-8-

*Rivera v. Equifax Info. Servs., LLC*, 2025 WL 1185376, at *11 (N.D. Ga. Mar. 26, 2025) (ordering parties to agree on a means to reduce the number of nonparty subpoenas).

Here, the cost data subpoena campaign began with over 200 subpoenas served on 172 recipients. This campaign yielded 114 substantive responses, and the data produced was usable from most but not all the producing firms. Nearly six dozen non-party respondents produced usable annual cost observations for some or all cost categories, totaling over seven hundred variable cost data points. Apple stops short of saying (at 32-33) how many subpoenas or responses it believes would be sufficient. Instead, Apple just asserts this is insufficient.[2] The degree of discovery that Apple's objection implies would be "a sprawling, costly, and hugely time-consuming undertaking" not easily managed by the Courts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558–60 & n.6 (2007). A new layer of requirements that multiplies the non-party subpoena needs in each of the several MDL antitrust cases each year would impose nightmarish burdens on parties, non-parties, and the Courts alike. *See Rivera*, 2025 WL 1185376, at *11 (a campaign of hundreds of nonparty subpoenas is burdensome). There is no need to impose data requirements beyond what the experts themselves deem sufficient in their areas of expertise:

> The advisory committee's notes state that the rule's emphasis on sufficiency "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Instead, the sufficiency inquiry examines "the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, *and what is deemed sufficient by experts in the pertinent field when working outside the courtroom.*"

---

[2] Apple never commits to what it or its experts think an adequate data pool might be, but it is possible to infer a position from Apple's complaining. Apple argues that grouping genres is unacceptable, implicitly insisting on a representative sample of apps ***from each genre***. The App Store has 27 genres. If Apple were to demand cost data from at least ten apps per genre—a number that Apple (at 25, 28) only hints at—Plaintiffs would need to obtain usable cost data from ***at least*** 270 third-party app developers. Given the rate of usable responses Plaintiffs received here (71 usable responses from 172 recipients, or 41%), that implies substantive responses from no fewer than 658 non-parties—if, and only if, a random selection of subpoena recipients yielded the same ratio of subpoenas to useable responses, which might or might not be a random sample of developers—who might or might not keep sufficiently detailed and useful cost data. If Apple's assertions about statistical significance were accepted as correct, a more realistic estimate of the number of subpoenas required would number in the thousands. Neither the litigants nor the Court could endure such a massive undertaking.

*Collinge v. IntelliQuick Delivery, Inc.*, 2018 WL 1088811, at *7 (D. Ariz. Jan. 9, 2018) (first quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment; and then quoting 29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 6268 (2nd ed. 2017) (emphasis added).[3] "The word 'sufficient' signifies that the expert may properly base her opinion on something less than all the pertinent facts or data." 29 Wright & Miller, *supra*, § 6268. Moreover, "[i]n cases where courts have excluded testimony because the expert relied on too little data, it was clear that the lack of data undermined or distorted the methodology itself." *Official Comm. of Unsecured Creditors*, 2020 WL 4041483, at *5. Here, there is no such distorting effect.

Apple's citations are inapposite. In *Laumann v. National Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), the court did not rule on the sufficiency of the expert's data. Instead, it noted that the results "seem[ed] nonsensical." *Id.* at 318. The defendant's expert there (Prof. Daniel McFadden) had explained that plaintiffs' expert had used data selectively, and disregarded other useful data that available to him. *Id.* at 318 & n.123. By contrast here, Prof. MacCormack called upon his vast software industry experience to determine whether the margin ranges produced by the usable data make sense, and he sought out public data and made necessary adjustments to those ranges accordingly. *See* Byrd Decl., Ex. 32 (MacCormack Rep.) ¶¶ 11, 17, 49, 97, 101, 124-25, 127, 132, 137-38, 143, 145, 148, 150, 156, 160, 172, 176, 197, 199-202, 205, 208-210, 218, 222, 226-227, 234-35, 238-243, 251, 255, 260, 262, 264-65, 270, 285, 295, 300, 305 & nn. 81, 82, 97, 108, 116, 136, 137, 145, 166, 175, 182, 200, 207, 216, 230, 315. Critically, Prof. MacCormack has not left any usable data "on the table," as the expert did in *Laumann*.

Also inapposite is *Grodzitsky v. American Honda Motor Co.,* 957 F.3d 979, 983, 985 (9th Cir. 2020). The Ninth Circuit affirmed exclusion of an expert's opinion because the expert's sample size failed to support his damages theory. No such disconnection exists here.

Other cases Apple cites present problems of obvious cherry-picking, which is the opposite

---

[3] *Narcisse v. All Ways Transp., LLC*, 2023 WL 6544930, at *4 (M.D. La. Sept. 22, 2023) (same); *Shawnee Mission Plaza, LLC v. Noland*, 2016 WL 7637685, at *4 (W.D. Okla. Oct. 26, 2016) (same); *In re Gold King Mine Release in San Juan Cnty., Colo., on Aug. 5, 2015*, 2022 WL 3543470, at *4 (D.N.M. Aug. 18, 2022) (same); *Official Comm. of Unsecured Creditors v. CalPERS Corp. Partners, LLC*, 2020 WL 4041483, at *5 (D. Me. July 17, 2020) (same).

[PROPOSED] ORDER DENYING DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE
THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK
-10-

of what Apple complains of here: Prof. MacCormack, as Apple admits, employed all the usable results. In *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1175–76 (7th Cir. 2008), the court upheld the exclusion of an expert's report where the expert used a price of more than five times the actual prevailing price in all his calculations because in *one month, for one customer on one occasion*, there was a price adjustment to the higher price. In *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *6 (N.D. Cal. July 12, 2021), the expert used only four samples and, unlike Prof. MacCormack here, ignored other readily available samples, including one she had written about in her own book. Moreover, the expert in *Rearden LLC* acknowledged that she cherrypicked her examples, limiting them to ones supporting her hypothesis. *Id.* at *7.[4]

### 2. Prof. MacCormack Produced Proper Inputs For the McFadden Model

Apple disputes (at 35-38) how Plaintiffs' experts measured the cost of selling in-app digital goods to iOS device users. But this Court already rejected Apple's argument that marginal cost have to be measured at the level of single units of game tokens, and expressly accepted that Prof. McFadden's model that takes the user's *total monthly spend* on IAP as the appropriate unit of analysis for apps that monetize by IAP (almost all of them, at this point in the App Store's history):

> Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id.* ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale.

Dkt. No. 789 at 7 (emphasis in original). Apple also raised this issue when it petitioned for Rule 23(f) review, (Dkt. No. 793-1 at 28), and the Ninth Circuit declined to grant that review (Dkt. No.

---

[4] Apple puts forth *Rearden* as collecting similar cases, but these are all similarly inapposite: in *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 529 (N.D. Cal. 2020), the four samples at issue were not presented by an expert, but in an argument over attorney's fees; in *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 69 (S.D.N.Y. 2018), the court found that a study of only two pairs of male-female executives could not be statistical evidence of pay disparities, and that there was also a "significant danger of reporting bias," because the expert relied on interviews with the two executives' managers; and in *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522–23 & n.25 (N.D. Cal. 2012), the argument was over whether to regionally disaggregate or pool complex gender-differentiated employment promotion data.

875).

Apple continues its error as to how marginal costs may be measured. Indeed, Apple's expert Prof. Jeffrey Prince acknowledged that economists think of marginal costs in both the short run (such as single units of game tokens) and the long run (Prof. McFadden's monthly app spending), with the difference impacting which costs to include in a marginal cost analysis. Dkt. No. 789 at 9 n.5.

Prof. MacCormack, Prof. McFadden, and Dr. Song have all used a definition of marginal cost that is the real incurred cost of serving the paying user. Each worked in his own field of expertise. Apple's argument (at 36-37) that the economists should have supervised the work of a non-economist simply has no merit, as its strained citations demonstrate. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 665-66 (S.D.N.Y. 2007), stands only for the proposition that an expert cannot be a mere "mouthpiece" for an analysis performed by another. Here, Prof. MacCormack offers his own opinions and takes responsibility for his part of the analysis: determining profitability of the app developers in the genre, after incurring the variable costs of attracting and retaining the customers and keeping them happily spending. Likewise, Prof. McFadden offers his own opinions and takes responsibility for his part: the creation of the model considered at class certification. And Dr. Song offers his own opinions and takes responsibility for his part: the implementation of the model, with all genres, apps and transaction data, using Prof. MacCormack's findings as to variable profit margins as input for the fully loaded marginal cost of serving the customers to sustain their app-month spend.

Apple's reliance on *Mirkin v. XOOM Energy LLC*, 2024 WL 4143376 (E.D.N.Y. Sep. 11, 2024), is misplaced. That case stands only for the inapplicable proposition that an expert, having put forth a model, cannot without leave of Court "supplement" seven months out of time by jettisoning the original model and adopting one that operated entirely differently. *Id.* at *10–11. Nothing like that happened here.

Apple's continued insistence that only the per-transaction "minting" cost is a valid marginal cost is disputed between economists; Apple may not prevent the experts from putting their point of view before a jury by having the Court peremptorily exclude Prof. MacCormack's

work as inapplicable to the model, when the economists say it is the correct input.

### 3. Prof. MacCormack Exercised Appropriate Judgment in Grouping Genres

Apple next criticizes (at 34-35) Prof. MacCormack's choice to group certain genres together. His decision to do so is a classic expert choice in the analysis and presentation of data.[5] With 25 years of expertise in the software development industry, including teaching software development economics to MBA students, and with cost data obtained by subpoena from 68 app developers of 71 different apps across all genres, Prof. MacCormack is amply qualified to determine when two genres should be considered together because of the similarities in cost structures between the largest apps in each genre.

It is no slight to Prof. MacCormack's work that genres are inexact categories. Apple has defined the genres and allows app developers to identify which genre they believe should apply to their apps. While developers may have particular reasons for choosing one genre or another, it was reasonable for Prof. MacCormack to rely on their business choices in performing his analysis. The genres are broad, pre-existing categories, and the cost ranges Prof. MacCormack calculates are meant only to conform the center of a distribution curve, where the pricing data from billions of transactions creates the remainder of the shape.

Apple mischaracterizes (at 34) Prof. MacCormack's grouping decisions as ad hoc. In fact, Prof. MacCormack enumerated the exact steps of his analysis for each grouping decision he made. *See* Byrd Decl., Ex. 32 (MacCormack Rep.) ¶¶ 97-118; *id.* § 6.3 & App. B.

Apple cites no authority that an expert in possession of a substantial body of data cannot simplify the data through grouping or exercise expert judgment in analyzing grouped data. Indeed, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Similar grouping decisions were found to be appropriate. *See, e.g.*, *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 287 (N.D. Cal. 2016) (antitrust case approving expert's "selection process" that "involved a combination of matching job titles to the . . . [s]urvey, the assistance of an algorithm,

---

[5] Apple's attacks on Prof. MacCormack's grouping of genres affect only part of the commerce at issue. Byrd Decl., Ex. 32 (MacCormack Rep.) ¶ 112.

*and his own judgment about what job titles to include*") (emphasis added); *360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 204 (D. Del. 2021) (expert validly relied on own experience in breaking content creators into three groups); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) ("When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." (cleaned up)).

Apple's citations on this point are unavailing. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) concerns a damages calculation with no regression model where the entire opinion is reliant on information from counsel. By contrast, Prof. MacCormack used data from more than 70 app developers, and Apple challenges his decisions (each explained in his report) based on experience to group some of them in certain ways. A similar attempt to extend *Zenith* was rejected in *Warren Distributing Co. v. Inbev USA LLC*, 2010 WL 2179167, at *9 (D. N.J. May 28, 2010) (expert did not rely solely on party's information but explained sources and steps). *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) is equally unhelpful. In a standard essential patent case, the expert predicted a dollar figure that the parties would have agreed as a license fee in negotiation, and never linked that factor to any method for quantification. By way of explanation he cited only "all the evidence in the record" and "30 years of experience." *Id.* at *4. By contrast here Prof. MacCormack explains in each instance that he reviewed the highest revenue apps in each genre, considered the functions that they served for their users, and applied his experience in determining which should be grouped, before proceeding to construction of profit metrics for each group of genres from his box-and-whisker analysis. *See, e.g.*, Byrd Decl., Ex. 32 (MacCormack Rep.) ¶ 306.

Further, as a robustness check on his cost ranges, Prof. MacCormack performed in his Rebuttal Report a single combined analysis of the cost ranges as though there were no genres. The result demonstrates that even ignoring genres entirely and using cost data on "an app is an app" basis would produce broadly similar results and usable inputs for Prof. McFadden's econometric damages model. Apple's objection is unfounded.

Accordingly, Apple's motion to preclude Prof. MacCormack's testimony is **DENIED**.

IV.     **CONCLUSION**

For the foregoing reasons, Apple's Motion is **DENIED** in full.

**IT IS SO ORDERED.**

DATED: _____, 2025

_____
The Honorable Yvonne Gonzalez Rogers
United States District Judge