THEODORE J. BOUTROUS JR., SBN 132099
 tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
 dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
 chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
 jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
 dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
 elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
 crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
 hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted *pro hac vice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:        October 14, 2025<br>Time:        2:00 p.m.<br>Courtroom: 1, 4th Floor |

1

**TABLE OF CONTENTS**

2  PRELIMINARY STATEMENT................................................................................................ 1

3  I.    THE COURT SHOULD EXCLUDE MR. THOMPSON'S OPINIONS ............................... 1

4       A.    Thompson Is Not Qualified As An Expert Under Rule 702 ........................................ 1

5       B.    Thompson Used Unreliable Methods........................................................................... 4

6             1.    Thompson's purported methods are not testable ............................................. 4

7             2.    Thompson's methods have not been peer-reviewed or accepted by the
                    scientific community ...................................................................................... 6

8
9             3.    There is no known error rate to Thompson's methods .................................... 7

10      C.    Thompson Applied His Methods Unreliably ............................................................... 9

11            1.    Thompson did not reliably clean the data ...................................................... 9

12            2.    Thompson did not reliably deduplicate the data ........................................... 10

13      D.    Thompson's Work Is Not Relevant To This Case ..................................................... 12

14  II.   THE COURT SHOULD EXCLUDE PROF. MACCORMACK'S MARGIN
          OPINIONS ................................................................................................................... 14

15      A.    MacCormack Used Insufficient Data......................................................................... 14

16      B.    MacCormack Lacks Any Methodology For Combining Genres .............................. 18

17      C.    MacCormack Measured Irrelevant Costs .................................................................. 19

18  CONCLUSION ................................................................................................................... 20

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE THOMPSON & MACCORMACK
4:11-CV-06714

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360Heros, Inc. v. GoPro, Inc.*,
    569 F. Supp. 3d 198 (D. Del. 2021) .................................................................................19

*Adv. Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
    2010 WL 11575000 (N.D. Cal. Aug. 30, 2010) ..................................................................8

*Akeva L.L.C. v. Mizuno Corp.*,
    212 F.R.D. 306 (M.D.N.C. 2002) .....................................................................................10

*Anderson v. Ford Motor Co.*,
    950 F. Supp. 2d 1217 (D. Utah 2013) .................................................................................8

*Arista Records LLC v. Lime Group LLC*,
    2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...............................................................1, 2, 4

*Arriaga v. Logix Fed. Credit Union*,
    2022 WL 3052318 (C.D. Cal. Apr. 22, 2022) .....................................................................7

*Blockchain Innovation v. Franklin Resources*,
    2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) .................................................................3, 7

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .............................................................................................4

*Collinge v. IntelliQuick Delivery, Inc.*,
    2018 WL 1088811 (D. Ariz. Jan. 9, 2018) .......................................................................18

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ............................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .......................................................................9, 12, 14, 19, 20

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..............................................................................................4, 15, 19

*DL v. District of Columbia*,
    194 F. Supp. 3d 30 (D.D.C. 2016) ......................................................................................2

*DL v. District of Columbia*,
    730 F. Supp. 2d 78 (D.D.C. 2010) ......................................................................................2

*Domingo ex rel. Domingo v. T.K.*,
    289 F.3d 600 (9th Cir. 2002) .............................................................................................12

*Dueker v. CSRT Expedited Inc.*,
    2020 WL 7222095 (C.D. Cal. Dec. 7, 2020) ................................................................6, 11

*Engilis v. Monsanto Co.*,
    --- F.4th ---, 2025 WL 2315898 (9th Cir. Aug. 12, 2025) .............................................7, 20

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Geiger v. Creative Impact Inc.*,
   2020 WL 3268675 (D. Ariz. June 17, 2020)................................................................................7

*Goodness Films, LLC v. TV One, LLC*,
   2014 WL 12780291 (C.D. Cal. May 19, 2014) ........................................................................18

*In re Google Play Store Antitrust Litig.*,
   2023 WL 5532128 (N.D. Cal. Aug. 28, 2023)..........................................................................20

*Great Am. All. Ins. Co. v. Sir Columbia Knoll Assocs.*,
   484 F. Supp. 3d 946 (D. Or. 2020) ............................................................................................8

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
   2017 WL 8943159 (C.D. Cal. Oct. 30, 2017) ..........................................................................16

*Hangarter v. Provident Life and Accident Ins.*,
   373 F.3d 998 (9th Cir. 2004)......................................................................................................3

*Hayes v. Wal-Mart Stores, Inc.*,
   294 F. Supp. 2d 1249 (E.D. Okla. 2003) ...................................................................................8

*Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*,
   340 F. Supp. 3d 934 (N.D. Cal. 2018) .....................................................................................13

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
   2022 WL 898595 (9th Cir. Mar. 28, 2022)............................................................................4, 6

*In re Intel Laptop Battery Litigation*,
   2010 WL 5173930 (N.D. Cal. Dec. 15, 2010) .........................................................................13

*Kamakahi v. Am. Soc'y for Reproductive Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015)..............................................................................................16

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 3d 956 (N.D. Cal. 2025) .....................................................................................12

*Krommenhock v. Post Foods, LLC*,
   334 F.R.D. 552 (N.D. Cal. 2020)..............................................................................................20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................................................17

*Laumann v. Nat'l Hockey League*,
   117 F. Supp. 3d 299 (S.D.N.Y. 2015).......................................................................................17

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*,
   989 F. Supp. 2d 165 (D. Mass. 2013) ........................................................................................2

*Mercer Global Advisors, Inc. v. Hewitt*,
   2024 WL 5423015 (C.D. Cal. Oct. 31, 2024)....................................................................15, 16

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016)..............................................................................................19

*Optronic Technologies v. Ningbo Sunny Electronic*,
   2019 WL 4780183 (N.D. Cal. Sept. 30, 2019) ..........................................................................3

iv

*In re: Packaged Seafood Prods. Antitrust Litig.*,
   2020 WL 4530744 (S.D. Cal. Aug. 6, 2020) ........................................................13

*In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. & Prods.
Liab. Litig.*,
   214 F. Supp. 3d 478 (D.S.C. 2016) ..............................................................16, 17

*In re PFA Ins. Mktg. Litig.*,
   2022 WL 3146557 (N.D. Cal. June 15, 2022) ........................................................3

*Roblox v. WowWee Group*,
   2024 WL 4057418 (N.D. Cal. Sept. 3, 2024) ..........................................................3

*Shalaby v. Newell Rubbermain, Inc.*,
   379 F. App'x 620 (9th Cir. 2010) ................................................................8, 11

*Thomas v. Newton Int'l Enters.*,
   42 F.3d 1266 (9th Cir. 1994) ..........................................................................3

*TK-7 Corp. v. Estate of Barbouti*,
   993 F.2d 722 (10th Cir. 1993) .........................................................................6

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) .........................................................................7

*United States v. Hermanek*,
   289 F.3d 1076 (9th Cir. 2002) ........................................................................18

*United States v. Rite Aid Corp.*,
   2020 WL 3970201 (E.D. Cal. July 14, 2020) ..........................................................6

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   45 F. Supp. 3d 724 (N.D. Ohio 2014) ..................................................................2

*Y.H. v. Blizzard Entertainment, Inc.*,
   2024 WL 5431490 (C.D. Cal. Aug. 14, 2024) ........................................................13

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ....................................................................18, 19

*Zetz v. Boston Sci. Corp.*,
   644 F. Supp. 3d 684 (E.D. Cal. 2022) .................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ..........................................................................6

**Other Authorities**

David H. Kaye & David A. Freedman, Reference Guide on Statistics, in Reference
   Manual on Scientific Evidence (Fed. Jud. Ctr. ed., 3d ed., 2011) .........................1, 2, 16

Experimentation in the Law: Report of the Federal Judicial Center Advisory
   Committee on Experimentation in the Law (Fed. Jud. Ctr. 1981)................................16

J.D. Kelleher & B. Tierney, Data Science (The MIT Press, 2018)....................................2

K.M. Ramachandran & C.P. Tsokos, MATHEMATICAL STATISTICS WITH APPLICATIONS IN R (Academic Press, 3rd ed. 2020) ............................................................................2

Paul Newbold, William L. Carlson, & Betty Thorne, Statistics for Business & Economic*s* (8th ed. 2012) .............................................................................16

## Rules

Fed. R. Civ. P. 23 ....................................................................................................4

Fed. R. Civ. P. 23(c)(2)(B)......................................................................................3

Fed. R. Evid. 702 .................................................................................1, 2, 7, 18, 19

Fed. R. Evid. 702(b)...............................................................................................15

Fed. R. Evid. 702 advisory committee's note to 2000 amendments...............2, 17

Fed. R. Evid. 703 ..............................................................................................5, 6

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE THOMPSON & MACCORMACK
4:11-CV-06714

**PRELIMINARY STATEMENT**

Plaintiffs' opposition confirms their experts failed to do what they admit was "needed" for this case to proceed to trial, despite receiving every opportunity to do so. Dkt. 1031-5 ("Opp.") at 1. Mr. Thompson has not reliably matched transactions "with actual consumers to ascertain class members." Dkt. 789 at 1. Prof. MacCormack does not provide the "fulsome analysis" of developers' costs that Plaintiffs' damages model requires. Dkt. 630 at 10 n.8. The Court should exclude their opinions.

## I.     THE COURT SHOULD EXCLUDE MR. THOMPSON'S OPINIONS

Mr. Thompson's opinions are not based on a scientific background (he has none) or the scientific methods that statisticians and data scientists have long applied for data matching in large datasets like Apple's payor records. Rather, as Plaintiffs explain, the basis for his testimony is his "experiential expertise" from working as a class action administrator. Opp. 20. While experience can serve as a basis for expert testimony in certain situations, Thompson's job was to match a dataset of ███████ records with actual consumers to "tell [the Court] exactly who is in the class and who's not in the class." Ex. 134 (June 23, 2023 Hr'g Tr.) 89:14–15. As the Federal Judicial Center's Reference Manual on Scientific Evidence (RMSE) explains, such "statistical methods" are the stuff of "scientific knowledge," not mere experience. David H. Kaye & David A. Freedman, Reference Guide on Statistics, in RMSE, at 214 (Fed. Jud. Ctr. ed., 3d ed., 2011). They must therefore satisfy *Daubert*. Thompson's opinions do not do so because his methods are not testable, have not been peer-reviewed or accepted by any scientific community, and have no known error rate. Even if they were reliable, he failed to apply them reliably here. His purported cleaning *introduced* errors, and his deduplication could not even accurately match records for the named plaintiff Robert Pepper. He performed no genuine validation of his results. And his opinions lack fit because they are aimed at the wrong question—who clicked the purchase button (which is impossible to tell from the data) rather than who paid for the transaction. All of Thompson's opinions are unreliable and should be excluded.

### A.     Thompson Is Not Qualified As An Expert Under Rule 702

Thompson is not qualified under Rule 702 because he lacks expertise in the relevant field— statistics and data science—to reliably match approximately ██████ records to class members. *Cf. Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at *2, 5 (S.D.N.Y. May 2, 2011)

(computer science and engineering professor "not qualified to offer an expert opinion about statistics or surveying issues"); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 739–741 (N.D. Ohio 2014) ("as a non-statistician" analytic chemist was unqualified to opine that another expert's "statistical analysis is valid and correct").

"[D]istilling conclusions from [a] large set of data" is an activity within "the field of statistics." *DL v. District of Columbia*, 730 F. Supp. 2d 78, 83 (D.D.C. 2010); *see also* Kaye & Freedman, Reference Guide on Statistics, *supra*, at 214.[1]  Statistical experts are qualified when they possess relevant academic training, have published relevant articles, or can otherwise demonstrate knowledge of statistical principles.  *Compare Mass. Mut. Life Ins. Co. v. Residential Funding Co.,* 989 F. Supp. 2d 165, 169 (D. Mass. 2013) (former "Chief Statistician of the U.S. Department of Education's National Center for Education Statistics" with a PhD "in Mathematical Statistics" who "authored numerous books and articles on statistical design methods" was qualified to conduct statistical analysis) *with Arista Records LLC*, 2011 WL 1674796, at *5 (purported expert with no degree in statistics who was unable to explain basic statistical principles unqualified to perform statistical analysis).  Thompson is no statistician: He was ignorant of common statistical methods and literature relevant to data cleaning, matching, and validation; he has no scientific background or degree in statistics; and he lacks expertise in conducting data analysis outside of his settlement administration work.  Mot. 9.

Plaintiffs do not dispute Thompson's shortcomings.  Instead, they contend that his settlement administration experience alone "qualif[ies] him as an expert in data deduplication" since "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Opp. 8 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).  But statistical analysis is not one of those fields.  *See, e.g., DL v. District of Columbia*, 194 F. Supp. 3d 30, 39–40 (D.D.C. 2016) ("qualified expert in statistics" not only had "experience conducting statistical analysis" but held a Ph.D. in statistics and had published "several statistics-based articles").

---

[1] The scholarly literature agrees.  *See, e.g.*, K.M. Ramachandran & C.P. Tsokos, MATHEMATICAL STATISTICS WITH APPLICATIONS IN R 2 (Academic Press, 3rd ed. 2020) ("The field of statistics is concerned with the scientific study of collecting, organizing, analyzing, and drawing conclusions from data."); J.D. Kelleher & B. Tierney, DATA SCIENCE Preface (The MIT Press, 2018) ("The goal of data science is to improve decision making by basing decisions on insights extracted from large data sets" with "[m]ethods from statistics and probability . . . used throughout the data science process . . .").

None of Plaintiffs' cases suggests otherwise. *First,* Plaintiffs (Opp. 8–10) point to cases in which experts relied on experience to testify about norms and standards of a particular industry. *See Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (longshoreman of 29 years qualified to testify that a boat's uncovered manhole was an "unusual and hazardous condition"); *Hangarter v. Provident Life and Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (25-year insurance industry veteran was qualified to testify on "practices and norms of insurance companies"); *In re PFA Ins. Mktg. Litig.*, 2022 WL 3146557, at *2 (N.D. Cal. June 15, 2022) (similar for life insurance professional with 39 years' experience testifying on "industry standards"). Unlike those experts, Thompson is not testifying on norms and standards of any industry—he's opining on analysis of a large-scale dataset.

*Second,* Plaintiffs rely on cases with expert opinions on non-scientific topics that were not susceptible to objective testing. But here, Thompson is opining on the scientific, objectively verifiable topic of statistical data matching. For example, in *Optronic Technologies v. Ningbo Sunny Electronic*, the court held that analyzing the defendant's telescope manufacturing capabilities was not the "sort of analysis" that would be "subject to peer review or exact replication," and admitted the testimony because the expert provided a "sufficient basis" for his opinions. 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019). Likewise, in *Roblox v. WowWee Group*, the court found an expert's "expertise in game studies" probative of whether video game characters' "trade dress" appeared in games consistently. 2024 WL 4057418, at *4 (N.D. Cal. Sept. 3, 2024). Nor does *Blockchain Innovation v. Franklin Resources* help Plaintiffs because, there, a purported expert on trade secret valuation *was excluded* because he based his opinions on "experience with investors" and, like Thompson, "fail[ed] to offer a reliable methodology." 2024 WL 5483606, at *11 (N.D. Cal. Oct. 22, 2024).

Thompson's experience does not render him up to the task here. His work as a settlement administrator involves deduplicating class member contact information for the purpose of sending the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). In that context, his goal is to notify the class in ███████████████████████████. Dkt. 1003-17 (Thompson Dep.) 60:23–61:18; *see id.* 61:13–18 (███████████████). But as the Court has explained, what is "acceptable in a settlement context" is not acceptable where Plaintiffs rely on Thompson's deduplication work as part of a necessary step in establishing injury,

"ascertain[ing] which class members were uninjured," and calculating purported classwide and individual damages—and showing under Rule 23 that all this can be done with common evidence. Dkt. 789 at 4–5, 24 n.17 (finding predominance met because Plaintiffs represented that they would "calculate both aggregate and individual damages *before trial*"). Because Thompson lacks the necessary expertise in statistics, and has applied only inapt experience, his testimony is not reliable and should be excluded. *See Arista Records*, 2011 WL 1674796, at *5–6.

**B.    Thompson Used Unreliable Methods**

Plaintiffs also contend that, notwithstanding his lack of qualifications, Thompson's opinions satisfy *Daubert* because he "follow[ed] the same analytical framework" that a statistical expert would. Opp. 15, 18 (citation and quotation marks omitted). That is false. Thompson's methods differ entirely from those that have been vetted and accepted by data scientists and statisticians for decades. Indeed, if Thompson's methods were sound, Plaintiffs would have no problem subjecting them to the four *Daubert* factors to establish their "scientific validity and thus [their] evidentiary relevance and reliability." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993). Plaintiffs suggest instead that only one of the factors (testability) applies and that the other three do not, Opp. 21–23, and therefore all but concede Thompson's methods do not satisfy *Daubert* and are scientifically unreliable.

**1.    Thompson's purported methods are not testable**

Plaintiffs claim that Thompson's methods satisfy the first *Daubert* factor—testability—because they were disclosed in "sufficient detail" that Apple's expert, Stodden, was able to "explain" aspects of his coding. Opp. 19. But "[t]o demonstrate testability under *Daubert*," the Ninth Circuit requires "an expert [to] provide sufficient explanation for their methodology such that '[s]omeone else using the same data and methods [would] be able to ***replicate the result[s]***.'" *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022) (emphasis added) (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014)). Here, an indisputably qualified data scientist, Prof. Stodden, could not replicate Thompson's results with the code and explanation that he provided. Thompson himself *admits* ███████████████████████. Dkt. 1003-17 (Thompson Dep.) 174:20–24. Thompson's methods thus fail to satisfy this *Daubert* factor.

*First*, critical parts of Thompson's code ████████████████ were missing or

1   went unrecorded. Dkt. 1003-30 (Stodden Reb. Report) ¶¶ 33, 128–29.  As Stodden observed,

2   ███████████████████████████████████████████████████████████████████

3   █████████████████ *Id.* ¶ 128 (quotations omitted).  Those files also stated that parts of the code—

4   without specifying which—would need to be turned on and off for the "script to fully execute." *Id.*

5   But when asked at deposition, Thompson ███████████████████████████████████

6   █ Dkt. 1003-17 (Thompson Dep.) 172:13–17, 172:18–20.  Without this information, Stodden was

7   left to guess what methodology Thompson applied and could not attempt to replicate it without making

8   "significant modifications" to his code.  Dkt. 1003-30 (Stodden Reb. Report) ¶¶ 128–29.  Even with

9   these modifications, she could not replicate his results. *Id.*  And while Thompson claims to have

10  validated his results, Stodden could "not identify any code in his backup materials" supporting that

11  assertion. *Id.* ¶ 102.  Nor could she identify code in his backup showing what he did to clean outliers

12  in the dataset (e.g., ████████████████████████████).  *Id.* ¶ 116 n.196.  It is no wonder

13  that Thompson conceded that ███████████████████████.  Dkt. 1003-17

14  (Thompson Dep.) 174:20–24████████████████████████

15      *Second*, Plaintiffs do little to respond to Apple's observation that Thompson's work cannot be

16  tested because it is riddled with subjective judgments that not even he could explain—for example,

17  why he chose to use certain fields in his first tier of matching, or why he stopped matching records

18  when he did.  Mot. 14–15.  Plaintiffs point to Thompson's testimony that he chose the fields to match

19  on his first tier because, with a match on those fields, ████████████████████████

20  ████████████████████ Opp. 20 n.6.  That is *ipse dixit*, as confirmed by the next

21  two lines of his testimony where, ████████████████████████████████

22  ██████████ Dkt. 1003-17 (Thompson Dep.) 177:3–4.  Courts routinely exclude expert opinions

23  based solely on experience because experience cannot be tested.  Mot. 16 (collecting cases).  And, as

24  explained above, Thompson lacks the statistical expertise to offer an opinion here. *See* § I.A., *supra*.

25      *Third*, Plaintiffs do not dispute that Thompson relied on a third party, Melissa Data Solutions,

26  to conduct some of the matching, but cannot explain Melissa Data's methods.  Plaintiffs claim this

27  accords with this Court's prior *Daubert* ruling, Opp. 20, but they misrepresent the cited order.  There,

28  the Court recognized that under Rule 703, an expert is allowed to "base his opinion on 'facts or data *in*

1   *the case* that the expert has been made aware of'"; therefore, Prof. McFadden was allowed to "base

2   [his] opinion in part on what a different expert [Dr. Abrantes-Metz] believes." Dkt. 789 at 16 n.10

3   (emphasis added). But Melissa Data—the entity that ran Thompson's data against its own database—

4   is not an expert witness and has submitted no report. None of Melissa Data's underlying data or work

5   has been produced, so it is not "in the case." *Id.* At deposition, Thompson could only ████████

6   ███████████████████████ Dkt. 1003-17 (Thompson Dep.) 188:3–5; Mot. 15–16. This is

7   entirely different from one expert relying on another's disclosed opinions, and supports exclusion. *See*

8   *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (affirming exclusion of expert

9   because he was unfamiliar with third party's "methodology" underlying his opinions); *TK-7 Corp. v.*

10  *Estate of Barbouti*, 993 F.2d 722, 732–33 (10th Cir. 1993) (similar).[2]

11       *Finally*, the lack of replicability does not simply go to the weight of Thompson's opinions as

12  Plaintiffs suggest, Opp. 20; it goes to their admissibility. Plaintiffs' authority, *United States v. Rite Aid*

13  *Corp.*, 2020 WL 3970201 (E.D. Cal. July 14, 2020), is inapposite. There, "plaintiffs fundamentally

14  complied with their . . . duties" to "document all steps taken" to produce multiple data samples such

15  that their results might be replicable. *Id.* at *14 (citation omitted). Replicating Thompson's results is

16  *impossible* because he admittedly did not ████████████████████████████

17  ███████████████. Dkt. 1003-17 (Thompson Dep.) 172:13–20, 174:22–24. Because Thompson

18  "did not provide a meaningful methodological explanation," *Incretin*, 2022 WL 898595, at *1, Stodden

19  was left grasping in the dark when it came to replicating his results. Indeed, Thompson's "computer

20  code did not function when using [his] own [data files]," so his methods could not "be recreated or

21  reliably tested." *Dueker v. CSRT Expedited Inc.*, 2020 WL 7222095, at *4–5 (C.D. Cal. Dec. 7, 2020).

22  This supports exclusion. *Id.*

23       **2.    Thompson's methods have not been peer-reviewed or accepted by the scientific
             community**

24       Plaintiffs do not deny that Thompson's methods have not been peer-reviewed or accepted by

25  the scientific community. *See* Mot. 16–19. They principally argue that these factors do not apply

---

[2] At a minimum, Thompson's opinions relying on Melissa Data's process should be stricken. That would undo up to 27 million "matches" in Thompson's list (the difference between the approximately 270 million records he sent to Melissa Data and the 243 million unique payors in his final results), Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 42, n.50, resulting in a larger, still arbitrary pool of "unique payors" different from the one on which Plaintiffs' damage experts based their injury calculations.

because Thompson's work is based on his experience. Opp. 21. But, again, the cases they cite involved testimony on non-scientific or niche subjects that were so unique they had not been peer-reviewed or evaluated by the scientific community. For example, in *United States v. Hankey*, the Ninth Circuit held that expert testimony about "gang membership" was not the kind that could be subject to the four *Daubert* factors and that its reliability instead "depend[ed] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." 203 F.3d 1160, 1169 (9th Cir. 2000). Plaintiffs' cases about experts in fashion modeling, *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020), and credit reporting, *Arriaga v. Logix Fed. Credit Union*, 2022 WL 3052318, at *1–2 (C.D. Cal. Apr. 22, 2022), are likewise inapposite. The methods needed here have been studied rigorously by statisticians and data scientists for decades. Mot. 8–9. Plaintiffs' attempt to liken Thompson's work to that of a gang expert or a modelling agent should be rejected.[3]

### 3. There is no known error rate to Thompson's methods

Plaintiffs concede there is no known error rate for Thompson's methods but argue that this "absence" does not justify exclusion because "*Prof. Stodden* offered only two concrete methods for estimating an error rate," "*Prof. Stodden* . . . did not try to determine" Thompson's error rate, and "*Prof. Stodden* made no effort to . . . estimate the rate of false-positives or false-negatives in Mr. Thompson's work." Opp. 22–23 (emphases added). In other words, Plaintiffs turn the error rate inquiry on its head and argue it was Stodden's—and thus Apple's—job to calculate the error rate for Thompson's work. That is not how *Daubert* works. Plaintiffs bear the burden of demonstrating the reliability of Thompson's opinions. Fed. R. Evid. 702 (proponent must show "it is more likely than not" that the expert's opinions are reliable); *Engilis v. Monsanto Co.*, --- F.4th ---, 2025 WL 2315898, at *4–6 (9th Cir. Aug. 12, 2025) ("[A] proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and . . . there is no presumption in favor of admission."). It was Thompson who should have calculated an error rate in order to validate his methodology. But the record shows he did not ████████████████████. Dkt. 1003-17 (Thompson Dep.) 168:9–169:6.

[3] *Blockchain Innovation* is similarly inapposite. The court found that a lack of peer review was not disqualifying where, unlike here, the expert "disclosed and testified to the entire results of his search" and there was "no reason [defendants] could not replicate" it. 2024 WL 5483606, at *7.

Gibson, Dunn &
Crutcher LLP

Because Thompson failed to even "discuss the possible rate of error" of his methods, his testimony should be excluded. *See Shalaby v. Newell Rubermain, Inc.*, 379 F. App'x 620, 622–23 (9th Cir. 2010); *Great Am. All. Ins. Co. v. Sir Columbia Knoll Assocs.*, 484 F. Supp. 3d 946, 957–58 (D. Or. 2020) (excluding expert who "provide[d] no error rate"). Plaintiffs' lone citation (Opp. 22) to *Zetz v. Boston Sci. Corp.*, 644 F. Supp. 3d 684, 713 (E.D. Cal. 2022), does not dictate otherwise. There, the court held the "lack of an error rate does not make [the expert's] damages figure unreliable," where the expert had applied a reliable methodology based on a "standard constant growth model" and financial documents normally analyzed by experts in his field. *Id.* at 713–14. Here, Thompson ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *See* Mot. § I.B.3.b. Where, as here, Thompson departs from well-accepted practices and instead relies principally on his experience to justify his methods (and results), the lack of an error rate demands exclusion. *Adv. Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2010 WL 11575000, at *3 (N.D. Cal. Aug. 30, 2010) (excluding expert report in part because there was "no error rate linked to [expert's] figure" which "appear[ed] to be based solely on his generalized industry 'experience'").

Nor is Thompson rescued by Plaintiffs' argument that an overall error rate cannot be determined. Opp. 22. The lack of a known or even knowable error rate would only strengthen the case for exclusion. *Anderson v. Ford Motor Co.*, 950 F. Supp. 2d 1217, 1224–25 (D. Utah 2013) (excluding expert theory because "there is no known error rate for this theory"); *Hayes v. Wal-Mart Stores, Inc.*, 294 F. Supp. 2d 1249, 1250–51 (E.D. Okla. 2003) (similar). In reality, however, statisticians and data scientists regularly assess error rates for their methods, including by comparing their results against benchmarks like a "gold standard" dataset. Dkt. 1003-30 (Stodden Reb. Rep.) ¶¶ 95–96. Thompson could have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ got wrong in his produced results. Dkt. 1003-17 (Thompson Dep.) 153:21–155:13. Tabulating those matches that his methodology missed would yield an error rate. Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 96. But Thompson did not ▮▮▮▮ ▮▮▮▮▮▮. Dkt. 1003-17 (Thompson Dep.) 99:16–22.

## C.     Thompson Applied His Methods Unreliably

Turning to the methodology Thompson did employ, Plaintiffs all but concede he made critical errors when purporting to clean and deduplicate payor records and did little to nothing to validate his results.  Plaintiffs are wrong that these errors are immaterial.  Regardless, their argument misses the fundamental *Daubert* question: It's not whether Thompson made errors (he did), but whether his methods were applied reliably.  *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) (*Daubert II*).  The errors confirm Thompson's methods were unreliable as applied to his task.

### 1.     Thompson did not reliably clean the data

Plaintiffs do not contest that Thompson's purported data cleaning methods did not actually clean the data.  In fact, they admit Thompson

Cleaning methods like Thompson's that do not adequately clean the data and actually introduce additional errors are not reliable.

As to the special characters, Plaintiffs first ignore that                                     Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 59.  For example, Thompson                                     .  Opp. 24; *see also* Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 57 n.70.  That creates new potential for errors                                     .  Plaintiffs say this is no problem because there would only be a match if "other more trustworthy pieces of data" also matched.  Opp. 24.  Neither Plaintiffs nor Thompson identify what these other "trustworthy" pieces of data are, but a look at his produced backup files shows that, apparently, "name" suffices.  *See* Dkt. 1003-30 (Stodden Reb. Rep.) Ex. 3 (Thompson's Tier 4 matched on                                     ).  That is, Thompson's                                     .



Similarly, ███████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████." Dkt. 1003-17
(Thompson Dep.) 89:20–90:17 (emphasis added).  But, Plaintiffs concede, he ████████
███████████████████████████  Doing so was, by his admission, unreliable.

Unable to grapple with the merits of Apple's critique, Plaintiffs argue that issues like Thompson's faulty cleaning can be fixed during the claims administration process post-trial.  Opp. 11, 25.  Not so.  Thompson's job is to identify the class members allegedly injured by Apple's conduct and therefore to establish liability and damages.  As this Court specifically "advised plaintiffs," they "[can]not wait until *after trial* to ascertain which class members" were "harmed" and "unharmed."  Dkt. 789 at 4–5.  This "core merits issue" needs to be resolved before trial.  *Id.*  Indeed, to the extent Thompson offers "additional expert opinion[]" on this issue after trial, his opinions should be excluded as untimely.  *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310–13 (M.D.N.C. 2002) (excluding expert testimony disclosed "after the time set in the discovery plan").

**2.    Thompson did not reliably deduplicate the data**

Plaintiffs do not dispute that Thompson's deduplication methodology resulted in the errors that Apple flagged *as exemplars* of his failings.  Their attempts to explain away these errors ring hollow.

*First*, Plaintiffs argue that Thompson failed to ██████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████  Opp. 25.  In Thompson's words, he ████████
████████████████████████████.  Dkt. 1003-17 (Thompson Dep.) 155:14–25.  But this, too, was ineffective given the clear instances ██████████████████████████████████
████████████████████  And it does not excuse Thompson's departure from the █████████
███████████████████████████████████████  Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 119.  Instead, Plaintiffs tacitly acknowledge that ███████████████████
█████████████████████████████████████████████████

APPLE'S REPLY I.S.O. *DAUBERT* MOTION TO EXCLUDE THOMPSON & MACCORMACK
4:11-CV-06714

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████ .

3 *Second*, Plaintiffs concede that ███████████████████████████

4 ██████████████████████████ Opp. 26, a small town with a total population of 375, Dkt.

5 1003-30 (Stodden Reb. Rep.) ¶ 101.  Plaintiffs blame the data for this error.  Opp. 26.  But Apple has

6 long told Plaintiffs and this Court that user-generated information is not always accurate.  Dkt. 476-12

7 at ¶ 5; Dkt. 1003-37 at 2.  And far from complaining that such issues in the data would cause errors in

8 his work, Thompson claimed to have cleaned the data and "confirmed" that he could deduplicate it to

9 identify "unique payor[s]," Dkt. 1003-36 (Thompson Supp. Rep.) ¶¶ 9–11.  It is only now, faced with

10 Thompson's blatant errors, that Plaintiffs' counsel attempts to walk back their promise that matching

11 the records would be "a simple mechanical process" completed "before trial," Dkt. 1003-77 (June 23,

12 2023 Hr'g Tr.) 93:7–94:6.  Moreover, this type of error demonstrates that Thompson did not effectively

13 validate his results. ████████████████████████████████████████

14 ████████████████████████████████

15 *Third*, while Plaintiffs concede that Thompson "█████████████████████

16 ████████████████████████ Opp. 26, they say ████████████████████

17 ████████████████████████████████████████ *Id.* This

18 is categorically false. ███████████████

19 ███████████████████ . Dkt. 1003-30 (Stodden Reb. Rep.) Ex. 9 ████████████

20 ████████████████████████████████ This lack of

21 explanation for the error is all the more reason to exclude Thompson.  *See Shalaby*, 379 F. App'x at

22 622 (affirming exclusion where expert "did not adequately explain the results" of his "non-standardized

23 tests"); *Dueker*, 2020 WL 7222095, at *4 (similar).  Plaintiffs attempt to minimize the issue by claiming

24 the error affects a small percentage of the payors Thompson identified, Opp. 26–27, but the error is

25 another symptom of a larger problem with Thompson's methods: They cannot reliably match records,

26 and when mismatching occurs, they don't catch the errors.

27 In a last-ditch effort to save Thompson, Plaintiffs claim his methods are reliable because the

28 "total aggregate damages stayed the same" when Dr. Song calculated damages at the payor level using

Thompson's analysis and "at the Apple ID level." Opp. 27. This argument relies on a late-disclosed expert report that must be stricken, *see* Reply ISO MSJ 14, but is not sound logic in any event. First, the fact that two unreliable methods reached a roughly similar outcome does not mean either of them is reliable. Second, Thompson's task was not simply to support calculation of "total aggregate damages"—his task was to accurately identify unique payors, each matched to the correct set of transactions, so that "harm" could be accurately assigned to class members. *See* Dkt. 789 at 1. Even if Thompson purported to identify a number of unique payors that was very close to the number of unique accounts, his analysis might assign to each purported payor an entirely incorrect mix of transactions. In fact, as Stodden observed, █████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████ Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 90. In other words, Thompson's matching could have resulted in the same total purported damages (or a different total amount), but many of Thompson's "payors" necessarily reflect different sets of transactions compared to Song's untimely "account-as-class-member" methodology (which the Court has already rejected, *see* Dkt. 789 at 1).

Taken together, the errors illustrate that Thompson did not identify unique payors as he claimed, and his opinions should be excluded. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming exclusion where expert's "conclusion simply did not follow from his analysis"); *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 966–67 (N.D. Cal. 2025) (same).

**D.    Thompson's Work Is Not Relevant To This Case**

Lastly, Thompson's opinions are not "relevant to the task at hand" because he applied a legally erroneous definition of "payor." Mot. 11–13 (quoting *Daubert II*, 43 F.3d at 1315). Plaintiffs do not dispute that, rather than identify individuals whose money was used to pay for transactions, Thompson attempted to identify people who initiated transactions. Opp. 13. They defend his analysis by arguing that "whose money the direct purchaser spent" is immaterial, *id.*, but that is wrong as a matter of law.

In addition to the binding precedent Apple cited in its motion, numerous decisions from within the Ninth Circuit—including from this Court—confirm that an individual who pays for a transaction with someone else's money is not injured by an alleged overcharge. Rather, the person whose money was used is the potentially injured party. For example, in the *Apple iPod iTunes Anti-Trust Litigation*,

this Court found that a named direct-purchaser plaintiff was inadequate and "d[id] not possess the same interest or suffer the same injury as the absent class members" because she had purchased her iPod using a credit card from her husband's law firm, rather than with her own money. Ex. 129 (Tr. of Proceedings held on Dec. 8, 2014, No. 05-00037-YGR) at 1303. Similarly, in *Y.H. v. Blizzard Entertainment, Inc.*, the district court held that a minor who made digital card game purchases using her father's credit card lacked standing because the plaintiff "did not spend her own money on the cards. Thus, any claimed economic damage resulting from the cards was her father's, not her own." 2024 WL 5431490 at *5 (C.D. Cal. Aug. 14, 2024). And in *In re Intel Laptop Battery Litigation*, the court held that a plaintiff who used corporate funds to purchase a laptop lacked standing because he "did not personally loose [sic] any money in association with the transaction. Rather, [the corporation] would have suffered the injury and lost money." 2010 WL 5173930, at *3 (N.D. Cal. Dec. 15, 2010). As these cases make clear, when an individual makes a purchase with someone else's money, the potentially injured payor is the person whose money is spent, not the person who "clicked 'purchase.'" Opp. 13; *see also* Reply ISO Decert. Mot. § II.A.1 (discussing the Clayton Act's antitrust injury requirement).

Thompson's misunderstanding of the term "payor" means that his opinions do not "fit" this case. *See Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 941, 970 (N.D. Cal. 2018) (excluding expert opinions for lack of "fit" where they "depend[ed] on incorrect statements of the law"); *In re: Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 4530744, at *2 (S.D. Cal. Aug. 6, 2020) (excluding calculations of "damages related to indirect purchases" where only direct purchases were relevant). In fact, ██████████████████████████████████████████████████ ██████████████████████████, *see* Ex. 128 (Stodden Depo.) 82:6–83:2, 92:11–21, ██████ ████████████████████████████████████████ Dkt. 1003-30 at ¶ 53. ████████████████████████████████████████████████████████ *Id.* There is no way to tell from Thompson's analysis which of these tens of millions of individuals are actual payors who spent their money on app transactions and which are non-payors who used another person's payment method, like a minor child using a parent's credit card. *See* Mot. 12. As a result, Thompson's "unique payor" list cannot be used to ascertain actual class members as it includes an indeterminate

1    number of non-payors—███████████—who (a) did not spend any money; (b) do not

2    have standing to sue, and (c) cannot be distinguished in Thompson's analysis from actual payors in any

3    systematic way. For these reasons, Thompson's analysis wholly fails to "logically advance[] a material

4    aspect of the proposing party's case" and should be excluded. *Daubert II*, 43 F.3d at 1315.

5    **II.    THE COURT SHOULD EXCLUDE PROF. MACCORMACK'S MARGIN OPINIONS**

6    Plaintiffs' opposition to Apple's motion against Prof. MacCormack is remarkable for what it

7    does not say. Plaintiffs do not dispute that MacCormack's margin bounds—which are based on a small

8    handful of developers' data per genre—are the dominant input in their methodology for proving pass-

9    through, injury, and damages. They do not deny that MacCormack's inputs guarantee the model will

10   find $16 billion in damages whatever the data on transactions say about demand for apps and in-app

11   purchases. They do not deny that, because of the margin bounds, the McFadden-Song model still

12   calculates billions of dollars in damages when real transactions data are replaced by random placebo

13   data. And they do not claim to have a working damages model without MacCormack's input. In fact,

14   Plaintiffs not only fail to dispute these points, they do not even mention them in their opposition. The

15   whole section of Apple's motion pointing out these flaws (Mot. 38–40) simply goes unanswered.

16   Given that MacCormack's inputs drive Plaintiffs' colossal damages, it is imperative that

17   MacCormack provide relevant and statistically reliable opinions about developers' margins in each

18   App Store genre for use in the model. But MacCormack did not do this. Instead, he provided ranges

19   based on data from a few non-representative developers without even knowing why those developers

20   were chosen, based on genre groupings he made up and that make no sense, and based on costs that are

21   irrelevant for use in Plaintiffs' damages model. The Court should exclude his opinions and preclude

22   Dr. Song and Prof. McFadden from relying on them.

23   **A.    MacCormack Used Insufficient Data**

24   Plaintiffs do not deny that MacCormack's conclusions about the average profit margins earned

25   by thousands of App Store developers are based on data from no more than 10, and as few as two,

26   developers per genre. *See* Mot. 29–31. Nor do they dispute that his sample of developer costs is

27   unrepresentative—it omits vast swaths of the App Store (like social networking apps) and instead

28   extrapolates from a few large developers picked for reasons that neither Plaintiffs' opposition, nor any

expert, has ever even explained. *Id.* at 31–33.  Because expert testimony must rest on "good grounds" not "speculation," *Daubert*, 509 U.S. at 590, MacCormack's unsupported opinions about developers' gross profit margins must be excluded. *See* Fed. R. Evid. 702(b).

Nothing in Plaintiffs' opposition compels a contrary conclusion.  Plaintiffs' repeated fallback is that MacCormack relied on "██ margin data points" in total, a number they deem "exceptionally large."  Opp. 28, 29, 31.  But as Apple explained in its motion (at 33 n.4), the total number of data points MacCormack used is meaningless.  Apple does not take issue with how many data points MacCormack has about the particular developers *within* his dataset.  *See* Opp. 29 (discussing number of supposed data points on royalties, acquisition, and other costs).  In Games, for instance, Apple doesn't dispute that there may be enough data for MacCormack to opine about Roblox, Niantic, or the other four developers he studies.  The issue is whether *those six* developers are "representative of the entire [Games developer] population" such that MacCormack can "draw reliable conclusions" about profit margins earned by *all the other* Games developers based on the profits and costs of those six alone.  *Mercer Global Advisors, Inc. v. Hewitt*, 2024 WL 5423015, at *6 (C.D. Cal. Oct. 31, 2024) (excluding expert for relying on nonrepresentative sample).  Were it otherwise, Prof. McFadden's original sample—which in fact relied on *more* data points (as Plaintiffs define that term) than MacCormack did for some genres—would have been sufficient.  *Compare* Ex. 110 (McFadden 1st Class Cert. Rep.) ¶¶ 189–91 (at least 16 data points for Games developers), with Dkt. 1003-27 (Hitt Reb. Rep.) App'x 6 (██ data points or fewer for Social Networking + Lifestyle, Education, and Sports groupings).  But the Court found that "the financial records of six developers" in the Games, Music, and Entertainment genres were not "fulsome" enough for McFadden to opine about the costs and margins earned by all developers in those genres.  Dkt. 630 at 10 n.8.

On this key point, Plaintiffs' opposition is silent.  MacCormack admitted at deposition that he "d[id]n't know" whether his sample was "random" or "a good sample for the population of apps [] in general."  Dkt. 1003-14 (MacCormack Dep. I) 228:3–12.  To this day, ***neither Plaintiffs nor any of their experts have explained why this sample of developers was selected***, much less defended it as random and representative.  Yet the statistical literature cited in Apple's motion (Mot. 31, 33) and expert reports (Dkt. 1003-27 (Hitt Reb. Rep. ¶¶ 568, 570 & fns.))—which Plaintiffs fail to address,

15

much less reconcile with MacCormack's methods—makes clear that "representative[ness] of the population" is crucial where, as here, results are to be "extrapolated" from a sample.  *See* Kaye & Freedman, Reference Guide on Statistics, *supra*, at 226–27; *accord* Paul Newbold, William L. Carlson, & Betty Thorne, Statistics for Business & Economics 23 (8th ed. 2012) (similar); Experimentation in the Law: Report of the Federal Judicial Center Advisory Committee on Experimentation in the Law 18 (Fed. Jud. Ctr. 1981) (similar).  So do judicial precedents like *Mercer* and *Kamakahi*, which Plaintiffs likewise ignore despite spending pages distinguishing Apple's other cases.  In these cases and others, courts refused to admit opinions "extrapolated" from a small sample when the experts—like MacCormack—could not provide "a reliable indicator that the sample is representative of the entire population."  *Mercer*, 2024 WL 5423015, at *6 (excluding opinion based on non-random sample of 23% of clients); *Kamakahi v. Am. Soc'y for Reproductive Med.*, 305 F.R.D. 164, 179–80 (N.D. Cal. 2015) (excluding opinion that "extrapolate[d] [an] effect to all other clinics" based on only three clinics' data when expert could not say whether sample was "random or representative"); *see Grodzitsky v. Am. Honda Motor Co., Inc.*, 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017) (claims about "a larger population based on an inspection of a smaller subset" require "some minimal level of statistical significance"), *aff'd* 957 F.3d 979 (9th Cir. 2020).[4]

"[T]o draw reliable conclusions about a population based on a statistical sample, the sample size must be large enough to support those conclusions."  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1033 (C.D. Cal. 2013); *In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 490–91 (D.S.C. 2016) (same).  It is no answer that MacCormack's cost data sample is larger than datasets he used in published papers.  Opp. 29.  MacCormack has never calculated developers' "genre gross margin" ranges in his academic work.  Dkt. 1003-14 (MacCormack Dep. I) 132:15–21; *see also id.* at 44:10–17 ("calculating

---

[4] Plaintiffs try to distinguish *Grodzitsky* as a case where "the expert's sample size failed to support his damages theory."  Opp. 34.  But the same can be said of MacCormack—his sample size of no more than 10 developers per genre grouping "fails to support" a "damages theory" that depends on *all* developers potentially passing on a commission increase to consumers. Plaintiffs also note that some of Apple's other cases involved "cherry-picking" and ignoring "readily available" data.  Opp. 34.  But MacCormack does that too—throwing out data as "insufficiently usable" simply because developers reported zero variable costs in given categories.  *See* Dkt. 1003-27 (Hitt Reb. Rep.) ¶ 575.

Gibson, Dunn &
Crutcher LLP

ranges is something that you're not often doing in academia").  Regardless, as Plaintiffs acknowledge, MacCormack's most cited papers offered "case studies" of software development projects.  Opp. 29.[5] They did not—as he does here—generalize their results to thousands of software developers.  In fact, in one such paper, MacCormack explicitly *warned against* doing so because his sample was not "a true random sample," did not "represent the broader population of projects in each region" and therefore "might not generalize to these broader populations."  Dkt. 1003-76 (*Software Development Worldwide: The State of the Practice*) at 29–30.  His failure to be "as careful" here "as he would in his regular professional work outside his paid litigation consulting" is another mark against admitting his opinions. Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Most of Plaintiffs' remaining arguments focus not on the merits of MacCormack's methods, but on the burdens and timeline of collecting data.  Opp. 31–33 & n.7.  "[C]onvenience is not a substitute for reliability under *Daubert*."  *Pella*, 214 F. Supp. 3d at 493 (rejecting broad conclusions drawn from sample absent some guarantee of representativeness).  Instead, "the law is clear" that expert opinions must be "based on sufficient facts or data . . . no matter how burdensome or difficult collecting relevant data" may be.  *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015) (quotation omitted).  Contrary to Plaintiffs' protests, nothing *required* them to impose margin constraints on their damages model; as McFadden admits, the App Store transaction data should provide "sufficient information" to estimate consumer demand and developers' marginal costs without data from developers themselves.  Dkt. 1003-12 (McFadden Dep. V) at 151:1–14; Dkt. 1003-34 (McFadden Rep.) ¶¶ 33–34.  Having chosen to use developer data to constrain their model and effectively determine its results, however, Plaintiffs needed to ensure the data were random and representative—even if that required serving many more subpoenas.  Opp. 32 n.7; *see* Dkt. 1003-14

---

[5] *See* Dkt. 1003-76 (Alan MacCormack et al., *Software Development Worldwide: The State of the Practice*, IEEE Software (2003)), at 28 (providing "descriptive results" of a survey of software developers to "shed light on international differences" in software development); *see also* Ex. 133 (Alan MacCormack et al., *Trade-Offs Between Productivity and Quality in Selecting Software Development Practices*, IEEE Software (2003)) at 79–80 (survey limited to Hewlett-Packard employees); Ex. 132 (Alan MacCormack et al., *Developing Products on 'Internet Time': The Anatomy of a Flexible Development Process*, 47 Mgmt. Sci. 133 (2001)) at 138–39 (study based on interviews, survey, and site visits).

(MacCormack Dep. I) 249:10–251:7 (acknowledging that, if starting "from scratch," MacCormack would have "sen[t] out requests for information to randomly selected app developers across the spectrum of different sizes").

Finally, Plaintiffs urge the Court to defer to MacCormack because he "deem[ed]" his data "sufficient." Opp. 33. But none of the cases they cite suggests a court can relinquish its gatekeeper function to a self-interested expert based on his "industry experience" alone. In fact, Plaintiffs' lead case says the opposite: In *Collinge v. IntelliQuick Delivery, Inc.*, which Plaintiffs block quote for the proposition that Rule 702 requires data "deemed sufficient by experts in the pertinent field," *see* Opp. 33, the court then applied that rule by *excluding* testimony that drew "class-wide inferences" from a too "small sample." 2018 WL 1088811, at *7 (D. Ariz. Jan. 9, 2018). Because MacCormack does exactly that, his opinions are inadmissible.

## B.    MacCormack Lacks Any Methodology For Combining Genres

Plaintiffs' defense of MacCormack's arbitrary genre groupings likewise ignores the crux of Apple's motion. Plaintiffs' response boils down to an assertion that MacCormack used his "25 years of expertise in the software industry," Opp. 37, "exercise[d] expert judgment," Opp. 38, and "applied his experience," Opp. 39, to decide what genres to group together. But appeals to "expertise" cannot spare an expert who "ha[s] no method or could not describe one." *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418–20 (7th Cir. 2005); *see Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *2 (C.D. Cal. May 19, 2014) (rejecting opinions based on experience when expert could not describe method). And MacCormack's testimony confirmed that he did not employ any method for grouping apps beyond opening them to decide which looked alike. Dkt. 1003-14 (MacCormack Dep. I) 220:13–221:12 (confirming that he "basically download[ed], open[ed], and review[ed] the top apps in each of the genres" and did not "make any record of the themes and features of the apps as part of this review"). Plaintiffs claim in a throwaway sentence that MacCormack "enumerated the exact steps of his analysis" in his report," Opp. 38; tellingly, they do not explain what those steps were, much less how "reliable principles and methods underlie" his conclusions. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). Indeed, even they seem in the dark about MacCormack's methods—claiming he grouped genres based on "similarities in cost structures," Opp. 37, when he purported to

group based on "similar themes and features" in his report and at deposition, Dkt. 1003-31 (MacCormack Rep.) ¶ 109. Such confusion confirms MacCormack's groupings rest impermissibly on "intuition," *Zenith*, 395 F.3d at 419, and "subjective belief," *Daubert*, 509 U.S. at 590.[6]

## C.    MacCormack Measured Irrelevant Costs

Lastly, the Court should exclude MacCormack's gross margin opinions for the independent reason that he measures irrelevant costs for the McFadden-Song model. *Daubert II*, 43 F.3d at 1315. Here too, Plaintiffs concede most of the key points. They admit that MacCormack's margin ranges depend on measuring costs per additional user, rather than costs per transaction. Opp. 36; *see* Mot. 36. And they do not deny that if the McFadden-Song model assumes developers set prices based on different costs—marginal costs per transaction—MacCormack's inputs would be unfit for the model and his opinions irrelevant under Rule 702. *See* Mot. 37.

The only point of debate, then, is what costs are relevant in the McFadden-Song model. Plaintiffs spend pages spinning this as a "dispute[] between economists" about "how marginal costs may be measured"—namely "whether it is appropriate to measure marginal cost as variable costs (including incremental costs when operating at scale) rather than short-term unit costs." Opp. 35–37. This is all misdirection. The issue is not what costs *should be used* for purposes of modeling developers' price setting, but rather what costs *are actually used* in McFadden's model. *See* Dkt. 1003-27 (Hitt Rebuttal Rep.) ¶¶ 593–95 (explaining the distinction).

That question is not subject to a "difference in Apple's and Plaintiffs' views." Opp. 36. As Prof. Watson has explained, it is a mathematical question that can be answered by just "read[ing] th[e] model." Ex. 127 (Watson Dep.) 228:3–232:3. In the model McFadden wrote, the marginal cost of a paid download is denoted by $c_{jt}^{d}$, and the marginal cost of an in-app purchase is denoted by $c_{jt}^{IAP}$. *See* Ex. 110 (McFadden 1st Class Cert. Rep.) App'x E ¶ 36; Dkt. 1003-27 (Hitt Rebuttal Rep.) ¶ 592. McFadden has previously explained that these *c* in his equations represent the "net cost per unit." Ex. 121 (McFadden Dep. III) 156:17–157:1; *see id.* at 153:18–154:17 (agreeing that "each unit that's sold

---

[6] Plaintiffs cite two cases (at 38) in which data-grouping opinions were ruled admissible; but in those, the experts' selection was based on objective data or corresponded to pre-existing categories in the industry. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 287 (N.D. Cal. 2016) (groupings based on employment data and a survey); *360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 204 (D. Del. 2021) (subgroups were "widely accepted" in the relevant industry). Neither is true of MacCormack's genre groupings.

19

incurs a cost equal to whatever value little *c* takes . . . in the respective cases of downloads and IAPs."); *id.* at 156:9–16 (agreeing that *c* is "the developer's marginal cost," namely the "net incremental cost of deliver[ing] one unit"). And in his recent deposition, McFadden confirmed that the "unit of output" in his model is either "a download" of an app or "a unit of IAP content." Dkt. 1003-12 (McFadden Dep. V) 136:9–13; *see also id.* at 135:3–11. The only testimony of McFadden's that Plaintiffs cite on this subject (at 35) is about whether to estimate aggregate or individual in-app purchase prices—it says nothing about marginal costs. *See* Dkt. 1032-15 (McFadden Dep. III) 105:10–22.[7]

McFadden's testimony and equations are clear: The marginal cost in his model is a marginal cost per download or in-app purchase. It is not, as Plaintiffs and Dr. Song claim, "the total variable cost of serving [a] user to keep the user spending money on in-app digital content." Opp. 35. In fact, McFadden's testimony refutes that point directly. If his model measured the cost of keeping each user spending money, those costs would vary depending on each individual user because some users (like high spenders) cost more to service than others. *See* Dkt. 1003-14 (MacCormack Dep. I) 111:4–16 ("there are more costs" for serving high-spending users than low-spending users). But McFadden agreed that "if two users make the same in-app purchase at the same time," his model "treat[s] the cost of each of those transaction as the same" regardless. Dkt. 1003-12 (McFadden Dep. V) 137:15–22; *see also id.* at 136:17–23 (model does not treat users as the unit of output). Because it is undisputed that MacCormack did not measure the marginal cost of an additional transaction, *see* Dkt. 1003-31 (MacCormack Rep.) ¶¶ 8, 37–39, his resulting margin opinions are irrelevant inputs for the McFadden-Song model, "do not logically advance a material aspect" of Plaintiffs' case, and should be excluded. *Daubert II*, 43 F.3d at 1315; *see Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576–78 (N.D. Cal. 2020) (excluding expert testimony based on inappropriate measure for Plaintiffs' damages theory).

## CONCLUSION

In its role as gatekeeper for expert evidence, *see Engilis*, 2025 WL 2315898, at *4–6, the Court should grant Apple's *Daubert* motion.

---

[7] Plaintiffs invoke this Court's prior discussion of marginal costs in McFadden's model, Opp. 35, but those rulings were made without the benefit of the "more developed record" on this question—including McFadden's new testimony about which costs are relevant in his model. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *2 (N.D. Cal. Aug. 28, 2023) ("[T]he path to a fair result often has some turns, particularly as the record develops in a complex antitrust dispute such as this one.").

DATED:  September 23, 2025                    GIBSON, DUNN & CRUTCHER LLP

                                             By: */s/ Cynthia E. Richman*

                                                 Theodore J. Boutrous Jr.
                                                 Daniel G. Swanson
                                                 Cynthia E. Richman
                                                 Caeli A. Higney
                                                 Julian W. Kleinbrodt
                                                 Dana L. Craig
                                                 Eli M. Lazarus
                                                 Harry R. S. Phillips

                                                 *Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP