THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*Admitted *pro hac vice*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date: October 14, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ................................................................................................1

4    II.    ARGUMENT.......................................................................................................1

5          A.    Plaintiffs' One-Sided Market Definition Fails As A Matter Of Law .........................1

6          B.    Plaintiffs Cannot Disclaim Their Direct Challenge To Apple's Refusals To
7                 Deal........................................................................................................4

          C.    Plaintiffs' Challenge To The Design Of iOS Fails As A Matter of Law ...................9
8
9          D.    The Court Should Reject Plaintiffs' IAP And Anti-Steering Theories.....................11

10                1.    Plaintiffs cannot sneak unpled IAP and anti-steering theories to the jury ......11

11                2.    Plaintiffs lack antitrust standing to challenge the former anti-steering
                       rule .........................................................................................................12
12
                 3.    Plaintiffs' in-app purchasing theories are time-barred ................................12
13
          E.    Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims ...........13
14    III.   CONCLUSION..................................................................................................15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### Cases

4
*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ............................................................................................. 9, 10

5
*Anderson v. Liberty Lobby, Inc.*,
6   477 U.S. 242 (1986) ................................................................................................................ 1

7
*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ........................................................................................................... 1, 12

8
*Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
9   459 U.S. 519 (1983) .............................................................................................................. 12

10
*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ................................................................................................. 10

11
*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
12   509 U.S. 209 (1993) ................................................................................................................ 2

13
*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,
   613 F.2d 727 (9th Cir. 1979) ............................................................................................. 9, 10

14
*City of Vernon v. S. Cal. Edison Co.*,
15   955 F.2d 1361 (9th Cir. 1992) ........................................................................................... 6, 14

16
*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................................................ 15

17
*Coronavirus Rep. v. Apple Inc.*,
18   85 F.4th 948 (9th Cir. 2023) ................................................................................................... 3

19
*CoStar Group, Inc. v. Commercial Real Estate Exch., Inc.*,
   --- F.4th ---, 2025 WL 2573045 (9th Cir. Sept. 5, 2025) ................................................... 7, 10

20
*Eagle v. Star-Kist Foods, Inc.*,
21   812 F.2d 538 (9th Cir. 1987) ................................................................................................ 12

22
*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ...........................................................................3, 4, 5, 9

23
*Epic Games, Inc. v. Apple Inc.*,
24   67 F.4th 946 (9th Cir. 2023) ...........................................................................................3, 4, 12

25
*Evervictory Elec. (B.V.I.) Co. v. Invision Indus. Inc.*,
   2012 WL 2030177 (C.D. Cal. June 4, 2012) ....................................................................... 11

26
*In Re FirstEnergy Corp. Sec. Litig.*,
27   2025 WL 2331754 (6th Cir. Aug. 13, 2025) ....................................................................... 15

28
*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ............................................................................................. 9, 10

Gibson, Dunn &
Crutcher LLP

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...................................................................... 3, 4, 5

*In re Google Play Store Antitrust Litig*,
    147 F.4th 917 (9th Cir. 2025) ............................................................................ 3

*In re Google Play Store Antitrust Litig.*,
    No. 20-cv-5671, Dkt. 491 (N.D. Cal. Oct. 20, 2023) ........................................ 8

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
    --- F.4th ---, 2025 WL 2374859 (7th Cir. Aug. 15, 2025) ................................ 6

*Hughes v. Gen. Motors Corp.*,
    35 F.3d 571 (9th Cir. 1994) .............................................................................. 14

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) .......................................................... 12

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .......................................................................... 15

*Intergraph Corp. v. Intel Corp.*,
    195 F. 3d 1346 (Fed. Cir. 1999) ........................................................................ 6

*Jacobson v. Rose*,
    592 F.2d 515 (9th Cir. 1978) ............................................................................ 12

*Key v. Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025) ...................................................................... 5, 14

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ............................................................................................ 8

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) .................................................................... 7, 8

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ......................................................................... 7, 8

*Noohi v. Johnson & Johnson Consumer Inc.*,
    146 F.4th 854 (9th Cir. 2025) .......................................................................... 15

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...................................................................... 4, 6

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988) ............................................................................. 9

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ......................................................................................... 2, 3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ......................................................................... 13, 14

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015) ......................................................................... 2, 11

iii

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)............................................................................................................9

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*,
    371 F. App'x 719 (9th Cir. 2010) ....................................................................................3

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ....................................................................................1, 3, 4

*SaurikIT, LLC v. Apple Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023)..................................................................13

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    2020 WL 2097611 (N.D. Cal. May 1, 2020) ..................................................................3

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) .........................................................................................4

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .........................................................................................1

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................................................14

*United States v. Apple Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025)......................................................................7

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)...........................................................................................2, 3

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).....................................................................................................5, 8

*Williams v. Boeing Co.*,
    517 F.3d 1120 (9th Cir. 2008) ......................................................................................13

**Statutes**

15 U.S.C. § 15b...................................................................................................................13

**Rules**

9th Cir. Rule 36-3(c)...........................................................................................................15

Fed. R. Civ. P. 37(c)(1).......................................................................................................14

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

# I. INTRODUCTION

Plaintiffs do not have a case to try. They cannot articulate what market they intend to define at trial and try to talk around whether it will be one or two sided. But they cannot skip this threshold element of their case. Whether or not their experts "analyze[d] both sides" of the App Store, Opp. 6, Plaintiffs' alleged one-sided "retail" market for all "iOS apps," Dkt. 229, Third Am. Compl. ("TAC") ¶¶ 16, 47, is not legally tenable. Yet this is far from the only fatal flaw in their case: Plaintiffs strain against the refusal to deal doctrine but tacitly concede their theory assumes Apple should have been compelled to license its technology to an "alternative iOS app store." Dkt. 1031-1 ("Opp.") 25. Apple's refusal to do so is an archetypal refusal to deal just as Apple's initial security measures are textbook product design decisions. Nor can Plaintiffs salvage their theories with unpled claims about Apple's in-app payment system and anti-steering provisions—particularly with their damages model that cannot disaggregate lawful from allegedly unlawful conduct. The Court should enter summary judgment.

# II. ARGUMENT

## A.    Plaintiffs' One-Sided Market Definition Fails As A Matter Of Law

Apple moved for summary judgment because Plaintiffs cannot prove their alleged one-sided "retail market for the sale of [iOS] apps." Dkt. 1004 ("Mot.") 5. That put to Plaintiffs the task of "present[ing] a sufficient disagreement" of fact "to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Plaintiffs' response does anything but. They don't say what market they'll define, wobble between one-sided and two-sided theories, and even toy with skipping market definition altogether. *See* Opp. 4–8. Because Plaintiffs cannot prove their alleged market (to the extent they even intend to stick by it), the Court should enter summary judgment for Apple. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (summary judgment appropriate if a plaintiff "cannot sustain a jury verdict on the issue of market definition"); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373–74, 1380 (9th Cir. 1989) (similar).

**1.** Plaintiffs do not dispute that they pleaded a "retail market for the sale of [iOS] apps," a one-sided aftermarket for all iOS apps of every genre. *Apple Inc. v. Pepper*, 587 U.S. 273, 278 (2019). Yet Plaintiffs now equivocate from page to page. They at first appear to stick by this one-sided "retail

1

1   model." Opp. 5. But then they assert the App Store—like "most" retail stores—is two sided, *id.* at 5–

2   6, and claim their "experts do not express" an opinion that the "market is one-sided," *id.* at 8. And by

3   the next page, Plaintiffs go back to suggesting a "single-brand market" like theirs cannot be two sided,

4   *id.* at 7, and confirm their "retail" market is not "a two-sided transaction platform in the *Amex* sense,"

5   *id.* at 6. At no point do Plaintiffs say what market they will define at trial and whether it is one or two

6   sided. *See* Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 288:14–290:7 (equivocating on if the relevant

7   market is one or two sided). Obfuscation is no substitute for evidence—particularly as it is legal error

8   to proceed on a one-sided definition in a case involving a two-sided transaction platform. Opp. 8;

9   *accord US Airways, Inc. v. Sabre Holdings Corp.* ("*Sabre*"), 938 F.3d 43, 58 (2d Cir. 2019).

10      Nor do Plaintiffs contest the undisputed evidence demonstrating the App Store bears all the

11   hallmarks of a two-sided transaction platform under *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529,

12   534–35 (2018). *See* Mot. 6–8; *see also* Dkt. 1003-22 (Jin Rep.) ¶ 60; Dkt. 1003-23 (Sundararajan Rep.)

13   ¶ 144.[1] Their only resistance is Stiglitz's assertion that "an *Amex*-like analysis is unnecessary because

14   no evidence demonstrates any 'substantial indirect network effects.'" Opp. 6. But while "[e]xpert

15   testimony is useful as a guide to interpreting market facts," "it is not a substitute for them"—and cannot

16   alone forestall judgment as a matter of law. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,

17   509 U.S. 209, 242 (1993); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923 (9th

18   Cir. 2015) ("[T]he mere proffering of unsupported expert testimony does not create a triable issue.").

19   Regardless, Stiglitz is wrong, as he was wrong in *Sabre*, that quantification of strong indirect network

20   effects is a prerequisite for *Amex* to apply. *Sabre*, 938 F.3d at 58–59, 69 (vacating jury verdict). The

21   factual prerequisites recognized by the Supreme Court—namely, that the platform connects two groups

22   through simultaneous transactions, *id.* at 58—*create* indirect network effects, not the other way around.

23   *See* Dkt. 1003-23 (Sundararajan Rep.) ¶¶ 32–33, 35–36.

24      On this record, Plaintiffs cannot distinguish the many cases holding that the App Store has those

25   predicate features and *is* a two-sided transaction platform. They first assert that "no case hold[s] that

---

[1] Plaintiffs suggest in their separate statement (but not opposition) that App Store transactions are not simultaneous. *See* Dkt. 1031-3 ("Resp. Fact") 41. But even their own expert admits transactions are simultaneous. *See* Dkt. 1003-105 (Dec. 15, 2022 Abrantes-Metz Dep.) 108:8–109:1 (conceding "the purchase and sale of apps" on the App Store "happen[s] simultaneously").

2

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

1    the App Store is a two-sided transaction platform." Opp. 7. But that is plain wrong: This Court found

2    "the App Store is a two-sided transaction market," *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898,

3    994 (N.D. Cal. 2021), which the Ninth Circuit affirmed, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946,

4    1000–01 (9th Cir. 2023), and twice reiterated, *Coronavirus Rep. v. Apple Inc.*, 85 F.4th 948, 955–57

5    (9th Cir. 2023); *In re Google Play Store Antitrust Litig*, 147 F.4th 917, 931, 945, 950 (9th Cir. 2025)

6    ("app stores . . . compet[e]" in a "two-sided market"). They next argue that, unlike these cases, they

7    dispute the "predicate fact" that the App Store is "a transaction platform." Opp. 8. But mere say-so is

8    not enough when, as explained above, Plaintiffs adduce no evidence and no authority to "avoid the

9    obvious" fact that the App Store is a two-sided transaction platform, *Epic*, 559 F. Supp. 3d at 1016—

10   meaning their alleged one-sided market fails as a matter of law. *See Sabre*, 938 F.3d at 58.

11       **2.** Plaintiffs' principal argument instead appears to be that they don't need to prove any

12   particular market because *Amex* speaks only to the "impact" a plaintiff must show. Opp. 5–6. This

13   puts the cart before the horse. As *Amex* holds, a court "must first define the relevant market" before

14   assessing competitive effects. 585 U.S. at 542. The Ninth Circuit in *Epic* indeed discussed how to

15   prove anticompetitive effects in cases involving a two-sided market, Opp. 4–5, but only *after* describing

16   "defining the relevant market" as a "threshold step." 67 F.4th at 975. That is consistent with precedent

17   both before and after *Epic*. *See Coronavirus Rep.*, 85 F.4th at 957; *FTC v. Qualcomm Inc.*, 969 F.3d

18   974, 992 (9th Cir. 2020). Nor does *SC Innovations, Inc. v. Uber Techs., Inc.* suggest otherwise as it

19   speaks to monopoly power, not market definition. 2020 WL 2097611, at *9 (N.D. Cal. May 1, 2020).

20       **3.** Plaintiffs also cannot circumvent their burden by saying their experts "analyzed both sides

21   of the App Store." Opp. 6. Ninth Circuit precedent is clear: Failure to prove a relevant market is fatal

22   to a Section 2 claim. *Rebel Oil*, 51 F.3d at 1435; *see also, e.g.*, *Plush Lounge Las Vegas LLC v. Hotspur

23   Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010). Plaintiffs' experts did not define a two-sided

24   market that encompasses all iOS app transactions. Dkt. 1033-11 (Stiglitz Rep.) § V.B (outlining SSNIP

25   test for consumer-side substitution only); Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 290:17–19 (failing

26   to define a relevant market for the developer side of the platform). And Plaintiffs cannot rescue their

27   claims by pointing to Apple's experts for a fallback definition. To be "relevant to [Plaintiffs] theory

28   of harm at issue," any two-sided market alternative must cover all 26 app genres included in Plaintiffs

case. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024). None of Apple's experts defined such a market. Dkt. 1003-20 (Hitt Rep.) ¶¶ 90, 96–97; Dkt. 1003-22 (Jin Rep.) ¶¶ 91–93; Dkt. 1003-27 (Hitt Reb. Rep.) ¶ 299; Dkt. 1003-28 (Sundararajan Reb. Rep.) ¶ 261. Apple's experts disclaimed a market encompassing all transactions for all genres because, as this Court recognized when defining a two-sided mobile gaming transaction market in *Epic*, the two-sided "competitive conditions for transactions vary significantly across different app genres." Dkt. 1003-20 (Hitt Rep.) ¶¶ 90, 96–97; *see also Epic*, 559 F. Supp. 3d at 1019. Critically, that means only one proposed market—a one-sided aftermarket for all iOS apps of every genre—has been tendered to support Plaintiffs' claims. *Cf. Rebel Oil*, 51 F.3d at 1421; *Epic*, 67 F.4th at 978 & n.9 (relying on *Rebel Oil* to allow the plaintiff's claims to go forward on "a third in-between market"). Because that market fails as a matter of law, Plaintiffs' antitrust claims do too.

**B.      Plaintiffs Cannot Disclaim Their Direct Challenge To Apple's Refusals To Deal**

Plaintiffs now characterize their suit as challenging Apple's "restrictions on both app developers and iOS device consumers" that "interfere with dealing among third parties and rivals." Opp. 9. But Plaintiffs cannot dodge the refusal to deal doctrine by "recast[ing] [Apple's] conduct as an 'affirmative' act of interference." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013). Plaintiffs' allegations, expert testimony, and case law all make clear that Apple's conduct is a refusal to assist or deal with rivals—and is protected under settled law.

**1.** As an initial matter, *Epic* does not "foreclose Apple's refusal-to-deal argument." Opp. 9. Both this Court and the Ninth Circuit rejected Epic's Section 1 claims and therefore declined to analyze the Section 2 claims separately since a "find[ing] that the conduct in question is not anticompetitive under § 1" means "the court need not separately analyze the conduct under § 2." *Epic*, 67 F.4th at 998 (quoting *Qualcomm*, 969 F.3d at 991). Nothing in *Epic* suggests that if the case had been brought as a Section 2 case alone it would not have been analyzed as a refusal to deal. *See* Opp. 9 (citing no part of either decision to support this purported reading). The applicability of refusal to deal doctrine is a gating issue here: Plaintiffs have no Section 1 claim, so there is no rule-of-reason analysis under Section 1 that will precede an analysis under Section 2. *See Novell*, 731 F.3d at 1072 (courts in Section 2 cases apply "considerably more specific rules for common forms of alleged misconduct").

Setting aside this material difference, Plaintiffs cannot argue *Epic* controls even if it were true the "Court and the Ninth Circuit rejected Apple's refusal-to-deal arguments." Opp. 9. Here, for example, Plaintiffs seek to compel Apple to code sign rival app marketplaces, *see infra* § II.C—a textbook refusal-to-deal-with-rivals theory that Epic explicitly "disclaim[ed]." *Epic*, 559 F. Supp. 3d at 1034 n.599. Indeed, Plaintiffs would doom themselves to defeat insofar as they claim *Epic* is indistinguishable on the facts and law given that *Epic* upheld the restrictions challenged here under the antitrust laws. *See Key v. Qualcomm Inc.*, 129 F.4th 1129, 1137 (9th Cir. 2025) (requiring "extraordinary differences" for a case "to survive" at odds with a prior precedential opinion).

**2.** Plaintiffs also cannot evade the refusal to deal framework just because they did not label their cause of action "a refusal to deal *claim*." Opp. 14 n.10. Substance matters, not form. The FTC did not cast Qualcomm's licensing practices as a refusal to deal either. *See, e.g.*, Compl., *FTC v. Qualcomm Inc.*, Case 5:17-cv-00220 (N.D. Cal. Jan. 17, 2017), Dkt. 1. But the Ninth Circuit applied duty-to-deal precedents nonetheless. *Qualcomm*, 969 F.3d at 993–95. And while Plaintiffs try to frame their case as one about "restrictions on both app developers and iOS device consumers that block their voluntary dealings with each other," Opp. 9, they elide the actual restrictions at issue.

The restrictions at issue here are refusing to allow any third-party store in the App Store or by sideloading, and "terminat[ing] apps developers who [would] sell apps in competition with" the App Store. Mot. 9. Plaintiffs' own economist confirmed as much. *See* Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 226:24–227:11 (opining on Apple's general "policy of not allowing app stores in its own App Store"); Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 114:23–115:2 (taking issue with Apple's "refus[al] to deal with developers who sell iOS apps outside the App Store"). These restrictions reflect Apple's "refusal to cooperate with rivals." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). After all, Plaintiffs' alleged relevant market is one in which Apple, as a "retail store," sells apps and IAPs to consumers. Opp. 7. And Plaintiffs even assert the entire genesis of these restrictions was a world in which "Cydia emerged as an option for downloading iOS apps from the internet" and Facebook provided "store-like" apps. *Id.* at 3. Refusing to allow a competing store on iOS—and terminating developers who would sell apps on iPhone and iPad via another competing store—is a quintessential refusal to deal with rivals in the relevant market. Mot. 12–13. And if Apple's

1  sideloading restrictions don't bar rivals, then they can't be exclusionary at all. *See Intergraph Corp. v.*

2  *Intel Corp.*, 195 F.3d 1346, 1356 (Fed. Cir. 1999).

3        Plaintiffs' own arguments underscore this point. They admit their damages model presumes

4  Apple's restrictions prevented an "alternative iOS App Store" from entering. Opp. 21, 25; *see also*

5  Dkt. 1033-3 (Abrantes-Metz Rep.) ¶ 23. And while Plaintiffs foreswear any claim for injunctive relief,

6  Opp. 14–15, they do not deny that their but-for world remains one in which Apple is compelled to

7  license its proprietary technology to others so that they can offer native iOS apps for download to

8  consumers. *See* Mot. 13. As in *City of Vernon v. Southern California Edison Co.*, Plaintiffs' theory of

9  injury and damages unveils their case as one premised on Apple's refusal "to give all of the access to

10  the facility[y] that [the plaintiff] desire[d]." 955 F.2d 1361, 1366 (9th Cir. 1992). Apple's refusals to

11  deal thus carry a "presumption of legality," Opp. 9 (quoting *Novell*, 731 F.3d at 1073), and Plaintiffs

12  do not even try to satisfy an exception to the rule, *see* Mot. 11–12.

13        Nor can Plaintiffs stretch Apple's consumer warranty into a grand theory of anticompetitive

14  conduct. Plaintiffs implicitly recognize that Apple's warranty policies, standing alone, cannot be

15  anticompetitive. *See* Resp. Fact 25 (arguing that Apple's warranty policies are anticompetitive only

16  "in conjunction" with other restrictions); *see also In re Harley-Davidson Aftermarket Parts Mktg.,*

17  *Sales Pracs. & Antitrust Litig.*, --- F.4th ---, 2025 WL 2374859, at *9 (7th Cir. Aug. 15, 2025) (rejecting

18  monopolization claim based on warranty that only "foreclose[d] competition for parts that would not

19  be covered by the limited warranty"). And they do not claim that if Apple covered warranty costs for

20  jailbroken phones, it would somehow cause alternative app stores to enter. Regardless, unlike the

21  pleadings decisions Plaintiffs cite (Opp. 10 n.9), Plaintiffs have not identified a single instance of Apple

22  voiding warranties of iOS device owners "who buy competing apps" here. Mot. 16 (citing TAC ¶ 79).

23  At most, Apple may deny service for devices whose security features have been disabled. No case

24  cited by Plaintiffs contends that sort of action reflects anticompetitive conduct. Nor does their liability

25  expert, Stiglitz. *See* Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 147:15–21 (conceding it is not

26  "anticompetitive for Apple to make the customer pay for the consequences [of] deciding to jailbreak").

27      **3.** For these reasons, Plaintiffs find no support in precedent. They first miss the mark in

28  comparing Apple's restrictions on rival stores to the restrictions on commercial real estate listings

challenged in *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, --- F.4th ---, 2025 WL 2573045, at *11 (9th Cir. Sept. 5, 2025). There, CoStar precluded its customers' "ability to use other listing *platforms*" and effectively prevented CoStar's rivals from "access[ing] [customers'] listings in [customers'] *own websites*." *Id.* (emphasis added). Those restrictions directly restrained customers and prevented them from engaging with CoStar's rivals. But Apple does not prevent iPhone owners from using their Amazon Fire Stick to rent movies from Prime Video instead of the Apple TV app. Rather, Apple prohibits competitors from using its own proprietary technology to compete against it— either by offering competing stores within the App Store or through sideloading directly onto iOS. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303, 305 (D.C. Cir. 2023) (rejecting theory that would require a platform to "lend its facilities to its potential competitors"). And CoStar's restrictions— which were not known to CoStar's broker-customers—were "particularly problematic because of their deceptive element." *CoStar*, 2025 WL 2573045, at *12. No similar evidence of duplicity exists here.[2]

In stark contrast, Plaintiffs struggle in vain to distinguish the cases that actually bear on this case. Plaintiffs contend that the *Meta* court analyzed Facebook's policies under "exclusive dealing law, not refusal to deal," Opp. 13, but the D.C. Circuit's reliance on *Trinko* disproves that point. *See Meta*, 66 F.4th at 305–06. And Plaintiffs' own description of *Novell* as involving a challenge which "sought to force Microsoft to share software code" demonstrates its applicability to Plaintiffs' claims here. Opp. 14. Plaintiffs cannot distinguish either case on the ground that those defendants did not "affirmatively interfer[e]" with the dealings of third parties. *Id.*; *see New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31 (D.D.C. 2021) ("[R]efusals can always be reframed as offers to deal only on the condition that the third party refrains from competing."). After all, Microsoft's refusal to share APIs with independent software vendors restricted Novell from providing features to Word Perfect users, just as Facebook's policies restricted its users from interacting with third-party apps—both situations in which the defendant allegedly "interfered" with its rivals' ability to interact with consumers.

For the same reason that *Meta* recognized, *Lorain Journal Co. v. United States*, 342 U.S. 143

---

[2] So too for Plaintiffs' reliance on *United States v. Apple Inc.*, 2025 WL 1829127, at *11–12 (D.N.J. June 30, 2025). *See* Opp. 11. As Apple explained, the court held that the alleged conduct was not a refusal to deal with smartphone competitors to monopolize an alleged smartphone market. Mot. 10. Here by contrast, Plaintiffs assert that Apple refused to deal with "developers who sell [or would sell] apps in competition with Apple' in the alleged 'iOS applications aftermarket." *Id.*; *see* TAC ¶¶ 79, 84.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

1    (1951), and its progeny are inapplicable here.  *See* Opp. 13–14.  In such cases, the defendants directly

2    coerced customers from contracting with interbrand competitors.  *See Facebook*, 549 F. Supp. 3d at

3    32.  But Facebook's policy did not prohibit developers from working with competitors—it "limit[ed]

4    only how [certain] apps on Facebook operate" while "leav[ing] app developers entirely free to develop

5    applications for Facebook's competitors."  *Meta*, 66 F.4th at 304.  So too here.  For *Lorain Journal* to

6    apply, Plaintiffs would need evidence that Apple conditioned developers' access to iOS and the App

7    Store on their agreement not to distribute through Google Play, Steam, or other app marketplaces.  No

8    such evidence exists here.

9        Nor can Plaintiffs distinguish *Google Play*'s rejection of an indistinguishable store-within-a-

10   store claim as a lawful refusal to deal.  *See* Order at 1, Dkt. 491, *In re Google Play Store Antitrust*

11   *Litig.*, No. 20-cv-5671 (N.D. Cal. Oct. 20, 2023).  Without disagreeing with the merits of Judge

12   Donato's decision, Plaintiffs cobble together irrelevant observations comparing Google and Apple's

13   developer agreements.  Opp. 14.  None of that drove the result under Section 2 there, and they should

14   not do so here.  Instead, those distinctions were presented in the context of a Section 1 claim, so they

15   have little relevance here.  That Epic agreed Google's "store within a store" restrictions were lawful

16   refusals to deal under Section 2 only highlights the anomalous position that Plaintiffs take in this case.

17       **4.**  Finally, Plaintiffs seek to analogize Apple's conduct to tying, arguing that Apple conditions

18   access to iOS on consumers' use of Apple's app distribution system.  *See* Opp. 11–13.  But that cannot

19   forestall summary judgment either.  For one, Plaintiffs admit to "not pursuing a Section 1 tying claim."

20   *Id.* at 13.  And their "analogies" to tying miss the mark: Having conceded the absence of any actual

21   phone-app-store tying agreement, their newest theory, whatever it may be, was never pleaded and

22   should be rejected for reasons discussed below.  *Id.*; *see infra* § II.D.1.  In reality, Plaintiffs are

23   attempting to circumvent refusal to deal precedent by dressing up Apple's platform policies as a hybrid

24   form of conduct between "conditional dealing," "quasi-tying," and "monopoly leveraging."  The Court

25   should reject this effort to manufacture a new theory of liability unsupported by law or fact.  *See*

26   *Facebook*, 549 F. Supp. 3d at 31; *see also Trinko*, 540 U.S. at 415 n.4 (rejecting such a claim because

27   "leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal

28   claim we have rejected"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 455–57 (2009)

1   (refusing to "alchemize" claims into "a new form of antitrust liability never before recognized").

2   **C.      Plaintiffs' Challenge To The Design Of iOS Fails As A Matter of Law**

3          Plaintiffs similarly cannot avoid the product design doctrine by distorting their theory of
4   liability.  The operative complaint challenges the technical restrictions that make iOS a "closed"
5   platform.  TAC ¶ 36.  And Plaintiffs continue to attack Apple's requirement that iOS apps possess a
6   "digital signature" or software "certificate" that "can only be obtained through the App Store."  Resp.
7   Fact 20.  Yet they do not dispute that Apple's "on-device protections, including sandboxing, code
8   signing, and entitlements are 'an essential part of iOS's approach to security.'"  Resp. Fact 21.  That
9   means Plaintiffs' challenge fits squarely within—and summary judgment is required under—*Allied*
10  *Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010).

11         To be sure, Plaintiffs disagree about the *extent* of "consumer appeal and supposed security
12  risks" addressed by Apple's decision to employ technical safeguards to make iOS a "closed" platform.
13  Opp. 17.  But summary judgment is appropriate so long as a product's "design provided *some* new
14  benefit to consumers."  *Allied Orthopedic*, 592 F.3d at 1000 (emphasis added).  And Plaintiffs do not
15  dispute that Apple's design choices aim to make its products "more attractive to buyers."  *Cal. Comput.*
16  *Prods., Inc. v. Int'l Bus. Machs. Corp.* ("*CalComp*"), 613 F.2d 727, 744 (9th Cir. 1979); *see* Dkt. 1004-
17  1 ("SUF") 26; *see also Epic*, 559 F. Supp. 3d at 1038 ("centralized app distribution" helps Apple
18  "provide[] a safe and trusted user experience on iOS").  Plaintiffs therefore ask the Court to defy
19  binding precedent by submitting to a jury the task of "balancing the benefits or worth of a product
20  improvement against its anticompetitive effects."  *Allied Orthopedic*, 592 F.3d at 1000.

21         Plaintiffs also try to distinguish *Allied Orthopedic* and its predecessors as cases about "*changes*
22  in product design."  Opp. 16.  But *Allied Orthopedic* speaks to "new *and* improved product design."
23  *Allied Orthopedic*, 592 F.3d at 1000 (emphasis added); *see also, e.g.*, *Foremost Pro Color, Inc. v.*
24  *Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983) (applying doctrine to "new products").  If
25  anything, the reasons for refusing to second-guess innovation is at its apex with the introduction of a
26  novel product: Consumers are worse off when companies forgo development of new products for fear
27  of Section 2 liability.  *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988)
28  (courts have "consistently rejected antitrust liability for a monopolist's decision about when or whether

Gibson, Dunn & Crutcher LLP

1  to market new products"). That is why "any firm, even a monopolist, may generally bring its products

2  to market whenever and however it chooses." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263,

3  286 (2d Cir. 1979). Regardless, Plaintiffs recognize that Apple catered to "huge" demand by opening

4  iOS to native (and not just web-based) apps. Resp. Fact 1. That change was an "improvement" to

5  iPhone and "does not violate Section 2." *Allied Orthopedic*, 592 F.3d at 999–1000.

6      Nor can Plaintiffs escape these decisions by casting Apple's "technical restrictions" as

7  "limitations on innovation and new product offerings." Opp. 16–17. The Ninth Circuit has rejected

8  that argument time and time again. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 1002 (rejecting argument

9  that defendant "force[d] consumers to adopt its new technology" by restricting compatibility with

10  interoperating technologies); *CalComp*, 613 F.2d at 741 (rejecting argument that "IBM made design

11  changes on certain of its CPUs, disk drives and controllers of no technological advantage and solely

12  for the purpose of frustrating competition from plug-compatible manufacturers"). *CoStar* does not

13  dictate a different result. CoStar allegedly "constructed technological barriers that impede[d] [its

14  rival's] ability to access brokers' listing information" without the brokers' knowledge and without any

15  alleged benefit to consumers. 2025 WL 2573045, at *11. No such "deceptive element" exists here,

16  and this Court has ample record evidence (unlike the *CoStar* court) about the benefits of Apple's

17  foundational design decisions. *Id.* at *12; *see* SUF 20–23.

18      Finally, Plaintiffs claim to challenge Apple's "associated anticompetitive conduct" (Opp. 1, 15)

19  but identify no such conduct aside from the lawful refusals to deal addressed above. *See supra* § II.B.

20  That matters because Plaintiffs must identify exclusionary conduct other than "the product introduction

21  itself." *Foremost*, 703 F.2d at 545–46. In *Allied Orthopedic*, for example, the defendant's new and

22  improved pulse oximetry monitors were incompatible with the old sensor technology that competitors

23  had used, but that incompatibility did not amount to a distinct abuse of market power to force adoption

24  of the new system. 592 F.3d at 1002. Instead, because "the product improvement at issue in th[e] case,

25  not some associated conduct by [the defendant], caused the incompatibility," the plaintiffs had no

26  viable Section 2 claim. *Id.* So too here, where Plaintiffs have not identified anticompetitive conduct

27  beyond Apple's technical restrictions or plain refusals to deal.

28

1    **D.    The Court Should Reject Plaintiffs' IAP And Anti-Steering Theories**

2        **1.    Plaintiffs cannot sneak unpled IAP and anti-steering theories to the jury**

3        In denying Plaintiffs leave to amend, this Court made clear that the "scope" of the case was

4    locked and could not be "widen[ed]." Dkt. 573 at 7. Plaintiffs were thus bound by the TAC's tripartite

5    theory that Apple acquired or attempted to acquire monopoly power by: (a) "designing the iOS Devices

6    operating system as a closed system and installing security measures and program locks," (b)

7    "establishing the App Store as the exclusive worldwide distributor of iOS apps," and (c) "terminating

8    or threatening to terminate app[] developers who sell apps in competition" and "voiding the warranties

9    of iOS Devices consumers who buy competing apps." TAC ¶¶ 79, 84. It also means anti-steering and

10   IAP restrictions were not part of Plaintiffs' case. They do not deny that the TAC never mentions

11   Apple's former anti-steering rules. *See* Opp. 17–19. While they make much of their passing references

12   to in-app purchases, *id.* at 17, these general allusions do not suffice because restrictions on in-app

13   purchases raise "distinct concepts" compared to Plaintiffs' other challenges. *Evervictory Elec. (B.V.I.)*

14   *Co. v. Invision Indus. Inc.*, 2012 WL 2030177, at *2 (C.D. Cal. June 4, 2012); *see infra* § II.D.2

15   (identifying distinctions between purchase of apps and in-app purchases). And broad hints of Apple

16   "threaten[ing] to terminate developers who sell in competition with Apple" say nothing about in-app

17   purchases at all. Opp. 17 (citing TAC ¶¶ 79, 84). None of these scattered references provided Apple

18   with notice that Plaintiffs would launch a direct challenge to the IAP design.

19       It does not matter that Plaintiffs sketched these theories in discovery or that Apple was

20   compelled to devote some attention to these theories in its own rebuttal expert reports (Opp. 18–19).

21   And it is implausible that plaintiffs only belatedly "discovered" these theories through recent discovery.

22   The operative complaint dictates the boundary of Plaintiffs' claims—not sparse references in discovery

23   or class certification briefing. *See In re Online DVD-Rental*, 779 F.3d 914, 924 n.3 (9th Cir. 2015)

24   ("The district court also did not abuse its discretion in excluding evidence at summary judgment that

25   supported new, unpled liability theories, even though the evidence had been adduced in discovery.").

26   Whether Plaintiffs properly *pleaded* claims related to IAP is a merits issue ripe now, not something

27   relevant to class certification. The Court already rejected Plaintiffs' attempt to add post-*Epic* theories,

28   including those targeting IAP and anti-steering provisions, because such a claim "is not consistent with

their [then] proposed complaint." Dkt. 573 at 6–7. Plaintiffs' efforts to reintroduce those theories now, without leave of court, should be rejected again.[3]

### 2.    Plaintiffs lack antitrust standing to challenge the former anti-steering rule

Plaintiffs lack antitrust standing to challenge Apple's former anti-steering rule because calculating the alleged harm to consumers relies on a series of contingent events that makes apportioning damages complex—with the attendant risk of duplicative recovery between developers and consumers. *See Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534, 543–44 (1983).[4] Plaintiffs respond by overreading *Pepper*. Opp. 19. There, the Supreme Court held on the pleadings that Plaintiffs could sue Apple as direct purchasers under *Illinois Brick Co. v. Illinois*. *See Pepper*, 587 U.S. at 281. But as *Illinois Brick* itself recognized, remoteness of injury and indirect purchaser standing are "analytically distinct." 431 U.S. 720, 728 n.7 (1977). Nor could the Supreme Court's decision in *Pepper* touch on the former as Plaintiffs had not alleged any challenge to Apple's former anti-steering rules at the time. *See supra* § II.D.1.

Plaintiffs otherwise argue that "Apple's anti-steering directly stopped developers from directing customers to other platforms." Opp. 21. But that only highlights the indirectness. The restraint was imposed on developers, not the class. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987) (restraint must "lead directly" to plaintiffs as "the immediate victims"). Moreover, Plaintiffs do not dispute, as the Ninth Circuit observed in *Epic*, that translating that restraint to an effect on developers at the first step "would require a protracted and speculative inquiry." 67 F.4th at 1003.

### 3.    Plaintiffs' in-app purchasing theories are time-barred

Plaintiffs admit they seek damages for alleged overcharges on in-app purchases even though they waited nearly nine years to even mention such transactions in their pleadings. Opp. 23; *see generally* TAC. In a footnote, Plaintiffs argue that each in-app purchase was a new injury that restarted the limitations window. Opp. 22 n.15. But that is the same argument considered and rejected in

---

[3] Nor can Plaintiffs—as suggested in passing in a footnote—amend the pleadings at trial. Opp. 18 n.12. They concede such a practice is disfavored where there are no "newly-revealed material facts." *Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978). No such new facts were uncovered here.

[4] Plaintiffs' argument (Opp. 20) that they have standing to challenge alleged restraints related to in-app purchases is irrelevant because Apple's standing challenge is limited to Plaintiffs' claims concerning Apple's former anti-steering rule. *See* Mot. 19–21.

1  *SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023).  That case involved the same

2  kind of time-barred challenge to foundational decisions about the App Store.  *Id.* at *1.  And there too,

3  Plaintiffs argued that each sale (and each warranty entered into with a customer as a result) was an

4  overt act to restart the limitations period.  *Id.*  But the Ninth Circuit rejected that argument, recognizing

5  the continued sale of Apple's products or services is merely "a reiteration or extension of" an original

6  decision—which does not restart the limitations period.  *Id.*  So too here.  At minimum, damages, if

7  any, must be limited to the four-year period preceding the TAC.  *See* 15 U.S.C. § 15b.

8      Nor can Plaintiffs avoid the statute of limitations by arguing the TAC "relates back."  Opp. 22–

9  23.  Their new claim that Apple has "foreclose[ed] . . . alternative iOS in-app payment processing

10  solutions," Dkt. 1003-32 (Stiglitz Rep.) ¶ 80, does not "share a common core of operative facts" with

11  Plaintiffs' initial app purchase claim because it rests on "different statistical evidence and witnesses."

12  *See Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008).  Plaintiffs' own experts admit they

13  concern discrete restrictions in the DPLA and App Review Guidelines and unique competitive

14  conditions related to the purchase of digital content across platforms.  *See* Dkt. 1003-32 (Stiglitz Rep.)

15  ¶¶ 63, 80; Dkt. 1003-35 (Song Rep.) ¶ 45; Dkt. 1003-34 (McFadden Rep.) ¶¶ 15–16.  Apple has

16  objected to this prejudicial change in direction since Plaintiffs filed the TAC because it is not

17  appropriate to introduce a new legal theory nine years into litigation, particularly when, as here,

18  Plaintiffs represented that the prior operative complaint "does not currently concern anything other

19  than iPhone apps purchases."  *See* TAC at 4 (Stipulation and Order for Leave to File TAC).

20  **E.    Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims**

21      **1.**  Plaintiffs lack evidence sufficient to prove "antitrust impact on a class-wide basis" given the

22  unreliability of their experts' work.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

23  31 F.4th 651, 681 (9th Cir. 2022) (en banc); *see* Mot. 22–25.  Plaintiffs protest that they do not need

24  Mr. Thompson's analysis because "the model measures overcharges for every transaction."  Opp. 24.

25  But the certified class includes individuals, not transactions.  *See* Dkt. 789 at 2 (certifying class defined

26  as "All persons . . .").  Plaintiffs therefore must show injury to actual people—as they tacitly recognize

27  by arguing that Hayter, as an individual, is damaged.  Opp. 24 n.16; *see also* Dkt. 789 at 1 (certifying

28  the class on "plaintiffs' representation" that they could match transactions to people).  Thompson's

1   unreliable deduplication efforts are the only evidence Plaintiffs have connecting transactions to

2   individuals.  Because that analysis is inadmissible, Plaintiffs lack proof of classwide injury.  *Olean*, 31

3   F.4th at 681; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 436 (2021) (the "concrete harm"

4   requirement must be satisfied by each "individual" class member).[5]

5           Nor can Plaintiffs (in a footnote, *see* Opp. 24 n.16) create a triable issue for Mr. Hayter alone.

6   Plaintiffs rely on a new declaration from Dr. Song served on September 2, 2025.  Dkt. 1031-2.  The

7   Court should strike this declaration, as well as the August 1 Supplemental Report (Dkt. 1034-7) on

8   which it relies.  Though expert discovery closed on July 11, Song's submissions include new opinions,

9   including Hayter's damages (Dkt. 1031-2 ¶¶ 4–5), and calculations of individual and classwide

10  damages at the account level (Dkt. 1031-2 ¶¶ 7–8; Dkt. 1034-7 ¶¶ 3–5).  Nothing stopped Song from

11  analyzing Hayter's damages or performing account-based calculations in his prior reports; indeed, he

12  acknowledged in March that his team could "allocate Class-wide damages to anonymized Apple IDs."

13  Dkt. 1003-35 (Song Rep.) ¶ 11.  Apple's experts have had no opportunity to respond to these new

14  analyses.  *See* Ex. 109 (Aug. 15, 2025 Letter from E. Lazarus to M. Rifkin).  Nor can Plaintiffs claim

15  this is proper "supplementation" under Rule 26(e); Song's supplement and declaration weren't offered

16  to correct his reports but because Plaintiffs "shift[ed] their litigation strategy" at the eleventh hour.

17  *Key*, 129 F.4th at 1144 (affirming exclusion of supplemental report).  Song's untimely disclosures were

18  not justified or harmless and must be stricken.  Fed. R. Civ. P. 37(c)(1).

19          **2.**  Plaintiffs also do not dispute that their model aggregates all challenged conduct to estimate

20  damages.  *See* Mot. 23–25.  Nor do Plaintiffs dispute that courts "reject[] a damages model for failure

21  to disaggregate conduct after determining, at class certification or summary judgment, that some

22  alleged conduct was lawful."  Opp. 24.  Thus, binding Ninth Circuit precedent requires summary

23  judgment in full if Apple prevails on any argument above.  *See City of Vernon*, 955 F.2d at 1373.

24          Plaintiffs suggest a jury can find any conduct anticompetitive and then award any "*amount* of

25  damages" so long as it "is not the product of speculation or guess work."  Opp. 24–25 (quoting *Hughes*

26  *v. Gen. Motors Corp.*, 35 F.3d 571, at *2 (9th Cir. 1994) (table)).  For one, *Hughes* is a dated

27

28  ───────────────
    [5] Plaintiffs make no claim that they have any standalone challenge to Apple's price tier policies
    independent of their other claims.  And rightly so, because Plaintiffs have no evidence of classwide
    injury and damages caused solely by price tiers.  *See* Mot. 24 n.10.

Gibson, Dunn &
Crutcher LLP

1    unpublished opinion that may not be cited in this Court.  *See* 9th Cir. Rule 36-3(c).  For another,

2    Plaintiffs' suggestion that "close enough" is "good enough" ignores the Supreme Court's subsequent

3    decision in *Comcast Corp. v. Behrend*, 569 U.S. 27, 36–37 (2013).  Plaintiffs repeat the same error as

4    the *Comcast* plaintiffs by "assum[ing] the validity of all [their] theories of antitrust impact" without

5    "attribut[ing] damages to any one particular theory."  *Id.* at 36–37; *see In Re FirstEnergy Corp. Sec.*

6    *Litig.*, 2025 WL 2331754, at *22 (6th Cir. Aug. 13, 2025) (requiring "rigorous analysis to determine

7    whether a plaintiff's damages case is consistent with its liability case" (cleaned up)).

8          Plaintiffs' only other response is to suggest that the failure of some aspect of their liability

9    theory is unproblematic because their damages model is "conservative."  Opp. 21, 25.  But

10   conservatism is not a substitute for disaggregation.  A damages model must be capable of adjusting to

11   the *specific conduct* found unlawful by the jury.  *See, e.g.*, *Noohi v. Johnson & Johnson Consumer Inc.*,

12   146 F.4th 854, 866 (9th Cir. 2025) (damage model must be capable of "separating out those damages

13   from damages tied to the plaintiff's theory").  Indeed, Plaintiffs' argument turns on the assumption that

14   a single "alternative iOS App Store" would enter the market.  Opp. 25.  But if the Court holds that

15   iOS's technical design (e.g., code signing) independently prevents sideloading, for example, any

16   "alternative iOS App Store" could not be loaded on iOS devices—even if Apple's restriction on third-

17   party marketplaces could be deemed separately unlawful.  SUF 18–20; Resp. Add'l Fact 55.  Nor can

18   Plaintiffs' model be saved by Abrantes-Metz's assertion that her analysis "accounts for entry of

19   competition, however achieved."  Opp. 25.  The portion of Abrantes-Metz's testimony cited by

20   Plaintiffs (*id.*) provides no basis for her fanciful claim that removing any restriction alone would place

21   the *exact same* "downward pressure on the commission rate" as removing any other restraint and thus

22   result in the *exact same* commission rate regardless.  It thus does not permit a factfinder to "segregate

23   damages attributable to lawful competition from damages attributable to . . . monopolizing conduct."

24   *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997).  If the Court grants

25   *any* part of Apple's motion for summary judgment, summary judgment should be entered with respect

26   to Plaintiffs' damages too.

27                              **III.  CONCLUSION**

28          The Court should grant Apple's motion for summary judgment.

DATED: September 23, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: __/s/ Cynthia E. Richman__
    CYNTHIA E. RICHMAN

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*