THEODORE J. BOUTROUS JR., SBN 132099
    tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
    dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
    chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
    jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
    dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
    elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA RICHMAN, D.C. Bar No. 492089*
    crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
    hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

* admitted *pro hac vice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |
| --- | --- |
| | **DEFENDANT APPLE INC.'S RESPONSE TO PLAINTIFFS' ADDITIONAL MATERIAL FACTS** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date:        October 14, 2025<br>Time:        2:00 p.m.<br>Courtroom:    1, 4th Floor |

**APPLE'S TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex. __ | Exhibits to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| [Date] [Name] Dep. | Deposition transcript of named witness, each attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025. |
| Abrantes-Metz Reb. Rep. | Reply Report of Rosa M. Abrantes-Metz, Ph.D., dated June 13, 2025. |
| *Epic* Trial Tr. | Transcript from the trial held in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, from May 3, 2021 to May 24, 2021. |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025. |
| Halderman Reb. Rep. | Rebuttal Expert Report and Declaration of J. Alex Halderman, Ph.D., dated June 13, 2025. |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025. |
| Hitt Reb. Rep. | Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated June 13, 2025. |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025. |
| Jin Reb. Rep. | Rebuttal Expert Report and Declaration of Ginger Jin, Ph.D., dated June 13, 2025. |
| Majumdar Reb. Rep. | Rebuttal Expert Report and Declaration of Adrian Majumdar, Ph.D., dated June 13, 2025. |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025. |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025. |
| Simonson Rep. | Opening Expert Report and Declaration of Itamar Simonson, Ph.D., dated March 7, 2025. |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025. |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025. |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025. |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025. |
| Schiller Decl. | Declaration of Philip W. Schiller ISO Apple's Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. 74, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on September 15, 2020. |

| Kosmynka Decl. | Declaration of Trystan Kosmynka, Dkt. 821-10, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on October 8, 2021. |

Pursuant to the Court's Standing Order in Civil Cases, Defendant Apple Inc. ("Apple") hereby submits the following Supporting Separate Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Definition)<br><br>Issue 3 (iOS Design) | **Fact 1:** Apple released iPhone in 2007. Initially, iPhone could run only applications that were preinstalled by Apple. In October 2007, Apple announced that it would allow third-party developers to create native iOS apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 135:18–22, 136:5–17, 138:19–24, 146:1–19, 248:5–11; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 22:4–6; Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. Initially, iPhone could run only **native** applications that were preinstalled by Apple and Steve Jobs advised developers to create web-based applications that would work through the Safari browser. *See* Ex. 41 (Stiglitz Rep.) ¶ 38.[2] Apple changed course after ████████████████████████ ████████████████████ " Ex. 10 (Forstall Dep.) at 84:1–85:9. |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 2:** Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to iPhone users. At launch, the App Store included 538 third-party applications. By 2023, the U.S. App Store had over 1.6 million apps.<br><br>Ex. 5 (Feb. 12, 2021 Cook Dep.) 146:1–19; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 224:5–18; Ex. 19 (Hitt Rep.) ¶ 46(a); Ex. 80 (Schiller Decl.) ¶ 3. | Disputed. At least one competitor, Cydia, launched a third-party app store in 2008 that was available to iOS device users even before Apple introduced its App Store. *See* Ex. 41 (Stiglitz Rep.) ¶ 73; Ex. 33 (Abrantes-Metz Rep.) ¶¶ 89, 107; Ex. 3 (Shoemaker Dep.) at 316:22-24; Ex. 6 (Federighi Dep.) at 296:5-11; Ex. 12 (Elhauge Dep.) at 160:6-23; Ex. 30 (July 11, 2025 Abrantes-Metz Dep.) at 201:16-202:4.<br><br>Apple prevented iOS users from purchasing native apps and in-app digital content from Cydia and other potential competitors through technological and contractual restrictions that made the App Store the exclusive source for iOS apps and in-app digital content. *See* Ex. 21 (May 30, 2025 Stiglitz Dep.) at 116:14-119:22; Ex. 41 (Stiglitz Rep.) ¶¶ 64, 67-79; Ex. 33 (Abrantes-Metz Rep.) ¶ 89; Ex. 38 (McFadden Rep.) ¶ 14; Ex. 87 (APL- |

---

[1] Issue numbers correspond with the issues listed in the Statement of Issues to be Decided in Apple's concurrently filed Motion for Summary Judgment. *See* Mot. for Summary Judgment at ii.

[2] All exhibits referenced in Plaintiffs' responses or affirmative material facts are attached to the contemporaneously filed Byrd Declaration.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | EG_01895633) at -635 (Apple &■■■■■■■■■■■■■■■■■■■■■■); Ex. 60 (APL-APPSTORE_09869802) at -803 (Facebook); Ex. 66 (APL-APPSTORE_06587460) at -460 (Facebook); Ex. 7 (Patel (NVIDIA) Dep.) at 150:22-152:1. |
| Issue 1 (Market Definition) | **Fact 3:** The App Store facilitates simultaneous transactions between consumers, on the one hand, and developers, on the other.<br><br>Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; Ex. 22 (Sundararajan Rep.) ¶¶ 153–164; Ex. 105 (Apple Inc., *Apple Developer Program*, Apple Developer) ("Join the Apple Developer Program to reach customers around the world on the App Store for all Apple platforms."). | Disputed. The App Store sells apps and in-app digital content directly to consumers. Separately, and at a different time, the App Store sells app and in-app digital content distribution services to developers while retaining sole discretion to make apps and in-app digital content available to consumers. The App Store does not connect consumers to developers to transact with each other. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:19-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296 (Apple Developer Program License Agreement stating app ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■."). |
| Issue 1 (Market Definition) | **Fact 4:** In addition to the App Store, developers can distribute their apps and digital content through web apps, their own websites, and other app transaction platforms.<br><br>Ex. 4 (Feb. 15, 2021 Schiller Dep.) 426:2–13; Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 76:6–9, 98:2–11; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122. | Disputed. Apple substantially limits the distribution of iOS apps and in-app digital content. Developers are prohibited from distributing iOS apps through any other platform, and Apple imposes restrictions, including anti-steering rules, that severely limit developers from distributing in-app content outside of the iOS platform. Likewise, iOS users cannot obtain developer content through any app store or in-app purchasing system other than Apple's App Store and its "IAP" system. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 22-23, 27, 67-95, 100-04; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 28:24-29:9; Ex. 15 (Dec. 5, 2022 McFadden Dep.) at 187:3-17; Ex. 3 (Shoemaker Dep.) at |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 277:12-23; Ex. 2 (Fischer Dep.) at 292:5-12; Ex. 28 (Jin Dep.) at 137:16-138:3; Ex. 11 (Rubinfeld Dep.) at 64:12-23; Ex. 63 (APL-APPSTORE_00318230) at -260, -263. |
| Issue 1 (Market Definition) | **Fact 5:** Apple allows users of apps that operate across multiple platforms to access content, subscriptions, or features they have acquired in the app on other platforms or the developer's website, including consumable items in multi-platform games, provided the content, subscriptions, and features are also available as in-app purchases within the app (unless the app qualifies as a "reader" app, in which case users can access previously purchased content or subscriptions that are not available to purchase within the app).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) at § 3.1.3 (a)–(b) at 26 ("'Reader' Apps" and "Multiplatform Services"); Ex. 19 (Hitt Rep.) ¶¶ 122–133, 136, 140, 141; *see, e.g.,* Ex. 53 (Roblox Corp., *Roblox*, Apple App Store) (explaining that Roblox on iOS "features full cross-platform support, meaning you can join your friends and millions of other people on their computers, mobile devices, Xbox One, or VR headsets.") *and* Ex. 72 (Nia, *Is Roblox Cross-Platform Enabled? Everything to Know*, PlaySwap, Dec. 24, 2024) (similar). | Disputed as incomplete. Under the App Store Review Guidelines, Apple prohibited app developers from directing or informing iOS users of availability of apps and in-app purchases on other platforms. *See* Ex. 63 (APL-APPSTORE_00318230) at -260, -263; Ex. 41 (Stiglitz Rep.) ¶ 87-95; *see also* Ex. 4 (Haun Dep.) at 87:17-89:4; Ex. 3 (Shoemaker Dep.) at 117:20-22; Ex. 5 (Kosmynka Dep. & Errata) at 52:17-24.<br><br>For example, throughout the Class Period, ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████ *See, e.g.,* Ex. 41 (Stiglitz Rep.) ¶ 89-95; Ex. 5 (Kosmynka Dep.) at 98:6-100:9; Ex. 4 (Haun Dep.) at 172:16-173:19; Ex. 1 (Okamoto Dep.) at 371:1-373:14. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 6:** At the App Store's launch, Steve Jobs stated that Apple was "trying to do two diametrically opposed things at once—provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc."<br><br>Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. ████████████████████ ████████████████████ *See* Richman Decl. Ex. 61 (Dkt. 1003-62). Further, Jobs gives the example of Nokia, which "█████████████████████ ████████████████████ ████████████████████ *Id.* at 2. ████████████████████ *See* Ex. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 79 (APL-APPSTORE_10888329) at -349. |
| Issue 2 (Refusal to Deal) Issue 3 (iOS Design) | **Fact 7:** From the App Store's inception, Apple adopted a closed and secure platform model for distributing native iOS apps, which enables developers to build those apps using Apple's proprietary software and tools such that developers could offer iOS apps (paid or free) through the App Store alone. Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 73:10–74:8; Ex. 43 (APL-APPSTORE_00000055) at 081; *see* Ex. 4 (Feb. 11, 2021 Schiller Dep.) 69:1–9, 217:18–25, 292:2–17, 306:8–307:13; Ex. 20 (Halderman Rep.) ¶ 84; Ex. 80 (Schiller Decl.) ¶¶ 3, 4, 10–14, 24, 25. | Disputed. Apple's App Review process suffers from several known weaknesses and has been unable to prevent apps that may compromise device security or user data from being distributed on the App Store. *See* Ex. 43 (Kohno Rep.) ¶¶ 148-70; Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 136-78; Ex. 65 (APL-EG_04107164) at -164 (" ███████ ████████████████ ). |
| Issue 1 (Market Definition) Issue 2 (Refusal to Deal) | **Fact 8:** Developers can join the Apple Developer Program to obtain a license to use and gain access to Apple's proprietary software development tools and technology in order to develop iOS apps for distribution through the App Store. These tools include over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits ("SDKs"). Ex. 50 (Apple Developer Program License Agreement, June 9, 2025 ("DPLA")) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."); Ex. 5 (Feb. 12, 2021 Cook Dep.) 251:5–10; Ex. 68 (Jessica Burley, *The Apple Ecosystem in the US*, May 2025) at 11 ("Apple has released over 250,000 APIs[.]"); Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14. | Disputed. Incomplete and misleading. The DPLA says ███████ ████████████████████ ████████████████████ ██████████." Richman Decl. Ex. 50 (Dkt. 1003-51) at 1. But all this means is that Apple charges and collects from developers a $99 annual fee and imposes a set of terms and conditions on developers for access to its APIs and SDKs. *See* Fact 9. |
| Issue 1 (Market Definition) | **Fact 9:** Since its launch in 2008, developers who want to distribute apps on the App Store to iPhone users must (i) sign the Developer Program License | Undisputed. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (Refusal to Deal)<br><br>Issue 5 (Untimely Claims) | Agreement, which sets out Apple's terms and conditions, (ii) abide by the App Review Guidelines, and (iii) pay a $99 annual fee.<br><br>Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14; Ex. 82 (*Epic* Trial Tr.) 2742:6–2743:10 (Schiller); *see* Ex. 50 (DPLA) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."). | |
| Issue 1 (Market Definition) | **Fact 10:** Apple applies a headline commission rate of 30% to digital good purchases made in the App Store. Apple has never increased this headline commission rate. On the contrary, Apple has lowered the commission in multiple instances, including: (1) in 2016, Apple reduced its commission rate to 15% for all subscription renewals after the first year; (2) in 2021, Apple introduced the Small Business Program which offers a reduced rate of 15% to small business developers, who comprise more than 90% of all developers on the App Store; (3) in 2016 and 2021, respectively, Apple also introduced the Video Partner Program and News Partner Program, which reduced the commission rate to 15% for participating developers.<br><br>Ex. 82 (*Epic* Trial Tr.) 2740:3–15, 2804:18–2805:11 (Schiller); Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 86:10–87:2; Ex. 5 (Feb. 12, 2021 Cook Dep.) 24:12–21; Ex. 64 (Apple Inc., *Small developers on the App Store grew revenue by 71 percent over the past two years*, Apple Newsroom, May 11, 2023); Ex. 84 (Apple Inc., *Apple introduces the News Partner Program*, Apple Newsroom, Aug. 26, 2021); Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer); Ex. | Disputed. Misleading and incomplete. Apple did not introduce the Small Business Program in response to competition; rather, Apple CEO Tim Cook characterized the initially temporary program as motivated by a concern for small businesses, especially in the context of the COVID-19 pandemic. *See* Ex. 41 (Stiglitz Rep.) ¶ 44 & n.63; *see also* Ex. 94 (May 21, 2021 Trial Testimony of Tim Cook, *Epic Games, Inc. v. Apple, Inc.*, No. C-20-5640 YGR) at 3992:4-17. Apple only continued the Small Business Program because it was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Ex. 84 (APL-APPSTORE_10871989) at -995. Moreover, Apple viewed its Video Partner Program, News Partner Program, and subscription programs as a "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" *Id.*<br><br>The Video Partner Program is a self-promotional tool that only provides eligibility to developers that agree to integrate with Apple TV and other Apple features, *see* Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 37-38, and ▇▇▇▇▇▇▇▇ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | 80 (Schiller Decl.) ¶ 7. | ███" Ex. 54 (APL-APPSTORE_ 09980457) at -457; *see* Ex. 41 (Stiglitz Rep.) ¶ 44. The News Partner Program likewise is a self-promotional tool that requires that news apps provide their content to Apple News while allowing ███████████████ ███████." Ex. 86 (APL-APPSTORE_11289619) at -619; *see* Ex. 41 (Stiglitz Rep.) ¶ 44. |
| Issue 1 (Market Definition) | **Fact 11:** As of 2023, 95% of the apps on the U.S. Storefront were free to download and incurred no commission on the download, and 82.4% were both free to download and did not offer in-app purchases of digital goods and services.<br><br>Ex. 19 (Hitt Rep.) ¶¶ 46 (c), 47 (Exhibit 1), 259 n.420. | Undisputed. |
| Issue 2 (Refusal to Deal) | **Fact 12:** Apple reviews each app and app update that is submitted to the App Store in a process known as App Review, which uses a combination of automated tools and human reviewers to evaluate apps against the App Review Guidelines, and rejects those apps and app updates that fail review.<br><br>Ex. 81 (Kosmynka Decl.) ¶ 2; Ex. 80 (Schiller Decl.) ¶¶ 19, 26; Ex. 2 (Feb. 2–3, 2021 Kosmynka Dep.) 112:1–12, 238:14–239:2, 243:9–20; *see* Ex. 49 (App Review Guidelines, June 9, 2025) at 1 ("[E]very app is reviewed by experts . . . We also scan each app for malware and other software that may impact user safety, security, and privacy."). | Disputed. Apple purports to do this. All apps and app updates go through App Review, but both the human and automated processes have significant flaws, and apps that should fail get through. *See* Ex. 43 (Kohno Rep.) ¶ 115 ("███████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ████"); *id.* ¶ 189 (██████ ██████████████████ ██████████████████ ██████████████████ ███████); Ex. 47 (Kohono Rebuttal Rep.) ¶¶ 136-78; Ex. 67 (APL-APPSTORE_02921977) at -977 (█████████████████ ██████████████████ ██████████████████ ██████████████████ ████████"); Ex. 58 (APL-APPSTORE_09166610) at -610 ("█████████████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | ▆▆▆▆▆▆▆▆ "). |
| Issue 2 (Refusal to Deal) Issue 5 (Untimely Claims) | **Fact 13:** Apple has applied some kind of app-review criteria since the App Store's launch, and in 2010, it formalized this process in the App Review Guidelines. Apple has never permitted third-party app marketplaces on iOS for app distribution in the United States.<br><br>Ex. 43 (APL-APPSTORE_00000055) at 080; *see* Ex. 2 (Feb. 2, 2021 Kosmynka Dep.) 197:6–14; *see* Ex. 106 (APL-APPSTORE_03238239) (App Store Review Guidelines, 2010) at 248; Ex. 49 (App Review Guidelines, June 9, 2025) §§ 2.5.2, 4.7 at 16–17, 37. | Disputed. The App Review Guidelines did not formalize the App Review process. The App Review Guidelines are guidance for the developer that neither fully explain the review process, nor are applied mechanically or consistently. *See* Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 111-32 (outlining the inconsistencies in how Apple treats different categories of apps during App Review). |
| Issue 2 (Refusal to Deal) Issue 5 (Untimely Claims) | **Fact 14:** In 2010, Apple launched iPad, a tablet. iPad ran on iOS until 2019, when Apple launched iPadOS.  iPad has an App Store where users can purchase and download apps.  As with iPhone, Apple requires native iPad apps to be submitted through App Review and distributed through the App Store.<br><br>Ex. 63 (Apple Inc., *Apple Launches iPad*, Apple Newsroom, Jan. 27, 2010); Ex. 88 (Apple Inc., *The new iPadOS powers unique experiences designed for iPad*, Apple Newsroom, June 3, 2019). | Undisputed. |
| Issue 1 (Market Definition) | **Fact 15:** Developers set prices for their app downloads and in-app digital content and they can currently choose among over 800 price tiers.<br><br>Ex. 50 (DPLA), Schedule 2, §3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool[.]"); Ex. 58 (Apple Inc., *App Store Connect Help: Manage app pricing - Set a price*, | Disputed. Incomplete and misleading. Apple's price tiers constrain developers in their pricing choices, for example, by limiting options for bundling and contingent pricing. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 121-37; Ex. 72 (APL-APPSTORE_10342115) at -159. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple Developer) ("You'll need to set pricing for your app before you submit it for review. Choose from up to 800 price points by default, and request to access an additional 100 higher price points (up to $10,000)."); *see* Ex. 54 (Apple Inc., *App Store Connect Help: Reference - Pricing and Availability*, Apple Developer) ("The price you choose for the in-app purchases . . . determines both the customer price and your proceeds."); *see also* Ex. 43 (APL-APPSTORE_00000055) at 075 ("we talk about the 70/30 revenue split but the developer gets to pick the price . . .") | |
| Issue 1 (Market Definition) | **Fact 16:** The App Store provides developers with guidance on how to create app descriptions, how to choose app names, and how to select the best app genre.<br><br>*See* Ex. 59 (Apple Inc., *App Store: Creating your product page*, Apple Developer); *see also* Ex. 22 (Sundararajan Rep.) ¶ 155. | Undisputed. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 17:** Apple has never permitted sideloading on iOS for app distribution in the United States.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 133 ("Unlike other mobile platforms, iOS, iPadOS, and visionOS don't allow users to install potentially malicious unsigned apps from websites or to run untrusted apps. Instead . . . all apps must be downloaded from the App Store."); Ex. 82 (*Epic* Trial Tr.) 2738:12–14 (Schiller); Ex. 43 (APL-APPSTORE_00000055) at 075. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 18:** "Sideloading" refers to the ability to install apps to devices via third-party app marketplaces or direct downloads.  For iOS, this refers to the installation of native apps from outside the App Store. | Disputed. There is no widely accepted definition of "sideloading." Professor Stiglitz defines it as "███████████████████████████████████████████" Ex. 41 (Stiglitz Rep.) ¶ 74. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Ex. 3 (Feb. 10, 2021 Federighi Dep.) 303:12–17; *see* Ex. 20 (Halderman Rep.) ¶ 112. | |
| Issue 3 (iOS Design) | **Fact 19:** "Jailbreaking" refers to a process of effectively removing the security protections of a device to modify the device's behavior.  For iOS, this is a process that deliberately bypasses various security features of iOS.<br><br>Ex. 3 (Feb. 10, 2021 Federighi Dep.) 288:6–13; Ex. 20 (Halderman Rep.) ¶¶ 15(j), 105. | Disputed. Apple's definition is overbroad. "Jailbreaking" refers to the process by which iOS devices users can access and unlock the iOS operating system to ███████████████ ████████████████████ ██████████ Ex. 64 (APL-EG_ 02273420) at -465; Ex. 41 (Stiglitz Rep.) ¶ 72. |
| Issue 3 (iOS Design) | **Fact 20:** Apple's technical safeguards include system-level software protections that prevent "sideloading" (outside of limited app-testing contexts) and guard against threats arising from removing security measures from devices, including through "jailbreaking."  These protections serve as "another line of defense against harmful software."  Technical restrictions of this sort were integrated into iOS beginning with the release of iPhone in 2007.<br><br>Ex. 20 (Halderman Rep.) ¶ 92, *see id.* ¶¶ 93, 96, 105, 112; Ex. 3 (Feb. 10, 2021 Federighi Dep.) 224:19–225:15, 227:21–228:21, 289:9–21; Ex. 43 (APL-APPSTORE_00000055) at 080; Ex. 6 (March 8, 2021 Forstall Dep.) 71:9–72:15. | Disputed. Vague and misleading. Apple's iOS software, which was implemented on the iPhone in 2007, prevents use of apps not downloaded through the App Store by requiring a "digital signature" or "certificate" that can only be obtained through the App Store. *See* Ex. 41 (Stiglitz Rep.) ¶ 74 ( ███████████████████ ██████████████████ "); Ex. 6 (Federighi Dep.) at 224:19-225:15, 227:21-228:21, 288:6-13, 289:10-21. Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers can distribute their apps through alternative distribution methods. *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77. |
| Issue 3 (iOS Design) | **Fact 21:** Providing on-device protections, including sandboxing, code signing, and entitlements are "an essential part of iOS's approach to security."<br><br>Ex. 20 (Halderman Rep.) ¶¶ 14; *see id.* ¶¶ 15(i), 93, 97, 106–108, 110, 143–49; *see also* Ex. 3 (Feb. 10, 12, 2021 Federighi Dep.) 78:15–20, 201:13–204:10, 356:19–22, 360:19–24, 363:12–18; 364:12–20. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 22:** Mandatory code signing is a process where devices verify that any third-party code has been electronically signed by a specific entity. On iOS, | Disputed as misleading. Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple requires that a developer who is a member of the Apple Developer Program sign their code for their app before submitting it for distribution via the App Store.  iOS will not run unsigned apps.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 131 ("To help ensure that all apps come from a known and approved source and haven't been tampered with, these operating systems require that all executable code be signed using an Apple-issued certificate."); *see* Ex. 20 (Halderman Rep.) ¶ 93. | can distribute their apps through alternative distribution methods. *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77; id. ¶ 276 (" ██████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ ████ "). |
| Issue 3 (iOS Design) | **Fact 23:** Apple built entitlements—controls on which operating system resources may be accessed by certain apps or other software—into iOS.  Entitlements are designed to prevent unauthorized access to device features and data, including access by malicious code.<br><br>*See* Ex. 57 (Apple Inc., *Documentation: Bundle Resources - Entitlements*) ("An entitlement is a right or privilege that grants particular capabilities to an executable."); Ex. 20 (Halderman Rep.) ¶ 97; *see also* Ex. 90 (*Epic* Trial Tr.) 1102:9–17 (Kosmynka) ("[A]n entitlement gives an app a particular permission to a set of resources of APIs on the . . . user's device."); Ex. 91 (*Epic* Trial Tr.) 3386:20–3387:4 (Federighi). | Undisputed. |
| Issue 3 (iOS Design) | **Fact 24:** Jailbroken phones are more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data as the process relies on vulnerabilities that have not been resolved.  Entitlements are critical to mitigate vulnerabilities. | Disputed.  Misleading and vague.  Phones that are jailbroken in the sense defined by Prof. Stiglitz – *see* Fact 19 – in theory have more vulnerabilities because jailbreaking bypasses iOS's sandboxing requirement.  ██████████████ ████████████████████████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | *See* Ex. 20 (Halderman Rep.) ¶¶ 106, 107, 110; Ex. 3 (Feb. 10 2021 Federighi Dep.) 291:4–8. | ████████████████. *See* Ex. 5 (Kosmynka Dep.) at 30:18-31:5; Ex. 10 (Forstall Dep.) at 290:22-25; Ex. 8 (Schiller Dep.) at 168:21-169:7. ████████████████ ████████████████ *See* Ex. 10 (Forstall Dep.) at 268:14-269:6; Ex. 90 (APL-EG_00875856) at -858. None of Apple's cited evidence explains how entitlements, specifically, are critical to preventing jailbreaking or mitigating the dangers, if any, posed by apps downloaded via an app store accessed on a jailbroken phone.████████ ████████████████ *See* Ex. 6 (Federighi Dep.) at 291:1-293:6. |
| Issue 3 (iOS Design) | **Fact 25:** Apple's warranty "does not apply" to claims for warranty services made with respect to "an Apple Product that has been modified to alter functionality or capability without the written permission of Apple[.]" There is no evidence in the record that Apple's warranty policies are anticompetitive.<br><br>Ex. 97 (iPhone hardware warranty, current) at 2; *see* Ex. 45 (APL_APPSTORE_06928901) (pre-2011 iPhone hardware warranty) at 902; *see* Ex. 11 (May 14, 2025 McFadden Dep.) 98:20–24 ("Q. Do you have any understanding or opinion as to whether Apple voids the warranties of iOS device consumers who buy competing apps? A. Actually, I don't know whether it actually does."); *see* Ex. 28 (Halderman Reb. Rep.) ¶¶ 237–38, 242–43; *see* Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. | Disputed. Apple's warranty policies are anticompetitive because those policies (in conjunction with other end-user agreements), the contractual restrictions placed on developers, and the technical "walled garden" make the App Store "█ ████████████████ ████████████████ " Ex. 41 (Stiglitz Rep.) ¶ 42; Ex. 1 (Okamoto Dep.) at 278:10-12 (████ ████████████████ ████████ ); Richman Decl. Ex. 45 (Dkt. 1003-46) (warranty); Ex. 68 (APL-EG_07832391) at -392 (████ ████████████████ ████████ ); Ex. 76 (APL-EG_09483903) at -903 ████ ████████████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 26:** Survey data has shown that consumers have ranked "malware protection" and "privacy" as the most important features in Apple's App Store. An Apple survey in 2023 found that 81% of iPhone buyers in the U.S. were satisfied with their devices.  An Apple-conducted survey in 2020 found 93% of iPad owners in the U.S. were satisfied with their device.  Another Apple-conducted survey concluded that consumers distinguish iOS from Google's Android system by Apple's security and privacy features.<br><br>*See* Ex. 23 (Simonson Rep.) ¶¶ 57–58 ("[P]rivacy, malware protection, and app description details were identified as 'must-have' by the greatest number of respondents[.]"), ¶¶ 92, 103; Ex. 107 (APL-APPSTORE_11425222) (iPhone Buyer FY 23-Q4 Full Report) at 304 (iPhone consumer satisfaction rate); Ex. 92 (APL-APPSTORE_11029055) (iPad Buyer FY20-Q2 Full Report) at 086 (iPad consumer satisfaction rate); Ex. 65 (APL-APPSTORE_11425412) (Q2 2021 Privacy & Security) at 430, 435, 460–61 (showing consumers value privacy and associate Apple with better security and privacy features compared with Android). | Disputed as incomplete and misleading.<br><br>. *See* Ex. 39 (Simonson Rep.) ¶¶ 79-82.<br><br>*See* Ex. 49 (Hover Rebuttal Rep.) ¶¶ 35-38 ("<br><br>").<br><br>Neither of Apple's<br><br>And APL-APPSTORE_11425412<br><br>*See* Ex. 36 (Hover Rep.) ¶ 73. |
| Issue 1 (Market Definition)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 27:** Apple introduced In-App Purchase ("IAP") in 2009, which is a commerce functionality integrated within iOS.  IAP is not bought or sold directly to or by consumers.  IAP processes payments, deducts Apple's commission, and remits the remainder to the developer.<br><br>Ex. 48 (APL-APPSTORE_00000004) at 006–007 ("I'm happy to say that we are supporting all of these additional purchasing models in iPhone 3.0 and we are doing it with what we call 'in-app purchase.'); *see* Ex. 50 (DPLA) § 1.2 at 8 (IAP API definition), Attachment 2 | Disputed.  IAP is "Apple's in-app payment processor."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023); Ex. 41 (Stiglitz Rep.) ¶ 43 (<br><br>It was introduced in 2009.  *See* Ex. 91 (APL-APPSTORE 00207407) at -407 (<br><br>").  It is little, if anything, more than an interface with a consumer's underlying payment source, such as a credit or debit card. With IAP |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | ("Additional Terms for Use of the In-App Purchase API") at 88–93; *see also* Ex. 80 (Schiller Decl.) ¶¶ 32–34, 38, 40. | ███████████████████████ ███████████████████" Ex. 41 (Stiglitz Rep.) ¶ 43. ██████ ████████████████████████ ███████████████ *Id.* But all iOS app developers may only use IAP as their payment processor. *See* Ex. 89 (APL-APPSTORE_10745991) at -6000 (" ██████████████"); Ex. 41 (Stiglitz Rep.) ¶ 43. |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 28:** Since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital products. Apple has never allowed apps in the App Store that are selling digital goods or services to use third-party payment processors on iOS in the United States (other than as part of the Video Partner Program, which requires integration with a number of Apple technologies).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) § 3.1.1 at 20 ("If you want to unlock features or functionality within your app . . . you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, cryptocurrencies and cryptocurrency wallets, etc."); Ex. 81 (Kosmynka Decl.) ¶ 15; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 37:18–38:4, 121:21–122:2; Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer). | Undisputed. |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and | **Fact 29:** Until October 2021, Apple's App Review Guidelines prohibited developers from using information obtained within the app to target individual users outside of the app to use purchasing methods other than in-app purchase. Apple applied these written policies uniformly to U.S. developers. | Disputed as misleading. Apple changed this guideline only because of the settlement in Cameron et al v. Apple. *See* Ex. 56 (Aug. 26, 2021 news article); Ex. 83 (APL-APPSTORE_11453959) at -962 (" ██████████████████████ ██████████████████████ ██████████████████████ ██████████████). |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Standing)<br><br>Issue 5 (Untimely Claims) | *See* Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) § 3.1.3 at 350; Ex. 95 (App Review Guidelines, Oct. 22, 2021) § 3.1.3 at 12; Ex. 87 (Apple Inc., *News: App Store Review Guideline updates now available*, Apple Developer, Oct. 22, 2021); Ex. 4 (Feb. 11, 2021 Schiller Dep.) 156:2–8, 162:6–8. | |
| Issue 2 (Refusal to Deal)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 30:** The App Review Guidelines previously barred developers from including links, buttons, or using other methods to direct users to external payment mechanisms. These provisions were modified in January 2024 and April 2025.<br><br>Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) §§ 3.1.1, 3.1.3 at 348, 350; Ex. 89 (App Review Guidelines, Jan. 16, 2024) §3.1.1(a) at 11; Ex. 103 (App Review Guidelines, Apr. 30, 2025) § 3.1.1(a) at 22; Ex. 108 (Apple Inc., News: *Updated guidelines now available*, Apple Developer, May 1, 2025). | Disputed as incomplete. The *Epic* injunction required Apple to change its anti-steering policies. *See* Permanent Injunction, *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR (N.D. Cal. Sept. 10, 2021) Dkt. 813. Apple's efforts to "thwart[] the Injunction's goals" throughout the Class Period resulted in a contempt order. Order at 2, *Epic Games*, (N.D. Cal. Apr. 30, 2025) Dkt. 1508. |
| Issue 6 (Proof of Damages and Injury) | **Fact 31:** Plaintiffs' own damages model calculates that named plaintiff Hayter benefited monetarily from the challenged conduct.<br><br>Ex. 98 (Prince Reb. Rep.) ¶ 38. | Disputed. Mr. Hayter has damages under Plaintiffs "Price Tier" model. Song Decl. ¶ 5. Apple's conduct also harmed Mr. Hayter and other Plaintiffs by reducing app output, diminishing quality, and stifling innovation within the iOS ecosystem. *See* Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 18 (May 14, 2025 McFadden Dep.) at 13:22-15:25, 74:2-12; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11; Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120. |
| Issue 6 (Proof of Damages | **Fact 32:** The McFadden-Song model is the sole proof that Plaintiffs suffered monetary injury and quantified damages.[3] | Disputed. Misleading as to injury. In addition to supracompetitive prices, all consumers are injured by having only one |

[3] Points relating to the flaws and assumptions of the McFadden-Song model, which pertain to issue number 6 regarding failure to prove injury and damages, are not included in this Statement because they are not questions of fact. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile

*(Cont'd on next page)*

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| and Injury) | Ex. 98 (Prince Reb. Rep.) ¶¶ 9–12. | iOS app distribution and in-app purchase option. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 100-04. Decreased output, quality, and innovation on the App Store are also anticompetitive harms. *See id.* at ¶¶ 109-120. |
| Issue 5 (Untimely Claims) | **Fact 33:** Plaintiffs' original Complaint (filed in Dec. 2011), Consolidated Complaint (filed in March 2021), Amended Complaint (filed in September 2012), and Second Amended Consolidated Complaint (filed in September 2013) did not mention in-app purchases.<br><br>Dkt. 1, 26, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |
| Issue 5 (Untimely Claims) | **Fact 34:** Plaintiffs' Third Amended Consolidated Complaint ("TAC") was filed on September 17, 2020, over 8 years from the filing of their original Complaint.<br><br>Dkt. 1, 229. | Undisputed. |
| Issue 5 (Untimely Claims) | **Fact 35:** Plaintiffs did not include in-app purchases as part of the alleged iOS market until they filed their TAC on September 17, 2020.<br><br>*Compare* Dkt. 229 *with* Dkt. 1, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |

the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

**OPPOSING PARTY'S ADDITIONAL MATERIAL FACTS**

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Def) | **Additional Fact 36**: A market having two sides is not always a two-sided *transaction* platform. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 101:11-16, 121:10-14; Ex. 22 (June 4, 2025 Song Dep.) at 92:4-19; Ex. 37 (Jin Rep.) ¶ 59; Ex. 28 (Jin Dep.) at 87:21-88:9, 101:12-102:4, 103:3-15. | Immaterial because the App Store must be analyzed as a two-sided transaction platform under *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 545 (2018) (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction."). <br><br> To the extent Additional Fact 36 is material, it is undisputed that a "market having two sides" is not always a "two-sided transaction platform." |
| Issue 1 (Market Def) | **Additional Fact 37**: Two-sided markets that do not facilitate simultaneous transactions or sell the same product to both sides can be analyzed as one-sided if their indirect network effects are weak, because such analyses still capture all anticompetitive effects. *See* Ex. 26 (June 25, 2025 Stiglitz Dep.) at 290:2-7; Ex. 41 (Stiglitz Rep.) ¶ 373-74; Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 57. | Immaterial because this is an improper legal conclusion. Plaintiffs cannot create a genuine dispute of fact by having their expert opine on the ultimate outcome of a legal claim. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile the data contained within an econometric model may well be 'questions of fact' . . . what those data prove is no more a question of fact than what our opinions hold."). <br><br> Additionally, Plaintiffs' experts put forth no evidence suggesting the App Store's indirect network effects are weak. *See* Dkt. 1003-32 (Stiglitz Rep.) ¶¶ 372–78; Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶ 38 ("[N]either Professor Stiglitz nor Dr. Abrantes-Metz provide a calculation of the strength of indirect network effects associated with the App Store . . . ."). <br><br> Also immaterial because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction."). |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1<br>(Market Def) | **Additional Fact 38:** Apple's experts do not quantify the strength of App Store indirect network effects. *See* Ex. 25 (June 25, 2025 Sundararajan Dep.) at 174:19-25; Ex. 28 (Jin Dep.) at 99:11-21; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54 n.100, 57-60, 65. | <u>Immaterial</u> because Apple's experts considered and evaluated existing, undisputed research which quantified indirect network effects in rendering their opinion that the App Store is characterized by strong indirect network effects. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 225–26.<br><br>Also <u>immaterial</u> because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction.").<br><br>To the extent Additional Fact 38 is material, it is <u>undisputed</u> that neither Plaintiffs' nor Apple's experts conducted their own empirical quantification of the strength of App Store's indirect network effects. |
| Issue 1<br>(Market Def) | **Additional Fact 39:** There is no evidence the App Store exhibits significant indirect network effects. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-76; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 57-60; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 61-68; Ex. 22 (June 4, 2025 Song Dep.) at 93:6-22; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 182:14-25; Ex. 26 (June 25, 2025 Stiglitz Dep & Errata) at 288:18-289:6. | <u>Immaterial</u> because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction.").<br><br>To the extent Additional Fact 39 is material, it is not supported by the factual record. Unrebutted third-party economic analysis demonstrates that the App Store is characterized by significant indirect network effects. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 225–26. |
| Issue 1<br>(Market Def) | **Additional Fact 40:** Apple's experts do not point to any study showing the App Store is a two-sided *transaction* platform or facilitates *simultaneous* transactions. *See* Ex. 48 (Sundararajan Rebuttal Rep.) App. | <u>Immaterial</u> because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | Ex. C.1; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 146:20-25; Ex. 37 (Jin Rep.) ¶ 60 n.110. | a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction.").<br><br>To the extent Additional Fact 40 is material, Apple's experts described and cited many studies and expert opinions in related litigation that recognize and support the conclusion that the App Store is a two-sided transaction platform that facilitates simultaneous transactions between developers and consumers. *See, e.g.*, Dkt. 1003-23 (Sundararajan Rep.) ¶ 144 & n.327; Dkt. 1003-28 (Sundararajan Reb. Rep.) App'x Ex. C.1.  Plaintiffs' experts also admitted that the App Store is a two-sided transaction platform that facilitates simultaneous transactions between developers and consumers.  *See* Dkt. 1003-105 (Dec. 15, 2022 Abrantes-Metz Dep.) 108:8–109:1 (if a "transaction is going to happen [in the App Store], it needs to have a buyer and a seller" and "the purchase and sale of apps . . . happen[s] simultaneously."); Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 183:1–4, 184:13–25 (Q: Do you agree the relevant App Store product is transactions? . . .  A: It is the distribution of apps and in-app content.  Q: Those would be transactions, would they not? A: Yes, but . . . there's more[.]"); Dkt. 1003-103 (June 19, 2025 MacCormack Dep.) 33:16–34:4 (Q: Do you agree that the Apple App Store platform has a consumer and a developer side? . . .  A: Yes, it does.  Q: So you agree that the Apple App Store is a two-sided platform? . . .  A: I've certainly seen it described as a two-sided platform.  Q: And you've described it that way, have you not?  A: . . . I probably have."). |
| Issue 1<br>(Market Def) | **Additional Fact 41**: The App Store does not connect parties on both sides to transact directly.  Rather, it sells distribution services to app developers while retaining discretion to make their apps available to device users separately and at a different time.  *See* Ex. 46 (Stiglitz Rebuttal | <u>Immaterial</u> because the App Store must be analyzed as a two-sided transaction platform *Amex*, 585 U.S. 529, 545 (2018) (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction participants."); *id*. (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:21-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 121:10-14. | be supplying only one product—transaction."). To the extent Additional Fact 41 is material, it is undisputed that Apple operates a two-sided transaction platform that facilitates a direct, simultaneous transaction between developers and users. SUF 3. Plaintiffs' experts have conceded that the transactions on the App Store happen simultaneously. *See* Dkt. 1003-105 (Dec. 15, 2022 Abrantes-Metz Dep.) 108:8–109:1 (if a "transaction is going to happen [in the App Store], it needs to have a buyer and a seller" and "the purchase and sale of apps . . . happen[s] simultaneously."); Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 183:1–4, 184:13–25 (Q: Do you agree the relevant App Store product is transactions? . . . A: It is the distribution of apps and in-app content. Q: Those would be transactions, would they not? A: Yes, but . . . there's more[.]"); Dkt. 1003-103 (June 19, 2025 MacCormack Dep.) 33:16–34:4 (Q: Do you agree that the Apple App Store platform has a consumer and a developer side? . . . A: Yes, it does. Q: So you agree that the Apple App Store is a two-sided platform? . . . A: I've certainly seen it described as a two-sided platform. Q: And you've described it that way, have you not? A: . . . I probably have."). |
| Issue 1 (Market Def) | **Additional Fact 42**: Like a customer at a traditional retailer, iOS users purchase apps directly from Apple through its App Store and IAP system. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 9 (Feb. 12, 2021 Cook Dep.) at 227:10-25; Ex. 22 (June 4, 2025 Song Dep.) at 114:21-115:3; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 110:18-21; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 29:18-22. Apple prevents iOS users from buying apps directly from developers and significantly constrains their other options for buying in-app digital content. *See* | Immaterial because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction."). To the extent Additional Fact 42 is material, it is undisputed that iOS users are direct purchasers of App Store and in-app transactions. *See* Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 183:1–4, 184:13–25 (Q: Do you agree the relevant App Store product is transactions? . . . |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | Ex. 41 (Stiglitz Rep.) ¶¶ 87-95; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 59 (APL-APPSTORE_ 11045202) at -204; Ex. 61 (APL-APPSTORE_06713744) at -744; Ex. 77 (APL-APPSTORE_10890472) at -478. | A: It is the distribution of apps and in-app content.  Q: Those would be transactions, would they not? A: Yes, but . . . there's more[.]").  Also disputed that Apple prevents iOS users from buying apps directly from developers.  Apple does not prevent iOS users from buying apps directly from developers on non-iOS devices.  Further, Apple does not "significantly constrain[] their other options for buying in-app digital content."  Apple does not prohibit customers from accessing in-app content and subscriptions on their iOS device that were purchased on developers' websites or other platforms.  *See* SUF 4, 5. |
| Issue 1 (Market Def) | **Additional Fact 43:** Plaintiffs' market definition accounts for how Apple's conduct affects both consumers *and* developers.  *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-378; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54-65; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 183:6-7; Ex. 26 (June 25, 2025 Stiglitz Dep.) at 286:8-14, 290:17-291:16;  Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:13-18. | **Immaterial** because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction."). |
| Issue 1 (Market Def) | **Additional Fact 44:** Plaintiffs' damages model accounts for both sides of the App Store.  *See* Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2 (" ███████████████████ ); Ex. 18 (May 14, 2025 McFadden Dep.) at 55:3-11; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 233:7-10; Ex. 40 (Song Rep.) ¶ 8; Ex. 22 (June 4, 2021 Song Dep.) at 56:22-57:6; Ex. 41 (Stiglitz Rep.) ¶ 378. | **Immaterial** because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction.").  Plaintiffs' damages model fails as a matter of law because it is predicated on their experts' flawed one-sided, all-genre market definition. *See* Ex. 114 (Jin. Reb. Rep. ¶¶ 16–64).  The model further relies on a but-for commission rate from Abrantes-Metz that itself is not a two-sided model. *See id.* ¶¶ 21–25.  Apple's experts have explained that the Plaintiffs' but-for commission rate is flawed and fails to account |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | for indirect network effects. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 220–22); Ex. 117 (Hitt Reb. Rep.) ¶ 265. |
| Issue 1 (Market Def) | **Additional Fact 45:** Plaintiffs' but-for commission rate accounts for both iOS users and developers, and the method works whether or not the App Store is a two-sided platform. *See* Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 104:7-12, 112:2-5; Ex. 20 (May 23, 2025 Abrantes-Metz Dep. & Errata ) at 26:3-13. | <u>Immaterial</u> because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood to be supplying only one product—transaction."). Plaintiffs' damages model fails as a matter of law because it is predicated on their expert's flawed one-sided, all-genre market definition. *See* Ex. 114 (Jin. Reb. Rep. ¶¶ 16–64). The model further relies on a but-for commission rate from Abrantes-Metz, who does not use a two-sided model. *See id.* ¶¶ 21–25. Apple's experts have explained that the Plaintiffs' but-for commission rate is flawed and fails to account for indirect network effects. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 220–22; Ex. 117 (Hitt Reb. Rep.) ¶ 265. |
| Issue 1 (Market Def) | **Additional Fact 46:** Apple has monopolized both sides of the App Store. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 28, 377. | <u>Immaterial</u> because this is an improper legal conclusion. Plaintiffs cannot create a genuine dispute of fact by having their expert opine on the ultimate outcome of a legal claim. *See Comcast*, 569 U.S. at 36 n.5 ("[W]hile the data contained within an econometric model may well be 'questions of fact' . . . what those data prove is no more a question of fact than what our opinions hold."). |
| Issue 2 (refusal to deal)[4] | **Additional Fact 47:** The DPLA "conditions" developer access to iOS developer tools on agreement to only distribute apps through the App Store. *See* Ex. 70 (APL-APPSTORE_10429513) at -513, -547, -549; Ex. 41 (Stiglitz Rep.) ¶¶ | <u>Undisputed</u> that developers who want to distribute native apps on the App Store to iPhone users must abide by the DPLA. *See* SUF 9 (undisputed by Plaintiffs). |

[4] All Issue 2 citations are relevant to Issue 3 given Apple's argument that its design-choice argument "falls within the ambit of the refusal-to-deal doctrine." Mot. for Summary Judgment at 13.

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | 43, 68-71, 75. | |
| Issue 2 (refusal to deal) | **Additional Fact 48:** The DPLA "conditions" developer access to the App Store on their agreement to use Apple's IAP for all App Store in-app purchases. *See* Ex. 100 (APL-APPSTORE_ 10859338) at -348 (§3.1.1); Ex. 41 (Stiglitz Rep.) ¶¶ 43, 80-86. | <u>Immaterial</u> to Apple's motion for summary judgment. Apple's specific payment-processing policies are irrelevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *See* Mot. 9–13 <br><br> To the extent Additional Fact 48 is material, it is <u>undisputed</u> that since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital goods and services. SUF 28 (undisputed by Plaintiffs). |
| Issue 2 (refusal to deal) | **Additional Fact 49:** Apple has rejected requests from app developers to offer alternative payment solutions to customers. *See* Ex. 88 (APL-APPSTORE_10991276) at -276 (Spotify); Ex. 81 (APL-APPSTORE_10871795) (Amazon) ("███████████████"); Ex. 41 (Stiglitz Rep.) ¶ 81 (Epic). | <u>Immaterial</u> to Apple's motion for summary judgment. Apple's specific payment-processing policies are irrelevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *See* Mot. 9–13. <br><br> To the extent Additional Fact 49 is material, it is <u>undisputed</u> that since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital goods and services. SUF 28 (undisputed by Plaintiffs). |
| Issue 2 (refusal to deal) | **Additional Fact 50:** Developers may not mention the 30% commission paid to Apple. *See* Ex. 3 (Shoemaker Dep.) at 144:10-23 ("███████████████ ███████████████ ██████"). | <u>Immaterial</u> to Apple's motion for summary judgment. Whether developers may mention the 30% commission is irrelevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *See* Mot. 9–13. |
| Issue 2 (refusal to deal) | **Additional Fact 51:** Developers may not create apps "similar to the App Store." *See* Ex. 100 (APL-APPSTORE_10859338) at -353; Ex. 66 (APL-APPSTORE_06587460) at -460-61 ███████████); Ex. 41 (Stiglitz Rep.) ¶¶ 69-70. | <u>Undisputed</u> that the App Review Guidelines provide that "[c]reating an interface for displaying third-party apps, extensions, or plug-ins similar to the App Store or as a general-interest collection" is not an acceptable business model. Dkt. 1003-50 (App Review Guidelines, June 9, 2025) § 3.2.(i) at 30.[5] |
| Issue 2 (refusal to deal) | **Additional Fact 52:** Under | <u>Immaterial</u> because this is an improper legal |

---

[5] Where available, Apple refers to page numbers at the bottom of the page as opposed to ECF page numbers.

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | Schedule 2 of the DPLA, Developers must agree to set their prices in designated price tiers and pay Apple its 30% commission (or other applicable rate). *See* Ex. 80 (APL-APPSTORE_11288950) at -952 (§ 3.1 - tiers) & -953 (§ 3.4 - commission). Developers must also cede control of their apps to Apple, which exercises sole discretion to provide certain services, including "hosting services." See id. at -950 (§§ 1.1-1.2) | conclusion as to whether developers "cede control of their apps." Pricing policies, Apple's commission, and whether developers "cede control of their apps" are irrelevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *See* Mot. 9–13. <br><br> To the extent Additional Fact 52 is material, it is <u>undisputed</u> that under Schedule 2 of the DPLA, developers set prices from designated price tiers and agree to pay Apple the applicable commission. |
| Issue 2 (refusal to deal) | **Additional Fact 53:** Apple's warranty policy ███████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████." *See* Ex. 73 (APL-APPSTORE_06928875) at -876 (warranty); Ex. 1 (Okamoto Dep.) at 278:7-12. | Undisputed. |
| Issue 2 (refusal to deal) | **Additional Fact 54:** Apple's end-user agreements prohibit circumventing Apple's technological "walled garden." *See* Ex. 62 (Software License Agreement for iOS) at 13 (prohibiting "jailbreaking"); Ex. 55 (Apple Media Services Terms and Conditions) at 3-4 ("You may not tamper with or circumvent any security technology included with the Services or Content"); Ex. 41 (Stiglitz Rep.) ¶ 42 and nn.50-51. | <u>Undisputed</u> that Apple's Software License Agreement for iOS provides that: "If you make unauthorized modifications to your Device, such as by disabling hardware or software controls (sometimes referred to as 'jailbreaking'), your Device may no longer be eligible to access or use the Services" and that Apple's Media Services Terms and Conditions contains the quoted language in Additional Fact 54. *See* Dkt. 1030-62 (iOS and iPadOS Software License Agreement) at 14; Dkt. 1030-55 (Apple Media Services Terms and Conditions) at 3–4; *see also* SUF 20. <br><br> Plaintiffs' assertion that Apple has any "technological 'walled garden'" is vague and unsupported. The phrase "walled garden" does not appear in any of the documents cited by Plaintiffs. *See generally* Dkt. 1030-62 (iOS and iPadOS Software License Agreement); Dkt. 1030-55 (Apple Media Services Terms and Conditions); Dkt. 1033-11 (Stiglitz Rep.). |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 <br> (refusal to deal) | **Additional Fact 55:** Apple's technical design reinforces its contractual restrictions in making the App Store the only source for apps and in-app purchases. *See* Ex. 41 (Stiglitz Rep.) ¶ 74 (DPLA and Apple's certificate/code-signing technology work together to make sideloading of iOS apps impossible); *id.* at ¶ 73 (Apple has used its tech to make jailbreaking virtually impossible); Ex. 6 (Federighi Dep.) at 294:17-22. | Immaterial because this is an improper legal conclusion that "contractual restrictions" "mak[e] the App Store the only source for apps and in-app purchases," or that such alleged contractual restrictions are "reinforce[d]" by "Apple's technical design." Developers can and do make their apps and digital content available on iPhone as web apps and, with respect to in-app content, through their own websites. SUF 4. Developers also have the freedom to distribute apps and app content through other platforms. *See* Ex. 111 (Hitt Rep.) ¶ 66. Apple does not prohibit customers from accessing content and subscriptions on their iOS device that were purchased on other platforms. *See* SUF 4, 5. <br><br> To the extent Additional Fact 55 is material, it is undisputed that Apple has developed technical safeguards for iPhone that deter sideloading, protect users' security and privacy, protect device reliability, and protect against threats arising from removing security measures from devices (such as through jailbreaking). *See* SUF 20 ("These protections serve as 'another line of defense against harmful software.'"). |
| Issue 2 <br> (refusal to deal) | **Additional Fact 56:** Apple has market power in the markets for smartphones and tablets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-305. | Immaterial because factual determinations relating to device markets are not material for the disposition of this motion, which argues that Plaintiffs' one-sided consumer aftermarket for iOS apps fails as a matter of law. *See* Mot. 5–9. Factual determinations relating to device markets are also not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *Id.* at 9–13. <br><br> Also immaterial because whether Plaintiffs have established that Apple has market power in any markets for smartphones or tablets is an improper legal conclusion. Apple disagrees that they have done so. *See* Ex. 114 (Jin Reb. Rep.) ¶¶ 133–136, 172–173. Plaintiffs also failed to establish that the smartphones or tablets sold in the U.S. constitute relevant antitrust markets. |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | *See id.* ¶¶ 116–129, 158–171.<br><br>Plaintiffs' experts have conceded that Apple did not have market power when it launched the App Store in 2008. *See* Ex. 123 (May 30, 2025 Stiglitz Dep.) 86:13–18 ("Q: And that figure shows that Apple had a 28 per cent market share [in the smartphone market] in 2008 when the App Store opened; correct? A: That's right. Q: Would you agree that 28 percent is not a monopoly share? A: Not a monopoly share, that's clear."); 92:25–93:5 ("Q. In your opinion, did Apple have market power in the smartphone market in 2008 when it opened the App Store? A. . . . The answer is no."). |
| Issue 2<br>(refusal to deal) | **Additional Fact 57:**<br>███████████████████████████████████████████████████████████████████████████ *See* Ex. 41 (Stiglitz Rep.) ¶¶ 273, 274 (Figs. 7,8), 280, 301 (Fig. 9), 302. | Immaterial because factual determinations relating to device markets are not material for the disposition of this motion, which argues that Plaintiffs' one-sided consumer aftermarket for iOS apps fails as a matter of law. *See* Mot. 5–9. Factual determinations relating to device markets are also not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *Id.* at 9–13.<br><br>Moreover, Plaintiffs failed to define a proper relevant market in which to measure device market shares. *See supra* Response to Add'l Fact 56. Plaintiffs failed to establish that the smartphones or tablets sold in the U.S. constitute relevant antitrust markets. *See* Ex. 114 (Jin Reb. Rep.) ¶¶ 116–29, 158–71. Plaintiffs also failed to establish that Apple has market power in any markets for smartphones or tablets. *See id.* ¶¶ 133–36, 172–73. |
| Issue 2<br>(refusal to deal) | **Additional Fact 58:** There are significant barriers to entry into both the smartphone and tablets markets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 277-81, 303-05. | Immaterial because factual determinations relating to barriers to entry in device markets are not material for the disposition of this motion, which argues that Plaintiffs' one-sided consumer aftermarket for iOS apps fails as a matter of law. *See* Mot. 5–9. Factual determinations relating to barriers to entry in device markets are also not relevant to Apple's argument that Apple's restrictions on rival app |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | distributors are lawful refusals to deal. *Id.* at 9–13.<br><br>Also <u>immaterial</u> because Plaintiffs' statement that there are "significant barriers to entry" to any markets is an improper legal conclusion. Moreover, Plaintiffs' experts' barriers-to-entry analysis is flawed. *See* Ex. 114 (Jin Reb. Rep.) ¶¶ 137–41, 180–83. |
| Issue 2<br>(refusal to deal) | **Additional Fact 59**:  There are high rates of co-ownership of iPhones and iPads and purchase of one device often leads to purchase of the other. *See* Ex. 98 (APL-EG_06218185) at -185; Ex. 99 (APL-APPSTORE_11109932) at -976; Ex. 57 (APL-EG_09278862) at -905; Ex. 41 (Stiglitz Rep.) ¶¶ 35, 170, 182; Ex. 97 (APL-APPSTORE_10339734) at -953. | <u>Immaterial</u> because device purchasing patterns are not relevant to Apple's motion, which argues that Plaintiffs' one-sided consumer aftermarket for iOS apps fails as a matter of law. *See* Mot. 5–9.  Factual determinations relating to device purchasing patterns are also not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *Id.* at 9–13.<br><br>To the extent Additional Fact 59 is material, it is <u>undisputed</u> that some individuals own both iPhones and iPads and <u>disputed</u> as to the improper and vague characterization of any "high" rates of co-ownership and whether and how "purchase of one device often leads to purchase of the other." |
| Issue 2<br>(refusal to deal) | **Additional Fact 60:**<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-50; Ex. 34 (Barnes Rep.) ¶¶ 55-63 & Exs. 5-12; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 89:18-90:2. | <u>Immaterial</u> because factual determinations relating to margins or rates of return in device markets are not material for the disposition of this motion, which argues that Plaintiffs' one-sided consumer aftermarket for iOS apps fails as a matter of law. *See* Mot. 5–9.  Factual determinations relating to margins or rates of return in device markets are also not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. *Id.* at 9–13.<br><br>To the extent Additional Fact 60 is material, it is <u>disputed</u> because it is unsupported by the evidence. Plaintiffs' experts have not put forth any evidence that suggests any of its estimations of iPhones or iPads operating margins are "high" from an economics perspective. *See* Ex. 115 (Majumdar Reb. Rep.) ¶¶ 256, 260. |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | Moreover, the terms "substantial margins" and "excessive rates of return" are vague and conclusory. |
| Issue 2 (refusal to deal) | **Additional Fact 61**: The App Store has "extraordinarily high operating margins." *Epic Games v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023); *see also* Ex. 34 (Barnes Rep.) ¶¶ 5-6, 23-54. | Immaterial to Apple's motion for summary judgment. Factual determinations relating to Apple's operating margins are not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. Mot. 9–13. Further, Plaintiffs' citation to a factual finding from a different proceeding does not create a material dispute of fact. *See M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983). |
| Issue 2 (refusal to deal) | **Additional Fact 62**: Apple's commission rate is supra-competitive. *See* Ex. 33 (Abrantes-Metz Rep.) ¶ 21 (modeling competitive rate at 13.6%); Ex. 41 (Stiglitz Rep.) ¶¶ 145-47. | Immaterial because Plaintiffs' statement is an improper legal and economic conclusion, not a material fact. Further, any analysis of the commission rate is irrelevant to the disposition of Apple's motion, which does not depend on whether Apple's commission is or is not supra-competitive. |
| Issue 2 (refusal to deal) | **Additional Fact 63**: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 41 (Stiglitz Rep.) ¶¶ 363-71. | Immaterial because Plaintiffs' statement is an improper legal conclusion, not a material fact. Further, Apple could not have "leverage[d] its market power in the smartphone market" because it does not have market power in any smartphone market, including when it launched the App Store in 2008 and introduced in-app purchases in 2009. *See* Dkt. 1000-9 (Sundararajan Reb. Rep.) ¶¶ 74–77, 132; Ex. 123 (May 30, 2025 Stiglitz Dep.) 92:25–93:5 ("Q: . . . In your opinion, did Apple have market power in the smartphone market in 2008 when it opened the App Store? A. You know, almost by definition, did it have market power in the smartphone market as defined at the, by IDC at that time? The answer is no."). |
| Issue 2 (refusal to deal) | **Additional Fact 64**: There is considerable consumer demand for alternative app stores and alternative in-app purchase solutions. *See* Ex. 49 (Hoyer Rebuttal Rep.) ¶ 36. | Immaterial to Apple's motion for summary judgment. Consumer demand for alternative app stores or in-app purchasing solutions is not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. Mot. 9–13  To the extent Additional Fact 64 is material, it is |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | <u>disputed</u> as to Plaintiffs' vague and improper characterization of "considerable consumer demand." It is also <u>disputed</u> that Plaintiffs' expert Prof. Hoyer's modified survey of Apple's expert Prof. Simonson's Opening Report Survey 2 properly assessed consumer demand. Hoyer admitted that that this survey ██████████████████████████████ ██████████████████████████████ Ex. 124 (June 20, 2025 Hoyer Dep.) 229:17– 230:1. |
| Issue 2 (refusal to deal) | <u>**Additional Fact 65**</u>: Consumers have no way of knowing how much of their App Store spending is due to Apple's commission. *See* Ex. 36 (Hoyer Rep.) ¶ 84, fig. 15 (████ ████████████████████; *id.* at ¶¶ 80-84 (majority of iOS mobile device users do not have any knowledge of Apple's requirements on app developers); Ex. 35 (Chen Rep.) ¶¶ 51-67. | <u>Immaterial</u> to Apple's motion for summary judgment. Consumers' knowledge of spending is not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. Mot. 9–13. Additionally, Plaintiffs' statement is vague and ambiguous. |
| Issue 2 (refusal to deal) | <u>**Additional Fact 66**</u>: Consumers often purchase iPhones and iPads without considering their app purchasing options or their app store spending over time. *See* Ex. 36 (Hoyer Rep.) ¶¶ 70-73, 78, 87; Ex. 35 (Chen Rep.) ¶¶ 32-35. | <u>Immaterial</u> to Apple's motion for summary judgment. Consumers' behaviors with regard to estimating life-cycle costs when purchasing devices are not relevant to Apple's argument that Apple's restrictions on rival app distributor are lawful refusals to deal. Mot. 9–13 |
| Issue 2 (refusal to deal) | <u>**Additional Fact 67**</u>: Significant switching costs include losing device familiarity, Ex. 35 (Chen Rep.) ¶¶ 166-69; 214-29, and interoperability, *id.* at ¶¶ 181-200, the expense of transferring or losing device content, *id.* at ¶¶ 201-213, and the cost of a new device. Ex. 41 (Stiglitz Rep.) ¶¶ 170, 172, 174-77. | <u>Immaterial</u> to Apple's motion for summary judgment. Consumer decisions to switch smartphones or tablets are not relevant to Apple's argument that Apple's restrictions on rival app distributors are lawful refusals to deal. Mot. 9–13<br><br>To the extent Additional Fact 67 is material, it is <u>disputed</u> as to the phrase "significant switching costs," which is vague and conclusory. |
| Issue 2 (refusal to deal) | <u>**Additional Fact 68**</u>: Data shows switching away from iOS is limited. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 197-200 | <u>Immaterial</u> because the App Store must be analyzed as a two-sided transaction platform under *Amex*, 585 U.S. at 545 (a "two-sided |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | ("████████████████████ ████████); Ex. 39 (Simonson Rep.) ¶ 166 (██████████████████ ████████████████████. | transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants."); *id.* (Platforms that "cannot make a sale unless both sides of the platform simultaneously agree," they are "understood as supplying only one product—transactions.").<br><br>To the extent Additional Fact 68 is material, it is <u>disputed</u> because this statement mischaracterizes evidence. Simonson's survey found 76.7% of respondents did not consider switching devices. However, Simonson also found that this was because of consumers' preferences for Apple's products, not switching costs. *See* Dkt. 1033-9 (Simonson Rep.) ¶ 25 ("[B]y far the most common reasons for current iPhone/iPad users for not switching . . . from iPhone/iPad to Android devices reflect[s] their perceptions and preferences for Apple devices' features and Apple more generally. . . By contrast, the fact that users own other Apple devices or the anticipated difficulty in making transitions were not mentioned by many of the respondents as reasons for not switching.").<br><br>Moreover, the record evidence shows that consumers can and do switch between an iOS device and an Android device at a rate comparable to switching rates in other industries. *See* Ex. 111 (Hitt Rep.) ¶¶ 206–08. |
| Issue 3<br>(iOS design) | **Additional Fact 69:** ████████████████████████ ████████████████████████ ████████████████████. *See* Ex. 43 (Kohno Rep.) ¶¶ 70-94, 242-49. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether additional security benefits are provided by mechanisms other than hardware and software security protections built into iOS is not relevant to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16.<br><br>To the extent Additional Fact 69 is material, it is <u>undisputed</u> that hardware and software security protections built into the iOS operating system provide device and data security. It is also undisputed that hardware and software protections, such as checking that apps come from a known and approved source and |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | preventing unauthorized access to system components and capabilities, provide security benefits. It is disputed that hardware and software security protections are solely responsible for device and data security on iPhone. Plaintiffs' own security expert, Dr. Kohno, testified that the App Review process, centralized distribution of apps through the App Store, and monitoring by Apple contribute to security. *See* Ex. 126 (June 25, 2025 Kohno Dep.) 139:1–8 ███████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also* Ex. 112 (Halderman Rep.) ¶¶ 51–82; Ex. 125 (June 23, 2025 Halderman Dep.) 138:6–139:5. |
| Issue 3 (iOS design) | **Additional Fact 70:** ███████████████████████████████████████ *See* Ex. 43 (Kohno Rep.) ¶¶ 242-45, 264-90. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether additional security benefits are provided when every iOS app undergoes App Review is not relevant to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16.<br><br>To the extent Additional Fact 70 is material, it is <u>disputed</u> because it mischaracterizes the cited evidence and is incomplete.<br><br>App Review entails ongoing review of apps both before and after they are initially available for distribution. At a minimum, Apple cannot perform ongoing App Review of apps after initial distribution if they are distributed on stores or websites other than the App Store. Among other things, developers may take measures to hide apps from Apple, or to ensure that apps behave differently for the App Review team than they do for consumers. Dkt. 1003-21 (Halderman Rep.) ¶ 84 ("[C]entral distribution through the App Store is what enforces that all apps must undergo App Review before reaching consumers—and that all apps will continue to be subject to App Review even after becoming available for distribution to users"); *id.* ¶ 90 |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | ("Moreover, when an app is found to be harming users, centralized distribution allows Apple to take effective countermeasures. For instance, Apple can immediately halt further distribution of the app by removing it from the App Store"); Dkt. 1003-29 (Halderman Reb. Rep.) ¶¶ 41–42, 44–45, 48–51.<br><br>Moreover, Plaintiffs cite Kohno's Opening Report, which in turn cites incomplete excerpts of testimony from a foreign jurisdiction. Plaintiffs omit reference to further testimony by the same witness stating that, without centralized distribution, Apple "cannot maintain the same level of security in my opinion but it could be done." Dkt. 1033-13 (Kohno Rep.) ¶ 274; Dkt. 1003-21 (Halderman Rep.) ¶¶ 83–91; Dkt. 1003-29 (Halderman Reb. Rep.) ¶ 39. |
| Issue 3<br>(iOS design) | **Additional Fact 71:**<br>[REDACTED]<br>*See* Ex. 43 (Kohno Rep.) ¶ 264-80; Ex. 79 (APL-APPSTORE_10888329) at -348. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether the notarization process may also provide security benefits is not relevant to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16. It is also immaterial because Apple's motion for summary judgment does not require any assessment of Apple's conduct made to comply with non-U.S. legal regimes nor any assessment of alternative business models.<br><br>To the extent Additional Fact 71 is material, it is <u>undisputed</u> that in the EU, Apple has been forced to make certain changes because of the passage of the EU Digital Markets Act, including implementing a "Notarization for iOS" process. The Notarization for iOS process is different from full App Review in the United States, including because it does not enforce the full set of App Review Guidelines. *See* Ex. 131 (Apple Inc., *Complying with the Digital Markets Act* (March 2024), https://developer.apple.com/security/complying-with-the-dma.pdf) at 6, 8, 10–11 (explaining that Notarization for iOS provides the "checks necessary to protect [Apple's] users and essential to platform integrity" but is "not App |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | | Review" and does "not include" analyzing apps for compliance with "many of the most substantial App Store Review Guidelines" (emphasis omitted); *see also* Dkt. 1033-13 (Kohno Rep.) ¶ 266; Dkt. 1003-29 (Halderman Reb. Rep.) ¶¶ 101–28. |
| Issue 3 (iOS design) | **Additional Fact 72:** [redacted] *See* Ex. 43 (Kohno Rep.) ¶ 280; Ex. 85 (APL-APPSTORE_11433454) at -457. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether the notarization process may also provide security benefits is not relevant to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16. It is also immaterial because Apple's motion for summary judgment does not require any assessment of Apple's conduct made to comply with non-U.S. legal regimes nor any assessment of alternative business models.<br><br>To the extent Additional Fact 72 is material, it is <u>disputed</u> because it is misleading and unsupported by the cited evidence. The notarization process for macOS employs different tools and a different process than the Notarization for iOS process employed in the EU. *See* Dkt. 1003-29 (Halderman Reb. Rep.) ¶ 101; Ex. 120 (Feb. 10, 2021 Federighi Dep.) 34:18–25; 36:1–11; *see also supra* Response to Add'l Fact 71. |
| Issue 3 (iOS design) | **Additional Fact 73:** [redacted] *See* Ex. 85 (APL-APPSTORE_11433454) at -457 (" [redacted] "); Ex. 43 (Kohno Rep.) ¶ 265. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether the notarization process may also provide security benefits is not relevant to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16. It is also immaterial because Apple's motion for summary judgment does not require any assessment of Apple's conduct made to comply with non-U.S. legal regimes nor any assessment of alternative business models.<br><br>To the extent Additional Fact 73 is material, it is <u>disputed</u> because the term "modeled after" is vague and ambiguous, misleading, and mischaracterizes the evidence. As explained in Apple's responses to Additional Facts 71 and 72, Notarization for Mac operates differently from Notarization for iOS in the EU. |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| **Issue 3** (iOS design) | **Additional Fact 74:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Ex. 43 (Kohno Rep.) ¶ 277. | <u>Immaterial</u> to Apple's motion for summary judgment. Whether and how app developers in the EU sign up for the Apple Developer Program and whether Apple can revoke a signed certificate from malicious developers are immaterial to Apple's argument that its technical design of iOS is lawful product design. Mot. 13–16. These issues are also immaterial because Apple's motion for summary judgment does not relate to the App Store's operation in the EU.<br><br>To the extent Additional Fact 74 is material, it is <u>disputed</u> because developers in the EU may distribute their apps on the web without signing up for the Apple Developer Program, and such apps do not require a signed certificate from Apple to be distributed. *See, e.g.*, Dkt. 1003-50 (App Review Guidelines (June 9, 2025)), Introduction at 1–2, § 3.2.2 at 30; SUF 4, 5; Ex. 130 (*Epic* Trial Tr.) 990:21–23 (Kosmynka). Further, Plaintiffs do not provide any evidence that Apple has the authority to, in the EU, or actually has, "revoke[d] a signed certificate from malicious developers regardless of how they distribute their apps." |
| **Issue 6** (Damages/Injury) | **Additional Fact 75:** Apple's conduct has reduced app output, quality, and innovation for iOS developers, while insulating Apple from competitive pressure to enhance its services or develop new apps. Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11. ▇▇▇▇▇▇▇▇▇▇. Ex. 78 (APL-APPSTORE_10908929) at -935; Ex. 74 (APL-APPSTORE_10767225) at -227; Ex. 75 (APL-APPSTORE_10929194) at -245. | <u>Immaterial</u> to Apple's motion for summary judgment. Moreover, the first statement is a conclusory and speculative opinion from Plaintiffs' experts, not a fact. |
| **Issue 6** (Damages/Injury) | **Additional Fact 76:** McFadden's damages model does not depend on | <u>Undisputed</u> that McFadden's damages model does not rely on Thompson's work to calculate |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | Thompson's work linking transactions to payors because the model measures monetary harm at the transaction level. *See* Ex. 40 (Song Rep.) ¶¶ 61, 65-67; Ex. 29 (July 3, 2025 Song Dep.) at 13:15-22; Ex. 38 (McFadden Rep.) ¶¶ 49, 56. | purported injury incurred on individual transactions. It is also <u>undisputed</u> that without Thompson's matching methodology, the model cannot show purported injury to individual class members. To be clear, Plaintiffs' damages model is therefore dependent on Thompson's work to show individual damages or aggregate classwide damages. *See* Ex. 113 (Song Rep.) ¶¶ 11, 70–73; Dkt. 976-2 (McFadden Rep.) ¶ 58. |
| Issue 6 (Damages/Injury) | <u>**Additional Fact 77:**</u> Dr. Abrantes-Metz's model assumes, as a conservative modeling choice, that there would be another app store; the results do not depend on Plaintiffs prevailing on each alleged theory of anticompetitive conduct. Ex. 33 (Abrantes-Metz Rep.) ¶¶ 19, 23; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 57-59. | <u>Immaterial</u> because this statement is a conclusory and self-serving characterization of their expert's work, not a material fact. Further, Abrantes-Metz's purported economic model of the but-for world is not conservative or reliable. It relies on unsupported assumptions, engages in incomplete modeling that is inconsistent with economic principles, and contradicts market facts. *See* Ex. 117 (Hitt Reb. Rep.) ¶¶ 244, 254–70. |

## ATTESTATION

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

By: _/s/ Cynthia E. Richman_
Cynthia E. Richman

DATED: September 23, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: _/s/ Cynthia E. Richman_
Cynthia E. Richman

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Theodore J. Boutrous Jr. (132099)
   tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
   dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
   chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
   jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
   dcraig@gibsondunn.com
Eli M. Lazarus (284082)
   elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*