THEODORE J. BOUTROUS JR., SBN 132099
 tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
 dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
 chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
 jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
 dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
 elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
 crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
 hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*Admitted *pro hac vice*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date: October 14, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

1

**TABLE OF CONTENTS**

2

**Page**

3   I.      INTRODUCTION ................................................................................................................. 1

4   II.     ARGUMENT ........................................................................................................................ 2

5           A.      Common Issues Do Not Predominate ........................................................................ 2

6                   1.      Uninjured Class Members Cannot Be Identified Absent Individual
                            Inquiry ............................................................................................................. 2

7
                    2.      The Class Still Contains Over 10 Million Uninjured People ........................... 8
8
                    3.      Plaintiffs' Noneconomic Injury Theory Does Not Rescue The Class ........... 11
9
10          B.      The Defined Class Is Not Superior And The Class Representatives Are Not
                    Adequate ................................................................................................................. 13

11          C.      Plaintiffs Lack A Reliable Damages Model ........................................................... 15

12  III.    CONCLUSION .................................................................................................................. 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  2017 WL 4073792 (N.D. Cal. Sept. 14, 2017) ...............................................................13

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) .........................................................................................................2

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) .......................................................................................5, 12

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .......................................................................................................10

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .......................................................................................12

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .........................................................................................5

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................2, 4, 15

*Dairy, LLC v. Milk Moovement, Inc.*,
  2023 WL 3437426 (E.D. Cal. May 12, 2023) ...............................................................12

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 ....................................................................................................................4

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..........................................................................................12

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) ..........................................................................................12

*In re Google Play Store Antitrust Litig.*,
  No. 21-md-02981-JD (N.D. Cal. Sept. 13, 2023), Dkt. 604 .............................................2

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ..........................................................................................6

*Huckaby v. CRST Expedited, Inc.*,
  2025 WL 987195 (C.D. Cal. Apr. 1, 2025) ...................................................................14

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) ...........................................................................12

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ...........................................................................................4

*In re Lidoderm Antitrust Litig.*,
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..................................................................12

ii

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
*(Continued)*

Page

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011)..................................................................................4

*Mays v. Tenn. Valley Auth.*,
    274 F.R.D. 614 (E.D. Tenn. 2011) .......................................................................14

*Mr. Dee's Inc. v. Inmar, Inc.*,
    2023 WL 5436178 (M.D.N.C. Aug. 23, 2023) ....................................................13

*Mr. Dee's Inc. v. Inmar, Inc.*,
    127 F.4th 925 (4th Cir. 2025) ..............................................................................13

*In re Niaspan Antitrust Litig.*,
    67 F.4th 118 (3d Cir. 2023) ...................................................................................3

*Noohi v. Johnson & Johnson Consumer Inc.*,
    146 F.4th 854 (9th Cir. 2025) ................................................................................5

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)..............................................2, 3, 4, 6, 9, 10, 11, 14

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ...............................................................................................5

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019).....................................................................9, 13, 15

*Reiter v. Sontone Corp.*,
    442 U.S. 330 (1979) ............................................................................................6, 7

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016)...........................................................................8, 10

*Sherman v. Yahoo! Inc.*,
    2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) ......................................................5

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..............................................................................1, 2, 7, 9, 10

*Van v. LLR Inc.*,
    61 F.4th 1053 (9th Cir. 2023)................................................................................4

*Victorino v. FCA US LLC*,
    2020 WL 2306609 (S.D. Cal. May 8, 2020) .........................................................6

*Walmart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................4, 5, 9, 11, 15

*Weiner v. Ocwen Fin. Corp.*,
    343 F.R.D. 628 (E.D. Cal. 2023) ...........................................................................6

*Williams v. Apple Inc.*
    338 F.R.D. 629 (N.D. Cal. 2021) .........................................................................10

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2020 WL 4212811 (N.D. Cal. July 22, 2020) ........................................................9

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

**TABLE OF AUTHORITIES**
(*Continued*)

Page

**Statutes**

15 U.S.C. § 15(a) ........................................................................................................................6

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

# I. INTRODUCTION

Plaintiffs' bid to maintain the certification of this unprecedented class—one that Plaintiffs admit still contains over ten million uninjured persons—rests on a logical inconsistency. Plaintiffs contend that their damages class cannot be "overbroad," no matter how "high" the "number or percentage of class members who eventually are proven to lack damages" may be, yet at the same time, they argue that discarding the claims of millions of consumers who allegedly did incur damages was a necessary evil "to reduce the number of economically undamaged class members" and "cure a potential overbreadth problem." Opp. 14, 19–21. Both of these things cannot be true. If, contrary to the Supreme Court's command that "every class member must have Article III standing in order to recover individual damages," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a damages class really could have an unbounded number of members known to be uninjured, then Plaintiffs' decision to limit the class to consumers who spent more than $10 from any one Apple ID account—whose only stated purpose was to depress the number of uninjured class members—lacks any justification. That would prove the class definition is arbitrary and violates Rule 23's superiority and adequacy requirements. If instead (as is true), a class cannot have a staggering number of uninjured members who lack standing (more uninjured than almost any other class has *members*), then Plaintiffs' class should be decertified.

Plaintiffs have no cogent response to the many other flaws Apple has identified. Plaintiffs concede that the class cannot go to trial unless they have a reliable way to link class members to App Store transactions. Yet Plaintiffs do not deny that their methodology for matching people to transactions has produced glaringly wrong results. Plaintiffs dismiss these serious errors by suggesting, without any evidence, that they are the *only* ones in the entire dataset. That beggars belief. The errors Apple identified—in the course of the spot checks it performed in the limited time afforded by Plaintiffs' late expert report—are likely just the tip of the iceberg. These errors confirm that any *accurate* matching will have to be done on an individualized basis that accounts for nuances in the data—a task that will destroy predominance. Meanwhile, to defend their expert's methodology, Plaintiffs must maintain, contrary to black letter law, that the class includes children who use their parents' credit cards for purchases, rather than the parents who paid for those purchases. There can be no serious dispute that children who did not spend their own money lack both any valid claim for

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

damages and Article III standing. These are among the many reasons why identifying the individuals with claims or standing is not possible absent individualized inquiry.

Plaintiffs promised this Court that further discovery and expert analysis would render their certified class even more suitable for classwide adjudication. The opposite is true: The gerrymandered class still contains at least ten million admittedly uninjured persons and rests on unreliable expert methodologies that will leave a jury adrift. *See In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, (N.D. Cal. Sept. 13, 2023), Dkt. 604 (decertifying class based on "new development[]" that expert's opinion proved unreliable). The Court should decertify the class now, before an improper and unmanageable class trial is held.

## II. ARGUMENT

Developments since this Court's February 2024 certification order, including Plaintiffs' merits expert reports, confirm the class still has an unprecedented ten million uninjured members (if not more) who cannot be identified without individualized factfinding; the class arbitrarily excludes millions of consumers with identical claims, many of whom Plaintiffs say *are* injured; and there is no reliable proof showing injury, damages, standing, or class membership on a classwide basis. If Rule 23 truly imposes "stringent requirements for certification that in practice exclude most claims," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), this plainly flawed class must be decertified.

### A.    Common Issues Do Not Predominate

Every member of a Rule 23(b)(3) class "must be able to sufficiently answer the question: 'what's it to you?'" *TransUnion*, 594 U.S. at 423. Indeed, the Court recognized that determining which class members were injured and their damages was a "core merits issue" Plaintiffs would need to address before a class trial. Dkt. 789 at 4–5. They have not.

#### 1.    Uninjured Class Members Cannot Be Identified Absent Individual Inquiry

Plaintiffs' predominance argument is based on flawed expert opinions and assumptions that fail the "rigorous analysis" this Court must conduct. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

**a. Plaintiffs cannot match transactions to people.** None of the following is in dispute: to

1    determine whether a class member had a compensable injury (and if so, to calculate the damages),

2    Plaintiffs need to match that *person* with their app and in-app transactions. Mot. 11; Opp. 8–13. This

3    is because Plaintiffs' model attempts to calculate the difference between the prices class members

4    actually paid and those they would have paid but for Apple's conduct. Mot. 11. For many transactions,

5    the model calculates "negative damages"—i.e., that the class member would have paid *more* money

6    but for Apple's conduct. *Id.*; Dkt. 1003-35 (Song Rep.) ¶ 79. Plaintiffs must therefore "net out [the]

7    'negative' damages" from the payor's transactions against any "positive" damages from other

8    transactions. *Id.* ¶¶ 73, 79. Proper attribution requires proper matching of class members and their

9    transactions, and Plaintiffs do not dispute that their class fails Rule 23's predominance requirement

10   unless this can be done at scale in "one stroke." *Olean*, 31 F.4th at 663–64.

11       Plaintiffs' expert, Darryl Thompson, attempted to identify unique payment profiles and

12   associate them with real people so that their profiles could be matched with transactions. But his

13   purported matching of profiles to people is riddled with astonishing errors, ████████████████

14   ████████████████████████████. Mot. 13. Plaintiffs do not dispute that these errors exist.

15   Their defense is that the errors are "insignificant" because the specific examples cited by Apple

16   "concern[] only .01% of all customer records." Opp. 9. But the errors identified by Apple are only

17   *examples*. Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 65–66. That Thompson failed to correctly ████

18   ████████████████████████████, Mot. 13, suggests the errors are widespread—the tip

19   of a gigantic iceberg. The court made exactly this point in *In re Niaspan Antitrust Litig.*, 67 F.4th 118,

20   137 (3d Cir. 2023). Plaintiffs there attempted to use "automated data matching to identify class

21   members," but when the defendant "examined [the plaintiffs'] methodology in four of the examples, it

22   discovered that [the methodology] was wrong in half of them." *Id.* at 137. The district court concluded,

23   and the Third Circuit agreed, that these two errors implied that others were abounding among the

24   "millions of transactions" at issue, requiring "individualized fact-finding" to identify and fix. *Id.* at

25   137, 139 n.13. The examples here show many magnitudes more than two errors. Mot. 13 & n.3; Dkt.

26   1003-30 (Stodden Rebuttal Rep.) ¶ 94. ████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ████ Mot. 13; Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 94–97. Nor did Plaintiffs timely provide

1  Apple with the backup data necessary for Apple's expert to calculate an error rate herself, much less

2  undertake the individualized process of identifying each error manually.  *See* Dkt. 1003-1 ¶¶ 3–8.

3          Plaintiffs try to shift the burden to Apple to prove that Rule 23's requirements are not satisfied,

4  but that is an inversion of the burden the Supreme Court announced in *Comcast*, 569 U.S. at 33, 35–

5  36, and *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–54 (2011).  Plaintiffs continue to bear this

6  burden on decertification.  *See Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011);

7  Mot. 8.  If they want to argue that the glaring errors can be safely ignored, they need proof the issues

8  with Thompson's work are not widespread.  They have none.  This is fatal.

9          Even if Thompson were allowed to testify, his pervasive errors mean that Apple would have

10 the right to litigate injury status and damages on an individual class-member basis.  "Because the Rules

11 Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class

12 cannot be certified on the premise that [Apple] will not be entitled to litigate its statutory defenses."

13 *Dukes*, 564 U.S. at 367 (citations omitted); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

14 982–84 (even when plaintiffs have expert evidence, class certification is improper when the evidence

15 cannot be applied on a classwide basis); Mot. 13–14.  Now that potentially tens of millions of class

16 members require individualized inquiry, Reply ISO *Daubert* Mot. § 1.D—there is no way of knowing

17 which—Plaintiffs cannot avoid "the spectre of class-member-by-class-member adjudication."  *Van v.*

18 *LLR Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023); *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th

19 1134, 1140 (9th Cir. 2022) (affirming denial of class certification where "figuring out whether each

20 plaintiff was injured would be an individualized process").  Such a class is "fatally overbroad" because

21 even as "redefine[d]," it still does not contain "only those members who can rely on the same body of

22 common evidence to establish the common issue."  *Olean*, 31 F.4th at 669 n.14.  Again, Plaintiffs' only

23 defense is that the errors are *de minimis*—an implausible, unsupported view.

24         For all the same reasons, it is impossible to determine in one stroke who the class members

25 even are, much less who among them was injured.  Plaintiffs do not dispute that, because class

26 membership turns on which transactions a consumer "paid" for, identifying class members also requires

27 a matching exercise.  Mot. 14–15; Opp. 8–9.  Plaintiffs deride this point as a mere "ascertainability

28 argument."  Opp. 11.  But identifying class members also implicates predominance and thus the

4

1    "rigorous analysis" required by Rule 23.  *Dukes*, 564 U.S. at 350–51; *see Briseno v. ConAgra Foods,*

2    *Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) (explaining that "definitional deficiencies" in the class

3    should be addressed "through analysis of Rule 23's enumerated requirements"); *Sherman v. Yahoo!*

4    *Inc.*, 2015 WL 5604400, at *10 (S.D. Cal. Sept. 23, 2015) (the lack of a "method of identifying class

5    members," "suggests that common questions do not predominate over individual ones").  And

6    identifying class members here will swamp every other question in this case.

7         Plaintiffs argue that injured class members can be identified later, through a "post-trial claims

8    administration" process run by Thompson.  Opp. 12.  But this Court has explained that Plaintiffs "could

9    not wait until *after trial*" to perform their matching, which goes to their ability to establish a core

10   element of their Section 2 claim.  Dkt. 789 at 4–5.  Plaintiffs also concede, as they must under *Noohi*

11   *v. Johnson & Johnson Consumer Inc*., 146 F.4th 854, 867 (9th Cir. 2025), that "any failures in the

12   model can be explored at trial."  Opp. 23.  Apple has the right to a "workable" plan to "press at trial

13   genuine challenges to allegations of injury-in-fact" that "does not cause individual inquiries to

14   overwhelm common issues."  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018).  But

15   that is not possible if Thompson's work needs to be "continued" with more "granularity."  Opp. 12.

16   Waiting until trial to deliver the "fully executed" version of Thompson's matching, *see Noohi*, 146

17   F.4th at 867, is just the sort of "adventurous application" of class-action procedure that would abridge

18   Apple's "Seventh Amendment jury trial rights," *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46

19   (1999).  Plaintiffs' argument that Thompson's failure infects only individual and not aggregate

20   damages, Opp. 12, is also untenable.  His matching determines whether and by how much someone's

21   "positive" injuries are netted out by "negative" injuries.  If the matching is wrong, aggregate damages

22   (the sum of each class member's net-positive damages) will also be wrong.  Dkt. 1003-99 (Prince

23   Rebuttal Rep.) ¶¶ 49–50.

24        Even if it were permissible for Plaintiffs to establish an element of their claims after trial (and

25   it is most certainly not), they do not explain what Thompson would do differently if he got a post-

26   verdict do-over.  Opp. 12–13 (proposing to rely on the same evidence that Thompson already

27   considered, *see* Dkt. 1003-36 (Thompson Supp. Rep.) ¶ 8).  In Plaintiffs' cited cases, the court relied

28   on evidence showing that injury or class membership could be identified on a classwide basis.  *See*

*Victorino v. FCA US LLC*, 2020 WL 2306609, at *3–4 (S.D. Cal. May 8, 2020); *Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628, 633 (E.D. Cal. 2023). Here Plaintiffs have not shown that this can ever be so.

Plaintiffs vaguely intimate that Apple played a role in Thompson's errors, noting that for reasons of protecting consumer privacy, Thompson worked with a version of the data that omitted the transactions associated with each account, leaving Apple to fill in that information once Thompson was done. Opp. 8–9 & n.5. As Apple explained and Plaintiffs previously acknowledged, that process was "ministerial." Mot. 6. The Opposition does not contest this. Likewise, Plaintiffs' argument that the data Apple gave to Thompson was "poorly maintained" is a red herring. Opp. 12. Thompson reviewed Apple's data at the outset and determined that it was suitable for his task. Mot. 14; Dkt. 1003-36 (Thompson Supp. Rep.) ¶¶ 9–10. And Plaintiffs do not argue that anomalies in Apple's data are responsible for any of the identified errors, nor could they. *See* Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 66, 119. The problems flow from Thompson's unreliable methodology and demonstrate Plaintiffs' inability to match individuals to transactions in one stroke. *See* Reply ISO *Daubert* Mot. § I.B.

A separate issue also dooms Plaintiffs' class. By their own admission, Plaintiffs' methodology makes no attempt to match transactions to the person who *paid* for that transaction. Mot. 12. Instead, Plaintiffs argue that the person who paid is irrelevant: even if a child used her parent's credit card to pay for an app, or if a girlfriend paid for her boyfriend's in-app transaction, then the child or boyfriend can properly be treated as paying the overcharge and should be the class member. *Id.* That is not how antitrust law—or Article III—works. Plaintiffs sue under Section 4 of the Clayton Act, which authorizes an antitrust action by "any person who shall be injured in his business or property." 15 U.S.C. § 15(a); *see* Third Am. Compl., Dkt. 229 ¶ 26. Consumer antitrust plaintiffs may recover for an overcharge when their property in the form of "money has been diminished by reason of an antitrust violation." *Reiter v. Sontone Corp.*, 442 U.S. 330, 339 (1979) (emphasis added). They then incur "measurable damages" "in the form of higher prices paid." *Olean*, 31 F.4th at 670. Likewise, Article III requires plaintiffs to have suffered an "injury in fact," for example that they "paid more for a product than they otherwise would have." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (alteration marks omitted). Here, only the individual whose payment method was used has a damages claim or standing. For example, when a child uses her parent's credit card to initiate an app transaction,

only the parent's money (if anyone's) is "diminished." *Reiter*, 442 U.S. at 339.[1]  And in the same vein, because the child lost no money, she would not have constitutional standing.  *See TransUnion*, 594 U.S. at 417 ("[n]o concrete harm, no standing"); Reply ISO *Daubert* Mot. § I.D.

Plaintiffs suggest that when Apple gave its data to Thompson, it conceded the person who paid was not the proper plaintiff.  Opp. 10.  This is false.  Plaintiffs' citation confirms that Apple produced the requested data without making any representations on this issue.  Dkt. 1035-15 at 2.  In any event, Apple has consistently maintained that the actual *payors* are the proper class members.  *See* Mot. 12.

Reference to the class definition only further undermines Plaintiffs' position.  The class is limited to people "who *paid* more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account."  Dkt. 789 at 2 (emphasis added).  Plaintiffs newly argue the phrase "from any one Apple ID account" in the class definition necessarily contemplates that the "registrant" on the Apple ID account is the person who did the "paying."  Opp. 11.  But Plaintiffs know well that Apple ID account holders are not the same as payors, and there can be multiple payor profiles associated with an account.  *See* Dkt. 953-8 at 4, 8–10 (Plaintiffs explaining "the person who has the email address associated with an Apple ID may not be the payor for that account"); Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶ 52, Ex. 5; *see also* Dkt. 1002-1 at 5.

Plaintiffs cannot blame Apple for their misguided methodology.  Apple produced the data that would have allowed Plaintiffs, had they retained a suitable expert with a scientific methodology (and not committed numerous other unforced errors), to use credit card numbers to deduplicate payors accurately.  *See* Reply ISO *Daubert* Mot. § I.D; Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 52–53, Ex. 5; Ex. 128 (July 17, 2025 Stodden Dep.) 82:6–83:2, 92:11–21.  But Plaintiffs inexplicably chose to take a different approach.  And even if Apple ID account holders were the right "payors," then Thompson's methods still do not accomplish the task because that is not the matching he performed.

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[1] Plaintiffs suggest in passing that this case is akin to one where "a child's parent gave them … money," which the child then used to buy candy.  Opp. 10.  But even assuming that the child's fleeting possession of the money in this hypothetical would yield a different result, here the child never possessed the money for even a moment.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████.

4 So Plaintiffs' methodology does not conform to even their revisionist reading of the class definition.

5      In a case like this one, where there is a substantial non-overlap between user accounts and the

6 individuals who paid for transactions on those accounts, the plaintiffs need to determine who *paid* for

7 the relevant transactions. Of the purported unique payors identified by Thompson who used credit or

8 debit cards, at least 22.3% appear to have used a card that is also attributed to another alleged unique

9 payor. Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 53; *see* Dkt. 1002-1 § I.B.2. Plaintiffs' failure to

10 deduplicate the records they requested according to who actually paid defeats predominance.

11      **b. The damages model remains incapable of reliably identifying the uninjured.** Plaintiffs

12 do not dispute the evidence that their damages model is volatile, with even the slightest tweaks to it

13 causing numerous individuals to flip between injured and uninjured—and often in ways that make no

14 sense. Mot. 15. They argue only that the Court has considered this issue before. Opp. 16. But since

15 class certification, the situation has gotten materially worse, with new evidence highlighting the

16 model's continued instability. When Plaintiffs removed iPod transactions accounting for less than ██

17 of billings over the full class period, this caused more than 300,000 payors to switch from injured to

18 uninjured, while somehow also causing the same number to switch from uninjured to injured. Mot.

19 15; Dkt. 962-2 ¶ 5. The Opposition does not attempt to explain how that makes sense. Opp. 16. It is

20 one thing if a model's output changes somewhat in response to new inputs; it is another for the model

21 to experience wild swings—often in the wrong direction. The newest evidence from the iPod touch

22 transactions is yet another demonstration that the model cannot reliably winnow out uninjured class

23 members. *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016).

24     **2.**    **The Class Still Contains Over 10 Million Uninjured People**

25      Plaintiffs do not dispute that under the version of their damages model that properly accounts

26 for focal-point pricing, there are approximately 11 million uninjured class members[2]—a number

27

28 _____

[2] Plaintiffs do not dispute focal-point pricing is the more realistic modeling assumption, given the "overwhelming evidence," that "developers would choose" that. Order, Dkt. 630 at 11.

1    greater than the previous count of 10.3 million uninjured accounts they promised to reduce.  Mot. 16;

2    Dkt. 666-1 at 15; Dkt. 789 at 26.  Nor do they dispute that this number is substantially higher than the

3    number of uninjured plaintiffs in any reported federal class action successfully certified.  Mot. 17.  This

4    case is barreling toward trial with an unprecedented and unacceptably high number of class members

5    who lack standing.  *See TransUnion*, 594 U.S. at 417.

6         Plaintiffs deflect based on technicalities.  They argue that they could not have "failed to reduce

7    the number of uninjured class members" because they did not previously "present the number of

8    uninjured *Class members*" to the court, having discussed only accounts.  Opp. 8.  But Plaintiffs'

9    promise was that the number of uninjured class members would fall significantly below the 10.3 million

10   figure for unharmed accounts.  Dkt. 666-1 at 14–15.  And it rose to approximately 11 million.  Plaintiffs

11   also try to keep the focus on the unharmed *percentage*, which fell from 7.9% to 5.9%.  Opp. 8, App'x

12   A.  One can question whether a fall by two percentage points—which at 5.9% still lands at the outer

13   edge of "the outer limit" of "5% to 6%" uninjured class members recognized by some courts—counts

14   as a significant decrease.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C.

15   Cir. 2019); *see* Mot. 17.  If anything, that still-high percentage confirms that the high raw count is not

16   just a function of Apple's large size.  Mot. 17; *contra* Opp. 16.  This is not the first federal class to have

17   hundreds of millions of members.  *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL

18   4212811, at *11 (N.D. Cal. July 22, 2020) (discussing classes with 110 million and 194 million

19   members).  It is, however, the first to have this many *uninjured* members.  Regardless, the raw number

20   of uninjured class members is more important than the percentage under *Olean* and Rule 23.  *See Olean*,

21   31 F.4th at 669 n.14.  The raw number is what determines whether the trial will be intractably bogged

22   down with individualized determinations.  Mot. 17.

23        Nothing in the Ninth Circuit's precedent suggests that a class with over 10 million uninjured

24   members should remain certified.  Plaintiffs rely on the part of *Olean* which held that a class may be

25   certified if it has *some* number of uninjured members.  *Olean*, 31 F.4th at 669; Opp. 8, 13–14.  But they

26   disregard *Olean*'s other teaching: that if the class "include[s] a *great number* of members who for some

27   reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined

28   too broadly to permit certification."  *Olean*, 31 F.4th at 669 n.14 (emphasis added).  And a class with

1  this number of uninjured persons seeking damages is impossible to reconcile with the Supreme Court's

2  holding that "[e]very class member must have Article III standing in order to recover individual

3  damages." *TransUnion*, 594 U.S. at 431.

4      Plaintiffs' attempt to explain away this portion of *Olean* runs headlong into both their own

5  economic theories and the Ninth Circuit's opinion.  Plaintiffs argue that because the uninjured class

6  members *could* "have been harmed" by Apple's conduct (though they were not), their presence in the

7  class does not count against certification.  Opp. 14.  But Plaintiffs' economic model finds that class

8  members who bought certain products suffered "negative damages."  Dkt. 1003-12 (May 14, 2025

9  McFadden Dep.) 240:12–241:2.  Thus, these class members could *not* have been damaged, because

10  they paid *less* than they would have but for Apple's conduct.  *See* Mot. 11.  Nor is it correct, as a matter

11  of law, that a class member "could not have been harmed" under *Olean* only if she was not "exposed

12  to" the defendant's conduct.  Opp. 14.  This distinction is contradicted by *Olean*, whose lead example

13  of when uninjured plaintiffs doom a class was where certain class members bought a product after

14  viewing a misleading advertisement but "learned that the advertising was misleading before purchase."

15  *Olean*, 31 F.4th at 669 n.14.  Those class members were no less "exposed to" the challenged conduct

16  than the uninjured consumers here who made app purchases but did not pay an inflated price.  *Id.*

17      *Ruiz Torres* says nothing different.  *Contra* Opp. 15 n.8.  It held that class certification was "not

18  necessarily defeat[ed]" when certain class members, for "fortuitous" reasons, were not harmed but

19  could be "winnow[ed] out."  835 F.3d at 1137.  Here, millions of class members went uninjured because

20  of the underpinning economics of Plaintiffs' pass-through theory—not by fortuitous happenstance.

21  *Ruiz Torres* does not say that a class may be certified whenever there is unlawful conduct, no matter

22  how many class members were unquestionably unharmed—a conclusion that would be incompatible

23  with *Olean*.[3]

24

25

26  [3] Moreover, in *Ruiz Torres*, the defendant had "accepted for the sake of argument[ ]that every class member was exposed to 'unlawful conduct.'"  *Williams v. Apple Inc.* 338 F.R.D. 629 (N.D. Cal. 2021).

27  But in an antitrust case like this one, the Plaintiffs must show actual injury, not mere exposure.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339–340 & n.8 (1990) (assuming that an

28  antitrust violation "distort[ed]" competition, and explaining that nonetheless, "[t]he antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity").

Gibson, Dunn & Crutcher LLP

1    If Plaintiffs believe that no number of "undamaged class members defeats class certification,"

2    Opp. 14, then their prosecution of this case has been inexplicable. Their only stated reason for applying

3    the $10 spending limit was to reduce the number of undamaged class members. Dkt. 666-1 at 15; Mot.

4    19. On Plaintiffs' present theory, those gymnastics were for nothing. For that matter, it is not clear

5    why Plaintiffs are still touting the percentage of unharmed class members. As they ultimately must

6    concede, their current theory implies that even a high "*percentage* of class members who eventually

7    are proven to lack damages" would not be fatal to certification. Opp. 14 (emphasis added). On their

8    view, a class with 50% uninjured members would be fine. The law does not work this way.

9    ### 3.    Plaintiffs' Noneconomic Injury Theory Does Not Rescue The Class

10    Plaintiffs cannot paper over the above failings by arguing that the 10 million-plus class

11    members who purportedly paid less money thanks to Apple's alleged anticompetitive conduct were

12    nonetheless harmed because they had less choice. Plaintiffs concede that these consumers are not

13    entitled to damages based on this diminished choice; they argue only that the lack of choice establishes

14    antitrust injury. Opp. 17; *accord Olean*, F.4th at 665–66 (injury and damages are distinct elements of

15    an antitrust claim). So even if reduced choice sufficed for antitrust injury, Plaintiffs would still fail to

16    prove *damages* on a classwide basis, which is reason alone why decertification of their 23(b)(3)

17    damages class is necessary. *See* Order, Dkt. 981 at 2 ("Plaintiffs did not move to certify an injunctive

18    class.").

19    Regardless, Plaintiffs' theory about diminished choice does not establish even injury on a

20    classwide basis, leaving the Court without a "common contention" whose "truth or falsity will resolve

21    an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

22    Not every consumer was injured by less choice, because many consumers prefer the status quo. Even

23    Plaintiffs' own expert found that 40% of users would not buy any apps from outside the App Store

24    when given the option. Dkt. 1003-26 (Hoyer Rebuttal Rep.) ¶¶ 33–36, Fig. 5; *see* Mot. 18. Plaintiffs

25    do not explain how these consumers could have been harmed insofar as Apple's alleged conduct

26    prevented a design feature they would actively *not* choose. Lack of choice is not intrinsically an injury.

27

28

1   *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201–02 (9th Cir. 2012).[4]

2          None of Plaintiffs' other cases says otherwise. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d

3   367, 370, 368, 374 (9th Cir. 2003), and *Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426, at *3,

4   *11 (E.D. Cal. May 12, 2023), were lawsuits by individual plaintiffs who unquestionably wished to be

5   free from the defendants' conduct.  They do not address the issue here, where a significant portion of

6   the class prefers the status quo.  And in *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 803–04 (N.D.

7   Cal. 2022), the plaintiffs plausibly alleged a concrete antitrust injury when they claimed that reduced

8   competition gave the defendant leverage to extract "personal information" from each user.  In each of

9   these cases, the plaintiffs coupled reduced choice with a concrete harm—which Plaintiffs have failed

10  to do.  Because some consumers value choice and others do not, the factfinder here will need to

11  determine this purported injury on an individual basis.  This mirrors the situation in *Asacol*, in which

12  class adjudication was held improper because "the only way to sort out whether class members would

13  have switched to a generic drug was through the testimony of 100% of the class members, and 'a trial

14  in which thousands of class members testify.'"  Opp. 15 (quoting *Asacol*, 907 F.3d at 42, 57–58).

15         Moreover, even if a given class member would have preferred more choice, to determine

16  whether she suffered a non-monetary injury in the form of decreased quality, the factfinder would need

17  to consider all factors that bear on quality, such as how Apple's policies *increased* privacy and security,

18  and balance any decreased quality against any monetary benefit.  Mot. 19.  Plaintiffs assert that such

19  weighing is improper, but their only authorities are off point.  Plaintiffs' quotation from *Epic* is not

20  about antitrust injury at all; it concerns anticompetitive conduct.  Opp. 18 (citing *Epic Games, Inc. v.*

21  *Apple Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023)).  And in *In re Lidoderm Antitrust Litig.*, 2017 WL

22  679367, at *21 (N.D. Cal. Feb. 21, 2017), the court stated that the defendants' overcharges could not

23  be offset by other benefits.  But here, many plaintiffs did not incur monetary damages.  And a class

24  member would not have incurred the non-monetary equivalent of an "overcharge" unless quality has

25  been reduced, which cannot be determined without considering both the alleged harms and benefits

26

27  ─────────────────────
    [4] Plaintiffs attempt to distinguish *Brantley* on the basis that it was a case about the anticompetitive-

28  conduct element of an antitrust claim, not the injury element.  Opp. 18.  But *Brantley* was about both
    elements: it held that "an agreement [which] has the effect of reducing consumers' choices … does not
    sufficiently allege an injury to competition."  675 F.3d at 1202.

1   from Apple's conduct. That is an intractable individualized inquiry. *Accord Rail Freight*, 934 F.3d at

2   623–27 (individualized inquiries for some 2,000 class members infeasible).

3   **B.     The Defined Class Is Not Superior And The Class Representatives Are Not Adequate**

4           In their attempts to suppress the number of uninjured class members, Plaintiffs excised millions

5   of consumers whom they believe incurred damages. This arbitrary splitting—in pursuit of an end that

6   Plaintiffs now say was not even necessary—confirms that Plaintiffs' class is not a superior way to

7   resolve this case and that Plaintiffs' interests do not align with those of the class.

8           **Superiority.** The defined class is not superior because it excludes millions of allegedly injured

9   plaintiffs based on the arbitrary cutoff that class members must spend $10 from one account. Mot. 19–

10  21. The Fourth Circuit's decision in *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925 (4th Cir. 2025),

11  explains why such a class definition cannot stand. There, the named plaintiffs tried to slim down their

12  class using thresholds whose sole purpose was to lower the number of uninjured class members. 2023

13  WL 5436178, at *5–6, 8 (M.D.N.C. Aug. 23, 2023). The Fourth Circuit rejected that move because it

14  "raise[d] a superiority problem." *Mr. Dee's*, 127 F.4th at 932. "[T]he criteria for class membership

15  b[ore] little relationship to the defendants' conduct." *Id.* And by excluding "thousands" of allegedly

16  injured plaintiffs, the class definition "might expose defendants to a continued trickle of individual

17  lawsuits," contrary to class actions' "efficiency goal." *Id.*

18          Here, too, the resulting class bears no relationship to Apple's conduct. Plaintiffs do not dispute

19  that their $10 threshold is irrelevant to their antitrust theories. *See* Mot. 19. Not only are the excluded

20  "claims against [Apple] substantially similar to those of other class members," but they are identical:

21  The excluded class members bought the same exact products, just fewer of them, or maybe even the

22  same quantity, spread across more accounts. *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2017

23  WL 4073792, at *2 (N.D. Cal. Sept. 14, 2017). That is "arbitrar[y]." *Id.* Plaintiffs try to distinguish

24  *Abante Rooter* on the ground that "there the plaintiffs' basis for excluding certain potential class

25  members was that they lacked 'readily available data' to identify them." Opp. 21. But that reason for

26  excluding class members is, if anything, more explicable than Plaintiffs' reasoning—to remove *other*

27  class members whom Plaintiffs believe are uninjured, even as they claim the number doesn't matter.

28  Also like in *Mr. Dee's*, Plaintiffs' arbitrary cutoff exposes Apple to more litigation. Plaintiffs attempt

1    to distinguish *Mr. Dee's* by noting that there, unlike here, "nearly 40% of potential [injured] class

2    members [were] excluded." Opp. 19. But, as Apple has already explained, this distinction has no basis

3    in the court's reasoning. *See* Mot. 21. Plaintiffs do not venture to answer this point. Plaintiffs also

4    argue that the excluded class members could not bring a new class action under the statute of

5    limitations. Opp. 19. Apple agrees that any attempted class action would suffer numerous flaws. But

6    that does not mean an enterprising plaintiff will not try, and Apple may still need to expend substantial

7    resources to defeat such a case. And although the Ninth Circuit previously declined to exercise

8    discretion under Rule 23(f) to consider a loosely similar argument, Opp. 19, rejecting Apple's argument

9    today would create a circuit split given *Mr. Dee's*. This development in "procedural law" is "good

10   cause" to consider Apple's argument now. *Huckaby v. CRST Expedited, Inc.*, 2025 WL 987195, at *10

11   (C.D. Cal. Apr. 1, 2025).

12        **Adequacy.** Plaintiffs' readiness to discard millions of class members they think were injured

13   shows that they will not adequately protect all class members' interests. Mot. 21–22. They respond

14   that this is old news because they had already tossed aside many purportedly injured class members by

15   the time they sought certification. Opp. 21. But since then, Plaintiffs have discarded millions more

16   potential claimants, permanently extinguishing the claims of ███████ class members through their

17   iPod touch maneuver—███████ of whom they think were harmed. *See* Mot. 21–22; Dkt. 957-1 at

18   12. Plaintiffs' willingness to make this move *twice* is a damning pattern which proves they do not have

19   the class's best interests at heart. Plaintiffs invoke *Olean*, which endorsed "*refining* the class

20   definition" to make it less "over-inclusive," but it did not endorse using a hacksaw to throw out more

21   injured class members than uninjured ones. 31 F.4th at 669 n.14 (emphasis added). Plaintiffs also

22   assert they discarded the iPod touch claims because those claims "lacked merit." Opp. 22. But that is

23   not what they maintained at the time, *see* Mot. 22; Dkt. 953-8 at 6, and their unreasoned pivot only

24   highlights their readiness to throw their fellow consumers under the bus.

25        Plaintiffs' "demonstrated … willingness to abandon claims on behalf of … unnamed class

26   members" shows that they are not adequate class representatives. *Mays v. Tenn. Valley Auth.*, 274

27   F.R.D. 614, 622–24 (E.D. Tenn. 2011). In *Mays*, as Plaintiffs note, the class representatives were not

28   adequate because they had abandoned fellow plaintiffs' claims, a move which "*potentially* had res

1    judicata effect." Opp. 22 n.10 (emphasis added). This is worse: The new claims Plaintiffs have

2    abandoned are *definitely* doomed because they were dismissed with prejudice. Dkt. 981 at 1.

3    **C.    Plaintiffs Lack A Reliable Damages Model**

4        If Plaintiffs lack a reliable damages model, then they cannot show injury or damages on a

5    classwide basis and the class must be decertified. *Rail Freight*, 934 F.3d at 626 ("No damages model,

6    no predominance, no class certification."). This will be so if the Court rejects even one of the model's

7    critical inputs and design features. Mot. 22–25. With one exception, Plaintiffs do not dispute this.

8    They instead lead with a procedural objection: that Apple's argument is premature because the Court

9    has not yet rejected any of the model's inputs. Opp. 23. But if the Court does so in resolving any of

10   the pending *Daubert* and summary judgment arguments, then the class should be decertified.

11       Plaintiffs contest only one of Apple's arguments in substance. Their damages model calculates

12   damages compared to a hypothetical world in which Apple undertook none of the challenged conduct.

13   Mot. 23–24. The model assumes that Apple would have charged the same commission regardless of

14   the scope of Apple's conduct in the but-for world. *Id.*; Dkt. 1003-99 (Prince Rebuttal Rep.) ¶¶ 51–54.

15   The model's failure to separate theories of liability means that summary judgment against Plaintiffs on

16   any one of those theories dooms their entire case. *See Comcast*, 569 U.S. at 35–36. Plaintiffs respond

17   by parroting their expert's conclusory opinion that Apple's but-for rates would be the same regardless

18   of which of Apple's conduct had changed. Opp. 23. But as elaborated in the reply to Apple's summary

19   judgment motion, this argument is absurd. *See* Reply ISO MSJ § I.E.

20       Plaintiffs do not grapple with the implications of their model's brittleness. If the jury

21   disbelieves even one of Plaintiffs' assumptions, it will be unable to calculate damages. Mot. 24. And

22   if the jury returns any damages figure other than Plaintiffs', it will be impossible to fairly apportion

23   those damages because the Court will not know which aspect of Plaintiffs' analysis the jury found

24   lacking. This class must be decertified lest the Court have to engage in the "novel project" of "Trial

25   by Formula" that obscures individualized issues that preclude class treatment. *Dukes*, 564 U.S. at 367.

26                                    **III.  CONCLUSION**

27       The Court should grant Apple's motion to decertify the class.

28

1    DATED: September 23, 2025                    **GIBSON, DUNN & CRUTCHER LLP**

2                                                 By: _/s/ Cynthia E. Richman_
3                                                     CYNTHIA E. RICHMAN

4                                                 Cynthia E. Richman (*pro hac vice*)
                                                  crichman@gibsondunn.com
5                                                 Harry R. S. Phillips (*pro hac vice*)
                                                  hphillips@gibsondunn.com
6                                                 1700 M Street, N.W.
                                                  Washington, D.C. 20036-4504
7                                                 Telephone: 202.955.8234
                                                  Facsimile: 202.530.9691

8                                                 Theodore J. Boutrous Jr. (132099)
                                                  tboutrous@gibsondunn.com
9                                                 Daniel G. Swanson (116556)
                                                  dswanson@gibsondunn.com
10                                                **GIBSON, DUNN & CRUTCHER LLP**
                                                  333 South Grand Avenue
11                                                Los Angeles, CA 90071-3197
                                                  Telephone: 213.229.7000
12                                                Facsimile: 213.229.7520

13                                                Caeli A. Higney (268644)
                                                  chigney@gibsondunn.com
14                                                Julian W. Kleinbrodt (302085)
                                                  jkleinbrodt@gibsondunn.com
15                                                Dana L. Craig (251865)
                                                  dcraig@gibsondunn.com
16                                                Eli M. Lazarus (284082)
                                                  elazarus@gibsondunn.com
17                                                **GIBSON, DUNN & CRUTCHER LLP**
                                                  One Embarcadero Center, Suite 2600
18                                                San Francisco, CA 94111-3715
                                                  Telephone: 415.393.8200
19                                                Facsimile: 415.393.8306

20                                                *Attorneys for Defendant Apple Inc.*

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR