BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
[Additional counsel on signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' NOTICE OF FILING PER DKT. NO. 994**<br><br>The Honorable Yvonne Gonzalez Rogers |

1  Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence
2  ("Plaintiffs") hereby provide notice that, pursuant to this Court's Order Authorizing Filing of
3  Motions and Relieving Parties from Summary Judgment Pre-Filing Conference Requirement (Dkt.
4  No. 994), Plaintiffs are herewith filing the following unredacted documents:

| Exhibit No. | Description |
|---|---|
| 1 | Defendant Apple Inc.'s July 9, 2025 letter requesting permission to file a motion for summary judgment (Dkt. No. 986-1) |
| 2 | Defendant Apple Inc.'s July 9, 2025 letter requesting permission to file *Daubert* motions (Dkt. No. 986-2) |
| 3 | Plaintiffs' July 11, 2025 letter requesting permission to file *Daubert* motions (Dkt. No. 987-1) |

DATED: October 6, 2025

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**

By:   /s/ Rachele R. Byrd
        RACHELE R. BYRD

RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES M. WEBSTER (*pro hac vice*)

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX P. TREIGER (*pro hac vice*)
CAROLINE A. SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Class Counsel for Plaintiffs*

**EXHIBIT 1**

**GIBSON DUNN**

Cynthia Richman
Partner
T: +1 202.955.834
M: +1 202.701.3424
CRichman@gibsondunn.com

July 9, 2025

VIA CM/ECF

The Honorable Yvonne Gonzalez Rogers
U.S. District Court for the Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street
Oakland, CA 94612

Re:   *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.)

Dear Judge Gonzalez Rogers:

Pursuant to Section 9 of this Court's Standing Order, Apple Inc. ("Apple") respectfully requests a pre-filing conference regarding Apple's anticipated motion for summary judgment in this matter. Subject to the Court's availability, Apple proposes holding the conference on **July 18, July 22, July 30, or August 1, 2025, at 2:00 p.m. PT.**[1]

Apple intends to seek summary judgment on Plaintiffs' Sherman Act Section 2 monopolization and attempt claims, which allege that Apple violated the law by "designing the iOS Devices operating system as a closed system and installing security measures and program locks," "establishing the App Store as the exclusive worldwide distributor of iOS apps" and "terminating or threatening to terminate apps developers who sell apps in competition with Apple." Third Amended Compl. ("TAC") ¶¶ 79, 84. Unlike in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd*, 67 F.4th 946 (9th Cir. 2023), Plaintiffs bring no Section 1 or Unfair Competition Law claim and do not challenge Apple's in-app purchase requirement or its former anti-steering provisions. Plaintiffs' Section 2 claims raise no genuine disputes of material fact.

***First***, Plaintiffs' Section 2 claims fail at the threshold because they are based on a single all-apps "retail" aftermarket that is one-sided. But the markets in which the alleged conduct takes place must be defined as two-sided and, because the App Store is a two-sided transaction platform, must include only app transactions. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 545–47 (2018); *see also Epic Games*, 67 F.4th at 985, 1000–01 (identifying a distinct game app transaction market). Plaintiffs assert no alternative two-sided market for transactions, so summary judgment for Apple is appropriate. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995).

---

[1] Apple is submitting a separate request for a pre-filing conference at the same dates and time to discuss anticipated *Daubert* motions. Consistent with the Court's May 30, 2025 guidance that it will "rule on the [decertification motion] once [it] receive[s] it," Dkt. 980 at 16:1–2, Apple intends to file a motion to decertify, *see also* Dkt. 957-1 at 11–17 (Apple previewing fatal flaws in class). Apple is, of course, happy to submit a pre-filing letter for that motion if the Court wishes, and will in any case be prepared to discuss it at the pre-filing conference as necessary.

**GIBSON DUNN**

***Second***, Plaintiffs' Section 2 claims challenge Apple's consistent policy of refusing to deal with developers who seek to open competing iOS app marketplaces or similarly compete with Apple's App Store.[2] Under settled Section 2 law, Apple has "no antitrust duty to deal with its competitors," and "certainly . . . no duty to deal under terms and conditions that" its rivals "find commercially advantageous." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Plaintiffs can establish none of the prerequisites to a duty to deal. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020). Apple has never had a prior course of dealing with third-party app stores on the iOS platform (whether allowing them in the App Store or on the iPhone via sideloading), which alone compels summary judgment.[3] *See id.* at 993. In *New York v. Facebook, Inc.*, a virtually identical policy whereby Facebook refused to deal with (or terminated) developers whose apps competed with Facebook's own platform was upheld. Such a policy was "plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing." 549 F. Supp. 3d 6, 28 (D.D.C. 2021), *aff'd, New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023); *see also* Order, *In re Google Play Store Antitrust Litigation*, No. 20-cv-5671, Dkt. 491 at *1 (N.D. Cal. October 20, 2023) (granting partial summary judgment on claims that Google Play barred rival app marketplaces). Moreover, Plaintiffs' theory would impose an unprecedented and legally invalid duty on Apple to license its intellectual property to rivals for use in competing app marketplaces. *See Epic Games*, 559 F. Supp. 3d at 1050 n.626 (noting that Apple's argument against compelled licensing of IP "appears meritorious").

***Third***, Plaintiffs' challenge to Apple's design of a "closed" system with security measures and locks, *see* TAC ¶¶ 79, 84, is not actionable under Section 2.[4] This challenge too fails under the refusal to deal precedent. Regardless, product-design decisions "that improve[] a product by providing a new benefit to consumers" are lawful. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998, 1000 (9th Cir. 2010); *see Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544–45 (9th Cir. 1983). Apple's product-design restrictions were not challenged by Epic for good reason. *Epic Games*, 559 F. Supp. 3d at 1034 n.599.

---

[2] *See* TAC ¶¶ 79, 84; Stiglitz Mar. 7, 2025 Rep. ¶¶ 69–71, 120; Stiglitz May 30, 2025 Dep. at 114–15 ("Q: In your opinion is it anticompetitive conduct for Apple to refuse to deal with developers who sell iOS apps outside the App Store?  A: . . . [Y]es."); Stiglitz June 25, 2025 Dep. at 226–27 ("Q: You're aware that Apple has a policy of not allowing app stores in its own App Store; right?  A: That's right.  Q:  Is it your opinion that that policy is anticompetitive? . . . A: [Y]es.").  Apple is prepared to submit Prof. Stiglitz's excerpted liability report and testimony if helpful to the Court.

[3] Nor can Plaintiffs prove that "sacrific[ing] short-term benefits in order to obtain higher profits in the long run" is the "only conceivable purpose" of Apple's refusing to deal; or that "similarly situated customers" receive preferential treatment. *Qualcomm*, 969 F.3d at 993–94.

[4] Plaintiffs allege that the iPhone's closed design has violated Section 2 "since June 2007," *i.e.*, since the iPhone's inception.  TAC ¶¶ 16, 31, 51.  Apple is entitled to summary judgment on such pre-App Store claims for the same reasons as discussed above; further, claims before July 10, 2008, the opening date for class membership, have been "abandon[ed]." *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000).

**GIBSON DUNN**

July 9, 2025
Page 3

Unilateral design decisions that have security benefits are lawful regardless of any impact on would-be rivals. "There is no room in this analysis for balancing the benefits or worth of a product improvement against its anticompetitive effects." *Allied Orthopedic*, 592 F.3d at 1000.

***Fourth***, Plaintiffs cannot prevail on their unpled theories targeting Apple's IAP mandate and former anti-steering rules. These theories have been raised for the first time in expert reports. This Court already rejected Plaintiffs' "belated request to reopen the pleadings," holding that their "argument that they intend to pursue the same claim decided in the Epic Games/Apple case is not consistent with their [then] proposed complaint which does not address any of those factual issues at all." Dkt. 573 at 7. Plaintiffs cannot circumvent that ruling by introducing the same or other unpled theories "identified only in [their] expert report[s]." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 (9th Cir. 2011); *see Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008). Adding such theories would be futile in any event because they too challenge refusals to deal on rivals' preferred terms. Further, Apple's restrictions on developers' payment-processing choices or on steering to alternative sales channels affect Plaintiffs only derivatively at best and such effects are "too remote" and speculative to support standing. *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001). For example, the Ninth Circuit previously held that assessing damages for developers at the first step "would require a protracted and speculative inquiry," thus making any such damages "not readily . . . calculable." *Epic Games*, 67 F.4th at 1003. Derivative consumer harm—dependent on intervening decisions by third party developers—is not the direct, non-speculative injury the antitrust laws require. *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541–43 (9th Cir. 1987).

***Fifth***, any theories based on in-app purchasing are also entirely or largely time-barred. Dkt. 228 at 4 (reserving statute of limitations defenses). In-app purchases were introduced in 2009, yet Plaintiffs did not mention them in their original Complaint, First Amended Complaint, or Second Amended Complaint. *See* Dkts. 26, 81, 111. If Plaintiffs are found to have timely raised any in-app purchase theories in the TAC, filed September 17, 2020 (*see* Dkt. 229), any damages under those theories must be limited to the four years preceding that date under 15 U.S.C. § 15b.

***Sixth***, Plaintiffs' damages model is legally insufficient even aside from the defects that will be documented in Apple's forthcoming decertification motion. The model assumes *all* of Apple's challenged conduct is unlawful and does not disaggregate the effects of any specific conduct. A damages model must "segregate the losses caused by acts which were not antitrust violations from those that were." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir. 2015). If Plaintiffs cannot "show[] . . . a clear connection between that which makes [the defendant's] conduct unlawful and an injury actually sustained," the Court must grant summary judgment for Apple because Plaintiffs have not furnished evidence to prove an "essential element" of their claims. *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1058 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984). Thus, summary judgment for Apple on *any* piece of this case would doom Plaintiffs' damages model, warranting summary judgment on the entire case.

***Finally***, Apple is entitled to summary judgment on the individual claims of named plaintiff Hayter. Hayter suffered no overcharge according to Plaintiffs' own damage model. *See* Dkt. 957-17 ¶ 19.

**GIBSON DUNN**

July 9, 2025
Page 4

Respectfully submitted,

/s/ *Cynthia E. Richman*

Cynthia E. Richman

*Counsel for Apple Inc.*

**EXHIBIT 2**

## GIBSON DUNN

July 9, 2025

Cynthia Richman<br>
Partner<br>
T: +1 202.955.834<br>
M: +1 202.701.3424<br>
CRichman@gibsondunn.com

VIA CM/ECF

The Honorable Yvonne Gonzalez Rogers
U.S. District Court for the Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street
Oakland, CA 94612

Re:   *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.)

Dear Judge Gonzalez Rogers:

Apple Inc. ("Apple") respectfully requests a pre-filing conference regarding anticipated *Daubert* motions to exclude opinions of two of Plaintiffs' 12 expert witnesses: (i) Mr. Darryl Thompson and (ii) Prof. Alan MacCormack (including reliance on those opinions by other experts).  *See* Dkt. 940 at 2 n.1.  Apple reiterates and preserves its objections to the opinions and methodologies of Prof. Daniel McFadden (now implemented by Dr. Minjae Song) and Dr. Rosa Abrantes-Metz, which are largely unchanged from the class certification phase and remain inadmissible for the same reasons.  *See* Dkts. 476-11, 581-4, 688-1.  Apple also reserves the right to object at trial and/or move *in limine* against or to strike the admission of expert opinions that do not comply with the Federal Rules of Evidence or Civil Procedure.

**Grounds for Excluding Opinions of Mr. Darryl Thompson:**  The Court certified a class on the assumption that Plaintiffs' expert would "match the Apple identification numbers he has with *actual consumers* to ascertain class members."  Dkt. 789 at 1.  But Plaintiffs disclosed no such expert when the deadline arrived.  Instead, Dr. Song sought to rely on a six-page declaration from Darryl Thompson of the claims administration firm JND, asserting that he had done so.  Mr. Thompson has no qualifications, expertise, or experience in statistics or data science—his day job instead involves reducing duplicate class notice mailings and processing class claims.  Nevertheless, he asserts that he has performed the complex task of deduplicating Apple's payor records to identify unique, individual payors to be associated with every App Store transaction.  That is, he claims to have developed a method to determine whether (for example) "Jon Smith" in one payor record is the same person as "Jonathan Smith" in another but not "Jon R. Smith" in a third—and had supposedly repeated that task for more than one billion potential payors.

After repeated inquiries from Apple, Plaintiffs belatedly conceded that Mr. Thompson's declaration should be treated as an expert report.  But despite the requirement to provide relied-upon data in a way that allows replication of results, *see* Dkt. 201; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995), Plaintiffs sought to shield Mr. Thompson's methodology from Apple, claiming it as "source code" proprietary to JND that could be viewed only in person at JND's office in Seattle.  After Apple told Plaintiffs it would move to compel, Plaintiffs finally produced Mr. Thompson's backup data to Apple's experts in San Francisco, 71 days late.  That production revealed an arbitrary, error-ridden, and unreliable "methodology" that fails to satisfy standards that would be met by a qualified expert in statistics and data science.  As explained by Apple's expert, Prof. Victoria Stodden, a statistician and data science professor at the University of Southern California:

- Mr. Thompson's supposed "methodology" is no such thing—it is guesswork based on his own uninformed judgment.  Mr. Thompson cites no literature whatsoever and ignores

- widely accepted scientific methods for data cleaning and deduplication. He has not assessed the error rate of his method and is not aware of any way such an assessment could be made. His methods have never been peer reviewed or tested in the field, and no court has admitted them as expert analysis. Nor are they replicable: the code that Mr. Thompson used and produced to Apple differs significantly from the method described in his report and deposition; his code does not reproduce the results he purports to have found; and Mr. Thompson did not record and does not even remember what parts of his code he used at different parts of his analysis.

- Mr. Thompson makes many elementary data mistakes, sometimes splitting up records for a single person into multiple purported payors and sometimes grouping multiple, different individuals into a single purported payor. For instance, he concludes that (named Plaintiff) "Robert Pepper" and "Rob Pepper" are different payors even though they share the same address, phone number, and payment method. By contrast, Mr. Thompson identifies a single "payor" with over 40,000 different records, many with different last names, addresses, phone numbers, and payment methods, the only commonality among all of them being the first name "Kim."

- Mr. Thompson used the wrong definition of payor. Instead of seeking to identify individuals who spent money on transactions, Mr. Thompson "was not aware of anything that suggests that [a payor has to use] their own credit card" as opposed to someone else's. This leads to absurd results—Mr. Thompson counts my own adolescent daughter, using my credit card, as a separate payor from me. In addition, more than 22% of "payors" using credit or debit cards appear to use a card that is also attributed to another "unique payor."

For these and other reasons, the true number of payors may be higher or lower than what Mr. Thompson finds (indeed, the number in his report, about 246 million, is inexplicably 3 million more than in the backup data he produced). While his method may be sufficient for his usual business of reducing duplicate class notice mailings, it is wholly inadequate for reliably identifying unique payors who are potential class members. *See*, *e.g.*, *Sonneveldt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *1–2 (9th Cir. Dec. 30, 2024) (affirming exclusion of expert who "failed to provide sufficient facts and data to support every necessary link in his theory" and "did not satisfactorily explain or support the methodology he employed"); *Dueker v. CSRT Expedited Inc.*, 2020 WL 7222095, at * 4 (C.D. Cal. Dec. 7, 2020) (excluding data expert where method was "not peer-reviewed," was "unnecessarily difficult, if not impossible, to test or replicate," and "fail[ed] to explain critical assumptions underlying his opinions" or "address data anomalies").

**Grounds for Excluding Opinions of Prof. Alan MacCormack:** Apple also seeks leave to exclude Prof. MacCormack's opinions about developers' gross profit margins. To estimate damages, Prof. McFadden's model needs to estimate consumers' price sensitivity. The model does this through a regression analysis using the App Store transactions data and developer cost data. *See* Dkt. 688-1 at 19–20. At class certification, the Court criticized the developer cost data Prof. McFadden used in his model—which then comprised "the financial records of six developers"—as "not fulsome" and stated that it "would expect a more fulsome analysis or reliance on an industry expert for purposes of trial." Dkt. 630 at 10 n. 8; *see also* Dkt. 789 at 13 (similar).

Plaintiffs have now turned to a new expert, Prof. MacCormack, who is an adjunct professor at Harvard Business School. He claims to analyze developer cost and revenue data subpoenaed by

July 9, 2025<br>Page 3

Plaintiffs to come up with ranges of developer gross margins in each App Store genre (or in genre groupings of Prof. MacCormack's invention). Dr. Song inputs these ranges into Prof. McFadden's damages model supposedly to "refine" its estimates of price sensitivity. But the data underlying Prof. MacCormack's opinions are no more fulsome than Prof. McFadden's, and his opinions in any event are untethered to the facts or his expertise.

First, his opinions are not "based on sufficient facts or data." Fed. R. Evid. 702(b). Prof. MacCormack estimates separate gross margin ranges for 13 App Store genres (or invented genre groupings). Each contains *thousands* of diverse developers, but Prof. MacCormack extrapolates from a tiny handful—including just six in the Games genre (by far the biggest source of spending) and only five in the major Music + Entertainment grouping. His arbitrary genre groupings even leave some critical categories missing; for instance, he lacks any developer data from social media developers to opine about the average profits for "Social Networking + Lifestyle" apps. Prof. MacCormack makes no claim that his collections of developer data are a statistically valid sample or otherwise representative for any genre group—in fact, he does not even know how Plaintiffs selected which developers to subpoena.

Second, in any event, Prof. MacCormack's opinions are not "relevant to the task at hand" because he measured the wrong costs for Prof. McFadden's model. *Daubert*, 43 F.3d at 1315. Prof. McFadden's model assumes developers set prices based on their marginal costs—i.e., the increase in cost from producing one more unit of output. Prof. McFadden agreed in deposition that the "unit of output" in his model, for which marginal costs must be estimated, is an additional app download or in-app purchase. But Prof. MacCormack conceded he does not understand the model or its inputs, and received no guidance from Prof. McFadden or Dr. Song. As a result, his margin ranges are based on developers' costs *per user*, not per transaction—an irrelevant measure misfit to estimating consumer demand in the McFadden-Song model, as Prof. McFadden himself admits.

Prof. MacCormack's opinions are the dominant input in the McFadden-Song model. Dr. Song testified that Prof. MacCormack's "margin bounds" are an inseparable part of the model. And Apple's expert, Prof. Mark Watson, finds that the model's price sensitivity regression spews nonsense without the bounds. The model thus requires relevant and statistically reliable margin bounds, but Prof. MacCormack has not provided these. Worse, these unreliable bounds force the model to produce false damages estimates—never less than $16 billion. Prof. Watson shows that it is the bounds, and not the billions of App Store transactions, that drive Plaintiffs' damages by providing the model's results when completely random numbers are used instead of actual transactions data. *See Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315–16 (excluding damages model where consumer demand estimates relied on insufficient and irrelevant data); *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (similar).

***

Apple proposes filing *Daubert* motions as to Mr. Thompson and Prof. MacCormack not exceeding 15 pages per motion. Subject to the Court's availability, Apple requests a pre-motion conference on **July 18, July 22, July 30, or August 1, at 2:00 p.m. PT**, concurrent with a pre-filing conference on Apple's anticipated motion for summary judgment. *See* MSJ Pre-filing Letter.

Respectfully submitted,

*/s/ Cynthia Richman*
Cynthia E. Richman, *Counsel for Apple Inc.*

# EXHIBIT 3

# WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE
NEW YORK, NY 10016
212-545-4600

SYMPHONY TOWERS
750 B STREET - SUITE 1820
SAN DIEGO, CA 92101
619-239-4599

**MARK C. RIFKIN**
DIRECT DIAL: 212-545-4762
FACSIMILE: 212-686-0114
rifkin@whafh.com

July 11, 2025

VIA ECF
Hon. Yvonne Gonzalez Rogers
U.S. District Court for the Northern District of California
Oakland Courthouse, Courtroom 1 – 4th Floor
1301 Clay Street Oakland, CA 94612

     Re:   *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)

Dear Judge Gonzalez Rogers:

     We represent Plaintiffs in the above-referenced action. Pursuant to Section 9 of this Court's Standing Order, Plaintiffs respectfully request a pre-filing conference regarding anticipated *Daubert* motions to exclude the opinions of four of Defendant's ten expert witnesses: (1) Arun Sundararajan, (2) James E. Malackowski, (3) J. Alex Halderman, and (4) Jonah Berger.

     ***First***, Prof. Sundararajan lacks the "specialized knowledge" required to offer his proffered opinions. Fed. R. Evid. 702(a). His reports cover at least 25 topics, including antitrust market definition, market power, tying, competition, privacy, security, app reliability, substitute platforms, the hypothetical monopolist test, economic modeling, and damages. Most of those opinions require expertise in economics, yet Prof. Sundararajan does not have a Ph.D., Masters, or Bachelor's degree in economics. His CV states that he is only a Professor of "Entrepreneurship and Technology." His CV reflects no expertise in competition economics, econometrics, or economic modeling. He does not demonstrate expertise in any of those areas, has never been hired to perform economic modeling in litigation, and has never built a damages model or quantified economic damages. In fact, no court has ever deemed him an expert economist. Indeed, when confronted with his lack of credentials to offer his many economic opinions, Prof. Sundararajan admitted he is a "self-proclaimed economist." Sundararajan Dep. Tr. 53:18-20.

     Prof. Sundararajan also has no qualifications as an antitrust expert. He has never published peer-reviewed research on market definition, market power, or tying. This case marks the first time that he has evaluated a hypothetical monopolist test. Prof. Sundararajan also lacks expertise in app reliability and security and platform operations. He admitted he is not a privacy expert and has never written about data privacy. His CV shows no qualifications in these fields, either. He admits he lacks the "technical knowledge" necessary to understand basic App Store operations.

Hon. Yvonne Gonzalez Rogers
July 11, 2025
Page 2

Prof. Sundararajan also offers several opinions that merely parrot the opinions of Apple's other experts. This testimony involves no application of principles and methods, and is not the product of any such principles and methods. It should be stricken under Rules 702(c) and (d).

**Second**, Mr. Malackowski's opinions are not the product of reliable principles and methods, and do not reflect a reliable application of the principles and methods to the facts. *See* Rules 702(c)-(d). Mr. Malackowski, a CPA who has been proffered as an expert in intellectual property, has been precluded from offering opinions (in whole or in part) ***no fewer than 20 times*** in 12 years. This Court should be the twenty-first.

For starters, Mr. Malackowski's opinions about Apple's "substantial investments" in IP are unsupported by any attempt to allocate Apple's global research and development costs to the App Store. He merely counts the number of Apple's patents and relies on that total to conclude that Apple has substantial IP relating to the iOS operating system and the App Store. Other than addition, his opinions are not quantified in any meaningful way. Importantly, he does not connect that IP to Apple's monopoly or its App Store commission.

Mr. Malackowski next opines that Apple's brand value somehow reinforces its IP values. But he conducts no analysis himself, and merely parrots third-party valuations. Nor does Mr. Malackowski tie those third-party estimates to Apple's monopoly or its 30% commission. Although neither an economist nor an econometrician, Mr. Malackowski criticizes Plaintiffs' experts' modeling of the But-For World based on several hypothetical counter-factual possibilities, but he makes no attempt to determine their likelihood or model their impact.

Mr. Malackowski lastly offers several legal opinions about Apple's purported "rights" as an owner of IP, including its purported "exclusive right" to "set" the terms on which developers can use Apple's IP. These are inadmissible legal opinions that usurp the Court's role. *See* Rule 702(a).

**Third**, Prof. Jonah Berger's opinions should be excluded under Rules 702(a), (c), and (d). For starters, Prof. Berger lacks the expertise needed to offer the opinions contained in his rebuttal report. *See* Rule 702(a). While he has been an expert in this case for more than four years, he offers for the first time, in his rebuttal report, opinions regarding whether (1) iOS device purchasers consider or attempt to estimate the lifecycle costs of apps and in-app purchases, and (2) the non-monetary costs of switching away from iOS mobile devices. Yet, Prof. Berger lacks any specialized knowledge or expertise to offer those opinions. He has not published any papers on non-monetary switching costs or lifecycle costs, and has not conducted any research on present bias or the default effect (which are behavioral biases that Plaintiffs' expert, Prof. Chen, analyzes). *See* Berger Dep. Tr. 45:10-18; 48:1-15. In fact, Prof. Berger could not even provide a definition of "non-monetary switching costs" or provide an example. *Id.* at 49:9-10; 101:22-102:19.

Even if Prof. Berger were qualified to testify in these areas, he has performed no analysis, followed no recognized methodology, and applied no known standards to form his opinions. *See* Rules 702(c)-(d). Regarding lifecycle costs, he merely reviewed "literature cited by Professor Chen," Plaintiffs' behavioral economics expert, and Prof. Wayne Hoyer, Plaintiffs' survey expert, without conducting any actual analysis of his own. Likewise, Prof. Berger admits he "was not

Hon. Yvonne Gonzalez Rogers
July 11, 2025
Page 3

asked to conduct my own independent analysis" of non-monetary switching cost, and he has not done so. Berger Dep. Tr. 50:13-14. He merely read the opening report of Prof. Chen, reviewed the academic literature cited therein, and cited other literature that he argues contradicts Prof. Chen's opinions. That "analysis" is unreliable and unhelpful to the jury. *See* Order at 30, *Stitch Editing Ltd. v. TikTok, Inc.*, No. 2:21-cv-06636-SB-SK, Dkt. No. 379 (C.D. Cal. Jan. 26, 2023) (excluding expert's "critiques that could equally be made by counsel through cross-examination or in closing argument.").

*Lastly*, Plaintiffs seek leave to file a fourth *Daubert* motion as to Prof. Halderman's opinions supporting Apple's privacy defense, which are not "the product of reliable principles and methods." Fed. R. Evid. 702(c). Prof. Halderman never defines "privacy" in his report, making it impossible to tell what (if any) generally accepted privacy standards he is applying to Apple's operation of the App Store, or how those standards apply. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). The only source he cites containing any privacy definition is a 1967 book written by Prof. Alan F. Westin—but Prof. Halderman expressly disclaims reliance on Westin's own work after 1967. What's more, few or no scholars rely on Prof. Westin's framework today. The consensus among privacy scholars is that Prof. Westin's framework is not helpful for understanding whether a practice is a privacy violation. Indeed, the only scholar Prof. Halderman could think of that cites Prof. Westin's framework in literature today is Fourth Amendment scholar Prof. Orin Kerr (he doesn't). To the extent he relies on that inapt and outdated sixty-year-old privacy framework, Prof. Halderman has failed to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the [privacy] field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Young v. Cree Inc.*, 2021 WL 292549, at *9 (N.D. Cal. Jan. 28, 2021) (Gonzales Rogers, J.) (excluding expert testimony because the methods relied upon were not "generally accepted in the relevant engineering community"). His privacy opinions should therefore be excluded under Rule 702(c).

\* \* \*

For these reasons, Plaintiffs request leave to file *Daubert* motions to exclude Prof. Sundararajan's, Mr. Malackowski's, Prof. Berger's, and Prof. Halderman's testimony. Subject to the Court's availability, Plaintiffs respectfully request a pre-filing conference on **July 18, July 22, July 30, or August 1, at 2:00 p.m. PT**, concurrent with a pre-filing conference on Apple's proposed motions.

Respectfully yours,

Mark C. Rifkin

cc: All Counsel (via ECF)