# EXHIBIT 1

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **NO. 4:11-cv-06714-YGR** |
| | **Hon. Yvonne Gonzalez Rogers** |

REPLY REPORT OF

# ROSA M. ABRANTES-METZ, PH.D.

**13 JUNE 2025**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.   **Introduction** ...................................................................................................................... 1

II.  **The App Store's Commission Rate in a Competitive But-For World Would Have Been At Most 13.63%**............................................................................................................ 5

    A.   The 30% Commission Rates Cited by Apple's Experts Are Not Comparable Competitive Benchmarks .......................................................................................... 5

    B.   The Two-Tier Structure Is Consistent with a Supra-Competitive Commission Rate..... 21

    C.   Professor Hitt's Inclusion of Free Apps in the Average Commission Rate Is Mathematically and Economically Wrong ................................................................. 25

    D.   Alternative Monetization Strategies Cited by Apple's Experts Have Not Constrained App Store's Commission Rate .................................................................................... 28

    E.   Examples of Entry Cited by Apple's Experts Are Irrelevant and Have Not Constrained the App Store's Commission Rate ................................................................................ 34

    F.   Professor Sundararajan's Opinion that the App Store Is a Two-Sided Platform Does Not Affect My Estimated But-For Commission Rate ............................................... 39

    G.   The 13.63% Commission Rate in the But-For World Would Not Compromise App Security, as Implied by Professor Halderman ............................................................... 44

III. **New Evidence Produced by Apple Confirms My Previous Opinions** .......................... 47

**Appendix A : Materials Relied Upon** ............................................................................... 52

    A.1  Expert Reports........................................................................................................ 52

    A.2  Filings ..................................................................................................................... 53

    A.3  Depositions & Trial Testimonies ............................................................................ 53

    A.4  Produced Documents ............................................................................................. 54

    A.5  Publications ............................................................................................................ 54

    A.6  Other Public Sources ............................................................................................. 55

**Appendix B : Curriculum Vitae of Rosa M. Abrantes-Metz** ....................................... 60

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## I.   INTRODUCTION

1.  My name is Rosa M. Abrantes-Metz, and I am a Ph.D. economist specializing in applied industrial organization, econometrics and finance, with a particular focus on matters involving platforms and pricing benchmarks. I am a Managing Director at Berkeley Research Group, a global consulting firm providing economic, financial and analytical advice for a range of disciplines. I previously submitted a merits Opening Report in this matter on March 7, 2025, in which I disclosed my qualifications and the materials I relied on.[1] Appendix A lists the additional materials I relied on in preparing this Reply Report. Appendix B contains my updated curriculum vitae, which includes all my publications and testimony from the last four years. I am being compensated for my time in this matter at a rate of $1,325 an hour. This compensation does not depend on the outcome of this litigation.

2.  In my Opening Report, I have reached the following conclusions:[2]

    a.  The commission rate that would reasonably be expected to prevail in a competitive But-For World, absent Apple's alleged misconduct, can be determined using the evidence produced in this case.

    b.  The evidence produced demonstrates that, absent Apple's alleged anticompetitive conduct, Apple's App Store would have charged a single But-For commission rate that would not have exceeded 13.63% throughout the class action period.

    c.  A But-For commission rate of 13.63% would have allowed Apple's App Store to remain profitable and achieve an operating profit margin above 50%.

    d.  The But-For commission rate of 13.63% represents an upper bound, calculated using an economic model with conservative assumptions and inputs, and further supported by reasonably comparable benchmarks.

---

[1]   Expert Report of Rosa Abrantes-Metz, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Abrantes-Metz Opening Report").

[2]   Abrantes-Metz Opening Report, ¶ 17.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

e. Using more realistic but still conservative data inputs for market shares, costs and market size in the But-For World reduces the estimated commission rate to 12% or lower. Therefore, to the extent that the commission observed in the But-For World is a rounded integer, it would reasonably have been 12%, or at most 13%.

f. The relevant data for determining the But-For commission rate are from 2019 or earlier. Data from 2020 onwards are not suitable for assessing the commission rate that would prevail in a competitive long-term equilibrium, as they are distorted by the effects of the Covid-19 pandemic.

g. Even if recent post-Covid data were used to estimate the But-For commission rate, the resulting rate would increase by only about half a percentage point to 14.11%, which does not alter my opinion that 13.63% is a reasonable estimate.

3. In the expert declarations filed on March 7, 2025, Apple's experts presented several opinions that disputed my conclusion that, in a competitive But-For World, Apple's App Store would have charged a commission rate no higher than 13.63%. In this report, I focus exclusively on such opinions that are relevant to my analysis. In particular, I address the following points raised by Apple's experts:

a. Professor Hitt and Professor Jin argue that the App Store's current commission rate is not supra-competitive.[3] Relying on largely the same evidence (and with Professor Jin often citing Professor Hitt for support), they advance several arguments in support of this claim:

i. They point to other platforms with similar commission rates and argue that, therefore, a 30% commission rate is not supra-competitive because it is not unique. However, that is a logical non-sequitur, and in fact these other platforms are either not comparable due to different business models or operate in markets that are themselves not competitive (Section II.A).

---

[3] Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Hitt Opening Report").

Opening Expert Report and Declaration of Ginger Jin, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Jin Opening Report").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

ii. They claim that the App Store's commission rate has declined over time. This conclusion is misleading, as any observed reductions are better understood as price discrimination strategies aimed at extracting additional monopoly rents (Section II.B).

iii. Professor Hitt (though not Professor Jin) claims that the effective commission rate has substantially decreased when free apps are included in the calculation. However, his argument relies on a mathematically flawed and economically meaningless metric (Section II.C).

iv. They assert that developers can circumvent the App Store's commission through alternative monetization strategies and, therefore, Apple's commission rate is constrained to competitive levels. However, that is a logical non-sequitur, and in fact these strategies are often either unavailable or economically unviable for most developers. These limited attempts to bypass the commission are themselves evidence that the rate is supra-competitive (Section II.D).

v. They contend that entry by platforms outside the iOS environment constrains Apple's ability to charge a supra-competitive rate. However, they cite to no examples of entry in the iOS environment, where Apple has consistently earned extraordinary profit margins (Section II.E).

b. Professor Sundararajan characterizes the App Store as a two-sided platform and argues that ignoring its two-sided nature can lead to erroneous economic conclusions.[4] However, my methodology remains valid regardless of whether the App Store is considered multi-sided, so this characterization does not contradict my analysis. In fact, Professor Sundararajan accepts the same price and profit structure assumed in my model – namely, that the App Store charges developers a commission as a percentage of billings, while consumers are not charged – without presenting any evidence that either side receives a subsidy (Section II.F). Several of Professor Sundararajan's points are related to arguments made by Professor Hitt and Professor Jin, which I address together in Sections II.A to II.E.

---

[4] Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Sundararajan Opening Report").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

c.  Professor Halderman provides a technical report describing the App Store's security system and argues that Apple's conduct is pro-competitive because it protects user safety.[5] A key claim is that alternatives to centralized distribution – specifically, sideloading via direct downloads or "unofficial" third-party app stores – would expose users to harmful apps. While I do not take a position on Apple's specific security features, I disagree with the implication that introducing competition for the App Store on iOS devices would inherently compromise user safety. This concern reflects a fundamental misunderstanding of the relevant competitive But-For World. In the But-For World I analyze, a rival app store could offer the same or equivalent security features as the App Store. My model, in fact, assumes the entry of one competing app store offering the same technical and policy safeguards as Apple's App Store currently provides. Furthermore, I assume that the competing app store operates under exactly the same cost structure as the App Store does currently, a cost structure which includes all current security-related App Store costs. I understand this is consistent with the opinions of Plaintiffs' privacy and security experts. Professor Halderman's testimony does not therefore undermine my economic conclusions (Section II.G).

d.  Professor Simonson has resubmitted the same survey evidence he previously presented during class certification.[6] To my understanding, the results and findings from these surveys, including the one used in my economic model, remain unchanged. My Opening Report already accounts for Professor Simonson's surveys, incorporates one of those surveys to calibrate my model and discusses their limitations. Since the substance of his analysis remains the same, I do not address Professor Simonson's merits report further herein.

e.  Finally, Mr. Malackowski's report focuses on intellectual property rights, particularly Apple's rights to determine its terms of use,[7] while Professor Berger's report addresses 99-pricing.[8] As neither of these reports are concerned with my analysis, I do not address them herein.

---

[5]  Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Halderman Opening Report").

[6]  Opening Expert Report and Declaration of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

[7]  Opening Expert Report and Declaration of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

[8]  Opening Expert Report and Declaration of Jonah Berger, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

4. In addition to my rebuttal of the opening reports and declarations submitted by Apple's experts in Section II, I also provide in Section III a brief discussion of new evidence that Apple produced after I submitted my Opening Report. I have reviewed this new evidence and find that it further supports the opinions and conclusions set out in my Opening Report.

5. After carefully reviewing the expert reports referenced above and the new evidence produced by Apple, I conclude that the opinions expressed in my Opening Report remain effectively unrefuted. To the extent that certain arguments or evidence are not addressed in this Rebuttal Report, that should not be interpreted as my agreement with such arguments. My conclusions may be updated if new relevant information becomes available.

## II.     THE APP STORE'S COMMISSION RATE IN A COMPETITIVE BUT-FOR WORLD WOULD HAVE BEEN AT MOST 13.63%

6. In this Section, I rebut several claims made by Apple's experts – Professor Hitt, Professor Jin and Professor Sundararajan – regarding the alleged competitiveness of App Store's commission rate in the actual world. These claims are inconsistent with my conclusion that, in a But-For World where Apple's App Store faced competition from a rival store of comparable quality, Apple would have charged a uniform commission rate no higher than 13.63% throughout the class period. As discussed below, Apple's experts rely on flawed and biased reasoning: they selectively cite non-competitive benchmarks, present internally inconsistent and unsupported arguments and, in at least one instance, rely on a mathematically and economically invalid calculation. I also address Professor Halderman's opinion that competition in the But-For World would come at the expense of app security.

### A.     THE 30% COMMISSION RATES CITED BY APPLE'S EXPERTS ARE NOT COMPARABLE COMPETITIVE BENCHMARKS

7. Apple's experts argue that the App Store's headline 30% commission rate is not supra-competitive because it aligns with the rates charged by "almost all other platforms."[9] In particular,

---

[9]  "From the beginning of the Class Period and continuing for several years, almost all platforms (…) charged a 30 percent headline commission rate." Hitt Opening Report, ¶ 245.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Professor Hitt claims that – aside from a few exceptions – the 30% rate has been broadly consistent with those charged by a wide range of app transaction platforms throughout the class period, including:[10]

a.  Mobile app stores, such as Google Play, Amazon Appstore and Samsung Galaxy Store;

b.  PC platforms, such as GOG, Steam and the Mac App Store; and

c.  Game console marketplaces, including the Microsoft Store for Xbox, the Nintendo eShop and the PlayStation Store.

8.  Professor Jin and Professor Sundararajan make essentially the same argument as Professor Hitt, relying on the same set of comparators. Professor Jin states that "the evidence Professor Hitt presents in his report indicates that the App Store's commission rates have been in line with the commission rates charged by comparable app transaction platforms" and concludes this contradicts the claim that Apple charged supra-competitive rates.[11] Professor Sundararajan similarly argues that Apple's revenue-sharing model and initial commission rate were comparable to – or even lower than – those charged by other platforms, citing Steam and early gaming marketplaces like Xbox, PlayStation and Nintendo Wii.[12]

---

[10]  "[W]ith few exceptions, the App Store's headline commission rates are similar to the headline commission rates charged by other app transaction platforms throughout the Class Period and continue to be similar to the headline commission rates on the majority of app transaction platforms. (…) This includes app transaction platforms for Android devices and other mobile devices (such as Amazon Appstore, Google Play, and the Samsung Galaxy Store), app transaction platforms for personal computers (such as GOG, the Mac App Store, and Steam), and app transaction platforms for game consoles (such as the Microsoft Store for Xbox, Nintendo eShop, and the PlayStation Store), as well as the App Store." Hitt Opening Report, ¶ 245.

[11]  "[T]he evidence Professor Hitt presents in his report indicates that the App Store's commission rates have been in line with the commission rates charged by comparable app transaction platforms. That the App Store's commission rates are in line with the commission rates of comparable app transaction platforms is inconsistent with Plaintiffs' claims that Apple has been able to exercise market, or monopoly power to charge supra-competitive rates." Jin Opening Report, ¶ 143.

[12]  "This revenue sharing structure and level of commission rate set by Apple in 2008 was comparable to or lower than the commission rates charged by other app marketplaces. Revenue sharing models with associated commission rates of between 30 percent and 40 percent on apps have been common since the advent of online app distribution. Steam charged third-party developers a 40 percent commission rate in 2005 on sales of games to consumers. App marketplaces for gaming devices like Xbox, PlayStation, and Nintendo Wii, which began operations in 2005 and 2006, charged a commission rate of 30 percent." Sundararajan Opening Report, ¶ 130.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

9.  I note that in *Epic Games v Apple*, the Court found that Apple's challenged conduct "unreasonably restrains competition," enabling Apple to "extract supracompetitive commissions" and "reap supracompetitive operating margins."[13] The Court also found that Apple's decision to set a 30% commission rate was "set by historic gamble" and "not tied to the value of its intellectual property" or "to anything in particular."[14] These findings – which Apple's experts fully ignore – are consistent with my calculation of a But-For commission rate of 13.63%, which is substantially lower than Apple's 30% commission for the App Store.

10. Simply observing other platforms with similar (or even higher) commission rates does not establish that the Apple App Store's rate is competitive or supra-competitive. One would need to establish at a minimum that the other stores (i) are comparable in terms of business model; (ii) lack significant market power; and (iii) are operating in competitive or nearly competitive markets. The commission rates cited by Professor Hitt, Professor Jin and Professor Sundararajan are not valid comparators for the App Store, as already explained in detail in my Opening Report.[15]

11. Several of the referenced platforms have themselves been subject to antitrust scrutiny, and their pricing may reflect anti-competitive conduct rather than a competitive equilibrium. Moreover, most of these platforms operate under fundamentally different business models, making them unsuitable benchmarks. As I previously explained, and supported with evidence, these examples do not provide a reliable basis for assessing whether the App Store's commission is supra-competitive. I summarize and expand on those points again below.

12. *First*, the commission rates charged by mobile app stores in the Android environment are not valid competitive benchmarks and do not support the claim that a 30% commission is competitive. Several antitrust cases were brought against Google concerning the alleged monopolization of

---

[13]  Rule 52 Order After Trial on the Merits, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.), September 10, 2021, ECF No. 812 ("Rule 52 Order After Trial on the Merits, Epic Games v. Apple"), pp. 92 and 118.

[14]  Rule 52 Order After Trial on the Merits, Epic Games v. Apple, pp. 50 and 92.
Order Granting Epic Games, INC's Motion to Enforce Injunction, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), April 30, 2025 ("Order Granting Epic's Motion to Enforce Injunction"), p. 2.

[15]  Abrantes-Metz Opening Report, ¶¶ 177-184.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Android app distribution – with at least one case having proven anticompetitive conduct by Google. In the *Epic Games v. Google* litigation, a jury found that Google holds monopoly power in Android apps distribution and in-app billing services.[16] The verdict also concluded that all the alleged agreements – including "DDA agreements," "[a]greements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program," and "[a]greements with OEMs that sell mobile devices" – constituted unreasonable restraints of trade.[17]

13. Several other cases have been brought against Google alleging monopolization of the Google Play Store. These include a lawsuit led by the Attorneys General of multiple states – the Utah complaint[18] – as well as a consumer class action.[19] These cases were resolved through a combined settlement valued at $700 million.[20] The alleged conduct and effects identified closely mirror those raised by the consumer plaintiffs in this matter, namely:

   a. Google allegedly requires Android device manufacturers to pre-install and prominently display the Google Play Store on their devices.[21]

   b. Google allegedly entered into revenue-sharing agreements with Android device manufacturers, conditioned on not pre-installing rival app stores, and in some cases, even prohibiting user access to them.[22]

   c. Consumers who download apps from the Google Play Store must allegedly use Google Play Billing for all in-app purchases.[23]

---

[16] Verdict, *In Re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD (N.D. Cal.), December 11, 2023 ("Google Play Store Verdict"), pp. 3-4.

[17] Google Play Store Verdict, p. 5.

[18] Complaint, State of Utah et al. v. Google LLC et al., Case No. 3:21-cv-05227 (N.D. Cal.), July 7, 2021, ECF No. 1 ("State of Utah et al. v. Google, LLC et al., Complaint").

[19] Consolidated Consumer Class Action Complaint, *In Re Google Play Consumer Antitrust Litigation*, Case No. 3:20-CV-05761-JD (N.D. Cal.), December 28, 2020.

[20] "Google's total financial commitment under this Settlement Agreement shall be $700,000,000 (…)." Settlement Agreement and Release, *In Re Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981-JD, (N.D. Cal.), December 18, 2023. ¶ 5.2.

[21] State of Utah et al. v. Google, LLC et al., Complaint, 14:9-18.

[22] State of Utah et al. v. Google, LLC et al., Complaint, 13:26:15:2.

[23] State of Utah et al. v. Google, LLC et al., Complaint, 11:15-23.

d.  Google allegedly reached agreements with Samsung to reduce competition from the Samsung Galaxy Store.[24]

14.  Given that the Google Play Store and the Apple's App Store offer many similar apps and serve similar functions, the jury's finding that the Google Play Store holds monopoly power in the *Epic Games v. Google* case – together with similar allegations in the State of Utah and consumer class actions cases – is consistent with my conclusion that Apple's identical 30% commission rate is supra-competitive. Far from being a competitive benchmark, the comparison relied on by Apple's experts reinforces the view that App Store's 30% commission rate reflects market power, not competition.

15.  Moreover, other platforms selling Android apps do not provide appropriate competitive benchmarks either. Given Google's nearly 90% share of Android app and in-app purchases in the US,[25] Google had the ability to engage in actions that tainted and influenced the behavior of other platforms selling Android apps. These actions would have affected the pricing behavior of such platforms, meaning that neither Samsung nor Amazon serve as reasonable competitive benchmarks:

a.  One allegation in the Utah complaint against Google is that Google entered into agreements with Samsung to reduce competition from the Samsung Galaxy Store, which would have influenced how Samsung set its commission rates.[26] This Complaint alleges that Google attempted to "pay Samsung to abandon relationships with top developers and scale back competition."[27] Further, it alleges that Google "was willing to offer Samsung myriad benefits and concessions" on the condition that Samsung would "give up its direct commercial relationships in app distribution with consumers and developers" and grant the Google Play Store "exclusivity on the default home screen and the adoption of Android game device standards devised by Google."[28] All of these alleged agreements would have reduced

---

[24]  State of Utah et al. v. Google, LLC et al., Complaint, 44:4-11, 45:20-47:11.
[25]  State of Utah et al. v. Google, LLC et al., Complaint, 11:12-14.
[26]  Abrantes-Metz Opening Report, footnote 315.
[27]  State of Utah et al. v. Google, LLC et al., Complaint, 129:15-19.
[28]  State of Utah et al. v. Google, LLC et al., Complaint, 46:9-20.

9

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Samsung's ability to compete. Moreover, while the Samsung Galaxy Store previously applied a default 30% commission rate, its portal explicitly noted that this rate was negotiable.[29] Samsung recently updated its terms and conditions, currently charging a 15% commission for subscription-based revenues and 20% for all other revenue.[30]

b.  A similar issue applies to the Amazon Appstore, as the State of Utah complaint against Google alleges that Google took steps to limit its visibility and accessibility to consumers. Specifically, Google allegedly refused to list the Amazon Appstore on the Google Play Store, limiting its visibility and consumer access.[31] Additionally, in response to Amazon's entry, Google allegedly changed its policies to prevent Amazon from directing users from the Amazon shopping app to a browser to install the Amazon Appstore.[32] These actions would have limited any meaningful competition between the Google Play Store and the Amazon Appstore, reducing the incentives of both to compete on prices as they would have in a competitive market absent Google's conduct.

16.  *Second*, the defendant's experts also reference the commission rates of platforms for PC games – namely, Valve's Steam and GOG – as competitive benchmarks.[33] However, these platforms do

---

[29]  Abrantes-Metz Opening Report, footnote 315.

[30]  Samsung Galaxy Store Seller Portal, "Terms and Conditions," May 15, 2025, available at https://seller.samsungapps.com/help/termsAndConditions.as, ¶ 6.1.

[31]  "Google forces app developers, as a condition of appearing in the Google Play Store, to sign a non-negotiable Developer Distribution Agreement ("DDA"). Section 4.5 of the DDA prohibits developers from using "Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." In other words, no app on the Play Store may compete in the Android App Distribution Market. The DDA also gives Google the right to remove and disable any Android app that Google determines violates this agreement." State of Utah et al. v. Google, LLC et al., Complaint, 36:11-17.

[32]  "The original language of the [Developer Distribution Agreement] was limited to apps that had a 'primary purpose' of facilitating distribution of apps outside of Android market, which allowed some flexibility for developers to use the Play Store to distribute Android apps that also linked to apps that could be downloaded outside Google's app store. In 2012, however, when Amazon attempted to distribute its app store to consumers directly through its Amazon Store app, distributed on the Play Store, Google took swift action. Amazon used a browser within the app to direct users to a page to download Android application files, which use the extension '.apk.' This effectively allowed customers to download Amazon apps without going through the Play Store. […] Google eventually changed its policy in response to Amazon's Store app. […] Eventually, Amazon was forced to disable this functionality, and its app store was only available via sideloading, a process that makes it significantly harder to reach Android users." State of Utah et al. v. Google, LLC et al., Complaint, 37:1-16.

[33]  Hitt Opening Report, ¶ 245. Sundararajan Opening Report, ¶ 130.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

not reflect competitive pricing and should not be considered pro-competitive benchmarks, especially when taken in isolation. Valve, in particular, has a history of market incumbency and alleged anticompetitive conduct, which undermines its appropriateness as a competitive benchmark:

a. First-mover advantage and market dominance: Valve entered the market early, when PC games were primarily distributed physically, and adopted a 30% commission for the Steam platform – mirroring the rates charged by physical retailers despite facing lower costs.[34] This first-mover advantage enabled Valve to gain and maintain an incumbent leading position in digital PC game distribution for many years.[35] As a result, its commission rate does not reflect the outcome of competition in the But-For World. Valve's dominance remained largely unchallenged until recently, when it introduced a tiered commission structure with lower rates for the Steam platform.[36]

b. MFN clause: Valve is also alleged to have imposed a most-favored-nations (MFN) clause, which would have prevented developers from offering lower prices on other platforms under threat of punitive actions, including removal of their games from Steam.[37] This practice would have insulated Valve from competitive pressure, thus hindering price competition. A recent court ruling found these allegations "sufficient to plausibly allege unlawful conduct" and allowed the MFN claims to proceed.[38]

---

[34] Second Amended Consolidated Class Action Complaint Demand for Jury Trial, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), December 20, 2021, ECF No. 68, ("Wolfire Games, LLC, et al. v. Valve Corporation, Second Amended Consolidated Class Action Complaint Demand for Jury Trial"), 11:7-25, 14:12-16:18.

[35] Id.

[36] "Valve takes a 30% cut of all sales on Steam as a base. However, a few years ago the company introduced a scaling system that gives more money to developers with higher earnings: those who earn 10 million dollars get a rate of 25% and those who earn 50 million only give 20% to Valve. Historically, most game developers believe that Steam does not deserve a 30% fee." Pedro Domínguez, "Epic Games sets its sights on Steam in its crusade against commissions in digital stores," *Softonic*, December 16, 2023, available at https://en.softonic.com/articles/epic-games-sets-its-sights-on-steam-in-its-crusade-against-commissions-in-digital-stores.

[37] Order, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), May 6, 2022, ECF No. 80 ("Wolfire Games, LLC, et al. v. Valve Corporation, Order"), 6:2-7:2.

[38] Wolfire Games, LLC, et al. v. Valve Corporation, Order, 6:2-7:6.

11

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

17. In contrast to Apple experts' selective use of benchmarks, I conducted a comprehensive benchmark analysis of Windows PC game app sales in my Opening Report.[39] While Apple's experts focus only on platforms with higher commission rates, such as Steam and GOG, I considered a broader range of platforms, including large third-party stores like Epic Store and Microsoft Store with 12% commission rates, smaller third-party stores like itch.io and Game Jolt with rates around 10%, and other major stores with direct-to-consumer sales that have self-distribution costs below 10%.[40] My analysis, which estimates a weighted average commission rate of 10%-14% across all platforms, offers a more accurate picture of what commission rates would have been in a competitive, But-For World.[41] I also conservatively included Steam in my analysis, despite its historical incumbency advantage, as well as potential anticompetitive conduct.[42]

18. This selective use of benchmarks reveals a bias in Apple experts' argument. Not only do they cherry-pick platforms with higher commission rates, but they also focus on Steam with a 30% commission rate reflective at least of incumbency advantage if not also of anticompetitive conduct, instead of a commission rate that would prevail in the But-For World. This further supports the conclusion that the rate charged by the App Store is supra-competitive. In contrast to Apple's experts, my analysis considered all relevant platforms, including those with lower commission rates, while also conservatively including Steam.

19. Professor Hitt also refers to the 30% commission rate charged by the MAC App Store,[43] which I considered and ultimately excluded as a valid benchmark in my Opening Report.[44] Apple's executives testified that the same commission rate is set for both the MAC App Store and iOS

---

[39]  Abrantes-Metz Opening Report, Section VI.
[40]  Abrantes-Metz Opening Report, ¶¶ 185-214.
[41]  Abrantes-Metz Opening Report, ¶ 216 and Figure 1.
[42]  Abrantes-Metz Opening Report, ¶ 217.
[43]  Hitt Opening Report, ¶ 245.
[44]  Abrantes-Metz Opening Report, ¶ 152.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

App Store to "create parity and consistency."[45] As a result, the MAC App Store's commission rate is influenced by the iOS App Store's supra-competitive commission rate and should not be regarded as a competitive benchmark.

20.  *Third*, the 30% commission rates charged by game console marketplaces, including the Microsoft Store for Xbox, the Nintendo eShop, and the PlayStation Store, are also not relevant competitive benchmarks for the App Store, albeit for a different reason. As explained in my Opening Report, video game console stores operate under a different economic model from the App Store, often selling hardware at a loss and subsidizing it through commission fees.[46] These platforms are able to offset losses from the sale of hardware because they are able to extract surplus rent from their game stores. I note that the hardware on which the App Store operates, such as iPhones and iPads, typically have substantial profit margins and do not tend to be sold at a loss.[47]

21.  It is therefore incorrect to use the commission rate of game consoles, which not only cover the losses from selling hardware below cost but also provide a return on the investment required to develop and make the consoles viable, as benchmarks to what an app store would charge in the competitive But-For World. This fundamental difference in business models makes console video game sales an inappropriate comparison to App Store's app and in-app content sales, and therefore, they cannot be considered a valid benchmark for a competitive But-For World.

22.  In addition to relying on invalid benchmarks that reflect fundamentally different business models and non-competitive conditions, Apple's experts also attempt to justify the App Store's 30% commission rate by comparing it to historical rates charged by early app distribution platforms. Professor Hitt claims that, at launch, the App Store's 30% rate was lower than those charged by

---

[45]  "Q. What commission does Apple charge on the Mac Store? A. 30 percent on the Mac App Store. But the same, again, 30 percent, 15 percent for developers in the small business program, 15 percent for developers after year one that are offering subscriptions. So it's the same, we always achieve to try to create parity and consistency across the different App Stores that we manage." Remote Proceedings of Videotaped Deposition of Matthew Fischer, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR (N.D. Cal.), January 7, 2021 ("Fischer Deposition"), 323:21-324:5.

[46]  Abrantes-Metz Opening Report, ¶ 153.

[47]  "[R]eported operating income percentages for iPhone ranged from ▮▮▮▮▮ between 2009 and 2023" and "reported operating income percentages for iPad ranged from ▮▮▮▮ between 2010 and 2023." Opening Expert Report of Ned S. Barnes, CPA, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Barnes Opening Report"), ¶¶ 57-58.

the first app distribution platforms, such as Handango, Nokia, and Verizon.[48] Professor Sundararajan makes a similar point, stating that the App Store's rate was below Handango's and comparable to those of Nokia's Ovi Store, Blackberry's App World, and the Windows Phone Marketplace.[49]

23. The examples cited by Apple's experts may be of historical interest but are not appropriate benchmarks for assessing the App Store's commission rate in a competitive But-For World. In particular, when Handango was launched in 1999, it operated in a pre-smartphone era under fundamentally different market conditions, characterized by a very limited app economy – as recognized in an interview with Handango's CEO: "Handango's success in the smartphone market required setting anchor in 1999, a year when phones were no smarter than their tiny caller ID displays."[50] For nearly a decade, it faced virtually no competition in digital distribution until the launch of the App Store in 2008.[51] It was then quickly displaced as more advanced technologies and app stores emerged. As such, it provides no meaningful insight into what a competitive equilibrium commission rate would be.

---

[48] "In fact, Apple's 30 percent commission rate at the launch of the App Store was lower than the commission rates charged by other app transaction platforms. For example, an internal Apple document from 2007 shows that Nokia charged a commission rate of 40 to 50 percent, Blackberry/Handango had a standard commission rate of 40 percent, and Verizon charged a commission rate of 55 to 60 percent. Software developers that sold through physical stores at the time often paid about 50 percent of the retail price to distributors." Hitt Opening Report, ¶ 246.

[49] "Many early mobile app marketplaces like Handango also charged commission rates between 30 percent and 40 percent. Nokia's Ovi Store and Blackberry's Blackberry World charged commission rates of 30 percent in 2011." Sundararajan Opening Report, ¶ 130.

[50] D Magazine, "Handango CEO Is Dialed In," February 22, 2007, available at https://www.dmagazine.com/publications/d-ceo/2007/march/handango-ceo-is-dialed-in/.

[51] "1994 – The very first smartphone, Simon, was launched by IBM. It contained a few simple apps like calendar, address book, sketchpad calculator, world clock, notepad, touchscreen, email capability, and so on. (…) 1997 – Nokia includes a game app, 'The Snake' in its phone. 1999 – (…) The first 'app store' Handango was launched. (…) At the turn of the millennium, once the Y2K scare was finally extinguished, the smartphone revolution really took off. (…) In 2002, RIM launched the Blackberry 5810 with pre-loaded apps like ringtone editor, to-do list, sketch pad, arcade games, and also introduced wireless email. However, the real game changer was when Steve Jobs' Apple launched the iPhone in 2007, which had several apps like photos, maps, weather, and more. A year later, HTC released the first Android smartphone, the HTC Dream. In 2008 itself, Apple launched its App Store with over 500 apps, and version 2.0 of their OS. A whopping 10 million downloads took place within three days of the launch! Not to be outdone, Google launched the Android market." Sunila Goray, "History of Mobile Apps - The Past, Present and Future," *WAC*, November 28, 2023, available at https://webandcrafts.com/blog/history-of-mobile-apps.

14

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

24. Other legacy app stores cited by Apple's experts, while somewhat more recent than Handango, are equally unsuitable as competitive benchmarks. Stores such as Nokia's Ovi Store, BlackBerry's App World, and Verizon's V CAST Apps launched during the early smartphone era but suffered from similar limitations. Below, I provide a brief overview of the trajectory of each of these legacy platforms, from their launch to their eventual discontinuation:

a. Nokia's Ovi Store launched in 2009 for Symbian and Series 40 devices,[52] when Nokia was already losing market share to iOS and Android.[53] The Ovi Store initially took a 30% commission but later introduced incentive programs for developers that resulted in a lower effective commission rate.[54] At that time, the Ovi Store served as an interim solution to consolidate services in a single entry point for publishers and did not have the functionality of modern app stores.[55] In 2011, Nokia rebranded it as the Nokia Store and began transitioning to Windows Phone through a partnership with Microsoft.[56] In 2014, Nokia started transition to

---

[52] Tech Crunch, "Nokia Unveils Ovi Store, Application Sales To Debut In May," February 16, 2009 ("Tech Crunch(2009)"), available at https://techcrunch.com/2009/02/16/nokia-unveils-ovi-store-application-sales-to-debut-in-may/.

[53] "Nokia is a global brand and has been the world leader in the smartphone market since 1997. Its market share stood at 39%, and it was the most recognized brand till 2007. However, things began to change with the entry of Apple and Google in 2007. Nokia underestimated the threat from new entrants, failed to understand the changing customer preferences, and delayed its smartphone segment entry. (…) The entrance of Samsung and Apple in 2007 led to Nokia's failure, as it took only five years for the brand to fall miserably, and by the end of 2013, it was finished." Team Pepper, "How and Why Did Nokia Fail?," *Pepper Content*, May 5, 2022, available at https://www.peppercontent.io/blog/how-and-why-did-nokia-fail/.

[54] "Nokia also said 70 percent of revenues from the store would go back to software developers." Tech Crunch (2009). For a discussion of Nokia's incentive programs to developers, see ¶ .

[55] According to George Linardos, the vice-president of product and media at Nokia in 2009, "The over-riding ambition was to consolidate the services, building a single service for consumers and a single point of entry for publishers. Neither would be perfect, but it was as opposed to continuing with the previous fragmented approach. If the market dynamics hadn't changed, that would possibly have been okay (…) When the decision was made, there was no such thing as the Apple App Store. But when the industry changed around that, suddenly this thing [Ovi Store] has to be judged in terms of 'is it the definitive competitive response to other app stores?' And that's not what it was necessarily conceived to be at that point – there was always the understanding that this was interim." Stuart Dredge, "The moment Nokia realised its Ovi Store wasn't going to cut the mustard," *The Guardian*, June 7, 2011, available at https://www.theguardian.com/technology/appsblog/2011/jun/07/nokia-ovi-store.

[56] Brian X. Chen, "Microsoft-Nokia Hookup Leaves Symbian Devs Hanging," *Wired*, February 15, 2011, available at https://www.wired.com/2011/02/nokia-developers/.

15

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

the Android operating system and released its first Android-based device, Nokia X.[57] The Nokia Store was officially shut down in 2015.[58]

b. BlackBerry App World launched in 2009,[59] shortly before BlackBerry peaked in the smartphone market in 2010, after which BlackBerry's market share began to decline.[60] BlackBerry App World initially charged a 20% commission for a short period, but it increased the rate to 30% by 2010.[61] BlackBerry later introduced incentive programs similar to Nokia's, which reduced the effective commission rate.[62] In 2014, BlackBerry integrated access to the Amazon Appstore on BlackBerry 10 OS devices in an attempt to compensate for its limited native app ecosystem.[63] BlackBerry started launching Android-based devices in 2015[64] and

---

[57] Sven Grundberg, "Nokia unveils Nokia-X - its first Android phone," *Market Watch*, February 24, 2014, available at https://www.marketwatch.com/story/nokia-unveils-nokia-x-its-first-android-phone-2014-02-24.

[58] Aloysius Low, "Microsoft to shut down Nokia Store for feature phones," *CNET*, November 18, 2014, available at https://www.cnet.com/tech/services-and-software/microsoft-to-shut-down-nokia-store-for-feature-phones/.

[59] PC Mag Encyclopedia, "BlackBerry App World," available at https://www.pcmag.com/encyclopedia/term/blackberry-app-world.

[60] "Canadian-based BlackBerry, known then as Research in Motion (RIM), launched its BlackBerry 5810, one of the first phones with email capabilities, as early as 2002, and continued dominating the smartphone market until the end of 2009. After falling from a high point of 20 percent market share in the smartphone market around 2010, BlackBerry found itself at a crossroad, restructuring itself as a cybersecurity and enterprise software company specializing in securing endpoints and user data flow." Alexandra Borgeaud, "BlackBerry - statistics & facts," *Statista*, June 12, 2024, available at https://www.statista.com/topics/5316/blackberry/#topicOverview.

[61] "[Blackberry App World] has also adopted the 'industry standard' 70/30 revenue spilt, having previously offered a more generous 80/20." Mobile World Live, "BlackBerry App World reaches 10,000 app 'milestone,'" September 9, 2010, available at https://www.mobileworldlive.com/old_latest-stories/blackberry-app-world-reaches-10-000-app-milestone/.

[62] See ¶ .

[63] Blackberry, "BlackBerry To Expand Application Ecosystem By Making Amazon Appstore Available on BlackBerry 10 Smartphones," June 18, 2014, available at https://web.archive.org/web/20191229161440/https://www.blackberry.com/us/en/company/newsroom/press-releases/2014/blackberry-to-expand-application-ecosystem-by-making-amazon-appstore-available-on-blackberry-10-smartphones.

[64] My Broad Band, "BlackBerry's first Android smartphone – South African launch date and price," January 26, 2016, available at https://mybroadband.co.za/news/smartphones/153041-blackberrys-first-android-smartphone-south-african-launch-date-and-price.html.

16

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

the company announced in 2017 that BlackBerry World would be discontinued at a future date.[65]

c.   Verizon's V CAST Apps, launched in 2010,[66] was a carrier-specific app store available only on a subset of BlackBerry and Android smartphones sold through Verizon.[67] While charging developers a 30% commission,[68] V Cast Apps primarily featured Verizon's own proprietary apps and offered a limited selection of third-party apps.[69] For independent developers, using V CAST Apps required building two separate versions of the same app – one for Android and another for BlackBerry – while excluding customers of other major carriers, such as AT&T.[70] The platform was discontinued by January 2013.[71] Given its narrow focus, short lifespan and limited reach, V CAST Apps is unlikely to have exerted any meaningful competitive pressure on BlackBerry App World and did not compete with Nokia's Ovi Store.

---

[65]   Angela Moscaritolo, "BlackBerry World App Store Is Shutting Down," *PC Mag*, December 15, 2017, available at https://www.pcmag.com/news/blackberry-world-app-store-is-shutting-down.

[66]   Ken Yeung, "Verizon shutting its app store in January 2013, removes Apps application from Android and RIM devices," *The Next Web*, November 5, 2012 ("Yeung (2012)"), available at https://thenextweb.com/news/verizon-closes-app-store-january-2013.

[67]   Sarah Perez, "Verizon's VCast App Store: Good for Consumers, Better for Verizon," *The New York Times*, March 25, 2010, available at https://archive.nytimes.com/www.nytimes.com/external/readwriteweb/2010/03/25/25readwriteweb-verizons-vcast-app-store-good-for-consumers-17127.html.

[68]   "Developers will receive the same 70/30 revenue split from Verizon's V Cast Apps store as they do from Google's Android Market." JR Raphael, "Verizon's Android App Store: Everything There Is To Know," *PC World,* November 4, 2010, available at https://www.pcworld.com/article/498393/verizons_android_app_store_everything_there_is_to_know.html.

[69]   "The VCast app store was created back in March 2010 at a time when the carrier said app popularity surged. (…) Verizon created it as a way to get their own proprietary apps out into the marketplace (…)." Yeung (2012).

"V Cast Apps (…) remains a relative anomaly in the increasingly crowded app store segment" and is "[l]imited to fewer than a dozen Verizon smartphones and boasting just a fraction of the applications available in Apple's (NASDAQ:AAPL) App Store or Google's (NASDAQ:GOOG) Android Market." Jason Ankeny, "Verizon's Murphy talks V Cast Apps a year after launch," *Fierce Network*, March 28, 2011 ("Ankeny (2011)"), available at https://www.fierce-network.com/developer/verizon-s-murphy-talks-v-cast-apps-a-year-after-launch?itm_source=parsely-api.

[70]   "I'll be honest--we are crawling along at 11 devices. Seven RIM devices and four Android devices. As a developer, you've got to decide 'What are my distribution channels? How do I prioritize my resources?' Because in the world we live in, you can't do it all." Ankeny (2011).

[71]   Yeung (2012).

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

25. None of these legacy app stores provide an appropriate benchmark for assessing a competitive But-For commission rate. Nokia's Ovi Store and BlackBerry's App World initially faced little or no competition from alternative app stores on their respective devices, where they operated in largely insulated environments. V CAST Apps, in turn, offered few third-party apps and was available only on Verizon-network devices. As a result, the 30% headline commission rates charged by these stores are not the outcome of a competitive process and, if anything, further support my opinion that a 30% rate is supra-competitive.

26. Although Nokia and BlackBerry eventually opened their devices to other app stores – Nokia by transitioning to Windows Phone in 2011 and BlackBerry by integrating the Amazon Appstore in 2014 – these changes came only after their smartphone market shares had already declined and the companies were on the verge of collapse.[72] With falling consumer demand for their devices, any resulting competition between app stores was minimal. Simply put, meaningful aftermarket competition requires a viable product in the foremarket: when the underlying devices are no longer competitive, competition between app stores on those devices cannot be effective.

27. Had Nokia or BlackBerry succeeded in the smartphone market as Apple and Google did, effective competition could have emerged within their environments, leading to lower commission rates that could potentially have served as relevant benchmarks. But that did not have the chance to happen. Ultimately, both Nokia and BlackBerry attempted to recover their declining market positions for their devices by transitioning to Android and ended up abandoning their proprietary app stores. These legacy app stores therefore provide no reliable basis for assessing what the commission rate would be in a competitive But-For World.

28. Setting aside the fact that the legacy app stores cited by Apple's experts faced little or no competition and operated on devices being displaced by iOS and Android, it is also important to

---

[72] Nokia's global smartphone market share declined sharply from around 50% in 2007 to 12% by the end of 2011, and further to just 3% by the end of 2012. Statista, "Global market share held by Nokia smartphones from 1st quarter 2007 to 2nd quarter 2013," available at https://www.statista.com/statistics/263438/market-share-held-by-nokia-smartphones-since-2007/.

BlackBerry's global smartphone market share fell from around 20% in 2009 to less than 1% by the end of 2013. Felix Richter, "The Terminal Decline of BlackBerry," *Statista*, June 26, 2017, available at https://www.statista.com/chart/8180/blackberrys-smartphone-market-share/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

note that their headline 30% commission rates did not reflect the effective rates developers actually paid. In efforts to attract developers, both Nokia and BlackBerry introduced incentive programs that reduced net developer payments, possibly even resulting in negative effective commission rates in some cases:

a. Although the Ovi Store nominally applied a 30% commission, Nokia offered various developer incentives, including direct funding of app development, marketing support, and free devices – many of which were not publicly disclosed.[73] One of the most prominent examples was a contest co-sponsored by AT&T and Nokia, offering $10 million in cash and prizes to winning app developers.[74]

b. Similarly, beyond funding the development of specific apps, BlackBerry introduced several other developer incentives. One such program guaranteed minimum payouts: for eligible apps generating more than $1,000 in revenue, BlackBerry would pay developers the difference between their actual earnings and $10,000 – subject to a maximum total program payout of $10 million.[75] In another initiative, BlackBerry offered $100 per new app submitted to the

---

[73] "Nokia is attempting to woo app developers with such incentives as (…) funding development of an app, according to three people involved in the negotiations. (…) A Nokia spokeswoman said the company offers app developers a variety of incentives, some in partnership with Microsoft, which include coding assistance and marketing. 'We do not disclose these arrangements, as each is different,' she said." Mark Millan, "Nokia paying developers to build Windows Phone apps," *CNN*, September 30, 2011, available at https://edition.cnn.com/2011/09/30/tech/mobile/nokia-windows-phone.

See also Matt Brian, "Nokia tempts developers with a free Nokia E7 and Windows Phone 7 handset," *The Next Web*, February 18, 2011, available at https://thenextweb.com/news/nokia-tempts-developers-with-free-a-nokia-e7-and-windows-phone-7-handset.

[74] Nokia, "Nokia and AT&T Give Developers 10 Million Reasons to Create Apps," *PR Newswire*, September 23, 2010, available at https://www.prnewswire.com/news-releases/nokia-and-att-give-developers-10-million-reasons-to-create-apps-103612744.html.

[75] BlackBerry, "10k Developer Commitment Rules," https://web.archive.org/web/20130729161650/http:/developer.blackberry.com/builtforblackberry/documentation/overview/10kcommitment.html. ("Apps funded by RIM are not eligible for the 10k Developer Commitment.")

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

BlackBerry App World store, up to 20 apps per vendor and a total program cap of $500,000.[76] Additional incentives included free devices for participating developers.[77]

29. In sum, even setting aside the broader issues that render Nokia's Ovi Store and BlackBerry's App World unreliable benchmarks discussed above, their headline 30% commission rates did not reflect the effective rates developers actually paid. Both stores implemented incentive programs that lowered developers' net commission rate, a fact ignored by Apple's experts. Any meaningful attempt to use these legacy stores as competitive benchmarks for the But-For World would, at a minimum, require adjusting for these programs to estimate their actual effective commission rates.

30. Finally, it is important to emphasize that Apple's experts selectively cited examples of platforms charging a 30% commission rate to support their arguments, while ignoring others that charge lower rates. Yet Apple's own internal documents show that Apple was comparing its commission rate not only to game consoles (as its experts do), but also to e-commerce business services – where the document notes commission rates below 6% – and to physical retail in shopping malls, with rates ranging from 5% to 20%.[78] Apple's experts disregarded these comparisons, having focused only on those that supported their position. In contrast, my analysis relies on a functionally similar and more competitive market – Windows PC game apps distribution – and includes all relevant players, without selectively omitting those that may not support my conclusions.

---

[76] "In exchange for making apps compatible with BlackBerry 10, devs will receive $100 per eligible app submitted to the store during the port-a-thon, up to a maximum of 20 paid apps per vendor. Submitting more than five also means developers end up in a draw for one of 250 Dev Alpha BlackBerry 10 devices. RIM said a total of $500,000 is available as part of the reward programme. Its last port-a-thon overran by an hour and a half but resulted in more than 15,000 additional app submissions to the App World Store." Ben Woods, "RIM pays developers $500,000 to build apps for BlackBerry 10," *ZD Net*, January 18, 2013, available at https://www.zdnet.com/article/rim-pays-developers-500000-to-build-apps-for-blackberry-10/.

[77] Id.

[78] CX-0014, at 10.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### B. THE TWO-TIER STRUCTURE IS CONSISTENT WITH A SUPRA-COMPETITIVE COMMISSION RATE

31. To support their claim that Apple's conduct did not result in anti-competitive effects on the commission rate paid by developers, Apple's experts point to the App Store's two-tiered commission structure, under which the commission rate was reduced from 30% to 15% in certain cases.[79] Professor Jin and Professor Hitt argue that the absence of any increase in the commission rate over time – and its reduction in some instances – is inconsistent with the exercise of market power through a supra-competitive commission rate.[80] Professor Sundararajan further explains the specific conditions under which the reduced rates apply and the timing of their introduction:[81]

> Since 2008, Apple has reduced its commission rate for certain transactions and developers.
>
> a. (…) in 2016, Apple lowered the commission rate on revenues generated from in-app subscription renewals (after the first year) to 15 percent.
>
> b. Apple launched the Apple Video Partner Program in 2016 to enable premium subscription video providers like Amazon Prime Video and Disney+ to integrate their services with Apple's technologies, such as the Apple TV app and Siri. (…) partners benefit from a reduced commission rate of 15 percent on in-app digital content purchases.
>
> c. On January 1, 2021, Apple launched the App Store Small Business Program for new developers and existing developers with less than one million dollars in total

---

[79] For a discussion of Apple's two-tiered pricing structure – comprising a 30% headline commission rate and a reduced 15% rate under certain conditions – see Hitt Opening Report, ¶¶ 52-54, 247 and Sundararajan Opening Report ¶132. In addition, Professor Jin, citing Professor Hitt's discussion of the reduced rate, states that "Apple set the App Store's commission rate when it launched the App Store in 2008 and has decreased, but never increased, it for many transactions." Jin Opening Report, ¶ 144.

[80] "In general, the fact that Apple (…) has only decreased its commission rate over time is inconsistent with Plaintiffs' allegation that Apple has exercised monopoly power to charge supra-competitive rates." Jin Opening Report, ¶ 144. "If Apple were to possess and exercise alleged market power, I would expect it to engage in one or more of the following: raise commission rates, restrict output, or decrease innovation. However, I do not find this for any of these outcomes. I find that (…) (ii) Apple's commission rates have not increased over time even as the App Store has become more popular." Hitt Opening Report, ¶ 31.

[81] Sundararajan Opening Report, ¶ 132.

21

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

earnings from all of their apps in the prior calendar year. (…) this commission rate thus decreases to 15 percent so long as the developer meets the aforementioned eligibility criteria of the program.

32. The fact that Apple reduced its commission rate for some developers under a two-tiered pricing structure does not refute my conclusion that the competitive But-For commission rate would be 13.63%, *which is lower than both 30% and 15%*. A reduction in the effective commission rate in some instances does not imply that Apple was not charging a supra-competitive rate relative to what would have prevailed absent its alleged anticompetitive conduct. In fact, the claim that lowering the rate to 15% for certain transactions is inconsistent with the exercise of market power is incorrect and misrepresents basic principles of monopoly pricing – specifically, that a monopolist has incentives to price discriminate to extract a greater monopoly rent.[82]

33. The existence of different commission tiers is not evidence of competition but rather is consistent with monopolistic behavior aimed at maximizing rent extraction by charging different prices based on developers' willingness to pay. Such tiered pricing, as a form of price discrimination, is itself evidence of market power.[83] The 15% rate applied in specific cases – while maintaining the 30% default in all others – was not introduced in response to competitive pressure from rival app stores, particularly given that entry on iOS devices is effectively blocked and no rival app store could emerge to constrain Apple's pricing. Instead, the pricing structure is more accurately explained as price discrimination: Apple retains the 30% rate for developers with relatively inelastic supply, while applying the 15% rate only to those with lower willingness to pay and stronger outside

---

[82] "Under pure Pigouvian third-degree price discrimination, a monopolist maximizes profits by charging different prices to different markets or classes of consumers" Richard Schmalensee, "Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination," *The American Economic Review*, 71(1) (1981): 242-247, p. 242.

A study by Aguirre, Cowan and Vickers develops "general conditions that determine whether third-degree price discrimination by a monopolist serving all markets reduced or raises output and social welfare, defined as the sum of consumer surplus and profit." They show that "[m]oving from nondiscrimination to discrimination raises the firm's profits, harms consumers in markets where prices increase and benefits the consumers who face lower prices." Iñaki Aguirre, Simon Cowan and John Vickers, "Monopoly Price Discrimination and Demand Curvature," *The American Economic Review*, 100(4) (2010): 1601-1615, p. 1601.

[83] N. Gregory Mankiw, Principles of Economics, 8th Edition, (Cengage Learning, 2018), p. 304. ("For a firm to price discriminate, it must have some market power.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

options. This pattern is clear when examining the circumstances under which Apple applies the 15% rate, as detailed by Professor Hitt and Professor Sundararajan:[84]

a.  *First*, the App Store's reduced 15% commission applies to premium video subscription providers that are part of the "Apple Video Partner Program",[85] as well as to subscription renewals after the first year. Subscription service providers typically have stronger outside options and are less dependent on the App Store than many other app developers. In the US, over 75% of Netflix, Amazon Prime, and Disney+ viewers prefer watching these subscription services on TV, while mobile viewing is far less common.[86] As a result, subscription services like Disney+ and Netflix can more easily avoid paying the 30% commission by discontinuing the option to subscribe through the mobile iOS app.[87] In response, Apple offers a lower commission rate to retain these high-value services. This is not evidence of app store competition but of Apple responding to providers with credible alternatives and lower willingness to pay – a situation that does not apply to many other developers.

b.  *Second*, Apple applies the lower 15% rate to smaller developers earning under $1 million annually. This too reflects standard price discrimination. Apple's experts acknowledge that the bulk of the App Store's revenue comes from a small subset of large developers,[88] most of

---

84    Hitt Opening Report, ¶¶ 52-54 and Sundararajan Opening Report ¶132

85    Apple, "Apple Video Partner Program," available at https://developer.apple.com/programs/video-partner/.

86    "A survey conducted in 2023 revealed that TV sets dominated as the preferred device for streaming programs across various services in the United States. For example, 77 percent of Netflix users in the U.S. preferred TVs for streaming video, with similar trends for Amazon Prime Video, Hulu, Disney+, and Apple TV+. In contrast, mobile viewing was less common, with usage rates between seven and 11 percent." Julia Stoll, "Most preferred devices to watch selected streaming services in the United States in 2023," *Statista*, March 19, 2025, available at https://www.statista.com/statistics/1464051/preferred-devices-streaming-platforms-us/.

87    "Disney has removed the option to subscribe to both Disney+ and Hulu through their respective iOS apps. From now on, new users are instructed to create an account via an external website. (…) Disney follows other streaming platforms such as Netflix and Spotify, which have also dropped Apple's in-app purchases." Filipe Espósito, "Disney+ and Hulu ditch App Store In-App Purchase billing as latest round of price increases goes into effect," *9 To 5 Mac*, October 21, 2024, available at https://9to5mac.com/2024/10/21/disney-hulu-app-store-in-app-purchase/.

88    "I find that ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Hitt Opening Report, ¶ 240.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

which continue to pay the full 30% commission rate. After exhausting rent extraction from these large developers, who have higher willingness to pay, Apple adjusted its commission structure to extract additional rent from smaller, price-sensitive developers, without reducing the commission charged to its most profitable partners. Again, this is textbook monopolistic price discrimination: charge higher prices to developers with inelastic supply and selectively reduce prices only where necessary to capture additional value from those with more elastic supply.[89]

34. In sum, rather than undermining the finding that Apple charges a supra-competitive commission, the App Store's tiered pricing structure reinforces it. Apple initially applied a uniform 30% commission rate – well above competitive levels – to all developers. Instead of lowering its commission rate over time across the board, as one would expect in a competitive market, Apple selectively reduced the rate to 15% where it faced greater resistance from price-sensitive developers. This is a classic monopolistic strategy designed to extract maximum economic rent while offering price reductions only where it becomes necessary. Far from proving that the commission rate is competitive, the evidence offered by Apple's experts is consistent with the behavior of a monopolist charging a supra-competitive two-tiered commission rate.

---

[89] "According to the received theory, under price discrimination, consumers with lower demand elasticities are charged a higher price than those with higher demand elasticities." Francis K. Cheung and Xinghe Wang, "Price Discrimination in a Rent-Seeking Economy," *Public Choice*, 86(1/2) (1996): 103-116, p. 103. The same principle applies on the supply side: sellers with more elastic supply are charged lower fees, while those with inelastic supply face higher fees.

"Retail firms and restaurants commonly offer senior citizen discounts. I suspect this practice is not motivated by altruism. Rather, the behavior can be better explained as profit-maximizing price discrimination; these firms are setting a low price in a market which probably has high elasticity of demand." Thomas J. Holmes, "The Effects of Third-Degree Price Discrimination in Oligopoly," *The American Economic Review*, 79(1) (1989): 244-250, p. 244.

### C.    PROFESSOR HITT'S INCLUSION OF FREE APPS IN THE AVERAGE COMMISSION RATE IS MATHEMATICALLY AND ECONOMICALLY WRONG

35. Professor Hitt argues that the average commission rate paid by developers on the App Store has declined over time.[90] To support his claim, he calculates an average commission rate per download by assigning a 0% rate to free downloads and then averaging across all downloads – combining those that pay a commission (30% or 15%) with those that do not.[91] Based on this method, he claims the average commission rate per download fell from 2.9% to ▊▊▊▊ between 2009 and 2024:[92]

> I calculate the average commission rate per download on the App Store over time. The average commission rate for initial app downloads has decreased over time after accounting for free transactions, consistent with developers' shift from paid downloads to free downloads combined with greater use of in-app purchases and other types of monetization. For example, in the first quarter of 2009, 9.8 percent of initial downloads were paid, and the average commission rate across all initial downloads was 2.9 percent. By the first quarter of 2024, only ▊▊ percent of initial downloads were paid, and the average commission rate was ▊▊ percent.

36. Professor Hitt's conclusion that the average commission rate paid by developers has declined over time is based on his flawed and misleading calculation. The metric he uses – an "average commission per download" – is not economically meaningful for assessing whether the commission rate is competitive or supra-competitive. It is also based on a flawed mathematical manipulation that distorts the result, leading to incorrect conclusions. Below, I explain first why this metric lacks economic relevance, and then I address the underlying mathematical error.

37. *First*, calculating an average commission rate per initial download by including free downloads in the denominator provides no economic insight into the actual commission charged by the App

---

[90]    "The average commission rate for App Store initial downloads and in-app purchases has decreased over time, as has the percent of initial downloads that are paid." Hitt Opening Report, ¶ 250 and Section 8.2. titled "Average commission rates paid by developers on the App Store have decreased over time."

[91]    "Since developers do not pay a commission for the download of a free-to-download app, it is useful to define an average commission rate charged to developers that accounts for the many free App Store transactions. I refer to the 'average commission rate' as a measure of the commission rate charged by Apple that includes both free and paid transactions in the data by assigning a zero percent commission rate to free transactions." Hitt Opening Report, ¶ 251.

[92]    Hitt Opening Report, ¶ 252.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Store, since free apps are not subject to any commission. As the number of free downloads increases, this metric mechanically lowers the average commission – simply because it adds more "zero-commission" transactions to the calculation. This decline does not reflect a decrease in the App Store's commission rate set by Apple, but rather a shift in strategy by developers from paid apps to free apps, as Professor Hitt acknowledges.[93] That shift made by developers may result from the Apple's App Store setting a commission rate that is too high, leading developers to a different monetization strategic choice. Hence, while we may expect to observe that ever-higher commission rates lead to an ever-greater incidence of free apps, Professor Hitt's measure could lead to the perverse conclusion that ever-higher commission rates lead to ever-lower commission rates. Professor Hitt's metric tells us nothing about whether the App Store's commission rate is competitive or supra-competitive.

38. To further illustrate why Professor Hitt's average commission per download metric is economically meaningless, consider the following example. Suppose Apple increased its commission rate to 100%, so that the App Store kept all revenue from paid downloads. Faced with such extreme terms, developers abandon paid downloads entirely and switch to free apps. Under Professor Hitt's method, this would cause the "average commission rate per download" to fall to 0%, since there would be no commission revenue and only free downloads counted. But that is completely wrong, leading to the absurd conclusion that a 100% commission rate leads to a 0% commission rate, a more competitive market outcome than a 30% commission rate. The flaw in Professor Hitt's logic is clear: adding more "zero-commission downloads" doesn't mean the platform is charging less – it simply hides the impact of high commission rates behind a growing number of free apps.

39. *Second*, Professor Hitt does not calculate the effective commission rate for free apps correctly. The standard and meaningful way to measure an effective commission rate is to calculate the App Store's share of developer revenue – that is, the ratio of the App Store's commission revenue to the total revenue earned by developers from paid apps and in-app purchases. This yields a clear and interpretable result when applied to paid transactions. However, for free downloads – where both the App Store's commission revenue and the developer revenue are zero – the

---

[93]   Hitt Opening Report, ¶ 252.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

calculation becomes 0 divided by 0, which is mathematically indeterminate (and *not* zero, as Professor Hitt assumes). Assigning a 0% commission rate to free apps is thus arbitrary and incorrect.

40. The problem with Professor Hitt's logic is further clarified with another simple example. Following his approach, we could assign any arbitrary commission rate to free app downloads – say 10% – because 10% of zero developer revenue still equals zero revenue for the App Store. The same applies to 20%, 30% or even 100% commissions, since any percentage of zero is still zero. By this reasoning, one could claim the App Store charges a 100% commission on free apps, capturing all of the developer's zero revenue, which would misleadingly suggest that average commission rates per download have increased over time as free apps became more common. This demonstrates that Professor Hitt's metric is mathematically flawed and can be manipulated to support any conclusion.

41. Professor Hitt also calculates an average commission rate on in-app purchases and concludes that such average has declined over time – from nearly 30% at launch to around ▇▇ in recent years.[94] However, this metric suffers from a similar flaw: he calculates an average commission per transaction and assigns a 0% commission rate to free in-app purchases, such as free trials and promotional offers that generate no revenue.[95] This again lowers the average commission mechanically, even though no commission applies to these transactions. While the distortion is smaller here – since free in-app purchases are relatively less common – it still undermines the reliability of the metric.

---

[94]    "In Exhibit 44, I calculate the average commission rate in each quarter for in-app purchases on the App Store, starting after the introduction of in-app purchases on the platform in July 2009. The data shows a declining average commission rate on in-app purchases over time." Hitt Opening Report, ¶ 253 and Exhibit 44.

[95]    "The commission rate is calculated for each transaction, and a simple average is calculated across transactions per quarter. The commission rate is set to zero percent for all transactions with no overall revenue." Hitt Opening Report, Exhibit 44 (figure note). "The average commission rate for in-app purchases is slightly below 30 percent in 2009. This occurs because some in-app purchases correspond to free trials or promotions. Thus, these in-app purchases are free and do not generate a commission for Apple." Hitt Opening Report, footnote 414.

27

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

42. Even setting aside the distortion from including free transactions, the decline in the average commission rate on in-app purchases reported by Professor Hitt is not evidence of a competitive rate. This decline mainly reflects the introduction of a 15% discounted rate for specific cases – such as small developers and subscriptions – while the 30% rate still applies to most others. As explained in Section II.B, this two-tier pricing structure is consistent with monopolistic price discrimination aimed at maximizing profits. The drop in the average rate is therefore not a sign of competitive pressure, but the result of selective discounts within an overall supra-competitive commission structure.

### D.    ALTERNATIVE MONETIZATION STRATEGIES CITED BY APPLE'S EXPERTS HAVE NOT CONSTRAINED APP STORE'S COMMISSION RATE

43. Professor Hitt argues that Apple could not have charged a supra-competitive commission rate because developers could use alternative monetization strategies that allow them to avoid any commission to the App Store.[96] In other words, if Apple tried to raise its commission, developers could simply bypass it, preventing any sustained increase above competitive levels. Professor Hitt supports this claim by noting that over ██ of transactions on the App Store are not subject to any commission, which is indicative of a "widespread utilization of alternative monetization strategies that are not subject to a commission."[97]

44. Other experts retained by Apple make similar claims. Professor Jin argues that the availability of alternative monetization strategies that do not involve paying commission to the App Store prevents Apple from charging a supra-competitive rate, as any such attempt would prompt

---

[96]  "I find that (…) app developers are increasingly taking advantage of monetization strategies that allow them to pay zero commission to Apple. Thus, I find no evidence that the challenged conduct resulted in supracompetitive commissions, and therefore, in a but-for world in which app developers and consumers could make iOS app transactions outside of the App Store, Apple would not charge lower commission rates." Hitt Opening Report, ¶ 243.a.

[97]  "Evidence shows that developers are increasingly taking advantage of monetization strategies that allow them to pay zero commission to Apple on transactions through the App Store. (…) In fact, about ██ percent of transactions were not subject to any Apple commission in 2023. This is indicative of a widespread utilization of alternative monetization strategies that are not subject to a commission (even though Apple continues to provide the initial download transaction and all accompanying support to both developers and consumers, including providing app updates and re-downloads over the lifetime of the app as well as the tools and technology for developing apps)." Hitt Opening Report, ¶¶ 258-260.

developers to switch to those alternatives, making any increase above competitive levels unprofitable.[98] Professor Jin specifically refers to two alternative monetization strategies: *in-app advertising and the sale of physical goods.*[99] Professor Sundararajan makes the same point, citing the same type of monetization strategies mentioned by Professor Jin.[100] Both contend that these alternatives limit Apple's ability to charge supra-competitive rates – though Professor Jin appears to acknowledge that such strategies are not viable for all developers.[101]

45. In addition to alternative monetization strategies such as in-app advertising and sales of physical goods, Professor Hitt argues that developers can avoid the App Store's commission by directing users to their own websites to purchase content for use on iOS devices. He claims this option is particularly available to the largest developers, who account for most of the App Store's commission revenue:[102]



I find that (…) the top ▮ percent of developers—corresponding to ▮ developers—account for ▮ percent of App Store commissions in the U.S. (…) Apple's studies show that ▮▮▮. This means that even a ▮▮▮

---

[98]  "Were Apple to charge a supra-competitive commission rate, app developers could choose an alternative monetization method, rendering an attempt to raise the commission rate above competitive levels unprofitable." Jin Opening Report, ¶ 149.

[99]  "Evidence indicates that monetization methods that do not require developers to pay any commission to the App Store are viable for developers of iOS apps: Developers are able to monetize via in-app advertisements (…); Developers can also monetize their apps by selling physical goods and services that are not subject to the App Store's commission (…)." Jin Opening Report, ¶ 149.

[100]  "A developer may embed alternative monetization options into a free app. For example, developers might earn money from the sale of physical goods and services offered through the app or from the sales of ads that are displayed in the apps. Uber's iOS app is free to download, and Uber monetizes by charging participants when facilitating transportation, food delivery, and other services through the app. Retail banks like Chase and Citibank offer free iOS apps with the objective of attracting and retaining consumers. iOS game apps such as Solitaire, a card game, and 2048, a puzzle game, which are free to download, generate revenue through in-app advertisements shown to users, and Apple does not levy a commission on this revenue. Thus, Apple chose to enable developers to monetize their apps in a variety of ways that require no payment to Apple." Sundararajan Opening Report, ¶139.

[101]  "[E]ven if each alternative may not be viable for all developers, taken together these alternatives can limit Apple's ability to charge a supra-competitive commission rate." Jin Opening Report, ¶ 149.

[102]  Hitt Opening Report, ¶¶ 240-241.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



. (…) According to one document from 2023, .

46. The arguments presented by Apple's experts are economically (and logically) flawed and mischaracterize the concept of a supra-competitive commission rate. In fact, their argument seems directed at disproving a claim no one is making – that a commission rate can only be supra-competitive if it faces no constraints whatsoever. But no serious economist suggests that prices in any market, including those with limited competition, can be raised indefinitely. Even a monopolist, *unconstrained by competition*, is still constrained by users' willingness to pay and by the existence of outside options.[103] For example, a monopolist controlling all car sales would still be constrained by the fact that people can walk or ride a bicycle. The mere existence of those outside options does not mean the prices it charges for cars are competitive.[104] In this case, the defendants' experts are simply restating a basic point: that higher prices eventually reduce demand. This does not undermine the fact that a price – or a commission – can be well above competitive levels even if it is bound by *something*.

47. Available evidence shows that the primary alternative monetization method cited by Apple's experts – in-app advertising – is not a meaningful substitute for in-app purchases or paid

---

[103] The monopolist maximizes profits by setting a supra-competitive price that reflects a trade-off: higher per-unit revenue at the cost of reduced demand. The resulting decrease in output is a defining feature of monopoly power.

See, for instance, Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, 4th Edition, (Pearson Education, 2015), p. 113: "The market demand curve constrains the monopoly. In its quest to maximize profit, it can set only price or only quantity—not both. If the monopoly sets quantity, the market price is determined by the market demand curve (…) If the monopoly lowers its price to $p_1$, its revenues may rise or fall. The monopoly gains revenue on the extra unit it sells at price $p_1$ (…). To sell that extra unit, however, it must cut its price from $p_0$ to $p_1$ on the original $Q_0$ units, resulting in a loss of revenues." See also a discussion on the deadweight loss of monopoly in pp. 119-120.

[104] If a monopolist controlled the entire car market, it could charge prices well above competitive levels, despite facing some constraints. Some consumers might switch to walking or biking, but the existence of these alternatives does not prevent supra-competitive pricing – it simply limits how high prices can go. The shift to outside options is a typical effect of supra-competitive prices, leading to reduced output and consumer surplus.

downloads. One study examines demand for in-app purchases in mobile apps and, among other things, estimates the "elasticity of substitution between two ways of paying for in-game benefits: time (watching rewarded videos) and money (making in-app purchases)."[105] The authors find that the estimated elasticity is around 0.5, which they describe as "on the low side."[106] This indicates that advertising is a poor substitute for in-app purchases, and such a low elasticity is insufficient to constrain a hypothetical monopolist from charging supra-competitive prices. The study further notes that very few users make in-app purchases, and those who do are unlikely to switch to ad-based alternatives when prices rise:[107]

> "we highlight that only a very small share of consumers make in-app purchases. Our model predicts that the customers who are affected on the margin by the changes in price are those that have a relatively high opportunity cost of time and, thus, have a relatively low tendency to switch to a more time-consuming way of playing if prices of in-app purchases increase."

48. Similarly, the sales of physical goods or merchandise are even weaker substitutes – if substitutes at all – for in-app purchases or paid app downloads. While this monetization strategy is important for e-commerce apps such as Amazon, it seems to represent only a secondary source of revenue for the vast majority of apps and not a viable alternative to in-app purchases. In the case of mobile games, total app revenue was around $226 billion in 2022, with ad revenue and in-app purchases (including one-time purchases and subscriptions) each accounting for approximately half.[108] In contrast, the gaming merchandise market was valued at half a billion dollars in 2025 – less than 0.5% of total app revenue from games.[109] This is inconsistent with merchandise sales being a real alternative developers can switch to in response to a price increase.

---

[105] Andreea Enache, Richard Friberg and Magnus Wiklander, "Demand for in-app purchases in mobile apps—A difference-in-difference approach," *International Journal of Industrial Organization*, 88 (2023): 1-18, p. 2.

[106] Id.

[107] Id.

[108] Jordan Fragen, "Data.ai: Mobile game app revenue split evenly between ads, IAP," *Venture Beat*, May 16, 2023, available at https://venturebeat.com/games/dataai-total-app-revenue-mobile-games-in-app-ad-spend/.

[109] Research Nester, "Global Market Size, Forecast, and Trend Highlights Over 2025-2037," December 26, 2024, available at https://www.researchnester.com/reports/gaming-merchandise-market/6863.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

49. Consistent with this evidence, my analysis of App Store's But-For commission rate confirms that alternatives such as in-app advertising and merchandise sales are weak and do not meaningfully constrain the App Store from charging a supra-competitive commission rate. I estimate the competitive But-For commission rate to be 13.63%, while the App Store's effective rate is about twice that.[110] If these alternative monetization models truly constrained pricing, even a modest 10% price increase from 13.63% to 15% would have caused sufficient diversion to ad-based models or merchandise sales to render the increase unprofitable. Instead, Apple was able to double the commission rate above the competitive level without triggering enough diversion to limit or discipline that price increase.

50. With respect to Professor Hitt's claim that developers can avoid paying the App Store's commission "by enticing high-value customers to make transactions on the app developer's webstore instead of the App Store,"[111] he fails to acknowledge that Apple enforces strict policies prohibiting developers from directing users to external payment methods to bypass its fees.[112] Apple itself notes in internal documents that "developers cannot direct customers to payment methods outside of the App Store."[113] In fact, in the *Epic Games v. Apple* litigation, the district court's 2021 injunction prohibited Apple from preventing developers from directing customers to purchasing mechanisms outside the App Store.[114] Despite this, Apple continued implementing

---

[110] According to Professor Stiglitz, "the average commission rate is 27.2 percent and has been stable and above 25 percent in every month since the App Store was launched." Expert Report of Joseph E. Stiglitz, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025 ("Stiglitz Opening Report"), ¶ 145.

[111] Hitt Opening Report, ¶ 241.

[112] See Stiglitz Opening Report, Section III.C.

[113] CX-0014, at 2.

[114] "[T]he Court had prohibited Apple from denying developers the ability to communicate with, and direct consumers to, other purchasing mechanisms. Apple's response: impose new barriers and new requirements to increase friction and increase breakage rates with full page "scare" screens, static URLs, and generic statements. Apple's goal: to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream. In the end, Apple sought to maintain a revenue stream worth billions in direct defiance of this Court's Injunction." Order Granting Epic's Motion to Enforce Injunction, at 2:11-22.

measures that discouraged consumers from using alternative payment options. This led to a recent contempt order, in which the Court found Apple in willful violation of the 2021 injunction.[115]

51. Professor Hitt's argument – that developers can avoid the App Store's commission by directing high-value users to their own webstores – directly undermines the defendant's position that Apple's conduct has not resulted in anti-competitive effects, such as a supra-competitive commission rate.[116] One of the practices challenged in the present matter is Apple's use of anti-steering provisions to prevent developers from informing users about or linking to alternative payment options outside the App Store.[117] Professor Hitt effectively acknowledges that if developers were allowed to steer users to external websites, this would exert competitive pressure on the App Store's commission rate. This implies that, absent Apple's restrictions, the commission rate would be reasonably expected to have been lower – an admission that the anti-steering provisions help sustain supra-competitive fees. Far from supporting Apple's no-harm argument, Professor Hitt's claim highlights one of the very mechanisms through which Apple maintains its supra-competitive pricing.

52. Moreover, even if a few developers have managed to direct high-value users to their own websites to avoid the App Store's commission rate – as Professor Hitt suggests – that is not evidence against a supra-competitive rate.[118] On the contrary, it is consistent with such. As Professor Jin notes, "Were Apple to charge a supra-competitive commission rate, app developers could choose an alternative monetization method."[119] Therefore, the fact that some developers have gone to

---

[115]  "[T]he Court FINDS Apple in willful violation of this Court's 2021 Injunction which issued to restrain and prohibit Apple's anticompetitive conduct and anticompetitive pricing. Apple's continued attempts to interfere with competition will not be tolerated." Order Granting Epic's Motion to Enforce Injunction, at 1:23-26.

[116]  See Hitt Opening Report, Section 7 and Jin Opening Report, Section 6.

[117]  Stiglitz Opening Report, Section III.C.

[118]  "For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A second example involves ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Hitt Opening Report, ¶ 241.

[119]  Jin Opening Report, ¶ 149.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

significant lengths to circumvent the App Store's commission rate – despite Apple's anti-steering rules – supports the conclusion that the commission is, indeed, supra-competitive. For example, Epic built its own payment system and the Epic Store specifically to avoid paying the 30% commission charged by the App Store.[120] Crucially, however, this workaround is not viable for most developers and therefore does not constrain Apple's commission rate. If bypassing the App Store were a broadly accessible option, we would expect many more developers to have used it – since paying no fee is clearly better than paying 30% or even 15%.

### E. EXAMPLES OF ENTRY CITED BY APPLE'S EXPERTS ARE IRRELEVANT AND HAVE NOT CONSTRAINED THE APP STORE'S COMMISSION RATE

53. Apple's experts argue that the entry of alternative app transaction platforms has constrained the App Store from raising its commission rate to supra-competitive levels. For instance, Professor Hitt points to the entry of platforms such as Google Play Store, Samsung Galaxy Store and Nintendo eShop, as well as console game stores like Xbox and PlayStation 3.[121] Professor Jin makes a similar claim, referring to the same examples of platform entry cited by Professor Hitt

---

[120] "The video game maker, led by Tim Sweeney, created its own in-app payment system to avoid Apple's 30% cut of its in-app purchases, which resulted in a ban of 'Fortnite' from the App Store." Angel Au-Yeung, "Epic Games Vs. Apple Ruling: A Verdict With No Clear Winners," *Forbes*, September 10, 2021, available at https://www.forbes.com/sites/angelauyeung/2021/09/10/apple-vs-epic-ruling-a-verdict-with-no-clear-winners/.

[121] "Since the launch of the App Store, several new game app transaction platforms that compete with the App Store have entered the market, which is consistent with low barriers to entry in the digital game app transactions market. App transaction platforms that have launched since the App Store include Google Play on October 22, 2008 (…); Samsung Galaxy Store on January 6, 2010 (…); Nintendo eShop on June 7, 2011; Amazon Appstore on March 22, 2011; and Microsoft Store on October 26, 2012 as Windows Store." Hitt Opening Report, ¶ 231.

"In the video streaming app transactions market, video streaming apps have been or have become available on other app transaction platforms, including video game consoles. For example, Netflix became available on Xbox in the U.S. on November 19, 2008, and later became available to other gaming consoles, such as PlayStation 3 and Nintendo 3DS." Hitt Opening Report, ¶ 234.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

and concluding that such evidence is inconsistent with Apple having charged a supra-competitive commission rate over a sustained period.[122]

54. None of the examples cited by Apple's experts involve the entry of alternative app stores or in-app payment systems within the iOS environment. On iOS devices, the App Store remains the sole authorized channel for installing apps and processing in-app payments in all world regions except the European Union.[123] Instead, the examples provided by Apple's experts relate either to (i) app stores launched within the Android environment or (ii) alternative distribution channels, such as game consoles, smart TVs or websites – in other words, platforms that operate in different environments or provide fundamentally different user experiences and technical features.

55. While Apple's experts argue that the entry of these platforms has constrained the App Store's ability to charge a supra-competitive commission, this claim is contradicted by the fact that the App Store has maintained substantial profit margins consistently above competitive levels.[124] According to the analysis by plaintiffs' accounting expert Mr. Barnes, the App Store's operating income has grown every year over the past decade, exceeding $10 billion annually since 2019.[125] App Store's operating margins – defined as operating income over revenue – have remained

---

[122] "Prof. Hitt discusses in his report evidence of entry of app transaction platforms, which is inconsistent with Apple being able to exercise market power and charge a supra-competitive price for a sustained period of time. (…) Several new game app transaction platforms have launched. Examples include Google Play in 2008 (…), the Samsung Galaxy Store in 2010 (…), Nintendo eShop in 2011, the Amazon Appstore in 2011, and the Microsoft Store in 2012 (…). New channels through which game developers can transact with consumers have emerged. For example, some gaming platforms have introduced cloud streaming services, which allow consumers to access game content without downloading the native game app. (…) Video streaming services such as Netflix have become available on different platforms, including game consoles, smart TVs, TV boxes, and streaming services' own websites." Jin Opening Report, ¶ 140.

[123] "To reflect the Digital Markets Act's changes, users in the European Union are able to install alternative app marketplaces and install apps offered through alternative app marketplaces in iOS 17.4 or later, or iPadOS 18 or later. Users in the European Union can also install apps from a developer's website in iOS 17.5 or later, or iPadOS 18 or later. (…) However, you must be in the European Union to install alternative app marketplaces and new apps through alternative app distribution." Apple, "About alternative app distribution in the European Union," December 11, 2024, available at https://support.apple.com/en-gb/118110.

[124] "Evidence suggests that Apple sustained substantial profit margins in the iOS apps and in-app content aftermarket, exceeding the levels one would expect in a competitive market." Stiglitz Opening Report, ¶ 143.

[125] Barnes Opening Report, Table 1.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

stable and consistently above 75%, reaching near 80% in recent years.[126] These margins are exceptionally high when compared to competitive benchmarks – and even some non-competitive ones:

a.  As explained in my Opening Report, sales of Windows PC games apps provide the most appropriate competitive benchmark for Apple's App Store.[127] Among third-party Windows PC game app stores, the Microsoft Store offers the best comparison for a competitive profit level, as it is a long-standing and profitable competitor with limited market power relative to the incumbent, Steam.[128] ███████████████████████████████████████████ ████████████████████████████ ██ ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ By contrast, Apple recorded a 77% operating income margin in 2019 – more than three times higher – illustrating the extent of App Store's supra-competitive profits.[130]

b.  Even when compared to a non-competitive benchmark, Apple's profit margins are unusually high. As shown in Mr. Barnes's expert report, applying the same methodology, Google Play Store's operating income margin was 54% in 2019.[131] Google Play Store is comparable in terms of functionality and business model, as it provides a similar service for Android users. However, it is not a benchmark of competitive outcomes, as Google Play Store was found by a court to have monopoly power over the distribution of Android apps and in-app content.[132]

---

[126]  Barnes Opening Report, Table 1. The operating income margins reported by Mr. Barnes in Table 1 – based on Apple's "allocation method 1" for operating expenses – may understate the true profitability of the App Store after 2020 due to the effects of Covid-19. As explained in ¶ 24 of the Barnes Opening Report: "Method 1, according to Kevan Parekh, Apple's 30(b)6 witness on relevant topics, involves allocating OPEX to individual business units based on the relative portion of revenue generated by each business unit." As during Covid-19 App Store's revenues grew faster than other business units (see Exhibits 3 and 14 of Barnes Opening Report), this allocation method mechanically assigns a larger share of OPEX to the App Store – even if its actual costs did not rise proportionally – potentially resulting in an understatement of its operating margins for the years affected by Covid-19.

[127]  Abrantes-Metz Opening Report, Section VI.A.

[128]  Abrantes-Metz Opening Report, ¶ 137.

[129]  Abrantes-Metz Opening Report, ¶ 138 and MSFT_EPIC_00000093, p. 39.

[130]  Barnes Opening Report, Table 1

[131]  Barnes Opening Report, Table 2.

[132]  Google Play Store Verdict, pp. 3-4. See also Stiglitz Opening Report, ¶ 144.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

That Apple's App Store achieved a profit margin higher than that of an established monopoly further reinforces the conclusion that Apple earned supra-competitive profits.

56. The sustained profitability of the App Store is therefore inconsistent with a commission rate constrained by meaningful and ongoing entry. Its profit margins are three times higher than a reasonable competitive benchmark and exceed those of a comparable monopolist with a similar business model by over 40%. If the types of entry cited by Apple's experts had exerted real competitive pressure, Apple would have been pushed to reduce its commission rate, driving the App Store's margin toward competitive levels. Instead, the App Store continues to generate extraordinary profits. This undermines the claim that the cited examples of entry constrain App Store in any meaningful way and confirms that commission rate charged by Apple is supra-competitive.

57. In contrast, the type of entry required to bring the App Store's commission rate down to the competitive level I estimate (13.63%) would need to occur within the iOS environment – that is, through the entry of viable alternatives for users of iOS devices. The clearest example is the entry of a rival app store on iOS, as considered in my model.[133] A rival store offering equivalent services would force Apple to lower its commission rate, or risk losing developers and users who could switch to the rival store to download apps on the same iOS devices, without paying a supra-competitive rate.[134] At a lower commission, developers could charge consumers less while retaining a larger share of revenue. The effect mirrors a standard result in microeconomics: reducing a transaction tax benefits both buyers and sellers, with the distribution of gains depending on demand and supply elasticities.[135]

58. However, entry of a full rival app store is not strictly necessary. Any meaningful form of entry within iOS – such as other alternatives discussed by Professor Stiglitz in his report[136] – would exert similar competitive pressure, as long as they allowed developers to effectively avoid the App

---

[133] Abrantes-Metz Opening Report, ¶ 23.

[134] Abrantes-Metz Opening Report, ¶ 24.

[135] See, for instance, Hal R. Varian, Intermediate Economics: A Modern Approach, 8th Edition, (W. W. Norton & Company, 2009), Chapter 16.7.

[136] Stiglitz Opening Report, Section III.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Store's supra-competitive commission. For example, the entry of an alternative in-app purchase payment processing solution,[137] even in the absence of a competing app store, would be sufficient to push Apple to lower its rate. Otherwise, developers would accept in-app payments only through the cheaper system. Even if this rival in-app purchases payment system exerted competitive pressure only on in-app transactions (and not on paid app downloads), Apple would still need to reduce its commission on paid downloads. Otherwise, developers could simply shift monetization by offering apps for free and charging users within the app – e.g. immediately upon launch to access content. In any case, because in-app purchases account for nearly all App Store billings, while paid apps represent a negligible share,[138] the entry of an in-app payment solution would have in practice the same economic effect as the entry of an alternative app store.

59. Similarly, fully eliminating Apple's anti-steering restrictions (i.e. allowing developers to direct users to alternative payment methods outside the App Store) would have an effect equivalent to the entry of a rival in-app payment solution.[139] As long as developers could effectively offer in-app content at a lower price through an external payment option, this would exert the same type of competitive pressure, pushing the App Store to reduce its commission rate to 13.63% or lower. As a result, my predicted But-For commission rate applies as long as the elimination of Apple's anti-competitive conduct in the But-For World enables the entry of any of the alternatives discussed by Professor Stiglitz – whether a rival app store, an alternative in-app payment solution or other forms of competition outside the App Store.[140]

---

[137] "Apple mandates that nearly all in-app transactions for digital content utilize IAP as a payment processing solution; this mandate prevents developers from using alternative payment methods, such as PayPal. (…) Throughout the Class Period, Apple has identified numerous instances in which developers have attempted to integrate "alternative payment handling." Stiglitz Opening Report, ¶¶ 80-81.

[138] In-app purchases account for USD 50.36 billion of total App Store billings, while paid app purchases account for only USD 0.73 billion – equivalent to 1.4% of total App Store billings. APL-APPSTORE_09090476, at 477.

[139] "From the release of the App Review Guidelines in 2010, Apple has imposed 'anti-steering provisions' that limit the ability of developers to direct users to payment methods outside of the App Store. Until January 2024, Apple prohibited developers from including 'buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [Apple's In-App Purchase system].' Reader apps were the only exception to Apple's anti-steering provisions." Stiglitz Opening Report, ¶ 87.

[140] Stiglitz Opening Report, Section III.

60. However, this kind of meaningful entry is effectively not possible due to Apple's own conduct, as shown by Professor Stiglitz.[141] In a competitive But-For World without Apple's restrictions, the barriers preventing entry would be removed, and alternative app stores and in-app payment solutions would enter. This scenario is not merely theoretical: in the EU, where the Digital Markets Act (DMA) requires Apple to allow app distribution through channels other than the App Store,[142] several third-party app stores for iOS have been released, including AltStore PAL, Setapp Mobile, the Epic Games Store, Aptoide, and others.[143]

### F.    PROFESSOR SUNDARARAJAN'S OPINION THAT THE APP STORE IS A TWO-SIDED PLATFORM DOES NOT AFFECT MY ESTIMATED BUT-FOR COMMISSION RATE

61. Apple's expert Professor Sundararajan argues that the App Store is a two-sided transaction platform characterized by indirect network effects.[144] He describes its pricing structure as follows: App Store does not charge consumers any usage or participation fee, and charges developers an annual fee of $99, along with a commission on paid downloads and in-app purchases that

---

[141] "Apple's contractual and technological restrictions have effectively excluded competing app stores and in-app payment solutions, and its anti-steering provisions further limit competition from purchase options outside of the App Store. These actions substantially limit consumers' options for downloading apps and in-app content, as well as developer's choice of payment solutions to incorporate into their apps. The evidence I have reviewed strongly suggests that there would have been more options for consumers to purchase iOS apps and in-app content in the But-For World." Stiglitz Opening Report, ¶ 100.

[142] "Under the DMA, Apple is required to allow for the distribution of apps on its iOS operating system by means other than through the Apple App Store. In practical terms, this means that Apple should allow third party app stores on iOS and apps to be downloaded to the iPhone directly from the web." European Commission, "Commission closes investigation into Apple's user choice obligations and issues preliminary findings on rules for alternative apps under the Digital Markets Act," *Press Release*, April 23, 2025, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_25_1086.

[143] Sarah Perez, "Move over, Apple: Meet the alternative app stores coming to the EU," *Tech Crunch*, March 13, 2025, available at https://techcrunch.com/2025/03/13/move-over-apple-meet-the-alternative-app-stores-coming-to-the-eu/.

[144] Professor Sundararajan claims that "the App Store is a two-sided transaction platform whose product is a transaction simultaneously facilitated between app developers and consumers, that displays indirect network effects, and that, consistent with other two-sided transaction platforms, implements services and governance mechanisms to (1) encourage and enhance participation; (2) facilitate discovery, matching, and transacting; and (3) facilitate trusted and safe interactions." Sundararajan Opening Report, ¶ 107.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

ranges from 15% to 30%.[145] He notes that developers are not charged for certain transactions, including "those involving free downloads, or transactions eligible under the Reader Rule or the Multiplatform Rule."[146]

62. At no point does Professor Sundararajan explicitly state that the App Store provides any form of subsidy – either to consumers or to developers – or that it would in the But-For World. In his general discussion of multi-sided platform economics, he cites academic literature noting that such platforms often use subsidized pricing to attract participation from the more price-sensitive side.[147] While he does not directly claim that any of the App Store's prices are subsidized, he refers to two mechanisms that, in his view, Apple uses to attract price-sensitive consumers:

   a. First, he argues that under Apple's current centralized distribution and revenue-sharing model, consumers enjoy free access to the App Store,[148] and suggests that Apple's incentive to offer such access could diminish in the absence of the conduct at issue.[149]

   b. Second, he claims that by not charging commissions on free apps, "consumers benefit from more apps being available because of indirect network effects, which in turn could increase the likelihood of paid transactions".[150]

---

[145] "As part of this pricing structure, the App Store does not charge consumers a fee to participate(…), the Apple charges developers an annual fee of $99 (…), the App Store employs a revenue sharing model with developers under which developers pay a commission rate on certain transactions (for example, paid downloads and in-app digital content purchases) while not being charged for other transactions (for example, those involving free downloads, or transactions eligible under the Reader Rule or the Multiplatform Rule (see Section V.A.3.b). This commission rate ranges from 15 to 30 percent." Sundararajan Opening Report, ¶ 177.

[146] Id.

[147] Sundararajan Opening Report, footnote 36.

[148] "Under centralized distribution and the accompanying revenue sharing model, Apple is able to provide consumers with free access to the App Store. This ability to access the App Store and download apps for free likely attracts those consumers who may not participate if charged, thereby increasing participation." Sundararajan Opening Report, ¶ 187.

[149] "Without the challenged conduct, Apple's diminished ability to monetize its investments in the tools, technologies, and services it provides consumers and developers, would, as an economic matter, lower its incentives to offer free access to consumers (…)." Sundararajan Opening Report, ¶ 25.

[150] Sundararajan Opening Report, ¶ 129. Similarly, Professor Hitt states that "about 72 percent of transactions were not subject to any Apple commission in 2023 (…) even though Apple continues to provide the initial download transaction and all accompanying support to both developers and consumers, including providing app updates and re-downloads over the lifetime of the app as well as the tools and technology for developing apps." Hitt Opening Report, ¶ 260.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

63. As I explained in my Opening Report, I have considered the possibility that the App Store operates as a two-sided platform. My methodology for estimating the But-For commission rate remains valid regardless of whether the App Store is one-sided or two-sided.[151] The relationship between commission rates and profits that supports my analysis is the same in either case.[152] None of Apple's experts has offered any argument to suggest that my profit function in my model is not appropriate for the App Store or a rival app store. If the App Store were a two-sided platform, network effects would only be relevant to the extent that they influence how Apple sets prices across the two sides: developers and consumers.[153] While I agree that developers pay a $99 annual fee and pay commissions of either 15% or 30% on paid apps and in-app purchases, it is my view that neither the so-called "free access" to the App Store nor the treatment of free apps reflects a subsidy from Apple. In what follows, I explain why the mechanisms cited by Professor Sundararajan do not constitute subsidized pricing.

64. *First*, the fact that consumers can *access* the App Store for free does not imply that they are subsidized in any meaningful economic sense, nor does it support the conclusion that the App Store functions as a multi-sided platform with significant cross-group network effects. Rather, it simply reflects the absence of a participation or membership fee – an approach that is standard in virtually all retail stores. Most traditional brick-and-mortar retailers do not charge admission or membership fees, allowing consumers to enter freely and covering the costs of operating the store through margins on transactions made by paying customers.[154] This is a common pricing strategy aimed at attracting potential paying customers, not evidence of a subsidy. Moreover, in retail

---

[151] Abrantes-Metz Opening Report, Section II.D.

[152] Abrantes-Metz Opening Report, ¶ 40.

[153] Abrantes-Metz Opening Report, ¶¶ 42-43.

[154] "A membership club requires the consumer to pay a fee to become a member in exchange for additional benefits. Three membership clubs are considered here, Amazon Prime, Walmart+, and Costco. The fee is one of the primary distinguishing features of a membership club from a store loyalty card program, which has been available for many years, primarily in grocery retailing. Over 61% of all American adults carry at least one store loyalty card, with an average of 3.1 cards. An exception to a long history of retail membership is Costco, which has always required membership to enter the store." Dr. Martin Block, "Retail Membership Clubs: Part One," *Northwestern University, Retail Analytics Council*, available at https://spiegel.medill.northwestern.edu/retail-membership-clubs-part-1/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

models where consumers do pay a membership fee – such as warehouse clubs – that fee is typically offset by lower per-transaction prices.[155]

65. In the case of the App Store, any costs Apple incurs to operate the store and provide access to consumers are more than offset by the revenue generated from purchases made by paying customers – a very substantial share of which goes to Apple.[156] My model explicitly accounts for all relevant operating costs,[157] including any potential costs associated with maintaining consumer access. The But-For commission rate I estimate is sufficient not only to fully recover these costs but also to deliver a profit margin exceeding 50% for Apple.[158] In this context, there is no economic basis to characterize free consumer access as a subsidy: it is a standard commercial practice where operating costs are recovered through transaction margins, not through cross-group subsidization.

66. *Second*, the availability of free apps in the App Store does not represent a price subsidy by Apple. The availability of free apps reflects a monetization strategy adopted by *developers*, not by Apple. In any case, Professor Sundararajan argues that by not charging commission on free apps, Apple encourages developers to create them, which attracts consumers and increases the likelihood of

---

[155] "Despite a 20-year history of warehouse club industry in the U.S., rare attempt has been made to explain the true motivation of the membership policy by warehouse clubs. Why do they charge a membership fee? There seem to be many possible explanations on this industry practice. On the wall of a Costco store in Mountain View, California, the chain itself puts the following statement, trying to explain their membership fee policy: 'Costco's membership fee provides a means of covering part of our operating costs and overheads, thereby reducing our prices on the products we sell. This way, the more members we have, the lower our prices - and the more you buy, the more you save!'" Sang-Hoon Kim and S. Chan Choi, "The role of warehouse club membership fee in retail competition," *Journal of Retailing*, 83(2) (2007): 171-181, p.171.

[156] While developers are the ones who collect payments from consumers and who make the payment of the commission to App Store, from an economic perspective, the commission functions as a transaction tax. The identity of the party making the payment is irrelevant to the economic incidence of the commission. What determines the true burden of the commission are the relative elasticities of supply and demand – that is, the responsiveness of developers and consumers to price changes. See, for instance, Hal R. Varian, Intermediate Economics: A Modern Approach, 8th Edition, (W. W. Norton & Company, 2009), Chapter 16.7.

[157] Abrantes-Metz Opening Report, ¶ 130.

[158] Abrantes-Metz Opening Report, ¶ 36.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

paid transactions – a mechanism he describes as an example of indirect network effects.[159] This framing suggests that Apple incurs losses from free apps that are then recovered through paid transactions, implying a cross-subsidy. However, this view is incorrect for two main reasons:

a. First, the claim that Apple earns no revenue or even loses money on free apps is demonstrably false. As Professor Sundararajan acknowledges, Apple charges all developers (whether they offer free or paid apps) a flat annual fee of $99.[160] Based on my estimates, this fee alone more than covers Apple's variable costs of operating the App Store.[161] Thus, Apple does not lose money when developers offer free apps on the App Store, and hence, these free apps are not costly to Apple; at minimum, the annual developer fee covers their cost. If Apple were genuinely subsidizing free apps to attract consumers to the App Store, it would incur losses on free apps (for example, by paying the developers to create them) which is not the case here.

b. Second, beyond the annual fee, Apple has strong economic incentives to encourage free apps because they enhance the appeal and utility of its devices by expanding available content and functionality. This directly improves user experience and supports Apple's ability to charge premium prices for its iPhones and iPads. Professor Sundararajan cites an interview where Steve Jobs stated, "Our purpose in the App Store is to add value to the iPhone. Free apps do that just as well as paid apps sometimes. We love free apps."[162] This statement underscores

---

[159] "Although Apple gains no commissions from transactions involving free apps, consumers benefit from more apps being available because of indirect network effects, which in turn could increase the likelihood of paid transactions for developers that also yield commissions for Apple." Sundararajan Opening Report, ¶ 129.

[160] Sundararajan Opening Report, ¶ 177.

[161] In 2022, App Store had approximately 34 million registered developers. At a USD 99 annual fee per developer, this generated roughly USD 3.4 billion in revenue – exceeding my estimate of App Store's variable costs of USD 2.9 billion for the same year. For the App Store variable costs in 2022, see Abrantes-Metz Opening Report, ¶ 187. For the number of registered developers, see Andrew Orr, "Apple now has over 34 million registered developers," *Apple Insider*, June 6, 2022, available at https://appleinsider.com/articles/22/06/06/apple-now-has-over-34-million-registered-developers.

[162] Nick Wingfield, "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201. See also Sundararajan Opening Report, footnote 264.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

that Apple views free apps primarily as a means to increase device value, not as a tool to generate more paid app transactions through indirect network effects.

67. This evidence shows that free apps are not subsidized by Apple. Free (and all) apps generate fees from developers that more than cover any variable costs and, more importantly, significantly increase the value of iOS devices. Claiming that allowing free apps in the App Store is a type of subsidy by Apple is equivalent to saying that when Apple develops its own apps – such as camera, messages or calendar – it is providing a consumer subsidy. This is not the case. These apps are integral to the device's software, enhancing its usefulness and value, allowing Apple to sell the device at a high margin. If anything, the cost of developing free apps is effectively subsidized by developers, who attract consumer attention to monetize through advertising or other means.

68. In summary, none of the mechanisms identified by Professor Sundararajan amount to subsidies designed to attract a price-sensitive group of consumers to the App Store. But even if they did, there is no reason to expect the overall price structure in the But-For World to differ. It is my understanding that Apple's own experts do not show any evidence that any such subsidies would emerge or disappear in the But-For World. In any case, even if Apple were to adjust its pricing structure in the But-For World – for example, by creating a subsidy to attract more consumers – it would only do so if this change allowed it to increase billings profitably, meaning, if the revenues generated by such practice were larger than its costs. In that scenario, the But-For commission rate would be even lower than the one I estimate.[163] This further confirms that my estimated rate is conservative.

### G. THE 13.63% COMMISSION RATE IN THE BUT-FOR WORLD WOULD NOT COMPROMISE APP SECURITY, AS IMPLIED BY PROFESSOR HALDERMAN

69. In this section, I briefly address Professor Halderman's report on app security. Without offering an opinion on whether the general concerns raised by Professor Halderman are valid in any

---

[163] Note that in my model, when billings increase, the commission rate required to achieve the same profit level decreases.

44

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

technical sense, I explain why those concerns do not apply to the relevant competitive But-For World I have modeled – one in which Apple would charge a 13.63% commission rate.

70. As Apple's expert in computer science and engineering, Professor Halderman outlines the security risks posed by harmful apps and argues that safety was a core design principle of the App Store.[164] He argues that Apple developed the iOS operating system to offer stronger protection against malicious apps compared to preexisting devices such as Mac.[165] Professor Halderman claims this approach has proven effective.[166]

71. According to Professor Halderman, Apple's defense strategy consists of three components designed to work together – app review, the centralized App Store and on-device protections.[167] Professor Halderman argues that alternatives to centralized distribution through the App Store – specifically, any system that allows "sideloading" of apps via direct downloads or unofficial third-party stores – would compromise user security by creating opportunities for malicious actors to

---

[164] "Apple designed iOS to achieve better protection from harmful apps than preexisting devices such as Macs. Securing iOS was appropriately a major design consideration for Apple when it chose to launch the App Store and enable the installation of native third-party apps on iPhones. The solution Apple developed involves multiple layers of defense, or 'defense-in-depth:' all apps available to all iOS device users are vetted through the App Review process, monitored and easy to update through the App Store, and limited by on-device protections in their ability to cause harm." Halderman Opening Report, ¶ 15.b.

[165] Id.

[166] "This security design has been effective, as demonstrated by the fact that there are more than a billion iOS devices and nearly two million apps, while iOS devices suffer from less risk from harmful apps than other commonly used smartphones and computers." Halderman Opening Report, ¶ 15.b.

[167] "iOS's security architecture addresses threats using a sophisticated multi-layered defense approach. I highlight here three critical components of this defense-in-depth approach: the App Review process, Apple's centralized App Store, and on-device protections implemented by the iOS operating system and device hardware. These components are designed to work together, and working together increases their effectiveness as a defense. In combination, they provide a property called defense-in-depth, which means that multiple security mechanisms need to be breached for an attack to succeed. Defense-in-depth is a widely recognized security best practice. It is necessary and appropriate for Apple to pursue a defense-in-depth strategy in light of the heightened security threats that iOS faces. No system's security is ever perfect, but a system designed for defense-in-depth, like iOS, can remain resilient even if an attacker manages to circumvent any one of its defensive layers." Halderman Opening Report, ¶ 51.

45

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

spread harmful apps.[168] He supports his claim with empirical evidence suggesting that iOS devices are safer than Android and Windows devices and that nearly 90% of harmful apps are distributed through *untrustworthy* third-party stores.[169]

72. While I take no position on the technical merits of the App Store's security features, Prof. Halderman raises security concerns based on a But-For World that differs fundamentally from the one I model in which Apple would charge a 13.63% commission. His analysis appears to rely on a scenario in which users can install apps from any unregulated or unvetted third-party store, or download apps directly from websites, with minimal security protection. This creates a false dichotomy between Apple's current monopoly and a fully unregulated environment with no minimum safeguards.

73. In contrast, the competitive But-For World I analyze assumes a single rival app store offering the same features and functionality as Apple's App Store,[170] including equivalent levels of security and privacy. In calculating the But-For commission rate, I conservatively assign to the Apple's App Store the same cost structure it has in the As-Is World. This includes the same level of fixed

---

[168] "In contrast to Apple's centralized distribution model that requires all apps to be screened by App Review and distributed through the App Store, Android and Windows allow apps to be distributed to their devices through third-party app stores and via direct downloads. Installing apps via these methods is sometimes called sideloading. Allowing sideloading on these devices comes at a cost to users' security, as these additional distribution channels provide malicious actors with expanded opportunities to disseminate malware and harmful apps. While the App Store and App Review provide a trustworthy source for vetted apps, sideloading puts the risk and corresponding burden of determining whether apps are safe to install squarely on individual users—a task for which they are not always well equipped or willing to take the time to perform." Halderman Opening Report, ¶ 112.

[169] "This threat is demonstrated by empirical studies of malware on third-party Android app stores. Researchers at RiskIQ measured the prevalence of malware across iOS and Android app stores, including the Apple App Store, the Google Play Store, and more than 120 third-party app stores. They uncovered 102,312 harmful apps across iOS and Android of which nearly 90% were distributed through third-party app stores. RiskIQ observed that 'hundreds of less reputable app stores represent a murky mobile underworld outside of the relative safety of reputed stores.' Exposing users to these third party stores, as users of Android devices are, exposes those users to a multitude of untrustworthy stores." Halderman Opening Report, ¶ 130.

"Numerous data-driven studies by security researchers and third-party firms show that iOS devices are safer from malware and other harmful apps compared to other commonly used devices that broadly support decentralized app distribution, such as Android and Windows devices. Real-world data shows that Android app stores carry large numbers of malicious apps, whereas Apple's App Store hosts malware so rarely that it has been likened to 'Fort Knox.'" Halderman Opening Report, ¶ 143.

[170] Abrantes-Metz Opening Report, ¶ 23.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

costs and the same variable costs expressed as a percentage of billing, including all applicable costs related to security and privacy.[171] I apply the same conservative assumption to the rival store, which is assumed to face the same fixed costs and variable costs (as a share of billings) as Apple's App Store.[172] As a result, the 13.63% commission rate in the But-For World reflects lower profit margins due to competition, not cost-cutting measures that would compromise user safety.

74. Importantly, my model assumptions are conservative not only with respect to the But-For commission rate, but also with respect to the levels of security and privacy in the But-For World. My model focuses solely on the effect of price competition on the commission rate and does not account for the potential impact of competition on quality dimensions.[173] However, competition can also lead firms to improve product quality, including security and privacy features. If anything, the presence of a rival could push both Apple's App Store and the rival store to compete on these dimensions, making my approach conservative in this respect as well. I understand this is consistent with the opinions of Plaintiffs' security and privacy experts.[174] Therefore, the 13.63% commission rate I estimate does not come at the expense of security.

## III.    NEW EVIDENCE PRODUCED BY APPLE CONFIRMS MY PREVIOUS OPINIONS

75. In this supplementary section, I address additional evidence produced by Apple after the submission of my Opening Report. I have reviewed the new evidence and conclude that it is consistent with my opinions expressed here and in my Opening Report. In fact, some of the new

---

[171] Abrantes-Metz Opening Report, ¶ 126.

[172] Id.

[173] Abrantes-Metz Opening Report, ¶ 63.

[174] According to Prof. Kohno, "of the aspects of Apple's App Review process that might provide some measure of 'security,' other firms are at least equally capable of offering those as Apple. I am not aware of any security protections provided by the App Review process that a third party could not provide at least as well, and there are real-world examples of ways that Apple could supplement its App Review process but has not yet done so." Expert Report of Tadayoshi Kohno, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025, ¶ 17.

"Alternative app stores could better meet consumer privacy preferences and needs through reasonable, economically viable measures." Expert Report of Kirsten Martin, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025, ¶ 8.c.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

documents further reinforce my view that data from the Covid-19 period is not suitable for estimating a long-term competitive equilibrium representative of the class period.

76. As explained in my Opening Report, lockdown measures during the pandemic significantly increased consumer demand for games and apps, resulting in higher revenues than would have occurred under normal market conditions.[175] This was a temporary effect, not reflective of a competitive equilibrium, and therefore not appropriate for estimating a commission rate in a But-For World.[176] The new evidence produced confirms both the scale of the Covid-19 impact, as well as its temporary character. In particular:

a. An equity research presentation by Barclays from February 2023 confirms that App Store experienced atypical growth during the Covid lockdowns, particularly relative to other business lines: "Prior to Covid, no business accounted for over 35% of services and we think App Store surpassed that 35% threshold during Covid lockdowns".[177] The presentation also indicates that this growth was temporary and normalized after the pandemic, referring to "Low growth in App Store" as "the New Norm" post-Covid and explaining that "[a]fter eight years of averaging over 30% growth, a number of issues contributed to App Store only growing ~6% in FY22," including "[p]ost Covid normalization of spending on apps and games."[178] The sharp growth in App Store revenue at the start of the pandemic, followed by a post-Covid decline, is shown in the blue line in the figure below.

---

[175]  Abrantes-Metz Opening Report, ¶¶ 221-227.
[176]  Abrantes-Metz Opening Report, ¶¶ 228-231.
[177]  APL-APPSTORE_11452069, at 71.
[178]  APL-APPSTORE_11452069, at 70.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**FIGURE 1. APP STORE REVENUES**



Source: APL-APPSTORE_11452069, at 72.

b.  A Bank of America equity research report from March 2023 – around the time most lockdowns had been lifted – notes a decline in consumer demand following the pandemic surge. The report states: "Global gaming rev declined 6.4% so far in F2Q23 QTD".[179] It also highlights broader concerns about weakening demand, stating: "We continue to worry about an overall decline in consumer demand" and warns that "App Store and Licensing (Google payments), which accounts for more than 60% of Services revenue, have incremental risk of further deceleration".[180]

c.  A Morgan Stanley equity report for F2Q22, while noting that "iPhone13 Cycle Continues to Outperform Expectations", highlights a contrasting trend for Services due to the performance of App Store: "We lower our March quarter Services estimate by 3% due to slower App Store growth".[181]

d.  An internal Apple presentation with key highlights for Q4 2022 confirms a deceleration of App Store billings growth, driven by ▮▮▮▮▮: "Over the course of the year, the billings growth has decelerated from ▮▮▮▮ Y/Y in October'21 (P1) to ▮▮▮ in August (P11) driven by broad-based

---

[179]  APL-APPSTORE_11452023, at 24.

[180]  Id.

[181]  APL-APPSTORE_11429686, at 86 and 88.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

deceleration in the ▆▆▆ Category which has impacted every Geo".[182] The following figure shows ▆▆▆▆ in gross billings from App Store ▆▆▆ during the pandemic, followed by a ▆▆▆▆▆▆▆ by the end of 2022:

**FIGURE 2. APP STORE GAMES BILLINGS, BY QUARTER**



Source: APL-APPSTORE_11455859, at 62.

e.  Another presentation by Apple shows a similar trend for the games software industry. It notes: "Things fell a little bit in 2022 as the world opened up. You can see that over the last 8 years, mobile has been driving the growth of the games industry, with PC and Console relatively flat for the past several years, though mobile has fallen a bit harder as the pandemic bump recedes."[183] Again, the impact of the end of the pandemic on industry revenue is clear in the next figure.

---

[182]  APL-APPSTORE_11455859.

[183]  APL-APPSTORE_11443572, at 646.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**FIGURE 3. GAME SOFTWARE INDUSTRY REVENUE**



Source: APL-APPSTORE_11443572, at 646.

77. All this evidence illustrates the impact of Covid on App Store's business – driven in particular by games – and the subsequent slowdown, supporting the view that its earlier growth during the pandemic was not sustained.

78. I reserve the right to update my opinions if and when more information becomes available.

Respectfully submitted,

Rosa M. Abrantes-Metz, Ph.D.

13 June 2025

51

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## APPENDIX A: MATERIALS RELIED UPON

### A.1    EXPERT REPORTS

Expert Report of Joseph E. Stiglitz, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Expert Report of Kirsten Martin, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Expert Report of Rosa Abrantes-Metz, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Expert Report of Tadayoshi Kohno, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of Ginger Jin, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of Jonah Berger, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Opening Expert Report of Ned S. Barnes, CPA, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 7, 2025.

### A.2    FILINGS

Complaint, *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227 (N.D. Cal.), July 7, 2021, ECF No. 1.

Consolidated Consumer Class Action Complaint, *In Re Google Play Consumer Antitrust Litigation*, Case No. 3:20-CV-05761-JD (N.D. Cal.), December 28, 2020.

Order Granting Epic Games, INC's Motion to Enforce Injunction, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), April 30, 2025.

Order, *Wolfire Games, LLC, et al. v. Valve Corporation*, Case No. 2:21-cv-00563-JCC (W.D. Wash.), May 6, 2022, ECF No. 80.

Rule 52 Order After Trial on the Merits, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.), September 10, 2021, ECF No. 812.

Second Amended Consolidated Class Action Complaint Demand for Jury Trial, *Wolfire Games, LLC, et al. v. Valve Corporation*, Case No. 2:21-cv-00563-JCC (W.D. Wash.), December 20, 2021, ECF No. 68.

Settlement Agreement and Release, *In Re Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981-JD, (N.D. Cal.), December 18, 2023.

Verdict, *In Re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD (N.D. Cal.), December 11, 2023.

### A.3    DEPOSITIONS & TRIAL TESTIMONIES

Remote Proceedings of Videotaped Deposition of Matthew Fischer, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR (N.D. Cal.), January 7, 2021.

53

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## A.4    PRODUCED DOCUMENTS

APL-APPSTORE_09090476.

APL-APPSTORE_11429686.

APL-APPSTORE_11443572

APL-APPSTORE_11452023.

APL-APPSTORE_11452069.

APL-APPSTORE_11455859.

CX-0014 (Epic Injunction Hearing Exhibit).

MSFT_EPIC_00000093.


## A.5    PUBLICATIONS

Aguirre, Iñaki, Simon Cowan and John Vickers, "Monopoly Price Discrimination and Demand Curvature," *The American Economic Review*, 100(4) (2010): 1601-1615.

Carlton, Dennis W. and Jeffrey M. Perloff, Modern Industrial Organization, 4th Edition, (Pearson Education, 2015).

Cheung, Francis K. and Xinghe Wang, "Price Discrimination in a Rent-Seeking Economy," *Public Choice*, 86(1/2) (1996): 103-116.

Enache, Andreea, Richard Friberg and Magnus Wiklander, "Demand for in-app purchases in mobile apps—A difference-in-difference approach," *International Journal of Industrial Organization*, 88 (2023): 1-18.

Holmes, Thomas J., "The Effects of Third-Degree Price Discrimination in Oligopoly," *The American Economic Review*, 79(1) (1989): 244-250.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Kim, Sang-Hoon and S. Chan Choi, "The role of warehouse club membership fee in retail competition," *Journal of Retailing*, 83(2) (2007): 171-181.

Mankiw, N. Gregory, Principles of Economics, 8th Edition, (Cengage Learning, 2018).

Schmalensee, Richard, "Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination," *The American Economic Review*, 71(1) (1981): 242-247.

Varian, Hal R., Intermediate Economics: A Modern Approach, 8th Edition, (W. W. Norton & Company, 2009).

## A.6    OTHER PUBLIC SOURCES

Ankeny, Jason, "Verizon's Murphy talks V Cast Apps a year after launch," *Fierce Network*, March 28, 2011, available at https://www.fierce-network.com/developer/verizon-s-murphy-talks-v-cast-apps-a-year-after-launch?itm_source=parsely-api.

Apple, "About alternative app distribution in the European Union," December 11, 2024, available at https://support.apple.com/en-gb/118110.

Apple, "Apple Video Partner Program," available at https://developer.apple.com/programs/video-partner/.

Au-Yeung, Angel, "Epic Games Vs. Apple Ruling: A Verdict With No Clear Winners," *Forbes*, September 10, 2021, available at https://www.forbes.com/sites/angelauyeung/2021/09/10/apple-vs-epic-ruling-a-verdict-with-no-clear-winners/.

Blackberry, "BlackBerry To Expand Application Ecosystem By Making Amazon Appstore Available on BlackBerry 10 Smartphones," June 18, 2014, available at https://web.archive.org/web/20191229161440/https:/www.blackberry.com/us/en/company/newsroom/press-releases/2014/blackberry-to-expand-application-ecosystem-by-making-amazon-appstore-available-on-blackberry-10-smartphones.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

BlackBerry, "10k Developer Commitment Rules,"
https://web.archive.org/web/20130729161650/http:/developer.blackberry.com/builtforblackberry/documentation/overview/10kcommitment.html.

Block, Martin, "Retail Membership Clubs: Part One," Northwestern University, Retail Analytics Council, available at https://spiegel.medill.northwestern.edu/retail-membership-clubs-part-1/.

Borgeaud, Alexandra, "BlackBerry - statistics & facts," *Statista*, June 12, 2024, available at https://www.statista.com/topics/5316/blackberry/#topicOverview.

Brian, Matt, "Nokia tempts developers with a free Nokia E7 and Windows Phone 7 handset," *The Next Web*, February 18, 2011, available at https://thenextweb.com/news/nokia-tempts-developers-with-free-a-nokia-e7-and-windows-phone-7-handset.

Chen, Brian X., "Microsoft-Nokia Hookup Leaves Symbian Devs Hanging," *Wired*, February 15, 2011, available at https://www.wired.com/2011/02/nokia-developers/.

D Magazine, "Handango CEO Is Dialed In," February 22, 2007, available at https://www.dmagazine.com/publications/d-ceo/2007/march/handango-ceo-is-dialed-in/.

Domínguez, Pedro, "Epic Games sets its sights on Steam in its crusade against commissions in digital stores," *Softonic*, December 16, 2023, available at https://en.softonic.com/articles/epic-games-sets-its-sights-on-steam-in-its-crusade-against-commissions-in-digital-stores.

Dredge, Stuart, "The moment Nokia realised its Ovi Store wasn't going to cut the mustard*," The Guardian*, June 7, 2011, available at https://www.theguardian.com/technology/appsblog/2011/jun/07/nokia-ovi-store.

Espósito, Filipe, "Disney+ and Hulu ditch App Store In-App Purchase billing as latest round of price increases goes into effect," *9 To 5 Mac*, October 21, 2024, available at https://9to5mac.com/2024/10/21/disney-hulu-app-store-in-app-purchase/.

European Commission, "Commission closes investigation into Apple's user choice obligations and issues preliminary findings on rules for alternative apps under the Digital Markets Act,"

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

*Press Release*, April 23, 2025, available at
https://ec.europa.eu/commission/presscorner/detail/en/ip_25_1086.

Fragen, Jordan, "Data.ai: Mobile game app revenue split evenly between ads, IAP," *Games Beat*, May 16, 2023, available at https://venturebeat.com/games/dataai-total-app-revenue-mobile-games-in-app-ad-spend/.

Goray, Sunila, "History of Mobile Apps - The Past, Present and Future," *WAC*, November 28, 2023, available at https://webandcrafts.com/blog/history-of-mobile-apps.

Grundberg, Sven, "Nokia unveils Nokia-X - its first Android phone," *Market Watch*, February 24, 2014, available at https://www.marketwatch.com/story/nokia-unveils-nokia-x-its-first-android-phone-2014-02-24.

Low, Aloysius, "Microsoft to shut down Nokia Store for feature phones," *CNET*, November 18, 2014, available at https://www.cnet.com/tech/services-and-software/microsoft-to-shut-down-nokia-store-for-feature-phones/.

Millan, Mark, "Nokia paying developers to build Windows Phone apps," *CNN*, September 30, 2011, available at https://edition.cnn.com/2011/09/30/tech/mobile/nokia-windows-phone.

Mobile World Live, "BlackBerry App World reaches 10,000 app 'milestone,'" September 9, 2010, available at https://www.mobileworldlive.com/old_latest-stories/blackberry-app-world-reaches-10-000-app-milestone/.

Moscaritolo, Angela, "BlackBerry World App Store Is Shutting Down," *PC Mag*, December 15, 2017, available at https://www.pcmag.com/news/blackberry-world-app-store-is-shutting-down.

My Broad Band, "BlackBerry's first Android smartphone – South African launch date and price," January 26, 2016, available at https://mybroadband.co.za/news/smartphones/153041-blackberrys-first-android-smartphone-south-african-launch-date-and-price.html.

Nokia, "Nokia and AT&T Give Developers 10 Million Reasons to Create Apps," *PR Newswire*, September 23, 2010, available at https://www.prnewswire.com/news-releases/nokia-and-att-give-developers-10-million-reasons-to-create-apps-103612744.html.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Orr, Andrew, "Apple now has over 34 million registered developers," *Apple Insider*, June 6, 2022, available at https://appleinsider.com/articles/22/06/06/apple-now-has-over-34-million-registered-developers.

PC Mag Encyclopedia, "BlackBerry App World," available at https://www.pcmag.com/encyclopedia/term/blackberry-app-world.

Perez, Sarah, "Move over, Apple: Meet the alternative app stores coming to the EU," *Tech Crunch*, March 13, 2025, available at https://techcrunch.com/2025/03/13/move-over-apple-meet-the-alternative-app-stores-coming-to-the-eu/.

Perez, Sarah, "Verizon's VCast App Store: Good for Consumers, Better for Verizon," *The New York Times*, March 25, 2010, available at https://archive.nytimes.com/www.nytimes.com/external/readwriteweb/2010/03/25/25readwriteweb-verizons-vcast-app-store-good-for-consumers-17127.html.

Raphael, JR, "Verizon's Android App Store: Everything There Is To Know," PC World, November 4, 2010, available at https://www.pcworld.com/article/498393/verizons_android_app_store_everything_there_is_to_know.html.

Research Nester, "Global Market Share, Forecast, and Trend Highlights Over 2025-2037," December 26, 2024, available at https://www.researchnester.com/reports/gaming-merchandise-market/6863.

Richter, Felix, "The Terminal Decline of BlackBerry," *Statista*, June 26, 2017, available at https://www.statista.com/chart/8180/blackberrys-smartphone-market-share/.

Samsung Galaxy Store Seller Portal, "Terms and Conditions," May 15, 2025, available at https://seller.samsungapps.com/help/termsAndConditions.as.

Statista, "Global market share held by Nokia smartphones from 1st quarter 2007 to 2nd quarter 2013," available at https://www.statista.com/statistics/263438/market-share-held-by-nokia-smartphones-since-2007/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Stoll, Julia, "Most preferred devices to watch selected streaming services in the United States in 2023," *Statista*, March 19, 2025, available at https://www.statista.com/statistics/1464051/preferred-devices-streaming-platforms-us/.

Team Pepper, "How and Why Did Nokia Fail?," *Pepper Content*, May 5, 2022, available at https://www.peppercontent.io/blog/how-and-why-did-nokia-fail/.

Tech Crunch, "Nokia Unveils Ovi Store, Application Sales To Debut In May," February 16, 2009, available at https://techcrunch.com/2009/02/16/nokia-unveils-ovi-store-application-sales-to-debut-in-may/.

Wingfield, Nick, "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *The Wall Street Journal*, July 25, 2018, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201.

Woods, Ben, "RIM pays developers $500,000 to build apps for BlackBerry 10," *ZD Net*, January 18, 2013, available at https://www.zdnet.com/article/rim-pays-developers-500000-to-build-apps-for-blackberry-10/.

Yeung, Ken, "Verizon shutting its app store in January 2013, removes Apps application from Android and RIM devices," *The Next Web*, November 5, 2012, available at https://thenextweb.com/news/verizon-closes-app-store-january-2013.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## APPENDIX B: CURRICULUM VITAE OF ROSA M. ABRANTES-METZ



# ROSA M. ABRANTES-METZ, PHD

## MANAGING DIRECTOR

Miami, FL

Email: RAbrantes-Metz@thinkBRG.com

Cell: +1.917.499.4944

Dr. Rosa M. Abrantes-Metz is a Managing Director at the Berkeley Research Group, based in Miami, FL, having previously been based in New York. She has over two decades of experience specializing in antitrust, securities, and financial regulation, including work in consulting and banking, as well as in government. Her main areas of specialization are industrial organization, monetary and financial economics, and statistics and econometrics. Dr. Abrantes-Metz has a particular expertise involving the intersection between alleged market manipulations and competition issues, including alleged coordinated conduct, and in monopolization matters. She is also an experienced expert on the economics of multisided platforms.

Dr. Abrantes Metz is a former adjunct associate professor at Leonard N. Stern School of Business, New York University, where she taught money and banking, financial institutions and the financial crisis, industrial economics, and econometrics for MBAs. She is a former Lecturer for honors econometrics at the department of economics at the University of Chicago, and various other fields of economics at Universidade Católica Portuguesa, in Lisbon, Portugal.

Dr. Abrantes-Metz's work is regularly featured in the media such as *The Wall Street Journal*, *Financial Times*, *The Economist*, *CNNMoney*, *CNBC*, *Forbes*, *Bloomberg*, *Fox Business*, *BusinessWeek*, *Washington Post*, *Huffington Post*, *Reuters*, *Crain's*, *Risk Magazine*, *Investor's Business Daily*, *L'Agefi Hebdo*, *Les Temps*, *Le Monde*, *Bloomberg TV*, *Sky News TV*, *BNN-Bloomberg TV*, *BBC Radio*, and *BBC TV*. She also contributes with Opinion Articles to several of these outlets.

Dr. Abrantes-Metz has received multiple awards and recognitions for her work as an economic expert. In 2019, she was recognized among "40 in their 40's" Notable Women Competition Professionals in the Americas, for which thirty six distinguished lawyers and four distinguished economists were selected among North, Central and South American professional women. She has also been honored by the American Antitrust Institute in 2022

for "Outstanding Antitrust Litigation Achievement in Economics" for her testimony in *US Airways v Sabre*. This matter was also selected by GCR as Matter of the Year among cases worldwide for 2022, for "creative, strategic and innovative work by teams of in-house and external lawyers and economists." In 2024 she received the same award by the American Antitrust Institute for her testimony *in Re: Apple iPhone Antitrust Litigation*. Also in 2024, one of her articles on antitrust compliance and AI received an award from Les Concurrences in the Business digital category. In addition, Dr. Abrantes-Metz also testified on *United States v Google*, a matter selected by GCR as Matter of the Year among cases worldwide for 2025, and winning in the Behavioral category. In 2025, Dr. Abrantes-Metz was selected as one of the Women in Antitrust list by GCR. She is has been selected as a *Who's Who* of Competition Lawyers & Economists every year since 2009, as well as a Thought Leader.

After working as a staff economist at the Federal Trade Commission, Dr. Abrantes-Metz continued to serve as a consultant for special projects with the Commission's Bureau of Economics. She was also a senior competition policy advisor for the World Bank. Dr. Abrantes-Metz is the author of several articles on econometric methods and screens for conspiracies, manipulations and fraud, multisided platforms, gasoline, pharmaceuticals and health care, telecommunications, event studies and valuation, structured finance, payments systems, credit default swaps, credit ratings agencies and regulation, financial benchmarks reform, new statistical tests, and diversity in assets management. Dr. Abrantes-Metz has published in peer-reviewed journals such as the *International Journal of Industrial Organization*, the *Journal of Pharmaceutical Finance, Economics and Policy*, *Applied Economics Letters*, the *Journal of International Arbitration*, the *Journal of Banking and Finance*, *Harvard Business Law Review*, and University of Pennsylvania *Journal of Business Law*. Her work has also appeared in trade publications including the *ABA Antitrust Section's Economics Committee Newsletter*, *The Antitrust Source*, *The Antitrust Magazine*, *The Antitrust Counselor*, Competition Policy International's *Journal* and *Antitrust Chronicle*; *Derivatives Litigation Reporter*; and *Securities Litigation Report*.

Dr. Abrantes-Metz is a co-author of a chapter on the role of the economic experts in addressing conspiracy allegations under federal antitrust laws in a book published by the American Bar Association. In addition, she has contributed to other books on international arbitration with a focus on event studies, and is a co-author of the chapter on antitrust corporate governance and compliance in the *Oxford Handbook of International Antitrust Economics*. She has addressed the economics of alleged cartels and information exchanges from various perspectives, and is the author of the 2013 guidelines on exchanges of information among competitors for the Latin America Regional Center for Competition. Most recently, she co-authored a chapter on screens in antitrust compliance for a book published by Les Concurrences.

Dr. Abrantes-Metz has developed numerous empirical screens for assessing potential conspiracies, manipulations, fraud, and price gouging, and is a pioneer in the field, contributing to the further development and increased adoption of these methods

worldwide. Screens are used by both plaintiffs and defendants in assessing antitrust risk. Her work covers both liability and damages, in the intersection between market manipulation and cartel activity. In 2008, she flagged the possibility of collusion in LIBOR prior to the launch of large-scale investigations. She has also flagged the possibility of manipulation and collusion in gold markets as well as in other markets, and more recently the possibility of bid rigging in US Treasuries auctions, among other financial products. She has developed and applied screens not only to assist governmental agencies and plaintiffs, but also on the defense side when companies and individuals are faced with allegations of this type of conduct.

Dr. Abrantes-Metz has extended her experience in LIBOR to the analyses of other financial benchmarks and potential illegal behavior worldwide, including in assessing alleged manipulations of spot markets.  She is regularly retained to address issues of price artificiality and price impact between price indices and prices in related markets as well as various types of contracts.  Some of her work included analyses of transportation of commodities as an alleged accessory or vehicle to market manipulation.  Her experience in alleged market abuse also extends to a variety of financial and commodities markets on alleged of spoofing and high frequency trading, for oil and gasoline, natural gas, electricity, silver, gold, platinum, palladium, aluminum, zinc, copper and other metals including scrap metals, as well as stock prices, futures prices and NYMEX settlement prices, various swaps and options, credit default swaps, foreign exchange markets, ISDAfix, US Treasuries, sovereign and supranational bonds, agency municipal bonds, variable rate demand obligations, mortgages, cryptocurrencies, payments systems, mortgage backed-securities, catering, lithium-ion batteries, airlines and other transportation and travel, professional sports, insurance, pharmaceuticals, mortgage foreclosure and evictions, defaults, among others.  In addition to her work in this area, Dr. Abrantes-Metz has been invited by regulatory bodies to participate in roundtables on how to reform financial benchmarks worldwide and has formally advised American and European authorities on this topic.  She has also advised public and private institutions on the development and implementation of new financial benchmarks. Dr. Abrantes-Metz has advised competition and other regulatory and securities agencies around the world on the use of empirical screens to detect the possibility of market rigging and fraud in general, on the use of pricing algorithms, and has formally been engaged as an economic expert in related matters by several governmental agencies.

In pharmaceuticals, she co-developed a model to estimate the likelihood of drugs failing and succeeding each of the clinical stages of the Food and Drug Administration, and their expected durations in each of these phases.  This model has become one of the most used by industry analysts to assist in valuing pharmaceutical and biotechnology pipelines. More recently, she studied the possibility of collusion in pharmaceutical markets.  Her research on pharmaceuticals and on rigging of markets has been discussed in books on how to value pharmaceutical and biotechnology companies, and in publications pertaining to healthcare, intellectual property and cartels.

Dr. Abrantes-Metz has provided testimony on damages, liability, class certification and plans of allocation for classes, related to alleged bid-rigging, price-fixing and market allocation in various markets, information exchanges, monopolization, mergers involving horizontal and vertical restraints, market definition, conduct involving multisided platforms in various industries including payments systems, healthcare, and airline bookings, the valuation of an energy services provider company, the valuation of expropriated oil services assets, the valuation of stock options and various types of swaps, the valuation of utilities, and breach of contracts due to changes in financial and commodity benchmarks, among others. Her clients include companies as American Airlines and Fannie Mae. Dr. Abrantes-Metz has also provided written and oral testimony as an economic expert for the U.S. Government – The U.S. Federal Energy Regulatory Commission – on BP's manipulation of natural gas markets, leading to a conviction by FERC and upheld by the Fifth Circuit Court of Appeals.  She is engaged as an expert witness in other energy markets manipulation matters on behalf of FERC on *FERC v Total*. Dr. Abrantes-Metz has testified on behalf of Fannie Mae through the Department of Justice on an alleged fraud matter in the market for mortgages foreclosures and evictions and has also been engaged by the U.S. Federal Trade Commission and the U.S. Department of Justice as an expert witness in matters involving multisided platforms. She has been retained by various Attorneys General offices. Most recently, she testified as the liability expert for the Department of Justice and seventeen states in US v Google in the Ad Tech industry, leading to a 2025 court decision of monopolization by Google in two relevant markets. In addition, she consults with numerous other competition authorities around the world. Dr. Abrantes-Metz's work has been cited in decisions by U.S. Federal Courts and by other Courts and Administrative Proceedings. She has testified before such courts and in jury trials, as well as in international arbitration and contractual disputes settings, in Europe, Brazil, Canada and the United States, both in English and in Portuguese.  Dr. Abrantes-Metz has been a signatory to Amicus Briefs submitted to the U.S. Supreme Court. In addition, she has undertaken pro bono consulting work assisting counsel on behalf of children with special needs, when estimating damages and settlement amounts in various matters in the state of New York.

Rosa Abrantes-Metz holds a Ph.D. and a Masters in Economics from the University of Chicago. She also holds a Masters in Economics from the Universitat Pompeu Fabra in Barcelona, Spain, and a *Licenciatura* in Economics from Universidade Católica Portuguesa.

## PROFESSIONAL EXPERIENCE

2023–                Berkeley Research Group
*Managing Director*

2020–2023        The Brattle Group
*Principal & Co-Chair Global Antitrust and Competition (2021-2023)*

*Co-Chair Technology Practice (2021)*

**2011–2020**      Global Economics Group & Market Platform Dynamics
*Managing Director & Principal*

**2007–2011**      LECG
*Principal*

**2004–2007**      NERA Economic Consulting
*Senior Consultant*

**2002–2004**      Federal Trade Commission, Bureau of Economics
*Economist*

**2001**      RCF Economic and Financial Consulting, Inc.
*Part-time Consultant (June–October)*

**2001**      Board of Governors of the Federal Reserve System
*Spring Associate (February–June)*

**1998**      Banco Bozano Simonsen - Rio de Janeiro, Brazil
*Summer Associate (June–October)*

## Teaching & Research Positions

**2009–2020**      New York University, Leonard N. Stern School of Business
*Adjunct Associate Professor – Department of Economics*
*Visiting Scholar*

**1998–2001**      University of Chicago, Department of Economics
*Lecturer for Honors Econometrics*
*Teaching Assistant for Graduate Econometrics and Macroeconomics*

**1992–1995**      Universidade Católica Portuguesa, Lisbon, Portugal
*Research Assistant*
*Instructor and Teaching Assistant, Lecturer*

## OTHER ACADEMIC AND AGENCY AFFILIATIONS

**2011–2018**      World Bank
*Senior Competition Policy Affiliated Expert*
*Consultant for Special Projects*

2004–2008        Federal Trade Commission, Bureau of Economics
*Consultant for Special Projects*

2007–2009        Suffolk University, Sawyer Business School
*Board of Advisors – Department of Accounting*

## EDUCATION

**University of Chicago**
PhD & MA in Economics

**Universitat Pompeu Fabra, Barcelona, Spain**
MA in Economics (with High Honors)

**Universidade Nova de Lisboa, Lisbon, Portugal**
Completed First Year Ph.D. Program Course Work in Economics

**Universidade Católica Portuguesa, Lisbon, Portugal**
*Licenciatura* in Economics (Magna Cum Laude)
Second highest average among all graduating students

## REPRESENTATIVE MATTERS

### Multisided Platforms, Antitrust and Regulation

- **Liability and Damages Involving Multisided Platforms.** Conducted analyses and testimony related monopolization, collusion, market definition, predatory pricing, damages, causation and liability, in industries such as financial and derivatives markets, payments systems, app stores, advertising, hotel bookings, air travel services and transportation, and health care markets.  This work included deposition and trial testimony on behalf of US Airways (American Airlines) in *US Airways v. Sabre,* testimony on behalf of the US Federal Trade Commission in *FTC v Surescripts,* testimony on behalf of a class of consumers in *Re Apple iPhone Antitrust Litigation,* testimony on behalf of SIBS payment system in *Portuguese Competition Authority v. SIBS,* testimony on behalf of the US Department of Justice in *United States of America, et al. v Google LLC,* among other public non-public multisided platform matters.

- **The Economics and Regulation of the Portuguese Retail Payments System.** Co-authored 2013 report analyzing how the Portuguese payment system operates and how regulatory interventions, especially those involving controls, would likely affect the interest of the various stakeholders in the system including consumers, merchants, banks, schemes, and infrastructure providers.  Filed another report on addressing allegations of monopolization by SIBS in various markets. In 2022, testified on behalf of SIBS

addressing anticompetitive conduct, awaiting trial in 2024.

- **Network Effects in Payment Systems.** Co-authored report on the evolution of a Portuguese payment system and the strength of its network effects.

- **Alleged Conspiracy in Multisided Platforms Markets.** Provided expert testimony on behalf of merchants, on market definition and collusion on an alleged cartel by the four credit card companies on the transition to EMV technology.

### Other Non-Financial Markets Conspiracies, Monopolization, Competition, Oil & Gasoline, Pharmaceuticals and Health Care, and Other General Antitrust Matters

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Appellees, *Susan Giordano, Angelene Hayes, Ying-Liang Wang, Anja Beachum v Saks & Company LLC, Saks Incorporated, Louis Vuitton USA Inc, Loro Piana & C. Inc, Gucci America, Inc., Prada USA Corp., Brunello Cucinelli USA, Inc.,* Eastern District of New York, 2023, co-signer.

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Petitioners, *National Collegiate Athletic Association v Shawne Alston*, U.S. Supreme Court, 2020, co-signer.

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Petitioners, *National Football League v Ninth Inning*, U.S. Supreme Court, 2020, co-signer.

- **Alleged Conspiracy in Catering.** Provided expert testimony on an alleged cartel case involving price-fixing, bid-rigging and market allocation in catering.  Developed numerous empirical approaches to address materiality and likelihood of such behaviors, and to address the alleged exchange of information among competitors.  Estimated alleged overcharges.  Trial testimony, company found not guilty.

- **Alleged Monopolization and Collusion in Food Markets Services.** Providing expert testimony for defendant on alleged monopolization and collusion of corporations in the provision of tech services for some food products.

- **Alleged Collusion in the Master Data Management in Life Sciences.** Providing expert testimony on behalf of IQVIA against allegations by Veeva that IQVIA and Reltio colluded to monopolize the market for Master Data Management.

- **Alleged Collusion in the Broiler Chicken Industry.** Providing expert testimony on behalf of the Washington State against various broiler chicken producers related to the Agri Stats information exchange.

- **Class Certification in Lithium Ion Batteries.** Provided expert testimony on class certification in the LIB market, and on the likelihood of collusion and likely market price effect.

- **Class Actions Certification and Price-Fixing.** Addressed class certification using various empirical methods to determine similarity of effects across consumers allegedly belonging to classes in price-fixing conspiracies in various financial and commodities markets.

- **Alleged Collusion and Analysis of Information Exchanges in Food Markets.** Developed economic analyses to assess the relevance of information exchanges among competitors and their impact on food markets overall.

- **Monopolization in Generic Pharmaceuticals.** Testimony submitted to the International Trade Commission on monopolization, damages and welfare loss related to market exclusion of competing generic products.

- **Alleged Conspiracy among Business Partners.** Developed an innovative approach to detect collusion based on survey data. Studied whether the patterns of responses to a survey by business partners of a major financial institution were indicative of collusion and identified suspects, later confirmed by internal records.

- **Guidelines on Exchanges of Information among Competitors.** Authored the guidelines on best practices for exchanges of information among competitors for Central and South American countries.

- **Collusion Detection in Oil and Gasoline Markets.** Developed empirical screens to detect conspiracies in gasoline. Applied screens to the US retail and wholesale data. Contributed to the FTC's gasoline monitoring program. Work performed as an FTC economist.

- **Analyses of Potential Collusion in Liquefied Natural Gas Markets.** Developed empirical and structural screens to address whether collusion in regional liquefied natural gas markets around the world may have happened, on behalf of investigated company.

- **Mergers and Acquisitions in Oil and Gasoline Markets.** Developed empirical analyses to access market behavior post mergers as an FTC economist. Developed and implemented empirical analyses to assist in merger evaluation both as an FTC economist and on behalf of the merging parties.

- **Training of Competition Authorities on Cartel Detection.** Trained Competition Authorities around the world on how to detect collusion through screening and advised on how to enhance anti-cartel antitrust policies. Training also involved the development of but-for models for prices and the estimation of overcharges.

- **International Bid-Rigging.** Developed economic and empirical analyses to flag likely ongoing bid-rigging in multiple international markets on behalf of competition

authorities around the world.

▪ **Estimation of Exposed Population and Brand Name Drug Sales.** Built models to estimate exposed population to a disease of interest and relevant drug sales on behalf of an insurance company in order to access validity of claims submitted due to adverse effects allegedly caused by the drug.

▪ **Analysis of Pharmaceutical Merger involving Horizontal and Vertical Restraints.** Expert report on vertical restraints related to an acquisition of major wholesalers by the national association of pharmacies in Europe. Report focused on tying, bundling and exchanges of information.

▪ **Mergers and Acquisitions in Pharmaceuticals.** Worked on numerous mergers in the pharmaceutical and biotech industries and addressed potential anticompetitive effects. Also valued biotech and pharmaceutical pipelines. Work performed both as an FTC economist and as an economic consultant on behalf of merging or acquired parties.

▪ **Competitive Dynamics in Consumer Products.** Empirical analyses of competition in brick-and-mortar and online for various consumer products.

▪ **Brand Name vs. Generic Pharmaceutical Drugs.** Estimated the effect of generic entry on price, volume and market shares of branded drugs in specific therapeutic areas. Used findings to estimate the but-for scenario absent generic entry. Estimated alleged damages.

▪ **Material Adverse Change in Connection with Acquisitions.** Determined the materiality of a disclosure on the existence of a price-fixing conspiracy sometime in the past in the aspartame market, prior to the relevant acquisition, and which could have affected the later decision to acquire the company.

▪ **Merger in the Poultry Industry in Brazil.** Co-authored and submitted an expert report on the estimation of the elasticities of demand across products in the same relevant market in an acquisition in the Brazilian poultry industry. Estimated efficiency gains and price changes due to the acquisition.

▪ **Mergers and Acquisitions in the Waste Management Industry in Portugal.** Report on likely pro and anticompetitive effects of a specific acquisition raising both horizontal and vertical concerns.

▪ **Daily Gasoline Pricing Forecast.** Developed an econometric model on behalf of a major oil company to predict daily gasoline prices for all of its competitors at the terminal level, and across all of its terminals in the United States. The model significantly improved analysts' forecasts and assisted with daily pricing decisions.

- **Trends and Cycles in Gasoline Prices.** Decomposed movements in gasoline prices between long-run and short-run components, across 365 cities in the United States, in order to study interconnections across various regional markets.  Work performed as an FTC economist.

- **Spectral Test for Mergers and Acquisitions.** Developed a new statistical test in the frequency domain and applied it to antitrust market definition in gasoline markets. This test was later used for other applications including in financial markets.  Work performed as an FTC economist.

- **Prediction of Hart-Scott-Rodino Filings.** Developed econometric models to predict HSR filings as a function of major economic indicators.  Work performed as an FTC economist.

- **Estimation of the Likelihood of Success and Duration of Drugs in Clinical Stages.** Co-developed a duration model to estimate the likelihood of success and failure of drugs in each of the clinical stages of the Food and Drug Administration, as a function of various drugs characteristics.  The model also estimates the expected duration for each of the drugs based on the same characteristics.  Model informs mergers and acquisitions, intellectual property and valuation.  Used as supporting evidence in FTC decisions such as in the Genzyme Corporation / Novazyme Pharmaceuticals, Inc., 2003 merger.  Work performed as an FTC economist and as an economic consultant.

- **Mergers and Acquisitions in Other Areas.** Worked on mergers and acquisitions in various other industries such as cable television, boats, railroads, and appliances.

- **Health Care Costs and Innovation.** Developed a new econometric approach to estimate the contribution of technological progress to the increase in health care expenditures in the United States over the last four decades.

- **Benefits of Health Care Spending.** Developed simple econometric models to assist in determining if countries spending more on health care also experience greater health benefits from such spending.

### Securities, Valuation, Risk Assessment, Financial Regulation, Other Conspiracies and Antitrust involving Financial Markets, and Manipulations and Fraud in Financial and Commodities Markets

- **Class Certification and Liability on an Alleged Collusion in Variable Rate Demand Obligation Bonds.**  Provided expert testimony on class certification related to collusion among major financial institutions to raise VRDO interest rates. Class was certified.

- **Alleged Hub and Spoke Conspiracy in Customized One Hundred Percent Placement**

**Bonds.**  Provided expert testimony on an alleged hub and spoke conspiracy organized by Nuveen to exclude Preston Hollow from doing business with major financial institutions. Settlement reached.

- **Alleged WTI Futures Manipulation on April 20, 2020.** Conducted numerous economic analyses to address transportation and storage capacity, algorithmic mal-function and market manipulation of the NYMEX WTI crude oil futures settlement price on April 20, 2020, which took a negative value.

- **USD LIBOR Conspiracy and Manipulation.** Research assisted in the launch of investigations around the world.  Subsequently analyzed liability and estimated damages for various securities benchmarked against USD LIBOR on behalf of large institutional investors and governmental agencies in the United States and abroad.

- **Alleged Manipulation and Collusion in Gasoline Spot Markets in Specific U.S. Regions.** Expert testimony on collusion and manipulation in a regional US market involving a benchmark price and other collusive conduct.  Estimation of price artificiality.

- **Alleged Conspiracies and Manipulations of Oil Prices Platts Indices.** Developed empirical approaches to determine whether there was evidence of a material impact of an alleged conspiracy and manipulation of the Platts WTI Index and Brent crude oil prices, for both spot and futures markets.  Studied trading data across all market players to address price materiality, causation, market power and possible motive.  Studied other related commodities and markets. Calculated illegal profits and damages.

- **Natural Gas Manipulation by Total.** Expert testimony on behalf of the Federal Energy Regulatory Commission.  Developed various empirical approaches to assist in addressing liability, causation, and artificiality, consistent with Total's traders' manipulation in natural gas markets in several regions in the United States.

- **Natural Gas Manipulation by BP.** Expert testimony on behalf of the Federal Energy Regulatory Commission.  Developed various empirical approaches to assist in addressing intent, causation, and artificiality, consistent with BP's manipulation in natural gas markets in 2008.  BP was found guilty of such conduct.  Written and oral testimony, deposition and testimony at hearing.  Commissions' decisions refer to Abrantes-Metz' testimony approximately 150 times all together.  Opinions upheld in several appeals by the Commission and in Federal Court and by the Fifth Circuit Court of Appeals.

- **Fraud in Services Provided on Mortgages Foreclosures and Evictions.** Written testimony on behalf of Fannie Mae and the U.S. Department of Justice.  Developed various empirical approaches to address liability and damages due to alleged overpricing of service providers in the market for mortgages foreclosures and evictions for a decade.

- **Manipulation of Cryptocurrencies.** Analyses of alleged collusion, manipulation and fraud potentially involving various cryptocurrencies.

- **Reform of LIBOR and Other Financial Benchmarks.** Advised regulatory agencies around the world on methodology, governance, regulation, transition and implementation of reforms of key financial benchmarks worldwide.

- **Design and Implementation of New Financial Benchmarks.** Advised private companies interested in developing and implementing new financial benchmarks.

- **Manipulations and Conspiracies of other (besides USD LIBOR) Financial Benchmarks including Euribor, Yen LIBOR, TIBOR, ISDAfix, Foreign Exchange WM/Reuters Fixing and FX Futures, Platts Brent and WTI Oil Benchmarks, and US Treasuries Futures.** Worked on manipulations and conspiracies of most major financial benchmarks, auction settings, bond issuance, and secondary markets for various bond types currently under investigation around the world.

- **Manipulations and Conspiracies in Precious and Non-Precious Metals Benchmarks for Sport Prices.** Developed numerous empirical and structural analyses to address collusion and manipulation for precious and non-precious metals benchmarks including LBMA gold and silver, platinum and palladium, aluminum, zinc and copper, assisting in the launching of investigations worldwide.

- **Metals Prices Artificiality due to Unwarranted Increased Warehousing**. Worked on manipulations and conspiracies in various metals markets involving alleged squeezes in metals markets due to unwarranted increased warehousing inventories.  These included London Metal Exchange warehousing disruptions on Aluminum, Zinc, Copper, among others. Developed empirical approaches to assist in addressing causation, artificiality, intent, and likelihood of collusion and damages.

- **Collusion and Manipulation of U.S. Treasuries Auctions and other Bonds.** Developed empirical and economic analyses to detect possible bid rigging in U.S. Treasuries auctions and its effect on the secondary, when issued and futures markets.

- **Collusion, Manipulation and Fraud in Specific Bond Markets including SSA bonds, Agencies bonds, and others.** Developed empirical and other economic analyses to detect possible rigging in bonds markets around the world as the expert economist for competition authorities.

- **Collusion and Manipulation involving Spoofing in Spot and Futures Markets for Various Commodities.** Developed empirical analyses to assist in the detection and identification of spoofing in commodities markets and estimate damages.

- **Analyses and Testimony of Liability and Damages Assessment in Alleged Breach of Contract Due to Change in Commodities Benchmark for Scrap Metal.** Developed empirical and economic analyses to address the impact on transactions due to a change in scrap metal index underlying contracts.  Testified on behalf of defendant in arbitration.

- **Collusion and Manipulation of Volatility Indices (VIX).** Developed empirical analyses consistent with collusion, manipulation and artificiality in the VIX Settlement Procedure.

- **Manipulations of Stock Prices.** Developed empirical approaches to determine whether an alleged revenue management episode in the computer industry materially affected the stock price of the company.

- **Alleged Manipulations of Hedge Funds Accounts.** Developed empirical approaches to estimate the likelihood that the observed patterns in trading and in profits by a specific trader were the result of a manipulation to maximize profits of specific accounts to the detriment of others.

- **Alleged Conspiracy and Manipulation Among Brokers and Dealers of Major Financial Institutions.** Estimated but-for transaction prices in an alleged conspiracy between brokers and dealers of a major financial institution.  Evaluated execution quality when compared to unsuspected benchmarks.  Estimated allegedly illegal profits and consumers' disadvantage. Developed analyses of liability. Presented at the SEC assisting in closing of investigation.

- **Commodities Futures Contracts Alleged Manipulations.** Developed empirical approaches to determine whether commodities futures prices of various precious metals were manipulated.  Defined relevant markets, estimated price artificiality, addressed causation and market power.  Studied floor and electronic trading, and where price discovery took place. Linked analyses to cash markets and related commodities. Estimated but-for trading, allegedly illegal profits, and potential damages.

- **Profitability Analyses of Special Purpose Vehicles.** Developed empirical analysis to estimate the profitability of various Special Purpose Vehicles after extracting the effects of taxes and other benefits, in comparison with foreign investments.

- **Alleged Fraud Related to Delivery Delay of Shorted Securities.** Conducted empirical analyses to assist in determining whether defendant's conduct was consistent with SEC's allegations of purposed delay in delivering shorted securities to profit from illicit additional interest earned.

- **Credit Ratings and Risk.** Analyzed the evolution of structured finance ratings during the eruption of the recent financial crisis in the United States.  Timed these changes

with various measures of increased risk in the market and disclosures of exposures to this risk by major financial institutions.

- **Valuation of Structured Finance Securities during the 2007-2009 Financial Crisis.** Analyzed econometric models and assumptions used to value structured finance securities, namely RMBS and CDOs, during the eruption of the financial crisis. Evaluated models' sensitivities to stress scenarios and calibrations. Developed models for RMBS expected cumulative losses based on corporate default models, and tested model implications on mortgages correlations, crossed-pool correlations, and volatility of house price growth and of cumulative losses against actual and forecasted data.

- **Risk Assessment in the Financial Crisis.** Developed and implemented a sophisticated Markov Regime Switching Model to identify the evolution of risk in ABX indices from 2007 through 2009, which allowed for five different states of variable intensity and volatility. Applied various measures of relative risk in the literature to the financial crisis to assist in determine how early was subprime risk identifiable by the market.

- **Analysis of Disclosures during the Subprime Mortgages Crisis.** Matched companies' disclosures of information related to the exposure of particular assets to the evolution of risk in the market place to assist in determining whether public disclosures were timely made.

- **Valuation of Expropriated Assets in the Oil Industry.** Provided expert testimony on an international arbitration matter on the value of expropriated assets belonging to a publicly traded oil services company with headquarters in Texas, whose assets were expropriated by Venezuela.

- **Valuation of Utilities Assets.** Provided expert testimony on the valuation of a utilities company, containing a fairness opinion and addressing robustness and appropriateness of various valuation methods employed during a merger and acquisition process. Addressed issues related to material adverse change with respect to the acquisition.

- **Valuation in the Pharmaceutical and Biotechonology Industries.** Opined on the price offered by a major pharmaceutical company in the acquisition of a leading biotechnology company. Used discounted cash flow models, multiple models and event studies. Assisted in the estimation of the value of the biotechnology R&D pipeline.

- **Damages Suffered by Beyond Meat.** Expert testimony on damages suffered by Beyond Meat due to alleged misinformation spread by main competitor.  Analyses included an event study, the pricing of a convertible bond and debt pricing in the context to the Merton model.

- **Stock Options and Swaps Valuation.** Opined on the valuation of stock and indices options

by a financial institution in Europe.

- **Section 10b-5 Securities Litigation.** Used event studies to estimate the effect of alleged fraud on companies' stock prices and the economic value of the effect. Estimated alleged damages.

- **Insider Trading.** Analyzed the materiality of the gain allegedly obtained through insider trading. Evaluated stock and bond prices reactions to the allegedly private and illegally obtained information. Determined the extent to which such information had previously been known and assimilated by the market.

- **Testing for Market Efficiency.** Implemented a variety of statistical tests for market efficiency of particular securities during the financial crisis and compared results with those prior to the crisis. Assessed and explained changes and the appropriateness of the assumption of market efficiency.

- **Analysis of Credit Default Swaps.** Analyzed the information content of credit default swaps and to assist in determining the material impact of having only quote data available rather than final transaction prices for market participants in general.

- **Stock Options Backdating and Spring Loading.** Developed various empirical screens to determine whether patterns observed in stock price excess returns related to alleged stock options backdating and spring loading were statistically anomalous. Studied the materiality of these events.

- **Trading in Major Stock Exchanges.** Assisted in determined whether brokers and dealers in a major stock exchange illegally profited from not crossing buying and selling orders. Estimated allegedly illegal profits and consumers' disadvantage.

- **Materiality of Disclosures Related to Conspiracies.** Investigated whether the disclosure of an alleged conspiracy between members of the same industry materially affected stock prices of the companies in the same industry and the transaction price of a merger.

- **Material Adverse Change in Connection with Merger Agreements.** Determined materiality of the stock price response to information not disclosed prior to an acquisition, information which may have affected the acquisition decision itself had it previously been known.

### Other

- **Diversity of Asset Managers.** Co-authored a study to assess the representation of women and racial or ethnic minorities among asset managers used by the top 50 charitable endowments in the United States.

- **Drug Recalls.** Estimated damages associated with the recall of major blockbuster drugs.

- **Asbestos.** Estimated damages associated with construction workers' exposure to asbestos.

- **Macroeconomic Effects of Airport Expansion**. Assisted in the estimation of the macroeconomic and sectorial specific impacts of the expansion of the Lisbon airport into the Portuguese economy.

- **Postal Services Modeling.** Developed a new econometric model to predict demand for the United States Postal Service. Model results assisted management on decisions related to pricing and product innovations.

- **Patent infringement in Medical Devices.** Estimated lost profits due to alleged patent infringement in the medical device industry.

- **Patent infringement in Pharmaceuticals.** Estimated lost profits due to alleged patent infringement in the pharmaceutical industry.

## RECENT ORAL TESTIMONY

*In re: Interest Rate Swaps Antitrust Litigation*
United States District Court for the Southern District of New York
Index No.: 16-MD-2704-JPO

*United States of America v Google LLC*
United States District Court for the Eastern District of Virginia
Alexandria Division
Index No.: 1:23-cv-00108

*State of Washington v Tyson Foods, Inc., et al*
State of Washington King County Superior Court
Index No.: 21-2-14174-5 (SEA)

*Veeva Systems, Inc. v IQVIA Inc. and IMS Software Services, Ltd.*
United States District Court for the District of New Jersey
Index No.: 2:19-cv-15517 (CCC-MF)

*Preston Hollow Capital LLC v Nuveen Asset Management LLC, and John V. Miller*
United States District Court, Southern District of New York
Index No.: 20-cv-5597 (PKC-JLC)

*The City of Philadelphia, et al. v. Bank of America Corporation, et al.*

16 of 37

United States District Court, Southern District of New York
No. 19-cv-1608 (JMF)

*Portuguese Competition Authority: Autoridade da Concorrência v SIBS*
Portugal
No. PRC/2020/05

*In Re: Apple iPhone Antitrust Litigation*
United States District Court, Northern District of California Oakland Division
Case No. 4:11-cv-06714-YGR

*FERC v. Total*
Federal Energy Regulatory Commission Office of Enforcement
Total Gas & Power North America, Inc. et al.
No. IN12-17-000

*Don Lee Farms v. Beyond Meat, Inc., et al.*
Superior Court of the State of California, County of Los Angeles
No. BC662838

*B&R Supermarket, et al. v. Visa, Inc., et al.*
United States District Court for the District of Columbia
No. 1:17-cv-02738-MKB-JO

*Federal Trade Commission v. Surescripts, LLC*
United States District Court for the District of Columbia
No. 19-cv-1080 (JDB)

*US Airways, Inc. v. Sabre Holdings Corporation et al.*
United States District Court, Southern District of New York
No. 1:11-cv-02725 (LGS)

*In Re: Lithium Ion Batteries Antitrust Litigation*
United States District Court, Northern District of California, Oakland Division
No. 13-MD-02420 YGR (DMR)

*FERC v. BP*
Federal Energy Regulatory Commission
BP America Inc., et al.
No. IN13-15-000

## PUBLICATIONS AND MANUSCRIPTS

### Direct and Indirect Network Effects, Multisided Platforms, Dynamic Competition, Antitrust and Regulation

"Network Effects and the Neutrality of Transaction Fees," with Albert D. Metz, *Working Paper,* 2025.

"Assessing Coordinated Effects in Mergers with Price Leadership Models," with Pedro Erdei-Gonzaga, Albert D. Metz, and Ben Wagner, *The Antitrust Source*, October 2024.

"Bundled Benefits of Retail Memberships," with Mame Maloney and Jeff Brazell, available at CCIA (https://research.ccianet.org/reports/bundled-benefits-retail-memberships/), December 2023; shorter version titled "Unravelling the Bundled Benefits of Retail Memberships," *Law360*, January 2024.

"How to Approach the Calculation of Overcharge by Multisided Platforms," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* January 2023.

"Competitive Dynamics of Online and Brick-and-Mortar Retail Prices," with Mame Maloney, available at CCIA (https://research.ccianet.org/wp-content/uploads/2022/08/CCIA_Competitive-Dynamics-Handout.pdf), and a shorter version at *Competition Policy International, Antitrust Chronicle,* July 2022.

"Understanding the Economics of Platforms," with Michael Cragg, Albert Metz and Minjae Song, American Bar Association, Antitrust Law Section's *The Antitrust Magazine*, December 2021.

"Competition and Payment Card Interchange Fees: A Brief Note to the OECD Latin American and Caribbean Competition Forum," prepared for Forum presentation, September 2021.

"Collusion and Network Effects: Modeling the Dynamics of Single- and Multisided Platforms," with Albert D. Metz, *Working Paper,* June 2021.

"Modeling the Dynamics of Network Entry and Competition Under Single- and Multi-Homing," with Albert D. Metz, *Working Paper,* June 2021.

"The Dynamics of Single- and Multisided Platform Monopolies," with Albert D. Metz, *Working Paper,* September 2020.

"Regulating Multisided Platforms? The Case Against Treating Platforms as Utilities" *Competition Policy International, Antitrust Chronicle,* August 2020.

"The Economics and Regulation of the Portuguese Retail Payments System," with David S.

Evans, SIBS, November 2013.

**Conspiracies, Manipulations, Information Exchanges, Empirical Screens, Pricing Algorithms, Antitrust and Financial Regulation**

"The Key Role of Guidelines on Exchanges of Information Among Competitors and the Divergent Transatlantic Paths," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* January 2025.

"Can Exchanges of Anonymized Disaggregated Data Facilitate Collusion?" with Pedro Ergei-Gonzaga, Albert D. Metz, Ben Wagner, *Working Paper,* March 2024.

"The Increased Role of Economics in Cartel Cases," with Pedro Ergei-Gonzaga, Albert D. Metz, Ben Wagner, *Competition Polic.y International, Antitrust Chronicle,* April 2024.

"Information Exchanges Between Competitors in the Age of AI: A Note," with Pedro Ergei-Gonzaga, February 2024.

"Antitrust & Regulatory Compliance in the 21st Century: New Challenges, New Opportunities and the Role of AI," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* September 2023.

"A Note on Screens' Worldwide Adoption and Successes," *OECD Regional Centre for Latin America*, January 2021.

"Pricing Algorithms and Collusion: Is There Clarity on What Corporations may be on the Hook For?" with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* November 2020.

"Why Screening is a 'Must Have' Tool for Effective Antitrust Compliance Programs," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* November 2019.

"Pricing Algorithms and Implications for Competition," *Competition Policy International, Cartel Column,* May 2019.

"The Future of Cartel Deterrence and Detection," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* January 2019.

"Can Machine Learning Aid in Cartel Detection?" with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* July 2018.

"Recent Financial Sector Conspiracies and Manipulations: How to Prevent Future Similar Conduct?" *Competition Policy International, Antitrust Chronicle,* June 2016 (1).

"Antitrust Compliance 2.0: The Use of Structural Analysis and Empirical Screens to Detect Collusion and Corruption in Bidding Procurement Processes," with Elizabeth Prewitt, *Competition Policy International, Antitrust Chronicle,* June 2015 (2).

"Comments on ICE Benchmark Administration's Position Paper of 20 October 2014: LIBOR Reform," with Albert D. Metz, December 18, 2014.

"Recent Successes of Screens for Conspiracies and Manipulations: Why Are There Still Skeptics?" *Competition Policy International, Antitrust Chronicle,* October 2014 (2).

"Roundtable on *Ex Officio* Cartel Investigations and the Use of Screens to Detect Cartels, A Paper by Rosa M. Abrantes-Metz," prepared for the Directorate for Financial and Enterprise Affairs, Competition Committee, Organization for Economic Cooperation and Development, for discussion at its meeting held on October 31, 2013, OECD, Paris.

"Aluminum Market Dislocation: Evidence, Incentives and Reform," September 18, 2013, Working Paper, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2328902.

"Proactive *vs.* Reactive Anti-Cartel Policy: The Role of Empirical Screens," Working Paper, June 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2284740.

"Principles for Financial Benchmarks: Comments on the OICU-IOSCO Consultation Report on Financial Benchmarks," May 15, 2013, available at http://www.iosco.org/library/pubdocs/409/pdf/Rosa%20M.%20Abrantes%20Metz.pdf.

"The Determinants of Cartel Duration," with John M. Connor and Albert D. Metz, Working Paper, April 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263782.

"Enhancing Financial Benchmarks: Comments on the OICU-IOSCO Consultation Report on Financial Benchmarks," with David S. Evans, Working Paper, February 10, 2013, available at http://www.iosco.org/library/pubdocs/399/pdf/Prof.%20Rosa%20Abrantes%20-%20Metz%20NYU.pdf.

"Revolution in Manipulation Law: The New CFTC Rules and the Urgent Need for Economic and Empirical Analyses," with Gabriel Rauterberg and Andrew Verstein, *University of Pennsylvania Journal of Business Law,* 15(2), 357-418, 2013, also available at https://www.law.upenn.edu/live/files/1806-verstein15upajbusl3572013pdf.

"Regional Competition Center for Latin America Presents: Guidelines on Exchanges of Information Among Competitors," *Competition Policy International Latin America Column*, January 17, 2013.

"Will The Wheatley Recommendations Fix LIBOR?" with David S. Evans, *Competition Policy International, Antitrust Chronicle,* November 2012 (2), refer also to http://blogs.law.harvard.edu/corpgov/2013/01/04/replacing-the-libor-with-a-transparent-and-reliable-index/#comments.

"Antitrust Guidelines for Horizontal Exchanges of Information among Competitors for the Regional Competition Center for Latin America," October 2013.

"Replacing LIBOR with a Transparent and Reliable Index of Interbank Lending: Comments on the Wheatley Review of LIBOR Initial Discussion Paper," with David S. Evans, Working Paper, September 6, 2012, available at http://cdn.hm-treasury.gov.uk/condoc_wheatley_review_responses_1.pdf.

"Lessons from LIBOR for Detection and Deterrence of Cartel Wrongdoing," with Daniel D. Sokol, *Harvard Business Law Review Online*, vol 3, pp 10-16, available at http://www.hblr.org/2012/10/the-lessons-from-libor-for-detection-and-deterrence-of-cartel-wrongdoing/.

"How Should the LIBOR be Reformed?" *Competition Policy International, Antitrust Chronicle,* July 2012 (1).

"Interview: Update on 'Screens for Conspiracies and Their Multiple Applications,'" *Competition Policy International, Antitrust Journal*, June 8(1), 2012.

"A Short Note on Manipulation, Speculation and Crude Oil Prices," Mimeo, April 2012.

"How Far Can Screens Go in Detecting Explicit Collusion? New Evidence From the LIBOR Setting," with Albert D. Metz, *Competition Policy International Antitrust Chronicle*, March (1) 2012.

"Why and How to Use Empirical Screens in Antitrust Compliance?" *Competition Policy International Antitrust Chronicle*, February (1) 2012.

"Defending Against Allegations of Fraud and Manipulation: The Role of the Economist under the New CFTC Rules," Working Paper, December 2011.

"Design and Implementation of Screens and Their Use by Defendants," *Competition Policy International Antitrust Chronicle*, September (2) 2011.

"LIBOR Litigation and the Role of Screening: The Need for Enhanced Compliance Programs," *Competition Policy International Antitrust Chronicle*, July (2), 2011.

"LIBOR Manipulation?" with Michael Kraten, Albert D. Metz and Gim Seow, *Journal of Banking and Finance,* 36, 136-150, 2012, *List of Most Download Journal of Banking and Finance Articles,* 2012, first draft dated August 4, 2008 and available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1201389.

"Tracking the LIBOR Rate," with George G. Judge and Sofia B. Villas-Boas, *Applied Economics Letters,* 18, 893-899, 2011.

"Investigating the LIBOR Rate," with Sofia B. Villas-Boas, Working Paper, July 2010, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1646600.

"Screens for Conspiracies and Their Multiple Applications - Extended," with Patrick Bajari, *Competition Policy International Journal,* 6(2), Autumn 2010.

"The Power of Screens to Trigger Investigations," *Securities Litigation Report*, Vol. 10, No. 10, November 2010.

"Enhancing Compliance Programs through Antitrust Screening," with Patrick Bajari and Joseph E. Murphy, *The Antitrust Counselor*, 4(5), September 2010.

"Antitrust Screening: Making Compliance Programs Robust," with Patrick Bajari and Joseph E. Murphy, Working Paper, July 2010.

"Economic Expert Testimony in Conspiracy Cases Under Federal Antitrust Laws," with Dina O. Aguilar, Mark Frankena, Kostis Hatzitaskos and David Scheffman, Working Paper, February 2010 (in "Proof of Conspiracy Under Federal Antitrust Laws, ABA editions, 2010).

"Screens for Conspiracies and their Multiple Applications," with Patrick Bajari, American Bar Association, Antitrust Section's *The Antitrust Magazine*, 24(1), Fall 2009.

"Screening for Conspiracies: Applications for Litigation, Pre-Litigation, Regulation and Internal Monitoring," with Patrick Bajari, March 2009, available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863.

"Is the Market Being Fooled? An Error-Based Test for Manipulation," with Sumanth Addanki, available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863, 2007, revise and resubmit.

"Competition Authorities are Screening for Conspiracies: What are they Likely to Find?" with Luke M. Froeb, *The American Bar Association Section of Antitrust Law Economics Committee Newsletter*, 8(1), 10-16, Spring 2008.

"A Variance Screen for Collusion," with Luke M. Froeb, John F. Geweke and Chris T. Taylor, *International Journal of Industrial Organization*, 24, 467-486, 2006, *Most Cited International Journal of Industrial Organization Articles,* 2010.

## Pharmaceuticals and Health Care

"The Determinants of Pharmaceutical Review, Success and Duration," with Chris P. Adams and Albert D. Metz, Working Paper, November 2014.

"Health Care Benefits vs. Costs: Are We Making the Right Choices?" *Competition Policy International, Antitrust Chronicle*, September (2), 2014.

"Why a Reduction of Health Care Costs *per se* May be a Misleading Policy Objective," *Competition Policy International, Antitrust Chronicle*, July (2), 2012.

"Benefits to Society from Health Care Spending: Do We Get More for Higher Spending?" Working Paper, May 2012.

"Defining the Cost and Price of Medical Innovation: An Economic Approach," December 16, 2010, available at http://www.disruptivewomen.net/2010/12/16/defining-the-cost-and-price-of-medical-innovation-an-economic-framework/.

"New Evidence on The Pharmaceutical Pipeline and Its Meaning for Mergers," *The American Bar Association Section of Antitrust Law Economics Committee Newsletter*, 5(1), 18-23, Spring 2005.

"Empirical Facts and Innovation Markets: Analysis of the Pharmaceutical Industry," with Chris P. Adams and Albert D. Metz, American Bar Association, Antitrust Section's *The Antitrust Source*, 4(4), March 2005.

"New Evidence On The Pharmaceutical Pipeline and Its Meaning for 2005," *Pharmaceutical Processing*, January 2005.

"Pharmaceutical Development Phases: A Duration Analysis," with Chris P. Adams and Albert D. Metz, *Journal of Pharmaceutical Finance, Economics & Policy*, 14, 19–42, 2006.

## Monetary and Financial Economics, Theoretical Econometrics, Other Applied Econometrics, Other Antitrust and Regulation of Financial Markets

"Is Financial Regulation Appropriately Dealing With Systemic Risk? Are We Really Fixing Existing Problems or Creating New Ones?" January 2014, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2381180.

"Did Credit Rating Agencies Cause the European Sovereign Debt Crisis?" *Competition Policy International, Antitrust Chronicle,* January 2014 (2).

"Misdiagnosing and Mistreating the Market for Credit Ratings?" *Competition Policy International, Antitrust Chronicle,* November 2013 (2).

"What's to be done with Rating Agencies? Understanding the Problem to Find a Solution," with Kristiyana T. Teodosieva, *The Exchange*, *American Bar Association*, September 2013, also available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2288195.

"Testing Equalities of Variances for Paired Time Series at Selected Frequencies: An application to Sovereign Credit Default Swaps," with Albert D. Metz, August 2011.

"The Use of the Event Study Methodology in International Arbitration Damages Assessments," with Santiago Dellepiane, *Journal of International Arbitration*, 28(4), 327-342, 2011.

"The Information Content of Credit Default Swap Prices," with Cathy Niden, *Derivatives Litigation Reporter*, 14(18), July 2008.

"The Effect of Entry on Prices and Costs in Mobile Telephony," with Pedro Pereira, http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863, Working Paper 2008, revise and resubmit.

"Before and After the EMU: Financial Integration, Monetary Policy and Welfare Changes," PhD Dissertation in Economics, University of Chicago, June 2002.

"The European Monetary Union–Could there be any 'Winners' and 'Losers'?" Manuscript, University of Chicago, July 2001.

"An Evaluation of the Macroeconomic Stability of the European Monetary Union, and an Original Decomposition of its Business Cycles into Real and Monetary Components," Manuscript, University of Chicago, June 1999.

### Book Contributions

"Antitrust and Regulatory Compliance: New Challenges and Opportunities, and the Use of AI" with Albert Metz. book chapter included in *Research Handbook on Competition and Corporate Law,* edited by Florence Thepot, forthcoming.

"The Role of Screening in Antitrust Compliance," book chapter included in *A Guide to Antitrust Compliance*, with Albert D. Metz, published by *Les Concurrences*, Antitrust Publications and Events, 2021.

"Antitrust Governance and Compliance," with Daniel Sokol, *The Oxford Handbook of International Antitrust Economics*, Chapter 23, 2015, 586-618.

Co-author of a chapter on the "Role of Event Studies in International Arbitration Cases", second book of the *Foro de Arbitraje en Materia de Inversión*, Sonia Rodríguez Jiménez and Herfried Wöss (eds.), *Instituto de Investigaciones Jurídicas, Universidad Nacional Autónoma de México*, México, September 2013, http://biblio.juridicas.unam.mx/libros/libro.htm?l=3386.

Co-drafter of the chapter on "Restraints of Trade," Volume on "2010 Annual Review of Antitrust Law Developments," *American Bar Association Editions*, March 2011.

Co-drafter of the chapter on "The Role of the Economic Expert in Conspiracy Cases," included in the Volume on "Proof of Conspiracy under Antitrust Federal Laws," *American Bar Association Editions*, April 2010.

### Ongoing Research

"Antitrust Compliance: Its History, Art and Science," with Don Klawiter.

"Competitive Entry Deterrence in Multisided Platforms," with Albert D. Metz.

"The Multiple Applications of Screens in Finance: Manipulations, Conspiracies, Insider Trading, FCPA Violations, and Other Fraud."

"Detecting Collusion in Survey Data," with Albert D. Metz.

### Selected Opinion Articles

"Time to rethink deficient market structures," *Financial Times*, April 11, 2016, available at https://www.ft.com/content/f95648f8-d499-11e5-829b-8564e7528e54.

"Stress Tests Won't Prevent the Next Financial Crisis: Expected losses under invented scenarios tell us little about risk and reality," *The Wall Street Journal*, March 18 2014, available at http://online.wsj.com/news/articles/SB10001424052702303704304579380961631198726.

"Time is nigh to rethink the role of benchmarks: New indices should reflect lessons learnt from recent scandals," *Financial Times*, January 10, 2013, available at http://www.ft.com/intl/cms/s/0/222f4230-79ec-11e3-8211-00144feabdc0.html#axzz2rTDaZS6s.

"How to Keep Banks from Rigging Gold Prices," *Bloomberg*, December 19, 2013, available at http://www.bloomberg.com/news/2013-12-19/how-to-keep-banks-from-rigging-gold-prices.html.

"Banks' Role in Metal Trade Deserves Scrutiny," *Bloomberg*, July 31, 2013, available at http://www.bloomberg.com/news/2013-07-31/banks-role-in-metal-trade-deserves-scrutiny.html.

"How to Use Statistics to Seek Out Criminals," *Bloomberg*, February 26, 2013, available at http://www.bloomberg.com/news/2013-02-26/how-to-use-statistics-to-seek-out-criminals.html.

"Should New Financial Products be Regulated by an FDA-like Agency? 8 Reasons Why Not," May 16, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/should-new-financial-products-be-regulated-by-an-fda-like-agency-8-reasons-why-not/.

"Credit Rating Agencies, the Financial Crisis, and Regulation," April 18, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/credit-rating-agencies-the-financial-crisis-and-regulation/.

"The Complexity and Challenges of Proposed Swap Regulations," April 4, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/the-complexity-and-challenges-of-proposed-swaps-regulations/.

"Screens and the Alleged LIBOR Conspiracy and Manipulation," March 21, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/screens-and-the-alleged-libor-conspiracy-and-manipulation/.

"Has the LIBOR-Alleged Conspiracy and Manipulation Inspired the New CFTC Regulations?" March 7, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/has-the-libor-alleged-conspiracy-and-manipulation-inspired-the-new-cftc-regulations/.

## SELECTED PRESENTATIONS

### Multisided Platforms, Big Data & Technology, Labor and Dynamic Competition

"Presidential Politics and Antitrust," Panel discussion, American Bar Association, October 2024.

"Competition Law and Digital Ecosystems," Panel discussion, GCR Law Leaders Global, Miami, February 2024.

"Latest Antitrust Developments," Invited Dinner Speaker, Willkie Farr, Antitrust Spring Meetings, Washington DC, March 2023.

"Do Not Pass Go – Steering and Monopolies," Panel discussion at the Antitrust Spring Meetings, American Bar Association," Washington DC, March 2023.

"Competition in Labor Markets:  What Antitrust Has To Do With That?" Panel discussion, hosted by New York University, New York, December 2022.

"Labor Markets: Where are the Antitrust Concerns?" Panel discussion, 10th Bill Kovacic Antitrust Salon, hosted by Les Concurrences, Washington DC, September 2022.

"The Role of Economics and Economists in Judicial Review of Antitrust Enforcement," Panel discussion, co-hosted by OECD Regional Centre for Competition (RCC) in Latin America, July 2022.

"Dynamic Competition and Public Policy," Panel discussion, co-hosted by the George Washington University Regulatory Studies Center and Information Technology and Innovation Foundation, Washington D.C., April 2022.

Expert Witness at Mock Trial, ABA Spring Meetings, Washington D.C., April 2022, on Merger-to-Monopoly matter in multisided platforms.

"Antitrust and the Future of Multisided Platforms," Panel discussion, ABA Webinar, December 2021.

"Digital Transformation Investment," Panel discussion, C-Vision Internal Council, November 2021.

"Competition and Payment Card Interchange Fees," Presentation, OECD Latin American and Caribbean Competition Forum, November 2021.

"What does big data mean for antitrust?" Panel discussion, University of Iowa, September 2021.

"The Future of Competition Policy in China," Panel discussion, Fordham Competition Law Institute Webinar, June 2021.

"Financial Sector Consortia & Collaborations: A Brief Economic Perspective," Panel discussion, Les Concurrences, April 2021.

"Economic Issues Involving Platforms, Privacy and the Digital Economy," Panel discussion, The Canadian Bar Association Competition Law Section, February 2021.

"Understanding Network Effects in the Platform Context," Panel discussion with Mike Cragg, Evan Chesler, Lars Kjolbye, Kai-Uwe Kuhn, and Christopher Yates, at the *Fordham Competition Law Institute*, October 2020.

"Antitrust Analysis of Platform Markets: Beyond American Express," panel discussion with Joseph E. Stiglitz, David S. Evans, Evan Chesler and Michael Cragg, Competition Policy International, March 2020.

### Conspiracies, Manipulations, Fraud, Price Gauging, Screens, Pricing Algorithms and Regulation and Financial Markets

"Competition and Innovation in Financial Services," Panel discussion at the American Bar Association meetings in the Americas, Cartagena, Colombia, May 2025.

"Mind Your Exchanges: Talk Isn't Always Cheap," Panel discussion at the Antitrust Spring Meetings, American Bar Association," Washington DC, April 2024.

"Pricing Algorithms and Antitrust," Invited Lunch Speaker, Antitrust Group at Willkie Farr, Washington DC, March 2024.

"Leveraging Data to Enhance Antitrust Compliance," Panel discussion, American Bar Association, February 2024.

"Pricing Algorithms: What to be Concerned About?" Panel discussion, Berkeley Research Group, Washington DC, February 2024.

"Cartels Screening and Pricing Algorithms" Invited Guest Presentation to ICC-Mexico Diploma in Competition Policy Academic Program," February 2024.

"Antitrust Compliance and AI," Panel discussion at Morgan Lewis' 2023 Antitrust in the Financial Sector Summit," Morgan Lewis NY office, September 2023.

"Antitrust Compliance History, Art and Science," Workshop on Research Handbook on Competition and Corporate Law," ZEW, Mannheim, Germany, March 2023.

"International Cartels, Screening, and Algorithmic Collusion," Invited Guest Presentation to ICC-Mexico Diploma in Competition Policy Academic Program," January 2023.

"Outsourcing Competition Law Enforcement," Panel discussion, GCR Law Leaders Global, Miami, February 2023.

"Adoption of Screens in Antitrust Compliance Programs and Antitrust Compliance in General," Panel discussion for *Les Concurrences*, launch of new Antitrust Compliance book, May 2022.

"International cartels and how to detect them," Presentation, ICC-Mexico Diploma in Competition Policy Academic Program, November 2021.

"Algorithms and Competition Policy," Panel discussion, CRESSE Conference, July 2021.

"Screening for Conspiracies: What's New? What's Best?" Presentation for the OECD Virtual Workshop on Screening for Ukrenergo, June 2021.

"Working with Economic Experts from Selection Through Trial: Women's Insights," Panel discussion, The American Bar Association, series Bar None II: Women Leading in the Courtroom, April 2021.

"Using Econometrics and Big Data to Guide Antitrust Enforcement and Compliance," panel discussion, ABA Antitrust Law Section, Economics Committee, March 2021.

"#88 What's in a Screen? Using Data as Evidence of Collusion and Manipulation (or lack thereof)," Guest speaker at *Our Curious Amalgam podcast*, American Bar Association, Antitrust Section, November 2020.

"Screens: A Must for Cartel Detection and Deterrence," presentation for the OECD Regional Centre for Competition in Latin America, section on "Proactive Tools for Cartel Detection." Panel discussion with heads of cartel enforcement for competition authorities of Argentina, Brazil, Mexico and Peru, September 2020.

"The Economics of Price Gouging," Panel presentation and discussion on "COVID-19 Price Gouging Roundtable," Fideres, September 2020.

"2020 Next Generation of Antitrust, Data Privacy and Data Protection Scholars Conference," Invited Panel Moderator on Collusion and Pricing Algorithms, New York University Law School and American Bar Association, New York, January 2020.

"Estimating Price Impact Due to Manipulation," Federal Energy Regulatory Commission, Washington, DC, April 2019.

"Pricing Algorithms and Collusion," Panel Discussion, Federal Trade Commission's Hearings on Competition, Washington DC, November 2018.

"Beyond Leniency: What else can be done to detect and deter collusion?" Presentation to the NYSBA Executive Committee, New York, May 16, 2018.

"Negotiating Cartel Fines and Civil Settlements," American Bar Association, Antitrust Section Spring Meetings, Panel discussion with Adam Hemlock, Rachel Adcox, Jeff Martino and Hollis Salzman, Washington D.C, April 11, 2018.

"The Role of Market Power in the Digital Economy," NYSBA Annual Meetings, Panel discussion with Eric Hochstadt, Kellie Lerner, Nicholas Gaglio, and Pat DeGraba, New York,

January 25, 2018.

"Comments on "Collusion on Markets with Syndication" by Hatfield, Kominers, Lowery and Barry," 2018 Next Generation of Antitrust Scholars Conference, New York University Law School and American Bar Association, New York, January 26, 2018.

"Embracing Change: Innovation in the Practice and Enforcement of Competition Law," Panel discussion at the Canadian Bar Association Fall Meetings, Antitrust Section, Ottawa, October 2017.

"Collusion and Manipulation in Gold Markets: Additional Developments," Invited Speaker to Gold and Mines Conference, New York, May 5, 2017.

"Screens for Conspiracies and Manipulations: My Most Recent Ongoing Research," Competition Law & Policy Seminar Series, U.S Department of Justice Seminar Series, Washington, DC, April 2017.

"How to Develop and Implement Screens for Conspiracies," Philippines Competition Authority, February 2017.

"Screens for Cartels and Antitrust Compliance Training," Macmillan Publishers, Required Antitrust training for Senior Management and Staff, New York, January 2017.

"Screens for Conspiracies and Their Recent Successes," Canadian Bar Association, scheduled for December 2016.

"Collusion and Manipulation in Gold Markets: Latest Developments," Invited Speaker to Gold and Mines Conference, London, scheduled for November 2016.

"Using Screenings to Detect Conspiracies in Commodities Markets," Federal Energy Regulatory Commission, Washington, DC, November 2015.

"Using Screens to Detect Conspiracies and Manipulations," Invited Speaker at the University of British Columbia Summer Conference on Industrial Organization, Vancouver, Canada, July 2016.

"Screens for Conspiracies and Bid-Rigging Detection," Guest Speaker at OECD Conference, Mexico City, Mexico, April 2016.

"Evolution of Market Reference Rates: Libor, Euribor, IBR," Guest Speaker at The Colombian Banking Association (Asobancaria), 18th Treasury Management Congress, Colombia, scheduled for January 29, 2016.

"The Use of Screens in Cartel Detection," Guest Speaker at the Hong-Kong Competition Authority, October 26, 2015, Hong-Kong.

"Screens for Conspiracies and Manipulations," Conference Keynote Speaker, Hong-Kong Economic Association Annual Meeting, October 24, 2015, Hong-Kong.

"Using Screens to Complement Leniency Programs," Panel discussion at the Portuguese Competition Authority Annual Meeting on Competition Economics, Lisbon, Portugal, October 22, 2015.

"Screens for Conspiracies and Manipulations: Recent Successes," Seminar at the US Department of Justice, Antitrust Division, New York, October 15, 2015.

"London Gold Fixing Conspiracy and Manipulation," Invited Keynote Speaker at the Mines and Money upcoming conference in Hong-Kong, scheduled for March 2015.

"Exchange Rates, Manipulation and Reform," Invited Keynote Speaker at the Fourth Annual Workshop on "Financial Determinants of Exchange Rates," organized by the European Central Bank, the Dutch Central Bank and the Bank of Italy, Amsterdam, The Netherlands, scheduled for December 2014.

"Screens: Multiple Uses and Successes," Presentation at the Competition Markets Authority, United Kingdom, September 11, 2014.

"Problem Markets: Collusion and Manipulation in Financial Benchmarks," Presentation at the CCP Annual Conference, University of East Anglia, United Kingdom, June 12-13 2014.

"Financial Benchmarks: Collusion, Manipulation, Screening and Reform," Financial Conduct Authority, London, United Kingdom, June 11 and September 10, 2014.

"Financial Benchmarks, Collusion and Reform," Dutch Competition Law Conference, New York (through video conference), April 24, 2014.

"Empirical Screening of Markets: Detection, Deterrence and Defense," American Bar Association, Business Section Spring Meetings, Panel Discussion with David Rosenfield, Vincent Briganti, D. Loren Washburn, and Harvey Westbrook, Los Angeles, April 12, 2014.

"Looming Temptation: Antitrust and Benchmark Pricing," American Bar Association, Antitrust Section Spring Meetings, Panel discussion with Henry McFarland, William Rooney and Elizabeth Prewitt, Washington D.C, March 26, 2014.

"Manipulating Benchmarks: Antitrust Concerns about Coordination vs. Oversight of Unilateral Conduct," at CRA Annual Brussels Conference, Economic Developments in European

31 of 37

Competition Law. Panel discussion with Christopher Woolard, FCA, Miguel de-la- Mano, EC, and Cristina Caffarra, CRA, Brussels, Belgium, December 11, 2013.

"Commodities Manipulations and Conspiracies: Empirical Evidence," Chief Economist Team, European Commission, Brussels, December 10, 2013.

"Screens for Conspiracies and Dawn Raids," Competition Authority for Peru, Lima, Peru, November 19, 2013.

"Screens for Conspiracies and their Role in Effective Anti-Cartel Policy," Organization for Economic Cooperation and Development (OECD) Roundtable Discussion on "Ex-Officio Cartel Investigations and the Use of Screens to Detect Cartels," Paris, France, October 30, 2013; Supporting materials available at http://www.oecd.org/competition/exofficio-cartel-investigations.htm.

"Screens for Conspiracies and Antitrust Enforcement: Detection without Leniency" Annual National Association of Attorneys General Antitrust Section, Hartford, Connecticut, September 26, 2013.

"LIBOR, Screens for Conspiracies, Manipulations and Fraud: Lessons for an Effective Anti-Fraud Program," Presentation to the Securities and Exchange Commission, Washington D.C., August 6, 2013.

"Proactive versus Reactive Cartel Detection Policy: The Role of Screening," 8th European Summer School and Conference in Competition and Regulation, Corfu, Greece, July 6, 2013.

"LIBOR, Euribor, TIBOR and Other Financial Benchmarks: Detection, Antitrust and Reform," Portuguese Competition Authority, Lisbon, Portugal, June 20, 2013.

"Briefing Room on Screens for Conspiracies," Panel discussions with David Evans, Antonio Capobianco, Carlos Mena Labarthe, Carlos Ragazzo, Danny Sokol, Donald Klawiter and Kai Hueschelrath, Competition Policy International, May 2013.

"The Economics of Collusion and Damages," Romanian Competition Authority, Bucharest, Romania, April 23, 2013.

"Benchmarks: Maintaining Integrity and Reliability," Panel discussion with David Lawton, Jim Rosenthal, Nick Collier and David Eichhorn, CFTC International Regulators Meeting, Florida, March 2013.

"LIBOR, Screening and Reform," Public Lecture, University College London, February 2013.

"Financial Benchmarks Reform," IOSCO, FSA, CFTC and other International Regulators

Meeting, London & Washington, DC, February 2013. Summary of Washington, D.C. Roundtable available at http://www.sifma.org/members/hearings.aspx?id=8589942209, and video available at http://www.youtube.com/watch?v=duUODyMdnsE&feature=youtu.be.

"LIBOR, Screening and Reform," European Commission, Brussels, December 6, 2012, available http://ec.europa.eu/internal_market/economic_analysis/docs/presentations/121206_libor-screening-reform_en.pdf.

"Screens in the Detection of Illegal Behavior," Romanian Competition Authority, Bucharest, Romania, December 5, 2012.

"The LIBOR Conspiracy & Manipulation: Screening as a Tool to Detect Illegal Behavior," World Bank Seminar, Washington, D.C., November 29, 2012.

"The Effective Use of Economics in Competition Enforcement," Panel Presentation with Pierluigi Sabbatini, Fiorenzo Bovenzi, Arvid Fredenberg and Kai Hüschelrath, Polish Competition Authority, Warsaw, Poland, November 22, 2012, available at http://www.uokik.gov.pl/news.php?news_id=10116.

"Recent Benchmarks Manipulation Scandals and Need for Deterrent Sanction Regimes," IOSCO, EMC Annual Meeting, November 19, 2012, Santiago, Chile.

"Economic Tools & Cartel Detection: Screens & Applications," Mexican Antitrust Bar Association, November 15, 2012, Mexico City, Mexico.

"Empirical Screens to Detect and Defend Conspiracies and Manipulations," Panel discussion, CIDE, November 15, 2012, Mexico City, Mexico.

"What To Do About LIBOR: A Special Webinar Series," Panel Discussion with David S. Evans, Miguel de-la-Mano and Michael Barr, Competition Policy International, November 8, 2012, available at https://www.competitionpolicyinternational.com/what-to-do-about-libor- a-special-cpi-webinar/.

"Making markets work for sustainable economic growth and economic recovery: The role of competition policy," Panel discussion, World Bank, Washington, D.C., November 5, 2012.

"The Determinants of Cartel Duration," Seminar in Economics, Michigan University, October 12, 2012.

"Finance, Regulation, and Ethics: Lessons from the LIBOR Scandal", with Margaret Levenstein, Michael Barr and David Mayer, Ross School of Business, Michigan University, October 11, 2012.

"Antitrust Guidelines for Horizontal Collaborations among Competitors for Central and South American Countries," Regional Center for Competition in Latin America, First Conference, Santo Domingo, Dominican Republic, September 20, 2012.

"Credit Ratings Agencies, Antitrust and Regulation," Joint with Lawrence White, Competition Policy International, June 2012.

"21st Century Antitrust Compliance: Beyond the Basics," panel discussion, joint with Alicia Downey, Theodore Banks, Joseph Murphy and Eric Morehead, American Bar Association, Antitrust Section Spring Meetings, Washington D.C., March 2012.

"Beyond Leniency: Empirical Methods of Cartel Detection," with Donald Klawiter, D. Daniel Sokol, Carlos Mena and Carlos Ragazzo, American Bar Association Brown Bag Series, December 15, 2011.

"The Use of Economic Screens in Antitrust Litigation: The Case of the London Interbank Offered Rate," Afternoon Speaker Series, New York University Law School. New York, November 2011.

"Alleged Libor Conspiracy and Manipulation: The Role of Screens," Executive Committee of the New York State Bar's Antitrust Law Section, New York, October 2011.

"Screens for Conspiracies and Manipulations and Their Multiple Applications," Portuguese Competition Authority, Lisbon, Portugal, June 2011.

"Competition Compliance: Up Your Game, Add to the Bottom Line, and Be a Corporate Star," Joint with Theodore Banks, Brian Henry and Joseph Murphy, Corporate Counsel Committee, Canadian Bar Association, June 2011.

"Empirical Methods for Conspiracies and Manipulations," Executive Committee of the New York State Bar's Antitrust Law Section, New York, December 2010.

"Screening for Conspiracies," French Competition Authority, Paris, France; German Competition Authority, Bonn, Germany, October 2010.

"Screening Devices for Detecting Collusion," Presentation and Panel Discussion with Christina Hummer and Maarten Janssen, Austrian Federal Competition Authority, Vienna, Austria, October 2010.

"Conspiracies Detection and Empirical Screens," ZEW Conference on Quantitative Analysis in Competition Assessments, Mannheim, Germany, October 2010.

"Screening for a Libor Conspiracy and Manipulation," Microeconomics Lunch Seminar,

Department of Economics, Leonard N. Stern School of Business, New York University, May 2010.

"Cartel Detection, Leniency Programs and the Latin America Experience," Joint with Carlos Mena-Labarthe, November 2009.

"Econometrics and Antitrust," Joint with David S. Evans, Competition Policy International, November 2009.

"Legal and Economic Analysis of Collusion," Joint with Patrick Bajari, Competition Policy International, June 2009.

"The Determinants of Cartel Duration," International Industrial Organization Conference, Boston, April 2009.

"On Detecting Agents' Influence in Market Data Outcomes," International Industrial Organization Conference, Boston, April 2009.

"The Empirical Detection of Conspiracies and Manipulations," Bureau of Economics, Federal Trade Commission, Washington D.C., September 2008.

"Globalization, Cartel Formation and Detection," Knowledge Globalization Annual Conference, Boston, April 2008.

"Detecting Conspiracies and Manipulations," Sawyer Business School, Suffolk University, Boston, December 2007.

"How to Spot Cheaters? Empirical Methods to Detect Conspiracies and Manipulations," Instituto Superior de Economia e Gestão, Lisbon, Portugal, July 2007.

"Is the Market being Fooled? An Error-Based Screen for Manipulation," First Meeting of the Portuguese Economic Journal, Ponta Delgada, Portugal, July 2007.

"A Variance Screen for Collusion," Portuguese Competition Authority, Lisbon, Portugal, June 2005.

## Pharmaceuticals and Health Care

"Is there too much Innovation? Benefits to Society from Technological Progress and its Contribution to Health Care Costs," International Industrial Organization Conference, Vancouver, Canada, May 2010.

"The Determinants of Pharmaceutical Review, Success and Duration," International Industrial Organization Conference, Virginia, May 2008.

"Assessing the Prospects of Drugs in the Pipeline," A Medical Affairs Leadership Conference: The Good, the Bad, and the Emerging, sponsored by Scientific Advantage, New Jersey, May 2008.

"Bringing Drugs to Market: Which Ones? How Fast? What Value?" The Center for Business Intelligence, January 2008.

"Pharmaceutical Development Phases: A Duration Analysis," Portuguese Authority for Competition, Lisbon, Portugal, November 2005; Federal Trade Commission, Washington D.C., March 2003; Congressional Budget Office, Washington, D.C., March 2003; International Industrial Organization Conference, Boston, April 2003; North American Summer Meetings of the Econometric Society, Chicago, June 2003.

## Other Monetary and Financial Economics

"Before and After the EMU: Financial Integration, Monetary Policy and Welfare Changes," The University of Chicago, Chicago, May 2002; Board of Governors of the Federal Reserve System, Washington, D.C., February 2002; European Central Bank, Frankfurt am Main, Germany, February 2002; Federal Reserve Bank of St. Louis, St. Louis, February 2002; Bank of England, London, England, January 2002.

"The European Monetary Union – Could there be any 'Winners' and 'Losers'?" The University of Western Australia, Perth, Australia, November 2001; Board of Governors of the Federal Reserve System, Washington, D.C., May 2001; The University of Chicago, Chicago, November 2000.

"The European Monetary Union and its Consequences for Financial Markets," Banco Bozano Simonsen, Rio-de-Janeiro, Brazil, September 1998.

## HONORS AND AWARDS, FELLOWSHIPS AND SCHOLARSHIPS

Selected for GCR's list of *Women in Antitrust 2025*.

Economic Expert in *United States v. Google*, selected by GCR as Matter of the Year among matters worldwide for 2024, and winner in the Behavioral category.

Honoree for the American Antitrust Institute 2024 Antitrust Enforcement Awards: Outstanding Antitrust Litigation Achievement in Economics, for expert work *In Re: Apple iPhone Antitrust Litigation*.

Thought Leader, The International *Who's Who* of Competition Lawyers & Economists, 2024.

Economic Expert in *US Airways v. Sabre*, selected by GCR as Matter of the Year among

matters worldwide for 2022, for "Creative, strategic and innovative work by teams of in-house and external lawyers and economists."

Honoree for the American Antitrust Institute 2022 Antitrust Enforcement Awards: Outstanding Antitrust Litigation Achievement in Economics.

Nominated as a Distinguished Professional Woman in Competition in "40s in their 40s" for North, Central and South America, January 2019.

Member, The International *Who's Who* of Competition Lawyers & Economists every year since 2009.

Award winner article on AI and antitrust compliance, Les Concurrences, April 2024.

Nominated Author for Best Antitrust and Process Article in Economics, Les Concurrences, for multiple years.

Fellowships from Fundação Calouste Gulbenkian, Portugal, 1999-2002.

Scholarship from Portuguese Government – PRAXIS XXI, 1995-1999.

Scholarship from Luso-American Foundation for Development, Portugal, 1995-1999.

Scholarship from Universitat Pompeu Fabra, PhD Program, Spain, 1995-1996.

## OTHER

Editor, 2024, "Shades of the Spectrum: A Brother's Reflection on Autism," authored by Henry Abrantes Metz.

Referee, *Journal of Political Economy*, *RAND Journal*, *The Review of Industrial Organization*, the *International Journal of Industrial Organization*, *Southern Economic Journal* and the *Journal of Law, Economics and Organization*, *Journal of Banking and Finance*, *Journal of Economics and Management Strategy*, among others.

Member, Editorial Advisory Board, *The Antitrust Chronicle*, *Competition Policy International*, 2011-2020.

Co-Editor of the Monthly Cartel Column "From Collusion to Competition," *Competition Policy International*, 2013-2021.