# EXHIBIT 2

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br><br>Hon. Yvonne Gonzalez Rogers |

REPORT OF

# ROSA M. ABRANTES-METZ, PH.D.

**MARCH 7, 2025**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

**I.  Introduction** ...................................................................................................................1
   A.  Qualifications .......................................................................................................... 1
   B.  Assignment ............................................................................................................. 4
   C.  Summary of Opinions ............................................................................................. 6

**II.  My Economic Model Calculates a But-For Commission Rate of 13.63%** .......................7
   A.  Description of the Model ......................................................................................... 8
   B.  Calibration of the Model ........................................................................................ 13
   C.  Results ................................................................................................................... 15
   D.  Application of the Model to Multi-Sided Platforms ................................................ 17

**III.  The Assumptions of the Model Are Reasonable and Conservative** .............................21
   A.  Duopoly of Two App Stores .................................................................................. 21
   B.  Homogeneous App Stores ..................................................................................... 32
   C.  Single Commission Rate ........................................................................................ 39
   D.  Constant Commission Rate Over Time .................................................................. 42
   E.  Commissions as the Only Revenue Source ........................................................... 43
   F.  Lack of Consumer Subsidies ................................................................................. 45
   G.  App Stores Starting on Equal Footing .................................................................... 48
   H.  No Alternative Monetization and Differentiation Strategies .................................. 50

**IV.  The Model Inputs Are Conservative and Based on Real-World Data** ..........................54
   A.  Total Market Size .................................................................................................. 55
   B.  Apple and Rival Store's Market Shares ................................................................. 56
   C.  Apple and Rival Store's Costs ............................................................................... 70
   D.  Rival Store's Operating Margin .............................................................................. 75

**V.  More Realistic Data Inputs Would Further Decrease the But-For Commission Rate**.. 86
   A.  Rival Store's Increased Market Share .................................................................... 87
   B.  Rival Store's Reduced Fixed Costs ........................................................................ 88
   C.  Market Expansion in Response to Lower Commission Rate ................................... 89

**VI.  My Empirical Analysis Confirms the Reliability of the But-For Commission Rate** ...... 90
   A.  Sales of Windows PC Game Apps in 2019 As an Appropriate Benchmark ................ 91
   B.  Commission Rates of Major Third-Party Stores ..................................................... 100
   C.  Self-Distributing Costs of Direct-to-Consumer Stores ........................................... 113
   D.  Average Commission Rate ..................................................................................... 123

**VII.  My Conclusions Are Unaffected by Post-Covid Data** ................................................ 127

    A.   Post-Covid Profit Margins Are Unreliable for Estimating The But-For Commission Rate ..................................................................................................................................... 128

    B.   Model Predictions Are Nearly Unchanged By Post-Covid Data................................. 137

    C.   Observed Commission Rates Are Nearly Unchanged Post-Covid ............................ 141

**Appendix A: Materials Relied Upon** ................................................................................... **145**

    A.   Workpapers ............................................................................................................ 145

    B.   Expert Reports ....................................................................................................... 145

    C.   Filings .................................................................................................................... 147

    D.   Depositions & Trial Testimonies ............................................................................ 149

    E.   Produced Documents ............................................................................................. 150

    F.   Publications ............................................................................................................ 152

    G.   Other Public Sources ............................................................................................. 154

**Appendix B: Economic Model Estimate 2019 Calculations** ............................................... **171**

    A.   "Model Calculation" tab ......................................................................................... 171

    B.   "Apple App Store VC, FC 2019" tab....................................................................... 172

    C.   "Unattributed App Store OPEX" tab ....................................................................... 174

    D.   "Rival Market Share" tab ........................................................................................ 177

    E.   "Rival Operating Profit Margin" tab ........................................................................ 179

**Appendix C: Economic Model Estimate 2018 Calculations** ............................................... **180**

    A.   "Model Calculation" tab ......................................................................................... 180

    B.   "Apple App Store VC, FC 2018" tab....................................................................... 180

    C.   "Unattributed App Store OPEX" tab ....................................................................... 181

    D.   Remaining tabs ...................................................................................................... 181

**Appendix D: Economic Model Estimate 2019 - Sensitivity Analysis Calculations** ........... **182**

    A.   "Scenario A" tab .................................................................................................... 182

    B.   "Scenario B" tab .................................................................................................... 183

    C.   "Scenario C" tab .................................................................................................... 183

    D.   "All Scenarios Combined" tab ................................................................................ 184

**Appendix E: Economic Model Estimate 2022 Calculations** ............................................... **185**

    A.   "Model Calculation" tab ......................................................................................... 185

    B.   "Apple App Store VC, FC 2022" tab....................................................................... 185

    C.   "Rival Market Share" tab ........................................................................................ 188

    D.   "Rival Operating Profit Margin" tab ........................................................................ 188

**Appendix F: Benchmark Estimate 2019 Calculations** ....................................................... **189**

    A.   "Benchmark Estimates" tab.................................................................................... 189

    B.   "Steam" tab ............................................................................................................ 193

C.   "Microsoft Store" tab ................................................................................. 196

D.   "Microsoft" tab ........................................................................................... 197

E.   "EGS" tab .................................................................................................. 198

F.   "EGS Variable Cost" tab ............................................................................ 199

G.   "GOG.com" tab .......................................................................................... 200

H.   "Activision Blizzard" tab ............................................................................ 201

I.   "EA" tab ...................................................................................................... 204

J.   "Ubisoft" tab .............................................................................................. 206

K.   "Take-Two" tab .......................................................................................... 207

L.   "estimate_remainder.R" code ..................................................................... 209

**Appendix G: Benchmark Estimate 2023 Calculations**........................................**211**

A.   "Benchmark Estimates" tab........................................................................ 211

B.   "Updated commission rates" tab ............................................................... 213

C.   "EGS Variable Cost" tab ............................................................................ 214

**Exhibit 1: Curriculum Vitae of Rosa M. Abrantes-Metz** .....................................**216**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION

### A.    QUALIFICATIONS

1. My name is Rosa M. Abrantes-Metz, and I am a Ph.D. economist specializing in industrial organization, econometrics, and finance. I am a Managing Director at Berkeley Research Group, a global consulting firm providing economic, financial, and analytical advice for a range of disciplines. I am a former Adjunct Associate Professor at Leonard N. Stern School of Business at New York University, where I taught industrial organization and competitive analyses, statistics and econometrics, and monetary and financial economics.

2. Prior to my career as a consultant, I was an economist at the Federal Trade Commission, a Lecturer for advanced econometrics and macroeconomics in the Department of Economics at the University of Chicago, and a Lecturer in economics at Universidade Católica Portuguesa in Lisbon, Portugal. I received my Ph.D. in Economics from the University of Chicago, where I also received my second MA in Economics. I obtained my first MA in Economics from Universitat Pompeu Fabra in Barcelona, Spain and my Licenciatura (a five-year BA degree) in Economics from Universidade Católica Portuguesa in Lisbon, Portugal.

3. Industrial organization is the study of markets, how they work in theory and in practice, and the behavior of firms; it encompasses, among other things, issues such as the definition of market power, barriers to entry, the dynamics of competition and collusion, and their impact on market outcomes. An inquiry central to industrial organization economics is the phenomenon of market power, whether a firm possesses market power, how we measure it, and what its existence implies about pricing. This becomes particularly relevant in the context of litigation when an economist is asked to put forward her view of the world But-For an alleged anticompetitive conduct which, among other potential effects, may have affected pricing. My extensive experience in industrial organization and estimation of benchmarks that would reasonably have prevailed But-For an allegedly anticompetitive conduct, is directly germane to this matter.

4. I have directed many consulting projects in my areas of expertise during the last two decades. I have authored or co-authored in the areas of financial and industrial economics, as well as

1

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

econometrics, both in peer review journals and in trade publications. I have contributed to books in both antitrust and finance.

5. A significant portion of my work as both a consultant and an author focuses on market abuse such as collusion, manipulation, various types of fraud, and anticompetitive conduct. Among other things, I develop empirical methods, which I call "screens," to flag the possibility of such practices, and to estimate impact on market outcomes.

6. I have worked on behalf of defendants, plaintiffs, and governmental agencies in many matters. For example, my work has assisted in the launching of some recent regulatory investigations, including investigations into the LIBOR conspiracy and manipulation, the gold conspiracy and manipulation, and several others. These have also involved foreign exchange markets, swap markets, bond markets including U.S. Treasuries, mortgage-linked derivatives markets and others. In these matters, I have consulted on topics related to both liability and the overall market impact and damages of the alleged conduct, most of which included the determination of the price that would have prevailed But-For the alleged collusion, manipulation and fraud, and the estimation of damages and market wide impact.

7. At the invitation of the World Bank, I authored the "Guidelines on Exchanges of Information and Collaborations among Competitors for Central and South American Countries" in 2013. I advised antitrust and securities authorities around the world on specific types of collaborations among competitors, and on the implementation of screens that I developed. At the invitation of then CFTC Chairman, Gary Gensler, I advised various agencies worldwide on financial and commodities benchmarks replacements and reforms, in the wake of the LIBOR rigging. These also focused on financial regulation and actual benchmark restructuring to enhance robustness of these structures, as well as on guidelines for best practices of benchmarks. These authorities include the U.S. Commodity Futures Trading Commission, the United Kingdom's Financial Conduct Authority, the European Commission, and the International Organization of Securities Commissions.

8. Another major focus of my work over the last decade has been on the economics of multisided platforms, in the context of monopolization and collusion, both on liability and damages. I have co-authored working papers and studies on these topics. These papers lay out structural models

2

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

which study the dynamics of single- and multisided platforms under monopoly, collusion, and competition, with a particular focus on the impact of single-homing on market dynamics and equilibrium. In addition, I have also written on the regulation of multisided platforms. For example, on payments systems, I co-authored the report, "The Economics of the Portuguese Retail Payments Systems" with Dr. David S. Evans in 2014. This report provides a detailed analysis of how the Portuguese payment system operates and how regulatory interventions, especially those involving price controls, would likely affect the interest of the various stakeholders in the system including consumers, merchants, banks, and infrastructure providers. My work with the Portuguese payment systems is ongoing, in the context of alleged monopolization and tying, market definition and overall market impact of alleged anticompetitive conduct, including the determination of potential But-For rates that would have been charged to various groups of customers But-For the alleged conduct.

9. In cases involving multisided platforms, I have testified on market definition, collusion, monopolization, liability and damages in industries involving payments systems, air travel software booking platforms, and healthcare software platforms. In most of these cases, I was asked to put forward benchmarks reflecting the But-For World. Most recently, as an expert economist on behalf of US Airways (American Airlines) in US Airways v. Sabre, my work on But-For prices and calculation of actual monopoly profits by Sabre, assisted in the Court's finding that Sabre, a two-sided platform, was a monopolist in the relevant market. I have also provided testimony on behalf of the US Federal Trade Commission in FTC v Surescripts on But-For prices and calculated Surescripts' monopoly profits. In all these matters, I calculated the firm's actual profits and contrasted them against the profits the firm would have earned absent the alleged anticompetitive conduct. As part of this process, the determination of reasonable But-For prices encompasses the finding of appropriate benchmarks.

10. My work also extends to other areas of antitrust, studying the potential for anticompetitive behavior more broadly. Among others, this includes mergers and acquisitions, monopolization cases, vertical restraints, foreclosure, joint ventures and other collaborations among competitors, antitrust compliance, policy evaluation, as well as the competitive effects of healthcare reform and its effects on innovation and consumer welfare. Most recently, I testified on liability on behalf of the Department of Justice in *United States v Google* in the Ad Tech industry, involving allegations of monopolization in various markets.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

11. I have provided testimony on damages, liability, class certification (including plans of allocation), and antitrust compliance in matters involving alleged bid-rigging, price-fixing and market allocation. I have also provided testimony on information exchanges in various markets, including financial and commodities markets, as well as multisided platforms. I have also testified on the valuation of an energy services provider company, the valuation of expropriated oil services assets, the valuation of stock options and various types of swaps, the valuation of utilities, and breach of contracts due to changes in financial and commodity benchmarks.

12. In addition, I have served as an expert witness in two matters for the Federal Energy Regulatory Commission. In the first such matter, FERC v BP, BP was found guilty of manipulation of natural gas markets. In that case, as in many others involving financial and commodities abuse, I developed the benchmark for the But-For-world, calculated price artificiality due to the conduct, and served as the liability expert. I have also testified for the Department of Justice on behalf of Fannie Mae on an alleged fraud matter in the market for mortgage foreclosures and evictions, in which I calculated the But-For rates that would have been charged to Fannie Mae absent the alleged fraud, and the damages suffered by Fannie Mae. Besides FERC and the DOJ, I have been retained and/or testified on behalf of the Federal Trade Commission, the CFTC, and various Attorneys General offices.

13. To date, I have testified in U.S. federal courts including jury trials and administrative proceedings. In addition, I have provided testimony in international arbitration and contractual disputes settings in Europe, Brazil, and Canada.

14. My qualifications are further detailed in my curriculum vitae, which includes all of my publications and testimony from the last four years. I am being compensated for my time in this matter at a rate of $1,325 an hour. This compensation does not depend on the outcome of this litigation.

## B. ASSIGNMENT

15. I have been asked by counsel for Consumer Plaintiffs to (1) assess whether the App Store commission rate that would reasonably be expected to prevail in a competitive But-For World without Apple's alleged misconduct can be determined using a common approach; and (2) if a

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

common approach exists, estimate the But-For commission rate that is common to the consumer class.[1] In forming the opinions herein, I have reviewed the following materials:

a. Relevant court rulings and filings, including Plaintiffs' third amended consolidated class action complaint, Apple's Daubert motion, plaintiffs' opposition to the Daubert motion, Apple's reply in support of Daubert motion, plaintiffs' renewed motion for class certification, and Apple's opposition to renewed class certification motion.

b. Expert reports from the class certification stage of this case, including those filed by Prof. McFadden, Mr. Barnes and me, as well as selected reports from Apple's experts, including Prof. Hitt, Prof. Schmalensee, Prof. Simonson and Mr. Malackowski, along with their deposition testimony, including the remote depositions of Kevan Parekh from Apple and Jeffrey David Powers from Valve.

c. Expert Reports from the current case on merits, including those by Prof. Stiglitz, Prof. McFadden, Prof. MacCormack and Mr. Barnes.

d. Reports from other relevant cases, including Prof. Economides' report in Cameron et al. v Apple Inc.[2]

e. Documents produced to date in the context of this litigation by Apple and other relevant parties, as well as various deposition testimony.

f. Relevant economic literature, industry studies and publicly available information.

16. My work in this matter is ongoing. I reserve the right to supplement my analyses and conclusions should any additional information be provided to me after the submission of this report.

---

[1] The consumer class is defined as "[a]ll persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ('Apple'), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the 'Class Period'). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account." *See* Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), February 2, 2024, ECF No. 789 ("Class Certification Order"), 2:9-13.

[2] Expert Class Certification Report of Professor Nicholas Economides, *Cameron, et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), June 1, 2021, ECF No. 331-5, ("Economides Report"), ¶ 9.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

C. SUMMARY OF OPINIONS

17. Based on all the materials reviewed and analyses performed, I have reached the following conclusions:

a. The commission rate that would reasonably be expected to prevail in a competitive But-For World, absent Apple's alleged misconduct, can be determined using the evidence produced in this case.

b. The evidence produced demonstrates that, absent Apple's anticompetitive conduct, Apple's App Store would have charged a single But-For commission rate that would not have exceeded 13.63% throughout the class action period.

c. A But-For commission rate of 13.63% would have allowed Apple's App Store to remain profitable and achieve an operating profit margin above 50%.

d. The But-For commission rate of 13.63% represents an upper bound, calculated using an economic model with conservative assumptions and inputs, and further supported by reasonably comparable benchmarks.

e. Using more realistic but still conservative data inputs for market shares, costs and market size in the But-For World reduces the estimated commission rate to 12% or lower. Therefore, to the extent that the commission observed in the But-For World is a rounded integer, it would reasonably have been 12%, or at most 13%.

f. The relevant data for determining the But-For commission rate are from 2019 or earlier, as post-2019 data are unreliable due to pandemic-related distortions.

g. Even if recent post-Covid data were used to estimate the But-For commission rate, the resulting rate would increase by only about half a percentage point to 14.11%, which does not alter my opinion that 13.63% is a reasonable estimate.

18. My conclusions are based on an assessment of economic evidence common to the class, using a combination of economic modelling techniques calibrated with real-world data and empirical analysis of a more competitive market. The analysis primarily focuses on 2019 data, as it is the most recent year for the class period prior to the significant industry disruptions caused by the Covid-19 crisis. Nonetheless, even if post-Covid data were used, it would further support my opinion on a reasonable But-For commission rate during the Class Period.

6

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

19. To estimate the Apple App Store's commission rate in the But-For World, I employ a simple, yet robust economic model grounded in fundamental economic principles. This model captures how competitive pressure from a rival app store would have driven the Apple App Store's commission rate down. Using reasonable and generally conservative assumptions to calibrate the model with real-world data, I estimate that the But-For commission rate the Apple App Store would have charged during the Class Period, absent Apple's anticompetitive conduct. I estimate that it would not have exceeded 13.63%. Deviations from my model assumptions would generally result in an even lower commission rate.

20. To support the conclusions of my economic model, I conduct a benchmark analysis using empirical data from a functionally similar, yet relatively more competitive market – the sale of Windows PC game apps and in-app content. This market includes both third-party stores (e.g. Steam, Microsoft Store, Epic Games Store) and direct-to-consumer stores (e.g. Battle.net, Origin, Ubisoft Connect). I compute the sales-weighted average effective commission rate across all Windows PC game app stores and find that it ranges from approximately ▮▮ to ▮▮. This finding further supports the reasonableness of the But-For commission rate estimated from my economic model. Additionally, I note that the Windows PC game app stores market is predominantly characterized by single-commission rate pricing, except for Steam which, for reasons discussed below, is not an appropriate competitive benchmark.

## II.  MY ECONOMIC MODEL CALCULATES A BUT-FOR COMMISSION RATE OF 13.63%

21. In this Section, I describe the economic model used to estimate the commission rate that would have prevailed in a more competitive, yet still concentrated, But-For World.[3] As is standard in

---

[3]  In my economic model, I conservatively assume that the market share for Apple and its rival would be 76.9% and 23.1%, respectively. This results in a Herfindahl–Hirschman Index ("HHI") that is over 5,000, which indicates that the But-For World would still be highly concentrated. In a But-For World that is truly competitive, rival(s) should be able to achieve a market share higher than 23.1%. Note that the DOJ and the FTC define markets with "HHI above 1,000 as concentrated markets, with HHI between 1,000 and 1,800 as 'moderately concentrated' and above 1,800 as 'highly concentrated.'" *See* U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023, available at https://www.justice.gov/atr/merger-guidelines, ¶ 6.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

economics, the characterization of the But-For World rests on certain assumptions because the But-For World has never been observed. Using generally conservative assumptions and calibrating my model with conservative inputs, I estimate a But-For commission rate of 13.63%, which would have enabled Apple App Store to achieve an operating profit margin of over 50% in 2019. This analysis applies a common methodology to estimate the Apple App Store's But-For commission rate, meaning the same economic model is used to determine the appropriate But-For commission rate for any single member of the consumer class.

22. My economic model-based estimation of the But-For commission rate is similar to the "Rival Profit Yardstick" analysis Prof. Economides presented in his expert report filed on behalf of the Developer Class. While Prof. Economides used a similar economic model to mine, he relied on different data and documents for his model's inputs, concluding that the prevailing commission rate would have been 13.0% in a But-For World where Apple faces two rivals, and 14.8% in a But-For World where Apple faces one rival.[4] As I discuss below, I only analyze the single-rival world, which is the more conservative competitive landscape.

## A.    DESCRIPTION OF THE MODEL

23. My model considers a But-For World in which, in the absence of significant entry barriers, a single rival third-party app store competes against the Apple App Store. In this scenario, there are no direct-to-consumer channels, and all app sales occur through a duopoly of third-party stores.[5] The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects, with each charging a single commission rate to all game developers. Commissions are the sole source of revenue for the app stores and remain constant over time. Moreover, I assume that app stores do not subsidize consumers by paying them to buy a game. Finally, I assume that the two stores entered the market around the same time, with

---

[4]    Economides Report, ¶ 9.

[5]    This is another conservative assumption. As I discuss in Section VI.C, actual competitive markets are characterized by a large number of direct-to-consumer stores that generate a considerable amount of PC game app sales. Economic logic suggests that these direct-to-consumer sales, which are precluded by Apple in the As-Is World, would exert additional downward pressure on the But-For commission rate.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

neither having a first mover advantage. As I explain in Section III, these assumptions are reasonable and generally conservative.

24. From the assumptions of my model, two key results emerge. First, the commission rates charged by both stores must be identical. Given that app stores generally do not face capacity constraints and are assumed to be homogeneous, any disparity in commission rates would lead all developers to sell exclusively on the cheaper store, a well-established outcome in economic literature.[6] Second, the profit margins earned by the stores must be sufficiently low to deter new entrants. A core principle of economics is that in the absence of barriers to entry, rival firms will enter a market until profits are exhausted, so that the marginal potential entrant is dissuaded from entering.[7] Economists agree that such entry reduces prices and profits for market participants.[8]

25. Identifying the operating profit margin that would prevail in a competitive But-For World is essential for estimating the But-For commission rate. In a duopoly equilibrium, the less profitable firm must be (i) sufficiently profitable such that it does not exit the market and (ii) not so profitable that it attracts a third firm's entry. In other words, profits cannot be too low or too high. To estimate the commission rate in a competitive market, my model relies on the fundamental principle that

---

[6] Even in a highly concentrated duopoly setting, it is reasonable to expect that prices among competitors are close or identical. This is consistent with standard duopoly models of homogeneous products in the academic literature in which a single price typically predominates in the market. *See* Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies*, (Cambridge University Press, 2010), at Sections 3.1 and 3.2 and Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Edition, (Pearson Education, 2015), pp. 185, 197.

[7] *See, e.g.* Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), at Section 4.2 ("Take the opposite view that there are no entry or exit barriers other than entry costs. In this case, we expect firms to enter as long as they can make economic profits […] the free-entry equilibrium number of firms […] satisfies the zero-profit condition.").

Economic profits are given by revenue minus all economic costs. I do not have enough available data to estimate economic costs in the But-For World. Instead, I rely on operating profits from the Microsoft Store, which has been a long-time participant in Windows PC game app distribution. The longevity of the Microsoft Store and the functional similarities of Windows PC game app distribution to iOS app distribution are strong evidence that the Microsoft Store's 23.0% operating profit margin would correspond with a positive economic profit margin for the rival in the But-For World.

[8] *See, e.g.* Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), at Section 4.2 ("Unambiguously, more competition exerts stronger [downward] pressure on price so that effectively consumers are better off."). *See also* Hugo A. Hopenhayn, "Entry, exit, and firm dynamics in long run equilibrium," *Econometrica* 60(5) (September 1992): 1127-1150.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

an app store's operating profit margin is the difference between its revenue and its costs. Revenue, in turn, depends on the total billings in the market, the store's share of those billings, and the commission rate it charges. The operating profit margin for an app store that earns revenue by collecting a commission on sales of apps and in-app content can be expressed as follows:

$$\text{Operating Profit Margin for Firm i} = \frac{s_i M(\tau_i - VC_i) - FC_i}{s_i\, M\tau_i},$$

where $s_i$ represents firm i's market share of all app and in-app content sales, M the total market expenditure on apps and in-app content, $\tau_i$ the commission rate, $VC_i$ the variable cost per dollar of gross sales through the app store and $FC_i$ the fixed operating cost. The numerator reflects the operating profit, calculated as commission revenue minus variable and fixed operating costs, while the denominator represents total commission revenue.

26. Using this fundamental equation, I can calculate the But-For commission rate based on the operating profit margin expected in a competitive But-For World. By incorporating the app stores' cost structure, market shares and profit margins typical of a moderately competitive market as inputs, the model determines the corresponding commission rate. For instance, a lower operating profit margin leads to a lower commission rate, all else being equal.[9] Similarly, a higher market share or a greater market size is associated with a lower commission rate, all else held constant.[10] Lower operating costs for an app store result in a lower commission rate, again assuming all else remains the same.[11] Reallocating costs away from $FC_i$ toward $VC_i$ is also associated with a lower

---

[9]    To see this, notice that in the equation above, a lower operating profit margin results in a lower left-hand side of that equation. The right-hand side of that equation can be represented as $1 - \frac{s_i M(VC_i) + FC_i}{s_i\, M\tau_i}$. Thus, if the left-hand side is lower, for any $s_i M, VC_i,$ and $FC_i$, it must be the case that $\tau_i$ is lower, too.

[10]    Total app store billings (the product of market share and market size) and commission rates move in opposite directions, because higher billings reduce average fixed costs. Therefore, to keep operating profit margins constant even as average costs fall, the commission rate $\tau_i$ must fall.

[11]    As costs decrease, operating profit margin increases, unless the commission rate falls. Thus, for a fixed operating profit margin, it must be the case that costs and the commission rate move in the same direction.

10

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

commission rate, all else held equal.[12] Consequently, adjusting these inputs to reflect different competitive conditions would yield a different commission rate.

27. During the class certification stage, Apple's experts did not dispute that the equation of my model is mathematically correct and reflective of a profit equation for this setting. They also did not dispute its applicability to the App Store and to the But-For World. Indeed, as Prof. Schmalensee testified, "As an accounting identity, it applies to any business […] including the App Store."[13] Prof. Schmalensee further recognized that accounting identities are used in both economic models and econometric modelling.[14] Prof. Hitt likewise admitted that this equation "would apply to any

---

[12]    To see how this follows from the operating profit margin equation, note that the equation is equivalent to:

$$\tau_i = \frac{VC_i}{(1 - Operating\ Margin_i)} + \frac{FC_i}{s_i M (1 - Operating\ Margin_i)}.$$

Note that the terms in the denominators, $(1 - Operating\ Margin_i)$ and $s_i M$ are always positive. Assuming $0 < s_i < 1$, an additional dollar of fixed cost increases the commission rate more than an additional dollar of variable cost. Therefore, moving a dollar from fixed to variable cost corresponds with a lower commission rate. To be explicit, note that since $VC_i$ is expressed as a share of store billings $(s_i M)$, moving a dollar away from fixed toward variable cost means $(s_i M) VC_i$ increases by one dollar.

[13]    Remote Deposition of Richard Schmalensee, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), April 4, 2023, ECF No. 702-8 ("Schmalensee Deposition (April 2023)"), 119:9-19. ("Q. Okay. Do you say in your report that the formula that Dr. Metz has set forth in paragraph 26 of her report does not apply to the App Store? A. She doesn't use it to apply to the App Store. She uses it for the single competitor that she assumes to be present in the but-for world. As an accounting identity, it applies to any business. Q. Including the App Store, correct? A. Including the App Store.").

[14]    Schmalensee Deposition (April 2023), 101:17-21. ("Q. And do you cite anywhere in your report any authoritative literature that says an economic model cannot rely on an accounting identity? A. No. I think people use accounting identities in economic models."); and Schmalensee Deposition (April 2023), 101:9-16. ("Q. Okay. Do you identify anywhere in your report any authoritative literature that says that an econometric model cannot incorporate an accounting identity? A. No. And I wouldn't -- I wouldn't know what to make of such a statement.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

business operation."[15] Prof. Hitt also agreed that an accounting identity is equivalent to an accounting equation, and that "economists often use accounting equations in their models."[16]

28. Despite this, Apple sought "to exclude [my] opinion on the grounds it is a product of an 'accounting identity,' rather than an economic model."[17] This claim is false. My model goes beyond a simple accounting equation by applying well-established economic principles and reasonable assumptions to predict economic outcomes. This has also been previously used: the economic principles underlying my model are similar to those employed by Prof. Economides in his "Rival Profit Benchmark" analysis in Cameron et al. v Apple Inc.[18] The argument that my model is merely an accounting equation was also rejected by the court in the class certification order approving my methodology:[19]

> Apple's criticism is, essentially, that Dr. Abrantes-Metz erred in using an equation rather than an economic model. This is pedantic; economic models generally consist of mathematic equations that describe a theory of economic behavior. That Dr. Abrantes-Metz's economic model consists of one mathematical equation does not mean that she has "no theory of economic behavior underpinning her analysis," as Apple charges. Dr. Abrantes-Metz explains, step by step, how she calculates the "fundamental principles" underpinning her equation. And though Apple may disagree with her inputs (as analyzed below), it has nothing to say about why those fundamental principles are not a reliable application of her expertise.

---

[15] Remote Deposition of Loren M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), April 14, 2023, ECF No. 702-4 ("Hitt Deposition (April 2023)"), 167:13-22. ("Q. And do you say anywhere in your report that the equation Dr. Metz uses does not apply to the App Store? A. So let me separate that into two pieces. That equation is essentially a definition. And so, it would apply to any business operation […] certainly the idea that you have these accounting relationships, I don't object to that.").

[16] Hitt Deposition (April 2023), 166:17-23. ("Q. So, let me ask […] if an accounting identity is the same thing as an accounting equation. A. […] I don't think there is any problem treating them as equivalent at least for the purposes of today."). *See also* Hitt Deposition (April 2023), 169:3-8. ("Q. Do you agree that economists often use accounting equations in their models to identify important quantities? A. Sure. I think you can use definitions and you can use equations as part of a larger model that has economic behavior in it.").

[17] Class Certification Order, p. 16.

[18] In his analysis, Prof. Economides relied upon the same relationship between operating profit and commission rate as I do. *See* Economides Report, ¶¶ 40-41.

[19] Class Certification Order, pp. 17:23-18:2.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### B.    CALIBRATION OF THE MODEL

29.  I use observable 2019 data from the As-Is World to calibrate each variable in the model to values that would likely prevail in a competitive But-For World. The year 2019 was chosen because it is the most recent year prior to the impact of Covid-19 on the industry. These data allow me to calculate the But-For commission rate based on the established economic relationships among these variables. By calibrating the overall market size, operating costs, market share, and profit margins in a competitive market, the model calculates the commission rate that either firm would charge. Section IV provides detailed calculations for calibrating the parameters and explains why each of the input values I used is estimated reasonably but conservatively. Section VII discusses why using data from the Covid-19 period is inappropriate, as it does not reflect a competitive market equilibrium relevant to the class action period. However, for completeness, I also show in Section VII that using the most recently available data would not materially affect my conclusions.

30.  First, I calibrate the overall market size using the total billings of the Apple App Store worldwide in 2019, which amounted to USD 51 billion. This approach is consistent with the relevant antitrust product market defined by Prof. Stiglitz – the sale of iOS apps and in-app content – which Apple is alleged to have monopolized.[20] While the relevant geography is the US, using worldwide billings provides a comprehensive view of revenues and costs without requiring additional assumptions on cost allocation across jurisdictions. Furthermore, calibrating the market size based on actual billings from the As-Is World is a conservative approach. In a competitive But-For World, increased competition would be expected to drive market expansion, which in turn, would result in an even lower commission rate than the one I estimate. This is explained in detail in Section IV.A.

31.  Second, I calibrate the market shares of Apple and its rival using a consumer survey conducted by Apple's expert, Professor Simonson. The survey results suggest that in the But-For World, the Apple App Store would have a market share of 77%, while the rival app store would hold 23%. This asymmetrical distribution is a conservative estimate. While economic models of competition between firms selling homogeneous goods often assume an even 50%–50% market share split,

---

[20]    *See* Stiglitz Report.

13

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

which would yield a lower But-For commission rate, I do not rely on this assumption. Instead, I account for Apple's potentially stronger market position, leading to a higher But-For commission rate. Section IV.B provides a detailed explanation of how I derived these market shares from the survey data and why this approach is conservative.

32. Third, I calibrate variable and fixed costs using Apple's actual 2019 cost data for operating the App Store. The data show that variable costs accounted for 3.8% of billings, while fixed costs amounted to approximately USD 800 million, or 1.5% of billings. I conservatively assume the rival app store would have the same cost structure, even though, given its smaller market share, it would likely incur lower costs, such as marketing expenses. These lower costs would result in an even lower But-For commission rate than my estimate. In Section IV.C, I provide a detailed explanation of how I calculate these costs from Apple's data and why the inputs used in this analysis are conservative.

33. Fourth, I use the operating profit margin of Microsoft Store in 2019, which was ███ , as the benchmark for the rival app store's equilibrium operating margin in the But-For World. This margin reflects the performance of a real firm in a more competitive market. Apple's experts have not suggested that a profit margin of ███ is too low to sustain operations and would result in firms exiting the market. And while we might consider whether such a margin is so high that it might attract additional entry into the market, that would simply mean that the implied commission rate I have calculated is itself too high and hence, conservative. In Section IV.D, I explain in detail why the Microsoft Store serves as the most appropriate available benchmark for estimating the competitive margin of the rival store.

34. Apple's experts have previously acknowledged during class certification that the equation used in my model is appropriate for this case; thus, I now turn to the validity of the inputs. The inputs I have employed are economically sound and reasonable, ensuring that the model's output is also reasonable. But using inputs that are flawed or lack economic justification would lead to outputs that are similarly flawed. For example, as I explained in my reply report during the class certification, Prof. Hitt misapplied my model by inputting alternative values without considering the

14

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

economic meaning of those inputs or the fundamental principles governing their relationships, resulting in unreliable and unreasonable conclusions.[21]

## C.   RESULTS

35. To calculate the But-For commission rate, I solve the equation presented in Section II.A for the commission rate, as shown below. I then substitute all the parameters on the right-hand side of the equation with the calibrated values described in the previous Section for the rival app store. Specifically, I replace the market size M with 51 billion, the rival's market share $s_i$ with 23%, the variable cost $VC_i$ with 3.8%, the fixed cost $FC_i$ with 800 million and the operating margin of the rival sore with 23% (rounded values; exact values are available in the worksheet).[22] This results in a But-For commission rate of 13.63%. As previously explained, since the two app stores are assumed to be homogeneous, this commission rate would be charged not only by the rival store but also by Apple.

$$\tau_i = \frac{VC_i}{(1 - \text{Operating Margin}_i)} + \frac{FC_i}{s_i M(1 - \text{Operating Margin}_i)}.$$

36. I can further use my economic model to estimate Apple's operating profit margin in the But-For World. Given that both Apple and the rival app store charge the same commission rate and maintain symmetric cost structures – including identical fixed costs – Apple's higher market share implies a correspondingly higher operating margin. To calculate Apple's operating margin, I substitute the calibrated values into the equation, using now Apple's But-For market share of 77% and the estimated commission rate of 13.63% as inputs. This analysis shows that Apple's App Store would achieve an equilibrium operating profit margin of 57.2% in the simulated But-For World.[23] Importantly, this margin is higher than the profitability benchmarks identified in Apple's

---

[21]   Reply Report of Rosa M. Abrantes-Metz, Ph.D., in Support of Plaintiffs' Renewed Motion for Class Certification, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), April 28, 2023 ("Abrantes-Metz Reply Report"), para. 135-136.

[22]   Workpaper "Economic Model Estimate 2019.xlsx," tab "Model Calculation."

[23]   Workpaper "Economic Model Estimate 2019.xlsx," tab "Model Calculation."

internal Profitability Benchmarking slides, as well as the Microsoft Store's operating profit margin of ▮▮ for Windows PC game apps sales.[24]

37. All data inputs used for the calibration of the model – with the exception of the rival store's market share, which was estimated based on Prof. Simonson's survey – were based on 2019 accounting data. However, App Store's billings and costs, as well as Microsoft's operating margin, are also available for 2018. Using 2018 accounting data instead of 2019 to calibrate the market size, rival store's costs and operating margin, together with the ▮▮ figure for the rival store's market share, results in a lower But-For commission rate of ▮▮▮▮.[25] Therefore, using 2019 data is a more conservative approach in determining the But-For commission rate.

38. It is important to note that my estimated commission rate represents an upper bound for the rate that would be expected to prevail in the But-For World. This estimate is derived from a principled methodology that is standard in economic analysis and used reasonable economic inputs. Given that the But-For World has not been realized due to Apple's alleged anticompetitive conduct, there is inherent uncertainty involved, making it impossible to predict with certainty the exact commission that would have been charged. But this uncertainty does not invalidate the reasonableness and conservative nature of the But-For commission rate as I estimated at 13.63%.

39. Lastly, while reporting an expected commission rate that is not an integer is standard and appropriate in damages calculations, it is possible that the commission rate observed in the absence of Apple's conduct would have been an integer. Given that the assumptions in my model are generally conservative, as are the inputs used for calibration, it is reasonable to expect that such But-For commission rate would be 13% or lower. As I elaborate in Section V, using alternative, more realistic but still conservative data inputs reduces the estimated commission rate to around 12%. Therefore, if the commission rate in the But-For World were an integer, it would reasonably be expected to be 12% or, at most, 13%.

---

[24]    APL-EG_10015274, at 275. The highest non-Apple margin reported in the document is Facebook's 37.3%.

[25]    *See* Workpaper "Economic Model Estimate 2018.xlsx," tab "Model Calculation."

16

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## D.     APPLICATION OF THE MODEL TO MULTI-SIDED PLATFORMS

40.   In this Section, I explain why my methodology for estimating the But-For commission rate would be appropriate for multi-sided platforms and explain my decision not to assess network effects in this instance. As previously explained, the mathematical basis of my economic analysis is the relationship between profits and commission rate. This relationship holds true whether the App Store is considered a one-sided retailer or a two-sided transaction platform.  Apple's experts have not disputed that the profit relationship I use in this case applies in either case.[26]

41.   I have applied the same methodology of this report to two other litigation contexts, US Airways v. Sabre and FTC v. Surescripts, both of which involved two-sided transaction platforms.[27] In both matters, I estimated But-For profits and used an accounting relationship to predict But-For prices collected by the platforms.[28] The details of the profit analyses in those cases differ from the analysis here not only because of the facts of the cases, but also because in those cases there did not exist a comparable marketplace in the As-Is World that could be directly used to calibrate But-For profit levels. For the sale of iOS apps, such a comparable marketplace – the sale of Windows PC game apps – does exist, simplifying the analysis relative to both the Sabre and Surescripts matters. But the fundamental methodology is the same: I derive an implication for

---

[26]   Schmalensee Deposition (April 2023), 119:09-17. *See also* Hitt Deposition (April 2023) 167:13-22. ("Q. And do you say anywhere in your report that the equation Dr. Abrantes-Metz uses does not apply to the App Store? A. So let me separate that into two pieces. That equation is essentially a definition. And so, it would apply to any business operation […] certainly the idea that you have these accounting relationships, I don't object to that.").

[27]   Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, Case No. 19-1080-JDB (D.D.C.), March 30, 2023, ECF No. 177 ("Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, March 30, 2023"), pp. 2-3. *See also* Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, Case No. 11-2725-LGS (S.D. N.Y.), May 3, 2022, ECF No.1228 ("Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, May 3, 2022"), 1143:10-1145:23.

[28]   Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, Case No. 11-2725-LGS (S.D.N.Y.), May 2, 2022, ECF No. 1226, 1102:11-1112:7 and 1121:8-1126:2. *See also* Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, March 30, 2023, pp. 2-3.

17

But-For profit and then use applicable economic relationships to infer the But-For price that would have prevailed.[29]

42. When estimating But-For profits involving multi-sided markets, there may not be a need to directly assess network effects, depending on the specifics of the case. Indirect network effects may influence how a platform balances prices between its different sides, and in some cases, the economist may undertake their measurement in order to estimate a But-For price for one of the sides. In the Sabre matter there was a need to empirically assess these.[30] However, in other cases, such as Surescripts and the current matter, such an analysis is not necessary.

   a. In the Sabre matter, I found very large subsidy payments to one side of the platform in the As-Is World.[31] The question of whether that payment would persist in a competitive But-For World was a germane merits topic to the matter. Critically, there was no analog As-Is, more competitive, marketplace which could be observed to draw any inferences on whether the large subsidy payments would persist under competition. Hence, I conducted a thorough analysis of the strength of indirect network effects to inform my opinion that the payment was not likely to continue in a But-For World.[32]

   b. In the Surescripts matter, it was not necessary for me to analyze indirect network effects because the Federal Trade Commission, for whom I preformed my work, was only concerned with whether the total price collected by the platform was supra-competitive.[33] It was not concerned with how the price would be allocated between the various sides of the platform.

---

[29] I also note that in Sabre, a prior trial took place in which I was not involved as an expert. At that first trial, Sabre's conduct was being decided as a one-sided platform, rather than as a two-sided platform, and the expert assigned to determine the but-for GDS fee also used a profit equation to do so. His methodology was accepted by the court. Opinion, *US Airways, Inc., for American v. Sabre Holdings Corporation*, Case No. 17-960 (2d Cir. 2019), September 11, 2019, ECF No. 201, pp. 14, 36-37.

[30] Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, May 3, 2022, 1145:24-1146:7.

[31] Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, May 3, 2022, 1144:20-1145:8.

[32] Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, May 3, 2022, 1144:20-1148:12.

[33] Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, March 30, 2023, pp. 13-14.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

43. Consistent with my approach in other litigation matters, an analysis of indirect network effects is not necessary in this case.[34] Apple's App Store collects an ad valorem commission from developers and neither makes subsidy payments to consumers nor collects participation fees from them.[35] The same pricing structure is observed in the Windows PC game apps marketplace, which, as explained in Section VI.A, serves as a reasonable benchmark for the But-For World. Furthermore, no expert in this case has presented evidence that consumer subsidies or fees would exist in the But-For World.[36] In fact, Prof. Economides, in his analysis for the Cameron case, implicitly determined that consumer subsidy payments would be zero – a conclusion that Apple did not dispute in its Daubert motion against Developer Class Plaintiffs.[37] Therefore, with the price structure in the But-For World already established, there is no need to assess the strength of indirect network effects.

44. Some of my academic work on multi-sided platforms has involved different and sometimes more elaborate modeling than that required in this case. For instance, in one of my academic papers, I used a structural model of a monopolistic, two-sided subscription platform to compare market

---

[34] Videotaped Deposition of Rosa Abrantes-Metz, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), December 15, 2022, ECF No. 688-12 ("Abrantes-Metz Deposition (December 2022)"), 157:15-158:23.

[35] For a description of Apple's App Store commissions and fees, *see* Stiglitz Report, Section II.C. *See also* McFadden Report (2025), Section II.B on "Apple App Store Commissions and Fees".

[36] Schmalensee Deposition (April 2023), 156:4-13. ("Q. And do you have any insight into their likelihood of happening? A. I have no knowledge of what discussions inside Apple look like at this point or any other point, for that matter. So, I can't say whether there are people who really want to do this or not. Q. And you've not done any modeling or economic analysis to predict that result in the but-for world, have you? A. I have not.").

Schmalensee Deposition (April 2023), 182:4-13. ("Q. Okay. Have you modeled for consumer-side subsidies in the but-for world? A. I have not modeled consumer-side subsidies in the but-for world. Q. Do you have any empirical evidence you can point to that says that Apple would offer consumer-side subsidies in the but-for world? A. I've indicated that it is possible. I do not know what Apple is thinking.").

Schmalensee Deposition (April 2023), 183:15-21. ("Q. Do you provide any analysis of what a subsidy would look like in the but-for world for consumers? A. I don't know what Apple is thinking. I gave some examples of what they might do, and I could give more. But what they would do, I don't know.").

[37] *See* Defendant Apple Inc.'s Notice of *Daubert* Motion To Exclude Testimony Of Professor Einer Elhauge, Professor Nicholas Economides, And Christian Tregillis, Memorandum Of Points And Authorities, *Donald R. Cameron et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), August 10, 2021, ECF No. 376-11 ("Apple's Daubert Motion Against Developer Class Plaintiffs").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

dynamics of single versus multi-sided platforms.[38] Unlike my previous academic work, the But-For World in this case involves a competitive platform which charges a transaction fee, not a subscription fee paid up front to join the platform. In addition, the research questions addressed in that work are different from those in this matter, naturally requiring different models.

a.  First, in that research, I was interested in the optimizing decisions of a dynamic monopolist as opposed to the myopic monopolist most often studied in the literature.[39] That is, much research has investigated the profit-maximizing pricing of a monopolist who is only concerned with a single period's profit and does not consider future profits (i.e. a static model). Exploring this topic required introducing a concept of future-discounted profit streams. I found that this dynamic or "long-lived" monopolist would always set a lower price than an equivalent myopic or "single-period" monopolist.[40] Applying my academic finding to this case would suggest that abstracting from such discounting and dynamic considerations is a conservative choice, meaning that I estimated a higher But-For commission rate than I would have estimated otherwise. However, not all the conditions in that research are present here.

b.  Second, that paper was also focused on how varying the strength of direct and indirect network effects would impact the allocation of prices across the sides of the platform in the context of such dynamic considerations.[41] As I explained above, such an inquiry is not required in this case, hence I did not need to employ an equally elaborate modeling framework.

---

[38]  Rosa M. Abrantes-Metz and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *Working Paper*, September 2020 ("Abrantes-Metz and Metz, 2020"), p. 2.

[39]  Abrantes-Metz and Metz, 2020, p. 13. ("The myopic monopolist simply maximizes single-period profit.").

[40]  Abrantes-Metz and Metz, 2020, p. 14. ("Compared with the myopic optimal price $P_\pi$, the monopolist's dynamic optimal price $P_M$ is everywhere lower.").

[41]  Abrantes-Metz and Metz, 2020, p. 7. ("[T]his current paper contributes to the literature by providing a general, tractable framework for studying the dynamics of single and multi-sided platforms applied to monopolies herein (as well as competition and collusion in upcoming work). It also explores the relationship between the strength of the network effects (whether direct or indirect) and various equilibria levels such as profit margins, pricing, network size, cross subsidies, deadweight loss and others.").

20

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

45. Finally, I note that my model and analysis in this case are very similar to those used by Prof. Economides in Cameron.[42] In that case, Prof. Economides explicitly opined that the Apple App Store was a two-sided transaction platform.[43] Nevertheless, Apple did not contend that Prof. Economides' methodology was inapplicable to a two-sided transaction platform in their Daubert motion against Developer Class Plaintiffs.[44] Thus, this is another reason why Prof. Schmalensee's previous criticism during class certification that I failed to consider whether the Apple App Store is a two-sided platform is entirely misplaced.

## III.  THE ASSUMPTIONS OF THE MODEL ARE REASONABLE AND CONSERVATIVE

46. In this Section, I demonstrate that the assumptions of my economic model are supported by sound economic principles and consistent with the literature. I performed a quantitative economic analysis to determine a prevailing commission rate in the absence of Apple's alleged anticompetitive conduct. That analysis contemplates a competitive But-For World that we have never been able to observe, because Apple's alleged conduct precluded that world from ever developing. I therefore made reasonable and conservative modeling choices to analyze the But-For World. While there might be additional complexities I abstracted from, those complexities would reasonably be expected to lead to an even lower, not higher, But-For commission rate.

### A.  DUOPOLY OF TWO APP STORES

47. My economic model posits a duopoly with the Apple App Store and a competing app store. This is a conservative assumption, relative to the multiple-rival case that Prof. Economides considered,

---

[42]  Economides Report, ¶¶ 40-41.

[43]  Economides Report, ¶ 42.

[44]  Economides Report, ¶¶ 9, 42, and 47. See also Apple's Daubert Motion Against Developer Class Plaintiffs.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

in which he estimated a lower But-For commission than in the single-rival case.[45] The single-rival case limits the amount of competition in the But-For World and therefore the downward pressure on the But-For commission rate.[46] As the U.S. Department of Justice and the Federal Trade Commission state in the 2023 Merger Guidelines, higher market concentration is associated with enhanced market power, and therefore typically higher prices, among other adverse effects for consumers.[47] Additional rivals would decrease the market concentration level in the But-For World as measured, for instance, using the Herfindahl–Hirschman Index (HHI).

48. Apple's experts claimed during class certification that this market structure is at odds with my empirical analysis of the digital Windows PC game apps marketplace.[48] Yet the existence of multiple stores in the digital Windows PC game apps marketplace does not invalidate my choice to model a duopoly. I agree with Prof. Schmalensee and Prof. Hitt that in the absence of Apple's

---

[45] Apple Expert Prof. Hitt has criticized Prof. Economides's implementation of the multiple-rival version of his model, on the basis that he "just assumes that each of the two alternative iOS app transaction platforms in his two-entrant scenario would achieve a 25% market share." This type of assumption was necessary due to lack of data – rather than make a similar assumption here, I simply exclude this case, but discuss why additional rivals would typically lead to even lower but-for commission rates. *See* Expert Report and Declaration of Lorin M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 376-4, ("Hitt First Class Report"), ¶ 284.

[46] Prof. Economides's analysis also confirms that my single-rival assumption is conservative. In Prof. Economides's single-rival case, the But-For commission is 14.8%, while in the two-rival case, it is 13.0%. *See* Economides Report, ¶ 9. However, implementing this multiple-rival case requires assumptions about how the two rivals would split their market share, and Apple expert Prof. Hitt has criticized Prof. Economides' implementation of the two-rival case. *See* Hitt First Class Report, ¶ 284.

[47] "Market concentration and the change in concentration due to the merger are often useful indicators of a merger's risk of substantially lessening competition. In highly concentrated markets, a merger that eliminates a significant competitor creates significant risk that the merger may substantially lessen competition or tend to create a monopoly. As a result, a significant increase in concentration in a highly concentrated market can indicate that a merger may substantially lessen competition, depriving the public of the benefits of competition." 2023 Merger Guidelines, p. 5.

[48] Expert Report and Declaration of Lorin M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 10, 2023, ECF No. 688-3 ("Hitt Second Class Report"), ¶ 267. ("Dr. Abrantes-Metz claims that a 'comparable benchmark to the competitive but-for world,' is the Windows PC game apps 'market' […] Dr. Abrantes-Metz notes this variety, which directly contradicts the single undifferentiated rival iOS app transaction platform she purports in the but-for world."). *See also* Expert Report and Declaration of Richard Schmalensee, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), March 10, 2023, ECF No. 688-4 ("Schmalensee Second Class Report"), ¶ 78. ("Dr. Abrantes-Metz's model assumes only one rival app store. She claims this 'single-rival world' is 'the more conservative competitive landscape.' Yet, Dr. Abrantes-Metz claims that 'the sale of Windows PC game apps is the most comparable benchmark to the competitive but-for world,' and in that analysis, her benchmark but-for world contains multiple rivals.").

22

conduct, the market for iOS apps might support more than two app stores. However, I chose to model a duopoly, not because that is the only possibility in the But-For World, but because it is the most conservative possibility.[49] That is, if I modeled more competitors, as Apple's experts point out is the case in the benchmark marketplace, then the But-For commission rate would be even lower.

49. Economists observe that an increase in the number of competitors drives prices down, which is a fundamental principle of competition economics.[50] Competitive pressure increases when there are more firms, pressuring competitors to reduce their prices in order to maintain market share. Thus, standard models of competition in industrial organization find that prices fall with more competitors.[51] This principle has long informed antitrust analysis, as entry of new competitors is often associated with "a variety of procompetitive effects, including increased output or investment, higher wages or improved working conditions, greater innovation, higher quality, and lower prices."[52] Through this standard lens of competition, assuming more competitors in the But-For World means my commission rate would be even lower.

50. During class certification, Apple's experts argued that more competitors could lead to higher prices, disregarding the fundamental economic principle that competition places downward pressure on prices.[53] For instance, Prof. Hitt strayed from his own academic writings by

---

[49] I understand Prof. Schmalensee claims that the academic literature on two-sided platforms purports to show that prices need not fall with more competition. As I argue in ¶ 27, the result that competition among two-sided platforms can increase prices is based on assumptions that are not relevant to the But-For world. *See* Schmalensee Second Class Report, ¶ 74.

[50] At the very least, more competitors do not generally increase prices. In some models of competition, two competitors are sufficient to obtain the perfectly competitive price level. *See* Luís M. B. Cabral, *Introduction to Industrial Organization*, 2nd Edition (The MIT Press, 2002), at Section 7.1. *See also* Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), Section 4.2.

[51] Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), p. 57.

[52] 2023 Merger Guidelines, p. 11.

[53] Schmalensee Second Class Report, footnote 104. ("It is not immediately clear that assuming a single-rival world is a conservative approach—I understand Prof. Hitt discusses why the assumption of a single-rival world in the context of Dr. Abrantes-Metz's model is in fact not conservative."). *See also* Hitt Second Class Report, ¶ 293. ("[A]ccording to [Dr. Abrantes-Metz's] accounting formula, additional rivals would likely put upward pressure on the but-for commission rate by stealing at least some of each other's market share.").

23

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

postulating that more competition increases prices but does not reduce profitability, despite admitting that he conducted no analysis that "would predict either the industry structure or the outcomes in terms of pricing" of competition in the But-For World.[54] These criticisms by Apple's experts are flawed and were rejected by Judge Gonzalez Rogers:[55]

> [Dr. Abrantes-Metz] conservatively chose to model a duopoly, rather than a market with multiple rivals, because of the unremarkable and well-supported proposition in economics that more competition equals lower prices. (…) Apple does not dispute this basic tenet but instead argues that, under Dr. Abrantes-Metz's model, having more than one rival app store would actually increase Apple's but-for commission rate. Professor Hitt, Apple's expert, arrives at this counterintuitive conclusion by changing the respective market shares in Dr. Abrantes-Metz's existing model while maintaining the same profit margins. (...) As Dr. Abrantes-Metz states, it makes no economic sense to presume that "more competition increases prices but does not reduce profitability."

51. Specifically, Prof. Hitt purported to show that an additional rival would raise the But-For commission rate in the context of my economic model.[56] Prof. Hitt's exercise speculated about how an additional rival would fragment the market, leading to a lower But-For market share for the first rival. He speculated about two hypothetical cases, one in which each a smaller rival captures 15.4% of the market, and another in which each rival captures 11.5% of the market.[57]

---

[54] Lorin M. Hitt and Erik Brynjolfsson, "Productivity, Business Profitability, and Consumer Surplus: Three *Difference* Measures of Information Technology Value," *MIS Quarterly* 20(2) (June 1996): 136. ("Such an increase in efficiency (and therefore productivity) can be shown to intensify competition by lowering barriers to entry and eliminating the market inefficiencies that enable firms to maintain a degree of monopoly over their customers (Bakos, 1991). One effect of this increased competition is to reduce prices paid for firm output. […] However, the lower price paid for output will directly reduce profitability, possibly more than any cost savings achieved through rationalization."). Hitt Second Class Report, ¶¶ 292-299. *See also* Hitt Deposition (April 2023), 198:22-199:16. ("Q. Have you done any analysis of what that competition would look like in the but-for world? A. […] I haven't tried to develop, for example, from scratch any kind of structural model or similar economic analysis that would predict either the industry structure or the outcomes in terms of pricing, quantities, and other practices.").

[55] Class Certification Order, ¶¶ 18:18-19:2.

[56] Hitt Second Class Report, ¶ 293. ("[A]ccording to [Dr. Abrantes-Metz's] accounting formula, additional rivals would likely put *upward* pressure on the but-for commission rate by stealing at least some of each other's market share. As I will demonstrate, her accounting formula produces a higher but-for commission rate in a multiple-rival world if the presence of additional rivals results in a lower market share for each one, relative to Dr. Abrantes-Metz's benchmark value of 23.06 percent, holding other inputs constant.").

[57] Hitt Second Class Report, ¶ 297, Figure 28.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

He then plugged in these values for market share while holding all other inputs fixed, including profit margins and costs.[58]

52. Prof. Hitt's flawed analysis ignores standard economic principles which predict, even in the context of two-sided platforms, that an additional competitor reduces the profitability of competitors. This is precisely the mechanism that ultimately limits entry into every line of business.[59] Indeed, Prof. Schmalensee in deposition agreed that more competition reduces profits.[60] Prof. Hitt acknowledged this in his report as well.[61] Further, Prof. Hitt's own academic writings state that profits fall with increased competition.[62] It is clearly unreasonable to hold profits fixed in this exercise, as it forces the model to describe a non-sensible market situation, with more competition but no decrease in profits, to provide the result supportive of his claim. Consequently, it is unsurprising that Prof. Hitt produces a non-sensible result.

53. Further, Prof. Hitt also held fixed costs constant in his exercise. This is also unreasonable, because as Prof. Hitt pointed out in his deposition, smaller firms can have smaller fixed costs.

---

[58]   Hitt Second Class Report, Figure 28.

[59]   N. Gregory Mankiw, *Principles of Economics,* 8th Edition (Cengage Learning, 2018), p. 323. ("In other words, profit encourages entry, and entry shifts the demand curves faced by the incumbent firms to the left. As the demand for incumbent firms' products falls, these firms experience declining profit.").

[60]   Schmalensee Deposition (April 2023), 134:3-24. ("Q. Okay. Do you also agree with the general proposition that, all other things being equal, more competition -- in other words, the availability of at least one other app store or distribution channel -- would result in lower commission rates in the App Store? A. I think it's plausible. I think generally you expect competition to squeeze margins, so to reduce profitability at the App Store. But both in theory and in practice, more competition seems to change or can change the price structure as well as the price level. So, it could be that as prices to consumers charged by the store go up, commission rates might go down. You would expect them to go down. But then you look at China, and you say, 'There's a lot of competition in China, and commission rates are very high.' I don't have a model of that, but that's a fact."). *See also* Schmalensee Deposition (April 2023), 135:9-22. ("Q. Right. So, at least here, in the United States market, generally speaking, you would expect that more competition would result in lower commission rates, correct? A. As I said, the theory says the price structure might change. I would expect the world to remain complicated in the but-for world with more competition. I would be surprised if there were a single commission rate of the sort that plaintiffs have assumed. But it would certainly put pressure on the App Store's margins.").

[61]   Hitt Second Class Report, ¶ 293. ("Additional entrants could potentially result in a lower but-for commission rate if other inputs changed—for example, if each entrant earned a lower profit margin compared to the single-rival case—but Dr. Abrantes-Metz provides no way to assess whether such changes would occur.").

[62]   Lorin M. Hitt and Erik Brynjolfsson, "Productivity, Business Profitability, and Consumer Surplus: Three *Different* Measures of Information Technology Value," *MIS Quarterly* 20(2) (June 1996): p.136.

25

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Yet, when Prof. Hitt speculated about smaller, fractured rivals, he held all fixed costs constant, rather than allowing them to fall, corresponding with the rival's smaller scale. Higher fixed costs correspond with a higher But-For commission, so Prof. Hitt's results are similarly biased further upward by this error.[63]

54. Similarly, Prof. Schmalensee argued that digital app stores are an exception to the basic principle that competition drives prices down, because they are two-sided transaction platforms. He noted that some theoretical work on two-sided platform competition finds that fees charged to one side might increase with competition. However, he acknowledged in his report and stated in deposition that this research still finds that competition would tend to reduce the combined fees charged to both sides by the platform.[64] As discussed in Section II.D, I have seen no evidence that suggests Apple would charge consumers a fee to use the App Store in the But-For World, and Prof. Schmalensee agreed in deposition.[65] Also, as discussed in Section III.F, I expect that there would

---

[63]  To see how this follows from the operating profit margin equation, note that the equation is equivalent to:

$$\tau_i = \frac{VC_i}{(1 - Operating\ Margin_i)} + \frac{FC_i}{s_i M(1 - Operating\ Margin_i)}.$$

Note that the terms in the denominators, $(1 - Operating\ Margin_i)$ and $s_i M$ are always positive. Assuming $0 < s_i < 1$, an additional dollar of fixed cost increases the commission rate more than an additional dollar of variable cost. Therefore, moving a dollar from fixed to variable cost corresponds with a lower commission rate. To be explicit, note that since $VC_i$ is expressed as a share of store billings $(s_i M)$, moving a dollar away from fixed toward variable cost means $(s_i M)\ VC_i$ increases by one dollar.").

[64]  Schmalensee Second Class Report, footnote 98. Schmalensee Second Class Report, ¶ 74. ("Depending on the strength of network effects and the buyers' ability and willingness to multi-home, higher competition due to increased entry can increase fees on the seller side, even though the combined fees of both sides decrease."). Schmalensee Deposition (April 2023), 150:11-17. ("Q. And does he also say that the total price, in such an instance with multihoming, always falls with more competitors? A. Well, that's the general result that seems to arise everywhere, and sort of what you expect with more competition, that the total price would fall.").

[65]  Schmalensee Deposition (April 2023), 151:13-153:7. ("Q. Does Apple charge consumers a commission price? A. It does not, of course. Q. Okay. That's in the as-is world, Apple doesn't charge any of the commission to consumers, correct? A. Correct. Q. And Apple does not charge consumers any fee for using the App Store, correct? A. That's correct. Q. And have you seen any evidence that Apple would begin to charge consumers any cost to use the App Store in a competitive but-for world? A. I have no idea what Apple is thinking about the but-for world. [...] Q. So, do you have any reason to believe that in a competitive but-for world, developers would continue to pay all of the commission charges on the App Store? A. I think it's likely based on what we've seen at other stores. I expect headline commission rates to stay pretty high in the App Store, perhaps stay at 30 percent, and discounts of various kinds as I've discussed in my report and other reports, for that matter.").

be no subsidies in the But-For World. In other words, properly modeling a third or fourth rival would yield not only a lower combined fee as acknowledged by Prof. Schmalensee, but also a lower commission rate.[66]

55. Prof. Schmalensee cited academic papers that raise the possibility that competition may increase platform fees charged to the seller.[67] However, those papers derive that result under the assumption of single-homing. In this case, single-homing means that iOS users can only buy from one app store and cannot buy from any others. While this is what happens in the As-Is World (because iOS device users can only buy apps and in-app content from the App Store), it fundamentally does not describe the But-For World I am modeling, which explicitly allows for multi-homing by both developers and consumers.[68] In deposition, Prof. Schmalensee endorsed my view that consumers would be permitted to multi-home in the But-For World.[69] When consumers multi-home, the four academic papers cited by Prof. Schmalensee do not support the contention that more competition raises seller fees:

a. Correia-da-Silva et al. (2019) develop a simple model in which additional competition among two-sided platforms may increase fees to either side. Their model relies on the assumption of single-homing on both sides of the platform.[70]

---

[66] Even if the seller-side price were to increase with more competition, Prof. Schmalensee recognized that the total price would fall. *See* Schmalensee Deposition (April 2023), 150:11-17. ("Q. And does he also say that the total price, in such an instance with multihoming, always falls with more competitors? A. Well, that's the general result that seems to arise everywhere, and sort of what you expect with more competition, that the total price would fall.").

Taking Prof. Schmalensee's stance on two-sided platforms seriously, this is only possible if the subsidy payments to consumers also increased with more competition, and to a greater extent than the seller-side price increased.

[67] Schmalensee Second Class Report, ¶ 74.

[68] Abrantes-Metz Deposition (December 2022), 166:8-12. ("[A.] […] [I]n the but-for world, a world where at least two competing app stores would exist and a world where both consumers and developers could multi-home between the two platforms.").

[69] Schmalensee Deposition (April 2023), 147:16-20. ("Q. In the but-for world, the competitive but-for world that we've been discussing, do you believe that consumers would be permitted to multi-home? A. Of course.").

[70] Joao Correia-da-Silva, Bruno Jullien, Yassine Lefouili, and Joana Pinho, "Horizontal mergers between multisided platforms: Insights from Cournot Competition," *Journal of Economics and Management Strategy*, 28(1) (2019): 109-124, p. 113.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

b.  Tan and Zhou (2021) develop a more complex model of multi-sided platform competition, and similarly find that increased competition can increase platform fees. Their model relies on the assumption of single-homing on all sides of the platform.[71]

c.  Evans and Schmalensee (2013) survey the literature on multi-sided platforms and cite to Chandra and Collard-Wexler (2009), discussing how that paper shows the theoretical possibility that a merger could reduce fees on both sides of a two-sided platform.[72] But Chandra and Collard-Wexler (2009) also derive their unusual result under the assumption of single-homing.[73] Moreover, in his paper and in deposition, Prof. Schmalensee cautioned that both the model and results in Chandra and Collard-Wexler (2009) are not generally applicable.[74]

d.  Teh et al. (2022) find that, when users can freely multi-home, fees charged to sellers – e.g. commissions charged to developers – fall with more competitors.[75]

---

[71]  Guofu Tan and Junjie Zhou, "The Effects of Competition and Entry in Multi-sided Markets," *Review of Economic Studies*, 88(2) (2021): 1002-1030, p. 1007.

[72]  David S. Evans and Richard Schmalensee, "The Antitrust Analysis of Multi-Sided Platform Businesses," *NBER Working Paper*, Vol. 18783, February 2013.

[73]  Ambarish Chandra andAllan Collard-Wexler, "Mergers in Two-Sided Markets: An Application to the Canadian Newspaper Industry," *Journal of Economics & Management Strategy*, 18(4) (2009): 1045-1070, p. 1052.

[74]  David S. Evans and Richard Schmalensee, "The Antitrust Analysis of Multi-Sided Platform Businesses," in *The Oxford Handbook of International Antitrust Economics* (Oxford University Press 2014): 404-447, p. 427. ("As this discussion indicates, the possibility of this particular result depends on a number of special assumptions, and even then whether prices go up or down depends on the values of particular parameters in the model. This model is certainly not generally applicable.").

Schmalensee Deposition (April 2023), 172:14-24. ("A. I'm talking about the Chandra and Wexler 2009 model and its results; and I'm saying this model isn't generally applicable. So, I have to go back and look at that model. Yeah. That's -- if you look at that model, it really does rest on a lot of specialized assumptions about which readers shift and what about advertisers and -- ah, that's a very special model of the newspaper business. Even for the newspaper business, it's -- you could argue it's not generally applicable.").

[75]  Tat-How Teh, Chunchun Liu, Julian Wright, and Junjie Zhou, "Multihoming and Oligopolistic Platform Competition," *American Economic Journal: Microeconomics*, (2022) forthcoming, pp. 22-24. ("[W]hen there is two-sided multihoming, increased platform competition tends to shift the fee structure in favor of sellers."). Buyer fees may increase with more competition when the authors assume, among other assumptions, the probability density function of a seller's valuation of the transaction is weakly

56. In fact, under my But-For World where users can freely multi-home, competition among app stores would place downward pressure on commission rates paid by developers. This is consistent with the general view that increased competition places greater downward pressure on commission rates, and thus confirms that my duopoly model is conservative. Ultimately, however, it is unnecessary to speculate about the effects of entry on commission rates. We can observe that entry into the digital Windows PC game apps marketplace has been associated with lower, and not higher, commission rates.[76] The available empirical evidence further demonstrates that the conditions in the app distribution marketplace do not correspond to the unique conditions required in the theoretical literature cited by Prof. Schmalensee.

57. Prof. Schmalensee also attempted to show that competition need not reduce prices by referencing a case study of the Android app distribution ecosystem in China. He observes that "proliferation of competing app stores does not necessarily lead to a reduction in commission rates" in the Chinese market, but that to the contrary, "most of the popular stores have commission rates that are even higher than the App Store's headline commission rate, at least for some app genres, particularly games."[77] Nonetheless, this "case study" is of no economic value and provides no meaningful evidence of the effect of competition on commission rates. Prof. Schmalensee does not track commission rates in China to see what happens as new app stores enter or exit the market. Instead, he simply takes a point-in-time snapshot of commission rates in China and notes

---

decreasing. However, Teh et al. (2022) writes, "Nonetheless, in more general cases, the net see-saw effect could be weak so that $p^b$ decreases (or is non-monotone) when $n$ increases." Even if buyer fees increase, Teh et al. (2022) points out that buyers can still be better off on net, because there are more sellers. ("[…] [T]he decrease in $p^s$ due to entry is significantly larger than the increase in $p^b$, so that: (i) on the seller side the positive effect through the per-transaction surplus dominates the negative effect of transacting with fewer buyers; (ii) on the buyer side, the negative effect through the per-transaction surplus is dominated by the positive effect of transacting with more sellers.").

[76] In August 2021, Microsoft Matched the Epic Games Store's commission structure and cut its commission fee to 12% for PC games. Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge*, April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent. Industry observers regarded the Microsoft's commission reduction as the result of "stiff competition." Kyle Orland, "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%," *Ars Technica*, April 29, 2021, available at, https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pc-game-sales-to-12/.

[77] Schmalensee Second Class Report, ¶ 97.

29

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

that they are higher than that in the U.S., which says nothing of whether competition puts upward or downward pressure on prices.

58. This "case study" is flawed in its details as well. Besides listing a few Chinese app stores and their headline commission rates, Prof. Schmalensee has presented no empirical analysis in his case study. For example, although Prof. Schmalensee assumes that there probably are some discounts, he did "not discuss them," further conceding that he "did not do a complete detailed study of China."[78] In his deposition, he acknowledges that the economic environment in China is considerably different from the United States, and yet he has not analyzed how these differences would impact commission rates.[79] He further admits that he is not aware of any academic literature that indicates the Chinese app store market is a useful proxy for analyzing the American app store market.[80] Indeed, Prof. Schmalensee himself considers these as "strange results" and not "a model for what the But-For World would look like."[81] Prof. Schmalensee's case study that

---

[78] Schmalensee Deposition (April 2023), 185:13-186:1. ("Q. So, you say, for example, in paragraph 98, that many stores charge at least a 30 percent commission rate for app downloads and in-app transactions, and this commission rate is at least 50 percent for games, right? A. Yeah. I'm not sure that's true for all stores, but its true for some stores, yeah. Q. Do you discuss in your report discounts that are offered on those commission rates? A. I don't. I assume there probably are some, but I do not discuss them. Q. Did you consider them at all? A. I did not do a complete detailed study of China.").

[79] Schmalensee Deposition (April 2023), 134:25-135:8. ("Q. Right. And you would agree that the economic environment in China is considerably different than the economic environment in the United States? A. I would agree in general terms. None of the differences in which I'm aware have obvious implications for the Android App Stores in China. But, obviously, the systems are different.").

[80] Schmalensee Deposition (April 2023), 192:4-7. ("Q. Are you aware of academic literature that would indicate China's app store is a useful proxy for analyzing the American app store market? A. I'm not aware of any such literature").

[81] Schmalensee Deposition (April 2023), 190:16-191:25. ("Q. Okay. […] Did you do any quantitative analysis of the impact of macroeconomic factors on the Chinese app store practices? A. […] Apart from recently, when the government has cracked down on the tech sector, business in China is recognizable using the kind of economic analysis we would do elsewhere. So, nothing I've learned about China over the years tells me that, again, putting aside the recent tightening, that there's any obvious thing that would bias. On the other hand, these are strange -- these are strange results. They suggest a much more complicated world than one finds in simple models."). *See also* Schmalensee Deposition (April 2023), 192:4-15. ("Q. Are you aware of academic literature that would indicate China's app store is a useful proxy for analyzing the American app store market? A. I'm not aware of any such literature, and I'm not taking it as a model. I am taking it as indicating that competition can have interesting and unexpected effects. And that's what we see in China. I'm not saying that's a model for what the but-for world would look like.").

highlights selected Chinese app stores' headline commission rates while ignoring all other features of the "much more complicated" Chinese market is thus uninformative.[82]

59. Inconsistent with Professor Schmalensee's argument, Prof. Hitt previously deemed it inappropriate for Prof. Economides to include WeGame (a Chinese direct distributor of Windows PC game apps) in his benchmark analysis, stating that "the Chinese market is fragmented and highly regulated, making its developers poor benchmarks for comparison with U.S. developers."[83] Further, he took issue with the fact that "PC app distribution is subject to different competitive conditions in China compared to the U.S., and Professor Economides has provided no justification for using direct distribution of PC apps in China as a benchmark for the U.S."[84] Prof. Schmalensee's China case study evidently suffers from the same shortcomings that Apple's own expert criticized.

60. The best available evidence in this case on the effect of competition on commission rates comes from the Windows PC game app marketplace in the U.S. That evidence shows that entry by new third-party app stores is associated with decreasing, instead of increasing, commission rates. The data Prof. Schmalensee has assembled from the Chinese market do not contradict or refute that finding in any way.

61. While nothing precludes modeling an equilibrium with more than two stores, and while I do not dispute Apple's experts that the market for the distribution of iOS apps and in-app content might

---

[82] Schmalensee Deposition (April 2023), 190:24-191:25. ("Q. Well, for example, the regulatory environment, number one. Number two might be the cultural factors. Number three might be overall economic trends in China. Any macroeconomic factor. Factors that don't relate particularly to the practices on any of these Chinese app stores. A. You define "macroeconomic" rather broadly. It's a marketplace. They're selling apps. Different antitrust policy might have a different impact. I don't know what cultural factors might do. Business in China --most businesses are recognizable, despite cultural differences. I'm not sure what else you listed; GDP, growth rates. As I say, you can look at business in China. Apart from recently, when the government has cracked down on the tech sector, business in China is recognizable using the kind of economic analysis we would do elsewhere. So, nothing I've learned about China over the years tells me that, again, putting aside the recent tightening, that there's any obvious thing that would bias. On the other hand, these are strange -- these are strange results. They suggest a much more complicated world than one finds in simple models.").

[83] Hitt First Class Report, ¶ 390.

[84] Hitt First Class Report, ¶ 159.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

support more than two stores But-For Apple's alleged conduct, modeling the additional details and complexity discussed above would lead to lower, not higher, But-For commission rates.

## B.    HOMOGENEOUS APP STORES

62. In my model, I assume two essentially identical app stores in the But-For World and do not speculate on how each competitor might attempt to differentiate itself in a multitude of dimensions. In particular, I see no basis for assuming that either store would necessarily be dominant along some non-price dimension. I therefore chose to represent instead an equilibrium where the two stores provided essentially identical terms and services. Again, we will never know exactly how the But-For World would have unfolded in the absence of Apple's alleged misconduct, but the assumption I made is reasonable given the presence of proto-app stores despite Apple's attempts to thwart competition.[85]

63. The assumption in my model that the two app stores are homogeneous is also intentionally conservative. By treating the app stores as identical, I focus solely on price competition, assuming that Apple's alleged anti-competitive behavior affected only commission rates, which were set higher than they would have been in a competitive market. However, if the app stores in the But-For World were differentiated, they would likely have competed on more than just price. Both stores might also have improved their service quality to attract developers and consumers, striving to offer the best platform. This competition on quality would have likely resulted in a better experience for both developers and users in the But-For World. By simplifying the analysis to focus exclusively on price effects, my model does not account for additional potential losses related to quality improvements and innovation that may have been stifled by Apple's conduct.

---

[85]    My assumption that the two stores are essentially identical is also consistent with the academic literature on platform competition, which often assumes "symmetric" platforms. *See* Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, 1(4) (2003): 990-1029; and Guofu Tan and Junjie Zhou, "The Effects of Competition and Entry in Multi-sided Markets," *Review of Economic Studies*, 88(2) (2021): 1002-1030, p. 1018. See also Paul Belleflamme and Martin Peitz*, Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), p. 70; and N. Gregory Mankiw, *Principles of Economics*, 8th Edition (Cengage Learning, 2018), p. 279.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

64. However, during class certification, Prof. Schmalensee argued this reasonable modeling decision is inappropriate for the But-For World, presenting the following arguments:

    a. Prof. Schmalensee stated that the Apple App Store has numerous levers to differentiate itself from the rival app store.[86] Specifically, he claimed that Apple would have a comparative advantage over any rival, due to its ownership of technical toolkits.[87]

    b. Prof. Schmalensee posited that the Apple App Store could have launched a consumer rewards program to retain customers or require its in-app purchase payment mechanism for physical goods and services.[88]

    c. Apple's experts argued that the assumptions of identical app stores in the But-For World contradict observations from my benchmark marketplace of differentiated digital Windows PC game app stores.[89]

    d. Prof. Schmalensee cited an episode where Google considered charging developers a fee to list an app as evidence that "platforms are cognizant of differentiating themselves from the App Store, either through quality or price."[90]

65. I note that, consistent with my economic arguments on this point, Prof. Schmalensee's several criticisms of my assumption that Apple and the rival store would provide homogeneous services in the But-For World were also rejected by Judge Gonzalez Rogers:[91]

---

[86] Schmalensee Second Class Report, ¶ 90. ("There are various aspects of its as-is world business model that Apple could employ to differentiate itself from a new rival store.").

[87] Schmalensee Second Class Report, ¶ 91. ("Apple could begin to charge for use of certain APIs, such as Metal, which would have a greater impact on developers – and ultimately consumers – in the Games genre than in other genres.").

[88] Schmalensee Second Class Report, ¶¶ 92-93.

[89] Schmalensee Second Class Report, ¶ 77. ("In her model, Dr. Abrantes-Metz simply assumes that the rival app store offers identical services and terms to consumers and developers as those offered by the App Store. Yet, the two-sided transaction platforms included in her benchmarking analysis – which is meant to reflect the competitive conditions of the but-for world – offer a variety of services and terms to consumers and developers."). *See also* Hitt Second Class Report, ¶¶ 266-269.

[90] Schmalensee Second Class Report, ¶ 94. ("Evidence from Google also demonstrates that platforms are cognizant of differentiating themselves from the App Store, either through quality or price.").

[91] Class Certification Order, ¶¶19:23-20:2.

33

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

> Dr. Abrantes-Metz's cites to economic literature for the proposition that two competitors in a duopoly would provide the same services. (…) Apple's experts do not contest that economists use symmetric competitors to design economic models—one of Apple's experts, Professor Hitt, stated in his deposition that it is not an "unusual assumption"—but instead speculate that in the but-for world Apple might try to differentiate itself by, for example, offering a consumer rewards program (…). Such speculation in the face of widely accepted principles goes to weight, not admissibility.

66. Prof. Schmalensee's list of potential ways the App Store might differentiate itself is purely speculative. He acknowledged that he conducted no rigorous analysis to demonstrate the likelihood of any of these possibilities.[92] Furthermore, he neither quantified nor attempted to measure how these dimensions of differentiation would impact the But-For commission rate, if at all.[93] Determining how competing app stores might differentiate in the But-For World would require a more complex model, which no expert from Apple has provided. Even Prof. Schmalensee admitted during his deposition that he cannot predict how Apple's business strategy might change in the But-For World.[94] Therefore, these claims remain speculative.

67. While it is possible that stores could attempt to differentiate themselves from each other in the But-For World, there is no compelling reason to believe that such differentiation is necessary or

---

[92] Schmalensee Deposition (April 2023), 178:5-180:4. ("Q. Have you done any work to quantify the effect of complex pricing strategies such as commission tiers or subsidies on prices in the but-for world? A. I have not. Q. Have you done anything to quantify or measure or model the impact of any additional features that could be provided to developers either on the App Store or on a competitor in the but-for world. A. Sorry, to model their effects on developers? Q. Yes, sir. A. I have not. Q. Have you done anything to model the effect of changes to pricing policies such as imposing charges on developers for developer tools or APIs or any other changes on developers in the but-for world? A. I think the extent of the analysis I have done there is to point out that different kinds of charges, since they use -- make different use of development tools. But that apart, I have not done a quantitative analysis. […] Q. Are you aware of any evidence that Apple would differentiate between different app tools and how to charge for them in the but-for world? A. I do not know what Apple is thinking of doing, if it finds itself in the but-for world.").

[93] Id.

[94] Schmalensee Deposition (April 2023), 155:17-20. ("Q. And what you just mentioned are all in the realm of possibilities, correct? A. Correct. I do not know what Apple is thinking."); Schmalensee Deposition (April 2023), 179:25-180:4. ("Q. Are you aware of any evidence that Apple would differentiate between the different app tools and how to charge for them in the but-for world? A. I do not know what Apple is thinking of doing, if it finds itself in a but-for world."); and Schmalensee Deposition (April 2023), 183:15-21. ("Q. Do you provide any analysis of what a subsidy would look like in the but-for world for consumers? A. I don't know what Apple is thinking. I gave some examples of what they might do, and I could give more. But what they would do, I don't know.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

even expected to occur. Assuming identical stores aligns with established economic literature on platform competition. Notably, the academic works cited by Prof. Schmalensee and Prof. Hitt adopt this commonplace modeling assumption. [95] For example, Tan and Zhou (2021) and Teh et al. (2022) assume that competitors are identical.[96] Prof. Schmalensee acknowledged in his deposition that assuming symmetric competitors is a standard practice in economic modeling and that he has assumed symmetric competitors in his own academic papers.[97] Similarly, Prof. Hitt acknowledged that a symmetric equilibrium is not an unusual assumption in the economic literature.[98] Given these admissions, the unfounded speculation from Apple's experts regarding differentiation among competitors appears aimed at constructing a But-For World that they claim would necessitate individual inquiry.

68. There is also no reason to believe that an advantage would necessarily accrue to the Apple App Store over its rival. As discussed in Section III.G, my model assumes that both stores would begin operations simultaneously. In contrast, as explained in Section VI.A, the digital Windows PC game apps marketplace has not been characterized by simultaneous entry; instead, it has featured a progression of entrants seeking to enter a market dominated by an incumbent with a clear first-mover advantage. While it is not surprising that digital Windows PC game app stores in the As-Is

---

[95] Schmalensee Second Class Report, footnotes 96, 98; Hitt Second Class Report, footnote 346.

[96] Tat-How Teh, Chunchun Liu, Julian Wright, and Junjie Zhou, "Multihoming and Oligopolistic Platform Competition," *American Economic Journal: Microeconomics,* (2022) forthcoming, p. 33 ("[W]e rely on symmetry to make our analysis tractable."); and Guofu Tan and Junjie Zhou, "The Effects of Competition and Entry in Multi-sided Markets," *Review of Economic Studies*, 88(2) (2021): 1002-1030, at p. 1013 ("The tractability of our model, and the simplicity of the pricing formula, is a joint product of symmetry, single-homing, full market coverage, and the additive separability of the customer utility, and does not rely on the functional forms of externalities and the distributions of customer membership benefits.").

[97] Schmalensee Deposition (April 2023), 212:1-7. ("[A.] […] To assume that competitors are symmetric is a pretty standard kind of assumption. I could probably find a half a dozen papers where I've made it. I don't know if I've ever done it in a two-sided context. I haven't done these really fancy, two-sided models, but I've certainly done it in other settings.").

[98] Hitt Deposition (April 2023), 204:16-205:5. ("Q. Okay. In the case of two-sided markets, do you know -- are you aware of academic literature in which economists assume symmetric equilibrium between competitors in two-sided markets? A There are -- I mean, that's not an unusual assumption. So, there's two separate things that you could be meaning by that. So one is that the competitors are actually symmetric. And the second is that, in that case, you assume that the equilibrium is symmetric. And those aren't the same thing. But that's not a tremendously unusual assumption. It's not always made, but that's something you can do.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

World attempt to differentiate themselves, this observation is not relevant to assessing the level of differentiation that would plausibly exist in a But-For World where competing app stores launch simultaneously.

69. Finally, the Google example cited by Prof. Schmalensee, where Google considered charging developers a fee to list an app, contradicts Prof. Schmalensee's point.[99] Google ultimately decided against charging fees to list apps in its own platform, due to concerns about the rival operating system iOS.[100] In the But-For World, the rival app store may also effectively discipline the Apple App Store from differentiating its terms and services.

### 1. Impact of Homogeneous App Stores Assumption on Commission Rates

70. The assumption that the two app stores provide identical services implies that, in equilibrium, they will charge the same commission rate. Since both app stores in the But-For World begin with equal market conditions and offer the same services, economic theory dictates that they would ultimately charge the same commission rate.[101] If one store charged a lower rate, it would capture the entire customer base, forcing the higher-priced store to reduce its rate to remain competitive. Economic models predicting symmetric (equal) prices are standard in the literature, including those on platform competition. For example, both Tan and Zhou (2021) and Teh et al. (2022)

---

[99] Schmalensee Second Class Report, ¶ 94.

[100] Schmalensee Second Class Report, ¶ 94. ██████████████████████████████████████████████████████████████████████████████ ).

[101] See Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), Sections 3.1 and 3.2; and Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Edition (Pearson Education, 2015), pp. 185, 197.

analyze symmetric equilibria.[102] Both Prof. Hitt and Prof. Schmalensee also acknowledged in deposition that symmetric pricing is a common modeling assumption in the literature.[103]

71. While Apple's experts did not dispute that equal commission rates follow logically from the assumptions of my model, they nevertheless criticized this outcome during class certification by presenting the following arguments:[104]

   a. First, Apple's experts claimed that the app stores in the But-For World would be differentiated.[105] As previously explained, the assumption of homogeneous app stores is reasonable, conservative and consistent with the academic literature, whereas the assertion that the app stores would necessarily be differentiated is speculative.

   b. Second, Apple's experts argued that store differentiation implies price differentiation.[106] That conclusion is also incorrect. The assumption of homogeneous platforms is not necessary to obtain equal prices. In standard models of industrial organization, product differentiation is a necessary but not sufficient condition for price differentiation, as two firms can offer

---

[102]  Guofu Tan and Junjie Zhou, "The Effects of Competition and Entry in Multi-Sided Markets," *The Review of Economic Studies*, 88(2) (2021): p. 1003 (Prof. Schmalensee cited to the forthcoming version of this paper) which states: "We focus on customer heterogeneity (or platform product differentiation) by membership benefits and on homogeneous network effects (both within-side and cross-side externalities). Based on the assumptions of single-homing and full market coverage, we establish the existence of a symmetric pricing equilibrium in which the price on each side follows a simple formula: the price equals a mark-up, due to market power associated with product differentiation, minus a subsidy, due to cross-side (and possibly within-side) externalities."

[103]  Hitt Deposition (Apr 2023), 205:14-18 ("Q. And do economists assume symmetric prices? A. So they may restrict their attention to symmetric pricing in environments where competitors are ex-ante identical. That's a pretty common assumption."). *See also* Schmalensee Deposition (April 2023), 208:10-20. ("Q. And do you agree that, assuming identical prices by competitors in a competitive market, even for two-sided platforms, is common in the academic literature? […] A. It may be common in the academic literature. It doesn't seem to be common in the marketplace. But it is certainly common in the academic literature as a simplification, as an equilibrium description.").

[104]  Hitt Second Class Report, ¶ 25; Schmalensee Second Class Report, ¶¶ 82-87; and Hitt Deposition (April 2023), 176:17-177:2. ("[A.] […] Economic theory would say two identical competitors, one equilibrium outcome is that they look identical. Q. And that would imply a 50/50 market share between two competitors, correct? A. Yes. They're absolutely undifferentiated and charge exactly the same price, and that's the best response that would be one equilibrium. It doesn't have to [be] the only one, but that is not an unusual one, especially if you rule out asymmetric equilibrium.").

[105]  Hitt Second Class Report ¶ 255. ("App transaction platforms are differentiated from each other, and thus charge different commission rates, often including a 30 percent headline commission rate.").

[106]  Hitt Second Class Report, ¶¶ 272-275; and Schmalensee Second Class Report, ¶¶ 82-83.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

differentiated products but still charge the same price.[107] Academic articles in which differentiated platforms charge the same price were cited by Apple's experts.[108] Merely postulating that competitors would differentiate themselves in the But-For World is therefore insufficient to establish differentiated prices. Such analysis requires, at a minimum, specifying how stores would differentiate themselves, how the differentiation would impact consumer demand, and how different rates could be sustained in a competitive equilibrium. Apple's experts offered no analysis of this kind.[109]

c. Third, Apple's experts argued that it is more plausible for the Apple App Store to charge a different rate than the rival app store, citing instances where app stores in my benchmark marketplace charge different rates.[110] However, this comparison fails to account for key differences between the As-Is digital Windows PC game apps marketplace and the But-For World, such as Steam's incumbent advantage.[111] Moreover, empirical evidence from my benchmark marketplace shows that differentiated competitors can and do charge the same price. For example, the Microsoft Store and Steam offer different catalogs of games and services.[112] Yet, prior to Epic's entry, they charged the same commission rate on games – a point Prof. Hitt does not contest.[113] Similarly, in August 2021, the Microsoft Store matched the Epic Games Store's commission rate despite multiple differences between the two stores. This empirical evidence demonstrates that even when stores differentiate in terms of game selection, developer services and user experience, they often set identical commission rates.

---

[107] Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies* (Cambridge University Press, 2010), pp. 49-51, 87-89.

[108] Schmalensee Second Class Report, footnote 96; and Hitt Second Class Report, footnote 346.

[109] *See* Schmalensee Deposition (April 2023), 209:16-210:11.

[110] Hitt Second Class Report, ¶¶ 46-47; and Schmalensee Second Class Report, ¶¶ 35, 77.

[111] As discussed in Section VI.B.1, there are at least two reasons why Steam's high commission rate could be deemed supracompetitive. *First*, Steam was one of the first digital app stores during the transition from physical distribution (which is characterized by high costs) to digital distribution, and its dominance as a digital distributor of PC games was not challenged until recently. *Second*, Steam imposes an allegedly anticompetitive most-favored-nations requirement.

[112] See ¶ 143.

[113] Hitt Deposition (April 2023), 215:13-18. ("Q. Do you know if Microsoft and Steam […] charged the same commission rate for games before Epic entered the Market? A. So I would say headline rates prior to 20 -- late 2018 when Epic entered were the same.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Thus, the assumption that non-price differentiation necessarily leads to price differentiation is unfounded both theoretically and empirically.

## C.    SINGLE COMMISSION RATE

72.    Another assumption of my model is that, in the But-For World, both Apple and the rival store would charge a single commission rate for all app sales and in-app purchases. I recognize that Apple charges two different commission rates in the As-Is World: a 30% commission rate for most app purchases and in-app transactions; and a 15% commission rate for a limited subset of transactions, including subscription renewals after the first year and transactions qualifying for the Apple Video Partner Program or the App Store Small Business Program.[114] However, charging tiered commission rates is a form of price discrimination, and price discrimination requires market power.[115] As competition tends to drive prices closer to costs, in the But-For World competitive pressure would likely constrain app stores' ability to sustain materially different tiered commission rates. As a result, I do not incorporate tiered commissions in my model, as Apple would likely have adopted a single commission rate in the But-For World.

73.    My decision to model a single commission rate is supported by my benchmark analysis in Section VI, which examines the marketplace for digital Windows PC game apps as a robustness check for the But-For commission rate estimated by my economic model. In this relatively more

---

[114]    Apple, "Auto-renewable Subscriptions," available at, https://developer.apple.com/app-store/subscriptions/; Apple, "Apple Video Partner Program," available at, https://developer.apple.com/programs/video-partner/; Apple, "App Store Small Business Program," available at, https://developer.apple.com/app-store/small-business-program/; *See also* Expert Report of Daniel L. McFadden, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), June 1, 2021, ECF Nos. 442-11, 443-14, 643-11, ("McFadden Opening Report"), ¶¶ 31-32.

[115]    N. Gregory Mankiw, *Principles of Economics*, 8th Edition, (Cengage Learning, 2018), p. 304. ("For a firm to price discriminate, it must have some market power.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

competitive market, I have not identified any third-party app store charging tiered commissions, except for Steam:[116]

a.  For instance, the Epic Games Store charges a single 12% commission rate, and there is no evidence that it charges different commission rates for game subscription services or other types of transactions.[117]

b.  As another example, Microsoft Store charged a single commission rate of 30% for game apps from January 1, 2015 to August 1, 2021, and has maintained a single commission rate of 12% for game apps since August 1, 2021.[118] Note, however, that Microsoft charges a different commission rate for non-game apps that has historically been lower than its rate for games. Although the current rate structure shows a higher headline rate for non-game apps, this rate is an optional payment processing fee rather than a distribution commission.[119] Distributors

---

[116]  On November 30, 2018, Steam announced that it would reduce its 30% revenue share to 25% for game earnings between USD 10 million and USD 50 million and to 20% for game earnings beyond USD 50 million. Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at,
https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838. *See also* Romain Dillet, "Valve changes revenue-sharing tiers on Steam," *TechCrunch*, December 3, 2018, available at, https://techcrunch.com/2018/12/03/valve-changes-revenue-sharing-tiers-on-steam/.

I am aware that, prior to 2015, the Microsoft Store had a headline commission rate of 30% and a reduced commission rate of 20% for sales beyond $25,000. However, the sale of Windows PC game apps only became a relatively more competitive market in recent years after Epic's entry. *See* Brad Sams, "Starting Jan 1st, Microsoft's app store policy change makes it less attractive for developers," *Neowin*, November 20, 2014, available at, https://www.neowin.net/news/starting-jan-1st-microsoft039s-app-store-policy-change-makes-it-less-attractive-for-developers/.

[117]  Epic Games Store, "Reach over 100 million players by self-publishing your game on the Epic Games Store," available at, https://store.epicgames.com/en-US/publish.

[118]  Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge*, April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/; Chuong Nguyen, "Microsoft wants a bigger cut of the revenue from Windows developers," *Windows Central*, November 21, 2018, available at, https://www.windowscentral.com/microsoft-wants-bigger-cut-revenue-windows-developers.

[119]  Ian Carlos Campbell and Julia Alexander, "A guide to platform fees, The hidden costs behind your favorite apps, games, and more," *The Verge*, August 24, 2021, https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google.

opting out of the payment processing service incur no fee.[120] This indicates that, even if genre-based commission tiers existed in the But-For World, non-game commissions would still be lower than game commissions.

c.  Steam, on the other hand, is alleged to have substantial market power in the PC game distribution market, so its commission rate structure is less representative of the rate structure in the competitive But-For World.[121]

74.  Therefore, while tiered rates in a competitive But-For World are possible, common evidence and economic logic suggest such tiering is not reasonably expected to be substantial. Given the empirical evidence from Windows PC game app stores, it is reasonable to conclude that the Apple App Store would charge a single commission rate in the competitive But-For World.[122]

75.  My assumption of a single commission rate is also conservative. In my economic model, I calibrate the rival's operating profit margin using the profit margin that Microsoft Store earned on game apps in 2019, when Microsoft charged a commission rate of 30% on game apps sales and 15% on non-game app sales.[123] Consequently, my estimated But-For commission rate of 13.63% is based on the highest tier among Microsoft Store's commission rates. If the But-For commission structure reflects Microsoft Store's commission from 2019, any additional tiers would likely be below 13.63%.

---

[120]  Ian Carlos Campbell and Julia Alexander, "A guide to platform fees, The hidden costs behind your favorite apps, games, and more," *The Verge*, August 24, 2021, https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google, ("Non-game sellers can also use their own payment system and avoid Microsoft's commission entirely as of July 28th 2021.").

[121]  Consolidated Amended Class Action Complaint Demand for Jury Trial, *In Re Valve Antitrust Litigation,* Case No. 2:21-cv-00563-JCC (W.D. Wash.), August 26, 2022, ECF No. 99 ("Consolidated Amended Class Action Complaint Demand for Jury Trial, In Re Valve Antitrust Litigation"), ¶¶ 5, 8-9, 92,129.

[122]  In his analysis, Prof. Economides produced two-tiered commission rates in the But-For World, analogous to Apple's current pricing tiers of 15 or 30%. Apple Expert Prof. Hitt has criticized Prof. Economides's assumptions in the calculation of But-For commission tiers as "speculative." *See* Economides Report, ¶¶ 57-62; Hitt First Class Report, ¶ 168.

[123]  See Section VI.B.3.

41

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### D.    CONSTANT COMMISSION RATE OVER TIME

76. My economic model estimates an equilibrium But-For commission rate that would have prevailed throughout the entire class period. As I explained in my deposition, abstracting from the dynamic path of commission rates is a conservative modeling choice.[124] To the extent that earlier commission rates may have differed from the equilibrium rate, they would likely have been lower, reflecting the efforts of nascent competitors to gain volume through aggressive pricing.[125] While I do not dispute that the But-For World might be characterized by a dynamic evolution toward the equilibrium commission rate, my assumption is not only reasonable; it also illustrates how modeling complexity would lead to even lower, not higher, commission rates.

77. During class certification, Apple's experts criticized my choice to keep the commission rate constant over time, arguing that earlier periods may have experienced different rates as the market moved toward equilibrium.[126] However, no expert from Apple analyzed a likely trajectory of commission rates in the But-For World.[127] Additionally, they contended that assigning a single But-For commission rate for the entire class period is inconsistent with empirical evidence, as commission rates in the benchmark marketplace have not remained static.[128]

---

[124]  Abrantes-Metz Deposition (December 2022), 204:5-12. ("[A.] […] So my experience tells me that if I were to have modeled this from a dynamic perspective and even averaging out all the possible paths that could have led to the same equilibrium, I would expect to see rates that would have been lower converging to 13.6 from below, not from above.").

[125]  David Besanko, Ulrich Doraszelski, and Yaroslav Kryukov, "How Efficient Is Dynamic Competition? The Case of Price as Investment," *American Economic Review* 109(9), (September 2019): 3339-3364. *See also* Abrantes-Metz Deposition (December 2022), 203:21-204:12. *See also* Abrantes-Metz and Metz, 2020, p. 14. *See also* ¶ 44.a above.

[126]  Hitt Second Class Report, ¶ 263. ("Dr. Abrantes-Metz assumes that in the but-for world this single, common commission rate would hold from the launch of the App Store to today. She does not allow for any changes to competition that could impact the but-for commission rate over the 14-year period since the launch of the App Store."). *See also* Schmalensee Second Class Report, ¶ 61. ("Dr. Abrantes-Metz's model does not (and cannot) account for how the App Store's commission rate would change over time in the but-for world.").

[127]  Schmalensee Deposition (April 2023), 181:14-18. ("Q. And have you done anything to quantify what I'll describe as early period dynamics in commission rates? A. I think I have a pretty general idea of what you're talking about. The answer is no.").

[128]  Schmalensee Second Class Report, Exhibit IV.3.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

78. While commission rates charged by storefronts in the digital Windows PC game apps marketplace have decreased over time – clearly illustrating the effects of competition and new entrants – most Windows PC game apps were primarily distributed through brick-and-mortar stores prior to 2010.[129] Steam maintained a 30% commission rate due to its incumbent market position and the higher costs associated with physical distribution.[130] However, as digital distribution gained traction, it attracted additional entrants, increasing competition among digital storefronts and driving down commission rates.[131] Therefore, recent periods serve as a more appropriate benchmark for the competitive But-For World, where there would be no transition from physical to digital distribution and no incumbent with a first-mover advantage.[132]

## E.    COMMISSIONS AS THE ONLY REVENUE SOURCE

79. I have conservatively modeled commissions as the sole revenue source for the rival app store in the But-For World. Including any additional revenue streams would lead to an even lower estimated But-For commission rate. In my economic model, the rival app store achieves a 23% operating profit margin, regardless of whether its revenue comes from commissions or other activities. If additional revenue sources existed, they would reduce the commission revenue needed to maintain the 23% margin, thereby lowering the But-For commission rate. This is evident

---

[129] Oliver Chiang, "The Master of Online Mayhem," Forbes, February 9, 2011, available at, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html/?sh=7f132e45451e ("A milestone was reached last year [2010] when unit sales of PC games via download outstripped sales of boxed games in stores for the first time, according to research firm NPD Group.")

[130] Steam was distributing third-party games in 2005 and was considered a cheaper alternative to physical distribution, despite its 30% commission fee. *See* Order, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), May 6, 2022, ECF No. 80 ("Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022"), 7:17-7:24. See also Second Amended Consolidated Class Action Complaint Demand for Jury Trial, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), December 20, 2021, ECF No. 68, ("Wolfire Games, LLC, et al. v. Valve Corporation, Second Amended Consolidated Class Action Complaint Demand for Jury Trial"), 15:17-24.

[131] Prof. Schmalensee's own Exhibit IV.3 demonstrates that the Epic Games Store's entry in late 2018 precipitated a drop in commission rates in this marketplace. *See* Schmalensee Second Class Report, Exhibit IV.3.

[132] See Section VI.A for a more detailed explanation of why it is only in recent years that Windows PC game app sales have exhibited certain characteristics central to their comparability to a hypothetical competitive market for iOS apps and in-app content sales.

when considering my original model's operating profit margin equation and modifying it to include additional revenue, denoted as $R_i'$, in both the numerator and denominator:[133]

$$\text{Operating Profit Margin for Firm i} = \frac{s_i M(\tau_i - VC_i) + R_i' - FC_i}{s_i M \tau_i + R_i'}$$

80. Solving this equation for the commission rate $\tau_i$ yields the following expression:

$$\tau_i = \frac{VC_i}{(1 - \text{Operating Margin}_i)} + \frac{FC_i}{s_i M(1 - \text{Operating Margin}_i)} - \frac{R_i'}{s_i M}$$

81. As shown in this expression, the larger the additional revenue sources $R_i'$, the lower the But-For commission rate in equilibrium. By excluding these additional revenue sources for the rival store, I conservatively estimate the maximum commission rate consistent with my model inputs. Since, in equilibrium, the Apple App Store and the rival store are expected to charge the same commission rate, I am also conservatively estimating the maximum commission rate that applies to the Apple App Store based on my model parameters.

82. During class certification, Prof. Schmalensee criticized me for assuming that "the only element of the App Store's but-for business model and that of its competitor is a single commission rate that applies to all transactions."[134] He further suggested that I have ignored "[o]ther elements of the App Store's As-Is business model" and the revenues they generate in my economic model analysis.[135] Prof. Schmalensee also claimed that my approach contradicts Prof. McFadden's But-For World, in which "all other elements of the App Store's business model besides its headline commission rate are the same in the but-for world as in the as-is world […]."[136] As previously explained, my assumption is a conservative modeling choice rather than an oversight.

---

[133] Prof. Schmalensee also agreed that this formulation would be appropriate in his deposition. *See* Schmalensee Deposition (April 2023) 132:20-133:2. ("Q. Okay. Only in the numerator, not the denominator? A. Well, operating profit margin is calculated here and generally is a sense -- is a share of gross sales. So I wouldn't put it -- well, you're right. It would go in the denominator as well.").

[134] Schmalensee Second Class Report, ¶ 41.

[135] Schmalensee Second Class Report, ¶ 41. ("Other elements of the App Store's As-Is business model are not part of her analysis and do not affect revenues.").

[136] Schmalensee Second Class Report, ¶ 41.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### F.    LACK OF CONSUMER SUBSIDIES

83. In this Section, I explain why consumers are not expected to either receive subsidies or pay fees when using Apple's app store or the rival app store for purchasing games or making in-app purchases. This is important because, as discussed in Section II.D, indirect network effects can shape how multi-sided platforms balance pricing between different sides, and measuring these effects could be important when the platform's pricing structure – such as potential subsidies – differs between the As-Is and But-For Worlds. Since no such subsidies or fees are anticipated for consumers in either world, analyzing the strength of indirect network effects was unnecessary.

84. Empirical evidence from app distribution markets indicates that there are no meaningful consumer subsidies or participation fees. In the As-Is iOS app distribution market, developers pay commission rates, while consumers are neither charged nor receive meaningful subsidy payments per transaction from the platform. The same holds for the sale of digital Windows PC game apps, a reasonable benchmark for a more competitive But-For World. Likewise, I have found no evidence of mobile or digital Windows PC game app stores charging consumers participation fees for purchasing apps or in-app content. Prof. Schmalensee has also previously testified that this is true for the iOS App Store in the As-Is World.[137] This strongly suggests that it is reasonable to expect that neither Apple nor its rival would charge consumers fees in the But-For World.

85. Some consumer loyalty reward programs exist but are limited in scope. For example, the Microsoft Store offers consumer rewards which "don't have any cash value" that can only be redeemed in the store and are subject to expiration.[138] Similarly, Steam also has a rewards program where

---

[137] Schmalensee Deposition (April 2023), 151:13-22. ("Q. Does Apple charge consumers a commission price? A. It does not, of course. Q. Okay. That's in the as-is world, Apple doesn't charge any of the commission to consumers, correct? A. Correct. Q. And Apple does not charge consumers any fee for using the App Store, correct? A. That's correct.").

[138] Microsoft, "How to earn Microsoft Rewards points," available at, https://support.microsoft.com/en-us/topic/how-to-earn-microsoft-rewards-points-83179747-1807-7a5e-ce9d-a7c544327174#:~:text=Microsoft%20Rewards%20points%20don%27t,earning%20activities%20within%2018%20months. *See also* Microsoft, "Reward yourself, make a difference with Microsoft Rewards," available at, https://www.microsoft.com/en-us/rewards#coreui-areaheading-37u4igy. *See also* Microsoft, "How to redeem Microsoft Rewards points," available at, https://support.microsoft.com/en-us/topic/how-to-redeem-microsoft-rewards-points-52f5f51f-38ed-3a9b-b6e1-8308dd49a3c3.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

users receive points for every dollar spent on the platform, but these points are only redeemable within the Steam store for profile backgrounds, avatars and other decorative items for the user's profile.[139] Outside digital Windows PC game app stores, the Google Play Store launched the Play Points rewards program in the U.S. in November 2019, allowing consumers to earn points that can be redeemed for certain store purchases or donated to select charities.[140]

86. The presence of consumer loyalty programs does not imply that app stores must be two-sided transaction platforms. From an economic perspective, loyalty programs are similar to loyalty discounts, as they can be interpreted as a form of price discrimination analogous to quantity and bundled discounts, existent in many one-sided businesses.[141] The main difference is that loyalty programs may offer rewards in the form of points or free purchases rather than direct price reductions, though the underlying principles remain the same.[142] Loyalty programs are commonly observed in many single-sided markets – for example, coffee shops offering a free drink after several purchases. In practice, such programs function as rebates for repeated purchases rather than subsidies designed to attract consumers to a platform. These loyalty schemes thus differ importantly from the direct per-transaction payments seen in both Sabre and Surescripts, where large cash payments were made to consumers from the revenues collected on the platform.[143] I

---

[139] Steam, "The Points Shop: Steam Points," available at, https://store.steampowered.com/points/howitworks ("The Points Shop is where you'll find a variety of items to personalize your Steam presence […] Animated Avatars, Frames, Backgrounds, Badges and Chat items you get are yours to keep forever.")

[140] *See* Kyle Wiggers, "Google Play Points launches in the U.S.," *Venture Beat*, November 4, 2019, available at, https://venturebeat.com/business/google-play-points-launches-in-the-u-s/.

[141] "Loyalty programs can perhaps be interpreted as a form of price discrimination analogous to quantity and bundled discounts." R. Caminal & A. Claici, "Are loyalty-rewarding pricing schemes anti-competitive?", *International Journal of Industrial Organization*, Vol. 25, No. 4, 2007, pp. 657-674. https://doi.org/10.1016/j.ijindorg.2006.07.004.

[142] As noted by the International Competition Network (ICN), "The agencies define loyalty discounts and rebates as (…) discounts or rebates on units purchased of a single product, conditioned on the level or share of purchases. Some agencies highlighted that loyalty discounts and rebates condition discounts on loyal purchasing behavior; in other words, customers receive the discount only if their purchases exceed a certain threshold." International Competition Network, 2009, "Report on the Analysis of Loyalty Discounts and Rebates Under Unilateral Conduct Laws", The Unilateral Conduct Working Group, p. 2.

[143] Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, May 3, 2022, 1144:15-1145:8. *See also* Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, March 30, 2023, pp. 7-8.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

have not found evidence of such payment structures in any app distribution market, and I do not expect them to emerge in the But-For World.

87.  Moreover, during class certification, none of Apple's experts presented direct evidence or economic analysis to demonstrate that there would be any form of subsidy payment or participation fee in the But-For World.[144] Prof. Schmalensee, whom Apple has offered as an expert in multi-sided platform economics, testified in his deposition that he "can't say that [subsidy payments] are probable" in the But-For World.[145] He further testified that he has "not done any modeling or economic analysis to predict" the likelihood of subsidy payments in the But-For World.[146] Prof. Schmalensee acknowledged in his deposition that, if an app store were to offer consumer subsidy payments, it would only be to attract consumers.[147] This observation suggests that such payments would only be offered if they benefitted consumers.

---

[144]  Schmalensee Deposition (April 2023), 151:23-152:06. ("Q. And have you seen any evidence that Apple would begin to charge consumers any cost to use the App Store in a competitive but-for world? A. I have no idea what Apple is thinking about the but-for world. There's some discussion of what Google thought. We have a document or documents about things that Google thought about doing. I don't think it included charging consumers."). Schmalensee Deposition (April 2023), 183:15-21. ("Q. Do you provide any analysis of what a subsidy would look like in the but-for world for consumers? A. I don't know what Apple is thinking. I gave some examples of what they might do, and I could give more. But what they would do, I don't know.").

[145]  Schmalensee Deposition (April 2023), 155:4-156:3. ("Q. Okay. Do you believe that Apple would begin to pay consumers to use the App Store in the but-for world? A. It could, in the but-for world, do some sort of loyalty thing, like Google does; or Apple, being clever, might think of some other way to incentivize patronage. It could enhance the service function. It could spend more money reviewing apps and make the reviews more visible. So, it could do a variety of things for consumers in addition to or instead of loyalty points. It has a lot of capabilities. Q. And what you just mentioned are all in the realm of possibilities, correct? A. Correct. I do not know what Apple is thinking. Q. Okay. And you didn't mean to suggest that they were probabilities, rather than possibilities, correct? A. Well, probabilities suggest I have some insight into their likelihood. I think they are possibilities. I can't rule them out, but I can't say that they are probable.").

[146]  Schmalensee Deposition (April 2023), 156:4-13. ("Q. And do you have any insight into their likelihood of happening? A. I have no knowledge of what discussions inside Apple look like at this point or any other point, for that matter. So, I can't say whether there are people who really want to do this or not. Q. And you've not done any modeling or economic analysis to predict that result in the but-for world, have you? A. I have not.").

[147]  Schmalensee Deposition (April 2023), 182:14-22. ("Q. If consumers were offered subsidies in the but-for world, they would be offered to attract consumers to the App store in a competitive market, correct? A. Well, I've argued in our earlier discussion that there's a case they're getting a subsidy now for which they're not getting charged. And if they, let's say, increase that in a but-for world, it would be to attract them, yes.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

88. Finally, the conclusion that there would be no subsidy payments in the But-For World was previously made by Prof. Economides in the Developers case. In his analysis, which closely aligns with mine, Prof. Economides equated the price output from his economic model with the developer commission rate.[148] Although Prof. Economides considered the Apple App Store to be a two-sided transaction platform, he implicitly concluded that no consumer subsidy payments would occur. Notably, Apple did not challenge this conclusion in their Daubert motion against the Developer Class Plaintiffs.[149]

### G.    APP STORES STARTING ON EQUAL FOOTING

89. In my analysis, I modeled a scenario where a competing app store starts on equal footing with the Apple App Store and competes with it throughout the entire class period. Market facts indicate that, in the absence of Apple's challenged conduct, competing app stores would have been permitted to operate from the very launch of the Apple App Store. Proto-app stores, such as Cydia, preceded the launch of the Apple App Store and enabled users to sideload third-party apps, even when Apple did not allow third-party apps on the iPhone.[150] Despite Apple's initial opposition, an ecosystem of third-party apps distributed by proto-app stores quickly developed.[151]

---

[148]  Economides Report, ¶¶ 9 and 51-52.

[149]  *See* Apple's Daubert Motion Against Developer Class Plaintiffs.

[150]  First Amended Complaint, *Saurikit, LLC v Apple Inc*, Case No. 4:20-cv-08733-YGR (N.D. Cal.), January 19, 2022, ECF No. 72 ("Cydia Complaint"), 1:21-2:2. ("Plaintiff SaurikIT, LLC ('SaurikIT' or 'Cydia') […] was the App Store before the App Store even existed.").

Cydia Complaint, 2:3-9. ("Cydia became hugely popular by offering a marketplace that, until recently, users have always been able to obtain directly from the internet (*i.e.*, not through Apple) and install on their phones to find and obtain third party iOS applications that greatly expanded the capabilities of the stock iPhone, including games, productivity applications, and audio/visual applications […] Apple subsequently took many of these early third party applications' innovations, incorporating them into the iPhone directly or through apps.").

[151]  Cydia Complaint, 6:9-21. ("Plaintiff Cydia is a California company […] The Cydia application is an app marketplace that seeks to expand the capabilities of the iPhone for users, including by distributing innovative applications, games, and packages. Cydia was developed in 2008 […] and has ever since been made available for download and installation via the internet (as opposed to the App Store). At its inception in 2008, Cydia was the most successful iOS app distributor, predating the App Store. Apple

48

However, as Apple implemented technological restrictions on sideloading, these proto-app stores could not sustain their operations.[152] Absent such restrictions, it is reasonable to expect that a rival app store could launch simultaneously with the Apple App Store and compete throughout the class period.

90. During class certification, Apple's experts presumed, without basis, that the Apple App Store would have competitive advantages over rival stores in the But-For World.[153] Prof. Schmalensee claimed that the Apple App Store would have entered the market before competitors, thereby conferring a first-mover advantage.[154] He argued that this would make it difficult for competitors to gain market share.[155] However, during his deposition, Prof. Schmalensee admitted that he was not aware of any app stores that existed prior to the launch of the Apple App Store. This

---

then escalated the anticompetitive conduct described herein, which forced its later-developed App Store into a dominant position and largely shut Cydia and other competitors out of the iOS app distribution market. Yet, even under these anticompetitive circumstances, Cydia has consistently been the second-most successful iOS app distribution channel, demonstrating both the demand for Cydia specifically, and for non-Apple iOS app distribution services generally. It was not until 2018 through 2020 […] that Apple succeeded in effectively excluding the Cydia app entirely from the iPhone."). *See also* Brian X. Chen, "Jailbreakers Battle Apple for Control of iPhone," *Wired*, November 12, 2009, https://www.wired.com/2009/11/jailbreak-community/.

[152] Cydia Complaint, 3:21-4:23. ("At the January 5, 2022 hearing in this matter, the Court asked Cydia 'Why file this case now?' The answer is that Apple's anticompetitive acts finally broke the proverbial camel's back in late 2019.").

[153] Schmalensee Second Class Report, ¶ 60. ("Dr. Abrantes-Metz assumes that the App Store and the rival store start on 'equal footing.' […] it is more likely that there would have been sequential entry in which the App Store starts first, followed by the rival store."). *See also* Hitt Second Class Report, ¶ 253. ("[Dr. Abrantes-Metz] does not model whether, or when, hypothetical rival transaction platforms would enter […] Instead, she simply assumes what should be the outcomes of an economic model: that a single rival iOS app transaction platform that is identical to the App Store enters immediately at the start of the Class Period."); and Schmalensee Deposition (April 2023), 120:18-25. ("Q. And is it equally fair to say that you assumed that the rivals would not enter at the same time; you merely assumed that the App Store would exist first, followed by a rival? A. I made the assumption -- I made the statement that it seemed more plausible. I didn't say that it was certain. I said it seemed more plausible.").

[154] Schmalensee Second Class Report, ¶ 60. ("[I]t is more likely that there would have been sequential entry in which the App Store starts first, followed by the rival store."); and Schmalensee Second Class Report, ¶ 65. ("It is more plausible that the App Store would have launched first and a potential entrant would have waited until the App Store had demonstrated the viability of the business. In doing so, the App Store would have developed a first-mover competitive advantage.").

[155] Schmalensee Second Class Report, ¶ 65. ("Under these conditions, a rival would need to provide additional incentives to attract both consumers and developers.").

49

misunderstanding of the historical facts underlies his assumption of a first-mover advantage for the Apple App Store, an assumption which is actually counterfactual:[156]

> Q. Okay. So, is it your understanding that there were no preexisting app stores for iOS devices when the App Store entered the market? A. That's my understanding, yes. Q. Is that understanding part of your reason for arguing that a rival would enter the market after the App Store entered the market? […] A. I suppose it is because there was no other source of information on the viability of an iOS App Store.

91. Market facts from the As-Is World thus contradict the presumption that Apple would have a first-mover advantage in the But-For World. Additionally, Apple's experts did not model what such competitive advantage would entail or how it would affect market share or the But-For commission rate. Even if one were to assume a first-mover advantage for Apple, a textbook economic model typically used to analyze such scenarios (the Stackelberg model) suggests that the leader would capture about two-thirds of the market, while the follower would hold the remaining third.[157] By contrast, my analysis assumes the rival store's market share is only 23%, meaning my approach is conservative even under the assumption that Apple had a first-mover advantage.

## H.    NO ALTERNATIVE MONETIZATION AND DIFFERENTIATION STRATEGIES

92. Finally, it is important to note that my model does not account for potential alternative monetization or differentiation strategies that app stores might adopt in the But-For World, a point of criticism raised by Apple's experts during class certification.[158] Prof. Schmalensee claimed that my But-For World is "overly simplistic" because I ignored "the complexities associated with alternative

---

[156]  Schmalensee Deposition (April 2023), 123:19-124:9.

[157]  The Stackelberg competition model with linear demand and equal constant marginal costs predicts that the first mover (leader) produces twice as much as the second mover (follower). In equilibrium, the leader's quantity is $q_1 = \frac{a-c}{2b}$, while the follower's quantity is $q_2 = \frac{a-c}{4b}$. This results in the leader holding 66% of the total market and the follower holding 33%.

[158]  Schmalensee Second Class Report, ¶ 40. *See also*, Schmalensee Second Class Report, Exhibits 1.A-1.D. *See also* Expert Report and Declaration of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-9 ("Malackowski Second Class Report"), ¶ 207. ("Plaintiffs' experts fail to provide any evidence of why Apple would be obligated to, or even likely to, maintain the same commission and licensing structure rather than utilizing a wide range of alternatives that are possible and common in real-world IP licensing and monetization.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

business models that Apple might adopt in the but-for world."[159] Similarly, Mr. Malackowski argued that in a properly constructed But-For World, Apple would change its monetization strategy with respect to its intellectual property and would not allow "IP free riding."[160] He suggested that in the But-For World, Apple could employ a "wide range of options […] to monetize the Developer Program and associated Apple IP," such as introducing fixed licensing fees, per-use API fees or tiered developer fees.[161]

93. Apple's experts have previously raised these arguments, which have already been addressed by Prof McFadden in previous reports.[162] As I explain below, this criticism does not undermine the conclusions of my economic model for several reasons.

94. First, Apple's experts have speculated about potential changes to Apple's monetization strategy in the But-For World, but none have analyzed Apple's economic incentives to determine how reasonably expected these strategies are.[163] Prof. Schmalensee admitted in his deposition that he has not presented evidence or conducted analysis regarding the likelihood of Apple adopting these strategies in the But-For World:[164]

> Q. Have you done any work to quantify the effect of complex pricing strategies such as commission tiers or subsidies on prices in the but-for world? A. I have not.

---

[159] Schmalensee Second Class Report, ¶ 40. ("By ignoring the complexities associated with alternative business models that Apple might adopt for the but-for world, Professor McFadden's and Dr. Abrantes-Metz's but-for world is overly simplistic and unsupported.").

[160] Malackowski Second Class Report, ¶¶ 189-192.

[161] Malackowski Second Class Report, ¶ 200. *See also* Malackowski Second Class Report, ¶¶ 201-206.

[162] *See* Hitt First Class Report, ¶¶ 335-343; Expert Report and Declaration of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 478-2 ("Malackowski First Class Report"), ¶¶ 201-206; and Expert Report and Declaration of Richard Schmalensee, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 534-1, ¶¶ 148, 154-160. *See also* Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), October 19, 2021, ECF No. 554-5 ("McFadden 2021 Reply Report"), ¶¶ 60-72.

[163] Schmalensee Second Class Report, ¶ 40. ("The PC game stores Steam, Microsoft Store, and Epic Games Store, for example, all use a wide variety of pricing structures to monetize their developer tools, ranging from pay-per-use fees to flat fees. […] By ignoring the complexities […] in the but-for world, […] Dr. Abrantes-Metz's but-for world is overly simplistic and unsupported."). *See also* Schmalensee Second Class Report, ¶¶ 90-94.

[164] Schmalensee Deposition (April 2023), 178:5-179:5.

Q. Have you done anything to quantify or measure or model the impact of any additional features that could be provided to developers either on the App Store or on a competitor in the but-for world? [...] A. I have not. Q. Have you done anything to model the effect of changes to pricing policies such as imposing charges on developers for developer tools or APIs or any other charges on developers in the but-for world? A. I think the extent of the analysis I have done there is to point out that different kinds of apps would be differentially affected by those kinds of charges, since they use -- make different use of development tools. But that apart, I have not done a quantitative analysis.

95. Similarly, Mr. Malackowski has made no evaluation of whether these strategies would significantly contribute to Apple's But-For revenue. In his 2021 deposition, Mr. Malackowski, like Prof. Schmalensee, conceded that he had not assessed the likelihood of Apple implementing any of the alternative monetization strategies mentioned in his 2021 report:[165]

Q. Okay. Okay. You identify the six different alternative monetization strategies in paragraphs […] 201 through 206 of your first report.[…] So in Paragraph 201 you say that: 'One way Apple could replace any revenue it would lose in the but-for world is that it could charge a fee for the use of each specific API developer tool or software package.' Right? A. Right. […] Q. Do you -- do you understand the difference between the word could and the word would? A. Could is an explanation of possibility. Would is a prediction of reality […] Q. Did you -- did you mean to use the word could in Paragraph 201? A. Yes. Q. Okay. You didn't mean to use the word would, did you? […] THE WITNESS: I did not. […] Q. Okay. Is there anything

---

[165] Remote Deposition of James E. Malackowski, *In Re Apple iPhone Antitrust* Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), October 5, 2021, ECF No. 554-8 ("Malackowski Deposition (October 2021)"), 104:16-106:23.

*See also* Malackowski Deposition (October 2021), 107:2-15. ("Q. Okay. Now, in Paragraph 202, which appears on the next page of your report, page ninety-nine, you say: 'Apple could charge separately for bundles of developer tools or functionality.' Correct? A. Yes, sir. Q. And, again, you meant to use the word could rather than the word would; correct? A. Correct. Q. Is there anything in Paragraph 202 that measures the likelihood of that monetization strategy being followed in the but-for world? A. No.").

*See also* Malackowski Deposition (October 2021), 107:18-108:5. ("Q. Okay. Same for Paragraph 203. You say Apple could raise the developer and license fee generally, correct? A. True. Q. And, again, you use the word could, not the word would purposefully; correct? A. I do. Q. And there is nothing that measures the likelihood that Apple would pursue the alternative monetization strategy you have defined in Paragraph 203; correct? A. Correct. There is no probability assessment.").

*See also* Malackowski Deposition (October 2021), 108:6-18. ("Q. And the same for paragraph 204, where you say: 'Apple could introduce a developer revenue-based royalty.' Is -- is that also correct that there is no probability assessment for that alternative monetization strategy in the but-for world? A. Yes. The same is true for Paragraph 204, 205, and 206. Q. Okay. A. They all reference could, not would, and there is no probability assessment.").

about the word could that measures the likelihood of that outcome in Paragraph 201? A. No.

96. Moreover, even if Mr. Malackowski has since conducted such an assessment, he has not included it in his 2023 report.[166] I am aware that Mr. Malackowski added to his 2023 report a fee Apple recently charges "for heavy users of the WeatherKit API." He then speculates about which types of app developers might be willing to pay for different levels of access. He offers no information on the amount of revenue Apple has collected from this API fee, and no information on the relative significance of this revenue compared to App Store commission revenue collected from the developers who use the API. Lastly, he again presents no assessment of the likelihood that such programs would become a significant source of revenue for Apple in the But-For World.

97. Second, none of Apple's experts has demonstrated a causal link between changes in Apple's incentives to adopt alternative monetization or differentiation strategies and the removal of Apple's alleged misconduct. Specifically, they offer no economic analysis explaining why Apple would implement these strategies in the But-For World when they are not employed in the As-Is World. In a previous deposition, Mr. Malackowski opined that these alternative monetization strategies would negatively impact Apple's business in both worlds.[167] It remains unclear why Apple would

---

[166] See Malackowski First Class Report, ¶ 201 and Malackowski Second Class Report, ¶ 201.

[167] Mr. Malackowski has acknowledged that Apple could have employed these alternative monetization strategies in the as-is world if it were beneficial to do so. See Malackowski Deposition (October 2021), 101:3-18. ("Q. Okay. Would -- would you agree with me that if -- if in the but-for world Apple would lose revenue from The App Store, it could make up for that revenue in some other business segment? It could do so -- not would, but could do so? […] THE WITNESS: I have no basis to say they could. To the extent that they could generate more revenue or optimize revenue in another segment, I know of no reason why they wouldn't be doing that today; so it would not make sense to me that they are leaving that money in the table and would turn to it in the event of the relief being sought; rather, they would focus on how to recover that revenue related to the business that -- the business that was impacted."). See also Malackowski Deposition (October 2021), 118:7-25.

However, he also ultimately offered the opinion that these alternative monetization strategies would have negative effects on Apple in both the As-Is World and But-For World. See Malackowski Deposition (October 2021), 114:3-115:7. ("Q. All right. So did you do anything to measure the difference in incentives or constraints for this alternative monetization strategy in the as-is world versus the but-for world? […] THE WITNESS: I did not do anything to specifically measure the inefficiencies associated

pursue these strategies, despite their negative effects, when the Apple App Store would still achieve an operating profit margin of 57% in the But-For World.

98. Finally, even if Apple were to adopt some of these alternative monetization strategies in the But-For World that it does not implement today, Apple's experts have not modeled how these changes would impact the But-For commission rate.[168] While one could speculate that additional revenue sources might enable the Apple App Store to undercut the rival's commission, putting downward pressure on competitive commission rates, none of Apple's experts has presented any evidence, theory or argument suggesting that other revenue streams would allow Apple to charge a higher commission rate than its rival in equilibrium.

## IV.    THE MODEL INPUTS ARE CONSERVATIVE AND BASED ON REAL-WORLD DATA

99. In this Section, I describe how I calibrate my economic model using real-world data. I begin by explaining the calibration of market size, followed by the market shares of Apple and the rival store, their cost structures, and the rival store's operating profit margin. For each of these, I explain how my approach to calibration results in a conservative estimate of the But-For commission rate that Apple would have charged absent its conduct. Just as in the previous Section, the use of conservative inputs to calibrate the model implies that adjusting these inputs to be less conservative would result in a lower But-For commission rate.

---

with any of the listed alternatives. I do refer in Paragraph 207 to the fact that the structures would increase friction and transaction costs and, therefore, be less efficient […] Q. 'And consistent result of many of the alternative structures is an increase in friction and transaction costs.' Is that -- is that where you are referring me? A. Yes. Q. Is -- is that true in the but-for world? A. Yes. Q. Is it true in the as-is world? A. Yes. Which is why these alternatives are generally not employed.") *See also* Malackowski Deposition, 113:5-10; 115:22-116:7; 120:10- 121:1; 131:10-18; and 134:20-135:6.

[168] If these alternative monetization strategies do not impact commission rates, it is not at all clear that they would impact consumer prices. As Prof. McFadden pointed out in his 2021 Reply Report, Mr. Malackowski's speculation that "developers facing higher upfront costs of development, such as higher annual fees and/or upfront license fees for certain tools/APIs, may respond by increasing application prices" is clearly misplaced, as basic economic principle indicates that fixed costs do not affect a firm's profit-maximizing price. McFadden 2021 Reply Report, ¶ 71. *See also* Malackowski Second Class Report, ¶ 219.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### A.    TOTAL MARKET SIZE

100.  As mentioned in Section II.B, I calibrate the overall market size using the total billings of the Apple App Store globally in 2019, which amounted to USD 51 billion.[169] By doing so, I implicitly assume that the market size is the same in the But-For World and in the As-Is World. In turn, this implies that the lower commission rate observed in the But-For World would not result in increased market demand (i.e., that customers would not buy more games due to lower prices). This is a conservative assumption because, in reality, when a store reduces its commission rate, it typically attracts two groups of customers: (1) those who would have bought from a competing store, and (2) those who otherwise would not have bought apps at all. By excluding this second group, my assumption underestimates the incentive for stores to reduce commission rates.

101.  To further illustrate that assuming the market size (M) remains the same in the But-For and As-Is Worlds is conservative, I examine the model equation used to calculate the But-For commission rate. In the equation below, M appears only in the denominator of the second term. If the market size were larger in the But-For World – which is in fact likely since a lower commission rate will attract more users – a higher M would result in an even lower But-For commission rate.

$$\tau_i = \frac{VC_i}{(1 - \text{Operating Margin}_i)} + \frac{FC_i}{s_i M(1 - \text{Operating Margin}_i)}.$$

102.  It is important to clarify that my assumption that As-Is billings and But-For billings are the same does not imply that app billings remain constant across all years in the But-For World. In fact, my model does not rely on such an assumption. For instance, I perform a sensitivity check using 2018 cost data, where I used the 2018 app billings level (USD 43 billion) rather than the 2019 level (USD 51.1 billion).[170] Likewise, in Section VII, I conduct a robustness check to estimate the But-For commission rate using post-Covid data, updating Apple's billings and other model parameters for 2022.

---

[169]  In Apple's fiscal year 2019, this figure is equal to $51.1 billion. APL-APPSTORE_09090476, at 477.

[170]  Workpaper "Economic Model Estimate 2018.xlsx," tab "Apple App Store VC, FC 2018" and workpaper "Economic Model Estimate 2019.xlsx," tab "Apple App Store VC, FC 2019." I discuss this exercise in further detail below. I also note that due do a difference in sourcing, this USD 43.0 billion figure is lower than Prof. Hitt's USD 43.9 billion for app billings in 2018. *See* Hitt Second Class Report, Figure 29. As I note above, this lower level of app billings corresponds with a higher But-For commission rate.

103. Apple's Daubert Motion claims that I assume "that the market was at all times the same size as it was in 2019."[171] This is patently false. In the same paragraph, the Daubert Motion cites Prof. Hitt's report, where he notes that I use "total App Store billings for 2019 and [apply] the resulting but-for commission rate to the entire class period, from 2008 to the present."[172] While this is true, as already explained in Section III.D, the assumption of a constant commission rate over the period is conservative. However, this assumption does not imply that app billings are constant across all years in the But-For World.[173]

### B.    APPLE AND RIVAL STORE'S MARKET SHARES

104. I will now explain how I calibrate the market shares of the Apple App Store and the rival store in the But-For World using a survey conducted by Apple's expert, Prof. Simonson. As mentioned in Section II.B, I estimate that the rival store would capture 23% of the market, while Apple would capture the remaining 77%. In contrast, Prof. Economides estimated the But-For rival market share based on projections from an internal Epic Games document, which forecasted that Epic could achieve a 35% share in the market for PC app sales after five years of investment.[174] Therefore, my approach is a more conservative method for calculating the rival app store's market share in the But-For World.

105. In his expert report, Prof. Simonson conducts a series of surveys to assess consumer interest in using alternative app stores. He presented respondents with a hypothetical app store that was characterized by "lower" app variety and "unknown" levels of privacy, malware protection and

---

[171] Apple's Daubert Motion (2023), 28:3-4. ("Abrantes-Metz assumes that the market was at all times the same size as it was in 2019. *Id.*; *see* Abrantes-Metz ¶ 56.").

[172] Apple's Daubert Motion (2023), 28:3-5. ("Abrantes-Metz assumes that the market was at all times the same size as it was in 2019. *Id.*; *see* Abrantes-Metz ¶ 56. That is of course not true as revenues on the App Store in 2019 were 10 times as high as in 2012. Hitt ¶ 301, Fig. 29."). *See* also Hitt Second Class Report, ¶ 300. ("Dr. Abrantes-Metz sets the market size in her accounting formula equal to total App Store billings for 2019 and applies the resulting but-for commission rate to the entire class period, from 2008 to the present.").

[173] To see why, note that, for example, it is possible for lower billings to correspond to lower fixed costs. This can result in the same commission rate across multiple years, without requiring billings to be fixed.

[174] Economides Report, ¶ 48. Apple Expert Prof. Hitt has criticized Prof. Economides's use of this figure, on the basis that the Epic Games Store had not achieved a 35% market in the time since the document was created. *See* Hitt First Class Report, ¶¶161-163 and ¶ 372.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

quality control. In comparison, Prof. Simonson rated the Apple App Store as having "high" marks across all features.[175] Prof. Simonson then asked respondents to "[i]magine that, when downloading/purchasing apps and making in-app purchases on your iPhone and/or iPad, you can choose between the two app stores," with identical prices.[176] Respondents could choose between the following answers:

    i. "I would download/purchase all of my paid apps and make all of my in-app purchases from Apple App Store."

    ii. "I would download/purchase most of my paid apps and make most of my in-app purchases from Apple App Store."

    iii. "I would download/purchase my paid apps and make my in-app purchases about equally from both stores."

    iv. "I would download/purchase most of my paid apps and make most of my in-app purchases from App Store B."

    v. "I would download/purchase all of my paid apps and make all of my in-app purchases from App Store B."

    vi. "Don't know/Unsure."

106. To calculate the market shares of the Apple App Store and the rival store based on responses to Prof. Simonson's survey, I assign market share values to the different answers. Specifically, I allocate the following market shares to the rival store: 100% for respondents who chose App Store B for all purchases; 75% for those who selected App Store B for most purchases; 50% for respondents intending to purchase equally from both stores; 25% for those who chose the Apple App Store for most purchases; and 0% for respondents who selected the Apple App Store for all purchases. Additionally, I distribute the responses of those who answered "Don't Know / Unsure"

---

[175] Expert Report and Declaration of Itamar Simonson, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 11, 2021, ECF Nos. 476-9, ("Simonson First Class Report"), Exhibit 12 and Exhibit 22.

[176] Simonson First Class Report, Exhibit 22, Q5.

in proportion to the shares of the other choices. This calculation results in a market share of 23.1% for the rival store and 76.9% for the Apple App Store.[177]

107. The market shares estimated using this methodology are conservative, primarily due to the way Prof. Simonson designed the survey:

a. First, Prof. Simonson's survey builds on a "scenario in which consumers would have less information about the features of an alternative store."[178] While this might be reasonable for an entrant in the As-Is World, it does not accurately reflect the But-For World, where a rival store would have entered the market at the same time as Apple rather than a decade later.[179] As previously discussed in Section III.G, market evidence shows that third-party app stores existed before Apple but were later eliminated by Apple's restrictions. Proto-app stores, such as Cydia, enabled sideloading of third-party apps before Apple's launch, fostering a growing app ecosystem. Thus, assuming simultaneous entry in the But-For World is, if anything, conservative. The rival would not face the informational disadvantages of Store B in Prof. Simonson's survey and would likely capture a larger market share.

b. Second, in his survey, Prof. Simonson assigned Store B "lower" app variety and "unknown" levels of privacy, malware protection and quality control, while giving the Apple App Store "high" ratings across all features. However, in his 2023 deposition, Prof. Simonson admitted

---

[177] Rival's share: (0%*344 + 25%*122 + 50%*75 + 75%*53 + 100%*38)/(683-51) = 23.1%. This calculation implicitly distributes the 51 "Don't Know / Unsure" responses to the other responses in proportion with their share. Then Apple's share is given by 100% - 23.1% = 76.9%. Note that an alternative approach would be to assign these 51 responses to the "about equally from both stores" group. This would result in the rival's share increasing to 25.1% which, in turn, would result in a lower But-For commission rate.

[178] Simonson First Class Report, ¶ 19. ("Building on a likely scenario in which consumers would have less information about the features of an alternative store as compared with the Apple App Store, Survey 1 examined consumer choices between the Apple App Store and another store associated with greater uncertainty.").

[179] Prof. Simonson confirmed this as-is nature of his survey question in his 2023 deposition. *See* Remote Deposition of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), April 6, 2023, ECF No. 702-10 ("Simonson Deposition (April 2023)"), 49:2-8. ("Q. Okay. So stepping back for a second. So you conducted all of these surveys, both survey one and survey two and the others, with -- in connection with your first report. You conducted all those in the year 2021; correct? A. Yes."); and Simonson Deposition (April 2023), 51:5-13 ("[Q.] […] Survey two did not instruct respondents to assume that the app -- that App Store B had entered into the marketplace at the same time as the Apple App Store. Is that true? […] THE WITNESS: There was no reference to when it would -- it entered the market.").

that assessing malware protection was not part of his expertise or "something [he] was asked to evaluate."[180] This quality asymmetry between the stores is not an accurate reflection of the But-For World and is inconsistent with my model, which assumes the stores would be homogeneous.

108.  Both assumptions made by Prof. Simonson – regarding asymmetric information and lower quality levels disadvantaging the rival store – are inconsistent with the But-For World and lead to an underestimation of the rival store's market share. Despite these assumptions, Prof. Simonson's survey still indicates that a substantial number of respondents would make purchases through the hypothetical App Store B. I incorporate Prof. Simonson's survey data into my model because it is grounded in empirical data and provides a conservative estimate of the rival store's market share, resulting in a conservative But-For commission rate.

109.  My estimated market shares, based on Prof. Simonson's survey, are a conservative alternative to the commonly assumed 50%-50% market share split. As discussed in Sections III.B and III.G, my model assumes that the services offered by the rival store would be essentially identical to those provided by the Apple App Store with both starting on equal footing. A standard assumption in the economics literature, particularly in platform competition, is that homogeneous firms entering a market at the same time will split the market evenly (50-50) in what is known as a symmetric equilibrium.[181] While this assumption is widely accepted, it is not a strict outcome, as other distributions are possible. If I were to adopt this conventional assumption of a symmetric

---

[180]  Simonson First Class Report, Exhibit 12 and Exhibit 22.

Simonson Deposition (April 2023), 53:3-13. ("Q. Okay. Now, moving to the qualitative descriptors. In 2021, when you conducted survey two, did Apple -- did the Apple App Store have a high level of malware protection? […] THE WITNESS: I -- I was not asked to evaluate the malware protection of Apple. I -- I assume that it was existing and effective. But that is not part of my expertise or something that I was asked to evaluate.").

[181]  Tat-How Teh, Chunchun Liu, Julian Wright, and Junjie Zhou, "Multihoming and Oligopolistic Platform Competition," American Economic Journal: Microeconomics 15(4), pp. 68 - 113, p. 98 ("[W]e rely on symmetry to make our analysis tractable."); and Guofu Tan and Junjie Zhou, "The Effects of Competition and Entry in Multi-sided Markets," Review of Economic Studies, 88(2) (2021): 1002-1030, at p. 1013 ("The tractability of our model, and the simplicity of the pricing formula, is a joint product of symmetry, single-homing, full market coverage, and the additive separability of the customer utility, and does not rely on the functional forms of externalities and the distributions of customer membership benefits.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

equilibrium where both the rival and Apple each capture 50% of the market, my model would estimate a lower But-For commission rate of just 9%.[182]

110. During class certification, Prof. Hitt acknowledged that in my model of the But-For World, where two competitors offer essentially identical services and terms, "economic theory would predict identical market shares and profit margins for the competing platforms."[183] In his deposition, he explained that if the competitors are identical, a 50/50 market share would be "one equilibrium" and correctly noted that assuming this split would result in an even lower But-For commission rate than the one I calculated.[184] While I do not rule out the possibility of a symmetric equilibrium, my methodology is more conservative, aligning with Prof. Simonson's survey findings on consumer preferences.

111. Finally, although my estimated market shares suggest a more competitive environment than the As-Is World, the market remains highly concentrated. With a rival capturing 23% of sales, the Apple App Store would account for nearly 80% of the market. This level of concentration is conservative for estimating the competitive But-For commission rate and approaches the threshold of what can be deemed competitive. A duopoly with market shares of 23% and 77% would produce a Herfindahl–Hirschman Index (HHI) of over 5,000 points, which is classified as a "Highly Concentrated Market" according to the Department of Justice (DOJ) and Federal Trade

---

[182] Using 50% as the market share for the rival in combination with the other would generate a But-For commission rate of:

$$\tau_i = \frac{3.828\%}{(1 - 22.973\%)} + \frac{0.786}{50\% \times 51.1 \times (1 - 22.973\%)} = 8.96\%$$

[183] Hitt Second Class Report, ¶ 272. ("In Dr. Abrantes-Metz's 'model' of 'two competitors who provide essentially identical services and terms to developers and consumers' at identical costs, economic theory would predict identical market shares and profit margins for the competing platforms.").

[184] Hitt Deposition (April 2023), 252:10-21. ("Q. Do you agree that if other inputs were to change in the model --for example, if each entrant earned a lower profit margin entered the competitive market -- that would result in a lower but-for world commissions? A. So as an abstract principle, without modeling the actual nature of competition in entry, I don't think you can say. If you restrict it to the accounting formula -- if the world is Dr. Abrantes-Metz's accounting formula, I think that mechanically is true, that if you reduce profit margins you reduce prices.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Commission (FTC) Merger Guidelines.[185] Assigning the Apple App Store more than 77% in the But-For World would make the market too concentrated to be considered reasonably competitive.

112. The subsequent subsections provide further details on the methodology used to estimate the market shares of Apple and its rival based on Prof. Simonson's survey data.

### 1.    My Quantification of the Survey Categorical Data is Standard

113. My analysis involved a reasonable quantification of Prof. Simonson's survey results, where respondents indicated their likelihood of purchasing apps and in-app content from the Apple App Store and a rival "Store B".[186] As previously explained, I assigned the following purchase shares to the rival store: 100% to respondents who chose Store B for "all" purchases, 50% to those who indicated they would purchase "about equally from both stores," and 0% to respondents who selected the Apple App Store for "all" purchases. It is standard practice for economists to conduct quantitative analyses on categorical data like this.[187] Prof. Simonson agreed with these aspects of my quantification during his deposition, stating that the "all" response implied a respondent would allocate 100% of their purchases to the indicated store, leaving 0% for the competitor. He also agreed that the "about equally" response suggested a 50% purchase share for each store.[188]

> Q. So the first that is listed there is, quote: 'I would download/purchase all of my paid apps and make all of my in-app purchases from the Apple App Store,' end quote. Dr. Simonson, my question is isn't it fair to say that according to your survey results that a respondent who chose that option would make 100 percent of their purchases from the Apple App Store? […] A. That's correct. […] Q. Yes. And the corresponding choice, which is the fifth choice that is listed there, isn't it also safe -- safe to say, based on these survey results, that the respondents who indicated they would make, quote, unquote, all of their purchases from App Store B would be making 100 percent of their purchases from App Store B? A. Yes. That is what

---

[185]  The DOJ and the FTC define markets with "HHI above 1,000 as concentrated markets, with HHI between 1,000 and 1,800 as 'moderately concentrated' and above 1,800 as 'highly concentrated.'" *See* 2023 Merger Guidelines, ¶ 6.

[186]  Simonson First Class Report, Exhibit 22.

[187]  For example, it is common to perform regression analysis on categorical variables in order to estimate the quantitative impact of qualitative characteristics (including characteristics collected via survey response) on an outcome of interest. Jeffrey Wooldridge*, Introductory Econometrics: a Modern Approach*, 5th Edition (South-Western Cengage Learning, 2013), Sections 7.1 and 7.2.

[188]  Simonson Deposition (April 2023), 63:23-64:9, 64:13-22, 64:23-65:10.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

> the results are. Q. Okay. Jumping around now to the third option here, which says, quote: 'I would download/purchase my paid apps and make my in-app purchases about equally from both stores,' end quote. So Dr. Simonson, based on your survey results, is it fair to say that a respondent who chose this option would make 50 percent of their choices -- sorry. Purchases from the Apple App Store and 50 percent of their purchases from App Store B? A. That – that's what the survey results show, given the options that were presented to them in the survey.

114. Prof. Simonson has nonetheless criticized my assignment of a 75% purchase share to respondents who chose App Store B for "<u>most</u>" purchases,[189] although he agreed in deposition that the appropriate number lies between 50% and 100%.[190] While I agree that the share for "most" should fall within this range, Prof. Simonson did not suggest that any specific value between 50% and 100% is more likely than 75%.[191] If all values in this range are equally probable interpretations of "most," then the expected value of the purchase share estimate is exactly 75%.[192] Therefore, 75% represents the "certainty equivalent" purchase share for "most," as it

---

[189] Expert Report and Declaration of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-8 ("Simonson Second Class Report"), ¶ 16. ("Dr. Abrantes-Metz translates the qualitative response scale used in Survey 2 to a quantitative share of apps downloaded from each app store, assuming that downloading/purchasing 'most' apps from a particular store equates to purchasing 75 percent of apps from that store. This is merely speculation."); *See also* Hitt Second Class Report, ¶ 292. ("Dr. Abrantes-Metz determines a value for the rival's market share from an arbitrary quantification of Prof. Simonson's survey […] for survey respondents who would make 'most' but not 'all' of their transactions on the App Store, Dr. Abrantes-Metz assumes this corresponds to 75 percent of transactions through the App Store. She provides no basis for these assumptions[.]").

[190] Simonson Deposition (April 2023), 66:7-17. ("[Q.] […] So we have established that the -- equally from both stores is 50 percent of purchases and all is 100 percent; so the word most is trying to -- essentially trying to figure out the amount of purchases that a consumer would make somewhere between a 50 and 100 percent range. Is that fair to say? […] THE WITNESS: I think it was trying to determine what the percentage will be between 50 and 100 percent.").

[191] Simonson Second Class Report, ¶ 37. ("There is no way to tell from the results of Survey 2 if respondents interpreted "most" to mean 55 percent, 75 percent, 99 percent, or something else.")

[192] I present the following mathematical proof: let $s(x)$ be the market share of App Store B for any given value of *x,* which represents the share of purchases made from the relevant app store by respondents who selected "<u>most</u>." Denote the "true" value for this share with $x'$, which Prof. Simonson says cannot be known. This unknown value is distributed according to the uniform probability distribution on the interval from 0.5 to 1. Thus, its probability density function is given by $f(x) = 1/(1 - 0.5)$ for *x* between

produces the same market share whether assumed with certainty or treated as a uniformly distributed random variable between 50% and 100%.

### 2. My Market Share Estimate Is Not Sensitive to Market Awareness

115. During class certification, Prof. Simonson argued that while the framing of the Survey 2 question made 100% of respondents aware of the existence of App Store B, this does not realistically reflect actual market awareness.[193] He claimed it was unreasonable to assume the rival store would have 100% consumer awareness, citing a result from his Survey 5, where Amazon Appstore (an Android OS app store that entered the market in March 2011) had only 33.8% awareness among consumers.[194] In his deposition, Prof. Simonson suggested that Amazon Appstore's awareness level could serve as a reasonable "reference point" for the rival store's awareness in the But-For World.[195] Based on this reasoning, he proposed adjusting my market

---

50% and 100%, and $f(x) = 0$ for all other $x$. Last, note that, substituting $x'$ into my original market share calculation, we have:

$s(x') = (0\% \times 344 + (1 - x') \times 122 + 50\% \times 75 + x' \times 53 + 100\% \times 38)/(683 - 51)$.  Then the expected value of the function $s(x)$ (integrating over all possible values of $x$) is given by:

$\int_{0.50}^{1}[(0\% \times 344 + (1 - x) \times 122 + 50\% \times 75 + x \times 53 + 100\% \times 38)/(683 - 51)]f(x)dx$

$= (0\% \times 344 + \int_{0.50}^{1}(1 - x)f(x)dx \times 122 + 50\% \times 75 + \int_{0.50}^{1} xf(x)dx \times 53 + 100\% \times 38)/(683 - 51)$

$= (0\% \times 344 + 25\% \times 122 + 50\% \times 75 + 75\% \times 53 + 100\% \times 38)/(683 - 51)$

$= 23.1\%$

[193] Simonson Second Class Report, ¶ 33. ("By presenting the rival app store side-by-side with Apple App Store and asking respondents to indicate choices, Survey 2 caused 100 percent of the respondents to consider buying apps from that rival store (in addition to the Apple App Store, which would have been known to the consumer regardless). While this design was useful for the stated objective of the survey […] it is not realistic for assessing the market share of the hypothetical rival store in the but-for world.").

[194] Simonson Second Class Report, ¶ 35. ("The Amazon Appstore has been available to Android users since March 2011. Yet, despite the recognizability and popularity of the Amazon brand, according to the results of Survey 5 reported in my previous report (and conducted in 2021), only 3.4 percent of respondents had downloaded or purchased apps from the Amazon Appstore, and only 33.8 percent of respondents were even aware of the Amazon Appstore. In other words, ten years after its launch, only approximately one-third of respondent Android users were even aware of the Amazon Appstore.").

[195] Simonson Deposition (April 2023), 77:25-78:4. ("[Q.] […] So you -- you decide -- looking up to paragraph thirty-five, you decide to use the Amazon App Store as, quote, 'a reference point for the market position of a hypothetical rival'? A. Yes.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

share by multiplying the rival's 23.1% share by the 33.8% awareness of Amazon Appstore,[196] resulting in 33.3% × 23.1% = 7.69% (seemingly making the decision to round 33.8% down to 33.3%).[197]

116.  Prof. Simonson's concern that awareness would be significantly less than 100% results from a fundamental misunderstanding of the But-For World. In my model, the rival enters the market simultaneously with the Apple App Store – an assumption that Prof. Simonson does not contest in his 2023 Report. Furthermore, the rival store in this scenario would be comparable to the Apple App Store and would not face any anticompetitive barriers to reach consumers. Given these two factors – simultaneous entry and the absence of such barriers – it follows that consumers would be equally aware of the rival store as they are of the Apple App Store. Prof. Simonson did not address this point in his analysis. Therefore, if we accept the notion of adjusting for awareness, the correct market share estimate would trivially be: 100% × 23.1% = 23.1%.

117.  Prof. Simonson is incorrect to suggest that awareness of the Amazon Appstore in the As-Is World serves as a reliable proxy for what awareness of the rival store would be in the But-For World. First, the Amazon Appstore did not enter the market at the same time as the Google Play Store, but rather began distributing Android apps in March 2011, three years after the Google Play Store launched in 2008.[198] Prof. Simonson failed to consider this staggered entry in relation to Google's app distribution operations.[199] As a result, Google had an important three-year advantage to build its developer and consumer base and establish itself as the primary app source. This first-mover

---

[196]  Simonson Second Class Report, ¶ 36. ("Dr. Abrantes-Metz used Survey 2 to 'derive' a market share estimate of 23.1 percent for the rival app store under an assumption that all consumers were aware of and considered the rival app store. If, similar to the Amazon Appstore, only approximately 33 percent of consumers even considered the rival store in a but-for world, the 'derived' market share for the rival app store would have been only one-third of Dr. Abrantes-Metz's estimate, or roughly 7.7 percent.").

[197]  Simonson Second Class Report, ¶ 36. *See also* Simonson Second Class Report, footnote 45. ("Calculated as 0.333 * 0.231 = 0.0769.").

[198]  Simonson Second Class Report, ¶ 35.

John Callaham, "From Android Market to Google Play: a brief history of the Play Store," *Android Authority,* March 2017, available at, https://www.androidauthority.com/android-market-google-play-history-754989/.

[199]  Simonson Deposition (April 2023), 71:12-17. ("Q. Okay. Was that the first app store to launch in the market for Android Apps? A. I think it was not. I think the Google Play Store was launched before that. I -- I don't recall the exact dates, but perhaps the year earlier. But I'm not certain.").

advantage in the As-Is World does not apply to the competition between the Apple App Store and its rival in the But-For World.

118.   Moreover, the use of Amazon Appstore as a benchmark for the rival store's awareness in the But-For World is flawed, because Google has been found guilty of anticompetitive conduct in Android app distribution.[200] According to a recent verdict, a jury determined that "Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct" in the markets for Android app distribution and Android in-app billing services for digital goods and services transactions, worldwide excluding China.[201] Google's conduct and its influence on Android app and in-app content sales bear striking similarities to the Consumer Plaintiffs' claims in this case, particularly regarding Google Play's 90% share of the market for distributing apps and in-app content, which mirrors the App Store's monopolization of the market for distributing iOS apps and in-app content.[202] Since Amazon Appstore operated under these constraints, its awareness in the As-Is World is not a reliable proxy for estimating awareness of the rival store in a competitive But-For World.

119.   Prof. Simonson acknowledged in his deposition that he was aware of the antitrust litigation against Google regarding its practices in Android app distribution.[203] However, in his 2023 report, he provided no analysis on how Google's conduct have affected the Amazon Appstore or consumers' awareness of it.[204] Internal Google documents show that Google sought to exclude Amazon as a rival app store, identifying it as a competitive threat and noting an opportunity to react before

---

[200]   Verdict, *In Re Google Play Store Antitrust Litigation,* Case No. 20-cv-05671-JD (N.D. Cal.), December 11, 2023, ("Google Play Store Verdict").

[201]   Google Play Store Verdict, p. 3-4.

[202]   Complaint, State of Utah et al. v. Google LLC et al., Case No. 3:21-cv-05227 (N.D. Cal), July 7, 2021, ECF No. 1 ("State of Utah et al. v. Google, LLC et al., Complaint"), 11:12-14.

[203]   Simonson Deposition (April 2023), 72:4-9. ("Q. Okay. Did you -- did you indicate during your last deposition that you were aware of ongoing litigation regarding the Google Play Store? A. I didn't memorize my prior testimony, but I am aware that there is parallel litigation involving the Google app store."); *See also* Remote Videotaped Deposition of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No.4:11-cv-06714-YGR (N.D. Cal), October 1, 2021, 198:24-199:3 ("Q. Are you aware that there is litigation against Google that contains allegations that the Google Play Store is self preferencing its Google Play Store over other app stores? A. I -- I am aware of that litigation, yes.").

[204]   Simonson Second Class Report.

Amazon established critical mass.[205] For example, it is relevant that Google allegedly refused to list the Amazon Appstore on the Google Play Store, further limiting its visibility and accessibility to consumers.[206] In the competitive But-For World I have modeled, Apple would not engage in similar behavior. Without examining the impact of Google's conduct on Amazon Appstore awareness, using As-Is awareness as a proxy for But-For awareness is unfounded.

120. It is possible that less than 100% of consumers would be aware of both the rival and the Apple App Store in the But-For World. As Prof. Simonson's Survey 5 shows, around 98% of Android users were aware of the Google Play Store.[207] However, in the But-For World I have modeled, what matters is that consumer awareness of the two stores would be roughly equal, ensuring that neither has a clear awareness advantage as Prof. Simonson suggests. This equal awareness

---

[205] *In Re Google Play Store Antitrust Litigation,* Case No. 20-cv-05671-JD (N.D. Cal.), December 21, 2023, Exhibit 682, at 2 ("Bad news: We face the risk of becoming a 'showroom' for Amazon and other apps stores. Play JP growth already under pressure, Amazon JP expected to be ~2.2% of Play JP by year end with possibility of higher downside risk. JP might just be the start as Amazon (historically) tries different approaches in a market (usually for a couple of years) before scaling up and going global with services. Good news: Amazon yet to establish critical mass. We have an opportunity to react before this happens.")

[206] This allegation implies that a key channel through which Android users discover apps is foreclosed for the Amazon Appstore. Further, while the Amazon shopping app is available on the Play Store, Google is alleged to have also forced Amazon to remove access to the Amazon Appstore from the Amazon app, on threat of delisting the Amazon app itself. *See* State of Utah et al. v. Google, LLC et al., Complaint, 37:1-16. ("The original language of the [Developer Distribution Agreement] was limited to apps that had a 'primary purpose' of facilitating distribution of apps outside of Android market, which allowed some flexibility for developers to use the Play Store to distribute Android apps that also linked to apps that could be downloaded outside Google's app store. In 2012, however, when Amazon attempted to distribute its app store to consumers directly through its Amazon Store app, distributed on the Play Store, Google took swift action. Amazon used a browser within the app to direct users to a page to download Android application files, which use the extension '.apk.' This effectively allowed customers to download Amazon apps without going through the Play Store. […] Google eventually changed its policy in response to Amazon's Store app. […] Eventually, Amazon was forced to disable this functionality, and its app store was only available via sideloading, a process that makes it significantly harder to reach Android users[.]").

These alleged measures reasonably reduce the exposure of consumers to the Amazon Appstore, and also illustrate why wide consumer awareness of the Amazon brand need not translate to awareness of the Amazon Appstore in particular. Further, these additional frictions could reduce Amazon's incentives to make consumers more aware of the Amazon Appstore because an incremental increase in consumer awareness may lead to fewer downloads than if the downloading process were simple and straightforward.

[207] Simonson First Class Report, Exhibit 65.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

outcome, even if not 100%, results from the model's assumption that both stores are homogeneous and launch at the same time.[208]

a.  If awareness in the But-For World is roughly equal and very high, the estimated market shares would remain approximately 77% and 23%, as I originally estimated.[209]

b.  If awareness is roughly equal but relatively lower, the market shares would converge toward a symmetric outcome of 50/50 as consumers become equally aware of both stores.[210] This would result in a lower, rather than higher, equilibrium commission rate than 13.63%.

121. Factoring in market awareness is hence another example of the complexity that would lead to a lower estimated commission rate.

---

[208]  This is also empirically observed in many cases of competing platforms. In the specific example of digital content distribution, a 2024 study by Hub Research polled TV consumers with broadband access who watched at least one hour of TV per week on their awareness of several popular TV streaming platforms. That study found that 100% of consumers are aware of Netflix, 99% of consumers are aware of Amazon Prime, 99% of consumers are familiar with Hulu, 98% of consumers are familiar with HBO Max, and 98% of consumers are aware of Disney+. "Consumer awareness and understanding of selected video streaming services in the United States as of February 2024," *Statista*, March 27, 2024, available at, https://www.statista.com/statistics/1301234/consumer-awareness-and-familiarity-with-streaming-services-us/.

[209]  In fact, the rival store could have a greater market share in these cases than in the case with 100% awareness for both stores. For example, suppose both stores have 98.2% awareness, matching the Google Play example mentioned above. All consumers who buy apps must be aware of at least one store. Then it is the case that 1.8% of consumers are aware of the Apple App Store, but not the rival, and 1.8% of consumer are aware of the rival, but not the Apple App Store. The remaining 96.4% are aware of both. When consumers are aware of only one store, they naturally make 100% of their purchases in that store.

Thus, the rival's share is $96.4\% \times 23.1\% + 0 \times 1.8\% + 1 \times 1.8\% = 24.07\%$, and Apple's share's is $96.4\% \times 76.9\% + 0 \times 1.8\% + 1 \times 1.8\% = 75.93\%$.

[210]  Consider the extreme scenario where 50% of consumers are aware only of the Apple store, while the other 50% are aware only of the rival store. In this case, since consumers can only purchase from the store they know, each store would capture a 50% market share. In turn, with a higher 50% market share, the rival store would charge a lower But-For commission rate to maintain the same profit margin, assuming all else remains constant.

### 3.    My Market Share Estimate Is Consistent with Consumer Multi-Homing

122.  Prof. Simonson presented an alternative first survey that limited respondents to three options: "Apple App Store," "App Store B" and "Don't Know/Unsure."[211] This approach simulates a world where multi-homing is impossible, meaning consumers can only make purchases from one app store or the other, but not both. There is no logical basis for this limitation, aside from Apple's anticompetitive conduct. In contrast, Prof. Simonson's results from Survey 2, which I relied upon, indicate that many consumers would prefer to shop at both app stores in the But-For World. Therefore, I conclude that Survey 1 inaccurately represents the But-For World when compared to Survey 2.[212]

123.  Prof. Simonson claimed that "the response scale used in Survey 1 may be a more realistic representation of consumer choices than the response scale used in Survey 2,"[213] claiming that "it is quite likely that consumers would have settled on one app store option and would not bother switching between stores for different purchases." This perspective demonstrates his fundamental misunderstanding of the But-For World. In deposition, Prof. Simonson conceded that Survey 2 allows consumers to buy all their apps and in-app purchases from a single store if they choose.[214] Furthermore, he did not dispute that some consumers engage in multi-homing in real-

---

[211]  Simonson First Class Report, Exhibit 12

[212]  Simonson First Class Report, Exhibit 12 and Exhibit 22.

[213]  Simonson Second Class Report, ¶ 39.

[214]  Simonson Deposition (April 2023), 49:15-51:3. ("Q. Okay. […] [I]s it accurate that in order to be qualified to participate in survey two, the respondent first had to have – had to own an iPhone and/or iPad? A. Yes. Q. Okay. Is it also true that the survey respondent had to have downloaded an app or purchased an IAP in the twelve months preceding the survey? A. Yes. Q. Okay. And is it also true that the survey respondent had to intend to download an app or purchase an IAP in the next -- in the twelve months following the survey? A. That's correct. Q. And I may be a little imprecise here, but when I say download an app, do you understand that to mean the respondent had to purchase an app from the app store? A. Either purchase or download the free app. Q. Okay. Free apps were included? A. […] [T]here are different versions, and at some point I decided to add respondents, who were required to say that they actually did -- did pay for apps and/or would pay for apps. Q. Understood. So Dr. Simonson, the only marketplace from which respondents to survey two could download an iOS app or purchase an iOS IAP was the Apple App Store. Is that true. A. I think so […] I think that's correct.").

world markets, such as switching between ride-sharing services like Uber and Lyft.[215] This indicates that, contrary to his speculation, there are indeed consumers who do "bother switching" between platforms. Thus, Survey 2 is more aligned with the But-For World, while Survey 1 is not.

### 4.   My Market Share Estimation Does Not Speculate About Consumer Expenditure

124.   Lastly, Prof. Simonson argued during class certification that "[i]t is quite possible […] that those who would have bought exclusively from the Apple App Store would have spent more on average than those who would purchase apps at both stores."[216] In other words, the share of dollars spent in the Apple App Store could exceed the share of consumers shopping there. However, this assertion is purely speculative. As Prof. Simonson acknowledged, Survey 2 does not address this issue, and he provides no evidence to support his claim that the But-For World would favor Apple's share over that of the rival.[217]

125.   Moreover, even if asymmetric spending occurs, there is no reason to assume that consumers in the Apple App Store would necessarily be higher spenders. In fact, considering his points on market awareness, consumers drawn to the more obscure rival could be "app enthusiasts" willing to spend more. This could lead to the rival's share of spending being larger than its share of consumers, resulting in a market share exceeding 23%. Prof. Simonson offered no evidence to suggest that this asymmetry would favor one side over the other.

---

[215]   Simonson Deposition (April 2023), 44:2-18. ("[Q.] […] Dr. Simonson, are you familiar with ride sharing apps, like Uber and Lyft? A. Yes. Q. Okay. Let's say that I were to use Uber to call a ride home from work on Monday and then Lyft to call a ride home from work on Tuesday. Would that be an example of multihoming in the ride-sharing market? […] THE WITNESS: I would say it would be, yes. […] Q. Okay. And you would agree, wouldn't you, that there exists consumers in the world that might regularly switch between those two ride-sharing apps? […] THE WITNESS: I think it is possible, yes.").

[216]   Simonson Second Class Report, ¶ 38.

[217]   Simonson Second Class Report, ¶ 38: "nor does Survey 2 provide any insight into the amount each respondent spent on apps."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## C.    APPLE AND RIVAL STORE'S COSTS

126.    To calibrate the cost parameters in my model, I assume Apple and the rival store have identical cost structures. Specifically, I assume they share the same variable costs as a percentage of their respective app billings and the same fixed costs in absolute terms.[218] Additionally, I base both stores' costs in the But-For World on Apple's actual costs in the As-Is World. As explained next, both assumptions are conservative, meaning that they lead to an overestimation of the rival store's costs and consequently an overestimation of the But-For commission rate. In other words, adjusting these assumptions to be more "realistic" would result in a lower rate, not higher.

127.    First, assuming identical cost structures for both stores overestimates the fixed costs expected to be incurred by the rival store. It is conservative to assume that a rival capturing only a 23% portion of the market would incur the same fixed costs as Apple, which currently controls 100% of the market. The fixed costs for marketing, product development and capacity needed to serve 23% of the market would likely be lower. For variable costs, I assume they are a constant share of app billings, as payment processing – one of the main variable costs of game stores – is typically charged as a fixed percentage of the store's billings. However, it is also plausible that variable costs increase with production, as it is generally the case in a competitive market equilibrium, in which case the smaller rival would have lower variable costs than Apple.[219] Lower variable or fixed costs for the rival store would imply a lower But-For commission rate.

128.    Second, estimating But-For costs based on those observed in the As-Is World is again conservative. Apple's current control of the entire iOS games apps market likely leads to higher costs, particularly fixed costs, than would be incurred if it held only a 77% market share, as modeled in the But-For World. Additionally, competition tends to drive costs down for all firms involved. In competitive markets, firms not only compete on price and quality, but also have

---

[218]    It is reasonable to make this assumption about variable costs in terms of app billings (rather than download or IAP quantity) because one of the main variable costs for these app stores is payment processing, which typically charges a share of the store's app billings.

[219]    In contrast, natural monopolies exhibit decreasing variable costs at equilibrium. This market does not appear to meet that condition, as shown by the competitive structure observed in the similar market for Windows PC game apps.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

greater incentives to improve cost efficiency.[220] If such competitive pressure existed in the But-For World, both Apple and the rival store would likely face lower costs, which would further reduce the But-For commission rate.

129. Despite my conservative assumptions, Prof. Hitt argued during class certification that "it would be more appropriate to use a higher variable cost" because "the rival has a lower market share" than Apple.[221] He did not, however, provide a theoretical basis for his claim and conceded in his deposition that he has performed no analysis of the rival's variable costs in the But-For World.[222] Prof. Hitt relied solely on my analysis of the Epic Games Store's variable costs, citing it as an example of a platform with different costs.[223] He did not explain why these variable costs are relevant to any iOS app store or why they are more informative than the actual variable costs of the Apple App Store, which I used to estimate the But-For rival's costs. Additionally, Prof. Hitt's reliance on the Epic Games Store's variable costs undermines his argument. My estimates of these costs show steep revenue increases and generally constant (not-decreasing) variable costs across all components (see my "Benchmark Estimate 2019" workpaper).[224]

---

[220]  Leibenstein, H., "On the basic proposition of x-efficiency theory," *American Economic Review* 68(2) (1978): 328–332, https://www.jstor.org/stable/1816715.

[221]  Hitt Second Class Report, ¶ 304. ("Indeed, since the rival has a lower market share, it would be more appropriate to use a higher variable cost in Dr. Abrantes-Metz's accounting formula, which would result in a higher but-for commission rate.").

[222]  Hitt Deposition (April 2023), 257:4-20. ("Q. Do you agree that variable costs decline as total revenue rises? A. That can be true. It depends on the economics of the business. There may be stair-steps. But if, for example, there are economies of scale in some way beyond simple amortization of fixed costs, that could be true. Q. Have you done any analysis of whether there would be economies of scale in the but-for world here? A. No, I haven't done any independent assessment of that. Q. Have you produced any analysis to suggest that smaller rivals in the but-for world would have larger variable costs? A. I think it's plausible given the data we've seen, but I haven't done any further analysis.").

[223]  Hitt Deposition (April 2023), 258:9-259:5. ("Q. You have not formally analyzed the costs for different transaction platforms as part of your work here, have you? A. So I think there's places where I have used those figures. For example, the one we were just talking about. I have not concluded a systematic analysis, nor did I try to articulate what all of the cost structures would be of a potential rival. Q. And you have not conducted any analysis to demonstrate that smaller firms in the but-for world would have larger variable costs? A. I think that -- so there's no -- other than the normal economic intuitions about economies of scale, I haven't done any systematic analysis there. And we also have our datapoint where we have a smaller rival with higher variable costs. But I haven't done anything else beyond that. Q. A smaller rival costs with higher variable costs, again, that's based on your comparison of the Epic Games Store to the App Store, correct? A. That's correct").

[224]  *See* "Benchmark Estimate 2019.xlsx," tab "EGS Variable Cost."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

130. I calculate Apple's variable and fixed costs using Apple's App Store-specific accounting data from 2019, the last year unaffected by Covid-19. In addition to the costs reported in the App Store's P&L statement, I account for additional costs related to marketing, developer relations and other activities relevant to the App Store's operations. This comprehensive approach results in a higher cost estimate than if I relied solely on the App Store's P&L. Assigning these additional costs is conservative, as it leads to a higher But-For commission rate in my model. Below is a detailed list of the costs considered:

   a. *App Store P&L Costs*: the Apple App Store P&L reports USD ▇▇▇▇▇▇ in costs of goods sold (COGS) and USD ▇▇▇▇▇▇ in other costs of goods sold, both of which I classify as variable costs. Additionally, the Apple App Store P&L reports operating expenses (OPEX) of USD ▇▇▇▇▇▇▇, with USD ▇▇▇▇▇▇ (or ▇▇▇ identified as "revenue variable." I therefore classify this portion of OPEX as variable costs and treat the remaining OPEX as fixed costs.[225]

   b. *Apple's World Wide Developer Relations (WWDR)*: WWDR costs are expenses associated with Apple's developer relations program, which provides support to developers using the App Store. This includes services like helping developers onboard their apps to the platform, providing technical guidance and reviewing apps.[226] Since these activities are directly involved in managing and maintaining the App Store, these costs should be considered part of the App Store's expenses. Apple's internal documents report USD ▇▇▇▇▇▇ of OCOGS for WWDR, which I allocate as variable costs.[227] Additionally, Apple's internal documents show WWDR OPEX of USD ▇▇▇▇▇▇.[228] Consistent with my approach for App Store's P&L OPEX, I allocate 53% of these as variable and the remaining as fixed costs.

   c. *Marketing Costs*: I also include the costs labeled as "App Store Marketing" in Apple's Marketing P&L.[229] These expenses cover central marketing finance, general marketing, and

---

[225] APL-APPSTORE_10176241, at 318 (2019 data). *See* calculations in Workpaper "Economic Model Estimate 2019.xlsx," tab "Apple App Store VC, FC 2019."

[226] Remote Proceedings of Videotaped Deposition of Mark Rollins (Apple), *In Re Apple iPhone Antitrust Litigation.*, Case No. 4:11-06714-YGR-TSH (N.D. Cal.), February 11, 2021 ("Deposition of Mark Rollins"), 135:8-136:17.

[227] APL-APPSTORE_09814097.

[228] APL-APPSTORE_09814099.

[229] APL-APPSTORE_09814098.

72

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

other marketing-related costs that support Apple as a whole.[230] Apple reports USD ████ in App Store marketing OPEX,[231] of which I allocate ███ to variable costs, with the remainder classified as fixed costs.

d. *Unattributed operating expenses*: I understand that there may be additional operating expenses not explicitly attributed to the App Store in Apple's accounting documents. To be conservative, I allocate part of those unattributed operating expenses to the App Store.[232] This produces additional operating expenses of about USD ████████ for the App Store.[233] I then allocate these expenses between variable and fixed costs using the same ████████ split as for the App Store P&L operating expenses.

---

[230] Deposition of Mark Rollins, 129:10-133:1.

[231] APL-APPSTORE_09814098.

[232] APL-APPSTORE_08856866, tab "LOB - Services". *See also* APL-APPSTORE_09806205. *See also* and Workpaper "Economic Model Estimate 2019.xlsx," tab "Unattributed App Store OPEX." I begin by noting that Apple Services is attributed with USD 6.3 billion in OPEX in Apple P&L statements, or 13.7% of Apple Services revenue. The App Store is a component of the iTunes division of the Apple Services line of business, so I first identify the portion of this USD 6.3 billion in OPEX that should be attributed to iTunes.

In Apple P&L statements, iTunes is attributed USD 2.49 billion in OPEX, or 12.0% of iTunes revenue. To estimate the amount of unattributed costs, I note that if all of Apple Services' OPEX were allocated to its constituent divisions in proportion to their revenue, iTunes would have been attributed OPEX equal to 13.7% of its revenue. This allocation would imply an unattributed OPEX of USD 348 million for iTunes, or 1.7% of iTunes revenue. I understand that the allocation of costs based on revenue is a methodology used by Apple, including in its Line of Business reports, such as the one reporting Apple Services' P&L, based on testimony given by Mr. Rollins. *See* Deposition of Mark Rollins, 154:15-155:12.

Lastly, I allocate this unattributed OPEX of $348 million to iTunes' constituent business units in proportion to their revenue. Specifically, the App Store's portion of this cost can be calculated as 1.7% of the App Store's revenue.

[233] APL-APPSTORE_10176241, at 318. *See also* Workpaper "Economic Model Estimate 2019.xlsx," tab "Unattributed App Store OPEX." Christian Tregillis implemented a similar adjustment in his analysis of Apple's operating profit margins on behalf of the Developer Class. Expert Class Certification Report of Christian Tregillis, CPA, ABV, CFF, CLP, *Cameron, et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), June 1, 2021, ECF Nos. 331-7 ("Tregillis Report"), ¶¶ 68-71.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

131.  My calculations show that, in 2019, the App Store's variable costs were 3.8% of its billings, while fixed costs amounted to USD 786 million or 1.5% of App Store billings.[234] In my model, I assume the rival app store has the same variable costs share – 3.8% of its own billings ($s_iM$) – and identical fixed costs of USD 786 million, as incurred by Apple's App Store.

132.  During class certification, Apple's experts raised two criticisms of my methodology for estimating Apple's variable and fixed costs. First, Mr. Malackowski claimed that estimating App Store costs is impossible because Apple's joint costs cannot be reasonably allocated to "an individual operating unit below the segment level," due to the firm's reporting practices.[235] Second, Mr. Malackowski further contended that the documents I relied on are not GAAP-compliant, fully-burdened P&L statements, and therefore cannot be used to estimate Apple App Store costs.[236]

133.  These criticisms are unfounded, as Apple has produced documents that provide P&L estimates for management consumption, which I used for my cost estimation.[237] My estimates of Apple's variable and fixed costs, encompassing a wide range of operations related to the App Store, are all informed by the testimony of Apple's finance manager, Mark Rollins, who was deposed regarding all costs that could potentially be attributed to the App Store.[238] None of Apple's experts has identified any App Store costs omitted from these estimates. Furthermore, it is not necessary for me to produce a GAAP-compliant P&L to determine reasonable estimates of the fixed and variable costs a rival app store would incur in the But-For World. Economists undertake these estimations frequently.

---

[234]  Workpaper "Economic Model Estimate 2019.xlsx," tab "Apple App Store VC, FC 2019." Note that I use Apple's 2019 cost data, and updated, backward-looking 2019 app billing data, to match the 2019 Microsoft Store data I use. Prof. Economides used an average of 2018 and 2019 Apple cost data and relied on projected app billing data. These data sourcing differences only result in trivial bottom-line cost differences. Both my analysis and Prof. Economides's produce variable costs of 3.83% and fixed costs of 1.54% of app billings. *See* Economides Report backup, "Economides Profit Yardsticks.xlsx" tab "Apple Cost."

[235]  Malackowski Second Class Report, ¶ 249. *See also* Malackowski Second Class Report, Sections 11.2 and 11.3.

[236]  Malackowski Second Class Report, Sections 11.2, 11.3.1, and 11.3.2.

[237]  Written Direct Testimony of Ned Barnes, CPA, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), April 28, 2021, ECF No. 509-7 ("Ned Barnes Written Direct Testimony"), ¶¶ 4-8, 10-13, Table 1, Table 2.

[238]  Deposition of Mark Rollins, 129:10-133:1, 135:8-136:17, 154:15-155:12.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

134. Moreover, in Epic v. Apple, plaintiff expert Ned Barnes relied on the same documents and the same testimony from Apple's finance manager, Mark Rollins, as I did and produced identical cost estimates for the App Store.[239] The objections raised by Apple experts to Mr. Barnes' calculations in Epic v. Apple were the same as those they raised against mine in this matter. Notably, Mr. Barnes also relied on P&Ls that were not GAAP-compliant and did not produce GAAP-compliant P&Ls as his outputs.[240] Nonetheless, the Court was unpersuaded by those objections:[241]

> "Apple counters that it does not maintain profit and loss statements for individual divisions and that Mr. Barnes' analysis is inaccurate. The Court disagrees with the latter. Mr. Barnes made appropriate adjustments based on sound economic principles to reach his conclusions. Apple's protestations to the contrary, notwithstanding the evidence, shows that Apple has calculated a fully burdened operating margin for the App Store as part of their normal business operations. Apple's financial planning and analysis team are tracking revenues, fixed and variable operating costs, and allocation of IT, Research & Development, and corporate overheads to an App Store P&L statement. The team's calculation was largely consistent with that of Mr. Barnes. Although there are multiple ways to account for shared costs in a business unit, the consistency between Mr. Barnes' analysis and Apple's own internal documents suggest that Mr. Barnes' analysis is a reasonable assessment of the App Store's operating margin."

## D. RIVAL STORE'S OPERATING MARGIN

135. In this Section, I explain why I calibrate the rival app store's operating profit margin in the But-For World of my economic model using data from the Microsoft Store, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[242] As with other model inputs, I demonstrate that this choice is reasonable, conservative and based on real-world data from the most comparable benchmark available – thus expected to result in an overestimation of the But-For commission rate. I also

---

[239]  Ned Barnes Written Direct Testimony, ¶¶ 4-8, 10-13, and Tables 1 and 2.

Similarly, in Cameron, developer plaintiffs' accounting expert Christian Tregillis also relied on these materials and reached the same conclusions about App Store costs. See Tregillis Report, ¶¶ 68-71.

[240]  Rule 52 Order After Trial on the Merits, Epic Games, Inc. v. Apple Inc., Case No. 4:20-cv-05640-YGR (N.D. Cal.), September 10, 2021, ECF No. 812 ("Rule 52 Order After Trial on the Merits, Epic Games, Inc. v. Apple Inc."), pp. 41-42.

[241]  Rule 52 Order After Trial on the Merits, Epic Games, Inc. v. Apple Inc., p. 42.

[242]  MSFT_EPIC_00000093, p. 17.

discuss other benchmark options I considered and explain why the Microsoft Store ultimately serves as a better benchmark for the rival store.

136.  As detailed in Section VI.A, Windows PC game apps provide the most appropriate benchmark for a competitive market due to their functional similarities and diverse sales channels. Both Windows and iOS are operating systems for general-purpose computing devices, generating revenue from app and in-app content sales. Like the App Store, PC game app stores must maintain a virtual storefront, offer search functionality and curate content. Crucially, for benchmarking purposes, Microsoft, the owner of Windows, does not restrict consumers from purchasing apps through non-Microsoft game app stores or directly from developers, fostering more competition among Windows PC game app stores.

137.  Among third-party Windows PC app stores, I reviewed information for Steam, Epic and the Microsoft Store, and conclude that the Microsoft Store is the most appropriate benchmark for the rival store's profitability. Microsoft has been a well-established, profitable, long-term competitor to Steam (the largest store in the Windows PC game app market), making it comparable to the rival app store competing with the Apple App Store in my model. Additionally, it was important to identify a profit margin that supports the But-For rival's entry and continued operation without attracting additional entrants. The Microsoft Store provided the most reasonable example of such a profit margin.

138.  According to Microsoft's internal estimate, the Microsoft Store earned an operating profit margin of ▮ in 2019.[243] This margin is derived from the ratio of its operating profit of ▮ to its adjusted revenue of ▮, reflecting the Microsoft Store's commission fees from third-party PC game app sales.[244] I used global operating profit margins because North American margins are not available. This approach is reasonably expected to be conservative, as user

---

[243]  These estimates were presented in an internal document titled "CY2019 Game Industry Profit" prepared by Microsoft's Gaming Business Planning & Strategy team. *See* MSFT_EPIC_00000093, p. 39.

[244]  MSFT_EPIC_00000093, p. 39. *See also* Workpaper "Economic Model Estimate 2019.xlsx," tab "Rival Operating Profit Margin."

acquisition costs are typically higher in North America than in other regions, resulting in a higher But-For commission rate.[245]

139. Consistent with the other model parameters, I use 2019 data because it reflects increased competition compared to previous years and it is the most recent year not affected by Covid-19. As discussed in Section VI.B.2, the entry of Epic Games Store in late 2018, along with the shift towards digital-only sales of PC games, further increased competition among PC game app stores. Additionally, using 2019 data allows us to observe Microsoft's margin after the Epic Games Store entered the market but before the Microsoft Store reduced its commission rate in response, which is a conservative approach. Overall, the ███ profit margin I observe from the Microsoft Store in 2019 serves as an adequate real-world analog for the appropriate profit margin in my model: it is sustainable and arguably not so high as to continue attracting additional entry.

140. To assess whether the Microsoft Store provides a reasonable operating profit margin benchmark for the rival store in the But-For World, I evaluate the operating profit margins of the firms that Apple uses for internal profitability benchmarking. An internal 2019 presentation sent to Apple's CEO, Tim Cook, compares Apple's projected operating profit margin to a set of large tech, media, retail and finance companies.[246] Both the average and median operating profit margin among Apple's chosen benchmark firms is ███.[247] Additionally, the presentation compares a subset of firms to Apple Services, the business unit which includes the App Store. This subset has an average margin of ███ and a median margin of ███, in contrast to the App Store's high operating

---



[245] ██████████████████████████████████████████████ See, e.g., Laura Ceci, "Average mobile app user acquisition costs from September 2019 to August 2020, by region," Statista, November 4, 2024, available at: https://www.statista.com/statistics/941273/mobile-app-average-user-acquisition-cost-worldwide/.

[246] See APL-EG_10015274 (Slideshow titled "FY19/20 Profitability: Profitability Benchmarking 09/25/19").

[247] APL-EG_10015274, at 275. These values refer to non-Apple firms. See Workpaper "Apple Profitability Benchmarking Analysis.xlsx," tab "Summary Statistics."

margin of 78%.[248] Using Microsoft's operating margin of ▮▮▮▮ instead of any of the lower profit benchmarks identified by Apple is conservative, resulting in a higher But-For commission rate.

141. During class certification, Prof. Hitt claimed that I "relie[d] on the Microsoft Store's profit margin through an unprincipled process of elimination"[249] and "consider[ed] no other reasons why it may or may not be an adequate benchmark" beyond the fact that "it is an established rival against Steam in the sale of Windows PC game apps."[250] Aside from the fact that these assertions are false, the economic objection to a profit margin of 23% in a duopoly model must be that it is either too low, meaning that the duopoly is unstable because the rival firm would exit, or too high, meaning that the duopoly is unstable because at least a third firm would enter. No Apple expert has argued that this profit level is so low that it would lead to the exit of the rival, or so high that it would attract additional entry. The first concern of the profit margin being too low can be dismissed. As for the second concern, while it is possible that this profit margin is high enough to invite new entrants, this would imply that the But-For commission rate I compute is itself too high.

142. As another criticism of using the Microsoft Store as a benchmark for the rival store's operating profit margin in the But-For World, Prof. Hitt claimed that the Microsoft Store is "widely viewed as a low-quality platform," citing trade press critical of the store.[251] He supported this allegation by stating that "some major apps remained absent on the store as recently as 2021, illustrating the struggles Microsoft had in attracting app developers to the platform."[252] In addition, he cited trade

---

[248] APL-EG_10015274, at 276. These values refer to non-Apple firms. *See* Workpaper "Apple Profitability Benchmarking Analysis.xlsx," tab "Summary Statistics."

[249] Hitt Second Class Report, ¶ 280.

[250] Hitt Second Class Report, footnote 374. ("Dr. Abrantes-Metz justifies the Microsoft Store as 'the most adequate available benchmark' because 'it is an established rival against Steam in the sale of Windows PC game apps' but considers no other reasons why it may or may not be an adequate benchmark."). Prof. Hitt also proposes that I "neglect[ed] to consider whether similar criticisms apply to the Microsoft Store," but the only such "similar" criticism he raises in his report is that the Microsoft Store may be a "low-quality" platform. Hitt Second Class Report, ¶¶ 280-281. However, that is not a criticism I offered against any of the app stores I ruled out.

[251] Hitt Second Class Report, ¶ 281. ("The Microsoft Store has been widely viewed as a low-quality transaction platform that offers a limited variety of apps, suffers from significant security issues, and struggles to connect consumers and app developers.").

[252] Hitt Second Class Report, ¶ 281. ("Although Microsoft lifted that requirement in 2019, some major apps remained absent on the store as recently as 2021, illustrating the struggles Microsoft had in attracting app developers to the platform.").

78

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

press accusing the Microsoft Store of listing "deceptive knockoffs" and apps containing "malware."[253]

143. Prof. Hitt's criticism is unfounded, as he provided no quantitative evidence to demonstrate the scale of these issues or compare critiques of the Microsoft Store with its competitors. In his deposition, he admitted he had not conducted any systematic analysis of Microsoft's app catalogue relative to its rivals, instead relying on publicly available criticism.[254] Even a basic comparison of the Microsoft Store and the Steam's app catalogues would be more informative than the evidence Prof. Hitt provided. Notably, the Microsoft Store has a very large catalogue, with 669,000 total apps as of 2020 and over 44,000 game apps by 2022, compared to Steam's 50,000 game apps in 2023.[255] Moreover, Prof. Hitt conceded in his deposition that it is likely there are games available on the Microsoft Store but not on Steam – further highlighting his lack of a systematic analysis to support his claim that the Microsoft Store is "low-quality."[256]

> Q. Do you know any games that are only available on Steam and are not available on the Microsoft Store? A. So that's not systematic analysis that I've done. I understand at various times there have been games that are released exclusively on Steam, but I haven't recently done a full comparison … Q. [A]ny games that are only on the Microsoft Store and not available on Steam? A. I don't know one way or the other. I would surmise that both exist.

---

[253] Hitt Second Class Report, ¶ 281. ("In terms of security, a major problem on the Microsoft Store is the presence of 'crapware…[and] deceptive knockoffs' that divert sales from the original app developers. In addition, consumers risk downloading malware hidden in popular games.")

[254] Hitt Deposition (April 2023), 259:20-260:3. ("Q. Have you analyzed whether the Microsoft store's catalog is, in fact, limited? A. I haven't gone through and systematically analyzed the catalog. That is a criticism that has been raised and people have described -- by people who have described the Microsoft store. But I didn't do an independent analysis other than citing to things that are written in the public domain.").

[255] *See* James Anthony, "Number of Apps in Leading App Stores in 2022/2023: Demographics, Facts, and Predictions," *Finances Online Reviews for Business*, March 23, 2023, available at https://financesonline.com/number-of-apps-in-leading-app-stores/.

Laura Ceci, "Number of available apps on the Microsoft Store in 2nd quarter 2022, by category," *Statista*, August 11, 2023, available at: https://www.statista.com/statistics/1333740/microsoft-store-number-of-available-apps-by-category/.

Dustin Bailey, "Steam just reached 50,000 total games listed," *PC Games N*, February 12, 2021, available at: https://www.pcgamesn.com/steam/total-games.

[256] Hitt Deposition (April 2023), 260:11-18 and 260:19-23.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

144.  Prof. Hitt has also no basis to assert that the Microsoft Store is lower quality than the Apple App Store, which has also faced issues with scam apps in recent years.[257] Similarly, malware has been found in apps listed on the Apple App Store, Google Play Store and Steam.[258] In his report, Prof. Hitt failed to mention these incidents or provide any rigorous comparison between these stores and the Microsoft Store. In his deposition, he acknowledged the existence of scam apps on the Apple App Store but made no attempt to quantify them for comparison.[259] Indeed, he admitted that such evaluations likely exist but did not "cite to any in at least this report."[260] As a result, his claims about the Microsoft Store's relative quality are unsupported.

145.  All that said, the implication of the Microsoft Store being a low quality store is presumably that this would make it a low profit store. That may or may not follow – after all, the store might save in costs and still preserve its margin. However, Prof. Hitt's criticism does not assert whether a ▮▮▮▮ profit margin is too high or too low. The relevant economic question is not whether the Microsoft Store might be more profitable if it were better managed, but whether a profit margin of ▮▮▮ is so low as to make a duopoly unstable because of exit.

146.  Next, I discuss other Windows PC app stores and alternative sales channels I considered, explaining why they are not suitable benchmarks for the rival store's operating profit margin.

---

[257]  Reed Albergotti and Chris Alcantara, "Apple's tightly controlled App Store is teeming with scams," *The Washington Post*, June 6, 2021, available at https://www.washingtonpost.com/technology/2021/06/06/apple-app-store-scams-fraud/ ("Of the 1,000 highest-grossing apps on the App Store, nearly 2 percent are scams, according to an analysis by The Washington Post. And those apps have bilked consumers out of an estimated $48 million during the time they've been on the App Store, according to market research firm Appfigures.").

[258]  Elliot Nesbo, "How Does Malware Make It Through to the App Store," *MUO*, March 28, 2022, available at https://www.makeuseof.com/malware-app-store/; Lorenzo Franceschi-Bicchierai, "Google flags apps made by popular Chinese e-commerce giant as malware," *TechCrunch*, March 20, 2023, available at, https://techcrunch.com/2023/03/20/google-flags-apps-made-by-popular-chinese-e-commerce-giant-as-malware/; Becky Bracken, "Steam Gaming Platform Hosting Malware," *threatpost*, June 10, 2021, available at https://threatpost.com/steam-gaming-delivering-malware/166784/; and Brian Barrett, "How 18 Malware Apps Snuck Into Apple's App Store," *Wired*, October 25, 2019, available at https://www.wired.com/story/apple-app-store-malware-click-fraud/.

[259]  Hitt Deposition (April 2023), 263:1-4. ("Q. Okay. How many apps on the App Store are scams? A. I understand there may exist some. Again, I haven't tried to quantify that.").

[260]  Hitt Deposition (April 2023), 263:1-9. ("Q. Okay. How many apps on the App Store are scams? A. I understand there may exist some. Again, I haven't tried to quantify that. Q. Do you know if anybody has? A. I believe there's been evaluations of that at various times. I don't recall any specific ones, and I don't think I cite to any in at least this report.").

### 1.    Google Store

147.    The Google Play Store distributes Android apps and in-app content and is functionally similar to the Apple App Store. However, in a recent case, a jury ruled that Google engaged in anticompetitive conduct to acquire or maintain monopoly power in the markets for Android app distribution and Android in-app billing services for digital goods and services transactions, worldwide excluding China.[261] This finding closely parallels the Consumer Plaintiffs' claims in this case, further confirming that Google Play is not a reliable source for profit margins in the competitive But-For World, which should reflect a competitive duopoly. Additionally, Google is alleged to have attempted to "pay Samsung to abandon relationships with top developers and scale back competition," undermining the competitiveness of the Samsung Galaxy Store. Therefore, I do not consider Google Play a reasonable benchmark for the rival app store in a competitive But-For World.

### 2.    Steam

148.    Steam is the largest PC game app store ███████████████████████,[262] making it an inappropriate comparison for the But-For rival store for several reasons. First, as Steam enjoys an incumbency advantage, in my duopoly model it would be considered the incumbent rather than the rival app store. Second, with a market share of up to ███ of all third-party game sales, Steam cannot reasonably serve as an analog to the smaller rival store in the But-For World.[263] Third, Steam is currently involved in an antitrust lawsuit alleging it has "market power and/or substantial market power in the PC game distribution market" and has charged a supracompetitive commission rate to developers.[264] Consequently, it is likely that a rival in the competitive But-For

---

[261]    Google Play Store Verdict, pp. 3-4.

[262]    *See* MSFT_EPIC_00000093, p. 17. *See also* Wesley Yin-Poole, "The Epic Games Store is getting a lot more popular," *Eurogamer*, January 28, 2021, available at, https://www.eurogamer.net/the-epic-games-store-is-getting-a-lot-more-popular. *See also* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers," *The Verge,* November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

[263]    *See* "Benchmark Estimate 2019 – Sensitivity Analysis.xlsx," tab "Benchmark Estimates."

[264]    Consolidated Amended Class Action Complaint Demand for Jury Trial, In Re Valve Antitrust Litigation, ¶¶ 5, 8-9, 92, 129.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

World would be less profitable than Steam, making Steam an unsuitable profit benchmark for the rival app store in this context.

149. During class certification, Prof. Hitt presented several arguments against the exclusion of Steam as a reasonable benchmark, but all his arguments are flawed and poorly informed:

a. First, Prof. Hitt argued that the presence of direct-to-consumer distribution has "weaken[ed] any incumbency advantage Steam may have enjoyed."[265] However, according to Prof. Hitt's own report, Steam enjoys the highest profit margin among third-party Windows PC game app stores.[266] Steam also accounts for over ███ of the revenue in third-party Windows PC game app distribution.[267] Steam's share of over ███ clearly makes it an inappropriate comparator for the But-For rival.

b. Second, Prof. Hitt claimed that at the time of Steam's entry, "direct digital distribution options already existed, such as Blizzard's Battle.net, which launched in 1996."[268] However, Prof. Hitt's historical claim is false – Battle.net did not distribute games when it launched in 1996; rather, it offered support for Diablo, a game that was only distributed by physical channels.[269] Blizzard only began digitally distributing games in 2008, several years after Steam, which was distributing third-party games in 2005.[270] Prof. Hitt provided no historical sales data on any other digital sales channels, nor evidence that their presence posed any difficulty for Steam in developing its third-party Windows PC game app distribution business.

---

[265] Hitt Second Class Report, ¶ 286. ("Direct distribution has competed with Steam since Steam's inception and represented 70.3 percent of all digital PC game revenues in 2019, weakening any incumbency advantage Steam may have enjoyed.").

[266] Hitt Second Class Report, Figure 27.

[267] *See* "Benchmark Estimate 2019 – Sensitivity Analysis.xlsx," tab "Benchmark Estimates."

[268] Hitt Second Class Report, ¶ 286.

[269] *Diablo* could not be purchased digitally until around 2019, and then not through Battle.net. *See* Sam Machkovech, "Blizzard has handed Diablo 1's keys to GOG, and you can buy it right now," *Ars Technica*, March 7, 2019, available at, https://arstechnica.com/gaming/2019/03/original-diablo-is-now-on-sale-for-10-drm-free-but-not-on-blizzards-app/.

[270] Robert Purchese, "Blizzard begins digital distribution", *EUROGAMER*, May 6, 2008, available at, https://www.eurogamer.net/blizzard-begins-digital-distribution ("Blizzard previously sold its games - boardgames and videogames - online and then had them delivered to your house."). *See also* Jimmy Thang, "Blizzard Store Debuts Digital Downloads," *IGN*, May 5, 2008, available at, https://www.ign.com/articles/2008/05/05/blizzard-store-debuts-digital-downloads.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

c. Third, Prof. Hitt also argued that Steam's incumbency is "further weakened given that consumers can use multiple app transaction platforms (or 'multi-home')."[271] However, Steam allegedly imposes an anticompetitive most-favored-nations requirement and allegedly threatens to retaliate against developers that sell games at a lower price through other distribution channels with punitive actions including the removal of their Steam-enabled games.[272] If true, this practice would sharply reduce incentives for consumers to multi-home, since developers would be precluded from offering lower consumer prices outside of Steam.

150. Moreover, Apple's Daubert Motion asserted that I was not "consistent" in my consideration of allegations of anticompetitive conduct by Steam, because the FTC has sued Microsoft over its "considerable power in videogames" and its practice of making "acquired [video game] titles exclusive to its own" platforms.[273] However, the FTC complaint does not allege any misconduct by Microsoft in Windows PC game app distribution, referring instead to Microsoft's attempted merger with Activision.[274] Unlike the anticompetitive allegations against Steam, the FTC complaint does not allege any anticompetitive effect in Windows PC game app distribution because of Microsoft's proposed merger or prior conduct.[275] Further, as Prof. Hitt notes, the Microsoft Store

---

[271] Hitt Second Class Report, ¶ 287.

[272] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 6:2-7:2. See Section VI.B.1

[273] Apple's Daubert Motion (2023), 30:1-4. ("Nor was [Dr. Abrantes-Metz] even consistent in her deployment of this rationale: the FTC has sued Microsoft over its 'considerable power in video games' and its practice of making 'acquired [video game] titles exclusive to its own' platforms.").

[274] The complaint mentioned in Apple's Daubert Motion alleges that the proposed acquisition would be likely to lessen competition or create a monopoly in "high-performance consoles, multi-game content library subscription services, and cloud gaming subscription services." The complaint also alleges that Microsoft is "a significant player" in "Multi-game Content Library Subscription Services," including for games played on PC, but specifically notes that "Buy-to-play games are not commercially reasonable alternatives and therefore are not included" in this market, meaning that Microsoft is not alleged to have market power in game app sales either. Complaint, *In Re Microsoft Corp. and Activision Blizzard, Inc.*, Case No. 9412 (F.T.C. December 8, 2022), at ECF No. 691-14 ("FTC Complaint"), ¶¶ 74-75, and 79.

[275] FTC Complaint, ¶ 14. ("The Proposed Acquisition is reasonably likely to substantially lessen competition and/or tend to create a monopoly in both well-developed and new, burgeoning markets, including high-performance consoles, multi-game content library subscription services, and cloud gaming subscription services").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

only has a 7.7% share of revenue.[276] Therefore, this critique is misplaced and, if anything, further enhances my choice of using Microsoft as a benchmark.

### 3.    Epic Games

151.  The Epic Games Store, as the last entrant with a market share below 50%, could be a reasonable analog to the smaller store in the duopoly model. However, Epic has reported negative operating profits, mainly due to its recent entry and aggressive efforts to grow and challenge Steam's incumbency.[277] Negative profits would not persist in a stable duopoly equilibrium, as firms like Epic or a rival iOS app store would exit rather than incur perpetual losses. While Epic may eventually achieve positive profits, its 2019 margin is inconsistent with my But-For model equilibrium and would lead to an implausibly low commission rate. This concern does not apply to the Microsoft Store. Excluding Epic's negative margin is thus a conservative approach, as a higher margin would result in a higher But-For commission rate.

---

"High-performance consoles" refers to "the most recent generation of Microsoft Xbox and Sony PlayStation consoles—the Xbox Series X|S and the PS5." FTC Complaint, ¶ 64.

"Multi-game content library subscription services" refers to "services that offer unlimited access to a library of video games that are predominantly played on non-mobile devices and are available to play at zero additional cost beyond the subscription fee, either via download or cloud streaming." FTC Complaint, ¶ 74. This is not a major product in the Windows PC game app distribution space, and as the FTC notes, to the extent that Microsoft is a significant player in this market, it is "through its Xbox Game Pass offerings." FTC Complaint, ¶ 75.

"Cloud gaming subscription services" refers to "services that offer the ability to play predominantly non-mobile video games via cloud streaming." FTC Complaint, ¶ 84. This service is distinct from app distribution—rather, it is a way for users to play games they already own or have access to, without the need for high-end hardware. FTC Complaint, ¶ 87.

[276]  Hitt Second Class Report, ¶ 296. ("I calculate the Microsoft Store's share of third-party Windows PC game app transactions using Figure 1 in the Abrantes-Metz Report, which shows that the Microsoft Store's share is 7.7 percent.").

[277]  As discussed in Section VI.B.2, the Epic Games Store has operated at a loss due to the minimum guarantees provided to developers for exclusive distribution rights. *See* Trial Testimony of Timothy Sweeney, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.), May 3, 2021, ECF No. 616, ("Trial Testimony of Timothy Sweeney, May 3, 2021"), at 126:19-23. *See also* Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), May 3, 2021, ECF Nos. 777-4 ("Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., *Epic Games, Inc. v. Apple, Inc.*"), ¶ 485. *See also* Trial Testimony of Steven Allison, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.), May 7, 2021, ECF No. 620, 1194-1285 ("Trial Testimony of Steven Allison"), at 1230:5–8, 1232:23-1233:1.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 4.    Mac App Store

152. While I have also considered MacOS app sales as a possible benchmark, Apple executives testified that Apple sets the same commission rate for both the Mac App Store and iOS App Store to "create parity and consistency."[278] As a result, the Mac App Store's commission rate is influenced by the iOS App Store's supracompetitive commission rate.[279] This concern, again, does not apply to the Microsoft Store.

### 5.    Video Game Console Stores

153. Video game console developers like Sony and Microsoft each operate proprietary, console-specific digital app stores where users can purchase and download video games and additional content. However, these console stores function under a different economic model than the App Store, often selling hardware at a loss and subsidizing it with commission fees. This distinct business model suggests that console video game sales are not directly comparable to iOS app and in-app content sales, making them an unreasonable benchmark for the competitive But-For World. This concern does not apply to the Microsoft Store.[280]

154. During class certification, Prof. Hitt argued that eliminating console video game app stores from consideration is unjustified, claiming that PC game apps are suitable substitutes because many consumers own PCs.[281] However, this is not true for all titles; many console games, especially

---

[278] Remote Proceedings of Videotaped Deposition of Matthew Fischer, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR (N.D. Cal.), January 7, 2021 ("Fischer Deposition"), 324:21-325:5. ("Q. What commission does Apple charge on the Mac Store? A. 30 percent on the Mac App Store. But the same again, 30 percent, 15 percent for developers in the small business program, 15 percent for developers after year one that are offering subscriptions. So it's the same, we always achieve to try to create parity and consistency across the different App Stores that we manage.").

[279] Since Apple's iOS App Store accounts for approximately 99% of its total app sale revenues, Apple's joint profit-maximizing commission would naturally be very close to the commission level that maximizes iOS App Store profits. In other words, the commission rate charged by the Mac App Store is tainted by the iOS App Store's supracompetitive commission rate. Consequently, macOS app sales commission rate is not an appropriate competitive benchmark for the But-For world. *See* APL-APPSTORE_08882431, at 607.

[280] The internal Microsoft document from which I obtained the profit margin for the Microsoft Store separately reports a different profit margin for its console sales. *See* MSFT_EPIC_00000093, p. 39. This eliminates the concern for taint.

[281] Hitt Second Class Report, ¶¶ 289.

major releases from Nintendo, are not available on PC.[282] Additionally, if console hardware is sold at a loss, it indicates that console operators can extract surplus profits from their game stores, rendering the profitability of those stores inappropriate benchmarks for a competitive But-For rival app store. Thus, Prof. Hitt has not provided a sound economic argument against using Windows PC game app stores or for using console game app stores.

### 6.    Other Platforms with Digital Content Sales

155.  I have also considered various distribution channels for digital content that do not rely on app stores for sales as potential benchmarks. These include video streaming platforms (YouTube, Instagram, TikTok), game streaming platforms (Twitch), podcasting platforms (Spotify, Anchor, Stitcher), and membership platforms (Patreon). However, these platforms operate under different business models and provide different services, making them less comparable to app stores. Unlike developers selling iOS apps, creators on these platforms often offer their content for free and generate revenue from alternative sources such as advertisements, subscriptions or viewer tips.

156.  In his analysis, Prof. Economides used profit margins from "online marketplaces that sell on a commission basis," including Alibaba and Ebay.[283] Apple Expert Prof. Hitt criticized this approach, arguing that these platforms are not "app transaction platforms."[284] My use of operating profit margin data from the Microsoft Store addresses this criticism, as the Microsoft Store is specifically an app store that sells Windows PC apps to users.

### V.    MORE REALISTIC DATA INPUTS WOULD FURTHER DECREASE THE BUT-FOR COMMISSION RATE

157.  In the previous Sections, I used an economic model to calculate a But-For commission rate of 13.63% based on conservative assumptions and inputs. In this Section, I perform a series of

---

[282]  Nicholas Brooks, "Will Nintendo's Biggest Franchises Ever Make the Jump to PC Gaming?," *CBR.com*, September 1, 2021, available at https://www.cbr.com/nintendo-pc-gaming/.

[283]  Economides Report, ¶¶ 9, 45.

[284]  Hitt First Class Report, ¶¶ 164, 372.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

sensitivity analyses to evaluate the robustness of my economic model by adjusting: (i) the rival store's market share, (ii) the rival store's fixed costs and (iii) market size. I consider three scenarios, each revising one of these inputs to what is arguably a more realistic – but still conservative – value, while holding the others constant. In each scenario, the model calculates a But-For commission rate of around 12%, closely aligning with the 12% rates currently charged by Epic and Microsoft. When all three inputs are adjusted simultaneously to more realistic values, the model generates a But-For commission rate of around 10% which is close to the cost of self-distribution.[285] This analysis demonstrates that the model produces reasonable results and confirms the conservative nature of my 13.63% estimate.

### A.    RIVAL STORE'S INCREASED MARKET SHARE

158.  In my economic model, the market share of the rival store was estimated at 23%, using the consumer survey designed by the opposing expert, Prof. Simonson, as elaborated in detail in Section IV.B. This survey likely biased the rival store's market share downward by presenting consumers with a choice between the App Store and a rival store described as having lower or uncertain quality attributes. If a more neutral survey had been conducted – where both stores were assumed to offer equivalent quality – the rival store's market share would likely have been higher. Recall that as the rival share increases, the But-For commission rate decreases, all else equal.

159.  Economists view a market share of 70% as commonly indicative of significant market power, meaning that in a competitive duopoly, the rival store would have at least a 30% market share. As a sensitivity test, I adjust the rival store's market share to 30%, implying a 70% share for Apple's App Store, which is more balanced than the 23%/77% split originally used in my model. This adjustment remains conservative compared to the typical 50%-50% split assumed in duopoly models with homogeneous products. With the rival's market share set at 30%, the model predicts a lower But-For commission rate of approximately 11.6%.[286]

---

[285]  See workpaper "Economic Model Estimate 2019 - Sensitivity Analysis.xlsx".
[286]  See workpaper "Economic Model Estimate 2019 - Sensitivity Analysis.xlsx".

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## B.    RIVAL STORE'S REDUCED FIXED COSTS

160.    I previously calibrated the rival store's costs based on Apple's App Store's costs in the actual world. As detailed in Section IV.C, this approach is conservative because the rival store would likely have lower costs in the But-For World, resulting in a lower But-For commission rate. There are two main reasons for this. First, with a smaller market share in the But-For World, the rival store would require less capacity to serve fewer developers and consumers, leading to reduced fixed costs. Second, large conglomerates with monopoly power, such as Apple's App Store, often incur higher costs in general due to inefficiencies associated with monopoly power. In contrast, firms operating in competitive markets typically achieve greater productivity and cost efficiency.[287]

161.    As another sensitivity test, I exclude certain costs previously attributed to the rival store to more closely reflect its smaller scale compared to Apple's App Store and the more competitive nature of the But-For World. One of the assumptions in my calculation of the rival store's costs was the inclusion of Apple's unattributed operational expenses. These expenses, covering areas such as administration, legal, HR, sales and brand marketing, are associated with managing a large conglomerate with diverse business operations. While it is debatable whether these expenses should be considered as part of Apple's App Store's costs, it is unlikely that a smaller rival store operating in a competitive market would incur such high level of expenses.

162.    To recalibrate the model with more realistic costs for the rival store, I exclude the category of unattributed operational expenses, which represents only 8% of total App Store's costs. Importantly, I still include in the analysis all costs reported in the App Store P&L, as well as all costs related to Apple's Worldwide Developer Relations program and App Store marketing expenses, which combined account for the remaining 92% of App Store's costs. This approach

---

[287]   See, for instance, Dirk Pilat, "Competition, Productivity and Efficiency," *OECD Economic Studies* 27(2) (January 1996). "Productivity growth is influenced by a range of factors, and most studies suggest that there is no simple way to boost it (…) The degree of competition in a particular country or sector is often considered to be among the most important of such factors, since a lack of competition reduces the pressure on firms to incorporate better technology, remove organisational slack and improve productivity performance."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

ensures that the adjustment remains conservative. With this revised input, the recalculated But-For commission rate is 12.2%.[288]

### C.    MARKET EXPANSION IN RESPONSE TO LOWER COMMISSION RATE

163. Finally, I assume in my economic model that the market size in the But-For World would be the same as the As-Is World market size, which was measured based on Apple's App Store worldwide billings. This approach is conservative because a lower commission rate in the But-For World would likely have led to market expansion: with reduced commissions charged for apps, developers would have economic incentives to produce and sell more apps and in-app content to consumers.[289] Total billings, meaning the overall market, would then increase.

164. For this sensitivity test, I assume that the elasticity of total billings with respect to the commission rate is at least 1 in absolute value. This is a direct analog to the well-established economic principle that the elasticity of demand for any profit-maximizing firm must be at least 1, as such firms do not operate in the inelastic portion of their demand curve.[290]

165. To simplify the analysis and to avoid the complexities of price discrimination, consider a scenario where Apple charges a 15% commission rate to all developers.[291] If the commission rate were reduced from 15% to 13.63%, this would represent an approximate 10% decrease in the commission rate. As a result, I would expect market billings to increase by at least 10%.

---

[288]  See workpaper "Economic Model Estimate 2019 - Sensitivity Analysis.xlsx".

[289]  This result follows from the law of demand, which states that, generally, lower prices lead to higher demand, all else being equal. In this case, a lower commission rate reduces the cost of distributing apps, increasing developers' demand for the app store. New developers may be attracted by the improved profitability, while existing developers may release more apps or invest more in app development. For conditions under which demand is monotonically decreasing with prices, *see*, for instance, W. Hildenbrand (1983), "On the 'Law of Demand,'" Econometrica, Vol. 51, No. 4, pp. 997–1019. https://doi.org/10.2307/1912048.

[290]  See for instance H. R. Varian (1992), *Microeconomic Analysis* (3rd ed.), W.W. Norton & Company, p. 235 ("It follows from the first-order condition that at the optimal level of output the elasticity of demand must be greater than 1 in absolute value. If this were not the case, marginal revenue would be negative and hence could not be equal to the nonnegative marginal cost.").

[291]  Given that most developers currently pay a 30% commission rate, the potential expansion of demand may be even greater than what I consider in this scenario, making even this adjusted But-For commission rate highly conservative.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

166. Recalculating the But-For commission rate with a 10% increase in market size, while holding all other inputs constant, gives an adjusted But-For commission rate of 12.8%.[292]

## VI.    MY EMPIRICAL ANALYSIS CONFIRMS THE RELIABILITY OF THE BUT-FOR COMMISSION RATE

167. In addition to conducting an economic model analysis to estimate the But-For commission rate, I performed a benchmark analysis using empirical data to assess whether a But-For commission rate of 13.63% aligns with rates observed in a more competitive market. I used data from the Windows PC Game Apps marketplace which, although not fully competitive or a perfect reflection of the But-For World, is still relatively more competitive than the As-Is iOS app distribution. My analysis found that the sales-weighted average effective commission rates among digital Windows PC game app stores ranges from 9.8% to 14.2%. Therefore, real-world data from a comparable and relatively competitive marketplace suggests my model-based But-For commission rate is reasonable.

168. My benchmark analysis largely resembles the "Commission Rate Yardstick" analysis Prof. Economides presented in his expert report filed on behalf of the Developer Class.[293] Prof. Economides also considered the Windows PC app distribution market as a reliable benchmark and included both third-party stores and direct-to-consumer stores in his analysis.[294] He concluded that the prevailing commission rate would have been approximately 14.5%.[295] Although I use the same benchmark as Prof. Economides (i.e. the sale of Windows PC game apps), I use different data and take a different approach to estimate the effective commission rate for direct-to-consumer stores, which results in slightly different But-For commission rates. I provide details of these differences in this Section of the report.

---

[292]  See workpaper "Economic Model Estimate 2019 - Sensitivity Analysis.xlsx".
[293]  Economides Report, Section II.C.1.
[294]  Economides Report, ¶ 9.
[295]  Economides Report, ¶ 9.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

A.    SALES OF WINDOWS PC GAME APPS IN 2019 AS AN APPROPRIATE BENCHMARK

169.  A benchmark marketplace should share key features with the relevant market while being as free as possible from anticompetitive conduct. I evaluated several candidate marketplaces selling digital products but found none to be a perfect benchmark for the competitive But-For World. Among those considered, I concluded that Windows PC game app sales is the most comparable benchmark to the competitive But-For World for two main reasons: (1) the sale of Windows PC game apps closely mirrors the sale of iOS apps and in-app content due to functional similarities and sales channels that provide the same services – selling apps to consumers; and (2) unlike Apple, Microsoft does not impose significant entry barriers, allowing third-party stores and developers to freely sell apps on the Windows operating system.

170.  It is important to emphasize that the sale of Windows PC game apps is not a perfect competitive benchmark. As discussed later in this Section, the largest third-party store, Steam, is alleged to have engaged in anticompetitive conduct, enabling it to charge a supracompetitive commission rate.[296] However, the sale of Windows PC game apps has faced more competition than apps and in-app content on iOS and Android. To date, Microsoft, the owner of Windows, has not been alleged to have monopolized the distribution of Windows game apps or otherwise engaged in anticompetitive conduct. For these reasons, I view Windows PC game app sales as the most appropriate benchmark. To the extent that Steam's alleged market power taints this benchmark, my estimates of the But-For commission rate would remain conservative.

171.  Only in more recent years have Windows PC game app sales shown characteristics that make them comparable to a hypothetical competitive market for iOS apps and in-app content. Two key facts support this conclusion:

---

[296]  Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 7:8-8:2.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

a.  First, prior to 2010, most PC games were sold as physical units (i.e. boxed games),[297] which involved higher costs compared to digital delivery.[298] Since physical sales dominated retail channels and digital delivery had a cost advantage, price competition among digital game stores was likely limited during this period. For example, Steam, which began distributing third-party games in 2005, was seen as a cheaper alternative despite its 30% commission fee.[299] The shift to digital sales gained momentum in the early 2010s,[300] with the emergence of direct-to-consumer stores like EA's Origin in 2011 and Ubisoft's Uplay in 2012, as well as third-party stores like Microsoft in 2012, increasing consumer options and competition.[301] Unlike PC games, mobile apps and in-app content have always been sold digitally and did not go through

---

[297] Oliver Chiang, "The Master of Online Mayhem," *Forbes*, February 9, 2011, available at, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html/?sh=7f132e45451e ("A milestone was reached last year [2010] when unit sales of PC games via download outstripped sales of boxed games in stores for the first time, according to research firm NPD Group.")

[298] Activision Blizzard reports: "The increased importance of digital online channels in our industry increases our potential competition, as the minimum capital needed to produce and publish a digitally delivered game, particularly a game for a mobile platform, may be significantly less than that needed to produce and publish one that is purchased through [physical] retail distribution and is played on a game console or PC." Activision Blizzard, Inc., "Form 10-K, Annual Report for the year ended December 31, 2021," ("Activision Blizzard Inc., Annual Report 2021"), p. 21, available at, https://investor.activision.com/static-files/d7b4f08d-213b-4bd5-a41b-7497baa9c106.

Electronic Arts reports: "Increases in consumer adoption of digital purchase of games combined with increases in our live services revenue generally results in expansion of our gross margin, as costs associated with selling a game digitally is generally less than selling the same game through traditional retail and distribution channels." *See* Electronic Arts, Inc., Form 10-K, Annual Report for the year ended March 31, 2021, p. 27, available at, https://s204.q4cdn.com/701424631/files/doc_financials/2021/q4/7205ec00-ad63-4913-a8b5-7dfed24158cf.pdf.

[299] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 7:17-24. *See also* Wolfire Games, LLC, et al. v. Valve Corporation, Second Amended Consolidated Class Action Complaint Demand for Jury Trial, 15:17-24.

[300] Digital sales of PC games surpassed physical sales in 2010. *See* Nicholas Deleon, "PC Game Digital Sales Have Now Outpaced Physical Sales," *TechCrunch*, September 20, 2010, available at, https://techcrunch.com/2010/09/20/pc-game-digital-sales-have-now-outpaced-physical-sales/.

[301] EA launched Origin in June 2011. *See* EA, "EA launches Origin," June 3, 2011, available at, https://ir.ea.com/press-releases/press-release-details/2011/EA-Launches-Origin/default.aspx. Ubisoft launched Uplay in August 2012. *See* Ubisoft, "Ubisoft reports first-half 2012-13 sales and earnings figures," November 6, 2012, available at, https://staticctf.akamaized.net/8aefmxkxpxwl/3OoT5tHHDXwNrt6HBPX4VA/ca1200236cedbfc5f44087a3f68b4ba1/Ubisoft_H1_FY13_English.pdf. Microsoft launched the Microsoft Store in February 2012. *See* Jamie Keene, "Windows Store launches for Windows 8," *The Verge*, February 29, 2012, available at, https://www.theverge.com/2012/2/29/2832684/windows-8-store-announcement-mwc.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

a similar transition, so a competitive benchmark should focus on later periods when PC game sales became predominantly digital.[302]

b.  Second, industry research and documents show that the launch of the Epic Games Store in late 2018 heightened competition among Windows PC game app stores. Epic's entry prompted both price and non-price responses from competitors like Steam and Microsoft, indicating increased competition amongst PC game app stores. I will discuss the competitive effects of Epic's entry in more detail later in this Section.

172.  For these reasons, I rely on 2019 data for my benchmark analysis of Windows PC game apps. The 2019 year reflects heightened competition compared to prior years and is the most recent year unaffected by Covid-19, which caused significant changes in the gaming industry relative to the class action period. In Section VII, I explain why using post-Covid data is inappropriate, as it does not reflect a competitive market equilibrium relevant to the class action period. However, as a robustness check, I also recalculate my benchmark analysis using more recent data, and as I show, the conclusions remain consistent despite the effects of Covid-19.

173.  During class certification, Apple's experts repeatedly questioned my use of 2019 data in the benchmarking analysis,[303] with Prof. Hitt proposing to use earlier periods.[304] However, Apple's experts' arguments against using 2019 data are baseless. Apart from Prof Hitt's claim that the recent period is unreliable, he fails to articulate why the time frame I chose is inadequate.[305] None of Apple's experts provided a reason to prefer data drawn from a less competitive environment to data drawn from a more competitive environment. While some claimed the Windows PC game app marketplace was "sufficiently" competitive before 2019, none suggested it became less competitive after Epic's entry. To find a "competitive benchmark," it is axiomatic to use data from a more competitive period.

---

[302]  For example, according to the Newzoo Global Games Market Report, revenues from digital PC game sales comprised 95% of all revenues from PC game sales in North America in 2019. APL-EG_06093173, tab 'Digital-Boxed Breakdown.' *See also* Workpaper "Benchmark Estimate 2019.xlsx," tab "Benchmark Estimates."

[303]  Hitt Second Class Report, ¶ 314. *See also* Schmalensee Second Class Report, ¶¶ 107-110.

[304]  Hitt Second Class Report, ¶ 314.

[305]  Hitt Second Class Report, ¶ 314.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

174. Prof. Schmalensee further argued that the 12% commission rates charged by the Epic Games Store in 2019 and the Microsoft Store in 2021 are temporarily low.[306] He speculated that the Epic Games Store might raise its rate in the future and suggested, without evidence, that the Microsoft Store might also respond by raising its rate.[307] The crux of Prof. Schmalensee's argument is that the commission rates I used in my benchmark analysis are temporary aberrations and unsuitable for benchmarking. However, real-world evidence contradicts this – both the Epic Games Store and the Microsoft Store have maintained their 12% commission rate on games since their implementation in 2019 and 2021, respectively.[308] In contrast, the commission rates reported by Prof. Schmalensee before the Epic Games Store's launch reflect the transition from high-cost physical distribution and are plausibly tainted by Steam's alleged anticompetitive conduct.[309]

175. Finally, no Apple expert has advanced any argument to suggest that the digital distribution of Windows PC game apps is not a suitable benchmark. None has claimed that its business model is too dissimilar from iOS app distribution or that it is contaminated by excessive anticompetitive conduct that would render it unreliable. While there are allegations of anticompetitive behavior by

---

[306] Schmalensee Second Class Report, ¶ 108.

[307] Schmalensee Second Class Report, ¶ 108.

[308] Allegra Frank, "Epic Games is launching its own store, and taking a smaller cut than Steam," *Polygon*, December 4, 2018, available at, https://www.polygon.com/2018/12/4/18125498/epic-games-store-details-revenue-split-launch-date; James Batchelor, "Tim Sweeney on Apple's 15% cut: 'We're not fighting for a lower commission'," *GamesIndustry.biz*, November 19, 2020, available at, https://www.gamesindustry.biz/tim-sweeney-on-apples-15-percent-cut-were-not-fighting-for-a-lower-commission; Dean Takahashi, "Epic Games wins injunction favoring alternative payments in antitrust lawsuit against Apple," *GamesBeat*, September 10, 2021, available at, https://venturebeat.com/games/epic-games-wins-injunction-favoring-alternative-payments-in-antitrust-lawsuit-against-apple/; "Is this the real reason Epic Games acquired Bandcamp? (Clue: It's got nothing to do with the Metaverse.)," *Music Business Worldwide*, March 15, 2022, available at, https://www.musicbusinessworldwide.com/podcast/is-this-the-real-reason-epic-games-acquired-bandcamp/; Jay Peters, "Epic will now let developers self-publish to the Epic Games Store," *The Verge*, March 9, 2023, https://www.theverge.com/2023/3/9/23630864/epic-games-store-self-publish-tools-ratings; Epic Games, "Distribution," available at, https://store.epicgames.com/en-US/distribution ("88%/12% Revenue Split. Keep 88% of the revenue and monitor product performance with integrated analytics dashboards."). *See also* "Microsoft Store, Version 8.8, Publish Date: June 16, 2022, Effective Date: July 16, 2022, App Developer Agreement," *Microsoft*, June 16, 2022, p. 15, available at, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4YJB0 ("For all Net Receipts generated on or after August 1, 2021: Twelve percent (12%) of Net Receipts for any Games (and any in-App Products in such Games).").

[309] Schmalensee Second Class Report, Exhibit IV.3.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Steam in my benchmark marketplace, these are less consequential than the alleged conduct by Apple, as the digital Windows PC game apps marketplace clearly exhibits more competition than iOS app distribution.

176. In what follows, I discuss several alternative markets I considered as potential benchmarks for Windows PC game sales and explain why I ultimately excluded them, as they presented significant flaws for reliable comparison.

### 1.    Android Apps Sales

177. The sale of Android apps closely mirrors the sale of iOS apps in terms of functionality. Both are smartphone operating systems, and developers typically create two versions of the same app for each platform.[310] During class certification, Apple's experts suggested that the Android app marketplace could serve as a valid benchmark.[311] However, it should not be used as such given the jury's affirmative finding that Google does hold monopoly power over the distribution of Android apps and in-app content.[312] In the verdict, Google was found to have maintained its monopoly through multiple restraints of trade imposed on the Android ecosystem.[313] The Google Play Store accounts for over 90% of Android app and in-app purchases in the US, with no competing store holding more than 5% of the market.[314] The complaint, filed by 36 states and the District of Columbia in July 2021, included several allegations,[315] including the following:

---

[310] Ahmed Sherif, "Mobile operating system distribution for software development worldwide in 2022 and 2023," *Statista*, March 6, 2024, available at, https://www.statista.com/statistics/1078678/software-development-operating-system-mobile/.

[311] Hitt Second Class Report, ¶¶ 324-332. *See also* Schmalensee Second Class Report, ¶¶ 102-106.

[312] Google Play Store Verdict, pp. 3-4.

[313] Specifically, the jury found that Google entered into the following agreements that unreasonably restrained trade in the relevant antitrust market: DDA agreements, agreements with Google's alleged competitors or potential competitors, and agreements with OEMs that sell mobile devices. *See* Google Play Store Verdict, p. 5.

[314] State of Utah et al. v. Google, LLC et al., Complaint, 11:12-14.

[315] The complaint also outlined multiple coordinated initiatives Google allegedly used to prevent Samsung's Galaxy Store from becoming a viable competitor. For instance, the Complaint claims that

a. Google requires Android device manufacturers to pre-install and prominently display the Google Play Store on their devices.[316]

b. Google entered into revenue-sharing agreements with Android device manufacturers, conditioned on not pre-installing rival app stores, and in some cases, even prohibiting user access to them.[317]

c. Consumers who download apps from the Google Play Store must use Google Play Billing for all in-app purchases.[318]

d. Google reached agreements with Samsung to reduce competition from the Samsung Galaxy Store.[319]

178. Google's anticompetitive conduct and its effects on Android app sales are notably similar to those raised by Consumer Plaintiffs in this litigation. Specifically: (1) Google's revenue-sharing agreements with device manufacturers suppress competition in the Android ecosystem, much like Apple's barriers to entry restrict competition in the iOS ecosystem; (2) Google Play's 90% market share of Android app purchases mirrors the App Store's dominance in the iOS app and in-app content aftermarket. Due to these parallels in anticompetitive behavior, I do not consider the Google Play Store a valid competitive benchmark for the But-For World. As such, the Android app marketplace cannot be used as a reasonable benchmark for this case.

---

Google made an attempt to "pay Samsung to abandon relationships with top developers and scale back competition […]" Further, the complaint claims that Google "was willing to offer Samsung myriad benefits and concessions," on the conditions that Samsung would "give up its direct commercial relationships in app distribution with consumers and developers […]" and give the Google Play Store "exclusivity on the default home screen and the adoption of Android game device standards devised by Google." *See* State of Utah et al. v. Google, LLC et al., Complaint, 129:15-19 and ¶ 46. Although the Samsung Galaxy Store does charge a default 30% commission rate, it has explicitly stated that this rate is negotiable. *See* Samsung Galaxy Store Seller Portal, "Terms and Conditions," August 13, 2020, available at, https://seller.samsungapps.com/help/termsAndConditions.as, ¶ 6.1.

[316] State of Utah et al. v. Google, LLC et al., Complaint, 14:9-18.

[317] State of Utah et al. v. Google, LLC et al., Complaint, 13:26:15:2.

[318] State of Utah et al. v. Google, LLC et al., Complaint, 11:15-23.

[319] State of Utah et al. v. Google, LLC et al., Complaint, 44:4-11, 45:20-47:11.

96

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 2.   MacOS App Sales

179.   Although Apple operates the Mac App Store for macOS devices, it does not exclude rival app stores or developers selling apps designed for macOS as it does for iOS app sales. Consequently, in this regard, the sale of macOS apps is similar to the sale of Windows PC apps, as developers can distribute directly to consumers or through a third-party app store.[320] During class certification, both Prof. Schmalensee and Prof. Hitt have, in fact, identified the distribution of macOS apps as potential benchmarks.[321] However, as I explain next, pricing on the Mac App Store is affected by the challenged conduct in the Apple App Store.

180.   Evidence suggests that the commission rate of the Mac App Store is closely tied to that of the iOS App Store. Apple executives have testified that Apple sets the same commission rate for its Mac App Store and iOS App Store to "create parity and consistency."[322] Since Apple's iOS App Store accounts for approximately 99% of its total app sale revenues, Apple's joint profit-maximizing commission would naturally be very close to the commission level that maximizes iOS App Store profits.[323] In other words, the commission rate charged by the Mac App Store is tainted by the iOS App Store's supracompetitive commission rate. Consequently, the macOS app sales commission rate is not an appropriate competitive benchmark for the But-For World.

### 3.   Console Video Game Sales

181.   Video game console developers like Sony and Microsoft operate proprietary, console-specific digital app stores where users can purchase video games and additional content. Both Sony's PlayStation Store and Microsoft's Xbox Store charge a 30% commission rate.  However, console video game stores operate under a different economic model from the App Store, as hardware is

---

[320]   Apple, "Distributing software on macOS," available at, https://developer.apple.com/macos/distribution/.

[321]   Hitt Second Class Report, ¶¶ 288-289; Schmalensee Second Class Report, Exhibit IV.2.

[322]   Fischer Deposition, 324:21-325:5. ("Q: What commission does Apple charge on the Mac Store? A: 30 percent on the Mac App Store. But the same again, 30 percent, 15 percent for developers in the small business program, 15 percent for developers after year one that are offering subscriptions. So it's the same, we always achieve to try to create parity and consistency across the different App Stores that we manage.").

[323]   APL-APPSTORE_08882431, at 607.

often sold at a loss to consumers and cross-subsidized by commission fees.[324] In contrast, Apple reports a ██████ operating profit margin from iPhone sales and a ██████ operating profit margin from "Apple Services," which includes the App Store as well as other services like iTunes and Apple Music.[325] The distinct business model that characterizes console video game sales suggests that these stores are not directly comparable to iOS app and in-app content sales, and therefore, they are not a reasonable benchmark for the competitive But-For World.

182.   Moreover, as the Court described in a recent decision in an antitrust lawsuit against Sony, "a PlayStation user wishing to find a lower price for a digital game would have to look at the games for an entirely different console, necessitating another console purchase in the hundreds of dollars."[326] This observation underscores the similarities between the sale of video games for a specific game console and the sale of iOS apps and in-app content in the As-Is World, where purchasers of iOS mobile devices are economically locked into buying iOS apps and in-app content from the App Store. However, in the competitive But-For World, consumers would have been able to seek lower prices from alternative sales channels within the iOS ecosystem rather than being required to purchase another mobile device.

183.   Despite my rationale, both Prof. Schmalensee and Prof. Hitt identify the distribution of game consoles as a potential benchmark.[327] Specifically, Prof. Hitt claims that console makers compete with other channels of game distribution, such as PC and mobile devices.[328] This claim is contradicted by empirical facts:

---

[324]   Paul Tassi, "Sony Gaming Profit Drops 33%, Partially Due To Selling PS5 At A Loss," *Forbes*, August 4, 2021, available at, https://www.forbes.com/sites/paultassi/2021/08/04/sony-gaming-profit-drops-33-due-to-selling-ps5-at-a-loss/?sh=37cd84c54fc4. *See also* Emma Kent, "Microsoft confirms it's never turned a profit on sale of Xbox consoles," *Eurogamer*, May 6, 2021, available at, https://www.eurogamer.net/microsoft-confirms-its-never-made-profit-from-sale-of-an-xbox-console.

[325]   APL-EG_10015274, at 278.

[326]   Order Granting Motion to Dismiss, *Caccuri v. Sony Interactive Entertainment LLC*, Case No. 21-cv-03361-RS (N.D. Cal.), July 15, 2022, ECF No. 60, 7:9-11.

[327]   Hitt Second Class Report, ¶¶ 288-289; Schmalensee Second Class Report, Exhibit IV.2.

[328]   Hitt Second Class Report, ¶ 338. ("Console app transaction platforms compete with other app transaction platforms, such as those for PC and mobile devices, which constrains the commission rates they can charge.").

a.  First, console game app stores operate in a separate market from mobile games, as only a small fraction of popular mobile games are available on consoles, and console and mobile games often target different consumers groups.[329]

b.  Second, if console makers were competing with PC stores, there would not be a significant and sustained gap between the commission rates charged for console and PC games.[330] However, since 2021, Microsoft, which sells games for both its Xbox console and PC, has charged a much lower rate on sales of PC games in the Microsoft Store. [331] This reality aligns with my argument that console makers operate under a different business model in which commission revenues from game sales cross-subsidize losses on hardware. To earn higher margins, console makers must, by definition, set higher prices for distribution relative to cost. This is not the case for the iPhone and iOS apps.

### 4.  Other Digital Content Sales

184.  I have also considered various distribution channels for digital content that do not necessarily rely on app stores for sales and distribution as candidate benchmarks. Among these are video

---

[329] Rule 52 Order After Trial on the Merits, Epic Games, Inc. v. Apple Inc., pp. 125-126. "Substantial evidence was presented showing that mobile gaming is a distinct submarket (…) Another industry report describes distinct user bases for mobile gaming: young children, teenage girls, and older adults are disproportionally likely to be mobile gamers only. Multiplatform gaming, by contrast, is driven by teenage boys and young adults under 25. Even without Apple documents, the experts largely agree that mobile and non-mobile platforms provide different types of games. Dr. Hitt—whom Apple commissioned to show that game transactions are substitutable—ended up showing the opposite. In his original written direct testimony (which Apple withdrew after cross-examination), Dr. Hitt showed that only 12% and 16% of the most popular App Store games are available on consoles. Both Dr. Hitt's and Dr. Cragg's trial testimony remain in the record, and each shows that console games are largely separate from mobile games. Moreover, while Dr. Hitt originally opined that mobile games are available on PCs, his work could not be entirely reproduced during trial, as some of the games he listed as available on both platforms (PC and mobile platforms) could not be found. The fact that Apple tried and failed to show cross-availability of mobile games with PC indicates that they are distinct."

[330] N. Gregory Mankiw, *Principles of Economics*, 8th Edition (Cengage Learning, 2018), p. 67. ("Because buyers and sellers in perfectly competitive markets must accept the price the market determines, they are said to be *price takers*.").

[331] The commission rate on Xbox console games is 30%. *See* Hitt Second Class Report, ¶ 357. The commission rate on PC game sales in the Microsoft Store is 12%. *See* Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," The Verge, April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

streaming platforms (YouTube, Instagram, or TikTok), game streaming platforms (Twitch), podcasting platforms (Spotify, Anchor, or Stitcher), and membership platforms (Patreon). Generally, these platforms provide different services and operate under distinct business models that make them less comparable to app stores. Moreover, unlike developers selling iOS apps, the creators of these digital products often offer their content to consumers for free and generate revenue from other sources, such as advertisement revenue, subscription fees, or viewer tips.[332] Due to these significant differences, I conclude that other digital content distribution channels are more distant from the market of interest and are unlikely to serve as valid benchmarks.

### B.    COMMISSION RATES OF MAJOR THIRD-PARTY STORES

185.    Having concluded that the digital sale of Windows PC game apps is a reasonable benchmark and superior to other alternatives, I considered all relevant market participants in my analysis, including third-party game app stores and direct-to-consumer stores. In this Section, I identify each major third-party app store for Windows, explain why they should be included in the benchmark analysis, and describe the data gathered to calculate their effective commission rates

---

[332] For instance, creators of video content streamed on YouTube, Instagram, or TikTok largely monetize from advertisement revenues or viewer tips. *See* Alec Chillingworth, "An Overview of Video Monetization for YouTube, Instagram, Facebook & TikTok," *Epidemic Sound*, September 15, 2022, available at, https://www.epidemicsound.com/blog/video-monetization-for-youtube-instagram-facebook-tiktok/.

Podcast creators that distribute on Spotify Anchor or Stitcher earn revenues from advertisement revenues, subscription revenues, or donations. *See* Anchor, "Introducing Anchor Listener Support: Now you can get paid to podcast," *Medium*, August 9, 2018, available at, https://medium.com/anchor/introducing-anchor-listener-support-now-you-can-get-paid-to-podcast-64aefa5cfa9d. *See also* Anchor, "Fee schedule and cashing out," *Spotify,* August 8, 2018, available at, https://help.anchor.fm/hc/en-us/articles/360012563112. *See also* Stitcher, "A Year End Stitcher Report Update & Some Podcaster Insights," Medium, December 7, 2021, available at, https://stitcher.medium.com/a-year-end-stitcher-report-update-some-podcaster-insights-eee4034f745c.

Alternatively, creators that choose to share their videos, podcasts, or musical works on Patreon can collect either subscription fees or payments for individual releases. *See* Patreon Support, "What is Patreon? Patreon is a membership platform that makes it easy for creators to get paid," 2020, available at, https://support.patreon.com/hc/en-us/articles/204606315-What-is-Patreon.

For the video game live streaming platform Twitch, streamers profit from both subscription revenues and advertising revenues. *See* Twitch, "Twitch Basics," available at, https://www.twitch.tv/creatorcamp/en/get-rewarded/twitch-basics/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

charged to developers. Generally, I used either their headline commission rates or, when necessary, estimated their effective commission rates based on their internal data.

### 1.    Steam

186.   Steam, owned by game developer Valve, is the largest PC game store by active users.[333] Steam launched in September 2003 to support Valve's own video games and expanded to distributing third-party games in 2005, competing against brick-and-mortar game distributors that had a higher cost structure.[334] Today, third-party games make up ███████████████████[335] From 2005 through 2018, Steam charged a flat 30% commission rate to developers.[336] However, just a week before Epic's entry in late 2018, Steam introduced new revenue share tiers with commission rates ranging from 20% to 30%.[337] Steam's current tiered commission rate works as follows:[338]

> Valve takes a 30% cut of all sales on Steam as a base. However, a few years ago the company introduced a scaling system that gives more money to developers with higher earnings: those who earn 10 million dollars get a rate of 25% and those

---

[333] Wesley Yin-Poole, "The Epic Games Store is getting a lot more popular," Eurogamer, January 28, 2021, available at, https://www.eurogamer.net/the-epic-games-store-is-getting-a-lot-more-popular ("Monthly active users rose from 32 million in 2019 to 56 million in December 2020, Epic announced […]. Epic Games Store still has some way to go before it catches up with market leader Steam. Earlier this month, Valve announced Steam had over 120 million monthly active users.").

Similarly, "Although it remains the biggest PC game marketplace, with more than 150 million registered users, the company clearly recognizes that it can't rest on its laurels." *See* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers" *The Verge,* November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

[334] Gennaro Cuofano, "How Does Steam Make Money? The Steam Business Model In A Nutshell," *FourweekMBA*, January 10, 2022, available at, https://fourweekmba.com/steam-business-model/.

[335] MSFT_EPIC_00000093, p. 17.

[336] Romain Dillet, "Valve changes revenue-sharing tiers on Steam," *TechCrunch*, December 3, 2018, available at, https://techcrunch.com/2018/12/03/valve-changes-revenue-sharing-tiers-on-steam/.

[337] Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[338] Pedro Domínguez, "Epic Games sets its sights on Steam in its crusade against commissions in digital stores," *Softonic*, December 16, 2023, available at: https://en.softonic.com/articles/epic-games-sets-its-sights-on-steam-in-its-crusade-against-commissions-in-digital-stores.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

who earn 50 million only give 20% to Valve. Historically, most game developers believe that Steam does not deserve a 30% fee.

187. Given Steam's tiered commission rate based on developers' earnings, I used Valve's internal data to estimate the effective average commission rate charged to developers. This was done by calculating the ratio of revenue Valve retained after paying its partners (developers) to the total net revenue from selling apps on the Steam platform. According to Valve's internal documents, in 2019, Valve's own revenue after paying partners was USD ████████, while the net revenue from game sales on Steam was USD ████████.[339] This results in an effective commission rate of ████.[340]

188. Steam's effective commission rate is notably one of the highest in the market. I include Steam in my benchmark analysis for completeness, though I do not view it as a suitable benchmark for competitive rates in the But-For World. There are at least two reasons why Steam's commission rate could be considered supracompetitive, and thus, why Steam should be excluded from the benchmark analysis.

a. First, in the early 2000s, PC games were primarily distributed through physical copies.[341] Steam, with its significant cost advantage in digital delivery, became a cheaper alternative to physical distribution, despite charging a 30% commission fee.[342] This cost advantage, combined with Valve's own popular game catalogue, attracted developers and consumers to Steam, securing its dominance in digital PC game distribution – a dominance that remained largely unchallenged until recently.[343] In contrast, iOS app and in-app content sales have

---

[339] VALVE000650, at 659.

[340] Prof. Evans found the same average effective rate for the Steam Store in the *Epic v. Apple* case. *See* Trial Testimony of David Evans, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), May 14, 2021, ECF No. 769, at 2441:2-6.

[341] Nicholas Deleon, "PC Game Digital Sales Have Now Outpaced Physical Sales," *TechCrunch*, September 20, 2010, available at, https://techcrunch.com/2010/09/20/pc-game-digital-sales-have-now-outpaced-physical-sales/.

[342] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 7:17-24. *See also* Wolfire Games, LLC, et al. v. Valve Corporation, Second Amended Consolidated Class Action Complaint Demand for Jury Trial, 16:3-18.

[343] Wolfire Games, LLC, et al. v. Valve Corporation, Second Amended Consolidated Class Action Complaint Demand for Jury Trial, 11:7-25, 14:12-16:2.

always been digital-only. In the But-For World, Apple would likely have faced competition from rival app stores from the start, exerting downward pressure on commission rates.

b. Second, Valve is alleged to impose an anticompetitive most-favored-nations (MFN) clause, threatening to retaliate against developers who sell their games at a lower price through other distribution channels with punitive actions, including removing their games from Steam.[344] If true, this practice would prevent developers from passing on savings from lower commission fees to consumers by discounting their games on other platforms, thereby insulating Steam from competitive pressure from lower-priced rivals. In an antitrust lawsuit filed by the independent game developer Wolfire Games against Valve in April 2021, Wolfire claims that Valve "enforces this regime through a combination of written and unwritten rules" imposing conditions on how "non-Steam-enabled games are sold and priced."[345] A recent court ruling found "these allegations are sufficient to plausibly allege unlawful conduct," allowing the MFN claims to proceed.[346] The court also concluded that the plaintiffs have plausibly alleged price-based harm arising from the 30% commission fee charged by Steam.[347]

189. While I include Steam in my benchmark analysis for completeness, in principle it should be excluded for the reasons previously presented. During class certification, Prof. Hitt claimed that early competitors would have eroded Steam's incumbency.[348] However such competitors clearly did not hinder Steam's dominant position: Steam is the largest PC game app store ████████ ████████████████████;[349] and, according to my calculations, it accounted for up to ██

---

[344] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 6:2-7:2.

[345] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 6:2-7:2. The Claim was initially filed in April 2021. *See* Class Action Complaint Demand for Jury Trial, *Wolfire Games, LLC, et al. v. Valve Corporation*, Case No. 2:21-cv-00563 (W.D. Wash.), April 27, 2021, ECF No. 1.

[346] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 6:2-7:6.

[347] Wolfire Games, LLC, et al. v. Valve Corporation, Order, May 6, 2022, 7:8-8:2.

[348] Hitt Second Class Report, ¶ 310.

[349] MSFT_EPIC_00000093, p. 17. *See also* Wesley Yin-Poole, "The Epic Games Store is getting a lot more popular," *Eurogamer*, January 28, 2021, available at, https://www.eurogamer.net/the-epic-games-store-is-getting-a-lot-more-popular. *See also* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers," *The Verge,* November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

of all digital Windows PC game app sales by third-party stores in 2019.[350] At that time, GOG.com and the Humble Store, which are Prof. Hitt's examples of early entrants, each had no more than 2% of all sales by third-party stores.[351] Finally, Prof. Hitt's claim that Battle.net distributed digital game apps prior to Steam is simply untrue.[352]

190.  As a result, at the end of this Section, I report two sets of But-For commission rate estimates: one with Steam included and one without.[353] The inclusion of Steam results in more conservative But-For commission rates. However, the inclusion of Steam should not be interpreted as my agreement that Steam is a reasonable benchmark.

## 2.    The Epic Games Store

191.  In December 2018, Epic launched the Epic Games Store, leveraging the success of its popular title Fortnite to distribute both its own and third-party Windows PC games.[354] Epic set itself apart by charging a lower 12% commission rate compared to Steam's 30%, and by allowing developers to use alternative storefronts without restrictions, unlike Steam's most-favored-nation provisions.[355] Additionally, the store's use of "timed exclusive" deals, weekly free games and

---

[350]   *See* "Benchmark Estimate 2019.xlsx," tab "Benchmark Estimates."

[351]   Hitt Second Class Report, ¶ 313.

[352]   Hitt Second Class Report, ¶ 286. Battle.net did not distribute games when it launched in 1996; rather, it offered support for *Diablo*, a game that was only distributed by physical channels. *Diablo* could not be purchased digitally until around 2019, and then not through Battle.net. *See* Sam Machkovech, "Blizzard has handed Diablo 1's keys to GOG, and you can buy it right now," *Ars Technica*, March 7, 2019, available at, https://arstechnica.com/gaming/2019/03/original-diablo-is-now-on-sale-for-10-drm-free-but-not-on-blizzards-app/.

[353]   Excluding Steam from my benchmark analysis reduces But-For commission rates from 14.18% to ▮▮▮▮ when using effective commission rates estimated from Humble Widget self-distribution costs, and from 13.91% to ▮▮▮ when using effective commission rate estimated from the Epic Games Store's self-distribution costs.

[354]   Epic Games Store, "The Epic Games store is now live," December 7, 2018, available at, https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live.

[355]   See Section VI.B.1

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

major sales events helped it gain rapid traction and popularity.[356] By 2020, two years after its launch, the Epic Games Store reported USD 700 million in sales, 56 million monthly active users and 31 million daily active users. [357] By 2021, Epic had retained nearly 50% of Steam's monthly active user base.[358]

192.    Moreover, since December 2019, Epic no longer requires developers to use its payment processing system for in-app purchases.[359] As a result, developers using the Epic Games Store "have more options for processing payments" and "Epic won't take a cut of any payments made through those third-party services."[360] Several developers, such as Wizards of the Coast and Ubisoft, have opted to use their own payment processing systems for in-game purchases.[361] In

---

[356]    Wesley Yin-Poole, "The Epic Games Store is getting a lot more popular," *Eurogamer*, January 28, 2021, available at, https://www.eurogamer.net/the-epic-games-store-is-getting-a-lot-more-popular. *See also* Jimmy Donnellan, "Timed Epic Games Store Exclusives: The Complete List," *Cultured Vultures*, August 24, 2022, available at, https://culturedvultures.com/timed-epic-games-store-exclusives-list/. *See also* Erron Kelly, "The Epic Mega Sale is back for a third year and bringing big discounts," *GamesBeat*, May 19, 2022, available at, https://venturebeat.com/games/epic-mega-sale-is-back-for-a-third-year-with-big-discounts/.

[357]    Steven Shaw, "Steam vs Epic Games Users and Revenue 2021 Market Share Update," *Stealth Optional*, May 10, 2021, available at, https://stealthoptional.com/how-to/steam-epic-games-users-revenue-market-update-2021/.

[358]    Steam reached 132 million monthly active users, whilst the Epic Games Store reached, in December, a peak of 62.2 million monthly active users. Steam, "Steam – 2021 Year in Review," March 8, 2022, available at, https://store.steampowered.com/news/group/4145017/view/3133946090937137590. See also Epic Games Store, "Epic Games Store 2021 Year in Review," January 27, 2022, available at, https://store.epicgames.com/en-US/news/epic-games-store-2021-year-in-review.

[359]    Trial Testimony of Steven Allison, at 1222:5-21. Furthermore, Epic, since at least April 2019, charged consumers rather than developers fees for certain payment options. *See*, Epic Games Store, "Reach over 100 million players by self-publishing your game on the Epic Games Store," available at, https://store.epicgames.com/en-US/publish; Wadan Khan, "Epic Games Store Players To Pay Extra Fees up to 7% On Certain Payment Methods," *TheNerdMag*, April 11, 2019, available at, https://www.thenerdmag.com/epic-games-store-players-to-pay-extra-fees-up-to-7-on-certain-payment-methods/.

[360]    Epic allows developers to "choose among the best stores, in-app payment processors, online services, and engines" available to them, "[a]nd to mix and match those components as they wish." *See* Jeff Grubb, "Epic Games Stores devs can now choose their own in-game payment processor," *Venture Beat*, December 6, 2019, available at, https://venturebeat.com/2019/12/06/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

[361]    Trial Testimony of Steven Allison, at 1223:8-20.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

contrast, Steam requires all in-app payments be made through the Steam Wallet.[362] Therefore, while I use Epic's headline rate of 12% in my benchmarking calculations, the fact that Epic charges no commission when developers use their own payment methods suggests its effective commission rate is likely lower.[363] This makes my approach conservative.

193. Epic's entry into the market and its competitive offerings have led to ███████████████ ████████████████████████████.[364] Before Epic's launch, both Steam and the Microsoft Store charged a 30% commission on all game sales and in-game purchases.[365] However, one week before the Epic Games Store entered, Valve announced a revision to Steam's revenue-sharing structure, introducing its tiered commission model: 30% for a game's first USD 10 million in sales, 25% for sales between USD 10 million and USD 50 million, and 20% for sales

---

[362] Steamworks, "Microtransactions (In-Game Purchases)," available at, https://partner.steamgames.com/doc/features/microtransactions. Steam further prohibits developers from promoting any game version other than "the Steam version and its availability via Steam[.]" *See* Steamworks, "Steam Community," available at, https://partner.steamgames.com/doc/features/community.

[363] Trial Testimony of Timothy Sweeney, May 3, 2021, at 125:13-25.

[364]

[365] Microsoft Store, "App Developer Agreement," July 10, 2020, available at, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4o4bH. *See also* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers," *The Verge*, November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

beyond USD 50 million.[366] Industry observers at the time suggested that this change was aimed at discouraging successful game developers from switching to the Epic Games Store.[367]

194. The Microsoft Store also adjusted its commission rates following Epic's market entry.

"[368] While it introduced a 15% revenue share model in 2018 for "qualifying PC apps," games were excluded.[369] However, in August 2021, Microsoft reduced its commission for PC games to 12%, aligning with the Epic

---

[366] Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838. *See also* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers," *The Verge*, November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

[367] Nick Statt and Sean Hollister, "Epic Games takes on Steam with its own fairer game store," *The Verge*, December 4, 2018, available at, https://www.theverge.com/2018/12/4/18124203/epic-games-fortnite-valve-steam-game-store-distribution-unreal-engine.

In addition to changing its commission structure, Valve loosened its policies governing how developers can use data about their games sold on Steam. Though Valve's old guidelines were previously restrictive in this regard, the revised guidelines allowed developers to "share sales data about their game as they see fit." Valve further assured developers that it is "spending a bunch of time and energy adding some new developer tools and features for self-marketing\promotion, improved navigation data, as well as more insight into metrics on impressions and activity for your games on Steam." *See* Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[368] MSFT_ EPIC_00000120, p. 4.

[369] Microsoft also experimented with a 95/5 model for non-games on sales generated through developers' own promotions – this program was discontinued in early 2020. *See* Joao Cassasqueira, "Microsoft is apparently canceling its 95% revenue share program [Update]," *Neowin*, January 15, 2020, available at, https://www.neowin.net/news/microsoft-is-apparently-canceling-its-95-revenue-share-program/. *See also* Microsoft Store, "App Developer Agreement," July 10, 2020, available at, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4o4bH.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Games Store.[370] Industry observers attributed this reduction to "stiff competition"[371] and noted Microsoft's goal of retaining developers and users, as gaming content became an increasingly important revenue stream.[372] This move also aimed to further enable Microsoft to distinguish "itself further from privately held Valve Software's Steam store."[373]

195. Publishers and developers have welcomed the competition Epic's entry brought to the market. Paradox Interactive's CEO explained that this competition will "benefit both players and game

---

[370] Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge*, April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent; Matt Booty, the head of the Xbox Game Studios, characterized this update as part of a "re-invigorated push on PC." *See* Jess Conditt, "Microsoft follows Epic and cuts Xbox PC revenue share to 12 percent," *Engadget*, April 29, 2021, available at, https://www.engadget.com/xbox-pc-rev-share-88-12-epic-apple-130036485.html.

[371] Kyle Orland, "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%," *Ars Technica*, April 29, 2021, available at, https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pc-game-sales-to-12/.

[372] Jordan Novet, "Microsoft will match Epic and share more money with video game makers," *CNBC*, April 29, 2021, available at, https://www.cnbc.com/2021/04/29/microsoft-will-match-epic-and-share-more-money-with-video-game-makers.html.

[373] Jordan Novet, "Microsoft will match Epic and share more money with video game makers," *CNBC*, April 29, 2021, available at, https://www.cnbc.com/2021/04/29/microsoft-will-match-epic-and-share-more-money-with-video-game-makers.html.

Microsoft also carried out quality improvements following increased competition from the Epic Games Store. For example, Microsoft announced in 2019 that its store would begin supporting traditional desktop apps, commonly known as "Win32" apps. Win32 apps (applications written for 32-bit Windows operating systems) is the predominant Windows app format that the later Universal Windows Platform ("UWP") format, introduced in Windows 10 was designed to replace. Phil Spencer, Microsoft's current CEO of Microsoft Gaming explained that this will unlock more options for developers and gamers and allow for "the customization and control they've come to expect from the open Windows gaming ecosystem." *See* Nick Statt, "Microsoft will distribute more Xbox titles through Steam and finally support Win32 games," *The Verge*, May 30, 2019, available at, https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows. *See also* Pete Brown, "Find your success in the Microsoft Store on Windows," *Microsoft Store*, available at, https://developer.microsoft.com/en-us/microsoft-store/overview/.

Moreover, Microsoft began "inviting third-party app stores to integrate into the Microsoft Store" in September 2021, with Amazon and the Epic Games Store being the first app stores to be distributed through the Microsoft Store. Microsoft has shared that they are open to hosting Steam on the Microsoft Store as well. *See* Tom Warren, "Microsoft opens its Windows store up to third-party app stores," *The Verge*, September 28, 2021, available at, https://www.theverge.com/2021/9/28/22698196/microsoft-store-third-party-app-stores-epic-games-amazon.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

publishers."[374] Rami Ismail, independent game developer and co-founder of the games studio Vlambeer, considers Epic's entry "a very good thing for the industry."[375] Take-Two's CEO similarly praised Epic for opening their store stating that "[w]e see competition on the retail side to be a good thing. It just means more distribution."[376]

196. Epic's CEO Tim Sweeney testified that the "12 percent is intended to cover all Epic's variable operating costs" and that "Epic makes a gross profit on the variable cost associated with a new purchase."[377] Epic "decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment."[378] According to Sweeney, however, the Epic Games Store has operated at a loss, primarily due to the minimum guarantees provided to developers for exclusive distribution rights.[379] Other evidence suggests the store's unprofitability stems from upfront investments to enhance its offerings and capture market share, rather than its 12% commission being below variable costs.[380]

197. It is common for companies to sacrifice short-term profits in exchange for long-term growth, especially when entering a new market. Industry estimates suggest it takes on average two to three years for a start-up to become profitable,[381] though it can take much longer in high-tech sectors. For instance, Amazon and Uber took 9 and 14 years, respectively, to become

---

[374] Tomas Franzese, "Paradox Interactive CEO Thinks Competition from Epic Games Store Will 'Benefit Both Players and Game Publishers,'" *DualShockers*, November 12, 2019, available at, https://www.dualshockers.com/epic-games-store-benefits-players-paradox-interactive/

[375] PCGamesN, "Rami Ismail: We're seeing Steam bleed…that's a very good thing for the industry," March 20, 2019, available at, https://www.pcgamesn.com/rami-ismail-interview

[376] Pramath, "Take-Two CEO Talks About Epic Games Store And Alternate Launchers: We Want To Be Where The Customer Is," *GamingBolt*, February 6, 2019, available at, https://gamingbolt.com/take-two-ceo-talks-about-epic-games-store-and-alternate-launchers-we-want-to-be-where-the-customer-is

[377] Trial Testimony of Timothy Sweeney, May 3, 2021, 126:8-18.

[378] Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., *Epic Games, Inc. v. Apple, Inc.*, ¶ 490.

[379] Trial Testimony of Timothy Sweeney, May 3, 2021, at 126:19-23.

[380] Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., *Epic Games, Inc. v. Apple, Inc.*, ¶ 485. *See also* Trial Testimony of Steven Allison, at 1230:5–8, 1232:23-1233:1.

[381] Ellis Davidson, "The Average Time to Reach Profitability in a Start Up Company," *Chron*, April 9, 2019, available at, https://smallbusiness.chron.com/average-time-reach-profitability-start-up-company-2318.html

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

profitable.[382] The time frame depends on several factors, including the level of start-up capital required.[383] Economic principles further indicate that market entrants often face significant upfront fixed costs to operate efficiently, such as investments in facilities or development of digital content.[384] As a result, these firms may incur large initial losses as their investments gradually pay off.[385]

198. Given this evidence, it is reasonable to conclude that the entry of the Epic Games Store has increased competition in the PC game app market. Therefore, when estimating the commission rate in the competitive But-For World, Epic's 12% rate must be considered. Additionally, as I will discuss next, the commission rates charged by other third-party stores post-Epic's entry, such as the Microsoft Store's 12% rate, reflect heightened competition and should also be taken into account. However, excluding Epic and Microsoft's rates from the benchmark analysis would not affect the results, as I demonstrate later.

### 3.    The Microsoft Store

199. The Microsoft Store, formerly known as the Windows Store, was launched in 2012 as Microsoft's digital storefront for applications, including Windows PC games.[386] Initially, Microsoft charged a commission of 30% on developer sales, which decreased to 20% if sales exceeded USD

---

[382] Approve, "The Fastest Time To Profit," available at: https://www.approve.com/time-to-profit/. *See also*, Timothy Green, "Uber is Profitable. For Real This Time," *The Motley Fool*, August 2, 2023, available at: https://www.fool.com/investing/2023/08/02/uber-is-profitable-for-real-this-time/.

[383] Ellis Davidson, "The Average Time to Reach Profitability in a Start Up Company," *Chron*, April 9, 2019, available at, https://smallbusiness.chron.com/average-time-reach-profitability-start-up-company-2318.html

[384] N. Gregory Mankiw, *Principles of Economics,* Eighth Edition, (Cengage Learning, 2018), pp. 259-261.

[385] In microeconomics, firms can produce more efficiently with investment, which is often characterized as fixed costs. Since a firm cannot change fixed costs in the short-run, it realizes the benefits of production changes over time. As a result, a firm may have outsized losses in the short-run when the cost of changing production is incurred upfront, but the benefits are realized over time. N. Gregory Mankiw, *Principles of Economics*, Eighth Edition, (Cengage Learning, 2018), pp. 259-261.

[386] Jamie Keene, "Windows Store launches for Windows 8," *The Verge*, February 29, 2012, available at, https://www.theverge.com/2012/2/29/2832684/windows-8-store-announcement-mwc

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

25,000.[387] In 2015, Microsoft revised its policy to implement a uniform commission rate of 30%, regardless of gross receipts.[388] In October 2017, Microsoft introduced a new 15% commission rate for "non-Game subscriptions" and later expanded this revenue share to all non-game apps in 2019.[389] In 2021, Microsoft lowered its commission rate from 30% to 12% for game apps.[390] I use the headline rate of 12% applicable for game apps in my benchmarking calculations, as this rate reflects the increased competition brought by Epic's entry into the sale of Windows PC games.

### 4.  GOG.com

200. GOG.com – formerly Good Old Games – is another third-party game store.[391] Unlike other third-party game stores, GOG.com offers an extensive catalogue of classic PC games, often requiring considerable investment to ensure compatibility with modern PCs and to secure licensing rights. What sets GOG.com apart is its DRM-free (Digital Rights Management) gaming model, which lets users install games offline without requiring a connection to internet or a server, much like the traditional games consumers used to purchase.[392] GOG.com charges a 30% headline

---

[387] Brad Sams, "Starting Jan 1st, Microsoft's app store policy change makes it less attractive for developers," *Neowin*, November 20, 2014, available at, https://www.neowin.net/news/starting-jan-1st-microsoft039s-app-store-policy-change-makes-it-less-attractive-for-developers/

[388] Brad Sams, "Starting Jan 1st, Microsoft's app store policy change makes it less attractive for developers," *Neowin*, November 20, 2014, available at, https://www.neowin.net/news/starting-jan-1st-microsoft039s-app-store-policy-change-makes-it-less-attractive-for-developers/

[389] Microsoft Store, "App Developer Agreement," July 10, 2020, available at, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4o4bH. Microsoft also experimented with a 95/5 model for sales of non-games generated through developers' own promotions – this program was discontinued in early 2020. *See* João Cassasqueira, "Microsoft is apparently canceling its 95% revenue share program [Update]," *Neowin*, January 15, 2020, available at, https://www.neowin.net/news/microsoft-is-apparently-canceling-its-95-revenue-share-program/.

[390] Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge*, April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/

[391] *See* Konvoy, "Deep Dive: PC Distribution Platforms," December 17, 2021, available at, https://www.konvoy.vc/newsletter/deep-dive-pc-distribution-platforms

[392] Volkan Bozkaya, "Show Me the Money: How to Pick the Best PC Marketplace for Your Game," *Medium*, October 25, 2023, https://medium.com/@volkan.bozkaya/show-me-the-money-how-to-pick-the-best-pc-marketplace-for-your-game-dcce05ec33af.

commission rate, [393] at least partially due to its highly differentiated game offerings and greater distribution costs. For GOG.com, I use its headline rate of 30% since inception in my calculations.

### 5.     Other Third-Party PC Games Stores

201.  There are also several smaller third-party PC games stores. For example, itch.io focuses on independent game developers, operating on a "pay what you want" model. Besides paying a payment processing fee, developers can choose what percentage of revenue to share with the store, with the default set at 10%.[394] Game Jolt uses a similar "pay-what-you-choose" model, though its commission rate is capped at 10%.[395] The Humble Store, operated by Humble Bundle, charges a 25% commission but keeps only 15%, allocating the remaining 10% to users in "Humble Rewards," which can be used for future purchases or donated to charity.[396] In the absence of data on effective commission rates for most small third-part PC game stores, I conservatively assume a 30% commission for all smaller stores, even though the rate charged by the identified smaller stores are substantially lower.[397]

---

[393]  *See* Dom Peppiatt, "Most developers think Steam's 30% revenue cut is unjustified," *VG247*, April 29, 2021,     available     at,     https://www.vg247.com/steam-30-percent-revenue-cut-unjustified-developer-survey

[394]  Leaf Corcoran, founder of itch.io, stated, "I want them [(developers)] to feel okay to put [the percentage] at zero," and noted that most developers set the split at 8%. Patricia Hernandez, "The game store that outshines Steam by staying small and weird," *The Verge*, November 29, 2018, available at, https://www.theverge.com/2018/11/29/18118217/itchio-steam-leaf-corcoran-pc-games-indie.     This revenue share does not include payment processing fees which the developers incur. *See* Itch.io, "Accepting Payments and Getting Paid," available at, https://itch.io/docs/creators/payments#open-revenue-sharing

[395]  Game Jolt, "This is How it Works…," available at, https://gamejolt.com/marketplace

[396]  Humble     Bundle,     "Humble     Bundle     Developer     Resources,"     available     at, https://www.humblebundle.com/developer

Humble     Bundle,     "Humble     Rewards,"     available     at,     https://support.humblebundle.com/hc/en-us/articles/360019314334-Humble-Rewards.
Humble Choice members receive a growing discount for applicable store purchases, ranging from 10% to 20%.

Humble     Bundle,     "Humble     Choice     -     Perk:     Growing     Store     Discount,"     available     at, https://support.humblebundle.com/hc/en-us/articles/360026249173

[397]  I estimate the revenues attributable to all other third-party stores in Appendix F, Section L, and in the workpaper "estimate_remainder.R".

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### C.    SELF-DISTRIBUTING COSTS OF DIRECT-TO-CONSUMER STORES

202.    Direct-to-consumer game stores are a key part of Windows PC game sales, typically run by publishers or developers to distribute their own titles exclusively. These stores enable publishers and developers to avoid the high commission fees imposed by Steam and other third-party platforms.[398] Beyond acting as storefronts, direct-to-consumer platforms often provide a variety of features such as social networking, multiplayer gaming, in-game rewards and subscription services that enhance customer engagement and satisfaction.[399] Estimates from Microsoft suggest that, in 2019, direct-to-consumer sales accounted for over ███ of global PC game sales, while third-party stores accounted for only ███ of sales.[400]

---

[398]    Samuel Horti, "Is It Worth Cutting Out Steam to Sell Indie Games Direct?" *PC Gamer*, available at, https://www.pcgamer.com/is-it-worth-cutting-out-steam-to-sell-indie-games-direct/. This is true even when developers sell Steam keys that would allow customers to later redeem the game on Steam. Steam keys are a "convenient tool for game developers to sell their game on other stores and at retail. Steam keys are free and can be activated by customers on Steam to grant a license to a product." *See* Steam, "Steam Keys (Steamworks Documentation)," available at, https://partner.steamgames.com/doc/features/keys. For example, the Humble Widget gives developers an option to distribute their game via Steam or direct download, bypassing Steam keys entirely. *See* Humble Support, "Widget Developer FAQ," available at, https://support.humblebundle.com/hc/en-us/articles/202742190-Widget-Developer-FAQ. The Epic Games Store also provides keys that allow consumers to redeem games purchased from other stores on the Epic Games Store. *See* Epic Games Store Developer Documentation, "Access Keys," available at, https://dev.epicgames.com/docs/epic-games-store/access-keys. *See also* Humble Support, "How to Redeem an Epic Games Key," available at, https://support.humblebundle.com/hc/en-us/articles/360020257973-How-to-Redeem-an-Epic-Games-Key.

[399]    For example, Ubisoft's proprietary gaming client Uplay enhanced Ubisoft's game offerings. Moreover, Ubisoft Club, linked to a player's Uplay account, offered in-game rewards to drive player engagement. It also offered a monthly subscription service called Uplay+, which gave players access to over a hundred Ubisoft titles. Ubisoft later revamped Uplay into Ubisoft Connect, a similarly integrated platform for distribution, reward incentives, and subscription offerings. *See* Matt Purslow, "Ubisoft Announces Uplay+ Subscription Service for PC - E3 2019," *IGN*, June 10, 2019, available at, https://www.ign.com/articles/2019/06/10/ubisoft-announces-uplay-subscription-service-for-pc-e3-2019; Andy Chalk, "The Ubisoft Club, Ubi's new online rewards program, opens its doors," *PC Gamer*, October 19, 2015, available at, https://www.pcgamer.com/the-ubisoft-club-ubis-new-online-rewards-program-opens-its-doors/. Alissa McAloon, "Ubisoft Connect announced as a 'refreshed' replacement for Uplay and Ubisoft Club," *Game Developer*, October 21, 2020, available at, https://www.gamedeveloper.com/console/ubisoft-connect-announced-as-a-refreshed-replacement-for-uplay-and-ubisoft-club.

Battle.net also offers communication and social networking features that allow players to connect via the platform. *See* Activision Blizzard, Inc., "Form 10-K, Annual Report for the year ended December 31, 2019," p. 6, available at, https://investor.activision.com/static-files/e610f6ff-cdf2-4f92-b373-4df046a590bb.

[400]    MSFT_EPIC_00000093, p. 17.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

203. Direct-to-consumer stores compete directly with third-party stores like Steam by offering exclusive games that attract consumers to their proprietary storefront. Third-party PC games stores recognize the competitive pressure from these direct-to-consumer stores. For instance, Valve, the owner of Steam, has acknowledged that it competes with direct-to-consumer stores such as Activision Blizzard's Battle.net, EA's Origin and Ubisoft Connect.[401] Similarly, Epic's CEO Tim Sweeney has testified that the Epic Games Store views proprietary stores run by publishers as competitors in the PC and Mac markets.[402]

204. While direct-to-consumer stores do not pay commission fees to third-party platforms, they still incur variable costs when selling directly to consumers, which effectively function as a commission rate on their sales. In fact, when self-distributing, game publishers and developers replace paying sales-based commissions to third-party stores with incurring their own variable self-distribution costs. These costs typically include expenses associated with operating their own game store, such as server maintenance, payment processing fees and content delivery network charges.[403] Therefore, I consider the variable costs of self-distribution, expressed as a percentage of total sales, to be the effective commission rate for direct-to-consumer stores.

205. I rely on two different approaches based on market data to determine self-distribution costs, both indicating that the effective commission rate for direct-to-consumer sales is less than 10%:[404]

   a. First, I can provide an upper bound for this effective commission rate based on the fees charged by companies like Humble Widget, which help app publishers or developers sell their

---

[401] Defendant Valve Corporation's Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint, *Wolfire Games, LLC, v. Valve Corporation*, Case No. 2:21-cv-00563-JCC, September 17, 2021, ECF No. 37, 10:8-15.

[402] Trial Testimony of Timothy Sweeney, May 3, 2021, at 94:22–95:2.

[403] For example, third-party digital delivery services such as the Humble Widget provide digital content delivery and payment processing. *See* Humble Widget, "Payment, delivery, and support. We have you covered," available at, https://www.humblebundle.com/developer/widget

[404] See Workpaper "Benchmark Estimate 2019.xlsx."

114

games on their own websites.[405] Humble Widget charges 5% of total sales, net of a 5% payment processing fee, resulting in an effective commission rate of 9.75%.[406] This is a conservative estimate of self-distribution costs, as developers with variable costs below 9.75% may choose to build their own direct-to-consumer stores, while those with higher costs can use third-party services like Humble Widget to cap their variable costs at 9.75%.

b.  Alternatively, I can estimate the effective commission rate for direct-to-consumer stores using Epic Store's variable costs as a proxy, as it is the only third-party app store for which I have reliable cost data. Based on internal documents from Epic, payment processing fees account for 5.3% of total revenues, hosting costs for 1%, and variable marketing and labor expenses for approximately 3% more.[407] In total, Epic Games Store's variable costs amount to 9.36% of total revenues. This is slightly lower than the effective commission rate charged by third-party delivery services, which supports the idea that 9.75% serves as an upper bound for the effective commission rate for direct-to-consumer stores.

206.  After criticizing Prof. McFadden's benchmarking analysis for cherry-picking storefronts in the first round of class certification briefing, Apple's experts then advocated for excluding direct-to-consumer stores from the benchmark analysis during the second round of class certification

---

[405]  The Humble Widget, offered by Humble Bundle since at least 2015, enables developers to add a widget directly to their website to sell their games. *See* Alex Wawro, "Reinvigorated Humble Widget lets devs offer in-browser game demos," *Game Developer*, February 25, 2015, available at, https://www.gamedeveloper.com/business/reinvigorated-humble-widget-lets-devs-offer-in-browser-game-demos. *See also* Humble Bundle, "Humble Bundle Developer Resources," available at, https://www.humblebundle.com/developer.

In 2016, Humble Bundle launched Humble Gamepages, which allow developers to create and customize their website incurring no additional fees beyond the 5% cut Humble Bundle already takes from sales through its widget. *See* Alex Wawro, "Humble launches Gamepages to give devs a website for their Humble Widgets," *Game Developer*, July 18, 2016, available at, https://www.gamedeveloper.com/business/humble-launches-gamepages-to-give-devs-a-website-for-their-humble-widgets.

[406]  Humble Support, "Widget Developer FAQ," available at, https://support.humblebundle.com/hc/en-us/articles/202742190-Widget-Developer-FAQ

[407]  Workpaper "Benchmark Estimate 2019.xlsx," tab "EGS Variable Cost." I understand that some Epic projections consider only hosting and payment processing fees as variable costs. See, e.g., EPIC_03964638, tab "P&L"; EPIC_04349601, tab "2018-2023" under D2C (Direct-to-consumer). As such, my variable cost estimates, which include (in addition to hosting and payment processing costs) the variable portions of marketing and labor costs, are likely conservative. This is also consistent with Prof. Economides's analysis of the Epic Games Store's variable cost. See Economides Report, ¶ 38.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

briefing, albeit for different reasons. This inconsistency among Apple's experts highlights the meritless nature of their arguments, as excluding direct-to-consumer stores also constitutes a cherry-picking exercise.[408]

a.  Prof. Schmalensee claimed that direct-to-consumer stores should be excluded from the analysis because they are not two-sided platforms.[409] He argued that these stores lack certain services provided to consumers and developers, suggesting they are not comparable to two-sided platforms.[410] Prof. Schmalensee used this alleged absence of services to claim that direct-to-consumer stores have "lower costs" and should therefore be excluded.[411] However, direct-to-consumer storefronts do offer features to their users, including social networking, in-game rewards, game recommendations and subscription services.[412] Prof. Schmalensee admitted that he has conducted no analysis to support the claim that one-sided storefronts have lower costs than two-sided platforms.[413] Moreover, there is no principled reason to limit the benchmark to only the highest-cost firms in the marketplace, particularly where they demonstrably face competition from lower-cost firms.

---

[408]  Hitt Second Class Report, ¶ 270. Schmalensee Second Class Report, ¶ 102.

[409]  Schmalensee Second Class Report, ¶ 103. ("A benchmarking approach to estimating the but-for world commission rate for two-sided platforms should be based on other two-sided platform benchmarks. […] DTC vendors primarily sell their own games and are not two-sided platforms comparable to the App Store.").

[410]  Schmalensee Second Class Report, ¶ 104.

[411]  Schmalensee Second Class Report, ¶ 104. ("It is simple economics, which Dr. Abrantes-Metz chooses to ignore, that vendors that do not need to offer services to developers, and only provide some limited services to consumers, have lower costs compared to the App Store and other two-sided transaction platforms. […] Comparing the cost of self-distribution to the App Store's commission rate highlights Dr. Abrantes-Metz's failure to take seriously the two-sided nature of the App Store in any of her analyses of the but-for commission rate."). *See also* Apple's Daubert Motion (2023), 30:15-26, citing to Schmalensee Second Class Report, ¶ 104.

[412]  See footnote 399.

[413]  Schmalensee Deposition (April 2023), 195:14-19. ("Q. Have you done any analysis to compare the cost incurred by stores with direct-to-consumer sales for -- only for the store's own apps, versus the costs to stores with third-party sales? A. I could tell you what the nature of the costs are, but I haven't tried to quantify them.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

b.  Prof. Hitt concedes that third-party stores "compete in the presence" of direct distributors,[414] but paradoxically cites this as a reason to exclude direct-to-consumer stores from the analysis.[415] He claimed that the commission rates charged by third-party stores "already reflect competition" from direct distributors.[416] While this is obviously true according to basic economic principles,[417] it does not logically support the exclusion of direct-to-consumer stores. When a third-party store sets its commission rate, it considers the pricing and services offered by all competitors, including direct-to-consumer stores, but this does not justify excluding those direct stores from the analysis. In fact, during his deposition, Prof. Hitt acknowledged that the Microsoft Store's 12% commission rate in 2021 "reflects competition" with Steam.[418] If we accept his logic, Steam should also be excluded from the benchmark analysis. Ultimately, such reasoning could lead to the arbitrary exclusion of any storefront, or even set of storefronts, based merely on the researcher's convenience, undermining the integrity of the entire analysis.

c.  The defendants further argued that direct-to-consumer stores should be excluded from the analysis on the grounds that they do not charge a commission rate.[419] This perspective reflects a fundamental misunderstanding of economics. For instance, a homeowner choosing to repair

---

[414]  Hitt Second Class Report, ¶ 316. ("[T]he best measure of the but-for commission rate […] charged by other app transaction platforms in the actual world that *compete in the presence of direct distribution* […] Third–party distribution is not the same as direct distribution and these two modes of distribution can, and have, coexisted for decades.").

[415]  Hitt Second Class Report, ¶ 316. ("[T]he supposed costs of direct distribution should not be used in any benchmark analysis to […] support the but-for commission rate."). Moreover, in both the Hitt First Class Report and Hitt Second Class Report, Prof. Hitt argues that direct distribution is part of the market for game and video streaming apps. Hitt First Class Report, ¶¶ 249-250 and Appendix D ¶ 92; and Hitt Second Class Report, ¶ 352.

[416]  Hitt Second Class Report, ¶ 316. ("Thus, the commission rates charged by Windows PC game app transaction platforms such as the Epic Games Store, Steam, and the Microsoft Store, *already reflect competition with direct distribution.*").

[417]  N. Gregory Mankiw, *Principles of Economics,* 8th Edition (Cengage Learning, 2018), p. 320.

[418]  Hitt Deposition (April 2023), 269:18-23. ("Q. And so what I'm asking you is this: Does the commission rate charged on the Microsoft Store already reflect competition with Steam? A. Yes. They do -- it does reflect competition with Steam[.]").

[419]  Apple's Daubert Motion (2023), 30:15-19. ("[Abrantes-Metz] also dramatically skews the average rate downward by including sales from direct-to-consumer stores—i.e., stores that only sell a producer's own games, not games made by third parties—which (unlike the stores in her 'model') are not two-sided platforms, face significantly lower costs, and do not even charge commission rates.").

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

her own staircase instead of hiring a carpenter does not incur a monetary charge, but she still faces costs related to the repair. In the same way, a developer can opt to distribute through a third-party store and pay an explicit commission or self-distribute, which also incurs costs. These costs represent the effective commission rate for self-distribution. Since direct-to-consumer stores involve costs for distribution, excluding them from my benchmark analysis is economically unfounded.

207. In addition to advocating for the exclusion of direct-to-consumer stores, Prof. Hitt criticized my calculations of direct distribution costs, claiming that I assumed all direct-to-consumer storefronts incur the same distribution costs.[420] This critique mischaracterizes my economic rationale. The fees charged by platforms like Humble Widget provide a reasonable and conservative upper bound for self-distribution costs. The principle of revealed preference supports this argument: If a developer can self-distribute more efficiently in-house than it can distribute through a provider, it is free to do so.  Developers are likely to choose Humble Widget or Xsolla if and only if these options are less expensive than self-distributing. Therefore, the self-distribution costs for developers who do not use these services should logically be lower than the costs associated with using these external platforms. By applying the Humble Widget rate to all self-distributing store, I account for a higher effective commission rate than if I were to examine individual developer costs. Notably, no expert from Apple has refuted this analysis, either by putting forward an empirical study of self-distribution costs, or by attacking the economic logic; they merely ignore it.

208. Lastly, Prof. Hitt claimed that because Humble Widget and Xsolla provide lower visibility and search functionality than the Apple App Store, app developers would have to incur additional costs to make consumers aware of their apps distributed using these third-party digital delivery services.[421] However, it is unclear that the Humble Widget and Xsolla do in fact provide lower visibility and search functionality than the Apple App Store. Prof. Hitt did not provide any evidence or analysis to support this premise. In fact, some developers pay for "sponsored app advertisements" to market their apps on the Apple App Store, on top of the 30% commission

---

[420]  Hitt Second Class Report, ¶¶ 318-319.
[421]  Hitt Second Class Report, ¶ 321.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

fee.[422] Dr. Michael Cragg, an expert in Epic v. Apple, found that "sponsored ads are massively profitable for Apple, generating $15 million per week in 2020 in the United States, and $28 million per week globally."[423]

209. In what follows, I provide a brief overview of the direct-to-consumer stores included in my analysis. I consider not only major direct-to-consumer stores such as Battle.net and Origin, as Prof. Economides did in his own analysis, but also a variety of smaller direct-to-consumer stores that collectively account for a significant share of PC game sales.[424]

### 1.    Battle.net Operated by Activision Blizzard

210. Activision Blizzard, one of the top ten gaming companies by revenue, operates Battle.net to distribute most of Blizzard's content and selected Activision titles directly to PC consumers.[425] Battle.net has millions of active players and ranks among the largest online game platforms globally.[426] Major titles like Call of Duty (from November 2017 onward), World of Warcraft, Destiny 2 and Diablo have either been exclusively released on Battle.net or relied heavily on it for

---

[422]  Expert Rebuttal Report of Michael I. Cragg, Ph.D., *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), March 15, 2021 ("Cragg Rebuttal Report, Epic Games, Inc. v. Apple Inc."), ¶ 148. ("Professor Hitt claims that commission rates have decreased over time; but he does not address whether the all in *price* has decreased. As such, I consider not just the commission rate, but the *effective commission rate*, which I define as the percent of all app revenues that developers pay to Apple, has in fact increased substantially over time. One factor contributing to this increase is Apple's introduction of 'sponsored app advertisements' in the App Store.").

[423]  Cragg Rebuttal Report, Epic Games, Inc. v. Apple Inc., ¶ 150.

[424]  Economides Report, Table 4.

[425]  Newzoo, "Top 25 Public Companies by Game Revenues," available at, https://newzoo.com/insights/rankings/top-25-companies-game-revenues/; Activision Blizzard, Inc., Annual Report 2021, p. 7. Language in Activision Blizzard's annual report confirms that effectively all of Blizzard's games are dependent on Battle.net, along with some Activision titles. "The risk is particularly pronounced with respect to: […] (2) the functioning of our proprietary online gaming service, Blizzard Battle.net, the disruption of which could prevent Blizzard from delivering content digitally or render all of Blizzard games, as well as selected Activision content for the PC platform, unavailable; […]". *See* Activision Blizzard, Inc., "Form 10-K, Annual Report for the year ended December 31, 2020," p. 20, available at, https://investor.activision.com/static-files/09bb50e3-b2e8-4407-9ee3-2aec3c7bc29d.

[426]  Activision Blizzard, Inc., Annual Report 2019, p. 6, available at, https://investor.activision.com/static-files/e610f6ff-cdf2-4f92-b373-4df046a590bb.

distribution.[427] Industry reports highlight that such exclusivity helps avoid commission fees charged by third-party stores.[428]

### 2.    Origin Operated by Electronic Arts

211.    Electronic Arts (EA), another top ten gaming company by revenue, publishes popular titles such as Star Wars, The Sims, Apex Legends, and sports franchises like FIFA, Madden NFL, and NBA Live under its EA Sports label.[429] In 2011, EA launched Origin, a digital platform for users to download and play EA and selected third-party games directly.[430] Industry observers noted that EA created Origin in part to bypass Steam's commission on digital sales, [431] leading EA to withhold

---

[427]    Chaim Gartenberg, "Destiny 2 will exclusively be available on PC through Blizzard's Battle.net," *The Verge*, May 18, 2017, available at, https://www.theverge.com/2017/5/18/15659404/destiny-2-battlenet-blizzard-activision-exclusive-pc-online-gameplay. After November 2017 and before the upcoming October 2022 all new releases of Call of Duty have been exclusive to Battle.net. *See* Wesley Yin-Poole, "Five years later, Call of Duty returns to Steam with Modern Warfare 2," *Eurogamer*, June 8, 2022, available at, https://www.eurogamer.net/five-years-later-call-of-duty-returns-to-steam-with-modern-warfare-2. *See also* Surej Singh, "'Call of Duty: Black Ops Cold War' will be a Battle.net exclusive for PC," *NME*, August 24, 2020, available at, https://www.nme.com/news/gaming-news/call-of-duty-black-ops-cold-war-will-release-exclusively-on-battle-net-for-pc-2735762. New Call of Duty releases are expected to return to Steam in October 2022. *See also* Liam Mackay, "Activision could bring more games to Steam ahead of Modern Warfare 2," *Charlie Intel*, July 18, 2022, available at, https://charlieintel.com/activision-could-bring-more-games-to-steam-ahead-of-modern-warfare-2/187225.

[428]    Brendan Sinclair, "Destiny 2 PC exclusive to Battle.net," *Games Industry.biz*, May 18, 2017, available at, https://www.gamesindustry.biz/destiny-2-pc-exclusive-to-battle-net.

[429]    Newzoo, "Top 25 Public Companies by Game Revenues," available at, https://newzoo.com/insights/rankings/top-25-companies-game-revenues/; Electronic Arts, "Featured PC Games," available at, https://www.ea.com/games/library/pc-download.

[430]    Shaun Prescott, "The most popular desktop gaming clients, ranked," *PC Gamer*, July 5, 2019, available at, https://www.pcgamer.com/the-most-popular-desktop-gaming-clients-ranked/; Origin was retired in 2020 and replaced by the EA Desktop App. *See* Jon Porter, "EA's Origin client to become EA desktop app," *The Verge*, September 15, 2020, available at, https://www.theverge.com/2020/9/15/21437680/ea-origin-desktop-app-play-access-premier-pro-steam-battlenet. Electronic Arts launched Origin to primarily distribute its own gaming content. *See* Andrew Katkin, "Electronic Arts Launches Origin," *Electronic Arts*, June 3, 2011, available at, https://www.ea.com/news/electronic-arts-launches-origin.

[431]    Jeff Grubb, "Why Electronic Arts games are coming back to Steam (probably)," *Games Beat*, October 28, 2019, available at, https://venturebeat.com/pc-gaming/why-electronic-arts-games-are-coming-back-to-steam-probably/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

major titles from Steam for nearly a decade.[432] While EA games returned to Steam in November 2019, [433] Origin continues to serve as a direct digital distribution platform for EA's games.[434]

### 3.    Uplay/Ubisoft Connect Operated by Ubisoft

212.    Ubisoft, known for franchises like Assassin's Creed and Tom Clancy's Rainbow Six, launched its Uplay client and digital storefront in 2012, later rebranding it as Ubisoft Connect in 2020.[435] Like EA, Ubisoft's direct-to-consumer platform enabled the company to bypass Steam's commission fees. As an example, in 2019, Ubisoft released its flagship title, Tom Clancy's The Division 2, exclusively on Uplay and the Epic Games Store.[436] Ubisoft's CEO, Yves Guillemot, explained their decision to bypass Steam, stating that "we seized an opportunity to increase player exposure to our own store" while taking advantage of Epic's "materially better terms."[437]

### 4.    Take-Two Interactive

213.    Take-Two Interactive, a video game holding company, owns subsidiaries that publish popular series like Civilization, Grand Theft Auto and NBA 2K.[438] Take-Two sells its PC games through

---

[432] Jeff Grubb, "Why Electronic Arts games are coming back to Steam (probably)," *Games Beat*, October 28, 2019, available at, https://venturebeat.com/pc-gaming/why-electronic-arts-games-are-coming-back-to-steam-probably/.

[433] Brendan Sinclair, "EA returns to Steam," *Games Industry.biz*, October 29, 2019, available at, https://www.gamesindustry.biz/ea-returns-to-steam.

[434] Imogen Beckhelling, "It's official - EA is returning to Steam," *Eurogamer*, October 29, 2019, available at, https://www.eurogamer.net/its-official-ea-is-returning-to-steam.

[435] Ubisoft, "2019 Universal Registration Document and Annual Report," p. 14, available at, https://staticctf.akamaized.net/8aefmxkxpxwl/5bzFRXK7RgTlv2p3EGnaXd/04f0efdee8bdab3a82035a002448083d/DDR_VA_FINAL.pdf. Uplay hosted games by other publishers. Alissa McAloon, "Ubisoft Connect announced as a 'refreshed' replacement for Uplay and Ubisoft Club," October 21, 2020, available at, https://www.gamedeveloper.com/console/ubisoft-connect-announced-as-a-refreshed-replacement-for-uplay-and-ubisoft-club.

[436] Joao Silva, "Ubisoft games might be coming back to Steam," *TechSpot*, November 30, 2021, available at, https://www.techspot.com/news/92433-ubisoft-games-might-coming-back-steam.html.

[437] Sherif Saed, "Ubisoft explains why The Division 2 ditched Steam, says PC pre-orders already beating original game," *VG247*, February 15, 2019, available at, https://www.vg247.com/the-division-2-pc-pre-orders-high-despite-skipping-steam.

[438] Take-Two Interactive Software, Inc., "Form 10-K, Annual Report for the year ending March 31, 2020," p. 3, available at, https://taketwointeractivesoftwareinc.gcs-web.com/static-files/02781927-7af1-4ce4-811b-a759024ca289.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

its website via Steam Keys, Epic Games Keys or direct downloads, as it does not have a dedicated launcher.[439] However, its subsidiary Rockstar Games launched a direct distribution storefront and launcher where new titles are first released exclusively.[440] CEO Strauss Zelnick emphasized that Take-Two Interactive's distribution strategy focuses on maximizing customer access, therefore relying on both third-party platforms and direct-to-consumer channels.[441]

### 5.    Other Direct-to-Consumer Stores

214.  In addition to the direct-to-consumer stores mentioned above, other publishers and developers sell their games directly to consumers through their own website.[442] For those opting to outsource online distribution, services like Humble Widget and Xsolla offer payment processing, customer support and other auxiliary functions in exchange for a percentage of sales.[443] My estimates suggest that these direct-to-consumer sales represent a significant portion of PC game sales in North America.[444] Riot Games serves as a prominent example of a direct-to-consumer distributor,

---

[439]  For example, 2K, a subsidiary of Take-Two Interactive, sells PC games such as Civilization VI, Borderlands 3, and NBA 2K23 on its online store. 2K fulfills these purchases by distributing a Steam or Epic Games game key to the buyer. For some games, 2K offers direct download to a user's PC. *See, e.g.* 2K, "Sid Meier's Civilization VI," available at, https://store.2k.com/game/buy-civilization-6. A subsidiary of Take-Two Interactive, 2K distributes its own gaming content via the 2K Store. *See* 2K, "2K Store," *Internet Archive Wayback Machine*, January 2, 2019, https://web.archive.org/web/20190102144411/http:/store.2k.com/store/Tk22k/list/categoryID.6780150 0/size.25/sort.ranking ascending/includeVariations.true/facetFilterName.platform/facetFilterQuery.PC.

[440]  Vitor Braz, "How to preload Red Dead Redemption 2 PC," *Game Revolution,* October 30, 2019, available at, https://www.gamerevolution.com/guides/611579-red-dead-redemption-2-pc-pre-load-available.

[441]  Christopher Dring, "Take-Two CEO on Epic Store: Competition is a good thing," *Games Industry.biz*, February 6, 2019, available at, https://www.gamesindustry.biz/articles/2019-02-06-take-two-ceo-on-epic-store-competition-is-a-good-thing.

[442]  Some developers provide users with the option to buy their games via the developer's website using a "Buy on Humble" button. *See, e.g.* Subset Games, "Into the Breach," available at, https://subsetgames.com/#.

[443]  Humble Bundle, "Humble Bundle Developer Resources," available at, https://www.humblebundle.com/developer; Xsolla, "Connect Directly With Your Players, From The Start," available at, https://xsolla.com/solutions/online-game-sales?cardId=166; Xsolla, "One Price For Everything. 5% of Transactions + Cost of Channel," available at, https://xsolla.com/products/in-game-store/pricing. The micro game studio Subset Games uses the Humble Widget to self-distribute its game "Into The Breach" through its own website. *See* Subset Games, "Into The Breach," available at, https://subsetgames.com/#.

[444]  See Workpaper "Benchmark Estimate 2019.xlsx."

publishing the strategy game League of Legends, which alone generated USD 1.5 billion globally in 2019.[445] Until 2021, the only platform for playing League of Legends was Riot Games' dedicated launcher.[446] Another notable example is Square Enix, a video game and entertainment conglomerate whose Massive Multiplayer Online (MMO) titles earned USD 361 million globally in 2020.[447] While these titles are available on Steam, they can also be downloaded directly from Square Enix's website.[448]

### D.    AVERAGE COMMISSION RATE

215. This Section presents the findings from my benchmark analysis of Windows PC game app sales in North America for 2019 – the latest year with comprehensive data not affected by the pandemic. I calculate the average commission rate by considering the commission rates of all third-party stores and the estimated self-distribution costs for all publishers or developers who sell apps directly to consumers ("direct-to-consumer stores"). The average is weighted by each store's PC game app sales, ensuring the result reflects the market size of different players. This weighted average represents the effective commission paid by developers per dollar spent by consumers on Windows PC games. Two key inputs are required for this calculation: the PC game app sales of each store and their effective commission rates.

---

[445]    Jessica Clement, "League of Legends (LoL) revenue worldwide from 2015 to 2020," *Statista*, January 2021, available at, https://www.statista.com/statistics/806975/lol-revenue/.

[446]    Carrie Talbot, "League of Legends heads to the Epic Games Store," *PCgamesN,* November 4, 2021, available at, https://www.pcgamesn.com/league-of-legends/epic-games-store.

[447]    Square Enix reported 40.1 billion Japanese yen in revenues from "Digital Entertainment – MMO" for FY 2020. *See* Square Enix, "Outline of Financial Results Briefing by Square Enix Holdings," May 13, 2020, p. 3, available at, https://www.hd.square-enix.com/eng/ir/library/pdf/20q4outline.pdf. Conversion of JPY to USD based on March 20, 2020 conversion rate of 0.009009 JPY to 1 USD. *See* Exchange Rates.org, "Japanese Yen (JPY) to US Dollars (USD) exchange rate for March 20, 2020," available at, https://www.exchange-rates.org/Rate/JPY/USD/3-20-2020.

[448]    Square Enix Store, "Square Enix Store," *Internet Archive Wayback Machine*, December 3, 2019, available at, https://web.archive.org/web/20191203103737/https://store.na.square-enix-games.com/en_US/. Square Enix games available for download from its store included the Final Fantasy VII and XIV installments, and Dragon Quest Builders 2. *See* Square Enix, "Final Fantasy VII Remake," available at, https://ffvii-remake.square-enix-games.com/en-us, Square Enix, "Final Fantasy XIV," available at, https://na.finalfantasyxiv.com/shadowbringers/, Square Enix, "Dragon Quest Builders 2," available at, https://dragonquest.square-enix-games.com/builders2/en-us/home/.

a. *Commission rates:* For third-party stores, I calculate their effective commission rate when data is available and rely on their headline commission rates otherwise, as detailed in Section VI.B. For direct-to-consumer stores, the effective commission rate reflects the variable costs of self-distribution, which I estimate using fees charged by off-the-shelf developer tools, such as Humble Widget. These fees represent an upper bound for self-distribution costs for direct-to-consumer stores, as explained in Section VI.C. As an alternative, I also estimate the effective commission rate of direct-to-consumer stores as the variable costs of the Epic Games Store. In cases where a store distributes both third-party and its own games, I apply the effective or headline commission rate for third-party sales and the direct-to-consumer rate for the sales of its own games.

b. *Sales of PC game apps*: To estimate the sales of PC game apps for each store, I rely on a variety of figures from documentary evidence and public sources.[449] Recognizing that the relevant geographic market is the US, I focus on revenue data for North America, [450] as this is the closest level of reporting in documents and financial disclosures.[451] Since to my knowledge no complete census of North American Windows PC game stores exists, I apply established econometric techniques to allocate sales to third-party and direct-to-consumer stores.[452] While the available data do not distinguish sales by operating system (e.g. Windows vs. macOS), this is unlikely to affect the results meaningfully, as macOS accounts for a small portion of PC gamers and third-party stores generally apply the same commission rates

---

[449]  See workpaper "Benchmark Estimate 2019.xlsx.

[450]  Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-06714-YGR (N.D. Cal.), September 17, 2020, ECF No. 229, Ex. A, ¶ 62.

[451]  Given Canada's much smaller PC gaming market, excluding Canadian sales would not have a material impact on my estimates. According to the Newzoo Global Games Market Report, PC game sales in Canada accounts for less than 8% of North America sales in 2019. *See* APL-EG_06093173, tab "Digital-Boxed Breakdown". In 2019, Canadian PC digital game revenue were $0.42 billion and North American PC game revenue were $5.61 billion, hence, Canada accounted for 7.5% of revenues.

Apple Expert Prof. Hitt has criticized Prof. Economides's inclusion of China-based yardsticks and pointed out the large impact WeGame has on the estimated effective commission rate. I exclude the direct-to-consumer store WeGame that predominantly operates in China in my analysis. *See* Hitt First Class Report, ¶ 159.

[452]  See in Appendix F, Section L, and Workpaper "estimate_remainder.R".

across platforms.[453] For instance, macOS and other non-Windows users made up less than 5% of Steam's user base in August 2022.[454]

216. Figure 1 presents the PC game stores included in my benchmark analysis, along with their North American sales for 2019 and respective commission rates. Based on these inputs, I estimate an average commission rate of approximately 14% when accounting for all stores, which aligns to the 13.63% But-For commission rate from my economic model. However, as discussed in Section VI.B.1, Steam is not as a valid benchmark due to potential anticompetitive conduct that could have allowed it to charge a supracompetitive commission. Thus, the average commission rate calculated with Steam included is likely conservative. Excluding Steam, the weighted average commission rate would have been around 10%, lower than the 13.63% But-For rate from my model. This confirms that the benchmark analysis, grounded in observed data from a more competitive market, supports the conclusion that the model-based But-For commission rate is both realistic and conservative.

217. During class certification, Apple's experts repeatedly mischaracterized my benchmark analysis, most notably in their claims that I excluded Steam from my calculations.[455] While I explain that Steam should be excluded based on principle, both this report and my opening report for class certification calculate the average commission rate for all third-party and direct-to-consumer

---

[453] Across all PC users, Windows held between 91% and 70% of the operating system market share globally from January 2013 and June 2022, compared to macOS's share ranging from 7% to 19%. *See* Statista, "Global market share held by operating systems for desktop PCs, from January 2013 to June 2022," July 27, 2022, available at: https://www.statista.com/statistics/218089/global-market-share-of-windows-7/.

The Steam gaming platform operates both on Windows and Mac operating systems, however Steam's distribution agreement with developers does not specify different commissions according to the operating system. *See* Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838. Similarly, Epic Games Store is available both on PC and Mac and does not differentiate the commission it charges developers by platform. *See* Epic Games Store, "Frequently asked questions," August 18, 2021, available at, https://www.epicgames.com/site/en-US/epic-games-store-faq.

[454] Steam, "Steam Hardware & Software Survey: January 2025", available at https://store.steampowered.com/hwsurvey/Steam-Hardware-Software-Survey-Welcome-to-Steam.

[455] Hitt Second Class Report, ¶ 310. *See also* Schmalensee Second Class Report, ¶ 77.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

stores of Windows PC game apps, including Steam.[456] The fact the But-For commission rate of 13.63% derived from my economic model aligns with the benchmark average commission rate of 14%, despite Steam's supra-competitive commission rate skewing the average upwards, further supports that my economic model is conservative.

218. Prof. Schmalensee claimed that I failed to consider whether the Epic's ongoing litigation with Apple influenced Epic Games Store's commission rate of 12%,[457] as well as Microsoft Store's subsequent adoption of a 12% rate shortly thereafter.[458] However, none of my conclusions rely on the Epic Games Store or Microsoft Store's 12% commission rate. In fact, excluding both the Epic Games Store and Microsoft Store from my benchmark analysis would still yield an average commission rate ranging between 10% and 14.6%,[459] showing that their exclusion has a limited impact on my empirical analysis and qualitative conclusions. Additionally, neither the Epic Games Store's nor the Microsoft Store's 12% commission rate is an input in my economic model, meaning that the model's But-For commission rate of 13.63% is not affected by Epic's litigation strategy.[460]

---

[456] Expert Report of Rosa M. Abrantes-Metz, Ph.D. in Support of Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal), September 26, 2022, ECF No. 666-2 ("Abrantes-Metz Opening Report") , ¶ 66.

[457] Schmalensee Second Class Report, ¶¶ 108-109. ("[Dr. Abrantes-Metz] neglects to acknowledge that the Epic Games Store's 12 percent commission rate may not be sustainable in the long run […] Dr. Abrantes-Metz […] ignores Epic's litigation strategy and its effect on their choice of commission rate.").

[458] Schmalensee Second Class Report, ¶ 109. ("Dr. Abrantes-Metz not only ignores Epic's litigation strategy and its effect on their choice of commission rate, but she also does not consider that Microsoft's changes to its commission rate in 2021 may also have been motivated by the Epic litigation.").

[459] "Benchmark Estimate 2019 – Sensitivity Analysis.xlsx," tab "Benchmark Estimates."

[460] I use the Microsoft Store's profit margin in 2019, when its commission rate was not yet 12%, in the economic model. *See* Eddie Makuch, "Microsoft Will Pay Developers Even More Money on PC, Matching Epic Games Store," *Gamespot*, April 29, 2021, available at, https://www.gamespot.com/articles/microsoft-will-pay-developers-even-more-money-on-pc-matching-epic-games-store/1100-6490770/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**FIGURE 1: BENCHMARK CALCULATION BASED ON NORTH AMERICA PC DIGITAL GAME SALES**

| Store (Owner) | Total Sales in 2019 ($ millions) | Commission Rate | |
| --- | --- | --- | --- |
| | | Self-Distribution Costs from Humble Widget | Self-Distribution Costs from Epic Games Store |
| | [A] | [B] | [C] |



Source: Workpaper "Benchmark Estimate 2019.xlsx," tab "Benchmark Estimates."

## VII.    MY CONCLUSIONS ARE UNAFFECTED BY POST-COVID DATA

219. My previous conclusions in this report were based on an economic model estimating a But-For commission rate, supported by a benchmark analysis, both using 2019 data – the most recent year prior to the Covid-19 pandemic. In this Section, I demonstrate that it is inappropriate to use more recent data to calculate the But-For commission rate, and, in any event, using more recent data would not change my opinions. There are three reasons for this.

a. First, recent data on costs, revenues and ultimately profit reflect temporary aberrations due to the Covid pandemic. Such data cannot be considered reliable for calculating a competitive market equilibrium relevant to the class action period. As explained below, the pandemic was generally "good" for game and app stores. Some, notably Microsoft, have reported high profit

127

margins as a result. But it would be incorrect to treat such margins as reliable estimates of stable, equilibrium levels.

b. Second, even if I were to use the recent data to recalibrate the model, the estimated But-For commission rate would change by only about half a percentage point to 14.11%. Considering the conservative nature of my methodology, this degree of increase would not cause me to alter my opinion that a But-For commission rate of 13.63% is a reasonable estimate.

c. Third, the commission rates for Windows game app stores used in my benchmark analysis have remained virtually unchanged through the Covid pandemic. This is additional supporting evidence that while the pandemic may have (and evidently did) impacted costs, revenues and profits, those impacts are temporary in nature and have not caused any permanent change in store commission rates.

### A.    POST-COVID PROFIT MARGINS ARE UNRELIABLE FOR ESTIMATING THE BUT-FOR COMMISSION RATE

220. Microsoft's profit margin, which I used in my economic model as a benchmark for the rival store that would have competed with Apple in the But-For World, ▮▮▮▮ during the pandemic. While the 2019 margin used to calibrate the model was ▮▮,[461] this ▮▮▮▮ to ▮ in 2020[462] before ▮▮ to ▮▮ in both 2021[463] and 2022.[464] Using these ▮▮▮▮ would suggest a ▮▮ But-For commission rate than I have calculated. However, such an approach is inappropriate for at least two reasons.

a. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[461]  MSFT_EPIC_00000093, p. 39.
[462]  MSFT_AAPL_00000163, p. 32.
[463]  MSFT_AAPL_00000169, p. 30.
[464]  MSFT_AAPL_00000498, p. 30.

b. ████████████████████████████████████████████

████. Simply updating one parameter without considering these other parameters is methodologically unsound. I discuss this in more detail in the next Section.

221. A limitation of relying on Microsoft's recent profit margins is that they were impacted by the Covid-19 pandemic, which disrupted market conditions and enabled game stores to earn profits that would not be expected in a competitive market equilibrium. Unlike many industries that suffered during Covid-19, the pandemic had a highly positive effect on the game industry. Consumers were confined at home and unable to engage in their usual leisure activities. As a result, many would have turned to computer games as a new form of entertainment,[465] while existing gamers further increased their spending and time spent on games. This trend has been confirmed by research:[466]

> The covid-19 pandemic has had unexpected consequences for many industries. One of these industries is the video game industry. People increased their time at home, and they turned to play games to socialize and get away from stress. (…) We observed that there is a significant increase in the number of active players and users daily. The hypothesis that large companies in the gaming industry increased their share values were established, and this hypothesis was confirmed as a result of the hypothesis tests. We examined the pandemic period, the sector's growth, and the economic dimension of this increase. Due to the increase in the demand for video games, game companies' stock prices are also increasing.

222. Apple's App Store is a clear example of how the pandemic had a substantial – but ultimately temporary – impact on revenue from games and apps more broadly. As noted in one App Store annual review, "FY20 has been a tremendous year for the store, with billings projected to grow by $13.9B over FY19. Beginning in Q2'20, growth began to swell as the early impacts of COVID on the world hit China, first pushing the local growth to 66%. In Q3, the rest of the world began to

---

[465] Jin Yang, Ruoxu Wang, Amy Cook and Rhema Fuller, "Gaming during the COVID-19 pandemic: Examining its effect on loneliness & motivation, playing and gratification differences between competitive and recreational gamers", *Telematics and Informatics Reports* 11 (September 2023), https://doi.org/10.1016/j.teler.2023.100093.

[466] Deniz Şener, Türkan Yalçın and Osman Gulseven, "The Impact of Covid-19 on the Video Game Industry" (January 2021), p. 1, http://dx.doi.org/10.2139/ssrn.3766147.

see the effects which continue into this quarter."[467] In the executive remarks for Q3 2020, Apple further announced that it "had strong performance in our digital Services with all-time revenue records in the App Store, Apple Music, Video, Cloud Services, and our App Store search ad business, as well as elevated engagement on iMessage, Siri and FaceTime."[468] This surge in performance resulted in App Store's billings exceeding its original 2020 forecast by more than 5 USD billion:[469]

> And when we met last summer to discuss our FY20 plan, we forecasted we'd grow the business to $59.2B by the end of the fiscal year. As millions of people around the world have faced a new reality due to COVID, the value of the App Store and our amazing ecosystem has never been stronger, and we're poised to reach an incredible (...) $65.0B in FY20, up 27% Y/Y.

223. Internal documents indicate that the App Store's exceptional performance in 2020 was largely driven by the pandemic. This is evident in an internal email from Ryan Slagle dated April 12, 2020, noting that an increase in App Store's gross billings forecast was "largely driven by stronger performance over the last couple of weeks in the US and EMEA due to COVID-19".[470] Similarly, an internal review of Apple Services in September 2020 confirms that "[o]ver the last 6 months games have maintained elevated billings levels largely due to COVID."[471] Regarding why the pandemic favored the App Store, an internal review of Apple's financial performance for 2020 emphasizes that "with COVID-19, more people have come to the store searching for tools and resources."[472] As further elaborated in Apple's Q3 2020 executive remarks:[473]

---

[467] APL-APPSTORE_10979411 (App Store FY20 Review, FY21 Focus Areas, and Financials & Resources), at 515.

[468] APL-APPSTORE_11209120 (Executive Remarks, Q3'20 Earnings Announcement, July 30 2020), at 121.

[469] APL-APPSTORE_10979411 (App Store FY20 Review, FY21 Focus Areas, and Financials & Resources), at 420.

[470] APL-APPSTORE_11212632 (Email from Ryan Slagle about App Store Weekly Scorecard, 12 April 2020), at 633.

[471] APL-APPSTORE_11277293, at 301.

[472] APL-APPSTORE_10979411 (App Store FY20 Review, FY21 Focus Areas, and Financials & Resources), at 477.

[473] APL-APPSTORE_11209120 (Executive Remarks Q3'20 Earnings Announcement, July 30 2020), at 121-122.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

> Especially in a time of COVID-19, you can measure economic resilience in the ways in which the App Store supports remote ordering for restaurants, digital commerce for small businesses, and an enduring entrepreneurial opportunity for creators and visionaries.

224.  Given this growth driven by an atypical global shock, Apple itself deemed it essential to evaluate the performance of App Store by isolating the effect of Covid-19, in order to determine what its performance would have been under normal market conditions: [474]

> Now, as we think about FY21, understanding and being able to strip out the impact of COVID is critical. This will help us understand what our growth is with and without the unprecedented events. To do this, we worked with analytics on forecasting what FY20 would have been without COVID. By comparing this against how we expect to close out FY20, the impact is ~$5.2B.

225.  Apple's own attempts to estimate its revenue growth in a counterfactual scenario without Covid-19 are illustrated in the following figure, which is based on Apple's internal analysis. The orange line represents the revenue Apple projected for its App Store, assuming the pandemic had not occurred, while the blue line shows the actual revenue observed.[475] When the blue line is above the orange line, it indicates that the actual revenue growth exceeded Apple's projection for a Covid-free scenario, according to Apple's own analysis.

---

[474] APL-APPSTORE_10979411 (App Store FY20 Review, FY21 Focus Areas, and Financials & Resources), at 518.

[475] While the legend for the orange line in the figure mentions "COVID + INT. norm.", the "INT. norm." component only marginally affects Q2 2020 and has no significant impact on the figure otherwise. Therefore, the difference between the blue and orange lines is essentially driven by Covid.

**FIGURE 2. APP STORE NORMALIZED REVENUE GROWTH TREND, Q1'20-Q4'21**



Source: APL-APPSTORE_11200881 (Q4'21 M1 Final P&L Forecast, 2 August 2021), at 910.

226. As Figure 2 shows, Apple's own estimates indicate that Covid-19 had a substantial impact on App Store's revenue growth from Q2 2020 to Q1 2021. The reported revenue growth (blue line) exceeded the revenue growth that would have been expected in the absence of Covid-19 (orange line). Notably, while the figure shows the two lines converging in Q2 and Q3 2021, the overall level of revenue observed throughout 2021 remained higher than what would have been expected without Covid-19. This is due to the positive revenue growth accumulated in earlier quarters. Therefore, throughout the Covid-19 period, Apple's App Store experienced a sustained increase in revenues that extended well beyond 2020.

227. When Apple's current Vice President of Financial Planning and Analysis, Kevan Parekh, was questioned about this internal Apple analysis, he confirmed its meaning: [476]

[476] Remote Deposition of Keven Parekh, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal), December 18, 2024, 42:6-43:5.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Q Okay. So the diagram here confirms that COVID had a positive effect on revenue growth? [Objection] Q Is that correct? [Objection] THE WITNESS: I believe it's an estimate. I don't know if there is a real way to understand it for sure, but I think this was an estimate by the team. (…) Q Right. But the team is estimating that it had a positive impact; correct? A Yes, this chart shows that the as reported is higher than the orange line. Q For example, in Q3 20, the as reported is 37 percent, COVID normalized is 19 percent; correct? [Objection] THE WITNESS: That's what the chart shows, yes. (…) Q That's a substantial difference; correct? [Objection] THE WITNESS: Yes, about an 18-point difference, correct.

228. While Covid-19 substantially increased App Store's revenues for an extended period, the temporary nature of the pandemic and lockdown measures meant this effect would eventually diminish over time – despite lasting longer than initially expected due to new virus variants and additional lockdowns. As noted in an internal App Store review: "The base assumption in our FY21 forecast was that the COVID situation would normalize by FQ1'21. Obviously, based on recent results, this may not be as likely as it felt a few weeks ago."[477] Apple's more recent estimates, reported in a 2022 P&L forecast, indicate that the impact of Covid-19 on App Store's revenues would, in fact, only begin to reverse at the end of 2021, as shown in the following figure from Apple's internal documents. Again, the orange line represents Apple's own internal estimates of projected revenue growth in the absence of Covid-19, while the blue line shows the actual observed revenue.

---

[477] APL-APPSTORE_10979411 (App Store FY20 Review, FY21 Focus Areas, and Financials & Resources), at 514.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**FIGURE 3. APP STORE NORMALIZED REVENUE GROWTH TREND, Q1'21-Q1'22**



| | Q1'21 | Q2'21 | Q3'21 | Q4'21 | Q1'22 |
|---|---|---|---|---|---|
| COVID | 497 | 770 | 662 | 240 | 86 |
| Int. Norm. | 0 | 0 | 0 | -70 | 0 |
| Total | 497 | 770 | 662 | 170 | 86 |

Source: APL-APPSTORE_11205377 (Q1'22 October P&L Forecast, 18 October 2021), at 398.

229.  Figure 3 shows that in Q4 2021 and Q1 2022, the revenue growth absent Covid-19 (orange line) exceeded the reported revenue growth (blue line) for the first time. In other words, during this period, App Store's reported revenue was growing at a slower rate than in a counterfactual scenario without Covid-19, suggesting that revenue levels started gradually returning to previous levels. Importantly, while this normalization began, the revenue levels in Q1 2022 were still around 30% higher than what would have been observed absent Covid[478] – indicating that at least part of 2022 was still affected by Covid. Therefore, while Covid-19 had a substantial and unprecedented impact on the App Store, its effects were largely temporary and began reversing at the end of 2021, though they persisted to some extent through 2022.

---

[478]  From Q1 2020 to Q1 2022, the cumulative revenue growth observed exceeded the cumulative revenue growth expected in the absence of the pandemic. $\frac{1+ Cumulative\ Growth\ Observed}{1+ Cumulative\ Growth\ Absent\ Covid} - 1 = \frac{(1+17\%)\times(1+24\%)\times(1+37\%)\times(1+30\%)\times(1+31\%)\times(1+24\%)\times(1+15\%)\times(1+16\%)\times(1+15\%)}{(1+17\%)\times(1+16\%)\times(1+19\%)\times(1+16\%)\times(1+17\%)\times(1+23\%)\times(1+15\%)\times(1+26\%)\times(1+27\%)} - 1 = 30\%.$

230.  This interpretation of Figure 3 – that the impact of Covid-19 on App Store revenues is temporary – is also supported by the testimony of Kevan Parekh:[479]

> Q So whereas before COVID was having a positive impact on revenue, that ceases after Q3 21; correct? [Objection] THE WITNESS: It looks like it's smoothing out an impact. You can see in the front part of the chart in Q1 21, Q2 21, the blue line was above the orange line. Q So those substantial impacts, like the 18 percent we saw before, those were temporary? [Objection] THE WITNESS: Yes, they happened in different periods of time. There could have been more revenue during COVID when people are home and then later, it's a lower amount, that's what this chart says, yes.

231.  The temporary nature of Covid-19's impact on App Store's business is corroborated by multiple internal documents in evidence. Consistent with the figure above, a Wolfe Research article from late April 2021 noted that "App Store sales are easing back towards pre COVID growth of 20%."[480] It was not until mid-2022 that the App Store's business, particularly in the gaming segment, began to slow down more notably, coinciding with the end of lockdowns and a broader return to normal conditions. This trend is highlighted in an internal email from Nate Barton dated June 7, 2022, discussing the App Store's performance in Q3 2022:[481]

> The most notable item is the slowdown we have seen in the U.S. and ROW Games business. U.S. Games had a run rate of $270M/week, but over the last 3 weeks, that average has dropped to ~$250M/week. ROW Games was previously trending closer to $230M/week, which has now dropped to ~$200M/week also over the last 3 weeks, with the decline coming specifically from the EU and UK. The run rate for games did not see any drop-off in volume during this time last year; in addition, we also looked back at pre-COVID run rates 3 years ago in case there was any seasonal drop in billings (e.g., due to summer travel); however, weekly spend on games was fairly stable across April, May, and June. (…) **it is possible COVID kept billings at higher levels until recently, and now it is starting to unwind/reset a bit.** [emphasis added]

---

[479]  Parekh Deposition (December 2024), 46:22-47:13.

[480]  APL-APPSTORE_11219963 (Cloud Communications, April 28, 2021).

[481]  APL-APPSTORE_10805059 (Email from Nate Barton on Q3 App Store Performance, May 29, 2022), at 61-62.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

232. The impact of Covid-19 on the game industry has likewise been acknowledged by other major providers of third-party game stores, including Valve. In 2020, Valve's Steam platform saw a 50% increase in hours played compared to 2019 and a 20% increase in games purchased.[482] This trend continued in the following years, with Valve noting that "2021 was successful even in comparison to 2020's unprecedent growth."[483] Consumers spending rose by 27% and time spent playing increased by 21% in 2021.[484] In 2022, Steam's user base continued to grow substantially, having "crossed the threshold of 30,000,000 concurrent users signed into Steam – only a year and a half after hitting 20,000,000 for the first time."[485] Valve recognized the role of Covid-19 in driving this growth:[486]

> As many of you already know, this past year had more than its share of challenges, with everyone's lives upended by the global pandemic. While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games, and hopefully bringing some joy to counter-balance some of the craziness that was 2020. This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers (2.6 million per month), hours of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).

233. The identified effects of Covid-19 on the consumption of games during lockdowns enabled the entire industry to both receive increased revenues, as previously shown, and achieve higher profit levels and margins. According to Microsoft's annual analysis, ███████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ █████████████████████████████

---

[482] "Steam - 2020 Year in Review," Steam, January 13, 2021, available at https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

[483] Steam, "Steam - 2021 Year in Review," March 8, 2022, available at https://store.steampowered.com/news/group/4145017/view/3133946090937137590.

[484] *Id.*

[485] Steam, "Steam Year in Review 2022," February 16, 2023, available at https://store.steampowered.com/news/group/4145017/view/3677786186779762807.

[486] Steam, "Steam - 2020 Year in Review," January 13, 2021, available at https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

[487] MSFT_AAPL_00000498, at p. 7.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

234. Considering that the profit margins of Microsoft's game store in recent years have been impacted by Covid-19, they cannot serve as a benchmark for a competitive market equilibrium, as they do not reflect normal long-term market conditions. The pandemic enabled Microsoft and other players to expand their customer base and increase sales per customer in the short-term, resulting in temporarily abnormal profit margins. As the effects of Covid-19 gradually diminished and confinement measures eased, profit margins began to decline and are expected to continue decreasing until they stabilize at equilibrium levels.

## B.   MODEL PREDICTIONS ARE NEARLY UNCHANGED BY POST-COVID DATA

235. These arguments notwithstanding, for completeness I recalculate the commission rate predicted by my economic model using the most recent data available. As I will demonstrate, the recalibrated model using 2022 data estimates a But-For commission rate of 14.11%, which is similar to the figure derived from 2019 data. This consistency reinforces the robustness of my prior estimate, confirming that its value would not differ substantially even under the unique market conditions that emerged immediately after the Covid-19 pandemic.

236. As noted in the previous Section, Covid-19 had a dramatic (positive) impact on game stores, allowing them to increase profit margins as lockdowns forced consumers to spend more time at home, driving a surge in demand for computer games. This trend was evident for Microsoft, whose operating margin increased from ██ in 2019[490] to ██ in 2020[491] before partially reversing to

---

[488]  *Id.*

[489]  "2020 was a notable year for the gaming world. The pandemic's effect is evident: between 2019 and 2022, the sector's growth tripled in percentage, returning to pre-Covid figures a year later." Nielsen NIQ, "Market Study of the Video Game Industry: Gaming in Full Growth", August 19, 2024, available at https://nielseniq.com/global/en/insights/analysis/2024/market-study-of-the-video-game-industry-gaming-in-full-growth/.

[490]  MSFT_EPIC_00000093, p. 39.

[491]  MSFT_AAPL_00000163, p. 32.

137

███ in both 2021[492] and 2022.[493] Given the extraordinary circumstances of 2020, when the pandemic and lockdowns were at their peak, I discard the year 2020 and use the more recent ███ margin observed in 2022 to calibrate the rival operating margin in the post-Covid period. This ███ figure is a conservative estimate for a post-Covid competitive equilibrium, as at least revenue levels in 2022 were still positively impacted by the pandemic. Microsoft's operating margin would be expected to return to long-term equilibrium levels in the coming years, other things equal.

237.  Of course, adjusting the rival store's profit margin to reflect Microsoft's greater performance in recent years cannot be done in isolation; other parameters of the model must also be updated accordingly. While calibrating the profit margin to ██% would result in a higher But-For commission rate if all other factors remain constant, making this adjustment alone would not be economically sound. The higher profit margins observed post-Covid were influenced by market changes that must also be taken into account. Therefore, to accurately estimate the But-For commission rate for the post-Covid period, I must assess how other model parameters have evolved, including market size, the rival's variable and fixed costs, as well as the market shares of both Apple and the rival store in the But-For World.

238.  First, as discussed in the previous Section, pandemic lockdowns led to a surge in new users playing computer games and increased consumption among existing users. To calibrate the market size, I previously used App Store's worldwide billings for 2019, which totaled USD 51 billion. For this analysis, I update the figure using App Store's worldwide billings for 2022, which ████████████████████, as reported in a "F24 App Store Budget" presentation in evidence.[494] I rely on 2022 data because, to the best of my knowledge, it is the most recent year for which actual reported billings are available in evidence, while reported figures for 2023 and 2024 are forecasted and thus less reliable. Additionally, using 2022 data ensures consistency with the calibration of the rival store's profit margin, as both are based on actual figures from the same year.

---

[492]  MSFT_AAPL_00000169. p. 30.
[493]  MSFT_AAPL_00000498, p. 30.
[494]  APL-APPSTORE_10910625 (App Store Budget F24), at 894 and 896.

239. Next, it is essential to update the rival store's variable and fixed costs. Given the significant expansion in market size over the last years, variable costs are expected to have increased to meet the additional demand for games, while fixed costs, by their nature, should have remained relatively stable. Previously, I calibrated the rival store's costs using Apple's App Store-specific accounting data from 2019, as detailed in Section IV.C. For this analysis, I updated all cost categories to the best of my ability using the most recent actual data available in evidence, which corresponds to 2022. Relying on 2022 data again ensures consistency with the other calibrated parameters.

a. *App Store P&L Costs*: as reported in a "Limited Financials" table of a F24 App Store Budget produced by Apple, ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████ ██ █████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ [497]

b. *Apple's Worldwide Developer Relations (WWDR)*: the updated 2022 costs associated to the WWDR program are detailed in the Worldwide Marketing F24 Plan in evidence.[498] According to this document, ████████████████████████████████████████ ██████████████ USD 74 million in 2019.[500] Additionally, ██████████████████ ███████████████████████████ USD 101 million in 2019.[502]

c. *Marketing Costs and Unattributed Operating Expenses*: for these two last cost categories, due to the lack of sufficient data in evidence, I assumed they ████████████████████

---

[495]  For the 2022 figures, *see* APL-APPSTORE_10910625 (App Store Budget F24), at 925. For the 2019 figures, *see* APL-APPSTORE_10176241, at 318.

[496]  *Id.*

[497]  *Id.*

[498]  APL-APPSTORE_11364124 (Worldwide Marketing FY24 Plan).

[499]  APL-APPSTORE_11364124 (Worldwide Marketing FY24 Plan), at 164.

[500]  APL-APPSTORE_09814097.

[501]  APL-APPSTORE_11364124 (Worldwide Marketing FY24 Plan), at 163.

[502]  APL-APPSTORE_09814099.



Based on this assumption, I estimate that ████████████████████████████████ ████████████████████ USD 22 million in 2019,[504] while █████████████████████████████ ███████████████████ USD 226 million in 2019. As App Store marketing OPEX and unattributed operating expenses together account for less than 10% of total App Store costs, ██████████████████████████ is unlikely to have a material impact on the results.

240.  For the calibration of the rival store's market share, I continue to rely on the 23.1% figure derived from Professor Simonson's survey. Updating this figure is neither feasible nor necessary, as no updated survey is available, and there is no evidence suggesting that consumer preferences for a hypothetical rival store would have decreased post-Covid. The 23.1% estimate remains, in fact, conservative compared to the 50/50 split expected if the rival and Apple entered the market simultaneously with similar offerings.

241.  In summary, for this exercise I calibrate the model with the following inputs: (i) Microsoft's 2022 operating profit margin as a benchmark for the rival store's margin, (ii) App Store's actual 2022 billings for market size, (iii) 2022 cost figures for App Store as an estimate of the rival store's costs, and (iv) the same market shares for Apple and the rival store as previously derived from Professor Simonson's survey. This calibration produces an estimated But-For commission rate of 14.11%, which aligns with the 13.63% But-For commission rate I estimated for the class period.[505] The consistency of this result underscores the model's robustness even to shocks as exceptional as Covid-19. Therefore, despite the higher operating margins observed for Microsoft in recent

---

[503]  (1,044 + 2,100 + 53 + 88 + 136) / (942 + 1,332 + 46 + 74 + 101) − 1 = 0.37.

[504]  One document in evidence includes a table listing various categories of Apple cost data for 2022, including a line labeled "App Store Mktg", which may refer to App Store Marketing OPEX (APL-APPSTORE_11364297 at 419). The data in this table differs substantially from the source used for 2019: it is less disaggregated and does not indicate whether the figures reported per quarter represent total quarterly values or annualized amounts. If the figures are quarterly values, they would imply a value of USD 66 million for 2022 – triple the 2019 figure – suggesting these figures are not directly comparable. Given the lack of clarity and reliability of these data, I chose not to rely on this table and instead estimated App Store marketing costs based on the trends observed in other cost categories. However, even if a USD 66 million figure were used, the resulting But-For commission rate would be 14.27% instead of 14.11%, representing only a marginal difference.

[505]  Workpaper "Economic Model Estimate 2022.xlsx," "Model Calculation" tab. *See also* Workpaper "Economic Model Estimate 2019.xlsx"

years, largely driven by market expansion during the pandemic, the estimated But-For commission rate remains nearly unchanged.

### C. OBSERVED COMMISSION RATES ARE NEARLY UNCHANGED POST-COVID

242. As an additional robustness check for my estimated But-For commission rate of 13.63%, I updated my benchmark analysis using the commission rates currently charged by the same game stores analyzed in Section VI. For this exercise, I relied on the most recent publicly available information from 2023 and 2024. However, this information should be interpreted with caution. The effects of Covid-19 on the computer games industry may render this updated benchmark analysis less directly relevant to the class period. Therefore, it should be used solely as a robustness check to ensure that results do not diverge from the previous analysis.

243. My updated benchmark analysis reveals that the vast majority of commission rates have remained unchanged since before 2019 and were not affected by Covid-19 in any meaningful way, including those of Microsoft and Epic, which have two of the most competitive rates. According to Microsoft's website, updated in December 2023, their terms and conditions still allow developers to "use Microsoft's commerce platform and pay a competitive fee of 15% for apps and 12% for games."[506] Epic, on the other hand, not only maintained its 88/12 revenue sharing structure but also began offering additional incentives to attract new developers, including a 0% commission for the first six months a game is published under certain conditions:[507]

> Epic Games has announced that it will be offering developers 100% of revenue generated for the first six months if the game is signed exclusively to the Epic Games Store. The announcement came during GDC and is a part of Epic's new 'Now on Epic' program. Epic had previously introduced one of the best revenue

---

[506] Microsoft, "Benefits of distributing your apps via Microsoft Store," December 14, 2023, available at: https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/why-distribute-through-store.

[507] Tom Henderson, "Epic Games is Offering 100% Revenue to Developers for First 6 Months," Insider Gaming Network, March 20, 2024, available at: https://insider-gaming.com/epic-games-100-percent-revenue/.

splits in the industry at 88% to developers, and 12% to Epic Games, but the move marks a new stage for the publisher. As outlined in the Epic Games blog, after six months of 100% revenue to developers, the revenue split will go back to the publisher's standard 88/12 split.

244. Likewise, Valve has maintained the same fee structure for the Steam platform that it had before Covid-19, but the effective commission rate charged to developers has marginally decreased. Valve's revenue-sharing model for the Steam platform, which rewards larger developers with higher earnings, involves a 30% commission on all sales until the developer reaches USD 10 million, a 25% commission on billings above USD 10 million, and a 20% commission on billings above USD 50 million.[508] Although this revenue-sharing structure has not changed, the impact of Covid-19 on PC game consumption allowed many developers to reach these thresholds, reducing their effective commission rate. As a result, Steam's effective commission rate fell from 27% in 2019 to 24% in 2023.[509] The ▮▮▮▮ in Steam's effective commission rate was acknowledged in the deposition testimony of Jeffrey David Powers from Valve:[510]



245. In addition to updating the commission rates of third-party game stores, I also assessed how the self-distribution costs of direct-to-consumers stores have evolved in recent years, using the same two methodologies previously employed: (1) based on the costs of distributing through Humble Widget and (2) based on the variable costs of the Epic Games Store. On the one hand, the costs of distributing through Humble Widget have remained unchanged at 9.8%, suggesting that self-

---

[508] Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," November 30, 2018, available at, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838. *See also* Nick Statt, "Valve's new Steam revenue agreement gives more money to game developers," *The Verge*, November 30, 2018, available at, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

[509] See workpaper "Benchmark Estimate 2023.xlsx", tab "Updated Commission Rates".

[510] Remote Deposition of Jeffrey David Powers, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal), July 25, 2024, 147:12-148:17.

distribution costs have stayed the same.[511] On the other hand, according to the Epic Games Store's P&L in evidence, the Epic Games Store's variable costs were 10.6% of revenue in 2022, which is slightly higher than the previously estimated 9.4%.[512]

246.  Given that game stores' commission rates have remained largely unchanged, the weighted average commission rate charged by PC digital game stores in North America has also not notably changed since the pandemic. In my updated benchmark analysis, when approximating the commission rate of direct-to-consumer stores based on the cost of distributing through Humble Widget, the weighted average commission rate is ▮▮▮▮ excluding Steam and ▮▮▮▮ including Steam.[513] When using instead the distribution costs of the Epic Games Store, the weighted average commission rate is ▮▮▮▮ excluding Steam and ▮▮▮▮ including Steam.[514]

247.  In conclusion, my updated benchmark analysis based on recent post-Covid data indicates that the weighted average commission rate for PC digital game stores in North America has remained largely unchanged. The results are also consistent with the But-For commission rate predicted by my economic model, both before and after Covid. Notably, the most conservative weighted average commission rates in my updated benchmark analysis – ▮▮▮▮▮▮▮▮▮ (both of which include Steam) – are ▮▮▮▮ to my estimated But-For commission rate of 13.63% for the class period and to the 14.11% rate predicted by the economic model based on post-Covid data. This further supports the fact that the But-For commission rate of 13.63% is, at minimum, reasonable and realistic, aligning with the current market reality even after the impact of Covid-19.

---

[511]  See workpaper "Benchmark Estimate 2023.xlsx", tab "Benchmark Estimates".

[512]  See workpaper "Benchmark Estimate 2023.xlsx", tab "EGS Variable Cost".

[513]  See workpaper "Benchmark Estimate 2023.xlsx". For the updated calculations, I used the same sales weights based on 2019 data, as I do not have access to the updated data required to estimate the sales of each store in subsequent years. While Covid-19 allowed PC game stores to increase their sales, I do not expect the sales weights to differ substantially today, given that the pandemic had an impact on all stores.

[514]  *Id.*

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

248. I reserve the right to update my opinions if and when more information becomes available.

Respectfully submitted,

_____

Rosa M. Abrantes-Metz, PhD

March 7, 2025

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**APPENDIX A: MATERIALS RELIED UPON**

A.    WORKPAPERS

"Apple Profitability Benchmarking Analysis.xlsx"

"Benchmark Estimate 2019 – Sensitivity Analysis.xlsx"

"Benchmark Estimate 2019.xlsx"

"Benchmark Estimate 2023.xlsx"

"Economic Model Estimate 2018.xlsx"

"Economic Model Estimate 2019 – Sensitivity Analysis.xlsx"

"Economic Model Estimate 2019.xlsx"

"Economic Model Estimate 2022.xlsx"

"estimate_remainder.R"

B.    EXPERT REPORTS

Expert Class Certification Report of Christian Tregillis, CPA, ABV, CFF, CLP, Cameron, et al. v. Apple Inc, Case No. 4:19-cv-03074-YGR (N.D. Cal.), June 1, 2021, ECF Nos. 331-7.

Expert Class Certification Report of Professor Nicholas Economides, Cameron, et al. v. Apple Inc, Case No. 4:19-cv-03074-YGR (N.D. Cal.), June 1, 2021, ECF No. 331-5.

Expert Rebuttal Report of Michael I. Cragg, Ph.D., Epic Games, Inc. v. Apple Inc., Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), March 15, 2021.

Expert Report and Declaration of Itamar Simonson, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 476-9.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Expert Report and Declaration of Itamar Simonson, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-8.

Expert Report and Declaration of James E. Malackowski, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 478-2.

Expert Report and Declaration of James E. Malackowski, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-9.

Expert Report and Declaration of Lorin M. Hitt, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), 10, 2021, ECF No. 376-4.

Expert Report and Declaration of Lorin M. Hitt, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-3.

Expert Report and Declaration of Richard Schmalensee, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), August 10, 2021, ECF No. 534-1.

Expert Report and Declaration of Richard Schmalensee, Ph.D. In Re Apple iPhone Antitrust Litigation. Case No. 4:11-cv-06714-YGR (N.D. Cal.). March 10, 2023. ECF No. 688-4.

Expert Report of Daniel L. McFadden, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), June 1, 2021, ECF Nos. 442-11, 443-14, 643-11.

Expert Report of Rosa M. Abrantes-Metz, Ph.D. in Support of Plaintiffs' Motion for Class Certification. In Re Apple iPhone Antitrust Litigation. Case No. 4:11-cv-06714-YGR (N.D. Cal.). September 26, 2022. ECF No. 666-2.

Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), October 19, 2021, ECF No. 554-5.

Reply Report of Rosa M. Abrantes-Metz, Ph.D., in Support of Plaintiffs' Renewed Motion for Class Certification, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), April 28, 2023

146

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Written Direct Testimony of Ned Barnes, CPA, Epic Games, Inc. v. Apple Inc., Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), April 28, 2021, ECF No. 509-7.

### C.    FILINGS

Class Action Complaint Demand for Jury Trial, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), April 27, 2021, ECF No. 1.

Complaint, *In Re Microsoft Corp. and Activision Blizzard, Inc.* Case No. 9412 (F.T.C. December 8, 2022), ECF No. 691-14.

Complaint, *State of Utah et al. v. Google LLC, et al.* Case No. 3:21-cv-05227 (N.D. Cal.), July 7, 2021, ECF No. 1.

Consolidated Amended Class Action Complaint Demand for Jury Trial, In Re Valve Antitrust Litigation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), August 26, 2022, ECF No. 99.

Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz, Memorandum of Points and Authorities, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), March 10, 2023, ECF No. 688-2.

Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, Memorandum of Points and Authorities, *Donald R. Cameron, et al. v. Apple Inc,* Case No. 4:19-cv-03074-YRG (N.D. Cal.), August 10, 2021. ECF No. 376-11.

Defendant Valve Corporation's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC, (W.D. Wash.), September 17, 2021, ECF No. 37.

Economides Report Backup, "Economics Profits Yardsticks.xlsx"

Exhibit 682, *In Re Google Play Store Antitrust Litigation,* Case No. 20-cv-05671-JD (N.D. Cal.), December 21, 2023.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. Epic Games, Inc. v. Apple, Inc. Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), May 3, 2021, ECF Nos. 777-4.

First Amended Complaint, *Saurikit, LLC v. Apple Inc.*, Case No. 4:20-cv-08733-YGR (N.D. Cal.), January 19, 2022, ECF No. 72.

Memorandum Opinion, *Federal Trade Commission v. Surescripts, LLC*, Case No. 1:19-1080-JDB (D.D.C.), March 30, 2023, ECF No. 177.

Opinion, *US Airways, Inc., for American v. Sabre Holdings Corporation*, Case No. 17-960 (2d Cir.), September 11, 2019, ECF No. 201.

Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), February 2, 2024, ECF No. 789.

Order Granting Motion to Dismiss, Caccuri v. Sony Interactive Entertainment LLC, Case No. 21-cv-03361-RS (N.D. Cal.), July 15, 2022, ECF No. 60.

Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal.), September 17, 2020, ECF No. 229.

Order, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), May 6, 2022, ECF No. 80.

Rule 52 Order After Trial on the Merits, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.), September 10, 2021, ECF No. 812.

Second Amended Consolidated Class Action Complaint Demand for Jury Trial, Wolfire Games, LLC, et al. v. Valve Corporation, Case No. 2:21-cv-00563-JCC (W.D. Wash.), December 20, 2021, ECF No. 68.

Verdict, *In Re Google Play Store Antitrust Litigation,* Case No. 20-cv-05671-JD (N.D. Cal.), December 11, 2023.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

D.    DEPOSITIONS & TRIAL TESTIMONIES

Remote Deposition of Itamar Simonson, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), April 6, 2023, ECF No. 702-10.

Remote Deposition of James E. Malackowski, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), October 5, 2021, ECF No. 554-8.

Remote Deposition of Jeffrey David Powers, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal), July 25, 2024.

Remote Deposition of Keven Parekh, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR (N.D. Cal), December 18, 2024.

Remote Deposition of Loren M. Hitt, Ph.D, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal), April 14, 2023, ECF No. 702-4.

Remote Deposition of Richard Schmalensee, Ph.D, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal), April 4, 2023, ECF No. 702-8.

Remote Proceedings of Videotaped Deposition of Mark Rollins, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR-TSH (N.D. Cal.), February 11, 2021.

Remote Proceedings of Videotaped Deposition of Matthew Fischer, In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06715-YGR (N.D. Cal.), January 7, 2021.

Remote Videotaped Deposition of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No.4:11-cv-06714-YGR (N.D. Cal), October 1, 2021.

Trial Testimony of David Evans, Epic Games, Inc. v. Apple, Inc. Case No. 4:20-cv-05640-YGR-TSH (N.D. Cal.), May 14, 2021, ECF No. 769.

Trial Testimony of Rosa Abrantes-Metz, US Airways, Inc. v. Sabre Holdings Corp., et al., Case No. 11-2725-LGS (S.D. NY.), May 2, 2022, ECF No. 1226.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Trial Testimony of Rosa Abrantes-Metz, *US Airways, Inc. v. Sabre Holdings Corp., et al.*, Case No. 11-2725-LGS (S.D. NY.), May 3, 2022, ECF No. 1228.

Trial Testimony of Steven Allison, Epic Games, Inc. v. Apple, Inc. Case No. 4:20-cv-05640-YGR (N.D. Cal.), May 7, 2021, ECF No. 620.

Trial Testimony of Timothy Sweeney, Epic Games, Inc. v. Apple, Inc. Case No. 4:20-cv-05640-YGR (N.D. Cal.), May 3, 2021, ECF No. 616.

Videotaped Deposition of Rosa Abrantes-Metz, Ph.D., In Re Apple iPhone Antitrust Litigation, Case No. 4:11-cv-06714-YGR (N.D. Cal.), December 15, 2022, ECF No. 688-12.

## E.    PRODUCED DOCUMENTS

APL-APPSTORE_08882431

APL-APPSTORE_08883133

APL-APPSTORE_09090476

APL-APPSTORE_09806205

APL-APPSTORE_09814097

APL-APPSTORE_09814098

APL-APPSTORE_09814099

APL-APPSTORE_10176241

APL-APPSTORE_10805059

APL-APPSTORE_10910625

APL-APPSTORE_10979411

APL-APPSTORE_11200881

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

APL-APPSTORE_11205377

APL-APPSTORE_11209120

APL-APPSTORE_11212632

APL-APPSTORE_11219963

APL-APPSTORE_11277293

APL-APPSTORE_11364124

APL-APPSTORE_11364297

APL-EG_06093173

APL-EG_10015274

APL-APPSTORE_08856866

EPIC_00127277

EPIC_03964638

EPIC_04027660

EPIC_04349601

EPIC_04523683

EPIC_PEPPER_00000001

MSFT_EPIC_00000093

MSFT_ EPIC_00000095

MSFT_ EPIC_00000120

MSFT_AAPL_00000163

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

MSFT_AAPL_00000169

MSFT_AAPL_00000498

VALVE 000650

VALVE 000669

VALVE000677

## F.   PUBLICATIONS

### 1.   Articles

Abrantes-Metz, Rosa M., and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *Working Paper*, September 2020.

Besanko, David, Ulrich Doraszelski, and Yaroslav Kryukov, "How Efficient Is Dynamic Competition? The Case of Price as Investment," *American Economic Review* 109(9) (September 2019): 3339-3364.

Caminal, R., and A. Claici, "Are loyalty-rewarding pricing schemes anti-competitive?", *International Journal of Industrial Organization*, 25(4) (2007): 657-674.

Chandra, Ambarish, and Allan Collard-Wexler, "Mergers in Two-Sided Markets: An Application to the Canadian Newspaper Industry," *Journal of Economics & Management Strategy* 18(4) (2009): 1045-1070.

Correia-da-Silva, Joao, Bruno Jullien, Yassine Lefouili, and Joana Pinho, "Horizontal mergers between multisided platforms: Insights from Cournot Competition," *Journal of Economics and Management Strategy* 28(1) (2019): 109-124.

Evans, David S., and Richard Schmalensee, "The Antitrust Analysis of Multi-Sided Platform Businesses," *NBER Working Paper*, Vol. 18783, February 2013.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Evans, David S., and Richard Schmalensee, "The Antitrust Analysis of Multi-Sided Platform Businesses" in *The Oxford Handbook of International Antitrust Economics*, (Oxford University Press, 2014): 404-447.

Ghose, Anindya, and Sang Pil Han, "Estimating Demand for Mobile Applications in the New Economy," Management Science 60 (6) (June 2014): 1470-1488.

Hildenbrand, W., "On the 'Law of Demand,'" *Econometrica* 51(4) (1983): 997–1019

Hitt, Lorin M., and Erik Brynjolfsson, "Productivity, Business Profitability, and Consumer Surplus: Three *Difference* Measures of Information Technology Value," *MIS Quarterly* 20(2) (June 1996): 121-142.

Hopenhayn, Hugo A., "Entry, Exit, and firm Dynamics in Long Run Equilibrium," Econometrics 60 (5) (September 1992): 1127-1150.

Leibenstein, H., "On the basic proposition of x-efficiency theory," *American Economic Review* 68(2) (1978): 328–332.

Nagelkerke, Nico, "A Note on a General Definition of the Coefficient of Determination," Biometrika 3 (Sep. 1991): 691-692.

Pilat, Dirk, "Competition, Productivity and Efficiency," *OECD Economic Studies* 27(2) (January 1996).

Rochet, Jean-Charles, and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association* 1(4) (2003): 990-1029.

Şener, Deniz, Türkan Yalçın and Osman Gulseven, "The Impact of Covid-19 on the Video Game Industry," SSRN (January 2021).

Tan, Guofu, and Junjie Zhou, "The Effects of Competition and Entry in Multi-sided Markets," *Review of Economic Studies* 88(2) (2021): 1002-1030.

Teh, Tat-How, Chunchun Liu, Julian Wright, and Junjie Zhou, "Multihoming and Oligopolistic Platform Competition," *American Economic Journal: Microeconomics* (2022) forthcoming.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Yang, Jin, Ruoxu Wang, Amy Cook and Rhema Fuller, "Gaming during the COVID-19 pandemic: Examining its effect on loneliness & motivation, playing and gratification differences between competitive and recreational gamers", *Telematics and Informatics Reports* 11 (September 2023), https://doi.org/10.1016/j.teler.2023.100093.

### 2.    Textbooks

Belleflamme, Paul, and Martin Peitz, *Industrial Organization: Markets and Strategies*, (Cambridge University Press, 2010).

Cabral, Luís M. B., *Introduction to Industrial Organization*, 2nd Edition (The MIT Press, 2002).

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Edition. (Pearson Education Limited, 2015).

Mankiw, N. Gregory, *Principles of Economics*, 8th Edition (Cengage Learning, 2018).

Varian, H. R., *Microeconomic Analysis,* 3rd Edition (W.W. Norton & Company, 1992).

Wooldridge, Jeffrey, *Introductory Econometrics: A Modern Approach*, 5th Edition (South-Western Cengage Learning, 2013).

### G.    OTHER PUBLIC SOURCES

2K, "2K Store," Internet Archive Wayback Machine, January 2, 2019, https://web.archive.org/web/20190102144411/http:/store.2k.com/store/Tk22k/list/categoryID.67801500/size.25/sort.ranking ascending/includeVariations.true/facetFilterName.platform/facetFilterQuery.PC.

2K, "Sid Meier's Civilization VI," https://store.2k.com/game/buy-civilization-6.

Activision Blizzard, Inc, "Form 10-K, Annual Report for the year ended December 31, 2019," https://investor.activision.com/static-files/e610f6ff-cdf2-4f92-b373-4df046a590bb.

Activision Blizzard, Inc, "Form 10-K, Annual Report for the year ended December 31, 2020," https://investor.activision.com/static-files/09bb50e3-b2e8-4407-9ee3-2aec3c7bc29d.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Activision Blizzard, Inc., "Form 10-K, Annual Report for the year ended December 31, 2021," https://investor.activision.com/static-files/d7b4f08d-213b-4bd5-a41b-7497baa9c106

Albergotti, Reed, and Chris Alcantara. "Apple's tightly controlled App Store is teeming with scams," The Washington Post, June 6, 2021, https://www.washingtonpost.com/technology/2021/06/06/apple-app-store-scams-fraud/.

Anchor, "Fee schedule and cashing out," Spotify, August 8, 2018, https://help.anchor.fm/hc/en-us/articles/360012563112.

Anchor, "Introducing Anchor Listener Support: Now you can get paid to podcast," Medium, August 9, 2018, https://medium.com/anchor/introducing-anchor-listener-support-now-you-can-get-paid-to-podcast-64aefa5cfa9d.

Anthony, James, "Number of Apps in Leading App Stores in 2022/2023: Demographics, Facts, and Predictions," *Finances Online Reviews for Business*, March 23, 2023, https://financesonline.com/number-of-apps-in-leading-app-stores/.

Apple, "App Store Small Business Program," https://developer.apple.com/app-store/small-business-program/.

Apple, "Apple Video Partner Program," https://developer.apple.com/programs/video-partner/.

Apple, "Auto-renewable Subscriptions," https://developer.apple.com/app-store/subscriptions/.

Apple, "Distributing software on macOS," https://developer.apple.com/macos/distribution/.

Approve, "The Fastest Time To Profit," https://www.approve.com/time-to-profit/.

Bailey, Dustin, "Steam just reached 50,000 total games listed," PC Games N, February 12, 2021, https://www.pcgamesn.com/steam/total-games.

Barrett, Brian, "How 18 Malware Apps Snuck Into Apple's App Store," Wired, October 25, 2019, https://www.wired.com/story/apple-app-store-malware-click-fraud/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Batchelor, James, "Tim Sweeney on Apple's 15% cut: 'We're not fighting for a lower commission,'" GamesIndustry.biz, November 19, 2020, https://www.gamesindustry.biz/tim-sweeney-on-apples-15-percent-cut-were-not-fighting-for-a-lower-commission.

Beckhelling, Imogen, "It's official - EA is returning to Steam," Eurogamer, October 29, 2019, https://www.eurogamer.net/its-official-ea-is-returning-to-steam.

Blizzard, Inc., "Call of Duty Surpasses $3 Billion in Net Bookings Over Last 12 Months as Activision Ignites a New Business Model," December 4, 2020, https://investor.activision.com/news-releases/news-release-details/call-duty-surpasses-3-billion-net-bookings-over-last-12-months#:~:text=Following%20the%20record%2Dsetting%20launch,franchise%20highs%20over%20the%20period.

Bozkaya, Volkan, "Show Me the Money: How to Pick the Best PC Marketplace for Your Game," *Medium*, October 25, 2023, https://medium.com/@volkan.bozkaya/show-me-the-money-how-to-pick-the-best-pc-marketplace-for-your-game-dcce05ec33af.

Bracken, Becky, "Steam Gaming Platform Hosting Malware," threatpost, June 10, 2021, https://threatpost.com/steam-gaming-delivering-malware/166784/.

Braz, Vitor, "How to preload Red Dead Redemption 2 PC," Game Revolution, October 30, 2019, https://www.gamerevolution.com/guides/611579-red-dead-redemption-2-pc-pre-load-available.

Brooks, Nicholas, "Will Nintendo's Biggest Franchises Ever Make the Jump to PC Gaming?," CBR.com, September 1, 2021, https://www.cbr.com/nintendo-pc-gaming/.

Brown, Pete, "Find your success in the Microsoft Store on Windows," Microsoft Store, https://developer.microsoft.com/en-us/microsoft-store/overview/.

Callaham, John, "From Android Market to Google Play: a brief history of the Play Store," Android Authority, March 2017, https://www.androidauthority.com/android-market-google-play-history-754989/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Campbell, Ian Carlos, and Julia Alexander, "A guide to platform fees, The hidden costs behind your favorite apps, games, and more," The Verge, August 24, 2021, https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google.

Cassasqueira, João, "Microsoft is apparently canceling its 95% revenue share program [Update]," Neowin, January 15, 2020, https://www.neowin.net/news/microsoft-is-apparently-canceling-its-95-revenue-share-program/.

CD Projekt Group, "Management Board Report on the Activities of The CD Projekt Group and CD Projekt S.A. in 2019," April 8, 2020, https://www.cdprojekt.com/en/wp-content/uploads-en/2020/04/sprawozdanie-fy-2019-en-preview08-small.pdf.

Ceci, Laura, "Average mobile app user acquisition costs from September 2019 to August 2020, by region," Statista, November 4, 2024, https://www.statista.com/statistics/941273/mobile-app-average-user-acquisition-cost-worldwide/.

Ceci, Laura, "Number of available apps on the Microsoft Store in 2nd quarter 2022, by category," Statista, August 11, 2023, https://www.statista.com/statistics/1333740/microsoft-store-number-of-available-apps-by-category/.

Chalk, Andy, "The Ubisoft Club, Ubi's new online rewards program, opens its doors," PC Gamer, October 19, 2015, https://www.pcgamer.com/the-ubisoft-club-ubis-new-online-rewards-program-opens-its-doors/.

Chen, Brian X., "Jailbreakers Battle Apple for Control of iPhone," Wired, November 12, 2009, https://www.wired.com/2009/11/jailbreak-community/.

Chiang, Oliver, "The Master of Online Mayhem," Forbes. February 9, 2011, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html/?sh=7f132e45451e.

Chillingworth, Alec, "An Overview of Video Monetization for YouTube, Instagram, Facebook & TikTok," Epidemic Sound, September 15, 2022, https://www.epidemicsound.com/blog/video-monetization-for-youtube-instagram-facebook-tiktok/.

157

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Clement, J, "League of Legends (LoL) revenue worldwide from 2015 to 2020," Statista, January 2021, https://www.statista.com/statistics/806975/lol-revenue/.

Conditt, Jess, "Microsoft follows Epic and cuts Xbox PC revenue share to 12 percent," Engadget. April 29, 2021, https://www.engadget.com/xbox-pc-rev-share-88-12-epic-apple-130036485.html.

Cuofano, Gennaro, "How Does Steam Make Money? The Steam Business Model In A Nutshell," FourWeekMBA, January 10, 2022, https://fourweekmba.com/steam-business-model/.

Davidson, Ellis, "The Average Time to Reach Profitability in a Start Up Company," Chron, April 9, 2019, https://smallbusiness.chron.com/average-time-reach-profitability-start-up-company-2318.html.

Deleon, Nicholas, "PC Game Digital Sales Have Now Outpaced Physical Sales," TechCrunch, September 20, 2010, https://techcrunch.com/2010/09/20/pc-game-digital-sales-have-now-outpaced-physical-sales/.

Dillet, Romain, "Valve changes revenue-sharing tiers on Steam," TechCrunch, December 3, 2018, https://techcrunch.com/2018/12/03/valve-changes-revenue-sharing-tiers-on-steam/.

Domínguez, Pedro, "Epic Games sets its sights on Steam in its crusade against commissions in digital stores," Softonic, December 16, 2023, https://en.softonic.com/articles/epic-games-sets-its-sights-on-steam-in-its-crusade-against-commissions-in-digital-stores.

Donnellan, Jimmy, "Timed Epic Games Store Exclusives: The Complete List," Cultured Vultures, August 24, 2022, https://culturedvultures.com/timed-epic-games-store-exclusives-list/.

Dring, Christopher, "Take-Two CEO on Epic Store: Competition is a good thing," Games Industry, February 6, 2019, https://www.gamesindustry.biz/articles/2019-02-06-take-two-ceo-on-epic-store-competition-is-a-good-thing.

Electronic Arts, Inc., "Form 10-Q for quarterly period ending in December 31, 2019," https://d18rn0p25nwr6d.cloudfront.net/CIK-0000712515/8baed059-bdda-466c-b15e-3404977667ce.pdf.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Electronic Arts, Inc., "Form 10-K, Annual Report for the year ended March 31, 2020,"
https://www.sec.gov/Archives/edgar/data/712515/000071251520000019/ea-20200331.htm.

Electronic Arts, Inc., "Form 10-K, Annual Report for the year ended March 31, 2021,"
https://s204.q4cdn.com/701424631/files/doc_financials/2021/q4/7205ec00-ad63-4913-a8b5-
7dfed24158cf.pdf.

Electronic Arts, "EA launches Origin," June 3, 2011, https://ir.ea.com/press-releases/press-
release-details/2011/EA-Launches-Origin/default.aspx.

Electronic Arts, "Featured PC Games," https://www.ea.com/games/library/pc-download.

Epic Games Developer Documentation, "Access Keys," Epic Games, 2022.
https://dev.epicgames.com/docs/epic-games-store/access-keys.

Epic Games, "Distribution," https://store.epicgames.com/en-US/distribution.

Epic Games Store, "Epic Games Store 2021 Year in Review," January 27, 2022,
https://store.epicgames.com/en-US/news/epic-games-store-2021-year-in-review.

Epic Games Store, "Frequently asked questions," August 18, 2021,
https://www.epicgames.com/site/en-US/epic-games-store-faq.

Epic Games Store, "Reach over 100 million players by self-publishing your game on the Epic
Games Store," https://store.epicgames.com/en-US/publish.

Epic Games Store, "The Epic Games store is now live," December 7, 2018,
https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live.

European Central Bank. "ECB reference exchange rate, Polish zloty/Euro, 2:15 pm (C.E.T.)."

European Central Bank. "ECB reference exchange rate, US dollar/Euro, 2:15 pm (C.E.T.)."

Exchange Rates.org, "Japanese Yen (JPY) to US Dollars (USD) exchange rate for March 20,
2020," https://www.exchange-rates.org/Rate/JPY/USD/3-20-2020.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Franceschi-Bicchierai, Lorenzo, "Google flags apps made by popular Chinese e-commerce giant as malware," TechCrunch. March 20, 2023, https://techcrunch.com/2023/03/20/google-flags-apps-made-by-popular-chinese-e-commerce-giant-as-malware/.

Frank, Allegra, "Epic Games is launching its own store, and taking a smaller cut than Steam," Polygon, December 4, 2018, https://www.polygon.com/2018/12/4/18125498/epic-games-store-details-revenue-split-launch-date.

Franzese, Tomas, "Paradox Interactive CEO Thinks Competition from Epic Games Store Will 'Benefit Both Players and Game Publishers,'" DualShockers, November 12, 2019, https://www.dualshockers.com/epic-games-store-benefits-players-paradox-interactive/.

Game Jolt, "This is How it Works…," https://gamejolt.com/marketplace.

Gartenberg, Chaim, "Destiny 2 will exclusively be available on PC through Blizzard's Battle.net," The Verge, May 18, 2017, https://www.theverge.com/2017/5/18/15659404/destiny-2-battlenet-blizzard-activision-exclusive-pc-online-gameplay.

Green, Timothy, "Uber is Profitable. For Real This Time," *The Motley Fool*, August 2, 2023, https://www.fool.com/investing/2023/08/02/uber-is-profitable-for-real-this-time/.

Grubb, Jeff, "Epic Games Stores devs can now choose their own in-game payment processor," Venture Beat, December 6, 2019, https://venturebeat.com/2019/12/06/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

Grubb, Jeff, "Why Electronic Arts games are coming back to Steam (probably)," Games Beat, October 28, 2019, https://venturebeat.com/pc-gaming/why-electronic-arts-games-are-coming-back-to-steam-probably/.

Henderson, Tom, "Epic Games is Offering 100% Revenue to Developers for First 6 Months," Insider Gaming Network, March 20, 2024, https://insider-gaming.com/epic-games-100-percent-revenue/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Hernandez, Patricia, "The game store that outshines Steam by staying small and weird," The Verge, November 29, 2022, https://www.theverge.com/2018/11/29/18118217/itchio-steam-leaf-corcoran-pc-games-indie.

Horti, Samuel, "Is It Worth Cutting Out Steam to Sell Indie Games Direct?," PC Gamer, March 7, 2018, https://www.pcgamer.com/is-it-worth-cutting-out-steam-to-sell-indie-games-direct/.

Humble Bundle, "Humble Bundle Developer Resources," https://www.humblebundle.com/developer.

Humble Bundle, "Humble Bundle Developer Resources," https://www.humblebundle.com/developer.

Humble Bundle, "Humble Choice - Perk: Growing Store Discount," https://support.humblebundle.com/hc/en-us/articles/360026249173.

Humble Bundle, "Humble Rewards," https://support.humblebundle.com/hc/en-us/articles/360019314334-Humble-Rewards.

Humble Support, "How to Redeem an Epic Games Key," Humble Bundle, https://support.humblebundle.com/hc/en-us/articles/360020257973-How-to-Redeem-an-Epic-Games-Key.

Humble Support, "Widget Developer FAQ," Humble Bundle, https://support.humblebundle.com/hc/en-us/articles/202742190-Widget-Developer-FAQ.

Humble Widget, "Payment, delivery, and support. We have you covered," Humble Bundle, https://www.humblebundle.com/developer/widget.

International Competition Network, "Report on the Analysis of Loyalty Discounts and Rebates Under Unilateral Conduct Laws", *The Unilateral Conduct Working Group* (2009)*.* https://www.internationalcompetitionnetwork.org/wp-content/uploads/2018/07/UCWG_SR_LoyDisRebates.pdf

Itch.io, "Accepting Payments and Getting Paid," https://itch.io/docs/creators/payments#open-revenue-sharing.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Katkin, Andrew, "Electronic Arts Launches Origin," Electronic Arts. June 3, 2011, https://www.ea.com/news/electronic-arts-launches-origin.

Keene, Jamie, "Windows Store launches for Windows 8," The Verge, February 29, 2012, https://www.theverge.com/2012/2/29/2832684/windows-8-store-announcement-mwc.

Kelly, Erron, "The Epic Mega Sale is back for a third year and bringing big discounts," GamesBeat, May 19, 2022, https://venturebeat.com/games/epic-mega-sale-is-back-for-a-third-year-with-big-discounts/.

Kent, Emma, "Microsoft confirms it's never turned a profit on sale of Xbox consoles," Eurogamer, May 6, 2021, https://www.eurogamer.net/microsoft-confirms-its-never-made-profit-from-sale-of-an-xbox-console.

Khan, Wadan, "Epic Games Store Players To Pay Extra Fees up to 7% On Certain Payment Methods," TheNerdMag, April 11, 2019, https://www.thenerdmag.com/epic-games-store-players-to-pay-extra-fees-up-to-7-on-certain-payment-methods/.

Konvoy, "Deep Dive: PC Distribution Platforms," December 17, 2021, https://www.konvoy.vc/newsletter/deep-dive-pc-distribution-platforms.

Machkovech, Sam, "Blizzard has handed Diablo 1's keys to GOG, and you can buy it right now," Ars Technica, March 7, 2019, https://arstechnica.com/gaming/2019/03/original-diablo-is-now-on-sale-for-10-drm-free-but-not-on-blizzards-app/.

Mackay, Liam, "Activision could bring more games to Steam ahead of Modern Warfare 2," Charlie Intel, July 18, 2022, https://charlieintel.com/activision-could-bring-more-games-to-steam-ahead-of-modern-warfare-2/187225.

Makuch, Eddie, "Microsoft Will Pay Developers Even More Money on PC, Matching Epic Games Store," Gamespot, April 29, 2021, https://www.gamespot.com/articles/microsoft-will-pay-developers-even-more-money-on-pc-matching-epic-games-store/1100-6490770/.

McAloon, Alissa, "Ubisoft Connect announced as a 'refreshed' replacement for Uplay and Ubisoft Club," Game Developer, October 21, 2020,

162

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

https://www.gamedeveloper.com/console/ubisoft-connect-announced-as-a-refreshed-replacement-for-uplay-and-ubisoft-club.

Microsoft, "10-Q for quarterly period ending in December 31, 2019," https://www.microsoft.com/en-us/investor/sec-filings.aspx?startdate=7/1/2022&enddate=6/30/2023&filing=xbrl.

Microsoft, "Annual Report, 2019," https://www.microsoft.com/investor/reports/ar19/index.html.

Microsoft Store, "App Developer Agreement," July 10, 2020, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4o4bH.

Microsoft, "Benefits of distributing your apps via Microsoft Store," December 14, 2023, https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/why-distribute-through-store.

Microsoft, "How to earn Microsoft Rewards points," https://support.microsoft.com/en-us/topic/how-to-earn-microsoft-rewards-points-83179747-1807-7a5e-ce9d-a7c544327174#:~:text=Microsoft%20Rewards%20points%20don%27t,earning%20activities%20within%2018%20months.

Microsoft, "How to redeem Microsoft Rewards points," https://support.microsoft.com/en-us/topic/how-to-redeem-microsoft-rewards-points-52f5f51f-38ed-3a9b-b6e1-8308dd49a3c3.

Microsoft, "Microsoft Store, Version 8.8, Publish Date: June 16, 2022, Effective Date: July 16, 2022, App Developer Agreement," June 16, 2022, https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4YJB0.

Microsoft, "Reward yourself, make a difference with Microsoft Rewards," https://www.microsoft.com/en-us/rewards#coreui-areaheading-37u4igy.

Music Business Worldwide, "Is this the real reason Epic Games acquired Bandcamp? (Clue: It's got nothing to do with the Metaverse)," March 15, 2022, https://www.musicbusinessworldwide.com/podcast/is-this-the-real-reason-epic-games-acquired-bandcamp/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Nesbo, Elliot, "How Does Malware Make It Through to the App Store," MUO, March 28, 2022, https://www.makeuseof.com/malware-app-store/.

Newzoo, "Top 25 Public Companies by Game Revenues," https://newzoo.com/insights/rankings/top-25-companies-game-revenues/.

Nguyen, Chuong, "Microsoft a bigger cut of the revenue from Windows developers," Windows Central, November 21, 2018, https://www.windowscentral.com/microsoft-wants-bigger-cut-revenue-windows-developers.

Nielsen NIQ, "Market Study of the Video Game Industry: Gaming in Full Growth", August 19, 2024, https://nielseniq.com/global/en/insights/analysis/2024/market-study-of-the-video-game-industry-gaming-in-full-growth/.

Novet, Jordan, "Microsoft will match Epic and share more money with video game makers," CNBC, April 29, 2021, https://www.cnbc.com/2021/04/29/microsoft-will-match-epic-and-share-more-money-with-video-game-makers.html.

Orland, Kyle, "Microsoft follows Epic's lead, lowers its cut of PC game sales to 12%," Ars Technica, April 29, 2021, https://arstechnica.com/gaming/2021/04/microsoft-follows-epics-lead-lowers-its-cut-of-pc-game-sales-to-12/.

Patreon Support, "What is Patreon," 2020, https://support.patreon.com/hc/en-us/articles/204606315-What-is-Patreon.

PCGamesN, "Rami Ismail: We're seeing Steam bleed…that's a very good thing for the industry," March 20, 2019, https://www.pcgamesn.com/rami-ismail-interview.

Peppiatt, Dom, "Most Developers think Steam's 30% revenue cut is unjustified," VG 247, April 29, 2021, https://www.vg247.com/steam-30-percent-revenue-cut-unjustified-developer-survey.

Peters, Jay, "Epic will now let developers self-publish to the Epic Games Store," The Verge, March 9, 2023, https://www.theverge.com/2023/3/9/23630864/epic-games-store-self-publish-tools-ratings.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Porter, Jon, "EA's Origin client to become EA desktop app," The Verge, September 15, 2020, https://www.theverge.com/2020/9/15/21437680/ea-origin-desktop-app-play-access-premier-pro-steam-battlenet.

Pramath, "Take-Two CEO Talks About Epic Games Store And Alternate Launchers: We Want To Be Where The Customer Is," GamingBolt, February 6, 2019, https://gamingbolt.com/take-two-ceo-talks-about-epic-games-store-and-alternate-launchers-we-want-to-be-where-the-customer-is.

Prescott, Shaun, "The most popular desktop gaming clients, ranked," PC Gamer, July 5, 2019, https://www.pcgamer.com/the-most-popular-desktop-gaming-clients-ranked/.

Purchese, Robert, "Blizzard begins digital distribution, Warcraft III, StarCraft first on offer," EUROGAMER, May 6, 2008, https://www.eurogamer.net/blizzard-begins-digital-distribution.

Purslow, Matt, "Ubisoft Announces Uplay+ Subscription Service for PC - E3 2019," IGN, June 10, 2019, https://www.ign.com/articles/2019/06/10/ubisoft-announces-uplay-subscription-service-for-pc-e3-2019.

Reichenberg, David, and Stephen D. Libowsky, "Monopoly," Concurrences, https://www.concurrences.com/en/dictionary/Monopoly.

Saed, Sherif, "Third-party games made $251 million on Epic Games Store in 2019, free games to continue in 2020," VG247, January 14, 2020, https://www.vg247.com/epic-games-store-free-games-coming-2020-251-million-revenue#:~:text=World%20War%20Z%2C%20Borderlands%203,some%20of%20the%20biggest%20earners.

Saed, Sherif, "Ubisoft explains why The Division 2 ditched Steam, says PC pre-orders already beating original game," VG247, February 15, 2019, https://www.vg247.com/the-division-2-pc-pre-orders-high-despite-skipping-steam.

Sams, Brad, "Starting Jan 1st, Microsoft's app store policy change makes it less attractive for developers," Neowin, November 20, 2014, https://www.neowin.net/news/starting-jan-1st-microsoft039s-app-store-policy-change-makes-it-less-attractive-for-developers/.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Samsung Galaxy Store Seller Portal, "Terms and Conditions," August 13, 2020, https://seller.samsungapps.com/help/termsAndConditions.as.

Shaw, Steven, "Steam vs Epic Games Users and Revenue 2021 Market Share Update," Stealth Optional, May 10, 2021, https://stealthoptional.com/how-to/steam-epic-games-users-revenue-market-update-2021/.

Sherif, Ahmed, "Mobile operating system distribution for software development worldwide in 2022 and 2023," *Statista*, March 6, 2024," https://www.statista.com/statistics/1078678/software-development-operating-system-mobile/.

Silva, Joao, "Ubisoft games might be coming back to Steam," TechSpot, November 30, 2021, https://www.techspot.com/news/92433-ubisoft-games-might-coming-back-steam.html.

Sinclair, Brendan, "Destiny 2 PC exclusive to Battle.net," Games Industry, May 18, 2017, https://www.gamesindustry.biz/destiny-2-pc-exclusive-to-battle-net.

Sinclair, Brendan, "EA returns to Steam," Games Industry, October 29, 2019, https://www.gamesindustry.biz/ea-returns-to-steam.

Singh, Surej, "'Call Of Duty: Black Ops Cold War' will be a Battle.net exclusive for PC," NME, August 24, 2020, https://www.nme.com/news/gaming-news/call-of-duty-black-ops-cold-war-will-release-exclusively-on-battle-net-for-pc-2735762.

Square Enix, "Dragon Quest: Builders 2," https://dragonquest.square-enix-games.com/builders2/en-us/home/.

Square Enix, "Final Fantasy VII," https://ffvii-remake.square-enix-games.com/en-us.

Square Enix, "Final Fantasy XIV: Shadowbringers," https://na.finalfantasyxiv.com/shadowbringers/.

Square Enix, "Outline of Financial Results Briefing by Square Enix Holdings," May 13, 2020, https://www.hd.square-enix.com/eng/ir/library/pdf/20q4outline.pdf.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Square Enix Store, "Square Enix Store," Internet Archive Wayback Machine, December 3, 2019, https://web.archive.org/web/20191203103737/https://store.na.square-enix-games.com/en_US/.

Statista, "Consumer awareness and understanding of selected video streaming services in the United States as of February 2024," March 27, 2024, https://www.statista.com/statistics/1301234/consumer-awareness-and-familiarity-with-streaming-services-us/.

Statista, "Global market share held by operating systems for desktop PCs, from January 2013 to June 2022," Statista. July 27, 2022, https://www.statista.com/statistics/218089/global-market-share-of-windows-7/.

Statt, Nick, "Microsoft will distribute more Xbox titles through Steam and finally support Win32 games," The Verge, May 30, 2019, https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows.

Statt, Nick, "Valve's new Steam revenue agreement gives more money to game developers," The Verge, November 30, 2018, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition.

Statt, Nick, and Sean Hollister, "Epic Games takes on Steam with its own fairer game store," The Verge, December 4, 2018, https://www.theverge.com/2018/12/4/18124203/epic-games-fortnite-valve-steam-game-store-distribution-unreal-engine.

Steam, "Steam Hardware & Software Survey: January 2025", https://store.steampowered.com/hwsurvey/Steam-Hardware-Software-Survey-Welcome-to-Steam.

Steam, "The Points Shop: Steam Points," https://store.steampowered.com/points/howitworks.

Steam, "Steam - 2020 Year in Review," January 13, 2021, https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Steam, "Steam - 2021 Year in Review," March 8, 2022,
https://store.steampowered.com/news/group/4145017/view/3133946090937137590.

Steam, "Steam Year in Review 2022," February 16, 2023,
https://store.steampowered.com/news/group/4145017/view/3677786186779762807.

Steam, "Steam Keys (Steamworks Documentation),"
https://partner.steamgames.com/doc/features/keys.

Steamworks, "New Revenue Share Tiers and other updates to the Steam Distribution
Agreement." November 30, 2018,
https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

Steamworks, "Microtransactions (In-Game Purchases),"
https://partner.steamgames.com/doc/features/microtransactions.

Steamworks, "Steam Community," https://partner.steamgames.com/doc/features/community.

Stitcher, "A Year End Stitcher Report Update & Some Podcaster Insights," Medium, December
7, 2021, https://stitcher.medium.com/a-year-end-stitcher-report-update-some-podcaster-insights-eee4034f745c.

Subset Games, "Into the Breach," https://subsetgames.com/#.

Takahashi, Dean, "Epic Games wins injunction favoring alternative payments in antitrust lawsuit
against Apple," GamesBeat, September 10, 2021, https://venturebeat.com/games/epic-games-wins-injunction-favoring-alternative-payments-in-antitrust-lawsuit-against-apple/.

Take-Two Interactive Software, Inc., "Form 10-K, for the year ended March 31, 2020,"
https://taketwointeractivesoftwareinc.gcs-web.com/static-files/02781927-7af1-4ce4-811b-a759024ca289.

Take-Two Interactive Software, Inc., "Form 10-K, for the year ended March 31, 2019,"
https://taketwointeractivesoftwareinc.gcs-web.com/static-files/9e318735-182b-4a4b-b2be-fce2d1c2f940.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

"Take-Two Interactive Software, Inc., Reports Better Than Expected Results for Fiscal First Quarter 2022", *Business Wire*, August 2, 2021, https://www.businesswire.com/news/home/20210802005541/en/Take-Two-Interactive-Software-Inc.-Reports-Better-Than-Expected-Results-for-Fiscal-First-Quarter-2022.

Talbot, Carrie, "League of Legends heads to the Epic Games Store," PCgamesN, November 4, 2021, https://www.pcgamesn.com/league-of-legends/epic-games-store.

Tassi, Paul, "Sony Gaming Profit Drops 33% Partially Due To Selling PS5 At A Loss," Forbes, August 4, 2021, https://www.forbes.com/sites/paultassi/2021/08/04/sony-gaming-profit-drops-33-due-to-selling-ps5-at-a-loss/?sh=37cd84c54fc4.

Thang, Jimmy, "Blizzard Store Debuts Digital Downloads," IGN, May 5, 2008, https://www.ign.com/articles/2008/05/05/blizzard-store-debuts-digital-downloads.

Twitch, "Twitch Basics," https://www.twitch.tv/creatorcamp/en/get-rewarded/twitch-basics/.

Ubisoft, "2019 Universal Registration Document and Annual Report," https://staticctf.akamaized.net/8aefmxkxpxwl/5bzFRXK7RgTIv2p3EGnaXd/04f0efdee8bdab3a82035a002448083d/DDR_VA_FINAL.pdf.

Ubisoft, "2020 Universal Registration Document and Annual Report," https://downloads.ctfassets.net/8aefmxkxpxwl/OrrTmfbfpJKm1yhWSRDtS/fc82e78cc07fb0e1ba385197962610f7/UBI2020_URD_EN_20_06_18_MEL.pdf.

Ubisoft, "2021 Universal Registration Document and Annual Report," https://downloads.ctfassets.net/8aefmxkxpxwl/3d835a7MATY05YvlprREg9/cba93c9257e4d26e28e266d3d260fab1/UBI2021_URD_EN_COMPLET_Vmel_160621.pdf.

Ubisoft, "Ubisoft Reports First-Half 2012-13 Sales and Earnings Figures," November 6, 2012, https://staticctf.akamaized.net/8aefmxkxpxwl/3OoT5tHHDXwNrt6HBPX4VA/ca1200236cedbfc5f44087a3f68b4ba1/Ubisoft_H1_FY13_English.pdf.

U.S. Department of Justice and the Federal Trade Commission, "2023 Merger Guidelines," December 18, 2023, https://www.justice.gov/atr/merger-guidelines.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Warren, Tom, "Microsoft opens its Windows store up to third-party app stores," The Verge, September 28, 2021, https://www.theverge.com/2021/9/28/22698196/microsoft-store-third-party-app-stores-epic-games-amazon.

Warren, Tom, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," The Verge, April 29, 2021, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/.

Wawro, Alex, "Humble launches Gamepages to give devs a website for their Humble Widgets," Game Developer, July 18, 2016, https://www.gamedeveloper.com/business/humble-launches-gamepages-to-give-devs-a-website-for-their-humble-widgets.

Wawro, Alex, "Reinvigorated Humble Widget lets devs offer in-browser game demos," Game Developer, February 25, 2015, https://www.gamedeveloper.com/business/reinvigorated-humble-widget-lets-devs-offer-in-browser-game-demos.

Wiggers, Kyle, "Google Play Points launches in the U.S.," Venture Beat, November 4, 2019, https://venturebeat.com/business/google-play-points-launches-in-the-u-s/.

Xsolla, "Connect Directly With Your Players, From The Start," https://xsolla.com/solutions/online-game-sales?cardId=166.

Xsolla, "One Price For Everything. 5% of Transactions + Cost of Channel," https://xsolla.com/products/in-game-store/pricing.

Yin-Poole, Wesley, "Five years later, Call of Duty returns to Steam with Modern Warfare 2," Eurogamer, June 8, 2022, https://www.eurogamer.net/five-years-later-call-of-duty-returns-to-steam-with-modern-warfare-2.

Yin-Poole, Wesley. "The Epic Games Store is getting a lot more popular," Eurogamer, January 28, 2021, https://www.eurogamer.net/the-epic-games-store-is-getting-a-lot-more-popular.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**APPENDIX B: ECONOMIC MODEL ESTIMATE 2019 CALCULATIONS**

The workbook "Economic Model Estimate 2019.xlsx" calculates the But-For commission rate of 13.63% using 2019 data.

### A. "MODEL CALCULATION" TAB

#### 1. Model Inputs [1]-[4]

249. The first tab, "Model Calculation," contains a table with four data inputs used in the economic model:

- **Rival Market Share [1]**: 23.1%, calculated using Prof. Simonson's survey, as detailed in the "Rival Market Share" tab.

- **Variable Cost [2]**: 3.8%, conservatively assumed to be the same for Apple and the rival store, calculated in "Apple App Store VC, FC 2019" tab.

- **Fixed Cost [3]**: 1.5%, expressed as the ratio of fixed cost to total market expenditure, and conservatively assumed to be equal for Apple and the rival store. It is calculated in the "Apple App Store VC, FC 2019" tab.

- **Rival Operating Profit Margin [4]**: 23.0%, calculated in the "Rival Operating Profit Margin" tab.

250. The table also displays two outputs calculated by the model based on these inputs: the But-For commission rate [5] and the profit margin Apple would have earned in the But-For World [6], as discussed next.

#### 2. But-for commission rate [5]

- **But-for Commission Rate [5]**: 13.63%, calculated using the following formula:

$$\tau = \frac{-s_r \times VC - \frac{FC}{M}}{(\pi_r - 1)s_r} = \frac{-23.1\% \times 3.8\% - 1.5\%}{(23\% - 1) \times 23.1\%} = 13.63\%,$$

171

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

251. where $\tau$ is the But-For commission rate, $s_r$ is the rival store's market share [1], $VC$ is the variable cost [2], $\frac{FC}{M}$ is the ratio of fixed operating costs to total market expenditure [3] and $\pi_r$ is the rival store's operating margin [4]. The subscript $r$ denotes the rival store. This equation is derived from the economic model equation in the report, by solving for $\tau$.[515]

### 3.    Apple Profit Margin [6]

- **Apple Profit Margin [6]**: 57.2%, calculated by inputting the estimated But-For commission rate of 13.63% into the profit margin equation and using Apple's market share $s_a = 1 - s_r = 76.9\%$.[516]

$$\text{Apple Profit Margin [6]} = \frac{s_a(\tau - VC) - \frac{FC}{M}}{s_a\tau} = \frac{76.9\%(13.63\% - 3.8\%) - 1.5\%}{76.9\% \times 13.63\%} = 57.2\%.$$

### B.    "APPLE APP STORE VC, FC 2019" TAB

252. This tab calculates the variable cost (VC) and the ratio of fixed costs to total market expenditure $\left(\frac{FC}{M}\right)$, assumed to be the same for Apple and the rival store, based on Apple's worldwide billings and cost data for 2019.

### 1.    Billings and Cost Data [1]-[9]

253. The table in this tab shows the following billings and cost data used as inputs:

- **App Store Billings [1]**: USD 51,100 million, retrieved from "App Store Fiscal Year Scorecard: 2019" (APL-APPSTORE_09090476, at 477).

  - As noted in the source, App Store's billings are the sum of in-app billings (~ USD 50 billion) and paid app billings (~ USD 1 billion).

---

[515]    $$\text{Operating Profit Margin Firm}_i = \frac{s_i M(\tau_i - VC_i) - FC_i}{s_i M\tau_i}.$$

[516] Calculations in this appendix are rounded, so intermediary values may not sum exactly to the final result. In the spreadsheet workpapers, no rounding was applied.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **App Store P&L costs [2]-[4]**: retrieved from the App Store P&L (APL-APPSTORE_10176241, at 318), including:

    - **COGS [2]**: USD 46 million.

    - **OCOGS [3]**: USD 942 million.

    - **OPEX [4]**: USD 1,332 million.

- **Worldwide Developer Relations costs [5]-[6]**:

    - **OCOGS [5]**: USD 74 million, as reported in APL-APPSTORE_09814097.

    - **OPEX [6]**: USD 101 million, as reported in APL-APPSTORE_09814099.

- **App Store Marketing OPEX [7]**: USD 22 million, as reported in APL-APPSTORE_09814098.

- **Unattributed App Store OPEX [8]**: USD 226 million, calculated in the tab with the same name (see below).

- **App Store OPEX Variable Share [9]**: 53.2% share of App Store's OPEX classified as revenue variable by Apple. This share is calculated based on the ratio of revenue variable OPEX to total OPEX, as reported in the App Store P&L (APL-APPSTORE_10176241, at 318):

$$App\ Store\ OPEX\ Variable\ Share\ [9] = \frac{OPEX\ Revenue\ Variable}{Total\ OPEX} = \frac{709}{1332} = 53.2\%.$$

### 2.    Variable and Fixed Cost Shares [10]-[14]

254. Based on the previous inputs, the variable and fixed costs as a share of App Store billings are calculated as follows.

- **Total OPEX [10]**: USD 1,680 million, calculated as the sum of App Store's OPEX [4], WWDR's OPEX [6], App Store's marketing OPEX [7] and unattributed App Store's OPEX [8]:

$$Total\ OPEX\ [10] = 1,332 + 101 + 22 + 226 = 1,680.$$

- **Variable OPEX [11]**: USD 894 million. The variable component of OPEX is calculated by applying the 53.2% variable share of App Store's OPEX [9] to the total OPEX [10].

$$Variable\ OPEX\ [11] = Total\ OPEX\ [10] \times App\ Store\ OPEX\ Var\ Share\ [9] =$$

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$Variable\ OPEX = 1,680 \times 53.2\% = 894.$$

- **Fixed OPEX [12]**: USD 786 million, calculated by deducting the variable OPEX [11] from the total OPEX [10].

$$Fixed\ OPEX\ [12] = Total\ OPEX\ [10] - Variable\ OPEX[11] = 1680 - 894 = 786.$$

- **Variable Cost [13]**: USD 1,956 million, calculated as the sum of COGS [2], OCOGS  (from both App Store P&L [3] and WWDR [5]) and the variable component of OPEX [11].

$$Variable\ Cost\ [13] = COGS\ [2] + (OCOGS\ [3] + OCOGS\ [5]) + Variable\ OPEX[11]$$

$$Variable\ Costs\ [13] = 46 + (942 + 74) + 894 = 1,956.$$

  – **Variable Cost share of billings [13B]**: 3.8%, obtained by diving variable costs [13] by App Store's billings [1]:

$$VC\ [13B] = \frac{Variable\ Cost\ [13]}{App\ Store\ Billings\ [1]} = \frac{1,956}{51,100} = 3.8\%.$$

- **Fixed Costs [14]**: USD 786 million, calculated as the portion of total OPEX that is not variable.

$$Fixed\ Cost\ [14] = Fixed\ OPEX[12] = 786.$$

  – **Fixed Costs share of billings [14B]**: 1.5%, likewise obtained by dividing fixed costs [14] by App Store's billings [1]:

$$\frac{FC}{M}\ [14B] = \frac{Fixed\ Cost\ [14]}{App\ Store\ Billings\ [1]} = \frac{786}{51,100} = 1.5\%.$$

## C.    "UNATTRIBUTED APP STORE OPEX" TAB

255. This tab calculates the unattributed App Store OPEX, fully aligned with the methodology applied by Mr. Barnes, as detailed in his written testimony.[517] To understand these calculations, it is important to note that:

---

[517]  Ned Barnes Written Direct Testimony, ¶ 12 and Table 1.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- The App Store is part of the iTunes business segment.

- The iTunes business segment belongs to the Apple Services line of business.

- Apple maintains internal reports with revenues and cost data for its lines of business, including Apple Services.

- Apple maintains internal P&L statements for business segments such as iTunes, but iTunes P&L does not fully account for allocated general corporate expenses (e.g. IS&T and HR).

256. With this context in mind, this tab calculates unattributed App Store OPEX through the following steps.

### 1.    Apple Services Revenue and OPEX [1]-[3]

257. The first step is to calculate *OPEX as a share of revenue* for the Apple Services line of business.

- **Apple Services Net Revenue [1]**: USD 46,290,778 thousand, retrieved from Apple's Line of Business Report (APPSTORE_08856866).

- **Apple Services Operating Expenses (OPEX) [2]**: USD 6,324,909 thousand, retrieved from the same report.

- **Apple Services OPEX as a Share of Revenue [3]**: 13.7%, calculated by dividing OPEX [2] by the net revenue [1] from Apple Services:

$$Apple\ Services\ OPEX\ as\ a\ Share\ of\ Rev\ [3] = \frac{Apple\ Services\ OPEX\ [2]}{Apple\ Services\ Net\ Revenue\ [1]} = \frac{6,324,909}{46,290,778}$$
$$= 13.7\%.$$

### 2.    iTunes Unattributed OPEX [4]-[8]

258. The second step is to calculate iTunes' unattributed OPEX using iTunes' revenue and cost data, retrieved from iTunes' P&L (APL-APPSTORE_09806205).

- **iTunes Revenue [4]**: USD 20,731,700 thousand.

- **iTunes Attributed OPEX [5]**: USD 2,485,065 thousand.

175

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **iTunes Total "Fully Burdened" OPEX [6]**: USD 2,832,662 thousand. Since iTunes' OPEX does not fully account for all general corporate expenses, the fully burden OPEX [6] is estimated by multiplying iTunes' revenue [4] by the OPEX share of revenue previously calculated for Apple Services [3]:

$$iTunes\ Fully\ Burden\ OPEX\ [6] = iTunes\ Rev\ [4] \times Apple\ Services\ OPEX\ as\ a\ Share\ of\ Rev[3]$$

$$iTunes\ Fully\ Burden\ OPEX\ [6] = 20{,}731{,}700 \times 13.7\% = 2{,}832{,}662.\ [518]$$

- **iTunes Unattributed OPEX [7]**: USD 347,597 thousand, calculated as the difference between iTunes' fully burden OPEX [6] and iTunes' attributed OPEX [5]:

$$iTunes\ Unattributed\ OPEX\ [7] = iTunes\ Fully\ Burden\ OPEX[6] - iTunes\ Attributed\ OPEX[5]$$

$$iTunes\ Unattributed\ OPEX = 2{,}832{,}662 - 2{,}485{,}065 = 347{,}597.$$

- **iTunes Unattributed OPEX as a Share of iTunes Revenue [8]**: 1.7%, calculated as:

$$\frac{iTunes\ Unattributed\ OPEX\ [7]}{iTunes\ Revenue\ [4]} = \frac{347{,}597}{20{,}731{,}700} = 1.7\%.$$

### 3.    App Store Unattributed OPEX [9]-[10]

259.    Lastly, App Store's unattributed OPEX is calculated by multiplying iTunes' unattributed OPEX as a share of revenue by App Store's revenue.

- **App Store Revenue [9]**: USD 13,459,000 thousand, retrieved from APL-APPSTORE_10176241, at 318.

- **App Store Unattributed OPEX [10]**: USD 225,660 thousand, calculated as:

$$App\ Store\ Unattrib.\ OPEX\ [10] = iTunes\ Unattrib.\ OPEX\ as\ a\ Share\ of\ Rev\ [8] \times App\ Store\ Rev[9]$$

---

[518]  Calculations in this appendix are rounded, so intermediary values may not sum exactly to the final result. In the spreadsheet workpapers, no rounding was applied.

176

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$\text{App Store Unattributed OPEX }[10] = 1.7\% . \times 13,459,000 = USD\ 225,660.\text{[519]}$$

### D.    "RIVAL MARKET SHARE" TAB

260.    All calculations in this tab are based on data from Simonson Survey,[520] specifically respondents' replies to Q5 of Survey 2:

> "Imagine that, when downloading/purchasing apps and making in-app purchases on your iPhone and/or iPad, you can choose between the two app stores shown below (…)
>
> I would download/purchase all of my paid apps and make all of my in-app purchases from the Apple App Store.
>
> I would download/purchase most of my paid apps and make most of my in-app purchases from the Apple App Store.
>
> I would download/purchase my paid apps and make my in-app purchases about equally from both stores.
>
> I would download/purchase most of my paid apps and make most of my in-app purchases from the App Store B.
>
> I would download/purchase all of my paid apps and make all of my in-app purchases from the App Store B.
>
> Don't know / Unsure."

261.    In the table on this tab, each column contains data or figures for each optional response to the survey question in rows [1]-[7], which are used to calculate the rival market share.

---

[519]  Id.

[520]  Simonson First Class Report, ¶ 64-83. *See also* Simonson First Class Report, Appendix F.1., Appendix F.2.

177

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **Number of Respondents [A]**: number of respondents who chose each option provided for the question above.

  – For example, 344 respondents selected the first option [1], 122 selected the second option [2], etc.

  – The total number of respondents excluding "Don't know / Unsure" [7] is 632.

  – The total number of respondents [8] is 683.

- **Response Share Excluding "Don't know / Unsure" [B]**: response share calculated by dividing the number of respondents who selected a given option by the total number of respondents who did not select "don't know or unsure" in the denominator.

  – For example, the share of respondents who would download / purchase all apps and make most in-apps purchases from Apple's App Store [1] is calculated as follows:

$$Share_{Option\,[1]} = \frac{Respondents_{Option\,[1]}}{Respondents\;Excluding\;"Don't\;know\;/\;Unsure"} = \frac{344}{632} = 54.4\%.$$

- **Distributed Responses [C]**: response share adjusted by proportionally reallocating respondents who selected "unsure/don't know" across the remaining five options.

  – For example, the adjusted number of respondents who would download/purchase all apps and make most in-app purchases from Apple's App Store is calculated as follows:

$$Dist\;Responses_{Option\,[1]} = Respondents_{Option\,[1]} + Respondents_{Unsure} \times Resp\;Share_{Option\,[1]}$$

$$Distributed\;Responses_{Option\,[1]} = 344 + 51 \times 54.4\% = 371.8.\,[521]$$

- **Assumed Rival Share [D]**: usage share of the rival store assigned to each respondent group – 100% for "all", 75% for "most" and 50% for "about equally".

---

[521] Calculations in this appendix are rounded, so intermediary values may not sum exactly to the final result. In the spreadsheet workpapers, no rounding was applied.

– For example, respondents who answered, "I would download/purchase most of my paid apps and make most of my in-app purchases from the Apple App Store" are assumed to allocate 25% of their usage to the rival store.

- **Total Rival Usage [E]**: total usage of the rival store for each group of respondents, calculated by multiplying the distributed responses [C] by the assumed rival share [D].

– For example, the total usage of the rival store by respondents who selected "I would download/purchase most of my paid apps and make most of my in-app purchases from the Apple App Store" [2] is calculated as follows:

$$Total\ Rival\ Usage_{Option\ [2]} = Distributed\ Responses_{Option\ [2]} \times Assumed\ Rival\ Share_{Option\ [2]}$$

$$Total\ Rival\ Usage_{Option\ [2]} = 131.8 \times 25\% = 33.$$

- **Implied Rival Market Share [9]**: the rival market share implied by the survey is calculated by adding up the total rival usage [E] for all alternative answers to Q5 and dividing the sum by the total number of respondents [8]:

$$Rival\ Market\ Share = \frac{0 + 33 + 40.5 + 43 + 41.1}{683} = 23.1\%.$$

### E.    "RIVAL OPERATING PROFIT MARGIN" TAB

262.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## APPENDIX C: ECONOMIC MODEL ESTIMATE 2018 CALCULATIONS

263. The workbook "Economic Model Estimate 2018.xlsx" provides an alternative calculation of the But-For commission rate using 2018 data instead of 2019. All calculation steps in this workbook are identical to those in "Economic Model Estimate 2019.xlsx." The only differences are the use of 2018 sources, which result in slightly different data inputs and a slightly lower But-For commission rate of 13.25%.

### A. "MODEL CALCULATION" TAB

264. In the table in the "Model Calculation" tab, the rival market share [1] and the rival operating profit margin [4] remain the same as for 2019 due to the absence of alternative data. However, the other data inputs differ:

- **Variable Cost [2]**: 4.1%, instead of 3.8% in 2019.

- **Fixed Cost [3]**: 1.4% instead of 1.5% in 2019.

265. The adjusted inputs result in the following output changes:

- **But-for Commission Rate [5]**: 13.25%

- **Apple Profit Margin [6]**: 55.4% (in the But-For World).

### B. "APPLE APP STORE VC, FC 2018" TAB

266. This tab follows the same calculation steps as the equivalent tab in the 2019 workpaper, with the only difference being that it uses 2018 figures instead of 2019 values. While most billings and cost figures rely on the same sources (which contain both 2018 and 2019 data), two figures had to be calculated using alternative methods:

- **App Store Billings for 2018 [1]**: these are estimated based on the 2019 App Store's billings figure, scaled by the year-over-year change in constant currencies, both of which are reported in the same source as previously used (APL-APPSTORE_09090476, at 477).

$$App\ Store\ Billings_{2018} = \frac{App\ Store\ Billings_{2019}}{1 + Y/Y_{CC}} = \frac{51,100}{1 + 18.9\%} = 42,977.$$

180

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **App Store P&L Costs for 2018 [2]-[4]:** these costs are retrieved from an earlier App Store P&L (APL-APPSTORE_08883133, at 286), since they were unavailable in the source file used for the "Economic Model Estimate 2019.xlsx" workpaper (APL-APPSTORE_10176241, at 318).

267. For all other figures in the tab, the calculations are the same as in the 2019 workpaper, with the only difference being that the values have been updated to reflect 2018 data instead of 2019.

### C.    "UNATTRIBUTED APP STORE OPEX" TAB

268. Almost all sources in this tab are identical to those in the "Economic Model Estimate 2019.xlsx" workpaper but are based on 2018 data instead. The only exception is the App Store Revenue [9], which is sourced from an earlier App Store P&L (APL-APPSTORE_08883133, p.286), as 2018 data was unavailable in the more recent P&L (APL-APPSTORE_10176241, at 318).

### D.    REMAINING TABS

269. The remaining tabs are identical to those in the "Economic Model Estimate 2019.xlsx" workpaper.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## APPENDIX D: ECONOMIC MODEL ESTIMATE 2019 - SENSITIVITY ANALYSIS CALCULATIONS

270.  This workpaper recalculates the But-For commission rate for 2019 by conducting four alternative sensitivity analyses, as described in Chapter V of the report. All intermediate calculations and sources used in this workpaper are identical to those in the "Economic Model Estimate 2019.xlsx" workpaper. Likewise, this workpaper includes a "Model Calculations" tab, which is identical to the corresponding tab in the "Economic Model Estimate 2019.xlsx" workpaper, showing the calculation of the 13.63% But-For commission rate.

271.  The only difference in this workpaper is the inclusion of four additional tabs: "Scenario A," "Scenario B," "Scenario C," and "All Scenarios Combined." Each tab presents an alternative calculation of the But-For commission rate based on modified data inputs. In these tabs, all deviations from the original calculations in the "Economic Model Estimate 2019.xlsx" workpaper are highlighted in yellow.

### A.  "SCENARIO A" TAB

272.  In Scenario A, the rival's market share is increased.

- **Rival Market Share [1]:** adjusted from 23.1% to 30%. As explained in the footnote in the table, 30% can be seen as a lower bound market share for a duopoly market to be considered "competitive."[522]

273.  As a result of the adjustment in the rival market share, the But-For commission rate [5] decreases to **11.63%** in this scenario.

---

[522] "Courts generally accept market shares higher than 70% as an indication of monopoly power if [paired] with significant barriers to entry or expansion." See David Reichenberg and Stephen D. Libowsky, "Monopoly," Concurrences, available at https://www.concurrences.com/en/dictionary/Monopoly.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

B.    "SCENARIO B" TAB

274.  In scenario B, both the variable cost share and the fixed cost ratio to market expenditure are adjusted by excluding the unattributed App Store OPEX from the calculation.

- **Variable Cost [2]**: adjusted from 3.8% to 3.6%. The adjusted figure is calculated by deducting the variable component (53.2%) of the unattributed App Store OPEX (USD 226 million) from App Store's previously calculated variable cost (USD 1,956 million), and then dividing the result by App Store's billings (USD 51,100 million):

$$Variable\ Cost\ [2] = \frac{1,956 - 53.2\% \times 226}{51,100} = 3.6\%.$$

- **Fixed Cost [3]**: adjusted from 1.5% to 1.3%. The adjusted figure is calculated by deducting the variable component (46.8%) of the unattributed App Store OPEX (USD 226 million) from App Store's previously calculated fixed cost (USD 785 million), and then dividing the result by App Store's billings (USD 51,100 million):

$$Fixed\ Cost\ [3] = \frac{786 - 46.8\% \times 226}{51,100} = 1.3\%.$$

275.  As a result of the adjustment in the rival store's costs, the But-For commission rate [5] decreases to **12.16%** in this scenario.

C.    "SCENARIO C" TAB

276.  In Scenario C, the ratio of fixed costs to market expenditure is adjusted to account for market expansion in the But-For World.

- **Fixed Cost [3]**: adjusted from 1.5% to 1.4%, to reflect an increase of 10% in App Store's billings:

$$Fixed\ Cost\ [3] = \frac{786}{51,100 \times (1 + 10\%)} = 1.4\%.$$

277.  As a result of the 10% market expansion, the But-For commission rate [5] decreases to 12.84%.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### D.    "ALL SCENARIOS COMBINED" TAB

278. Lastly, the tab "All Scenarios Combined" calculates the But-For commission rate [5] when all adjustments from Scenarios A, B, and C are implemented simultaneously. In this scenario, the following adjustments are made:

- **Rival Market Share [1]**: increased to 30%.

- **Variable Cost [2]**: decreased to 3.6%, due to the exclusion of the variable component of unattributed App Store OPEX.

$$Variable\ Cost\ Share = \frac{1,956 - 53.2\% \times 226}{51,100} = 3.6\%.$$

- **Fixed Cost [3]**: decreased to 1.2% due to the simultaneous exclusion of the fixed component of unattributed App Store OPEX and the 10% market expansion.

$$Fixed\ Cost\ Ratio = \frac{786 - 46.8\% \times 226}{51,100 \times (1 + 10\%)} = 1.2\%.$$

279. As a result of all combined adjustments, the But-For commission rate [5] decreases to 9.9%.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**APPENDIX E: ECONOMIC MODEL ESTIMATE 2022 CALCULATIONS**

280. The workbook "Economic Model Estimate 2022.xlsx" provides an updated calculation of the But-For commission rate based on 2022 post-Covid data, resulting in a 14.11% figure. As noted in the report, this workpaper serves solely as a robustness check to confirm that the model's results remain reasonable, reliable and largely consistent when more recent data is applied. However, it is important to highlight that recent data is generally unreliable for assessing a long-term equilibrium commission rate due to the pandemic's significant impact on the gaming industry.

A.  "MODEL CALCULATION" TAB

281. The "Model Calculation" tab displays the four updated data inputs based on 2022 data:

- **Rival Market Share [1]:** calculated using Prof. Simonson's survey, it remains unchanged at 23.1%.

- **Variable Cost [2]:** this figure, calculated in the "Apple App Store VC, FC 2022" tab, ▆▆▆▆▆▆ ▆▆▆▆▆ in 2022, compared to the 3.8% figure for 2019.

- **Fixed Cost [3]:** also calculated in the "Apple App Store VC, FC 2022" tab, this ratio ▆▆▆▆ ▆▆▆ in 2022, down from 1.5% in 2019.

- **Rival Operating Profit Margin [4]:** calculated in the "Rival Operating Profit Margin" tab, it increases to 43% in 2022, compared to 23% in 2019.

The updated data inputs result in the following model outputs:

- **But-for Commission Rate [5]:** 14.11%

- **Apple Profit Margin [6]:** 66.1%.

B.    "APPLE APP STORE VC, FC 2022" TAB

282. This tab replicates the same intermediate calculations as the "Apple App Store VC, FC 2019" tab in the "Economic Model Estimate 2019.xlsx" workpaper, but uses alternative sources for Apple's worldwide billings and cost data for 2022.

185

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



### C.    "RIVAL MARKET SHARE" TAB

286.  All calculations in this tab are identical to those in the "Economic Model Estimate 2019.xlsx" workpaper, using the same data derived from respondents' replies to Q5 of Prof. Simonson's Survey 2.

### D.    "RIVAL OPERATING PROFIT MARGIN" TAB

287.

188

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### APPENDIX F: BENCHMARK ESTIMATE 2019 CALCULATIONS

288. This workpaper calculates the weighted average commission rate for PC digital game sales in North America in 2019.

#### A. "BENCHMARK ESTIMATES" TAB

289. This tab presents the "benchmark" table in the report, detailing the calculation of the weighted average commission rate for PC digital game sales in North America. The calculation is based on the commission rates and sales volumes of stores of PC Digital Games. At the top of the table, the following key parameters [i]-[v] are outlined:

- **Digital PC Games Revenue, North America 2019 ($ millions) [i]**: this USD 5,610 million figure is sourced from a digital/boxed revenue breakdown in a Newzoo Global Games Market Report Premium (APL-EG_06093173, tab "Digital-Boxed Breakdown"). The value reflects the total revenue for digitally downloaded PC games in North America in 2019,[523] converted from USD billion to million.

- **North America, Digital Share of PC Games Revenue, 2019 [ii]**: 95.2%, represents the share of PC games sold digitally (i.e. downloaded) [i] versus boxed copies in North America for 2019. It is derived from the same Newzoo report source used for [1] (APL-EG_06093173, tab ""Digital-Boxed Breakdown") and is calculated as follows:

$$Digital\ Share\ of\ PC\ Games\ Revenue = \frac{Downloaded\ PC\ Games\ [i]}{Downloaded\ PC\ Games\ [i] + Boxed\ PC\ Games}$$

$$Digital\ Share\ of\ PC\ Games\ Revenue = \frac{5.61}{5,61 + 0.29} = 95.2\%.$$

---

[523] Note that while the source table labels the row as "Downloaded/Boxed PC Games," it falls under the "Digital" section, meaning it includes only downloaded PC games, not boxed games. Boxed PC games are listed separately under the "Boxed" section.

189

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **Humble Widget Rate [iii]**: 5% commission rate charged by the Humble Widget on publisher/developer revenues, net of processing fees, according to "Humble Bundle Developer Resources."

- **Payment Processing Fee [iv]**: a typical 5% processing fee applied to publisher/developer revenues, as stated in Humble Support's 'Widget Developer FAQ.'

- **Epic Games Store Variable Costs [v]**: 9.36% self-distribution cost for the Epic Games Store, as calculated in the "EGS Variable Cost" tab.

290. The remainder of the table presents the commission rates and corresponding sales figures used as weights in calculating the weighted average commission rate. It includes data for both major stores with third-party sales and stores with direct-to-consumer sales.

### 1.    Total Sales in 2019 (Column A)



HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



---

524  Ubisoft's revenues from Uplay represented 40% of Ubisoft's revenues in the financial year ended March 31, 2020. See Ubisoft, '2020 Universal Registration Document and Annual Report,' p. 3, available at https://downloads.ctfassets.net/8aefmxkxpxwl/OrrTmfbfpJKm1yhWSRDtS/fc82e78cc07fb0e1ba3851 97962610f7/UBI2020_URD_EN_20_06_18_MEL.pdf.

191

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 2.    Commission Rates (Columns B and C)

292. Columns B and C show the commission rates of third-party and direct-to-consumer PC games stores in North America in 2019.

- **Commission Rate of Stores with Third-Party Sales**:

  – **Steam (Valve) [1]**: effective commission rate of ████, calculated as 100% minus the effective rate ████ paid to partners, as reported in the "Steam" tab.

  – **Microsoft Store (Microsoft) [2]**: headline commission rate of 12%, for 2021, sourced from Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," The Verge, April 29, 2021.

  – **Epic Game Store (Epic) [3]**: headline commission rate of 12%, sourced from Nick Statt and Sean Hollister, "Epic Games takes on Steam with its own fairer game store," The Verge, December 4, 2018.

  – **GOG.com [4]**: headline commission rate of 30%, sourced from Dom Peppiatt, "Most developers think Steam's 30% revenue cut is unjustified," Vg247, April 29, 2021 ("3% of participants said that it's fair for stores such as Steam and GOG to take 30% of their revenue").

  – **Other Stores with Third-Party Sales [5]**: commission rate conservatively estimated at 30%.

- **Commission Rate of Stores with Direct-to-Consumer Sales**:

  – **Methodology 1 (Column B, [6]-[13])**: the commission rate is estimated as the 9.75% cost of self-distributing through Humble Widget, which is the sum of the 5% payment processing fee [iv] plus the 5% Humble Widget rate [iii], applied on revenues net of payment processing fees:

  $$\text{Distribution Cost} = \text{Processing Fee} + \text{Humble Widget Rate} \times (1 - \text{Processing Fee})$$

  $$\text{Distribution Cost} = 5\% + 5\% \times (1 - 5\%) = 9.75\%.$$

  – **Methodology 2 (Column C, ([6]-[13])**: the commission rate is estimated as Epic Game Store's variable cost of 9.36%, which is calculated in the "EGS Variable Cost" tab.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 3.    Sales-Weighted Average Commission Rate [14]-[15]

293.    Finally, the "Benchmark Estimates" tab provides the estimated sales-weighted average (SWA) commission rate, based on the commission rates and sales figures previously described. The SWA commission rate is calculated with the following formula:

$$SWA\ Commission\ Rate = \frac{\sum(Commission\ Rate_{Store\ i} \times Sales_{Store\ i})}{Total\ Sales}.$$

294.    Four different SWA commission rates are reported, depending on the inclusion or exclusion of Steam from the calculations and the methodology used to estimate the commission rate of direct-to-consumer stores:



- **SWA Commission Rate of 14.18% [15][B]** includes Steam and estimates the commission rate of direct-to-consumer stores based on the cost of self-distributing through Humble Widget.

- **SWA Commission Rate of ▮▮▮▮ [14][C]**: excludes Steam and estimates the commission rate of direct-to-consumer stores based on the variable costs of the Epic Games Store.



### B.    "STEAM" TAB

295.    This tab calculates both Steam's third-party sales [8] and direct-to-consumer sales [9] in North America in 2019, using the following three sources:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- The North America share of total revenue, as reported in EPIC_04523683, at 686.

296.  Below is a step-by-step breakdown of how Steam's sales are calculated.

### 1.    Third-Party Sales and Direct-to-Consumer Sales Worldwide [1]-[6]

- **Partner Revenue Share Payments, Packages + In-Game [1]:** USD ███████████ share of payments earned by partners from sales of "packages" and "in-game" content in Steam for 2019 (excludes marketplace revenues). ████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████

- **Effective Rate Paid to Partners, per Internal Estimates [2]:** ██████ rate paid to partners, ████████████████████████████████████████ ████████████████████████████████████████ ███████

- **Partner Revenues, Packages + In-Game [3]**: total revenue of USD ███████████ generated by partners from sales of packages and in-game content, including both the share of payments that partners keep (████████) and the effective commission rate paid to Valve (████████).

$$Partner\ Revenue\ Share\ [1] = Effective\ Rate\ Paid\ to\ Partners\ [2] \times Partner\ Revenues\ [3]$$

$$Partner\ Revenues\ [3] = \frac{Partner\ Revenue\ Share\ Payments[1]}{Effective\ Rate\ Paid\ to\ Partners\ [2]}$$

$$Partner\ Revenues\ [3] = \frac{\blacksquare\blacksquare\blacksquare}{\blacksquare\blacksquare} = \blacksquare\blacksquare\blacksquare$$

297.  *Note: this partner revenues figure corresponds to Steam's third-party sales worldwide.*

- **Total Revenues, Packages + In-Game [4]:** total revenue of USD ███████████ from sales of packages and in-game content, as reported in VALVE000677. This figure differs from [3] in that ████████████████████████████████████████████████████ ███████████████████████

- **Valve Own Sales Revenues, Packages + In-Game [5]:** USD ███████████, the difference between Steam's total revenues [4] and the revenue generated by partners [3].

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$Total\ Revenues\ [4] = Partner\ Revenues\ [3] + Valve\ Own\ Sales\ Revenues\ [5]$$

$$Valve\ Own\ Sales\ Revenues\ [5] = Total\ Revenues\ [4] - Partner\ Revenues\ [3]$$

$$Valve\ Own\ Sales\ Revenues\ [5] = \blacksquare - \blacksquare = \blacksquare$$

- **Valve Total Net Revenues, Direct-to-Consumer + Commissions [6]**: USD ▮▮▮▮▮▮, comprising both the commissions earned on partner revenues that accrue to Valve, as well as Valve's own sales (self-distribution) in the Steam store.

$$Valve\ Total\ Net\ Revenues\ [6] = Commission\ Rate \times Partner\ Revenues\ [3] + Valve\ Own\ Sales\ [5]$$

$$Valve\ Total\ Net\ Revenues\ [6] = (1 - \blacksquare) \times \blacksquare + \blacksquare$$

$$Valve\ Total\ Net\ Revenues\ [6] = \blacksquare.$$

298. *Note: this Valve total net revenues figure is not used in the benchmark calculations; it is merely a consistency check to ensure that Valve total net revenues resulting from my calculations matches the "net to Valve" revenue from packages and in-game sales reported in VALVE000677.*

### 2. Third-Party Sales and Direct-to-Consumer Sales in North America [7]-[9]

- **Revenue, North America Share [7]**: ▮▮▮, as reported in EPIC_04523683, at 686.

- **Third-Party Sales, North America [8]**: USD ▮▮▮▮▮▮, calculated by multiplying the partner revenues [3] worldwide by the North America share of revenues [7]:

$$NA\ Third\ Party\ Sales\ [8] = NA\ Revenue\ Share\ [7] \times WW\ Partner\ Revenues\ [3]$$

$$NA\ Third\ Party\ Sales\ [8] = \blacksquare \times \blacksquare = \blacksquare.$$

- **Direct-to-Consumer Sales, North America [9]**: USD ▮▮▮▮▮, calculated by multiplying Valve's own sales revenues [5] worldwide by the North America share of revenues [7]:

$$NA\ Direct\ to\ Consumer\ Sales\ [9] = NA\ Revenue\ Share\ [7] \times WW\ Valve\ Own\ Sales\ [5]$$

$$NA\ Direct\ to\ Consumer\ Sales\ [9] = \blacksquare \times \blacksquare = \blacksquare.$$

C.    "MICROSOFT STORE" TAB

299.



HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 3.    Third-Party Sales and Direct-to-Consumer Sales in the US [7]-[9]

300.



### D.    "MICROSOFT" TAB

301. The "Microsoft" tab calculates the US share of Microsoft Store's worldwide revenues for 2019, which was previously used in the "Microsoft Store" tab for calculating US third-party and direct-to-consumer sales. The calculation of the US share of Microsoft Store's worldwide revenue is based on two sources:

- Revenue data for the year ended June 30, 2019, from Microsoft's annual report, page 83.

- Revenue data for the periods July to December 2018 and July to December 2019, sourced from Microsoft SEC Filings.[525]

302. Microsoft Store's revenue for 2019 (January to December) is calculated by combining the revenue data from these sources as follows:

---

[525] Microsoft, "10-Q for quarterly period ending in December 31, 2019,' tab 'dividends-3.', https://www.microsoft.com/en-us/investor/sec-filings.aspx?startdate=7/1/2022&enddate=6/30/2023&filing=xbrl.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$Revenue_{2019} = Revenue_{Year\ ended\ June\ 2019} - Revenue_{Jul-Dec\ 2018} + Revenue_{Jul-Dec\ 2019}.$$

- **Revenue, US Share [3]**: 51.5% share calculated with the following formula:

$$US\ Revenue\ Share_{2019} = \frac{US\ Revenue_{2019}}{US\ Revenue_{2019} + Other\ Countries\ Revenue_{2019}}$$

$$US\ Revenue\ Share_{2019} = \frac{69{,}091}{69{,}091 + 65{,}158} = 51.5\%.$$

### E.    "EGS" TAB

303. This tab calculates the Epic Game Store's third-party sales [5] and direct-to-consumer sales [6] in North America in 2019.

#### 1.    Third-Party Sales and Direct-to-Consumer Sales Worldwide [1]-[3]

- **Third-Party Game Sales via EGS [1]**: USD 251 million, sourced from Epic, 2019 Year in Review reported by Sherif Saed, "Third-party games made $251 million on Epic Games Store in 2019, free games to continue in 2020," VG247, January 14, 2020.

- **Direct-to-Consumer Sales [3]**: USD 429 million, calculated as the difference between total consumer spending on the Epic Game Store [2] (sourced from the 2019 Year in Review referenced for [1]) and third-party game sales [1]:

$$Direct\ to\ Consumer\ Sales\ [3] = Total\ Spending\ [2] - 3P\ Game\ Sales\ [1]$$

$$Direct\ to\ Consumer\ Sales\ [3] = 680 - 251 = 429.$$

#### 2.    Third-Party Sales and Direct-to-Consumer Sales in the US [4]-[6]

304. US third-party sales and direct-to-consumers sales are calculated by multiplying the worldwide figures, previously calculated, by the North American sales share [4] (retrieved from EPIC_04523683, at 686).

- **Third-Party Sales, North America [5]**: USD 118 million, calculated as follows:

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$3P\ Sales\ North\ America\ [5] = 3P\ Sales\ WW\ [1] \times North\ America\ Sales\ Share\ [4]$$

$$3P\ Sales\ North\ America\ [5] = 251 \times 47\% = 118.$$

- **Direct-to-Consumer Sales, North America [6]**: USD 202 million, calculated as follows:

$$D2C\ Sales\ North\ America\ [6] = D2C\ Sales\ WW\ [3] \times North\ America\ Sales\ Share\ [4]$$

$$D2C\ Sales\ North\ America\ [6] = 429 \times 47\% = 202.$$

### F.    "EGS VARIABLE COST" TAB

305. This tab estimates the variable costs of the Epic Games Store, which serves as an approximation of the self-distributing costs for direct-to-consumer stores. All data in this tab comes from the same source – a 5 Year P&L and User Forecast containing forecast revenue and cost data for the Epic Games Store (EPIC_00127277, at 293). Specifically, the estimated variable cost of the Epic Game Store relies on the following revenue and cost data from 2019-2024, retrieved from the "Aggressive Pursuit Model" forecast:

- **Gross Revenues [1]** of the Epic Game Store, including signed deals, pipeline (non-signed deals) and free games.

- Costs of sales, including **marketing [2]**, **payment processing [3]** and **hosting [4]**.

- OPEX costs related to **people [5]**.

### 1.    Estimated Variable Costs as a Share of Revenue [6]-[10]

- **Marketing, without 2019 Start-up Costs[6]**: 2.04% (maximum from 2020-2024), calculated as marketing costs [2] divided by gross revenue [1]. Marketing costs for 2019 are excluded as they are assumed to be startup-related.

- **Payment Processing [7]**: 5.3% (maximum from 2019-2024), calculated as payment processing costs [3] divided by gross revenue [1].

- **Hosting [8]**: 1.02% (maximum from 2019-2024), calculated as hosting costs [4] divided by gross revenue [1].

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **People, minus $15 million Fixed Costs [9]**: 1% (maximum from 2019-2024), calculated as people OPEX [5], minus an assumed USD 15 million of fixed costs per year, divided by gross revenue [1].

- **Variable Costs [10]**: 9.36% (maximum from 2019-2024), calculated as the sum of all variable cost categories as a percentage of revenue, using the following formula:

$$\frac{Variable\ Cost}{Gross\ Revenue} = \sum \frac{Variable\ Cost_i}{Gross\ Revenue}$$

$$\frac{Variable\ Cost}{Gross\ Revenue} = 2.04\% + 5.30\% + 1.02\% + 1\% = 9.36\%.$$

### G.    "GOG.COM" TAB

306.  This tab calculates GOG.com's third-party sales in North America in 2019 [9].

### 1.    Third-Party Sales Worldwide [1]-[4]

307.  The following worldwide sales revenues of GOG.com for 2019 (in Polish Zlotych, PLN) were retrieved from a 2019 CD Projekt Management Board Report:[526]

- **Sales Revenues GOG.com [1]**: PLN 162,256 thousand.

- **Revenues from Sales of Products [2]**: PLN 7,633 thousand.

- **Revenues from Sales of Services [3]**: PLN 250 thousand.

- **Revenues from Sales of Goods and Materials (Third-Party Sales) [4]:** PLN 154,373 thousand.

---

[526]  CD Projekt, "Management Board Report on the activities of the CD Projekt Group and CD Projekt S.A. in 2019," p. 92, available at https://www.cdprojekt.com/en/wp-content/uploads-en/2020/04/sprawozdanie-fy-2019-en-preview08-small.pdf.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 2.    Third-Party Sales in North America [5]-[9]

308. To estimate GOG.com's third-party sales in North America, the following additional information was used:

- **CD Projekt Revenues, North America Share [5]**: 60%, retrieved from the same CD Projekt Management Board Report.[527]

- **Exchange Rate PLN/USD [8]**: 0.26 (1 PLN = 0.26 USD), calculated using the following exchanges rates from the European Central Bank (ECB):

$$Exchange\ Rate_{PLN/USD}\ [8] = \frac{Exchange\ Rate_{EUR/USD}\ [7]}{Exchange\ Rate_{EUR/PLN}\ [6]}$$

$$Exchange\ Rate_{PLN/USD}\ [8] = \frac{1.12}{4.30} = 0.26.$$

- **Revenues from Third-Party Sales, North America [9]**: USD 24 million, derived by multiplying worldwide third-party sales [4] by the North America revenue share [5] and converting to USD:

$$3P\ Sales\ NA\ [9] = \frac{3P\ Sales\ WW\ [4] \times NA\ Rev\ Share\ [5] \times Exchange\ Rate_{PLN/USD}\ [8]}{1000}$$

$$3P\ Sales\ NA\ [9] = \frac{154{,}373 \times 60\% \times 0.26}{1000} = 24.$$

### H.    "ACTIVISION BLIZZARD" TAB

309. This tab calculates Battle.net's direct-to-consumer sales in the US in 2019 [13], including revenues from both Activision and Blizzard.

---

[527] CD Projekt, "Management Board Report on the activities of the CD Projekt Group and CD Projekt S.A. in 2019," p. 9, available at https://www.cdprojekt.com/en/wp-content/uploads-en/2020/04/sprawozdanie-fy-2019-en-preview08-small.pdf.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 1.    Net Revenues [1]-[2]

- **Net Revenues [1]**: retrieved from Activision Blizzard Annual Report 2019.[528]

- **Net Revenues, PC [2]**: retrieved from Activision Blizzard Annual Report 2019.

310.  Revenue figures are split for Activision, Blizzard and both.

### 2.    Net Revenues by Geography [3]-[8]

- **Net Revenues, Americas Share [4]:** calculated by dividing net revenues in Americas [3] (from Activision Blizzard Annual Report 2019) by total net revenues [1]. This share is calculated both for Activision (58.8%), Blizzard (44.4%), and the total (51.5%).

$$Americas\ Share\ Net\ Revenues\ [4] = \frac{Net\ Revenues\ in\ Americas\ [3]}{Net\ Revenues\ [1]}.$$

- **Net Revenues, US Share [5]**: 46%, retrieved from the same Annual Report 2019, and is only available for the combined Activision and Blizzard.

- **Net Revenue, ratio US to Americas [6]**: 89.3%, calculated as the ratio of US share of net revenues [5] to Americas' share of net revenues [4]:

$$Ratio\ of\ US\ to\ Americas\ Revenues\ [6] = \frac{US\ Share\ of\ Net\ Revenues\ [5]}{Americas\ Share\ of\ Net\ Revenues\ [4]}$$

$$Ratio\ of\ US\ to\ Americas\ Revenues\ [6] = \frac{46\%}{51.5\%} = 89.3\%.$$

- **PC Net Revenues, Americas [7]**: calculated by multiplying PC net revenues [2] by Americas' share of net revenues [4]:

    – Activision:

$$Amer\ PC\ Net\ Rev_{Activision}[7] = PC\ Net\ Rev_{Activision}[2] \times Amer\ Share\ of\ Net\ Rev_{Activision}[4]$$

---

[528]  Total consolidated net revenues from Activision Blizzard, Inc., "Form 10-K, Annual Report for the year ended December 31, 2019."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$Amer\ PC\ Net\ Rev_{Activision}[7] = 298 \times 58.8\% = 175.$$

– Blizzard:

$$Amer\ PC\ Net\ Rev_{Blizzard}[7] = PC\ Net\ Rev_{Blizzard}[2] \times Amer\ Share\ of\ Net\ Rev_{Blizzard}[4]$$

$$Amer\ PC\ Net\ Rev_{Blizzard}[7] = 1346 \times 44.4\% = 597.$$

- **PC Net Revenues, US [8]**: calculated by multiplying Americas PC net revenues [7] by the ratio of US to Americas revenues [6].

    – Activision:

$$US\ PC\ Net\ Rev_{Activision}[8] = Amer\ PC\ Net\ Rev_{Activision}[7] \times Ratio\ of\ US\ to\ Amer\ Rev\ [6]$$

$$US\ PC\ Net\ Rev_{Activision}[8] = 175 \times 89.3\% = 157.$$

    – Blizzard:

$$US\ PC\ Net\ Rev_{Blizzard}[8] = Amer\ PC\ Net\ Rev_{Blizzard}[7] \times Ratio\ of\ US\ to\ Amer\ Rev\ [6]$$

$$US\ PC\ Net\ Rev_{Blizzard}[8] = 597 \times 89.3\% = 534.$$

### 3.    Direct-to-Consumer Revenues [9]-[13]

311.  To estimate direct-to-consumer revenues, I adjust Activision's PC net revenues to exclude third-party sales. For that, I account only for the sales of "Call of Duty", one of Activision's biggest titles, which is published exclusively on Battle.net.

- **CoD share of Activision [11]**: 81.3%, calculated as the ratio of CoD Net Booking in 2020 [10][529] to Activision's net revenues in 2020 [9].[530]

---

[529]  2020 net bookings from Activision Blizzard, Inc., "Call of Duty Surpasses $3 Billion in Net Bookings Over Last 12 Months as Activision Ignites a New Business Model," December 4, 2020.

[530]  Total consolidated net revenues from Activision Blizzard, Inc., 'Form 10-K, Annual Report for the year ended December 31, 2019."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$CoD\ Share\ of\ Activision\ [11] = \frac{CoD\ Net\ Booking\ [10]}{Activision\ Net\ Revenues\ [9]} = \frac{3000}{3689} = 81.3\%.$$

- **PC Net Revenues, US, Adjusted for Potential Third-Party Sales [12]:**

  - For Activision, this figure is adjusted by multiplying US PC Net Revenues [8] by CoD Share of Activision [11], resulting in a total of USD 127 million.

$$US\ PC\ Net\ Rev\ Adj_{Activision}\ [12] = US\ PC\ Net\ Rev_{Activision}\ [8] \times CoD\ share\ of\ Activision\ [11]$$

$$US\ PC\ Net\ Rev\ Adj_{Activision}\ [12] = 157 \times 81.3\% = 127.$$

  - For Blizzard, the figure is the same as US PC net revenues [8], that is, USD 534 million.

- **Direct-to-Consumer PC Net Revenues, US [13]**: USD 661 million, calculated as the sum of the adjusted net revenues of Activision and Blizzard:

$$USD\ D2C\ PC\ Net\ Revenues\ [13] = 127 + 534 = 661.$$

    I.    "EA" TAB

312. This tab estimates Electronic Arts' PC net revenues in North America in 2019 [5], using data from EA's Annual[531] and Quarterly[532] Reports. The tab contains three columns of revenue figures:

- Year ended March 31, 2019.

- Calendar year Jan-Dec 2019 (the relevant period).

- Year ended March 31, 2020.

313. The Jan-Dec 2019 revenue is derived using the following formula:

$$Rev_{Jan\ 2019-Dec\ 2019} = Rev_{Apr\ 2019-Dec\ 2019} + \left(Rev_{Apr\ 2018-Mar\ 2019} - Rev_{Apr\ 2018-Dec\ 2018}\right)$$

---

[531]  Electronic Arts, Inc., "Form 10-K, Annual Report for the year ended March 31, 2019".
[532]  Electronic Arts, Inc., "10-Q for quarterly period ending in December 31, 2019".

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$-(Rev_{Oct\ 2019-Dec\ 2019} - Rev_{Oct\ 2018-Dec\ 2018}).$$

- In this equation, the first term $\left(Rev_{Apr\ 2018-Mar\ 2019} - Rev_{Apr\ 2018-Dec\ 2018}\right)$ isolates revenues from Jan-Mar 2019.

- The second term $\left(Rev_{Oct\ 2019-Dec\ 2019} - Rev_{Oct\ 2018-Dec\ 2018}\right)$ adjusts the last quarter by replacing Oct-Dec 2019 with Oct-Dec 2018 revenues, since EA started distributing via Steam in Nov 2019. This adjustment helps estimate direct-to-consumer sales before this distribution change.

314.  The following figures are calculated for the Jan-Dec 2019 period:

- **Net Revenues [1]**: USD 5,084 million, based on data from the Annual and Quarterly Reports applied to the formula above.

- **Net Revenues, PC/Browser [2]**: USD 925 million, derived in the same way.

- **Net Revenues, North America [3]**: USD 2,010 million, also derived using the same approach.

- **Net Revenues, North America Share [4]**: 39.5%, calculated as the ratio of North America net revenues [3] to worldwide net revenues [1].

$$NA\ Share\ of\ Net\ Rev\ [4] = \frac{NA\ Net\ Rev\ [3]}{Net\ Rev\ [1]} = \frac{2,010}{5,084} = 39.5\%.$$

- **PC Net Revenues, North America [5]**: USD 366 million, calculated by multiplying PC net revenues [2] by the North America share of net revenues [4].

$$NA\ PC\ Net\ Rev\ [5] = PC\ Net\ Rev\ [2] \times NA\ Share\ of\ Net\ Rev\ [4]$$

$$NA\ PC\ Net\ Rev\ [5] = 925 \times 39.5\% = 366.$$

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### J.    "UBISOFT" TAB

315. This tab estimates Ubisoft's PC sales in North America [6], using data from Ubisoft's 2020 and 2021 Annual Reports,[533] and exchange rate data from the European Central Bank (ECB). The tab contains three columns of revenue figures:

- Year ended March 31, 2019.

- Calendar year Jan-Dec 2019 (the relevant period).

- Year ended March 31, 2020.

316. The following figures are calculated for the Jan-Dec 2019 period:

- **Sales (EUR) [1]**: EUR 1,629 million, retrieved from the 2020 Annual Report, page 6.

- **Exchange Rate [2]**: 1.12, calculated as the average USD/EUR ECB daily exchange rate for 2019.

- **Sales (USD) [3]**: USD 1,824 million, obtained by multiplying sales in EUR million [1] by the exchange rate USD/EUR [2].

$$Sales\ in\ USD\ million\ [3] = Sales\ in\ EUR\ million\ [1] \times Exchange\ Rate\ USD/EUR\ [2]$$

$$Sales\ in\ USD\ million\ [3] = 1,629 \times 1.12 = 1,824.$$

- **Net Bookings, PC [4]**: 27.5% for the calendar year Jan-Dec 2019. This share is calculated as a weighted average of:

  – 25% of the PC share of net bookings for the year ended March 31, 2019.

  – 75% of the PC share of net bookings for the year ended March 31, 2020.

$$PC\ Share\ Net\ Book_{Jan\ 2019-Dec\ 2019}$$
$$= 0.25 \times PC\ Share\ Net\ Book_{Apr\ 2018-Mar\ 2019} + 0.75 \times PC\ Share\ Net\ Book_{Apr\ 2019-Mar\ 2020}$$

---

[533] Ubisoft, "2020 Universal Registration Document and Annual Report" and Ubisoft, "2021 Universal Registration Document and Annual Report".

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

$$PC\ Share\ Net\ Book_{Jan\ 2019-Dec\ 2019} = 0.25 \times 26\% + 0.75 \times 28\% = 27.5\%.$$

317. *Note: The PC share figures for these fiscal years are obtained from Ubisoft's 2019 and 2020 Annual Reports.*

- **Net Bookings, North America [5]**: 47.8% for the calendar year Jan-Dec 2019. This share is calculated as a weighted average of:

  – 25% of the North America share of net bookings for the year ended March 31, 2019.

  – 75% of the North America share of net bookings for the year ended March 31, 2020.

$$NA\ Share\ Net\ Book_{Jan\ 2019-Dec\ 2019}$$
$$= 0.25 \times NA\ Share\ Net\ Book_{Apr\ 2018-Mar\ 2019} + 0.75 \times NA\ Share\ Net\ Book_{Apr\ 2019-Mar\ 2020}$$

$$NA\ Share\ Net\ Book_{Jan\ 2019-Dec\ 2019} = 0.25 \times 44\% + 0.75 \times 49\% = 47.8\%.$$

- **PC Sales, North America [6]**: USD 239 million, calculated as:

$$North\ America\ PC\ Sales\ [6] = Sales\ [3] \times PC\ Share\ Net\ Book\ [4] \times NA\ Share\ net\ Book\ [5]$$

$$North\ America\ PC\ Sales\ [6] = 1824 \times 27.5\% \times 47.8\% = 239.$$

### K.    "TAKE-TWO" TAB

318. This tab estimates Take-Two Interactive's direct-to-consumer PC net revenues in the US for 2019, based on Take-Two Interactive's Annual[534] and Quarterly Reports.[535] The tab contains two columns of revenue figures:

- Year ended March 31, 2019.

- Calendar year Jan-Dec 2019 (the relevant period).

---

[534]  Take-Two Interactive Software, Inc., 'Form 10-K, for the year ended March 31, 2019".

[535]  Take-Two Interactive Software, Inc. "Take-Two Interactive Software, Inc. Reports Results for Fiscal Third Quarter 2020."

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

319. The Jan-Dec 2019 revenue is derived using the following formula:

$$Rev_{Jan\ 2019-Dec\ 2019} = Rev_{Apr\ 2019-Dec\ 2019} + \left(Rev_{Apr\ 2018-Mar\ 2019} - Rev_{Apr\ 2018-Dec\ 2018}\right).$$

### 1. PC Net Revenues [1]-[4]

- **Net Revenues [1]**: USD 2,867,436 thousand for the Jan-Dec 2019 period, derived from annual and quarterly reports based on the formula above.

- **Net Revenues, PC and Other [2]**: USD 678,573 thousand, similarly calculated.

- **Net Revenues, Mobile Share, Q1 2020 [3]**: 6% based on Q1 2020 data.[536]

- **Net Revenues, PC and Other Net of Mobile [4]**: USD 506,527 thousand, calculated by subtracting mobile revenues ($[3] \times [1]$) from PC & other net revenues [2].

$$PC\ Net\ Rev\ [4] = PC\ \&\ Other\ Net\ Rev\ [2] - Mob\ Share\ of\ Net\ Rev\ [3] \times Net\ Rev\ [1]$$

$$PC\ Net\ Rev\ [4] = 678{,}573 - 6\% \times 2{,}867{,}436 = 506{,}527.$$

### 2. US Net Revenues [5]-[6]

- **Net Revenues, US [5]**: USD 1,636,602 thousand, derived from annual and quarterly reports, using the same formula for Jan-Dec 2019.

- **Net Revenues, US Share [6]**: 57.1%, calculated as the ratio of US net revenues [5] to net revenues [1].

$$US\ Share\ Net\ Rev\ [6] = \frac{US\ Net\ Rev\ [5]}{Net\ Rev\ [1]} = \frac{1{,}636{,}602}{2{,}867{,}436} = 57.1\%.$$

---

[536] "Take-Two Interactive Software, Inc., Reports Better Than Expected Results for Fiscal First Quarter 2022", *Business Wire*, August 2, 2021, available at: https://www.businesswire.com/news/home/20210802005541/en/Take-Two-Interactive-Software-Inc.-Reports-Better-Than-Expected-Results-for-Fiscal-First-Quarter-2022.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 3. Direct-to-Consumer PC Net Revenues [7]-[8]

320. This final calculation step excludes sales through third-party distributors, providing an estimate of Take-Two Interactive's direct-to-consumer PC net revenues in the US for 2019.

- **Revenues Share from 5 Largest Customers, year ended March 2020 [7]**: 71.5%, representing third-party store sales.

- **Direct-to-Consumer PC Net Revenues, US [8]**: USD 82,394, calculated as PC net revenues [4] multiplied by the US share of revenues [6], adjusted to exclude sales through the five largest customers [7], which serve as a proxy for third-party stores.

$$D2C\ PC\ Net\ Rev\ US\ [8] = PC\ Net\ Rev\ [4] \times US\ Share\ Net\ Rev\ [6] \times (1 - Rev\ Share\ Top\ 5\ [7])$$

$$D2C\ PC\ Net\ Rev\ US\ [8] = 506{,}527 \times 57.1\% \times (1 - 71.5\%) = 82{,}394.$$

### L. "ESTIMATE_REMAINDER.R" CODE

321. I estimate remainder third-party PC games stores' revenues ([5], "Benchmark Estimates" tab) by first calibrating the relationship between sales ranking and sales quantity and then predicting the sales quantity for the remainder third-party stores. I derive the remainder direct-to-consumer stores' revenues from the difference between overall North America PC game revenues and the already-estimated third-party stores' and major self-publishers' revenues.

322. Following Ghose and Han (2014), I assume that the revenue of third-party game stores follows a Pareto distribution.[537] This assumption leads to a relationship between the store's revenues and its rank by revenue. That relationship is parametrized by $\alpha$ and $\beta$ and takes the form:

$$Sales\ Quantity = \beta \times Sales\ Rank^{-\alpha} + \varepsilon$$

323. I use the PC digital games sales and rankings for the third-party stores included in my benchmark analysis – Steam, the Microsoft Store, the Epic Games Store, and GOG.com – to calibrate the

---

[537] Anindya Ghose and Sang Pil Han, "Estimating Demand for Mobile Applications in the New Economy," *Management Science* 60(6) (June 2014):1470-1488.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

equation shown above.[538] I find that the parameters are both statistically significant at the 95 percent level, and the pseudo-$R^2$ value is 0.99, implying good model fit.[539]

324. Using the calibrated Pareto distribution, and assuming that there are 50 third-party stores in 2019 that generated PC games sales in North America, I estimate the PC games revenues for the remainder third-party stores to be approximately USD 28 million. Although 50 third-party stores is likely an overestimate, it is conservative for the But-For commission rate estimate, as more stores would result in larger remainder third-party revenues to which I apply a 30% rate.[540]

---

[538] An internal Microsoft document confirms that ███████████████████████████████████

[539] I report Nagelkerke's pseudo-$R^2$ value. This value captures how well the model fits, specifically the likelihood of the model replicating the observed data. See Workpaper "Benchmark Estimate 2019.xlsx," tab "Third-Party Remainder Model" for Nagelkerke's pseudo-$R^2$ and Nico Nagelkerke, "A Note on a General Definition of the Coefficient of Determination," *Biometrika* 3 (Sep. 1991), pp. 691-692.

[540] In ordinary course documents, third-party stores that are frequently analyzed include Steam, the Microsoft Store, the Epic Games Store, GOG.com, Itch.io, Game Jolt, and Humble Bundle. *See, e.g.,* EPIC_04027660.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**APPENDIX G: BENCHMARK ESTIMATE 2023 CALCULATIONS**

325. The workbook "Benchmark Estimate 2023.xlsx" updates the weighted average commission rate for PC digital game sales in North America. As noted in the report, this serves as a robustness check to confirm that applying more recent data does not materially alter the benchmark results. However, due to the pandemic's impact on the gaming industry, recent data is generally less reliable.

### A. "BENCHMARK ESTIMATES" TAB

326. This tab presents the 2023 benchmark calculation for North America PC digital game sales, maintaining the same structure as the equivalent tab in **"Benchmark Estimate 2019.xlsx."** All values updated with 2023 data are highlighted in yellow (even though most remain unchanged from 2019).

327. The following figures were updated:

- Commission rates for third-party stores [1]-[5].

- Commission rates for direct-to-consumer stores [6]-[13], based on two alternative methodologies:

    – Self-distribution costs through Humble Widget [iii]-[iv].
    – Variable costs of the Epic Games store [v].

- Sales-weighted average (SWA) commission rates [13]-[14].

#### 1. Total Sales in 2019 (Column A)

328. Due to limited data availability, total 2019 sales – used for weight calculations in the SWA commission rate – were not updated. This also applies to other North America digital PC game revenue figures, including total sales [i] and North America share [ii]. However, since COVID-19 affected all stores similarly, this is not expected to materially impact the SWA commission rate.

211

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### 2.    Commission Rates (Columns B and C)

- **Stores with Third-Party Sales [1]-[5]**: updated commission rates are sourced from the "Updated Commission Rates" tab. Most remain unchanged since 2019, except for Steam, ███████████████████

- **Stores with Direct-to-Consumer Sales [6]-[13]**:

    - **Self-Distribution Costs from Humble Widget (Column B, [6]-[13])**: 9.75% (unchanged relative to 2019). This is based on Humble Widget's updated rate [iii] of 5% and of a typical processing fee [iv] of 5%, which remain unchanged.[541]

    - **Epic Games Store Variable Costs (Column C, [6]-[13])**: 10.61% (increase relative to the 2019 benchmark analysis). The revised calculation is detailed in the "EGS Variable Cost" tab.

### 3.    Sales-Weighted Average Commission Rate [14]-[15]

329.    Given the minor changes observed, the SWA commission rate remained largely unchanged. As before, four different SWA commission rates are reported:

- **SWA Commission Rate [14][B]**: ██████ (unchanged). Excludes Steam and estimates the commission rate of direct-to-consumer stores based on the cost of self-distributing through Humble Widget. This is the only figure that remains unaltered.

- **SWA Commission Rate [15][B]**: █████████████████ 14.18%). Includes Steam and estimates the commission rate of direct-to-consumer stores based on the cost of self-distributing through Humble Widget.

- **SWA Commission Rate [14][C]**: ████████████████████ Excludes Steam and estimates the commission rate of direct-to-consumer stores based on the variable costs of the Epic Games Store.

---

[541] Humble Bundle, "Humble Bundle Developer Resources," available at, https://www.humblebundle.com/developer. *See also* Humble Support, "Widget Developer FAQ," available at, https://support.humblebundle.com/hc/en-us/articles/202742190-Widget-Developer-FAQ.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- **SWA Commission Rate [15][C]**: ███████████████ from 13.91%). Includes Steam and estimates the commission rate of direct-to-consumer stores based on the variable costs of the Epic Games Store.

### B.    "UPDATED COMMISSION RATES" TAB

330. This tab calculates the updated commission rates for third-party stores and direct-to-consumer stores, comparing them to the rates used in the original benchmark analysis ("Benchmark Estimate 2019.xlsx").

### 1.    Commission Rates of Third-Party Game Stores [1]-[6]

- **Steam (Valve) [1]**: ██████████████████ calculated based on Steam sales data for 2023 (VALVE001525). The commission rate is determined by dividing net revenue to Valve (packages and in-game sales) by net Steam sales (package and in-game).

$$Steam\ Commission\ Rate\ [1] = \frac{Net\ to\ Valve_{Package\ \&\ In-Game}}{Net\ Steam\ Sales_{Package\ \&\ In-Game}}$$

$$Steam\ Commission\ Rate\ [1] = \frac{\blacksquare\blacksquare\blacksquare + \blacksquare\blacksquare}{\blacksquare\blacksquare\blacksquare + \blacksquare\blacksquare} = \blacksquare\blacksquare.$$

331. *Note: In 2019, an alternative calculation was used due to data limitations, as the available file combined third-party and first-party sales, making it impossible to isolate third-party sales. In contrast, the 2023 file includes only third-party sales, allowing for a direct calculation of the commission rate.*

- **Microsoft Store (Microsoft) [2]**: 12% (unchanged), sourced from public data.[542]

- **Epic Games Store (Epic) [3]**: 12% (unchanged), sourced from public data.[543]

---

[542] Microsoft, "Benefits of Distributing Your Apps Via Microsoft Store", December 14, 2023, available at, https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/why-distribute-through-store

[543] Tom Henderson, "Epic Games is Offering 100% Revenue to Developers for First 6 Months," *Insider Gaming Network*, March 20, 2024, available at: https://insider-gaming.com/epic-games-100-percent-revenue/.

- **GOG.com (CD Projekt) [4]**: 30% (unchanged), sourced from public data.[544]

- **Itch.io (Leaf Corcoran) [5]**: 10%, default share in a "pay-what-you-choose" model (unchanged), sourced from public data.[545]

- **Game Jolt [6]**: 10%, max capped commission rate in a "pay-what-you-choose" model (unchanged), sourced from public data.[546]

### 2.    Self-Distributing Costs [7]-[8]

- **Humble Widget [7]**: 9.75% (unchanged), representing the cost of self-distributing through Humble Widget. This is calculated as

$$Humble\ Widget\ Dist\ Cost = Processing\ Fee + Humble\ Widget\ Rate \times (1 - Processing\ Fee)$$

$$Humble\ Widget\ Dist\ Cost = 5\% + 5\% \times (1 - 5\%) = 9.75\%.$$

- **Epic Variable Costs [8]**: 10.61% (up from 9.36%), calculated in the "EGS Variable Costs" tab.

### C.    "EGS VARIABLE COST" TAB

332.    This tab estimates the Epic Game Store's variable costs as a share of gross revenue, serving as a proxy for self-distributing costs of direct-to-consumer stores. It relies on the following 2022 data (most recent data available) sourced from an Epic Store "Ecosystem P&L"[547]:

- **Gross Epic Games Store revenue [1]**: USD 1480 million.

- **Total COGS [7]**: USD 112 million in 2022. COGS are the sum of:

    – **Payment Fees [2]**: USD 71 million.

---

[544] Volkan Bozkaya, "Show Me the Money: How to Pick the Best PC Marketplace for Your Game", *Medium*, October 25, 2023, available at, https://medium.com/@volkan.bozkaya/show-me-the-money-how-to-pick-the-best-pc-marketplace-for-your-game-dcce05ec33af.

[545] Itch.io, "Accepting Payments and Getting Paid", available at, https://itch.io/docs/creators/payments

[546] Game Jolt, "This is How it Works…", available at, https://gamejolt.com/marketplace

[547] EPIC_PEPPER_00000001, at 171.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

   – **Revenue Share (2nd party) [3]**: USD 3 million.

   – **Customer Service [4]**: USD 10 million.

   – **Hosting Cost [5]**: USD 28 million.[548]

   – **EGS User Acquisition [6]**: USD 1 million.

- **Total Direct OPEX [8]:** USD 60 million.

333. Based in this cost data, the variable costs as a share of revenue are calculated as follows.

- **Fixed Costs [9]**: USD 15 million. Consistent with the 2019 benchmark analysis, OPEX are assumed to include fixed costs of USD 15 million – equal to people costs in 2019.

- **Variable Costs [10]**: USD 157 million, calculated as total COGS [7] plus OPEX [8], minus fixed costs [9].

- **Variable Costs, Share Of Revenue [11]**: 10.61%, calculated as:

$$Var\ Costs\ Share\ [11] = \frac{Variable\ Costs\ [10]}{Gross\ Revenue\ [1]}.$$

$$Var\ Costs\ Share\ [11] = \frac{157}{1480} = 10.61\%.$$

---

[548] The source file contains a typo, incorrectly listing Hosting Costs for the Ecosystem in 2022 as 0.0 instead of USD 28 million (which is the sum of the values recorded for 1st, 2nd and 3rd party). *See* EPIC_PEPPER_00000001, at 171.

215

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 1: CURRICULUM VITAE OF ROSA M. ABRANTES-METZ**



# ROSA M. ABRANTES-METZ, PHD

## MANAGING DIRECTOR

Miami, FL

Email: RAbrantes-Metz@thinkBRG.com
Cell: +1.917.499.4944

Dr. Rosa M. Abrantes-Metz is a Managing Director at the Berkeley Research Group, based in Miami.  She has over two decades of experience specializing in antitrust, securities, and financial regulation, including work in consulting and banking, as well as in government. Her main areas of specialization are industrial organization, monetary and financial economics, and statistics and econometrics.  Dr. Abrantes-Metz has a particular expertise involving the intersection between alleged market manipulations and competition issues, including alleged coordinated conduct.  She is also an experienced expert on the economics of multisided platforms.

Dr. Abrantes Metz is a former adjunct associate professor at Leonard N. Stern School of Business, New York University, where she taught money and banking, financial institutions and the financial crisis, industrial economics, and econometrics for MBAs. She is a former Lecturer for honors econometrics at the department of economics at the University of Chicago, and various other fields of economics at Universidade Católica Portuguesa, in Lisbon, Portugal.

Dr. Abrantes-Metz's work is regularly featured in the media such as *The Wall Street Journal*, *Financial Times*, *The Economist*, *CNNMoney*, *CNBC*, *Forbes*, *Bloomberg*, *Fox Business*, *BusinessWeek*, *Washington Post*, *Huffington Post*, *Reuters*, *Crain's*, *Risk Magazine*, *Investor's Business Daily*, *L'Agefi Hebdo*, *Les Temps*, *Le Monde*, *Bloomberg TV*, *Sky News TV*, *BNN-Bloomberg TV*, *BBC Radio*, and *BBC TV*. She also contributes with Opinion Articles to several of these outlets.  In 2019, she was recognized among "40 in their 40's" Notable Women Competition Professionals in the Americas, for which thirty six distinguished lawyers and four distinguished economists were selected among North, Central and South American professional women.  She has also been honored by the American Antitrust Institute in 2022 for "Outstanding Antitrust Litigation Achievement in Economics" for her testimony in *US Airways v Sabre*. This matter was also selected by GCR as Matter of the Year among cases worldwide for 2022, for "creative, strategic and innovative work by teams of in-house and external lawyers and economists." In 2024 she received the same

1 of 37

award by the American Antitrust Institute for her work *in Re: Apple iPhone Antitrust Litigation*. Also in 2024, one of her articles on antitrust compliance and AI received an award from Les Concurrences in the Business digital category.  In addition, Dr. Abrantes-Metz also testified on *United States v Google*, a matter selected by GCR as Matter of the Year among cases worldwide for 2024.

After working as a staff economist at the Federal Trade Commission, Dr. Abrantes-Metz continued to serve as a consultant for special projects with the Commission's Bureau of Economics. She was also a senior competition policy advisor for the World Bank. Dr. Abrantes-Metz is the author of several articles on econometric methods and screens for conspiracies, manipulations and fraud, multisided platforms, gasoline, pharmaceuticals and health care, telecommunications, event studies and valuation, structured finance, payments systems, credit default swaps, credit ratings agencies and regulation, financial benchmarks reform, new statistical tests, and diversity in assets management.  Dr. Abrantes-Metz has published in peer-reviewed journals such as the *International Journal of Industrial Organization*, the *Journal of Pharmaceutical Finance, Economics and Policy*, *Applied Economics Letters*, the *Journal of International Arbitration*, the *Journal of Banking and Finance*, *Harvard Business Law Review*, and University of Pennsylvania *Journal of Business Law*. Her work has also appeared in trade publications including the *ABA Antitrust Section's Economics Committee Newsletter*, *The Antitrust Source*, *The Antitrust Magazine*, *The Antitrust Counselor*, Competition Policy International's *Journal* and *Antitrust Chronicle*; *Derivatives Litigation Reporter*; and *Securities Litigation Report*.

Dr. Abrantes-Metz is a co-author of a chapter on the role of the economic experts in addressing conspiracy allegations under federal antitrust laws in a book published by the American Bar Association.  In addition, she has contributed to other books on international arbitration with a focus on event studies, and is a co-author of the chapter on antitrust corporate governance and compliance in the *Oxford Handbook of International Antitrust Economics*.  She has addressed the economics of alleged cartels and information exchanges from various perspectives, and is the author of the 2013 guidelines on exchanges of information among competitors for the Latin America Regional Center for Competition. Most recently, she co-authored a chapter on screens in antitrust compliance for a book published by Les Concurrences.

Dr. Abrantes-Metz has developed numerous empirical screens for assessing potential conspiracies, manipulations, fraud, and price gouging, and is a pioneer in the field, contributing to the further development and increased adoption of these methods worldwide. Screens are used by both plaintiffs and defendants in assessing antitrust risk. Her work covers both liability and damages, in the intersection between market manipulation and cartel activity. In 2008, she flagged the possibility of collusion in LIBOR prior to the launch of large-scale investigations. She has also flagged the possibility of manipulation and collusion in gold markets as well as in other markets, and more recently the possibility of bid rigging in US Treasuries auctions, among other financial products. She has developed

and applied screens not only to assist governmental agencies and plaintiffs, but also on the defense side when companies and individuals are faced with allegations of this type of conduct.

Dr. Abrantes-Metz has extended her experience in LIBOR to the analyses of other financial benchmarks and potential illegal behavior worldwide, including in assessing alleged manipulations of spot markets. She is regularly retained to address issues of price artificiality and price impact between price indices and prices in related markets as well as various types of contracts. Some of her work included analyses of transportation of commodities as an alleged accessory or vehicle to market manipulation. Her experience in alleged market abuse also extends to a variety of financial and commodities markets on alleged of spoofing and high frequency trading, for oil and gasoline, natural gas, electricity, silver, gold, platinum, palladium, aluminum, zinc, copper and other metals including scrap metals, as well as stock prices, futures prices and NYMEX settlement prices, various swaps and options, credit default swaps, foreign exchange markets, ISDAfix, US Treasuries, sovereign and supranational bonds, agency municipal bonds, variable rate demand obligations, mortgages, cryptocurrencies, payments systems, mortgage backed-securities, catering, lithium-ion batteries, airlines and other transportation and travel, professional sports, insurance, pharmaceuticals, mortgage foreclosure and evictions, defaults, among others. In addition to her work in this area, Dr. Abrantes-Metz has been invited by regulatory bodies to participate in roundtables on how to reform financial benchmarks worldwide and has formally advised American and European authorities on this topic. She has also advised public and private institutions on the development and implementation of new financial benchmarks. Dr. Abrantes-Metz has advised competition and other regulatory and securities agencies around the world on the use of empirical screens to detect the possibility of market rigging and fraud in general, on the use of pricing algorithms, and has formally been engaged as an economic expert in related matters by several governmental agencies.

In pharmaceuticals, she co-developed a model to estimate the likelihood of drugs failing and succeeding each of the clinical stages of the Food and Drug Administration, and their expected durations in each of these phases. This model has become one of the most used by industry analysts to assist in valuing pharmaceutical and biotechnology pipelines. More recently, she studied the possibility of collusion in pharmaceutical markets. Her research on pharmaceuticals and on rigging of markets has been discussed in books on how to value pharmaceutical and biotechnology companies, and in publications pertaining to healthcare, intellectual property and cartels.

Dr. Abrantes-Metz has provided testimony on damages, liability, class certification and plans of allocation for classes, related to alleged bid-rigging, price-fixing and market allocation in various markets, information exchanges, monopolization, mergers involving horizontal and vertical restraints, market definition, conduct involving multisided platforms in various industries including payments systems, healthcare, and airline

bookings, the valuation of an energy services provider company, the valuation of expropriated oil services assets, the valuation of stock options and various types of swaps, the valuation of utilities, and breach of contracts due to changes in financial and commodity benchmarks, among others. Her clients include companies as American Airlines and Fannie Mae.  Dr. Abrantes-Metz has also provided written and oral testimony as an economic expert for the U.S. Government – The U.S. Federal Energy Regulatory Commission – on BP's manipulation of natural gas markets, leading to a conviction by FERC and upheld by the Fifth Circuit Court of Appeals.  She is engaged as an expert witness in other energy markets manipulation matters on behalf of FERC on *FERC v Total*. Dr. Abrantes-Metz has testified on behalf of Fannie Mae through the Department of Justice on an alleged fraud matter in the market for mortgages foreclosures and evictions and has also been engaged by the U.S. Federal Trade Commission and the U.S. Department of Justice as an expert witness in matters involving multisided platforms, including Google. She has been retained by various Attorneys General offices.  In addition, she consults with numerous other competition authorities around the world.  Dr. Abrantes-Metz's work has been cited in decisions by U.S. Federal Courts and by other Courts and Administrative Proceedings.  She has testified before such courts and in jury trials, as well as in international arbitration and contractual disputes settings, in Europe, Brazil, Canada and the United States, both in English and in Portuguese.  Dr. Abrantes-Metz has been a signatory to Amicus Briefs submitted to the U.S. Supreme Court. In addition, she has undertaken pro bono consulting work assisting counsel on behalf of children with special needs, when estimating damages and settlement amounts in various matters in the state of New York.

Rosa Abrantes-Metz holds a Ph.D. and a Masters in Economics from the University of Chicago. She also holds a Masters in Economics from the Universitat Pompeu Fabra in Barcelona, Spain, and a *Licenciatura* in Economics from Universidade Católica Portuguesa. She is has been selected as a *Who's Who* of Competition Lawyers & Economists every year since 2009.

## PROFESSIONAL EXPERIENCE

**2023–**         **Berkeley Research Group**
*Managing Director*

**2020–2023**     **The Brattle Group**
*Principal & Co-Chair Global Antitrust and Competition (2021-2023)*
        *Co-Chair Technology Practice (2021)*

**2011–2020**     **Global Economics Group & Market Platform Dynamics**
*Managing Director & Principal*

2007–2011        LECG
*Principal*

2004–2007        NERA Economic Consulting
*Senior Consultant*

2002–2004        Federal Trade Commission, Bureau of Economics
*Economist*

2001                RCF Economic and Financial Consulting, Inc.
*Part-time Consultant (June–October)*

2001                Board of Governors of the Federal Reserve System
*Spring Associate (February–June)*

1998                Banco Bozano Simonsen - Rio de Janeiro, Brazil
*Summer Associate (June–October)*

## Teaching & Research Positions

2009–2020        New York University, Leonard N. Stern School of Business
*Adjunct Associate Professor – Department of Economics*
*Visiting Scholar*

1998–2001        University of Chicago, Department of Economics
*Lecturer for Honors Econometrics*
*Teaching Assistant for Graduate Econometrics and Macroeconomics*

1992–1995        Universidade Católica Portuguesa, Lisbon, Portugal
*Research Assistant*
*Instructor and Teaching Assistant, Lecturer*

## OTHER ACADEMIC AND AGENCY AFFILIATIONS

2011–2018        World Bank
*Senior Competition Policy Affiliated Expert*
*Consultant for Special Projects*

2004–2008        Federal Trade Commission, Bureau of Economics
*Consultant for Special Projects*

2007–2009        Suffolk University, Sawyer Business School
*Board of Advisors – Department of Accounting*

## EDUCATION

**University of Chicago**
PhD & MA in Economics

**Universitat Pompeu Fabra, Barcelona, Spain**
MA in Economics (with High Honors)

**Universidade Nova de Lisboa, Lisbon, Portugal**
Completed First Year Ph.D. Program Course Work in Economics

**Universidade Católica Portuguesa, Lisbon, Portugal**
*Licenciatura* in Economics (Magna Cum Laude)
Second highest average among all graduating students

## REPRESENTATIVE MATTERS

### Multisided Platforms, Antitrust and Regulation

- **Liability and Damages Involving Multisided Platforms.** Conducted analyses and testimony related monopolization, collusion, market definition, predatory pricing, damages, causation and liability, in industries such as financial and derivatives markets, payments systems, app stores, advertising, hotel bookings, air travel services and transportation, and health care markets.  This work included deposition and trial testimony on behalf of US Airways (American Airlines) in *US Airways v. Sabre,* testimony on behalf of the US Federal Trade Commission in *FTC v Surescripts*, testimony on behalf of a class of consumers in *Re Apple iPhone Antitrust Litigation*, testimony on behalf of SIBS payment system in *Portuguese Competition Authority v. SIBS*, testimony on behalf of the US Department of Justice in *United States of America, et al. v Google LLC*, among other public non-public multisided platform matters.

- **The Economics and Regulation of the Portuguese Retail Payments System.** Co-authored 2013 report analyzing how the Portuguese payment system operates and how regulatory interventions, especially those involving controls, would likely affect the interest of the various stakeholders in the system including consumers, merchants, banks, schemes, and infrastructure providers.  Filed another report on addressing allegations of monopolization by SIBS in various markets. In 2022, testified on behalf of SIBS addressing anticompetitive conduct, awaiting trial in 2024.

- **Network Effects in Payment Systems.** Co-authored report on the evolution of a Portuguese payment system and the strength of its network effects.

- **Alleged Conspiracy in Multisided Platforms Markets.** Provided expert testimony on behalf of merchants, on market definition and collusion on an alleged cartel by the four credit card companies on the transition to EMV technology.

## Other Non-Financial Markets Conspiracies, Monopolization, Competition, Oil & Gasoline, Pharmaceuticals and Health Care, and Other General Antitrust Matters

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Appellees, *Susan Giordano, Angelene Hayes, Ying-Liang Wang, Anja Beachum v Saks & Company LLC, Saks Incorporated, Louis Vuitton USA Inc, Loro Piana & C. Inc, Gucci America, Inc., Prada USA Corp., Brunello Cucinelli USA, Inc.,* Eastern District of New York, 2023, co-signer.

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Petitioners, *National Collegiate Athletic Association v Shawne Alston*, U.S. Supreme Court, 2020, co-signer.

- **Amicus Brief.** Brief of Amici Curiae Economists in Support of Petitioners, *National Football League v Ninth Inning*, U.S. Supreme Court, 2020, co-signer.

- **Alleged Conspiracy in Catering.** Provided expert testimony on an alleged cartel case involving price-fixing, bid-rigging and market allocation in catering. Developed numerous empirical approaches to address materiality and likelihood of such behaviors, and to address the alleged exchange of information among competitors. Estimated alleged overcharges. Trial testimony, company found not guilty.

- **Alleged Monopolization and Collusion in Food Markets Services.** Providing expert testimony for defendant on alleged monopolization and collusion of corporations in the provision of tech services for some food products.

- **Alleged Collusion in the Master Data Management in Life Sciences.** Providing expert testimony on behalf of IQVIA against allegations by Veeva that IQVIA and Reltio colluded to monopolize the market for Master Data Management.

- **Alleged Collusion in the Broiler Chicken Industry.** Providing expert testimony on behalf of the Washington State against various broiler chicken producers related to the Agri Stats information exchange.

- **Class Certification in Lithium Ion Batteries.** Provided expert testimony on class certification in the LIB market, and on the likelihood of collusion and likely market price effect.

- **Class Actions Certification and Price-Fixing.** Addressed class certification using various empirical methods to determine similarity of effects across consumers allegedly belonging to classes in price-fixing conspiracies in various financial and commodities markets.

▪ **Alleged Collusion and Analysis of Information Exchanges in Food Markets.** Developed economic analyses to assess the relevance of information exchanges among competitors and their impact on food markets overall.

▪ **Monopolization in Generic Pharmaceuticals.** Testimony submitted to the International Trade Commission on monopolization, damages and welfare loss related to market exclusion of competing generic products.

▪ **Alleged Conspiracy among Business Partners.** Developed an innovative approach to detect collusion based on survey data. Studied whether the patterns of responses to a survey by business partners of a major financial institution were indicative of collusion and identified suspects, later confirmed by internal records.

▪ **Guidelines on Exchanges of Information among Competitors.** Authored the guidelines on best practices for exchanges of information among competitors for Central and South American countries.

▪ **Collusion Detection in Oil and Gasoline Markets.** Developed empirical screens to detect conspiracies in gasoline. Applied screens to the US retail and wholesale data. Contributed to the FTC's gasoline monitoring program. Work performed as an FTC economist.

▪ **Analyses of Potential Collusion in Liquefied Natural Gas Markets.** Developed empirical and structural screens to address whether collusion in regional liquefied natural gas markets around the world may have happened, on behalf of investigated company.

▪ **Mergers and Acquisitions in Oil and Gasoline Markets.** Developed empirical analyses to access market behavior post mergers as an FTC economist. Developed and implemented empirical analyses to assist in merger evaluation both as an FTC economist and on behalf of the merging parties.

▪ **Training of Competition Authorities on Cartel Detection.** Trained Competition Authorities around the world on how to detect collusion through screening and advised on how to enhance anti-cartel antitrust policies. Training also involved the development of but-for models for prices and the estimation of overcharges.

▪ **International Bid-Rigging.** Developed economic and empirical analyses to flag likely ongoing bid-rigging in multiple international markets on behalf of competition authorities around the world.

▪ **Estimation of Exposed Population and Brand Name Drug Sales.** Built models to estimate exposed population to a disease of interest and relevant drug sales on behalf of an

insurance company in order to access validity of claims submitted due to adverse effects allegedly caused by the drug.

- **Analysis of Pharmaceutical Merger involving Horizontal and Vertical Restraints.** Expert report on vertical restraints related to an acquisition of major wholesalers by the national association of pharmacies in Europe.  Report focused on tying, bundling and exchanges of information.

- **Mergers and Acquisitions in Pharmaceuticals.** Worked on numerous mergers in the pharmaceutical and biotech industries and addressed potential anticompetitive effects. Also valued biotech and pharmaceutical pipelines. Work performed both as an FTC economist and as an economic consultant on behalf of merging or acquired parties.

- **Competitive Dynamics in Consumer Products.** Empirical analyses of competition in brick-and-mortar and online for various consumer products.

- **Brand Name vs. Generic Pharmaceutical Drugs.** Estimated the effect of generic entry on price, volume and market shares of branded drugs in specific therapeutic areas.  Used findings to estimate the but-for scenario absent generic entry.  Estimated alleged damages.

- **Material Adverse Change in Connection with Acquisitions.** Determined the materiality of a disclosure on the existence of a price-fixing conspiracy sometime in the past in the aspartame market, prior to the relevant acquisition, and which could have affected the later decision to acquire the company.

- **Merger in the Poultry Industry in Brazil.** Co-authored and submitted an expert report on the estimation of the elasticities of demand across products in the same relevant market in an acquisition in the Brazilian poultry industry.  Estimated efficiency gains and price changes due to the acquisition.

- **Mergers and Acquisitions in the Waste Management Industry in Portugal.** Report on likely pro and anticompetitive effects of a specific acquisition raising both horizontal and vertical concerns.

- **Daily Gasoline Pricing Forecast.** Developed an econometric model on behalf of a major oil company to predict daily gasoline prices for all of its competitors at the terminal level, and across all of its terminals in the United States.  The model significantly improved analysts' forecasts and assisted daily pricing decisions.

- **Trends and Cycles in Gasoline Prices.** Decomposed movements in gasoline prices between long-run and short-run components, across 365 cities in the United States, in order to study interconnections across various regional markets.  Work performed as an

FTC economist.

▪ **Spectral Test for Mergers and Acquisitions.** Developed a new statistical test in the frequency domain and applied it to antitrust market definition in gasoline markets. This test was later used for other applications including in financial markets.  Work performed as an FTC economist.

▪ **Prediction of Hart-Scott-Rodino Filings.** Developed econometric models to predict HSR filings as a function of major economic indicators.  Work performed as an FTC economist.

▪ **Estimation of the Likelihood of Success and Duration of Drugs in Clinical Stages.** Co-developed a duration model to estimate the likelihood of success and failure of drugs in each of the clinical stages of the Food and Drug Administration, as a function of various drugs characteristics.  The model also estimates the expected duration for each of the drugs based on the same characteristics.  Model informs mergers and acquisitions, intellectual property and valuation.  Used as supporting evidence in FTC decisions such as in the Genzyme Corporation / Novazyme Pharmaceuticals, Inc., 2003 merger.  Work performed as an FTC economist and as an economic consultant.

▪ **Mergers and Acquisitions in Other Areas.** Worked on mergers and acquisitions in various other industries such as cable television, boats, railroads, and appliances.

▪ **Health Care Costs and Innovation.** Developed a new econometric approach to estimate the contribution of technological progress to the increase in health care expenditures in the United States over the last four decades.

▪ **Benefits of Health Care Spending.** Developed simple econometric models to assist in determining if countries spending more on health care also experience greater health benefits from such spending.

Securities, Valuation, Risk Assessment, Financial Regulation, Other Conspiracies and Antitrust involving Financial Markets, and Manipulations and Fraud in Financial and Commodities Markets

▪ **Class Certification and Liability on an Alleged Collusion in Variable Rate Demand Obligation Bonds.**  Provided expert testimony on class certification related to collusion among major financial institutions to raise VRDO interest rates. Class was certified.

▪ **Alleged Hub and Spoke Conspiracy in Customized One Hundred Percent Placement Bonds.**  Provided expert testimony on an alleged hub and spoke conspiracy organized by Nuveen to exclude Preston Hollow from doing business with major financial institutions. Settlement reached.

- **Alleged WTI Futures Manipulation on April 20, 2020.** Conducted numerous economic analyses to address transportation and storage capacity, algorithmic mal-function and market manipulation of the NYMEX WTI crude oil futures settlement price on April 20, 2020, which took a negative value.

- **USD LIBOR Conspiracy and Manipulation.** Research assisted in the launching of investigations around the world.  Subsequently analyzed liability and estimated damages for various securities benchmarked against USD LIBOR on behalf of large institutional investors and governmental agencies in the United States and abroad.

- **Alleged Manipulation and Collusion in Gasoline Spot Markets in Specific U.S. Regions.** Expert testimony on collusion and manipulation in a regional US market involving a benchmark price and other collusive conduct.  Estimation of price artificiality.

- **Alleged Conspiracies and Manipulations of Oil Prices Platts Indices.** Developed empirical approaches to determine whether there was evidence of a material impact of an alleged conspiracy and manipulation of the Platts WTI Index and Brent crude oil prices, for both spot and futures markets.  Studied trading data across all market players to address price materiality, causation, market power and possible motive.  Studied other related commodities and markets. Calculated illegal profits and damages.

- **Natural Gas Manipulation by Total.** Expert testimony on behalf of the Federal Energy Regulatory Commission.  Developed various empirical approaches to assist in addressing liability, causation, and artificiality, consistent with Total's traders' manipulation in natural gas markets in several regions in the United States.

- **Natural Gas Manipulation by BP.** Expert testimony on behalf of the Federal Energy Regulatory Commission.  Developed various empirical approaches to assist in addressing intent, causation, and artificiality, consistent with BP's manipulation in natural gas markets in 2008.  BP was found guilty of such conduct.  Written and oral testimony, deposition and testimony at hearing.  Commissions' decisions refer to Abrantes-Metz' testimony approximately 150 times all together.  Opinions upheld in several appeals by the Commission and in Federal Court and by the Fifth Circuit Court of Appeals.

- **Fraud in Services Provided on Mortgages Foreclosures and Evictions.** Written testimony on behalf of Fannie Mae and the U.S. Department of Justice.  Developed various empirical approaches to address liability and damages due to alleged overpricing of service providers in the market for mortgages foreclosures and evictions for a decade.

- **Manipulation of Cryptocurrencies.** Analyses of alleged collusion, manipulation and fraud potentially involving various cryptocurrencies.

11 of 37

▪ **Reform of LIBOR and Other Financial Benchmarks.** Advised regulatory agencies around the world on methodology, governance, regulation, transition and implementation of reforms of key financial benchmarks worldwide.

▪ **Design and Implementation of New Financial Benchmarks.** Advised private companies interested in developing and implementing new financial benchmarks.

▪ **Manipulations and Conspiracies of other (besides USD LIBOR) Financial Benchmarks including Euribor, Yen LIBOR, TIBOR, ISDAfix, Foreign Exchange WM/Reuters Fixing and FX Futures, Platts Brent and WTI Oil Benchmarks, and US Treasuries Futures.** Worked on manipulations and conspiracies of most major financial benchmarks, auction settings, bond issuance, and secondary markets for various bond types currently under investigation around the world.

▪ **Manipulations and Conspiracies in Precious and Non-Precious Metals Benchmarks for Sport Prices.** Developed numerous empirical and structural analyses to address collusion and manipulation for precious and non-precious metals benchmarks including LBMA gold and silver, platinum and palladium, aluminum, zinc and copper, assisting in the launching of investigations worldwide.

▪ **Metals Prices Artificiality due to Unwarranted Increased Warehousing**. Worked on manipulations and conspiracies in various metals markets involving alleged squeezes in metals markets due to unwarranted increased warehousing inventories.  These included London Metal Exchange warehousing disruptions on Aluminum, Zinc, Copper, among others. Developed empirical approaches to assist in addressing causation, artificiality, intent, and likelihood of collusion and damages.

▪ **Collusion and Manipulation of U.S. Treasuries Auctions and other Bonds.** Developed empirical and economic analyses to detect possible bid rigging in U.S. Treasuries auctions and its effect on the secondary, when issued and futures markets.

▪ **Collusion, Manipulation and Fraud in Specific Bond Markets including SSA bonds, Agencies bonds, and others.** Developed empirical and other economic analyses to detect possible rigging in bonds markets around the world as the expert economist for competition authorities.

▪ **Collusion and Manipulation involving Spoofing in Spot and Futures Markets for Various Commodities.** Developed empirical analyses to assist in the detection and identification of spoofing in commodities markets and estimate damages.

▪ **Analyses and Testimony of Liability and Damages Assessment in Alleged Breach of Contract Due to Change in Commodities Benchmark for Scrap Metal.** Developed empirical and economic analyses to address the impact on transactions due to a change in

scrap metal index underlying contracts.  Testified on behalf of defendant in arbitration.

- **Collusion and Manipulation of Volatility Indices (VIX).** Developed empirical analyses consistent with collusion, manipulation and artificiality in the VIX Settlement Procedure.

- **Manipulations of Stock Prices.** Developed empirical approaches to determine whether an alleged revenue management episode in the computer industry materially affected the stock price of the company.

- **Alleged Manipulations of Hedge Funds Accounts.** Developed empirical approaches to estimate the likelihood that the observed patterns in trading and in profits by a specific trader were the result of a manipulation to maximize profits of specific accounts to the detriment of others.

- **Alleged Conspiracy and Manipulation Among Brokers and Dealers of Major Financial Institutions.** Estimated but-for transaction prices in an alleged conspiracy between brokers and dealers of a major financial institution.  Evaluated execution quality when compared to unsuspected benchmarks.  Estimated allegedly illegal profits and consumers' disadvantage. Developed analyses of liability. Presented at the SEC assisting in closing of investigation.

- **Commodities Futures Contracts Alleged Manipulations.** Developed empirical approaches to determine whether commodities futures prices of various precious metals were manipulated.  Defined relevant markets, estimated price artificiality, addressed causation and market power.  Studied floor and electronic trading, and where price discovery took place. Linked analyses to cash markets and related commodities. Estimated but-for trading, allegedly illegal profits, and potential damages.

- **Profitability Analyses of Special Purpose Vehicles.** Developed empirical analysis to estimate the profitability of various Special Purpose Vehicles after extracting the effects of taxes and other benefits, in comparison with foreign investments.

- **Alleged Fraud Related to Delivery Delay of Shorted Securities.** Conducted empirical analyses to assist in determining whether defendant's conduct was consistent with SEC's allegations of purposed delay in delivering shorted securities to profit from illicit additional interest earned.

- **Credit Ratings and Risk.** Analyzed the evolution of structured finance ratings during the eruption of the recent financial crisis in the United States.  Timed these changes with various measures of increased risk in the market and disclosures of exposures to this risk by major financial institutions.

- **Valuation of Structured Finance Securities during the 2007-2009 Financial Crisis.** Analyzed econometric models and assumptions used to value structured finance securities, namely RMBS and CDOs, during the eruption of the financial crisis. Evaluated models' sensitivities to stress scenarios and calibrations. Developed models for RMBS expected cumulative losses based on corporate default models, and tested model implications on mortgages correlations, crossed-pool correlations, and volatility of house price growth and of cumulative losses against actual and forecasted data.

- **Risk Assessment in the Financial Crisis.** Developed and implemented a sophisticated Markov Regime Switching Model to identify the evolution of risk in ABX indices from 2007 through 2009, which allowed for five different states of variable intensity and volatility. Applied various measures of relative risk in the literature to the financial crisis to assist in determine how early was subprime risk identifiable by the market.

- **Analysis of Disclosures during the Subprime Mortgages Crisis.** Matched companies' disclosures of information related to the exposure of particular assets to the evolution of risk in the market place to assist in determining whether public disclosures were timely made.

- **Valuation of Expropriated Assets in the Oil Industry.** Provided expert testimony on an international arbitration matter on the value of expropriated assets belonging to a publicly traded oil services company with headquarters in Texas, whose assets were expropriated by Venezuela.

- **Valuation of Utilities Assets.** Provided expert testimony on the valuation of a utilities company, containing a fairness opinion and addressing robustness and appropriateness of various valuation methods employed during a merger and acquisition process. Addressed issues related to material adverse change with respect to the acquisition.

- **Valuation in the Pharmaceutical and Biotechonology Industries.** Opined on the price offered by a major pharmaceutical company in the acquisition of a leading biotechnology company. Used discounted cash flow models, multiple models and event studies. Assisted in the estimation of the value of the biotechnology R&D pipeline.

- **Damages Suffered by Beyond Meat.** Expert testimony on damages suffered by Beyond Meat due to alleged misinformation spread by main competitor. Analyses included an event study, the pricing of a convertible bond and debt pricing in the context to the Merton model.

- **Stock Options and Swaps Valuation.** Opined on the valuation of stock and indices options by a financial institution in Europe.

- **Section 10b-5 Securities Litigation.** Used event studies to estimate the effect of alleged fraud on companies' stock prices and the economic value of the effect. Estimated alleged damages.

- **Insider Trading.** Analyzed the materiality of the gain allegedly obtained through insider trading. Evaluated stock and bond prices reactions to the allegedly private and illegally obtained information. Determined the extent to which such information had previously been known and assimilated by the market.

- **Testing for Market Efficiency.** Implemented a variety of statistical tests for market efficiency of particular securities during the financial crisis and compared results with those prior to the crisis. Assessed and explained changes and the appropriateness of the assumption of market efficiency.

- **Analysis of Credit Default Swaps.** Analyzed the information content of credit default swaps and to assist in determining the material impact of having only quote data available rather than final transaction prices for market participants in general.

- **Stock Options Backdating and Spring Loading.** Developed various empirical screens to determine whether patterns observed in stock price excess returns related to alleged stock options backdating and spring loading were statistically anomalous. Studied the materiality of these events.

- **Trading in Major Stock Exchanges.** Assisted in determined whether brokers and dealers in a major stock exchange illegally profited from not crossing buying and selling orders. Estimated allegedly illegal profits and consumers' disadvantage.

- **Materiality of Disclosures Related to Conspiracies.** Investigated whether the disclosure of an alleged conspiracy between members of the same industry materially affected stock prices of the companies in the same industry and the transaction price of a merger.

- **Material Adverse Change in Connection with Merger Agreements.** Determined materiality of the stock price response to information not disclosed prior to an acquisition, information which may have affected the acquisition decision itself had it previously been known.

## Other

- **Diversity of Asset Managers.** Co-authored a study to assess the representation of women and racial or ethnic minorities among asset managers used by the top 50 charitable endowments in the United States.

- **Drug Recalls.** Estimated damages associated with the recall of major blockbuster drugs.

- **Asbestos.** Estimated damages associated with construction workers' exposure to asbestos.

- **Macroeconomic Effects of Airport Expansion**. Assisted in the estimation of the macroeconomic and sectorial specific impacts of the expansion of the Lisbon airport into the Portuguese economy.

- **Postal Services Modeling.** Developed a new econometric model to predict demand for the United States Postal Service. Model results assisted management on decisions related to pricing and product innovations.

- **Patent infringement in Medical Devices.** Estimated lost profits due to alleged patent infringement in the medical device industry.

- **Patent infringement in Pharmaceuticals.** Estimated lost profits due to alleged patent infringement in the pharmaceutical industry.


## RECENT ORAL TESTIMONY

*In re: Interest Rate Swaps Antitrust Litigation*
United States District Court for the Southern District of New York
Index No.: 16-MD-2704-JPO

*United States of America v Google LLC*
United States District Court for the Eastern District of Virginia
Alexandria Division
Index No.: 1:23-cv-00108

*State of Washington v Tyson Foods, Inc., et al*
State of Washington King County Superior Court
Index No.: 21-2-14174-5 (SEA)

*Veeva Systems, Inc. v IQVIA Inc. and IMS Software Services, Ltd.*
United States District Court for the District of New Jersey
Index No.: 2:19-cv-15517 (CCC-MF)

*Preston Hollow Capital LLC v Nuveen Asset Management LLC, and John V. Miller*
United States District Court, Southern District of New York
Index No.: 20-cv-5597 (PKC-JLC)

*The City of Philadelphia, et al. v. Bank of America Corporation, et al.*
United States District Court, Southern District of New York
No. 19-cv-1608 (JMF)

*Portuguese Competition Authority: Autoridade da Concorrência v SIBS*
Portugal
No. PRC/2020/05

*In Re: Apple iPhone Antitrust Litigation*
United States District Court, Northern District of California Oakland Division
Case No. 4:11-cv-06714-YGR

*FERC v. Total*
Federal Energy Regulatory Commission Office of Enforcement
Total Gas & Power North America, Inc. et al.
No. IN12-17-000

*Don Lee Farms v. Beyond Meat, Inc., et al.*
Superior Court of the State of California, County of Los Angeles
No. BC662838

*B&R Supermarket, et al. v. Visa, Inc., et al.*
United States District Court for the District of Columbia
No. 1:17-cv-02738-MKB-JO

*Federal Trade Commission v. Surescripts, LLC*
United States District Court for the District of Columbia
No. 19-cv-1080 (JDB)

*US Airways, Inc. v. Sabre Holdings Corporation et al.*
United States District Court, Southern District of New York
No. 1:11-cv-02725 (LGS)

*In Re: Lithium Ion Batteries Antitrust Litigation*
United States District Court, Northern District of California, Oakland Division
No. 13-MD-02420 YGR (DMR)

*FERC v. BP*
Federal Energy Regulatory Commission
BP America Inc., et al.
No. IN13-15-000

## PUBLICATIONS AND MANUSCRIPTS

### Direct and Indirect Network Effects, Multisided Platforms, Dynamic Competition, Antitrust and Regulation

"Network Effects and the Neutrality of Transaction Fees," with Albert D. Metz, *Working Paper*.

"Assessing Coordinated Effects in Mergers with Price Leadership Models," with Pedro Erdei-Gonzaga, Albert D. Metz, and Ben Wagner, *The Antitrust Source*, October 2024.

"Bundled Benefits of Retail Memberships," with Mame Maloney and Jeff Brazell, available at CCIA (https://research.ccianet.org/reports/bundled-benefits-retail-memberships/), December 2023; shorter version titled "Unravelling the Bundled Benefits of Retail Memberships," *Law360*, January 2024.

"How to Approach the Calculation of Overcharge by Multisided Platforms," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* January 2023.

"Competitive Dynamics of Online and Brick-and-Mortar Retail Prices," with Mame Maloney, available at CCIA (https://research.ccianet.org/wp-content/uploads/2022/08/CCIA_Competitive-Dynamics-Handout.pdf), and a shorter version at *Competition Policy International, Antitrust Chronicle,* July 2022.

"Understanding the Economics of Platforms," with Michael Cragg, Albert Metz and Minjae Song, American Bar Association, Antitrust Law Section's *The Antitrust Magazine*, December 2021.

"Competition and Payment Card Interchange Fees: A Brief Note to the OECD Latin American and Caribbean Competition Forum," prepared for Forum presentation, September 2021.

"Collusion and Network Effects: Modeling the Dynamics of Single- and Multisided Platforms," with Albert D. Metz, *Working Paper,* June 2021.

"Modeling the Dynamics of Network Entry and Competition Under Single- and Multi-Homing," with Albert D. Metz, *Working Paper,* June 2021.

"The Dynamics of Single- and Multisided Platform Monopolies," with Albert D. Metz, *Working Paper,* September 2020.

"Regulating Multisided Platforms? The Case Against Treating Platforms as Utilities" *Competition Policy International, Antitrust Chronicle,* August 2020.

"The Economics and Regulation of the Portuguese Retail Payments System," with David S. Evans, SIBS, November 2013.

### Conspiracies, Manipulations, Information Exchanges, Empirical Screens, Pricing Algorithms, Antitrust and Financial Regulation

"The Key Role of Guidelines on Exchanges of Information Among Competitors and the

Divergent Transatlantic Paths," with Albert D. Metz, *Competition Polic.y International, Antitrust Chronicle,* January 2025.

"Can Exchanges of Anonymized Disaggregated Data Facilitate Collusion?" with Pedro Ergei-Gonzaga, Albert D. Metz, Ben Wagner, *Working Paper,* March 2024.

"The Increased Role of Economics in Cartel Cases," with Pedro Ergei-Gonzaga, Albert D. Metz, Ben Wagner, *Competition Polic.y International, Antitrust Chronicle,* April 2024.

"Information Exchanges Between Competitors in the Age of AI: A Note," with Pedro Ergei-Gonzaga, February 2024.

"Antitrust & Regulatory Compliance in the 21st Century: New Challenges, New Opportunities and the Role of AI," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* September 2023.

"A Note on Screens' Worldwide Adoption and Successes," *OECD Regional Centre for Latin America*, January 2021.

"Pricing Algorithms and Collusion: Is There Clarity on What Corporations may be on the Hook For?" with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* November 2020.

"Why Screening is a 'Must Have' Tool for Effective Antitrust Compliance Programs," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* November 2019.

"Pricing Algorithms and Implications for Competition," *Competition Policy International, Cartel Column,* May 2019.

"The Future of Cartel Deterrence and Detection," with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* January 2019.

"Can Machine Learning Aid in Cartel Detection?" with Albert D. Metz, *Competition Policy International, Antitrust Chronicle,* July 2018.

"Recent Financial Sector Conspiracies and Manipulations: How to Prevent Future Similar Conduct?" *Competition Policy International, Antitrust Chronicle,* June 2016 (1).

"Antitrust Compliance 2.0: The Use of Structural Analysis and Empirical Screens to Detect Collusion and Corruption in Bidding Procurement Processes," with Elizabeth Prewitt, *Competition Policy International, Antitrust Chronicle,* June 2015 (2).

"Comments on ICE Benchmark Administration's Position Paper of 20 October 2014: LIBOR Reform," with Albert D. Metz, December 18, 2014.

"Recent Successes of Screens for Conspiracies and Manipulations: Why Are There Still Skeptics?" *Competition Policy International, Antitrust Chronicle,* October 2014 (2).

"Roundtable on *Ex Officio* Cartel Investigations and the Use of Screens to Detect Cartels, A Paper by Rosa M. Abrantes-Metz," prepared for the Directorate for Financial and Enterprise Affairs, Competition Committee, Organization for Economic Cooperation and Development, for discussion at its meeting held on October 31, 2013, OECD, Paris.

"Aluminum Market Dislocation: Evidence, Incentives and Reform," September 18, 2013, Working Paper, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2328902.

"Proactive *vs.* Reactive Anti-Cartel Policy: The Role of Empirical Screens," Working Paper, June 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2284740.

"Principles for Financial Benchmarks: Comments on the OICU-IOSCO Consultation Report on Financial Benchmarks," May 15, 2013, available at http://www.iosco.org/library/pubdocs/409/pdf/Rosa%20M.%20Abrantes%20Metz.pdf.

"The Determinants of Cartel Duration," with John M. Connor and Albert D. Metz, Working Paper, April 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263782.

"Enhancing Financial Benchmarks: Comments on the OICU-IOSCO Consultation Report on Financial Benchmarks," with David S. Evans, Working Paper, February 10, 2013, available at http://www.iosco.org/library/pubdocs/399/pdf/Prof.%20Rosa%20Abrantes%20-%20Metz%20NYU.pdf.

"Revolution in Manipulation Law: The New CFTC Rules and the Urgent Need for Economic and Empirical Analyses," with Gabriel Rauterberg and Andrew Verstein, *University of Pennsylvania Journal of Business Law,* 15(2), 357-418, 2013, also available at https://www.law.upenn.edu/live/files/1806-verstein15upajbusl3572013pdf.

"Regional Competition Center for Latin America Presents: Guidelines on Exchanges of Information Among Competitors," *Competition Policy International Latin America Column*, January 17, 2013.

"Will The Wheatley Recommendations Fix LIBOR?" with David S. Evans, *Competition Policy International, Antitrust Chronicle,* November 2012 (2), refer also to http://blogs.law.harvard.edu/corpgov/2013/01/04/replacing-the-libor-with-a-transparent-and-reliable-index/#comments.

"Antitrust Guidelines for Horizontal Exchanges of Information among Competitors for the Regional Competition Center for Latin America," October 2013.

"Replacing LIBOR with a Transparent and Reliable Index of Interbank Lending: Comments on the Wheatley Review of LIBOR Initial Discussion Paper," with David S. Evans, Working Paper, September 6, 2012, available at http://cdn.hm-treasury.gov.uk/condoc_wheatley_review_responses_1.pdf.

"Lessons from LIBOR for Detection and Deterrence of Cartel Wrongdoing," with Daniel D. Sokol, *Harvard Business Law Review Online*, vol 3, pp 10-16, available at http://www.hblr.org/2012/10/the-lessons-from-libor-for-detection-and-deterrence-of-cartel-wrongdoing/.

"How Should the LIBOR be Reformed?" *Competition Policy International, Antitrust Chronicle,* July 2012 (1).

"Interview: Update on 'Screens for Conspiracies and Their Multiple Applications,'" *Competition Policy International, Antitrust Journal*, June 8(1), 2012.

"A Short Note on Manipulation, Speculation and Crude Oil Prices," Mimeo, April 2012.

"How Far Can Screens Go in Detecting Explicit Collusion? New Evidence From the LIBOR Setting," with Albert D. Metz, *Competition Policy International Antitrust Chronicle*, March (1) 2012.

"Why and How to Use Empirical Screens in Antitrust Compliance?" *Competition Policy International Antitrust Chronicle*, February (1) 2012.

"Defending Against Allegations of Fraud and Manipulation: The Role of the Economist under the New CFTC Rules," Working Paper, December 2011.

"Design and Implementation of Screens and Their Use by Defendants," *Competition Policy International Antitrust Chronicle*, September (2) 2011.

"LIBOR Litigation and the Role of Screening: The Need for Enhanced Compliance Programs," *Competition Policy International Antitrust Chronicle*, July (2), 2011.

"LIBOR Manipulation?" with Michael Kraten, Albert D. Metz and Gim Seow, *Journal of Banking and Finance,* 36, 136-150, 2012, *List of Most Download Journal of Banking and Finance Articles,* 2012, first draft dated August 4, 2008 and available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1201389.

"Tracking the LIBOR Rate," with George G. Judge and Sofia B. Villas-Boas, *Applied Economics Letters,* 18, 893-899, 2011.

"Investigating the LIBOR Rate," with Sofia B. Villas-Boas, Working Paper, July 2010, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1646600.

"Screens for Conspiracies and Their Multiple Applications - Extended," with Patrick Bajari, *Competition Policy International Journal,* 6(2), Autumn 2010.

"The Power of Screens to Trigger Investigations," *Securities Litigation Report*, Vol. 10, No. 10, November 2010.

"Enhancing Compliance Programs through Antitrust Screening," with Patrick Bajari and Joseph E. Murphy, *The Antitrust Counselor*, 4(5), September 2010.

"Antitrust Screening: Making Compliance Programs Robust," with Patrick Bajari and Joseph E. Murphy, Working Paper, July 2010.

"Economic Expert Testimony in Conspiracy Cases Under Federal Antitrust Laws," with Dina O. Aguilar, Mark Frankena, Kostis Hatzitaskos and David Scheffman, Working Paper, February 2010 (in "Proof of Conspiracy Under Federal Antitrust Laws,: ABA editions, 2010).

"Screens for Conspiracies and their Multiple Applications," with Patrick Bajari, American Bar Association, Antitrust Section's *The Antitrust Magazine*, 24(1), Fall 2009.

"Screening for Conspiracies: Applications for Litigation, Pre-Litigation, Regulation and Internal Monitoring," with Patrick Bajari, March 2009, available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863.

"Is the Market Being Fooled? An Error-Based Test for Manipulation," with Sumanth Addanki, available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863, 2007, revise and resubmit.

"Competition Authorities are Screening for Conspiracies: What are they Likely to Find?" with Luke M. Froeb, *The American Bar Association Section of Antitrust Law Economics Committee Newsletter*, 8(1), 10-16, Spring 2008.

"A Variance Screen for Collusion," with Luke M. Froeb, John F. Geweke and Chris T. Taylor, *International Journal of Industrial Organization*, 24, 467-486, 2006, *Most Cited International Journal of Industrial Organization Articles,* 2010.

## Pharmaceuticals and Health Care

"The Determinants of Pharmaceutical Review, Success and Duration," with Chris P. Adams and Albert D. Metz, Working Paper, November 2014.

"Health Care Benefits vs. Costs: Are We Making the Right Choices?" *Competition Policy International, Antitrust Chronicle*, September (2), 2014.

"Why a Reduction of Health Care Costs *per se* May be a Misleading Policy Objective," *Competition Policy International, Antitrust Chronicle*, July (2), 2012.

"Benefits to Society from Health Care Spending: Do We Get More for Higher Spending?" Working Paper, May 2012.

"Defining the Cost and Price of Medical Innovation: An Economic Approach," December 16, 2010, available at http://www.disruptivewomen.net/2010/12/16/defining-the-cost-and-price-of-medical-innovation-an-economic-framework/.

"New Evidence on The Pharmaceutical Pipeline and Its Meaning for Mergers," *The American Bar Association Section of Antitrust Law Economics Committee Newsletter*, 5(1), 18-23, Spring 2005.

"Empirical Facts and Innovation Markets: Analysis of the Pharmaceutical Industry," with Chris P. Adams and Albert D. Metz, American Bar Association, Antitrust Section's *The Antitrust Source*, 4(4), March 2005.

"New Evidence On The Pharmaceutical Pipeline and Its Meaning for 2005," *Pharmaceutical Processing*, January 2005.

"Pharmaceutical Development Phases: A Duration Analysis," with Chris P. Adams and Albert D. Metz, *Journal of Pharmaceutical Finance, Economics & Policy*, 14, 19–42, 2006.

## Monetary and Financial Economics, Theoretical Econometrics, Other Applied Econometrics, Other Antitrust and Regulation of Financial Markets

"Is Financial Regulation Appropriately Dealing With Systemic Risk? Are We Really Fixing Existing Problems or Creating New Ones?" January 2014, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2381180.

"Did Credit Rating Agencies Cause the European Sovereign Debt Crisis?" *Competition Policy International, Antitrust Chronicle,* January 2014 (2).

"Misdiagnosing and Mistreating the Market for Credit Ratings?" *Competition Policy International, Antitrust Chronicle,* November 2013 (2).

"What's to be done with Rating Agencies? Understanding the Problem to Find a Solution," with Kristiyana T. Teodosieva, *The Exchange*, *American Bar Association*, September 2013, also available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2288195.

"Testing Equalities of Variances for Paired Time Series at Selected Frequencies: An application to Sovereign Credit Default Swaps," with Albert D. Metz, August 2011.

"The Use of the Event Study Methodology in International Arbitration Damages Assessments," with Santiago Dellepiane, *Journal of International Arbitration*, 28(4), 327-342, 2011.

"The Information Content of Credit Default Swap Prices," with Cathy Niden, *Derivatives Litigation Reporter*, 14(18), July 2008.

"The Effect of Entry on Prices and Costs in Mobile Telephony," with Pedro Pereira, http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=339863, Working Paper 2008, revise and resubmit.

"Before and After the EMU: Financial Integration, Monetary Policy and Welfare Changes," PhD Dissertation in Economics, University of Chicago, June 2002.

"The European Monetary Union–Could there be any 'Winners' and 'Losers'?" Manuscript, University of Chicago, July 2001.

"An Evaluation of the Macroeconomic Stability of the European Monetary Union, and an Original Decomposition of its Business Cycles into Real and Monetary Components," Manuscript, University of Chicago, June 1999.

## Book Contributions

"Antitrust and Regulatory Compliance: New Challenges and Opportunities, and the Use of AI" with Albert Metz. book chapter included in *Research Handbook on Competition and Corporate Law,* edited by Florence Thepot, forthcoming.

"The Role of Screening in Antitrust Compliance," book chapter included in *A Guide to Antitrust Compliance*, with Albert D. Metz, published by *Les Concurrences*, Antitrust Publications and Events, 2021.

"Antitrust Governance and Compliance," with Daniel Sokol, *The Oxford Handbook of International Antitrust Economics*, Chapter 23, 2015, 586-618.

Co-author of a chapter on the "Role of Event Studies in International Arbitration Cases",

second book of the *Foro de Arbitraje en Materia de Inversión*, Sonia Rodríguez Jiménez and Herfried Wöss (eds.), *Instituto de Investigaciones Jurídicas, Universidad Nacional Autónoma de México*, México, September 2013, http://biblio.juridicas.unam.mx/libros/libro.htm?l=3386.

Co-drafter of the chapter on "Restraints of Trade," Volume on "2010 Annual Review of Antitrust Law Developments," *American Bar Association Editions*, March 2011.

Co-drafter of the chapter on "The Role of the Economic Expert in Conspiracy Cases," included in the Volume on "Proof of Conspiracy under Antitrust Federal Laws," *American Bar Association Editions*, April 2010.

## Ongoing Research

"Antitrust Compliance: Its History, Art and Science," with Don Klawiter.

"Competitive Entry Deterrence in Multisided Platforms," with Albert D. Metz.

"The Multiple Applications of Screens in Finance: Manipulations, Conspiracies, Insider Trading, FCPA Violations, and Other Fraud."

"Detecting Collusion in Survey Data," with Albert D. Metz.

## Selected Opinion Articles

"Time to rethink deficient market structures," *Financial Times*, April 11, 2016, available at https://www.ft.com/content/f95648f8-d499-11e5-829b-8564e7528e54.

"Stress Tests Won't Prevent the Next Financial Crisis: Expected losses under invented scenarios tell us little about risk and reality," *The Wall Street Journal*, March 18 2014, available at http://online.wsj.com/news/articles/SB10001424052702303704304579380961631198726.

"Time is nigh to rethink the role of benchmarks: New indices should reflect lessons learnt from recent scandals," *Financial Times*, January 10, 2013, available athttp://www.ft.com/intl/cms/s/0/222f4230-79ec-11e3-8211-00144feabdc0.html#axzz2rTDaZS6s.

"How to Keep Banks from Rigging Gold Prices," *Bloomberg*, December 19, 2013, available at http://www.bloomberg.com/news/2013-12-19/how-to-keep-banks-from-rigging-gold-prices.html.

"Banks' Role in Metal Trade Deserves Scrutiny," *Bloomberg*, July 31, 2013, available at http://www.bloomberg.com/news/2013-07-31/banks-role-in-metal-trade-deserves-scrutiny.html.

"How to Use Statistics to Seek Out Criminals," *Bloomberg*, February 26, 2013, available at http://www.bloomberg.com/news/2013-02-26/how-to-use-statistics-to-seek-out-criminals.html.

"Should New Financial Products be Regulated by an FDA-like Agency? 8 Reasons Why Not," May 16, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/should-new-financial-products-be-regulated-by-an-fda-like-agency-8-reasons-why-not/.

"Credit Rating Agencies, the Financial Crisis, and Regulation," April 18, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/credit-rating-agencies-the-financial-crisis-and-regulation/.

"The Complexity and Challenges of Proposed Swap Regulations," April 4, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/the-complexity-and-challenges-of-proposed-swaps-regulations/.

"Screens and the Alleged LIBOR Conspiracy and Manipulation," March 21, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/screens-and-the-alleged-libor-conspiracy-and-manipulation/.

"Has the LIBOR-Alleged Conspiracy and Manipulation Inspired the New CFTC Regulations?" March 7, 2012, available at http://www.globaleconomicsgroup.com/financial-regulation/has-the-libor-alleged-conspiracy-and-manipulation-inspired-the-new-cftc-regulations/.

## SELECTED PRESENTATIONS

### Multisided Platforms, Big Data & Technology, Labor and Dynamic Competition

"Presidential Politics and Antitrust," Panel discussion, American Bar Association, October 2024.

"Competition Law and Digital Ecosystems," Panel discussion, GCR Law Leaders Global, Miami, February 2024.

"Latest Antitrust Developments," Invited Dinner Speaker, Willkie Farr, Antitrust Spring Meetings, Washington DC, March 2023.

"Do Not Pass Go – Steering and Monopolies," Panel discussion at the Antitrust Spring Meetings, American Bar Association," Washington DC, March 2023.

"Competition in Labor Markets:  What Antitrust Has To Do With That?" Panel discussion,

hosted by New York University, New York, December 2022.

"Labor Markets: Where are the Antitrust Concerns?" Panel discussion, 10th Bill Kovacic Antitrust Salon, hosted by Les Concurrences, Washington DC, September 2022.

"The Role of Economics and Economists in Judicial Review of Antitrust Enforcement," Panel discussion, co-hosted by OECD Regional Centre for Competition (RCC) in Latin America, July 2022.

"Dynamic Competition and Public Policy," Panel discussion, co-hosted by the George Washington University Regulatory Studies Center and Information Technology and Innovation Foundation, Washington D.C., April 2022.

Expert Witness at Mock Trial, ABA Spring Meetings, Washington D.C., April 2022, on Merger-to-Monopoly matter in multisided platforms.

"Antitrust and the Future of Multisided Platforms," Panel discussion, ABA Webinar, December 2021.

"Digital Transformation Investment," Panel discussion, C-Vision Internal Council, November 2021.

"Competition and Payment Card Interchange Fees," Presentation, OECD Latin American and Caribbean Competition Forum, November 2021.

"What does big data mean for antitrust?" Panel discussion, University of Iowa, September 2021.

"The Future of Competition Policy in China," Panel discussion, Fordham Competition Law Institute Webinar, June 2021.

"Financial Sector Consortia & Collaborations: A Brief Economic Perspective," Panel discussion, Les Concurrences, April 2021.

"Economic Issues Involving Platforms, Privacy and the Digital Economy," Panel discussion, The Canadian Bar Association Competition Law Section, February 2021.

"Understanding Network Effects in the Platform Context," Panel discussion with Mike Cragg, Evan Chesler, Lars Kjolbye, Kai-Uwe Kuhn, and Christopher Yates, at the *Fordham Competition Law Institute*, October 2020.

"Antitrust Analysis of Platform Markets: Beyond American Express," panel discussion with Joseph E. Stiglitz, David S. Evans, Evan Chesler and Michael Cragg, Competition Policy International, March 2020.

Conspiracies, Manipulations, Fraud, Price Gauging, Screens, Pricing Algorithms and Regulation and Financial Markets

"Mind Your Exchanges: Talk Isn't Always Cheap," Panel discussion at the Antitrust Spring Meetings, American Bar Association," Washington DC, April 2024.

"Pricing Algorithms and Antitrust," Invited Lunch Speaker, Antitrust Group at Willkie Farr, Washington DC, March 2024.

"Leveraging Data to Enhance Antitrust Compliance," Panel discussion, American Bar Association, February 2024.

"Pricing Algorithms: What to be Concerned About?" Panel discussion, Berkeley Research Group, Washington DC, February 2024.

"Cartels Screening and Pricing Algorithms" Invited Guest Presentation to ICC-Mexico Diploma in Competition Policy Academic Program," February 2024.

"Antitrust Compliance and AI," Panel discussion at Morgan Lewis' 2023 Antitrust in the Financial Sector Summit," Morgan Lewis NY office, September 2023.

"Antitrust Compliance History, Art and Science," Workshop on Research Handbook on Competition and Corporate Law," ZEW, Mannheim, Germany, March 2023.

"International Cartels, Screening, and Algorithmic Collusion," Invited Guest Presentation to ICC-Mexico Diploma in Competition Policy Academic Program," January 2023.

"Outsourcing Competition Law Enforcement," Panel discussion, GCR Law Leaders Global, Miami, February 2023.

"Adoption of Screens in Antitrust Compliance Programs and Antitrust Compliance in General," Panel discussion for *Les Concurrences*, launch of new Antitrust Compliance book, May 2022.

"International cartels and how to detect them," Presentation, ICC-Mexico Diploma in Competition Policy Academic Program, November 2021.

"Algorithms and Competition Policy," Panel discussion, CRESSE Conference, July 2021.

"Screening for Conspiracies: What's New? What's Best?" Presentation for the OECD Virtual Workshop on Screening for Ukrenergo, June 2021.

"Working with Economic Experts from Selection Through Trial: Women's Insights," Panel discussion, The American Bar Association, series Bar None II: Women Leading in the

Courtroom, April 2021.

"Using Econometrics and Big Data to Guide Antitrust Enforcement and Compliance," panel discussion, ABA Antitrust Law Section, Economics Committee, March 2021.

"#88 What's in a Screen? Using Data as Evidence of Collusion and Manipulation (or lack thereof)," Guest speaker at *Our Curious Amalgam podcast*, American Bar Association, Antitrust Section, November 2020.

"Screens: A Must for Cartel Detection and Deterrence," presentation for the OECD Regional Centre for Competition in Latin America, section on "Proactive Tools for Cartel Detection." Panel discussion with heads of cartel enforcement for competition authorities of Argentina, Brazil, Mexico and Peru, September 2020.

"The Economics of Price Gouging," Panel presentation and discussion on "COVID-19 Price Gouging Roundtable," Fideres, September 2020.

"2020 Next Generation of Antitrust, Data Privacy and Data Protection Scholars Conference," Invited Panel Moderator on Collusion and Pricing Algorithms, New York University Law School and American Bar Association, New York, January 2020.

"Estimating Price Impact Due to Manipulation," Federal Energy Regulatory Commission, Washington, DC, April 2019.

"Pricing Algorithms and Collusion," Panel Discussion, Federal Trade Commission's Hearings on Competition, Washington DC, November 2018.

"Beyond Leniency: What else can be done to detect and deter collusion?" Presentation to the NYSBA Executive Committee, New York, May 16, 2018.

"Negotiating Cartel Fines and Civil Settlements," American Bar Association, Antitrust Section Spring Meetings, Panel discussion with Adam Hemlock, Rachel Adcox, Jeff Martino and Hollis Salzman, Washington D.C, April 11, 2018.

"The Role of Market Power in the Digital Economy," NYSBA Annual Meetings, Panel discussion with Eric Hochstadt, Kellie Lerner, Nicholas Gaglio, and Pat DeGraba, New York, January 25, 2018.

"Comments on "Collusion on Markets with Syndication" by Hatfield, Kominers, Lowery and Barry," 2018 Next Generation of Antitrust Scholars Conference, New York University Law School and American Bar Association, New York, January 26, 2018.

"Embracing Change: Innovation in the Practice and Enforcement of Competition Law," Panel

discussion at the Canadian Bar Association Fall Meetings, Antitrust Section, Ottawa, October 2017.

"Collusion and Manipulation in Gold Markets: Additional Developments," Invited Speaker to Gold and Mines Conference, New York, May 5, 2017.

"Screens for Conspiracies and Manipulations: My Most Recent Ongoing Research," Competition Law & Policy Seminar Series, U.S Department of Justice Seminar Series, Washington, DC, April 2017.

"How to Develop and Implement Screens for Conspiracies," Philippines Competition Authority, February 2017.

"Screens for Cartels and Antitrust Compliance Training," Macmillan Publishers, Required Antitrust training for Senior Management and Staff, New York, January 2017.

"Screens for Conspiracies and Their Recent Successes," Canadian Bar Association, scheduled for December 2016.

"Collusion and Manipulation in Gold Markets: Latest Developments," Invited Speaker to Gold and Mines Conference, London, scheduled for November 2016.

"Using Screenings to Detect Conspiracies in Commodities Markets," Federal Energy Regulatory Commission, Washington, DC, November 2015.

"Using Screens to Detect Conspiracies and Manipulations," Invited Speaker at the University of British Columbia Summer Conference on Industrial Organization, Vancouver, Canada, July 2016.

"Screens for Conspiracies and Bid-Rigging Detection," Guest Speaker at OECD Conference, Mexico City, Mexico, April 2016.

"Evolution of Market Reference Rates: Libor, Euribor, IBR," Guest Speaker at The Colombian Banking Association (Asobancaria), 18th Treasury Management Congress, Colombia, scheduled for January 29, 2016.

"The Use of Screens in Cartel Detection," Guest Speaker at the Hong-Kong Competition Authority, October 26, 2015, Hong-Kong.

"Screens for Conspiracies and Manipulations," Conference Keynote Speaker, Hong-Kong Economic Association Annual Meeting, October 24, 2015, Hong-Kong.

"Using Screens to Complement Leniency Programs," Panel discussion at the Portuguese

Competition Authority Annual Meeting on Competition Economics, Lisbon, Portugal, October 22, 2015.

"Screens for Conspiracies and Manipulations: Recent Successes," Seminar at the US Department of Justice, Antitrust Division, New York, October 15, 2015.

"London Gold Fixing Conspiracy and Manipulation," Invited Keynote Speaker at the Mines and Money upcoming conference in Hong-Kong, scheduled for March 2015.

"Exchange Rates, Manipulation and Reform," Invited Keynote Speaker at the Fourth Annual Workshop on "Financial Determinants of Exchange Rates," organized by the European Central Bank, the Dutch Central Bank and the Bank of Italy, Amsterdam, The Netherlands, scheduled for December 2014.

"Screens: Multiple Uses and Successes," Presentation at the Competition Markets Authority, United Kingdom, September 11, 2014.

"Problem Markets: Collusion and Manipulation in Financial Benchmarks," Presentation at the CCP Annual Conference, University of East Anglia, United Kingdom, June 12-13 2014.

"Financial Benchmarks: Collusion, Manipulation, Screening and Reform," Financial Conduct Authority, London, United Kingdom, June 11 and September 10, 2014.

"Financial Benchmarks, Collusion and Reform," Dutch Competition Law Conference, New York (through video conference), April 24, 2014.

"Empirical Screening of Markets: Detection, Deterrence and Defense," American Bar Association, Business Section Spring Meetings, Panel Discussion with David Rosenfield, Vincent Briganti, D. Loren Washburn, and Harvey Westbrook, Los Angeles, April 12, 2014.

"Looming Temptation: Antitrust and Benchmark Pricing," American Bar Association, Antitrust Section Spring Meetings, Panel discussion with Henry McFarland, William Rooney and Elizabeth Prewitt, Washington D.C, March 26, 2014.

"Manipulating Benchmarks: Antitrust Concerns about Coordination vs. Oversight of Unilateral Conduct," at CRA Annual Brussels Conference, Economic Developments in European Competition Law. Panel discussion with Christopher Woolard, FCA, Miguel de-la- Mano, EC, and Cristina Caffarra, CRA, Brussels, Belgium, December 11, 2013.

"Commodities Manipulations and Conspiracies: Empirical Evidence," Chief Economist Team, European Commission, Brussels, December 10, 2013.

"Screens for Conspiracies and Dawn Raids," Competition Authority for Peru, Lima, Peru,

November 19, 2013.

"Screens for Conspiracies and their Role in Effective Anti-Cartel Policy," Organization for Economic Cooperation and Development (OECD) Roundtable Discussion on "Ex-Officio Cartel Investigations and the Use of Screens to Detect Cartels," Paris, France, October 30, 2013; Supporting materials available at http://www.oecd.org/competition/exofficio-cartel-investigations.htm.

"Screens for Conspiracies and Antitrust Enforcement: Detection without Leniency" Annual National Association of Attorneys General Antitrust Section, Hartford, Connecticut, September 26, 2013.

"LIBOR, Screens for Conspiracies, Manipulations and Fraud: Lessons for an Effective Anti-Fraud Program," Presentation to the Securities and Exchange Commission, Washington D.C., August 6, 2013.

"Proactive versus Reactive Cartel Detection Policy: The Role of Screening," 8th European Summer School and Conference in Competition and Regulation, Corfu, Greece, July 6, 2013.

"LIBOR, Euribor, TIBOR and Other Financial Benchmarks: Detection, Antitrust and Reform," Portuguese Competition Authority, Lisbon, Portugal, June 20, 2013.

"Briefing Room on Screens for Conspiracies," Panel discussions with David Evans, Antonio Capobianco, Carlos Mena Labarthe, Carlos Ragazzo, Danny Sokol, Donald Klawiter and Kai Hueschelrath, Competition Policy International, May 2013.

"The Economics of Collusion and Damages," Romanian Competition Authority, Bucharest, Romania, April 23, 2013.

"Benchmarks: Maintaining Integrity and Reliability," Panel discussion with David Lawton, Jim Rosenthal, Nick Collier and David Eichhorn, CFTC International Regulators Meeting, Florida, March 2013.

"LIBOR, Screening and Reform," Public Lecture, University College London, February 2013.

"Financial Benchmarks Reform," IOSCO, FSA, CFTC and other International Regulators Meeting, London & Washington, DC, February 2013. Summary of Washington, D.C. Roundtable available at http://www.sifma.org/members/hearings.aspx?id=8589942209, and video available at http://www.youtube.com/watch?v=duUODyMdnsE&feature=youtu.be.

"LIBOR, Screening and Reform," European Commission, Brussels, December 6, 2012, available http://ec.europa.eu/internal_market/economic_analysis/docs/presentations/121206_libor-screening-reform_en.pdf.

"Screens in the Detection of Illegal Behavior," Romanian Competition Authority, Bucharest, Romania, December 5, 2012.

"The LIBOR Conspiracy & Manipulation: Screening as a Tool to Detect Illegal Behavior," World Bank Seminar, Washington, D.C., November 29, 2012.

"The Effective Use of Economics in Competition Enforcement," Panel Presentation with Pierluigi Sabbatini, Fiorenzo Bovenzi, Arvid Fredenberg and Kai Hüschelrath, Polish Competition Authority, Warsaw, Poland, November 22, 2012, available at http://www.uokik.gov.pl/news.php?news_id=10116.

"Recent Benchmarks Manipulation Scandals and Need for Deterrent Sanction Regimes," IOSCO, EMC Annual Meeting, November 19, 2012, Santiago, Chile.

"Economic Tools & Cartel Detection: Screens & Applications," Mexican Antitrust Bar Association, November 15, 2012, Mexico City, Mexico.

"Empirical Screens to Detect and Defend Conspiracies and Manipulations," Panel discussion, CIDE, November 15, 2012, Mexico City, Mexico.

"What To Do About LIBOR: A Special Webinar Series," Panel Discussion with David S. Evans, Miguel de-la-Mano and Michael Barr, Competition Policy International, November 8, 2012, available at https://www.competitionpolicyinternational.com/what-to-do-about-libor- a-special-cpi-webinar/.

"Making markets work for sustainable economic growth and economic recovery: The role of competition policy," Panel discussion, World Bank, Washington, D.C., November 5, 2012.

"The Determinants of Cartel Duration," Seminar in Economics, Michigan University, October 12, 2012.

"Finance, Regulation, and Ethics: Lessons from the LIBOR Scandal", with Margaret Levenstein, Michael Barr and David Mayer, Ross School of Business, Michigan University, October 11, 2012.

"Antitrust Guidelines for Horizontal Collaborations among Competitors for Central and South American Countries," Regional Center for Competition in Latin America, First Conference, Santo Domingo, Dominican Republic, September 20, 2012.

"Credit Ratings Agencies, Antitrust and Regulation," Joint with Lawrence White, Competition Policy International, June 2012.

"21st Century Antitrust Compliance: Beyond the Basics," panel discussion, joint with Alicia Downey, Theodore Banks, Joseph Murphy and Eric Morehead, American Bar Association, Antitrust Section Spring Meetings, Washington D.C., March 2012.

"Beyond Leniency: Empirical Methods of Cartel Detection," with Donald Klawiter, D. Daniel Sokol, Carlos Mena and Carlos Ragazzo, American Bar Association Brown Bag Series, December 15, 2011.

"The Use of Economic Screens in Antitrust Litigation: The Case of the London Interbank Offered Rate," Afternoon Speaker Series, New York University Law School. New York, November 2011.

"Alleged Libor Conspiracy and Manipulation: The Role of Screens," Executive Committee of the New York State Bar's Antitrust Law Section, New York, October 2011.

"Screens for Conspiracies and Manipulations and Their Multiple Applications," Portuguese Competition Authority, Lisbon, Portugal, June 2011.

"Competition Compliance: Up Your Game, Add to the Bottom Line, and Be a Corporate Star," Joint with Theodore Banks, Brian Henry and Joseph Murphy, Corporate Counsel Committee, Canadian Bar Association, June 2011.

"Empirical Methods for Conspiracies and Manipulations," Executive Committee of the New York State Bar's Antitrust Law Section, New York, December 2010.

"Screening for Conspiracies," French Competition Authority, Paris, France; German Competition Authority, Bonn, Germany, October 2010.

"Screening Devices for Detecting Collusion," Presentation and Panel Discussion with Christina Hummer and Maarten Janssen, Austrian Federal Competition Authority, Vienna, Austria, October 2010.

"Conspiracies Detection and Empirical Screens," ZEW Conference on Quantitative Analysis in Competition Assessments, Mannheim, Germany, October 2010.

"Screening for a Libor Conspiracy and Manipulation," Microeconomics Lunch Seminar, Department of Economics, Leonard N. Stern School of Business, New York University, May 2010.

"Cartel Detection, Leniency Programs and the Latin America Experience," Joint with Carlos Mena-Labarthe, November 2009.

"Econometrics and Antitrust," Joint with David S. Evans, Competition Policy International,

November 2009.

"Legal and Economic Analysis of Collusion," Joint with Patrick Bajari, Competition Policy International, June 2009.

"The Determinants of Cartel Duration," International Industrial Organization Conference, Boston, April 2009.

"On Detecting Agents' Influence in Market Data Outcomes," International Industrial Organization Conference, Boston, April 2009.

"The Empirical Detection of Conspiracies and Manipulations," Bureau of Economics, Federal Trade Commission, Washington D.C., September 2008.

"Globalization, Cartel Formation and Detection," Knowledge Globalization Annual Conference, Boston, April 2008.

"Detecting Conspiracies and Manipulations," Sawyer Business School, Suffolk University, Boston, December 2007.

"How to Spot Cheaters? Empirical Methods to Detect Conspiracies and Manipulations," Instituto Superior de Economia e Gestão, Lisbon, Portugal, July 2007.

"Is the Market being Fooled? An Error-Based Screen for Manipulation," First Meeting of the Portuguese Economic Journal, Ponta Delgada, Portugal, July 2007.

"A Variance Screen for Collusion," Portuguese Competition Authority, Lisbon, Portugal, June 2005.

### Pharmaceuticals and Health Care

"Is there too much Innovation? Benefits to Society from Technological Progress and its Contribution to Health Care Costs," International Industrial Organization Conference, Vancouver, Canada, May 2010.

"The Determinants of Pharmaceutical Review, Success and Duration," International Industrial Organization Conference, Virginia, May 2008.

"Assessing the Prospects of Drugs in the Pipeline," A Medical Affairs Leadership Conference: The Good, the Bad, and the Emerging, sponsored by Scientific Advantage, New Jersey, May 2008.

"Bringing Drugs to Market: Which Ones? How Fast? What Value?" The Center for Business Intelligence, January 2008.

"Pharmaceutical Development Phases: A Duration Analysis," Portuguese Authority for Competition, Lisbon, Portugal, November 2005; Federal Trade Commission, Washington D.C., March 2003; Congressional Budget Office, Washington, D.C., March 2003; International Industrial Organization Conference, Boston, April 2003; North American Summer Meetings of the Econometric Society, Chicago, June 2003.

### Other Monetary and Financial Economics

"Before and After the EMU: Financial Integration, Monetary Policy and Welfare Changes," The University of Chicago, Chicago, May 2002; Board of Governors of the Federal Reserve System, Washington, D.C., February 2002; European Central Bank, Frankfurt am Main, Germany, February 2002; Federal Reserve Bank of St. Louis, St. Louis, February 2002; Bank of England, London, England, January 2002.

"The European Monetary Union – Could there be any 'Winners' and 'Losers'?" The University of Western Australia, Perth, Australia, November 2001; Board of Governors of the Federal Reserve System, Washington, D.C., May 2001; The University of Chicago, Chicago, November 2000.

"The European Monetary Union and its Consequences for Financial Markets," Banco Bozano Simonsen, Rio-de-Janeiro, Brazil, September 1998.

### HONORS AND AWARDS, FELLOWSHIPS AND SCHOLARSHIPS

Economic Expert in *United States v. Google*, selected by GCR as Matter of the Year among matters worldwide for 2024.

Honoree for the American Antitrust Institute 2024 Antitrust Enforcement Awards: Outstanding Antitrust Litigation Achievement in Economics, for expert work *In Re: Apple iPhone Antitrust Litigation.*

Thought Leader, The International *Who's Who* of Competition Lawyers & Economists, 2024.

Economic Expert in *US Airways v. Sabre*, selected by GCR as Matter of the Year among matters worldwide for 2022, for "Creative, strategic and innovative work by teams of in-house and external lawyers and economists."

Honoree for the American Antitrust Institute 2022 Antitrust Enforcement Awards: Outstanding Antitrust Litigation Achievement in Economics.

Nominated as a Distinguished Professional Woman in Competition in "40s in their 40s" for North, Central and South America, January 2019.

Member, The International *Who's Who* of Competition Lawyers & Economists every year since 2009.

Award winner article on AI and antitrust compliance, Les Concurrences, April 2024.

Nominated Author for Best Antitrust and Process Article in Economics, Les Concurrences, for multiple years.

Fellowships from Fundação Calouste Gulbenkian, Portugal, 1999-2002.

Scholarship from Portuguese Government – PRAXIS XXI, 1995-1999.

Scholarship from Luso-American Foundation for Development, Portugal, 1995-1999.

Scholarship from Universitat Pompeu Fabra, PhD Program, Spain, 1995-1996.

## OTHER

Editor, 2024, "Shades of the Spectrum: A Brother's Reflection on Autism," authored by Henry Abrantes Metz.

Referee, *Journal of Political Economy*, *RAND Journal*, *The Review of Industrial Organization*, the *International Journal of Industrial Organization*, *Southern Economic Journal* and the *Journal of Law, Economics and Organization*, *Journal of Banking and Finance*, *Journal of Economics and Management Strategy*, among others.

Member, Editorial Advisory Board, *The Antitrust Chronicle*, *Competition Policy International*, 2011-2020.

Co-Editor of the Monthly Cartel Column "From Collusion to Competition," *Competition Policy International*, 2013-2021.