# EXHIBIT 7

**FILED UNDER SEAL**

THEODORE J. BOUTROUS JR., SBN 132099
   tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
   dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
   chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
   jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
   dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
   elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
   crichman@gibsondunn.com
HARRY R.S. PHILLIPS, D.C. Bar No. 1617356*
   hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*Admitted *pro hac vice*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date: October 14, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

2         PLEASE TAKE NOTICE that on October 14, 2025 at 2:00 p.m. before the Honorable Yvonne

3    Gonzalez Rogers, in Courtroom 1 of the United States District Court for the Northern District of

4    California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. ("Apple") will and

5    hereby does move this Court to grant Apple's Motion to Decertify the Class, on the ground that

6    Plaintiffs, including the named plaintiffs and class members, cannot maintain certification of the class

7    under Federal Rule of Civil Procedure 23.

8         This motion is based on this Notice and Motion, the accompanying Memorandum of Points and

9    Authorities, the concurrently filed Declarations and Exhibits, other documents on file in this or related

10   actions, oral argument of counsel, witness testimony, and any other matters of which the Court may

11   take judicial notice.

12

13   DATED: August 4, 2025                    **GIBSON, DUNN & CRUTCHER LLP**

14                                            By:    */s/ Cynthia E. Richman*
                                                  CYNTHIA E. RICHMAN

15
                                             Cynthia E. Richman (*pro hac vice*)
16                                           crichman@gibsondunn.com
                                             Harry R. S. Phillips (*pro hac vice*)
17                                           hphillips@gibsondunn.com
                                             1700 M Street, N.W.
18                                           Washington, D.C. 20036-4504
                                             Telephone: 202.955.8234
19                                           Facsimile: 202.530.9691

20                                           Theodore J. Boutrous Jr. (132099)
                                             tboutrous@gibsondunn.com
21                                           Daniel G. Swanson (116556)
                                             dswanson@gibsondunn.com
22                                           **GIBSON, DUNN & CRUTCHER LLP**
                                             333 South Grand Avenue
23                                           Los Angeles, CA 90071-3197
                                             Telephone: 213.229.7000
24                                           Facsimile: 213.229.7520

25                                           Caeli A. Higney (268644)
                                             chigney@gibsondunn.com
26                                           Julian W. Kleinbrodt (302085)
                                             jkleinbrodt@gibsondunn.com
27                                           Dana L. Craig (251865)
                                             dcraig@gibsondunn.com
28                                           Eli M. Lazarus (284082)
                                             elazarus@gibsondunn.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF CONTENTS

2

Page

3      I.      STATEMENT OF ISSUES TO BE DECIDED ........................................................ 1

4      II.     INTRODUCTION .................................................................................................... 1

5      III.    BACKGROUND ...................................................................................................... 4

6              A.      The Court Certifies a Class with Ten Million Unharmed Members Based on
                       "Plaintiffs' Representations" That This "Number Will Be Reduced" ....................... 4

7
               B.      After Extensive Discovery, the Number of Unharmed Class Members
8                      Increases ..................................................................................................................... 5

9              C.      Plaintiffs Amend the Class Definition ......................................................................... 8

10     IV.     LEGAL STANDARD .............................................................................................. 8

11     V.      ARGUMENT ........................................................................................................... 9

12             A.      Common Issues Do Not Predominate: The Class Still Contains a Staggering
                       Number of Impossible-to-Identify Uninjured Members ............................................ 9

13                     1.      Uninjured Class Members Cannot Be Identified Absent Individual
14                             Inquiry ............................................................................................................. 10

15                     2.      The Class Still Contains Over 10 Million Uninjured Individuals ................... 16

16                     3.      Plaintiffs' Noneconomic Injury Theory Confirms That Individualized
                               Injury Questions Will Predominate ................................................................. 18
17
               B.      Plaintiffs' Arbitrary Narrowing of the Class Confirms That the Defined Class
18                     Is Not Superior and the Class Representatives Are Not Adequate ............................. 19

19             C.      Plaintiffs Lack a Reliable Damages Model, Even More So If the Court Grants
20                     Apple's *Daubert* Motions or Awards Partial Summary Judgment ............................. 22

       VI.     CONCLUSION ...................................................................................................... 25
21

22

23

24

25

26

27

28

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

1

**TABLE OF AUTHORITIES**

2
Page

**Cases**

*Abante Rooter & Plumbing,*
　2017 WL 4073792 (N.D. Cal. Sept. 14, 2017) ...................................................................21

*In re Aluminum Warehousing Antitrust Litig.,*
　336 F.R.D. 5 (S.D.N.Y. 2020) .........................................................................................15

*Amchem Prods., Inc. v. Windsor,*
　521 U.S. 591 (1997)........................................................................................................9, 21

*Apple Inc. v. Pepper,*
　587 U.S. 273 (2019)....................................................................................................1, 2, 10

*In re Asacol Antitrust Litig.,*
　907 F.3d 42 (1st Cir. 2018) ...........................................................................................17, 19

*AT&T Mobility LLC v. Concepcion,*
　563 U.S. 333 (2011) ............................................................................................................17

*Atl. Richfield Co. v. USA Petroleum Co.,*
　495 U.S. 328 (1990) ............................................................................................................18

*Brantley v. NBC Universal, Inc.,*
　675 F.3d 1192 (9th Cir. 2012)............................................................................................18

*Comcast Corp. v. Behrend,*
　569 U.S. 27 (2013) ...........................................................................................3, 23, 24, 25

*Ellis v. Costco Wholesale Corp.,*
　657 F.3d 970 (9th Cir. 2011)..............................................................................................12

*Epic Games, Inc. v. Apple Inc.,*
　67 F.4th 946 (9th Cir. 2023) ........................................................................................24, 25

*Garon v. eBay, Inc.,*
　2011 WL 6329089 (N.D. Cal. Nov. 30, 2011)...........................................................11, 12

*In re Google Play Store Antitrust Litig.,*
　No. 21-md-02981 (N.D. Cal. Sept. 13, 2023) ..................................................................10

*Jensen v. Natrol, LLC,*
　2020 WL 416420 (N.D. Cal. Jan. 27, 2020) .....................................................................21

*Korean Publishers Assoc. v. Apple Inc.,*
　No. 4:25-cv-4438 (N.D. Cal.) ............................................................................................20

*Lab'y Corp. of Am. Holdings v. Davis,*
　145 S. Ct. 1608 (2025) .......................................................................................................16

*Lara v. First Nat'l Ins. Co. of Am.,*
　25 F.4th 1134 (9th Cir. 2022) ...........................................................................................14

Gibson, Dunn & Crutcher LLP

*In re Lithium Ion Batteries Antitrust Litig.*,
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ...................................................22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................1

*Mays v. Tenn. Valley Auth.*,
274 F.R.D. 614 (E.D. Tenn. 2011) ..................................................................22

*Moeller v. Taco Bell Corp.*,
220 F.R.D. 604 (N.D. Cal. 2004) .....................................................................22

*Mr. Dee's, Inc. v. Inmar*,
127 F.4th 925 (4th Cir. 2025) ...............................................................3, 20, 21

*Mr. Dee's Inc. v. Inmar*,
2023 WL 5436178 (M.D.N.C. Aug. 23, 2023) ................................................20

*In re Multiplan Health Ins. Provider Litig.*,
2025 WL 1567835 (N.D. Ill. June 3, 2025) .....................................................12

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ...............................................................................11

*In re Niaspan Antitrust Litig.*,
67 F.4th 118 (3d Cir. 2023) .............................................................................15

*Noohi v. Johnson & Johnson Consumer Inc.*,
2025 WL 2089582 (9th Cir. July 25, 2025) .....................................................23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ...........................1, 2, 3, 9, 10, 12, 14, 16, 17, 18, 19, 21, 25

*Proton AG v. Apple Inc.*,
No. 4:25-cv-0540 (N.D. Cal.) ...........................................................................20

*Pure Sweat Basketball, Inc. v. Apple Inc.*
No. 4:25-cv-03858 (N.D. Cal.) .........................................................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ..........................................14, 15, 17, 19, 23

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ................................................................25

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ....................................................................8, 21

*Ruiz-Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ...................................................................15, 25

*Schellenbach v. GoDaddy.com LLC*,
321 F.R.D. 613 (D. Ariz. 2017) .......................................................................17

*Schellenbach v. GoDaddy.com LLC*,
2017 WL 3719883 (D. Ariz. Aug. 29, 2017) ...................................................17

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

*Sherman v. Yahoo! Inc.*,
   2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) ...............................................................15

*Staton v. Boeing Co.*,
   327 F.3d 939 (9th Cir. 2003)..........................................................................................21

*In re Stec Inc. Sec. Litig.*,
   2012 WL 6965372 (C.D. Cal. Mar. 7, 2012) ..................................................................22

*Taison Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
   308 F.R.D. 630 (N.D. Cal. 2015) ....................................................................................22

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..........................................................................................................9

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) ....................................................................................11, 14

*Ward v. Apple Inc.*,
   2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ..................................................................22

*Wetlzet v. CertainTeed Corp.*,
   2019 WL 3976204 (W.D. Wash. Mar. 25, 2019) ............................................................22

*Williams v. Apple Inc.*,
   338 F.R.D. 629 (N.D. Cal. 2021).....................................................................................10

*Wood v. Marathon Ref. Logistics Servs. LLC*,
   2024 WL 4868181 (N.D. Cal. Oct. 28, 2024)...................................................................8

## Rules

Fed. R. Civ. P. 23(a)..............................................................................................................9

Fed. R. Civ. P. 23(a)(4).......................................................................................................21

Fed. R. Civ. P. 23(b) ..............................................................................................................9

Gibson, Dunn &
Crutcher LLP

# I. STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' class should be decertified under Federal Rule of Civil Procedure 23 because:

A. The class continues to have at least ten million uninjured members (6% of the class) who cannot be identified absent individual inquiry, defeating predominance as to standing, injury, and damages.

B. Plaintiffs have defined the class using arbitrary cutoffs, defeating superiority and adequacy.

C. Plaintiffs lack classwide evidence of standing, injury, and damages given the unreliability of their experts' model.

# II. INTRODUCTION

Despite having every opportunity to define a class that satisfies Federal Rule of Civil Procedure 23, Plaintiffs have come up short. After another lengthy discovery period, thousands of pages of expert reports, and yet another amendment to the class definition, Plaintiffs have not rectified the defects that the Court warned must be addressed to avoid decertification. That is no surprise. Over six years ago, when the Supreme Court held that Plaintiffs stated a claim as "direct purchasers" of apps, Justice Gorsuch predicted the difficulties of establishing classwide pass-through of the App Store commission. This is not a function of Apple's size or the App Store's success. It is a result of Plaintiffs' theory of harm, which Justice Gorsuch explained would "necessitate a complex inquiry into how Apple's conduct affected third-party pricing decisions." *Apple Inc. v. Pepper*, 587 U.S. 273, 292 (2019) (Gorsuch, J., dissenting). He warned that showing pass-through, "if it can be done at all, will entail wrestling with 'complicated theories' about 'how the relevant market variables would have behaved had there been no overcharge.'" *Id.* Despite the support of a bevy of experts, including two Nobel Laureates, Plaintiffs cannot deliver a model that is capable of reliably showing classwide standing, injury, or damages in "one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). The class must be decertified because it continues to have a staggering number of unidentifiable, unharmed class members, it excludes numerous people whom Plaintiffs think *were* injured, and it rests on a patently unreliable damages model.

To start, there is no debate that injury is an "essential element[]" of Plaintiffs' liability claims and a prerequisite to get into federal court. *Olean*, 31 F.4th at 666; *Lujan v. Defs. of Wildlife,* 504 U.S.

Gibson, Dunn & Crutcher LLP

555, 561 (1992).  Yet Plaintiffs' model for determining injury and damages is infected by numerous flaws, including several that concerned this Court at class certification.  To start, Apple has ███ billion payor records relevant to this case and over ███ million accounts, numbers that are both vastly greater than any plausible estimate of the class size.  This is because millions of class members have made purchases using multiple Apple accounts and payment methods.  To determine whether a class member was injured and their damages, it is therefore necessary to aggregate their App Store and in-app purchases across accounts.  As the Court has explained, this is "a core merits issue" that must be addressed before trial.  Dkt. 789 at 4–5.  Although Plaintiffs did not perform this critical task before seeking certification, they claimed it could be accomplished "mechanical[ly]."  Dkt. 666-1 at 13 n.12; Dkt. 708-1 at 6.  While the Court "accept[ed] plaintiffs' representation" that they could match transactions to people, Dkt. 789 at 1, reality has not lived up to their promise.  Data matching and deduplication on the scale required here is a recognized discipline within data science, yet Plaintiffs delegated this mission-critical task to a claims administrator lacking any experience in that field.  As explained in Apple's *Daubert* motion, he profoundly failed at his one job—leaving Plaintiffs without classwide evidence indicating which Plaintiffs were harmed (or how much their damages, if any, should be).[1]  Moreover, changes to the model that should not impact *who* was injured instead cause millions of class members to switch between injured and uninjured.

The class also continues to contain a massive number of uninjured members, rendering it "fatally overbroad."  *Olean*, 31 F.4th at 664, 669 n.14.  If Apple "has not caused [a] consumer to pay a higher-than-competitive price, then th[at] plaintiff's damages will be zero," *Apple v. Pepper*, 587 U.S. at 284, and this is frequently the case.  At class certification, Plaintiffs sought to cull unharmed class members by changing the class definition and applying a $10 minimum spending threshold.  The resulting class still contained at least 10 million uninjured accounts.  Dkt. 789 at 26.  The Court

---

[1] Remarkably, Plaintiffs belatedly appear to agree that Thompson's analysis is unsound and unfit for this case.  On the last business day before the deadline for this motion, Plaintiffs served a "Supplemental Expert Report of Minjae Song, Ph.D.," which purports to switch back to account-based damages calculations—with no matching to class members and no mention of Mr. Thompson.  While Apple will not further address Dr. Song's untimely supplemental report herein (reserving the right to move to strike it at an appropriate juncture), Plaintiffs' nonsensical attempt to justify their tardy disclosure by the Court's decision not to amend the class definition more than two months ago underscores Plaintiffs' apparent recognition that they cannot move forward in this case relying on Thompson.  *See* Ex. 79 (May 30, 2025 Hrg. Tr.) 21:4–25 ("[W]e'll leave it the way it is"); *accord* Dkt. 981.

expressed "concern[]" about this unprecedented number, *id.*, but certified the class based on Plaintiffs' assurances that this number would decline once they matched those accounts to actual individuals. The gambit failed to achieve its goal: By Plaintiffs' own count, the class now includes *11 million* uninjured individuals (6% of the class), and the real figure is likely far greater. Uninjured numbers of this magnitude—which vastly exceed those in any reported federal class action—cannot satisfy Plaintiffs' burden to prove "the essential element" of antitrust injury with "a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666.

The collateral damage of Plaintiffs' crude attempts to shear the class of uninjured individuals creates other Rule 23 problems. Plaintiffs have ejected from this case millions of erstwhile class members whom their model says were injured. No matter how this case ends, Apple will not enjoy the finality that is an inherent purpose of class-action litigation; another class-action suit will be lurking around the corner. Indeed, six years after the first App Store developer class action was filed, additional lawsuits continue to trickle into this Court, seeking to exploit any possible opening to bring identical claims on behalf of every conceivable group of developers. As the Fourth Circuit recently explained when confronting a nearly identical fact pattern, Plaintiffs' invitation to a piecemeal resolution hardly satisfies Rule 23's requirement that a class be the superior way to resolve this litigation. *Mr. Dee's, Inc. v. Inmar*, 127 F.4th 925, 932 (4th Cir. 2025). Plaintiffs' continued willingness to toss aside individuals whom they deem injured, in the service of their own interests, also confirms that they are not aligned with the whole class and are not adequate representatives.

Finally, Plaintiffs' proof of damages rests on a house-of-cards model. It calculates damages on a host of contested assumptions and the premise that Plaintiffs will prevail on all their theories of anticompetitive conduct. And one of the model's critical inputs is the unreliable opinion of a new expert, Professor Alan MacCormack. *See Daubert* Mot. to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack ("*Daubert* Mot.") § II. If any aspect of Plaintiffs' case fails to survive summary judgment or a jury's scrutiny, or if the Court grants either of Apple's *Daubert* motions, or if other prime modeling assumptions fail, then Plaintiffs will have no classwide damages calculation—a required element for class certification. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

This case is barreling toward trial with a class that, according to Plaintiffs' own ever-changing count, has more uninjured members than the populations of New York and San Francisco combined, and no reliable way of telling who those uninjured members even are. At the close of discovery there is no fair or manageable path forward. Their class should be decertified.

## III.    BACKGROUND

### A.    The Court Certifies a Class with Ten Million Unharmed Members Based on "Plaintiffs' Representations" That This "Number Will Be Reduced"

In 2022, when Plaintiffs sought class certification for the second time, the central disputed issue was whether they had a valid methodology for determining injury and damages on a classwide basis. *See* Dkt. 666-1. In round one, Plaintiffs had staked their proof of these elements on a model developed by Prof. Daniel McFadden. They did so again in round two, with minimal modification. The McFadden model purports to predict the prices that app developers will charge to consumers for apps and in-app purchases, depending on the level of the App Store commission rate. Ex. 33 (McFadden Rep.) ¶¶ 38–39. As Apple explained when opposing certification, the model is unreliable and insufficient to show classwide injury (or nonspeculative damages) for multiple reasons.

First, McFadden's model calculated the purported damages sustained by each *Apple ID* account. Dkt. 688-2 at 24. Because many class members had multiple accounts, there are over ██ million relevant to this case. Ex. 76 (June 23, 2023 Hrg. Tr.) 92:24–93:6. Apple ID accounts, however, cannot be members of a class action. Classes contain people. And the relevant people here are not the Apple ID account holders, but the individuals who *paid for* the transactions made by a given Apple ID. *See, e.g.*, Dkt. 815 at 1 (Plaintiffs inquiring which "individuals . . . paid for transactions"). Plaintiffs thus needed a "mechanism" to prove "the net damage to each individual customer" who paid for an app download or in-app purchase. Dkt. 630 at 26. Plaintiffs asserted that they could accomplish this with discovery into Apple's payor records, which contain personal identifying information of the actual consumers who paid for transactions on the App Store ("payors"). Ex. 76 (June 23, 2023 Hrg. Tr.) 93:21–94:6. But Plaintiffs had not yet even sought this data. *See* Dkt. 815. Still, in response to the Court's concern, Plaintiffs promised that "matching Apple IDs to Class members" would be a "mechanical step." Dkt. 708-1 at 6–7.

A second problem with McFadden's model was that it found that more than 30 million Apple ID accounts would have paid *more* to Apple absent the challenged conduct and thus were benefitted rather than injured. Dkt. 679-1 at 32; Dkt. 688-5 ¶¶ 56, 58. The number of unharmed accounts had grown steadily throughout the class-certification stage, as McFadden was repeatedly forced to revise his model to fix various calculation and data-processing errors. Ex. 98 (Prince Rebuttal Rep.) ¶¶ 21–25. To reduce the number of uninjured accounts, Plaintiffs then proposed to limit the class to consumers who spent more than $10 from any one account. Dkt. 666-1 at 1, 15. This cutoff had nothing to do with Plaintiffs' theory of liability, which does not hinge on the amount spent in an account. Rather the cutoff's admitted purpose was to depress the number of uninjured class members. *Id.* at 1. Even so, the proposed class still had 10.3 million concededly unharmed Apple ID accounts. Dkt. 786-1 ¶¶ 10–11. Plaintiffs represented that their promised matching was "likely" to "reduce the number and percentage of Class members with no damages." Dkt. 666-1 at 16.

Ultimately, the Court certified a class of those who "paid more than $10 to Apple" since 2008 "for iOS application and in-app purchases from any one Apple ID account" for use on an iPhone, iPad, or iPod touch but expressed "concern[]" that over 10 million unharmed accounts remained in the proposed class. Dkt. 789 at 2, 26. In doing so, it accepted Plaintiffs' "representations" that this "number will be reduced" before trial. *Id.* at 26. The Court also "accept[ed] plaintiffs' representation" that they would be able to "match the Apple identification numbers . . . with *actual consumers* to ascertain class members." *Id.* at 1. If Plaintiffs "fail to do both," the Court previewed, it would "consider whether modification or decertification is appropriate." *Id.*

**B.    After Extensive Discovery, the Number of Unharmed Class Members Increases**

After the Court certified the class, the parties spent the next seventeen months completing discovery. Plaintiffs attempted to fulfill their promise to calculate damages by payor rather than by Apple ID account. To do this they needed to match individual transactions to payors. And to that end, they sought Apple's App Store "payor records." Dkt. 815 at 1. Every time an iOS user purchases an app or makes an in-app transaction using an Apple ID, the transaction is associated with a separate payor record. Ex. 29 (Stodden Rebuttal Rep.) ¶ 11. The record contains personal information (e.g., name, address, phone number) and payment information (e.g., credit card information). *See* Ex. 35

(Thompson Supp. Rep.) ¶ 8. A single real person can have multiple payor records, for example if the person's identifying information or payment method has changed. Ex. 29 (Stodden Rebuttal Rep.) ¶ 21. And they frequently do. Apple has over ███ *billion* payor records relevant to this case. *Id.* Even if this represented 185 million individuals by Plaintiffs' estimate, *see* Ex. 34 (Song Rep.) Fig. 13, that means the average person is associated with █ payor records. A critical part of the matching exercise therefore entails deduplicating multiple payor records—i.e., determining that they are associated with the same person. Apple provided all the data Plaintiffs asked for, all ███ billion records. Ex. 35 (Thompson Supp. Rep.) ¶ 11. To protect users' privacy, the dataset provided to Plaintiffs did not include details about which transactions were associated with each payor record. Ex. 78 (Aug. 9, 2024 Hrg. Tr.) 5:25–6:5. The agreed plan was that once Plaintiffs purported to match payor records to unique payors, they would send Apple a table reflecting this matching. Ex. 35 (Thompson Supp. Rep.) ¶ 20. Apple could then "attach[] the transactions to the payor[s]," a step the parties agree was "ministerial." Ex. 77 (July 19, 2024 Hrg. Tr.) 15:17–18. Once Plaintiffs matched payor records to unique individuals, it was an automatic step (involving *no* discretion by Apple) to determine all the transactions associated with each "unique individual" as identified by Plaintiffs. Ex. 29 (Stodden Rebuttal Rep.) ¶¶ 13 n.11, 86, Ex. 1.[2]

      Plaintiffs rely on Darryl Thompson, the COO of a class actions claims administrator, to match and deduplicate the payor data. Ex. 35 (Thompson Supp. Rep.) ¶¶ 1, 8–9. Thompson claims that using "proprietary methods," he processed the data and "eliminated duplicate[s]" to group the records associated with each unique payor. *Id.* ¶ 10, 12. Thompson's deduplication effort is severely flawed. At first, Plaintiffs did not disclose Thompson as an expert or produce the computer code needed to replicate and test his methodology. Dkt. 957-1 at 5, 10. When they finally turned over some code, it became clear that Thompson has no replicable methodology. *Daubert* Mot. § I.B.3. Not only did Thompson fail to use any known statistical methods for deduplicating the payor data, he is not *aware*

---

[2] Specifically, every Apple transaction is associated with a "████████" identifier, which relates the transaction to a payor profile. When Apple gave Plaintiffs information about its payor profiles, it included each profile's "████████" identifier. Ex. 35 (Thompson Supp. Rep.) ¶ 13. Plaintiffs then related each "████████" identifier to a new ID called "JND_Assigned_ID," with each unique value of that ID purportedly corresponding to a different real person. *Id.* ¶ 20. For each transaction, Apple could then automatedly substitute (per Plaintiffs' purported payor-record-to-payor matching) the "████████" field with Plaintiffs' "JND_Assigned_ID" field.

Gibson, Dunn &
Crutcher LLP

of those methods.  *Id.* § I.B.1.  Instead, he employs an untested procedure of his own design that he could not describe and that cannot be replicated.  Indeed, the code Thompson produced to Apple does not yield the results he claims to have found.  *Id.* § I.B.3.a.

Thompson's methodology fails elementary checks.  For instance, it fails to properly deduplicate the records of the lead plaintiff, Mr. Pepper, by not recognizing that "Rob Pepper" and "Robert Pepper" were the same person even though they lived at the same address and used the same credit card.  Ex. 29 (Stodden Rebuttal Rep.) ¶ 64.  Thompson also concluded that some ███████ payor records were all related to the same individual, even though the only commonality among them is that they all involved someone with the first name "███." *Id.* ¶ 66.  According to Plaintiffs, ████████████████████ ████████████████████████ of Cupertino are all the same payor—and their transactions (and those of more than ██████ other payors) should be aggregated to assess injury and a single individual damages award.  *Id.* Ex. 9.  Thompson's method fails to address errors like these, much less "tr[y] to quantify [his error rate] at all."  Ex. 16 (June 5, 2025 Thompson Dep.) 99:16–22; *Daubert* Mot. § I.B.4.

Plaintiffs also used merits discovery to redo their damages model.  While they continue to rely on McFadden's methodology, they instructed one of his Brattle Group support team, Dr. Minjae Song, to implement it.  Whereas McFadden had sponsored the model's implementation for only three genres of apps, Song runs it on all of them.  Ex. 34 (Song Rep.) ¶¶ 50–51.  To do so, he relies on the work of another Plaintiffs' expert, MacCormack, who attempts to estimate the average profit margins for developers of the apps in each App Store genre or collection of genres based on his opinions about developer costs.  *See* Ex. 30 (MacCormack Rep.) ¶ 90.  Song also relies on an estimate by Dr. Abrantes-Metz of the commission she says Apple would have charged but for its challenged conduct.  Ex. 34 (Song Rep.) ¶ 46.  Based on these inputs, Song used the model to calculate damages for each transaction.  Unlike McFadden, Song calculated damages for each unique payor (as identified by Thompson) who, according to plaintiffs, is in the class.  *Id.* ¶¶ 11, 70–73.  The same errors that infected Thompson's analysis carried over to Song's.  Ex. 98 (Prince Rebuttal Rep.) ¶¶ 48–49.

Nor did using payors instead of accounts reduce the number of uninjured class members.  Song calculated damages under two scenarios.  In one scenario, Song simulated a but-for world where prices would no longer be tiered around specific focal points (e.g., $.99, $1.99).  Ex. 34 (Song Rep.) ¶ 62.  On

Gibson, Dunn &
Crutcher LLP

this simulated basis, there remained 9.7 million unharmed class members (5.2% of the class).  *Id.* Fig. 24.  When Song instead assumed that developers would continue to set prices around price tiers or focal points, the number of unharmed class members *rose* to 11 million (5.9% of the class). *Id.* ¶¶ 62–63, Fig. 25.

## C.    Plaintiffs Amend the Class Definition

In April 2025, Plaintiffs moved to amend the class definition in two ways.  Dkt. 953-8.  First, they sought to remove iPod touch transactions.  This modification excises over 6 million people from the class—including more than 4 million whom Plaintiffs' model found were injured.  Dkt. 957-17 ¶ 7. This also swings hundreds of thousands of the remaining class members from injured to uninjured or vice versa.  Ex. 98 (Prince Rebuttal Rep.) ¶ 34.  That 300,000 individuals flip from uninjured to injured, *id.*, is particularly striking: One would expect removing allegedly impacted transactions to generally make damages go *down*.  Second, Plaintiffs asked the Court to apply a $10 cutoff based on all spending by a given "payor" as identified by Thompson, rather than that payor's spending within a single account.  This change would add over 500,000 new people to the class, more than 100,000 of whom were admittedly uninjured.  Dkt. 957-17 at 8.  The Court granted Plaintiffs' first proposed redefinition (and dismissed with prejudice all "claims stemming from iPod Touch purchases").  Dkt. 981 at 1.  The Court deferred ruling on Plaintiffs' second proposed redefinition, noting that "it expects the parties to further brief the issue with forthcoming anticipated motions."  *Id.*  The Court also stated that "the appropriate remedy" for Apple's continued concerns with the class definition is a "motion for decertification."  Ex. 79 (May 30, 2025 Hrg. Tr.) 14:9–12.

## IV.  LEGAL STANDARD

"A district court may decertify a class at any time."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).  "A motion for class decertification is subject to the same standard as a motion for class certification under Federal Rule of Civil Procedure 23."  *Wood v. Marathon Ref. Logistics Servs. LLC*, 2024 WL 4868181, at *1 (N.D. Cal. Oct. 28, 2024).  And "as with class certification, the party seeking certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met."  *Id.*  Plaintiffs' class must be decertified unless they can show that "the questions of law or fact common to class members predominate over any questions affecting only individual members,"

1    that "a class action is superior to other available methods for fairly and efficiently adjudicating the

2    controversy," and that class representatives "will fairly and adequately protect the interests of the

3    class." Fed. R. Civ. P. 23(a)–(b); Dkt. 630 at 15.

4                                                **V. ARGUMENT**

5            Legal and factual developments since class certification confirm that Plaintiffs cannot satisfy

6    their Rule 23 burden.  First, Plaintiffs cannot reliably distinguish between the injured and uninjured

7    and have failed to reduce the number of uninjured class members, defeating predominance.  Second,

8    Plaintiffs cannot show superiority or adequacy because of the massive number of purportedly injured

9    class members whom Plaintiffs deliberately excluded.  Finally, Plaintiffs' case rests on a knife's edge

10   by relying on a single, deeply flawed model—their only classwide evidence of injury and monetary

11   damages.  If the Court rejects any input to, or design feature of, that model for any of the reasons

12   articulated below or in Apple's accompanying summary judgment and *Daubert* motions, then the

13   model fails, and with it the class.  Because Plaintiffs have put forward no manageable way of trying

14   their case on a classwide basis—after countless opportunities to do so—the class should be decertified.

15
     **A.      Common Issues Do Not Predominate: The Class Still Contains a Staggering Number of
16            Impossible-to-Identify Uninjured Members**

17           The predominance requirement is "demanding."  *Amchem Prods., Inc. v. Windsor*, 521 U.S.

18   591, 624 (1997).  Courts must undertake a "rigorous analysis" to determine whether individualized

19   questions—including those "relate[d] to the injury status of class members"—"will overwhelm

20   common ones and render class certification inappropriate."  *Olean*, 31 F.4th at 664, 668–69.  This is

21   particularly true in an antitrust case, because injury is an "essential element[]" of every antitrust claim,

22   *id.* at 666, and "[e]very class member must have Article III standing in order to recover individual

23   damages," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Plaintiffs therefore must "establish

24   the existence of antitrust impact through common proof," meaning "a common body of evidence,

25   applicable to the whole class."  *Olean*, 31 F.4th at 666.

26           Here, merits expert discovery confirms that Plaintiffs' model is fundamentally incapable of

27   resolving the classwide question of injury "in one stroke."  *Olean*, 31 F.4th at 664, 666.  Plaintiffs'

28   promises to fix the issues that concerned the Court at class certification have not been fulfilled.

1    Plaintiffs have not reliably linked class members to their transactions.  Discovery has confirmed that

2    the McFadden-Song model is so volatile that the slightest tweaks or corrections cause the calculated

3    damages per transaction to change considerably, further leading numerous individuals to flip from

4    injured to uninjured or vice versa.  The number of uninjured class members has only *increased* since

5    Plaintiffs' attempted matching.  And because Plaintiffs' theories of noneconomic injury cannot cure

6    their inability to reliably identify uninjured class members, they cannot satisfy predominance, and the

7    class should be decertified.  *See* Order, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, at

8    *1 (N.D. Cal. Sept. 13, 2023) (Dkt. 604) (decertifying class after excluding expert's opinions based on

9    unreliable "passthrough formula," which "was an essential element of the consumer plaintiffs'

10   argument in support of certification").

11        **1.     Uninjured Class Members Cannot Be Identified Absent Individual Inquiry**

12        A "rigorous analysis" into whether injury can be determined on a classwide basis is of particular

13   importance in this case because Plaintiffs' proffer of injury and estimated damages depends on a

14   complicated, multi-step analysis inherently prone to individualized inquiries.  *See Olean*, 31 F.4th at

15   679 (contrasting the inquiry demanded in a price-fixing case with the model required for a "complex"

16   "theory requiring multiple speculative steps").  Plaintiffs' core theory is that Apple's conduct allows it

17   to charge developers a supra-competitive commission, which developers then pass through to

18   consumers.  Dkt. 630 at 2.  Whether developers would have charged lower prices if the commission

19   were lower depends on the "extent [to which] each individual app developer was able—and then

20   opted—to pass on the 30% commission to its consumers."  *Pepper*, 587 U.S. at 293 (Gorsuch, J.,

21   dissenting).  Answers to those questions necessarily turn on questions of market power and pricing

22   decisions specific to the millions of developers, apps, and in-app items on the App Store.  *Id.*

23        Plaintiffs attempt to address these complex causation and injury issues on a classwide basis by

24   using an economic model to estimate "how developer pricing changes [would] respon[d]" to the but-

25   for commission rate.  Ex. 33 (McFadden Rep.) ¶¶ 38–41.  The model recognizes that not all app

26   developers would behave identically—some of their prices go up, while others go down.  And so some

27   Plaintiffs paid *less* on net because of Apple's conduct.  These Plaintiffs have no valid antitrust claim

28   because what matters is not whether they were "exposed" to Apple's conduct, *Williams v. Apple Inc.*,

Gibson, Dunn &
Crutcher LLP

338 F.R.D. 629, 643–44 (N.D. Cal. 2021), but whether they paid more as a result, *Garon v. eBay, Inc.*, 2011 WL 6329089, at *5 (N.D. Cal. Nov. 30, 2011) (plaintiffs lack "antitrust injury" unless they "actually paid supra-competitive fees"); *see also Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) (no Article III injury without overpayment).

Two key implications flow from this. First, to determine whether someone was injured or even in the class, Plaintiffs must accurately identify all transactions the individual paid through different Apple ID accounts. And second, to satisfy Plaintiffs' burden under Rule 23, their model must reliably determine which individuals were injured and by how much. These complex inquiries require a rigorous "test [of] the viability of plaintiffs' novel theory for proving common impact." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26 (1st Cir. 2008). Plaintiffs fail this test.

**Plaintiffs cannot match transactions to people.** Plaintiffs need a valid, common method for accurately assigning app transactions to those individuals who paid for them. First, this is necessary to determine who was injured (i.e., those who paid, on net, higher-than-competitive prices to Apple). This follows from Plaintiffs' concession that for many transactions, App Store payors incurred negative damages. Ex. 34 (Song Rep.) ¶ 79. These negative damages—monetary benefits from the challenged conduct—are not fortuitous, but inherent in Plaintiffs' chosen model and economic analysis. Ex. 11 (May 14, 2025 McFadden Dep.) 240:12–241:2 (testifying that "negative damage[s]" result from his "economic standard practices" that associate negative marginal costs with negative damages). The result of this economic reality is that, to determine whether a payor paid supra-competitive prices overall, it is necessary to "net out [the] 'negative' damages'" from the payor's transactions against any "positive" damages from other transactions. Ex. 34 (Song Rep.) ¶ 79. And this cannot be done until one knows all the transactions for which each potential class member paid. Ex. 98 (Prince Rebuttal Rep.) ¶ 49. Second, it is also necessary to relate transactions to payors simply to determine who is in the class, which is defined in terms of total spending. But Plaintiffs have failed to put forward a reliable method to do so.

For this exercise, Plaintiffs chose not to hire a data scientist but instead attempted to rely entirely on Thompson. Thompson's opinions are unreliable and should be excluded. *See Daubert* Mot. § I. But even if Thompson passes muster under *Daubert*, Plaintiffs' demonstrated failures in matching

transactions to people means their expert evidence is "inadequate to prove [the] element" of individual injury "for the entire class." *Olean* 31 F.4th at 666 n.9 (even if admissible, insufficiently reliable evidence of classwide damages cannot satisfy Rule 23); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–84 (9th Cir. 2011) (under Rule 23's "rigorous analysis' standard," a court may not stop at admissibility but must "examin[e] the merits" of the parties' respective evidence).

Thompson's efforts to match transactions and class members fails at the outset because he did not make any attempt to determine whether his assigned "payor" for a given transaction was actually the person who paid. The person injured by an allegedly too-high price is whoever paid that price. *See Garon*, 2011 WL 6329089, at *5. Thompson, however, assumed that the "payor" for any transaction was whoever's name was on the associated payor record—not necessarily who paid. *Daubert Mot.* § I.B.2. This discrepancy is substantial in practice; for example, numerous App Store transactions were conducted with payor records bearing a child's name but paid for by the parent. *Id.* Thompson's methodologies repeatedly mishandled these cases, reporting the children as payors (and therefore potential class members). *Id.*; *cf. In re Multiplan Health Ins. Provider Litig.*, 2025 WL 1567835 at *9 (N.D. Ill. June 3, 2025) (observing that "parents who buy a chocolate bar for a child [are] in the market for chocolate bars," even if "the child consumes the chocolate").

Even going by the names on the payor record, cleaning or deduplicating data on the scale of the App Store calls for expertise Thompson lacked. Consider this representative (but fictious to preserve privacy) example of the data Thompson needed to deduplicate. Ex. 29 (Stodden Rebuttal Rep.) ¶ 23.

| | person_id _hashed | first_ name | last_ name | hash_hashed | phone_number _hashed | city | state | postal _code | street1 |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 9q4ei2e3... | Jane | Brown | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 2. | 9q4ei2e3... | J@ne | Brown1 | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 3. | 1e5ee5e5... | Bob | Brown | 4a8596a7... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 4. | 83cf8b60... | Bob | Brown | 377adeb4... | 124dfe52... | Dallas | TX | 75201 | The moon |
| 5. | 5344c411... | Ann | Lee | a7f0b84d... | 08efb597... | San Francisco | CA | 94102 | 11 Fifth St |
| 6. | 234666d7... | Ann | Lee | 9ae2bdd7... | fb824fc4... | San Fransisco | CA | 94102 | 11 Fifth St |
| 7. | fd0f7e53... | Frank | Kim | ee377871... | ede1c491... | NYC | NY | 10010 | 12 W 50th St |
| 8. | 98f1f17f... | Frank | Kim | d59eced1... | 9e0b260d... | New York City | NY | 10010 | 12 W 50th Street |
| 9. | d359f8b5... | Bill | Smith | 14063697... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 10. | 30e4c022... | William | Smith | 768b84ef... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 11. | 30e4c022... | W | S | | 7fcbba91... | | | | |

A successful methodology must recognize that "Jane" and "J@ne" are likely the same person based on their same address and last names, despite their different recorded first names; that though

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

"Jane" and "Bob" likewise have different first names, the same last name, and the same address, they are *not* likely the same person; and that "Ann Lee" and "Ann Lee," who have the *same* name but *different* phone numbers and addresses (note the typo in "San Fransisco") *are* likely the same person. The methodology needs to recognize that "NYC" means "New York City," that "St" means "Street," and that "Bill" is a nickname for "William." And so on, for many permutations of typos and variants.

As elaborated in Apple's *Daubert* motion, rather than use a recognized and reliable methodology to tackle these issues, Thompson instead went his own way, devising new methods lacking any rigor. *Daubert* Mot. § I.B.3. These methods failed, and the proof is in the pudding: Thompson's results are riddled with errors that even the most cursory check would have revealed. For example, Thompson failed to recognize that an entry for "Rob Pepper" is the same person as named plaintiff "Robert Pepper"; he concludes that 40,000 records bearing the first name "Kim" were all for the same person despite their many different last names and cities; and he identified 1.8 million "unique" individuals with an address in King Salmon, Alaska—population 375. Ex. 29 (Stodden Rep.) ¶ 64, 66, 101. While Thompson did not attempt to quantify his error rate (even though doing so is standard scientific practice), Ex. 16 (June 5, 2025 Thompson Dep.) 164:15–165:6; Ex. 29 (Stodden Rep.) ¶ 94, the magnitude of errors identified by Prof. Stodden suggests it is high.[3]

Plaintiffs have no excuse. They have been on notice for years that this correspondence exercise was essential to establishing injury and damages, and they assured the Court they were up to the task. *See* Dkt. 630 at 26. Yet they chose to treat it not as a matter of liability but as a matter of slipshod claims administration and bet everything on an unqualified "expert" manifestly not up to the task.

Because of that decision, it is now impossible to determine whether any given class member was injured or uninjured without undertaking a person-by-person inquiry that would dwarf this case's common issues. Even if Thompson's testimony were admitted, Apple would have the right to test the evidence at trial and expose its clear errors: to ask the factfinder to note Pepper's address; consider the data associated with Pepper's name and address; observe the separate entries for "Rob Pepper" and "Robert Pepper"; deduce that they likely referred to the same person; and then assess the evidence

---

[3] And these are but a few of Thompson's elementary errors. For example, as explained in Apple's *Daubert* motion, his result did not replicate when Apple's expert ran his computer code. *Daubert* Mot. § I.B.3.

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

1   about the transactions associated with both those payors.  Ex. 29 (Stodden Rebuttal Rep.) ¶¶ 64–65.
2   Similarly, the factfinder would need to bring enough Kims into court to understand which of their
3   transactions were made by the same individual.  It would need to summon the supposed residents from
4   King Salmon, Alaska and determine how many are the same person, how many fit the class definition,
5   and how many were injured.  And this time-consuming process would need to be replicated across (by
6   their count) almost 200 million class members, for the myriad further errors likely infecting
7   Thompson's methodology, rendering any classwide trial wholly unmanageable.

8          Now that it is clear that "at least some class members" require individualized inquiry but there
9   is no way of knowing in advance which ones, Plaintiffs cannot avoid "the spectre of class-member-by-
10  class-member adjudication."  *Van*, 61 F.4th at 1069.  Nor can Plaintiffs seek to lay the blame on Apple's
11  data.  Thompson reviewed that data and determined it was possible to perform the necessary cleaning
12  and matching exercise.  Ex. 35 (Thompson Supp. Rep.) ¶ 9–10.  But Thompson failed to do so reliably.
13  And now there can be no plainer exemplar of when the "need to identify uninjured class members . . .
14  predominate[s] and render[s] an adjudication unmanageable."  *Olean*, 31 F.4th at 669 n.13; *see, e.g.*,
15  *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022) (affirming denial of class
16  certification where "figuring out whether each plaintiff was injured would be an individualized
17  process"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624 (D.C. Cir. 2019) ("a
18  finding of predominance" was "precluded" when "individualized inquiries" were necessary for at least
19  2,037 class members).

20         Just as one cannot know whether a payor was injured until one identifies all their transactions,
21  knowing the payor's full set of transactions is also necessary to determine whether the individual is
22  even in the class.  Under the current class definition, it is necessary to determine which consumers
23  "paid more than $10 in total to Apple" since 2008 "from any one Apple ID account."  Dkt. 789 at 2.
24  Because the class is defined in terms of what consumers *paid for*, class membership cannot be
25  determined without relating app transactions to payors.  Thompson's failings render this impossible.
26  And the problem is even worse for the new proposed class definition—where membership turns on
27  whether someone spent $10 or more *across* all their accounts.  Earlier this year, the Court invited
28  further briefing on whether the class should be redefined in this way.  *See supra* III.B.  The above

discussion shows why Plaintiffs cannot reliably identify class members under this redefinition either. *See Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *6, 10 (S.D. Cal. Sept. 23, 2015) (denying class certification because the individualized inquiries needed to match class member records "suggest[ed] that common questions do not predominate"); *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137 (3d Cir. 2023) (class certification properly denied where plaintiffs "ha[d] not shown they can identify, without individualized inquiry, the [end-payor] class members" by matching transactions and payor data).

**The damages model remains incapable of reliably identifying the uninjured.**  Plaintiffs' updated model (the McFadden-Song model) continues to be infected by myriad flaws and unfounded assumptions that render it unstable and unable to identify and "winnow out" uninjured class members. *Ruiz-Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016).  The McFadden-Song model is so volatile that after even the slightest tweaks or corrections, the new calculations cause numerous individuals to flip from injured to uninjured or *vice versa*.  One error, for instance, caused more than a million accounts to switch from injured to uninjured.  Ex. 98 (Prince Rebuttal Rep.) ¶ 27.  Dr. Song has not fixed the model's instability.  *Id.* ¶ 34.  In fact, further discovery has laid it bare: Simply removing iPod transactions—which accounted for less than 1% of billings over the full class period— caused more than 300,000 payors to switch from injured to uninjured, and (even more surprising) about the same number to switch from uninjured to injured.  *Id.*; Dkt. 962-2 ¶ 5.  That someone would become "injured" according to Plaintiffs only when their apps are categorized in a specific genre, or when certain of their purchases are *eliminated* from the model, illustrates the model's plain "inability to isolate the effects" of the alleged anticompetitive conduct and "disqualifies [it] from serving as classwide proof." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020).

In sum, Plaintiffs' inability to put forward a reliable, classwide method dooms continued certification of the class.  The fact that millions of payors paid *less* in reality than they allegedly would have in Plaintiffs' but-for world and thus were uninjured is itself fatal to certification.  But at the bare minimum, these "[u]ninjured class members cannot prevail on the merits, so their claims must be winnowed away as part of the liability determination." *Rail Freight*, 934 F.3d at 624.  Because Plaintiffs offer no reliable method to "winnow" away millions of uninjured class members without a person-by-person analysis, the class should be decertified.

## 2.    The Class Still Contains Over 10 Million Uninjured Individuals

Not only is the task of identifying uninjured class members fraught with individualized inquiries, the sheer number of uninjured people in the class remains intolerably high.  As this Court observed, "whether plaintiffs' class definition sweeps in a statistically significant number of uninjured class members" is "core to the predominance analysis."  Dkt. 789 at 24.  In *Olean*, the Ninth Circuit reiterated that a class which "include[s] a great number of [unharmed class] members . . . is defined too broadly to permit certification."  *Olean*, 31 F.4th at 669 n.14 (citing approvingly a decision rejecting a class containing "thousands" of uninjured class members).  Apple maintains the better view is that, under Article III and Rule 23, the presence of *any* uninjured class member is grounds to decertify.  *See Lab'y Corp. of Am. Holdings v. Davis*, 145 S. Ct. 1608, 1609 (2025) (Kavanaugh, J., dissenting from dismissal) ("[W]hen a damages class includes both injured and uninjured members, common questions do not predominate.").  But even under a more lenient standard, Plaintiffs' class is fatally overbroad.

Far from reducing the number of uninjured class members as Plaintiffs promised, Dkt. 789 at 26, the problem of uninjured class members has only gotten worse.  At class certification, the class included 10.3 million uninjured accounts, even after Plaintiffs applied the $10 cutoff designed to decrease the number of uninjured.  *Id.*  Now, the version of Plaintiffs' model that disregards focal-point pricing calculates 9.7 million uninjured class members, while the version that accounts for focal-point pricing has 11 million uninjured.  *See supra* III.B.  There is every reason to think the focal-point model is the more accurate of the two, because that version of Plaintiffs' model is consistent with the "overwhelming evidence suggesting that [even absent a requirement by Apple] developers would choose to price their apps at focal points ending in 99 cents."  Order Denying Class Cert., Dkt. 630 at 11; *see also* Ex. 9 (Nov. 5, 2021 McFadden Dep.) 152:7–153:2 ("I agree that focal point pricing is common, and I agree that I would expect to see it in—in any world, including a but-for world."); Ex. 86 (Berger Rep.) ¶ 19 (explaining how "99-cent pricing is commonplace . . . even in the absence of any externally imposed requirement to do so").  And there is ample evidence, as any jury would hear, that the number and percentage of uninjured soars when the model's unreasonable assumptions are altered *See* Ex. 98 (Prince Rebuttal Rep.) ¶ 29 n.42 (percentage uninjured ranging beyond 40%).  But even taking Plaintiffs' best case—their model that unrealistically ignores focal-point pricing—the conceded

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

1   number of injured is not meaningfully smaller than 10 million; it is at least 9.7 million, or approximately

2   5.2% of the class.  *See supra* III.B.

3          Either way, there remain "a great number of" unharmed class members, *Olean*, 31 F.4th at 669

4   n.14 —more than the number courts have found unacceptably high in other cases.  For example, in *Rail*

5   *Freight*, 934 F.3d 619 (D.C. Cir. 2019), the D.C. Circuit affirmed the district court's denial of class

6   certification where the plaintiffs' model showed just over 2,000 putative class members (or 13% of the

7   class) were uninjured.  *Id.* at 623, 625.  Similarly, in *In re Asacol Antitrust Litigation*, 907 F.3d 42 (1st

8   Cir. 2018), the court reversed the district court's order certifying a class that contained "around 10%,"

9   or "thousands" of uninjured class members under the plaintiffs' model.  *Id.* at 47, 51–54; *see also*

10  *Schellenbach v. GoDaddy.com LLC*, 321 F.R.D. 613, 625 (D. Ariz. 2017) & 2017 WL 3719883, at *5

11  (D. Ariz. Aug. 29, 2017) (denying certification where "approximately 1,000 of the 10,000 potential

12  class members" were uninjured).  There is no precedent for permitting certification of a class that

13  contains 11 million uninjured class members.  Dkt. 739 (joint submissions compiling classes certified

14  with uninjured class members, with no comparable examples).

15         Plaintiffs do not get a pass simply because of the App Store's popularity or scale.  The number

16  of uninjured class members is unprecedently large even in comparison to the class size.  Even the

17  percentage of class members who are uninjured stands at 5.9%, the outer edge of "the outer limit" of

18  "5% to 6%" recognized by some courts.  *Rail Freight*, 934 F.3d at 625.  And the astronomical raw

19  number of uninjured members contributes to a class's intractability and "in terrorem" power to

20  "pressur[e] [a] settl[ement]."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (discussing

21  how a class with a mere "tens of thousands" of members could have this effect).

22         The situation is intolerable.  The number of uninjured class members remains exorbitant even

23  after Plaintiffs and their experts have indulged every assumption and maneuver to reduce its magnitude.

24  The true number of uninjured mushrooms when any of these gambits is scrutinized and put to the test of

25  reasonableness.  Ex. 98 (Prince Rebuttal Rep.) ¶¶ 21–25.  And none of this accounts for *any* of the

26  benefits that the App Store delivers to consumers and developers.  Because the class "is defined so

27  broadly as to include a great number of members who for some reason could not have been harmed,"

28  it is "defined too broadly to permit certification."  *Olean*, 31 F.4th at 669 n.14.

### 3.    Plaintiffs' Noneconomic Injury Theory Confirms That Individualized Injury Questions Will Predominate

Plaintiffs cannot take refuge in their experts' suggestion that payors without monetary damages were harmed in other ways.  Plaintiffs' experts argue that even consumers who did not pay higher prices were injured because they enjoyed less innovation, output, or choice.  *See, e.g.*, Ex. 31 (Stiglitz Rep.) ¶ 100; Ex. 34 (Song Rep.) ¶¶ 47, 81; Ex. 33 (McFadden Rep.) ¶ 8.  These alleged nonmonetary injuries are irrelevant to certification of a *damages* class under Rule 23(b)(3), which is the only class certified here.  Dkt. 981 at 2.  Moreover, allegations that conduct "has the effect of reducing consumers' choices or increasing prices to consumers do[] not sufficiently allege an injury to competition."  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201–02 (9th Cir. 2012).  And "broad allegations of harm to the 'market' as an abstract entity" cannot establish "antitrust injury" in any event.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990).

Regardless, these other hypothesized injuries are not susceptible to classwide treatment and Plaintiffs have not even attempted to show otherwise.  *See* Ex. 98 (Prince Rebuttal Rep.) ¶¶ 35–40.  Take reduced choice.  Any damages based on reduced choice would necessarily need to be determined person by person.  Around half of respondents in a consumer survey said they would not use an alternative app store even if given the option.  Ex. 23 (Simonson Rep.) ¶¶ 92, 103; *see also* Ex. 25 (Hoyer Rebuttal Rep.) ¶¶ 33–36 (finding that even under plaintiff-friendly assumptions, 40% of users would not buy any apps from outside the App Store).  Without knowing which camp each consumer falls into, a factfinder could not begin to determine whether reduced choice constituted an injury for that person.  Likewise, calculating any damages from less innovation or output would entail not only predicting innovation and output in the but-for world (which Plaintiffs have not done), but also calculating how much each Plaintiff would have benefited from the innovation and output.  Ex. 98 (Prince Rebuttal Rep.) ¶ 39.  Plaintiffs have not even attempted to quantify this harm (although McFadden admitted it could be done), much less show such impact on a classwide basis.  Ex. 11 (May 14, 2025 McFadden Dep.) 57:22–25, 100:14–103:8.  Indeed, Plaintiffs' liability expert conceded he was not opining that all or nearly all class members suffered nonmonetary injuries.  Ex. 14 (May 30, 2025 Stiglitz Dep.) 33:6–10.  Further, just as McFadden's model shows that some class members are

Gibson, Dunn &
Crutcher LLP

better off monetarily because of Apple's conduct, any accounting for non-monetary impacts of Apple's conduct must also assess positive benefits for class members (e.g., consumer privacy and security). But Plaintiffs' model does not do that. Ex. 11 (May 14, 2025 McFadden Dep.) 105:6–19, 106:22–107:04, 108:18–109:9. So even monetarily "harmed" class members (on McFadden's reckoning) may not be injured at all.

Deciding the injury status of every class member would thus require "individualized questions" that "will overwhelm" the proceedings. *Olean*, 31 F.4th at 668–69. Take named plaintiff Hayter. To determine that he would buy from a different app store, he would need to testify on that topic for several minutes (as he did at his deposition), and then a factfinder would need to believe him. *See* Ex. 7 (May 22, 2020 Hayter Dep.) 19:3–21:20. Now multiply that effort by the approximately 200 million people Plaintiffs say are in the class. Courts have found far easier undertakings to be infeasible. In *Asacol*, the court reversed class certification because there were "apparently thousands [of class members] who in fact suffered no injury," whose identity could not be determined absent individualized inquiries into whether each class member was "brand loyal." 907 F.3d at 46–47, 53–54; *see also Rail Freight*, 934 F.3d at 619 (individualized inquiries for some 2,000 class members infeasible). Assessing whether *millions* of individuals were loyal to the App Store, among other questions, is not manageable.

## B.     Plaintiffs' Arbitrary Narrowing of the Class Confirms That the Defined Class Is Not Superior and the Class Representatives Are Not Adequate

Plaintiffs' attempts to artificially suppress the number of uninjured class members expose another reason for decertification: The class definition has become so arbitrary that it is not a superior way to resolve this case, and Plaintiffs' interests do not align with those of the class.

**Superiority.** When Plaintiffs limited the class to consumers who spent at least $10 in one account, they did so for one reason only. It was not because that threshold related in any way to their merits theory. Dkt. 666-1 at 15–16 (never claiming that). Nor was it their expert's idea. *See* Ex. 10 (Dec. 5, 2022 McFadden Dep.) 216:21–217:22. Plaintiffs' only avowed purpose for injecting a $10 threshold into the case was to "reduce the number and percentage of undamaged Class members." Dkt. 666-1 at 15. But they achieved this reduction with the bluntest of tools: a cutoff that by their own calculation removed more *injured* accounts—over 20 million—than *uninjured* ones. *See* Ex. 98 (Prince

1   Rebuttal Rep.) ¶¶ 15, 47 (calculating that the $10 cutoff eliminates about 23 million allegedly injured
2   accounts, compared to 17 million unharmed accounts).

3        Recent case law confirms that culling so many allegedly injured plaintiffs, simply to reduce the
4   number of uninjured ones, is not a superior way to resolve a dispute.  In *Mr. Dee's Inc. v. Inmar*, the
5   named plaintiffs tried to slim down their class with arbitrary conditions for the sole purpose of lowering
6   the number of uninjured class members.  2023 WL 5436178, at *5–6, 8 (M.D.N.C. Aug. 23, 2023).
7   The named plaintiffs succeeded at this aim, removing many uninjured class members—at the cost of
8   removing over two thousand injured ones.  *Id.* at *7.  The district court refused to certify this class, and
9   just months ago the Fourth Circuit affirmed.  Because "the criteria for class membership b[ore] little
10  relationship to the defendants' conduct," the circuit explained, "the class definition [was] untethered
11  from the purpose of employing the class action procedure."  127 F.4th 925, 932 (4th Cir. 2025).  This
12  "raise[d] a superiority problem": Since the class "exclude[d] thousands of [potential plaintiffs]
13  purporting to show the same harm as the included class members, certifying such an incomplete class
14  might expose defendants to a continued trickle of individual lawsuits and thereby impair the efficiency
15  goal which is a key purpose of the class action mechanism."  *Id.*

16       The Fourth Circuit could have been writing about the present facts.  Here, the class excludes
17  many allegedly harmed plaintiffs for reasons that have no "relationship to [Apple]'s conduct."  *Mr.
18  Dee's*, 127 F.4th at 932.  Under Plaintiffs' theory, consumers can be harmed by the lack of other iOS
19  app transaction platforms whether they paid $100, $10, or $1.  Ex. 98 (Prince Rebuttal Rep.) ¶ 47.  And
20  as in *Mr. Dee's*, the arbitrary definition exposes Apple to tack-on litigation.  The individuals whose
21  accounts all have less than $10 in App Store transactions were never in the certified class and may
22  launch another suit.  So no matter how this case concludes, Apple may soon be facing yet another class
23  action, with 40 million users or more, over the same alleged conduct and supra-competitive
24  commission—just like in the developer cases.[4]  Ex. 98 (Prince Rebuttal Rep.) ¶ 47.  And these plaintiffs
25  would not be bound by the McFadden-Song model: They would be free to propose an inconsistent
26  formula that so happens to amplify the alleged overcharge to smaller-spending users.  This prospect

27

28  _____
    [4]  *See, e.g.*, *Korean Publishers Assoc. v. Apple Inc.*, No. 4:25-cv-4438 (N.D. Cal.); *Pure Sweat Basketball, Inc. v. Apple Inc.* No. 4:25-cv-03858 (N.D. Cal.); *Proton AG v. Apple Inc.*, No. 4:25-cv-0540 (N.D. Cal.).

undercuts the "economies of time, effort, and expense" and "uniformity of decision as to persons similarly situated" that Rule 23(b)(3) was designed to promote. *Amchem*, 521 U.S. at 615.

Plaintiffs attempt to distinguish *Mr. Dee's* by noting that there, the plaintiffs' arbitrary cutoff removed nearly 40% of the harmed plaintiffs from the class, while here the percentage is lower. Dkt. 962-1 at 12. But this distinction has no basis in the court's reasoning. The *Mr. Dee's* plaintiffs had "a superiority problem" because their class "exclude[d] thousands of manufacturers" who could threaten future lawsuits; not because of how that number compared in magnitude to the count of included injured plaintiffs. 127 F.4th at 932. And here Plaintiffs' proposed class action excludes ten thousand times more supposedly damaged plaintiffs than the fatally underinclusive class in *Mr. Dee's*. *Compare id.* at 932 (around 2,000), *with* Ex. 98 (Prince Rebuttal Rep.) ¶ 47 (at least 20 million).

When *Olean* contemplated that a class could be "redefin[ed]" to avoid a predominance problem, this is not what the court had in mind. 31 F.4th at 669 n.14. *Olean*'s instruction was to narrow the class to those "who can rely on the same body of common evidence to establish" injury, *id.*; not to "arbitrarily exclude individuals" whose "claims . . . are substantially similar to those of other class members." *Abante Rooter & Plumbing*, 2017 WL 4073792, at *2 (N.D. Cal. Sept. 14, 2017) (Gonzalez Rogers, J.) (rejecting class modification on that basis). A class definition still must be "'reasonably co-extensive' with the plaintiff's chosen theory of liability." *Jensen v. Natrol, LLC*, 2020 WL 416420, at *1 (N.D. Cal. Jan. 27, 2020). Plaintiffs' crude class definition does not fit that bill. It exposes Apple to piecemeal litigation of claims that it has already spent fifteen years defending, is not a superior way to resolve this case, and should be rejected.

**Adequacy.** Plaintiffs' $10 cutoff and other machinations also reveal that they do not "adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs and their counsel "owe [a] fiduciary responsibility to the class." *Staton v. Boeing Co.*, 327 F.3d 939, 960 (9th Cir. 2003); *see also Rodriguez*, 563 F.3d at 968. But all along, the named plaintiffs have been quick to discard class members—including those they think were injured and deserve a remedy—just to reduce the count of unharmed class members. Before the class was certified, Plaintiffs abandoned 40 million Apple accounts, including over 20 million they calculated to be injured, to excise a smaller number of uninjured accounts. Ex. 98 (Prince Rebuttal Rep.) ¶ 47. Later, they kicked out and forever extinguished

the claims of another 6.2 million absent class members, including 4 million whom they believe suffered damages. Dkt. 957-12 at 4–5, 7. Plaintiffs could not bring themselves to say that those 4 million plaintiffs lacked a meritorious claim. *See* Dkt. 953-8 at 6 (removing transactions related to the iPod touch on the theory that "Apple lacks market power" with respect to that device, even while maintaining that their "claim does not depend on monopoly power").

Plaintiffs' continued willingness to "abandon" the claims of absent class members without "any real explanation" creates a serious "adequacy problem" under Rule 23(a). *Taison Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 641 (N.D. Cal. 2015). Because of math errors and the like, the number of class members calculated as uninjured has ballooned upwards throughout this case, only to be periodically yanked down with blunt adjustments to the class definition that excise many millions of purportedly injured payors. Named plaintiffs have shown that they will do whatever it takes to get some class, *any* class, past certification, presumably to get a settlement—including jettisoning those with the smallest claims, the people "for [whose] benefit" "[t]he class action procedure exists." *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 612 (N.D. Cal. 2004). Named plaintiffs are therefore not adequate class representatives. *See Wetlzet v. CertainTeed Corp.*, 2019 WL 3976204, at *14–15 (W.D. Wash. Mar. 25, 2019) (similar); *In re Stec Inc. Sec. Litig.*, 2012 WL 6965372, at *8–9 (C.D. Cal. Mar. 7, 2012) (similar); *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 622–24 (E.D. Tenn. 2011) (similar).

## C.     Plaintiffs Lack a Reliable Damages Model, Even More So If the Court Grants Apple's *Daubert* Motions or Awards Partial Summary Judgment

An antitrust damages class may not be certified unless the plaintiffs have a model that shows "antitrust impact and damages . . . on a class-wide basis." *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018). "Absent a data-driven model, [P]laintiffs have failed to meet their 'burden under Rule 23 to provide a viable method for demonstrating class-wide antitrust injury based on common proof.'" *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018). Because Plaintiffs rely on a single model for their injury and damages elements, Plaintiffs' class has no margin for error. It must be decertified if the Court rejects any input to, or design feature of, that model for any of the reasons articulated below or in Apple's accompanying *Daubert* motions, or awards summary judgment to Apple on any of Plaintiffs' theories.

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

First, the class must be decertified if the Court excludes Thompson's or MacCormack's testimony. *See generally* Daubert Mot. Neither of those experts' opinions was offered in advance of class certification, but they are *necessary* to Plaintiffs' classwide proof, and a "plaintiff may not avoid ultimate scrutiny of the admissibility of their experts' final opinions simply by declining to develop those opinions in advance of class certification." *Noohi v. Johnson & Johnson Consumer Inc.*, 2025 WL 2089582, at *7 (9th Cir. July 25, 2025). The McFadden-Song model relies on MacCormack's opinions to group apps by genre and estimate their average profit margins. *See supra* III.C. Those margin estimates are critical to determining damages: Song admitted at deposition that there is no model without them. Ex. 15 (June 4, 2025 Song Dep.) 172:16–22 ("[I]t's not accurate to [discuss] Professor McFadden's model without the margin bounds"); *see also* Ex. 24 (Watson Rebuttal Rep.) ¶ 50; *Daubert* Mot. § II.A. But as Apple's *Daubert* motion explains, MacCormack's opinions are both unreliable and irrelevant under Rule 702. Not only does he extrapolate from an exceedingly small and non-representative sample of developers, but he does not even measure the correct costs for the McFadden-Song model. *Id.* § II.B. If MacCormack's testimony is excluded, Song cannot run McFadden's model, and Plaintiffs will lack any common evidence of injury and damages. Likewise, "[t]o the extent that payor records have not been properly aggregated, and thus transactions are not assigned to the correct unique payor, [Plaintiffs] cannot reliably determine whether a class member is harmed or to what extent." Ex. 98 (Prince Rebuttal Rep.) ¶ 49; *see supra* V.A.1. So, if Thompson's methodology for deduplicating the payor data is ruled inadmissible, *Daubert* Mot. § I, Plaintiffs will also have no reliable classwide damages estimate. In either case, the class must be decertified. *Rail Freight*, 934 F.3d at 626 ("No damages model, no predominance, no class certification.").

Second, summary judgment against Plaintiffs on any of their theories dooms their entire case. When a plaintiff is "entitled only to damages resulting from [one particular theory]," then "at the class-certification stage" the plaintiffs must propound a model that "attempt[s]" to "measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35–36. Otherwise, the plaintiff "fall[s] short of establishing that damages are capable of measurement on a classwide basis." *Id*. at 34. That is the case here. As Apple expounds in its summary-judgment motion, the McFadden-Song model assumes that all facets of Apple's challenged conduct are illegal and calculates damages compared to

a hypothetical world in which Apple undertook none of that conduct. The model does not try to separate out how much each challenged act contributed to the damages. *See* Ex. 98 (Prince Rebuttal Rep.) ¶¶ 51–54. But much of this conduct—Apple's in-app payment and anti-steering policies—is not even challenged in the Complaint and is not properly part of this lawsuit. *See* Mot. for Summary Judgment § IV.F. If the Court agrees, then Plaintiffs lack classwide evidence of the damages that stem from any conduct properly challenged, and the class must be decertified. *Comcast*, 569 U.S. at 35. Likewise, if the Court dismisses any aspect of Apple's conduct for any reason given in the summary-judgment motion, Plaintiffs will lack a classwide damages model for their remaining theories.[5]

Finally, rejecting *any* of the model's key assumptions would render it incapable of serving as classwide proof of injury and damages. For example, the model assumes, contrary to actual practice, that Apple would charge the same commission rate for every app purchase and in-app transaction for the entirety of the class period. Dkt. 688-2 at 20 n.5. It assumes that every hypothetical rival to Apple would charge the same commission as Apple (an unrealistic simplification that avoids the need to assess whether each individual class member would have stuck with the App Store). *Id.* at 19; *see Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023) (explaining that to correctly "[c]alculat[e] the damages caused by the anti-steering provision would require a protracted and speculative inquiry into" details about "each of . . . 300,000 games"). It assumes without foundation that nothing other than the challenged conduct would change in the but-for world—that Apple would not, for example, offer loyalty incentives for consumers if another iOS app marketplace existed. Dkt. 688-2 at 23. It assumes that higher-priced apps and in-app purchases *must* have higher marginal costs, meaning that, for example, a $4.99 game app can never have a zero or close-to-zero marginal cost. *Id.* at 14; *see also* Ex. 24 (Watson Rebuttal Rep.) Ex. 9. It assumes that developers set in-app purchase prices based on the *simple* average price across items rather than setting item prices individually (or even using a weighted average). Dkt. 668-2 at 14, 17, 21. And it assumes that developers in each genre must earn profit margins on average within the ranges established by MacCormack. Ex. 34 (Song Rep.) ¶¶ 50–

---

[5] As Apple elaborates in the summary-judgement motion, the model cannot be salvaged by Dr. Abrantes-Metz's conclusory assertions that her result would stay the same regardless of *which* of Apple's conduct continued in the but-for world. *See* Mot. for Summary Judgment § IV.F. The assertion that the model would yield the exact same answer regardless of Apple's conduct is an indictment of the model, not a defense of it.

Gibson, Dunn &
Crutcher LLP

52.  If the jury disagrees with *any* of these assumptions, it will be left adrift.  *See* Ex. 11 (May 14, 2025 McFadden Dep.) 230:18–231:23 (admitting that the jury could not reliably revise the model if it disagreed with assumptions about in-app purchase prices, marginal costs, or developer profit margins; "it would be . . . clearly beyond the capacity of a jury").  Moreover, changing certain of these assumptions would plainly require new individualized inquiries.  For example, if commission rates and quality-adjusted prices were different on competing iOS app stores, a factfinder would have to determine whether a given individual would have switched to another iOS app store.  *See* Ex. 11 (May 14, 2025 McFadden Dep.) 229:18–230:17; *Epic*, 67 F.4th at 1003.

These defects render the model unreliable and defeat certification.  "A plaintiff is required to establish the elements necessary to prove standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  *Olean*, 31 F.4th at 682.  Accordingly, not only must Plaintiffs have classwide proof of injury and damages, but their proof—the model—must be "sound."  *Comcast*, 569 U.S. at 37.  "Courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23."  *Olean* 31 F.4th at 666 n.9.  As this case heads to the final stage (trial), the unfounded (and highly consequential) nature of the model's assumptions demonstrates that Plaintiffs' evidence of injury does not live up to its task.  When "very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702," much less Rule 23.  *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014).  The McFadden-Song model's persistent instability means that the Court should have no confidence that Plaintiffs can or will ever reliably separate the injured from the uninjured individuals, or ascertain who is owed what.  This renders class certification inappropriate.  *Ruiz Torres*, 835 F.3d at 1137.

## VI.    CONCLUSION

The Court should grant Apple's motion to decertify the class.

//
//
//
//
//
//

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

1 | DATED: August 4, 2025

**GIBSON, DUNN & CRUTCHER LLP**

2

3

By: ___/s/ Cynthia E. Richman_____
        CYNTHIA E. RICHMAN

4

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com

5

Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com

6

1700 M Street, N.W.
Washington, D.C. 20036-4504

7

Telephone: 202.955.8234
Facsimile: 202.530.9691

8

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com

9

Daniel G. Swanson (116556)
dswanson@gibsondunn.com

10

**GIBSON, DUNN & CRUTCHER LLP**

11

333 South Grand Avenue
Los Angeles, CA 90071-3197

12

Telephone: 213.229.7000
Facsimile: 213.229.7520

13

Caeli A. Higney (268644)
chigney@gibsondunn.com

14

Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com

15

Dana L. Craig (251865)
dcraig@gibsondunn.com

16

Eli M. Lazarus (284082)
elazarus@gibsondunn.com

17

**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600

18

San Francisco, CA 94111-3715
Telephone: 415.393.8200

19

Facsimile: 415.393.8306

20

*Attorneys for Defendant Apple Inc.*

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR