# EXHIBIT 19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

# REBUTTAL EXPERT REPORT AND DECLARATION OF LORIN M. HITT, PH.D.

**June 13, 2025**

**Table of Contents**

**1. QUALIFICATIONS ........ 10**

**2. ASSIGNMENT ........ 10**

**3. OVERVIEW OF PLAINTIFFS' EXPERTS' OPINIONS ........ 12**

**4. SUMMARY OF OPINIONS ........ 15**

***4.1. Professor Stiglitz's analysis of the relevant market (Section 5) ........ 15***

***4.2. Professor Stiglitz's analysis of whether Apple has monopoly power or market power in the relevant market (Section 6) ........ 18***

***4.3. Professor Stiglitz's analysis of whether the challenged conduct has had anticompetitive effects that have harmed consumers (Section 7) ........ 20***

***4.4. Dr. Abrantes-Metz's calculation of the alleged but-for commission rate (Section 8) .... 21***

***4.5. Professor McFadden and Dr. Song's estimation of but-for prices and calculation of damages (Section 9) ........ 26***

***4.6. Professor MacCormack's calculation of genre gross margin ranges (Section 10) ........ 28***

***4.7. Overall conclusions about damages (Section 11) ........ 29***

**5. PROFESSOR STIGLITZ'S ALLEGED MARKET FOR THE "SALE OF IOS APPS AND IN-APP CONTENT" IS BOTH TOO NARROW AND TOO BROAD AND IS BASED ON FLAWED ANALYSES ........ 31**

***5.1. Professor Stiglitz's market for the "sale of iOS apps and in-app content" is too narrow because it excludes multiple reasonable substitutes to app transactions on the App Store .. 36***

*5.1.1. Professor Stiglitz incorrectly excludes app transactions on non-mobile devices from the relevant market ........ 36*

*5.1.2. Professor Stiglitz incorrectly excludes app transactions on mobile devices other than iOS, such as Android phones and tablets, from his market ........ 46*

*5.1.3. Professor Stiglitz incorrectly excludes direct distribution of digital content ........ 57*

*5.1.4. Professor Stiglitz incorrectly excludes app transactions through web apps and progressive web apps from his market ........ 67*

***5.2. Professor Stiglitz's alleged market for the "sale of iOS apps and in-app content" is too broad because it combines transactions for different types of apps into a single market..... 72***

***5.3. Professor Stiglitz's non-standard SSNIP test relies on flawed inputs and circular reasoning ........ 75***

**6. PROFESSOR STIGLITZ'S FLAWED MONOPOLY POWER ANALYSIS IS PREMISED ON HIS INCORRECT MARKET DEFINITION AND OTHER FAULTY ANALYSES ........ 80**

***6.1. Professor Stiglitz's purported indirect evidence of Apple's monopoly power—its alleged 100 percent market share and its enactment of high entry barriers—is premised on his invalid market definition ... 81***

***6.2. Professor Stiglitz's purported direct evidence of market power or monopoly power suffers from multiple flaws ... 82***

*6.2.1. Professor Stiglitz conclusion that Apple's purported App Store margins reflect Apple's market power or monopoly power is without basis ... 83*

*6.2.2. Professor Stiglitz wrongly concludes that Apple charges supracompetitive commission rates by relying on Dr. Abrantes-Metz's flawed but-for commission rate ... 90*

*6.2.3. Professor Stiglitz misinterprets the App Store's two commission rates as evidence of market power or monopoly power ... 91*

*6.2.4. Professor Stiglitz misinterprets Apple's contractual terms as evidence of market power and, without basis, claims they degrade the user experience ... 94*

**7. PROFESSOR STIGLITZ HAS NOT DEMONSTRATED THAT APPLE'S CHALLENGED CONDUCT HAS RESULTED IN ANTICOMPETITIVE EFFECTS THAT HARMED CONSUMERS ... 98**

***7.1. Professor Stiglitz's conclusion that consumers would have additional purchase channels for making app transactions in the but-for world ignores the various options that consumers currently have for making these transactions and is based on a flawed comparison to Windows PC app transaction platforms ... 101***

*7.1.1. Professor Stiglitz ignores the many options for performing app transactions that consumers and developers have in the actual world ... 102*

*7.1.2. Professor Stiglitz's assertion that the but-for world would be comparable to macOS and Windows PC app transaction platforms is a faulty comparison ... 103*

*7.1.3. Professor Stiglitz's assertion that the passage of the DMA in the European Union led to substantially more choice for app transactions is unsupported and flawed ... 104*

***7.2. Professor Stiglitz's conclusion that consumers would pay lower prices for iOS apps and in-app purchases in the but-for world is based on fundamentally flawed analyses performed by Dr. Abrantes-Metz and Dr. Song as well as non-representative and flawed anecdotes ... 107***

*7.2.1. Professor Stiglitz's claim that consumers would pay less for iOS app transactions in the but-for world relies on flawed analyses performed by Dr. Abrantes-Metz and Dr. Song ... 108*

*7.2.2. Professor Stiglitz's four examples of apps with higher prices on the App Store compared to their prices elsewhere are non-representative, contradicted by the prices of numerous other apps, and do not demonstrate that consumers paid higher prices ... 108*

*7.2.3. The McFadden/Song model predicts that most consumers who made transactions in the first few years after the launch of the App Store benefitted from the challenged conduct, undermining Professor Stiglitz's claim of consumer harm ... 110*

***7.3. Professor Stiglitz's conclusion that Apple's challenged conduct has resulted in reduced output is based on flawed analysis and inconsistent with my analysis of continuously increasing output on the App Store over time ....113***

*7.3.1. Professor Stiglitz does not independently analyze developers' app output but instead relies on the flawed analyses of Dr. Abrantes-Metz and Dr. Song ....113*

*7.3.2. Professor Stiglitz bases his assertions on flawed and non-representative examples and ignores the available data on iOS app transactions and contradictory evidence ....114*

*7.3.3. Contrary to Professor Stiglitz's assertion, the available data show that output on the App Store has been consistently increasing over time ....117*

***7.4. Professor Stiglitz's conclusion that Apple's challenged conduct has reduced the viability of cloud streaming apps and super apps is flawed and lacks support ....118***

*7.4.1. Professor Stiglitz makes flawed claims about cloud streaming of games ....118*

*7.4.2. Professor Stiglitz makes flawed claims about super apps ....120*

***7.5. Professor Stiglitz's conclusion that Apple's price tiers have reduced developer competition and increased prices is without basis ....120***

*7.5.1. Professor Berger's analyses show that Apple's price tiers do not systematically increase prices for iOS apps and in-app purchases and therefore do not have an anticompetitive effect ....121*

*7.5.2. The McFadden/Song model contradicts Professor Stiglitz's assertion that apps and in-app purchases priced at the minimum price tier in the real world would have lower prices in the but-for world ....123*

**8. DR. ABRANTES-METZ'S BUT-FOR COMMISSION OPINIONS ARE UNRELIABLE, UNSUPPORTED, AND RUN COUNTER TO REAL-WORLD EVIDENCE ....124**

***8.1. Dr. Abrantes-Metz fails to apply well-established economic principles to her purported economic model of the but-for world ....127***

*8.1.1. Summary of Dr. Abrantes-Metz's approach to calculating a but-for commission rate ....127*

*8.1.2. Dr. Abrantes-Metz's modeling of the but-for world is incomplete, and its predictions are inconsistent with economic principles and market facts ....130*

***8.2. Dr. Abrantes-Metz assumes a but-for iOS app transaction "market" structure that is contrary to market facts ....133***

*8.2.1. Market facts establish that any iOS app transaction platforms, as well as direct downloads from app developers' websites, would be differentiated in the but-for world... 136*

*8.2.2. Market facts and economic theory establish that differentiated app transaction platforms would charge different commission rates ....145*

*8.2.3. Market facts establish that any but-for market structure would evolve as firms entered and exited ....152*

*8.2.4. Dr. Abrantes-Metz's simplifying assumptions are not conservative....157*

***8.3. Dr. Abrantes-Metz's use of biased, unreliable, and inconsistent inputs in her accounting formula drives her but-for commission rate result ........................................ 165***

*8.3.1. Dr. Abrantes-Metz has no basis to rely on the Microsoft Store's profit margin as representing a but-for profit margin ........................................ 167*

*8.3.2. Dr. Abrantes-Metz relies on the App Store costs as cost inputs for the rival firm despite these costs being inconsistent with her other inputs........................................ 180*

*8.3.3. The rival platform's market share assumed by Dr. Abrantes-Metz is unreliable and inconsistent with her other inputs ........................................ 184*

*8.3.4. Using alternative market sizes in Dr. Abrantes-Metz's accounting formula for calculating the but-for commission rate shows its unreliability ........................................ 187*

*8.3.5. Dr. Abrantes-Metz's dismissal of post-2019 data is inappropriate, and her calculation of a but-for commission rate using 2022 data suffers from the same flaws as her calculation using 2019 data ........................................ 191*

***8.4. Dr. Abrantes-Metz's claimed but-for commission rate is contrary to market facts, including commission rates charged by platforms in Dr. Abrantes-Metz's benchmark ..... 193***

*8.4.1. Market facts contradict Dr. Abrantes-Metz's claim that the App Store's real world commission rate of 30 percent was supracompetitive at the App Store's launch in 2008... 194*

*8.4.2. Market facts establish that the App Store's real world commission rates remain competitive, contradicting Dr. Abrantes-Metz's claim that the App Store's commission rates were supracompetitive throughout the class period ........................................ 196*

***8.5. Dr. Abrantes-Metz misinterprets market facts in her commission rate benchmark analysis, and properly interpreted market facts do not support her assumed common lower but-for commission rate ........................................ 197***

*8.5.1. Dr. Abrantes-Metz's "benchmark analysis of Windows PC games apps" is flawed. 198*

*8.5.2. Dr. Abrantes-Metz incorrectly ignores other app transaction platforms as potential benchmarks ........................................ 208*

***8.6. Dr. Abrantes-Metz ignores how Apple would monetize its proprietary tools and technology in the but-for world ........................................ 215***

**9. PROFESSOR MCFADDEN AND DR. SONG'S MODEL CANNOT, AND DOES NOT, ACCURATELY ESTIMATE INDIVIDUAL OR CLASSWIDE DAMAGES BECAUSE IT IS BASED ON UNRELIABLE INPUTS AND ASSUMPTIONS AND IT MAKES INCORRECT PREDICTIONS ........................................ 217**

***9.1. The McFadden/Song model predicts but-for prices that contradict real-world evidence ........................................ 222***

***9.2. The McFadden/Song model erroneously predicts consumer prices in the but-for world because it imposes incorrect assumptions that drive the model's predictions ..................... 241***

*9.2.1. The McFadden/Song model assumes a simplistic relationship between overcharge and app-level prices, which leads Dr. Song to erroneously predict consumer price changes in the but-for world ........................................ 241*

*9.2.2. The McFadden/Song model uses an app-level composite measure of prices that does not reflect the realities of consumer or developer behavior and leads the model to incorrectly estimate damages ........ 244*

***9.3. The McFadden/Song model imposes a formulaic and unrealistic relationship between price and margin ........ 252***

***9.4. The McFadden/Song model fails to account for several economic realities that imply that consumer prices are unlikely to decline in response to a commission rate reduction. 254***

*9.4.1. The McFadden/Song model does not properly account for app developers with zero marginal costs and therefore fails to predict that many app developers would not reduce prices in response to lower commission rates ........ 255*

*9.4.2. The McFadden/Song model fails to account for Apple's price tiers and voluntary focal point pricing and therefore fails to predict that many app developers would not reduce prices in response to lower commission rates ........ 259*

*9.4.3. The McFadden/Song model does not consider that app developers will likely not reduce prices in response to lower commission rates if they compete with digital content providers that do not pay commissions ........ 263*

*9.4.4. The McFadden/Song model fails to consider that app developers that transact with consumers across multiple platforms and prefer uniform pricing across channels will likely not reduces prices in response to lower App Store commission rates ........ 267*

*9.4.5. The McFadden/Song model cannot identify app developers that monetize using both in-app advertising and in-app purchases and therefore may increase prices when commission rates fall ........ 268*

***9.5. The McFadden/Song model fails to correctly predict app developers' margins and marginal costs ........ 274***

*9.5.1. The margins estimated by the McFadden/Song model are contradicted by the margins calculated based on cost information produced in this matter and considered by Professor MacCormack ........ 274*

*9.5.2. The marginal costs estimated by the McFadden/Song model are unrealistically high given that most developers have zero or minimal marginal costs ........ 278*

**10. PROFESSOR MCFADDEN AND DR. SONG CONSTRAIN THEIR MODEL'S RESULTS BASED ON PROFESSOR MACCORMACK'S ARBITRARY AND UNRELIABLE ESTIMATES OF DEVELOPERS' MARGINAL COSTS ........ 283**

***10.1. Professor McFadden and Dr. Song's margin constraints are based on estimates of margins from a selected and limited set of developers analyzed by Professor MacCormack ........ 288***

*10.1.1. Professor MacCormack reviews the costs for only a few, non-representative developers per genre ........ 289*

*10.1.2. Professor MacCormack assigns apps to genres, and groups together those genres, in ways that are arbitrary, combine dissimilar apps, and lead him to apply margin estimates to apps based on data from developers that do not represent all apps within the group ........ 298*

***10.2. Professor MacCormack calculates developer margins based on a subjective and unreliable approach that incorrectly classifies many costs as variable costs...................... 302***

*10.2.1. Professor MacCormack conducts his marginal cost calculations based on users rather than paid transactions, which is the relevant cost measure for the McFadden/Song model.............................................................................................................................. 303*

*10.2.2. Professor MacCormack assumes without basis that all the costs he includes in his calculations are variable costs rather than fixed costs...................................................... 309*

*10.2.3. Professor MacCormack inappropriately includes ad valorem costs when calculating his margin ranges........................................................................................... 312*

*10.2.4. Professor MacCormack uses an inconsistent approach to calculating margins .... 315*

*10.2.5. Professor MacCormack ultimately substitutes his subjective judgement to determine average margins for different types of apps in place of his already flawed calculations of variable cost shares based on the produced developer data...................... 324*

**11. PLAINTIFFS' EXPERTS OFFER NO RELIABLE EVIDENCE OF DAMAGES OR HARM TO ALL OR NEARLY ALL CLASS MEMBERS.................................................. 329**

240. In Section 8.4, I show that Dr. Abrantes-Metz's calculated but-for commission rate also contradicts market facts. Dr. Abrantes-Metz claims that the but-for commission rate for iOS app transactions would be 13.63 percent.[516] However, I show that the App Store's actual commission rates are consistent with competitive benchmark rates charged by other app transaction platforms, contradicting Dr. Abrantes-Metz's finding that Apple's rates are supracompetitive.

241. Relatedly, I explain in Section 8.5 that Dr. Abrantes-Metz's benchmarking analysis, which purports to confirm the but-for commission rate she calculates based on her accounting formula, is flawed. Once corrected and correctly interpreted, this benchmarking exercise confirms that Apple's actual commission rates are consistent with competitive benchmarks.

242. Finally, I explain in Section 8.6 that Dr. Abrantes-Metz does not take into consideration that Apple monetizes the provision of its proprietary tools, technology, and services relevant for iOS app development via its App Store commissions. Any comparison of prices between the actual and the but-for worlds would necessarily have to account for how Apple would change its pricing structure for these tools, technologies, and services, which are necessary to create iOS apps.

243. As a preface to the analyses and conclusions developed in this section, I note that Dr. Abrantes-Metz assumes one but-for world and purports to calculate one but-for commission rate associated with this but-for world. Presumably, Dr. Abrantes-Metz's but-for world represents a world absent all of Apple's challenged conduct, and her calculated but-for commission rate equals the commission rate that would prevail as a result of the removal of this conduct.[517] However, she fails to articulate how her but-for world connects to the different types of challenged conduct or how the resulting but-for commission rate would change based on the specific challenged conduct allowed (or not allowed) in the but-for world. In deposition, Dr. Abrantes-Metz claimed that her model could be modified if some but not all of the challenged conduct was deemed unlawful, but she asserted that the but-for commission rate would still be 13.63 percent irrespective of the parts of the conduct deemed unlawful.[518] The fact that Dr. Abrantes-Metz concludes that Apple would charge the same App Store commission rate in the

[516] Abrantes-Metz Report, ¶ 35 ("This results in a But-For commission rate of 13.63%.").

[517] See, for example, Stiglitz Report, Section III.

[518] Deposition of Rosa Abrantes-Metz, May 23, 2025 ("Abrantes-Metz 2025 Deposition"), pp. 49:7–50:5 ("Q… Can the jury adjust your model to calculate the but-for commission rate of some but not all of the alleged conduct if unlawful? A. The jury could, but my opinion is that so long as some entry exists in any of the different type of conduct that is alleged, that will put pressure for the but-for commission rate to come down. Q…How would the jury adjust your model to calculate the but-for world commission rate if it concluded that some, but not all, of the alleged conduct is unlawful?... A. So as I said earlier, the jury could adjust, but I wouldn't adjust because in my opinion, the long run equilibrium is 13.63 reasonably, as long as some conduct is determined to be illegal.").

but-for world, irrespective of the parts of the challenged conduct that would remain in that but-for world, illustrates the unreliability of her findings.

### *8.1. Dr. Abrantes-Metz fails to apply well-established economic principles to her purported economic model of the but-for world*

244. Contrary to Dr. Abrantes-Metz's claim, her supposed economic model of the but-for world does not involve "applying well-established economic principles and reasonable assumptions to predict economic outcomes."[519] Instead, it relies on unsupported assumptions, engages in incomplete modeling that is inconsistent with economic principles, and contradicts market facts. In Section 8.1.1, I first summarize Dr. Abrantes-Metz's approach to calculating a but-for commission rate. Then, in Section 8.1.2, I explain how she has not constructed a valid "economic model" and that the "key results" that she claims "emerge" from her "model" are inconsistent with her contrived but-for world and with market facts.[520] The sections of my report that follow further establish that Dr. Abrantes-Metz has not utilized reasonable assumptions in her calculation of a but-for commission rate.

#### *8.1.1. Summary of Dr. Abrantes-Metz's approach to calculating a but-for commission rate*

245. In the but-for world, Dr. Abrantes-Metz assumes that one (and only one) other iOS app transaction platform would have entered the marketplace (the "rival" platform).[521] She then uses an accounting formula to determine that platform's but-for commission rate as an algebraic function of a few basic inputs: the platforms' assumed profit margin, costs, and market share; and the total market size.[522]

246. Dr. Abrantes-Metz's accounting formula makes four critical assumptions:

a. First, Dr. Abrantes-Metz assumes that the profit margin earned by the rival iOS app transaction platform equals the profit margin earned by the Microsoft Store for PC apps in 2019.[523] Dr. Abrantes-Metz rules out using other app transaction platforms, such as Steam and Google Play, as relevant benchmarks for determining the rival platform's but-for profit margin. Thus, she does not rely on the profit margins of any app transaction platforms other

---

519 Abrantes-Metz Report, ¶ 28.
520 Abrantes-Metz Report, ¶ 24.
521 Abrantes-Metz Report, ¶ 23.
522 Abrantes-Metz Report, ¶¶ 25–26.
523 Abrantes-Metz Report, ¶ 33.

than the Microsoft Store for PC apps.[524] She also rules out using profit margins for years other than 2019.[525]

b. Second, Dr. Abrantes-Metz assumes the market share earned by the rival iOS app transaction platform equals the share she purports to calculate based on the qualitative responses given to one question posed in the survey conducted in this matter by one of Apple's experts, Professor Itamar Simonson, regarding whether consumers would transact on another iOS app transaction platform.[526]

c. Third, Dr. Abrantes-Metz assumes the fixed and variable costs for this rival iOS app transaction platform would equal the App Store's "actual costs," which she attempts to estimate based on alleged "App Store-specific accounting data from 2019" and by allocating "part" of Apple's "unattributed" operating costs to the App Store.[527]

d. Fourth, Dr. Abrantes-Metz assumes the total "market" size of iOS app transactions would equal total global App Store billings in 2019.[528]

247. Based on these assumptions, Dr. Abrantes-Metz's accounting formula calculates that the rival iOS app transaction platform would set a but-for commission rate of 13.63 percent.[529] In other words, if the supposed rival platform imposed a 13.63 percent commission rate, it would—according to Dr. Abrantes-Metz's accounting formula—achieve a profit margin equal to the Microsoft Store's profit margin in 2019.

248. Dr. Abrantes-Metz further assumes that 13.63 percent would be the single, uniform commission rate charged by any and all iOS app transaction platforms in the but-for world,[530] a

[524] Abrantes-Metz Report, Section IV.D.

[525] Abrantes-Metz Report, ¶ 139, Section VI.A.

[526] Abrantes-Metz Report, ¶ 31, Section IV.B. See also Expert Report and Declaration of Itamar Simonson, Ph.D., August 10, 2021.

[527] Abrantes-Metz Report, ¶ 32, Section IV.C, ¶¶ 126 ("I base both stores' costs in the But-For World on Apple's actual costs in the As-Is World."), 130 ("I calculate Apple's variable and fixed costs using Apple's App Store-specific accounting data from 2019, the last year unaffected by Covid-19... I understand that there may be additional operating expenses not explicitly attributed to the App Store in Apple's accounting documents. To be conservative, I allocate part of those unattributed operating expenses to the App Store.").

[528] Abrantes-Metz Report, ¶ 30.

[529] Abrantes-Metz Report, ¶¶ 21, 35.

[530] In her deposition, Dr. Abrantes-Metz reiterated that 13.63 percent would be the actual prevailing commission rate in the but-for world rather than an average commission rate. See Deposition of Rosa Abrantes-Metz, December 15, 2022 ("Abrantes-Metz 2022 Deposition"), p. 225:1–9 ("Q. Well, is 13.63 percent an average effective rate? A. Well, it is the average – it is the rate that would be charged. You know, I can't cancel out the numbers and tell you I can approximate that to 14. I still think that those difference in cents are meaningful and therefore I don't want to cut it out.").

rate that has not been adopted by any other app transaction platform she considers in her benchmarking exercise.[531] Thus, she assumes that the App Store would set the same uniform commission rate to be identical to this assumed rival platform throughout the class period.[532] Dr. Abrantes-Metz conducts no analysis of market competition between the App Store and her assumed single rival iOS app transaction platform to reach this conclusion.

249. Dr. Abrantes-Metz purports to confirm the reliability of her estimate by performing a "benchmark analysis."[533] Dr. Abrantes-Metz finds that "the sales-weighted average effective commission rates among digital Windows PC game app stores ranges from 9.8% to 14.2%," which she claims confirms that the single but-for commission rate estimate from her accounting formula is "reasonable."[534]

250. Dr. Abrantes-Metz only picks Windows PC game app transaction platforms, or stores that directly distribute Windows PC game apps, for her benchmarks, and she rules out all other app transaction platforms, including app transaction platforms for Android and for consoles.[535]

251. Dr. Abrantes-Metz claims to "rely on 2019 data for [her] benchmark analysis of Window PC game apps."[536] However, as I discuss further below in Section 8.5.1.1, she utilizes the 2021 Microsoft Store for PC commission rate in her analysis.[537] Dr. Abrantes-Metz combines the commission rates of third-party transaction platforms with the alleged costs of stores that directly distribute Windows PC game apps to calculate a weighted average commission rate.[538] She uses each platform's or store's PC game app sales in 2019 as a weight.[539] As I discuss further below

[531] Abrantes-Metz Report, Figure 1.

[532] Abrantes-Metz Report, ¶¶ 35 ("[S]ince the two app stores are assumed to be homogeneous, this commission rate would be charged not only by the rival store but also by Apple."), 76 ("My economic model estimates an equilibrium But-For commission rate that would have prevailed throughout the entire class period."); Abrantes-Metz 2022 Deposition, pp. 173:23–25 ("[A.] So the competitive pressure is that the commission rates would equalize between the two competitors."), 221:14–23 ("Q. You're not testifying to the view, are you, that the commission rate would change every year? A. No. So the but-for world I give is one of equilibrium, the final equilibrium, where this rate would have existed from the beginning. Q. And so from the beginning would be the whole class period starting in 2008? A. Yes.").

[533] Abrantes-Metz Report, Section VI, ¶ 167 ("In addition to conducting an economic model analysis to estimate the But-For commission rate, I performed a benchmark analysis using empirical data to assess whether a But-For commission rate of 13.63% aligns rates observed in a more competitive market.").

[534] Abrantes-Metz Report, ¶ 167.

[535] Abrantes-Metz Report, Section VI.A.

[536] Abrantes-Metz Report, ¶ 172.

[537] Abrantes-Metz Report, ¶ 199.

[538] Abrantes-Metz Report, Section VI.D.

[539] Abrantes-Metz Report, ¶ 215.

in Section 8.5.1.2, Dr. Abrantes-Metz calculates that 70.3 percent of transactions occur through these stores that offer direct distribution, which she assumes are subject to much lower costs.[540]

252. In addition, Dr. Abrantes-Metz argues that Steam, the largest platform for Windows PC game app transactions which charges an estimated effective commission rate of approximately [redacted] percent, "is not… a valid benchmark due to potential anticompetitive conduct that could have allowed it to charge a supracompetitive commission," and, in her view, should be excluded from her calculation of the weighted average commission rate for Windows PC game app transactions.[541] I discuss this exclusion further in Section 8.5.1.1.

253. Dr. Abrantes-Metz's "benchmark" analysis calculates an average commission rate of [redacted] percent to [redacted] percent when excluding Steam and an average commission rate of 13.91 percent to 14.18 percent when including Steam.[542] Based on these estimates collectively, Dr. Abrantes-Metz concludes that her "model-based But-For commission rate [of 13.63 percent] is both realistic and conservative."[543]

*8.1.2. Dr. Abrantes-Metz's modeling of the but-for world is incomplete, and its predictions are inconsistent with economic principles and market facts*

254. Dr. Abrantes-Metz claims that "from the assumptions of my model, two key results emerge:" "the commission rates charged by both stores must be identical" and "the profit margins earned by the stores must be sufficiently low to deter new entrants."[544] However, Dr. Abrantes-Metz's contrived but-for world is inconsistent with these "key results," and she has not established in either case that market facts support these "key results."

255. Fundamentally, Dr. Abrantes-Metz has not offered an economic model of competition in the but-for world that includes any sort of optimizing behavior by platforms, app developers, or consumers (I outlined her approach to the but-for world in Section 8.1.1). This means that the equilibrium outcomes predicted by her "model" are not the result of economic decisions made by economic agents: in her "model," Dr. Abrantes-Metz does not discuss how platforms choose the

[540] Abrantes-Metz Report, Figure 1. The sum of total sales in 2019 for stores that offer direct-to-consumer sales listed in Figure 1 is $3.95 billion, which represents 70.3 percent of the sum of all total Windows PC game sales in 2019 ($5.61 billion) including Steam.

[541] Abrantes-Metz Report, Figure 1, ¶¶ 188 ("Steam's effective commission rate is notably one of the highest in the market. I include Steam in my benchmark analysis for completeness, though I do not view it as a suitable benchmark for competitive rates in the But-For World. There are at least two reasons why Steam's commission rate could be considered supracompetitive, and thus, why Steam should be excluded from the benchmark analysis."), 216.

[542] Abrantes-Metz Report, Figure 1, ¶ 216.

[543] Abrantes-Metz Report, ¶ 216.

[544] Abrantes-Metz Report, ¶ 24.

optimal commission rate that maximizes their profits, how consumers choose their preferred platform based on their characteristics and prices, or how these decisions lead to specific market outcomes. Instead, she only relies on an accounting formula and unsupported assumptions about certain characteristics of the but-for world. By doing so, Dr. Abrantes-Metz makes assertions that contradict well-established economic principles and the real world.[545]

256. For example, as I explain below in Section 8.2.2, Dr. Abrantes-Metz's assumption that both platforms charge the same commission rate contradicts market facts. Further, this assumption conflicts with her conclusion that the two competing app transaction platforms would have unequal market shares in the but-for world.[546] The fact that in her but-for world the App Store would still maintain a competitive advantage, reflected in a higher market share, also indicates that the App Store would be able to charge a higher commission rate than its rival. This is because the demand for the App Store must be greater than the demand for the rival for the App Store to achieve the higher market share.[547] Dr. Abrantes-Metz simply *assumes* that Apple will charge the same commission rate. This conflicts with the economic principles of competition and her assumption that Apple has a competitive advantage. In the absence of an economic model of competition, it is impossible to determine either the optimal commission rate or how the market would respond to different commission rates. The impact of a commission rate above 13.63 percent on Apple's profits would need to be calculated, and it cannot be assumed that a 13.63 percent commission rate is optimal, as Dr. Abrantes-Metz has assumed.

257. This absence of economic behavior in Dr. Abrantes-Metz's "model" is also illustrated by the absurd predictions of her accounting formula. For example, I show in Section 8.3.4 that Dr. Abrantes-Metz's opinion that both iOS app transaction platforms would have charged a 13.63 percent commission rate since the inception of the App Store implies that the App Store would have only started earning profit in 2014, and the rival platform starting in 2017.[548] Dr. Abrantes-

---

[545] Similarly, Professor Sundararajan explains that Dr. Abrantes-Metz's "economic model" does not follow economic principles that would allow her to predict specific market outcomes as a result of competition between app transaction platforms. He further explains that her approach does not account for key market realities that characterize the nature of competition between app transactions platforms. See Sundararajan Rebuttal Report, Sections V.A and V.B.

[546] Abrantes-Metz Report, ¶ 31 ("[I]n the But-For World, the Apple App Store would have a market share of 77%, while the rival app store would hold 23%.").

[547] Dr. Abrantes-Metz acknowledges that "economic models of competition between firms selling homogeneous goods often assume an even 50%-50% market share split." However, she claims to "account for Apple's potentially stronger market position" by using a 77/23 split. She does not follow "well-established economic principles" to also allow for the possibility that "Apple's potentially stronger market position" would imply that it would have an incentive to charge a higher commission rate than its rival. Dr. Abrantes-Metz's claim that her use of an asymmetrical market share distribution—which violates the economic principles inherent in her "economic modeling"—is "conservative" does not alleviate the ad hoc nature of her conclusions. See Abrantes-Metz Report, ¶¶ 28, 31. Moreover, I explain why her assumption of a 77/23 split is not conservative in Section 8.3.3.

[548] See Exhibit 9.

Metz's accounting formula delivers this prediction because it fails to incorporate any optimization by platforms and assumes that the but-for commission rate would have stayed the same throughout the class period, irrespective of changing economic conditions.

258. The profit margin that Dr. Abrantes-Metz claims the rival iOS app transaction platform would earn in the but-for world suffers from the same failure to apply "well-established economic principles."[549] Again, while Dr. Abrantes-Metz purports to model the App Store and the rival iOS app transaction platform as homogeneous, she concludes that in equilibrium they will have different profit margins.[550] This conclusion is inconsistent with an equilibrium arising from competition between two identical firms, which Dr. Abrantes-Metz draws upon to conclude that they would charge identical commission rates.[551] Economic theory would predict identical profit margins (and market shares) for the competing platforms.[552]

259. In addition, Dr. Abrantes-Metz does not actually establish that the profit margins she assumes or calculates are, in fact, "sufficiently low to deter new entrants."[553] She states that the profit margin for game transactions earned by the Microsoft Store for PC, which she uses as the profit margin for the rival iOS app transaction platform, is "arguably not so high as to continue attracting additional entry."[554] However, Dr. Abrantes-Metz provides no analysis to support her claim. Even more, she does not state whether the 57.2 percent margin she calculates that the App Store would achieve in the but-for world is also "arguably not so high as to continue attracting

[549] Abrantes-Metz Report, ¶ 28 ("My model goes beyond a simple accounting equation by applying well-established economic principles and reasonable assumptions to predict economic outcomes.").

[550] Abrantes-Metz Report, ¶¶ 33 ("I use the operating profit margin of Microsoft Store in 2019, which was 23%, as the benchmark for the rival app store's equilibrium operating margin in the But-For World."), 36 ("Apple's App Store would achieve an equilibrium operating profit margin of 57.2% in the simulated But-For World."), 62 ("In my model, I assume two essentially identical app stores in the But-For World and do not speculate on how each competitor might attempt to differentiate itself in a multitude of dimensions.").

[551] Abrantes-Metz Report, ¶ 62 ("In my model, I assume two essentially identical app stores in the But-For World and do not speculate on how each competitor might attempt to differentiate itself in a multitude of dimensions.").

[552] Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, Eighth Edition, (Upper Saddle River, NJ: Pearson, 2013), pp. 464–465 ("The Bertrand model... applies to firms that produce the same homogenous good and make their decisions at the same time... If both firms charge the same price, consumers will be indifferent as to which firm they buy from and each firm will supply half the market.").

[553] Abrantes-Metz Report, ¶ 24. In her deposition, Dr. Abrantes-Metz stated that "[a] profit margin of 35% is pretty high and it's possible that in that world, a third competitor would come in reasonably, which would then reduce everybody's profit margins." Abrantes-Metz 2025 Deposition, pp. 120:7–11. However, she has provided no evidence that 35 percent is a high profit margin or that it would encourage additional entry.

[554] Abrantes-Metz Report, ¶ 139.

additional entry."[555] I discuss this further in Section 8.3.1.1 below. In addition, as I discuss in Section 8.2.4, assuming a lack of further entry is not conservative, as she claims.[556]

260. Finally, Dr. Abrantes-Metz's claim that profit margins must be sufficiently low to deter new entrants is flawed in concept. As I explain in Section 8.3.1.1, the economic literature and real-world evidence demonstrate that some industries foster significant entry despite low profit margins while others feature less entry despite high profit margins. This is because entry or development costs impact whether firms would enter an industry. Dr. Abrantes-Metz fails to consider this factor, and her accounting formula does not take into account these entry costs (see Section 8.3.1.1 below).

261. In sum, Dr. Abrantes-Metz fails to follow well-established economic principles when establishing her but-for world. Instead, she relies on unsupported assumptions that not only contradict market facts but also makes her but-for world inconsistent with expected outcomes in a properly defined market equilibrium.

### *8.2. Dr. Abrantes-Metz assumes a but-for iOS app transaction "market" structure that is contrary to market facts*

262. Dr. Abrantes-Metz purports to use an economic model "to estimate the commission rate that would have prevailed in a more competitive, yet still concentrated, But-For World."[557] She notes that her "characterization of the But-For World rests on certain assumptions because the But-For World has never been observed."[558] While any but-for world requires making assumptions, these assumptions must be consistent with real-world market conditions to accurately predict real-world outcomes.[559] As discussed above, Dr. Abrantes-Metz makes three key groups of assumptions: (1) the App Store faces a single rival offering an identical service (i.e., a duopoly of

---

[555] Abrantes-Metz Report, ¶¶ 36, 139.

[556] Abrantes-Metz Report, ¶ 141. Dr. Abrantes-Metz states that "while it is possible that this profit margin [the Microsoft Store profit margin of 23%] is high enough to invite new entrants, this would imply that the But-For commission rate that I compute is itself too high."

[557] Abrantes-Metz Report, ¶ 21.

[558] Abrantes-Metz Report, ¶ 21.

[559] The *Reference Manual on Scientific Evidence* discusses the need to have consistent assumptions between the but-for and actual scenarios and indicates that models containing "too many assumptions and simplifications that are not supported by real-world evidence" could be rejected by a court due to lack of adequate foundation or research design. See Federal Judicial Center, *Reference Manual on Scientific Evidence*, Third Edition (Washington, DC: The National Academies Press, 2011), at p. 309, footnote 20, and p. 496 ("For example, the compensation paths for both but-for and actual earnings should be based on consistent assumptions about general economic conditions, about conditions in the local labor market for the plaintiff's type of work, the age-earnings profile for the career path, and particularly about the plaintiff's likely increased skills and earning capacity.").

homogeneous iOS app transaction platforms);[560] (2) the two app transaction platforms each charge a single, common commission rate (with no other sources of revenue) on all transactions, and this commission rate does not change over time;[561] and (3) the App Store and the rival app transaction platform simultaneously enter at the start of the class period.[562]

263. In other words, this market structure is *assumed*, as Dr. Abrantes-Metz herself admits.[563] It is also not based on the observation of an actual market, much less the assumed competitive benchmark Windows PC games "market" which has multiple competitors, sequential entry, and time-varying commission rates. It is also not the outcome of any economic model of competition, such as modeling platform competition. As discussed above, Dr. Abrantes-Metz does not model any optimization decisions by, or strategic interactions between, hypothetical rival iOS app transaction platforms or the App Store. That is, while she claims she has provided an economic model, her model does not include any *economic behavior* on the part of either consumers (who have no ability to choose rival iOS app transaction platforms based on the availability of apps or app prices) or firms (who have no ability to differentiate their services or charge different prices). Thus, her finding of a common, lower but-for commission rate is an assumption—and not a conclusion—of her "economic model."

264. Because Dr. Abrantes-Metz's "model" does not describe economic behavior, it cannot explain how changes in the competitive environment would affect market outcomes, such as the commission rates of the App Store and its hypothetical rival. Her application of her accounting formula embeds certain assumed market outcomes and can only calculate a single common commission rate that corresponds to these outcomes. In other words, while it may describe the optimal choices by market participants at a point in time under certain conditions, it cannot be generalized to any other conditions because it fails to account for how changing conditions would lead participants (developers, consumers, and the competing iOS app transaction platforms) to make different choices in response. Further, Dr. Abrantes-Metz does not allow for any changes to competition that could impact the but-for commission rate over the 16-year

[560] Abrantes-Metz Report, ¶ 23 ("In this scenario, there are no direct-to-consumer channels, and all app sales occur through a duopoly of third-party stores. The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects.").

[561] Dr. Abrantes-Metz also assumes that the two platforms do not subsidize consumer transactions on the platforms. Abrantes-Metz Report, ¶ 23 ("The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects, with each charging a single commission rate to all game developers. Commissions are the sole source of revenue for the app stores and remain constant over time. Moreover, I assume that app stores do not subsidize consumers by paying them to buy a game.").

[562] Abrantes-Metz Report, ¶ 23 ("Finally, I assume that the two stores entered the market around the same time, with neither having a first mover advantage.").

[563] Abrantes-Metz Report, ¶ 21 ("As is standard in economics, the characterization of the But-For World rests on certain assumptions because the But-For World has never been observed.").

period since the launch of the App Store. She also ignores the market reality, which I discussed in Section 5.2, that app transactions do not take place in a single relevant market but rather in different markets that face different competitive conditions.[564]

265. In addition, Dr. Abrantes-Metz ignores that the App Store or other app transaction platforms are two-sided platforms with indirect network effects and what this fact implies for the but-for commission rate. Professor Sundararajan explains in his rebuttal report that the economic literature, including academic papers written by Dr. Abrantes-Metz, emphasizes the roles of the two-sidedness of the platform and of indirect network effects in determining the optimal price charged by a platform on each side of the market.[565] The failure by Dr. Abrantes-Metz to consider these indirect network effects when assessing the commission rate charged by app transaction platforms in the but-for world illustrates the absence of economic behavior in her purported "economic model" and the unreliability of her approach.

266. More importantly, the assumptions that Dr. Abrantes-Metz makes are contrary to the observable structure of the marketplace that she uses as a competitive benchmark—Windows PC game app transactions.[566] The features of this marketplace demonstrate that her assumptions are neither reasonable nor (as she claims) conservative.

267. First, the features of this marketplace demonstrate that any but-for world would include differentiated—not homogeneous—iOS app transaction platforms as well as the ability to transact on developers' websites (Section 8.2.1). Dr. Abrantes-Metz in fact refers to these as "diverse sales channels."[567]

[564] Professor McFadden similarly recognizes that transactions for different types of apps face different competitive conditions. McFadden Report, ¶ 45 ("Rather than letting all apps and in-app purchases have the same demand coefficients, my model allows apps that belong to different app categories (hereafter referred to as "genres") to have different coefficients."). As I discuss further below, Dr. Abrantes-Metz utilizes an input from a game apps benchmark in her calculation of a single but-for commission rate that she claims applies to all apps. She provides no evidence or analysis that the but-for commission rate generated by her accounting formula for game apps would be applicable to transactions for different types of apps.

[565] Sundararajan Rebuttal Report, Section V.

[566] Abrantes-Metz Report, ¶ 136 ("Windows PC game apps provide the most appropriate benchmark for a competitive market due to their functional similarities and diverse sales channels.").

[567] Abrantes-Metz Report, ¶ 136.

268. Second, the Windows PC game app marketplace demonstrates that such a structure leads to different commission rates across app transaction platforms (Section 8.2.2).[568] Economic theory also supports a conclusion of different commission rates.

269. Third, the Windows PC game app marketplace demonstrates that entry occurs over time and that the marketplace structure evolves rather than remains fixed as it was at inception (Section 8.2.3). Indeed, the commission rates she claims are "competitive" did not arise until 2019 (or 2021 in the case of the commission rate for one of her benchmarks, the Microsoft Store for PC), more than 14 years after firms began offering digital transactions for Windows PC games.[569]

270. Finally, Dr. Abrantes-Metz assumptions are not conservative (Section 8.2.4).

*8.2.1. Market facts establish that any iOS app transaction platforms, as well as direct downloads from app developers' websites, would be differentiated in the but-for world*

271. In contrast to Dr. Abrantes-Metz's simplistic assumption that two identical iOS app transaction platforms would compete in the but-for world, market realities establish that any competing iOS app transaction platforms or alternative means for performing iOS app transactions in the but-for world would be differentiated and likely charge different commission rates (including a 30 percent commission rate).

272. Economists agree that nearly all markets involve some degree of product differentiation.[570] As Professor Carl Shapiro points out, "[e]ven in a classic homogeneous-goods market – such as the market for an agricultural commodity or for a specific chemical compound – producers often attempt to differentiate themselves based on product quality, reliability, or customer service."[571]

---

[568] The alleged Windows PC game app marketplace, which Dr. Abrantes-Metz calls "the most appropriate benchmark for a competitive market," also demonstrates that a 30 percent headline commission rate is among the different commission rates offered by market participants.[568] I discuss this further in Section 8.5.

[569] "Deep Dive: PC Distribution Platforms," *Konvoy*, December 17, 2021, available at https://www.konvoy.vc/newsletters/deep-dive-pc-distribution-platforms, accessed on June 2, 2025 ("Established: 2003… Introducing third-party content: In 2005, Steam introduced its first titles that were not developed by Valve."); Abrantes-Metz Report, ¶ 174 ("Epic Games Store and the Microsoft Store have maintained their 12% commission rate on games since their implementation on 2019 and 2021, respectively.").

[570] Jeffrey M. Perloff, *Microeconomics*, Seventh Edition, (Pearson Education, Inc., 2015) ("Perloff (2015)"), p. 453 ("[M]arkets with differentiated goods – automobiles, stereos, computers, toothpastes, and spaghetti sauces – are extremely common, as is price setting by firms in such markets."); Carl Shapiro, "Mergers with Differentiated Products," *Antitrust*, 10, 1996, pp. 23–30 ("Shapiro (1996)") at p. 24 ("To a greater or lesser degree, virtually all markets involve some element of product differentiation.").

[571] Shapiro (1996), p. 24.

273. App transaction platforms are not a homogenous good and are differentiated along many dimensions, such as the types of apps offered. For example, while the Microsoft Store and the macOS App Store both offer transactions for a wide range of apps, other platforms such as Steam and the Epic Games Store focus on game app transactions.[572] GOG.com (an acronym for "Good Old Games"), on the other hand, initially focused on transactions for older, "retro" games but has more recently started also offering transactions for newer games, typically from independent developers.[573]

274. App transaction platforms may also be differentiated because they are operated by multiproduct firms that also offer hardware, operating systems, and application software or services. This creates the possibility of complementarities between products from the same ecosystem. Indeed, many of the large Windows PC game app transaction platforms also provide games (e.g., Epic, Valve, and Microsoft), operating systems (e.g., Microsoft), or hardware (e.g., Valve and Microsoft).[574]

---

[572] The Microsoft Store has a total of 26 different app categories and 75 different app subcategories, with categories ranging from games to productivity and lifestyle. For a full list of categories, see Windows Learn, "Categories and Subcategories for MSIX App," July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/categories-and-subcategories, accessed on June 6, 2025. Similarly, the macOS App Store is separated into 27 different categories where developers choose primary and secondary categories including gaming, news and medical. For a full list of categories, see Apple Developer, "Choosing a Category," available at https://developer.apple.com/app-store/categories/, accessed on June 6, 2025. The Epic Games Store was separated into categories of gaming apps exclusively until December 2020, when Spotify began offering its apps on the Epic Games Store. See Epic Games, "Store," available at https://www.epicgames.com/store/en-US/browse, accessed on June 6, 2025; Igor Bonifacic, "Spotify is Now Available on the Epic Games Store," *Engadget*, December 17, 2020, available at https://www.engadget.com/spotify-epic-games-store-183259781.html, accessed on June 6, 2025 ("Add the Epic Games Store to the list of places where you can download Spotify."). Likewise, Steam is separated into categories of exclusively gaming apps. See Steam, "Games on Steam," available at https://store.steampowered.com/games, accessed on June 6, 2025.

[573] Shaun Prescott, "The Most Popular Desktop Gaming Clients, Ranked," *PCGamer*, July 5, 2019, available at https://www.pcgamer.com/the-most-popular-desktop-gaming-clients-ranked/, accessed on June 6, 2025 ("Good Old Games was originally conceived as a storefront for DRM-free retro PC games… GOG is no longer exclusively about retro games: the storefront has a huge selection of modern indie games, not to mention CD Projekt's catalogue (they own GOG, didn't you know).").

[574] Epic Games, "About Epic Games," available at https://www.epicgames.com/site/en-US/about, accessed on June 6, 2025 ("Through Fortnite, Unreal Engine, Epic Games Store, and Epic Online Services, Epic provides an end-to-end digital ecosystem for developers and creators to build, distribute, and operate games and other content."); Valve, "At Valve We Make Games, Steam, and Hardware," available at https://www.valvesoftware.com/en/about, accessed on June 6, 2025 ("At Valve we make games, Steam, and hardware."); Microsoft 2024 10-K, p. 12 ("Our More Personal Computing segment consists of products and services that put customers at the center of the experience with our technology. This segment primarily comprises… Gaming, including Xbox hardware and Xbox content and services, comprising first-party content (such as Activision Blizzard) and third-party content, including games and in-game content; Xbox Game Pass and other subscriptions; Xbox Cloud Gaming; advertising; third-party disc royalties; and other cloud services… The Windows operating system is designed to deliver a more personal computing experience for users by enabling consistency of experience, applications, and information across their devices… We design and sell devices, such as Surface (including Copilot+ PCs), HoloLens, and PC accessories.").

*I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.*

*Executed on June 13, 2025,*

______________________________

*Lorin M. Hitt*