# EXHIBIT 27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |

REBUTTAL EXPERT REPORT OF
TADAYOSHI KOHNO, Ph.D.

JUNE 13, 2025

**TABLE OF CONTENTS**

**Page(s)**

I.    Scope of Rebuttal Assignment and Summary of Opinions ................................................ 1

    A.    Scope of Rebuttal Analysis: Issues Not Further Analyzed .................................... 1

    B.    Summary of Rebuttal Opinions ............................................................................. 1

II.   Apple's Combination of the App Store Process and iOS Device Security is *Not* an
      Example of Defense-in-Depth ........................................................................................ 4

    A.    Defining Defense-in-Depth .................................................................................... 4

    B.    Multiple Layers Does *Not* Imply Defense-in-Depth ............................................. 7

    C.    Apple's Combination of the App Store Process and iOS Device Security:
    General Considerations ........................................................................................ 8

    D.    Apple's Combination of the App Store Process and iOS Device Security:
        Details ................................................................................................................... 11

    E.    Summary of Defense-in-Depth Findings ............................................................. 13

III.  Examples of Security Concerns in Other Contexts Do Not Preclude the Possibility of a
      Secure Alternative to the Apple App Store ...................................................................... 14

    A.    The Problem of Induction and the "Proof by Example" Logical Fallacy ............. 14

    B.    Dr. Halderman's Use of Examples in Other Contexts Do Not Support a
      Conclusion that a Secure Alternative to the Apple App Store Cannot Exist .......................... 14

    C.    Summary of Alternative App Distribution Findings ........................................... 21

IV.   Dr. Halderman's Discussion of Alternate App Stores and App Vetting Practices
      Undermine His Argument ............................................................................................... 22

    A.    Dr. Halderman's Discussion of Console Game App Stores Undermines
        His Argument ...................................................................................................... 22

    B.    The U.S. National Institute of Standards and Technology Recommends
        Third-Party App Vetting Due to Opacity and Lack of Trust in the iOS App ..........
        Review Process; Alternate App Stores Could Also Conduct Such Rigorous
        App Vetting .......................................................................................................... 24

V.    Using the Term "Threat Model" is Different than Employing a Rigorous
      Threat Modeling Process ................................................................................................ 26

    A.    Dr. Halderman Does Not Present Evidence of Threat Modeling During
        the Design of the Apple App Store ...................................................................... 26

    B.    Using the Term "Threat Model" Does Not Equal a Rigorous Threat
        Model Created Through a Rigorous Threat Modeling Process ........................... 27

VI.    Centralized Distribution through the Apple App Store Process Can Negatively Impact
       Users if Apps Are Vulnerable .................................................................................... 31

VII.   Dr. Halderman's Definition of Security Seems to Be Retrospective, Claiming as Security-
       Motivated what Apple had Already Chosen to Do ...................................................... 34

       A.    What Dr. Halderman Considers as Security Objectives ...................................... 34

             1.    Apple Did Not Consistently Treat Buggy Apps As A Threat, Or
                   Consistently Exclude Them .................................................................... 35

             2.    Apple Did Not Consistently Treat Apps With Objectionable
                   Content as a Threat, Or Consistently Exclude Them .............................. 39

             3.    Summary ................................................................................................ 41

       B.    The Apple App Store Contains Apps that Violate Dr. Halderman's "Definition"
             of Security .......................................................................................................... 43

             1.    Apple Failed to Exclude Apps That Fostered Human Trafficking
                   and Child Exploitation ........................................................................... 46

             2.    Evidence Does Not Show That Apple Regarded Social Media Apps As ....
                   Security Risks, Though They Meet Dr. Halderman's Criteria ................ 52

VIII.  Dr. Halderman's Analysis Extensively References Apple's Public-Facing Materials and
       Apple Testimony, Not Apple-Internal Documents ...................................................... 55

**I.      Scope of Rebuttal Assignment and Summary of Opinions**

**A.      Scope of Rebuttal Analysis: Issues Not Further Analyzed**

1.     I have been asked by Counsel to review and comment upon the expert report of Apple's proposed security expert, J. Alex Halderman, Ph.D., dated March 7, 2025, as it pertains to the Apple App Store and the marketplace for iOS apps and in-app content, and to supplement my own expert report dated March 7, 2025, as necessary based upon any newly-discovered evidence or newly-completed analyses.

2.     I do not address IAP in this report because I addressed it in my March 7, 2025 report.  Dr. Halderman does not address IAP in his March 7, 2025 report, with few exceptions.  I reserve the right to supplement my analysis if Dr. Halderman or another expert addresses the opinions that I expressed concerning IAP in a subsequent report which I have not yet had the opportunity to review.

3.     I also do not add analysis of notarization in this report, because I addressed it in my March 7, 2025, report, principally at Section VII.  Dr. Halderman's March 7, 2025 report does not address notarization for iOS at all.  I reserve the right to supplement my analysis if Dr. Halderman or another expert addresses the opinions that I expressed concerning notarization in a subsequent report which I have not yet had the opportunity to review.

**B.      Summary of Rebuttal Opinions**

4.     In this report, I present opinions in addition to those I expressed in my Opening Report dated March 7, 2025.  My analysis continues to be ongoing, and I reserve the right to expand or supplement my opinions before trial.

5.     I offer the following additional opinions based in part upon my analysis of Dr. Halderman's report:

6.     First, Dr. Halderman's analysis and opinions concerning Apple's App Store security are very general.  Many of his opinions are supported primarily by an analysis of Apple's public claims about its security, rather than an analysis of internal documents or underlying facts or practices.  His report appears to treat all Apple public statements concerning the intention, mechanics, or success of its security as presumptively true and needing no supporting evidence.

7.      Second, Dr. Halderman's claim that Apple has both designed for and achieved defense-in-depth lacks support.  Dr. Halderman typologizes Apple's security into (1) on-device security, (2) app review, and (3) centralized distribution.  However, he does not demonstrate, as is necessary for defense-in-depth, that these are redundant security barriers, requiring an adversary to defeat more than one barrier to compromise a security objective.

8.      If it were true that the security areas that Dr. Halderman describes were sufficient to constitute defense-in-depth, then by the generally accepted view in the security community, any one of the three could be withdrawn and reliance on the other two would be sufficient.  In such a case, Apple could relinquish centralized distribution with no reduction in security and rely entirely on app review and on-device security.

9.      Third, Dr. Halderman provides no evidence to refute my opinion that one or more alternative app stores would be able to provide the same or better security in comparison to Apple[1].  Instead, Dr. Halderman largely focuses on arguing that the Android operating system and its app stores, in the as-is world, demonstrate security flaws.  This approach does not, as a matter of theory or of evidence, show that a competing app store would be any less secure than Apple's current monopoly App Store.

10.     Dr. Halderman made no attempt in his original report to discuss the notarization process that Apple has adopted for the European Union, where regulators have disallowed monopoly control of the App Store and required that Apple permit App Store competitors.  This process offers an obvious route to controlling iOS device security even without centralized app distribution.  Furthermore, centralization can itself have negative effects on security by delaying the crucial process of updating apps in response to threats.

11.     Fourth, Dr. Halderman has not compared Apple's security to any rigorous, contemporaneous threat model, but has conformed his analysis of Apple's security to a post-hoc conception of security. This approach, in turn, exposes flaws that make Dr. Halderman's analysis valueless for assessing Apple's security, as explained further

---

[1]*See*, *e.g*., Expert Report of Tadayoshi Kohno, Ph.D. ¶¶ 17, 289-90 (Mar. 7, 2025) (hereinafter "Kohno Opening Report").

below.

12.  Dr. Halderman has defined "security" after the fact to mirror what Apple claims to have accomplished.  As I pointed out in my Opening Report, the foundation of security claims is the threat model constructed through a rigorous threat modeling process.  Dr. Halderman neither demonstrates that Apple had a threat model for its App Store Process (which includes Apple's controlled marketplace for selling iOS apps and in-app content together with Apple App Review), nor does he attempt in any rigorous way to create one (and in doing so he would inevitably be faced with the challenge of constructing a threat model uninfluenced by what Apple is already doing or not doing to mitigate threats).

13.  Moreover, Dr. Halderman has defined "security" so broadly that it seems to include decisions Apple has made to limit or exclude apps from the App Store, even when the decision to do so was obviously or demonstrably taken for reasons other than security.  But worse, even taking Dr. Halderman's assertions at face value, my analysis below shows that Apple did not design the App Store systematically to do, or achieve in practice, the things that Dr. Halderman now says were the focus of Apple's design.  For example, Apple did not rigorously test for bugs or crashes, though Dr. Halderman now discusses the exclusion of apps that crashed as though it had always been an integral part of Apple's security plan.

14.  As another example, Apple claims to exclude certain applications with potentially offensive content, or content that can lead to manipulation or abuse of users, and Dr. Halderman now concludes that this is part of Apple's security design.  But Apple has not, and has not systematically attempted to, exclude from the App Store applications that meet this definition.  Some are large social media apps, where it is possible that the business rationale for including them overcame any countervailing security rationale for exclusion.  My findings show that Apple does not have any contemporaneous history of systematically treating user abuse and manipulation as a vector for security threats to be excluded.

3

II.    **Apple's Combination of the App Store Process and iOS Device Security is *Not* an Example of Defense-in-Depth**

   A.    **Defining Defense-in-Depth**

15.    In ¶ 51 of his expert report, Dr. Halderman identifies "a property called **defense-in-depth**, which means that *multiple security mechanisms need to be breached for an attack to succeed*" (bold in the original, italics added). He then adds that "Defense-in-depth is a widely recognized security best practice." In the same paragraph, Dr. Halderman elaborates on the definition of defense-in-depth by saying: "a system designed for defense-in-depth, like iOS, can remain resilient even if an attacker manages to circumvent any one of its defensive layers." Defense-in-depth is a widely known concept in computer security. I accept Dr. Halderman's definition of defense-in-depth that, for a system to offer defense-in-depth, "multiple security mechanisms need to be breached for an attack to succeed" (quoting Dr. Halderman) and his assertion in ¶ 15d, opinion 4, that in "a defense-in-depth strategy . . . multiple defensive layers must all be breached for an attack to succeed." However, I disagree with Dr. Halderman's argument that Apple provides defense-in-depth through the App Store Process and iOS device security.

16.    In ¶ 51 of Dr. Halderman's report, he says that defense-in-depth is a widely recognized security best practice, citing a document titled *Secure by Design*[2], which includes the following paragraph (bold added):[3]

> Secure information technology (IT) development practices and multiple layers of defense— known as **defense-in-depth**—are also recommended to prevent malicious actors from compromising systems or obtaining unauthorized access to sensitive data. The authoring organizations further recommend manufacturers use a tailored **threat model during the product development stage** to address all potential threats to a system and account for each system's deployment process.

---

[2] The "authoring organizations" of this document include the U.S. Cybersecurity & Infrastructure Security Agency (CISA), the U.S. National Security Agency (NSA), and the U.S. Federal Bureau of Investigation (FBI) as well as organizations from other countries, including the U.K. National Cyber Security Centre and the Canadian Centre for Cyber Security among others.

[3]*Secure by Design: Shifting the Balance of Cybersecurity Risk: Principles and Approaches For Secure By Design Software*, Cybersecurity and Infrastructure Security Agency (Oct. 2023), https://www.cisa.gov/sites/default/files/2023-10/Shifting-the-Balance-of-Cybersecurity-Risk-Principles-and-Approaches-for-Secure-by-Design-Software.pdf (accessed June 13, 2025)

4

17.    These two sentences in the document that Dr. Halderman cites put defense-in-depth on par with threat modeling as best practices "during the product development stage," as I discuss in my first report. From his citation of *Secure by Design*, I can only conclude that Dr. Halderman agrees that threat modeling during the product development stage is a best practice in computer security.

18.    Page 29 of *Secure by Design* has a bullet that defines defense-in-depth as follows (bold retained from the original, italics added)[4]:

**Defense-in-Depth.** Design infrastructure so that the *compromise of a single security control does not result in compromise of the entire system.* For example, ensuring that user privileges are narrowly provisioned, and access control lists are employed can reduce the impact of a compromised account. Also, software sandboxing techniques can quarantine a vulnerability to limit compromise of an entire application.

19.    I offered a similar definition in my book *Cryptography Engineering*, which I co-authored with Niels Ferguson and Bruce Schneier, on page 7 (italics in the original):[5]

it's worth strengthening multiple links so that if one link fails, the remaining links can still provide security—a property known as *defense in depth.*

20.    I additionally cite as a reference the National Institute of Standards and Technology document NISTIR 8183A Volume 3, titled "Cybersecurity Framework Manufacturing Profile Low Impact Level Example Implementations Guide: Volume 3—Discrete-based Manufacturing System Use Case" (September 2019).[6] That document defines defense-in-

---

[4] Since the document that Halderman cites includes threat modeling as a best practice in the same paragraph that it includes defense-in-depth as a best practice, I quote here additional text from that document regarding the importance of threat modeling. This quote is from page 23, listed as item 2 in "Secure Product Development Practices" (bold retained, italics added): "**Publish high-level threat models.** *Secure by design products start with written threat models that describe what the creators are trying to protect and from whom.* Effective threat models are informed by the way intrusions happen in the wild, and should cover both the enterprise and development environments, as well as the way the software manufacturers intend for it to be used in customer environments." This quote supports my arguments regarding the importance of threat modeling in my first report.

[5] Niels Ferguson, Bruce Schneier & Tadayoshi Kohno, *Cryptography Engineering: Design Principles and Practical Applications*, at p. 7 (Wiley Publishing, Inc. 2010).

[6] Keith Stouffer et al., *Cybersecurity Framework Manufacturing Profile Low Impact Level Example Implementations Guide: Volume 3—Discrete-based Manufacturing System Use Case*, National Institute of Standards and Technology (Sept. 2019), https://nvlpubs.nist.gov/nistpubs/ir/2019/NIST.IR.8183A-3.pdf (accessed June 13, 2025)

depth in the context of manufacturing environments as (bold retained):

**Defense-in-depth -** The application of multiple countermeasures in a layered or stepwise manner to achieve security objectives. The methodology involves layering heterogeneous security technologies in the common attack vectors to ensure that attacks missed by one technology are caught by another. [62443 1-1]

21.    The NIST definition further makes clear that for *each* "security objective[]" and *each* "common attack vector[]," there must be *multiple* countermeasures. While the NIST document does not explicitly define the term "common attack vector," it does provide examples of "common threat sources" (quoted below). From these examples, I conclude that "common attack vectors" and "common threat sources" are broad in definition. Given the breadth of this definition, I would not expect to find Apple having as a security objective something that would not be associated with a "common attack vector." Quoting from the NIST document (bold retained):

There are many different types of threats that can affect IT and OT infrastructure. Common threat sources (adapted from NIST SP 800-30[]) include:

- **Adversarial** — individuals, groups, organizations, or states that seek to exploit the organization's dependence on cyber resources.

- **Accidental** — Erroneous actions taken by individuals in the course of executing their everyday responsibility

- **Structural** — Failure of equipment, environmental controls, or software due to gaining, resource depletion, or other circumstances which exceed expected operating parameters.

- **Environmental** — Natural disasters and failures of critical infrastructures on which the organization depends, but which are outside the control of the organization.

22.    Indeed, to an expert in security, an unqualified claim that a system provides "defense-in-depth" means that the system is designed to provide "defense-in-depth" for all security objectives that the designers have deemed important to achieve following a threat modeling process; if a system is designed to provide "defense-in-depth" for only some security objectives, then I would expect the claim to include appropriate qualifiers narrowing the scope of the "defense-in-depth" only to those security objectives that are, in fact, achieved through multiple layers.

23.    In short, whether we call them links (as I did in my book), controls (as in *Secure by*

6

*Design* that Dr. Halderman cites), or layers (as Dr. Halderman wrote and as *Secure by Design* also wrote), or countermeasures (as NIST wrote), the common core element of these definitions is that defense-in-depth involves the use of *multiple* components such that at least one other component provides resiliency if another component fails to provide the intended security protections.

### B.    Multiple Layers Does *Not* Imply Defense-in-Depth

24.    Dr. Halderman's report suggests that Apple's centralized app review process, centralized app distribution process, and iOS operating system, when combined, emulates this "defense-in-depth" principle.  Dr. Halderman's logic is flawed.  The fact that he identifies multiple components does not necessarily mean that they embody "defense-in-depth." And as I explain in later sections, those components in fact do not embody "defense-in-depth."

25.    By way of example, consider a castle protected on all sides by guards (an "inner" layer of protection). Then, the guards are surrounded by high walls (a "middle" layer of protection). Then, those walls are surrounded by a moat (an "outer" layer of protection). *This* is an example of defense in depth because, to reach the castle, an attacker must overcome the moat, and then the wall, and then the guards. If an attacker could overcome only the moat, the castle would be protected because the wall and guards provide the "multiple security mechanisms need to be breached for an attack to succeed" (quoting from Dr. Halderman ¶ 51). Likewise, if an attacker knew how to overcome the wall but not the moat or the guards, the moat and guards would continue to protect the castle. But suppose, further, that the wall was removed from the West and the guards were removed from the East and the moat were removed from the North. The system would still have defense-in-depth—attacks from the North, South, East, and West are all, still, both protected by at least two layers of defenses.

26.    Having read Dr. Halderman's definition of multiple layers of security, one might reach the conclusion that simply having any moat and any wall and any guards would provide defense-in-depth. This is not the case. Namely, simply the use of multiple layers (or components or links or countermeasures) that, individually, might offer some security protections is not sufficient to claim that how those layers as used provide defense-in-

depth. Instead, one must determine how, for each security objective, the use of those multiple layers provides redundancy if one layer fails to meet the security objective. Continuing the physical world example, suppose that the castle designer placed a moat only on the South and West, and the wall only on the West and North, and the guards only on the West, North, and East. The moat (if secure) would protect against attacks from the South and West. The wall (if secure) would protect against attacks from the West and North. The guards (if secure) would protect against attacks from the West, North, and East. And there is defense-in-depth against attacks from the West—the West has the moat, the walls, and the guards. Likewise for the North, which has both the wall and guards. But, both in the physical world and the digital world, evidence that there is defense-in-depth for one or more security objectives (here, protecting against attacks from the West and North) does not imply that the system (the castle, in this case) has defense-in-depth. In this example, if the moat were breached from the South, there would be no additional defenses; likewise, if the guards were breached from the East. In this example, the placement of the moat, wall, and guards would more accurately be described as "division of responsibility" than "defense-in-depth." Thus, the use of all three forms of protection is not defense-in-depth as the term is used in computer security, unless for each identified security objective, at least two of the protections must each separately be defeated in order for an adversary to compromise the security objective; this same statement applies to the use of multiple defensive layers for other systems, physical or digital, even if those defensive layers might seem complementary.

### C.    Apple's Combination of the App Store Process and iOS Device Security: General Considerations

27.    Apple's use of the App Store Process and iOS device security is akin to the above physical-world example of a castle with a moat on the South and West and a wall on the West and North and guards on the West, North, and East. Namely, to the degree that the App Store Process and iOS device security offer some security protection, my review of the materials from Apple lead me to conclude that, even if their security protections were to overlap to some degree (like threats from the West and North in the castle example), in other cases there are only single points of failure (like the South wall in the castle example).

8

28.  To demonstrate otherwise – and for Apple to claim that, together, the App Store Process and iOS device security offer defense-in-depth – Apple would need to articulate all security objectives that they sought to meet. Then, for each such security objective, Apple would need to demonstrate that there are multiple components designed to meet those security objectives such that the failure of any one component would not lead to the compromise of a security objective. To convincingly demonstrate the above, Apple and Apple's security expert would first need to articulate all security objectives that they sought to meet, which means that they would need to present a rigorously constructed threat model[7] encompassing the Apple App Store Process, iOS device security, and the combination of both. Then, Apple and Apple's security expert would need to consider each security objective in turn and demonstrate defense-in-depth for each objective in the system as implemented.

29.  The above steps are necessary for Apple to demonstrate that, together, the App Store Process and iOS device security *offer* defense-in-depth; here I emphasize the word "offer." I use the word "necessary," not "sufficient," because if a system is not *designed* for defense-in-depth, a retroactive analysis of what a system offers could be biased or influenced by past design decisions, as I discuss later.[8] Beginning at ¶ 32 below, I additionally discuss what Apple must do to demonstrate that the App Store Process and iOS device security were *designed* for defense-in-depth.

30.  Returning to the question of whether Apple *offers* defense-in-depth, if Apple cannot present such a threat model, as I explained in my first report, Apple has no basis for claims of security. And, further, I cannot see how Apple—or its security expert—could

---

[7] Dr. Halderman also articulates the role of a threat model in defining what it means for a system to be secure when he wrote, "A threat model answers the question*, what does the system need to defend against?*" (italics retained) in his ¶ 46.

[8] The document Dr. Halderman cites as the source for defense-in-depth as a best practice–*Secure by Design: Shifting the Balance of Cybersecurity Risk: Principles and Approaches For Secure By Design Software*, Cybersecurity and Infrastructure Security Agency (Oct. 2023), https://www.cisa.gov/sites/default/files/2023-10/Shifting-the-Balance-of-Cybersecurity-Risk-Principles-and-Approaches-for-Secure-by-Design-Software.pdf–also discusses other best practices, including the practice of designing for security vs retroactively considering security, e.g., the following quote: "Secure by design development requires the strategic investment of dedicated resources by software manufacturers at each layer of the product design and development process that cannot be 'bolted on' later." (accessed June 13, 2025)

argue that Apple provides defense-in-depth if they cannot articulate, in a principled way, all the security objectives in it. Apple and Dr. Halderman might argue defense-in-depth for the security objectives that they know about. But without threat modeling, there are certain to be security risks and objectives that they *should* have known of in order to protect security, but that they do not know about, have not considered, and have not designed for.

31. Without Apple's use of a rigorous threat modeling process during the design of the Apple App Store, any retroactive creation of a threat model does not and could not address the shortcoming of failing to threat model during the product development stage as I articulated as a best practice in my opening report. Additionally, if Apple were to strive to rigorously create a threat model now, they must find a way to do so that overcomes any bias or other influence imparted by the knowledge of their current design and considerations and by this legal case.

32. To demonstrate that the App Store Process and iOS device protections were *designed* for defense-in-depth, the bar is higher; emphasizing the word "designed." Apple must demonstrate intentionality and thoroughness of defense-in-depth during the design phase. However, Apple could not demonstrate this without having incorporated a rigorous threat modeling process during the design phase. Additionally, Apple must demonstrate intentionality in the design of multiple security mechanisms as defenses for each of their identified security objectives. Without identifying Apple's intentionality in defining the scope of security via threat modeling and intentionality in designing for defense-in-depth, any argument that Dr. Halderman might make regarding the Apple App Store Process and iOS device security as offering defense in depth would, to a security expert, appear as trying to find good security-based justification for what Apple already has done rather than describing an intentional, rigorous defense-in-depth design.

33. In my opening report, I explained that Apple lacked a rigorous threat model for the App Store Process and iOS. Despite citing *Secure by Design*, which puts defense-in-depth on par with threat modeling as best practices, Dr. Halderman has not identified any such threat model, whether as part of his so-called defense-in-depth design or otherwise. I am aware of no internal Apple documents, and Dr. Halderman does not cite any, that show

10

either that (1) Apple designed the App Store with the "defense-in-depth" principle in mind or (2) Apple considered how to promote defense-in-depth more generally.

34.    I do not consider whether Apple has followed best practices for implementing defensive effectiveness in this report because Apple has failed to demonstrate the precursor to such an evaluation: a design for defense-in-depth.

### D.    Apple's Combination of the App Store Process and iOS Device Security: Details

35.    I first consider Dr. Halderman's discussion of "Apple's centralized App Store," recalling Dr. Halderman's claim in ¶ 51 (bold retained, italics added) that "a property called **defense-in-depth** . . . means that multiple security mechanisms need to be breached *for an attack to succeed.*"

36.    A central component of his definition is "multiple security mechanisms need to be breached for an attack to succeed." According to Dr. Halderman's definition, defense-in-depth is composed of multiple security mechanisms designed to prevent an attack from succeeding. However, in his discussion of "Apple's centralized App Store," Dr. Halderman refers, in ¶ 52 of his report, to "harmful apps that avoid detection prior to distribution." That is, Dr. Halderman acknowledges that "harmful apps" are not detected prior to distribution (by which I assume he means passing App Review and becoming available for sale on the App Store). Plainly, his description of "Apple's centralized App Store" is not about preventing attacks from succeeding, but instead it is about responding to successful attacks—apps that did make it into the App Store and hence possibly onto users' devices.

37.    In the next sentence, in ¶ 52 of his report, Dr. Halderman refers to Apple's attempt to "monitor[] apps" that have made their way onto the App Store and "other signals that . . . app[s] may be causing harm." Again, Dr. Halderman emphasizes the reactive role of the "Apple's centralized App Store" *after* apps have already escaped App Review and have already caused harm. The claim in the next sentence of the same paragraph, that Apple tries to "stop further distribution" of harmful apps, makes Dr. Halderman's perspective clear that Apple's own approach to the security contributions of its "centralized App Store" are primarily retroactive, after an adversary might have already achieved their

11

adversarial objective. Hence, under Dr. Halderman's own definition of defense-in-depth and his discussion of "Apple's centralized App Store" here, "Apple's centralized App Store" cannot be considered part of a defense-in-depth strategy because the security features that Halderman mentions are enacted *after* a successful attack.

38.     This leaves "the App Review process" and "On-Device Protections" as the two remaining eligible components for Dr. Halderman's "defense-in-depth" argument. Dr. Halderman discusses "App Review" and "Apple's App Review Process" in ¶¶ 53 to 82 of his report. Dr. Halderman writes that "[o]n-device protections provide another, complementary layer of defense that attempts to reduce the damage harmful apps can cause if they reach the device." He then discusses "On-Device Protections" in ¶¶ 92 to 104. For Dr. Halderman to argue that "the App Review process" and "on-device protections" together constitute defense-in-depth for all the security objectives he considers, it is necessary that he demonstrate that each of the security objectives he argues that "the App Review process" addresses (¶¶ 53 to 82) is also handled by the "on-device protections" (¶¶ 92 to 104) and vice-versa.[9]  Not only does Dr. Halderman fail to do this in his report, but from my analysis, I have concluded that Dr. Halderman has not and could not do this because there are some categories of adversarial actions, like social engineering attacks (which Dr. Halderman discusses in ¶ 63 of his report) that the "on-device protections" were not designed to detect and protect against.

39.     Thus, I conclude that the App Store Process and iOS device security do not provide defense-in-depth. Rather than offering defense-in-depth, the design is that of divided responsibilities. In making this statement, I consider both "the App Review process" and "Apple's centralized App Store," using Dr. Halderman's terminology, to be part of the App Store Process. In this statement, I consider "on-device protections" to be akin to what I refer to as iOS device security.

40.     As a thought exercise, suppose that the App Store Process (centralized distribution and App Review) and iOS device security constitute defense-in-depth. Then assuming no unknown vulnerabilities in either, there would be no measurable loss in security if either

---

[9] Recall the role of an underlying threat model in any argument of defense-in-depth and, hence, the word "necessary" here and not the word "sufficient."

component was removed from the Apple system. The previous sentence follows directly from the definition of defense-in-depth and the intention of the overall system remaining secure even if an adversary can bypass one layer of protection.

41.    If Apple wished to provide users with defense-in-depth related to security objectives associated with the App Review Process but not iOS device protections, then Apple could consider a model like what they are doing in the European Union. First, Apple could review apps with respect to those objectives during the notarization phase. Second, a third-party app store could independently review the notarized apps with respect to those same objectives. The second, independent review for each security objective would thus constitute defense-in-depth, for those security objectives, for the apps available on the third-party app store. I write "for those security objectives" because, as noted earlier, a rigorously constructed threat model is a precursor to fully designing for defense-in-depth.

### E.    Summary of Defense-in-Depth Findings

42.    In his report, Dr. Halderman states that Apple implementing defense-in-depth is necessary, and yet my analysis shows that Apple's design of the App Store Process and on-device security protections do not offer defense-in-depth under Dr. Halderman's own definition of the term.

43.    In my first report, I discussed the absence of evidence that Apple employed a rigorous threat modeling process during the product development stage of the Apple App Store Process, nor did I find evidence of Apple applying a rigorous threat modeling process later. In this report, I find that Apple's approach to iOS security, spanning the App Store Process and iOS device security, does not constitute defense-in-depth. Given that Dr. Halderman argues that defense-in-depth is necessary, and given that Apple does neither the defense-in-depth nor threat modeling best practices identified in *Secure by Design* and cited by Dr. Halderman, my findings call into question any claim Apple might have for its Apple App Store Process being designed for security, or that a competing app store would not or could not be able to compete with Apple by offering equal or superior security.

13

III.    **Examples of Security Concerns in Other Contexts Do Not Preclude the Possibility of a Secure Alternative to the Apple App Store**

A.    **The Problem of Induction and the "Proof by Example" Logical Fallacy**

44.    Dr. Halderman's report shows that he has not analyzed the evidence; rather, he has searched the evidence for anecdotes that support his conclusions.

B.    **Dr. Halderman's Use of Examples in Other Contexts Do Not Support a Conclusion that a Secure Alternative to the Apple App Store Cannot Exist**

45.    Dr. Halderman's report includes instances of the "proof by example" logical fallacy, where he appears to draw the conclusion that something is generally or categorically true because he cites anecdotal examples. It is a logical fallacy to assert that one or more examples proves that the examples reflect a continuous or universal condition. As one specific example, it is possible to conclude that Apple's security is imperfect by identifying a single flaw in Apple's security. But it is not possible to prove that no alternative to the Apple App Store could be at least as secure as the Apple App Store, simply by identifying (or constructing) one or more alternatives that fail to be at least as secure at the Apple App Store.

46.    Consider, for example, ¶ 45 of Dr. Halderman's report, which states:

> Moreover, Android and Windows both have imitated iOS by introducing app stores where users can obtain vetted apps.[] However, unlike iOS, they allow consumers to install apps from outside their official stores, which is widely exploited to spread malware.[] This shows that centralized distribution is a crucial element to iOS's superior real-world security.

> That is a flawed assertion, and Dr. Halderman cites no proof for his claim that Android and Windows imitated iOS with respect to the vetting of apps. Instead, in his own ¶ 42, Dr. Halderman suggests that Apple sought to imitate the vetted app stores in console games. For reference, for example, the Xbox Live Marketplace was launched in 2005, before the Apple App Store and the iPhone even existed.[10]

47.    Leaving that obvious flaw aside, the second sentence in ¶ 45 implies that Android and

---

[10]Major Nelson, *Xbox Live Marketplace Launch Content*, Xbox Wire (Nov. 15, 2005), https://news.xbox.com/en-us/2005/11/15/xbox-live-marketplace-launch-content/ (accessed June 13, 2025)

Windows offer inferior security protection because they "allow consumers to install apps from outside their official stores[.]" Setting aside the accuracy (or inaccuracy) of this claim, the existence of some security concerns in those app stores does not prove that allowing "consumers to install apps from outside their official stores" on iOS devices would lead to security concerns. In other words, the example that Dr. Halderman presents does not prove that "centralized distribution is a crucial element to iOS's … security" and that it could not be replaced with an alternative that is just as secure if not more secure. Dr. Halderman's argument here is a classic "proof by example" logical fallacy.

48.    Of course, assuming that the Android devices are more vulnerable to malware exploitation than iOS devices (which I do not concede), Dr. Halderman ignores a fundamental difference between Android and iOS that may explain the difference in security vulnerability. As has long been well known, Android is an "open" operating system while iOS is a "closed" operating system.[11] Dr. Halderman's report does not discuss whether and to what extent this fundamental difference explains any observed difference in security vulnerability between Android and iOS devices. Dr. Halderman also ignores at least one other difference between Android and iOS devices, which is that Android devices are made by many different manufacturers and hence Android must run on a diversity of hardware while iOS devices are made only by Apple. Additionally, as the following figure shows,[12] different phones are more popular in different parts of the world, and—without evidence to the contrary—regional differences could also impact the nature of malware for different phone platforms when data is evaluated globally.

---

[11]*See* A.J. Singh and Akshay Bhardwaj, *Android vs. IOS: An Architectural Perspective*, Int'l Journal of Innovative Research & Development, Vol. 3, Issue 1 (Jan. 2014), https://www.internationaljournalcorner.com/index.php/ijird_ojs/article/view/134737/93862 (accessed June 13, 2025).

[12]Steven Ferris, *The Most Popular Phone Brands in Every Country in 2023*, John's Phone (Jan. 9, 2024), https://www.johnsphones.com/research/the-most-popular-phone-brands-in-every-country (accessed June 13, 2025).



The most popular phone brands around the world
Vendor market share as of October 2023

49. Dr. Halderman also does not consider a world in which iOS retains (or improves) its security protection – whatever level of protection that may be – while also permitting alternate distribution pathways for iOS apps.

50. Moreover, I presume that as Apple's security expert, Dr. Halderman is familiar with Apple's response to the recent European Union regulation and Apple's use of notarization in the European Union. Assuming that Dr. Halderman is familiar with notarization and Apple's acceptance of non-centralized distribution in Europe, he cannot responsibly make the claim that "centralized distribution is a crucial element to iOS's superior real-world security," at least not without discussing the security experiences in the EU. He cannot be saying that Apple no longer offers "superior real-world security" in the European Union, given Apple's own claim that it "will continue to prioritize safety, security, and privacy measures that promote the best experience possible for EU users under this new regulation" in prior materials.[13] Both statements cannot be true at the same time.

51. Consider also ¶ 140 in Dr. Halderman's report:

---

[13]*Update on apps distributed in the European Union*, Apple Support, https://developer.apple.com/support/dma-and-apps-in-the-eu/ (accessed June 13, 2025)

16

The history of Android also illustrates that third-party app stores may lack the resources necessary to sustain the security of their marketplaces in response to evolving threats. While Google has considerably enhanced the Play Store's security over the past decade, these improvements have been challenging for third-party Android app stores to match. This is illustrated by data from AndroZoo, a research effort that continuously crawls several Android marketplaces and tests the apps they contain with a suite of antivirus tools.[] In 2016, the AndroZoo researchers reported that 22% of apps they downloaded from the Play Store were flagged by at least one antivirus product as malware, compared to 50% of apps from the Chinese Android marketplace AppChina.[] More recent AndroZoo data shows that in 2023, only 3% of apps downloaded from the Play Store were flagged as malware, versus 59% from AppChina.[] This demonstrates that third-party app stores cannot be relied on to keep up with the level of security provided by first-party stores as threats evolve over time.

52. This paragraph sets up examples of malware on third-party app stores for Android. The last sentence in ¶ 140 illustrates the fallacy of "proof by example." By pointing to one or two instances of security vulnerability, Dr. Halderman has not proven that all third-party app stores cannot be relied upon. Indeed, in my first report I showed that there is no reason to believe that an alternate app store could not offer at least as much if not more security protection than the Apple App Store. Dr. Halderman has also not considered whether Apple could design its system such that all authorized third-party app stores could be relied upon to "keep up with the level of security provided by first-party stores."

53. Moreover, with its efforts for the European Union, Apple already has demonstrated that it can design its system such that authorized third-party app stores can "keep up with the level of security provided by first-party stores." My first report describes in more detail notarization and Apple's efforts in the European Union and provides further context, but for the purposes of the rest of this paragraph, I consider the security criteria evaluated during the notarization process and recall, for example, that one reason Apple might notarize an app but reject it from the Apple App Store is because the app provides "objectionable" content or features, such as pornography, that may not be security risks, at least as that term is understood by computer security experts, but that do not comply with Apple's criteria for inclusion in its App Store.[14] If Apple restricts third-party app

---

[14] *See* APL-APPSTORE_11478929 (determining to keep guidelines that prohibit apps containing "[f]alse information and features" as part of the notarization review, but dropping guidelines that prohibit apps

stores to only distributing notarized apps, and if it reviews all apps prior to notarization, then by definition those third-party app stores that choose to permit users to download such "objectionable" apps are, nonetheless, maintaining the same level of security provided by the Apple App Store because they are, in fact, adopting at least the security evaluation provided by Apple.  I additionally observe that Apple could make different decisions about what is included and excluded from notarization in the U.S. than for what they did in the European Union; such decisions could also be made in collaboration with external entities such as U.S. regulators.

54. Another instance of a "proof by example" fallacy is found in ¶ 121 of Dr. Halderman's report:

> On platforms that support sideloading, individual users are forced to play a more active role in assessing whether apps are safe to install. Users are not always as equipped to make this determination, nor do they always want to take the time and effort to make this determination.

55. The second sentence in ¶ 121 offers an example that might arise in some systems depending on how sideloading is implemented. However, from this example, one cannot make the claim that "users are forced to play a more active role" on all platforms that support sideloading. Dr. Halderman does not explain why an alternative app store could not provide the same level of app review – or even greater app review – as that provided by Apple. Given Apple's failure to threat model, as well as the many instances of flawed App Review and the many shortcomings of App Review described in my opening report, such an app store is not only possible, but even likely.

56. Further, Dr. Halderman's use of the word "forced" implies that users are not given the option to choose. Users could choose to buy iOS apps and in-app content on the Apple App Store just as easily as they could choose to buy from a competitor depending on their assessment of the value proposition the two app stores offer.  Regardless of the security of any sideloading process, users would *not* be forced to use those sideloading processes and hence would *not* be forced to engage in any decision making resulting from the use

---

from containing "mean-spirited content," "[d]epictions that encourage illegal or reckless use of weapons and dangerous objects," and "[o]vertly sexual or pornographic material").

18

of those sideloading processes.

57. Moreover, Apple's efforts with notarization for the European Union allows it to support secure sideloading, both under Dr. Halderman's definition of sideloading (his ¶ 112) and Apple's definition.[15] I fail to see how Dr. Halderman, as Apple's security expert, could both know about Apple's response in the European Union and make the claim he has made in ¶ 121 of his report. Nor can I see how he could not know about Apple's response in the European Union.

58. Likewise, consider ¶ 114 in Dr. Halderman's report:

> Requiring Apple to broadly support sideloading on iOS would make iOS devices less secure and expose users to greater risks from scams, malware, and other harmful apps. As I discuss further below, studies show that users of devices that allow sideloading encounter harmful apps far more often than iOS device users do. For instance, researchers at Zimperium found that users who engage in sideloading are 200% more likely to have malware running on their devices than those who do not. An academic research team reported that 97.8% of malicious repackaged Android apps they uncovered were distributed via sideloading.[] A 2020 study by Nokia found that Android devices were 46 times more likely to be infected with malware than iOS devices, which Nokia attributed to Android's support for sideloading and third-party app stores.[] In 2021 and 2023, Nokia detected negligible numbers of infected iOS devices, while Android devices were found to make up 50.31% of the infected devices in 2021 detected in mobile and fixed networks where Nokia's NetGuard Endpoint Security solution is deployed and 30% or 49% of infected devices detected in fixed and mobile networks, respectively, in 2023.[]

59. Most of ¶ 114 offers examples of sideloading in other contexts. This is another instance of the "proof by example" fallacy. Moreover, this is yet another instance in which Apple's actions in the European Union provide a compelling counter-example to Dr. Halderman's claim since, as I note and discuss above, Apple is supporting sideloading in the European Union. and has said it "will continue to prioritize safety, security, and privacy measures that promote the best experience possible for EU users under this new regulation."

---

[15] For the latter, on an Apple web page, under the heading "Do these changes mean that Apple is allowing sideloading in the EU?" Apple says: "Yes. In the EU, users will have the option to download apps from alternative marketplaces and a developer's website using Web Distribution." *Update on apps distributed in the European Union*, Apple Support, https://developer.apple.com/support/dma-and-apps-in-the-eu/ (accessed June 13, 2025).

60.    In ¶ 105 of his report, Dr. Halderman defines "jailbreaking" as "the process of circumventing a device's security features to modify the device's behavior." He offers a similar definition in ¶ 15 at the start of his Opinion 10. If Apple were to support third-party app stores or other authorized methods to install apps onto iOS devices, then by definition those methods to install apps onto devices would be supported, and apps distributed through those app stores would be installed without "circumventing a device's security features." Hence, any discussion of jailbreaking and the implications of jailbreaking are distinct from the questions of whether and how supported third-party apps stores could provide the same or greater security protection compared to the Apple App Store.

61.    Having made these observations, I again observe that any findings or speculation about an alternate set of facts—in this case, iOS devices that have been jailbroken—do not imply what necessarily would be true if alternate app distribution models, including supported third-party app stores, were to exist. Dr. Halderman has not proven that alternative app stores would necessarily be inferior from a security perspective or that alternative app stores could not offer greater security protection than the Apple App Store (or even, as a result of competitive pressure, force Apple to improve security protection on the App Store). For example, in Europe, Apple's notarization of apps allows it to support third-party app stores for iOS devices without requiring those iOS devices to be jailbroken.

62.    Dr. Halderman's ¶ 119 begins, "In addition, sideloading would reduce the efficacy of App Review in detecting harmful apps, as it would inherently mean that App Review is no longer seeing, reviewing, and learning from all apps available to consumers, nor all apps submitted for distribution to consumers." What Apple is doing in Europe demonstrates that Dr. Halderman's conclusions that "it would inherently mean" more security risk is factually false since all apps are still reviewed by Apple before distribution to consumers as part of notarization. Additionally, Halderman has not demonstrated the inability for effective information sharing about harmful apps discovered post-distribution regardless of their distribution pathway.

20

### C.    Summary of Alternative App Distribution Findings

63.    Dr. Halderman fails to prove that an alternate app store for iOS could and would not offer at least as much if not greater security protection than the Apple App Store. Instead, Dr. Halderman simply offers examples, which he expressly or implicitly claims are comparable or informative without proving they are, of assumed insecurity in those other contexts.  But to prove that a competitor could not equal or better Apple's App Store security, Dr. Halderman would have to demonstrate something about Apple's App Store process that could neither be duplicated, nor improved, by a rival. He does not, or even attempt to, do so.

64.    Not only does Dr. Halderman fail to consider the ways in which Apple's present security offerings could be duplicated or replaced with improved ones by a competitor.  He also has failed to consider what Apple is already doing in the European Union, which provides exactly an example of a measure that could replace Apple's current measures. Apple's security expert cannot claim in good faith that centralized distribution of apps only through the Apple App Store is "essential" for security[16] while completely avoiding any discussion of how Apple has already begun to support the distribution of notarized apps through alternate app stores in the European Union. Apple promises that it "will continue to prioritize safety, security, and privacy measures that promote the best experience possible for EU users under this new regulation."[17]  This undermines Dr. Halderman's argument that Apple's control over iOS app distribution is "essential" to security.

65.    Moreover, even if Dr. Halderman were to find some criticism of Apple's own approach for app distribution in alternate app stores in the European Union, this hardly demonstrates the impossibility of improving Apple's process.  Dr. Halderman's claim that no adequate security can arise from decentralized distribution can only be supported

---

[16] *See* ¶ 14 of Halderman's report.  In writing about "App Review, centralized distribution through the App Store, and Apple's on-device protections" in his ¶ 14, Halderman writes that "Removing any one of them would undermine the effectiveness of these defenses." Such a possible future—that of the removal of an existing component with no changes to the other components or the addition of new components—is only one of a multitude of possible futures.

[17]*Update on apps distributed in the European Union*, Apple Support, https://developer.apple.com/support/dma-and-apps-in-the-eu/ (accessed June 13, 2025)

by evidence of something Apple does through centralized distribution that cannot be duplicated nor bettered nor supported in other ways.  Instead, he offers anecdotes of unsatisfactory arrangements and speculates that Apple's present cannot be improved on. This is strictly speaking a "proof by example" logical fallacy.

**IV.     Dr. Halderman's Discussion of Alternate App Stores and App Vetting Practices Undermine His Argument**

**A.     Dr. Halderman's Discussion of Console Game App Stores Undermines His Argument**

66.     In ¶ 42 of Dr. Halderman's report, he writes that "Apple's security design needed to achieve a similar level of security" to that of game consoles, thereby setting the basis of comparison for Apple's App Store security to be that of game consoles (italics added):

In essence*, Apple's ambition was to provide a security* experience where developers and apps are so carefully vetted that harmful software rarely reached users. *This is similar to the experience with game consoles*. Yet game consoles typically ran only a relatively small number of high-value titles and had less valuable information stored upon and accessible through them. Moreover, since games were few and each very costly to develop, it made sense for console platforms to subject them to weeks or months of manual review and testing before distribution. Such prolonged and extensive testing is not necessarily economically viable with "lots of little apps"—which Apple intended to support. Instead, Apple's security design needed to achieve a similar level of security while scaling to hundreds to thousands of times more apps and developers than game consoles supported.

67.     In ¶ 29 of his report, Dr. Halderman discusses the strength of game console app store security (italics added):

*Some systems achieve lower security risks by restricting what apps they will run* and how these apps can be distributed. For instance, *game consoles such as PlayStation, Xbox, and Nintendo Switch will only run games that are certified by their respective console manufacturer*, and they only allow games to be distributed online through their official stores.[] *Getting console games certified is often a long and expensive process that can require developers to undergo vetting, purchase development kits that can cost thousands of dollars, and submit their games for testing by the console manufacturer, which can take weeks to complete*.[] These factors, along with the relatively lower number of users of each console, can deter attackers from targeting game consoles; *the costs of attempting to get a malicious app certified are high, and the odds of it passing certification* and then remaining long in distribution, particularly to a large audience*, are low*. As a result, *malware is infrequently associated with console platforms*. On the

22

other hand, the cost and complexity of console certification can price-out legitimate developers, and there are far fewer game titles available for console platforms than for PCs.[]

68.    Dr. Halderman's discussion of the game console app store security actually acknowledges that it is possible for a rival app store to have security at least as great as, if not greater than, any security offered by the Apple App Store.

69.    Moreover, although Dr. Halderman does not explicitly claim that the Apple App Store has not achieved the same level of security as that of console game app stores, that conclusion is implied by his statement in ¶ 52 of his report that the App Store Process includes a process to "detect and stop harmful apps that avoid detection prior to distribution." But Dr. Halderman provides no such discussion in his report of the post-approval rejection process of apps from game consoles. Rather, he writes in ¶ 29 of his report that "malware is infrequently associated with console platforms." Thus, having made different design decisions, despite needing "to achieve a similar level of security" to that of console game app stores, Apple has not successfully done so.

70.    Dr. Halderman's finding about the security of game console app stores and their app review process thus highlights the falsehood of his claim that an alternate app store for iOS could not be at least as secure if not more secure than the Apple App Store. An alternate app store for iOS could provide greater security protection, as game console manufacturers choose to do, and Dr. Halderman offers no reason why one could or would not do so.

71.    Although, according to Dr. Halderman, Apple has prioritized economic viability and cost savings over user security, an alternate app store for iOS devices could make different decisions and prioritize user security more than Apple does.

72.    Lastly, I observe that Halderman's arguments against alternate app stores, however logically flawed they might be, seem based entirely on security, not on costs to Apple if it were to support one or more alternate app stores, including costs associated with security. As a result, Halderman does not quantify or analyze any additional cost to Apple attributed to support for alternate app stores.

23

**B.    The U.S. National Institute of Standards and Technology Recommends Third-Party App Vetting Due to Opacity and Lack of Trust in the iOS App Review Process; Alternate App Stores Could Also Conduct Such Rigorous App Vetting**

73.    In ¶ 125 of Dr. Halderman's report, he cites National Institute of Standards and Technology (NIST) Special Publication 800-163 Revision 1, titled "Vetting the Security of Mobile Applications," when he writes (italics added):[18]

Replicating the stronger protections available from App Review and the App Store is beyond the resources of individual consumers (and even third-party app stores or other entities). This is illustrated by guidance published by NIST for *organizations that need to vet apps on their own, independently of official app stores*. Large enterprises and government agencies are sometimes required to do this for compliance reasons. NIST's vetting guidance is 55 pages long and states that to complete the vetting process, "it is critical for the organization to hire personnel with appropriate expertise" in software security, information assurance, and mobile security. It further notes that "costs may be significant and can include licensing costs for test tools and salaries for analysts, approvers, and administrators."

74.    The third paragraph of the introduction to NIST Special Publication 800-163 contains the following text (italics added):

The *commercial app stores provided by mobile operating system vendors* (Android, *iOS*) review the apps for issues such as malware, objectionable content, collecting user information without notice, performance impact (e.g., battery), etc. prior to allowing them to be hosted in their app market. *The level and type of reviews conducted are opaque to consumers and the federal government.* Furthermore, these app markets serve a global customer base that numbers in the billions and their reviews of apps are consumer- and brand-focused. *Enterprise organizations—federal agencies, regulated industries, other non-governmental organizations—that plan to use consumer apps for their business will need to make risk-based decisions for app acquisition based on their own security, privacy and policy requirements and risk tolerance.*

75.    This provides context for interpreting Dr. Halderman's reference to "organizations that need to vet apps on their own, independently of official app stores." His statement implies that alternative app stores could not or would not perform their own app review, which could equal or surpass Apple's App Review. NIST Special Publication 800-163,

---

[18]Michael Ogata et al., *Vetting the Security of Mobile Applications*, National Institute of Standards and Technology (Apr. 2019), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-163r1.pdf (accessed June 13, 2025).

officially published by the U.S. government, articulates the inadequacy of security for the Apple App Store Process, at least for "federal agencies, regulated industries, other non-governmental organizations," and hence the need for independent app vetting and "risk-based decisions for app acquisition based on their own security, privacy and policy requirements and risk tolerance" beyond any review by Apple. Additionally, the following text in the document demonstrates NIST's perspective that customers and the federal government cannot trust Apple's app review process: "The level and type of reviews conducted are opaque to consumers and the federal government."

76.    Section 1.1 of NIST Special Publication 800-163 defines the document's purpose as (italics added):

> This document defines an *app vetting process* and provides guidance on (1) planning and implementing an app vetting process, (2) developing security requirements for mobile apps, (3) identifying appropriate tools for testing mobile apps and (4) determining if a mobile app is acceptable for deployment on an organization's mobile devices. An overview of techniques commonly used by software assurance professionals is provided, including methods of testing for discrete software vulnerabilities and misconfigurations related to mobile app software.

77.    That NIST Special Publication 800-163 defines an "app vetting process" beyond that of the Apple's App Review, and Dr. Halderman's own statement that there are "organizations that need to vet apps on their own," both suggest that an alternate app store could have greater security than the Apple App Store. For example, the "organizations that need to vet apps on their own" could be alternate app stores with high bars for security evaluation.

78.    Additionally, the NIST "Vetting the Security of Mobile Applications" document does not reference "proprietary" information at all in its discussion of app vetting. That the U.S. National Institute of Standards and Technology does not express proprietary information as a limitation on the ability of "federal agencies, regulated industries, other non-governmental organizations" to "make risk-based decisions for app acquisition based on their own security, privacy and policy requirements and risk tolerance" suggests that the U.S. government does not believe that these enterprise organizations need any proprietary information from Apple in order to implement a rigorous app vetting process.

79.    Additionally, NIST's expressed a concern that "[t]he level and type of reviews conducted [by Apple before apps are made available in the Apple App Store] are opaque to consumers and the federal government." In his report, Dr. Halderman ignores many examples of defective app review or deficiencies in Apple's App Review, including technical (e.g., delayed implementation of tools to aid in app review), human (e.g., overworked app reviewers and human error), and systematic (e.g., backlog and excessive emphasis on reducing app review time); I discuss these types of issues in my opening report, and I do so having studied materials not generally available to the public and hence opaque to a broader audience.

## V.    Using the Term "Threat Model" is Different than Employing a Rigorous Threat Modeling Process

### A.    Dr. Halderman Does Not Present Evidence of Threat Modeling During the Design of the Apple App Store

80.    Dr. Halderman agrees with me that threat modeling is foundational, and that it forms the basis on which security can be assessed, e.g., how well are the identified assets secured against the identified threats by the identified mitigations. *See, e.g*., Dr. Halderman ¶¶ 15c, 46. However, Dr. Halderman does not cite a threat model for the App Store Process, or for components such as App Review. He has offered a typology of Apple's security (App review, Centralized Distribution, and On-Device protections), but has not cited any threat model that shows Apple designed its security in this way.

81.    In my review of Dr. Halderman's report, I find that he also articulates the importance and value of threat modeling. For example, his ¶ 15c, begins (bold retained):

**Opinion 3.** System designers such as Apple can use threat modeling to identify potential security threats and develop appropriate defenses.

82.    His use of "can" is striking, as he notably does not assert that Apple in fact did use threat modeling. This is no accident, as in ¶ 46, Dr. Halderman also writes that (bold retained) (italics added):

System designers *can* use a process called **threat modeling** to *systematically identify* potential threats, prioritize them, and guide the development of defensive measures.

83.    In Dr. Halderman's own words, threat modeling is "systematic" and that threat modeling

26

is a process to "guide the development of defensive measures." ¶ 46.

84. Thus, Dr. Halderman agrees with a key principle that I articulated in my first report, that threat modeling is essential to determining and defining what it means for a system to be secure. In ¶ 46 of Dr. Halderman's report, he says that the threat model determines and defines "*what does the system need to defend against*" (italics retained).

85. Dr. Halderman continues, "I also have seen evidence indicating that Apple utilizes threat modeling in connection with the development of particular features and functionality.[]" ¶ 47. Notably, however, his citations to "Apple utilizes threat modeling" are to systems that are not the App Store; his first citation is to APL-EG_05622260, a slide deck titled, "File Systems" and his second citation is to APL-APPSTORE_05501925, a document titled, "Threat Model: iCloud Support Application." That Dr. Halderman did not cite an Apple threat modeling document for the Apple App Store is consistent with my finding that Apple has not demonstrated the application of a rigorous threat modeling process during the design of the Apple App Store and my finding that Apple has not produced a threat model.

**B.      Using the Term "Threat Model" Does Not Equal a Rigorous Threat Model Created Through a Rigorous Threat Modeling Process**

86. Dr. Halderman asserts that "[a]pplying threat modeling to iOS shows that it faces, and would be expected to face, extraordinary security threats." ¶ 48. His use of the term "threat model" here, however, is misleading. He applies it informally, and not as a reference to either a rigorous process or a rigorous model. Namely, while Dr. Halderman implies that iOS "faces, and would be expected to face, extraordinary security threats" that follows from a "process called threat modeling to systematically identify potential threats," Dr. Halderman does *not* cite to or provide any evidence of a systematic threat modeling process or an actual threat model leading to his conclusions. ¶ 46. Since the colloquial use of the term could lead to confusion to a non-expert, I explicitly articulate the difference in the usage of the term here.

87. Consider, for example, the document Dr. Halderman cites as one example that "Apple

utilizes threat Modeling" (¶ 47)[19]. And, in particular, see the following screenshot from the document that Dr. Halderman cites:



Apple Confidential

The document itself is headed "Threat Model." It identifies assets to be protected (access

---

[19] APL-APPSTORE_05501925

to customer accounts), catalogues threats (ways unauthorized access could be achieved, with reference to an appendix in places), and lists mitigations.

88.   This is at least a portion of a threat model for iCloud. Dr. Halderman has not identified any document like this for the App Store Process. He has not cited a document in this form, and he has not cited a document that systematically serves this function.

89.   Nor has Dr. Halderman done the work on constructing such a threat model in retrospect for the App Store Process. Moreover, for Dr. Halderman to have done so, he would certainly have needed to rely upon significant Apple internal resources to catalog assets, threats, and mitigations in detail. His citation to contemporaneous internal documents generally is light, and he has not cited documents that would allow an analysis of threats and mitigations.

90.   In any event, retrospective construction of a threat model is not a best practice. Particularly here, in the context of litigation, even a well-meaning security expert would almost inexorably create a threat-model-by-hindsight to fit the threats encountered and mitigations employed to what has already happened, instead of designing the system looking at threats that might be encountered and creating mitigations in anticipation. Further, as expressed in my opening report, threat modeling should be done in teams, not by a single individual. Consequently, Dr. Halderman's statement, "Applying threat modeling to iOS…" (¶ 48) cannot be read as relying upon a rigorous threat modeling process, either contemporaneous or of his own invention retrospectively.

91.   Since Dr. Halderman's informal usage of the term "threat modeling" in ¶ 48 can lead to confusion, I offer further clarification of other uses of the term here.

92.   In my first report, I discussed the role of threat modeling during the design and implementation of a system. In contrast, when analyzing a system for vulnerabilities, it is not necessary to rigorously construct a threat model. The reason for the difference is as follows: the designers of a system strive to be aware of all possible attacks so that they can make conscious decisions of what to do about each such attack. The designers of a system would then use the threat model to guide the system design and implementation process. A party seeking to find a vulnerability (a researcher, an attacker, a penetration tester) only needs to find one such vulnerability. Such a party will have a "threat model"

29

that encompasses the vulnerability or vulnerabilities they are exploring and the context in which they are exploring it (e.g., a model that includes their own resources and the attack vector they are exploring). But, for a party seeking to find a vulnerability, the "threat model" does not need to be as comprehensive and rigorous as a threat model used by designers. Likewise, to discuss a vulnerability or possible vulnerability does not require a comprehensive and rigorous threat model; rather, it would be sufficient to discuss what the vulnerability is, who might exploit it, and why one might care. In such contexts, references to a threat model, retroactively or from the point of view of assessing the prospects of a single attack, use the term in an informal sense, rather than in the systematic way necessary to designing a system according to security best practices.

93.     The term "threat modeling" is also used differently in another context. When an academic researcher in the field of computer security writes a paper describing the design of a new system, it is customary for that academic paper to contain a threat model. The rigor expected of that threat model by academic peer reviewers is significantly different than the rigor I described as part of the best practices for companies designing and implementing systems. The reason for this difference is due to a difference in goals. In general, the goal of academic researchers is to advance science and contribute new knowledge to the field; in such cases, the threat model needs to be sufficient to describe the context in which science is advanced from new discoveries. In general, an academic researcher's goal is not to contribute a product that should be secure after deployed and when used by real users. Indeed, when I was a junior academic, I learned through experience that the level of rigor for threat modeling expected for an academic publication that describes the design and/or implementation of a system—the exploration of which advances science and knowledge—is significantly less than the level of rigor for threat modeling needed for a commercial system with users.

94.     It is because of these differences in the usage of the term "threat model" that Dr. Halderman's colloquial usage of the term "threat model" in his ¶ 48 is confusing.  It is consistent with some uses of the term in some contexts.  But coming as it does shortly after his sentence in ¶ 46 that included the words "**threat modeling** to systematically…" (bold retained), it is misleading.  Apple did not construct a rigorous threat model for its App Store Process, and Dr. Halderman has neither cited one nor attempted to construct

30

his own.

## VI. Centralized Distribution through the Apple App Store Process Can Negatively Impact Users if Apps Are Vulnerable

95.     In ¶ 91 of his report, Dr. Halderman says that Apple's centralized approach "offers a way to quickly and comprehensively distribute app security updates to every iOS device where a vulnerable app is installed." The implication is that Apple's centralized approach is better than alternatives with respect to the distribution of updates to vulnerable apps. I disagree, and the evidence I reviewed supports my opinion.

96.     Consider, ¶ 184 in my first report, in which I discuss an email thread from May 2019[20]. In that email exchange, Mr. Semerda wrote (italics added):

> *I've asked App Review team over and over* to tell us what those API's are without any resolution.
>
> We rolled back our app to previous approved builds and still the same issue.
>
> *I'm lost for words atm and extremely disappointed with how the App Review team has been handling this issue.*
>
> It has impacted our company's release dates and we started to *bleed customers because we cannot ship bug fixes*.

97.     Centralized distribution creates a single point of failure, a potentially critical bottleneck that can in some circumstances actually delay response to threats; likewise for centralized app review. Any delays in the App Review process for software updates to vulnerable apps can delay the distribution of software updates to those apps. The above quote, including, "I've asked the App Review team over and over" and, "we cannot ship bug fixes," demonstrates that the App Review process has negatively impacted the time to distribute bug fixes.

98.     While Apple does offer an expedited review process[21], Apple's failure to prioritize security in other contexts as well as Apple's actions that resulted in Mr. Semerda's app "bleeding customers because we cannot ship bug fixes" leads me to conclude that Dr.

---

[20] APL-EG_04869415-22

[21]*App Review*, Apple Support,
https://developer.apple.com/distribute/app-review/#submitting-for-review (accessed June 13, 2025)

31

Halderman's assessment of Apple's role in the quick distribution of software updates for vulnerable apps is superficial and overly optimistic.

99.    Dr. Halderman should have reviewed data to determine whether Apple did, in practice, rapidly approve updates that fix vulnerabilities and allow them to be sent to customers via the Apple App Store.  He provides no evidence of having undertaken this analysis. Instead, Dr. Halderman appears to merely assume that rapid distribution of updates is a feature of Apple's centralized approach to app distribution.  Without actually analyzing the outcome, Dr. Halderman is not in a position to claim that centralized distribution is better for users than alternate approaches.

100.    On the other hand, I sought information related to Apple's expedited review. In one document,[22] I found a request, dated "07/28/2019 18:50:18," for an expedited review because, according to the expedited review request, "The dev explained that the previous version 1.0.4 had a security breaching sending the costumer's credit card information to another server. For this reason, need new version approved to remove old version for sale." The email then says that the expedited review was approved at "07/29/2019 08:01:02 PM 0000 (GMT)." Assuming that the time zones were equivalent for both dates, there was at least a 13-hour delay before the start of the expedited review, and hence longer before the app would be approved (if it is approved). During that delay, the app could still be "sending the costumer's credit card information to another server."

101.    As another example, consider a 2016 email thread that begins on "Dec 22, 2016 at 9:11 AM" with the following (italics added):[23]

Patrick is a friend and CEO of Stripe. They're working with Google on an app they're hoping to get approved before the holidays. Patrick can provide more color, but the *gist is the app is critical to closing a Google Apps vulnerability that's actively being exploited.*

The app ID is 1152066360. It's called Google Smart Lock and *is currently stuck in review. Is there anything we can do to expedite?*

102.    Of note is that the app is "critical to closing a Google app vulnerability" and that the

---

[22] APL-APPSTORE_09477352

[23] APL-EG_01466069

delay started before December 22 since, prior to the first email the app "is currently stuck in review." The reply in the thread includes the text, indicating that to review the app, Apple first had to wait for the arrival of hardware:

Our contacts at Google tell us that a package of Smart Lock keys was dropped off at Cupertino yesterday. Marcus East is apparently the reviewer. Since this is a slightly complex app (involving hardware), just want to make sure that it doesn't slip through the cracks.

103.    The last email in the thread, dated "Fri, 23 Dec 2016 02:33:44" said:

We have yet to receive the hardware and therefore cannot proceed with the review, we are working with partnership management to track it down.

104.    Thus, even at the time of the last email in the thread of the document I analyzed, Apple had not yet been able to review the app despite the app being "critical to closing a Google app vulnerability." The thread does not comment on whether there was heightened criticality for distributing this app before the December 25 holiday. Regardless of the dates, a delay for any "critical … vulnerability" would suggest that a non-centralized app review and distribution pathway could offer security advantages to users in such cases.

105.    Another document that I reviewed did not give me confidence in the objectivity of how expedited review requests are processed. In particular, in a document titled "App Review: Expedited App Review Guidelines" and dated 2018, I found the following text:[24]

When determining whether or not to grant an expedite request, consider more than just the criteria listed here. Take other factors into account. For example:

- Consider the developer's overall history.
- Is the developer a native English speaker?
- Would denying the request have negative repercussions on Apple?

As well as:

Be on the alert for notable developers who submit expedited review requests for their apps. In general, Advisors should be more receptive to accepting expedite requests from notable developers and for notable apps. Notable developers and apps include the following:

- Well-known brands, whether American or international
- Financial institutions (examples include banks, stock exchanges, and

---

[24] APL-EG_01547280

- investment firms)
  - Government agencies
  - Transportation agencies
  - Telecommunications companies or telecommunication service carriers
  - Apps with a "notable developer" or Top Popularity App badge in DJ (located in the top right corner of the app's version select page)

106. This document does not mention security or vulnerabilities. Nevertheless, to the degree that expedited reviews for security updates are handled the same way, this document suggests that priority might be given to people who are native English speakers and who are notable developers. If this means that non-native English speakers and non-notable developers are marginalized in the expedited review process, then a non-centralized app review and app distribution process could lead to better overall security for their users if it would allow them to distribute their software updates more efficiently than waiting for Apple's App Review.

107. If an app manufacturer needs to rapidly push a software update to fix a critical vulnerability, if their experiences are like some of the experiences I capture above, Apple's centralized app review and app distribution process would become the bottleneck and would prevent them from rapidly distributing the software update. Thus, in the absence of extensive data demonstrating that software updates that fix vulnerabilities are approved by Apple's app review process and sent to customers via the Apple App Store are no slower than if the app manufacturers controlled their own software update pathways and optimized for efficiency, one cannot conclude that Apple's centralized approach to app distribution is better for users than alternate approaches with respect to the distribution of software updates for vulnerable apps.

## VII. Dr. Halderman's Definition of Security Seems to Be Retrospective, Claiming as Security-Motivated what Apple had Already Chosen to Do

### A. What Dr. Halderman Considers as Security Objectives

108. In ¶ 61 of his report, Dr. Halderman writes that:

App Review reviews apps in accordance with Apple's App Review Guidelines, which include provisions that protect against many kinds of harmful apps and help safeguard users' security, privacy, and safety.[]

34

109. Attached to that sentence, he references the "App Review Guidelines" web page.[25] In the subsequent paragraphs, Dr. Halderman seeks to establish connections between the App Review Guidelines and security objectives. In articulating these security objectives, Dr. Halderman is implying elements of his definition of security for the Apple App Store. I write "elements of his definition of security" because, as established elsewhere in this report, Dr. Halderman has not produced or systematically created a rigorous threat model for the Apple App Store. Nevertheless, from what he writes, it is clear that he is articulating what he believes to be included in Apple's security objectives and hence any security definition that he might later provide.

110. In the subsequent paragraphs, Dr. Halderman makes it clear that his definition of security is broad, encompassing broad categories of apps ranging from low-quality and unreliable apps to gambling apps and pornography apps. That his definition of security builds on and references the App Review Guidelines makes it clear that his definition is retrospective, seeking to find a definition of security that encompasses and hence justifies (from a security perspective) what Apple says that the App Store provides. Here, I write "what Apple says that the App Store provides" because, later, I investigate what Apple actually provides with respect to its guidelines and the security objectives that Dr. Halderman articulates.

### 1. Apple Did Not Consistently Treat Buggy Apps As A Threat, Or Consistently Exclude Them

111. Consider, for example, Dr. Halderman's ¶ 64, which reads:

App Review also serves to screen out low-quality apps (Guideline 5.6.4), including apps that are unreliable because they crash or have obvious technical problems (Guideline 2.1).[] These checks enhance security by helping to prevent apps with exploitable vulnerabilities from entering the App Store. Software crashes are frequently a sign of memory corruption bugs, which are often severe vulnerabilities.[] More generally, modern software testing and quality assurance practices help reduce both reliability problems and vulnerabilities.[] Obvious reliability issues indicate an app has not been adequately tested and is thus at greater risk for security problems.[]

112. In the above-cited paragraph, Dr. Halderman suggests that the Apple App Review

---

[25]*App Review Guidelines*, Apple Support, https://developer.apple.com/app-store/review/guidelines/ (accessed June 13, 2025)

process rejects "low-quality apps" and "apps that are unreliable because they crash or have obvious technical problems" because such apps could have bugs that could be exploitable by an adversary. Dr. Halderman justifies App Review's screening "out of low-quality apps" because, in his words, they are a "greater risk for security problems." He appears to recognize that the low quality of an app, by itself, is not a security concern, which is a position that I agree with.  But Dr. Halderman posits that Apple's review for app quality is security-motivated because such apps are associated with vulnerabilities.  I also agree that certain quality problems such as memory corruption bugs can be exploitable vulnerabilities.

113.    However, implicit in Dr. Halderman's analysis is an assertion of intent: that buggy apps with exploitable vulnerabilities are part of Apple's threat model, and that Apple intentionally designed their App Store Process to weed out buggy apps because they might be exploitable, rather for some other reason such as user experience.

114.    Since Dr. Halderman did not cite any rigorous threat modeling document from Apple for the App Store Process, we cannot consult Apple's nonexistent App Store threat model to see whether it identifies bugs in apps as a threat vector. Nor does Dr. Halderman cite contemporaneous documents here that this was Apple's intent. I also have not found concrete evidence that Apple had, in fact, considered such buggy apps with exploitable vulnerabilities as a security threat, instead of assessing them in business and user experience terms. I do not recall having seen any documentation from Apple regarding the rejection of buggy apps because those apps could be exploitable. Hence, I conclude that this is an instance of Dr. Halderman seeking a broad, post hoc definition of security that encompasses what Apple has already said that it does.

115.    Further, if Apple had been motivated as Dr. Halderman suggests, we would have seen an App Review process consistent with trying to operate on this logic. If Apple reasoned as Dr. Halderman suggests, Apple should have adopted a more extensive bug and vulnerability finding process as part of its app review process, including extensive static and dynamic analysis of apps for reliability. Not only did I not find any evidence of extensive testing with the goal of detecting unreliable apps during my review, I observe that Dr. Halderman also did not discuss efforts focused on detecting unreliable apps in his

36

section on "Apple's App Review Process" (¶¶ 68 to 82). That Apple did not include more extensive testing for such unreliable apps is evidence that Apple did not, in fact, consider such apps as a security threat as Dr. Halderman now retrospectively suggests. It is possible, in the alternative, that Dr. Halderman is accurately describing Apple's then-reasoning and Apple did consider such apps as a security risk, but if so, it did not invest sufficient resources in mitigating that threat.

116. This second possibility (that Apple did consider buggy apps a threat vector, but did not prioritize efforts to mitigate the threat) returns to my central thesis about threat modeling: even if Apple at times had ideas about threats that could be addressed through the App Store process, its failure to catalogue the assets, threats, and mitigations at the App Store level left Apple then unable to shape their App Store process to mitigate those threats. Both then and now, because Apple did not create a threat model encompassing the App Store, Apple and Dr. Halderman are unable to make well-founded assertions about how well Apple's security works.

117. In Dr. Halderman's above-cited paragraph, he references Section 2.1 of the App Review Guidelines. I quote Section 2.1 of those guidelines below (bold retained, italics added)[26]:

**2.1 App Completeness**
(a) [] Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. Make sure your app has been tested on-device for bugs and stability before you submit it, and include demo account info (and turn on your back-end service!) if your app includes a login. If you are unable to provide a demo account due to legal or security obligations, you may include a built-in demo mode in lieu of a demo account with prior approval by Apple. Ensure the demo mode exhibits your app's full features and functionality. *We will reject incomplete app bundles and binaries that crash or exhibit obvious technical problems.*

(b) If you offer in-app purchases in your app, make sure they are complete, up-to-date, visible to the reviewer and functional. If any configured in-app purchase items cannot be found or reviewed in your app, explain the reason in your review notes.

---

[26]*App Review Guidelines*, Apple Support, https://developer.apple.com/app-store/review/guidelines/ (accessed June 13, 2025).

118. Section 2.1 of the App Review Guidelines is in Section 2, titled "Performance." Looking further back in time, a 2012 document titled "App Store Review Guidelines" lists "Apps that crash will be rejected" in its Section 2.1, which is part of its Section 2 titled, "Functionality."[27]  I additionally reviewed an Apple-internal document that appears to be written for use by Apple's app reviewers.[28] Section 2 of that document is titled "Functionality." Section 2.1 is titled, "Apps that Crash." And the "Objectives" listed in that document in Section 2.1 is "[t]o ensure a good end user experience." Section 2.2 is titled, "Apps that Exhibit Bugs." And the "Objectives" listed in Section 2.2 is "[t]o ensure a good end user experience." In both cases, there is no mention of security.

119. Another Apple document, titled "Top 10 Rejection Reasons" has a Section 2.2 titled, "Apps that exhibit bugs will be rejected."[29] That section reads (italics added):

> While a robust QA cycle is a software development best practice, it might be helpful to remember that *App Review is not a test cycle. We do not test your apps for you*; and you probably don't want your users to do that for you either. Make sure you conduct a comprehensive testing process BEFORE you submit your app. *If we notice a bug, we'll reject your app*; *if your users do*, what will they do?

120. Not only does that description not make any explicit connection to security, with words like "[a]pp review is not a test cycle," "[w]e do not test your apps for you," "[i]f we notice a bug," and "if your users do" make it clear that Apple's process described in this document was not even sufficient to confidently find bugs that users might later encounter, let alone sufficient to confidently find bugs that might be exploitable security vulnerabilities.

121. That document also has a Section 2.1 titled, "Apps that crash will be rejected."[30]  That section reads (italics added):

> *If we get a crash* while reviewing, it's a pretty good sign you didn't conduct as thorough of a QA cycle as you thought you did. *Don't rely on the App Review*

---

[27] APL-APPSTORE_02812524-25

[28] APL-APPSTORE_01996035-36

[29] APL-APPSTORE_00408974-75

[30] APL-APPSTORE_00408975

*process to find crashes and bugs in your app*. Save time - and your users' experience - by thoroughly QAing your app before you submit.

122.    As with that document's Section 2.2, that section does not make any explicit connection to security. Moreover, with words like "[i]f we get a crash" and "[d]on't rely on the App Review process to find crashes and bugs," it is clear that, here as well, Apple's process is not even sufficient to confidently find bugs, let alone bugs that might be exploitable security vulnerabilities.

123.    Hence, from the Apple documents that I cited above, I found no link between security and apps that exhibit bugs, including crashing, despite Dr. Halderman seeking to establish such a connection, providing further evidence that Dr. Halderman's efforts to establish the detection of low-quality apps as a security objective is retrospective and intended to support the App Review Guidelines that Apple had already produced.

### 2.    Apple Did Not Consistently Treat Apps With Objectionable Content as a Threat, Or Consistently Exclude Them

124.    Consider also Dr. Halderman's discussion of illicit or objectionable apps in his ¶ 26, which began:

Certain categories of illicit or objectionable apps create additional security concerns because they tend to be associated with malware distribution and other forms of online crime. For instance, an analysis by Kaspersky found that pornographic content was associated with 25.4% of malware encounters on the Android platform.[]

125.    Dr. Halderman's ¶ 26 is inside his Section II.A titled, "Users Face Many Kinds of Threats from Harmful Apps." The first sentence in the first paragraph of that section begins "'Security' has various definitions…" and the last sentence in that first paragraph is, "[a]ll these forms of harm are within the scope of security." His ¶ 18 also says, "[t]his broad notion of security is relevant to system design, because there are several distinct ways that apps can cause security harms." Consequently, it is clear that Dr. Halderman's ¶ 26 articulates what Dr. Halderman believes to be within the definition of security for the Apple App Store.

126.    Returning to Dr. Halderman's ¶ 26, Dr. Halderman includes pornography as a category identified by Apple as a security concern.  But as early as 2010, Steve Jobs indicated that

the motivation for keeping adult content off of the iPhone was *not* security related. Instead, he said, "we do believe we have a moral responsibility to keep porn off the iPhone. Folks who want porn can buy and [sic] Android phone."[31]

127.    While Jobs's own motivation appears to be ideological opposition to pornography, Dr. Halderman's ¶ 26 imposes a different motivation.  He posits a correlation between pornography and malware, one which need not be true in a future iOS environment. Recalling my earlier discussion of the use of examples in arguments, any correlation between pornography and malware on Android is simply an example instance of a correlation in a different context and does not demonstrate that there would be such a correlation in a future iOS environment, if Apple were required to support third-party app stores.

128.    Moreover, Apple's efforts in Europe already demonstrate the possibility of decoupling pornography from malware. In a January 2024 slide deck titled "Updates to Apple's App Ecosystem in the EU: Press Briefing," the speaker notes on slide 130 read (italics added):[32]

> The Notarization process is focused on platform integrity, and will check for things like *malware*. Unlike the App Store's App Review process, it does not enforce quality standards for business practices and content issues, like prohibiting *pornography*.

129.    The above speaker notes say that Notarization will check for "things like malware" but "not enforce" things like "prohibiting pornography." In short, the pornography apps that are Notarized will be ones that Apple does not assess to contain malware. Hence, Apple has already demonstrated that the correlation between malware and pornography that Dr. Halderman seeks to establish would *not* be a correlation if Apple supported third-party app stores in the US similar to how they support third-party app stores in Europe, with notarization. Hence, Dr. Halderman's blanket inclusion of objectionable apps, and hence

---

[31]Brian Chen, *Want Porn? Buy an Android Phone, Steve Jobs Says*, Wired (Apr. 20, 2010), https://web.archive.org/web/20140331063405/https://www.wired.com/2010/04/steve-jobs-porn/ (accessed June 13, 2025)

[32] APL-APPSTORE_10888458

pornography apps, as a security concern is excessively broad and overreaching.

130. Returning to a consideration of the Apple App Store as it operates today in the United States, the lessons from Europe are telling. To the degree that Apple's App review process is effective at rejecting apps with malware, Apple could, even for today's App Store in the United States, reject pornography apps that contain malware and allow non-malware pornography apps into the Apple App Store. Thus, the correlation between pornographic apps and malware that Dr. Halderman seeks to establish is unfounded even in the context of today's Apple App Store in the United States.

131. Moreover, within the computer security research community, there are researchers who explicitly do not consider pornography a security risk. Rather, there are security researchers who seek to provide better security for people wishing to engage in digital intimacy, including sex work and pornography. Consider, for example, an article titled "Safer Digital Intimacy for Sex Workers and Beyond: A Technical Research Agenda" and published in the IEEE Security and Privacy magazine.[33] The abstract for that article is:

Digital intimacy, engaged in by sex workers, clients, and others who share intimate content recreationally, has significant security and privacy risks, exacerbated by stigma. We present a commercial digital intimacy threat model and 10 research directions for safer digital intimacy.

132. Any characterization of pornography *per se* as a security risk unto itself would be inconsistent with the research agenda established in this IEEE Security and Privacy publication.

### 3. Summary

133. Above, I provide evidence that Dr. Halderman sought to classify broad categories of apps as security concerns without evidence (1) that they would in fact be security concerns if Apple were to allow third-party app stores or (2) that Apple actually considered them as security concerns. The existence of counterexamples to Dr. Halderman's definition of

---

[33]Vaugh Hamilton et al., *Safer Digital Intimacy for Sex Workers and Beyond: A Technical Research Agenda*, IEEE Security & Privacy, vol. 22, no. 02, pp. 17-28, (Mar.-Apr. 2024), https://www.cs.umd.edu/~kaptchuk/publications/sw-threat-modeling.pdf (accessed June 13, 2025)

security calls into question the validity of his definition as a whole and, hence, calls into question any claims that Dr. Halderman would make with respect to his definition.

134. Further, a lack of rigorous threat modeling here has created a situation where Apple's expert appears to be attempting to reconstruct Apple's security reasoning and practices over the entire life of the App Store from the vantage point of the present. This has, in my opinion, led Dr. Halderman astray in applying such a broad and encompassing "definition" of security. Dr. Halderman now recasts as security decisions many things Apple has done in the past which readily suggest, or were even contemporaneously explained as non-security business steps, such as the exclusion of pornography. Dr. Halderman makes such assertions, even where he is unable to present contemporaneous evidence of that reasoning. This further underscores the absence of a formal threat modeling process, and hence a formal threat modeling document, for the Apple App Store Process. A threat model for the App Store Process, updated at intervals, would allow us to (1) say with confidence what Apple considered a threat at the time; and (2) assess how effectively Apple mitigated that threat.

135. The absence of this thinking and documentation leaves Dr. Halderman to construct his own definition of security, doubtlessly informed by 20/20 hindsight: everything Apple excluded from the App Store can, years later, potentially be deemed a security threat, and in the absence of contemporaneous documents, reasons can be supplied for those decisions that make sense to Dr. Halderman now, whether they were in the minds of Apple personnel years ago or not. Further, as noted above in the context of Apple's lack of extensive efforts within app review to detect unreliable apps, even if Dr. Halderman can articulate a plausible explanation for how a security threat makes sense now, he would not be able to claim that Apple actually considered and intentionally mitigated that threat unless at least (1) Apple has documentation articulating the consideration of that threat during the system's design process, (2) Apple has demonstrated intentional and comprehensive efforts to mitigate that threat, and (3) Apple has evaluated the efficacy of its mitigations and addressed any shortcomings. Without being able to demonstrate (1), (2), and (3), any effort that Dr. Halderman claims addresses that security threat would be best characterized as ad hoc and piecemeal, undercutting any claim that it actually mitigates that threat.

42

### B. The Apple App Store Contains Apps that Violate Dr. Halderman's "Definition" of Security

136. In considering Dr. Halderman's definition of security to include those apps with dangerous, illicit or objectionable content, I find that Dr. Halderman's definition appears to be backward conforming to what Apple now says that it does rather than a contemporaneous policy enforced through the App Store's history. I find this because of the manifest inconsistency between what Dr. Halderman now claims and Apple's historical decisions about which apps are permitted on the app store.

137. Beyond Dr. Halderman's recasting of buggy apps or those with adult content as security threats, he also posits that a broad array of potential harms were considered as security threats by Apple and faced exclusion from the App Store as a mitigation. In ¶ 25, he writes (bold and underscore retained):

> **<u>Dangerous, Illicit, or Objectionable Content</u>.** Apps can also be harmful when their content or functionality is dangerous, objectionable, or inappropriate. For instance, apps can physically endanger their users by promoting self-harm, such as suicide or eating disorders, by encouraging high-risk behaviors such as drunk driving or illicit drug sales, or by facilitating human trafficking or child exploitation.[] Apps can also cause psychological harm, for instance by exposing users to content that is shocking, violent, or offensive, by failing to prevent harassment or cyberbullying, or by targeting children with age-inappropriate content.

138. If Dr. Halderman is correct in describing what Apple considered a security objective at the time, we would then expect two things. First, Apple would have, and Dr. Halderman would be able to cite, contemporaneous documents describing and applying this definition. Second, Apple's decisions as to which apps to permit in the App Store would be consistent with this definition.

139. As to the first, I note that Dr. Halderman has cited few contemporaneous internal documents overall, and few or none that reference the decision to bar apps from the store based on offensive or harmful content as security decisions.

140. As to Apple's actual app selection decisions, I am able to observe a large array of apps that would have been excluded from the App Store under Dr. Halderman's definition, but were not.

141.    I pause here to note that I offer no opinion on whether the apps I discuss should or should not be offered in Apple's or any app store.  My analysis is whether Apple's decisions were or were not consistent with what Dr. Halderman now seems to posit, that decisions about dangerous or objectionable content were considered security decisions by Apple, resulting in a rigorous process of exclusion of apps with content of that kind.

142.    Consider, for example, game apps. If Apple intended to disallow apps that "can physically endanger their users," they could have excluded apps that raised particular risks to players' physical wellbeing.   Pokémon Go raises such issues, but it has been and remains on the App Store. An academic paper titled "Death by Pokémon GO: The Economic and Human Cost of Using Apps While Driving," highlights that Pokémon Go can physically endanger users. The abstract of that paper begins as follows[34]:

> Using police accident reports for Tippecanoe County, Indiana, and exploiting the introduction of the augmented reality game Pokémon GO as a natural experiment, we document a disproportionate increase in crashes and associated vehicular damage, injuries, and fatalities in the vicinity of locations where users can play the game while driving.

143.    The "disproportionate increase in crashes and … where users can play the game" suggests that Pokémon Go "can physically endanger their users." That Pokémon Go can lead to physical harms to users is well-known enough that there exists a "Pokémon Go Death Tracker" web page[35]. Pokémon Go has been in the Apple App Store since 2016.[36]

144.    Further, Apple offers a large selection of mobile phone games including what are sometimes called "casual games" in the App Store.  Mobile phone games are also known to harm users by fostering addiction. As background, a 2012 academic paper titled "Online gaming addiction in children and adolescents: A review of empirical research" and published in the Journal of Behavioral Addictions discusses online game addiction in

---

[34]Mara Faccio and John J. McConnell, *Death by Pokemon GO: The Economic and Human Cost of Using Apps While Driving*, SSRN (Feb. 2, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3073723 (accessed June 13, 2025)

[35] https://pokemongodeathtracker.com/ (accessed June 13, 2025)

[36]Jason Wilson, *Pokemon Go launches in U.S. on iOS and Android*, GamesBeat (July 6, 2016), https://venturebeat.com/games/pokemon-go-launches-worldwide-on-ios-and-android/ (accessed June 13, 2025)

general, underscoring that the addictiveness of online games has been known for years.[37]

The "Background and aims" section of the abstract says:

> Research suggests that excessive online gaming may lead to symptoms commonly experienced by substance addicts. Since games are particularly appealing to children and adolescents, these individuals may be more at risk than other groups of developing gaming addiction.

145.    Regarding the harms with online gaming, the above-cited research paper adds:

> This is an important finding as it appears to show that online gaming addiction appears to be a genuine health problem for youth. Furthermore, this is emphasized by the deleterious effect that online gaming addiction has on adolescent health, including anxiety, psychosomatic, psychosocial and academic problems, and suicidal ideation.

146.    Given the potential dire health consequences of online gaming addiction, if Apple truly intended all along to treat the protection of users from dangerous content as a security issue, as articulated in Dr. Halderman's ¶ 25, I would have expected Apple to explicitly consider and exclude—or at a minimum carefully evaluate—addictive apps, including addictive games, from the Apple App Store. But, in reviewing Apple's "App Review Guidelines,"[38] I see no mention of the words "addictive" or "addict."

147.    Moreover, it is known that addictive games are included in the Apple App Store. Consider, for example, the paper titled "Are you addicted to Candy Crush Saga? An exploratory study linking psychological factors to mobile social game addiction" which was published in 2016 in the Telematics and Informatics journal and which found, according to their abstract, that "7.3% of the participants in the study sample were considered addicts."[39] Another paper, titled "The Candy Crush Sweet Tooth: How 'Near-misses' in Candy Crush Increase Frustration, and the Urge to Continue Gameplay" and

---

[37]Daria J. Kuss and Mark D. Griffiths, *Online gaming addition in children and adolescents: A review of empirical research*, Journal of Behavioral Addictions (Mar. 1, 2012), https://akjournals.com/view/journals/2006/1/1/article-p3.xml (accessed June 13, 2025)

[38]*App Review Guidelines*, Apple Support, https://developer.apple.com/app-store/review/guidelines/ (accessed June 13, 2025)

[39]Cheng Chen and Louis Leung, *Are you addicted to Candy Crush Saga? An exploratory study linking psychological factors to mobile social game addiction*, Telematics and Informatics, Volume 33, Issue 4, Pages 1155-1166 (Nov. 2016), https://www.sciencedirect.com/science/article/abs/pii/S073658531500132X (accessed June 13, 2025)

published in the Journal of Gambling Studies in 2016, studies the relationship between addictive behaviors in Candy Crush and gambling. The paper references prior speculation on the relationship between Candy Crush addiction and gambling when it wrote, "Several speculations comparing the structural similarities of Candy Crush and slot machines have been made in attempt to explain why Candy Crush has such an 'addictive' quality (see Smith 2014; Gardner 2014)."[40] Candy Crush Saga launched on iOS in 2012.[41]

### 1. Apple Failed to Exclude Apps That Fostered Human Trafficking and Child Exploitation

148. If Apple considered potentially dangerous content or exploitive contacts as a security issue, as Dr. Halderman says, we would also expect Apple to have a history of carefully considering social media apps, which pose exactly these concerns. Sadly, mainstream social media apps are a major forum for many harmful or exploitive contacts.

149. If Apple truly cared about disallowing apps that facilitate "human trafficking or child exploitation," for example, then it would have evaluated and possibly disallowed many if not all of the most popular social media apps. Consider, for example, a document titled "Tik Tok, Snapchat, and other apps predators are using to exploit children" and made available on the U.S. Department of Defense (DoD) Combating Trafficking in Persons (CTIP) website.[42] That document says, "[b]ut increasingly, predators are lurking online, prying into your child's phone."

150. It continues:

---

[40]Chanel J. Larche, et al., *The Candy Crush Sweet Tooth: How 'Near-misses' in Candy Crush Increase Frustration, and the Urge to Continue Gameplay*, Journal of Gambling Studies, vol. 33, pp. 599-615 (July 20, 2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC5445157/pdf/10899_2016_Article_9633.pdf (accessed June 13, 2025)

[41]*King.com launches mobile game as part of strategy shift*, VentureBeat (Oct. 30, 2012), https://venturebeat.com/mobile/king-com-launches-mobile-game-as-part-of-strategy-shift/ (accessed June 13, 2025)

[42]Emma Goss, *Tik Tok, Snapchat, and other apps predators are using to exploit children*, Department of Defense – Combating Trafficking in Persons Program Management Office (Jan. 31, 2020),

https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-card-9-assets/SocialMediaApps.pdf (accessed June 13, 2025)

"We're seeing it on Instagram, all over the place," Look said. "Tik Tok. There's over 20 apps that our kids use that most parents don't even know about. That's how they meet people, and set up their dates. And it starts from there," she said.

151.    In an October 2021 document titled "Parent Resource Guide" and published by the U.S. Department of Defense Combating Trafficking in Persons program, "Action Card #9: Trafficking and the Internet" begins with the following text (italics preserved):[43]

The National Human Trafficking Hotline has received thousands of reports of trafficking on *mainstream* social media platforms including, but not limited to, Facebook, Instagram, Snapchat, Twitter, Kik, Meetme.com, Tiktok, WhatsApp; dating sites/apps like Plenty of Fish, Tinder, and Grindr; gaming sites such as Fortnite, Minecraft, and Discord; and websites like Craigslist. Traffickers are using these sites to recruit unsuspecting children and teens, but they are also using these sites to sell minors.

152.    This document makes it clear that "*mainstream* social media platforms" are used by traffickers to exploit children. Facebook has been available on iOS since at least 2012.[44] Instagram became available for iOS in 2010.[45] Initially named Picaboo, Snapchat became available on iOS in 2011.[46]

153.    We might also expect that if, as Dr. Halderman says, Apple had a policy of excluding apps that fostered exploitive contacts, there would be some universe of more harmful social media, that was available only in third-party app stores but was banned by the Apple App Store. But my review of the U.S. DoD's top concerns found that it lists no such apps. It is the mainstream apps available through first-party marketplaces, not more obscure apps found only in third-party marketplaces, that are of the greatest concern.

154.    It is perhaps understandable that some of the world's most popular social media

---

[43]*Parent Resource Guide to Student Guide to Preventing Human Trafficking*, Department of Defense – Combating Trafficking in Persons Program Management Office (Oct. 2021), https://ctip.defense.gov/Portals/12/Parent%20Resource%20Guide_FINAL_update%202025.pdf (accessed June 13, 2025)

[44]Sergio De Simone, *The Ten Year Journey of Facebooks App for iOS*, InfoQ (Feb. 8, 2023), https://www.infoq.com/news/2023/02/Facebook-app-ten-years/ (accessed June 13, 2025)

[45]*The complete history of Instagram*, Buzz Voice (Dec. 22, 2020), https://buzzvoice.com/blog/the-complete-history-of-instagram/ (accessed June 13, 2025)

[46]Sidney Bill, *The History of Snapchat*, thinglabs (Nov. 15, 2014),

https://thinglabs.io/the-history-yof-snapchat (accessed June 13, 2025)

applications are too large for Apple to exclude, as a business matter. But if Dr. Halderman was correct in asserting that Apple does and always has treated apps that can facilitate human trafficking and child exploitation as a security threat worth protecting users from, then it is disingenuous to any claims of protecting users if Apple were to uphold those security objectives only when doing so does not infringe on other business objectives—e.g., to uphold the security objective for niche apps but not for the most popular apps with many users (and hence, also, many potential victims).

155. The U.S. Department of Defense Combating Trafficking in Persons website also hosts another document, titled "This $1 Billion App Can't 'Kik' Its Huge Child Exploitation Problem."[47] The article includes the text (italics preserved):

> A joint *Forbes* and *Point Report* investigation has uncovered evidence of a vast number of child exploitation cases involving the use of Kik, where some of the most appalling material is being shared and young girls and boys are being targeted for grooming.

156. At the time of this writing, I found Kik available on the Apple App Store. Kik became available on iOS in or before 2010.[48]

157. There are other apps that Apple would disallow if it truly sought to eliminate apps that facilitate "human trafficking or child exploitation" from the Apple App Store. Consider, for example, the following paragraph in the May 2025 issue of the "Quarterly CTIP Newsletter," published by the U.S. Department of Defense Combatting Trafficking in Persons Program Office (italics added)[49]:

> SA Miller explained how predators use a wide range of platforms including social media, *online games, video hosting sites, and virtual reality spaces* to groom and exploit minors. He identified popular apps parents should be aware of, such as

---

[47]Thomas Brewster, *This $1 Billion App Can't 'Kik' Its Huge Child Exploitation Problem*, Department of Defense – Combating Trafficking in Persons Program Management Office, https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-card-9-assets/KikMessenger.pdf (accessed June 13, 2025)

[48]*Kik the New Instant Messenger*, Black PR Wire (Dec. 18, 2010), https://blackprwire.com/press-releases/2946-bprw_kik_the_new_instant_messenger (accessed June 13, 2025)

[49]*Quarterly CTIP Newsletter*, Department of Defense – Combating Trafficking in Persons Program Management Office, vol. 2 (May 2025), https://ctip.defense.gov/Portals/12/Newsletters/May%202025%20Newsletter_Final.pdf (accessed June 13, 2025)

Instagram, Snapchat, Tumblr, Yubo (formerly Yellow), Kik Messenger, Threads, WhatsApp, Omegle, Tinder, and Telegram where predators often operate. While some platforms like Snapchat claim to delete content quickly or automatically, predators can easily capture and misuse content by using secondary devices to take pictures and videos. *Gaming platforms* like Discord and Twitch were also highlighted as emerging spaces where groomers seek to connect with children.

158. This document thus lists online games, video hosting sites, and virtual reality spaces as examples of technologies that predators use beyond social media apps.

159. As a concrete example of a non-social media app that has facilitated child exploitation, consider a document made available on the U.S. Department of Defense Combating Trafficking in Persons website.[50] That 2020 document, titled "Police warn sexual predators use this app to target kids," describes a "3-D virtual reality app" named "Avakin Life." At the time of this writing, I found the app Avakin Life: 3D Avatar Creator available in the Apple App Store.

160. A New York Times article in December 2024[51] revealed numerous apps where users offered paid access to live video of child sexual abuse. Again, I contextualize this discussion in Dr. Halderman's claims. In his ¶ 25, he posits that Apple's idea of security encompassed a broad array of content, including apps with pornography or other potentially offensive content, and which also included certain harms, such as human trafficking and self-harm. If Dr. Halderman's opinion correctly reflects Apple's then-thinking about security, we would expect (1) that Apple would have documented these concerns as security concerns, either in a threat model or at least in informal contemporaneous documents; and (2) that Apple's behavior in App Review would be consistent with viewing these apps as a security threat. Dr. Halderman fails to identify any such evidence. To the contrary, the news reports of apps fostering child sexual abuse are manifestly inconsistent with any real attempt by Apple to mitigate this kind of app

---

[50]Michelle Bandur, Police warn sexual predators use this app to target kids, Department of Defense – Combating Trafficking in Persons Program Management Office (Jan. 14, 2020), https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-card-9-assets/PoliceWarnAvakinLife.pdf (accessed June 13, 2025)

[51]Michael Keller, *On These Apps, the Dark Promise of Mothers Sexually Abusing Children*, The New York Times (Dec. 7, 2024), https://www.nytimes.com/2024/12/07/us/child-abuse-apple-google-apps.html (accessed June 13, 2025)

content.

161.  The New York Times article singles out Bigo Live, a livestreaming app, but also indicates that there were numerous similar apps where reporters could easily determine that child sexual abuse was offered by users. For example: "The Apple App Store's search recommendations also helped The Times surface some of the apps advertising children by suggesting sexual terms such as 'x.x.x live.'"  The article also says that Apple took down an "additional 20" apps "after an internal investigation in response to The Times's findings," meaning that there were at least that many apps of this nature in the Apple App Store prior to The Times's findings.

162.  Dr. Halderman states that the exclusion of pornography apps was for reasons of security, though Steve Jobs clearly said it was ideological. Whereas pornography can and often does refer to content created consensually,[52] the examples above are of *non-consensual* sexual content.  The apps the New York Times found indicate a tacit abandonment of a bar on apps that facilitate the exchange of *non-consensual* sexual content, at least when taking the form of live chat or video streaming.  This is inconsistent with Dr. Halderman's assertion that Apple viewed these apps as security threats.

163.  Worse, the presence of apps where reporters easily determined that the user-generated content was rife with child sexual exploitation shows that Apple had little to no meaningful commitment to remove apps that fostered serious harms to users.  Because Apple did not remove apps that encouraged the sexual exploitation of children, the underlying reality of the App Store Process is manifestly inconsistent with Dr. Halderman's assertion that Apple designed to and did screen out apps that meet the definitions of potential harm he sets forth in ¶ 25.

164.  Furthermore, Apple has, internally, acknowledged that addressing "Child predator grooming" is a concern both with respect to the App Store and their own iMessage application. Consider the following image shared in a 2020 chat between two Apple

---

[52]Miranda Wei et al., *"We're utterly ill-prepared to deal with something like this": Teachers' Perspective on Student Generation of Synthetic Nonconsensual Explicit Imagery* (2025), https://dl.acm.org/doi/pdf/10.1145/3706598.3713226 (accessed June 13, 2025)

employees:[53]



165.  That Apple identifies "Child predator grooming" as "under-resourced" both for the App Store and Apple's own iMessage application calls into question any claim that Apple might make with respect to the efficacy of Apple and its App Store at mitigating the risk of child exploitation. While possibly referring to a different product from Apple, the following message from Eric Friedman, also in that message thread, further emphasizes the inefficacy of Apple's approach for combatting child exploitation:

Which is why we are the greatest platform for distributing child porn, etc.

166.  Friedman elaborates in a sequence of three subsequent messages, making it clear that not only does he know that there are unsafe social media integrations on their platforms, but that Apple has "chosen to not know" more:

But -- and here's the key -- we have chosen to not know in enough places where we really cannot say.

The NYTimes published a bar graph showing how companies are doing in this area. We are on it, but I think it's an underreport.

Also, we KNOW that developers on our platform are running social media integrations that are inherently unsafe. We can do things in our ecosystem to help

---

[53] APL-APPSTORE_09884199

with that. For example "ask to chat" is a feature we could require developers to adopt and use for U13 accounts.

### 2.     Evidence Does Not Show That Apple Regarded Social Media Apps As Security Risks, Though They Meet Dr. Halderman's Criteria

167.    Social media apps can also violate Dr. Halderman's proffered definition of security if they can cause "psychological harm."  However, this concern likewise implicates a number of the most popular social media apps.  Dr. Halderman offers no evidence that the propensity of these apps to foster those consequences was treated as a security consideration within Apple in the past.

168.    Instagram, which is currently available on the Apple App Store and has been available for years, is an example of "Apps can also cause psychological harm." Consider, for example, a 2021 The *Wall Street Journal* article titled, "Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show."[54] The subtitle of this article is "Its own in-depth research shows a significant teen mental-health issue that Facebook plays down in public." For context, Facebook owns Instagram. The following paragraphs are from that article:

For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.

"We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.

"Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."

Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

169.    The article also adds that:

---

[54]Georgia Wells et al., Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show, The Wall Street Journal (Sept. 14, 2021), https://www.wsj.com/tech/personal-tech/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739 (accessed June 13, 2025)

Teen boys aren't immune. In the deep dive Facebook's researchers conducted into mental health in 2019, they found that 14% of boys in the U.S. said Instagram made them feel worse about themselves. In their report on body image in 2020, Facebook's researchers found that 40% of teen boys experience negative social comparison.

170. In other words, Facebook's own research identifies negative psychological impacts that teenagers—both girls and boys—attribute to Instagram, ranging from body image issues to anxiety and depression to suicidal thoughts. Thus, Instagram falls into Dr. Halderman's definition of "Dangerous, Illicit, or Objectionable Content" not just because of its use in human trafficking and child exploitation but because of the associated psychological harms.

171. Additionally, a 2022 article in the International Journal of Mental Health Nursing titled "Assessing the impact of Instagram use and deliberate self-harm in adolescents: A scoping review" begins its abstract with the sentence "The use of Instagram by adolescents to access deliberate self-harm content is a growing concern among scholars, mental health professionals and families, with many adolescents (10–19-year-olds) imitating offline what they have seen online."[55] The abstract also includes the text "Thematic analysis indicated that there was a relationship between time spent on Instagram and deliberate self-harm; desensitization of deliberate self-harm resulting in normalization; social contagion and that Instagram provided a sense of belonging to its users who engaged in deliberate self-harm." Thus, it would be reasonable to conclude that Instagram additionally meets the "promoting self-harm" component of Dr. Halderman's "Dangerous, Illicit, or Objectionable Content" definition.

172. The U.S. website stopbullying.gov, on a page titled "What is Cyberbullying," has the following text followed by additional bullets:[56]

The most common places where cyberbullying occurs are:
- Social Media, such as Facebook, Instagram, Snapchat, and Tik Tok

---

[55]Carla Moss et al., *Assessing the impact of Instagram use and deliberate self-harm in adolescents:  A scoping review*, International Journal of Mental Health Nursing, Volume 32, Issue 1, pp. 14-29 (Aug. 22, 2022), https://onlinelibrary.wiley.com/doi/abs/10.1111/inm.13055 (accessed June 13, 2025)

[56]*What Is Cyberbullying*, Stop Bullying (Oct. 7, 2014), https://www.stopbullying.gov/cyberbullying/what-is-it (accessed June 13, 2025)

173. At the time of this writing, all four apps are available on the Apple App Store. According to the U.S government stopbullying.gov web page and Halderman's definition of security, Instagram should also be excluded from the Apple App Store because of its role in "failing to prevent harassment or cyberbullying." This would be in addition to Instagram's role in "facilitating human trafficking or child exploitation," "psychological harm," and "promoting self-harm" through its content. Thus, Instagram remains available in the Apple App Store despite at least *four* clear violations of Halderman's definition.

174. Dr. Halderman offers no contemporaneous evidence that the dangers posed by social media apps such as Instagram – human trafficking or child exploitation, psychological harm, promoting self-harm, and cyberbullying – were considered by Apple as part of what he claims was its broad definition of security.

175. Additionally, at least in the past, the Snapchat app satisfied Dr. Halderman's definition of "Dangerous, Illicit, or Objectionable Content" as a category of security threat, because it encouraged high risk behavior. Consider, for example, a 2021 Car and Driver article that begins with the following three bullets:[57]

- Snap, Inc., introduced a speed filter in 2013 as a way for users to document how fast they were driving when a particular video was taken.

- In the following years, numerous fatal crashes involved the speed filter in some way, leading to a gamification of driving by some young Snapchat users.

- In May, the Ninth Circuit Court ruled that parents of young men who died in a crash where a speed filter was used right before impact could sue Snap, Inc. This month, the feature was removed.

176. The dangerous "gamification of driving by some young Snapchat users" that resulted in "numerous fatal crashes" is an example of an app feature "encouraging high-risk behaviors." However, Dr. Halderman offers no contemporaneous evidence that Apple excluded Snapchat or even considered its content as a security issue.

177. In summary, while Dr. Halderman offers an expanded definition of security whereby

---

[57]Sebastian Blanco, *Snapchat Removes Speed Filter Blamed for Numerous High-Speed Crashes*, Car and Driver (June 20, 2021), https://www.caranddriver.com/news/a36777379/snapchat-removes-speed-filter-crashes/ (accessed June 13, 2025)

apps with potentially offensive or harmful content are security threats, the defense against which are security objectives, there is little evidence that Apple actually subscribed to or applied this definition in years past. Because Dr. Halderman offers scant support for the idea that Apple has consistently viewed app content as a security issue, and because Apple's decisions show no sign of taking the approach Dr. Halderman suggests, there is my opinion that Dr. Halderman's inclusion of app content in his security definition is an effort at rewriting history.

178. If we take the inclusion of potentially offensive or harmful app content as a security issue at face value, however, there is no reason to believe that this is a competitive advantage for Apple. Taking Dr. Halderman's definition as granted, evidence shows that Apple has been at best partial and inconsistent in screening apps for the sort of content Dr. Halderman suggests it does. An alternate app store could make different decisions that result in greater security protections for users. For example, an alternate app store could disallow the apps identified by the U.S. Department of Defense Combating Trafficking in Persons program as being key contributors to child exploitation. If Apple supported alternate app stores, and if a parent had the ability to restrict their child's device to an alternate app store like I describe above, then that parent may be able to protect their child from the apps that, per the above discussion, Apple fails to protect against.

## VIII. Dr. Halderman's Analysis Extensively References Apple's Public-Facing Materials and Apple Testimony, Not Apple-Internal Documents

179. In my analysis of Dr. Halderman's report, I found repeated instances of Dr. Halderman taking statements from Apple at face value without independently assessing for himself whether those statements were correct. As Apple's independent security expert, I would have expected him to study non-public materials from Apple and make independent assessments of the correctness of any claims made by Apple.

180. Consider, for example, Dr. Halderman's ¶ 95, which begins (italics added):

For example, in 2015, *many app developers fell victim to a software supply-chain attack carried out using a Trojan called XcodeGhost that posed as Apple's Xcode compiler.*[] When the Trojan compiler was used to build and sign apps, it added hidden malicious functionality without the developer's knowledge. The attack reportedly affected over 4,000 apps.[] *Apple responded by removing the infected*

55

*apps from the App Store and developing additional malware scanning tools that are now part of App Review*.[]

181. Dr. Halderman, in his discussion in ¶ 95, only cites public documentation or testimony from Apple. Referencing these public documents and Apple testimony, Dr. Halderman speaks positively of Apple when he writes, "Apple responded by removing the infected apps from the App Store and developing additional malware scanning tools." In citing only these public sources and Apple testimony, Dr. Halderman seems to not have investigated Apple's internal response to XcodeGhost. According to Apple-internal documents, I found that the technology from an external company, SourceDNA, would have flagged XcodeGhost (my ¶ 208 in my opening report) and that Apple acquired SourceDNA afterwards (my ¶ 209) and that SourceDNA had better technology or skills than Apple (my ¶ 210).

182. Several sections of Dr. Halderman's report are heavily reliant on Apple's public pronouncements.  Notably, the entire section titled "App Review," his ¶¶s 53 to 67, rely almost entirely on public information, including significant references to Apple's public-facing materials, and Apple testimony. As an example of the disconnect between Dr. Halderman's report and Apple's internal discussions, policies, and practices, Dr. Halderman initiates a discussion of large language models (LLMs) as part of an app review process. ¶ 58. The discussion is long enough to imply, to a casual reader, that Apple uses LLMs as part of app review. However, upon closer reading, it is clear that Dr. Halderman does not actually say that Apple's App Review uses LLMs.  Nor is there a discussion of LLMs in the App Review process in any of the materials Dr. Halderman lists in his Materials Relied Upon section.

183. Likewise, Dr. Halderman's section titled "Centralized Distribution Through the App Store," his ¶¶ 83 to 91, and his section titled "On-Device Protections," his ¶¶ 92 to 104, reference only public information, including significant references to Apple's public-facing materials, and Apple testimony. His section titled "Securing iOS Against 'Jailbreaking' Protects Vulnerable Users," his ¶¶ 105 to 111, also references only public-facing materials. Although Dr. Halderman's section "Apple's App Review Process," ¶¶ 68 to 82, does reference some Apple-internal documents, it mostly relies on testimony from Apple and Apple's public-facing materials. For example, in the discussion related to

56

APIs from ¶¶ 72, 73, and 74, Dr. Halderman does not reference any Apple-internal documents, though he references Apple testimony extensively; likewise for other discussions in this section.

184.    In contrast, I extensively analyzed Apple-internal materials. Dr. Halderman's failure to consider Apple's internal materials leaves him prone to accept Apple's self-serving characterizations. Dr. Halderman's reliance on Apple's public-facing materials and after-the-fact testimony leads him to form opinions predominantly aligned with Apple's business interests. Consider, for example, his ¶ 57, which includes the text:

> The participation of human experts makes App Review more robust, including to new forms of attack and attempts to subvert the automated computer analysis. This is demonstrated by the fact that Apple's human reviewers have been able to catch issues that computer analysis did not, including threats that the automated computer tools have not encountered before and fail to recognize. Involving human reviewers in every approval also enables the application of judgment and contextual awareness that would be very difficult to automate securely and reliably.

185.    Assuming that human experts *could* do what Dr. Halderman describes, having not referenced any Apple-internal documents in this section ("App Review") at all, Dr. Halderman has not established that Apple's human reviewers are experts. In my Opening Report, supported by Apple's own contemporaneous internal documents, I instead found that Apple's human review process was chronically undertrained, underfunded, and overworked. Further, Dr. Halderman has not established that Apple's human reviewers are routinely and regularly doing all that he describes, which is what he seems to be implying. Again, from an analysis of Apple's internal documents, I have found Apple say internally "[w]e are making critical errors" (my ¶ 129) among the other concerns that I discuss in my first report.

Respectfully Submitted,

Tadayoshi Kohno

----------------------------------------------------

Tadayoshi Kohno, Ph.D.

57

# TADAYOSHI KOHNO — CURRICULUM VITAE

Paul G. Allen School of Computer Science & Engineering
University of Washington
101 Paul G. Allen Center
Seattle, WA 98195-2350, USA

Phone: (206) 491-8778
Fax: (206) 616-3804
E-mail: yoshi@cs.washington.edu
URL: http://www.cs.washington.edu/homes/yoshi/

## APPOINTMENTS

- Associate Dean for Faculty Success, College of Engineering, University of Washington, 2024–Present.
- Associate Director for Diversity, Equity, Inclusion, and Access, Paul G. Allen School of Computer Science & Engineering, University of Washington, 2020–2023.
- Professor, Department of Computer Science & Engineering, University of Washington, September 2016–Present. (The Department of Computer Science & Engineering is now called the Paul G. Allen School for Computer Science & Engineering.)
- Adjunct Professor, School of Law, University of Washington, September 2020–Present.
- Adjunct Professor, Department of Electrical Engineering, University of Washington, September 2016–Present. (The Department of Electrical Engineering is now called the Department of Electrical & Computer Engineering.)
- Adjunct Professor, Information School, University of Washington, September 2016–Present.
- Short-Dooley Endowed Career Development Professor, Department of Computer Science & Engineering, University of Washington, July 2014–2017.
- Associate Professor, Department of Computer Science & Engineering, University of Washington, September 2011–September 2016.
- Adjunct Associate Professor, Department of Electrical Engineering, University of Washington, February 2016–September 2016.
- Adjunct Associate Professor, Information School, University of Washington, September 2011–September 2016.
- Assistant Professor, Department of Computer Science & Engineering, University of Washington, July 2006–September 2011.
- Visiting Researcher (on sabbatical), Microsoft Research, Microsoft, January 2014–November 2014.
- Cryptographer, Software Security Group, Cigital, January 2000–June 2001.
- Cryptographer, Counterpane Systems, May 1999–January 2000.

## EDUCATION

- Ph.D. in Computer Science, University of California at San Diego, June 2006.
  Advisor: Professor Mihir Bellare.
- M.S. in Computer Science, University of California at San Diego, December 2004.
  Advisor: Professor Mihir Bellare.
- B.S. in Computer Science, University of Colorado at Boulder, May 1999.
  Advisors: Professors Harold N. Gabow and Evi Nemeth.

## SELECTED AWARDS AND HONORS

### Fellowship, innovator, other awards

- Fellow, Institute of Electrical and Electronics Engineers (IEEE), 2023.
- United States Air Force Commander's Public Service Award, 2020.
- Short-Dooley Endowed Career Development Professorship, 2014.
- Member, Defense Science Study Group (DSSG), 2014.
- Senior Member, Institute of Electrical and Electronics Engineers (IEEE), 2012.
- National Science Foundation CAREER Award, 2009.
- Alfred P. Sloan Research Fellowship, 2008.
- Technology Review TR35 Young Innovator Award, 2007.
- IBM Ph.D. Fellowship, 2004.
- National Defense Science and Engineering Graduate Fellowship, 2001.
- Cal IT Fellowship, University of California at San Diego, 2001. Declined in favor of the above fellowship.
- National Science Foundation Graduate Fellowship Honorable Mention, 2001.

### Major research awards

- Honorable Mention, 2024, 12th Annual Best Scientific Cybersecurity Paper Competition, for my 2023 paper [150]; awarded by the U.S. National Security Agency (NSA).
- Test of Time Award, 2023, USENIX Networked Systems Design and Implementation, for my 2012 paper [65].
- Honorable Mention, 2023, 10th Annual Best Scientific Cybersecurity Paper Competition, for my 2021 paper [126]; awarded by the U.S. National Security Agency (NSA).
- American Association for the Advancement of Science (AAAS) Golden Goose Award, 2021. Co-recipient with Stephen Checkoway, Karl Koscher, and Stefan Savage for our 2010 and 2011 automotive security research [52, 62].
- Test of Time Award, 2020 IEEE Symposium on Security and Privacy, for my 2010 paper [52].
- Test of Time Award (Inaugural Year), 2019 Annual Computer Security Applications Conference (ACSAC), for my 2000 paper [4].
- Test of Time Award (Inaugural Year), 2019 IEEE Symposium on Security and Privacy, for my 2008 paper [33].

### Additional research awards

- Best Paper Award Honorable Mention, 2025 ACM Conference on Human Factors in Computing Systems (CHI). (See publication [172].)
- Best Paper Award, 2024 Internet Measurement Conference. (See publication [169].)
- Andreas Pfitzmann Best Student Paper Award Runner Up, 2024 Privacy Enhancing Technologies Symposium. (See publication [159].)
- Distinguished Paper Award, 2023 USENIX Security Symposium. (See publication [150].)
- Selected Paper, 2023 USENIX Security Symposium; paper invited to appear in ;login:. (See publications [150, 190].)
- Spotlight Paper, 2023 The Web Conference. (See publication [146].)
- Best Paper Award Runner Up, 2021 Internet Measurement Conference. (See publication [133].)

2

- Selected Paper, 2021 IEEE Symposium on Security and Privacy; paper invited to appear in IEEE Security & Privacy Magazine. (See publications [126, 187].)
- Selected Paper, 2017 IEEE Symposium on Security and Privacy; paper invited to appear in IEEE Security & Privacy Magazine. (See publications [103, 185].)
- Selected Paper, 2016 USENIX Security Symposium; paper invited to appear in ;login:. (See publications [98, 184].)
- Best Student Paper Award, 2016 USENIX Annual Technical Conference (ATC). (See publication [96].)
- Selected Paper, 2012 Networked Systems Design and Implementation (NSDI); paper invited to appear in ;login:. (See publications [65, 183].)
- Best Practical Paper Award, 2012 IEEE Symposium on Security and Privacy. (See publication [66].)
- Best Student Paper Award, 2011 European Conference on Computer Systems (EuroSys). (See publication [59].)
- CPDP Multidisciplinary Privacy Award, 2011, Computers, Privacy & Data Protection Conference. (Awarded for publication [53], appearing at SOUPS 2010.)
- CPDP Multidisciplinary Privacy Award Honorable Mention, 2011, Computers, Privacy & Data Protection Conference. (Awarded for publication [51], appearing at CHI 2010.)
- Outstanding Student Paper Award, 2009 USENIX Security Symposium. (See publication [46].)
- Best Paper Award, 2008 International Conference on Mobile Systems, Application, and Services (MobiSys). (See publication [34].)
- Outstanding Paper Award, 2008 IEEE Symposium on Security and Privacy. (See publication [33].)
- Selected abstract for video release (one of two out of over 4000 submissions), 2008 American Heart Association Annual Scientific Sessions. (See publication [178].)
- CSE PhD Dissertation Award, 2006, University of California at San Diego, Department of Computer Science and Engineering.
- Award Paper, 2005 IEEE Symposium on Security and Privacy; paper invited to a special issue of the IEEE Transactions on Dependable and Secure Computing. (See publications [18, 19].)
- Selected Paper, 2002 ACM Conference on Computer and Communications Security; paper invited to a special issue of the ACM Transactions on Information and System Security. (See publications [8, 16].)
- Outstanding Paper Award, 2000 Annual Computer Security Applications Conference; paper invited to a special issue of the ACM Transactions on Information and System Security. (See publications [4, 7].)
- Selected Paper, 2000 Workshop on Algorithm Engineering and Experiments; paper invited to a special issue of the ACM Journal of Experimental Algorithmics. (See publications [1, 5].)
- Best rump session talk (works in progress talk), CRYPTO 2003; research later published at IEEE S&P 2004 [15].

## Award for Teaching

- ACM Teaching Award, 2022, Awarded by the students of the Paul G. Allen School for Computer Science & Engineering, University of Washington.

## Awards for PhD dissertations (advised)

- Western Association of Graduate Schools (WAGS) and ProQuest WAGS/ProQuest Innovation in Technology Award, 2021, awarded to Ivan Evtimov. (Single University of Washington nominee across all departments.)

3

- William Chan Memorial Dissertation Award, 2021, University of Washington, Paul G. Allen School of Computer Science & Engineering, awarded to Ivan Evtimov.
- SIGSAC Doctoral Dissertation Award for Outstanding PhD Thesis in Computer and Information Security, Runner Up, 2015, awarded to Karl Koscher.
- William Chan Memorial Dissertation Award, 2014, University of Washington, Department of Computer Science & Engineering, awarded to Franziska Roesner.
- SIGOPS Dennis M. Ritchie Dissertation Award, Honorable Mention, 2013, awarded to Roxana Geambasu.
- William Chan Memorial Dissertation Award, 2011, University of Washington, Department of Computer Science & Engineering, awarded to Roxana Geambasu.

### Awards for undergraduate and masters research (advised)

- Outstanding Master's Thesis Award, Allen School, University of Washington, 2024, awarded to Natalie Grace Brigham.
- Best Senior Thesis Award, Allen School, University of Washington, 2020, awarded to Kimberly Ruth (co-advised with Franziska Roesner).
- CRA Outstanding Undergraduate Researcher Award, 2019, awarded to Kimberly Ruth (co-advised with Franziska Roesner).
- CRA Outstanding Undergraduate Researcher Award, Finalist, 2018, awarded to Kimberly Ruth (co-advised with Franziska Roesner).
- CRA Outstanding Undergraduate Researcher Award, Finalist, 2017, awarded to Kimberly Ruth (co-advised with Franziska Roesner).

## PROFESSIONAL ACTIVITIES

### Litigation Support Experience

- Thompson Coburn, LLP. Retained by FCA US LLC in Flynn et al. versus FCA US LLC and Harman International, Inc. Wrote one expert report. Deposed October 2019. Retained as expert witness in class action lawsuit.
- Lowe Graham Jones, PLLC. Retained by DocuSign, Inc. in RMail Limited, RPost Communications Limited, and RPost Holdings, Inc. versus DocuSign, Inc. Wrote expert reports. Deposed June 2013 and April 2019. Case settled June 2019. Retained as expert witness in patent litigation.

### Organization leadership and activities

- Co-Director, Security and Privacy Research Lab, University of Washington (Computer Science & Engineering), 2006–Present.
- Co-Director, Technology and Policy Lab, University of Washington (Computer Science & Engineering, the Information School, the School of Law), 2013–Present.
- Founding Member, IEEE Center for Secure Design, 2014–2016.
- Inaugural Member, Forum on Cyber Resilience, Computer Science and Telecommunications Board, Division of Engineering and Physical Sciences, National Research Council, 2014–2018.
- Intelligence Science and Technology Experts Group, National Academies, 2015–Present.
- Advisor, Diabetes Technoloogy Society Cybersecurity Standard for Connected Diabetes Devices, 2015.
- Member, U.S. Air Force Scientific Advisory Board, 2016–2020.
- Founding Member, USENIX Committee for Black, African-American, and African Diaspora Inclusion, 2020–2021.

- Member, Electronic Frontier Foundation (EFF) Advisory Board, 2020–2023.
- Steering Committee, Partnership on AI (Safety Critical AI), 2022–2023.
- Executive Member, International Academy of Digital Arts and Sciences (IADAS), 2022–Present.
- Member, Electronic Frontier Foundation (EFF) Board of Directors, 2023–Present.

## Conference steering committees

- Steering Committee member, USENIX Security Symposium, 2012–Present. (Founding member; although founded in 1988, USENIX Security did not have an official Steering Committee until 2012.)
- USENIX Board Liaison, USENIX Security Symposium, 2014–2021.
- Steering Group member, Network and Distributed System Security Symposium (NDSS), 2011–2014.
- Co-founder and Steering Committee member, USENIX Workshop on Health Security and Privacy (Health-Sec), 2010–15. The event changed its name to the USENIX Summit on Health Information Technologies (HealthTech).

## Program chairs and editorial activities

- Research Ethics Committee Chair, USENIX Security Symposium, Seattle, WA, August 2025.
- Co-Editor, IEEE Security and Privacy Magazine, Special Issue on Security and Privacy for the Metaverse, January/February 2024.
- Department Editor, Off by One, IEEE Security and Privacy Magazine, February 2022–Present.
- Co-Chair, An Interactive Workshop on the Human Aspects of Smarthome Security and Privacy (WSSP), August 2018.
- Co-Chair, World Wide Web Conference, Security and Privacy Track, Perth, Australia, April 2017.
- Co-Chair, Workshop on Usable Privacy & Security for Wearable and Domestic Ubiquitous Devices (UP-SIDE), Seattle, WA, September 2014.
- Co-Chair, Learning from Authoritative Security Experiment Results Workshop (LASER), Arlington, VA, October 2013.
- Co-Chair, Workshop on Home Usable Privacy and Security (HUPS), Newcastle, UK, July 2013.
- Chair, USENIX Security Symposium, Bellevue, WA, August 2012.
- Co-chair and Co-founder, USENIX Workshop on Health Security and Privacy (HealthSec), Washington, DC, August 2010.
- Chair, USENIX Workshop on Hot Topics in Security (HotSec), Montreal, Canada, August 2009.
- Co-chair, USENIX/ACCURATE Electronic Voting Technology Workshop (EVT), San Jose, CA, August 2008.

## Program committees

- Gender, Online Safety, and Sexuality (GOSS), Philadelphia, PA, August 2024.
- USENIX Security, Philadelphia, PA, August 2024. Member: Research Ethics Committee.
- IEEE European Symposium on Security and Privacy, Vienna, Austria, July 2024.
- USENIX Security, Anaheim, CA, August 2023.
- USENIX Security, Boston, MA, August 2022.
- USENIX Security, Vancouver, BC, August 2021.
- USENIX Security, Boston, MA, August 2020. (Transitioned to virtual event due to COVID-19.)

5

- Privacy Enhancing Technologies Symposium (PETS), Montreal, Canada , July 2020.  (Transitioned to virtual event due to COVID-19.)
- USENIX Security, Santa Clara, CA, August 2019.
- Privacy Enhancing Technologies Symposium (PETS), Stockholm, Sweden, July 2019.
- USENIX Secruity, Baltimore, MD, August 2018.
- USENIX Security, Vancouver, BC, August 2017.
- Privacy Enhancing Technologies Symposium (PETS), Minneapolis, MN, 2017.
- International Workshop on Pervasive Smart Living Spaces (PerLS), Kona, Hawaii, March 2017
- USENIX Security, Austin, TX, August 2016.
- Privacy Enhancing Technologies Symposium (PETS), Darmstadt, Germany, July 2016.
- USENIX Security, Washington, DC, August 2015. (Work-in-Progress Chair.)
- Privacy Enhancing Technologies Symposium (PETS), Philadelphia, PA, June 2015.
- Financial Cryptography, Puerto Rico, USA, January 2015.
- USENIX Security, San Diego, CA, August 2014. (Work-in-Progress Chair.)
- Workshop on Usable Security, San Diego, CA, February 2014.
- IEEE Symposium on Security and Privacy, San Jose, CA, May 2014.
- Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS), San Francisco, CA, May 2013.
- IEEE Symposium on Security and Privacy, San Francisco, CA, May 2012.
- Financial Cryptography, Bonaire, Netherlands Antilles, February 2012.
- USENIX Security, San Francisco, CA, August 2011.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2011.
- Advances in Cryptology – EUROCRYPT, Tallinn, Estonia, May 2011.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Phoenix, AZ, March 2011.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2011.
- ACM Conference on Computer and Communication Security (CCS), Chicago, IL, October 2010.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2010.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2010.
- ACM Conference on Computer and Communication Security (CCS), Chicago, IL, November 2009.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2009.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Krakow, Poland, June 2009.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Santa Cruz, CA, 2009.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, 2009.
- ACM Conference on Computer and Communication Security (CCS), Alexandria, VA, 2008.
- USENIX Security, San Jose, CA, August 2008.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Boulder, CO, June 2008.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2008.
- Advances in Cryptology – EUROCRYPT, Istanbul, Turkey, April 2008.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Napa Valley, CA, February 2008.

- USENIX Security, Boston, MA, August 2007.
- Steps to Reducing Unwanted Traffic on the Internet (SRUTI), Santa Clara, CA, June 2007.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Puerto Rico, USA, June 2007.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2007. (Work-in-Progress Chair.)
- WWW 2007 Security, Privacy, Reliability and Ethics Track, Banff, Canada, May 2007.
- ACM Workshop on Recurring Malcode (WORM), Fairfax, VA, November 2006.
- ACM Workshop on Wireless Security (WiSe), Los Angeles, CA, September 2006.
- Financial Cryptography and Data Security, Anguilla, BWI, February 2006.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2006.
- USENIX Security 2005, Baltimore, MD, August 2005.
- WWW 2005 Security, Privacy, and E-Commerce Track, Chiba, Japan, May 2005.
- WWW 2004 Security and Privacy Track, New York, NY, May 2004.

## External reviews

- Journals and magazines: Journal of Cryptology (1 paper), Journal of Computer Security (1 paper), Communications of the ACM (2 papers), IEEE Transactions on Mobile Computing (1 paper), ACM Transactions on Sensor Networks (1 paper), ACM Transactions on Information and System Security (1 paper), IEEE Security and Privacy (4 papers), ACM Computing Surveys (1 paper).
- Conferences (approximately 1 or 2 papers per conference): CRYPTO (2003); EUROCRYPT (2004, 2005); ACM CCS (2001); Network and Distributed System Security Symposium (2001); Fast Software Encryption (2001); Theory of Cryptography Conference (2006); RSA Conference Cryptographers' Track (2003, 2006); Financial Cryptography (2004); Workshop on Privacy in the Electronic Society (2003); Workshop on Information Security Applications (2003); USENIX/ACCURATE Electronic Voting Technology Workshop (2007), International Conference on Provable Security (2007), CHI (2008), NSDI (2008), UIST (2009,2012), Ubicomp (2009), Pervasive (2009).

## Other organizing roles

- Co-chair, UW MSR Summer Institute, July 2011. Institute title: Security and Privacy for a Consumer, Cloud World.
- Co-chair, UW MSR Summer Institute, July 2014. Institute title: Security Analytics.
- Steering Committee, Workshop to Develop a Building Code and Research Agenda for Medical Device Software Security, 2014.
- Organizing committee, The National Academies, National Research Council, Computer Science and Telecommunications Board), July 2015. Workshop title: Workshop on Privacy for the Intelligence Community.

## Other external activities

- Invited participant, Microsoft Research Faculty Summit, July 2007.
- Technical Advisor, ACLU Electronic Voting Committee (II), August 2007–October 2010.
- Invited participant, Intel Trust Evidence Workshop, May 2010
- Invited participant, Google Faculty Summit, July 2010.
- Reviewer, National Research Council, Toward Better Usability, Security, and Privacy of Information Technology: Report of a Workshop, 2010.

7

- Invited participant, Summit on Education in Secure Software, October 2010.
- Invited participant, NSF Workshop on Trustworthy Computing, October 2010.
- Member, The Ad Hoc Committee for Responsible Computing (Drafting "Moral Responsibility for Computing Artifacts: The Rules"), 2010.
- Judge, Develop for Privacy Challenge (Organized by the ACLU of Northern California, the ACLU of Washington, the Tor Project, and the Information & Privacy Commissioner's Office of Ontario, Canada), 2011.
- Invited participant, Google Faculty Summit, July 2011.
- Invited participant, Microsoft Research Faculty Summit, July 2011.
- Search Committee for a new Editor-in-Chief, IEEE Security & Privacy Magazine, March-April 2012.
- Invited participant, Microsoft Research Faculty Summit, July 2012.
- Invited participant, Intel Security Curriculum Workshop, October 2012.
- Invited participant, Microsoft Research Faculty Summit, July 2013.
- Member, Microsoft Research Ethics Review Board, 2014–2017.
- Invited participant, APRU Internet Governance Seminar in Tokyo, March 2015.
- Invited participant, Hewlett Foundation Internet of Things Workshop, April 2015.
- Invited participant, NSF Visioning Workshop on Smart and Connected Communities Research and Education, January 2016.
- Invited participant, Government Accountability Office's Comptroller General Forum on 21st Century Data and Analytics, January 2016.
- Invited participant, DARPA/ISAT Workshop on "Whither the Data?" March 2016.
- Chair, ACM SIGSAC Ph.D. Dissertation Award Committee, 2016.
- Invited participant, DARPA/ISAT Workshop on "Dangers of Augmented Reality (DARE)," November 2016.
- Judge, FTC IoT Home Inspector Challenge, 2017.

### Internal activities

- Coach, University of Washington Aikido Club, 2024–Present.
- Chair, 10-Year Review, Department of Bioengineering, University of Washington, 2023.
- Associate Director for Diversity, Equity, Inclusion, and Access, Paul G. Allen School of Computer Science & Engineering, University of Washington, 2020–2023.
- Executive Committee, Department of Computer Science and Engineering, University of Washington, 2010–2011, 2020–2023.
- Faculty Recruiting Committee Member, Department of Computer Science and Engineering, University of Washington, 2010–2011, 2011-2012, 2012-2013, 2014-2015, 2015-2016, 2017-2018 (chair), 2018-2019 (chair), 2019-2020 (chair), 2023-2024 (teaching track).
- Faculty sponsor, Computer Security Competition Team, Department of Computer Science and Engineering, University of Washington, Spring 2008–2011. (Team won 1st place in the 2008, 2009, 2010, 2011 Pacific Rim Regional Collegiate Cyber Defense Competition. Team won 1st place in the 2011 National Collegiate Cyber Defense Competition.)

## PUBLICATIONS

### Publication summary

- Journal publications: 17 total; 2 ACM TISSEC; 1 IEEE TDSC; 1 ACM JEA; 1 JoC; 1 AIEthics; 1 ACM OSR; 1 DevEng; 1 IEEE Data Engineering, 1 Neurosurgical Focus; 1 Heart Rhythm Journal; 1 Journal of Diabetes Science and Technology; 1 New England Journal of Medicine; 1 Berkeley Technical Law Journal; 1 Digital Threats; 1 Cardiovascular Digital Health Journal; 1 Telemedicine and e-Health.

- Top-tier and strong security and cryptography conference and workshop publications: 77 total; 12 IEEE S&P; 11 ACM CCS; 18 USENIX Security; 3 EUROCRYPT; 1 CRYPTO; 4 NDSS; 1 EuroS&P; 11 PETS; 3 SOUPS; 3 ACSAC; 3 WWW / Web Conf; 5 FSE; 3 HotSec; 1 NSPW.

- Top-tier system, mobile systems, human-computer interaction, AI, fairness, and vision conference and workshop publications: 43 total; 11 CHI; 4 AIES; 2 FAccT; 1 OSDI; 3 NSDI; 2 MobiSys; 3 Ubicomp; 1 EuroSys; 1 UIST; 1 CSCW; 1 IDC; 1 ECCV; 1 CVPR; 4 IMC; 1 NeurIPS; 1 ICTD; 1 ATC; 2 HotOS; 4 HotMobile.

- Top-tier computer science education conference publications: 1 SIGCSE.

- Other cryptography, security, and systems conference and workshop publications: 22 total; 1 ACNS; 1 ICCPS; 1 HealthSec; 2 FC; 2 WOOT; 1 AES; 1 UbiPriv; 3 WPES; 1 AISec; 1 LASER; 1 CREDS; 1 3GSE; 1 UPSIDE; 1 PerLS; 1 Bitcoin; 1 ConPro; 1 VR4Sec; 1 ML-Perils; 1 USEC; 1 EuroUSEC.

- Non-cryptography, security, and systems workshop publications: 1 ALENEX, 2 EAAMO.

- Peer-reviewed research magazine publications: 7 total; 3 CACM; 2 IEEE Pervasive Computing, 1 IEEE Software; 1 IEEE Security and Privacy.

- Peer-reviewed non-research magazine publications: 4 total; 1 CACM; 3 IEEE Security and Privacy.

- Non-peer-reviewed non-research magazine publications: 7 total; 3 IEEE Security and Privacy; 3 USENIX ;login:; 1 Technology Review.

- Standards documents: 1 RFC.

- Fiction and other creative works (excluding works included in other sections): 12 total; 8 IEEE Security and Privacy; 1 Little Blue Marble; 1 After Dinner Conversations; 1 Haven Speculative; 1 HyphenPunk; 1 365tomorrows.

- Books: 1 cryptography text, 1 anthology of short stories, 1 novella, 1 self-study journaling notebooks.

- Book chapters: 1 Cyberbiosecurity.

- Games and educational toolkits: 1 card game; 1 card-based brainstorming toolkit.

### Peer-reviewed journal and conference publications

[1] Harold N. Gabow and Tadayoshi Kohno. A network-flow-based scheduler: Design, performance history, and experimental analysis. In *Second Workshop on Algorithm Engineering and Experiments*, pages 1–14, January 2000. (Conference version of [5].)

[2] John Kelsey, Tadayoshi Kohno, and Bruce Schneier. Amplified boomerang attacks against reduced-round MARS and Serpent. In Bruce Schneier, editor, *Fast Software Encryption*, volume 1978 of *Lecture Notes in Computer Science*, pages 75–93. Springer-Verlag, April 2000.

[3] Tadayoshi Kohno, John Kelsey, and Bruce Schneier. Preliminary cryptanalysis of reduced-round Serpent. In *Third AES Candidate Conference*, pages 195–211, April 2000.

[4] John Viega, J. T. Bloch, Yoshi Kohno, and Gary McGraw. ITS4: A static vulnerability scanner for C and C++ code. In *Sixteenth Annual Computer Security Applications Conference*, pages 257–267, December 2000. (Conference version of [7]; recipient of the conference's Outstanding Paper Award. Recipient of the conference's inaugural 2019 Test of Time Award.)

9

[5]  Harold N. Gabow and Tadayoshi Kohno. A network-flow-based scheduler: Design, performance history, and experimental analysis. *ACM Journal of Experimental Algorithmics*, 6, 2001. (Journal version of [1]; invited submission.)

[6]  Tadayoshi Kohno and Mark McGovern. On the global content PMI: Improved copy-protected Internet content distribution. In Paul F. Syverson, editor, *Financial Cryptography*, volume 2339 of *Lecture Notes in Computer Science*, pages 79–90. Springer-Verlag, February 2001.

[7]  John Viega, J. T. Bloch, Tadayoshi Kohno, and Gary McGraw. Token-based scanning for source code security problems. *ACM Transactions on Information and System Security*, 5(3):238–261, August 2002. (Journal version of [4]; invited submission.)

[8]  Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. Authenticated encryption in SSH: Provably fixing the SSH binary packet protocol. In Vijay Atluri, editor, *Proceedings of the 9th ACM Conference on Computer and Communications Security*, pages 1–11. ACM Press, November 2002. (Conference version of [16]; highest ranked paper after conference program committee reviews.)

[9]  Niels Ferguson, Doug Whiting, Bruce Schneier, John Kelsey, Stefan Lucks, and Tadayoshi Kohno. Helix: Fast encryption and authentication in a single cryptographic primitive. In Thomas Johansson, editor, *Fast Software Encryption*, volume 2887 of *Lecture Notes in Computer Science*, pages 330–346. Springer-Verlag, February 2003.

[10]  Lars R. Knudsen and Tadayoshi Kohno. Analysis of RMAC. In Thomas Johansson, editor, *Fast Software Encryption*, volume 2887 of *Lecture Notes in Computer Science*, pages 182–191. Springer-Verlag, February 2003.

[11]  Mihir Bellare and Tadayoshi Kohno. A theoretical treatment of related-key attacks: RKA-PRPs, RKA-PRFs, and applications. In Eli Biham, editor, *Advances in Cryptology – EUROCRYPT 2003*, volume 2656 of *Lecture Notes in Computer Science*, pages 491–506. Springer-Verlag, May 2003.

[12]  Tadayoshi Kohno, John Viega, and Doug Whiting. CWC: A high-performance conventional authenticated encryption mode. In Bimal Roy and Willi Meier, editors, *Fast Software Encryption*, volume 3017 of *Lecture Notes in Computer Science*, pages 408–426. Springer-Verlag, February 2004.

[13]  Tetsu Iwata and Tadayoshi Kohno. New security proofs for the 3GPP confidentiality and integrity algorithms. In Bimal Roy and Willi Meier, editors, *Fast Software Encryption*, volume 3017 of *Lecture Notes in Computer Science*, pages 427–445. Springer-Verlag, February 2004.

[14]  Mihir Bellare and Tadayoshi Kohno. Hash function balance and its impact on birthday attacks. In Christian Cachin and Jan Camenisch, editors, *Advances in Cryptology – EUROCRYPT 2004*, volume 3027 of *Lecture Notes in Computer Science*, pages 401–418. Springer-Verlag, May 2004.

[15]  Tadayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach. Analysis of an electronic voting system. In *IEEE Symposium on Security and Privacy*, pages 27–40. IEEE Computer Society, May 2004.

[16]  Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. Breaking and provably repairing the SSH authenticated encryption scheme: A case study of the Encode-then-Encrypt-and-MAC paradigm. *ACM Transactions on Information and System Security*, 7(2):206–241, May 2004. (Journal version of [8]; invited submission.)

[17]  Tadayoshi Kohno. Attacking and repairing the WinZip encryption scheme. In Birgit Pfitzmann, editor, *Proceedings of the 11th ACM Conference on Computer and Communications Security*, pages 72–81. ACM Press, October 2004.

[18]  Tadayoshi Kohno, Andre Broido, and kc claffy. Remote physical device fingerprinting. In *IEEE Symposium on Security and Privacy*, pages 211–225. IEEE Computer Society, May 2005. (Conference version of [19]; one of three award papers at the conference.)

10

[19] Tadayoshi Kohno, Andre Broido, and K.C. Claffy. Remote physical device fingerprinting. *IEEE Transactions on Dependable and Secure Computing*, 2(2):93–108, April–June 2005. (Journal version of [18]; invited submission.)

[20] Michel Abdalla, Mihir Bellare, Dario Catalano, Eike Kiltz, Tadayoshi Kohno, Tanja Lange, John Malone-Lee, Gregory Neven, Pascal Paillier, and Haixia Shi. Searchable encryption revisited: Consistency properties, relation to anonymous IBE, and extensions. In Victor Shoup, editor, *Advances in Cryptology – CRYPTO 2005*, volume 3621 of *Lecture Notes in Computer Science*, pages 205–222. Springer-Verlag, August 2005. (Conference version of [35].)

[21] Kevin Fu, Seny Kamara, and Tadayoshi Kohno. Key regression: Enabling efficient key distribution for secure distributed storage. In *ISOC Network and Distributed System Security Symposium*, February 2006.

[22] David Molnar, Tadayoshi Kohno, Naveen Sastry, and David Wagner. Tamper-evident, history-independent, subliminal-free data structures on PROM storage -or- how to store ballots on a voting machine (extended abstract). In *IEEE Symposium on Security and Privacy*. IEEE Computer Society, May 2006.

[23] John Kelsey and Tadayoshi Kohno. Herding hash functions and the Nostradamus attack. In Serge Vaudenay, editor, *Advances in Cryptology – EUROCRYPT 2006*, Lecture Notes in Computer Science. Springer-Verlag, May 2006.

[24] Naveen Sastry, Tadayoshi Kohno, and David Wagner. Designing voting machines for verification. In *15th USENIX Security Symposium*, August 2006.

[25] Mihir Bellare, Tadayoshi Kohno, and Victor Shoup. Stateful public-key cryptosystems: How to encrypt with one 160-bit exponentiation. In Rebecca Wright and Sabrina De Capitani di Vimercati, editors, *Proceedings of the 13th ACM Conference on Computer and Communications Security*. ACM Press, November 2006.

[26] Ben Greenstein, Ramakrishna Gummadi, Jeffrey Pang, Mike Y. Chen, Tadayoshi Kohno, Srinivasan Seshan, and David Wetherall. Can Ferris Bueller still have his day off? Protecting privacy in the wireless era. In *11th Workshop on Hot Topics in Operating Systems*, May 2007.

[27] T. Scott Saponas, Jonathan Lester, Carl Hartung, Sameer Agarwal, and Tadayoshi Kohno. Devices that tell on you: Privacy trends in consumer ubiquitous computing. In *16th USENIX Security Symposium*, August 2007.

[28] Vibhor Rastogi, Evan Welbourne, Nodira Khoussainova, Travis Kriplean, Magda Balazinska, Gaetano Borriello, Tadayoshi Kohno, and Dan Suciu. Expressing privacy policies using authorization views. In *Workshop on Ubicomp Privacy: Technologies, Users, Policy*, September 2007.

[29] Kevin Bauer, Damon McCoy, Dirk Grunwald, Tadayoshi Kohno, and Douglas Sicker. Low-resource routing attacks against Tor. In *Workshop on Privacy in the Electronic Society*, October 2007.

[30] Travis Kriplean, Evan Welbourne, Nodira Khoussainova, Vibhor Rastogi, Magda Balazinska, Gaetano Borriello, Tadayoshi Kohno, and Dan Suciu. Physical access control for captured RFID data. *IEEE Pervasive Computing*, 6(4), 2007.

[31] Daniel Halperin, Thomas S. Heydt-Benjamin, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Security and privacy for implantable medical devices. *IEEE Pervasive Computing*, 7(1), 2008.

[32] Charles Reis, Steven D. Gribble, Tadayoshi Kohno, and Nicholas C. Weaver. Detecting in-flight page changes with web tripwires. In *USENIX Symposium on Networked Systems Design & Implementation*, April 2008.

[33] Daniel Halperin, Thomas S. Heydt-Benjamin, Benjamin Ransford, Shane S. Clark, Benessa Defend, Will Morgan, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Pacemakers and implantable cardiac defibrillators: Software radio attacks and zero-power defenses. In *IEEE Symposium on Security and Privacy*.

11

IEEE Computer Society, May 2008. (Recipient of the conference's Outstanding Paper Award. Recipient of the symposium's Inaugural 2019 Test of Time Award. )

[34] Ben Greenstein, Damon McCoy, Jeffrey Pang, Tadayoshi Kohno, Srinivasan Seshan, and David Wetherall. Improving wireless privacy with an identifier-free link layer protocol. In *International Conference on Mobile Systems, Application, and Services (MobiSys)*, June 2008. (Recipient of the conference's Best Paper Award.)

[35] Michel Abdalla, Mihir Bellare, Dario Catalano, Eike Kiltz, Tadayoshi Kohno, Tanja Lange, John Malone-Lee, Gregory Neven, Pascal Paillier, and Haixia Shi. Searchable encryption revisited: Consistency properties, relation to anonymous IBE, and extensions. *Journal of Cryptology*, 21(3):350–391, July 2008. (Journal version of [20].)

[36] Damon McCoy, Kevin Bauer, Dirk Grunwald, Tadayoshi Kohno, and Douglas Sicker. Shining light in dark places: Understanding the Tor network. In *Privacy Enhancing Technologies Symposium*, July 2008.

[37] Alexei Czeskis, David J. St. Hilaire, Karl Koscher, Steven D. Gribble, Tadayoshi Kohno, and Bruce Schneier. Defeating encrypted and deniable file systems: TrueCrypt v5.1a and the case of the tattling OS and applications. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[38] Tamara Denning, Kevin Fu, and Tadayoshi Kohno. Absence makes the heart grow fonder: New directions for implantable medical device security. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[39] Michael Piatek, Tadayoshi Kohno, and Arvind Krishnamurthy. Challenges and directions for monitoring P2P file sharing networks – or – why my printer received a DMCA takedown notice. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[40] Thomas Ristenpart, Gabriel Maganis, Arvind Krishnamurthy, and Tadayoshi Kohno. Privacy-preserving location tracking of lost or stolen devices: Cryptographic techniques and replacing trusted third parties with DHTs. In *17th USENIX Security Symposium*, July–August 2008.

[41] Jaeyeon Jung, Anmol Sheth, Ben Greenstein, David Wetherall, Gabriel Maganis, and Tadayoshi Kohno. Privacy Oracle: A system for finding application leaks with black box differential testing. In Paul F. Syverson and Somesh Jha, editors, *Proceedings of the 15th ACM Conference on Computer and Communications Security*. ACM Press, October 2008.

[42] Alexei Czeskis, Karl Koscher, Joshua R. Smith, and Tadayoshi Kohno. RFIDs and secret handshakes: Defending against ghost-and-leech attacks and unauthorized reads with context-aware communications. In Paul F. Syverson and Somesh Jha, editors, *Proceedings of the 15th ACM Conference on Computer and Communications Security*. ACM Press, October 2008.

[43] Katherine M. Everitt, Tanya Bragin, James Fogarty, and Tadayoshi Kohno. A comprehensive study of frequency, interference, and training of multiple graphical passwords. In *Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI 2009)*, April 2009.

[44] Tamara Denning, Yoky Matsuoka, and Tadayoshi Kohno. Neurosecurity: Security and privacy for neural devices. *Neurosurgical Focus*, 27, July 2009.

[45] Barath Raghavan, Tadayoshi Kohno, Alex C. Snoeren, and David Wetherall. Enlisting ISPs to improve online privacy: IP address mixing by default. In *Privacy Enhancing Technologies Symposium*, August 2009.

[46] Roxana Geambasu, Tadayoshi Kohno, Amit A. Levy, and Henry M. Levy. Vanish: Increasing data privacy with self-destructing data. In *18th USENIX Security Symposium*, August 2009. (Recipient of the conference's Best Student Paper Award.)

12

[47] Tamara Denning, Cynthia Matuszek, Karl Koscher, Joshua R. Smith, and Tadayoshi Kohno. A spotlight on security and privacy risks with future household robots: Attacks and lessons. In *11th International Conference on Ubiquitous Computing (Ubicomp)*, September-October 2009.

[48] Sinjin Lee, Kevin Fu, Tadayoshi Kohno, Benjamin Ransford, and William H. Maisel. Clinically significant magnetic interference of implanted cardiac devices by portable headphones. *Heart Rhythm Journal*, 6(10), October 2009.

[49] Karl Koscher, Ari Juels, Vjekoslav Brajkovic, and Tadayoshi Kohno. EPC RFID tag security weaknesses and defenses: Passport cards, enhanced drivers licenses, and beyond  In Somesh Jha and Angelos D. Keromytis, editors, *Proceedings of the 16th ACM Conference on Computer and Communications Security*. ACM Press, November 2009.

[50] William H. Maisel and Tadayoshi Kohno. Improving the security and privacy of implantable medical devices. *New England Journal of Medicine*, 362(13):1164–1166, April 2010.

[51] Tamara Denning, Alan Borning, Batya Friedman, Brian T. Gill, Tadayoshi Kohno, and William H. Maisel. Patients, pacemakers, and implantable defibrillators: Human values and security for wireless implantable medical devices. In *Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI 2010)*, April 2010. (Recipient of a 2011 CPDP Multidisciplinary Privacy Award Honorable Mention.)

[52] Karl Koscher, Alexei Czeskis, Franziska Roesner, Shwetak Patel, Tadayoshi Kohno, Stephen Checkoway, Damon McCoy, Brian Kantor, Danny Anderson, Hovav Shacham, and Stefan Savage. Experimental security analysis of a modern automobile. In *IEEE Symposium on Security and Privacy*. IEEE Computer Society, May 2010. (Recipient of the symposium's 2020 Test of Time Award. )

[53] Alexei Czeskis, Ivayla Dermendjieva, Hussein Yapit, Alan Borning, Batya Friedman, Brian Gill, and Tadayoshi Kohno. Parenting from the pocket: Value tensions and technical directions for secure and private parent-teen mobile safety. In *Symposium On Usable Privacy and Security (SOUPS)*, July 2010. (Recipient of the 2011 CPDP Multidisciplinary Privacy Award.)

[54] Qi Shan, Brian Curless, and Tadayoshi Kohno. Seeing through obscure glass. In *European Conference on Computer Vision (ECCV)*, September 2010.

[55] Roxana Geambasu, Amit A. Levy, Tadayoshi Kohno, Arvind Krishnamurthy, and Henry M. Levy. Comet: An active distributed key-value store. In *USENIX Symposium on Operating Systems Design and Implementation (OSDI)*, October 2010.

[56] David W. Richardson, Steven D. Gribble, and Tadayoshi Kohno. The limits of automatic OS fingerprint generation. In *Workshop on Artificial Intelligence and Security (AISec)*, October 2010.

[57] Tadayoshi Kohno and Brian David Johnson. Science fiction prototyping and security education: Cultivating contextual and societal thinking in computer security education and beyond. In *ACM Technical Symposium on Computer Science Education (SIGCSE)*, March 2011.

[58] Gabriel Maganis, Jaeyeon Jung, Tadayoshi Kohno, Anmol Sheth, and David Wetherall. Sensor tricorder: What does that sensor know about me? In *12th Workshop on Mobile Computing Systems and Application (HotMobile)*, March 2011.

[59] Roxana Geambasu, John P. John, Steven D. Gribble, Tadayoshi Kohno, and Henry M. Levy. Keypad: An auditing file system for theft-prone devices. In *European Conference on Computer Systems (EuroSys)*, April 2011. (Recipient of the conference's Best Student Paper Award.)

[60] David (Yu) Zhu, Jaeyeon Jung, Dawn Song, Tadayoshi Kohno, and David Wetherall. TaintEraser: Protecting sensitive data leaks using application-level taint tracking. *ACM Operating Systems Review*, 45(1), 2011.

13

[61] Mikhail Afanasyev, Tadayoshi Kohno, Justin Ma, Nick Murphy, Stefan Savage, Alex C. Snoeren, and Geoffrey M. Voelker. Network support for privacy-preserving forensic attribution. *Communications of the ACM*, 54(5):78–87, May 2011.

[62] Stephen Checkoway, Damon McCoy, Brian Kantor, Danny Anderson, Hovav Shacham, Stefan Savage, Karl Koscher, Alexei Czeskis, Franziska Roesner, and Tadayoshi Kohno. Comprehensive experimental analyses of automotive attack surfaces. In *20th USENIX Security Symposium*, August 2011.

[63] Miro Enev, Sidhant Gupta, Tadayoshi Kohno, and Shwetak Patel. Televisions, video privacy, and powerline electromagnetic interference. In George Danezis and Vitaly Shmatikov, editors, *Proceedings of the 18th ACM Conference on Computer and Communications Security*. ACM Press, October 2011.

[64] Nathanael Paul, Tadayoshi Kohno, and David C. Klonoff. A review of the security of insulin pump infusion systems. *Journal of Diabetes Science and Technology*, 5(6), November 2011.

[65] Franziska Roesner, Tadayoshi Kohno, and David Wetherall. Detecting and defending against third-party tracking on the web. In *Networked Systems Design and Implementation (NSDI)*, April 2012. (Conference version of [183].) (Recipient of the conference's 2023 Test of Time Award.)

[66] Franziska Roesner, Tadayoshi Kohno, Alex Moshchuk, Bryan Parno, Helen J. Wang, and Crispin Cowan. User-driven access control: Rethinking permission granting in modern operating systems. In *IEEE Symposium on Security and Privacy*, May 2012. (Recipient of the conference's Best Practical Paper Award.)

[67] Nathanael Paul and Tadayoshi Kohno. Security risks, low-tech user interfaces, and implantable medical devices: A case study with insulin pump infusion systems. In *USENIX Workshop on Health Security and Privacy (HealthSec)*, August 2012.

[68] Franziska Roesner, James Fogarty, and Tadayoshi Kohno. User interface toolkit mechanisms for securing interface elements. In *25th ACM Symposium on User Interface Software and Technology (UIST 2012)*, October 2012.

[69] Alexei Czeskis, Michael Dietz, Dan Wallach, Tadayoshi Kohno, and Dirk Balfanz. Strengthening user authentication through opportunistic cryptographic identity assertions. In George Danezis and Virgil Gligor, editors, *Proceedings of the 19th ACM Conference on Computer and Communications Security*. ACM Press, October 2012.

[70] Miro Enev, Jaeyeon Jung, Liefeng Bo, Xiaofeng Ren, and Tadayoshi Kohno. SensorSift: Balancing sensor data privacy and utility in automated face understanding. In *Annual Computer Security Applications Conference*, December 2012.

[71] Tamara Denning, Tadayoshi Kohno, and Henry M. Levy. Computer security in the modern home. *Communications of the ACM*, 56(1):94–103, January 2013.

[72] Alexei Czeskis, Alex Moshchuk, Tadayoshi Kohno, and Helen J. Wang. Lightweight server support for browser-based CSRF protection. In *23rd International World-Wide Web Conference (WWW 2013)*, May 2013.

[73] Loris D'Antoni, Alan Dunn, Suman Jana, Tadayoshi Kohno, Benjamin Livshits, David Molnar, Alexander Moshchuk, Eyal Ofek, Franziska Roesner, Scott Saponas, Margus Veanes, and Helen J. Wang. Operating system support for augmented reality applications. In *14th Workshop on Hot Topics in Operating Systems (HotOS XIV)*, May 2013.

[74] Stefan Savage and Tadayoshi Kohno. Vulnerability research in the cyberphysical world. In *Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS)*, May 2013.

[75] Franziska Roesner and Tadayoshi Kohno. Securing embedded user interfaces: Android and beyond. In *22nd USENIX Security Symposium*, August 2013.

14

[76] Temitope Oluwafemi, Sidhant Gupta, Shwetak Patel, and Tadayoshi Kohno. Experimental security analyses of non-networked compact fluorescent lamps: A case study of home automation security. In *Learning from Authoritative Security Experiment Results (LASER)*, October 2013.

[77] Tamara Denning, Adam Lerner, Adam Shostack, and Tadayoshi Kohno. Control-Alt-Hack: The design and evaluation of a card game for computer security awareness and education. In *ACM Conference on Computer and Communications Security*, November 2013.

[78] Tamara Denning, Zakariya Dehlawi, and Tadayoshi Kohno. In situ with bystanders of augmented reality glasses: Perspectives on recording and privacy-mediating technologies. In *Conference on Human Factors in Computing Systems (CHI)*, April 2014.

[79] Franziska Roesner, Brian Gill, and Tadayoshi Kohno. Sex, lies, or kittens? Investigating the use of Snapchat's self-destructing messages. In *International Conference on Financial Cryptography and Data Security*, February 2014.

[80] Xinran Wang, Tadayoshi Kohno, and Bob Blakley. Polymorphism as a defense for automated attack of websites. In *Applied Cryptography and Network Security (ACNS '14)*, June 2014.

[81] Franziska Roesner, Tadayoshi Kohno, and David Molnar. Security and privacy for augmented reality systems. *Communications of the ACM*, 57(4):88–96, April 2014.

[82] Tamara Denning, Adam Shostack, and Tadayoshi Kohno. Practical lessons from creating the Control-Alt-Hack card game and research challenges for games in education and research. In *USENIX Summit on Gaming, Games and Gamification in Security Education (3GSE '14)*, August 2014.

[83] Franziska Roesner, Tamara Denning, Bryce Clayton Newell, Tadayoshi Kohno, and Ryan Calo. Augmented reality: Hard problems of law and policy. In *UbiComp 2014 Workshop on Usable Privacy & Security for wearable and domestic ubIquitous DEvices (UPSIDE)*, September 2014.

[84] Franziska Roesner, David Molnar, Alexander Moshchuk, Tadayoshi Kohno, and Helen J. Wang. World-driven access control for continuous sensing. In *ACM Conference on Computer and Communications Security*, November 2014.

[85] Tamara Denning, Batya Friedman, Brian Gill, Daniel B. Kramer, Matthew R. Reynolds, and Tadayoshi Kohno. CPS: Beyond usability: Applying value sensitive design based methods to investigate domain characteristics for security for implantable cardiac devices. In *Annual Computer Security Applications Conference (ACSAC)*, December 2014.

[86] Emily McReynolds, Adam Lerner, Will Scott, Franziska Roesner, and Tadayoshi Kohno. Cryptographic currencies from a tech-policy perspective: Policy issues and technical directions. In *2nd Workshop on Bitcoin Research*, January 2015.

[87] Tamara Bonaci, Junjie Yan, Jeffrey Herron, Tadayoshi Kohno, and Howard Jay Chizeck. Experimental analysis of denial-of-service attacks on teleoperated robotic systems. In *ACM/IEEE International Conference on Cyber-Physical Systems*, April 2015.

[88] Haitham Hassanieh, Jue Wang, Dina Katabi, and Tadayoshi Kohno. Securing RFIDs by randomizing the modulation and channel. In *Networked Systems Design and Implementation (NSDI)*, May 2015.

[89] Adam Lerner, Alisha Saxena, Kirk Ouimet, Ben Turley, Anthony Vance, Tadayoshi Kohno, and Franziska Roesner. Analyzing the use of quick response codes in the wild. In *13th International Conference on Mobile Systems, Applications, and Services (MobiSys)*, May 2015.

[90] Karl Koscher, Tadayoshi Kohno, and David Molnar. SURROGATES: Enabling near-real-time dynamic analyses of embedded systems. In *USENIX Workshop on Offensive Technologies (WOOT '15)*, August 2015.

15

[91] Paul Vines and Tadayoshi Kohno. Rook: Using video games as a low-bandwidth censorship resistant communication platform. In *Workshop on Privacy in the Electronic Society*, October 2015.

[92] Kiron Lebeck, Tadayoshi Kohno, and Franziska Roesner. How to safely augment reality: Challenges and directions. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2016.

[93] Alexis Hiniker, Sungsoo (Ray) Hong, Tadayoshi Kohno, and Julie A. Kientz. MyTime: Designing and evaluating an intervention for smartphone non-use. In *Conference on Human Factors in Computing Systems (CHI)*, May 2016.

[94] Jane Cleland-Huang, Tamara Denning, Tadayoshi Kohno, Forrest Shull, , and Samuel Weber. Keeping ahead of our adversaries. *IEEE Software*, May/June 2016.

[95] Camille Cobb, Samuel Sudar, Nicholas Reiter, Richard Anderson, Franziska Roesner, and Tadayoshi Kohno. Computer security for data collection technologies. In *International Conference on Information and Communication Technologies and Development (ICTD2016)*, June 2016. (Conference version of [109].)

[96] Will Scott, Thomas Anderson, Tadayoshi Kohno, and Arvind Krishnamurthy. Satellite: Joint analysis of CDNs and network-level interference. In *USENIX Annual Technical Conference*, June 2016. (Recipient of the conference's Best Student Paper Award.)

[97] Miro Enev, Alex Takakuwa, Karl Koscher, and Tadayoshi Kohno. Automobile driver fingerprinting. In *Privacy Enhancing Technologies Symposium*, July 2016.

[98] Adam Lerner, Anna Kornfeld Simpson, Tadayoshi Kohno, and Franziska Roesner. Internet Jones and the raiders of the lost trackers: An archaeological study of web tracking from 1996 to 2016. In *25th USENIX Security Symposium*, August 2016. (Conference version of [184].)

[99] Alexis Hiniker, Shwetak N. Patel, Tadayoshi Kohno, and Julie A. Kientz. Why would you do that? Predicting the uses and gratifications behind smartphone-usage behaviors. In *ACM International Joint Conference on Pervasive and Ubiquitous Computing (UbiComp)*, September 2016.

[100] Anna Kornfeld Simpson, Franziska Roesner, and Tadayoshi Kohno. Securing vulnerable home IoT devices with an in-hub security manager. In *First International Workshop on Pervasive Smart Living Spaces (PerLS)*, March 2017.

[101] Genevieve Gebhart and Tadayoshi Kohno. Internet censorship in Thailand: User practices, potential threats, and necessary responses. In *IEEE European Symposium on Security and Privacy (EuroS&P'17)*, April 2017.

[102] Camille Cobb and Tadayoshi Kohno. How public is my private life?: Privacy in online dating. In *Proceedings of the 26th International Conference on World Wide Web*, April 2017.

[103] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Securing augmented reality output. In *IEEE Symposium on Security and Privacy*, May 2017. (Conference version of [185].)

[104] Peter Ney, Ian Smith, Gabriel Cadamuro, and Tadayoshi Kohno. Seaglass: Enabling city-wide IMSI-catcher detection. In *Privacy Enhancing Technologies Symposium*, July 2017.

[105] Peter Ney, Karl Koscher, Lee Organick, Luis Ceze, and Tadayoshi Kohno. Computer security and privacy in DNA sequencing. In *USENIX Security Symposium*, August 2017.

[106] Rajalakshmi Nandakumar, Alex Takakuwa, Tadayoshi Kohno, and Shyamnath Gollakota. Covertband: Activity information leakage using music. *Proceedings of the ACM on Interactive, Mobile, Wearable and Ubiquitous Technologies*, 1(3):87:1–87:24, September 2017. (Publication venue also known as UbiComp.)

[107] Paul Vines, Franziska Roesner, and Tadayoshi Kohno. Exploring ADINT: Using ad targeting for surveillance on a budget – or – how Alice can buy ads to track Bob. In *ACM Workshop on Privacy in the Electronic Society (WPES)*, October 2017.

16

[108] Ada Lerner, Tadayoshi Kohno, and Franziska Roesner. Rewriting history: Changing the archived web from the present. In *ACM Conference on Computer and Communications Security (CCS)*, November 2017.

[109] Camille Cobb, Samuel Sudar, Nicholas Reiter, Richard Anderson, Franziska Roesner, and Tadayoshi Kohno. Computer security for data collection technologies. *Development Engineering*, 3, 2018. (Journal version of [109].)

[110] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Towards security and privacy for multi-user augmented reality: Foundations with end users. In *IEEE Symposium on Security and Privacy*, May 2018.

[111] Lucy Simko, Ada Lerner, Samia Ibtasam, Franziska Roesner, and Tadayoshi Kohno. Computer security and privacy for refugees in the United States. In *IEEE Symposium on Security and Privacy*, May 2018.

[112] Kevin Eykholt, Ivan Evtimov, Earlence Fernandes, Bo Li, Amir Rahmati, Chaowei Xiao, Atul Prakash, Tadayoshi Kohno, and Dawn Song. Robust physical-world attacks on deep learning visual classification. In *Computer Vision and Pattern Recognition (CVPR)*, June 2018.

[113] Lucy Simko, Luke Zettlemoyer, and Tadayoshi Kohno. Recognizing and imitating programmer style: Adversaries in program authorship attribution. In *Privacy Enhancing Technologies Symposium*, July 2018.

[114] Kevin Eykholt, Ivan Evtimov, Earlence Fernandes, Bo Li, Amir Rahmati, Florian Tramer, Atul Prakash, Tadayoshi Kohno, and Dawn Song. Physical adversarial examples for object detectors. In *USENIX Workshop on Offensive Technologies (WOOT)*, August 2018.

[115] Shrirang Mare, Logan Girvin, Franziska Roesner, and Tadayoshi Kohno. Consumer smart homes: Where we are and where we need to go. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2019.

[116] Kiron Lebeck, Tadayoshi Kohno, and Franziska Roesner. Enabling multiple applications to simultaneously augment reality: Challenges and directions. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2019.

[117] Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Secure multi-user content sharing for augmented reality applications. In *28th USENIX Security Symposium*, August 2019.

[118] Ivan Evtimov, David O'Hair, Earlence Fernandes, Ryan Calo, and Tadayoshi Kohno. Is tricking a robot hacking? *Berkeley Technology Law Journal*, 34(3), 2019.

[119] Peter Ney, Luis Ceze, and Tadayoshi Kohno. Genotype extraction and false relative attacks: Security risks to third-party genetic genealogy services beyond identity inference. In *ISOC Network and Distributed System Security Symposium*, February 2020.

[120] Camille Cobb, Lucy Simko, Tadayoshi Kohno, and Alexis Hiniker. User experiences with online status indicators. In *Conference on Human Factors in Computing Systems (CHI)*, April 2020.

[121] Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. Bad news: Clickbait and deceptive ads on news and misinformation websites. In *Workshop on Technology and Consumer Protection (ConPro)*, May 2020.

[122] Camille Cobb, Lucy Simko, Tadayoshi Kohno, and Alexis Hiniker. A privacy-focused systematic analysis of online status indicators. In *Privacy Enhancing Technologies Symposium*, July 2020.

[123] Shrirang Mare, Franziska Roesner, and Tadayoshi Kohno. Smart devices in Airbnbs: Considering privacy and security for both guests and hosts. In *Privacy Enhancing Technologies Symposium*, July 2020.

[124] Justin Chan, Dean Foster, Shyam Gollakota, Eric Horvitz, Joseph Jaeger, Sham Kakade, Tadayoshi Kohno, John Langford, Jonathan Larson, Puneet Sharma, Sudheesh Singanamalla, Jacob Sunshine, and Stefano Tessaro. PACT: Privacy-sensitive protocols and mechanisms for mobile contact tracing. *Bulletin of the IEEE Computer Society Technical Committee on Data Engineering*, 43(2):15–35, 2020.

17

[125] Sudheesh Singanamalla, Esther Han Beol Jang, Richard Anderson, Tadayoshi Kohno, and Kurtis Heimerl. Accept the risk and continue: Measuring the long tail of government https adoption. In *Internet Measurement Conference*, October 2020.

[126] Alaa Daffalla, Lucy Simko, Tadayoshi Kohno, and Alexandru G. Bardas. Defensive technology use by political activists during the Sudanese revolution. In *IEEE Symposium on Security and Privacy*, May 2021. (Conference version of [187].) (Recipient of Honorable Mention Award at the 10th Annual Best Scientific Cybersecurity Paper Competition (2023).)

[127] Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. What makes a "bad" ad? User perceptions of problematic online advertising. In *Conference on Human Factors in Computing Systems (CHI)*, May 2021.

[128] Lucy Simko, Britnie Chin, Sungmin Na, Harkiran Kaur Saluja, Tian Qi Zhu, Tadayoshi Kohno, Alexis Hiniker, Jason Yip, and Camille Cobb. Would You Rather: A focus group method for eliciting and discussing formative design insights with children. In *Interaction Design and Children (IDC)*, 2021.

[129] Ivan Evtimov, Pascal Sturmfels, and Tadayoshi Kohno. FoggySight: A scheme for facial lookup privacy. *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2021.

[130] Peter Ney, Lee Organick, Jeff Nivala, Luis Ceze, and Tadayoshi Kohno. DNA sequencing flow cells and the security of the molecular-digital interface. *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2021.

[131] Pardis Emami-Naeini, Tiona Francisco, Tadayoshi Kohno, and Franziska Roesner. Understanding privacy attitudes and concerns towards remote communications during the COVID-19 pandemic. In *Symposium On Usable Privacy and Security (SOUPS)*, 2021.

[132] Franziska Roesner and Tadayoshi Kohno. Security and privacy for augmented reality: Our 10-year retrospective. In *VR4Sec: 1st International Workshop on Security for XR and XR for Security*, 2021.

[133] Eric Zeng, Miranda Wei, Theo Gregersen, Tadayoshi Kohno, and Franziska Roesner. Polls, clickbait, and commemorative $2 bills: Problematic political advertising on news and media websites around the 2020 U.S. elections. In *ACM Internet Measurement Conference (IMC)*, 2021.

[134] Chunjong Park, Anas Awadalla, Tadayoshi Kohno, and Shwetak Patel. Reliable and trustworthy machine learning for health using dataset shift. In *Conference on Neural Information Processing Systems (NeurIPS)*, 2021.

[135] Ivan Evtimov, Ian Covert, Aditya Kusupati, and Tadayoshi Kohno. Disrupting model training with adversarial shortcuts. In *A Blessing in Disguise: The Prospects and Perils of Adversarial Machine Learning*, 2021.

[136] Ryan N. Hansen, Basil Matthew Saour, Brian Serafini, Blake Hannaford, Lanu Kim, Tadayoshi Kohno, Ryan James, Wayne Monsky, and Stephen P. Seslar. Opportunities and barriers to rural telerobotic surgical health care in 2021: Report and research agenda from a stakeholder workshop. *Telemedicine and e-Health*, 28(7), 2022.

[137] Miranda Wei, Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. Anti-privacy and anti-security advice on TikTok: Case studies of technology-enabled surveillance and control in intimate partner and parent-child relationships. In *Eighteenth Symposium on Usable Privacy and Security (SOUPS 2022)*, August 2022.

[138] Kentrell Owens, Anita Alem, Franziska Roesner, and Tadayoshi Kohno. Electronic monitoring smartphone apps: An analysis of risks from technical, human-centered, and legal perspectives. In *31st USENIX Security Symposium*, 2022.

[139] Kentrell Owens, Johanna Gunawan, David Choffnes, Pardis Emami-Naeini, Tadayoshi Kohno, and Franziska Roesner. Exploring deceptive design patterns in voice interfaces. In *Proceedings of the 2022 European Symposium on Usable Security*, 2022.

[140] Lucy Simko, Jack Chang, Maggie Jiang, Ryan Calo, Franziska Roesner, and Tadayoshi Kohno. Covid-19 contact tracing and privacy: A longitudinal study of public opinion. *Digital Threats*, October 2022.

[141] Eric Zeng, Rachel McAmis, Tadayoshi Kohno, and Franziska Roesner. What factors affect targeting and bids in online advertising? A field measurement study. In *ACM Internet Measurement Conference (IMC)*, 2022.

[142] Brian Serafini, Lanu Kim, Basil M. Saour, Ryan James, Blake Hannaford, Ryan Hansen, Tadayoshi Kohno, Wayne Monsky, and Stephen P. Seslar. Exploring telerobotic cardiac catheter ablation in a rural community hospital: A pilot study. *Cardiovascular Digital Health Journal*, 3(6):313–319, December 2022.

[143] Pardis Emami-Naeini, Joseph Breda, Wei Dai, Tadayoshi Kohno, Kim Laine, Shwetak Patel, and Franziska Roesner. Understanding people's concerns and attitudes toward smart cities. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[144] Miranda Wei, Sunny Consolvo, Patrick Gage Kelley, Tadayoshi Kohno, Franziska Roesner, and Kurt Thomas. "There's so much responsibility on users right now:" Expert advice for staying safer from hate and harassment. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[145] Jackson Stokes, Tal August, Robert Marver, Alexei Czeskis, Franziska Roesner, Tadayoshi Kohno, and Katharina Reinecke. How language formality in security and privacy interfaces impacts intended compliance. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[146] Christina Yeung, Umar Iqbal, Yekaterina Tsipenyuk O'Neil, Tadayoshi Kohno, and Franziska Roesner. Online advertising in Ukraine and Russia during the 2022 Russian invasion. In *The Web Conference (WebConf)*, May 2023.

[147] Miranda Wei, Pardis Emami-Naeini, Franziska Roesner, and Tadayoshi Kohno. Skilled or gullible? Gender stereotypes related to computer security and privacy. In *IEEE Symposium on Security and Privacy*, May 2023.

[148] Kaiming Cheng, Jeffery F. Tian, Tadayoshi Kohno, and Franziska Roesner. Exploring user reactions and mental models towards perceptual manipulation attacks in mixed reality. In *USENIX Security Symposium*, August 2023.

[149] Rachel McAmis and Tadayoshi Kohno. The writing on the wall and 3D digital twins: Personal information in (not so) private real estate. In *USENIX Security Symposium*, August 2023.

[150] Tadayoshi Kohno, Yasemin Acar, and Wulf Loh. Ethical frameworks and computer security trolley problems: Foundations for conversations. In *USENIX Security Symposium*, August 2023. Full version and additional materials available online at https://securityethics.cs.washington.edu. (Recipient of the Distinguished Paper Award.) (Conference version of [190].) (Recipient of Honorable Mention Award at the 12th Annual Best Scientific Cybersecurity Paper Competition (2024).)

[151] Rachel Hong, Tadayoshi Kohno, and Jamie Morgenstern. Evaluation of targeted dataset collection on racial equity in face recognition. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, August 2023.

[152] Mattea Sim, Kurt Hugenberg, Tadayoshi Kohno, and Franziska Roesner. A scalable inclusive security intervention to center marginalized & vulnerable populations in security & privacy design. In *New Security Paradigms Workshop (NSPW)*, September 2023.

19

[153] Lucy Simko, Harshini Sri Ramulu, Tadayoshi Kohno, and Yasemin Acar. The use and nonuse of technology during hurricanes. In *ACM Conference On Computer-Supported Cooperative Work And Social Computing (CSCW)*, October 2023.

[154] Christina Yeung, Umar Iqbal, Tadayoshi Kohno, and Franziska Roesner. Gender biases in tone analysis: A case study of a commercial wearable device. In *Equity and Access in Algorithms, Mechanisms, and Optimization (EAAMO)*, October 2023.

[155] Ashish Hooda, Andrey Labunets, Tadayoshi Kohno, and Earlence Fernandes. Experimental analyses of the physical surveillance risks in client-side content scanning. In *Network and Distributed Security Symposium*, February 2024.

[156] Inyoung Cheong, Aylin Caliskan, and Tadayoshi Kohno. Safeguarding human values: Rethinking US law for generative AI's societal impacts. *AI and Ethics*, May 2024.

[157] Jaron Mink, Miranda Wei, Collins W. Munyendo, Kurt Hugenberg, Tadayoshi Kohno, Elissa M. Redmiles, and Gang Wang. It's trying too hard to look real: Deepfake moderation mistakes and identity-based bias. In *ACM Conference on Human Factors in Computing Systems (CHI)*, May 2024.

[158] Rachel McAmis, Betül Durak, Melissa Chase, Kim Laine, Franziska Roesner, and Tadayoshi Kohno. Handling identity and fraud in the metaverse. *IEEE Security & Privacy Magazine*, 2024.

[159] Rachel McAmis, Mattea Sim, Mia Bennett, and Tadayoshi Kohno. Over fences and into yards: Privacy threats and concerns of commercial satellites. In *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2024.

[160] Natalie Grace Brigham, Miranda Wei, Tadayoshi Kohno, and Elissa Redmiles. "Violation of my body:" Perceptions of AI-generated non-consensual (intimate) imagery. In *Symposium on Usable Privacy and Security*, August 2024.

[161] Kaiming Cheng, Arka Bhattacharya, Michelle Lin, Jaewook Lee, Aroosh Kumar, Jeffery F. Tian, Tadayoshi Kohno, and Franziska Roesner. When the user is inside the user interface: An empirical study of UI security properties in augmented reality. In *USENIX Security Symposium*, August 2024.

[162] Miranda Wei, Jaron Mink, Yael Eiger, Tadayoshi Kohno, Elissa M. Redmiles, and Franziska Roesner. SoK (or SoLK?): On the quantitative study of sociodemographic factors and computer security behaviors. In *USENIX Security Symposium*, 2024.

[163] Kabir Panahi, Shawn Robertson, Yasemin Acar, Alexandru G. Bardas, Tadayoshi Kohno, and Lucy Simko. "But they have overlooked a few things in Afghanistan:" An analysis of the integration of biometric voter verification in the 2019 Afghan presidential elections. In *USENIX Security Symposium*, 2024.

[164] Miranda Wei, Sunny Consolvo, Patrick Gage Kelley, Tadayoshi Kohno, Tara Matthews, Sarah Meiklejohn, Franziska Roesner, Renee Shelby, Kurt Thomas, and Rebecca Umbach. Understanding help-seeking and help-giving on social media for image-based sexual abuse. In *USENIX Security Symposium*, 2024.

[165] Umar Iqbal, Tadayoshi Kohno, and Franziska Roesner. LLM platform security: Applying a systematic evaluation framework to OpenAI's ChatGPT plugins. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, 2024.

[166] Jimin Mun, Liwei Jiang, Jenny Liang, Inyoung Cheong, Nicole DeCario, Yejin Choi, Tadayoshi Kohno, and Maarten Sap. Particip-AI: A democratic surveying framework for anticipating future AI use cases, harms and benefits, 2024.

[167] Kentrell Owens, Erin Freiburger, Ryan Hutchings, Mattea Sim, Franziska Roesner Kurt Hugenberg, and Tadayoshi Kohno. Face the facts: Using face averaging to visualize gender-by-race bias in facial analysis algorithms. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, 2024.

20

[168] Rachel Hong, William Agnew, Tadayoshi Kohno, and Jamie Morgenstern. Who's in and who's out? A case study of multimodal CLIP-filtering in DataComp. In *Equity and Access in Algorithms, Mechanisms, and Optimization (EAAMO)*, October 2024.

[169] Christina Yeung, Tadayoshi Kohno, and Franziska Roesner. On the (in)accessibility of web ads: Measurement and user study. In *ACM Internet Measurement Conference (IMC)*, November 2024. (Recipient of the Best Paper Award.)

[170] Kaiming Cheng, Mattea Sim, Tadayoshi Kohno, and Franziska Roesner. User comprehension and comfort with eye-tracking and hand-tracking permissions in augmented reality. In *Usable Security and Privacy Symposium (USEC)*, February 2025.

[171] Yuhao Wu, Franziska Roesner, Tadayoshi Kohno, Ning Zhang, and Umar Iqbal. IsolateGPT: An execution isolation architecture for LLM-based systems. In *Network and Distributed Security Symposium*, February 2025.

[172] Miranda Wei, Christina Yeung, Franziska Roesner, and Tadayoshi Kohno. "We're utterly ill-prepared to deal with something like this": Teachers' perspectives on student generation of synthetic nonconsensual explicit imagery. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2025. (Recipient of a Best Paper Honorable Mention Award.)

[173] Collins W. Munyendo, Kentrell Owens, Faith Strong, Shaoqi Wang, Adam J. Aviv, Tadayoshi Kohno, and Franziska Roesner. "You have to ignore the dangers": User perceptions of the security and privacy benefits of WhatsApp mods. In *IEEE Symposium on Security and Privacy*, May 2025.

[174] Kentrell Owens, Yael Eiger, Basia Radka, Tadayoshi Kohno, and Franziska Roesner. Understanding experiences with compulsory immigration surveillance in the U.S. In *ACM Conference on Fairness, Accountability, and Transparency (FAccT)*, June 2025.

[175] Mattea Sim, Basia Radka, Tadayoshi Kohno, Franziska Roesner, and Kurt Hugenberg. Characterizing the default persona: Mental representations of technology users are gendered. In *ACM Conference on Fairness, Accountability, and Transparency (FAccT)*, June 2025.

[176] Mattea Sim, Basia Radka, Emi Yoshikawa, Franziska Roesner, Kurt Hugenberg, and Tadayoshi Kohno. To reveal or conceal: Privacy and marginalization in avatars. In *Proceedings on Privacy Enhancing Technologies (PoPETs)*, July 2025.

[177] Cassidy Gibson, Daniel Olszewski, Natalie Grace Brigham, Anna Crowder, Kevin Butler, Patrick Traynor, Elissa M. Redmiles, and Tadayoshi Kohno. Analyzing the AI nudification application ecosystem. In *USENIX Security Symposium*, August 2025.

## Abstract (medical venue)

[178] Sinjin Lee, Benjamin Ransford, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Electromagnetic interference (EMI) of implanted cardiac devices by MP3 player headphones. *Circulation*, 118(18 Supplement), October 2008. Abstract; also presented at the American Heart Association Scientific Sessions 2008.

[179] Stephen P. Seslar, Brian Serafini, Lanu Kim, Basil Saour, Blake Hannaford, Tadayoshi Kohno, Ryan Hansen, Ryan James, and Wayne Monsky. Telerobotic cardiac catheter ablation in a rural hospital: A proof-of-concept simulation study. *HeartRhythm*, 19(5 Supplement), May 2022. Abstract only.

## Additional journal and magazine publications and book chapters

[180] John Viega, Tadayoshi Kohno, and Bruce Potter. Trust (and mistrust) in secure applications. *Communications of the ACM*, 44(2):31–36, February 2001.

[181] Tadayoshi Kohno. Protecting security and privacy. *Technology Review*, September/October 2007. (Invited article.)

[182] Ryan W. Gardner, Matt Bishop, and Tadayoshi Kohno. Are patched machines really fixed? *IEEE Security & Privacy Magazine*, 7(5), 2009.

[183] Franziska Roesner, Chris Rovillos, Tadayoshi Kohno, and David Wetherall. ShareMeNot: Balancing privacy and functionality of third-party social widgets. *USENIX ;login:*, 2012. (Magazine version of [65]; invited submission.)

[184] Adam Lerner, Anna Kornfeld Simpson, Tadayoshi Kohno, and Franziska Roesner. Excavating web trackers using web archaeology. *USENIX ;login:*, 2016. (Magazine version of [98]; invited submission.)

[185] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Arya: Operating system support for securely augmenting reality. *IEEE Security & Privacy Magazine*, January/February 2018. (Magazine version of [103]; invited submission.)

[186] Jean Camp, Ryan Henry, Tadayoshi Kohno, Shrirang Mare, Steve Myers, Shwetak Patel, and Joshua Streiff. Toward a secure Internet of Things: Directions for research. *IEEE Security & Privacy Magazine*, 18(4):28–37, 2020.

[187] Alaa Daffalla, Lucy Simko, Tadayoshi Kohno, and Alexandru G. Bardas. Defensive technology use during the 2018-2019 Sudanese revolution. *IEEE Security & Privacy Magazine*, March/April 2022. (Magazine version of [126]; invited submission.)

[188] Carl Landwehr, Michael K. Reiter, Laurie Williams, Gene Tsudik, Trent Jaeger, Tadayoshi Kohno, and Apu Kapadia. Looking backwards (and forwards): NSF Secure and Trustworthy Computing 20-year retrospective panel transcription. *IEEE Security & Privacy Magazine*, March/April 2023.

[189] Elissa M. Redmiles, Mia M. Bennett, and Tadayoshi Kohno. Power in computer security and privacy: A critical lens. *IEEE Security & Privacy Magazine*, March/April 2023.

[190] Tadayoshi Kohno, Yasemin Acar, and Wulf Loh. Computer security research, moral dilemmas, and ethical frameworks. *USENIX ;login:*, 2023. (Magazine version of [150]; invited submission.)

[191] Peter Ney, Arkaprabha Bhattacharya, Luis Ceze, Karl Koscher, Tadayoshi Kohno, and Jeff Nivala. Cybersecurity across the DNA-digital boundary: DNA samples to genomic data. In Dov Greenbaum, editor, *Cyberbiosecurity: A New Field to Deal with Emerging Threats*. 2023.

[192] Kevin Butler, Kurt Hugenberg, Eakta Jain, Apu Kapadia, Tadayoshi Kohno, Elissa M. Redmiles, Franziska Roesner, Mattea Sim, Patrick Traynor, and Hanna Barakat. Extending the Heilmeier catechism to evaluate security & privacy systems: Who is left out? *IEEE Security & Privacy Magazine*, 2025.

## Fiction and Creative Writing (Excluding Works Included in Other Sections)

[193] Tadayoshi Kohno. Aurras, what would you like on your pizza? *365tomorrows*, May 2021. https://365tomorrows.com/2021/05/20/aurras-what-would-you-like-on-your-pizza/.

[194] Tadayoshi Kohno. Civilizations. *Little Blue Marble*, May 2021. https://littlebluemarble.ca/2021/05/28/civilizations/.

[195] Tadayoshi Kohno. The glowing bonsai and the kintsugi pot. *After Dinner Conversation*, March 2022. https://www.amazon.com/gp/product/B09PYDX4C2/.

[196] Tadayoshi Kohno. Hope: A perspective from the forest. *Haven Speculative*, March 2022. https://www.havenspec.com/hope-a-perspective-from-the-forest.

[197] Tadayoshi Kohno. Excerpts from the New Dictionary of Cybersecurity, 2036. *IEEE Security & Privacy Magazine*, May/June 2022. https://www.computer.org/csdl/magazine/sp/2022/03/09782877/1DIwXnmch7G.

[198] Tadayoshi Kohno. Mx. President has a brain. *IEEE Security & Privacy Magazine*, May/June 2022. `https://www.computer.org/csdl/magazine/sp/2022/03/09782819/1DIwY0DWchi`.

[199] Tadayoshi Kohno, Camille Cobb, Ada Lerner, Michelle Lin, and Adam Shostack. The Buffet Overflow Café. *IEEE Security & Privacy Magazine*, July/August 2022. `https://www.computer.org/csdl/magazine/sp/2022/04/09826523/1EVdFa4nQty`.

[200] Tadayoshi Kohno The David and the fig leaf. *HyphenPunk*, September 2022.

[201] Tadayoshi Kohno. The schuhmacher. *IEEE Security & Privacy Magazine*, September/October 2022. `https://www.computer.org/csdl/magazine/sp/2022/05/09889017/1GDrB9gtoJ2`.

[202] Tadayoshi Kohno. The Our Reality privacy policy. *IEEE Security & Privacy Magazine*, November/December 2022. `https://www.computer.org/csdl/magazine/sp/2022/06/09935617/1HYqGuiyKLm`

[203] Tadayoshi Kohno. In Earth until (ready). *IEEE Security & Privacy Magazine*, March/April 2023. `https://www.computer.org/csdl/magazine/sp/2023/02/10102629/1MkXULlB4Ws`

[204] Tadayoshi Kohno. In your eyes. *IEEE Security & Privacy Magazine*, September/October 2023. `https://www.computer.org/csdl/magazine/sp/2023/05/10242186/1QdYSpZskKY`

[205] Tadayoshi Kohno. The task piper. *IEEE Security & Privacy Magazine*, July/August 2024. `https://ieeexplore.ieee.org/document/10621863`

### Books

[206] Niels Ferguson, Bruce Schneier, and Tadayoshi Kohno. *Cryptography Engineering: Design Principles and Practical Applications*. Wiley Publishing, Inc., 2010. (Translations completed or in-progress: Chinese, Italian, and Korean.)

[207] Tadayoshi Kohno. *Research Ideas Notebook*. 2020.

[208] Ryan Calo, Batya Friedman, Tadayoshi Kohno, Hannah Almeter, and Nick Logler, editors. *Telling Stories: On Culturally Responsive Artificial Intelligence*. University of Washington Tech Policy Lab, 2020.

[209] Tadayoshi Kohno. *Our Reality: A Novella*. 2021. ([231] is the companion manuscript.)

### Dissertation

[210] Tadayoshi Kohno. *Authenticated Encryption in Practice: Generalized Composition Methods and the Secure Shell, CWC, and WinZip Schemes*. PhD thesis, University of California at San Diego, June 2006. (PhD Dissertation Award, Department of Computer Science and Engineering, UC San Diego.)

### Standards document

[211] Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. SSH transport layer encryption modes. IETF RFC 4344, January 2006. (Based on [16, 8].)

### Game and Educational Toolkits

[212] Tamara Denning, Tadayoshi Kohno, and Adam Shostack. *Control-Alt-Hack™: White Hat Hacking for Fun and Profit*. 2012. (This is a tabletop card game designed to be both educational and fun; see also [77].)

[213] Tamara Denning, Batya Friedman, and Tadayoshi Kohno. *The Security Cards: A Security Threat Brainstorming Toolkit*. 2013. (This is a card deck designed to assist in computer security threat brainstorming and computer security threat education.)

## Technical Reports and Other Manuscripts

[214] Tadayoshi Kohno. Congressional testimony. In *Hearing on Electronic Voting System Security: Hearing Before the Committee on House Administration, House of Representatives, One Hundred Eighth Congress, Second Session*, July 7, 2004.

[215] Ryan Gardner, Alec Yasinsac, Matt Bishop, Tadayoshi Kohno, Zachary Hartley, John Kerski, David Gainey, Ryan Walega, Evan Hollander, and Michael Gerke. Software review and security analysis of the Diebold voting machine software. Report commissioned by the Florida Department of State, July 2007.

[216] Niels Ferguson, Stefan Lucks, Bruce Schneier, Doug Whiting, Mihir Bellare, Tadayoshi Kohno, Jon Callas, and Jesse Walker. The Skein hash function family. Submission to the NIST Cryptographic Hash Algorithm Competition, October 2008.

[217] Mihir Bellare, Tadayoshi Kohno, Stefan Lucks, Niels Ferguson, Bruce Schneier, Doug Whiting, Jon Callas, and Jesse Walker. Provable security support for the Skein hash family. February 2009.

[218] Alexei Czeskis, Karl Koscher, Max Andrews, Nell Carden Grey, Batya Friedman, and Tadayoshi Kohno. The International Criminal Tribunal for Rwanda Information Heritage Project (aka Voices of the Rwanda Tribunal): Integrity verification architecture. Technical Report UW-CSE-09-01-02, University of Washington Computer Science and Engineering, March 2009.

[219] Roxana Geambasu, Tadayoshi Kohno, Arvind Krishnamurthy, Amit Levy, Henry M. Levy, Paul Gardner, and Vinnie Moscaritolo. New directions for self-destructing data. Technical Report UW-CSE-11-08-01, University of Washington Computer Science and Engineering, August 2011.

[220] Alexei Czeskis, David Mah, Omar Sandoval, Ian Smith, Karl Koscher, Jacob Appelbaum, Tadayoshi Kohno, and Bruce Schneier. DeadDrop/Strongbox security assessment. Technical Report UW-CSE-13-08-02, University of Washington Computer Science and Engineering, August 2013.

[221] Iván Arce, Kathleen Clark-Fisher, Neil Daswani, Jim DelGrosso, Danny Dhillon, Christoph Kern, Tadayoshi Kohno, Carl Landwehr, Gary McGraw, Brook Schoenfield, Margo Seltzer, Diomidis Spinellis, Izar Tarandach, and Jacob West. Avoiding the top 10 software security design flaws. Technical report, IEEE Center for Secure Design, 2014.

[222] Temitope Oluwafemi, Earlence Fernandes, Oriana Riva, Franziska Roesner, Suman Nath, and Tadayoshi Kohno. Per-app profiles with appfork: The security of two phones with the convenience of one. Technical Report MSR-TR-2014-153, Microsoft Research, December 2014.

[223] Bruce Schneier, Matthew Fredrikson, Tadayoshi Kohno, and Thomas Ristenpart. Surreptitiously weakening cryptographic systems. Technical Report 2015/097, Cryptology ePrint Archive, February 2015.

[224] Tadayoshi Kohno, Joel Kollin, David Molnar, and Franziska Roesner. Display leakage and transparent wearable displays: Investigation of risk, root causes, and defenses. Technical Report MSR-TR-2015-18, Microsoft Research, February 2015.

[225] Kiron Lebeck, Temitope Oluwafemi, Tadayoshi Kohno, and Franzi Roesner. Rethinking mobile money security for developing regions. Technical Report UW-CSE-2015-12-01, University of Washington, December 2015.

[226] Stefano Baldassi, Tadayoshi Kohno, Franziska Roesner, and Moqian Tian. Challenges and new directions in augmented reality, computer security, and neuroscience – part 1: Risks to sensation and perception. Technical Report 1806.10557, arXiv, June 2018.

[227] Alex Takakuwa, Tadayoshi Kohno, and Alexei Czeskis. The Transfer Access Protocol — Moving to new authenticators in the FIDO ecosystem. Technical Report UW-CSE-17-06-01, University of Washington, June 2017.

24

[228] Franziska Roesner and Tadayoshi Kohno (editors). 2019 industry-academia summit on mixed reality security, privacy, and safety: Summit report, April 2020.

[229] Ivan Evtimov, Weidong Cui, Ece Kamar, Emre Kıcıman, Tadayoshi Kohno, and Jerri Li. Security and machine learning in the real world. Technical Report 2007.07205, arXiv, July 2020.

[230] Kevin Fu, Tadayoshi Kohno, Daniel Lopresti, Elizabeth Mynatt, Klara Nahrstedt, Shwetak Patel, Debra Richardson, and Ben Zorn. Safety, security, and privacy threats posed by accelerating trends in the Internet of Things. Technical Report 2008.00017, arXiv, July 2020.

[231] Tadayoshi Kohno. Background and Context to the *Our Reality* Novella. Manuscript, June 2021. (This is a companion manuscript to the novella [209].)

[232] Peter Ney, Arkaprabha Bhattacharya, David Ward, Luis Ceze, Tadayoshi Kohno, and Jeff Nivala. Doctoring direct-to-consumer genetic tests with DNA spike-ins. Technical report, bioRxiv, 2022.

[233] Rock Yuren Pang, Dan Grossman, Tadayoshi Kohno, and Katharina Reinecke. The case for anticipating undesirable consequences of computing innovations early, often, and across computer science. Technical Report 2309.04456, arXiv, 2023.

[234] Natalie Grace Brigham, Chongjiu Gao, Tadayoshi Kohno, Franziska Roesner, and Niloofar Mireshghallah. Developing story: Case studies of generative AI's use in journalism. In *Socially Responsible Language Modeling Research (SoLaR)*, December 2024. Presented at a NeurIPS workshop without proceedings; also available as Technical Report 2406.13706, arXiv, June 2024.

## Film

[235] Tadayoshi Kohno (participant). *NOVA ScienceNOW: Can Science Stop Crime?* Season 6, Episode 2, October 2012.

[236] Tadayoshi Kohno (participant). *NOVA CyberWar Threat*, Season 43, Episode 4, October 2015.

## PRESENTATIONS

### Invited talks

1. DC Security Geeks, Falls Church, VA, September 2003. Talk title: Analysis of an electronic voting system.

2. Computer and Information Science Department, University of Oregon, Eugene, OR, April 2004. Talk title: Electronic voting: Is it ready for prime-time.

3. Information Security Institute, The Johns Hopkins University, Baltimore, MD, December 2007. Talk title: Privacy-respecting proactive forensics.

4. Gnomedex, Seattle, WA, August 2008. Joint talk with Gabriel Maganis. Talk title: Adeona: Privacy-preserving device tracking.

5. 11th Software Design for Medical Devices Conference, San Diego, CA, October 2008. Talk title: Security and privacy for wireless implantable devices: Pacemakers, defibrillators, and more.

6. Qualcomm Security Summit, San Diego, CA, May 2009. Talk title: Academic explorations in security.

7. U.S.-France Young Engineering Scientists Symposium (YESS), Washington, DC, July 2009. Talk title: Privacy-respecting digital forensics.

8. Technology Alliance, Science & Technology Discovery Series, September 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

9. Information Technology Study Group (ITSG, an Industry/Law Enforcement Workshop), Seattle, WA, October 2009. Talk title: Vanish: Increasing data privacy with self-destructing data.

25

10. Google, Fremont, WA, October 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

11. MITACS Speaker Series on Privacy, David R. Cheriton School of Computer Science, University of Waterloo, March 2009. Talk title: Increasing privacy with self-destructing data.

12. Medical Devices Summit, Boston, MA, March 2010. Talk title: Security and privacy for wireless implantable devices.

13. The Center for Internet and Society, Stanford Law School, Stanford, April 2010. Talk title: Computer security and privacy for emerging technologies: Implantable medical devices and household robots.

14. Intel Trust Evidence Workshop, Santa Clara, CA, May 2010. Talk title: Trust evidence in heterogeneous environment: Defining viable research agendas.

15. Microsoft Research Networking Summit, Bellevue, WA, June 2010. Talk title: Vanish: Self-destructing data.

16. Science Café, Pacific Science Center, Kirkland, WA, July 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

17. Washington Technology Industry Association IT Security SIG, Seattle, WA, August 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

18. Poynter Center for the Study of Ethics and American Institutions, Bloomington, IN, October 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

19. Science Café, Pacific Science Center, Seattle, WA, November 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

20. Tenth Annual Diabetes Technology Meeting, Diabetes Technology Society, Bethesda, MD, November 2010. Talk title: Computer Security Risks and Mitigations for Wireless Implantable Medical Devices.

21. Medical Device R&D Summit, Hollywood, FL, December 2010. Talk title: Computer Security for Wireless Implantable Medical Devices.

22. Keynote, IEEE International Workshop on Information Forensics and Security, Seattle, WA, December 2010. Talk title: Security for Cyber-physical Systems: Case Studies with Medical Devices, Robots, and Automobiles.

23. Automobile Security Symposium, Information-Technology Promotion Agency, Tokyo, Japan, February 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

24. Committee on Electronic Vehicle Controls and Unintended Acceleration, National Academies, Washington, DC, March 2011. Joint talk with Stefan Savage. Talk title: Experimental Security Analysis of a Modern Automobile.

25. Oregon Security Day, Department of Computer and Information Science, University of Oregon, Eugene, OR, April 2011. Talk title: Security and Privacy in the 21st Century – or – Experimental Security Analysis Research Case Studies.

26. Colloquium, Department of Computer Science, Dartmouth College, Hanover, NH, May 2011. Talk title: Experimental Security Analysis Research: Case Studies with Medical Devices, Robots, and Cars.

27. In-Q-Tel Tech Focus Day, Arlington, VA, June 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

28. In-Q-Tel Tech Focus Day, Arlington, VA, June 2011. Talk title: Security, Emerging Technologies, and Disappearing Data.

29. Discovery 2015, Oak Ridge National Labs, Oak Ridge, TN, September 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

30. Colloquium, Department of Computer Science, University of Colorado, Boulder, CO, October 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

26

31. Keynote, 9th ESCAR Embedded Security in Cars Conference, Dresden, Germany, November 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

32. Computer Science and Telecommunications Board Meeting, National Academies, Redmond, WA, March 2012. Talk title: Experimental Security Analysis of a Modern Automobile.

33. Keynote, ACM Conference on Security and Privacy in Wireless and Mobile Networks (ACM WiSec), April 2012. Talk title: Security for Cyber-physical Systems: Case Studies with Medical Devices, Robots, and Automobiles.

34. Featured speaker, 2012 Science Luminaries Series, Seattle Science Festival (celebrating the 50th anniversary of the 1962 Seattle World's Fair), Seattle, WA, June 2012. Talk title: Computer Security for Everyday Devices.

35. Technology and Ethics Study Group, Yale University, New Haven, CT, August 2012. Talk title: Computer Security and Everyday Objects: Case Studies with Medical Devices, Robots, and Automobiles.

36. ZonCon, Amazon.com, Seattle, WA, March 2013. Talk title: Control-Alt-Hack: White Hat Hacking for Fun and Profit. (Co-presented with Tamara Denning and Adam Shostack.)

37. Cool Jobs in CS, Seattle Science Festival, Pacific Science Center, Seattle, WA, June 2013.

38. Keynote, IEEE Pacific Rim International Symposium on Dependable Computing (PRDC), Vancouver, BC, Canada, December 2013. Talk title: Computer Security and Everyday Objects: Case Studies with Medical Devices, Robots and Automobiles.

39. SPY—The Secret World of Espionage exhibit, Pacific Science Center, Seattle, WA, April 2014. Talk title: Computer Security and Everyday Objects: Case Studies and with Medical Devices, Robots, and Automobiles.

40. Science Café, Pacific Science Center, Kirkland, WA, April 2014. Talk title: Computer Security and Everyday Objects: Case Studies and with Medical Devices, Robots, and Automobiles.

41. Inaugural Stanford University Congressional Cyber Boot Camp (for U.S. congressional staff), Stanford University, Stanford, CA, August 2014. Talk title: Security as a Concept.

42. Keynote, IEEE MIT Undergraduate Research Technology Conference, Boston, MA, November 2015.

43. The Washington Area Trustworthy Computing Hour (WATCH) seminar series, National Science Foundation, Arlington, VA, November 2015. Talk title: Computer Security and the Internet of Things.

44. DARPA ISAT, Whither the Data? Toward Understanding Flows in Complex Data Ecosystems, Virtual Meeting, December 2015. Talk title: Opaque Data Flows and National Security.

45. NSF Visioning Workshop on Smart and Connected Communities Research and Education, Seattle, WA, January 2016. Talk title: Security & Privacy in the Age of IoT.

46. USENIX Enigma, San Francisco, CA, January 2016. Talk title: Computer Security and the Internet of Things.

47. Netgain Partnership, "Fireside Chat", San Francisco, CA, October 2017. Topic: Internet of Things and Security.

48. Keynote, GREPSEC III, San Jose, CA, May 2017. Talk title: Experimental Computer Security Research: Project Conception, Execution, and Communication.

49. NIAC Workshop on Data Sciences: Smart Mobility/Transportation, Seattle, WA, May 2017. Talk title: Security and Privacy in the Age of IoT.

50. Libro.fm, Seattle, WA, December 2021. Diversity, Equity, and Inclusion.

51. Keynote, Border Regimes in the Age of Technoscience, Eberhard Karls Universität Tübingen, June 2022.

52. Seminar, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Carnegie Mellon University, Pittsburgh, PA, October 2023.

53. Seminar, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Stanford University, Palo Alto, CA, November 2023.

54. Keynote, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Qualcomm Product Security Summit, May 2023. (With Yasemin Acar.)

55. Dean's Distinguished Lecture, Computer Security and Privacy Research: The Past, the Present, and the Future, School of Information, University of California Berkeley, Berkeley, CA, October 2023.

56. Distinguished Lecture, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Department of Computer Sciences, University of Wisconsin, Madison, WI, November 2023.

57. Keynote, Ethical Frameworks and Computer Security Trolley Problems , Research Open House, Department of Computer Science & Engineering, University of California at San Diego, La Jolla, CA, January 2024.

58. The American Bar Association's Forensic Science and Information Technology Institute, San Diego, CA, April 2024. Talk title: A Computer Security Researchers Thoughts on the Future Risks with Generative AI System.

59. Max Planck Institute for Security and Privacy (MPI-SP), Symposium on Systems Security, Bochum, Germany, June 2024. Talk title: Ethical Frameworks and Computer Security Trolley Problems.

60. Keynote, Navigating Academia, ACM CCS 2024 DEI Workshop, October 2024.

61. Department Colloquium, Ethical Frameworks and Computer Security Trolley Problems, University of Colorado, Boulder, CO, December 2024.

## Congressional testimony

62. Invited testimony before the U.S. House of Representatives, Committee on House Administration, Hearing on Electronic Voting System Security, July 2004.

## Invited panels

63. KQED Public Radio San Francisco and Sacramento, Friday Forum, February 2004. Panelist with Sharon Harrington, Harris Miller, and Barbara Simons. Topic: Electronic voting.

64. First Microsoft Youth Summit for Online Safety, San Diego, CA, June 2005. Panelist with William Griswold, Blake Irving, John G. Malcolm, Trevor Marsh, Teri Schroeder, and Michael Sullivan. Topic: Youth online safety.

65. ACLU of Washington Annual Membership Conference, Seattle, WA, February 2007. Panelist with Christina Drummond and Barry Steinhardt. Topic: Electronic voting.

66. National ACLU Biennial Conference, Seattle, WA, June 2007. Panelist with Laughlin McDonald and Howard Simon. Topic: Electronic voting.

67. Microsoft Research Faculty Summit 2007, Redmond, WA, July 2007. Panelist with Eric Horvitz, Frank McSherry, Wendy Seltzer, and Daniel Weitzner. Topic: Computer security challenges and opportunities.

68. Emerging Technologies Conference at MIT, Boston, MA, September 2007. Panelist with Paul Q. Judge, Ivan Krstić, and Anna Lysyanskaya. Topic: Emerging technologies and computer security.

69. International Conference on Mobile Systems, Application, and Services (MobiSys), Breckenridge, CO, June 2008. Panelist with Paul K. Ohm, Kevin Fu, Marco Gruteser. Topic: Wireless privacy.

70. Federal Trade Commission's (FTC) Town Hall meeting on "Pay on the Go: Consumers & Contactless Payment", Seattle, WA, July 2008. Panelist with Paula J. Bruening, John Carlson, Alissa Cooper, David Moorman, and Kathryn D. Ratté. Topic: Contactless payment.

71. Privacy Enhancing Technologies Symposium (PETS), Seattle, WA, August 2009.  Panelist with Doug Klunder and Landon Cox. Topic: Privacy for emerging technologies.

72. USENIX Workshop on Cyber Security Experimentation and Test, Washington, DC, August 2010. Panelist with Deborah Frincke, Kevin Fu, and Marcelo Masera.

73. Federal Trade Commission's (FTC), Internet of Things Workshop, Washington, DC, November 2013. Panelist with John Nielson, Kenneth Wayne Powell, and Christopher Wolf.

74. RSA Conference, Securing Smart Machines: Where We Are, Where We Want to Be, and Challenges, San Francisco, CA, February 2014. Panelist with Akshay Aggarwal, Dan Guido, and Laura Berger.

75. Intel Developer Forum, Academia and Security Curriculum—A Need for Future Developers, San Francisco, CA, August 2014. Panelist with Blair Taylor and Paul Tymann.

76. Government Accountability Office, Comptroller General Forum on 21st Century Data and Analytics, Washington, DC, January 2016. Panelist with Ashkan Soltani, Michael Lynch, and Oliver Richard.

77. Federal Trade Commission's (FTC), Start with Security, Seattle, WA, February 2016. Panelists TBD.

78. RSA Conference, Do We Need Cyber-Ratings for the Auto Industry? San Francisco, CA, March 2016. Panelist with Jacob Olcott, Chan Lieu, and Michal Freedhoff.

79. NSF SaTC PI Meeting, SaTC Retrospective, Arlington, VA, June 2022. Panelist with Lorrie Cranor, Trent Jaeger, Gene Tsudik, Laurie Williams; Carl Landwehr as moderator.

## Guest lectures in courses

80. Undergraduate operating systems course, Department of Computer Science, University of Colorado, Boulder, CO, April 1999. Topic: Common pitfalls in computer security.

81. Undergraduate advanced Internet and web services course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2006.  Topic: Key principles in computer security and applied cryptography.

82. Graduate advanced information assurance course, Department of Computer Science, University of Massachusetts, Amherst, MA, September 2007. Topic: Information forensics.

83. Undergraduate scalable systems course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2008.  Topic: Key principles in computer security and applied cryptography.

84. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2008.  Topic: Contemporary directions in computer security and privacy research.

85. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2009. Topic: Computer security for emerging technologies.

86. Freshman "Engineering as a Humanitarian Pursuit" seminar, College of Engineering, University of Washington, Seattle, WA, October 2009. Topic: Computer security for emerging technologies.

87. Undergraduate advanced Internet and web services course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2009.  Topic: Key principles in computer security and applied cryptography.

88. Freshman "Engineering for Society" seminar, College of Engineering, University of Washington, Seattle, WA, October 2010. Topic: Computer security for emerging technologies.

89. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, December 2010. Topic: Computer security for emerging technologies.

90. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2011. Topic: Experimental security analysis of a modern automobile.

29

91. Undergrad research seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, May 2012. Topic: Security for cyber-physical systems: Case studies with medical devices, robots, and automobiles.

92. Undergraduate advanced Internet systems, Department of Computer Science and Engineering, University of Washington, Seattle, WA, February 2015. Topic: Bitcoin.

93. Introduction to research course for first year PhD students, School of Information, University of Washington, Seattle, WA, October 2017.

94. Freshman seminar, Department of Computer Science, University of Colorado, Boulder, CO, November 2018.

95. Freshman seminar, Department of Computer Science, University of Colorado, Boulder, CO, November 2020.

96. Graduate computer security course, Department of Computer and Information Science and Engineering, University of Florida, Gainesville, FL, February 2023.

## Talks affiliated with the University of Washington

97. Bay Area Alumni Meeting, Department of Computer Science and Engineering, Mountain View, CA, April 2007. Talk title: Security and privacy in the 21st Century.

98. Bay Area Alumni Meeting, Department of Computer Science and Engineering, Bellevue, WA, May 2007. Talk title: Security and privacy in the 21st Century.

99. University of Washington and Microsoft Research Summer Institute, Blaine, WA, July 2009. Talk title: Securing technologies in the home: Is there anything new?

100. Engineering Lecture Series, College of Engineering, University of Washington, Seattle, WA, October 2009. Joint talk with Magdalena Balazinska. Talk title: The cyberspace data explosion: Boon or black hole.

101. Keynote, Annual Industrial Affiliates Meeting, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2009. Talk title: Protecting the bionic man: Overcoming security challenges in emerging technologies.

102. Web Application Security Peer Working Group (WASP), University of Washington, Seattle, WA, October 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

103. Puget Sound Regional Council, Seattle, WA, December 2009. Talk title: Mobile personal privacy and security: A new framework and technology to account for human values.

104. Pre-engineering Orientation, College of Engineering, University of Washington, Seattle, WA, July 2010. Talk title: Computer security for emerging technologies.

105. Keynote, high school programming contest, Department of Computer Science and Engineering, University of Washington, Seattle, WA, December 2011. Talk title: Computer security for emerging technologies.

106. Keynote, Professional Masters Program Reunion, Department of Computer Science and Engineering, University of Washington, Seattle, WA, May 2015. Topic: Computer security and the Internet of Things.

107. Panelist, UW Engineering Lecture Series, College of Engineering, University of Washington, Seattle, WA, November 2015. Panelist with Ryan Calo and Batya Friedman. Panel title: Responsible Innovation: A Cross Disciplinary Lens on Privacy and Security Challenges.

108. Interactive Intelligence (student group), April 2024. Talk title: Ethical Frameworks and Computer Security Trolley Problems.

109. Panelist, GEN1 (student group) event on "Student-Professor Talks: Grad School & Research", April 2024.

110. Host, EFF and the UW Tech Policy Lab and the UW Society + Technology's event on "The Model Hacker? The Intersection of AI and Security Research", May 2024.

## Conference and workshop paper presentations

111. A network-flow-based scheduler: Design, performance history, and experimental analysis. Second Workshop on Algorithm Engineering and Experiments, San Francisco, CA, January 2000.

112. Preliminary cryptanalysis of reduced-round Serpent. Third AES Candidate Conference, New York, NY, April 2000.

113. On the global content PMI: Improved copy-protected Internet content distribution. Financial Cryptography, Grand Cayman, BWI, February 2001.

114. Authenticated encryption in SSH: Provably fixing the SSH binary packet protocol. Ninth ACM Conference on Computer and Communications Security, Washington, DC, November 2002.

115. Analysis of RMAC. Fast Software Encryption, Lund, Sweden, February 2003.

116. A theoretical treatment of related-key attacks: RKA-PRPs, RKA-PRFs, and applications. Advances in Cryptology – EUROCRYPT, Warsaw, Poland, May 2003.

117. Birthday attacks on hash-functions, revisited: The importance of being well-balanced. Advances in Cryptology – EUROCRYPT, Interlaken, Switzerland, May 2004.

118. Remote physical device fingerprinting. IEEE Symposium on Security and Privacy, Oakland, CA, May 2005.

119. Stateful public-key cryptosystems: How to encrypt with one 160-bit exponentiation. 13th ACM Conference on Computer and Communications Security, Alexandria, VA, November 2006.

120. Science fiction prototyping and security education: Cultivating contextual and societal thinking in computer security education and beyond. ACM Technical Symposium on Computer Science Education (SIGCSE), Dallas, TX, March 2011.

121. Vulnerability research in the cyberphysical world. Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS), San Francisco, CA, May 2013. (Co-presented with Stefan Savage.)

122. Ethical frameworks and computer security trolley problems: Foundations for conversations. USENIX Security Symposium, Anaheim, CA, August 2023.

## Other presentations

123. New results on iterated DES constructions. CRYPTO 2002 Rump Session, Santa Barbara, CA, August 2002. (This was a comedic talk cryptanalyzing Paul Kocher's 4DES.)

124. Authenticated encryption in SSH: Fixing the SSH binary packet protocol. CRYPTO 2002 Rump Session, Santa Barbara, CA, August 2002.

125. Analysis of an electronic voting system. CRYPTO 2003 Rump Session, Santa Barbara, CA, August 2003. (Recipient of the "Best Rump Session Talk" award.)

## TEACHING AND EDUCATION

## Courses

- Grader, Design and Analysis of Algorithms, graduate course (CSCI 5454), Department of Computer Science, University of Colorado, Spring 1997 and Spring 1998. (Instructor: Prof. Harold N. Gabow.)

- Teaching Assistant, Computer Networks, undergraduate and graduate course (CSCI 4273 and CSCI 5273), Department of Computer Science, University of Colorado, Fall 1998. (Instructor: Prof. Evi Nemeth.)

- Teaching Assistant, Introduction to Modern Cryptography, undergraduate course (CSE 107), Department of Computer Science and Engineering, University of California at San Diego, Winter 2005. (Instructor: Prof. Mihir Bellare.)

31

- Teaching Assistant, Modern Cryptography, graduate course (CSE 207), Department of Computer Science and Engineering, University of California at San Diego, Fall 2005. (Instructor: Prof. Mihir Bellare.)

- Instructor, Selected Topics in Computer Security, graduate course (CSE 599 G), Department of Computer Science and Engineering, University of Washington, Autumn 2006.

- Instructor, Selected Topics in Computer Security, professional masters course (CSEP 590 B), Department of Computer Science and Engineering, University of Washington, Winter 2007. (Co-instructor: Dr. John Manferdelli.)

- Instructor, Selected Topics in Computer Security, undergraduate course (CSE 490 K), Department of Computer Science and Engineering, University of Washington, Spring 2007.

- Instructor, Selected Topics in Computer Security, graduate course (CSE 599 G), Department of Computer Science and Engineering, University of Washington, Autumn 2007.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2008.

- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Autumn 2008.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2009.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2010.

- Instructor, Computer Security, graduate seminar (CSE 590 K1), Department of Computer Science and Engineering, University of Washington, Spring 2010. (Co-instructor: Dr. David Molnar.)

- Instructor, Computer Security, professional masters course (CSEP 590 C), Department of Computer Science and Engineering, University of Washington, Spring 2010.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2011.

- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Spring 2011.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2011. (Co-instructor: Dan Halperin.)

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2012.

- Instructor, Computer Security, professional masters course (CSEP 564), Department of Computer Science and Engineering, University of Washington, Autumn 2012.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2013.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2013.

- Instructor, Computer Security, professional masters course (CSEP 564), Department of Computer Science and Engineering, University of Washington, Winter 2015.

- Instructor, Cryptography, graduate course (CSE 599 B), Department of Computer Science and Engineering, University of Washington, Spring 2015.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2015.

- Instructor, Cryptography, undergraduate course (CSE 490C), Department of Computer Science and Engineering, University of Washington, Winter 2016.

32

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2016.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2017. (Co-taught with Franziska Roesner.)
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2018.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2018.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2018.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2019.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2019.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2020.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2021.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2021.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2022.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Spring 2022.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Autumn 2022.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2023.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2024.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Spring 2024.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2025.

**Educational materials developed (beyond normal classroom materials)**

- Security reviews and computer security mindset education. Security reviews, the approach used in UW CSE 484 to teach the computer security mindset, received national attention after a 2008 Wired article discussed the course and the associated teaching methodology (`http://archive.wired.com/politics/security/commentary/securitymatters/2008/03/securitymatters_0320`). The approach has subsequently been adopted by instructors at other institutions.
- Science fiction prototyping and computer security mindset education. Science fiction prototyping, another approach used in UW CSE 484 to teach the computer security mindset, was covered in publication [57]. The approach has also been adopted by instructors at other institutions.

33

- *Control-Alt-Hack*[TM] *: White Hat Hacking for Fun and Profit*, 2012 (co-developed with Tamara Denning and Adam Shostack). This a card game designed to be fun and educational. We have distributed free copies to educators around the world. This game has been used at numerous academic institutions and companies.
- The Security Cards: A Security Threat Brainstorming Toolkit, 2013 (co-developed with Tamara Denning and Batya Friedman). This is a deck of cards design to assist in computer security brainstorming and threat modeling. We have distributed free copies to educators around the world. This game has been used at numerous academic institutions and companies and with policy makers.

**Educational development**

- Participant, National Effective Teaching Institute, Atlanta, GA, June 2013. Nominated for participation by the University of Washington College of Engineering.

**Additional activities**

- Reviewer, Senior exhibitions, University City High School, San Diego, CA, 2002–2004.
- Session organizer, Washington Summer Scholars (high school honors program), University of Washington, July 2007. Session topic: Cryptography and computer security.
- Session organizer, CS4HS (computer science for high school teachers workshop), Department of Computer Science and Engineering, University of Washington, July 2008. Session topic: High school mathematics and cryptography.
- Workshop organizer, Mathematics Academy, College of Engineering, University of Washington, July 2010. Workshop title: Computer security for emerging technologies: Medical devices, robots, cars, and more. (Organized a three-day workshop on computer science and computer security for underrepresented minorities.)
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2014.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2015.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2016.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2017.
- Chair, Evaluation Committee, GREPSEC III (NSF Supported Workshop for Women and Underrepresented Groups Interested in Computer Security Research), 2017.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2018.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2019.
- Chair, Evaluation Committee, GREPSEC IV (NSF Supported Workshop for Women and Underrepresented Groups Interested in Computer Security Research), 2019.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2020.
- Panelist, Student Advisory Council Vulnerability and Failure Panel, May 2020.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2021.
- Keynote presenter, CS4teachers, Allen School, University of Washington, August 2021.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2023.
- Mentor and session organizer, GREPSEC, August 2023. GREPSEC is a workshop for PhD students in computer security and privacy, focusing on underrepresented populations, including women, non-binary, and gender minorities; Black, Hispanic/Latino/Latina, Native American and Indigenous students; and LGBTQ+ students.
- Presenter, UWHS (UW in the High School) Teacher Training and Professional Development, May 2024. Session/activity #1: Threat Modeling and Security. Session/activity #2: Ethical Framework and Computer

Security Trolley Problem.

**MATERIALS CONSIDERED**

**Expert Reports**

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR (N.D. Cal.) – Opening Expert Report and Declaration of J. Alex Halderman, Ph.D. (Mar. 7, 2025)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR (N.D. Cal.) – Expert Report of Tadayoshi Kohno, Ph.D. (Mar. 7, 2025)

**Bates Documents**

APL-APPSTORE_00408974
APL-APPSTORE_01996035
APL-APPSTORE_02812524
APL-APPSTORE_05501925
APL-APPSTORE_09477352
APL-APPSTORE_09884199
APL-APPSTORE_10888458
APL-APPSTORE_11478929
APL-EG_01466069
APL-EG_01547280
APL-EG_0486941

**Articles, Books, and Websites**

*App Review*, Apple Support,
https://developer.apple.com/distribute/app-review/#submitting-for-review

*App Review Guidelines*, Apple Support,
https://developer.apple.com/app-store/review/guidelines/

*Update on apps distributed in the European Union*, Apple Support,
https://developer.apple.com/support/dma-and-apps-in-the-eu/

Michelle Bandur, Police warn sexual predators use this app to target kids, Department of Defense – Combating Trafficking in Persons Program Management Office (Jan. 14, 2020),
https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-card-9-assets/PoliceWarnAvakinLife.pdf

Sebastian Blanco, *Snapchat Removes Speed Filter Blamed for Numerous High-Speed Crashes*, Car and Driver (June 20, 2021),
https://www.caranddriver.com/news/a36777379/snapchat-removes-speed-filter-crashes/

Sidney Bill, *The History of Snapchat*, thinglabs (Nov. 15, 2014),
https://thinglabs.io/the-history-of-snapchat

1

*Kik the New Instant Messenger*, Black PR Wire (Dec. 18, 2010),
https://blackprwire.com/press-releases/2946-bprw_kik_the_new_instant_messenger

Thomas Brewster, *This $1 Billion App Can't 'Kik' Its Huge Child Exploitation Problem*,
Department of Defense – Combating Trafficking in Persons Program Management Office,
https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-
card-9-assets/KikMessenger.pdf

*The complete history of Instagram*, Buzz Voice (Dec. 22, 2020),
https://buzzvoice.com/blog/the-complete-history-of-instagram/

Brian Chen, *Want Porn? Buy an Android Phone, Steve Jobs Says*, Wired (Apr. 20, 2010),
https://web.archive.org/web/20140331063405/https://www.wired.com/2010/04/steve-jobs-porn/

Cheng Chen and Louis Leung, *Are you addicted to Candy Crush Saga? An exploratory study
linking psychological factors to mobile social game addiction*, Telematics and Informatics,
Volume 33, Issue 4, Pages 1155-1166 (Nov. 2016),
https://www.sciencedirect.com/science/article/abs/pii/S073658531500132X

*Secure by Design: Shifting the Balance of Cybersecurity Risk: Principles and Approaches For
Secure By Design Software*, Cybersecurity and Infrastructure Security Agency (Oct. 2023),
https://www.cisa.gov/sites/default/files/2023-10/Shifting-the-Balance-of-Cybersecurity-Risk-
Principles-and-Approaches-for-Secure-by-Design-Software.pdf

Sergio De Simone, *The Ten Year Journey of Facebooks App for iOS*, InfoQ (Feb. 8, 2023),
https://www.infoq.com/news/2023/02/Facebook-app-ten-years/

*Parent Resource Guide to Student Guide to Preventing Human Trafficking*, Department of
Defense – Combating Trafficking in Persons Program Management Office (Oct. 2021),
https://ctip.defense.gov/Portals/12/Parent%20Resource%20Guide_FINAL_update%202025.pdf

*Quarterly CTIP Newsletter*, Department of Defense – Combating Trafficking in Persons
Program Management Office, vol. 2 (May 2025),
https://ctip.defense.gov/Portals/12/Newsletters/May%202025%20Newsletter_Final.pdf

Mara Faccio and John J. McConnell, *Death by Pokemon GO: The Economic and Human Cost of
Using Apps While Driving*, SSRN (Feb. 2, 2018),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3073723

Niels Ferguson, Bruce Schneier & Tadayoshi Kohno, *Cryptography Engineering: Design
Principles and Practical Applications* (Wiley Publishing, Inc. 2010)

Steven Ferris, *The Most Popular Phone Brands in Every Country in 2023*, John's Phone (Jan. 9,
2024),
https://www.johnsphones.com/research/the-most-popular-phone-brands-in-every-country

Emma Goss, *Tik Tok, Snapchat, and other apps predators are using to exploit children*, Department of Defense – Combating Trafficking in Persons Program Management Office (Jan. 31, 2020), https://ctip.defense.gov/CTIP-Student-Guide/courseFiles/ContentPages/CoursePages/action-card-9-assets/SocialMediaApps.pdf

Vaugh Hamilton et al., *Safer Digital Intimacy for Sex Workers and Beyond: A Technical Research Agenda*, IEEE Security & Privacy, vol. 22, no. 02, pp. 17-28, (Mar.-Apr. 2024), https://www.cs.umd.edu/~kaptchuk/publications/sw-threat-modeling.pdf

Michael Keller, *On These Apps, the Dark Promise of Mothers Sexually Abusing Children*, The New York Times (Dec. 7, 2024), https://www.nytimes.com/2024/12/07/us/child-abuse-apple-google-apps.html

Daria J. Kuss and Mark D. Griffiths, *Online gaming addition in children and adolescents: A review of empirical research*, Journal of Behavioral Addictions (Mar. 1, 2012), https://akjournals.com/view/journals/2006/1/1/article-p3.xml

Carla Moss et al., *Assessing the impact of Instagram use and deliberate self-harm in adolescents: A scoping review*, International Journal of Mental Health Nursing, Volume 32, Issue 1, pp. 14-29 (Aug. 22, 2022), https://onlinelibrary.wiley.com/doi/abs/10.1111/inm.13055

Major Nelson, *Xbox Live Marketplace Launch Content*, Xbox Wire (Nov. 15, 2005), https://news.xbox.com/en-us/2005/11/15/xbox-live-marketplace-launch-content/

Michael Ogata et al., *Vetting the Security of Mobile Applications*, National Institute of Standards and Technology (Apr. 2019), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-163r1.pdf

A.J. Singh and Akshay Bhardwaj, *Android vs. IOS: An Architectural Perspective*, Int'l Journal of Innovative Research & Development, Vol. 3, Issue 1 (Jan. 2014), https://www.internationaljournalcorner.com/index.php/ijird_ojs/article/view/134737/93862

Keith Stouffer et al., *Cybersecurity Framework Manufacturing Profile Low Impact Level Example Implementations Guide: Volume 3—Discrete-based Manufacturing System Use Case*, National Institute of Standards and Technology (Sept. 2019), https://nvlpubs.nist.gov/nistpubs/ir/2019/NIST.IR.8183A-3.pdf

*What Is Cyberbullying*, Stop Bullying (Oct. 7, 2014), https://www.stopbullying.gov/cyberbullying/what-is-it

*King.com launches mobile game as part of strategy shift*, VentureBeat (Oct. 30, 2012), https://venturebeat.com/mobile/king-com-launches-mobile-game-as-part-of-strategy-shift/

3

Miranda Wei et al., *"We're utterly ill-prepared to deal with something like this": Teachers' Perspective on Student Generation of Synthetic Nonconsensual Explicit Imagery* (2025), https://dl.acm.org/doi/pdf/10.1145/3706598.3713226

Georgia Wells et al., Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show, The Wall Street Journal (Sept. 14, 2021), https://www.wsj.com/tech/personal-tech/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

Jason Wilson, *Pokemon Go launches in U.S. on iOS and Android*, GamesBeat (July 6, 2016), https://venturebeat.com/games/pokemon-go-launches-worldwide-on-ios-and-android/

Chanel J. Larche, et al., *The Candy Crush Sweet Tooth: How 'Near-misses' in Candy Crush Increase Frustration, and the Urge to Continue Gameplay*, Journal of Gambling Studies, vol. 33, pp. 599-615 (July 20, 2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC5445157/pdf/10899_2016_Article_9633.pdf

https://pokemongodeathtracker.com/