# EXHIBIT 28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR |

EXPERT REPORT OF
TADAYOSHI KOHNO, Ph.D.

MARCH 7, 2025

**TABLE OF CONTENTS**

**Page(s)**

I.      Qualifications ...................................................................................................... 1

II.     Background of Assignment .................................................................................. 2

III.    Summary of Opinions .......................................................................................... 3

IV.     Apple Lacks a Threat Model for the App Store .................................................. 4

   A.   The Foundation of System Security Is Threat Modeling .................................... 4

   B.   There is General Agreement that Threat Modeling is a Best Practice ................ 5

   C.   Threat Modeling Begins at or Before the Start of Development ........................ 7

   D.   The Threat Modeling Process ............................................................................. 8

   E.   Threat Modeling and Risk Management ............................................................. 11

   F.   Proper Use of Threat Modeling .......................................................................... 11

   G.   On How Often to Threat Model .......................................................................... 13

   H.   Apple Has Not Performed Threat Modeling of the App Store Process ............. 14

V.      App Security in iOS ............................................................................................ 22

   A.   iOS and iPadOS Provide Most Security Protections .......................................... 22

   B.   iOS Handles IAP Payments ................................................................................ 26

VI.     App Security in the App Store Process ............................................................... 28

   A.   What the Absence of Threat Modeling for the App Store Process Means ......... 29

   B.   Analysis of the App Store Process ...................................................................... 30

   C.   Recognition of Limitations and Critical Errors ................................................. 36

   D.   Lack of a Dynamic Analyzer .............................................................................. 38

   E.   Known Weaknesses ............................................................................................ 41

   F.   Apple Policed Apps Retrospectively ................................................................. 47

   G.   The Human Component of App Review is Both a Core Component of The App Store Process and is Plagued by Errors and Omissions ...................................... 50

   H.   Apple Looked to Outside Capabilities for App Review ..................................... 56

   I.   The App Review Process Has Significant Performance Pressures and Limited Human Resources That Reduced Apple's Ability to Thoroughly Evaluate Apps ............... 61

   J.   Adversaries Manipulate the App Store for Adversarial Gain ............................ 66

   K.   Security for the App Review Process and the App Store Itself Has Not Been a Priority to Apple ................................................................................................... 67

   L.   App Review is Unnecessary for iOS Device and Data Security ........................ 68

VII.    Security of iOS Apps Downloaded Outside the App Store ............................................. 70

  A.    App Review Versus Notarization ..................................................................................... 78

VIII.    Security of IAP Payment ................................................................................................. 80

IX.    Conclusion of Analysis .................................................................................................... 83

## I.    Qualifications

1.    I am a Professor in the Paul G. Allen School of Computer Science & Engineering, University of Washington.  I currently serve as the Associate Dean for Faculty Success within the University of Washington College of Engineering.  I have held a faculty position at the University of Washington since 2006.

2.    I am the co-Director of the Security and Privacy Research Lab at the University of Washington.  I have served in that capacity since 2006.  I am a Fellow of the Institute of Electrical and Electronics Engineers, and a founding member of the IEEE Center for Secure Design. I served as a member of the Forum on Cyber Resilience for the National Research Council from its creation in 2014 to 2018.

3.    I have twice won the IEEE Symposium on Security & Privacy Test of Time Award.  In 2019, I received the award for my work initiating the modern field of medical device computer security.  The following year, I won the Test of Time Award for my work initiating the modern field of automotive computer security.  My work on automotive security also resulted in an American Association for the Advancement of Science Golden Goose Award in 2021.  The Golden Goose Award is offered to a researcher whose federally funded research produced outsized human or economic benefits.

4.    I testified before the House of Representatives Committee on House Administration as an invited expert in its Hearing On Electronic Voting System Security in July 2004.  I served on the U.S. Air Force Scientific Advisory Committee from 2016 to 2020.

5.    I hold a Ph.D. in Computer Science from the University of California at San Diego, a Master's in Computer Science from the same institution, and a Bachelor of Science in Computer Science from the University of Colorado at Boulder.

6.    Prior to my academic career, I was a cryptography and computer security consultant in the private sector.  I was an early member of Cigital's Software Security Group in 2000, and before that I worked at Counterpane Systems.

7.    During a faculty sabbatical, I was a visiting researcher at Microsoft Research, in 2014.

8.    I have published more than 170 papers on computer security topics for peer reviewed journals and conferences, co-authored a book on the subject, and taught to undergraduate and graduate students for nearly twenty years.

9.    A more complete list of my publication credits, awards, and faculty activities is included in my CV, attached hereto as Appendix A.

10.     I have worked on two prior litigation engagements as a retained expert, detailed in my CV at Appendix A.

11.     I am being compensated for my time on this engagement at the rate of $750 per hour.  My compensation is not contingent upon the outcome of the litigation.

## II.     Background of Assignment

12.     Counsel for the Plaintiffs have requested that I analyze the following questions:

- Whether and to what extent Apple promotes security through its mechanisms dedicated specifically to the distribution of iOS apps and in-app content;

- Whether for security purposes it is necessary for Apple to control the means by which iOS apps and in-app content are distributed to iOS device users;

- Whether and to what extent Apple promotes security through its requirement that payment for all in-app purchases of digital content must be completed using Apple's App Store; and

- Whether a competing third-party app store distributing iOS apps and in-app content could offer iOS device users the same, or a greater, level of security in distributing iOS apps and in-app content as Apple currently does.

13.     I understand that Apple offers "security" as a justification for its control of the marketplace for the sale of iOS apps and the method of payment for in-app digital content (which I refer to as "IAP payment"). I have reviewed many relevant documents, deposition testimony, and security literature[1] from which I conclude that "security"—to the extent Apple is able to claim its iOS devices are "secure"—is and has been provided primarily through iOS, the operating system that operates and controls iPhones, and iPadOS, the operating system that (following its launch in 2019) operates and controls iPads. Prior to the launch of iPadOS in 2019, iPads were operated and controlled by iOS. Because there is no meaningful difference between iOS and iPadOS from a security perspective, for convenience I frequently refer to both operating systems as "iOS."

14.     I am unaware that Apple has claimed or demonstrated that its control of the marketplace for app sales and payment for in-app digital content is necessary to protect Apple's own hardware, systems, or network from malicious activity.  Therefore, I confine my observations to whether Apple's control of the marketplace for app sales and payment for in-app digital content is necessary to protect or enhance user security.

15.     In the case of a general consumer in the United States, I am aware that the iOS operating system permits users to obtain apps only through the App Store. As C.K. Haun,

---

[1] A complete list of the materials I have relied upon is attached as Appendix B.

Director of Developer Technical Support at Apple, testified, "iOS applications are provided to our retail customers through the iOS App Store. . . . iOS applications are provided to customers through iPhone, iOS App Store. There is no other methodology available."  Tr. Haun I, 51:24-25; 52:7-9. As he explained, "There are no legitimate iOS App Stores other than the one provided through Apple." Tr. Haun II, 315:10-11. That is different than the Mac operating environment, where Apple allows consumers to choose where they obtain apps. Tr. Haun I, 57:20-58:2.[2]

16.    I am also aware that, as a general matter with few limited exceptions (such as currency in multi-platform games), in-app purchases of digital content (such as a game token or unlocked feature) must be paid for through the App Store. Tr. Haun I, 74:9-15.

## III.    Summary of Opinions

17.    Based upon my review of the relevant documents, testimony, and literature, as well as my knowledge and experience in the computer security field, it is my opinion that Apple does not need to control the means by which iOS apps and in-app content are distributed to iOS device users, or the means by which iOS device users pay for those apps and in-app content in order to promote its business goal of offering users a "secure" experience on iOS devices. That conclusion follows from the following four opinions I have also reached upon a review of the relevant documents, testimony, and literature, as well my experience in the computer security field:

- *First*, whatever security protection Apple provides for iOS devices and user data is provided primarily through iOS.  The security protections offered through iOS are entirely separate from the app distribution and in-app payment processing mechanisms.  They would exist even if Apple had never created the App Store or IAP.  As a result, it is my opinion that the limited security Apple does provide for

---

[2] One exception is the Apple Developer Enterprise Program ("ADEP"), which permits certain large organizations with 100 or more employees "*to create proprietary, in-house apps for internal use, and to distribute these apps privately and securely to employees within the organization.*" See "Apple Developer Enterprise Program" (available at https://developer.apple.com/programs/enterprise/) (emphasis added). ADEP "is only for the *internal use and distribution of proprietary apps in specific use cases that are not adequately addressed with public apps on the App Store*, custom apps through Apple Business Manager or Ad Hoc distribution, or beta testing through TestFlight." Id. ADEP targets the "internal use and distribution of proprietary apps in specific use cases that are not adequately addressed with public apps on the App Store" and affects only a small portion of iOS device consumers, I have not considered it further at this time.

iOS devices and user data is achieved primarily, if not exclusively, through its design and modification of iOS.

- *Second*, Apple's protection of iOS devices and user data through the App Store Process is "limited" because I find no evidence that Apple has conducted a proper threat assessment, called "threat modeling," to identify the nature of potential security risks to iOS devices and user data through the App Store Process. Without proper threat modeling, Apple cannot protect device and data security properly through the App Store Process, and it has no basis on which to say the devices and data are "secure" as a result.

- *Third*, while I understand Apple asserts that its App Review process—which all apps and in-app content must successfully pass before being listed for sale on the App Store—is a necessary component of "security," it is my opinion that Apple's App Review process is limited and flawed in many important respects.

- *Fourth, of the aspects of Apple's App Review process that might provide some measure of "security," other firms are at least equally capable of offering those as Apple. I am not aware of any security protections provided by the App Review process that a third party could not provide at least as well, and there are real-world examples of ways that Apple could supplement its App Review process but has not yet done so.*

18.     Additionally, based upon my review of the relevant documents, testimony, and literature, as well as my knowledge and experience in the computer security field, it is my opinion that Apple's control over the method of payment for in-app digital content is unnecessary to protect the security of users' iOS devices or data. I am unaware of any security protections provided by Apple's IAP payment process that a third-party could not provide at least as well as Apple.

## IV.    Apple Lacks a Threat Model for the App Store

### A.    The Foundation of System Security Is Threat Modeling

19.     It is generally recognized within my field that having a well-considered and regularly updated threat model is a necessary component of security. I will explain the importance of this process at some length, because in later sections of my report, I find that Apple did not do threat modeling at the App Store level, and this is a component of my conclusions.

20.     By "threat modeling," I mean a process by which a developer (1) systematically (2) catalogues the assets to be protected, (3) the threats facing those assets, (4) the countermeasures deployed to defeat those threats, and (5) the areas requiring elevated consideration or countermeasure focus.[3]  The result of this process is the "threat model."[4]

21.     By "threat model document," I mean a document that records the threat model, and embodies the product of the systematic consideration that is threat modeling.  Both the process of threat modeling, and the threat model document, are considered important in the field of computer security.  The process of constructing the threat model document typically guides the systematic consideration that begins with identifying assets and threats, and the absence of a threat model document tends to indicate that this identification has not been done in any rigorous or systematic way.  The presence of a threat model document allows the developer to consider all this thinking in one place, both for the purpose of implementing it, and to update it over time as the security landscape evolves.

### B.     There is General Agreement that Threat Modeling is a Best Practice

22.     At the 2004 Annual Computer Security Applications Conference (ACSAC), Steven B. Lipner gave a keynote speech as the "Distinguished Practitioner."[5] The abstract for his paper, associated with his keynote speech, began (italics added):[6]

> This paper discusses the Trustworthy Computing Security Development Lifecycle (or simply the SDL), a *process* that Microsoft has adopted for the development of software that needs to withstand malicious attack. The *process* encompasses the addition of a series of security-focused activities and deliverables to each of the phases of Microsoft's software development *process*.

Steve Lipner, *The Trustworthy Computing Security Development Lifecycle* (Microsoft Corp. 2004).[7]

---

[3] See Steven B. Lipner, Microsoft Corp., Keynote Address at the Annual Computer Security Applications Conference ("ACSAC"): Practical Assurance: Evolution of a Security Development Lifecycle (2004), https://www.acsac.org/archive/ and https://www.acsac.org/2004/dist.html (both last visited Mar. 5, 2025); Michael Howard & Steve Lipner, *The Security Development Lifecycle* (Microsoft Press 2006), at pp. 102-105, and discussion below.

[4] See Adam Shostack, *Threat Modeling: Designing for Security* (John Wiley & Sons, Inc. 2013) at p. xxii for uses of the terms "threat modeling" and "threat model."

[5] https://www.acsac.org/archive/ and https://www.acsac.org/2004/dist.html.

6 https://www.acsac.org/2004/papers/Lipner.pdf`

[7] https://www.acsac.org/2004/papers/Lipner.pdf.

His paper highlights the importance of having a process for developing secure computer systems.

23.    Mr. Lipner's abstract continued (emphasis added):

These activities and deliverables include the development of *threat models* during software design, the use of static analysis code-scanning tools during implementation, and the conduct of code reviews and security testing during a focused "security push."

24.    In the above, I italicized the words "threat models" because of the criticality of threat modeling as part of the process toward building security into systems. In their 2006 book titled *The Security Development Lifecycle*, Michael Howard and Mr. Lipner write the following at the start of their chapter titled "Stage 4: Risk Analysis" on page 101 (Howard & Lipner, supra; italics added).:

If we had our hands tied behind our backs (we don't) and could *do only one thing to improve software security*—threat modeling, better security code reviews, or better security testing—*we would do threat modeling every day of the week*.

25.    Indeed, Apple's security expert in the *Epic Games v. Apple Inc.* litigation, Dr. Aviel D. Rubin, wrote something similar regarding the criticality of threat modeling. Specifically, Dr. Rubin wrote that "[i]t is industry best practice for device manufacturers to perform a formal security analysis, including a threat model, of a product before bringing it to market". I provide more context for Dr. Rubin's quote, from his March 15, 2021 rebuttal expert report in the case of *Epic Games, Inc. v Apple Inc.* (CASE NO.: 4:20-cv-05640-YGR) below (italics added) :

*When considering a system's security, it is not enough to enumerate the security controls in place.* For instance, one must consider how users use the system. One must also consider attackers in terms of goals, capabilities, and return on investment. How might an attacker recover private data from a smartphone, and why would they want to do that? Does an attack require sophisticated hardware? What information would be accessible and how many users would be impacted? And is it costly? The context of a system's use can greatly influence the answers to these questions as one context may be grossly insecure compared to another. For example, a security analysis of a laptop requires understanding of how the system is accessed, who accesses it, when and where they access it, and how and where data is stored. *These details give insight into the threat model.*

    *A threat model formalizes security risks to the system by enumerating vulnerabilities, weaknesses, and defects and considers the risk of those defects if exploited by an attacker. It is industry best practice for device manufacturers to perform a formal security analysis, including a threat model, of a product before bringing it to market. A threat model formally defines attackers in terms of goals, capabilities, and relation to the system.*

Id. at pp. 14-15.

6

26.      Dr. Rubin, offering an opinion on Apple's behalf, appears to agree with me that a "threat model" is a document that "formalizes" the systematic consideration of at least assets and threats.  This is unsurprising, as this recognition is common to our field of study. In their book, Howard and Lipner write: "The idea behind threat modeling is simply to understand the potential security threats to the system."[8] They present a table titled "Threat-Model Quality Guidelines." The row for "No threat model (0)", the lowest rating, reads:

- No threat model is in place—this is simply not acceptable because it indicates that no threats are being considered.[9]

### C.      Threat Modeling Begins at or Before the Start of Development

27.      Threat modeling has a specific place in security, and that place is near the starting point in the development process.  Bruce Schneier, in his 2000 book *Secrets and Lies: Digital Security in a Networked World*, at the beginning of a chapter entitled "Threat Modeling and Risk Assessment," wrote:

> Threat modeling *is the first step in any security solution.* It's a way to start making sense of the vulnerability landscape. What are the real threats against a system? If you don't know that, how do you know what kind of countermeasures to employ?[10]

28.      I include Figure 2 from Lipner's paper associated with his ACSAC 2004 keynote[11] below; in the figure below, I added the red arrows. This figure, as indicated by the red arrows, highlights threat modeling in the "Design & Threat Modeling" arrow, the "Security Push" arrow, and in the "Final Security Review (FSR)" arrow. The figure below provides a visual overview of how critical threat modeling is to the security development process.

---

[8] Howard & Lipner, supra, p. 101.

[9] Id. at p. 129.

[10] Bruce Schneier, *Secrets and Lies: Digital Security in a Networked World,* p. 288 (John Wiley & Sons, Inc. 2000) (emphasis added).

[11] Lipner, supra, https://www.acsac.org/2004/papers/Lipner.pdf

Figure 2. SDL Overview

### D.     The Threat Modeling Process

29.     Threat modeling belongs to the design phase, which "identifies the overall requirements and structure for the software."[12]  Dr. Lipner offers a textual explanation of the role of threat modeling in the design process in his ACSAC 2004 keynote (Lipner, supra, https://www.acsac.org/2004/papers/Lipner.pdf) (emphasis added):

> The design phase identifies the overall requirements and structure for the software.  From a security perspective, the key elements of the design phase are:
>
> - Define security architecture and design guidelines: Define the overall structure of the software from a security perspective, and identify those components whose correct functioning is essential to security (the "trusted computing base"). ....
>
> - Document the elements of the software attack surface. ....
>
> - *Conduct threat modeling.*  The *product team conducts threat modeling at a component-by-component level.  Using a structured methodology*, the component team *identifies the assets* that the software must manage and the interfaces by which those assets can be accessed.  The threat modeling process *identifies threats* that can do harm to each asset and the likelihood of harm being done (an estimate of risk).  The component team then *identifies countermeasures* that mitigate the risk – either in the form of security features such as encryption, or in the form of proper functioning of the software that protects the assets from harm.  Thus, threat modeling helps the product team *identify needs for security features as well as areas*

---

[12] Lipner, supra, Section 2.2 ("Design Phase"), https://www.acsac.org/2004/papers/Lipner.pdf.

8

*where especially careful code review and security testing are required.* The threat modeling process should be supported by a tool that captures threat models in machine-readable form for storage and updating.

● Define supplemental ship criteria. ....

30.    As the above indicates, threat modeling is a systematic process of identification. Based on my experience and the literature in the field including that quoted above, threat modeling is "a structured methodology" that will identify:

● assets;

● threats;

● countermeasures;

● needs for security features as well as areas where especially careful code review and security testing are required.

31.    These principles are foundational, in the sense that they are taught at the undergraduate level and have been for many years.  The first year that I taught undergraduate computer security, 2007, I created slides using the then-current literature.  In the first class session, for example, I explained to students that the threat modeling process must assess assets, and that each asset should be associated with a value.[13] The first lecture also covered the identification of threats and countermeasures.[14] The next time I taught the course, in 2008, I offered students simple forms to aid in the threat modeling process.[15]

32.    It is further a best practice to capture "threat models in machine-readable form for storage and updating."[16] The threat model document (which as discussed below must be regularly updated) is more useful if kept in the most user-friendly format.[17]

33.    At a high level, the model-building process follows these steps:

● **Prepare**  System designers take the lead in preparing, with input from the development team, to build the DFDs [Data Flow Diagrams]. The resulting artifact is sent to other team members for review before the core threat-modeling analysis process begins.

---

[13] https://courses.cs.washington.edu/courses/cse484/07sp/lectures/Lecture01-mini.pdf slides 2 and 3.

[14] https://courses.cs.washington.edu/courses/cse484/07sp/lectures/Lecture01-mini.pdf

[15] https://courses.cs.washington.edu/courses/cse484/08wi/lectures/Lecture02.pdf

[16] Lipner, supra, https://www.acsac.org/2004/papers/Lipner.pdf.

[17] https://courses.cs.washington.edu/courses/cse484/07sp/lectures/Lecture01-mini.pdf

- **Analyze**   All threats are uncovered through the analysis process and are added to the *threat model document*. At this stage, you include more people in the process. However, try to keep the number of attendees manageable—if you include more than ten people, you'll probably model too much. Also remember that at this stage you should discuss only threats, not mitigations.
- **Develop mitigations**    More of the product team is involved in identifying mitigations. *This step is performed once the threat model is basically complete*. The team considers the model to determine the appropriate remedies to the threats. No doubt there will be feedback from people not involved in the earlier analysis stage; this is to be expected.[18]

34.        In other words, *threat modeling* is a process which results in a *threat model document*; that document captures the *threat model*.

35.        At a more granular level, the stages of the process are as follows:

1.   Define use scenarios.

2.   Gather a list of external dependencies.

3.   Define security assumptions.

4.   Create external security notes.

5.   Create one or more DFDs of the application being modeled.

6.   Determine threat types.

7.   Identify the threats to the system.

8.   Determine risks.

9.   Plan mitigations.[19]

36.        The discipline of computer security recognized variation in both the process and the document.  Just as a developer might choose different languages and workflows in the development process depending on individual circumstances, the details of the threat modeling process can reasonably vary across projects.[20]   The above steps underscores a structured approach for threat modeling. But the "right way" to threat model is "that way that finds good

---

[18] Howard & Lipner, *The Security Development Lifecycle*, supra, section titled "Building the Threat Model" , pp. 104-105 (bold in original, italics added).

[19] Id. at  p.105.

[20] See generally Adam Shostack, *Threat Modeling: Designing for Security, supra* section titled "There's More Than One Way to Threat Model", at p. xxxi ("If you ask a programmer "What's the right programming language for my new project?" you can expect a lot of clarifying questions. There is no one ideal programming language. .... So you can think of threat modeling like programming. Within programming there are languages, paradigms (such as waterfall or agile), and practices (pair programming or frequent deployment). The same is true of threat modeling. ....)

threats."[21]

37.    Howard and Lipner's description is descriptive rather than proscriptive.  The right way to model threats is whatever way best identifies the "good threats," that is those that can be met with better countermeasures through additional work.[22] Threat modeling is a systematic process to uncover and understand threats against a system.  In the security field, we recognize that the form of that process and the form in which it is documented may vary.  But the absence of a systematic assessment of assets, threats and countermeasures cannot be excused as a variant in approach.[23] As Mr. Shostack phrases it, "*Threat modeling is the key to a focused defense. Without threat models, you can never stop playing whack-a-mole.*"[24]

### E.    Threat Modeling and Risk Management

38.    Threat modeling and risk analyses are deeply interconnected. Howard and Lipner's bullet 8 was: "Determine risks."[25] In my professional experience, I have found it the case that sometimes people define threat modeling to be a threat identification process up to the point of risk assessment; in other cases (as in the Howard and Lipner book), risk assessment is treated as part of the threat modeling process. But using either phrasing, it is important for design teams to assess risk because it is through the risk assessment process that the design team can determine how to prioritize security defenses.  The end product of the threat modeling process must produce in some form a ranking of threats, ordered by risk, with the higher risks addressed early in development, and the less serious ones addressed before release or as time permits.[26]

### F.    Proper Use of Threat Modeling

39.    The work of threat modeling, embodied in a threat model, is an important guide in subsequent phases of software development.  In the "Implementation Phase" (Section 2.3), Lipner writes (italics added):

> *The results of threat modeling provide particularly important guidance during the implementation phase.*  Developers pay special attention to ensuring the

---

[21] Id.

[22] Id.

[23] Id. at pp. xxii-xxiv.

[24] Id. at p. xxiii.

[25] Howard & Lipner, supra p.105.

[26] Howard & Lipner supra p. 124.

correctness of code that mitigates high-priority threats and testers focus their testing on ensuring that such threats are in fact blocked or mitigated.

Lipner, supra, https://www.acsac.org/2004/papers/Lipner.pdf.

40.     Section 5.1 of Lipner's paper is titled "Effectiveness of Elements of the SDL [Security Development Lifecycle]" and begins (italics added):

> The *consensus across the SWI* [Secure Windows Initiative] *team is that threat modeling is the highest-priority component of SDL*.  Obviously, threat modeling is not applied in isolation: threat modeling drives design, code review and testing, and a process that implemented only threat modeling but then took no action in response to the models (by failing to test the effectiveness of mitigations for example) would not be effective at all.  Statistics in the form of bug counts tend to understate the role of threat modeling because much of the contribution of threat modeling is to ensure that bugs that would lead to security vulnerabilities are never created.  However, *the role of threat modeling in focusing the process of developing secure software is so critical that it clearly rises to the top of the list.*

Id.

41.     In my book *Cryptography Engineering*, co-authored with Niels Ferguson and Bruce Schneier, we write on page 10, in a section titled "Threat Model":

> Every system can be attacked. There is no such thing as perfect security. The whole point of a security system is to provide access to some people and not to others. In the end, you will always have to trust some people in some way, and these people may still be able to attack your system.
>
> It is very important to know *what you are trying to protect, and against whom you wish to protect it. What are the assets of value? What are the threats?* These sound like simple questions, but it turns out to be a much harder problem than you'd think. Since there's really no such thing as perfect security, when we say that a system is "secure", what we are really saying is that it provides a sufficient level of security for our assets of interest against certain classes of threats. We need to assess the security of a system *under the designated threat model*.

Niels Ferguson, Bruce Schneier & Tadayoshi Kohno, *Cryptography Engineering: Design Principles and Practical Applications*, at p. 10 (Wiley Publishing, Inc. 2010).

42.     On page 12, we write:

> *Threat models are important*. Whenever you start on a cryptographic security project, sit down and think about *what your assets are and against which threats you wish to protect them*. A mistake in your threat analysis can render an entire project meaningless.

Id. at 12.

43.     In their book, Howard and Lipner write the following with respect to the benefits

12

of threat modeling[27]:

> The benefits of threat modeling are numerous. Notably, threat modeling
>
> - Contributes to the risk management process because threats to software and infrastructure are risks to the user and environment deploying the software.
> - Uncovers threats to the system before the system is committed to code.
> - Revalidates the architecture and design by having the development team go over the design again.
> - Forces development staff to look at the design from a different viewpoint—that of security and privacy. To understand the most at-risk components, development staff focuses on components with a high attack probability.
> - Helps clarify the selection of appropriate countermeasures for the application and environment.
> - Contributes to the Attack Surface Reduction (ASR) process of the software. (See Chapter 7, "Stage 2: Define and Follow Design Best Practices.")
> - Helps guide the code review process.
> - Guides the penetration testing process.

44.    As a general rule, absent a rigorous threat modeling of a system, one cannot be confident that those designing or evaluating a system know if they have truly thought of all relevant and important potential threats. Properly threat modeling is thus essential to properly securing a system. With a threat model, one can, for example, "[uncover] threats to the system before the system is committed to code."

### G.    On How Often to Threat Model

45.    I agree with Howard and Lipner that a "threat model should be updated for evolving threats perhaps every six months":

> A threat model should be updated for evolving threats perhaps every six months. A threat model that is more than a year old is probably woefully out of date because of ongoing security research. For example, in mid-September 2005, researchers at the University of California, Berkeley, found a way to analyze keyboard clicks to determine in real time what a user types (UC Berkeley 2005). To some people, this is not a big deal, but to others it might very well be a serious threat. Prior to September 2005, this potential threat was unknown.[28]

---

[27] Howard & Lipner, supra, p. 102.

[28] Id. at 103.

46.     Howard and Lipner also present a table titled "Threat-Model Quality Guidelines". The row for "Not acceptable (1)" reads[29]:

- Threat model is clearly out of date if:
  ○ Current design is significantly different from that defined in the threat model.
- —Or—
  ○ Date in document shows that it is older than 12 months.

47.     In short, a threat model should exist at the creation of the system for guidance in design, but must be also revisited repeatedly as the system evolves and as the world and other systems evolve around it, e.g., as new adversarial capabilities or new knowledge about potential adversaries manifest.

### H.    Apple Has Not Performed Threat Modeling of the App Store Process

48.     Despite the importance of threat modeling to security, I am unaware that Apple has performed threat modeling for or created a threat model for its App Store Process.

49.     To begin my analysis of Apple's security protection, I sought information about Apple's threat model and threat modeling processes in the iOS environment, including the App Store Process. Despite the importance of formal threat modeling, as I discuss above, to date, I have found almost no evidence of formal threat modeling as part of the process of creating and maintaining the App Store, of performing App Review, or of distributing apps.

50.     The single exception I found was a document titled "App Store Personalization: Threat assessment," APL-APPSTORE_02770959.pdf, which focused on a feature "providing to every user a personalized experience of the iOS App Store," which had as a goal to "Get users to download and use more apps!" As app store personalization is independent of which apps are in the app store, I do not consider it further here.

51.     Significantly, I have found evidence of Apple threat modeling technologies *other than* the App Store Process. I offer examples below. These examples highlight not only the importance of threat modeling, but Apple's awareness of its important role in computer security, at least in other settings.

---

[29] Id. at 129.

52.     For example, an internal Apple document from 2012 titled "Malware Attacks vs Safari: An Economic Analysis" states (italics added):[30]

> With the growing poluarity [sic] of the Mac and the increasing familiarity of black hats with the platform, Mac OS X is increasingly a potential target for malware attack. . . .
>
>      . . .
>
> *Why Analyze?*
>
>     *It's tempting to decide what security measures to take based on fuzzy criteria and gut feeling. In many areas, this is actually a useful way to operate, with strong decision-makers in place. However,* there are many possible responses to the risk of malware attacks. We need a way to choose the highest value measures that fit in our development budget. To do that, we need a shared understanding of which possible security measures have the highest benefit. *Because people's gut feelings have differed on this, it is useful to have an analytic framework to help us decide.*
>
>     Attacker Incentives
>
>      . . .
>
> *Threat Model*
>
>     In order to discuss how we can change attacker incentives, we need to consider how they will mount their attack, and what type of defenses the attacker would need to bypass. Delivery of malware to the browser takes two basic approaches, social engineering, and "drive-by" code execution attacks. Social engineering is easier and thus more common, but likely results in a lower rate of spread. Some malware distributors will actually use both approaches, as was the case with Flashback.
>
>     With both approaches, initial exposure in the browser is often via advertising. Misleading ads, often placed on a site with other low-quality advertising and poor checks, will direct the user to a malware site that either tricks them into running a trojan or perpetrates a code execution exploit. The ad could also attempt a code execution exploit directly.

53.     This text, and in particular the "need to consider how they will mount their attack, and what type of defenses the attacker would need to bypass," indicates that Apple agrees with my analysis of the importance of threat modeling.

54.     An internal Apple email exchange from 2016, entitled "Threat Modeling Efforts," discusses an attached "MZSupport Threat Model from 2015" and a "draft of the iCloud Support Threat Model (new)."[31] Both threat models are attached to the email.

---

[30] APL-EG_08398998-99

[31] APL-APPSTORE_05501918-19

55.    One attachment is titled "Threat Model: iCloud Support Application."[32] Section 2 of that document describes a methodology, beginning as follows:

As part of this exercise, we surveyed the iCloud Support Application, the role based access control matrix, the application's internal documentation, and the AppleCare process and procedures located on iDesk. As we surveyed the application and the supporting documentation, we identified sensitive data or functionality that could be accessible through the application. For data or functionality categorized as sensitive, we also evaluated which application roles had access to those areas.

56.    While different methods for threat modeling are acceptable, as discussed above, the attachment shows that a method was used in the creation of the threat model for the iCloud Support Application.  Apple utilizes a formal threat modeling process and creates formal threat model documents in other areas.

57.    The following two tables appeared thereafter in the "Threat Model: iCloud Support Application" document. I include these tables as illustrative examples of the output of Apple's threat modeling process on the iCloud Support Application:

---

[32] APL-APPSTORE_05501926





58.    The document titled "Subject: iTunes Content Threat Model - Content Delivery"[33] appears to be a calendar invite for an internal meeting within Apple to discuss a threat modeling exercise for an aspect of iTunes with a company named Cigital.[34] The calendar invite description says (italics added):

> The *goal of these threat models is to gain a better understanding* of the high and low risk areas, and specific threats facing applications, systems and processes. We can *use this to better prioritize and scope security assessments, inform monitoring and alerting efforts, and identify areas for improvement from a security perspective*.

59.    As another example, Apple's 2018 document titled "Digital Health: Assessment" includes a section on "Assessment," which itself has two subsections, "Assets and Threats" and

---

[33] APL-EG_01265559

[34] For context, I was one of the initial members of Cigital's Software Security Group; the group was founded in 1999 (when Cigital was called Reliable Software Technologies), and I joined Cigital's Software Security Group in January 2000.

"Objectives."[35] The "Assets and Threats" section has its own two subsections, "Assets" and "Threats." The document begins with an "Introduction", which contains a section on "Feature description"; that section includes a section on "Goals" and a section on a "Design summary". The structure of this document is reminiscent of a threat modeling process that I offer students in my undergraduate computer security course (e.g., see slides included above).

60.    An internal Apple slide presentation, entitled "Engaging with the Fraud & Account Security Team,"[36] includes a slide titled "Questions we'll ask" that lists five bullets for discussion (italics added):

- What is your product/service and what does it do for customers?
- Why do you think you have (or will have) a fraud problem?
- *Is your threat model abuse of a feature, attacks on good customers, or both?*
- Suppose that we could detect bad actors reliably. What action(s) would you want to take?
- If good customer pain becomes intolerable, what are our options?

While the third bullet point does not elaborate on threat modeling, use of the term "threat model" recognizes the importance of having a threat model to evaluate adversarial actions.

61.    As I noted above, Apple retained Dr. Rubin as its security expert in the *Epic v. Apple* litigation:[37]

> to provide opinions regarding the security, privacy, and reliability of Apple's App Store, including the means by which Apple's app review process ensures and enhances the security, privacy, and reliability of the apps distributed through the App Store as well as how Apple's review procedures compare to those employed on other mobile platforms.

62.    In his written report in that case, Dr. Rubin wrote:[38]

> It is industry best practice for device manufacturers to perform a formal security analysis, including a threat model, of a product before bringing it to market.

Dr. Rubin includes the same sentence in his rebuttal report (March 2021) as well. [39]

63.    On page 2 of his written direct testimony on May 3, 2021, Dr. Rubin began his

---

[35] APL-APPSTORE_02770969

[36] APL-APPSTORE_09173256

[37] Expert Report of Aviel D. Rubin, Ph.D. (dated Feb. 16, 2021), at p.1.

[38] Id. at p. 14.

[39] Rebuttal Expert Report of Aviel D. Rubin, Ph.D. (dated Mar. 15, 2021) at p. 15.

"Opinion 2" in his "Summary of Opinions" as follows:[40]

> **Opinion 2.** *Security assessments must consider the threat model, which is an analysis of factors including who wants to attack the device / user, how frequently such attacks are likely to occur, and what the consequences are (for the attacker and the victim) of a successful attack.*

(bold retained, italics added).

64.     Section III.A of Dr. Rubin's written direct testimony is entitled "Security Encompasses Broad Categories and Must Consider the Threat Model." On page 6 of Dr. Rubin's written direct testimony[41], he wrote:

> *Threat models help formalize the security risks to a system, by enumerating vulnerabilities, weaknesses, and defects, as well as impact of their exploitation.* For example, *it is important to ask*: What might a potential attacker be motivated to attack, and why? What data could be targeted by the attacker? Would an attack require sophisticated hardware? What mechanisms could the attacker use in seeking to recover private data from an iPhone? How physically accessible is an iPhone, and the data that it contains? How many users could be impacted? What would the potential cost of an attack be?

(italics added).

65.     Given that Dr. Rubin was retained by Apple "to provide opinions regarding the security, privacy, and reliability of Apple's App Store," and his view of the need for a formal threat model, I expected Dr. Rubin to have sought and studied all available information from Apple with respect to iOS devices, the Apple App Store, and threat modeling before finalizing his report in the *Epic* litigation. However, in Dr. Rubin's deposition, he did not identify any documentation related to threat modeling:[42]

> Q. Okay. I'm looking at the sentence that says:
>
>> "It is industry best practice for device manufacturers to perform a formal security
>>
>> analysis, including a threat model, of a product before bringing it to market."
>>
>> Do you see that?
>
> A. Yes.

---

[40] *Epic Games, Inc. v. Apple Inc.*, written direct testimony of Aviel D. Rubin, Ph.D. (dated May 3, 2021) at p.2.

[41] Id. at p.6.

[42] *Epic Games, Inc. v. Apple Inc.*, Tr. Rubin (dated Mar. 26, 2021).

Q. Do you have any evidence that Apple, in fact, performed a formal security analysis, including a threat model of a product before bringing it to market, specifically that -- referring to the iPhone?

A. Based -- based on my conversations with the Apple engineers, it is clear to me that they had large teams looking at this various issue.

Q. Okay. And who -- who, in particular, are you relying on for that?

A. The combination of discussions that I had gave me the impression that they had put a lot of energy into studying the security and modeling – and threat modeling of the product.

Q. And, in particular, *did they indicate to you that they had performed a formal security analysis, including a threat model, before the iPhone was brought to market?*

A. I -- *I don't believe we discussed that one way or the other.*

*Epic Games, Inc. v. Apple Inc.,* Tr. Rubin (dated Mar. 26, 2021), 43:17-44:18.

(italics added).

66.    The examination of Dr. Rubin continued (italics added):

Q. Okay. Have you seen any contemporaneous documentation of Apple having performed a security analysis, including a threat model, before bringing the iPhone to market?

MR. LO: Vague.

THE WITNESS: I – *I'm sure that I have, but I can't think of any specific document right now.*

Tr. Rubin, 44:19-25.

67.    Ultimately, Dr. Rubin acknowledged he had no actual threat model in mind (italics added):

BY MR. BYARS:

Q. Okay. *If you had found one, would it be cited somewhere in your report, do you think?*

A. Well, I was referring more to the experience I have in the industry. And a lot of the security conferences I go to focus sometimes on mobile and have sessions on mobile, and I would have been in those talks and seen people talking about the security model, the threat modeling for Apple. But *I don't have any specific [Apple] document in my mind right now that I can point you to.*

Tr. Rubin, 45:1-11.

68.    Dr. Rubin's deposition testimony indicates that he was not aware of a specific threat model document for iOS devices.  His written report, deposition testimony, and written

21

trial testimony in the *Epic* litigation indicate to me that I have not overlooked any formal threat model for the App Store Process.

69.    In short, absent a threat model, Apple cannot claim that the App Store Process provides adequate security protection for iOS device users or for their data.

## V.    App Security in iOS

### A.    iOS and iPadOS Provide Most Security Protections

70.    Apple's approach to iOS device security is summarized in a December 2024 document called "Apple Platform Security," which is publicly available. In the chapter on "App security," Apple states as follows:

App Store security protections include:

- *Automated scans for known malware:* To help prevent it from ever making it onto the App Store and thus ever reaching or harming users.

- *Human review by a team of experts:* To review the app description—including marketing text and screenshots—for accuracy. This creates a high barrier against the most common scams used to distribute malware: misrepresenting the malware as a popular app or claiming to offer enticing features that aren't actually provided.

- *Manual checks:* To check that the app doesn't unnecessarily request access to sensitive data and extra evaluation of apps targeted at children to help ensure they comply with stringent data collection and safety rules.

- *Trustworthy, centralized user reviews:* To help surface issues and significantly reduce the attacker's prospects of misleading many users. *Even if a malicious app were able to completely hide its behavior during the review process, users of the app who encounter and report issues alert others—and Apple—thereby providing another avenue for detection.* The App Store aggressively combats fraudulent reviews to improve the value of this signal.

- *Processes for correction and removal:* In case issues should occur. In a case *where an app makes it into the App Store but is then later discovered to violate guidelines*, Apple works with the developer to quickly resolve the issue. In dangerous cases, involving fraud and malicious activity, the app is immediately removed from the App Store and users who downloaded the apps can be notified of the app's malicious behavior.

Apple Platform Security, at p. 133 (Dec. 2024), https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

71. The "Apple Platform Security" document states:

Security of apps on iOS and iPadOS relies on a combination of all layers—robust App Review to help prevent the installation of malicious apps, and robust

platform protections to limit the damage malicious apps can inflict. The security designed into iOS and iPadOS provides users with powerful protections that are the best of any consumer device, but those protections aren't engineered to protect against choices a user might be tricked into making. App Review enforces the App Store policies designed to protect users from apps that may attempt to harm them or trick them into granting access to sensitive data. And, in the very serious instances of malicious apps trying to bypass on-device protections, App Review makes it harder for them to get onto users' devices in the first place.

Id. at 134.

72.    The "Apple Platform Security" document states that "security designed into iOS, iPadOS and visionOS provides users with powerful protections," which Apple says "are the best of any consumer device." Leaving apart whether the protections in iOS and iPadOS are, in fact, the best of any consumer device, the "Apple Platform Security" document makes it clear that the iOS and iPadOS operating systems play a central role in whatever level of security is provided on iOS devices. This is consistent with my understanding of how security is provided for on computer devices generally.

73.    The "Apple Platform Security" document includes a chapter titled "App security." The second section of that chapter is entitled "App security in iOS,iPadOS and visionOS." The introduction to that section states:

Unlike other mobile platforms, iOS, iPadOS and visionOS don't allow users to install potentially malicious unsigned apps from websites or to run untrusted apps. Instead, (outside the EU) all apps must be downloaded from the App Store, where all apps come from identified developers and must pass automated and human review. At runtime, code signature checks of all executable memory pages are made as pages are loaded to help ensure that an app hasn't been modified since it was installed or last updated.

After an app is verified to be from an approved source, iOS,iPadOS, and visionOS enforce security measures designed to prevent it from compromising other apps or the rest of the system.[43]

74.    Importantly, the Apple Platform Security document states that security measures are provided by the iOS and iPadOS operating systems.

75.    In 2015, Apple issued a white paper called "iOS Security iOS 9.0 or later" to coincide with its release of its latest update to the iOS device operating system, designated iOS

---

[43] https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

9.0. Ex. 147. In the white paper, Apple states that "Apple designed the iOS platform with security at its core."

76.     During his deposition, Mr. Haun confirmed that statement in the white paper:

The—my understanding from my experience . . . inside of Apple as a developer technical support engineer responsible for an operating system [macOS] release and my activities participating in some of the fundamental design principles of macOS 10 prior to its release, as well as my interactions and understanding of the engineering activities associated with iPhone OS, subsequently iOS, indicated to me that security has been a priority for our operating systems from the inception, and that includes iOS.

Tr. Haun II, 321:17-322:3.

77.     The white paper continued:

We thought about the security hazards of the desktop environment and established a new approach to security in the design of iOS. We developed and incorporated innovative features that tighten mobile security and protect the entire system by default.

iOS protects not only the device and its data at rest, but the entire ecosystem…

Ex. 147 at p.4.

78.     During his deposition, Mr. Haun also confirmed the accuracy of those statements in the white paper. Tr. Haun II, 322:9-323:19 (clarifying that he is reluctant to use the word "everything" in the context of computer software). He confirmed the accuracy of those statements as to every subsequent release of the first iPhone and every subsequent release of iOS. Tr. Haun II, 324:5-21.

79.     The statements in the white paper, and Mr. Haun's confirming testimony, is consistent with, informs, and supports my opinion that iOS device security is provided primarily through the iOS operating system.

80.     The white paper noted that Apple "regularly" issues updates to its iOS operating system at least in part "to address emerging security concerns." Ex. 147 at p.6. Mr. Haun confirmed that the issuance of iOS operating system updates was intended to improve the security iPhones, which are iOS devices. Tr. Haun II, 327:12-18.

81.     I have reviewed information concerning all the major releases and sub-releases of the iOS operating system from its launch in 2007 through the end of 2023, of all the major releases and sub-releases of the iPadOS operating system from its launch in 2018 through 2023, and of all the major releases and sub-releases of the macOS operating system over that same period of time (2007 to 2023).

24

82.    From 2007 through mid-2024, Apple introduced 17 major updates and 166 sub-releases of its iOS operating system. From 2018 through 2024, Apple introduced five major updates and 24 sub-releases of its iPadOS operating system. In total, Apple claimed that 10 major updates and 154 sub-releases of its iOS operating system addressed "security" issues. Since its introduction in 2018, Apple claimed that two major releases and 21 sub-releases of its iPadOS operating system addressed "security" issues.

83.    In general, I observed that a high majority of major release and sub-releases of the iOS operating system and the iPadOS operating system listed improved "security" as at least one reason for the release.

84.    The results in the following table summarizes these findings.

| | Major Releases | Sub-Releases | Total Releases | Security Related | % Security Related |
|---|---|---|---|---|---|
| iOS | 17 | 166 | 183 | 164 | 89.62% |
| iPadOS | 5 | 24 | 29 | 23 | 79.31% |
| MacOS | 4 | 123 | 127 | 115 | 90.55% |

85.    I note that Mr. Haun testified generally that each successive release of iOS versions was incrementally more secure than—or at least as secure as—the prior versions of iOS. Tr. Haun II, 307:5-308:8.

86.    This is consistent with, informs, and supports my opinion that security for iOS devices is provided primarily through the iOS operating system as opposed to app review conducted by Apple.[44]

87.    According to Apple's 2015 white paper on iOS security functions:

iOS provides layers of protection to ensure that apps are signed and verified, and are sandboxed to protect user data.

Ex. 147, at p.18.

88.    Digitally signing apps refers to the process by which some entity (in this case Apple) "signs" an app such that another entity (in this case, an iOS device) can verify that the app has not been tampered with since the first entity (Apple) signed it.

---

[44] In the next section of my report, Section VI, I discuss the limitations on Apple's App Review process, which likewise is consistent with my opinion that security for iOS devices is provided primarily through the iOS operating system.

89.     Verifying a signature on an app means that some entity (an iOS device, in this case) verifies that the app was signed by an authorized signer (in this case, Apple).

90.     Regarding verification, a subsection of the "App security overview section in the 2024 Apple Platform Security, titled "App code signing process in iOS, iPadOS, tvOS, watchOS and visionOS" provides as:

> After the kernel has started, it controls which user processes and apps can be run. To help ensure that all apps come from a known and approved source and haven't been tampered with, these operating systems require that all executable code be signed using an Apple-issued certificate.

91.     The process described in the "App code signing process in iOS, iPadOS, tvOS, watchOS and visionOS" subsection is a code signature creation and verification process.

92.     The "App code signing process" subsection makes it clear that signature verification is handled by the iOS and iPadOS platforms, not by the App Store or the app review process. Indeed, the code signature verification architecture resides on each user's own device. Its operation falls outside the scope of an analysis of Apple's App Store. While the App Store provides a mechanism for app distribution and placing code on a device, it plays no role in the verification process.

93.     Sandboxing broadly means limiting the machine assets, features, and functionality that may be accessed by a particular application. Apple developed "sandboxing" as a device security feature on macOS, and later implemented it on iOS.  Tr. Haun I, 185:1-14. Sandboxing is a more advanced security feature of the iOS operating system than of the macOS operating system. Id. In addition, it is imbedded in iOS, such that developers have no way to select whether its apps will be sandboxed. Tr. Haun II, 336:3-25;.  Mr. Federighi added that "the operating system kernel itself runs apps in process sandboxes where both the OS memory is blocked from modification."  Tr. Federighi I, 202:13-4.

94.     These mechanisms, along with the use of entitlements, Address Space Layout Randomization, and the Execute Never feature (as outlined in the Apple Platform Security document), are ways that Apple protects the security of iOS devices. I understand that all these functions are performed by iOS, as opposed to App Review.

**B.      iOS Handles IAP Payments**

95.     Mr. Haun has described the payment process for in-app digital content, which Apple requires developers to offer exclusively through the App Store, as follows:

So the steps are – and we can go in depth on any of them. A developer would first make their determination as to what they would like to provide to a customer for a fee. They would then go into our online portal system that they manage their apps in and create a record describing that thing; which would include a title, a price, a description, and a graphical icon. They would also create their own part number or inventory number for that item.

Then in their application, their software application, their engineers would -- and user interface designers would decide how best to present this purchasing opportunity to the customer.

In other words, they create the list or button or whatever that tells a customer, say in a slot machine game, that they could buy 5,000 slot tokens for 99 cents.

If the user says, "I want to proceed with a purchase for that," the third party software developer has written code that then tells the IAP system on the device, "please present the user with a confirmation dialogue saying the app is selling you this for this price. Please confirm the purchase."

That dialogue is handled by the operating system. The confirmation or cancellation of that transaction is reported back to the third-party application and they then take the steps necessary, depending on what the digital product or service is, to deliver that.

Tr. Haun I, 194:2-195:5 (emphasis added).

96.     According to Mr. Haun, the only security protocol involved in the IAP payment process is an occasional call for the user attempting to make a purchase to enter a password or use a fingerprint or facial recognition (after they became available on iPhones and iPads) to complete the purchase. Tr. Haun I, 195:10-18.

97.     Once the user requests the purchase and (in those cases where it is required) properly validates the purchase, the iOS operating system then calls for the transaction to occur.

98.     The only involvement by App Review in the IAP payment process identified by Mr. Haun is occasional sampling to "try in-app purchases in applications to ensure that the purchase has been—has been or will be fulfilled." Tr. Haun I, 199:6-9. That is not a computer security function.

99.     During his deposition, Mr. Haun acknowledged that a third-party could perform the same IAP payment functions as Apple. 199:15-22. That is consistent with my understanding

of how IAP payment takes place. It is, essentially, an intermediary function between a user and his or her bank, credit card company, or financial institution, like PayPal.[45]

100.    From a technical standpoint, Apple's IAP payment system is no more secure for consumers than processing payments by credit card, debit card, or a third-party payor service such as PayPal.

## VI.    App Security in the App Store Process

101.    In the preceding section, I demonstrated that, to the extent Apple provides security protection for iOS devices and user data, it is provided primarily by the iOS and iPadOS operating systems. I now consider security provided in Apple's iOS App Store, App Review, and the app distribution process.

102.    The Apple Platform Security document claimed that Apple provides the following "App Store security protections":

App Store security protections include:

- *Automated scans for known malware:* To help prevent it from ever making it onto the App Store and thus ever reaching or harming users.

- *Human review by a team of experts:* To review the app description — including marketing text and screenshots — for accuracy. This creates a high barrier against the most common scams used to distribute malware: misrepresenting the malware as a popular app or claiming to offer enticing features that aren't actually provided.

- *Manual checks:* To check that the app doesn't unnecessarily request access to sensitive data and extra evaluation of apps targeted at children to help ensure they comply with stringent data collection and safety rules.

- *Trustworthy, centralized user reviews:* To help surface issues and significantly reduce the attacker's prospects of misleading many users. Even if a malicious app were able to completely hide its behavior during the review process, users of the app who encounter and report issues alert others — and Apple — thereby providing another avenue for detection. The App Store aggressively combats fraudulent reviews to improve the value of this signal.

- *Processes for correction and removal:* In case issues should occur. In a case where an app makes it into the App Store but is then later discovered to violate guidelines, Apple works with the developer to quickly resolve the issue. In dangerous cases, involving fraud and malicious activity, the app is immediately removed from the App Store and users who downloaded the apps can be notified of the app's malicious behavior.

---

[45] See *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, Rule 52 Order After Trial On The Merits, at pp. 115-116, see p.155 fn 620.

https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

103.    To analyze what security protections Apple provides through the App Store Process, I reviewed materials made available to me regarding the App Store and App Review and app distribution processes. Generally speaking, I sought to determine whether and to what extent Apple promotes security through its mechanisms dedicated specifically to the distribution of iOS apps, whether for security purposes it is necessary for Apple to control the means by which iOS apps are distributed to iOS device users, and whether a competing third-party app store distributing iOS apps could offer iOS device users the same, or a greater, level of iOS device and data security in distributing iOS apps than Apple currently does.

104.    In general, I find that Apple has set a low bar for security and the role of the App Store Process, and I find no evidence suggesting that a third-party app store could not offer users the same or a greater security as Apple in reviewing and distributing iOS apps.

### A.    What the Absence of Threat Modeling for the App Store Process Means

105.    The absence of threat modeling by Apple for the App Store Process raises two primary points to consider. First it is a concern that not having done so runs contrary to security best practices, as I have discussed above. In general, a failure to threat model may mean that a resulting system is vulnerable to threats unknown to the developers of the system, or that the developers may struggle to prioritize addressing the known threats. Some of the findings I discuss later — like the fact some security mitigations were known to Apple for years but not done — are, in my professional opinion as a computer security expert, consistent with a failure to threat model.

106.    Second, recall that what it means for a system to "be secure" is a function of its threat model (as discussed above). Comparing the security of two systems is a function of comparing both the security properties they seek to provide (i.e., their threat model) and whether they provide those security properties.

107.    For Apple to claim that its App Store provides a measurably higher level of security than all other possible app stores, Apple would need to (1) provide a threat model for its App Store Process; (2) demonstrate how its App Store Process mitigates the risks under that threat model; and (3) show that an alternate app store would not be able to mitigate those identified risks. Only then would it be possible to clearly and precisely compare the threat models between the Apple App Store and an alternate app store and compare the mitigations for similar threats.

108.    In my professional opinion as an expert in computer security, in the absence of evidence of threat modeling, not only does Apple have no basis to make claims about the security of its App Store Process, it also has no valid basis on which to argue that an alternate app store could not provide the same or a higher level of security as the App Store Process does.

### B.    Analysis of the App Store Process

109.    I now provide an analysis of the security features of the App Store, App Review, and the app distribution process.

110.    In general, Apple App Review has faced several challenges, including backlogs, insufficiently qualified reviewers, and difficulty detecting malware and other fraudulent activity. I have reviewed deposition testimony and internal Apple documents showing that App Review backlogs have been a persistent issue, and sometimes requiring reviewers to work overtime or managers to participate in reviews.[46] This backlog often resulted in app review mistakes where apps were "being approved that should be rejected and rejected [apps] that should be approved . . . ." Tr. Shoemaker I (dated Jan. 12, 2021), 101:1-9. Concerns about backlog size have existed since the first year of the App Store's existence, and the problem is exacerbated by Apple's service agreements with developers, which aim for most apps to be reviewed within 24 hours after they are submitted.[47]

111.    The following quote from a 2016 email from Eric Friedman, an Apple employee with senior responsibility for fraud prevention, captures my high-level findings well:[48]

> Regarding review processes: please don't ever believe that they accomplish anything that would deter a sophisticated attacker. I consider them a wetware rate limiting service and nothing more. Yes, they sometimes catch things, but you should regard them as little more than the equivalent of the TSA at the airport. Their KPI is "how many apps can we get through the pipe" and not "what exotic exploits can we detect?"

112.    When Trystan Kosmynka, Apple's Senior Director of App Review, was asked if Apple had proprietary software for conducting app review to promote iOS device security, he

---

[46] See Tr. Kosmynka I (dated Feb. 2, 2021), 202:2-206:15, see e.g. Tr. Kosmynka I, 203:8. ("The concern is missing our SLA," trained reviewers would work overtime, including managers and other with secondary functions)

[47] See Tr. Kosmynka I 202:2-206:15  (describing focus on meeting SLA requirements for app review speed and admitting the backlog is ever-present).

[48] APL-APPSTORE_09166610

responded first by describing the complexity and challenges of protecting against malicious code:

> malware is extremely complicated and any type of safety concern can be extremely complicated. These are cases where malware may be something that's statically discoverable in a binary and able to be detected with the app import systems.
>
> It may be something that the DT App Analyzer information that we gather is an indicator that there is something amiss here. And so, extracting that information, writing a rule on that is one way to prevent those apps from getting to the store, to Apple's infrastructure in general.
>
> There may be other cases where the malware is completely dynamic. So, in the event that an app changes its features or functionality post review, and does so with malice, that may not be something that the Ingest automation would be capable of finding. It may not be something that the post review automation may be capable of finding because it's deeply embedded in the app. It may be something that only a human being could find. And I think all of these things really work together to make sure that the store remains safe and trusted.

Kosmynka I, 117:16-118:12.

113.    After describing the complexity and challenges of protecting against malicious code, Mr. Kosmynka then said:

> And so, to say that there's, like a secret sauce somewhere, I think the secret sauce is the – the App Store, App Review, and how we've managed that and how serious we take it that there's a human being that launched the app prior to it showing up on the store.
>
> So, I don't have an individual name of a thing. I think each one of these pieces plays a role. I do have other tools that I can name, if that's helpful, that play a part of the App Review process, but it's not as – unfortunately, not as simple, like there's one piece of software.

Tr. Kosmynka I, 118:13-23.

114.    In general, I accept Mr. Kosmynka's description of the complexity and challenges of analyzing iOS applications for malicious code and activity. I disagree with his characterization of Apple's approach to App Review. As I explained above, without a formal threat model for the App Store Process—which Apple lacks—it does not take security "seriously" as Mr. Kosmynka said. I also note that Mr. Kosmynka was answering a specific question that led him to omit the iOS and iPadOS operating systems as a locus of security. As I explained above, most of the security protection Apple does provide is handled by iOS, not the App Store Process. However, I accept Mr. Kosmynka's statement that in the App Store Process has no particular "special sauce" for promoting iOS device and user data security.

31

115.    I found a significant focus on efficiency of the App Review process and that the process resulted in many false negative and false positive app review results, meaning the incorrect approval of apps that should not have been approved under Apple's review criteria and the incorrect rejection of apps that should not have been rejected under Apple's review criteria. Additionally, I did not find any evidence that a third-party app store could not offer iOS device users the same or higher security assurances as the App Store offers them.

116.    There is significant anecdotal evidence of deficiencies in App Review and Apple's awareness of its deficiencies. For example, a December 9, 2010, email titled "Re: Reviewing complex apps" describes App Review as follows (italics added):[49]

> *We review, we do not test*. That's been *a guiding principle in App Review since we conceived of it*. There are iOS apps that are very deep, and *we don't get to all of the parts of them. That's OK, and should be the norm*. We review what we can quickly and competently get to, *we will never have all the expertise or time to go into everything*.
>
> There will be times when launch/quit, and poke around at things as best we can, is the appropriate level of review. *We can never, and will never, be able to find all the crashes hidden in a complex (or even simple) app*. From a functionality standpoint, developers agree (in the PLA and in the guidelines) that they are providing our app store customers with quality apps that do not crash. We review to have some comfort in that assurance, never 100% assurance.
>
> *If we find a hotspot of app types that we think needs particular expertise then we'll develop that, but not for only a few*.
>
> And in the case of an app like this we'll take it one-off, not make a policy.

117.    While the email specifically addressed crashing apps, the statements that "we review, we do not test," "there are iOS apps that are very deep, and we don't get to all of the parts of them," "that's OK, and should be the norm," and "we will never have all the expertise or time to go into everything" indicate the insufficiency of App Review to detect security-related risks. Additionally, that "[w]e review, we do not test" has been the "guiding principle in App Review since we conceived of it" suggests that, since conception, Apple's app review was more superficial than thorough.

118.    Gollmann, on page 4 of his book, wrote that, compared to reliability issues and usability issues, "[s]ecurity is concerned with *intentional* failures" (italics in original).[50] It is well known within the field of security that "intentional failures" — failures created by adversaries —

---

[49] APL-APPSTORE_00293204

[50] Dieter Gollmann, *Computer Security,* (John Wiley & Sons, Ltd. 2006)

can be both more serious and harder to find than accidental failures resulting from reliability issues.

119. Other examples of apps that evaded Apple's app review include apps like "Hotrod" that used remote triggers on the back end to change a car app to one that showed male genitalia, Tr. Shoemaker II, (dated Jan. 14, 2021), 574:25-575:13, and Uber, which hid the use of private APIs if the user was in Cupertino, Tr. Shoemaker II, 575:14-25

120. My review of Apple documents and testimony revealed a sustained focus on minimizing the time and cost of app review. For example, in an August 12, 2011 email, one Apple employee, wrote:[51]

> There has been a lot of discussion about incorporating a step into the app approval process but it appears that this is *too expensive to do this for every application. ("30 seconds added to the review process increases my costs by $5m per quarter." -- Phillip Shoemaker).* Our current tools for checking take minutes and we do not have time to improve them before Telluride ships. Further, *even if we do this for every application there would still be applications that grow over time that would not be discovered during an app review.*
>
>   To boot strap this process I propose we follow the follow short term activities. This would catch applications that have been shipped to customers and are detected as a top offending application. *It would not catch new applications until after they have already been approved and distributed to customers.* (italics added).

121. While the above email thread focuses on "excessive backup/restore iCloud traffic and storage" and not directly on security, it underscores the limits of App Review. In this instance, with the objective of identifying applications that have behaviors Apple seeks to avoid, the Apple employee acknowledges that "even if we do this for every application there would still be applications that grow over time that would not be discovered during an app review."

122. An undated internal Apple document on App Review attached to a 2010 Apple email[52] begins[53]:

> Because App Review rejections account for the majority of our time in review, we feel it is best to figure out how to reduce the number of rejections, and the amount of time spent doing rejections.

---

[51] APL-APPSTORE_01969536

[52] APL-APPSTORE_03232618

[53] APL-APPSTORE_03232622

123.    In a section on "Escalating Trust," the document includes:

We've discussed the idea about trusted developers in the past, but there are two key points with this model:

1. The trust is earned, not given. Only by submitting updates over and over, and without problems, do you earn the trust. This is not something that you are given by a partner manager, or an app reviewer.

2. The trust is easily lost. Do an unforgivable App Review sin, and you're never considered a 'trusted developer' again.

3. With the Automated Test system 'token', at least we can guarantee that the developer has tested their application on a supported platform, and that it runs.

124.    The next page of that document includes the following diagram:



The diagram shows at least one path for an app developer to avoid App Review: if the submission is an update and if "trust > 5" and if a signature is present and if a "large % of code or rating change" is a "no", then the app is approved without review according to the flowchart. If a signature is not present or if a "large % of code or rating change" is a "yes", then a "short review" is conducted.

125.    Were the "trusted developer" program to be implemented, it provides a clear path for adversarial developers to put unreviewed apps into the Apple App Store. While the author of this document clearly notes this risk—the document says "The trust is easily lost. Do an unforgivable App Review sin, and you're never considered a 'trusted developer' again"—the

review process as described above would allow the adversarial developer, once trusted, to put an unreviewed app into the Apple App Store at least once.

126.    The following testimony from Mr. Shoemaker indicates that the "trusted developer" program was highly successful; even though the program was eventually rejected by Apple, it was deployed and tested and hence provided a path for apps to enter the App Store without review:

> Q   Did the program ever get tested behind the scenes just to see what would have happened had you adopted the program?
>
> A   Many times.
>
> Q   And what were the results of those tests?
>
> A   The results were really good. They were very favorable. Showed that the apps -- so I looked at a group of apps that we put through it six months ago, and then we waited six months and we saw how those apps were and they had received no rejections in the meantime, they would have -- overwhelmingly, it would have been a positive thing.
>
> Q   Who decided to -- strike that. Who made the decision not to adopt the trusted developer program?
>
> A   Phil Schiller.

Tr. Shoemaker I, 94:21-95:11.

127.    The July 2010 email transmitting the document states:[54]

> As our volumes have been increasing, so has our backlog. Neither our tools, nor our staffing, can handle the nearly 19k apps that we are seeing for this third straight week.
>
> . . .
>
> Immediate Process Optimizations
>
> Promote 7 more reviewers to handle end to end reviews of updates - Low risk
>
> This means *one less set of eyes on each app update that we process*, but the risk is not as high as with news. These 7 reviewers are ones who have proven that they are smart, trustworthy, and understand the guidelines. *There is risk, but is one that we can appropriately manage with additional training, and auditing.*
>
> Mass approval of specific updates - *Medium risk*
>
> We have pulled a report of apps in the queue that 1) have had more than 2 updates, and 2) been previously approved with no rejections.
>
> This list of low risk apps, audited by myself and my team, comes out to just under 2000 apps. *We can run a mass approve over these apps, getting them into the store quickly. There is risk*, but the app names and developers have been vetted

---

[54] APL-APPSTORE_03232618

by us, each of these have 2 or more updates approved, and have never had a rejection. Is this something that we believe is worth exploring?

128.    In short, the email above also reflects a perspective within Apple that a "medium risk" to users—a risk to users because the "mass approve over these apps" would mean not reviewing those apps before approval—could be acceptable given that "Neither our tools, nor our staffing, can handle the nearly 19k apps that we are seeing for this third straight week". Additionally, the email states that "one less set of eyes on each app update that we process" is an acceptable risk. Said another way, the contents of this email suggest that decreasing security assurances for users is an acceptable tradeoff given that as App Review "volumes have been increasing, so has [their] backlog."

## C.    Recognition of Limitations and Critical Errors

129.    Apple executives recognized repeatedly that the review process made critical errors. An October 24, 2019, email thread entitled "Re: New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now" also is informative. In it, Mr. Kosmynka wrote:[55]

> Weird one, looks like we took it down, it came back to review, *two folks ignored the notes (not hard to do that) and approved the app*. The app was arc hidden, not hidden refusal, so it did not come back to the ARC team. *The second person to review an update after the ARC even marked the issues as resolved (not sure how either of them verified it without going back to TI)*
>
> *We are making critical errors, it's a game of telephone where the instructions are left in a note for the next person to action.*

(italics added). Mr. Kosmynka's email shows that Apple knew its review of the security properties of apps were not only incomplete, but that "We are making critical errors" in App Review. Such a recurrence of critical errors is inconsistent with Apple's claim that App Review is an important of iOS device and user data security.

130.    The limitations of the app review process were covered by the business media. Mr. Kosmynka's email thread included text from a *Forbes* article entitled "New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now." The article describes the failure of the app review process to discover and stop 17 different malware from a single developer:

---

[55] APL-APPSTORE_02921977

The trojan focuses on ad fraud, but it also encrypts and sends data from the infected device to an external command and control server, raising the risk profile. Wandera told me that an even more worrying element of the trojan, one not included in the write-up, is a set of devious techniques to evade detection. *The malware triggered only when loaded with an active SIM and left running for two days.* We have seen this before on Android—an attempt to hide from security researchers in lab conditions. *This isn't what Apple users have come to expect* from the locked down world of iOS.

. . .

In his view, *Apple misses the runtime element of an app's behaviour when scanned before approval. "They don't have a deep threat research expertise," he explains, "but to find malicious network traffic, you have to watch live apps and see how they perform."*

131.    The article's revelation that "Apple misses the runtime element of an app's behavior when scanned before approval" indicates a serious limitation in App Review.

In a 2016 email, Apple employee Eric Friedman wrote (italics added) the following about App Review:[56, 57]

> *Regarding review processes: please don't ever believe that they accomplish anything that would deter a sophisticated attacker. I consider them a wetware rate limiting service and nothing more. Yes, they sometimes catch things, but you should regard them as little more than the equivalent of the TSA at the airport. Their KPI is "how many apps can we get through the pipe" and not "what exotic exploits can we detect?"*

132.    Mr. Friedman's statement "please don't ever believe that they accomplish anything that would deter a sophisticated attacker" is informative. The remainder of his statement about App Review is also informative, particularly his observation that App Review is more concerned about "how many apps can we get through the pipe (i.e., App Review)" than it is about detecting exotic exploits. Mr. Friedman's comment echoes others like it I have seen where Apple employees expressed concern about the backlog of apps awaiting review and about the fast turn-around time demanded of the app reviewers,[58] all of which contributes to both false negatives and false positives in security screening, particularly when there is no threat model to aid their review. Calling App Review a "*a wetware rate limiting service and*

---

[56] APL-APPSTORE_09166610

[57] "Wetware" is a term commonly used in the computer industry to refer to the human brain. A "rate limiting service" is a process that limits the number of requests that can be made within a specific time frame.

[58] See Ex.354 to the Dep. Of Trystan Kosmynka dated Feb. 3, 2021 (Kosmynka II)

*nothing more*" adds the insight that App Review does little more than slow down the approval process for adding apps to the App Store.

133.     Regarding Mr. Friedman's reference to "TSA at the airport," a well-known perspective within the computer security community is that TSA is merely "security theater"— i.e., it is for show and lacks substance as a security mechanism. See security expert Bruce Schneier's blog post titled "Don't Fear the TSA Cutting Airport Security. Be Glad That They're Talking about It" (2018).[59] Mr. Friedman is implying that the App Review may make users feel safer but does not genuinely improve security.

### D.     Lack of a Dynamic Analyzer

134.     Echoing Mr. Friedman's email, Philip Shoemaker, Apple's Director of App Review, said in an email sent on August 27, 2013, which refers to an *Ars Technica* article titled "Seemingly benign 'Jekyll' app passes Apple review, then becomes 'evil,'" the following (italics added):[60] [61]

> We didn't have time to discuss at ERB this past Friday, but *I want you to be armed with the information on what we need in order to prevent this from happening in the future*.

The email from Mr. Shoemaker makes it clear that Apple knows it failed to prevent the security risks described in the *Ars Technica* article and that new innovations were needed to detect such apps in the future.

135.     Mr. Shoemaker's email continued:

> There were three key points from this document, and they are:
>
> 1. The use of private APIs can get through the process when these APIs are obfuscated. This is because we use a static analyzer.

---

[59] https://www.schneier.com/blog/archives/2018/08/dont_fear_the_t.html. In his blog, Mr. Schneier posted in 2018, "Over the years, I have written many essays critical of the TSA and airport security, in general. Most of it is security theater—measures that make us feel safer without improving security. For example, the liquids ban makes no sense as implemented, because there's no penalty for repeatedly trying to evade the scanners. The full-body scanners are terrible at detecting the explosive material PETN if it is well concealed—which is their whole point."

[60] APL-APPSTORE_09400729

[61] I understand that "ERB," short for Executive Review Board, is the informal way that Apple employees refer to the App Review committee. TR. Shoemaker I, 111:17-112:5 ("So the Executive Review Board was a group of executives and attorneys that would help us decide which apps should be approved and which apps should not.").

2. Once these private APIs are used, apps can access content that they're not allowed to, and send these off device to a back end server.

3. That developers can have a backdoor switch to have the app act one way during review, and an entirely different way once the app is live on the store.

136.    In a later 2015 email, Mr. Shoemaker wrote that Apple uses a static analyzer that captures less than 20% of that abuse.[62]

137.    During his deposition, Apple employee C.K. Haun, Apple's Director of Developer Technical Support, discussed two broad categories of automated app analysis: static analysis and dynamic analysis. In general, static analysis consists of a review of the machine code—or set of computer instructions at the machine level—that an app issues to cause the iOS device to do certain things.

138.    As Mr. Haun described it, "static analysis looks at [the software] searching for certain patterns of machine instructions or data to determine what the application may or may not do." Tr. Haun I, 208:15-22. I agree with his general explanation of static analysis.

139.    Mr. Haun gave two examples of static analysis: one was to assess what machine code would do given a "number that is obtained from the internet" and the other was to see if the machine code called up a private API. Tr Haun I, 208:25-209:17.

140.    I am unaware of any reason why both of those kinds of static analysis could not be performed by a third party as well as, or even better than, Apple.

141.    Mr. Haun distinguished static analysis from dynamic analysis. As Mr. Haun described it, dynamic analysis actually executes the machine code "line by line as the operating system or a processor would, effectively simulating the application running and observing what the application does in a real dynamic mode. This is in general in the computer science profession to be considered to be a more accurate way of analyzing code" than static analysis. Tr. Haun I, 209:18-25. I agree in part with Mr. Haun's general explanation of dynamic analysis, and that it can identify security threats that static analysis typically cannot.

142.    Regarding the limits of Apple's static analyzer, Mr. Shoemaker explained how it was unable to catch obfuscated approaches for accessing private APIs (italics added):

The Static Analyzer enables us to catch direct accessing of Private APIs, but *it completely misses apps using indirect methods of accessing these Private APIs.* This is what the authors used in their Jekyll apps.

---

[62] APL-APPSTORE_00491119 (Ex. 137)

143. The next paragraph in Mr. Shoemaker's email states that a dynamic analyzer has been on the roadmap for Apple for close to four years, implying that Apple has also known the limits of their static analyzer for close to four years or longer (italics added):

> *A dynamic analyzer has been on the roadmap from DevTools for close to four years now*, but doesn't appear to be getting any closer to being done. *This is an important component in our ability to catch these types of apps, but more importantly, without this, I can guarantee that we will continue to allow apps accessing Private APIs to get onto the store, because we don't have the tools to catch these types of shenanigans.*

144. Mr. Shoemaker's observation that a dynamic analyzer had been on the roadmap for close to four years but does not appear to be any closer to being done is noteworthy because it was widely known at Apple that the static analyzer was inadequate.[63]

145. A dynamic analyzer would examine the runtime behavior of an application. Yet the *Forbes* article referred to in the October 24, 2019 email thread titled "Re: New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now" stated the following (italics added):[64]

> In his view, Apple misses the runtime element of an app's behavior when scanned before approval. "They don't have a deep threat research expertise," he explains, "but to find malicious network traffic, *you have to watch live apps and see how they perform.*"

(emphasis added).

146. The absence of a dynamic analyzer and runtime analysis for Apple's app review was, therefore, longstanding. I am unaware of any reason why dynamic analysis could not be performed by a third party on iOS apps.

147. This 2021 testimony from Mr Federighi is informative:

> I can't tell you why he thought it was on the roadmap or was something that he thought we could deliver. But as mentioned in this thread, Chris Lattner, who at the time was the head of our DevTools organization, who would be responsible for delivering it, had come to the conclusion that we couldn't -- we could not create such dynamic analyzer that would actually work against a motivated attacker; that the ways that apps could forge their dynamic calls would be effectively indistinguishable to such an analyzer from allowed calls. And so this just wasn't something we could do. We've pursued addressing these problems over time in many other ways. Like, for instance, taking privacy-sensitive

---

[63] For example, as Mr. Shoemaker noted, it is practically guaranteed that apps accessing private APIs will continue to evade detection by App Review without a dynamic analyzer.

[64] APL-APPSTORE_02921977-79

information and moving it completely out of process so that, even were an app to attempt to call SPIs, that would not help them circumvent access controls.

Tr. Federighi I, 181:6-25.

### E.   Known Weaknesses

148.   There is considerable additional anecdotal evidence demonstrating the weaknesses in Apple's App Review process, some of which I now discuss.

149.   For example, returning to Mr. Shoemaker's 2013 email, the next section is on a "Privacy Proxy." In it, Mr. Shoemaker said (italics added):[65]

> *Once an app has accessed any content on the device, the developer has the ability to send it to a back end server*. While the team looks for apps appropriately accessing data, and informing the user, *we have no real knowledge what they are doing with this data. To solve this, we designed a "Privacy Proxy"* that is simply a Wifi Access Point, that you simply log into with your review device, and it watches all of the data that is being transferred through it. When it detects that a UDID, or Mac address, or contacts are being sent to a back end server, it messages that reviewer's Mac, and the reviewer is then armed with the knowledge that this data is being transferred. It is now up to that reviewer to make the determination if this is allowed or not (if the contacts are being backed up to the cloud and this is a key feature of the app, then this should be ok).
>
>    We have worked with a variety of teams on this including iOS, DTS, IS&T and InfoSec, but it appears to be in no-mans land right now. *IS&T wants to support this, but we just don't have the pressure to get this onto their roadmap any time soon.*

(emphasis added).

150.   Mr. Shoemaker then identified another known App Review weakness: that developers have "the ability to send it [content that the app has accessed] to a back end server this" and "we [the App Reviewers] have no real knowledge what they are doing with this data." To solve this weakness, Mr. Shoemaker noted that Apple had "designed a 'Privacy Proxy'" to enable it to monitor some information leaving the device being used as part of the app review. However, he noted that "we just don't have the pressure to get this onto their roadmap any time soon."

151.   This is another example of a situation in which (1) Apple knew about a weakness in its review process with respect to how apps handle private date, (2) that Apple envisioned a tool ( "Privacy Proxy" in this case) to assist in the review process with respect to that known

---

[65] APL-APPSTORE_09400730

weakness, and (3) that it is not on the roadmap for actual use "any time soon".

152.    In the next section of Mr. Shoemaker's 2013 email, titled "Backdoor Switch", Shoemaker writes (italics added):

> *This is one that App Review have lived with since the beginning, and we are nowhere near closer to figuring out how to handle it.* One idea is to capture stack shots during review, and compare them to real user's stack shots in the wild (for users that have data collection turned on), and see if there are differences. If so, this should automatically trigger a re-review. *Any other ideas would be greatly appreciated.*

The text quoted above states that Apple has had to live with the "backdoor switch" problem "since the beginning" and that they "are nowhere near closer to figuring out how to handle it."

153.    The last sentence in the quote from Mr. Shoemaker's email above suggest that even though the "App Review have lived with since the beginning," Apple has struggled to develop approaches for detecting apps' use of a "backdoor switch." Apple's recognition of this prolonged fundamental problem shows that it understood that App Review played a limited role in security for iOS devices and user data.

154.    The next paragraph of Mr. Shoemaker's 2013 email reads (italics added):

> *We need some help in convincing other teams to implement this functionality for us.* Until then, it is more brute force, and somewhat ineffective.

This suggests that other teams would be resistant to implement something that had the potential to enable the app review team to detect problematic "backdoor switch" behaviors that they were currently unable to detect.

155.    Thus, the discussion in this email not only speaks to the awareness, within Apple, of the inability of their app review process to detect problematic security-related behaviors within applications, but that there were internal challenges within Apple with respect to implementing changes within the app review process that might have allowed them to improve their app review process. For example, had Apple employed a threat modeling process for the Apple App Store, app review, and app distribution, Apple might have had greater clarity, agreement, and buy-in on whether and how to prioritize mechanisms that could mitigate security risks with respect to the Apple App Store, app review, and app distribution.

156.    Consider also a March 2015 email thread with the subject "Fwd: Interesting iOS malware / grayware paper."[66] In the first email in the thread, Mr. Kosmynka begins (italics

---

[66] APL-EG_01492129

added):

> This is old, perhaps you've seen it and we already have some of the recommended safeguards in place on the import side.
>
>   *Scary to see that they successfully got through app review with half a dozen apps that did everything from cracking pins to secretly recording video.*

157.    Later in the same email thread, Jason Fosback, an Apple Software Engineer, wrote[67]:

> One of the techniques this paper does NOT discuss are conditional behaviors in an application. It would be trivial to check a server setting and only perform malicious activity once you flip the switch on the server. Thus, you would bypass App Review, as well as any runtime analysis.

158.    His reference to "runtime analysis" as the "biggest thing that would catch a lot of what's in this paper" echoes the desire for "dynamic analysis" and the "Privacy Proxy" from the above-mentioned 2013 email thread.[68] His quote echoes Mr. Shoemaker's discussion of the challenges with detecting applications that have a "Backdoor Switch" in a 2013 email thread discussed above.[69]

159.    Consider also the March 8, 2016 email thread titled "Re: Blog post regarding FairPlay MitM attack".[70] That email thread discusses "a draft for a blog post that will be going live soon regarding MitM attacks on FairPlay in order to install apps on people's devices" and then references "AceDeceiver", a family of malware documented in the public security literature, including a blog post by Palo Alto Networks.[71]

> Three different iOS apps in the AceDeceiver family were uploaded to the official App Store between July 2015 and February 2016, and all of them claimed to be wallpaper apps. These apps successfully bypassed Apple's code review at least seven times (including the first time each was uploaded and then four rounds of code updates, which require an additional review by Apple for each instance) using a method similar to that used by ZergHelper, where the app tailors its behavior based on the physical geographic region in which it's being executed. In this case, AceDeceiver only displays malicious behaviors when a user is located

---

[67] Id.

[68] APL-APPSTORE_09400729

[69] APL-APPSTORE_09400729-30

[70] APL-EG_01474591-02

[71] https://unit42.paloaltonetworks.com/acedeceiver-first-ios-trojan-exploiting-apple-drm-design-flaws-to-infect-any-ios-device/ (last visited Mar. 5, 2025)

in China, but that would be easy for the attacker to change in any time. Apple removed these three apps from the App Store after we reported them in late February 2016. However, the attack is still viable because the FairPlay MITM attack only requires these apps to have been available in the App Store once. As long as an attacker could get a copy of authorization from Apple, the attack doesn't require current App Store availability to spread those apps.

160.    Returning to the email thread,[72] on March 8, 2016, Mr. Kosmynka wrote, "Check out the attachment, one of these apps was approved 7 times!!" Less than an hour later, he followed up with: "When can we run write rules to guard against this making it to app review."

161.    The email discussion then proceeded with Ashish Agarwal, a Quality Test Automation Engineer at Apple, replying:[73]

Once Network collector data starts going to Mozart. We planned that work over the next month. So, 6-8 weeks atleast.

Mr. Kosmynka then replied to Dr. Agarwal:

Is this something we'd catch with network collector is strings output from the binary a better method?

Then Mr. Kosmynka writes:

+Zhui

Looking at the strings output in the unencrypted binary there is a ton of stuff that we could flag on, unfortunately no itms-service protocol though.

cat strings.txt | grep "://"
cat strings.txt | grep "mobileconfig"
cat strings.txt | grep "download"
cat strings.txt | grep "jail"
<strings.txt>

And Zhui Deng, an Engineering Manager at Apple, replied (italics added):

Apparently all the pages under the i4.cn domain looks malicious from their contents. *I'm wondering if it is possible to automatically determine if a URL contained in a binary seems to be malicious site* or not, through some kind of content analysis. *But the attacker could turn off the site during review though....*

To which Mr. Kosmynka replied:

We could definitely grab the content from the urls and scan them

162.    The importance of this email exchange—in addition to noting that the iOS

---

[72] APL-EG_01474592

[73] APL-EG_01474591

44

malware being discussed was "approved 7 times!!"—is that Apple did not have sufficient mechanisms to "guard against this making it to app review" in the first place. Additionally, despite the possibility that an "attacker could turn off the site during review", I would have expected—in 2016—for Apple already to have mechanisms in place to "automatically determine if a URL contained in a binary seems to be malicious site," given that systems like Site Advisor have existed since at least 2006,[74] and that a rigorous threat modeling process would have identified that an app could reference a URL pointing to a malicious site.

163. Consider also an August 2019 email from Walker Ferox to Craig Federighi, Apple's Senior Vice President of Software Engineering,[75] (italics added):

https://www.macrumors.com/2019/08/19/ios-12-4-vulnerability-leads-to-jailbreak/

I hope this is being looked into ASAP. *I can't imagine Apple testing all apps and app updates to the app store for this exploit fast enough.*

Thanks,
G

164. The article referenced in Mr. Freox's email[76] begins: Apple in iOS 12.4 mistakenly unpatched a vulnerability that was fixed in the iOS 12.3 update, leading to a new jailbreak available for iOS 12.4 devices, reports Motherboard.

Later in the article, the author stated:

Ned Williamson from Google Project Zero said that the bug could be exploited to install spyware on a target iPhone.

And the article continued:

The researcher told Motherboard that "somebody could make a perfect spyware" taking advantage of Apple's mistake. For example, he said, a malicious app could include an exploit for this bug that allows it to escape the usual iOS sandbox--a mechanism that prevents apps from reaching data of other apps or the system--and steal user data.

Another scenario is a hacker including the exploit in a malicious webpage, and pairing it with a browser exploit, according to the researcher.

---

[74] https://web.archive.org/web/20080430154753/http://www.codecon.org/2006/program.html (last visited Mar. 5, 2025)

[75] APL-EG_04107165

[76]https://www.macrumors.com/2019/08/19/ios-12-4-vulnerability-leads-to-jailbreak/ (last visited Mar. 5, 2025)

45

165.    Turning back to the August 2019 email thread,[77] Mr. Federighi forwarded the initial email from Mr. Ferox and wrote:

Is this something detectable with our app scanning?

Apple employee Ivan Krstić replied a few days later (bold preserved, italics added):

Sorry about the delay – I was trying to positively confirm my belief that our existing app scanning rules would **already** discover and block this, because we find dangerous use of IOKit SPI from previous jailbreaks. That turned out to be true. However, *as we were verifying this, we discovered that 81 flagged apps were allowed into the App Store over the last year even though the App Review process is intended to reject all apps that trigger the rule. This is very troubling.*

166.    Thus, even when Apple had tools to detect potentially problematic behavior — even when "the App Review process is intended to reject all apps that trigger the rule" — such apps *still* were allowed into the App Store. As Krstić notes, "This is very troubling".

167.    Consider also the 140-slide presentation titled "Fraud Summit," dated December 19, 2019.[78] The author notes section on the last slide says (italics added):

There are a lot of different projects underway across these organizations that attempt to deal with the problems we've discussed. *There are almost certainly duplicate or misaligned efforts here and fraudsters can profit from that disarray. This is not the most effective way for Apple to combat these abuses.*

168.    The closing slide in the "Fraud Summit" presentation acknowledges that Apple's approach is in "disarray," that "fraudsters can profit" from the disarray, and that "This is not the most effective way for Apple to combat these abuses."

169.    Because Apple recognized the limited efficacy of app review to detect and prevent security risks, Apple relied also upon rejecting applications after they appeared in the store and their behaviors were better understood.

170.    The above discussion makes it clear that the app review process for the Apple App Store was fundamentally unable to prevent apps that might compromise a user's device security or user data from entering the Apple App Store.

---

[77] APL-EG_04107165

[78]

APL-APPSTORE_10183060-199

### F.    Apple Policed Apps Retrospectively

171.    In this section, I discuss some of Apple's efforts to evict apps from the Apple App Store *after* they have already entered the store and their behavior was later determined to be problematic.

172.    A key takeaway from this discussion is that much of Apple's efforts to curate the Apple App Store are reactive (after an app has been approved) rather than proactive (blocking the app from entering the App Store in the first place). Indeed, Apple self-describes the role of their reactive approach in the bullet "Process for correction and removal" in the "About App Store security" section of the Apple Platform Security document. That Apple needed to implement reactive approaches speaks to the limitations of the thoroughness of the Apple App Store app review process.

173.    For example, an August 2011 email thread[79] titled "Re: Apps that cause excessive backup/restore iCloud traffic and storage." While focused on "excessive backup/restore iCloud traffic and storage" and not security, the following quote highlights Apple's reliance on post-facto eviction of problematic apps (italics added):

> To boot strap this process I propose we follow the follow short term activities. *This would catch applications that have been shipped to customers and are detected as a top offending application. It would not catch new applications until after they have already been approved and distributed to customers.*

174.    Likewise, an August 2013 email thread with the title "Re: Seemingly benign 'Jekyll' app passes Apple review, then becomes 'evil' | Ars Technica."[80] Quoted within the email thread, near the start of an email from Phillip Shoemaker <pshoemaker@apple.com>, is the following text related to how a "backdoor switch" within an app can cause difficulties for app review teams:

> There were three key points from this document, and they are:
>
>     . . .
>
>     3. That developers can have a backdoor switch to have the app act one way during review, and an entirely different way once the app is live on the store.

175.    Later in that email, in a section titled "Backdoor Switch," Mr. Shoemaker wrote

---

[79] APL-APPSTORE_01969536-37

[80] APL-APPSTORE_09400729-30

47

(italics added):

> *This is one that App Review have lived with since the beginning*, and we are nowhere near closer to figuring out how to handle it. One idea is to capture stack shots during review, and *compare them to real user's stack shots in the wild* (for users that have data collection turned on), and see if there are differences. If so, this should automatically *trigger a re-review.* Any other ideas would be greatly appreciated.

176.    In short, in addition to acknowledging that the "backdoor switch" has been a challenge for app review "since the beginning", this email suggests the idea of studying "real user's [app behavior] in the wild". That is, Mr. Shoemaker's "one idea" in this email amounts to studying the behaviors of approved apps "in the wild" to detect if, after review and approval, the apps start to exhibit adversarial behavior "in the wild" and with real users—i.e., after real users might have already been harmed.

177.    Consider also a 2021 slide presentation from Apple.[81] Slide 50 in the presentation is entitled "App Review By The Numbers." The following two lines appeared at the top of that slide beneath the title:

1,800,000 apps available worldwide

*1M+ apps removed* for objectionable or illegal content

178.    The statement that "1M+ apps removed for objectionable or illegal content" implies that more than one million apps with "objectionable or illegal content" were approved by App Review and were offered to iOS device users on the App Store for at least some period of time. While the "objectionable or illegal content" does not necessarily imply a security risk to users, the volume of "1M+ apps removed" speaks to the fallibility of App Review. I recognize that the number of apps available worldwide refers to the number available when the slide was prepared whereas "1M+ apps removed for objectionable or illegal content" refers to app removal over time. However, the large number of apps that were implies that Apple has relied heavily on post facto rejection of approved apps because it failed to detect a significant number of apps with "objectionable or illegal content" during the App Review process before they became available in the App Store.

179.    I am aware of some evidence that Apple's malware procedure has been to rerun apps post review to determine if things have changed in significant ways. See Tr. Kosmynka I,

---

[81] *Epic Games, Inc. v. Apple, Inc.*, Opening Trial Demonstrative

48

112:1-11.

180.    However, after App Review is completed and an application is approved and becomes available on the App Store, App Review "does not typically look at most of the apps again that go through that process." Tr. Haun II, 288:5-9.

181.    Rather, as Mr. Shoemaker testified, in most cases, bad apps were discovered only when there were reports from third parties; the app review team did not go back to rereview them routinely.

> Once an app was submitted to the App Store, it left our -- our -- our purview; right? We didn't -- we didn't go back and – and rereview them routinely. Except with -- with regards to my quality control team, who would randomly pick reviews that were done of apps, both rejected and approved, we wouldn't know about any sort of bad actors; however, bad actors cannot keep their mouths shut; right?
>
> So they would tweet. They would blog. They would do whatever -- or they would talk to the media, at which point we would immediately see what the bad actor did and -- and -- and verify it in their app, and then we could remove the app from the store.
>
> But -- but, for the most part, we -- if something got through the review team, we wouldn't know until someone told us.

Tr. Shoemaker II, 432:4-20.

182.    These examples make it clear that the App Review was unable to prevent apps that might negatively impact a user's iOS device security or user-fraud resiliency from entering the App Store.

183.    Another type of error made during the Apple App Store app review process is the incorrect rejection of apps that should not have been rejected. This additional evidence convinces me that Apple's App Review is imprecise in both directions: some apps are improperly allowed onto the App Store, and other apps are improperly rejected. A short slide presentation,[82] discussed further below, gave the results of an audit of 386 app reviews by 70 reviewers: 22% of approvals, and 30% of rejections, were incorrect.

184.    An email thread from May 2019[83] includes the following from Ernest Semerda, co-founder of app developer Veryfi, complaining about App Review (italics added):

I also rolled back the code to previous accepted builds and nada. Still rejected.

---

[82] APL-APPSTORE_09407970

[83] APL-EG_04869415-22

> *I'm lost for words and honestly feel like crying that an organization [Apple] has so much power to destroy a business like mine.*
>
> Just so you know I have now escalated this issue via Y Combinator (we are a YC company) and I have our VCs in Silicon Valley pushing this case through their network into Apple management.
>
> *This process has hurt our business and the rate we are being handed down to people is unacceptable.*
>
> *The fact the build system cannot tell me more information so our engineers can work out why the rejection is occurring is unacceptable.*

Mr. Semerda added in the email exchange (italics added):

> I've asked App Review team over and over to tell us what those API's are without any resolution.
>
> We rolled back our app to previous approved builds and still the same issue.
>
> *I'm lost for words atm and extremely disappointed with how the App Review team has been handling this issue.*
>
> *It has impacted our company's release dates and we started to bleed customers* because we cannot ship bug fixes.

185.    While the email thread does not reach a conclusion regarding whether this particular developer's rejections were "valid" or "invalid," it is clear that rejections from Apple have the potential to harm app developers. The email also shows that, when an app is rejected by the App Review, developers may struggle to determine the cause of rejection and a possible path forward. For example, in the same email thread, Semerda wrote:

> App Review team has been handing our case down to 4 people now over 2.5 weeks without a resolution as to why their build system keeps on rejecting our binary. We provided them our ipa and everything they needed.

### G.    The Human Component of App Review is Both a Core Component of The App Store Process and is Plagued by Errors and Omissions

186.    Several internal Apple documents claimed that human reviews were core to the Apple app review process. For example, the trial slide presentation,[84] included the following slide (italics added):

> App Review uses computer-automated and *human review on every app and update.*

187.    In a March 2015 email exchange entitled "Re: Google Review,"[85]  Mr. Shoemaker

---

[84] *Epic Games, Inc. v. Apple, Inc.* Opening Trial Demonstrative at slide 48.

[85] APL-APPSTORE_00491119

wrote the following comparison between Apple's and Google's app reviews (italics added):

> A tool like this allows google to keep the play store free of API abuse without involving people. This is completely automated. In app review, we have a static analyzer that rejects apps at the door, but it only catches the easy ones, less than 20% of the abuse. After that, we have another tool that we manually run, and it finds an additional 10% or so. *Then we leave it up to the reviewer to look for suspicious activity, and then we move it to a technical investigation which is another resource intensive process.*

188.    To better illustrate the role of humans during the app review process, a document dated March 20, 2012, with the text "App Review Process v3" included a series of flowcharts that highlight the importance of human in Apple's App Review Process.[86] The first flow chart was for "Claiming Apps":



The same document included a second flow chart for "Installing Apps":



The document included a third flow chart in the March 2012 document was for "Metadata Review":

---

[86] APL-APPSTORE_06719448



The March 2012 document included a fourth flow chart for "Runtime Review":



The fifth flowchart in the document was for "Approving Apps":

52



The sixth flowchart in the document was for "Rejecting Apps":



And the seventh flowchart in the March 2012 document was for "Escalating Apps":

53



189.    Apple also produced documents making it clear that human reviews are error-prone. For example, a slide presentation, described above at ¶184[87] and included with a May 4, 2014, email[88]  shows significant error rates:



---

[87] APL-APPSTORE_09407970-71

[88] APL-APPSTORE_09407969

The pie charts show high error rates among human reviewers—a 22% invalid approval rate and a 30% invalid rejection rate. While it is likely that not all errors were related to security, the high error rates call into question the reliability of App Review and its role in providing security for iOS devices and user data.

190.    The next slide in that presentation was:



The author notes for that slide say:

We assigned a score that reflects severity or egregiousness of the error.

We have provided results to your manager who will sit down with you and review.

For those who scored 100%, they will be listed on our Review Hall of Fame.

191.    Thus, while some reviewers received a 100% score, a number of reviewers did not—other scores were 75%, 50%, 25%, and even 0%.

192.    I previously cited an October 24, 2019, email thread entitled "Re: New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now"[89] which contained the following text from Mr. Kosmynka (italics added):

Weird one, looks like we took it down, it came back to review, *two folks ignored the notes (not hard to do that) and approved the app*. The app was arc hidden, not hidden refusal, so it did not come back to the ARC team. *The second person to review an update after the ARC even marked the issues as resolved (not sure how either of them verified it without going back to TI)*

---

[89] APL-APPSTORE_02921977

> *We are making critical errors, it's a game of telephone where the instructions are left in a note for the next person to action.*

Mr. Kosmynka's comment makes clear that human error can lead to "making critical errors" and that some errors—like "two folks ignored the notes"—were "not hard to do."

### H.    Apple Looked to Outside Capabilities for App Review

193.    I now turn to the study of evidence that Apple employees who were involved with the Apple App Store app review process sought security-related expertise and tools from outside of Apple. These findings point to perceived and actual limitations within the App Review process and teams.

194.    For example, a March 2015 email exchange titled "Re: Google Review."[90] The email thread appears to originate with an email from Mr. Shoemaker, which begins (italics added):

> *The google play store has had automated tools since they've opened their store. And over the years, they've refined them significantly.* I want to point out that Google does not review all apps. Rather they only review apps that their automated tools have flagged for further review.

195.    Mr. Shoemaker's comment that Google has refined its automated review significantly points to Apple's awareness of Google's investment in the Google app review process, which Apple lagged behind.

196.    Mr. Shoemaker then wrote that Google's tools included a dynamic analyzer (italics added):

> A tool like this *allows google to keep the play store free of API abuse without involving people*. This is completely automated. *In app review, we have a static analyzer that rejects apps at the door, but it only catches the easy ones, less than 20% of the abuse. After that, we have another tool that we manually run, and it finds an additional 10% or so*. Then we leave it up to the reviewer to look for suspicious activity, and then we move it to a technical investigation which is another resource intensive process.

197.    After describing Google's dynamic analyzer and how it "allows google to keep the play store free of API abuse without involving people," Mr. Shoemaker compared the efficacy of Google's dynamic analyzer with Apple's static analyzer, which "only catches the easy ones, less than 20% of the abuse" and "another tool that we manually run, and it finds an additional 10% or so." Apple then relies upon "the reviewer to look for suspicious activity", which is subject to

---

[90] APL-APPSTORE_00491119-21

human error (which I discuss elsewhere in this report).

198.    On the topic of static and dynamic analyzers, recall that in an August 27, 2013 email[91] Mr. Shoemaker wrote (italics added):

> *A dynamic analyzer has been on the roadmap from DevTools for close to four years now*, but doesn't appear to be getting any closer to being done*. This is an important component in our ability to catch these types of apps, but more importantly, without this, I can guarantee that we will continue to allow apps accessing Private APIs to get onto the store, because we don't have the tools to catch these types of shenanigans.*

199.    Thus, while a dynamic analyzer has been planned since 2009, even as late as 2015, when Mr. Shoemaker wrote that in "app review, we have a static analyzer," Apple relied on a static analyzer despite Shoemaker's "guarantee that we will continue to allow apps accessing private APIs to get into the store" without a dynamic analyzer.

200.    The next section in Mr. Shoemaker's 2015 email is entitled "Automated text analysis." The two paragraphs in this section read (italics added):

> The *google tools do a very good job of analyzing the text in the marketing text and they find issues like bad words, misleading text, defamatory speech, etc.* This allows them to find issues with the text that describes the app with limited personnel interaction, automatically rejecting the obvious ones, but flagging the others for the review team. Tools like this help to speed up the review process by only requiring the reviewers to look at flagged apps.
>
>   *iOS App Review has only rudimentary tools to handle this.* iTC has a list of "bad words" that flag the issue to the developer, allowing them to continue or make a change. App Review has implemented a tool that marks words in Aquarium at time of review, but it also is fairly rudimentary and does not do any semantic analysis of the text, which is required in order to automate this.

201.    In short, Mr. Shoemaker's review of Google's "automated text analysis" tools — which he said "do a very good job"—shows that, as late as 2015, not only were Google's tools more effective and sophisticated than Apple's which are "only rudimentary tools," but that Apple knew how much better Google's tools were than its own.

202.    The next section of Mr. Shoemaker's email, entitled "Image recognition," included the following text (italics added):

> Google Play has a set of image recognition tools that scan the binary assets as well as the screenshots, looking for specific trademark issues and skin tone analysis (one of the better porn detection image recognition algorithms known).

---

[91] APL-APPSTORE_09400730

*This allows them to flag issues to reviewers, and the reviewers only review flagged screenshots and binaries. This significantly reduces the number of apps in review.*

203.    In the next section of his email, titled "Better Store Search," Mr. Shoemaker then wrote the following text (italics added):

Because search is a key Google technology, *they use this technology to more accurately search their store, almost eliminating the gaming that occurs on other platforms.* Our search algorithms use app names and keywords to help determine what they return in search results. *This is why the review team spends a significant amount of time looking at keywords, increasing review time, and all of this time is context specific and therefore very manual. Google doesn't need to do this.*

204.    Mr. Shoemaker contrasted Google's approach with Apple's approach, which uses "app names and keywords to help determine what they return in search results." He concluded that "This is why the [Apple] review team spends a significant amount of time ..." and that "Google doesn't need to do this."

205.    Mr. Shoemaker's email concluded as follows (italics added):

*We have been asked by Phil [likely Phil Schiller] to get all of our tools implemented by the various engineering teams within Apple, however, we get virtually no engineering cycles on issues that would help us speed up review.* Rather, we get just in time tools to handle the latest technologies on the devices and/or iOS. *As an operations organization, this is not the right way to do this.* Rather, *we need to have a small engineering team within App Review, focused on building the best tools to help us speed up review.* If we were allowed to build an engineering and UAT team of ~10 people, we would be able to be at a 24 hour SLA within 6 months.

Not only does Mr. Shoemaker's email speak to the greater sophistication of Google's tools, compared to Apple's tools, but it also speaks to challenges at Apple to building such tools.

206.    Within Apple, there was concern that Apple lacked sufficient tools to provide adequate security for iOS devices. For example, a September 2015 email from Mr. Kosmynka entitled "SourceDNA" references malware called "XcodeGhost." By way of background:

XcodeGhost is the first compiler malware in OS X. Its malicious code is located in a Mach-O object file that was repackaged into some versions of Xcode installers. These malicious installers were then uploaded to Baidu's cloud file sharing service for used by Chinese iOS/OS X developers. Xcode is Apple's official tool

58

for developing iOS or OS X apps and it is clear that some Chinese developers have downloaded these Trojanized packages.[92]

The web page continues (italics added):

XcodeGhost exploits Xcode's default search paths for system frameworks, and *has successfully infected multiple iOS apps created by infected developers. At least two iOS apps were submitted to App Store, successfully passed Apple's code review, and were published for public download.*

   This is the sixth malware that has made it through to the official App Store after LBTM, InstaStock, FindAndCall, Jekyll and FakeTor.

   *XcodeGhost's primary behavior in infected iOS apps is to collect information on the devices and upload that data to command and control (C2) servers.* The malware has exposed a very interesting attack vector, targeting the compilers used to create legitimate Apps. This technique could also be adopted to attack enterprise iOS apps or OS X apps in much more dangerous ways.

207.    Mr. Kosmynka's September 2015 email[93] continued (italics added):

The XcodeGhost issue has generated much more interest in acquiring SourceDNA. Now would be a opportunistic time to *resume* these conversations.

This *technology & team would be a huge advantage for Columbus, malware detection, reactive product security and technical investigation team within App Review.*

*In the case of Xcodeghost SourceDNA would have flagged this with their system for new library discovery which clusters unrecognized code across developers.*

*Where we left off with corporate development* was that we needed the Columbus headcount to get approved before we get the support to make a move.

208.    Clearly, Mr. Kosmynka was critical of Apple's internal security process, noting that that a system outside of Apple— SourceDNA —"would have flagged this" even though Apple's internal process did not.

209.    A later email thread, dated April 2016,[94] discusses Apple's acquisition of "SourceDNA (Project Sphinx)". Within that thread is an email from Arp Patel, an Apple employee, entitled "Deal context / company background," which discussed Apple's potential acquisition of SourceDNA:

Sphinx has built unique technology to detect vulnerabilities in mobile applications

---

[92] https://unit42.paloaltonetworks.com/novel-malware-xcodeghost-modifies-xcode-infects-apple-ios-apps-and-hits-app-store/

[93] APL-APPSTORE_01957586

[94] APL-APPSTORE_02128778-80

. . .

At Apple, Sphinx's technology will eventually be used to improve security and privacy within both the App Store and CoreOS

210.    Like Mr. Kosmynka, Mr. Patel expressed concern that Apple lacked sufficient tools to develop security protections for iOS devices and user data. His email also acknowledged that outside companies like SourceDNA had better technology or skills to do so than Apple possessed.

211.    As another example, in a July 2015 email thread entitled "Fwd: Intro",[95] Mr. Kosmynka wrote (italics added):

Evayn and I met with Appthority this week, *their product and tech looks to align with many of the initiatives our teams have discussed*.

We had them run a few sample apps through their system, attached is a report that includes the results of static and dynamic analysis. Also attached is some of the raw data generated by their system.

This email is further evidence that "product and tech" existed outside of Apple that aligned with the security needs for iOS devices and user data.

212.    A 2018 press release from Symantec describes Appthority (italics added):

The Appthority technology is a key addition to Symantec's Integrated Cyber Defense Platform. This acquisition delivers on the promise of broader mobile security that combines *the best of mobile app analysis* and mobile threat defense to enhance overall security and workflow.[96]

213.    Whether Appthority actually provided the "best of mobile app analysis" as Symantec claimed, it is significant that such technology exists outside of Apple and that there appears to have been some discussion between Apple and Appthority of static and dynamic analysis.[97]

214.    Consider an October 24, 2019 email thread titled "Re: New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now".[98] That email included a quote from a *Forbes* article that offers further evidence of security expertise outside of Apple (italics

---

[95] APL-APPSTORE_02801953

[96] https://www.businesswire.com/news/home/20181105005145/en/Symantec-Acquires-Appthority-to-Enhance-Protection-From-Mobile-Application-Vulnerabilities

[97] APL-APPSTORE_02801953

[98] APL-APPSTORE_02921978-79

added):

> In his view, *Apple misses the runtime element of an app's behaviour when scanned before approval.* "They don't have a deep threat research expertise," he explains, "but to find malicious network traffic, you have to watch live apps and see how they perform."
>
>    *. . .*
>
> *Wandera discovered the malicious apps when its monitoring platform detected network traffic* back to the external C&C server. "That forced us to work backwards," Covington tells me, "we found one of those apps, and from there we found the developer and then the other indicators of compromise that led to the other apps."

## I. The App Review Process Has Significant Performance Pressures and Limited Human Resources That Reduced Apple's Ability to Thoroughly Evaluate Apps

215. The discussion above underscores that human reviewers have had an essential role in Apple's App Review process. Documents from Apple make it clear that Apple has sought new analysis tools to speed up the review process and become less dependent on human review (and its attendant high error rate). For example, in a March 2015 email exchange discussed above,[99] Mr. Shoemaker wrote (italics added):

> We have been asked by Phil [likely Phil Schiller] to get all of our tools implemented by the various engineering teams within Apple, however, we get virtually no engineering cycles on issues that would help us speed up review. Rather, we get just in time tools to handle the latest technologies on the devices and/or iOS. As an operations organization, this is not the right way to do this. Rather, *we need to have a small engineering team within App Review, focused on building the best tools to help us speed up review.* If we were allowed to build an engineering and UAT team of ~10 people, we would be able to be at a 24 hour SLA within 6 months.

216. Mr. Shoemaker's email speaks to Apple's need to "speed up review." Other parts of the email give examples, drawing from an analysis of the app review tools that Google used, of how "building the best tools" could lead to less work for human reviewers.

217. Another email thread from August that I discuss above,[100] included the following comment from Mr. Shoemaker, which speaks to Apple's business justification for making the review process as fast as possible (italics added):

---

[99] APL-APPSTORE_00491119

[100] APL-APPSTORE_01969536

("*30 seconds added to the review process increases my costs by $5m per quarter.*")

218.    I also previously discussed a July 2010 email thread titled "App Review Volumes",[101] which included the following comment (italics added):

*As our volumes have been increasing, so has our backlog. Neither our tools, nor our staffing, can handle the nearly 19k apps that we are seeing* for this third straight week.

219.    That email discussed several strategies to address the increasing volume, including "Immediate Process Optimizations" that come with "low risk" and "Medium risk" as well as the potential employment of additional people (italics added):

In addition to this, *we have begun investigating the possibility of hiring a temporary workforce* whenever we predict a spike.

The document associated with this email,[102] begins with the following text under the heading "App Review Process" (italics added):

The app review process is one that is constantly being refined, *attempting to squeeze every bit of time out of the process*:

220.    The first section of that document ends with the following paragraph, which speaks to a desire to decrease the amount of time human reviewers spend reviewing applications (italics added):

*Because App Review rejections account for the majority of our time in review*, we feel it is best to figure out how to reduce the number of rejections, and the amount of time spent doing rejections

221.    In a January 2016 email,[103] Mr. Friedman wrote the following (italics added):

Regarding review processes: please don't ever believe that they accomplish anything that would deter a sophisticated attacker. I consider them a wetware rate limiting service and nothing more. Yes, they sometimes catch things, but you should regard them as little more than the equivalent of the TSA at the airport. Their *KPI is "how many apps can we get through the pipe"* and not "what exotic exploits can we detect?"

---

[101] APL-APPSTORE_03232618

[102] APL-APPSTORE_03232622

[103] APL-APPSTORE_09166610

That he considered the "key performance indicator" to be "how many apps can we get through the pipe" additionally speaks to the time pressures on App Review, which may explain the excessive human error rate discussed above.

222.    I now turn more directly to the human element of the app review process — the experiences of app reviewers. These experiences lead me to find significant performance pressure on the App Review process and the App Review team and highlight the impact of high performance demands on app reviewers.

223.    For example, an April 1, 2015 email exchange between Apple employees Elke Sisco, Arnaud Guerrand, and Mr. Shoemaker included text from an earlier email exchange between Ms. Sisco and another Apple employee, Stoney Gamble.[104] Ms. Sisco wrote the following (italics added):

> Hi Phillip,
>
> Thanks for coming to talk to us today! Perfect timing to follow up, since I've had several of my team members talk to me about hours, and weekends specifically, asking when we are getting our weekends back.
>
> You said we subscribe to the "hiring when it hurts" approach, but *we are hurting ALL THE TIME*.
>
> *We have hired so many people, yet we are still working mandatory minimum 10 hour days and mandatory weekends. I believe we could hire another 100 people and still have enough work for everyone.*
>
> *Is there any relief in sight? Are we ever going to get our weekends back? I mean, EVER?* There are loads of people who say with resignation "It's never ever ever gonna change", but I want to believe that we're better than that.
>
> Even though I want to believe this, I look back and see that it hasn't gotten any better. Seems to get worse, actually: *I've been here 5 1/2 years, and I have worked an additional 133 days on weekends. 17 weekends in 2011. 25 weekends in 2012. 29 weekends in 2013. 30 weekends in 2014.* Not the trend I would like to see. :-(
>
> I'm appending an email I wrote to Stoney about 3 years ago. Sad to look at it again and see that I could have written the exact same thing today. (Well, I am, I guess.)
>
> What can we do to make this better?
>
> Elke

224.    That email is a concrete example of the demands on the App Review team, which no doubt contributed to the excessive human error rate I documented above. In the same

---

[104] APL-APPSTORE_03237475-77

email, Ms. Sisco again raised an issue she said she "wrote to Stoney about 3 years ago" (italics added):

> Thank you for saying that, and for implicitly admitting that *our morale is bad*, and that *we are demotivated*. I wish I could disagree, but I'm a bad liar.
>
> Here are some thoughts ... I think we are all just feeling overworked and underappreciated. I think we need two things:
>
> > 1. relief, and just knowing that relief is coming
> >
> > 2. more carrot and less stick

225.    In describing what she means by "relief," and "more carrot and less stick" Ms. Sisco wrote (italics added):

> 1. Relief: we all know to expect crunch time before the holidays. *What we didn't expect is that we are still working overtime and weekends well after the holidays are over.* Is this ever going to end? For most of us, *the worst part of this is never knowing until Friday whether we have to work on the weekend.* Several reviewers have told me they are *sick and tired of being on call 24/7, having to put our entire lives on hold, and not even being able to plan ahead for our weekends in the summer*.
>
> Nothing wrong with working hard. But *working hard all the time, every single day, without any break, is wearing us down.* A lot of us are a lot closer to burnout.
>
> *I hope we can find better ways to organize extra hours and weekend work.* Perhaps we could go to a rotating schedule again? And I thought Mary had a good point a couple of weeks ago in the chat room when she suggested a buddy-up so that *instead of everybody working every weekend for 4 hours*, we could switch off, and half of us work a full weekend day and know we have the next weekend off. This would be especially nice for those who have longer commutes. (Arnaud acknowledged her question and promised to look into it. It would be nice to have that followed up on.)
>
> 2. More carrot and less stick: we're all grumbling about being whipped harder and harder. *There seems to be less respect for us as valuable, skilled knowledge workers, and more cattle prodding to work harder and harder.* The targets always get ratcheted up, and at the same time, there are emails about having to watch out for this and changing the rules for that, without any acknowledgement that having to be more careful takes a little longer.
>
> And then, to add insult to injury, the damn App Count app doesn't even log correspondences and holds - and those are the things that take the longest!
>
> I regularly hear from people that they feel like they just can't win. *If you try harder and get closer to the target, the target gets adjusted upwards. If you don't meet your target, you are being questioned about how you spend your day. If you try to work faster and keep your correspondences as cookie-cutter as possible, you must improve communications with the developers.* (I am one of the lucky ones, because Sara knows that the In App apps take longer. I am sure you've heard from other reviewers that other managers are not so understanding with their direct reports.)

64

*I realize that this is a volume play, and that we are constantly trading off good-enough quality and as-much-as-we-can quantity*, but could this at least be talked about openly? Personally, I feel this is what demotivates most of us: that we get all these conflicting messages which is never openly acknowledged, and that we are left to fend for ourselves to sort out the middle path. And like I said above, no matter what you do, you still can't win.

226.    Again, I find that Ms. Sisco's email is consistent with the "Reviewer Accuracy" slide I have discussed above, showing 22% invalid approval and 30% invalid rejections.

227.    The app review conditions described in Ms. Sisco's email are not likely to maximize the accuracy of human app review. Recall the 2019 email thread entitled "Re: New iPhone Threat: These 17 Malicious Apps May Be On Your Device—Delete Them Now"[105] and the following quote from that email (italics added):

Weird one, looks like we took it down, it came back to review, *two folks ignored the notes (not hard to do that) and approved the app*. The app was arc hidden, not hidden refusal, so it did not come back to the ARC team. *The second person to review an update after the ARC even marked the issues as resolved (not sure how either of them verified it without going back to TI)*

*We are making critical errors, it's a game of telephone where the instructions are left in a note for the next person to action.*

As noted earlier, Mr. Kosmynka's comment makes clear that human error can lead to "making critical errors" and that some errors—like "two folks ignoring the notes"—were "not hard to do."

228.    A June 2019 email thread[106] discussed similar issues. In the first email in the thread, Kristin Huguet, Apple's Vice President of Worldwide Communications, wrote:

Following your meeting at CNBC, Kif Leswig, their new .com reporter in the bay area who joined the meeting by phone, is planning a story about the App Review team and process.

We recommend declining to comment. He said it would run in the next few days.

229.    The next email in the thread, from Phil Schiller, Apple Fellow and Head of the App Store, responded with the following text (italics added):

*The hours might be spun to make it sound like a sweat shop - which would be awful*

230.    This email exchange shows that significant time demands remained on app

---

[105] 000018_APL-APPSTORE_02921977

[106] 000029_APL-APPSTORE_04069843

reviewers.

231.    I am aware of testimony from Mr. Shoemaker characterizing Apple's app reviewers as "dumb" and saying they were "making decisions . . . that they were not allowed to make." Tr. Shoemaker I, 312:7-9.

232.    I am also aware of testimony from Mr. Shoemaker that Apple's app reviewers were "overzealous," meaning that they were concerned with protecting themselves and their jobs and protecting Apple from competition:

> Q. And by overzealous, you told me overzealous where they saw porn where there was no porn. They are not overzealous in protecting users.
>
> They are they are overzealous in protecting Apple; right?
>
> A. I would say they are more overzealous in protecting themselves and their job. They were afraid they would get fired if they did something incorrect.
>
> Q. Okay. And they thought that they might get fired because they thought that Apple would not want to approve things that are competing against Apple; is that right?
>
> A. That is my understanding, yes.

Tr. Shoemaker II, 490:13-21. Again, while not directly implicating computer security, Mr. Shoemaker's criticisms of Apple's app reviewers undermine confidence in the App Store Process and, in turn, its contribution to security.

### J.    Adversaries Manipulate the App Store for Adversarial Gain

233.    Any discussion of the Apple App Store and security note that the App Store is, itself, susceptible to manipulation by adversaries, and that Apple knows this.

234.    For example, the December 19, 2019 "Fraud Summit" slide presentation[107] included a slide entitled "Search Ranking Manipulation" with a subtitle "This is how App Store rankings are manipulated":

---

[107] APL-APPSTORE_10183145



The author notes for that slide contains (italics added):

> app store ranking manipulation farm.
>
> Her job is to download, install, and uninstall specific apps over and over again *to boost their App Store rankings*.

235.    In short, to the degree that users choose to download apps as a function of their ranking in the Apple App Store, because of "Search Ranking Manipulation", adversaries may be able to leverage properties of the Apple App Store to manipulate users and which apps they download.

### K.    Security for the App Review Process and the App Store Itself Has Not Been a Priority to Apple

236.    In the preceding discussions, I provided evidence that suggests that the Apple App Store and security — both for the App Store itself and for the app review process — have not been priorities for Apple.

237.    For example, I discussed evidence to suggest that, whereas Apple had done threat modeling exercises with other Apple technologies, I was unable to find a threat model from Apple with respect to the Apple App Store and the app review process.

238.    I discussed how Apple had considered acquiring SourceDNA, how that was paused, how the XcodeGhost incident provided an "opportunistic time to resume these conversations" in 2015, and how it was acquired by Apple in 2016. That it was paused prior to

the XcodeGhost incident speaks to acquiring SourceDNA not having been a priority.

239.    I also discussed how the App Store app review team was understaffed. And I additionally discussed how those familiar with the app review process desired additional tooling and resources, in some cases for years. For example, I discussed a 2013 email thread[108] in which Mr. Shoemaker wrote that (italics added):

> A dynamic analyzer has been *on the roadmap from DevTools for close to four years* now, but *doesn't appear to be getting any closer to being done.*

240.    And, with respect to what Mr. Shoemaker describes as a "Privacy Proxy", Shoemaker wrote (italics added):

> IS&T [Information Systems & Technology] wants to support this, but *we just don't have the pressure to get this onto their roadmap any time soon.*

241.    In that email, Mr. Shoemaker also wrote (italics added):

> *We need some help in convincing other teams to implement this functionality for us.* Until then, it is more brute force, and somewhat ineffective.

## L.    App Review is Unnecessary for iOS Device and Data Security

242.    Regarding whether Apple's control of the App Store Process is necessary for security, I also have reviewed Dr. Rubin's trial testimony in the case captioned *Kent v. Apple Inc., et al.*, Case No. 1403/7/7/21, currently pending in the United Kingdom's Competition Appeal Tribunal (the "UK Proceeding"). Prof. Rubin testified under oath in the UK Proceeding that Apple's control of the marketplace for app distribution and of the IAP payment process was unnecessary for app review, as follows:

> Q.  So it follows that centralised distribution through the App Store is not necessary to ensure that every iOS app goes through the initial Apple App Review process, yes?
>
> A.  *Correct.*

Tr. Day 11, 104:10-13 (emphasis added).

243.    Prof. Rubin also testified in the UK Proceeding as follows:

> Q.  In a world of decentralised app distribution and mandatory app review, after identifying one app that contains malicious functionality, Apple could determine whether other apps submitted for app review in the past also contain malicious functionality in the original app, correct?

---

[108] APL-APPSTORE_09400730

A.    Under the assumption of a full app review, yes.

Tr. Day 11, 106:11-18.

244.    Referring to mandatory verification and code signing by developers, Prof. Rubin also testified in the UK Proceeding as follows:

A.    These policies . . . are orthogonal to the app review process and app distribution model. . . . I agree that Apple could continue to enforce these security mechanisms in an alternative world where apps can be distributed through websites and third-party app marketplaces.

. . .

Q.    So in the counterfactual world that we are discussing, it would be possible for Apple to require all developers of iOS apps to register with Apple before permitting them to distribute iOS apps even if Apple permitted distribution of iOS apps otherwise than through the App Store, yes?

A.    Yes, that works in the counterfactual.

Tr. Day 11, 108:11-109:1.

245.    In the UK Proceeding, Prof. Rubin acknowledged it would be possible to have app review without Apple's control over app distribution:

Q.    You can have App Review for iOS [apps] without having centralised app distribution for iOS, yes?

A.    You cannot maintain the same level of security in my opinion but it could be done.

Tr. Day 11, 184:8-11.

246.    Prof. Rubin's testimony in the UK Proceeding confirms the other evidence I have seen that whatever iOS device and user data security Apple provides is handled primarily through iOS and that Apple's monopoly over the marketplace for iOS apps is unnecessary to protect users' security.

247.    I have reviewed Mr. Haun's deposition testimony. Mr. Haun has worked on both macOS and iOS, and he "started the App Review team when [Apple] opened the iPhone App Store." Tr. Haun I, 13:19-14:14.

248.    Mr. Haun claimed that app review by Apple offers advantages to consumers that app review by a third-party could not. During his two-day deposition, Mr. Haun identified the ability to distinguish between public APIs and private APIs as an advantage of iOS app review conducted by Apple over iOS app review conducted by a third-party app store.

249.    Thus, in my opinion, app review by Apple does not offer consumers any

69

identifiable security protection that could not be provided by a third-party's own app review.

## VII.    Security of iOS Apps Downloaded Outside the App Store

250.    Installing apps on a mobile device in a way other than the way offered by the device manufacturer as the primary distribution channel, in this case the App Store—is called "sideloading." If Apple permitted developers to sell their iOS apps through another app store or directly to iOS device through an Internet browser, users could "sideload" iOS apps onto their mobile devices that way.

251.    I understand from Counsel that two significant issues in this case are (i) whether Apple's control of the marketplace for iOS apps (i.e., by prohibiting "sideloading") and for IAP payment is necessary to protect iOS device and user data security; and (ii) whether other, less restrictive means are available to protect iOS devices and user data security. In my opinion as an expert in computer security, Apple's control of the marketplace for iOS apps and IAP payment is not necessary to protect iOS device and user data security. It is also my opinion as a computer security expert that other, less restrictive means are available to do so, including review by third-party app stores and notarization by Apple.

252.    I begin my analysis by considering Google Play Protect. Google introduced its Google Play Protect in 2017. Google Play Protect enhanced app security on Android devices by incorporating dynamic analysis techniques to scan Android apps for potentially harmful activities.

253.    In October 2023, Google improved Play Protect by adding real-time code-level scanning. The enhancement allows Play Protect to analyze an app's code during installation, extracting key signals and sending them to Google's backend for thorough evaluation. If the app is deemed potentially harmful, the system alerts the user, preventing installation on his or her Android device.

254.    Significantly, Play Protect scans even those apps installed from sources outside the Google Play Store if a user enables Play Protect on his or her device to allow scanning of apps from outside the Play Store. This scanning capability is part of the Play Protect system, which also helps protect users from malicious apps that may be sideloaded onto Android devices. Play Protect automatically scans Android apps, including those installed from third-party sources, for harmful behavior as long as the user enables the feature in their device settings. See Google Play Protect Overview (from Google's official developer documentation): Google Play Protect Overview; Security Blog Post (October 2023): Google Blog - Enhanced

70

Play Protect.

255.    I have reviewed the description of Google Play Protect at
https://developers.google.com/android/play-protect/client-protections. It includes a section
entitled "Real-time protections for non-Play installs" (italics added) as follows:

> *Google Play Protect offers protection for apps that are installed from sources*
> *outside of Google Play.* When a user tries to install an app, Play Protect conducts
> a real-time check of the app against known harmful or malicious samples that
> Google Play Protect has cataloged. The app is also checked by on-device
> machine learning, similarity comparisons and other techniques to confirm if it's
> suspicious. If the app is identified as malicious or suspicious, we will warn users
> or block the installation in extreme cases.
>
> Google Play Protect also offers new protections for emerging threats that were
> previously not scanned before. When Play Protect does not recognize any
> malicious code from the collected samples, it recommends a real-time code-level
> scan of the app to extract important signals for evaluation by Google. This helps
> combat novel malicious apps that may have been altered to avoid detection. If a
> user agrees to scan the app, they will upload the app data to Google for analysis.
> A short time later, Play Protect will let users know if the app appears safe to
> install or is potentially harmful.

256.    At a technical level, I see no reason why Apple could not implement similar
capabilities for iOS devices. While I lack sufficient information to determine whether Google's
approach to security is adequate, I can conclude that doing so would add additional security for
apps running on iOS devices, regardless of how those apps are installed. For example, other
app stores could distribute apps after their own app review. Another app store's app review
combined with a Play Protect-like system offers the (very real) possibility that those other app
stores could and would deliver greater security protections than the limited security protections
Apple has provided to iOS device users through the App Store Process.

257.    In this regard, I note that Apple *already* has committed to on-device analyses,
with XProtect for macOS since macOS 10.15 in 2019, and has committed to some form of
"Additional malware protections" after an app has already been installed on an iOS device (at
least in the EU).

258.    Google's Play Protect has similarities with Apple's XProtect, an antivirus
protection software that Apple provides on Mac computers.

259.    From the Apple Platform Security document (December 2024)
https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf, on page 140,
Apple describes XProtect (original italics kept, some more added):

macOS includes built-in antivirus technology called *XProtect* for the signature-based detection and removal of malware. The system uses YARA signatures, a tool used to conduct signature-based detection of malware, which Apple updates regularly. Apple monitors for new malware infections and strains, and updates signatures automatically—independent from system updates—to help defend a Mac from malware infections. XProtect automatically detects and blocks the execution of known malware. In macOS 10.15 or later, XProtect checks for known malicious content whenever:

- An app is first launched
- An app has been changed (in the file system)
- XProtect signatures are updated

When XProtect detects known malware, it blocks it and moves it to the Trash. Then it alerts the user in the Finder. Users might be asked to share malware samples with Apple to improve macOS security. If they agree, XProtect uploads only the malware executable or, if it's in an app bundle, the entire bundle. Nothing else is shared.

*Note: Notarization is effective against known files (or file hashes) and can be used on apps that have been previously launched. The signature-based rules of XProtect are more generic than a specific file hash, so it can find variants that Apple hasn't seen*. XProtect scans only apps that have been changed or apps at first launch.

Should malware make its way onto a Mac, XProtect also includes technology to remediate infections. For example, it includes an engine that remediates infections based on updates automatically delivered from Apple (as part of automatic updates of system data files and security updates). This system removes malware upon receiving updated information, and it continues to periodically check for infections; however, XProtect doesn't automatically restart the Mac. *In addition, XProtect contains an advanced engine to detect unknown malware based on behavioral analysis.* Information about malware detected by this engine, including what software was ultimately responsible for downloading it, is used to improve XProtect signatures and macOS security.

260.    In short, XProtect on macOS is a "built-in antivirus technology" that will check for malicious content when an "app is first launched" or an "app has been changed."

261.    Like Google's Play Protect, I am unaware of any reason why Apple could not offer XProtect on iOS devices.

262.    Mr. Federighi described XProtect as "a kind of built-in antivirus technology," and acknowledged that it uses certain "industry standards" and "industry knowledge about specific threats," including information about malware threats reported to Apple by companies like Symantec, McAfee for Apple to add to its XProtect block list. Tr. Federighi I, 51:12-52:11. He admitted that, beginning with Mac 10.15 in 2019, XProtect has checked for "known malicious content whenever an app is first launched or has been changed. Tr. Federighi I, 53:1-6.

263.    Most importantly, Mr. Federighi admitted there was no reason why Apple could not offer security protection on iOS devices like XProtect. When he was asked if Apple could

implement XProtect in iOS if it were to allow apps to be obtained outside the App Store, Mr. Federighi replied, "*We could implement something like XProtect, yes.*" Federighi I, 79:15-21 (italics added). Mr. Federighi then admitted that Apple could implement all the security] mechanisms it offers in macOS in iOS as well. Tr. Federighi I, 80:2-5.

264.    As another example of security for apps obtained outside the App Store, I note that app distribution outside of the App Store is happening now in the European Union. It is my assessment that the approach taken for the European Union is one supportive of security and, as such, it is not necessary, from a security perspective, for Apple to restrict app distribution to the Apple App Store.

265.    In the European Union, users can install apps on iOS devices outside of the Apple App Store. A key element of the approach taken in the European Union is that of notarization, similar to the notarization model that Apple uses for macOS. In fact, Mr. Federighi testified that the closest alternative app distribution model for iOS apps might be the Mac distribution model rather than the Google Play Store.[109]

266.    Apple has adopted a similar notarization process for apps distributed via alternative distribution methods in the European Union. Apple's webpage titled "Update on apps distributed in the European Union"[110] describes the notarization process:

> Notarization for iOS and iPadOS apps is a baseline review that applies to all apps, regardless of their distribution channel, focused on platform policies for security and privacy and to maintain device integrity. *Through a combination of automated checks and human review, Notarization helps ensure apps are free of known malware, viruses, or other security threats, function as promised, and don't expose users to egregious fraud.*
>
> Information from the Notarization process is also used for app installation sheets, which provide at-a-glance descriptions of apps and their functionality before users download, including the developer, screenshots, and other essential information. Apps distributed on the App Store will continue to be responsible for meeting Apple's high standards for user safety, security, and privacy and undergo the standard App Review process, including Notarization and enforcement of content and commerce policies.

---

[109] UK Proceeding, Trial Day 8 Tr. 180:15-17 (Jan. 22, 2025).

[110] https://developer.apple.com/support/dma-and-apps-in-the-eu/ (emphasis added) (last visited Mar. 5, 2025)

*Developers can submit a single binary and choose alternative distribution options in App Store Connect.* Notarization for iOS and iPadOS apps will check for:

- **Accuracy —** Apps must accurately represent the developer, capabilities, and costs to users.

- **Functionality —** Binaries must be reviewable, free of serious bugs or crashes, and compatible with the current version of iOS and iPadOS. They cannot manipulate software or hardware in ways that negatively impact the user experience.

- **Safety —** Apps cannot promote physical harm of the user or public.

- **Security —** *Apps cannot enable distribution of malware or of suspicious or unwanted software. They cannot download executable code, read outside of the container, or direct users to lower the security on their system or device. Also, apps must provide transparency and allow user consent to enable any party to access the system or device, or reconfigure the system or other software.*

- **Privacy —** *Apps cannot collect or transmit private, sensitive data without a user's knowledge or in a manner contrary to the stated purpose of the software.*

Apple encrypts and *signs all iOS and iPadOS apps intended for alternative distribution to help protect developers' intellectual property and ensure that users get apps from known parties*.

Notarized apps also undergo a series of checks during installation to ensure that they haven't been tampered with and that the installation was initiated through an authorized web browser.

*If Apple determines that an iOS or iPadOS app contains known malware after it's been installed, it will be prevented from launching and new installations will be revoked*.

267.     In short, notarized iOS apps are reviewed by Apple, and Apple's notarization process checks for a number of things, including security. Once notarized, Apple signs all iOS "apps intended for alternative distribution". A notarized app can be distributed through alternative app marketplaces or on developers' websites.[111]

268.     In the "Developer Q&A" section of the same webpage, Apple posits that "The Digital Markets Act's requirements create a number of risks that – left unchecked – would

---

[111] https://developer.apple.com/support/dma-and-apps-in-the-eu/ and https://developer.apple.com/help/app-store-connect/distributing-apps-in-the-european-union/submit-for-notarization, https://developer.apple.com/documentation/appdistribution/distributing-your-app-from-your-website, and https://developer.apple.com/documentation/marketplacekit/distributing-your-app-on-an-alternative-marketplace (emphasis added) (last visited Mar. 5, 2025)

seriously compromise the privacy and security of our EU users' experience on their devices."[112] Apple then provides examples of such risks, including malware, increased risk of scams, and distribution of pirated software.[113]  Importantly, these examples are *not* a list of risks associated with Apple's approach to alternate app distribution pathways in the European Union. Rather, it is a list of risks created by the Digital Market Act's requirements that might manifest if "left unchecked." But Apple has stated that it will "continue to prioritize safety, security, and privacy measures"[114] while supporting app distribution outside of the App Store and, in doing so, has implemented new mechanisms supportive of security. In addition to notarization, these mechanisms include:

- **App installation sheets —** that use information from the Notarization process to provide at-a-glance information about apps and their functionality before download, including the developer, screenshots, and other essential information.
- **Authorization for marketplace developers and Web Distribution —** a review process to help ensure developers who create alternative app marketplaces and distribute on their websites meet specific criteria and commit to ongoing requirements that help protect users and developers.
- **Allow Apps from Developer —** a permission in Settings that lets EU users identify the developers they allow alternative app marketplaces and apps to be installed from.
- **Additional malware protections —** if Apple determines an iOS and iPadOS app contains malware after it has been installed, iOS and iPadOS will prevent the app from launching.

These additional safeguards speak to the fact that Apple has striven not to leave security-relevant risks unchecked in the European Union.

269.    I have reviewed Mr. Federighi's trial testimony in the case captioned *Kent v. Apple Inc., et al.*, Case No: 1403/7/7/21, which is underway at this time in the United Kingdom's Competition Appeal Tribunal (the "UK Proceeding").

270.    Of note, Mr. Federighi testified that, even in the absence of restrictions on app distribution, Apple could and would review all apps for distribution in the United Kingdom – the relevant market in the UK Proceeding – against the full set of app review guidelines.

271.    I also have reviewed the trial testimony of Dr. Rubin, whom Apple called to testify

---

[112] https://developer.apple.com/support/dma-and-apps-in-the-eu/

[113] *Id.*

[114] *Id.*

as an expert witness on computer security in the UK Proceeding. Prof. Rubin, who is a Professor of Computer Science at Johns Hopkins University and Technical Director of the Information Security Institute at Johns Hopkins, testified under oath in the UK Proceeding that Apple's monopolization of the marketplace for app distribution was unnecessary for app review, as follows:

> Q. So it follows that centralised distribution through the App Store is not necessary to ensure that every iOS app goes through the initial Apple App Review process, yes?
>
> A. Correct.

Tr. Day 11, 104:10-13.

272. Prof. Rubin also testified in the UK Proceeding as follows:

> Q. In a world of decentralised app distribution and mandatory app review, after identifying one app that contains malicious functionality, Apple could determine whether other apps submitted for app review in the past also contain malicious functionality in the original app, correct?
>
> A. Under the assumption of a full app review, yes.

Tr. Day 11, 106:11-18.

273. Referring to mandatory verification and code signing by developers, Prof. Rubin also testified in the UK Proceeding as follows:

> A. These policies . . . are orthogonal to the app review process and app distribution model. . . . I agree that Apple could continue to enforce these security mechanisms in an alternative world where apps can be distributed through websites and third-party app marketplaces.
>
> . . .
>
> Q. So in the counterfactual world that we are discussing, it would be possible for Apple to require all developers of iOS apps to register with Apple before permitting them to distribute iOS apps even if Apple permitted distribution of iOS apps otherwise than through the App Store, yes?
>
> A. Yes, that works in the counterfactual.

Tr. Day 11, 108:11-109:1.

274. In the UK Proceeding, Prof. Rubin acknowledged it would be possible to have app review without Apple's control over app distribution:

> Q. You can have App Review for iOS [apps] without having centralised app distribution for iOS, yes?
>
> A. You cannot maintain the same level of security in my opinion but it could be done.

Tr. Day 11, 184:8-11.

275.    Prof. Rubin's testimony in the UK Proceeding, discussed earlier as well, confirms the other evidence I have seen that Apple's monopoly over the marketplace for iOS apps and IAP is unnecessary to protect users' security.

276.    Furthermore, the same iOS security protections that apply to apps downloaded from the App Store will also apply to apps downloaded from alternative distribution channels. Mr. Federighi testified that for apps downloaded via alternative distribution methods in the European Union 1) iOS devices would continue to utilize a secure boot for apps, 2) iOS devices would continue to utilize a Secure Enclave processor that is isolated from an iOS device's main processor for additional data protections, 3) iOS devices would continue utilize kernel integrity protection, and 4) iOS apps would continue to be sandboxed.[115]

277.    App developers are also still required to sign up for the Apple Developer Program prior to submitting an app for notarization, regardless of how they intend to distribute their apps.[116]  And Apple can still revoke the signing certificates of malicious developers, which prevents malicious apps from being run on an iOS device regardless of distribution source.[117]

278.    In my analysis, I sought to understand, from a security perspective, what apps Apple would reject during the App Review process for an app submitted to appear in the App Store but that Apple would *not* reject when submitted for notarization. A January 2024 slide deck titled "Updates to Apples App Ecosystem in the EU" with the subtitle "Press Briefing" offers some insight:[118]

> *The Notarization process is focused on platform integrity, including security and privacy, and will check for things like malware. Unlike the App Stores App Review process, it does not enforce quality standards for business practices and content issues, like prohibiting illicit content and pornography.*
>
> We think notarization is an important step no matter where an app is distributed.
>
> Other app marketplaces can decide to have their own additional policies for review. Apps distributed on the App Store must continue to meet Apple's full App Review standards.

---

[115] UK Proceeding, Trial Day 8 Tr. 34:1-40:21-23 (Jan. 22, 2025).

[116] UK Proceeding, Trial Day 8 Tr. 47: 10-15.

[117] UK Proceeding, Trial Day 11 Tr. 109:23-110:3 (Rubin) (Jan. 28, 2025).

[118] APL-APPSTORE_10888329 at slide 24 (emphasis added).

279.    The first paragraph says that the notarization process "is focused on platform integrity, including security and privacy, and will check for things like malware." And it gives as an example, apps with "illicit content and pornography" being a type of app that might receive notarization but be rejected from the Apple App Store. As discussed above, the notarization process checks apps for accuracy, functionality, safety, security, and privacy.

280.    In short, according to Apple, the notarization process *does* seek to reject apps that "enable distribution of malware or of suspicious or unwanted software." The Apple notarization process *does* seek to reject apps that might mislead users with respect to the developer, capabilities, or costs (e.g., an app that claims to be the Facebook app but is not actually produced by Facebook). The Apple notarization process *does* seek to reject apps that "cannot collect or transmit private, sensitive data without a user's knowledge or in a manner contrary to the stated purpose of the software." Further, Mr. Federighi testified that Apple uses the same tools for the computer review element of notarization that it uses for App Review, and the computer review element includes a malware scan.[119]

### A.    App Review Versus Notarization

281.    To analyze the efficacy of the App Review process versus notarization, I consider two categories of apps. Category 1 apps are apps that Apple would reject for security-related reasons during the notarization process, assuming a perfect notarization review process. Category 2 apps are apps that Apple would reject during App Review, assuming a perfect App Review process. I assume perfect notarization and App Review processes for simplicity and because, as Mr. Federighi has testified, "App Review is imperfect."[120]

282.    In the "Updates to Apples App Ecosystem in the EU" slide deck, Apple states, "Now that apps can be installed from places other than the App Store, we're going to notarize **all iOS apps**, regardless of how they are distributed."[121]  Given that Apple is "going to notarize all iOS apps, regardless of how they are distributed," we can conclude that Apple will apply the same process and rigor in conducting the notarization checks for apps that will be distributed outside of the App Store as it applies to apps submitted for distribution in the App Store. It would be highly contrary to Apple's claim that "Apple will continue to prioritize safety, security, and privacy measures that promote the best experience possible for EU users under this new

---

[119] UK Proceeding, Trial Day 8 Tr. 47:23-48:8-11.

[120] UK Proceeding, Trial Day 8 Tr. 93:17.

[121] APL-APPSTORE_10888329.pdf at slide 20, (emphasis in original).

regulation" if Apple were to conduct a more rigorous review for apps distributed in the Apple App Store compared to apps distributed via other pathways. We can thus conclude that the set of Category 1 apps is a subset of the Category 2 apps, as both categories consist of apps that the notarization process is intended to reject. I consider each of these categories in turn below.

283.    Concerning security risks of Category 1 apps obtained outside the App Store, I consider the risk to users if they obtain iOS apps via the mechanisms Apple has established for the European Union. In other words, whether users face an increased security risk by downloading notarized apps via alternative distribution channels.

284.    I conclude there is no increased security risk to users obtaining a Category 1 app via alternate distribution pathways than if they obtain apps via the Apple App Store. This conclusion draws from the fact that the set of Category 1 apps is a subset of the set of Category 2 apps.

285.    I turn next to considering security risks of Category 2 apps obtained outside the App Store, It is more interesting—and important—to consider apps that would *not* be rejected by notarization but that would be rejected by App Review. As noted above, Category 2 apps may include apps that contain "illicit content and pornography." I conclude that — due to the intended screening criteria and tools used during the notarization process — it is unlikely for there to be apps in Category 2 but not Category 1 that pose significant security risks to users. Thus, I again conclude that the security risk to iOS users is low with respect to Category 2 apps.

286.    If there were Category 2 apps that pose significant security risks to users that are *not* in Category 1, *i.e.*, there are apps that App Review would reject but that notarization would not reject despite posing significant security risks to users, I would question the sincerity of Apple's claim that it "will continue to prioritize safety, security, and privacy measures that promote the best experience possible for EU users under this new regulation." If the app that passes notarization but that is rejected by App Review contains an exploit that might, for example, allow the app to escape its sandbox or access data on the iOS device that it should not, then Apple's investment in the security of the underlying iOS platform will serve to mitigate the risks to iOS users who obtain the app via a distribution pathway outside of the Apple App Store. As detailed above, the same iOS security protections that apply to apps downloaded from the App Store also apply to apps downloaded from alternative distribution channels.

287.    If there are Category 2 apps that are not in Category 1 but that pose security risks to users, it is Apple's responsibility to demonstrate concrete examples of such apps. I

further conclude that Apple should present a rigorous and thorough threat model for both the Apple App Store and its App Review and distribution process and notarization and the notarization review process, such that it is clear and unambiguous why Apple has chosen not to reject those concrete example apps from notarization but has chosen to reject those apps from the Apple App Store.

288.    If an app is neither in Category 1 nor Category 2, then the app would neither be rejected by the notarization process nor the App Review process. Consequently, the security risks to users of such an app are equivalent regardless of whether the user obtains apps via the Apple App Store or an alternate distribution pathway.

289.    Accordingly, I conclude, from a security perspective, that it is not necessary for app distribution to be controlled only by Apple via the Apple App Store.

290.    I further conclude that a third party app store, were one to enter the market, could do as well or better in securing iOS users' devices and data as Apple's App Store.

## VIII.    Security of IAP Payment

291.    I now turn to an analysis of Apple's requirement for developers to use their in-app purchase payment system for certain types of digital content purchases, such as subscriptions and in-game currencies. I find that, from the perspective of the security of a user's iOS device or data, there is no compelling reason for Apple to require the use of IAP payment.

292.    Apple requires developers to use IAP payment for several categories of in-app content. The "Business" section of Apple's "App Review Guidelines" states[122]:

- *If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase.* Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, cryptocurrencies and cryptocurrency wallets, etc.

293.    However, in certain circumstances, not only does Apple allow the use of payment systems other than IAP, but it *requires* the use of a payment system other than IAP. For example, the "Business" section of the guidelines explicitly says that other payment systems

---

[122] https://developer.apple.com/app-store/review/guidelines/#business (emphasis added) (last visited Mar. 5, 2025).

may be used[123]:

- **3.1.3(d) Person-to-Person Services:** If your app enables the purchase of real-time person-to-person services between two individuals (for example tutoring students, medical consultations, real estate tours, or fitness training), *you may use purchase methods other than in-app purchase to collect those payments.* One-to-few and one-to-many real-time services must use in-app purchase.

And the following says that other payment systems *must* be used[124]:

- **3.1.3(e) Goods and Services Outside of the App:** If your app enables people to purchase physical goods or services that will be consumed outside of the app, *you must use purchase methods other than in-app purchase to collect those payments, such as Apple Pay or traditional credit card entry.*

294.     Because Apple not only allows but actually requires apps to "use purchase methods other than in-app purchase to collect those payments, such as Apple Pay or traditional credit card entry" in some contexts, Apple must not consider there to be significant device or data security risks to users with the use of these other payment systems. If any security risk exists (*e.g.*, any risk implied through the use of a third-party library to assist with payment), Apple's assessment of the risk level must be low enough for Apple to *require* the use of an alternate payment system. If Apple did consider there to be significant device or data security risks to users with the use of payment systems other than in-app purchase, it would be surprising for Apple to require their use for "Goods and Services Outside of the App."

295.     There is no evidence that alternative payment systems are any less secure than IAP. Mr. Schiller testified that he was unaware of any Apple analysis or external studies on the comparative security protections between IAP and alternative payment systems.[125] Phillip Shoemaker, Former Apple Senior Director of App Store Review, likewise testified that he had no evidence that IAP was safer than alternative payment systems, such as PayPal.[126] Matthew Fischer, former Vice President and Head of Worldwide App Store, testified that he was unaware of any analysis indicating that IAP is more secure than PayPal or Stripe.[127]

296.     And  Dr. Rubin, Apple's security expert in an anti-competition proceeding in the

---

[123] Id. (emphasis added).

[124] Id. (emphasis added).

[125] Tr. Schiller I, 120:4-123:7

[126] Tr. Shoemaker 149:3-150:9

[127] *Epic v. Apple* Injunction Hearing Tr. 55:3-56:19 (May 8, 2024).

United Kingdom, presented no evidence in his reports that iOS device users who purchase physical goods and services through iOS apps have had their personal or financial information compromised.[128]  Dr. Rubin also testified that Apple's security mechanism it has implemented in the iOS device hardware and iOS software will still operate if Apple's control of IAP were removed.[129]

297.    I additionally reviewed the December 2024 version of the "Apple Platform Security" document for any reference to in-app purchase that would suggest that in-app purchase has a role in the security of a user's device or data.[130] While there was a lengthy discussion on Apple Pay (pages 147-63), I did not find any reference to the role of in-app purchase on the security of a user's device or data. This is consistent with my conclusion above, which is that there are not device or data security risks to users with the use of these other payment systems, and hence not a role for in-app purchase in mitigating any such risk.

298.    I also reviewed internal Apple documents and did not find any indication of in-app purchase having a role in protecting a user's device or data security.

299.    Similar to the above, I conclude that Apple must not consider there to be significant security risks to users if they were to use "traditional credit card entry" or some other "purchase methods other than in-app purchase" to make a purchase when using an app.

300.    In summary, I found no evidence of in-app purchase having a role in a user's device or data security. Additionally, I found that, in some cases, Apple *requires* the use of payment methods other than in-app purchase, which is not what I would expect if in-app purchase had a role in a user's device or data security. Consequently, I conclude—just as Apple has done in the context of "Person-to-Person Services" and "Goods and Services Outside of the App"—that, from a security perspective, the use of methods other than in-app purchase to make purchases is acceptable and should be allowed.

301.    In my opinion, based upon my extensive review of the relevant documents, testimony, and literature, as well as my knowledge and experience as a security expert, Apple's control of the marketplace for IAP payment is not necessary to protect users' security. I am unaware of any technical reason why a third-party could not not provide at least as much, if not

---

[128] UK Proceeding, Trial Day 12 Tr. 17:10-15 (Jan. 29, 2025).

[129] UK Proceeding, Trial Day 11 Tr. 52:1-12.

[130] https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

more, security protection to users paying for in-app digital content than Apple provides.

## IX.     Conclusion of Analysis

302.     It is my opinion as an expert on computer security that Apple's App Store and App Review provides inadequate security protection for iOS devices and user data. Aside from personalization, I find no evidence that Apple has ever threat modeled its App Store Process, as it does for other products and services (like the iCloud Support Application), a necessary first step in providing security protection. In addition, its App Review process has faced multiple challenges, including insufficiently qualified reviewers, inadequate review tools, backlogs, and difficulty detecting malware and other fraudulent activity.

303.     It is also my opinion as a computer security expert that Apple's control over the marketplace for iOS apps and IAP payment does not contribute meaningfully to the modest amount of security protection it does provide for iOS devices and user data. Nearly all that security protection is provided by the iOS and iPadOS operating systems rather than Apple's App Store Process. I see no evidence that the App Store Process is necessary to  protect iOS device and user data security it does provide.

304.     Further, it is also my opinion as a computer security expert that other, less restrictive approaches are available to provide security protection for iOS devices and user data. Those other means include: (i) performing security reviews of apps by third-party app stores; and (ii) notarization, as Apple now does in the European Union without evidence of any significant change in security vulnerability for the iOS devices or user data. Additional security can be offered through performing security protection on the devices themselves, as Google does with Play Protect, as Apple itself does with XProtect in the Mac environment, and it already does with iOS and iPadOS.

305.     Moreover, it is also my opinion as a computer security expert that other app stores could provide the same, or even greater, security protection for iOS devices and user data than Apple provides through the App Store Process. Likewise, it is my opinion as a computer security expert that alternative methods of payment for in-app digital content could provide the same, or even greater, security protection for iOS devices and user data than Apple provides through the IAP payment process.

306.     I find no evidence of any unique or specialized knowledge, skills, or processes that Apple applies to iOS devices and user data security through its control of the marketplace for iOS apps and of the method for IAP payment. While the App Store Process may have

84

prevented some adversarial apps from appearing on the App Store, I find no evidence of any unique or specialized knowledge, skills, or processes that Apple applies to iOS devices and user data security through its control of the marketplace for iOS apps and the method for IAP payment.

307.    My analysis is ongoing and I reserve the right to revise or expand my opinions.


Respectfully submitted,

_____

Tadayoshi Kohno, Ph.D.

APPENDIX A

# TADAYOSHI KOHNO — CURRICULUM VITAE

Paul G. Allen School of Computer Science & Engineering
University of Washington
101 Paul G. Allen Center
Seattle, WA 98195-2350, USA

Phone: (206) 491-8778
Fax: (206) 616-3804
E-mail: yoshi@cs.washington.edu
URL: http://www.cs.washington.edu/homes/yoshi/

## APPOINTMENTS

- Associate Dean for Faculty Success, College of Engineering, University of Washington, 2024–Present.
- Associate Director for Diversity, Equity, Inclusion, and Access, Paul G. Allen School of Computer Science & Engineering, University of Washington, 2020–2023.
- Professor, Department of Computer Science & Engineering, University of Washington, September 2016–Present. (The Department of Computer Science & Engineering is now called the Paul G. Allen School for Computer Science & Engineering.)
- Adjunct Professor, School of Law, University of Washington, September 2020–Present.
- Adjunct Professor, Department of Electrical Engineering, University of Washington, September 2016–Present. (The Department of Electrical Engineering is now called the Department of Electrical & Computer Engineering.)
- Adjunct Professor, Information School, University of Washington, September 2016–Present.
- Short-Dooley Endowed Career Development Professor, Department of Computer Science & Engineering, University of Washington, July 2014–2017.
- Associate Professor, Department of Computer Science & Engineering, University of Washington, September 2011–September 2016.
- Adjunct Associate Professor, Department of Electrical Engineering, University of Washington, February 2016–September 2016.
- Adjunct Associate Professor, Information School, University of Washington, September 2011–September 2016.
- Assistant Professor, Department of Computer Science & Engineering, University of Washington, July 2006–September 2011.
- Visiting Researcher (on sabbatical), Microsoft Research, Microsoft, January 2014–November 2014.
- Cryptographer, Software Security Group, Cigital, January 2000–June 2001.
- Cryptographer, Counterpane Systems, May 1999–January 2000.

## EDUCATION

- Ph.D. in Computer Science, University of California at San Diego, June 2006.
  Advisor: Professor Mihir Bellare.
- M.S. in Computer Science, University of California at San Diego, December 2004.
  Advisor: Professor Mihir Bellare.
- B.S. in Computer Science, University of Colorado at Boulder, May 1999.
  Advisors: Professors Harold N. Gabow and Evi Nemeth.

## SELECTED AWARDS AND HONORS

### Fellowship, innovator, other awards

- Fellow, Institute of Electrical and Electronics Engineers (IEEE), 2023.
- United States Air Force Commander's Public Service Award, 2020.
- Short-Dooley Endowed Career Development Professorship, 2014.
- Member, Defense Science Study Group (DSSG), 2014.
- Senior Member, Institute of Electrical and Electronics Engineers (IEEE), 2012.
- National Science Foundation CAREER Award, 2009.
- Alfred P. Sloan Research Fellowship, 2008.
- Technology Review TR35 Young Innovator Award, 2007.
- IBM Ph.D. Fellowship, 2004.
- National Defense Science and Engineering Graduate Fellowship, 2001.
- Cal IT Fellowship, University of California at San Diego, 2001. Declined in favor of the above fellowship.
- National Science Foundation Graduate Fellowship Honorable Mention, 2001.

### Major research awards

- Honorable Mention, 2024, 12th Annual Best Scientific Cybersecurity Paper Competition, for my 2023 paper [150]; awarded by the U.S. National Security Agency (NSA).
- Test of Time Award, 2023, USENIX Networked Systems Design and Implementation, for my 2012 paper [65].
- Honorable Mention, 2023, 10th Annual Best Scientific Cybersecurity Paper Competition, for my 2021 paper [126]; awarded by the U.S. National Security Agency (NSA).
- American Association for the Advancement of Science (AAAS) Golden Goose Award, 2021. Co-recipient with Stephen Checkoway, Karl Koscher, and Stefan Savage for our 2010 and 2011 automotive security research [52, 62].
- Test of Time Award, 2020 IEEE Symposium on Security and Privacy, for my 2010 paper [52].
- Test of Time Award (Inaugural Year), 2019 Annual Computer Security Applications Conference (ACSAC), for my 2000 paper [4].
- Test of Time Award (Inaugural Year), 2019 IEEE Symposium on Security and Privacy, for my 2008 paper [33].

### Additional research awards

- Best Paper Award, 2024 Internet Measurement Conference. (See publication [169].)
- Andreas Pfitzmann Best Student Paper Award Runner Up, 2024 Privacy Enhancing Technologies Symposium. (See publication [159].)
- Distinguished Paper Award, 2023 USENIX Security Symposium. (See publication [150].)
- Selected Paper, 2023 USENIX Security Symposium; paper invited to appear in ;login:. (See publications [150, 188].)
- Spotlight Paper, 2023 The Web Conference. (See publication [146].)
- Best Paper Award Runner Up, 2021 Internet Measurement Conference. (See publication [133].)
- Selected Paper, 2021 IEEE Symposium on Security and Privacy; paper invited to appear in IEEE Security & Privacy Magazine. (See publications [126, 185].)

2

- Selected Paper, 2017 IEEE Symposium on Security and Privacy; paper invited to appear in IEEE Security & Privacy Magazine. (See publications [103, 183].)
- Selected Paper, 2016 USENIX Security Symposium; paper invited to appear in ;login:. (See publications [98, 182].)
- Best Student Paper Award, 2016 USENIX Annual Technical Conference (ATC). (See publication [96].)
- Selected Paper, 2012 Networked Systems Design and Implementation (NSDI); paper invited to appear in ;login:. (See publications [65, 181].)
- Best Practical Paper Award, 2012 IEEE Symposium on Security and Privacy. (See publication [66].)
- Best Student Paper Award, 2011 European Conference on Computer Systems (EuroSys). (See publication [59].)
- CPDP Multidisciplinary Privacy Award, 2011, Computers, Privacy & Data Protection Conference. (Awarded for publication [53], appearing at SOUPS 2010.)
- CPDP Multidisciplinary Privacy Award Honorable Mention, 2011, Computers, Privacy & Data Protection Conference. (Awarded for publication [51], appearing at CHI 2010.)
- Outstanding Student Paper Award, 2009 USENIX Security Symposium. (See publication [46].)
- Best Paper Award, 2008 International Conference on Mobile Systems, Application, and Services (MobiSys). (See publication [34].)
- Outstanding Paper Award, 2008 IEEE Symposium on Security and Privacy. (See publication [33].)
- Selected abstract for video release (one of two out of over 4000 submissions), 2008 American Heart Association Annual Scientific Sessions. (See publication [176].)
- CSE PhD Dissertation Award, 2006, University of California at San Diego, Department of Computer Science and Engineering.
- Award Paper, 2005 IEEE Symposium on Security and Privacy; paper invited to a special issue of the IEEE Transactions on Dependable and Secure Computing. (See publications [18, 19].)
- Selected Paper, 2002 ACM Conference on Computer and Communications Security; paper invited to a special issue of the ACM Transactions on Information and System Security. (See publications [8, 16].)
- Outstanding Paper Award, 2000 Annual Computer Security Applications Conference; paper invited to a special issue of the ACM Transactions on Information and System Security. (See publications [4, 7].)
- Selected Paper, 2000 Workshop on Algorithm Engineering and Experiments; paper invited to a special issue of the ACM Journal of Experimental Algorithmics. (See publications [1, 5].)
- Best rump session talk (works in progress talk), CRYPTO 2003; research later published at IEEE S&P 2004 [15].

## Award for Teaching

- ACM Teaching Award, 2022, Awarded by the students of the Paul G. Allen School for Computer Science & Engineering, University of Washington.

## Awards for PhD dissertations (advised)

- Western Association of Graduate Schools (WAGS) and ProQuest WAGS/ProQuest Innovation in Technology Award, 2021, awarded to Ivan Evtimov. (Single University of Washington nominee across all departments.)
- William Chan Memorial Dissertation Award, 2021, University of Washington, Paul G. Allen School of Computer Science & Engineering, awarded to Ivan Evtimov.

3

- SIGSAC Doctoral Dissertation Award for Outstanding PhD Thesis in Computer and Information Security, Runner Up, 2015, awarded to Karl Koscher.
- William Chan Memorial Dissertation Award, 2014, University of Washington, Department of Computer Science & Engineering, awarded to Franziska Roesner.
- SIGOPS Dennis M. Ritchie Dissertation Award, Honorable Mention, 2013, awarded to Roxana Geambasu.
- William Chan Memorial Dissertation Award, 2011, University of Washington, Department of Computer Science & Engineering, awarded to Roxana Geambasu.

### Award for undergraduate research (advised)

- CRA Outstanding Undergraduate Researcher Award, 2019, awarded to Kimberly Ruth (co-advised with Franziska Roesner).
- CRA Outstanding Undergraduate Researcher Award, Finalist, 2018, awarded to Kimberly Ruth (co-advised with Franziska Roesner).
- CRA Outstanding Undergraduate Researcher Award, Finalist, 2017, awarded to Kimberly Ruth (co-advised with Franziska Roesner).

## PROFESSIONAL ACTIVITIES

### Litigation Support Experience

- Thompson Coburn, LLP. Retained by FCA US LLC in Flynn et al. versus FCA US LLC and Harman International, Inc. Wrote one expert report. Deposed October 2019. Retained as expert witness in class action lawsuit.
- Lowe Graham Jones, PLLC. Retained by DocuSign, Inc. in RMail Limited, RPost Communications Limited, and RPost Holdings, Inc. versus DocuSign, Inc. Wrote expert reports. Deposed June 2013 and April 2019. Case settled June 2019. Retained as expert witness in patent litigation.

### Organization leadership and activities

- Co-Director, Security and Privacy Research Lab, University of Washington (Computer Science & Engineering), 2006–Present.
- Co-Director, Technology and Policy Lab, University of Washington (Computer Science & Engineering, the Information School, the School of Law), 2013–Present.
- Founding Member, IEEE Center for Secure Design, 2014–2016.
- Inaugural Member, Forum on Cyber Resilience, Computer Science and Telecommunications Board, Division of Engineering and Physical Sciences, National Research Council, 2014–2018.
- Intelligence Science and Technology Experts Group, National Academies, 2015–Present.
- Advisor, Diabetes Technoology Society Cybersecurity Standard for Connected Diabetes Devices, 2015.
- Member, U.S. Air Force Scientific Advisory Board, 2016–2020.
- Founding Member, USENIX Committee for Black, African-American, and African Diaspora Inclusion, 2020–2021.
- Member, Electronic Frontier Foundation (EFF) Advisory Board, 2020–2023.
- Steering Committee, Partnership on AI (Safety Critical AI), 2022–2023.
- Executive Member, International Academy of Digital Arts and Sciences (IADAS), 2022–Present.
- Member, Electronic Frontier Foundation (EFF) Board of Directors, 2023–Present.

4

## Conference steering committees

- Steering Committee member, USENIX Security Symposium, 2012–Present. (Founding member; although founded in 1988, USENIX Security did not have an official Steering Committee until 2012.)
- USENIX Board Liaison, USENIX Security Symposium, 2014–2021.
- Steering Group member, Network and Distributed System Security Symposium (NDSS), 2011–2014.
- Co-founder and Steering Committee member, USENIX Workshop on Health Security and Privacy (Health-Sec), 2010–15. The event changed its name to the USENIX Summit on Health Information Technologies (HealthTech).

## Program chairs and editorial activities

- Research Ethics Committee Chair, USENIX Security Symposium, Seattle, WA, August 2025.
- Co-Editor, IEEE Security and Privacy Magazine, Special Issue on Security and Privacy for the Metaverse, January/February 2024.
- Department Editor, Off by One, IEEE Security and Privacy Magazine, February 2022–Present.
- Co-Chair, An Interactive Workshop on the Human Aspects of Smarthome Security and Privacy (WSSP), August 2018.
- Co-Chair, World Wide Web Conference, Security and Privacy Track, Perth, Australia, April 2017.
- Co-Chair, Workshop on Usable Privacy & Security for Wearable and Domestic Ubiquitous Devices (UP-SIDE), Seattle, WA, September 2014.
- Co-Chair, Learning from Authoritative Security Experiment Results Workshop (LASER), Arlington, VA, October 2013.
- Co-Chair, Workshop on Home Usable Privacy and Security (HUPS), Newcastle, UK, July 2013.
- Chair, USENIX Security Symposium, Bellevue, WA, August 2012.
- Co-chair and Co-founder, USENIX Workshop on Health Security and Privacy (HealthSec), Washington, DC, August 2010.
- Chair, USENIX Workshop on Hot Topics in Security (HotSec), Montreal, Canada, August 2009.
- Co-chair, USENIX/ACCURATE Electronic Voting Technology Workshop (EVT), San Jose, CA, August 2008.

## Program committees

- Gender, Online Safety, and Sexuality (GOSS), Philadelphia, PA, August 2024.
- USENIX Security, Philadelphia, PA, August 2024. Member: Research Ethics Committee.
- IEEE European Symposium on Security and Privacy, Vienna, Austria, July 2024.
- USENIX Security, Anaheim, CA, August 2023.
- USENIX Security, Boston, MA, August 2022.
- USENIX Security, Vancouver, BC, August 2021.
- USENIX Security, Boston, MA, August 2020. (Transitioned to virtual event due to COVID-19.)
- Privacy Enhancing Technologies Symposium (PETS), Montreal, Canada , July 2020. (Transitioned to virtual event due to COVID-19.)
- USENIX Security, Santa Clara, CA, August 2019.
- Privacy Enhancing Technologies Symposium (PETS), Stockholm, Sweden, July 2019.
- USENIX Secruity, Baltimore, MD, August 2018.

5

- USENIX Security, Vancouver, BC, August 2017.
- Privacy Enhancing Technologies Symposium (PETS), Minneapolis, MN, 2017.
- International Workshop on Pervasive Smart Living Spaces (PerLS), Kona, Hawaii, March 2017
- USENIX Security, Austin, TX, August 2016.
- Privacy Enhancing Technologies Symposium (PETS), Darmstadt, Germany, July 2016.
- USENIX Security, Washington, DC, August 2015. (Work-in-Progress Chair.)
- Privacy Enhancing Technologies Symposium (PETS), Philadelphia, PA, June 2015.
- Financial Cryptography, Puerto Rico, USA, January 2015.
- USENIX Security, San Diego, CA, August 2014. (Work-in-Progress Chair.)
- Workshop on Usable Security, San Diego, CA, February 2014.
- IEEE Symposium on Security and Privacy, San Jose, CA, May 2014.
- Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS), San Francisco, CA, May 2013.
- IEEE Symposium on Security and Privacy, San Francisco, CA, May 2012.
- Financial Cryptography, Bonaire, Netherlands Antilles, February 2012.
- USENIX Security, San Francisco, CA, August 2011.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2011.
- Advances in Cryptology – EUROCRYPT, Tallinn, Estonia, May 2011.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Phoenix, AZ, March 2011.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2011.
- ACM Conference on Computer and Communication Security (CCS), Chicago, IL, October 2010.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2010.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2010.
- ACM Conference on Computer and Communication Security (CCS), Chicago, IL, November 2009.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2009.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Krakow, Poland, June 2009.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Santa Cruz, CA, 2009.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, 2009.
- ACM Conference on Computer and Communication Security (CCS), Alexandria, VA, 2008.
- USENIX Security, San Jose, CA, August 2008.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Boulder, CO, June 2008.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2008.
- Advances in Cryptology – EUROCRYPT, Istanbul, Turkey, April 2008.
- Workshop on Mobile Computing Systems and Applications (HotMobile), Napa Valley, CA, February 2008.
- USENIX Security, Boston, MA, August 2007.
- Steps to Reducing Unwanted Traffic on the Internet (SRUTI), Santa Clara, CA, June 2007.
- International Conference on Mobile Systems, Application, and Services (MobiSys), Puerto Rico, USA, June 2007.
- IEEE Symposium on Security and Privacy, Oakland, CA, May 2007. (Work-in-Progress Chair.)

6

- WWW 2007 Security, Privacy, Reliability and Ethics Track, Banff, Canada, May 2007.
- ACM Workshop on Recurring Malcode (WORM), Fairfax, VA, November 2006.
- ACM Workshop on Wireless Security (WiSe), Los Angeles, CA, September 2006.
- Financial Cryptography and Data Security, Anguilla, BWI, February 2006.
- Network and Distributed System Security Symposium (NDSS), San Diego, CA, February 2006.
- USENIX Security 2005, Baltimore, MD, August 2005.
- WWW 2005 Security, Privacy, and E-Commerce Track, Chiba, Japan, May 2005.
- WWW 2004 Security and Privacy Track, New York, NY, May 2004.

## External reviews

- Journals and magazines: Journal of Cryptology (1 paper), Journal of Computer Security (1 paper), Communications of the ACM (2 papers), IEEE Transactions on Mobile Computing (1 paper), ACM Transactions on Sensor Networks (1 paper), ACM Transactions on Information and System Security (1 paper), IEEE Security and Privacy (4 papers), ACM Computing Surveys (1 paper).
- Conferences (approximately 1 or 2 papers per conference): CRYPTO (2003); EUROCRYPT (2004, 2005); ACM CCS (2001); Network and Distributed System Security Symposium (2001); Fast Software Encryption (2001); Theory of Cryptography Conference (2006); RSA Conference Cryptographers' Track (2003, 2006); Financial Cryptography (2004); Workshop on Privacy in the Electronic Society (2003); Workshop on Information Security Applications (2003); USENIX/ACCURATE Electronic Voting Technology Workshop (2007), International Conference on Provable Security (2007), CHI (2008), NSDI (2008), UIST (2009,2012), Ubicomp (2009), Pervasive (2009).

## Other organizing roles

- Co-chair, UW MSR Summer Institute, July 2011. Institute title: Security and Privacy for a Consumer, Cloud World.
- Co-chair, UW MSR Summer Institute, July 2014. Institute title: Security Analytics.
- Steering Committee, Workshop to Develop a Building Code and Research Agenda for Medical Device Software Security, 2014.
- Organizing committee, The National Academies, National Research Council, Computer Science and Telecommunications Board), July 2015. Workshop title: Workshop on Privacy for the Intelligence Community.

## Other external activities

- Invited participant, Microsoft Research Faculty Summit, July 2007.
- Technical Advisor, ACLU Electronic Voting Committee (II), August 2007–October 2010.
- Invited participant, Intel Trust Evidence Workshop, May 2010
- Invited participant, Google Faculty Summit, July 2010.
- Reviewer, National Research Council, Toward Better Usability, Security, and Privacy of Information Technology: Report of a Workshop, 2010.
- Invited participant, Summit on Education in Secure Software, October 2010.
- Invited participant, NSF Workshop on Trustworthy Computing, October 2010.
- Member, The Ad Hoc Committee for Responsible Computing (Drafting "Moral Responsibility for Computing Artifacts: The Rules"), 2010.

7

- Judge, Develop for Privacy Challenge (Organized by the ACLU of Northern California, the ACLU of Washington, the Tor Project, and the Information & Privacy Commissioner's Office of Ontario, Canada), 2011.
- Invited participant, Google Faculty Summit, July 2011.
- Invited participant, Microsoft Research Faculty Summit, July 2011.
- Search Committee for a new Editor-in-Chief, IEEE Security & Privacy Magazine, March-April 2012.
- Invited participant, Microsoft Research Faculty Summit, July 2012.
- Invited participant, Intel Security Curriculum Workshop, October 2012.
- Invited participant, Microsoft Research Faculty Summit, July 2013.
- Member, Microsoft Research Ethics Review Board, 2014–2017.
- Invited participant, APRU Internet Governance Seminar in Tokyo, March 2015.
- Invited participant, Hewlett Foundation Internet of Things Workshop, April 2015.
- Invited participant, NSF Visioning Workshop on Smart and Connected Communities Research and Education, January 2016.
- Invited participant, Government Accountability Office's Comptroller General Forum on 21st Century Data and Analytics, January 2016.
- Invited participant, DARPA/ISAT Workshop on "Whither the Data?" March 2016.
- Chair, ACM SIGSAC Ph.D. Dissertation Award Committee, 2016.
- Invited participant, DARPA/ISAT Workshop on "Dangers of Augmented Reality (DARE)," November 2016.
- Judge, FTC IoT Home Inspector Challenge, 2017.

## Internal activities

- Coach, University of Washington Aikido Club, 2024–Present.
- Chair, 10-Year Review, Department of Bioengineering, University of Washington, 2023.
- Associate Director for Diversity, Equity, Inclusion, and Access, Paul G. Allen School of Computer Science & Engineering, University of Washington, 2020–2023.
- Executive Committee, Department of Computer Science and Engineering, University of Washington, 2010–2011, 2020–2023.
- Faculty Recruiting Committee Member, Department of Computer Science and Engineering, University of Washington, 2010–2011, 2011-2012, 2012-2013, 2014-2015, 2015-2016, 2017-2018 (chair), 2018-2019 (chair), 2019-2020 (chair), 2023-2024 (teaching track).
- Faculty sponsor, Computer Security Competition Team, Department of Computer Science and Engineering, University of Washington, Spring 2008–2011. (Team won 1st place in the 2008, 2009, 2010, 2011 Pacific Rim Regional Collegiate Cyber Defense Competition. Team won 1st place in the 2011 National Collegiate Cyber Defense Competition.)

## PUBLICATIONS

### Publication summary

- Journal publications: 17 total; 2 ACM TISSEC; 1 IEEE TDSC; 1 ACM JEA; 1 JoC; 1 AIEthics; 1 ACM OSR; 1 DevEng; 1 IEEE Data Engineering, 1 Neurosurgical Focus; 1 Heart Rhythm Journal; 1 Journal of Diabetes Science and Technology; 1 New England Journal of Medicine; 1 Berkeley Technical Law Journal; 1 Digital Threats; 1 Cardiovascular Digital Health Journal; 1 Telemedicine and e-Health.

8

- Top-tier and strong security and cryptography conference and workshop publications: 77 total; 12 IEEE S&P; 11 ACM CCS; 18 USENIX Security; 3 EUROCRYPT; 1 CRYPTO; 4 NDSS; 1 EuroS&P; 11 PETS; 3 SOUPS; 3 ACSAC; 3 WWW / Web Conf; 5 FSE; 3 HotSec; 1 NSPW.

- Top-tier system, mobile systems, human-computer interaction, AI, and vision conference and workshop publications: 43 total; 11 CHI; 4 AIES, 1 OSDI; 3 NSDI; 2 MobiSys; 3 Ubicomp; 1 EuroSys; 1 UIST; 1 CSCW; 1 IDC; 1 ECCV; 1 CVPR; 4 IMC; 1 NeurIPS; 1 ICTD; 1 ATC; 2 HotOS; 4 HotMobile.

- Top-tier computer science education conference publications: 1 SIGCSE.

- Other cryptography, security, and systems conference and workshop publications: 22 total; 1 ACNS; 1 ICCPS; 1 HealthSec; 2 FC; 2 WOOT; 1 AES; 1 UbiPriv; 3 WPES; 1 AISec; 1 LASER; 1 CREDS; 1 3GSE; 1 UPSIDE; 1 PerLS; 1 Bitcoin; 1 ConPro; 1 VR4Sec; 1 ML-Perils; 1 USEC; 1 EuroUSEC.

- Non-cryptography, security, and systems workshop publications: 1 ALENEX, 2 EAAMO.

- Peer-reviewed research magazine publications: 7 total; 3 CACM; 2 IEEE Pervasive Computing, 1 IEEE Software; 1 IEEE Security and Privacy.

- Peer-reviewed non-research magazine publications: 4 total; 1 CACM; 3 IEEE Security and Privacy.

- Non-peer-reviewed non-research magazine publications: 6 total; 2 IEEE Security and Privacy; 3 USENIX ;login:; 1 Technology Review.

- Standards documents: 1 RFC.

- Fiction and other creative works (excluding works included in other sections): 12 total; 7 IEEE Security and Privacy; 1 Little Blue Marble; 1 After Dinner Conversations; 1 Haven Speculative; 1 HyphenPunk; 1 365tomorrows.

- Books: 1 cryptography text, 1 anthology of short stories, 1 novella, 1 self-study journaling notebooks.

- Book chapters: 1 Cyberbiosecurity.

- Games and educational toolkits: 1 card game; 1 card-based brainstorming toolkit.

## Peer-reviewed journal and conference publications

[1] Harold N. Gabow and Tadayoshi Kohno. A network-flow-based scheduler: Design, performance history, and experimental analysis. In *Second Workshop on Algorithm Engineering and Experiments*, pages 1–14, January 2000. (Conference version of [5].)

[2] John Kelsey, Tadayoshi Kohno, and Bruce Schneier. Amplified boomerang attacks against reduced-round MARS and Serpent. In Bruce Schneier, editor, *Fast Software Encryption*, volume 1978 of *Lecture Notes in Computer Science*, pages 75–93. Springer-Verlag, April 2000.

[3] Tadayoshi Kohno, John Kelsey, and Bruce Schneier. Preliminary cryptanalysis of reduced-round Serpent. In *Third AES Candidate Conference*, pages 195–211, April 2000.

[4] John Viega, J. T. Bloch, Yoshi Kohno, and Gary McGraw. ITS4: A static vulnerability scanner for C and C++ code. In *Sixteenth Annual Computer Security Applications Conference*, pages 257–267, December 2000. (Conference version of [7]; recipient of the conference's Outstanding Paper Award. Recipient of the conference's inaugural 2019 Test of Time Award.)

[5] Harold N. Gabow and Tadayoshi Kohno. A network-flow-based scheduler: Design, performance history, and experimental analysis. *ACM Journal of Experimental Algorithmics*, 6, 2001. (Journal version of [1]; invited submission.)

[6] Tadayoshi Kohno and Mark McGovern. On the global content PMI: Improved copy-protected Internet content distribution. In Paul F. Syverson, editor, *Financial Cryptography*, volume 2339 of *Lecture Notes in Computer Science*, pages 79–90. Springer-Verlag, February 2001.

9

[7]   John Viega, J. T. Bloch, Tadayoshi Kohno, and Gary McGraw. Token-based scanning for source code security problems. *ACM Transactions on Information and System Security*, 5(3):238–261, August 2002. (Journal version of [4]; invited submission.)

[8]   Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. Authenticated encryption in SSH: Provably fixing the SSH binary packet protocol. In Vijay Atluri, editor, *Proceedings of the 9th ACM Conference on Computer and Communications Security*, pages 1–11. ACM Press, November 2002. (Conference version of [16]; highest ranked paper after conference program committee reviews.)

[9]   Niels Ferguson, Doug Whiting, Bruce Schneier, John Kelsey, Stefan Lucks, and Tadayoshi Kohno. Helix: Fast encryption and authentication in a single cryptographic primitive. In Thomas Johansson, editor, *Fast Software Encryption*, volume 2887 of *Lecture Notes in Computer Science*, pages 330–346. Springer-Verlag, February 2003.

[10]  Lars R. Knudsen and Tadayoshi Kohno. Analysis of RMAC. In Thomas Johansson, editor, *Fast Software Encryption*, volume 2887 of *Lecture Notes in Computer Science*, pages 182–191. Springer-Verlag, February 2003.

[11]  Mihir Bellare and Tadayoshi Kohno. A theoretical treatment of related-key attacks: RKA-PRPs, RKA-PRFs, and applications. In Eli Biham, editor, *Advances in Cryptology – EUROCRYPT 2003*, volume 2656 of *Lecture Notes in Computer Science*, pages 491–506. Springer-Verlag, May 2003.

[12]  Tadayoshi Kohno, John Viega, and Doug Whiting. CWC: A high-performance conventional authenticated encryption mode. In Bimal Roy and Willi Meier, editors, *Fast Software Encryption*, volume 3017 of *Lecture Notes in Computer Science*, pages 408–426. Springer-Verlag, February 2004.

[13]  Tetsu Iwata and Tadayoshi Kohno. New security proofs for the 3GPP confidentiality and integrity algorithms. In Bimal Roy and Willi Meier, editors, *Fast Software Encryption*, volume 3017 of *Lecture Notes in Computer Science*, pages 427–445. Springer-Verlag, February 2004.

[14]  Mihir Bellare and Tadayoshi Kohno. Hash function balance and its impact on birthday attacks. In Christian Cachin and Jan Camenisch, editors, *Advances in Cryptology – EUROCRYPT 2004*, volume 3027 of *Lecture Notes in Computer Science*, pages 401–418. Springer-Verlag, May 2004.

[15]  Tadayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach. Analysis of an electronic voting system. In *IEEE Symposium on Security and Privacy*, pages 27–40. IEEE Computer Society, May 2004.

[16]  Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. Breaking and provably repairing the SSH authenticated encryption scheme: A case study of the Encode-then-Encrypt-and-MAC paradigm. *ACM Transactions on Information and System Security*, 7(2):206–241, May 2004. (Journal version of [8]; invited submission.)

[17]  Tadayoshi Kohno. Attacking and repairing the WinZip encryption scheme. In Birgit Pfitzmann, editor, *Proceedings of the 11th ACM Conference on Computer and Communications Security*, pages 72–81. ACM Press, October 2004.

[18]  Tadayoshi Kohno, Andre Broido, and kc claffy. Remote physical device fingerprinting. In *IEEE Symposium on Security and Privacy*, pages 211–225. IEEE Computer Society, May 2005. (Conference version of [19]; one of three award papers at the conference.)

[19]  Tadayoshi Kohno, Andre Broido, and K.C. Claffy. Remote physical device fingerprinting. *IEEE Transactions on Dependable and Secure Computing*, 2(2):93–108, April–June 2005. (Journal version of [18]; invited submission.)

[20]  Michel Abdalla, Mihir Bellare, Dario Catalano, Eike Kiltz, Tadayoshi Kohno, Tanja Lange, John Malone-Lee, Gregory Neven, Pascal Paillier, and Haixia Shi. Searchable encryption revisited: Consistency properties, relation to anonymous IBE, and extensions. In Victor Shoup, editor, *Advances in Cryptology –*

10

*CRYPTO 2005*, volume 3621 of *Lecture Notes in Computer Science*, pages 205–222. Springer-Verlag, August 2005. (Conference version of [35].)

[21] Kevin Fu, Seny Kamara, and Tadayoshi Kohno. Key regression: Enabling efficient key distribution for secure distributed storage. In *ISOC Network and Distributed System Security Symposium*, February 2006.

[22] David Molnar, Tadayoshi Kohno, Naveen Sastry, and David Wagner. Tamper-evident, history-independent, subliminal-free data structures on PROM storage -or- how to store ballots on a voting machine (extended abstract). In *IEEE Symposium on Security and Privacy*. IEEE Computer Society, May 2006.

[23] John Kelsey and Tadayoshi Kohno. Herding hash functions and the Nostradamus attack. In Serge Vaudenay, editor, *Advances in Cryptology – EUROCRYPT 2006*, Lecture Notes in Computer Science. Springer-Verlag, May 2006.

[24] Naveen Sastry, Tadayoshi Kohno, and David Wagner. Designing voting machines for verification. In *15th USENIX Security Symposium*, August 2006.

[25] Mihir Bellare, Tadayoshi Kohno, and Victor Shoup. Stateful public-key cryptosystems: How to encrypt with one 160-bit exponentiation. In Rebecca Wright and Sabrina De Capitani di Vimercati, editors, *Proceedings of the 13th ACM Conference on Computer and Communications Security*. ACM Press, November 2006.

[26] Ben Greenstein, Ramakrishna Gummadi, Jeffrey Pang, Mike Y. Chen, Tadayoshi Kohno, Srinivasan Seshan, and David Wetherall. Can Ferris Bueller still have his day off? Protecting privacy in the wireless era. In *11th Workshop on Hot Topics in Operating Systems*, May 2007.

[27] T. Scott Saponas, Jonathan Lester, Carl Hartung, Sameer Agarwal, and Tadayoshi Kohno. Devices that tell on you: Privacy trends in consumer ubiquitous computing. In *16th USENIX Security Symposium*, August 2007.

[28] Vibhor Rastogi, Evan Welbourne, Nodira Khoussainova, Travis Kriplean, Magda Balazinska, Gaetano Borriello, Tadayoshi Kohno, and Dan Suciu. Expressing privacy policies using authorization views. In *Workshop on Ubicomp Privacy: Technologies, Users, Policy*, September 2007.

[29] Kevin Bauer, Damon McCoy, Dirk Grunwald, Tadayoshi Kohno, and Douglas Sicker. Low-resource routing attacks against Tor. In *Workshop on Privacy in the Electronic Society*, October 2007.

[30] Travis Kriplean, Evan Welbourne, Nodira Khoussainova, Vibhor Rastogi, Magda Balazinska, Gaetano Borriello, Tadayoshi Kohno, and Dan Suciu. Physical access control for captured RFID data. *IEEE Pervasive Computing*, 6(4), 2007.

[31] Daniel Halperin, Thomas S. Heydt-Benjamin, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Security and privacy for implantable medical devices. *IEEE Pervasive Computing*, 7(1), 2008.

[32] Charles Reis, Steven D. Gribble, Tadayoshi Kohno, and Nicholas C. Weaver. Detecting in-flight page changes with web tripwires. In *USENIX Symposium on Networked Systems Design & Implementation*, April 2008.

[33] Daniel Halperin, Thomas S. Heydt-Benjamin, Benjamin Ransford, Shane S. Clark, Benessa Defend, Will Morgan, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Pacemakers and implantable cardiac defibrillators: Software radio attacks and zero-power defenses. In *IEEE Symposium on Security and Privacy*. IEEE Computer Society, May 2008. (Recipient of the conference's Outstanding Paper Award. Recipient of the symposium's Inaugural 2019 Test of Time Award. )

[34] Ben Greenstein, Damon McCoy, Jeffrey Pang, Tadayoshi Kohno, Srinivasan Seshan, and David Wetherall. Improving wireless privacy with an identifier-free link layer protocol. In *International Conference on Mobile Systems, Application, and Services (MobiSys)*, June 2008. (Recipient of the conference's Best Paper Award.)

11

[35] Michel Abdalla, Mihir Bellare, Dario Catalano, Eike Kiltz, Tadayoshi Kohno, Tanja Lange, John Malone-Lee, Gregory Neven, Pascal Paillier, and Haixia Shi. Searchable encryption revisited: Consistency properties, relation to anonymous IBE, and extensions. *Journal of Cryptology*, 21(3):350–391, July 2008. (Journal version of [20].)

[36] Damon McCoy, Kevin Bauer, Dirk Grunwald, Tadayoshi Kohno, and Douglas Sicker. Shining light in dark places: Understanding the Tor network. In *Privacy Enhancing Technologies Symposium*, July 2008.

[37] Alexei Czeskis, David J. St. Hilaire, Karl Koscher, Steven D. Gribble, Tadayoshi Kohno, and Bruce Schneier. Defeating encrypted and deniable file systems: TrueCrypt v5.1a and the case of the tattling OS and applications. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[38] Tamara Denning, Kevin Fu, and Tadayoshi Kohno. Absence makes the heart grow fonder: New directions for implantable medical device security. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[39] Michael Piatek, Tadayoshi Kohno, and Arvind Krishnamurthy. Challenges and directions for monitoring P2P file sharing networks – or – why my printer received a DMCA takedown notice. In *3rd USENIX Workshop on Hot Topics in Security (HotSec '08)*, July 2008.

[40] Thomas Ristenpart, Gabriel Maganis, Arvind Krishnamurthy, and Tadayoshi Kohno. Privacy-preserving location tracking of lost or stolen devices: Cryptographic techniques and replacing trusted third parties with DHTs. In *17th USENIX Security Symposium*, July–August 2008.

[41] Jaeyeon Jung, Anmol Sheth, Ben Greenstein, David Wetherall, Gabriel Maganis, and Tadayoshi Kohno. Privacy Oracle: A system for finding application leaks with black box differential testing. In Paul F. Syverson and Somesh Jha, editors, *Proceedings of the 15th ACM Conference on Computer and Communications Security*. ACM Press, October 2008.

[42] Alexei Czeskis, Karl Koscher, Joshua R. Smith, and Tadayoshi Kohno. RFIDs and secret handshakes: Defending against ghost-and-leech attacks and unauthorized reads with context-aware communications. In Paul F. Syverson and Somesh Jha, editors, *Proceedings of the 15th ACM Conference on Computer and Communications Security*. ACM Press, October 2008.

[43] Katherine M. Everitt, Tanya Bragin, James Fogarty, and Tadayoshi Kohno. A comprehensive study of frequency, interference, and training of multiple graphical passwords. In *Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI 2009)*, April 2009.

[44] Tamara Denning, Yoky Matsuoka, and Tadayoshi Kohno. Neurosecurity: Security and privacy for neural devices. *Neurosurgical Focus*, 27, July 2009.

[45] Barath Raghavan, Tadayoshi Kohno, Alex C. Snoeren, and David Wetherall. Enlisting ISPs to improve online privacy: IP address mixing by default. In *Privacy Enhancing Technologies Symposium*, August 2009.

[46] Roxana Geambasu, Tadayoshi Kohno, Amit A. Levy, and Henry M. Levy. Vanish: Increasing data privacy with self-destructing data. In *18th USENIX Security Symposium*, August 2009. (Recipient of the conference's Best Student Paper Award.)

[47] Tamara Denning, Cynthia Matuszek, Karl Koscher, Joshua R. Smith, and Tadayoshi Kohno. A spotlight on security and privacy risks with future household robots: Attacks and lessons. In *11th International Conference on Ubiquitous Computing (Ubicomp)*, September-October 2009.

[48] Sinjin Lee, Kevin Fu, Tadayoshi Kohno, Benjamin Ransford, and William H. Maisel. Clinically significant magnetic interference of implanted cardiac devices by portable headphones. *Heart Rhythm Journal*, 6(10), October 2009.

12

[49] Karl Koscher, Ari Juels, Vjekoslav Brajkovic, and Tadayoshi Kohno. EPC RFID tag security weaknesses and defenses: Passport cards, enhanced drivers licenses, and beyond  In Somesh Jha and Angelos D. Keromytis, editors, *Proceedings of the 16th ACM Conference on Computer and Communications Security.* ACM Press, November 2009.

[50] William H. Maisel and Tadayoshi Kohno.  Improving the security and privacy of implantable medical devices. *New England Journal of Medicine*, 362(13):1164–1166, April 2010.

[51] Tamara Denning, Alan Borning, Batya Friedman, Brian T. Gill, Tadayoshi Kohno, and William H. Maisel. Patients, pacemakers, and implantable defibrillators: Human values and security for wireless implantable medical devices. In *Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI 2010)*, April 2010. (Recipient of a 2011 CPDP Multidisciplinary Privacy Award Honorable Mention.)

[52] Karl Koscher, Alexei Czeskis, Franziska Roesner, Shwetak Patel, Tadayoshi Kohno, Stephen Checkoway, Damon McCoy, Brian Kantor, Danny Anderson, Hovav Shacham, and Stefan Savage. Experimental security analysis of a modern automobile. In *IEEE Symposium on Security and Privacy*. IEEE Computer Society, May 2010. (Recipient of the symposium's 2020 Test of Time Award. )

[53] Alexei Czeskis, Ivayla Dermendjieva, Hussein Yapit, Alan Borning, Batya Friedman, Brian Gill, and Tadayoshi Kohno.  Parenting from the pocket: Value tensions and technical directions for secure and private parent-teen mobile safety.  In *Symposium On Usable Privacy and Security (SOUPS)*, July 2010. (Recipient of the 2011 CPDP Multidisciplinary Privacy Award.)

[54] Qi Shan, Brian Curless, and Tadayoshi Kohno. Seeing through obscure glass. In *European Conference on Computer Vision (ECCV)*, September 2010.

[55] Roxana Geambasu, Amit A. Levy, Tadayoshi Kohno, Arvind Krishnamurthy, and Henry M. Levy. Comet: An active distributed key-value store. In *USENIX Symposium on Operating Systems Design and Implementation (OSDI)*, October 2010.

[56] David W. Richardson, Steven D. Gribble, and Tadayoshi Kohno.  The limits of automatic OS fingerprint generation. In *Workshop on Artificial Intelligence and Security (AISec)*, October 2010.

[57] Tadayoshi Kohno and Brian David Johnson.  Science fiction prototyping and security education: Cultivating contextual and societal thinking in computer security education and beyond.  In *ACM Technical Symposium on Computer Science Education (SIGCSE)*, March 2011.

[58] Gabriel Maganis, Jaeyeon Jung, Tadayoshi Kohno, Anmol Sheth, and David Wetherall. Sensor tricorder: What does that sensor know about me? In *12th Workshop on Mobile Computing Systems and Application (HotMobile)*, March 2011.

[59] Roxana Geambasu, John P. John, Steven D. Gribble, Tadayoshi Kohno, and Henry M. Levy. Keypad: An auditing file system for theft-prone devices.  In *European Conference on Computer Systems (EuroSys)*, April 2011. (Recipient of the conference's Best Student Paper Award.)

[60] David (Yu) Zhu, Jaeyeon Jung, Dawn Song, Tadayoshi Kohno, and David Wetherall. TaintEraser: Protecting sensitive data leaks using application-level taint tracking. *ACM Operating Systems Review*, 45(1), 2011.

[61] Mikhail Afanasyev, Tadayoshi Kohno, Justin Ma, Nick Murphy, Stefan Savage, Alex C. Snoeren, and Geoffrey M. Voelker. Network support for privacy-preserving forensic attribution. *Communications of the ACM*, 54(5):78–87, May 2011.

[62] Stephen Checkoway, Damon McCoy, Brian Kantor, Danny Anderson, Hovav Shacham, Stefan Savage, Karl Koscher, Alexei Czeskis, Franziska Roesner, and Tadayoshi Kohno. Comprehensive experimental analyses of automotive attack surfaces. In *20th USENIX Security Symposium*, August 2011.

13

[63] Miro Enev, Sidhant Gupta, Tadayoshi Kohno, and Shwetak Patel. Televisions, video privacy, and powerline electromagnetic interference. In George Danezis and Vitaly Shmatikov, editors, *Proceedings of the 18th ACM Conference on Computer and Communications Security*. ACM Press, October 2011.

[64] Nathanael Paul, Tadayoshi Kohno, and David C. Klonoff. A review of the security of insulin pump infusion systems. *Journal of Diabetes Science and Technology*, 5(6), November 2011.

[65] Franziska Roesner, Tadayoshi Kohno, and David Wetherall. Detecting and defending against third-party tracking on the web. In *Networked Systems Design and Implementation (NSDI)*, April 2012. (Conference version of [181].)

[66] Franziska Roesner, Tadayoshi Kohno, Alex Moshchuk, Bryan Parno, Helen J. Wang, and Crispin Cowan. User-driven access control: Rethinking permission granting in modern operating systems. In *IEEE Symposium on Security and Privacy*, May 2012. (Recipient of the conference's Best Practical Paper Award.)

[67] Nathanael Paul and Tadayoshi Kohno. Security risks, low-tech user interfaces, and implantable medical devices: A case study with insulin pump infusion systems. In *USENIX Workshop on Health Security and Privacy (HealthSec)*, August 2012.

[68] Franziska Roesner, James Fogarty, and Tadayoshi Kohno. User interface toolkit mechanisms for securing interface elements. In *25th ACM Symposium on User Interface Software and Technology (UIST 2012)*, October 2012.

[69] Alexei Czeskis, Michael Dietz, Dan Wallach, Tadayoshi Kohno, and Dirk Balfanz. Strengthening user authentication through opportunistic cryptographic identity assertions. In George Danezis and Virgil Gligor, editors, *Proceedings of the 19th ACM Conference on Computer and Communications Security*. ACM Press, October 2012.

[70] Miro Enev, Jaeyeon Jung, Liefeng Bo, Xiaofeng Ren, and Tadayoshi Kohno. SensorSift: Balancing sensor data privacy and utility in automated face understanding. In *Annual Computer Security Applications Conference*, December 2012.

[71] Tamara Denning, Tadayoshi Kohno, and Henry M. Levy. Computer security in the modern home. *Communications of the ACM*, 56(1):94–103, January 2013.

[72] Alexei Czeskis, Alex Moshchuk, Tadayoshi Kohno, and Helen J. Wang. Lightweight server support for browser-based CSRF protection. In *23rd International World-Wide Web Conference (WWW 2013)*, May 2013.

[73] Loris D'Antoni, Alan Dunn, Suman Jana, Tadayoshi Kohno, Benjamin Livshits, David Molnar, Alexander Moshchuk, Eyal Ofek, Franziska Roesner, Scott Saponas, Margus Veanes, and Helen J. Wang. Operating system support for augmented reality applications. In *14th Workshop on Hot Topics in Operating Systems (HotOS XIV)*, May 2013.

[74] Stefan Savage and Tadayoshi Kohno. Vulnerability research in the cyberphysical world. In *Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS)*, May 2013.

[75] Franziska Roesner and Tadayoshi Kohno. Securing embedded user interfaces: Android and beyond. In *22nd USENIX Security Symposium*, August 2013.

[76] Temitope Oluwafemi, Sidhant Gupta, Shwetak Patel, and Tadayoshi Kohno. Experimental security analyses of non-networked compact fluorescent lamps: A case study of home automation security. In *Learning from Authoritative Security Experiment Results (LASER)*, October 2013.

[77] Tamara Denning, Adam Lerner, Adam Shostack, and Tadayoshi Kohno. Control-Alt-Hack: The design and evaluation of a card game for computer security awareness and education. In *ACM Conference on Computer and Communications Security*, November 2013.

14

[78] Tamara Denning, Zakariya Dehlawi, and Tadayoshi Kohno. In situ with bystanders of augmented reality glasses: Perspectives on recording and privacy-mediating technologies. In *Conference on Human Factors in Computing Systems (CHI)*, April 2014.

[79] Franziska Roesner, Brian Gill, and Tadayoshi Kohno. Sex, lies, or kittens? Investigating the use of Snapchat's self-destructing messages. In *International Conference on Financial Cryptography and Data Security*, February 2014.

[80] Xinran Wang, Tadayoshi Kohno, and Bob Blakley. Polymorphism as a defense for automated attack of websites. In *Applied Cryptography and Network Security (ACNS '14)*, June 2014.

[81] Franziska Roesner, Tadayoshi Kohno, and David Molnar. Security and privacy for augmented reality systems. *Communications of the ACM*, 57(4):88–96, April 2014.

[82] Tamara Denning, Adam Shostack, and Tadayoshi Kohno. Practical lessons from creating the Control-Alt-Hack card game and research challenges for games in education and research. In *USENIX Summit on Gaming, Games and Gamification in Security Education (3GSE '14)*, August 2014.

[83] Franziska Roesner, Tamara Denning, Bryce Clayton Newell, Tadayoshi Kohno, and Ryan Calo. Augmented reality: Hard problems of law and policy. In *UbiComp 2014 Workshop on Usable Privacy & Security for wearable and domestic ubIquitous DEvices (UPSIDE)*, September 2014.

[84] Franziska Roesner, David Molnar, Alexander Moshchuk, Tadayoshi Kohno, and Helen J. Wang. World-driven access control for continuous sensing. In *ACM Conference on Computer and Communications Security*, November 2014.

[85] Tamara Denning, Batya Friedman, Brian Gill, Daniel B. Kramer, Matthew R. Reynolds, and Tadayoshi Kohno. CPS: Beyond usability: Applying value sensitive design based methods to investigate domain characteristics for security for implantable cardiac devices. In *Annual Computer Security Applications Conference (ACSAC)*, December 2014.

[86] Emily McReynolds, Adam Lerner, Will Scott, Franziska Roesner, and Tadayoshi Kohno. Cryptographic currencies from a tech-policy perspective: Policy issues and technical directions. In *2nd Workshop on Bitcoin Research*, January 2015.

[87] Tamara Bonaci, Junjie Yan, Jeffrey Herron, Tadayoshi Kohno, and Howard Jay Chizeck. Experimental analysis of denial-of-service attacks on teleoperated robotic systems. In *ACM/IEEE International Conference on Cyber-Physical Systems*, April 2015.

[88] Haitham Hassanieh, Jue Wang, Dina Katabi, and Tadayoshi Kohno. Securing RFIDs by randomizing the modulation and channel. In *Networked Systems Design and Implementation (NSDI)*, May 2015.

[89] Adam Lerner, Alisha Saxena, Kirk Ouimet, Ben Turley, Anthony Vance, Tadayoshi Kohno, and Franziska Roesner. Analyzing the use of quick response codes in the wild. In *13th International Conference on Mobile Systems, Applications, and Services (MobiSys)*, May 2015.

[90] Karl Koscher, Tadayoshi Kohno, and David Molnar. SURROGATES: Enabling near-real-time dynamic analyses of embedded systems. In *USENIX Workshop on Offensive Technologies (WOOT '15)*, August 2015.

[91] Paul Vines and Tadayoshi Kohno. Rook: Using video games as a low-bandwidth censorship resistant communication platform. In *Workshop on Privacy in the Electronic Society*, October 2015.

[92] Kiron Lebeck, Tadayoshi Kohno, and Franziska Roesner. How to safely augment reality: Challenges and directions. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2016.

[93] Alexis Hiniker, Sungsoo (Ray) Hong, Tadayoshi Kohno, and Julie A. Kientz. MyTime: Designing and evaluating an intervention for smartphone non-use. In *Conference on Human Factors in Computing Systems (CHI)*, May 2016.

15

[94] Jane Cleland-Huang, Tamara Denning, Tadayoshi Kohno, Forrest Shull, , and Samuel Weber. Keeping ahead of our adversaries. *IEEE Software*, May/June 2016.

[95] Camille Cobb, Samuel Sudar, Nicholas Reiter, Richard Anderson, Franziska Roesner, and Tadayoshi Kohno. Computer security for data collection technologies. In *International Conference on Information and Communication Technologies and Development (ICTD2016)*, June 2016. (Conference version of [109].)

[96] Will Scott, Thomas Anderson, Tadayoshi Kohno, and Arvind Krishnamurthy. Satellite: Joint analysis of CDNs and network-level interference. In *USENIX Annual Technical Conference*, June 2016. (Recipient of the conference's Best Student Paper Award.)

[97] Miro Enev, Alex Takakuwa, Karl Koscher, and Tadayoshi Kohno. Automobile driver fingerprinting. In *Privacy Enhancing Technologies Symposium*, July 2016.

[98] Adam Lerner, Anna Kornfeld Simpson, Tadayoshi Kohno, and Franziska Roesner. Internet Jones and the raiders of the lost trackers: An archaeological study of web tracking from 1996 to 2016. In *25th USENIX Security Symposium*, August 2016. (Conference version of [182].)

[99] Alexis Hiniker, Shwetak N. Patel, Tadayoshi Kohno, and Julie A. Kientz. Why would you do that? Predicting the uses and gratifications behind smartphone-usage behaviors. In *ACM International Joint Conference on Pervasive and Ubiquitous Computing (UbiComp)*, September 2016.

[100] Anna Kornfeld Simpson, Franziska Roesner, and Tadayoshi Kohno. Securing vulnerable home IoT devices with an in-hub security manager. In *First International Workshop on Pervasive Smart Living Spaces (PerLS)*, March 2017.

[101] Genevieve Gebhart and Tadayoshi Kohno. Internet censorship in Thailand: User practices, potential threats, and necessary responses. In *IEEE European Symposium on Security and Privacy (EuroS&P'17)*, April 2017.

[102] Camille Cobb and Tadayoshi Kohno. How public is my private life?: Privacy in online dating. In *Proceedings of the 26th International Conference on World Wide Web*, April 2017.

[103] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Securing augmented reality output. In *IEEE Symposium on Security and Privacy*, May 2017. (Conference version of [183].)

[104] Peter Ney, Ian Smith, Gabriel Cadamuro, and Tadayoshi Kohno. Seaglass: Enabling city-wide IMSI-catcher detection. In *Privacy Enhancing Technologies Symposium*, July 2017.

[105] Peter Ney, Karl Koscher, Lee Organick, Luis Ceze, and Tadayoshi Kohno. Computer security and privacy in DNA sequencing. In *USENIX Security Symposium*, August 2017.

[106] Rajalakshmi Nandakumar, Alex Takakuwa, Tadayoshi Kohno, and Shyamnath Gollakota. Covertband: Activity information leakage using music. *Proceedings of the ACM on Interactive, Mobile, Wearable and Ubiquitous Technologies*, 1(3):87:1–87:24, September 2017. (Publication venue also known as UbiComp.)

[107] Paul Vines, Franziska Roesner, and Tadayoshi Kohno. Exploring ADINT: Using ad targeting for surveillance on a budget – or – how Alice can buy ads to track Bob. In *ACM Workshop on Privacy in the Electronic Society (WPES)*, October 2017.

[108] Ada Lerner, Tadayoshi Kohno, and Franziska Roesner. Rewriting history: Changing the archived web from the present. In *ACM Conference on Computer and Communications Security (CCS)*, November 2017.

[109] Camille Cobb, Samuel Sudar, Nicholas Reiter, Richard Anderson, Franziska Roesner, and Tadayoshi Kohno. Computer security for data collection technologies. *Development Engineering*, 3, 2018. (Journal version of [109].)

16

[110] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Towards security and privacy for multi-user augmented reality: Foundations with end users. In *IEEE Symposium on Security and Privacy*, May 2018.

[111] Lucy Simko, Ada Lerner, Samia Ibtasam, Franziska Roesner, and Tadayoshi Kohno. Computer security and privacy for refugees in the United States. In *IEEE Symposium on Security and Privacy*, May 2018.

[112] Kevin Eykholt, Ivan Evtimov, Earlence Fernandes, Bo Li, Amir Rahmati, Chaowei Xiao, Atul Prakash, Tadayoshi Kohno, and Dawn Song. Robust physical-world attacks on deep learning visual classification. In *Computer Vision and Pattern Recognition (CVPR)*, June 2018.

[113] Lucy Simko, Luke Zettlemoyer, and Tadayoshi Kohno. Recognizing and imitating programmer style: Adversaries in program authorship attribution. In *Privacy Enhancing Technologies Symposium*, July 2018.

[114] Kevin Eykholt, Ivan Evtimov, Earlence Fernandes, Bo Li, Amir Rahmati, Florian Tramer, Atul Prakash, Tadayoshi Kohno, and Dawn Song. Physical adversarial examples for object detectors. In *USENIX Workshop on Offensive Technologies (WOOT)*, August 2018.

[115] Shrirang Mare, Logan Girvin, Franziska Roesner, and Tadayoshi Kohno. Consumer smart homes: Where we are and where we need to go. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2019.

[116] Kiron Lebeck, Tadayoshi Kohno, and Franziska Roesner. Enabling multiple applications to simultaneously augment reality: Challenges and directions. In *Workshop on Mobile Computing Systems and Applications (HotMobile)*, February 2019.

[117] Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Secure multi-user content sharing for augmented reality applications. In *28th USENIX Security Symposium*, August 2019.

[118] Ivan Evtimov, David O'Hair, Earlence Fernandes, Ryan Calo, and Tadayoshi Kohno. Is tricking a robot hacking? *Berkeley Technology Law Journal*, 34(3), 2019.

[119] Peter Ney, Luis Ceze, and Tadayoshi Kohno. Genotype extraction and false relative attacks: Security risks to third-party genetic genealogy services beyond identity inference. In *ISOC Network and Distributed System Security Symposium*, February 2020.

[120] Camille Cobb, Lucy Simko, Tadayoshi Kohno, and Alexis Hiniker. User experiences with online status indicators. In *Conference on Human Factors in Computing Systems (CHI)*, April 2020.

[121] Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. Bad news: Clickbait and deceptive ads on news and misinformation websites. In *Workshop on Technology and Consumer Protection (ConPro)*, May 2020.

[122] Camille Cobb, Lucy Simko, Tadayoshi Kohno, and Alexis Hiniker. A privacy-focused systematic analysis of online status indicators. In *Privacy Enhancing Technologies Symposium*, July 2020.

[123] Shrirang Mare, Franziska Roesner, and Tadayoshi Kohno. Smart devices in Airbnbs: Considering privacy and security for both guests and hosts. In *Privacy Enhancing Technologies Symposium*, July 2020.

[124] Justin Chan, Dean Foster, Shyam Gollakota, Eric Horvitz, Joseph Jaeger, Sham Kakade, Tadayoshi Kohno, John Langford, Jonathan Larson, Puneet Sharma, Sudheesh Singanamalla, Jacob Sunshine, and Stefano Tessaro. PACT: Privacy-sensitive protocols and mechanisms for mobile contact tracing. *Bulletin of the IEEE Computer Society Technical Committee on Data Engineering*, 43(2):15–35, 2020.

[125] Sudheesh Singanamalla, Esther Han Beol Jang, Richard Anderson, Tadayoshi Kohno, and Kurtis Heimerl. Accept the risk and continue: Measuring the long tail of government https adoption. In *Internet Measurement Conference*, October 2020.

[126] Alaa Daffalla, Lucy Simko, Tadayoshi Kohno, and Alexandru G. Bardas. Defensive technology use by political activists during the Sudanese revolution. In *IEEE Symposium on Security and Privacy*, May 2021. (Conference version of [185].)

17

[127] Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. What makes a "bad" ad? User perceptions of problematic online advertising. In *Conference on Human Factors in Computing Systems (CHI)*, May 2021.

[128] Lucy Simko, Britnie Chin, Sungmin Na, Harkiran Kaur Saluja, Tian Qi Zhu, Tadayoshi Kohno, Alexis Hiniker, Jason Yip, and Camille Cobb. Would You Rather: A focus group method for eliciting and discussing formative design insights with children. In *Interaction Design and Children (IDC)*, 2021.

[129] Ivan Evtimov, Pascal Sturmfels, and Tadayoshi Kohno. FoggySight: A scheme for facial lookup privacy. *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2021.

[130] Peter Ney, Lee Organick, Jeff Nivala, Luis Ceze, and Tadayoshi Kohno. DNA sequencing flow cells and the security of the molecular-digital interface. *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2021.

[131] Pardis Emami-Naeini, Tiona Francisco, Tadayoshi Kohno, and Franziska Roesner. Understanding privacy attitudes and concerns towards remote communications during the COVID-19 pandemic. In *Symposium On Usable Privacy and Security (SOUPS)*, 2021.

[132] Franziska Roesner and Tadayoshi Kohno. Security and privacy for augmented reality: Our 10-year retrospective. In *VR4Sec: 1st International Workshop on Security for XR and XR for Security*, 2021.

[133] Eric Zeng, Miranda Wei, Theo Gregersen, Tadayoshi Kohno, and Franziska Roesner. Polls, clickbait, and commemorative $2 bills: Problematic political advertising on news and media websites around the 2020 U.S. elections. In *ACM Internet Measurement Conference (IMC)*, 2021.

[134] Chunjong Park, Anas Awadalla, Tadayoshi Kohno, and Shwetak Patel. Reliable and trustworthy machine learning for health using dataset shift. In *Conference on Neural Information Processing Systems (NeurIPS)*, 2021.

[135] Ivan Evtimov, Ian Covert, Aditya Kusupati, and Tadayoshi Kohno. Disrupting model training with adversarial shortcuts. In *A Blessing in Disguise: The Prospects and Perils of Adversarial Machine Learning*, 2021.

[136] Ryan N. Hansen, Basil Matthew Saour, Brian Serafini, Blake Hannaford, Lanu Kim, Tadayoshi Kohno, Ryan James, Wayne Monsky, and Stephen P. Seslar. Opportunities and barriers to rural telerobotic surgical health care in 2021: Report and research agenda from a stakeholder workshop. *Telemedicine and e-Health*, 28(7), 2022.

[137] Miranda Wei, Eric Zeng, Tadayoshi Kohno, and Franziska Roesner. Anti-privacy and anti-security advice on TikTok: Case studies of technology-enabled surveillance and control in intimate partner and parent-child relationships. In *Eighteenth Symposium on Usable Privacy and Security (SOUPS 2022)*, August 2022.

[138] Kentrell Owens, Anita Alem, Franziska Roesner, and Tadayoshi Kohno. Electronic monitoring smartphone apps: An analysis of risks from technical, human-centered, and legal perspectives. In *31st USENIX Security Symposium*, 2022.

[139] Kentrell Owens, Johanna Gunawan, David Choffnes, Pardis Emami-Naeini, Tadayoshi Kohno, and Franziska Roesner. Exploring deceptive design patterns in voice interfaces. In *Proceedings of the 2022 European Symposium on Usable Security*, 2022.

[140] Lucy Simko, Jack Chang, Maggie Jiang, Ryan Calo, Franziska Roesner, and Tadayoshi Kohno. Covid-19 contact tracing and privacy: A longitudinal study of public opinion. *Digital Threats*, October 2022.

[141] Eric Zeng, Rachel McAmis, Tadayoshi Kohno, and Franziska Roesner. What factors affect targeting and bids in online advertising? A field measurement study. In *ACM Internet Measurement Conference (IMC)*, 2022.

18

[142] Brian Serafini, Lanu Kim, Basil M. Saour, Ryan James, Blake Hannaford, Ryan Hansen, Tadayoshi Kohno, Wayne Monsky, and Stephen P. Seslar. Exploring telerobotic cardiac catheter ablation in a rural community hospital: A pilot study. *Cardiovascular Digital Health Journal*, 3(6):313–319, December 2022.

[143] Pardis Emami-Naeini, Joseph Breda, Wei Dai, Tadayoshi Kohno, Kim Laine, Shwetak Patel, and Franziska Roesner. Understanding people's concerns and attitudes toward smart cities. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[144] Miranda Wei, Sunny Consolvo, Patrick Gage Kelley, Tadayoshi Kohno, Franziska Roesner, and Kurt Thomas. "There's so much responsibility on users right now:" Expert advice for staying safer from hate and harassment. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[145] Jackson Stokes, Tal August, Robert Marver, Alexei Czeskis, Franziska Roesner, Tadayoshi Kohno, and Katharina Reinecke. How language formality in security and privacy interfaces impacts intended compliance. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2023.

[146] Christina Yeung, Umar Iqbal, Yekaterina Tsipenyuk O'Neil, Tadayoshi Kohno, and Franziska Roesner. Online advertising in Ukraine and Russia during the 2022 Russian invasion. In *The Web Conference (WebConf)*, May 2023.

[147] Miranda Wei, Pardis Emami-Naeini, Franziska Roesner, and Tadayoshi Kohno. Skilled or gullible? Gender stereotypes related to computer security and privacy. In *IEEE Symposium on Security and Privacy*, May 2023.

[148] Kaiming Cheng, Jeffery F. Tian, Tadayoshi Kohno, and Franziska Roesner. Exploring user reactions and mental models towards perceptual manipulation attacks in mixed reality. In *USENIX Security Symposium*, August 2023.

[149] Rachel McAmis and Tadayoshi Kohno. The writing on the wall and 3D digital twins: Personal information in (not so) private real estate. In *USENIX Security Symposium*, August 2023.

[150] Tadayoshi Kohno, Yasemin Acar, and Wulf Loh. Ethical frameworks and computer security trolley problems: Foundations for conversations. In *USENIX Security Symposium*, August 2023. Full version and additional materials available online at https://securityethics.cs.washington.edu. (Recipient of the Distinguished Paper Award.) (Conference version of [188].)

[151] Rachel Hong, Tadayoshi Kohno, and Jamie Morgenstern. Evaluation of targeted dataset collection on racial equity in face recognition. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, August 2023.

[152] Mattea Sim, Kurt Hugenberg, Tadayoshi Kohno, and Franziska Roesner. A scalable inclusive security intervention to center marginalized & vulnerable populations in security & privacy design. In *New Security Paradigms Workshop (NSPW)*, September 2023.

[153] Lucy Simko, Harshini Sri Ramulu, Tadayoshi Kohno, and Yasemin Acar. The use and nonuse of technology during hurricanes. In *ACM Conference On Computer-Supported Cooperative Work And Social Computing (CSCW)*, October 2023.

[154] Christina Yeung, Umar Iqbal, Tadayoshi Kohno, and Franziska Roesner. Gender biases in tone analysis: A case study of a commercial wearable device. In *Equity and Access in Algorithms, Mechanisms, and Optimization (EAAMO)*, October 2023.

[155] Ashish Hooda, Andrey Labunets, Tadayoshi Kohno, and Earlence Fernandes. Experimental analyses of the physical surveillance risks in client-side content scanning. In *Network and Distributed Security Symposium*, February 2024.

19

[156] Inyoung Cheong, Aylin Caliskan, and Tadayoshi Kohno. Safeguarding human values: Rethinking US law for generative AI's societal impacts. *AI and Ethics*, May 2024.

[157] Jaron Mink, Miranda Wei, Collins W. Munyendo, Kurt Hugenberg, Tadayoshi Kohno, Elissa M. Redmiles, and Gang Wang. It's trying too hard to look real: Deepfake moderation mistakes and identity-based bias. In *ACM Conference on Human Factors in Computing Systems (CHI)*, May 2024.

[158] Rachel McAmis, Betül Durak, Melissa Chase, Kim Laine, Franziska Roesner, and Tadayoshi Kohno. Handling identity and fraud in the metaverse. *IEEE Security & Privacy Magazine*, 2024.

[159] Rachel McAmis, Mattea Sim, Mia Bennett, and Tadayoshi Kohno. Over fences and into yards: Privacy threats and concerns of commercial satellites. In *Proceedings on Privacy Enhancing Technologies (PoPETs)*, 2024.

[160] Natalie Grace Brigham, Miranda Wei, Tadayoshi Kohno, and Elissa Redmiles. "Violation of my body:" Perceptions of AI-generated non-consensual (intimate) imagery. In *Symposium on Usable Privacy and Security*, August 2024.

[161] Kaiming Cheng, Arka Bhattacharya, Michelle Lin, Jaewook Lee, Aroosh Kumar, Jeffery F. Tian, Tadayoshi Kohno, and Franziska Roesner. When the user is inside the user interface: An empirical study of UI security properties in augmented reality. In *USENIX Security Symposium*, August 2024.

[162] Miranda Wei, Jaron Mink, Yael Eiger, Tadayoshi Kohno, Elissa M. Redmiles, and Franziska Roesner. SoK (or SoLK?): On the quantitative study of sociodemographic factors and computer security behaviors. In *USENIX Security Symposium*, 2024.

[163] Kabir Panahi, Shawn Robertson, Yasemin Acar, Alexandru G. Bardas, Tadayoshi Kohno, and Lucy Simko. "But they have overlooked a few things in Afghanistan:" An analysis of the integration of biometric voter verification in the 2019 Afghan presidential elections. In *USENIX Security Symposium*, 2024.

[164] Miranda Wei, Sunny Consolvo, Patrick Gage Kelley, Tadayoshi Kohno, Tara Matthews, Sarah Meiklejohn, Franziska Roesner, Renee Shelby, Kurt Thomas, and Rebecca Umbach. Understanding help-seeking and help-giving on social media for image-based sexual abuse. In *USENIX Security Symposium*, 2024.

[165] Umar Iqbal, Tadayoshi Kohno, and Franziska Roesner. LLM platform security: Applying a systematic evaluation framework to OpenAI's ChatGPT plugins. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, 2024.

[166] Jimin Mun, Liwei Jiang, Jenny Liang, Inyoung Cheong, Nicole DeCario, Yejin Choi, Tadayoshi Kohno, and Maarten Sap. Particip-AI: A democratic surveying framework for anticipating future AI use cases, harms and benefits, 2024.

[167] Kentrell Owens, Erin Freiburger, Ryan Hutchings, Mattea Sim, Franziska Roesner Kurt Hugenberg, and Tadayoshi Kohno. Face the facts: Using face averaging to visualize gender-by-race bias in facial analysis algorithms. In *AAAI/ACM Conference on AI, Ethics, and Society (AIES)*, 2024.

[168] Rachel Hong, William Agnew, Tadayoshi Kohno, and Jamie Morgenstern. Who's in and who's out? A case study of multimodal CLIP-filtering in DataComp. In *Equity and Access in Algorithms, Mechanisms, and Optimization (EAAMO)*, October 2024.

[169] Christina Yeung, Tadayoshi Kohno, and Franziska Roesner. On the (in)accessibility of web ads: Measurement and user study. In *ACM Internet Measurement Conference (IMC)*, November 2024.

[170] Kaiming Cheng, Mattea Sim, Tadayoshi Kohno, and Franziska Roesner. User comprehension and comfort with eye-tracking and hand-tracking permissions in augmented reality. In *Usable Security and Privacy Symposium (USEC)*, February 2025.

20

[171] Yuhao Wu, Franziska Roesner, Tadayoshi Kohno, Ning Zhang, and Umar Iqbal. IsolateGPT: An execution isolation architecture for LLM-based systems. In *Network and Distributed Security Symposium*, February 2025.

[172] Miranda Wei, Christina Yeung, Franziska Roesner, and Tadayoshi Kohno. "we're utterly ill-prepared to deal with something like this"': Teachers' perspectives on student generation of synthetic nonconsensual explicit imagery. In *ACM Conference on Human Factors in Computing Systems (CHI)*, April 2025.

[173] Collins W. Munyendo, Kentrell Owens, Faith Strong, Shaoqi Wang, Adam J. Aviv, Tadayoshi Kohno, and Franziska Roesner. "You have to ignore the dangers"': User perceptions of the security and privacy benefits of WhatsApp mods. In *IEEE Symposium on Security and Privacy*, May 2025.

[174] Mattea Sim, Basia Radka, Emi Yoshikawa, Franziska Roesner, Kurt Hugenberg, and Tadayoshi Kohno. To reveal or conceal: Privacy and marginalization in avatars. In *Proceedings on Privacy Enhancing Technologies (PoPETs)*, July 2025.

[175] Cassidy Gibson, Daniel Olszewski, Natalie Grace Brigham, Anna Crowder, Kevin Butler, Patrick Traynor, Elissa M. Redmiles, and Tadayoshi Kohno. Analyzing the AI nudification application ecosystem. In *USENIX Security Symposium*, August 2025.

## Abstract (medical venue)

[176] Sinjin Lee, Benjamin Ransford, Kevin Fu, Tadayoshi Kohno, and William H. Maisel. Electromagnetic interference (EMI) of implanted cardiac devices by MP3 player headphones. *Circulation*, 118(18 Supplement), October 2008. Abstract; also presented at the American Heart Association Scientific Sessions 2008.

[177] Stephen P. Seslar, Brian Serafini, Lanu Kim, Basil Saour, Blake Hannaford, Tadayoshi Kohno, Ryan Hansen, Ryan James, and Wayne Monsky. Telerobotic cardiac catheter ablation in a rural hospital: A proof-of-concept simulation study. *HeartRhythm*, 19(5 Supplement), May 2022. Abstract only.

## Additional journal and magazine publications and book chapters

[178] John Viega, Tadayoshi Kohno, and Bruce Potter. Trust (and mistrust) in secure applications. *Communications of the ACM*, 44(2):31–36, February 2001.

[179] Tadayoshi Kohno. Protecting security and privacy. *Technology Review*, September/October 2007. (Invited article.)

[180] Ryan W. Gardner, Matt Bishop, and Tadayoshi Kohno. Are patched machines really fixed? *IEEE Security & Privacy Magazine*, 7(5), 2009.

[181] Franziska Roesner, Chris Rovillos, Tadayoshi Kohno, and David Wetherall. ShareMeNot: Balancing privacy and functionality of third-party social widgets. *USENIX ;login:*, 2012. (Magazine version of [65]; invited submission.)

[182] Adam Lerner, Anna Kornfeld Simpson, Tadayoshi Kohno, and Franziska Roesner. Excavating web trackers using web archaeology. *USENIX ;login:*, 2016. (Magazine version of [98]; invited submission.)

[183] Kiron Lebeck, Kimberly Ruth, Tadayoshi Kohno, and Franziska Roesner. Arya: Operating system support for securely augmenting reality. *IEEE Security & Privacy Magazine*, January/February 2018. (Magazine version of [103]; invited submission.)

[184] Jean Camp, Ryan Henry, Tadayoshi Kohno, Shrirang Mare, Steve Myers, Shwetak Patel, and Joshua Streiff. Toward a secure Internet of Things: Directions for research. *IEEE Security & Privacy Magazine*, 18(4):28–37, 2020.

[185] Alaa Daffalla, Lucy Simko, Tadayoshi Kohno, and Alexandru G. Bardas. Defensive technology use during the 2018-2019 Sudanese revolution. *IEEE Security & Privacy Magazine*, March/April 2022. (Magazine version of [126]; invited submission.)

[186] Carl Landwehr, Michael K. Reiter, Laurie Williams, Gene Tsudik, Trent Jaeger, Tadayoshi Kohno, and Apu Kapadia. Looking backwards (and forwards): NSF Secure and Trustworthy Computing 20-year retrospective panel transcription. *IEEE Security & Privacy Magazine*, March/April 2023.

[187] Elissa M. Redmiles, Mia M. Bennett, and Tadayoshi Kohno. Power in computer security and privacy: A critical lens. *IEEE Security & Privacy Magazine*, March/April 2023.

[188] Tadayoshi Kohno, Yasemin Acar, and Wulf Loh. Computer security research, moral dilemmas, and ethical frameworks. *USENIX ;login:*, 2023. (Magazine version of [150]; invited submission.)

[189] Peter Ney, Arkaprabha Bhattacharya, Luis Ceze, Karl Koscher, Tadayoshi Kohno, and Jeff Nivala. Cybersecurity across the DNA-digital boundary: DNA samples to genomic data. In Dov Greenbaum, editor, *Cyberbiosecurity: A New Field to Deal with Emerging Threats*. 2023.

## Fiction and Creative Writing (Excluding Works Included in Other Sections)

[190] Tadayoshi Kohno. Aurras, what would you like on your pizza? *365tomorrows*, May 2021. `https://365tomorrows.com/2021/05/20/aurras-what-would-you-like-on-your-pizza/`.

[191] Tadayoshi Kohno. Civilizations. *Little Blue Marble*, May 2021. `https://littlebluemarble.ca/2021/05/28/civilizations/`.

[192] Tadayoshi Kohno. The glowing bonsai and the kintsugi pot. *After Dinner Conversation*, March 2022. `https://www.amazon.com/gp/product/B09PYDX4C2/`.

[193] Tadayoshi Kohno. Hope: A perspective from the forest. *Haven Speculative*, March 2022. `https://www.havenspec.com/hope-a-perspective-from-the-forest`.

[194] Tadayoshi Kohno. Excerpts from the New Dictionary of Cybersecurity, 2036. *IEEE Security & Privacy Magazine*, May/June 2022. `https://www.computer.org/csdl/magazine/sp/2022/03/09782877/1DIwXnmch7G`.

[195] Tadayoshi Kohno. Mx. President has a brain. *IEEE Security & Privacy Magazine*, May/June 2022. `https://www.computer.org/csdl/magazine/sp/2022/03/09782819/1DIwYODWchi`.

[196] Tadayoshi Kohno, Camille Cobb, Ada Lerner, Michelle Lin, and Adam Shostack. The Buffet Overflow Café. *IEEE Security & Privacy Magazine*, July/August 2022. `https://www.computer.org/csdl/magazine/sp/2022/04/09826523/1EVdFa4nQty`.

[197] Tadayoshi Kohno The David and the fig leaf. *HyphenPunk*, September 2022.

[198] Tadayoshi Kohno. The schuhmacher. *IEEE Security & Privacy Magazine*, September/October 2022. `https://www.computer.org/csdl/magazine/sp/2022/05/09889017/1GDrB9gtoJ2`.

[199] Tadayoshi Kohno. The Our Reality privacy policy. *IEEE Security & Privacy Magazine*, November/December 2022. `https://www.computer.org/csdl/magazine/sp/2022/06/09935617/1HYqGuiyKLm`

[200] Tadayoshi Kohno. In Earth until (ready). *IEEE Security & Privacy Magazine*, March/April 2023. `https://www.computer.org/csdl/magazine/sp/2023/02/10102629/1MkXULlB4Ws`

[201] Tadayoshi Kohno. In Your Eyes. *IEEE Security & Privacy Magazine*, September/October 2023. `https://www.computer.org/csdl/magazine/sp/2023/05/10242186/1QdYSpZskKY`

## Books

[202] Niels Ferguson, Bruce Schneier, and Tadayoshi Kohno. *Cryptography Engineering: Design Principles and Practical Applications*. Wiley Publishing, Inc., 2010. (Translations completed or in-progress: Chinese, Italian, and Korean.)

[203] Tadayoshi Kohno. *Research Ideas Notebook*. 2020.

[204] Ryan Calo, Batya Friedman, Tadayoshi Kohno, Hannah Almeter, and Nick Logler, editors. *Telling Stories: On Culturally Responsive Artificial Intelligence*. University of Washington Tech Policy Lab, 2020.

[205] Tadayoshi Kohno. *Our Reality: A Novella*. 2021. ([227] is the companion manuscript.)

## Dissertation

[206] Tadayoshi Kohno. *Authenticated Encryption in Practice: Generalized Composition Methods and the Secure Shell, CWC, and WinZip Schemes*. PhD thesis, University of California at San Diego, June 2006. (PhD Dissertation Award, Department of Computer Science and Engineering, UC San Diego.)

## Standards document

[207] Mihir Bellare, Tadayoshi Kohno, and Chanathip Namprempre. SSH transport layer encryption modes. IETF RFC 4344, January 2006. (Based on [16, 8].)

## Game and Educational Toolkits

[208] Tamara Denning, Tadayoshi Kohno, and Adam Shostack. *Control-Alt-Hack$^{TM}$: White Hat Hacking for Fun and Profit*. 2012. (This is a tabletop card game designed to be both educational and fun; see also [77].)

[209] Tamara Denning, Batya Friedman, and Tadayoshi Kohno. *The Security Cards: A Security Threat Brainstorming Toolkit*. 2013. (This is a card deck designed to assist in computer security threat brainstorming and computer security threat education.)

## Technical Reports and Other Manuscripts

[210] Tadayoshi Kohno. Congressional testimony. In *Hearing on Electronic Voting System Security: Hearing Before the Committee on House Administration, House of Representatives, One Hundred Eighth Congress, Second Session*, July 7, 2004.

[211] Ryan Gardner, Alec Yasinsac, Matt Bishop, Tadayoshi Kohno, Zachary Hartley, John Kerski, David Gainey, Ryan Walega, Evan Hollander, and Michael Gerke. Software review and security analysis of the Diebold voting machine software. Report commissioned by the Florida Department of State, July 2007.

[212] Niels Ferguson, Stefan Lucks, Bruce Schneier, Doug Whiting, Mihir Bellare, Tadayoshi Kohno, Jon Callas, and Jesse Walker. The Skein hash function family. Submission to the NIST Cryptographic Hash Algorithm Competition, October 2008.

[213] Mihir Bellare, Tadayoshi Kohno, Stefan Lucks, Niels Ferguson, Bruce Schneier, Doug Whiting, Jon Callas, and Jesse Walker. Provable security support for the Skein hash family. February 2009.

[214] Alexei Czeskis, Karl Koscher, Max Andrews, Nell Carden Grey, Batya Friedman, and Tadayoshi Kohno. The International Criminal Tribunal for Rwanda Information Heritage Project (aka Voices of the Rwanda Tribunal): Integrity verification architecture. Technical Report UW-CSE-09-01-02, University of Washington Computer Science and Engineering, March 2009.

[215] Roxana Geambasu, Tadayoshi Kohno, Arvind Krishnamurthy, Amit Levy, Henry M. Levy, Paul Gardner, and Vinnie Moscaritolo. New directions for self-destructing data. Technical Report UW-CSE-11-08-01, University of Washington Computer Science and Engineering, August 2011.

23

[216] Alexei Czeskis, David Mah, Omar Sandoval, Ian Smith, Karl Koscher, Jacob Appelbaum, Tadayoshi Kohno, and Bruce Schneier. DeadDrop/Strongbox security assessment. Technical Report UW-CSE-13-08-02, University of Washington Computer Science and Engineering, August 2013.

[217] Iván Arce, Kathleen Clark-Fisher, Neil Daswani, Jim DelGrosso, Danny Dhillon, Christoph Kern, Tadayoshi Kohno, Carl Landwehr, Gary McGraw, Brook Schoenfield, Margo Seltzer, Diomidis Spinellis, Izar Tarandach, and Jacob West. Avoiding the top 10 software security design flaws. Technical report, IEEE Center for Secure Design, 2014.

[218] Temitope Oluwafemi, Earlence Fernandes, Oriana Riva, Franziska Roesner, Suman Nath, and Tadayoshi Kohno. Per-app profiles with appfork: The security of two phones with the convenience of one. Technical Report MSR-TR-2014-153, Microsoft Research, December 2014.

[219] Bruce Schneier, Matthew Fredrikson, Tadayoshi Kohno, and Thomas Ristenpart. Surreptitiously weakening cryptographic systems. Technical Report 2015/097, Cryptology ePrint Archive, February 2015.

[220] Tadayoshi Kohno, Joel Kollin, David Molnar, and Franziska Roesner. Display leakage and transparent wearable displays: Investigation of risk, root causes, and defenses. Technical Report MSR-TR-2015-18, Microsoft Research, February 2015.

[221] Kiron Lebeck, Temitope Oluwafemi, Tadayoshi Kohno, and Franzi Roesner. Rethinking mobile money security for developing regions. Technical Report UW-CSE-2015-12-01, University of Washington, December 2015.

[222] Stefano Baldassi, Tadayoshi Kohno, Franziska Roesner, and Moqian Tian. Challenges and new directions in augmented reality, computer security, and neuroscience – part 1: Risks to sensation and perception. Technical Report 1806.10557, arXiv, June 2018.

[223] Alex Takakuwa, Tadayoshi Kohno, and Alexei Czeskis. The Transfer Access Protocol — Moving to new authenticators in the FIDO ecosystem. Technical Report UW-CSE-17-06-01, University of Washington, June 2017.

[224] Franziska Roesner and Tadayoshi Kohno (editors). 2019 industry-academia summit on mixed reality security, privacy, and safety: Summit report, April 2020.

[225] Ivan Evtimov, Weidong Cui, Ece Kamar, Emre Kıcıman, Tadayoshi Kohno, and Jerri Li. Security and machine learning in the real world. Technical Report 2007.07205, arXiv, July 2020.

[226] Kevin Fu, Tadayoshi Kohno, Daniel Lopresti, Elizabeth Mynatt, Klara Nahrstedt, Shwetak Patel, Debra Richardson, and Ben Zorn. Safety, security, and privacy threats posed by accelerating trends in the Internet of Things. Technical Report 2008.00017, arXiv, July 2020.

[227] Tadayoshi Kohno. Background and Context to the *Our Reality* Novella. Manuscript, June 2021. (This is a companion manuscript to the novella [205].)

[228] Peter Ney, Arkaprabha Bhattacharya, David Ward, Luis Ceze, Tadayoshi Kohno, and Jeff Nivala. Doctoring direct-to-consumer genetic tests with DNA spike-ins. Technical report, bioRxiv, 2022.

[229] Rock Yuren Pang, Dan Grossman, Tadayoshi Kohno, and Katharina Reinecke. The case for anticipating undesirable consequences of computing innovations early, often, and across computer science. Technical Report 2309.04456, arXiv, 2023.

**Film**

[230] Tadayoshi Kohno (participant). *NOVA ScienceNOW: Can Science Stop Crime?* Season 6, Episode 2, October 2012.

[231] Tadayoshi Kohno (participant). *NOVA CyberWar Threat*, Season 43, Episode 4, October 2015.

24

## PRESENTATIONS

### Invited talks

1. DC Security Geeks, Falls Church, VA, September 2003. Talk title: Analysis of an electronic voting system.

2. Computer and Information Science Department, University of Oregon, Eugene, OR, April 2004. Talk title: Electronic voting: Is it ready for prime-time.

3. Information Security Institute, The Johns Hopkins University, Baltimore, MD, December 2007. Talk title: Privacy-respecting proactive forensics.

4. Gnomedex, Seattle, WA, August 2008. Joint talk with Gabriel Maganis. Talk title: Adeona: Privacy-preserving device tracking.

5. 11th Software Design for Medical Devices Conference, San Diego, CA, October 2008. Talk title: Security and privacy for wireless implantable devices: Pacemakers, defibrillators, and more.

6. Qualcomm Security Summit, San Diego, CA, May 2009. Talk title: Academic explorations in security.

7. U.S.-France Young Engineering Scientists Symposium (YESS), Washington, DC, July 2009. Talk title: Privacy-respecting digital forensics.

8. Technology Alliance, Science & Technology Discovery Series, September 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

9. Information Technology Study Group (ITSG, an Industry/Law Enforcement Workshop), Seattle, WA, October 2009. Talk title: Vanish: Increasing data privacy with self-destructing data.

10. Google, Fremont, WA, October 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

11. MITACS Speaker Series on Privacy, David R. Cheriton School of Computer Science, University of Waterloo, March 2009. Talk title: Increasing privacy with self-destructing data.

12. Medical Devices Summit, Boston, MA, March 2010. Talk title: Security and privacy for wireless implantable devices.

13. The Center for Internet and Society, Stanford Law School, Stanford, April 2010. Talk title: Computer security and privacy for emerging technologies: Implantable medical devices and household robots.

14. Intel Trust Evidence Workshop, Santa Clara, CA, May 2010. Talk title: Trust evidence in heterogeneous environment: Defining viable research agendas.

15. Microsoft Research Networking Summit, Bellevue, WA, June 2010. Talk title: Vanish: Self-destructing data.

16. Science Café, Pacific Science Center, Kirkland, WA, July 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

17. Washington Technology Industry Association IT Security SIG, Seattle, WA, August 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

18. Poynter Center for the Study of Ethics and American Institutions, Bloomington, IN, October 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

19. Science Café, Pacific Science Center, Seattle, WA, November 2010. Talk title: Securing Emerging Technologies: Medical Devices, Robots, Cars, and More.

20. Tenth Annual Diabetes Technology Meeting, Diabetes Technology Society, Bethesda, MD, November 2010. Talk title: Computer Security Risks and Mitigations for Wireless Implantable Medical Devices.

21. Medical Device R&D Summit, Hollywood, FL, December 2010. Talk title: Computer Security for Wireless Implantable Medical Devices.

22. Keynote, IEEE International Workshop on Information Forensics and Security, Seattle, WA, December 2010. Talk title: Security for Cyber-physical Systems: Case Studies with Medical Devices, Robots, and

25

Automobiles.

23. Automobile Security Symposium, Information-Technology Promotion Agency, Tokyo, Japan, February 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

24. Committee on Electronic Vehicle Controls and Unintended Acceleration, National Academies, Washington, DC, March 2011. Joint talk with Stefan Savage. Talk title: Experimental Security Analysis of a Modern Automobile.

25. Oregon Security Day, Department of Computer and Information Science, University of Oregon, Eugene, OR, April 2011. Talk title: Security and Privacy in the 21st Century – or – Experimental Security Analysis Research Case Studies.

26. Colloquium, Department of Computer Science, Dartmouth College, Hanover, NH, May 2011. Talk title: Experimental Security Analysis Research: Case Studies with Medical Devices, Robots, and Cars.

27. In-Q-Tel Tech Focus Day, Arlington, VA, June 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

28. In-Q-Tel Tech Focus Day, Arlington, VA, June 2011. Talk title: Security, Emerging Technologies, and Disappearing Data.

29. Discovery 2015, Oak Ridge National Labs, Oak Ridge, TN, September 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

30. Colloquium, Department of Computer Science, University of Colorado, Boulder, CO, October 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

31. Keynote, 9th ESCAR Embedded Security in Cars Conference, Dresden, Germany, November 2011. Talk title: Experimental Security Analysis of a Modern Automobile.

32. Computer Science and Telecommunications Board Meeting, National Academies, Redmond, WA, March 2012. Talk title: Experimental Security Analysis of a Modern Automobile.

33. Keynote, ACM Conference on Security and Privacy in Wireless and Mobile Networks (ACM WiSec), April 2012. Talk title: Security for Cyber-physical Systems: Case Studies with Medical Devices, Robots, and Automobiles.

34. Featured speaker, 2012 Science Luminaries Series, Seattle Science Festival (celebrating the 50th anniversary of the 1962 Seattle World's Fair), Seattle, WA, June 2012. Talk title: Computer Security for Everyday Devices.

35. Technology and Ethics Study Group, Yale University, New Haven, CT, August 2012. Talk title: Computer Security and Everyday Objects: Case Studies with Medical Devices, Robots, and Automobiles.

36. ZonCon, Amazon.com, Seattle, WA, March 2013. Talk title: Control-Alt-Hack: White Hat Hacking for Fun and Profit. (Co-presented with Tamara Denning and Adam Shostack.)

37. Cool Jobs in CS, Seattle Science Festival, Pacific Science Center, Seattle, WA, June 2013.

38. Keynote, IEEE Pacific Rim International Symposium on Dependable Computing (PRDC), Vancouver, BC, Canada, December 2013. Talk title: Computer Security and Everyday Objects: Case Studies with Medical Devices, Robots and Automobiles.

39. SPY—The Secret World of Espionage exhibit, Pacific Science Center, Seattle, WA, April 2014. Talk title: Computer Security and Everyday Objects: Case Studies and with Medical Devices, Robots, and Automobiles.

40. Science Café, Pacific Science Center, Kirkland, WA, April 2014. Talk title: Computer Security and Everyday Objects: Case Studies and with Medical Devices, Robots, and Automobiles.

41. Inaugural Stanford University Congressional Cyber Boot Camp (for U.S. congressional staff), Stanford University, Stanford, CA, August 2014. Talk title: Security as a Concept.

42. Keynote, IEEE MIT Undergraduate Research Technology Conference, Boston, MA, November 2015.

26

43. The Washington Area Trustworthy Computing Hour (WATCH) seminar series, National Science Foundation, Arlington, VA, November 2015. Talk title: Computer Security and the Internet of Things.

44. DARPA ISAT, Whither the Data? Toward Understanding Flows in Complex Data Ecosystems, Virtual Meeting, December 2015. Talk title: Opaque Data Flows and National Security.

45. NSF Visioning Workshop on Smart and Connected Communities Research and Education, Seattle, WA, January 2016. Talk title: Security & Privacy in the Age of IoT.

46. USENIX Enigma, San Francisco, CA, January 2016. Talk title: Computer Security and the Internet of Things.

47. Netgain Partnership, "Fireside Chat", San Francisco, CA, October 2017. Topic: Internet of Things and Security.

48. Keynote, GREPSEC III, San Jose, CA, May 2017. Talk title: Experimental Computer Security Research: Project Conception, Execution, and Communication.

49. NIAC Workshop on Data Sciences: Smart Mobility/Transportation, Seattle, WA, May 2017. Talk title: Security and Privacy in the Age of IoT.

50. Libro.fm, Seattle, WA, December 2021. Diversity, Equity, and Inclusion.

51. Keynote, Border Regimes in the Age of Technoscience, Eberhard Karls Universität Tübingen, June 2022.

52. Seminar, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Carnegie Mellon University, Pittsburgh, PA, October 2023.

53. Seminar, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Stanford University, Palo Alto, CA, November 2023.

54. Keynote, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Qualcomm Product Security Summit, May 2023. (With Yasemin Acar.)

55. Dean's Distinguished Lecture, Computer Security and Privacy Research: The Past, the Present, and the Future, School of Information, University of California Berkeley, Berkeley, CA, October 2023.

56. Distinguished Lecture, Ethical Frameworks and Computer Security Trolley Problems: Foundations for Conversations, Department of Computer Sciences, University of Wisconsin, Madison, WI, November 2023.

57. Keynote, Ethical Frameworks and Computer Security Trolley Problems , Research Open House, Department of Computer Science & Engineering, University of California at San Diego, La Jolla, CA, January 2024.

58. The American Bar Association's Forensic Science and Information Technology Institute, San Diego, CA, April 2024. Talk title: A Computer Security Researchers Thoughts on the Future Risks with Generative AI System.

59. Max Planck Institute for Security and Privacy (MPI-SP), Symposium on Systems Security, Bochum, Germany, June 2024. Talk title: Ethical Frameworks and Computer Security Trolley Problems.

## Congressional testimony

60. Invited testimony before the U.S. House of Representatives, Committee on House Administration, Hearing on Electronic Voting System Security, July 2004.

## Invited panels

61. KQED Public Radio San Francisco and Sacramento, Friday Forum, February 2004. Panelist with Sharon Harrington, Harris Miller, and Barbara Simons. Topic: Electronic voting.

62. First Microsoft Youth Summit for Online Safety, San Diego, CA, June 2005. Panelist with William Griswold, Blake Irving, John G. Malcolm, Trevor Marsh, Teri Schroeder, and Michael Sullivan. Topic: Youth online safety.

63. ACLU of Washington Annual Membership Conference, Seattle, WA, February 2007. Panelist with Christina Drummond and Barry Steinhardt. Topic: Electronic voting.

64. National ACLU Biennial Conference, Seattle, WA, June 2007. Panelist with Laughlin McDonald and Howard Simon. Topic: Electronic voting.

65. Microsoft Research Faculty Summit 2007, Redmond, WA, July 2007. Panelist with Eric Horvitz, Frank McSherry, Wendy Seltzer, and Daniel Weitzner. Topic: Computer security challenges and opportunities.

66. Emerging Technologies Conference at MIT, Boston, MA, September 2007. Panelist with Paul Q. Judge, Ivan Krstić, and Anna Lysyanskaya. Topic: Emerging technologies and computer security.

67. International Conference on Mobile Systems, Application, and Services (MobiSys), Breckenridge, CO, June 2008. Panelist with Paul K. Ohm, Kevin Fu, Marco Gruteser. Topic: Wireless privacy.

68. Federal Trade Commission's (FTC) Town Hall meeting on "Pay on the Go: Consumers & Contactless Payment", Seattle, WA, July 2008. Panelist with Paula J. Bruening, John Carlson, Alissa Cooper, David Moorman, and Kathryn D. Ratté. Topic: Contactless payment.

69. Privacy Enhancing Technologies Symposium (PETS), Seattle, WA, August 2009. Panelist with Doug Klunder and Landon Cox. Topic: Privacy for emerging technologies.

70. USENIX Workshop on Cyber Security Experimentation and Test, Washington, DC, August 2010. Panelist with Deborah Frincke, Kevin Fu, and Marcelo Masera.

71. Federal Trade Commission's (FTC), Internet of Things Workshop, Washington, DC, November 2013. Panelist with John Nielson, Kenneth Wayne Powell, and Christopher Wolf.

72. RSA Conference, Securing Smart Machines: Where We Are, Where We Want to Be, and Challenges, San Francisco, CA, February 2014. Panelist with Akshay Aggarwal, Dan Guido, and Laura Berger.

73. Intel Developer Forum, Academia and Security Curriculum—A Need for Future Developers, San Francisco, CA, August 2014. Panelist with Blair Taylor and Paul Tymann.

74. Government Accountability Office, Comptroller General Forum on 21st Century Data and Analytics, Washington, DC, January 2016. Panelist with Ashkan Soltani, Michael Lynch, and Oliver Richard.

75. Federal Trade Commission's (FTC), Start with Security, Seattle, WA, February 2016. Panelists TBD.

76. RSA Conference, Do We Need Cyber-Ratings for the Auto Industry? San Francisco, CA, March 2016. Panelist with Jacob Olcott, Chan Lieu, and Michal Freedhoff.

77. NSF SaTC PI Meeting, SaTC Retrospective, Arlington, VA, June 2022. Panelist with Lorrie Cranor, Trent Jaeger, Gene Tsudik, Laurie Williams; Carl Landwehr as moderator.

## Guest lectures in courses

78. Undergraduate operating systems course, Department of Computer Science, University of Colorado, Boulder, CO, April 1999. Topic: Common pitfalls in computer security.

79. Undergraduate advanced Internet and web services course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2006. Topic: Key principles in computer security and applied cryptography.

80. Graduate advanced information assurance course, Department of Computer Science, University of Massachusetts, Amherst, MA, September 2007. Topic: Information forensics.

81. Undergraduate scalable systems course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2008. Topic: Key principles in computer security and applied cryptography.

28

82. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2008. Topic: Contemporary directions in computer security and privacy research.

83. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2009. Topic: Computer security for emerging technologies.

84. Freshman "Engineering as a Humanitarian Pursuit" seminar, College of Engineering, University of Washington, Seattle, WA, October 2009. Topic: Computer security for emerging technologies.

85. Undergraduate advanced Internet and web services course, Department of Computer Science and Engineering, University of Washington, Seattle, WA, November 2009. Topic: Key principles in computer security and applied cryptography.

86. Freshman "Engineering for Society" seminar, College of Engineering, University of Washington, Seattle, WA, October 2010. Topic: Computer security for emerging technologies.

87. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, December 2010. Topic: Computer security for emerging technologies.

88. Undergraduate direct admits seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2011. Topic: Experimental security analysis of a modern automobile.

89. Undergrad research seminar, Department of Computer Science and Engineering, University of Washington, Seattle, WA, May 2012. Topic: Security for cyber-physical systems: Case studies with medical devices, robots, and automobiles.

90. Undergraduate advanced Internet systems, Department of Computer Science and Engineering, University of Washington, Seattle, WA, February 2015. Topic: Bitcoin.

91. Introduction to research course for first year PhD students, School of Information, University of Washington, Seattle, WA, October 2017.

92. Freshman seminar, Department of Computer Science, University of Colorado, Boulder, CO, November 2018.

93. Freshman seminar, Department of Computer Science, University of Colorado, Boulder, CO, November 2020.

94. Graduate computer security course, Department of Computer and Information Science and Engineering, University of Florida, Gainesville, FL, February 2023.

## Talks affiliated with the University of Washington

95. Bay Area Alumni Meeting, Department of Computer Science and Engineering, Mountain View, CA, April 2007. Talk title: Security and privacy in the 21st Century.

96. Bay Area Alumni Meeting, Department of Computer Science and Engineering, Bellevue, WA, May 2007. Talk title: Security and privacy in the 21st Century.

97. University of Washington and Microsoft Research Summer Institute, Blaine, WA, July 2009. Talk title: Securing technologies in the home: Is there anything new?

98. Engineering Lecture Series, College of Engineering, University of Washington, Seattle, WA, October 2009. Joint talk with Magdalena Balazinska. Talk title: The cyberspace data explosion: Boon or black hole.

99. Keynote, Annual Industrial Affiliates Meeting, Department of Computer Science and Engineering, University of Washington, Seattle, WA, October 2009. Talk title: Protecting the bionic man: Overcoming security challenges in emerging technologies.

100. Web Application Security Peer Working Group (WASP), University of Washington, Seattle, WA, October 2009. Talk title: Securing emerging technologies: From medical devices to cloud computing.

29

101. Puget Sound Regional Council, Seattle, WA, December 2009. Talk title: Mobile personal privacy and security: A new framework and technology to account for human values.

102. Pre-engineering Orientation, College of Engineering, University of Washington, Seattle, WA, July 2010. Talk title: Computer security for emerging technologies.

103. Keynote, high school programming contest, Department of Computer Science and Engineering, University of Washington, Seattle, WA, December 2011. Talk title: Computer security for emerging technologies.

104. Keynote, Professional Masters Program Reunion, Department of Computer Science and Engineering, University of Washington, Seattle, WA, May 2015. Topic: Computer security and the Internet of Things.

105. Panelist, UW Engineering Lecture Series, College of Engineering, University of Washington, Seattle, WA, November 2015. Panelist with Ryan Calo and Batya Friedman. Panel title: Responsible Innovation: A Cross Disciplinary Lens on Privacy and Security Challenges.

106. Interactive Intelligence (student group), April 2024. Talk title: Ethical Frameworks and Computer Security Trolley Problems.

107. Panelist, GEN1 (student group) event on "Student-Professor Talks: Grad School & Research", April 2024.

108. Host, EFF and the UW Tech Policy Lab and the UW Society + Technology's event on "The Model Hacker? The Intersection of AI and Security Research", May 2024.

## Conference and workshop paper presentations

109. A network-flow-based scheduler: Design, performance history, and experimental analysis. Second Workshop on Algorithm Engineering and Experiments, San Francisco, CA, January 2000.

110. Preliminary cryptanalysis of reduced-round Serpent. Third AES Candidate Conference, New York, NY, April 2000.

111. On the global content PMI: Improved copy-protected Internet content distribution. Financial Cryptography, Grand Cayman, BWI, February 2001.

112. Authenticated encryption in SSH: Provably fixing the SSH binary packet protocol. Ninth ACM Conference on Computer and Communications Security, Washington, DC, November 2002.

113. Analysis of RMAC. Fast Software Encryption, Lund, Sweden, February 2003.

114. A theoretical treatment of related-key attacks: RKA-PRPs, RKA-PRFs, and applications. Advances in Cryptology – EUROCRYPT, Warsaw, Poland, May 2003.

115. Birthday attacks on hash-functions, revisited: The importance of being well-balanced. Advances in Cryptology – EUROCRYPT, Interlaken, Switzerland, May 2004.

116. Remote physical device fingerprinting. IEEE Symposium on Security and Privacy, Oakland, CA, May 2005.

117. Stateful public-key cryptosystems: How to encrypt with one 160-bit exponentiation. 13th ACM Conference on Computer and Communications Security, Alexandria, VA, November 2006.

118. Science fiction prototyping and security education: Cultivating contextual and societal thinking in computer security education and beyond. ACM Technical Symposium on Computer Science Education (SIGCSE), Dallas, TX, March 2011.

119. Vulnerability research in the cyberphysical world. Cyber-security Research Ethics Dialog & Strategy Workshop (CREDS), San Francisco, CA, May 2013. (Co-presented with Stefan Savage.)

120. Ethical frameworks and computer security trolley problems: Foundations for conversations. USENIX Security Symposium, Anaheim, CA, August 2023.

**Other presentations**

121. New results on iterated DES constructions. CRYPTO 2002 Rump Session, Santa Barbara, CA, August 2002. (This was a comedic talk cryptanalyzing Paul Kocher's 4DES.)

122. Authenticated encryption in SSH: Fixing the SSH binary packet protocol. CRYPTO 2002 Rump Session, Santa Barbara, CA, August 2002.

123. Analysis of an electronic voting system. CRYPTO 2003 Rump Session, Santa Barbara, CA, August 2003. (Recipient of the "Best Rump Session Talk" award.)

## TEACHING AND EDUCATION

**Courses**

- Grader, Design and Analysis of Algorithms, graduate course (CSCI 5454), Department of Computer Science, University of Colorado, Spring 1997 and Spring 1998. (Instructor: Prof. Harold N. Gabow.)

- Teaching Assistant, Computer Networks, undergraduate and graduate course (CSCI 4273 and CSCI 5273), Department of Computer Science, University of Colorado, Fall 1998. (Instructor: Prof. Evi Nemeth.)

- Teaching Assistant, Introduction to Modern Cryptography, undergraduate course (CSE 107), Department of Computer Science and Engineering, University of California at San Diego, Winter 2005. (Instructor: Prof. Mihir Bellare.)

- Teaching Assistant, Modern Cryptography, graduate course (CSE 207), Department of Computer Science and Engineering, University of California at San Diego, Fall 2005. (Instructor: Prof. Mihir Bellare.)

- Instructor, Selected Topics in Computer Security, graduate course (CSE 599 G), Department of Computer Science and Engineering, University of Washington, Autumn 2006.

- Instructor, Selected Topics in Computer Security, professional masters course (CSEP 590 B), Department of Computer Science and Engineering, University of Washington, Winter 2007. (Co-instructor: Dr. John Manferdelli.)

- Instructor, Selected Topics in Computer Security, undergraduate course (CSE 490 K), Department of Computer Science and Engineering, University of Washington, Spring 2007.

- Instructor, Selected Topics in Computer Security, graduate course (CSE 599 G), Department of Computer Science and Engineering, University of Washington, Autumn 2007.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2008.

- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Autumn 2008.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2009.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2010.

- Instructor, Computer Security, graduate seminar (CSE 590 K1), Department of Computer Science and Engineering, University of Washington, Spring 2010. (Co-instructor: Dr. David Molnar.)

- Instructor, Computer Security, professional masters course (CSEP 590 C), Department of Computer Science and Engineering, University of Washington, Spring 2010.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2011.

- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Spring 2011.

31

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2011. (Co-instructor: Dan Halperin.)
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2012.
- Instructor, Computer Security, professional masters course (CSEP 564), Department of Computer Science and Engineering, University of Washington, Autumn 2012.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2013.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2013.
- Instructor, Computer Security, professional masters course (CSEP 564), Department of Computer Science and Engineering, University of Washington, Winter 2015.
- Instructor, Cryptography, graduate course (CSE 599 B), Department of Computer Science and Engineering, University of Washington, Spring 2015.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2015.
- Instructor, Cryptography, undergraduate course (CSE 490C), Department of Computer Science and Engineering, University of Washington, Winter 2016.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2016.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2017. (Co-taught with Franziska Roesner.)
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2018.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2018.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2018.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2019.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Autumn 2019.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2020.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Winter 2021.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Spring 2021.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2022.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Spring 2022.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Autumn 2022.

- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2023.
- Instructor, Computer Security, undergraduate course (CSE 484), Department of Computer Science and Engineering, University of Washington, Winter 2024.
- Instructor, Computer Security Capstone, undergraduate course (CSE 481S), Department of Computer Science and Engineering, University of Washington, Spring 2024.
- Instructor, Computer Security, graduate course (CSE 564), Department of Computer Science and Engineering, University of Washington, Winter 2025.

## Educational materials developed (beyond normal classroom materials)

- Security reviews and computer security mindset education. Security reviews, the approach used in UW CSE 484 to teach the computer security mindset, received national attention after a 2008 Wired article discussed the course and the associated teaching methodology (http://archive.wired.com/politics/security/commentary/securitymatters/2008/03/securitymatters_0320). The approach has subsequently been adopted by instructors at other institutions.
- Science fiction prototyping and computer security mindset education. Science fiction prototyping, another approach used in UW CSE 484 to teach the computer security mindset, was covered in publication [57]. The approach has also been adopted by instructors at other institutions.
- *Control-Alt-Hack$^{TM}$: White Hat Hacking for Fun and Profit*, 2012 (co-developed with Tamara Denning and Adam Shostack). This a card game designed to be fun and educational. We have distributed free copies to educators around the world. This game has been used at numerous academic institutions and companies.
- The Security Cards: A Security Threat Brainstorming Toolkit, 2013 (co-developed with Tamara Denning and Batya Friedman). This is a deck of cards design to assist in computer security brainstorming and threat modeling. We have distributed free copies to educators around the world. This game has been used at numerous academic institutions and companies and with policy makers.

## Educational development

- Participant, National Effective Teaching Institute, Atlanta, GA, June 2013. Nominated for participation by the University of Washington College of Engineering.

## Additional activities

- Reviewer, Senior exhibitions, University City High School, San Diego, CA, 2002–2004.
- Session organizer, Washington Summer Scholars (high school honors program), University of Washington, July 2007. Session topic: Cryptography and computer security.
- Session organizer, CS4HS (computer science for high school teachers workshop), Department of Computer Science and Engineering, University of Washington, July 2008. Session topic: High school mathematics and cryptography.
- Workshop organizer, Mathematics Academy, College of Engineering, University of Washington, July 2010. Workshop title: Computer security for emerging technologies: Medical devices, robots, cars, and more. (Organized a three-day workshop on computer science and computer security for underrepresented minorities.)
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2014.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2015.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2016.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2017.

33

- Chair, Evaluation Committee, GREPSEC III (NSF Supported Workshop for Women and Underrepresented Groups Interested in Computer Security Research), 2017.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2018.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2019.
- Chair, Evaluation Committee, GREPSEC IV (NSF Supported Workshop for Women and Underrepresented Groups Interested in Computer Security Research), 2019.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2020.
- Panelist, Student Advisory Council Vulnerability and Failure Panel, May 2020.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2021.
- Keynote presenter, CS4teachers, Allen School, University of Washington, August 2021.
- Evaluation Committee member, Scholarships for Women Studying Information Security, 2023.
- Mentor and session organizer, GREPSEC, August 2023. GREPSEC is a workshop for PhD students in computer security and privacy, focusing on underrepresented populations, including women, non-binary, and gender minorities; Black, Hispanic/Latino/Latina, Native American and Indigenous students; and LGBTQ+ students.
- Presenter, UWHS (UW in the High School) Teacher Training and Professional Development, May 2024. Session/activity #1: Threat Modeling and Security. Session/activity #2: Ethical Framework and Computer Security Trolley Problem.

APPENDIX B

**MATERIALS CONSIDERED**

**Court Documents**

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR, Rule 52 Order After Trial on the Merits, ECF No. 812 (N.D. Cal. Sept. 10, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR, Declaration of Philip W. Schiller in Support of Defendant Apple Inc.'s Opposition to Plaintiff's Motion for a Preliminary Injunction, ECF No. 74 (N.D. Cal. Sept. 15, 2020)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR, Transcript of Proceedings for Evidentiary Hearing (N.D. Cal. May 8, 2024)

**Depositions**

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Deposition of Aviel Rubin (Mar. 26, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of C.K. Haun, Volume 1 (Jan. 13, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of C.K. Haun, Volume 2 (Jan. 14, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Craig Federighi, Volume 1 (Feb. 10, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Craig Federighi, Volume 2 (Feb. 12, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Eddy Cue (Feb. 8, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Eric Gray, Volume 1 (Feb. 12, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Eric Gray, Volume 2 (Feb. 15, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Matthew Fischer, Volume 1 (Dec. 18, 2020)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Matthew Fischer, Volume 2 (Jan. 7, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Phillip Schiller, Volume 1 (Feb. 11, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Phillip Schiller, Volume 2 (Feb. 15, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Phillip Shoemaker, Volume 1 (Jan. 12, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Phillip Shoemaker, Volume 2 (Jan. 14, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Ron Okamoto, Volume 1 (Dec. 16, 2020)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Ron Okamoto, Volume 2 (Dec. 17, 2020)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Scott Forstall, Volume 1 (Mar. 8, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Scott Forstall, Volume 2 (Mar. 8, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Timothy Cook, Volume 1 (Feb. 12, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Trystan Kosmynka, Volume 1 (Feb. 2, 2021)

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Deposition of Trystan Kosmynka, Volume 2 (Feb. 3, 2021)

**Expert Reports**

*In re: Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.) – Expert Report and Declaration of Aviel D. Rubin, Ph.D. (Aug. 10, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Expert Report of Professor Wenke Lee (Feb. 16, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Rebuttal Written Direct Testimony of Dr. Wenke Lee (Apr. 27, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Expert Report of James W. Mickens, Ph.D. (Feb. 16, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Expert Report of Aviel D. Rubin, Ph.D. (Feb. 16, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Rebuttal Expert Report of Aviel D. Rubin, Ph.D. (Mar. 15, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Written Direct Testimony of Aviel D. Rubin, Ph.D. (Apr. 23, 2021)

*Epic Games. Inc. v. Apple Inc.*, Case No. 4:20-cv-5640-YGR (N.D. Cal.) – Expert Declaration of Richard Schmalensee, Ph.D. (Sept. 15, 2020)

**Trial Transcripts**

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 13, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 14, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 15, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 16, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 17, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 20, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 21, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 22, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 23, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 27, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 28, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 29, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Jan. 30, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Feb. 3, 2025)

*Dr. Rachel Kent v. Apple Inc. and Apple Distribution Int. Ltd.*, Case No. 1403/7/7/21 (Competition Appeal Tribunal) Trial Transcript (Feb. 4, 2025)

*Epic Games. Inc. v. Apple Inc.* – Trial Documents

| | |
|---|---|
| Apple Opening Demonstrative | PX-0373 |
| Epic Opening Demonstrative | PX-0374 |
| DX-4192 | PX-0416 |
| PX-0060 | PX-0436 |
| PX-0063 | PX-0880 |
| PX-0131 | PX-0892 |
| PX-0367 | PX-2029 |
| PX-0371 (Redacted) | PX-2084 |

**Bates Documents**

| | |
|---|---|
| | APL-APPSTORE_03062645 |
| APL-APPSTORE_00040616 | APL-APPSTORE_03062646 |
| APL-APPSTORE_00047668 | APL-APPSTORE_03062647 |
| APL-APPSTORE_00047669 | APL-APPSTORE_03118515 |
| APL-APPSTORE_00202867 | APL-APPSTORE_03118516 |
| APL-APPSTORE_00293204 | APL-APPSTORE_03158329 |
| APL-APPSTORE_00319050 | APL-APPSTORE_03158332 |
| APL-APPSTORE_00424815 | APL-APPSTORE_03170312 |
| APL-APPSTORE_00491119 | APL-APPSTORE_03170313 |
| APL-APPSTORE_00493726 | APL-APPSTORE_03170314 |
| APL-APPSTORE_01957586 | APL-APPSTORE_03170315 |
| APL-APPSTORE_01969536 | APL-APPSTORE_03170316 |
| APL-APPSTORE_01993436 | APL-APPSTORE_03230968 |
| APL-APPSTORE_01993439 | APL-APPSTORE_03232618 |
| APL-APPSTORE_01993440 | APL-APPSTORE_03232622 |
| APL-APPSTORE_02061188 | APL-APPSTORE_03237475 |
| APL-APPSTORE_02064067 | APL-APPSTORE_04069843 |
| APL-APPSTORE_02085400 | APL-APPSTORE_04464150 |
| APL-APPSTORE_02128778 | APL-APPSTORE_04535722 |
| APL-APPSTORE_02770950 | APL-APPSTORE_05264242 |
| APL-APPSTORE_02770951 | APL-APPSTORE_05270507 |
| APL-APPSTORE_02770959 | APL-APPSTORE_05329453 |
| APL-APPSTORE_02770969 | APL-APPSTORE_05329454 |
| APL-APPSTORE_02801953 | APL-APPSTORE_05389500 |
| APL-APPSTORE_02801963 | APL-APPSTORE_05414657 |
| APL-APPSTORE_02801964 | APL-APPSTORE_05414658 |
| APL-APPSTORE_02801965 | APL-APPSTORE_05414659 |
| APL-APPSTORE_02849857 | APL-APPSTORE_05501918 |
| APL-APPSTORE_02921977 | APL-APPSTORE_05501925 |
| APL-APPSTORE_02921982 | APL-APPSTORE_05501941 |
| APL-APPSTORE_03062642 | APL-APPSTORE_05620203 |
| APL-APPSTORE_03062644 | APL-APPSTORE_05620204 |

APL-APPSTORE_05917605
APL-APPSTORE_05953873
APL-APPSTORE_06614229
APL-APPSTORE_06614230
APL-APPSTORE_06719448
APL-APPSTORE_07064947
APL-APPSTORE_08827179
APL-APPSTORE_08929971
APL-APPSTORE_08929973
APL-APPSTORE_08929977
APL-APPSTORE_08929985
APL-APPSTORE_08929991
APL-APPSTORE_08962238
APL-APPSTORE_08969649
APL-APPSTORE_09078934
APL-APPSTORE_09082832
APL-APPSTORE_09082845
APL-APPSTORE_09166610
APL-APPSTORE_09166611
APL-APPSTORE_09173251
APL-APPSTORE_09173252
APL-APPSTORE_09173254
APL-APPSTORE_09173255
APL-APPSTORE_09174569
APL-APPSTORE_09320250
APL-APPSTORE_09320251
APL-APPSTORE_09323304
APL-APPSTORE_09323305
APL-APPSTORE_09400729
APL-APPSTORE_09407969
APL-APPSTORE_09407970
APL-APPSTORE_09410634
APL-APPSTORE_09410635
APL-APPSTORE_09708186
APL-APPSTORE_09884189
APL-APPSTORE_09885056
APL-APPSTORE_09937220
APL-APPSTORE_10183060
APL-APPSTORE_10774669
APL-APPSTORE_10780287
APL-APPSTORE_10780299
APL-APPSTORE_10781700
APL-APPSTORE_10781701
APL-APPSTORE_10803725
APL-APPSTORE_10859239
APL-APPSTORE_10859241
APL-APPSTORE_10888329
APL-APPSTORE_10901149
APL-APPSTORE_10901152
APL-APPSTORE_10905718
APL-APPSTORE_10920582

APL-APPSTORE_11070857
APL-APPSTORE_11070870
APL-APPSTORE_11086346
APL-APPSTORE_11116599
APL-APPSTORE_11128544
APL-APPSTORE_11128547
APL-APPSTORE_11128548
APL-APPSTORE_11128549
APL-APPSTORE_11149386
APL-APPSTORE_11149959
APL-APPSTORE_11149961
APL-APPSTORE_11156159
APL-APPSTORE_11156160
APL-APPSTORE_11159071
APL-APPSTORE_11235118
APL-APPSTORE_11235149
APL-APPSTORE_11258431
APL-EG_00332352
APL-EG_00457069
APL-EG_01264165
APL-EG_01264619
APL-EG_01265559
APL-EG_01474591
APL-EG_01492129
APL-EG_01492132
APL-EG_02241259
APL-EG_02241268
APL-EG_02241269
APL-EG_02241270
APL-EG_02241271
APL-EG_02241272
APL-EG_02241273
APL-EG_02241274
APL-EG_02241275
APL-EG_02241276
APL-EG_02241277
APL-EG_02241278
APL-EG_02241279
APL-EG_02241280
APL-EG_02241281
APL-EG_02241282
APL-EG_02241291
APL-EG_02241309
APL-EG_02252634
APL-EG_02252703
APL-EG_02252778
APL-EG_04107164
APL-EG_04170028
APL-EG_04260311
APL-EG_04869415
APL-EG_04869425

APL-EG_05435251                    APL-EG_08745050
APL-EG_06698313                    APL-EG_08745068
APL-EG_06848438                    APL-EG_09301612
APL-EG_06908262                    APL-EG_09301705
APL-EG_08240013                    APL-EG_09464751
APL-EG_08398998

**Articles, Books, and Websites**

Apple Platform Security (Dec. 2024),
   https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

Building a Trust Ecosystem for Millions of Apps (October 2021)

Apple, App Store Review Guidelines (Sept. 11, 2020)

Apple Developer Program License Agreement

Apple Developer Enterprise Program License Agreement

Google Play Protect, https://developers.google.com/android/play-protect/client-protections

Adam Shostack, *Threat Modeling: Designing for Security* (John Wiley & Sons, Inc. 2014)

Bruce Schneier, *Secrets and Lies: Digital Security in a Networked World* (John Wiley & Sons,
   Inc. 2000)

Bruce Schneier, *Schneier on Security* website,
https://www.schneier.com/blog/archives/2018/08/dont_fear_the_t.html

Claud Xiao, *AceDeceiver: First iOS Trojan Exploiting Apple DRM Design Flaws to Infect Any
iOS Device*, Unit 42 website, Mar. 16, 2016, https://unit42.paloaltonetworks.com/acedeceiver-
first-ios-trojan-exploiting-apple-drm-design-flaws-to-infect-any-ios-device/

Claud Xiao, *Novel Malware XcodeGhost Modifies Xcode, Infects Apple iOS Appls and Hits App
Store*, Unit 42 website, Sept. 17, 2015, https://unit42.paloaltonetworks.com/novel-malware-
xcodeghost-modifies-xcode-infects-apple-ios-apps-and-hits-app-store/

Dieter Gollmann, *Computer Security* (2d ed., John Wiley & Sons Ltd. 2006)

Internet Archive Wayback Machine, capture for http://www.codecon.org/2006/program.html,
https://web.archive.org/web/20080430154753/http://www.codecon.org/2006/program.html

Juli Clover, *Apple Accidentally Unpatches Vulnerability, Leading to New iOS 12.4 Jailbreak*,
MacRumors website, Aug. 19, 2019, https://www.macrumors.com/2019/08/19/ios-12-4-
vulnerability-leads-to-jailbreak/

Michael Howard & Steve Lipner, *The Security Development Lifecycle* (Microsoft Press 2006)

Niels Ferguson, Bruce Schneier & Tadayoshi Kohno, *Cryptography Engineering: Design
   Principles and Practical Applications* (Wiley Publishing, Inc. 2010)

Steve Lipner, *The Trustworthy Computing Security Development Lifecycle* (Microsoft Corp. 2004), https://www.acsac.org/2004/papers/Lipner.pdf

Steven B. Lipner, Microsoft Corp., Keynote Address at the Annual Computer Security Applications Conference ("ACSAC"): Practical Assurance: Evolution of a Security Development Lifecycle (2004), https://www.acsac.org/archive/ and https://www.acsac.org/2004/dist.html

Symantec Press Release, *Symantec Acquires Authority to Enhance Protection From Mobile Application Vulnerabilities*, Nov. 5, 2018, https://www.businesswire.com/news/home/20181105005145/en/Symantec-Acquires-Appthority-to-Enhance-Protection-From-Mobile-Application-Vulnerabilities