# EXHIBIT 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

- - - - - - - - - - - - - - - - -x

IN RE:  APPLE IPHONE          : Civil Action No.

ANTITRUST LITIGATION          : 4:11-cv-06714-YGR

- - - - - - - - - - - - - - - - -x

VIDEOTAPED DEPOSITION OF ALAN D. MacCORMACK, a witness called by counsel for the Defendant, appearing remotely via Zoom from Boston, Massachusetts, taken pursuant to the Federal Rules of Civil Procedure, before Jane M. Werner, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing remotely from Halifax, Massachusetts, on Thursday, June 19, 2025, commencing at 11:01 a.m.

JOB No. 7436186

PAGES 1 - 76

Page 1

PRESENT:

ALL PARTICIPANTS APPEARED VIA ZOOM VIDEOCONFERENCE

Wolf Haldenstein Adler Freeman & Herz LLP
   (by Thomas H. Burt, Esq.)
   270 Madison Avenue, New York, NY 10016,
   burt@whafh.com
   212.545.4600
      -and-
Kellogg, Hansen, Todd, Figel &
   Frederick, P.L.L.C.
   (by Ashley J. Holman, Esq.)
   1615 M Street, NW, Suite 400, Washington,
   DC 20036, for the Certified Class.
   aholman@kelloghansen.com
   202.326.7900

Gibson, Dunn & Crutcher LLP
   (by Daniel Swanson, Esq.)
   333 South Grand Avenue, Los Angeles,
   CA 90071-3197
   dswanson@gibsondunn.com
   213.229.7430
      -and-
Gibson, Dunn & Crutcher LLP
   (by Harry R. S. Phillips, Esq.)
   1700 M Street, N.W., Washington, DC 20036
   hphillips@gibsondunn.com
   202.955.8500
   for the Defendant.

Also Present:  Kevin Gallagher, Videographer
         Todd Kumler, Cornerstone Research
         David Grothouse, Apple

Page 2

              I N D E X

WITNESS:            DIRECT  CROSS
ALAN D. MacCORMACK
(By Mr. Swanson)         5
(By Mr. Burt)            69


           E X H I B I T S
EX. NO.                        PAGE

EXHIBIT 112  Expert Rebuttal Report of Alan
        D. MacCormack, dated 6/13/25      4
EXHIBIT 113  Teaching Note entitled "Research
        in Motion:  The Mobile OS
        Platform War"            34
EXHIBIT 114  Teaching Note entitled "Barnes
        & Noble: Managing the E-Book
        Revolution"            50

Page 3

          P R O C E E D I N G S
       (Document premarked as DX
       Exhibit 112 for identification)
   THE VIDEOGRAPHER:  We are now going on the
record at approximately 11:01 a.m.  Today's date is   11:01:44
June 19, 2025.  This is Media Unit No. 1 of the
video-recorded deposition of Alan D. MacCormack
taken in the matter of In Re: Apple iPhone Antitrust
Litigation.  It is filed in the United States
District Court, Northern District of California.     11:02:04
The case number is 14:11-CV-06714-YGR.
       This deposition is being held remotely via
Zoom.  My name is Kevin Gallagher.  I'm the
videographer.  And the court reporter is Jane
Werner.  We're both from the firm of Veritext Legal   11:02:25
Solutions.  All of the appearances are on the
written record.
       And at this time our court reporter will
swear the witness, and we can proceed.

Page 4

          ALAN D. MacCORMACK
a witness called for examination by counsel for the
Defendant, having been satisfactorily identified by
the production of his driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:
       DIRECT EXAMINATION
   BY MR. SWANSON:
   Q.  Thank you, Professor MacCormack, for making
yourself available today.  Good morning.          11:02:58
   A.  Good morning.
   Q.  We've premarked as DX 112 a copy of what we
understand to be your rebuttal report.  Could you
switch over to Exhibit Share to review that document
and confirm, if you can, that that is indeed a copy   11:03:14
of your rebuttal report.
   A.  I'm getting a circling ball.
   Q.  Not a good sign.
   A.  Should I try to go back out and in?
   Q.  I'm probably the last person to ask.       11:03:48
Someone in this proceeding will have a better idea.
   A.  It still has not come up.
       MR. SWANSON:  Shall we go off the record,
then, and try to fix this?

Page 5

2 (Pages 2 - 5)

THE WITNESS: I don't need to download it, right? I just need to --

MR. BURT: It should come up in Exhibit Share. Let's do as Mr. Swanson suggests and go off the record.                                    11:04:26

THE VIDEOGRAPHER: We are going off the record at 11:04 a.m.

(Discussion off the record)

THE VIDEOGRAPHER: We are now going back on the record at approximately 11:07 a.m. This is the 11:07:48 beginning of Media Unit 2.

Go ahead, Counsel.

BY MR. SWANSON:

Q. Professor MacCormack, you should now have in front of you a digital copy of DX 112. Do you 11:07:59 see that now?

A. I do.

Q. Okay, great. Can you confirm that that is a copy of your rebuttal report in this matter?

A. Yes, it is.                              11:08:11

Q. All right. Thank you.

Does that report, DX 112, contain a complete statement of all rebuttal opinions you currently plan to express at trial?

Page 6

A. Yes, it does.

Q. Have you identified any errors or material omissions in either of your reports?

A. I have not.

Q. Now, is it correct that your assignment, at 11:08:36 least with respect to rebuttal, was to rebut certain sections of the opening reports of Professors Hitt and Sundararajan?

A. That is correct.

Q. And are those sections of the Hitt and 11:08:51 Sundararajan reports that you're rebutting identified in your rebuttal report?

A. Yes, they are.

Q. Are you offering any rebuttal opinion or opinions about the definition of the relevant market 11:09:06 or markets in this case?

A. I'm not.

Q. Are you offering any rebuttal opinion or opinions that Apple has or threatens to obtain monopoly power in any market?              11:09:19

A. No.

Q. Are you offering any rebuttal opinion that any of Apple's conduct is anticompetitive?

A. They're not my opinions. I think they're

Page 7

findings of fact.

Q. Are you offering -- are you offering factual assertions about whether or not Apple has engaged in anti-competitive conduct?

A. I'm merely citing I think things that are 11:09:47 in the public domain.

Q. Are you offering any rebuttal opinion with respect to the existence or amount of injury or damages to the class?

A. No.                                      11:09:58

Q. Could you please turn to Page 6 of your rebuttal report and focus on Paragraph 8. Let me know when you're there.

A. Yup, I'm there.

Q. I want to focus on the second sentence 11:10:23 there. In your report, you say, "Professor Hitt's analysis implies that the gross profit margin of app developers is either zero or very low..."

Do you see that?

A. I do.                                    11:10:41

Q. Why do you think Professor Hitt's analysis implies a zero or low gross profit margin?

A. My understanding is he's looking at the unit of the digital good and the variable costs and

Page 8

gross margins associated with the digital good, such as an IEP. And his analysis assumes, basically, that these low marginal costs will translate into high gross margins on that digital good.

Q. But why are you saying here that he is 11:11:18 implying that the gross margins are zero or very low? That's not high.

A. Oh, sorry. I think, actually, this is -- this is actually reversed. I noticed that in reading the report through. "Implies that the gross 11:11:35 profit margin of app developers is" -- that should read "very high."

Q. Did someone else write this sentence?

A. That particular sentence was probably developed by Keystone under my direction.          11:11:54

Q. Who else assisted in writing this report?

A. The Keystone team that we talked about in the opening deposition.

Q. Okay. And the same individuals?

A. Yes, exactly.                            11:12:19

Q. And who undertook to prepare the first draft of the rebuttal report?

MR. BURT: Objection, form.

A. Obviously I had a proposed outline for how

Page 9

3 (Pages 6 - 9)

the report would be put together. And then certain sections of it were drafted at my direction. So it's -- I guess it's a collaborative process.

Q. How did you decide which points in the reports of Professors Hitt and Sundararajan to rebut?

A. So in looking through Professor Hitt's and Sundararajan's reports, it was really focused on areas where they touched on parts of this case that I opined on in my opening report or that were relevant to the gross margins that I was calculating into the conduct of firms conducting business in this area. I won't say any more than that, but there was some discussion with counsel, which obviously --

Q. No, you don't need to get into that part of it.

Could you now turn, please, to Page 50 of your rebuttal report. This is in your Appendix C, "Materials Relied Upon."

MR. BURT: I'm sorry, Mr. Swanson, did you say a page?

MR. SWANSON: Page 50, 5-0.

A. Yes, I've got there.

Page 10

Q. Do you see the list of expert reports and declarations there?

A. I do.

Q. And one of the things that you list under that heading is the March 7 opening report of Dr. Song. Do you see that?

A. I do.

Q. You're not relying on Dr. Song's rebuttal report; is that correct?

A. I'm not, no.

Q. Have you spoken with Dr. Song since your last deposition?

A. I have not.

MR. BURT: Objection to the extent that you're calling for the substance.

MR. SWANSON: I'm not.

BY MR. SWANSON:

Q. Have you spoken with Professor McFadden since your last deposition?

A. I have not.

Q. Have you reviewed all of Dr. Song's March 7th opening report?

A. I have not.

Q. What parts did you review?

Page 11

A. Um, in fact, the reference that's made to Dr. Song's report in my rebuttal report is purely some data in support of an argument. I wish I had the footnote off the top of my head, but we would find it if we searched the document. So really only that part.

Q. Do you have a better understanding today than you did at your last deposition about how Professor McFadden's model works?

A. I do not, because I didn't concern myself with trying to do that.

Q. If -- well, let me put it this way:

Do you think you could find in Dr. Song's opening March 7th report the part that explains how Professor McFadden's model calculates costs?

A. I doubt it.

Q. Do you at least agree that the model predicts marginal costs and not some other measure of cost?

MR. BURT: Objection to form.

A. I am actually -- my assignment didn't require me to dig down deep into the mechanics of the model. So I wouldn't be comfortable asserting something about it at this point.

Page 12

Q. So the answer is you don't know as you sit here?

A. I don't know, yes.

Q. Do you estimate developer marginal costs in either of your reports?

A. I estimate genre gross margins, which are done on a user basis. So these are very relevant to developers. I forget exactly the way you phrased it, but --

Q. I'm happy to repeat it.

In the course of estimating developer gross margins, genre gross margins, do you estimate the developer's marginal cost?

A. I wasn't asked to do that.

Q. Is it your opinion that the accounting concept of cost of goods sold or COGS, C-O-G-S, is the same as marginal cost?

A. That is not my opinion.

Q. And you refer in your rebuttal report to an accounting concept called "contribution margin," correct?

A. I do.

Q. And accountants define "contribution margin" using the variable portion of cost; is that

Page 13

4 (Pages 10 - 13)

correct?

A.  That is correct.

Q.  And in your opinion, with respect to developer costs, gross margin is the same as contribution margin?                    11:18:22

MR. BURT:  Objection to form.

A.  It can vary a little bit, depending on how developers are reporting their financials.  In general, COGS basically accounts for the direct cost of producing the good or delivering the service to  11:18:40 the user.  A contribution margin will have other variable costs included in it.  And for some developers, they are one in the same.  But for many, they're actually different.  And one of the main differences might be that contribution margin takes  11:19:02 into account user acquisition and such costs which are variable.  So sales commissions might be an example.

Q.  And accountants regard gross margin as accounting for both fixed and variable cost, don't  11:19:24 they?

A.  In general, accountants would regard gross margin as accounting for the direct costs of producing the product or the service.  To a large

Page 14

extent, those costs are variable.  At the margin, perhaps there are one or two things that are regarded as fixed, but they directly vary with the unit of output.

Q.  Let me ask you to turn to Page 14 of your  11:20:00 rebuttal report, please.  I want to focus on Figure 1 on that page.

A.  Yes.

Q.  Now, Figure 1 reports gross profit margins for the listed developers, correct?        11:20:28

A.  That's right.

Q.  Did you check to see if any of those developers report contribution margins?

A.  I did not in this case.  In general, contribution margin is harder to find in financial  11:20:41 reports.  So if any of these reported contribution margins, it would definitely be a subset of these.

Q.  Your Figure 1 includes commission costs, right?

A.  You mean by app store commission costs?  11:21:02

Q.  Yes.  Yes.

A.  Yes, it would.  Because these are from public financial data.

Q.  Now, in your expert reports, you include

Page 15

commissions from your gross margin calculations, correct?

A.  Yes.  These are not meant to be comparable analyses.

Q.  Now, looking at Figure 1, there's a line  11:21:27 there for "MatchGroup."  Do you see that?

A.  I do.

Q.  That shows an average gross margin above 70 percent?

A.  Yes.                                11:21:38

Q.  Fair?

A.  That's what it looks like roughly, yes.

Q.  If the commissions that Match pays were deducted, the average gross margin would be at or above 100 percent, would it not?            11:21:58

A.  If all of their revenue went through the App Store, I don't know what their average commission rate is for that particular genre.  But that would be true.  In this particular case, obviously Adobe, for example, would get the majority  11:22:15 of their revenues from nonApp Store-related products and services.  So these figures are not controlling for the relative penetration of App Store revenue versus other revenue.

Page 16

Q.  Focusing on Duolingo, do you see that?

A.  I do, yes.  Sorry.

Q.  Duolingo also has a listed average gross profit margin here of around 70 percent, correct?

A.  That's right.                        11:23:02

Q.  And Duolingo also pays commissions to App Stores; Apple and Google Play and perhaps others, correct?

A.  Yes, it does.

Q.  If those commissions were subtracted in the  11:23:14 way that you subtract them for purposes of your expert reports, Duolingo would also have a profit margin here closer to 100 percent, right?

A.  Well, again, I don't know for sure the percentage of their business that is running through  11:23:30 an App Store versus other channels.  But for each of these companies, to the extent that some portion of their business runs through an App Store, adding back in the commission to understand kind of their comparable figure would actually increase their  11:23:52 gross margins, in the same way that was done in Report 1.

Q.  So with those adjustments for MatchGroup and Duolingo, it's quite possible that the majority

Page 17

5 (Pages 14 - 17)

of the developers in this table would have gross margins at or above 100 percent?

MR. BURT: Objection to form.

A. I think that would be highly likely and financially impossible. These are financial reported gross margins for their entire businesses. And they do not include, obviously -- because gross margin typically does not include user acquisition and retention costs, which are large costs for many of these firms. So we would have to, unfortunately, get non-public data to adjust this in the way that you suggest. So I couldn't say that that would be a reliable figure for margins should we add back the App Store commissions.

Q. Do you still believe that Figure 1 has reliable information to convey in support of your opinion?

A. Yes.

MR. BURT: Objection to form.

THE WITNESS: Sorry, Mr. Burt.

MR. BURT: Go ahead. Objection to form. You can go ahead and answer the question if you understand it.

A. Um, yes. The intention of Figure 1 was to

Page 18

basically show that there are, for all of these firms, significant reported variable costs. And if we look at the mean level of gross margins across this set of firms that have responded to our -- actually, this is firms that have a presence kind of on the App Store. And we actually see that 60 percent gross margins on average is I would say indicated -- indicates that there are significant variable costs. And this is really a rebuttal to the claim that these firms have very low variable costs.

Q. Which of these companies are -- well, strike that. We'll move on. Sorry.

Let's move to Page 12. I'd like to ask you a question about Paragraph 21 of your development report. Are you at Paragraph 21, sir?

A. I am, yes.

Q. There -- I think it's the second sentence -- you say, "A gross profit margin that is meaningfully below 100 percent indicates that the developers incur variable costs that are greater than zero." Do you see that?

A. I do, yes.

Q. And you say, "If developers could acquire

Page 19

and serve additional users without incurring new costs, gross profit margins would be close to 100 percent."

Is that true if marginal cost is lower than average variable cost?

MR. BURT: Objection.

A. I wouldn't want to speculate. Here I'm talking about variable costs.

Q. Are you familiar with the concept of economies of scale?

A. Yes.

Q. It's something you teach at the Harvard Business School?

A. We do.

Q. Did app developers benefit from the economies of scale, in your opinion?

A. Interestingly, you would think so. And the diversity of cost structures in the data doesn't give us necessarily a clear picture of that. So in general, I think they would benefit from economies of scale.

Q. The next question takes us to Page 9 of your rebuttal report. I just want to ask a question about Footnote 19.

Page 20

A. Oh, yes, the long footnote.

Q. I'm only going to ask a general question about that; but if you want to read it, feel free. But in this footnote you make reference to correspondence between developers and plaintiff's counsel regarding the subpoenas they received; is that fair?

A. That is fair, yes.

Q. And this is correspondence you had not seen before you prepared your original report; is that correct?

A. It's correspondence I certainly didn't recall seeing, which might mean the same thing. And so obviously having been presented with it at the first deposition, I made an effort to understand what were the communications and how might they impact the process that I had gone through in my opening report.

Q. Are you relying on that correspondence now?

MR. BURT: Objection.

A. I'm being responsive to the fact that you presented me with things that I wasn't sure I had seen. And I'm talking about whether these communications would have a material impact on my

Page 21

6 (Pages 18 - 21)

opinions, which they do not.

Q. Could you turn next, please, to Paragraph 27. That's on Page 15.

A. Yes.

Q. In the middle of that paragraph you state 11:30:33 that you believe that "...users are the correct unit of analysis instead of digital goods and services..." Do you see that?

A. I do.

Q. Is it your opinion that developers compete 11:30:47 for users rather than for sales of digital goods and services?

MR. BURT: Objection.

A. So when we teach the founding of software firms and the management of software firms, one of 11:31:08 the biggest constructs or concepts that we have to communicate to our students and to executives is the unit economics of software firms. And if you just Google how you measure the unit economics of software firms, every reference you will find talks 11:31:26 about doing it with users as the basis of analysis. And they will also talk about the value of customers and the cost of acquiring them.

So here I am measuring the gross margins of

Page 22

software developers. And I do think that the developers in some way -- there is some competition to attract users to the platform and then to upscale them, if you like, to extract more value from them.

Q. Do mobile game developers compete against 11:32:03 PC game developers for users?

MR. BURT: Objection.

A. I think it varies. And, um, I have known quite a lot of app developers whose primary focus is just to develop IOS apps or Google Play apps. And 11:32:27 they're not considering the PC market at all, because there is some part of the market that is for people who just want to play games on their mobile devices.

It's much easier to play a game while 11:32:49 you're out and about in your ten minutes of spare time, rather than lugging a laptop or a PC around.

Q. Well, are there game apps that operate across multiple platforms?

A. There are. And I know that Professor Hitt 11:33:04 focuses very intensely on those in his reports. I would say if you looked -- there's certainly been studies of this, the concept of multihoming, which you're probably familiar with. And the studies

Page 23

suggest obviously the bigger companies tend to multihome. But a lot of app developers do not multihome. Or if they multihome, it's basically to the extent of just operating under both the App Store umbrellas, but not necessarily going to 11:33:41 consoles or PCs or other platforms.

Q. Well, focusing on the multihoming or multi-platform developers, who do they compete against for users?

A. I would imagine similar apps that are 11:34:05 providing -- similar apps providing similar functionality, similar user benefits.

Q. Do PC game developers compete against console game developers for users, in your view?

MR. BURT: Objection to form. 11:34:30

A. I'm not sure I know. I think ultimately, the PC game market -- certainly there are games that are available on both. And so being multi-platform can be helpful. But ultimately, there's only so much you can do on an IOS device that is limited by 11:34:53 space and processing power.

And so do all games that are on the PC compete against IOS apps? I think that would probably not be a true statement.

Page 24

Q. My question was about PC and console games. I didn't mention IOS.

A. Sorry.

Q. Do PC game developers compete against console game developers for users? 11:35:20

MR. BURT: The same objection.

A. To some extent, I think that there will be competition across those platforms.

Q. In the McFadden model, are users the unit of analysis instead of digital goods and services? 11:35:37

MR. BURT: Objection to form.

A. My knowledge of the McFadden model is very limited, so I couldn't answer that question with certainty.

Q. Well, do you at least agree that output in 11:35:53 the McFadden model is either an app download or a unit of IAP content?

MR. BURT: Objection to form.

A. The McFadden model is a model that I really last paid a lot of attention to about a year ago, so 11:36:12 I actually don't know the answer to that.

Q. Would you have any reason to dispute Professor McFadden's testimony on that point?

A. I certainly would not, no.

Page 25

7 (Pages 22 - 25)

Q. Do you agree that many of the developers have their apps on both the Apple App Store and the Google Play Store?

A. I think many do. But there's a difference. And they prioritize them differently. I think we talked before, last time, about Duolingo. I just want to introduce that as an interesting example, because that's a premium model app. And the CEO is on record as saying that IOS basically gets -- you know, any new feature, any function is rolled out to IOS users a year ahead of Android users.

So when people are on both, that doesn't necessarily mean that they treat them equally or that they view them equally in terms of what their priorities are.

Q. I recall that interesting interview.

But do you recall if he explained what the difference was between Google/Android and IOS that led to that approach on the part of Duolingo?

A. I think he alluded to the fact that IOS users are wealthier, let's say, and so tend to have more disposable dollars at their disposal to spend on these items.

Q. If a developer has an app in both stores, Android and IOS, and the app has the same number of paid users by Android as on IOS, would you expect that the developer has the same variable costs for those apps?

MR. BURT: Objection to form.

A. I think that across app stores, I would imagine that margins owed to be similar. The cost of serving these stores will include commissions that may differ, of course. I don't know how Apple and Android stack up on that front. But if we think about user acquisition, it's still expensive. If we think about infrastructure, I'm not sure there's a huge difference between an infrastructure for IOS versus Android. If you think about maintenance and support, again, I think those things would be similar. And if we think about royalties -- certainly from a gross margin perspective, I would imagine that the royalties would be similar. I think I just went through all the variable costs that I identified.

Q. I think so. One more question about the McFadden model, if you have an understanding. Would you agree that the McFadden model assumes that developers choose price by setting

marginal revenue equal to marginal cost?

MR. BURT: Objection to form.

A. So I can't confirm or deny that, because my understanding of the model is limited.

Q. You are familiar, in general, though, with the concept of marginal revenue in economics?

A. Um, the extra revenue from an additional user?

Q. (Nods head)

A. Okay, I did well.

Q. With a passing grade.

How do you define "marginal revenue" when the unit of analysis is users instead of digital goods and services?

A. Well, if I could just kind of go back to my assignment, my assignment was to calculate the gross margins defined in a particular way, which is the revenues minus the variable costs.

And the way I like to think about it is across the user's journey -- and this is something, again, that we teach. So we have to acquire that user. We have to retain that user. We have to provide them products and services. We sometimes have to update those products and services. And then we have other maintenance support costs, etc. So I'm looking at the gross margins of that entire stream.

Now, at any given point within that stream, there might be marginal costs and marginal revenues along the way, but I'm not disentangling those. So marginal costs and marginal revenues that come in along the way for various purchases or various costs that we incur are bucketed in my approach to give us the profitability at a user level. And it includes users that -- you know, the acquisition of users. It includes the fact that we have to spend money to retain them as well.

So I don't have, certainly in the statistics that I generated, anything that tells me about the -- at the microlevel about marginal costs and revenues.

Q. I'd like to ask you next about the regressions that you discuss in your rebuttal report. Those are the ones that you report the results of in your Table 1, which starts on Page 17.

A. Yes.

Q. You discuss four specifications of the regressions in Paragraph 31 of your report; is that

Page 26

Page 27

Page 28

Page 29

8 (Pages 26 - 29)

correct?

A. That is true.

Q. Did you personally specify those regressions?

A. I specified the regressions, and they were 11:42:42 carried out by the team.

Q. In Paragraph 30, you say that you include developer fixed effects in your regressions. What does that mean?

A. Well, obviously developers, as we know from 11:43:00 the dataset, are extremely diverse in terms of the different costs that they might incur. And I want to make sure that I'm not merely capturing differences between developers.

So in order to do that, what I have to do 11:43:20 is basically have a dummy variable for each developer. And then I have to have multiple years of data from a developer to understand when revenue goes up, do these particular costs also go up, and the reverse. 11:43:41

So obviously in a regression like this, I'm limited a little bit, so this is not the full dataset that I had at my disposal in the opening report, because I can only look at those developers

Page 30

who have multiple years of data. And the fixed effects will basically control out for the differences across each developer in the level of cost that they have. So we're kind of removing the average cost from each developer. 11:44:10

Q. Do your regressions control for anything other than developer fixed effects?

A. No, I don't think so.

Q. Do you think your regression results apply to the variable costs perhaps on the Google Play 11:44:25 Store as well?

A. Well, these are actually showing the relationship in revenue variable costs for all of the subpoenaed data that fits obviously the restrictions that they have to have multiple years 11:44:45 of data. For some of those people, they actually provided IOS-specific information. For others, they did not.

So this is a regression that reflects basically some aggregate data as well. 11:44:59

Q. So this would include developers' costs, for example, for console games?

A. That, I'm not sure. I'd have to go back and look at my notes about the subpoenaed

Page 31

respondents and how they responded.

It might be if it was depending upon public information, for example, to fill in some of the costs that we didn't have access to.

Q. If you would be kind enough to turn now to 11:45:37 Page 19 of your report. I'd like to ask you a question about Footnote 56. Do you see that?

A. Yes, I do. Yes.

Q. And that's a footnote where you cite a report from the CMA Mobile ecosystems market study. 11:46:00 Do you see that?

A. I do, yes.

Q. Have you read that report?

A. I have not read that report.

Q. In the parenthetical you include a quote 11:46:10 from the report.

Was there a reason you included that quote?

A. Well, I think as good practice -- let me actually, first of all, just read it again. Are we on 56, is it? 11:46:24

Q. 56, yes.

A. Okay. (Witness reviews document)

So in general in this report, where I instructed my team whenever we were citing something

Page 32

to actually include any relevant text from that report, just to make referencing easier for anybody that was reading it.

Q. And this quote says, "An App Store is an online market place for the buying and selling of 11:46:58 native apps - they provide a platform that connects consumers with apps, and app developers with consumers."

Do you agree with that?

MR. BURT: Objection to form. 11:47:10

A. Yes, I guess.

Q. Do you agree that the Apple App Store is a platform?

MR. BURT: Objection to form.

A. I think it's a platform in a retail outlet. 11:47:25

Q. Do you agree that the Apple App Store platform has a consumer and a developer side?

MR. BURT: Objection to form.

A. Yes, it does.

Q. So you agree that the Apple App Store is a 11:47:38 two-sided platform?

MR. BURT: Objection to form. Calls for legal conclusion.

A. I've certainly seen it described as a

Page 33

9 (Pages 30 - 33)

two-sided platform.

Q. And you've described it that way, have you not?

A. I'm trying to think of -- I probably have.

Q. Now, during your last deposition, we looked at an exhibit. It was marked DX 68. And that was a Harvard Business School case note that you had written about smart phone competition entitled, "Research in Motion: The Mobile OS Platform War." Do you recall that?

A. I do, yes.

Q. And then subsequent to the deposition, plaintiffs produced a teaching note associated with that case note?

A. I did, yes.

MR. SWANSON: So let's mark that as our next exhibit, which I guess would be DX 113.

(Document marked as DX Exhibit 113 for identification)

Q. Now we'll go through the excitement of Exhibit Share.

A. Okay.

Q. Let me know when that has popped up for you.

Page 34

A. Yeah, I think I have it open now.

Q. All right, good.

Can you confirm that that is a copy of the teaching note that is associated with your case notes on the Mobile OS Platform War?

A. Yes, it is.

Q. And a teaching note has the answers for professors teaching the case to business school students, right?

A. I think "answers" is a strong word. In a teaching note, the idea is that you are showing the Professor how you would run an engaging class. Sometimes there are, let's say, right answers in it, but sometimes there are just frameworks.

So if we look at Figure 1, which perhaps you're going to look at anyway, so here is kind of a framework for thinking about the comparison of different kinds of platforms.

The idea here is to communicate to students, like how would you go about analyzing this situation? And here are some dimensions upon which you might analyze the situation. The degree of openness or the degree of closedness for these competing platforms.

Page 35

So it doesn't always have the answers in a -- you know, kind of to use that in a very specific way. Very much what we're hoping is to, through the process of debating, is for students to arrive at a richer understanding of the strategic choices that are available.

Q. Okay, understood.

On the first page of DX 113, there's a heading "Case Overview." Do you see that?

A. Yes, I do.

Q. And a little further down there's a listing of relevant topics. Do you see that?

A. Yes, I do, yes, uh-hum.

Q. And the first couple of relevant topics listed here are two-sided markets, multisided markets, and platform markets. Do you see that?

A. Yes, I do.

Q. What is a two-sided market, as you use that term here?

A. Well, it's a platform or a market where there are both -- to use your words, actually -- there are customers and consumers on one side, and there are developers on the other. And in order to promote -- to gain profits, you have to consider

Page 36

both sides of the marketplace, basically.

Q. And why are two-sided markets a relevant topic for this particular case note about smart phone competition?

A. Well, because in order for you to have a wonderful market and a set of consumers on one side, you actually need to have developers on the other side that have produced apps that the consumers want. So this always leads to the chicken-and-the-egg question. Do we try and ramp up on the supply side and attract app developers to our platform, or do we ramp up on the demand side. And the answer, of course, is both.

Q. Can you please turn to Page 4. Let me know when you get there.

A. Yeah, I'm there.

Q. In the top half of that -- I guess it's part of the third full paragraph at the end there -- you say, "The discussion lends itself to a two-sided market diagram." And then below that are application developers on the left, customers on the right, OS platform in the middle, with arrows connecting each of those.

Do you see that?

Page 37

10 (Pages 34 - 37)

A.  I do, yes.

Q.  What does this diagram, if we can call it that, depict?

A.  Purely that when you are running a platform like this, that you would have to optimize for both 11:53:23 sides of the equation, so that you're both satisfying customers and you're also satisfying app developers.

When we teach about the business models, we're always talking about a value creation and 11:53:38 value capture.  And when you have multiple sides of a market, you have to make sure that everybody is getting value -- certainly getting more value than they're paying.

Q.  And a little further down on Page 4 you 11:53:56 say, "With this two-sided market diagram, the class can now start to address the question of what RIM can or should do about their situation."

Now, "RIM" is BlackBerry, right?

A.  It is, yes.                11:54:11

Q.  And why is the two-sided market relevant to what BlackBerry can or should do, at least at this point in time?

MR. BURT:  Objection to form.

Page 38

A.  I'm not sure there was ever a winning strategy for RIM, unfortunately.  But they came from a position of strength.  And at one point I think we all had BlackBerries.  And now in this new world, where they were not a very -- they weren't really a 11:54:37 two-sided market-focused firm, in that they didn't really have an App Store that was providing lots of options that the consumer wanted.  So a lot of their functionality was just built in themselves to the device.  So with -- and again, I'm going back, 11:54:58 because I haven't taught this case, but I obviously wrote the teaching note.

So with the two-sided market diagram, you would start to say, "Okay, are there strategic options here for RIM?  What could they do?" 11:55:13

And ultimately, there was not a lot of great options for them, because the marketplace had filled in in different ways since they were the market leader.

Q.  Do you have an understanding of the term 11:55:31 "indirect network effects"?

A.  So it's more of an economics term.  But I think it refers to the fact that more participants on one side will lead to positive benefits on the

Page 39

other side.  Did I get that right?

Q.  Is that a concept that you refer to as "cross-side network effects"?

A.  I think that might be another term that's used interchangeably.                11:56:08

Q.  Do smart phone platforms exhibit indirect network effects?

MR. BURT:  Objection to form.

A.  Well, to the degree that there's more apps available on one side, that potentially could make 11:56:27 the platform more valuable to the users that are on the other side.  So I think that would be an example that fits your description.

Q.  And would it also fit the description that if there are more users, that makes the platform 11:56:42 more valuable to developers?

MR. BURT:  Objection to form.

A.  I would agree with that.

Q.  Could you turn to Page 12 of this teaching note.                11:56:56

A.  Yes.

Q.  If you look toward the top, there's that diagram again.  A little bit below that you write here with respect to smart phones that "Customers

Page 40

have influence on the platform in that they get to choose which platform to adopt and on application developers in that they get to choose which applications to purchase."

Do you see that?                11:57:33

A.  I do.

Q.  That was your view at the time that you wrote this?

MR. BURT:  Objection to form.

A.  I would think it must be.                11:57:47

Q.  You further write here, "Application Developers have influence on the platform in that the platform benefits from the existence of apps (such that developers could withhold an app from a platform, demand concessions from the platform, 11:58:03 etc.)"

Do you see that?

A.  I do.

Q.  That was something that you thought was descriptive of the market when you wrote this? 11:58:10

MR. BURT:  Objection, form.

A.  It's written, so that would have been my viewpoint at the time.  Obviously, things have changed quite a bit since this was written.

Page 41

11 (Pages 38 - 41)

Q.   And then in the next paragraph you write, "Finally, Platforms have influence on both Application Developers and Customers in that, without the platform, the two groups would have no way of interacting with (and benefitting from) one another."

Do you see that?

A.   Yes, I do.

Q.   Is that another statement that you believed to be true when you wrote this?

A.   Yes, it makes sense.

Q.   If you flip to the next page, Page 13, I'd like to ask you about the bottom paragraph there. Let me know when you're there.

A.   I'm there.

Q.   You write, "With a single dominant OS" -- that's "operating system"?

A.   Uh-hum, that's true.

Q.   "With a single dominant OS that platform would have considerable leverage with both Application Developers and Customers, similar to the PC market dominated by Microsoft Windows.  As in that case, however, the dominant platform has incentives to keep both sides reasonably happy -

Page 42

price gouging either side could keep participants out of the market and thus prevent the platform from maximizing profits."

Was that your opinion when you wrote this teaching note?

MR. BURT:  Objection to form.

A.   Yes.  I think it's a fairly succinct statement of the tradeoffs.

Q.   This teaching note also discusses whether BlackBerry should adopt what you call a closed or an open architecture for its smart phone platform, correct?

A.   Yes, it does.

Q.   If we turn back to Page 1, I wanted to ask you about something at the bottom of that page.  Let me know when you make it there.

A.   I am there.

Q.   At the bottom there, the second sentence of the last paragraph, you say, "The section discusses how Apple has been successful with its closed-architecture products, affirming the possible validity of this strategy for RIM."

Do you see that?

A.   Yes, I do.

Page 43

Q.   And by Apple's closed architecture products, you mean the iPhone, correct?

A.   Yes, indeed.

Q.   And one feature that makes the iPhone a closed architecture is Apple being the sole distributor of apps, correct?

A.   Well, I think there's actually a diagram that's further down that talks about open and closed.

Q.   That's Page 5, if you want to turn to that.

A.   Yeah, yeah.  Now this figure is actually drawn from a 2008 paper, at which point I believe Apple had a different approach to whether it allowed third parties to put apps onto the device.

And so when we think about the application developer, the table shows its closed there.  And then, of course -- I'm not sure exactly of the timeline, but at some point, Apple opened up its architecture to allow third parties to put apps on the phone.  However, it was commonly accepted at that time that they had a lot more control, I guess, over the procedures and the hoops that the folks had to jump through in order to make it onto the device. So it was fully closed.  And then it became closed,

Page 44

but a little bit more open, because it's now open to third parties.

Q.   And at this point in time when you wrote this note and you were teaching that case, the App Store was open?  No question about that in your mind, is there?

MR. BURT:  Objection to form.

A.   So I've never actually taught the case, which I'm very unfortunate about that.  But the App Store was definitely open, so your assertion is correct.

Q.   And on Page 5, when you describe the closed or integrated architecture -- this is above Figure 1 -- you describe it as "Platform architecture in which the platform owner exerts the most control over the platform (e.g., by being the sole manufacturer of its devices, by being the sole distributor of complements).  Example:  Apple (Mac, iPhone)."  Do you see that?

A.   I do.

Q.   And "sole distributor" there refers to the App Store with respect to the iPhone, correct?

A.   For the hardware, I mean, obviously a closed architecture; nobody can make, you know,

Page 45

12 (Pages 42 - 45)

Android. I guess a bunch of people can make those phones; but for apps, that's not true. This, I'm kind of thinking a little bit about when Chris first raised the idea of developing this case with me, that there was kind of a broader set of cases that 12:04:04 also looked at the PC and the issue of standards in the PC industry and how things evolved. There was, of course, a lot of focus on how IBM was successfully opened and then, of course, lost a lot of the value from that. 12:04:27

So strategies for capturing the most value had to really make careful decisions about the degree of openness versus closedness. I did not sponsor the IBM case, so there's no more of those to dig through. 12:04:44

Q. In Figure 1, you've got the iPhone on the right-hand side, correct?

A. Sorry. Let me just go back to that.

Q. Yes.

A. In Figure 1? Oh, yes. Sorry. Yes. 12:04:57

Q. And Figure 1, this says, for the record, "Comparison of Openness by Role in Platform-Mediated Networks," right?

A. Yes. Yes, that's the title. Sorry, yes.

Page 46

Q. And then the top row says, "Demand-Side User (End User)." Do you see that?

A. Yes, I do.

Q. What does that refer to?

A. Gosh, I would guess it means that we'll 12:05:25 sell it to anybody. So there's no restrictions on who can buy. And then as you go down, obviously there's increasing restrictions, depending on the operating system you're talking about.

Q. And "Supply-Side User," which is the next 12:05:45 one down, refers to "Application Developer," correct?

A. Exactly.

Q. And then you say here the iPhone is closed, right? 12:05:56

A. Yes. As I mentioned a few minutes ago, this figure is drawn from a 2008 article. And I don't know if you know anything about the academic publishing process; but normally when something comes out, it's probably been written at least a 12:06:14 year ahead of that.

So my guess is they're referring to the fact that Apple dictated what the apps were on the iPhone at that point in time.

Page 47

Q. You think this was before the app store was open?

A. So I don't know when the -- I don't know for sure when the App Store was open to third parties to -- is that something you know? 12:06:46

Q. I know when it was opened to third parties. It was in 2008.

A. Yeah.

Q. But in any event, I don't know what these people were saying. 12:07:01

A. I'd have to go back to the original Eisenmann. Tom is a good friend. But I think they were just trying to paint a picture. Probably it was written a year before. And at that point when Apple had entered with the iPhone, obviously it was 12:07:15 a closed strategy.

Q. And with the opening of the App Store, is it your view that that entry, instead of saying "closed," should say something else?

MR. BURT: Objection to form. 12:07:28

A. Um, so there are degrees of open. And when you actually teach this case, I think -- or if you just look at the literature out there, at one point in time, it was very easy for people to put a lot of

Page 48

Android apps out there. And maybe it was easier to get them onto a device, whereas Apple maintained a lot more control about the elements that you had to -- certain policies and procedures that you had to meet in order to get onto a device. 12:08:09

So it was open, but not to the degree that Android was at the time. So I think I would say, you know, there's some degrees there. That table that they developed in 2008 probably needed to be adapted. 12:08:27

MR. SWANSON: I think we've been going for about an hour, so why don't we take a break.

THE VIDEOGRAPHER: We are now going off the record at approximately 12:08.

(Recess taken from 12:08 to 12:27) 12:08:41

THE VIDEOGRAPHER: We are now going back on the record at approximately 12:27 p.m. This is the beginning of Media No. 3.

Go ahead, Counsel.

BY MR. SWANSON: 12:27:50

Q. All right. We're back from a break.

Mr. MacCormack, still staying for a moment with teaching on the Platform Wars case, was -- were you attempting to convey in the teaching of one

Page 49

13 (Pages 46 - 49)

thing professors should direct their students to discuss was whether adopting a closed architecture, like the iPhone, would have been a valid strategy for BlackBerry?

A. Yeah, I think we wanted them to explore all 12:28:27 of the strategic options that were available to them.

So obviously, the open versus closed question on those four dimensions would describe the landscape which potentially they could choose 12:28:47 between.

MR. SWANSON: Okay. We can move on from that one.

There's one more that I'd like to have marked as an exhibit. This would be DX 114. 12:28:58

(Document marked as DX Exhibit 114 for identification)

Q. This is the teaching that corresponds to your Barnes & Noble case notes, which I think we marked last time as DX 68. We can go back to the 12:29:09 case note; but I think if the miracle of Exhibit Share is working, the Barnes & Noble teaching note should magically appear.

A. And it did.

Page 50

Q. Great. Can you confirm for the record that that is a copy of the teaching note associated with the Barnes & Noble case note?

A. Yes, it is.

Q. Okay. And then could you please turn to 12:29:41 Page 5 of that teaching note.

A. I'm there, yes.

Q. Toward the bottom there, there's an indentured topic, "Where are the network effects?" Do you see that? 12:30:13

A. Yes, I do.

Q. And if you turn to the next page, Page 6, under that "Network Effects" heading, there's a discussion here of "cross-side network effects." Do you see that? 12:30:29

A. Yes, I do.

Q. And that's the term that is interchangeable with "concept of indirect network effects"?

A. Yeah.

Q. Okay. And you say here, "The cross-side 12:30:38 network effects are also evident." This is in the e-Books two-sided market?

MR. BURT: Objection to form.

A. Yes.

Page 51

Q. You go on to say that "The more consumers there are who adopt an e-book reading platform, the more important that platform becomes for book publishers. Similarly, the more content there is available on a platform, the more attractive the 12:31:07 platform becomes for consumers."

Do you see that?

A. I do.

Q. And that is a description of indirect networks or cross-side network effects? 12:31:17

A. Yes.

Q. How do you determine whether those kind of network effects are evident in a market?

MR. BURT: Objection to form.

A. I've never tried to test that, so I don't 12:31:34 know.

Q. Well, you say they're evident here in your teaching note. How did you come to that conclusion?

A. I think it was supposition from the literature that talks about the use of standards on 12:31:50 different sides of a platform.

Q. And are indirect network effects important to two-sided platforms in determining their monetization models?

Page 52

MR. BURT: Objection to form.

A. In determining their monetization? I just don't know.

Q. Are indirect network effects important to two-sided platforms in deciding a price? 12:32:30

MR. BURT: Objection to form.

A. Well, from the examples that I've read in literature, that would be true.

Q. All right. You can put that one aside. I guess electronically aside. 12:32:51

If you could go back to your rebuttal report, I have a question about Paragraph 89. That's on Page 41.

A. Yes.

Q. Really just focusing on part of that first 12:33:24 sentence there, you refer to the optimal monetization model of an app. Do you see that?

A. I do.

Q. By "optimal," do you mean the most profitable? 12:33:40

A. I think that's fair.

Q. Is it fair to assume that the prices that IOS developers charge for their apps in an app content are the ones that maximize their profits?

Page 53

14 (Pages 50 - 53)

A.  Well, they have a suite of prices. Obviously, there could be a download price, there could be in-app prices, and there could be subscription prices.  So I would expect an app developer to consider those related prices as a set 12:34:15 of prices that they're setting in order to maximize their profit.

Q.  Do you agree that a developer's choice of monetization strategy impacts the commission it pays to Apple? 12:34:34

MR. BURT:  Objection.

A.  Yes.  If it chooses to monetize through downloads, obviously that's subject to commission. If it tries to monetize by advertising, obviously that is not subject to commission.  Well, it's 12:34:53 subject to commission by the app platforms that are selling those apps, potentially.

Q.  Are there any platforms that seek to monetize advertising by developers by obtaining a portion of the advertising revenues? 12:35:16

A.  I'm not familiar with the business models of the firms that are specialized on that part of the market.

Q.  Does the commission that Apple charges

Page 54

affect the developers' choice in monetization strategy?

MR. BURT:  Objection to form.

A.  So by this, you mean the different mechanisms that they might use versus the actual 12:35:52 prices they set?

Q.  Fair enough.

A.  Okay.  I would imagine that it should.

Q.  You would agree, wouldn't you, that app developers facing commission fees with App Stores 12:36:13 have, in principle, a strong motivation to rely more heavily on ad-based monetization of their app content?

THE WITNESS:  I'm waiting for Mr. Burt.

MR. BURT:  Doctor, if you understand the 12:36:28 question, go ahead and answer.

A.  So commission rates are just one variable in the optimization.  And as I point out pretty extensively in the rebuttal report, the amount of revenue that's available from paid users far 12:36:43 surpasses the amount of revenue per user that would come from an advertising model.  So just seeking to avoid commissions is not an optimal monetization strategy.  You have to consider all of the elements

Page 55

of the model.  And that will include, you know, the revenue per user, using different approaches, and then, you know, the cost structures and all of the associated factors.

Q.  If you turn to Paragraph 64 of your report, 12:37:19 please.  That is on Page 31.

A.  Yup.

Q.  Do you still agree with that first sentence?

A.  Well, I think it's saying, in principle, if 12:37:46 there are two ways to make money and one of them seems to be lower cost, then I ought to favor the other.

However, as is then written about in the succeeding paragraphs, we have to balance the fact 12:38:05 that lower costs may come along with lower revenues.

Q.  Do you agree that approximately 60 percent of app revenues are generated from in-app advertising?

A.  That's my understanding. 12:38:24

Q.  In your opinion, would 60 percent of in-app revenues be generated from in-app advertising if the commission was 13 percent instead of 30 percent?

MR. BURT:  Objection to form.

Page 56

A.  If the commission was lower -- I'd have to think about that.  I'm not sure which way things would go.

Q.  Is selling subscriptions a monetization strategy for app developers? 12:39:00

A.  Yes, it is.

Q.  If you could flip to Paragraph 68 of your report, I would appreciate it.

A.  Yes, I'm there.

Q.  You refer there to a 2022 analysis that 12:39:24 examined the revenue streams for 3,000 subscription apps.  That analysis showed that 82 percent and 36 percent of the developer revenues are generated by a subscription for non-gaming and gaming apps respectively. 12:39:42

Do you see that?

A.  I do, yes.

Q.  Would you agree that in mid-2016, Apple reduced its commission to 15 percent for auto renewing subscriptions after the first year? 12:39:57

A.  I'm familiar with the fact that the subscription rate was reduced for ordering new subscriptions.  I don't know the year, but I would assume you're telling me the right year.

Page 57

15 (Pages 54 - 57)

Q.  Did that commission reduction result in an increasing adoption of the subscription monetization model by developers?

MR. BURT:  Objection; form, incomplete hypothetical.                    12:40:26

A.  That's not an area that I've studied.

Q.  Have you looked at the portion of Professor Hitt's expert reports that talks about that?

A.  I've seen it, but it was not something that I focused on for my rebuttal.                    12:40:44

Q.  Would you be surprised to know that the share of overall App Store billings from in-app subscriptions has gone from less than 20 percent in 2016 to almost ▮▮ percent in 2023?

MR. BURT:  Objection to form.                    12:41:04

A.  Given the move, this would seem a rational response.

Q.  Given the reduced commission rate?

A.  Yes.

Q.  Would you be surprised to learn that there    12:41:14 are some genres where the share of billings from in-app subscriptions has gone from very low in 2016 to almost ▮▮ percent in 2023?

MR. BURT:  Objection to form.

Page 58

A.  Again, that seems a rational response to a reduction in commission rate.

Q.  Let me ask you to turn to Paragraph 58 of your rebuttal report, please.

A.  I am there.                    12:41:53

Q.  You indicate here that you have data from 13 out of 71 IOS developers on their revenue sources?

A.  That's right.

Q.  And those developers are listed in Footnote    12:42:04 109 on that page?

A.  Yes, they are.

Q.  And they're also listed on Table 2 on Page 23?

A.  I think they're the same.                    12:42:18

Q.  Would you agree that none of these developers is in the top 50 by revenue?

A.  Again, if you tell me that, I have no reason to disbelieve it.  We are limited here, obviously, by the set of respondents who actually    12:42:40 broke out the revenue in ways that allowed us to do the analysis.

So I'm using whatever data I have in order to examine some of the assertions that are here.

Page 59

Q.  In your Paragraph 59, you indicate that, (as read) "On average, those developers generate as much as 75 percent of their total revenues from the combination of Apple's App Store and Google's Play Store."  Do you see that?                    12:43:18

A.  Yes, I do.

Q.  Now, in Table 2, you report that these developers on average generate ▮▮ percent of their revenue from the Apple App Store, right?

A.  Table 2 is where, again?                    12:43:35

Q.  Table 2 is Page 23.

A.  Okay, I see that.  Uh-hum.

Q.  Does this mean these developers generated only about 12 percent of their revenues from the Google Play Store; namely 75 percent minus 63    12:44:00 percent?

MR. BURT:  Objection to the form of the question.

A.  I'm just checking if the denominator that's used here is the same across the two analyses.    12:44:23 (Witness reviews document)  If that's true, then that would be what the table is implying.

Q.  So if that's true, then these developers generate about twice as much revenue from other

Page 60

channels than they do from the Google Play Store, correct?

A.  That's what the numbers seem to say.

Q.  And the numbers say that they generate as much as 25 percent of the revenues on average from    12:45:19 channels other than the App Store and the Google Play Store, right?

A.  That's true.

Q.  Do you think it's unlikely that all of these 25 percent revenues were generated by mobile    12:45:29 users who were contacted directly and encouraged to process subscriptions away from the App Store, right?

MR. BURT:  Objection to form.

Q.  It's in Paragraph 62 of your report.    12:45:47

A.  I do, yes.

Q.  Do you think it's unlikely that 10 percent of these revenues were generated by those means?

A.  I think the two examples they give here of firms that have dominant revenue streams that are    12:46:07 generated outside of app stores are examples of -- The Athletic, of course, is very common to -- it's basically a division of the New York Times, and so we go to the website to sign up for that extra

Page 61

16 (Pages 58 - 61)

sports content that we're all craving.

So it's not typically I think somebody who is trying to buy it on the app and is suddenly shunted over to a different place to buy it. For title, I can't speak as much to that. So I don't     12:46:40 know what the percentage is I think is the answer to your question.

Q. And whatever means by which this 25 percent of revenue arrived, do you agree that it likely came from users who had mobile phones?     12:47:01

A. I would say that the majority of our users actually do have mobile phones. I think these folks are obviously multihoming, in a sense. And they're looking to -- I'm not sure if prices are differentiated between the channels here. But     12:47:28 basically for the New York Times, it certainly doesn't surprise me that that's often regarded as an add-on to their digital subscription.

Q. Would you agree that the app developers in this analysis of yours were competing for users     12:47:41 across multiple channels?

MR. BURT: Objection to form.

A. So The Athletic is more of a newspaper type of content, reading content. So when you say

Page 62

"competing across multiple channels," you mean that I'm competing against, like, websites and other places I might get that similar content?

Q. Sure. Whether IOS or Android or Web browsers.     12:48:18

A. It would seem reasonable.

Q. To analyze -- let me ask you this: You have a figure of around 25 percent here from this analysis. Do you have an opinion as to how representative that result is?     12:48:40

A. I think the sample obviously is constructed purely using only the subpoenaed respondents, who provided a breakdown of revenues by type. And so I can't verify that this is representative of the entire genre -- the universe of apps. So I'm really     12:49:01 using this as a set of case studies where we have granular data, which we don't often have access to.

Q. Do you rule out the possibility that the percentage of revenue generated by other sources not the App Store, not the Google Play Store, is greater     12:49:28 than 25 percent for the universe of developers?

A. I can't make an assertion about that from the data I have here.

Certainly if you go back to studies of

Page 63

multihoming, which suggest there are a lot of people who are only present on App Stores, for them, obviously, revenue can only come within App Stores.

So as to the balance of how much they represent versus the rest of the universe, I don't     12:49:59 have that information.

Q. Well, even developers who are only in app stores can, for example, obtain subscription revenue through their websites, can they not?

MR. BURT: Objection, incomplete     12:50:15 hypothetical.

A. That's hypothetically possible. But I think in this case, where somebody has an IOS-focused app -- let's say they just have an app on the IOS store. It would seem -- and we talked     12:50:37 about this in the rebuttal -- that trying to encourage them to leave the App Store, to sign up and buy things on a different channel, is actually going to be quite a cumbersome process and introduces a lot of frictions. So it would be     12:50:54 unusual to see that.

Q. Do you subscribe to Netflix?

A. I do.

Q. Did you find that a cumbersome process?

Page 64

A. Well, Netflix is a huge player that I believe doesn't allow you to sign up for a subscription through the App Store.

So once upon a time, I think I did subscribe through the App Store, and then I was     12:51:20 forced not to, so...

Q. Were you forced not to?

A. Or not have a Netflix subscription, you mean?

Q. Yes.     12:51:34

A. I mean, I --

Q. Do you recall at some point being told that your subscription was terminated?

A. I don't remember the mechanics of how it happened. I just remember having to do something     12:51:41 different than I normally do.

Q. I apologize if I've already asked this. Do you have an iPhone?

A. I do, yes.

Q. I remember that.     12:51:50

A. It's on the desk behind me.

Q. Good for you.

Did you explore whether other data has been produced in this manner by developers that would

Page 65

17 (Pages 62 - 65)

show the share of revenue that is generated through the App Store and other channels?

A. I was primarily focused on the subpoenaed data, which was produced specifically for the purpose of generating gross margin ranges, and then public information that was available that might help me to supplement that data, in addition to my own judgment.

Q. Do you know if Microsoft produced data that shows revenue from other channels?

A. I don't know, I'm sorry.

Q. Do you know if the MatchGroup produced such data?

A. The dating company?

Q. I believe so. None of us know about that. But wild guess, yes, I think so.

A. Obviously, we accessed the 10Ks of many of these companies. So if that's in a 10K, we may have seen that. If it's not in a 10K, I don't know if I've seen it.

Q. Have you seen such data about multiple sources of revenue from Epic Games?

A. No. The Epic Games submission that was -- that we talked about in the last deposition, they

Page 66

provided some financials, but it was about their App Store, which didn't seem particularly relevant to apps. It would be more comparable to the profitability of the App Store.

Q. Have you seen any data from Roblox, R-O-B-L-O-X, indicating its revenue sources?

A. We have the 10Ks, and we use those in our analysis. I don't recall if they split out their numbers by source. If they're in one of the tables here, then it's possible they did.

Q. Do you recall whether any other experts who opined in this case had analyzed the share of revenues that developers earn through the App Store compared to other channels?

A. I don't want to guess, so I just don't know.

Q. Would it surprise you to learn that only 4.2 percent of Hulu's revenues occurred through the App Store in 2020?

MR. BURT: Objection to form and foundation.

A. Nothing really surprises me in this case.

MR. SWANSON: Well, then I won't ask the next question.

Page 67

We're close to time out, in any event. But, Tom, if it's okay with you, if we can take a brief break, and then I can see if I'm wrapped up.

MR. BURT: Sure, that's fine.

THE VIDEOGRAPHER: We are now going off the record at approximately 12:55 p.m.

(Recess taken from 12:55 to 1:05)

THE VIDEOGRAPHER: We are back on the record at approximately 1:05 p.m. This is the beginning of Media Unit No. 4.

Go ahead, Counsel.

BY MR. SWANSON:

Q. Just to wrap it up, if the existence of other data produced in discovery had been brought to your attention -- data that indicated developer sources of revenue in addition to the App Store -- would you have included that additional information in your analyses?

MR. BURT: Objection to form, incomplete hypothetical.

A. I mean, I'd obviously have to see if there's more data available and take a look at it.

MR. SWANSON: All right. I've got nothing further at this time.

Page 68

MR. BURT: I think I have just a very few questions I wanted to ask.

CROSS EXAMINATION

BY MR. BURT:

Q. Professor, can you remind me the RIM note -- the RIM teaching note, what year was that prepared?

A. I think it was 2013 or '14. So 12 years ago.

Q. Okay. And if I understood you correctly, the Figure 1 was earlier than that? Do I have that right?

A. Yes. So I say that some of the initial work on two-sided platforms, ways to think about them, obviously was developed in the single-digit 2000s. So there was a figure that was taken from one of those papers. Things have come a long way since then.

Q. And if I understood you correctly, you've never taught that -- you were a coauthor of that case, but you never taught it?

A. I have not taught it. I have a pretty high bar in terms of deciding when I want to teach something and why I want to teach it. And it helped

Page 69

18 (Pages 66 - 69)

to have a -- to be kind of the main case developer and having done the interviews and having done kind of the background work for it. So it's much easier for me to teach cases in that scenario.

Q. Hypothetically, if you were to decide that 13:07:50 you wanted to teach that case today, would you pick up that teaching note and teach it as it exists now or something else?

A. I would absolutely have to update it, because so much has happened since that time. Our 13:08:09 understanding of the dynamics in these marketplaces has evolved. The technical options available to developers have evolved as well. So it could be certainly a very rich case at this point in time.

Q. Changing topics, do you express any opinion 13:08:29 about the existence or amount of cross-sided network effects concerning the Apple App Store?

A. No, I was not asked to do that, and neither did I do it.

Q. Okay. Do you have a basis to -- withdrawn. 13:08:44

MR. BURT: No further questions.

MR. SWANSON: All right. Thank you, Professor. I appreciate it.

THE VIDEOGRAPHER: We are now going off the

Page 70

record.

THE WITNESS: Thank you, Mr. Swanson. It was a pleasure.

THE VIDEOGRAPHER: We are off the record now at 1:08 p.m.                    13:09:04

THE COURT REPORTER: Does anyone need a rough?

MR. BURT: Yes, we'll take a rough.

MR. PHILLIPS: Yes, we'll take one also.

(Whereupon, the deposition was concluded at 1:08 p.m.)

Page 71

REPORTER'S CERTIFICATE

I, Jane M. Werner, RMR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 19th day of June, 2025, at 11:01 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 20th day of June, 2025.

*Jane M Werner*

Notary Public

Commission expires 1/27/2028

Page 72

Thomas H. Burt, Esq.
burt@whafh.com
                    June 20, 2025
RE: In Re Apple Iphone Antitrust Litigation
6/19/2025, Alan D. MacCormack, (#7436186).
The above-referenced transcript has been
completed by Veritext Legal Solutions and
review of the transcript is being handled as follows:
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
   to schedule a time to review the original transcript at
   a Veritext office.
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
   Transcript - The witness should review the transcript and
   make any necessary corrections on the errata pages included
   below, notating the page and line number of the corrections.
   The witness should then sign and date the errata and penalty
   of perjury pages and return the completed pages to all
   appearing counsel within the period of time determined at
   the deposition or provided by the Code of Civil Procedure.
   Contact Veritext when the sealed original is required.
__ Waiving the CA Code of Civil Procedure per Stipulation of
   Counsel - Original transcript to be released for signature
   as determined at the deposition.
__ Signature Waived – Reading & Signature was waived at the
   time of the deposition.

Page 73

19 (Pages 70 - 73)

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 74

In Re Apple Iphone Antitrust Litigation

Alan D. MacCormack (#7436186)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Alan D. MacCormack)        Date

Page 76

C E R T I F I C A T E

I, ALAN D. MacCORMACK, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2025.

_____

ALAN D. MacCORMACK

Page 75

20 (Pages 74 - 76)

**[& - 75]**

**&**

**&** 2:3,6,12,17 3:18 50:19,22 51:3 73:24 74:10

**0**

**06714** 1:6 4:11

**1**

**1** 1:24 4:6 15:7 15:9,18 16:5 17:22 18:15,24 29:21 35:15 43:14 45:14 46:16,20,21 69:11 74:1
**1/27/2028** 72:24
**10** 61:17
**100** 16:15 17:13 18:2 19:20 20:2 58:23
**10016** 2:4
**109** 59:11
**10k** 66:18,19
**10ks** 66:17 67:7
**112** 3:12 4:3 5:12 6:15,22
**113** 3:14 34:17 34:19 36:8
**114** 3:17 50:15 50:17
**11:01** 1:18 4:5 72:6

**11:04** 6:7
**11:07** 6:10
**12** 19:14 40:19 60:14 69:8
**12:08** 49:14,15
**12:27** 49:15,17
**12:55** 68:6,7
**13** 42:12 56:23 59:7
**14** 15:5 69:8
**14:11** 4:11
**15** 22:3 57:19
**1615** 2:8
**17** 29:21
**1700** 2:18
**19** 1:18 4:6 20:24 32:6
**19th** 72:5
**1:05** 68:7,9
**1:08** 71:5,11

**2**

**2** 6:11 59:13 60:7,10,11
**20** 58:13 73:3
**2000s** 69:16
**20036** 2:9,18
**2008** 44:12 47:17 48:7 49:9
**2013** 69:8
**2016** 57:18 58:14,22
**202.326.7900** 2:10

**202.955.8500** 2:19
**2020** 67:19
**2022** 57:10
**2023** 58:14,23
**2025** 1:18 4:6 72:6,20 73:3 75:10
**2025.520** 73:9 73:12
**20th** 72:19
**21** 19:15,16
**212.545.4600** 2:5
**213.229.7430** 2:15
**23** 59:14 60:11
**25** 61:5,10 62:8 63:8,21
**27** 22:3
**270** 2:4
**28623** 72:22

**3**

**3** 49:18
**3,000** 57:11
**30** 30:7 56:23 74:1
**31** 29:24 56:6
**333** 2:13
**34** 3:16
**36** 57:12

**4**

**4** 3:13 37:14 38:15 68:10

**4.2** 67:18
**400** 2:8
**41** 53:13
**4:11** 1:6

**5**

**5** 3:5 44:10 45:12 51:6
**5-0** 10:23
**50** 3:19 10:18 10:23 58:14 59:17
**56** 32:7,20,21
**58** 59:3
**59** 60:1

**6**

**6** 8:11 51:12
**6/13/25** 3:13
**6/19/2025** 73:5
**60** 19:6 56:17 56:21
**62** 61:15
**63** 60:8,15
**64** 56:5
**68** 34:6 50:20 57:7
**69** 3:6

**7**

**7** 11:5
**70** 16:8 17:4
**71** 59:7
**7436186** 1:23 73:5 76:2
**75** 60:3,15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[76 - app]**

| | | | |
|---|---|---|---|
| **76** 1:24 | **acquisition** | **advertising** | **analyses** 16:4 |
| **7th** 11:22 12:14 | 14:16 18:8 | 54:14,19,20 | 60:20 68:18 |
| **8** | 27:11 29:11 | 55:22 56:19,22 | **analysis** 8:17 |
| **8** 8:12 | **action** 1:5 | **affect** 55:1 | 8:21 9:2 22:7 |
| **82** 57:12 | 72:17 | **affirming** | 22:21 25:10 |
| **89** 53:12 | **actual** 55:5 | 43:21 | 28:13 57:10,12 |
| **9** | **actually** 9:8,9 | **affixed** 72:19 | 59:22 62:20 |
| **9** 20:22 | 12:21 14:14 | **aggregate** | 63:9 67:8 |
| **90071-3197** | 17:20 19:5,6 | 31:20 | **analyze** 35:22 |
| 2:14 | 25:21 31:12,16 | **ago** 25:20 | 63:7 |
| **a** | 32:19 33:1 | 47:16 69:9 | **analyzed** 67:12 |
| **a.m.** 1:18 4:5 | 36:21 37:7 | **agree** 12:17 | **analyzing** |
| 6:7,10 72:6 | 44:7,11 45:8 | 25:15 26:1 | 35:20 |
| **above** 16:8,15 | 48:22 59:20 | 27:23 33:9,12 | **android** 26:11 |
| 18:2 45:13 | 62:12 64:18 | 33:16,20 40:18 | 26:18 27:1,2 |
| 73:6 | **ad** 55:12 | 54:8 55:9 56:8 | 27:10,14 46:1 |
| **absolutely** 70:9 | **adapted** 49:10 | 56:17 57:18 | 49:1,7 63:4 |
| **academic** 47:18 | **add** 18:13 | 59:16 62:9,19 | **angeles** 2:13 |
| **accepted** 44:20 | 62:18 | **ahead** 6:12 | **answer** 13:1 |
| **access** 32:4 | **adding** 17:18 | 18:21,22 26:11 | 18:22 25:13,21 |
| 63:17 | **addition** 66:7 | 47:21 49:19 | 37:13 55:16 |
| **accessed** 66:17 | 68:16 | 55:16 68:11 | 62:6 |
| **account** 14:16 | **additional** 20:1 | **aholman** 2:10 | **answers** 35:7 |
| **accountants** | 28:7 68:17 | **alan** 1:10 3:4 | 35:10,13 36:1 |
| 13:23 14:19,22 | **address** 38:17 | 3:12 4:7 5:1 | **anti** 8:4 |
| **accounting** | **adjust** 18:11 | 73:5 75:3,15 | **anticompetitive** |
| 13:15,20 14:20 | **adjustments** | 76:2,24 | 7:23 |
| 14:23 | 17:23 | **allow** 44:19 | **antitrust** 1:6 |
| **accounts** 14:9 | **adler** 2:3 | 65:2 | 4:8 73:4 76:1 |
| **accurate** 75:7 | **adobe** 16:20 | **allowed** 44:13 | **anybody** 33:2 |
| **acquire** 19:24 | **adopt** 41:2 | 59:21 | 47:6 |
| 28:21 | 43:10 52:2 | **alluded** 26:20 | **anyway** 35:16 |
| **acquiring** | **adopting** 50:2 | **amount** 8:8 | **apologize** 65:17 |
| 22:23 | **adoption** 58:2 | 55:19,21 70:16 | **app** 8:17 9:11 |
| | | | 15:20 16:17,23 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[app - background]**

17:6,16,18
18:14 19:6
20:15 23:9
24:2,4 25:16
26:2,8,24 27:1
27:6 33:4,7,12
33:16,20 37:11
38:7 39:7
41:14 45:4,9
45:22 48:1,4
48:17 53:17,23
54:3,4,16 55:9
55:10,12 56:18
56:18,21,22
57:5 58:12,12
58:22 60:4,9
61:6,12,21
62:3,19 63:20
64:2,3,7,14,14
64:17 65:3,5
66:2 67:1,4,13
67:19 68:16
70:17
**appear** 50:23
**appearances**
4:16
**appeared** 2:2
**appearing** 1:12
1:16 73:18
74:7
**appendix** 10:19
**apple** 1:5 2:24
4:8 7:19 8:3
17:7 26:2 27:9
33:12,16,20

43:20 44:5,13
44:18 45:18
47:23 48:15
49:2 54:10,24
57:18 60:9
70:17 73:4
76:1
**apple's** 7:23
44:1 60:4
**application**
37:21 41:2,11
42:3,21 44:15
47:11
**applications**
41:4
**apply** 31:9
**appreciate** 57:8
70:23
**approach**
26:19 29:9
44:13
**approaches**
56:2
**approximately**
4:5 6:10 49:14
49:17 56:17
68:6,9
**apps** 23:10,10
23:18 24:10,11
24:23 26:2
27:4 33:6,7
37:8 40:9
41:13 44:6,14
44:19 46:2
47:23 49:1

53:23 54:17
57:12,14 63:15
67:3
**architecture**
43:11,21 44:1
44:5,19 45:13
45:14,24 50:2
**area** 10:13 58:6
**areas** 10:9
**argument** 12:3
**arrive** 36:5
**arrived** 62:9
**arrows** 37:22
**article** 47:17
**ashley** 2:8
**aside** 53:9,10
**asked** 13:14
65:17 70:18
**asserting** 12:23
**assertion** 45:10
63:22
**assertions** 8:3
59:24
**assignment** 7:5
12:21 28:16,16
**assisted** 9:16
**associated** 9:1
34:13 35:4
51:2 56:4
**assume** 53:22
57:24
**assumes** 9:2
27:24
**athletic** 61:22
62:23

**attempting**
49:24
**attention** 25:20
68:15
**attorney** 72:14
72:16
**attract** 23:3
37:11
**attractive** 52:5
**auto** 57:19
**available** 5:10
24:18 36:6
40:10 50:6
52:5 55:20
66:6 68:22
70:12
**avenue** 2:4,13
**average** 16:8
16:14,17 17:3
19:7 20:5 31:5
60:2,8 61:5
**avoid** 55:23

**b**

**b** 3:9 67:6 74:1
**back** 5:19 6:9
17:19 18:13
28:15 31:23
39:10 43:14
46:18 48:11
49:16,21 50:20
53:11 63:24
68:8
**background**
70:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[balance - certainty]**

balance 56:15 64:4

ball 5:17

bar 69:23

barnes 3:17 50:19,22 51:3

based 55:12

basically 9:2 14:9 19:1 24:3 26:9 30:16 31:2,20 37:1 61:23 62:16

basis 13:7 22:21 70:20

beginning 6:11 49:18 68:10

believe 18:15 22:6 44:12 65:2 66:15

believed 42:9

benefit 20:15 20:20

benefits 24:12 39:24 41:13

benefitting 42:5

better 5:21 12:7

bigger 24:1

biggest 22:16

billings 58:12 58:21

bit 14:7 30:22 40:23 41:24 45:1 46:3

blackberries 39:4

blackberry 38:19,22 43:10 50:4

book 3:18 52:2 52:3

books 51:22

boston 1:12

bottom 42:13 43:15,18 51:8

break 49:12,21 68:3

breakdown 63:13

brief 68:3

broader 46:5

broke 59:21

brought 68:14

browsers 63:5

bucketed 29:9

built 39:9

bunch 46:1

burt 2:4,5 3:6 6:3 9:23 10:21 11:14 12:20 14:6 18:3,19 18:20,21 20:6 21:20 22:13 23:7 24:15 25:6,11,18 27:5 28:2 33:10,14,18,22 38:24 40:8,17 41:9,21 43:6

45:7 48:20 51:23 52:14 53:1,6 54:11 55:3,14,15 56:24 58:4,15 58:24 60:17 61:14 62:22 64:10 67:20 68:4,19 69:1,4 70:21 71:8 73:1,2

business 10:12 17:15,18 20:13 34:7 35:8 38:9 54:21

businesses 18:6

buy 47:7 62:3,4 64:18

buying 33:5

**c**

c 4:1 10:19 13:16 75:1,1

ca 2:14 73:9,12 73:21

calculate 28:16

calculates 12:15

calculating 10:11

calculations 16:1

california 1:2 4:10

call 38:2 43:10

called 1:11 5:2 13:20

calling 11:15

calls 33:22

capture 38:11

capturing 30:13 46:11

careful 46:12

carried 30:6

case 4:11 7:16 10:9 15:14 16:19 34:7,14 35:4,8 36:9 37:3 39:11 42:23 45:4,8 46:4,14 48:22 49:23 50:19,21 51:3 63:16 64:13 67:12,22 69:21 70:1,6 70:14

cases 46:5 70:4

cause 72:10

ccp 73:9,12

ceo 26:8

certain 7:6 10:1 49:4

certainly 21:12 23:22 24:17 25:24 27:17 29:14 33:24 38:13 62:16 63:24 70:14

certainty 25:14

**[certificate - considerable]**

certificate  72:1
certified  2:9
certify  72:5,14
  75:3,5
change  76:4,7
  76:10,13,16,19
changed  41:24
changing  70:15
channel  64:18
channels  17:16
  61:1,6 62:15
  62:21 63:1
  66:2,10 67:14
charge  53:23
charges  54:24
check  15:12
checking  60:19
chicken  37:10
choice  54:8
  55:1
choices  36:6
choose  27:24
  41:2,3 50:10
chooses  54:12
chris  46:3
circling  5:17
cite  32:9
citing  8:5 32:24
civil  1:5,14
  73:19,21
claim  19:10
class  2:9 8:9
  35:12 38:16
clear  20:19

close  20:2 68:1
closed  43:10,21
  44:1,5,9,16,24
  44:24 45:12,24
  47:14 48:16,19
  50:2,8
closedness
  35:23 46:13
closer  17:13
cma  32:10
coauthor  69:20
code  73:9,12,19
  73:21
cogs  13:16 14:9
collaborative
  10:3
combination
  60:4
come  5:22 6:3
  29:7 52:18
  55:22 56:16
  64:3 69:17
comes  47:20
comfortable
  12:23
commencing
  1:18
commission
  15:18,20 16:18
  17:19 54:9,13
  54:15,16,24
  55:10,17 56:23
  57:1,19 58:1
  58:18 59:2
  72:24

commissions
  14:17 16:1,13
  17:6,10 18:14
  27:8 55:23
common  61:22
commonly
  44:20
commonwealth
  1:16 72:4
communicate
  22:17 35:19
communicati...
  21:16,24
companies
  17:17 19:12
  24:1 66:18
company  66:14
comparable
  16:3 17:20
  67:3
compared
  67:14
comparison
  35:17 46:22
compete  22:10
  23:5 24:8,13
  24:23 25:4
competing
  35:24 62:20
  63:1,2
competition
  23:2 25:8 34:8
  37:4
competitive  8:4

complements
  45:18
complete  6:23
completed  73:7
  73:17 74:6
completion
  74:11
concept  13:16
  13:20 20:9
  23:23 28:6
  40:2 51:18
concepts  22:16
concern  12:10
concerning
  70:17 72:9
concessions
  41:15
concluded
  71:11
conclusion
  33:23 52:18
conduct  7:23
  8:4 10:12
conducting
  10:12
confirm  5:15
  6:18 28:3 35:3
  51:1
connecting
  37:23
connects  33:6
consider  36:24
  54:5 55:24
considerable
  42:20

**[considering - deducted]**

| | | | |
|---|---|---|---|
| **considering** 23:11 | **copy** 5:12,15 6:15,19 35:3 51:2 | 20:8 27:3,19 28:18 29:1,5,7 29:8,16 30:12 30:19 31:10,13 31:21 32:4 56:16 | **d** |
| **console** 24:14 25:1,5 31:22 | **cornerstone** 2:23 | | **d** 1:10 3:1,4,13 4:1,7 5:1 73:5 75:3,15 76:2 76:24 |
| **consoles** 24:6 | **correct** 7:5,9 11:9 13:21 14:1,2 15:10 16:2 17:4,8 21:11 22:6 30:1 43:12 44:2,6 45:11 45:22 46:17 47:12 61:2 | | **damages** 8:9 |
| **constructed** 63:11 | | **counsel** 1:11 5:2 6:12 10:14 21:6 49:19 68:11 72:15,16 73:18,22 74:7 | **daniel** 2:13 |
| **constructs** 22:16 | | | **data** 12:3 15:23 18:11 20:18 30:18 31:1,14 31:16,20 59:6 59:23 63:17,23 65:23 66:4,7,9 66:13,21 67:5 68:14,15,22 |
| **consumer** 33:17 39:8 | | **couple** 36:14 | |
| **consumers** 33:7 33:8 36:22 37:6,8 52:1,6 | | **course** 13:11 27:9 37:13 44:17 46:8,9 61:22 | **dataset** 30:11 30:23 |
| **contact** 73:9,20 | **corrections** 73:14,15 74:3 74:4 75:7 | | **date** 4:5 73:16 74:5 76:24 |
| **contacted** 61:11 | | **court** 1:1 4:10 4:14,18 71:6 | **dated** 3:13 75:9 |
| **contain** 6:22 | **correctly** 69:10 69:19 | **craving** 62:1 | **dating** 66:14 |
| **content** 25:17 52:4 53:24 55:13 62:1,24 62:24 63:3 | **corresponden...** 21:5,9,12,19 | **creation** 38:10 | **david** 2:24 |
| | | **cross** 3:3 40:3 51:14,20 52:10 69:3 70:16 | **day** 72:5,19 75:9 |
| | **corresponds** 50:18 | | **dc** 2:9,18 |
| **contribution** 13:20,23 14:5 14:11,15 15:13 15:15,16 | **cost** 12:19 13:13,16,17,24 14:9,20 20:4,5 20:18 22:23 27:7 28:1 31:4 31:5 56:3,12 | **crutcher** 2:12 2:17 | **debating** 36:4 |
| | | **cumbersome** 64:19,24 | **decide** 10:4 70:5 |
| **control** 31:2,6 44:21 45:15 49:3 | | **currently** 6:24 | **deciding** 53:5 69:23 |
| | | **customers** 22:22 36:22 37:21 38:7 40:24 42:3,21 | **decisions** 46:12 |
| **controlling** 16:22 | **costs** 8:24 9:3 12:15,18 13:4 14:4,12,16,23 15:1,18,20 18:9,9 19:2,9 19:11,21 20:2 | | **declarations** 11:2 |
| **controversy** 72:9 | | **cv** 1:6 4:11 | **deducted** 16:14 |
| **convey** 18:16 49:24 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[deep - disposable]

deep 12:22
defendant 1:12
  2:20 5:3
define 13:23
  28:12
defined 28:17
definitely 15:17
  45:10
definition 7:15
degree 35:22
  35:23 40:9
  46:13 49:6
degrees 48:21
  49:8
delivering
  14:10
demand 37:12
  41:15 47:1
denominator
  60:19
deny 28:3
depending 14:7
  32:2 47:8
depict 38:3
deposition 1:10
  4:7,12 9:18
  11:12,19 12:8
  21:15 34:5,12
  66:24 71:10
  72:12 73:19,23
  73:25 74:8,11
describe 45:12
  45:14 50:9
described
  33:24 34:2

description
  40:13,14 52:9
descriptive
  41:20
desk 65:21
determine
  52:12
determined
  73:18,23 74:7
determining
  52:23 53:2
develop 23:10
developed 9:15
  49:9 69:15
developer 13:4
  13:11 14:4
  26:24 27:3
  30:8,17,18
  31:3,5,7 33:17
  44:16 47:11
  54:5 57:13
  68:15 70:1
developer's
  13:13 54:8
developers
  8:18 9:11 13:8
  14:8,13 15:10
  15:13 18:1
  19:21,24 20:15
  21:5 22:10
  23:1,2,5,6,9
  24:2,8,13,14
  25:4,5 26:1
  27:24 30:10,14
  30:24 31:21

33:7 36:23
37:7,11,21
38:8 40:16
41:3,12,14
42:3,21 53:23
54:19 55:1,10
57:5 58:3 59:7
59:10,17 60:2
60:8,13,23
62:19 63:21
64:7 65:24
67:13 70:13
developing
  46:4
development
  19:15
device 24:20
  39:10 44:14,23
  49:2,5
devices 23:14
  45:17
diagram 37:20
  38:2,16 39:13
  40:23 44:7
dictated 47:23
differ 27:9
difference 26:4
  26:18 27:13
differences
  14:15 30:14
  31:3
different 14:14
  30:12 35:18
  39:18 44:13
  52:21 55:4

56:2 62:4
64:18 65:16
differentiated
  62:15
differently 26:5
dig 12:22 46:15
digit 69:15
digital 6:15
  8:24 9:1,4 22:7
  22:11 25:10
  28:13 62:18
dimensions
  35:21 50:9
direct 3:3 5:7
  14:9,23 50:1
direction 9:15
  10:2 72:12
directly 15:3
  61:11
disbelieve
  59:19
discovery
  68:14
discuss 29:19
  29:23 50:2
discusses 43:9
  43:19
discussion 6:8
  10:14 37:19
  51:14
disentangling
  29:6
disposable
  26:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [disposal - executives]

**disposal** 26:22 30:23
**dispute** 25:22
**distributor** 44:6 45:18,21
**district** 1:1,2 4:10,10
**diverse** 30:11
**diversity** 20:18
**division** 1:3 61:23
**doctor** 55:15
**document** 4:2 5:14 12:5 32:22 34:18 50:16 60:21
**doing** 22:21
**dollars** 26:22
**domain** 8:6
**dominant** 42:16,19,23 61:20
**dominated** 42:22
**doubt** 12:16
**download** 6:1 25:16 54:2
**downloads** 54:13
**dr** 11:5,8,11,21 12:2,13
**draft** 9:22
**drafted** 10:2
**drawn** 44:12 47:17

**driver's** 5:4
**dswanson** 2:15
**duly** 5:5 72:7
**dummy** 30:16
**dunn** 2:12,17
**duolingo** 17:1,3 17:6,12,24 26:6,19
**dx** 4:2 5:12 6:15,22 34:6 34:17,18 36:8 50:15,16,20
**dynamics** 70:11

### e

**e** 3:1,9,18 4:1,1 51:22 52:2 73:9,12 74:1 75:1,1 76:3,3,3
**e.g.** 45:16
**earlier** 69:11
**earn** 67:13
**easier** 23:15 33:2 49:1 70:3
**easy** 48:24
**economics** 22:18,19 28:6 39:22
**economies** 20:10,16,20
**ecosystems** 32:10
**effects** 30:8 31:2,7 39:21 40:3,7 51:9,13

51:14,18,21 52:10,13,22 53:4 70:17
**effort** 21:15
**egg** 37:10
**eisenmann** 48:12
**either** 7:3 8:18 13:5 25:16 43:1
**electronically** 53:10
**elements** 49:3 55:24
**employed** 72:15,16
**encourage** 64:17
**encouraged** 61:11
**engaged** 8:4
**engaging** 35:12
**entered** 48:15
**entire** 18:6 29:2 63:15
**entitled** 3:14,17 34:8
**entry** 48:18
**epic** 66:22,23
**equal** 28:1
**equally** 26:13 26:14
**equation** 38:6
**errata** 73:14,16 74:3,5

**errors** 7:2
**esq** 2:4,8,13,18 73:1
**estimate** 13:4,6 13:12
**estimating** 13:11
**event** 48:9 68:1
**everybody** 38:12
**evident** 51:21 52:13,17
**evolved** 46:7 70:12,13
**ex** 3:10
**exactly** 9:20 13:8 44:17 47:13
**examination** 5:2,7 69:3 72:11
**examine** 59:24
**examined** 5:5 57:11 72:10
**example** 14:18 16:20 26:7 31:22 32:3 40:12 45:18 64:8
**examples** 53:7 61:19,21
**excitement** 34:20
**executives** 22:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [exerts - form]

**exerts** 45:15
**exhibit** 3:12,14
   3:17 4:3 5:14
   6:3 34:6,17,19
   34:21 40:6
   50:15,17,21
**existence** 8:8
   41:13 68:13
   70:16
**exists** 70:7
**expect** 27:2
   54:4
**expensive**
   27:11
**expert** 3:12
   11:1 15:24
   17:12 58:8
**experts** 67:11
**expires** 72:24
**explained**
   26:17
**explains** 12:14
**explore** 50:5
   65:23
**express** 6:24
   70:15
**extensively**
   55:19
**extent** 11:14
   15:1 17:17
   24:4 25:7
**extra** 28:7
   61:24
**extract** 23:4

**extremely**
   30:11

### f

**f** 75:1
**facing** 55:10
**fact** 8:1 12:1
   21:21 26:20
   29:12 39:23
   47:23 56:15
   57:21
**factors** 56:4
**factual** 8:3
**fair** 16:11 21:7
   21:8 53:21,22
   55:7
**fairly** 43:7
**familiar** 20:9
   23:24 28:5
   54:21 57:21
**far** 55:20
**favor** 56:12
**feature** 26:10
   44:4
**federal** 1:13
   74:1,8,10
**feel** 21:3
**fees** 55:10
**figel** 2:6
**figure** 15:6,9
   15:18 16:5
   17:20 18:13,15
   18:24 35:15
   44:11 45:13
   46:16,20,21
   47:17 63:8

   69:11,16
**figures** 16:22
**filed** 4:9
**fill** 32:3
**filled** 39:18
**finally** 42:2
**financial** 15:15
   15:23 18:5
**financially** 18:5
   72:17
**financials** 14:8
   67:1
**find** 12:5,13
   15:15 22:20
   64:24
**findings** 8:1
**fine** 68:4
**firm** 4:15 39:6
**firms** 10:12
   18:10 19:2,4,5
   19:10 22:15,15
   22:18,20 54:22
   61:20
**first** 5:5 9:21
   21:15 32:19
   36:8,14 46:3
   53:15 56:8
   57:20
**fit** 40:14
**fits** 31:14 40:13
**fix** 5:24
**fixed** 14:20
   15:3 30:8 31:1
   31:7

**flip** 42:12 57:7
**focus** 8:12,15
   15:6 23:9 46:8
**focused** 10:8
   39:6 58:10
   64:14 66:3
**focuses** 23:21
**focusing** 17:1
   24:7 53:15
**folks** 44:22
   62:12
**follows** 5:6
   73:8
**footnote** 12:4
   20:24 21:1,4
   32:7,9 59:10
**forced** 65:6,7
**foregoing** 75:4
**forget** 13:8
**form** 9:23
   12:20 14:6
   18:3,19,21
   24:15 25:11,18
   27:5 28:2
   33:10,14,18,22
   38:24 40:8,17
   41:9,21 43:6
   45:7 48:20
   51:23 52:14
   53:1,6 55:3
   56:24 58:4,15
   58:24 60:17
   61:14 62:22
   67:20 68:19

**[foundation - happy]**

| | | | |
|---|---|---|---|
| **foundation** 67:21 | **games** 23:13 24:17,22 25:1 31:22 66:22,23 | 47:7 48:11 49:19 50:20 52:1 53:11 | **greater** 19:21 63:20 |
| **founding** 22:14 | **gaming** 57:14 57:14 | 55:16 57:3 61:24 63:24 | **gross** 8:17,22 9:1,4,6,10 |
| **four** 29:23 50:9 | **general** 14:9,22 15:14 20:20 | 68:11 | 10:11 13:6,11 |
| **framework** 35:17 | 21:2 28:5 32:23 | **goes** 30:19 | 13:12 14:4,19 14:22 15:9 |
| **frameworks** 35:14 | **generate** 60:2,8 60:24 61:4 | **going** 4:4 6:6,9 21:2 24:5 | 16:1,8,14 17:3 17:21 18:1,6,7 |
| **frcp** 74:1 | **generated** 29:15 56:18,22 | 35:16 39:10 49:11,13,16 | 19:3,7,19 20:2 22:24 27:17 |
| **frederick** 2:7 | 57:13 60:13 | 64:19 68:5 | 28:16 29:2 |
| **free** 21:3 | 61:10,18,21 63:19 66:1 | 70:24 | 66:5 |
| **freeman** 2:3 | **generating** 66:5 | **good** 5:10,11 5:18 8:24 9:1,4 | **grothouse** 2:24 |
| **frictions** 64:20 | **genre** 13:6,12 | 14:10 32:18 35:2 48:12 | **groups** 42:4 |
| **friend** 48:12 | 16:18 63:15 | 65:22 | **guess** 10:3 33:11 34:17 |
| **front** 6:15 27:10 | **genres** 58:21 | **goods** 13:16 22:7,11 25:10 | 37:17 44:21 46:1 47:5,22 |
| **full** 30:22 37:18 | **getting** 5:17 38:13,13 | 28:14 | 53:10 66:16 67:15 |
| **fully** 44:24 | **gibson** 2:12,17 | **google** 17:7 22:19 23:10 | |
| **function** 26:10 | **gibsondunn.c...** 2:15,19 | 26:3,18 31:10 60:15 61:1,6 | **h** |
| **functionality** 24:12 39:9 | **give** 20:19 29:9 61:19 | 63:20 | **h** 2:4 3:9 73:1 76:3 |
| **further** 36:11 38:15 41:11 | **given** 29:4 58:16,18 72:13 | **google's** 60:4 **gosh** 47:5 | **haldenstein** 2:3 |
| 44:8 68:24 70:21 72:14 | **go** 5:19,23 6:4 6:12 18:21,22 | **gouging** 43:1 **grade** 28:11 | **half** 37:17 **halifax** 1:17 |
| 75:5 | 28:15 30:19 31:23 34:20 | **grand** 2:13 **granular** 63:17 | **hand** 46:17 72:18 |
| **g** | 35:20 46:18 | **great** 6:18 39:17 51:1 | **handled** 73:8 |
| **g** 4:1 13:16 | | | **hansen** 2:6 |
| **gain** 36:24 | | | **happened** 65:15 70:10 |
| **gallagher** 2:22 4:13 | | | **happy** 13:10 42:24 |
| **game** 23:5,6,15 23:18 24:13,14 24:17 25:4,5 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[harder - ios]

harder 15:15
hardware 45:23
harry 2:18
harvard 20:12 34:7
head 12:4 28:9
heading 11:5 36:9 51:13
heavily 55:12
held 4:12
help 66:7
helped 69:24
helpful 24:19
hereinbefore 72:6
hereto 72:16
hereunto 72:18
herz 2:3
high 9:4,7,12 69:22
highly 18:4
hitt 7:7,10 10:5 23:20
hitt's 8:16,21 10:7 58:8
holman 2:8
hoops 44:22
hoping 36:3
hour 49:12
hphillips 2:19
huge 27:13 65:1
hulu's 67:18

hum 36:13 42:18 60:12
hypothetical 58:5 64:11 68:20
hypothetically 64:12 70:5

**i**

iap 25:17
ibm 46:8,14
idea 5:21 35:11 35:19 46:4
identification 4:3 34:19 50:17
identified 5:3 7:2,12 27:20
iep 9:2
imagine 24:10 27:7,18 55:8
impact 21:17 21:24
impacts 54:9
implies 8:17,22 9:10
implying 9:6 60:22
important 52:3 52:22 53:4
impossible 18:5
incentives 42:24
include 15:24 18:7,8 27:8 30:7 31:21

32:15 33:1 56:1
included 14:12 32:17 68:17 73:14 74:3
includes 15:18 29:10,12
incomplete 58:4 64:10 68:19
increase 17:20
increasing 47:8 58:2
incur 19:21 29:9 30:12
incurring 20:1
indentured 51:9
indicate 59:6 60:1
indicated 19:8 68:15
indicates 19:8 19:20
indicating 67:6
indirect 39:21 40:6 51:18 52:9,22 53:4
individuals 9:19
industry 46:7
influence 41:1 41:12 42:2
information 18:16 31:17

32:3 64:6 66:6 68:17
infrastructure 27:12,13
initial 69:13
injury 8:8
instructed 32:24
integrated 45:13
intensely 23:21
intention 18:24
interacting 42:5
interchangea... 51:17
interchangea... 40:5
interested 72:17
interesting 26:7,16
interestingly 20:17
interview 26:16
interviews 70:2
introduce 26:7
introduces 64:20
ios 23:10 24:20 24:23 25:2 26:9,11,18,20 27:1,2,13 31:17 53:23 59:7 63:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[ios - made]**

64:14,15
**iphone**  1:5 4:8
  44:2,4 45:19
  45:22 46:16
  47:14,24 48:15
  50:3 65:18
  73:4 76:1
**issue**  46:6
**items**  26:23

**j**

**j**  2:8
**jane**  1:14 4:14
  72:3
**job**  1:23
**journey**  28:20
**judgment**  66:8
**jump**  44:23
**june**  1:18 4:6
  72:6,19 73:3

**k**

**keep**  42:24 43:1
**kellogg**  2:6
**kelloghansen...**
  2:10
**kevin**  2:22 4:13
**keystone**  9:15
  9:17
**kind**  17:19 19:5
  28:15 31:4
  32:5 35:16
  36:2 46:3,5
  52:12 70:1,2
**kinds**  35:18

**know**  8:13 13:1
  13:3 16:17
  17:14 23:20
  24:16 25:21
  26:10 27:9
  29:11 30:10
  34:23 36:2
  37:14 42:14
  43:16 45:24
  47:18,18 48:3
  48:3,5,6,9 49:8
  52:16 53:3
  56:1,3 57:23
  58:11 62:6
  66:9,11,12,15
  66:19 67:16
**knowledge**
  25:12 72:8
**known**  23:8
**kumler**  2:23

**l**

**l**  67:6
**landscape**
  50:10
**laptop**  23:17
**large**  14:24
  18:9
**lead**  39:24
**leader**  39:19
**leads**  37:9
**learn**  58:20
  67:17
**leave**  64:17
**led**  26:19

**left**  37:21
**legal**  4:15
  33:23 73:7
**lends**  37:19
**level**  19:3 29:10
  31:3
**leverage**  42:20
**license**  5:4
**likely**  18:4 62:9
**limited**  24:20
  25:13 28:4
  30:22 59:19
**line**  16:5 73:15
  74:4 76:4,7,10
  76:13,16,19
**list**  11:1,4
**listed**  15:10
  17:3 36:15
  59:10,13
**listing**  36:11
**literature**
  48:23 52:20
  53:8
**litigation**  1:6
  4:9 73:4 76:1
**little**  14:7 30:22
  36:11 38:15
  40:23 45:1
  46:3
**llp**  2:3,12,17
**locked**  73:12
  74:1
**long**  21:1 69:17
**look**  19:3 30:24
  31:24 35:15,16

40:22 48:23
  68:22
**looked**  23:22
  34:5 46:6 58:7
**looking**  8:23
  10:7 16:5 29:2
  62:14
**looks**  16:12
**los**  2:13
**lost**  46:9
**lot**  23:9 24:2
  25:20 39:8,16
  44:21 46:8,9
  48:24 49:3
  64:1,20
**lots**  39:7
**low**  8:18,22 9:3
  9:7 19:10
  58:22
**lower**  20:4
  56:12,16,16
  57:1
**lugging**  23:17

**m**

**m**  1:14 2:8,18
  72:3
**mac**  45:18
**maccormack**
  1:11 3:4,13 4:7
  5:1,9 6:14
  49:22 73:5
  75:3,15 76:2
  76:24
**made**  12:1
  21:15

**[madison - mobile]**

madison  2:4
magically
  50:23
main  14:14
  70:1
maintained
  49:2
maintenance
  27:14 29:1
majority  16:20
  17:24 62:11
make  21:4
  30:13 33:2
  38:12 40:10
  43:16 44:23
  45:24 46:1,12
  56:11 63:22
  73:14 74:3
makes  40:15
  42:11 44:4
making  5:9
management
  22:15
managing  3:18
manner  65:24
manufacturer
  45:17
march  11:5,21
  12:14
margin  8:17,22
  9:11 13:20,24
  14:4,5,11,15,19
  14:23 15:1,15
  16:1,8,14 17:4
  17:13 18:8

19:19 27:17
  66:5
marginal  9:3
  12:18 13:4,13
  13:17 20:4
  28:1,1,6,12
  29:5,5,7,7,16
margins  9:1,4,6
  10:11 13:6,12
  13:12 15:9,13
  15:17 17:21
  18:2,6,13 19:3
  19:7 20:2
  22:24 27:7
  28:17 29:2
mark  34:16
marked  34:6
  34:18 50:15,16
  50:20
market  7:15,20
  23:11,12 24:17
  32:10 33:5
  36:18,20 37:6
  37:20 38:12,16
  38:21 39:6,13
  39:19 41:20
  42:22 43:2
  51:22 52:13
  54:23
marketplace
  37:1 39:17
marketplaces
  70:11
markets  7:16
  36:15,16,16

37:2
massachusetts
  1:13,16,17
  72:4
match  16:13
matchgroup
  16:6 17:23
  66:12
material  7:2
  21:24
materials  10:20
matter  4:8 6:19
matters  72:9
maximize
  53:24 54:6
maximizing
  43:3
mcfadden
  11:18 25:9,12
  25:16,19 27:22
  27:23
mcfadden's
  12:9,15 25:23
mean  15:20
  19:3 21:13
  26:13 30:9
  44:2 45:23
  53:19 55:4
  60:13 63:1
  65:9,11 68:21
meaningfully
  19:20
means  47:5
  61:18 62:8

meant  16:3
measure  12:18
  22:19
measuring
  22:24
mechanics
  12:22 65:14
mechanisms
  55:5
media  4:6 6:11
  49:18 68:10
mediated  46:22
meet  49:5
mention  25:2
mentioned
  47:16
merely  8:5
  30:13
merit  1:15
microlevel
  29:16
microsoft
  42:22 66:9
mid  57:18
middle  22:5
  37:22
mind  45:6
minus  28:18
  60:15
minutes  23:16
  47:16
miracle  50:21
mobile  3:15
  23:5,13 32:10
  34:9 35:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[mobile - obviously]**

61:10 62:10,12
**model**  12:9,15
   12:17,23 25:9
   25:12,16,19,19
   26:8 27:22,23
   28:4 53:17
   55:22 56:1
   58:3
**models**  38:9
   52:24 54:21
**moment**  49:22
**monetization**
   52:24 53:2,17
   54:9 55:1,12
   55:23 57:4
   58:2
**monetize**  54:12
   54:14,19
**money**  29:12
   56:11
**monopoly**  7:20
**morning**  5:10
   5:11
**motion**  3:15
   34:9
**motivation**
   55:11
**move**  19:13,14
   50:12 58:16
**multi**  24:8,18
**multihome**
   24:2,3,3
**multihoming**
   23:23 24:7
   62:13 64:1

**multiple**  23:19
   30:17 31:1,15
   38:11 62:21
   63:1 66:21
**multisided**
   36:15

**n**

**n**  3:1 4:1
**n.w.**  2:18
**name**  4:13
**named**  72:7
**native**  33:6
**necessarily**
   20:19 24:5
   26:13
**necessary**
   73:14 74:3
**need**  6:1,2
   10:16 37:7
   71:6
**needed**  49:9
**neither**  70:18
   72:14
**netflix**  64:22
   65:1,8
**network**  39:21
   40:3,7 51:9,13
   51:14,18,21
   52:10,13,22
   53:4 70:16
**networks**  46:23
   52:10
**never**  45:8
   52:15 69:20,21

**new**  2:4 20:1
   26:10 39:4
   57:22 61:23
   62:16
**newspaper**
   62:23
**noble**  3:18
   50:19,22 51:3
**nods**  28:9
**non**  18:11
   57:14
**nonapp**  16:21
**normally**  47:19
   65:16
**northern**  1:2
   4:10
**notarial**  72:19
**notary**  1:15 5:5
   72:3,23
**notating**  73:15
   74:4
**note**  3:14,17
   34:7,13,14
   35:4,7,11 37:3
   39:12 40:20
   43:5,9 45:4
   50:21,22 51:2
   51:3,6 52:18
   69:6,6 70:7
**notes**  31:24
   35:5 50:19
**noticed**  9:9
**number**  4:11
   27:1 73:15
   74:4

**numbers**  61:3,4
   67:9
**nw**  2:8
**ny**  2:4

**o**

**o**  4:1 13:16
   67:6,6
**oakland**  1:3
**oath**  72:11
**objection**  9:23
   11:14 12:20
   14:6 18:3,19
   18:21 20:6
   21:20 22:13
   23:7 24:15
   25:6,11,18
   27:5 28:2
   33:10,14,18,22
   38:24 40:8,17
   41:9,21 43:6
   45:7 48:20
   51:23 52:14
   53:1,6 54:11
   55:3 56:24
   58:4,15,24
   60:17 61:14
   62:22 64:10
   67:20 68:19
**obtain**  7:19
   64:8
**obtaining**
   54:19
**obviously**  9:24
   10:15 16:20
   18:7 21:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [obviously - particularly]

24:1 30:10,21 31:14 39:11 41:23 45:23 47:7 48:15 50:8 54:2,13 54:14 59:20 62:13 63:11 64:3 66:17 68:21 69:15

**occurred** 67:18

**offering** 7:14 7:18,22 8:2,2,7

**office** 73:11

**oh** 9:8 21:1 46:20

**okay** 6:18 9:19 28:10 32:22 34:22 36:7 39:14 50:12 51:5,20 55:8 60:12 68:2 69:10 70:20

**omissions** 7:3

**once** 65:4

**ones** 29:20 53:24

**online** 33:5

**open** 35:1 43:11 44:8 45:1,1,5,10 48:2,4,21 49:6 50:8

**opened** 44:18 46:9 48:6

**opening** 7:7 9:18 10:10 11:5,22 12:14 21:18 30:23 48:17

**openness** 35:23 46:13,22

**operate** 23:18

**operating** 24:4 42:17 47:9

**opined** 10:10 67:12

**opinion** 7:14,18 7:22 8:7 13:15 13:18 14:3 18:17 20:16 22:10 43:4 56:21 63:9 70:15

**opinions** 6:23 7:15,19,24 22:1

**optimal** 53:16 53:19 55:23

**optimization** 55:18

**optimize** 38:5

**options** 39:8,15 39:17 50:6 70:12

**order** 30:15 36:23 37:5 44:23 49:5 54:6 59:23

**ordering** 57:22

**original** 21:10 48:11 73:10,20 73:22

**os** 3:15 34:9 35:5 37:22 42:16,19

**ought** 56:12

**outlet** 33:15

**outline** 9:24

**output** 15:4 25:15

**outside** 61:21

**overall** 58:12

**overview** 36:9

**owed** 27:7

**own** 66:8

**owner** 45:15

### p

**p** 4:1

**p.l.l.c.** 2:7

**p.m.** 49:17 68:6 68:9 71:5,11

**page** 3:10 8:11 10:18,22,23 15:5,7 19:14 20:22 22:3 29:21 32:6 36:8 37:14 38:15 40:19 42:12,12 43:14 43:15 44:10 45:12 51:6,12 51:12 53:13 56:6 59:11,13

60:11 73:15 74:4 76:4,7,10 76:13,16,19

**pages** 1:24 73:14,17,17 74:3,6,6

**paid** 25:20 27:2 55:20

**pains** 75:5

**paint** 48:13

**paper** 44:12

**papers** 69:17

**paragraph** 8:12 19:15,16 22:2,5 29:24 30:7 37:18 42:1,13 43:19 53:12 56:5 57:7 59:3 60:1 61:15

**paragraphs** 56:15

**parenthetical** 32:15

**part** 10:16 12:6 12:14 23:12 26:19 37:18 53:15 54:22

**participants** 2:2 39:23 43:1

**particular** 9:14 16:18,19 28:17 30:19 37:3

**particularly** 67:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [parties - primarily]

parties  44:14 44:19 45:2 48:5,6 72:16

parts  10:9 11:24

passing  28:11

paying  38:14

pays  16:13 17:6 54:9

pc  23:6,11,17 24:13,17,22 25:1,4 42:22 46:6,7

pcs  24:6

pdf  73:12 74:1

penalties  75:5

penalty  73:16 74:5

penetration 16:23

people  23:13 26:12 31:16 46:1 48:10,24 64:1

percent  16:9,15 17:4,13 18:2 19:7,20 20:3 56:17,21,23,23 57:12,13,19 58:13,14,23 60:3,8,14,15,16 61:5,10,17 62:8 63:8,21 67:18

percentage 17:15 62:6 63:19

period  73:18 74:7

perjury  73:17 74:6 75:6

person  5:20 72:6

personally  30:3

perspective 27:17

phillips  2:18 71:9

phone  34:8 37:4 40:6 43:11 44:20

phones  40:24 46:2 62:10,12

phrased  13:8

pick  70:6

picture  20:19 48:13

place  33:5 62:4

places  63:3

plaintiff's  21:5

plaintiffs  34:13

plan  6:24

platform  3:16 23:3 24:8,18 33:6,13,15,17 33:21 34:1,9 35:5 36:16,20 37:12,22 38:4 40:11,15 41:1

41:2,12,13,15 41:15 42:4,19 42:23 43:2,11 45:14,15,16 46:22 49:23 52:2,3,5,6,21

platforms 23:19 24:6 25:8 35:18,24 40:6 42:2 52:23 53:5 54:16,18 69:14

play  17:7 23:10 23:13,15 26:3 31:10 60:4,15 61:1,7 63:20

player  65:1

please  8:11 10:18 15:6 22:2 37:14 51:5 56:6 59:4

pleasure  71:3

point  12:24 25:23 29:4 38:23 39:3 44:12,18 45:3 47:24 48:14,23 55:18 65:12 70:14

points  10:4

policies  49:4

popped  34:23

portion  13:24 17:17 54:20 58:7

position  39:3

positive  39:24

possibility 63:18

possible  17:24 43:21 64:12 67:10

potentially 40:10 50:10 54:17

power  7:20 24:21

practice  32:18

predicts  12:18

premarked  4:2 5:12

premium  26:8

prepare  9:21

prepared  21:10 69:7

presence  19:5

present  2:1,22 64:2

presented 21:14,22

pretty  55:18 69:22

prevent  43:2

price  27:24 43:1 53:5 54:2

prices  53:22 54:1,3,4,5,6 55:6 62:14

primarily  66:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[primary - rebuttal]**

**primary** 23:9
**principle** 55:11
   56:10
**priorities** 26:15
**prioritize** 26:5
**probably** 5:20
   9:14 23:24
   24:24 34:4
   47:20 48:13
   49:9
**procedure** 1:14
   73:19,21
**procedures**
   44:22 49:4
**proceed** 4:19
**proceeding**
   5:21
**process** 10:3
   21:17 36:4
   47:19 61:12
   64:19,24
**processing**
   24:21
**produced**
   34:13 37:8
   65:24 66:4,9
   66:12 68:14
**producing**
   14:10,24
**product** 14:24
**production** 5:4
**products** 16:21
   28:23,24 43:21
   44:2

**professor** 5:9
   6:14 8:16,21
   10:7 11:18
   12:9,15 23:20
   25:23 35:12
   58:7 69:5
   70:23
**professors** 7:7
   10:5 35:8 50:1
**profit** 8:17,22
   9:11 15:9 17:4
   17:12 19:19
   20:2 54:7
**profitability**
   29:10 67:4
**profitable**
   53:20
**profits** 36:24
   43:3 53:24
**promote** 36:24
**proposed** 9:24
**provide** 28:23
   33:6
**provided** 31:17
   63:13 67:1
   73:19 74:8
**providing**
   24:11,11 39:7
**public** 1:15 5:5
   8:6 15:23
   18:11 32:2
   66:6 72:3,23
**publishers** 52:4
**publishing**
   47:19

**purchase** 41:4
**purchases** 29:8
**purely** 12:2
   38:4 63:12
**purpose** 66:5
**purposes** 17:11
**pursuant** 1:13
**put** 10:1 12:12
   44:14,19 48:24
   53:9

**q**

**question** 18:22
   19:15 20:22,23
   21:2 25:1,13
   27:21 32:7
   37:10 38:17
   45:5 50:9
   53:12 55:16
   60:18 62:7
   67:24
**questions** 69:2
   70:21
**quite** 17:24
   23:9 41:24
   64:19
**quote** 32:15,17
   33:4

**r**

**r** 2:18 4:1 67:6
   75:1 76:3,3
**r&s** 74:1,10
**raised** 46:4
**ramp** 37:10,12

**ranges** 66:5
**rate** 16:18
   57:22 58:18
   59:2
**rates** 55:17
**rather** 22:11
   23:17
**rational** 58:16
   59:1
**read** 9:12 21:3
   32:13,14,19
   53:7 60:2 75:4
**reading** 9:10
   33:3 52:2
   62:24 73:24
   74:10
**really** 10:8 12:5
   19:9 25:19
   39:5,7 46:12
   53:15 63:15
   67:22
**reason** 25:22
   32:17 59:19
   76:6,9,12,15,18
   76:21
**reasonable**
   63:6
**reasonably**
   42:24
**rebut** 7:6 10:6
**rebuttal** 3:12
   5:13,16 6:19
   6:23 7:6,12,14
   7:18,22 8:7,12
   9:22 10:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[rebuttal - return]**

11:8 12:2 13:19 15:6 19:9 20:23 29:19 53:11 55:19 58:10 59:4 64:16
**rebutting** 7:11
**recall** 21:13 26:16,17 34:10 65:12 67:8,11
**received** 21:6
**recess** 49:15 68:7
**record** 4:5,17 5:23 6:5,7,8,10 26:9 46:21 49:14,17 51:1 68:6,9 71:1,4 72:13 75:7
**recorded** 4:7
**reduced** 57:19 57:22 58:18 72:11
**reduction** 58:1 59:2
**refer** 13:19 40:2 47:4 53:16 57:10
**reference** 12:1 21:4 22:20
**referenced** 73:6
**referencing** 33:2
**referring** 47:22

**refers** 39:23 45:21 47:11
**reflects** 31:19
**regard** 14:19 14:22
**regarded** 15:3 62:17
**regarding** 21:6
**registered** 1:15
**regression** 30:21 31:9,19
**regressions** 29:19,24 30:4 30:5,8 31:6
**related** 16:21 54:5 72:15
**relationship** 31:13
**relative** 16:23
**released** 73:22
**relevant** 7:15 10:11 13:7 33:1 36:12,14 37:2 38:21 67:2
**reliable** 18:13 18:16
**relied** 10:20
**rely** 55:11
**relying** 11:8 21:19
**remember** 65:14,15,20
**remind** 69:5

**remotely** 1:12 1:17 4:12
**removing** 31:4
**renewing** 57:20
**repeat** 13:10
**report** 3:12 5:13,16 6:19 6:22 7:12 8:12 8:16 9:10,16 9:22 10:1,10 10:19 11:5,9 11:22 12:2,2 12:14 13:19 15:6,13 17:22 19:16 20:23 21:10,18 29:20 29:20,24 30:24 32:6,10,13,14 32:16,23 33:2 53:12 55:19 56:5 57:8 59:4 60:7 61:15
**reported** 15:16 18:6 19:2
**reporter** 1:15 4:14,18 71:6
**reporter's** 72:1
**reporting** 14:8
**reports** 7:3,7 7:11 10:5,8 11:1 13:5 15:9 15:16,24 17:12 23:21 58:8
**represent** 64:5

**representative** 63:10,14
**requested** 74:1 74:10,11
**require** 12:22
**required** 73:20
**research** 2:23 3:14 34:9
**respect** 7:6 8:8 14:3 40:24 45:22
**respectively** 57:15
**responded** 19:4 32:1
**respondents** 32:1 59:20 63:12
**response** 58:17 59:1
**responsive** 21:21
**rest** 64:5
**restrictions** 31:15 47:6,8
**result** 58:1 63:10
**results** 29:21 31:9
**retail** 33:15
**retain** 28:22 29:13
**retention** 18:9
**return** 73:17 74:6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[revenue - showed]**

| | | | |
|---|---|---|---|
| **revenue** 16:16 16:23,24 28:1 28:6,7,12 30:18 31:13 55:20,21 56:2 57:11 59:7,17 59:21 60:9,24 61:20 62:9 63:19 64:3,8 66:1,10,22 67:6 68:16 | 49:21 53:9 57:24 59:9 60:9 61:7,13 68:23 69:12 70:22 | **says** 33:4 46:21 47:1 | **seems** 56:12 59:1 |
| **revenues** 16:21 28:18 29:5,7 29:17 54:20 56:16,18,22 57:13 60:3,14 61:5,10,18 63:13 67:13,18 | **rim** 38:17,19 39:2,15 43:22 69:5,6 | **scale** 20:10,16 20:21 | **seen** 21:9,23 33:24 58:9 66:19,20,21 67:5 |
| **reverse** 30:20 | **rmr** 72:3 | **scenario** 70:4 | **sell** 47:6 |
| **reversed** 9:9 | **roblox** 67:5 | **schedule** 73:10 | **selling** 33:5 54:17 57:4 |
| **review** 5:14 11:24 73:8,10 73:13 74:2 | **role** 46:22 | **school** 20:13 34:7 35:8 | **sense** 42:11 62:13 |
| **reviewed** 11:21 | **rolled** 26:10 | **seal** 72:19 | **sentence** 8:15 9:13,14 19:19 43:18 53:16 56:9 |
| **reviews** 32:22 60:21 | **rough** 71:7,8 | **sealed** 73:20 | |
| **revolution** 3:19 | **roughly** 16:12 | **searched** 12:5 | |
| **rich** 70:14 | **row** 47:1 | **second** 8:15 19:18 43:18 | **serve** 20:1 |
| **richer** 36:5 | **royalties** 27:16 27:18 | **section** 43:19 | **service** 14:10 14:24 |
| **right** 6:2,21 15:11,19 17:5 17:13 35:2,9 35:13 37:22 38:19 40:1 46:17,23 47:15 | **rule** 63:18 | **sections** 7:7,10 10:2 | **services** 16:22 22:8,12 25:10 28:14,23,24 |
| | **rules** 1:13 74:8 | **see** 6:16 8:19 11:1,6 15:12 16:6 17:1 19:6 19:22 22:8 32:7,11 36:9 36:12,16 37:24 41:5,17 42:7 43:23 45:19 47:2 51:10,15 52:7 53:17 57:16 60:5,12 64:21 68:3,21 | **serving** 27:8 |
| | **run** 35:12 | | **set** 19:4 37:6 46:5 54:5 55:6 59:20 63:16 72:18 |
| | **running** 17:15 38:4 | | **setting** 27:24 54:6 |
| | **runs** 17:18 | | **share** 5:14 6:4 34:21 50:22 58:12,21 66:1 67:12 |
| | **s** | | |
| | **s** 2:18 3:9 4:1 13:16 76:3 | **seeing** 21:13 | |
| | **sales** 14:17 22:11 | **seek** 54:18 | |
| | | **seeking** 55:22 | |
| | **sample** 63:11 | **seem** 58:16 61:3 63:6 64:15 67:2 | **show** 19:1 66:1 |
| | **satisfactorily** 5:3 | | **showed** 57:12 |
| | **satisfying** 38:7 38:7 | | |
| | **saying** 9:5 26:9 48:10,18 56:10 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[showing - strike]**

| | | | |
|---|---|---|---|
| **showing** 31:12 35:11 | **similarly** 52:4 | **speak** 62:5 | **store** 15:20 16:17,21,23 |
| **shows** 16:8 44:16 66:10 | **single** 42:16,19 69:15 | **specialized** 54:22 | 17:16,18 18:14 19:6 24:5 26:2 |
| **shunted** 62:4 | **sir** 19:16 | **specific** 31:17 36:3 | 26:3 31:11 |
| **side** 33:17 36:22 37:6,8 | **sit** 13:1 | **specifically** 66:4 | 33:4,12,16,20 39:7 45:5,10 |
| 37:11,12 39:24 | **situation** 35:21 35:22 38:18 | **specifications** 29:23 | 45:22 48:1,4 |
| 40:1,3,10,12 | **smart** 34:8 37:3 40:6,24 43:11 | **specified** 30:5 | 48:17 58:12 60:4,5,9,15 |
| 43:1 46:17 47:1,10 51:14 | **software** 22:14 22:15,18,20 | **specify** 30:3 | 61:1,6,7,12 |
| 51:20 52:10 | 23:1 | **speculate** 20:7 | 63:20,20 64:15 64:17 65:3,5 |
| **sided** 33:21 34:1 36:15,18 | **sold** 13:16 | **spend** 26:22 29:12 | 66:2 67:2,4,13 |
| 37:2,19 38:16 | **sole** 44:5 45:16 45:17,21 | **split** 67:8 | 67:19 68:16 70:17 |
| 38:21 39:6,13 51:22 52:23 | **solutions** 4:16 73:7 | **spoken** 11:11 11:18 | **stores** 17:7 26:24 27:6,8 |
| 53:5 69:14 70:16 | **somebody** 62:2 64:13 | **sponsor** 46:14 | 55:10 61:21 64:2,3,8 |
| **sides** 37:1 38:6 38:11 42:24 | **song** 11:6,11 | **sports** 62:1 | **strategic** 36:5 39:14 50:6 |
| 52:21 | **song's** 11:8,21 12:2,13 | **stack** 27:10 | **strategies** 46:11 |
| **sign** 5:18 61:24 64:17 65:2 | **sorry** 9:8 10:21 17:2 18:20 | **standards** 46:6 52:20 | **strategy** 39:2 43:22 48:16 |
| 73:16 74:5 | 19:13 25:3 | **start** 38:17 39:14 | 50:3 54:9 55:2 |
| **signature** 72:22 73:22,24,24 | 46:18,20,24 66:11 | **starts** 29:21 | 55:24 57:5 |
| 74:10 | **source** 67:9 | **state** 22:5 73:9 73:12 | **stream** 29:3,4 |
| **significant** 19:2 19:8 | **sources** 59:8 63:19 66:22 | **statement** 6:23 24:24 42:9 | **streams** 57:11 61:20 |
| **similar** 24:10 24:11,11,12 | 67:6 68:16 | 43:8 | **street** 2:8,18 |
| 27:7,16,18 | **south** 2:13 | **states** 1:1 4:9 | **strength** 39:3 |
| 42:21 63:3 | **space** 24:21 | **statistics** 29:15 | **strike** 19:13 |
| | **spare** 23:16 | **staying** 49:22 | |
| | | **stipulation** 73:21 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[strong - telling]**

| | | | |
|---|---|---|---|
| **strong** 35:10 55:11 | **subtract** 17:11 | 62:14 63:4 68:4 | **takes** 14:15 20:22 |
| **structures** 20:18 56:3 | **subtracted** 17:10 | **surpasses** 55:21 | **talk** 22:22 |
| **students** 22:17 35:9,20 36:4 50:1 | **succeeding** 56:15 | **surprise** 62:17 67:17 | **talked** 9:17 26:6 64:15 66:24 |
| **studied** 58:6 | **successful** 43:20 | **surprised** 58:11,20 | **talking** 20:8 21:23 38:10 47:9 |
| **studies** 23:23 23:24 63:16,24 | **successfully** 46:9 | **surprises** 67:22 | **talks** 22:20 44:8 52:20 58:8 |
| **study** 32:10 | **succinct** 43:7 | **swanson** 2:13 3:5 5:8,23 6:4 6:13 10:21,23 11:16,17 34:16 49:11,20 50:12 67:23 68:12,23 70:22 71:2 | |
| **subject** 54:13 54:15,16 | **suddenly** 62:3 | | **taught** 39:11 45:8 69:20,21 69:22 |
| **submission** 66:23 | **suggest** 18:12 24:1 64:1 | | **teach** 20:12 22:14 28:21 38:9 48:22 69:23,24 70:4 70:6,7 |
| **subpoenaed** 31:14,24 63:12 66:3 | **suggested** 75:7 | **swear** 4:19 | |
| | **suggests** 6:4 | **switch** 5:14 | |
| **subpoenas** 21:6 | **suite** 2:8 54:1 | **sworn** 5:5 72:7 | |
| **subscribe** 64:22 65:5 | **sundararajan** 7:8,11 10:5 | **system** 42:17 47:9 | **teaching** 3:14 3:17 34:13 35:4,7,8,11 39:12 40:19 43:5,9 45:4 49:23,24 50:18 50:22 51:2,6 52:18 69:6 70:7 |
| **subscription** 54:4 57:11,14 57:22 58:2 62:18 64:8 65:3,8,13 | **sundararajan's** 10:8 | | |
| | **supplement** 66:7 | **t** | |
| | **supply** 37:11 47:10 | **t** 3:9 75:1,1 76:3,3 | |
| **subscriptions** 57:4,20,23 58:13,22 61:12 | **support** 12:3 18:16 27:15 29:1 | **table** 18:1 29:21 44:16 49:8 59:13 60:7,10,11,22 | |
| | | | **team** 9:17 30:6 32:24 |
| **subsequent** 34:12 | **supposition** 52:19 | **tables** 67:9 | |
| **subset** 15:17 | **sure** 17:14 21:22 24:16 27:12 30:13 31:23 38:12 39:1 44:17 48:4 57:2 | **take** 49:12 68:2 68:22 71:8,9 | **technical** 70:12 |
| **substance** 11:15 | | **taken** 1:13 4:8 49:15 68:7 69:16 | **tell** 59:18 |
| | | | **telling** 57:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[tells - ultimately]

| | | | |
|---|---|---|---|
| **tells** 29:15 | 32:18 33:15 | **timeline** 44:18 | 53:8 60:21,23 |
| **ten** 23:16 | 34:4 35:1,10 | **times** 61:23 | 61:8 72:13 |
| **tend** 24:1 26:21 | 39:3,23 40:4 | 62:16 | 75:7 |
| **term** 36:19 | 40:12 41:10 | **title** 46:24 62:5 | **truth** 72:8,8 |
| 39:20,22 40:4 | 43:7 44:7,15 | **today** 5:10 12:7 | **try** 5:19,24 |
| 51:17 | 48:1,12,22 | 70:6 | 37:10 |
| **terminated** | 49:7,11 50:5 | **today's** 4:5 | **trying** 12:11 |
| 65:13 | 50:19,21 52:19 | **todd** 2:6,23 | 34:4 48:13 |
| **terms** 26:14 | 53:21 56:10 | **together** 10:1 | 62:3 64:16 |
| 30:11 69:23 | 57:2 59:15 | **told** 65:12 | **turn** 8:11 10:18 |
| **test** 52:15 | 61:9,17,19 | **tom** 48:12 68:2 | 15:5 22:2 32:5 |
| **testified** 5:6 | 62:2,6,12 | **top** 12:4 37:17 | 37:14 40:19 |
| **testify** 72:7 | 63:11 64:13 | 40:22 47:1 | 43:14 44:10 |
| **testimony** | 65:4 66:16 | 59:17 | 51:5,12 56:5 |
| 25:23 72:13 | 69:1,8,14 | **topic** 37:3 51:9 | 59:3 |
| 75:4,8 | **thinking** 35:17 | **topics** 36:12,14 | **twice** 60:24 |
| **text** 33:1 | 46:3 | 70:15 | **two** 15:2 33:21 |
| **thank** 5:9 6:21 | **third** 37:18 | **total** 60:3 | 34:1 36:15,18 |
| 70:22 71:2 | 44:14,19 45:2 | **touched** 10:9 | 37:2,19 38:16 |
| **thing** 21:13 | 48:4,6 | **touching** 72:9 | 38:21 39:6,13 |
| 50:1 | **thomas** 2:4 | **toward** 40:22 | 42:4 51:22 |
| **things** 8:5 11:4 | 73:1 | 51:8 | 52:23 53:5 |
| 15:2 21:22 | **thought** 41:19 | **tradeoffs** 43:8 | 56:11 60:20 |
| 27:15 41:23 | **threatens** 7:19 | **transcript** 73:6 | 61:19 69:14 |
| 46:7 57:2 | **thursday** 1:17 | 73:8,10,13,13 | **type** 62:23 |
| 64:18 69:17 | **time** 4:18 23:17 | 73:22 74:2,2 | 63:13 |
| **think** 7:24 8:5 | 26:6 38:23 | 75:4,6 | **typewriting** |
| 8:21 9:8 12:13 | 41:7,23 44:21 | **translate** 9:3 | 72:11 |
| 18:4 19:18 | 45:3 47:24 | **treat** 26:13 | **typically** 18:8 |
| 20:17,20 23:1 | 48:24 49:7 | **trial** 6:24 | 62:2 |
| 23:8 24:16,23 | 50:20 65:4 | **tried** 52:15 | **u** |
| 25:7 26:4,5,20 | 68:1,24 70:10 | **tries** 54:14 | **uh** 36:13 42:18 |
| 27:6,10,12,14 | 70:14 73:10,18 | **true** 16:19 20:4 | 60:12 |
| 27:15,16,19,21 | 73:25 74:7 | 24:24 30:2 | **ultimately** |
| 28:19 31:8,9 | | 42:10,18 46:2 | 24:16,19 39:16 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[um - websites]**

| | | | |
|---|---|---|---|
| **um** 12:1 18:24 23:8 28:7 48:21 | **upscale** 23:3 | **variable** 8:24 13:24 14:12,17 14:20 15:1 | **w** |
| **umbrellas** 24:5 | **use** 36:2,18,21 52:20 55:5 67:7 | 19:2,9,10,21 20:5,8 27:3,19 28:18 30:16 | **waiting** 55:14 |
| **under** 9:15 11:4 24:4 51:13 72:12 75:5 | **used** 40:5 60:20 | 31:10,13 55:17 | **waived** 73:24 73:24 |
| **understand** 5:13 17:19 18:23 21:15 30:18 55:15 | **user** 13:7 14:11 14:16 18:8 24:12 27:11 28:8,22,22 29:10 47:2,2 47:10 55:21 56:2 | **varies** 23:8 | **waiving** 73:21 |
| | | **various** 29:8,8 | **want** 8:15 15:6 20:7,23 21:3 23:13 26:7 30:12 37:9 44:10 67:15 69:23,24 |
| | | **vary** 14:7 15:3 | |
| | | **verify** 63:14 | |
| | | **veritext** 4:15 73:7,9,11,20 | |
| **understanding** 8:23 12:7 27:22 28:4 36:5 39:20 56:20 70:11 | **user's** 28:20 | **versus** 16:24 17:16 27:14 46:13 50:8 55:5 64:5 | **wanted** 39:8 43:14 50:5 69:2 70:6 |
| | **users** 20:1 22:6 22:11,21 23:3 23:6 24:9,14 25:5,9 26:11 26:11,21 27:2 28:13 29:11,11 40:11,15 55:20 61:11 62:10,11 62:20 | **video** 4:7 | **war** 3:16 34:9 35:5 |
| **understood** 36:7 69:10,19 | | **videoconfere...** 2:2 | **wars** 49:23 |
| **undertook** 9:21 | | **videographer** 2:22 4:4,14 6:6 6:9 49:13,16 68:5,8 70:24 71:4 | **washington** 2:8 2:18 |
| **unfortunate** 45:9 | | | **way** 12:12 13:8 17:11,21 18:11 23:2 28:17,19 29:6,8 34:2 36:3 42:5 57:2 69:17 |
| **unfortunately** 18:10 39:2 | **using** 13:24 56:2 59:23 63:12,16 | | |
| **unit** 4:6 6:11 8:24 15:4 22:6 22:18,19 25:9 25:17 28:13 68:10 | | **videotaped** 1:10 | **ways** 39:18 56:11 59:21 69:14 |
| | **v** | **view** 24:14 26:14 41:7 48:18 | |
| | **valid** 50:3 | | **we've** 5:12 49:11 |
| **united** 1:1 4:9 | **validity** 43:22 | **viewpoint** 41:23 | **wealthier** 26:21 |
| **universe** 63:15 63:21 64:5 | **valuable** 40:11 40:16 | | **web** 63:4 |
| **unusual** 64:21 | **value** 22:22 23:4 38:10,11 38:13,13 46:10 46:11 | | **website** 61:24 |
| **update** 28:24 70:9 | | | **websites** 63:2 64:9 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[went - zoom]**

| | |
|---|---|
| **went** 16:16 27:19 | **writing** 9:16 |
| **werner** 1:14 4:15 72:3 | **written** 4:17 34:8 41:22,24 47:20 48:14 56:14 |
| **whafh.com** 2:5 73:2 | **wrote** 39:12 41:8,20 42:10 43:4 45:3 |
| **whereof** 72:18 | |
| **wild** 66:16 | **x** |
| **windows** 42:22 | **x** 1:4,7 3:1,9 67:6 |
| **winning** 39:1 | **xx** 74:1 |
| **wish** 12:3 | |
| **withdrawn** 70:20 | **y** |
| **withhold** 41:14 | **yeah** 35:1 37:16 44:11,11 48:8 50:5 51:19 |
| **witness** 1:11 3:3 4:19 5:2 6:1 18:20 32:22 55:14 60:21 71:2 72:13,18 73:13 73:16 74:2,5 | **year** 25:20 26:11 47:21 48:14 57:20,23 57:24 69:6 |
| **wolf** 2:3 | **years** 30:17 31:1,15 69:8 |
| **wonderful** 37:6 | **ygr** 1:6 4:11 |
| **word** 35:10 | **york** 2:4 61:23 62:16 |
| **words** 36:21 | **yup** 8:14 56:7 |
| **work** 69:14 70:3 | **z** |
| **working** 50:22 | |
| **works** 12:9 | **zero** 8:18,22 9:6 19:22 |
| **world** 39:4 | **zoom** 1:12 2:2 4:13 |
| **wrap** 68:13 | |
| **wrapped** 68:3 | |
| **write** 9:13 40:23 41:11 42:1,16 | |

Page 24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.