# EXHIBIT 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4:11-cv-06714 YGR


*********************************

IN RE:

APPLE IPHONE ANTITRUST LITIGATION

*********************************



VIDEOTAPED DEPOSITION OF ALAN D. MAC CORMACK, DBA

MC DERMOTT WILL & EMERY

200 Clarendon Street

Boston, Massachusetts

May 23, 2025        8:36 a.m.



Reported by:

Darlene M. Coppola

Registered Merit Reporter

Certified Realtime Reporter

Job No. 7306620

PAGES 1 - 271



Page 1

APPEARANCES:

Representing the Consumer Plaintiffs:

WOLF HALDENSTEIN ALDER FREEMAN & HERZ LLP

270 Madison Avenue

New York, NY 10016

BY: THOMAS BURT, ESQUIRE

T 212.545.4600

E burt@whafh.com

-and-

KELLOGG, HANSEN, TODD,

FIGEL & FREDERICK, P.L.L.C.

1615 M Street, N.W.

Suite 400

Washington, D.C. 20036

BY: ASHLE J. HOLMAN, ESQUIRE

T 202.326.7900

E aholman@kellogghansen.com

(Continued on next page)

Page 2

INDEX

EXAMINATION

Witness Name                    Page

ALAN D. MAC CORMACK, PH.D.

Direct By Mr. Swanson ............................. 7

Cross By Mr. Burt ................................. 262

EXHIBITS

Number      Description                    Page

Exhibit DX-66  Expert Report of Alan D. MacCormack    12
            In Support of Plaintiffs, dated
            March 5, 2025
Exhibit DX-67  Plaintiffs' Amended Disclosure    16
            of Expert Witnesses
Exhibit DX-68  "Research in Motion:    67
            The Mobile OS Platform  War"
Exhibit DX-69  Barnes & Noble:    87
            Managing the E-Book Revolution
Exhibit DX-70  Article titled    228
            "Software Development
            Worldwide:  The State of Practice"
Exhibit DX-71  Document from Ethan Jacobs to    236
            Rourke Donahue dated 06/30/23

Page 4

APPEARANCES (Continued):

Representing the Defendant:

GIBSON, DUNN & CRUTCHER LLP

333 South Grand Avenue

Los Angeles, CA 90071

BY: DANIEL G. SWANSON, ESQUIRE

THOMAS PHILLIPS, ESQUIRE

T 213.229.7000

E dswanson@gibsondunn.com

tphillips@gibsondunn.com

Also Present:

Shawn Budd, Videographer

David Grothouse, Apple (Via Zoom)

Todd Kumler (Via Zoom)

Tathagat Mukhopadhyay, Cornerstone Research

(Via Zoom)

Page 3

EXHIBITS

Exhibit      Description                    Page

Exhibit DX-72  Email from Rourke Donahue to    237
            Ramie Snodgrass dated 04/12/24
Exhibit DX-73  Email chain from Rourke    238
            Donahue to Olga Borzenkova
            dated 04/19/24
Exhibit DX-74  Email chain from Andrew    238
            Purdy to Rourke Donahue
            dated 05/03/24

Page 5

2 (Pages 2 - 5)

PROCEEDING

(Commencing at 8:36 a.m.)

THE VIDEOGRAPHER: We are on the record. This is the videographer speaking, Shawn Budd, with Veritext Legal Solutions.

Today's date is May 23, 2025, and the time is 8:36 a.m. We are here in Boston, Massachusetts, to take the video deposition of Professor Alan D. MacCormack, in the matter of Apple iPhone Antitrust Litigation.

Would counsel please introduce themselves for the record.

MR. SWANSON: Dan Swanson for Apple, Inc.

MR. PHILLIPS: Harry Phillips for Apple, Inc.

MR. BURT: Thomas Burt, Wolf Haldenstein, for the certified class.

MS. HOLMAN: Ashle Holman, Kellogg Hansen, for the certified class.

THE VIDEOGRAPHER: Would the people on Zoom like to introduce themselves?

Page 6

MR. GROTHOUSE: David Grothouse, in-house counsel at Apple.

MR. KUMLER: Todd Kumler, Cornerstone Research, with Apple, Inc.

THE VIDEOGRAPHER: The court reporter today is Darlene Coppola. Would you please swear in the witness.

ALAN D. MAC CORMACK, DBA, a witness called for examination by counsel for the Defendant, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

THE STENOGRAPHER: Thank you. You may proceed.

DIRECT EXAMINATION
BY MR. SWANSON:

Q. Good morning, Professor.

A. Good morning.

Q. Could you please state your name for

Page 7

the record.

A. Alan David MacCormack.

Q. And what is your business address?

A. Harvard Business School, Soldier's Field, Boston, MA 02163. We're on the Boston side of the river.

Q. Have you had your deposition taken before?

A. Once.

Q. So are you familiar with the procedure?

A. It was ten years ago, so I've probably forgotten a little bit.

Q. Now, you're an adjunct professor of business administration at Harvard Business School; is that right?

A. That's correct.

Q. And what is an adjunct professor?

A. It can mean different things at different places. For our purposes, I'm a full-time term faculty member, which means I have a fixed-term appointment which gets renewed on a periodic basis.

Q. Is that distinct from being a tenured

Page 8

professor?

A. Yes. They're two different tracks basically.

Q. And have you ever been a tenured professor at any academic institution?

A. No.

Q. Your resume indicates that you are a cofounder and board member of Silverthread, Inc.; is that correct?

A. Yes.

Q. And what business is Silverthread in?

A. They're in the software business.

Q. Is Silverthread an app developer?

A. No. They develop tools that app developers might use.

Q. And what portion of your time do you devote to Silverthread?

A. These days, not so much. I was a founder, so in the early days, it was a lot. I came off the board last year. So a few hours maybe a month.

Q. What type of tools does Silverthread offer?

A. They're tools for understanding the

Page 9

3 (Pages 6 - 9)

design of your software, and given the metrics that they generate, they will project the costs of that software, things like maintenance costs, the potential costs if you want to redesign it. So they're used by a variety of companies to kind of understand technical metrics as well as costs.

Q. And what type of cost metrics does Silverware [sic] generate?

MR. BURT: Object to form.

MR. SWANSON: Did I say Silverware?

A. We got --

BY MR. SWANSON:

MR. BURT: You can use it for advertising, if you want.

THE WITNESS: Okay.

MR. BURT: Royalty free.

A. Sorry. Could you repeat the question.

BY MR. SWANSON:

Q. Yes. If I can manage it.

What type of cost metrics does the Silverthread software generate?

A. Things like projected monthly

Page 10

maintenance costs, for example. So as I mentioned, it starts with technical metrics. So things like modularity, complexity, things that software engineers care about, and then says, Oh, well, you know, if you continue with something that's designed like this, you can expect the costs to be these things in the future.

Q. And are these cost metrics reported based on some particular user standard or on some other basis?

A. Well, the company has a database of past engagements where they've seen different code bases and costs that emerge from that. So there's kind of like a benchmarking database. So when you measure a new code base, then you can kind of look and say, Ah, relative to our past experience, kind of here's the types of costs that come out.

Q. And is this particular types of software? Is it enterprise software or something else?

A. It's mostly enterprise software. I mean, it could -- there's no theoretical

Page 11

reason why it can't be used in a variety of different places.

Q. And who are the major customers for Silverthread?

A. The government and the Department of Defense.

Q. Do you consider yourself to be an app developer?

A. I don't develop apps, no.

Q. Your billing rate currently is $800 a hour; is that right?

A. That's correct.

Q. Do you have an estimate of how many hours you've spent on the case to date?

A. I don't know precisely, but my guess is it's 150 hours.

MR. SWANSON: Let me do a little exhibit marking.

(Exhibit No. DX-66 marked for identification.)

BY MR. SWANSON:

Q. I've marked as DX-66 what appears to

Page 12

be a copy of the expert of report of Alan D. MacCormack, dated March 6, 2025.

Professor, if you could, take a look at that and confirm that that is indeed a copy of your expert report in this case, I would appreciate it.

A. (Witness reviews document.)

It looks to be.

Q. Could you turn to Paragraph 4 on page 5, please.

A. Yes.

Q. You indicate there that support for the development of this report was provided by "Keystone Strategy LLC, a global strategy and economic consulting firm."

Do you see that?

A. I do.

Q. And you indicate that Keystone's staff, working under your direction and supervision, conducted the required research and analyzed the data used in this report.

Which Keystone staff are you referring to here?

A. I'm not sure I'll get their second

Page 13

4 (Pages 10 - 13)

names, but Lorenz, Rory, and Sankalp. Sankalp was the project manager. And then Sankalp left the firm recently, and so we now have a new project manager, George.

Q. So Sankalp originally and then George were the project managers.

What was Rory's role?

A. Rory was primarily helping with the data production from the subpoena data production.

Q. And what was Lorenz's role?

A. Lorenz is an econometrician.

Q. Had you worked with any of these individuals before?

A. I had not, although, peculiarly, I had taught Sankalp. He was a past student of mine.

Q. That's a good sign.

A. Yes.

Q. All right. And then, let's see.

You indicate in Paragraph 4 that you received compensation from Keystone based on staff billings accrued while supporting you in this matter.

Page 14

That's in addition to your hourly rate?

A. That is.

Q. How much total compensation would you estimate you've received to date from Keystone and/or plaintiffs directly?

A. Gosh, I don't really know the answer to that, but ballpark, maybe 150,000.

Including both; is that your question?

Q. Yes, it is.

A. Yes. Okay.

Q. Thank you.

What did you do to prepare for today's deposition?

A. I met with counsel. Talked once in person and twice on Zoom.

Q. And that was Mr. Burt?

A. Yes.

Q. And approximately how many hours did you spend meeting in preparation for the deposition?

A. I think there were two three-hour sessions on Zoom, but I think we finished early both times. And yesterday was maybe

Page 15

another four hours. Five hours, let's say.

Q. You have degrees in management and business administration, correct?

A. Yes.

Q. Do you have any other advanced degrees?

A. No.

Q. You're not an accountant, right?

A. I'm not, no.

Q. Okay. Do you consider yourself to be an expert in accounting?

A. I understand accounts, and I teach at a business school, so I've got to, you know, find my way around a statement. But I'm not an expert in accounting.

MR. SWANSON: We'll mark another exhibit just to make life exciting.

(Exhibit No. DX-67 marked for identification.)

MR. SWANSON: This will be DX-67.

BY MR. SWANSON:

Page 16

Q. So this is Plaintiffs' Amended Disclosure of Expert Witnesses. I just wanted to ask you a question about the disclosure that relates to you, which is on page 3.

A. Uh-huh.

Q. Page 3, if you can flip to that.

A. Okay. Yes.

Q. This indicates that your areas of expertise are management of innovation, technology, and product development in high technology industries with a focus on the software injury [sic].

Do you see that?

A. I do.

MR. BURT: Objection to form.

THE WITNESS: Sorry.

MR. BURT: Injury.

MR. SWANSON: Injury?

MR. BURT: You said injury rather than industry.

MR. SWANSON: All right. I'm on a roll this morning. It will give you something to do. Keep me -- keep me on the straight and narrow.

Page 17

5 (Pages 14 - 17)

BY MR. SWANSON:

Q. Is -- as amended, is that a correct description of your area of expertise?

A. Yes, it is.

Q. And how does this subject area relate to the topic of the cost of operating software applications?

A. So I study software companies, how they develop software, how they distribute it, the operations of software firms, which all lead to costs that then will determine the profitability. So I've got a lot of expertise and probably talked to hundreds of software companies and wrote cases on many of them, and I've done some empirical studies on some of them.

Q. Are there any textbooks in this subject area?

A. In which subject -- in this area?

Q. Yes.

A. Oh, there are lots of textbooks related to management of innovation, yes.

Q. Okay. Other --

A. And product development as well. I

Page 18

mean, it's a massive field.

Q. And textbooks that focus particularly on the software industry?

A. Yes, there are.

Q. Okay. And what would be the main textbooks that come to mind in that area?

A. Steve McConnell's -- I can't remember the title. Software development maybe. It's a very famous reference.

"The Mythical Man-Month," which is a collection of essays on software investment.

Michael Cusumano has written several books --

(Stenographer clarification.)

A. Oh, sorry -- Cusumano, who is a coauthor of mine, has written some textbooks about the software business.

Those, I think -- I think Michael's book might be regarded as kind of a -- one of the leading books that you would set in a class, for example.

Q. And does that book, to focus on one, have particular sections that address cost issues?

Page 19

A. I don't recall. It's been quite a while since I read it.

Q. Do you have expertise in software programming?

A. I -- I have programmed in the past, but I don't consider myself an expert. Fortran was the language that I did most of my programming in.

Q. I studied basic, so I'm way behind.

Do you have expertise in the pricing of software applications?

A. It's something that we -- that I teach in the classes that I teach. I don't study pricing of software.

Q. Do you teach cost -- software costs?

A. Yes, very much so.

Q. Okay. And what would be an example of a course that you taught where the subject of software cost was prominent?

A. Launch Lab, which is -- I teach the capstone sequence to our joint degree MS/MBA program. So these are people who, say it a little humorously, are meant to be the next Mark Zuckerbergs or Bill Gates of the world

Page 20

but will finish their degrees.

Q. You're not an economist, right?

A. I'm not. Oh, no. Sorry. I didn't mean it that way.

Q. I've heard that a lot. Also about lawyers.

Do you have expertise in the area of statistics or econometrics?

A. I use statistics for my empirical studies, so I have a working knowledge of the statistics that would be used for the kind of research that I do. I focus on real-world data, which is often very messy, and there are often limitations on the kinds of techniques that can be applied.

Q. I take it, though, you don't consider yourself to be an expert in econometrics?

A. No.

Q. Are there any textbooks that you consult with respect to the topic of statistics?

A. Though I have a set of them on my -- on my bookshelves, but they would be the standard texts. I don't remember the last

Page 21

6 (Pages 18 - 21)

time I had to consult one of those.

Q. You can put Exhibit 67 to one side. I don't think we'll be looking back to that.

A. Okay.

Q. But back to 66, your report, if you could, please flip to Appendix E, which is your CV. It's at page -- or at least it starts at page 162.

A. Yes.

Q. I'm just trying to find the area -- let me see here. There we go.

You list select examples at the bottom here of consulting clients?

A. Yes.

Q. Do you see that?

It's not listed here, but have you ever consulted for Apple?

A. I have not.

Q. How about the company Epic Games?

A. No.

Q. Microsoft?

A. I've -- not consulting for them. I've worked with them.

Q. Worked with them in the sense of

Page 22

preparing an academic study?

A. Where I wrote a -- a couple of cases on Microsoft, yes.

Q. Were you compensated by Microsoft for that?

A. For the cases, no. HBS cases, we don't do that.

Q. Okay. So when say you worked with them, you're not indicating any type of employment relationship with Microsoft at that time?

A. No.

I think years ago, probably around 2013, I wrote a white paper on the total cost of ownership of software, and that was written with Keystone. And I think Microsoft had some involvement in that on the Keystone side because they were -- at the time, there was an interest in comparing operating system total costs basically for things like Windows and Linux. And for that, I was paid some money by Keystone.

Q. Have you ever consulted for Spotify?

A. No.

Page 23

Q. Flipping back to the beginning of your report, paragraph 3, which is on page 4, you indicate -- well, I'll wait until you're there.

A. Paragraph 4?

Q. Yes.

You indicate there that you have worked extensively with leading software firms, like Microsoft.

A. Yes, I -- I guess my -- that -- I mean, as part of my work, I develop cases. Cases are teaching vehicles. So the list -- I'm on the wrong paragraph, I think.

Is this No. 3, Paragraph 3?

Q. I think it was Paragraph 3.

A. Okay. Great. Yes.

So "worked" here means I've written cases with Microsoft, Red Hat, Yahoo!, Netscape, Activision, and the list goes on.

Q. The work with Activision, that was a case --

A. Yes.

Q. -- that you wrote?

A. Uh-huh.

Page 24

Q. Have you ever consulted with a client about developing an iOS or Android app?

A. I have been involved in work where app development was a part of the engagement.

Q. And app development meaning specifically an iOS or Android app?

A. Yes.

Q. On more than one occasion?

A. Yes.

Q. How many occasions would you say?

A. Well, I'm referring to two specific examples here, which were prior litigations of Facebook and Amazon.

Q. And --

A. My work was not solely related to the app, but it was a little broader, but the app was a part of it.

Q. And these were cases that involved tax issues?

A. Yes, that's right.

Q. And you were, respectively, an expert witness testifying for Amazon and then Facebook?

A. Yes.

Page 25

7 (Pages 22 - 25)

Q. Is the Facebook case resolved?

A. I don't believe so. It's taken a long time. I think it took two years for Amazon to be resolved as well.

Q. Did you say the Amazon one has been resolved?

A. It has, yes. They have an opinion.

Q. How did that compare to your input in that case?

A. My opinion was upheld. I was asked to speak about the life cycle of software and how long software lasts. And the IRS's position was that software lasts forever, and that was not Amazon's position. Neither was it what the analysis showed.

Q. In Paragraph 3 -- I think this is from pages 4 to 5 -- you mention that you worked with MBA students on start-ups "with a significant portion of them featuring mobile applications and operation as part of their strategy."

Have any of your students developed iOS or Android apps?

A. Yes, they have.

Page 26

Q. Any particular ones that come to mind?

A. So a lot of these are -- when I see them, they're in development, so it's a little hard for me to track postgraduation what happened to them. About ten years ago, we actually had a program where we had all of our first tier -- 1,000 first tiers start businesses, and typically, around 10 percent of them decided to focus on apps. They were the usual set of food delivery, dating, the things you might expect. So, on average, we would have 10 to 15 of those a year for the five years that that course was running.

Q. Setting aside the -- this case, the Amazon case, the Facebook case, have you ever been retained as a testifying expert in any other litigation?

A. There was one other case, but it's not a public case. Involved a software company. I also was involved many years ago in an arbitration, but I don't know if that counts as the same kind of thing.

Q. Was the software company that you

Page 27

referred to initially one that has any iOS apps?

A. Yes.

Q. Does the litigation involve the software company's iOS app?

A. Not to my knowledge. It's another tax-related matter.

Q. And did the arbitration involve a software dimension?

A. It was -- it was more about an acquisition and the earn-out terms in acquisition and a disagreement over whether certain features of that agreement had been reached.

(Stenographer clarification.)

A. Reached, not breached.

BY MR. SWANSON:

Q. Professor, when were you engaged by or on behalf of plaintiffs as a potential expert?

A. I think it was around February of last year the first contact was made and probably a

Page 28

couple of months later when actual work started.

Q. And who was it who first approached you?

A. The contact was made by Keystone.

Q. And then at some point, you had contact from one of the lawyers --

A. Yes.

Q. -- one or more of the lawyers?

A. Yes.

Q. Mr. Burt?

A. Mr. Burt.

MR. BURT: I'll let you answer that, but if any question he asks you seems to suggest that you should reveal the contents of discussions with attorneys, do not do so.

THE WITNESS: Okay.

BY MR. SWANSON:

Q. So the question was was it Mr. Burt?

A. Yes, as well, I think, as perhaps some other people too.

Q. Who else?

A. I don't remember.

Q. Once you were on board, what was your

Page 29

8 (Pages 26 - 29)

assignment in the case?

A.  Sure.  I'll just refer directly to --

Q.  Sure.

A.  -- the assignment that's on page 6.

So I was asked to do a few things. Explain the process of developing software and specifically mobile apps; to describe the costs that were associated with the development and operations of software and mobile apps, and particularly focus on the fixed versus the variable costs in development and operations; and then estimate a range for the variable costs incurred by developer in each genre of apps.

Q.  Have you reviewed plaintiffs' complaint in this matter?

A.  I actually am not entirely sure.  I think if I did, it would have been last February when the -- when I was thinking whether to take the case.

Q.  What is your understanding of the nature of plaintiff's challenge to Apple's conduct?

A.  That the App Store commission acts as

a form of tax basically on consumers to the extent that it's not reasonable.

Q.  Any -- any other conduct that you're aware of that plaintiffs challenge?

A.  Not to my knowledge.

Q.  Do you have any understanding of what relevant market plaintiffs are alleging here in this case?

A.  I don't.

Q.  Do you have an understanding of what the relevant product is that plaintiffs contend is sold in the relevant market?

MR. BURT:  Objection to form.

A.  I -- my understanding is that the complaint relates to all apps that are sold through the App Store.

BY MR. SWANSON:

Q.  And do you have an understanding as to who sells those apps?

MR. BURT:  Objection.  Form.

A.  App developers.

BY MR. SWANSON:

Q.  Do you intend to offer any opinions on whether Apple's alleged conduct is

anticompetitive?

A.  I do not.

Q.  Do you have any such opinions?

A.  I don't.

Q.  Do you intend to offer any opinions on whether Apple's alleged conduct has caused injury to the class members?

A.  I do not.

Q.  Do you have any such opinions?

A.  No.

Q.  Do you intend to offer any opinions on the amount of damages caused by Apple's alleged conduct?

A.  I don't.

Q.  Do you have any such opinions?

A.  I do not.

Q.  Did you draft your expert report yourself?

A.  I did with the help of some Keystone staff.

Q.  You indicate in Paragraph 4 that Keystone staff periodically consulted you "to review data and research, conduct analyses, assist with drafting and editing the report."

Who was doing the assisting with respect to drafting and editing the report? Was that all of the names --

A.  The team, yeah.

MR. BURT:  Objection.

THE WITNESS:  Sorry.

BY MR. SWANSON:

Q.  Did anyone else aside from you and that team draft any portions of the report?

A.  I think there might have been one other Keystone person later in the process who helped with copy editing or whatever that term might be.

Q.  Do you recall their name?

A.  I unfortunately don't.

Q.  When did you start drafting the report?

A.  Well, there have been multiple deadlines of the report.  So my recollection is probably two months before the first deadline, maybe started to put some sections together, and then maybe it was a little bit stop/start as the dates were changing.

Q.  I'm going to ask you a few questions

about your Appendix D, which is -- I think starts -- well, it starts at page 148 of your report.

This is the appendix about materials relied upon.

Does this appendix identify all documents and information that you considered or relied upon in -- well, strike that.

We'll forget considered.

Does this appendix identify all documents and information that you relied upon in connection with forming the opinions set forth in your report?

A. I believe so.

Q. You relied on no depositions or other testimony that I saw. Is that -- is that right?

A. That is correct.

Q. Have you read any of the expert depositions that have taken place since the expert reports were exchanged?

A. I have not.

Q. Under "Books and Papers," at the top of page 148, you list three of your own

Page 34

articles?

A. Uh-huh.

Q. What particular reliance do you place on these three articles?

A. I'd have to go back to the footnote to see where I referred to them. But they are articles that pertain to the analysis of the software code that is in different products, and the potential costs that those different code bases incur because of their design.

Q. Do any of these three articles set forth or discuss the methodology you've used in this expert report?

A. Not to my knowledge.

Q. Do you rely on any other articles that you've written?

A. Well, to the -- I'm -- obviously there's some judgment involved in the tasks that I was asked to do. So everything that I've written, all of the cases I've written are in some ways helping to contribute to the base of experience I have for making judgments, but they're not specific articles.

Q. On page 148 under "Data and Materials

Page 35

Received from Counsel," you list certain expert reports. How did you decide which expert reports to rely on?

A. It was -- it made sense to look at Professor McFadden's initial reports, and given that I was being asked to provide data, that would potentially go into those reports.

Q. Have you had any communications with Professor McFadden or his staff working under his direction about this matter?

MR. BURT: I'm going to object and caution the witness that there's a stipulation that limits how much counsel can inquire to communications with either another expert or another expert's team to that on which you have relied.

BY MR. SWANSON:

Q. A yes or no would be fine.

A. So sorry. What was the question again, then?

Q. Sure. Have you had any communications with Professor McFadden or his staff working under his direction about this matter?

A. I've certainly not talked to Professor

Page 36

McFadden. The only person who was on a call early on, which I think was related to getting access to the subpoenaed data, was somebody from Brattle, who I think held the initial data.

Q. Do you remember who that was?

A. I think it was Minjae.

Q. Are you relying on that communication with the Brattle individual?

A. No, I don't remember much about it. It was just one of many.

Q. Have you had any communications with Dr. Song or staff working under his direction about the case?

A. I have not.

Q. Have you ever met Dr. Song before?

A. I have not.

Q. Do you rely on any of the expert reports that were disclosed at about the same time as your own?

A. I do not rely on those.

Q. Have you -- have you seen, for example, the May 7 expert report of Professor McFadden?

Page 37

10 (Pages 34 - 37)

A.  I have not seen that.

Q.  Or the expert report of Dr. Song?

A.  I have not seen that.

Q.  Have you seen any of the reports of the Apple experts that were submitted in March?

A.  The only one that I've seen is Dr. Hitt's' report.  Actually, that may not be true, but I would forget the name of the -- Subra -- Subra (phonetic)?

Q.  Sivarajan.

A.  Okay.  Sivarajan, yeah.

Q.  Did you interview anyone at all in connection with reaching the opinions that you set forth in your report?

A.  No, I did not.

Q.  Did counsel provide any assumptions that you relied on in forming your opinions in this case?

A.  There were no assumptions.  I was passed some data, which I think the report outlines.

Q.  Does your report contain a complete statement of all opinions you currently plan

Page 38

to express at trial?

A.  Well, there is the potential for a rebuttal.

Q.  Setting aside rebuttal opinions that you may have developed since March 7.

A.  Yes, it does.

Q.  Have you identified any errors or omissions in your report since you submitted it?

A.  I have not.

Q.  Aside from staff at Keystone and plaintiffs' counsel, have you discussed the opinions in your report with anyone?

A.  No.

Q.  Let me ask you to flip to Paragraph 5 of your report.

I would ask you a question about the second bullet in that paragraph once you're there.

A.  Yes, sure.

Q.  You state that your assignment is to "Describe the costs associated with the development and operations of software and mobile applications."

Page 39

Do you see that?

A.  Yes, I do.

Q.  Do you draw a distinction between software apps and mobile apps?

A.  I -- in this report, I'm really describing software development in general, which these costs apply to all of these different categories.

Q.  Are mobile apps a subset of software applications?

A.  I would think so.

Q.  What do you consider to be a mobile app?

A.  Software -- a software product or service that sits on the device and potentially delivers useful features to the user and may or may not communicate to a back-end server to help deliver those features.

Q.  How does the mobile part come into that definition?

A.  Well, the device is a mobile device.

Q.  And what do you consider to be a mobile device?

Page 40

A.  Any smartphone or tablet-related device that is carried with you.

Q.  How about a laptop?

A.  Laptops are -- I consider to be a little bit of a different category because they are running typically on different operating systems and fulfill a slightly different purpose.

Q.  Are you familiar with the Nintendo Switch?

A.  Yes, I am.

Q.  Do you consider that to be a mobile device?

A.  It's a mobile gaming platform, so I guess that's a subset of devices.

Q.  Do mobile app developers have the same cost structures as developers of nonmobile software applications?

A.  They engage in many of the same activities.  And so to a large degree, those costs can be regarded to be similar.  Obviously, in terms of distribution, there's a fairly significant difference with the fees that App Stores charge.

Page 41

11 (Pages 38 - 41)

Q.   Are there any systematic differences in cost structure as between mobile app developers and developers of nonmobile software applications?

A.   I -- I don't think I necessarily have the data to be able to make that distinction. My experience suggests that in all of these firms where they're developing apps or other software for desktop devices, a similar set of activities go on, and so a similar set of costs are incurred.

Q.   I'm still on Paragraph 5, second bullet, the first subbullet where you say you are asked to explain the broad categories of fixed and variable costs incurred in software development and operations.

Are the broad cost categories that you refer to here the same for mobile app developers and developers of nonmobile software applications?

A.   To a large degree, yes, with the exception of the App Store commission fees.

Q.   Moving to the third bullet in Paragraph 5 on page 6, you state an additional

part of your assignment is "to estimate the range of variable costs incurred by a typical developer in each genre of apps available on the App Store."

Do you see that?

A.   I do.

Q.   Did anyone provide you with any guidance about how to categorize costs as fixed or variable?

A.   No.  That was -- that was up to me based on my experience.

Q.   And what guidance, if any, were you given about how to approach the calculation of a range of variable costs?

A.   I was only told the ranges were a viable input to the model, and so there was no guidance at all, so I let the data guide me on the degree to which ranges were wider or narrower.

Q.   Were you given any guidance about how broad a range to calculate?

A.   No.

Q.   Did you receive any guidance about how to choose the lower end of the range?

A.   No.

Q.   Did you receive any guidance about how to choose the upper end of the range?

A.   No.

Q.   Were you asked to employ statistical techniques in reaching your estimates?

A.   I was just asked to do this the way that I would do it as if it was a research project in my field.

Q.   And have there been research projects that you've embarked on in the past that are similar to this one?

A.   I would say there are a few similarities, but calculating ranges is something that you're not often doing in academia.  We're a little bit more interested in prediction.

Q.   Could you please turn to Paragraph 36 of your report, which I believe is on page 17.

You -- well, let me know when you're there.

A.   Sorry, sorry.

Q.   No problem.  Take your time.

A.   Yes.

Q.   You indicate here that you will describe why users are the relevant economic unit for analyses of software and mobile application developers.

My question is what do you mean by "relevant economic unit"?

A.   Well, if you -- if you go to a software firm and look at how they manage themselves, I've seen a software firm that, you know, splits out and analyzes profitability by tokens, for example.  I don't see that.

So what I see is that people actually manage themselves by looking at the profitability of users and capturing all of the economic costs that are incurred in order to serve a user and to monetize that user.

Q.   So that would be true, for example, of Facebook?

A.   The user being a unit of analysis?

Q.   Yes.

A.   I think for software, in general, is what I've seen.  That's my experience.

Q.   Would that be the case say, for

example, for Amazon?

A. The relevant unit of analysis is users, which turns into revenues, and understanding the margins that are associated with those users, yes.

Q. Are there economic units other than users that you can think of that software developers pay attention to?

A. Well, in some cases, products that are offered to customers might be essentially if you sell X products, it's basically to X users, and so there's an alignment between those two things. But if you look at a software firm and how they measure unit economics, there's very much this central focus on the user.

Q. And are there different types of users?

A. There are.

Q. Okay. What are the different kinds of users?

A. Well, in the report, we outline there might be -- for apps, for example, there might be free users. There are paid users. They

Page 46

pay in different ways. So these are basically the main distinctions that are drawn in the report.

MR. BURT: Before you ask your next question, I objected to form to that question. I'm a quiet objector so as not to interfere with Mr. Swanson's examination. But if you're not getting it, let me know that my mic is too low.

(Off-the-record discussion.)

BY MR. SWANSON:

Q. Could you flip back to Paragraph 8 of your report, please, which is on page 7.

You indicate there that you "believe that users, rather than digital goods and services, are the appropriate unit of analysis for evaluating the economics of app developers."

Do you see that?

A. Yes.

Q. What do you mean by "the economics of app developers"?

Page 47

A. I mean their profitability, the margins they make, so the most relevant to my assignment, which was to understand genre gross margins.

Q. You also state that "Measuring per-user revenues and costs captures all the expenses associated with offering products to users and facilitating user engagement."

A. Uh-huh.

Q. Why do you need to measure per-user revenues in order to capture expenses? Aren't they different things?

A. Well, my assignment is to understand the margins, and so what I want to understand is, for the life cycle of a user, it's going to cost something to acquire them. It is well-known in -- in software, every company talks about their cost of customer acquisition. And then once you've acquired that customer, there's a cost to serve them.

There are multiple ways that you may engage with them and multiple ways that they may deliver revenue to you, and then there's a set of costs associated with the

Page 48

infrastructure for delivering the service to the user as well as the maintenance and support that the user might need.

So it's really looking at the end to end. In order for me to, you know, profit from this user that really loves games, I need to capture all of the components of the costs and ideally the revenues that are coming from that person in order to establish a gross margin.

Q. And when you say "facilitating user engagement," what specifically do you mean by that?

A. Well, users are a fickle bunch, and they get -- they quickly get tired of things, and so facilitating engagement might require you to add more features and functions, another level to a game, for example, to add more services to your app. So there's a constant evolution of the software, and there's a constant need -- in software, it's clearly -- churn can be a big issue. So if you're a subscriber, managing your churn is one of biggest levers that you get in terms

Page 49

13 (Pages 46 - 49)

of -- that dictate your profitability.

So keeping them engaged requires not only product changes and feature changes, but it also requires potentially some marketing investments in order to keep them in the fold, so to speak.

Q.   Is engagement any type of synonym for purchasing?

A.   Well, I think --

MR. BURT:  Objection.

THE WITNESS:  Sorry.

MR. BURT:  Objection to form.

A.   I think we -- we expect and hope, if you're an app developer, that there's a correlation between a user's engagement and your ability to extract some monetization from them.

BY MR. SWANSON:

Q.   When you refer here to products capturing all the expenses associated with offering products to users, et cetera, are you including products that are offered -- well, that are free to some users at least?

A.   I'm looking for the word "product."

Is it in Paragraph 8 still?

Q.   Yes, Paragraph 8.  Yes.

A.   (Witness reviews document.)

So I think that's a true statement for everyone.

Q.   Flip now, please, to Paragraph 36. And that would be a carryover to the top of page 18.

You state here, "Indeed, interest in users as the unit of analysis is reflected in metrics commonly used and reported by software developers such as monthly or annual average revenue per user, ARPU, and average revenue per paying user, ARPPU."

Do you see that?

A.   Yes, I do.

Q.   In your opinion, are these metrics the appropriate ones for measuring per-user revenues?

A.   Well, there are -- there are many others as well, but these are examples of the kinds of things that I see when I am inside software companies.

Annual average revenue per user,

another popular one is recurring revenue per user because your ability to get venture capital or to get future investment typically depends upon the fact that you're not losing those customers.

Q.   Are there other metrics that you can think of?

A.   Well, I -- having just mentioned the recurring revenue per user, I think in a typical app developer, you might break those down further into tiers, for example, if people are -- are paying for the product in different ways, but they're -- they're two of the most common.

Q.   Do any metrics involve taking all of the prices charged for in-app digital goods and averaging the price?

MR. BURT:  Objection.  Form.

A.   There may be.  I don't know the list of all the metrics that all software companies use.

BY MR. SWANSON:

Q.   Have you ever seen that before?

A.   Could you explain again the specific

of the...

Q.   Yes.

Have you ever heard of anything called app-level pricing?

A.   I'm not sure I -- I mean, I obviously understand what the price of an app is.  But app-level pricing, could you explain a little more?

Q.   App level -- have you ever heard of app-level pricing of in-app content?

A.   Well, certainly I understand that you can -- you can price things that are inside the app very, very differently, and consumers will make their minds up as to which way to go on -- to buy something or not.

So upcharge or, you know, how many customers do we take from Tier 1 to Tier 2 is, again, a super important metric for -- especially for companies that would have a premium style of model where they really want to be taking people from, let's say, the low base, where they're not being paid, to the subscription or, you know, in-app purchase model.

14 (Pages 50 - 53)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. Could you flip back -- and I'm afraid we're going to move all around your report, so bear with me -- to Paragraph 8 on page 7.

I want to focus on the last sentence there, which says, "Such an analysis offers a comprehensive view of the developer's business, capturing important costs that might be missed by an analysis focusing only on digital goods, which form a small part of the overall service delivered to users."

Do you see that?

A. I do.

Q. First of all, what do you mean by "the overall service delivered to users"?

A. So, for example, if it was a game, the overall service delivered to users is engagement with the game, getting to different levels, acquiring resources, whatever the game actually needs.

As a part of that game, there might be an opportunity to pay for things that will allow you to help, like get a new pickax or shovel or something, so that the overall service to the user is -- is broader than just

Page 54

the provision of just a digital token to the user.

Q. You refer here to "digital goods." Are there other products or services other than digital goods that are relevant to this case that you can think of?

A. Well, this was the --

MR. BURT: Object to form.

A. Knowing the background and some of the divergent views on this topic, digital goods was the one that was most salient.

BY MR. SWANSON:

Q. What is a digital good?

A. A digital good is a good that exists in information form.

Q. Is a subscription to a mobile app a digital good?

A. I would -- I would -- I would think I would talk about that more as a monetization strategy. So your subscription is giving you access to certain digital goods and to game play.

Q. Would you consider it to be a digital service?

Page 55

A. A subscription?

Q. Yes.

A. Possibly. I would have to think about it. I'm not sure.

Q. Is an in-app purchase a digital good?

A. The thing that you're buying might be a digital good. An in-app purchase is just a purchase transaction.

Q. Are there -- well, what other types of in-app purchase transactions are there? There are physical goods that one can purchase, right?

A. For most of the things that we're considering here, you would be buying things that are digital goods.

Q. Is a paid download of a mobile app a digital good?

A. The app itself is a digital good. The payment for it is a -- is a transaction.

Q. And do you draw a distinction between a transaction and a digital good?

MR. BURT: Objection to form.

A. I think I -- I do, uh-huh.

BY MR. SWANSON:

Page 56

Q. And what distinction do you draw?

A. Well, I'm paying for something, and then I'm handing over some kind of money, and then the digital good is being transferred to me.

Q. When you say here that digital goods are a small part of the overall service offered, do you mean a small monetary part?

A. I mean that -- again, going back to the example of tokens, of course, we know they're a large part of the economy. They're a small part of all of the costs that would be incurred in order to serve the user with the digital good.

Q. When you refer to a token, are you referring to digital currency?

A. Yes, yes.

Q. Like a virtual currency?

A. Exactly.

Q. Do you include in your analyses in this report the cost of developers selling physical goods and services?

A. Not to my knowledge.

MR. SWANSON: I think we've been

Page 57

15 (Pages 54 - 57)

going for about an hour. Do you want to take a short break?

THE WITNESS: Sure.

MR. SWANSON: And anytime you want to take a break other than in the middle of a question, it's okay.

THE WITNESS: The hard ones?

THE VIDEOGRAPHER: The time is 9:37. We're off the record.

(Recess taken from 9:37 a.m. to 9:52 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:52.

BY MR. SWANSON:

Q. Professor MacCormack, could you please turn to Paragraph 2 of your report, not to backtrack, but...

That would be on page 4.

A. Uh-huh.

Q. You state there that you've "published several peer-reviewed papers that focus on the costs associated with the development and

Page 58

maintenance of software."

Are these papers listed in your CV?

A. Yes, they are.

Q. And are you able to identify which papers these are?

A. I'll find my CV.

Q. I think page 163 may be relevant, that section.

A. Yes. So technical data and system architecture systems and software.

Q. Are we on page 163?

A. Yes. I am, yes.

Q. How far down -- I see it.

A. It's like -- yeah.

Q. Uh-huh.

A. "Hidden structure: Using Network Methods to Map System Architecture."

"Exploring the duality between product and organizational architectures."

"Do you need a New Product-Development Strategy?"

"Critical Decisions in Software Development."

"Exploring the Structure of Complex

Page 59

Software Designs."

"Software Development Worldwide: The State of the Practice."

"Trade-offs Between Productivity and Quality in Selecting Software Development Practices."

"Developing Products on Internet Time." I think there's two versions of that.

Yeah, that's probably a good start.

Q. And in each of those papers, there will be some discussion of the costs associated with the development and maintenance of software?

A. That's right.

Q. Have you published any papers that focus on the costs associated specifically with the development and maintenance of iOS applications?

A. I've not. I've written case studies that include a discussion of that process.

Q. The process of developing iOS applications?

A. Yes.

Q. In --

Page 60

A. And the outputs that come from them, yeah.

Q. And in Paragraph 2, you state that you've "written over 50 cases, teaching notes and module notes which describe the business and operations of software firms, their product development, marketing, and their underlying cost structures."

First, what do you mean by "underlying cost structures"?

A. I mean these are cases that describe the entire operations of a company. So Microsoft would be a good example. So I worked with the -- the Office team to basically paint a picture of how Microsoft Office gets developed. That case was actually about the launch process for Microsoft Office, so it includes discussion of the role of marketing and sales and understanding what should be built and then released to market, or "RTM" is the phrase that they use.

Similarly with Red Hat, same kind of thing. Red Hat, coincidentally, I wrote those cases at the same time, which was very

Page 61

16 (Pages 58 - 61)

interesting because the Microsoft guys were very -- very downbeat on open-source software, and then eventually I guess they turned the corner and thought it ended up being a good idea.

So all of these, Netscape -- Activision was actually a case about the development of the Kelly Slater, Pro Surfer, project. It was meant to build on the success of Tony Hawk. Tony Hawk, of course, got a royalty. He selected a great deal for his -- for that game, which was wildly successful. And Activision then thought, Oh, like, if one extreme sport is very successful, we'll go and do some more.

And that case is actually about the development process inside Activision, the costs that they incur, and then just as they get to the market, how do we release this? You know, how do we acquire customers?

Q. Just to ask a very general question, at least in the Harvard Business School context, what is a case?

A. Yeah. So this is -- basically, 95

Page 62

percent of our classes involve a case. It's a document which is typically 10 to 15 pages long that describes the company and a situation. And we -- in the class, we give them certain assignment questions. What would you do? How would you improve? So it allows the professor to take a class through a discussion of changes you would make. Did they write -- did they make the right decision?

So we -- rather than lecturing at HBS, it's a much more participative style, a little bit more like law school, I guess.

Q. Is there a difference between a case and a teaching note and a module note?

A. Yeah. Sorry.

Q. Sorry.

A. I've got to pause more.

Q. So start with a teaching note.

A. Yeah. So cases are -- you know, you or I can log on and buy a case. A case doesn't have the answers. A teaching note has the answers, so -- and the answers are often frameworks for thinking about a topic. So how

Page 63

should I approach this general situation?

So in general, the teaching notes are only given to people who are bona fide academics so that the answers don't get out into the field basically.

Q. What's a module note?

A. When we write cases, they're meant to be put in courses, and courses are structured into modules. So we would write a module note where we describe this is a module about product development and how it works. And inside that module there's going to be these four cases, and here's how they all fit together, and here's what you're going to communicate to the students by teaching the four together. So it's really to help, again, instructors design courses.

Q. It's another general question, but how do you go about preparing a case or a teaching note?

A. So as a professor, it's my job to identify good potential candidates for cases. Sometimes they don't always want to speak to us because it might be a situation where, you

Page 64

know, it's an example of what not to do. Those end up being public -- public source cases. And sometimes they really like to speak to us, and they view it as a great way to get a little bit of PR for the company.

Normally, after you've approached the company about writing it, you would set up a series of interviews, and you would spend time at the company. I would say, on average, you would spend time with eight to ten people doing interviews, and you would have a case writer who would come along, and you might outline the case, but then the case writer is filling in all of the details basically.

And then, of course, you have to shape it. Pretty rarely is it the first time that you teach a case is it -- does it synch the way it should. So we then adapt it, and hopefully, it reaches its peak at that point.

Q. You indicated in your report that you've been involved in 50 cases or notes.

Are the ones that deal with the cost structures of software firms listed in your CV?

Page 65

17 (Pages 62 - 65)

A. Yes. Well, I think -- I think most of my cases are listed there, yes.

Q. Could you take a look at that again -- I think we're starting around page 166 for that section -- and let us know which ones of those deal with the cost structures of software firms?

A. (Witness reviews document.)

Well, when we talk about cost structure, let me kind of illuminate what -- what we mean there.

So Activision is all about how the development process works, who's involved, how big that team is. It actually talks about the launch campaign. So it's costs. It's not necessarily saying, you know, here is the gross margin of that company. Most cases have the financials for the company in the pack, but the contents of the case talk about costs in a variety of different ways.

So Activision would definitely be one. D-Wave Systems, that's a quantum computer, so we -- we don't need the quantum computer, actually.

Page 66

Q. Oh, okay.

A. "Living on Internet Time."
"Microsoft Office 2000."
"Microsoft.NET."
"Red Hat and the Linux Revolution."
I think the RIM case on BlackBerry probably has a fair amount in there.

Q. The "Research in Motion" --

A. Yeah, that's right.

Q. -- one?

A. Yeah. Some of these are quite old so I actually don't remember.
"Virgin.com" and "Wholesaler Direct."

Q. Have you written any cases or notes about Apple?

A. I've not.

MR. SWANSON: Let's mark as 68. We'll mark an exhibit.

(Exhibit No. DX-68 marked for identification.)

BY MR. SWANSON:

Q. We've had marked as DX-68 a document

Page 67

that appears to be a publication, "Research in Motion: The Mobile OS Platform War."

Do you have that in front of you, Professor?

A. Yes, I do.

Q. And you're listed here as one of the authors, correct?

A. That's right.

Q. Do you recall authoring this document?

A. Yes. As a little bit of background, so Chris and Brian are -- were my collaborators here. Chris is a University of Pittsburgh professor, who is in the business school, study of software, like I do. They led the development of this particular example. And the reason I'm listed at the top is we're not allowed to have a non-HBS person listed at the top.

Q. And Chris is Chris Kemerer?

A. Yes.

Q. K-e-m-e-r-e-r?

A. Uh-huh.

Q. Then Brian is Brian Dunn?

A. And Brian was a doctoral student of

Page 68

Chris's when this work was done.

Q. And then in the upper right-hand corner, there's a date, April 3, 2024. It says "Rev." Does that refer to a particular revision?

A. Yes. I don't remember this necessarily being revised, and it was put into the system probably around that time. Sometimes revisions happen because people spotted a typo or something that just needed to be corrected.

Q. Have you ever updated this case after April, 2024?

A. No. In fact, I haven't taught the case either.

Q. You haven't taught it since then or taught it at all?

A. I don't use it in my classes.

Q. Is there some reason for that?

A. No. I think it's -- it's a lot easier to teach the cases that you were the primary lead on. So this was Chris -- Chris and I have written some articles together, and he really wanted to have a outlet for this work,

Page 69

18 (Pages 66 - 69)

and so we collaborated on a couple of cases.

Q. What is "The Mobile OS Platform War" that's referred to in the title?

A. This is the -- basically the competition between different mobile devices and the operating systems that sit on them.

Q. And this case was about the challenges faced by RIM, Research In Motion?

A. That's right.

Q. And RIM was the company that made the BlackBerry, right?

A. Yes.

Q. And this case was about the marketplace it faced in about 2012?

A. That's correct.

Q. If you could, turn to page 7 of the case on the Section 4 on that page. If you're there, it's entitled "The Mobile OS Competition."

Do you see that?

A. Sorry. I'm on the wrong page. Which page are we on again?

Q. It's page 7.

A. Okay. Uh-huh.

Page 70

Q. Do you see 4, "The Mobile OS Competition"?

A. Yes.

Q. Then below that is a subheading "Apple iOS"?

A. Uh-huh. Okay.

Q. What is this "Apple iOS" section about?

A. I think we're painting a picture of the market that RIM is trying to compete in. And specifically, this case was designed to actually tell the story of a disruptive technology.

And as we all know, BlackBerry didn't come out very well in the smartphone wars, and yet we all had one in our pocket at some point in time. And so the case at large was about, well, how do we -- how do we account for the fact that this really successful company, in the end, they still -- they're still alive but basically became much smaller.

Q. And --

A. This was describing -- I think -- let me just look through here.

Page 71

This was describing the various alternatives that were in the marketplace at the time the case was written, which was around 2012.

Q. And the "Apple iOS" section here is about the iPhone; is that right?

A. Yes, it is.

Q. Turn to page 8, please. If you go to the fourth full paragraph there, you refer -- or you and your coauthors refer to "key innovations that the iPhone contained"?

A. Uh-huh.

Q. Do you see that?

A. Uh-huh.

Q. And then the article observes that "Perhaps bigger than the device's technological innovations were the business innovations that Apple brought to the smartphone industry."

Do you see that?

A. I'm looking, but I'll get it eventually. This is the fourth paragraph, right?

Q. Yes, this is the fourth full

Page 72

paragraph. So it's the paragraph that starts --

A. Oh, okay. Okay.

Yes.

Q. And was one of the business innovations that Apple brought to the smartphone industry that Apple bypassed the wireless carriers and sold third-party apps to iPhone users?

MR. BURT: Objection to form.

A. I don't recall what our intention is with this sentence, but that would make sense.

BY MR. SWANSON:

Q. On page 9, focusing on the first full paragraph there, the article states that "Another fundamental smartphone business change was Apple's App Store. Apple's success with the iTunes store led the company to extend the concept to software for iOS. Customers seeking to extend the capabilities of their iPhones could do so by buying and downloading apps directly through the App Store."

Do you see that?

Page 73

19 (Pages 70 - 73)

A. Yes, I do.

Q. Is this another one of the business innovations that you were referring to?

A. Yes. I think, if I recall correctly, Apple's initial launch did not allow customers to access apps, and there was a lot of jailbreaking that was going on at the time. And then a decision was made to allow that to be a part of the strategy for the phone.

Q. And in that same paragraph, you go on to state that "Apple retained a 30 percent commission on all apps sold, giving application developers a 70 percent cut, considerably more generous than the payments developers had received from wireless carriers."

Do you see that?

A. I do.

Q. What payments had developers received from wireless carriers beforehand?

A. I actually don't recall. Sorry.

MR. BURT: Objection to form.

BY MR. SWANSON:

Q. Go ahead.

Page 74

A. I don't recall the numbers that they were getting from the wireless carriers.

Q. But you do recall that the 70 percent payment that Apple offered developers was considerably more generous than what developers previously had received for their apps?

A. Through wireless carriers, I think, is an important caveat there.

Q. And what do you mean by that, "caveat"?

A. Meaning that -- so if you were to get it through Verizon or, you know, other -- other basically carriers.

Q. And those carriers demanded more than a 30 percent cut; is that correct?

A. Based on this sentence, it must have been true.

Q. And I take it you were involved in editing this article or this case before it was finalized?

A. I was.

Q. Do you agree that mobile application developers were encouraged by the considerably

Page 75

more generous financial terms offered by Apple to divert resources away from developing apps for other mobile operating systems?

A. I think at that point in time we would have to read the other competing -- competing ecosystems to understand if that was a trend towards Apple alone or if it was a trend away from wireless carriers. In which case, you know, Google and Microsoft -- other -- other players could also have benefited from the trend.

Q. Well, in that first full paragraph on page 9, after referring to the 30 percent commission as considerably more generous, you say, "Mobile application developers were thus encouraged to divert resources away from developing apps for other mobile operating systems and to instead focus on the iPhone."

Do you see that?

A. I do.

Q. Is that an accurate statement?

A. Yes.

Q. These developers who were dealing with Apple through the App Store had lower variable

Page 76

costs as a result of Apple's business innovations, didn't they?

A. If they -- if the commissions were higher going through the wireless carriers and there were no alternative platforms, then that would save them costs.

Q. You indicate here that "Not only did the App Store serve as a money generator for the company, its existence also drove customers to adopt the iPhone."

Is that a true statement?

A. I think so.

Q. Do you agree that the App Store was a popular feature of the iPhone?

A. I do.

Q. Looking at the third full paragraph on page 9, the article states, "Despite Apple's failure to win the PC platform competition, the iPhone represented a closed architecture similar to that of the company's computers."

Do you see that?

A. Yes, I do.

Q. What do you mean by that statement?

A. Very often -- so we would take the PC,

Page 77

20 (Pages 74 - 77)

the IBM PC, obviously that was an open architecture where there were a lot of clones that came out and they could build their systems with a whole bunch of different components.

Apple basically retained the rights to the standards for the -- for the iPhone system. They're the only one that could make the operating system. And they had the gatekeeping rights on what got onto the platform.

Q. And you say that "Apple controlled the distribution of third-party software onto the -- onto the device."

Is that also what you mean by a closed architecture system?

A. That's part of it, yes. A closed architecture often refers to the standards that are used by the -- by the device maker. And clearly with the PC, we had seen a proliferation of different providers, and here that was not going to be possible.

Q. The article also states that "This was, however, the same approach that Apple had

Page 78

taken with its iPod."

By "same approach," did you mean that Apple also controlled distribution of software onto the iPod?

A. Well, to my knowledge, I don't think the iPod had -- the original iPod was really just a music player, so it was not taking on apps. So I think what we're talking about here is that the iPod was a closed system. So it was -- you couldn't load your own songs basically onto the iPod where -- or it was hard to do that relative to one of the competing MP3 players at the time.

Q. Let me just make sure I understand that.

Your recollection, it was hard to load songs onto the iPod?

MR. BURT: Objection to form.

A. With the original iPod, I think there was -- through iTunes, you could synch your you music library, assuming that you had burned your CDs onto your PC. So there was a mechanism to do that, yes.

BY MR. SWANSON:

Page 79

Q. And you state -- or at least the article states that "Apple's approach to the iPod had proved wildly successful."

What did you mean by that?

A. I think it got, you know, hype. For a consumer device, it got very high penetration. The original iPod was very iconic in terms of its design. I think we all loved that. I still use it in class as a demonstration of design excellence.

Q. And did you consider the iPhone to be a demonstration of design excellence as well?

A. I think the iPhone was a very disruptive device at a time when not everyone was convinced that BlackBerry could be beaten.

Q. And as a disruptive device, do you mean to convey that you regarded it to be an example of design excellence?

A. I think it was -- it was a good design.

Q. Do you have an iPhone?

A. I do. It's right here.

Page 80

Q. Have you ever had an Android phone?

A. I have not, no.

Q. Have you had multiple iPhones?

A. Our family have iPhones. When you're dealing with a family, it's quite helpful to know where everyone is.

Q. Amen.

The next section in this paper on page 9 is subtitled or the subheading is entitled "Google Android."

A. Uh-huh.

Q. Do you see that?

A. Uh-huh.

Q. Do you recall what that section is about?

A. It's about the competing operating system for mobile -- other mobile devices.

Q. You say "the competing operating system." There were multiple competing mobile operating systems at this time, were there not?

A. Yes.

Q. And Android was one of them?

A. Yes, uh-huh. Android was something

Page 81

21 (Pages 78 - 81)

that was not just in phones. It was embedded in a lot of other hardware as well.

Q. In the first paragraph under that "Google Android" heading, the paper states that "Some application developers were discouraged by Apple's insistence that all apps be sold through its proprietary App Store and be subject to Apple's approval, which was neither universal nor guaranteed. Many of these concerns were addressed in 2009, when another new generation of mobile LS was released, Android."

What do you mean when you say that "Many of these concerns were addressed"?

A. Well, I think the rolled garden approach where one person gets to control what's on there and Android's approach, at least as I recall at the time, was more open as to what apps would be allowed onto the device.

Q. And you don't identify here Apple's 30 percent commission as a developer concern in this case, do you?

MR. BURT: Objection to form.

Page 82

A. No. But we have to realize that cases are vehicles for discussion in a class. They're not meant to be primary sources of reference.

BY MR. SWANSON:

Q. They're meant to be accurate, correct?

A. Yes, yes. Absolutely.

Q. And they're meant to be relatively comprehensive?

A. Actually, that's not necessarily true because our cases are only limited to be typically 10 to 12 pages, so you tend to focus them on a topic. So obviously, there's not a lot -- I mean, how much do we have on Apple? A page and a half. Clearly, we can't describe everything about Apple in a page and a half.

Q. But in this page and a half, you described Apple's 30 percent commission as considerably more generous than what had been available beforehand, correct?

A. At the time, yes.

Q. And when Apple introduced the iPhone, it was available only to AT&T subscribers, was it not?

Page 83

A. Yes.

Q. Do you agree that Android quickly became the mobile market share leader?

A. I don't recall, but it may be in the case.

Q. I'm looking at page 11, the sixth full paragraph --

A. Uh-huh.

Q. -- the paragraph that starts "Regardless of Google's support, however, Android had become the mobile OS market share leader."

A. Yes.

Q. Is that correct?

A. Yes.

Q. And do you agree that Android had allowed app developers freedom from Apple's leverage?

A. It certainly allowed more freedom in terms of what apps could get onto the device.

Q. The bottom of page 11, there's another subheading "Microsoft and Nokia."

Do you see that?

A. I do.

Page 84

Q. And what is that section of the case about?

A. Microsoft had a competing operating system called Windows Mobile that was not a particularly good operating system for mobile devices. They at some point bought Nokia, and I think there was a hope that they could put Microsoft Windows Mobile onto Nokia devices and become a major competitor in the marketplace.

Q. When you indicate that Microsoft had the Windows Mobile competing operating system and it was not appreciably good, do you have an understanding as to why that was the case?

A. In the -- I spent a lot of time at Microsoft over the years, and my understanding was that rather than a code-it-from-scratch approach that they may have tried to shrink Windows to fit on a smaller device. But that -- those were my impressions from conversations I had. So I don't know if that was exactly true technically.

Q. On page 13, right before the

Page 85

22 (Pages 82 - 85)

conclusion section, the article states, "With quality mobile hardware now available for Windows Phone and with the company eyeing the coming release of the next generation of PC OS, Windows 8, the year 2012 looked to be a promising one for Microsoft."

Was that your perspective at the time?

A. I think some of the comments we put in here are meant to generate debate about what is likely to happen in the industry, which is what we want our students to do.

Probably in the press, there was that kind of sentiment that, Oh, Microsoft is entering here. Perhaps there will be, you know, more interesting products and services that are going to emerge. They did not turn out to be true.

Q. And how about BlackBerry? Did it have a promising position in or about 2012?

A. No. As the introduction to the case describes, I think they were really at loggerheads about what to do to save the company.

Page 86

Q. And had their position been promising just a few years before that?

A. Yes, they were. I think their market cap eventually declined from something like 150 billion down to less than 10.

Q. Was their position promising around the time that Apple introduced the iPhone?

A. I believe from a smartphone perspective, they were the leader at the time.

Q. You can put that one to one side. I'll mark another exhibit.

(Exhibit No. DX-69 marked for identification.)

THE WITNESS: Another Chris case.

MR. SWANSON: We're going to get an HBS education here, free.

THE WITNESS: Do you have the teaching note, though?

MR. SWANSON: We had to read different cases.

BY MR. SWANSON:

Page 87

Q. I have had marked as DX-69, I believe, what appears to be a case entitled "Barnes & Noble: Managing the E-Book Revolution" bearing revision date of April 3, 2014.

A. Uh-huh.

Q. Is this another case that you were a coauthor of?

A. Yes, it is.

Q. And this was, again, a case coauthored with Mr. Kemerer and Mr. Dunn?

A. That's right.

Q. Okay. And what were the circumstances surrounding the creation of this case?

A. Similar to the RIM case, I believe Chris had a course that he taught on platforms at Pittsburgh and had certain cases that he thought would be -- have broader appeal than just having it taught at Pittsburgh. And so we talked a little bit about the opportunities for things that he had worked on to make it into the Harvard case catalog.

Q. Could you turn to page 8 of this case, please.

At the top of this page, there's a

Page 88

heading, "Apple and the Agency Model."

Do you see that?

A. Uh-huh.

Q. Do you have an --

A. Sorry. Yes.

Q. -- understanding of what that refers to?

A. Off the top of my head, I don't recollect.

Q. If you look at the third paragraph, the case states that "When Apple followed the success of the iPod with the release of the iPhone, the company again followed a similar strategy."

What was the strategy that you were referring to here?

A. Well, according to the next sentence, it's -- there's profits on the sale of the phone but also profits through the sale of applications through the App Store.

Q. And you go on to state that "Apple made the App Store the sole source of applications for the device."

Is that strategy similar to the iPod

Page 89

23 (Pages 86 - 89)

strategy?

A. Well, with the iPod, I don't remember -- at some point it became a device I think that you could put things on, but I don't remember when that change was made.

Q. You indicate here that "Apple encouraged companies to develop iPhone apps by allowing developers to set the sales price and taking only a 30 percent commission; i.e., developers received 70 percent of the sales price from Apple."

Do you see that?

A. I do.

Q. You're saying here that charging only a 30 percent commission encouraged developers to make iPhone apps?

MR. BURT: Objection to form.

A. I -- I think I'm just saying it's a 30 percent commission.

BY MR. SWANSON:

Q. Okay. It's only -- you say it's only a 30 percent commission, correct?

A. Yes. And it may -- it may be that, again, we're talking about the comparison to

Page 90

the wireless companies, which was in the prior case.

Q. Are there other comparisons you're aware of where developers around this time were getting better deals than they were from Apple through the App Store?

A. I don't know what the other stores were charging. Nokia had an App Store for some of its smart devices, but I don't know what the commission rates were for those apps.

Q. Did BlackBerry have an App Store or marketplace?

A. I -- I don't remember.

Q. Okay. You can put that to one side.

Professor, are you familiar with the concept of marginal cost?

A. Yes.

Q. Do you teach the concept of marginal cost to business students at HBS?

A. The school does. I -- I, in my classes, focus a little bit more on costs that are relevant for software companies.

Q. How do you define "marginal cost"?

A. The cost to produce another unit or

Page 91

product or service to the user.

Q. Are you familiar with the concept of average variable cost?

A. It's not something I use in my day-to-day, but I am familiar with variable costs.

Q. Okay. Have you come across the concept of average variable cost before?

A. It's possible.

Q. Do you have any understanding as to whether marginal cost and an average variable cost are necessarily the same thing?

A. I -- I don't think they're necessarily the same thing.

Q. Are they the same for app developers?

A. Not -- not to my knowledge.

Q. If they are different for app developers, which one are you measuring in this case, marginal cost or average variable cost?

A. I've been asked -- my assignment was to measure gross margins for each genre and to do that in a very specific way where I identify sets or four buckets of variable

Page 92

costs, and then to work out what the margin is after subtracting those variable costs from a revenue figure.

In accounting terms, this is often called a contribution margin. Here, I call it a genre gross margin because I'm only taking account of the four major variable cost buckets that I identified, and there may be other variable costs in an accounting contribution margin.

Q. Okay. Well, we'll come back to that.

Could you please turn to Paragraph 34 of your report, assuming you've still got that in front of you.

Paragraph 34. You indicate toward the end of that paragraph that "Developers both need and make use of more fine-grained control over the pricing and billing strategies for their software, e.g., usage-based pricing, monthly subscriptions, et cetera."

Do you see that?

A. Yes, I do.

Q. What do you mean by "more fine-grained control"?

Page 93

24 (Pages 90 - 93)

A. Well, rather than an environment where you pay once and, you know, you get the software and that set of rights to use it for a long time, there are now multiple options for charging within the app for different pieces of functionality and service that might be delivered to you. And there can be different tiers as well.

Q. What do you mean by "usage-based pricing"?

A. I think -- I think for something like this, you can sometimes buy in the app, like, the ability to, let's say, make a purchase to bring you up to a certain level, and then you might pay more to go to a different level, and that will allow you -- it will open up more functionality, and it will open up more levels of usage to you.

Q. Do iOS developers engage in usage-based pricing?

A. Well, I think it's one of the monetization approaches that they're -- that's available to them.

Q. Are in-app purchases generally

Page 94

considered to be usage-based pricing?

A. I'm not sure if that's a general statement, no.

Q. Are subscriptions usage-based pricing, or can they be usage-based pricing?

A. I think they probably can.

Q. Can a paid download of an app be usage-based pricing?

A. If it's just a one-off price for a download, I would think it would not fall into the category.

Q. What pricing and billing strategies other than usage-based pricing do iOS developers use?

A. Well, first we have paid downloads, which was historically a large feature of -- for app developers. Then we would have downloads where you have the option of subscribing into a higher tier, so they're subscriptions. And then there are also monetization strategies, which involve in-app purchases.

And in the report, we talk about subscriptions under IAPs, but IAPs can also

Page 95

involve per -- you know, per-service or per-feature charges or, in currency, you know, purchases of tokens, for example.

Q. And I had asked you before if you heard of app-level pricing.

Is that, to the extent you may recall that, anything that falls under the heading of usage-based pricing?

A. App? Sorry, app --

Q. App-level pricing.

A. App-level pricing? It's not a term I'm familiar with.

Q. Do you have an understanding as to whether developers make use of 99 cent price points?

A. Purely by observation, certainly.

Q. And what have you observed?

A. That this is a common price point.

Q. Do you have an understanding as to why that -- that is the case?

A. I believe there's literature that talks about the -- you know, the psychology of certain price points being more attractive for consumers.

Page 96

Q. Is that a literature you're familiar with?

A. It's -- not really.

Q. Is that a literature that's taught at HBS?

A. When we talk about pricing at HBS, we're -- very often, we are balancing kind of value creation and value capture, and we tell our students about how to work out what the right price is. But I personally don't teach the psychology of pricing. That is probably in a class somewhere.

Q. If you could, turn to Paragraph 37 of your report.

You indicate there that "A different method of evaluation would be to consider the revenue and costs per digital good or service sold such as a token in a game."

Do you see that?

A. Yes, I do.

Q. A token in a game would be an in-app purchase or IAP, correct?

A. That's right.

Q. A digital good also includes an app

Page 97

25 (Pages 94 - 97)

download, correct?

A.  I would think so.

Q.  You go on to state that "In such cases, the cost of creating another unit, i.e., the marginal original cost, is often extremely low, sometimes approaching zero."

By "such cases" in this sentence, are you referring to the sale of digital goods?

MR. BURT:  Objection to form.

A.  Yes.  The marginal cost would be close to zero for certainly something like a token.

BY MR. SWANSON:

Q.  And you note here in a footnote that "In his expert reports, Professor Hitt refers to various academic sources to support this view."

Do you see that?

A.  I do.

Q.  Okay.  Have you reviewed those academic sources?

A.  I've -- I'm aware of that zero marginal cost literature.  I've not found it to be particularly useful for my research in the management of software firms because it

Page 98

actually from day to day is not how software firms manage their business.  They're much more interested in contribution margin and the margins, you know, over a long period of time that can capture all of the costs that a user will -- we will have to incur in order to engage and to monetize that user.

Q.  So are you indicating that you disagree with those various academic sources?

A.  I --

MR. BURT:  Objection to form.

A.  I don't -- I've not read them, so I don't -- other than the fact that this exists as a literature, I've not looked to find out what those sources say.

BY MR. SWANSON:

Q.  Is there an academic literature that deals with this issue of marginal cost that reflects the day-to-day manner in which software firms manage their business?

A.  So there is strong academic literature that talks about unit economics of software firms and how to think about the unit economics of software firms.

Page 99

Q.  And is that, for example, a type of literature that would be reflected in the Cusumano textbook that you mentioned earlier?

A.  I actually don't remember if Mike talks about it.  It is -- it is a literature that's actually much more associated with start-ups and new businesses and how they can structure their cost structures in order to be successful.

So it talks a lot about the cost of acquiring customers and then the value that those customers create.  So obviously in a new business, you're always -- you're always trying to balance those two things.

Q.  And this would be academic literature of the business school sort?

A.  Yes, yes.

Q.  Are you thinking of any particular texts?

A.  I'm trying to think of the best references.  "Disciplined Entrepreneurship" might be one.  That's Bill Aulet at MIT.

And then there are notes that actually talk about this quite a lot.  Would you like

Page 100

me to give you a professor?

Q.  Sure.

A.  Sure.  So Tom Eisenmann is an entrepreneurial management professor who talks about start-up failure, and he's written notes on business models for entrepreneurial companies that talk extensively about these -- what is a business model and what are the unit economics that you would likely see in a start-up.

Q.  And where does he -- where does he teach?

A.  He's at HBS.

Q.  HBS?

A.  Yes.  It's a small group.

Q.  Back in Paragraph 37, moving forward in that paragraph, you say, "While this approach may accurately measure unit profitability per product or digital good, it does not fully capture the business of developing and operating on mobile application."

Do you see that?

A.  I do.

Page 101

26 (Pages 98 - 101)

Q. And by "this approach," do you mean looking at the marginal cost of a digital good?

A. Yes, that's what I do -- I did.

Q. Okay. When you say that this approach "does not fully capture the business of developing and operating a mobile application," are you saying that marginal cost is lower than average variable cost for such a business?

MR. BURT: Objection to form.

A. In general. So there may be good reasons to use marginal costs in some circumstances. When -- my experience with software companies is they are much more focused on variable costs, or average variable costs would be a way of smoothing that over some time frame. They're much more interested in margins.

BY MR. SWANSON:

Q. And in Paragraph 37, you refer to the cost of creating another unit as the marginal cost.

What is the marginal cost when the

Page 102

user is the relevant economic unit?

MR. BURT: Objection to form.

A. What is the marginal cost?

BY MR. SWANSON:

Q. Yes.

A. Well, if the user is an economic unit of analysis, we have to think of what is the marginal cost of attracting and serving that user. It may -- it may include elements of customer acquisition cost. It may -- if that's not a user I have, it may include elements of customer retention cost. It will include potentially infrastructure cost for serving that user in order to deliver them a game or have them use a token. It really is a set of variable costs, actually, that I identify in my report.

Q. In Paragraph 39 of your report, this would be the part that's -- that is at the top of page 19 --

A. Uh-huh.

Q. -- you state that "While the marginal cost of producing an individual digital good may approach zero, it does not account for the

Page 103

marginal cost of serving an additional user."

Are you assuming here that an additional sale of a digital good requires the acquisition of an additional user?

A. No. I think I'm just plainly stating that it doesn't account for serving an extra user. So obviously, serving the same user, there's a different marginal cost.

Q. Do you agree that for some developers, such as game studios, the top 1 percent of users account for 50 percent of their revenues while the top 10 percent generate 90 percent of the revenues?

A. Those -- that's consistent with my experience and with articles that I've read, industries studies I've read.

Q. Are those users sometimes called whales?

A. That's right.

Q. In Paragraph 39, you say that "Marginal cost of serving an additional user accounts for all expenses associated with serving the user and collecting the corresponding revenue and is an appropriate

Page 104

metric for evaluating the profitability of a developer."

Do you see that?

A. We're in 39?

Q. Yes.

A. Could you start the sentence again for me again. Thanks.

Q. Sure. I think we're focusing on the last sentence there.

A. Okay.

Q. Although the latter -- the latter refers to "the marginal cost of serving an additional user," I believe. But you say, "The latter accounts for all expenses associated with serving the user, and collecting the corresponding revenue is an appropriate metric for evaluating the profitability of a developer."

Do you see that?

A. Yes.

Q. So the metric that you're estimating in that discussion is a marginal cost metric?

MR. BURT: Objection to form.

Page 105

27 (Pages 102 - 105)

A. Yeah. I'm not sure if this is a particularly clear sentence here. I am evaluating a gross margin, which is a revenue minus the variable costs for the user. So it's -- it's an interpretation of the marginal cost truly for the user level really is the contribution margin.

BY MR. SWANSON:

Q. Are the cost ranges that you list in your report marginal cost ranges?

A. The cost ranges are gross margin ranges but defined to be the difference between revenues and all variable costs -- sorry -- the four buckets of variable costs that I study.

MR. SWANSON: We've been going for about an hour. Should we take a well-earned break?

MR. BURT: Sure.

THE VIDEOGRAPHER: The time is 10:52. We're off the record.

(Recess taken from 10:52 a.m. to 11:10 a.m.)

Page 106

THE VIDEOGRAPHER: We are back on the record. The time is ten minutes after 11:00.

BY MR. SWANSON:

Q. Professor MacCormack, with reference to that Research In Motion case, that was the teaching -- was that the public version?

A. Yes, that was the case for the students. So there is a teaching note that goes alongside that.

Q. And do you have a copy of that teaching note? I am not with you, but --

A. Yes. I do, yes.

Q. Someone --

A. Yes, it is...

Q. Someone at HBS has a copy of that?

A. Yes. We've got it, yes.

Q. Did I understand you correctly to be indicating earlier that the marginal cost of a digital good is not relevant to software companies?

MR. BURT: Objection to form.

A. I -- in the software companies that I

Page 107

have worked in and in my teaching, we focus on what are the levers that would allow you to manage day to day and that you would report on at the end of different periods.

So gross margins and contribution margins tend to be a more useful metric than marginal cost, where it's small.

BY MR. SWANSON:

Q. Is it your opinion that the marginal cost of a digital good is irrelevant to setting the price for that digital good?

MR. BURT: Objection to form. Objection to form.

A. I wouldn't say that. Sorry. I would -- I wouldn't go that far.

BY MR. SWANSON:

Q. In what way is the marginal cost of a digital good relevant to setting the price of a -- of that digital good?

MR. BURT: Objection to form.

A. In setting the price of the good, I would want to understand all of the variable costs that are going to be involved in order to think about that user's journey. This is

Page 108

at least how we teach it.

And so I need to acquire the customer. I need to engage them. I need to support them with infrastructure, maintenance, and support. So all of these costs are typically variable costs. And so that is how we would tell our students, like, You need to understand all of these things in order to set the appropriate pricing for the value you're creating for someone.

BY MR. SWANSON:

Q. In that approach that developers take, is it your understanding that their objective is to cover the variable costs and nothing more?

A. Obviously, without a contribution margin, the better you can make the contribution margin, you're basically contributing to fixed costs.

Q. And in terms of pricing a digital good, does a developer take into account the attractiveness of the digital good to users?

A. Yes. The pricing, in general, would be a function of the value you're delivering

Page 109

28 (Pages 106 - 109)

to the user, the cost for you, the producer, and the competition as well. So that's the triangulation basically that's going on.

Q. The developer wants to recover its costs at a minimum, correct?

A. Absolutely.

Q. And desires to obtain, in fact, the highest profit it can subject to competition from other developers; is that fair?

A. I think that would be a fair description.

Q. And in that exercise, does marginal cost of a digital good that may be close to zero play any role?

A. It's possible. I just haven't seen it in the firms that I've worked with.

Q. Could you turn to Paragraph 47 of your report, please.

If you've got that in front of you, I wanted to focus on something we alluded to earlier. The last sentence there, you say, "Some developers, such as game studios, term the highest spending users as whales and note in some cases the top 1 percent of users

Page 110

account for 50 percent of the revenue while the top 10 percent generate 90 percent of the revenue."

In these particular cases, is it your opinion that the top 1 percent of users account for 50 percent of variable costs and the top 10 percent account for 90 percent of variable costs?

A. I'm not sure if I can make that statement or not. I mean, in general, whales are people you are delivering an extra service to. So in a premium model, they're paying for more things. So there are more costs. And, in general, so you would expect the bulk of the variable costs to be associated with the bulk of the revenues.

Q. So if the top 1 percent of users are accounting for 50 percent of the revenues from digital goods, that's still going to add up to zero marginal cost times a whole bunch of transactions, right?

MR. BURT: Objection to form.

A. I'm -- I -- I'm not sure I understood the question there. So the top -- so there's

Page 111

obviously a lot of users who are not generating much of the revenue, and you've got a few users generating a bunch of the revenue because they are paying.

BY MR. SWANSON:

Q. They're buying digital goods?

A. They're -- yes, they're the paid users that we're focusing on.

Q. Right.

A. So to deliver those paid -- those additional paid services, there's a cost associated with that, so...

Q. But these are the people who are generating all those revenues by buying digital goods, correct?

A. Or subscriptions or whatever it is, yes.

Q. Sure.

A. Yes.

Q. And so those particular purchases generally have a marginal cost that's close to zero, correct?

MR. BURT: Objection to form.

A. So you still have to consider -- so

Page 112

obviously, I concede the point that digital goods have close to zero marginal cost. But for these users, it's hard to get them. So the cost of acquiring that customer and the cost to serve them may still be high. So the fact that that digital good is -- has a low marginal cost may -- is not necessarily the overriding factor in terms of looking at the profitability of that user.

BY MR. SWANSON:

Q. But is it your testimony that in this case where the top 1 percent generates 50 percent of the revenue by buying digital goods, that the variable costs are likely to be close to 50 percent of all the variable costs?

A. I think we would expect that the variable costs would in some way correlate with the variable -- the revenues that are being generated. So if I'm delivering a subscription to someone and that's got a whole bunch of bells and whistles that are not in the -- not in the package that the average person is getting, there's a cost associated

Page 113

29 (Pages 110 - 113)

with that. That is proportionate, I mean, in -- proportionate in some way.

Q. I mean, a lot of these whales are buying digital currency, right?

A. Uh-huh. The -- so the references -- I was just looking at these last night. So the -- if you take something like Duolingo, which is the reference of the top 10 percent generating, I think in that article it was 80 percent of their revenue. That was -- that was not digital tokens. He was talking about subscriptions that give you a lot more features inside the app. It's probably true for games, but it's not generally true for other situations where there's a premium strategy employed and the extra tiers or the extra subscriptions are giving you access to new functions.

Q. Well, let's just focus on games where these whales are essentially buying digital currency which they can use in the app to trade for dances, characters, higher levels, extra lives, whatever it is.

A. Uh-huh. Uh-huh.

Page 114

Q. But they're buying digital currency.

In those cases when that top 1 percent of users in such a game are accounting for 50 percent of the app's revenue through those digital currency purchases, is it your expectation that the variable costs that they generate are proportional to that 50 percent revenue figure?

A. That they are -- they're certainly higher, and so in some cases, I think they would be proportionate.

Q. Are there cases when that 1 percent of users would not be generating 50 percent of the costs for the app?

A. So --

MR. BURT: Objection to form.

A. -- I think the -- it's easy to focus on the person once acquired and say, Oh, well, this is a very profitable person to, you know -- to mint another token and for zero marginal cost and to get that revenue.

At large, we still have to account for the fact that it's hard to get these whales. So there's still an acquisition cost to

Page 115

account for. There's a retention cost these folks might churn very heavily, so we have to kind of keep them on board. We have to develop new functionality for which they can buy the axe or whatever it is that they're looking for.

So I think at the management level in the software company, they really want to take account of all of those things to understand what the true profitability is of that whale user. So is the profitability 100 percent? I've not seen a software company where they come up with that because they would probably be nixing all of their other products and say, All we need to do is sell tokens. But that doesn't work because you actually need all the other things too.

BY MR. SWANSON:

Q. If you turn now to Paragraph 39 of your report -- and actually, I'm focusing more on the footnote that is appended to that paragraph. It's Footnote 17 on page 19.

A. Uh-huh.

Q. Footnote 17, you indicate that "This

Page 116

view is consistent with that of Professor McFadden." And then you say, "In his 2021 reply report, Professor McFadden states that 'marginal cost in my model' -- 'marginal costs in my model do not merely represent the "production and distribution," "replication," or cost of in-game currency. In my model, marginal costs represent all the different variable costs that come along with app developers' iOS app monetization business."

Do you see that?

A. Yes, I do.

Q. Did you form your view before you saw Professor McFadden's view on marginal costs?

A. Well, as I explained earlier, when I first took the assignment, I had to look at Professor McFadden's initial report, not an in-depth report, mainly to understand what my assignment was going to be in terms of supplying ranges for this model.

But my assignment was not to look at these buckets only. My assignment was actually to classify the costs that software developers incur and then using the subpoenaed

Page 117

30 (Pages 114 - 117)

data and other sources to actually kind of evaluate what those are.

So what you will find is, for example, in the subpoena requests, the costs are actually titled a little bit differently to the way that I title them. Mine are a little bit more broader in terms of maintenance support whereas in the subpoena request it was a little bit narrower in terms of content moderation.

So my goal was to really look at this from a big picture -- what are the costs? -- and then to look at the data that was available to me, both the subpoenaed data and the public source data, and to put that together with my judgment to come up with these ranges.

That was a very long-winded answer. I apologize.

Q. I appreciate it.

MR. SWANSON: Speaking of Professor McFadden's report, we previously marked that as DX-37. If you're okay, we can just use that number, and we'll handle it

Page 118

out.

MR. BURT: Yes, sure.

BY MR. SWANSON:

Q. So this was a copy of Professor McFadden's report that was marked probably several times at his various depositions. Is this the report -- one of the reports of his -- of Professor McFadden's that you looked at?

A. (Witness reviews document.)

If it's the 2021 one, I think it would be.

Q. I wanted to ask you a question about something on page 82. If you can, flip to that.

Let me know when you're there.

A. Yes.

Q. So there's a footnote at the bottom -- or toward the bottom of the page, Footnote 250 --

A. Uh-huh.

Q. -- where Professor McFadden is quoting from an economic text. In the footnote, he says, "Variable costs are costs that change

Page 119

with the level of output associated with the concepts of total cost, and variable cost is marginal cost, which is the increment or addition to cost that results from producing one more unit of output. Because fixed cost does not change as output increases, the increase in total cost when output increases is identical to the corresponding increase in the variable costs."

Do you see that?

A. I do.

Q. Do you recall reading that when you looked at Professor McFadden's report earlier in time?

A. I don't.

Q. Is this consistent with your view about the definition of marginal cost?

MR. BURT: Objection to form.

A. I really didn't bother myself too much with the definition of marginal cost because my assignment was actually to focus on margins -- gross margins and the difference between revenues and variable costs.

BY MR. SWANSON:

Page 120

Q. Having said that and understanding that, when you say in your report that your view is consistent with Professor McFadden's, is your view consistent with this definition of marginal cost?

MR. BURT: Objection to form.

A. It's from a pretty well-known textbook, so yes.

BY MR. SWANSON:

Q. Does -- you can put that aside for now.

A. Okay.

Q. It's a big pile of paper there.

Does your view of marginal cost apply to a developer like Amazon that operates an online store via the Amazon app?

A. My view of marginal cost is -- as we explained earlier, is very closely related to contribution margin. Contribution margin is measured by many firms and many software developers, so I would imagine that there is a consistency there. I've not looked to Amazon's reports.

Q. So when Amazon sells a physical book

Page 121

31 (Pages 118 - 121)

through the app, the relevant marginal cost is the wholesale cost of the book plus the marginal cost of serving an additional user?

A. We're on marginal cost again, not variable?

Q. Yes.

A. It would be, by the definition, whatever the incremental cost is to serve the additional, in this case, product to the user.

Q. So it would be something higher than the wholesale cost of the book?

A. I would imagine if there are other costs besides the book, yes.

Q. How about when Amazon sells an e-book? Do you agree that the unit cost of an e-book is effectively zero?

MR. BURT: Objection to form.

A. We're talking about marginal cost, right? So the marginal cost would be probably close to zero.

BY MR. SWANSON:

Q. And then there would be, in that digital transaction, some marginal cost of serving an additional user?

Page 122

A. Yes. I mean, things like infrastructure, things like maintenance support, all have to be factored in eventually. I think with marginal cost, sometimes we forget about the straw that breaks the camel's back. So there are some lumpiness in some of these costs.

Q. In setting prices, do developers also pay attention to their fixed costs?

A. In my experience, it's a consideration, but how that is done will vary by developer. Ultimately, we teach a methodology called agile development, lean development, which is written a little bit about in the report, where you actually try and keep your fixed costs minimal and you actually try and make more of your costs variable so that you can scale with the user if you happen to be successful. So -- and that's been a movement that's happened in start-ups since probably the dot-com era.

Q. Could you turn to Paragraph 50 of your report, please.

I wanted to focus on the next to the

Page 123

last sentence there where you say, "Based on commonly accepted definitions, I categorized costs that do not vary with output, i.e., costs that are independent of the number of users eventually consuming the service as fixed costs."

Do you see that?

A. I do.

Q. What commonly accepted definitions are you referring to?

A. I think they're accounting definitions.

Q. Do you agree that the commonly accepted definition of a variable cost is a cost that increases with output?

A. It seems reasonable.

Q. And in commonly accepted definitions, what is meant by "output"?

A. If it's a production environment, obviously, it could mean the number of products that were produced. If it's a software environment, it could mean the number of users that were served.

Q. In the software environment, can it

Page 124

mean the number of digital goods and services that are produced?

MR. BURT: Objection to form.

A. When I -- in analyzing software companies, variable costs are most -- mostly assumed to be those that are driven by users or usage.

BY MR. SWANSON:

Q. Would you agree that users are not the output of software apps?

A. Apps are a product or service to -- delivered to a user.

Q. In Paragraph 50, you state that you "categorize costs that change with the number of users and generally increase as an application reaches a larger user base as variable costs."

Do you see that?

A. Yes, I do.

Q. If you define output as the amount of digital goods that a developer sells, would your opinions in the report be different?

MR. BURT: Objection to form.

A. You're asking me a hypothetical, I

Page 125

32 (Pages 122 - 125)

think, to change my definition which I believe, so I'd need to consider that.

BY MR. SWANSON:

Q. Well, as you consider it, would it change your opinions if you defined output as the amount or volume of digital goods as opposed to the number of users?

A. I -- I believe my opinions are robust --

MR. BURT: Objection to form.

A. -- to the way that I think about variable costs.

BY MR. SWANSON:

Q. So you would be comfortable offering the same opinions if you defined output as the amount of digital goods that a developer sells?

MR. BURT: Objection to form.

A. I don't want to repeat myself, but this -- I don't -- I don't see in software companies them looking at economics in that fashion.

BY MR. SWANSON:

Q. In Paragraph 51, you state, "While

Page 126

for some of the other variable costs, like infrastructure, you would expect kind of a more direct, immediate relationship. If we stream more hours, we need more servers, and so that's, you know, literally hour to hour.

Q. Do you agree that a -- that the time horizon is one of the key factors in deciding whether a cost is variable or fixed?

MR. BURT: Objection to form.

A. I -- it certainly is from the point of view of accounting definitions as to what do we consider these staffing costs fixed? Certainly buildings. You know, you have to expand your campus at some point if you're growing. You know, here there is the potential to actually look at some of the long-term correlations between costs to see if they change.

BY MR. SWANSON:

Q. Well, when you say "here," what is the time horizon that is considered in your analysis of costs in this case? Is it, for example, more or less than a year?

A. So the subpoena data is basically

Page 128

certain costs are variable in the long run and depends directly on the number of users, there may be times when they appear to be fixed. This could be due to a multitude of factors ranging from the time horizon that is considered in the analysis to the idiosyncratic choices of developers."

First of all, what do you mean by the "long run"?

A. So if you take staffing costs, for example, you might be able to operate with a certain number of users with a staff of, let's say, ten and then you double the number of users.

And let's take maintenance support costs. The more users you have, typically the more maintenance support tasks that you will generate, and, therefore that number of people may have to rise.

It doesn't scale quickly. You have to recruit people. So the time frame over which those costs correlate or the variable costs correlate with the activity is probably months, quarters, or potentially years whereas

Page 127

annual data. There were very few occasions where people tried to do monthly, but there's not enough monthly data to basically use it.

So we're really looking at sort of annual snapshots of costs. And so that's really kind of the time frame that is the basis for the analysis.

Q. And in Paragraph 51, what do you mean by "the idiosyncratic choices of developers"?

A. Well, for example, you might take maintenance support, and you might say, Let's recruit all those people in-house, and we'll have a maintenance support team.

And then that is lumpy because you're increasing, you know, we need to recruit five more people. Five more people, you might decide to outsource that or use contract workers, and so these choices will scale with a different time period, and so that really is kind of capturing the differences the developers can make in terms of staffing and their strategy.

Q. At the end of Paragraph 51, you state that you "do not attempt to explain the

Page 129

33 (Pages 126 - 129)

factors that drive such behavior and instead outline the cost categories that I deem variable and discuss their relationship with the number of users."

Q. What behavior are you speaking about there?

A. So the idiosyncratic choices of developers, so I'm really kind of at a broad conceptual level saying, Here are the buckets of variable costs. And then obviously we have the data from the subpoena responses.

Q. If you could, flip to the next page, Paragraph 56. You state there that "While fixed costs described in the previous section are concerned with foundational stages of application development, variable costs are incurred by developers during the operation of their apps and the delivery of relevant services to users."

The fixed costs that you're referring to here are R&D and general and administrative expenses; is that right?

A. Yes, the costs that are described above.

Q. Are there any developer costs other than G&A that you deem to be fixed that are incurred by developers during the operation of their apps and the delivery of relevant services to users?

A. Well, they're -- my variable costs are defined into four buckets. So it's possible that there are other costs that I do not highlight here that might fall into the fixed-costs bucket, but they're -- let's say they're not things that you would necessarily find on a balance sheet or a set of accounts.

Q. Could you flip back to Paragraph 10 of your report, please.

You indicate there that you define a metric called the genre gross margin, or GGM, "which quantifies the difference between revenues and variable costs for all developers within a genre (an App Store category that groups apps with similar functionalities) as a percentage of their revenue."

Do you see that?

A. I do. I do.

Q. Then in Footnote 2, you say that you

"define this term because gross margin and contribution margin are both accounting terms of art, and specifically, GGM allows for more readability than using those terms in their technical sense."

Q. Is your genre gross margin metric different in any technical sense from the accounting concept of gross margin?

A. Yes. An accounting gross margin is revenue less cost of goods sold. And in this, my GGMs are more akin to a contribution margin. They may not be identical to an accounting contribution margin because I only consider four buckets of variable costs.

Q. Is genre gross margin a term of art in your area of expertise?

A. It's not a term I've used before.

Q. Have you ever seen it used by any other experts in your field?

A. It's not -- no, I've not seen a published paper using that term.

Q. Moving to Paragraph 10, further down the page, you state there, toward the end of that paragraph, that you "exclude distribution

and payment processing costs covered by the App Store commission for my analysis and rely on the information provided by counsel instead."

Q. What do you mean that you rely on information provided by counsel instead?

A. The -- there was no point in trying to calculate what the commission rates were for these different genres because there's actual data on that. So there's not a reliance upon the subpoena data to understand commission rates and payment processing fees. So that was purely data that was handed to me by counsel.

And, in general, I'm not using that information to calculate gross margins anyway. It's excluded from my analysis. It's only used in one particular way.

Q. And what's that particular way?

A. That way is I assume the developers in general have to be profitable. And so it's used as a check on the lower bound margin to make sure that the developers in a genre could actually pay the fee.

Q. Could you turn now to Paragraph 87 of your report.

I wanted to ask you about the second sentence there, "Distribution costs typically include a fee" --

A. Oh, Paragraph 87. I'm on page 87.

Q. Yes, 87. I'm sorry. Yes.

A. I'm getting mixed up with pages and paragraphs here.

My apologies.

Q. No problem.

A. Okay. I'm there.

Q. Okay. So I am looking in Paragraph 87 I think actually the two sentences there, where you say, "Distribution costs typically include a fee charged by distribution channels such as App Stores on which a developer chooses to publish their app. On many App Stores, this fee represents a percentage of every transaction made within the distributed app and is typically charged in exchange for access to the App Store's proprietary technology and user base."

Is that statement true of Apple's App

Page 134

Store?

MR. BURT: Objection to form.

A. As far as I know.

BY MR. SWANSON:

Q. What do you mean by "the App Store's proprietary technology"?

A. There are technologies that might be provided to the app developer to help them build their app and to integrate it with the -- with the device.

Q. Are those sometimes called "APIs" and "frameworks" and other similar terms?

A. That's exactly right.

Q. And sometimes there's a reference to SDKs?

A. Software development kits are an important part of a developer's tool kit to develop the app in the first place and to get it on to the store.

Q. And what do you mean in this discussion in your report about -- what are you referring to by "access to the App Store's user base"?

A. iOS users are a very attractive set of

Page 135

users. In fact, the article, Duolingo, I was referring to the fact that iOS users spend four times what Android users do. So iOS users are a very attractive target customer for developers.

Q. And when you -- when you refer to a fee in the portion of the report I read to you, do you mean a commission?

A. That's what I'm referring to, yes.

Q. If you could, next turn to page 40 of your report. I'm going to direct you to a footnote.

Let's see, page 40, Footnote 60.

You state that "While initially these commissions included payment processing fees, over time, they have been disaggregated."

What do you mean by that?

A. I think that there is -- disaggregated means there's a choice as to the route through which you are going to -- the choice of the payment processing system you're going to use. So now you get a choice to...

Q. And what is the time frame over which that has been disaggregated?

Page 136

MR. BURT: Objection to form.

A. I don't remember -- I don't recall when that decision was made to disaggregate it.

BY MR. SWANSON:

Q. In that footnote, you further note that "By excluding all fees associated with distribution, I may also be excluding payment processing fees which I understand amount to about 2 to 5 percent of a transaction's value."

What do you mean by that?

A. For the -- one way of looking at the gross revenues for some of our respondents, we might have had to go from net to gross. In making that calculation, we are basically assuming a certain commission rate that applies to the -- to the genre.

So in this particular case, we're using the genre-level average. We're not disaggregating to work out did they use the payment process of the system or not.

Q. Could you now turn to Paragraph 89 of your report.

Page 137

35 (Pages 134 - 137)

You state there there that "As the number of users interacting with an app grows, so does the volume of purchases made within the app."

Do you see that?

A. Yes.

Q. What is the correlation coefficient for that relationship? Is it less than 1?

MR. BURT: Objection to form.

A. I don't have that data.

BY MR. SWANSON:

Q. Do you have any understanding, rough though it may be, of the correlation coefficient for that relationship?

A. No. In my assignment, I was basically asked -- given data on the commissions and payment processing fees separately, and so my focus really was on the four variable costs.

Q. Are you referring in that sentence to paying users or free users or all users?

A. Well, free users are not typically buying things within the app.

Q. Well, is there a correlation between the number of free users and the volume of purchases?

Page 138

A. I don't -- I don't know the correlation. It's not -- I didn't analyze the -- this relationship.

Q. On average, what percentage of a mobile app's users are paying users?

A. Well, there are -- there are different models, so, on average, it covers a wide constitute -- constitution of different models of paying.

So obviously there are apps where they're purely ad monetized. So for that set of apps, obviously there's -- they're not paying users. There are apps like, you know, a Netflix or a Spotify where everybody is a paying user, but there might also be other revenue sources as well.

And then there are freemium apps. And for the freemium apps, the industry studies or experts suggest that, on average, typically 2 to 5 percent are paying users, but they generate a disproportionately large share, as you were pointing out earlier about the whales. So this 2 to 5 percent would generate -- I think the number was 60 to 90,

Page 139

but it is somewhere here in the report of the revenue.

Q. Is it possible for the volume of purchases for an app to grow without any increase in the size of the user base?

A. If there was increased penetration amongst users, perhaps brought about by new functionality, perhaps brought about by advertising campaigns to help drive greater usage amongst existing users.

Q. Is it possible for the amount of purchases to grow by a dint of a developer raising the price of purchases?

A. So is it possible for demand to grow by you raising the price? Is that -- sorry -- was that the question?

Q. That's a fair amendment. I'll accept that, yes.

A. It would be unusual -- in economics, there are, of course, certain classes of good whereby increasing the price sometimes does lead to an increase in demand. But, in general, for apps you would expect price increases to lead to reductions in demand.

Page 140

Q. Have you studied the average price of apps on -- in the App Store over time?

A. I have not done that.

Q. Would it surprise you if the average price of apps has increased steadily since the App Store opened?

MR. BURT: Objection to form.

A. It would not surprise me. I think inflation is everywhere.

BY MR. SWANSON:

Q. Is -- so inflation increase in cost would be one reason why developers would raise the price of their apps?

A. Uh-huh.

Q. And that would be true of in-app purchases too?

A. I don't have data on how prices have changed, so you're presenting me with new information.

Q. Would market power on the part of developers be another reason why the price of apps could increase over time?

MR. BURT: Objection to form.

A. In a theoretical sense.

Page 141

36 (Pages 138 - 141)

BY MR. SWANSON:

Q. Do you have any view as to whether or not developer market power on iOS has increased over the years?

MR. BURT: Objection to form.

A. I don't have an opinion on that.

BY MR. SWANSON:

Q. Is that something you've studied?

A. No.

Q. Is that something that's within the area of your expertise?

A. The effect of market power on pricing?

Q. Well, the -- yes.

A. It's not an area I would opine on.

Q. In Paragraph 89, you indicate or state that "Therefore, distribution and payment processing costs, which, as explained above, are commonly charged as a percentage share of total amounts paid by end users, are variable with the number of users engaging with the app."

Do you see that?

A. I do.

Q. Aren't distribution and payments costs

more directly variable with the volume of purchases?

A. They would be, but there would be a high correlation with the number of users.

Q. But the more accurate assessment would be by looking at the volume of purchases; would it not?

A. Yes, because it's a percentage share.

Q. Okay. Moving backwards to Paragraph 5 of your report, let me know when you're there.

A. Yep. Got it.

Q. Okay. You state that you "understand that plaintiffs are seeking to establish the consequent economic damages to consumers as a result of Apple's alleged anticompetitive conduct and that the model used for estimating the economic damages does so by genre and uses as an input a range of variable costs experienced by typical developers in a genre."

You understand that the model that you're referring to here was devised by Professor McFadden, correct?

A. I do.

Q. We talked a bit about Professor

McFadden's reports. We pulled one out that had previously been marked.

You've identified in your relied-upon materials a couple of additional reports by Professor McFadden. We can flip to that, if you would like, but do you recall that generally?

A. I remember them in the materials, yes.

Q. Do you recall attempting to rely on all of the reports that Professor McFadden has issued?

A. No. I believe that there were updates and updates of updates, so it really didn't impact my assignment. So there is not really a lot to say about the updates of the updates.

Q. We talked earlier about how you did look at, for example, the 2021 report of Professor McFadden.

Did you review his specification of his model?

A. I did not. I'm not an economist, so the model's not really something I would necessarily have a strong understanding of.

Q. Did you review the portions of

Professor McFadden's report or reports that discussed the so-called margin constraints?

A. No.

Q. Are you familiar with the term "margin constraints" or "margin bounds"?

A. I mean, I've heard it just in general, but, no, I'm not.

Q. Were there other portions of Professor McFadden's reports that you focused on when you looked at the reports?

A. Well, this was back, you know, primarily when this was kicking off and just to get an understanding of, okay, in general, what's -- what's the -- what is the context for my assignment. So that was really what I was doing.

Q. Did you understand the topic of margin constraints to be part of the context of your assignment?

A. No. My assignment was -- was actually very specific and was about providing gross margin ranges. Obviously, I understood that this was going to be an input to his model, but the precise way that that would be

manifested in the model was not something that I tried to dig into.

Q. Can you pull out that Exhibit 37, which is the 2021 McFadden report.

I wanted to take you to Paragraph 170 of that report on page 78.

MR. BURT: The paragraph starts on 77.

THE WITNESS: Okay.

BY MR. SWANSON:

Q. It starts on 77. The part I was going to ask about is on 78, but feel free to -- yes, feel free to reorient yourself with the whole thing or more, if you want.

A. (Witness reviews document.)

Oh, sorry. I'm here, yes.

Q. Sorry.

On page 78, looking at the second line, do you see that variable C with a superscript D and a subscript T?

A. Yes.

Q. And that's described as the variable costs the app developer incurs per download?

A. I see that.

Q. Do you know what role that variable plays in Professor McFadden's model?

A. I do not.

Q. Okay. Have you in your work identified the variable costs that app developers incur per download?

A. I've identified the variable costs relative to the revenues that are generated by the user.

Q. Per download?

MR. BURT: Objection to form.

A. Per -- per download was not a part of my assignment.

BY MR. SWANSON:

Q. Okay. And then if you look further in the next line, you'll see there's another variable, C, with a superscript IAP and a subscript T.

Do you see that?

A. Yes.

Q. And that's described as the variable costs the app developer incurs per IAP transaction.

Do you see that?

A. I do.

Q. Do you know what role that variable plays in Professor McFadden's model?

A. I don't.

Q. Is that a variable cost you have estimated in your work?

A. I have estimated the variable costs relative to revenues because -- as noted before.

Q. Specifically for IAP transactions?

A. The subpoena asked for -- for paid users, and in some cases, that information was available; in other cases, not. So in the report, we -- or I outline why the -- the assumptions under which it would be reasonable to use the -- the margins in aggregate versus the margins only for a paid user.

Q. You note here that Professor McFadden distinguishes between the variable cost of an app download and the variable cost of an in-app purchase transaction.

Do you find those variable costs to be different based on your own work in this case?

A. I'm only capturing it at an aggregate level, so I can't disentangle from the subpoena data that I have.

Q. How about from your wider experience in the field? Do you think those two variable costs are different?

A. It's possible, but I don't know.

Q. You can put that report to one side.

Then go back to your own report, Paragraph 5.

You state in Paragraph 5, before the bullets, that you understand that Professor McFadden's model "uses as an input a range of variable costs experienced by typical developers in a genre."

Do you have a specific grasp of how this range of variable costs is used in his model?

A. I do not.

Q. Are your ranges intended to be inputs into his model?

A. That's my assumption.

Q. Okay. Do you have any understanding of the impact of your genre gross margin

38 (Pages 146 - 149)

ranges on the damage estimates that come from the model?

A. I don't.

Q. Do you agree that, to be conservative, you should err on the side of estimating ranges that generate lower rather than higher damages?

MR. BURT: Objection to form.

A. I'm not sure I agree.

I -- I took the data I was provided with, and I provided ranges that I thought were appropriate given the data that I had. So erring on the side of being high or low was not something in my mind when I did this.

BY MR. SWANSON:

Q. How can you take a conservative approach if you don't know how your estimates affect the damage calculations?

MR. BURT: Objection to form.

A. So are you referring to a word that I said here? Sorry.

BY MR. SWANSON:

Q. Well, you used the concept of conservative approach in your report in

Page 150

various places, correct?

A. It's possible. If you could point it out, that would be great. But I can still talk to you.

So in this particular case, I think you could apply the word "conservative" to the bounds -- the ranges that are -- you're coming up with. And given the data that you have, right, if you were very, very confident, that might be a narrow range. If you're not as confident because there's just not as much data, that might be a wider range.

So "conservative" here does not speak to higher or lower damages. It speaks to the -- basically the breadth of the range.

MR. SWANSON: Do we want to think about lunch now? Should we go off the record?

THE VIDEOGRAPHER: The time is 12:08. We're off the record.

(Recess taken from 12:08 p.m. to 1:00 p.m.)

Page 151

THE VIDEOGRAPHER: We are back on the record. The time is 1:00 p.m.

BY MR. SWANSON:

Q. Professor MacCormack, could you please turn to Paragraph 90 of your report.

Now, you indicate there that, in this Section 6 of your report, you "apply the cost framework to application developers across various genres on the App Store and estimate ranges of variable costs as a share of revenue."

Do you see that?

A. Yes.

Q. Why do you compute variable cost as a share of revenue?

A. I was -- I was asked to determine genre gross margins, and the way that I define genre gross margin, its variable cost is a percentage of revenue.

Q. If the proper economic unit is users, why not calculate variable cost per user?

A. The assumption here is that the revenue, of course, is proportional to users. I don't necessarily have the data that was

Page 152

provided. It was actually done in terms of revenues, so I don't have user data.

Q. Have you made any calculations of variable costs or gross margins on a per-user basis?

A. No. All of these are done on a revenue basis.

Q. Is it your opinion that there is a stable relationship between variable cost and revenue?

MR. BURT: Objection to form.

A. These can change over time as firms change their strategy. I was provided with snapshots on an annual basis. So I can actually see variation from year-to-year even for the same developer.

BY MR. SWANSON:

Q. And when you say "variations," variations in the shares as a fraction of revenue?

A. Yes. So a developer might have provided multiple years of data on a particular cost, and so I have multiple observations basically from them.

Page 153

39 (Pages 150 - 153)

Q. So does that tell you that there is not a stable relationship between variable costs and revenues?

MR. BURT: Objection to form.

A. It tells me that there's variation from year to year. Some of that can be explained by corporate transactions. We see, for example, changes when one company acquires another. But from year to year, there are a lot of different reasons why these numbers might change.

BY MR. SWANSON:

Q. Looking at Paragraph 91 of your report, in -- I guess it's the third sentence -- you say that -- you explain in your Section 6 the methodology behind your analysis, "including key statistical measures used to understand variability in the data."

The key statistical measures that you're referring to here relate to box plots and whisker plots; is that right?

A. That's right.

Q. And you calculate the IQRs?

A. Yes.

Page 154

Q. That's an abbreviation for interquartile ranges?

A. That's right.

Q. And the IQR just measures the spread of the middle 50 percent of the values?

A. That's correct.

Q. Are there any other statistical measures that you use in your methodology.

A. They're -- at some point, I think there's a correlation between royalties and UAR costs.

Q. Do any of your statistical measures allow you to calculate statistical significance or other measures of statistical reliability for your estimates?

A. For the margin ranges that I construct, there are not those measures -- those statistical measures.

Q. Is that because you were unable to construct statistical measures of reliability for those?

A. In --

MR. BURT: Objection to form.

A. In the data that I had access to,

Page 155

especially as it pertains to particular genres, there's in some case a relatively low number of observations, in which cases I would supplement those observations with public information, where available. So there was an amalgamation of sources plus judgment to determine the range, and there was not the availability of a clear natural statistical metric to summarize the interval.

BY MR. SWANSON:

Q. Wouldn't you say there was a relatively low number of observations for all of your genres?

MR. BURT: Objection to form.

A. So in aggregate, we have 71 app developer observations from 68 unique developers. In my field, that's actually a pretty decent sample size. My two highest citation papers were based upon considerably lower number of observations. So we're often dealing with data that is -- has a low end and has a little bit of messiness. Seventy-one is a good sample size. When we partition it out into genres, of course, it becomes a

Page 156

relatively low number.

BY MR. SWANSON:

Q. What were the two papers you were referring to?

A. Gosh, let me get the precise titles for you.

"Developing Products on Internet Time," the Management Science, 2001.

And then in 2003, "Trade-offs Between Productivity and Quality in Selecting Software Development Practices."

Q. Thanks.

Moving to Paragraph 93, you define "genre gross margin" as the "arithmetic mean of the gross margins of all developers within a single genre."

When you say "arithmetic mean," you mean a simple average, not a weighted average, correct?

A. That's correct.

Q. And that's reflected in Equation 1 on page 37 by the 1 over N, right?

A. That's correct.

Q. When do you think a simple average is

Page 157

40 (Pages 154 - 157)

appropriate?

A.   The assignment I was given was to construct the typical range of developer gross margins.  And a simple average basically captures every -- every data point as -- is equally weighted in that simple average.

Q.   A simple average gives all developers' margins equal weight, right?

A.   Yes.

Q.   According to that approach, your estimate of gross margin gives as much weight of to the hundred smallest developers as it gives to the hundred top developers, correct?

A.   That's correct.

Q.   Did you study the cost of the hundred smallest developers?

A.   I studied the costs of the sample that was available to me, many of which were in the list of the top 100 for their genre.  I think 58 of the 68 were actually in the top 100.  So they were, in general, on the larger side, but obviously, not necessarily the largest.

Page 158

Q.   Well, did you study gross margins of any small developers?

A.   Again, the dataset that was available to me was -- it was a given.  So it -- I was not able to go out and do further study beyond that.

Q.   You had no input into the dataset?

MR. BURT:  Objection --

A.   I subpoenaed -- sorry.

MR. BURT:  Objection to form.

A.   I was not a part of the case when the subpoena -- that whole process was a long process that played out before I was involved.

BY MR. SWANSON:

Q.   Paragraph 94 of your report indicates that "Since my estimates of genre gross margins are ultimately used to evaluate the demand for the developers' paid downloads and IAPs, I focused my analysis on the revenues and associated costs associated with paid users only."

Did you focus your analysis on variable costs associated with paid downloads separately from variable costs associated with

Page 159

IAPs?

A.   In this particular case, my focus was for the paid user, but the data available to me didn't necessarily always come in that form.  So there wasn't a way to necessarily disentangle these different types of users.

Q.   Well, my question was more about different types of transactions.

A.   Uh-huh.

Q.   Did you focus on variable costs associated with paid download transactions separately from variable costs associated with in-app purchase transactions?

A.   I didn't do that because it was a -- the subpoena production was an aggregate production.  And in the vast majority of the cases, it does not separate out those things out.

Q.   But you saw earlier that Professor McFadden's model used those things as different, right?

MR. BURT:  Objection to form.

A.   I -- again, I was asked a particular thing, so I completed my assignment as asked.

Page 160

BY MR. SWANSON:

Q.   Why don't you take a look at Paragraph 95, and I guess I'm focusing on the part on page 38, although feel free to read the whole thing.

But you indicate that your Formula 3, which is on page 38, demonstrates that "one can estimate the average cost shares of each variable cost type to arrive at the final gross [sic] margin value."

Your Formula 3 uses a simple average and not a weighted average approach to the calculation, right?

A.   That's correct.

Q.   And in Paragraph 96, you indicate that your "approach more closely follows Formula 3 and estimates an average range for each type of cost share."

Do you see that?

It's kind of in the middle on Paragraph 96.

A.   Uh-huh.  Yes, yes.

Q.   You took that approach because you didn't have the data needed to calculate genre

Page 161

41 (Pages 158 - 161)

gross margins using your Formula 2, which is on page 37, right?

A. Yes. The number of observations by cost varied.

Q. And when you say you estimate an average range for each type of cost share, are you following Formula 3 and using a simple average approach?

A. So what I'm doing is, for each of the costs given that there's a different number of observations, I'm establishing a range for that cost that I believe the arithmetic mean would fall within, and then I am then combining those ranges to arrive at a potential gross margin range.

Q. The obverse of the gross margin is the variable margin, right?

A. If I understand you correctly, I think you're right, yes.

Q. In Paragraph 96, you state that "To account for the heterogeneity in technical designs and business models of apps even within a single genre, I estimate ranges for the genre gross margin rather than single

Page 162

precise values."

Do you see that?

A. Yes.

Q. By saying that you don't estimate single precise values, you mean that you don't estimate the actual average genre gross margin; is that right?

A. I am trying to provide a range within which the average would lie, or alternatively -- or as well, within which the typical developer lies.

Q. You have not actually calculated the true average for any genre, correct?

MR. BURT: Objection to form.

A. The -- as an input to the ranges actually, the averages are discussed in each of these ranges, but they're just an input to the range. And they -- the way that that data was used is combined with other public information as well as my judgment. So the means are in there, but they're used as an input.

BY MR. SWANSON:

Q. You would agree that there is actually

Page 163

a true average gross margin for each one of these genres, right?

MR. BURT: Objection to form.

A. In theory, if we had all of the -- if we had all of the apps available to us and all of their cost structures, there would be an average, yes.

BY MR. SWANSON:

Q. And that's what you're trying to get at, isn't it?

A. I'm trying to understand, yes, in that case where we had all that data, where would it likely be and establish a range within which it would lie.

Q. And when you talk about finding the statistic for the typical developer, are you saying anything other than that you're trying to get at that true average for the genre?

A. Essentially.

MR. BURT: Objection to form.

A. I think the -- what we know from the data is there is huge heterogeneity amongst costs for developers. So a typical range, hard to know exactly how much that would cover

Page 164

because we know for sure that there are outliers that will lie outside it. But what my aim was was to basically construct a range that I would be confident a -- the average arithmetic mean would lie within.

(Stenographer clarification.)

BY MR. SWANSON:

Q. The true arithmetic mean --

MR. BURT: Objection to form.

BY MR. SWANSON:

Q. -- correct?

A. For the entire population --

Q. Yes.

A. -- is that what you're saying?

True, yes.

Q. Now, you have no best estimate of the true arithmetic mean for any of these genres, correct?

MR. BURT: Objection to form.

A. I have provided only ranges.

BY MR. SWANSON:

Q. Turn, please, to Paragraph 344, which

Page 165

42 (Pages 162 - 165)

is on page 140.

A.  Uh-huh.

Q.  Yes.  Toward the end of Paragraph 344, you state your opinion that it is impossible "to estimate single pointwise values for true variable cost shares."

Do you see that?

A.  Yes.  Let me just read the whole sentence.

Q.  Yes, go ahead.

THE WITNESS:  Am I allowed to mark my report or not?

MR. BURT:  Please don't.

THE WITNESS: Okay.  Okay.

MR. BURT:  It's part of the exhibits.

THE WITNESS:  Okay.

A.  Yes.  It's my belief that in most of these cases, we're dealing with very limited data, and so estimating a point value would be -- it would be a very difficult thing to do.

Some of the ranges are quite small because if you take royalties, for example --

Page 166

actually, for example, in social media and lifestyle, the estimate is zero percent, so that actually is a point value.  But for most of them, there's a range within which I would expect the arithmetic mean to lie.

BY MR. SWANSON:

Q.  One reason you give in Paragraph 344 for it being impossible, in your view, is because apps in the same genre are never identical.

Do you see that?

A.  Yes.

Q.  Why does that make it impossible to estimate an average?

A.  I think that's just a description of what's going on within a genre.  It's the first part of the sentence where cost information is limited and there's incomplete disaggregated cost data, so that's the thing that's more relevant to the making it hard to do a point estimate.

Q.  And that is what adds a great deal of uncertainty about where the point estimate actually is, correct?

Page 167

MR. BURT:  Objection to form.

A.  So the ranges are meant to capture the fact that there's a wide -- or there's a possible set of distributions for where the mean lies.

BY MR. SWANSON:

Q.  And in terms of cost information being limited, you have cost information from only a small number of developers, correct?

MR. BURT:  Objection to form.

A.  I have cost information from 71 app developers for costs for multiple years, which is approximately 760 data points.  Again, as I mentioned earlier, from the point of view of work in this field, that's a relatively large number of data points.  However, when we pull it down into -- by genre, then it becomes a smaller number of data points and hence the limitations.

BY MR. SWANSON:

Q.  Are you aware that there are well over a million iOS app developers?

A.  I wasn't until you told me.

Q.  I mean --

Page 168

A.  That would make sense.

Q.  Did you view it as part of your assignment to determine how many iOS app developers there are?

A.  No.  I was -- my assignment was to take the data and to understand what the margins were for the people who had provided data.

Q.  In Paragraph 344, when you're talking about cost information being limited and you say due to a -- "e.g., due to a small number of developers," are you speaking of the data that you have there?

A.  Well, here we're taking about each genre, so the small number of developers will be for a genre.

Q.  So you agree that you have a small number of developers' cost information for each genre?

MR. BURT:  Objection to form.

A.  For some of these genres, we have a very -- a small number of developers, and that is why the -- the information needs to be supplemented by public information or by -- or

Page 169

43 (Pages 166 - 169)

and by my judgment.

BY MR. SWANSON:

Q. Do you have only incomplete disaggregated cost data generally for the various genres?

MR. BURT: Objection to form.

A. When you say "incomplete," incomplete in what way?

BY MR. SWANSON:

Q. I'm looking at your parenthetical here --

A. Okay.

Q. -- incomplete disaggregated cost data.

So I'm asking if that describes the data you had available?

A. So, for an example, we might have a developer who just gave us infrastructure costs and we don't have anything else. But let's say -- I'll give you another example, Spotify. Spotify doesn't provide royalty information, but everybody knows that that's their biggest cost.

So it's hard to basically calculate the gross margin based upon all of the costs

Page 170

because, for many of these developers, they've not provided all of the costs.

Q. In Paragraph 344, you say that "To ensure a maximally conservative approach, one must approximate Equation 4 and estimate ranges rather than single values within which the true cost shares and consequently the GGMs, genre gross margins, lie."

What do you mean by "maximally conservative" here?

A. Yes. As before when we were talking about conservative, I think what I mean is not constraining the range to be overly narrow. So it's not that it's low or high. It's when the data suggests that there's high variety in a cost, then I'll reflect that in the range.

Q. By being maximally conservative, is it your view that the probability is 100 percent that the true cost shares and gross margins will lie within your ranges?

MR. BURT: Objection to form.

A. I can't tell you a statistical certain number. This is my judgment that I would be confident that the GGMs do lie in this range.

Page 171

And you'll see that the ranges vary in how wide they are, which reflects the data that I happen to have for the cost for the genre.

BY MR. SWANSON:

Q. In the Footnote 239 at the bottom on page 140, you say that the approach you take is "in recognition of the fact that the probability of the true value lying within a range is higher than the accuracy of a single estimate."

Isn't that true only if there is no error in placing the upper and lower points of the range?

MR. BURT: Objection to form.

A. I'm not sure I understand. So could you repeat that.

BY MR. SWANSON:

Q. Sure. You say, "The probability of the true value lying within a range is higher than the accuracy of a single estimate."

Is that assertion only true if there's no error in placing the upper and lower points of the range?

MR. BURT: Same objection.

Page 172

A. I'm not -- I'm not sure I necessarily understand exactly what you're getting at there. I think what I'm trying to say in this footnote is that if I had a single point estimate, it's highly likely to be wrong whereas I have a range, I think I can have a lot of confidence that the arithmetic mean is going to be in there.

BY MR. SWANSON:

Q. Well, what, in your view, is the probability that the true values lie within your ranges? Is it better than fifty-fifty?

A. I think, again, statistically, I don't have a way to calculate a confidence interval because of the limited number of data points in a -- by genre.

Q. Fifty-fifty isn't a confidence interval.

Do you --

A. Higher than -- I would say it's higher than fifty-fifty.

Q. Okay. Can you say how much higher?

A. I am maximally confident that I can't put a number on it.

Page 173

44 (Pages 170 - 173)

Q. Would a range of 0 to 100 percent be maximally conservative as an estimate for your genre gross margins?

A. That would certainly be the broadest range I could have for any given cost. None of my -- none of my costs are, of course, that broad because the data that I have points to the fact that I can actually be, you know, tighter.

Q. Can you attach any probability to the -- the possibility that the true values are outside your ranges?

MR. BURT: Objection.

A. With the data available to me, I can't calculate that probability.

BY MR. SWANSON:

Q. In your opinion, is the true value likely to be in the middle of your range?

MR. BURT: Objection. Form.

A. In constructing these ranges, I believe it's more likely that they are in the middle of the ranges than the end. But they all represent, obviously because they're in the range, possible -- possible places.

Page 174

BY MR. SWANSON:

Q. Let's take an example and -- well, I'll take it from your Table 1, which is on page 11.

Looking at gains --

A. Yes.

Q. -- lower -- for the genre gross margin, the lower point in the range is 50 percent. The upper point is 76 percent. In that specific case, do you have any opinion as to whether the true average is closer to 76 or closer to 50 percent?

A. With the information I have available to me, it's most likely to be towards the middle of that range, but they're both -- 50 and 76 of are both inclusive of possible means. And obviously, the way, when we discuss the individual costs, you'll -- there's discussion about why the ranges are the way that they are.

Q. So focusing again on that range, do you believe it is extraordinarily unlikely that the true value could be 77 percent?

A. Well, the ranges were constructed for

Page 175

a reason, and they are based upon a data-driven process that used the subpoena data, the public financial information, as well as some of my own judgment. So I would not alter these. The information I have kind of led to the ranges that I've chosen.

Q. Well, my question is do you believe that it's extraordinarily unlikely that the true value for the game genre would be 77 percent?

A. I tried to construct the ranges in a way that reflects the data that I have. So it would be more unlikely. I think you used the word "extremely unlikely." I'm not sure I would necessarily say that, but, yes, I would say unlikely because I would -- they were -- they're constructed so that they are broad enough to reflect the data I have.

Q. Are you confident that your estimates are reliable enough to improve the results from Professor McFadden's model?

MR. BURT: Objection to form.

A. I -- when we say "improve the results," I'm not sure I really know the

Page 176

original results. So I think they are reliable enough to be an input to a model.

BY MR. SWANSON:

Q. You're aware that Professor McFadden's model has information from thousands of developers?

MR. BURT: Objection to form.

BY MR. SWANSON:

Q. Or are you?

A. I don't recall that.

Q. Let's take a look at social networking plus lifestyle on Table 1.

Your estimate there for the range is 57 to 94 percent.

A. Uh-huh.

Q. Would you -- well, is it -- is it entirely possible that the true value is 94 percent?

A. It is a possibility the range constructed that way.

Q. A 94 percent gross margin would be pretty close to a zero marginal cost, correct?

MR. BURT: Objection to form.

Page 177

45 (Pages 174 - 177)

A. I'm not sure about that, but it would be a pretty high -- it would be a pretty high margin, yes.

BY MR. SWANSON:

Q. Well, when you say you're not sure about that, what are you unsure about?

MR. BURT: Objection.

A. Are you -- can I --

MR. BURT: Go ahead.

A. You mean that 94 is close to 100? I'll give you that.

BY MR. SWANSON:

Q. I'll take that.

A. Yes.

Q. I'll take it. I mean, that's what that means, right?

A. Okay.

Q. If the margin was 100 percent, you would view the marginal cost of zero as being the true estimate of the relevant cost here, right?

A. Yes. There are, as we go look down the table, a number of genres where the upper bound on the range of genre gross margin is

Page 178

actually 90 or higher. So you picked the highest one there. And those are -- those would be great gross margins, and they're viable -- they're viable outputs to the question of what is the arithmetic mean?

But as mentioned before, I would expect those means to lie closer to the midpoints.

Q. Now, your ranges for genre gross margins are estimated based on your variable cost share ranges, right?

A. They are.

Q. And you take ranges for four variable cost components. You've spoken about those earlier. And you then turn those into ranges for genre gross margins?

A. Yes.

Q. Generally speaking.

Why don't you turn back to Paragraph 345 -- or turn back to that part of the report, at any rate.

You indicate there that a simple summation of the ranges -- well, let me know when you're there.

Page 179

A. I've got it, yes.

Q. You indicate that the simple summation of the ranges -- I think you're referring here to the variable cost share ranges -- is maximally conservative.

Do you see that?

A. Yes, I've used it again.

Q. Yes. What do you mean by that?

A. So if we have two costs and they are varying between zero and 20 and we don't know anything about the possible correlation between those variables, then the sum of those two variables, the maximal interpretation of what that range would be would be zero to 40 so that's what that means.

Q. Okay. And then you decided not to take the maximally conservative approach, right?

A. Yes, for two of the costs.

Q. And how does your methodology dictate whether or not you are going to take the maximally conservative approach?

A. I'm relying upon the well-known phenomena in software development that there

Page 180

are multiple ways to acquire customers -- this is the cost of customers acquisition -- and that some app developers will rely upon existing content and IP, and some will generate their own IP and content, and then they will use a lot of advertising basically to acquire customers.

So the example would be I'm developing a game, and I use Star Wars characters. I'm going to pay a whole bunch for the Star Wars characters, but I've kind of got an in-built market for people and versus you and I would lightsabers, probably not a very a attractive game. So we might need to market basically a whole lot to get people to purchase that game.

So this is actually a kind of well-known phenomena where there is -- you can trade off a little bit. So we know -- we know that from that phenomena there is an essentially kind of like a negative correlation. So the sum off those costs is going to vary less than if I just added the ranges the way that I just told you.

Q. And if you could, turn to

Page 181

46 (Pages 178 - 181)

Paragraph 187. That may be where you're talking about this, at least among other places.

A. Oh, paragraph?

Q. Yes, Paragraph 187.

MR. BURT: Page 77?

THE WITNESS: Yes, that's right.

MR. BURT: I hope you don't mind. I'm just trying to get us there.

MR. SWANSON: That's all right. I appreciate it.

BY MR. SWANSON:

Q. So in 187, you indicate that you calculate the correlation coefficient between royalties and user acquisition and retention cost across all genres at the developer level of minus 0.34, which you say "indicates that developers who spend less on UAR initiatives incur higher royalty expenses."

Do I have that, right?

A. That's correct.

Q. And UAR, again, is user acquisition and retention?

A. Yes, it is.

Q. And you refer to this as an inverse relationship between royalties and UAR costs, right?

A. Yes.

Q. Do you agree that a correlation of minus 0.34 is a weakly negative correlation?

MR. BURT: Objection to form.

A. In this particular case, because we're correlating royalties with UAR and there's substantially different numbers of observations between the two, UAR -- we're awash in UAR observations. A lot of developers responded to that on royalties, where, you know, a much smaller number -- 23 it says here. So from a power perspective, we don't have a lot of statistical power.

So this is suggestive of a relationship and gels with my own experience and, you know, what is written about the -- acquiring customers in software businesses.

BY MR. SWANSON:

Q. Did you check to see whether your correlation coefficient is statistically

significantly different from zero?

A. For this one, I did, and it was not a statistically significant relationship. So it was correlated. It was indicative. But again, with the power, it was limited.

Q. Do you have any opinion as to whether this negative correlation holds for all the categories of apps?

A. I think it's some -- it's a general rule.

Now, if we take something like music and entertainment, it's almost like table stakes to be -- I've got to be -- you know, I've got to be buying some -- some content, so there was a possibility that perhaps it would not necessarily apply there. But given the number of developer observations we have and the -- and the correlations that we have, it seemed more appropriate to apply this, which is a well-known relationship, uniformly across genres.

Q. Did you check it -- did you check the correlation for any of the individual genres?

A. That would almost be impossible because of the -- the number of data points would be down to six or eight data points, and royalties are actually one of the data points that are hard to -- hard to achieve in the subpoena responses.

Q. Now, your approach to account for the inverse relationship that you saw and to avoid yielding wide genre gross margin ranges was to adjust the sum of royalties and UAR costs across all the genres?

A. Yes, it was.

Q. Is your adjustment related in any way to the 0.34 correlation coefficient?

MR. BURT: Objection to form.

A. No. I -- I used an approach which, again, was based on my experience in the world of software and the fact that this relationship exists, where what I see is that the sum of these variables has less variation than if you considered them alone, and the adjustment that I made basically has the impact of reducing the range of the -- those two sums.

47 (Pages 182 - 185)

In some of our genre -- genre-specific data, they actually show that. For example, in mobile gaming, if you actually look at the sum of royalties in UAR, they actually tighten up compared to if you're just looking at them alone.

So -- I'll let you ask the questions.

BY MR. SWANSON:

Q. That's all right.

Well, my next question was to take a look at Table 9 or related to taking a look at Table 9 on page 79. If you could, move there, then I'll ask you my question.

Now, your approach looking at the game genre --

A. Uh-huh.

Q. -- your adjustment approach that we've been talking about yields this 50 to 76 percent range for games, right?

A. Yes.

Q. If you took the maximally conservative approach, your range would be 45 to 81 percent; is that right?

MR. BURT: Objection to form.

Page 186

A. Your math sounds right.

Basically, it has the impact of not changing the midpoint or the mean, essentially, or the midpoint of the range, but scooching it down, compressing it a little bit.

BY MR. SWANSON:

Q. And one of the reasons you had given for rejecting the maximally conservative approach was to avoid yielding wide ranges.

Is a wide gross margin range a sign of unreliability, in your view?

MR. BURT: Objection to form.

A. No. What I wanted to do was to make an adjustment based upon my prior experience, which is somewhat demonstrated in some of the data that we have here, that there is this trade-off between spending on royalties versus spending on UAR costs.

BY MR. SWANSON:

Q. Looking at Table 9, you have gross margin ranges of over 40 percent -- 40 percentage points, right?

A. In the right-hand column, are we

Page 187

talking here?

Q. Yes. Yes. Sports, navigation, and travel?

A. Yes.

Q. And many of your ranges are over 25 or 30 percentage points; would you agree?

A. It looks that way, yes.

Q. Do you think any of your ranges are too wide?

A. Well, they're as wide as the data that was available to me suggested. And so clearly in some of these areas, there are narrower ranges, and then some are wider. And this is because potentially there is less data points, less observations in the genre.

If I could go to Paragraph 202 --

Q. Sure.

A. -- you'll see a little bit of a discussion of why -- how the methodology might lead to different -- different ranges -- size ranges because the methods and the data used to arrive at these ranges would depend upon how many observations do we have, so how many are meant to develop the cost data? Then the

Page 188

dispersion of the data itself might also be different.

The availability of public data, so there's more public data on games than there is on weather, for example.

So there's kind of a lot of reasons why some of these ranges may end up being smaller than others if the data is -- warrants it.

Q. Thank you.

Could you turn to Paragraph 345 focused on the -- let me make sure I'm on the right page.

A. 140?

MR. BURT: 140?

MR. SWANSON: Yes, that's where it starts. Let me make sure I'm at the right place myself.

Yes, I'm sorry. I think I -- actually, it's 347. I apologize.

BY MR. SWANSON:

Q. There on 347, which is on page 141, you state that "In some cases, revenue and cost information provided by developers is not

Page 189

48 (Pages 186 - 189)

specific to the App Store and is not fully disaggregated by platform. In such instances, I use the data as provided to calculate cost shares."

Do you see that?

A. Yes, I do.

Q. How important, in your view, is it for your estimates to be specific to the App Store?

A. Well, it would -- it would certainly be desirable for -- for this data to be specific to the App Store. But in order to make sure I have access to the most amount of information, if I have -- for example, in a 10-K -- sometimes we use 10-Ks -- not all subpoenaed responses actually gave us the revenues. So we -- in order to produce a data point, we have to go and take their 10-K revenues, and they may or may not break it out.

So it's an assumption here that these variable cost shares are similar across platforms. In the main, from the subpoena responses, I'm using their data, the data

Page 190

that's given to me. But obviously, this is an assumption where I'm bringing in some of that outside data.

Q. Is it your opinion that the assumption that variable cost shares faced by developers are similar across platforms is an accurate one?

A. So in looking at this, if you look at some of these data on gross margins and contribution margins, so you actually go and look at the software industry in general and gross margins and contribution margins, there are a lot of similarities. So I'm comfortable with that as an assumption.

Q. Is it a maximally conservative assumption?

A. I'm -- I'm not sure -- a maximally conservative assumption might just rule out, I guess, things that are not related to the App Store. So I'm including data here that I have evidence for is the assumption holds, but in specific cases, it may not.

Q. What platforms specifically are you assuming have similar costs for developers

Page 191

aside from the App Store?

A. So if I was looking at -- I mean, Activision is a company I wrote a case with, right? So do their -- does the cost structure of a console game developer, is it somewhat similar to the cost structure of an App Store game developer? So that -- that would be the kind of example.

Q. In making your assumption, are you assuming that -- that variable cost shares faced by Android developers are similar to those faced by iOS developers?

A. To the extent that somebody did not -- "somebody" meaning respondent -- did not disaggregate those, then that would be an assumption that, in order for me to use their data, would have to be -- would have to be part -- part of this methodology.

Q. If you could, turn to Paragraph 358 on page 144 and then look at Footnote 243, I guess, footnote to that paragraph.

In that footnote, you indicate that UAR costs are variable and change based on several factors, including the platforms and

Page 192

operating systems targeted.

A. Yes.

Q. What do you mean by that?

A. So here I think the point is that UAR costs -- you referred to the whales earlier. So let's imagine you have a freemium strategy, so you have a lot of free users, for want of a better word. Acquiring those folks might be relatively cheap, but turning them into paid users might cost a lot. Obviously, we have aggregate data here in some cases, and so we've got these folks kind of put together.

But in general, you would imagine that the cost of customer acquisition, which, of course, is the main thing that our software firms are focused on, is going to be a lot higher to convert somebody to a paid user.

Q. Would you imagine that, or do you have evidence of that?

A. I -- in the data that -- the subpoena data, I don't have evidence of that here. I'm trying to think if I know that for sure or from elsewhere. I -- I have seen evidence of that elsewhere, but I can't give you a

Page 193

49 (Pages 190 - 193)

citation. So, you know...

Q. Is that evidence identified in your report somewhere?

A. No. No, it's not.

Q. Is that because of some proprietary trade secret that you can't reveal?

A. No, no. No, I mean, I think it's just about -- it's the cost of customer acquisition in general is -- clearly, in order to get somebody to go from paying nothing to paying something, that's actually -- there's a bump to get them over.

So there's a fair amount written upon that in the start-up literature and comparing the costs of customer acquisition, which is especially important, again, if you're interested in the unit economics of your software firm and the ability to get investments.

Q. Is it important for your estimates in this case to isolate UAR costs that are targeted to the App Store in the iOS operating system?

A. That was the aim, but that's not

Page 194

always been possible due to the data that's available. So there are some assumptions that are required in order to make the more general form of these -- of these costs kind of applicable.

Q. Do developers spend money on marketing that is simultaneously addressed to both iOS and Android uses?

A. Some part of the marketing expenses, absolutely. Some part are likely to be, for example, embedded with other apps on your device if they're trying to reach you. But some part might be general, you know, banner ads on websites, and they're equally applying to both users.

Q. Did you look into whether the developers who responded to the subpoena had apps on Android as well as iOS?

A. I didn't check that.

Q. Did you check to see whether they had apps on any of the game consoles?

A. Again, I -- I don't know for sure.

Q. Did you check to see if any of them had apps in any of the PC game markets like

Page 195

Steam or Epic Game store?

A. I was -- I wasn't focused on checking the other platforms that they were on.

Q. Do you have an opinion as to whether paid user acquisition costs are higher for Android apps or iOS apps?

A. I've not seen that data, so I couldn't opine on that.

Q. If you can, flip to Paragraph 352 on page 142.

In that paragraph, you refer to "scenarios where paid users generate both digital and ancillary revenue." And you state that "As discussed in Section 5, in such cases, ancillary revenue from paid users constitutes a small percentage of both the total revenue generated by paid users and the total ancillary revenue generated by the app."

Do you see that?

A. Yes. Uh-huh.

Q. By "ancillary revenue," do you principally mean advertising revenue?

A. I do.

Q. Okay. And where in Section 5 do you

Page 196

present evidence that ancillary revenue from paid users is relatively small?

A. Could you give me a starting point for Section 5?

Q. Well, I mean, you discussed advertising at Paragraph 45 --

A. Okay.

Q. -- for example.

I don't know if that's where you would go first, but it might be one place.

A. (Witness reviews document.)

So it's actually in 48.

Q. Okay.

A. So, "If 2 to 5 percent of an app's users are paid users, as noted above, then it is intuitive that paid users account for about 2 to 5 percent of ancillary revenue."

This is assuming, of course, that we can't determine when we're serving ads whether someone is paid or is not paid.

Q. Well, that statement says "if 2 to 5 percent of an app's users are paid users."

That part's a hypothetical, right?

A. Well, it's based upon the prior

Page 197

50 (Pages 194 - 197)

paragraph, which is 47, where, in fact, this is citing industry papers and, you know, interviews where people are talking about that as a general -- a general statistic for freemium apps.

Q. And that's Footnotes 23 and 24?

A. Yes. And I think 25 and 26 are in there too.

Q. Okay.

A. In fact, 25 is the one I was talking about earlier, the Duolingo.

Q. And if we go to those sources cited in Footnotes 23 to 26, you believe we will conclude that there's sufficient evidence to reliably opine that only 2 to 5 percent of a freemium app users base constitute paid users?

A. Well, I think -- I think for sure we know that there's diversity. So these references are talking about, you know, the general case, but I'm sure we can find apps where those statistics are not necessarily true. So this is a -- this is a general claim that was made by the folks that are studying

Page 198

the industry.

Q. And you think it's a reliable claim?

A. I think it gels with my general experience in the develop- -- in the endeavors I've had to help students develop apps that are -- that have these freemium style of models.

I think, you know, whether it's 2 to 5, or I think the Duolingo gentleman said his was 10 percent basically of his app was generating 80 percent of his revenue. So there's a fair amount of convergence on the general set of statistics that's offered there.

Q. Do you have any support for your estimate or that general estimate in your developer cost data?

A. I do not because we're -- we're -- our data is typically not split. So people have either given us specific paid user data, or we have aggregate data, but we don't -- we can't split it up.

The average developer, it's very sad to say, is not very good at tracking costs and

Page 199

revenues by different channels or customers.

Q. Do you have any estimate of the share of mobile app revenue that is due to advertising to free users?

A. Not through this work. I know that it's a lot.

Q. Do advertising revenues from free users subsidize the provision of digital products to paid users?

MR. BURT: Objection to form.

A. Advertising revenues to -- sorry, could you explain again?

BY MR. SWANSON:

Q. Yes.

Is it true that advertising revenues from free users subsidize the provision of digital products to paid users?

A. I -- I don't know if that's true, in general. As a strategy, you know, it's a possible strategy that people are breaking even on the free-to-try and attract more people into the paid.

Q. Would you have an opinion as to whether developers generally lose money on

Page 200

free users?

A. It's not something I know.

Q. Do you have an estimate of the gross margin that iOS developers earn from with free users?

A. I don't.

MR. SWANSON: We've been going for a little over an hour. Should we take a break?

THE WITNESS: Thank you.

THE VIDEOGRAPHER: The time is 2:03. We're off the record.

(Recess taken from 2:03 p.m. to 2:20 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:20.

BY MR. SWANSON:

Q. Professor MacCormack, could you please turn to Paragraph 349 of your expert report.

A. Yes.

Q. You state there that "allocating cost data to specific users and therefore user

Page 201

51 (Pages 198 - 201)

types is more difficult since some costs (e.g. UAR) vary by user type, while others (infrastructure) are more consistent."

Are you speaking here of paid versus free users?

A. I think so.

Q. And in Paragraph 348, you note that most developers "do not consistently categorize costs" between free and paid users?

A. Well, if they have a mixed model, they're often pretty poor at capturing it on their revenue or the cost side or one or the other, which makes matching kind of tough.

Q. Did any developers who have a mixed model consistently categorize costs between free and paid users?

A. I don't recall anybody that did that in a perfect way.

Q. I am looking at Paragraph 358. Let me make sure I'm on the right place myself. Footnote 243, which is on page 144.

At the end of that footnote, you say, "In contrast, UAR costs can vary between types

of users because paid users are generally more difficult to acquire and require free trials, complementary [sic] packages, bundled with other popular services, et cetera."

Do you see that?

A. Yes, I do.

Q. Free trials are just zero revenue, right?

A. Yes. They might be accounted for in different ways, but it's basically, Try it out for a month and then we'll take your credit card and keep charging you.

Q. "Complementary packages bundled with other popular services," how is that a cost?

A. You might have to pay the partner to put the bundle together.

Q. Is the notion that the complimentary packages would be discounted.

A. To -- yes, to encourage trial basically.

Q. That would be like a temporary price reduction?

A. Uh-huh, yes. Yes. Sorry.

Q. That's not a cost, though, is it?

It's a reduction in revenue?

A. Well, the packages here could be packages that you're bundling, or they could be packages that are bundled with other service providers.

Q. What costs, aside from UAR costs, vary by the kind of user?

A. The infrastructure is potentially similar across users. It depends on the service. UAR costs, definitely. Maintenance and support costs, if the user is using more intently, potentially there's additional maintenance and support costs.

Q. Can free users use an app's services more intensely?

A. They can do. But if you're paying for an additional set of features, there's more ways that things can go wrong, and then you have to call for support and maintenance.

Q. Are you familiar with multiplayer game apps, like Fortnite, for example?

A. Yes. All too familiar.

Q. Now, Fortnite, we know -- I don't know if you do -- I'll ask you. From data that's

been produced that's available in this case, Fortnite players on iOS -- when I was on iOS, 90 percent of them paid nothing.

A. Uh-huh.

Q. Do you -- do you take account, at least in theory, conceptually of the cost imposed by those types of free users?

A. Fortnite's not in our data set. So the -- to the extent that any of our subpoena respondents have a similar business model, then we would be purely capturing all of these costs in the same way that we have for each of our observations.

Q. Were you aware that a wide variety of information was available from Epic Games?

A. Recently, I became aware of that, yes.

Q. Is that something that you think would be relevant to your work in this -- in this case?

A. We did take a look recently at data that was available from Epic Games, but it was not in the format that would allow us to use it for the purposes of this matter.

Q. If you could, flip to Paragraph 350 of

your report.

You're assuming here that "in scenarios where paid users only generate digital revenue (e.g., via in-app purchases), variable costs of paid users are proportional to the revenue they generate."

That's what you call your Assumption 1, right?

A.  Uh-huh.  Sorry.  Yes.

Q.  So if an app generates 70 percent of its revenue from the sale of digital goods and 30 percent from advertising to free users only, you will assume that 70 percent of the variable costs are loaded onto the paid users?

A.  So this section is basically constructed to help explain what happens when we are -- what are the assumptions that would be useful in order to use the aggregate data and to basically have that aggregate data be relevant to the matter at hand.

So there are two assumptions, and they apply in slightly different scenarios.  The first one is exactly as you put it, that those

Page 206

costs and revenues are proportional for the different kinds of users.  And the second one concerns ancillary revenue where the paid user actually generates some ancillary revenue, so like a "New York Times" subscriber who's still getting served ads.

Q.  So I just want to make sure I get Assumption 1 right in a concrete example.  I'm not -- I don't know if I am or not, so let's go through that example again, that hypothetical.

So if you have an app, it has paid users and free users, the app generates advertising revenue only from free users, generates paid revenue only from paid users.  70 percent of the revenue comes from the paid user side sale of digital goods.

So how do you apply Assumption 1 when you are allocating the variable costs of that app?

MR. BURT:  Objection to form.

A.  So it's not an assumption that gets applied.  It's an assumption that allows you to -- should it be a true assumption, allows

Page 207

you to use the aggregate data and for that to be an accurate representation of the paid user margin shares.  So to the extent that the assumption does not fully hold, then you would introduce a -- an error term in the range.  And so we have examples in the text somewhere in here where we talk about Spotify, for example, and where we actually have examples of their premium user margins as well as their total user margins, and we basically show that they're very, very close in terms of the percentages.

BY MR. SWANSON:

Q.  I just want to know how Assumption 1 works.

A.  Okay.  Okay.

Q.  We'll get to Assumption 2.

A.  Uh-huh.  Yes, uh-huh.

Q.  So if Assumption 1 says that variable costs to paid users are proportional to the revenue they generate, so if the paid users generate 70 percent of the revenue, do you allocate, according to this assumption, 70 percent of the variable costs of the app to

Page 208

those paid users?

A.  All we do is -- so we use the aggregate figures.

Q.  In theory?

A.  Yes, I mean, in -- that's right, in theory, that's what the assumption is saying.

Q.  I understand you're saying you may not be able to do that?

A.  Yes, yes, yes.

Q.  But it's an assumption and, therefore...

A.  Uh-huh.

Q.  So again, understanding that this is an assumption, is it your view that it would be correct, then, that if only 5 percent of users are paid users, that you would allocate just 5 percent of the app's cost to those paid users?

A.  No, because we're talking about the revenues.  So the --

Q.  I see.

A.  -- so the 60 or 70 percent of the revenue, let's say, so they would be 60, 70 percent of the costs.

Page 209

53 (Pages 206 - 209)

Q.  I see.  So if 5 percent of the -- are paid users and they generate 70 percent of the revenues --

A.  Yes.

Q.  -- you would allocate 70 percent of the variable costs to those 5 percent of the users who happen to be paid users?

A.  Yes.  I'm not allocating anything, but that's what the assumption is saying.

Q.  Got it.

A.  Because we're just using the aggregate level.

Q.  But in order to justify relying on the aggregate level, your assumption --

A.  The assumption should hold.  That's right.

Q.  Do you think it is a reasonable assumption, Assumption 1?

A.  I think it's reasonable.  There are likely to be cases where it doesn't hold.  And part of the reason that -- getting back to using broad margin ranges -- is because there may be situations where that broader range will help to deal with the situations where

Page 210

the assumption doesn't fully hold.

Q.  If the user is the relevant economic unit in your analysis, why don't you assume that costs should be allocated according to the number of users as opposed to their share of app revenues?

A.  I don't have access to the users here.  I just have access to the revenues.  So doing some kind of allocation is very hard for me because all I know for sure is the revenues that they generate.

Q.  Have you made any calculation of the genre gross margins based on an assumption that the variable costs per user are the same?

A.  I have not done that calculation.

Q.  Still, I think, with Paragraph 350 going, I think, to the other scenario?

A.  Uh-huh.

Q.  You're also assuming that "In scenarios where paid users also generate ancillary revenue, the share of ancillary revenue generated by paid users and the associated variable costs incurred by a developer are proportional to the share of

Page 211

paid users."

That's what you call your Assumption 2, right?

A.  Yes.

Q.  And you indicate in Paragraph 352 that that means that you further assume that "The ancillary cost per paid user and per free user are the same"?

A.  Only for the ancillary revenue.  So, yes, notwithstanding the other costs.

Q.  You say, "In other words, the ancillary cost per paid user and per free user are the same," right?

A.  Yes, I think -- I think that's there somewhere.

Q.  That's in 352?

A.  Yes.

Q.  And you say that's reasonable because paid users make up only a small fraction of an app's total user base, right?

A.  Let me see.

Yes.  So if they're 2 to 5 percent of the users and we're advertising to everyone, then the advertising revenue is likely to

Page 212

be -- 2 to 5 percent of it comes from the paid users.

Q.  Can you turn to page 25 of your report.  This is the part of your report with Heading 5.5.1.

A.  Uh-huh.

Q.  The heading says, "Royalties are incurred by developers for licensing third-party content and are variable with the number of users."

By "royalties" here in this section, do you include payments for the use of intellectual property?

MR. BURT:  Objection to form.

A.  So we are talking about both -- yes, intellectual property could be movies, music, et cetera.  It can be technical intellectual property, APIs and things like that and other forms.  So basically, yes.

BY MR. SWANSON:

Q.  In your estimate of royalties, do you include royalties that are structured based on a percentage of revenues earned from downloads or IAPs?

Page 213

54 (Pages 210 - 213)

A. In my estimate of royalties, I'm, in general, basing it on the subpoena responses as to what the developer is reporting that their royalties are, and then in -- it turns out that people don't really want to share their royalties very much for competitive reasons, so I have to go to industry studies and to public sources to try and understand what the right level is for -- for these figures.

Q. Well, if -- to the extent you have the information, if a royalty is charged as, say, for example, 20 percent of the price of a download or an in-app purchase, you would include that in your estimate; is that a fair statement?

A. I think so.

Q. And you consider those kind of percentage royalties to be variable with the number of users?

A. They are variable with the number of users or with the usage, and I fully expect and believe that there's a strong correlation between those two things.

Page 214

Q. Precisely speaking, they're variable with the amount of purchases, correct?

A. So if we're -- they are at the level of the developer's cost structure. That's true.

Q. Could you turn to Paragraph 149, please.

A. Uh-huh.

Q. You refer in 149 here to Roblox, a developer?

A. Yes.

Q. You're familiar with Roblox?

A. Yes. My kids were big fans.

Q. You note that Roblox offers generous revenue-sharing agreements for popular creators?

A. Yes. Sorry. I'm just getting there. 149.

Q. Go ahead. 149.

A. Yes.

Q. What is a revenue-sharing agreement?

A. For Roblox?

Q. In general -- well, in general terms.

A. Oh, okay. It's an agreement that

Page 215

if -- if one party can get compensated for access to something they've created, that they will get a percentage of, let's say, the final sale price of that item.

Q. So in the case of digital transactions, that would be a percentage of the app download or a percentage of the in-app purchase?

A. For Roblox specifically, the things that people -- give you an example. My son is a big aviation enthusiast, so he would design airports on Roblox, but then he could sell the airports to other people, and then he would get paid in some way.

Q. He would get a percentage of what --

A. Of what --

Q. -- the other people pay?

A. That's exactly right, yes.

Q. And that would be an in-app purchase for the other people?

A. Exactly.

Q. And that's the general characteristic of a revenue-sharing agreement?

A. I think so.

Page 216

Q. You give several other examples in your report of percentage revenue share royalties --

A. Uh-huh.

Q. -- correct?

A. Yes, I do.

Q. You give examples of Udemy, ▮▮▮▮▮ Twitch, Zynga, YouTube, Adobe, Canva. Do you recall all of those are developers that have some type of percentage royalty sharing?

A. Yes.

Q. Did you feel you had sufficient information in those cases to assess the information about those agreements -- those revenue share agreements for purposes of estimating your ranges?

A. Well, in each of those cases, the reason that there was a search for additional information was that the royalty data provided by subpoena recipients may not have been particularly comprehensive. So I felt a need to go out and vet additional data points. They're hard to come by because people disguise they are royalty payments. They're

Page 217

55 (Pages 214 - 217)

not typically contained in a 10-K. Occasionally, they are. So I tried to get what I could basically.

Q. Can you please turn to Paragraph 109 of your report.

In Paragraph 109, you talk about analyzing each of the 27 App Store genres and their top revenue-generating apps.

Do you see that?

A. I do.

Q. And you did that to assess whether any of them are similar enough to be combined and treated together. You say, "If the genres contain apps with largely similar themes and features, they can be expected to have similar business models and technical designs, making it reasonable to treat them as a single category for the estimation of gross margin ranges."

My first question is what is a theme in this sense?

A. What is a theme? Sorry.

Q. Yes. What do you mean by a theme here when you talk about similar themes?

Page 218

A. Oh, okay. There, I found it.

Really it's kind of the features or the functions that are being delivered to users. So to use an example from the report, if you look at social media and lifestyle, you end up finding out that the majority of apps in the top ten at least of those genres are dating apps.

So the developers independently have made this decision to allocate their software offerings into different categories. So when we look at them, we're saying, Well, it's quite likely that these things are quite similar, so for the purposes of constructing a broader group that perhaps will have more observations in it, we can kind of put those things together.

Q. And you referenced features of an app. What were the features you were analyzing or paying attention to in this work?

A. So they are the user-facing features. So, in general, let's say a dating app -- I don't know anything about them, by the way -- but, in general -- before my time -- they

Page 219

allow you to set up a profile. They allow you to browse the profiles of others. They allow you to send messages. So kind of that really is about kind of the user-facing functions that basically that the software is providing.

Q. Dating apps -- I don't know anything about them either -- are in what genre?

A. They're in both. They're in lifestyle and social networking. And for all I know, there could be dating apps in other genres too. I think we're all aware of the limitations of the genre buckets.

Q. When you were doing this work, did you basically download, open, and review the top apps in each of the genres?

A. Yes. The top -- the top ten apps in each of the genres and then looked for similarities in the kinds of functions they were trying to perform.

Q. And how much time did you spend looking at each app?

A. I'm not sure. 10 or 15 minutes.

Q. Did you make any purchases in any of the apps, not the dating apps?

Page 220

A. No. This was what can we understand about things based upon what we see?

Q. Did you make any record of the themes and features of the apps as part of this review?

A. No. I think in looking at the groups that emerged and which the descriptions of which are described genre by genre in the appendix, most of these things do not seem controversial. There's a natural affinity in terms of the types of features and functions that they're giving to the user.

Q. Are you assuming or concluding either way that the apps within a genre are generally substitutes in the eyes of consumers?

MR. BURT: Objection to form.

A. I certainly am not assuming that. Take business and productivity. One app might track your expenses on a business trip. The other one is for inputting your billable hours. These are obviously different functions, and so somebody might want both of those apps.

It is helpful -- sorry to carry on.

Page 221

56 (Pages 218 - 221)

But in software analysis, in general, so in doing this kind of work, it is helpful to have some categories to anchor on because, certainly in my work, I've seen that sometimes there are systematic differences that might be explained by the category.

So in my prior work, for example, looking at software productivity, software performance, I might get a whole bunch of projects and then say, Well, some of these are about the operating system, and some of these are about application software. And we don't know, but those might be kind of different things. So let's make sure that we put in a control to see what we pick up there.

BY MR. SWANSON:

Q. Well, in Paragraph 102 of your report, more the part at page 41, but you refer to the -- I'll wait until you're there. You refer to "the subjective nature of app categorization, which results in similar apps being categorized separately."

A. Yes.

Q. What do you mean by "subjective"?

Page 222

A. Actually, I simply mean that the developers get to decide, and they most likely make a decision based -- obviously, you want your app to be found by the customer, which is probably the dominant consideration. But you might imagine that somebody could say, Well, given dating apps are in different places, maybe I want to be in a slightly different genre to differentiate.

So we don't really have any control over what the developer chooses, and we know they can also switch. I'm not sure there are any restrictions on when they switch either.

Q. Are you aware that Apple publishes App Store category definitions to guide developers in their choice of genres?

A. I think I am aware of that, yes.

Q. Did you look at those?

A. I did not, no.

Q. Are you aware that developers can designate both primary and secondary genres?

A. I was aware of that, and I don't recall if we used that information or not.

Q. Are you aware that many of the genres

Page 223

have subgenres?

A. Yes, I've seen that.

Q. Was any of that information information that you made use of in your expert work?

A. I don't -- I don't recall making use of that. I think it was top-level analysis.

Q. How common a phenomenon do you think it is that similar apps are categorized separately in different genres?

A. Well, we see it with dating apps. You might imagine that TikTok and YouTube are substitutes, but they appear in different genres. So there are different choices made. I don't really know if there's -- that's what my kids tell me.

Q. That's a Meta case.

Could you turn next to Paragraph 97 of your report.

In Paragraph 97, I think you indicate one of the primary data sources for your opinions is financial records from a set of subpoenaed developers that distribute their apps on the App Store, correct?

Page 224

A. That's correct.

Q. You refer to that as developer cost data, right?

A. Yes.

Q. And you indicate that -- and this is in Paragraph 98 -- that the developer cost data was provided to you by counsel; is that fair?

A. That's correct, yes.

Q. In Paragraph 98, you note that "Developer financial data is not publicly distributed or easily accessible for the vast majority of app developers."

Is that your experience?

A. That is.

Q. Have you had access to nonpublic iOS app developer financial data aside from your work in this case?

A. I don't think so, no.

Q. So you don't rely on any such financial data?

A. No, no.

Q. Still with Paragraph 98, you state that "The lack of public data led counsel to

Page 225

57 (Pages 222 - 225)

issue subpoenas to a number of developers distributing their apps on the App Store for access to their financial records."

I believe you indicated earlier that you were not involved in that process?

A. That's correct.

Q. Do you have an understanding as to how the developers were selected for receipt of subpoenas?

A. I don't know how they were, but I've read the subpoena request.

Q. Do you know how many subpoenas were sent to developers?

A. I thought I had heard, but I'm not sure.

THE VIDEOGRAPHER: We just lost -- off the record a sec. The time is 2:54. We're off the record.

(Recess taken from 2:54 p.m. to 2:54 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:54.

Page 226

BY MR. SWANSON:

Q. We may have lost one of the questions on the record, so let me try it again.

A. Sure.

Q. At least on the video record. We'll see if I have the right question.

But do you know how many subpoenas were sent to developers?

A. I don't know for sure.

Q. There were 114 productions in response to subpoenas that you're aware of, right?

A. That is correct.

Q. Do you know if there were developers who made no productions despite receiving subpoenas?

A. Who made no productions?

Q. Yes.

A. I anticipate the difference between 114 and -- yes, I would think there were.

Q. Do you know how many developers there were who made no productions despite receiving the subpoena?

A. I am not aware, no.

Q. Do you regard the set of developers

Page 227

who received subpoenas to be a statistically representative sample of something?

A. Of something. So I think that -- as I look at the 71 app submissions that I received, it's representative of the diversity of apps that are out there. Is it a good sample for the population of apps, in general? I don't know.

Q. Do you know if it's even a random sample?

A. Well, I wasn't involved in the selection, so I don't know.

Q. Do you have any experience in designing or implementing developer surveys?

A. I do.

MR. SWANSON: Let us mark another exhibit.

(Exhibit No. DX-70 marked for identification.)

BY MR. SWANSON:

Q. We've had marked as DX-70 an article entitled "Software Development Worldwide: The

Page 228

State of the Practice" listing Mr. Cusumano, Professor MacCormack, Mr. Kemerer, and Bill Crandall coauthors. Do you have that in front of you?

A. I do.

Q. Do you recognize this exhibit?

A. I do.

Q. And is this an article that you coauthored?

A. Yes, it is.

Q. And this article reports on a global survey of developers, correct?

A. That's right.

Q. And this was a survey that yielded 104 responses after removing duplicates and insufficient or incomplete responses that I believe we can glean from page 30. But why don't you take a look.

A. (Witness reviews document.) Yes, that's correct.

Q. Now, at page 29 of the article, you acknowledge that this sample was not a true random sample, correct?

A. That's right.

Page 229

58 (Pages 226 - 229)

Q. And in this article, you emphasize that, because the sample is not truly random, your results must be interpreted cautiously, right?

A. That's right.

Q. That's good practice in your profession, correct?

A. Uh-huh, yes. That's right, yes.

Q. And at page 30, you pointed out that your tabulations were not a statistical analysis, correct?

A. I'm just looking for that.

Q. Yes. Page 30. The right-hand column.

A. Okay. Yes.

Yes, I see that.

Q. And you said that "References to significant differences were informal and not to be interpreted in the statistical sense of the word," right?

A. That's right.

Q. And that was also good practice to acknowledge in your profession, correct?

A. Uh-huh, yes. Sorry.

Q. And you underscored that because of

Page 230

large variations in the samples of this type -- excuse me. Withdraw that.

And you underscored that "Because of large variances in samples of this type, many seemingly large differences in averages turn out not to be statistically significant at a 1 percent or even 5 percent confidence level."

Do you see that?

A. I do.

Q. And it was also good professional practice to disclose that correct?

A. Yes.

Q. Now, in your report, you haven't disclosed any statistical confidence levels for any of your estimates, correct?

MR. BURT: Objection to form.

A. I don't calculate statistics other than the ones for determining the box plots.

BY MR. SWANSON:

Q. You indicated that your -- you had calculated that your correlation coefficient was not statistically significantly different from zero, correct?

MR. BURT: Objection to form.

Page 231

A. That -- yes, due to the low power of that particular test.

BY MR. SWANSON:

Q. And you did not report that in your expert report, right?

MR. BURT: Objection to form.

A. I don't recall, but it's -- if you say so, yes.

BY MR. SWANSON:

Q. Well, would it be your practice to report that -- if you had reached that conclusion, that something wasn't statistically significant at the 1 percent or even 5 percent confidence level?

A. I think what I was trying do there was to indicate there's a known phenomena out there about the trade-off between UAR and royalties. And that we see it indicated -- despite the weakness of that relationship, we do see it in a small number of -- the small number of sample that we had.

Q. Now, you mentioned your box plots. Did you disclose any statistical confidence levels for any of those?

Page 232

A. They're just box plots, so they're a pretty standard statistical technique.

Q. Is it possible to compute any statistical assessments of whether any of your estimates of variable cost shares are statistically different from zero?

MR. BURT: Objection to form.

A. So the way that these ranges are constructed combines both the data from the subpoena, of which we have 71 app submissions, but it also has public data to varying amounts depending on the genre, and then there are judgments that I have made. So there are -- it's not a sample in the same way that this AEEE Software article is, where we just took the data, ran the numbers, and didn't apply judgment.

So I can't -- I can't apply the same statistical tests to it.

BY MR. SWANSON:

Q. Could you turn to Paragraph 192 of your report, please.

You note that the subpoena was initially served in March of 2021 and

Page 233

59 (Pages 230 - 233)

compliance continued through 2024.

A. That's right.

Q. Did you get copies of all of the subpoenas?

A. I assume that. I don't know for sure. All of the responses, you mean?

Q. Well, first of all, all of the subpoenas. Did you get any of the actual subpoenas or just the template?

A. I have the template for the subpoena.

Q. So did you see any of the specific subpoenas?

A. The outward going?

Q. Yes.

A. I did not see those.

Q. So in Footnote 134 on page 80, you say you were "provided with a template of the subpoena that contained the information requested." And you cite something that you refer to as "Doc subpoena dash 2024 template."

Do you see that?

A. I do.

Q. Was there a template before 2024?

A. I'm not aware of that.

Page 234

Q. Do you know if the template changed at all?

A. I don't know if it did.

Q. Do you know if the template that you saw was rigorously implemented with each subpoena that went out?

MR. BURT: Object to form.

A. I didn't see the subpoenas, so...

BY MR. SWANSON:

Q. Did you get copies of all written communications between plaintiffs' counsel and counsel for the subpoena recipients?

A. In some of the records that the -- in the subpoena responses, there are some records of communications. So I've seen some of those, but I don't know if I have all of them.

Q. Did you ask for all of them?

A. I didn't.

Q. But what was made available to you, you reviewed?

A. Yes, I -- this was a pretty comprehensive set of data from 71 app developers.

Q. But when you say "comprehensive," do

Page 235

you know if you had all the correspondence from the developers' lawyers?

A. I don't know for sure.

MR. SWANSON: Let's mark another exhibit.

(Exhibit No. DX-71 marked for identification.)

BY MR. SWANSON:

Q. We've had marked as DX-71 a document from Ethan Jacobs to Rourke Donaho -- Donahue -- excuse me -- dated Friday, June 30, 2023.

Have you seen this before?

A. I don't -- I don't think so.

Q. Okay. If you look at 1-A --

A. Uh-huh.

Q. -- there's a question there referring to user acquisition performance marketing costs. "Do any of those costs vary with the number of users?"

There's a response that says, "These costs do not vary with the number of users.

Page 236

Pixel cut sets weekly budgets for user acquisition performance marketing which it runs on the various ad platforms."

Does that refresh your recollection at all that you may have seen this document?

A. I -- I don't believe I have.

MR. SWANSON: Let's mark another one.

(Exhibit No. DX-72 marked for identification.)

BY MR. SWANSON:

Q. Okay. So we've marked as DX-72 an email from Mr. Donahue to a Ramie Snodgrass, with others in the copy field, dated Friday, April 12, 2024.

Do you see that?

A. Yes, I do.

Q. Is this a document that you've seen before?

A. I can't be sure, but I -- it doesn't ring any bells.

MR. SWANSON: Okay. You can put

Page 237

60 (Pages 234 - 237)

that one aside.

(Exhibit No. DX-73 marked for identification.)

BY MR. SWANSON:

Q. We have now marked as Exhibit DX-73 a -- an email from Mr. Donahue -- at least the topmost part of the email is from Mr. Donahue to an Olga Borzenkova bearing the date Friday, April 19, 2024.

Do you see that?

A. Yes.

Q. Do you recall having seen this email chain before?

A. It's not something that triggers my memory.

MR. SWANSON: Okay.

(Exhibit No. DX-74 marked for identification.)

BY MR. SWANSON:

Q. We've had marked as DX-74 another

Page 238

email chain. This one, at the topmost level, appears to be an email from Mr. Andrew Purdy to Mr. Donahue. The date on this is Friday, May 3, 2024.

Do you have that in front of you, Professor MacCormack?

A. Yes, I do.

Q. Is this an email chain that you recall having seen before?

A. (Witness reviews document.)

Again, it's not something I remember.

Q. Okay. You can put that aside.

Turning back to your expert report, can you go back to Paragraph 192.

You refer there to instructions. Do you see that?

A. Yes.

Q. What do you mean by that?

A. You mean compliance with the subpoena continue to instructing developers or...

Q. Yes, the instructions requested, that part.

A. I think that's trying to describe what the subpoena was doing.

Page 239

Q. Okay. And you had nothing to do with the instructions?

A. No, but I saw the template, so I knew the -- what the goals were.

Q. You indicate that developers were instructed "to provide detailed financial information covering the years 2012 through 2023 and pertaining to revenues, costs, and key operating metrics, e.g., the number of monthly active users, of the firm," correct?

A. Yeah.

Q. Did you verify that the template contained a request for key operating metrics?

A. I --

MR. BURT: Objection to form.

A. I've seen the subpoena, but I don't recall if that's on there.

BY MR. SWANSON:

Q. Did most developers provide the requested information about key operating metrics?

MR. BURT: Objection to form.

A. Most developers provided very custom developer-specific responses that were not

Page 240

necessarily provided in the template.

BY MR. SWANSON:

Q. Well, the template asked for developer-specific responses, right?

A. Yeah. I'm just saying that when they replied, they must have sent a bunch of information, and so that had to be pulled together in a way that mapped to the -- to the instructions.

Q. Well, did most developers provide information on monthly active users?

A. My recollection is that was not what most developers did.

Q. In Paragraph 192, you further state that the instructions from plaintiffs' counsel requested "that the cost data include variable costs such as payment processing, distribution, infrastructure, software maintenance, licensing, and UAR expenses."

Do you see that?

A. I do.

Q. Is it your understanding, then, that counsel instructed developers that these were variable costs?

Page 241

61 (Pages 238 - 241)

MR. BURT: Objection to form.

A. The -- the subpoena that I reviewed actually asked them to provide variable costs, so didn't necessarily say that these are variable costs, and then had some headings.

BY MR. SWANSON:

Q. Well, do you know if developers disagreed that some of these or maybe all of these were variable costs?

MR. BURT: Objection to form.

A. I don't know what was in their heads because they came in mostly before I was engaged.

BY MR. SWANSON:

Q. How would a developer indicate, for example, that they did not believe software maintenance was a variable cost?

MR. BURT: Objection to form.

A. I would be speculating, so I'm not sure I should speculate.

BY MR. SWANSON:

Q. If a developer regarded infrastructure or software maintenance expenses as fixed rather than variable costs, how could you tell

Page 242

from their responses?

MR. BURT: Objection to form.

A. They -- they would have the option of writing zero in the variable cost column in the template.

BY MR. SWANSON:

Q. Looking at Paragraph 193 of your report, you say that of the 114 developer subpoena responses that you're aware of, you "identified and retained usable data from 71 submissions pertaining to 68 unique developers," right?

A. That's right.

Q. And that's what you referred to in your report as developer cost data, right?

A. That is. That is.

Q. And in Paragraph 194 there at the bottom of page 80, you say that you "have usable information from six developers in the game genre."

What do you mean by "usable information"?

A. Well, if we go to Appendix B, I think we would see the games.

Page 243

So that means that there are six developers who provided responses and for whom we have data that we can use to calculate cost shares.

Q. So usable data was -- is a reference here to your conclusion --

A. To the -- sorry for interrupting.

Q. -- your conclusion that you could use the data?

A. Yes. "Usable data" means -- so if you move from the 114 down to the 71, where there's a very lovely table, Table 10, page 82, which kind of takes you through how we go from 114 to 71 and then how we move up to the number of data points that we have, so this is referring to out of the 71, 6 of these were in the -- the game genre.

Q. Do you have an estimate of how many iOS developers there are in the game genre?

A. I know it's a lot.

Q. A lot being more than 50,000?

A. I would guess yes.

Q. More than 100,000?

A. I would imagine it's higher than that.

Page 244

Q. Are the 6 game developers that you have usable data from representative of the universe of more than 100,000 iOS game developers?

MR. BURT: Objection to form.

A. It would be unlikely that they would necessarily be fully representative of the universe. That's why I would have to take into account public information and other data in order to make the assessment of the ranges.

BY MR. SWANSON:

Q. Did public data give you information about more than six game developers?

A. Yes.

Q. How many?

A. Well, if we refer to page 86, so Paragraph 207, as we go through royalties, we have -- sorry. It was Paragraph 210.

So we have public information from G5 Gaming and Remedy Games reporting annual royalties. And I'm using that to supplement the royalties that came in from the respondents.

I also have, in Paragraph 212, some

Page 245

62 (Pages 242 - 245)

information from Zynga, which pertains to royalties. So using basically the developers that I have as the subpoena respondents plus those set of public observations, that helps me on the royalties front.

Then for UAR separately, I bring in information from the 10-K reports from Activision, Electronic Arts, and Take-Two Interactive. So again, supplementing the information that was provided by the respondents.

Q. So you've got six game developers with usable information from the subpoena response, three game developers who had some information out in the public domain on royalties, and three game developers who had information out in the public domain on UAR costs.

That adds up to 12 game developers?

A. And then there's also my own experience, which, in this particular case, I use where UAR is concerned to help inform the range. So we use the developer responses, where there's six of them. They actually all provide UAR costs. UAR costs tend to be

Page 246

commonly provided by respondents.

I then take the three public firms, and then I also have my own experience of developers in this genre and the level of customer acquisition cost that they would typically be incurring. So I'm putting that all together to get to my range.

Q. Okay. Now I had understood earlier that you didn't have any nonpublic information from iOS developers.

Are you saying you did have nonpublic information about iOS developer costs?

MR. BURT: Objection to form.

A. So for the -- for the LTV to CAC ratio -- so the way of calculating customer acquisition costs that comes about through my experience is relevant to multiple software categories. So this is -- this is not an app -- a specific iOS developer.

BY MR. SWANSON:

Q. Okay. I'm just trying to --

A. Yes, yes.

Q. -- understand how many game developers --

Page 247

A. Yes.

Q. To use an example -- an important example, you had data from -- that led to and informed specifically your selection of the --

A. Of the ranges.

Q. -- the ranges --

A. Yeah.

Q. -- right?

So I was up to 12 game developers --

A. Uh-huh.

Q. -- and that's when you said you had your own judgment and the like that you applied, which I understand.

A. Sure.

Q. But is there any other information you've disclosed in this report from an iOS game developer that you used specifically in identifying the range for iOS game developer -- the iOS game genre? I'm sorry.

A. I'm just checking in my report to see if there are our public data sources.

(Witness reviews document.)

In Section 219, I think I'm using some of the same observations to basically make the

Page 248

point about the inverse correlation between UAR and royalties. So there we have Roblox, G5, and Glu Mobile again and the data for the combined expenses. But that -- that's the total.

Q. Okay. So that would be 14?

A. Yeah.

Q. Okay. 14 game developers, right?

A. In -- yes.

Q. Okay. How would you -- if you were starting from scratch, how would you go about identifying a random sample of iOS game developers?

MR. BURT: Objection to form.

A. Well, I could basically send out requests for information to randomly selected app developers across the spectrum of different sizes and -- and different types of games. So that -- that would be one approach.

BY MR. SWANSON:

Q. And knowing that there are more than 100,000 -- likely more than 100,000 game developers, as we discussed earlier --

A. Uh-huh.

Page 249

63 (Pages 246 - 249)

Q. -- how many of those would you send out --

MR. BURT: Objection to form.

BY MR. SWANSON:

Q. -- to get a random sample that you could rely on?

MR. BURT: Objection to form.

A. I think in -- again, back to my assignment, I think I was asked to take what was a -- for my field, a relatively large sample of projects and try and make some inferences about the ranges, knowing that it's very hard to get this kind of data. So I can't -- I can't really speculate about what sample size I think I would need to truly get a statistical estimate of the true mean.

BY MR. SWANSON:

Q. Is that because this is not an area of your expertise, designing samples of developers in order to get reliable information about their cost structure?

MR. BURT: Objection to form.

A. I think understanding that many of these developers are nonpublic and will not

Page 250

give the information out, a typical survey response for academic surveys of, you know, this type, you're lucky if it's a 5 percent response rate. So you would be sending out a lot of information and trying to get back a lot. I mean, that would be a very, very large endeavor.

BY MR. SWANSON:

Q. You understand, though, that with subpoenas, generally, people actually have to provide information?

MR. BURT: I'm going to object to the form of the question.

A. I understand. The subpoena process happened before I was a part of the process, and so it was not really a part of my assignment.

BY MR. SWANSON:

Q. Would usable information from two game developers be sufficient for you to reach reliable estimates?

MR. BURT: Objection to form.

A. The -- each genre here has obviously a different number of actual subpoena

Page 251

respondents. In each case, I looked for public data where there is some, used my own judgment where it is relevant, and then if there are not -- so I'll take sports as an example, which you may have been coming to anyway. There, the respondents, I don't think, were particularly representative of that category after going through an analysis of the apps that are in that category and so made a reasoning based upon their similarities to some of our other genres that do have more information.

So many sports apps, for example, are apps that are based upon -- they're more akin to entertainment. Other sports apps provide real-time scores, and so they're more akin to news and reading. So there's a variety of ways that I arrive at a range where there are, let's say, a sparse number of data points.

MR. SWANSON: Should we take a break?

THE WITNESS: Yes.

THE VIDEOGRAPHER: The time is 3:26. We're off the record.

Page 252

(Recess taken from 3:26 p.m. to 3:42 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:42.

BY MR. SWANSON:

Q. Professor MacCormack, can you please turn to Paragraph 101 of your report.

MR. BURT: Page 40.

MR. SWANSON: Page 40, yes.

BY MR. SWANSON:

Q. You indicate here that you used data from the fourth category, publicly available financial information, in two separate scenarios.

What's the first scenario?

A. So just as an example, if a -- if a respondent provided data on costs that they didn't provide data on revenue and that was something that looked like it was readily available from a public source, then we used it to be able to calculate a cost share.

Q. Now, in Paragraph 101, you say, "In

Page 253

64 (Pages 250 - 253)

the second scenario, I use public information from a variety of sources beyond 10-K filings, including industry reports, blog posts, and other relevant materials to inform and sense check my estimates due to the scarcity or lack of necessary granularity of the information provided by developers."

Do you see that?

A. Yes, I do.

Q. So what do you mean by "sense check"?

A. You can take the developer cost data as kind of one bucket of data, and that will tell a certain story. And then the 10-K filings and industry reports might give us additional context.

So to take music and entertainment as an example, sparse data on royalties, but there is some information out there in the public domain, not necessarily from financials because people like to hide that, but there is information that suggests -- and we cite a few sources -- as to what the royalty levels are. So basically the information from the subpoena

Page 254

responses is kind of supplemented. So a sense check is kind of a strong word here, but we are kind of combining these things with a little bit of judgment as to how to get to a final range.

Q. Is sense checking, to some degree, subjective?

MR. BURT: Objection to form.

A. I think sense check, as I mentioned here, is what -- in some cases -- let me back up.

We might find some public information that actually -- so Spotify would be an example, in fact, because they actually published their paid user margins. And so we've got a set of margins for that genre and then right at the back end we say, Oh, look, it turns out that the data that they provide is very, very similar to the margins that we've come up with.

So sense checking is like information that I have that's available that kind of tells me that these ranges gives me extra confidence that they -- that the ranges are

Page 255

good.

BY MR. SWANSON:

Q. And how do you know when an estimate fails the sense check?

A. Well, if I -- if I had looked to, you know, Spotify's paid users margins and they were entirely different, I would, at that point, be going back to say, Okay. What happened here?

Q. How many of your estimates changed as a result of your sense checking in the second scenario?

MR. BURT: Objection to form.

A. I don't recall -- I don't recall a situation where there was a sense check that basically took us in a direction that had -- was not indicated by the ranges. And these are, as we know, some fairly broad ranges, depending on the genre.

BY MR. SWANSON:

Q. But the second scenario was a situation where you had a scarcity or lack of necessary granularity of the information provided by the developers, right?

Page 256

A. In general, that's where I looked for these other indicators. As we looked at Paragraph 202 earlier, the availability of public information unfortunately is limited to certain of these genres, so there's only an ability to do it for some places.

Q. Do any of your estimates in your report rely on informed speculation?

MR. BURT: Objection to form.

A. No, they -- they rely on three sources: the subpoena data, 10-Ks or public -- or industry reports, and then my judgment from experience of working with Microsoft activity and you name it.

BY MR. SWANSON:

Q. And do any of the estimates in your report rely on anecdotal evidence?

MR. BURT: Objection to form.

A. They do not. I should ask you what you mean by "anecdotal," I suppose. Hearsay maybe?

BY MR. SWANSON:

Q. Is that a term that you've used before, "anecdotal evidence"?

Page 257

65 (Pages 254 - 257)

MR. BURT: Objection to form.

A. Anecdotal evidence, to me, is, you know, somebody told me something. So I don't rely on that, no.

BY MR. SWANSON:

Q. Do you agree that Apple is the developer of the app Store?

A. I would think so, yes.

Q. App store is an app, right?

A. Yes, yes.

Q. Do you agree that, as a developer, Apple encourages user acquisition and retention costs for the App Store?

A. I would think so, like all software companies.

Q. Can you give an example?

A. Of a user acquisition?

Q. Uh-huh.

A. They might place ads in developers' apps that are meant to encourage other developers to place their products on the App Store.

Q. In your opinion, would a user be more likely to engage with the App Store if Apple

Page 258

improved the features of the iPhone or the iPad?

MR. BURT: Objection to form.

A. I think anytime you make a technical improvement to the phone and potentially provide some extra functionality that a user can take advantage of, that's an added bonus for the app developer.

BY MR. SWANSON:

Q. In your opinion, would a user be more likely to engage with the App Store if Apple improved the features of the iOS operating system?

MR. BURT: Objection to form.

A. I can -- I can see a scenario where that would be true.

BY MR. SWANSON:

Q. Based on your work as reflected in your report, do you have any estimate of Apple's UAR costs for the App Store app?

A. No, I don't know what it is.

Q. How would you go about estimating that?

MR. BURT: Objection to form.

Page 259

A. I would subpoena them.

BY MR. SWANSON:

Q. Would you rely on the information that you've published in this expert report of the yours?

MR. BURT: Objection to form.

A. I'm not sure how to think about the App Store as a piece of software. So I don't know. I would have to think about that.

BY MR. SWANSON:

Q. Does it fall into a category of software that you think is not appropriate to look at in coming to the conclusions that you reached in your report?

MR. BURT: Objection to form.

A. Given it's software, I think it would obey -- it would have these universal costs that I've talked about, so it would have UAR costs. It would have maintenance and support costs, infrastructure costs. It would have all of these costs. As to where it stacks up relative to this data, I don't know.

BY MR. SWANSON:

Q. Do you have any estimate of Apple's

Page 260

gross margin for the App Store?

MR. BURT: Objection to form.

A. I don't know it.

MR. SWANSON: I am about done for the day. I know we just took a break, but if we can take two or three more minutes --

MR. BURT: Yes, we can.

MR. SWANSON: -- I can wrap up anyway, subject to reserving time for the next go-around.

MR. BURT: Obviously, we're both reserving time for the next go-around. And if I ask any questions, you may have redirect. All understandable.

MR. SWANSON: Thanks.

THE VIDEOGRAPHER: The time is 3:52. We're off the record.

(Recess taken from 3:52 p.m. to 3:59 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:59.

MR. SWANSON: I'll reserve the

Page 261

66 (Pages 258 - 261)

rest of my time.

MR. BURT: Okay. I have very little, but I am going to ask a few questions.

CROSS-EXAMINATION

BY MR. BURT:

Q. Professor, how many -- if you can estimate for me, how many total semesters of business have you taught, including your time at Harvard and at Sloan?

A. Gosh. Make me feel old. I started in 1998. So that's 26 years, 27 years. I'm getting it wrong. 27 years times two semesters, so 50-plus semesters.

Q. In your field, do you typically decline to draw any conclusion if you're unable to do so through a methodology that's susceptible to a statistically calculated confidence interval?

A. No. In fact, in many occasions, we're dealing with qualitative data or messy data, and it's our job to try and see through the noise and to determine trends and to make calls.

Page 262

Q. Do you remember where Table 10 is in your report?

A. Whoever can find it first gets...

I think it's towards the back by the appendix.

Q. I'm going to tell you I think it's at page 82.

A. Okay. Yes.

Q. So I see here that in total number of data points used in analysis, it gives a number of 762.

Do you see where it says that?

A. I do.

Q. Can you explain how that number is constructed for me?

A. Yes. So every one of the 71 developers that we deemed to have a viable response to the subpoena could answer on each of the four costs, and they could answer for each of the years that we were asking for data. So when you multiply up developers times costs times years, you end up with 762 data points. And throughout the report, as you saw, we have the IQRs, which we were

Page 263

consistently looking at the ranges I had identified and then comparing that to if you just used the box plots and the IQRs. Those IQRs are based upon these 762 data points.

Q. So in your experience within the published peer-reviewed field of literature that you work within, how do you think that stacks up as a set of data to analyze?

A. At an aggregate level, this is a strong dataset, certainly comparable to the highly cited publications that I have that we talked about earlier. So I thought there was more than enough information to certainly -- we didn't talk a little bit about how to determine whether UAR costs or royalties vary by genre, but there was enough information for us to determine that and to determine that two of the other costs were likely to essentially be the same across genres. So a pretty strong dataset.

Q. I'd like to have you look for me, if you could, at Table 1, which is on page 11 of your report.

You've been answering questions from

Page 264

Mr. Swanson now for a little over five hours. I want you to take a look at the genre gross margin endpoints that you've expressed in each one of these lines. And considering the top of the range and the bottom of the range separately, are there any figures that, as an extreme end of range, you think -- I want to rephrase that -- that as an endpoint of the range in which you would expect to find the mean developer experience within that genre after asking -- after answering Mr. Swanson's questions that you now think you can't stand behind with a reasonable degree of professional confidence?

A. No. I'm -- after the great questions from Mr. Swanson, I am still fairly confident that these are the right ranges.

MR. BURT: No further questions.

MR. SWANSON: Okay.

MR. BURT: Are we off?

MR. SWANSON: We're off.

MR. BURT: Subject to the rest of your time.

MR. SWANSON: Subject to the

Page 265

67 (Pages 262 - 265)

rest of the time.

THE VIDEOGRAPHER:  The time is 4:03.  We're off the record.

THE STENOGRAPHER:  Do both counsel need a rough draft?

MR. BURT:  Yes, I'll take a draft.

MR. SWANSON:  Yes.

THE STENOGRAPHER:  And do both sides need the final expedited?

MR. BURT:  Yes, please.

MR. SWANSON:  Yes.

(Deposition concluded at 4:06 p.m.)

Page 266

---

THOMAS BURT, ESQUIRE
burt@whafh.com
                    May 27, 2025
RE: In Re Apple Iphone Antitrust Litigation
5/23/2025, Alan D. MacCormack, (#7306620).
The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.
__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.
__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.
__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 268

---

CERTIFICATION

I, DARLENE M. COPPOLA, a Notary Public, do hereby certify that ALAN D. MAC CORMACK, DBA, after having satisfactorily identifying himself, came before me on the 23rd day of May, 2025, in Boston, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND THIS 25th day of May, 2025.

*Darlene M. Coppola*

DARLENE M. COPPOLA          My commission expires:
NOTARY PUBLIC                November 2, 2029
REGISTERED MERIT REPORTER
CERTIFIED REALTIME REPORTER

Page 267

---

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 269

---

68 (Pages 266 - 269)

I, ALAN D. MAC CORMACK, DBA, say that I have read the foregoing deposition and hereby declare under penalty of perjury the foregoing is true and correct:  (as prepared)  (as corrected on errata.)

Executed this _____ day of _____, 2025, at _____, _____.

_____

ALAN D. MAC CORMACK, DBA

Page 270

In Re Apple Iphone Antitrust Litigation

Alan D. MacCormack (#7306620)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Alan D. MacCormack)         Date

Page 271

69 (Pages 270 - 271)

**[& - 2024]**

| & |
|---|
| **&**  1:13 2:4,12 3:4 4:18 88:2 268:24 269:10 |

| 0 |
|---|
| **0**  174:1 |
| **0.34**  182:18 183:7 185:14 |
| **02163**  8:5 |
| **04/12/24**  5:5 |
| **04/19/24**  5:8 |
| **05/03/24**  5:11 |
| **06/30/23**  4:24 |
| **06714**  1:4 |

| 1 |
|---|
| **1**  1:24 53:17 104:10 110:24 111:5,17 113:12 115:2 115:12 138:7 157:21,22 175:3 177:12 206:8 207:8,18 208:14,19 210:18 231:6 232:13 236:17 264:22 269:1 |
| **1,000**  27:8 |
| **10**  27:9,13 63:2 83:12 87:5 104:12 111:2,7 114:8 131:13 132:22 190:15 190:15,18 |

199:10 218:1 220:22 244:12 246:7 254:2,14 257:11 263:1

**100**  116:11 158:20,22 171:18 174:1 178:10,18

**100,000**  244:23 245:3 249:22 249:22

**10016**  2:6

**101**  253:9,24

**102**  222:17

**104**  229:14

**109**  218:4,6

**10:52**  106:21 106:23

**11**  84:6,21 175:4 264:22

**114**  227:10,19 243:8 244:11 244:14

**11:00**  107:4

**11:10**  106:24

**12**  4:11 83:12 237:17 246:18 248:9

**12:08**  151:20 151:22

**13**  85:24

**134**  234:16

**14**  249:6,8

**140**  166:1 172:6 189:14

189:15

**141**  189:22

**142**  196:10

**144**  192:20 202:22

**148**  34:2,24 35:24

**149**  215:6,9,18 215:19

**15**  27:13 63:2 220:22

**150**  12:16 87:5

**150,000**  15:8

**16**  4:14

**1615**  2:13

**162**  22:8

**163**  59:7,11

**166**  66:4

**17**  44:19 116:22,24

**170**  146:5

**18**  51:8

**187**  182:1,5,14

**19**  103:20 116:22 238:11

**192**  233:21 239:14 241:14

**193**  243:7

**194**  243:17

**1998**  262:12

**1:00**  151:23 152:2

| 2 |
|---|
| **2**  53:17 58:18 61:3 131:24 137:10 139:19 139:23 162:1 197:14,17,21 198:15 199:8 208:17 212:3 212:22 213:1 267:22 |
| **20**  180:10 214:13 |
| **200**  1:14 |
| **2000**  67:3 |
| **2001**  157:8 |
| **2003**  157:9 |
| **20036**  2:15 |
| **2009**  82:10 |
| **2012**  70:14 72:4 86:5,20 240:7 |
| **2013**  23:14 |
| **2014**  88:4 |
| **202**  188:16 257:3 |
| **202.326.7900**  2:17 |
| **2021**  117:2 119:11 144:17 146:4 233:24 |
| **2023**  236:14 240:8 |
| **2024**  69:3,13 234:1,20,23 237:17 238:11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[2024 - 51]**

239:4
**2025** 1:16 4:13 6:8 13:2 267:6 267:18 268:3 270:6
**2025.520** 268:9 268:12
**2029** 267:22
**20471** 267:20
**207** 245:17
**210** 245:18
**212** 245:24
**212.545.4600** 2:8
**213.229.7000** 3:9
**219** 248:23
**228** 4:20
**23** 1:16 6:8 183:15 198:6 198:13
**236** 4:23
**237** 5:4
**238** 5:6,9
**239** 172:5
**23rd** 267:6
**24** 198:6
**243** 192:20 202:22
**25** 188:5 198:7 198:10 213:3
**250** 119:20
**25th** 267:18
**26** 198:7,13 262:12

**262** 4:6
**27** 218:7 262:12,13 268:3
**270** 2:5
**271** 1:24
**29** 229:21
**2:03** 201:12,14
**2:20** 201:15,18
**2:54** 226:18,20 226:21,24

**3**

**3** 17:4,6 24:2 24:14,14,15 26:16 69:3 88:4 161:6,11 161:16 162:7 239:4
**30** 74:11 75:16 76:13 82:21 83:18 90:9,15 90:18,22 188:6 206:12 229:17 230:9,13 236:13 269:1
**333** 3:5
**34** 93:12,15
**344** 165:24 166:3 167:7 169:9 171:3
**345** 179:20 189:11
**347** 189:20,22
**348** 202:7

**349** 201:21
**350** 205:24 211:16
**352** 196:9 212:5,16
**358** 192:19 202:20
**36** 44:18 51:6
**37** 97:13 101:16 102:21 118:23 146:3 157:22 162:2
**38** 161:4,7
**39** 103:18 104:20 105:4 116:19
**3:26** 252:24 253:2
**3:42** 253:3,6
**3:52** 261:17,19
**3:59** 261:20,23

**4**

**4** 13:9 14:21 24:2,5 26:17 32:21 58:20 70:17 71:1 171:5
**40** 136:10,13 180:14 187:22 187:22 253:10 253:11
**400** 2:14
**41** 222:18
**45** 186:22 197:6

**47** 110:17 198:1
**48** 197:12
**4:03** 266:3
**4:06** 266:14
**4:11** 1:4

**5**

**5** 4:13 13:10 26:17 39:15 42:12,24 137:10 139:20 139:23 143:9 149:10,11 196:14,24 197:4,14,17,21 198:15 199:9 209:15,17 210:1,6 212:22 213:1 231:7 232:14 251:3
**5.5.1.** 213:5
**5/23/2025** 268:5
**50** 61:4 65:21 104:11 111:1,6 111:18 113:12 113:15 115:3,7 115:13 123:22 125:13 155:5 175:8,12,15 186:18 262:14
**50,000** 244:21
**51** 126:24 129:8,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[56 - account]**

| | | | |
|---|---|---|---|
| **56** 130:13 | 233:10 235:22 | **87** 4:18 134:1,6 | **ability** 50:16 |
| **57** 177:14 | 236:7,11 | 134:6,7,13 | 52:2 94:13 |
| **58** 158:21 | 243:10 244:11 | **89** 137:23 | 194:18 257:6 |
| | 244:14,16 | 142:15 | 267:13 |
| **6** | 263:16 | **8:36** 1:16 6:3,9 | **able** 42:6 59:4 |
| **6** 13:2 30:4 | **72** 5:4 237:10 | | 127:11 159:5 |
| 42:24 152:7 | 237:14 | **9** | 209:8 253:23 |
| 154:16 244:16 | **73** 5:6 238:3,7 | **9** 73:14 76:13 | **above** 130:24 |
| 245:1 | **7306620** 1:23 | 77:17 81:9 | 142:17 197:15 |
| **60** 136:13 | 268:5 271:2 | 186:11,12 | 268:6 |
| 139:24 209:22 | **74** 5:9 238:20 | 187:21 | **absolutely** 83:7 |
| 209:23 | 238:24 | **90** 104:12 | 110:6 195:10 |
| **66** 4:11 12:20 | **76** 175:9,11,16 | 111:2,7 139:24 | **academia** |
| 12:24 22:5 | 186:18 | 152:5 179:1 | 44:16 |
| **67** 4:14,16 | **760** 168:13 | 205:3 | **academic** 9:5 |
| 16:19,23 22:2 | **762** 263:11,22 | **90071** 3:6 | 23:1 98:15,20 |
| **68** 4:16 67:17 | 264:4 | **91** 154:13 | 99:9,17,21 |
| 67:20,24 | **77** 146:8,11 | **93** 157:13 | 100:15 251:2 |
| 156:16 158:21 | 175:23 176:9 | **94** 159:15 | **academics** 64:4 |
| 243:11 | 182:6 | 177:14,17,21 | **accept** 140:17 |
| **69** 4:18 87:13 | **78** 146:6,12,18 | 178:10 | **accepted** 124:2 |
| 88:1 | **79** 186:12 | **95** 62:24 161:3 | 124:9,14,17 |
| **7** | **8** | **96** 161:15,21 | **access** 37:3 |
| **7** 4:5 37:23 | **8** 47:14 51:1,2 | 162:20 | 55:21 74:6 |
| 39:5 47:15 | 54:3 72:8 86:5 | **97** 224:18,20 | 114:17 134:22 |
| 54:3 70:16,23 | 88:22 | **98** 225:6,10,23 | 135:22 155:24 |
| **70** 4:20 74:13 | **80** 114:9 | **99** 96:14 | 190:13 211:7,8 |
| 75:3 90:10 | 199:11 234:16 | **9:37** 58:9,11 | 216:2 225:16 |
| 206:10,13 | 243:18 | **9:52** 58:12,15 | 226:3 |
| 207:16 208:22 | **800** 12:10 | **a** | **accessible** |
| 208:23 209:22 | **81** 186:22 | **a.m.** 1:16 6:3,9 | 225:12 |
| 209:23 210:2,5 | **82** 119:14 | 58:11,12 | **account** 71:18 |
| 228:19,23 | 244:13 263:7 | 106:23,24 | 93:7 103:24 |
| **71** 4:23 156:15 | **86** 245:16 | **abbreviation** | 104:6,11 |
| 168:11 228:4 | | 155:1 | 109:21 111:1,6 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [account - advertising]

111:7 115:22
116:1,9 162:21
185:7 197:16
205:5 245:9
**accountant**
16:8
**accounted**
203:9
**accounting**
16:11,15 93:4
93:9 111:18
115:3 124:11
128:11 132:2,8
132:9,13
**accounts** 16:12
104:22 105:14
131:12
**accrued** 14:23
**accuracy** 172:9
172:20
**accurate** 76:21
83:6 143:5
191:6 208:2
**accurately**
101:18
**achieve** 185:5
**acknowledge**
229:22 230:22
**acquire** 48:16
62:20 109:2
181:1,7 203:2
**acquired** 48:19
115:18
**acquires** 154:8

**acquiring**
54:18 100:11
113:4 183:21
193:8
**acquisition**
28:11,12 48:19
103:10 104:4
115:24 181:2
182:16,23
193:14 194:8
194:15 196:5
236:20 237:2
247:5,16
258:12,17
**action** 267:17
**active** 240:10
241:11
**activision**
24:19,20 62:7
62:13,17 66:12
66:21 192:3
246:8
**activities** 41:20
42:10
**activity** 127:23
257:14
**acts** 30:24
**actual** 29:1
133:9 163:6
234:8 251:24
**actually** 27:7
30:17 38:8
45:13 54:19
61:16 62:7,16
66:14,24 67:12

71:12 74:21
83:10 99:1
100:4,6,23
103:16 116:16
116:20 117:23
118:1,5 120:21
123:15,17
128:16 133:24
134:14 145:20
153:1,15
156:17 158:21
163:12,16,24
167:1,3,24
174:8 179:1
181:16 185:4
186:2,3,4
189:20 190:16
191:10 194:11
197:12 207:4
208:8 223:1
242:3 246:23
251:10 255:13
255:14
**ad** 139:11
237:3
**adapt** 65:18
**add** 49:17,18
111:19
**added** 181:22
259:7
**addition** 15:1
120:4
**additional**
42:24 104:1,3
104:4,21

105:13 112:11
122:3,9,24
144:4 204:12
204:17 217:18
217:22 254:16
**address** 8:3
19:23
**addressed**
82:10,14 195:7
**adds** 167:22
246:18
**adjunct** 8:14
8:18
**adjust** 185:10
**adjustment**
185:13,22
186:17 187:15
**administration**
8:15 16:3
**administrative**
130:21
**adobe** 217:8
**adopt** 77:10
**ads** 195:14
197:19 207:6
258:19
**advanced** 16:5
**advantage**
259:7
**advertising**
10:16 140:9
181:6 196:22
197:6 200:4,7
200:11,15
206:12 207:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [advertising - android]

212:23,24
**aeee** 233:15
**affect** 150:18
**affinity** 221:10
**afraid** 54:1
**agency** 89:1
**aggregate**
  148:16 149:1
  156:15 160:15
  193:11 199:21
  206:19,20
  208:1 209:3
  210:11,14
  264:9
**agile** 123:13
**ago** 8:12 23:13
  27:6,21
**agree** 75:23
  77:13 84:2,16
  104:9 122:15
  124:13 125:9
  128:6 150:4,9
  163:24 169:17
  183:6 188:6
  258:6,11
**agreement**
  28:13 215:21
  215:24 216:23
**agreements**
  215:15 217:14
  217:15
**ah** 11:17
**ahead** 74:24
  166:10 178:9
  215:19

**aholman** 2:18
**aim** 165:3
  194:24
**airports** 216:12
  216:13
**akin** 132:11
  252:14,16
**alan** 1:12 4:4
  4:11 6:11 7:9
  8:2 13:1 267:4
  268:5 270:1,11
  271:2,24
**alder** 2:4
**alignment**
  46:12
**alive** 71:20
**alleged** 31:24
  32:6,13 143:15
**alleging** 31:7
**allocate** 208:23
  209:16 210:5
  219:10
**allocated** 211:4
**allocating**
  201:23 207:19
  210:8
**allocation**
  211:9
**allow** 54:22
  74:5,8 94:16
  108:2 155:13
  205:22 220:1,1
  220:2
**allowed** 68:17
  82:19 84:17,19

166:11
**allowing** 90:8
**allows** 63:6
  132:3 207:23
  207:24
**alluded** 110:20
**alongside**
  107:11
**alter** 176:5
**alternative**
  77:5
**alternatively**
  163:10
**alternatives**
  72:2
**amalgamation**
  156:6
**amazon** 25:13
  25:22 26:3,5
  27:16 46:1
  121:15,16,24
  122:14 217:7
**amazon's** 26:14
  121:23
**amen** 81:7
**amended** 4:14
  17:1 18:2
**amendment**
  140:17
**amount** 32:12
  67:7 125:20
  126:6,16 137:9
  140:11 190:13
  194:13 199:12
  215:2

**amounts**
  142:19 233:11
**analyses** 32:23
  45:3 57:20
**analysis** 26:15
  35:7 45:20
  46:2 47:18
  51:10 54:5,8
  103:7 127:6
  128:22 129:7
  133:2,17
  154:17 159:19
  159:22 211:3
  222:1 224:7
  230:11 252:8
  263:10
**analyze** 139:2
  264:8
**analyzed** 13:21
**analyzes** 45:10
**analyzing**
  125:4 218:7
  219:19
**anchor** 222:3
**ancillary**
  196:13,15,18
  196:21 197:1
  197:17 207:3,4
  211:21,21
  212:7,9,12
**andrew** 5:9
  239:2
**android** 25:2,6
  26:23 81:1,10
  81:23,24 82:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[android - apple's]**

82:12 84:2,11
84:16 136:3
192:11 195:8
195:18 196:6
**android's**
82:17
**anecdotal**
257:17,20,24
258:2
**angeles** 3:6
**annual** 51:12
51:24 129:1,5
153:14 245:20
**answer** 15:7
29:13 118:18
263:18,19
**answering**
264:24 265:11
**answers** 63:22
63:23,23 64:4
**anticipate**
227:18
**anticompetitive**
32:1 143:15
**antitrust** 1:8
6:12 268:4
271:1
**anybody**
202:18
**anytime** 58:4
259:4
**anyway** 133:16
252:6 261:9
**apis** 135:11
213:18

**apologies**
134:10
**apologize**
118:19 189:20
**app** 9:13,14
12:7 25:2,3,5,6
25:16,16 28:5
30:24 31:16,21
40:13 41:16,24
42:2,18,22
43:4 47:19,24
49:19 50:14
52:10,16 53:4
53:6,7,9,10,10
53:13,23 55:16
56:5,7,10,16,18
73:17,22 76:24
77:8,13 82:7
84:17 89:20,22
91:6,8,11
92:15,17 94:5
94:12,24 95:7
95:17,21 96:5
96:9,9,10,11
97:21,24
114:13,21
115:14 117:9
117:10 121:16
122:1 131:19
133:2 134:17
134:18,18,21
134:22,24
135:5,8,9,18,22
138:2,3,21
140:4 141:2,6

141:15 142:21
146:23 147:5
147:22 148:20
148:21 152:9
156:15 160:13
168:11,22
169:3 181:3
190:1,8,12
191:19 192:1,6
194:22 196:18
198:16 199:10
200:3 206:4,10
207:12,13,20
208:24 211:6
214:14 216:7,7
216:19 218:7
219:18,22
220:21 221:18
222:20 223:4
223:14 224:24
225:13,17
226:2 228:4
233:10 235:22
247:19 249:17
258:7,9,9,13,21
258:24 259:8
259:11,20,20
260:8 261:1
**app's** 115:4
139:5 197:14
197:22 204:14
209:17 212:20
**appeal** 88:17
**appear** 127:3
224:13

**appearances**
2:1 3:1
**appearing**
268:18 269:7
**appears** 12:24
68:1 88:2
239:2
**appended**
116:21
**appendix** 22:6
34:1,4,6,10
221:9 243:23
263:5
**apple** 1:8 3:16
6:12,16,18 7:2
7:4 22:17 38:5
67:15 71:4,7
72:5,18 73:6,7
74:11 75:4
76:1,7,24 78:6
78:12,24 79:3
83:14,16,22
87:7 89:1,11
89:21 90:6,11
91:6 223:14
258:6,12,24
259:11 268:4
271:1
**apple's** 30:22
31:24 32:6,12
73:17,17 74:5
77:1,17 80:2
82:6,8,21
83:18 84:17
134:24 143:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[apple's - ashle]**

259:20 260:24
**applicable**
195:5
**application**
45:4 74:13
75:23 76:15
82:5 101:22
102:8 125:16
130:16 152:8
222:12
**applications**
18:7 20:11
26:20 39:24
40:10 41:18
42:4,20 60:18
60:22 89:20,23
**applied**  21:15
207:23 248:13
**applies**  137:18
**apply**  40:7
121:14 151:6
152:7 184:16
184:19 206:23
207:18 233:16
233:18
**applying**
195:14
**appointment**
8:22
**appreciably**
85:13
**appreciate**  13:6
118:20 182:12
**approach**
43:13 64:1

78:24 79:2
80:2 82:16,17
85:19 101:18
102:1,5 103:24
109:12 150:17
150:24 158:10
161:12,16,23
162:8 171:4
172:6 180:17
180:22 185:7
185:16 186:14
186:17,22
187:10 249:19
**approached**
29:3 65:6
**approaches**
94:22
**approaching**
98:6
**appropriate**
47:18 51:18
104:24 105:17
109:8 150:12
158:1 184:19
260:12
**approval**  82:8
**approximate**
171:5
**approximately**
15:19 168:13
**apps**  12:9
26:23 27:10
28:2 30:7,10
30:14 31:15,19
40:4,4,9 42:8

43:3 46:23
73:8,22 74:6
74:12 75:7
76:2,17 79:8
82:7,19 84:20
90:7,16 91:10
125:10,11
130:18 131:4
131:20 139:10
139:12,13,17
139:18 140:23
141:2,5,13,22
162:22 164:5
167:9 184:8
195:11,18,21
195:24 196:6,6
198:5,21 199:5
204:21 218:8
218:14 219:6,8
220:6,10,15,16
220:24,24
221:4,14,23
222:21 223:7
224:9,11,24
226:2 228:6,7
252:9,13,14,15
258:20
**april**  69:3,13
88:4 237:17
238:11
**arbitration**
27:22 28:8
**architecture**
59:10,17 77:19
78:2,16,18

**architectures**
59:19
**area**  18:3,5,18
18:19 19:6
21:7 22:10
132:16 142:11
142:14 250:18
**areas**  17:8
188:12
**arithmetic**
157:14,17
162:12 165:5
165:10,19
167:5 173:7
179:5
**arppu**  51:14
**arpu**  51:13
**arrive**  161:9
162:14 188:22
252:18
**art**  132:3,15
**article**  4:20
72:15 73:15
75:20 77:17
78:23 80:2
86:1 114:9
136:1 228:23
229:8,11,21
230:1 233:15
**articles**  35:1,4
35:7,11,15,23
69:23 104:15
**arts**  246:8
**ashle**  2:16 6:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[aside - aware]**

**aside** 27:15
33:8 39:4,11
121:10 192:1
204:6 225:17
238:1 239:12
**asked** 26:10
30:5 35:19
36:6 42:14
44:5,7 92:21
96:4 138:15
148:11 152:16
160:23,24
241:3 242:3
250:9
**asking** 125:24
170:14 263:20
265:11
**asks** 29:14
**assertion**
172:21
**assess** 217:13
218:11
**assessment**
143:5 245:10
**assessments**
233:4
**assignment**
30:1,4 39:21
43:1 48:3,13
63:5 92:21
117:16,19,21
117:22 120:21
138:14 144:14
145:15,19,20
147:13 158:2

160:24 169:3,5
250:9 251:17
**assist** 32:24
**assisting** 33:1
**associated** 30:8
39:22 46:4
48:7,24 50:20
58:24 60:12,16
100:6 104:22
105:15 111:15
112:12 113:24
120:1 137:7
159:20,20,23
159:24 160:11
160:12 211:23
**assume** 133:20
206:13 211:3
212:6 234:5
**assumed** 125:6
**assuming** 79:21
93:13 104:2
137:17 191:24
192:10 197:18
206:2 211:19
221:13,17
**assumption**
149:22 152:22
190:21 191:2,4
191:14,16,18
191:21 192:9
192:16 206:8
207:8,18,22,23
207:24 208:4
208:14,17,19
208:23 209:6

209:10,14
210:9,14,15,18
210:18 211:1
211:13 212:3
**assumptions**
38:17,20
148:15 195:2
206:18,22
**at&t** 83:23
**attach** 174:10
**attempt** 129:24
**attempting**
144:9
**attention** 46:8
123:9 219:20
**attorney**
267:15
**attorneys** 29:16
**attract** 200:21
**attracting**
103:8
**attractive**
96:23 135:24
136:4 181:13
**attractiveness**
109:22
**aulet** 100:22
**authoring** 68:9
**authors** 68:7
**availability**
156:8 189:3
257:3
**available** 43:3
83:20,23 86:2
94:23 118:14

148:13 156:5
158:19 159:3
160:3 164:5
170:15 174:14
175:13 188:11
195:2 205:1,15
205:21 235:19
253:14,22
255:22
**avenue** 2:5 3:5
**average** 27:12
51:12,13,24
65:9 92:3,8,11
92:19 102:9,16
113:23 137:20
139:4,7,19
141:1,4 157:18
157:18,24
158:4,6,7
161:8,11,12,17
162:6,8 163:6
163:9,13 164:1
164:7,18 165:4
167:14 175:11
199:23
**averages**
163:16 231:5
**averaging**
52:17
**aviation** 216:11
**avoid** 185:8
187:10
**aware** 31:4
91:4 98:21
168:21 177:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[aware - bit]

205:14,16
220:11 223:14
223:17,20,22
223:24 227:11
227:23 234:24
243:9
**awash** 183:13
**axe** 116:5

**b**

**b** 243:23 269:1
**back** 22:3,5
24:1 35:5
40:18 47:14
54:1 57:9
58:14 93:11
101:16 107:2
123:6 131:13
145:11 149:9
152:1 179:19
179:20 201:17
210:21 226:23
239:13,14
250:8 251:5
253:5 255:10
255:17 256:8
261:22 263:4
**background**
55:9 68:10
**backtrack**
58:19
**backwards**
143:9
**balance** 100:14
131:12

**balancing** 97:7
**ballpark** 15:8
**banner** 195:13
**barnes** 4:18
88:2
**base** 11:17
35:22 53:22
125:16 134:23
135:23 140:5
198:16 212:20
**based** 11:10
14:22 43:11
75:17 93:19
94:9,20 95:1,4
95:5,8,13 96:8
124:1 148:23
156:19 170:24
176:1 179:10
185:17 187:15
192:23 197:24
211:13 213:22
221:2 223:3
252:10,14
259:18 264:4
**bases** 11:14
35:10
**basic** 20:9
**basically** 9:3
23:20 31:1
46:11 47:1
61:15 62:24
64:5 65:14
70:4 71:21
75:14 78:6
79:11 109:18

110:3 128:24
129:3 137:16
138:14 151:15
153:24 158:4
165:3 170:23
181:6,14
185:22 187:2
199:10 203:10
203:20 206:16
206:20 208:10
213:19 218:3
220:5,14 246:2
248:24 249:15
254:24 256:16
**basing** 214:2
**basis** 8:23
11:11 129:7
153:5,7,14
**bear** 54:3
**bearing** 88:4
238:10
**beaten** 80:17
**beginning** 24:1
**behalf** 28:21
**behavior** 130:1
130:5
**belief** 166:18
**believe** 26:2
34:14 44:19
47:16 87:8
88:1,14 96:21
105:13 126:2,8
144:12 162:12
174:21 175:22
176:7 198:13

214:23 226:4
229:17 237:6
242:16
**bells** 113:22
237:23
**benchmarking**
11:15
**benefited** 76:10
**best** 100:20
165:18 267:13
**better** 91:5
109:17 173:12
193:8
**beyond** 159:5
254:2
**big** 49:22 66:14
118:12 121:13
215:13 216:11
**bigger** 72:16
**biggest** 49:24
170:22
**bill** 20:24
100:22 229:2
**billable** 221:20
**billing** 12:10
93:18 95:12
**billings** 14:23
**billion** 87:5
**bit** 8:13 33:22
41:5 44:16
63:13 65:5
68:10 88:19
91:21 118:5,7
118:9 123:14
143:24 156:22

Page 9

[bit - burt]

181:18 187:6 188:18 255:4 264:14

**blackberry** 67:6 70:11 71:14 80:16 86:19 91:11

**blog** 254:3

**board** 9:8,20 29:24 116:3

**bona** 64:3

**bonus** 259:7

**book** 4:19 19:19,22 88:3 121:24 122:2 122:11,13,14 122:15

**books** 19:13,20 34:23

**bookshelves** 21:23

**borzenkova** 5:7 238:10

**boston** 1:15 6:9 8:5,5 267:6

**bother** 120:19

**bottom** 22:12 84:21 119:18 119:19 172:5 243:18 265:5

**bought** 85:6

**bound** 133:22 178:24

**bounds** 145:5 151:7

**box** 154:20 231:18 232:22 233:1 264:3

**brattle** 37:4,9

**breached** 28:18

**breadth** 151:15

**break** 52:10 58:2,5 106:18 190:19 201:9 252:21 261:5

**breaking** 200:20

**breaks** 123:6

**brian** 68:11,23 68:23,24

**bring** 94:14 246:6

**bringing** 191:2

**broad** 42:14,17 43:21 130:8 174:7 176:17 210:22 256:18

**broader** 25:16 54:24 88:17 118:7 210:23 219:15

**broadest** 174:4

**brought** 72:18 73:6 140:7,8

**browse** 220:2

**bucket** 131:10 254:13

**buckets** 92:24 93:8 106:14 117:22 130:9

131:7 132:14 220:12

**budd** 3:15 6:7

**budgets** 237:1

**build** 62:9 78:3 135:9

**buildings** 128:13

**built** 61:20 181:11

**bulk** 111:14,16

**bullet** 39:18 42:13,23

**bullets** 149:12

**bump** 194:11

**bunch** 49:14 78:4 111:20 112:3 113:22 181:10 222:9 241:6

**bundle** 203:16

**bundled** 203:3 203:13 204:4

**bundling** 204:3

**burned** 79:22

**burt** 2:7,9 4:6 6:19,19 10:10 10:15,18 15:17 17:15,17,19 29:11,12,13,19 31:13,20 33:5 36:11 47:4 50:10,12 52:18 55:8 56:22 73:10 74:22

79:18 82:24 90:17 98:9 99:11 102:11 103:2 105:24 106:19 107:23 108:12,20 111:22 112:23 115:16 119:2 120:18 121:6 122:17 125:3 125:23 126:10 126:18 128:9 135:2 137:1 138:8 141:7,23 142:5 146:7 147:11 150:8 150:19 153:11 154:4 155:23 156:14 159:8 159:10 160:22 163:14 164:3 164:20 165:11 165:21 166:13 166:15 168:1 168:10 169:20 170:6 171:21 172:14,24 174:13,19 176:22 177:7 177:24 178:7,9 182:6,9 183:8 185:15 186:24 187:13 189:15 200:10 207:21 213:14 221:16

**[burt - case]**

231:16,24
232:6 233:7
235:7 240:15
240:22 242:1
242:10,18
243:2 245:5
247:13 249:14
250:3,7,22
251:12,22
253:10 255:8
256:13 257:9
257:18 258:1
259:3,14,24
260:6,15 261:2
261:7,11 262:2
262:6 265:18
265:20,22
266:6,11 268:1
268:2
**business** 8:3,4
8:15,15 9:11
9:12 16:3,13
19:17 54:7
61:5 62:22
68:13 72:17
73:5,16 74:2
77:1 91:19
99:2,20 100:13
100:16 101:6,8
101:20 102:6
102:10 117:10
162:22 205:10
218:16 221:18
221:19 262:9

**businesses** 27:9
100:7 183:21
**buy** 53:15
63:21 94:12
116:5
**buying** 56:6,14
73:21 112:6,14
113:13 114:4
114:20 115:1
138:21 184:14
**bypassed** 73:7

**c**

**c** 6:1 146:19
147:17
**ca** 3:6 268:9,12
268:21
**cac** 247:14
**calculate** 43:21
133:8,16
152:21 154:23
155:13 161:24
170:23 173:14
174:15 182:15
190:3 231:17
244:3 253:23
**calculated**
163:12 231:21
262:18
**calculating**
44:14 247:15
**calculation**
43:13 137:16
161:13 211:12
211:15

**calculations**
150:18 153:3
**california** 1:2
**call** 37:1 93:5
204:19 206:7
212:2
**called** 7:10 53:3
85:4 93:5
104:17 123:13
131:16 135:11
145:2
**calls** 262:24
**camel's** 123:6
**campaign**
66:15
**campaigns**
140:9
**campus** 128:14
**candidates**
64:22
**canva** 217:8
**cap** 87:4
**capabilities**
73:20
**capital** 52:3
**capstone** 20:21
**capture** 48:11
49:7 97:8 99:5
101:20 102:6
168:2
**captures** 48:6
158:5
**capturing**
45:15 50:20
54:7 129:20

149:1 202:12
205:11
**card** 203:12
**care** 11:4
**carried** 41:2
**carriers** 73:8
74:16,20 75:2
75:8,14,15
76:8 77:4
**carry** 221:24
**carryover** 51:7
**case** 1:4 12:14
13:5 24:21
26:1,9 27:15
27:16,16,19,20
30:1,20 31:8
37:14 38:19
45:24 55:6
60:19 61:16
62:7,16,23
63:1,14,21,21
64:19 65:11,13
65:13,17 66:19
67:6 69:12,15
70:7,13,17
71:11,17 72:3
75:20 76:8
82:23 84:5
85:1,15 86:21
87:17 88:2,6,9
88:13,14,21,22
89:11 91:2
92:19 96:20
107:7,9 113:12
122:9 128:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[case - chosen]**

137:19 148:24 151:5 156:2 159:11 160:2 164:12 175:10 183:9 192:3 194:21 198:21 205:1,19 216:5 224:17 225:18 246:20 252:1

**cases** 18:14 23:2,6,6 24:11 24:12,18 25:18 35:20 46:9 61:4,11,24 63:20 64:7,13 64:22 65:3,21 66:2,17 67:14 69:21 70:1 83:1,11 87:23 88:16 98:4,7 110:24 111:4 115:2,10,12 148:12,13 156:3 160:17 166:19 189:23 191:22 193:11 196:15 210:20 217:13,17 255:10

**catalog** 88:21

**categories** 40:8 42:14,17 130:2 184:8 219:11 222:3 247:18

**categorization** 222:21

**categorize** 43:8 125:14 202:9 202:16

**categorized** 124:2 222:22 224:9

**category** 41:5 95:11 131:19 218:18 222:6 223:15 252:8,9 253:14 260:11

**cause** 267:9

**caused** 32:6,12

**caution** 36:12

**cautiously** 230:3

**caveat** 75:9,11

**ccp** 268:9,12

**cds** 79:22

**cent** 96:14

**central** 46:15

**certain** 28:13 36:1 55:21 63:5 88:16 94:14 96:23 127:1,12 137:17 140:20 171:22 254:14 257:5

**certainly** 36:24 53:11 84:19 96:16 98:11 115:9 128:10

128:13 174:4 190:10 221:17 222:4 264:10 264:13

**certification** 267:1

**certified** 1:22 6:20,22 267:24

**certify** 267:4,14

**cetera** 50:21 93:20 203:4 213:17

**chain** 5:6,9 238:15 239:1,8

**challenge** 30:22 31:4

**challenges** 70:7

**change** 73:17 90:5 119:24 120:6 125:14 126:1,5 128:18 153:12,13 154:11 192:23 271:5,8,11,14 271:17,20

**changed** 141:18 235:1 256:10

**changes** 50:3,3 63:8 154:8

**changing** 33:23 187:3

**channels** 134:16 200:1

**characteristic** 216:22

**characters** 114:22 181:9 181:11

**charge** 41:24

**charged** 52:16 134:16,21 142:18 214:12

**charges** 96:2

**charging** 90:14 91:8 94:5 203:12

**cheap** 193:9

**check** 133:22 183:23 184:22 184:22 195:19 195:20,23 254:5,11 255:2 255:9 256:4,15

**checking** 196:2 248:20 255:6 255:21 256:11

**choice** 136:19 136:20,22 223:16

**choices** 127:7 129:9,18 130:7 224:14

**choose** 43:24 44:3

**chooses** 134:18 223:11

**chosen** 176:6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[chris - company]

chris  68:11,12
  68:19,19 69:22
  69:22 87:16
  88:15
chris's  69:1
churn  49:22,23
  116:2
circumstances
  88:12 102:14
citation  156:19
  194:1
cite  234:19
  254:22
cited  198:12
  264:11
citing  198:2
civil  268:19,21
claim  198:23
  199:2
clarendon  1:14
clarification
  19:14 28:16
  165:7
class  6:20,22
  19:21 32:7
  63:4,7 80:9
  83:2 97:12
classes  20:13
  63:1 69:18
  91:21 140:20
classify  117:23
clear  106:2
  156:8
clearly  49:22
  78:20 83:15

188:11 194:9
client  25:1
clients  22:13
clones  78:2
close  98:10
  110:13 112:21
  113:2,15
  122:20 177:22
  178:10 208:11
closed  77:19
  78:15,17 79:9
closely  121:18
  161:16
closer  175:11
  175:12 179:7
coauthor  19:16
  88:7
coauthored
  88:9 229:9
coauthors
  72:10 229:3
code  11:14,16
  35:8,10 85:18
  268:9,12,19,21
coefficient
  138:6,13
  182:15 183:24
  185:14 231:21
cofounder  9:8
coincidentally
  61:23
collaborated
  70:1
collaborators
  68:12

collecting
  104:23 105:16
collection
  19:11
column  187:24
  230:13 243:4
com  123:21
combined
  163:19 218:12
  249:4
combines  233:9
combining
  162:14 255:3
come  11:19
  19:6 27:1
  40:20 61:1
  65:12 71:15
  92:7 93:11
  116:13 117:9
  118:16 150:1
  160:4 217:23
  255:20
comes  207:16
  213:1 247:16
comfortable
  126:14 191:13
coming  49:8
  86:4 151:7
  252:5 260:13
commencing
  6:3
comments  86:9
commission
  30:24 42:22
  74:12 76:14

82:22 83:18
  90:9,15,19,22
  91:10 133:2,8
  133:11 136:8
  137:17 267:21
commissions
  77:3 136:15
  138:15
common  52:14
  96:18 224:8
commonly
  51:11 124:2,9
  124:13,17
  142:18 247:1
communicate
  40:17 64:15
communication
  37:8
communicati...
  36:8,14,21
  37:12 235:11
  235:15
companies  10:6
  18:8,14 51:23
  52:20 53:19
  90:7 91:1,22
  101:7 102:15
  107:22,24
  125:5 126:21
  258:15
company  11:12
  22:19 27:20,24
  48:17 61:12
  63:3 65:5,7,9
  66:17,18 70:10

Page 13

**[company - considerably]**

71:19 73:18
77:9 86:3,24
89:13 116:8,12
154:8 192:3
**company's**
28:5 77:20
**comparable**
264:10
**compare** 26:8
**compared**
186:5
**comparing**
23:19 194:14
264:2
**comparison**
90:24
**comparisons**
91:3
**compensated**
23:4 216:1
**compensation**
14:22 15:4
**compete** 71:10
**competing** 76:5
76:5 79:13
81:16,18,19
85:3,12
**competition**
70:5,19 71:2
77:18 110:2,8
**competitive**
214:6
**competitor**
85:9

**complaint**
30:16 31:15
**complementary**
203:3,13
**complete** 38:23
**completed**
160:24 268:7
268:17 269:6
**completion**
269:11
**complex** 59:24
**complexity**
11:3
**compliance**
234:1 239:19
**complimentary**
203:17
**components**
49:7 78:5
179:14
**comprehensive**
54:6 83:9
217:21 235:22
235:24
**compressing**
187:5
**compute**
152:14 233:3
**computer**
66:22,23
**computers**
77:20
**concede** 113:1
**concept** 73:19
91:16,18 92:2

92:8 132:8
150:23
**concepts** 120:2
**conceptual**
130:9
**conceptually**
205:6
**concern** 82:22
**concerned**
130:15 246:21
**concerning**
267:9
**concerns** 82:10
82:14 207:3
**conclude**
198:14
**concluded**
266:14
**concluding**
221:13
**conclusion** 86:1
232:12 244:6,8
262:16
**conclusions**
260:13
**concrete** 207:8
**conduct** 30:23
31:3,24 32:6
32:13,23
143:16
**conducted**
13:20
**confidence**
173:7,14,17
231:7,14

232:14,23
255:24 262:19
265:14
**confident** 151:9
151:11 165:4
171:24 173:23
176:19 265:16
**confirm** 13:4
**connection**
34:12 38:14
**consequent**
143:14
**consequently**
171:7
**conservative**
150:4,16,24
151:6,13 171:4
171:10,12,17
174:2 180:5,17
180:22 186:21
187:9 191:15
191:18
**consider** 12:7
16:10 20:6
21:16 40:12,23
41:4,12 55:23
80:11 97:16
112:24 126:2,4
128:12 132:14
214:18
**considerably**
74:14 75:5,24
76:14 83:19
156:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[consideration - correct]

consideration 123:11 223:5
considered 34:7,9 95:1 127:6 128:21 185:21
considering 56:14 265:4
consistency 121:22
consistent 104:14 117:1 120:16 121:3,4 202:3
consistently 202:8,16 264:1
console 192:5
consoles 195:21
constant 49:20 49:21
constitute 139:8 198:16
constitutes 196:16
constitution 139:8
constraining 171:13
constraints 145:2,5,18
construct 155:17,20 158:3 165:3 176:11

constructed 175:24 176:17 177:20 206:17 233:9 263:15
constructing 174:20 219:14
consult 21:20 22:1
consulted 22:17 23:23 25:1 32:22
consulting 13:15 22:13,22
consumer 2:3 80:6
consumers 31:1 53:13 96:24 143:14 221:15
consuming 124:5
contact 28:24 29:5,7 268:9 268:20
contain 38:23 218:14
contained 72:11 218:1 234:18 240:13
contend 31:12
content 53:10 118:9 181:4,5 184:14 213:9
contents 29:15 66:19

context 62:23 145:14,18 254:16
continue 11:5 239:20
continued 2:21 3:1 234:1
contract 129:17
contrast 202:24
contribute 35:21
contributing 109:19
contribution 93:5,10 99:3 106:7 108:5 109:16,18 121:19,19 132:2,11,13 191:10,12
control 82:16 93:17,24 222:15 223:10
controlled 78:12 79:3
controversial 221:10
controversy 267:9
convergence 199:12
conversations 85:22

convert 193:17
convey 80:19
convinced 80:16
copies 234:3 235:10
coppola 1:20 7:6 267:3,21
copy 13:1,4 33:12 107:12 107:17 119:4 237:16
cormack 1:12 4:4 7:9 267:4 270:1,11
corner 62:4 69:3
cornerstone 3:18 7:4
corporate 154:7
correct 8:17 9:9 12:12 16:3 18:2 34:18 68:7 70:15 75:16 83:6,20 84:14 90:22 97:22 98:1 110:5 112:15 112:22 143:22 151:1 155:6 157:19,20,23 158:14,15 161:14 163:13 165:13,20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[correct - costs]

167:24 168:9
177:23 182:22
209:15 215:2
217:5 224:24
225:1,9 226:6
227:12 229:12
229:20,23
230:7,11,22
231:11,15,23
240:10 270:4
**corrected**   69:11
270:4
**corrections**
268:14,15
269:3,4
**correctly**   74:4
107:19 162:18
**correlate**
113:18 127:22
127:23
**correlated**
184:4
**correlating**
183:10
**correlation**
50:15 138:6,12
138:22 139:2
143:4 155:10
180:11 181:21
182:15 183:6,7
183:24 184:7
184:23 185:14
214:23 231:21
249:1

**correlations**
128:17 184:18
**corresponden...**
236:1
**corresponding**
104:24 105:16
120:8
**cost**   10:8,22
11:9 18:6
19:23 20:15,19
23:14 41:17
42:2,17 48:16
48:18,20 57:21
61:8,10 65:22
66:6,9 91:16
91:19,23,24
92:3,8,11,12,19
92:20 93:7
98:4,5,10,22
99:18 100:8,10
102:2,9,9,22,23
102:24 103:3,8
103:10,12,13
103:23 104:1,8
104:21 105:12
105:22 106:6,9
106:10,11
107:20 108:7
108:10,17
110:1,13
111:20 112:11
112:21 113:2,4
113:5,7,24
115:21,24
116:1 117:4,7

120:2,2,3,4,5,7
120:17,20
121:5,14,17
122:1,2,3,4,8
122:11,15,18
122:19,23
123:4 124:14
124:15 128:8
130:2 132:10
141:11 148:5
148:19,20
152:7,14,18,21
153:9,23
158:16 161:8,9
161:18 162:4,6
162:12 164:6
166:6 167:17
167:19 168:7,8
168:11 169:10
169:18 170:4
170:13,22
171:7,16,19
172:3 174:5
177:22 178:19
178:20 179:11
179:14 180:4
181:2 182:17
188:24 189:24
190:3,22 191:5
192:4,6,10
193:10,14
194:8 199:17
201:23 202:13
203:14,24
205:6 209:17

212:7,12 215:4
225:2,6 233:5
241:16 242:17
243:4,15 244:3
247:5 250:21
253:23 254:12
**costs**   10:3,4,4,7
11:1,7,14,19
18:11 20:15
23:20 30:8,11
30:13 35:9
39:22 40:7
41:21 42:11,15
43:2,8,14
45:16 48:6,24
49:7 54:7
57:12 58:24
60:11,16 62:18
66:15,19 77:1
77:6 91:21
92:6 93:1,2,9
97:17 99:5
102:13,16,17
103:16 106:4
106:13,14
108:23 109:5,6
109:14,19
110:5 111:6,8
111:13,15
113:14,16,18
115:6,14 117:4
117:8,9,14,23
118:4,12
119:24,24
120:9,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[costs - damage]**

122:13 123:7,9
123:16,17
124:3,4,6
125:5,14,17
126:12 127:1
127:10,16,22
127:22 128:1
128:12,17,22
129:5 130:10
130:14,16,20
130:23 131:1,6
131:8,10,18
132:14 133:1
134:4,15
138:17 142:17
142:24 143:18
146:23 147:5,7
147:22 148:7
148:22 149:6
149:14,17
152:10 153:4
154:3 155:11
158:18 159:20
159:23,24
160:10,12
162:10 164:23
168:12 170:18
170:24 171:2
174:6 175:18
180:9,19
181:21 183:3
185:10 187:19
191:24 192:23
193:5 194:15
194:21 195:4

196:5 199:24
202:1,9,16,24
204:6,6,10,11
204:13 205:12
206:5,14 207:1
207:19 208:20
208:24 209:24
210:6 211:4,14
211:23 212:10
236:21,21,24
240:8 241:17
241:24 242:3,5
242:9,24
246:17,24,24
247:12,16
253:19 258:13
259:20 260:17
260:19,20,20
260:21 263:19
263:22 264:15
264:18
**counsel** 6:13
7:2,11 15:15
36:1,13 38:17
39:12 133:3,6
133:14 225:7
225:24 235:11
235:12 241:15
241:23 266:5
267:15 268:18
268:22 269:7
**counts** 27:23
**couple** 23:2
29:1 70:1
144:4

**course** 20:18
27:14 57:10
62:10 65:15
88:15 140:20
152:23 156:24
174:6 193:15
197:18
**courses** 64:8,8
64:17
**court** 1:1 7:5
**cover** 109:14
164:24
**covered** 133:1
**covering** 240:7
**covers** 139:7
**crandall** 229:3
**create** 100:12
**created** 216:2
**creating** 98:4
102:22 109:9
**creation** 88:13
97:8
**creators** 215:16
**credit** 203:11
**critical** 59:22
**cross** 4:6 262:5
**crutcher** 3:4
**currency** 57:16
57:18 96:2
114:4,21 115:1
115:5 117:7
**currently** 12:10
38:24
**custom** 240:23

**customer** 48:18
48:20 103:10
103:12 109:2
113:4 136:4
193:14 194:8
194:15 223:4
247:5,15
**customers** 12:3
46:10 52:5
53:17 62:20
73:20 74:5
77:10 100:11
100:12 181:1,2
181:7 183:21
200:1
**cusumano**
19:12,15 100:3
229:1
**cut** 74:13 75:16
237:1
**cv** 1:4 22:7 59:2
59:6 65:24
**cycle** 26:11
48:15

**d**

**d** 1:12 4:4,11
6:1,11 7:9 13:2
34:1 66:22
146:20 267:4
268:5 270:1,11
271:2,24
**d.c.** 2:15
**damage** 150:1
150:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[damages - definition]**

| | | | |
|---|---|---|---|
| **damages** 32:12 143:14,17 150:7 151:14 | 174:14 176:2,3 176:12,18 185:2,3,4 | 264:4,8 | **deals** 91:5 99:18 |
| **dan** 6:15 | 186:2 187:17 | **database** 11:12 11:16 | **debate** 86:10 |
| **dances** 114:22 | 188:10,14,21 | **dataset** 159:3,7 264:10,20 | **decent** 156:18 |
| **daniel** 3:7 | 188:24 189:1,3 | **date** 6:8 12:14 | **decide** 36:2 129:17 223:2 |
| **darlene** 1:20 7:6 267:3,21 | 189:4,8 190:3 190:11,17,24 | 15:5 69:3 88:4 238:10 239:3 | **decided** 27:10 180:16 |
| **dash** 234:20 | 190:24 191:3,9 | 268:16 269:5 271:24 | **deciding** 128:7 |
| **data** 13:21 14:9 14:9 21:13 | 191:20 192:17 193:11,20,21 | **dated** 4:12,24 5:5,8,11 13:2 | **decision** 63:10 74:8 137:3 219:10 223:3 |
| 32:23 35:24 36:6 37:3,5 | 195:1 196:7 199:17,19,20 | 236:13 237:16 | **decisions** 59:22 |
| 38:21 42:6 43:17 59:9 | 199:21 201:24 204:24 205:8 | **dates** 33:23 **dating** 27:11 | **declare** 270:2 **decline** 262:16 |
| 118:1,13,14,15 128:24 129:1,3 | 205:20 206:19 206:20 208:1 | 219:8,22 220:6 220:10,24 | **declined** 87:4 **deem** 130:2 131:2 |
| 130:11 133:10 133:11,13 | 217:19,22 224:21 225:3,7 | 223:7 224:11 **david** 3:16 7:1 | **deemed** 263:17 **defendant** 3:3 |
| 138:9,15 141:17 149:3 | 225:11,17,21 225:24 233:9 | 8:2 **day** 92:5,5 99:1 | 7:11 **defense** 12:6 |
| 150:10,12 151:8,12 | 233:11,16 235:22 241:16 | 99:1,19,19 108:3,3 261:5 | **define** 91:23 125:20 131:15 |
| 152:24 153:2 153:22 154:18 | 243:10,15 244:3,5,9,10,15 | 267:6,18 270:5 **days** 9:18,19 | 132:1 152:17 157:13 |
| 155:24 156:21 158:5 160:3 | 245:2,9,12 248:3,21 249:3 | **dba** 1:12 7:9 267:4 270:1,11 | **defined** 106:12 126:5,15 131:7 |
| 161:24 163:18 164:12,22 | 250:13 252:2 252:19 253:13 | **deadline** 33:21 **deadlines** 33:19 | **definitely** 66:21 204:10 |
| 166:20 167:19 168:13,16,18 | 253:19,20 254:12,13,18 | **deal** 62:11 65:22 66:6 | **definition** 40:21 120:17 |
| 169:6,8,12 170:4,13,15 | 255:18 257:11 260:22 262:21 | 167:22 210:24 **dealing** 76:23 | 120:20 121:4 122:7 124:14 |
| 171:15 172:2 173:15 174:7 | 262:21 263:10 263:21,23 | 81:5 156:21 166:19 262:21 | 126:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[definitions - developers]**

**definitions** 124:2,9,12,17 128:11 223:15
**degree** 20:21 41:20 42:21 43:18 255:6 265:13
**degrees** 16:2,6 21:1
**deliver** 40:18 48:23 103:14 112:10
**delivered** 54:10 54:14,16 94:7 125:12 219:3
**delivering** 49:1 109:24 111:11 113:20
**delivers** 40:16
**delivery** 27:11 130:18 131:4
**demand** 140:14 140:22,24 159:18
**demanded** 75:15
**demonstrated** 187:16
**demonstrates** 161:7
**demonstration** 80:9,12
**department** 12:5

**depend** 188:22
**depending** 233:12 256:19
**depends** 52:4 127:2 204:9
**deposition** 1:12 6:10 8:7 15:14 15:21 266:14 268:19,23,25 269:8,11 270:2
**depositions** 34:15,20 119:6
**depth** 117:18
**dermott** 1:13
**describe** 30:7 39:22 45:2 61:5,11 64:10 83:15 239:23
**described** 83:18 130:14 130:23 146:22 147:21 221:8
**describes** 63:3 86:22 170:14
**describing** 40:6 71:23 72:1
**description** 4:9 5:2 18:3 110:11 167:15
**descriptions** 221:7
**design** 10:1 35:10 64:17 80:8,10,12,20 80:22 216:11

**designate** 223:21
**designed** 11:6 71:11
**designing** 228:14 250:19
**designs** 60:1 162:22 218:16
**desirable** 190:11
**desires** 110:7
**desktop** 42:9
**despite** 77:17 227:14,21 232:19
**detailed** 240:6
**details** 65:14
**determine** 18:11 152:16 156:7 169:3 197:19 262:23 264:15,17,17
**determined** 268:18,23 269:7
**determining** 231:18
**develop** 9:14 12:9 18:9 24:11 90:7 116:4 135:18 188:24 199:4,5
**developed** 26:22 39:5 61:16

**developer** 9:13 12:8 30:13 43:3 50:14 52:10 82:22 105:2,18 109:21 110:4 121:15 123:12 125:21 126:16 131:1 134:17 135:8 140:12 142:3 146:23 147:22 153:16 153:21 156:16 158:3 163:11 164:16 170:17 182:17 184:17 192:5,7 199:17 199:23 211:24 214:3 215:10 223:11 225:2,6 225:11,17 228:14 240:24 241:4 242:15 242:22 243:8 243:15 246:22 247:12,19 248:17,19 254:12 258:7 258:11 259:8 265:10
**developer's** 54:6 135:17 215:4
**developers** 9:15 31:21

**[developers - differently]**

| | | | |
|---|---|---|---|
| 41:16,17 42:3 | 195:17 200:24 | 19:8 25:4,5 | 222:5 230:17 |
| 42:3,19,19 | 201:4 202:8,15 | 27:4 30:9,11 | 231:5 |
| 45:4 46:8 | 213:8 217:9 | 39:23 40:6 | **different**  8:19 |
| 47:20,24 51:12 | 219:9 223:2,15 | 42:16 58:24 | 8:20 9:2 11:13 |
| 57:21 74:13,15 | 223:20 224:23 | 59:20,23 60:2 | 12:2 35:8,9 |
| 74:19 75:4,6 | 225:13 226:1,8 | 60:5,12,17 | 40:8 41:5,6,8 |
| 75:24 76:15,23 | 226:13 227:8 | 61:7 62:8,17 | 46:17,20 47:1 |
| 82:5 84:17 | 227:13,20,24 | 64:11 66:13 | 48:12 52:13 |
| 90:8,10,15 | 229:12 235:23 | 68:15 123:13 | 54:17 66:20 |
| 91:4 92:15,18 | 236:2 239:20 | 123:14 130:16 | 70:5 78:4,21 |
| 93:16 94:19 | 240:5,19,23 | 135:16 157:11 | 87:23 92:17 |
| 95:14,17 96:14 | 241:10,13,23 | 180:24 228:24 | 94:5,8,15 |
| 104:9 109:12 | 242:7 243:12 | **device**  40:15,22 | 97:15 104:8 |
| 110:9,22 | 243:19 244:2 | 40:22,24 41:2 | 108:4 117:8 |
| 117:10,24 | 244:19 245:1,4 | 41:13 78:14,19 | 125:22 129:19 |
| 121:21 123:8 | 245:13 246:2 | 80:6,15,18 | 132:7 133:9 |
| 127:7 129:9,21 | 246:12,14,16 | 82:20 84:20 | 139:6,8 148:23 |
| 130:8,17 131:3 | 246:18 247:4 | 85:20 89:23 | 149:6 154:10 |
| 131:18 133:20 | 247:10,24 | 90:3 135:10 | 160:6,8,21 |
| 133:23 136:5 | 248:9 249:8,13 | 195:12 | 162:10 183:11 |
| 141:12,21 | 249:17,23 | **device's**  72:16 | 184:1 188:20 |
| 143:19 147:6 | 250:20,24 | **devices**  41:15 | 188:20 189:2 |
| 149:15 152:8 | 251:20 254:7 | 42:9 70:5 | 200:1 203:10 |
| 156:17 157:15 | 256:24 258:19 | 81:17 85:6,8 | 206:23 207:2 |
| 158:7,12,13,17 | 258:21 263:17 | 91:9 | 219:11 221:21 |
| 159:2,18 | 263:21 | **devised**  143:21 | 222:13 223:7,8 |
| 164:23 168:9 | **developing** | **devote**  9:17 | 224:10,13,14 |
| 168:12,22 | 25:2 30:6 42:8 | **dictate**  50:1 | 231:22 233:6 |
| 169:4,12,15,18 | 60:7,21 76:2 | 180:20 | 249:18,18 |
| 169:22 171:1 | 76:17 101:21 | **difference** | 251:24 256:7 |
| 177:6 181:3 | 102:7 157:7 | 41:23 63:14 | **differentiate** |
| 182:19 183:14 | 181:8 | 106:12 120:22 | 223:9 |
| 189:24 191:5 | **development** | 131:17 227:18 | **differently** |
| 191:24 192:11 | 4:21 13:13 | **differences** | 53:13 118:5 |
| 192:12 195:6 | 17:10 18:24 | 42:1 129:20 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[difficult - donaho]**

**difficult** 166:21 202:1 203:2
**dig** 146:2
**digital** 47:17 52:16 54:9 55:1,3,5,10,13 55:14,17,21,23 56:5,7,15,17,18 56:21 57:4,6 57:14,16 97:17 97:24 98:8 101:19 102:2 103:23 104:3 107:21 108:10 108:11,18,19 109:20,22 110:13 111:19 112:6,15 113:1 113:6,13 114:4 114:11,20 115:1,5 122:23 125:1,21 126:6 126:16 196:13 200:8,17 206:4 206:11 207:17 216:5
**dimension** 28:9
**dint** 140:12
**direct** 4:5 7:20 67:13 128:3 136:11
**direction** 13:19 36:10,23 37:13 256:16

**directly** 15:6 30:2 73:22 127:2 143:1
**disaggregate** 137:3 192:15
**disaggregated** 136:16,18,24 167:19 170:4 170:13 190:2
**disaggregating** 137:21
**disagree** 99:9
**disagreed** 242:8
**disagreement** 28:12
**disciplined** 100:21
**disclose** 231:11 232:23
**disclosed** 37:19 231:14 248:16
**disclosure** 4:14 17:2,3
**discounted** 203:18
**discouraged** 82:6
**discuss** 35:12 130:3 175:18
**discussed** 39:12 145:2 163:16 196:14 197:5 249:23

**discussion** 47:11 60:11,20 61:18 63:8 83:2 105:22 135:21 175:19 188:19
**discussions** 29:16
**disentangle** 149:2 160:6
**disguise** 217:24
**dispersion** 189:1
**disproportion...** 139:21
**disruptive** 71:12 80:15,18
**distinct** 8:24
**distinction** 40:3 42:6 56:20 57:1
**distinctions** 47:2
**distinguishes** 148:19
**distribute** 18:9 224:23
**distributed** 134:20 225:12
**distributing** 226:2
**distribution** 41:22 78:13 79:3 117:6 132:24 134:4

134:15,16 137:8 142:16 142:24 241:18
**distributions** 168:4
**district** 1:1,2
**divergent** 55:10
**diversity** 198:19 228:5
**divert** 76:2,16
**division** 1:3
**doc** 234:20
**doctoral** 68:24
**document** 4:23 13:7 51:3 63:2 66:8 67:24 68:9 119:10 146:15 197:11 229:19 236:11 237:5,20 239:10 248:22
**documents** 34:7,11
**doing** 33:1 44:15 65:11 145:16 162:9 211:8 220:13 222:2 239:24
**domain** 246:15 246:17 254:20
**dominant** 223:5
**donaho** 236:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[donahue - emerge]

**donahue** 4:24 5:4,7,10 236:13 237:15 238:8,9 239:3
**dot** 123:21
**double** 127:13
**downbeat** 62:2
**download** 56:16 95:7,10 98:1 146:23 147:6,10,12 148:20 160:11 214:14 216:7 220:14
**downloading** 73:22
**downloads** 95:15,18 159:18,23 213:23
**dr** 37:13,16 38:2,8
**draft** 32:17 33:9 266:5,7
**drafting** 32:24 33:2,16
**draw** 40:3 56:20 57:1 262:16
**drawn** 47:2
**drive** 130:1 140:9
**driven** 125:6 176:2

**driver's** 7:13
**drove** 77:9
**dswanson** 3:10
**duality** 59:18
**due** 127:4 169:11,11 195:1 200:3 232:1 254:5
**duly** 7:13 267:7
**dunn** 3:4 68:23 88:10
**duolingo** 114:7 136:1 198:11 199:9
**duplicates** 229:15
**dx** 4:11,14,16 4:18,20,23 5:4 5:6,9 12:20,24 16:19,23 67:20 67:24 87:13 88:1 118:23 228:19,23 236:7,11 237:10,14 238:3,7,20,24

**e**

**e** 2:9,18 3:10 4:19 6:1,1 22:6 68:21,21,21 88:3 122:14,15 268:9,12 269:1 271:4,4,4
**e.g.** 93:19 169:11 202:2

206:4 240:9
**earlier** 100:3 107:20 110:21 117:15 120:13 121:18 139:22 144:16 160:19 168:14 179:15 193:5 198:11 226:4 247:8 249:23 257:3 264:12
**early** 9:19 15:24 37:2
**earn** 28:11 201:4
**earned** 106:18 213:23
**easier** 69:20
**easily** 225:12
**easy** 115:17
**econometrician** 14:12
**econometrics** 21:8,17
**economic** 13:15 45:2,6,16 46:6 103:1,6 119:23 143:14,17 152:20 211:2
**economics** 46:15 47:19,23 99:22,24 101:9 126:21 140:19 194:17

**economist** 21:2 144:21
**economy** 57:11
**ecosystems** 76:6
**editing** 32:24 33:2,12 75:20
**education** 87:19
**effect** 142:12
**effectively** 122:16
**eight** 65:10 185:3
**eisenmann** 101:3
**either** 36:14 69:15 199:20 220:7 221:13 223:13
**electronic** 246:8
**elements** 103:9 103:12
**email** 5:4,6,9 237:15 238:8,9 238:14 239:1,2 239:8
**embarked** 44:11
**embedded** 82:1 195:11
**emerge** 11:14 86:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[emerged - evaluating]

emerged  221:7
emery  1:13
emphasize
  230:1
empirical  18:15
  21:9
employ  44:5
employed
  114:16
employee
  267:15,16
employment
  23:10
encourage
  203:19 258:20
encouraged
  75:24 76:16
  90:7,15
encourages
  258:12
endeavor  251:7
endeavors
  199:4
ended  62:4
endpoint  265:8
endpoints
  265:3
engage  41:19
  48:22 94:19
  99:7 109:3
  258:24 259:11
engaged  28:20
  50:2 242:13
engagement
  25:4 48:8

49:12,16 50:7
  50:15 54:17
engagements
  11:13
engaging
  142:20
engineers  11:4
ensure  171:4
entering  86:15
enterprise
  11:21,23
entertainment
  184:12 252:15
  254:17
enthusiast
  216:11
entire  61:12
  165:14
entirely  30:17
  177:17 256:7
entitled  70:18
  81:10 88:2
  228:24
entrepreneurial
  101:4,6
entrepreneurs...
  100:21
environment
  94:1 124:19,22
  124:24
epic  22:19
  196:1 205:15
  205:21
equal  158:8

equally  158:6
  195:14
equation
  157:21 171:5
era  123:21
err  150:5
errata  268:14
  268:16 269:3,5
  270:4
erring  150:13
error  172:12,22
  208:5
errors  39:7
especially
  53:19 156:1
  194:16
esquire  2:7,16
  3:7,8 268:1
essays  19:11
essentially
  46:10 114:20
  164:19 181:20
  187:4 264:18
establish  49:9
  143:13 164:13
establishing
  162:11
estimate  12:13
  15:5 30:12
  43:1 152:9
  158:11 161:8
  162:5,23 163:4
  163:6 165:18
  166:5 167:2,14
  167:21,23

171:5 172:10
  172:20 173:5
  174:2 177:13
  178:20 199:16
  199:16 200:2
  201:3 213:21
  214:1,15
  244:18 250:16
  256:3 259:19
  260:24 262:8
estimated
  148:6,7 179:10
estimates  44:6
  150:1,17
  155:15 159:16
  161:17 176:19
  190:8 194:20
  231:15 233:5
  251:21 254:5
  256:10 257:7
  257:16
estimating
  105:21 143:16
  150:5 166:20
  217:16 259:22
estimation
  218:18
et  50:21 93:20
  203:4 213:17
ethan  4:23
  236:12
evaluate  118:2
  159:17
evaluating
  47:19 105:1,17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [evaluating - expert's]

106:3
**evaluation**
  97:16
**eventually**  62:3
  72:22 87:4
  123:4 124:5
**everybody**
  139:14 170:21
**evidence**
  191:21 193:19
  193:21,23
  194:2 197:1
  198:14 257:17
  257:24 258:2
**evolution**  49:20
**exactly**  57:19
  85:23 135:13
  164:24 173:2
  206:24 216:18
  216:21
**examination**
  4:2 7:10,20
  47:7 262:5
  267:11
**examined**  7:14
  267:10
**example**  11:1
  19:21 20:17
  37:23 45:11,18
  46:1,23 49:18
  52:11 54:15
  57:10 61:13
  65:1 68:16
  80:20 96:3
  100:1 118:3

127:11 128:23
129:10 144:17
154:8 166:24
167:1 170:16
170:19 175:2
181:8 186:2
189:5 190:14
192:8 195:11
197:8 204:21
207:8,10 208:8
214:13 216:10
219:4 222:7
242:16 248:2,3
252:5,13
253:18 254:18
255:14 258:16
**examples**  22:12
  25:12 51:21
  208:6,8 217:1
  217:7
**excellence**
  80:10,12,20
**exception**
  42:22
**exchange**
  134:21
**exchanged**
  34:21
**exciting**  16:17
**exclude**  132:24
**excluded**
  133:17
**excluding**
  137:7,8

**excuse**  231:2
  236:13
**executed**  270:5
**exercise**  110:12
**exhibit**  4:11,14
  4:16,18,20,23
  5:2,4,6,9 12:18
  12:20 16:17,19
  22:2 67:18,20
  87:11,13 146:3
  228:17,19
  229:6 236:5,7
  237:10 238:3,7
  238:20
**exhibits**  4:8 5:1
  166:16
**existence**  77:9
**existing**  140:10
  181:4
**exists**  55:14
  99:13 185:19
**expand**  128:14
**expect**  11:7
  27:12 50:13
  111:14 113:17
  128:2 140:23
  167:5 179:7
  214:22 265:9
**expectation**
  115:6
**expected**
  218:15
**expedited**
  266:10

**expenses**  48:7
  48:11 50:20
  104:22 105:14
  130:22 182:20
  195:9 221:19
  241:19 242:23
  249:4
**experience**
  11:18 35:22
  42:7 43:11
  45:23 102:14
  104:15 123:10
  149:4 183:19
  185:17 187:15
  199:4 225:14
  228:13 246:20
  247:3,17
  257:13 264:5
  265:10
**experienced**
  143:19 149:14
**expert**  4:11,15
  13:1,5 16:11
  16:15 17:2
  20:6 21:17
  25:21 27:17
  28:22 32:17
  34:19,21 35:13
  36:2,3,15
  37:18,23 38:2
  98:14 201:21
  224:5 232:5
  239:13 260:4
**expert's**  36:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[expertise - filling]

| | | | |
|---|---|---|---|
| **expertise** 17:9 18:3,12 20:3 20:10 21:7 132:16 142:11 250:19 | **extract** 50:16 | **fails** 256:4 | **featuring** 26:19 |
| **experts** 38:5 132:19 139:19 | **extraordinarily** 175:22 176:8 | **failure** 77:18 101:5 | **february** 28:23 30:19 |
| **expires** 267:21 | **extreme** 62:14 265:7 | **fair** 67:7 110:9 110:10 140:17 194:13 199:12 214:15 225:8 | **federal** 269:1,8 269:10 |
| **explain** 30:6 42:14 52:24 53:7 129:24 154:15 200:12 206:17 263:14 | **extremely** 98:6 176:14 | **fairly** 41:23 256:18 265:16 | **fee** 133:24 134:5,16,19 136:7 |
| **explained** 117:15 121:18 142:17 154:7 222:6 | **eyeing** 86:3 | **fall** 95:10 131:9 162:13 260:11 | **feel** 146:12,13 161:4 217:12 262:11 |
| **exploring** 59:18,24 | **eyes** 221:15 | **falls** 96:7 | **fees** 41:23 42:22 133:12 136:15 137:7,9 138:16 |
| **express** 39:1 | **f** | **familiar** 8:10 41:9 91:15 92:2,5 96:12 97:1 145:4 204:20,22 215:12 | **felt** 217:21 |
| **expressed** 265:3 | **facebook** 25:13 25:23 26:1 27:16 45:19 | **family** 81:4,5 | **fickle** 49:14 |
| **extend** 73:19 73:20 | **faced** 70:8,14 191:5 192:11 192:12 | **famous** 19:9 | **fide** 64:3 |
| **extensively** 24:8 101:7 | **facilitating** 48:8 49:11,16 | **fans** 215:13 | **field** 8:5 19:1 44:9 64:5 132:19 149:5 156:17 168:15 237:16 250:10 262:15 264:6 |
| **extent** 31:2 96:6 192:13 205:9 208:3 214:11 | **facing** 219:21 220:4 | **far** 59:13 108:15 135:3 | **fifty** 173:12,12 173:17,17,21 173:21 |
| **extra** 104:6 111:11 114:16 114:17,23 255:23 259:6 | **fact** 52:4 69:14 71:19 99:13 110:7 113:6 115:23 136:1,2 168:3 172:7 174:8 185:18 198:1,10 255:14 262:20 | **fashion** 126:22 | **figel** 2:12 |
| | **factor** 113:8 | **feature** 50:3 77:14 95:16 96:2 | **figure** 93:3 115:8 |
| | **factored** 123:3 | **features** 28:13 40:16,19 49:17 114:13 204:17 218:15 219:2 219:18,19,21 221:4,11 259:1 259:12 | **figures** 209:3 214:10 265:6 |
| | **factors** 127:4 128:7 130:1 192:24 | | **filings** 254:2,15 |
| | **faculty** 8:21 | | **filling** 65:14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[final - form]**

**final** 161:9 216:3 255:5 266:10

**finalized** 75:21

**financial** 76:1 176:3 224:22 225:11,17,21 226:3 240:6 253:15

**financially** 267:17

**financials** 66:18 254:20

**find** 16:14 22:10 59:6 99:14 118:3 131:12 148:22 198:21 255:12 263:3 265:9

**finding** 164:15 219:6

**fine** 36:18 93:17,23

**finish** 21:1

**finished** 15:23

**firm** 13:15 14:3 45:8,9 46:14 194:18 240:10

**firms** 18:10 24:9 42:8 61:6 65:23 66:7 98:24 99:2,20 99:23,24 110:16 121:20 153:12 193:16

247:2

**first** 7:13 27:8 27:8 28:24 29:3 33:20 42:13 54:13 61:9 65:16 73:14 76:12 82:3 95:15 117:16 127:8 135:18 167:17 197:10 206:24 218:20 234:7 253:17 263:3

**fit** 64:13 85:20

**five** 16:1 27:14 129:15,16 265:1

**fixed** 8:22 30:11 42:15 43:9 109:19 120:5 123:9,16 124:6 127:3 128:8,12 130:14,20 131:2,10 242:23

**flip** 17:6 22:6 39:15 47:14 51:6 54:1 119:14 130:12 131:13 144:5 196:9 205:24

**flipping** 24:1

**focus** 17:11 19:2,22 21:12

27:10 30:10 46:16 54:4 58:23 60:16 76:18 83:12 91:21 108:1 110:20 114:19 115:17 120:21 123:24 138:17 159:22 160:2 160:10

**focused** 102:16 145:9 159:19 189:12 193:16 196:2

**focusing** 54:8 73:14 105:8 112:8 116:20 161:3 175:21

**fold** 50:5

**folks** 116:2 193:8,12 198:24

**followed** 89:11 89:13

**following** 162:7

**follows** 7:15 161:16 268:8

**food** 27:11

**footnote** 35:5 98:13 116:21 116:22,24 119:18,20,23 131:24 136:12 136:13 137:6 172:5 173:4

192:20,21,22 202:22,23 234:16

**footnotes** 198:6 198:13

**foregoing** 270:2,3

**forever** 26:13

**forget** 34:9 38:9 123:5

**forgotten** 8:13

**form** 10:10 17:15 31:1,13 31:20 47:5 50:12 52:18 54:9 55:8,15 56:22 73:10 74:22 79:18 82:24 90:17 98:9 99:11 102:11 103:2 105:24 107:23 108:12,13,20 111:22 112:23 115:16 117:13 120:18 121:6 122:17 125:3 125:23 126:10 126:18 128:9 135:2 137:1 138:8 141:7,23 142:5 147:11 150:8,19 153:11 154:4 155:23 156:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[form - game]**

159:10 160:5 160:22 163:14 164:3,20 165:11,21 168:1,10 169:20 170:6 171:21 172:14 174:19 176:22 177:7,24 183:8 185:15 186:24 187:13 195:4 200:10 207:21 213:14 221:16 231:16,24 232:6 233:7 235:7 240:15 240:22 242:1 242:10,18 243:2 245:5 247:13 249:14 250:3,7,22 251:13,22 255:8 256:13 257:9,18 258:1 259:3,14,24 260:6,15 261:2
**format**  205:22
**forming**  34:12 38:18
**forms**  213:19
**formula**  161:6 161:11,16 162:1,7
**forth**  34:13 35:12 38:15

**fortnite**  204:21 204:23 205:2
**fortnite's**  205:8
**fortran**  20:7
**forward**  101:16
**found**  98:22 219:1 223:4
**foundational** 130:15
**founder**  9:19
**four**  16:1 64:13 64:16 92:24 93:7 106:14 131:7 132:14 136:3 138:17 179:13 263:19
**fourth**  72:9,22 72:24 253:14
**fraction**  153:19 212:19
**frame**  102:18 127:21 129:6 136:23
**framework** 152:8
**frameworks** 63:24 135:12
**frcp**  269:1
**frederick**  2:12
**free**  10:18 46:24 50:23 87:19 138:19 138:20,23 146:12,13 161:4 193:7

200:4,7,16,21 201:1,4 202:5 202:9,17 203:2 203:7 204:14 205:7 206:12 207:13,14 212:7,12
**freedom**  84:17 84:19
**freeman**  2:4
**freemium** 139:17,18 193:6 198:5,16 199:6
**friday**  236:13 237:16 238:10 239:3
**front**  68:3 93:14 110:19 229:3 239:5 246:5
**fulfill**  41:7
**full**  8:21 72:9 72:24 73:14 76:12 77:16 84:6
**fully**  101:20 102:6 190:1 208:4 211:1 214:22 245:7
**function** 109:24
**functionalities** 131:20

**functionality** 94:6,17 116:4 140:8 259:6
**functions**  49:17 114:18 219:3 220:4,18 221:11,22
**fundamental** 73:16
**further**  52:11 132:22 137:6 147:15 159:5 212:6 241:14 265:18 267:14
**future**  11:8 52:3

---

**g**

**g**  3:7 6:1
**g&a**  131:2
**g5**  245:19 249:3
**gains**  175:5
**game**  49:18 54:15,17,18,20 55:21 62:12 97:18,21 103:15 104:10 110:22 115:3 117:7 176:9 181:9,14,15 186:14 192:5,7 195:21,24 196:1 204:20 243:20 244:17 244:19 245:1,3

**[game - give]**

245:13 246:12
246:14,16,18
247:23 248:9
248:17,18,19
249:8,12,22
251:19
**games** 22:19
49:6 114:14,19
186:19 189:4
205:15,21
243:24 245:20
249:19
**gaming** 41:14
186:3 245:20
**garden** 82:15
**gatekeeping**
78:10
**gates** 20:24
**gels** 183:19
199:3
**general** 40:6
45:22 62:21
64:1,2,18 95:2
102:12 109:23
111:10,14
130:21 133:15
133:21 140:23
145:6,13
158:22 184:9
191:11 193:13
194:9 195:3,13
198:4,4,21,23
199:3,13,16
200:19 214:2
215:23,23

216:22 219:22
219:24 222:1
228:7 257:1
**generally** 94:24
112:21 114:14
125:15 144:7
170:4 179:18
200:24 203:1
221:14 251:10
**generate** 10:2,9
10:23 86:10
104:12 111:2
115:7 127:18
139:21,24
150:6 181:5
196:12 206:3,6
208:21,22
210:2 211:11
211:20
**generated**
113:20 147:8
196:17,18
211:22
**generates**
113:12 206:10
207:4,13,15
**generating**
112:2,3,14
114:9 115:13
199:11 218:8
**generation**
82:11 86:4
**generator** 77:8
**generous** 74:14
75:5 76:1,14

83:19 215:14
**genre** 30:14
43:3 48:3
92:22 93:6
131:16,19
132:6,15
133:23 137:18
137:20 143:17
143:19 149:15
149:24 152:17
152:18 157:14
157:16 158:20
159:16 161:24
162:23,24
163:6,13
164:18 167:9
167:16 168:17
169:15,16,19
171:8 172:3
173:16 174:3
175:7 176:9
178:24 179:9
179:16 185:9
186:1,1,15
188:15 211:13
220:7,12 221:8
221:8,14 223:9
233:12 243:20
244:17,19
247:4 248:19
251:23 255:16
256:19 264:16
265:2,10
**genres** 133:9
152:9 156:2,13

156:24 164:2
165:19 169:21
170:5 178:23
182:17 184:21
184:24 185:11
218:7,13 219:7
220:10,15,17
223:16,21,24
224:10,14
252:11 257:5
264:19
**gentleman**
199:9
**george** 14:4,5
**getting** 37:2
47:8 54:17
75:2 91:5
113:24 134:8
173:2 207:6
210:21 215:17
262:13
**ggm** 131:16
132:3
**ggms** 132:11
171:8,24
**gibson** 3:4
**gibsondunn.c...**
3:10,11
**give** 17:22 63:4
101:1 114:12
167:7 170:19
178:11 193:24
197:3 216:10
217:1,7 245:12
251:1 254:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[give - group]**

258:16
**given** 10:1 36:6
  43:13,20 64:3
  138:15 150:12
  151:8 158:2
  159:4 162:10
  174:5 184:16
  187:8 191:1
  199:20 223:7
  260:16 267:12
**gives** 158:7,11
  158:13 255:23
  263:10
**giving** 55:20
  74:12 114:17
  221:12
**glean** 229:17
**global** 13:14
  229:11
**glu** 249:3
**go** 22:11 35:5
  36:7 42:10
  45:7 53:14
  62:14 64:19
  72:8 74:10,24
  89:21 94:15
  98:3 108:15
  137:15 149:9
  151:17 159:5
  166:10 178:9
  178:22 188:16
  190:18 191:10
  194:10 197:10
  198:12 204:18
  207:10 214:7

215:19 217:22
239:14 243:23
244:14 245:17
249:11 259:22
261:10,12
**goal** 118:11
**goals** 240:4
**goes** 24:19
  107:11
**going** 33:24
  36:11 48:15
  54:2 57:9 58:1
  64:12,14 74:7
  77:4 78:22
  86:17 87:18
  106:16 108:23
  110:3 111:19
  117:19 136:11
  136:20,21
  145:23 146:11
  167:16 173:8
  180:21 181:10
  181:22 193:16
  201:7 211:17
  234:13 251:12
  252:8 256:8
  262:3 263:6
**good** 7:22,23
  14:18 55:13,14
  55:14,17 56:5
  56:7,17,18,21
  57:4,14 60:9
  61:13 62:4
  64:22 80:21
  85:5,13 97:17

97:24 101:19
102:3,12
103:23 104:3
107:21 108:10
108:11,18,19
108:21 109:21
109:22 110:13
113:6 140:20
156:23 199:24
228:6 230:6,21
231:10 256:1
**goods** 47:17
  52:16 54:9
  55:3,5,10,21
  56:11,15 57:6
  57:22 98:8
  111:19 112:6
  112:15 113:2
  113:14 125:1
  125:21 126:6
  126:16 132:10
  206:11 207:17
**google** 76:9
  81:10 82:4
**google's** 84:10
**gosh** 15:7 157:5
  262:11
**government**
  12:5
**grained** 93:17
  93:23
**grand** 3:5
**granularity**
  254:6 256:23

**grasp** 149:16
**great** 24:16
  62:11 65:4
  151:3 167:22
  179:3 265:15
**greater** 140:9
**gross** 48:4 49:9
  66:17 92:22
  93:6 106:3,11
  108:5 120:22
  131:16 132:1,6
  132:8,9,15
  133:16 137:14
  137:15 145:21
  149:24 152:17
  152:18 153:4
  157:14,15
  158:3,11 159:1
  159:16 161:10
  162:1,15,16,24
  163:6 164:1
  170:24 171:8
  171:19 174:3
  175:7 177:21
  178:24 179:3,9
  179:16 185:9
  187:11,21
  191:9,12 201:3
  211:13 218:18
  261:1 265:2
**grothouse** 3:16
  7:1,1
**group** 101:15
  219:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[groups - house]**

| | | | |
|---|---|---|---|
| **groups** 131:20 221:6 | **happen** 69:9 86:11 123:19 172:3 210:7 | **heard** 21:5 53:3 53:9 96:5 145:6 226:14 | 244:24 |
| **grow** 140:4,12 140:14 | **happened** 27:6 123:20 251:15 256:9 | **hearsay** 257:20 | **highest** 110:8 110:23 156:18 179:2 |
| **growing** 128:15 | | **heavily** 116:2 | **highlight** 131:9 |
| **grows** 138:2 | **happens** 206:17 | **held** 37:4 | **highly** 173:5 264:11 |
| **guaranteed** 82:9 | **hard** 27:5 58:7 79:12,16 113:3 | **help** 32:19 40:18 54:22 64:16 135:8 140:9 199:5 206:17 210:24 246:21 | **historically** 95:16 |
| **guess** 12:15 24:10 41:15 62:3 63:13 154:14 161:3 191:19 192:21 244:22 | 115:23 164:24 167:20 170:23 185:5,5 211:9 217:23 250:13 | | **hitt** 98:14 |
| | | | **hitt's** 38:8 |
| | **hardware** 82:2 86:2 | | **hold** 208:4 210:15,20 211:1 |
| | | **helped** 33:12 | |
| | | **helpful** 81:5 221:24 222:2 | |
| **guidance** 43:8 43:12,17,20,23 44:2 | **harry** 6:17 | | **holds** 184:7 191:21 |
| | **harvard** 8:4,15 62:22 88:21 262:10 | **helping** 14:8 35:21 | **holman** 2:16 6:21,21 |
| **guide** 43:17 223:15 | | **helps** 246:4 | **hope** 50:13 85:7 182:9 |
| **guys** 62:1 | **hat** 24:18 61:22 61:23 67:5 | **herz** 2:4 | |
| **h** | | **heterogeneity** 162:21 164:22 | **hopefully** 65:19 |
| **h** 271:4 | **hawk** 62:10,10 | **hidden** 59:16 | **horizon** 127:5 128:7,21 |
| **haldenstein** 2:4 6:20 | **hbs** 23:6 63:11 68:17 87:19 91:19 97:5,6 101:13,14 107:17 | **hide** 254:21 | **hour** 12:11 15:22 58:1 106:17 128:5,5 201:8 |
| **half** 83:15,16 83:17 | | **high** 17:10 80:6 113:5 143:4 150:13 171:14 171:15 178:2,2 | |
| **hand** 69:2 187:24 206:21 230:13 267:18 | **head** 89:8 | **higher** 77:4 95:19 114:22 115:10 122:10 150:6 151:14 172:9,19 173:20,20,22 179:1 182:20 193:17 196:5 | **hourly** 15:1 |
| | **heading** 82:4 89:1 96:7 213:5,7 | | **hours** 9:21 12:14,16 15:19 16:1,1 128:4 221:21 265:1 |
| **handed** 133:13 | | | |
| **handing** 57:3 | | | |
| **handle** 118:24 | **headings** 242:5 | | **house** 7:2 129:12 |
| **handled** 268:8 | **heads** 242:11 | | |
| **hansen** 2:11 6:22 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[huge - increment]

**huge** 164:22
**huh** 17:5 24:24
  35:2 48:9
  56:23 58:21
  59:15 68:22
  70:24 71:6
  72:12,14 81:11
  81:13,24 84:8
  88:5 89:3
  103:21 114:5
  114:24,24
  116:23 119:21
  141:14 160:9
  161:22 166:2
  177:15 186:16
  196:20 203:23
  205:4 206:9
  208:18,18
  209:12 211:18
  213:6 215:8
  217:4 230:8,23
  236:18 248:10
  249:24 258:18
**humorously**
  20:23
**hundred**
  158:12,13,16
**hundreds**
  18:13
**hype** 80:5
**hypothetical**
  125:24 197:23
  207:11

**i**
**i.e.** 90:9 98:5
  124:3
**iap** 97:22
  147:17,22
  148:10
**iaps** 95:24,24
  159:19 160:1
  213:24
**ibm** 78:1
**iconic** 80:7
**idea** 62:5
**ideally** 49:8
**identical** 120:8
  132:12 167:10
**identification**
  12:21 16:20
  67:21 87:14
  228:20 236:8
  237:11 238:4
  238:21
**identified** 7:12
  39:7 93:8
  144:3 147:5,7
  194:2 243:10
  264:2
**identify** 34:6
  34:10 59:4
  64:22 82:21
  92:24 103:17
**identifying**
  248:18 249:12
  267:5
**idiosyncratic**
  127:7 129:9

130:7
**illuminate**
  66:10
**imagine** 121:21
  122:12 193:6
  193:13,18
  223:6 224:12
  244:24
**immediate**
  128:3
**impact** 144:14
  149:24 185:23
  187:2
**implemented**
  235:5
**implementing**
  228:14
**important**
  53:18 54:7
  75:9 135:17
  190:7 194:16
  194:20 248:2
**imposed** 205:7
**impossible**
  166:4 167:8,13
  185:1
**impressions**
  85:21
**improve** 63:6
  176:20,23
**improved**
  259:1,12
**improvement**
  259:5

**include** 57:20
  60:20 103:9,11
  103:13 134:5
  134:16 213:12
  213:22 214:15
  241:16
**included**
  136:15 268:14
  269:3
**includes** 61:18
  97:24
**including** 15:9
  50:22 154:17
  191:20 192:24
  254:3 262:9
**inclusive**
  175:16
**incomplete**
  167:18 170:3,7
  170:7,13
  229:16
**increase** 120:7
  120:8 125:15
  140:5,22
  141:11,22
**increased**
  140:6 141:5
  142:4
**increases** 120:6
  120:7 124:15
  140:24
**increasing**
  129:15 140:21
**increment**
  120:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[incremental - instances]**

**incremental** 122:8
**incur** 35:10 62:18 99:6 117:24 147:6 182:20
**incurred** 30:13 42:11,15 43:2 45:16 57:13 130:17 131:3 211:23 213:8
**incurring** 247:6
**incurs** 146:23 147:22
**independent** 124:4
**independently** 219:9
**index** 4:1
**indicate** 13:12 13:18 14:21 24:3,7 32:21 45:1 47:16 77:7 85:11 90:6 93:15 97:15 116:24 131:15 142:15 152:6 161:6,15 179:22 180:2 182:14 192:22 212:5 224:20 225:5 232:16 240:5 242:15 253:13

**indicated** 65:20 226:4 231:20 232:18 256:17
**indicates** 9:7 17:8 159:15 182:18
**indicating** 23:9 99:8 107:20
**indicative** 184:4
**indicators** 257:2
**individual** 37:9 103:23 175:18 184:23
**individuals** 14:14
**industries** 17:11 104:16
**industry** 17:20 19:3 72:19 73:7 86:11 139:18 191:11 198:2 199:1 214:7 254:3,15 257:12
**inferences** 250:12
**inflation** 141:9 141:11
**inform** 246:21 254:4
**informal** 230:17

**information** 34:7,11 55:15 133:3,6,16 141:19 148:12 156:5 163:20 167:18 168:7,8 168:11 169:10 169:18,23,24 170:21 175:13 176:3,5 177:5 189:24 190:14 205:15 214:12 217:13,14,19 223:23 224:3,4 234:18 240:7 240:20 241:7 241:11 243:19 243:22 245:9 245:12,19 246:1,7,10,13 246:14,16 247:9,12 248:15 249:16 250:21 251:1,5 251:11,19 252:12 253:15 254:1,6,19,22 254:24 255:12 255:21 256:23 257:4 260:3 264:13,16
**informed** 248:4 257:8
**infrastructure** 49:1 103:13

109:4 123:2 128:2 170:17 202:3 204:8 241:18 242:22 260:20
**initial** 36:5 37:4 74:5 117:17
**initially** 28:1 136:14 233:24
**initiatives** 182:19
**injury** 17:12,17 17:18,19 32:7
**innovation** 17:9 18:22
**innovations** 72:11,17,18 73:6 74:3 77:2
**input** 26:8 43:16 143:18 145:23 149:13 159:7 163:15 163:17,22 177:2
**inputs** 149:20
**inputting** 221:20
**inquire** 36:14
**inside** 51:22 53:12 62:17 64:12 114:13
**insistence** 82:6
**instances** 190:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[institution - judgment]**

institution 9:5
instructed
  240:6 241:23
instructing
  239:20
instructions
  239:15,21
  240:2 241:9,15
instructors
  64:17
insufficient
  229:16
integrate 135:9
intellectual
  213:13,16,17
intend 31:23
  32:5,11
intended
  149:20
intensely
  204:15
intention 73:11
intently 204:12
interacting
  138:2
interactive
  246:9
interest 23:19
  51:9
interested
  44:16 99:3
  102:18 194:17
  267:17
interesting
  62:1 86:16

interfere 47:7
internet 60:7
  67:2 157:7
interpretation
  106:5 180:13
interpreted
  230:3,18
interquartile
  155:2
interrupting
  244:7
interval 156:9
  173:14,18
  262:19
interview 38:13
interviews 65:8
  65:11 198:3
introduce 6:13
  6:24 208:5
introduced
  83:22 87:7
introduction
  86:21
intuitive
  197:16
inverse 183:2
  185:8 249:1
investment
  19:11 52:3
investments
  50:5 194:19
involve 28:4,8
  52:15 63:1
  95:21 96:1

involved 25:3
  25:18 27:20,21
  35:18 65:21
  66:13 75:19
  108:23 159:13
  226:5 228:11
involvement
  23:17
ios 25:2,6 26:23
  28:1,5 60:17
  60:21 71:5,7
  72:5 73:19
  94:19 95:13
  117:10 135:24
  136:2,3 142:3
  168:22 169:3
  192:12 194:22
  195:7,18 196:6
  201:4 205:2,3
  225:16 244:19
  245:3 247:10
  247:12,19
  248:16,18,19
  249:12 259:12
ip 181:4,5
ipad 259:2
iphone 1:8 6:12
  72:6,11 73:9
  76:18 77:10,14
  77:19 78:7
  80:11,14,23
  83:22 87:7
  89:13 90:7,16
  259:1 268:4
  271:1

iphones 73:21
  81:3,4
ipod 79:1,4,6,6
  79:9,11,17,19
  80:3,7 89:12
  89:24 90:2
iqr 155:4
iqrs 154:23
  263:24 264:3,4
irrelevant
  108:10
irs's 26:12
isolate 194:21
issue 49:22
  99:18 226:1
issued 144:11
issues 19:24
  25:19
item 216:4
itunes 73:18
  79:20

**j**

j 2:16
jacobs 4:23
  236:12
jailbreaking
  74:7
job 1:23 64:21
  262:22
joint 20:21
journey 108:24
judgment
  35:18 118:16
  156:6 163:20
  170:1 171:23

**[judgment - large]**

176:4 233:17
248:12 252:3
255:4 257:13
**judgments**
35:23 233:13
**june** 236:13
**justify** 210:13

**k**

**k** 68:21 190:15
190:18 218:1
246:7 254:2,14
**keep** 17:23,23
50:5 116:3
123:16 203:12
**keeping** 50:2
**kellogg** 2:11
6:22
**kellogghanse...**
2:18
**kelly** 62:8
**kemerer** 68:19
88:10 229:2
**key** 72:10 128:7
154:17,19
240:9,13,20
**keystone** 13:14
13:22 14:22
15:5 23:16,17
23:22 29:5
32:19,22 33:11
39:11
**keystone's**
13:18
**kicking** 145:12

**kids** 215:13
224:16
**kind** 10:6 11:15
11:17,18 19:19
21:11 27:23
57:3 61:22
66:10 86:14
97:7 116:3
118:1 128:2
129:6,20 130:8
161:20 176:5
181:11,16,20
189:6 192:8
193:12 195:4
202:14 204:7
211:9 214:18
219:2,16 220:3
220:4 222:2,13
244:13 250:13
254:13 255:1,2
255:3,22
**kinds** 21:14
46:20 51:22
207:2 220:18
**kit** 135:17
**kits** 135:16
**knew** 240:3
**know** 11:5
12:15 15:7
16:13 27:22
44:20 45:10
47:8 49:5
52:19 53:16,23
57:10 62:20
63:20 65:1

66:5,16 71:14
75:13 76:9
80:5 81:6
85:22 86:16
91:7,9 94:2
96:1,2,22 99:4
115:20 119:16
128:5,13,15
129:15 135:3
139:1,13
143:10 145:11
147:1 148:2
149:7 150:17
164:21,24
165:1 174:8
176:24 179:23
180:10 181:18
181:18 183:15
183:20 184:13
193:22 194:1
195:13,22
197:9 198:2,19
198:20 199:8
200:5,18,19
201:2 204:23
204:23 207:9
208:14 211:10
219:23 220:6,9
222:13 223:11
224:15 226:10
226:12 227:7,9
227:13,20
228:8,9,12
234:5 235:1,3
235:4,16 236:1

236:3 242:7,11
244:20 251:2
256:3,6,18
258:3 259:21
260:9,22 261:3
261:5
**knowing** 55:9
249:21 250:12
**knowledge**
21:10 28:6
31:5 35:14
57:23 79:5
92:16 267:8,13
**known** 48:17
121:7 180:23
181:17 184:20
232:16
**knows** 170:21
**ks** 190:15
257:11
**kumler** 3:17
7:3,3

**l**

**lab** 20:20
**lack** 225:24
254:5 256:22
**language** 20:7
**laptop** 41:3
**laptops** 41:4
**large** 41:20
42:21 57:11
71:17 95:16
115:22 139:21
168:15 231:1,4
231:5 250:10

Page 34

**[large - long]**

251:6
**largely** 218:14
**larger** 125:16
158:22
**largest** 158:24
**lasts** 26:12,13
**launch** 20:20
61:17 66:15
74:5
**law** 63:13
**lawyers** 21:6
29:7,9 236:2
**lead** 18:11
69:22 140:22
140:24 188:20
**leader** 84:3,12
87:9
**leading** 19:20
24:8
**lean** 123:13
**lecturing** 63:11
**led** 68:15 73:18
176:6 225:24
248:3
**left** 14:3
**legal** 6:7 268:7
**level** 49:18 53:4
53:7,9,10
94:14,15 96:5
96:10,11 106:6
116:7 120:1
130:9 137:20
149:2 182:17
210:12,14
214:9 215:3

224:7 231:7
232:14 239:1
247:4 264:9
**levels** 54:18
94:17 114:22
231:14 232:24
254:23
**leverage** 84:18
**levers** 49:24
108:2
**library** 79:21
**license** 7:13
**licensing** 213:8
241:19
**lie** 163:9
164:14 165:2,5
167:5 171:8,20
171:24 173:11
179:7
**lies** 163:11
168:5
**life** 16:17 26:11
48:15
**lifestyle** 167:2
177:12 219:5
220:8
**lightsabers**
181:13
**likely** 86:11
101:9 113:14
164:13 173:5
174:18,21
175:14 195:10
210:20 212:24
219:13 223:2

249:22 258:24
259:11 264:18
**limitations**
21:14 168:19
220:12
**limited** 83:11
166:19 167:18
168:8 169:10
173:15 184:5
257:4
**limits** 36:13
**line** 146:19
147:16 268:15
269:4 271:5,8
271:11,14,17
271:20
**lines** 265:4
**linux** 23:21
67:5
**list** 22:12 24:12
24:19 34:24
36:1 52:19
106:9 158:20
**listed** 22:16
59:2 65:23
66:2 68:6,16
68:18
**listing** 229:1
**literally** 128:5
**literature**
96:21 97:1,4
98:22 99:14,17
99:21 100:2,5
100:15 194:14
264:6

**litigation** 1:8
6:12 27:18
28:4 268:4
271:1
**litigations**
25:12
**little** 8:13 12:17
20:23 25:16
27:4 33:22
41:5 44:16
53:7 63:12
65:5 68:10
88:19 91:21
118:5,6,9
123:14 156:22
181:18 187:5
188:18 201:8
255:4 262:3
264:14 265:1
**lives** 114:23
**living** 67:2
**llc** 13:14
**llp** 2:4 3:4
**load** 79:10,16
**loaded** 206:14
**locked** 268:12
269:1
**log** 63:21
**loggerheads**
86:23
**long** 26:2,12
63:3 94:4 99:4
118:18 127:1,9
128:17 159:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[look - make]**

| | | | |
|---|---|---|---|
| **look** 11:17 13:3 36:4 45:8 46:13 66:3 71:24 89:10 117:16,21 118:11,13 128:16 144:17 147:15 161:2 177:11 178:22 186:3,11,11 191:8,11 192:20 195:16 205:20 219:5 219:12 223:18 228:4 229:18 236:17 255:17 260:13 264:21 265:2 | 187:21 191:8 192:2 202:20 220:21 221:6 222:8 230:12 243:7 264:1 | 156:12,21 157:1 171:14 232:1 | 134:20 137:3 138:3 153:3 185:22 198:24 211:12 219:10 224:4,14 227:14,16,21 233:13 235:19 252:10 |

**look** 11:17 13:3 36:4 45:8 46:13 66:3 71:24 89:10 117:16,21 118:11,13 128:16 144:17 147:15 161:2 177:11 178:22 186:3,11,11 191:8,11 192:20 195:16 205:20 219:5 219:12 223:18 228:4 229:18 236:17 255:17 260:13 264:21 265:2

**looked** 86:5 99:14 119:8 120:13 121:22 145:10 220:17 252:1 253:21 256:5 257:1,2

**looking** 22:3 45:14 49:4 50:24 72:21 77:16 84:6 102:2 113:8 114:6 116:6 126:21 129:4 134:13 137:13 143:6 146:18 154:13 170:10 175:5 186:5,14

187:21 191:8 192:2 202:20 220:21 221:6 222:8 230:12 243:7 264:1

**looks** 13:8 188:7

**lorenz** 14:1,12

**lorenz's** 14:11

**los** 3:6

**lose** 200:24

**losing** 52:4

**lost** 226:17 227:2

**lot** 9:19 18:12 21:5 27:3 69:20 74:6 78:2 82:2 83:14 85:16 100:10,24 112:1 114:3,12 144:15 154:10 173:7 181:6,15 183:13,17 189:6 191:13 193:7,10,16 200:6 244:20 244:21 251:5,6

**lots** 18:21

**loved** 80:8

**lovely** 244:12

**loves** 49:6

**low** 47:9 53:21 98:6 113:6 150:13 156:2

156:12,21 157:1 171:14 232:1

**lower** 43:24 76:24 102:9 133:22 150:6 151:14 156:20 172:12,22 175:7,8

**ls** 82:11

**ltv** 247:14

**lucky** 251:3

**lumpiness** 123:7

**lumpy** 129:14

**lunch** 151:17

**lying** 172:8,19

**m**

**m** 1:20 2:13 68:21 267:3,21

**ma** 8:5

**mac** 1:12 4:4 7:9 267:4 270:1,11

**maccormack** 4:11 6:11 8:2 13:2 58:17 107:6 152:4 201:20 229:2 239:6 253:8 268:5 271:2,24

**made** 28:24 29:5 36:4 70:10 74:8 89:22 90:5

134:20 137:3 138:3 153:3 185:22 198:24 211:12 219:10 224:4,14 227:14,16,21 233:13 235:19 252:10

**madison** 2:5

**main** 19:5 47:2 190:23 193:15

**maintenance** 10:4 11:1 49:2 59:1 60:13,17 109:4 118:7 123:2 127:15 127:17 129:11 129:13 204:10 204:13,19 241:19 242:17 242:23 260:19

**major** 12:3 85:9 93:7

**majority** 160:16 219:6 225:13

**make** 16:17 42:6 48:2 53:14 63:8,9 73:12 78:8 79:14 88:20 90:16 93:17 94:13 96:14 109:17 111:9 123:17 129:21

Page 36

[make - materials]

133:23 167:13 169:1 187:14 189:12,17 190:13 195:3 202:21 207:7 212:19 220:23 221:3 222:14 223:3 245:10 248:24 250:11 259:4 262:11 262:23 268:14 269:3

**maker** 78:19

**makes** 202:14

**making** 35:22 137:16 167:20 192:9 218:16 224:6

**man** 19:10

**manage** 10:21 45:8,14 99:2 99:20 108:3

**management** 16:2 17:9 18:22 98:24 101:4 116:7 157:8

**manager** 14:2,4

**managers** 14:6

**managing** 4:19 49:23 88:3

**manifested** 146:1

**manner** 99:19

**map** 59:17

**mapped** 241:8

**march** 4:13 13:2 38:6 39:5 233:24

**margin** 49:10 66:17 93:1,5,6 93:10 99:3 106:3,7,11 109:17,18 121:19,19 131:16 132:1,2 132:6,8,9,12,13 132:15 133:22 145:2,4,5,17,22 149:24 152:18 155:16 157:14 158:11 161:10 162:15,16,17 162:24 163:7 164:1 170:24 175:8 177:21 178:3,18,24 185:9 187:11 187:22 201:4 208:3 210:22 218:18 261:1 265:3

**marginal** 91:16 91:18,23 92:11 92:19 98:5,10 98:22 99:18 102:2,8,13,22 102:24 103:3,8 103:22 104:1,8

104:21 105:12 105:22 106:5 106:10 107:20 108:7,9,17 110:12 111:20 112:21 113:2,7 115:21 117:4,4 117:8,14 120:3 120:17,20 121:5,14,17 122:1,3,4,18,19 122:23 123:4 177:22 178:19

**margins** 46:4 48:2,4,14 92:22 99:4 102:19 108:5,6 120:22,22 133:16 148:16 148:17 152:17 153:4 157:15 158:4,8 159:1 159:17 162:1 169:7 171:8,19 174:3 179:3,10 179:16 191:9 191:10,12,12 208:9,10 211:13 255:15 255:16,19 256:6

**mark** 16:16 20:24 67:17,18 87:11 166:12 228:16 236:4

237:7

**marked** 12:20 12:24 16:19 67:20,24 87:13 88:1 118:23 119:5 144:2 228:19,23 236:7,11 237:10,14 238:3,7,20,24

**market** 31:7,12 61:20 62:19 71:10 84:3,11 87:3 141:20 142:3,12 181:12,14

**marketing** 50:4 61:7,19 195:6 195:9 236:20 237:2

**marketplace** 70:14 72:2 85:10 91:12

**markets** 195:24

**marking** 12:18

**massachusetts** 1:15 6:10 267:6

**massive** 19:1

**matching** 202:14

**materials** 34:4 35:24 144:4,8 254:4

**[math - michael]**

| | | | |
|---|---|---|---|
| **math**  187:1 | 21:4 24:11 | **meaning**  25:5 | **mentioned**  11:2 |
| **matter**  6:11 | 45:5 47:23 | 75:12 192:14 | 52:8 100:3 |
| 14:24 28:7 | 48:1 49:12 | **means**  8:21 | 168:14 179:6 |
| 30:16 36:10,23 | 53:5 54:13 | 24:17 136:19 | 232:22 255:9 |
| 205:23 206:21 | 57:8,9 61:9,11 | 163:21 175:17 | **merely**  117:5 |
| **matters**  267:9 | 66:11 75:10 | 178:16 179:7 | **merit**  1:21 |
| **maximal** | 77:23 78:15 | 180:15 212:6 | 267:23 |
| 180:13 | 79:2 80:4,19 | 244:1,10 | **messages**  220:3 |
| **maximally** | 82:13 83:14 | **meant**  20:23 | **messiness** |
| 171:4,9,17 | 93:23 94:9 | 62:9 64:7 83:3 | 156:22 |
| 173:23 174:2 | 102:1 111:10 | 83:6,8 86:10 | **messy**  21:13 |
| 180:5,17,22 | 114:1,3 123:1 | 124:18 168:2 | 262:21 |
| 186:21 187:9 | 124:20,22 | 188:24 258:20 | **met**  15:15 |
| 191:15,17 | 125:1 127:8 | **measure**  11:16 | 37:16 |
| **mba**  20:21 | 129:8 133:5 | 46:14 48:10 | **meta**  224:17 |
| 26:18 | 135:5,20 136:8 | 92:22 101:18 | **method**  97:16 |
| **mc**  1:13 | 136:17 137:12 | **measured** | **methodology** |
| **mcconnell's** | 145:6 157:14 | 121:20 | 35:12 123:13 |
| 19:7 | 157:17,18 | **measures** | 154:16 155:8 |
| **mcfadden**  36:9 | 162:12 163:5 | 154:17,19 | 180:20 188:19 |
| 36:22 37:1,24 | 165:5,10,19 | 155:4,8,12,14 | 192:18 262:17 |
| 117:2,3 119:22 | 167:5 168:5,24 | 155:17,18,20 | **methods**  59:17 |
| 143:22 144:5 | 171:9,12 173:7 | **measuring**  48:5 | 188:21 |
| 144:10,18 | 178:10,15 | 51:18 92:18 | **metric**  53:18 |
| 146:4 148:18 | 179:5 180:8 | **mechanism** | 105:1,17,21,23 |
| **mcfadden's** | 187:3 192:2 | 79:23 | 108:6 131:16 |
| 36:5 117:14,17 | 193:3 194:7 | **media**  167:1 | 132:6 156:9 |
| 118:22 119:5,8 | 196:22 197:5 | 219:5 | **metrics**  10:1,7 |
| 120:13 121:3 | 209:5 218:23 | **meeting**  15:20 | 10:8,22 11:2,9 |
| 144:1 145:1,9 | 222:24 223:1 | **member**  8:21 | 51:11,17 52:6 |
| 147:2 148:3 | 234:6 239:18 | 9:8 | 52:15,20 240:9 |
| 149:13 160:20 | 239:19 243:21 | **members**  32:7 | 240:13,21 |
| 176:21 177:4 | 250:16 251:6 | **memory**  238:17 | **mic**  47:9 |
| **mean**  8:19 | 254:10 257:20 | **mention**  26:17 | **michael**  19:12 |
| 11:24 19:1 | 265:10 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[michael's - n.w.]**

**michael's** 19:18
**microsoft**
  22:21 23:3,4
  23:10,16 24:9
  24:18 61:13,15
  61:17 62:1
  67:3 76:9
  84:22 85:3,8
  85:11,17 86:6
  86:14 257:14
**microsoft.net.**
  67:4
**middle** 58:5
  155:5 161:20
  174:18,22
  175:15
**midpoint** 187:3
  187:4
**midpoints**
  179:8
**mike** 100:4
**million** 168:22
**mind** 19:6 27:2
  150:14 182:10
**minds** 53:14
**mine** 14:17
  19:16 118:6
**minimal** 123:16
**minimum**
  110:5
**minjae** 37:7
**mint** 115:20
**minus** 106:4
  182:18 183:7

**minutes** 107:3
  220:22 261:6
**missed** 54:8
**mit** 100:22
**mixed** 134:8
  202:11,15
**mobile** 4:17
  26:19 30:7,10
  39:24 40:4,9
  40:12,20,22,24
  41:12,14,16
  42:2,18 45:3
  55:16 56:16
  68:2 70:2,5,18
  71:1 75:23
  76:3,15,17
  81:17,17,19
  82:11 84:3,11
  85:4,5,8,12
  86:2 101:21
  102:7 139:5
  186:3 200:3
  249:3
**model** 43:16
  53:20,24 89:1
  101:8 111:12
  117:4,5,7,20
  143:16,20
  144:20 145:23
  146:1 147:2
  148:3 149:13
  149:18,21
  150:2 160:20
  176:21 177:2,5
  202:11,16

205:10
**model's** 144:22
**models** 101:6
  139:7,8 162:22
  199:7 218:16
**moderation**
  118:10
**modularity**
  11:3
**module** 61:5
  63:15 64:6,9
  64:10,12
**modules** 64:9
**monetary** 57:8
**monetization**
  50:16 55:19
  94:22 95:21
  117:10
**monetize** 45:17
  99:7
**monetized**
  139:11
**money** 23:21
  57:3 77:8
  195:6 200:24
**month** 9:21
  19:10 203:11
**monthly** 10:24
  51:12 93:20
  129:2,3 240:10
  241:11
**months** 29:1
  33:20 127:24
**morning** 7:22
  7:23 17:22

**motion** 4:16
  67:8 68:2 70:8
  107:7
**move** 54:2
  186:12 244:11
  244:14
**movement**
  123:20
**movies** 213:16
**moving** 42:23
  101:16 132:22
  143:9 157:13
**mp3** 79:13
**mukhopadhyay**
  3:18
**multiplayer**
  204:20
**multiple** 33:18
  48:21,22 81:3
  81:19 94:4
  153:22,23
  168:12 181:1
  247:17
**multiply**
  263:21
**multitude**
  127:4
**music** 79:7,21
  184:11 213:16
  254:17
**mythical** 19:10

|  n  |
| --- |

**n** 6:1 157:22
**n.w.** 2:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[name - object]**

**name** 4:3 7:24 33:14 38:9 257:14
**names** 14:1 33:3
**narrow** 17:24 151:10 171:13
**narrower** 43:19 118:9 188:12
**natural** 156:8 221:10
**nature** 30:22 222:20
**navigation** 188:2
**necessarily** 42:5 66:16 69:7 83:10 92:12,13 113:7 131:11 144:23 152:24 158:23 160:4,5 173:1 176:15 184:16 198:22 241:1 242:4 245:7 254:20
**necessary** 254:6 256:23 268:14 269:3
**need** 48:10 49:3 49:6,21 59:20 66:23 93:17 109:2,3,3,7 116:15,16

126:2 128:4 129:15 181:14 217:21 250:15 266:5,10
**needed** 69:10 161:24
**needs** 54:19 169:23
**negative** 181:20 183:7 184:7
**neither** 26:14 82:9
**net** 137:15
**netflix** 139:14
**netscape** 24:19 62:6
**network** 59:16
**networking** 177:11 220:9
**never** 167:9
**new** 2:6 11:16 14:4 54:22 59:20 82:11 100:7,12 114:18 116:4 140:7 141:18 207:5
**news** 252:17
**night** 114:6
**nintendo** 41:9
**nixing** 116:14
**noble** 4:18 88:3
**noise** 262:23

**nokia** 84:22 85:6,8 91:8
**non** 68:17
**nonmobile** 41:17 42:3,19
**nonpublic** 225:16 247:9 247:11 250:24
**normally** 65:6
**northern** 1:2
**notary** 7:14 267:3,22
**notating** 268:15 269:4
**note** 63:15,15 63:19,22 64:6 64:9,20 87:21 98:13 107:10 107:13 110:23 137:6 148:18 202:7 215:14 225:10 233:23
**noted** 148:8 197:15
**notes** 61:4,5 64:2 65:21 67:14 100:23 101:5
**notion** 203:17
**notwithstandi...** 212:10
**november** 267:22
**number** 4:9 118:24 124:4

124:20,22 125:1,14 126:7 127:2,12,13,18 130:4 138:1,23 139:24 142:20 143:4 156:3,12 156:20 157:1 162:3,10 168:9 168:16,18 169:11,15,18 169:22 171:23 173:15,24 178:23 183:15 184:17 185:2 211:5 213:10 214:20,21 226:1 232:20 232:21 236:22 236:24 240:9 244:15 251:24 252:19 263:9 263:11,14 268:15 269:4
**numbers** 75:1 154:10 183:11 233:16
**ny** 2:6

**o**

**o** 6:1
**oakland** 1:3
**oath** 267:10
**obey** 260:17
**object** 10:10 36:11 55:8 235:7 251:12

Page 40

**[objected - okay]**

| | | | |
|---|---|---|---|
| **objected** 47:5 | 200:10 207:21 | 83:13 100:12 | 115:18 134:6 |
| **objection** 17:15 | 213:14 221:16 | 104:7 109:16 | 146:16 182:4 |
| 31:13,20 33:5 | 231:16,24 | 112:1 113:1 | 215:24 219:1 |
| 50:10,12 52:18 | 232:6 233:7 | 124:20 130:10 | 255:17 |
| 56:22 73:10 | 240:15,22 | 139:10,12 | **okay** 10:17 |
| 74:22 79:18 | 242:1,10,18 | 145:22 158:23 | 15:11 16:10 |
| 82:24 90:17 | 243:2 245:5 | 174:23 175:17 | 17:7 18:23 |
| 98:9 99:11 | 247:13 249:14 | 191:1 193:10 | 19:5 20:17 |
| 102:11 103:2 | 250:3,7,22 | 221:21 223:3 | 22:4 23:8 |
| 105:24 107:23 | 251:22 255:8 | 251:23 261:11 | 24:16 29:17 |
| 108:12,13,20 | 256:13 257:9 | **occasion** 25:8 | 38:12 46:20 |
| 111:22 112:23 | 257:18 258:1 | **occasionally** | 58:6 67:1 |
| 115:16 120:18 | 259:3,14,24 | 218:2 | 70:24 71:6 |
| 121:6 122:17 | 260:6,15 261:2 | **occasions** 25:10 | 73:3,3 88:12 |
| 125:3,23 | **objective** | 129:1 262:20 | 90:21 91:14 |
| 126:10,18 | 109:13 | **offer** 9:23 | 92:7 93:11 |
| 128:9 135:2 | **objector** 47:6 | 31:23 32:5,11 | 98:19 102:5 |
| 137:1 138:8 | **observation** | **offered** 46:10 | 105:10 118:23 |
| 141:7,23 142:5 | 96:16 | 50:22 57:8 | 121:12 134:12 |
| 147:11 150:8 | **observations** | 75:4 76:1 | 134:13 143:9 |
| 150:19 153:11 | 153:24 156:3,4 | 199:13 | 143:12 145:13 |
| 154:4 155:23 | 156:12,16,20 | **offering** 48:7 | 146:9 147:4,15 |
| 156:14 159:8 | 162:3,11 | 50:21 126:14 | 149:23 166:14 |
| 159:10 160:22 | 183:12,13 | **offerings** | 166:14,17 |
| 163:14 164:3 | 184:17 188:15 | 219:11 | 170:12 173:22 |
| 164:20 165:11 | 188:23 205:13 | **offers** 54:5 | 178:17 180:16 |
| 165:21 168:1 | 219:16 246:4 | 215:14 | 196:24 197:7 |
| 168:10 169:20 | 248:24 | **office** 61:14,16 | 197:13 198:9 |
| 170:6 171:21 | **observed** 96:17 | 61:17 67:3 | 208:16,16 |
| 172:14,24 | **observes** 72:15 | 268:11 | 215:24 219:1 |
| 174:13,19 | **obtain** 110:7 | **offs** 60:4 157:9 | 230:14 236:17 |
| 176:22 177:7 | **obverse** 162:16 | **oh** 11:5 18:21 | 237:14,24 |
| 177:24 178:7 | **obviously** | 19:15 21:3 | 238:18 239:12 |
| 183:8 185:15 | 35:17 41:22 | 62:13 67:1 | 240:1 247:8,21 |
| 186:24 187:13 | 53:5 78:1 | 73:3 86:14 | 249:6,8,10 |

Page 41

**[okay - page]**

256:8 262:2 263:8 265:19
**old** 67:11 262:11
**olga** 5:7 238:10
**omissions** 39:8
**once** 8:9 15:15 29:24 39:18 48:19 94:2 115:18
**ones** 27:1 51:18 58:7 65:22 66:5 231:18
**online** 121:16
**open** 62:2 78:1 82:18 94:16,17 220:14
**opened** 141:6
**operate** 127:11
**operates** 121:15
**operating** 18:6 23:19 41:7 70:6 76:3,17 78:9 81:16,18 81:20 85:3,5 85:12 101:21 102:7 193:1 194:22 222:11 240:9,13,20 259:12
**operation** 26:20 130:17 131:3

**operations** 18:10 30:9,12 39:23 42:16 61:6,12
**opine** 142:14 196:8 198:15
**opinion** 26:7,10 51:17 108:9 111:5 142:6 153:8 166:4 174:17 175:10 184:6 191:4 196:4 200:23 258:23 259:10
**opinions** 31:23 32:3,5,9,11,15 34:12 38:14,18 38:24 39:4,13 125:22 126:5,8 126:15 224:22
**opportunities** 88:19
**opportunity** 54:21
**opposed** 126:7 211:5
**option** 95:18 243:3
**options** 94:4
**order** 45:16 48:11 49:5,9 50:5 57:13 99:6 100:8 103:14 108:23 109:8 190:12

190:17 192:16 194:9 195:3 206:19 210:13 245:10 250:20
**organizational** 59:19
**original** 79:6 79:19 80:7 98:5 177:1 268:10,20,22
**originally** 14:5
**os** 4:17 68:2 70:2,18 71:1 84:11 86:5
**outcome** 267:17
**outlet** 69:24
**outliers** 165:2
**outline** 46:22 65:13 130:2 148:14
**outlines** 38:22
**output** 120:1,5 120:6,7 124:3 124:15,18 125:10,20 126:5,15
**outputs** 61:1 179:4
**outside** 165:2 174:12 191:3
**outsource** 129:17
**outward** 234:13

**overall** 54:10 54:14,16,23 57:7
**overly** 171:13
**overriding** 113:8
**own** 34:24 37:20 79:10 148:23 149:9 176:4 181:5 183:19 246:19 247:3 248:12 252:2
**ownership** 23:15

**p**

**p** 6:1
**p.l.l.c.** 2:12
**p.m.** 151:22,23 152:2 201:14 201:15 226:20 226:21 253:2,3 261:19,20 266:14
**pack** 66:18
**package** 113:23
**packages** 203:3 203:13,18 204:2,3,4
**page** 2:21 4:3,9 5:2 13:10 17:4 17:6 22:7,8 24:2 30:4 34:2 34:24 35:24 42:24 44:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[page - part]**

47:15 51:8
54:3 58:20
59:7,11 66:4
70:16,17,21,22
70:23 72:8
73:14 76:13
77:17 81:9
83:15,16,17
84:6,21 85:24
88:22,24
103:20 116:22
119:14,19
130:12 132:23
134:6 136:10
136:13 146:6
146:18 157:22
161:4,7 162:2
166:1 172:6
175:4 182:6
186:12 189:13
189:22 192:20
196:10 202:22
213:3 222:18
229:17,21
230:9,13
234:16 243:18
244:13 245:16
253:10,11
263:7 264:22
268:15 269:4
271:5,8,11,14
271:17,20
**pages** 1:24
26:17 63:2
83:12 134:8

268:14,17,17
269:3,6,6
**paid** 23:21
46:24 53:22
56:16 95:7,15
112:7,10,11
142:19 148:11
148:17 159:18
159:20,23
160:3,11 193:9
193:17 196:5
196:12,15,17
197:2,15,16,20
197:20,22
198:16 199:20
200:9,17,22
202:4,9,17
203:1 205:3
206:3,5,14
207:3,12,15,15
207:17 208:2
208:20,21
209:1,16,17
210:2,7 211:20
211:22 212:1,7
212:12,19
213:1 216:14
255:15 256:6
**paint** 61:15
**painting** 71:9
**paper** 23:14
81:8 82:4
121:13 132:21
**papers** 34:23
58:23 59:2,5

60:10,15
156:19 157:3
198:2
**paragraph**
13:9 14:21
24:2,5,13,14,15
26:16 32:21
39:15,18 42:12
42:24 44:18
47:14 51:1,2,6
54:3 58:18
61:3 72:9,22
73:1,1,15
74:10 76:12
77:16 82:3
84:7,9 89:10
93:12,15,16
97:13 101:16
101:17 102:21
103:18 104:20
110:17 116:19
116:22 123:22
125:13 126:24
129:8,23
130:13 131:13
132:22,24
134:1,6,13
137:23 142:15
143:9 146:5,7
149:10,11
152:5 154:13
157:13 159:15
161:3,15,21
162:20 165:24
166:3 167:7

169:9 171:3
179:20 182:1,4
182:5 188:16
189:11 192:19
192:21 196:9
196:11 197:6
198:1 201:21
202:7,20
205:24 211:16
212:5 215:6
218:4,6 222:17
224:18,20
225:6,10,23
233:21 239:14
241:14 243:7
243:17 245:17
245:18,24
253:9,24 257:3
**paragraphs**
134:9
**parenthetical**
170:10
**part** 24:11 25:4
25:17 26:20
40:20 43:1
54:9,20 57:7,8
57:11,12 74:9
78:17 103:19
135:17 141:20
145:18 146:11
147:12 159:11
161:4 166:15
167:17 169:2
179:20 192:18
192:18 195:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[part - performance]

195:10,13
210:21 213:4
221:4 222:18
238:9 239:22
251:15,16
**part's** 197:23
**participative**
63:12
**particular**
11:10,20 19:23
27:1 35:3
68:15 69:4
100:18 111:4
112:20 133:18
133:19 137:19
151:5 153:23
156:1 160:2,23
183:9 232:2
246:20
**particularly**
19:2 30:10
85:5 98:23
106:2 217:21
252:7
**parties** 267:15
267:16
**partition**
156:23
**partner** 203:15
**party** 73:8
78:13 213:9
216:1
**passed** 38:21
**past** 11:13,18
14:16 20:5

44:11
**pause** 63:18
**pay** 46:8 47:1
54:21 94:2,15
123:9 133:24
181:10 203:15
216:17
**paying** 51:14
52:12 57:2
111:12 112:4
138:19 139:5,9
139:13,15,20
194:10,10
204:16 219:20
**payment** 56:19
75:4 133:1,12
136:15,21
137:8,22
138:16 142:16
241:17
**payments**
74:14,19
142:24 213:12
217:24
**pc** 77:18,24
78:1,20 79:22
86:5 195:24
**pdf** 268:12
269:1
**peak** 65:19
**peculiarly**
14:15
**peer** 58:23
264:6

**penalty** 268:16
269:5 270:3
**penetration**
80:6 140:6
**people** 6:24
20:22 29:21
45:13 52:12
53:21 64:3
65:10 69:9
111:11 112:13
127:18,21
129:2,12,16,16
169:7 181:12
181:15 198:3
199:19 200:20
200:22 214:5
216:10,13,17
216:20 217:23
251:10 254:21
**percent** 27:9
63:1 74:11,13
75:3,16 76:13
82:22 83:18
90:9,10,15,19
90:22 104:10
104:11,12,12
110:24 111:1,2
111:2,5,6,7,7
111:17,18
113:12,13,15
114:8,10 115:2
115:4,7,12,13
116:11 137:10
139:20,23
155:5 167:2

171:18 174:1
175:9,9,12,23
176:10 177:14
177:18,21
178:18 186:19
186:23 187:22
197:14,17,22
198:15 199:10
199:11 205:3
206:10,12,13
207:16 208:22
208:24 209:15
209:17,22,24
210:1,2,5,6
212:22 213:1
214:13 231:7,7
232:13,14
251:3
**percentage**
131:21 134:19
139:4 142:18
143:8 152:19
187:23 188:6
196:16 213:23
214:19 216:3,6
216:7,15 217:2
217:10
**percentages**
208:12
**perfect** 202:19
**perform** 220:19
**performance**
222:9 236:20
237:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[period - popular]

period   99:4
129:19 268:18
269:7
periodic   8:23
periodically
32:22
periods   108:4
perjury   268:17
269:6 270:3
person   15:16
33:11 37:1
49:9 68:17
82:16 113:24
115:18,19
personally
97:10
perspective
86:7 87:9
183:16
pertain   35:7
pertaining
240:8 243:11
pertains   156:1
246:1
ph.d.   4:4
phenomena
180:24 181:17
181:19 232:16
phenomenon
224:8
phillips   3:8
6:17,17
phone   74:9
81:1 86:3
89:19 259:5

phones   82:1
phonetic   38:10
phrase   61:21
physical   56:11
57:22 121:24
pick   222:15
pickax   54:22
picked   179:1
picture   61:15
71:9 118:12
piece   260:8
pieces   94:6
pile   121:13
pittsburgh
68:13 88:16,18
pixel   237:1
place   34:20
35:3 135:18
189:18 197:10
202:21 258:19
258:21
places   8:20
12:2 151:1
174:24 182:3
223:7 257:6
placing   172:12
172:22
plainly   104:5
plaintiff's
30:22
plaintiffs   2:3
4:12,14 15:6
17:1 28:21
30:15 31:4,7
31:11 39:12

143:13 235:11
241:15
plan   38:24
platform   4:17
41:14 68:2
70:2 77:18
78:11 190:2
platforms   77:5
88:15 190:23
191:6,23
192:24 196:3
237:3
play   55:22
110:14
played   159:13
player   79:7
players   76:10
79:13 205:2
plays   147:2
148:3
please   6:13 7:7
7:24 13:10
22:6 44:18
47:15 51:6
58:17 72:8
88:23 93:12
110:18 123:23
131:14 152:4
165:24 166:13
201:20 215:7
218:4 233:22
253:8 266:11
plots   154:20,21
231:18 232:22
233:1 264:3

plus   122:2
156:6 177:12
246:3 262:14
pocket   71:16
point   29:6
65:19 71:16
76:4 85:6 90:3
96:18 113:1
128:10,14
133:7 151:2
155:9 158:5
166:20 167:3
167:21,23
168:14 173:4
175:8,9 190:18
193:4 197:3
249:1 256:8
pointed   230:9
pointing
139:22
points   96:15,23
168:13,16,18
172:12,22
173:15 174:7
185:2,3,4
187:23 188:6
188:14 217:22
244:15 252:19
263:10,23
264:4
pointwise
166:5
poor   202:12
popular   52:1
77:14 203:4,14

**[popular - processing]**

215:15
**population**
165:14 228:7
**portion** 9:16
26:19 136:7
**portions** 33:9
144:24 145:8
**position** 26:12
26:14 86:20
87:1,6
**possibility**
174:11 177:19
184:15
**possible** 78:22
92:9 110:15
131:7 140:3,11
140:14 149:7
151:2 168:4
174:24,24
175:16 177:17
180:11 195:1
200:20 233:3
**possibly** 56:3
**postgraduation**
27:5
**posts** 254:3
**potential** 10:4
28:21 35:9
39:2 64:22
128:16 162:15
**potentially**
36:7 40:16
50:4 103:13
127:24 188:14
204:8,12 259:5

**power** 141:20
142:3,12
183:16,17
184:5 232:1
**pr** 65:5
**practice** 4:22
60:3 229:1
230:6,21
231:11 232:10
**practices** 60:6
157:11
**precise** 145:24
157:5 163:1,5
**precisely** 12:15
215:1
**prediction**
44:17
**premium** 53:20
111:12 114:15
208:9
**preparation**
15:20
**prepare** 15:13
**prepared** 270:4
**preparing** 23:1
64:19
**present** 3:14
197:1
**presenting**
141:18
**press** 86:13
**pretty** 65:16
121:7 156:18
177:22 178:2,2
202:12 233:2

235:21 264:19
**previous**
130:14
**previously** 75:6
118:22 144:2
**price** 52:17
53:6,12 90:8
90:11 95:9
96:14,18,23
97:10 108:11
108:18,21
140:13,15,21
140:23 141:1,5
141:13,21
203:21 214:13
216:4
**prices** 52:16
123:8 141:17
**pricing** 20:10
20:14 53:4,7
53:10 93:18,19
94:10,20 95:1
95:4,5,8,12,13
96:5,8,10,11
97:6,11 109:9
109:20,23
142:12
**primarily** 14:8
145:12
**primary** 69:21
83:3 223:21
224:21
**principally**
196:22

**prior** 25:12
91:1 187:15
197:24 222:7
**pro** 62:8
**probability**
171:18 172:8
172:18 173:11
174:10,15
**probably** 8:12
18:13 23:13
28:24 33:20
60:9 67:7 69:8
86:13 95:6
97:11 114:13
116:13 119:5
122:19 123:21
127:23 181:13
223:5
**problem** 44:23
134:11
**procedure** 8:11
268:19,21
**proceed** 7:18
**process** 30:6
33:11 60:20,21
61:17 62:17
66:13 137:22
159:12,13
176:2 226:5
251:14,15
**processing**
133:1,12
136:15,21
137:9 138:16
142:17 241:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[produce - public]

produce   91:24
190:17
produced
124:21 125:2
205:1
producer   110:1
producing
103:23 120:4
product   17:10
18:24 31:11
40:14 50:3,24
52:12 59:18,20
61:7 64:11
92:1 101:19
122:9 125:11
production
7:12 14:9,10
117:6 124:19
160:15,16
productions
227:10,14,16
227:21
productivity
60:4 157:10
221:18 222:8
products   35:8
46:9,11 48:7
50:19,21,22
55:4 60:7
86:16 116:14
124:21 157:7
200:9,17
258:21
profession
230:7,22

professional
231:10 265:14
professor   6:11
7:22 8:14,18
9:1,5 13:3
28:20 36:5,9
36:22,24 37:23
58:17 63:7
64:21 68:4,13
91:15 98:14
101:1,4 107:6
117:1,3,14,17
118:22 119:4,8
119:22 120:13
121:3 143:22
143:24 144:5
144:10,18
145:1,8 147:2
148:3,18
149:12 152:4
160:20 176:21
177:4 201:20
229:2 239:6
253:8 262:7
profile   220:1
profiles   220:2
profit   49:5
110:8
profitability
18:12 45:11,15
48:1 50:1
101:19 105:1
105:18 113:9
116:10,11

profitable
115:19 133:21
profits   89:18
89:19
program   20:22
27:7
programmed
20:5
programming
20:4,8
project   10:2
14:2,4,6 44:9
62:9
projected
10:24
projects   44:10
222:10 250:11
proliferation
78:21
prominent
20:19
promising   86:6
86:20 87:1,6
proper   152:20
property
213:13,16,18
proportional
115:7 152:23
206:5 207:1
208:20 211:24
proportionate
114:1,2 115:11
proprietary
82:7 134:22
135:6 194:5

proved   80:3
provide   36:6
38:17 43:7
163:8 170:20
240:6,19
241:10 242:3
246:24 251:11
252:15 253:20
255:18 259:6
provided   13:13
133:3,6 135:8
150:10,11
153:1,13,22
165:22 169:7
171:2 189:24
190:3 217:19
225:7 234:17
240:23 241:1
244:2 246:10
247:1 253:19
254:7 256:24
268:19 269:8
providers
78:21 204:5
providing
145:21 220:5
provision   55:1
200:8,16
psychology
96:22 97:11
public   7:14
27:20 65:2,2
107:8 118:15
156:4 163:19
169:24 176:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[public - range]**

189:3,4 214:8 225:24 233:11 245:9,12,19 246:4,15,17 247:2 248:21 252:2 253:22 254:1,20 255:12 257:4 257:12 267:3 267:22
**publication** 68:1
**publications** 264:11
**publicly** 225:11 253:14
**publish** 134:18
**published** 58:22 60:15 132:21 255:15 260:4 264:6
**publishes** 223:14
**pull** 146:3 168:16
**pulled** 144:1 241:7
**purchase** 53:23 56:5,7,8,10,11 94:13 97:22 148:21 160:13 181:15 214:14 216:8,19
**purchases** 94:24 95:22

96:3 112:20 115:5 138:3,24 140:4,12,13 141:16 143:2,6 206:4 215:2 220:23
**purchasing** 50:8
**purdy** 5:10 239:2
**purely** 96:16 133:13 139:11 205:11
**purpose** 41:8
**purposes** 8:20 205:23 217:15 219:14
**put** 22:2 33:21 64:8 69:7 85:7 86:9 87:10 90:4 91:14 118:15 121:10 149:8 173:24 193:12 203:16 206:24 219:16 222:14 237:24 239:12
**putting** 247:6

**q**

**qualitative** 262:21
**quality** 60:5 86:2 157:10
**quantifies** 131:17

**quantum** 66:22 66:23
**quarters** 127:24
**question** 10:19 15:9 17:3 29:14,19 36:19 39:17 45:5 47:5,6 58:6 62:21 64:18 111:24 119:13 140:16 160:7 176:7 179:5 186:10,13 218:20 227:6 236:19 251:13
**questions** 33:24 63:5 186:7 227:2 261:13 262:3 264:24 265:12,15,18
**quickly** 49:15 84:2 127:20
**quiet** 47:6
**quite** 20:1 67:11 81:5 100:24 166:23 219:13,13
**quoting** 119:22

**r**

**r** 6:1 68:21,21 271:4,4
**r&d** 130:21
**r&s** 269:1,10

**raise** 141:12
**raising** 140:13 140:15
**ramie** 5:5 237:15
**ran** 233:16
**random** 228:9 229:23 230:2 249:12 250:5
**randomly** 249:16
**range** 30:12 43:2,14,21,24 44:3 143:18 149:13,17 151:10,12,15 156:7 158:3 161:17 162:6 162:11,15 163:8,18 164:13,23 165:3 167:4 171:13,16,24 172:9,13,19,23 173:6 174:1,5 174:18,24 175:8,15,21 177:13,19 178:24 180:14 185:23 186:19 186:22 187:4 187:11 208:5 210:23 246:22 247:7 248:18 252:18 255:5

[range - recollection]

265:5,5,7,9
**ranges**  43:15
  43:18 44:14
  106:9,10,11,12
  117:20 118:17
  145:22 149:20
  150:1,6,11
  151:7 152:10
  155:2,16
  162:14,23
  163:15,17
  165:22 166:23
  168:2 171:6,20
  172:1 173:12
  174:12,20,22
  175:19,24
  176:6,11 179:9
  179:11,13,15
  179:23 180:3,4
  181:23 185:9
  187:10,22
  188:5,8,13,20
  188:21,22
  189:7 210:22
  217:16 218:19
  233:8 245:10
  248:5,6 250:12
  255:23,24
  256:17,18
  264:1 265:17
**ranging**  127:5
**rarely**  65:16
**rate**  12:10 15:2
  137:17 179:21
  251:4

**rates**  91:10
  133:8,12
**rather**  17:20
  47:17 63:11
  85:18 94:1
  150:6 162:24
  171:6 242:24
**ratio**  247:15
**reach**  195:12
  251:20
**reached**  28:14
  28:18 232:11
  260:14
**reaches**  65:19
  125:16
**reaching**  38:14
  44:6
**read**  20:2 34:19
  76:5 87:22
  99:12 104:15
  104:16 136:7
  161:4 166:8
  226:11 270:2
**readability**
  132:4
**readily**  253:21
**reading**  120:12
  252:17 268:24
  269:10
**real**  21:12
  252:16
**realize**  83:1
**really**  15:7 40:5
  49:4,6 53:20
  64:16 65:3

69:24 71:19
  79:6 86:22
  97:3 103:15
  106:6 116:8
  118:11 120:19
  129:4,6,19
  130:8 138:17
  144:13,14,22
  145:15 176:24
  214:5 219:2
  220:3 223:10
  224:15 250:14
  251:16
**realtime**  1:22
  267:24
**reason**  12:1
  68:16 69:19
  141:12,21
  167:7 176:1
  210:21 217:18
  271:7,10,13,16
  271:19,22
**reasonable**
  31:2 124:16
  148:15 210:17
  210:19 212:18
  218:17 265:13
**reasoning**
  252:10
**reasons**  102:13
  154:10 187:8
  189:6 214:7
**rebuttal**  39:3,4
**recall**  20:1
  33:14 68:9

73:11 74:4,21
  75:1,3 81:14
  82:18 84:4
  96:6 120:12
  137:2 144:6,9
  177:10 202:18
  217:9 223:23
  224:6 232:7
  238:14 239:8
  240:17 256:14
  256:14
**receipt**  226:8
**receive**  43:23
  44:2
**received**  14:22
  15:5 36:1
  74:15,19 75:6
  90:10 228:1,5
**receiving**
  227:14,21
**recently**  14:3
  205:16,20
**recess**  58:11
  106:23 151:22
  201:14 226:20
  253:2 261:19
**recipients**
  217:20 235:12
**recognition**
  172:7
**recognize**
  229:6
**recollect**  89:9
**recollection**
  33:19 79:16

Page 49

**[recollection - rely]**

237:4 241:12
**record**  6:6,14
  8:1 47:11 58:9
  58:15 106:21
  107:3 151:18
  151:20 152:2
  201:12,18
  221:3 226:17
  226:18,24
  227:3,5 252:24
  253:6 261:17
  261:23 266:3
  267:12
**records**  224:22
  226:3 235:13
  235:14
**recover**  110:4
**recruit**  127:21
  129:12,15
**recurring**  52:1
  52:9
**red**  24:18 61:22
  61:23 67:5
**redesign**  10:5
**redirect**  261:13
**reduced**  267:11
**reducing**
  185:23
**reduction**
  203:22 204:1
**reductions**
  140:24
**refer**  30:2
  42:18 50:19
  55:3 57:15

69:4 72:9,10
  102:21 136:6
  183:2 196:11
  215:9 222:18
  222:20 225:2
  234:20 239:15
  245:16
**reference**  19:9
  83:4 107:6
  114:8 135:14
  244:5
**referenced**
  219:18 268:6
**references**
  100:21 114:5
  198:20 230:16
**referred**  28:1
  35:6 70:3
  193:5 243:14
**referring**  13:22
  25:11 57:16
  74:3 76:13
  89:16 98:8
  124:10 130:20
  135:22 136:2,9
  138:18 143:21
  150:20 154:20
  157:4 180:3
  236:19 244:16
**refers**  78:18
  89:6 98:14
  105:12
**reflect**  171:16
  176:18

**reflected**  51:10
  100:2 157:21
  259:18
**reflects**  99:19
  172:2 176:12
**refresh**  237:4
**regard**  227:24
**regarded**  19:19
  41:21 80:19
  242:22
**regardless**
  84:10
**registered**  1:21
  267:23
**rejecting**  187:9
**relate**  18:5
  154:20
**related**  18:22
  25:15 28:7
  37:2 41:1
  121:18 185:13
  186:11 191:19
**relates**  17:4
  31:15
**relationship**
  23:10 128:3
  130:3 138:7,13
  139:3 153:9
  154:2 183:3,19
  184:3,20 185:8
  185:19 232:19
**relative**  11:18
  79:12 147:8
  148:8 260:22
  267:14,16

**relatively**  83:8
  156:2,12 157:1
  168:15 193:9
  197:2 250:10
**release**  62:19
  86:4 89:12
**released**  61:20
  82:12 268:22
**relevant**  31:7
  31:11,12 45:2
  45:6 46:2 48:2
  55:5 59:7
  91:22 103:1
  107:21 108:18
  122:1 130:18
  131:4 167:20
  178:20 205:18
  206:21 211:2
  247:17 252:3
  254:4
**reliability**
  155:15,20
**reliable**  176:20
  177:2 199:2
  250:20 251:21
**reliably**  198:15
**reliance**  35:3
  133:10
**relied**  34:5,8,11
  34:15 36:16
  38:18 144:3
**rely**  35:15 36:3
  37:18,21 133:2
  133:5 144:9
  181:3 225:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[rely - respondents]**

250:6 257:8,10 257:17 258:4 260:3

**relying** 37:8 180:23 210:13

**remedy** 245:20

**remember** 19:7 21:24 29:23 37:6,10 67:12 69:6 90:3,5 91:13 100:4 137:2 144:8 239:11 263:1

**removing** 229:15

**renewed** 8:23

**reorient** 146:13

**repeat** 10:19 126:19 172:16

**rephrase** 265:8

**replication** 117:6

**replied** 241:6

**reply** 117:3

**report** 4:11 13:1,5,13,21 22:5 24:2 32:17,24 33:2 33:9,17,19 34:3,13 35:13 37:23 38:2,8 38:15,21,23 39:8,13,16 40:5 44:19 46:22 47:3,15

54:2 57:21 58:18 65:20 93:13 95:23 97:14 103:17 103:18 106:10 108:3 110:18 116:20 117:3 117:17,18 118:22 119:5,7 120:13 121:2 123:15,23 125:22 131:14 134:2 135:21 136:7,11 137:24 140:1 143:10 144:17 145:1 146:4,6 148:14 149:8,9 150:24 152:5,7 154:14 159:15 166:12 179:21 194:3 201:21 206:1 213:4,4 217:2 218:5 219:4 222:17 224:19 231:13 232:4,5,11 233:22 239:13 243:8,15 248:16,20 253:9 257:8,17 259:19 260:4 260:14 263:2 263:23 264:23

**reported** 1:19 11:9 51:11

**reporter** 1:21 1:22 7:6 267:23,24

**reporting** 214:3 245:20

**reports** 34:21 36:2,3,5,7 37:19 38:4 98:14 119:7 121:23 144:1,4 144:10 145:1,9 145:10 229:11 246:7 254:3,15 257:12

**represent** 117:5,8 174:23

**representation** 208:2

**representative** 228:2,5 245:2 245:7 252:7

**represented** 77:19

**representing** 2:3 3:3

**represents** 134:19

**request** 118:8 226:11 240:13

**requested** 234:19 239:21 240:20 241:16 269:1,10,11

**requests** 118:4 249:16

**require** 49:16 203:2

**required** 13:20 195:3 268:20

**requires** 50:2,4 104:3

**research** 3:18 4:16 7:4 13:20 21:12 32:23 44:8,10 67:8 68:1 70:8 98:23 107:7

**reserve** 261:24

**reserving** 261:9 261:12

**resolved** 26:1,4 26:6

**resources** 54:18 76:2,16

**respect** 21:20 33:2

**respectively** 25:21

**responded** 183:14 195:17

**respondent** 192:14 253:19

**respondents** 137:14 205:10 245:23 246:3 246:11 247:1 252:1,6

Page 51

**[response - right]**

| | | | |
|---|---|---|---|
| **response** 227:10 236:23 246:13 251:2,4 263:18 | **reveal** 29:15 194:6 | 111:16,18 112:14 113:19 120:23 131:18 137:14 147:8 148:8 153:2 154:3 159:19 190:17,19 200:1,7,11,15 207:1 209:20 210:3 211:6,8 211:10 213:23 240:8 | 21:2 25:20 34:17 56:12 60:14 63:9 67:9 68:8 69:2 70:9,11 72:6 72:23 80:24 85:24 88:11 97:10,23 104:19 111:21 112:9 114:4 122:19 130:22 135:13 151:9 154:21,22 |
| **responses** 130:11 185:6 190:16,24 214:2 229:15 229:16 234:6 235:14 240:24 241:4 243:1,9 244:2 246:22 255:1 | **revenue** 48:23 51:13,13,24 52:1,9 93:3 97:17 104:24 105:16 106:3 111:1,3 112:2 112:3 113:13 114:10 115:4,8 115:21 131:21 132:10 139:16 140:2 152:11 152:15,19,23 | | 155:3 157:22 158:8 160:21 161:13 162:2 162:17,19 163:7 164:2 178:16,21 179:11 180:18 182:8,11,21 |
| **rest** 262:1 265:22 266:1 | 153:7,10,20 189:23 196:13 | **review** 32:23 144:19,24 220:14 221:5 268:8,10,13 269:2 | 183:4 186:9,19 186:23 187:1 187:23,24 189:13,17 192:4 197:23 |
| **restrictions** 223:13 | 196:15,17,18 196:21,22 197:1,17 | | |
| **result** 77:1 143:15 256:11 | 199:11 200:3 202:13 203:7 204:1 206:4,6 206:11 207:3,4 207:14,15,16 | **reviewed** 30:15 58:23 98:19 235:20 242:2 264:6 | 202:21 203:8 206:8 207:8 209:5 210:16 212:3,13,20 214:9 216:18 |
| **results** 120:4 176:20,24 177:1 222:21 230:3 | | **reviews** 13:7 51:3 66:8 119:10 146:15 197:11 229:19 239:10 248:22 | 225:3 227:6,11 229:13,24 230:4,5,8,13,19 230:20 232:5 |
| **resume** 9:7 | 208:21,22 209:23 211:21 | | |
| **retained** 27:17 74:11 78:6 243:10 | 211:22 212:9 212:24 215:15 215:21 216:23 | **revised** 69:7 **revision** 69:5 88:4 | |
| **retention** 103:12 116:1 182:16,24 258:13 | 217:2,15 218:8 253:20 | **revisions** 69:9 **revolution** 4:19 67:5 88:3 | |
| **return** 268:17 269:6 | **revenues** 46:3 48:6,11 49:8 51:19 104:11 104:13 106:13 | **right** 8:16 12:11 14:20 16:8 17:21 | |
| **rev** 69:4 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[right - section]**

234:2 241:4 243:12,13,15 248:8 249:8 255:17 256:24 258:9 265:17
**rights** 78:6,10 94:3
**rigorously** 235:5
**rim** 67:6 70:8 70:10 71:10 88:14
**ring** 237:23
**rise** 127:19
**river** 8:6
**roblox** 215:9 215:12,14,22 216:9,12 249:2
**robust** 126:9
**role** 14:7,11 61:18 110:14 147:1 148:2
**roll** 17:22
**rolled** 82:15
**rory** 14:1,8
**rory's** 14:7
**rough** 138:11 266:5
**rourke** 4:24 5:4 5:6,10 236:12
**route** 136:19
**royalties** 155:10 166:24 182:16 183:3 183:10,14

185:4,10 186:4 187:18 213:7 213:11,21,22 214:1,4,6,19 217:3 232:18 245:17,21,22 246:2,5,15 249:2 254:18 264:15
**royalty** 10:18 62:11 170:20 182:20 214:12 217:10,19,24 254:23
**rtm** 61:21
**rule** 184:10 191:18
**rules** 269:8
**run** 127:1,9
**running** 27:14 41:6
**runs** 237:3

| s |
| --- |

**s** 271:4
**sad** 199:23
**sale** 89:18,19 98:8 104:3 206:11 207:17 216:4
**sales** 61:19 90:8,10
**salient** 55:11
**sample** 156:18 156:23 158:18 228:2,7,10

229:22,23 230:2 232:21 233:14 249:12 250:5,11,15
**samples** 231:1 231:4 250:19
**sankalp** 14:1,1 14:2,5,16
**satisfactorily** 7:12 267:5
**save** 77:6 86:23
**saw** 34:16 117:13 160:19 185:8 235:5 240:3 263:24
**saying** 66:16 90:14,18 102:8 130:9 163:4 164:17 165:16 209:6,7 210:9 219:12 241:5 247:11
**says** 11:5 54:5 69:4 119:24 183:16 197:21 208:19 213:7 236:23 263:12
**scale** 123:18 127:20 129:18
**scarcity** 254:5 256:22
**scenario** 211:17 253:17 254:1 256:12 256:21 259:15

**scenarios** 196:12 206:3 206:23 211:20 253:16
**schedule** 268:10
**school** 8:4,16 16:13 62:22 63:13 68:14 91:20 100:16
**science** 157:8
**scooching** 187:5
**scores** 252:16
**scratch** 85:18 249:11
**sdks** 135:15
**sealed** 268:20
**search** 217:18
**sec** 226:17
**second** 13:24 39:18 42:12 134:3 146:18 207:2 254:1 256:11,21
**secondary** 223:21
**secret** 194:6
**section** 59:8 66:5 70:17 71:7 72:5 81:8 81:14 85:1 86:1 130:14 152:7 154:16 196:14,24

[section - services]

197:4 206:16
213:11 248:23
**sections** 19:23
33:21
**see** 13:16 14:20
17:13 22:11,15
27:3 35:6 40:1
43:5 45:12,13
47:21 51:15,22
54:11 59:13
70:20 71:1
72:13,20 73:24
74:17 76:19
77:21 81:12
84:23 89:2
90:12 93:21
97:19 98:17
101:9,23 105:3
105:19 117:11
120:10 124:7
125:18 126:20
128:17 131:22
136:13 138:4
142:22 146:19
146:24 147:16
147:19,24
152:12 153:15
154:7 161:19
163:2 166:7
167:11 172:1
180:6 183:23
185:19 188:18
190:5 195:20
195:23 196:19
203:5 209:21

210:1 212:21
218:9 221:2
222:15 224:11
227:6 230:15
231:8 232:18
232:20 234:11
234:15,21
235:8 237:18
238:12 239:16
241:20 243:24
248:20 254:8
259:15 262:22
263:9,12
**seeking** 73:20
143:13
**seem** 221:9
**seemed** 184:19
**seemingly**
231:5
**seems** 29:14
124:16
**seen** 11:13
37:22 38:1,3,4
38:7 45:9,23
52:23 78:20
110:15 116:12
132:18,20
193:23 196:7
222:4 224:2
235:15 236:15
237:5,20
238:14 239:9
240:16
**select** 22:12

**selected** 62:11
226:8 249:16
**selecting** 60:5
157:10
**selection**
228:12 248:4
**sell** 46:11
116:15 216:12
**selling** 57:21
**sells** 31:19
121:24 122:14
125:21 126:17
**semesters**
262:8,14,14
**send** 220:3
249:15 250:1
**sending** 251:4
**sense** 22:24
36:4 73:12
132:5,7 141:24
169:1 218:21
230:18 254:4
254:10 255:1,6
255:9,21 256:4
256:11,15
**sent** 226:13
227:8 241:6
**sentence** 54:4
73:12 75:17
89:17 98:7
105:6,9 106:2
110:21 124:1
134:4 138:18
154:15 166:9
167:17

**sentences**
134:14
**sentiment**
86:14
**separate**
160:17 253:15
**separately**
138:16 159:24
160:12 222:22
224:10 246:6
265:6
**sequence** 20:21
**series** 65:8
**serve** 45:17
48:20 57:13
77:8 113:5
122:8
**served** 124:23
207:6 233:24
**server** 40:18
**servers** 128:4
**service** 40:15
49:1 54:10,14
54:16,24 55:24
57:7 92:1 94:6
96:1 97:17
111:11 124:5
125:11 204:5
204:10
**services** 47:18
49:19 55:4
57:22 86:16
112:11 125:1
130:19 131:5
203:4,14

**[services - sloan]**

204:14
**serving** 103:8
  103:14 104:1,6
  104:7,21,23
  105:12,15
  122:3,24
  197:19
**sessions** 15:23
**set** 19:20 21:22
  27:11 34:12
  35:11 38:15
  42:9,10 48:24
  65:7 90:8 94:3
  103:16 109:8
  131:12 135:24
  139:11 168:4
  199:13 204:17
  205:8 220:1
  224:22 227:24
  235:22 246:4
  255:16 264:8
**sets** 92:24
  237:1
**setting** 27:15
  39:4 108:11,18
  108:21 123:8
**seventy** 156:22
**several** 19:12
  58:23 119:6
  192:24 217:1
**shape** 65:15
**share** 84:3,11
  139:21 142:18
  143:8 152:10
  152:15 161:18

162:6 179:11
180:4 200:2
211:5,21,24
214:5 217:2,15
253:23
**shares** 153:19
  161:8 166:6
  171:7,19 190:4
  190:22 191:5
  192:10 208:3
  233:5 244:4
**sharing** 215:15
  215:21 216:23
  217:10
**shawn** 3:15 6:7
**sheet** 131:12
**short** 58:2
**shovel** 54:23
**show** 186:2
  208:10
**showed** 26:15
**shrink** 85:19
**sic** 10:9 17:12
  161:10 203:3
**side** 8:6 22:2
  23:17 87:10
  91:14 149:8
  150:5,13
  158:23 202:13
  207:17
**sides** 266:10
**sign** 14:18
  187:11 268:16
  269:5

**signature**
  267:20 268:22
  268:24,24
  269:10
**significance**
  155:14
**significant**
  26:19 41:23
  184:3 230:17
  231:6 232:13
**significantly**
  184:1 231:22
**silverthread**
  9:8,11,13,17,22
  10:23 12:4
**silverware** 10:9
  10:12
**similar** 41:21
  42:9,10 44:12
  77:20 88:14
  89:13,24
  131:20 135:12
  190:22 191:6
  191:24 192:6
  192:11 204:9
  205:10 218:12
  218:14,15,24
  219:14 222:21
  224:9 255:19
**similarities**
  44:14 191:13
  220:18 252:10
**similarly** 61:22
**simple** 157:18
  157:24 158:4,6

158:7 161:11
162:7 179:22
180:2
**simply** 223:1
**simultaneously**
  195:7
**single** 157:16
  162:23,24
  163:5 166:5
  171:6 172:9,20
  173:4 218:17
**sit** 70:6
**sits** 40:15
**situation** 63:4
  64:1,24 256:15
  256:22
**situations**
  114:15 210:23
  210:24
**sivarajan** 38:11
  38:12
**six** 185:3
  243:19 244:1
  245:13 246:12
  246:23
**sixth** 84:6
**size** 140:5
  156:18,23
  188:20 250:15
**sizes** 249:18
**slater** 62:8
**slightly** 41:7
  206:23 223:8
**sloan** 262:10

Page 55

[small - specific]

**small**  54:9 57:7
  57:8,12 101:15
  108:7 159:2
  166:23 168:9
  169:11,15,17
  169:22 196:16
  197:2 212:19
  232:20,20
**smaller**  71:21
  85:20 168:18
  183:15 189:8
**smallest**  158:12
  158:17
**smart**  91:9
**smartphone**
  41:1 71:15
  72:19 73:7,16
  87:8
**smoothing**
  102:17
**snapshots**
  129:5 153:14
**snodgrass**  5:5
  237:15
**social**  167:1
  177:11 219:5
  220:9
**software**  4:21
  9:12 10:1,3,23
  11:4,21,21,23
  17:12 18:6,8,9
  18:10,13 19:3
  19:8,11,17
  20:3,11,14,15
  20:19 23:15

24:8 26:11,12
26:13 27:20,24
28:5,9 30:6,9
35:8 39:23
40:4,6,9,14,14
41:18 42:4,9
42:15,20 45:3
45:8,9,22 46:7
46:14 48:17
49:20,21 51:11
51:23 52:20
59:1,10,22
60:1,2,5,13
61:6 62:2
65:23 66:7
68:14 73:19
78:13 79:3
91:22 93:19
94:3 98:24
99:1,20,22,24
102:15 107:21
107:24 116:8
116:12 117:23
121:20 124:22
124:24 125:4
125:10 126:20
135:16 157:10
180:24 183:21
185:18 191:11
193:15 194:18
219:10 220:5
222:1,8,8,12
228:24 233:15
241:18 242:16
242:23 247:17

258:14 260:8
260:12,16
**sold**  31:12,15
  73:8 74:12
  82:7 97:18
  132:10
**soldier's**  8:4
**sole**  89:22
**solely**  25:15
**solutions**  6:7
  268:7
**somebody**  37:3
  192:13,14
  193:17 194:10
  221:22 223:6
  258:3
**somewhat**
  187:16 192:5
**son**  216:10
**song**  37:13,16
  38:2
**songs**  79:10,17
**sorry**  10:19
  17:16 19:15
  21:3 33:6
  36:19 44:22,22
  50:11 63:16,17
  70:21 74:21
  89:5 96:9
  106:14 108:14
  134:7 140:15
  146:16,17
  150:21 159:9
  189:19 200:11
  203:23 206:9

215:17 218:22
  221:24 230:23
  244:7 245:18
  248:19
**sort**  100:16
  129:4
**sounds**  187:1
**source**  62:2
  65:2 89:22
  118:15 253:22
**sources**  83:3
  98:15,20 99:9
  99:15 118:1
  139:16 156:6
  198:12 214:8
  224:21 248:21
  254:2,23
  257:11
**south**  3:5
**sparse**  252:19
  254:18
**speak**  26:11
  50:6 64:23
  65:4 151:13
**speaking**  6:6
  118:21 130:5
  169:12 179:18
  202:4 215:1
**speaks**  151:14
**specific**  25:11
  35:23 52:24
  92:23 145:21
  149:16 175:10
  186:1 190:1,8
  190:12 191:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[specific - store]

199:20 201:24 234:11 240:24 241:4 247:19
**specifically** 25:6 30:7 49:12 60:16 71:11 132:3 148:10 191:23 216:9 248:4,17
**specification** 144:19
**spectrum** 249:17
**speculate** 242:20 250:14
**speculating** 242:19
**speculation** 257:8
**spend** 15:20 65:8,10 136:2 182:19 195:6 220:20
**spending** 110:23 187:18 187:19
**spent** 12:14 85:16
**split** 199:19,22
**splits** 45:10
**spoken** 179:14
**sport** 62:14
**sports** 188:2 252:4,13,15

**spotify** 23:23 139:14 170:20 170:20 208:7 255:13
**spotify's** 256:6
**spotted** 69:10
**spread** 155:4
**stable** 153:9 154:2
**stacks** 260:21 264:8
**staff** 13:19,22 14:23 32:20,22 36:9,22 37:13 39:11 127:12
**staffing** 127:10 128:12 129:21
**stages** 130:15
**stakes** 184:13
**stand** 265:12
**standard** 11:10 21:24 233:2
**standards** 78:7 78:18
**star** 181:9,10
**start** 26:18 27:8 33:16,23 60:9 63:19 100:7 101:5,10 105:6 123:21 194:14
**started** 29:2 33:21 262:11
**starting** 66:4 197:3 249:11

**starts** 11:2 22:8 34:2,2 73:2 84:9 146:7,11 189:17
**state** 4:22 7:24 39:21 42:24 48:5 51:9 58:22 60:3 61:3 74:11 80:1 89:21 98:3 103:22 125:13 126:24 129:23 130:13 132:23 136:14 138:1 142:15 143:12 149:11 162:20 166:4 189:23 196:13 201:23 225:23 229:1 241:14 268:9,12
**statement** 16:14 38:24 51:4 76:21 77:11,23 95:3 111:10 134:24 197:21 214:16 267:12
**states** 1:1 73:15 77:17 78:23 80:2 82:4 86:1 89:11 117:3
**stating** 104:5
**statistic** 164:16 198:4

**statistical** 44:5 154:17,19 155:7,12,13,14 155:18,20 156:8 171:22 183:17 230:10 230:18 231:14 232:23 233:2,4 233:19 250:16
**statistically** 173:13 183:24 184:3 228:1 231:6,22 232:13 233:6 262:18
**statistics** 21:8,9 21:11,21 198:22 199:13 231:17
**steadily** 141:5
**steam** 196:1
**stenographer** 7:17 19:14 28:16 165:7 266:4,9
**steve** 19:7
**stipulation** 36:13 268:21
**stop** 33:23
**store** 30:24 31:16 42:22 43:4 73:17,18 73:23 76:24 77:8,13 82:7 89:20,22 91:6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [store - subset]

91:8,11 121:16
131:19 133:2
135:1,19 141:2
141:6 152:9
190:1,9,12
191:20 192:1,6
194:22 196:1
218:7 223:15
224:24 226:2
258:7,9,13,22
258:24 259:11
259:20 260:8
261:1
**store's**  134:22
135:5,22
**stores**  41:24
91:7 134:17,19
**story**  71:12
254:14
**straight**  17:24
**strategies**
93:18 95:12,21
**strategy**  13:14
13:14 26:21
55:20 59:21
74:9 89:14,15
89:24 90:1
114:16 129:22
153:13 193:6
200:19,20
**straw**  123:5
**stream**  128:4
**street**  1:14 2:13
**strike**  34:8

**strong**  99:21
144:23 214:23
255:2 264:10
264:19
**structure**  42:2
59:16,24 66:10
100:8 192:4,6
215:4 250:21
**structured**  64:8
213:22
**structures**
41:17 61:8,10
65:23 66:6
100:8 164:6
**student**  14:16
68:24
**students**  26:18
26:22 64:15
86:12 91:19
97:9 107:10
109:7 199:5
**studied**  20:9
141:1 142:8
158:18
**studies**  18:15
21:10 60:19
104:16 139:18
214:7
**studios**  104:10
110:22
**study**  18:8
20:13 23:1
68:14 106:15
158:16 159:1,5

**studying**
198:24
**style**  53:20
63:12 199:6
**subbullet**  42:13
**subgenres**
224:1
**subheading**
71:4 81:9
84:22
**subject**  18:5,18
18:19 20:18
82:8 110:8
261:9 265:22
265:24
**subjective**
222:20,24
255:7
**submissions**
228:4 233:10
243:11
**submitted**  38:5
39:8
**subpoena**  14:9
118:4,8 128:24
130:11 133:11
148:11 149:3
159:12 160:15
176:2 185:6
190:23 193:20
195:17 205:9
214:2 217:20
226:11 227:22
233:10,23
234:10,18,20

235:6,12,14
239:19,24
240:16 242:2
243:9 246:3,13
251:14,24
254:24 257:11
260:1 263:18
**subpoenaed**
37:3 117:24
118:14 159:9
190:16 224:23
**subpoenas**
226:1,9,12
227:7,11,15
228:1 234:4,8
234:9,12 235:8
251:10
**subra**  38:10,10
**subscriber**
49:23 207:5
**subscribers**
83:23
**subscribing**
95:19
**subscript**
146:20 147:18
**subscription**
53:23 55:16,20
56:1 113:21
**subscriptions**
93:20 95:4,20
95:24 112:16
114:12,17
**subset**  40:9
41:15

**[subsidize - swanson]**

| | | | |
|---|---|---|---|
| **subsidize** 200:8 200:16 | **sums** 185:24 | 150:9 165:1 | 36:17 47:13 |
| **substantially** 183:11 | **super** 53:18 | 172:15,18 | 50:18 52:22 |
| **substitutes** 221:15 224:13 | **superscript** 146:20 147:17 | 173:1 176:14 | 55:12 56:24 |
| **subtitled** 81:9 | **supervision** 13:20 | 176:24 178:1,5 | 57:24 58:4,16 |
| **subtracting** 93:2 | **supplement** 156:4 245:21 | 188:17 189:12 | 67:17,23 73:13 |
| **success** 62:9 73:17 89:12 | **supplemented** 169:24 255:1 | 189:17 190:13 | 74:23 79:24 |
| **successful** 62:12,14 71:19 80:3 100:9 123:19 | **supplementing** 246:9 | 191:17 193:22 | 83:5 87:18,22 |

subsidize 200:8 200:16
substantially 183:11
substitutes 221:15 224:13
subtitled 81:9
subtracting 93:2
success 62:9 73:17 89:12
successful 62:12,14 71:19 80:3 100:9 123:19
sufficient 198:14 217:12 251:20
suggest 29:15 139:19
suggested 188:11
suggestive 183:18
suggests 42:7 171:15 254:22
suite 2:14
sum 180:12 181:21 185:10 185:20 186:4
summarize 156:9
summation 179:23 180:2

sums 185:24
super 53:18
superscript 146:20 147:17
supervision 13:20
supplement 156:4 245:21
supplemented 169:24 255:1
supplementing 246:9
supplying 117:20
support 4:12 13:12 49:3 84:10 98:15 109:3,4 118:8 123:3 127:15 127:17 129:11 129:13 199:15 204:11,13,19 260:19
supporting 14:23
suppose 257:20
sure 13:24 30:2 30:3,17 36:21 39:20 53:5 56:4 58:3 79:14 95:2 101:2,3 105:8 106:1,19 111:9 111:23 112:18 119:2 133:23

150:9 165:1
172:15,18
173:1 176:14
176:24 178:1,5
188:17 189:12
189:17 190:13
191:17 193:22
195:22 198:18
198:21 202:21
207:7 211:10
220:22 222:14
223:12 226:15
227:4,9 234:5
236:3 237:22
242:20 248:14
260:7
surfer 62:8
surprise 141:4 141:8
surrounding 88:13
survey 229:12 229:14 251:1
surveys 228:14 251:2
susceptible 262:18
swanson 3:7 4:5 6:15,15 7:21 10:11,14 10:20 12:17,23 16:16,22,24 17:18,21 18:1 28:19 29:18 31:17,22 33:7

36:17 47:13
50:18 52:22
55:12 56:24
57:24 58:4,16
67:17,23 73:13
74:23 79:24
83:5 87:18,22
87:24 90:20
98:12 99:16
102:20 103:4
106:8,16 107:5
108:8,16
109:11 112:5
113:10 116:18
118:21 119:3
120:24 121:9
122:21 125:8
126:3,13,23
128:19 135:4
137:5 138:10
141:10 142:1,7
146:10 147:14
150:15,22
151:16 152:3
153:17 154:12
156:10 157:2
159:14 161:1
163:23 164:8
165:9,12,23
167:6 168:6,20
170:2,9 172:4
172:17 173:9
174:16 175:1
177:3,8 178:4
178:12 182:11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[swanson - teach]**

| | | | |
|---|---|---|---|
| 182:13 183:22 186:8 187:7,20 189:16,21 200:13 201:7 201:19 208:13 213:20 222:16 227:1 228:16 228:22 231:19 232:3,9 233:20 235:9 236:4,10 237:7,13,24 238:6,18,23 240:18 241:2 242:6,14,21 243:6 245:11 247:20 249:20 250:4,17 251:8 251:18 252:20 253:7,11,12 256:2,20 257:15,22 258:5 259:9,17 260:2,10,23 261:4,8,15,24 265:1,16,19,21 265:24 266:8 266:12 **swanson's** 47:7 265:11 **swear** 7:7 **switch** 41:10 223:12,13 **sworn** 7:14 267:7 | **synch** 65:17 79:20 **synonym** 50:7 **system** 23:19 59:9,17 69:8 78:8,9,16 79:9 81:17,19 85:4 85:5,12 136:21 137:22 194:23 222:11 259:13 **systematic** 42:1 222:5 **systems** 41:7 59:10 66:22 70:6 76:3,18 78:4 81:20 193:1 | | |

| **t** |
|---|

| | | | |
|---|---|---|---|
| **t** 2:8,17 3:9 146:20 147:18 271:4,4 **table** 175:3 177:12 178:23 184:12 186:11 186:12 187:21 244:12,12 263:1 264:22 **tablet** 41:1 **tabulations** 230:10 **take** 6:10 13:3 21:16 30:20 44:23 53:17 58:1,5 63:7 66:3 75:19 | 77:24 106:17 109:12,21 114:7 116:8 127:10,15 129:10 146:5 150:16 161:2 166:24 169:6 172:6 175:2,3 177:11 178:13 178:15 179:13 180:17,21 184:11 186:10 190:18 201:8 203:11 205:5 205:20 221:18 229:18 245:8 246:8 247:2 250:9 252:4,20 254:12,17 259:7 261:6 265:2 266:6 **taken** 8:7 26:2 34:20 58:11 79:1 106:23 151:22 201:14 226:20 253:2 261:19 **takes** 244:13 **talk** 55:19 66:9 66:19 95:23 97:6 100:24 101:7 151:4 164:15 208:7 218:6,24 264:14 | **talked** 15:15 18:13 36:24 88:19 143:24 144:16 260:18 264:12 **talking** 79:8 90:24 114:11 122:18 169:9 171:11 182:2 186:18 188:1 198:3,10,20 209:19 213:15 **talks** 48:18 66:14 96:22 99:22 100:5,10 101:4 **target** 136:4 **targeted** 193:1 194:22 **tasks** 35:18 127:17 **tathagat** 3:18 **taught** 14:16 20:18 69:14,16 69:17 88:15,18 97:4 262:9 **tax** 25:18 28:7 31:1 **teach** 16:12 20:12,13,15,20 65:17 69:21 91:18 97:10 101:12 109:1 123:12 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[teaching - think]

teaching  24:12
  61:4 63:15,19
  63:22 64:2,15
  64:19 87:21
  107:8,10,13
  108:1
team  33:4,9
  36:15 61:14
  66:14 129:13
technical  10:7
  11:2 59:9
  132:5,7 162:21
  213:17 218:16
  259:4
technically
  85:23
technique
  233:2
techniques
  21:14 44:6
technological
  72:17
technologies
  135:7
technology
  17:10,11 71:13
  134:23 135:6
tell  71:12 97:8
  109:6 154:1
  171:22 224:16
  242:24 254:14
  263:6
tells  154:5
  255:23

template  234:9
  234:10,17,20
  234:23 235:1,4
  240:3,12 241:1
  241:3 243:5
temporary
  203:21
ten  8:12 27:6
  65:10 107:3
  127:13 219:7
  220:16
tend  83:12
  108:6 246:24
tenured  8:24
  9:4
term  8:21,22
  33:12 96:11
  110:22 128:17
  132:1,15,17,21
  145:4 208:5
  257:23
terms  28:11
  41:22 49:24
  76:1 80:7
  84:20 93:4
  109:20 113:8
  117:19 118:7,9
  129:21 132:2,4
  135:12 153:1
  168:7 208:11
  215:23 221:11
test  232:2
testified  7:15
testify  267:7

testifying  25:22
  27:17
testimony
  34:16 113:11
  267:12
tests  233:19
text  119:23
  208:6
textbook  100:3
  121:8
textbooks
  18:17,21 19:2
  19:6,16 21:19
texts  21:24
  100:19
thank  7:17
  15:12 189:10
  201:10
thanks  105:7
  157:12 261:15
theme  218:20
  218:22,23
themes  218:14
  218:24 221:3
theoretical
  11:24 141:24
theory  164:4
  205:6 209:4,6
thing  27:23
  56:6 61:23
  92:12,14
  146:14 160:24
  161:5 166:21
  167:19 193:15

things  8:19
  10:3,24 11:3,3
  11:7 23:20
  27:12 30:5
  46:13 48:12
  49:15 51:22
  53:12 54:21
  56:13,14 88:20
  90:4 100:14
  109:8 111:13
  116:9,17 123:1
  123:2 131:11
  138:21 160:17
  160:20 191:19
  204:18 213:18
  214:24 216:9
  219:13,17
  221:2,9 222:14
  255:3
think  15:22,23
  19:18,18 22:3
  23:13,16 24:13
  24:15 26:3,16
  28:23 29:20
  30:18 33:10
  34:1 37:2,4,7
  38:21 40:11
  42:5 45:22
  46:7 50:9,13
  51:4 52:7,9
  55:6,18 56:3
  56:23 57:24
  59:7 60:8 66:1
  66:1,4 67:6
  69:20 71:9,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[think - told]**

74:4 75:8 76:4
77:12 79:5,8
79:19 80:5,8
80:14,21 82:15
85:7 86:9,22
87:3 90:4,18
92:13 94:11,11
94:21 95:6,10
98:2 99:23
100:20 103:7
104:5 105:8
108:24 110:10
113:17 114:9
115:10,17
116:7 119:11
123:4 124:11
126:1,11
134:14 136:18
139:24 141:8
149:5 151:5,17
155:9 157:24
158:21 162:18
164:21 167:15
171:12 173:3,6
173:13 176:13
177:1 180:3
184:9 188:8
189:19 193:4
193:22 194:7
198:7,18,18
199:2,3,8,9
202:6 205:17
210:17,19
211:16,17
212:14,14

214:17 216:24
220:11 221:6
223:17 224:7,8
224:20 225:19
227:19 228:3
232:15 236:16
239:23 243:23
248:23 250:8,9
250:15,23
252:7 255:9
258:8,14 259:4
260:7,9,12,16
263:4,6 264:7
265:7,12
**thinking**  30:19
63:24 100:18
**third**  42:23
73:8 77:16
78:13 89:10
154:14 213:9
**thomas**  2:7 3:8
6:19 268:1
**thought**  62:4
62:13 88:17
150:11 226:14
264:12
**thousands**
177:5
**three**  15:22
34:24 35:4,11
246:14,16
247:2 257:10
261:6
**tier**  27:8 53:17
53:17 95:19

**tiers**  27:8 52:11
94:8 114:16
**tighten**  186:4
**tighter**  174:9
**tiktok**  224:12
**time**  6:9 8:21
9:16 22:1
23:11,18 26:3
37:20 44:23
58:8,15 60:8
61:24 65:8,10
65:16 67:2
69:8 71:17
72:3 74:7 76:4
79:13 80:15
81:20 82:18
83:21 85:16
86:8 87:7,9
91:4 94:4 99:4
102:18 106:20
107:3 120:14
127:5,21 128:6
128:21 129:6
129:19 136:16
136:23 141:2
141:22 151:19
152:2 153:12
157:8 201:11
201:18 219:24
220:20 226:17
226:24 252:16
252:23 253:6
261:9,12,16,23
262:1,9 265:23
266:1,2 268:10

268:18,25
269:7
**times**  15:24
111:20 119:6
127:3 136:3
207:5 262:13
263:22,22
**tired**  49:15
**title**  19:8 70:3
118:6
**titled**  4:20
118:5
**titles**  157:5
**today**  7:6
**today's**  6:8
15:13
**todd**  2:11 3:17
7:3
**together**  33:22
64:14,16 69:23
118:16 193:12
203:16 218:13
219:17 241:8
247:7
**token**  55:1
57:15 97:18,21
98:11 103:15
115:20
**tokens**  45:11
57:10 96:3
114:11 116:15
**told**  43:15
168:23 181:23
258:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[tom - turning]**

**tom** 101:3
**tony** 62:10,10
**took** 26:3
  117:16 150:10
  161:23 186:21
  233:15 256:16
  261:5
**tool** 135:17
**tools** 9:14,22,24
**top** 34:23 51:7
  68:16,18 88:24
  89:8 103:19
  104:10,12
  110:24 111:2,5
  111:7,17,24
  113:12 114:8
  115:2 158:13
  158:20,21
  218:8 219:7
  220:14,16,16
  224:7 265:4
**topic** 18:6
  21:20 55:10
  63:24 83:13
  145:17
**topmost** 238:9
  239:1
**total** 15:4 23:14
  23:19 120:2,7
  142:19 196:17
  196:18 208:10
  212:20 249:5
  262:8 263:9
**touching** 267:8

**tough** 202:14
**toward** 93:15
  119:19 132:23
  166:3
**towards** 76:7
  175:14 263:4
**tphillips** 3:11
**track** 27:5
  221:19
**tracking**
  199:24
**tracks** 9:2
**trade** 60:4
  114:22 157:9
  181:18 187:18
  194:6 232:17
**transaction**
  56:8,19,21
  122:23 134:20
  147:23 148:21
**transaction's**
  137:10
**transactions**
  56:10 111:21
  148:10 154:7
  160:8,11,13
  216:6
**transcript**
  268:6,8,10,13
  268:13,22
  269:2,2
**transferred**
  57:4
**travel** 188:3

**treat** 218:17
**treated** 218:13
**trend** 76:6,7,11
**trends** 262:23
**trial** 39:1
  203:19
**trials** 203:2,7
**triangulation**
  110:3
**tried** 85:19
  129:2 146:2
  176:11 218:2
**triggers** 238:16
**trip** 221:19
**true** 38:9 45:18
  51:4 75:18
  77:11 83:10
  85:23 86:18
  114:13,14
  116:10 134:24
  141:15 163:13
  164:1,18
  165:10,17,19
  166:5 171:7,19
  172:8,11,19,21
  173:11 174:11
  174:17 175:11
  175:23 176:9
  177:17 178:20
  198:23 200:15
  200:18 207:24
  215:5 229:22
  250:16 259:16
  267:12 270:3

**truly** 106:6
  230:2 250:15
**truth** 267:7,8
**try** 123:15,17
  200:21 203:10
  214:8 227:3
  250:11 262:22
**trying** 22:10
  71:10 100:14
  100:20 133:7
  163:8 164:9,11
  164:17 173:3
  182:10 193:22
  195:12 220:19
  232:15 239:23
  247:21 251:5
**turn** 13:9 44:18
  58:18 70:16
  72:8 86:17
  88:22 93:12
  97:13 110:17
  116:19 123:22
  134:1 136:10
  137:23 152:5
  165:24 179:15
  179:19,20
  181:24 189:11
  192:19 201:21
  213:3 215:6
  218:4 224:18
  231:5 233:21
  253:9
**turned** 62:3
**turning** 193:9
  239:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[turns - unit]**

turns   46:3 214:4 255:18
twice   15:16
twitch   217:8
two   9:2 15:22 25:11 26:3 33:20 46:13 52:13 60:8 100:14 134:14 149:5 156:18 157:3 180:9,13 180:19 183:12 185:24 206:22 214:24 246:8 251:19 253:15 261:6 262:13 264:17
type   9:22 10:8 10:22 23:9 50:7 100:1 161:9,17 162:6 202:2 217:10 231:2,4 251:3
types   11:19,20 46:17 56:9 160:6,8 202:1 202:24 205:7 221:11 249:18
typical   43:2 52:10 143:19 149:14 158:3 163:11 164:16 164:23 251:1
typically   27:9 41:6 52:3 63:2

83:12 109:5 127:16 134:4 134:15,21 138:20 139:19 199:19 218:1 247:6 262:15
typo   69:10

**u**

uar   155:11 182:19,23 183:3,10,12,13 185:10 186:4 187:19 192:23 193:4 194:21 202:2,24 204:6 204:10 232:17 241:19 246:6 246:17,21,24 246:24 249:2 259:20 260:18 264:15
udemy   217:7
uh   17:5 24:24 35:2 48:9 56:23 58:21 59:15 68:22 70:24 71:6 72:12,14 81:11 81:13,24 84:8 88:5 89:3 103:21 114:5 114:24,24 116:23 119:21 141:14 160:9 161:22 166:2

177:15 186:16 196:20 203:23 205:4 206:9 208:18,18 209:12 211:18 213:6 215:8 217:4 230:8,23 236:18 248:10 249:24 258:18
ultimately   123:12 159:17
unable   155:19 262:17
uncertainty   167:23
under   13:19 34:23 35:24 36:9,23 37:13 82:3 95:24 96:7 148:15 270:2
underlying   61:8,9
underscored   230:24 231:3
understand   10:6 16:12 48:3,13,14 53:6,11 76:6 79:14 107:19 108:22 109:7 116:9 117:18 133:11 137:9 143:12,20 145:17 149:12

154:18 162:18 164:11 169:6 172:15 173:2 209:7 214:8 221:1 247:23 248:13 251:9 251:14
understandable   261:14
understanding   9:24 30:21 31:6,10,14,18 46:4 61:19 85:14,17 89:6 92:10 96:13,19 109:13 121:1 138:11 144:23 145:13 149:23 209:13 226:7 241:22 250:23
understood   111:23 145:22 247:8
unfortunately   33:15 257:4
uniformly   184:20
unique   156:16 243:11
unit   45:3,6,20 46:2,14 47:18 51:10 91:24 98:4 99:22,23 101:8,18 102:22 103:1,6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[unit - users]**

120:5 122:15
152:20 194:17
211:3
**united** 1:1
**units** 46:6
**universal** 82:9
260:17
**universe** 245:3
245:8
**university**
68:12
**unreliability**
187:12
**unsure** 178:6
**unusual** 140:19
**upcharge** 53:16
**updated** 69:12
**updates** 144:12
144:13,13,15
144:15
**upheld** 26:10
**upper** 44:3
69:2 172:12,22
175:9 178:23
**ups** 26:18
100:7 123:21
**usable** 243:10
243:19,21
244:5,10 245:2
246:13 251:19
**usage** 93:19
94:9,18,20
95:1,4,5,8,13
96:8 125:7
140:10 214:22

**use** 9:15 10:15
21:9 52:21
61:21 69:18
80:9 92:4
93:17 94:3
95:14 96:14
102:13 103:15
114:21 118:24
129:3,17
136:21 137:21
148:16 155:8
181:6,9 190:3
190:15 192:16
204:14 205:22
206:19 208:1
209:2 213:12
219:4 224:4,6
244:3,8 246:21
246:22 248:2
254:1
**used** 10:5 12:1
13:21 21:11
35:12 51:11
78:19 132:17
132:18 133:18
133:22 143:16
149:17 150:23
154:18 159:17
160:20 163:19
163:21 176:2
176:13 180:7
185:16 188:21
223:23 248:17
252:2 253:13
253:22 257:23

263:10 264:3
**useful** 40:16
98:23 108:6
206:19
**user** 11:10
40:17 45:17,17
45:20 46:16
48:6,8,10,15
49:2,3,6,11
51:13,14,18,24
52:2,9 54:24
55:2 57:13
92:1 99:5,7
103:1,6,9,11,14
104:1,4,7,7,21
104:23 105:13
105:15 106:4,6
110:1 113:9
116:11 122:3,9
122:24 123:18
125:12,16
134:23 135:23
139:15 140:5
147:9 148:17
152:21 153:2,4
160:3 182:16
182:23 193:17
196:5 199:20
201:24 202:2
204:7,11 207:3
207:17 208:2,9
208:10 211:2
211:14 212:7,7
212:12,12,20
219:21 220:4

221:12 236:20
237:1 255:15
258:12,17,23
259:6,10
**user's** 50:15
108:24
**users** 45:2,15
46:3,5,7,12,18
46:21,24,24
47:17 48:8
49:14 50:21,23
51:10 54:10,14
54:16 73:9
104:11,17
109:22 110:23
110:24 111:5
111:17 112:1,3
112:7 113:3
115:3,13 124:5
124:23 125:6,9
125:15 126:7
127:2,12,14,16
130:4,19 131:5
135:24 136:1,2
136:3,4 138:2
138:19,19,19
138:20,23
139:5,5,13,20
140:7,10
142:19,20
143:4 148:12
152:20,23
159:21 160:6
193:7,10
195:15 196:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[users - versus]

| | v | 131:6,18 | 185:20 |
|---|---|---|---|
| 196:15,17 | **value** 97:8,8 | 132:14 138:17 | **variations** |
| 197:2,15,15,16 | 100:11 109:9 | 142:19 143:1 | 153:18,19 |
| 197:22,22 | 109:24 137:11 | 143:18 146:19 | 231:1 |
| 198:16,17 | 161:10 166:20 | 146:22 147:1,5 | **varied** 162:4 |
| 200:4,8,9,16,17 | 167:3 172:8,19 | 147:7,17,21 | **variety** 10:6 |
| 201:1,5,24 | 174:17 175:23 | 148:2,5,7,19,20 | 12:1 66:20 |
| 202:5,10,17 | 176:9 177:17 | 148:22 149:5 | 171:15 205:14 |
| 203:1,1 204:9 | **values** 155:5 | 149:14,17 | 252:17 254:2 |
| 204:14 205:7 | 163:1,5 166:5 | 152:10,14,18 | **various** 72:1 |
| 206:3,5,12,15 | 171:6 173:11 | 152:21 153:4,9 | 98:15 99:9 |
| 207:2,13,13,14 | 174:11 | 154:2 159:23 | 119:6 151:1 |
| 207:16 208:20 | **variability** | 159:24 160:10 | 152:9 170:5 |
| 208:21 209:1 | 154:18 | 160:12 161:9 | 237:3 |
| 209:16,16,18 | **variable** 30:11 | 162:17 166:6 | **vary** 123:11 |
| 210:2,7,7 | 30:13 42:15 | 179:10,13 | 124:3 172:1 |
| 211:5,7,20,22 | 43:2,9,14 | 180:4 190:22 | 181:22 202:2 |
| 212:1,19,23 | 76:24 92:3,5,8 | 191:5 192:10 | 202:24 204:6 |
| 213:2,10 | 92:11,19,24 | 192:23 206:5 | 236:21,24 |
| 214:20,22 | 93:2,7,9 102:9 | 206:14 207:19 | 264:15 |
| 219:4 236:22 | 102:16,16 | 208:19,24 | **varying** 180:10 |
| 236:24 240:10 | 103:16 106:4 | 210:6 211:14 | 233:11 |
| 241:11 256:6 | 106:13,14 | 211:23 213:9 | **vast** 160:16 |
| **uses** 143:17 | 108:22 109:5 | 214:19,21 | 225:12 |
| 149:13 161:11 | 109:14 111:6,8 | 215:1 233:5 | **vehicles** 24:12 |
| 195:8 | 111:15 113:14 | 241:16,24 | 83:2 |
| **using** 59:16 | 113:15,18,19 | 242:3,5,9,17,24 | **venture** 52:2 |
| 117:24 132:4 | 115:6 117:9 | 243:4 | **verify** 240:12 |
| 132:21 133:15 | 119:24 120:2,9 | **variables** | **veritext** 6:7 |
| 137:20 162:1,7 | 120:23 122:5 | 180:12,13 | 268:7,9,11,20 |
| 190:24 204:11 | 123:18 124:14 | 185:20 | **verizon** 75:13 |
| 210:11,22 | 125:5,17 | **variances** | **version** 107:8 |
| 245:21 246:2 | 126:12 127:1 | 231:4 | **versions** 60:8 |
| 248:23 | 127:22 128:1,8 | **variation** | **versus** 30:11 |
| **usual** 27:11 | 130:3,10,16 | 153:15 154:5 | 148:16 181:12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[versus - winded]

187:18 202:4
**vet** 217:22
**viable** 43:16
  179:4,4 263:17
**video** 6:10
  227:5
**videographer**
  3:15 6:5,6,23
  7:5 58:8,14
  106:20 107:2
  151:19 152:1
  201:11,17
  226:16,23
  252:23 253:5
  261:16,22
  266:2
**videotaped**
  1:12
**view** 54:6 65:4
  98:16 117:1,13
  117:14 120:16
  121:3,4,14,17
  128:11 142:2
  167:8 168:14
  169:2 171:18
  173:10 178:19
  187:12 190:7
  209:14
**views** 55:10
**virgin.com**
  67:13
**virtual** 57:18
**volume** 126:6
  138:3,23 140:3
  143:1,6

**w**

**wait** 24:3
  222:19
**waived** 268:24
  268:24
**waiving** 268:21
**want** 10:5,16
  48:14 53:20
  54:4 58:1,5
  64:23 86:12
  108:22 116:8
  126:19 146:14
  151:16 193:7
  207:7 208:14
  214:5 221:22
  223:3,8 265:2
  265:7
**wanted** 17:2
  69:24 110:20
  119:13 123:24
  134:3 146:5
  187:14
**wants** 110:4
**war** 4:17 68:2
  70:2
**warrants** 189:8
**wars** 71:15
  181:9,10
**washington**
  2:15
**wave** 66:22
**way** 16:14 20:9
  21:4 44:7
  53:14 65:4,18
  92:23 102:17

108:17 113:18
114:2 118:6
126:11 133:18
133:19,20
137:13 145:24
152:17 160:5
163:18 170:8
173:14 175:17
175:20 176:12
177:20 181:23
185:13 188:7
202:19 205:12
216:14 219:23
221:14 233:8
233:14 241:8
247:15
**ways** 35:21
  47:1 48:21,22
  52:13 66:20
  181:1 203:10
  204:18 252:18
**we've** 57:24
  67:24 106:16
  107:18 186:17
  193:12 201:7
  228:23 236:11
  237:14 238:24
  255:16,20
**weakly** 183:7
**weakness**
  232:19
**weather** 189:5
**websites**
  195:14

**weekly** 237:1
**weight** 158:8
  158:11
**weighted**
  157:18 158:6
  161:12
**went** 235:6
**whafh.com** 2:9
  268:2
**whale** 116:10
**whales** 104:18
  110:23 111:10
  114:3,20
  115:23 139:23
  193:5
**whisker** 154:21
**whistles** 113:22
**white** 23:14
**wholesale**
  122:2,11
**wholesaler**
  67:13
**wide** 139:7
  168:3 172:2
  185:9 187:10
  187:11 188:9
  188:10 205:14
**wider** 43:18
  149:4 151:12
  188:13
**wildly** 62:12
  80:3
**win** 77:18
**winded** 118:18

Page 67

**[windows - zynga]**

| | | | |
|---|---|---|---|
| **windows** 23:20 85:4,8,12,20 86:3,5 | **work** 24:11,20 25:3,15 29:1 69:1,24 93:1 97:9 116:16 137:21 147:4 148:6,23 168:15 200:5 205:18 219:20 220:13 222:2,4 222:7 224:5 225:18 259:18 264:7 | 24:17 35:16,20 35:20 60:19 61:4 67:14 69:23 72:3 101:5 123:14 183:20 194:13 235:10 | 127:24 142:4 153:22 168:12 240:7 262:12 262:12,13 263:20,22 |
| **wireless** 73:8 74:15,20 75:2 75:8 76:8 77:4 91:1 | | | **yep** 143:11 |
| **withdraw** 231:2 | | | **yesterday** 15:24 |
| **witness** 4:3 7:7 7:10 10:17 13:7 17:16 25:22 29:17 33:6 36:12 50:11 51:3 58:3,7 66:8 87:16,20 119:10 146:9 146:15 166:11 166:14,17 182:7 197:11 201:10 229:19 239:10 248:22 252:22 267:13 267:18 268:13 268:16 269:2,5 | | **wrong** 24:13 70:21 173:5 204:18 262:13 | **ygr** 1:4 |
| | **worked** 14:13 22:23,24 23:8 24:8,17 26:17 61:14 88:20 108:1 110:16 | **wrote** 18:14 23:2,14 24:23 61:23 192:3 | **yielded** 229:14 |
| | | **x** | **yielding** 185:9 187:10 |
| | | **x** 46:11,11 | **yields** 186:18 |
| | **workers** 129:18 | **xx** 269:1 | **york** 2:6 207:5 |
| | **working** 13:19 21:10 36:9,22 37:13 257:13 | **y** | **youtube** 217:8 224:12 |
| | | **yahoo** 24:18 | **z** |
| | **works** 64:11 66:13 208:15 | **yeah** 33:4 38:12 59:14 60:9 61:2 62:24 63:16,20 67:9,11 106:1 240:11 241:5 248:7 249:7 | **zero** 98:6,11,21 103:24 110:14 111:20 112:22 113:2 115:20 122:16,20 167:2 177:22 178:19 180:10 180:14 184:1 203:7 231:23 233:6 243:4 |
| **witnesses** 4:15 17:2 | **world** 20:24 21:12 185:17 | | |
| **wolf** 2:4 6:19 | **worldwide** 4:22 60:2 228:24 | **year** 9:20 27:13 28:24 86:5 128:23 153:15 153:15 154:6,6 154:9,9 | |
| **word** 50:24 150:20 151:6 176:14 193:8 230:19 255:2 | **wrap** 261:8 | | **zoom** 3:16,17 3:19 6:24 15:16,23 |
| | **write** 63:9 64:7 64:9 | | |
| | **writer** 65:12,13 | **years** 8:12 23:13 26:3 27:6,14,21 85:17 87:2 | **zuckerbergs** 20:24 |
| | **writing** 65:7 243:4 267:11 | | **zynga** 217:8 246:1 |
| **words** 212:11 | **written** 19:12 19:16 23:15 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.