# EXHIBIT 33



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

IN RE APPLE IPHONE LITIGATION

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS

Case No. 4:11-cv-06714-YGR

# REBUTTAL EXPERT REPORT AND DECLARATION OF JAMES E. MALACKOWSKI

**June 13, 2025**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



1. **Firm Background and Qualifications** ....................................................................................... **1**

2. **Assignment** ............................................................................................................................... **1**

3. **Summary of Opinions and Analyses** ....................................................................................... **1**

   3.1. Summary of Opinions ............................................................................................................ 2

   3.2. Bases for Opinions and Analyses ......................................................................................... 4

4. **Summary of Information Considered** ..................................................................................... **4**

5. **Plaintiffs' Experts Ignore the Role of IP in Connection With Apple's Tools, Technologies, and Services** ...................................................................................................................................... **5**

   5.1. Overview of Plaintiffs' Experts' Opinions ............................................................................ 5

   5.2. Apple's IP Rights in the But-For World ............................................................................... 10

   5.3. Conclusions Regarding the Plaintiffs' Experts' Oversight of Apple's IP ............................ 15

6. **Response to Plaintiffs' Experts' Profitability Analyses** ......................................................... **16**

   6.1. GAAP Creates a Consistent Standard for Financial Reporting ............................................ 16

   6.2. Apple's Audited Financial Statements are GAAP-Compliant .............................................. 18

   6.3. Calculations Based on *Ad Hoc* Data From Internal Company Reports and Apple's Fully-Burdened, Standalone App Store Profitability .................................................................................................... 22

   6.4. Return on Capital Employed Ratio Calculation ................................................................... 29

   6.5. Comparison of Play Store to App Store Profitability is Unsupported and Speculative ......... 35

7. **Effects of But-For World Assumptions on the Potential But-For Commission Rate and Other Consequences** ............................................................................................................................. **39**

   7.1. Effects on a Potential But-For World .................................................................................... 39

   7.2. Potential Consequences of Alternative Compensation Structures ......................................... 42

8. **Conclusion** ................................................................................................................................. **50**

9. **Signature** ................................................................................................................................... **51**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

## 1.    FIRM BACKGROUND AND QUALIFICATIONS

1.    I am the Chief Intellectual Property Officer ("CIPO") of J.S. Held and the firm's Intellectual Property Practice Leader. I previously submitted an expert report and declaration in this matter on March 7, 2025, in which I set forth my background and qualifications. Since the submission of the Opening Expert Report and Declaration of James E. Malackowski on March 7, 2025 ("Malackowski Opening Report"), I was recognized by the Licensing Executives Society International ("LES") with its highest honor in the business of IP – the LES Gold Medal. I am only the 31st recipient of the LES Gold Medal, first awarded in 1971.

2.    I incorporate in full the Malackowski Opening Report, including its Appendices and Schedules, into this report and declaration as if fully stated herein.[1]

## 2.    ASSIGNMENT

3.    This declaration is designated as containing Highly Confidential – Attorneys' Eyes Only information under the Protective Orders issued in this matter as specified in the footer of each page.[2] This expert report is to be used only for the purpose of this litigation. No part of this expert report may be published or used for any other purpose without written consent.

4.    I have been asked to analyze and respond to certain opinions and analyses provided on behalf of the Plaintiffs in the opening reports of Mr. Ned Barnes, Dr. Daniel McFadden, Dr. Rosa Abrantes-Metz, Dr. Joseph Stiglitz, Dr. Minjae Song, and Mr. Alan MacCormack.[3] Specifically, I have been asked to analyze if and how Plaintiffs' experts address Apple's IP in their reports, the experts' suggested alternatives in the but-for world, and their characterizations of the App Store's profitability.

5.    Since my work in this matter is ongoing, I may review additional materials produced after the issuance of this report or conduct further analysis. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to other experts' reports and any additional information I may receive.

## 3.    SUMMARY OF OPINIONS AND ANALYSES

6.    My opinions and analyses in this matter are provided for use by the Court in identifying and evaluating the connection between Apple's IP protected tools, technologies, and services and the acts and conduct by Apple that are alleged to be unlawful in this litigation.

---

[1] An updated version of my *curriculum vitae* is attached to this report as Appendix A.

[2] "Stipulation Between Epic Games, Inc. and Apple Inc. and Amended Protective Order," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), Dkt. #274, January 21, 2021, p. 2; Stipulated Amended Protective Order, Dkt. #252, January 21, 2021, p. 1.

[3] Opening Expert Report of Ned S. Barnes, CPA, March 7, 2025, p. 1; Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025, p. 1; Report of Rosa M. Abrantes-Metz, Ph.D., March 7, 2025, p. 1; Expert Report of Joseph E. Stiglitz, Ph.D., March 7, 2025, p. 1; Expert Report of Minjae Song, Ph.D., March 7, 2025, p. 1, Expert Report of Alan D. MacCormack in Support of Plaintiffs, March 6, 2025, p. 1.

OCEAN TOMO®
A PART OF JS|HELD

7.    I previously submitted expert reports and declarations in connection with Plaintiffs' original motion for class certification, as well as Plaintiffs' renewed motion for class certification, making similar observations.[4] After the Plaintiffs' class was certified, I submitted an opening expert report and declaration.[5]

### 3.1. Summary of Opinions

**Opinion 1: The opening reports submitted by the Plaintiffs' experts generally ignore the breadth and importance of Apple's IP rights, and do not acknowledge the extent to which Apple would have the ability to determine the terms of access to its IP-protected tools, technology, and services.**

8.    **Opinion 1.1 –** In their analyses, Plaintiffs' experts ignore Apple's IP, including whether the tools, technologies, and services utilized by developers in connection with their iOS applications are protected by Apple's IP, and whether or how this may impact their analyses and conclusions. Plaintiffs' experts further fail to consider whether or how Apple's ownership of its IP would affect its ability to determine the terms of use and access to its IP-protected tools, technologies, and services, and consequently the but-for world they propose, including their calculations of a purported but-for commission rate. To the contrary, Plaintiffs' experts appear to assume there is no need to calculate any compensation due for access to or use of Apple's IP-protected tools, technologies, and services – instead allowing others to free-ride on Apple's investment in its proprietary technology.

9.    **Opinion 1.2 –** A critical flaw in the Plaintiffs' experts' analyses is their failure to consider or acknowledge that both developers and consumers utilize and benefit from Apple's IP-protected tools, technologies, and services in connection with the development, distribution, and use of iOS apps.

10.   **Opinion 1.3 –** Plaintiffs' experts' failure to consider the role and impact of IP-protected tools, technologies, and services accessed and used by developers and consumers also affects their benchmark selection and exclusion criteria and reasoning. These mirror an oversimplified description of the App Store as a simple storefront isolated from a larger ecosystem.

11.   **Opinion 1.4 –** Plaintiffs' experts' analyses of a potential but-for commission rate and other characteristics of a but-for world are further flawed by their failure to account for the myriad potential fee structure changes to the Developer Program, and the diversity of the particular Apple IP-protected tools, technologies, and services on which different developers rely. They accordingly do not appear to fully account for how unlikely it would be to have a common or universal outcome for developers in the but-for world – nor, by extension, the consumers of their apps. Instead, each individual developer and individual consumer would be affected

---

[4] Expert Report and Declaration of James E. Malackowski, Dkt. #476-5 (August 10, 2021), p. 1; Expert Report and Declaration of James E. Malackowski, Dkt. #534-3 (March 10, 2023), p. 1.
[5] Malackowski Opening Report, p. 1.



differently by a transition to the but-for world proposed by Plaintiffs. Given the unique characteristics of each developer and consumer, some would be advantaged by the change, others disadvantaged, and others relatively unaffected. Consumers may see different prices, and different available choices, in apps as a consequence of changes to the terms of access to developer tools and associated costs. See Section 7.

**Opinion 2: The profitability analyses proffered by Plaintiffs' experts do not reflect or calculate the fully-burdened, standalone profitability of the App Store. As a result, their conclusions regarding Apple's alleged durable and sustained market power are likely overstated.**

12. **Opinion 2.1 –** Apple, as a publicly traded company, provides quarterly and annual audited financial statements in a standardized format compliant with Generally Accepted Accounting Principles ("GAAP"). The reporting segmentation of these financial statements adheres to the Management Approach within GAAP, meaning it aligns with how management views and makes decisions about the business. Apple manages its business as an interrelated ecosystem of products and services, and Apple's GAAP reporting segments are based on geography rather than business line. Apple does not allocate joint R&D and corporate expenses to and among its identified reporting segments because it does not view those expenses on an allocated basis in managing the business; and if joint costs are not and cannot be allocated at the segment level, those costs cannot be meaningfully allocated at the category level of operations, or more specifically, to the App Store, as Mr. Barnes attempts to do. See Section 6.2.

13. **Opinion 2.2 –** In referring to alleged profitability of the App Store, Mr. Barnes uses improper financial projections and metrics that are not specific to the App Store. His profitability analysis is flawed and inconsistent with Apple's financial reporting practices. His estimates ignore: 1) GAAP and 2) rely on economically arbitrary methods to allocate inseparable joint costs. See Section 6.

14. **Opinion 2.3 –** Mr. Barnes produces two comparative profit analyses: 1) a comparison of historical profitability of the App Store and the Google Play Store and 2) a comparison of return on capital employed ("ROCE") for the iPhone and iPad to Apple's company-wide weighted average cost of capital ("WACC"). Based on Mr. Barnes's conclusions and analyses, the Stiglitz Opening Report finds that the App Store profitability comparison "supports Apple having monopoly power in the sale of iOS apps and in-app content" and that the "high and persistent positive economic returns [based on the ROCE comparison analysis] suggest the presence of market power, as such profits would typically attract new entrants in a competitive market until they are competed away."[6] However, Mr. Barnes's app marketplace profitability analysis fails to account for important differences between Google and Apple, as well as, again, the importance of Apple's IP-protected tools, technologies, and services, rendering the comparison ineffectual.

---

[6] Barnes Opening Report, pp. 1-7; Stiglitz Opening Report, pp. 75-76, 124-127.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



Additionally, the use of the ROCE metric used by Mr. Barnes and Dr. Stiglitz is, at best, a poor indicator of Apple's alleged market power. See Sections 6.4 and 6.5.

### 3.2. Bases for Opinions and Analyses

15. The bases for my opinions and analyses are discussed within the body of my expert report and are further supported by the schedules attached as Appendix C. The opinions and analyses discussed throughout this expert report are based on my current understanding of the facts and circumstances surrounding this matter, my review of certain produced documentation, testimony, and third-party information available to date, and my experience and training. The opinions and analyses described in my expert report are subject to change based upon additional discovery or other developments. If additional information becomes available in this matter, I plan to review the information and prepare a supplemental report, if appropriate and allowed by the Court. If an expert provides analysis or offers opinions regarding the subject of my opinions in this matter, or a fact witness provides evidence regarding issues I have addressed in this matter, I will review those analyses and opinions and prepare a rebuttal or response, as and if appropriate. If requested to provide testimony at trial in this matter, in addition to evidence cited in this report, I may rely on deposition or trial testimony and/or demonstrative exhibits that illustrate the concepts and conclusions contained in this declaration.

## 4. SUMMARY OF INFORMATION CONSIDERED

16. A detailed list of documents I have considered to date in connection with this litigation – in addition to those listed in the Malackowski Opening Report (and its associated Appendix B) – is attached as Appendix B. I reviewed the following:

   - Expert reports and deposition testimony of the following individuals:

     - Expert Report of Alan D. MacCormack in Support of Plaintiffs, March 6, 2025 ("MacCormack Opening Report");[7]

     - Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025 ("McFadden Opening Report");[8]

     - Expert Report of Joseph E. Stiglitz, Ph.D., March 7, 2025 ("Stiglitz Opening Report");[9]

     - Expert Report of Minjae Song, Ph.D., March 7. 2025 ("Song Opening Report");[10]

     - Opening Expert Report of Ned S. Barnes, CPA, March 7, 2025 ("Barnes Opening Report");[11]

---

[7] MacCormack Opening Report, p. 1.
[8] McFadden Opening Report, p. 1.
[9] Stiglitz Opening Report, p. 1.
[10] Song Opening Report, p. 1.
[11] Barnes Opening Report, p. 1.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

- Report of Rosa M. Abrantes-Metz, Ph.D., March 7, 2025 ("Abrantes-Metz Opening Report");[12]

- Deposition of Wayne Hoyer, Ph.D., April 18, 2025;

- Deposition of Ned S. Barnes, CPA, May 1, 2025;

- Deposition of Daniel L. McFadden, Ph.D., May 14, 2025;

- Deposition of Rosa Abrantes-Metz, Ph.D., May 23, 2025;

- Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025; and

- Deposition of Minjae Song, Ph.D., June 4, 2025.

  - Publicly available information.

17. References to documents and testimony in this declaration are meant to provide examples of supporting information but are not intended to be a comprehensive or exhaustive list of all known support.

## 5. PLAINTIFFS' EXPERTS IGNORE THE ROLE OF IP IN CONNECTION WITH APPLE'S TOOLS, TECHNOLOGIES, AND SERVICES

### 5.1. Overview of Plaintiffs' Experts' Opinions

18. Various of Plaintiffs' experts prepared or relied upon analyses related to the App Store in forming their conclusions. However, it is my opinion that their analyses, and as a result, their ultimate conclusions, are flawed as a consequence failing consider, address, or otherwise account for the existence or possibility of at least the following:

   a) As explained in the Malackowski Opening Report, Apple has IP protecting its proprietary tools, technologies, and services integral to its iOS and App Store ecosystem, spanning patents, copyrights, trademarks, and trade secrets;

   b) Developers utilize Apple IP-protected tools, technologies, and services during the development and distribution of their apps; and

   c) Plaintiffs benefit from Apple's IP-protected tools, technologies, and services in connection with the apps created by developers, which are distributed for use on Apple's devices, and whose development utilizes Apple IP-protected tools, technologies, and services.

---

[12] Abrantes-Metz Opening Report, p. 1.

OCEAN TOMO®
A PART OF JS|HELD

19.    For example, multiple developers have provided testimony or other evidence that they use Apple's IP-protected tools, technologies, and services in connection with the apps, including at least:

   a)   Richard Czeslawski, Pure Sweat's Chief Operating Officer, who testified via deposition:

   *Q. Are you generally aware that in order to put your app on the App Store, you have to … use Apple's intellectual property in order to accomplish that goal?*

   *A. I'm generally aware of that, yes.*[13]

   b)   Donald Cameron, an app developer, testified that he utilizes Apple's IP:

   *Q. Do you understand that as part of signing that [DPLA] you acquired a license to use Apple's intellectual property?*

   *A. Yes, of course.*

   *Q. Okay. And do you agree that Apple's entitled to a return on its investment for its intellectual property?*

   *A. Yes.*

   *Q. You would agree that Apple doesn't need to provide you access to its intellectual property for free, correct?*

   *A. Yes.*[14]

   c)   Epic Games, the developer of Fortnite and other apps, has provided evidence that it uses multiple SDKs, APIs, and other frameworks and services in connection with developing and offering its apps for use on iOS devices and that at least some of those tools and technologies would be used by Epic Games regardless of the mechanism of distribution.[15]

20.    In connection with my review of how the Plaintiffs' experts address the role of IP, and particularly Apple's IP-protected tools, technologies, and services, I searched the opening reports of Dr. Abrantes-Metz, Dr. Stiglitz, Dr. McFadden, Mr. McCormack, Dr. Song, and Mr. Barnes for consideration of Apple's IP, or IP rights more generally.

21.    In my searches, excluding *curriculum vitae*, exhibits, and qualifications sections, I found the following references to Apple's IP in 583 pages of reports, as described below.

22.    In the 144 pages of the Abrantes-Metz Opening Report, "intellectual property" is mentioned 1 time in responding to opinions that I had offered in an expert report I submitted during class certification briefing, specifically with respect to potential changes that could be available for Apple's compensation strategy in the but-for world.[16] Other than addressing this particular opinion with a response that focuses on the question of whether I attempted to calculate the

---

[13] Deposition of Richard Czeslawski, June 17, 2021, p. 209.
[14] Deposition of Donald Cameron, June 25, 2021, p. 103.
[15] "Reporter's Transcript of Proceedings: Volume 3 – Testimony of Andrew Grant," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 5, 2021, pp. 745-749.
[16] Abrantes-Metz Opening Report, p. 51.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

revenue that would be generated under different potential compensation strategies, however, Dr. Abrantes-Metz does not appear to incorporate any additional analyses or attempt to determine how the allowance of IP free-riding in the but-for world would affect the outcome of her but-for commission rate (or the IP landscape more generally), rather continuing to allow a near-identical version of the App Store to exist in the but-for world.[17] "Patent," "copyright," "trademark," "trade secret," "know-how," and "IP rights" are not mentioned in the Abrantes-Metz Opening Report.

23.    In the 187 pages of the Stiglitz Opening Report, "copyright" is mentioned in 1 paragraph discussing Apple's valid measures designed to discourage users from jailbreaking their iPhone.[18] Trademark is mentioned 1 in a quotation found in a footnote.[19] "Intellectual property," "patent," "trade secret," "know-how," and "IP rights" are not mentioned in the Stiglitz Opening Report. Moreover, Dr. Stiglitz testified during his deposition that he did not remember if he discussed Apple's intellectual property rights anywhere in his opening report.[20] Furthermore, Dr. Stiglitz acknowledged in his deposition that he did not consider the intellectual property rights contained in Apple's tools and technologies.[21]

24.    In the 53 pages of the Song Opening Report, "intellectual property," "patent," "copyright," "trademark," "trade secret," "know-how,", and "IP rights" are not mentioned.

25.    In the 147 pages of the MacCormack Opening Report, "intellectual property," is mentioned generally in the context of discussing and estimating variable costs – generally royalties – incurred by developers for licensing third-party content and not Apple IP-protected tools, technologies, and services or rights specifically.[22] Mr. MacCormack notes that "[royalties] are present in any industry where IP is created and distributed by distinct parties. … Royalties can also be incurred in exchange for functional, rather than creative, content. For example, a developer building an app that provides transit or commute information may pay a third party for the use of traffic data in various cities. Payments of this kind are common in apps that rely on difficult-to-obtain data and are typically called 'data license fee' or 'API fees.' It is intuitive that the cost of such data would also be proportional to its usage – a third party with highly valuable information is incentivized to maximize their own revenue."[23] "Copyright" is mentioned 6 times – generally again in relation to deriving royalty costs; 3 of these mentions relate to examples relating to Bible publishing.[24] "Trademark" has a single reference in acknowledging UFC's ownership of the IP associated with their events, and their ability to license this IP in exchange for monetary consideration – a key missing part of the Plaintiffs'

---

[17] Abrantes-Metz Opening Report, pp. 50-54.
[18] Stiglitz Opening Report, p. 33.
[19] Stiglitz Opening Report, p. 10.
[20] Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025, p. 134.
[21] Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025, pp. 134-135.
[22] MacCormack Opening Report, pp. 25-27, 33, 81, 117-118, 129-130.
[23] MacCormack Opening Report, pp. 25, 27.
[24] MacCormack Opening Report, pp. 52, 101, 110, 123.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



overall but-for world.[25] "IP rights" are discussed once, but "Patent," "trade secret," and "know-how" are not mentioned in the MacCormack Opening Report.[26]

26.    In the 22 pages of the McFadden Opening Report, "intellectual property," "patent," "copyright," "trademark," "trade secret," "know-how," and "IP rights" are not mentioned. During his August 2021 deposition in this matter, Dr. McFadden testified both that his "analysis does not depend on Apple abrogating its property rights," but that "the iOS operating system is protected by intellectual property rights … as a general matter [though he] do[es not] know specifically what those property rights are."[27]

27.    In the 30 pages of the Barnes Opening Report, "intellectual property," "patent," "copyright," "trademark," "trade secret," "know-how," and "IP rights" are not mentioned. Mr. Barnes estimates Apple's investment in intangible assets over the period he studies in his ROCE-based analysis; I discuss and respond to this specific analysis in greater detail below.[28]

28.    Dr. Abrantes-Metz also testified that "everyone distributing games either directly or through third party in the Window PC game world uses intellectual property from Microsoft."[29] She also testified to Apple's ability to adjust its terms in the but-for world, stating:

> *Q. Well, if Apple imposed a license fee on its rival for use of iOS based on the number of transactions that the rival facilitated, would that affect how the model operates?*
>
> *A. Well, I didn't speculate in all of the many different thousands of ways that Apple could have done things that it actually never did, because one can conceive different ways in which Apple could in the but-for world have gone about this.*[30]

29.    Despite this, Dr. Abrantes-Metz confirmed that her model did not make any estimate of how much Apple would charge its rival for use of its IP-protected tools, technologies, and services in the but-for world, rather claiming that her "task was to calculate the but-for commission rate and to be conservative enough to allow for those types of possibilities" and that she assumed that "the but-for world is one where the same app would be available in two different stores[, and] [i]f the same app is available in two different stores and both developers and consumers can multi-home, you would expect that the price of the app should be about the same."[31] The Abrantes-Metz Opening Report uses the same operating profit margin hypothetical economic model as in the class certification phase and therefore this model is flawed for the same reasons.[32]

---

[25] MacCormack Opening Report, pp. 129-130.

[26] MacCormack Opening Report, pp. 117-118.

[27] Deposition of Daniel L. McFadden, Ph.D., August 3, 2021, pp. 19-20.

[28] Barnes Opening Report, pp. 27-29.

[29] Deposition of Rosa Abrantes-Metz, Ph.D., December 15, 2022, pp. 194-195.

[30] Deposition of Rosa Abrantes-Metz, Ph.D., December 15, 2022, pp. 196-197.

[31] Deposition of Rosa Abrantes-Metz, Ph.D., December 15, 2022, pp. 196-197.

[32] Abrantes-Metz Opening Report, p. 10; Expert Report of Rosa M. Abrantes-Metz, Ph.D., September 26, 2022, pp. 9-10.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



30. Dr. Abrantes-Metz's analysis does not consider whether or how Apple could or should be compensated for the use of its IP-protected tools, technologies, and services. Instead, it appears that Plaintiffs' experts simply assume and rely upon full access to Apple's IP-protected tools, technologies, and services, including access to Apple's IP-protected APIs and SDKs, without attempting to evaluate or calculate its impact on the but-for commission rate.

31. Dr. Abrantes-Metz describes the hypothetical but-for world as follows:

> *My model considers a but-for world in which, in the absence of significant entry barriers, a single rival third-party app store competes against the Apple App Store. In this scenario, there are no direct-to-consumer channels, and all app sales occur through a duopoly of third-party stores. The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects, with each charging a single commission rate to all game developers. Commissions are the sole source of revenue for the app stores and remain constant over time. Moreover, I assume that app stores do not subsidize consumers by paying them to buy a game. Finally, I assume that the two stores entered the market around the same time, with neither having a first-mover advantage.*[33]

32. Dr. Abrantes-Metz's model based on these assumptions results in Apple charging a lower, identical commission rate as the hypothetical competitor app marketplace. However, this hypothetical but-for world lacks description and consideration of important aspects underlying the homogeneity assumption of the non-App Store competitor, ignoring the realities of Apple's real-world development and ownership of IP-protected tools, technologies, and services, including:

a) Differentiated use of Apple's vast array of IP-protected tools, technologies, and services among developers and the Plaintiffs (*e.g.*, categorical, frequency-based);

b) The creation, continued development, ongoing investment in, and maintenance of such tools, technologies, and services;

c) Apple's rights to enforce and/or determine the terms of use and access to its IP-protected tools, technologies, and services; or

d) Apple's ability to generate a return on its investments in creating, developing, and maintaining its IP-protected tools, technologies, and services.

33. Apple has made substantial investments in innovation related to the iPhone, iOS, APIs, SDKs, security, and more; since development of the iPhone began in FY 2005, Apple has invested over $210 billion in R&D through the end of FY 2024.[34] I was unable to find any indication that Apple intends to decrease, much less end, its R&D investments in the future. Assuming that Apple does continue its investments into innovation, the but-for world's assumption of open,

---

[33] Abrantes-Metz Opening Report, pp. 8-9.
[34] Malackowski Opening Report, pp. 4-5.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS HELD

unpaid access of Apple's IP-protected tools, technologies, and services would continue to assume the benefits of these ongoing investments in innovation into the future.

34.    Such a broad assumption of access, with a corresponding refusal to consider compensation, defies the realities of IP rights – which I discuss further in the Malackowski Opening Report. Moreover, refusal to consider the role that compensation for, or the right to determine the terms of access and use of IP-protected tools, technologies, and services, has been observed to reduce incentives for continued investment (and therefore innovation) such as that which has underpinned the App Store since its initial development and release. As noted in Section 6.2 of the Malackowski Opening Report, the USPTO has observed that "IP incentivizes the creation of new goods and services by conferring exclusive rights to their creators."[35] Failing to consider these incentives and their effect on the but-for commission rate (much less the presence of a homogeneous competitor) undermine the analytical results proffered by Plaintiffs' experts, which consequently fail to properly acknowledge, much less compensate, Apple for the IP-protected tools, technologies, and services Apple has generated and made available to developers in the Developer Program and associated agreements.

## 5.2. Apple's IP Rights in the But-For World

35.    Plaintiffs' experts' blatant disregard for the significance of Apple's IP-protected tools, technologies, services, and rights is evidenced by how they present their analysis of purported App Store comparable options. Dr. Abrantes-Metz uses the Microsoft Store 2019 operating profit margin as the benchmark for the hypothetical rival app marketplace's equilibrium operating margin in the but-for world, while discussing other benchmark stores with third-party sales (*i.e.*, Steam, Epic).[36] In selecting this benchmark, Dr. Abrantes-Metz did not evaluate whether it would or could provide a commensurate level of access to IP-protected tools, technologies, and services that Apple provides to its developers and users. Rather, her only criteria underlying app marketplace comparability are: 1) functional similarities and sales channels (*i.e.*, selling apps to consumers); and 2) lack of significant barriers to entry.[37]

36.    Plaintiffs' experts' benchmark and excluded benchmark options mirror an oversimplified description of the App Store as a simple storefront isolated from a larger ecosystem. In doing so, their analyses ignore the IP-protected tools, technologies, and services that developers and consumers use and enjoy in the regular course of developing, distributing, downloading, and using apps. Below I provide examples of the scope of IP-protected tools, technologies, and services that Apple provides above and beyond what is provided by the examples put forth by the Plaintiffs' experts.

---

[35] Malackowski Opening Report, Section 6.2.
[36] Abrantes-Metz Opening Report, pp. 14-16, 75-86, 127.
[37] Abrantes-Metz Opening Report, pp. 91-93. This lack of barriers to entry appears to include the lack of allegation of market power commanded by the comparable in question.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

- Apple has designed and developed the App Store as "more than just a storefront – it's an innovative destination focused on bringing you amazing experiences. And a big part of those experiences is ensuring that the apps we offer are held to the highest standards for privacy, security, and content."[38] Privacy and security are important aspects in the marketplace that even Dr. Stiglitz testified were "things that people care about."[39] Since its initial release in 2008, the App Store has experienced tremendous, sustained growth in usage, with cumulative downloads from the App Store now exceeding 380 billion and the number of available apps growing from approximately 500 to almost 1.9 million by late 2023, reflecting the support Apple's innovation has provided to the App Store, the use of developer tools, technologies, and services provided by Apple under the terms and conditions of the Developer Program and its related agreements, and the safe and trustworthy environment created by Apple.[40] With regard to the use of developer tools the DPLA specifically states that, "Apple is willing to grant [the developer] a limited license to use the Apple Software and Services provided to [the developer] under this Program to develop and test [the developer's] Applications on the terms and conditions set forth in this Agreement."[41] Access for use of tools and software to develop and test applications supports the notion the App Store is more expansive than just a storefront.

- Since the release of the App Store in 2008, Apple has taken a "a multilayered approach to try to keep the iPhone reliable and secure for [Apple's] customers."[42] The App Store, which comprises 175 storefronts in over 40 languages, has "100% of apps … automatically screened for known malware."[43] Additionally, "over 16K apps use Apple health technologies like HealthKit, CareKit, and ResearchKit designed to protect patient privacy."[44] As seen in the figure below, "privacy and security [is] built into everything we do."[45] For example, all apps are automatically screened for known malware and Apple reports that it rejected over 215,000 submissions the prior year for violating privacy guidelines.[46] As an additional layer of consumer protection, apps on the iPhone are not permitted to pull user data from other apps.[47] To review for compliance with Apple's guidelines, "[e]very week over 500 dedicated

---

[38] "App Store," *Apple*, https://www.apple.com/app-store/.
[39] Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025, p. 38.
[40] Malackowski Opening Report, Schedule 5.0; "App Store," *Apple*, https://www.apple.com/app-store/; "Reporter's Transcript of Proceedings: Volume 11 – Testimony of Philip Schiller," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 17, 2021, pp. 2,753, 2,760, 2,780, 2,784-2,787; APL-APPSTORE_10137258-263; APL-APPSTORE_10334884-960.
[41] APL-APPSTORE_10334884-960 at 884.
[42] "The Mobile Industry's Never Seen Anything Like This: An Interview with Steve Jobs at the App Store's Launch," Nick Wingfield, *Wall Street Journal*, July 25, 2018, https://www.wsj.com/articles/the-mobile-industrys-never-seenanything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201.
[43] "App Store," *Apple*, https://www.apple.com/app-store/.
[44] "App Store," *Apple*, https://www.apple.com/app-store/.
[45] "App Store," *Apple*, https://www.apple.com/app-store/.
[46] "App Store," *Apple*, https://www.apple.com/app-store/.
[47] "App Store," *Apple*, https://www.apple.com/app-store/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

experts around the world review over 100K apps."[48] Apple also works to enforce intellectual property rights by taking down apps that do not have rights to any included copyrighted materials.[49] As a result, the Court in *Epic Games, Inc. v. Apple, Inc.* issued an opinion that stated "consumer surveys in the record show that security and privacy is an important aspect of a device purchase for 50% to 62% of iPhone users and 76% to 89% of iPad users worldwide. Even Epic's CEO testified that he purchased an iPhone over an Android smartphone in part because it offers 'better security and privacy.'"[50]

<strong>Figure 1: Apple Security and Privacy</strong>[51]



- Beyond the IP-protected tools, technologies, and services related to the App Store itself, Apple CEO Tim Cook acknowledged in his deposition that the integration of hardware, software, and services was one of the distinguishing features of the iPhone when it was launched and that the "integration of hardware and software and the services element are key to having the customer experience [be] this sort of delightful experience."[52] I note that Dr. Stiglitz recognized as well that there may be technological reasons why an operating system is developed in conjunction with hardware.[53] As outlined in the Malackowski Opening Report, Apple has 28,730 issued U.S. utility patents, 4,653 issued design patents,

---

[48] "App Store," *Apple*, https://www.apple.com/app-store/.

[49] "The Mobile Industry's Never Seen Anything Like This: An Interview with Steve Jobs at the App Store's Launch," Nick Wingfield, *Wall Street Journal*, July 25, 2018, https://www.wsj.com/articles/the-mobile-industrys-never-seenanything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201; "App Store Review Guidelines," *Apple*, https://developer.apple.com/app-store/review/guidelines/.

[50] "Opinion," *Epic Games, Inc. v. Apple Inc.* (Case No. 21-16506), Dkt. #215-1, April 23, 2023, pp. 53-55.

[51] "App Store," *Apple*, https://www.apple.com/app-store/.

[52] Deposition of Timothy Cook, February 12, 2021, pp. 138-139.

[53] Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025, p. 55.

<strong>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY<br>SUBJECT TO PROTECTIVE ORDER</strong>

and 5,067 filed U.S. applications pertaining to various aspects of this integrated ecosystem, in addition to having copyrights, trademarks, and trade secrets.[54]

- "Apple designs security into the core of its platforms … Every Apple device combines *hardware*, *software*, and *services* designed to work together for maximum security and a transparent user experience in service of the ultimate goal of keeping personal information safe. For example, Apple-designed silicon and security hardware powers critical security features. And software protections work to keep the operating system and third-party apps protected. Finally, services provide a mechanism for secure and timely software updates, power a protected app ecosystem, and facilitate secure communications and payments. As a result, Apple devices protect not only the device and its data but the entire ecosystem, including everything users do locally, on networks, and with key internet services."[55]

- Apple's innovations in support of app developers reflect and build on previous improvements to hardware, the OS, and tools and services for app developers. Mr. Schiller testified that: "from my perspective, [the] majority of engineering Apple does is to support and benefit app developers, whether it is new hardware features that developers will take advantage of, new software features in the operating systems and in the APIs we developed, and the capabilities of the [App Store] to distribute [and] support their apps."[56] In fact, hardware and software teams work together at Apple, consistent with the its goal to "make a product as a complete experience of the hardware and software working together to create a unique offering."[57] To this point, Apple has an array of IP rights, including at least 484 U.S. patent grants and 274 U.S. applications covering foundational security APIs as well as trademarks, copyrights, and trade secrets.[58]

37. The but-for world created by Plaintiffs' experts does not make any attempt to address, much less quantify, Apple's compensation for the extensive IP-protected tools, technologies, and services it would be expected to provide to the rival app marketplace and associated developers and consumers; as noted in the Malackowski Opening Report, Apple has invested over $210 billion in R&D since FY 2005 through FY 2024. As a result of these investments, Apple's portfolio of publicly-known IP assets is extensive, including approximately 38,450 active granted U.S. patents and applications, 6,202 U.S. registered copyrights, 980 U.S. registered trademarks; these investments have also created trade secrets that Apple has not disclosed to the public or its competitors.[59]

---

[54] Malackowski Opening Report, Schedule 1.1, Schedule 1.3, and Schedule 1.2.

[55] "Introduction to Apple platform security," *Apple*, https://support.apple.com/guide/security/intro-to-apple-platform-security-seccd5016d31/web.

[56] Deposition of Philip Schiller, February 11, 2021, p. 91.

[57] "Reporter's Transcript of Proceedings: Volume 11 – Testimony of Philip Schiller," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 17, 2021, p. 2,723.

[58] Malackowski Opening Report, Schedule 3.3.

[59] Malackowski Opening Report, Schedule 1.0, Schedule 2.0, and Schedule 2.1.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



38. Even when Dr. Abrantes-Metz discusses the question of whether potential alternative compensation strategies could be available to Apple, her critiques focus on the amount of revenue or operating profit that might be generated under these alternative strategies, not the question of whether or how to incorporate the role of access to Apple's IP-protected tools, technologies, and services into her analysis of a but-for commission rate.[60]

39. As described in Section 6.3 of the Malackowski Opening Report, IP-protected assets are particularly susceptible to free riding, while patents and other IP rights serve to restrict the free riding of others – facilitating commercialization of innovations they protect. Rather, in the but-for world, Plaintiffs' experts fail to even consider whether Apple has a right to receive compensation for having to (unwillingly) provide its IP-protected tools, technologies, and services to a third-party – or the impact of such a right – implying that the rival app marketplace (and therefore the developers and consumers that utilize said rival app marketplace) should be able to use, implement, and practice Apple's extensive array of IP-protected tools, technologies, and services without providing any compensation or otherwise abide by terms that Apple sets to govern such use.

40. Plaintiffs' experts take all of the IP-protected tools, technologies, and services referenced above and in the Malackowski Opening Report for granted in the but-for world. Dr. McFadden stated in a previous report that it is important for his "analysis to consider what behavior would not be present in the But-For world," including, "Apple's Developer Agreement, which app developers must enter before selling apps, forbids them from selling apps to iOS device consumers outside the App Store or creating competing app stores."[61] Nor has this changed in his most recent reports, with the McFadden Opening Report indicating that "unless otherwise noted, I reaffirm my opinions from my 2023 Supplemental Report and my other reports during the class certification stage."[62]

41. Similarly, Dr. Abrantes-Metz does not account for potential restrictions on terms of access and use, or alternative compensation strategies, that could be imposed in connection with access to and use of Apple's IP-protected tools, technologies, and services.[63] In other words, the Plaintiffs' experts appear to assume the rival app marketplace and associated developers and consumers would be allowed to free-ride such tools, technologies, and services, while Apple will provide access to and use of these valuable IP-protected tools, technologies, and services while being unable to freely set the terms of that access and use or negotiate the compensation for such usage. This is marked when considering a for-profit company – with fiduciary duties to its shareholders – that has successfully invested billions over the last two decades into R&D and

---

[60] Abrantes-Metz Opening Report, pp. 51-54.
[61] Expert Report of Dr. Daniel McFadden, June 1, 2021, pp. 59-60.
[62] McFadden Opening Report, p. 4.
[63] Abrantes-Metz Opening Report, pp. 9-10, 31-32, 50-51.

technology development and relies on its innovation as a foundational element of its business and a differentiator in a highly competitive industry.

42.    Overall, Plaintiffs' experts' position that Apple will continue to provide, update, and improve its IP-protected tools, technologies, and services in the face of such ongoing access and use, when Apple's ability to set the terms of access and use, and to obtain a return on its investment for such IP-protected tools, technologies, and services is curtailed (if not entirely eliminated) in a but-for world has no empirical basis. Indeed, IP owners bear the risk of failure when investing in innovation, and obtaining patents, copyrights, trademarks, and/or trade secrets which carry with them various rights for their owner, such as the right to seek a return on their investment.[64] Plaintiffs' experts appear to make the irrational assumption that Apple would continue to make significant investments in the development of the IP underlying its tools, technologies, and services, yet do not factor any right of Apple to seek a return on its investment into their analyses. Indeed, if Apple were to give away access to its IP-protected innovations for free, Apple would be losing both the right and the opportunity to control and obtain a return on investment for its valuable portfolio of IP-protected tools, technologies, and services.

### 5.3. Conclusions Regarding the Plaintiffs' Experts' Oversight of Apple's IP

43.    Plaintiffs' experts fail to consider the role and significance of innovations developed and now embodied in Apple's IP-protected tools, technologies, and services, along with the rights that Apple has as an IP owner. Plaintiffs' experts fail to acknowledge Apple's innovation and associated IP rights, the role they have in the iOS and iPhone features implemented by various apps, the App Store, and developer tools and services, casting a long shadow over their assumptions and resulting but-for world they argue would exist absent Apple's alleged misconduct.

44.    The lack of consideration for Apple's IP-protected tools, technologies, and services, and their role in the iOS ecosystem more broadly, results in a flawed but-for world that artificially limits Apple's ability to determine (or at least negotiate) the terms and conditions surrounding the access and use of such tools, technologies, and services. These limitations on Apple's ability to condition the terms (including compensation) of its IP-protected assets is in direct juxtaposition with the protections – stemming in part from the U.S. Constitution – that have been granted. Plaintiffs' experts demonstrate a lack of awareness or clear misunderstanding of the fundamental economic incentives of IP-protected assets.

---

[64] "Intellectual Property Strategy and Business Strategy: Connections through Innovation Strategy," Daniel Samson, June 2005, https://www.researchgate.net/publication/228740384_Intellectual_Property_Strategy_and_Business_Strategy _Connections_through_Innovation_Strategy, p. 4. Last accessed on January 7, 2021; 35 U.S.C. § 271(d)(4).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



### 6.    RESPONSE TO PLAINTIFFS' EXPERTS' PROFITABILITY ANALYSES

45.    Apple, as a publicly-traded company, provides quarterly and annual audited financial statements in a standardized manner compliant with GAAP. The reporting segmentation of these financial statements adheres to the Management Approach within GAAP, which indicates they align with how management views and makes decisions regarding the business. Apple manages its business as an interrelated ecosystem of products (both hardware and software) and services, with GAAP reporting segments based on geography rather than business line. Mr. Barnes even acknowledges the format of the publicly-available financial documents, stating that "Apple's public SEC filings do not report complete income statements or P&Ls for either Products or Services, or for individual business units within Product or Services."[65]

46.    Mr. Barnes' accounting estimates are flawed for multiple reasons, including that: 1) they ignore GAAP; 2) they reflect a mischaracterization of Apple's business practices and the level at which Apple collects and reports its financial performance; and 3) they rely on economically arbitrary methods to allocate inseparable joint costs. Accordingly, Mr. Barnes purported calculations (and those they rely on his analyses and conclusions) are arbitrary and unreliable.

### 6.1. GAAP Creates a Consistent Standard for Financial Reporting

47.    Generally Accepted Accounting Principles "are a collection of commonly-followed accounting rules and standards for financial reporting."[66] The purpose of such principles is to ensure that financial reporting is transparent and consistent between organizations.[67] In the U.S., the Financial Accounting Standards Board ("FASB"), a not-for-profit organization, establishes the financial accounting and reporting standards that comprise GAAP.[68] The FASB is recognized by the U.S. Securities and Exchange Commission ("SEC") as the designated accounting standards setter for public companies. In order to be listed on a U.S. public stock exchange, a company is required to file audited, GAAP-compliant financial statements with the SEC.[69]

48.    Within GAAP, FASB Accounting Standards Codification ("ASC") 280 – Segment Reporting – governs the level of financial disclosure necessary. A fundamental principle of ASC 280 is the requirement that a company's financial disclosures be consistent with management's reporting

---

[65] Barnes Opening Report, pp. 9-10.
[66] "US GAAP: Generally Accepted Accounting Principles," *CFA Institute Research & Policy Center*, August 13, 2019, https://rpc.cfainstitute.org/policy/positions/gaap.
[67] "US GAAP: Generally Accepted Accounting Principles," *CFA Institute Research & Policy Center*, August 13, 2019, https://rpc.cfainstitute.org/policy/positions/gaap.
[68] "About the FASB," *FASB*, April 2025, https://www.fasb.org/page/ShowPdf?path=About_FASB_2025.pdf.
[69] "All About Auditors: What Investors Need to Know," *SEC*, June 23, 2002, https://www.sec.gov/about/reports-publications/investorpubsaboutauditorshtm.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



structure to allow users to "see through the eyes of management" and help users make more informed judgments about the entity as a whole.[70]

49. While GAAP requires public companies to present certain enterprise-level information, including revenues related to products and services regardless of the entity's organizational structure, under the ASC-defined "Management Approach," a company is required to disclose the segment financial information in a manner consistent with management's performance assessment and making operating decisions.[71] In particular, the Management Approach designates the internal reporting used by management for making decisions and assessing performance as the source of the company's reportable segments.[72] The Management Approach focuses on financial information that a company's decision makers use in operational matters; and the operating categories of the business that management establishes for that purpose are called operating segments.[73]

50. The FASB states the Management Approach is the preferred form of presentation for the following reasons:

a) It is based on an entity's internal organization, which highlights the risks and opportunities that management believes are important and allows users to assess the performance of individual operating segments in the same manner management reviews performance and makes decisions;

b) It provides users with the opportunity to see the entity from management's vantage point and enhances users' ability to predict actions or reactions of management that can significantly affect the entity's prospects for future cash flows;

c) It results in low incremental costs, as the information is already generated for management's use – therefore management should not need to prepare additional, new reports to comply with segment disclosure requirements; and

d) It is consistent with other significant sections of a company's annual report, such as the business review section and chairman's letter. These sections usually describe the company's

---

[70] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.
[71] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.
[72] Apple Inc. Form 10-K for the fiscal year ended September 24, 2022, p. 37; Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 2.
[73] "1.2 Management Approach to Segment Reporting," *Deloitte*, 2025, https://dart.deloitte.com/USDART/home/codification/presentation/asc280-10/roadmap-segment-reporting/chapter-1-overview-scope/1-2-management-approach-segment-reporting.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



business in the way management views and runs these businesses, which is how segment information is presented under the Management Approach.[74]

51. The focus of reporting using the Management Approach is to allow users to "see through the eyes of management" and make informed judgments about the company as a whole.[75] Accordingly, the level and usefulness of financial data at operating categories below the consolidated level will flow from management's perspective and approach to the management of the business.

52. For a business component to be classified as an operating segment under the Management Approach it must fulfill three separate criteria. First, the component must engage in business activities from which it may recognize revenues and incur expenses.[76] Second, the operating results of the component are regularly reviewed by the Chief Operating Decision Maker ("CODM") to assess the performance of the individual component and make decisions about resources to be allocated to the component.[77] And third, discrete financial information must be available for the component.[78]

### 6.2. Apple's Audited Financial Statements are GAAP-Compliant

53. As a public, NASDAQ-traded company, Apple reports its financial statements in accordance with GAAP.[79] Specifically, Apple discloses GAAP-compliant audited financial statements quarterly in its Form 10-Q quarterly report ("10-Q") and annually in its Form 10-K annual report ("10-K"). Apple's financial statements, including the company's segment reporting, are audited by Ernst & Young and have received an unqualified audit opinion. An unqualified audit opinion is an independent auditor's judgment that a company's financial statements are fairly and appropriately presented, without any identified exceptions, and in compliance with GAAP.[80]

---

[74] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.

[75] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.

[76] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.

[77] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf. The CODM is an individual or group within a company that is responsible for the allocation of resources and the assessment of operating results of the operating segments.

[78] "Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.

[79] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 26.

[80] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, pp. 26, 48-50.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

54.    In accordance with GAAP, Apple reports segment information based on the ASC-defined Management Approach, meaning the company discloses financial information in a manner consistent with management's review of performance and decision-making processes. The following excerpt from Apple's FY 2024 10-K filed with the SEC provides an overview of accounting policies and details regarding Apple's segment reporting and disclosure. Specifically, Apple indicates that:

> *The company manages its business primarily on a geographic basis. The Company's reportable segments consist of the Americas, Europe, Greater China, Japan, and Rest of Asia Pacific. Americas includes both North and South America. Europe includes European countries, as well as India, the Middle East and Africa. Greater China includes China mainland, Hong Kong and Taiwan. Rest of Asia Pacific includes Australia and those Asian countries not included in the Company's other reportable segments. Although the reportable segments provide similar hardware and software products and similar services, each one is managed separately to better align with the location of the Company's customers and distribution partners and the unique market dynamics of each geographic region.*

> *The Company evaluates the performance of its reportable segments based on net sales and operating income. Net sales for geographic segments are generally based on the location of customers and sales through the Company's retail stores located in those geographic locations. Operating income for each segment consists of net sales to third parties, related cost of sales, and operating expenses directly attributable to the segment. The information provided to the Company's chief operating decision maker for purposes of making decisions and assessing segment performance excludes asset information.*[81]

55.    Apple views and manages its operating on a geographic basis and discloses segment information for the geographies in which it operates, as well as company-wide financial information. As noted above, the Company's reportable segments include Americas, Europe, Greater China, Japan, and Rest of Asia Pacific.[82] Apple's financial reporting disclosures reflect both the risks and opportunities that Apple's management views to be important and allow users to assess the performance of the business overall. Apple's segment reporting reflects the fact that management views the company as a cross-functional, interrelated ecosystem of Apple's products and services.

56.    Apple's financial reporting disclosures reflect the risks and opportunities that Apple's management believe to be important and allow users to assess the performance of the overall business. The Company's segment reporting reflects the fact that management views the Company as a cross-functional, interrelated ecosystem of Apple's products and services (referred to in the Company's 10-K as "Products & Services").[83] Apple Finance Manager Mark Rollins testified to as much, stating:

---

[81] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 46.
[82] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 46.
[83] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 23. Products and Services are broken out into the following categories: iPhone, Mac, iPad, Wearables, Home and Accessories, and Services.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



*Apple isn't structured, for example, in a business unit function. Apple is structured in a functional unit. And so as a result of that, as part of Apple's, you know, general philosophy that the purpose of Apple's products and services is really part of an ecosystem.*

*…*

*[T]he way that Apple thinks about it is more at a higher level in terms of its ecosystem. And so the value of all of our products and services are sort of taken as a whole.*[84]

57.    Other Apple personnel have echoed this sentiment. For example, Philip Schiller testified that the cost of developing APIs has never been allocated to the App Store.[85] Apple CEO Tim Cook also testified that Apple does not consider any other profit margin besides that of the aggregate when running the business, and does not prepare fully-burdened P&L statements for business units.[86] Despite his analyses to the contrary, Mr. Barnes cites similar evidence in which Apple stated that it "does not maintain, in the ordinary course of business, a separate P&L for the App Store."[87]

58.    Rather, consistent with its public SEC filings, Apple manages its business geographically with costs and benefits shared throughout its product and service ecosystem. Apple does not allocate joint costs such as R&D and corporate overhead. The cost of developing and maintaining the IP-protected tools, technologies, and services in Apple's ecosystem is also shared and inseparable. There is no meaningful way for management to allocate costs such as R&D between Apple's products and services operating categories; this is consistent with Apple's public financial reporting which does not disclose financial data that purports to allocate costs between operating categories or otherwise reports the financial performance of "business units" on a standalone basis as it does not manage its business in that manner.

59.    Apple's geography-based segment reporting is consistent with its view of iOS as a cross-functional ecosystem supported by joint costs and personnel teams throughout the company; it manages its business geographically with costs and benefits distributed throughout the ecosystem as a whole. Although Apple includes revenue- and gross margin-level breakouts for products and services categories, these are not defined, reportable segments of Apple's business and therefore not viewed at the operating profit level.

60.    Consistent with GAAP, Apple does not fully allocate expenses or calculate operating profit at the product or service level. GAAP requires a company's financial disclosures to be consistent with management's reporting structure and the method the CODM assesses operating performance and makes key operating decisions. More directly, Apple's GAAP financials are a

---

[84] Deposition of Mark Rollins, February 11, 2021, pp. 78-79.

[85] "Reporter's Transcript of Proceedings: Volume 11 – Testimony of Philip Schiller," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 17, 2021, p. 2,733.

[86] "Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021, p. 3,875.

[87] Barnes Opening Report, p. 12.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

clear reflection of how the company is managed, and for Apple these GAAP financials clearly demonstrate that management personnel not only views and manages the company as a combined ecosystem but also they do not fully allocate expenses.

61. Even at the segment reporting level – the level at which management review operating performance – Apple does not fully allocate expenses. This is consistent with Apple CEO Tim Cook's testimony that "[Apple doesn't] do P&L's at an earnings level for … anything in the company other than for the total company."[88] Indeed, Apple's 2024 Form 10-K includes only one fully-burdened P&L statement – the Consolidated Statement of Operations.[89] As a result of Apple not fully allocating operating expenses at the segment level, Apple's Form 10-K shows significant differences between Apple's consolidated operating income and the total reported operating income for each reporting segment, as seen in the following figures. I summarize the differences in these figures in Schedule 1.2; between FY 2022 and FY 2024, Apple operating segment operating income was $108.9 billion higher than operating income from the consolidated statement of operation.[90]

**Figure 2: Apple 2024 Form 10-K Consolidated Statements of Operation – Operating Income**[91]

| CONSOLIDATED STATEMENTS OF OPERATIONS | | | |
|---|---|---|---|
| (In millions, except number of shares, which are reflected in thousands, and per-share amounts) | | | |
| | | Years ended | |
| | September 28, 2024 | September 30, 2023 | September 24, 2022 |
| Net sales: | | | |
| Products | $ 294,866 | $ 298,085 | $ 316,199 |
| Services | 96,169 | 85,200 | 78,129 |
| Total net sales | 391,035 | 383,285 | 394,328 |
| Cost of sales: | | | |
| Products | 185,233 | 189,282 | 201,471 |
| Services | 25,119 | 24,855 | 22,075 |
| Total cost of sales | 210,352 | 214,137 | 223,546 |
| Gross margin | 180,683 | 169,148 | 170,782 |
| Operating expenses: | | | |
| Research and development | 31,370 | 29,915 | 26,251 |
| Selling, general and administrative | 26,097 | 24,932 | 25,094 |
| Total operating expenses | 57,467 | 54,847 | 51,345 |
| Operating income | 123,216 | 114,301 | 119,437 |

**Figure 3: Apple 2024 Form 10-K Reporting Segment – Operating Income**[92]

---

[88] Deposition of Timothy Cook, February 12, 2021, p. 163.

[89] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 29.

[90] Schedule 1.2.

[91] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 29.

[92] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, p. 47.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

The following table shows information by reportable segment for 2024, 2023 and 2022 (in millions):

|  | 2024 | 2023 | 2022 |
|---|---|---|---|
| **Americas:** |  |  |  |
| Net sales | $ 167,045 | $ 162,560 | $ 169,658 |
| Operating income | $ 67,656 | $ 60,508 | $ 62,683 |
| **Europe:** |  |  |  |
| Net sales | $ 101,328 | $ 94,294 | $ 95,118 |
| Operating income | $ 41,790 | $ 36,098 | $ 35,233 |
| **Greater China:** |  |  |  |
| Net sales | $ 66,952 | $ 72,559 | $ 74,200 |
| Operating income | $ 27,082 | $ 30,328 | $ 31,153 |
| **Japan:** |  |  |  |
| Net sales | $ 25,052 | $ 24,257 | $ 25,977 |
| Operating income | $ 12,454 | $ 11,888 | $ 12,257 |
| **Rest of Asia Pacific:** |  |  |  |
| Net sales | $ 30,658 | $ 29,615 | $ 29,375 |
| Operating income | $ 13,062 | $ 12,066 | $ 11,569 |

62. Apple does not allocate joint R&D and corporate expenses to and among the identified reporting segments because it does not view those expenses on an allocated basis in managing the overall business. If joint costs cannot be allocated at the segment level, based on how Apple management operates and makes decisions, those costs cannot be meaningfully allocated at the category level of products and services, and specifically the App Store.

63. Additionally, any exercise to allocate joint expenses – such as R&D for management planning – would also not produce meaningful results. Each iOS product and service offered by Apple is a component of the iOS platform – an integrated ecosystem that contributes to and relies upon all of Apple's infrastructure and IP-protected technology assets. The costs of developing, protecting, and maintaining that ecosystem are inseparable, joint costs that cannot be allocated in an economically-meaningful way.[93] Moreover, the components of the iOS ecosystem benefit from one another, and the IP-protected technologies and infrastructure assets residing in each product and service business line support all other aspects of the iOS ecosystem, including the App Store. Therefore, any attempt by Plaintiffs' experts to allocate joint costs to arrive at a measure of profitability of an individual business unit below the segment level (*e.g.*, the App Store) would be an arbitrary exercise that ignores the contribution of join costs to the rest of the ecosystem.

**6.3. Calculations Based on *Ad Hoc* Data From Internal Company Reports and Apple's Fully-Burdened, Standalone App Store Profitability**

64. In the Abrantes-Metz Opening Report, Dr. Abrantes-Metz attempts to estimate the fully-burdened profitability data below the consolidated enterprise level with certain internal Apple documents and adjustments to the figures found in those documents to estimate a fully-burdened, standalone App Store profitability and margin.[94] Dr. Abrantes-Metz reviewed and

---

[93] "Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021, pp. 3,875-3,876.

[94] Abrantes-Metz Opening Report, pp. 72-73.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



analyzed the following documents in her efforts to calculate App Store profitability, which I refer to collectively as the "Abrantes-Metz Apple Documents," include the following:

    a.   App Store Business Management FY20 Overview presentation;[95]

    b.   Worldwide Developer Relations ("WWDR") (OCOGS);[96]

    c.   WWDR (OPEX);[97]

    d.   App Store Marketing (OPEX);[98] and

    e.   iTunes Worldwide P&L.[99]

65.    Similar to the Abrantes-Metz Opening Report, Mr. Barnes also provides analyses claiming to calculate fully-burdened App Store profitability and margin using Apple business records (some of which overlap with the Abrantes-Metz Apple Documents), including:[100]

    a.   Line of Business ("LOB") reports;[101]

    b.   iTunes P&L;[102]

    c.   App Store Gross Margin Report;[103]

    d.   Apple Corporate Financial Planning and Analysis Group ("Corp FP&A") Reports;[104] and

    e.   App Store P&Ls Included in Executive Presentation Documents.[105]

66.    Additionally, Mr. Barnes attempts to quantify iPhone and iPad-specific measures of operating income and margin based on LOB reports and Corp FP&A Forecasts. Mr. Barnes claims the LOB reports he relies on are "fully-burdened P&Ls" and "reflect a pro-rata allocation of OPEX based on revenue … which is consistent with Apple's internal reporting practices" despite acknowledging that he was unsure of the OPEX allocation method contained in the earliest

---

[95] APL-APPSTORE_10176241-337 at 318. This is similar to APL-APPSTORE_08883133-332 at 286.

[96] APL-APPSTORE_09814097.

[97] APL-APPSTORE_09814099.

[98] APL-APPSTORE_09814098.

[99] APL-APPSTORE_09806205.

[100] Barnes Opening Report, pp. 11-26.

[101] APL-APPSTORE_08856865; APL-APPSTORE_08856866; APL-APPSTORE_08856867. Mr. Barnes notes that "it is not clear how APL-APPSTORE_08856865, the earliest LOB report containing full year data for 2009 through 2012, allocated OPEX, but it does not appear to be on the basis of revenue. As a result, I have used the Method 1 OPEX allocation method to be consistent with Apple's internal business reporting for 2013-2019." *See*, Barnes Opening Report, fn. 112.

[102] APL-APPSTORE_09806205; APL-APPSTORE_10332891; APL-APPSTORE_04685286.

[103] APL-APPSTORE_08856864.

[104] APL-EG_08926412-433; APL-EG_08926407-408; APL-APPSTORE_11364297-445; APL-APPSTORE_11364883-931.

[105] APL-APPSTORE_08883133-332 at 286; APL-APPSTORE_10176241-337 at 318; APL-APPSTORE_09818248-415 at 344.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



LOB reports from 2009 through 2012.[106] However, the Corp FP&A Forecasts "only provide revenue and gross margin data and generally do not report OPEX or operating income figures for iPhone and iPad" – Mr. Barnes estimates operating expenses for these financial documents using a revenue-based allocation method.[107]

67.    Both the Abrantes-Metz Apple Documents and Barnes Apple Documents are generally *ad hoc*, internal use documents prepared for management consumption and include data characterized as revenue, expense, and "operating profit." First, Abrantes-Metz Apple Documents do not estimate profitability or costs based on documents specifically prepared for the App Store; this holds true for the Barnes Apple Documents as well with the exception of the App Store Gross Margin Report. That document aside, the Abrantes-Metz Apple Documents and Barnes Apple Documents are a patchwork of unannotated documents from an assortment of Apple business lines, with little to no supporting information provided in or with such document. Moreover, both experts cobble together assumptions based on the incomplete and unannotated financial information found in these documents.

68.    The documents relied upon by Dr. Abrantes-Metz and Mr. Barnes are generally either standalone spreadsheets with no narrative discussion, or broad business update presentations that are not focused on financial metrics and profitability measures specifically and used for internal purposes only. For example, Dr. Abrantes-Metz relies on a presentation titled "App Store Business Management FY20 Overview," which is not a financial statement analysis.[108] Rather, this business presentation focuses on billings, accounts, and updated or new features and services (including Apple Arcade, in-app events, app analytics, etc.).[109] In the almost 100-page presentation, there is a single slide labeled "App Store P&L" which shows a limited, unannotated, year-over-year comparative P&L data for the App Store.[110] This slide also fails to indicate whether the data presented reflects an effort to comprehensively or accurately allocate, in full, all operating expenses actually incurred in connection with the App Store. As noted above, Mr. Barnes relies on this document and other similar presentations but notes that "Apple has not produced, to my knowledge, supporting documentation or analysis related to these estimates or allocations."[111]

69.    Mr. Barnes employs the use of multiple document types that are used only internally by Apple, and is generally silent on how these documents are used by their stakeholders. Specifically, Mr. Barnes noted that the LOB reports are "for internal financial reporting purposes," App Store P&Ls Included in Executive Presentation Documents are "utilized … in connection with presentations made to senior Apple executives," and the App Store Gross Margin Report

---

[106] Barnes Opening Report, p. 26.
[107] Barnes Opening Report, p. 26. I refer to these documents collectively as the "Barnes Apple Documents".
[108] APL-APPSTORE_10176241-337.
[109] APL-APPSTORE_10176241-337 at 266.
[110] APL-APPSTORE_10176241-337 at 318.
[111] Barnes Opening Report, p. 18.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



summarizes "Apple's internally reported gross margin and gross margin percentage for the App Store."[112] As seen in the figure below – a reproduction of Table 9 of the Barnes Opening Report purportedly summarizing App Store operating income percentages – shows that for the one year in which Mr. Barnes finds estimates from multiple sources, there is a difference of approximately 7% in presented operating margin. Even Mr. Barnes' adjustments do not incorporate the same financial information as the Corp FP&A Reports as the operating margin difference is still almost 5%; indeed, Mr. Barnes even notes that "certain of the App Store P&Ls on which [Table 9] is based do not specifically identify the methodology employed by Apple to estimate or allocate OPEX to the App Store."[113]

**Figure 4: Barnes Opening Report Table 9 – App Store Operating Income Percentages**[114]

70.     GAAP accounting standards are not employed by the Abrantes-Metz Apple Documents or the Barnes Apple Documents, and none of them were prepared in accordance with GAAP. The fact that these documents were not prepared in accordance with GAAP, and the fact that GAAP accounting standards do not generally apply to internal financial statements is important for multiple reasons, including:

      a.   Accounting methods for internal financial statements and presentations typically utilize "Managerial Accounting" and are not required to comply with any accounting standard or requirements. Managerial Accounting is specifically meant to help managers make decisions as well as plan for future events, and therefore will sometimes present information in a manner most conducive to that decision-making process.

      b.   The presentation of information in internal reports does not follow any industry-wide guidelines. Each organization within the company is able to structure its reports and organize data and information in the best method it sees fit, allowing for greater flexibility in the types of information gathered and reports generated.

      c.   The disparities between GAAP-compliant financial statements and internal financial statements could include differences in accounting for revenue recognition and cost recognition, as well as differences in overall statement

---

[112] Barnes Opening Report, pp. 11, 14, 17.
[113] Barnes Opening Report, p. 23.
[114] Barnes Opening Report, p. 23.



structure. Furthermore, different managerial decisions necessitate different presentations of information, and could lead to variances even between internal financial reports within the same company.[115]

71. Based on this, any assumption that the financial information in either the Abrantes-Metz Apple Documents or Barnes Apple Documents represents an estimate of the stand-alone fully-burdened performance of Apple's Services category generally or the App Store specifically – including the particular costs related to the App Store – is unfounded. Further, as discussed above, any exercise by either expert to allocate joint costs that simply cannot be allocated in an economically defensible way to an individual category or operating segment would be arbitrary and meaningless.

72. To create her purported App Store profitability estimate, Dr. Abrantes-Metz uses a page titled "App Store P&L" from a FY 2020 business update presentation as a basis for her calculation.[116] However, because there is no evidence that Apple has fully-allocated joint costs to the App Store in this analysis, Dr. Abrantes-Metz then cobbles together additional expenses from multiple other sources in an attempt to "account for additional costs related to marketing, developer relations and other activities relevant to the App Store's operation."[117] And while adding in these costs is indeed conservative, there is no indication that either these are the only remaining costs needed to properly calculate fully-burdened operating expenses for the App Store or that her approach is the proper method to estimate these fully-burdened App Store expenses.

73. Dr. Abrantes-Metz's analysis does not become more appropriate or accurate through her attempt to quantify, account for, and allocate "unattributed" operating expenses based on the underlying assumption that the LOB report she uses indeed represents a fully-burdened P&L statement. Based on this unsupported assumption, Dr. Abrantes-Metz compares the operating expense margins of Services and iTunes, assuming the difference is due to "unattributed" iTunes (and by extension the App Store) expenses.[118] Rather, contrary to Dr. Abrantes-Metz's unsupported assumption, Apple employees have consistently testified that Apple does not calculate the allocation of joint costs specific to the App Store and Apple specifically does not utilize this approach, as reflected in Apple's public filings.

74. Mr. Barnes performs similar allocations as Dr. Abrantes-Metz – based on Mr. Rollins' testimony – that purport to adjust App Store P&L reported operating margins by including costs related to WWDR and other corporate-level costs. However, these adjustments do not rectify the fundamental issue that these costs represent the full allocation of joint costs of the App Store;

---

[115] "Principles of Accounting Volume 2 – Managerial Accounting," Patty Graybeal, Mitchell Franklin, Dixon Cooper, February 14, 2019, pp. 21-28, https://openstax.org/books/principles-managerial-accounting/pages/1-2-distinguish-between-financial-and-managerial-accounting#0.

[116] APL-APPSTORE_10176241-337 at 318.

[117] Abrantes-Metz Opening Report, pp. 72-73.

[118] Abrantes-Metz Opening Report, p. 73.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



for the same reasons, because Dr. Abrantes-Metz's "conservative" measure is fundamentally improper, Mr. Barnes' estimates are as well.

75. Despite Dr. Abrantes-Metz's claims her analysis is conservative, her calculations are unsupported and speculative. Her supporting documents follow no specified, consistent reporting standards and are, in fact, contrary to Apple management's consistent statements that the company does not create or rely on P&L statements before the consolidated enterprise level and does not allocate R&D or other significant expenses. Dr. Abrantes-Metz also provides no support for her assumption that the margins reflected in the Services LOB reports are both comparable to the App Store and fully-burdened, properly including and allocating all relevant, shared operating costs.[119] This is in direct contradiction to testimony in the record that the Services LOB report is not fully-burdened and does not allocate all operating costs properly to the App Store.[120]

76. Similar arguments maintain for Mr. Barnes, whose App Store analysis – even with adjustments – does not result in matching operating margin values for 2018 between Apple internal documents. Mr. Barnes does not provide a reason that these measures should be different, or an explanation for the difference itself. Rather, he only claims that these documents are "consistent in form and substance with the type of business records that, in my experience, are routinely maintained by businesses to track the financial performance of individual business segments or business units."[121] His analysis relies on the assumption that certain documents provide a full allocation of costs, while also adding additional costs for marketing and WWDR that were not initially allocated – the Plaintiffs' experts cannot have it both ways.

77. Both the Abrantes-Metz Apple Documents and Barnes Apple Documents also reference iTunes P&L statements – although neither expert provides reasoning or basis for the comparison of the App Store to either the Services LOB or the iTunes store other than "The App Store is a component of the iTunes division of the Apple Services line of business" and "the App Store is part of the iTunes business segment (which rolls up into the Services LOB)."[122] These documents also contain little, if any, narrative support or documentation to support the claims of representing fully-burdened cost allocations, and follow no specified or standardized reporting standard or accounting methodology.

78. As discussed above, Apple operates its business as a cross-functional, interrelated ecosystem of products and services. Apple does not estimate financial data according to any accounting methodology for its operating segments or components on a stand-alone basis. For purposes of internal planning, I understand that simple, high-level expense calculations may be used by

---

[119] "Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021, p. 3,875; Deposition of Mark Rollins, February 11, 2021, pp. 78-79.

[120] Deposition of Mark Rollins, February 11, 2021, pp. 83, 132-133.

[121] Barnes Opening Report, p. 22.

[122] Abrantes-Metz Opening Report, p. 73; Barnes Opening Report, p. 12.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

Apple to assess year-over-year or performance trends. Specifically, as indicated in testimony from Mr. Rollins, Apple, at times, uses both revenue and headcount-based allocation methods to perform certain high-level, period-over-period comparisons.[123] However, that same testimony is also clear that these calculations do not represent fully-burdened P&L statements.

79. While high-level calculations may offer management some insight into periodic trends, the use of either revenue or headcount to allocate joint expenses in a cross-functional ecosystem such as Apple's iOS environment is arbitrary and unreliable given the inherent nature of these costs as inseparable. Moreover, in an ecosystem such as iOS, both of these methods are arbitrary, flawed, and offer limited insight into the cost allocations to individual operating components within the cross-functional system as a whole.

80. First, headcount is the more specious basis for expense allocation. Mr. Barnes notes that "Apple's Corp FP&A group reportedly utilized Method 2 [headcount-based] to allocate OPEX to individual business units."[124] However, headcount is a poor representation of stand-alone expenses in a cross-functional ecosystem with share costs, as some business units will be able to generate significant sales and profits with few employees by leveraging existing IP-protected tools, technologies, services, and infrastructure, while other entities may require a greater number of employees but generate relatively fewer benefits from Apple's shared infrastructure/services and IP-protected assets. Neither Mr. Barnes nor Dr. Abrantes-Metz address the potential for biases created by utilizing financial documents that employ this methodology; Mr. Barnes even chooses to utilize a revenue-based operating expense allocation method rather than headcount-based, and he admits that there are many other ways to allocate costs outside of a revenue-based method.[125]

81. Expense apportionment based on net sales or revenue (as used by Dr. Abrantes-Metz and Mr. Barnes) is also flawed and may result in the disproportionate allocation of shared expenses. Sales volume by itself is not indicative of costs; neither of Plaintiffs' experts have indicated how this allocation method measures the contribution of other aspects the interrelated ecosystem – including, for example, shared infrastructure, tools, and technologies that are not specifically and exclusively developed only in connection with the App Store. As a general matter, high revenue, low margin business lines may sometimes require and benefit little from continued investment in IP-protected technologies and infrastructure while relatively lower revenue, higher margin components sometimes may more fully enjoy such benefits. Indeed, Mr. Barnes provides no basis for why this method is appropriate to estimate operating income and margin for hardware-based products iPhone and iPad based on Corp FP&A Forecasts, as these documents provide

---

[123] Deposition of Mark Rollins, February 11, 2021, p. 42.
[124] Barnes Opening Report, p. 15.
[125] Barnes Opening Report, p. 26; Deposition of Ned S. Barnes, May 1, 2025, pp. 297-298.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



only revenue and gross margin data, as well as Services-based products such as the App Store (other than Apple employs this method in its internal documents).[126]

82. Given the limitations of these allocation methods, along with the general issues surrounding the importance of allocating joint costs within a cross-functional ecosystem, even tying total operating margin of operating components to enterprise-level performance is meaningless, as the consistent application of any allocation method for expenses incurred outside of the operating categories would result in a consolidated total equal to that of the enterprise.

83. For these reasons, even if the information provided by the Abrantes-Metz Apple Documents and Barnes Apple Documents were consistent with other Apple internal documents or management methods and decision making processes, there is still no basis to accept the estimations and outcomes of either Dr. Abrantes-Metz or Mr. Barnes as an appropriate, much less accurate, measure of App Store, iPad, and/or iPhone profitability.

## 6.4. Return on Capital Employed Ratio Calculation

84. Mr. Barnes calculates an additional profit measure – Return on Capital Employed ("ROCE") – for the iPhone and iPad combined, as well as on the iPhone on a stand-alone basis.[127] Mr. Barnes states that ROCE is "reportedly utilized to analyze profitability of subject firms by the [Competition Market Authority]" and is a "good measure to test where profits for a particular firm or sector are high, because it can be compared against an objective benchmark, [the weighted average cost of capital]."[128]

85. Mr. Barnes's analysis employs operating income and margins for the Apple devices, and compares these figures to Apple's company-wide WACC; he concludes that "in every year of the relevant analysis period, the estimated ROCE for the iPhone and iPad combined was significant greater than Apple's average WACC."[129] Dr. Stiglitz then employs Mr. Barnes ROCE analyses and conclusions in his findings that "such high and persistent positive economic returns suggest the presence of market power, as such profits would typically attract new entrants in a competitive market until they are competed away."[130]

86. However, both Mr. Barnes' analyses (and Dr. Stiglitz's follow-on conclusions) fail to acknowledge, apply, or account for certain difficulties in both calculating and applying or comparing ROCE values. Indeed, there are many issues that both competition authorities and investors face when attempting to use ROCE as an indicator of market or monopoly power. I detail these issues below, and as a result, I find that Mr. Barnes' ROCE-based analysis is not indicative of persistent positive economic returns as he claims.

---

[126] Barnes Opening Report, p. 26.
[127] Barnes Opening Report, p. 28.
[128] Barnes Opening Report, pp. 27-28.
[129] Barnes Opening Report, p. 7. Mr. Barnes iPhone-only analysis results in the same conclusion.
[130] Stiglitz Opening Report, pp. 125-126.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

87.   As a preliminary threshold, again, Mr. Barnes' use of product-specific operating expenses, income, and margin completely disregards Apple management's decision-making processes and operating segments defined by geography, rather than products and services. Setting aside the fundamental issues which, at face value, render Mr. Barnes' ROCE analysis misleading and inaccurate, there exist other conceptual flaws in his analysis that result in either overstated or meaningless conclusions. Indeed, even with the added context and information detailed below, "regulators should exercise caution in drawing inferences based on profitability and returns on capital."[131]

88.   While Mr. Barnes concludes that his calculated values of ROCE exceed WACC, this simple conclusion fails to acknowledge any context – both theoretical and quantitative – surrounding these figures and results, including:

   a.   The prevalence and durability of persistently high returns, even within industries generally viewed as competitive;

   b.   The importance, use, and role of intangible capital, particularly as it generates benefits over multiple periods, can be difficult to measure based on public financial disclosures, and may provide excess returns on their as a result of the competitive advantages conferred;

   c.   The complexities of disentangling (or at least accounting for) the interrelatedness of "large technology firms [that] operate complex product and service ecosystems" as well as platform-based businesses with two-sided network effects; and

   d.   The potential inaccuracies due to timing mismatches of depreciation and profits in financial statements.[132]

89.   Properly accounting for these measures, it is clear that Mr. Barnes's ROCE analysis is incomplete and the conclusions he draws therefrom should hold little to no weight in assessing Apple's market or monopoly power in the iOS device market. As a consequence of the deficiencies in Mr. Barnes' analysis, Dr. Stiglitz's conclusions arising from the ROCE analysis are also overstated.

90.   I understand that economic profits for the marginal entrant firm are predicted to be zero in the long run only if each firm has equal access to the same technology and inputs - this is not the

---

[131] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.
[132] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

case in the real-world and unlikely to be the case in the but-for world.[133] Instead, Apple has invested significant amounts of R&D into developing and protecting innovations relating to new products and services relevant to the iOS ecosystem (and its products and services more broadly). Additionally, economic theory does not provide guidance on the appropriate length profits may be necessary to induce firms to invest in risky innovation.[134]

91.     Empirical analyses conducted by Analysis Group, as seen in the figures below, tend to indicate that excess returns calculated from public, U.S.-market listed companies between 2010 and 2019 were both commonplace and persistent across the time period studied. Figure 5 shows that approximately 37.5% of the companies studied – across multiple industries – had average excess returns.[135] The study also breaks out these excess return thresholds by the frequency a company remains above said threshold (Figure 6 below) – showing that numerous companies are able to sustain excess returns over multiple years.

**Figure 5: Company Count of Average Excess Returns[136]**

| Figure 1: Number of Companies with Average Excess Returns Above Various Thresholds | | | | | | |
|---|---|---|---|---|---|---|
| Average Excess Return Threshold: | 0% | 10% | 20% | 30% | 40% | 50% |
| Number of Companies Above Threshold: | 790 | 242 | 116 | 51 | 38 | 29 |
| Sources: S&P Capital IQ and Bloomberg. | | | | | | |

**Figure 6: Length of Average Excess Returns[137]**

---

[133] Dennis W. Carlton and Jeffery M. Perloff, "Competition," *Modern Industrial Organization*, (Pearson, 2015), p. 77.

[134] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

[135] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf. Calculated as 37.5% = (242 + 116 + 51 + 38+ 29) / (790 + 242 + 116 + 51 + 38 + 29).

[136] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

[137] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



| Number of Years | Excess Return Threshold: | | | | | |
| Above Threshold: | 0% | 10% | 20% | 30% | 40% | 50% |
|---|---|---|---|---|---|---|
| 1 | 1,173 | 671 | 387 | 270 | 188 | 146 |
| 2 | 1,089 | 515 | 299 | 200 | 132 | 95 |
| 3 | 999 | 416 | 221 | 129 | 81 | 56 |
| 4 | 918 | 340 | 171 | 92 | 56 | 40 |
| 5 | 835 | 287 | 122 | 62 | 37 | 29 |
| 6 | 720 | 229 | 92 | 50 | 32 | 23 |
| 7 | 622 | 176 | 69 | 31 | 23 | 15 |
| 8 | 506 | 129 | 53 | 26 | 15 | 13 |
| 9 | 412 | 104 | 38 | 20 | 12 | 9 |
| 10 | 282 | 65 | 22 | 12 | 4 | 3 |

**Figure 2:**
**Number of Companies with Excess Returns Above Various Thresholds for Multiple Years**

Sources: S&P Capital IQ and Bloomberg.
Note: Each counts represents the number of companies that had excess returns above the given threshold for at least the specified number of years.

92.    Mr. Barnes calculates ROCE excess returns for 14 or 15 years – but does not provide any indication of the frequency that a company in a technologically-innovative market might expect to enjoy excess returns. As seen above, it is common for companies to enjoy excess returns for multiple years – even up to the full time period studied. Mr. Barnes even fails to observe simple trends in his exhibits, which generally indicate that the ROCE has declined from the start of his analysis to the end. Specifically, Mr. Barnes' analyses demonstrate the following:

    a.   Excess ROCE for iPhone and iPad decreased from 30.6% in 2010 to 16.1% in 2020 (Barnes Opening Report, Exhibit 7);

    b.   Excess ROCE for iPhone decreased from 33.6% in 2009 to 14.5% in 2020 (Barnes Opening Report, Exhibit 8);

    c.   Excess ROCE (with net assets including cumulative R&D) for iPhone and iPad decreased from 32.2% in 2010 to 13.2% in 2020 (Barnes Opening Report, Exhibit 11);

    d.   Excess ROCE (with net assets including cumulative R&D) for iPhone decreased from 35.4% in 2009 to 12.4% in 2020 (Barnes Opening Report, Exhibit 12).

93.    Mr. Barnes also provides no context or description of the potential effects the COVID-19 pandemic may have had on either Apple's operating income, capital structure, assets, or R&D spend. While many of the ROCE results increase slightly from 2020 to 2023, they do not return to the levels seen in the first time period studied and, as explained below, may be due to external factors unrelated to Apple's alleged misconduct and resulting market power. Again, as economic theory provides no indication of how quickly economic profits should dissipate, there is no indication that the periods studied in the Barnes Opening Report indicate sustained and durable market power. The existence of common, persistent excess returns may indicate that using such metrics are not suited to be used as a "bright-line test," as they are unable to properly and accurately identify market power, instead resulting in a high frequency of false positives where

market power is found but does not actually exist. Indeed, other studies have found that "companies have generally been successful in sustaining their rates of ROIC. It appears that when companies have found a strategy that creates competitive advantages, they are often able to sustain and renew those advantages over many years."[138]

94.    Next, I understand issues arising from return-on-capital metrics such as ROCE using accounting data can be "exacerbated for firms whose capital is comprised primarily of intangible assets that are not reflected on companies' balance sheets."[139] Mr. Barnes does recognize as much, including a measure of cumulative R&D in his calculation of net assets in one variation of his ROCE calculation.[140] As seen in the figure below, Apple's overall company value – as measured by market capitalization – is heavily weighted towards intangible assets. Between 2009 and 2024, the intangible asset market value of Apple ranges from 73.1% to 98.4%.[141] Mr. Barnes does not account for this issue in four of the six ROCE metrics he calculates. During Mr. Barnes' deposition, he also testified that intangible assets not listed on the balance sheet would not be depreciated or amortized, thus not being recorded under GAAP in Apple's financial statements.[142]

**Figure 7: Apple Annual IAMV**[143]



---

[138] "Valuation – Seventh Edition," *McKinsey & Company*, 2020, p. 141 (cited in Analysis Group study).
[139] "The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.
[140] Barnes Opening Report, Exhibit 11 and Exhibit 12.
[141] Schedule 1.3.
[142] Deposition of Ned S. Barnes, May 1, 2025, pp. 151, 228, 259.
[143] Schedule 1.3.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO
A PART OF JS|HELD

95.    On top of these issues, ROCE above WACC is not, by itself, conclusive of market power or competitive misconduct. Rather, as outlined in multiple statutes, including the Constitution itself, firms can be incentivized to undertake innovation to generate and sustain a competitive advantage. Even though Mr. Barnes proffers results that indicate ROCE in excess of WACC, he does not discuss the role of Apple's successful innovations and whether they merit those returns.[144] As discussed in the Malackowski Opening Report, Apple has invested over $210 billion in R&D since FY 2005 and currently maintains 33,383 U.S. active granted patents, 5,067 U.S. active applications, 980 U.S. registered trademarks, 6,202 U.S. copyrights, and numerous trade secrets.[145] It is likely that Apple undertook its R&D processes with the expectation that it would be able to protect resulting innovations with IP rights and enjoy excess returns in exchange for allowing developers to use certain of its numerous, valuable IP-protected tools, technologies, and services related to the iOS ecosystem.

96.    Next, I understand that accounting conventions generally do not adequately capture the timing of the benefits and costs of investments. For example, investments made in one fiscal year may not generate returns the same fiscal year, much less until many fiscal years later. The accounting information provided by Apple and used by Mr. Barnes makes no distinction tying the benefits received (i.e. operating income) and the investments made. This is most apparent perhaps in Mr. Barnes' calculation of cumulative R&D – which he begins in in 2010.[146] However, the initial iPhone was released in 2007 and I understand R&D efforts began in earnest in FY 2004. The main benefits of these R&D efforts – the public market release of the iPhone – were not realized for three or more years in the future. Mr. Barnes excludes all R&D related to iPhone prior to 2010 in his analysis, despite its likely foundational nature in creating and developing a successful product and overall ecosystem.

97.    The ROCE analysis created by Mr. Barnes also appears to compare pre-tax apples to post-tax oranges. Specifically, Mr. Barnes measure of operating income and margin is a before-tax figure – "profit a company generate from its core business activities excluding interest, taxes, and certain other income and expense items that are not core to ongoing business operations" – while his comparator – WACC – is an after-tax benchmark figure.[147] Logically, a minuend (operating margin/ROCE) that does not have taxes removed – when that is the benefit received by the company or investor – and a subtrahend (WACC) that is lower due to removing tax effects – will result in an artificially higher difference, all else equal. The Analysis Group authors note that while the CMA calculated excess returns using pre-tax profits, as does Mr. Barnes, that this would "tend to overstate excess returns."[148]

---

[144] Deposition of Ned S. Barnes, May 1, 2025, pp. 118-121.
[145] Malackowski Opening Report, Schedule 1.0, Schedule 2.1, Schedule 2.0, and Schedule 6.0.
[146] Barnes Opening Report, Exhibit 25.
[147] Barnes Opening Report, pp. 9, 27; Deposition of Ned S. Barnes, May 1, 2025, p. 267.
[148] The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

98.    Mr. Barnes' ROCE analysis and comparison fails to properly account for the complexities of disentangling (or at least accounting for) the interrelatedness of "large technology firms [that] operate complex product and service ecosystems" as well as platform-based businesses with two-sided network effects.[149] The iOS platform – as noted elsewhere in this report – is viewed by management as a single, interrelated ecosystem. Management operates and makes decisions based on geographic operating segments, as its view that certain joint costs are inseparable given the overlap between products and services. Any attempt to parse specific yet fully-burdened costs to individual products (*e.g.*, iPad or iPhone) is futile given the accounting data provided by Apple. Again, for the reasons outlined in the section above, Mr. Barnes' analysis does not, and cannot, claim to be a fully-burdened P&L statement for a specific product.

99.    Additionally, the Analysis Group authors note that, as is the case here, the iOS ecosystem can be characterized by two-sided network effects and economies of scale, extending the challenges in properly calculating, apportioning, and allocating relevant costs and investments to measure excess returns. Apple as a company has recognized these challenges, and is likely part of the reason behind the definition of its operating segments. Mr. Barnes, on the other hand, does not attempt to account for any of these effects in his calculations, rendering them meaningless in measuring an accurate value of ROCE.

### 6.5. Comparison of Play Store to App Store Profitability is Unsupported and Speculative

100.    The Barnes Opening Report includes an attempt to conduct a "comparative analysis of the financial performance of the App Store and the Play Store."[150] In his attempt, Mr. Barnes claims to analyze and compare the historical operating income percentages for the App Store and Play Store.[151] Mr. Barnes concludes that "the operating income percentages generated by the App Store are significantly higher than the operating income percentages generated by the Play Store" from 2013 through 2020.[152] Mr. Barnes illustrates his conclusion with a simple table that contains the operating income percentage of the two app marketplaces with no commentary of the comparability of the results or discussions of which geographic regions the analysis includes. Furthermore, Mr. Barnes' attempt to compare operating income percentages from two different app marketplaces is fundamentally flawed as it does not consider whether there are differences between the App Store and the Play Store, or whether there are many such differences. More importantly, the Barnes Opening Report fails to explain why a comparison between the operating income percentages of Apple's App Store and Google's Play Store is proper to begin with.[153]

---

[149] The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.
[150] Barnes Opening Report, p. 24.
[151] Barnes Opening Report, p. 24.
[152] Barnes Opening Report, p. 25.
[153] Deposition of Ned S. Barnes, May 1, 2025, pp. 183-184.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

101.    As discussed throughout this report, Apple provides countless benefits to developers and consumers, such as keeping a secure marketplace that allows the apps listed to enjoy an orderly marketplace. Indeed, Apple is known to provide a high level of security in their App Store ecosystem and constantly touts its security measures that allow Apple to protect App Store users and developers as illustrated in the figure below. From 2020 through 2023, Apple claims to have prevented a total of $7 billion in potentially fraudulent transactions.[154]

**Figure 8: App Store Protection in 2023**[155]



102.    As part of Apple's account fraud prevention measures, Apple employs a dedicated team of over 500 experts who evaluate "every single app submission" before the app ever reaches users, which in 2023 resulted in a review of approximately 132,500 apps a week.[156] The App Store app review process requires several days in order for the app to be approved.[157] In addition to app review, Apple also reviews and removes fraudulent ratings and reviews from the App Store, and

---

[154] "App Store stopped over $7 billion in potentially fraudulent transactions in four years," *Apple*, May 14, 2024, https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[155] "App Store stopped over $7 billion in potentially fraudulent transactions in four years," *Apple*, May 14, 2024, https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[156] "App Store stopped over $7 billion in potentially fraudulent transactions in four years," *Apple*, May 14, 2024, https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[157] "Apple Store vs Google Play – Main Differences," *SplitMetrics*, https://splitmetrics.com/glossary/telling-apples-from-oranges-in-2022-apple-app-store-vs-google-play-store-for-app-publishers/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

Apple also employs several measures to protect users from credit card fraud.[158] Google's Play Store on the other hand is frequently considered less secure than the App Store.[159]

103.    Aside from the various measures Apple employs to keep its App Store safe and secure, other characteristics that Mr. Barnes fails to consider include the different user demographics contained in the App Store when compared to the Play Store. For example, there have been reports that in 2023 and 2024 the App Store accounted for more app consumer spending than Google's Play Store, even though the App Store contained fewer apps and games and fewer downloads, as illustrated in the figures below.[160] Yet Mr. Barnes does not consider user demographic difference between the two app marketplaces in his alleged comparability analysis.

**Figure 9: Global Mobile App Consumer Spending**[161]



**Figure 10: Global Mobile App Downloads**[162]

[158] "App Store stopped over $7 billion in potentially fraudulent transactions in four years," *Apple*, May 14, 2024, https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[159] "iOS App Store vs. Google Play Store: Which Is Better for App Developers?" Priya Viswanathan, *Lifewire*, July 29, 2024, https://www.lifewire.com/ios-app-store-vs-google-play-store-for-app-developers-2373130; "Difference Between App Store vs Google Play Store," *CitrusBits*, October 20, 2017, https://citrusbits.com/difference-between-app-store-vs-google-play-store/; "Apple Store vs Google Play – Main Differences," *SplitMetrics*, https://splitmetrics.com/glossary/telling-apples-from-oranges-in-2022-apple-app-store-vs-google-play-store-for-app-publishers/.

[160] "Apple App Store Statistics (2025)," David Curry, *Business of Apps*, January 22, 2025, https://www.businessofapps.com/data/apple-app-store-statistics/.

[161] "Despite Fewer App Downloads, Consumer Spending on App Store and Google Play Increased Compared to Last Year," Arooj Ahmed, *Digital Information World*, December 21, 2024, https://www.digitalinformationworld.com/2024/12/despite-fewer-app-downloads-consumer.html.

[162] "Despite Fewer App Downloads, Consumer Spending on App Store and Google Play Increased Compared to Last Year," Arooj Ahmed, *Digital Information World*, December 21, 2024, https://www.digitalinformationworld.com/2024/12/despite-fewer-app-downloads-consumer.html.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD



104.     Another characteristic that Mr. Barnes did not consider is the efficiency provided by Apple in its App Store. For example, there are anecdotal public claims that a developer implemented a feature in the App Store with only forty lines of code whereas that same feature required 500+ lines of code to implement in Android.[163] For example, Apple provides thousands of APIs and SDKs to assist developers in the efficient development of apps. In addition, developers of Play Store apps need to account for numerous form factors – product sizes, hardware, and specifications.

105.     Apple produces its own hardware while Android is loaded into Google hardware and other hardware manufactured by original equipment manufacturers ("OEMs"). Apple does not license iOS to an OEM as Apple's software and hardware are under one Apple umbrella. However, Google in the past has claimed they would charge licensing fees to OEMs for the Play Store and other apps in certain regions.[164] These proposed fees by Google could change the dynamic of access to its Play Store and would differentiate it from the structure currently in place for Apple.

106.     As discussed in the Malackowski Opening Report, Apple's vast IP protecting the iOS and the App Store ecosystem includes various patents, copyrights, trademarks, and trade secrets across the United States and the entire world. The entirety of Apple's IP allows for a connected ecosystem that benefits consumers and developers. Mr. Barnes did not mention Google's IP or discuss how much of Google's IP relates to the Play Store, how Google's IP connects the Play Store marketplace, or how Android's open-source availability could make Google a poor comparison against Apple. This lack of IP consideration and the resulting effects it has on

---

[163] "Here's why Apple's App Store is better than Google's Play Store," Braden Newell, *MobileSyrup*, March 6, 2023, https://mobilesyrup.com/2023/03/06/why-apples-app-store-is-better-than-googles-play-store/.
[164] "Google's Play Store will no longer be free to Android phone makers in Europe," Karissa Bell, *Mashable*, October 16, 2018, https://mashable.com/article/google-android-licensing-policies-changing-in-europe; "Google to start charging a licensing fee after EU Android ruling," Simon Van Dorpe, *Politico*, October 16, 2018, https://www.politico.eu/article/google-to-start-charging-a-licensing-fee-after-eu-android-ruling/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

operating margins results in an incomplete comparability analysis of the App Store and the Play Store that provides little insight, if any, into the operating margins of each company and its respective app marketplaces.

107.    Mr. Barnes also failed to discuss the results in the comparative table that includes Apple's App Store alleged operating margin decreasing from 81.8% in 2013 to 77.4% in 2020 while over that same time period Google's Play Store increased its operating margin 2.7x from 21.3% to 57.7%[165]. Additionally, Mr. Barnes also fails to discuss how Apple's App Store in 2013, a period in which Apple's smartphone share had more competition according to Dr. Song, generated a higher operating margin than in 2020, a year that allegedly only has the Google Play Store as competitor.[166] With respect to tablets, Dr. Stiglitz admits that Apple saw "a lot of competition" from 2010 to 2015.[167] Mr. Barnes also states that the fiscal years of the two companies end in different periods, yet he failed to account for the timing differences and groups financial metrics from two different periods for comparison.[168] Moreover, the operating income calculated for Apple uses Mr. Barnes' allocation method 1 which, as discussed above, is a flawed method, making the comparison to Google's Play Store operating income percentage meaningless.

## 7.    EFFECTS OF BUT-FOR WORLD ASSUMPTIONS ON THE POTENTIAL BUT-FOR COMMISSION RATE AND OTHER CONSEQUENCES

### 7.1. Effects on a Potential But-For World

108.    In the but-for world proposed by Plaintiffs' experts, Apple would permit distribution of iOS applications via third-party distribution platforms and direct distribution and would reduce the App Store commission rate. Plaintiffs' experts fail to acknowledge, however, that such changes could result in a modification of Apple's overall Developer Program compensation structure, which, in turn, could likely impact app pricing and therefore the potential but-for commission rate. As described throughout this report and the Malackowski Opening Report, Apple does not manage individual components of the ecosystem in a vacuum. Accordingly, hypothetical changes to any elements of the ecosystem (*e.g.*, commission rates) in the but-for world could necessitate that Apple reassess the overall management and compensation structure of the ecosystem, as the current model was specifically chosen absent of such restrictions.

109.    There are at least four primary effects that the proposed but-for world could have on consumers:

1. Prices charged to consumers for applications might increase;
2. Consumers might see a smaller selection of applications;

---

[165] Barnes Opening Report, Exhibit 4.
[166] Song Opening Report, p. 50.
[167] Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025, p. 79.
[168] Barnes Opening Report, Exhibit 4.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



3.  Consumers might have reduced access to or reduced benefits from new technology developments; and

4.  The iOS ecosystem and its consumer- and developer-facing benefits might shrink.

110.  I will discuss these effects on consumers in greater detail below. In order to fully understand these potential negative ramifications, however, it is important to understand the mechanisms through which they could transpire. As discussed in the Malackowski Opening Report, other entities offer access to and use of their software and development tools and technology for software development, including apps, in a variety of structures and pricing models that differ from Apple's Developer Program and related agreements.[169]

111.  Plaintiffs' experts, however, appear to discount the possibility that Apple's compensation structure would change on the grounds that the amount of revenue under different structures would differ. As noted earlier, this argument and analysis is flawed because of the fundamental failure to consider how the protected nature of Apple's tools, technologies, and services accessed and used by developers and consumers would affect the but-for world results and its assumptions, including the but-for commission rate.

112.  Dr. Abrantes-Metz uses a theoretical equation as a "model" to estimate the but-for commission rate.[170] The model presumes to "incorporat[e] the app stores' cost structure, market shares and profit margins" found in a "moderately competitive market[.]"[171] She goes on to claim that, "adjusting these inputs to reflect different competitive conditions would yield a different commission rate."[172]

113.  Putting aside other issues with her equation, the foundational assumption behind Dr. Abrantes-Metz's analysis and by extension her conclusions is that Apple's commission structure would remain largely unchanged in the but-for world. Moreover, she assumes that the App Store and rival app marketplaces would adopt the same, uniform commission rate. Dr. Abrantes-Metz explains she did not incorporate tiered commission in her model, "as Apple would likely have adopted a single commission rate in the But-For World[,]" while on the other hand admitting that "Apple charges two different commission rates in the As-Is World."[173] Yet, as I have explained in the Malackowski Opening Report, real-world compensation practices relating to software and development tools and technology provide ample evidence of the possibilities of varying commission structures – creating disparate effects for both developers and consumers.

114.  Dr. Abrantes-Metz assumes that a but-for commission rate can be determined through the use of a hypothetical, "all else equal" equation, shown in the figure below.

---

[169] Malackowski Opening Report, Sections 3.1, 9.
[170] Abrantes-Metz Opening Report, p. 10.
[171] Abrantes-Metz Opening Report, p. 10.
[172] Abrantes-Metz Opening Report, p. 11.
[173] Abrantes-Metz Opening Report, p. 39.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

*The operating profit margin for an app store that earns revenue by collecting a commission on sales of apps and in-app content can be expressed as follows:*

**Figure 11: Dr. Abrantes-Metz Hypothetical Economic Model**[174]

$$\text{Operating Profit Margin for Firm i} = \frac{s_i M(\tau_i - VC_i) - FC_i}{s_i M \tau_i},$$

where $s_i$ represents firm i's market share of all app and in-app content sales, M the total market expenditure on apps and in-app content, $\tau_i$ the commission rate, $VC_i$ the variable cost per dollar of gross sales through the app store and $FC_i$ the fixed operating cost. The numerator reflects the operating profit, calculated as commission revenue minus variable and fixed operating costs, while the denominator represents total commission revenue.

115. This sterile equation significantly oversimplifies reality and ignores the wide range of outcomes possible in practice. Therefore, at a fundamental level, Dr. Abrantes-Metz's analysis demonstrates a lack of awareness of the real-world economics of intellectual property and technology development, and investment.

116. In a but-for world in which Apple still provides a Developer Program to all iOS developers regardless of whether they distribute via the App Store, Apple could modify the Developer Program model to be compensated for its contributions of IP-protected tools, technologies, and services, to the program. When there is no or less guarantee of participation in application billings on the backend (due to the proposed allowance of app distribution outside of the App Store), Apple could, for example, instead seek more direct compensation for access to/use of its IP-protected tools, technologies, and services. Where apps are distributed outside the App Store, though, Apple also could consider that an increase in friction and other transaction costs may occur, including the costs of tracking, recording, and paying compensation amounts, or conducting and complying with audits necessary for the successful function of a model that is not based on a revenue stream Apple directly observes.

117. Shifting to an alternate compensation structure could affect members of the iOS ecosystem differently and likely introduce new challenges for at least some. There are options after which Apple could choose to model the Developer Program, if Apple deems that is the best course of action for its App Store and its ecosystem in the but-for world. To briefly summarize, some of the alternative compensation options observed in the real world for software and development tools and technology, as discussed in the Malackowski Opening Report, include:

- A fee for the use of each specific API, developer tool, or software package;

- Charge separately for bundles of developer tools or functionality;

---

[174] Abrantes-Metz Opening Report, p. 10.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

- Increase the fees associated with the Developer Program generally;

- Introduce a developer revenue-based fee;

- Implement a tiered structure of commission rates; and

- Vary fee terms based on the size or other characteristics of a particular developer.

The examples above are some of the options Apple could choose to explore further in the but-for world and are consistent with both my extensive experience with the licensing of tools, technology, services, the intellectual property rights that underlie them, and precedent models within the software application development industry.

118. I understand that Dr. Abrantes-Metz critiques an example above by stating that I have not offered earnings information or the potential for revenue generation by Apple in the but-for world.[175] However, some of these options are currently available to Apple in the current world could also and more than likely be available to Apple in the but-for world, contrary to Plaintiffs' experts assumption that Apple would grant access for its vast array of IP-protected tools, technologies, and services to developers at a lower commission rate with no reciprocity of benefits to Apple. Dr. Abrantes-Metz does not appear to consider whether a lower App Store commission rate, such as the one she proffers, would dynamically incentivize Apple to attempt to recoup its incurred costs spent for the creation of IP-protected tools, technologies, and services through other means outside of the App Store's existing commission rate and structure. Importantly, Plaintiffs' expert fail to provide or cite to any evidence supporting Apple's obligation, or likelihood, to maintain the same commission structure in the but-for world such that it would be appropriate to assume the same but-for commission rate or structure across app marketplaces.

119. The long list of alternative compensation structures and amalgamations thereof, when merged with the differential impacts on developers and consumers outlined below, would lead to a countless combination of developer and consumer sub-groups each harmed or benefitted in a different way, and consequently, in different amounts. An exercise in determining purported harm should necessitate an articulation of the various types of alternative compensation structures, the probability of each being put into effect, and an individual inquiry into each sub-group of developers and consumers affected. Yet this is neither acknowledged nor attempted by Plaintiffs' experts.

**7.2. Potential Consequences of Alternative Compensation Structures**

120. Any alternative compensation structure selected by Apple could change the costs and risks individual iOS developers face. Some alternate structures could drive up the overall cost of development for many, while bringing costs down for the highest earning developers. Others

---

[175] Abrantes-Metz Opening Report, p. 53.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



could shift the majority of development costs from the backend to upfront, effectively raising barriers to entry and increasing developers' financial risk relative to the status quo. As one example, as mentioned earlier, approximately 90% of developers' iOS ecosystem-related U.S. revenues – approximately $406 billion in 2024 – are currently not subject to the App Store commission structure, but those revenues could be impacted by an alternative compensation structure.[176] Such changes would affect each developer differently based on their specific circumstances, resulting in groups that may see increased costs, groups that may see reduced costs, and groups that will be relatively unaffected. These varying changes could impact the apps that those developers are and/or would have developed, and, by consequence, affect Plaintiffs and consumers differently. Some likely ramifications from the potential but-for world compensation structure changes are described below, including examples of their unique impact on certain developers.

**Developers might abandon iOS and consumers could lose the benefit of their would-be apps.**

121. Any compensation structure change that increases the cost of development could discourage some new developers from pursuing the iOS platform and drive away some existing iOS developers. For example, changes that introduce higher upfront fees (*e.g.*, upfront fees or paid access to specific developer tools) could mean new barriers to entry for developers, discouraging or prohibiting some from joining the iOS ecosystem at all. Across the developer spectrum, from free apps, to ad-supported apps, to transactional apps, higher development costs could drive some developers to leave iOS altogether. By consequence, consumers could lose those apps that would have been created in varying ways, with some consumers being impacted more heavily than others.

**Developers might cease use of beneficial Apple IP-protected tools, technologies, and services, resulting in app quality declines and waning developer innovation.**

122. If Apple were to implement a usage-based fee system, *ad hoc* technology bundle pricing, or tiered subscription options, developers would be faced with a choice: pay more to use more of Apple's IP-protected tools, technologies, and services, or pay less by minimizing such usage. The *status quo* encourages developer innovation in that it allows free, unrestricted access to the full suite of IP-protected tools, technologies, and services developed and provided by Apple. While the specific cost-benefit tradeoff would be developer-specific, at the ecosystem level it could discourage the use of more sophisticated, IP-rich technology Apple provides. Instead of focusing on developing the best applications possible using the optimal combination of the 150,000+ iOS APIs Apple provides, some developers could instead forego certain features or

---

[176] "App Store in the U.S. facilitated over $400 billion in developer billings and sales in 2024," *Apple*, May 29, 2025, https://www.apple.com/newsroom/2025/05/app-store-in-the-us-facilitated-406-billion-usd-in-developer-billings-and-sales-in-2024/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



implement sub-optimal workarounds in the interest of controlling cost.[177] Moreover, a usage-based fee system effectively increases costs which dissuades developers' exploration and implementation of new technologies, reducing the type of open technical innovation developers enjoy under the current Developer Program model and results quality and variety of apps. This cost-benefit tradeoff decision and its downstream ramifications could affect developers of free and paid applications across application categories, but the extent of the effect would vary based on the size, resources, and usage characteristics of individual developers. Consumers could be impacted as the quality, nature, and/or pricing approach of the apps they utilize change as a result – again, with consumers who use more sophisticated apps potentially being affected disparately from those who choose to use very few apps, or only very simple apps. For example, consumers of applications from relatively small developers or thinly-funded applications would likely experience more pronounced negative effects as a result of these changes.

**Developers might raise prices charged to consumers.**

123.    In response to increased or differently-structure costs, those developers who do not leave iOS completely may respond with application (or in-app purchase) price increases. Such increases would disparately affect consumers, depending on whether and to what extent developers raise their prices. It could also affect demand for other apps. For example, developers might choose to start charging for currently free applications in the face of usage-based fees and/or increased development costs. Currently, developers of free or ad-supported applications pay only the $99 annual fee in exchange for full access to the Developer Program benefits and distribution on the App Store. Across app genres, the percent of downloads that were free in 2021 ranged from 93.4% to 100.0%.[178]

124.    If Apple were to adopt a new model that predominantly charges developers upfront for access to developer tools or on an API-usage basis, the development cost of such free applications could increase dramatically. Affected developers may respond by leaving iOS as previously noted, but could also start charging for their previously free applications. Apple CEO Tim Cook articulated the benefits of free applications to App Store developers when he testified, "the way that I look at that, Your Honor, is that by having such a large number of apps that are free on the store, it increases traffic to the store dramatically. And so the benefit somebody gets that's charging is they get a much higher audience to – to sell to than they would otherwise if there weren't free apps there."[179] Accordingly, a decrease in the number of free apps available to consumers would most heavily impact those consumers who previously relied on free apps, as well as, more generally, adversely affect the App Store ecosystem as a whole.

---

[177] "Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021, p. 3,989; "App Store," *Apple*, https://developer.apple.com/app-store/features/.

[178] Expert Report of Lorin Hitt, March 10, 2023, Figure 130 and pp. 170, 343.

[179] "Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021, pp. 3,988-3,989.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



**Developers might introduce advertising in currently ad-free applications.**

125.    A potential result of rising application development costs is the increased use of advertising by developers to offset such costs, assuming that no commission is charged on advertising revenue consistent with the as-is world. While it is established in the app development industry that "using mobile application ads can pay back the cost of development over time," a heavy reliance on advertising could be at the detriment of user experience.[180] Such user experience harm may be particularly pronounced if a currently ad-free application begins serving in-app ads to existing users.

126.    It is important to note that the above effects on developers and resulting developer reactions could be developer-specific or app-specific and would vary significantly across and within app categories. Such case-specific developer reactions could result in varying impacts on different consumer groups based on the apps they purchase and use. For example, in an API-usage based fee model, consumers of complex, API-rich applications, such as high-graphics video games, could be affected to an entirely different degree than consumers of simple text-based games that rely on a relatively small number of APIs. The same disparity could exist between app categories as well, in that differences in the specific API or software usage, revenue models, or profitability common in an app category could dictate the extent to which developers in that category are affected by the but-for world changes. Accordingly, there would be a spectrum of outcomes for consumers generally, where some could be disadvantaged significantly, others could be affected minimally, and others still may benefit from the changes. Again, such disruption to the developers' business models could have a range of impacts on consumer choice and prices.

**Consumers might have reduced access to or reduced benefits from new technology developments.**

127.    As described above, a pricing model based on usage or access to specific technologies could require developers to pay more to implement and innovate around newly-developed Apple features and technologies. These additional costs could disincentivize the use and distribution of new or technically advanced technologies, and could also affect pricing in different ways depending on the extent to which a developer seeks to pass along such costs to consumers. Ultimately, under such a system, consumers could either not have access to the features due to low implementation or may have to pay more to use applications that incorporate the latest innovations.

128.    Given each consumer's unique app usage patterns, each consumer could be harmed differently. As shown in Figure 12 below, Apple's current pricing structure allows a developer of a game app

---

[180] "Use Mobile Application Ads to Monetise Your App Project," Marat Basyrov, *Intelligent Profit Solutions*, February 25, 2020, https://www.intelligentprofitsolutions.com/blog/ips-blog/use-mobile-application-ads-to-monetise-your-app-project; "Best Guide To Mobile App Monetization 2021 – Stats, Strategies & Insight," James Ewen, *Tamoco*, June 6, 2019, https://www.tamoco.com/blog/ultimate-app-monetization-guide/#In-app_advertising.



or health app, for example, to use as many of Apple's developer tools as necessary, paying a single, flat commission rate to create the best user experience for the consumer.

**Figure 12: iOS App Development Current State of Affairs**



129.    In the but-for world, however, developers may not have such broad access to the latest and greatest features and tools. In a scenario where Apple employs a pricing model with upfront access or usage fees for each developer tool, the developer of a game or health app may be forced to choose between passing along the cost to the consumer or creating workarounds which could negatively impact user experience as shown in Figure 13 below:

**Figure 13: iOS App Development in the But-For World**

130.    Whether the but-for pricing model causes developers to pass along costs to consumers or create workarounds to cut costs, it is clear that each consumer would be affected differently – both within and across app categories. In the above but-for example, the developer tools related to the game app are assumed to be more expensive than those of the health app, meaning that the

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

user of the game app could be worse off than the user of the health app should the developer choose to pass along that upfront cost. If the developer were to create workarounds instead, the negative impact on the consumer could also differ significantly across the two app types as shown in the above Figure 13.

131.    Further, consumers using the same type of app, for example a game, may also be affected differently depending on what developer tools the game utilizes. In the but-for world, a user of a graphically simple game that relies on Apple's Game Center (GameKit) for matchmaking and social multiplayer features could be affected differently than a user of a graphics-intensive single-player game which relies on Apple's Metal for high-performance graphics rendering. The impact on each consumer in the but-for world could ultimately depend on what apps they use, what the upfront cost of Apple's developer tools related to those apps would be, and how the developers of those apps choose to manage their high upfront costs.

**Cost prohibitive developer tools could limit developers from freely pivoting among different products and ideas, stifling innovation and the development of new apps and features.**

132.    A major catalyst of app innovation has come from broad access to Apple's developer tools and APIs. Free or low-cost access to development tools gives developers the confidence to experiment and explore new ideas and ways to use their products. Many popular apps used today have development stories that reflect this evolution of development and Apple's IP. Pinterest, for example, started out as a mobile shopping app but later transitioned into a photo-collecting and sharing app after realizing its consumers shopped in buckets. The Pinterest team built a product that allowed users to put images into separate buckets. This pivot garnered millions of users and massive popularity for Pinterest.[181]

133.    Another example is Instagram, which was originally named Burbn. Burbn let users check in at locations, make plans for future check-ins, and earn points for meeting with friends. The app was originally unsuccessful and complicated which led to the developers scrapping most of it and focusing on their photo-sharing infrastructure, which led to the development of the Instagram app.[182]

134.    Lastly, Flickr was originally a Massively Multiplayer Online ("MMO") game titled "Game Neverending" where the purpose was not to win, but rather to interact with people. The game was not commercially successful as the concept was too complicated and unfamiliar to consumers. However, the photo-sharing feature of the game was well-received which led the

[181] "INSIDE PINTEREST: An Overnight Success Four Years In the Making," Nicholas Carlson, *Business Insider*, May 1, 2012, https://www.businessinsider.com/inside-pinterest-an-overnight-success-four-years-in-the-making-2012-4.

[182] "Instagram Was First Called 'Burbn'," Megan Garber, *The Atlantic*, July 2, 2014, https://www.theatlantic.com/technology/archive/2014/07/instagram-used-to-be-called-brbn/373815/.

game's founder, Stewart Butterfield, to pivot toward photo-sharing resulting in the development of Flickr in 2004.[183]

135.    In the but-for world, nascent developers could be burdened with additional costs for the tools and APIs needed to develop features or apps. These costs could deter developers from exploring new, innovative ideas like those discussed in the examples above. Similarly, established developers could be more inclined to stick to their predictable business models as exploring new ideas and features could require more resources; and this could ultimately lead to less choice, less innovative apps, and fewer features for the consumer.

**Costs may increase where third-party app marketplaces fail.**

136.    Plaintiffs' experts assume their proposed App Store commission rate in the but-for world would be economically feasible for Apple and beneficial to all App Store consumers with disregard to actual examples available in the current world. For example, in 2011 Amazon introduced the Amazon Appstore for Android devices as an alternative to the Google Play Store.[184] However, after over a decade of investment by Amazon, a multi-trillion-dollar market cap company, made the decision to discontinue the Amazon Appstore on Android and focus on their Appstore experience in their own Amazon devices.[185] Amazon's reasoning for the change included that the "overwhelming majority" of Amazon's consumers currently engage with Amazon Appstore using Amazon's devices.[186]

137.    The decision by Amazon was not a one-time occurrence either – Amazon made a similar decision a year earlier with Windows 11 consumers using Amazon's Appstore in the Microsoft Store.[187] In both of these situations the consumers who chose the third-party app marketplace would be negatively affected by its exit as the apps and games those consumers purchased in those third-party app marketplaces could more than likely be discontinued and no longer supported.

---

[183] "Fun Fact – Flickr and Slack Started as 'A Game that Never Ends,'" Kaden Ng, *Jumpstart*, September 21, 2017, https://www.jumpstartmag.com/fun-fact-flickr-and-slack-started-as-a-game-that-never-ends/.

[184] "If Amazon can't make a third-party Android app store work, no one can," Taylor Kerns, *Android Police*, February 23, 2025, https://www.msn.com/en-us/news/technology/if-amazon-cant-make-a-third-party-android-app-store-work-no-one-can/ar-AA1zE0Ie.

[185] "Market capitalization of Amazon (AMZN)," *CompaniesMarketCap*, https://companiesmarketcap.com/amazon/marketcap/. Last accessed June 10, 2025; "Amazon to shut down its Android app store later this year," Karadeep Oberoi, *Android Police*, February 20, 2025, https://www.androidpolice.com/amazon-android-app-store-shut-down/?utm=syndication&pubDate=20250223.

[186] "Amazon to shut down its Android app store later this year," Karadeep Oberoi, *Android Police*, February 20, 2025, https://www.androidpolice.com/amazon-android-app-store-shut-down/?utm=syndication&pubDate=20250223.

[187] "Microsoft will kill Windows Subsystem for Android on Windows 11 next year, but Amazon just drove a nail in the coffin," Sean Endicott, *Windows Central*, March 6, 2024, https://www.windowscentral.com/software-apps/windows-11/microsoft-will-kill-windows-subsystem-for-android-on-windows-11-next-year-but-amazon-just-drove-a-nail-in-the-coffin#xenforo-comments-531156.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

OCEAN TOMO®
A PART OF JS|HELD

138.    The above Amazon Appstore exit from Android devices highlights another aspect of app marketplace consumers that the Plaintiffs' experts fail to consider. For example, it has been observed that the App Store has more "high-quality apps, a strict approval process, and a better user experience."[188] Other third parties have made similar observations, as seen in Figure 14.[189] Yet Plaintiffs' experts assume iPhone users would choose to follow a third-party app marketplace with little oversight on quality, safety, and security.

**Figure 14: *Lifewire* Summary of App Store and Google Play Store Comparison**[190]

139.    After Amazon made available its marketplace store for Android, it secured "early exclusives and gave away a plethora of premium content and Coins to anyone willing to do the legwork of installing the storefront on their Android phone."[191] Yet the Play Store users did not change to Amazon's app marketplace and Amazon did not gain any critical mass for its app marketplace. Indeed, the public now knows Amazon's share was immaterial as it was estimated to be around 0.1% of Android phones, casting doubt to Plaintiffs' experts' assumption that App Store users would seek out and accept third-party app marketplaces to the extent assumed.[192]

---

[188] "iOS App Store vs. Google Play Store: Which One is Better?" Matthew Lynch, *The Tech Advocate*, June 30, 2023, https://www.thetechedvocate.org/ios-app-store-vs-google-play-store-which-one-is-better/.

[189] "iOS App Store vs. Google Play Store: Which Is Better for App Developers?" Priya Viswanathan, *Lifewire*, July 29, 2024, https://www.lifewire.com/ios-app-store-vs-google-play-store-for-app-developers-2373130.

[190] "iOS App Store vs. Google Play Store: Which Is Better for App Developers?" Priya Viswanathan, *Lifewire*, July 29, 2024, https://www.lifewire.com/ios-app-store-vs-google-play-store-for-app-developers-2373130.

[191] "Amazon remembers it has an Android app store, kills it," Ryan Whitwam, *Ars Technica*, February 20, 2025, https://arstechnica.com/gadgets/2025/02/amazon-remembers-it-has-an-android-app-store-kills-it/?comments-page=1#comments.

[192] "Amazon remembers it has an Android app store, kills it," Ryan Whitwam, *Ars Technica*, February 20, 2025, https://arstechnica.com/gadgets/2025/02/amazon-remembers-it-has-an-android-app-store-kills-it/?comments-page=1#comments; Abrantes-Metz Opening Report, p. 67.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



**The iOS ecosystem and its benefits could shrink.**

140. Many of the aforementioned potential ramifications would harm the iOS ecosystem overall, particularly those that drive away developers or degrade the consumer experience. Such effects may be cyclical in that a reduced consumer experience may enable higher user turnover, decreasing the available audience for applications, further demotivating application development, and so on.

141. Ultimately, the specific effects of the but-for world on consumers could vary on a consumer-by-consumer basis. The aforementioned but-for world Developer Program compensation structure changes may have negative effects on some consumers, such as higher application costs, reduced application selection, more in-app advertising, and a degraded iOS ecosystem. On the other hand, some consumers may see price decreases in their favorite applications, particularly for applications developed by large developers who may benefit from the potential compensation structure changes. Whether a given consumer would see a net benefit, net cost, or a relatively neutral outcome is not predicted by their membership in the Plaintiff class, but is instead specific to their unique consumption habits and the relevant reactions of the particular developers with which they interact.

142. Nonetheless, Plaintiffs' experts' analyses fall short in contemplating, much less evaluating, this aspect of the but-for world and, as a result, their analyses are further undermined in their attempt to calculate a relevant but-for commission rate or define other features of a but-for world. Depending on the individual developer characteristics and the apps they create, the potential positive or negative ramifications of Apple's chosen compensation method in the but-for world could greatly differ. Many of the compensation scenarios made possible by the but-for world would risk reducing the quantity, variety, and quality of apps available to consumers, and by extension, consumer choice and pricing.

## 8. CONCLUSION

143. The but-for world constructed by Plaintiffs' experts ignores the beneficial role that Apple-developed and owned IP-protected tools, technologies, and services play in the distribution, development, and use of iOS apps. Instead, Apple – which as the owner of these IP-protected tools, technologies, and services has the ability to determine the terms of access to the same – would be forced in the but-for world to allow free-riding by its hypothetical competitor app marketplace while simultaneously unable to change the fee amounts and structures associated with the App Store and Developer Program. Given the unique characteristics of each developer and consumer, along with the diversity of Apple IP-protected tools, technologies, and services, it is unlikely that the effects of the shift to the but-for world would be ubiquitous amongst the developers and therefore, the certified class, in direct contradiction to Plaintiffs' experts' proposed but-for world.

144. Additionally, Plaintiffs' experts' allegations of durable and sustained market power are based on profitability analyses that are improper, misleading, overstated, inconsistent with both the

accounting standards underlying Apple's public financial statements and allocation methods used in managing and making decisions about the business. The metrics and comparisons utilized by such experts fail to account for important differences between the app marketplaces or have been noted to be potentially poor indicators of the market power Plaintiffs' experts' allege Apple maintains.

## 9. SIGNATURE

145. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Respectfully submitted,

_____                    June 13, 2025
James E. Malackowski                              Date

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



200 West Madison, Suite 1020

Chicago, IL 60606

(312) 327-4400

www.oceantomo.com

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

# Appendix A



June 13, 2025

# JAMES E. MALACKOWSKI
# CURRICULUM VITAE

**James E. Malackowski** is the Chief Intellectual Property Officer (CIPO) of J.S. Held LLC and the firm's Intellectual Property (IP) Practice Leader.  He is a Co-founder and Senior Managing Director of Ocean Tomo, a part of J.S. Held.  Ocean Tomo provides Expert Opinion, Management Consulting, Advisory, and Specialty Services focused on matters involving intellectual property and other intangible assets. Practice offerings address economic damage calculations and testimony; business licensing strategy and contract interpretation; patent-focused business intelligence; portfolio development strategy; litigation support; trade secret reasonable measures; asset and business valuation; strategy and risk management consulting; merger and acquisition advisory; debt and equity private placement; and IP brokerage. With more than 80 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

In 2025 the Licensing Executives Society International (LES) recognized Mr. Malackowski with its highest honor in the business of intellectual property – the LES Gold Medal. Mr. Malackowski is only the 31st recipient of the LES Gold Medal, first awarded in 1971. In 2022, along with Supreme Court Justice Stephen Breyer, Mr. Malackowski was inducted as the 87th member of the IP Hall of Fame, chosen by the IP Hall of Fame Academy from a long list of nominees put forward by the global IP community. Mr. Malackowski was further recognized by the Academy with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset. Notably, Mr. Malackowski is only the seventh person to be recognized both with the LES Gold Medal and inclusion in the IP Hall of Fame, a combination generally regarded as the ultimate recognition in the IP services industry.

Mr. Malackowski was first acknowledged in 2007 by leading industry publications as one of the 'World's Leading IP Strategists'.   Significantly, Mr. Malackowski is listed among "50 Under 45" by *IP Law & Business™*; included in the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and, named as one of "The Most Influential People in IP" by *Managing Intellectual Property™*. Mr. Malackowski was named as1 of 50 individuals, companies and institutions that framed the first 50 issues of *IAM Magazine* as well as 1 of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011 Mr. Malackowski was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013 he was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, Mr. Malackowski joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, Mr. Malackowski has served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the Federal Court of Australia, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, business significance of licensing terms including RAND obligations and exhaustion, venture financing including expected risk / return, the existence of markets or potential markets to assess copyright fair use, and equities of a potential injunction.  Mr. Malackowski's experience extends



to matters of general business valuation and commercial disputes, both domestic and foreign. Mr. Malackowski has publicly addressed policy issues affecting international trade and has provided expert opinions concerning antidumping and countervailing duties imposed by the U.S. Department of Commerce as well as testimony on domestic industry, bond, and remedies before the International Trade Commission.

Mr. Malackowski has substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues. He is Past President of The Licensing Executives Society International, Inc., with oversight for more than ten thousand members in thirty-two countries. Mr. Malackowski has focused his non-for-profit efforts with organizations leveraging science and innovation for the benefit of children and students, including those located in lesser developed countries. He has served for more than two decades as a Trustee or Director of the National Inventors Hall of Fame, Inc., an organization providing summer enrichment programs for more than 100,000 students annually. For more than ten years Mr. Malackowski served as a Director of Chicago's Stanley Manne Children's Research Institute, advancing the organization's agenda to measure and report the impact of its pediatric research. He most recently completed service on the Pritzker School of Molecular Engineering Council at the University of Chicago and continues as an Advisor to the Venture Builder Community at the University of Notre Dame.

Mr. Malackowski is a frequent speaker on emerging technology markets and related financial measures. He has addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CNBC Worldwide Exchange, CBS News Radio and Fox Business National Television as well as other recognized news-based internet video channels. Mr. Malackowski is a current or past judge for numerous new venture competitions awarding financial grants recognizing intellectual property protected products and services developed by students, university faculty, and professional entrepreneurs.

As an inventor, Mr. Malackowski has more than twenty issued U.S. patents. He is a frequent instructor for graduate studies on IP management and markets. Recently, Mr. Malackowski has lectured on application of intangible asset valuation models to corporate Environmental, Social, and Governance (ESG) standards, including applicability of United Nations Sustainable Development Goals (SDGs) to investment decisions. He is a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy. Mr. Malackowski is Certified/Accredited in Financial Forensics, Business Valuation and Blockchain Fundamentals; a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois; and, certified to receive United States Sensitive Security Information (SSI) as governed by Title 49 Code of Federal Regulations.

| | |
|---|---|
| **EMPLOYMENT** | Chief Intellectual Property Officer (CIPO) and IP Practice Leader, *J.S. Held LLC*, April 1, 2025 to present. |
| | Co-Founder and Senior Managing Director, *Ocean Tomo, LLC, a part of J.S. Held.*, July 1, 2003 to present. Mr. Malackowski shares responsibility for all aspects of the firm's intellectual property focused merchant banking practice. Mr. Malackowski served as Chairman from the firm's founding in 2003 until acceptance of Bow River Capital as a strategic partner in 2020. He served as Chief Executive Officer of Ocean Tomo, LLC from formation until its sale to J.H. Held in 2022. |
| | President and Chief Executive Officer, *IP Equity Management, LLC,* doing business as Duff & Phelps Capital Partners, March 1, 2002 to June 30, 2003. |



The firm's intellectual property structured finance efforts were consolidated with Ocean Tomo on July 1, 2003.

Principal and Founder, *VIGIC Services, LLC*, July 1, 2000 to February 28, 2002. Mr. Malackowski identified and evaluated intellectual capital based private equity investment opportunities and served as an advisor to four completed transactions.

Principal and co-Founder, *IPC Group LLC*, August 1, 1988 – June 30, 2000. Mr. Malackowski also held the offices of President and CEO and was a Board member / chairman of the firm.  Along with four co-founders, Mr. Malackowski grew IPC Group to become the largest professional services firm specializing in intellectual property valuation and strategy consulting.  IPC Group was sold in 1999 later changing its name to InteCap.

Executive Consultant, *Peterson & Co. Consulting*, Chicago, June 3, 1985 – July 30, 1988.  Mr. Malackowski began with Peterson as a Staff Consultant and was the firm's quickest promotion to both Senior Consultant and Executive Consultant.  Mr. Malackowski helped to establish the firm's intellectual property litigation and valuation practice.  Peterson & Co. was sold to Saatchi & Saatchi PLC in 1988.

|  |  |
|---|---|
| **NON-PROFIT AND ASSOCIATION EXPERIENCE** | Mr. Malackowski has been active in The Licensing Executives Society (LES) locally, nationally and internationally.  LES is the premiere global professional association of technology transfer and intellectual asset management professionals with more than 9,000 members in more than 32 countries. |

Mr. Malackowski is Past President of the Licensing Executives Society International, LLC, where his experience included the following positions:

- Director, LES Standards Development Organization (2018 – present)
- Chair, Past President's Council (2012 – 2013)
- President and Member of the Board (2011 - 2012)
- President Elect and Member of the Board (2010 - 2011)
- Secretary and Member of the Board (2007 - 2010)
- Member and Permanent Alternate, Board of Delegates (1992 - 2005)
- Past Chair, Membership, Investment, Education, Long-range Planning and Global Technology Impact Forum Committees.

Mr. Malackowski's term as President of LESI has been recognized for creation of the LESI Global Technology Impact Forum and concurrent Invent For Humanity™ Technology Transfer Exchange Fair; formalizing the National Presidents' Council; establishing the position of a permanent Executive Director; and, restructuring the leadership of LESI committees utilizing a Chair, Past Chair, Chair Elect ladder combined with functional responsibilities for committee Vice Chairs.  This later organizational stamp is based largely on Mr. Malackowski's experience as President of LES USA & Canada described below where he led a restructuring of the Board from a regional to a functional focus for each officer and Trustee.   As with his tenure at his national Society



discussed below, Mr. Malackowski led a financial turn-around returning LESI to positive cash flow following its' only two years of loss.

Mr. Malackowski is also Past President of The Licensing Executives Society (USA and Canada), Inc. where he held numerous offices in the organization including:

- President and Member of the Board (2001 – 2002)
- International Vice President and Member of the Board (2000)
- Treasurer and Member of the Board (1996 -- 1999)
- Trustee and Member of the Board (1992 – 1996)
- Chair, Annual Meeting in Miami Beach (1998) and the Summer Meeting in Chicago (1997)

Mr. Malackowski presided over a restructuring of the LES USA & Canada Board and a financial turn-around returning the organization to positive cash flow following its only two years of loss to such date.  Mr. Malackowski is the youngest President to hold office at LES USA & Canada as well as at LES International.

In 2007, Mr. Malackowski was the Founding Chair of the Board of Governors for what is now Certified Licensing Professionals, Inc., administrator of the Certified Licensing Professional (CLP) program for professionals in the fields of licensing, business development and commercialization of intellectual property.  More than 1,000 individuals involved in patenting, marketing, valuation, IP law, negotiation, and intellectual asset management have earned the CLP certification.  CLP, Inc. is a 501(c)(6) organization whose mission is to elevate the licensing profession through knowledge and standards.

In 2018 Mr. Malackowski joined the Standards Development Organization Board of LES USA & Canada.  LES standards are voluntary consensus-based professional practices that are guided in their development by the "American National Standards Institute's (ANSI's) Essential Requirements."  ANSI is the unique accrediting agency in the United States for voluntary consensus standards development organizations.  LES is an accredited ANSI Standards Developer and as such guarantees its constituents that its standards will be developed in a fair, balanced, consensus-based, due process driven way.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management and, where appropriate, offer enterprises the opportunity to differentiate themselves based on their use of these consensus professional practices, through certification of conformance to those standards.

Mr. Malackowski extends significant time to non-profit activities directed towards a further understanding of the economic importance of innovation and intellectual property, in both the United States and developing economies. These efforts include:

- Founding Board Member and member of the Executive Committee, United Stages Intellectual Property Alliance (USIPA) and Global Intellectual Property Alliance, (2020 -)
- Judge, University of Notre Dame McCloskey Venture Competition (2019 -)

4



- Advisory Council, University of Chicago, Pritzker School of Molecular Engineering (2018 - 2022)
- Judge, Illinois Technology Association, CityLIGHTS™ Innovation Awards (2013 - 2020)
- Member, World Economic Forum Network of Global Agenda Councils (2011 - 2012)
- Member, Master of IP Management & Markets Advisory Council, Chicago-Kent College of Law | Illinois Tech (2008 - 2018)
- Director, International Intellectual Property Institute, Washington D.C., (2002 - 2007)
- Resident Advisor, U.S. Information Agency, (1999)
- Resident Advisor, U.S. Department of Commerce Commercial Law and Development Program (1997)
- Founder and Chairman, The Center for Applied Innovation, Inc. (2004 -)

Recognizing the economic value created by new businesses enterprise protected by intellectual property, Mr. Malackowski has been appointed as a judge in numerous new venture competitions including:

- Judge, University of Notre Dame McCloskey Venture Competition (2019 -)
- Judge, 1st Source Bank Commercialization Awards (2019 -)
- Judge, Illinois Technology Association, CityLIGHTS™ Innovation Awards (2013 – 2020)
- PBS *Everyday Edisons* (2008)

In addition to his university instruction described herein, Mr. Malackowski focuses his non-for-profit efforts with those organizations leveraging science and innovation for the benefit of children.

- Director, Children's Research Fund (2013); Co-Chair Annual Fund Campaign (2013)
- Director, National Inventors Hall of Fame, Inc. (NIHF) including service as a Member, Trustee or Director of related subsidiaries and Board Committees (2001 - 2022).   The NIHF has provided summer enrichment programs for significantly more than one million students including Camp Invention™ for kids in grades 1-6 (and their parents and teachers); Collegiate Inventors Competition™ for college students (and their mentors); and, Club Invention™ for kids in grades 1-6 (and their parents and teachers).  NIHF provides more than 20,000 camp scholarships annually for children in financial need.
- President's Council, Chicago Museum of Science and Industry (2005 - 2011) including participation on the Education Advisory Committee (2007 - 2009) and the Alternative Revenue Committee (2008 - 2011)
- Director, Stanley Manne Children's Research Institute (2009 - 2020) including Chair of the Board's Technology Transfer Committee (2014 - 2020) and the Strategic Planning Resources Committee (2011 - 2012).  Mr. Malackowski is recognized for initiating the development of a program to measure and track innovation metrics relevant to the Institute.

Mr. Malackowski was the Founder of the Center for Applied Innovation, a Chicago based non-for-profit with both local and international programs.  CAI

5



was created to manage education, public policy outreach and related economic activity around applied technology and intellectual property (IP) rights in the State of Illinois and around the world.

- CAI created and patented the first commoditized contract for technology licensing, the Unit License Right™. This innovation has been licensed to the Chicago-based Intellectual Property Exchange International.
- Under Mr. Malackowski's continued leadership as Chairman, CAI organizes the Invent for Humanity™ Technology Transfer Exchange Fair (InventforHumanity.org) launched in January, 2012, in Geneva, Switzerland. Invent for Humanity showcases field-ready, sustainable innovations, known as "appropriate technologies", leveraging the experience of licensing professionals to match and structure the actual transfer of such technology to meet recognized needs of emerging market economies.

Mr. Malackowski's association and non-profit activities are informed in part by his participation in the Harvard Business School Executive Education Program on Governing for Nonprofit Excellence, November 2000. Mr. Malackowski's Board service is informed by his participation at the Rock Center Corporate Governance Directors College for Venture-Backed Company Directors, Stanford University, March 2016.

---

| | |
|---|---|
| **RELATED OFFICES** | *BPG Bio, LLC*, Member, Council of Advisors, Senior Advisor, Intellectual Property Licensing & Innovation (2012 - 2015) |

*The Copyright Hub, LLC d/b/a 3Discovered*, Founder. The company was formed as a collaborative venture between Ocean Tomo, LLC and Liberty Advisor Group in 2013. 3Discovered is a current portfolio company of US-based venture capital firm AITV. Mr. Malackowski served as Chairman of the company through September 2016. (2103 – 2106)

*Career Capture, LLC*, Secretary (2022 - ). Career Capture is a video based recruiting platform focused on engineering and technical school graduates entering the labor market. The company is a University of Southern California Iovine & Young Academy project led by Chase J. Malackowski (son).

*Curious Networks, Inc.*, Director, (1999 - 2000), Co-Chair of the Board's Strategic Partnership Committee. Mr. Malackowski led the company's first and second round of venture funding.

*ewireless, Inc.* (f/k/a JEMAN Holdings, Inc. d/b/a Cellular Linking), Director, (1995-1999, 2000-2002)

*Ford Global Technologies, Inc.*, Ford Motor Company, Director (1997 - 2001). Mr. Malackowski advised Ford Motor Company on the original business strategy which led to the formation of FGTI. FGTI was the largest known technology management company in the United States during Mr. Malackowski's term.

6



*Infocast, Corporation* (OTC BB: IFCC.OB), Director (2001-2002).  Member of the Audit and Compensation Committees.  Mr. Malackowski led the transition of the company's senior management team and continued U.S. based funding efforts.

*Insignis, Inc.*, Director (2000 - 2002)  Mr. Malackowski led the company's first round of venture funding.  Insignis is a Chicago based provider of institutional financial data services.

*The Intellectual Property Coin Group, Inc.*, Chairman and Co-Founder (2018 - 2021).  The company is a planned Ethereum based blockchain platform and related cryptocurrency designed to facilitate IP based transactions.

*The Intellectual Property Exchange International, Inc.*  Mr. Malackowski was the founder of the company guiding initial product development of IPXI and recruitment of executive management.  In 2011, IPXI was funded by an industry consortium including the Chicago Board Options Exchange.  Mr. Malackowski was the Chair or Co-Chair of the Exchange from inception to February 26, 2015.

*JEMAN Technologies, Inc*., Founder. (1995 – 1999).  Mr. Malackowski led the company's efforts to develop new technologies related to wireless direct response services.  JEMAN was sold to ewireless, Inc. in 1999 as part of a venture transaction funded by Bedrock Capital Partners and Tredegar Investments.

*Positive Growth Ventures, LLC*, Chairman. (2021 - ).  Mr. Malackowski organized the formation of an industry collective to facilitate direct-to-consumer cooperative advertising for health supplements and related medical products.

*Silent-Yachts Italia, Srl*, Member, Advisory Board (2021 - 2023).  Mr. Malackowski provided general business advice to both the company's chief executive as well as its original U.S. distributor of solar-electric catamarans. Silent-Yachts Italia is located in Fano, Italy.  Mr. Malackowski led the creditors committee of contracted yacht buyers through a corporate restructuring in December 2023.

*Solutionary, Inc.*, Director (2000 - 2013).  Arranged and advised on Solutionary's asset acquisition of S3Networks effective August 31, 2001 and sale to strategic buyer in 2013.  Member of the Board's Compensation Committee.

*Sendle, Pty*, Advisor (2012 - 2015).  See [www.Sendle.com](http://www.Sendle.com).

| | |
|---|---|
| **EDUCATION AND CERTIFICATION** | University of Notre Dame, B.B.A., Bachelor of Business Administration with majors in Accountancy and Philosophy.  Graduated Summa Cum Laude, 1985. |
| | Certified Licensing Professional, Certificate Number 1606 issued July 1, 2008; Recertification through November 30, 2026. |



Registered Certified Public Accountant, State of Illinois Certificate Number 41,187 issued October 3, 2006; License No. 239.007831; Expires September 30, 2025.

Certified in Financial Forensics, CFF™, American Institute of Certified Public Accountants, Certificate Number 391 issued July 31, 2008; Expires August 1, 2025.

Accredited in Business Valuation, ABV™, American Institute of Certified Public Accountants, Certificate Number 4278 issued May 31, 2014; Expires August 1, 2025.

Accredited in Blockchain Fundamentals for Accounting and Finance Professionals, American Institute of Certified Public Accountants, Certificate Number 15860970, 2018 - 2020.

---

**UNIVERSITY INSTRUCTION**

John Marshall Law School, Intellectual Property Damages (1992 - 1994)

DePaul University, Intellectual Property Entrepreneurial Finance (2003)

The George Washington University Law School, Intellectual Property Management (2004)

The University of Chicago Graduate School of Business:

- Intellectual Property Investment (2004 - 2006)
- Entrepreneurial Discovery, MBA Course 34705, Adjunct Professors Mark Tebbe and Brian Coe (Fall 2014 - 2015)

Indiana University Kelly School of Business, Intellectual Property Finance (2005)

University of Notre Dame, Mendoza College of Business, Adjunct Instructor:

- MBA Interterm Intensives, Intellectual Property Based Market Transactions, Valuation and Trading (Fall 2006, Fall 2008)
- MBA Executive Program, Course MBAE 70639, Intellectual Property, (Spring Semester 2008)
- MBA Program, Litigation Support and Valuation (Spring 2009)
- Notre Dame Law School, Advanced Trial Advocacy, LAW 75713-10 (Spring 2017)
- Member, Venture Builder Community Advisory Board (2019 - )
- MBA 60452: Climate Resilience In Business & Communities (Fall 2023)

University of California at Berkeley Haas School of Business, Innovation Markets (2008)

Chicago-Kent College of Law, Adjunct Professor of Law, IP Financial Markets and Legal Principles (Fall 2008)

Rutgers Professional Science Master's Program, Fundamentals of Intellectual Property (Summer 2011 and 2024)

Northwestern University Kellogg School of Management, Adjunct Instructor:

- MGMT 441, Intellectual Property Management, Clinical Professor James G. Conley (Fall 2012, Spring 2013 - 2017)
- DSGN 460, Innovation in Context, McCormick Engineering School (Spring 2017)

University of Texas McCombs School of Business, MBA Course:  Open Innovation, Professor Sirkka Jarvenpaa (Spring 2013)

University of Arizona, James E. Rogers College of Law, Advisor, Intellectual Property & Entrepreneurship Clinic (2017 - )

- IP Valuation (Spring 2017)
- IP Valuation for Commercial Transactions (Spring 2019)

University of Southern California, Lloyd Greif Center for Entrepreneurial Studies at the Marshall School of Business, Entrepreneurs Guide to Intellectual Property, Professor Luke L. Dauchot, JFF 322 (Fall 2017)

---

| | |
|---|---|
| **MEMBERSHIPS** | American Institute of Certified Public Accountants, Member 01182237 (1985 -) Private Directors Association (2023 - ) The Economic Club of Chicago (1990 - 2019) The Licensing Executives Society (1988 - ) Young Presidents' Organization ("YPO" / "YPO Gold" Chicago Chapter, 2006 – 2017) (Mid-America U.S. At Large Chapter, 2019 - 2021) |

---

**RECOGNITION AND AWARDS**

Individually, Mr. Malackowski has been recognized for his expertise as well as his work in developing markets for intellectual property transfer including:

- Gold Medal Recipient, Licensing Executives Society International (2025). Mr. Malackowski is only the 31st recipient of the LES Gold Medal, first awarded in 1971.
- Inductee, IP Hall of Fame (2022).  Mr. Malackowski was inducted as the 87th member of IP Hall of Fame, joining 13 current or former Directors of governmental patent offices, 10 former judges, two past U.S. Presidents, Nikola Tesla, and Thomas Edison.
- Received Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset (2022)
- *EY Entrepreneur Of The Year®*, Regional Semifinalist (2019 and 2020)
- "IAM Global Leaders", *IAM Magazine* (2020)
- "IAM Patent 1000: The World's Leading Patent Professionals", *IAM Magazine* (2015-2021)



- Named to the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers.  (August 2014)
- Named as 1 of 60 leading global Economics Expert Witnesses in the *IAM Patent 1000, IAM Magazine.* Selection based on interviews by IAM researchers with more than 100 patent litigators.  (May 2014)
- Inductee, Chicago Area Entrepreneurship Hall of Fame as selected by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration, (2013; 28th Year of Program)
- Named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011.
- "IP Personalities of 2008", *IAM blog* by Joff Wild, Editor
- "IAM Strategy 300:  The World's Leading IP Strategists", *IAM Magazine* (2012-2021); formally presented and included as "World's 250 Leading IP Strategists", *IAM Magazine* (2009-2011)
- "50 Under 45", *IP Law & Business™* (2008)
- "The Most Influential People in IP", *Managing Intellectual Property™* (2007)
- Member, IP Hall of Fame Academy (2007- )

Mr. Malackowski is only the seventh person to be recognized both with the LES Gold Medal and inclusion in the IP Hall of Fame, a combination generally regarded as the ultimate recognition in the IP services industry.  Others who have been previously recognized with both such awards are Dudley B. Smith who was instrumental in forming the Licensing Executives Society; Heinz Goddar who is widely regarded as a global IP luminary dedicating his career to advancing the understanding of IP across academia, research, governmental and commercial enterprises; Thierry Sueur who helped shape IP policy in his role at the International Chamber of Commerce as well as his work as chairman of the IP Committee of the French business federation MEDEF and vice chairman of the board of the French Patent Office; Francis Gurry as the former Director General of the World Intellectual Property Organization (WIPO); Randall R. Rader as former Chief Judge of the United States Court of Appeals for the Federal Circuit; and, Hon. Pauline Newman who was appointed to the United States Court of Appeals for the Federal Circuit in 1984.

Ocean Tomo as a firm has been likewise recognized for its accomplishments including:

- Ocean Tomo was chosen as the exclusive U.S. representative for the 2016 Healthcare & Pharma Leading Expert Awards by *Global Health & Pharma Magazine*.
- Ocean Tomo was recognized as a member of the *2015 Inc.5000®* list of fastest-growing private companies in America.
- Ocean Tomo was honored in 2011 with the "Best of Chicago Award in Investment Advisory Services" by the U.S. Commerce Association (USCA).
- In addition to Mr. Malackowski, Ocean Tomo as a firm was named as 1 of 50 Individuals, Companies, and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011 and the only firm other than Microsoft (2 of 50 mentions) to be recognized multiple times (5 of 50 mentions).



- The firm's Chicago office was presented the *2011 Alfred P. Sloan Awards for Business Excellence in Workplace Flexibility* after having been finalist for scoring in the top 20% of all firm's measured nationally.
- Ocean Tomo was recognized in 2010 by Corporate Voices for Working Families for its work-life balance as part of the National Workplace Flexibility Campaign published by *USA Today*.
- Ocean Tomo was recognized as a juried Finalist for the Illinois Technology Association 2010 CityLIGHTS Award for raising the stature of the Illinois technology industry.
- Selected as case study organization for Haas School of Business, University of California, Berkeley (2009)
- Selected as case study organization for Harvard Business School MBA Program (2008)
- Ocean Tomo was named one of 20 small and mid-sized firms recognized as the "Best Places to Work in Illinois" by Best Companies Group in a competition sponsored by the Illinois Chamber of Commerce and the Illinois State Council Society for Human Resource (2007)
- Ocean Tomo Auctions received the 2006 Chicago Innovation Award for most innovative new product or service introduced between January 1, 2005, and July 31, 2006, that uniquely satisfied unmet needs in the marketplace. The award was presented by Kuczmarski & Associates and the *Chicago Sun-Times*.
- Ocean Tomo Auctions was awarded the Department of Commerce Technology Administration & National Knowledge & Intellectual Property Management 2006 Innovator of the Year Award.
- Ocean Tomo was recognized as a "Top Ten IP Newsmakers of 2006" by *IP Law & Business*, Almanac 2006.

Numerous authors and graduate business programs have written case studies about Ocean Tomo and its affiliates including:

- Piscione, Deborah Perry, The Risk Factor, Copyright 2014.
- Houle, David, Entering the Shift Age, Copyright 2013.
- Kuczmarski, Thomas D., Dan Miller and Luke Tanen, Innovating Chicago-Style:  How Local Innovators Are Building The National Economy, Copyright 2012.
- Houle, David, The Shift Age, Copyright 2007.
- Chesbrough, Henry, Open Business Models: How to Thrive in the New Innovation Landscape, Copyright 2006.
- Harvard Business School Case Study
- University of California Business School Case Study

---

**RELATED U.S. SPEECHES AND PUBLICATIONS**

"The Determination of a Reasonable Royalty: Hypothetical Negotiation v. A General License Agreement", The Licensing Executives Society, Chicago Chapter, December 8, 1987.

"The Business Economics of Technology Development", The Licensing Executives Society, New England Chapter, February 9, 1988.

11



"The Importance of Protecting Intellectual Property Through Corporate Transition", Licensing Executives Society, National Meeting, October 18, 1989, Moderator.

"Valuation of Intellectual Property Rights", The Chicago Bar Association, March 6, 1990.

"Dispute Resolution -- There Are Alternatives!", Licensing Executives Society, National Meeting, October 22, 1990.

"How to Value a License", Adding to the Bottomline Through Licensing, LES / John Marshall Law School, November 1, 1990.

"An Advanced Discussion on Licensing and Patent Damages", Licensing Executives Society, National Meeting, October 28, 1992.

"An Advanced Discussion on Patent Damages", Licensing Executives Society, National Meeting, October 18, 1993.

Royalty Provisions in Technology License Agreements, Technology Transfers, American Conference Institute, November 15 & 16, 1993.

"Commercializing Technology and the Intellectual Property Quality Management Imperative", Technology Transfer, American Conference Institute, June 20 & 21, 1994.

"How to Accurately Value Software", The Software Protection and Litigation Institute, July 28 & 29, 1994.

"IP Damages Advanced Case Studies", Licensing Executives Society, National Meeting, October 19, 1994.

"Preparation and Presentation of Damages by Outside Consultants", AIPLA Mid-Winter Meeting, February 1, 1995

"Damages Discovery - An Expert's Perspective", Intellectual Property Law Association, New York, December 15, 1995.

"Pre-Litigation Damages Techniques: Patents and More", The Intellectual Property Strategist, March 1996.

"Corporate Exposures to Copyright, Patent, Trademark, and Trade Secret Claims", Digital Bullets - Digital Shields: A Financial Perspective, American Conference Institute, New York, March 5, 1996.

"IP Management and Taxation - How companies are proactively managing IP assets to maximize shareholder value, including measuring contribution of IP protection to corporate value", American Bar Association, Virginia, April 11, 1996.



"Effectively Select & Use Experts in Trademark & Copyright Cases", AIPLA Spring Meeting, Boston, May 1, 1996.

"The Industry-University Interface: Mechanisms For Technology Transfer", 1996 AUTM Central Region / Licensing Executives Society Chicago Chapter, Chicago, July 21, 1996.

"Valuing Health Care Technologies", Licensing Executives Society Winter Meeting, South Carolina, March 13, 1997.

"Creative Marketing & Packaging - How to Differentiate Yourself in a Competitive Market", CTIA Annual Meeting, Atlanta, February 23, 1998.

"Intellectual Property Valuation: The Latest Techniques from Boardroom and Courtroom", Patent Law Association of South Florida Annual Meeting, Fort Lauderdale, October 22, 1998.

"The Aftermath of *Rite-Hite v. Kelly*", 16th Judicial Conference of the U.S. Court of Appeals for the Federal Circuit, Washington D.C., April 6, 1999.

"Expert Admissibility After Daubert", Wisconsin Academy of Trial Lawyers, Milwaukee, December 3, 1999.

"Intellectual Property Strategic Planning: a Corporate Perspective", Research Directors Association of Chicago, Winter Meeting, January 10, 2000.

"Intellectual Property Asset Management: Linking IP and Corporate Strategy", 44th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School, Chicago, February 25, 2000.

"Boost Your Client's Intellectual Capital IQ: Get Top Management Involved", Corporate Legal Times, October 2000, p. 104.

"Strategic and Financial Opportunities for Privately Held and Public Middle Market Companies:  Building Shareholder Value", The Standard Club, Chicago, October 5, 2000.

"Commercializing Intellectual Capital Through Venture Funding", LESI Expanded Board of Directors Meeting and Seminar, Delray Beach, Florida, January 26, 2001; LES Chicago Meeting, May 10, 2001.

"New Paths to Growth:  Joint Ventures and Accessing Equity Capital", Panel Presentation and Discussion, LaSalle Street Project Economic Summit, Chicago, May 10, 2001.

*ViewPoints*, The Newsletter of the Licensing Executives Society (U.S.A. and Canada), Inc., President's Column: Vol. VIII No. 5, Nov. / Dec. 2001, "President Changes the Way LES Does Business";  Vol. VIV No. 1, Jan. / Feb. 2002, "It's Time To Count Our Intellectual Assets"; Vol. VIV No. 2; Vol. VIV No. 3, May / June 2002, "Mid-Year Review"; Vol. VIV No. 4, July / August 2002, "Ethical Issues Related To Intellectual Property".



"Venture Investment Grounded In Intellectual Capital", <u>From Ideas To Assets: Investing Wisely in Intellectual Property</u>, Edited by Bruce Berman, John Wiley & Sons, Inc., 2002.

"Current Issues in Accounting for Intangibles", Congressional Economic Leadership Institute, Panel Presentation and Discussion with Steven H. Wallman, Former Commissioner, United States Securities and Exchange Commission, Washington, DC, May 1, 2002.

"Intellectual Capital Based Corporate Carve-outs: Strategy, Structure and Funding", James E. Malackowski and Suzanne Harrison, <u>The LESI Guide to Licensing Best Practices</u>, Edited by Robert Goldscheider, John Wiley & Sons, Inc., 2002.

"Intellectual Property Finance: Securitization to Venture Capital", American Bar Association Intellectual Property Law Conference, Philadelphia, June 28, 2002.

"The IIPI Roundtable:  The New Emphasis on Patent Value – Opportunities and Challenges", Washington DC, July 22, 2002.

"Moving Technology from University to Marketplace:  Business Creation and the Venture Capital Community, Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Presidents' Forum on Intellectual Property:  A Leadership Discussion with The Licensing Executives Society, the American Intellectual Property Law Association, the Association of University Technology Managers, the Intellectual Property Owners Association, The National Inventors Hall of Fame, and BIO", Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Extracting Value From Your Intellectual Asset Portfolio: Ensuring ROI from IP and Technology Assets", World Research Group, November 22, 2002, Chicago, Illinois.

"Licensing", American Intellectual Property Law Association 2003 Mid-Winter Institute, Marco Island, Florida, January 22 – 25, 2003.

"Cashing in on Chicago: A Closer Look at Liquidity in the Heartland", The Executives' Club of Chicago, Panel Discussion, February 11, 2003.

Conference Chair and Speaker, "Optimizing Valuation & Value Realization of your IP/Intellectual Assets", World Research Group, Las Vegas, February 27-28, 2003.

Live Webcast, "Turning Your Intellectual Property into Cash", Ernst & Young Business Insights, April 28, 2003.

Intermediate PDS Workshop:  Application of Private Equity and Leveraged Finance Investing to Intellectual Property, LES / AUTM Summer Meeting, Philadelphia, May 8, 2003.

14



World Research Group, Advanced Intellectual Property Structured Finance, Conference Co-Chairperson, New York City, June 29-30, 2003.

The Conference Board, The 2003 Conference on Intellectual Asset Management & Value Reporting, "Application of Private Equity and Leveraged Finance Investing to Intellectual Property", Chicago, June 4, 2003.

Intellectual Property and Information Technology for Investment Funds, "Intellectual Capital Equity Management", Panel Discussion Sponsored by Schulte Roth & Zabel, New York City, June 18, 2003.

Chicago Capital Access Forum III, "Private Investors: The Case for Domestic Emerging Market Investments", Panel Discussion, Chicago, June 26, 2003.

Pension Consultants' Forum, "Extracting Value from Private Equity Investing", World Research Group, Chicago, July 22, 2003.

Midwest Intellectual Property Institute, "Intellectual Capital Equity Management", Minneapolis, September 19, 2003.

"Intellectual Asset Strategies", Add-On Seminar at the 2003 Licensing Executives Society Annual Meeting, San Diego, September 25, 2003.

"Leveraging Intellectual Property", Keynote Speaker, Thomson Financial Thought Leadership Forum, New York, October 8, 2003.

"Beyond Licensing: Innovative Techniques for Extracting Value", Advanced Forum on Licensing Intellectual Property, San Francisco, December 9, 2003.

<u>Intellectual Asset Management</u>, *Column:  IP Merchant Banker*, Douglas R. Elliott & James E. Malackowski, Issue 01, "Challenges of the Fifth Epoch", July / August 2003; Issue 02, "What the Market Fortells", September / October 2003; Issue 03, "Economics, Ethos and Intellectual Ethics", December / January 2004; Issue 04, "Patent Predictions – facts or fictions?", February / March 2004; "Wealth management in the age of patents", June / July 2004; "Patent pools – the 80% solution", August / September 2004.

"Intellectual Capital Equity Management:  IP as an Asset Class", Minnesota State Bar Association Continuing Legal Education, Minneapolis, January 15-16, 2004.

"Understanding the Motivations Behind an IP Structured Finance Transaction", "Analyzing the Anatomy of A Patent-Based Structured Finance Transaction", World Research Group, New York, January 21-22, 2004.

"Managing Your Intellectual Property", Investment Banking for Women / Minority Owned Business Enterprises, Annual Forum, Conference Co-Chairperson, Chicago, March 3-5, 2004.

"Private Equity: Investor Capital for Mature Businesses", Dream*Makers* Forum 2004, Santa Barbara, California, March 7 – 10, 2004.



"IP Finance:  Convergence of IP Valuation and Value Creation", World Research Group 2nd Annual Strategies and Solutions for Optimizing IP Valuation & Value Creation, Chicago, March 23 – 24, 2004.

"Leveraging the Value of Intellectual Property", Creating, Managing & Valuing an Intellectual Property Portfolio, Vedder Price Conference Series, Chicago, April 28, 2004.

"Federal Circuit Damages Decision Emphasizes the Importance of Sound Economic Models", IP Review, McDermott Will & Emery, with Robert M. Hess, Spring 2004.

"Intellectual Property Merchant Banking:  Leveraging Corporate Intangible Assets", The Licensing Executives Society (U.S.A. & Canada), Inc., Fairfield-Westchester Counties Chapter, June 23, 2004.

"Intellectual Property Financing and Securitization:  Conclusions and Future Implications for Financing the IP Market", New York, New York, July 21, 2004.

"Emerging Financial Concepts in IP Asset Management", Mining Patent Portfolios, Seattle, Washington, September 13, 2004.

"Intellectual Property Investment", National Institutes of Health, Commercialization Assistance Program, Larta Institute, Chicago, November 12, 2004.

"Using Intellectual Property to Grow", The Beacon, Chicagoland Entrepreneurial Center, Volume 3, Issue 4, December 10, 2004.

"Techniques for Assessing the Value of Your IP Portfolio", The Wall Street Transcript Intellectual Property Conference, New York, January 27, 2005.

"The Tipping Point:  Assessing Major Challenges and Growth Opportunities in IP Finance", Moderator, The 3rd Annual Advancing IP Structured Finance World Research Group Conference", New York, February 3, 2005.

"Commerce One IP Auction", Optimizing IP Valuation and Value Creation, World Research Group Conference, Miami, March 30-31, 2005.

"Intellectual Capital Equity Management: IP As An Asset Class", Minnesota Continuing Legal Education Conference, Minneapolis, May 12, 2005.

"Techniques for Evaluating IP Potential", Life for After Rembrandts, Law Seminars International, Chicago, Illinois, August 4, 2005.

Keynote Address, 2nd Annual Intellectual Property Financing and Securitization Summit, New York, September 26, 2005.

"The Power of Intellectual Property in Private Equity Deals", Association for Corporate Growth and The Licensing Executives Society Connecticut Chapters, Greenwich, Connecticut, October 6, 2005.

16



"Maximizing the Value of Distressed Debt Backed by Intellectual Property", Financial Research Associates Distressed Debt Summit 2005, New York, October 7, 2005.

"To Sell or Not to Sell", Licensing in the Boardroom 2005, a supplement to *Intellectual Asset Management* magazine, 2005.

Patent Auctions & Marketplaces: Leveraging Value from Under-employed Technologies, IP Master Class Presentation, Washington DC, January 10, 2006.

"Risky Business: Overlooking Patents as Financial Assets", Making Innovation Pay, Edited by Bruce Berman, Published by John Wiley & Sons, Inc., 2006.

"The State of Development & Current Trends in IP Structured Finance" and "The Tipping Point: Assessing Major Challenges, Growth Opportunities and Future Trends in IP Finance", Moderator, The 4th Annual Summit on IP Structured Finance, New York, March 22-23, 2006.

"Generating Revenue From Your Inventions", IIR 2nd Annual Summit on IP Rights for Financial Services, New York, April 25-26, 2006.

"A Behind the Scenes Look at the Patent Bazaar: How Companies and Industry Are Buying and Selling Patents", Innovators in IP Litigation, IP Law & Business, San Jose, California, May 17, 2006.

"Patent Markets and Their Impact to R&D Strategy", Industrial Research Institute Annual Meeting, May 21-24, 2006, Colorado.

USC Gould School of Law 2006 Intellectual Property Institute; Featured Speaker, "A Final Word"; Panelist, "Patent Trolls: The Good, the Bad and the Ugly"; May 23, 2006, Los Angeles.

"Patent Auctions: Past, Present & Future", The 50th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School Center for Intellectual Property Law, May 25-26, 2006, Chicago.   Speech published as "The Intellectual Property Marketplace: Past, Present and Future", 5 J. Marshall Rev. of Intell. Prop. L. 605, (2006)

"Patent Auctions: Risky Endeavor or Legitimate Market Opportunity?", Strafford Legal Teleconference Presentations, June 8, 2006.

The Intellectual Property Investment Summit:  Connecting Investors with Strategic Intellectual Property Opportunities, presented by the Center for Applied Innovation, Summit Co-Chairperson, June 15, 2006, Chicago.

Innovative Structures for Acquiring Intellectual Property:  The Benefits, Challenges and Process, LSI Law Seminars International, Program Co-Chair, July 17, 2006, Chicago.

"Licensing and Intellectual Property", Chicago Regional Independent Inventor's Conference, Presented by the United States Patent and Trademark Office,

17



Northwestern University School of Law, and the National Inventors Hall of Fame Foundation, July 28-29, 2006, Chicago.

"Reinventing the IP Marketplace – The Exclusive Ocean Tomo Patent Auction Case Study", IP Licensing Summit: Practical Strategies to Maximize Revenue in Today's Challenging Intellectual Property Marketplace, August 21-23, 2006, New York.

"Unlocking the Value of Intellectual Property Rights", Conference of the International Bar Association, September 20, 2006, Chicago.

"This Too Shall Pass", <u>Americas IP Focus 2006, Managing Intellectual Property Rights</u>, Copyright, Euromoney Institutional Investor, PLC, 2006.

"Developing Markets for Intellectual Assets and Technology", 21st Annual Intellectual Assets and Technology Law Institute, October 5 & 6, 2006, Irving, Texas.

"Patent Damages" and "Patent Reform Efforts: An Update and Review", The Sedona Conference Patent Litigation VII, October 12-13, 2006, Sedona, Arizona.

"Patent Auctions", 44th Annual Intellectual Property Law Conference, The Center for American and International Law, November 9-10, 2006, Plano, Texas.

"The Future of Developing IP Markets", 3rd Annual Monetization of Intellectual Property & Intangible Assets, Strategic Research Institute, November 16-17, 2006, Boston.

"The IP Transactional Landscape", Economics of IP Based Transactions, National Knowledge & Intellectual Property Management Taskforce Series Program, November 29-30, 2006, Washington, D.C.

Keynote Presentation, The Business of Intellectual Property Conference, Tech Council of Maryland, Rockville, Maryland, January 10, 2007.

Luncheon Speaker, Corporate Intellectual Property Roundtable, Georgia State University College of Law, Atlanta, January 24, 2007.

"Patent Markets", American Intellectual Property Law Association, 2007 Mid-Winter Institute, New Orleans, January 24-27, 2007.

"Assessing the Real Value of Your IP Portfolio" and "Growing IP Impact on Public and Semi-Public Markets", The 5th Annual Summit on Monetizing, Financing & Securitizing IP, New York, January 30-31, 2007.

"Ocean's 300", Moderator, <u>World Intellectual Property Review 2007</u>, pp. 16-20.

"The Intellectual Property Marketplace: Emerging Transaction and Investment Vehicles", Co-author with Cardoza, Gray and Conroy, *The Licensing Journal*, Aspen Publishers, Vol. 27, No. 2, pages 1 - 11, February 2007.



"The Importance of Emerging Intellectual Property Market Opportunities to the City of Chicago", Keynote Speaker, Notre Dame Club of Chicago Meeting, Chicago, March 8, 2007.

"The Intellectual Property Marketplace", Harvard Business School Club of New York, New York, April 12, 2007.

Keynote Address, BRICs & Mortar: Technological Drivers in Booming Economies of Brazil, Russia, India and China, Northwestern University Journal of Technology & Intellectual Property Second Annual Symposium, Chicago, April 13, 2007.

"Innovation Measurement:  The Economic Impact of Patent Value", Co-author with Barney, Cardoza, Walker and Gray, Submission to United States Department of Commerce Economics and Statistics Administration, Pursuant to Notice in the Federal Register, Vol. 72, No. 71, 18627, May 11, 2007.

"Objective Patent Valuation", Business Meeting, Association of Corporate Patent Counsel, Newport, Rhode Island, June 27, 2007.

"Intellectual Property Exchange Chicago", a two-day symposium presented by The National Knowledge & Intellectual Property Management Taskforce and The Center for Applied Innovation, Moderator and Speaker, July 17 – 18, 2007, Chicago.

"Start-up Stories: Tales from the Front Line", TiE Midwest, August 1, 2007, Chicago.

Keynote Address, Notre Dame Financial Executives Alumni Conference, September 21, 2007, South Bend, Indiana.

"The Birth of an IP Marketplace", Missouri Bar Association Seminar, November 2, 2007, St. Louis, Missouri.

"Market Forces and IP", The Giles S. Rich American Inn of Court, Howard University, January 17, 2008.

"Market for Technology:  Challenges and Opportunities", Panel Discussion on Impediments to Technology Markets, Duke University's Fuqua School of Business, February 20, 2008.

"IP Markets – An Intangible Walk Down Wall Street", Keynote Address, Securities Industry and Financial Markets Association, March 11, 2008, New York.

"Patent Valuation, Is there One or Many?", Mini-Plenary Session of the High Tech Sector, The Licensing Executives Society International Annual Meeting, May 7, 2008, Chicago.

"What is Patent Quality – A Merchant Banc's Perspective", with Jonathan A. Barney, *les Nouvelles*, June 2008, p. 123 – 134.



"Intangibles in the Firm and Financial Markets", *Intangible Assets: Measuring and Enhancing Their Contribution to Corporate Value and Economic Growth*, The National Academies, Washington DC, June 23, 2008.

"Developing IP Markets:  Opportunity for the Financial Services Industry", Keynote Address, The 5th Annual Patents & The Financial Services Industry Symposium, New York, July 29, 2008.

"New Trends in Monetizing IP Rights:  Trolls, Licensing and Securitization", Managing *Intellectual Property* Webinar, September 3, 2008.

"Magnificent Mile – Shopping for the Ideal IP Expert", DRI Intellectual Property Litigation Seminar, September 4-5, 2008, Chicago.

From Assets to Profits: Competing for IP Value and Return, Contributing Author, Edited by Bruce Berman, John Wiley & Sons, November 2008.

Ocean Tomo:  The New Kid on the (Auction) Block is All Grown Up, Institute for Law and Technology, 46th Annual Conference on Intellectual Property Law, November 10 – 11, 2008, Plano, Texas.

Federal Trade Commission:  The Evolving Intellectual Property Marketplace, Keynote Address, Public Hearings, April 17, 2009, Washington, DC.

"Protecting and Commercializing New Ideas", CoreNet Global Chicago Chapter Meeting, Chicago, May 13, 2009.

"The Future of the IP Marketplace", Moderator and Plenary Speaker, IP Markets 2009, Chicago, July 23, 2009.

"Staying Ahead of the Curve – Strategic Intelligence, Value Assessments and Monetization in a Highly Competitive Economy", The 6th Annual Patents & The Financial Services Industry Conference, New York City, July 28-29, 2009.

"Helping Companies in a Down Economy: Strategic Planning for Identifying and Valuing Your IP", American Bar Association Annual Meeting, Chicago, July 31, 2009.

"Managing IP During Uncertain Times", NanoBusiness Alliance Conference, Chicago, September 8, 2010.

National Economic Framework for Intellectual Property Based Commerce, A Research Report by the National Knowledge & Intellectual Property Management Taskforce, Net Worth Press, 2009.

"The Role of IP in Tough Economic Times and How to Use it to Your Advantage:  Corporate Recovery and Restructuring", Licensing Executives Society Annual Meeting, San Francisco, October 19, 2009.

"Global IP Market Development", 11th Annual Utah IP Summit, Salt Lake City, February 13, 2010.

20



"Law, Economics, Business and Policy Implications for Innovation and Competition of Diverse Business Models for Using Patents", Stanford University Hoover Institution Annual Conference, Stanford, California, June 25, 2010.

"Establishing an Objective Value of IP", IPO Annual Meeting, Atlanta, September 14, 2010.

"Intellectual Property and the Marketplace:  Hot Topics Impacting the Role of Patents, Trademarks and Copyrights in Today's Business World", Vedder Price Illinois Continuing Legal Education Forum, Chicago, October 6, 2010.

"IP Essentials for the Chief Executive Officer", Illinois Technology Association, Chairman's Dinner Keynote Speaker, Chicago, October 20, 2010.

"Valuation of IP in Emerging Market Platforms", 2010 IP Damages Institute, CalCPA Education Foundation, Los Angeles, November 8, 2010.

"Shifting Sands:  What is Discoverable and Admissible for Damages, Willfulness and Other Purposes", Intellectual Property Owners Association CLE Roundtable, Washington, DC, March 21, 2011.

"Intellectual Property: From Asset-to-Asset Class", Intellectual Property Strategies for the 21st Century Corporation, Bryer, Lebson & Asbell Editors, John Wiley & Sons, Inc., 2011.

"The Next Big Think in Monetizing IP: A Natural Progression to Exchange-Traded Units", Ian D. McClure co-author, *LANDSLIDE*, A Publication of the ABA Section of Intellectual Property Law, Volume 3, Number 5, May/June 2011, pp. 32-37.

"Risk Management Strategies to Defend Against Patent Trolls and the New Trend in Patent Royalty Trusts", 2011 Congress on Patent Strategies for the Financial Services Industry, New York, September 19-20, 2011.

"Patent Quality and its Impact on Valuation", Licensing Executives Society United States and Canada, Inc., Annual Meeting, San Diego, October 17, 2011.

Introduction, "LESI Global Technology Impact Forum (GTIF) Creates Tech Transfer Platform", *les Nouvelles*, Journal of the Licensing Executives Society International, Volume XLVII No. 2, June 2012.

Panelist, "IP Monetization", McDermott Will & Emery 2012 Intellectual Property Symposium, Chicago, June 14, 2012.

Keynote Address, Northwestern Law Fifth Annual Conference on Entrepreneurship and Innovation, Chicago, June 14, 2012.

"IP Market Development", 38th Annual Intellectual Property Law Summer Institute, Sponsored by the Intellectual Property Law Section of the State Bar of Michigan, Traverse City, Michigan, July 21, 2012.



"An Investors' Perspective on IP", CenterForce IP Strategy Summit, New York City, New York, November 13, 2012.

"Investing in IP", DealFlow Media Webinar, January 10, 2013.

"Evolving IP Marketplace", American Intellectual Property Law Association, Mid-Winter Meeting, Tampa, Florida, February 1, 2013.  Includes paper: *New Emphasis on the Analytical Approach of Apportionment In Determination of a Reasonable Royalty* by James E. Malackowski, Justin Lewis and Robert Mazur.

"An Inventor's Walk Down Wall Street", PatCon 3 at Illinois Institute of Technology Chicago-Kent School of Law, Chicago, April 12, 2013.

*Report on Judge Rader Comments at the 2013 LESI Annual Conference*, LES Global News, Vol. XLVIII No. 2, June 2013.

"Strategic Insights", Plenary Panel Discussion, IPBC 2013, IP Business Congress, Boston, June 9, 2013.

"IP and Antitrust", Panel Discussion, McDermott 2013 IP Symposium, June 13, 2013, Chicago.

*IP Investments and Markets* Presented by the Center for Applied Innovation, Panelist on IP Marketplace, Chicago, June 25-26, 2013.

*Capturing Innovation*, Irish Entrepreneurs:  An Affiliate Group of the Notre Dame Club of Chicago, Chicago, September 5, 2013.

*Preventing the Napsterization of 3D Printing:  Areas for Industry Collaboration and Transparency*, Inside 3D Printing Conference and Expo, San Jose, California, September 18, 2013.

*The Latest Thinking about Non-Practicing Entities*, 2013 AIPLA Annual Meeting, Washington, DC, October 25, 2013.

*Challenges and Opportunities in Asia*, Think Asia, Think Hong Kong: IP, Technology & China/U.S. Opportunities, The Hong Kong Business Association of the Midwest, Chicago, November 19, 2013.

*Rationalizing Remedies,* The 2013 Patent Institute presented by Cravath Swain & Moore, New York, December 5, 2013.

*Special Address:  Looking to the Future of the Intellectual Property Marketplace – Where Will We Be in 2020?,* Best Practices in Patent Monetization, Law Seminars International, San Francisco, March 6-7, 2014.

*Reinventing Finance:  Funding Innovation Beyond Silicon Valley*, Forbes Reinventing America Summit, Chicago, March 27-28, 2014.



*IP Pricing – Current Issues for Markets and Courts*, Georgia State University / Licensing Executives Society Joint Meeting, Atlanta, May 28, 2014.

*The Growing Global 3DP IP Market & How Much Is At Stake*, 3D Printing Politics, Washington D.C., September 17, 2014.

*The Changing Role of the Expert*, 2014 IP Institute presented by the Engleberg Center on Innovation Law & Policy at New York University and Cravath, Swaine & Moore, LLP, New York, December 4, 2104.

"Intellectual Property Exchange", Dallas Chapter Meeting of the Licensing Executives Society (USA & Canada), Inc., Dallas, January 22, 2015.

"Actavis, Valuation, and Fairness Opinions", 2015 Generic Pharmaceutical Association Annual Meeting, Miami, February 9-11, 2015.

Patent Damages Roundtable, USC Gould School of Law 2015 Intellectual Property Institute, Los Angeles, March 23, 2015.

"Intellectual Property Impact on M&A", Transaction Advisors Midwest Symposium, Chicago, September 17, 2015

"The Changing Landscape of Patent Value and Patent Risks", 2016 Berkeley Law / Cleary Gottlieb M&A-IP-Antitrust Conference, Berkeley Center for Law, Business and the Economy, San Francisco, January 29, 2016.

"Damages Experts on Evidence and Gatekeeping", The University of Texas School of Law Conference on Patent Damages, Austin, Texas, June 9-10, 2016.

"Investing In Innovation: Global Trends In Innovation and Sustainability", CFA Society of Chicago, Chicago, September 28, 2016.

IP Remedies Roundtable and Workshop, USC Gould School of Law 2017 Intellectual Property Institute, Los Angeles, March 20, 2017.

"Economic Tools Used for Damages Estimation", Panel Discussion, Intellectual Property Owners Association, Chicago, June 7, 2017.

"Quantitative Approaches to Determining FRAND Royalties", Intellectual Property Owners Association Annual Meeting, San Francisco, September 18, 2017.

"The Intersection of Intellectual Property, Blockchain and Cryptocurrency", Licensing Executives Society International Annual Conference, San Diego, April 30, 2018 – May 1, 2018.

"Best Practices and Useful Tools for Assessing the Value of Your Company's IP", American Intellectual Property Law Association 2018 Spring Meeting, May 15 - 17, 2018.

"Practical Blockchain", IDEA Week Innovation Festival, South Bend, Indiana, April 8, 2019.

23



"Blockchain Primer," Introductory Remarks by Hon. Kara F. Stoll, The Giles S. Rich American Inn of Court, Washington D.C., February 11, 2020.

*Managing Your Intellectual Property*, LESI Business Briefings, Series Co-author, May 2020.

"IP Transaction Ecosystem: An Update on Market Activity", LES USA & Canada, Inc., Greater Washington D.C. Chapter, September 9, 2021.

"Judicial Perspectives on Using Damages Specialty Experts", Intellectual Property Law Association of Chicago, Litigation Committee, September 15, 2021

"Global Patent Issues", Plenary Panel, University of Illinois Chicago 65th Annual IP Law Conference, UIC School of Law, Chicago, November 4, 2021.

"Issue 6: Damages.  What are the proper standards for the admissibility of expert testimony regarding patent damages?  What are the proper uses for licenses in a patent damages analysis?", Panelist, The Naples Roundtable, a part of the Leahy Institute, February 17-18, 2025.

"*Peeling Back the Value: Why Art is Worth More Than Meets the Eye*", with Erin Hollenbank, Claims Journal, March 15, 2025.

*"Evolving Landscape of Technology Rights Enforcement"*, JD Supra, April 24, 2025

---

| | |
|---|---|
| **INTERNATIONAL SPEECHES AND PUBLICATIONS** | "Taxation Issues when Licensing with the U.S.", Licensing Executives Society International, South Africa Conference, January 28, 1996. |

"Intellectual Property Damages: Advanced Case Studies", Licensing Executives Society Annual Meeting, Puerto Rico, September 30, 1996.

"License Agreement Royalty Audits: Untapped Riches Or Fool's Gold?", Licensing Executives Society Annual Meeting, Puerto Rico, October 1, 1996

"Valuation of IPR", Conference on Appeals Related to Intellectual Property, Bucharest, Romania, November 20, 1997.

"Avaliacao e Contabilizacao de Propriedade Intellectual – Metodologia e Aspectos Fiscais", XIX Seminario Nacional de Propriedade Intellectual, Rio de Janeiro, Brazil, August 16, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Sao Paolo, Brazil, August 18, 1999.



"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Curitiba, Brazil, August 20, 1999.

"IP Valuation Trends", Licensing Add-on Seminar, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 21, 2000.

"Intellectual Property from a Board Room Window", Plenary Session II LESI Strategies, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 23, 2000.

"Due Diligence in an Intellectual Capital Focused Investment", LES Annual Conference Add-on Session, Toronto, September 14, 2000.

"What's New in Intellectual Property Asset Management", Panel Discussion, 8th Annual Intellectual Property Law Institute, State Bar of Georgia,  Puerto Vallarta Mexico,  November 15, 2002.

"Les brevets en tant qu'actifs economiques: comment les exploiter au mieux" and "Brevets et financement: couvrir les couts, trouver des investisseurs", Un System Du Brevet Competitif Pour L'Europe,  sponsored by the European Patent Office, Brussels, May 3-4, 2006.

"What is Patent Quality?", Co-author with Jonathan A. Barney, Paper Presented to the Colloquium on a Comprehensive Approach to Patent Quality, Federation Internationale Des Conseils En propriete Industrielle, Amsterdam, June 8-9, 2007.

"Fostering Innovation with Seed Money and Venture Capital", Licensing Executives Society International Annual Conference, Zurich, June 19, 2007.

"Legal Problems Arising from Auctioning of IPR", Bi-Annual International Forum, Association Internationale Pour La Protection De La Propriete Intellectuelle, October 6, 2007.

"IP Auctions", Plenary Address, The Licensing Executives Society Annual Meeting, October 16, 2007, Vancouver, Canada.

"IP Valuation for IPO's", Warsaw Stock Exchange Executive Conference, June 27, 2008, Warsaw, Poland.

"IP As A Business Tool", Licensing Executives Society International Conference, January 29-30, 2009, New Delhi, India.

"Global IP Market Development", Keynote Address, The Licensing Executives Society Australia and New Zealand, April 2-4, 2009, Camberra, Australia.

"Global IP Market Development", The Licensing Executives Society Philippines, June 8, 2009, Manila, Philippines.
Entwicklung einer Infrastruktur im Blickpunkt, Der Intellectual Property Exchange, *IP Manager:  Journal for the Knowledge Economy*, 01/2009.



"Global IP Market View", Division des Analyses Economiques et des Statistiques, Organization de Cooperation et de Developpement Economiques, January 8, 2010, Paris, France.

"Global IP Market View", BusinessEurope Patents Working Group Meeting, The Confederation of European Business a.l.a.b.l., January 28, 2010, Brussels, Belgium.

"Global IP Market View", Inaugural Annual Conference, LES Turkey, January 29, 2010, Istanbul, Turkey.

"Commercialization Strategies for Industrial Property Assets", LES Brazil Annual Congress, January 28, 2011, Rio de Janeiro, Brazil.

"Developing Commercial IP Markets", LES Arab Countries and Abu Dhabi Higher Colleges of Technology Seminar, October 12, 2011, Abu Dhabi, UAE.

"Asian IP Market Development", LES Asia Pacific Meeting, LES Singapore, November 9-10, 2011, Singapore.

"Patent Auctions & Technology in an Emerging Global Economy", LES Philippines, November 16, 2011, Manila.

"Tech Transfer for Humanitarian Purpose", LESI Annual Conference, April 2, 2012, Auckland.

Moderator, "New Challenges in ICT:  How to Compete Using IP Assets", LES Pan European Meeting, Rome, June 12, 2012.

Workshop Panelist, "Accelerate Licensing & Avoid Litigation: Effective Use of Transparency, Investors & Risk Management Tools", LES Pan European Meeting, Rome, June 12, 2012.

Keynote Speech, "Research Trends Around the Globe on Licensing", LES Asia Pacific Regional Conference, Tokyo, Japan, September 3, 2012.

"Investing in IP and Developing IP Monetization and Risk Markets: U.S. Perspective", LES Scandinavia Annual Meeting, Helsinki, Finland, September 12, 2012.

"El Mercado Global De Tecnologia", LESI Innovation Tour, LES Mexico and Asociacion Mexicana de Directivos de la Investigation Aplicada y el Desarrollo Tecnologico, A.C., Mexico City, Mexico, September 21, 2012.

Research Handbook on Intellectual Property Licensing, Forward, Jacques de Werra, University of Geneva, Editor, Edward Elgar Publishing, 2012.

"Markets for Humanitarian Technology Transfer" and "Adoption by Resolution of LESI IP Business Principles", LESI Global Technology Impact Forum, Geneva, Switzerland, January 22, 2013.



Forward, Research Handbook on Intellectual Property Licensing, Edited by Jacques de Werra, Edward Elgar Publishing Limited, 2013.

"IP Market Development" / "Simplicity in Global IP Valuation", LESI Annual Conference, Rio de Janeiro, Brazil, April 10, 2013.

"Collaboration for IP Based Accounting and Reporting", LESI Global Technology Impact Forum, Geneva, Switzerland, January 20-21, 2014.

"IP Licensing and Intermediaries", LES Asia-Pacific Regional Conference, Seoul, Korea, November 4-6, 2014.

"Building IP Transaction Platforms", Keynote Presentation, 14th Annual Shanghai International Intellectual Property Forum, Hosted by the World Intellectual Property Organization, (Shenzhen, China, December 7, 2017 as an advance local presentation) Shanghai, China, December 13, 2017.

"Building and Enforcing a Global Portfolio for Protection and Monetization", Moderator, 2018 LES IP100 Executive Forum, Phoenix, Arizona, February 15-16, 2018.

"Valuation of IP In the Eye of the Beholder" and "IP Monetization Lifecycle", Moderator, Inaugural IP Conference on Issues that Make a Difference, University of Arizona Law, Tucson, Arizona, March 5-6, 2018.

Best Practices and Useful Tools For Assessing the Value of IP, Co-authored with Mick Baciu and Drew Sills, American Intellectual Property Law Association 2018 Spring Meeting, Seattle, Washington, May 15-17, 2018.

"Toward Early Dispute Resolution of Standard Essential Patents in the 5G Era", International Arbitration Center Tokyo, Mock Arbitration, Tokyo, Japan, June 29, 2018.

"Practical Blockchain", LESI Annual Conference, Yokohama, Japan, May 28, 2019.

"Managing Your Intellectual Property", LESI Business Briefing Report, published by the Licensing Executives Society International, Inc., Copyright 2020.

"Managing Your Intellectual Property", Rigorous Empirical Research on Intellectual Property, virtual presentation by 4iP Council and the Licensing Executives Society International, September 29, 2020.

"A Global Economic Framework for Intellectual Based Commerce", World IP Forum, India, April 30, 2021.

"Growth Financing", European Patent Office High-Tech Business Forum, European Patent Academy, October 28, 2021.

European Patent Office / Licensing Executives Society International, HTB Forum on IPR for Growth Financing, March 17, 2025.

27



| | |
|---|---|
| **TELEVISION, RADIO AND EDITORIAL** | Bloomberg Morning Call with Brian Sullivan, "Patent Auctions", March 3, 2006. |

Bloomberg Morning Call with Brian Sullivan, "Patent Auctions", March 3, 2006.

CNBC Closing Bell, "Patents for Purchase", Interview with Maria Bartilomo, April 4, 2006.

CNBC On the Money, "Patents for Sale", Interview and Report by Scott Wapner, April 7, 2006.

Bloomberg Morning Call with Brian Sullivan, "Ocean Tomo 300 Index" and "Fall Intellectual Property Auction", September 13, 2006.

CBS WBBM-AM News Radio with Andy Giersher, Noon Business Hour, "New Stock Market Index", December 2, 2006 plus repeats.

Bloomberg Evening *Market Pulse* with Pimm Fox, "Stock Selections with Strong Patents", January 9, 2007.

Judge, *Everyday Edisons: Ordinary People, Extraordinary Ideas*, a Public Broadcasting System documentary series, 2nd Season, to be aired 2008.

Bloomberg Final Word with Brian Sullivan, "Changes in IP Laws Affect Stock Price", March 10, 2008.

FOX Business National, "Investing in Patents", June 5, 2008.

"It's the auto technology, Congress", *The Detroit News*, detnews.com, December 2, 2008.

FOX Business National, "Capturing Value from IP During a Recession", January 12, 2009.

FOX Business National, "The Value of Technology and Patents in a Chrysler Bankruptcy", May 1, 2009.

FOX Business National, "Exchange Looks to Value Patents", October 5, 2009.

TV Tokyo, "IP Markets, October 4, 2010.

FOX Business National, "Patent Litigation Trends", October 4, 2010.

CNBC Street Signs, "Patent-Palooza", July 26, 2011.

CNBC Street Signs, "Patent Battleground", August 15, 2011.

CNBC Street Signs, "IPXI: Trading Patents in 2012", December 14, 2011.

CEO IntroNet, May 16, 2012.



CNBC Street Signs, "Research In Motion's Patent Portfolio, May 30, 2012.

Crain's Chicago Business, Chicago Business Video, "Preview of the Eureka Index", April 25, 2013.

CNBC Street Signs, "Valuing Intangible Assets", August 5, 2013.

Chicago Tribune Blue Sky Innovation, "Why Robots Roam the Halls…", July 16, 2014.

CNBC Worldwide Exchange, "The Big Battle Over Intellectual Property:  U.S. – China Trade Tariffs and IP", March 26, 2018.

IP Fridays Podcast with Dr Rolf Claessen, "The Ocean Tomo Story", Jan 31 2025.

---

**EXPERT TESTIMONY**

01 Communique Laboratory, Inc. v. Citrix Systems, Inc. & Citrix Online, LLC
Civil Action 1:06-CV-0253 (N.D. Ohio)
United States District Court for the Northern District of Ohio
Deposition Testimony

Abiomed Inc. v. Maquet Cardiovascular LLC
No. 1:16-cv-10914-FDS
United States District Court for the District of Massachusetts
Deposition Testimony

ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus, PLC
Civil Action: 14-cv503-wmc
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Acadia Research Group, LLC and Lifeport Sciences, LLC v. Boston Scientific Corporation
AAA File No. 02-15-0004-9460
American Arbitration Association
Hearing and Deposition Testimony

Acantha LLC v. DePuy Synthese Sales, Inc., DePuy Synthes Products, Inc., DePuy Synthes, Inc., Johnson & Johnson, Inc. Synthes, Inc. Synthes USA, LLC, DePuy Orthopaedics, Inc. and DePuy Spine, LLC
Case No. 1:15-cv-01257-WCG
United States District Court for the Eastern District of Wisconsin Green Bay Division
Trial and Deposition Testimony

Acorda Therapeutics, Inc. v. Alkermes PLC
Case No. 01-20-0010-8421
American Arbitration Association
Hearing and Deposition Testimony



Advanced Aerospace Technologies, Inc. v. The United States of America and The Boeing Company and Institu, Inc.
Case No. 12-85C
United States Court of Federal Claims
Deposition Testimony

Advanced Micro Devices, Inc. and ATI Technologies, ULC v. Samsung Electronics Co. Ltd. et al.
No. CV-08-0986-SI
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

Advanced Technology Materials, Inc. v. Praxair, Inc.,
Civil Action No.03 CV 5161 (RO)
United States District Court for the Southern District of New York
Deposition Testimony

A.I.T. Industries, Inc., f/k/a Photocentron, Inc. v. Yordan Vurich and Opti-Vue, Inc.
Civil Action No.94-C-5196
Deposition Testimony

Allan Stimmel v. Eugene Weiner, Kurt Gutfreund and M & L International, Inc.
Civil Action No. 89 C 6510 (ACW)
United States District Court for the Northern District of Illinois, Eastern Division
Deposition Testimony

Allscripts Healthcare, LLC v. DR / Decision Resources, LLC
Case No. 1:19-cv-11038
United States District Court for the District of Massachusetts
Trial and Deposition Testimony

Allele Biotechnology and Pharmaceuticals, Inc. v. Regeneron Pharmaceuticals, Inc.
Case No. 7:20-cv-08255-PMH
United States District Court for the Southern District of New York
Deposition Testimony

Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Ltd., et. al.
Civil Action No. 04-2355
United States District Court for the District of New Jersey
Deposition Testimony

Altria Client Services LLC and U.S. Smokeless Tobacco Company LLC v. R.J. Reynolds Vapor Company and Modoral Brands, Inc.
Civil Action No. 1:20-cv-00472
Trial and Deposition Testimony



Analog Devices, Inc. v. Christopher Michalski, Kiran Karnik and Maxim
Integrated Products, Inc.
Case 01 CVS 10614
State of North Carolina Superior Court Division, County of Guilford
Deposition Testimony

Andrx Pharmaceuticals, LLC v. GlaxoSmithKline, PLC and SmithKline
Beecham Corporation
Case No. 05-23264-CIV-Graham/O'Sullivan
United States District Court for the Southern District of Florida
Deposition Testimony

Appian Corporation v. Pegasystems Inc. and Youyong Zou
Case No 2020 07216
Virginia: In the Circuit Court of the Fairfax County
Trial and Deposition Testimony

Apple, Inc. v. Masimo Corporation and Sound United, LLC
Masimo Corporation v. Apple, Inc.
C.A. No. 22-1377-MN-JLH
United States District Court for the District of Delaware
Deposition Testimony

Appliance Computing III, Inc. Redfin Corporation
Case No. 6:20-cv-00376-ADA
United States District Court for the Western District of Texas
Trial and Deposition Testimony

Applied Medical Resources Corporation v. Gaya Limited
AAA Case No. 50 133T00316 06
Arbitration Testimony

Arendi S.A.R.L. v. Apple Inc.
Case No. 1:12-cv-01596
United States District Court for the District of Delaware
Deposition Testimony

Arthur Takeall v. PepsiCo, Inc.
Civil Action S92-766
United States District Court for the District of Maryland
Deposition Testimony

Ashley Furniture Industries v. Laura Ashley Holdings Plc and Laura Ashley, Inc.
AAA File No. 51 133 Y 01056 08
American Arbitration Association
Arbitration and Deposition Testimony

Atlantic Richfield Company, Chevron U.S.A., Inc., Exxon Corporation, Mobil
Oil Corporation, Shell Oil Products Company and Texaco Refining &
Marketing, Inc. v. Unocal Corporation and Union Oil Company of California
and  Union Oil Company of California v. Atlantic Richfield Company, Chevron

31



U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products
Company and Texaco Refining & Marketing, Inc.
Civil Action No. CV-95-2379 KMW(JRx)
Trial and Deposition Testimony

Avery Dennison Corp. et al v. FLEXcon Company, Inc.
Civil Action No. 96-C 4820
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Aylus Networks, Inc. vs. Apple, Inc.
Case No. 3:13-cv-4700
United States District Court for the Northern District of California
Deposition Testimony

Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC
Case No. 11 Civ 1594 (GBD)
United States District Court for the Southern District of New York
Deposition Testimony

Baxalta Inc. and Baxalta, GMbH v. Genentech, Inc.
C.A. No. 17-cv-00509-TBD
United States District Court for the District of Delaware
Deposition Testimony

Baxter International Inc. and Baxter Healthcare Corp. v. CyDex
Pharmaceuticals, Inc.
AAA Case No. 01-21-0002-6106
American Arbitration Association
Deposition Testimony

Bayer Pharma AG, Bayer Intellectual Property GMBH and Bayer Healthcare
Pharmaceuticals, Inc. v. Watson Laboratories, Inc.
Civil Action No 12-517-GMS
United States District Court for the District of Delaware
Trial and Deposition Testimony

Beloit Corp v. Voith, Inc. & J.M. Voith GmbH
Civil Action No. 92 C 0168 C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Bio-Rad Laboratories, Inc. and the President and Fellows of Harvard College v.
10x Genomics, Inc.
Case No. 1:19-cv-12533
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc., the University of Chicago, Lawrence Livermore
National Security, LLC and Fellows of Harvard College v. Stilla Technologies,
Inc and Stilla Technologies

32



Case No. 1:19-cv-11587
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc. and the University of Chicago v. 10x Genomics, Inc.
Case No. 15-152-RGA
United States District Court for the District of Delaware
Trial and Deposition Testimony

BioNTech SE and Pfizer Inc., Petitioners v. Moderna TX, Inc., Patent Owner
Case IPR2023-01358 / Patent No. 10,702,600
Case IPR2023-01359 / Patent No. 10,933,127
United States Patent and Trademark Office Before the Patent Trial and Appeal
Board (PTAB)
Deposition Testimony

Board of Trustees of the Leland Stanford Junior University and Litton Systems,
Inc. v. Tyco International LTD., Tyco International, Inc., Tyco
Telecommunications, Inc, Tyco Networks, Inc., Lucent Technologies, Inc.,
Agere Systems, Inc., JDS Uniphase Corporation, Ciena Corporation, Pirelli
S.p.A., Ericsson, Inc., Telefonaktiebolaget Lm Ericsson and Ericsson
Microelectronics Ab, Optoelectronic Products.
Case No. Cv-00-10584-TJH (RCx)
United States District Court for the Central District of California – Western
California
Deposition Testimony

Bracco Diagnostics, Inc. v. Amersham Health Inc., Amersham Health AS,
Amersham plc and Amersham Health Inc. v. Bracco Diagnostics, Inc.
Civil Action No. 03-6025
United States District Court for the District of New Jersey
Trial and Deposition Testimony

Brian D. Zdeb, et al v. Baxter International, Inc.
Civil Action No. 91-L-8726
Appellate Court of Illinois, First District, Sixth Division
Trial and Deposition Testimony

Briggs & Stratton Corporation v. Kohler Company
Case No. 05-C-0025-C
United States District Court for the Western District of Wisconsin
Deposition Testimony

Bristol-Myers Squibb Company v. Apotex Inc. and Apotex Corp.
Civil Action No. 3:10-cv-05810 (MLC)
United States District Court for District of New Jersey
Deposition Testimony

Brocade Communications Systems, Inc. and Foundry Networks, LLC v. A10
Networks, Inc. et al.
Case No. 10-cv-03428 LHK



United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Callpod, Inc. v. GN Netcom, Inc. et al.
Case No. 06-CV-4961
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

CareDx, Inc. v. Natera, Inc.
Case No. 1:19-cv-00662-CFC-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

CareFusion 303 v. Sigma International
Case No 10cv0442 DMS (WMC)
United States District Court for the Northern District of California
Trial and Deposition Testimony

Carter Bryant v. Mattel, Inc. and Consolidated Actions
United States District Court for the Central District of California Southern
Division
Case No. CV 04-9049-DOC (RNBx)
Consolidated with Nos. CV 04-9059 and CV 05-2727
Trial and Deposition Testimony

Catalina Marketing Corp. v. Advanced Promotion Technologies, Inc.
Civil Action No. CV 93-4741 WJR (Sx)
Deposition Testimony

Caterpillar Inc. v. International Truck & Engine Corp., Siemens Diesel Systems
Technology, LLC, Sturman Industries, Inc., Sturman Engine Systems, LLC,
Oded E. Sturman and Carol K. Sturman
United States District Court for the District of South Carolina, Columbia
Division
Case No. 3:03-1739-17
Deposition Testimony

Catherine Alexander v. Take-Two Interactive Software, et al.
United States District Court for the Southern District of Illinois East St. Louis
Division
Civil Action No. 3:18-cv-966-MJR-MAB
Trial Testimony

CEATS, Inc. v. Continental Airlines, Inc., AeroSvit Airlines, CJSC, Air China,
Ltd., Air Europa Lineas Aereas, SAU, AirTran Airways, Inc., Alaska Airlines,
Inc., Horizon Air Industries, Inc., All Nippon Airways Co., Ltd., Aerovias Del
Contenente Americano SA, Brendan Airways, LLC, Caribbean Airlines, Ltd.,
Delta Air Lines, Inc., EgyptAir Airlines, Co., Frontier Airlines, Inc., JetBlue
Airways Corporation, Malaysia Airline System Berhad, Qatar Airways
Company QCSC, Alia Royal Jordanian, PLC, TAM, SA, Thai Airways



International Public Co., Ltd., United Air Lines, Inc., US Airways, Inc., Virgin America, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

CEATS, Inc. v. Granada Theater, Live Nation Worldwide, Inc., Ticketmaster, LLC, Tickets.com, Inc., Ticket Software, LLC, Ticket Network, Inc., TicketsNow.com, Inc., TNow Entertainment Group, Inc., Concur Technologies, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

Centripetal Networks, Inc. v. Cisco Systems, Inc.
Case No. 2:18-CV-00094-HCM-LRL
United States District Court for the Eastern District of Virginia Norfolk Division
Trial and Deposition Testimony

Centripetal Networks, LLC v. Palo Also Networks, Inc.
No. 2:21-cv-00137-EWH-RJK
United States District Court for the Eastern District of Virginia Norfolk Division
Trial and Deposition Testimony

Cheetah Omni, LLC v. Alcatel-Lucent USA Inc., et al. (on behalf of Tellabs North America, Inc.)
Case No.  6:11CV390
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Ciba Specialty Chemicals Corporation v. Hercules Inc. and Cytec Industries, Inc.
Civil Action No. 04-293
United States District Court for the District of Delaware
Deposition Testimony

Cisco Systems, Inc. and Cisco Technology, Inc. v. Jedd Williams
In Arbitration before JAMS
Reference No. 1310025030
Deposition Testimony

Cisco Systems, Inc. and Cisco Technology, Inc. v. Plantronics, Inc., et al.
Case No. 4:19-CV-07562
United States District Court for the Northern District of California
Deposition Testimony

Comair Rotron, Inc. v. Matsushita Electric Corporation of America, et al. - New Jersey Action
Civil Action No. 85-4308 (HLS)
Trial and Deposition Testimony

Comet Technologies USA Inc. v. XP Power LLC
Case No. 5:20-CV-06408-NC
United States District Court for the Northern District of California



Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Lenovo (United States) et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:09-cv-00399-LED
Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Cisco Systems, Inc.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:11-cv-00343-LED
Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. MediaTek Inc., et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:12-cv-578-LED
Deposition Testimony

Computer Generated Solutions, Inc. v. Peter Loral, Loral Incorporated, PJK, Inc. and Belle Loral, LLC
Civil Action No. 97 Civ. 6298 (MBM)
Deposition Testimony

Confidential Parties
Case No. 01-21-4508
American Arbitration Association
Hearing Testimony

Construction Technology, Inc. v. Cybermation, Inc. et al.
Civil Action No. 91 Civ. 7474 (JSM)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

ControlSoft, Inc, v The Dow Chemical Company
Case No. 1:22-cv-02004-DAP
United States District Court of Ohio Eastern Division
Deposition Testimony

Cordis Corporation v. SciMed Life Systems, Inc.
Case No. CV 4-96-261
United States Court for the District of Minnesota
Deposition Testimony

CoStar Realty Information, Inc. v. Civix-DDI, LLC and Civix-DDI, LLC v. LoopNet, Inc.
Case No. 1:12-cv-04968 (consolidated with 07091 and 08632)
United States District Court for the Northeastern District of Illinois Eastern Division
Deposition Testimony

36



C.R. Bard v. M3 Systems
Civil Action No. 93 C-4788
Trial Testimony

Crocs, Inc. v. Effervescent, Inc. et al.
Civil Action No. 06-cv-00605-PAB-KMT
United States District Court for the District of Colorado
Deposition Testimony

Cuker Interactive, LLC v. Pillsbury Winthrop Shaw Pittman LLP
AAA Case No. 01-18-0001-5005
American Arbitration Association
Arbitration Testimony

Curtis Amplatz and Carina Royalty, LLC v. AGA Medical Corporation
Court File No. 27-CV-10-27664
State of Minnesota District Court, County of Hennepin, Fourth Judicial District
Trial Testimony

DaiNippon Screen Mfg., Co. Ltd. *et al*. v. Scitex Corp. Ltd. *et al.*
Case No. C 96-3296 FMS
United States District Court for the Northern District of California
Arbitration and Deposition Testimony

Dalmatia Import Group, Inc. and Maia MaGee v. Foodmatch, Inc., Lancaster
Fine Foods, Inc. et al.
Case No. 2:16-cv-02767-EGS
United States District Court for the Eastern District of Pennsylvania
Trial and Deposition Testimony

Dana-Farber Cancer Institute, Inc. v. Bristol-Myers Squibb, Co., E.R. Squibb &
Sons, LLC and Ono Pharmaceutical Co. Ltd.
Civil Action No. 1:19-cv-11380
United States District Court for the District of Massachusetts
Deposition Testimony

Digital-Vending Services International, Inc. v. The University of Phoenix, Inc.
Civil Action No. 2:09-cv-00555
United States District Court for the Eastern District of Virginia
Deposition Testimony

Design Solange, Ltd., Inc. v. Lane Bryant, Inc.
Civil Action No. 94 CIV 1299 (JFK)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Donald R. Cameron, et al. v. Apple Inc.
Civil Action No. 4:19-cv-03074-YGR
United States District Court for the Northern District of California
Deposition Testimony

DTS, Inc. and DTS Licensing Ltd. v. Nero AG and Nero Inc.



Case No. 2:14-cv-09791-RGK-PJW
United States District Court for the Central District of California
Deposition Testimony

Durel Corporation v. Osram Sylvania, Inc.
Civil Action No. 95-1750 PHx (EHC)
United States District Court for the District of Arizona
Trial and Deposition Testimony

Dynetix Design Solutions, Inc. v. Synopsys, Inc. and Does 1-50
Case No. 5:11-cv-05973-PSG
United States District Court for the Northern District of California
Deposition Testimony

Dyson, Inc. v. Bissell Homecare, Inc.
Case No. 10-cv-08126
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Earthlink, LLC v. Charter Communications Operating, LLC
Index No. 654332/2020
Supreme Court of the State of New York, County of New York Commercial
Division, Part 48
Deposition Testimony

Edward K. Isbey, Jr. v. Cooper Companies, Inc.
Civil Action No. 89-CVS-3776
Supreme Court of North Carolina
Deposition Testimony

Ellison v. The Chicago Heart Association
Civil Action No. 92-K-706
Deposition Testimony

Emblaze Ltd. v. Apple Inc.
Civil Action No. 45:11-cv-01079-SBA (PSG)
United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc., Micron
Technology Inc. and Intel Corporation et al.
Case No. 12-43166-TJT
United States Bankruptcy Court, Eastern District of Michigan Southern Division
Deposition Testimony

Enterasys Networks, Inc. v. Extreme Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Epic Games, Inc. v. Apple Inc.

38



Civil Action No. 4:20-cv-05640-YGR
United States District Court for the Northern District of California Oakland
Division
Trial and Deposition Testimony

Errant Gene Therapeutics, LLC v. Sloan Kettering Institute for Cancer Research
and Bluebird Bio Inc.
Index No. 150586/2017
Supreme Court of the State of New York
Trial and Deposition Testimony

Escada Beaute, et al. v. The Limited Inc. et al.
Civil Action No. 92-CIV-7530 (LLS)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Esquel Enterprises, Ltd., v. TAL Apparel Limited and TALTECH Limited
Civil Action No. C04-974Z
United States District Court for the Western District of Washington at Seattle
Deposition Testimony

EVEMeta, LLC v. Siemens Convergence Creators Corporation, Synacore, Inc.
Case No. 23139/MK
Supreme Court of New York for the County of New York
Deposition Testimony

Express, LLC v. Fetish Group, Inc.
Civil Action No. CV05-2931 SWV (JTLx)
United States District Court for the Central District of California Western
Division
Deposition Testimony

Extreme Networks, Inc. v. Enterasys Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Facebook, Inc. & Subsidiaries v. Commission of Internal Revenue
Docket No. 21959-16
U.S. Tax Court
Trial Testimony

Fairchild Semiconductor Corporation and System General Corporation v. Power
Integrations, Inc.
Civil Action No. 12-00540
United States District Court for the District of Delaware
Trial and Deposition Testimony

Faye Fish Estate et al. v. Beech Aircraft et al.
Civil Action No. 631333
Deposition Testimony



Ferring Pharmaceuticals Inc., Rebiotix Inc., v. Finch Therapeutics Group, Inc. et al.
Civil Action No. 21-01694-RGA
United States District Court for the District of Delaware
Trial and Deposition Testimony

FidoPharm, Inc. & Omnipharm, Ltd. v. Cheminova, Inc. A/S
AAA Case No. 50 503 T 00266 12
American Arbitration Association
Hearing Testimony

First Quality Tissue, LLC v. Irving Consumer Products Limited and Irving Consumer Products, Inc.
Case No. 1:19-cv-00428
United States District Court for the District of Delaware
Deposition Testimony

Footstar, Inc. et al v. Kmart Corporation
Chapter 11 Case No. 04-22350 (ASH)
United States Bankruptcy Court for the Southern District of New York
Deposition Testimony

Fortis Advisors LLC, solely in its capacity as representative of former stockholders of Auris Health, Inc. v. Johnson & Johnson, et al.
C.A. No. 2020-0881-LWW
In the Court of Chancery of the State of Delaware
Trial and Deposition Testimony

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.
Case No.: CV07-02-962
United States District Court for the Central District for the State of California
Deposition Testimony

Fractus, S.A. v. Samsung Electronics Co. Ltd.; et al (including LG Electronics, Inc. and related parties)
Civil Action No. 6:09cv203
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Fraunhofer-Gesellschaft Zur Forderlung der Andgwandten Forschung E.V. v. Sirius XM Radio Inc.
Civil Action No. 1:17-cv-00184
United States District Court for the District of Delware
Deposition Testimony

Fujitsu Ltd. v. Tellabs, Inc. et al.
Case No. 1:09-cv-04530
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

FXOne, LLC & Rosario Ingargiola v. Seabury Financial Solutions, et. al
JAMS New York, New York

40



Arbitration Hearing Testimony

General Mills, Inc. and General Mills IP Holdings II, LLC v. Fage Dairy
Industry, S.A., Fage USA Dairy Industry, Inc. and Fage USA Holdings, Inc.
United States District Court for the Northern District of New York
Deposition Testimony

Georgia-Pacific Corp. v. United States Gypsum Co. and L&W Supply Co.
Civil Action No. 94-989-RRM
United States District Court for the District of Delaware
Trial Testimony

Gibson Guitar Corp. v. Heritage Guitar, Inc. and Lasar Music Corp.
Civil Action No. 3-90-0009
Deposition Testimony

Gilberto Arvelo v. American International Insurance
Civil Action No. 93-1287
United States District Court for the District of Puerto Rico
Deposition Testimony

The Gillette Company LLC v. Dollar Shave Club, Inc., Dorco Company Ltd.,
and Pace Shave, Inc.
Case No. 1:15-CV-01158 (LPS)
United States District Court for the District of Delaware
Deposition Testimony

Google LLC v. Anthony Levandowski and Lior Ron
JAMS Ref No. 1100086069
Hearing and Deposition Testimony

Google LLC v. Sonos, Inc.
United States District Court for Northern District of California
Civil Action No. 3:20-cv-06754
Trial and Deposition Testimony

Government Employees Insurance Company v. Google, Inc. and Overture
Services, Inc.
United States District Court, Eastern District of Virginia, Alexandria Division
Civil Action No: 1:04cv507
Deposition Testimony

Group One v. Hallmark
Civil Action No. 97-1224-CV-W-1
United States District Court for the Western District of Missouri, Western
Division
Deposition Testimony

GSI Technology, Inc. v. United Memories, Inc., Integrated Silicon Solution, Inc.
Case No. 13-CV-1081-PSG
United States District Court for the Northern District of California, San Jose
Division



Trial and Deposition Testimony

Guardant Health, Inc. v. Natera, Inc.
Case No. 3:21-CV-04062-EMC
United States District Court for the Northern District of California San
Francisco Division
Trial and Deposition Testimony

hiQ Labs, Inc. v. LinkedIn Corporation
Civil Action No. 3:17-cv-03301
United States District Court for the Northern District of California
Deposition Testimony

Hitachi, Ltd. v. Samsung Display Devices Co., Ltd. and Samsung Display
Devices Co., Inc. and Samsung Electronics Co., Ltd. and Samsung Electronics
America Inc. and Office Depot
Civil Action No. 97-1988-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Hoechst Celanese Corporation v. Chase Plastic Services and Kevin P. Chase
Civil Action No. 94-75361
United States District Court
Trial and Deposition Testimony

Hoechst Celanese Corporation v. Nylon Engineering Resins, Inc.
Civil Action No. 94-346-CIV-FTM-24D
United States District Court for the Middle District of Florida
Trial Testimony

Huawei Technologies Co. Ltd. v. Verizon Communications, Inc. et al.
Civil Action No. 2:20-cv-00030
United States District Court for the Eastern District of Texas Marshall Division
Trial and Deposition Testimony

ICON Health & Fitness, Inc. v. Peloton Interactive, Inc.
Case No. 1:20-cv-01386-RGA
United States District Court for the District of Delaware
Deposition Testimony

iHance, Inc. v. Eloqua Limited and Eloqua Corporation
Case No. 2;11-CV-257-MSD-TEM
United States District Court for the Eastern District of Virginia Norfolk Division
Deposition Testimony

Illumina, Inc. et. al v. Ariosa Diagnostics, Inc.
Case No 3:14-cv-01921-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson v. Fullbright &
Jaworski, LLP

42



Cause No. A 05 CA 334 SS
United States District Court of Texas, Austin Division
Deposition Testimony

Impact Engine, Inc. v. Google LLC
Case No. 3:19-cv-01301-CAB-DEB
United States District Court for the Southern District of California
Deposition Testimony

In Re Apple iPhone Antitrust Litigation
Civil Action No. 4:11-cv-06714-YGR
United States District Court for the Northern District of California
Deposition Testimony

In Re Gabapentin Patent Litigation
MDL Docket No. 1384 (FSH)
Master Civil Action No. 00-2931 (FSH)
On behalf of Defendants Teva Pharmaceutical Industries Ltd. and IVAX
Corporation and related parties
United States District Court for the District of New Jersey
Deposition Testimony

In Re Nortel Networks Inc. et al. and
In the Matter of the Companies' Creditors Arrangement Act
Case No. 09-10138 (KG) and R.S.C. 1985, c. C-36
United States Bankruptcy Court for the District of Delaware and the Ontario
Superior Court of Justice
Trial and Deposition Testimony

In the Matter of Arbitration Between Open Text, Inc., Claimant, and State
Employee's Credit Union, Respondent
JAMS Arbitration No. 1400015026
Arbitration Testimony

In the Matter of Certain Botulinum Toxin Products, Processes for
Manufacturing or Relating to Same and Certain Products Containing Same
Investigation No. 337-TA-1145
On behalf of Allergan plc, Allergan, Inc. and Medytox Inc.
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Computer Network Security Equipment and Systems,
Related Software, Components Thereof, and Products Containing Same
Investigation No. 337-TA-1314
On behalf of Respondent Centripetal Networks, Inc.
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Electronic Devices with Graphics Data Processing
Systems, Components Thereof, and Associated Software
Investigation No. 337-TA-813
On behalf of Respondent Apple Inc.



United States International Trade Commission
Deposition Testimony

In the Matter of Certain High-Strength Aluminum or Aluminum Alloy-Coated
Steel, and Automotive Products and Automobiles Containing Same
Investigation No. 337-TA-813
On behalf of Complainant ArcelorMittal
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Medical Programmers with Printed Circuit Boards
Components
Investigation No. 337-TA-1396
On behalf of Respondent Axonics, Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Pre-Filled Syringes for Intravitreal Injection and
Components Thereof
Investigation No. 337-TA-1207
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Robotic Floor Cleaning Devices and Components
Thereof
Case No. 337-TA-1252
On behalf of the Respondents SharkNinja Operating LLC, SharkNinja
Management LLC, SharkNinja Management Company, SharkNinja Sales
Company, SharkNinja Hong Kong Co. Ltd., and EP Midco LLC
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Semiconductor Chips with Minimized Chip Package
Size and Products Containing Same (III)
Investigation No. 337-TA-630
On behalf of Respondents Acer, Nanya and Powerchip
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Short-Wavelength Light Emitting Diodes, Laser Diodes,
and Products Containing Same
Investigation No. 337-TA-640
On behalf of Respondent Panasonic
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Wearable Activity Tracking Devices, Systems and
Components Thereof
Investigation No. 337-TA-973
On Behalf of Complainant Fitbit, Inc.
United States International Trade Commission
Deposition Testimony



In the Matter of Certain Wiper Blades
Investigation No. 337-TA-816
On behalf of Respondents
United States International Trade Commission
Hearing (written) and Deposition Testimony

Industrial Print Technologies, LLC v. O'Neil Data Systems, Inc. and Hewlett-Packard Company et. al
Case No. 3:15-cv-01100-M, 01101-M, 01103-M, 01104-M and 01106-M
United States District Court for the Northern District of Texas Dallas Division
Deposition Testimony

InLine Connection, Corp v. AOL Time Warner, Inc. and American Online, Inc
Civil Action 02-272
United States District Court for the District of Delaware
Deposition Testimony

InLine Connection, Corp v. Earthlink, Inc.
Civil Action 02-477
United States District Court for the District of Delaware
Deposition Testimony

Innovention Toys, LLC v. MGA Entertainment, Inc., Wal-Mart Stores, Inc. and Toys 'R Us, Inc.
Civil Action No. 07-6510
United States District Court for the Eastern District of Louisiana
Trial and Deposition Testimony

Intel Corporation v. Future Link Systems, LLC
Civil Action No. 14-377(LPS)
United States District Court for the District of Delaware
Deposition Testimony

InterDigital Technology Corporation v. Motorola, Inc.
Civil Action No. 94-73
United States District Court for the District of Delaware
Trial and Deposition Testimony

International Business Machines Corporation v. Groupon, Inc.
C.A. No. 16-122-LPS-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

Invensas Corporation v. Renesas Electronics Corporation and Renesas Electronics America, Inc.
Case No. 11-cv-00448-GMS
United States District Court for the District of Delaware
Deposition Testimony

Invention Capital Partners v. Phoenix Technologies Ltd., Marlin Equity Partners, et. al



Case No: 113CV242491
Superior Court of the State of California County of Santa Clara
Deposition Testimony

Isogon Corporation v. Amdahl Corporation
Civil Action No. 97 CIV 6219 (SAS)
United States District Court for the Southern District of New York
Deposition Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0902C
United States District Court for the Western District of Wisconsin
Trial Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0905C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Jaguar Land Rover Limited v. Bentley Motors Limited and Bentley Motors, Inc.
Case No. 2:18-cv-320-MSD-LRL
United States District Court for the Eastern District of Virginia, Norfolk
Division
Deposition Testimony

Jamdat Mobile, Inc. v. JAMSTER International Sarl, Ltd; JAMBA! GMBH; and
Verisign, Inc.
Civil Action No. CV05-3945 PA (FMOx)
Deposition Testimony

James Hayden v. 2K Games, Inc. and Take-Two Interactive Software, Inc.
Civil Action No. 1:17-cv-02636-CAB
United States District Court for the Northern District of Ohio Eastern Division
Trial and Deposition Testimony

Jenner & Block LLP v. Parallel Networks, LLC and EpicRealm Licensing LP
JAMS Arbitration No. 1310019934
Arbitration and Deposition Testimony

John W. Evans, et al. v. General Motors Corporation
Docket # X06-CV-94-0156090S
Superior Court of Connecticut Judicial District of Waterbury
Deposition Testimony

Joy Recovery Technology Corp. v. The Penn Central Corp. and Carol Cable
Company, Inc., aka General Cable Industries, Inc.
Civil Action No. 93 C 0992
Deposition Testimony

K-Tube Corp. v. Sterling Stainless Tube Corp. et al.
Case No. CV 90 1653 JLQ (M)
Trial and Deposition Testimony

46



Kay-Cee Enterprises, Inc. v. Amoco Oil Company
Civil Action No. 97-2406 (JWL)
United States District Court for the District of Kansas
Trial and Deposition Testimony

Kennecott Corporation v. Kyocera International
Civil Action No. 80-0516 R (M)
United States District Court for the Southern District of California
Deposition Testimony

Keurig, Inc. v. Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.
C.A. No. 07-17 (GMS)
United States District Court for the District of Delaware
Deposition Testimony

Kimberly-Clark Corporation v. Cardinal Health 200, LLC
Civil Action No. 1:10 CV-0034-CAP
United States District Court Northern District of Georgia, Atlanta Division
Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc., Richard Weston,
Medela AG, Medela, Inc., and Patient Care Systems, Inc.
Civil Action SA-03-CA-0832-RG
United States District Court Western District of Texas San Antonio Division
Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc. and Smith &
Nephew, Inc.
Case No. SA:08-CV-00102-WRF
United States District Court Western District of Texas San Antonio Division
Preliminary Injunction Hearing, Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical
Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest
University Health Sciences v. Convatec, Inc., Boehringer Wound Systems, LLC
and Boehringer Technologies, LP
Civil Action No. 1:08-CV-00918-WO-LPA
United States District Court for the Middle District of North Carolina
Deposition Testimony

Kruse Technology Partnership v. Caterpillar, Inc.
Case No. CV 04-10435
United States District Court for the Central District of California
Deposition Testimony

Kuryakan Holdings LLC v. Ciro, LLC et al
Civ. No. 3:15-CV-00703
United States District Court for the Western District of Wisconsin
Deposition Testimony

47



Leo Pharma A/S v. Tolmar, Inc. et al.

C.A. No. 10-269 (SLR)
Deposition Testimony

Lincoln Electric Company, et al. v. National Standard, LLC
No. 1:09-cv-01886-DCN
United States District Court of Ohio Eastern Division
Deposition Testimony

LG Electronics Inc. v. Intellectual Ventures I, LLC et. al
C.A. No. N22C-11-145 SKR-CCLD
Superior Court of the State of Delaware
Trial Testimony

LNP Engineering Plastics, Inc. and Kawasaki Chemical Holding Co., Inc. v.
Miller Waste Mills, Inc. trading as RTP Company
Civil Action No. 96-462 (RRM)
United States District Court for the District of Delaware
Trial Testimony

Lotes Co. Ltd. v. Hon Hai Precision Industry Co. Ltd and Foxconn Electronics, Inc.
Civil Action No. 3:11-cv-01036-WHA
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Lucent Technologies Inc. v. Extreme Networks, Inc.
Civil Action No. 03-508 (JJF)
United States District Court for the District of Delaware
Trial and Deposition Testimony

Lunar Corp. & The UAB Research Foundation v. EG&G Astrophysics Research Corp.
Civil Action No. 96-C-199-S
Trial Testimony

Match Group, LLC v. Bumble Trading Inc. et al.
Civil Action 6:18-cv-00080
United States District Court for the Western District of Texas Waco Division
Deposition Testimony

Matsushita Electric Industrial Co., Ltd. v. MediaTek, Inc., Oppo Digital., and
Micro-Star International Computer Corp.
Case No. C05-03148 MMC
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

McKinley v. Zdeb
Civil Action No. 99-S-1178
United States District Court for the District of Colorado

48



Fact Deposition Testimony

Medgraph, Inc. v. Medtronic, Inc.
Case No. 6:09-cv-06610-DGL-MWP
United States District Court for the Western District of New York
Rochester Division
Deposition Testimony

MedImpact Healthcare Systems, Inc. et al v. IQVIA, Inc. et al.
Case No. 3:19-cv-1865-GPC-DEB
United States District Court for the Southern District of California
Deposition Testimony

Medtronic Xomed, Inc. v. Gryus ENT LLC
Case No.: 3:04CV400-J-32 MCR
United States District Court for the Middle District of Florida
Jacksonville Division
Deposition Testimony

MEI, Inc. v. JCM American Corp & Japan Cash Machine Co. Ltd.
Civil Action No. 09-00351
United States District Court for the District of New Jersey
Deposition Testimony

Meribear Productions, Inc. v. Showroom Interiors, Inc. et. al.
Case No. VC065653
Superior Court of the State of California, County of Los Angeles
Deposition Testimony

Message Phone, Inc. v. SVI Systems, Inc. and Tharaldson Properties
Civil Action No. 379CV-1813H
Trial Testimony

Mexichem Amanco Holdings, S.A. de C.V. v. The Chemours Company and The Chemours Company FC, LLC
Civil Action No. 4:20-cv-01960
Deposition Testimony

MGA Entertainment, Inc. and Isaac Larian v. Hartford Insurance Company of the Midwest, Harford Fire Insurance Company, The Hartford Financial Services Group and Does 1 through 10.
Case No. CV 08-0457 DOC (RNBx)
United States District Court for the Central District of California Southern Division
Deposition Testimony

Military Professional Services, Inc. v. BancOhio National Bank
Civil Action No. 91-5032
Deposition Testimony



Milwaukee Electric Tool Corporation, Metco Battery Technologies, LLC AC (Macao Commercial Offshore) Limited and Techtronic Industries Co. Ltd. v. Snap-On Incorporated
Case No. 2:14-cv-01296
United States District Court for the Eastern District of Wisconsin
Trial and Deposition Testimony

Minebea Co., Ltd., Precision Motors Deutsche Minebea GmbH, and Nippon Miniature Bearing Corp. v. George Papst, Papst Licensing GmbH, and Papst Licensing Verwaltungsgesellschaft MIT Beschrankter Haftung
Civil Action No. 97-CV-590 (PLF)
Trial and Deposition Testimony

Mitek Surgical Products, Inc. v. Arthrex, Inc.
Case No. 1:96CV 0087S
United States District Court for the District of Utah, Central Division
Deposition Testimony

Mitsubishi Electric Corp., Koninklijke Philips N.V., Thomson Licensing, GE Technology Development, Inc. Panasonic Corporation and Sony Corporation v. Sceptre, Inc.
Case No. 2:14-cv-04994-ODW-AJW
United States District Court for the Central District of California
Deposition Testimony

Money Suite Company v. Insurance Answer Center, LLC; Answer Financial, Inc.; AllState Insurance Company; Esurance Insurance Services, Inc.
United States District Court Central District of California Southern Division
Deposition Testimony

Motorola, Inc. v. InterDigital Technology Corporation
Civil Action No. 93-488
United States District Court for the District of Delaware
Trial and Deposition Testimony

Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN, BHD v. Hytera Communications Corporation Ltd., Hytera America, Inc. and Hytera Communications America (West), Inc.
Civil Action No. 1:17-cv-1973
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.
Civil Action No. 1:17-cv-1972
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Motorsport Aftermarket Group, Inc. v. Thomas Ellsworth
AAA Case No. 01-15-0006-1319
American Arbitration Association
Hearing Testimony

50



Natera, Inc. v. ArcherDx, Inc., ArcherDx, LLC and Invitae Corp.
Civil Action No. 20-125-LPS
United States District Court for the District of Delaware
Trial and Deposition Testimony

Natera, Inc. v. Neogenomics Laboratories, Inc.
C.A. No. 1:23-cv-629
United States District Court for the Middle District of North Carolina
Deposition Testimony

Nellcor Puritan Bennett, LLC v. CAS Medical Systems, Inc.
Case No. 2:11-CV-15697
United States District Court for the Eastern District of Michigan Southern
Division
Deposition Testimony

Netlist, Inc. v. Diablo Technologies, Inc.
Civil Action No. 4:13-CV-05962-YGR
United States District Court for the Central District of California Oakland
Division
Trial Testimony

Nike, Inv. v. Lululemon USA, Inc.
Case No. 1:23-cv-00771-AS
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Nomadix, Inc. v. Hewlett-Packard Company, et al.
Civil Action No. CV09-08441 DDP(VBKx)
United States District Court for the Central District of California Western
Division
Deposition Testimony

Nomix Corporation v. Quikrete Companies, Inc.
Civil Action No. H88-463-AHN
Trial and Deposition Testimony

Optical Air Data Systems, LLC v. L-3 Communications Corporation et al.
Civil Action No. N17C-05-619
Superior Court of the State of Delware
Trial and Deposition Testimony

Option3 Cyber Investments, LLC and Option3 Ventures, LLC v. Centripetal
Networks, Inc.
Case No. 2021-15490
Circuit Court for the County of Fairfax
Deposition Testimony

Oracle America, Inc. v. Google, Inc.
Case No. 3:10-CV-03561-WHA
United States District Court for the Northern District of California San
Francisco Division



Deposition Testimony

Orthofix, Inc., et al v. EBI Medical Systems, Inc., et al.
Civil Action No. 95-6035 (SMO)
United States District Court for the District of New Jersey
Trial and Deposition Testimony

PACT XPP Schweiz AG et al. v. Intel Corporation
Civil Action No. 19-cv-01006-JDW
United States District Court for the District of Delaware
Deposition Testimony

Pharmacia & Upjohn Company, LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.
Civil Action No. 04-833 (KAJ)
United States District Court for the District of Delaware
Deposition Testimony

Picker International, Inc. v. Mayo Foundation, et al.
Case No. 95-CV-2028
United States District Court for the Northern District of Ohio, Eastern Division
Trial and Deposition Testimony

Penda Corporation v. United States of America and Cadillac Products, Inc.
Case No. 473-89-C
United States Court of Federal Claims
Trial and Deposition Testimony

PepsiCo, Inc. v. Commissioner of Taxation and
Stokely-Van Camp, Inc. v. Commissioner of Taxation
VID53/2022, VID55/2022, VID57/2022, VID74/2022, VID82/2022
Federal Court of Australia
Hearing Testimony

Peter Daou and James Boyce v. Arianna Huffington, Kenneth Lerer and
TheHuffingtonPost.com, Inc.
Index No. 651997/2010
Supreme Court of the State of New York, County of New York
Deposition Testimony

PlastiPak Packaging, Inc. v. Premium Waters Inc.
Case No. 3:20-cv-00098
United States District Court for the Western District of Wisconsin
Deposition Testimony

Plexxikon Inc. v. Novartis Pharmaceuticals Corporation
Case No. 4:17-cv-04405-HSG
United States District Court for the Northern District of California Oakland
Division
Trial Deposition Testimony

Power Integrations, Inc. v. Fairchild Semiconductor International, Inc., Fairchild
Semiconductor Corporation and System General Corporation

52



Case No. 3:09-cv-05235-MMC
United States District Court for the Northern District of California
Trial and Deposition Testimony

Powertech Technology, Inc. v. Tessera, Inc.
Case No. CV10-00945EMC
United States District Court for the Northern District of California
Deposition Testimony

Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced
Technology Materials, Inc.
Civil Action No. 03-1158-SLR
United States District Court District of Delaware
Deposition Testimony

Prism Technologies, LLC v. AT&T Mobility, LLC
Civil Action No. 8:12-cv-122-LES-TDT
United States District Court of Nebraska
Deposition Testimony

Prism Technologies, LLC v. T-Mobile USA, Inc.
Civil Action No. 8:12-cv-00124
United States District Court of Nebraska
Trial and Deposition Testimony

Prism Technologies, LLC v. Sprint Spectrum L.P. d/b/a/ Sprint PCS
Civil Action No. 8:12-cv-123-LES-TDT
United States District Court of Nebraska
Trial and Deposition Testimony

The Procter & Gamble Company v. Paragon Trade Brands, Inc.
Civil Action No. 94-16-LON
United States District Court for the District of Delaware
Trial and Deposition Testimony

Promptu Systems Corporation v. Comcast Corporation and Comcast Cable
Communications LLC
C.A. No. 2:16-cv-06516-JS
United States District Court for the Eastern District of Pennsylvania
Deposition Testimony

Purecircle USA Inc. and Purecircle SDN BHD v. Sweegen, Inc. and Phyto Tech
Corp.
Case No. 8:18-CV-1679 JVS (JDE)
United States District Court for Central District of California Southern Division
Deposition Testimony

QR Spex, Inc. and Thomas G. Swab v. Motorola, Inc. and Frog Design, Inc.
Civil Action No 03-6284 JFW (FMOx)
United States District Court for the Central District of California
Deposition Testimony

53



Qualcomm, Inc. v. InterDigital Communications Corporation
Case No. 93-1091G (LSP)
Deposition Testimony

Quickie, LLC v. Medtronic, Inc.
Civil Action No. 02 CV 1157 (GEL)
United States District Court for the Southern District of New York
Deposition Testimony

Radware, LTD, and Radware, Inc. v. F5 Networks, Inc.
Civil Action No. 5:13-cv-02024 RMW
United States District Court for the Southern District of California San Jose
Division
Trial and Deposition Testimony

Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.
Civil Action No. 1:23-cv-89-TSK
United States District Court for the Northern District of West Viginia,
Clarksburg Division
Deposition Testimony

Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG et. Al
Case IPR2021-00816
United States Patent and Trademark Office Before the Patent Trial and Appeal
Board
Deposition Testimony and Written Declaration

Remcor v. Scotsman/Booth
Civil Action No. 93 C 1822
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Remcor v. Servend
Civil Action No. 93 C 1823
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Rensselaer Polytechnic Institute and Dynamic Advances, LLC v. Apple Inc.
Case No 1:13-cv-00633 (DNH/DEP)
United States District Court for the Northern District of New York
Deposition Testimony

Research Corporation Technologies, Inc. v. Hewlett-Packard Company
Civil Action No. CIV 95-490-TUC-JMR
United States District Court for the District of Arizona
Deposition Testimony

Robert E. Morley, Jr. and REM Holdings 3, LLC v. Square, Inc., Jack Dorsey
and James McKelvey, Jr.
No. 4:14-cv-00172-CDP



United States District Court for the Eastern District of Missouri
Deposition Testimony

Roche Diabetes Care, Inc. v. Insulet Corporation
Case No. 1:20-cv-00825
United States District Court for the District of Delaware
Deposition Testimony

Rommy Hunt Revson v. The Limited, Inc. et al.
Civil Action No. 90-3840 (MGC)
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Ameren Corporation; Union
Electric Company; Central Illinois Public Service Company; Cilcorp, Inc.;
Central Illinois Light Company
Case No. 07-4955 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. AOL, LLC, CompuServe
Interactive Services and Netscape Communications Corporation
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Cablevision Systems Corporation
et. al.
Case No. 2:07-ML-01816 / 02314 RGK-FFM
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Charter Communications, Inc.;
Charter Communications Holding Company, LLC; Charter Communications
Operating, LLC; and Charter Communications Entertainment I, LLC
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. CIGNA Corporation, CIGNA
Health Corporation, CIGNA HealthCare of Delaware, Inc., Tel-Drug of
Pennsylvania, LLC and Tel-Drug, Inc.
CV 07-2192 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Comcast Corporation, Sirius-XM
Radio, Inc., et al.
NO. 2:07-ML-01816-C RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony



Ronald A. Katz Technology Licensing, LP v. DHL Holdings (USA) Inc., DHL Express (USA), Inc., and Sky Courier, Inc.
Case No. 07-ml-01816-B RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Fifth Third Bankcorp, Fifth Third Bank, Fifth Third Bank (Central Ohio)
Case No. 07-4960 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Time Warner Cable Inc., Time Warner NY Cable LLC and Time Warner Entertainment Company, L.P.
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. United States Cellular Corporation, TDS Telecommunications Corporation and TDS Metrocom, LLC
Case No.07-ML-01816-B-RGK (FFMX)
United States District Court for the Central District of California
Deposition Testimony

Rosetta Stone Ltd. v. Google Inc.
Civil Action No. 1:09 CV 736 GBL / JFA
United States District Court for the Eastern District of Virginia
Deposition Testimony

RWM Kinetic Enterprises, Inc. and Thomas J. Ring v. Kinetic Concepts, Inc. and KCI Therapeutic Services, Inc.
Case No. SA-96-CA-603-OG
United States District Court for the Western District of Texas San Antonio Division
Trial Testimony

Sanofi-Aventis U.S. LLC and Regeneron Pharmaceuticals, Inc. v. Genentech, Inc. and City of Hope
Case No. 2:15-CV-05685
United States District Court for the Central District of California Western Division
Deposition Testimony

Sanyo Electric Co., Ltd. v. Intel Corporation
Civil Action No. 2018-0723-MTZ
Court of Chancery of the State of Delaware
Deposition Testimony

Saxon Innovations, LLC v. Nokia Corp, et al. (including Samsung Electronics, Co. and related parties)
Civil Action No. 6:07-cv-490-LED-JDL
United States District Court for the Eastern District of Texas Tyler Division

56



Deposition Testimony

SecurityPoint Holdings, Inc. v. The United States
Case No. 1:11-cv-00268-EGB
In the United States Federal Court of Claims
Deposition and Trial Testimony

Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd.,
S-LCD Corporation, Samsung Electronics America, Inc. Samsung
Telecommunications America, LLC
Civil Action No. 3:09-cv-00001
United States District Court for the Western District of Wisconsin
Deposition Testimony

Selex Galileo, Inc. v. Nomir Medical Technologies, Inc.
Case No. 01-17-0003-0930
American Arbitration Association
Hearing Testimony

Seven Networks, LLC v. Apple Inc.
Civil Action No. 2:19-cv-115-JRG
United States District Court for the Western District of Texas Marshall Division
Deposition Testimony

Shuffle Tech International, LLC and Aces Up Gaming, Inc. and Poydras-Talrick
Holdings, LLC v. Scientific Games Corporation and Bally Technologies, Inc.
(d/b/a SHFL Entertainment or Shuffle Master) and Bally Gaming, Inc.
Civil Action No. 1:15-cv-3702
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Silicon Image, Inc. v. Analogix Semiconductor, Inc.
Case No. C 07-00635 JCS
United States District Court for the Northern District of California, San
Francisco Division
Deposition Testimony

Site Microsurgical Systems v. The Cooper Companies
Civil Action S92-766
Deposition Testimony

Slot Speaker Technologies, Inc. v. Apple Inc.
Case No. 4:13-cv-01161-HSG
United States District Court Northern District of California Oakland Division
Deposition Testimony

SmartPhone Technologies, LLC v. Research In Motion Corp. et. al (on behalf
LG Electronics, Inc. and LG Electronics USA, Inc.)
Civil Action No. 6:10cv74-LED
United States District Court Eastern District of Texas Tyler Division
Deposition Testimony



St. Clair Intellectual Property Consultants v. Fuji Photo Film Co., Ltd., Fuji
Photo Film U.S.A., Inc., Fujifilm America, Inc., et al.
Civil Action No. 03-241 JJF
United States District Court for the District of Delaware
Trial and Deposition Testimony

Steven E. Berkheimer v. Hewlett-Packard Company
Case No. 1:12-cv-09023
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV44
United States District Court of Texas Sherman Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV45
United States District Court of Texas Sherman Division
Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 4:19-cv-01145
United States District Court for the Southern District of Texas Houston Division
Trial and Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 1:15-CV-8178
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Synopsys, Inc. v. Ubiquiti Networks, Inc. et al.
Civil Action No. 3:17-cv-00561-WHO
United States District Court for the Northern District of California
Deposition Testimony

Takata Corp. v. Allied Signal, Inc. and Breed Technologies, Inc.
Civil Action CV-95-1750
Deposition Testimony

Technol Medical Products, Inc., et al v. Robert Busse & Co., Inc.
Civil Action No. 3:94-CV-2284-X
Deposition Testimony

Tekmira Pharmaceuticals Corporation and Protiva Pharmaceuticals, Inc. v.
Alnylam Pharmaceuticals, Inc. and AlCana Technologies, Inc.
Civil Action No. 11-1010-BLS2
Massachusetts Superior Court for Suffolk County
Deposition Testimony

58



Tessera, Inc. v. Advanced Micro Devices, Inc. et al.
Case No. 4:05-cv-04063-CW
United States District Court for Northern District of California Oakland Division
Deposition Testimony

Tessera, Inc. v. UTAC (Taiwan) Corporation
Case No.: 5:10-cv-04435-EJD
United States District Court for Northern District of California San Jose Division
Deposition Testimony

Therma-Tru Corporation v. Caradon Peachtree, Inc.
Civil Action No. 95-CV-75534-DT
Deposition Testimony

Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation, v. ROSS Intelligence Inc.
Case No. 20-613-SB
United States District Court for the District of Delaware
Deposition Testimony

Toro Company v. MTD Products Inc., MTD Consumer Group Inc., and Cub Cadet LLC
Civil Action No 10-cv-007-JNE-TNL
United States District Court for the District of Minnesota
Deposition Testimony

Trustees of the University of Pennsylvania v. Genentech, Inc.
Case No. 1:22-cv-00145-JLH
United States District Court for the District of Delaware
Deposition Testimony

Ultratec, Inc. and CapTel, Inc. v. Sorenson Communications, Inc. and CaptionCall, LLC
Case No.: 3:14-cv-66-BBC
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Unicorn Energy AG v. Tesla, Inc.
Civil No. 5:21-cv-07476-BLF
United States District Court for the Northern District of California San Jose Division
Deposition Testimony

Unwired Planet, LLC v. Apple, Inc.
Case No. 3:13-cv-4134-VC
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

U.S.A. Dawgs, Inc. et al. v. Ronald Synder, et al.
Civil Action No. 16-cv-02004-PAB-KMT

59



United States District Court for the District of Colorado
Deposition Testimony

Valeo Schalter und Sensoren GmbH v. Nvidia Corporation
Case No. 5:23-cv-05721
United States District Court for the Northern District of California
Deposition Testimony

Valmet Paper Machinery, Inc. and Valmet-Charlotte, Inc. v. Beloit Corporation
Civil Action No. 93-C-587-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Verinata Health, Inc. and the Board of Trustees of the Leland Stanford Junior
University v. Sequenom, Inc. and Sequenom Center for Molecular Medicine, LLC.
Case No. 3:12-cv-00865-SI
Deposition Testimony

Verinata Health, Inc. v. Ariosa Diagnostics, Inc.
Case No. 3:12-cv-055501-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Viacom International Inc. v. MGA Entertainment, Inc.
Case No.: 2:15-cv-09621-R (Ex)
United States District Court for the Central District of California
Deposition Testimony

VimpelCom Ltd. v. Orascom TMT Investments S.a.r.l.
London Court of International Arbitration
Arbitration No: 153077
Hearing Testimony

Volterra Semiconductor Corporation v. Primarion, Inc., Infineon Technologies
AG and Infineon Technologies North America Corporation
Case No. C 08-05129 CRB
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Wang Laboratories, Inc. v. America Online, Inc. and Netscape Communications
Corporation
Civil Action No. 97-1628-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Wang Laboratories, Inc. v. FileNet Corporation
Civil Action No. 94-12141-RCL
Deposition Testimony

Waukesha Cherry-Burrell v. Wrightech Corporation
Civil Action No. 96-CV-00384



Deposition Testimony

Waymo LLC v. Uber Technologies, Inc., Ottomotto LLC and Otto Trucking LLC
Case No. 3:17-cv-00939-WHA
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Whirlpool Corporation v. Drinker Biddle & Reath LLP et. al.
Case No. 2015-L-007631
Circuit Court of Cook County, Illinois
Trial and Deposition Testimony

Wisk Aero LLC v. Archer Aviation Inc.
Civil Action No. 3:21-cv-02450-WHO
United States District Court for the Northern District of California
Deposition Testimony

Zenith Electronics LLC, Panasonic Corporation, U.S., Philips Corporation, and
the Trustees of Columbia University in the City of New York v. Sceptre, Inc.
Case No. 9:13-CV-80567
United States District Court for the Central District of California
Deposition Testimony

Zenith Electronics LLC v. Vizio, Inc.; Westinghouse Digital Electronics LLC, et al.
No. 5:06CV246-DF
United States District Court for the Eastern District of Texas
Texarkana Division
Deposition Testimony

ZiiLabs Inc., Ltd. v. Samsung Electronics Co. Ltd (and related Samsung parties)
and Apple Inc.
Case No. 2:14-cv-00203
United States District Court for the Eastern District of Texas Marshall Division
Deposition Testimony

---

**PATENTS**

Inventor, United States Patent No. 5,752,186, Access Free Wireless Telephony
Fulfillment Service System, May 12, 1998.

Inventor, United States Patent No. 5,867,780, Access Free Wireless Telephony
Fulfillment Service System, February 2, 1999.

Inventor, United States Patent No. 6.397,057, System and Method of Providing
Advertising Information to a Subscriber Through a Wireless Device, May 28,
2002.

Inventor, United States Patent No. 6,411,803, System and Method of Providing
Service Information to a Subscriber Through a Wireless Device, June 25, 2002.



Inventor, United States Patent No. 6,769,767, Eyewear with Exchangeable Temples Housing a Transceiver Forming Ad Hoc Networks with Other Devices, August 3, 2004.

Inventor, United States Patent No. 6,839,556, System and Method of Providing Information to a Subscriber through a Wireless Device, January 4, 2005.

Inventor, United States Patent No. 6,911,172, Method of Manufacturing Eyewear, June 28, 2005.

Inventor, United States Patent No. 6,929,365, Eyewear with Exchangeable Temples Housing Bluetooth Enable Apparatus, August 16, 2005.

Inventor, United States Patent No. 7,181,200, Method of Providing Information to a Telephony Subscriber, February 20, 2007.

Inventor, United States Patent No. 7,353,202, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 1, 2008.

Inventor, United States Patent No. 7,769,685, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, August 3, 2010.

Inventor, United States Patent No. 7,813,716, Method of Providing Information to a Telephony Subscriber, October 12, 2010.

Inventor, United States Patent No. 7,885,897, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, February 8, 2011.

Inventor, United States Patent No. 7,930,231, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 19, 2011.

Inventor, United States Patent No. 7,987,142, Intellectual Property Trading Exchange, July 26, 2011.

Inventor, United States Patent No. 8,041,341, System of Providing Information to a Telephony Subscriber, October 18, 2011.

Inventor, United States Patent No. 8,180,711, Intellectual Property Trading Exchange, May 15, 2012.

Inventor, United States Patent No. 8,255,932, System and Method for Managing Intellectual Property-Based Risks, January 15, 2013.

Inventor, United States Patent No. 8,515,851, Method and System for Generating an Index of Securities, August 20, 2013.

62



Inventor, United States Patent No. 8,554,687, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, October 8, 2013.

Inventor, United States Patent No. 8,694,419, Methods and Systems for Utilizing Intellectual Property Assets and Rights, April 8, 2014.

Inventor, United States Patent No. 8,787,878, System of Providing Information to a Telephony Subscriber, July 22, 2014.

Inventor, United States Patent No. 8,831,985, Financial Instrument Based on Content and Methods for Valuation, September 9, 2014.

Inventor, United States Patent No. 8,880,031, System of Providing Information to a Telephony Subscriber, November 4, 2014.

Inventor, United States Patent No. 9,058,628, Marketplace for Trading Intangible Asset Derivatives and a Method for Trading Intangible Asset Derivatives, June 16, 2015.

Inventor, United States Patent No. 9,244,292, Eyewear with Exchangeable Temples Housing A Radio Frequency, January 26, 2016.

---

**CONTACT**

James E. Malackowski, CPA, CLP
Chief Intellectual Property Officer
J.S. Held LLC
Co-founder and Senior Managing Director
Ocean Tomo, LLC, a part of J.S. Held
North Miami Beach, Florida

312-327-4410 Direct
james.malackowski@jsheld.com

# Appendix B

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

| Beginning Bates No. | Ending Bates No. | Beginning Bates No. | Ending Bates No. | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|---|---|
| APL_APPSTORE_04685286 | APL_APPSTORE_04685286 | APL-APPSTORE_09806205 | APL-APPSTORE_09806205 | APL-APPSTORE_11205374 | APL-APPSTORE_11205478 |
| APL_APPSTORE_08856864 | APL_APPSTORE_08856864 | APL-APPSTORE_09814097 | APL-APPSTORE_09814097 | APL-APPSTORE_11212636 | APL-APPSTORE_11212636 |
| APL_APPSTORE_08856865 | APL_APPSTORE_08856865 | APL-APPSTORE_09814098 | APL-APPSTORE_09814098 | APL-APPSTORE_11260800 | APL-APPSTORE_11260989 |
| APL_APPSTORE_08856866 | APL_APPSTORE_08856866 | APL-APPSTORE_09814099 | APL-APPSTORE_09814099 | APL-APPSTORE_11261919 | APL-APPSTORE_11262108 |
| APL_APPSTORE_08856867 | APL_APPSTORE_08856867 | APL-APPSTORE_09818248 | APL-APPSTORE_09818248 | APL-APPSTORE_11276885 | APL-APPSTORE_11277099 |
| APL_APPSTORE_09814097 | APL_APPSTORE_09814097 | APL-APPSTORE_10137258 | APL-APPSTORE_10137263 | APL-APPSTORE_11277100 | APL-APPSTORE_11277292 |
| APL_APPSTORE_09814098 | APL_APPSTORE_09814098 | APL-APPSTORE_10176241 | APL-APPSTORE_10176337 | APL-APPSTORE_11364297 | APL-APPSTORE_11364445 |
| APL_APPSTORE_09814099 | APL_APPSTORE_09814099 | APL-APPSTORE_10332891 | APL-APPSTORE_10332891 | APL-APPSTORE_11364883 | APL-APPSTORE_11364931 |
| APL-APPSTORE_04685286 | APL-APPSTORE_04685286 | APL-APPSTORE_10334884 | APL-APPSTORE_10334960 | APL-APPSTORE_11427337 | APL-APPSTORE_11427541 |
| APL-APPSTORE_08856864 | APL-APPSTORE_08856864 | APL-APPSTORE_10928963 | APL-APPSTORE_10929063 | APL-EG_05556169 | APL-EG_05556245 |
| APL-APPSTORE_08856865 | APL-APPSTORE_08856865 | APL-APPSTORE_10976414 | APL-APPSTORE_10976616 | APL-EG_08926407 | APL-EG_08926408 |
| APL-APPSTORE_08856866 | APL-APPSTORE_08856866 | APL-APPSTORE_10979411 | APL-APPSTORE_10979578 | APL-EG_08926412 | APL-EG_08926433 |
| APL-APPSTORE_08856867 | APL-APPSTORE_08856867 | APL-APPSTORE_11200878 | APL-APPSTORE_11200987 | APL-EG_10015140 | APL-EG_10015251 |
| APL-APPSTORE_08883133 | APL-APPSTORE_08883332 | APL-APPSTORE_11201375 | APL-APPSTORE_11201551 | APL-EG_10015274 | APL-EG_10015284 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

**Depositions & Related Exhibits**

Deposition of Mark Rollins, February 11, 2021.

Deposition of Philip Schiller, February 11, 2021.

Deposition of Timothy Cook, February 12, 2021.

Deposition of Richard Czeslawski, June 17, 2021.

Deposition of Donald Cameron, June 25, 2021.

Deposition of Daniel L. McFadden, Ph.D., August 3, 2021.

Deposition of Rosa Abrantes-Metz, Ph.D., December 15, 2022.

Deposition of Kevan Parekh, December 18, 2024.

Deposition of Wayne D. Hoyer, Ph.D., April 18, 2025.

Deposition of Ned S. Barnes, CPA, May 1, 2025.

Deposition of Daniel L. McFadden, Ph.D., May 14, 2025.

Deposition of Rosa Abrantes-Metz, Ph.D., May 23, 2025.

Deposition of Joseph E. Stiglitz, Ph.D., May 30, 2025.

Deposition of Minjae Song, Ph.D., June 4, 2025.

**Legal Filings - Current Matter**

Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, Dkt. #228, September 11, 2020.

Stipulated Amended Protective Order, Dkt. #252, January 21, 2021.

Plaintiffs' Disclosure of Expert Witnesses, March 7, 2025.

**Legal Filings - *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR)**

"Stipulation Between Epic Games, Inc. and Apple Inc. and Amended Protective Order," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), Dkt. #274, January 21, 2021.

"Reporter's Transcript of Proceedings: Volume 5 – Testimony of Andrew Grant," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 5, 2021.

"Reporter's Transcript of Proceedings: Volume 11 – Testimony of Philip Schiller," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 17, 2021.

"Reporter's Transcript of Proceedings: Volume 15 – Testimony of Timothy Cook," *Epic Games, Inc. v. Apple Inc.* (Case No. 4:20-cv-05640-YGR), May 21, 2021.

"Rule 52 Order After Trial on the Merits," *Epic Games, Inc. v. Apple, Inc.* (Case No. 4:20-cv-05640-YGR), Dkt. #812, September 10, 2021.

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

**Legal Filings - Other Matters**

"Opinion," *Epic Games, Inc. v. Apple Inc.* (Case No. 21-16506), Dkt. #215-1, April 23, 2023.

"Verdict Form," *In Re Google Play Store Antitrust Litigation* (MDL Case No. 21-md-02981-JD), Dkt. #606, December 11, 2023.

"Order Re UCL Claim and Injunctive Relief," *In Re Google Play Store Antitrust Litigation* (MDL Case No. 21-md-02981-JD), Dkt. #701, October 7, 2024.

"Trial Exhibit 428," *In Re Google Play Store Antitrust Litigation* (MDL Case No. 21-md-02981-JD).

**Expert Reports & Supporting Information**

Expert Report of Dr. Daniel McFadden, June 1, 2021.

Expert Report and Declaration of James E. Malackowski, Dkt. #476-5 (August 10, 2021).

Expert Report of Rosa M. Abrantes-Metz, Ph.D. in Support of Plaintiffs' Motion for Class Certification, September 26, 2022.

Expert Report and Declaration of James E. Malackowski, Dkt. #534-3 (March 10, 2023).

Expert Report of Lorin Hitt, March 10, 2023.

Expert Report of Alan D. MacCormack in Support of Plaintiffs, March 6, 2025.

Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025.

Expert Report of Joseph E. Stiglitz, Ph.D., March 7, 2025.

Expert Report of Kirsten Martin, March 7, 2025.

Expert Report of M. Keith Chen, Ph.D., March 7, 2025.

Expert Report of Minjae Song, Ph.D., March 7, 2025.

Expert Report of Tadayoshi Kohno, Ph.D., March 7, 2025.

Expert Report of Wayne D. Hoyer, Ph.D., March 7, 2025.

Expert Reprot of Daniel L. McFadden, Ph.D., March 7, 2025.

Opening Expert Report and Declaration of James E. Malackowski, March 7, 2025.

Opening Expert Report of Ned S. Barnes, CPA, March 7, 2025.

Report of Rosa M. Abrantes-Metz, Ph.D., March 7, 2025.

**Case Law & Other Related Legal Information**

35 U.S.C. § 271(d)(4).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

**Publicly Available Information**

"1.2 Management Approach to Segment Reporting," *Deloitte*, 2025, https://dart.deloitte.com/USDART/home/codification/presentation/asc280-10/roadmap-segment-reporting/chapter-1-overview-scope/1-2-management-approach-segment-reporting.

"About the FASB," *FASB*, April 2025, https://www.fasb.org/page/ShowPdf?path=About_FASB_2025.pdf.

"All About Auditors: What Investors Need to Know," *SEC*, June 23, 2002, https://www.sec.gov/about/reports-publications/investorpubsaboutauditorshtm.

"Amazon remembers it has an Android app store, kills it," Ryan Whitwam, *Ars Technica*, February 20, 2025, https://arstechnica.com/gadgets/2025/02/amazon-remembers-it-has-an-android-app-store-kills-it/?comments-page=1#comments.

"Amazon to shut down its Android app store later this year," Karadeep Oberoi, *Android Police*, February 20, 2025, https://www.androidpolice.com/amazon-android-app-store-shut-down/?utm=syndication&pubDate=20250223.

"App Store in the U.S. facilitated over $400 billion in developer billings and sales in 2024," *Apple*, May 29, 2025, https://www.apple.com/newsroom/2025/05/app-store-in-the-us-facilitated-406-billion-usd-in-developer-billings-and-sales-in-2024/.

"App Store Review Guidelines," *Apple*, https://developer.apple.com/app-store/review/guidelines/.

"App Store stopped over $7 billion in potentially fraudulent transactions in four years," *Apple*, May 14, 2024, https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

"App Store," *Apple*, https://developer.apple.com/app-store/features/.

"App Store," *Apple*, https://www.apple.com/app-store/.

"Appendix C: financial analysis of Apple's and Google's mobile ecosystems," *Competition & Markets Authority*, June 2022.

"Apple App Store Statistics (2025)," David Curry, *Business of Apps*, January 22, 2025, https://www.businessofapps.com/data/apple-app-store-statistics/.

"Apple Store vs Google Play – Main Differences," *SplitMetrics*, https://splitmetrics.com/glossary/telling-apples-from-oranges-in-2022-apple-app-store-vs-google-play-store-for-app-publishers/.

"Best Guide To Mobile App Monetization 2021 – Stats, Strategies & Insight," James Ewen, *Tamoco*, June 6, 2019, https://www.tamoco.com/blog/ultimate-app-monetization-guide/#In-app_advertising.

"Despite Fewer App Downloads, Consumer Spending on App Store and Google Play Increased Compared to Last Year," Arooj Ahmed, *Digital Information World*, December 21, 2024, https://www.digitalinformationworld.com/2024/12/despite-fewer-app-downloads-consumer.html.

"Difference Between App Store vs Google Play Store," *CitrusBits*, October 20, 2017, https://citrusbits.com/difference-between-app-store-vs-google-play-store/.

"Financial Ratios eBook," *Corporate Finance Institute*.

"Fun Fact – Flickr and Slack Started as 'A Game that Never Ends,'" Kaden Ng, *Jumpstart*, September 21, 2017, https://www.jumpstartmag.com/fun-fact-flickr-and-slack-started-as-a-game-that-never-ends/

"Google to start charging a licensing fee after EU Android ruling," Simon Van Dorpe, *Politico*, October 16, 2018, https://www.politico.eu/article/google-to-start-charging-a-licensing-fee-after-eu-android-ruling/.

"Google's Play Store will no longer be free to Android phone makers in Europe," Karissa Bell, *Mashable*, October 16, 2018, https://mashable.com/article/google-android-licensing-policies-changing-in-europe.

"Here's why Apple's App Store is better than Google's Play Store," Braden Newell, *MobileSyrup*, March 6, 2023, https://mobilesyrup.com/2023/03/06/why-apples-app-store-is-better-than-googles-play-store/.

"If Amazon can't make a third-party Android app store work, no one can," Taylor Kerns, *Android Police*, February 23, 2025, https://www.msn.com/en-us/news/technology/if-amazon-cant-make-a-third-party-android-app-store-work-no-one-can/ar-AA1zE0Ie.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

**Publicly Available Information**

"INSIDE PINTEREST: An Overnight Success Four Years In the Making," Nicholas Carlson, *Business Insider*, May 1, 2012, https://www.businessinsider.com/inside-pinterest-an-overnight-success-four-years-in-the-making-2012-4.

"Instagram Was First Called 'Burbn'," Megan Garber, *The Atlantic*, July 2, 2014, https://www.theatlantic.com/technology/archive/2014/07/instagram-used-to-be-called-brbn/373815/.

"Intellectual Property Strategy and Business Strategy: Connections through Innovation Strategy," Daniel Samson, June 2005, https://www.researchgate.net/publication/228740384_Intellectual_Property_Strategy_and_Business_Strategy_Connections_through_Innovation_Strategy. Accessed on January 7, 2021.

"Introduction to Apple platform security," *Apple*, https://support.apple.com/guide/security/intro-to-apple-platform-security-seccd5016d31/web.

"iOS App Store vs. Google Play Store: Which Is Better for App Developers?" Priya Viswanathan, *Lifewire*, July 29, 2024, https://www.lifewire.com/ios-app-store-vs-google-play-store-for-app-developers-2373130.

"iOS App Store vs. Google Play Store: Which One is Better?" Matthew Lynch, *The Tech Advocate*, June 30, 2023, https://www.thetechedvocate.org/ios-app-store-vs-google-play-store-which-one-is-better/.

"Market capitalization of Amazon (AMZN)," *CompaniesMarketCap*, https://companiesmarketcap.com/amazon/marketcap/. Last accessed June 10, 2025.

"Microsoft will kill Windows Subsystem for Android on Windows 11 next year, but Amazon just drove a nail in the coffin," Sean Endicott, *Windows Central*, March 6, 2024, https://www.windowscentral.com/software-apps/windows-11/microsoft-will-kill-windows-subsystem-for-android-on-windows-11-next-year-but-amazon-just-drove-a-nail-in-the-coffin#xenforo-comments-531156.

"Principles of Accounting Volume 2 – Managerial Accounting," Patty Graybeal, Mitchell Franklin, Dixon Cooper, February 14, 2019, https://openstax.org/books/principles-managerial-accounting/pages/1-2-distinguish-between-financial-and-managerial-accounting#0.

"Return on capital employed (ROCE): Definition and how to calculate," Nina Semczuk, *Bankrate*, October 25, 2023, https://www.bankrate.com/investing/return-on-capital-employed/.

"Segment reporting: Accounting Standards Codification 280," *Ernst & Young*, September 2024, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frdbb0698-09-26-24_.pdf.

"The Challenges of Using Return on Capital as an Indicator of Monopoly Power," Divya Mathur et al, *Analysis Group*, December 9, 2020, https://www.analysisgroup.com/globalassets/insights/publishing/2020-challenges-of-using-return-on-capital-as-an-indicator-of-monopoly-power.pdf.

"The Mobile Industry's Never Seen Anything Like This: An Interview with Steve Jobs at the App Store's Launch," Nick Wingfield, *Wall Street Journal*, July 25, 2018, https://www.wsj.com/articles/the-mobile-industrys-never-seenanything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1532527201.

"US GAAP: Generally Accepted Accounting Principles," *CFA Institute Research & Policy Center*, August 13, 2019, https://rpc.cfainstitute.org/policy/positions/gaap.

"Use Mobile Application Ads to Monetise Your App Project," Marat Basyrov, *Intelligent Profit Solutions*, February 25, 2020, https://www.intelligentprofitsolutions.com/blog/ips-blog/use-mobile-application-ads-to-monetise-your-app-project.

Apple Inc. Form 10-K for the fiscal year ended September 24, 2011.
Apple Inc. Form 10-K for the fiscal year ended September 24, 2016.
Apple Inc. Form 10-K for the fiscal year ended September 24, 2022.
Apple Inc. Form 10-K for the fiscal year ended September 25, 2010.
Apple Inc. Form 10-K for the fiscal year ended September 25, 2021.
Apple Inc. Form 10-K for the fiscal year ended September 26, 2015.
Apple Inc. Form 10-K for the fiscal year ended September 26, 2020.
Apple Inc. Form 10-K for the fiscal year ended September 27, 2008.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*
**DOCUMENTS CONSIDERED**
Appendix B

**Publicly Available Information**

Apple Inc. Form 10-K for the fiscal year ended September 27, 2014.
Apple Inc. Form 10-K for the fiscal year ended September 28, 2013.
Apple Inc. Form 10-K for the fiscal year ended September 28, 2019.
Apple Inc. Form 10-K for the fiscal year ended September 28, 2024.
Apple Inc. Form 10-K for the fiscal year ended September 29, 2007.
Apple Inc. Form 10-K for the fiscal year ended September 29, 2012.
Apple Inc. Form 10-K for the fiscal year ended September 29, 2018.
Apple Inc. Form 10-K for the fiscal year ended September 30, 2017.
Apple Inc. Form 10-K for the fiscal year ended September 30, 2023.
Apple Inc. Form 10-K/A (Amendment No. 1) for the fiscal year ended September 26, 2009.
Bloomberg data output. Last accessed May 19, 2025.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Appendix C

*In Re Apple iPhone Litigation*
**APPLE R&D EXPENSES FY 2005 - FY 2024**
Schedule 1.0

| *(in millions USD)* | FY 2005 [1] | FY 2006 [2] | FY 2007 [3] | FY 2008 [4] | FY 2009 [5] | FY 2010 [6] | FY 2011 [7] |
|---|---|---|---|---|---|---|---|
| R&D Expenses | $ 535 | $ 712 | $ 782 | $ 1,109 | $ 1,333 | $ 1,782 | $ 2,429 |
| Revenue | $ 13,931 | $ 19,315 | $ 24,578 | $ 37,491 | $ 42,905 | $ 65,225 | $ 108,249 |
| *R&D Share of Revenue* | *3.8%* | *3.7%* | *3.2%* | *3.0%* | *3.1%* | *2.7%* | *2.2%* |

| *(in millions USD)* | FY 2012 [8] | FY 2013 [9] | FY 2014 [10] | FY 2015 [11] | FY 2016 [12] | FY 2017 [13] | FY 2018 [14] |
|---|---|---|---|---|---|---|---|
| R&D Expenses | $ 3,381 | $ 4,475 | $ 6,041 | $ 8,067 | $ 10,045 | $ 11,581 | $ 14,236 |
| Revenue | $ 156,508 | $ 170,910 | $ 182,795 | $ 233,715 | $ 215,639 | $ 229,234 | $ 265,595 |
| *R&D Share of Revenue* | *2.2%* | *2.6%* | *3.3%* | *3.5%* | *4.7%* | *5.1%* | *5.4%* |

| *(in millions USD)* | FY 2019 [15] | FY 2020 [16] | FY 2021 [17] | FY 2022 [18] | FY 2023 [18] | FY 2024 [18] | Total |
|---|---|---|---|---|---|---|---|
| R&D Expenses | $ 16,217 | $ 18,752 | $ 21,914 | $ 26,251 | $ 29,915 | $ 31,370 | **$ 210,927** |
| Revenue | $ 260,174 | $ 274,515 | $ 365,817 | $ 394,328 | $ 383,285 | $ 391,035 | **$ 3,835,244** |
| *R&D Share of Revenue* | *6.2%* | *6.8%* | *6.0%* | *6.7%* | *7.8%* | *8.0%* | *5.5%* |

**Notes & Sources:**
[1] Apple Inc. Form 10-K for the fiscal year ended September 29, 2007, pp. 47-48.
[2] Apple Inc. Form 10-K for the fiscal year ended September 27, 2008, p. 46.
[3] Apple Inc. Form 10-K/A (Amendment No. 1) for the fiscal year ended September 26, 2009, p. 23.
[4] Apple Inc. Form 10-K for the fiscal year ended September 25, 2010, p. 38.
[5] Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 35.
[6] Apple Inc. Form 10-K for the fiscal year ended September 29, 2012, pp. 35-36.
[7] Apple Inc. Form 10-K for the fiscal year ended September 28, 2013, pp. 32-33.
[8] Apple Inc. Form 10-K for the fiscal year ended September 27, 2014, pp. 32-33.
[9] Apple Inc. Form 10-K for the fiscal year ended September 26, 2015, p. 28.
[10] Apple Inc. Form 10-K for the fiscal year ended September 24, 2016, pp. 26-27.
[11] Apple Inc. Form 10-K for the fiscal year ended September 30, 2017, pp. 23, 27.
[12] Apple Inc. Form 10-K for the fiscal year ended September 29, 2018, pp. 23, 27.
[13] Apple Inc. Form 10-K for the fiscal year ended September 28, 2019, pp. 20-21.
[14] Apple Inc. Form 10-K for the fiscal year ended September 26, 2020, pp. 22-23.
[15] Apple Inc. Form 10-K for the fiscal year ended September 25, 2021, pp. 22-23.
[16] Apple Inc. Form 10-K for the fiscal year ended September 24, 2022, pp. 22-23.
[17] Apple Inc. Form 10-K for the fiscal year ended September 30, 2023, pp. 22-23.
[18] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, pp. 23-24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*

**COMPARISON OF APPLE SEGMENT AND CONSOLIDATED REVENUE [1]**

Schedule 1.1

| Segment | 2022 | | 2023 | | 2024 | | Total | |
|---|---|---|---|---|---|---|---|---|
| Americas | $ | 169,658 | $ | 162,560 | $ | 167,045 | $ | 499,263 |
| Europe | $ | 95,118 | $ | 94,294 | $ | 101,328 | $ | 290,740 |
| Greater China | $ | 74,200 | $ | 72,559 | $ | 66,952 | $ | 213,711 |
| Japan | $ | 25,977 | $ | 24,257 | $ | 25,052 | $ | 75,286 |
| Rest of Asia Pacific | $ | 29,375 | $ | 29,615 | $ | 30,658 | $ | 89,648 |
| Total | $ | 394,328 | $ | 383,285 | $ | 391,035 | $ | 1,168,648 |
| Consolidated | $ | 394,328 | $ | 383,285 | $ | 391,035 | $ | 1,168,648 |
| **Difference** | $ | - | $ | - | $ | - | $ | - |

**Notes & Sources:**

In millions USD unless otherwise noted.

[1] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, pp. 29, 47.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*

**COMPARISON OF APPLE SEGMENT AND CONSOLIDATED OPERATING INCOME [1]**

Schedule 1.2

| Segment | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|
| Americas | $ 62,683 | $ 60,508 | $ 67,656 | $ **190,847** |
| Europe | $ 35,233 | $ 36,098 | $ 41,790 | $ **113,121** |
| Greater China | $ 31,153 | $ 30,328 | $ 27,082 | $ **88,563** |
| Japan | $ 12,257 | $ 11,888 | $ 12,454 | $ **36,599** |
| Rest of Asia Pacific | $ 11,569 | $ 12,066 | $ 13,062 | $ **36,697** |
| Total | $ 152,895 | $ 150,888 | $ 162,044 | $ **465,827** |
| Consolidated | $ 119,437 | $ 114,301 | $ 123,216 | $ **356,954** |
| **Difference** | $ **33,458** | $ **36,587** | $ **38,828** | $ **108,873** |

**Notes & Sources:**

In millions USD unless otherwise noted.

[1] Apple Inc. Form 10-K for the fiscal year ended September 28, 2024, pp. 29, 47.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*In Re Apple iPhone Litigation*
**APPLE INTANGIBLE ASSET MARKET VALUE [1]**
Schedule 1.3

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Market Capitalization | $ 44,146.9 | $ 65,472.1 | $ 133,463.8 | $ 113,604.7 | $ 163,370.1 | $ 267,052.7 | $ 374,822.8 | $ 625,348.2 | $ 438,576.9 | $ 603,277.6 |
| Total Assets | $ 11,551.0 | $ 17,205.0 | $ 24,878.0 | $ 36,171.0 | $ 47,501.0 | $ 75,183.0 | $ 116,371.0 | $ 176,064.0 | $ 207,000.0 | $ 231,839.0 |
| Total Intangible Assets | $ 96.0 | $ 177.0 | $ 420.0 | $ 559.0 | $ 453.0 | $ 1,083.0 | $ 4,432.0 | $ 5,359.0 | $ 5,756.0 | $ 8,758.0 |
| Total Liabilities | $ 4,085.0 | $ 7,221.0 | $ 10,347.0 | $ 13,874.0 | $ 15,861.0 | $ 27,392.0 | $ 39,756.0 | $ 57,854.0 | $ 83,451.0 | $ 120,292.0 |
| Net Tangible Asset Market Value ("TAMV") | $ 7,370.0 | $ 9,807.0 | $ 14,111.0 | $ 21,738.0 | $ 31,187.0 | $ 46,708.0 | $ 72,183.0 | $ 112,851.0 | $ 117,793.0 | $ 102,789.0 |
| *Share* | *16.7%* | *15.0%* | *10.6%* | *19.1%* | *19.1%* | *17.5%* | *19.3%* | *18.0%* | *26.9%* | *17.0%* |
| **Net Intangible Asset Market Value ("IAMV")** | $ 36,776.9 | $ 55,665.1 | $ 119,352.8 | $ 91,866.7 | $ 132,183.1 | $ 220,344.7 | $ 302,639.8 | $ 512,497.2 | $ 320,783.9 | $ 500,488.6 |
| **Share** | *83.3%* | *85.0%* | *89.4%* | *80.9%* | *80.9%* | *82.5%* | *80.7%* | *82.0%* | *73.1%* | *83.0%* |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Market Capitalization | $ 654,159.3 | $ 607,331.4 | $ 796,064.9 | $ 1,090,307.5 | $ 988,887.0 | $ 1,920,272.7 | $ 2,428,612.0 | $ 2,417,523.2 | $ 2,676,736.9 | $ 3,463,350.4 |
| Total Assets | $ 290,345.0 | $ 321,686.0 | $ 375,319.0 | $ 365,725.0 | $ 338,516.0 | $ 323,888.0 | $ 351,002.0 | $ 352,755.0 | $ 352,583.0 | $ 364,980.0 |
| Total Intangible Assets | $ 9,009.0 | $ 8,620.0 | $ 8,015.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Liabilities | $ 170,990.0 | $ 193,437.0 | $ 241,272.0 | $ 258,578.0 | $ 248,028.0 | $ 258,549.0 | $ 287,912.0 | $ 302,083.0 | $ 290,437.0 | $ 308,030.0 |
| TAMV | $ 110,346.0 | $ 119,629.0 | $ 126,032.0 | $ 107,147.0 | $ 90,488.0 | $ 65,339.0 | $ 63,090.0 | $ 50,672.0 | $ 62,146.0 | $ 56,950.0 |
| *Share* | *16.9%* | *19.7%* | *15.8%* | *9.8%* | *9.2%* | *3.4%* | *2.6%* | *2.1%* | *2.3%* | *1.6%* |
| **IAMV** | $ 543,813.3 | $ 487,702.4 | $ 670,032.9 | $ 983,160.5 | $ 898,399.0 | $ 1,854,933.7 | $ 2,365,522.0 | $ 2,366,851.2 | $ 2,614,590.9 | $ 3,406,400.4 |
| **IAMV Share** | *83.1%* | *80.3%* | *84.2%* | *90.2%* | *90.8%* | *96.6%* | *97.4%* | *97.9%* | *97.7%* | *98.4%* |

**Notes & Sources:**
In millions USD unless otherwise noted.
[1] Bloomberg data output. Last accessed May 19, 2025.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER