# EXHIBIT 34

**PAGES 1 - 91**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonee Gonzalez Rogers, Judge

IN RE: APPLE iPHONE ANTITRUST      )    No. 4:11-cv-06714-YGR
LITIGATION,                        )
_____)

Oakland, California

Tuesday, October 17, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

                Wolf Haldenstein Adler Freeman & Herz LLP
                270 Madison Avenue
                New York, New York 10016
    BY:  **MARK C. RIFKIN, ATTORNEY AT LAW**
        **THOMAS H. BURT, ATTORNEY AT LAW**

                Wolf Haldenstein Adler Freeman & Herz LLP
                750 B Street, Suite 1820
                San Diego, California 92101
    BY:  **RACHELE R. BYRD, ATTORNEY AT LAW**
        **BETSY C. MANIFOLD, ATTORNEY AT LAW**
        **STEPHANIE AVILES, ATTORNEY AT LAW**

(Appearances continued on the following page)

**REPORTED BY:  April Wood Brott, CSR No. 13782, Official United
States Reporter**

2

**<u>APPEARANCES (continued):</u>**

For Plaintiffs:

                    Kellogg Hansen PLLC
                    1615 M Street NW, Suite 400
                    Washington, D.C. 20036
          BY:   **DAVID C. FREDERICK, ATTORNEY AT LAW**
                **JAMES M. WEBSTER, III, ATTORNEY AT LAW**
                **KELLY C. SCHIFFMAN, ATTORNEY AT LAW**
                **ANTHONY R. GUTTMAN, ATTORNEY AT LAW**
                **KYLE M. WOOD, ATTORNEY AT LAW**

For Defendants:

                    Gibson, Dunn & Crutcher LLP
                    1700 M Street NW, Suite 2700
                    Washington, D.C. 20036
          BY:   **CYNTHIA RICHMAN, ATTORNEY AT LAW**
                **HARRY PHILLIPS, ATTORNEY AT LAW**

                    Gibson, Dunn & Crutcher LLP
                    333 South Grand Avenue
                    Los Angeles, CA 90071
          BY:   **DANIEL G. SWANSON, ATTORNEY AT LAW**
                **JASON C. LO, ATTORNEY AT LAW**

                    Gibson, Dunn & Crutcher LLP
                    One Embarcadero Center, Suite 2600
                    San Francisco, CA 94111-3715
          BY:   **ELI M. LAZARUS, ATTORNEY AT LAW**
                **JULIAN WOLFE KLEINBRODT, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Tuesday - October 14, 2025**                              **1:51 P.M.** |

<pre>
 1   <b>Tuesday - October 14, 2025</b>                              <b>1:51 P.M.</b>

 2                       <u>P R O C E E D I N G S</u>

 3                            ---o0o---

 4          <b>THE COURTROOM DEPUTY:</b>  United States District Court is

 5   now in session, the Honorable Yvonne Gonzalez Rogers presiding.

 6          <b>THE COURT:</b>  Good afternoon, everyone.

 7          <b>THE COURTROOM DEPUTY:</b>  Thank you.  Please be seated.

 8       Calling the civil matter 11-cv-6714-YGR, In re Apple

 9   iPhone Antitrust Litigation.

10       Parties, please step forward and state your appearances

11   for the record, starting with the plaintiffs.

12          <b>MR. RIFKIN:</b>  Good afternoon, Your Honor.  Mark Rifkin

13   from Wolf Haldenstein on behalf of the plaintiffs, and I'm

14   joined by my partners Thomas Burt, Rachele Byrd, and Betsy

15   Manifold.  And our --

16          <b>THE COURT:</b>  Okay.  I don't --

17          <b>MR. RIFKIN:</b>  I'm sorry.

18          <b>THE COURT:</b>  That's too fast.

19          <b>MR. RIFKIN:</b>  Okay.

20          <b>THE COURT:</b>  So Mr. Rifkin, you said Thomas Burt?  Yes.

21   Okay.  And then who was next?

22          <b>MR. RIFKIN:</b>  Rachele Byrd, Your Honor.  My partner

23   Rachele Byrd.

24          <b>THE COURT:</b>  Okay.

25          <b>MR. RIFKIN:</b>  And my partner Betsy Manifold has just
</pre>

 1    stood up.

 2              **THE COURT:**  Okay.

 3              **MR. RIFKIN:**  And our associate Stephanie Aviles.

 4              **THE COURT:**  Okay.  Good afternoon.

 5              **MR. FREDERICK:**  Good afternoon, Your Honor.  David

 6    Frederick from Kellogg Hansen, also for the plaintiffs.  With

 7    me are my partner James Webster.

 8              **THE COURT:**  Okay.

 9              **MR. FREDERICK:**  Kelley Schiffman, Kyle Wood.

10              **THE COURT:**  Okay.

11              **MR. FREDERICK:**  And Anthony Guttman.

12              **THE COURT:**  Thank you.  Good afternoon.

13              **MS. RICHMAN:**  Good afternoon, Your Honor.  Cynthia

14    Richman for Apple.  I'm joined by my colleagues Dan Swanson.

15              **THE COURT:**  Mr. Swanson, good afternoon.

16              **MS. RICHMAN:**  Caeli Higney.

17              **THE COURT:**  Who was that?

18              **MS. RICHMAN:**  Caeli Higney.

19              **THE COURT:**  Okay.

20              **MS. RICHMAN:**  Eli Lazarus.

21              **THE COURT:**  Okay.

22              **MS. RICHMAN:**  Julian Kleinbrodt, and Harry Phillips.

23    Oh, and did I say Jason Lo?  I'm sorry.  And Jason Lo.

24              **THE COURT:**  Okay.  Have you all, on either side,

25    divided up argument?

1          **MR. RIFKIN:**  We have, Your Honor.  On the plaintiffs'

2     side, you'll be hearing from me on the decertification motion;

3     you'll be hearing from Mr. Frederick on the summary judgment

4     motion; you'll be hearing from Mr. Webster on our Daubert

5     motion; and lastly, you'll be hearing from Mr. Burt on Apple's

6     Daubert motion.

7          **THE COURT:**  Okay.

8          **MS. RICHMAN:**  Your Honor, we have also divided up

9     argument.  I will be handling de-certification; Mr. Swanson

10    will be handling summary judgment; and I will address a couple

11    of procedural issues, as necessary, regarding summary judgment.

12        Mr. Lazarus will be handling the Daubert of Mr. Thompson.

13    Mr. Swanson will be handling the Daubert for Professor

14    MacCormack.  Ms. Higney will be responsible for the Berger,

15    Professor Berger, Daubert.  Mr. Lo will be handling the

16    Malackowski Daubert.  And I think that's everything.

17        Nope.  Professor Sundararajan.  I forgot.  Apologies.

18    Mr. Swanson will be handling that one as well.

19        **THE COURT:**  Okay.  Let's start with de-certification.

20    You'll both come forward.

21        Ms. Richman, it's your motion.  You may proceed.

22        **MS. RICHMAN:**  Thank you, Your Honor.

23        Your Honor, when you issued your decision in February 2024

24    certifying the class, you did so that with the express

25    expectation before trial, Plaintiffs would run their model

1    across the entire database of Apple transactions and match

2    actual class members to their transactions to determine who is

3    in the class, who is injured, and who is not injured.

4    Plaintiffs pledged to you that after they did that, the number

5    of uninjured members would be reduced to close to zero.

6         Now it's over two years later --

7              **THE COURT:**  So I'm going to stop you right there.

8              **MS. RICHMAN:**  Yes.

9              **THE COURT:**  I agree with you.

10        Mr. Rifkin, do you disagree?

11             **MR. RIFKIN:**  I do.

12             **THE COURT:**  All right.  Why?

13             **MR. RIFKIN:**  We said that the percentage of unharmed

14    people would be reduced.  We agreed to run the damages model.

15    We've done that.  We said the percentage of unharmed class

16    members would be reduced, but we never said anything about

17    reducing any number of unharmed people to zero.

18             **THE COURT:**  Okay.

19             **MS. RICHMAN:**  Your Honor --

20             **THE COURT:**  Hold on.  Hold on.

21        You do agree, though, that you represented that you would

22    have -- by doing the work that you were going to do, that you

23    would be able to have a model to identify people, because

24    accounts aren't class members?

25             **MR. RIFKIN:**  Correct, and we did.  And we have

1    proposed -- and Your Honor is aware of this.  We have proposed

2    computing the damages both by people, by payor, as well as by

3    account.

4            **THE COURT:**  I'm not going to do it by accounts.

5            **MR. RIFKIN:**  I understand.

6            **THE COURT:**  I've told you that multiple times.  The

7    request to do it, and the very late expert report suggesting

8    that I even suggested that I was amenable to that, is without

9    basis.

10           **MR. RIFKIN:**  Your Honor, respectfully, the revised

11   expert report that we prepared from Dr. Song was necessary when

12   the Court declined to change the class definition to apply the

13   $10 cutoff at the payor level.

14       If you recall, we had asked the Court to modify the class

15   definition.  The class is defined so that the $10 cutoff is

16   applied at the account level.  Once we ran the model, and once

17   we had the matching, we asked the Court to modify the class

18   definition to apply the $10 cutoff at the payor level, at the

19   individual class member level.

20       The Court declined to do so, and so we were then left to

21   have to rerun the model to apply the $10 cutoff at the Apple

22   account ID level, but we have identified with 99 percent

23   accuracy -- we have identified all of the class members, and we

24   have identified the percentage of unharmed, as well as

25   identifying --

```
 1          THE COURT:  I thought your expert couldn't give me an
 2   error rate.
 3          MR. RIFKIN:  Well, Your --
 4          THE COURT:  Am I wrong about the record?  What is the
 5   error rate, if I'm wrong?
 6          MR. RIFKIN:  So the question that I believe you've
 7   asked is if the methodology that Mr. Thompson used has a known
 8   error rate.  And the answer to that question is no, it does
 9   not.
10      But what we do know is as follows:  We know all of the
11   so-called errors that Apple has identified -- and there really
12   is only one, but all of the errors that Apple has identified
13   amount to a grand total of four one thousandths of a percent --
14          THE COURT:  Well, that's --
15          MR. RIFKIN:  -- of class members.
16          THE COURT:  -- somewhat disingenuous because that was
17   a sample.
18      A response, Ms. Richman?
19          MS. RICHMAN:  Your Honor -- let me just start at the
20   beginning, Your Honor.
21      First of all, during the June 2023 hearing, you said, "I
22   am being told that by the time I get to trial, that number of
23   uninjured is going to be closer to zero."
24      You said, "And again, as I understand it, by the time we
25   get to trial, that 7.9 percent will be eliminated once
```

 1    everything is run.  Again, that's my understanding.  Am I

 2    wrong, Mr. Rifkin?

 3         "No, Your Honor, you are correct."

 4         On the proprietary-ness of the Song supplemental

 5    declaration, Your Honor, the explanation that Plaintiffs give

 6    for submitting that on August 1st, months after the initial

 7    disclosures were due, is unpersuasive.  The class definition,

 8    for all important respects, is the same in March 2007 as it is

 9    now.

10         It has always been payors who are -- let me pull up --

11         **THE COURT:**  Well, I'm --

12         **MS. RICHMAN:**  -- the exact language.

13         **THE COURT:**  I'm looking at the definition, and it --

14         **MS. RICHMAN:**  Yes.

15         **THE COURT:**  -- talks about all persons.

16         **MS. RICHMAN:**  "Those persons who paid more than $10 in

17    total to Apple during the class period for IOS application and

18    in-app purchases from any one Apple ID account."  That was the

19    definition in March.  That was the definition in August.  That

20    remains the definition now.

21         **THE COURT:**  I agree with you.  So could you enlighten

22    me in terms of what Mr. Rifkin is trying to argue here that

23    somehow this definition is not what it is?

24         **MS. RICHMAN:**  Well, I honestly don't really

25    understand.  The only thing I conclude is that they recognize

1    that Mr. Thompson's analysis is fatally flawed as it is.  It's

2    a black box that can't be replicated, that can't be tested, and

3    they're trying to salvage their bid for class certification by

4    rewinding the clock to January 2024, when you told them that

5    they had to do the matching of IDs to individuals and pretend

6    that the, you know, intervening 18 months never occurred.

7    That's the only thing I can think of.

8        **THE COURT:**  I read in their briefs, and he again

9    mentions here today, this notion of something that I apparently

10    did or did not do, perhaps in a case management conference or

11    something, about not agreeing to change the definition.  What

12    is he talking about?

13        **MS. RICHMAN:**  Your Honor, we had a hearing before you

14    on May 30th of this year, and you did modify the class

15    definition.  You took out the iPod transactions, and you

16    dismissed those claims with prejudice.

17        The plaintiffs asked you as well, at that time, to change

18    the class definition to make it the class is limited to those

19    persons who paid more than $10 in total to Apple during the

20    class period for IOS application and in-app purchases from any

21    one Apple ID account.  The Court decided to defer ruling on the

22    request of Plaintiffs, to further make modifications to the

23    class definition.

24        But the point is that when Dr. Song submitted his report,

25    when Mr. Thompson submitted his report in March and April of

```
 1    this year, the class definition was identical to what it is
 2    today.  There is no reason for Dr. Song, months after that
 3    hearing, to submit a supplemental declaration.  It was a Hail
 4    Mary to try to plaster over the holes in Mr. Thompson's work,
 5    and it just is -- doesn't do what you told them to do.
 6             THE COURT:  So the iPod was an easy request, and I
 7    know that Apple objected.  But I don't have -- and I --
 8             MS. RICHMAN:  Well --
 9             THE COURT:  I don't have a -- that's why I'm somewhat
10    perplexed, because I don't have a motion to redefine the class.
11    And the class, as I went back and tried to reconstruct, talks
12    about people.  So --
13             MS. RICHMAN:  It does, Your Honor.
14             THE COURT:  -- I don't understand.
15             MS. RICHMAN:  Yes, and Plaintiffs, to be clear, have
16    withdrawn their request to modify the class definition further.
17    So the class definition is -- as I said, the class is limited
18    to those persons who paid more than $10 in total to Apple
19    during the class period for IOS application and in-app
20    purchases from any one Apple ID account.  Dr. Song's analysis
21    does not identify individuals who paid.
22        In fact, he's quite straightforward about it in his merits
23    report in March.  He says, "In Professor McFadden's prior
24    reports, it was not possible for him to identify individual
25    class" --
```

 1          **THE COURT:**  Stop.  Stop.  Stop.  Could you give me a

 2     paragraph number?

 3          **MS. RICHMAN:**  Sure, Your Honor.  It's the Song merits

 4     report at paragraph 11.

 5          **THE COURT:**  Okay.  Go ahead.

 6          **MS. RICHMAN:**  "In Professor McFadden's prior report,

 7     it was not possible for him to identify individual class

 8     members or the monetary harm attributable to each class member,

 9     due to the limitations of the app store transactions data

10     available to him at that time.  He was, instead, only able to

11     demonstrate how he could allocate class-wide damages to

12     anonymized Apple IDs."

13          That is exactly what Dr. Song did in his supplemental

14     report of August 1, which was, I should say, you know,

15     completely procedurally untimely, and should be stricken.

16     We've asked for it to be stricken because it was not disclosed

17     in either his opening or rebuttal reports.

18          **MR. RIFKIN:**  Your Honor, may I be heard on that?

19          **THE COURT:**  I'm to you now.

20          **MR. RIFKIN:**  Okay.  Thank you.

21          When we moved to amend the class definition, we did so on

22     two different fronts.  We asked the Court to amend the class

23     definition to clarify that it was limited to iPhones and iPads,

24     and, as Ms. Richman confirmed, the Court did grant that motion

25     and dismissed the iPod touch claims from this case on the

1    merits.

2        The second part of the motion was a request that the class

3    definition be amended in only one respect, and that was to have

4    the $10 spending cutoff applied not at the level of the Apple

5    ID but instead to have it apply at the --

6        **THE COURT:**  It doesn't say at the Apple ID.  This

7    definition doesn't say that.

8        **MR. RIFKIN:**  Your Honor, with respect, we think it

9    does.  It says --

10        **THE COURT:**  It doesn't.

11        **MR. RIFKIN:**  Your Honor, it says, "The class is

12    limited to those persons who paid more than $10 in total to

13    Apple during the class period for IOS applications and in-app

14    purchases from any one Apple ID account."

15        **THE COURT:**  I read that differently.  It means it can

16    be one, or it can be more than one, but it is any.

17        **MR. RIFKIN:**  And Your Honor --

18        **THE COURT:**  Any, and it has always been any.  So to

19    the extent that you disagree, you're wrong.

20        **MR. RIFKIN:**  Well, Your Honor, it says "any one Apple

21    ID account."  I don't want to belabor the point, but when --

22        **THE COURT:**  Has -- you -- the problem is, one, it's

23    never been that way; two, nothing that was ever done within the

24    confines of this case schedule suggested that it wasn't that

25    way.  And if the Court of Appeal goes back and rereads all of

1    the transcripts from all of the hearings that we have had over

2    years, they will see that that is what was intended.

3        Now, could I have put "any one or more"?  I guess I could

4    have.  But it is not what anybody thought.  Why?  Because we

5    knew -- back at the beginning, we knew that you could have a

6    person who had one account or multiple accounts, and that's why

7    you had to do the matching, because when you received the

8    information of multiple accounts, someone who was harmed could

9    turn into someone who was not harmed.

10        But that didn't mean that it -- you had to have multiple

11    accounts.  So it could be any.

12        **MR. RIFKIN:**  Your Honor, may I try to help

13    explain this --

14        **THE COURT:**  You're not going to recreate history the

15    way you'd like to.

16        **MR. RIFKIN:**  I --

17        **THE COURT:**  Hold on.  I'm going to allow you to make

18    your record --

19        **MR. RIFKIN:**  Thank you.

20        **THE COURT:**  -- but I think that what you're doing is

21    so disingenuous about what has happened in this case,

22    Mr. Rifkin.  It is absolutely disingenuous.

23        **MR. RIFKIN:**  Your Honor, I apologize if we have

24    created that impression, but I assure you that is not the case.

25    And if I can, I would like to go through step by step so that

1    we understand this.

2         **THE COURT:**  Is there some reason you didn't do that in

3    your briefing?

4         **MR. RIFKIN:**  We thought we had.  And in fact, when we

5    made the motion in April of 2025 and we asked the Court -- and

6    now I'm reading from Docket Number 951, when we asked the Court

7    to apply the $10 spending cutoff to individual payors rather

8    than Apple IDs, we thought in that motion --

9         **THE COURT:**  But --

10        **MR. RIFKIN:**  -- we explained it.

11        **THE COURT:**  -- what you're talking about --

12        **MR. RIFKIN:**  Your Honor, if I may try to explain this

13   to you so that at least you understand our position.  You may

14   agree or disagree with it, but we would at least like you to

15   understand our position.

16        When we moved for class certification, the reason we wrote

17   the proposed class definition the way we did was because at

18   that point in time -- and now I'm talking about 2021 and 2022

19   and 2023 and 2024.  At that point in time, the only data we had

20   was ID-level data.  We did not have payor-level data.  There

21   was no way for us to apply a cutoff at the payor level.  We

22   could not have.

23        Let me be clear about that.  We could not have aggregated

24   accounts so that we applied the $10 threshold to groups of

25   accounts that belonged to the same person.  Yes, Your Honor,

1    you are 100 percent correct that we have always known that

2    there are more Apple IDs than there are people.

3        What we did not know as late as February 2024, when Your

4    Honor certified the class -- what we did not know and could not

5    know and had no way to know was how those Apple IDs were

6    assigned to individual payors.  And the reason for that is

7    simple:  Up to that point in time, Apple had not provided that

8    information to us.

9        So when we went through class certification, we had to.

10   We had to apply the $10 cutoff at the individual ID level, and

11   that's why the class definition says that the cutoff had to

12   apply to any one Apple ID.  We had no other way to apply the

13   $10 cutoff.

14       When we did at that point in time, we identified

15   that there were -- and Your Honor may recall this.  7.9 percent

16   of the Apple IDs were uninjured, according to the formula that

17   Professor McFadden developed.  That was based on the model

18   being run against a truncated series of data.  It was three

19   genres, and it was for a shortened period of time.

20       When Your Honor certified the class, Apple delivered to us

21   a much larger database, a much larger database, almost 75

22   percent larger.  It included not just the three genres that we

23   had during class certification; it included all the genres, and

24   it included data all the way from 2008 to February 2024, the

25   date of the class certification.  We did not get that data

1    until after Your Honor certified the class.

2        Once we got that data, Dr. Song ran Professor McFadden's

3    model against the complete set of data, and he was only able to

4    do that after two things happened:  Number one, Mr. Thompson

5    had to roll up, de-duplicate, if you will, had to reduce the

6    number of potential class members from ████████████████

7    discrete individuals who were identified --

8            **THE COURT:**  Hold on a second.

9            **MS. RIFKIN:**  -- potential class members --

10           **THE COURT:**  Hold on.

11           **MS. RICHMAN:**  I'm sorry, Your Honor.  I believe that

12   those numbers are confidential and that we agreed with

13   Plaintiffs to keep them off the record.

14           **MR. RIFKIN:**  We had no such agreement, and if they're

15   confidential, I apologize.  I don't know that there's anybody

16   here who --

17           **MS. RICHMAN:**  Okay.  I may be misunderstanding, but --

18           **THE COURT:**  So in the briefing, that number is under

19   seal.

20           **MR. RIFKIN:**  Your Honor, forgive me.  We had no

21   agreement not to disclose that in court today.

22           **THE COURT:**  Okay.  Is there press in the audience?

23   Okay.  Until I make a decision, can I trust that --

24       Could you move, Mr. Rifkin, so that I can see them?

25           **MR. RIFKIN:**  I'm sorry.  You can do whatever is

```
 1    necessary.
 2            THE COURT:  Would the two of you agree to not write
 3    that number down, please?  I have not unsealed that number, and
 4    in all the briefing, it is sealed.
 5        Go ahead.
 6            MR. RIFKIN:  If I may continue, we took that number,
 7    and Mr. Thompson, using the same methodology he has used
 8    literally thousands of times in cases where he has been called
 9    upon to de-duplicate class records, to do the job he is the
10    most experienced in the United States at doing --
11            THE COURT:  So --
12            MR. RIFKIN:  He took that list, and he reduced it to a
13    much smaller number.
14        Is that number sealed?
15            THE COURT:  Yes, it is, but --
16            MR. RIFKIN:  Is the accurate number sealed?
17            THE COURT:  It is sealed, but I understand what that
18    number is.
19            MR. RIFKIN:  Okay.  So that number, that number and
20    that list of people -- it was not just a number, but it was a
21    list of people.
22        Now, Mr. Thompson did not know who those people were
23    because Apple did not provide the names of those people.  We
24    only knew them by hashed fields, by masked fields.  Mr.
25    Thompson took that list of that large number of people, smaller
```

 1    than the number I mentioned before, and delivered it to Apple.

 2    Apple then took the transactions.

 3         Is the number of transactions under seal?

 4         May I, Your Honor?  I don't want to disclose any more

 5    information that's confidential.

 6         There's a very large number of transactions that was in

 7    the database that Apple delivered to us.  We did not have a way

 8    of mapping the payors after Mr. Thompson did his roll-up.  We

 9    did not have a way of mapping the payors to their respective

10    transactions.  Okay?  We had to give that to Apple to do that.

11         Apple did that and then delivered that information to Dr.

12    Song.  Dr. Song received that information directly from Apple.

13    He then took that data and applied the $10 threshold at the

14    person level, the payor level, because we understood that was

15    ultimately how it was going to be applied.  He delivered a

16    report, his merits report, which does exactly what the Court

17    asked us to do.

18         It calculates per transaction, transaction by transaction

19    for all of those transactions, and it groups them person by

20    person by person.  And he has delivered that data, the results

21    of that work, to Apple and to us.  We now know with certainty

22    who those injured people are and who those uninjured people

23    are.  We know that 5 point -- may I disclose that number?  Is

24    that --

25              **MS. RICHMAN:**  No.  That's public.

1      **MR. RIFKIN:**  We know that 5.2 percent of the people,

2  of the payors -- 5.2 percent of the payors are unharmed.  And

3  by that, we all know we mean who have not had calculable,

4  recognizable damages.  The 5.2 percent, if you use the

5  methodology that Professor McFadden developed without Apple's

6  price tiers in place, that number goes to 5.9 percent if we

7  leave Apple's price tiers in place.

8      So we know that the number of uninjured people -- people,

9  payors, actual people -- based on the mapping of transactions

10  that Apple did and delivered to Dr. Song, the number of

11  uninjured people is somewhere between 5.2 percent and 5.9

12  percent.

13      Now, the reason that the raw number of uninjured people is

14  larger is because the database of transactions is much larger

15  than the database that we were using during class

16  certification.  But as we said we would do, we have done it.

17  We have reduced the percentage of unharmed from the 7.9 percent

18  of uninjured Apple IDs, which was the only way we could do it

19  during class certification.

20      We didn't have the ability to do it any other way.  So

21  somewhere between 5.2 and 5.9 percent.  And either way, we know

22  exactly who those 5.2 percent are.  We know exactly who those

23  5.9 percent are.  We know it, and Apple knows it.  They have

24  the list.  It is not correct that we have not done that.  We

25  have done that.

```
 1          And then subsequently, the Court did not grant the motion
 2     to amend, which we made in April of 2025.  The Court did not
 3     grant the motion to amend to apply that $10 cutoff the way we
 4     all understood it was going to be applied at the payor level.
 5     Your Honor, respectfully, that's what we said to the Court way
 6     back in April.
 7          We said, "We want to apply this $10 spending cutoff at the
 8     payor level," because that's how we were all thinking about it.
 9     We simply didn't have the ability to do it then because Apple
10     hadn't given us the data to do it.
11          THE COURT:  That, I don't understand.  And I don't
12     understand it because the definition is the definition.
13          MR. RIFKIN:  Well --
14          THE COURT:  And you were going to do the
15     calculations per the definition.  So --
16          MR. RIFKIN:  And we did, Your Honor.
17          THE COURT:  Okay.
18          MR. RIFKIN:  We did.
19          MS. RICHMAN:  Your Honor, may I respond?
20          THE COURT:  Yes.
21          MS. RICHMAN:  Your Honor, they did -- they attempted
22     to do exactly what you told them to do in February 2024, and
23     they failed.  That's why they hired Mr. Thompson, was to do the
24     matching.  He -- they hired -- they chose to hire a claims
25     administrator.
```

```
1              He may be the best in the country.  I don't know.  But
2       he's not a data scientist, and a data scientist is what they
3       needed in order to de-duplicate the payor records and determine
4       who is injured and who is uninjured pursuant to the
5       Song-McFadden definition.
6              The class definition now is the same as it was when you
7       certified the class in 2024, except for the removal of the iPod
8       transactions.  You told them to match those people who paid in
9       dollars in total to Apple during the class period for IOS
10      applications from any one Apple ID account.  That's what they
11      attempted to do with Mr. Thompson, and they failed to do it
12      reliably.
13             The fact that there are 5.2 to 5.9 percent uninjured in
14      the class now is really neither here nor there, because Mr.
15      Thompson -- because of Mr. Thompson's failings.  They are
16      utterly unable to identify who is injured and who is not
17      injured.  We cannot take the 5.2 --
18             THE COURT:  Wait.  So --
19             MS. RICHMAN:  -- to 5.9 percent --
20             THE COURT:  So let me stop you there.  They say 5.2 to
21      5.9, and you say that's not relevant.  Well, isn't it relevant?
22      I mean --
23             MS. RICHMAN:  Yeah.
24             THE COURT:  -- where else does 5.2 to 5.9 come from if
25      it's -- I don't understand that statement.
```

1          **MS. RICHMAN:**  Yes.  Okay.  I'm not saying it's not

2     relevant.  We think it's very relevant, Your Honor.  We think

3     standing alone, having 11 million uninjured --

4          **THE COURT:**  That's a separate issue.

5          **MS. RICHMAN:**  Okay.  We think 5.9 percent, standing

6     alone, is too many.  But my point is let's set that aside.

7          **THE COURT:**  Do you concede that it's 5.9?

8          **MS. RICHMAN:**  No, Your Honor, we don't.  We have no

9     idea what it is because Mr. Thompson didn't do the matching

10    correctly.  We know that.  They have not disputed that.

11         Now, they say, "Oh, it's just these few examples that

12    Apple identified."  But those are just illustrative examples,

13    Your Honor.  The flaw is with the core methodology or lack

14    thereof.

15         Mr. Thompson's analysis is a complete black box.  We can't

16    replicate it.  We can't test it.  There's -- he didn't write

17    down what he did, the code, which is part of the reason we

18    can't replicate it.  He did not use any sort of peer-reviewed

19    analyses, and Mr. Lazarus can talk more about why Mr.

20    Thompson's opinions are nothing more than ipse dixit that

21    should be excluded under Daubert.

22         But even if you were to find his opinions admissible, his

23    opinions are not sufficient to satisfy Rule 23(b)(3).  And

24    that's what Olean says.  Olean says that even admissible expert

25    testimony must be able to show that class-wide injury issues

```
1    will predominate at trial.  Here, individual issues are going
2    to predominate because we have to go through each class member
3    to figure out whether the records are matched properly or not.
4         So setting aside the percentage of injured, we have
5    another very significant problem that is on all fours with
6    Olean and this court's -- excuse me -- the Ninth Circuit's more
7    recent decisions in the Van v. LLR case and the Ambrosio v.
8    Progressive case from just last month.
9         And if you want to talk about percentages, let's talk
10   about percentages, because in those cases, it took just a
11   minuscule of examples of Defendant coming forward with evidence
12   that individual inquiry was necessary in order to raise the
13   specter of class member by class member adjudication.  And on
14   that basis, the Court found that certification had to either be
15   vacated or had been properly denied.
16        And I'm happy to talk more about those cases if Your Honor
17   feels it helpful, but I think it's -- the Van v. LLR case is
18   well set-out in our submissions, and the Ambrosio case from
19   just last month does not have a Fourth cite yet, but I can give
20   you the Westlaw citation, which is 2025 Westlaw 2628179.  And
21   the Court there found that denying the defendant the right to
22   impose individual defenses would violate due process rights.
23        And because allowing Defendant, on the other hand, to
24   mount their defense on a class member by class member basis
25   would be wholly infeasible that render class certification
```

1    inappropriate.

2          **THE COURT:**  Where is the 5.2 to 5.9 percent?  Where

3    does that number show up?

4          **MS. RICHMAN:**  Your Honor, probably the easiest place

5    for you to find them is in the plaintiffs' opposition.

6          **THE COURT:**  No, no, no.  I'm looking for the --

7          **MS. RICHMAN:**  Yes.

8          **THE COURT:**  -- actual report.

9          **MS. RICHMAN:**  Yes.  There's a -- I was just going to

10    point you to appendix A of the plaintiffs' opposition, which

11    has those citations in it.  But I can find them for you.

12          **THE COURT:**  I don't see those numbers in Thompson's

13    declaration or report.

14          **MS. RICHMAN:**  No, Your Honor.  Those would be in Dr.

15    Song's report from March, March 7th.

16          **THE COURT:**  All right.

17          **MS. RICHMAN:**  And Your Honor, just -- I'm reminded

18    that Song's original opening report in any event applied the

19    $10 cutoff both ways, $10 in one account or $10 across all

20    accounts.  And it's also incorrect that Thompson didn't have

21    the payor record names.  He definitely did.

22          **THE COURT:**  How can Song -- well, what paragraph is

23    the Song -- does Song identify those numbers?  I'm trying to

24    figure out how Song can get to those numbers when they don't

25    and have -- well, when there's problems with the underlying

1    analysis.

2          **MR. RIFKIN:**  Your Honor, I'm sorry --

3          **THE COURT:**  Where does he use those numbers?  What

4    paragraph?

5          **MR. RIFKIN:**  The 5.2 and 5.9 numbers?  Which paragraph

6    of his report?

7          **THE COURT:**  Correct.

8          **MR. RIFKIN:**  I'm sorry.  If you give me a moment, Your

9    Honor, I'm trying to identify the paragraph with the

10    uninjured --

11          **THE COURT:**  So I see 83 has 5.2.  But where's --

12          **MR. RIFKIN:**  Yeah.  I'm sorry, Your Honor.

13          **THE COURT:**  -- 83 and 84?

14          **MR. RIFKIN:**  It's in Exhibit 40, which is Dr. Song's

15    expert report.  It's figure 24.  That identifies the 5.2

16    percent number.  It's -- and I don't know if the actual raw

17    number is public or non-public.

18          **THE COURT:**  Well, there is no figure 20 -- the figure

19    only goes up to 17.

20          **MR. RIFKIN:**  Your Honor, I'm looking at figure 24

21    right now.  It's on page 104 of Dr. Song's expert report, dated

22    March 7, 2025.

23          **THE COURT:**  So in the appendix, not in the report?

24          **MR. RIFKIN:**  It may be the appendix, but it's part of

25    the report.  Page 104 of 111.

1          **THE COURT:**  I see.

2          **MR. RIFKIN:**  And he has in that -- in that report, he

3    has identified nine -- is that number --

4          **THE COURT:**  I'm looking at it.  I'm looking at figure

5    24.  So what do you want to say about it?

6          **MS. RICHMAN:**  Here it is.  It's in paragraphs 83 and

7    84, Your Honor.

8          **THE COURT:**  Right.  Yeah.

9          **MR. RIFKIN:**  Yeah, I'm sorry.  Thank you.  It's

10   paragraph 83.  And -- thank you.

11       It's paragraph 83, and what he sets out there is the

12   percentage of unharmed class members is 5.2 percent, and that's

13   applying the $10 spending cutoff at the payor level.  In the

14   merits report dated March 7th, 2025, Dr. Song only applied the

15   $10 spending cutoff at the payor level.  So that would be

16   across all Apple IDs.  So if I spent $4 in one account and $7

17   in another account --

18         **THE COURT:**  I understand how it works.  That's why

19   your attempt to change things is baffling.

20         **MR. RIFKIN:**  Well, and again, the reason for that is

21   when we ran the report originally and we defined the class, we

22   only had the ability to apply the $10 spending cutoff at the ID

23   level.

24         **THE COURT:**  You didn't have an ability to do what you

25   said you were going to do when I certified the class.  You said

1    that you would be able to once I certified the class, which is

2    what I allowed you to do.  But make no mistake.  I never

3    thought that you would have one consumer with one account.  We

4    never talked about it that way.

5        And in fact, Song's got analysis.  That's not how it

6    worked.  That's not reality.

7            **MR. RIFKIN:**  Your Honor, if I said that at any point

8    in time, I didn't mean to say that.

9            **THE COURT:**  Well, why would I --

10           **MR. RIFKIN:**  But if Your Honor has understood that, I

11   haven't been clear enough.  We have always known -- always

12   known -- and we have always said to the Court --

13           **THE COURT:**  Then you should --

14           **MR. RIFKIN:**  -- there are more accounts --

15           **THE COURT:**  -- stop raising -- stop.  You need to stop

16   raising some notion that somehow I took you off track by not

17   granting a motion so late in the game, in April of this year,

18   to do something that I always believed was done already.

19       So I don't know what kinds of games people play, but I'm

20   certainly not -- this case is way too old to be doing things at

21   the last minute anymore.

22           **MR. RIFKIN:**  Your Honor, before we made that motion --

23   before we made that motion, we did exactly what we said to the

24   Court we would do, exactly what Your Honor directed us to do.

25   Dr. Song -- once Dr. Song had all of the data from Apple and he

1    had the matching that Apple provided, matching transactions to

2    payors -- once he had that data, which he did not have when the

3    class was certified in 2024.  We knew we would get that after

4    class certification.  Once he got that, he did what we said we

5    were going to do.

6            **THE COURT:**  All right.

7            **MR. RIFKIN:**  He did what the Court directed us to do.

8    He ran that data using Professor McFadden's model and the

9    matching that Apple gave to him.  He matched transactions to

10   payors.  He applied the $10 cutoff at the payor level, and he

11   computed these numbers, including the total damages number,

12   which is 20.1 billion dollars -- that's a public number -- and

13   both the 5.2 percent with Apple's price tiers removed or 5.9

14   percent with Apple's price tiers in place.

15       He did that, and he reported that in his March '25 expert

16   report.  The only way he was able to report it in March of 2025

17   was because he did it.  And he was only able to do it once we

18   got the data from Apple for Mr. Thompson to do his work and Dr.

19   Song to do his work, which was after class certification had

20   been granted.

21       We did everything --

22           **THE COURT:**  There is then absolutely no reason --

23   right?  If you're saying that, there is absolutely no reason

24   why the supplemental report should come in and the supplemental

25   opinions, because he did what he needed to do back in --

```
 1                MR. RIFKIN:  I agree.

 2                THE COURT:  -- March.  All right.

 3                MR. RIFKIN:  I agree.

 4                THE COURT:  So the Daubert or the motion to strike the

 5      supplemental report of Song is unopposed because there's no

 6      need for it.

 7                MR. RIFKIN:  Because apparently Your Honor thought

 8      that's how it was going to be done all along.  We agree.  It's

 9      unnecessary.

10                THE COURT:  All right.  That motion is granted.

11                MS. RICHMAN:  Thank you, Your Honor.

12                THE COURT:  So on the 5.2 to 5.9 --

13                MR. RIFKIN:  Yes.

14                THE COURT:  The problem, as I understand it, is we

15      don't know if that's a good number because it, by definition,

16      has to rely on Thompson's analysis.  Is that Apple's

17      perspective?

18                MS. RICHMAN:  That's part of it, yes, Your Honor.

19      It's not just the number of uninjured, even for the individuals

20      who Thompson says are injured because we don't know if he did

21      the matching correctly.  And actually, we know he did not do it

22      correctly.

23                THE COURT:  Ms. --

24                MS. RICHMAN:  You would really have to go --

25                THE COURT:  Ms. Richman?
```

 1                **MS. RICHMAN:**  Yes, Your Honor.

 2                **THE COURT:**  You and I are going to disagree on the

 3     issue of percentages and actual numbers.

 4                **MS. RICHMAN:**  That's fine, Your Honor.

 5                **THE COURT:**  So it's preserved, if it ever needs to be.

 6     You and I are going to disagree on that issue.

 7                **MS. RICHMAN:**  Understood.

 8                **THE COURT:**  So I don't want to have argument on that.

 9     I understand your perspective.

10          What concerns me -- what concerns me is the reliability of

11     Thompson's analysis.  That's what I want to focus on next.

12                **MS. RICHMAN:**  Yes, Your Honor.

13                **MR. RIFKIN:**  Your Honor, would -- if my --

14                **THE COURT:**  Hold on.  No.

15                **MR. RIFKIN:**  Okay.

16                **THE COURT:**  It is not, in my view, Apple's burden.  It

17     is Plaintiffs' burden.  And it is Plaintiffs' burden because at

18     the time I certified the class, you were missing this piece.  I

19     told you you were missing this piece.  I told you you had to do

20     it, and if you couldn't do it, I would de-certify.  So I want

21     to make sure the record is clear and that you understand,

22     because I saw something in the briefing about the notion that

23     this was somehow Apple's responsibility.  In my view, it is

24     not.  It is your burden under Rule 23.

25          Again, as I understand it, Apple has shown me a number of

1    errors.  It is not a fulsome analysis of Thompson's work, but

2    they're pretty significant errors.  Now, it may just be a small

3    percentage, but it's still millions of people because what

4    we're dealing with is a data set that's so big.

5         **MR. RIFKIN:**  Your Honor, what I was trying to ask was

6    I think where we're going now is we're spilling over a bit into

7    the Daubert challenge to Mr. Thompson.

8         **THE COURT:**  Well, let me be clear.  If his analysis

9    doesn't come in, there is no class -- the class has to be

10   de-certified.

11        **MR. RIFKIN:**  I believe that, unless the Court allows

12   us to change the methodology that we've used, that methodology

13   that we have used, including the $10 cutoff and identifying the

14   uninjured and injured, relies on Mr. Thompson's matching.  That

15   is correct.  We don't dispute that.

16        But all I'm -- and I'm happy to address that in the

17   context of class certification.  Mr. Burt is here to address it

18   in the context of the Daubert challenge, and you may want to

19   hear from him.

20        But what I will say is this, just by way of preview:

21   There is only one error that has been identified, and I'll

22   summarize this very briefly.

23        **THE COURT:**  Well, I think --

24        **MR. RIFKIN:**  I'm sure Mr. --

25        **THE COURT:**  -- there have been three.

```
 1              MR. RIFKIN:  I'm sure Mr. Burt will discuss it in

 2    greater detail.  The only error that has been identified is

 3    what we refer to as the Kim error, and let me briefly explain

 4    what I mean by that.

 5              THE COURT:  Right.  The --

 6              MR. RIFKIN:  There are 42,000 -- is that number

 7    private or public?

 8              THE COURT:  Look.  In terms of the Kim error -- right?

 9    -- there were a number of records -- well, there's the Kim

10    error.  There's the Salmon error.  There's the named plaintiff

11    error.  So why don't we go to the Daubert.

12              MR. RIFKIN:  I think that's best --

13              THE COURT:  On Thompson.

14              MR. RIFKIN:  -- Your Honor.  And Mr. Burt will address

15    the Daubert motion.

16              MS. RICHMAN:  And Mr. Lazarus will for Apple.

17              MR. BURT:  Thomas Burt for Plaintiffs, Your Honor.

18    And thank you for --

19              THE COURT:  Just wait, because there was a request

20    that somehow I seal the courtroom for the discussion on this

21    motion, which, as I indicated yesterday on the docket, I was

22    not going to do.  It sounds as if you all have had some

23    discussions about how to maintain confidentiality.

24         Frankly, I didn't see an analysis of his proprietary

25    method, so -- in his report.  So I'm not sure what I'm supposed
```

```
 1    to be looking at.  I didn't see the trade secrets revealed in

 2    the report, so I don't know what that's supposed to be.  But in

 3    any event, the results of whatever it is he's done -- none of

 4    that is sealable, and I will not seal it.  So those things are

 5    fair game.

 6         You know, and Mr. Thompson has never done this for a

 7    trial.  He has never done this for trial.  And that is part of

 8    the problem.  What he has done is he's got 20-plus years in

 9    doing this in the context of a settlement, right?

10              MR. BURT:  Yes, Your Honor.

11              THE COURT:  Ever testified in trial on these kinds of

12    topics?

13              MR. BURT:  No, Your Honor.

14              THE COURT:  And that's the problem.  When you're in a

15    settlement context, typically speaking, we've got a pool of

16    money.  There's a pool of money agreed upon by the parties, and

17    the administrator goes in to find who they are, to send them

18    their share.  There are callbacks.  These are iterations of

19    ways to find class members.  That is not a trial expert.  It's

20    not.

21         When you are in trial and you have not settled with the

22    other side, you actually have to show it in the first instance,

23    and he fails to do that because that's not what he's ever done

24    in his experience of 20-plus years.

25              MR. BURT:  Your Honor, his experience as a
```

1  practitioner is closer to the real problem than is the

2  theoretical experience of a data science or statistical

3  professor.

4      **THE COURT:**  I disagree with you.  I tried -- get

5  this -- a TCPA class action trial.  Who tries these?  TCPA

6  class action.  $267,000,000 verdict under the statute, $500 per

7  person.

8      And we had a statistician on the stand with her

9  spreadsheet, phone numbers matched to people, and that expert

10  was able to identify the people to whom the unwanted calls

11  went.  Then she could do the math -- $500 per X number of calls

12  to X number of people, $267,000,000.  That is expert testimony

13  in the context of a trial.

14      **MR. RIFKIN:**  Your Honor, even Professor Stodden

15  conceded that one would not expect a hundred percent accuracy

16  in this regard.

17      **THE COURT:**  I'm not looking for a hundred percent

18  accuracy.  So let's talk about the glaring errors -- glaring

19  errors -- which give me significant concerns about the

20  reliability of what he's doing and/or done.

21      **MR. BURT:**  So, Your Honor, I want to start, if it

22  please the Court, with the Kim situation.  As I think the Court

23  understands, the methodology was one of the tiers of matching

24  takes into account that in the United States, we frequently

25  experience people change last names, either at time of marriage

1    or divorce, usually women, but not always.

2         And therefore, the matching logic included the concept

3    that if a person with the same first name at the same exact

4    address with the same exact phone number appears in the data,

5    sometimes with the same person ID, that that's the same person.

6    That is -- Apple has not shown that but for one circumstances,

7    that's an unreliable match.  They have shown that in one

8    circumstance, it produces incorrect results.

9         That circumstance could have been avoided if Mr. Thompson

10   had access to one of two pieces of data, and because I'm being

11   circumspect about the details -- not the results, but the

12   details in the methodology, if Your Honor will consult in our

13   opposition brief page 5, the fifth and seventh bullet points,

14   those are two numbers, one of which Mr. Thompson had access

15   only to the last four, and one of whom -- both of which were

16   masked.

17             **THE COURT:**  So let me --

18             **MR. BURT:**  They were hashes.

19             **THE COURT:**  Hold on.  Let me get that, because what I

20   have up here -- I am more concerned with the actual expert

21   reports than I am with the lawyers' arguments in briefs.  So --

22             **MR. BURT:**  Sure.  So Your Honor, I would direct the

23   Court to paragraph 37 of Mr. Thompson's declaration.

24             **THE COURT:**  The declaration that was submitted in

25   support?

1          **MR. BURT:**  That's correct, Your Honor, in opposition

2     to the Daubert.

3          If I may confer briefly while Your Honor looks?

4          **THE COURT:**  All right.

5          **MR. BURT:**  And, Your Honor, to be clear, because we're

6     all concerned about confidential information, I've conferred

7     with Mr. Lazarus about how to speak about this, and we're on

8     the same page.

9          I won't reveal the name of the field exactly, but there

10    are two fields that represent a hashed value for credit card

11    and a hashed value for phone number.  That's what I was

12    referring to when I directed the Court to the part of our

13    brief.  I was just trying to be elliptical in how I talked

14    about it.

15         **THE COURT:**  Okay.  So we asked you all for delivery of

16    expert reports so that I could go through these.  I think the

17    one that you're asking for was not delivered.  Is there -- do

18    you have a docket number?

19         **MR. LAZARUS:**  That's at Docket 1031-6, Your Honor.

20         **THE COURT:**  1031-6.  All right.  Why don't you proceed

21    while I try to pull that up.

22         **MR. BURT:**  Your Honor -- excuse me.  Your Honor, the

23    process by which what I'll call the marriage-divorce match.

24    The process by which that worked only came a cropper in the

25    specific circumstance where there was a user entered entry both

1    for exact address and for exact phone number.  That was not

2    accurate.

3        Apple delivered to Mr. Thompson a list of 16 phone numbers

4    that it knew were not good.  But Mr. Thompson had a very

5    limited ability to do any further analysis on phone because

6    Apple insisted on turning it over hashed.  And that problem is

7    entirely resolvable with an unhashed value there.

8        But it is also, Your Honor, entirely resolvable if there

9    is access to a -- to even a hashed credit card, and Apple

10   turned over what they said was a -- only a hashed last four

11   digits of credit card, which Mr. Thompson discounted because --

12   despite what Apple says about his level of care, because he

13   believed that the last four alone was not sufficiently specific

14   to exclude false matches.  If he had access to either of those

15   two things -- that is an unhashed phone number or a full --

16   even hashed full credit card, the Kim problem is entirely

17   resolved.

18       I would also point out, Your Honor, that in terms of an

19   error rate, to just -- we don't have a statistical error rate

20   for the process itself.  I concede that.  But we have a --

21           **THE COURT:**  How am I supposed to know?

22           **MR. BURT:**  Because we have a good proxy for an error

23   rate.  We know that both the -- that if one does -- and I

24   understand the Court's ruling.  I'm using this as a logical

25   backstop.  If one does this analysis using the cutoff -- let me

1    back up farther because I don't want to get lost.

2        I think the Court understands that the McFadden model

3    calculates damages by transaction.  Dr. Song has said he can

4    add up these transaction by transaction -- it's not even

5    damages.  The overcharge for the whole transaction is

6    determined by the but for commission rate that comes from

7    Dr. Abrantes-Metz.  It's the difference between what Apple

8    actually charges and -- obviously, the Court follows.  How much

9    of that fell upon the consumer is determined by the McFadden

10   model.

11       Dr. Song says, "Since it's transaction by transaction, I

12   can add those in any order, and but for the cutoff, they come

13   to the same number."

14       Now, Dr. Song has done that, as the Court knows, by

15   account, which the Court is not now going to permit to go

16   forward, but he's just done it.  And by payor, according to Mr.

17   Thompson's matching, passed through Apple's matching it to the

18   transactions.

19       They come out almost exactly the same.  That is an implied

20   cap on the error rate.  They wouldn't be that close if

21   adjusting the way one does the cutoff made that much of a

22   difference.  You can't be that far wrong if he's getting

23   basically the same number.

24       **MR. LAZARUS:**  Your Honor, may I --

25       **MR. BURT:**  The transactions, Your Honor, overlap at

1    99.9 percent, which -- by that, I mean which transactions are

2    and are not in the cutoff overlaps by 99.9 percent.  So I would

3    think the Court can think about that as backstopping how much

4    error that can be.

5         Now, I've addressed the Kim issue --

6         **THE COURT:**  So I need a response.

7         **MR. LAZARUS:**  Good afternoon, Your Honor.  Eli Lazarus

8    for Apple.

9         I would like to address a number of the points that

10   Mr. Burt made, the first one on the Kim error.  Mr. Burt took

11   you to Mr. Thompson's declaration at Docket 1031-6, paragraph

12   37, which states as Mr. Burt just repeated, that the Kim

13   records all had the same address and all had the same phone

14   number.

15        That is flatly false testimony, Your Honor.  If you look

16   at Professor Stodden's report at Exhibit 9, which is on page

17   38, in black and white, she shows a selection of the Kim

18   records that have different addresses and different phone

19   numbers.

20        So when Mr. Thompson tried to explain that error, he

21   resorted to false testimony.  He doesn't have an explanation,

22   Your Honor.  His method is a black box even to him.  Mr. Burt

23   also --

24        **THE COURT:**  Go ahead.

25        **MR. LAZARUS:**  Mr. Burt also referred to the hashed

```
 1   phone numbers that were in the payor data.  That was done in

 2   order to protect user privacy.  So because Mr. Thompson did not

 3   need to see the full phone number in order to know that there's

 4   a one-to-one match between --

 5           THE COURT:  Can we -- just get back on Stodden.

 6           MR. LAZARUS:  Yes.

 7           THE COURT:  Is this the June 27th report, or is there

 8   a declaration?

 9           MR. LAZARUS:  No.  That's the right report, Your

10   Honor.

11           THE COURT:  Then what paragraph?

12           MR. LAZARUS:  It's on page 38.  It's Exhibit 9.  I

13   don't have a paragraph number that goes with that.  It's above

14   paragraph 67, Your Honor.

15           THE COURT:  I see.  Okay.  So it -- oh, I see.

16       When you say Exhibit 9, you mean Exhibit 9 to the report.

17           MR. LAZARUS:  That's correct, Your Honor.

18           THE COURT:  Okay.  Keep going.

19           MR. LAZARUS:  On the hashed phone number issue, Your

20   Honor, those were hashed, again, to protect user privacy, and

21   those numbers were hashed in the sample data that Mr. Thompson

22   evaluated and which he said he confirmed could support his

23   de-duplication.  He then examined the full data set, and he

24   gave his opinion that he had de-duplicated it.  He did not

25   quibble and say, "I need unhashed phone numbers."
```

1   The plaintiffs never went to Judge Hixson and said, "We

2 need unhashed phone numbers."  Those were in the data all

3 along, and Plaintiffs never questioned it.

4   Mr. Burt also raises the question of the credit card

5 numbers, Your Honor.  In the sample data, Apple communicated to

6 Plaintiffs that only the last four digits were included in the

7 hash -- excuse me -- in the -- yes, in the hashed values in the

8 payor data, and Plaintiffs at that point requested that the

9 full data set include the full credit card numbers, and that is

10 what Apple produced.

11   When Mr. Thompson evaluated the data, he should have seen

12 that it would be mathematically impossible that it included

13 only the last four digits based on evaluating the frequencies

14 with which values appear in that field.  That is what a

15 qualified statistician would do.  Mr. Thompson did not do that.

16 And yet in evaluating the data, he said it was sufficient for

17 his purposes.

18   So they, Plaintiffs, similarly cannot complain that the

19 hashed credit card numbers that Mr. Thompson did not use led to

20 his errors.

21    **MR. BURT:**  Your Honor, I want to -- I just wanted

22 to --

23    **THE COURT:**  Just don't interrupt.  I didn't have him

24 interrupt you.  Do you have a pen?  Make yourself a note so you

25 know what you want to say.

1          Go ahead.

2          **MR. LAZARUS:**  Thank you, Your Honor.

3          On the error rate, Plaintiffs concede that Mr. Thompson

4     did not calculate an error rate himself, and that alone in the

5     case law is grounds for exclusion.  There is no way to tell how

6     much confidence to put into his analysis.

7          Now, the solution that Plaintiffs have tried to come up

8     with for that is the untimely Song report, which Your Honor has

9     stricken, and for good reason.  But even -- and the reason is

10    that Dr. Song's untimely report and declaration depend on

11    ignoring the class definition and calculating everything by

12    account.  That is the wrong approach.  We know that.

13         And so the fact that Mr. Thompson's approach matches the

14    wrong approach significantly is no evidence that his approach

15    is reliable and should be put to a jury.

16         **THE COURT:**  Now.

17         **MR. BURT:**  Apologize for interrupting, Your Honor.

18         Your Honor, first, on the credit card numbers, Apple did

19    represent that only the last four were included in the sample

20    set.  We actually lost this, as it were, on the field of

21    battle.  We tried to get an order that required full credit

22    card numbers.  We did not prevail.  And we had no reason to

23    believe that Apple had turned over full credit card numbers.

24         While I agree that a statistician or a --

25         **THE COURT:**  I don't understand that.  If someone's --

1    there's a huge difference between 16 digits and 4 digits, and

2    if someone is working with the data and they have it in the

3    fields, how is it that they don't know what they have?

4         **MR. BURT:** Because, Your Honor, a hash value doesn't

5    reveal the number of digits.  The hash string is much longer

6    than 16 digits.  I think it's 60.  The hashed value does not

7    reveal the number of underlying digits.

8         So having been told we only gave you last four, Apple

9    today is the first time Apple has affirmatively said that they

10   turned over full credit card numbers.  In fact, up until today,

11   they relied only on Professor Stodden's somewhat but not

12   entirely equivocal assertion that her analysis indicated to her

13   that it must have been the full number rather than

14   affirmatively representing we did turn over the full number.

15        If it's a 60-digit garbage string, as a hash value is,

16   there's no reason to just tell by eyeball, "Hey, they turned

17   over more than they said they did."  And having concluded,

18   based on the representation in the data dictionary, "This is

19   not a useful field, we lost on that issue, I can't use it," he

20   did no analysis of the credit card field.

21        It just looked like a string of 60 random digits, and

22   having been told, "We only gave you last four," he concluded,

23   "I can't do much with that" and didn't check to see if Apple's

24   representation was true.  The first time they've affirmatively

25   said, "Hey, that representation, we changed our mind.  We gave

1    you the whole number" -- this is the first time they've

2    affirmatively said that.

3        Your Honor, I also wanted to respond to what Mr. Lazarus

4    said was a false statement by Mr. Thompson, and I think I can

5    explain this.  Where Professor Stodden says that there were not

6    exact address matches, if there were a -- okay.  If there is a

7    Kim Abel -- and I'm creating a fictitious name for

8    illustration.

9        If there is a Kim Abel and a Kim Baker, and there are

10    eight different records for Kim Abel and seven records for Kim

11    Baker, when also Apple comes to their number for the Kim

12    problem, they're counting those as 15.  And when we come to our

13    smaller number, as reflected in the paragraph 37 of Mr.

14    Thompson's declaration, we're saying, "Well, Kim Abel would all

15    roll up together, and Kim Baker would all roll up together,"

16    and that's two different Kims.

17        Now, where I'm going with that, Your Honor, is when

18    Professor Stodden says, "Well, there were not exact address

19    matches for these people," Kim Abel may have lived at three

20    different residences, and Kim Baker may have lived at three

21    different residences.

22        What Professor Stodden is saying is that at some point

23    they didn't all have the same address, and we concede that

24    that's true.  When we say that this error arose only because

25    there was at some point the same address for both Kims, if Kim

1    Abel and Kim Baker both put in just once among all the records,

2    the not correct address -- and there's a particular one.  I

3    don't want to refer to it out loud.  It's a user entered answer

4    for address that occurred frequently in the data.

5        If they both put in that not true user address and also a

6    not true phone number that matched each other, that tier of

7    matching logic would match those and say, "This person stayed

8    at the same address, stayed at the same phone number, must have

9    changed their last name in marriage or divorce."

10       And obviously that's not a correct conclusion, but Mr.

11   Thompson did not make up or lie about the matching tier.

12   Professor Stodden's talking about a different thing.  She's

13   saying there were different addresses at Kim Abel and Kim Baker

14   depending on when they entered their user data.  We're saying

15   at some point that one now well-known false entry appeared in

16   both, and that's what caused them to match.

17       Does the Court follow that without me getting farther into

18   the weeds?

19       **THE COURT:**  I'm going to go back and look at the

20   report.  I'm having a hard time.

21       Response?

22       **MR. LAZARUS:**  Thank you, Your Honor.

23       On the credit card issue, Mr. Burt acknowledges Mr.

24   Thompson simply didn't analyze the credit card data that was

25   provided.  Had he done so, like a qualified statistician would

1    have done, he would have seen or he would have known that four

2    digits can have at most 10,000 values.  And if he had seen

3    hundreds of millions of values in that field, he should have

4    known that it could not have been the last four digits that he

5    claims that he thought it was.

6        On the Kim error, what Mr. Burt has said simply does not

7    accurately reflect what Mr. Thompson's declaration says.  This

8    is, again, in the -- this is in the declaration that we were

9    just referring to at paragraph 37 discussing the Kim error

10   discussing.

11       Mr. Thompson says the records all had same first name,

12   Kim, the same street address, city, state, and postal code.

13   And there's, I believe, a typo here because it repeats that

14   it's the same street address.  And crucially, the same phone

15   numbers.  All of that is simply factually untrue, as Your Honor

16   knows from looking at Professor Stodden's report at the

17   paragraph that I referenced a moment ago.

18       Your Honor, I do have affirmative points to make on our

19   side, but I would defer to the Court whether that's helpful or

20   if you have any questions that we could clarify.

21           **THE COURT:**  Well, there were other errors that gave me

22   concerns.  For instance, the failure to identify the named

23   plaintiff as both Rob and Robert, the somehow identifying 1.8

24   million individuals in King Salmon, Alaska, which has a

25   population of 375.  These concern me.

1      **MR. BURT:**  I understand, Your Honor, and I've been

2  waiting for my opportunity to address those.  The Rob and

3  Robert mismatch, I want to note that Rob and Robert appear in

4  records with different person IDs, which means Apple has

5  different records for people with that name.

6      We may think that certain names obviously are short

7  versions of other names.  I questioned Professor Stodden about

8  this, and I direct the Court to Professor Stodden's deposition

9  transcript starting at about page 48.

10      Professor Stodden conceded that those were essentially

11  conventional and that they -- what may seem obvious to us

12  because of names we're more familiar with omit as possibilities

13  that wouldn't be obvious to somebody from a different language

14  at all, for example.

15      And I'm just thinking of this example now.  We might think

16  Rob is obviously Robert, but we might not think that Dzohar is

17  obviously Dzohar, spelled D-Z-O-H-A-R, but -- and to somebody

18  with a different background, that might be just as obvious a

19  match.  Or we might think somebody with the name Nardavid --

20      **THE COURT:**  Does that --

21      **MR. BURT:**  -- would obviously --

22      **THE COURT:**  -- support the point that the methodology

23  is flawed?

24      **MR. BURT:**  I don't think so, Your Honor.  I think that

25  proves that the methodology does not overmatch.  It errors on

1    the side of under-matching.

2         **THE COURT:**  It's a problem though, because you have to

3    collect the information so that you can determine and run the

4    calculation to figure out if this person is harmed versus not

5    being harmed, as I believe one of the named plaintiffs turns

6    out is not harmed.  No damages.  Because when you -- when the

7    model was run -- let's see.  Who is it?  It's Mr....

8         **MR. BURT:**  I believe that's Mr. Hayter, Your Honor.

9         **THE COURT:**  Yeah, Mr. Hayter.  He has no economic

10   damages.

11        **MR. BURT:**  Well, we've explored that for the named

12   plaintiffs, Your Honor.

13        **THE COURT:**  It's a -- it is indicative of a problem,

14   and the fact that when you can run the numbers -- and by the

15   way, is Mr. Hayter dismissing himself from the case?  Is he

16   asking that he be dismissed from the case since he has no

17   economic damages?

18        **MR. FREDERICK:**  Your Honor, this is David Frederick,

19   and I will address this in the summary judgment motion.

20        But under Dr. Song's analysis, if price tiers are

21   determined by the jury to be valid or invalid, that will

22   determine whether Mr. Hayter suffers damages.  And the reason

23   is because Mr. Hayter acquired some expensive apps, and under

24   the Song model with respect to price tiers, the price tiers

25   would affect the pricing in a but-for world.

1          And based on that pricing scenario and what the jury would

2     find, there's a disputed issue of fact as to whether Mr. Hayter

3     would suffer damages or not.  But that ultimately would be a

4     jury question.

5               THE COURT:  Not now, Mr. Swanson.

6               MR. SWANSON:  Okay.

7               MR. BURT:  Your Honor, if I can address the King

8     Salmon issue, those -- Apple has not said those aren't real

9     transactions.  Someone made those transactions, and someone

10    paid for them.  So the real transaction --

11              THE COURT:  Hold on.  Am I -- I thought that the

12    evidence that was being suggested is not talking about

13    transactions but 1.8 million unique individuals.  Not

14    transactions.  Am I wrong?

15              MR. BURT:  No, you're not wrong, Your Honor.

16              THE COURT:  There aren't 1.8 million unique

17    individuals in a town with a population of 375.

18              MR. BURT:  And we agree with that, Your Honor.  Those

19    users have entered something that's not true about their

20    address.  We know that they've entered -- that some of them,

21    but we don't know which ones, have entered -- most of them, but

22    we don't know which ones -- have entered an address that's not

23    their actual address.  If those people don't come forward to

24    claim on their transactions if there is a verdict, then that's

25    on them.

1          **THE COURT:**  That's not -- we're not in settlement

2     mode.  I mean, again, this goes back to fraud, which we deal

3     with in a settlement mode, not trial mode.  We're in trial

4     mode.  And the fact that I've got that gives me concerns about

5     his methodology.

6          **MR. BURT:**  Your Honor, we -- there are things that one

7     can do to deal with user-created data, but they have included

8     an address that's not correct.  I...

9          **THE COURT:**  Response?

10          **MR. LAZARUS:**  Thank you, Your Honor.

11     I would like to address the errors that Your Honor has

12     called attention to, the Rob and Robert example and the King

13     Salmon example, but to back up for just a moment, the fields of

14     data science and statistics have been focused on this very

15     problem for decades, going back, Professor Stodden says, 80

16     years.

17     These fields have developed reliable ways to clean messy

18     data -- and this is a messy data set.  They have developed ways

19     to do that that are reliable and well-tested.  Those fields are

20     grounded in a robust body of academic literature, but Mr.

21     Thompson testified that he has no knowledge of any literature

22     or studies that would support his process.

23     On the errors that Professor Stodden has identified, they

24     are merely symptoms, Your Honor, of the flaws in Mr. Thompson's

25     methods that Professor Stodden saw in his work and discussed in

1   her report.

2        One example is that in the academic literature, two

3   records are considered a match if they communicate equivalent

4   information, what's called being equal semantically, meaning

5   they convey the same information, even if there are nicknames

6   or abbreviations involved.  But Mr. Thompson almost always

7   recognized a match only if he saw two values that matched

8   exactly verbatim, and that is what happened with the named

9   plaintiff, Rob and Robert Pepper.  A qualified statistician

10  would not make that mistake.

11       Similarly, with the King Salmon example, the problem -- a

12  problem -- with that is that Mr. Thompson simply didn't check.

13  He didn't look at his results and think, "Does this make sense

14  that there are this many people in this zip code?"  He had the

15  data to do that, and he simply didn't.

16       He says that he did some validation as he was going along

17  in his process, ad hoc tweaks to his code, but at the end of

18  the day, his attitude was "Set it and forget," Your Honor.  I

19  mean, he ran his code, and whatever it spat out, that's his

20  testimony.

21            **THE COURT:**  All right.  Response?

22            **MR. BURT:**  Your Honor, on the King Salmon issue, Apple

23  doesn't say that there's no real person behind those accounts.

24  Four accounts account for almost all of that, and they're not

25  going to be within the cutoff at that number of -- at that

 1    number of transactions, they're not going to be within the

 2    cutoff.  So that actually wouldn't result in somebody tripping

 3    or not tripping the cutoff.

 4        Professor Stodden was actually unable to suggest

 5    methodology that arises from what my friend Mr. Lazarus says

 6    are these well-worn problems within data science.  For example,

 7    I hadn't intended to say out loud that all of his matches were

 8    exact matches because that was sealed, but we're past that now.

 9        That's a -- one would say a Levenshtein distance of zero.

10    Of course, he recognizes there are other possibilities of

11    distance measurements.  As Professor Stodden said, it's well

12    known in the field of data science that you can have

13    approximate matches that have different Levenshtein distances.

14    But she didn't have any recommendation about how to put that

15    into practice.

16        I examined her at some length on that in her deposition,

17    and she was unable to say, for example, that this is the -- and

18    this is at about 60 and 61 of the transcript, of her

19    transcript.  She was unable to either apply those measurements

20    or say at what measurement level you would get only matches

21    that work for short names and long names and not matches that

22    don't work.

23        Albert can be Alphonse or -- Al can be Albert or Alphonse.

24    Rob and Rab, depending on how you measure, that -- I'm sorry.

25    Rob and Robert can be, for example, seven digits different.

1    Robert is a seven-digit string.  Rob only includes three of

2    those.

3         So I think I asked her an approximate.  I don't have it in

4    front of me.  I asked her approximately, "Well, does that mean

5    that a Levenshtein distance of 4 is the right answer?"  And she

6    declined to take a position on that.  While she tells us that

7    there are -- there is academic thinking about these problems,

8    she declined to provide actual practical solutions to any of

9    them.

10           **THE COURT:**  Any response?

11           **MR. LAZARUS:**  Your Honor, Professor Stodden did not

12   have the burden of developing a method to de-duplicate this

13   data set.  Her job was to look at what Mr. Thompson did and

14   comment on whether it was reliable or not.  She does say in her

15   report that there is no one single cookie-cutter approach that

16   will apply to all data sets.

17        And in this case, for either matching or calculating an

18   error rate, there are many different ways, many different

19   approaches that could be taken reliably within the fields of

20   data science and statistics.  Professor Stodden discusses those

21   in her report, and Mr. Thompson didn't take any of them.  But

22   what a qualified statistician would do is apply critical

23   thinking and say, "What method is appropriate here?"  Mr.

24   Thompson didn't do that.

25        And then just quickly on the sealing point, with Your

1     Honor's order yesterday generally denying Plaintiffs' request

2     to seal the hearing, my understanding was that on this Daubert

3     motion, we need to be discussing his methods, what he did in

4     this case, and so I did not -- we don't understand those to be

5     genuinely proprietary.  So I did not mean to say anything that

6     was --

7              THE COURT:  I haven't heard anything that I think is

8     proprietary.

9         Let me just pause, because we've been going at this now

10    for over an hour, and ask the court reporter to stop typing and

11    let me know how long of a break she'd like.

12             THE REPORTER:  Ten minutes is okay.

13             THE COURTROOM DEPUTY:  Ten minutes, Your Honor.

14             THE COURT:  Okay.  Where is -- we're going to take a

15    break here at any moment.

16        But where is the best statement of his methodology that

17    you somehow think is proprietary?  Where is it in the report?

18             MR. BURT:  Your Honor, the best statement of his

19    methodology is actually in the declaration.  It expands

20    somewhat by breaking out the steps differently.

21             THE COURT:  I really didn't see anything proprietary

22    in the declaration.  So can you tell me from your

23    perspective -- I'll pull up his declaration.

24             MR. BURT:  Well, first, Your Honor --

25             THE COURT:  So and I'm looking at the March 7th

```
 1    declaration, correct?  That's the declaration you're talking

 2    about?  Can you tell me what paragraphs, just by number, you

 3    consider to be confidential and proprietary trade secrets?

 4         MR. BURT:  Your Honor, I was not looking at the March

 5    declaration.  I was looking at the September 2nd, 2025,

 6    declaration, which, as I said that's -- and so the paragraphs

 7    that I'm looking at are 18 and 19.  We had cast a somewhat --

 8    I'm sorry.  18, 19, and 25.

 9       We had cast a somewhat broader net than that before, but I

10    understand the Court's direction.

11         THE COURT:  We'll stand in recess until 3:30.

12         THE COURTROOM DEPUTY:  Court is in recess.

13       (Recess taken.)

14         THE COURT:  Okay.  We're back on the record.  You may

15    be seated.  The record will reflect that the parties are

16    present.

17       Let's move on.  In part two here -- you can be seated,

18    gentlemen --

19         MR. LAZARUS:  Thank you.

20         THE COURT:  -- at this point.

21       In part two, I am going to give limited time -- well, or

22    we -- you know, you've got the time for the rest of everything

23    else.

24       What I will resolve first is the issue with Thompson.  And

25    I will get an order out on that sooner rather than later.  If
```

1    the Daubert is granted on Thompson and I decide to de-certify

2    the class, then I can get to the other things later.  I suspect

3    if I de-certify under Rule 23, the plaintiffs would prefer to

4    take that to the Court of Appeal than to try a case with four

5    individuals.

6         Am I right?

7         **MR. RIFKIN:**  Your Honor, I suspect that is what we

8    would intend to do.

9         **THE COURT:**  And the reason that -- I mean, that makes

10   sense to me, which is why I want to make a decision on that

11   part.  You all have trial filings that are going to be due

12   under my standing order within the next few weeks.  You need to

13   be exchanging exhibits and getting that all of those issues

14   done in order to meet the trial date.

15        When you asked me to extend the schedule for you, I told

16   you explicitly that you were going to have to parallel track if

17   necessary.  So it seems to me that's the most important thing

18   for me to resolve, even if I resolve the other things later.

19   So that's why I wanted part one to be focused on those issues.

20        So let's move to part two.

21        **MS. RICHMAN:**  Your Honor, if I may just add,

22   consistent with that, notice is scheduled to start on November

23   6th.  Notice has not gone out yet to the class, and it's

24   scheduled to start on November 6th.

25        **THE COURT:**  Okay.  Thank you.

1          **MR. RIFKIN:**  Your Honor, before we move on to the

2     second part, recognizing the importance of the Thompson issue

3     both in the court's mind, and frankly, as the parties briefs

4     all these motions, I just want to make sure that we're clear on

5     what Mr. Thompson did and how Apple was able to review it

6     because this may not have come through during the earlier part

7     of the session, so if I may take just one moment and see if I

8     can explain it.

9          Mr. Thompson worked on an air-gap computer.  Your Honor

10    may recall there was a lot of back and forth on this.  And the

11    methodology that he used is the methodology that claims

12    administrators and others in the profession of de-duplicating

13    records use, which is to identify --

14          **THE COURT:**  So --

15          **MR. RIFKIN:**  -- a series -- I'll be very brief, if

16    I --

17          **THE COURT:**  Okay.  Because I just reread his

18    declaration, and he explains.  Your colleague gave me the

19    paragraphs, so I went and reread it.

20          **MR. RIFKIN:**  Just very briefly, he goes through a

21    series of steps where he identifies matching logic at each

22    step, and at each step, the computer will then compare all of

23    the records to determine whether they match and don't match.

24    And in each sequential step, fewer and fewer and fewer records

25    will survive because they start to get coalesced.  Like, think

1    of it as a funnel.  And that's recorded in the air-gap computer

2    that Mr. Thompson worked on in Seattle.

3        Professor Stodden had access to that as well as a detailed

4    README file that Mr. Thompson prepared showing the steps that

5    he went through.  And what is proprietary and what we've tried

6    to be sensitive to, because it's their business, is the

7    sequence of steps that he goes through because not everyone

8    uses the same sequence of steps to identify matching records,

9    reduce the number, identify matching records, reduce the

10   number, so on and so forth.

11       And in that way, he's not doing the work statistically.

12   He's doing the work record by record by record.  And in each

13   step along the way, he's able to apply the next sequence of

14   matching logic in the manner in which he has been doing it for

15   the past 20-some years to coalesce that field until he reaches

16   the point where the application of yet another matching logic

17   does not significantly reduce the records at all.

18       So he reduces, he reduces, he reduces, he reduces, he

19   reduces, and the change diminishes until he gets to the point

20   where there's no more change when he applies the next

21   sequential step in the matching logic.  Professor Stodden saw

22   that she had all of that, and the error that she found, the Kim

23   error that she found, is the only error that she's identified.

24       I want to be clear about just a couple things.  The King

25   Salmon Alaska problem is not a mistake in the matching logic.

1    It's not an error in Mr. Thompson's methodology, or even in his

2    outcome.

3        Professor Stodden never says that those transactions are

4    fraudulent.  She never says that those account holders are

5    fraudulent.  The only thing we can say, the only thing a

6    statistician is qualified to say, is that they look suspicious.

7    But that doesn't mean that those people who actually bought

8    those apps and made those in-app purchases should be

9    disqualified from class membership.

10        That's the problem with applying statistics to a different

11    kind of problem that is more readily solved by the kind of

12    step-by-step, line-by-line, record-by-record matching that Mr.

13    Thompson did.  When Professor Stodden was asked if she could

14    identify a statistical methodology that would solve this

15    problem better than Mr. Thompson's methodology, she was unable

16    to do that.

17        So we're all quibbling here about the fact that he was not

18    a statistician, but we don't know, and Apple hasn't shown --

19    and in fact, to the contrary, we don't believe it to be the

20    case that statistics would apply and resolve the problem of

21    matching, of de-duplicating payors better than Mr. Thompson.

22        And when Mr. Burt said we know that if we take that

23    de-duplication effort out of the process altogether, we have a

24    99.9 percent overlap.  And he says that's a proxy for an error

25    rate.  What we mean to say is we believe that we've gotten this

1    right at a level of 99.9 percent accuracy, and no one -- not

2    Apple and its counsel, not Professor Stodden, no one -- has

3    identified more errors, and no one has identified a better way

4    to do it.

5        We understand that this is important to the Court, because

6    at the end of the day, the Court needs to be satisfied that

7    we've identified the right people.  We can't, and no

8    statistician can, identify the right people with a hundred

9    percent accuracy and a hundred percent certainty.

10            **THE COURT:**  You understand that I'm not asking for a

11   hundred percent?

12            **MR. RIFKIN:**  I do know that.

13            **THE COURT:**  But?

14            **MR. RIFKIN:**  But we don't know anything other than the

15   fact that there are 20 -- I'm sorry.

16       There are a very discrete number of Kims who may not be

17   the same person but who Mr. Thompson believes is the same

18   person.  That's the only error we know about, the only error we

19   know about.

20            **THE COURT:**  I'm assuming you want to respond?

21            **MR. LAZARUS:**  Thank you, Your Honor.

22       On the last point that the Kim error is the only error,

23   that is simply false.  Professor Stodden has walked through a

24   number of errors, which even that list is not exhaustive.  It

25   is a list of examples that represent, that reflect, the flaws

1    in Mr. Thompson's methodology that she has identified.

2        **THE COURT:**  I mean, so just to be -- wouldn't the same

3    problem exist if the last name was Jones or Smith or any common

4    name?

5        **MR. LAZARUS:**  The similar errors --

6        **THE COURT:**  We're not.

7        **MR. LAZARUS:**  Yes, Your Honor.  This is not --

8    Professor Stodden says in her report these are not the only

9    errors I saw.  This is just an example of this kind of error

10   that results from this flaw in his methodology.

11       **MR. RIFKIN:**  Your Honor, Kim is the first name, not

12   the last name.  It's Kim somebody.  The genesis of --

13       **THE COURT:**  How about Taylor --

14       **MR. RIFKIN:**  If Taylor --

15       **THE COURT:**  How about Taylor Swift versus Justin

16   Taylor?

17       **MR. RIFKIN:**  It would not be a problem.  It would not

18   be a problem.  The match -- and let me see if I can explain

19   this.  The matching logic --

20       **THE COURT:**  My only point is Kim can't be the only

21   name that fits into this category.

22       **MR. RIFKIN:**  That is correct.

23       **THE COURT:**  So that --

24       **MR. RIFKIN:**  That is certainly --

25       **THE COURT:**  -- means it is not the only time the

1    problem arises.

2         **MR. RIFKIN:**  We are aware of that, but we're not

3    explaining this clearly, and I want to make sure that I can.

4    There's no way to avoid that problem.

5         **THE COURT:**  The reason I'm asking the question is

6    because you stand there and you say there is one error.  I

7    don't understand what Apple is saying to be saying that there's

8    one error.  What I hear them saying is that we've identified an

9    error that is an example of the kinds of errors that exist.

10   And if the it happened in -- for that group, it is logical that

11   it would have happened in other similarly situated --

12        **MR. RIFKIN:**  It is certainly possible that there was a

13   similar first name match that misidentified people who were not

14   the same person, misidentified them as one person.  But -- this

15   is a big but -- the fault here is not ours.  The fault here is

16   that we were not given the tools that we needed to avoid the

17   Kim problem altogether.  Let me be clear about that.  Apple did

18   not give us --

19        **THE COURT:**  No.  You chose an approach.  You chose an

20   approach that has never been chosen because this man has never

21   done this for a trial.  So I will go back, and I will read, and

22   I will determine whether --

23        **MR. RIFKIN:**  Please --

24        **THE COURT:**  -- it passes, whether it passes muster.

25        **MR. RIFKIN:**  Please bear in mind, Your Honor, that

```
 1        that if we had either full credit card numbers --

 2                THE COURT:  You did.

 3                MR. RIFKIN:  We did not.

 4                THE COURT:  You did.  You didn't know it.

 5                MR. RIFKIN:  Well, that's the same -- that's the

 6        functional equivalent of not having it.  If you're told you

 7        don't have them, and if you're --

 8                THE COURT:  What dockets do I look at for that

 9        representation, on both sides?

10                MR. RIFKIN:  Just a moment, Your Honor, and I'll

11        provide it.

12                THE COURT:  Well, just get them to me at some point.

13        I don't want to wait.

14                MR. RIFKIN:  We will, Your Honor.  If we had -- if we

15        knew we had full credit card numbers or we knew we had full

16        phone numbers, the problem would have gone away.

17            And by the way, the phone number that Kim used is a common

18        phone number that I can assure the Court was familiar to Apple.

19        You know because you've read the papers.  You know why that is

20        that it's familiar to Apple.  It's a common phone number that

21        Apple had but we didn't have.

22            Apple gave us a list of bogus phone numbers because they

23        knew that the consumers used --

24                THE COURT:  I understand.

25                MR. RIFKIN:  -- not their real phone number.
```

1           **THE COURT:**  Right.  Anything --

2           **MR. RIFKIN:**  Okay.  This was not among them.  The Kim

3    numbers were not among them.

4           **MR. LAZARUS:**  Your Honor, if I could just respond to a

5    few points that, first of all, you asked earlier Mr. Burt to

6    identify the paragraphs in Mr. Thompson's recent declaration

7    that identify his methodology that are proprietary, and he

8    identified paragraphs 18, 19, and 25.

9           There is no methodology in those paragraphs.  There is a

10   list of fields that he used to match.  There is no reasoning

11   given for why he used those, why they would be reliable to

12   identify actual human beings.

13          We've heard, again, the point that Professor Stodden did

14   not propose an approach that could answer the question that was

15   put to Mr. Thompson.  She discusses in her report how data

16   scientists and statisticians approach these problems.  There is

17   not one cookie-cutter approach.  You have to think about the

18   actual problem, which Mr. Thompson didn't do.  He -- as

19   Plaintiffs say, he applied the method he's been using for

20   20-plus years.

21          I did want to say that the privacy protections in terms of

22   the hashing of the phone numbers, the hashing of the credit

23   card numbers, and the storage of the data in an air-gapped

24   room -- those were all either stipulated to by Plaintiffs or

25   presented to Plaintiffs in the sample data that they did not

1    object to.  So I'll pause there, Your Honor.  I know we're

2    short on time.

3         **THE COURT:**  Let's --

4         **MR. RIFKIN:**  Your Honor, did you want to know the

5    location of that information about the --

6         **THE COURT:**  Sure.

7         **MR. RIFKIN:**  It's in the -- Mr. Thompson's

8    declaration.  It's one page.  I'm sorry.  It's in the

9    opposition to Apple's Daubert motion, and it's Exhibit 95,

10   which is the payor data dictionary, and it's identified in

11   Exhibit 96 as the payor sample data.  It's described by Mr.

12   Thompson as hash, underscore, hashed.

13        **MR. LAZARUS:**  I believe we're not reading --

14        **MR. RIFKIN:**  I'm on page 5 of the reply, of the

15   response to your Daubert motion, and that's where we set forth

16   what we were told about the hash values.

17        **THE COURT:**  So I was asking for something where I

18   could actually --

19        **MR. RIFKIN:**  Okay.  We --

20        **THE COURT:**  -- where I could verify representations

21   that are being made, namely, the docket where you asked for

22   this information in front of Judge Hixson, where Apple refused

23   to give you that information, and then the date that Apple

24   claims it did give the information.

25        And I take it, generally speaking, there are cover

 1    letters.  Did the cover letter that accompanied the data or

 2    whatever not have that information?

 3            MR. RIFKIN:  Your Honor, rather than burden the Court

 4    with us putting that together now and rather than taking the

 5    time to do it, may we submit a brief supplemental submission on

 6    this --

 7            THE COURT:  You can --

 8            MR. RIFKIN:  -- providing that information?

 9            THE COURT:  -- jointly do it within 48 hours, not to

10    exceed two pages.

11            MR. RIFKIN:  Thank you, Your Honor.

12            MR. LAZARUS:  And to be clear, Your Honor's question

13    is about the credit card numbers?

14            THE COURT:  Correct.

15            MR. LAZARUS:  Okay.  Credit card numbers only.

16            THE COURT:  Correct.

17            MR. LAZARUS:  Thank you, Your Honor.

18            MR. RIFKIN:  And the phone numbers, Your Honor.  It's

19    the same problem.  The credit card numbers and the phone

20    numbers are the same problem.

21            THE COURT:  Okay.

22            MR. RIFKIN:  Thank you.

23            THE COURT:  Who wants to go next?  Mr. Swanson's

24    champing at the bit.

25            MR. SWANSON:  Wait until you hear what I have to say,

1    Your Honor.  I may not be champing too much.

2         Just to round out our Dauberts, the other Daubert we have

3    is directed at Professor McCormack's opinions, and we are happy

4    to submit on the briefs on that motion, Your Honor, unless you

5    have questions.  Or I'm happy to respond if they want to argue

6    it.

7         **MR. BURT:**  If the Court has questions, I'll address.

8         **THE COURT:**  Nope.  That's fine.

9    All right.  Who else wants to be heard?

10        **MR. SWANSON:**  I think that would -- at least for the

11   Dauberts, we're going to finish those.  That would be their

12   motions.

13        **THE COURT:**  Does anybody else wish to be heard?

14        **MR. WEBSTER:**  Your Honor, Jim Webster for the

15   plaintiffs.  As for our Daubert motions, unless the Court has

16   questions, we're happy to submit on the briefs as well.

17        **THE COURT:**  Not right now.

18   Okay.  So summary judgment.  Does anybody want to be

19   heard?

20        **MR. SWANSON:**  On the summary judgment, Your Honor,

21   again, we think it's all well-briefed.  The only issue --

22        **THE COURT:**  Go ahead.

23        **MR. SWANSON:**  -- I'd like to address is the one that

24   came up earlier with respect to named plaintiff, Mr. Hayter's,

25   damages.

1        Dr. Song never quantified the supposed damages of the

2   named plaintiffs.  He didn't do it in his opening merits

3   report.  He didn't do it in his rebuttal merits report.

4        In our summary judgment motion, we --

5            THE COURT:  Mr. Swanson, for any of the named

6   plaintiffs?

7            MR. SWANSON:  Any of the named plaintiffs.

8        So we took Mr. Hayter as our example.  In our motion for

9   summary judgment, we had Professor Prince in his rebuttal

10   report, paragraph 38.  That's Docket 1052-23.  And he ran the

11   model as to Mr. Hayter.  Mr. Hayter has fewer transactions,

12   very easy to do.  And Mr. Hayter not only has no overcharge,

13   he's actually worse off in the but-for world, according to

14   Professor McFadden's model and Dr. Song's calculation.

15        Now, the plaintiffs only responded to that in a footnote

16   in their opposition to our summary judgment motion.  They

17   attached a declaration at that point after all the merits in

18   the rebuttal reports were in, of Dr. Song, who said -- so we

19   think, as with the other late Song expert opinions, this one

20   should be stricken as well.

21        But what Dr. Song said was that well, if we assume price

22   tiers are legal, then Mr. Hayter is injured.  That makes no

23   sense because, as Professor Prince showed, when all of the

24   conduct that they challenge is assumed to be unlawful, the

25   damage model says he's not injured.  So the only time,

1    according to that model, he's injured is when you then assume

2    that price tiers are legal, and that's a Comcast problem.

3         If the only difference between those two calculations,

4    which makes the damages flip from no overcharge to overcharge

5    because you're now assuming price tiers are legal, then that is

6    whatever that model says.

7              **THE COURT:**  So --

8              **MR. SWANSON:**  They say it's an overcharge.

9              **THE COURT:**  -- why don't we have damages numbers for

10   each of these plaintiffs?

11             **MR. FREDERICK:**  Because we haven't gotten the names.

12             **THE COURT:**  For the named plaintiff.

13             **MR. FREDERICK:**  Correct, Your Honor.  The data, as I

14   understand it, has not been disclosed to the plaintiffs, which

15   is part of the problem that we've been spending the last hour

16   and a half on.

17        On the Song declaration, it is true that in one scenario,

18   he does not sustain damages.  In a different scenario, he does.

19   The question is as a matter of undisputed fact, can you grant

20   summary judgment as to the one individual, and we submit that

21   that is an incorrect application of the law.

22        If Apple wants to make --

23             **THE COURT:**  Why didn't Apple identify the data

24   relative to the named plaintiffs?

25             **MR. SWANSON:**  We just used -- we asked them in

1    discovery to identify those plaintiffs' data.  That's what we

2    used to calculate the damages.  We didn't go in and search for

3    anything that we didn't have.

4            **THE COURT:**  We have four named plaintiffs.

5            **MR. SWANSON:**  Right.

6            **THE COURT:**  They have to get on the stand and testify.

7    Did you associate their names with the data and give it to the

8    plaintiffs?

9            **MR. SWANSON:**  We took the data they gave us.  We asked

10   them, "Please tell us which accounts," because we didn't want

11   to root around in the data, especially, obviously, given that

12   the way that Mr. Thompson has dealt with it, it's generally not

13   possible to do it like with Rob and Robert.  So we just took

14   the data they gave us.  And Professor --

15           **THE COURT:**  They identified the accounts --

16           **MR. SWANSON:**  Yes -- -

17           **THE COURT:**  -- of their clients?

18           **MR. SWANSON:**  Yes.

19           **THE COURT:**  And you identified the accounts of your

20   clients, and you couldn't run the model as to them?

21           **MR. FREDERICK:**  Your Honor --

22           **THE COURT:**  Just yes or no before you explain.

23           **MR. FREDERICK:**  I don't know the answer to that.

24           **THE COURT:**  How can you not know the answer?

25           **MR. FREDERICK:**  Because I didn't do that analysis.  I

 1    personally did not do that analysis.

 2            **THE COURT:**  On the plaintiffs' side, I've got ten

 3    lawyers --

 4            **MR. FREDERICK:**  Your Honor --

 5            **THE COURT:**  -- over there.

 6            **MR. FREDERICK:** -- they didn't move for summary

 7    judgment as to those three.  They only moved as to Mr. Hayter.

 8    I think this is --

 9            **THE COURT:**  You're objecting on the grounds that they

10    didn't give you the data, and yet you had it.

11            **MR. FREDERICK:**  Do we have someone who can address

12    this?

13            **MR. RIFKIN:**  Yes.  I'm happy to, Your Honor.

14        The reason for it is this:  Dr. Song computed the damages

15    for the entire database.  He didn't compute the damages for any

16    one individual.

17            **THE COURT:**  You have four named -- Mr. Rifkin, how

18    many class action trials have you tried?

19            **MR. RIFKIN:**  Four, Your Honor.  Four.

20            **THE COURT:**  And did you not have named plaintiffs on

21    the stand who talked about their damages?

22            **MR. RIFKIN:**  No, Your Honor.  We had named plaintiffs

23    who talked about their purchases.  None of them talked about

24    their damages.  If you want to ask me if --

25            **THE COURT:**  Did they --

```
1              MR. RIFKIN:  -- the named plaintiffs are going to come

2     in and say, "I had an iPhone.  I had an iPad.  I bought apps.

3     I bought in-app content."  The answer to all of those questions

4     is yes, yes, yes, and yes.

5              THE COURT:  And damages relative to them?  You're not

6     asking for --

7              MR. RIFKIN:  They will not be asked to testify as to

8     their damages.

9              THE COURT:  That wasn't my question.

10             MR. RIFKIN:  I'm sorry.  I misheard.  I thought you

11    asked if I was going to have the named plaintiffs testify as to

12    their damages.

13             THE COURT:  Someone.  Isn't someone going to testify

14    as to the damages of the actual named plaintiffs?

15             MR. RIFKIN:  No, Your Honor, it's not our intention to

16    do that.

17             THE COURT:  How can you have -- how can you establish

18    injury, which -- Article III injury.  How can you establish

19    that without a reference to damages by the named plaintiffs?

20             MR. RIFKIN:  Your Honor, the named plaintiffs are

21    members of the class, and all of them will have been damaged by

22    the same conduct.  It turns out that all three of them --

23             THE COURT:  That's the point.

24             MR. RIFKIN:  Sorry.  Three of the four of them have

25    been damaged under any scenario, and one of them has been
```

1    damaged under one scenario.

2        If it's necessary -- if Your Honor believes it's necessary

3    to have Dr. Song calculate the damages for those plaintiffs,

4    then Dr. Song needs to know that -- what accounts those

5    plaintiffs had and what transactions are associated with it

6    because he does not have that information now because Apple

7    didn't give it to him.

8            **THE COURT:**  Apple -- he has --

9            **MR. RIFKIN:**  When Apple --

10           **THE COURT:**  -- the accounts?

11           **MR. RIFKIN:**  -- delivered them -- of course.

12           **THE COURT:**  Right, because it's your client.

13           **MR. RIFKIN:**  Of course.

14           **THE COURT:**  Your client knows what accounts they have.

15           **MR. RIFKIN:**  Of course.

16           **MR. SWANSON:**  And Your Honor, can I give you a

17    citation?

18           **THE COURT:**  So your clients know what accounts they

19    have, correct?

20           **MR. RIFKIN:**  Yes.

21           **THE COURT:**  So Apple doesn't have to give you your own

22    clients' information.  You already have that information.  It's

23    your client.

24           **MR. RIFKIN:**  We have that information, yes.

25           **THE COURT:**  But you just said a moment ago you

1    couldn't because you're waiting for Apple.

2          **MR. RIFKIN:**  No, no, no.

3          **THE COURT:**  To foot the bill.

4          **MR. RIFKIN:**  And I'm sorry if I confused the Court.

5    Again, I apologize.

6        Dr. Song calculated aggregate damages.  The plaintiffs

7    will testify as to their membership in the class.  Dr. Song is

8    not going to testify as to any individual class members'

9    damages, but if the Court requires us to testify as to named

10   plaintiffs' damages, he can extract that information the same

11   way Apple did.

12       It's there.  It's in the records.  He hasn't taken that

13   step because he was asked to compute damages on a class-wide

14   basis.  That's the answer to the question.  Every one of these

15   plaintiffs will identify their transactions.

16         **THE COURT:**  The problem --

17         **MR. RIFKIN:**  They will identify their accounts.

18         **THE COURT:**  The problem is that when you have a model

19   that has to be run in order to determine whether any particular

20   person has been harmed versus not harmed, it is inconceivable

21   to me that you did not know that you had to run that for your

22   own named plaintiff clients.

23         **MR. RIFKIN:**  Well, he has done it.  He just doesn't

24   know which -- and the reason for it is this:  He knows that a

25   payor -- by a value.  It's not a real name.  This is Dr. Song.

1    He knows the value.  If we -- if we knew the value that was

2    associated with that name, we could tell him, and he could say,

3    "Here's the damages."

4        But to have him go back and run the model again just for

5    these -- to extract the damages for those accounts, I suppose

6    he can do it, and if the Court believes it's necessary for him

7    to identify individual damages, he can do it the same way Apple

8    did it.

9        That's how they know Mr. Hayter has damages one way but

10   not another way, because we gave it to them both ways.  That's

11   how they know that all the other plaintiffs had damages both

12   ways, or surely they would have raised this issue as to the

13   other three plaintiffs.

14        **MR. FREDERICK:**  They didn't move for summary judgment

15   as to the other three, Your Honor.

16        **THE COURT:**  I agree.

17        **MR. FREDERICK:**  They only moved as to Mr. Hayter.  And

18   so I think that, coming to you now, the issue --

19        **THE COURT:**  There is -- I agree.  There is no motion

20   in front of me, but it is inconceivable to me that you all

21   didn't think that you had to run it as to your own clients.

22        **MR. FREDERICK:**  I think that, Your Honor, the question

23   is are these representative plaintiffs.

24        **THE COURT:**  Right, and if --

25        **MR. FREDERICK:**  If they are --

1          **THE COURT:**  -- they have no damage --

2          **MR. FREDERICK:**  But we know that three of them did

3    because they didn't move for summary judgment as to them.

4          **THE COURT:**  No.  You know, I don't want this to have

5    -- understand that in 2016 -- when was it?  When I tried the

6    Apple iPod --

7          **MR. SWANSON:**  2015, I think.

8          **THE COURT:**  When I tried that case, we were in the

9    middle of trial when we found out the named plaintiffs had no

10   damage.

11         **MR. FREDERICK:**  I understand, Your Honor.

12         **THE COURT:**  And I am not about to go into trial again

13   with plaintiffs who may not have damage.

14         **MR. FREDERICK:**  I understand, but what I'm submitting

15   to you, Your Honor, is that today, Apple had every incentive to

16   come to you --

17         **THE COURT:**  I'm just shocked.

18         **MR. FREDERICK:**  -- and say, "We've run all four of

19   them, and none of them have damages," and they have not made

20   that argument.  So Apple knows that three of the --

21         **THE COURT:**  I don't know those.  It's your

22   responsibility to your clients.  I'm just saying -- the reason

23   I'm mentioning this is because I'm shocked.

24         **MR. FREDERICK:**  Well, Your Honor, the question before

25   you is are there disputed issues of fact, and I categorically

1    declare that there are, because Apple has not put into issue --

2        **THE COURT:**  I hear you.

3        **MR. FREDERICK:**  It's their burden at summary judgment

4    to show that there are no disputes of fact.

5        **THE COURT:**  I agree.  It's just remarkable.  All

6    right.

7        **MR. SWANSON:**  Could I just give you the citation, Your

8    Honor?  It's Docket 1003-56.  That's the correspondence with

9    Plaintiffs where we identified to them the plaintiffs' account

10   IDs based on the email addresses they gave us.  So that's what

11   we all had.

12       Yeah.  We haven't looked at this the way Mr. Thompson has

13   because that's a mess, the Rob, Robert, so.

14       **THE COURT:**  Okay.  So just on, so that you know -- in

15   terms of most of the grounds that Apple has brought for summary

16   judgment, I tend not to agree with you.  That is from what I

17   can tell, you are really quibbling with the -- with evidentiary

18   issues.

19       That goes to weight, not admissibility.  The view that

20   they have to disaggregate, I don't agree with you on that.  I

21   don't think that they have to disaggregate.  So the argument's

22   been made.  You'll probably lose on that.

23       And then some of this, for instance, anti-steering, that's

24   out.  I already said it was out the last time when you tried to

25   amend your complaint to include that kind of evidence.  It's

1    never been in the complaint.  It will not come into this trial.

2    It is a total, you know, tagalong from Epic Games versus Apple,

3    and it doesn't come in.

4        That being said, it doesn't mean that you get summary

5    judgment.  All it means is that they have less evidence to

6    prove their case on a preponderance standard.  And I don't

7    think that the law says that they have to identify how much any

8    particular issue may have impacted the allegations or the

9    allegations of monopolization.

10       So I'll deal with that if we get there, but most of these

11   issues, I don't agree with the approach.  So you can argue, if

12   you want, generically.

13           **MR. SWANSON:**  I think, consistent with your prior

14   point, Your Honor, we're -- we can agree to disagree without

15   prolonging today.  I think we set our arguments out.  I think

16   we made our arguments about refusal to deal, product design,

17   one-sided versus two-sided markets.  All of those things, I

18   think, are not issues about evidence.  But in any event,

19   we've --

20           **THE COURT:**  I will say on the one-sided versus

21   two-sided that I do agree with you, and I disagree with

22   plaintiffs on this issue.  This is a two-sided market, as a

23   matter of law, and I will not let you argue something else to

24   the jury.  And again, if we get to that point, I'll lay it out,

25   and you can be heard on that if you want.

1          **MR. FREDERICK:**  Your Honor, the arguments that I would

2    make is that we don't disagree that it is a two-sided market.

3    The question is whether the relevant market for purposes of

4    consumer harm is on one side of the market.  And we've shown,

5    and we've got evidence from several of the experts, that the

6    market as a whole has suffered anticompetitive harm.

7          We have quantified and focused on it on one side of the

8    market, which is a Kodak classic aftermarket brand product

9    theory.  And I would say --

10          **THE COURT:**  It is odd that your expert somehow

11    equivocated repeatedly about the nature of the market.  I mean,

12    I read the deposition transcript, and it's -- he certainly did

13    not make the argument that you're standing there making.

14          **MR. FREDERICK:**  I think he did.  When he defined the

15    market -- and I'm referring to Professor Stiglitz, and this is

16    at his report on page 23, Docket 105-2-27 --

17          **THE COURT:**  I was looking at his deposition at 289, 16

18    to 290, line 7, where he says he would encourage the judge not

19    to get bogged down on to taxon --

20          **MR. FREDERICK:**  Taxonomy?

21          **THE COURT:**  Yes.  Thank you.

22          And into this kind of linguistic torture but to look at

23    the economics, et cetera.  And he didn't apparently do a deep

24    dive onto the other side, which is fine, but I am not going to

25    let anybody argue -- you may argue that you're seeing the

1    effects on one side, but to claim, after plenty of circuits

2    have indicated that these kinds of transactions exist on a

3    two-sided market, I think it would be legal error for me to

4    allow that to --

5             MR. FREDERICK:  Well, let me --

6             THE COURT:  To go in.

7             MR. FREDERICK:  Well, let me take a stab at that

8    because the Ninth Circuit has held twice that Amex creates a

9    fact question in which you look at the facts underlying the

10   market.  So it is a fact question.  It is not a summary

11   judgment question.

12        Point two, Professor Stiglitz says that when you look at

13   the developer side of the market, that is harmed by a lack of

14   competition because Apple has monopolized the distribution

15   services.  So he has looked at the market as a whole.

16        McFadden has quantified the damages that are to be

17   allocated and apportioned between the developer group and the

18   consumer group.  And we are obviously suing on behalf of the

19   consumers, and so the damages that we would present would be

20   that part allocable to the consumers.

21        So it's simply not correct to say that we haven't

22   presented the two sides of the market.  We dispute that it is

23   not like a credit card in the American Express sense for a

24   couple of reasons:  Number one, it's not a simultaneous

25   transaction between the consumer and the developer.  Apple

1    stands as an intermediary a hundred percent of the time,

2    precludes any relationship between the consumer and the

3    developer.

4        And so those two aspects of the American Express test are

5    not satisfied here as a factual matter.  And so there's a lot

6    of confusion about how you think about a two-sided market and

7    even, in fact, as Professor Stiglitz says, whether a grocery

8    store is a two-sided market, because an orange grower has to

9    have a market to sell to a grocery store, who then sells to an

10   individual.

11       **THE COURT:**  I'm going to tell you, you lose if that's

12   the kind of argument he's going to make to a jury.  When --

13   so --

14       **MR. FREDERICK:**  Well, I don't think so, because if you

15   look at the developer agreement, the developer agreement

16   creates no simultaneity between the consumer who downloads the

17   app or the in-app purchase and the payment that goes to the

18   developer.  In fact, the developer agreement creates a huge

19   time lag between that payment is happening.

20       Moreover, unlike a credit card, where there is a

21   relationship that gets developed between the person who gives

22   the credit card and the payment to the retailer, that is not

23   what is happening through the app store.

24       What is happening through the app store is that on one

25   side of this transaction, the developer gives over software to

1    the app store and never is allowed to communicate with the

2    consumer who gets the download.

3        And for those reasons, you might think of it as being

4    two-sided, but it's certainly not two-sided in the American

5    Express sense.

6        **MR. LAZARUS:**  I'm not quite sure where to start, but I

7    know I should be short.

8        Two things.  One is, why are we here?  We're here because

9    they told the Supreme Court on a pleading basis it's a

10    one-sided market.  Apple sells IOS apps to consumers in a

11    direct transaction.  Developers are wholesalers.  That is not a

12    two-sided market.

13        They just equivocate and double-speak, and they've got

14    Professor Stiglitz, who managed to get the same testimony in

15    the Sabre case, which was reversed by the Second Circuit.  It's

16    a guaranteed reversal if he testifies to this stuff again.

17    One-sided market, but there's injury on both sides, no indirect

18    network effects.  All of this stuff, Second Circuit said, "This

19    man is struggling with the law.  He's now creating issues of

20    fact."

21        But we're here because they're afraid to say flat-out or

22    have an expert who will say this is a two-sided market because

23    they're standing because they said it was a one-sided market to

24    the Supreme Court on the pleadings.

25        We're at the point where reality governs.  The undisputed

1    facts show this is a two-sided transaction platform and,

2    therefore, a two-sided transaction market.  They say both sides

3    of the market.  Which market?  Is it a game transaction

4    two-sided market?  Is it a video streaming two-sided

5    transaction market?

6         They haven't looked -- Stiglitz hasn't looked at the

7    developer options.  He's only looked at consumers in an

8    undifferentiated mass, all the different transactions thrown

9    together.  They can't just all of a sudden turn that into a

10   market, which now happens to be two-sided, and then say, "Oh,

11   there's injury on both sides, so you don't have to worry about

12   redefining the market in the first place."

13        **MR. FREDERICK:**  Well, Your Honor, there are jury

14   instructions that are helpful in this regard, and they are from

15   the Epic Games --

16        **THE COURT:**  I'm not --

17        **MR. FREDERICK:**  -- versus Google.

18        **THE COURT:**  -- going to ignore the Ninth Circuit's

19   decisions in the Epic Games cases.  They've already said it's a

20   two-sided market.

21        **MR. FREDERICK:**  Your Honor, we have standing because

22   we were direct purchasers from Apple.  That is why we have

23   antitrust standing, and that is what the Supreme Court held.

24   The fact that we have standing is a different question from how

25   you define the market, which is an intensely factual question

1    that has always been decided by juries and not as a matter of

2    law, which is why I think that Mr. Swanson is trying to do his

3    pivot to prevaricate about how the market gets defined.

4         Where the harm accrues to consumers is very clear, and we

5    have proved that and will prove that at trial.  The standard

6    that you apply -- and this is from Epic Games -- is whether --

7              **THE COURT:**  Which one?

8              **MR. FREDERICK:**  -- in a two-sided market --

9              **THE COURT:**  Which one?

10             **MR. FREDERICK:**  The Ninth Circuit Epic one.

11             **THE COURT:**  Which Epic Games?

12             **MR. FREDERICK:**  The appeal of the decision in this

13   court where the Court talked about --

14             **THE COURT:**  So Apple --

15             **MR. FREDERICK:**  -- the two --

16             **THE COURT:**  -- as opposed to Google.

17             **MR. FREDERICK:**  Correct.

18             **THE COURT:**  There are multiple.

19             **MR. FREDERICK:**  I understand.

20         But in the Apple Epic appeal to the Ninth Circuit where

21   the Court of appeals said that if you are saying it's

22   two-sided, evidence that there is harm to the market as a whole

23   is sufficient.  And that is how we will present the case.

24             **THE COURT:**  Anything else?

25             **MR. SWANSON:**  In the Epic versus Google Play decision,

1    the Ninth Circuit held that Android app stores have two sides,

2    intermediate transactions, and exhibit significant network

3    effects.  And that was important in looking at the issue of

4    remedies.  So the Ninth Circuit has spoken.  Obviously, you

5    were affirmed in defining a two-sided market in the Epic v.

6    Apple case.

7        The other point on juries --

8            **THE COURT:**  He asked --

9            **MR. FREDERICK:**  The second --

10           **THE COURT:**  He has an opinion both ways.  So, again, I

11   mean, he's analyzed it both as a one-sided market and a

12   two-sided market.  So, again, you don't win at summary judgment

13   when he's got two opinions.

14           **MR. SWANSON:**  So the reason why I would say we do,

15   which I know will not shock you, but he denies indirect network

16   effects, and that's exactly where he came up short in the Sabre

17   case in the Second Circuit.

18       The Second Circuit said, "You can't testify that way.  You

19   are wrong as a matter of law.  That testimony is wrong as a

20   matter of law."  So he hasn't defined it both ways because to

21   define it a two-sided way, he'd actually have to analyze it

22   conceding that inherent in a two-sided transaction platform in

23   a two-sided transaction market are indirect network effects.

24   That's what the Ninth Circuit said in Epic, Epic v. -- the

25   Google version that I just alluded to.

1            And in Sabre, the Second Circuit said -- literally it's a

2       quote -- "That is not a jury question, whether the market is

3       two-sided or not."  He hasn't given the opinion that it's

4       two-sided.  He didn't give the opinion there it was two-sided.

5       He just said it's injury on both sides of the market.  That

6       didn't save that from reversal.  And it can't, we would argue,

7       send this case to trial here and now.

8            **MR. FREDERICK:**  And we are in the Ninth Circuit, not

9       the Second Circuit, where Sabre was decided on a very different

10      factual record because the nature of those reservations that

11      went between an airline through Sabre to travel agents was the

12      kind of simultaneous transaction that arose, and the Court

13      analogized that to the credit card situation.

14           And it's true it disagreed with Professor Stiglitz.

15      They're going to get an opportunity to cross-examine him about

16      that.  They haven't made a Daubert challenge to Professor

17      Stiglitz on this point.  I think it's far afield to claim that

18      they get to get summary judgment on the basis of that kind of

19      testimony when Professor McFadden said there was harm on both

20      sides.  Professor Abrantes-Metz said there was harm on both

21      sides.

22           And the question of how you look at indirect effects is a

23      question ultimately of whether or not there's subsidization on

24      one side that is causing a change in the behavior of people on

25      the other side.  That's an intensely factual question that

1    there will be opportunities for further exploration at trial.

2         **MR. SWANSON:**  We --

3         **THE COURT:**  So there is no further explanation at

4    trial.  That is -- trial is not a time for new things to occur.

5    Trial is a time for juries to decide disputes where parties

6    cannot.

7         **MR. FREDERICK:**  Sure.

8         **THE COURT:**  And so everything should have been

9    disclosed at this time.

10         **MR. FREDERICK:**  It is, and what I'm saying further

11    explored, Your Honor, is that the explanation for why there are

12    no indirect effects here is a matter of fact.  Professor

13    Stiglitz has said he has observed no such effects.

14         **THE COURT:**  But he has to indicate why.

15         **MR. FREDERICK:**  And he --

16         **THE COURT:**  That is, he has to have it in his report.

17    He can't just make it up at trial.

18         **MR. FREDERICK:**  No, that's true, and he does.  What he

19    says is that Apple has monopolized both sides of the market and

20    that there is no evidence that there is subsidization going on

21    on either side of the market, which is what you would expect if

22    you were seeing some of these indirect effects.

23         And he said -- he goes into that at quite considerable

24    length in his report and was deposed about it.  And where he

25    says there are not strong indirect network effects, that is a

1    question ultimately of fact that goes into how you define the

2    market.

3              **THE COURT:**  Anything else?

4              **MR. SWANSON:**  And we are in the Ninth Circuit.  We are

5    in the Ninth Circuit of the Epic appeals, both of them, and as

6    I indicated, in the Google Play appeal, which the Ninth Circuit

7    just resolved, Ninth Circuit said that there are significant

8    indirect network effects that flow from app stores, and the app

9    store is an app store.

10        Secondly, we're in the United States, and the question is

11   what does the United States Supreme Court's Amex case mean.

12   The Second Circuit interpreted that in the Sabre case.  The

13   Second Circuit is, I think, not in any way, shape, or form an

14   outlier.

15        After all, the Amex case in the Supreme Court affirmed the

16   Second Circuit, and so there is nothing unusual about that

17   decision saying that indirect network effects, significant

18   indirect network effects, are an inherent aspect of transaction

19   platforms that are two-sided.

20        The market, therefore, must be defined as two-sided per

21   the Supreme Court's Amex decision, and experts aren't allowed

22   to, no matter how egregiously wrong they think Amex is like

23   Professor Stiglitz thinks, they can't create a fact issue by

24   testifying against and fighting with the law.

25              **MR. FREDERICK:**  Well, the Epic Games versus Apple

1    case -- the citation is 67 F.4th at 985 -- said, quote, "All

2    Amex held is that to establish that a practice is

3    anticompetitive in certain two-sided markets, the plaintiff

4    must establish an anticompetitive impact on the," quote,

5    "'market as a whole.'"

6        That's the Ninth Circuit interpretation that Apple is

7    fighting so hard to overcome.  I don't know how we establish

8    that unless we have facts and we have expert testimony, which

9    is what we have in this case.

10            **MR. SWANSON:**  Not fighting at all, Your Honor.  That

11    was a decision based on a determination that the market was

12    two-sided and that the app store was a two-sided transaction

13    platform.  So of course that part wasn't disputed.

14            **THE COURT:**  Anything else?

15            **MR. SWANSON:**  Not for Apple, Your Honor.

16            **MR. FREDERICK:**  We're fine.  Thanks.

17            **THE COURT:**  Okay.

18            **MR. SWANSON:**  Thank you.

19            **THE COURT:**  Any other issues you want to address here?

20    Mr. Rifkin?

21    Ms. Richman?

22            **MS. RICHMAN:**  Not for Apple, Your Honor.

23            **MR. RIFKIN:**  Nothing from the plaintiffs, Your Honor.

24            **THE COURT:**  Okay.  I'll be in touch in writing.

25            **MR. RIFKIN:**  Thank you.

1          **MS. RICHMAN:**  Thank you, Your Honor.

2          **THE COURTROOM DEPUTY:**  Court is adjourned.

3      (The proceedings concluded at 4:20 P.M.)

4                      ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2        I certify that the foregoing is a correct transcript from

 3   the record of proceedings in the above-entitled matter.

 4

 5   DATE:  October 17, 2025

 6

 7        _____

 8             April Wood Brott, CSR No. 13782

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```