# EXHIBIT 35

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
[Additional counsel on signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK** |
| | DATE:  October 14, 2025 |
| | TIME:  2:00 p.m. |
| | COURTROOM:  1, 4th Floor |
| | The Honorable Yvonne Gonzalez Rogers |

[UNREDACTED VERSION]

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    LEGAL STANDARD ........................................................................................... 2

III.   ARGUMENT ........................................................................................................ 3

   A.   Mr. Thompson's Expert Opinions Are Admissible ............................................ 3

      1.   Factual Background ................................................................................... 4

      2.   Mr. Thompson Is Well Qualified as an Expert in Data Deduplication........................... 8

      3.   Mr. Thompson's Deduplication Work Is Relevant to Assigning Transaction Overcharges to Potential Class Members ...................................................................... 12

      4.   Mr. Thompson Used Reliable Methods ........................................................................... 14

         a.   Mr. Thompson's Application of His Extensive Data Deduplication Experience Is Itself a Reliable Methodology............................................... 14

         b.   None of the *Daubert* Factors for Evaluating Scientific Opinions Justify Excluding Mr. Thompson's Deduplication Work ...................................................... 19

            i.   Mr. Thompson Adequately Disclosed His Methodology ..................................... 19

            ii.   It Is Irrelevant That Mr. Thompson's Methods Were Not Peer Reviewed or Scrutinized Within A "Scientific Community" ....................................................... 21

            iii.  Error Rate Calculations Offer No Probative Insight Into the Reliability of Mr. Thompson's Methods........................................................................................ 22

      5.   Mr. Thompson Applied His Methods Reliably............................................................... 23

         a.   Mr. Thompson Reliably Cleaned the Data ............................................................... 23

         b.   Mr. Thompson Reliably Deduplicated the Data ...................................................... 25

         c.   Mr. Thompson Reliably Validated His Results ....................................................... 27

   B.   Prof. MacCormack's Testimony Should Not Be Excluded ............................................. 28

      1.   Prof. MacCormack Used a Rich Data Array for His Field ........................................... 28

         a.   Apple Mischaracterizes Prof. MacCormack's Data and Analysis........................... 28

            i.   Prof. MacCormack's Data Was Appropriate To His Analysis ............................... 29

         b.   Apple Imposes Data Requirements of Its Own Invention ....................................... 31

         c.   Prof. MacCormack Produced Proper Inputs for the McFadden Model ................... 34

2.    Prof. MacCormack Exercised Appropriate Judgment in Grouping Genres ................. 37

IV.    CONCLUSION ........................................................................................... 39

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*360Heros, Inc. v. GoPro, Inc.*,
    569 F. Supp. 3d 198 (D. Del. 2021)......................................................................................39

*AFMS LLC v. United Parcel Serv. Co.*,
    2014 WL 12515335 (C.D. Cal. Feb. 5, 2014)......................................................................10

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
    738 F.3d 960 (9th Cir. 2013) .............................................................................3, 12, 24, 26

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019)......................................................................................................13, 14

*Arista Recs. LLC v. Lime Grp. LLC*,
    2011 WL 1674796 (S.D.N.Y. May 2, 2011) .......................................................................10

*Arriaga v. Logix Fed. Credit Union*,
    2022 WL 3052318 (C.D. Cal. Apr. 22, 2022) ....................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................................34

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
    2024 WL 5483606 (N.D. Cal. Oct. 22, 2024)........................................................19, 21, 22

*Brickman v. Fitbit, Inc.*,
    2017 WL 6209307 (N.D. Cal. Dec. 8, 2017).....................................................................20

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...............................................................................11, 26, 28

*Chartis Specialty Ins. Co. v. Queen Anne HS, LLC*,
    867 F. Supp. 2d 1111 (W.D. Wash. 2012).................................................................... 13-14

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) .........................................................................................35

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ...................................................................................... 19-20

*Collinge v. IntelliQuick Delivery, Inc.*,
    2018 WL 1088811 (D. Ariz. Jan. 9, 2018) ........................................................................34

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ........................................................................................3, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..........................................................................................3, 12, 14, 19

*DIRECTV, LLC v. Nexstar Media Grp., Inc.*,
    724 F. Supp. 3d 268 (S.D.N.Y. 2024)................................................................14

*Ellis v. Costco Wholesale Corp.*,
    285 F.R.D. 492 (N.D. Cal. 2012)............................................................... 35-36

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ...............................................3, 14, 15, 24

*Geiger v. Creative Impact Inc.*,
    2020 WL 3268675 (D. Ariz. June 17, 2020) ....................................................22

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ...........................................................................14

*In re Gold King Mine Release in San Juan Cnty., Colo., on Aug. 5, 2015*,
    2022 WL 3543470 (D.N.M. Aug. 18, 2022) ....................................................34

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...........................................20, 40

*Grodzitsky v. Am. Honda Motor Co.*,
    957 F.3d 979 (9th Cir. 2020) .............................................................................35

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) .............................................................................10

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)................................................................................... 13-14

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*,
    605 F. Supp. 3d 1295 (N.D. Cal. 2022)......................................................25, 28

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...........................................................................8, 14, 19

*Laumann v. Nat'l Hockey League*,
    117 F. Supp. 3d 299 (S.D.N.Y. 2015)...............................................................34

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...............................................................37

*Mirkin v. XOOM Energy LLC*,
    2024 WL 4143376 (E.D.N.Y. Sep. 11, 2024)...................................................38

*Narcisse v. All Ways Transp., LLC*,
    2023 WL 6544930 (M.D. La. Sept. 22, 2023)...................................................34

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)...................................................20

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016)................................................................................39

*Official Comm. of Unsecured Creditors v. CalPERS Corp. Partners, LLC*,
    2020 WL 4041483 (D. Me. July 17, 2020).................................................................34

*Open Text, S.A. v. Box, Inc.*,
    2015 WL 349197 (N.D. Cal. Jan. 23, 2015)...............................................................20

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co*,
    2019 WL 4780183 (N.D. Cal. Sept. 30, 2019), *aff'd*,
    20 F.4th 466 (9th Cir. 2021) ................................................... 4, 14-15, 19, 21, 22

*In re PFA Ins. Mkt'g Litig.*,
    2022 WL 3146557 (N.D. Cal. June 15, 2022).............................................................10

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .....................................................................................24

*In re Qualcomm Antitrust Litig.*,
    328 F.R.D. 280 (N.D. Cal. 2018)................................................................................32

*Rearden LLC v. Walt Disney Co.*,
    2021 WL 6882227 (N.D. Cal. July 12, 2021).............................................................35

*Rivera v. Equifax Info. Servs., LLC*,
    2025 WL 1185376 (N.D. Ga. Mar. 26, 2025).......................................................33, 34

*Roblox Corp. v. WowWee Grp. Ltd.*,
    2024 WL 4057418 (N.D. Cal. Sept. 3, 2024).............................................................21

*Safeco Ins. Co. of Am. v. County of San Bernardino*,
    347 F. App'x 315 (9th Cir. 2009) ..............................................................................33

*Shawnee Mission Plaza, LLC v. Noland*,
    2016 WL 7637685 (W.D. Okla. Oct. 26, 2016) .........................................................34

*Staley v. Gilead Scis., Inc.*,
    619 F. Supp. 3d 977 (N.D. Cal. 2022) .......................................................................14

*Steele v. Hosp. Corp. of Am.*,
    36 F.3d 69 (9th Cir. 1994) .........................................................................................14

*Synnex Corp. v. Axis Ins. Co.*,
    2023 WL 2530930 (N.D. Cal. Mar. 15, 2023)....................................................... 10-11

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) .................................................................................8, 10

*United States ex rel. Bergeletric Corp. v. Sauer, Inc.*,
    2020 WL 470273 (N.D. Cal. Jan. 29, 2020)........................................................ 32-33

*United States v. Garcia*,
 7 F.3d 885 (9th Cir. 1993) ...............................................................................................12

*United States v. Hankey*,
 203 F.3d 1160 (9th Cir. 2000) ..........................................................................................22

*United States v. Holguin*,
 51 F.4th 841 (9th Cir. 2022) .............................................................................................15

*United States v. Rite Aid Corp.*,
 2020 WL 3970201 (E.D. Cal. July 14, 2020) ...................................................................20

*United States v. Sandoval-Mendoza*,
 472 F.3d 645 (9th Cir. 2006) ............................................................................................39

*Victorino v. FCA US LLC*,
 2020 WL 2306609 (S.D. Cal. May 8, 2020)........................................................11, 26, 28

*Warren Distributing Co. v. Inbev USA LLC*,
 2010 WL 2179167 (D. N.J. May 28, 2010)........................................................................40

*Wasson v. Peabody Coal Co.*,
 542 F.3d 1172 (7th Cir. 2008) ..........................................................................................35

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
 445 F. Supp. 3d 508 (N.D. Cal. 2020) ..............................................................................35

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
 395 F.3d 416 (7th Cir. 2005) ............................................................................................39

*Zetz v. Boston Sci. Corp.*,
 644 F. Supp. 3d 684 (E.D. Cal. 2022)...............................................................................22

**RULES**

Fed. R. Evid. 702 ......................................................................................................3, 8, 24

Fed. R. Evid. 703 .............................................................................................................21

**OTHER MATERIALS**

29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. (2nd ed. 2017).........................34

Fed. R. Evid. 702 advisory committee's note to 2000 amendment. ...................................8, 34, 39

*Pay*, Black's Law Dictionary (12th ed. 2024) ............................................................13

*Pay*, Webster's Third New Int'l Dictionary 1659 (2002) ........................................ 13-14

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex. __ | Byrd Decl. Ex. __ |
| Payor Data Dictionary | Ex. 95 (July 10, 2024 Email from R. Lin to R. Byrd & K. Wood) |
| Payor Sample Data Prod. Ltr. | Ex. 96 (July 10, 2024 Ltr. from E. Lazarus to R. Byrd & K. Wood) |
| Song Decl. | Declaration of Minjae Song, Ph.D. In Support of Plaintiffs' Opposition to Defendant Apple Inc.'s Motion for Summary Judgment (Sept. 2, 2025) |
| Thompson Decl. | Declaration of Darryl Thompson In Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack (Sept. 2, 2025) |

## I.     INTRODUCTION

Immediately after the Court's February 2, 2024, Order certifying the Class (Dkt. 789), Plaintiffs set out to finish obtaining the two kinds of data the Court made clear Plaintiffs needed before trial to round out their common proof of damages. *First*, Plaintiffs pressed Apple to produce the data for matching potential Class members to transactions that it continued to withhold. *See* Hr'g Tr. 94:21-95:5 (June 23, 2023), Dkt. 736. *Second*, Plaintiffs concluded their three-year mission to collect app developer cost and revenue data to bolster the profit margin bounds utilized in Prof. McFadden's damages model. *See* Dkt. 630 at 10 n.8. Plaintiffs then retained two different experts to analyze those data. Apple's motion to preclude both experts from testifying fails.

The first expert is Mr. Darryl Thompson, who is the Chief Information Officer and Chief Operating Officer for JND Legal Administration, one of the country's largest legal administrators. Ex. 44 (Thompson Suppl. Rep.) ¶ 1. Plaintiffs retained him for analyses he has performed thousands of times: identify duplicate records from a raw dataset of potential Class members' personal identifying information. *Id.* ¶¶ 8-9. Here, he identified ███████ unique Apple customers from ████████████████████ *Id.* ¶¶ 11-12. Mr. Thompson's 27 years of experience as a data specialist performing data deduplication qualify him as an expert for performing that task. He has developed reliable data deduplication methods and reliably applied them to Apple's data. The only "flaws" Apple could find in his work result either from Apple's refusal to produce certain data or systemic flaws in the data it chose to produce. Ultimately, his work can and will be verified through the post-trial Class administration process (assuming Plaintiffs prevail at trial). For present purposes—estimating the number of Class members who suffered no economic damages—his work is reliable.

The second expert is Prof. Alan D. MacCormack, the Harvard Business School MBA Class of 1949 Adjunct Professor of Business Administration. Plaintiffs retained him to analyze the "more fulsome" developer cost data that the Court believed Plaintiffs needed to substantiate the profit margin bounds Prof. McFadden's model uses as an input to estimate consumer price

---

[1] Mr. Thompson's Report misstated this figure as ██████████ Thompson Decl. ¶ 40.

sensitivity.  *See* Dkt. 630 at 10 n.8; Dkt. 789 at 13-14.  Plaintiffs engaged in significant third-party discovery both before and after the Court certified the Class to obtain that data. They served nearly 250 subpoenas to more than 170 app developers seeking data concerning the costs of, and revenues generated from, developing and operating apps.   Prof. MacCormack is undisputedly an expert in software development economics, holding academic and real-world expertise in analyzing the business models of software companies—"how they develop software, how they distribute it, [and] the operations of software firms."  *See* Ex. 19 (MacCormack Dep.) at 18:2-16.  Here, Plaintiffs retained him to apply that expertise to calculate from that data "[g]enre [g]ross [m]argin[s] . . . which quantif[y] the difference between revenues and variable costs for all [app] developers within a genre . . . as a percentage of their revenue."  Ex. 32 (MacCormack Rep.) ¶ 10.  His calculations comply with Rule 702.  His genre gross margins are based on the right kind and amount of data, and he properly relied on his expert judgment in calculating them.  And Minjae Song, Ph.D., who implemented Prof. McFadden's damages model, properly used those genre gross margins "to form the variable profit margin bounds for [his] demand estimation."  Ex. 40 (Song Rep.) ¶¶ 51-52.  This is exactly what the Court understood Plaintiffs would do prior to trial.  *See* Dkt. 789 at 13.

Armed with fulsome margin bound data and the ability to assign transactions to actual Class members, Dr. Song determined that of the 243.6 million App Store customers that Mr. Thompson identified, 185.4 million qualify for Class membership.  Ex. 40 (Song Rep.) at p. 44 fig. 13.  Computing class-wide damages, transaction by transaction and ID by ID, those consumers suffered $20.4 billion in damages in the aggregate.  *Id.*   Only 5.2% of the Class incurred no measurable economic damages.  *Id.* ¶ 84.   That is a 34% reduction in the proportion of "undamaged" Class members compared to what the model predicted for undamaged Apple IDs as of February 2, 2024, based solely on Apple IDs and on only a portion of the transactional dataset.  *See* Dkt. 789 at 25.  The Court should deny Apple's motion.

## II.    LEGAL STANDARD

Trial courts are the gatekeepers of expert testimony, ensuring that all opinions are "based on sufficient facts or data," are "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  But "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022).  Instead, the court evaluates whether "the knowledge underlying [an expert's opinion] has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013).  The question "is not the correctness of the expert's conclusions but the soundness of his methodology."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility."  *Elosu*, 26 F.4th at 1024 (cleaned up).

## III.   ARGUMENT

### A.  Mr. Thompson's Expert Opinions Are Admissible

Apple's motion raises every possible *Daubert* challenge against Mr. Thompson's careful and detailed deduplication work.  None of those challenges has merit.

*First,* Mr. Thompson is a qualified expert in the field of data deduplication.  Having performed similar work thousands of times before, he is one of the most experienced experts on data deduplication efforts in the claims administration field.  Being an academic is not a *sine qua non* of expertise.  *Second*, he offers relevant and useful opinions for identifying individual Apple customers.  Apple's only contrary argument rests on a misunderstanding of the word "payor" that only Apple has adopted.  *Third*, Mr. Thompson's methodology is reliable.  Courts and litigants alike have utilized his data deduplication work for class notice and administration, and the methods he used here deploy the same ones deployed in prior engagements.  Apple's contrary arguments ignore those realities.  *Fourth*, Mr. Thompson reliably applied his methods.  Apple parades a few results it found in his work to assert the entire process was flawed, yet many of those examples are not errors at all or are so *de minimis* as to be immaterial.  "Because [Mr. Thompson] provides a sufficient basis for understanding how he reached his opinions and to show that they are supported, the requirements of Rule 702 have been satisfied."  *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021).

### 1. Factual Background

Mr. Thompson is a highly experienced expert in data deduplication. Ex. 23 (Thompson Dep.) at 57:10-13. He developed that experience over 27 years working as a data specialist: the first 13 years in the health care industry, and the last 14 in the legal administration field. He has applied that expertise in thousands of cases, and he "[p]ersonally analyzed data on [the] largest cases JND [has] administered." Ex. 44 (Thompson Suppl. Rep.) App. A.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 44 (Thompson Suppl. Rep.) ¶¶ 3-4.

Mr. Thompson's work began in the summer of 2024, as Plaintiffs sought to overcome Apple's innumerable arguments for refusing to produce the relevant data. By April 2024, Apple had agreed to "produce data sufficient" for Plaintiffs "to identify which individuals are potentially entitled to notice." Dkt. 815 at 1. Apple referred to those individuals as "payors." Plaintiffs adopted that nomenclature with the understanding that the Parties were discussing the same people: those who had purchased apps or made in-app purchases during the Class Period.

Apple refused to produce "information sufficient for Plaintiffs themselves to identify the specific transactions that each payor is associated with." *Id.* Instead, Apple insisted that, due to purported privacy and security reasons, it had to act as an intermediary in identifying which Class members incurred overcharges. *See id.* Specifically, Apple proposed that Plaintiffs deduplicate the payor dataset and return the list of unique potential Class members to Apple. *Id.* At that point, Apple would link the names on that list to transactions and then send that completed list to Prof. McFadden's team for use in calculating each Class member's level of harm. *Id.*

In an effort to compromise, given the then-operative October 2024 expert disclosure deadline, Plaintiffs tentatively agreed to that complicated process on the condition that Apple first provide a sample of the "payor data"—which is data entered by Apple's customers when they use a new payment method—so that Plaintiffs could have their expert (Mr. Thompson) ensure the proposal was feasible. *See* Dkt. 877 at 2. The sample would contain the data fields "associated with one million randomly selected Apple IDs," and the transactions associated with a subset of

those. *Id.* But the sample's production was delayed after Apple disclosed to Plaintiffs' counsel for the first time during a call on May 9, 2024, "that Apple ha[d] destroyed a certain data field" linking people to transactions from the beginning of the Class Period through sometime in 2014. Dkt. 877, Ex. 2 at 1 (May 14, 2024 Ltr. from J. Hafenbrack to E. Lazarus). Nearly a month later, Apple disclosed that it had "identified a method of restoring that data." Dkt. 877, Ex. 3 at 1 (June 6, 2024 Email from C. Higney to K. Wood et al.). Outside of insisting that the backup source was reliable, Apple refused to answer any of Plaintiffs' questions regarding the issue. *See id.*

Eventually, Apple delivered the sample data to Mr. Thompson in Seattle on July 10, 2024. *See* Ex. 96 (Payor Sample Data Prod. Ltr.). In its cover letter, Apple disclosed that it makes no effort to clean the customer data collected in the ordinary course. *Id.* at 2. Apple also provided a data dictionary for the 17 different fields of data it kept for "customer[s]":

- ███████████████": the user's Apple ID, but "hashed," meaning Apple converted it into a string of randomized alphanumerical characters. Apple previously provided this field to Prof. McFadden's team, but decided to *rehash* it before providing it to Mr. Thompson, meaning he and Prof. McFadden's team have entirely different sets of person_ids. The only entity that holds the key to translate them is Apple.

- ████████████████████: a hashed identification number for the record.

- ██████████████████": the date the record was generated.

- The customer's first name, last name, and prefix, each its own data field.

- The country dial code, area code, and phone number "for the customer." Each of these was its own data field, and the phone number—the most useful piece of the three—was hashed, meaning that Mr. Thompson could not see the actual number. All he could see were random characters.

- The customer's "billing address," reported in separate data fields called "street1," "street2," "street3," "city," "county," "state," and "postal_code."

- ███████████████: Apple represented this was a hashed value for the "last four digits of [the] payment card number."

Ex. 95 (Payor Data Dictionary) at 1. The data dictionary repeated the same disclaimer as the cover letter, *see id.* at 1, but went further and identified, "[b]y way of non-exhaustive example, some phone number values" that "appear[ed] to not be genuine phone numbers," such as "0," "456789," or "X," *id.* Apple gave Plaintiffs "a table decoding the hash" of 16 invalid phone numbers. *Id.*

Mr. Thompson analyzed the 13.2 million record sample to determine whether Plaintiffs might use it to identify the overcharges incurred by each Class member.  *See* Thompson Decl. ¶ 6. His review found significant data issues aside from the sixteen invalid phone numbers that Apple identified on July 10.  *Id.* ¶ 7.  To name a few:  hundreds of thousands of records had no entry in the street, city, state, and/or postal code field; 172,000 records had no first name, and many others contained "foreign characters, emojis, or other non-English language characters"; and there were 1,671 unique expressions of the fifty United States in the "state" field.  *Id.*

While Apple has insisted that Plaintiffs' effort to identify unique Class members from the payor data "cannot be done reliably," it nonetheless urged Judge Hixson to order Mr. Thompson to teach it how to deduplicate the data.  Hr'g Tr. 11:4-10 (Aug. 9, 2024), Dkt. 922-3.  Specifically, Apple asked Judge Hixson to order Mr. Thompson to give his proprietary data cleaning and deduplication processes to Apple "so that Apple could then mechanically apply Plaintiffs' process to the remainder of the payor data and identify for Plaintiffs the transactions associated with payors who are—according to Plaintiffs' method—the same."  Dkt. 877 at 4.  Judge Hixson rejected Apple's request as both infeasible and illogical:  "[I]t does matter to me that Apple's position is that the entire exercise that JND is performing simply can't be done reliably.  That gives me great concern about having JND operate in the dark and not have access to full data and try to guess at what code it should write [for Apple to implement].  I just don't think that that's a viable process." Hr'g Tr. 17:23-18:4 (Aug. 9, 2024), Dkt. 922-3.  Judge Hixson thus ordered Apple to produce the full payor dataset to Mr. Thompson with "the fields of payor information that were in the sample Apple provided," but this time without any transaction data (as Plaintiffs agreed).  Dkt. 919 at 1.

Before Prof. McFadden's team could use Mr. Thompson's work to match transactions to potential Class members by the revised March 7, 2025, expert disclosure deadline, Plaintiffs had to provide Mr. Thompson's work to Apple so it could match transactions to the people he identified.  Because Apple needed time to match transactions to the people Mr. Thompson identified, and Dr. Song then needed time to finalize the individual damages calculations with that information, Mr. Thompson had to finish his work by early January 2025.

Apple made its first production on September 12, 2024.  *See* Ex. 17 (Sept. 12, 2024 Ltr.

from E. Lazarus to R. Byrd & K. Wood).  But Apple's production was incomplete, with more than 352 million ████████████ billion records having no "Person_ID_hashed" (Apple ID) entry.  *See* Ex. 44 (Thompson Suppl. Rep.) ¶¶ 15-16; Ex. 24 (Oct. 7, 2024 Ltr. from K. Wood to E. Lazarus) at 1.  Apple needed two more tries to fix that flaw, producing supplements on October 25 and November 7.  *See* Ex. 27 (Oct. 25, 2024 Ltr. from E. Lazarus to R. Byrd & K. Wood); Ex. 50 (Nov. 7, 2024 Ltr. from E. Lazarus to R. Byrd & K. Wood).

Despite having less than two months to work with the full dataset, Mr. Thompson completed his work on January 3, 2025, producing to Apple a database reflecting all billing records associated with what he determined to be approximately 243.6 million unique individuals.  *See* Ex. 44 (Thompson Suppl. Rep.) ¶¶ 18-20.  This was an 80 percent reduction in the original number of records, a result that in Mr. Thompson's experience was "an exceptional deduplication effort."  Ex. 23 (Thompson Dep.) at 97:17-23.  Apple took Mr. Thompson's list and, two weeks later, provided Dr. Song with "a supplementary dataset that contains anonymized payor IDs" matched with "a transactions ID variable that allow[ed] [Dr. Song] to identify the transactions in the App Store transactions data associated with each individual payor."  Ex. 40 (Song Rep.) ¶ 69.

On March 7, 2025, Plaintiffs disclosed Mr. Thompson's methodology to Apple.  His original description of his methods and results was included as Exhibit 1 to Dr. Song's Opening Report.  Apple asked Plaintiffs on March 28 if Mr. Thompson should be considered an expert under Rule 26(a)(2)(A), which Plaintiffs confirmed on April 2.  Plaintiffs then made clear on April 8 that, because Mr. Thompson's backup materials contained both Apple's highly sensitive payor data and JND's proprietary deduplication algorithms and methodological techniques (inadvertent disclosure of which would adversely affect JND's competitive position), Plaintiffs were designating those materials as HIGHLY CONFIDENTIAL – SOURCE CODE under the operative Protective Order, and could be inspected at JND's offices anytime.

On April 28, Apple asked to visit the air-gapped computer housing Mr. Thompson's work.  *See* Ex. 53 (May 4, 2025 Ltr. from M. Rifkin to E. Lazarus) at 1, 3.  That visit occurred on May 5-6, 2025.  Afterwards, Apple renewed its request for Mr. Thompson's backup materials (which contain JND's proprietary deduplication algorithms) to be delivered to its consultants.  The parties

PLAINTIFFS' OPP. TO DEF. APPLE INC'S MOT. EXCLUDE OPINIONS OF
MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK
Case No. 11-cv-06714-YGR

-7-

agreed upon a protocol for completing delivery and to an extension of time for Apple's rebuttal expert, Prof. Victoria Stodden, to complete her analyses. *See* Dkt. 974 at 2-3.

Now, after initially asking the Court to compel Mr. Thompson to create code for Apple to clean and deduplicate the data itself, Apple wants the Court to strike Mr. Thompson's work.

### 2.   Mr. Thompson Is Well Qualified as an Expert in Data Deduplication

Rule 702 "contemplates a broad conception of expert qualifications," *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), which include the expert's "knowledge, skill, experience, training, or education," Fed. R. Evid. 702.  "Nothing . . . "suggest[s] that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*  So ordinarily, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

Mr. Thompson's experience as a data specialist, and the knowledge he has developed, qualify him as an expert in data deduplication.  Soon after graduating from Washington State University with a degree in Management Information Systems, Mr. Thompson joined Adaptis, a health care claims administration company, in September 1998 as the Managing Director of Information Technology.  Ex. 44 (Thompson Suppl. Rep.) App. A; Ex. 23 (Thompson Dep.) at 28:14-20.  For eleven years, Mr. Thompson "did hands-on data analysis work," which involved "matching . . . contact records to determine they're the same."  Ex. 23 (Thompson Dep.) at 29:14-21.  He then moved to Garden City Group, a legal administration firm, where he developed specialized experience with data deduplication, a process that is "very similar" to record matching. *See id.* at 29:22-30:4.  He continued data deduplication work when he joined JND, and he also took on additional managerial responsibility.  *Id.* at 24:22-25:15, 30:20-31:12.

In his current role, Mr. Thompson oversees JND's "entire IT organization" and "the operations organization."  *Id.* at 24:19-24.  In roughly 50 to 70 percent of JND's cases, Mr. Thompson personally oversees his team's data deduplication projects.  *Id.* at 25:5-15, 210:9-211:2.

He teaches his team the data deduplication methods he has learned and developed. *Id.* at 211:3-9; Thompson Decl. ¶¶ 13, 15. In fact, many of the data specialists he taught are now teaching others how to deduplicate data. Ex. 23 (Thompson Dep.) at 211:10-13.

Mr. Thompson also has an active data deduplication workload, particularly "for [JND's] most complex cases." *Id.* at 25:5-15. ███████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 44 (Thompson Suppl. Rep.) ¶ 4.

████████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.*; *see* Ex. 23 (Thompson Dep.) at 51:5-

53:7. ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ Ex. 44 (Thompson Suppl. Rep.) ¶ 4. ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████ *Id.*; *see* Ex. 23 (Thompson Dep.) at 53:8-57:9. ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████ Ex. 44 (Thompson Suppl. Rep.) ¶ 5 ████████████████████████████

██████████████████). Through Mr. Thompson's deep experiences, he has developed and applied expert methods of data deduplication and continually improves them based on his experience with a given dataset. Ex. 23 (Thompson Dep.) at 31:20-32:12; 51:24-53:7; 56:24-57:9.

Mr. Thompson's vast data deduplication experience "[c]learly . . . lays at least the minimal foundation of knowledge, skill, and experience required on order to give 'expert' testimony" regarding how to deduplicate the Apple payor data. *Thomas*, 42 F.3d at 1269-70 (holding district court abused its discretion by finding that "29 years of longshore experience" did not qualify an expert to opine on "the working conditions of experienced longshore personnel"); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (affirming an expert's qualification to testify "about claims adjustment standards in the context of an insurance

bad faith claim" based on his "twenty-five years' [worth of] experience working for insurance companies and as an independent consultant"); *In re PFA Ins. Mkt'g Litig.*, 2022 WL 3146557, at *2 (N.D. Cal. June 15, 2022) (Gonzalez-Rogers, J.) (similar).

Unlike the cases Apple cites (at 8-10), there is no disconnect between Mr. Thompson's experience and the assignment he undertook in this case. *See AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, at *5-6 (C.D. Cal. Feb. 5, 2014) (proffered expert with experience in "communication, media, and the laws related thereto" attempted to opine about competition economics in "the parcel shipping industry"); *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *5-6 (S.D.N.Y. May 2, 2011) (proffered expert, a professor of computer science who had never taught, published on, or performed any statistical work, lacked the expertise to rebut "the statistical conclusions" of the opposing party's statistical expert).

None of Apple's other arguments compels a different conclusion. Apple first insists (at 8-9) that Mr. Thompson needs to    ve specific qualifications in "statistics," because "the data analysis demanded in this case" requires (1) cleaning the data "to identify and eliminate data errors," (2) "matching" records, and (3) "validating such matching results." Mr. Thompson has been hired to do that thousands of times, and that is exactly what he did in this case: he "evaluated the entire data set to determine what data quality issues exist," cleaned the data, ran many iterations of code to deduplicate the records, and "intertwined" in those efforts "data validation and [more] data cleansing." Ex. 44 (Thompson Suppl. Rep.) ¶ 17 (a)-(h). Mr. Thompson does not need a special degree or credential in "statistics" to be qualified. *Synnex Corp. v. Axis Ins. Co.*, 2023 WL 2530930, at *6 (N.D. Cal. Mar. 15, 2023) (Gonzalez-Rogers, J.) ("Rule 702 does not require an expert to hold specific credentials or qualifications in the relevant subject matter.").

Apple also incorrectly argues (at 9) that Mr. Thompson lacks familiarity with statistical concepts like a "gold standard." Mr. Thompson testified to his (correct) understanding of the term in the abstract, and questioned "how that . . . is applicable in this situation." Ex. 23 (Thompson Dep.) at 168:9-21. And while Mr. Thompson—like Prof. Stodden—could not calculate a Levenshtein distance on command (*see id* at 114:6-19; Ex. 31 (Stodden Dep.) at 60:11-61:13), he knew well the issue the metric is designed to address: how to code an algorithm to address records

containing similar first names, like Deb and Deborah. *See* Ex. 23 (Thompson Dep.) at 207:6-208:11 ("[O]ver the years, that particular question has consumed dozens, if not hundreds, of hours of my time and analyzing where a cutoff was that produced the best match but didn't produce false matches."). Mr. Thompson's experience, therefore, is relevant, and will be informative.

Lastly, Apple claims (at 9-10) there are nuanced differences between data deduplication in the "statistics" field and the legal administration field that make Mr. Thompson unqualified. Of course, Apple overlooks that the deduplication process was done to fulfill the Court's request for Plaintiffs to identify actual consumers with and without damages, the full implementation of which will only become necessary after trial during Class administration. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131-33 (9th Cir. 2017) ("At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims. Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability." (cleaned up)); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3-4 (S.D. Cal. May 8, 2020) ("[T]he determination of class membership and protecting the defendant's due process rights can be done during the claims administration process."). But there are no meaningful differences between the data deduplication work that Mr. Thompson and an academic statistician perform. Mr. Thompson approaches his work with the same care and rigor as an academic statistician, making sure to exclude from his deduplication algorithms logic "that we did not have high confidence" would lead to a positive match. Ex. 23 (Thompson Dep.) at 60:10-61:18.[2] Far from showing that Mr. Thompson "sacrifice[s] accuracy" in his line of work (Apple Mot. at 9), his testimony confirms that, like any academic statistician, he carefully limits false positives and false negatives. Even Prof. Stodden and Apple's counsel do not expect perfection in these kinds of endeavors. *See* Ex. 31 (Stodden Dep.) at 166:11-167:18 (agreeing that an error affecting 0.1% of records "would [be] under[stood] . . . differently" in a

---

[2] For example, while Apple's expert Dr. Stodden's report indicates that "fuzzy logic" or approximate matching is accepted in data science, Mr. Thompson uses almost entirely the more restrictive exact match approach. *See* Ex. 51 (Stodden Rebuttal Rep.) ¶ 119.

case involving "observational data . . . as we have, you know, in this case user-entry data," than in "very precise medical studies," where any error "could be extremely meaningful for health outcomes"); Hr'g Tr. 12:11-20 (Aug. 9, 2024), Dkt. 922-3 ("[N]o one can expect to achieve perfection here."). And even if there were some distinctions to draw between Mr. Thompson's and an academic's deduplication work, those would at most present a challenge to the weight of Mr. Thompson's work. *See, e.g., United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993) (claims that an expert lacks "particularized expertise on the subject" "goes to the weight").

### 3. Mr. Thompson's Deduplication Work Is Relevant to Assigning Transaction Overcharges to Potential Class Members

Mr. Thompson's identification of potential Class members is relevant to Plaintiffs' case. Rule 702 requires that an expert's proffered opinion be "relevant to the task at hand," *Daubert*, 509 U.S. at 597, meaning that "the knowledge underlying it [must have] a valid connection to the pertinent inquiry," *Alaska Rent-A-Car*, 738 F.3d at 969 (citation omitted); *see also Daubert II*, 43 F.3d at 1315 (opinion must "logicall  advance[] a material aspect of the proposing party's case").

The fit between Mr. Thompson's deduplication work and Plaintiffs' case is tailor-made. The Court requested that Plaintiffs, before trial and before performing class administration, "(i) match the Apple identification numbers [in their possession] with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition." Dkt. 789 at 1. Mr. Thompson's work accomplishes both goals. First, Mr. Thompson rolled up ▮ billion Apple customer records to identify about 243.6 million unique purchasers of iOS apps and in-app content. The data provided to Mr. Thompson allowed him to do more than just match Apple IDs to people—it allowed him to see which Apple IDs were being used by multiple people. *See* Ex. 95 (Payor Data Dictionary) at 1. This furthers the second goal, giving the Court (and the jury, if necessary) a more precise idea of how many Class members were likely fortuitously unharmed by Apple's anticompetitive conduct. Prof. McFadden's model estimates that only 5.2% of purchasers incurred zero or negative economic damages in a But-For World without price tiers; with price tiers, only 5.9%. *See* Ex. 40 (Song Rep.) ¶¶ 83-84.

Mr. Thompson correctly understood that his deduplication exercise needed to identify "individual[s] that paid for something" on the App Store. Ex. 23 (Thompson Dep.) at 160:16-24.

This is a direct purchaser action.  Those with antitrust standing to sue as a direct purchaser are "the immediate buyers from the alleged antitrust violators."  *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019).  "It is undisputed" that iPhone and iPad users "bought . . . apps directly from Apple."  *Id.* at 278.  "Therefore, under *Illinois Brick*," those users "were direct purchasers who may sue Apple for alleged monopolization."  *Id.* at 278-79.  Apple eventually produced records of the contact and payment information for every "customer" that made app and in-app content purchases.  Ex. 95 (Payor Data Dictionary) at 1.  Mr. Thompson has identified the correct group of direct purchasers from that dataset:  "individuals that purchase[d] apps and in-app content on Apple iPhones and iPads" between July 2008 and February 2024.  Ex. 44 (Thompson Suppl. Rep.) ¶ 8.

Mr. Thompson's work also is fully consistent with the Class definition.  A Class member is anyone who "paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account."  Dkt. 789 at 2.  The plain meaning of the word "pay"—the present-tense form of the word "paid"—is "[t]o give money for a good or service that one buys; to make satisfaction."  *Pay*, Black's Law Dictionary (12th ed. 2024); *accord Chartis Specialty Ins. Co. v. Queen Anne HS, LLC*, 867 F. Supp. 2d 1111, 1119 (W.D. Wash. 2012) ("To 'pay' means 'to satisfy (someone) for services rendered or property delivered,' to 'discharge an obligation to,' 'to give in return for goods or service,' or 'to discharge indebtedness for.'" (quoting Webster's Third New Int'l Dictionary 1659 (2002))).  Consistent with *Illinois Brick*, the Class definition addresses whether someone gave money to Apple in exchange for an app or in-app content.  If an iPhone owner clicked "purchase" on an app, they are the direct purchaser.  And if they spent $10 from one Apple ID, they are a Class member.

Apple cannot (at 11-13) rewrite *Illinois Brick* to require analyzing *whose* money the direct purchaser spent.  "[T]he straightforward rule of *Illinois Brick*" is that if "retailer B sells to customer C, then . . . C may sue B if B is an antitrust violator."  *Pepper*, 587 U.S. at 280.  And none of Apple's cited cases hold otherwise.  They are just instances in which courts have found the particular plaintiff never overpaid.[3]  Because Mr. Thompson's deduplication work is consistent

---

[3] *See Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255–56 (9th Cir. 2008) (plaintiff had no antitrust injury since he paid "the same, or even lower," prices after the unlawful agreement);

with Plaintiffs' theory of antitrust injury and the Class definition, his opinions are relevant.

### 4.  Mr. Thompson Used Reliable Methods

The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, that considers if the expert's methods "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline," *Elosu*, 26 F.4th at 1024 (cleaned up).  While the *Daubert* Court named four factors—testability, error rate, peer review, and acceptance in the field—that is not "a definitive checklist." *Kumho Tire*, 526 U.S. at 150 (cleaned up).  In cases like this one, "the relevant reliability concerns may focus upon personal knowledge or experience."  *Id.*  Courts analyze "how [the expert's] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Optronic Techs.*, 2019 WL 4780183, at *3 (citation omitted).  This Court holds the "discretion to decide how to test an expert's reliability based on the particular circumstances of the particular case." *Elosu*, 26 F.4th at 1024 (cleaned up).  Considering the circumstances here, Mr. Thompson used reliable methods.  Apple's rigid application of the four *Daubert* factors inadequately examines Mr. Thompson's methods.

### a.  Mr. Thompson's Application of His Extensive Data Deduplication Experience Is Itself a Reliable Methodology

Mr. Thompson's methods are the culmination of continual assessment and refinement over a career spent analyzing datasets containing millions upon millions of oftentimes user-generated data, with more than 14 of those years spent applying those methods in the legal administration field.  "[T]he application of [that] extensive experience is a 'method' that can reliably support expert testimony." *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022).  However, neither the Court nor the jury will need to accept blindly Mr. Thompson's word that his methods are

---

*Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70-71 (9th Cir. 1994) (patients had no standing to sue under RICO because the scheme at most caused their insurance company to pay more); *Staley v. Gilead Scis., Inc.*, 619 F. Supp. 3d 977, 979-81 (N.D. Cal. 2022) (Blue Cross lacked Article III standing to sue for overpayments on drugs allegedly caused by monopolistic conduct because it only acted as a contracted administrator of federally-funded health plan and received the same "subscription fee" for administering the plan regardless of the defendant's acts); *DIRECTV, LLC v. Nexstar Media Grp., Inc.*, 724 F. Supp. 3d 268, 278-79 (S.D.N.Y. 2024) (no antitrust injury because plaintiff "refused" to pay defendant's allegedly supracompetitive prices).

reliable. The similarities his methods share with those espoused by Apple's expert, Prof. Victoria Stodden, confirm Mr. Thompson's deduplication experience is a reliable basis for his methods.

Apple (at 8-9) asserts that an expert with the allegedly required experience in statistics would conduct Mr. Thompson's exercise in three general stages. *First*, that person would "identify and eliminate data errors and 'maximize the accuracy and reliability of results.'" *Second*, that person would then begin matching. *Third*, that person would validate their matches. Mr. Thompson's report and backup materials show he did that.

Mr. Thompson first spent significant time cleaning the data. Both he and Prof. Stodden agree about the importance of this step. *See* Ex. 44 (Thompson Suppl. Rep.) ¶ 17(a) (the cleaning stage "is a necessary precursor to creating any code or process to work with the data"); Ex. 51 (Stodden Rebuttal Rep.) ¶ 109 ("Data cleaning . . . is an integral part of working with data."). Indeed, through that exercise Plaintiffs and Mr. Thompson learned that Apple twice failed to produce correctly Apple IDs for all ██ billion records. *See* Ex. 44 (Thompson Suppl. Rep.) ¶ 16; *see also supra* at pp. 6-7. As with every engagement, Mr. Thompson "developed a data cleansing algorithm to address any data issues in an attempt to leave usable data for future matching." Ex. 44 (Thompson Suppl. Rep.) ¶ 17(b). He helped developed the code used for this project,[4] and it is used as the starting point across all JND projects; he even teaches JND data analysts how to use it. Thompson Decl. ¶¶ 12-13. Mr. Thompson ran that cleansing code here and analyzed the results, repeating this iterative process several times, *id.* ¶¶ 14-15, each time using "additional layers of proprietary data cleansing code to address remaining data quality issues," Ex. 44 (Thompson Suppl. Rep.) ¶ 17(c). The code addressed a barrage of data issues like those in the sample dataset, including emojis in the first name field; profanity in various data fields; non-ASCII characters across the dataset. Ex. 23 (Thompson Dep.) at 86:17-89:16; *see* Thompson Decl. ¶ 7. Mr. Thompson did not stop until the "marginal returns were very low," Ex. 44 (Thompson Suppl. Rep.) ¶ 17(c), meaning he "reached a point . . . where [he] could no longer apply . . . cleansing . . . rules"

---

[4] Apple's counsel had Mr. Thompson's SQL code script available to it for his deposition, but never marked or asked a specific question about any of it.

that would yield beneficial results, Ex. 23 (Thompson Dep.) at 106:20-107:11.

Mr. Thompson then moved on to matching. Like the cleaning stage, Mr. Thompson began by "writing new code" that was informed by code used in prior deduplication engagements. Ex. 44 (Thompson Suppl. Rep.) ¶ 17(d). The matching occurred in four rounds.

That iterative process continued for each tier until Mr. Thompson determined "the marginal returns were outweighed by the time and effort required to continue." Ex. 44 (Thompson Rep.) ¶ 17(f); Thompson Decl. ¶ 20. That is, Mr. Thompson judged when he "was not finding additional matches that [he] could effectuate . . . in a both coded and confident manner." Ex. 23 (Thompson Dep.) at 103:17-104:1. Mr. Thompson's "years of experience performing data match and data deduplication" in the legal administration field informed that assessment. *Id.* 104:8-13.

With each successive tier, the matching logic became "slightly less stringent," providing the code the ability to match two records to the same unique individual despite minor differences in the expression of their address or, in many cases, a change in their last name following a marriage or divorce. Ex. 44 (Thompson Rep.) ¶ 17(e); *see* Thompson Decl. ¶¶ 17-18. Round 1 was complete after all 13 matching tiers were run on all four files. Thompson Decl. ¶¶ 17-24.



Mr. Thompson determined it was appropriate to cross-check the address information in the rolled-up records "against publicly available data through an NCOA (National Change of Address) search from the United States Postal Service."  Ex. 44 (Thompson Suppl. Rep.) ¶ 17(g).  In Mr. Thompson's experience, "[t]his is standard industry practice," especially when working with data like that which Apple produced, as it helped him "determine whether any particular name that has multiple addresses" can be rolled up with an already-known customer. *Id.*; *see also* Thompson Decl. ¶¶ 27-28.  Mr. Thompson, with the Court's permission, *see* Dkt. 919 at 1-2, extracted the names and addresses of unique Apple customers that his analysis had identified so far and uploaded those to a secure file transfer protocol maintained by a third party, Melissa Data Solutions.  Thompson Decl. ¶ 28.  A computerized application maintained by Melissa Data Solutions extracted the data that Mr. Thompson uploaded, standardized addresses to "the USPS form of an address," ran it through the NCOA database, and pulled all addresses associated with the identified Apple customers.  *Id.*; Ex. 23 (Thompson Dep.) at 186:4-18.  Mr. Thompson took the resulting output, re-uploaded it to the air-gapped computer housing the rest of the Apple



Throughout every round of deduplication, Mr. Thompson and one of his colleagues, Cameron Karlin, performed quality control checks of his algorithms and validated matches being generated.  Ex. 44 (Thompson Suppl. Rep.) ¶ 17(e); Thompson Decl. ¶¶ 20-22.

This iterative process bears the hallmarks of reliability.  Mr. Thompson applied methods he developed and refined through similar deduplication projects.  Those methods follow the same analytical framework Apple says (at 8-9) an expert "in statistics and data science" would follow: data cleansing, followed by matching, with data validation occurring throughout.  Indeed, Prof. Stodden does not fault Mr. Thompson for

Far from being junk science, Mr. Thompson's methods are grounded in his extensive, relevant, real-world experience.  That satisfies Rule 702(c).  *See Optronic Techs.*, 2019 WL 4780183, at *3 (expert's methods were reliable, even though his "analysis [was] not subject

to peer review or exact replication," because he "provide[d] a sufficient basis for understanding how he reached his opinions and to show that they are supported"); *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2024 WL 5483606, at *7 (N.D. Cal. Oct. 22, 2024) (similar).

### b. None of the *Daubert* Factors for Evaluating Scientific Opinions Justify Excluding Mr. Thompson's Deduplication Work

Apple's arguments (at 13-19) for excluding Mr. Thompson's methods as unreliable ignores the "flexible" inquiry that Rule 702 demands, *Daubert*, 509 U.S. at 594, and impermissibly treats the four factors applied in *Daubert* as talismanic in every case, *see Kumho Tire*, 526 U.S. at 151 (the *Daubert* factors were "meant to be helpful, not definitive").

### i. Mr. Thompson Adequately Disclosed His Methodology

Mr. Thompson's methods have been disclosed in more than sufficient detail to allow Apple and its retained expert to "challenge[]" his work in an "objective sense." *City of Pomona v. SQM N. Am. Cor* , 750 F.3d 1036, 1046-47 (9th Cir. 2014) (cleaned up). Mr. Thompson produced to Apple's consultants

---

[5] For these reasons, Apple's cited patent cases (at 13-14, 16) are inapposite. Unlike Mr. Thompson, who fully disclosed his methods, the experts in Apple's cases did not explain the "link, if any, between [their] inputs" and their proffered reasonable royalty rate. *Open Text, S.A. v. Box, Inc.*, 2015 WL 349197, at *5-7 (N.D. Cal. Jan. 23, 2015); *see GPNE v. Apple Inc.*, 2014 WL 1494247, at *3-6 (similar); *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020) (similar, striking Apple's security expert in *Epic*, Dr. Aviel Rubin).

█████████████████████████████████████████████████████  Apple (at 14)

ignores this testimony and Prof. Stodden never rebuts it, *see* Ex. 51 (Stodden Rebuttal Rep.) ¶ 130.

Ultimately, Prof. Stodden re-ran Mr. Thompson's process but obtained a different result. *See id.* ¶ 129.  That is cross-examination fodder for both sides, not a reason to exclude Mr. Thompson's methods. *See United States v. Rite Aid Corp.*, 2020 WL 3970201, at *14 (E.D. Cal. July 14, 2020) ("Any inability to replicate the data can be used in an effort to undermine the weight a factfinder gives that data, but does not require its exclusion.").  And "[w]hile [Mr. Thompson's] report is quite concise, brevity alone is not an automatic disqualifier under Rule 702 or *Daubert*, particularly when, as here, indicia of reliability and validity are present." *Brickman v. Fitbit, Inc.*, 2017 WL 6209307, at *4 (N.D. Cal. Dec. 8, 2017) (Donato, J.).

Apple also incorrectly asserts (at 14-15) that Mr. Thompson made improper subjective judgments.[6]  Mr. Thompson's reasoned judgments rested on decades of data deduplication experience, regarding when to stop one tier of matching and proceed to the next based on his inability to find "additional matches that [he] could effectuate . . . in a both coded and confident manner."  Ex. 23 (Thompson Dep.) at 103:17-104:1.  Those are not, as Apple claims (at 15), "unsupported assumptions"; they are applications of experiential expertise to observed data.  That is a reliable basis for expert testimony. *See Optronic Techs.*, 2019 WL 4780183, at *3; *Blockchain Innovation*, 2024 WL 5483606, at *11; *see also Roblox Corp. v. WowWee Grp. Ltd.*, 2024 WL 4057418, at *5 (N.D. Cal. Sept. 3, 2024) (finding "purported lack of testability" not dispositive).

Finally, Apple (at 15) resurrects an argument this Court previously found "borders on disingenuous," Dkt. 789 at 16 n.10:  that Mr. Thompson impermissibly relied on NCOA data obtained from Melissa Data Solutions in his analysis.  Rule 703 "permits an expert to base his opinion on facts or data in the case that the expert has been made aware of," including "data

---

[6] Apple also asserts (at 14-15) Mr. Thompson "recorded no reason for the data fields he chose to use" in the very first matching tier during Rounds 1 and 2.  But Mr. Thompson explained that the first matching tier was "the most stringent" because it required matches "on virtually every available and relevant personal identifying data point," giving him "an extremely high confidence level" that any matching records "should be the same person."  Ex. 44 (Thompson Supp. Rep.) ¶ 17(e); Ex. 23 (Thompson Dep.) at 176:16-177:2.

presented to the expert outside of court and other than by his own perception." Dkt. 789 at 16 n.10 (cleaned up). Mr. Thompson has made clear that relying on NCOA outputs like those Melissa Data Solutions compiled is a standard practice, Ex. 44 (Thompson Suppl. Rep.) ¶ 17(g), and Apple offers no contradictory evidence. Rule 703 is therefore satisfied. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

### ii.    It Is Irrelevant That Mr. Thompson's Methods Were Not Peer Reviewed or Scrutinized Within A "Scientific Community"

Contrary to Apple's argument (at 16-17), Mr. Thompson's methods need not have been subject to peer review or received the acceptance of the "scientific community." An expert opinion "based on the application of extensive experience . . . is the product of the expert's experience— not science." *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020); *see also United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) ("The *Daubert* factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."); *Blockchain Innovation*, 2024 WL 5483606, at *7 ("[T]he fact that an expert's analysis 'is not subject to peer review . . . is not disqualifying.'" (quoting *Optronic Techs.*, 2019 WL 4780183, at *3)). Here, Mr. Thompson unsurprisingly has never submitted his methods for peer review because doing so would irreparably damage his firm's competitive advantage. Thompson Decl. ¶¶ 13, 15. The legal administration industry is a competitive one, and firms compete by developing proprietary means of deduplicating large swaths of data in the most efficient way. *See id.* ¶ 9(a). Mr. Thompson's extensive qualifications and experience, coupled with the hallmarks of reliability that are evident from his disclosed proprietary methods, compensate for any lack of peer review and "scientific community" scrutiny. *See Arriaga v. Logix Fed. Credit Union*, 2022 WL 3052318, at *2 (C.D. Cal. Apr. 22, 2022) ("Having found Counts is qualified to testify as an expert at trial based on his specialized knowledge and experience, [the defendant's] contention that 'there is no assurance that Mr. Counts opinions have been tested, peer reviewed, published, checked for errors, subject to standard controls, or generally accepted in the relevant community' is irrelevant.").

### iii.   Error Rate Calculations Offer No Probative Insight Into the Reliability of Mr. Thompson's Methods

Mr. Thompson's methods remain reliable notwithstanding the absence of an error rate calculation from his report.  Mr. Thompson testified that calculating an error rate for matches in the Apple dataset would not be meaningful, and the lone calculation method that Apple's expert proposed did not prove him wrong.  Because "an overall error rate cannot be determined 'in a meaningful way,'" "the lack of an error rate does not make [Thompson's] [deduplication work] unreliable." *Zetz v. Boston Sci. Corp.*, 644 F. Supp. 3d 684, 713 (E.D. Cal. 2022).

Apple's argument (at 17-18) lacks sufficient support from its rebuttal expert, Prof. Stodden. In her report and during her deposition, Prof. Stodden offered only two concrete methods for estimating an error rate when operating under the same Protective Order restrictions as Mr. Thompson was: compare his work "against [a] comparable external dataset or a 'gold standard' benchmark dataset for a sample of correctly matched records."  Ex. 51 (Stodden Rebuttal Rep.) ¶ 96.  But there is no comparable external dataset to use.  And Prof. Stodden herself did not try to determine exactly what a "gold standard"—a known error-free sample that identifies real Apple customers—would look like or how it would be obtained.  She simply surmised that a "gold standard" for a dataset containing ▮ billion records could be completed with "20" records—i.e., a ▮ sample.  Ex. 31 (Stodden Dep.) at 114:15-115:8.  From there, she said she would "trace through what [she] would consider to be accurate matches" and use the resulting matches as "the basis of my gold standard data set." *Id.* 114:25-115:2.  But she performed no such analysis.

Prof. Stodden also recognized the limitations of the dataset provided to Mr. Thompson. Plastered throughout every production letter and submission to the Court is Apple's disclaimer of any and all responsibility for the reliability of the data it collects from users in the ordinary course. *See, e.g.*, Ex. 96 (Payor Sample Data Prod. Ltr.) at 2.  Initially, Prof. Stodden conceded "there would be a possibility of error" in any "gold standard" dataset one tries to create for the Apple payor data, "because at some point for some records there are ambiguities that are difficult or impossible to resolve based on the information in the Apple payor data."  Ex. 31 (Stodden Dep.) at 116:16-117:2.  But Prof. Stodden further acknowledged, "[J]ust based on the work that I have done in evaluating Mr. Thompson's records, it seems to me I wouldn't have an expectation" even

in a 20-record "gold standard" dataset "that I would drive the error [in those 20 records] to zero." *Id.* at 117:14-118:5. And Prof. Stodden made no effort to "actually implement[]" any other method to estimate the rate of false-positives or false-negatives in Mr. Thompson's work because it "was clearly outside the scope of [her] assignment." *Id.* at 105:2-25.

Mr. Thompson agreed with Prof. Stodden's assessment of the utility of a "gold standard" dataset during his deposition. When asked by Apple's counsel about the gold standard concept, Mr. Thompson was not clueless (*contra* Apple's brief (at 18)). Mr. Thompson responded that he was "[t]heoretically" aware of it, and knew it referred to "a – sort of a perfect sample," "but I would love to hear the definition in this context." Ex. 23 (Thompson Dep.) at 168:9-21. Mr. Thompson could not say "how that . . . is applicable in this situation" because, in his words, "what is the validation? . . . . That I cannot give you an example of because I do not know what it's attempting to reference." *Id.* at 168:22-169:6. Mr. Thompson addressed the reality that it is impossible for any sample drawn from the Apple data to serve as a "gold standard" without reaching out to many customers to verify records associated with that customer. Thompson Decl. ¶¶ 33-34. Ultimately, the jury should resolve any dispute over this issue. *See, e.g.*, *Elosu*, 26 F.4th at 1026 (juries must resolve "competing versions of the evidence").

### 5. Mr. Thompson Applied His Methods Reliably

Finally, Mr. Thompson's deduplication work is the product of "a reliable application of [his] principles and methods" to the Apple data. Fed. R. Evid. 702(d). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu*, 26 F.4th at 1024. Trial judges are "gatekeeper[s]," not "fact finder[s]"; their role is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969-70. Even "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (cleaned up). None of Apple's arguments warrants excluding Mr. Thompson's opinions.

### a. Mr. Thompson Reliably Cleaned the Data

Mr. Thompson applied his data cleaning processes reliably across the dataset. Apple,

correctly, points out (at 20-21) that pursuant to his data cleaning process, Mr. Thompson cleaned the "street1" field in the following non-exhaustive ways:

- Removed the "/" from, e.g., "101 1/2 Main Street" making it "10112 Main Street";

- Removed the "/" character from "N/A"; and

- Removed the "@" character from entries in the street address field.

But Apple fails to show that these decisions make Mr. Thompson's data cleaning unreliable. Mr. Thompson's algorithm required exact string matching, meaning that records would be rolled together "if they match exactly on some combination" of data fields within a coded logic tier. Ex. 23 (Thompson Dep.) at 109:13-17; Thompson Decl. ¶ 19. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ *See*

Thompson Decl. ¶¶ 18, 24-25, 29-30. In all instances, the removal of the characters "/" or "@" create no opportunity for records to roll-up without some other more trustworthy pieces of data matching. *Id.* ¶ 35. Apple does no more than speculate that these choices might have somehow introduced error, but fail to demonstrate that they did. That argument has no merit.

Apple also highlights (at 20) how it allowed 177,041 users ████ of all records) to input Apple's own business address as their billing address. That Mr. Thompson did not remove Apple's address from the get-go is not a flaw in his methodology. As Prof. Stodden herself conceded, it is impossible to tell from looking just at the dataset Apple produced what customers were thinking when entering this data. "It could be people thought it was funny[.]" Ex. 31 (Stodden Dep. & Errata) at 31:22-32:7. Or, "[i]t could be [Apple's] employees, with the information I had in that data set." *Id.* at 32:8-9. Other valid reasons for those entries exist. *See id.* at 32:9-11. Ultimately, Apple and Prof. Stodden have made no effort to identify exactly how many (if any) records were improperly rolled-up because Mr. Thompson did not immediately disregard Apple's address in every record. Without that analysis, Apple improperly asserts (at 21) that this "affect[ed] hundreds of thousands of alleged unique payors." *See, e.g., JH Kelly, LLC v. AECOM Tech. Servs., Inc.,*

605 F. Supp. 3d 1295, 1314 (N.D. Cal. 2022) (an expert's methods were reliable despite his admission that his work contained inadvertent "duplicate [data] inputs" because the moving party "fail[ed] to explain how these errors . . . affect the substance of [the expert's] opinions"). And even if erroneous matches occurred, the impact on absent Class members is infinitesimally small because Mr. Thompson's work will be verified and, if needed, corrected, through post-trial claims administration. *See Briseno*, 844 F.3d at 1131-33; *Victorino*, 2020 WL 2306609, at *3-4.

### b.  Mr. Thompson Reliably Deduplicated the Data

Mr. Thompson also reliably applied his deduplication methods across the cleaned dataset. He consistently applied his matching logic across all the records in the order reflected in his report, backup materials, and "Read Me" file.  Apple has not, and cannot, allege that Mr. Thompson went about deduplicating the Apple data in any manner other than that which he disclosed.  The best Apple can do (at 21-23) is deduce (erroneously) from observed results in Mr. Thompson's final work product flaws in the application of his methods.

*First*, it does not follow from Mr. Thompson's reasoned choice to design his code to require data fields in two records to be an exact match that his methods were applied unreliably.  Indeed, Apple does not (at 21) try to claim Mr. Thompson's code inappropriately rolled-up some records based on a data field partially matching.  It argues the reverse: that Mr. Thompson's methods are flawed because he did not allow for *more* records to roll-up based on a partial match.  Apple's favorite example of this is Mr. Thompson's identification of unique records for one "Rob Pepper" and one "Robert Pepper."  As Apple knows, Mr. Thompson's code did include logic that allowed matching on "a partial first name"—the first three initials of the first name, last name, address, and Apple ID.  Ex. 23 (Thompson Dep.) at 155:14-25; Thompson Decl. ¶ 18(m).  That matching logic was the product of hundreds of hours Mr. Thompson spent analyzing what cutoff produced the best match that did not also produce false matches.  *See* Ex. 23 (Thompson Dep.) at 207:6-20.

Prof. Stodden's opinion that Mr. Thompson should have matched more records like these invites subjectivity into Mr. Thompson's otherwise objective, reliable work.  Among other "methods," Prof. Stodden suggested that one could (i) make "a probabilistic guess" that two names are similar enough, Ex. 31 (Stodden Dep.) at 48:3-49:8; or (ii) use "common sense" and "Google"

to create working "assumptions" about how likely it is that two records with similar names should match, *id.* at 49:24-50:21.  Ultimately, Prof. Stodden and Mr. Thompson both have views on the best approach to matching these kinds of records.  The jury should be given the chance to decide which is more compelling.  *See Alaska Rent-A-Car*, 738 F.3d at 969-70.

*Second*, Apple cannot twist two data observations into methodological flaws.  It is true that Mr. Thompson's final product (1) identifies 1.9 million unique people that have self-reported to reside in King Salmon, Alaska, and (2) there are four "people" who collectively are associated with over 100,000 Apple ID accounts.  Thompson Decl. ¶ 36.  The data compelled those results. *See id.*  The results may well support Prof. Stodden's suspicions of fraudulent activity by some Apple users, *see* Ex. 51 (Stodden Rebuttal Rep.) ¶ 90 n.128 ("none of these payors appear[] to be legitimate"), but they are no reason to grow suspicious of Mr. Thompson's methods.

*Third*, Mr. Thompson's roll-ups of records with the first name "Kim," *see* Apple's Mot. at 22-23, do not undermine the validity of his work.  Rather, they illustrate how Apple's refusal to produce requested data impaired his deduplication efforts.  As Mr. Thompson explains, a group of about 42,000 records (just ▮▮▮▮▮ of all the records he processed) were rolled-up into a single "unique payor" with the first name "Kim."  Thompson Decl. ¶ 37.  The cause of the roll-up was inconsequential:  these records, inexplicably, matched because the users all had the same first name "Kim," the same address (Apple's Cupertino address), *and* the same phone number.  *Id*. Unlike most other sophisticated companies, Apple does not clean up such bad customer-entered data.  *See* Ex. 96 (Payor Sample Data Prod. Ltr.) at 2.  Had Mr. Thompson realized earlier in the process that the users' phone numbers were invalid, this minor issue might have been avoided.  But the best tool to detect that anomaly was thwarted by Apple.  The records all had the same phone number, but Apple's hashing of that field prevented (and still prevents) Mr. Thompson from knowing what that phone number is.  In addition, the phone number used by those 42,000 customers was not in the list of invalid phone numbers that Apple supplied.  Thompson Decl. ¶ 37.  If Mr. Thompson had any way of knowing that this phone number was invalid, these matches never would have been made, notwithstanding the user's decision to input Apple's address as their own.  *See id.*

In any event, Apple (at 23) overstates the magnitude of this issue.  The roll-up involves, at

most, 7,330 different individuals with the first name "Kim," which make up just three one-thousandths of one percent (0.003%) of the universe of potential Class members, and there is no evidence of any other similar record groupings. *Id.* ¶ 38. And if Mr. Thompson were to remove entirely the matching logic that helped contribute to this issue from his methodology, the impact on the final roll-up would be less than one-tenth of a percent. *Id.* ¶ 39. Such an insignificant anomaly—particularly because it originated with poor customer data entry and Apple's poor data-cleaning and because Mr. Thompson was denied the best tools to detect the issue—does not undermine Mr. Thompson's otherwise rigorous application of his methodology. *See JH Kelly*, 605 F. Supp. 3d at 1314. Moreover, again, these trivial kinks will all be ironed out during post-trial class administration. *See Briseno*, 844 F.3d at 1131-33; *Victorino*, 2020 WL 2306609, at *3-4.

More importantly, when Dr. Song re-ran his damages calculations at the Apple ID level—thus taking Mr. Thompson entirely out of the equation—the total aggregate damages stayed the same, at $20.382 billion. Ex. 40 (Song Rep.) ¶ 83 & fig. 13; Ex. 52 (Song Suppl. Rep.) ¶ 5 & fig. 1. And the number of unharmed Apple ID accounts versus the number of unharmed payors (when Mr. Thompson's matching was used) declined immaterially: from 5.2% to 5.1% (when using flexible pricing) and from 5.9% to 5.8% (when using Apple's price tiers). Ex. 40 (Song Rep.) ¶¶ 83-84 & fig. 13; Ex. 52 (Song Suppl. Rep.) ¶ 5 & fig. 1. As importantly, 99.9% of all App Store transactions (or ███████ transactions) are included in **both** the payor-based damages calculation **and** the Apple ID-based damages calculation. Song Decl. ¶¶ 7-8. These consistencies between the two sets of calculations confirm the reliability of Mr. Thompson's deduplication work.

### c.  Mr. Thompson Reliably Validated His Results

Apple repeats (at 24) its earlier arguments that Mr. Thompson "performed no systematic validation of his inputs or outputs," and did not calculate an error rate. *Compare with* Apple's Mot. at 17-18. Those arguments lack merit. *See supra* §§ III.A.4.a, III.A.4.b.iii.

\* \* \*

Mr. Thompson's extensive data deduplication experience qualifies him as an expert in data deduplication for identifying unique Apple customers. He reliably applied that expertise, and the methods he has developed and refined over the last 27 years, to the Apple data to provide helpful

insight into the number of Class members damaged by Apple's monopolistic conduct.  The Court thus should deny Apple's motion to exclude Mr. Thompson's expert opinions.

### B.  Prof. MacCormack's Testimony Should Not Be Excluded

#### 1.  Prof. MacCormack Used a Rich Data Array for His Field

##### a.  Apple Mischaracterizes Prof. MacCormack's Data and Analysis

When Plaintiffs first moved for class certification, Prof. McFadden used data from six app developers to construct the margin bounds necessary for his damages model.  The Court denied that first motion, stating it "would expect a more fulsome analysis or reliance on an industry expert for purposes of trial."  Dkt. 630 at 10 n.8.  The Court subsequently took notice of Plaintiffs' statement that "they will receive profit data from significantly more [app] developers and Professor McFadden will correspondingly update his estimated coefficients."  Dkt. 789 at 13.  Since then, Plaintiffs retained a noted software development industry expert, Prof. Alan MacCormack, ***and*** they obtained margin data from a total of 71 apps from 68 developers—an exceptionally large quantity of data—which Prof. MacCormack also supplemented with publicly-available margin data and his own deep experience to provide the margin inputs used in Prof. McFadden's model.

Apple's argument (at 29-34) that Prof. MacCormack lacked sufficient data for his margin analysis is untenable.  Apple nowhere contests that Prof. MacCormack worked from a dataset that is very large by the standards of his academic discipline, and, indeed, significantly larger than the dataset he used for his most-cited academic paper.  Ex. 19 (May 23, 2025 MacCormack Dep.) at 156:15-23.  Specifically, here, Prof. MacCormack used four datasets, the first and largest of which was real-world developer cost data produced pursuant to subpoenas.  Ex. 32 (MacCormack Rep.) ¶ 97.  Second, Prof. MacCormack supplemented that data with publicly reported costs from app developers where available.  *Id.*  Third, he used commission and revenue data provided by The Brattle Group.  *Id.*  Finally, Prof. MacCormack used a list of the largest app developers, supplied by the Brattle Group, to compare app developers and apps to assess genre margin groupings.  *Id*.

Plaintiffs' counsel began issuing subpoenas in 2021 and continued collecting subpoenaed data through late 2024.  *Id.* ¶ 192.  Counsel issued approximately 250 subpoenas, to 172 recipients, eventually receiving 114 substantive responses.  *Id.* ¶ 99.  All those responses were turned over to

Prof. MacCormack, who assessed them for usability and eliminated produced data only for specific, objective reasons. *Id.* ¶ 193. After removing the unusable data, there remained usable margin observations across multiple years for 71 apps, sold by 68 app developers. *Id.* ¶ 193.

Prof. MacCormack grouped costs into four categories based on his observations and his vast industry experience: Royalties; User Acquisition and Retention ("UAR"); Infrastructure; and Maintenance. He examined the data from each app developer category-by-category for the usability of responses for each category, and within them, for each year. In total, the subpoenaed data included 139 usable data points (app developer and year) for Royalties, 273 usable data points for UAR, 237 for Infrastructure, and 113 usable data points for Maintenance. *Id.* at p. 82 tbl. 10. In all, Prof. MacCormack had a total of 762 data points (covering cost, category, and year). *Id.*

Prof. MacCormack has testified that this number of margin data points is exceptionally large for the academic study of businesses. While Apple insists (at 33) that Prof. MacCormack has used statistical significance and standard error measurement in *some* of his academic writing, that is misleading. In fact, he has published peer-reviewed research that noted that no statistically significant result could be derived because of small sample size, though the data nevertheless served as a useful set to consider as case studies. Ex. 19 (MacCormack Dep.) at 228:23-230:23. Indeed, he has testified that the set of 762 margin data points in this case is substantially larger than the dataset he used in his own most cited academic paper. *Id.* at 156:15-23.

### i.     Prof. MacCormack's Data Was Appropriate To His Analysis

Prof. MacCormack testified that the app developer cost data available to him was sufficient for his analyses. For each genre or group of genres (discussed below), Prof. MacCormack calculated interquartile ranges for the data, a standard statistical method of data visualization sometimes called a "box-and-whisker plot." Statisticians treat the bottom quartile and top quartile of the observations (top and bottom "whiskers") as outliers, while the middle two quartiles form a box of prominent observations. According to Apple's own data expert, interquartile ranges, or box-and-whisker plots, are a recognized and accepted methodology in the field of data science as well. Ex. 31 (Stodden Dep.) at 183:23-184:2 (box plots are a recognized technique "to identify outliers"). Using the box-and-whisker plots for each genre group, Prof. MacCormack assessed

whether the data within each of the four cost categories varied meaningfully between genres. Royalties and UAR varied by genre, while maintenance and infrastructure were essentially constant across genres.  Ex. 32 (MacCormack Rep.) ¶¶ 130; *see also id.* ¶¶ 131-190.

Having made this observation, Prof. MacCormack used all the available data points for infrastructure and for maintenance (237 and 113 observations, respectively) to create estimated ranges for each to be applied to every genre.  Then, he turned to the cost categories that vary between genres.  Here, he again had over two hundred app-year data points for UAR.  Royalty data proved the most difficult because these agreements, the rates, and structures are often closely guarded secrets.  In this sense, royalties are especially emblematic of the problem at the center of industrial organizations economics, because companies do not readily supply academics with any reliable cost data.  Thus, deriving costs from other information is normal and working with real cost data is the exception.  Dkt. 789 at 13-14 (citing McFadden Reply ¶ 148).  Here, despite this difficulty, Prof. MacCormack had over 100 annual, real-world royalty observations to work with.

For each cost category, Prof. MacCormack first observed the interquartile range for each set of costs, and then applied his doctorate in business administration, experience in the industry, and 25 years of teaching software development at Harvard Business School, *see* Ex. 32 (MacCormack Rep.) at p. 10 fig. 3:



Figure 3: Reconciliation of Developer-Provided Cost Data and My Estimates: Royalties (left) and UAR costs (right)

In a few instances, public data sources prompted a slight adjustment to the range suggested by the interquartile analysis, and each such instance is described in his report.  Apple is free to

question him about that at trial, but these adjustments are typical aspects of his methodology.  Most notably, there is a known relationship between royalties and UAR: a company using recognized intellectual property, for which it typically must pay royalties, also buys in part the pre-existing audience for these stories or characters, reducing its cost to attract customers.  Prof. MacCormack found in the literature a measurement of this effect; it is well-studied and robust.  Therefore, he implemented a technique to embody this relationship in his analysis of cost.  Based on his experience in the field, as between royalties and UAR, he used the entirety of the narrower range, but added not the entire larger range, but the only portion from the low point to the midpoint of the broader range.  *See* Ex. 32 (MacCormack Rep.) ¶ 188.

After he processed those 762 usable app developer data points into a four-category analysis, determined where the categories varied by genre, and identified where a relationship between the categories had to be accounted for, Prof. MacCormack then used the cost data to construct a single combined range for each genre group:  a range within which a software industry expert (such as Prof. MacCormack) would expect the range of the average app developer's costs in that genre.  Importantly, apart from a dispute over the proper unit of measure for marginal cost (discussed below) that the Court has already considered and rejected, no Apple expert has disputed Prof. MacCormack's calculations or offered different ranges for his genre groupings.

### b.  Apple Imposes Data Requirements of Its Own Invention

Apple argues (at 31-33) that because Prof. MacCormack did not select the subpoenaed app developers himself and the selection did not produce a random sample of results, his analysis is infirm.  These are requirements for which Apple offers no persuasive authority or argument.  Indeed, "[d]istrict courts within . . . this district have often concluded that experts' decisions about what data to use in their analysis bear on the weight, not the admissibility, of expert testimony." *United States ex rel. Bergeletric Corp. v. Sauer, Inc.*, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) (quoting *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 305 (N.D. Cal. 2018)).

Prof. MacCormack did not select the subpoenaed entities because a full-blown third-party subpoena campaign in a case of this magnitude and complexity is a years-long endeavor.  But an expert may rely on data that others collected.  *Id.*; *see also Safeco Ins. Co. of Am. v. County of San*

*Bernardino*, 347 F. App'x 315, 317 (9th Cir. 2009). Here, that data collection effort began in 2021. Increasingly common in data-intensive, complex litigation, plaintiffs must send dozens or even hundreds of subpoenas for highly sensitive financial data for analysis by a testifying expert who does not work for them (or may even work for a competitor). Understandably, this tends to require a prolonged negotiation, litigation with recalcitrant subpoena recipients, and use of whatever data the subpoenaed companies have, in whatever form it is kept. Many recipients do not have what is needed in usable form. This imposes a substantial burden on the non-parties. *See Rivera v. Equifax Info. Servs., LLC*, 2025 WL 1185376, at \*11 (N.D. Ga. Mar. 26, 2025) (ordering parties to agree on a means to reduce the number of nonparty subpoenas).

Here, the cost data subpoena campaign began with over 200 subpoenas served on 172 recipients. This campaign yielded 114 substantive responses, and the data produced was usable from most but not all the producing firms. Nearly six dozen non-party respondents produced usable annual cost observations for some or all cost categories, totaling over seven hundred variable cost data points. Apple stops short of saying (at 32-33) how many subpoenas or responses it believes would be sufficient. Instead, Apple just asserts this is insufficient.[7] The degree of discovery that Apple's objection implies would be "a sprawling, costly, and hugely time-consuming undertaking" not easily managed by the Courts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-60 & n.6 (2007). A new layer of requirements that multiplies the non-party subpoena needs in each of the several MDL antitrust cases each year would impose nightmarish

---

[7] Apple never commits to what it or its experts think an adequate data pool might be, but it is possible to infer a position from Apple's complaining. Apple argues that grouping genres is unacceptable, implicitly insisting on a representative sample of apps *from each genre*. The App Store has 27 genres. If Apple were to demand cost data from at least ten apps per genre—a number that Apple (at 25, 28) only hints at—Plaintiffs would need to obtain usable cost data from *at least* 270 third-party app developers. Given the rate of usable responses Plaintiffs received here (71 usable responses from 172 recipients, or 41%), that implies substantive responses from no fewer than 658 non-parties—if, and only if, a random selection of subpoena recipients yielded the same ratio of subpoenas to useable responses, which might or might not be a random sample of developers—who might or might not keep sufficiently detailed and useful cost data. If Apple's assertions about statistical significance were accepted as correct, a more realistic estimate of the number of subpoenas required would number in the thousands. Neither the litigants nor the Court could endure such a massive undertaking.

burdens on parties, non-parties, and the Courts alike. *See Rivera*, 2025 WL 1185376, at \*11 (a campaign of hundreds of nonparty subpoenas is burdensome). There is no need to impose data requirements beyond what the experts themselves deem sufficient in their areas of expertise:

> The advisory committee's notes state that the rule's emphasis on sufficiency "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Instead, the sufficiency inquiry examines "the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, ***and what is deemed sufficient by experts in the pertinent field when working outside the courtroom***."

*Collinge v. IntelliQuick Delivery, Inc.*, 2018 WL 1088811, at \*7 (D. Ariz. Jan. 9, 2018) (first quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment; and then quoting 29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 6268 (2nd ed. 2017) (emphasis supplied).[8] "The word 'sufficient' signifies that the expert may properly base her opinion on something less than all the pertinent facts or data." 29 Wright & Miller, *supra*, § 6268. Moreover, "[i]n cases where courts have excluded testimony because the expert relied on too little data, it was clear that the lack of data undermined or distorted the methodology itself." *Official Comm. of Unsecured Creditors*, 2020 WL 4041483, at \*5. Here, there is no such distorting effect.

Apple's citations are inapposite. In *Laumann v. National Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), the court did not rule on the sufficiency of the expert's data. Instead, it noted that the results "seem[ed] nonsensical." *Id.* at 318. The defendant's expert there (Prof. Daniel McFadden) had explained that plaintiffs' expert had used data selectively, and disregarded other useful data that available to him. *Id.* at 318 & n.123. By contrast here, Prof. MacCormack called upon his vast software industry experience to determine whether the margin ranges produced by the usable data make sense, and he sought out public data and made necessary adjustments to those ranges accordingly. *See* Ex. 32 (MacCormack Rep.) ¶¶ 11, 17, 49, 97, 101, 124-25, 127, 132, 137-

---

[8] *Narcisse v. All Ways Transp.*, *LLC*, 2023 WL 6544930, at \*4 (M.D. La. Sept. 22, 2023) (same); *Shawnee Mission Plaza, LLC v. Noland*, 2016 WL 7637685, at \*4 (W.D. Okla. Oct. 26, 2016) (same); *In re Gold King Mine Release in San Juan Cnty., Colo., on Aug. 5, 2015*, 2022 WL 3543470, at \*4 (D.N.M. Aug. 18, 2022) (same); *Official Comm. of Unsecured Creditors v. CalPERS Corp. Partners*, *LLC*, 2020 WL 4041483, at \*5 (D. Me. July 17, 2020) (same).

38, 143, 145, 148, 150, 156, 160, 172, 176, 197, 199-202, 205, 208-210, 218, 222, 226-227, 234-35, 238-243, 251, 255, 260, 262, 264-65, 270, 285, 295, 300, 305 and nn. 81, 82, 97, 108, 116, 136-37, 145, 166, 175, 182, 200, 207, 216, 230, 315.  Critically, Prof. MacCormack has not left any usable data "on the table," as the expert did in *Laumann*.  To the contrary, he "attempt[ed] to use all of it to compute the variable costs," Ex. 32 (MacCormack Rep.) ¶ 196 n.135, and excluded data only for objective reasons explained in his report.  *Id.* ¶¶ 193, 196.

Also inapposite is *Grodzitsky v. American Honda Motor Co.,* 957 F.3d 979, 983, 985 (9th Cir. 2020).  The Ninth Circuit affirmed exclusion of an expert's opinion because the expert's sample size failed to support his damages theory.  No such disconnection exists here.

Other cases Apple cites present problems of obvious cherry-picking, which is the opposite of what Apple complains of here:  Prof. MacCormack, as Apple admits, employed all the usable results.  In *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1175-76 (7th Cir. 2008), the court upheld the exclusion of an expert's report where the expert used a price of more than five times the actual prevailing price in all his calculations because in *one month, for one customer on one occasion*, there was a price adjustment to the higher price.  In *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *6 (N.D. Cal. July 12, 2021), the expert used only four samples and, unlike Prof. MacCormack here, ignored other readily available samples, including one she had written about in her own book.  Moreover, the expert in *Rearden LLC* acknowledged that she cherrypicked her examples, limiting them to ones supporting her hypothesis.  *Id.* at *7.[9]

### c.  Prof. MacCormack Produced Proper Inputs for the McFadden Model

Apple disputes (at 35-38) how Plaintiffs' experts measured the cost of selling in-app digital

---

[9] Apple puts forth *Rearden LLC* as collecting similar cases, but these are all similarly inapposite: in *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 529 (N.D. Cal. 2020), the four samples at issue were not presented by an expert, but in an argument over attorney's fees; in *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 69 (S.D.N.Y. 2018), the court found that a study of only two pairs of male-female executives could not be statistical evidence of pay disparities, and that there was also a "significant danger of reporting bias," because the expert relied on interviews with the two executives' managers; and in *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522-23 & n.25 (N.D. Cal. 2012), the argument was over whether to regionally disaggregate or pool complex gender-differentiated employment promotion data.

goods to iOS device users. But this Court already rejected Apple's argument that marginal cost have to be measured at the level of single units of game tokens, and expressly accepted that Prof. McFadden's model that takes the user's ***total monthly spend*** on IAP as the appropriate unit of analysis for apps that monetize by IAP (almost all of them, at this point in the App Store's history):

> Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id*. ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale.

Dkt. 789 at 7 (emphasis in original). Apple also raised this issue when it petitioned for Rule 23(f) review, (Dkt. 793-1 at 28), and the Ninth Circuit declined to grant that review (Dkt. 875).

Apple continues its error as to how marginal costs may be measured. Indeed, Apple's expert Prof. Jeffrey Prince acknowledged that economists think of marginal costs in both the short run (such as single units of game tokens) and the long run (Prof. McFadden's monthly app spending), with the difference impacting which costs to include in a marginal cost analysis. Dkt. 789 at 9 n.5.

At the most basic level—apart from plowing old ground—Apple is inviting the Court to take the question whether it is appropriate to measure marginal cost as variable costs (including incremental cost when operating at scale) rather than short-term unit costs out of the jury's hands. Prof. McFadden has testified, Ex. 15 (McFadden Dep.) at 105:10-22, and will testify again at trial that the proper unit of analysis is users' app spending per month, and that for purposes of the model he designed, the marginal cost is the total variable cost of serving that user to keep the user spending money on in-app digital content. Apple does not dispute that Dr. Song has implemented Prof. McFadden's model with that variable cost in mind, using inputs from Prof. MacCormack. Like Prof. McFadden, Dr. Song says that monthly user app spending is the correct unit to measure variable costs for purposes of Prof. McFadden's econometric model.

To create the illusion of a mismatch between Prof. MacCormack's margin estimates and the marginal cost bounds used in Prof. McFadden's damages model, Apple distorts (at 37) Prof.

MacCormack's testimony, almost literally cutting his answer in half. Prof. MacCormack, who holds a Ph.D. in business administration and is not an economist, actually said:

> I concede the point that digital goods have close to zero marginal cost. But for these users, *it's hard to get them* [the users]. So the cost of acquiring that customer and the *cost to serve them* [the users] may still be high. So the fact that that digital good is – has a low marginal cost may – is not necessarily the overriding factor in terms of looking at the *profitability of that user*.

Ex. 19 (MacCormack Dep.) at 113:1-10 (emphases added). Prof. MacCormack neatly encapsulated the difference in Apple's and Plaintiffs' views: Apple insists on focusing on the immediate marginal cost of the digital transaction, whereas Plaintiffs' experts all uniformly believe that app developers must and do set prices to capture long-run marginal cost, which is the full cost of keeping those users spending. As Dr. Song testified:

> [Y]ou should think of those costs not as a cost of downloading or cost of purchasing another unit of virtual currency. Those costs in Professor McFadden's model is *the costs that are relevant for app developer's decision of what prices to charge on a monthly basis*. *So the unit of analysis is month app*, not per download or per purchase.

Ex. 22 (Song Dep.) at 188:13-21 (emphasis added). Apple thus fails to manufacture a mismatch between the software industry expert measuring costs from subpoenaed data and the econometricians who created and implemented the econometric model.

Prof. MacCormack, Prof. McFadden, and Dr. Song have all used a definition of marginal cost that is the real incurred cost of serving the paying user, much to Apple's frustration. Each worked in his own field of expertise. Apple's argument (at 36-37) that the economists should have supervised the work of a non-economist simply has no merit, as its strained citations demonstrate. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 665-66 (S.D.N.Y. 2007), stands only for the proposition that an expert cannot be a mere "mouthpiece" for an analysis performed by another. Here, Prof. MacCormack offers his own opinions and takes responsibility for his part of the analysis: determining profitability of the app developers in the genre, after incurring the variable costs of attracting and retaining the customers and keeping them happily spending. Likewise, Prof. McFadden offers his own opinions and takes responsibility for his part: the creation of the model considered at class certification. And Dr. Song offers his own opinions and

takes responsibility for his part: the implementation of the model, with all genres, apps and transaction data, using Prof. MacCormack's findings as to variable profit margins as input for the fully loaded marginal cost of serving the customers to sustain their app-month spend.

Apple's reliance on *Mirkin v. XOOM Energy LLC*, 2024 WL 4143376 (E.D.N.Y. Sep. 11, 2024), is misplaced.  That case stands only for the inapplicable proposition that an expert, having put forth a model, cannot without leave of Court "supplement" seven months out of time by jettisoning the original model and adopting one that operated entirely differently.  *Id.* at *10-11. Nothing like that happened here.

Apple's continued insistence that only the per-transaction "minting" cost is a valid marginal cost is disputed between economists; Apple may not prevent the experts from putting their point of view before a jury by having the Court peremptorily exclude Prof. MacCormack's work as inapplicable to the model, when the economists say it is the correct input.

**2.   Prof. MacCormack Exercised Appropriate Judgment in Grouping Genres**

Apple next criticizes (at 34-35) Prof. MacCormack's choice to group certain genres together.  His decision to do so is a classic expert choice in the analysis and presentation of data.[10] With 25 years of expertise in the software development industry, including teaching software development economics to MBA students, and with cost data obtained by subpoena from 68 app developers of 71 different apps across all genres, Prof. MacCormack is amply qualified to determine when two genres should be considered together because of the similarities in cost structures between the largest apps in each genre.

It is no slight to Prof. MacCormack's work that genres are inexact categories.  Apple has defined the genres and allows app developers to identify which genre they believe should apply to their apps. While developers may have particular reasons for choosing one genre or another, it was reasonable for Prof. MacCormack to rely on their business choices in performing his analysis.  The genres are broad, pre-existing categories, and the cost ranges Prof. MacCormack calculates are

---

[10] Apple's attacks on Prof. MacCormack's grouping of genres affect only part of the commerce at issue.  He grouped 23 genres, but left four freestanding, including games, which accounts for a higher share of the App Store commissions.  Ex. 32 (MacCormack Rep.) ¶ 112.

meant only to conform the center of a distribution curve, where the pricing data from billions of transactions creates the remainder of the shape.

Apple mischaracterizes (at 34) Prof. MacCormack's grouping decisions as ad hoc. In fact, Prof. MacCormack enumerated the exact steps of his analysis for each grouping decision he made. *See* Ex. 32 (MacCormack Rep.) ¶¶ 97-118; *id.* § 6.3 & App. B.

Apple cites no authority that an expert in possession of a substantial body of data cannot simplify the data through grouping or exercise expert judgment in analyzing grouped data. Indeed, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Similar grouping decisions were found to be appropriate. *See*, *e.g.*, *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 287 (N.D. Cal. 2016) (antitrust case approving expert's "selection process" that "involved a combination of matching job titles to the . . . [s]urvey, the assistance of an algorithm, ***and his own judgment about what job titles to include***") (emphasis added); *360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 204 (D. Del. 2021) (expert validly relied on own experience in breaking content creators into three groups); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) ("When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." (cleaned up)).

Apple's citations on this point are unavailing. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) concerns a damages calculation with no regression model where the entire opinion is reliant on information from counsel. By contrast, Prof. MacCormack used data from more than 70 app developers, and Apple challenges his decisions (each explained in his report) based on experience to group some of them in certain ways. A similar attempt to extend *Zenith* was rejected in *Warren Distributing Co. v. Inbev USA LLC*, 2010 WL 2179167, at *9 (D. N.J. May 28, 2010) (expert did not rely solely on party's information but explained sources and steps). *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) is equally unhelpful. In a standard essential patent case, the expert predicted a dollar figure that the parties would have agreed as a license fee in negotiation, and never linked that factor to any method for quantification. By way of explanation he cited only "all the evidence in the record" and "30 years

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny Apple's *Daubert* motion.

DATED: September 2, 2025

By: *[signature: David C. Frederick]*

DAVID C. FREDERICK

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
JAMES M. WEBSTER, III (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY GUTMAN (*pro hac vice*)

**KELLOGG, HANSEN, TODD, FIGEL &**
  **FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)

270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

*Class Counsel for Plaintiffs*