# EXHIBIT 38

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**REBUTTAL EXPERT REPORT AND DECLARATION OF JEFFREY T. PRINCE, PH.D.**

June 13, 2025

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**Table of contents**

1. INTRODUCTION ............................................................................................................................2

   *1.1. Qualifications* .......................................................................................................................... *2*

   *1.2. Assignment* .............................................................................................................................. *3*

   *1.3. Overview of Plaintiff Experts' Damages Model* .................................................................... *4*

2. SUMMARY OF OPINIONS ............................................................................................................6

3. THE MCFADDEN-SONG MODEL CANNOT SHOW THAT ALL OR NEARLY ALL CLASS MEMBERS WERE INJURED, NOR RELIABLY IDENTIFY UNHARMED CLASS MEMBERS .......... 7

   *3.1. The McFadden-Song Model Continues to Predict a Large Number of Unharmed Class Members* ....................................................................................................................................... *9*

      *3.1.1. The Number and Percent of Unharmed Class Members Consistently Rose with Every Implementation of Professor McFadden's Model throughout the Class Certification Stage* ................... *9*

      *3.1.2. Small Changes to Data and Professor McFadden's Model Resulted in a Large Number of Class Members Switching between Harmed and Unharmed in the Class Certification Stage* ............. *12*

      *3.1.3. Dr. Song's Extension of Professor McFadden's Model to All App Store Genres and Calculations at the "Payor" Level Does Not Meaningfully Reduce the Number of Unharmed Class Members* ................................................................................................................................ *14*

   *3.2. Plaintiffs Lack Common Evidence of Injury for the Millions of Class Members that the McFadden-Song Model Finds to Be Uninjured* ........................................................................... *16*

   *3.3. The $10 Spending Cutoff Is Arbitrary and Excludes Millions of Class Members with the Same Theory of Liability* ............................................................................................................. *21*

   *3.4. The Reliability of Dr. Song's Results Depends Upon the Reliability of the Methodology to Identify Payors for Linking to Transactions* ............................................................................... *24*

   *3.5. The McFadden-Song Model Cannot Measure the Impact on Consumers of Any Specific Challenged Conduct* ..................................................................................................................... *26*

4. APPENDIX A— CV ......................................................................................................................29

5. APPENDIX B—PRIOR TESTIMONY .........................................................................................53

6. APPENDIX C—DOCUMENTS RELIED UPON LIST ................................................................55

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

# 1. Introduction

## *1.1. Qualifications*

1. My name is Jeffrey T. Prince. I am an economist, tenured professor, and the Chairperson of Business Economics and Public Policy at the Kelley School of Business, Indiana University. I am also the Harold A. Poling Chair in Strategic Management, Advisory Committee Member for the Indiana University Center for Survey Research, and Faculty Affiliate of both the Indiana University Data Science Program and Kelley Institute for Corporate Governance and Ethics. From 2016 to 2022, I served as Co-Director of the Institute for Business Analytics at the Kelley School.

2. From Fall 2019 to Fall 2020, I served as Chief Economist at the Federal Communications Commission ("FCC"), where I advised the Chairman on a wide range of telecommunications policy issues and initiatives and led the internal research program.

3. My primary areas of economic expertise include industrial organization and applied econometrics. A great deal of my research focuses on technology markets, consumer demand, quality competition, and data privacy. Many of my published papers utilize and analyze market data and/or survey data and involve estimates of consumer preferences for product attributes. I have developed and taught Ph.D.-level courses on empirical industrial organization, in which I have instructed students on a wide range of econometric techniques, including those assessed in this report. At the Kelley School, I have developed courses on data analysis and empirical methods that my colleagues and I have taught to senior undergraduates, MBAs, and PhDs. I recently developed and taught a course on digital economics for business at the undergraduate level and will soon teach an advanced version of it in Kelley's executive education program as well. I am also the sole author of a textbook with McGraw-Hill Education on predictive analytics, a co-author of a managerial economics textbook entitled Managerial Economics and Business Strategy, also published by McGraw-Hill Education, and a coauthor of a book about the Metaverse, recently published by the Oxford University Press.

4. I graduated from Miami University with a B.S. in Mathematics and Statistics and a B.A. in Economics in 1998. I then received my Ph.D. in Economics from Northwestern University, specializing in Industrial Organization. Since earning my Ph.D. in 2004, I have published more than 30 research papers utilizing a wide range of econometric techniques, many in top economics and management journals. **Appendix A** provides my current CV.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

5. In addition to my work on this matter, I have extensive experience as a testifying expert in state and federal court. I have also provided expert briefings to state and federal enforcement agencies. This work has involved analysis of class certification issues on behalf of both plaintiffs and defendants. I have also analyzed competitive issues involving antitrust claims in digital markets. **Appendix B** provides a list of matters in which I have given testimony in the last four years.

### 1.2. Assignment

6. I previously submitted an Expert Report and Declaration in this matter on March 10, 2023, in support of Apple's Opposition to Plaintiffs' Renewed Motion for Class Certification and Apple's Motion to Exclude the Testimony of Professor Daniel McFadden and Dr. Rosa Abrantes-Metz.[1] I also submitted an Expert Report on August 10, 2021,[2] and Declarations on November 9, 2021, November 30, 2021, June 30, 2023, and April 29, 2025.[3]

7. I have been asked by counsel for Apple to analyze the Expert Reports of Professor Daniel L. McFadden and Dr. Minjae Song, dated March 7, 2025, as well as the Declaration of Dr. Minjae Song, dated May 6, 2025, and assess the methods and methodologies proposed therein.[4] Specifically, I was asked to evaluate the reliability, as a matter of economics and econometrics, of Professor McFadden's and Dr. Song's methods, models, and methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct and for identifying harmed and unharmed class members. I reserve the right to update or supplement my opinions as further information is made available to me.

8. I am being compensated for my work on this matter at my standard billing rate of $1,175 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor

---

[1] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., March 10, 2023 ("2023 Prince Report").

[2] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., August 10, 2021 ("2021 Prince Report").

[3] Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, November 9, 2021; Supplemental Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Testimony of Daniel L. McFadden, November 30, 2021; Reply Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's *Daubert* Motion, June 30, 2023; Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Opposition to Plaintiffs' Motion to Modify Class Definition, April 29, 2025.

[4] Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025 ("2025 McFadden Report"); Expert Report of Minjae Song, Ph.D., March 7, 2025, with backup materials ("Song Report"); Declaration of Minjae Song, Ph.D., in Support of Plaintiffs' Motion to Modify Class Definition and Approve Notice to the Class, May 6, 2025.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### *1.3. Overview of Plaintiff Experts' Damages Model*

9. Plaintiffs' damages model in this case was initially put forward by Professor McFadden ("Professor McFadden's model") and, more recently, implemented with some adjustments by Dr. Song (the "McFadden-Song model").[5] Each iteration of what is now the McFadden-Song model has found that prices for some apps would be higher with a lower assumed commission rate, meaning some class members, according to the model, would be worse off in a world absent Apple's challenged conduct ("the but-for world").[6] This occurs because for apps with sufficiently low real-world prices, the model estimates negative marginal cost, which leads the model to predict negative damages for class members who purchased those apps. I understand that Professors Lorin Hitt and Mark Watson each discuss the McFadden-Song model in depth and describe some of these aspects at greater length. For the purposes of this report, I note a few additional characteristics of the McFadden-Song model below.

10. While the main features of the McFadden-Song model are largely unchanged from Professor McFadden's model in the class certification phase of this case, Dr. Song's implementation of the model includes some updates. Specifically, in discussing Professor McFadden's model at the class certification phase, the Court indicated a concern about the high number of unharmed class members identified by Professor McFadden's model, and noted its expectation, based on Plaintiffs' representations, that extending the model to additional app genres would mitigate this concern by reducing the fraction and number of unharmed class members.[7] Accordingly, in the latest iteration, Dr. Song has extended the McFadden-Song model to additional genres of apps.

---

[5] Deposition of Daniel L. McFadden, May 14, 2025 ("2025 McFadden Deposition"), pp. 25:7–26:8 ("Q. You state in your current report that effective December 31, 2023, you retired as a principal of The Brattle Group. … You indicate in paragraph 4 of your report that since the time that you retired, 'Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data for all genres in his expert report, including preparing the underlying data for the modeling.' What do you mean in that sentence by 'directly overseen'? A. He is -- I'm no longer the -- the operating architect, the supervising architect for that work. I have retired from that, so he's taken on that role.").

[6] See, e.g., Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021 ("2021 McFadden Report"), Exhibits 16 and 17; Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022 ("2022 McFadden Supplemental Report"), Figure 1; Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022 ("2022 First Revised McFadden Supplemental Report"), Figure 1; Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, January 19, 2023 ("2023 Second Revised McFadden Supplemental Report"), Figure 1; Song Report, Figure 13.

[7] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, February 2,

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

11. In addition to extending the model to other app genres, Dr. Song incorporates newer data for more recent transactions on the App Store and adapts the model to changes in the class composition to exclude transactions on iPod touch devices.[8] Dr. Song then runs the McFadden-Song model to calculate damages and the share of unharmed class members, based on individual "payors" who had at least $10 in App Store spending in at least one account. Dr. Song relies on a purported matching of payment profiles, produced by JND Legal Administration, to assign transactions and thus damages.[9] To reduce the number of unharmed class members in the McFadden-Song model, Dr. Song applies a cutoff to exclude payors who paid less than $10. As was the case in Professor McFadden's original model, this cutoff is not determined as the result of an empirical analysis. The McFadden-Song model, like Professor McFadden's model, relies on a but-for commission rate calculated by Dr. Abrantes-Metz for its determination of harm. As was the case in Professor McFadden's model, the McFadden-Song model takes this but-for commission rate as given based on instruction from Plaintiffs' counsel.[10]

12. Professor McFadden and Dr. Song also assert that their analysis of harm and damages is "conservative" because it does not include additional types of harm—due to alleged loss of innovation, reduction of choice, and reduction of app variety, as described by Professor Stiglitz—over and above the putative monetary damages estimated by the McFadden-Song model.[11]

---

2024 ("2024 Class Certification Ruling"), p. 26 ("While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs representations, that once the model is fully run, that number will be reduced or the cutoff could be changed to reduce the impact of including unharmed accounts.").

[8] Dr. Song also relies on Professor MacCormack to apply constraints to the McFadden-Song model's margin estimation. I understand Professor Watson and Professor Hitt discusses this in detail in their reports.

[9] See Song Report, ¶ 70 ("I have received a declaration from JND Legal Administration that explains its methodology for identifying and removing duplicate payor records."); Deposition of Minjae Song, Ph.D., June 4, 2025, pp. 252:16–257:6 ("[Q.] This is the paragraph [paragraph 70] where you say you understand Apple matched the transactions data to unique payers after JND Legal Administration deduplicated approximately ███ billion potential payors. Do you see that? A. I do. Q. You attach a declaration from Darryl Thompson [Chief Information Officer and Chief Operating Officer for JND Legal Administration] to your expert report. A. Correct… Q. Okay. Mr. Thompson is the individual expert who sponsors this deduplication methodology, correct? A. He – he's the – he's – he's the expert who conducted the – the deduplication analysis… Q. Do you – do you have an understanding specifically of what his methodology is? A. I have a – a high-level understanding of what he did, but my understanding is limited because his methodology is proprietary… Q. Well, if Mr. Thompson does not do his work reliably, does that not tell you that your reported harmed and unharmed calculations are not likely to be reliable? A. Again, since I was not part of mapping Mr. Thompson's payor IDs to transactions data, I cannot really speak to that… I cannot really speak to the – the effects of any changes in Mr. Thompson's payor de – deduplication work.").

[10] Song Report, ¶ 12; 2025 McFadden Report, ¶ 5.

[11] Song Report, ¶ 16 ("Prof. McFadden's damages model, which I apply in this report, estimates the monetary harm caused by Apple's allegedly supracompetitive App Store commission. To the extent that Prof. Stiglitz identifies additional forms of consumer harm, my estimates provide a conservative measure."); 2025 McFadden Report, ¶ 19.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

## 2. Summary of Opinions

13. The McFadden-Song model is unreliable and incapable of determining which class members are harmed or unharmed due to Apple's conduct on a classwide basis using common evidence, or of calculating damages to individual class members. At all stages of this case, the McFadden-Song model has predicted that a substantial number of class members are unharmed. According to the most recent estimate from the model, approximately 9.7 million class members—or approximately 11.0 million class members when purportedly simulating Apple's price tiers—are unharmed. Moreover, small perturbations to that model—whether due to corrections in the methodology, small changes in the data, or changes to its (many) unreliable assumptions—are highly impactful on the number of unharmed class members and the identity of which class members are harmed or unharmed. None of the changes in Dr. Song's implementation of the McFadden-Song model has meaningfully reduced the number or the percentage of unharmed class members. (Section 3.1)

14. Professor Stiglitz claims that class members are harmed by Apple's alleged misconduct due to alleged loss of innovation, reduction of choice, and reduction of app variety. According to Professor Stiglitz, class members have suffered this harm beyond any putative monetary harm stemming from the McFadden-Song model. Relying on Professor Stiglitz's claims about this additional harm, Professor McFadden and Dr. Song seem to imply that class members predicted to be unharmed by their model are nevertheless harmed by Apple's conduct. However, Plaintiffs' experts have not pointed to any evidence (much less evidence common to class members) nor put forward any model to quantify the alleged additional harm that Professor Stiglitz claims exists, and they have not shown that the alleged additional harm exceeds the monetary benefits to unharmed class members predicted by the McFadden-Song model. Further, whether and to what extent a class member would be harmed by any alleged loss of innovation, reduction of choice, or reduction of app variety needs to account for variation in consumer preferences on these dimensions. Plaintiffs' experts have provided no analysis of this alleged harm, and it is not clear how Plaintiffs' experts would be able to establish the existence of these kinds of alleged harms based on evidence common to the class. (Section 3.2)

15. The $10 spending cutoff aimed at reducing the number of unharmed class members in the McFadden-Song model removes 23 million harmed payors that have (according to the McFadden-Song model) viable damages claims. The arbitrary cutoff is therefore untethered to Plaintiffs' theory of liability. The $10 spending cutoff results in a lower percentage of unharmed class members because it disproportionately removes consumers that primarily

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

purchase low-priced transactions. Specifically, in the McFadden-Song model, low-priced apps are the ones that have higher but-for prices (thereby generating no "harm"). Therefore, while the removal of payors that made only a few low-priced purchases appears to be aimed at reducing the number of unharmed payors, this is misleading because it is Dr. Song's and Professor McFadden's modeling assumptions—rather than any empirical evidence—that make unharmed payors cluster around low price points. (Section 3.3)

16. Plaintiffs purport to identify class members who are unique individual payors so that they can be linked to all of their relevant transactions. To the extent that payor records and transactions have been assigned to the wrong class members as a result of Plaintiffs' experts' data processing work, Dr. Song would be unable to reliably determine whether individual class members are harmed or to what extent. Further, in aggregate, the impact of such issues would have an ambiguous effect on the total fraction of unharmed class members. (Section 3.4)

17. Finally, the McFadden-Song model—and its associated damages estimate—is not directly connected to Apple's challenged conduct. Dr. Song, like Professor McFadden, relies on a but-for commission rate calculated by Dr. Rosa Abrantes-Metz to predict but-for app and in-app content prices. This but-for commission rate is determined independently from the McFadden-Song model and has not been apportioned across Apple's various kinds of alleged misconduct. According to Professor Lorin Hitt, Dr. Abrantes-Metz has failed to articulate how the but-for commission rate would change based on whether the specific challenged conduct is allowed (or not allowed) in the but-for world, and her conclusion that the but-for commission rate would be 13.63 percent independent of which part of Apple's conduct is found to be unlawful is unreliable. This implies that the McFadden-Song model, which relies entirely on Dr. Abrantes-Metz's testimony for the but-for commission rate, will be unable to reliably apportion the putative damages estimate to specific aspects of Apple's alleged misconduct. (Section 3.5)

**3. The McFadden-Song Model Cannot Show that All or Nearly All Class Members Were Injured, Nor Reliably Identify Unharmed Class Members**

18. I have reviewed Dr. Song's implementation of Professor McFadden's methodology in the Song Report. I find that the McFadden-Song model is not meaningfully different from the

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

model described by Professor McFadden in his 2023 Second Revised Supplemental Report.[12] Dr. Song's implementation—including its additional assumptions and reliance upon Professor MacCormack—does not resolve the various flaws I previously identified that render the model an unreliable methodology for identifying harmed and unharmed class members and calculating classwide damages. Therefore, I reaffirm the opinions presented in my Expert Report and Declaration, dated March 10, 2023 (the "2023 Prince Report").[13] I understand that Professors Hitt and Watson address similar and additional flaws, including the McFadden-Song model's false predictions regarding pass-through and marginal costs,[14] its unreliable predictions regarding the relationship between apps' prices and costs,[15] and its reliance on—and sensitivity to—app developers' profit margins.[16]

19. In this section, I explain how the McFadden-Song model is not a reliable methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct, nor is it a reliable methodology for identifying harmed and unharmed class members. Specifically, the McFadden-Song model continues to predict millions of unharmed class members, notwithstanding its extension to additional app genres and application to individual payors rather than accounts[17] (Section 3.1). Plaintiffs attempt to salvage this fundamental failing in a variety of ways. First, Plaintiffs make unsubstantiated claims that there are nonmonetary harms that may accrue to class members over and above any lack of putative monetary harm estimated by the McFadden-Song model (Section 3.2). Second, Plaintiffs continue to impose a $10 spending cutoff for class membership, which is arbitrary and excludes millions of putative class members with the same theory of liability (Section 3.3). Further, Plaintiffs' methodology to establish harm to particular class members depends upon the reliability of their methodology to identify unique payors (in order for them to be linked to transactions) (Section 3.4). Finally, the McFadden-Song model cannot measure the impact on class members of any specific challenged conduct. The model potentially measures damages from lawful and procompetitive conduct, and since it cannot be adapted if

---

[12] 2023 Second Revised McFadden Supplemental Report; Song Report, ¶¶ 49 ("I explain how I use the methodology Prof. McFadden demonstrated in the Class certification stage to estimate damages using all of the App Store transactions data which includes 27 genres in total, and how I identify harmed and unharmed Class members."), 55; 2025 McFadden Report, ¶ 4 ("Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data for all genres in his expert report, including preparing the underlying data for the modeling. Dr. Song and I have conferred regularly as he has implemented my methodology.").

[13] 2023 Prince Report.

[14] Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., March 7, 2025 ("2025 Hitt Report"), Section 9; Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., June 13, 2025 ("2025 Hitt Rebuttal Report"), Section 9.5.

[15] 2025 Hitt Rebuttal Report, Section 9.3.

[16] Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., June 13, 2025 ("2025 Watson Report"), Section IV.

[17] 2024 Class Certification Ruling, p. 26:12–15 ("While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs representations, that once the model is fully run, that number will be reduced or the cutoff could be changed to reduce the impact of including unharmed accounts.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

any type of conduct is ruled lawful and/or procompetitive, it cannot reliably establish impact or estimate damages (Section 3.5).

### *3.1. The McFadden-Song Model Continues to Predict a Large Number of Unharmed Class Members*

20. Throughout this matter, Professor McFadden's model has predicted that many class members were unharmed by the alleged conduct. His corrections to various errors have often increased that number, and only by implementing an arbitrary $10 cutoff (unrelated to Plaintiffs' theory of liability) have Professor McFadden and Dr. Song reduced the number of unharmed class members to what is still a very large number—approximately 9.7 million in their most recent reports (or approximately 11.0 million in the context of the McFadden-Song methodology that purportedly simulates Apple's price tiers).[18] In this section, I recap how the number of unharmed class members has historically increased with the implementation of corrections to Professor McFadden's model. I further explain how, since the class certification stage, the implementation of the McFadden-Song model continues to yield a large number of unharmed class members. As such, the McFadden-Song model does not show that all or nearly all class members were injured.

#### *3.1.1. The Number and Percent of Unharmed Class Members Consistently Rose with Every Implementation of Professor McFadden's Model throughout the Class Certification Stage*

21. As detailed in the 2023 Prince Report, the percent of unharmed App Store accounts steadily increased across each of Professor McFadden's reports throughout the class certification stage.[19] Exhibit 1 visually depicts the change in the percent of unharmed accounts across Professor McFadden's class certifications reports. Below, I explain how this percent changed over time.

---

[18] Song Report, Figure 13. The unrounded number reported by Dr. Song is 9,693,747. In his price tier simulation, this number if 10,986,763.

[19] 2023 Prince Report, Exhibit 4.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

***EXHIBIT 1***

***The Percent of Unharmed Accounts has Steadily Increased Across Each of Professor McFadden's Reports Throughout the Class Certification Stage***



Source: McFadden Reports

Note: Each bar represents the percentage of unharmed accounts in one of Professor McFadden's reports.

22. Professor McFadden reported approximately 5.8 percent of accounts were unharmed in his 2021 Initial Report.[20] However, in his 2021 Reply Report, Professor McFadden made two adjustments that yielded a finding that 14.6 percent of accounts were unharmed.[21] This increase stemmed from how Professor McFadden identified whether an account was harmed. Whereas he originally identified unharmed accounts as those that were not harmed for any single transaction, his 2021 Reply Report properly identified unharmed accounts as those that were not harmed on net across that account's total set of transactions.[22] Further, I identified a data processing error in Professor McFadden's analysis. Specifically, I explained how a computer rounding error led Professor McFadden to errantly drop observations from his

---

[20] 2021 McFadden Report, ¶ 241.

[21] Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021 ("2021 McFadden Reply Report"), ¶ 200, footnote 371.

[22] 2021 McFadden Reply Report, ¶ 200.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

analysis.[23] When fixing this error and using a measure of net harm, Professor McFadden acknowledged in his 2021 Reply Report that the fraction of unharmed accounts increased to 14.6 percent.[24]

23. Later, in his 2021 Declaration, Professor McFadden found that this number further increased to 15.3 percent.[25] Relative to his earlier reports, this difference stemmed from the set of apps included in his prediction of but-for prices. Whereas his earlier calculations included only but-for price predictions for the top 70 percent revenue apps, his 2021 Declaration included but-for price predictions for all apps in the genres he studied.[26] Following Professor McFadden's 2021 Declaration, the Court denied Plaintiffs' motion for class certification based on, in part, "Calculation Data and Model Errors" in Professor McFadden's model[27] and noted that no courts "have sanctioned a proposed class which included 14.6 percent" uninjured putative class members.[28]

24. In his 2022 Supplemental Report addressing the errors the Court identified in his original model, Professor McFadden found that 17.2 percent of accounts (or around 30.4 million accounts) were unharmed.[29] Relative to his 2021 Declaration, this difference stemmed from: (a) attempting to "address the switcher issue"—that the same account can switch between harmed and unharmed depending on the sample used to calculate damages—by estimating demand using 75 different 0.1 percent samples and using the average estimates to predict but-for prices;[30] and (b) "using the full App Store data rather than a sample of the data to calculate damages."[31]

25. Finally, after more revisions and corrections, Professor McFadden further adjusted his estimates of unharmed accounts upward to 17.6 percent in his 2022 First Revised

---

[23] See, for example, 2021 Prince Report, ¶ 32.

[24] 2021 McFadden Reply Report, footnote 371.

[25] Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, November 23, 2021 ("2021 McFadden Declaration"), ¶ 9.

[26] 2021 McFadden Declaration, ¶ 9. See also 2021 McFadden Reply Report, ¶ 209.

[27] Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, March 29, 2022 ("2022 Class Cert Motion"), p. 7.

[28] 2022 Class Cert Motion, p. 25.

[29] 2022 McFadden Supplemental Report, Figure 1.

[30] 2022 McFadden Supplemental Report, ¶¶ 12, 54–55.

[31] 2022 McFadden Supplemental Report, ¶ 29. After reaching 17.2 percent, Professor McFadden introduced a $10 spending cutoff to reduce the number and fraction of predicted unharmed accounts in his model. 2022 McFadden Supplemental Report, ¶ 77. I address this cutoff in Section 3.3.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Supplemental Report and 17.8 percent in his 2023 Second Revised Supplemental Report.[32] Relative to his 2022 Supplemental Report, these differences stemmed from errors in how he classified certain apps into certain genres over time, which impacted his estimates of but-for prices.[33] The fraction of unharmed accounts reached as high as 20.0 percent in the price tier analysis of his 2023 Second Revised Supplemental Report.[34]

*3.1.2. Small Changes to Data and Professor McFadden's Model Resulted in a Large Number of Class Members Switching between Harmed and Unharmed in the Class Certification Stage*

26. One of the reasons the McFadden-Song model cannot reliably determine which class members are harmed or unharmed is its instability. Specifically, as was true of Professor McFadden's model, the McFadden-Song model fails to produce similar results in the presence of small variations in the data or in the assumptions upon which the model is built. These small changes can result in millions of class members alternating between harmed and unharmed. This source of unreliability in Professor McFadden's model is something I discussed at length in the 2023 Prince Report.[35] Because Dr. Song has not made substantial changes to Professor McFadden's model in his implementation, this unreliability persists in the McFadden-Song model today.

27. As an example of the model's instability in the presence of small variations in the data, in the 2023 Prince Report, I explained how Professor McFadden mis-categorized the genre of certain apps in the App Store transaction data.[36] Upon correcting his error, 958 apps out of a pool of 545,438 Games and Music + Entertainment apps changed genres.[37] At well under one percent of apps (more precisely, approximately 0.18 percent), this is a numerically minor change. However, this minor change in app genre categorization caused more than a million accounts to change from harmed to unharmed.[38] While one million accounts may represent only a small share of total accounts, these additional unharmed accounts increased the already very large number of unharmed accounts by around 3.3 percent.[39]

---

[32] 2022 First Revised McFadden Supplemental Report, Figure 1; 2023 Second Revised McFadden Supplemental Report, Figure 1.

[33] See, for example, 2023 Prince Report, footnote 104.

[34] 2023 Second Revised McFadden Supplemental Report, Figure 7.

[35] 2023 Prince Report, Section 5.

[36] 2023 Prince Report, ¶¶ 51–54.

[37] 2023 Prince Report, ¶ 52, Exhibit 2.

[38] 2023 Prince Report, Exhibit 3.

[39] $1,000,000 \div (17.2\% \times 176,964,271) \approx 3.3\%$.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

28. This issue of instability in Professor McFadden's model was not mitigated by his use of 75 samples. Professor Watson found that for one of the 75 Music + Entertainment samples in that same report, the genre correction impacted only 7 apps (out of more than 800 apps), and yet this minor difference caused the price sensitivity estimate to change from -1.6 to -62.3 (i.e., consumers would be almost 40 times more sensitive to a change in prices).[40] Even though the other 74 samples saw much smaller changes, the total harm from Music + Entertainment transactions fell by ████████, or about ██ percent, and this difference led to the above-referenced shift in harm status for more than one million accounts.[41] As this example shows, the use of 75 samples does not correct the fact that Professor McFadden's model lacked the levels of robustness and stability that I would expect to be characteristic of a reliable methodology.

29. As an example of instability in the presence of changes to the assumptions upon which Professor McFadden's model was built, I also showed in the 2023 Prince Report that changing Professor McFadden's unrealistic and unsupported assumptions yielded more unharmed accounts, generating additional "switchers." For example, I showed that alternative assumptions regarding Professor McFadden's "percentage method," his price tier simulation, the $10 spending cutoff, the but-for commission rate, and the margin constraints all yielded large changes to the percentage and identity of unharmed accounts.[42] Further, as Professor McFadden testified, if the jury were to disagree with certain assumptions of the McFadden-Song model, the jury would not be able to adapt the model and identify which class members are harmed and which are not.[43] Therefore, the McFadden-Song model is

---

[40] 2023 Prince Report, ¶ 155. See also Expert Report and Declaration of Mark Watson, Ph.D., March 10, 2023 ("2023 Watson Report"), Appendix H. In the McFadden-Song model, an app's demand elasticity is its price times the price sensitivity parameter. For a $1 app, the difference between a -62.3 and -1.6 price sensitivity is the difference between a -62.3 and -1.6 price elasticity. The price elasticity of demand is the ratio between the percentage change in quantity demanded and the percentage change in price.

[41] 2023 Prince Report, ¶ 155.

[42] For example, I showed that (i) applying Professor McFadden's model to predict but-for prices for individual items instead of using his "percentage method" for calculating item-level but-for prices increases the share of unharmed accounts from 17.8 percent to 35.9 percent; (ii) changing the $10 spending cutoff to be based on spending across all genres instead of only Games and Music + Entertainment increases the share of unharmed accounts from 7.9 percent to 12.4 percent; (iii) changing the but-for commission rate to but-for rates consistent with Dr. Abrantes-Metz's methodology but different than her proposed 13.63 but-for rate increases the share of unharmed accounts from 17.8 percent up to 44.8 percent; and (iv) changing Professor McFadden's proposed margin constraints based on six developers' accounting data to Professor Watson's sensitivity analysis of the margin constraints increases the share of unharmed accounts from 17.8 percent to 29.0 percent. 2023 Prince Report, Exhibit 19.

[43] 2025 McFadden Deposition, pp. 229:18–231:23 ("Q. If the jury determines that… multiple stores would charge different commission rates, can your model calculate damages?... [A. I]f the -- and she [Dr. Abrantes-Metz] said that these rates would vary by rival, then I don't have a model of operation of rival stores. Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?... [A.] The answer is I don't – I don't think I can do it and I don't think they can do it reliably. Q… If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?... [A.] I don't know -- I don't know how they would proceed. Q… If the jury determines that the margin constraints generally should be set at higher ranges, in other words shifted up,

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

incapable of showing injury, calculating damages, and identifying harmed versus unharmed class members on a classwide basis in a reliable manner.

30. Given that Dr. Song has not corrected these issues in his implementation of Professor McFadden's model—i.e., in the McFadden-Song model—this fundamental unreliability has carried forward into his own results.

### 3.1.3. Dr. Song's Extension of Professor McFadden's Model to All App Store Genres and Calculations at the "Payor" Level Does Not Meaningfully Reduce the Number of Unharmed Class Members

31. Throughout class certification, Professor McFadden calculated whether an individual *account* was harmed or unharmed. By contrast, Dr. Song analyzes whether an individual "*payor*" is harmed or unharmed. This creates challenges in directly comparing the unharmed metrics in terms of number or percentage that result from one analysis to the other. For example, a single, unique payor may be associated with multiple accounts, and, conversely, an account may be associated with multiple payors. A harmed payor may also be associated with two accounts—one unharmed and the other harmed. Nonetheless, both approaches find a very high number and percentage of unharmed individuals (either measured in terms of accounts or payors). Plaintiffs have acknowledged that payors are the appropriate unit of analysis.[44]

---

how would the jury reliably calculate damages using your model? A… it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.").

[44] Song Report, ¶ 11 ("Apple has since produced a supplementary dataset that contains anonymized billing IDs (hereafter referred to as 'payor IDs'), which represent individual persons, and the transactions IDs associated with the transactions paid for by these persons. I further understand this supplementary dataset can be used together with the new transaction ID variable included in the revised App Store transactions dataset to identify the individual transactions attributable to each payor. Counsel has instructed me to use this supplementary dataset for the purposes of identifying which individuals meet the spending threshold for Class membership and determining whether any individual Class member incurred monetary harm.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

32. Professor McFadden reported that, absent the arbitrary $10 spending cutoff, approximately 17.8 percent of 176,964,271 accounts were unharmed, corresponding to approximately 31.5 million unharmed accounts.[45] Dr. Song's implementation of the McFadden-Song model—also without the arbitrary $10 spending cutoff—yields approximately 27.0 million unharmed payors, corresponding to 12.0 percent of all payors.[46] This large number and percentage of unharmed class members persists despite adjustments to Professor McFadden's model that Dr. Song undertook in his implementation of the McFadden-Song model, such as the inclusion of all other genres in the estimation as well as new assumptions regarding the estimation.[47] That is, without relying on the arbitrary $10 spending cutoff, the McFadden-Song model continues to find a large number and percentage of class members that are monetarily *benefited* by Apple's conduct, despite extending the model to additional genres of apps.

33. Even with the application of the $10 spending cutoff, the McFadden-Song model finds that there are approximately 9.7 million unharmed payors.[48] These unharmed *payors* are associated with more than 14.5 million unharmed *accounts* based on the McFadden-Song model.[49] Like the 10.3 million unharmed accounts that Professor McFadden identified in his 2023 Second Revised Supplemental Report,[50] Dr. Song continues to find a very large number of unharmed accounts.

34. The 9.7 million unharmed payors from Dr. Song's analysis excludes iPod touch transactions, whereas Professor McFadden's earlier analyses did not. Plaintiffs sought to

---

[45] 2023 Second Revised McFadden Supplemental Report, Figure 6. 17.8% × 176,964,271 ≈ 31,499,640. Including the arbitrary $10 cutoff, Professor McFadden estimated that 7.9 percent of accounts were unharmed, corresponding to approximately 7.9% × 130,519,401 ≈ 10,311,033 unharmed accounts. The discrepancy between the total number of accounts and payors reported by Professor McFadden and Dr. Song arises from the differing time periods analyzed. Professor McFadden's data span from July 2008 to April 2022, whereas Dr. Song's data span from July 2008 to February 2024.

[46] See Workpaper 1. Including only payors with at least one account with more than $10 in spending, Dr. Song estimated 9,693,747 payors were unharmed, or approximately 5.2 percent. See Workpaper 2.

[47] See, for example, Song Report, ¶¶ 51–52 ("I rely on the genre grouping Prof. MacCormack describes in his report for the purposes of estimating consumer demand. Furthermore, I rely on the genre-group level variable profit margin ranges estimated by Prof. MacCormack to form the variable profit margin bounds for my demand estimation."), 79 ("I calculate Class-wide damages for the Class members as the sum of the damages they incurred for each of their respective App Store transactions"), 150 ("Another constraint is that the coefficient of log downloads on in-app purchase demand… be between 0 and 1.").

[48] Song Report, Figures 24 and 25. Specifically, Dr. Song finds approximately 9.7 million unharmed payors counting payors with at least $10 in spending from one account, 9.8 million unharmed payors counting payors with at least $10 in total spending, 11.0 million unharmed payors counting payors with at least $10 in spending from one account under his price tier simulation, and 11.1 million unharmed payors counting payors with at least $10 in total spending under his price tier simulation.

[49] See Workpaper 3.

[50] 2023 Second Revised McFadden Supplemental Report, Figure 6. 7.9% × 130,519,401 ≈ 10,311,033 unharmed accounts.

remove iPod touch transactions from the class.[51] The Court has since dismissed claims related to iPod touch transactions with prejudice.[52] As a result, approximately 2.0 million unharmed payors associated with iPod touch transactions were removed, leaving an estimated 9.7 million unharmed payors as identified in the McFadden-Song model.[53] These payors are those who made iPod touch transactions that the McFadden-Song model predicts would become more expensive in the but-for world, thereby making these individuals unharmed. The exclusion of iPod touch transactions also provides another illustration of how the model cannot reliably identify harmed class members. Specifically, the exclusion of iPod touch transactions induces a substantial number of "switchers." By reincluding these transactions, 346,459 class members would switch from harmed to unharmed, while 296,128 would switch from unharmed to harmed.[54]

### 3.2. Plaintiffs Lack Common Evidence of Injury for the Millions of Class Members that the McFadden-Song Model Finds to Be Uninjured

35. Both Professor McFadden and Dr. Song claim that their damages estimates from the McFadden-Song model are "conservative" to the extent that "consumers are harmed in other ways as a result of Apple's alleged misconduct."[55] As support for this claim of *additional* impact of Apple's alleged misconduct (i.e., beyond the putative monetary harm calculated from the McFadden-Song model), Professor McFadden and Dr. Song rely on the opinions of Professor Stiglitz, who claims that Apple's alleged misconduct includes depriving consumers "of alternative channels through which they could purchase iOS apps and in-app content," which Professor Stiglitz alleges has "reduced innovation, decreased the app variety available

---

[51] Plaintiffs' Notice of Motion and Motion to Modify Class Definition and Approve Notice to the Class; Memorandum of Points and Authorities in Support, *In Re Apple iPhone Antitrust Litigation*, April 15, 2025, p. 1.

[52] Order Granting in Part Motion to Modify Class, *In Re Apple iPhone Antitrust Litigation*, June 11, 2025, p. 1.

[53] The exclusion of iPod touch transactions tends to remove unharmed payors even under the $10 cutoff. See Workpaper 4. The most complete approach to calculating the impact of excluding iPod touch transactions would be to include iPod touch transactions, rerun Dr. Song's data processing and analysis in its entirety, and compare the results. Due to the substantial computation resources involved with processing the App Store transaction data and running Dr. Song's analysis, I present approximations by processing the iPod touch transactions separately and reincorporating them rather than reprocessing the full transaction data from scratch. However, iPod touch transactions predominantly appear in the data prior to 2017. Because Dr. Song applies his margin constraints from 2017 onwards—and because, as Professor Watson explains, those margin constraints predominantly determine the estimates of the McFadden-Song model—I would not expect the inclusion of iPod touch transactions to have a substantial impact on the estimation results. Song Report, footnote 228; 2025 Watson Report, Section IV.

[54] See Workpaper 5.

[55] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct."); Song Report, ¶ 47 ("As explained by Prof. McFadden, the damages model I use in this report quantifies the monetary harm resulting from the supracompetitive App Store commission Apple charges. It does not capture the additional sources of consumer harm described by Prof. Stiglitz. The magnitude of consumer harm I obtain in this report are in that sense conservative.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

to iOS device users, and restricted output."[56] On this basis, Dr. Song opines that "[c]lass members for whom [his] damages calculation attributes no monetary damages may still be harmed by Apple's conduct during the Class period" because "Prof. Stiglitz has analyzed several other forms of harm, e.g., a loss in app and in-app purchase output."[57]

36. Professor McFadden and Dr. Song therefore seem to imply that the up to 11.0 million class members for whom the McFadden-Song model finds no monetary harm are still in fact harmed. If so, to my understanding, that is a new opinion that neither has offered before in this litigation. Importantly, Plaintiffs' experts have not pointed to sufficient evidence or put forward any model to quantify the alleged *additional* harm that Professor Stiglitz claims exists.[58] Nor have they indicated that this additional harm can be shown based on evidence common to the class. Indeed, Professor Stiglitz, on whom Professor McFadden and Dr. Song rely to assert this *additional* harm, testified that he did not analyze whether all or nearly all class members suffered harm in addition to the putative monetary harm found by the McFadden-Song model.[59] Absent sufficient supporting analysis, the claim of *additional* harm is little more than speculation, as is any claim that such harm is common to all class members. That is, without a method by which to measure this alleged *additional* harm, Plaintiffs' experts are unable to say whether and to what extent a given consumer was

---

[56] Song Report, ¶¶ 46–47.

[57] Song Report, ¶ 81. See also 2025 McFadden Report, ¶ 8 ("Section II summarizes Apple's alleged misconduct, and the resulting consumer harm analyzed by Prof. Stiglitz. I find his opinions consistent with the opinions I offered in my prior reports… The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct.").

[58] See, for example, 2025 McFadden Deposition, p. 102:10–20 ("Q. (By Mr. Swanson) With reference to the harms that Professor Stiglitz speaks of, the broader harms, those include loss in output or reduction in app variety; is that correct? A. Yes. Q. To your knowledge, has any expert in this matter proposed a model to calculate damages to class members from lost output or reduced app variety? A. In the case? I'm not aware of this being done in the case, no."). Professor Stiglitz describes examples of allegedly reduced innovation, asserting that Apple's alleged misconduct has negatively affected innovation for developers of games and super apps. However, these specific examples fall short showing that innovation is systematically restricted by the alleged misconduct. Expert Report of Jospeh E. Stiglitz, Ph.D., March 7, 2025 ("Stiglitz Report"), ¶¶ 117, 120 ("First, Apple's restrictions force game developers to develop multiple versions of their app (i.e., one for the cloud and one for iOS devices) instead of just one version for the cloud. This increases the costs associated with the development or improvement of any apps or in-app content offered, as developers must spend more resources making different versions of the same app; and should they decide to develop an app or in-app content only for iOS devices, it reduces their expected return. Consequently, product development and innovation are stifled…Apple has also imposed restrictions on super apps (single apps that run a number of mini programs and offer access to a wide range of physical and digital products as well as online and offline services), prohibiting digital transactions and stripping away the design and visual presentation of their content, such as recommending and categorizing games, because it has a 'store-like' resemblance. These restrictions can potentially lead to a reduced number of super app users, similarly disincentivizing developers to invest in the development or quality improvements of super apps.").

[59] Deposition of Joseph Stiglitz, May 30, 2025 ("Stiglitz Deposition"), p. 33:1–10 ("Q. Have you quantified the amount of any non-monetary harm, if any, that plaintiff suffered as a results of Apple's alleged misconduct? A. No, I, I didn't do any estimate of the damages themselves. It's much more of a qualitative analysis. Q. Were you asked to analyze whether the evidence shows that all or nearly all members of the plaintiff class suffered non-monetary harm? A. No, I didn't look at that kind of detailed analysis.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

injured, e.g., by the loss of innovation that allegedly would have occurred in the but-for world, or by a lack of alternative app stores.

37. In addition to their failure to sufficiently analyze or even indicate what kind of evidence or analysis could show whether and to what extent consumers suffered this *additional* harm, it is not clear how Plaintiffs' experts would be able to balance this alleged *additional* harm against any benefits. There are at least two kinds of benefits to consumers that Plaintiffs' experts would need to consider. First, for some transactions, the McFadden-Song model finds "negative" damages (in other words, putative positive monetary benefits to consumers).[60] Professor McFadden agreed that these "negative" damages should be thought of as monetary benefit to consumers.[61] Second, as Professor McFadden also testified, some consumers received other nonmonetary benefits stemming from the alleged anticompetitive conduct, including consumer privacy and security.[62]

38. For example, the McFadden-Song model predicts that named Plaintiff Mr. Hayter is unharmed.[63] To determine whether he is "harmed in other ways as a result of Apple's alleged misconduct"[64] would require an analysis of these other putative harms, including whether, on net, those harms surmount the monetary benefit Mr. Hayter receives from the change in Apple's but-for commission rate. Among Professor McFadden, Dr. Song, and Professor Stiglitz, none has provided any methodology, let alone any methodology using evidence common to all class members, for quantifying these other harms or even establishing if they

---

[60] See, for example, 2025 McFadden Deposition, p. 16:8–22 ("Q. If a consumer would have paid more in the but-for world, according to your model, is that consumer monetarily benefited by the super-competitive commission? … THE DEPONENT: In terms of the overcharge, the answer is that -- that person is now -- has a negative overcharge. That's correct. Q. (By Mr. Swanson) And a negative overcharge is good to consumers, is it not? … THE DEPONENT: This gets to the question of what's good for consumers. If you say have -- have they benefited monetarily in terms of the overcharge, the answer is yes.").

[61] 2025 McFadden Deposition, p. 104:18–22 ("Q. To the extent prices would be higher in the but-for world on account of Apple's conduct, the consumers who paid those particular prices obtained a monetary benefit, did they not? A. They did, yes.").

[62] 2025 McFadden Deposition, p. 105:6–11 ("Q. Is the protection of consumer privacy a nonmonetary benefit to a consumer? A. I would think so, yes. Q. Is the protection of a consumer's security a nonmonetary benefit? A. It -- it should be, yes.").

[63] See Workpaper 6. The Named Plaintiffs' transactions are identified by mapping the Apple IDs they provided to the anonymized "person_id" variable in the App Store transaction data. See Letter from Daniel G. Swanson (Gibson Dunn) to Rachele R. Byrd (Wolf Haldenstein Alder Freeman & Herz LLP), "Re: *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)," February 27, 2023. I determine whether a Named Plaintiff is harmed under the McFadden-Song model based on transactions made by accounts for each Named Plaintiff. I understand that an Apple expert will submit a report in response to Plaintiffs' methodology for assigning transactions to individual payors, which may alter the assignments of transactions to the Named Plaintiffs and affect the harm assessment.

[64] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct."); Song Report, ¶ 47 ("As explained by Prof. McFadden, the damages model I use in this report quantifies the monetary harm resulting from the supracompetitive App Store commission Apple charges. It does not capture the additional sources of consumer harm described by Prof. Stiglitz. The magnitude of consumer harm I obtain in this report are in that sense conservative.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

exist for any class members. Hence, there is no basis for claiming that Mr. Hayter would no longer be unharmed if "other ways" of harm were considered. Indeed, there is no method presented, and thus no basis for any claim that any of the class members deemed unharmed by the McFadden-Song model would experience any of these other harms at all. This means that Plaintiffs cannot rule out that all such class members would continue to be unharmed, even taking into account these other potential types of harm.

39. Furthermore, it is not evident that the alleged *additional* impact of Apple's challenged conduct would result in harm to all or nearly all consumers. Economic theory and consumer behavior suggest significant heterogeneity in consumer preferences,[65] and academic research indicates that apps are no exception to this.[66] This heterogeneity implies that the other harms claimed by Professor Stiglitz do not necessarily affect all consumers, rendering an individualized inquiry into consumer preferences necessary to determine which consumers would suffer any additional harm and by how much. For instance:

- *The alleged reduction in competition does not necessarily lead to loss of innovation, and even if there is an impact on innovation it does not necessarily affect all consumers*. As an initial matter, the alleged reduction in competition does not necessarily lead to less innovation. The economic literature has long understood that the relationship between the number of competitors and the level of innovation in an industry is ambiguous.[67] Hence, it is not at all clear that greater competition would necessarily yield more innovation; instead, it could result in less innovation, e.g., if Apple's innovation incentives are reduced with more competition. Even if there is a loss of innovation associated with the challenged conduct, the extent to which consumers would be harmed depends on consumer preferences, which vary.

---

[65] See, e.g., Kenneth E. Train, *Discrete Choice Methods with Simulation*, Second Edition, (Cambridge, England: Cambridge University Press, 2009), pp. 46–47 ("The value or importance that decision makers [consumers] place on each attribute of the alternatives varies, in general, over decision makers. For example, the size of a car is probably more important to households with many members than to smaller households. Low-income households are probably more concerned about the purchase price of a good, relative to its other characteristics, than higher-income households… Two people who have the same income, education, etc., will make different choices, reflecting their individual preferences and concerns.").

[66] See, e.g., Daniel Ershov, "Variety-Based Congestion in Online Markets: Evidence from Mobile Apps," *American Economic Journal: Microeconomics*, 16(2), 2024, pp. 180–203 at pp. 190 ("...consumers have idiosyncratic product preferences, which are difficult for platforms to predict."), 201 ("...personalization technology is unlikely to ever be perfect, as consumers have idiosyncratic product preferences that are difficult to predict."); Thomas W. Quan and Kevin R. William, "Product Variety, Across-Market Demand Heterogeneity, and the Value of Online Retail," *The RAND Journal of Economics*, 49(4), 2018, pp. 877–913 at p. 877 ("Our estimates indicate products face substantial demand heterogeneity across markets."); Federico Etro, "Device-Funded vs Ad-Funded Platforms," *International Journal of Industrial Organization*, 75(5), 2021, pp. 1–18 ("Our benchmark model has heterogenous consumers purchasing a device with an app store and variety of apps priced under monopolistic competition...").

[67] See, for example, Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and the Economy*, 6, 2006, pp. 159–215 at pp. 205–206 ("At the same time, neither theory nor empirical evidence supports a strong conclusion that competition is uniformly a stimulus to innovation.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

If the but-for world would have included higher-quality streaming video games, consumers uninterested in such products would presumably not be harmed by their absence.[68]

- *The alleged reduction of choice from alternative app stores does not necessarily affect all consumers*. The unavailability of alternative app stores in the actual world does not necessarily imply harm to consumers, nor would any such harm necessarily apply to all consumers. If some consumers never would have purchased from alternative app transaction platforms that would supposedly exist in the but-for world, the loss of such an option presumably would not cause any harm for those consumers. Professor Simonson's survey found that the majority of respondents were aware that the App Store was the only store from which they would be able to obtain apps on their iPhone and/or iPad and that users were satisfied with their App Store experiences.[69] In addition, Professor Simonson found that when evaluating a potential alternative to the App Store, consumers' preferences for the App Store "tend to be insensitive to the magnitude of the price and other key feature differences between the Apple App Store and a hypothetical alternative store."[70]

- *The alleged lack of app variety and output does not necessarily affect all consumers*. The value of additional app variety or more output is inherently particular to individual consumers. A consumer derives a benefit only if the additional offerings align with her preferences or needs. For example, the existence of additional weather apps may be superfluous to a consumer who already uses a weather app she likes. In such cases, more variety may impose costs—such as greater search costs—without conferring any benefits. Furthermore, under the McFadden-Song model, app transactions can result in "negative" damages.[71] This means that a greater variety or output of apps has the potential to generate additional negative harm for some consumers.

40. Importantly, the *additional* harm claimed by Plaintiffs' experts is not impossible to quantify. Professor McFadden noted during his deposition that, in principle, economists can measure such kinds of harm.[72] Thus, it is not the case that Plaintiffs' experts have asserted

---

[68] Professor Hitt found that 29.1 percent of accounts only spend in a single genre through the App Store. Additionally, Professor Hitt found that, for example, 6.3 percent of accounts with positive billing on apps had more than 90 percent of their spending in the Education genre alone. Such consumers would likely be uninterested in streaming video games products. See 2025 Hitt Report, Exhibits 20 and 21.

[69] Rebuttal Expert Report and Declaration of Itamar Simonson, Ph.D., June 13, 2025, Section III.C.4.

[70] Opening Expert Report and Declaration of Itamar Simonson, Ph.D., March 7, 2025, ¶ 19.

[71] Song Report, ¶ 79.

[72] 2025 McFadden Deposition, pp. 100:14–102:9 ("Q. (By Mr. Swanson) When you say that your model does not capture other forms of harm that consumers may have incurred as a result of Apple's alleged misconduct, are you referring to any

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

additional harm that cannot be measured. Rather, they have asserted theoretically measurable additional harms with no indication as to what kind of evidence or model they would use to substantiate their claim of such harm.

### 3.3. The $10 Spending Cutoff Is Arbitrary and Excludes Millions of Class Members with the Same Theory of Liability

41. As I opined in the 2023 Prince Report, Plaintiffs' $10 spending threshold for class membership is an arbitrary cutoff and is not based on any economic analysis.[73] Imposing this threshold arbitrarily reduces the percentage of purportedly unharmed accounts by excluding some (but not all) low-cost transactions that Professor McFadden estimated would have higher prices in the but-for world (and are therefore unharmed). As I discuss below, this continues to be true for the McFadden-Song model.

42. The application of this cutoff was also at odds with Plaintiffs' experts' own findings of "harm." Although applying this cutoff did achieve Plaintiffs' goal of reducing the number and percentage of purportedly unharmed accounts that Professor McFadden's model found, it also removed a substantial number of accounts that Professor McFadden found had been injured and therefore (according to the model) had viable claims. This issue persists for the McFadden-Song model today. In fact, as shown in Exhibit 2below, the $10 cutoff, when applied by Dr. Song in the McFadden-Song model, removes a greater number of purportedly

---

other forms of monetary harm? A. The -- the answer is -- let me step back, perhaps tell you about why this paragraph is here. In my original report and supplementary report, I used 'harm' as a synonym for an overcharge. Professor Stiglitz talks about harm in -- in a broader sense, I think which involves consumer -- consumer satisfaction. And so I want to draw a distinction between my use of the word 'harm' and my earlier reports in the use -- his use of the word 'harm,' and -- and I -- the point is that there can be forms of impacts on consumers' satisfaction separate from the issue of its impact on their -- on their payment, their monetary payment. And I am not offering opinions on -- on that or trying to quantify that. Q. And my question was: Are those other forms of harm considered by you to be monetary harm? A. Well, that's – that's -- you ask a deep economic question, which is can changes in consumer satisfaction be monetized, and I think the -- the answer is they -- they can be, but not necessarily in conformity with legal precedents and standards. Q. So those other forms of harm, to your mind as an economist, are also monetary harm, but they may not be legally recoverable monetary harm? … THE DEPONENT: Yeah, that's -- I think that's – that's a -- a fair characterization, in fact, to that -- and economists can do consumer surplus measurements in the -- in the traditional economic use of that term, but monetary standards – I'm sorry. The legal standards for -- for the recovery are often based in terms of actual lost income rather than the deeper question of – of trying to balance or -- or monetize consumer satisfaction."); Deposition of Daniel L. McFadden, November 5, 2021, pp. 194:4–195:8 ("Q. Can your model show the effect of Apple's anti-steering provisions on app and in-app purchase prices independently from the effect of any of the other conduct the plaintiffs challenge? … THE DEPONENT: I would say that my modeling framework and my mechanisms have the capacity to do that, but there are elements involving the extent to which consumers would follow leads or announcements within the -- within their app and actually use alternative mechanisms that could involve additional study of consumer choice. I have not been asked to do that. It -- I think it could be done, but I haven't done it. Q. (By Mr. Swanson) Until you actually are asked to do it and try to do it, can you testify that it can be done? … THE DEPONENT: Oh, I -- I would be prepared to say it can be done. It can be done by -- through -- through consumer experiments, for example. Q. (By Mr. Swanson) And that would involve some type of survey research? … THE DEPONENT: It could involve survey research and it could involve survey research enhanced by actual experimental treatments in which consumers are asked to make meaningful choices in -- in a simulated market.").

[73] 2023 Prince Report, Section 5.4.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*harmed* payors than it does unharmed ones. If the goal of this $10 cutoff is to segregate unharmed from harmed class members, it does not—and cannot—accomplish that purpose.

43. The fact that the cutoff is arbitrary and lacks a basis in any kind of economic analysis is evidenced in Professor McFadden's own testimony. Professor McFadden, who originally imposed the $10 threshold on an account basis, testified that he had no opinion on whether the class should be truncated by a dollar spend or whether such a cutoff should be at $10 or any other number.[74] He further testified that the reliability of his model is not improved in any way by this cutoff,[75] nor does it make his model any more capable of identifying harmed accounts.[76]

44. Despite this, as I noted above, Dr. Song continues to apply the $10 cutoff in his implementation of the McFadden-Song model. He provides no economic support for that implementation beyond relying on the class definition.[77] As I noted, Dr. Song's adoption of the $10 cutoff raises all the issues I described above in the context of Professor McFadden's prior analysis.

45. Mechanically, the $10 spending cutoff results in a lower percentage of unharmed class members because, unsurprisingly, it disproportionately removes low-priced transactions. However, this result is not because the challenged conduct affects low-priced transactions differently (i.e., less). Rather, it is a mathematical artifact of the McFadden-Song model, where low-priced apps have higher but-for prices (thereby resulting in a finding of no harm)—specifically, because those apps are estimated to have negative marginal costs.[78] As I discussed in the 2023 Prince Report, Professor McFadden's model's finding that lower-

---

[74] Deposition of Daniel L. McFadden, December 5, 2022 ("2022 McFadden Deposition"), pp. 216:21–217:22.

[75] 2022 McFadden Deposition, p. 231:12–23.

[76] 2022 McFadden Deposition, pp. 232:6–233:2 ("Q. … For your model to reliably determine whether a given account is harmed or unharmed, is it necessary for you to remove all accounts with $10 or less in lifetime spending from your model estimation? A. In -- in order to analyze the case with -- with this cutoff? Is that the question? Q. In order to reliably determine whether a given account is harmed or unharmed. … THE DEPONENT: The answer is whatever the definition of the class is and what accounts are in the class, I think the model -- the model procedure, the methodology in terms of the data that's used, how it's estimated and how damages are calculated, is -- is applicable, can be -- can be done, and -- there's no -- I see no particular relationship between that and the reliability of the analysis.").

[77] Song Report, ¶ 71 ("The Class is limited to those persons who paid more than $10 in total to Apple during the Class Period for iOS apps and in-app purchases from any one Apple ID. To identify the payors that satisfy this definition, I first merge the supplementary datasets containing payor IDs with the full App Store transactions data to identify the paid App Store transactions attributable to each payor. For each payor, I then calculate the total amount spent on apps and in-app purchases separately for every Apple ID through which they made paid transactions. I include all of a payor's transactions in my calculations if they spent more than $10 through at least one Apple ID.").

[78] See 2023 Prince Report, Exhibits 7 and 8.

priced apps are frequently associated with a benefit to consumers rather than harm resulted from an assumption in his model, not from empirical analysis.[79]

46. Professor Watson's analysis of but-for prices predicted by the McFadden-Song model for in-app purchases from Free Download Apps with Paid In-App Purchases in the Games genre summarizes this assumed relationship between price and findings of benefit or harm.[80] He shows that apps priced $2.99 or lower would be cheaper in the but-for world, but those priced $3.49 or higher would be more expensive.[81] By construction, payors that spent less than $10 cannot have purchased many expensive items (e.g., they cannot have purchased any item costing more than $10, or more than one item costing more than $5) but could have purchased multiple cheaper items (e.g., up to twenty $0.49 items). In fact, almost half of the transactions that are removed by applying a $10 cutoff in the McFadden-Song model had a price of $0.99 or less.[82] Therefore, while the removal of payors that made only a few low-priced purchases appears to be aimed at reducing the number of unharmed payors, this is misleading because it is Dr. Song's adoption of Professor McFadden's modeling assumptions—rather than any empirical evidence—that make unharmed payors cluster around low price points in the McFadden-Song model.

47. The majority of payors that the spending cutoff removes are actually the ones that the McFadden-Song model would otherwise find to be injured. This result confirms that this cutoff is unconnected to any theory of liability. Plaintiffs allege that consumers are harmed because Apple allegedly restricts their iOS app and in-app purchases to the App Store. Under Plaintiffs' theory of liability, consumers would therefore be harmed whether they spend $10 on apps, $3 on apps, or nothing on apps at all.[83] Yet a consumer's spending determines

---

[79] 2023 Prince Report, ¶ 23 ("In Professor McFadden's model, harm is closely related to marginal costs. If and only if an app's marginal costs are positive will a lower Apple commission mean a lower price, and a conclusion that consumers are harmed in Professor McFadden's view. Because of the strict relationship between prices and implied marginal costs in Professor McFadden's model, higher-priced apps must have higher marginal costs. As a result, higher-priced apps with positive marginal costs lower their prices in the but-for world and generate harm, while lower-priced apps with zero or negative marginal costs do not. I must emphasize that this is ultimately an assumption of Professor McFadden's, not a finding from any analysis. From this perspective, all that remains for his empirical work to do is determine how high the price of an app needs to be (i.e., what is the threshold price) for a given genre and App Store business model, such that one can assume marginal costs, and therefore purported harm, are positive. Consequently, by not considering differences in the demand faced by apps within a genre, Professor McFadden does not show that accounts are harmed in a common manner; instead, he assumes it.").

[80] 2025 Watson Report, Exhibit 10.

[81] Technically, within the McFadden-Song model, these are not prices for a particular in-app item. Because Dr. Song calculates app-level average prices across all items, they are instead average prices for each app's available in-app items. Therefore, the harm or benefit Dr. Song would estimate would depend not only on the price of the individual in-app item actually purchased, but also on the prices of all other items offered by the same app.

[82] 46.7 percent of the transactions removed by applying a $10 cutoff are associated with transactions with a price of $0.99 or less. See Workpaper 7.

[83] See, for example, Song Report, ¶ 18.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

whether that consumer belongs in the class. Exhibit 2 shows the payors excluded by applying a $10 spending threshold and whether they were harmed or unharmed in the context of the McFadden-Song model. The spending cutoff does remove over 17 million purportedly unharmed payors. However, as the exhibit shows, the cutoff removes more (23 million) payors that the McFadden-Song model finds have been harmed and therefore (according to the McFadden-Song model) have viable claims.[84]

**EXHIBIT 2**

*Plaintiffs' $10 Threshold Excludes Both Harmed and Unharmed Class Members in the McFadden-Song Model*

| Total Payors Excluded [A] | Harmed Payors Excluded [B] | Unharmed Payors Excluded [C] | Unharmed % of Total Excluded [D]=[C]/[A] |
|---|---|---|---|
| 40,498,263 | 23,155,881 | 17,342,382 | 42.8% |

Source: App Store Transaction Data; McFadden-Song Data Production
Note: Excluded payors consist of all payors that have a net spending of less than or equal to $10 on iPhone and iPad transactions in each of their accounts since July 10, 2008, and that have at least one covered transaction for which Dr. Song estimates a but-for price. Excluding payors that have a net spending of less than or equal to $10 on iPhone and iPad transactions across all accounts since July 10, 2008, and that have at least one covered transaction for which Dr. Song estimates a but-for price leads to 39,985,119 total payors excluded. Of those excluded payors, 43.0 percent (17,207,866 payors) are unharmed. For both cutoff methods, excluded payors' harmed versus unharmed status are evaluated using Dr. Song's estimates for but-for prices under his flexible pricing scenario. Damages across all excluded payors are calculated by applying Dr. Song's app-month consumer overcharge estimates to Dr. Song's App Store transaction data after the data are filtered to exclude: 1.) non-iPhone and non-iPad transactions; 2) free transactions; 3.) transactions associated with Apple-owned or internal developer accounts; 4.) transactions for which the account or the payor is not identified; and 5.) in-app purchases and subscriptions that are dated before the first instance of the purchasing account downloading the corresponding app or if the purchasing account has no record of downloading the corresponding app. Harmed Payors are those with net positive damages. Unharmed Payors are those with net negative or net zero damages.

### 3.4. The Reliability of Dr. Song's Results Depends Upon the Reliability of the Methodology to Identify Payors for Linking to Transactions

48. As noted above, Professor McFadden calculated damages at the level of an *account*, while Dr. Song calculates damages at the level of the *payor*.[85] Dr. Song defines payors as "the persons who paid for any particular transaction."[86] As I have previously explained, a fundamental issue in Professor McFadden's methodology was the attribution of harm to *accounts* rather than to *consumers*.[87] To address this issue, Dr. Song purports to estimate

---

[84] Despite removing more harmed payors, this nonetheless increases the relative proportion of harmed payors because unharmed payors are less common than harmed payors in the McFadden-Song model. If payors with less than $10 in spending were included in the class, there would be 27.0 million unharmed class members (12.0 percent of all class members). See Workpaper 8.

[85] Song Report, ¶ 68. See Section 3.1.3.

[86] Song Report, ¶ 69.

[87] See, for example, 2023 Prince Report, ¶ 46.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

harm for transactions aggregated to the unique payor level rather than the account level.[88] In particular, Dr. Song relies upon a declaration (which I understand Plaintiffs later designated to be an expert report) from Darryl Thompson at JND Legal Administration for the deduplication of alleged payors (i.e., the matching of payor records to a single unique payor) in an effort to match transactions to unique payors (consumers) rather than accounts.[89] Dr. Song states that JND Legal Administration analyzed approximately ▮ billion payor records and deduplicated them to identify ▮ million unique payors.[90] The payor records for these purportedly unique payors are associated with approximately ▮ billion transactions.[91] Dr. Song then conducts additional data analysis and concludes that ▮ million payors, with more than ▮ billion transactions, satisfy the class definition.[92]

49. To the extent that payor records have not been properly aggregated, and thus transactions are not assigned to the correct unique payor, Dr. Song cannot reliably determine whether a class member is harmed or to what extent. For example, suppose JND Legal Administration assigns transactions to "Payor A" and "Payor B" as separate unique payors, where Payor A is harmed by $2 and Payor B is unharmed by $5 (that is, Payor B's transactions would, on net, be $5 *more expensive* in the but-for world). If these transactions are actually associated with a single payor rather than two separate payors, that single payor would be unharmed by $3. In this example, the failure to correctly assign transactions to unique payors transforms a single unharmed payor into two separate payors, one harmed and another unharmed. In aggregate, across millions of payors, such deduplication errors would have an ambiguous effect on the total fraction of unharmed class members.

50. I do not have an opinion on the reliability of JND Legal Administration's methodology for identifying unique payors so that they can be linked to transactions. However, if this methodology is found to be unreliable, then Dr. Song's identification of payors in the data, which relies entirely on JND Legal Administration's methodology, and his payor-level damages methodology would be equally unreliable. Any conclusions Dr. Song reaches about which class members are harmed and by how much would therefore be unreliable.

---

[88] See, for example, Song Report, ¶ 71 ("For each payor, I… calculate the total amount spent on apps and in-app purchases separately for every Apple ID through which they made paid transactions. I include all of a payor's transactions in my calculations if they spent more than $10 through at least one Apple ID.").

[89] Song Report, ¶ 70.

[90] Song Report, ¶ 70.

[91] Song Report, ¶ 70.

[92] Song Report, ¶ 74.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

### 3.5. The McFadden-Song Model Cannot Measure the Impact on Consumers of Any Specific Challenged Conduct

51. Professor Stiglitz claims that Apple's conduct has "enabled it to gain and maintain its monopoly power in the aftermarket."[93] He points to three forms of alleged conduct: (a) "exclusionary restrictions on the sale of iOS apps;"[94] (b) the "mandate that developers must use Apple's own proprietary in-app payment system ('IAP') for the sale of in-app content within the app;"[95] and (c) "anti-steering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."[96]

52. Professor McFadden asserts that these three forms of conduct—taken together—lead to supracompetitive commissions and prices.[97] He states that "Apple's conduct has allowed it to acquire monopoly power" and "charge a supracompetitive App Store commission" in addition to the other allegedly harmful conduct discussed in Section 3.2.[98] Notably, Plaintiffs' complaint does not include anti-steering as basis for liability. This omission underscores a key flaw: the McFadden-Song model attributes harm to all three forms of conduct without distinguishing among them. When studying damages, it is important to establish a connection between the legal theory of the harmful event and the economic impact of that event.[99] The failure to do so undercuts the usefulness of the McFadden-Song model for calculating harm should any one form of challenged conduct be found to be lawful and / or to create benefits for consumers.

53. The results of the McFadden-Song model and associated estimates of damages are not directly connected—nor does the model apportion harm—to any particular type of

---

[93] Stiglitz Report, ¶ 63.

[94] Stiglitz Report, ¶ 63 and Section III.A.

[95] Stiglitz Report, ¶ 63 and Section III.B.

[96] Stiglitz Report, ¶ 63 and Section III.C.

[97] 2025 McFadden Report, ¶¶ 13–17 ("I find these opinions consistent with the opinions I offered in my class certification reports. First, Apple through its Developer Program License Agreement and App Review Guidelines sets the requirements developers must meet to distribute their products via the App Store….Second, Apple requires that developers distributing their apps through the App Store use Apple's own payment processing system (IAP) when selling their digital in-app content…Third, Apple has enacted as series of anti-steering provisions that insulate its App Store from competitions, at least until January 2024…Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers.").

[98] 2025 McFadden Report, ¶ 17.

[99] See Mark A. Allen, et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011), pp. 425–502 at p. 432 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event … The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario).").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

challenged conduct. Regardless of which aspects of the conduct are ultimately found unlawful, the McFadden-Song model would still give the same result. Specifically, the McFadden-Song model, like Professor McFadden's model before it, predicts but-for prices assuming a different but-for commission rate, which it takes as given.[100] Professor McFadden testified that he had no opinion on the but-for commission rate.[101] In particular, Plaintiffs' counsel instructed Professor McFadden and Dr. Song to assume a but-for commission rate "consistent with the opinions offered by Dr. Abrantes-Metz."[102] However, according to Professor Lorin Hitt, Dr. Abrantes-Metz has failed to articulate how the but-for commission rate would change based on whether the specific challenged conduct is allowed (or not allowed) in the but-for world, and her conclusion that the but-for commission rate would be 13.63 percent independent of which part of Apple's conduct is found to be unlawful is unreliable.[103] This implies that the McFadden-Song model, which relies entirely on Dr. Abrantes-Metz's testimony for the but-for commission rate, will be unable to reliably apportion the putative damages estimate to specific aspects of Apple's alleged misconduct.

54. In addition, if Dr. Abrantes-Metz's conclusion is found to be unreliable, the McFadden-Song model cannot distinguish between harmful, lawful, or procompetitive behavior. This raises the risk of attributing damages to conduct that is both lawful and benefits consumers. This failing undermines the reliability of the putative damages calculations for different possible outcomes in this case. Moreover, if any of the challenged conduct is also found to be associated with benefits to consumers, as I understand other experts have opined is the

---

[100] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate."). See also 2025 McFadden Deposition, pp. 90:1–5 ("Q. Does any element of conduct suffice to result in the but-for commission dropping to 13.6 percent? A. That's a question for Professor -- for Dr. Abrantes-Metz."), 95:11–18 ("Q. But doesn't your model need to predict what those prices would be in the but-for world? A. The model operates off the -- Apple's but-for commission, and so the -- your question is you need to have a great deal more detail on the nature of -- of the but-for world to support that but-for commission, and -- and the answer is that's a question for -- for Dr. Abrantes-Metz."), 108:22–109:9 ("[Q.] And my question is: Is it also possible in a competitive but-for world that some consumers will receive fewer privacy and security benefits? … [A.] think the answer to that is that -- that -- that's a legitimate question about the nature of the -- of the competition, and I would turn to Abrantes-Metz and ask in -- in comparable markets, what -- what, in fact, is the nature of these additional dimensions of product quality and are they, in fact, comparable markets in that respect. That -- that, I think -- is again the issue at hand.").

[101] 2022 McFadden Deposition, p. 195:15–21 ("Q. (By Mr. Swanson) Do you have any opinion as to whether Dr. Abrantes-Metz's 13.63 percent but-for commission rate is a reliable estimate? [A.] The answer is I have not read her report, so I have no opinion."); 2025 McFadden Deposition, pp. 49:16–50:4 ("Q. So on the one hand you say you rely on Dr. Abrantes-Metz for the 13.63 percent number, but you also say counsel instructed you to assume that. What is the role of Dr. Abrantes-Metz' conclusion given that instruction from counsel? A. Well, I think Abrantes-Metz would need to testify for the basis for -- for the 13.63 number, and so I'm -- I'm -- relying on counsel's instruction that that's going to be supported by her expert testimony. Q. Are you in any way vouching for the reliability of that number based on your review of her report? A. No, I'm offering no opinion.").

[102] Song Report, ¶ 46. See also 2025 McFadden Report, ¶ 5 ("I have been instructed by Counsel for Consumer Plaintiffs to assume that Apple would charge a 13.63 percent commission on app downloads and in-app purchases made through the App Store absent Apple's alleged anticompetitive conduct. I understand that this commission is consistent with the opinions offered by Dr. Abrantes-Metz.").

[103] 2025 Hitt Rebuttal Report, Section 8.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

case,[104] this creates a significant disconnect between the various kinds of challenged conduct and putative damages.

55. Further, as Professor Watson and I have shown in previous reports, and as I have discussed above, small changes to the McFadden-Song model reveal its instability, leading to substantial changes in both estimated damages and the number of harmed and unharmed consumers.[105] However, Professor McFadden has testified that changes to his model—such as operating at the item level rather than the app level, or if marginal costs for certain transactions should be zero, or if the margin constraints should be different—would make it impossible for the jury to reliably determine the extent of damages.[106] Therefore, if the jury disagrees with Plaintiffs on any of these points, or if certain aspects of Apple's challenged conduct are found to be lawful, then the jury has no method to decide whether all class members—or even most class members, or any particular class member—are damaged.

56. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of June, 2025.

Jeffrey T. Prince

---

[104] For example, Professor Sundararajan has described several such benefits to consumers. See Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., March 7, 2025, Section VI.

[105] 2023 Prince Report; 2023 Watson Report. For example, I have previously analyzed flawed aspects of Professor McFadden's marginal cost estimates, his "percentage method," his price tier analysis, aspects of his model's treatment of app competition, and his model's treatment of free apps. Professor Watson has demonstrated the flaws with Professor McFadden's margin constraints and shown how changing those constraints impacts putative damages as well as the fraction and identity of unharmed consumers.

[106] 2025 McFadden Deposition, pp. 229:18–231:23 ("Q. If the jury determines that… multiple stores would charge different commission rates, can your model calculate damages?... [A. I]f the -- and she [Dr. Abrantes-Metz] said that these rates would differ by rival, then I don't have a model of operation of rival stores. Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?... [A.] The answer is I don't -- I don't think I can do it and I don't think they can do it reliably. Q… If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?... [A.] I don't know -- I don't know how they would proceed. Q… If the jury determines that the margin constraints generally should be set at higher ranges, in other words shifted up, how would the jury reliably calculate damages using your model? A… it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**4. Appendix A— CV**

## VITA

### JEFFREY T. PRINCE

2029 S. Hawksmoore Dr.                                           Office: 812-856-2692
Bloomington, IN 47401                                           ostonFax:812-855-3354

E-mail: jeffrey.t.prince@gmail.com
Web page: https://sites.google.com/view/jeffrey-t-prince/home

**PERSONAL INFORMATION**
Born: April 29, 1976 at Cincinnati, OH
Citizenship: USA
Married to Ann Prince
Children: Katherine Prince, Elizabeth Prince, Henry Prince

**EDUCATION**
Ph.D.: Economics, Department of Economics, Northwestern University, 2004.
    Dissertation Title: The Diffusion of Durable Information Technology Products.
M.A.: Economics, Department of Economics, Northwestern University, 2000.
B.A.: Economics, Miami University, 1998, *Summa Cum Laude*.
B.S.: Mathematics/Statistics, Miami University, 1998, *Summa Cum Laude*.

**FIELDS OF SPECIALIZATION**
Primary:        Industrial Organization
Secondary:    Applied Econometrics, Strategy, Regulation

**ACADEMIC POSITIONS HELD**
Professor of Business Economics and Public Policy (with tenure), Kelley School of
    Business, Indiana University, 2017-present.

Harold A. Poling Chair in Strategic Management, Kelley School of Business, Indiana
    University, 2015-present.

Faculty Affiliate, Indiana University Institute for Corporate Governance and Ethics,
    2025-present.

Faculty Affiliate, Indiana University Data Science Program, 2018-present.

Advisory Committee Member, Indiana University Center for Survey Research,
    2018-present.

University Fellow at the Technology Policy Institute, 2021-present.

Chairperson, Department of Business Economics and Public Policy, Kelley School of
    Business, Indiana University, 2016-2019 & 2020-2025.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Co-Director, Kelley Institute for Business Analytics, 2016-2022.

Associate Professor (with tenure) of Business Economics and Public Policy, Kelley School of Business, Indiana University, 2010-2017.

Visiting Scholar, Strategy Department, Kellogg Graduate School of Management, Northwestern University, Summer and Fall, 2015.

Visiting Scholar, Center of Business and Public Policy, McDonough School of Business, Georgetown University, Fall, 2015.

Cathie and Jerry Anderson Faculty Fellow, Kelley School of Business, Indiana University, 2013-2015.

Assistant Professor, Applied Economics and Management, Cornell University, 2004-2010 (promoted to Associate with tenure, July, 2010).

## NONACADEMIC EXPERIENCE

Chief Economist, Federal Communications Commission, 2019-2020.

National Security Agency, Cryptologic Mathematician in Director's Summer Program, Fort George G. Meade, Maryland, Summer 1998.

UNEXT, Consultant and Co-author for Online Masters Business Course in Vertical Integration, Chicago, Illinois, Summer 2001.

Nationwide Insurance, Actuarial Intern, Columbus, Ohio, Summer 1997.

## EDITORIAL POSITIONS

Co-editor, *Journal of Economics and Management Strategy*, 2015-present.

Editorial Board member, *Information Economics and Policy*, 2008-present.

Co-editor, *Journal of Economics and Management Strategy Special Edition on Digital Transformation and the Business Revolution*, 2024.

## BOOKS

*Conglomerates and Ecosystems in the Digital Era*, co-editor with Justin (Gus) Hurwitz and Geoffrey A. Manne, Cambridge University Press, 2025 (expected).

*Managerial Economics and Business Strategy*, *2025 Release*, with Michael R. Baye, McGraw-Hill Education, 2025.

*The Metaverse: What Everyone Needs to Know*, with Scott J. Shackelford, Michael Mattioli, and Joao Marinotti, Oxford University Press, 2025.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Managerial Economics and Business Strategy*, *10th Edition*, with Michael R. Baye, McGraw-Hill Education, 2022.

*Predictive Analytics for Business Strategy: Reasoning from Data to Actionable Knowledge*, McGraw-Hill Education, 2019.

*Managerial Economics and Business Strategy*, *9th Edition*, with Michael R. Baye, McGraw-Hill Education, 2017.

*Managerial Economics and Business Strategy*, *8th Edition*, with Michael R. Baye, McGraw-Hill Education, 2014.

## WORKING PAPERS

"Does Market Power Impact Price Partitioning? Evidence from Cleaning Fees and Rental Rates on AirBnB" with Daniel Simon, 2025, in 2nd round at the *Journal of Industrial Economics*.

"Competitive Effects of Joint Ventures in the U.S. International Airline Market", with Hong Lee, Jaehak Lee, and Daniel Simon, 2025.

"The Time Elasticity of Online Variety", with Hong Lee and Shane Greenstein, 2025.

"Economic Assessment of Vertical Integration, with Antitrust Implications for Vertical Mergers", with Robert Kulick and Elena Ramirez Pierce, 2025.

"Do Shared Marketing and Operations within Joint Ventures Have Differential Impacts on Airline Pricing?" with Daniel Simon, Hong Lee, and Jaehak Lee, 2025.

## REFEREED PUBLICATIONS

"Do People Around the World Care Where Their Data Are Stored?" with Scott Wallsten, forthcoming in *Information Economics and Policy*.

"The Business Revolution: Economy-Wide Impacts of Artificial Intelligence and Digital Platforms", with Hanna Halaburda, D. Daniel Sokol, and Feng Zhu, forthcoming in the *Journal of Economics and Management Strategy,* Special Issue on Digital Transformation and the Business Revolution, 33, 2, pp. 269-275, 2024.

"Optimal Promises: Application of a General Framework to Airline Schedule Times", with Daniel Simon, *Journal of Air Transport Management*, 118, 102618, 2024.

"The Effect of Domestic Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, *Applied Economics Letters*, 31, 11, pp. 992-995, 2024.

"The Effect of International Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, *Southern Economic Journal*, 90, 2, pp. 224-241, 2023.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"How Much is Privacy Worth Around the World and Across Platforms?", with Scott
Wallsten, *Journal of Economics and Management Strategy*, 31, pp. 841-861,
2022.

"Mobile Internet Usage and Usage Based Pricing", with Shane Greenstein, *Journal of
Economics and Management Strategy*, 30, 4, pp. 760-783, 2021.

"Economics at the FCC: 2019-2020", with Allison Baker, Patrick Brogan, Octavian
Carare, Nicholas Copeland, Patrick DeGraba, Steven Kauffman, Paul LaFontaine,
Catherine Matraves, Sean Sullivan, Patrick Sun, and Emily Talaga, *Review of
Industrial Organization*, 57, pp. 827-858, 2020.

"The Persistence of Broadband User Behavior: Implications for Universal Service and
Competition Policy", with Andre Boik and Shane Greenstein,
*Telecommunications Policy*, 43, 8, 2019.  Extended working version titled:
Empirical Economics of Online Attention.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics",
*Information Economics and Policy*, 47, pp. 7-13, 2019.

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for
Broadband Internet Speed," with Yu-Hsin Liu and Scott Wallsten (lead article),
*Information Economics and Policy*, 45, pp. 1-15, 2018.

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?",
with Seth Freedman and Haizhen Lin, *Review of Industrial Organization*, 53, 1,
57-79, 2018.

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and
Mechanisms", with Seth Freedman and Haizhen Lin, *American
Journal of Health Economics*, 4, 1, 51-79, 2018.

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting
Behavior", with Shane Greenstein, (lead article) *Journal of Economics and
Management Strategy*, 26, 2, 293-317, 2017.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry", with
Daniel Simon, *Journal of Industrial Economics*, 65, 2, 336-362, 2017.

"The Effect of Competition on Toxic Pollution Releases", with Daniel Simon,
*Journal of Environmental Economics and Management*, 79, 40-54, 2016.

"Determinants of Private Long-Term Care Insurance Purchase in Response to the
Partnership Program", with Haizhen Lin, *Health Services Research*, 51, 2, 687-
703, 2016.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance", with Daniel Simon, *Management Science*, 61, 2, 372-390, 2015.

"Does Service Bundling Reduce Churn?", with Shane Greenstein, *Journal of Economics and Management Strategy*, 23, 4, 839-875, 2014.

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry", with Jin-Hyuk Kim and Calvin Qui, *International Journal of Industrial Organization*, 37, 6, 99-108, 2014.

"Is Dual Agency in Real Estate a Cause for Concern?", with Vrinda Kadiyali and Daniel Simon, *Journal of Real Estate Finance and Economics*, 48, 1, pp. 164-195, 2014.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage", with Haizhen Lin, *Journal of Health Economics*, 32, 6, pp. 1205-1213, 2013.

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews", with Lona Fowdur and Vrinda Kadiyali, *Journal of Economic Behavior and Organization*, 84, 1, pp. 292-307, 2012.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies", with Claudio Lucarelli and Kosali Simon, *International Economic Review*, 53, 4, pp. 1155-1177, 2012.

"Relating Inertia and Experience in Technology Markets: An Analysis of Households' Personal Computer Choices", *Applied Economics*, 43, 29, pp. 4501-4514, 2011.

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data", with Levon Barseghyan and Joshua Teitelbaum, *American Economic Review*, 101, 2, pp. 591-631, 2011.

"Is Time Inconsistency Primarily a Male Problem?", with Dan Shawhan, (lead article) *Applied Economics Letters*, 18, 6, pp. 501-504, 2011.

"Has the Internet Accelerated the Diffusion of New Products?", with Daniel Simon, *Research Policy*, 38, 8, pp. 1269-1277, 2009.

"How Do Households Choose Quality *and* Time to Replacement for a Rapidly Improving Durable Good?", *International Journal of Industrial Organization*, 27, 2, pp. 302-311, 2009.

"Multi-market Contact and On-Time Performance in the US Airline Industry", with Daniel Simon, *Academy of Management Journal*, 52, 2, pp. 336-354, 2009.

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Demand for Personal Computers", (lead article) *Journal of Economics and Management Strategy*, 17, 1, pp. 1-33, 2008.

"Internet Adoption and Usage Patterns are Different: Implications for the Digital Divide", with Avi Goldfarb, (lead article) *Information Economics and Policy*, 20, 1, pp. 2-15, 2008. (Listed as the #1 most cited article for this journal since 2008: http://www.journals.elsevier.com/information-economics-and-policy/most-cited-articles/)

"The Beginning of Online/Retail Competition and Its Origins: An Application to Personal Computers", *International Journal of Industrial Organization*, 25, 1, pp. 139-156, 2007.

"The Diffusion of the Internet and the Geography of the Digital Divide in the United States", with Shane Greenstein, in (eds) Robin Mansell, Chrisanthi Avgerou, Danny Quah, and Roger Silverstone, The Oxford Handbook of Information and Communication Technologies, Oxford University Press, pp. 168-195, 2007.

## EDITED CHAPTERS AND NON-REFEREED PUBLICATIONS

"Ensuring Antitrust Actually Promotes Competition in the Digital Economy: Evaluating Proposed Remedies in the Google Case", with D. Daniel Sokol and Feng Zhu, Computer & Communications Industry Association, 2025.

"Antitrust Economics of Digital Platforms," with D. Daniel Sokol, Cambridge University Press Handbook on Digital Platforms, eds. Dukes, A., Sokol, D., Sun, T., Zhu, F., 2025.

"Information," with Michael R. Baye, Elgar Encyclopedia on the Economics of Competition, Regulation and Antitrust, ed. Noel, M., 2024.

"Coordinated Effects (Merger)," Global Dictionary of Competition Law, eds. Kovacic, W., Whish, R., Healey, D., 2023.

"Empirical Evidence of the Value of Privacy," with Scott Wallsten, *Journal of European Competition Law and Practice*, 12, 8, pp. 648-654, 2021.

"The Economics of Digital Platforms: A Guide for Regulators", with Michael R. Baye, Global Antitrust Institute Report on the Digital Economy, 2020.

"Does Original Content Help Streaming Services Attract More Subscribers?", *Harvard Business Review*, April, 2018.

"Position Statement on Challenges Facing Online Video Distributors", FCC's Video Landscape Workshop, March, 2016.

"The Dynamic Effects of Triple Play Bundling in Telecommunications", Time Warner

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Research Program on Digital Communications, Winter, 2012.

"The Geographical Diffusion of the Internet in the United States", with Shane Greenstein, in (eds) Munindar Singh, <u>The Practical Handbook of Internet Computing</u>, CRC Press, pp. 56-1 – 56-17, 2004.

**TEACHING EXPERIENCE**

Lecturer, 2026 (scheduled).
Digital Economics for Business (Executive MBA)

Lecturer, 2025-present.
Digital Economics for Business (Undergraduate)

Lecturer, 2011-2017, 2024.
Predictive Analytics for Business Strategy (Undergraduate)
Lecturer, 2019-2021.
Predictive Analytics for Business Strategy II. (MBA)

Lecturer, 2018-2021.
Predictive Analytics for Business Strategy I. (MBA)

Lecturer, 2016.
Econometric Methods in Business II (PhD)

Lecturer, Summer 2012-2014.
Introduction to Economics (Global Business Institute)

Lecturer, 2011.
Managerial Economics (Undergraduate)

Lecturer, 2010.
Business Econometrics (Undergraduate)

At Cornell:
Lecturer, 2006-2010.
Empirical Analysis of Industrial Organization (PhD)

Lecturer, 2005-2010.
Introduction to Business Regulation (Undergraduate)

Lecturer, 2007-2010.
Game Theory for Applied Economists (PhD)

Lecturer, Summer 2007.
Gaming: In the Casino and Beyond (Cornell Adult University)

Guest Lecturer, 2005-2006.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Graduate Industrial Organization, Empirical methods (PhD)

At Northwestern:
Teaching Assistant, 2000-2004.
Introductory Econometrics, Transportation, Intermediate Microeconomics, Honors Thesis Seminar, Advanced Econometrics.

Lecturer, 2002-2003.
Introductory Econometrics, Accelerated Probability and Statistics.

## FELLOWSHIPS AND AWARDS

Best Research Poster, Research Conference on Communications, Information and Internet Policy, 2015.

Trustees Teaching Award, Indiana University, 2015.

Trustees Teaching Award Finalist, Indiana University, 2012, '13, '14, '15.

Certificate of Excellence in Reviewing, Information Economics and Policy, 2014.

Sauvain Teaching Award Nominee, 2014.

Innovative Teaching Award, Kelley School of Business, 2012.

Young Faculty Teaching Excellence Award, Cornell University, 2008.

Outstanding Graduate Student Teacher Award, Northwestern University, 2004.

Distinguished Teaching Assistant Award, Northwestern University, 2001,'02,'03,'04.

University Summer Fellowship, Northwestern University, 2003.

University Fellowship, Northwestern University, 1999-2000.

Teaching Assistant Fellow, Northwestern University.

George W. Thatcher Prize for top student in economics, Miami University, 1998.

Alumni Senior Prize for outstanding student in mathematics and statistics, Miami University, 1998.

Actuarial Exam P (equivalent based on passing pre-2000 Part 1 and Part 2 exams), 1998.

## GRANTS AND OTHER FUNDING

Advanced Analytics for IU's Addictions Grand Challenge

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

NET Institute Summer Research Grant

Research Data Grant, Kelley School of Business

Time Warner Research Stipend

Cornell's Institute for the Social Sciences Theme Project Faculty Fellow

Cornell Institute for the Social Sciences Small Grant Award

## INVITED PAPER PRESENTATIONS

"Do People Around the World Care Where Their Data Are Stored?"
- Plamadiso Talk, Weizenbaum Insitut, November, 2024.
- Ostrom Workshop, Indiana University, October, 2024.
- Cornell University, October, 2023.
- University of Nebraska, November, 2022.

"Optimal Promises: Application of a General Framework to Airline Schedule Times"
- International Industrial Organization Conference, May, 2022.

"How Much is Privacy Worth Around the World and Across Platforms?"
- University of Kent, October, 2021.
- Kelley Faculty Research Series, IU Mexico Gateway, May, 2021.
- Game Theoretic and Behavioral Economic Insights on Social Media, February, 2021.
- Research Conference on Communications, Information and Internet Policy, February, 2021.
- NBER Economics of IT and Digitization Workshop, July, 2020.
- FTC PrivacyCon, July, 2020.

"The Effect of International Travel on the Spread of Covid-19 in the U.S."
- Purdue, November, 2020.

"Mobile Internet Usage and Usage Based Pricing"
- Research Conference on Communications, Information and Internet Policy, February, 2021.
- Federal Communications Commission, October, 2020.
- International Industrial Organization Conference, May, 2020.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"
- Technology Policy Institute, February, 2018.

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed"
- Bureau of Economic Analysis, October, 2017.
- Technology Policy Institute, October, 2017.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Research Conference on Communications, Information and Internet Policy, September, 2017.

"The Empirical Economics of Online Attention"
- Pomona College, March, 2019.
- Research Conference on Communications, Information and Internet Policy, September, 2017.
- Searle 8th Annual Conference on Internet Commerce, June, 2017.
- Federal Communications Commission, March, 2017.
- Media Economics Workshop, October, 2016.
- University of Oklahoma, September, 2016.
- International Industrial Organization Conference, April, 2016.
- American Economic Association Annual Meetings, January, 2016.
- Kellogg School of Management, November, 2015.
- Georgetown University, October, 2015.
- Research Conference on Communications, Information and Internet Policy, September, 2015.

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?"
- International Industrial Organization Conference, April, 2017.

"The Effect of Competition on Toxic Pollution Releases"
- International Industrial Organization Conference, April, 2015.
- University of California, Davis, March, 2015.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
- Strategic Management Society Conference "Strategies in a World of Networks," September, 2014.
- International Industrial Organization Conference, April, 2014.

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior"
- Cable Show Academic Workshop, April, 2014.
- Research Conference on Communications, Information and Internet Policy, September, 2013.

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and Mechanisms"
- IUPUI, January, 2018
- Purdue University, November, 2014.
- ASHEcon Conference, June, 2014.
- University of Massachusetts, April, 2014.
- International Industrial Organization Conference, April, 2014.
- NBER Economics of IT and Digitization Workshop, July, 2013.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry"
-   Indiana University Economics Department, November, 2013.
-   International Industrial Organization Conference, May, 2013.

"Does Service Bundling Reduce Churn?"
-   NBER Economics of IT and Digitization Workshop, July, 2012.
-   International Industrial Organization Conference, March, 2012.
-   Federal Trade Commission, March, 2012.
-   Michigan University, November, 2011.
-   Research Conference on Communications, Information and Internet Policy, September, 2011.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"
-   University of Cincinnati, October, 2012.

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance"
-   Ohio State University, November, 2012.
-   Econometric Society North American Summer Meeting, June, 2011.
-   Temple University, November, 2010.
-   Miami University, October, 2010.
-   International Industrial Organization Conference, May, 2010.

"Has the Internet Accelerated the Diffusion of New Products?"
-   Bureau of Economic Analysis, November, 2009.

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data"
-   Econometric Society North American Summer Meeting, June, 2008.

"Multi-market Contact and On-Time Performance in the US Airline Industry"
-   International Industrial Organization Conference, May, 2008.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
-   ASHEcon Conference, June, 2010.
-   International Industrial Organization Conference, April, 2009.
-   Federal Trade Commission, March, 2008.

"Is Dual Agency in Real Estate a Cause for Concern?"
-   International Industrial Organization Conference, May, 2008.
-   Midwest Economic Association Annual Meeting, March, 2008.

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
-   University of Maryland, April, 2007.
"How Do Households Choose Quality and Time to Replacement for a Rapidly Improving Durable Good?"

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Kelley School of Business, February, 2010.
- Duke University, September, 2007.
- Cornell University, September, 2007.
- Econometric Society North American Summer Meeting, June, 2007.
- International Industrial Organization Conference, April, 2007.

"Relating Inertia and Experience in Technology Markets: An Analysis of Households' Personal Computer Choices"
- Dartmouth Winter IO Conference, January, 2006.

"The Beginning of Online/Retail Competition and Its Origins: An Application to Personal Computers"
- International Industrial Organization Conference, April, 2006.
- Cornell University, March, 2006.
- ASSA SGE, January, 2006.

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the Demand for Personal Computers"
- Penn State University, April, 2007.
- Econometric Society World Conference, August, 2005.
- International Industrial Organization Conference, April, 2005.
- Miami University, March, 2005.
- ASSA SGE, January, 2005.
- Duke University, November, 2004.
- Cornell University, November, 2004.
- NBER Summer Institute, July, 2004.

## EXPERT PANELS AND ENGAGEMENTS

Future of Regulation and Quasi-regulation, USC/Analysis Group Antitrust Conference, June, 2025.

The Economic Impact of Artificial Intelligence, Technology Policy Institute, Aspen Forum, August, 2024.

Panel on Unilateral Conduct, NERA Antitrust and Regulation Seminar, July, 2024.

AI Policy and Regulation: Balancing Consumer Protection and Innovation, NABE Tech Economics Conference, November, 2023.

Panel on the Economics of Privacy, Research Conference on Communications, Information and Internet Policy, September, 2023.

Panel on Privacy Law, Policy and Consumer Preferences, Technology Policy Institute Aspen Forum, August, 2023.

Panel on Breaking Developments in Damages Calculations, Litigating Patents and Trade

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Secret Remedies Summit, January, 2023.

Antitrust: Overview and Recent Developments, University of Nebraska Tech Policy Forum, January, 2023.

Econometrics for Policy Makers, University of Nebraska Tech Policy Forum, January, 2023.

Research Roundtable on Regulating Privacy, George Mason University, December, 2022.

Do People Care Where Their Data Are Stored?  Tech Refactored Podcast, Nebraska Governance and Technology Center, November 2022.

Advertising Markets: Is the Current Ecosystem Stimulating Competition?  Concurrences' Global Antitrust Economics Conference, November, 2021.

Damages from Data Breach and Misuse of Personal Information, Brattle Group, October, 2021.

Broadband Mapping Roundtable, Technology Policy Institute, October, 2021.

Panel on Competition and Innovation, 14th Annual Innovation Economics Conference, August, 2021.

Privacy, Please? American Bar Association Panel on Valuing Privacy, April, 2021.

Two Think Minimum Podcast with Scott Wallsten and Sarah Oh, Technology Policy Institute, February, 2021.

Panel on the Economy of Spectrum Sharing and Business Development, NSF Virtual Workshop on New Paradigms in Intelligent Spectrum Management and Regulations, December, 2020.

Scientific Sense Podcast Interview with Gill Eapen, October, 2020.

Panel on the Attention Economy, Technology Policy Institute Aspen Forum, October, 2020.

Panel on Antitrust Policy and Intellectual Property (moderator), Northwestern/USPTO Conference on Innovation Economics, August, 2020.

Panel on STELAR/Retransmission Consent, Phoenix Center Telecom Symposium, December, 2019.

BU Technology Policy Research Initiative Conference on the Law and Economics of IP, July, 2019.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

FTC Merger Retrospective Hearing, Federal Trade Commission, April, 2019.

Panel on Consumer Protection and Regulation, Maurer School of Law, March, 2018.

Terminator or the Jetsons? The Economics and Policy Implications of Artificial
Intelligence, Technology Policy Institute, February, 2018.

All Data is Health Data; The Impact of Data and Data Laws on Clinical Care, Innovation,
and Research, Symposium at Hall Center for Law and Health, October, 2017.

Tools of Damages Estimation, IPO's Damages and Injunctions Committee Conference,
June, 2017.

The Unlikely Pairing of Payers, Providers and Pharma for Patient Centered Analytics,
Kelley Forum on Healthcare Analytics, September, 2016.

Challenges Faced by Online Video Distributors, Federal Communications Commission
Video Landscape Workshop, March, 2016.

The Future of Video Policy and Business Models, hosted by the Technology Policy
Institute, January, 2014.

**PUBLIC SPEECHES**

"State of the Economy"
- Mechanical Contractor Association of Indiana Annual Meeting, June, 2022.

"IoT and Telecom Policy"
- Nelms Distinguished E-Seminar Series, University of Florida, October, 2020.

"Delivering Econometrics Skills within a Business Analytics Curriculum"
- Robert Morris Teaching Economics Conference, February, 2018

"Critical Assessment of Correlation vs. Causality for Business Decisions"
- 180 Degrees Consulting, Indiana University, February, 2017

"Bringing Repeated Games to Life via Empirical Examples"
- McGraw-Hill Education Fall INXPO Event, October, 2016
- University of Phoenix School of Business Symposium, March, 2016
- McGraw-Hill Education Teaching Workshop for Professional Development,
March, 2013

"Critical Assessment of Correlation vs. Causality for Public Policy"
- Vietnam Initiative with Indiana University, October, 2015

"As Graduates of Elder, You are Ready…"

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Cincinnati Elder High School Graduation Commencement, May, 2005

**PUBLIC COMMENTARY**

"Citizens Around the World Have Similar Data Privacy Preferences, At Least Relatively", with Scott Wallsten, Technology Policy Institute blog, October, 2024

"Privacy Preferences Differ by Gender and Age, But Not by Income", with Scott Wallsten, Technology Policy Institute Blog, November, 2023.

"Conflict of Interest and Platforms," Comment on DOJ and FTC Draft Merger Guidelines, with Avigail Kifer, public submission to antitrust agencies, September, 2023.

"Comment on the January 2022 DOJ and FTC RFI on Merger Enforcement: Issues Related to Digital Markets," with Lesley Chiou, Nathanial Hipsman, and Sachin Sancheti, public submission to antitrust agencies, March, 2022.

"People Lie When Answering Polls. Here's How to Fix It", with Scott Wallsten, *Technology Policy Institute Blog*, January, 2021.

"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests", with Daniel Simon, *The Conversation*, January, 2021.

"Improved Economic Analysis Should Be Lasting Part of Pai's FCC Legacy", with Babette Boliek and Jerry Ellig, *The Hill*, December, 2020.

"FCC Comments on Vertical Merger Guidelines," with Giulia McHenry, Patrick DeGraba, Eric Ralph, Catherine Matraves, Eugene Kiselev, and Aleksandr Yankelevich, February, 2020.

**MEDIA COVERAGE**

Specific Papers/Books/Public Commentary:

"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests," the *Conversation*, January, 2021.
- Reprint in Associated Press, Yahoo News

"How Much is Privacy Worth Around the World and Across Platforms?"
- "Facebook Would have to pay $3.50 Per Month to U.S. Users for Sharing Contact Info: Study" by Nandita Bose, *Reuters*, February 25, 2020. Reprint in *NY Times*.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "A Paradigm for Assessing the Scope and Performance of Predictive Analytics – Economic and Policy Implications of AI," by Wallis G. Romzek, Technology Policy Institute, April 17, 2018.

"Does Original Content Help Streaming Services Attract More Subscribers?"
- "Will Netflix Win the Streaming Wars?", Louis Foglia, BEME News, August, 2019.
- "Streaming Video: Original Content is the Hook," by David Marino-Nachison, Barron's Next, April 25, 2018.

Predictive Analytics for Business Strategy
- "Kelley Professor's New Book 'Actively' Advocates the Role of Economics within Today's Analytics Boom," by George Vlahakis, Kelley School official blog, March 27, 2018.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
- "Flight Delay? Lost Luggage? Don't Blame Airline Mergers, Research Shows," by George Vlahakis, reprinted in *Science Daily*, May 23, 2017.

"The Empirical Economics of Online Attention"
- "We Spend a Fixed Amount of Time Online Each Week (But People with Higher Incomes Spend Less)," by Julia Hann, Forbes, September 14, 2016.
- "Let Them Eat Internet," by Tyler Cohen, *Marginal Revolution*, July 19, 2016.
- "Consumers Have a Troubling Internet Habit That's Threatening Digital Media," by Myles Udland, *Business Insider*, July 19, 2016.
- "Richer People Spend Less Time on the Internet," by Allee Manning, *Vocativ*, July 19, 2016.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"
- "The Boomer Challenge: It's a Numbers Game," by Paul Barr, *Hospitals and Health Networks*, April 8, 2014.

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance"
- "Study Finds That Competition May Lead to More Airline Delays," by Hugo Martin, *LA Times*, December 22, 2013.

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews"
- "Psychology Uncovers Racism at the Movies," by Dr. Raj Persaud and Adrian Furnham, *Psychology Today*, September 5, 2015.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Men in Black the movie – but men in white would be a better film?," by Dr. Raj Persaud and Adrian Furnham, *Huffington Post*, May 22, 2012.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
- "Medicare As We've Known It Isn't an Option," by Betsy McCaughey, *Wall Street Journal*, April 27, 2011.

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
- "People below 'digital divide' would use the Internet more, if they had it," by Bill Steele, *Cornell Chronicle*, April 18, 2008.
- Invited guest for "Digital Divide," *Nevada Public Radio*.

Expert Opinion:
"ISP/Website 'Mutuality of Interests' – or Retrans Blackouts – Among Net Neutrality Reversal Possibilities," *Communications Daily*, Vol. 34, No. 17, January, 2014.

## PROFESSIONAL SERVICE

Miami University Economics Advisory Board, 2023-present.

BEPP Faculty Research Awards Committee, 2022-present.

NBER Small Digitization Grants Review Committee, 2022.
Research Conference on Communications, Information and Internet Policy (TPRC) Program Committee, 2017-2021.

International Industrial Organization Conference (IIOC) Local Organizer, 2018.

Midwest Health Economics Conference Local Organizing Committee, 2016.

European Conference on Information Systems (ECIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2016.

International Conference on Information Systems (ICIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2014.

International Industrial Organization Conference (IIOC) Program Committee, 2012-2014.

Ad hoc referee for:
*Agricultural and Resource Economics Review, American Economic Journal: Applied Economics, American Economic Review, Applied Economics, Applied Economics Letters, Applied Financial Economics, B.E. Journal of Economic Analysis & Policy,*

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Communications of the Association for Information Systems, Economic Inquiry, Economics of Education Review, Economics of Innovation and New Technology, Economics Letters, European Journal of Law and Economics, Geneva Papers on Risk and Insurance, Growth and Change: A Journal of Urban and Regional Policy, Health Economics, Health Services Research, Information Economics and Policy, Inter-America Development Bank, International Economic Review, International Journal of Industrial Organization, Israel Science Foundation, Journal of Air Transport Management, Journal of Banking and Finance, Journal of Competition Law and Economics, Journal of Economics and Business, Journal of Economics and Management Strategy, Journal of the European Economic Association, Journal of Gerontology, Journal of Health Economics, Journal of Industrial Economics, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Political Economy Microeconomics, Journal of Public Economics, Journal of Risk and Insurance, Journal of Rural Studies, Journal of Urban Technology, Leverhulme Trust, Management Science, Marketing Science, National Science Foundation, North American Journal of Economics and Finance, Organizational Science, Oxford Bulletin of Economics and Statistics, Quantitative Marketing and Economics, Quarterly Journal of Economics, Quarterly Review of Economics and Finance, RAND Corporation, RAND Journal of Economics, Research Policy, Review of Economics and Statistics, Review of Industrial Organization, Review of Network Economics, Risk Management and Insurance Review, Social Behavior and Personality, Southern Economic Journal, Strategic Management Journal, Telecommunications Policy, Telematics and Informatics, Transportation Research Part E, U.S.-Israel Binational Science Foundation, World Development*

External tenure/promotion/reappointment reviewer for:
Boston University, City University of Hong Kong, Cornell University, Drexel University, Emory University, Fairfield University, Georgetown University, Imperial College London, Loyola University Maryland, Pomona College, Purdue University, Stanford University, University of Central Florida, University of Colorado, University of Georgia, University of Massachusetts, University of Oklahoma, University of Oregon

External program reviewer for:
Ball State University Economics

## DISCUSSANT ACTIVITIES
Platform Dynamics Roundtable, November, 2023
- "Self-Preferencing at Amazon: Evidence from Search Rankings," by Chiara Farronato, Andrey Fradkin, and Alexander MacKay

International Industrial Organization Conference, April, 2023
- "Platform Information Design and Competitive Price Targeting," by Ruiqi Wu, Yufeng Huang, and Nan Li

International Industrial Organization Conference, May, 2022

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Conflicts of Interest, Ethical Standards, and Competition in Legal Services," by Jan Bouckaert and Johan Stennek

NBER Economics of Digitization Summer Institute Meeting, July, 2021
- "Browsers Don't Lie? Gender Differences in the Effects of Covid-19 Lockdowns on Digital Activity and Time Use," by Amalia R. Miller, Kamalini Ramdas, and Alp Sungu
- "Does Telemedicine Transcend Disparities or Create a Digital Divide? Evidence from the Covid-19 Pandemic," by Jeffrey McCullough, Kartik K. Ganju, and Chandy Ellimoottil

NBER Economics of Digitization Summer Institute Meeting, July, 2018
- "Steering Incentives and Bundling Practices in the Telecommunications Industry," by Brian McManus, Aviv Nevo, Zachary Nolan, and Jonathan W. Williams

International Industrial Organization Conference, April, 2017
- "Price-Linked Subsidies and Health Insurance Markups," by Sonia Jaffe and Mark Shepard

NBER Economics of Digitization Meeting, March, 2017
- "Using Massive Online Choice Experiments to Measure Changes in Well-being," by Erik Brynjolfsson, Felix Eggers, and Avinash Gannamaneni

International Industrial Organization Conference, April, 2016
- "Using Matching to Study Merger: An Application to the U.S. Airline Industry," by Zexuan Liu, Pallab Ghosh, and Qihong Liu
- "Market Structure with the Entry of Peer-to-Peer Platforms: The Case of Hotels and Airbnb," by Chiara Farronato and Andrey Fradkin

Searle Center Conference on Innovation Economics, June, 2015
- "How Do Open Standards Influence Inventive Activity? Evidence from the IETF," by Wen Wen, Chris Forman, and Sirkka Jarvenpaa

Searle Center Conference on Internet Search and Innovation, June, 2015
- "Match Quality, Search, and the Internet Market for Used Books," by Sara Fisher Ellison
- "E-Book Pricing and Vertical Restraints," by Babur De los Santos and Matthijs Wildenbeest

International Industrial Organization Conference, April, 2015
- "Do Private Medicare Firms Face Lower Costs?," by Keaton Miller
- "The Market for Electric Vehicles: Indirect Network Effects and Policy Impacts," by Yiyi Zhou

Searle Center Research Roundtable on Patents and Technology Standards: The Data Sets, April, 2015

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

American Economic Association Annual Meetings, Pricing and Resource Allocation in Telecommunications, January, 2015
- "Employing Auctions to Allocate Scarce Resources," by John Mayo and David Sappington

American Economic Association Annual Meetings, Digital Media Economics, January, 2015
- "Super Returns? The Effects of Ads on Product Demand," by Seth Stephens-Davidowitz, Hal Varian, and Michael D. Smith

Searle Center Conference on Internet Search and Innovation, June, 2014
- "Auction vs. Posted-Price: Market Mechanism, Lender Behaviors, and Transaction Outcomes in Online Crowdfunding," by Zaiyan Wei and Mingfeng Lin

Research Roundtable on the Law and Economics of Digital Markets, July, 2013
- "Digital Music Consumption on the Internet," by Bertin Martens and Luis Aguiar

Searle Center Conference on Internet Search and Innovation, June, 2013
- "When Does Retargeting Work? Information Specificity in Online Advertising," by Anja Lambrecht and Catherine Tucker
- "Local News Online: Aggregators, Geo-Targeting and the Market for Local News," by Lisa George

International Industrial Organization Conference, May, 2013
- "The Impact of Privacy Policy on the Auction Market for Online Display Advertising," by Garrett Johnson
- "Transactions in Two-Sided Markets," by Alexei Alexandrov and Daniel Spulber

American Economic Association Annual Meetings, Economics of the Internet, January, 2013
- "Supply-Side Responses to Privacy Protection," by Avi Goldfarb and Catherine Tucker

Searle Center Book Preview Roundtable, December, 2012
- *Innovation from the Edges: The Economics of Creating the Commercial Internet,* by Shane Greenstein

Searle Center Conference on Internet Search and Innovation, June, 2012
- "News Aggregators and Competition among Newspapers," by Doh-Shin Jeon and Nikrooz Nasr Esfahani

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Technology Shocks in Multi-Sided Markets: The Impact of Craigslist on Local Newspapers," by Robert Seamans and Feng Zhu

Midwest Health Economics Conference, May, 2012
- "The Anticipatory Effects of Medicare Part D on Drug Utilization," by Abby Alpert

International Industrial Organization Conference, March, 2012
- "Intra-Household Effects on Demand for Telephone Service: Empirical Evidence," by Ching-I Huang
- "Unobserved Risk Type and Sorting: Signaling Game in Online Credit Markets," by Kei Kawai, Ken Onishi, and Kosuke Uetake

NBER Economics of Digitization Meeting, February, 2012
- "The Effect of Localization in News Aggregators on Local News Consumption," by Susan Athey and Markus Mobius

Federal Trade Commission Microeconomics Conference, November, 2011
- "Do Firms Game Quality Ratings? Evidence from Mandatory Disclosure of Airline On-Time Performance," by Silke Forbes, Mara Lederman, and Trevor Tombe

International Industrial Organization Conference, May, 2010
- "Competition in Public School Districts: Student Sorting, School Quality Determination, and School Entry," by Nirav Mehta
- "A Model of Entry and Network Access Competition in Local Telephony," by Gustavo Marcos and Eduardo Saavedra

International Industrial Organization Conference, April, 2009
- "Consumer Search and Online Demand for Durable Goods," by Jun Kim, Bart Bronnenberg, and Paulo Albuquerque
- "Price Controls and Competition in Gasoline Retail Markets," by Juan Esteban Carranza and J.F. Houde

International Industrial Organization Conference, May, 2008
- "A Simple Model of Pricing for Non-storable Goods in Oligopoly: Some Considerations on Airline Pricing Behaviour," by Marco Alderighi

International Industrial Organization Conference, April, 2007
- "Markov Perfect Industry Dynamics with Many Firms," by Gabriel Weintraub

International Industrial Organization Conference, April, 2006
- "Price, Price Dispersion and Number of Sellers at a Low Entry Cost Shopbot," by Michelle Haynes and Steve Thompson

International Industrial Organization Conference, April, 2005

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Asymmetric Advertising Costs as a Barrier to Entry: Evidence from Theatrical Motion Pictures," by Charles Moul

## BOOK REVIEWS

Tucker, C. and Marthews, A., *You'll Pay for That: Payment Systems, Privacy, and Political Dissent*, MIT Press, 2023.

Bekes, G. and Kezdi, G., *Patterns, Causality and Prediction: Data Analysis for Business, Economics and Policy*, Cambridge University Press, 2017.

Lesser, W., *American Business Regulation: Understand, Survive, and Thrive*, M.E. Sharpe, 2015.

## CONSULTING AND EXPERT WITNESS WORK

Expert reports, deposition, testimony and consulting for various matters including:
Competition policy and antitrust
Consumer protection
Damages calculations
Intellectual property
Privacy valuation
Survey design and analysis
Telecommunications policy

## MEMBERSHIPS

American Economic Association.

Industrial Organization Society.

Academy of Management.

Association for Information Systems.

Team member for Cornell's Institute for the Social Sciences Theme Project, Getting Connected: Social Science in the Age of Networks, 2005-2008.

## UNIVERSITY SERVICE

Member of Subcommittee for Department Research Award, 2023-present.

Member of Indiana Business Research Center Executive Director Search Committee, 2021-2022.

Member of Diversity, Equity & Inclusion Task Force, 2020-2021.

Member of Hiring Committee for Business Economics and Public Policy, 2017-2018, 2015-2016 & 2010-2011.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Chair of Hiring Committee for Business Economics and Public Policy, 2014-2015 & 2013-2014.

Kelley Direct Policy Committee, 2014-2016.

Judge for Kelley Honors Case Competition, 2016.

Judge for Deloitte Undergraduate Case Competition, 2017, 2015, 2011.

Co-founder and Judge for Economic Consulting Case Competition (EC3), sponsored by the Keystone Group, 2011-2015.

Co-founder and Co-organizer for BEPP "Eat, Meet, & Compete," 2012-2015.

Undergraduate Policy Committee, 2012-2014 & 2010-2011.

Doctoral Advisor for Business Economics and Public Policy, 2011-2012.

Doctoral Policy Committee, 2011-2012.

Judge for Net Impact Sustainable Business Club 2010 Case Competition, 2010.
*At Cornell:*
Applied Economics and Management Petitions Committee, 2007-2010.

Policy Analysis and Management External Hiring Committee, 2006-2007 & 2009-2010.

Mann Café Advisory Board, 2007-2010.

Institute for the Social Sciences Small Grant Program Committee, 2008.

Biz Quiz Faculty Advisor, 2008.

Applied Economics and Management Seminar Committee, 2005-2007.

Judge for Globalize '07, Cornell Hotel School, 2007.

Mann Library Vendor Evaluation Sub-committee, 2006.

## PHD STUDENTS
*Committee Chair:*
Hong Lee
Aparna Soni
Yu-Hsin Liu
Yejing Ren
Junlin Du (Co-chair)
Fernanda Lopez de Leon

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Committee Member:*
>Ningning Guo
>Abhishek Ganguly
>Catalin Stefanescu
>Susan Kayser
>Eric Schmidbauer
>Shyam Venkatesan
>Carlos Castelan
>Joo Yeon Sun
>Annemie Maertens (Substitute member)
>Thanasin Tanompongphandh
>Jiahong Zhang
>Lona Fowdur
>Anirban Mukherjee
>Marc Bellemare (Substitute member)
>Hyunkyung Choe
>Daniel Shawhan

*External Proposal Reviewer:*
>Andres Jola Sanchez (chair)
>Mohammad Ghuloum
>Kyle Bradley

## MASTERS STUDENTS
*Committee Member:*
>Malcolm Wade (Johns Hopkins, Systems Engineering)

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**5. Appendix B—Prior Testimony**

<u>**Prior Four Years of Testimony**</u>

**JEFFREY T. PRINCE**

Alasdair Turner et al. v. <u>Apple, Inc.</u> (Case No. 5:20-cv-07495-EJD), United States District Court of California San Jose Division, March 25, 2025.

Inform Inc. v. <u>Google LLC, Alphabet Inc., and Youtube LLC</u> (Case No. 1:23-cv-01530), United States District Court Southern District of New York, March 14, 2025.

Briefing to the New York Attorney General's Office, on behalf of <u>Lycamobile</u>, Regarding T-Mobile Threats to MVNO Competition, June 4, 2024.

Briefing to the Department of Justice and Monitoring Trustee, on behalf of <u>Lycamobile</u>, Regarding T-Mobile Threats to MVNO Competition, May 24, 2024.

Briefing to Federal Communications Commission, on behalf of <u>Lycamobile</u>, Regarding T-Mobile Threats to MVNO Competition, May 15, 2024.

Langer et al. v. <u>CME Group, Inc. et al.</u> (Case No. 2014-CH-00829), Circuit Court of Cook County, November 14, 2023.

REX v. Zillow, Trulia, <u>NAR</u> (Case No. 2:21-cv-00312-TSZ), United States District Court Western District of Washington at Seattle, May 19, 2023.

<u>Apple</u> iPhone Antitrust Litigation (Case No. 4:11-cv-06714-YGR), United States District Court for the Northern District of California Oakland Division, April 12, 2023

Walter Peters et al. v. <u>Apple, Inc</u>. (Case No. 19STCV21787), Superior Court for the State of California County Los Angeles, September 12, 2022

<u>Hachette Book Group, Inc</u>. et al. v. Internet Archive (Case No. 1:20-cv-04160-JGK-OTW), United States District Court Southern District of New York, June 9, 2022

<u>Dennis McGrath et al</u>. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, March 21, 2022

<u>Dennis McGrath et al</u>. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, December 23, 2021

<u>Theta IP, LLC</u> v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (Case No. 6:20-cv-00160-ADA), United States District Court for the Western District of Texas Waco Division, October 28, 2021

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Apple iPhone Antitrust Litigation (Case No. 4:11-cv-06714-YGR), United States District Court for the Northern District of California Oakland Division, October 4, 2021

Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, August 13, 2021

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**6. Appendix C—Documents Relied Upon List**

**Academic Articles**

- Daniel Ershov, "Variety-Based Congestion in Online Markets: Evidence from Mobile Apps," *American Economic Journal: Microeconomics*, 16(2), 2024, pp. 180–203

- Federico Etro, "Device-Funded vs Ad-Funded Platforms," *International Journal of Industrial Organization*, 75(5), 2021, pp. 1–18

- Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and the Economy*, 6, 2006, pp. 159–215

- Thomas W. Quan and Kevin R. William, "Product Variety, Across-Market Demand Heterogeneity, and the Value of Online Retail," *The RAND Journal of Economics*, 49(4), 2018, pp. 877–913

**Books and Book Chapters**

- Kenneth E. Train, *Discrete Choice Methods with Simulation*, Second Edition, (Cambridge, England: Cambridge University Press, 2009)

- Mark A. Allen, et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011), pp. 425–502

**Data Sources**

- App Store Transaction Data

**Declarations**

- Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, November 9, 2021

- Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, November 23, 2021

- Supplemental Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Testimony of Daniel L. McFadden, November 30, 2021

- Reply Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's *Daubert* Motion, June 30, 2023

- Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Opposition to Plaintiffs' Motion to Modify Class Definition, April 29, 2025

- Declaration of Minjae Song, Ph.D., in Support of Plaintiffs' Motion to Modify Class Definition and Approve Notice to the Class, May 6, 2025

**Depositions**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Deposition of Daniel L. McFadden, November 5, 2021

- Deposition of Daniel L. McFadden, December 5, 2022

- Deposition of Daniel L. McFadden, May 14, 2025

- Deposition of Joseph Stiglitz, May 30, 2025

- Deposition of Minjae Song, Ph.D., June 4, 2025

**Expert Reports**

- Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021

- Expert Report and Declaration of Jeffrey T. Prince, Ph.D., August 10, 2021

- Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021

- Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022

- Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022

- Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, January 19, 2023

- Expert Report and Declaration of Jeffrey T. Prince, Ph.D., March 10, 2023

- Expert Report and Declaration of Mark Watson, Ph.D., March 10, 2023

- Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025

- Expert Report of Jospeh E. Stiglitz, Ph.D., March 7, 2025

- Expert Report of Minjae Song, Ph.D., March 7, 2025, with backup materials

- Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., March 7, 2025

- Opening Expert Report and Declaration of Itamar Simonson, Ph.D., March 7, 2025

- Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., March 7, 2025

- Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., June 13, 2025

- Rebuttal Expert Report and Declaration of Itamar Simonson, Ph.D., June 13, 2025

- Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., June 13, 2025

**Legal Documents**

- Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, March 29, 2022

- Letter from Daniel G. Swanson (Gibson Dunn) to Rachele R. Byrd (Wolf Haldenstein Alder Freeman & Herz LLP), "Re: *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)," February 27, 2023

- Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, February 2, 2024

- Plaintiffs' Notice of Motion and Motion to Modify Class Definition and Approve Notice to the Class; Memorandum of Points and Authorities in Support, *In Re Apple iPhone Antitrust Litigation*, April 15, 2025

- Order Granting in Part Motion to Modify Class, *In Re Apple iPhone Antitrust Litigation*, June 11, 2025