# EXHIBIT 43

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**

# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR**<br><br><br>**Hon. Yvonne Gonzalez Rogers** |

EXPERT REPORT OF
## MINJAE SONG, PH.D.

**MARCH 7, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## CONTENTS

**I. Introduction** .................................................................................................................1

    I.A. Qualifications ................................................................................................1

    I.B. Assignment ...................................................................................................2

    I.C. Summary of Opinions....................................................................................6

**II. App Store Transactions Data used for Estimating Damages** ...............................7

    II.A. App Downloads and In-App Purchases .......................................................8

    II.B. Apple App Store Commissions and Fees...................................................20

**III. Apple's Alleged Anticompetitive Conduct**............................................................26

**IV. Methodology for Estimating Damages** ..................................................................28

    IV.A. Damages Model Methodology ..................................................................28

        IV.A.1. Genre Groupings and Variable Profit Margin Bounds....................28

        IV.A.2. Demand Estimation .......................................................................32

        IV.A.3. But-For Price and Damages Calculations ......................................34

    IV.B. Methodology for Identifying Harmed and Unharmed Class Members ........37

**V. Estimation Results**...................................................................................................39

    V.A. Estimates of Consumers' Price Sensitivity for Apps and In-App Content....40

    V.B. Estimates of Class-wide Damages .............................................................42

**VI. Estimates of U.S. iPhone and iPad Shares** ...........................................................45

    VI.A. Overview of IDC Data used to Estimate iPhone and iPad Shares..............45

    VI.B. Estimates of U.S. iPhone Shares...............................................................48

    VI.C. Estimates of U.S. iPad Shares...................................................................51

**VII. Conclusion** ...........................................................................................................53

**Appendix A Curriculum Vitae** ..................................................................................54

**Appendix B Materials Relied Upon** ..........................................................................62

**Appendix C Data Processing**......................................................................................69

    C.1 Overview of Apple App Store Transactions Data...........................................69

    C.2 Transactions Excluded from Empirical Analyses ..........................................72

    C.3 The 75 0.1 Percent Samples .........................................................................73

    C.4 Processing the Catalogs Genre .....................................................................76

    C.5 The Full Data for Damages Calculations ......................................................77

    C.6 Supplemental Payor ID Data ........................................................................78

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

C.7  The IDC Data .................................................................................................................79

**Appendix D Technical Details of Damages Estimation ..............................................................82**
D.1  Model Estimation Methodology..................................................................................82
D.2  Statistical Significance of the Log-Downloads Coefficient ............................................98
D.3  Damages with Spending Cutoff Applied to Payor-Level Spending.............................104

**Appendix E Additional U.S. Share Calculations......................................................................106**
E.1  Smartphone Shares .....................................................................................................106
E.2  Tablet Shares ..............................................................................................................107

**Appendix F Additional Figures .................................................................................................108**
F.1  Distribution of Screen Size in IDC Data ...................................................................108
F.2  Developers' Use of New March 2023 Price Tiers for Newly Introduced Apps and In-App Content Items.......................................................................................................109

**Exhibit 1...................................................................................................................................111**

Figure 1: Number of Apps Available in the Apple App Store ....................................................... 11
Figure 2: Number of In-App Items Available in the Apple App Store ......................................... 12
Figure 3: Annual App Store Gross Revenues from App Downloads and In-App Purchases....... 13
Figure 4: Share of App Store Gross Revenues by App Business Model...................................... 15
Figure 5: App Store Gross Revenue and Effective Commission Rate by Genre ......................... 17
Figure 6: Top 10 Apps by Five-Year Period ............................................................................... 19
Figure 7: App Store Commission Revenues................................................................................. 21
Figure 8: Monthly Effective App Store Commission Rate........................................................... 23
Figure 9: App Store Gross Revenues and Commission Revenues by Platform ........................... 24
Figure 10: Annual Apple Developer Program Fees...................................................................... 26
Figure 11: Margin Bounds for Demand Estimation ..................................................................... 31
Figure 12: Average Demand Coefficients and Associated Standard Error .................................. 41
Figure 13: Class-Wide Damages Using Average Coefficients...................................................... 44
Figure 14: U.S. Smartphone Shares Based on Value by Brand, 2007-2024 ............................... 49
Figure 15: U.S. Smartphone Shares Based on Value by Operating System, 2007-2024 ............. 50
Figure 16: U.S. Tablet Shares Based on Value by Brand, 2010-2024......................................... 51
Figure 17: U.S. Tablet Shares Based on Value by Operating System, 2010-2024....................... 52
Figure 18: Summary of Variables in App Store Transactions Data ............................................. 71

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Figure 19: Summary of Margin Bounds Adjustments ................................................................ 92

Figure 20: Average Coefficients and Associated Standard Errors when Including Log-Downloads in All Genres ............................................................................................. 100

Figure 21: Distribution of Individual Sample Demand Coefficient Estimates when Including Log Downloads ............................................................................................... 102

Figure 22: Average Coefficients and Associated Standard Errors without Log Downloads..... 103

Figure 23: Distribution of Individual Samples Coefficient Estimates for the Model without Log Downloads ................................................................................................ 104

Figure 24: Class-Wide Damages Comparison to Spending Cutoff Applied to Payors' Total Spend, Flexible But-For Pricing Model ..................................................................... 104

Figure 25: Class-Wide Damages Comparison to Spending Cutoff Applied to Payors' Total Spend, Price Tiers in But-For World Model ............................................................... 105

Figure 26: U.S. Smartphone Shares Based on Units by Brand, 2007-2024 .............................. 106

Figure 27: U.S. Smartphone Shares Based on Units by Operating System, 2007-2024 ........... 106

Figure 28: U.S. Tablet Shares Based on Units by Brand, 2010-2024 ...................................... 107

Figure 29: U.S. Tablet Shares Based on Units by Operating System, 2010-2024 .................... 107

Figure 30: Smartphone and Tablet Screen Sizes, U.S., 2010-2024Q2 ...................................... 108

Figure 31: Percentage of Transactions for New Apps and In-App Purchases Priced on Apple's New Price Tiers That Are Below the Prior Minimum Price ....................................... 110

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# I. Introduction

## I.A. Qualifications

1. I am a Principal and head of U.S. Antitrust & Competition at The Brattle Group ("Brattle"). I am a Ph.D. economist with extensive expertise in the areas of industrial organization, applied econometrics, and competition policies centered on two-sided markets, monopolization, class certification, and horizontal mergers. I have testified as an economic expert in antitrust litigation matters and have also supported economic experts and provided economic consulting services on antitrust litigation matters. Additionally, I have consulted on merger matters where I either assisted the merging parties obtaining regulatory clearance from antitrust authorities, such as the U.S. Department of Justice and the European Commission, or assisted antitrust authorities investigating antitrust issues related to proposed mergers.

2. I received a Bachelor of Arts degree in Economics from Seoul National University in 1996. I received a Master of Arts degree in Economics from Harvard University in 2001 and a Ph.D. in Economics from Harvard University in 2003. From 2003 to 2007, I was an Assistant Professor of Economics at Georgia Institute of Technology (Georgia Tech) in Atlanta, GA. From 2007 to 2014, I was an Assistant Professor of Economics and Marketing at the University of Rochester in Rochester, NY. At these universities, I taught undergraduate-level microeconomics, Ph.D.-level industrial organization and econometrics, and MBA-level marketing courses.

3. I have published several peer-reviewed articles on various topics of industrial organization, applied econometrics, and marketing in leading scholarly and professional journals, including *The RAND Journal of Economics*, *American Economic Journal: Microeconomics*, and *International Economic Review*. Some of these publications focus on developing econometric models based on microeconomic theory and have been widely cited by academic researchers.[1]

---

[1] Minjae Song, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics* 13(2) (2021): 35-67; Minjae Song, Sean Nicholson, and Claudio Lucarelli, "Mergers with interfirm bundling: a case of pharmaceutical cocktails," *RAND Journal of Economics* 48(3) (2017): 810-834; Minjae Song, "A Hybrid Discrete Choice Model of Differentiated Product Demand with an Application to Personal Computers," *International Economic Review* 56(1) (2015): 265-301.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

4.   Brattle has been retained to provide economic analysis and expert witness testimony for Plaintiffs in this matter. I have worked on that engagement with Daniel L. McFadden, Ph.D., since 2020. I have overseen the econometric analyses performed by Brattle at the direction and in support of Prof. McFadden in this matter since that time. I have also submitted multiple declarations on this matter, including my declaration executed on January 30, 2024, in response to the Court's Order for Supplemental Information (ECF No. 784) entered on January 16, 2024.

5.   My curriculum vitae, which provides a more detailed summary of my qualifications and expert testimony, is contained in Appendix A.

6.   I am being compensated for my work in this matter at an hourly rate of $900. I have been assisted by staff at Brattle working under my direction and supervision. My compensation is not dependent on my opinions or the outcome of this, or any other, case.

## I.B. Assignment

7.   In the Class Certification Order issued on February 2, 2024, the Court certified a proposed Consumer Class that Consumer Plaintiffs allege are harmed by Apple's anticompetitive practices in the aftermarket for the sale of iOS applications ("apps") and in-app content.[2] The certified Consumer Class is defined as all persons in the United States who purchased one or more iOS apps from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS mobile device (an "iOS device" hereafter) at any time since July 10, 2008 (the "Class Period").[3] The Class is limited to those persons who paid more than $10 in total to Apple during the Class Period for iOS apps and in-app purchases from any one Apple ID.[4]

---

[2]   Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), February 02, 2024 (hereafter referred to as the "Second Class Certification Order"). *See also,* Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C 11-06714-YGR (N.D. Cal.), September 11, 2020, ECF No. 228 (hereafter referred to as the "Third Amended Consolidated Complaint").

[3]   Second Class Certification Order, 2:9-13. For the purposes of this report, I have been instructed by Counsel to treat iPhones and iPads, but not the iPod Touch, as iOS mobile devices. Moreover, I understand that the Class excludes "Apple and its employees, agents and affiliates, and the Court and its employees."

[4]   Second Class Certification Order, 2:9-13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

8. In prior testimony, Prof. McFadden explained how the Apple App Store's allegedly supracompetitive commission fee functions like a tax in the aftermarket for iOS apps and in-app purchases, thereby harming both the Consumer Class and developers.[5] Prof. McFadden also demonstrated how the econometric model described therein can be used to estimate the monetary harm incurred by the Consumer Class as a result of Apple's allegedly supracompetitive App Store commission fee and price tier restrictions.[6] I supported Prof. McFadden and acted under his direction during the creation, testing, and implementation of his model during this time. I understand that the Court found that Prof. McFadden's econometric damages model "relied on sound scientific and economic principles" and that he resolved the "deficiencies" the Court initially noted with the econometric model.[7]

9. Since the Court issued the Second Class Certification Order, Counsel for Consumer Plaintiffs has asked me to implement the econometric model Prof. McFadden demonstrated to the Court in his prior testimony to estimate damages—both on a Class-wide basis and for each individual Class member—for purchases made across all genres of iOS apps (including any in-app content offered through those apps) in the Apple App Store. I have been responsible for this implementation effort since February 2, 2024. I have kept Prof. McFadden apprised of my work.

10. Counsel for Consumer Plaintiffs has provided me with an updated App Store transactions dataset Apple produced after Prof. McFadden submitted his Supplemental Report in 2023.[8] I understand that the updated App Store transactions dataset corrects erroneous records contained in Apple's prior data productions, extends the timeframe of the data to span July 10, 2008 to February 2, 2024, and now includes an additional transaction ID variable that is necessary to identify the transactions associated with any given Class member.[9]

---

[5] Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), June 1, 2021 (hereafter referred to as the "McFadden 2021 Opening Report"); and Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), January 19, 2023 (hereafter referred to as the "McFadden 2023 Supplemental Report").

[6] *See, generally,* McFadden 2023 Supplemental Report.

[7] Second Class Certification Order, 3:3-8 and 1:15-19.

[8] Apple Transactions data produced via hard drive on May 31, 2024, APL-APPSTORE_10767153.

[9] Email from Eli M. Lazarus to Kyle M. Wood, et al. (June 6, 2024).

11. In Prof. McFadden's prior reports, it was not possible for him to identify individual Class members or the monetary harm attributable to each Class member due to the limitations of the App Store transactions data available to him at that time. He was instead only able to demonstrate how he could allocate Class-wide damages to anonymized Apple IDs.[10] Apple has since produced a supplementary dataset that contains anonymized billing IDs (hereafter referred to as "payor IDs"), which represent individual persons, and the transaction IDs associated with the transactions paid for by these persons.[11] I further understand this supplementary dataset can be used together with the new transaction ID variable included in the revised App Store transactions dataset to identify the individual transactions attributable to each payor.[12] Counsel has instructed me to use this supplementary dataset for the purposes of identifying which individuals meet the spending threshold for Class membership and determining whether any individual Class member incurred monetary harm.

12. I am aware that Counsel for Consumer Plaintiffs has also asked Prof. Stiglitz, Prof. MacCormack, and Dr. Abrantes-Metz to submit expert reports describing their opinions. I rely on several of their conclusions in forming some of my own opinions.[13] Counsel has instructed me to rely on the following list of conclusions from these experts when performing my damages calculations.

---

[10] *See, e.g.,* McFadden 2023 Supplemental Report, Section III.B.

[11] *See* APL-APPSTORE_11418586. *See also*, Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (January 17, 2025) (hereafter referred to as "Apple's Payor Data Supplemental Production Letter"). This supplemental dataset excludes transactions associated with zero spend. It is further missing the payor IDs associated with approximately 0.2 percent of paid transactions due to "potential data matching issues". The payor IDs provided includes only individuals with non-zero spend. *See also*, Email from Ramona Lin to Kyle M. Wood, et al. (January 24, 2025) ("individuals who have never paid for any transactions, by definition, are not 'payors,' and their PII was not included in the payor data production[.]"). Apple later produced a second supplemental dataset that included payor IDs for most, but not all, of the 0.2 percent of previously unmatched transactions. *See* APL-APPSTORE_11428390. *See also*, Letter from Eli. M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025). I explain how I incorporate these data in Appendix C.6.

[12] Apple's Payor Data Supplemental Production Letter ("Pursuant to the January 21, 2021 Stipulated Amended Protective Order… the June 14, 2024 Stipulated Supplemental Protective Order… and the Court Order on August 9, 2024… Defendant Apple Inc… produces to Plaintiffs… a list matching unique transaction IDs previously provided by Apple to Payor IDs assigned by Plaintiff's expert.").

[13] Expert Report of Joseph E. Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "Stiglitz Initial Report"); and Expert Report of Alan D. MacCormack, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "MacCormack Initial Report").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- I have been instructed by Counsel for Consumer Plaintiffs to assume that Apple would charge a 13.63 percent commission rate on app downloads and in-app purchases made through the App Store absent Apple's alleged anticompetitive conduct. I understand that this commission rate is consistent with the opinions offered by Dr. Abrantes-Metz.[14]

- I understand Prof. MacCormack has offered opinions regarding average variable profit margins for developers in each App Store genre, and which genres contain similar types of apps.

- I understand that Prof. Stiglitz has offered opinions related to the liability issues in this matter, including the relevant antitrust markets in which the App Store operates and whether and how Apple's alleged misconduct has harmed consumers. The methodology described in this report is consistent with these opinions.

13. Moreover, I have also been asked by Counsel for Consumer Plaintiffs to perform several additional calculations:

- I have been asked to calculate the U.S. share of iPads among tablet devices and the U.S. share of iPhones among smartphone devices. Counsel has provided me with the definitions for "smartphone" and "tablet" to use in my calculations.[15] I understand the definitions I have been provided are consistent with how Prof. Stiglitz defines the relevant antitrust markets containing iPhones and iPads, respectively.[16] I include these calculations in Section VI of this report.

---

[14] Expert Report of Rosa M. Abrantes-Metz, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

[15] A "smartphone" is an electronic device with cellular capabilities with a screen size generally less than 7 inches, and advanced hardware and software components that allow users to run a wide variety of functions and applications. Smartphones are to be distinguished against feature phones, which are mobile phones that have a limited and fixed set of functions beyond voice calling and text messaging (for example, web browsing, GPS, and email) and do not offer the same extensive array of functionalities as smartphones. While feature phones are portable and able to support some third-party software, these applications are preloaded on the phone, as opposed to downloaded from an app store, and do not integrate with other features of the phone, such as push notifications, syncing across apps, and a smooth app experience. A "tablet" is a portable, battery-powered, touchscreen device without a built-in keyboard, and a screen size that is generally larger than 7 inches. While many tablets are sold and operated with keyboards, a keyboard is not necessary for the tablet to have full functionality, and is not permanently attached. Depending on the model, tablets may be able to connect to cellular networks to allow for internet connectivity without a Wi-Fi connection. Similar to smartphones, tablets can run a wide array of applications.

[16] Stiglitz Initial Report, Section VI.A.2. *See also*, Stiglitz Initial Report, Section VI.B.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- I have been asked to calculate App Store consumer spending on app downloads, subscriptions, and non-subscription in-app content for each genre. I include these calculations in my workpapers.[17]

- I have been asked to determine the top 100 App Store apps by App Store revenue in each genre. I include these calculations in my workpapers.[18]

- I have been asked to determine the top 10 App Store apps by App Store revenue for three five-year periods, and across all years in the App Store transactions data. I include these calculations in Section II of this report.

- I have been asked to calculate the fraction of paid apps and in-app content released after March and priced at one of the new price points allowed by Apple following updates to its price tier restrictions in March 2023 that occur below the prior minimum price point allowed by Apple. I include these calculations in Appendix F.

14. Unless otherwise noted, I use the terminology from Prof. McFadden's prior reports.[19] For example, I use the terms "As-Is" and "But-For" worlds to refer to the economic conditions consumers actually faced and those they would face absent Apple's alleged misconduct, respectively. Similarly, I refer to digital content that is provided by iOS apps as "in-app content," purchases of in-app content made by iOS device users as "in-app purchases," and Apple's In-App Purchase method, which uses Apple's payment solution for in-app purchases, as "IAP." Finally, like Prof. McFadden, I refer to the three business models for paid apps: "Paid Download Only," "Paid Download IAP," and "Free Download IAP" apps.

## I.C. Summary of Opinions

15. In Section II, I summarize the App Store transactions data used throughout this report. Since Prof. McFadden's 2023 Supplemental Report, Apple has re-produced this data to include all U.S. App Store transactions from July 10, 2008, to February 2, 2024. Using the updated data, I analyze empirical trends related to the App Store's gross revenue, predominant app business

---

[17]   *See* Workpaper_Average Commission by Genre, 'Figure 5, Figure 8, Figure 9.xlsx.'
[18]   *See* Workpaper_Top 100 Apps by Genre, 'top_100_apps_by_genre.xlsx.'
[19]   *See*, *e.g.,* McFadden 2021 Opening Report, ¶ 11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

models and genres, and the fees Apple collects from developers using the App Store. The analysis shows substantial growth in the App Store's gross revenue over time, with the majority stemming from Free Download IAP apps and transactions made using iPhones. It also demonstrates that Apple's App Store commissions have grown significantly, while the App Store's effective commission rate has remained between 25 percent and 30 percent throughout the Class period.

16. In Section III, I summarize Apple's alleged misconduct and the forms of consumer harm analyzed by Prof. Stiglitz. Prof. McFadden's damages model, which I apply in this report, estimates the monetary harm caused by Apple's allegedly supracompetitive App Store commission. To the extent that Prof. Stiglitz identifies additional forms of consumer harm, my estimates provide a conservative measure.

17. In Section IV, I summarize the methodology used to estimate damages for the Consumer Class in this report. I rely on the model Prof. McFadden demonstrated to the Court in his Class certification reports and apply it across all genres in the App Store transactions data. When estimating consumer demand, I rely on Prof. MacCormack's analysis to group App Store genres and to determine the margin bounds for each genre grouping. Additionally, I incorporate data Apple has provided regarding the payors associated with each paid App Store transaction to determine which Class members did and did not incur monetary harm.

18. In Section V, I present the results of the damages analysis. The total damages incurred by harmed Class members are estimated to be $20.4 billion when Apple's price tier restrictions are removed in the But-For world and $20.2 billion when they persist. In these scenarios, 5.2% and 5.9% of Class members, respectively, did not incur monetary damages.

19. In Section VI, I estimate the U.S share of iPhones among smartphones and the U.S. share of iPads among tablets. My estimates show that iPhones and iPads are the predominant devices in their respective categories by share.

## II. App Store Transactions Data used for Estimating Damages

20. In this section, I describe the updated App Store transactions data I use to estimate damages. Specifically, Apple has produced additional App Store transactions datasets since Prof.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

McFadden filed his Supplemental Report in 2023, which I have incorporated in my analysis described in this report.

21. The updated App Store transactions data combines a table of transactions, referred to as the "Fact" table, with nine additional data tables intended to supplement the Fact table, which I collectively refer to as "Dimensions" tables. The Fact table contains information associated with each transaction therein contained, including the quantity purchased, price, consumer spend, developer royalties, and the Apple account ("Apple ID") making the transaction. The Fact table further contains a unique identifier for each transaction, which I hereafter refer to as a "transaction ID".[20] The Dimensions tables provide additional qualitative details, including the developer's name and the name and genre of each app. The updated App Store transactions data consists of approximately ▮ billion App Store transactions associated with ▮ million unique anonymized Apple IDs that occurred from July 10, 2008 through February 2, 2024.[21] I understand that this dataset includes all U.S App Store transactions, including free and paid app downloads as well as in-app purchases.[22]

22. In the subsections that follow, I first describe patterns of app downloads, in-app purchases, and app business models I observe in the App Store transactions data. I then discuss the fee structure of Apple's App Store and the evolution of these fees. I summarize the history of Apple's data productions and provide an overview of the key variables included in the data in Appendix C.1.

## II.A. App Downloads and In-App Purchases

23. iOS device users can obtain apps and in-app content from two sources. First, every iOS device purchased in the United States comes preinstalled with a suite of apps preselected by Apple.[23] For example, certain apps are "built-in" to iPhone and iPad, including the App Store, iTunes

---

[20]  Email from Eli M. Lazarus to Kyle M. Wood, et al. (June 6, 2024).

[21]  *See* Workpaper_In-text Citations, 'para21.csv.'

[22]  *See* McFadden 2021 Opening Report, Appendix C ¶ 1. *See also*,  Letter from Eli M. Lazarus to Rachele R. Byrd (May 31, 2024); and Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (June 29, 2024).

[23]  Stiglitz Initial Report, Section II.B. *See also*, Joe Cason, "Introducing Every Single Pre-Installed App on the iPhone," Make Use Of, May 28, 2022, accessed March 3, 2025, https://www.makeuseof.com/every-pre-installed-app-iphone/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Store, Safari, Camera, Phone, Messages, Facetime, and Wallet, among several others.[24] The set of preinstalled apps consists of so-called first party apps, as it includes only apps developed and released by Apple itself.[25]

24. For iOS device users to download and install additional apps and in-app content, they must first set up an Apple ID that acts as a central account giving a user access to "Apple services like the App Store, Apple Music, iCloud, iMessage, FaceTime, and more."[26] Device users can then log in with their Apple ID to access the Apple App Store, for which U.S. iOS device users have no reasonable substitutes to download and install additional apps and in-app content.[27] For example, iOS device users cannot download apps directly from developers' online websites in the U.S.[28]

25. To distribute their apps on the Apple App Store, developers must first submit their apps to Apple for approval.[29] They must also agree to Apple's Developer Program License Agreement, which, among other things, prevents developers from directing users to alternative purchase channels or using a payment processing system other than Apple's.[30] Once approved, developers then choose a category, or genre, in which to list their app.[31] Apple encourages developers to select their

---

[24]   *See, e.g.*, "iPhone 14 and iPhone 14 Plus," *Apple*, accessed February 18, 2025, https://www.apple.com/ca/iphone-14/specs/; and "Delete built-in Apple apps from your iPhone, iPad, or Apple Watch," *Apple Support*, April 3, 2024, accessed February 18, 2025, https://support.apple.com/en-us/118582. *See also*, Stiglitz Initial Report, Section II.A. *See also*, Joe Cason, "Introducing Every Single Pre-Installed App on the iPhone," *Make Use Of*, May 28, 2022, accessed March 3, 2025, https://www.makeuseof.com/every-pre-installed-app-iphone/.

[25]   Stiglitz Initial Report, Section II.B.

[26]   "Manage and use your Apple Account," *Apple Support*, November 15, 2024, accessed February 18, 2025, https://support.apple.com/en-us/105023. *See also*, "Apple Account Support," *Apple Support,* accessed February 18, 2025, https://support.apple.com/en-lamr/apple-account.

[27]   *See, generally*, Stiglitz Initial Report, Section V.B.

[28]   Stiglitz Initial Report, Section III.A.

[29]   Deposition of Ron Okamoto, Volume 1, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06715-YGR, December 16, 2020, 75:5-15 ("Q. So in terms of allowing a consumer on one side to access an app on the other the only way to do that is if you permitted the developer to publish the app on the App Store; is that correct? MS. LEWIS: Object to the form. THE WITNESS: What occurs is a developer can create their app using our tool, using our system, and be able to upload it into the app review. The app review team reviews it against the guidelines and then its posted up in the App Store. And that's how the consumer can get to the application."). *See also*, Stiglitz Initial Report, Section III.A.

[30]   Stiglitz Initial Report, Section III.A and III.B.

[31]   "Choosing a category," *Apple Developer*, accessed February 18, 2025, https://developer.apple.com/app-store/categories/ ("You can assign two categories to your app – a primary and a secondary category.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

app's category on the basis of the "app's purpose", "[w]here users naturally look for an app like [theirs]", and "which categories contain the same type of apps[.]"[32]

26. The number of apps listed on the App Store has grown substantially since the App Store's initial launch in 2008. Figure 1 below plots the number of apps available in the App Store's U.S. storefront in each year.[33] I exclude data from 2008 and 2024 from both this figure and each subsequent figure in this section of my report for graphical purposes because these are partial years of data.[34] I also exclude first-party apps in this analysis and all subsequent analyses in this report. Figure 1 shows that the number of apps available in the App Store increased quickly after the launch of the App Store in July 2008, peaking at over 2.3 million in 2017 before declining in recent years.[35]

---

[32] "Choosing a category," *Apple Developer*, accessed February 18, 2025, https://developer.apple.com/app-store/categories/ ("**Your app's purpose.** Your primary category should be the one that best describes the main function or subject matter of your app."). (**bold** emphasis in original).

[33] I count an app as "available" if it recorded at least one initial download or in-app transaction through the App Store during the year.

[34] The number of apps in 2008 and 2024 were 13,408 and 1,005,844, respectively. *See* Workpaper_Number of Apps and IAPs, 'para26.csv.'

[35] Stiglitz Initial Report, Section II.B. *See also*, Workpaper_Number of Apps and IAPs, 'para26.csv.'

Expert Report of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 10 of 111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 1: NUMBER OF APPS AVAILABLE IN THE APPLE APP STORE**



Source: Brattle analysis of the App Store transactions data.

Note: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. I count an app as "available" if it recorded at least one initial download or in-app transaction through the App Store during the year. I exclude data for 2008 and 2024 from the figure because these are partial years of data.

27. As the number of apps available in the App Store grew, so did the selection of in-app content available for purchase. As shown in Figure 2 below, in-app content available for purchase expanded rapidly from its introduction in 2009 to 2014, then stabilized through 2020 before gradually increasing again, reaching 1.12 million counts in 2023.[36]

---

[36]  *See* Workpaper_Number of Apps and IAPs, 'para27.csv.'

Expert Report of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 11 of 111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 2: NUMBER OF IN-APP ITEMS AVAILABLE IN THE APPLE APP STORE**



Source: Brattle analysis of the App Store transactions data.

Note: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. I count an in-app item as "available" if it recorded at least one in-app transaction through the App Store during the year. I exclude data for 2008 and 2024 from the figure because these are partial years of data.

28. Figure 3 below shows that the U.S. iOS device users' spending on these apps and their associated in-app content, i.e., App Store gross revenues, has grown substantially over time. For example, App Store spending grew from $0.2 billion in 2009, the first full year of data, to $4.4 billion just five years later. By 2023, the last full year of data, App Store spending totaled ███████.[37] Overall, iOS device users spent ████████ in the App Store between July 10, 2008 and

---

[37]    The App Store transactions data also includes transactions from July 2008 through December 2008 and January 2024 through February 2, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

February 2, 2024, with ▉ percent of that spending occurring in the most recent five years of data.[38]

**FIGURE 3: ANNUAL APP STORE GROSS REVENUES FROM APP DOWNLOADS AND IN-APP PURCHASES**



Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. The App Store transactions data begins on July 10, 2008 and ends on February 2, 2024. I exclude data from 2008 and 2024 from the figure because these are partial years of data. For the purposes of this figure, I classify an app as having in-app purchases if it sold at least one in-app item within the entire transactions data. The gross revenues in 2008 are $0 billion for Free Download IAP apps, $0.03 billion for Paid Download Only apps, and $0.01 billion for Paid Download IAP apps. In 2024, the gross revenues are ▉▉▉▉▉ for Free Download IAP apps, ▉▉▉▉▉ for Paid

---

[38]    App Store gross revenue in 2008 and 2024 were $35,616,197 and ▉▉▉▉▉, respectively. *See,* Workpaper_App Store Revenue, 'para28_a.csv' and 'para28_b.csv.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Download Only apps, and ▮▮▮▮▮ for Paid Download IAP apps. "Gross revenue" refers to spending on App Store purchases.

29. Figure 3 also disaggregates total App Store gross revenues by the method through which iOS app developers monetize their apps, or business model. Some apps are free to download and offer no in-app content for sale via the App Store.[39] These apps are excluded from the figure as they do not charge money for app downloads or digital content on the App Store.

30. Other app developers instead monetize their apps and in-app content directly by charging an upfront price to download their app, selling in-app content to users who have already downloaded their app, or both. When Apple introduced the App Store in July 2008, free-to-download apps could not offer additional content for sale within the app.[40] Apple changed its policy to allow users to purchase additional in-app content (in-app purchases) for free-to-download apps in late 2009.[41] This policy change allowed iOS app developers to adopt three broad business models: charging only an upfront price to download ("Paid Download Only"), charging both an upfront download price and a separate price for any in-app content ("Paid Download IAP"), and offering free-to-download apps that charge for any in-app content ("Free Download IAP"). Prof. McFadden used the same terms to characterize developers' business models in his Class certification reports.

31. Figure 4 shows the fraction of App Store gross revenue attributable to each of these three App Store business models. Both Figure 3 and Figure 4 show that the Free Download IAP business

---

[39] These apps may rely solely on advertising for revenue (like some social networking apps), enable the sale of "real-world" goods and services (like the ride-hailing app Lyft, the food delivery app DoorDash, or the online marketplace eBay), or they may be ancillary to the app provider's main business (for instance, apps provided by banks that allow customers to access services on their phone). *See* Stiglitz Initial Report, Section II.B.

[40] Free-to-download apps could not offer additional content for sale within the app until October 2009. *See* APL-EG_09249976 ("StoreKit In-App Purchases for Free Apps (October 15, 2009)."). *See also*, Chris Foresman, "Apple opens in-app purchasing for free iPhone apps," *arsTechnica*, October 15, 2009, accessed February 18, 2025, https://arstechnica.com/gadgets/2009/10/apple-opens-in-app-purchasing-for-free-iphone-apps/ ("Free applications from the App Store can now offer in-app purchases thanks to a change in policy from Apple."); Stiglitz Initial Report, Section II.B.

[41] APL-EG_09249976 ("StoreKit In-App Purchases for Free Apps (October 15, 2009)."). *See also*, Chris Foresman, "Apple opens in-app purchasing for free iPhone apps," *arsTechnica*, October 15, 2009, accessed February 18 2025, https://arstechnica.com/gadgets/2009/10/apple-opens-in-app-purchasing-for-free-iphone-apps/ ("Free applications from the App Store can now offer in-app purchases thanks to a change in policy from Apple. Now, even free apps can allow users to unlock features, purchase content, or subscribe to content or services directly within an iPhone application.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

model has become the dominant business model in terms of App Store gross revenue since Apple's policy change in 2009.[42] In fact, Free Download IAP apps accounted for ▮▮▮▮▮▮ of App Store spending in 2023. Overall, Free Download IAP apps account for approximately ▮ ▮▮▮▮ of all-time App Store spending.[43]

**FIGURE 4: SHARE OF APP STORE GROSS REVENUES BY APP BUSINESS MODEL**



Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. "Gross revenue" refers to App Store Apple ID spending on App Store purchases. I exclude data for 2008

---

[42]   In 2008, the shares of App Store gross revenues are 0 percent for Free Download IAP, 80.4 percent for Paid Download, and 19.6 percent for Paid Download IAP. For 2024, these shares are ▮▮▮▮▮▮ for Free Download IAP, ▮▮▮▮▮ for Paid Download, and ▮▮▮▮▮ for Paid Download IAP. *See* Workpaper_App Store Revenue, 'para31_a.csv.'

[43]   Paid Download IAP apps accounted for ▮▮▮▮▮▮ of App Store spending in 2023 and ▮▮▮▮▮▮ of all-time App Store spending. Paid Download Only apps accounted for around ▮ percent of App Store spending in 2023 and ▮ percent of all-time App Store spending. *See* Workpaper_App Store Revenue, 'para31_a.csv' and 'para31_b.csv.'

and 2024 from the figure because they represent partial years of data. For the purposes of this figure, I classify an app as having in-app purchases if it sold at least one in-app item within the entire transactions data. In 2008, the shares of App Store gross revenues are 0 percent for Free Download IAP, 80.4 percent for Paid Download, and 19.6 percent for Paid Download IAP. For 2024, these shares are ████████ for Free Download IAP, ████████ for Paid Download, and ████████ for Paid Download IAP.

32. The volume of App Store spending on apps and in-app purchase transactions also differs across App Store genres. Figure 5 shows the distribution of App Store gross revenue from apps and in-app purchases across genres.[44] ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ While I include all genres in my analyses, these smaller genres have a negligible impact on my ultimate damages estimates. This figure also displays the average App Store commission rates and royalties Apple pays developers after collecting its commissions by genre. I discuss the App Store commissions in Section II.B.

---

[44]   I have also calculated the distribution of App Store gross revenue across downloads, non-subscription IAP, and subscription IAP in each genre at the request of Counsel. *See* Workpaper_Average Commission by Genre, 'Figure 5, Figure 8, Figure 9.xlsx.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 5: APP STORE GROSS REVENUE AND EFFECTIVE COMMISSION RATE BY GENRE**

| | Gross Revenue ($ thousands) | Royalties ($ thousands) | Commission ($ thousands) | Effective Commission Rate |
|---|---|---|---|---|
| Games | | | | |
| Entertainment | | | | |
| Photo & Video | | | | |
| Lifestyle | | | | |
| Social Networking | | | | |
| Music | | | | |
| Health & Fitness | | | | |
| Education | | | | |
| Productivity | | | | |
| Sports | | | | |
| Business | | | | |
| Book | | | | |
| Utilities | | | | |
| News | | | | |
| Navigation | | | | |
| Finance | | | | |
| Reference | | | | |
| Graphics & Design | | | | |
| Weather | | | | |
| Medical | | | | |
| Travel | | | | |
| Shopping | | | | |
| Food & Drink | | | | |
| Magazines & Newspapers | | | | |
| Stickers | | | | |
| Developer Tools | | | | |
| Catalogs | | | | |
| **Total** | | | | |

Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. "Gross revenue" refers to consumer spending on App Store purchases. I exclude transactions with a missing ("NA") genre, which account for ▆▆▆▆ in gross revenue. App Store transactions in 2008 and 2024 are included in these calculations. *See* Workpaper_Average Commission by Genre.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

33. Figure 6 below illustrates the top apps in terms of spending. The figure shows the top 10 apps, their genre, and App Store spending on those apps for three 5-year periods.[45] In the first five-year period, nine of the top 10 apps belonged to the ▮▮▮▮▮ genre. Over the next five-year period, the genres associated with the top 10 apps expanded to include the ▮▮▮▮▮▮▮▮▮▮ genres. In the most recent five-year period, the genres associated with the top 10 apps are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[45]    I further report the top 100 apps in terms of revenue by genre in my backup. *See* Workpaper_Top 100 Apps by Genre, 'top_100_apps_by_genre.xlsx.'

Expert Report of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 18 of 111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 6: TOP 10 APPS BY FIVE-YEAR PERIOD**



Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made on the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## II.B. Apple App Store Commissions and Fees

34. Apple collects fees for using its App Store, including a commission levied on all consumer purchases of apps and in-app content and an annual fixed fee to enroll in one of Apple's developer programs, whose participation is required to list an app on the App Store.[46] Apple collects a 30 percent fee on app purchases and in-app purchase transactions with only limited exceptions, e.g., for auto-renewing subscriptions, which I summarize below.[47] Suppose, for example, a consumer spends $1.00 on an app on which Apple charges a 30 percent commission. Apple collects $0.30 as its commission fee and the developer of that app receives $0.70.

35. Figure 7 below shows the revenues Apple made from App Store commissions in the U.S by year. The figure illustrates that the rapid growth of App Store commission revenue is similar to that of App Store spending. Indeed, Apple's App Store commission revenue has grown from $0.05 billion in 2009, the first full year of data, to ▮▮▮▮▮▮ in 2023, the last full year of data.[48] Across all years, Apple collected a total of ▮▮▮▮▮▮ in App Store commissions in the U.S.[49]

---

[46]   Stiglitz Initial Report, Section II.C.1. *See also*, Stiglitz Initial Report, Section II.C.2. *See also* Stiglitz Initial Report, Section III.A.

[47]   Stiglitz Initial Report, Section II.C.1.

[48]   The App Store transactions data also includes transactions from July 2008 through December 2008 and January 2024 through February 2, 2024. *See* Workpaper_Average Commission by Genre, 'para35.csv.'

[49]   The App Store commission revenues in 2008 and 2024 are $10,604,020 and ▮▮▮▮▮▮, respectively. *See* Workpaper_Average Commission by Genre, 'para35.csv.'

**FIGURE 7: APP STORE COMMISSION REVENUES**



Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made using the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. The App Store transactions data begins on July 10, 2008, and ends on February 2, 2024. The years 2008 and 2024 are excluded from the figure because they represent partial years of data. App Store commission revenues for these partial years are 0.01 billion and ██████, respectively.

36. Over time, Apple has adjusted its commission fee structure to provide a reduced commission fee for select transactions.[50] For example, in June 2016, Apple reduced its commission fee to 15 percent for auto-renewing subscriptions after the first year.[51] Also starting in 2016, Apple

---

[50]  *See* Stiglitz Initial Report, Section II.C.1.

[51]  Dieter Bohn, "The Apple App Store: a brief history of major policy changes," *The Verge*, September 10, 2021, accessed February 18, 2025, https://www.theverge.com/22667242/apple-app-store-major-policy-changes-history ("**June 16, 2016**…The changes included dropping Apple's fee to 15 percent after the first year of subscription revenue."). (**bold** emphasis in original); "Auto-renewable subscriptions," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/app-store/subscriptions/#revenue-after-one-year ("The

Continued on next page

Expert Report of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 21 of 111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

allowed certain "premium subscription video entertainment providers" to pay a reduced commission fee of 15 percent on "sales from customers who sign up using Apple's in-app purchase system."[52] Apple further allowed these video entertainment partners to bypass the App Store's In-App Purchase system for "additional video transactions within the app" made by customers who initially purchased the subscription service using the provider's own payment method outside of the app.[53] Similarly, Apple reduced its commission fee to 15 percent for developers with annual post-commission App Store revenues less than $1 million beginning in January 2021.[54]

37.   Recall Figure 5 in Section II.A shows how the average effective App Store commission rate differs across App Store genres. While some genres, e.g., ███████ have an average commission rate very close to Apple's headline commission rate, other genres, e.g., ████████████ have a lower average commission rate. These differences are linked to the commission fee exceptions I outlined above. For example, the lower average commission rate in the ████████████ genre is linked to subscription-based video content, which may qualify for specific fee exceptions.

38.   Despite these exceptions, ████████████████████████████████████████ ████████████████████████ Figure 8 below shows the monthly average effective App Store commission rate levied on app download and in-app purchase spending. The average effective commission rate on these App Store transactions has remained above ███████ in every month since the App Store was launched. Across all months, the App Store's average effective

net revenue structure for auto renewable subscriptions differs from other business models on the App Store… After a subscriber accumulates one year of paid service, your net revenue increases to 85% of the subscription price[.]"). Note that an 85 percent revenue share for the developer indicates a 15 percent commission charged by Apple. *See also*, Stiglitz Initial Report, Section II.C.1.

52   "Apple Video Partner Program," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/programs/video-partner/. *See also*, Stiglitz Initial Report, Section II.C.1.

53   "Apple Video Partner Program," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/programs/video-partner/. *See also*, Stiglitz Initial Report, Section II.C.1.

54   "Apple announces App Store Small Business Program," *Apple Newsroom*, November 18, 2020, accessed February 19, 2025, https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/ ("Developers can qualify for the program and a reduced, 15 percent commission if they earned up to $1 million in proceeds during the previous calendar year. The App Store Small Business Program…will launch on January 1, 2021[.]"). *See also*, Stiglitz Initial Report, Section II.C.1.

commission rate is ███████. In fact, Apple charged a 30 percent commission rate on roughly ██████ of paid transactions in 2023.[55]

**FIGURE 8: MONTHLY EFFECTIVE APP STORE COMMISSION RATE**



Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made on the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts.

39. Apple collects most of its commissions from ████████████████████████. Figure 9 below shows App Store spending and Apple's commission revenue by device and year. Across all years, approximately ███████ of App Store spending and ███████ of App Store commissions are attributable to transactions made on iPhones. Conversely, ███████ and █ ██████ of App Store gross revenues and commissions, respectively, are attributable to transactions made on iPads.

---

[55] The commission rate for each transaction is rarely precisely 30 percent in the App Store transactions data. I calculate this ███████ as the percentage of all paid transactions with a commission rate between 29 percent to 30 percent. *See* Workpaper_Average Commission by Genre, 'para38.csv.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 9: APP STORE GROSS REVENUES AND COMMISSION REVENUES BY PLATFORM**

| | iPhone | | iPad | |
|---|---|---|---|---|
| | Gross Revenue (in thousands) | Commission (in thousands) | Gross Revenue (in thousands) | Commission (in thousands) |
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| 2011 | | | | |
| 2012 | | | | |
| 2013 | | | | |
| 2014 | | | | |
| 2015 | | | | |
| 2016 | | | | |
| 2017 | | | | |
| 2018 | | | | |
| 2019 | | | | |
| 2020 | | | | |
| 2021 | | | | |
| 2022 | | | | |
| 2023 | | | | |
| 2024 | | | | |
| **Total** | | | | |

Source: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data filtered to transactions made on the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts.

40. In addition to its commission fees, Apple collects fees from developers to enroll in its developer programs. Apple charges developers a fixed $99 fee for enrolling in its Apple Developer Program and $299 to enroll in its Apple Developer Enterprise Program.[56] While developers must

---

[56] "Choosing a Membership," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/support/compare-memberships/ ("If you're interested in creating apps for distribution on the App Store, Apple Business Manager, or Apple School Manager, join the Apple Developer Program…Enrollment is 99 USD…per membership year."). *See also*, "Apple Developer Enterprise Program," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/programs/enterprise/ ("If your organization is approved for membership in the Apple Developer Enterprise Program, you will receive the enterprise program license agreement for review and acceptance. The Apple Developer Enterprise Program is 299 USD per membership year[.]"). *See also*, Stiglitz Initial Report, Section II.C.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

enroll in one of these two programs in order to distribute their apps through the Apple App Store, they are designed for two different types of app developers. The Apple Developer Program is intended for developers of commercial apps. It provides the "tools needed to develop, test, and distribute apps and Safari Extensions."[57] In contrast, the Apple Developer Enterprise program is designed for businesses that are developing apps for internal purposes only.[58]

41. I understand that the App Store transactions data does not contain information on the fees collected by either developer program. I can instead estimate the total annual developer program fees Apple collects by multiplying the annual per-developer fee by the of number of app developers included in the App Store transactions data in each year.[59] I exclude from these calculations fees collected from the Apple Enterprise Developer Program as enterprise apps are not distributed for commercial purposes.

42. Figure 10 shows my estimates of Apple's total Apple Developer Program fees from 2009 through 2023.[60] While the total developer fees have increased over time, they are an order of magnitude smaller than the annual commission fees Apple collects: I estimate that, across all years, Apple's total fees from the Apple Developer Program are roughly ███████ of total App Store commission revenues.[61]

---

[57]   "Choosing a Membership," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/support/compare-memberships/.

[58]   "Apple Developer Enterprise Program," *Apple Developer*, https://developer.apple.com/programs/enterprise/ ("The Apple Developer Enterprise Program allows large organizations to develop and deploy proprietary, internal-use apps to their employees. This program is for specific use cases that require private distribution directly to employees using secure internal systems or through a Mobile Device Management solution."). Apple allows businesses to install their enterprise apps on employees' iOS devices without distributing their enterprise apps through the App Store. Businesses do not pay Apple a commission for distributing their enterprise apps. *See* Stiglitz Initial Report, Section V.B.6.

[59]   App developers are identified by the field "content_provider_id" in the App Store transactions data. Note that developers associated with a "nonprofit, educational institution, or government entity may be eligible for a fee waiver." *See* "Choosing a Membership," *Apple Developer*, accessed February 19, 2025, https://developer.apple.com/support/compare-memberships/. However, I cannot identify developers who receive fee waivers in the App Store transactions data.

[60]   The estimated developer fees for 2008 and 2024 are $521,136 and ███████, respectively. *See* Workpaper_Apple Developer Program, 'para_42a.csv.'

[61]   *See* Workpaper_In-text Citations, 'para42_b.csv.'

**FIGURE 10: ANNUAL APPLE DEVELOPER PROGRAM FEES**



Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on the full App Store transactions data after filtering to transactions made on the iPad or iPhone, and excluding invalid transactions, those related to enterprise or volume purchases, and those associated with Apple-owned or internal developer accounts. I exclude 2008 and 2024 from the figure as these represent partial years of data.

# III. Apple's Alleged Anticompetitive Conduct

43. Consumer Plaintiffs allege that Apple "lock[ed] consumers into buying apps only from Apple and paying Apple a 30% fee" without their consent.[62] They also allege that Apple prohibits iOS device users "from using any app that was not approved or sold by Apple" by locking their iOS devices.[63] In so doing, Consumer Plaintiffs allege that Apple "violated Section 2 of the Sherman

---

[62]    Third Amended Consolidated Complaint, ¶ 18.
[63]    Third Amended Consolidated Complaint, ¶ 18.

Act…in a manner that harmed competition and injured iOS apps[sic] consumers by reducing output and consumer choice, and by increasing prices for iOS apps to supracompetitive levels."[64]

44. I understand that Counsel for Consumer Plaintiffs has asked Prof. Stiglitz to analyze Apple's alleged misconduct and whether that misconduct harmed consumers.[65] I have reviewed Prof. Stiglitz's report and find his opinions persuasive. I summarize several of Prof. Stiglitz's opinions below.[66]

45. Broadly, Apple prevents developers from distributing apps that themselves distribute other apps through its App Store, while at the same time requiring that all iOS apps be distributed through the App Store.[67] Moreover, Apple further requires, with limited exception, that developers who distribute their apps through the App Store use Apple's own in-app payment processing solution (IAP) when selling their digital in-app content.[68] Finally, Apple has enacted a series of anti-steering provisions that prevent developers from, among other things, directing consumers to alternative channels from which they could purchase digital content available within their iOS apps.[69]

46. Through these restrictions and policies, Apple has deprived consumers of alternative channels through which they could purchase iOS apps and in-app content.[70] Because it has insulated itself from competition, Apple can, among other things, charge a supracompetitive App Store commission rate. Counsel for Consumer Plaintiffs has instructed me to assume Apple would charge a 13.63 percent commission rate but-for its alleged misconduct, which I understand is consistent with the opinions offered by Dr. Abrantes-Metz.

47. Prof. Stiglitz has also analyzed other ways in which Apple's alleged misconduct has harmed consumers. For example, he explains that Apple's alleged misconduct has reduced innovation,

---

[64]   Third Amended Consolidated Complaint, ¶ 19.
[65]   Stiglitz Initial Report, Section I.B.
[66]   Stiglitz Initial Report, Section I.C. *See also,* Stiglitz Initial Report, Section III*; and* Stiglitz Initial Report, Section IV.
[67]   *See, generally,* Stiglitz Initial Report, Section III.A.
[68]   *See, generally,* Stiglitz Initial Report, Section III.B.
[69]   *See, generally,* Stiglitz Initial Report, Section III.C.
[70]   *See, generally,* Stiglitz Initial Report, Section IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

decreased the app variety available to iOS device users, and restricted output.[71] As explained by Prof. McFadden, the damages model I use in this report quantifies the monetary harm resulting from the supracompetitive App Store commission Apple charges.[72] It does not capture the additional sources of consumer harm described by Prof. Stiglitz. The magnitude of consumer harm I obtain in this report are in that sense conservative.

# IV. Methodology for Estimating Damages

48. In the Class certification stage, Prof. McFadden estimated damages for the Games and Music & Entertainment genres for the purposes of demonstrating that common evidence can be used to estimate Class-wide and account-level damages. The Court certified the Consumer Class on February 2, 2024, and ordered the Consumer Plaintiffs to use the model to estimate damages using all of the App Store transactions data and separate harmed Class members from unharmed Class members before trial.[73]

49. In this section, I explain how I use the methodology Prof. McFadden demonstrated in the Class certification stage to estimate damages using all of the App Store transactions data which includes 27 genres in total, and how I identify harmed and unharmed Class members. In Section V, I present my estimates of consumer demand for iOS apps and in-app purchases, and Class-wide damages based on that methodology. I describe the technical details of my data processing and the damages methodology in Appendix C and Appendix D.1, respectively.

## IV.A. Damages Model Methodology

### IV.A.1. Genre Groupings and Variable Profit Margin Bounds

50. In the Class certification stage, Prof. McFadden estimated consumers' app and in-app purchase demand for the Games and Music & Entertainment genres. He further analyzed the variable profit margins for a set of developers operating in those genres and used the average variable profit margins in any particular genre (or group of genres) as bounds (the "margin bounds") that

---

[71]   *See, generally,* Stiglitz Initial Report, Section IV.

[72]   *See* Expert Report of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "McFadden 2025 Report"), Section II. McFadden 2021 Opening Report, ¶¶ 243-244. *See also,* McFadden 2023 Supplemental Report, ¶ 11.

[73]   Second Class Certification Order, 27:21-28:2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

his estimates for consumers' app and in-app purchase demand must satisfy.[74] In doing so, he grouped together the Music and Entertainment genres to use the same the margin bounds and obtain the same set of app and in-app purchase demand estimates for that genre group.[75]

51. I understand that the Consumer Plaintiffs retained Prof. MacCormack as an industry expert to 1) analyze the cost data that over 50 app developers have produced for this case and 2) evaluate developers' app monetization business more generally.[76] Prof. MacCormack has found that "apps with comparable functionalities and use cases can be listed under different genres on the App Store."[77] In cases, "[w]here apps in different genres offer similar features and have similar use cases from the perspective of end users, [Prof. MacCormack] categorize[s] them under a single genre group to derive a more meaningful Genre Gross Margin."[78] I rely on the genre groupings Prof. MacCormack describes in his report for the purposes of estimating consumer demand.[79]

52. Furthermore, I rely on the genre-group level variable profit margin ranges estimated by Prof. MacCormack to form the variable profit margin bounds for my demand estimation.[80] Prof. MacCormack's margin ranges are slightly different from my margin bounds because his way of treating developers' ancillary revenues in his formula for developers' variable profit margins results in a different denominator (but the same numerator) relative to the formula used in this report.[81] The ancillary revenues from paid users that Prof. MacCormack and I analyze in this

---

[74] McFadden 2021 Opening Report, ¶¶ 212-214. I use the terms "variable margin," "variable profit margin," and "gross margin" interchangeably in this report.

[75] McFadden 2021 Opening Report, ¶ 213 ("In estimating demand for the Entertainment and Music apps and IAPs, I impose the constraint that the average variable margin implied by demand estimates and the profit maximization conditions should range from 20 percent to 60 percent.").

[76] *See* MacCormack Initial Report, Section 2. *See also,* MacCormack Initial Report, Appendix A.

[77] MacCormack Initial Report, ¶ 108.

[78] MacCormack Initial Report, ¶ 102. *See also,* MacCormack Initial Report, ¶ 109.

[79] For a full list of grouped genres, *see* MacCormack Initial Report, Section 6.3.1. For detailed explanations of Prof. MacCormack's genre groupings, *see* MacCormack Initial Report, Appendix B.

[80] I understand Prof. MacCormack analyzed the variable costs developers incur and included those costs in his margin calculations. *See* MacCormack Initial Report, Section 3. For a summary of genre-level margin ranges, s*ee* MacCormack Initial Report, Table 9.

[81] This report's model includes these types of ancillary revenues as a negative component of estimated marginal costs. I do not separately estimate developers' ancillary revenues from the other components of its marginal costs. *See* McFadden 2021 Opening Report, footnote 245 ("I understand that some app developers have other

Continued on next page

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

case refer to the extra revenues that developers earn from iOS device users after they purchase iOS apps and in-app content. These revenues include, for example, the revenues from advertising that is not turned off after iOS device users pay for subscriptions.[82]

53. Given the size of the ancillary revenue attributable to paid users, I adjust Prof. MacCormack's margin ranges by an adjustment factor to make his margin ranges consistent with my report's treatment of ancillary revenues.[83] The mathematical details of how I calculate these adjustment factors are described in Appendix D.1.c.ii. I subsequently round up the adjusted margin ranges to the nearest integer to obtain the margin bounds my report uses when estimating demand. Because higher variable profit margins lead to smaller damages estimates all else equal, rounding up the adjusted bounds is conservative.[84] Figure 11 shows the genre groupings and each genre group's variable profit margin bounds I use for demand estimation. Appendix D.1.c. provides further details of the genre groupings and margin bounds my report uses for demand estimation.

---

revenues sources such as advertising. In the absence of detailed revenue data for app developers, $c_t^d$ and $c_t^{IAP}$ may capture part of the additional revenues as a negative component."). *See also,* Reply Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal), October 19, 2021 (hereafter referred to as the "McFadden 2021 Reply Report"), ¶ 83 ("In my Opening Report I account for the possibility that some app developers have other revenue sources such as advertising. In such a case, app developers' variable costs I estimate may capture part of these additional revenues as a negative component.")*;* Reply Report of Daniel L. McFadden, Ph.D., in Support of Plaintiff's Renewed Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.) April 28, 2023 (hereafter referred to as the "McFadden 2023 Reply Report"), ¶ 81 ("My model accounts for in-app advertising revenue as a negative component of the marginal cost."). Prof. MacCormack calculates ancillary revenue as part of the overall revenues that developers earn from iOS device users who spend money on iOS apps and in-app content, and not as a negative variable cost. *See* MacCormack Initial Report, Appendix C.5. Whether the ancillary revenue is treated as negative variable costs or part of developers' revenues makes no difference in estimating developers' variable profits because negative costs are mathematically equivalent to revenues. However, it makes a difference in estimating variable profit margins, which are calculated by dividing variable profits by revenues. Prof. MacCormack's margin formula includes the ancillary revenue in the denominator, whereas my formula excludes ancillary revenue from the denominator because it is treated as a negative cost.

[82]  Prof. MacCormack provides a more detailed description of ancillary revenues. *See* MacCormack Initial Report, ¶ 45 and footnote 22.

[83]  My calculated adjustment factors increase Prof. MacCormack's average margins by approximately 2 percent for all genre groups except Music & Entertainment, where the average margins increase by approximately 43 percent. *See* Appendix D.1.c.ii.

[84]  Prof. McFadden has previously demonstrated that higher margin bounds can result in lower price sensitivity estimates, which in turn lead to lower damages. For instance, McFadden 2021 Reply Report, Figure 2, illustrates that increasing the upper margin bound for the Games genre can result in lower damages.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### IV.A.2. Demand Estimation

#### IV.A.2.a. Sampling

54. As Prof. McFadden did in the Class certification stage, I draw 75 0.1 percent random samples of App Store transactions data, estimate demand for each genre group with each sample, and take the average of the 75 sets of estimated coefficients to obtain the average estimate for each of the demand parameters.[85] I use these average coefficient estimates when simulating But-For prices in my damages calculations.

#### IV.A.2.b. Demand Model Specifications

55. For the demand model, I use the same model specification Prof. McFadden used for the Games and Music & Entertainment genres in the Class certification stage.[86] The model includes two demand equations, one describing demand for app downloads and another describing demand for in-app purchases.[87] I describe these demand equations in detail in Appendix D.1.a.

56. The key demand coefficients that I estimate for use in the damages calculations are the coefficient on the app download price in the app download demand equation, and the coefficient on the in-app purchase price in the in-app purchase demand equation.[88] For Paid Download IAP apps, a third demand coefficient enters the damages calculation along with the two price coefficients, namely the coefficient for (the log of) the number of app downloads in a given month in the in-app purchase demand equation.[89]

---

[85]  *See* McFadden 2023 Supplemental Report, ¶ 58 *(*"1. I use Prof. Prince's random sampling code after correcting his sorting error to draw 75 unique 0.1 percent samples. 2. Then I estimate my demand model with each of the 75 samples and compute the average of these 75 sets of demand estimates. 3. I subsequently use the average of these 75 sets of coefficients to calculate class-wide and account-level damages using the *full* App Store data."). (*italics* emphasis in original). The ▮▮▮▮▮ genre, whose demand I estimate using the full App Store transactions data rather than a sample, is the only exception. The ▮▮▮▮▮ genre is the ▮▮▮▮▮ genre in the App Store transactions data with only ▮▮▮ paid transactions, and it accounts for just ▮▮▮▮▮ percent of App Store revenue as shown in Figure 5. Drawing a 0.1 percent sample will therefore, on average, yield too few data points to estimate demand. I explain how I use the full App Store transactions data to estimate the ▮▮▮▮ genre in Appendix C.4.

[86]  *See* McFadden 2021 Opening Report, Appendix E ¶¶ 23, 29-30.

[87]  *See* McFadden 2021 Opening Report, ¶ 180. *See also*, McFadden 2023 Supplemental Report, ¶ 107.

[88]  *See* McFadden 2021 Opening Report, ¶ 181, and Appendix E ¶¶ 41-44. *See also,* McFadden 2023 Supplemental Report, ¶¶ 110-115.

[89]  McFadden 2021 Opening Report, ¶ 181 and Appendix E ¶¶ 43-44. *See also*, McFadden 2023 Supplemental Report, ¶¶ 116-120.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

57. The model also includes equations describing how app developers set their prices. The model makes the standard economic assumption that app developers set prices to maximize their profits.[90] I explain these equations in detail in Appendix D.1.b.

58. I use the same procedure to estimate the demand coefficients for each genre grouping as Prof. McFadden used in his 2023 Supplemental Report. For each genre grouping, I estimate the model using each of the 75 0.1 random percent samples of the App Store transactions data, and then calculate the mean of the 75 individual sample coefficient estimates for each genre grouping.[91] As Prof. McFadden did in the Class certification stage, I exclude the log downloads variable from the in-app purchase demand equation when its estimated coefficient is not statistically significant.[92] I provide the mathematical details of the estimation methodology in Appendix D.1.c.

59. As noted above, the model assumes that developers are profit maximizers. Prof. McFadden has maintained this assumption throughout his prior reports.[93] A technical implication of the developer profit maximization assumption is that the coefficient on log downloads in the in-app purchase demand equation must fall between zero and one. I impose this constraint when

---

[90]  McFadden 2021 Opening Report, ¶ 137. *See also*, McFadden 2023 Supplemental Report, ¶ 106.

[91]  *See* McFadden 2021 Opening Report, ¶ 210 ("Rather than letting all apps and IAP items have the same coefficients, I let apps that belong to different app categories have different coefficients[.]"). *See also,* McFadden 2023 Supplemental Report Sections II.A. and V.A. *See also*, McFadden 2021 Opening Report, Appendix E.

[92]  Including a variable in a regression when its population regression coefficient is zero can reduce the precision with which I estimate the other regression coefficients. *See* McFadden 2023 Supplemental Report, ¶ 100 ("Because the log download variable is not statistically significant and excluding that variable does not appreciably affect the estimate of IAP price sensitivity, it is appropriate to exclude the log download variable."). *See also,* McFadden 2023 Supplemental Report, footnote 107. I determine the statistical significance of the log-downloads coefficient and estimated price coefficients by whether they are at least three time their respective standard errors in magnitude. I discuss the statistical significance of these coefficients in detail in Appendix D.2.

[93]  McFadden 2021 Opening Report, ¶ 137 ("That firms maximize profits is one of the most fundamental principals of economics… I use app developers' profit maximization conditions and the estimated demand and supply (costs) to calibrate app and in-app content prices that the Consumer Class would have paid in the competitive But-For world."); and McFadden 2023 Supplemental Report, Appendix E ¶ 106 ("Assuming that app developers set prices to maximize their profits, I solve for the developers' marginal costs and profit maximizing prices as functions of the demand parameters and Apple's commission rate.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

estimating the in-app purchase demand equation and explain this technicality further in Appendix D.1.b.[94]

60. Intuitively, if the coefficient on log downloads were negative, in-app content sales would increase when the app download quantity falls, which implies that some developers could maximize their profits by setting the download price as high as possible to forgo app download sales and increase in-app content sales. However, Paid Download IAP app developers in the As-Is world do not display such pricing patterns: They set download prices almost always below the upper limit allowed under Apple's price tier system.[95] Conversely, if the coefficient on log downloads were greater than one, an increase in app downloads would yield a disproportionately large increase in in-app content sales, which implies that some developers could maximize their profits by reducing their download prices as far as possible to increase in-app content sales. Developers who would increase profits from such a strategy would switch to Free Download IAP apps, but the very fact that these developers offer Paid Download IAP apps implies that the coefficient on log downloads is smaller than 1.[96]

## IV.A.3.  But-For Price and Damages Calculations

61. I conduct But-For simulations and damages calculations in the same three steps Prof. McFadden employed in the Class certification stage. First, I estimate the marginal costs of apps which are necessary for estimating prices in the But-For world. Second, I estimate app and in-app purchase

---

[94]  Economists sometimes impose constraints on parameter values when estimating demand to rule out unreasonable values. *See* Christopher Conlon and Jeff Gortmaker, "Best practices for differentiated products demand estimation with PyBLP," The RAND Journal of Economics 51(4) (2020): 1108-1161, p. 1120 ("Some optimization routines allow the user to input constraints on parameters, which can speed up estimation and prevent the optimization routine from considering 'unreasonable' values… Some typical constraints are that demand slopes down and that random coefficients have nonnegative but bounded variances.").

[95]  *See* Workpaper_In-text Citations, 'para60.csv.'

[96]  In Prof. McFadden's Supplemental Report, he also addressed the possibility that a negative value for the log downloads coefficient could interfere with the convergence of the But-For simulation. He noted that one could make minor implementation adjustments to resolve this issue. McFadden 2023 Supplemental Report, ¶ 126 ("The possibility of this fringe technical issue does not mean that my model fails, only that I would need to make minor, and economically reasonable, adjustments to address this situation if it were to occur. There are multiple reasonable solutions available should this issue arise.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

prices in the But-For world for a given But-For commission rate.[97] Lastly, I calculate damages at the transaction level using the estimated But-For app and in-app purchase prices.[98]

62. I calculate damages under two different But-For world scenarios. In the first scenario, I assume that Apple's price tier restrictions would not exist in the But-For world. Apple imposes restrictions on the price developers can set in the As-Is world in the form of price tier restrictions.[99] Prof. Stiglitz explains in his report how Apple's price tier restrictions inhibit competition among developers and that these restrictions are unlikely to exist in a competitive But-For world where the App Store competes with non-Apple distribution channels to attract developers.[100]

63. In the second scenario, I assume that Apple's price tier restrictions still exist in the But-For world such that developers can only adjust their app-month prices in increments consistent with the price tier restrictions in place each month.[101] As Prof. McFadden has explained in his prior reports, this But-For world scenario is applicable to both a But-For world in which Apple's price tier restrictions are maintained and a But-For world where developers set their prices at so-called focal prices absent Apple's price tier restrictions.[102]

---

[97] As described in Section III, I have been instructed by Counsel to assume that Apple would charge a 13.63 percent But-For commission rate.

[98] Appendix D.1.d provides the technical details of my marginal cost estimation, But-For price simulations, and damages calculations.

[99] Stiglitz Initial Report, Section II.D.

[100] Stiglitz Initial Report, Section IV.C.3.

[101] *See* McFadden 2023 Supplemental Report, ¶ 87 ("I conduct a simulation that approximates a But-For world where Apple maintains its current tier pricing structure, using a 0.1 percent sample drawn in the same way as in my Opening Report but using the extended App Store transactions data. In this simulation, I assume that developers must choose But-For download prices from Apple's current price tier schedule, and must choose But-For average IAP prices by adjusting their As-Is price in fixed increments consistent with the size of the increments on Apple's tier schedule. From this restricted set of prices, the developers select the prices that yield them the highest profits. This is the same approach that Prof. Prince used in his November 30 declaration.") (footnotes omitted).

[102] *See* McFadden 2023 Supplemental Report, ¶ 88 ("This analysis also demonstrates that [this report's] model can accommodate focal pricing, should the Court or the jury find on the merits that Apple's price tier restrictions are anti-competitive but that app developers would still set focal prices consistent with Apple's current price tiers in the But-For world. Apple's existing price tiers represent a conservative approximation of the set of prices from which developers could choose from in that scenario. There are many plausible focal prices that Apple does not currently allow. Furthermore, the aforementioned academic literature has found that focal pricing behavior is not universal. The simulation using Apple's existing price tiers puts a conservative bound on the extent to which focal pricing would affect But-For outcomes.") (footnotes omitted). *See also,* McFadden 2023 Reply Report, ¶

Continued on next page

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

64. Since the filing of Prof. McFadden's 2023 Supplemental Report, I understand that Apple has revised its price tier restrictions as part of an agreement to settle antitrust claims related to its App Store policies from a class of app developers.[103] Starting on March 9, 2023, Apple expanded the set of price points at which developers could set their app download and in-app purchase prices.[104] Apple also revised the price tiers available for subscription in-app purchases beginning on September 1, 2016.[105] When conducting the second of my But-For simulations in this report, I use Apple's price tiers that were in effect before September 1, 2016 to simulate But-For prices prior to September 2016, those that were in effect between September 1, 2016 and March 9, 2023 to simulate But-For prices during the September 2016 to March 2023 period, and the price tiers Apple released on March 9, 2023 to simulate But-For prices in or after March 2023.

65. Given the estimated But-For prices, I then calculate damages for each transaction using the "percentage method" Prof. McFadden described in his 2023 Supplemental Report.[106] That is, I first separately calculate the consumer overcharge for each app-month as a percentage of the commissions Apple collected from those same app-months. I then calculate damages for every transaction by multiplying the commissions associated with each transaction by the respective app-month overcharge percentage.

---

56 ("I explained that assuming that developers choose only from a limited menu of focal prices, such as Apple's price tiers, 'puts a conservative bound on the extent to which focal pricing would affect But-For outcomes.' Apple's own expert, Prof. Hitt, agreed in deposition that Apple's price tiers are designed to fall on focal prices, but that developers might choose from a larger set of focal prices absent Apple's price tiers. In other words, my price tier simulation is a conservative approximation to the rigidity imposed by focal pricing in the But-For world, and my focal price simulation with 750 price points may more accurately reflect the full set of focal prices developers might choose.") (footnotes omitted).

[103] Order Granting Motion for Final Approval of Class Action Settlement; Granting in Part and Denying in Part Motion for Attorney's Fees, Costs, and Service Award; and Judgment, *Donald R. Cameron et al. v. Apple Inc.*, No. 19-cv-3074-YGR (N.D. Cal.), August 24, 2021, p. 3. *See also*, Stiglitz Initial Report, Section II.D.

[104] Apple's revised price tier policy includes price points in USD ranging from a minimum of $0.29 to a maximum of $9,999.99 with increments between price points as follows: $0.10 increments from $0.29 up to $9.99, $0.50 increments from $0.49 up to $49.99, $1.00 increments from $0.99 up to $199.99, $5.00 increments from $4.99 up to $499.99, $10.00 increments from $9.99 to $999.99, and $100.00 increments from $99.99 to $9,999.99. In addition to these increments, this revised price tier policy supports all price points that end in 90-cents, 95-cents, 99-cents, and whole dollars. For example, while the 10-cent increments described between $0.29 and $9.99 exclude $1.95, Apple's revised policy supports the $1.95 price point because it ends in 95-cents. *See* Stiglitz Initial Report, Section II.D.

[105] For auto-renewing subscriptions, Apple revised its price tiers to lower the minimum price point from $0.99 to $0.49 and adjusted the increments between price points as follows: $0.50 increments between $0.49 and $29.99, $1.00 increments between $29.99 to $124.99, $5.00 increments between $124.99 to $299.99, $50.00 increments between $299.99 to $499.99 (plus one additional tier at $329.99), and $100.00 increments between $499.99 to $999.99. *See* Stiglitz Initial Report, Section II.D. *See also*, APL-APPSTORE_05520482.

[106] *See* McFadden 2023 Supplemental Report, ¶ 41.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

66. For example, Prof. McFadden estimated in his 2023 Supplemental Report that the consumer overcharge on Roblox in January 2018 at the 13.63 But-For commission rate is 35.5 percent of the App Store's commission revenues earned from Roblox that month.[107] Suppose that one consumer spent $9.99 and another consumer spent $0.99 on Roblox in January 2018. Apple's App Store commission revenues from the first consumer is $2.997 (30 percent of $9.99) for the first consumer and $0.297 (30 percent of $0.99) for the second consumer.[108] Using the percentage method, I would estimate that the first consumer was harmed by $1.064 (35.5 percent of $2.997), and the second consumer was harmed by $0.105 (35.5 percent of $0.297) for their January 2018 Roblox spending.

67. I can then aggregate these transaction-level damages based on the statistic of interest. For example, I can calculate total damages by adding up all transaction-level damages. Alternatively, I can calculate Class-wide damages by adding up only those transactions associated with Class members, the identification of whom I describe in Section IV.B.

## IV.B. Methodology for Identifying Harmed and Unharmed Class Members

68. In this section, I explain how I use supplementary data produced by Apple to determine the payors belonging to the Class, calculate the damages for each individual Class member, and separate the harmed from unharmed Class members. I present my estimates for Class-wide damages and the percent of unharmed payors based on that methodology in Section V.B.

69. Since Prof. McFadden filed his Supplemental Report in 2023, Apple has produced a supplementary dataset that contains anonymized payor IDs representing the persons who paid for any particular transaction ("payors").[109] While this dataset does not itself contain the transactions data, it includes a transactions ID variable that allows me to identify the transactions in the App Store transactions data associated with each individual payor.[110] I understand that this

---

[107]    *See* McFadden 2023 Supplemental Report, ¶ 41.

[108]    The precise App Store commission rate Prof. McFadden calculated for Roblox in January 2018 was 29.85 percent. *See* McFadden 2023 Supplemental Report, footnote 54.

[109]    APL-APPSTORE_11418586. *See also*, Apple's Payor Data Supplemental Production Letter.

[110]    This transactions ID variable is the same variable Apple included in its re-production of the App Store transactions data. *See* Apple's Payor Data Supplemental Production Letter. *See also*, Section II.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

supplementary dataset excludes the transaction IDs for transactions associated with zero spending and initially could not be used to identify the payors for approximately 0.2 percent of non-zero spend transactions due to "duplicates and other potential data matching issues" Apple identified in its own data.[111] Apple has since produced a second supplementary dataset containing payor IDs for most, but not all, of those 0.2 percent of transactions.[112]

70.  I understand Apple matched the transactions data to unique payors after JND Legal Administration deduplicated approximately ███ billion potential payors. I have received a declaration from JND Legal Administration that explains its methodology for identifying and removing duplicate payor records.[113] According to the declaration, this process has reduced the number of distinct, identifiable Apple customers from approximately ███ billion records to ████████ unique payors.[114] The databases Apple has provided link these ████████ unique payors to ████████ associated transactions.[115]

71.  As described in Section I.B, the Class is defined as all persons in the United States who purchased one or more iOS apps from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS device at any time since July 10, 2008.[116] The Class is limited to those persons who paid more than $10 in

---

[111]  *See* Apple's Payor Data Supplemental Production Letter. *See also*, Email from Ramona Lin to Kyle M. Wood, et al. (January 24, 2025).

[112]  Approximately 0.018 percent of non-zero spend transactions remain unmatched. *See* Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025). I exclude these transactions from my damages calculations.

[113]  Declaration of Darryl Thompson, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025. I have included Mr. Thompson's declaration as Exhibit 1 to this report.

[114]  Economists regularly rely on deduplicated data in academic research. The US Census is a prominent example of a dataset that goes through a deduplication process. *See* Andrew Keller and Ryan King, "How We Unduplicated Responses in the 2020 Census," *United States Census Bureau*, April 22, 2021, accessed March 7, 2025, https://www.census.gov/newsroom/blogs/random-samplings/2021/04/how_we_unduplicated.html. The Census data features in many academic papers in the economics field. For example, *see* Rebecca Diamond, "The Determinants and Welfare Implications of US Workers' Diverging Location Choices by Skill: 1980-2000," *American Economic Review* 106(3) (2016): 479-524; David H. Autor, David Dorn, and Gordon H. Hansen, "The China Syndrome: Local Labor Markets Effects of Import Competition in the United States," *American Economic Review* 103(6) (2013): 2121-2168; and Raj Chetty, Nathaniel Hendren, Patrick Kline, and Emmanuel Saez, "Where is the Land of Opportunity? The Geography of Intergenerational Mobility in the United States," *The Quarterly Journal of Economics* 129(4) (2014): 1553-1623. *See* Workpaper_In-text Citations, 'para71.csv.'

[115]  *See* Workpaper_In-text Citations, 'para70.csv.'

[116]  Second Class Certification Order, 2:9-13. For the purposes of this report, I have been instructed by Counsel to treat iPhones and iPads, but not the iPod Touch, as iOS mobile devices. Moreover, I understand that the Class excludes "Apple and its employees, agents and affiliates, and the Court and its employees."

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

total to Apple during the Class Period for iOS apps and in-app purchases from any one Apple ID. To identify the payors that satisfy this definition, I first merge the supplementary datasets containing payor IDs with the full App Store transactions data to identify the paid App Store transactions attributable to each payor. For each payor, I then calculate the total amount spent on apps and in-app purchases separately for every Apple ID through which they made paid transactions. I include all of a payor's transactions in my calculations if they spent more than $10 through at least one Apple ID.

72. Consider as an example two hypothetical payors. Payor "A" spent $11 through one Apple ID and $1 through a second Apple ID. Because they spent more than $10 through their first Apple ID, payor "A" is a member of the Class, and I include their full $12 of spending in my damages calculations. In contrast, payor "B" spent $7 through each of two separate Apple IDs. Payor "B" is not a member of the Class because they did not spend over $10 on at least one Apple ID. I exclude the transactions for both of those Apple IDs from my calculations as a result.

73. Given the set of transactions associated with Class members, I then calculate transaction-level damages following the same methodology I explained in Section IV.A.3. Any individual Class member's damages are then just the sum of damages attributable to each of their transactions. I classify those who have positive damages as "harmed" and those who have zero or negative damages as "unharmed."

74. After processing the App Store transactions data as described in Appendix C.5, I am able to match ████ positive spend transactions with a total of ████ payors.[117] Of these, ███ payors (and ████ transactions) satisfy the Class definition.[118]

## V. Estimation Results

75. In this section, I present the results of the methodology I described in Section IV. I begin by presenting the estimated demand coefficients in Section V.A. I subsequently present my estimates for Class-wide damages in Section V.B.

---

[117]   *See* Workpaper_In-text Citations, 'para74_a.csv.'

[118]   I explain how I process and merge the supplementary payor ID data to the processed App Store transactions data in Appendix C.6. *See* Workpaper_In-text Citations, 'para74_b.csv'.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## V.A. Estimates of Consumers' Price Sensitivity for Apps and In-App Content

76. Figure 12 below shows the mean estimated demand coefficients and their associated standard errors for each genre grouping. I have also excluded the log-downloads variable from the demand model in the Health & Fitness + Medical and Imaging genre groupings because it is not statistically significant in those two genre groupings.[119] The download and in-app purchase price coefficients are statistically significant in every genre group.[120]

77. The mean download price coefficients range from -0.27 for Business + Finance to -0.91 for Stickers. The mean in-app purchase price coefficients range from -0.10 for Sports to -0.94 for Stickers. For genres where the log downloads coefficient is statistically significant, the mean log downloads coefficient ranges from $1 \times 10^{-7}$ for Business + Finance to 0.96 for Education. Games, the biggest genre in terms of revenue, has a mean download price coefficient of -0.70 and a mean in-app purchase price coefficient of -0.30.

78. In Appendix D.2, I present additional results from my demand estimation, including estimates for the Imaging and Health & Fitness + Medical genre groupings with the log downloads variable included. I also summarize the distribution of the demand coefficients across the 75 0.1 percent random samples.

---

[119]    *See* Appendix D.2. I further do not estimate the in-app purchase demand equation for the Catalog genre because, as explained in Appendix C.4, all paid transactions in that genre are for downloads.

[120]    For details on assessing statistical significance for demand coefficients, *see* Appendix D.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 12: AVERAGE DEMAND COEFFICIENTS AND ASSOCIATED STANDARD ERROR**

| Genre | Download Demand | IAP Demand | |
|---|---|---|---|
| | Download Price | IAP Price | Log Downloads |
| Games | -0.70 (0.001) | -0.30 (0.005) | 0.35 (0.004) |
| Music + Entertainment | -0.78 (0.002) | -0.55 (0.036) | 0.53 (0.024) |
| Social Networking + Lifestyle | -0.42 (0.002) | -0.16 (0.005) | 0.12 (0.005) |
| Imaging (Photo & Video + Graphics & Design) | -0.50 (0.001) | -0.30 (0.002) | |
| Reading (Book + Magazines & Newspapers + News + Reference) | -0.38 (0.001) | -0.23 (0.007) | 0.22 (0.022) |
| Navigation + Travel | -0.30 (0.001) | -0.16 (0.006) | 0.79 (0.035) |
| Health & Fitness + Medical | -0.50 (0.001) | -0.15 (0.000) | |
| Education | -0.66 (0.001) | -0.27 (0.001) | 0.96 (0.009) |
| Workflow Tools (Utilities + Productivity + Developer Tools) | -0.39 (0.001) | -0.45 (0.006) | 0.49 (0.019) |
| Business + Finance | -0.27 (0.001) | -0.11 (0.000) | 0.00 (0.000) |
| Sports | -0.43 (0.003) | -0.10 (0.000) | 0.12 (0.013) |
| Weather | -0.29 (0.002) | -0.18 (0.000) | 0.90 (0.009) |
| Food & Drink | -0.50 (0.003) | -0.25 (0.011) | 0.38 (0.021) |
| Shopping | -0.56 (0.007) | -0.38 (0.015) | 0.64 (0.014) |
| Stickers | -0.91 (0.002) | -0.94 (0.042) | 0.31 (0.036) |
| Catalogs | -0.30 (0.059) | | |
| Year-Month FEs | x | x | |
| App FEs | x | | |
| IAP FEs | | x | |
| Average Downloads in Other Genres By Accounts Downloading App | x | | |
| Average IAP in Other Genres By Accounts Making IAP in App | | x | |

Source: Brattle analysis of App Store transactions data.

Notes: Calculations for all genres except Catalogs are based on 75 0.1 percent random samples. Reported coefficients are the average coefficient across point estimates from each of the 75 0.1 percent random samples. Standard deviations for the individual sample coefficient estimates are calculated by bootstrap. The standard error of the mean is then calculated as a function of the individual sample standard deviations. See the formulas in Appendix D.1.c.iv. Catalogs is estimated using a single sample containing all Catalogs transactions in the App Store transactions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

data. There are no in-app purchase transactions observed in the Catalogs genre, so I estimate only the download demand function for Catalogs. The standard error of the Catalogs download price coefficient is calculated by bootstrap. For all genres, app fixed effects and year-month fixed effects are included as explanatory variables in the app download demand. In-app purchase-item fixed effects and year-month fixed effects are included as explanatory variables in the in-app purchase demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of in-app purchase transactions in other genres for users who made an in-app purchase transaction is included as an explanatory variable in the in-app purchase regression. The coefficient for the log-downloads variable is bounded to be between 0 and 1 in estimation and is included in the in-app purchase regression model only for those genres where it is statistically significant. See Appendix D.2.a for the average demand coefficients including the log-downloads variable in the in-app purchase regression for all genres.

## V.B. Estimates of Class-wide Damages

79. I calculate Class-wide damages for the Class members as the sum of the damages they incurred for each of their respective App Store transactions. Notably, these calculations net out any "negative" damages, which arise when the model predicts an app-month would raise its price in the But-For world. As Prof. McFadden explains, these app-months are those that the damages model estimates to have negative marginal costs.[121] Whether a Class member incurs monetary damages therefore depends on which apps and in-app content they spent money on, and how much money they spent on each. A Class member who exclusively spent money on an app for which the damages model predicts a price increase in the But-For world may not incur monetary damages; however, a Class member who spent money on the same app would incur monetary damages if he/she spent sufficient money on another app for which the damages model predicts a price decrease.

80. This implies that a Class member who incurs no monetary damages in my estimation could incur such damages in the future, depending on which apps they spend money on, if Apple's alleged misconduct persists. Furthermore, determining whether a Class member incurs monetary damages requires estimating the damages model, as the price of an app in the But-For world cannot be determined without it.

---

[121] *See* McFadden 2025 Report, Section IV.A.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

81. Moreover, Prof. Stiglitz has analyzed several other forms of harm, e.g., a loss in app and in-app purchase output.[122] As Prof. McFadden explains, his damages model does not estimate these forms of consumer harm but instead measures monetary damages resulting from Apple's alleged supracompetitive commission rate.[123] Thus, Class members for whom my damages calculation attributes no monetary damages may still be harmed by Apple's conduct during the Class period. However, to simplify exposition, I refer to Class members who did not incur monetary harm resulting from Apple's alleged supracompetitive commission rate as "unharmed."

82. Figure 13 below presents my estimates of damages incurred by harmed Class members (column [B]), unharmed Class members (column [C]), and the sum of these two figures (column [A]) under two different But-For pricing scenarios. I denote the scenario where Apple's price tiers do not exist in the But-For world as the "Flexible But-For Pricing" model and the scenario in which I assume that Apple's price tiers remain in place in the But-For world as the "Price Tiers in But-For world" model.

83. Under the flexible But-For pricing scenario, damages incurred by harmed Class members total $20.413 billion, and the "negative" damages incurred by unharmed Class members total -$0.032 billion. The sum of damages for harmed Class members and unharmed Class members is estimated at $20.382 billion, with a standard error of $0.063 billion. This standard error implies that *at least* 89 percent of the distribution for Class-wide damages net of the "negative" damages incurred by unharmed Class members falls between $20.193 billion and $20.571 billion.[124] The unharmed payors represent just ████████ of Class members' spending and 5.2 percent of all payors included in my calculations.

---

[122]  *See, generally*, Stiglitz Initial Report, Section IV.

[123]  *See* McFadden 2025 Report, Section II. The monetary harm quantified in this report is consistent with Prof. Stiglitz's opinions on the consumer harm resulting from Apple's supracompetitive commission rate. *See* Stiglitz Initial Report, Section IV.

[124]  I construct these intervals as 3 standard errors above and below each point estimate. As Prof. McFadden explained, the probabilities associated with intervals constructed in this way are a lower bound on the true confidence interval they cover. It may be the case that the confidence levels associated with these intervals are even higher. For example, these ranges represent approximately 99.7 percent confidence interval using a normal distribution. *See* Michael R. Chernick, *The Essentials of Biostatistics for Physicians, Nurses, and Clinicians*, (Hoboken: John Wiley & Sons, Inc., 2011), p. 50. *See also*, Laurence Hoffman, Gerald Bradley, David Sobecki, and Michael Price, EBOOK: *Applied Calculus for Business, Economics and the Social and Life Sciences*, Expanded Edition, 11th Edition, (McGraw-Hill Education: 2013), p. 867; McFadden 2023 Supplemental Report, footnote 77.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

84. Under the price tiers in the But-For world scenario, when Apple's price tiers remain in the But-For world, damages incurred by harmed Class members total $20.218 billion, while the "negative" damages incurred by unharmed Class members amount to -$0.019 billion. The sum of these amounts results in an estimated total of $20.199 billion damages, with a standard error of $0.049 billion. This standard error implies that *at least* 89 percent of the distribution for Class-wide damages net of the "negative" damages incurred by unharmed Class members falls between $20.051 billion and $20.347 billion.[125] The unharmed payors represent just 0.4 percent of Class members' spending and 5.9 percent of all payors included in my calculation.

### FIGURE 13: CLASS-WIDE DAMAGES USING AVERAGE COEFFICIENTS

|  |  | Total | Harmed Payors | Unharmed Payors |
|---|---|---|---|---|
|  |  | [A] | [B] | [C] |
| **Flexible But-For Pricing** |  |  |  |  |
| Number of Payors | [1] | 185,431,885 | 175,738,138 | 9,693,747 |
| Spending (in $ millions) | [2] | ■■■ | ■■■ | ■■■ |
| Net Harm (in $ millions) | [3] | $20,382 | $20,413 | -$32 |
| **Price Tiers in But-For World** |  |  |  |  |
| Number of Payors | [4] | 185,431,885 | 174,445,122 | 10,986,763 |
| Spending (in $ millions) | [5] | ■■■ | ■■■ | ■■■ |
| Net Harm (in $ millions) | [6] | $20,199 | $20,218 | -$19 |

Source: Brattle analysis of App Store transactions data.

Notes: The standard errors of the damages estimates are $0.063 billion for "Flexible But-For Pricing" and $0.049 billion for "Price Tiers in But-For World." Class-wide damages are calculated by applying the mean demand coefficients estimated across 75 0.1 percent samples to simulate But-For prices and estimate app-month overcharges. I then apply the estimated app-month overcharge to every App Store transaction in the data belonging to Class members. Total damages shown in column [A] net out any negative damages from unharmed payors. Total spending is computed as the sum of payor-level spending from harmed and unharmed payors. Columns [B] and [C] show statistics for harmed and unharmed payors, respectively. The analysis excludes transactions with a missing ("NA") genre, which amount to $9 in gross revenue. *See* Workpaper_Average Commission by Genre, 'missing_genre_rev.csv.'

---

[125]   These intervals are constructed in the same way as I constructed the intervals for the flexible But-For pricing scenario.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

85. Additionally, at the request of Counsel for Consumer Plaintiffs, I present damages estimates for each But-For scenario by applying the $10 spending cutoff based on total payor-level spending rather than spending through payors' individual Apple IDs in Appendix D.3D.3.[126] The damages estimates from this application of the spending cutoff are not materially different from those shown in Figure 13.[127]

# VI. Estimates of U.S. iPhone and iPad Shares

86. In this section, I calculate the U.S. share of iPhones among smartphone devices and the U.S. share of iPads among tablet devices. I have been instructed by Counsel for Class Plaintiffs to use the definitions for "smartphones" and "tablets" listed in Section I.B when calculating these shares. I understand the definitions for "smartphone" and "tablet" I have been instructed to use are consistent with how Prof. Stiglitz defines the relevant antitrust markets containing iPhones and iPads.[128]

87. In the following subsections, I begin by providing an overview of the IDC data I use in my calculations. I then present my estimates for iPhone and iPad shares. I include additional details about the IDC data in Appendix C.7, and additional share calculations in Appendix E.

## VI.A. Overview of IDC Data used to Estimate iPhone and iPad Shares

88. I use data collected by the International Data Corporation ("IDC") for the purposes of estimating iPhone and iPad shares. The IDC is a global provider of market intelligence for information technology, telecommunications, and consumer technology markets.[129] Among other things, IDC compiles the IDC Mobile Phone Tracker dataset ("IDC phone data") and the IDC Personal Computing Device Tracker dataset ("IDC tablet data").[130] These two datasets record shipments,

---

[126] Consider payor B in the example presented in Section IV.B. This payor spent $7 through each of two separate Apple IDs but was excluded from the Class because they did not spend over $10 on any single Apple ID. In this alternative spending-cut application, payor B is a member of the Class because they spent over $10 in total.

[127] *See* Figure 24 for a comparison of Class-wide damages with the spending cutoff applied at payor-level spending for flexible But-For pricing, and Figure 25 for price tiers in But-For world.

[128] *See* Stiglitz Initial Report, Section VI.A.2. *See also*, Stiglitz Initial Report, Section VI.B.1.

[129] "About IDC," *IDC*, accessed February 10, 2025, https://www.idc.com/about.

[130] "Worldwide Quarterly Mobile Phone Tracker," *IDC*, accessed February 10, 2025, https://www.idc.com/getdoc.jsp?containerId=IDC_P8397. *See also*, "Worldwide Quarterly Personal Computing

Continued on next page

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and their associated dollar value, of mobile phones and tablets, respectively, to all distribution channels on a quarterly basis.[131] The IDC phone data spans from 2004Q1 through 2024Q2; and the IDC tablet data spans from 2010Q1 through 2024Q2.[132] I understand IDC data is used by market participants, including Apple, in their regular course of business.[133]

89. These two datasets record mobile phone and tablet shipments using several quantitative metrics and at various levels of aggregation. For example, the data records shipments separately for various international geographic regions (e.g., the United States versus Latin America).[134] It also provides data separately by device model name (e.g., iPhone 15 Pro versus Galaxy S24), device brand (e.g., Apple versus Samsung), and operating system (e.g., iOS versus Android).[135] The data further provides the volume of shipments for each group of devices based on both the number of units shipped and the total value in U.S. dollars of the shipped units.[136]

---

Device Tracker," *IDC*, accessed February 10, 2025, https://www.idc.com/getdoc.jsp?containerId=IDC_P36344. Personal Computing Devices include tablets, notebooks, and desktops. However, the Worldwide Quarterly Personal Computing Device Tracker I obtained from IDC was limited to only U.S. tablets. *See* Appendix C.7.

[131] The IDC defines distribution channels as "the channel from which end users purchase new devices. IDC does not track intermediate movements, such as vendor sales to first-tier distributors. For example, if a vendor sells to a mobile operator that then sells on to a retailer, IDC will capture the channel as retail [first-tier distributor], not telco [mobile operator]." *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 14-15; and IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021," February 2021, p. 13.

[132] *See* Workpaper_IDC Shares, in the "Raw IDC Data" files. This workpaper contains the raw data provided by the IDC for phones and tablets. Given that the IDC updates these datasets on a quarterly basis and that this data was obtained on September 23, 2024, both datasets end on 2024Q2. *See* "Worldwide Quarterly Mobile Phone Tracker," *IDC*, accessed February 10, 2025, https://www.idc.com/getdoc.jsp?containerId=IDC_P8397; "Worldwide Quarterly Personal Computing Device Tracker," *IDC*, accessed February 10, 2025, https://www.idc.com/getdoc.jsp?containerId=IDC_P36344. *See* Appendix C.7 for more details regarding the IDC data used.

[133] Apple has used IDC data to calculate smartphone and tablet shares. *See, e.g.,* APL-EG_05486829; APL-EG_05487690; APL-APPSTORE_11210311.

[134] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 29-30. *See also*, IDC, "IDC's Worldwide Personal Computing Device Taxonomy, 2021," February 2021, pp. 26-28. As I mentioned previously, while the IDC records data for various geographic regions, I use data limited to the U.S. for all share calculations.

[135] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 4, 10, 11, 12. *See also*, IDC, "IDC's Worldwide Personal Computing Device Taxonomy, 2021," February 2021, pp. 10, 33. These taxonomy documents do not describe in detail all fields contained in the raw data. For the full set of fields, *see* Workpaper_IDC Shares, in the "Raw IDC Data" files.

[136] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 33-36. *See also*, IDC, "IDC's Worldwide Personal Computing Device Taxonomy, 2021," February 2021, pp. 34-37.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

90. Notably, both datasets contain a field identifying the product category. For example, the IDC phone data separately reports shipments for smartphones and feature phones.[137] Similarly, the IDC tablet data separately includes information for slate and detachable tablets, both of which are included in my tablet share calculations.[138] The way in which the IDC data defines a "smartphone" and a "tablet" is consistent with the definitions I have been instructed to use.[139] I use this product category field to identify smartphones and tablets within each dataset.

91. I calculate U.S. iPhone shares among smartphone devices and U.S. iPad shares among tablet devices on an annual basis for several cuts of the IDC data. Specifically, I use data only for device shipments to the U.S. and aggregate the data for each group of devices from the quarterly level to the yearly level. I then calculate device shares for each brand and operating system as defined in the IDC data. I calculate the device shares on the basis of both device units and the total value of those units. For example, I can calculate the device shares on the basis of value by dividing the dollar value of iOS smartphone device shipments by the total dollar value of shipments across all smartphone devices.[140] I report my share calculations based on total shipment value by brand and operating system in Section VI.B and all other share calculations in Appendix E.

---

[137] The IDC defines a "smartphone" as follows: A smartphone is an electronic device with cellular capabilities and a screen size generally less than 7 inches. Smartphones typically have advanced hardware and software components that allows users to run a wide array of applications. Smartphones are to be distinguished against feature phones, which are devices that can offer the core basic functionalities of a smartphone but are much more limited in the breadth of applications that can be used on the device. *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 1-3.

[138] The IDC defines slate tablets as "portable, battery-powered computing devices that do not have a permanently attached keyboard and use touch as a primary user interface (though this may be supplemented by other input methods such as a pen, mouses, or keyboard) … The device must have a color display that is at least 7.0 inches but also less than 16.0 inches. Slate tablets do not offer an optional first-party keyboard." Detachable tablets are defined as a tablet that "meets all the criteria of a slate tablet but is designed and marketed to operate with a first-party keyboard designed specifically for the device." *See* IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021," February 2021, pp. 8-9.

[139] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 3; IDC, "IDC's Worldwide Personal Computing Device Taxonomy, 2021," February 2021, pp. 8-9. *See also*, Stiglitz Initial Report, Section VI.A.2 and VI.B.1. I have further confirmed that the screen sizes for products labeled as "smartphones" in the IDC data are predominantly less than 7 inches, and that the screen sizes for products labeled as "tablets" in the IDC data are greater than 7 inches. *See* Appendix F.1.

[140] I calculate shares in terms of units by dividing the number of units of, e.g., iOS smartphone device shipments, by the number of units shipped across all smartphone devices. *See* Workpaper_IDC Shares, 'Shares Analysis.xlsx.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

92.   Before discussing my iPhone and iPad share estimates, I note that iPhones are the only smartphones available for an Apple operating system. Apple developed its proprietary operating system exclusively for its own devices.[141] Moreover, all iPhone devices utilize the iOS operating system.[142] Hence, my share calculations by brand and operating system will yield the same estimated share for the Apple iPhone. The same is true for iPads.[143] Thus, my separate share calculations by brand and operating system instead show how the shares of non-Apple smartphone and tablet devices change depending on the level of aggregation used.

## VI.B. Estimates of U.S. iPhone Shares

93.   Figure 14 below shows my U.S. smartphone share estimates based on shipment value from 2007 to 2024 by brand. I exclude the time period spanning from 2004 to 2006 from my analysis as the iPhone was released in 2007.[144] My estimated iPhone shares are contained within the row labeled as "Apple" branded smartphones. I aggregate all brands with a 2024 share less than 1 percent into the "Others" category.[145] The U.S. iPhone share has risen over time from 22 percent during its release year in 2007 to a peak of 68 percent in each of 2020, 2021, and 2023. In fact, it has exceeded 50 percent in every year since 2014 and has exceeded 60 percent in every year since 2017.

---

[141]   *See* Stiglitz Initial Report, Section II.A.

[142]   Will Kenton, "Apple iOS: What It Is for iPhone and iPad, vs. MacOS," *Investopedia*, August 15, 2024, accessed February 10, 2025, https://www.investopedia.com/terms/a/apple-ios.asp. *See also,* Olga Knezevic, "Android vs iPhone security: which is safer?," *Norton*, June 28, 2024, accessed February 26, 2025, https://us.norton.com/blog/mobile/android-vs-ios-which-is-more-secure ("iOS doesn't work on phones from different brands"); and Stiglitz Initial Report, Section II.A.

[143]   "iOS version by device," *iOS Ref,* accessed February 10, 2025, https://iosref.com/ios#ipad. Note that the IDC data does not distinguish between iOS and iPadOS. While the first generation of Apple's iPad functioned with Apple's mobile iOS, the same OS as the iPhone, they have functioned on iPadOS, a version of iOS specifically for tablets, since 2019. *See* Abhishek Jariwala, "Everything Announced at the Apple WWDC 2019 Conference: iPadOS, Mac Pro, iOS 13, MacOS Catalina and More…," *TrueTech*, June 4, 2019, accessed February 19, 2025, https://true-tech.net/everything-announced-apple-wwdc-2019-conference-ipados-mac-pro-ios-13-macos-catalina/. *See also*, Stiglitz Initial Report, Section II.A.

[144]   Mark Coulstring, "iPhone History: From the Original iPhone to iPhone 16," *SeamGen*, October 1, 2024, accessed February 10, 2025, https://www.seamgen.com/blog/iphone-history-original-iphone-to-current-iphone. The largest smartphone brands before 2007 were BlackBerry, Nokia, and Palm. IDC does not record the shipment value or model names for all years before 2007. *See* Workpaper_IDC Shares, 'Shares Analysis.xlsx'; *and* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 14.

[145]   "Others" is a brand category constructed by the IDC itself. While IDC does not list the exhaustive list of brands under "Others", they state that "[u]nbranded phones", or 'white phones' [in the IDC data], are included under the '[O]thers' brand category." *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 4. I add all brands with a 2024 smartphone share less than 1 percent into this category.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 14: U.S. SMARTPHONE SHARES BASED ON VALUE BY BRAND, 2007-2024**

| Brand | Year | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] |
| Apple | 22% | 28% | 28% | 28% | 44% | 53% | 49% | 52% | 57% | 59% | 63% | 66% | 66% | 68% | 68% | 66% | 68% | 63% |
| Samsung | 6% | 5% | 3% | 10% | 15% | 25% | 32% | 30% | 27% | 26% | 23% | 22% | 21% | 22% | 23% | 24% | 23% | 26% |
| Motorola | 8% | 4% | 5% | 13% | 7% | 4% | 2% | 5% | 3% | 2% | 2% | 2% | 2% | 2% | 3% | 3% | 3% | 4% |
| Google | | | | | | | | | | 1% | 2% | 3% | 3% | 1% | 2% | 3% | 4% | 3% |
| Others | 65% | 62% | 64% | 49% | 34% | 18% | 17% | 13% | 13% | 12% | 10% | 7% | 7% | 6% | 4% | 3% | 3% | 3% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC phone data.

Notes: All shares are calculated based on shipment value. The IDC phone dataset also records mobile phone shipments based on units from 2004 to 2006. These years of data are excluded because the iPhone was released in 2007 and the IDC data do not include data on shipment value prior to 2007. The IDC data contain an "Others" brand category constructed by the IDC itself. I add to that category any brand with a 2024 U.S. smartphone share less than 1 percent. Share estimates are rounded to the nearest whole number and blank cells represent a zero share.

94. Figure 14 further shows that the second largest brand in terms of U.S. smartphone share, Samsung, has a substantially lower share than iPhones. Samsung's U.S. smartphone share rose from 6 percent in 2007 to a peak of 32 percent in 2013. Thereafter, it's U.S. smartphone share has remained between 20 and 30 percent. Since 2014, Samsung's U.S. smartphone share was between 22 and 46 percentage points lower than Apple's U.S. smartphone share.

95. Figure 15 below instead shows the U.S. smartphone share estimates based on shipment value by operating system as opposed to by brand. The IDC phone data separately identifies devices using the iOS or Android operating systems from all other devices, which it aggregates into a category called "Others".[146] My estimates for iPhone shares are contained within the row labeled as the "iOS" operating systems. As described in Section VI.A, the U.S. iPhone shares shown in Figure 14 and Figure 15 are identical because iPhones are the only smartphones manufactured by Apple and all iPhones utilize the iOS operating system.

---

[146]  The IDC's "Others" category contains 18 operating systems, including BlackBerry OS, Firefox, and Windows Phone. Moreover, the IDC also separately identifies phones using KaiOS and RTOS. I exclude these operating systems from my analysis as they are exclusively used on feature phones. *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

96. The figure shows that, since 2007, iPhones and smartphones based on the Android operating system have collectively grown to encompass virtually all U.S. smartphones.[147] iPhones and smartphones using the Android operating system have accounted for over 95 percent of U.S. smartphones since 2012. In fact, the IDC phone data does not record U.S. shipments of any smartphones that do not use iOS or Android since 2018.[148]

**FIGURE 15: U.S. SMARTPHONE SHARES BASED ON VALUE BY OPERATING SYSTEM, 2007-2024**

| Operating System | Year | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] |
| iOS | 22% | 28% | 28% | 28% | 44% | 53% | 49% | 52% | 57% | 59% | 63% | 66% | 66% | 68% | 68% | 66% | 68% | 63% |
| Android | | 2% | 9% | 39% | 44% | 43% | 48% | 46% | 42% | 41% | 37% | 34% | 34% | 32% | 32% | 34% | 32% | 37% |
| Others | 78% | 70% | 62% | 33% | 11% | 4% | 3% | 2% | 1% | 0% | 0% | | | | | | | |
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC phone data.

Notes: All shares are calculated based on shipment value. The IDC phone dataset also records mobile phone shipments based on units from 2004 to 2006. These years of data are excluded because the iPhone was released in 2007 and the IDC data do not include data on shipment value prior to 2007. The "Others" OS category is constructed by the IDC and consists of all other smartphone operating systems, including BlackBerry OS, Firefox, and the Windows phone. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

97.  In Appendix E.1, I provide additional estimates for U.S. iPhone shares based on the IDC phone data. For example, I report U.S. iPhone shares based on the number of units shipped rather than shipment value. While U.S. iPhone shares based on units are quantitatively lower than those based on shipment value, the qualitative results are no different: Apple's iPhone constitutes a large share of all U.S. smartphones in recent years.

---

[147] Android is an open-source operating system developed primarily by Google, and it is used by many non-Apple devices. *See* Erica Mixon, "What is Android OS?," *TechTarget*, October 2024, accessed February 10, 2025, https://www.techtarget.com/searchmobilecomputing/definition/Android-OS.

[148] The U.S. smartphone share for the "Others" category was 0.31 percent and 0.07 percent in 2016 and 2017, respectively. *See* Workpaper_IDC Shares, 'Shares Analysis.xlsx.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## VI.C. Estimates of U.S. iPad Shares

98.  Figure 16 below shows my U.S. tablet share estimates based on shipment value from 2010 to 2024 by brand. My estimated iPad shares are contained within the row labelled as "Apple" branded tablets. I aggregate all brands with a 2024 share less than 1 percent into the "Others" category.[149] The U.S. iPad share peaked at 87 percent during its release year in 2010. It decreased for the next several years before rebounding starting in 2016. Since 2019, the U.S. iPad share has remained between 60 and 70 percent.

**FIGURE 16: U.S. TABLET SHARES BASED ON VALUE BY BRAND, 2010-2024**

| Brand | Year | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] |
| Apple | 87% | 66% | 66% | 58% | 48% | 45% | 55% | 59% | 56% | 63% | 64% | 66% | 69% | 70% | 68% |
| Samsung | 2% | 4% | 6% | 14% | 18% | 11% | 12% | 11% | 10% | 10% | 9% | 9% | 10% | 13% | 15% |
| Microsoft | | | 2% | 4% | 6% | 15% | 11% | 10% | 15% | 15% | 12% | 11% | 8% | 7% | 8% |
| TCL | | | | | | | | | | | 1% | 3% | 3% | 4% | 3% |
| Amazon.com | | 6% | 10% | 7% | 2% | 2% | 5% | 9% | 6% | 5% | 7% | 8% | 7% | 3% | 2% |
| Others | 11% | 24% | 17% | 17% | 26% | 27% | 18% | 11% | 13% | 7% | 7% | 4% | 3% | 4% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC tablet data.

Notes: All shares are calculated based on shipment value and include both slate and detachable tablets. The IDC tablet data contain an "Others" brand category constructed by the IDC itself. I add to that category any brand with a 2024 U.S. tablet share less than 1 percent. These brands include for example, LG Electronics, Huawei, and Nokia. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

99. Figure 16 also shows that while the second largest brand in terms of U.S. tablet share has fluctuated over time, Apple's U.S. tablet share has far exceeded the next largest brand in all years in the data. In fact, Apple's U.S. tablet share has ranged from between 30 to 85 percentage points larger than then next largest brand in any given year.

---

[149]  "Others" is a value of the brand field pre-constructed by IDC within the IDC tablet data. The IDC documentation does not specify which brands "Others" is comprised of. *See* Workpaper_IDC Shares, in the "Raw IDC Data" files; *and* "IDC's Worldwide Personal Computing Device Tracker Taxonomy," IDC, February 2021, p. 33. I add brands with a 2024 share less than 1 percent to the IDC's pre-constructed "Others" category.

100. Figure 17 below instead shows U.S. tablet share estimates based on shipment value by operating system as opposed to by brand. As in Figure 16, I aggregate all operating systems with a 2024 U.S. tablet share less than 1 percent into the "Others" category.[150] iPad shares are contained within the row labelled as tablets using the "iOS" operating system. As described in Section VI.A, the U.S. iPad shares shown in Figure 16 and Figure 17 are identical because iPads are the only tablets manufactured by Apple and all iPads utilize the iOS operating system.[151]

101. Like smartphone operating systems, iPads and tablets utilizing the Android operating system encompass a large share of all U.S. tablets. The combined share of iPad and Android tablets was at least 78 percent in each year between 2010 and 2024. The only other operating system with a non-negligible tablet share is the Windows operating system.[152]

**FIGURE 17: U.S. TABLET SHARES BASED ON VALUE BY OPERATING SYSTEM, 2010-2024**

| Operating System | Year | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [A] | 2010 [B] | 2011 [C] | 2012 [D] | 2013 [E] | 2014 [F] | 2015 [G] | 2016 [H] | 2017 [I] | 2018 [J] | 2019 [K] | 2020 [L] | 2021 [M] | 2022 [N] | 2023 [O] | 2024 [P] |
| iOS | 87% | 66% | 66% | 58% | 48% | 45% | 55% | 59% | 56% | 63% | 64% | 66% | 69% | 70% | 68% |
| Android | 10% | 29% | 31% | 33% | 39% | 33% | 29% | 25% | 22% | 19% | 22% | 22% | 22% | 22% | 23% |
| Windows | 3% | 2% | 2% | 8% | 13% | 22% | 17% | 15% | 21% | 18% | 13% | 12% | 9% | 8% | 9% |
| Others | | 3% | 2% | 0% | 0% | 0% | | | 1% | 0% | 1% | 0% | 0% | 0% | 0% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC tablet data.

Notes: All shares are calculated based on shipment value and include both slate and detachable tablets. The IDC tablet data contain an "Others" OS category constructed by the IDC itself. I add to that category any operating system with a 2024 U.S. tablet share less than 1 percent. These

---

[150] The "Others" category in the IDC's tablet data is a pre-constructed value contained in the OS field. IDC does not specify what operating systems it classifies as "Others" in its tablet data. *See* IDC, "IDC's Worldwide Personal Computing Device Taxonomy, 2021," February 2021, p. 10; Workpaper_IDC Shares, in the "Raw IDC Data" files. I add operating systems with a 2024 share less than 1 percent to this pre-constructed "Others" category.

[151] As explained in Section VI.A, recent generations of the iPad use iPadOS in lieu of iOS; however, the IDC data does not make a distinction between the two operating systems.

[152] Windows is an operating system developed by Microsoft and is the operating system used by its Surface Pro product line. *See* Bhumika, "What is Windows operating system?," *Goseeko*, September 4, 2022, accessed February 10, 2025, https://www.goseeko.com/blog/what-is-windows-operating-system/. *See also*, "Surface supported operating systems," *Microsoft*, October 17, 2024, accessed February 10, 2025, https://learn.microsoft.com/en-us/surface/surface-supported-operating-systems.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

operating systems include Chrome OS and Windows RT. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

102. In Appendix E.2, I provide additional estimates for U.S. iPad shares based on the IDC tablet data. For example, I report U.S. iPad shares based on the number of units shipped rather than shipment value. These calculations confirm that iPads constitute a large share of all U.S. tablets throughout the entire period.

# VII. Conclusion

103. I reserve the right to supplement, update, or revise my opinions and analyses based on any information, documents, or data that are made available to me. I may prepare demonstrative aids if I am called to testify.

Minjae Song, Ph.D.
March 7, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# Appendix A Curriculum Vitae

---

## CONTACT INFORMATION

Minjae Song

The Brattle Group

1800 M ST NW, Suite 700 North, Washington, DC 20036

Phone: +1.202.908.2635

Email: minjae.song@brattle.com

---

## EDUCATION

- **Harvard University**

  MA and PhD in Economics

- **Seoul National University**

  BA in Economics

---

## PROFESSIONAL EXPERIENCE

- **The Brattle Group (2020–Present)**

  Principal

- **Bates White Economic Consulting (2014–2020)**

  Principal (2017–2020)

  Manager (2015–2017)

  Senior Economist (2014–2015)

- **University of Rochester Simon School of Business (2007–2014)**

  Assistant Professor of Economics and Marketing

- **Georgia Institute of Technology School of Economics (2003–2007)**

  Assistant Professor of Economics

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## AREAS OF EXPERTISE

- Antitrust & Competition

- Technology

- Telecommunications, Media & Entertainment

## TESTIMONY

- ***In re: Grubhub Holdings, Inc., et al. vs. Visa, Inc., et al.***

  *United States District Court for the Eastern District of New York, Master File 05-MD-1720*

  Provided testimony on behalf of Grubhub Holdings, Inc., et al. (Deposition: March 9, 2023).

- ***In re: hiQ Labs, Inc., vs. LinkedIn Corp***

  *U.S. District Court for the Northern District of California, Case No. 3:17-cv-03301-EMC*

  Provided testimony on behalf of hiQ Labs, Inc. (Deposition: July 27, 2022).

## REPORTS AND DECLARATIONS

- **Rebuttal Expert Report of Minjae Song,** ***In re: Grubhub Holdings, Inc., et al. vs. Visa, Inc., et al.***

  *United States District Court for the Eastern District of New York, Master File 05-MD-1720* (January 13, 2023)

- **Rebuttal Expert Report of Minjae Song,** ***In re: hiQ Labs, Inc., vs. LinkedIn Corp.***

  *United States District Court for the Northern District of California, Case No. 3:17-cv-03301-EMC* (June 30, 2022)

- **Declaration of Minjae Song,** ***In re: Apple iPhone Antitrust Litigation***

  *United States District Court for the Northern District of California, Oakland Division, Case No. 4:11-cv-06714-YGR* (August 25, 2021, July 23, 2022, and January 30, 2024)

## SELECTED CONSULTING EXPERIENCE

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Antitrust Litigation**

- In the ongoing antitrust litigation *United States of America, et al. v. Google LLC*, led a team supporting five Department of Justice experts, including two industry experts, a damages expert, a marketing expert, and a survey expert, in their analyses of Google's advertising technology and alleged monopolistic behaviors, among other issues. A decision in the case is expected in early 2025.

- On behalf of consumer plaintiffs *In re: Apple iPhone Antitrust Litigation*, supported the expert in developing economic and econometric evidence and preparing expert reports and testimony. The court certified the consumer Class on February 2, 2024.

- Supported the expert in a lawsuit involving antitrust claims regarding music performance rights.

- On behalf of CDK *In re: Dealer Management Systems Antitrust Litigation*, supported the expert in an analysis of CDK's antitrust liabilities.

- On behalf of American Express *In re*: *American Express Anti-Steering Rules Antitrust Litigation* with merchant plaintiffs, provided support for the expert's analysis of Amex's antitrust liabilities.

- Supported expert in cases against two major sporting organizations for their actions to monopolize television and internet broadcast rights to games.

**Mergers and Acquisitions**

- On behalf of the merging parties, led a trans-Atlantic team in analyzing the likely competitive effects of the proposed merger between two table grapes breeders, which resulted in the European Commission granting unconditional Phase 1 approval.

- On behalf of the merging parties, analyzed the likely competitive effects in the table grapes industry of the proposed merger between two table grapes breeders: International Fruit Genetics and Special New Fruit Licensing. Advised the merging parties in responding to multiple RFIs and drafting white papers describing the industry's competitive landscape before the European Commission, which granted unconditional Phase 1 approval.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- Retained as an economic expert by antitrust authority to analyze the effects of a merger between two media platforms. Using a two-sided market model, quantified welfare effects on both sides of the market (consumers and advertisers). The merger investigation was closed.

- On behalf of the publishers in the proposed merger of two newspaper publishers, analyzed both advertising and subscription aspects of the newspaper business in regard to Department of Justice (DOJ) concerns about competitive effects of the merger. The DOJ let the 30-day waiting period expire, thus clearing the transaction.

- On behalf of Sinclair Broadcast Group, Inc., analyzed the likely competitive effects of Sinclair's acquisition of 21 regional sports networks originally owned by 21st Century Fox.

- On behalf of Competition Bureau Canada, supported the expert in an analysis of the proposed merger between Tervita and Newalta, which both provide waste management and environmental solution services to the oil and gas industry.

- On behalf of United Technologies in its merger with Raytheon, provided advice to counsel on potential vertical and horizontal issues in various product areas. Provided significant assistance to United Technologies in responding to requests from the DOJ.

- On behalf of United Technologies, assisted counsel seeking antitrust regulatory approval for the acquisition of Rockwell Collins. Supported the expert's development of a white paper submitted to Chinese regulators.

- On behalf of DuPont, analyzed likely competitive effects of its proposed merger with Dow Chemical in a wide range of markets, including seeds and transgenic traits, agricultural chemicals, and specialty polymers.

- Provided analysis and expert support for the U.S. Department of Justice in analyzing the proposed merger of silicon metal producers FerroAtlantico and Globe Specialty Metals.

- Worked on behalf of Dr. Oetker to analyze the competitive effects of its proposed acquisition of McCain Foods' North American frozen pizza business.

**Economic Analysis**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- Provided a major business consulting firm with an economic analysis on drug pricing strategies in the cancer treatment market.

---

## ARTICLES & PUBLICATIONS

- "Generative AI: Drawing the U.S. Battle Lines," with James Keyte and Zening Li, *Antitrust*, vol. 38, no. 3 (2024): 41–48

- "Trends and Developments in Cloud Computing and On-Premise IT Solutions." Available at https://alliance4digitalinnovation.org/wp-content/uploads/2021/12/Brattle-Cloud-Computing-Whitepaper_Dec-2021-2.pdf

- "Understanding the Economics of Platforms," with Rosa Abrantes-Metz, Michael Cragg, and Albert Metz, *Antitrust*, vol. 36, no. 1 (2021): 30–36

- "The Competitive Effects of Common Ownership: Economic Foundations and Empirical Evidence," with Pauline Kennedy, Dan O'Brien, and Keith Waehrer (Working paper). Available at SSRN: https://ssrn.com/abstract=3008331

- "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics* 13, no. 2 (2021): 35–67

- "Impact of CCSP Assessment Fees on California Carpet Shipments," with Eric Gaier. Available at https://www2.calrecycle.ca.gov

- "Mergers with Interfirm Bundling: A Case of Pharmaceutical Cocktails," with Sean Nicholson and Claudio Lucarelli, *The RAND Journal of Economics* 48, no. 3 (2017): 810–34

- "Is the Daily Deal Social Shopping? An Empirical Analysis of Customer Panel Data," with Eunho Park, Byungjoon Yoo, and Seongmin Jeon, *Journal of Interactive Marketing* 33 (2016): 57–76

- "A Hybrid Discrete Choice Model of Differentiated Product Demand with an Application to PCs," *International Economic Review* 56, no. 1 (2015): 265–301

- "Platforms: A Multiplicity of Research Opportunities," with S. Sriram, P. Manchanda, et al., *Marketing Letters* (2014)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- "A Dynamic Analysis of Cooperative Research in the Semiconductor Industry," *International Economic Review* 52, no. 4 (2011): 1157–77

- "The Quality Adjusted Price Index in the Pure Characteristics Demand Model," *Journal of Business and Economic Statistics* 28, no. 1 (2010): 190–99

- "Do Media Consumers Really Dislike Advertising? An Empirical Assessment of the Role of Advertising in Print Media Markets," with Ulrich Kaiser, *International Journal of Industrial Organization* 27, no. 2 (2009): 292–301

- "Measuring Consumer Welfare in the CPU Market: An Application of the Pure Characteristics Demand Model," *The RAND Journal of Economics* 38, no.2 (2007): 429–46

---

## PRESENTATIONS & SPEAKING ENGAGEMENTS

- Panelist in 51st Annual Fordham Competition Law Institute Conference on International Antitrust Law & Policy: "Generative AI – Hold Your Horses?" (September 12, 2024)

- Moderator in 51st Annual Fordham Competition Law Institute Conference on International Antitrust Law & Policy, Antitrust Economics Workshop panel: "Generative AI: The Economic Battle Lines" (September 11, 2024)

- Discussion of "Labor and Product Market Effects of Mergers" by Hosken, Larson-Koester, and Taragin, DC Industrial Organization Day (May 24, 2024)

- Moderator in 50th Annual Fordham Competition Law Institute Conference on International Antitrust Law & Policy, Antitrust Economics Workshop panel: "AI, Algorithms, and Antitrust Economics" (September 20, 2023)

- Panelist in NYSBA Antitrust Law Section's Steve Houck Antitrust Expert Training Academy Fall 2022: "Working Effectively with Economic Experts from the Economist's Perspective" (October 21, 2022)

- "Why Antitrust for Economists?" ABA's "Why Antitrust?" Virtual Program Series (July 22, 2020)

- "The Competitive Effect of Common Ownership: Economic Foundations and Empirical Evidence"

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- – Presentation at the Searle Center Conference on Antitrust Economics and Competition Policy (September 21, 2018)

- – Seminar at Department of Justice Antitrust Seminar Series (April 3, 2018)

- Discussion of "The Effect of Common Ownership on Profits: Evidence from the US Banking Industry" by Gramlich and Grundl, DC Industrial Organization Day (May 25, 2018)

- "Platform Competition in Two-Sided Markets."
  - – Seminar at Consumer Financial Protection Bureau (March 5, 2014)
  - – Seminar at Harvard Business School (October 16, 2013)
  - – Seminar at Yonsei University (September 9, 2013)
  - – Presentation at the Society for Economic Dynamics Annual Conference (June 28, 2013)
  - – Seminar at European School of Management and Technology (June 3, 2013)

- "Platforms: A Multiplicity of Research Opportunities," presentation and discussion at the 9th Invitational Choice Symposium (June 15, 2013)

- "Cocktail Pricing in the Pharmaceutical Market," seminar at Whitman School of Management, Syracuse University (November 9, 2012)

---

## FIELDS OF RESEARCH

- Antitrust & Competition Economics

- Industrial Organization

- Applied Econometrics

- Applied Microeconomics

---

## SELECTED TEACHING AND ACADEMIC EXPERIENCE

**PhD Level (University of Rochester, 2007–2014)**

- Elements of Econometrics

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- Empirical Industrial Organization

**MBA Level (University of Rochester, 2007–2014)**

- Database Marketing

- Advanced Data Analysis

**Undergraduate Level (Georgia Institute of Technology, 2003–2007)**

- Introduction to Microeconomics

- Intermediate Microeconomics

---

## SELECTED REFEREE ACTIVITIES

- *American Economic Journal: Applied Economics*

- *American Economic Journal: Microeconomics*

- *American Economic Review*

- *International Journal of Industrial Organization*

- *Journal of Political Economy*

- *Management Science*

- *Marketing Science*

---

## PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS

- American Economic Association

- American Bar Association

- Korean American Economic Association

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# Appendix B Materials Relied Upon

## CASE MATERIALS

Defendant Apple Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, (N.D. Cal.), May 13, 2024.

Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), February 02, 2024.

Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C 11-06714-YGR (N.D. Cal.), September 11, 2020, ECF No. 228.

## EXPERT REPORTS

Expert Report of Alan D. MacCormack, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), June 1, 2021.

Declaration of Darryl Thompson, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Joseph E. Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Rosa M. Abrantes-Metz, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Reply Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification*, In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), Oct. 19, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Reply Report of Daniel L. McFadden, Ph.D., in Support of Plaintiff's Renewed Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.) April 28, 2023.

Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), January 19, 2023.

---

## DEPOSITIONS

Deposition of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), December 5, 2022.

Deposition of Mark Rollins*, In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR-TSH (N.D. Cal.), February 11, 2021.

Deposition of Ron Okamoto, Volume 1, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06715-YGR, (N.D. Cal.), December 16, 2020.

---

## RELATED CASE MATERIALS

Order Granting Motion for Final Approval of Class Action Settlement; Granting in Part and Denying in Part Motion for Attorney's Fees, Costs, and Service Award; and Judgment, *Donald R. Cameron et al. v. Apple Inc.*, No. 19-cv-3074-YGR (N.D. Cal.), August 24, 2021.

---

## PRODUCED DOCUMENTS

APL-APPSTORE_00199550
APL-APPSTORE_05520482
APL-APPSTORE_09281956
APL-APPSTORE_10334265
APL-APPSTORE_10750377
APL-APPSTORE_10766788
APL-APPSTORE_10767150

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

APL-APPSTORE_10767152
APL-APPSTORE_10767153
APL-APPSTORE_10767812
APL-APPSTORE_11210311
APL-APPSTORE_11418586
APL-APPSTORE_11428390
APL-EG_05486829
APL-EG_05487690
APL-EG_09249976

---

ACADEMIC ARTICLES AND BOOKS

A.K. Dixit, *Optimization in Economic Theory*, 2nd ed., (Oxford: Oxford University Press, 1990).

Bruce E. Hansen, *Econometrics*, (Princeton University Press, 2022).

Christopher Conlon and Jeff Gortmaker, "Best practices for differentiated products demand estimation with PyBLP," *The RAND Journal of Economics* 51(4) (2020): 1108–1161. Laurence Hoffman, Gerald Bradley, David Sobecki, and Michael Price, EBOOK: *Applied Calculus for Business, Economics and the Social and Life Sciences*, Expanded Edition, 11th ed., (McGraw-Hill Education: 2013).

Michael R. Chernick, *The Essentials of Biostatistics for Physicians, Nurses, and Clinicians*, (Hoboken: John Wiley & Sons, Inc., 2011).

Minjae Song, "A Hybrid Discrete Choice Model of Differentiated Product Demand with an Application to Personal Computers," *International Economic Review* 56(1) (2015): 265-301.

Minjae Song, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics* 13(2) (2021): 35–67.

Minjae Song, Sean Nicholson, and Claudio Lucarelli, "Mergers with interfirm bundling: a case of pharmaceutical cocktails," *RAND Journal of Economics* 48(3) (2017): 810-834.

Raj Chetty, Nathaniel Hendren, Patrick Kline, and Emmanuel Saez, "Where is the Land of Opportunity? The Geography of Intergenerational Mobility in the United States," *The Quarterly Journal of Economics* 129(4) (2014): 1553-1623.

Rebecca Diamond, "The Determinants and Welfare Implications of US Workers' Diverging Location Choices by Skill: 1980-2000," *American Economic Review* 106(3) (2016): 479-524.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Timothy Sauer, *Numerical Analysis*, (Pearson Education, Inc., 2012).

---

PUBLICLY AVAILABLE MATERIALS

"A better App Store Pricing Matrix," *Equinux*, https://www.equinux.com/us/appdevelopers/pricematrix.html.

"About IDC," *IDC*, https://www.idc.com/about.

"App Store pricing upgrades have expanded to all purchase types," *Apple Developer*, March 9, 2023, https://developer.apple.com/news/?id=dbrszv62.

"Apple Account Support," *Apple Support,* https://support.apple.com/en-lamr/apple-account.

"Apple announces App Store Small Business Program," *Apple Newsroom*, November 18, 2020, https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.

"Apple App Store Pricing Update: United States Dollar (USD) markets," *Apple Newsroom*, https://www.apple.com/newsroom/pdfs/App-Store-Pricing-Update.pdf.

"Apple Developer Enterprise Program," *Apple Developer*, https://developer.apple.com/programs/enterprise/.

"Apple Video Partner Program," *Apple Developer*, https://developer.apple.com/programs/video-partner/.

"Auto-renewable subscriptions," *Apple Developer*, https://developer.apple.com/app-store/subscriptions/#revenue-after-one-year.

"Choosing a category," *Apple*, https://developer.apple.com/app-store/categories/.

"Choosing a Membership," *Apple Developer*, https://developer.apple.com/support/compare-memberships/.

"Delete built-in Apple apps from your iPhone, iPad, or Apple Watch," *Apple Support*, April 3, 2024, https://support.apple.com/en-us/118582.

"Find minimum of constrained nonlinear multivariable function - MATLAB fmincon," *Mathworks*, https://www.mathworks.com/help/optim/ug/fmincon.html#description.

"iOS version by device," *iOS Ref,* https://iosref.com/ios#ipad.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"iPhone 14 and iPhone 14 Plus," *Apple*, https://www.apple.com/ca/iphone-14/specs/.

"Manage and use your Apple Account," *Apple Support*, November 15, 2024, https://support.apple.com/en-us/105023.

"Surface supported operating systems," *Microsoft*, October 17, 2024, https://learn.microsoft.com/en-us/surface/surface-supported-operating-systems.

"Worldwide Quarterly Mobile Phone Tracker," *IDC*, https://www.idc.com/getdoc.jsp?containerId=IDC_P8397.

"Worldwide Quarterly Personal Computing Device Tracker," *IDC*, https://www.idc.com/getdoc.jsp?containerId=IDC_P36344.

Abhishek Jariwala, "Everything Announced at the Apple WWDC 2019 Conference: iPadOS, Mac Pro, iOS 13, MacOS Catalina and More…," *TrueTech*, June 4, 2019, https://true-tech.net/everything-announced-apple-wwdc-2019-conference-ipados-mac-pro-ios-13-macos-catalina/.

Andrew Keller and Ryan King, "How We Unduplicated Responses in the 2020 Census," *United States Census Bureau*, April 22, 2021, https://www.census.gov/newsroom/blogs/random-samplings/2021/04/how_we_unduplicated.html.

Bhumika, "What is Windows operating system," *Goseeko*, September 4, 2022, https://www.goseeko.com/blog/what-is-windows-operating-system/.

Chris Foresman, "Apple opens in-app purchasing for free iPhone apps," *arsTechnica*, October 15, 2009, https://arstechnica.com/gadgets/2009/10/apple-opens-in-app-purchasing-for-free-iphone-apps/.

Dieter Bohn, "The Apple App Store: a brief history of major policy changes," *The Verge*, September 10, 2021, https://www.theverge.com/22667242/apple-app-store-major-policy-changes-history.

Erica Mixon, "What is Android OS?," *TechTarget*, October 2024, https://www.techtarget.com/searchmobilecomputing/definition/Android-OS.

IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021.

IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021," February 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Jeff Pitblado, "How are average marginal effects and their standard errors computed by margins using the delta method?," *Stata*, https://www.stata.com/support/faqs/statistics/compute-standard-errors-with-margins/.

Joe Cason, "Introducing Every Single Pre-Installed App on the iPhone," *Make Use Of*, May 28, 2022, https://www.makeuseof.com/every-pre-installed-app-iphone/.

Lauren Goode, "App Store 2.0," *The Verge*, June 8, 2016, https://www.theverge.com/2016/6/8/11880730/apple-app-store-subscription-update-phil-schiller-interview.

Lauren Goode, "Apple's new subscription offerings are now available to App Store developers", *The Verge*, September 2, 2016, https://www.theverge.com/2016/9/2/12774758/apple-developers-app-store-new-subscription-rules.

Mark Coulstring, "iPhone History: From the Original iPhone to iPhone 16," *SeamGen*, October 1, 2024, https://www.seamgen.com/blog/iphone-history-original-iphone-to-current-iphone.

Olga Knezevic, "Android vs iPhone security: which is safer?," *Norton* , June 28, 2024, https://us.norton.com/blog/mobile/android-vs-ios-which-is-more-secure.

Will Kenton, "Apple iOS: What It Is for iPhone and iPad, vs. MacOS," *Investopedia*, August 15, 2024, https://www.investopedia.com/terms/a/apple-ios.asp.

---

## OTHER MATERIALS

Letter from Eli M. Lazarus to Ted Wojcik and Rachele R. Byrd, Re: *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR Data Discovery, October 12, 2020.

Letter from Ethan Dettmer to Rachele R. Byrd and Ben Harrington, Re: *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), May 5, 2021.

Email from Eli M. Lazarus to Kyle M. Wood, et al. (June 6, 2024).

Email from Ramona Lin to Kyle M. Wood, et al. (January 24, 2025).

Letter from Eli M. Lazarus to Rachele R. Byrd (March 15, 2024).

Letter from Eli M. Lazarus to Rachele R. Byrd (May 31, 2024).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Letter from Eli M. Lazarus to Rachele R. Byrd, et al., (June 29, 2024).

Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (January 17, 2025).

Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025).

Letter from Ethan Dettmer to Rachele R. Byrd (July 11, 2022).

Letter from Ethan Dettmer to Rachele R. Byrd (August 25, 2023).

Letter from Ethan Dettmer to Rachel R. Byrd, et al. (January 5, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Appendix C Data Processing

### C.1 Overview of Apple App Store Transactions Data

104. At the time of filing his 2021 Opening Report, Prof. McFadden had access to App Store transactions data produced by Apple on January 15, 2021, which included over 64 billion transactions that occurred from July 2008 through September 2019.[153] Between the submission of his 2021 Opening Report and the filing of his 2023 Supplemental Report, Apple produced two additional App Store transactions datasets. First, Apple produced an additional App Store transactions data on June 2, 2021. This additional data expanded its original data production to include transactions that took place between September 2019 and April 2021.[154] Apple subsequently made a third production of App Store transactions data on July 11, 2022, spanning the period April 2, 2020 through April 25, 2022 and corrected corrupted transaction records related to its second data production.[155] When analyzing Apple's data productions in his 2023 Supplemental Report, Prof. McFadden had combined all three of these data productions into a single App Store transactions dataset covering the period spanning July 2008 through April 2022.[156] This dataset totaled roughly ▮▮▮▮▮▮ transactions.[157]

105. Apple has since produced several additional App Store transactions datasets. Apple first produced two incremental datasets on August 25, 2023 and March 15, 2024 that I understand were intended to collectively extend the data from Prof. McFadden's 2023 Supplemental Report

---

[153] APL-APPSTORE_10334265, *Fact* table. *See also*, Deposition of Mark Rollins, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR-TSH (N.D. Cal.), February 11, 2021, 303:8-305:17. *See also*, Letter from Ethan Dettmer to Rachel R. Byrd, et al. (January 5, 2021).

[154] APL-APPSTORE_10750377, *Fact* table. *See also*, McFadden 2023 Supplemental Report, ¶ 6.

[155] APL-APPSTORE_10766788, *Fact* table. In its transmittal letter, Apple's counsel stated that "[t]o the extent the date range of the data in this production overlaps with the date range of data that Apple has previously produced to Plaintiffs, the data in this production should replace the previously produced data. In particular, this new data includes a number of transactions dated April 25, 2020 that were not included in an earlier production, apparently due to a corruption of the data for that date." *See* Letter from Ethan Dettmer to Rachele R. Byrd (July 11, 2022). *See also*, McFadden 2023 Supplemental Report, ¶ 6.

[156] Per Apple's instructions, I used the first production for July 10, 2008 through September 30, 2019, the second production for October 1, 2019 through April 2, 2020 (before 23:50 PST), and the third production for the period April 3, 2020 (on or after 23:50 PST) through April 25, 2022 in constructing these data.

[157] *See* McFadden 2023 Supplemental Report, ¶ 6.

to include transactions made between April 2022 and February 2024.[158] However, neither these data productions nor Apple's prior data productions included a field uniquely identifying individual transactions, which, as I explain in Section IV.B, is required for identifying the harm attributable to each payor within the Consumer Class.

106. To fill this gap, Apple produced an additional App Store transactions dataset on May 31, 2024 that I understand is intended to replace all of Apple's prior App Store transactions data productions.[159] This production alone includes over ▬▬▬▬▬ App Store transactions that occurred from July 10, 2008 through February 2, 2024.[160] Apple's May 31, 2024 production of App Store transactions data is the transactions data I use to estimate damages in this report.[161]

107. The primary data table, referred to as the "Fact" table, contains information on transactions made through the App Store's U.S. storefront.[162] For each transaction, the "Fact" table contains 27 fields, including a unique transaction identifier, the transaction timestamp, a unique identifier for the Apple account associated with the transaction, an identifier for the app or in-app item transacted, the platform on which the transaction was made (e.g., iPhone versus iPad), as well as the total quantity, price, and developer royalties associated with the transaction.

108. The App Store transactions data contains additional data tables intended to supplement the Fact table, which I collectively refer to as the "Dimensions" tables.[163] These Dimensions tables

---

[158] Apple Transactions data produced via hard drive on August 25, 2023, APL-APPSTORE_10767150; and Apple Transactions data produced via hard drive on March 15, 2024, APL-APPSTORE_10767152. *See also*, Letter from Ethan Dettmer to Rachele R. Byrd (August 25, 2023); and Letter from Eli M. Lazarus to Rachele R. Byrd (March 15, 2024).

[159] *See* Email from Eli M. Lazarus to Kyle M. Wood, et al. (June 6, 2024).

[160] Apple Transactions data produced via hard drive on May 31, 2024, APL-APPSTORE_10767153. *See also,* Letter from Eli M. Lazarus to Rachele R. Byrd (May 31, 2024); Letter from Eli M. Lazarus to Rachele R. Byrd, et al., (June 29, 2024). *See* Workpaper_In-text Citations, 'para17.csv'.

[161] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Letter from Eli M. Lazarus to Rachel R. Byrd, et al. (June 29, 2024).

[162] Letter from Eli M. Lazarus to Ted Wojcik and Rachele R. Byrd, Re: *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR Data Discovery, October 12, 2020.

[163] In total, there are nine supplemental tables in addition to the Fact table. As noted above, Apple first produced all nine table on May 31, 2024 (APL-APPSTORE_10767153). The nine tables are ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Continued on next page

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

include information on transaction types, e.g. whether a transaction is invalid, information regarding purchase types, e.g. whether a purchase is made by an educational institution, and the genre associated with any particular app.[164] I merge information from the Dimensions tables to the Fact table using the common variables between them. Figure 18 below summarizes several of the variables contained within the App transactions data.

**FIGURE 18: SUMMARY OF VARIABLES IN APP STORE TRANSACTIONS DATA**

| Variable | Description |
|---|---|
| | |

Sources: Deposition of Mark Rollins, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR-TSH (N.D. Cal.), February 11, 2021; and Letter from Eli M. Lazarus to Ted Wojcik

---

█████████████. On June 29, 2024, Apple reproduced four of these supplemental tables due to escape and quote characters used in their May 31, 2024 productions, which caused data integrity concerns. I use the ███ and ███████████ tables reproduced in June 2024, and ██████████████ tables produced in May 2024 in my data analysis. *See* Letter from Eli M. Lazarus to Rachel R. Byrd, et al. (June 29, 2024). *See also*, Apple Transactions data produced via hard drive on June 29, 2024 (APL-APPSTORE_10767812).

[164] Letter from Ethan Dettmer to Rachele R. Byrd and Ben Harrington, Re: *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), May 5, 2021. *See also*, Deposition of Mark Rollins, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR-TSH (N.D. Cal.), February 11, 2021, 338:22-340:2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and Rachele R. Byrd, Re: *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, No. 4:19-cv-03074-YGR Data Discovery, October 12, 2020. *See also*, McFadden 2021 Opening Report, Figure 18. *See also*, Apple's Payor Data Supplemental Production Letter.

109.    There are two key differences between the App Store transactions data I rely on in this report and Apple's prior productions. First, Apple's prior productions did not include variables that can be used to uniquely identify the transactions associated with any given payor. Apple's revised App Store transactions data now includes a unique transaction identifier variable that can be used for that purpose. I explain how this transaction ID allows me to identify the total spending and monetary harm attributable to each payor in Section IV.B.

110.    Second, each of the three prior data productions available in Prof. McFadden's 2023 Supplemental Report contained a small number of apps and in-app items whose genre classifications differed across the three data productions.[165] In contrast, Apple's revised App Store transactions data now attributes a single genre to each app and in-app item.[166] Because the genre classification remains consistent across years, I no longer need the genre harmonization Prof. McFadden performed in his 2023 Supplemental Report.[167]

### C.2    Transactions Excluded from Empirical Analyses

111.    In preparing the transactions data for all empirical analyses, I exclude four sets of transactions from the data: (1) transactions that are not from "iPhone" or "iPad" iOS-installed mobile devices according to the ███████████' field; (2) transactions that are labelled as "invalid" in the

---

[165]    Deposition of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), December 5, 2022 (hereafter referred to as "McFadden 2022 Deposition"), 45:10-46:25.

[166]    Apple Transactions data produced via hard drive on May 31, 2024, APL-APPSTORE_10767153, *Content* table, and Apple Transactions data produced via hard drive on June 29, 2024 (APL-APPSTORE_10767812), *Content* table.

[167]    In his 2023 Supplemental Report, Prof. McFadden harmonized the genres for the apps and in-app items whose genre classification differed across the three data productions by assigning their respective genres in Apple's most recent production to the transactions for those apps and in-app items in all three of Apple's data productions. *See* McFadden 2022 Deposition, 45:10-46:25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

██████████████ field; (3) transactions from Apple-developed apps, and (4) enterprise and volume transactions based on the ██████████████████████.[168]

### C.3     The 75 0.1 Percent Samples

112. I generate 75 samples of the App Store transactions data for the purposes of estimating demand as described in Section IV.A.2.a.[169] I start with a sorted list of all "Apple ID" values in the App Store transactions data and assign each a random value between 0 and 1. I then keep only the transactions associated with any "Apple ID" with an assigned value below 0.001. I repeat this process independently 75 times, resulting in 75 independent and randomly drawn 0.1 percent samples.[170]

113. In addition to the excluded transactions described in Appendix C.2, I remove four other types of transactions from these samples: refunds, refunded transactions, non-initial downloads, and pre-download in-app purchase transactions.

---

[168]   I identified transactions from Apple-developed apps using the ███████████ and ███████████ fields. Per Apple's instructions, I exclude the following ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See* Defendant Apple Inc.'s Responses and Objections to Plaintiffs' Fourth Set of Interrogatories, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, (N.D. Cal.), May 13, 2024, Responses to Interrogatory No. 20. I identified enterprise and volume transactions based on the 'sap_line_item_type_name' field. *See* Letter from Ethan Dettmer to Rachele R. Byrd and Ben Harrington, Re: *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), May 5, 2021. *See also*, Deposition of Mark Rollins, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR-TSH, (N.D. Cal.), February 11, 2021, 338:22-340:2.



[169]   The process I use to prepare each 0.1 percent sample is very similar to the procedure Prof. McFadden followed to process the 0.1 percent sample used in his 2021 Opening Report. In this section, I reproduce much of Prof. McFadden's description of this process from Appendix E.1. of his 2021 Opening Report, but with some details updated to reflect the data used in this report. *See* McFadden 2021 Opening Report, Appendix E.1.

[170]   Prof. McFadden demonstrated in his 2021 Opening Report that a 0.1 percent sample is representative of the full data. *See* McFadden 2021 Opening Report, Figures 19-26.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- I classify a transaction as a refund if either the ███████ or ███████ field contains a negative values.

- I identify refunded transactions by subtracting the refunds from preceding original transactions in a reverse chronological order by "Apple ID" and item. Transactions that are completely offset by subsequent refunds are classified as refunded transactions, while those with remaining sales retain their balance.

- I identify non-initial downloads as all download transactions that follow the initial download for each "Apple ID" and app, ensuring only the first download is retained.[171]

- I define pre-download in-app purchase transactions as those in which an in-app purchase occurs before the initial download of the app for a given "Apple ID."[172]

114. For each app, I define its genre (app category) based on the genre of its first recorded download.

115. I then aggregate the transactions data to the item-month level, where an item refers to either a download or in-app purchase.[173] I include observations from their first appearance until February 2, 2024.

116. Because in-app content can be discontinued or removed from the App store, I exclude in-app purchase item-years without transactions and app-years without downloads or related in-app purchases.

---

[171] In rare cases in which multiple downloads occur simultaneously, I consider the most expensive download as the initial download. For download transactions where ███████ exceeds one, I set the ███████ to one. The frequency of non-initial downloads across Apple ID-app combinations that I observe in the App Store transactions data is ███████. *See* Workpaper_Duplicate Download and Pre-Download IAPs, 'para113.xlsx.'

[172] Some in-app purchase items are never linked to a download, either because the ███████ is missing or because it is not associated with a ███████ in the transactions data. *See* Letter from Ethan Dettmer to Rachele R. Byrd and Ben Harrington, Re: *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR; *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.), May 5, 2021. (Interrogatory 10: "Continued investigation has not determined the reason why an in-app purchase would appear in the transactional data without a ███████"). Nearly all in-app purchases are preceded by a download for their respective apps in the App Store transactions data. *See* Workpaper_Duplicate Download and Pre-Download IAPs, 'para113.xlsx.'

[173] I classify transactions as downloads based on the ███████ field.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

117. I add the variables necessary for estimating demand to this item-month level dataset.[174]

118. I limit the dataset to apps that, at any point, ranked among the top 70 percent in revenue for any genre and year. This includes apps that, when ranked by revenue, collectively generate 70 percent of a category's total revenue in a given year.[175] If an app ranked among the top 70 percent in apps revenue in any year, I include this app in all years. Prof. McFadden demonstrated in his 2021 Opening Report that the distribution of the download and in-app purchase prices is not significantly different between the top 70 percent revenue apps and the other apps.[176]

119. My demand estimation uses 3 datasets derived from this processed data: in-app purchase item-month data, app-download-month data, and app-year data. I prepare these datasets for the following genre groupings: Business + Finance, Catalogs, Education, Food & Drink, Games, Health & Fitness + Medical, Imaging (Photo & Video + Graphics & Design), Music + Entertainment, Navigation + Travel, Reading (Book + Magazines & Newspapers + News + Reference), Shopping, Social Networking + Lifestyle, Sports, Stickers, Weather, Workflow Tools (Developer Tools + Productivity + Utilities).[177]

120. To prepare the month-level datasets, I first take the log of the number of in-app purchase transactions and downloads.[178] Next, I create indicator variables for each month-year, app, and

---

[174] For each item-month, I calculate total transactions, spending (excluding partial returns), net-spending (accounting for partial returns), royalties Apple collects from consumers and remits to developers, and the average item price. If no transactions are reported in a month for an in-app purchase item or app, I set transaction count, spending, net-spending and royalty to zero and carry forward the last known average price for that transaction. When an app reports multiple developers in a month, I determine the primary developer by number of downloads, total transactions from downloads and in-app purchases, and recency, so that the most recent developer is considered the primary developer. I calculate, for each in-app purchase item, the average number of other-genre transactions for in-app spenders. In addition, I calculate for each app the average number of other-genre downloads for app users (replacing missing values with zero), the number of downloads, the average download price, the summed price of all in-app purchases, total in-app purchase transactions, total in-app purchase spending, and the number of in-app purchases. Lastly, for each app, I calculate the number and average price of downloads for apps in other genres, as well as the number of in-app purchase transactions and downloads for apps in other genres from the same developer. Missing values for other-genre download prices are replaced with zero. *See* McFadden 2021 Opening Report, Appendix E ¶ 23.

[175] For the genres with a large volume of transactions ███████████ I set the threshold at the top 70 percent. For the genres with lower transactions volume ███████████ I define the threshold using the revenue percentile of the top app plus a small delta (1E-6). For instance, if the top app generates 90 percent of the total genre revenue, my analysis for that genre includes only the top app.

[176] McFadden 2021 Opening Report, Figure 27.

[177] *See* Section IV.A.1.

[178] I apply the log transformations as ln(x+1).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

in-app purchase item. For the app-download-month data, I use the app indicator to demean all numeric variables, while for the in-app purchase item-month data, I use the in-app purchase item indicator.[179] I also add the one-month lag of each app's download price to the app-month data.[180]

121. To prepare the app-year level datasets, I calculate the following variables at the app-genre-year level: the annual commission, average download price, average in-app purchase price, and total downloads and in-app purchase transactions. I designate each app's business (monetization) model at the year level as one of "Paid Download Only," "Paid Download IAP," or "Free Download IAP" based on sources of revenue. App-years with no spending are dropped.[181]

122. I also create 150 bootstrap datasets for each of the 75 0.1 percent samples in order to estimate standard errors for each demand coefficient. I sample with replacement from the item-month level dataset I created, and then create the app download-month, in-app purchase item-month, and app-year level datasets described above with the data for each of the 150 bootstrap datasets.

## C.4   Processing the ███████ Genre

123. The ███████ genre is the smallest genre within the App Store transactions data. Across the entire App Store transactions data, there are ██████ paid transactions in this genre totaling ████████ in spending.[182] These paid transactions are associated with just 70 apps and are exclusively associated with app downloads.[183] Due to the limited number of transactions in the ████████ genre, it is feasible to create an estimation dataset derived from the full set of transactions in the ████████ genre. This data extract includes all transactions from Apple IDs that have at least one transaction in the Catalogs genre. For these reasons, I slightly adjust the data processing steps described in Appendix C.3.

124. The data extract includes all transactions in the ███████ genre, whereas the 75 samples represent a random subset of person IDs transacting across all genres. Additionally, as with the 75

---

[179] The in-app purchase item-month data is demeaned at the in-app purchase item level, while the app-month data is demeaned at the app level.

[180] I drop months with missing lagged values.

[181] McFadden 2021 Opening Report, Appendix E ¶ 27

[182] *See* Workpaper_In-text Citations, 'para123.csv.'

[183] *See* Workpaper_In-text Citations, 'para123.csv.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

samples, certain instrumental variables require data from ▮▮▮▮▮ genres. I construct these instrumental variables using the 75 samples to ensure they represent a random subset of the full dataset.

125.  Specifically, I first filter the 75 random data samples to include ▮▮▮▮ evelopers operating in ▮▮▮▮▮ genres. Transaction quantities are aggregated by month and developer, and merged back into the main ▮▮▮▮ dataset to provide a monthly, developer-level measure of transaction quantity in ▮▮▮▮ genres.

### C.5    The Full Data for Damages Calculations

126.  To create the full data for damages estimation I start with the full transactions data, and then remove the same sets of transactions from the data as in Appendix C.2. Because of the scale of the full transactions data, I then divide the dataset into 211 smaller datasets to facilitate more manageable data preparation for my damages calculations.[184]

127.  Across each of the 211 smaller datasets, I apply a data processing methodology similar to the steps described in Appendix C.3 in preparing app-month datasets for each genre grouping. I proceed as follows:

- I remove refunds, refunded transactions, non-initial downloads, and pre-download in-app purchase transactions.

- For each app, I define an app-level genre variable based on the genre of its first recorded download.

- I then aggregate the transactions data to the item-month level, including app downloads, from its first appearance until February 2024.

- Because in-app purchase items and apps can be discontinued or removed from the App store, I exclude app-years without downloads or associated in-app purchase transactions.

---

[184]  The 211 smaller datasets are created by assigning a group number to each app (▮▮▮▮▮▮'). Apps are grouped based on their cumulative transaction counts, with each group containing approximately ▮▮▮▮▮ transactions. The group number is assigned according to where each app's cumulative transaction count falls, ensuring that chunks are similar in size. This approach also ensures that the complete transaction history of an app is contained within a single chunk.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- For each item-month, I calculate the total count of transactions, spending (excluding partial returns), net-spending (accounting for partial returns), the royalty Apple collects from consumers and remits to developers, and the average item price. When an in-app purchase item or app has no transactions in a month, I set the transaction count, spending, net spending, and royalty to zero and report the most recent non-missing average price.

- For each app, I calculate the number of downloads, the average download price, the total price of all in-app purchases, total number of in-app purchase transactions, total in-app purchase spending, and the total number of in-app purchases.

128. Next, I remove free apps and aggregate the data to the app-month level data for use in my damages calculations. For each app-month, I calculate the monthly commission, average download price, average in-app purchase item price, and total downloads and in-app purchase transactions. I designate each app's business model at the month level as one of "Paid Download Only," "Paid Download IAP," or "Free Download IAP" based on sources of revenue. App-months with no spending are dropped.

129. For each of the 211 chunks of full data, I group app-months according to their genre grouping and stack app-month observations in the same genre groupings across the 211 chunks into unified datasets. These unified datasets serve as the input into the marginal cost calculations and the But-For price simulation described in Appendix D.1.d.

## C.6    Supplemental Payor ID Data

130. Apple provided a supplemental dataset with anonymized payor IDs on January 17, 2025, which I understand represent individual persons and their associated transaction IDs.[185] However, the supplemental dataset did not include payor IDs for 0.2 percent of transactions with non-zero spending in the App Store transactions data.[186] To address this, Apple produced a second supplemental dataset on February 14, 2025 to match most—but not all—of these transactions with their corresponding payor IDs. In this second production, Apple included a list of

---

[185]  APL-APPSTORE_11418586. *See also*, Apple's Payor Data Supplemental Production Letter.

[186]  *See*, Apple's Payor Data Supplemental Production Letter. *See also*, Email from Ramona Lin to Kyle M. Wood, et al. (January 24, 2025).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

approximately ███ transactions that it instructed should be removed from the first supplemental payor ID dataset.[187]

131. To prepare the payor ID data, I stacked both datasets to link transactions with their corresponding payor IDs. Following Apple's instructions, I then removed the roughly ███ transactions from the combined dataset.[188] After merging the payor ID data with the App Store transactions data, 0.018 percent of non-zero paid transactions remain unmatched to their corresponding payor IDs.[189]

### C.7    The IDC Data

132. The Brattle Group purchased the IDC Mobile Phone Tracker ("IDC phone data") and IDC's Personal Computing Device Tracker ("IDC tablet data") datasets from the IDC on September 23, 2024. The IDC provided the IDC phone data and IDC tablet data as pivot tables, allowing me to select the fields necessary for my analysis. Both the IDC phone and tablet datasets I obtained were pre-filtered to U.S. data only.[190] Furthermore, while IDC's Personal Computing Device Tracker tracks devices other than tablets, namely Desktops, Notebooks, and Workstations, the Personal Computing Device Tracker I received has been pre-filtered to only include tablets.[191] As described in Section VI.A, the IDC phone and tablet datasets record quarterly shipments and their corresponding dollar values for mobile phones and tablets separately across all distribution channels.[192]

---

[187]  *See* Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025).

[188]  *See* Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025).

[189]  *See* Letter from Eli M. Lazarus to Rachele R. Byrd, et al. (February 14, 2025).

[190]  The taxonomy documents indicate that IDC records data for the United States, Canada, Japan, EMEA (Europe, the Middle East and Africa), Asia/Pacific, and Latin America. *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 20; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 18. The data I use to calculate shares is limited to the United States. *See* Workpaper_IDC Shares, in the "Raw IDC Data" files.

[191]  The taxonomy document indicates that Personal Computing Device Tracker also records data for Desktop, Notebooks, and Workstations. *See* IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 1. The data I use to calculate shares contains "Slate Tablet" and "Detachable Tablet" for the "Product Category" field. *See* Workpaper_IDC Shares, in the "Raw IDC Data" files.

[192]  "Distribution channel" is defined as "the channel from which end uses purchase new devices. IDC does not track intermediate movements, such as vendor sales to first-tier distributors. For example, if a vendor sells to a mobile operator that then sells on to a retailer, IDC will capture the channel as retail [first-tier distributor], not telco [mobile operator]." See IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December

Continued on next page

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

133. The fields I include or exclude determine the number of columns and rows of each dataset. The number of rows and columns shapes the data's granularity, such as whether it is quarterly or annual, and the level of detail regarding device specifications.[193] While there is significant overlap in fields between the IDC phone and tablet datasets, there exist some fields exclusive to each device, and the values of each field can differ. The fields I use for my share calculations from each dataset are described below:

- "*Product Category*": This describes the product category of the shipment. For the IDC phone dataset, it can take the following two values: "*Smartphone*" or "*Feature phone*".[194] For the IDC tablet dataset, it can take the following two values: "*Slate tablet*" or "*Detachable tablet*".[195]

- "*Brand*": This field describes the brand under which the shipment was sent.[196] The IDC contains other fields to denote the corporate or legal entity a shipment belongs to, such as "*Vendor*" or "*Company*".[197]

---

2021, p. 13; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 13.

[193] The granularity of device specifications that the IDC allows can include characteristics such as Screen Size and Storage Size. *See, e.g.*, IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 12.

[194] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 3.

[195] IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 5. The IDC defines slate tablets as "portable, battery-powered computing devices that do not have a permanently attached keyboard and use touch as a primary user interface (though this may be supplemented by other input methods such as a pen, mouses, or keyboard) … The device must have a color display that is at least 7.0 inches but also less than 16.0 inches. Slate tablets do not offer an optional first-party keyboard." Detachable tablets are defined as a tablet that "meets all the criteria of a slate tablet but is designed and marketed to operate with a first-party keyboard designed specifically for the device." *See* IDC "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021," February 2021, pp. 8-9.

[196] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 4; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 33.

[197] The "*Vendor*" field reflects "in the current reporting period, the financial, legal, or corporate group entity that existed prior to a merger or an acquisition". The "*Company*" field reflects in the current reporting period, "the financial, legal, or corporate group entity that exists as the outcome of mergers or acquisitions as if it had been one financial, legal, or corporate group entity throughout all historical time periods". *See* IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 4; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 33.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- "*Model Name*": This field describes the model name of the device contained within the shipment.[198] I note that IDC only started recording this field in 2010, hence this field is not populated for any observations before 2010.[199]

- "*OS*": This field describes the operating system of the device contained within the shipment.[200]

- "*Value*": This field describes the unit of measurement for the shipment. This field takes three values: "*Units*", "*Value (US$M)*", and "*ASP (US$)*".[201] "*Units*" refers to the number of units shipped.[202] "*Value (US$M)*" refers to "the amount of money paid by end users for products", in millions.[203] Lastly, "*ASP (US$)*" refers to "Average Selling Price" and is an "estimate of the final price by the average end users" for the device.[204] These units of measurements are interrelated, as the total value of a shipment is calculated as: Value = Units x ASP.[205]

- "*20XXQ1*" to "*2024Q2*": A series of fields to record the shipment quantity based on the three measures of "*Values*" on a quarterly basis. For the IDC phone data, there are a total of 82 quarterly fields to describe the shipment for each quarter from 2004 Q1 to 2024 Q2. For the IDC tablet data, there are a total of 58 quarterly fields to describe the shipment for each quarter from 2010 Q1 to 2024 Q2.

134. When all the fields described above are selected from the pivot table to create the respective initial datasets, the datasets reports the value, units shipped, and ASP for every combination of categorical variables for each quarter covered in the respective datasets. I then annualize the

---

[198] *See, e.g.,* Workpaper_IDC Shares, in the "Raw IDC Data" files.

[199] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 14.

[200] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 10; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 10.

[201] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 33-36; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, pp. 34-37.

[202] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, pp. 33-36; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, pp. 34-37.

[203] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 36; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 37.

[204] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 35; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 36.

[205] IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2021," December 2021, p. 36; IDC, "IDC's Worldwide Personal Computing Device Tracker Taxonomy, 2021", February 2021, p. 37.

datasets by separately summing the number of shipped units and corresponding value of those shipments by year for every combination of all categorical variables, filtering out all observations with shipments measured in "ASP (US$)". Combinations of categorical variables where no shipments occurred are removed from the datasets.

135. The final IDC phone data has 9,397 observations and 7 fields. The final IDC tablet data has 4,590 observations and 7 fields. Each observation represents the annual sum of shipments for a given combination of all categorical fields based on the measurement of the "*Values*" field. All IDC share calculations throughout this report are based on these two final datasets.

# Appendix D Technical Details of Damages Estimation

## D.1    Model Estimation Methodology

136. Overall, the methodology by which I estimate damages proceeds as follows. First, I draw 75 0.1 percent random samples from the full App Store transactions data.[206] Second, for each sample and genre group, I estimate the demand model specified in equations (1) and (2) below via a standard econometric method called the generalized method of moments (GMM).[207] Third, for each model parameter in each genre grouping, I calculate the average of the 75 estimated coefficients and the standard error of that average.[208]

### D.1.a    Demand for Apps and In-App Purchases

137. In the notation of Prof. McFadden's 2021 Opening Report, the following equations model the demand for app downloads and in-app purchases, respectively:[209]

(1)    $\log(Q_{jt}) = \alpha^d p_{jt}^d + X_{jt}^d \gamma^d + u_{jt}^d$

(2)    $\log(\omega_{jkt}) = \alpha^{IAP} p_{jkt}^{IAP} + \beta^Q \log(Q_{jt}) + X_{jkt}^{IAP} \gamma^{IAP} + u_{jkt}^{IAP}$

---

[206]    *See* Appendix C.3 for a description of how I draw the 75 samples. *See also,* McFadden 2023 Supplemental Report, ¶ 58, McFadden 2023 Reply Report, ¶ 43, and McFadden 2021 Reply Report, ¶¶ 165-166 and 168-169.

[207]    *See* Appendix D.1.a, D.1.b, and D.1.c.i. *See also,* McFadden 2021 Opening Report Sections VI.D., VI.E., and Appendix E.2; McFadden 2023 Supplemental Report Section II.A. and Appendix E.

[208]    *See* AppendixD.1.c.iii and Appendix D.1.c.iv. *See also,* McFadden 2023 Supplemental Report ¶ 58 and footnote 72.

[209]    *See* McFadden 2021 Opening Report, ¶¶ 180, 209-210 and Appendix E.2 ¶¶ 29-30. *See also,* McFadden 2023 Supplemental Report, ¶¶ 107-108.

138. In the above equations, subscript $j$ indexes the app, subscript $t$ indexes the time period (year and month), and subscript $k$ indexes the in-app purchase item. The variable $Q$ represents the number of app downloads, $\omega$ is the number of in-app purchase items purchased, $p^d$ is the price per app download, and $p^{IAP}$ is the average in-app purchase item price. In equation (1), $X^d$ represents a vector of control variables that includes app and time fixed effects. In equation (2), $X^{IAP}$ represents a vector of control variables that includes item and time fixed effects. $u^d$ and $u^{IAP}$ represent the residuals for the app download and in-app purchase equations, respectively.[210]

139. The download price coefficient ($\alpha^d$) and the in-app purchase item price coefficient ($\alpha^{IAP}$) capture consumers' download and in-app purchase price sensitivities, respectively. The coefficient on the log of app downloads ($\beta^Q$) in equation (2) captures how the number of downloads for any particular app affects demand for in-app purchase items in the same app and month.[211] I estimate the download and in-app purchase demand equations for each genre grouping.[212] As a result, I obtain a different estimate of $\alpha^d$, $\alpha^{IAP}$, and $\beta^Q$ for each genre grouping.

### D.1.b     App Developer Pricing

140. As in Prof. McFadden's prior reports, I model app developers as firms setting app-level download and in-app purchase prices to maximize their profits.[213] As described in Section II of this report, apps that sell digital content through the App Store broadly fall into one of three business models: (1) paid download apps with no paid in-app purchase items (Paid Download Only apps), (2) free download apps that sell paid in-app purchase items (Free Download IAP apps), and (3) paid download apps that also sell paid in-app purchase items (Paid Download IAP apps).[214] Below, I explain how I model app developers' pricing decision for each of the three business models.

---

[210]   *See* McFadden 2021 Opening Report, ¶ 180. *See also*, McFadden 2023 Supplemental Report, ¶ 108.

[211]   *See* McFadden 2021 Opening Report, ¶ 181.

[212]   I rely on Prof. MacCormack's genre groupings. *See* Section IV.A.1. The Catalogs genre does not have any in-app purchase transactions. Therefore, I only estimate the download demand equation for the Catalogs genre.

[213]   *See* McFadden 2021 Opening Report, ¶ 137. *See also,* McFadden 2023 Supplemental Report, ¶ 106.

[214]   *See* Section II.A. *See also,* McFadden 2021 Opening Report, Appendix E ¶ 27; McFadden 2023 Supplemental Report, ¶ 109.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

141. Paid Download Only apps select a download price ($p_{jt}^d$) to maximize profits, taking as given the commission rate they face ($\tau_{jt}$) and the non-commission portion of their marginal costs ($c_{jt}^d$) of operating their app business. $Q_{jt}$ represents the number of app downloads and is a function of the download price as described in Appendix D.1.a. Thus, the profit function for these apps is given by:[215]

$$(3) \quad \pi_{jt}\left(p_{jt}^d\right) = \left((1 - \tau_{jt})p_{jt}^d - c_{jt}^d\right) Q_{jt}$$

142. The profit maximizing price is the point at which the marginal revenue and marginal cost are equal and is given by $p_{jt}^{d\,*} = \max\left(0, -\frac{1}{\alpha^d} + \frac{c_{jt}^d}{(1-\tau_{jt})}\right)$. Given an estimate for consumers' download price sensitivity, the marginal cost of the app, and the commission rate faced by the app, I can determine the app's profit maximizing price using this equation. Similarly, when the download price is positive, this equation can also be used to solve for the marginal cost for Paid Download Only apps: $c_{jt}^d = (1 - \tau_{jt})\left(p_{jt}^{d\,*} + \frac{1}{\alpha^d}\right)$.[216]

143. The profit function for Free Download IAP apps is identical in form to that of Paid Download Only apps: They select an average in-app purchase price ($p_{jt}^{IAP}$) given the commission rate they face and the non-commission component of their marginal costs ($c_{jt}^{IAP}$).[217] The profit function for these apps is shown below. $\omega_{jt}$ represents in-app purchase sales after aggregating the individual in-app purchase items into a composite app-level in-app purchase.[218]

$$(4) \quad \pi_{jt}\left(p_{jt}^{IAP}\right) = \left((1 - \tau_{jt})p_{jt}^{IAP} - c_{jt}^{IAP}\right) \omega_{jt}$$

144. Similar to Paid Download Only apps, developers will set their in-app purchase price for Free Download IAP apps such that the marginal revenue and marginal costs of selling in-app purchases are equal. Mathematically, the profit maximizing in-app purchase price is $p_{jt}^{IAP\,*} =$

---

[215] *See* McFadden 2021 Opening Report, ¶ 173. *See also,* McFadden 2023 Supplemental Report, ¶ 110.

[216] *See* McFadden 2021 Opening Report, Appendix E ¶ 36. *See also,* McFadden 2023 Supplemental Report, ¶ 110.

[217] Developers are modeled to set the average price of in-app content at the app-level. *See* McFadden 2023 Reply Report, ¶ 108. *See also,* McFadden 2021 Opening Report, Appendix E ¶¶ 36, 42-43. *See also*, McFadden 2021 Reply Report, ¶ 142. *See also,* McFadden 2023 Supplemental Report, ¶ 42 and footnote 55.

[218] *See* McFadden 2021 Opening Report, ¶ 174. *See also,* McFadden 2023 Supplemental Report, ¶ 113.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

$\max\left(0, -\frac{1}{\alpha^{IAP}} + \frac{c_{jt}^{IAP}}{(1-\tau_{jt})}\right)$ and, when the in-app purchase price is positive, the app marginal cost

is $c_{jt}^{IAP} = (1 - \tau_{jt})\left(p_{jt}^{IAP*} + \frac{1}{\alpha^{IAP}}\right)$.[219]

145.  Paid Download IAP apps make money by charging for both app downloads and in-app purchases. Hence, their profit function is given by:[220]

$$(5) \quad \pi_{jt}\left(p_{jt}^d, p_{jt}^{IAP}\right) = \left((1-\tau_{jt})p_{jt}^d - c_{jt}^d\right) Q_{jt} + \left((1-\tau_{jt})p_{jt}^{IAP} - c_{jt}^{IAP}\right)\omega_{jt}$$

The profit maximizing average in-app purchase price is $p_{jt}^{IAP*} = \max\left(0, -\frac{1}{\alpha^{IAP}} + \frac{c_{jt}^{IAP}}{(1-\tau_{jt})}\right)$. The

profit maximizing download price satisfies the equation $p_{jt}^{d*} = \max\left(0, -\frac{1}{\alpha^d} + \frac{c_{jt}^d}{(1-\tau_{jt})} + \frac{\beta^Q \omega_{jt}}{\alpha^{IAP}Q_{jt}}\right)$,

which differs in form relative to the profit maximizing download price for Paid Download Only apps.[221] This difference occurs because developers of Paid Download IAP apps account for the impact of their download prices on both app download and in-app purchase quantities. Again, when prices are positive, I can use these equations to solve for the marginal costs. The marginal cost of in-app purchases is $c_{jt}^{IAP} = (1-\tau_{jt})\left(p_{jt}^{IAP*} + \frac{1}{\alpha^{IAP}}\right)$, and the marginal cost of downloads

is $c_{jt}^d = (1 - \tau_{jt})\left(p_{jt}^{d*} + \frac{1}{\alpha^d} - \frac{\beta^Q \omega_{jt}}{\alpha^{IAP}Q_{jt}}\right)$.[222]

146.  The profit maximizing prices presented above are derived mathematically by setting the first derivative of the profit functions equal to zero (i.e., $\frac{\partial \pi_{jt}}{\partial p_{jt}^d} = 0$ and $\frac{\partial \pi_{jt}}{\partial p_{jt}^{IAP}} = 0$) and solving the resulting equations for price.[223] The prices derived from these first-order condition represent profit maximizing prices when the second derivative of the profit function is non-positive (i.e.,

---

219  *See* McFadden 2021 Opening Report, Appendix E ¶ 36. *See also,* McFadden 2023 Supplemental Report, ¶ 113.

220  *See* McFadden 2021 Opening Report, ¶ 170. *See also,* McFadden 2023 Supplemental Report, ¶ 116.

221  *See* McFadden 2021 Opening Report, Appendix E ¶ 36. *See also,* McFadden 2023 Supplemental Report ¶¶ 116-118.

222  *See* McFadden 2021 Opening Report, Appendix E ¶ 36. *See also,* McFadden 2023 Supplemental Report ¶¶ 116-118.

223  *See* McFadden 2021 Opening Report, ¶¶ 171-174. *See also,* McFadden 2023 Supplemental Report ¶ 116.

$\frac{\partial^2 \pi_{jt}}{\partial p_{jt}^{d\,2}} \leq 0$ and $\frac{\partial^2 \pi_{jt}}{\partial p_{jt}^{IAP\,2}} \leq 0$).[224] These second-order conditions hold for Paid Download Only apps, Free Download IAP apps, and for Paid Download with IAP apps' in-app purchase prices whenever consumers' demand for downloads and in-app purchases is downward sloping, i.e., $\alpha^d, \alpha^{IAP} < 0$.

147. The second-order condition for Paid Download with IAP apps' download price requires an additional restriction on the value of the log downloads coefficient $\beta^Q$. After substituting in the download price derived from their first-order condition, the second derivative of the Paid Download IAP apps' profit function with respect to the download price is:

$$(6) \quad \frac{\partial^2 \pi_{jt}}{\partial p_{jt}^{D\,2}} = \left(1 - \tau_{jt}\right)\alpha^D \left(Q_{jt} + \frac{\beta^Q(1-\beta^Q)\alpha^D}{\alpha^{IAP}}\,\omega_{jt}\right)$$

148. This second derivative can be positive when $\beta^Q$ is negative or greater than 1 depending on the volume of in-app purchases relative to the volume of app downloads. The sufficient conditions for equation (6) to be non-positive are $\alpha^d, \alpha^{IAP} < 0$ and $\beta^Q \in (0,1)$.

### D.1.c    Demand Model Estimation

#### D.1.c.i    GMM Estimation

149. For a given sample and genre group, the demand model is estimated using an econometric technique called the generalized method of moments ("GMM").[225] The GMM procedure estimates regression parameters by minimizing the GMM criterion function, which summarizes the distance between model-predicted moments and the data.[226] The GMM criterion function $f$ is the following:

$$f = f^d + f^{IAP}$$

where

$$f^d = u^{d'} Z^d \left(Z^{d'} Z^d\right)^{-1} Z^{d'} u^d$$

---

[224]  *See* A.K. Dixit, *Optimization in Economic Theory*, 2nd Ed., (Oxford: Oxford University Press, 1990), p. 106.
[225]  McFadden 2021 Opening Report, Appendix E.2 ¶ 31.
[226]  McFadden 2021 Opening Report, Appendix E.2 ¶ 31.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

$$f^{IAP} = u^{IAP\prime} Z^{IAP} \left( Z^{IAP\prime} Z^{IAP} \right)^{-1} Z^{IAP\prime} u^{IAP}$$

$Z^d$ is a matrix of exogenous variables and instruments for download demand, and $Z^{IAP}$ is a matrix of exogenous variables and instruments for in-app purchase demand.[227] $u^d$ and $u^{IAP}$ are vectors of residuals for download and in-app purchase demand, respectively.

150. The GMM estimation procedure solves the following optimization problem: For each genre group and sample, minimize the GMM criterion function subject to the average developer margin bounds and constraint on the app downloads coefficient, $\beta^Q$. Mathematically,

$$f = \min_{\alpha^d, \alpha^{IAP}, \beta^Q} f^d + f^{IAP} \; s.t. \; lb < \overline{m1}, \overline{m2} < ub; 0 < \beta^Q < 1$$

$$\overline{m1} = \frac{1}{N} \sum_{j,year} \frac{p^d_{j,year} - c^d_{j,year}}{p^d_{j,year}}$$

$$\overline{m2} = \frac{1}{N} \sum_{j,year} \frac{p^{IAP}_{j,year} - c^{IAP}_{j,year}}{p^{IAP}_{j,year}}$$

$$c^d_{j,year} = \left( 1 - \tau_{j,year} \right) \left( \frac{1}{\alpha^d} + p^d_{j,year} \right)$$

$$c^{IAP}_{j,year} = \left( 1 - \tau_{j,year} \right) \left( \frac{1}{\alpha^{IAP}} + p^{IAP}_{j,year} \right)$$

---

[227] I use the following instrumental variables ("IVs") in my GMM estimation. For the Music & Entertainment genre grouping, the IV for app download price is the lag of the app download price, and the IVs for in-app purchase price and the log downloads variable are the average app download price for apps sold by the same developer in other genres in the same month and the total number of in-app purchase transactions in other genres in the same month. For all other genres, the IV for app download price is the lag of the app download price, and the IVs for in-app purchase price and the log downloads variable are the number of app download transactions for apps sold by the same developer in other genres in the same month and the number of in-app purchase transactions sold by the same developer in other genres in the same month. For all genres, the download demand estimation controls include app fixed effects, year-month fixed effects, and the average number of downloads in other genres by accounts that downloaded the app. The in-app purchase demand estimation controls include in-app purchase-item fixed effects, year-month fixed effects, and the average number of in-app purchase transactions in other genres by accounts that made an in-app purchase transaction in the app.

where, $\overline{m^1}$ and $\overline{m^2}$ are average model-predicted margins for Paid Download Only and Free Download IAP apps, respectively.[228] $\overline{m^1}$ and $\overline{m^2}$ are functions of the demand parameters $\alpha^d$ and $\alpha^{IAP}$ through the app download marginal costs ($c^d_{j,year}$) and in-app purchase marginal costs ($c^{IAP}_{j,year}$), respectively.[229] $lb$ and $ub$ are genre-specific lower and upper margin bounds. I summarize the precise values of the margin bounds I use in Figure 19.[230] One estimation constraint is for $\overline{m^1}$ and $\overline{m^2}$ to be between the lower and upper margin bounds.[231] Another constraint is that the coefficient of log downloads on in-app purchase demand $\beta^Q$ be between 0 and 1.[232]

151.   The estimation algorithm searches over demand model parameters ($\alpha^d, \alpha^{IAP}, \beta^Q$) to solve the GMM minimization problem separately for each genre group. I implement the GMM estimation algorithm using MATLAB's $fmincon$ command.[233]

### D.1.c.ii    Margin Bounds Adjustments

152.   One input into the GMM estimation procedure described in the previous subsection is the genre-level variable profit margin bounds. I understand that Prof. MacCormack has estimated the variable profit margin ranges for each genre, or group of genres, in the App Store transactions data. As described in Section IV.A.1, I adjust Prof. MacCormack's gross margin ranges to calculate the gross margin bounds I use when estimating demand. I perform these adjustments to

---

[228]   I apply the margin bounds to average margins calculated using app-year observations from 2017 onwards. I omit app-year observations with a change in the download price within the year. *See* McFadden 2021 Opening Report, Appendix E ¶ 27 and footnote 292.

[229]   *See* McFadden 2021 Opening Report, Appendix E.2 ¶ 33.

[230]   *See also,* Section IV.A.1.

[231]   *See* McFadden 2021 Opening Report, ¶¶ 140-142 and Appendix E ¶¶ 32-34. *See also,* McFadden 2021 Reply Report, ¶¶ 149-150.

[232]   This constraint is consistent with app profit-maximization. Economists sometimes impose constraints on parameter values when estimating demand to speed up estimation and rule out unreasonable values. *See* Christopher Conlon and Jeff Gortmaker, "Best practices for differentiated products demand estimation with PyBLP," *The RAND Journal of Economics* 51(4) (2020): 1108-1161, p. 1120 ("Some optimization routines allow the user to input constraints on parameters, which can speed up estimation and prevent the optimization routine from considering 'unreasonable' values… Some typical constraints are that demand slopes down and that random coefficients have nonnegative but bounded variances.").

[233]   *See* "Find minimum of constrained nonlinear multivariable function - MATLAB fmincon," *Mathworks*, accessed February 18, 2025, https://www.mathworks.com/help/optim/ug/fmincon.html#description.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

account for slight differences between the gross margin formula used by Prof. MacCormack and the gross margin formula I use in this report's GMM estimation procedure.

153. The MacCormack Initial Report uses the following gross margin formula when estimating margin ranges:

$$MacCormack\ GM = \frac{R^{paid} - C^{paid}}{R^{paid}}$$

where $R^{paid}$ and $C^{paid}$ are the revenue and costs from paid users for a developer, respectively.[234] Prof. MacCormack's gross margin formula can be re-written as:

$$MacCormack\ GM = \frac{\left(R^{paid,digital} + R^{paid,ancillary}\right) - \left(C^{paid,digital} + C^{paid,ancillary}\right)}{R^{paid,digital} + R^{paid,ancillary}}$$

where $R^{paid,digital}$ and $C^{paid,digital}$ are the revenue and costs, respectively, from digital sources for paid users, and $R^{paid,ancillary}$ and $C^{paid,ancillary}$ are the revenue and costs, respectively, from ancillary sources for paid users.[235]

154. The denominator, but not the numerator, of this expression differs from the gross margin formulas I use to calculate $\bar{m}^1$ and $\bar{m}^2$ in the GMM estimation procedure described in Appendix

---

[234]  *See* MacCormack Initial Report, Appendix C.5 equation 5. *See also*, MacCormack Initial Report, ¶ 94 equation 1.

[235]  Professor MacCormack defines *digital revenue* as paid downloads and IAPs; and *ancillary revenue* as earnings from sources like advertising. *See* MacCormack Initial Report, Section 5.2. Prof. MacCormack mathematical notation differs slightly from my own. For example, Prof. MacCormack defines the revenue from paid users as the sum of digital and ancillary revenue from paid users: $R_{paid} = R_{digital} + U_{paid} * R_{ancillary}$. *See* MacCormack Initial Report, Appendix C.5 equation 10. In Prof. MacCormack's notation, $R_{paid}$ is the revenue from paid users, $R_{digital}$ is the digital revenue from paid users, and $U_{paid} * R_{ancillary}$ is the ancillary revenue from paid users. I instead denote the revenue from paid users as $R^{paid}$, digital revenue from paid users as $R^{paid,digital}$, and ancillary revenue from paid users as $R^{paid,ancillary}$. Similarly, Prof. MacCormack defines the costs from paid users as the sum of costs from digital and ancillary sources for paid users: $C_{paid} = C_{digital} + U_{paid} * C_{ancillary}$. *See* MacCormack Initial Report, Appendix C.5 equation 11. In Prof. MacCormack's notation, $C_{paid}$ is the cost of paid users, $C_{digital}$ is the digital cost of paid users, and $U_{paid} * C_{ancillary}$ is the ancillary cost of paid users. I instead denote the cost of paid users as $C^{paid}$, the digital cost of paid users as $C^{paid,digital}$, and the ancillary cost of paid users as $C^{paid,ancillary}$.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

D.1.c.i above. Consider as an example the gross margin formula I use for the Free Download IAP business model:[236]

$$McFadden\ GM = \frac{p^{IAP} - c^{IAP}}{p^{IAP}}$$

where $p^{IAP}$ and $c^{IAP}$ are the price and marginal cost of in-app purchases, respectively. This gross margin formula can be re-written as:[237]

$$McFadden\ GM = \frac{\left(R^{paid,digital} + R^{paid,ancillary}\right) - \left(C^{paid,digital} + C^{paid,ancillary}\right)}{R^{paid,digital}}$$

155. Prof. MacCormack's gross margin formula differs from my gross margin formula in that the ancillary revenue from paid users is included in the denominator of Prof. MacCormack's formula but not included in the denominator of my formula. To adjust the margin ranges in the MacCormack Initial Report so that they are consistent with my gross margin formula, I multiply Prof. MacCormack's gross margin ranges by the following adjustment factor:

$$\frac{McFadden\ GM}{MacCormack\ GM} = 1 + \frac{R^{paid,ancillary}}{R^{paid,digital}}$$

156. ████████████████████████████████████████████████

████████████████████████████████████████████████

---

[236] This is the same gross margin formula used by Prof. McFadden in his prior reports when calculating the average developer margin, so I denote it as "McFadden GM" in the formulas. *See* McFadden 2021 Opening Report Appendix E ¶ 33. The mathematical expressions that follow are structurally identical if I instead use the Paid Download Only business model to derive them.

[237] Multiplying both the numerator and denominator of McFadden GM by in-app purchase quantity, $\omega$, my margin formula can be re-written as $\frac{p^{IAP}\omega - c^{IAP}\omega}{p^{IAP}\omega}$. Because the marginal cost term in this report's model captures both the cost of selling in-app purchase and ancillary profits from paid users, it can be re-written as $c^{IAP} = c^{paid,digital} - (p^{paid,ancillary} - c^{paid,ancillary})$ where $p^{paid,ancillary}$ and $c^{paid,ancillary}$ are the per-unit ancillary revenue and costs, respectively. *See* McFadden 2023 Reply Report, ¶ 81 ("My model accounts for in-app advertising revenue as a negative component of the marginal cost."). Substituting this expression for the marginal cost term in this report's model, my gross margin formula becomes $\frac{p^{IAP}\omega + p^{paid,ancillary}\omega - c^{paid,digital}\omega - c^{paid,ancillary}\omega}{p^{IAP}\omega}$. Since $p^{IAP}$ is equivalent to the price paid for digital content, $R^{paid,digital} = p^{IAP} \times \omega$. Similarly, $R^{paid,ancillary} = p^{paid,ancillary} \times \omega$ is the ancillary revenue from paid users, $C^{paid,digital} = c^{paid,digital} \times \omega$ is the digital cost from paid users, and $C^{paid,ancillary} = c^{paid,ancillary} \times \omega$ is the ancillary cost from paid users. Therefore, my margin formula can be written as $McFadden\ GM = \frac{R^{paid,digital} + R^{paid,ancillary} - C^{paid,digital} - C^{paid,ancillary}}{R^{paid,digital}}$.



158.

---

238  MacCormack Initial Report, ¶ 47.

239  MacCormack Initial Report, ¶ 48 *generally* and footnote 34.

240  Define $R^{free,ancillary}$ as ancillary revenue from free users, $R^{ancillary} = R^{paid,ancillary} + R^{free,ancillary}$ as ancillary revenue from all users, and $R^{total} = R^{paid,digital} + R^{ancillary}$ as total revenue from all users. Furthermore, let $\mu_1 = \frac{R^{paid,digital}}{R^{total}}$ be the fraction of total revenue attributal to digital revenue and $\mu_2 = \frac{R^{paid,ancillary}}{R^{ancillary}}$ be the fraction of all ancillary revenue attributable to paid users. Then $\mu_2 \times \frac{1-\mu_1}{\mu_1} = \frac{R^{paid,ancillary}}{R^{ancillary}} \times \frac{R^{ancillary}}{R^{paid,digital}} = \frac{R^{paid,ancillary}}{R^{paid,digital}}$.



---

[241] In all samples where the average commission rate is higher than the lower margin bound in column [5] of Figure 19, I use the average commission rate as the lower margin bound in demand estimation. *See* MacCormack Initial Report, Section 6.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

*D.1.c.iii     75 Samples Averaging*



---

242  *See* McFadden 2023 Supplemental Report, ¶ 58 *(* "1. I use Prof. Prince's random sampling code after correcting his sorting error to draw 75 unique 0.1 percent samples. 2. Then I estimate my demand model with each of the 75 samples and compute the average of these 75 sets of demand estimates. 3. I subsequently use the average of these 75 sets of coefficients to calculate class-wide and account-level damages using the *full* App Store data."). (*italics* included in original).

243  *See* McFadden 2023 Supplemental Report, ¶ 63 ("By using the average value of the coefficients estimated from multiple samples, I greatly reduce statistical imprecision resulting from relying on a single sample.").

244  *See* McFadden 2021 Opening Report, Appendix E.1 ¶ 28. *See also*, McFadden 2023 Supplemental Report, footnote 72.

245  *See* Appendix C.3.



---

[246]  In some cases, the numeric optimization algorithm used to estimate the bootstrap samples stops without reaching the specified tolerance level for changes in the GMM objective function. I drop any bootstrap sample where this occurs, meaning I use fewer than 150 bootstrap samples to calculate the standard errors for some samples. In these instances, I adjust $B$ accordingly so that the standard error formula accounts for the number of bootstrap samples used.

[247]  *See* McFadden 2023 Supplemental Report, footnote 72.

[248]  *See* McFadden 2021 Opening Report, Appendix E ¶¶ 38-45.



---

[249] I do not calculate But-For prices for app-months where there was a download price change within the month, nor for Paid Download IAP app months with zero downloads. I assign zero damages to transactions associated with such app-months as a result. *See* McFadden 2023 Supplemental Report, footnote 75 ("As in my Reply Report, I assign zero damages for app-months that experience a within-month As-Is download price change because I assume these price changes represent temporary price reductions or price fluctuations that are not explained by fluctuations in demand or marginal costs.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER



---

250  This numeric optimization process is described in further detail in the McFadden 2021 Opening Report, ¶¶ 44-45.

251  *See* McFadden 2023 Supplemental Report, ¶¶ 86-87.

252  *See* Lauren Goode, "App Store 2.0," *The Verge*, June 8, 2016, accessed February 26, 2025, https://www.theverge.com/2016/6/8/11880730/apple-app-store-subscription-update-phil-schiller-interview. *See also*, Lauren Goode, "Apple's new subscription offerings are now available to App Store developers", *The Verge*, September 2, 2016, accessed February 27, 2025, https://www.theverge.com/2016/9/2/12774758/apple-developers-app-store-new-subscription-rules. *See also,* APL-APPSTORE_09281956; APL-APPSTORE_00199550; and APL-APPSTORE_05520482.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER



---

253  *See* "App Store pricing upgrades have expanded to all purchase types," *Apple Developer*, March 9, 2023, accessed February 18, 2025, https://developer.apple.com/news/?id=dbrszv62; "Apple App Store Pricing Update: United States Dollar (USD) markets," *Apple Newsroom*, accessed February 26, 2025, https://www.apple.com/newsroom/pdfs/App-Store-Pricing-Update.pdf. *See also*, Stiglitz Initial Report, Section II.D.

254  For the prices available before March 2023, I use the list of price tiers documented here: "A better App Store Pricing Matrix," *Equinux*, accessed February 18, 2025, https://www.equinux.com/us/appdevelopers/pricematrix.html. *See also*, McFadden 2021 Opening Report, ¶ 128; APL-APPSTORE_05520482; and Stiglitz Initial Report, Section II.D.

255  *See* McFadden 2023 Supplemental Report, ¶ 41.

███████████████████████ ██ ██████████████████████████████████████
████████████████████████████████████████████████████ ██

169. I use the delta method to calculate the standard errors for my damages estimates.[258] The delta method approximates the standard error of functions of estimated coefficients ($f(\theta)$) given the standard error of the coefficients ($\theta$) themselves. In addition to the standard error of the coefficients, the delta method formula takes as an input the derivative of the function, in this case damages, that transforms the underlying coefficients. I approximate the derivative of damages numerically in two steps. I first perturb the estimated coefficients upward and downwards by a value of $h$ and calculate damages at each of those perturbed coefficient values.[259] I then plug these values into the standard slope formula to obtain the numerical derivative: $\frac{f(\theta+h)-f(\theta-h)}{2h}$.[260]

## D.2    Statistical Significance of the Log-Downloads Coefficient

170. Figure 12 in Section V.A presents the 75-sample average demand coefficients estimated using the methodology described above. The estimated in-app purchase demand function includes log downloads as a covariate for genre groupings where it is statistically significant. However, the log downloads variable is omitted for the Health & Fitness + Medical genre grouping and the Imaging (Photo & Video + Graphics & Design) genre grouping because it is statistically insignificant when included. In this section, I present additional demand estimation results and

---

[256] I calculate transaction-level commissions by multiplying the consumer spending for each transaction by the average app-month commission rate, $\tau^{AS}$, associated with those transactions. *See* McFadden 2023 Supplemental Report, ¶¶ 41-43. *See also,* McFadden 2023 Reply Report, ¶¶ 111-113.

[257] *See* McFadden 2023 Supplemental Report, ¶¶ 42-43.

[258] *See* McFadden 2023 Supplemental Report, footnote 76. *See also*, Bruce E. Hansen, *Econometrics*, (Princeton University Press, 2022), pp. 161-162; Jeff Pitblado, "How are average marginal effects and their standard errors computed by margins using the delta method?," *Stata*, accessed February 18, 2025, https://www.stata.com/support/faqs/statistics/compute-standard-errors-with-margins/.

[259] I use a perturbation size of $h = 10^{-5}$ for the damages calculations assuming flexible But-For pricing. I instead use a perturbation size of $h = 10^{-2}$ for the damages calculations assuming Apple's price tiers remain in the But-For world due to the additional price rigidity caused by the price tiers. *See* Timothy Sauer, *Numerical Analysis*, (Pearson Education, Inc., 2012), pp. 247-248.

[260] I apply this "three-point centered-difference" numerical derivative for all coefficients, except for the log downloads coefficient for the Business + Finance genre grouping. Because the average log-downloads coefficient in the Business + Finance genre grouping is near zero, I use a "two-point forward difference" numerical derivative when calculating the derivative of damages with respect to the $\beta^Q$ coefficient in that genre. The forward difference formula is $\frac{f(\theta+h)-f(\theta)}{h}$. *See* Timothy Sauer, *Numerical Analysis*, (Pearson Education, Inc., 2012), pp 244-246.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

explain the statistical insignificance of the log-downloads variable for the Health & Fitness + Medical and Imaging genre groupings.

### D.2.a    Estimates for Demand Model with Log Downloads

171.  Figure 20 below shows the average demand coefficients and their associated standard errors when log downloads is included in the in-app purchase demand equations for *all* genre groupings.[261] For most genre groupings, these results are identical to those presented in Figure 12; but, for Imaging and Health & Fitness + Medical, the results in Figure 20 are different because the log downloads variable is included.

172.  As I explained in Appendix D.1.c.iv, I assess statistical significance by comparing the absolute value of the mean coefficient to its associated standard error. I consider a coefficient statistically significant if its absolute value is at least three times its associated standard error.[262] As shown in Figure 20, the mean download and in-app purchase price coefficients are statistically significant for all genres. However, the absolute value of the mean log download coefficient is smaller than three times its standard error for Imaging and Health & Fitness + Medical, meaning it is not statistically significant for these genres.[263] The mean log-downloads coefficient is statistically significant for all other genres.[264]

173.  Omitting the log downloads variable from the in-app purchase demand equation for Imaging and Health & Fitness + Medical has little effect on the price coefficient estimates. The estimated download and in-app purchase price coefficients with log-downloads included in Figure 20 are virtually the same as the download and in-app purchase price coefficients without log-downloads included in Figure 12.

---

[261]  The App Store transactions data do not include any in-app purchase transactions in the Catalogs genre, so the inclusion of the log downloads variable in the in-app purchase demand equation is moot for this genre. *See* Appendix C.4 for additional details about how I process data for the Catalogs genre.

[262]  *See* Michael R. Chernick, *The Essentials of Biostatistics for Physicians, Nurses, and Clinicians*, (Hoboken: John Wiley & Sons, Inc., 2011), p. 50. *See also*, Laurence Hoffman, Gerald Bradley, David Sobecki, and Michael Price, EBOOK: *Applied Calculus for Business, Economics and the Social and Life Sciences*, Expanded Edition, 11th ed., (McGraw-Hill Education: 2013), p. 867; McFadden 2023 Supplemental Report, footnote 77.

[263]  The mean coefficient for Imaging is 0.0000040 with a standard error of 0.00033. The mean coefficient for Health & Fitness + Medical is 0.018 with a standard error of 0.012.

[264]  Although the mean log downloads coefficient for Business + Finance is close to zero, the estimate is statistically significant. The mean coefficient is 0.00000014, while the standard error is 0.000000034.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 20: AVERAGE COEFFICIENTS AND ASSOCIATED STANDARD ERRORS WHEN INCLUDING LOG-DOWNLOADS IN ALL GENRES**

| Genre | Download Demand | IAP Demand | |
|---|---|---|---|
| | Download Price | IAP Price | Log Downloads |
| Games | -0.70 (0.001) | -0.30 (0.005) | 0.35 (0.004) |
| Music + Entertainment | -0.78 (0.002) | -0.55 (0.036) | 0.53 (0.024) |
| Social Networking + Lifestyle | -0.42 (0.002) | -0.16 (0.005) | 0.12 (0.005) |
| Imaging (Photo & Video + Graphics & Design) | -0.50 (0.001) | -0.30 (0.001) | 0.00 (0.000) |
| Reading (Book + Magazines & Newspapers + News + Reference) | -0.38 (0.001) | -0.23 (0.007) | 0.22 (0.022) |
| Navigation + Travel | -0.30 (0.001) | -0.16 (0.006) | 0.79 (0.035) |
| Health & Fitness + Medical | -0.50 (0.001) | -0.15 (0.000) | 0.02 (0.012) |
| Education | -0.66 (0.001) | -0.27 (0.001) | 0.96 (0.009) |
| Workflow Tools (Utilities + Productivity + Developer Tools) | -0.39 (0.001) | -0.45 (0.006) | 0.49 (0.019) |
| Business + Finance | -0.27 (0.001) | -0.11 (0.000) | 0.00 (0.000) |
| Sports | -0.43 (0.003) | -0.10 (0.000) | 0.12 (0.013) |
| Weather | -0.29 (0.002) | -0.18 (0.000) | 0.90 (0.009) |
| Food & Drink | -0.50 (0.003) | -0.25 (0.011) | 0.38 (0.021) |
| Shopping | -0.56 (0.007) | -0.38 (0.015) | 0.64 (0.014) |
| Stickers | -0.91 (0.002) | -0.94 (0.042) | 0.31 (0.036) |
| Catalogs | -0.30 (0.059) | | |
| Year-Month FEs | x | x | |
| App FEs | x | | |
| IAP FEs | | x | |
| Average Downloads in Other Genres By Accounts Downloading App | x | | |
| Average IAP in Other Genres By Accounts Making IAP in App | | x | |

Source: Brattle analysis of App Store transactions data.

Notes: Calculations for all genres except Catalogs are based on 75 0.1 percent random samples. Reported coefficients are the average coefficients across point estimates from each of the 75 0.1 percent random samples. Standard deviations for the individual sample coefficient estimates are calculated by bootstrap. The standard error of the mean is then calculated as a function of the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

individual sample standard deviations. See the formulas in Appendix D.1.c.iv. Catalogs is estimated using a single sample containing all Catalogs transactions in the App Store transactions data. There are no IAP transactions observed in the Catalogs genre, so I estimate only the download demand function for Catalogs. The standard error of the Catalogs download price coefficient is calculated by bootstrap. For all genres, app fixed effects and year-month fixed effects are included as explanatory variables in the app download demand. In-app-purchase item fixed effects and year-month fixed effects are included as explanatory variables in the in-app purchase demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of in-app purchase transactions in other genres for users who made an in-app purchase transaction is included in as an explanatory variable in the in-app purchase regression. The coefficient for the log-downloads variable is bounded to be between 0 and 1 in estimation.

174. Figure 21 summarizes the distribution of the 75 individual demand coefficient estimates from each 0.1 percent sample for each genre grouping when including the log-downloads variable in the in-app purchase demand equation. The median estimates—highlighted in blue—are close in value to the average coefficients presented in Figure 20. The 2.5[th] and 97.5[th] percentiles together constitute the inner 95 percent interval for each coefficient in each genre.[265] The inner 95 percent intervals show that the in-app purchase and download price coefficient estimates from the individual 0.1 percent samples are consistently negative and typically fall between 0 and -1. The Music + Entertainment and Stickers genre groupings have some individual in-app purchase price coefficient estimates within the inner 95 percent interval that are below -1. The inner 95 percent intervals for the log downloads coefficients show that the individual sample estimates fall between 0 and 1, consistent with the profit maximization constraint applied in estimation described in Appendix D.1. While the 75-sample average log downloads coefficients are in the interior of the 0 to 1 support for most of the genre groupings, the inner 95 percent intervals include some individual sample estimates that are equal to 0 or 1 for several genre groupings.

---

[265] These intervals could be used to inform the statistical significance of the individual sample coefficient estimates. They do not represent the dispersion of the 75-sample mean coefficient estimates, which are estimated with greater precision than individual sample estimates.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 21: DISTRIBUTION OF INDIVIDUAL SAMPLE DEMAND COEFFICIENT ESTIMATES WHEN INCLUDING LOG DOWNLOADS**

| Genre | Download Price | | | IAP Price | | | Log Downloads | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2.5% [A] | Median [B] | 97.5% [C] | 2.5% [D] | Median [E] | 97.5% [F] | 2.5% [G] | Median [H] | 97.5% [I] |
| Games | -0.737 | -0.698 | -0.654 | -0.348 | -0.328 | -0.151 | 0.120 | 0.347 | 0.515 |
| Music + Entertainment | -0.837 | -0.784 | -0.730 | -1.355 | -0.431 | -0.391 | 0.000 | 0.544 | 1.000 |
| Social Networking + Lifestyle | -0.466 | -0.424 | -0.369 | -0.261 | -0.120 | -0.099 | 0.000 | 0.117 | 0.240 |
| Imaging (Photo & Video + Graphics & Design)* | -0.530 | -0.500 | -0.474 | -0.321 | -0.296 | -0.273 | 0.000 | 0.000 | 0.000 |
| Reading (Book + Magazines & Newspapers + News + Reference) | -0.416 | -0.377 | -0.353 | -0.570 | -0.205 | -0.189 | 0.000 | 0.000 | 0.996 |
| Navigation + Travel | -0.322 | -0.297 | -0.272 | -0.277 | -0.147 | -0.128 | 0.002 | 0.998 | 1.000 |
| Health & Fitness + Medical* | -0.531 | -0.500 | -0.466 | -0.162 | -0.149 | -0.136 | 0.000 | 0.000 | 0.057 |
| Education | -0.679 | -0.656 | -0.639 | -0.299 | -0.273 | -0.255 | 0.611 | 1.000 | 1.000 |
| Workflow Tools (Utilities + Productivity + Developer Tools) | -0.405 | -0.384 | -0.368 | -0.594 | -0.429 | -0.310 | 0.148 | 0.465 | 0.923 |
| Business + Finance | -0.311 | -0.276 | -0.234 | -0.125 | -0.110 | -0.102 | 0.000 | 0.000 | 0.000 |
| Sports | -0.572 | -0.423 | -0.243 | -0.123 | -0.101 | -0.079 | 0.000 | 0.003 | 1.000 |
| Weather | -0.335 | -0.298 | -0.229 | -0.210 | -0.181 | -0.155 | 0.609 | 0.964 | 1.000 |
| Food & Drink | -0.569 | -0.506 | -0.437 | -0.521 | -0.189 | -0.155 | 0.000 | 0.369 | 0.870 |
| Shopping | -0.769 | -0.567 | -0.355 | -0.736 | -0.355 | -0.245 | 0.273 | 0.628 | 1.000 |
| Stickers | -0.941 | -0.907 | -0.879 | -2.118 | -0.848 | -0.772 | 0.000 | 0.002 | 1.000 |

Source: Brattle analysis of App Store transactions data.

Notes: Calculations based on 75 0.1 percent random samples. Reported percentiles are calculated across the point estimates from each of the 75 0.1 percent random samples. App fixed effects and year-month fixed effects are included as explanatory variables in the app download demand. In-app-purchase item fixed effects and year-month fixed effects are included as explanatory variables in the in-app purchase demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of in-app purchase transactions in other genres for users who made an in-app purchase transaction is included in as an explanatory variable in the in-app purchase regression. The coefficient for the log-downloads variable is bounded to be between 0 and 1 in estimation and is included in the in-app purchase regression model for all genres. The Catalogs genre is excluded from the figure since I estimate the demand model on the full set of Catalogs transactions. Genres with an asterisk are those where the average coefficient on the log-downloads variable is not statistically significant.

## D.2.b    Estimates for Demand Model without Log Downloads

175. Figure 22 below shows the average demand coefficients and their associated standard errors when log downloads are omitted from the in-app purchase demand equations for Imaging and Health & Fitness + Medical. These are the same results that appear in Figure 12 for these two genres. As noted above, omitting the log downloads variable from the in-app purchase demand equation does not have much impact on the 75-sample average price coefficient estimates for these genres. The price coefficients are statistically significant in both specifications.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

176. Figure 23 summarizes the distribution of the 75 individual demand coefficient estimates from each 0.1 percent sample for these genre groupings when omitting the log-downloads variable from the in-app purchase demand equation. Omitting the log downloads variable has minimal impact on the individual price coefficient estimates, as evidenced by the median, 2.5th percentile, and 97.5th percentile values.

**FIGURE 22: AVERAGE COEFFICIENTS AND ASSOCIATED STANDARD ERRORS WITHOUT LOG DOWNLOADS**

|  | Download Demand | IAP Demand |
|---|---|---|
| Genre | Download Price | IAP Price |
| Imaging (Photo & Video + Graphics & Design) | -0.50 | -0.30 |
|  | (0.001) | (0.002) |
| Health & Fitness + Medical | -0.50 | -0.15 |
|  | (0.001) | (0.000) |
| Year-Month FEs | x | x |
| App FEs | x |  |
| IAP FEs |  | x |
| Average Downloads in Other Genres By Accounts Downloading App | x |  |
| Average IAP in Other Genres By Accounts Making IAP in App |  | x |

Source: Brattle analysis of App Store transactions data.

Notes: Calculations based on 75 0.1 percent random samples. Reported coefficients are the average coefficients across point estimates from each of the 75 0.1 percent random samples. Standard deviations for the individual sample coefficient estimates are calculated by bootstrap. The standard error of the mean is then calculated as a function of the individual sample standard deviations. See the formulas in Appendix D.1.c.iv. App fixed effects and year-month fixed effects are included as explanatory variables in the app download demand. In-app-purchase item fixed effects and year-month fixed effects are included as explanatory variables in the in-app purchase demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of in-app purchase transactions in other genres for users who made an in-app purchase transaction is included as an explanatory variable in the in-app purchase regression. The coefficient for the log-downloads variable is not included in estimation.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 23: DISTRIBUTION OF INDIVIDUAL SAMPLES COEFFICIENT ESTIMATES FOR THE MODEL WITHOUT LOG DOWNLOADS**

| Genre | Download Price | | | IAP Price | | |
|---|---|---|---|---|---|---|
| | 2.5% [A] | Median [B] | 97.5% [C] | 2.5% [D] | Median [E] | 97.5% [F] |
| Imaging (Photo & Video + Graphics & Design) | -0.530 | -0.500 | -0.474 | -0.321 | -0.296 | -0.273 |
| Health & Fitness + Medical | -0.531 | -0.500 | -0.466 | -0.162 | -0.149 | -0.136 |

Source: Brattle analysis of App Store transactions data.

Notes: Calculations based on 75 0.1 percent random samples. Reported are calculated across the point estimates from each of the 75 0.1 percent random samples. App fixed effects and year-month fixed effects are included as explanatory variables in the app download demand. In-app-purchase item fixed effects and year-month fixed effects are included as explanatory variables in the in-app purchase demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of in-app purchase transactions in other genres for users who made an in-app purchase transaction is included in as an explanatory variable in the in-app purchase regression. The coefficient for the log-downloads variable is excluded in the in-app purchase regression model.

## D.3    Damages with Spending Cutoff Applied to Payor-Level Spending

**FIGURE 24: CLASS-WIDE DAMAGES COMPARISON TO SPENDING CUTOFF APPLIED TO PAYORS' TOTAL SPEND, FLEXIBLE BUT-FOR PRICING MODEL**

| | | Total [A] | Harmed Payors [B] | Unharmed Payors [C] |
|---|---|---|---|---|
| **Damages for Current Class Definition** | | | | |
| Number of Payors | [1] | 185,431,885 | 175,738,138 | 9,693,747 |
| Spending (in $ millions) | [2] | ■■■ | ■■■ | ■■■ |
| Net Harm (in $ millions) | [3] | $20,382 | $20,413 | -$32 |
| **Damages for Payors with >$10 in Total Spending** | | | | |
| Number of Payors | [4] | 185,945,029 | 176,116,766 | 9,828,263 |
| Spending (in $ millions) | [5] | ■■■ | ■■■ | ■■■ |
| Net Harm (in $ millions) | [6] | $20,382 | $20,414 | -$32 |

Source: Brattle analysis of App Store transactions data.

Notes: Damages are calculated by applying the mean demand coefficients estimated across 75 0.1 percent samples to simulate But-For prices and estimate app-month overcharges. I then apply the estimated app-month overcharge to every App Store transaction in the data. Total damages, shown

Expert Report of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 104 of 111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

in column [A], net out any negative damages from unharmed payors. Total spending is computed as the sum of payor-level spending from harmed and unharmed payors. Columns [B] and [C] show statistics for harmed and unharmed payors, respectively. The analysis excludes transactions with a missing ("NA") genre, which amount to ██ in gross revenue. *See* Workpaper_Average Commission by Genre, 'missing_genre_rev.csv.'

**FIGURE 25: CLASS-WIDE DAMAGES COMPARISON TO SPENDING CUTOFF APPLIED TO PAYORS' TOTAL SPEND, PRICE TIERS IN BUT-FOR WORLD MODEL**

|  |  | Total | Harmed Payors | Unharmed Payors |
|---|---|---|---|---|
|  |  | [A] | [B] | [C] |
| **Damages for Current Class Definition** |  |  |  |  |
| Number of Payors | [1] | 185,431,885 | 174,445,122 | 10,986,763 |
| Spending (in $ millions) | [2] | ██████ | ██████ | ████ |
| Net Harm (in $ millions) | [3] | $20,199 | $20,218 | -$19 |
| **Damages for Payors with >$10 in Total Spending** |  |  |  |  |
| Number of Payors | [4] | 185,945,029 | 174,801,718 | 11,143,311 |
| Spending (in $ millions) | [5] | ██████ | ██████ | ████ |
| Net Harm (in $ millions) | [6] | $20,199 | $20,218 | -$19 |

Source: Brattle analysis of App Store transactions data.

Notes: Damages are calculated by applying the mean demand coefficients across 75 0.1 percent samples to simulate But-For prices and estimate app-month overcharges. I then apply the estimated app-month overcharge to every App Store transaction in the data. Total damages, shown in column [A], net out any negative damages from unharmed payors. Total spending is computed as the sum of payor-level spending from harmed and unharmed payors. Columns [B] and [C] show statistics for harmed and unharmed payors, respectively. The analysis excludes transactions with a missing ("NA") genre, which amount to ██ gross revenue. *See* Workpaper_Average Commission by Genre, 'missing_genre_rev.csv.'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# Appendix E Additional U.S. Share Calculations

## E.1    Smartphone Shares

**FIGURE 26: U.S. SMARTPHONE SHARES BASED ON UNITS BY BRAND, 2007-2024**

| Brand | | | | | | | | | | | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] |
| Apple | 17% | 21% | 22% | 20% | 31% | 40% | 40% | 38% | 39% | 38% | 38% | 44% | 44% | 49% | 48% | 48% | 52% | 45% |
| Samsung | 6% | 6% | 3% | 10% | 16% | 27% | 30% | 26% | 23% | 24% | 25% | 24% | 23% | 24% | 26% | 26% | 22% | 27% |
| Motorola | 8% | 5% | 6% | 13% | 7% | 5% | 2% | 6% | 5% | 2% | 4% | 6% | 6% | 6% | 9% | 8% | 8% | 10% |
| Google | | | | | | | | | | 1% | 1% | 2% | 3% | 1% | 2% | 4% | 4% | 4% |
| Others | 68% | 68% | 69% | 57% | 46% | 29% | 28% | 30% | 34% | 35% | 32% | 25% | 24% | 20% | 16% | 15% | 14% | 14% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC phone data.

Notes: All shares are calculated based on units shipped. The IDC phone dataset also records mobile phone shipments based on units from 2004 to 2006. These years of data are excluded because the iPhone was released in 2007. The IDC data contain an "Others" brand category constructed by the IDC itself. I add to that category all brands with a 2024 U.S. smartphone share less than 1 percent based on value. Share estimates are rounded to the nearest whole number and blank cells represent a zero share.

**FIGURE 27: U.S. SMARTPHONE SHARES BASED ON UNITS BY OPERATING SYSTEM, 2007-2024**

| Operating System | | | | | | | | | | | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] |
| iOS | 17% | 21% | 22% | 20% | 31% | 40% | 40% | 38% | 39% | 38% | 38% | 44% | 44% | 49% | 48% | 48% | 52% | 45% |
| Android | | 2% | 11% | 41% | 54% | 56% | 57% | 59% | 59% | 62% | 62% | 56% | 56% | 51% | 52% | 52% | 48% | 55% |
| Others | 83% | 77% | 67% | 39% | 14% | 5% | 4% | 3% | 2% | 1% | 0% | | | | | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC phone data.

Notes: All shares are calculated based on units shipped. The IDC phone dataset also records mobile phone shipments based on units from 2004 to 2006. These years of data are excluded because the iPhone was released in 2007. The "Others" OS category is constructed by the IDC itself and consists of all other smartphone operating systems, including BlackBerry OS, Firefox, and the Windows phone. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## E.2    Tablet Shares

**FIGURE 28: U.S. TABLET SHARES BASED ON UNITS BY BRAND, 2010-2024**

| Brand | Year | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] |
| Apple | 77% | 47% | 46% | 42% | 35% | 30% | 32% | 34% | 37% | 45% | 39% | 41% | 45% | 52% | 51% |
| Samsung | 3% | 3% | 7% | 17% | 18% | 13% | 15% | 14% | 14% | 13% | 13% | 11% | 11% | 15% | 16% |
| Microsoft | | | 1% | 1% | 2% | 5% | 3% | 2% | 4% | 5% | 4% | 4% | 3% | 3% | 3% |
| TCL | | | | | | | | | | | 2% | 6% | 6% | 7% | 7% |
| Amazon.com | | 14% | 18% | 12% | 4% | 9% | 21% | 31% | 24% | 23% | 23% | 26% | 26% | 12% | 10% |
| Others | 21% | 36% | 28% | 28% | 41% | 43% | 29% | 19% | 21% | 15% | 19% | 11% | 9% | 11% | 13% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC tablet data.

Notes: All shares are calculated based on units shipped and include both slate and detachable tablets. The IDC data contain an "Others" brand category constructed by the IDC itself. Any brand with a 2024 U.S. tablet share less than 1 percent based on value is added to that category. These brands include LG Electronics, Huawei, and Nokia. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

**FIGURE 29: U.S. TABLET SHARES BASED ON UNITS BY OPERATING SYSTEM, 2010-2024**

| Operating System | Year | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] |
| iOS | 77% | 47% | 46% | 42% | 35% | 30% | 32% | 34% | 37% | 45% | 39% | 41% | 45% | 52% | 51% |
| Android | 22% | 48% | 51% | 54% | 58% | 58% | 61% | 59% | 54% | 49% | 55% | 54% | 51% | 44% | 45% |
| Windows | 1% | 1% | 1% | 4% | 7% | 12% | 7% | 7% | 8% | 6% | 5% | 5% | 4% | 4% | 4% |
| Others | | 4% | 2% | 0% | 0% | 0% | | | 1% | 0% | 1% | 0% | 0% | 0% | 0% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Brattle analysis of IDC tablet data.

Notes: All shares are calculated based on units shipped and include both slate and detachable tablets. The IDC tablet data contain an "Others" OS category constructed by the IDC itself. Any operating system with a 2024 U.S. tablet share less than 1 percent based on value is added to that category. These operating systems include Chrome OS and Windows RT. Share estimates are rounded to the nearest whole number. Blank cells represent a zero share.

# Appendix F Additional Figures

## F.1    Distribution of Screen Size in IDC Data



**FIGURE 30: SMARTPHONE AND TABLET SCREEN SIZES, U.S., 2010-2024Q2**

Source: Workpaper_Screen Size, 'Screen Sizes.xlsx.'

Notes: Shares are based on the number of unique device models for each screen size bin in inches for phones and tablets separately. Each bin is inclusive of the bottom limit and exclusive of the upper limit, e.g. the bin labeled 2-2.5 includes screens ≥2 inches and <2.5 inches. In the bins for which both smartphones and tablet models are observed, the bins are stacked upon one another. For example, it is not the case that around 23 percent of smartphone models have a screen size between 7 to 7.5 inches, rather that the share of smartphone models within this screen size range is less than 1 percent of all smartphone models and the share of tablet models is around 23 percent of all tablet models. The share of smartphones with screen sizes larger than 7 inches is less than 1 percent. These models are exceptions that IDC has identified which exceed the screen size threshold they otherwise use when defining smartphone devices. All these models are variations of phones that fold, which are smartphones under Samsung's Fold line, Google's Pixel Fold line, OnePlus's Open line, and Microsoft's Surface Duo line.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### F.2     Developers' Use of New March 2023 Price Tiers for Newly Introduced Apps and In-App Content Items

177. As described in Appendix D.1.d., Apple recently updated its price tier structure to include a larger set of price points and price-ending conventions. The new price tiers became available to developers on March 9, 2023.[266] Prior to the introduction of these new price tiers, the lowest price available for paid app downloads and non-subscription in-app purchases was $0.99, while the lowest price available for renewing subscriptions was $0.49.[267] The new price tiers introduced in March 2023 include some price points below these prior minimums, with a new minimum price of $0.29 for all apps and in-app purchases including renewing subscriptions.[268]

178. The graph below examines the extent to which developers utilized the new price tiers below the prior minimum compared to those introduced above the prior minimum for newly released apps and in-app purchase items. The blue line represents the share of App Store transactions for newly released apps and in-app content items priced at one of the new price tiers that fell below Apple's prior price minimums during the given month. The yellow line represents a cumulative version of this measure: The share of App Store transactions for newly released apps and in-app content items priced at one of the new price tiers that were below Apple's prior price minimums from March 9, 2023, through the given month.

179. The graph reveals that when developers utilized the newly available price tiers for new apps and in-app purchase items, they often chose prices below the minimum prices previously allowed by Apple's price tiers. In June and July 2023, approximately 90 percent of transactions for new apps and in-app purchase items that utilized the new price tiers were priced below the prior minimums. Cumulatively from March 2023 to January 2024, about 71 percent of transactions for new apps and in-app purchase items that utilized the new price tiers were below the prior minimum prices.

---

[266] *See* "App Store pricing upgrades have expanded to all purchase types," *Apple Developer*, March 9, 2023, accessed February 18, 2025, https://developer.apple.com/news/?id=dbrszv62. *See also*, Stiglitz Initial Report, Section II.D.

[267] "A better App Store Pricing Matrix," *Equinux*, January 24, 2019, accessed February 18, 2025, https://www.equinux.com/us/appdevelopers/pricematrix.html. *See also*, McFadden 2021 Opening Report, ¶ 128; APL-APPSTORE_05520482; and Stiglitz Initial Report, Section II.D.

[268] "Apple App Store Pricing Update: United States Dollar (USD) markets," *Apple Newsroom*, accessed February 26, 2025, https://www.apple.com/newsroom/pdfs/App-Store-Pricing-Update.pdf.

**FIGURE 31: PERCENTAGE OF TRANSACTIONS FOR NEW APPS AND IN-APP PURCHASES PRICED ON APPLE'S NEW PRICE TIERS THAT ARE BELOW THE PRIOR MINIMUM PRICE**



Source: Brattle analysis of the App Store transactions data.

Notes: Analysis includes apps and in-app purchases items (identified in the App Store transactions data by ▇▇▇▇▇▇▇▇ for which the first transaction occurred on or after March 9, 2023, and is limited to transactions that utilized one of the new price tiers introduced in Apple's March 9, 2023 price tier expansion. The blue line represents the share of such transactions within the given month that occurred at a price below the prior minimum price ($0.99 for app downloads and non-subscription in app purchases, and $0.49 for subscriptions). The yellow line represents the cumulative share of such transactions from March 9, 2023 through the given month that occurred at a price below the prior minimum price.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Exhibit 1

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

|  |  |
|---|---|
| IN RE APPLE IPHONE<br>ANTITRUST LITIGATION | **No. 4:11-cv-06714-YGR**<br><br><br><br>**Hon. Yvonne Gonzalez Rogers** |

DECLARATION OF

## DARRYL THOMPSON

**MARCH 7, 2025**

CONTENTS

**I. Introduction** ....................................................................................................................**1**

    I.A. Qualifications ...........................................................................................................1

    I.B. Assignment ..............................................................................................................2

**II. Summary of Results**....................................................................................................**2**

**III. Methodology** ...............................................................................................................**3**

**IV. Deduplication of Apple Payors**...............................................................................**5**

**Appendix A** ........................................................................................................................**9**

**Appendix B** ......................................................................................................................**11**

# I. Introduction

## I.A. Qualifications

1. I am the Chief Information Officer and Chief Operating Officer for JND Legal Administration. JND is a legal administration services provider with its headquarters located in Seattle, Washington. JND has extensive experience with all aspects of legal administration and has administered settlements in thousands of class action cases.

2. I have worked as a data specialist for over 25 years. I have worked in the class action settlement administration business for 14 of those years.  I personally have performed data analysis work on billions of lines of data in my career and performed or oversaw deduplication analysis for thousands of projects.  In recent years, I have worked on some very large and complex deduplication processes in connection with JND's settlement administration work for the Blue Cross Blue Shield ("BCBS") $2.7 billion antitrust settlement and the Equifax Data Breach settlement, the largest data breach class action settlement ever.

3.

4. Prior to being hired for this engagement, JND worked on previous class action settlements involving Apple and Apple data.  On those engagements, data specialists from JND performed standard cleansing and deduplication analysis, under my supervision, to effectuate class notice. In the MacBook Keyboard Settlement, JND analyzed millions of purchase and repair records to identify the purchaser contact information for each Class Computer using an agreed upon data hierarchy. JND then categorized Settlement Class Members by Settlement group, removed

duplicates, sanitized inappropriate entries, validated email addresses, and performed address research to obtain the most current mailing addresses.

5. My curriculum vitae is attached as Appendix A. A non-exhaustive list of class action settlement administrations for which I reviewed or oversaw the review of data in the last four years is contained in Appendix B.

## I.B. Assignment

6. In this case, JND was requested to evaluate a large data set produced by Apple containing information that it collects from "payors"—individuals that purchase apps and in-app content on Apple iPhones and iPads ("iOS Devices").  The data set—which I will refer to as the Apple Payor Data—was purported to contain information such as the name, address, phone number, and credit card information for every payor between July 2008 and February 2, 2024.

7. Specifically, Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person.  If such a means exists, Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor, and then match those payor identifiers to create a primary person ID.  I understand that each unique payor could be a potential Class member, depending on whether they meet the requirements for Class membership.

## II. Summary of Results

8. First, applying well-accepted methods of consolidating contact data in the claims administration field, including proprietary methods that JND has developed over the past nine years, to a random sample of approximately 13 million payor records, JND determined that the Apple Payor Data could be reliably deduplicated to remove the vast majority of duplicate entities.

9. Once I confirmed that deduplicating the records could be done using well-accepted methods of consolidating contact data in the claims administration field and JND's proprietary methods, I

applied those deduplication methods to the raw Apple Payor Data (which included duplicate records) for approximately ▆ billion records.

10.  By applying those well-accepted methods of consolidating contact data in the claims administration field and JND's proprietary methods, JND has eliminated duplicate payors to reduce the number of payor records from approximately ▆ billion to approximately 246 million records.

## III. Methodology

11.  Apple hand-delivered a sample of the Apple Payor Data to JND which, pursuant to a protocol developed by counsel for the parties, JND maintained on an air-gapped (meaning isolated from the internet) computer kept in a secure room with controlled access to protect the privacy of the information Apple delivered to JND.[1]

The sample Apple Payor Data received by JND included two files.[2]  The first file contained approximately ▆ million records.  The second file contained approximately ▆ million records.  The files included Person_ID_hashed, Billing_Info_ID_Hashed, Billing_Info_ID_Created, Name_Prefix, First_Name, Last_Name, Hash_Hashed, Country_Dial_Code, Area_Code, Phone_Number_Hashed, County, City, State, Postal_Code, Street1, Street2 and Street3.

12.  I applied well-accepted methods of consolidating payor data in the claims administration field and JND's proprietary methods to the sample Apple Payor Data to determine whether those records could be deduplicated reliably.

13.  Once I determined and communicated to Plaintiffs' Counsel that JND could reliably reduce duplication in the Apple data, Apple then arranged to transfer the full set of data to us. Again, via

---

[1] *See* Stipulated Supplemental Protective Order Governing Payor Data ¶ 5(c), *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR (N.D. Cal.), June 14, 2024, ECF No. 882.

[2] APL-APPSTORE_10767813; *see* Letter from E. Lazarus to R. Byrd & K. Wood (July 10, 2024).

hand-delivery, Apple provided approximately ███ billion records that we loaded onto the same computer in JND's air-gapped room that was established specifically, and only, for this matter.[3]

14. After receiving such data, we first needed to review the data submission to confirm its completeness. Through this review we determined that the data set was missing the Person ID for some ███ million records. Apple rectified this issue by supplying another data set.[4] However, this set was still missing approximately ██ million records. Apple submitted yet another file once alerted to this shortfall.

15. As we waited for Apple to provide additional Person IDs, we commenced our processes of deduplicating the data to the fullest extent possible. In doing so, we employed at least the following steps, as an iterative process, which are the steps we would take in any large-scale deduplication analysis:

   a. I evaluated the entire data set to determine what data quality issues exist. This stage is a necessary precursor to creating any code or process to work with the data.

   b. I developed a data cleansing algorithm to address any data issues in an attempt to leave usable data for future matching. The code I used for data cleansing constitutes JND's proprietary work and is extremely valuable in the highly competitive claims administration industry.

   c. I ran the data cleansing algorithm against the sample Apple Payor Data. I used additional layers of proprietary data cleansing code to address remaining data quality issues, and repeated the process again until the marginal returns were very low.

   d. The deduplication process also involved writing new code for this project based on my experience in prior data deduplication efforts.

   e. The first version of this deduplication algorithm contained the most stringent matching logic for the engagement. JND has developed proprietary standards for evaluating the strength of various pieces of identifying information in combination with each other.

---

[3] APL-APPSTORE_10809581; *see* Letter from E. Lazarus to R. Byrd & K. Wood (Sept. 12, 2024).

[4] APL-APPSTORE_10864885; *see* Letter from E. Lazarus to R. Byrd & K. Wood (Nov. 7, 2024).

f.  From there, the process was similar to the data cleansing process. I ran the deduplication algorithm against the data and reviewed the outcome, evaluated records that are potential matches that did not match in Version 1, I then wrote more code to apply additional matching logic to records that could not be matched during the first round, and repeated that iterative process continuously until I felt the marginal returns were outweighed by the time and effort required to continue.

g.  Because large populations like the one included in the Apple Payor Data moves frequently (my understanding is that anywhere from 12 to 15 percent of the population moves every year, and that rate is typically higher in younger populations), and because Apple's Payor Data included address information covering a period of 16 years, I cross-checked the address information against publicly available data obtained through an NCOA (National Change of Address) search from the United States Postal Service.  This is standard industry practice when working with older data, such as portions of the Apple Payor Data, to determine whether any particular name that has multiple addresses is actually the same person.

h.  Following the NCOA search, I reapplied the iterative process of deduplication and continued to do so until there were no additional improvements in the results.

## IV. Deduplication of Apple Payors

16. As a result of the deduplication efforts described in the preceding section, JND deduplicated the Apple Payor Data to reduce the number of potential Class members from approximately █ billion to 246 million unique individuals. Those 246 million unique individuals were listed in a Final Payor Database that I stored on the air gapped PC in the secure data room.

17. It is my opinion, based on my considerable experience and the methods I applied here, that the final number of approximately █ million records in the Final Payor Database is a reliable determination of unique individuals, based on the instructions provided by counsel, the methodologies employed, and the time spent on this endeavor.

18. Pursuant to a protocol that I understand was agreed upon by counsel for the parties, Apple retrieved the Final Payor Data in person from the air gapped PC on January 3, 2025.  The Final

Payor Database contained three fields: Billing_Info_ID_Hashed,

Primary_Billing_Info_ID_Hashed and JND_Assigned_ID.

19. I hereby declare, subject to penalty under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed at 1201 2nd Ave Suite 3400 Seattle, Washington, this 7th day of March, 2025.

*Darryl Thompson*

Darryl Thompson

# Appendix A

# Darryl Thompson

## CHIEF OPERATING OFFICER
## CHIEF INFORMATION OFFICER

 JND | LEGAL ADMINISTRATION

Accomplished IT Executive with over 20 years' experience with data management, building enterprise applications and assembling strong technical teams. Demonstrated history of leading teams through complex projects and deliver solutions to clients.

## EDUCATION

### Washington State University
**Bachelor of Arts**
1996 – Management Information Systems

## SKILLS

- Data Management
- Executive Management
- Data Architecture
- Application Development
- Strategic Planning
- Product Ownership

📞 206.923.8099

✉ darryl.thompson@jndla.com

## EXPERIENCE

- **Chief Operating Officer**
  **Chief Information Officer**
  **JND Legal Administration**
  January 2017 – Present
  - Personally analyzed data on largest cases JND administered.  Built standards and processes for data preparation.
  - Drove delivery of enterprise claims administration system in record time.
  - Utilizing a combination of resources, delivered continuous enhancements to the core application that supports hundreds of projects and billions of records of data.
  - Provide a collaborative team environment that encourages enhanced processes and procedures. \
  - As Product Owner, worked closely with Senior Operation team to design solutions.
  - Provided a system and infrastructure that supported a start-up growing to a leader in it's space.

- **Senior Vice President, Information Technology**
  **Garden City Group**
  October 2010 – June 2016
  - Oversaw data organization during tenure at GCG. Oversaw and worked on data for some of the largest cases in the company's history.
  - Built a development organization and delivered the first version of an enterprise application in 9 months.
  - Implemented changes in tools and process that generated millions in revenue. Interfaced with high profile clients to provide IT context and information in support of the sales organization.
  - Built a collaborative team that worked across the organization.

- **Managing Director, Information Technology**
  **Adaptis**
  September 1998 – July 2010
  - Ran and worked with a team that executed a data migration of 100's of millions of lines of data from a legacy application to a new enterprise application.
  - Built IT Tactical plan and road map that supported organization strategic plan and enterprise direction.
  - Product sponsor and owner for enterprise application.
  - Acted as client liaison when issues arose, and multiple organizations were required to resolve situations.
  - Evolved SDLC by integrating the end user and client in proof-of-concepts, unit test and validation, decreasing re-work.

# Appendix B

**Appendix B**

**Case Name**

Aaland v. Contractors.com and One Planet Ops

Aberin, et al. v. American Honda Motor Company, Inc.

Advance Trust & Life Escrow Services, LTA, as securities intermediary for *Life Partners Position Holder Trust  v. Security Life of Denver Insurance Company*

Aiken v Swedish

Air Force Veterans Settlement

Alemu v. Imperial Parking

Alexander v. DC

Allen v. Apache

Alta Mesa Resources, Inc. Securities Litigation

American National Insurance COI Litigation

Ameritrade Merger Litigation

Amneal Securities Litigation

Anderson v Boyne

Archer v. Defenders, Inc.

Armstrong v. Taco Bell

Arnold v. State Farm Fire and Casualty Company

Array Biopharma Securities Litigation

Arvest Bank - Deposits Late Fees

Arvest Bank - Kansas Late Fees

Arvest Bank - Late Fees

Arvest Bank - NSF Fees

Athira Derivative Settlement Notice

Atuogu v. Regeis Care Center, LLC

Aurora Cannabis Securities Litigation

AVX Corporation Stockholders Litigation

Ayala v. Chiawana

Bankhead v. Pacesetter Steel Service

Banks v. R.C. Bigelow, Inc.

Barbanell v. One Medical

Barker v. CDR Maguire, Inc.

Beaucage v. Ticketmaster Canada

Becerra v. Ametek, et al.

Becton, Dickinson and Company Securities Litigation

Belin, et al. v. Health Insurance Innovations, Inc., et al.

Belle Meade Labor Depreciation Settlement

Benecol Spreads Settlement

Bennett v. Providence Settlement

Benson v. Double Down Interactive, LLC

Bernstein v Cengage Learning, Inc. Matter

Binance Cryptocurrency Exchange Settlement

Bird v. Three Z Printing Co.

Blackbaud Inc Customer Data Security Breach Litigation

BNP Paribas Sudanese Matter

Bosch v. PeaceHealth

Boyle v. Harbor Freight Tools USA

Brasch v. K. Hovnanian

Briggs v Slatton Hodges

Bromley, et al. v. SXSW, LLC et al.

Bruzek, et al. v. Husky Energy Inc., et al.

Bryant Buescher, et al. v. Brenntag North America, Inc., et al.

Bumble Securities Litigation

Bunch v. Prinsco

Burlington FLSA Collective Settlement

Butler v. City of Baltimore

C&K Trucking Settlement

Cabot Oil Securities Litigation

Caldwell v UnitedHealthcare (Lipedema)

California DOJ Wedgewood Remediation Matter

Callister v. Swedish Health Services

Canadian Emissions Matter

Carillo v. Wells Fargo Bank, N.A.

Cavallaro v. USAA

Cesar v Pacifica of the Valley

Champion Homes Recall Notification

Charles River Associates Matter

Chase, et al. v. Gordon, Aylworth & Tami, PC, et al.

Chicas v. New Chimera

Chieftain Royalty Company v. BP America Production Company

Chieftain v. SM Energy

Chieftain v. Unit Petroleum Company

Christopher Williams v. Barrilleaux, Inc.

Citrix Systems Merger Settlement

City of Philadelphia v. Bank of Am. Corp.

Clayborne v. Chevron

Clover Health Securities Litigation

Cockerell v. Unit Petroleum Company

Colombian Housekeeper Settlement

Comscore Inc and Serge Matta Fair Fund

Conrad v. Sun Coast Resources

Convergent Restitution Project

Cook Childrens v. Diamondback

Cooper Clark Foundation v. Oxy USA

Cowan v. Devon

Cowan v. Triumph

Credit Acceptance Securities Litigation

Cruz v. Jame Roll Form Products

Cruze Bosch Settlement

Cuenca v Kaiser Permanente

Curtis Markson, Mark McGeorge, Clois McLendon, and Eric Clark vs. CRST International, Inc., CRST

Custode v. Ross, Supplemental Belaire Notice

Dahy v. FedEx Ground Package System, Inc.

D'Amario v. University of Tampa

Dargoltz v. Fashion Marketing & Merchandising Group

Davies v. PeaceHealth

Davis v. GEICO

DC 16 v. Sutter Health

DDL Oil & Gas LLC v. Tapstone Energy

Deitrich v. Enerfin

Del Rivero v. Centex

Diaz, et al. v. Griffin Health Services, et al.

Dinsmore v OK Petroleum

Dinsmore v Staghorn Settlement

Dinsmore v. ONEOK

Dinsmore v. Phillips 66

Dinsmore v. Scissortail

Dobbins, et al. v. Bank of America, N.A., et al.

Doe v. CDPH

Don Brokop v. Farmland Partners Inc., et al.

Drowatsky v. ADT

Duarte v. US Metals Refining Company

Dye Copper Pipe Class Action

Eagle Bancorp Inc Fair Fund

Earth Rated Compostable Settlement

Echard v. Wells Fargo

EEOC v Groupon

EEOC v. Cardinal Health

EEOC v. Circle K

EEOC v. MVM, Inc.

El Dorado Minerals v. Coffeyville

Electrical Welfare Trust Fund

Elinknan v. RP Field Services

Ellis v. Terminal Operations Management, Inc.

Energy Transfer Securities Litigation

Epstein Mental Health Fund

Escorza v. Contract Metal Products

Estate of Palazzo v The Polyclinic et al

ExamSoft Worldwide BIPA Settlement

Farris v. Carlinville Rehab and Health Care Center

Fast Acquisition Corp Stockholders Litigation

Felicia Dance v. First Data Corporation

Fernandez v. RentGrow, Inc.

Ferrando v. Zynga

Fiat Fair Fund

FibroGen Securities Litigation

Fiduciary Claymore Merger Litigation

Figueroa v. Molina Healthcare

Fishon v. Premier Nutrition Corporation

Fleming v. Impax Laboratories Inc., et al.

Florida All X-Ray Settlement

Fluor Fair Fund

Fluor Securities Settlement

Four Seasons Heating and AC Settlement

Fraud Shield Settlement

FTC v Credit Karma LLC

FTC v Fashion Nova

FTC v LCA-Vision Inc.

FTC v Nexway SASU

FTC v Nudge, LLC

FTC v Tate's Auto Center

FTC v WealthPress Holdings LLC

FTC v.  AT&T Mobility, LLC

FTC v. 8 Figure Lifestyle LLC

FTC v. ACRO BlueSnap & Tri Star

FTC v. American Financial Support Services Inc.

FTC v. Career Education Corp.

FTC v. Damian Kutzner

FTC v. Educare Centre Services, Inc.

FTC v. First American Payment Systems, LP

FTC v. GDP Network LLC

FTC v. Hey Dude Shoes

FTC v. Hylan Asset Management LLC

FTC v. Life Management Defendants

FTC v. Mission Hills Federal

FTC v. Preferred Law

FTC v. RagingBull.com LLC

FTC v. Resident Home, LLC

FTC v. Saint James School of Medicine

FTC v. Seed Consulting, LLC

FTC v. Student Advocates Team, LLC

FTC v. Teami, LLC

FTC v. Traffic and Funnels, LLC.,

FTC v. Vantage Point Services

FTC v. Warrior Trading, Inc.

FTC v. Zurixx LLC

FTX Cryptocurrency Exchange Collapse Settlement

Gallaway v. Great Western Pacific

GAP Refund Settlement

Gateway 2014 Customer Remediation

Geico Georgia Settlement

Geico Louisiana Settlement

GEICO Texas Settlement

General Electric Securities Litigation

Genworth COI Settlement

Gibbons v Weltman

Gifford v. Pets Global

Githieya, et al. v. Global Tel*Link Co.

Gjonbalaj v. Volkswagen Group of America, Inc.

GM Canada Ignition Switch Economic Settlement

GM Fuel Injection Pump Defect Litigation

GM Fuel Pump Settlement

GM Shift Quality Defect Litigation

Goldstein v. Houlihan Lawrence

Gomez v Harley-Davidson

Gonzalez and Gutierrez v Roche Fruit

Gonzalez, et al v. Banner Bank

Google CA Pay Settlement

Grady v RCM Technologies

Graf v. Orbit Machining Company

Graham v. University of Michigan

Grand Canyon Education Inc Securities Litigation

Gray v. Peacehealth Settlement

GTV Media Group Inc. et al Fair Fund

Hadden Settlement Fund

Haines v. Washington Trust Bank

Hanks v. Voya Retirement Insurance and Annuity Co

HAPO Overdraft Fee Settlement

Harding, et al. v. Southcoast Hospital Group, Inc., et al.

Hartnett v. Washington Federal Bank

Hawker v. Pekin Insurance Company

Hay Creek Royalties, LLC v. Roan Resources LLC

Hay Creek v Mewbourne

Heathcote v. SpinX Games Limited

Heller vs. Curaleaf

Hercules Laundry Card Settlement

Hernandez, et al. v. Wells Fargo Bank, N.A.

Hicks v. State Farm Fire and Casualty Company

Hill v. Valli Produce of Evanston, Inc.

Hino Motors Settlement

Hodges v. 77 Grandville

Holloway, et al. v. Parke & Son, Inc. d/b/a Parke Warehouses

Holt v. Cooperative Bank of Cape Cod

Hoog v. Trinity Operating

Horton v. Love's Travel Stops

HRG Securities Litigation

Huckaby v. CRST Expedited

Humphries v. Onni Contracting

Hunichen v. Atonomi LLC

Hyundai-Kia Airbag Control Unit Settlement

IKEA Kitchen Cabinet Inspection

Immunomedics Securities Settlement

In re Arizona Theranos, Inc. Litigation

In re BofI Holding, Inc. Securities Litigation

In re Boston Scientific Corporation Securities Litigation

In re Broiler Chicken Antitrust Litigation

In re Celgene Corporation, Inc. Securities Litigation

In re Cognizant Technology Solutions Corporation Securities Litigation

In re Conduent Inc. Securities Litigation

In Re FinServ Acquisition Corp SPAC Litigation

In re Hertz Corporation, et al. (Aiyekusibe)

In re Hertz Corporation, et al. (Kemal)

In re Mattel, Inc. Securities Litigation

In re Resideo Technologies, Inc. Sec. Litig

In re Stellantis N.V. v. Securities Litigation

In re: Red Robin International, Inc.

In re: Subaru Battery Drain Products Liability Litigation

Indianola v. Calyx

Irving v. Container Store

Jake and Doreen Miller v. Guenther Management LLC

James v. Mado Healthcare

Jeffrey O Freidland Fair Fund

Jenkins v. DentaQuest LLC

Jenkins v. Morley Companies, Inc

John Franklin v. Equity Residential, et al.

Johns Hopkins University Settlement

Jones Total Loss Settlement

Jordan v. WP Company LLC, d/b/a The Washington Post

Joye v. Richemont North America

Judd v. KeyPoint Government Solutions

Juul Labs Altria Subclass

Kasiotis v. NY Black Car Fund

Katapult Securities Litigation

Katz v. Equinox Holdings, Inc.

Kernen v. Casillas Operating LLC, et al.

Kernen-Citizen II Settlement

Kidwell v. Ruby IV, LLC et al.

Kimball v. Volkswagen Group Of America, Inc. et al

Kiplinger Settlement

Kohari v. Metlife Group

Koshman v. MultiCare Health Systems

Kraft Heinz Securities Litigation

Kristal Khan, et al. v. PTC, Inc.

KSE Magazine Settlement

Kunneman Properties v. Marathon

Land O'Lakes ERISA Settlement

Langer v. CME

Las Flores Pipeline System Settlement

Lawson v. Love's Travels & Country Stores, Inc.

Lee v. Trinity Operating

Lenders LIBOR Settlement (Credit Suisse and MUFG)

Leonard, et al. v. John Hancock Life Insurance Company of New York and John Lee Hancock Life

Lerman v. Apple Inc.

Levy v. Dolgencorp, LLC

Lewis v. Trident Manufacturing

Lexington Law Matter

Liang v. WA

Lincoln National COI Settlement

Lindenwood University COVID Tuition Settlement

Local TV Advertising Antitrust Litigation

Loftus v. Outside Integrated Media

London Terrace Gardens

Lordstown Motors Corp Stockholders Litigation

LSIMC v. American General Settlement

Lytle v. Revance Therapeutics, Inc.

MacBook Keyboard Settlement

Macias, et al. v. Los Angeles County Department of Water and Power

Magallon v. Robert Half International Inc.

Malone et al. v. Western Digital Corporation

Mamboleo v. Pacific Life Insurance Company

Mancilla v. Advanced Drainage Systems

Marical, et al. v. Boeing Employees' Credit Union

Massachusetts AGO Notice Mailing

Mazda Infotainment Settlement

Mazda Valve Stem Seal Settlement

McCoy v. GEICO

McKnight v. Bravo Arkoma

Meegan v. NFI Industries, Inc.

Mendez v. Steelscape Washington

Mendiola v. Kingspan Light & Air

Messner, et al. v. Cambridge Real Estate Services, Inc., et al.

Microsoft Consent Decree

Microsoft PAGA/Class Settlement

Miller-DCP Settlement

Mindbody Stockholder Litigation

MindGeek Class Action Litigation

Misti Brashear-Finney v. Mid-Am Building Supply, Inc.

Mitchell v. Murray Energy Corporation

Mitchell v. Red Bluff

Mitsubishi Airbag Control Unit Settlement

Mohawk Industries Inc. Securities Litigation

Moore v. Robinhood Financial LLC

Moses v. The New York Times Company

Moss v. Eugene Mobile Village, LLC

MSU Counseling & Mental Health Services Fund

Nash v. Deca Dental Management

National Association of Realtors Settlements

Navarette-Acosta v. National Vision, Inc.

Navy Federal Credit Union CFPB Settlement Fund

NC v. Hain Celestial Group

Nesbeth, et. al. v. Icon Clinical Research

NFL Sunday Ticket Antitrust Litigation

North American Company COI Litigation

Northpointe Association v. State Farm Fire and Casualty Co.

NY Student Health Insurance Refund

Oak Street Health Securities Settlement

Ocana/Nemore PACE L.A. Settlement

OGP v Contango

Orange County Oil Spill Settlement

Orange County Oil Spill Shipping Defendants Settlement

Oxnard and Pleasant Valley Ground Water Basins Adjudication Noticing

PacifiCorp Fire Litigation

Parker v. Maverick Tube Corporation

Parsons v MVP

Patrick v. Volkswagen Group of America, Inc.

Pauper v. Kaiser Francis

Payton Fernandez v Burlington

Pearlstein et al. v. BlackBerry Ltd. et al

Pease v. Kadlec

PHL Variable Insurance COI Litigation

PHT Holding I LLC and Alice Curtis, et al. v. ReliaStar Life Insurance Company

Piazza v. Jewel-Osco

Pine Manor Investors v. FPI Management, Inc.

Pivotal Software Stockholders Litigation

Plains Oil Spill Settlement

Plantronics, Inc. Securities Litigation

Plavin v. GHI

Porsche Gasoline Settlement

Portfolio Recovery Associates CFPB Redress Matter

Powell v. Subaru of America, Inc.

Prince-Cooke v Providence

ProPetro Securities Litigation

Providence Health Washington Consent Decree

Pruitt v. Par-A-Dice Casino

Quezada, et al. v. ArbiterSports, LLC

Quinnipiac University Settlement

R1 Securities Litigation

Radisson Blu Biometrics Settlement

Rae et al v. MultiCare

Ramirez v. Rite Aid Corporation

Raymo v. FCA et al

RCC, P.S. v. Unigard Insurance Company

Redmond v. GameStop

Reed v. Scientific Games Corp.

Rice v. Burlington Resources

Rieger v Volkswagen Group of America

Riley v General Motors LLC

Rilla Jefferson v. General Motors, LLC

Ritter v. Foundation Energy

Rizzo v. Randhurst Deli

Robinhood Financial LLC SEC Settlement

Rocchio, et al. v. Rutgers, The State University of New Jersey

Rosado v. Barry University, Inc.

Rosenberg v GEICO

Rotthoff v. New York State Catholic Health Plan Inc.

Rounds v. FourPoint/Unbridled

Rowe v. Shari's Management Corporation

Ryder System Securities Litigation

Ryder, et al. v. Wells Fargo Bank, N.A.

Sagacity v Cimarex

Sahlin v. Hospital Housekeeping Systems

Salgado v. UPMC Jameson

Salmon Direct Purchaser Settlement

Sampson v Subaru

Sanchez v Travelers Insurance

Sanchez v. Visual Pak

Sanith v State Farm

Schumacher v. Bank of Hope Settlement

Sea Limited Securities Settlement

SEB Investment Management AB et al v. Align Technology, Inc. et al

SEC v. O'Rourke, et al.

Seffern v. United Site Services of Nevada, Inc.

Senne v. Office of the Commissioner of Baseball

Sherrod v. Volkswagen Group of America

Shuman v Squaretrade Inc.

Silverstein v. Genworth Life Insurance Company

Singletary v AECOM and AMENTUM Services

Six Flags Securities Litigation

Solberg, et al. v. Victim Services, Inc, et al.

Solorio v. Fresno Community Hospital

Sonneveldt v Mazda

Spencer v. City of Mount Vernon

SpinX Games Settlement

State of Washington v. PreHired, LLC

State v. PeaceHealth

Staunton Lodge v. Pekin Insurance Company

Stein v. Eagle Bancorp LLC

Steuart, et al. v. Squaw Valley Resort, LLC, et al.

Steven D. Marcrum v. Hobby Lobby Stores, Inc.

Stewart v. Kaiser Permanente

Stout v. The GEO Group Settlement Phase

Strohm v. MAWC

Suaverdez v. Circle K Stores

Subaru CVT Settlement

Subaru Fuel Pumps Settlement

Swafford v. Ovintiv

Swetz v. GSK Consumer Health, Inc.

Sylvain v. Longwood Auto Acquisitions

Taro Pharmaceutical Industries Ltd. Securities Litigation

Tempoe LLC Redress CFPB Order

Tershakovec, et al. v. Ford Motor Company

Ticketmaster Settlement

Tijerina v. Volkswagen Group of America Inc.

Tither-Kaplan, et al. v. James Franco, et al.

Toland v. Nationstar Mortgage

Torres, et al. v. National Payment Systems OR, LLC

Toy v. City of San Francisco (Public Utility Commission)

TransUnion Rental Screening FCRA Litigation

Tuna DPP - Starkist/Lion Settlement

Tuna EPP - Starkist/Lion Settlement

Turkish Airlines Settlement

UMR Insurance Settlement

Underwood v. NGL Energy Partners

University of New Haven Settlement

USC Kelley State Court Litigation Consent Notice Project

USC Student Health Center Litigation

Van Jacobs v. New World Van Lines, Inc.

Vance v. Mazda

Vasser v. Mapco Express, Inc.

Venator Securities Litigation

VGW Games Settlement

Vida Longevity Fund v. Lincoln NY

Voyager Cryptocurrency Exchange Partial Settlements

Vybe Patient Refund Distribution

Wadding v Mott

Wake Energy v. EOG

Wake v BCE Mach

Wake v Devon Settlement

Wake v Mustang

Watson v. Checkr, Inc.

Weiner v. Ocwen Financial Corp. Settlement

Wells Fargo CFPB Enforcement Matter

Wells Fargo Lockbox Remediation

Welsh v. Hartford

White Family Minerals v. EOG Resources

Wills v. Seattle Children's Hospital

Wilner v. Leopold & Associates, PLLC

Wilson v. Santander Consumer USA

Woodard v Navient Solutions

Woods v. FleetPride

Wright v. Devon Energy Production Company

Wright v. Southern New Hampshire University

Wynn Securities Litigation

Youssef v Navient Solutions

Z.B., et al. v. Birmingham Community Charter High School, et al.

Zakinov v. Ripple Labs, Inc. Litigation

Zaslavskiy v. Weltman

Zindel v. El Gaucho

Zissa v. County of Los Angeles

Zwicky v. Diamond Resorts International