# EXHIBIT 46

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Rebuttal Expert Report and Declaration of Victoria C. Stodden, Ph.D.**

June 27, 2025

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

# Table of Contents

I.      Qualifications ................................................................................................. 1

II.     Background ...................................................................................................... 2

III.    Assignment ...................................................................................................... 5

IV.     Summary of Opinions ...................................................................................... 7

V.      Overview of the Data, the Challenge of Identifying Unique Payors, and Mr. Thompson's
        Method ........................................................................................................... 11

        A.      Overview of the Apple Payor Data ................................................... 11

        B.      Overview of the Challenge of Identifying Unique Payors .................... 13

        C.      Summary of Mr. Thompson's Proposed Method to Identify Unique Payors ....... 17

VI.     Mr. Thompson Used the Wrong Definition of Payor and As a Result His Method Cannot
        Reliably Identify Unique Payors ..................................................................... 26

VII.    Mr. Thompson's Methods Are Unreliable for the Purpose of Identifying Unique Payors 30

        A.      Mr. Thompson's Data Cleaning Is Ineffective for the Purpose of Identifying
                Unique Payors ................................................................................. 30

        B.      Mr. Thompson's Deduplication Is Unreliable for the Purpose of Identifying
                Unique Payors ................................................................................. 34

        C.      Mr. Thompson's Deduplication Is Inappropriately Sensitive to Small Changes .. 38

VIII.   Mr. Thompson's Deduplication Method Was Designed For Providing Class Notice and
        Claims Administration, and Such an Approach Is Not Appropriate for a Reliable
        Identification of Unique Payors ..................................................................... 41

IX.     Mr. Thompson's Conclusion that His "Deduplication" Approach Reliably Identifies
        Unique Individuals is Unsupported By Any Evidence .................................... 44

X.      Mr. Thompson Provided No Evidence that His Method Can Be Relied Upon in a Process
        to Assign Transactions to Payors ................................................................... 49

XI.     Mr. Thompson Provided No Assessment of the Error Rate of His Method and No
        Validation to Review Potential Sources of Error, Thus Omitting Key Components of
        Reliability Assessment ................................................................................... 52

        A.      Mr. Thompson Provided No Assessment of the Error Rate of His Method, a Key
                Component of Reliability Assessment ............................................... 53

        B.      Mr. Thompson Did Not Appropriately Validate the Inputs or Outputs to Identify
                Sources of Error .............................................................................. 56

XII.    Mr. Thompson Did Not Use or Even Acknowledge Applicable Widely-Accepted and
        Scientific Methods that Have Been Peer-Reviewed and Published ............... 59

A.     Mr. Thompson's Methods Are Based Entirely on His Subjective Opinions and Beliefs ............................................................................................................ 61

B.     Mr. Thompson Does Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Data Cleaning Methods from the Published Literature ... 63

C.     Mr. Thompson Did Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Deduplication Methods from the Published Literature ... 70

D.     Mr. Thompson's Methods Have Not Been Directly Evaluated by Any Third Party, Including Other Claims Administration Firms, or Any Opposing Party or Court in Previous Litigation ................................................................................................ 75

XIII.    Mr. Thompson's Own Computer Code Does Not Produce His Results, Rendering His Method Untestable and Unreliable ................................................................................. 77

XIV.    Mr. Thompson's Implemented Method Differs Materially from the Method Described in His Reports and Deposition ................................................................................................ 81

XV.     Conclusion ........................................................................................................................ 86

## I.     Qualifications

1.     I am an Associate Professor in the Department of Industrial and Systems Engineering at the University of Southern California. I graduated magna cum laude with a Bachelor's of Social Science in Economics from the University of Ottawa and hold a Master's degree in Economics from the University of British Columbia. I received a Ph.D. in Statistics from Stanford University and a Master's degree in Legal Studies from Stanford Law School.

2.     I held the Kauffman Fellowship in Law and Innovation at Yale Law School 2009–2010 and was a Berkman Klein fellow at Harvard Law School 2008–2009. Additionally, I did postdoctoral research at MIT in 2009 and held a faculty position at Columbia University 2010–2014 and a faculty position at the University of Illinois at Urbana Champaign 2014–2021 where I was awarded tenure in 2017. I have been a tenured faculty member at the University of Southern California since 2021.

3.     My research focuses on the reproducibility and reliability of scientific results, which has become a topic of great interest in the scientific community in part because of the challenges researchers face in transparently communicating methods that leverage increasingly large and complex computational code and data. I am internationally recognized as a leader in improving the reliability of scientific results in the face of increasingly sophisticated computational approaches to research—including, specifically, understanding when and how inferences from data are valid and reproducible; what it means to have replicated a result; the effect of "big data" and computation on reliable and reproducible scientific inference; the design and implementation of scientific validation systems; standards of openness and transparency for data and code sharing; and resolving legal and policy barriers to disseminating reproducible and reliable research. I also have experience in academic research with deduplication of individuals in large, complex datasets, such as Medicare claims. I have taught undergraduate and graduate courses in machine learning, replicating computational results, data science, data mining, statistical computing, quantitative methods, and other topics. My teaching has covered data deduplication.

4.     I have published more than 50 papers in scientific journals and conference proceedings, and have co-edited two professional books, both published in 2014—*Privacy, Big Data, and the*

*Public Good: Frameworks for Engagement*, published by Cambridge University Press, and *Implementing Reproducible Research*, published by Taylor & Francis.

5.　　In 2024, I was selected to receive a prestigious Humboldt Research Award in recognition of my entire research agenda. Also in 2024, I won the International Excellence Fellowship of the Karlsruhe Institute of Technology in Germany, which is awarded to an internationally renowned scientist in recognition of her or his scientific achievements and whose research has a lasting impact on their discipline beyond their own field of work while addressing global challenges facing society in the 21st century as well as topics of relevance to the future.

6.　　In 2009, I won the Access to Knowledge Kaltura prize for my publication on legal issues in reproducible research and scientific innovation. I have also served on the following National Academies of Science, Engineering, and Medicine committees: "Reproducibility and Replication in Science" and "Fostering Research Integrity." I co-chaired the National Science Foundation ("NSF") Advisory Committee for Cyberinfrastructure and was a member of the NSF Directorate for Computer and Information Science and Engineering Advisory Committee. In 2022, I served on the Committee of Visitors for the NSF's Office of Advanced Cyberinfrastructure (compute systems at scale), providing external review of both the quality and integrity of the program operations, as well as program-level technical and managerial aspects of research proposal decisions.[1]

7.　　I testified on scientific reproducibility before the U.S. House of Representatives Committee on Science, Space and Technology for the March 5, 2013 hearing on Scientific Integrity & Transparency.

8.　　A copy of my curriculum vitae, setting forth my professional experience and qualifications, is attached as **Appendix A**, and a list of my prior testimony in the last four years is attached as **Appendix B**.

## II.    Background

9.　　I understand that the Court has certified a class of "[a]ll persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees,

---

[1] *See* U.S. National Science Foundation, "Committees of Visitors," available at https://www.nsf.gov/about/performance/cov, accessed on June 16, 2025.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple account."[2] I also understand from Counsel that members of the certified class are referred to as "payors"[3]— in reference to "persons… who purchased… applications… or who paid Apple for… in-app purchases"[4]—and that Plaintiffs previously used Apple accounts as a proxy for payors. I further understand from Counsel that Plaintiffs retained Mr. Thompson to disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have used the same Apple accounts.[5]

10.    I understand that others of Plaintiffs' experts have proposed a methodology that purports to determine the price for each App Store transaction but for Apple's challenged conduct. I further understand that Plaintiffs' experts applied this methodology to data containing all U.S. App Store downloads and digital in-app purchases for all iOS apps (the "App Store Transaction Data") from the launch of the App Store to February 2024.[6] I understand that while these data

---

[2] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2. I also understand that claims arising from iPod transactions have been dismissed with prejudice. *See* Order Granting in Part Motion to Modify Class, *In re Apple iPhone Antitrust Litigation*, June 11, 2025. *See* also Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, September 17, 2020.

[3] Some payors may not meet all the conditions to be part of the class. Thus I understand that the class consists of payors, but not all payors are necessarily in the class.

[4] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2.

[5] *See* Section V; Supplemental Expert Report of Darryl Thompson, April 16, 2025 ("Thompson Supplemental Report"), ¶¶ 8–9.

[6] I have not reviewed nor been asked to review the App Store Transaction Data.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

contain a field that identifies the Apple account (i.e., an anonymized ID corresponding to an Apple ID) through which the transaction was made, these data do not contain any information about the payor for the transaction.[7]

11.    I understand that Apple and Plaintiffs both acknowledge that class members are payors rather than accounts. Apple therefore produced data containing payment information for paid transactions from the launch of the App Store to February 2, 2024.[8] Apple initially produced two files with a sample of approximately 1 million and 12 million records from the Apple Payor Data on or about July 10, 2024 (collectively the "Apple Payor Data Sample"), and Apple later produced the full dataset of approximately 1.69 billion records on or about September 12, 2024 ("Apple Payor Data").[9] The Apple Payor Data production was updated on or about October 25, 2024 and November 7, 2024. I understand that Apple communicated to counsel for Plaintiffs that each payor record consists of user-generated information purporting to represent the payor's name, their address, and their phone number (anonymized, i.e., "hashed," except for the area code). These data also include an anonymized Apple account and hashed payment information (related to the PayPal account or payment card used) associated with the payor record.[10]

12.    An individual may pay for transactions associated with different account identifiers if, for example, an individual has multiple Apple accounts concurrently or over time. In addition, the transactions made in association with a single account identifier may correspond to multiple

---

[7] *See* Apple Support, "Apple ID (or Apple Account)," available at https://support.apple.com/guide/itunes/aside/glos1009407f/windows, accessed on June 16, 2025 ("An Apple ID (also called an Apple Account) consists of an email address and a password.").

[8] *See* Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024.

[9] I understand that the full dataset consisted of multiple files, including supplemental files to correct missing information in the original production.

[10] I understand that this anonymized account identifier in the Apple Payor Data also corresponds to an Apple ID. However, to protect the privacy of App Store consumers, the anonymized account identifier in the Apple Payor Data has been re-hashed so that it is different from the anonymized account identifier in the App Store Transaction Data, and only Apple possesses the key to map the account identifiers in the two data sets.

payors if, for example, some transactions for the account are paid for by one person, such as a parent, while other transactions are paid for by another person, such as a child. To determine the full set of transactions paid for by a person, it would therefore be necessary to identify all the unique payor records in the Apple Payor Data that correspond to the unique individual that actually made the payments.

13.    I understand that Apple does not attempt to identify unique individuals associated with different payor records or associated with transactions in the ordinary course of business. I also understand that Plaintiffs retained JND Legal Administration ("JND") to attempt to identify unique payors based on the available fields in the Apple Payor Data.[11]

## III.    Assignment

14.    I have been asked by counsel for Defendant Apple to review and evaluate work done by Plaintiffs' expert Darryl Thompson of JND ("Mr. Thompson"), who purports to determine that there exists a reliable means to identify payor records that are associated with a unique person and to then identify payor records associated with unique persons using that method. I understand that Mr. Thompson's work is described in the August 1, 2024 Declaration of Darryl Thompson ("Thompson Declaration"), the March 7, 2025 Declaration of Darryl Thompson (which I will refer to as the "Thompson Report," as I understand it has been characterized by counsel for Plaintiffs as an expert report), the April 16, 2025 Supplemental Expert Report of Darryl Thompson ("Thompson Supplemental Report"), the computer code and related materials that Mr. Thompson produced to Apple's consultants at Cornerstone Research on May 21, 2025 and May 23, 2025 ("Computer Code"), a ReadMe file that Mr. Thompson produced on May 28, 2025, which Counsel for Apple requested Mr. Thompson produce to explain how to run his code

---

[11] I understand that after JND performed this matching process, Apple merged the anonymized payor identifiers onto the App Store Transaction Data, which allows both sides' experts to identify and analyze the transactions corresponding to each unique payor as identified by JND.

to produce his final output ("ReadMe"),[12] and the June 5, 2025 Deposition of Darryl Thompson ("Thompson Deposition"). Specifically, Counsel for Apple asked that I evaluate whether the methods implemented in the Computer Code are reliable methods for identifying unique payors for App Store transactions. Counsel also asked me to confirm whether or not the Computer Code performs the data cleaning and deduplication described in the Thompson Declaration, the Thompson Report, the Thompson Supplemental Report, and the Thompson Deposition.

15.     In forming my opinions, I relied upon my expertise in statistics and data analysis, the Thompson Declaration, the Thompson Report, the Thompson Supplemental Report, the materials referenced in those three submissions, the Computer Code and all other code and data produced by JND, Plaintiffs' complaint and other legal filings, the written transcript of the Thompson Deposition, academic literature, and publicly available information.[13] A list of the materials I relied upon is attached as **Appendix C**. I reserve the right to amend or supplement my opinions should new information become available to me.

16.     I am being compensated at my standard billing rate of $1,000 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based upon the content of my opinion or the outcome of this or any other matter.

---

[12] Counsel for Apple requested that Mr. Thompson produce "a ReadMe file that explains the order in which code files should be run to produce the final output. This should include sufficient information to allow Apple's expert to replicate JND's analysis with no changes to the code other than updates to filepaths. If there are any manual steps that are not performed by code (e.g., manually copying files from one folder to another folder), please include a detailed description of any such steps in the ReadMe file." *See* Email chain from Kyle Wood to Eli Lazarus, "RE: [EXTERNAL] RE: 4:11-cv-06714-YGR In re Apple iPhone Antitrust Litigation -- D. Thompson backup materials," June 4, 2025.

[13] I reviewed and analyzed the Apple Payor Data and Computer Code on an air-gapped desktop computer in a secured room at Cornerstone Research's San Francisco office.

IV.    **Summary of Opinions**

17.    Mr. Thompson failed to meet the burden of his assignment. He did not establish a "reliable means by which" to identify unique payors in the Apple Payor Data,[14] and I find that his methods are *not reliable* for the purpose of identifying unique payors. I arrive at this conclusion for the following reasons:

    a.    Mr. Thompson used the wrong definition of payor, and therefore his method cannot reliably identify unique payors. In particular, I understand that a payor is an individual whose money was used to pay for a transaction. But Mr. Thompson testified in his deposition that he "was not aware of anything that suggests that [a payor has to use] their own credit card," as opposed to someone else's credit card, "just that they have to make a payment" and have "a record in the transaction data with their personal information on it."[15] Mr. Thompson's definition of "payor" is untethered from the key question of who actually paid the money for a transaction.[16] The determination of who actually paid could require an individualized inquiry that would not be possible with the available Apple Payor Data. Furthermore, such inquiry is not isolated to a few examples. For the purported payors identified by Mr. Thompson who use credit and debit cards, 22.3 percent appear to use a card attributed to another "unique payor." Because he used the wrong definition of payor, Mr. Thompson's methods are not appropriate for identifying unique payors (Section VI).

---

[14] *See* Thompson Supplemental Report, ¶ 9 ("Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person.").

[15] Thompson Deposition, p. 160:16–24.

[16] In the case of a credit card (or other payment method) facilitated by intermediary institutions, I understand that the credit card holder (or holder of the payment method) should be considered the payor.

b. Setting aside the fundamental flaw that Mr. Thompson did not use the correct notion of a "payor" in his attempts to identify "unique payors," his method is still flawed and unreliable for the purpose of deduplicating records.

   i. Mr. Thompson's data cleaning is ineffective because, for example, his principal data cleaning operations simply replaced one invalid entry, such as a payor address like "The moon,"[17] with another invalid entry, such as a differently punctuated representation of the same invalid payor address, or with an entry that is actually less likely to match correctly (Section VII.A);

   ii. Mr. Thompson's deduplication approach is also unreliable for the purpose of identifying unique payors, in some instances erroneously assigning records for a single individual to multiple purported payors, and in other instances erroneously assigning records corresponding to multiple individuals to a single purported payor. As but one example, for the named plaintiff Pepper, Mr. Thompson's method concludes that "Rob Pepper" and "Robert Pepper" are two distinct payors, even though these records share the same address, phone number, and credit card (or other payment method). The true number of "unique payors" may be higher or lower than what Mr. Thompson finds, and the correct set of payor records associated with any given "unique payor" may be different than the set of records that Mr. Thompson associated with that "unique payor" (Section VII.B);

   iii. Mr. Thompson's deduplication is inappropriately sensitive to small changes that are inherently unrelated to matching accuracy. As one of many examples of his arbitrary judgments that lead to inappropriate sensitivity, if I change the sort order of records in the raw Apple Payor Data (the sort order of which I understand to be arbitrary), this change

---

[17] I discuss this example in more detail in Section V.

would significantly alter the number of purported "unique payors" (Section VII.C).

c. Mr. Thompson admitted his deduplication method was designed for providing class notice and claims administration, and such an approach is demonstrably too narrow for a reliable identification of unique payors in this matter (Section VIII).

d. Mr. Thompson's conclusion that his "deduplication" approach reliably identifies unique individuals is unsupported by evidence. Whether the Apple Payor Data has the quality and characteristics that would allow deduplication to identify unique individuals is a fact-specific empirical question and Mr. Thompson's claim that the methods described in the Thompson Supplemental Report produce a "reliable determination of unique individuals" in this case lacks any supporting analysis or factual basis and is without merit (Section IX).

e. Mr. Thompson provided no evidence that his method can be relied upon to reliably assign transactions to payors. Whatever error exists with regard to Mr. Thompson's list of unique payors likely significantly understates his total error in assigning each of the 1.69 billion payor records to the correct payor. Mr. Thompson's method appears to have difficulty disambiguating transactions in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account, with such ambiguous cases being assigned in a manner that is inconsistent or incorrect (Section X).

f. Mr. Thompson provided no assessment of the error rate of his method and no validation to review potential sources of error:

   i. Mr. Thompson made no attempt to quantify either the error rate of his method or the uncertainty or confidence associated with his output estimate. Such quantification is a critical standard practice in the scientific community, and without this information readers do not know whether

Mr. Thompson's estimate of the number of unique payors is expected to be close to or potentially far from the true number, given his methods (Section XI.A);

ii.   Mr. Thompson did not appropriately validate the input or output from his deduplication to identify sources of error. This is clear because, while he purported to review both his input and his output, I identified numerous important mistakes upon a brief inspection (Section XI.B);

g.   Mr. Thompson did not use or even acknowledge widely-accepted and scientific methods for data cleaning, deduplication, and address matching that have been peer-reviewed and published, nor have his methods been validated by any third party, including other claims administration firms, or any opposing party or Court in previous litigation.

i.   Rather than relying on widely-accepted practices from relevant scientific fields, Mr. Thompson instead repeatedly turned to his own subjective judgment and experience as the basis for his opinions (Section XII.A);

ii.   Despite the extensive academic literature on the importance of identifying and eliminating data errors, Mr. Thompson did not use or even consider widely-accepted and reliable data cleaning methods from the published literature (Section XII.B);

iii.   Similarly, he did not use or even consider widely-accepted and reliable deduplication methods from the published literature, even though such methods have been studied and relied upon in many disciplines for nearly 80 years. While there is no single approach from the published literature that works in all cases, there are certain best practices from the literature, such as allowing matches for records where it is sufficiently clear that those records represent the same information, even when those records are

not verbatim matches. Mr. Thompson did not follow such best practices (Section XII.C);

iv.  Finally, Mr. Thompson's methods have not been directly evaluated by any third party, including other claims administration firms, or any opposing party or Court in previous litigation. (Section XII.D).

h.  Furthermore, several fundamental flaws with Mr. Thompson's backup production make his work untestable. First, the Computer Code did not run at all without making significant modifications. Second, after making these modifications, the Computer Code produced results that were different from the output data provided by Mr. Thompson (Section XIII).

i.  In addition, Mr. Thompson's implemented method differs significantly from the method described in his reports and his deposition. For example, Mr. Thompson's actual data cleaning effort only removes a narrow set of invalid characters from names and addresses, and updates addresses based on the NCOA, even though he purported to apply "layers of proprietary data cleansing code" to address a range of data quality issues such as invalid addresses, profanity, and outliers (Section XIV). [18]

18.  As a result of this large number of important deficiencies, I conclude that not only does the Computer Code not perform the methods that Mr. Thompson said it did, but also that Mr. Thompson's methods are unreliable for the purpose of identifying "unique payors."

## V.  Overview of the Data, the Challenge of Identifying Unique Payors, and Mr. Thompson's Method

### A.  Overview of the Apple Payor Data

19.  I understand that the Apple Payor Data consists of payor records for all individuals who made at least one paid app download or digital in-app purchase on an iOS device (including

---

[18] Thompson Supplemental Report, ¶ 17.c.

iPhones, iPads, and iPod Touch devices) since the launch of the App Store on July 10, 2008 to February 2, 2024.

20.    The data contain 18 fields that can be grouped into six general categories, each category containing one or more fields. Five of those categories contain personally identifying information: Apple account identifier (one field), name (three fields), address (seven fields), payment method (two fields), and phone number (three fields). A sixth category contains record identifiers that were generated by Apple and contain no personally identifying information (two fields). The full list of fields from the data and a description of each field is shown in Exhibit 1.

---

*Exhibit 1*
*Names and Descriptions of Fields in the Apple Payor Data*

| | Category | Field | Note |
|---|---|---|---|
| 1. | Apple account identifier | person_id_hashed | hashed Apple account identifier |
| 2. | Name | name_prefix | |
| | | first_name | |
| | | last_name | |
| 3. | Phone number | country_dial_code | |
| | | area_code | area code for hashed phone number |
| | | phone_number_hashed | hashed phone number |
| 4. | Address | county | |
| | | city | |
| | | state | |
| | | postal_code | |
| | | street1 | |
| | | street2 | |
| | | street3 | |
| 5. | Payment method | ppal_payer_number_hashed | hashed PayPal account information |
| | | hash_hashed | hashed payment card information |
| 6. | Record identifier | billing_info_id_hashed | hashed record identifier |
| | | billing_info_id_created | date the record was created |

Source: Apple Payor Data
Note: The field names are directly from the Apple Payor Data and the notes are based on my own analysis, as well as my understanding from Counsel for Apple.

21.    I understand that a unique payor may have multiple records or rows in the Apple Payor Data, and that those records may contain information that differs in any of the five categories. For example, two different records corresponding to a single distinct payor might share the same Apple account identifier, name, address, and phone number, but have different payment methods. I also observe some records that are identical across all five categories of personally identifying information and differ only in the record identifier assigned by Apple. In total, the data include approximately ▇▇▇ billion records, ▇▇▇ million of which are distinct based on all available fields in the five categories of personally identifying information described above.[19]

### B. Overview of the Challenge of Identifying Unique Payors

22.    I understand from Counsel that Plaintiffs seek to identify unique payors who are potential members of the certified class and that previously Plaintiffs used the Apple account identifier as a proxy for class members.[20] However, I understand that there are circumstances in which a payor may pay for the transactions through multiple Apple accounts, or in which multiple payors may have paid for transactions through the same Apple account. My understanding from Counsel is that Plaintiffs have thus retained Mr. Thompson to help disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account.[21] While I have not reviewed Plaintiffs' damages model, I understand that failing to identify unique payors accurately may have substantial consequences when estimating damages for each potential class

---

[19] The difference between the 1.69 billion records in the full data and the 965 million records that are distinct based on all personally identifying information is important for evaluating Mr. Thompson's opinions. There are far fewer than 1.69 billion candidate "unique payors" that Mr. Thompson would need to disambiguate (at most 965 million), and furthermore, many of the potential payors in the Apple Payor Data do not exhibit the challenges associated with multiple accounts for the same payor, or multiple payors using the same account. Thus Mr. Thompson's method would only affect Plaintiffs' identification of a much smaller set of potential payors. *See* Workpaper 1.

[20] *See* Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, March 29, 2022.

[21] *See* Section V; Thompson Supplemental Report, ¶¶ 8–9.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

member. For example, because of the $10 spending threshold, I understand that incorrectly assigning transactions to class members may result in payors being improperly included or excluded from the class entirely. Additionally, I understand that failing to identify payors accurately may have a significant impact on identifying the share of Class Members who are unharmed.

23.     To illustrate the challenge of matching payment records to identify unique payors, I present fictitious data in Exhibit 2 with the same structure and format as and exhibiting some of the same types of data issues I have observed in the Apple Payor Data. For readability, I show just a subset of the fields in the five categories containing personally identifying information in the data in Exhibit 2: *person_id_hashed*, *first_name*, *last_name*, *hash_hashed*, *phone_number_hashed*, *city*, *state*, *postal_code*, and *street1*.[22]

### Exhibit 2
### Fictitious Examples of Apple Payor Data

| | person_id hashed | first_ name | last_ name | hash_hashed | phone_number hashed | city | state | postal code | street1 |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 9q4ei2e3... | Jane | Brown | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 2. | 9q4ei2e3... | J@ne | Brown1 | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 3. | 1e5ee5e5... | Bob | Brown | 4a8596a7... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 4. | 83cf8b60... | Bob | Brown | 377adeb4... | 124dfe52... | Dallas | TX | 75201 | The moon |
| 5. | 5344c411... | Ann | Lee | a7f0b84d... | 08efb597... | San Francisco | CA | 94102 | 11 Fifth St |
| 6. | 234666d7... | Ann | Lee | 9ae2bdd7... | fb824fc4... | San Fransisco | CA | 94102 | 11 Fifth St |
| 7. | fd0f7e53... | Frank | Nguyen | ee377871... | ede1c491... | NYC | NY | 10010 | 12 W 50th St |
| 8. | 98f1f17f... | Frank | Nguyen | d59eced1... | 9e0b260d... | New York City | NY | 10010 | 12 W 50th Street |
| 9. | d359f8b5... | Bill | Smith | 14063697... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 10. | 30e4c022... | William | Smith | 768b84ef... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 11. | 30e4c022... | W | S | | 7fcbba91... | | | | |

Source: Fictitious data resembling the Apple Payor Data
Note: See text.

---

█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████.

24.     Exhibit 2 shows eleven rows of fictitious data, where each row is a distinct combination of data across all fields. I understand that each of the fields in the raw data was user-generated data and that Apple anonymized the *person_id_hashed*, *hash_hashed*, and *phone_number_hashed* fields before production in this case, i.e., Apple assigned each value of these fields to a distinct alphanumeric sequence in a way that maintains distinctness.

25.     The examples presented in Exhibit 2 highlight some of the data issues in the Apple Payor Data, such as typos and invalid entries.[23] For example, rows 1 and 2 match on many of the fields, but in row 2 the *first_name* contains the special character "@" instead of the letter "a," and the *last_name* contains a numeric digit "1."[24] Rows 3 and 4 also match on many fields, but the *street1* field in row 4 indicates "The moon," which is not a valid street name in Dallas. Rows 1–3 also seem to have the same address and phone number but have two distinct names and account identifiers.

26.     There are additional typos and invalid entries in the user-generated addresses in Exhibit 2. For instance, rows 5 and 6 match on most fields, but the city field in row 6 misspells "San Francisco," instead writing "San Fransisco." In Rows 7 and 8, the records are similar except the *city* field in row 7 lists "NYC" while row 8 lists "New York City," and the *street1* field in row 7 lists "12 W 50th St" while in row 8 the *street1* field indicates "12 W 50th Street."

27.     Names can also take different forms. For example, rows 9 and 10 are identical except for the *person_id_hashed* and the *first_name* field: *first_name* in row 9 is "Bill" and *first_name* in row 10 is "William."

---

[23] These examples, though fictitious, are comparable to the data quality issues that Mr. Thompson mentioned. *See* Thompson Declaration, ¶ 5 ("A large portion of the records had missing data, values of '[Missing in DS]', 'NA' and 'X'. Nearly 10% of records provided have these data issue. Records also contained non-standard ASCII values ranging from foreign language characters to emojis. Fields contained unexpected data. For example, the state field contained over 1600 unique values. This is because sometimes a state, like California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields – for example, some of the 1600 states were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example).").

[24] I include sentence punctuation for my report inside of quotation marks. Such punctuation does not appear in the data unless specifically noted.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

28.     The fictitious data in Exhibit 2 present a small set of illustrative examples of the challenges associated with deduplicating records and identifying "unique payors."[25] Records must be cleaned, and judgments must be made about when it is appropriate to group records. Many of these judgments are not obvious without an individualized inquiry—for example, it is difficult to determine simply from comparing "William" and "Bill" Smith at the same address and phone number whether this is two unique individuals, such as a father and son, or whether this is a single individual who reported a nickname "Bill" in one instance and a legal name "William" in another.

29.     The topics of data cleaning and deduplication have long been active areas of research in statistics and data science. Scientists frequently develop methods to clean (including data verification and validation) and deduplicate user entered addresses and other identifying information in application areas such as optimization of package delivery routes, mail redirection, or grouping addresses for demographic purposes such as community identification.[26] Statistical methods, which I discuss in more detail in Section XII, are routinely used today in address matching, and many such models have been in frequent continuous use for many years.[27]

---

[25] Thompson Supplemental Report, ¶ 9 ("If such a means exists, Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor.").

[26] *See* Keshav Ramani and Daniel Borrajo, "Methods for Matching English Language Addresses," *Transactions in GIS*, 27(2), 2023, pp. 347–363 ("Ramani and Borrajo (2023)") at p. 348 ("Some potential applications of address matching are in the field of mail routing, clustering of addresses, and matching a given list of addresses of interest to a larger database."); Dengyue Li et al., "Approximate Address Matching," *Proceedings of the International Conference on P2P, Parallel, Grid, Cloud and Internet Computing*, 2010, pp. 264–269 ("Li et al. (2010)") at p. 264 ("Address matching and correction are widely used in daily life and business applications, in situations ranging from finding a friend who has moved to responding to a critical 911 call."). *See also* Sam Comber and Daniel Arribas-Bel, "Machine Learning Innovations in Address Matching: A Practical Comparison of Word2vec and CRFs," *Transactions in GIS*, 23(2), 2019, pp. 334–348 ("Comber and Arribas-Bel (2019)") at p. 335 ("In the absence of unique identifiers that enable direct linking of data in relational database management environments, practitioners have traditionally relied on mathematical linkage techniques broadly divided by deterministic or probabilistic principles.").

[27] Alvaro E. Monge, "Matching Algorithms Within a Duplicate Detection System," *IEEE Data Engineering Bulletin*, 23(4), 2000, pp. 14–20 ("Monge (2000)") at p. 15 ("The record matching problem has been recognized as

Statistical methods are also important to assess the reliability of data cleaning and deduplication, including through quantification of the error rates associated with data cleaning, deduplication, and estimation of unique payors.

### C. Summary of Mr. Thompson's Proposed Method to Identify Unique Payors

30.    Mr. Thompson purports to identify "unique payors" in the Apple Payor Data using a methodology that can be divided into three parts:[28] (1) data cleaning, (2) deduplication, and (3) validation. Mr. Thompson claims to have applied these steps in "an iterative process."[29]

31.    **Mr. Thompson's Described Data Cleaning.** As illustrated in Exhibit 2, records in the Apple Payor data can contain nonsensical, apparently fake or otherwise erroneous, or even missing values, as well as records that convey the same information in different ways (e.g., "NYC" and "New York City"). Mr. Thompson made similar observations in his Declaration, stating that "[d]uring the initial review of the Payor data [sample], significant data issues were identified."[30] In addition to finding missing or placeholder values, Mr. Thompson reported finding "non-standard ASCII values ranging from foreign language characters to emojis,"

---

important for at least 50 years."); Comber and Arribas-Bel (2019), p. 335 ("Traditionally, address matching has focused on the probabilistic linkage approaches developed by the US Census Bureau in the 1970s."). *See also* Halbert L. Dunn, "Record Linkage," *American Journal of Public Health*, 36(12), 1946, pp. 1412–1416; H.B. Newcombe et al., "Automatic Linkage of Vital Records," *Science*, 130(3381), 1959, pp. 954–959 ("Newcombe et al. (1959)"). For a historical discussion, *see, e.g.*, Jana Lynn Asher et al., "An Introduction to Probabilistic Record Linkage with a Focus on Linkage Processing for WTC Registries," *International Journal of Environmental Research and Public Health*, 17(18), Article 6937, 2020, pp. 1–16 ("Asher et al. (2020)"); Wen Xia et al., "A Comprehensive Study of the Past, Present, and Future of Data Deduplication," *Proceedings of the IEEE*, 104(9), 2016, pp. 1681–1710 ("Xia et al. (2016)").

[28] Mr. Thompson's code also includes code to load raw data for processing and export final output. These steps do not involve substantive analysis and therefore are not a focus of my report.

[29] Thompson Supplemental Report, ¶ 17.

[30] Thompson Declaration, ¶ 5.

"unexpected data" in fields ("over 1600 unique values" in the "state" field), and "data… in the wrong fields," such as cities in the "state" field or "name in the phone field as an example."[31]

32.      In his Supplemental Report, Mr. Thompson confirmed that he had "developed a data cleansing algorithm to address any data issues in an attempt to leave usable data for future matching."[32] He stated that this cleaning code contains "layers of proprietary data cleansing code to address the remaining data quality issues," and additional layers would be added and run until "marginal returns were very low."[33] I describe Mr. Thompson's data cleaning in more detail in Section XII.B.

33.      **Mr. Thompson's Described Deduplication**. The second part of Mr. Thompson's methodology is "deduplication." Mr. Thompson uses this terminology to refer to the process of attempting to match distinct records that correspond to a single "unique individual."[34] To deduplicate payor records, Mr. Thompson stated that he wrote "new code for this project" to identify records that match exactly on certain cleaned and combined fields.[35] Mr. Thompson's stated method consists of ▮ "Rounds" of deduplication using his cleaned fields, and each Round includes several combinations of these cleaned fields that are used to match records. Mr.

---

[31] Thompson Declaration, ¶ 5.

[32] Thompson Supplemental Report, ¶ 17.b. Mr. Thompson refers to cleaning the data as "data cleansing" while I refer to it in this report as "data cleaning." Data cleaning is the standard terminology used by the scientific community.

[33] Thompson Supplemental Report, ¶ 17.c.

[34] Deduplication is defined as "[t]he process of determination and elimination of duplicates." *See* Otmane Azeroual et al., "A Record Linkage-Based Data Deduplication Framework with DataCleaner Extension," *Multimodal Technologies and Interaction*, 6(4), Article 27, 2022, pp. 1–18 at p. 1. I use the term deduplication and matching of records interchangeably in this report. *See* Thompson Deposition, pp. 119:22–120:1 ("Q. Is identifying unique individuals distinct from deduplicating records? A. I'm trying to determine what the outcome of -- of -- of both efforts are in my head. I believe the outcome is essentially the same.").

[35] Thompson Supplemental Report, ¶ 17.d. The one exception to exact matching is that one step of his algorithm allows records to match on the first three characters of the first name, along with exact matching on additional fields. This is described below in Exhibit 3.

Thompson referred to each set of fields used to match records in subsequent steps as a "Tier."[36] Exhibit 3 shows the fields that are used in each Tier and Round in Mr. Thompson's deduplication method.

34.    In ▮▮▮▮▮▮▮▮ his deduplication process, Mr. Thompson used thirteen combinations of fields, or Tiers.[37] The thirteen Tiers match records based on the fields listed in Exhibit 3.[38]

---

*Exhibit 3*



[36] Thompson Supplemental Report, ¶ 17.e.

[37] Thompson testified that the choice and number of fields chosen for matching was done based only on his experience. Thompson Deposition, pp. 176:5–177:4 ("Q. … Sticking with your report, the paragraph 17E states that, 'the top tier of the matching algorithm is the most stringent and matched on Person_ID_Hashed, first name, last name, full address, city, state and postal code.' Do you see where I'm reading that from? A. I do. Q. And when you say, 'top tier,' does that mean that this tier was run first before other matching tiers? A. I -- yes, I believe that is correct. Q. Okay. And why were these variables chosen for matching in this top tier? A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual. And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all match, I have an extremely high confidence level that that should be the same person. Q. And what is that understanding based on? A. Experience."). *See also* Section XII.A.

[38] I observed in the Computer Code that Mr. Thompson created the following fields to use as the basis for deduplicating records: *compressed_full_name* catenates *first_name* and *last_name*; *compressed_full_address* catenates *street1*, *street2*, *street3*, *city*, *state*, and *postal_code*; *compressed_partial_address_w_postal* catenates *street1*, *street2*, *street3*, and *postal_code*; *compressed_partial_address_w_city_state* catenates *street1*, *street2*, *street3*, *city*, and *state*. I use the term "catenate" to refer to Mr. Thompson's removal of white space " " and addition of the "^" character delimiter. For example, *compressed_full_name* is *first_name* and *last_name* with no white space and a "^" delimiter between.

███████████████████████████████████████████████████████

35.    In each of the Tiers listed in Exhibit 3, Thompson considered records "duplicates" if they have exactly the same values for each of the fields in that Tier.[39] For example, in Tier 1, Mr. Thompson began by searching for exact matches based on the account identifier ████████████████████████████████████████████████ ████████████████████ [40] For each group of records that matches exactly at this step (and each "group" consisting of a single unmatched record), Mr. Thompson assigned a primary record that will then be considered for matching in subsequent Tiers. Importantly, the primary record Mr. Thompson chose was simply the record that happened to appear first in the data for each group. This determination is completely arbitrary and entirely dependent on the order in which records initially appeared in the Apple Payor Data. In subsequent rounds of matching, Mr. Thompson disregarded all information not contained in the primary records, except in Round 5 where Mr. Thompson attempted to match records with a missing name.[41] I return to this point in Section VII.C.

36.    In ████ of his deduplication algorithm, Mr. Thompson then looked for primary records that match ████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████

---

[39] In his deposition, Mr. Thompson testified that he allowed a partial match on the first three letters of *first_name*. Thompson Deposition, p. 155:19–25 ("A. So the -- the al- -- matching algorithm does do a partial first name along with last name and address. But I believe because partial first name does, you know, present a -- a increased risk of overmatching, I believe the algorithm includes a -- the phone_number_hashed as a -- as a validator to compensate for the increased risk of a partial name."). In his produced Computer Code, Mr. Thompson appears to only apply this partial match on the first three letters of the *first_name* field in ████.

[40] *See* footnote 38 for a description of the purportedly cleaned fields Mr. Thompson uses to match records.

[41] In Tiers ████████ Mr. Thompson allows records with a missing name to match to any of the 1.69 billion records in the full Apple Payor Data.

37.     **Example**. This process is depicted in Exhibit 4 for selected records that appear to be associated with named Plaintiff Robert Pepper. [42] In this example, █████████ are exact matches based on the account identifier, full name, and full address, so these are matched ████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ there are three potential "unique payors" still under consideration.

38.     In Tier 2, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

---

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

*Exhibit 4*



39.   Durin <span style="background:black">████████████████████████</span>
the Apple Payor Data (corresponding t<span style="background:black">████</span> million distinct records) at the same time. Instead,
according to the Computer Code, h<span style="background:black">████████████████████</span>

40.   <span style="background:black">███████████████</span> Mr. Thompson's deduplication process, he created a

41.    During ████ of Mr. Thompson's deduplication process, █████████



42.    After ████ Mr. Thompson sent every primary record that remained at this point of his deduplication process (approximately 270 million records) to Melissa Data, a third party service that uses the National Change of Address ("NCOA") data from the United States Postal Service ("USPS") to "update the addresses of customers that have moved."[43] However, due to the arbitrary sort order, the primary record does not always correspond to the most recent address available for a purported matched group of records, since the selection of the primary record was arbitrary for a matched group. Furthermore, the NCOA only maintains a four-year change of address history.[44]

---

[43] *See* Melissa Direct, "NCOALink® National Change of Address (NCOA) Service," available at https://www.melissa.com/direct/direct-mail/ncoa-link, accessed on June 25, 2025. NCOA is a centralized system that stores approximately 160 million change-of-address records consisting of names and addresses of individuals, families, and businesses who have submitted a change-of-address with the U.S. Postal Service. *See* "NCOALink®," *USPS*, available at http://postalpro.usps.com/mailing-and-shipping-services/NCOALink, accessed on June 23, 2025. I understand that Melissa Data is a full service provider of NCOA data licensed by U.S. Postal Service. "NCOALink® Full Service Provider Licensees," *USPS*, April 25, 2025, available at https://postalpro.usps.com/ncoalink/Full_Service_Provider_Licensees, accessed on June 23, 2025.

[44] *See* Workpaper 2. Among the 270 million records Mr. Thompson sent to Melissa Data, 58 percent of the records were created before year 2020.

43.    Using the addresses that he received back from Melissa Data, Mr. Thompson performed a



███████████████████████████████████████████████████
█████████████████████████████████████████████ .[45]

    a.    Tier 17: *compressed_full_name, NCOA_compressed_full address*[46]

44.    Finally, Mr. Thompson performed a ██████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████[47]

45.    ████████████████████████████████████

        ████████████████████████████████████████████

        █████████████████████████████████████████████

        ███████████████████████████████████████

        █████████████████████████████████

        ██████████████████████████

---

[45] I note that the code Mr. Thompson used to perform matching in ██████ has many additional Tiers that were "commented" out of Mr. Thompson's code. According to Mr. Thompson, commenting code means "flagging particular sections as don't run," and he agreed that in layman's terms, uncommenting and commenting mean "turning on and off different parts of code," respectively. *See* Thompson Deposition, p. 170:1–17 ("[C]ommenting is simply flagging particular sections as, don't run -- when this file is executed, don't run these -- this section. So that would be commenting it out. Or uncommenting it would be, make this particular section of code available for execution."). It is not clear if Mr. Thompson ever ran those additional Tiers that were commented in his code.

[46] █████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████

[47] Before ██████████ Mr. Thompson replaced or removed non-ASCII characters from fields █████████████
██████████████████████████████████████████████████████████

[48] I note that Mr. Thompson ran ████████████████████████████████████████
██████████████████████████████████████████████████



Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

46.     In Tiers ███ Mr. Thompson ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

47.     At the end of this process, Mr. Thompson purported to identify ███ million "unique individuals."[50]

48.     **Mr. Thompson's Described Validation**. As noted, Mr. Thompson stated that the data cleaning and deduplication parts of his method were "intertwined with data validation."[51] Based on my review of the materials Mr. Thompson produced, as well as Mr. Thompson's deposition testimony, I understand that his data "validation" was only used in an ad hoc way to help try to determine what data cleaning steps were necessary and to identify anomalies that required adjustment to his matching algorithm.[52]

---

[49] For each group of records that matched on each Tier, ████████████ ████████████████ . It is possible that there are multiple primary records in a matched group, however, Mr. Thompson's code ████████████████████████████████████████

[50] Mr. Thompson also asserted that there are ███ million unique payors in the Apple Payor Data. *See* Thompson Supplemental Report, ¶ 18. However, Mr. Thompson's backup materials show ████████ unique payors instead. *See* Workpaper 3. No explanation of this discrepancy is provided, nor any information on which value is correct.

[51] Thompson Supplemental Report, ¶ 17.e.

[52] Thompson Deposition, pp. 141:2–142:14 ("Q. (BY MR. LAZARUS) How was the review carried out? You mentioned Cameron assisted with that. What review was done by you and Cameron? A. For -- for each tier, we would --

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**VI.    Mr. Thompson Used the Wrong Definition of Payor and As a Result His Method Cannot Reliably Identify Unique Payors**

49.    I understand from Counsel that a payor is an individual whose money was used to pay for a transaction.[53] As discussed in Section II, I understand from Counsel that the Class consists of individual "payors,"[54] not, for example, individual Apple accounts, and that Plaintiffs retained Mr. Thompson to disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have used the same Apple accounts.[55] As I will discuss in this section, Mr. Thompson stated that his assignment was to "determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person [… and if] such a means exists, [… to ] proceed with deduplicating those records [… to identify] each unique payor."[56] Mr. Thompson also claimed that "each unique payor could be a potential Class member, depending on whether they meet the requirements for Class membership."[57] I conducted analyses that show Mr. Thompson's definition of "payor" in his deposition responses, and as implemented in his Computer Code, is untethered from the key question of who actually paid for a transaction, and as a result, his methods are not appropriate for identifying unique payors as required by his stated assignment.

50.    Mr. Thompson identified "payors" without regard for who actually paid for an app or in-app content. The Thompson Supplemental Report uses the terms "unique person," "unique

---

[53] As I described in footnote 16, in the case of a credit card (or other payment method) facilitated by intermediary institutions, I understand that the credit card holder (or holder of the payment method) should be considered the payor. For example, I understand from counsel that a child who uses a parent's credit card to perform transactions on the App Store would not be a distinct payor from the parent if the parent were the individual responsible for paying the credit card bill.

[54] Some payors may not meet all the conditions to be part of the class. Thus I understand that the class consists of payors, but not all payors are in the class.

[55] *See* Section V; Thompson Supplemental Report, ¶¶ 8–9.

[56] Thompson Supplemental Report, ¶ 9.

[57] Thompson Supplemental Report, ¶ 9.

individual," "unique payor," and "potential class member" interchangeably.[58] Mr. Thompson further testified in his deposition that a payor is "an individual that paid for something" and has "a record in the transaction data with [the individual's] personal information on [that record]."[59] Consistent with this language, Mr. Thompson largely did not use payment information in his deduplication method and does not consider who paid for transactions when assigning records to a "payor." As I discuss in Section IX, as Mr. Thompson's method was actually designed for identifying records that are "duplicates,"[60] and not "unique payors," Mr. Thompson effectively treated the observation that two records use the same payment information in the same manner as the observation that two records have the same name or the same address.

51.    To illustrate the impact of Mr. Thompson's definition of "payor," consider the following three records in Exhibit 5 from the Apple Payor Data that were presented to Mr. Thompson during his deposition. These three records list different names, but the records share the same

---

[58] Thompson Supplemental Report, ¶¶ 9 ("Specifically, Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person. If such a means exists, Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor … I understand that each unique payor could be a potential Class member…"), 18 ("…JND deduplicated the Apple Payor Data to reduce the number of potential Class members from approximately ▇ billion to approximately ▇ million unique individuals…"). *See also* Thompson Deposition, p. 79:4–13 ("Q. All right. You use the term 'unique payor' in paragraph 9. And then in paragraph 18 you use the term 'unique individual.' Do those mean the same thing in this context? ... A. Yeah, I think if -- the entire sentence read in context would suggest, that, yeah, individuals represents Apple payor.").

[59] Thompson Deposition, p. 160:16–24 (describing that Mr. Thompson views a payor as "a[n] individual that paid for something," and that he was "not aware of anything that suggests that it has to be their own credit card, just that they have to make a payment. And, therefore, they have a transact -- a record in the transaction data with their personal information on it.").

[60] Thompson Deposition, pp. 68:17–25 ("Q. Okay. And am I correct that, in broad strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate data by matching records that appear to you to represent the same person… Is that a fair characterization of what you have done? A. I think that is a reasonable summary."), 82:14–18 ("I also, when I produced the ultimate outcome to – back to Apple, I provided a – an ID indicator so that they understood that I was not providing duplicate records. They provided duplicate records to me and I was just providing an outcome for what they gave me."), 96:6–12 ("Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level? A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity.").

address and credit card payment information.[61] Mr. Thompson's method identified these records as three separate "unique payors."

*Exhibit 5*



52.    Mr. Thompson confirmed at deposition that he believed categorizing these records as three unique payors was correct, and that this was consistent with his definition of "unique payor."[62] However, I understand that these three records represent a mother, a father, and a

---

[61] Thompson Deposition, p. 159:4–11 (where Mr. Thompson agreed that the three records have the same address and payment information, "[D]o you see that they all three have the same address except that Avenue is fully spelled out in two of them and abbreviated in one of them? A. I do. Q. And do you see that all three of them use the same payment method…? A. I do.").

[62] Thompson Deposition, pp. 159:12–16 ("Q. Would it be -- well, in your opinion sitting here today, do you believe that these are one, two or three unique payors? A. With the data available in front of me, in isolation, it looks to be three different people."), 163:11–14 (testifying that he did "not see uncertainty in who the unique payors were" in that example), 163:17–164:9 (testifying that his "understanding of the Apple payor data is that each line represents a … billing event associated with transactions that I did not have and -- but represented billing events or purchases. And … each individual that made a purchase represented a potential class member if they fulfilled all additional requirements for … being part of the class. It -- I am unaware if it exists, but I am not privy to it, but I am unaware of anything within the class definition that suggests that a payor had to use their own credit card or -- and I don't -- I am unaware of how, on an individual basis, one could determine that regardless of the data. Because [daughter] could have used her -- whoever's credit card and gave him 20 bucks for it, and so she did actually pay. So the -- I don't see how the hypotheticals in this situation could ever be resolved.").

daughter.[63] I further understand that the daughter used the parents' credit card to make purchases on the App Store, but that the parents are the card holders and bear the responsibility to pay the credit card bills associated with the card in question—specifically, the *hash_hashed* field in Exhibit 5, which I understand to be the hashed payment card information, is identical across the three records. Consequently, based on my understanding from Counsel of the definition of "payor," these three records would correspond to at most two distinct payors—the father and the mother. In other words, the daughter should not be considered a distinct payor even though Mr. Thompson has designated her as one in both his deposition and in his Computer Code.[64] Identifying unique payors in such instances requires an individualized inquiry to determine who actually paid. Such inquiry would not be possible with the available Apple Payor Data.

53.    This is not an isolated example. For the purported payors identified by Mr. Thompson who use credit and debit cards, 22.3 percent appear to use a card attributed to another "unique payor."[65] Similarly, my analysis shows that 9 percent of alleged "unique payors" identified by Mr. Thompson use the same PayPal account as another "unique payor."[66] The pervasiveness of such examples shows that Mr. Thompson's fundamental misapplication of the notion of "payor" renders his method for identifying purportedly "unique payors" highly ineffective and unreliable in the disambiguation of unique payors it sought to accomplish.

54.    **Conclusion**. Mr. Thompson used a materially incorrect definition of payor, and therefore his method cannot reliably identify unique payors.

---

[63] I understand that one of these records corresponds to ███████████, who is a partner at Gibson, Dunn & Crutcher representing Apple in this matter. My understanding is that ████████ is therefore excluded from the class. *See* Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2. ████████'s class membership is not material, however, for purposes of assessing the reliability of Mr. Thompson's method at identifying "unique payors."

[64] From the data, I am unable to distinguish whether there should be one or two distinct unique payors in this example.

[65] *See* Workpaper 4.

[66] *See* Workpaper 5.

VII.    **Mr. Thompson's Methods Are Unreliable for the Purpose of Identifying Unique Payors**

55.    Setting aside the fundamental flaw that Mr. Thompson did not use the correct notion of a payor in his attempts to identify unique payors, his method is further flawed and unreliable for the purpose of deduplicating records. Mr. Thompson's data cleaning is ineffective, with no discernable methodology, and his deduplication is based on arbitrary and ad hoc judgments that are very sensitive to arbitrary changes, such as the order in which the raw data are sorted. These flaws render Mr. Thompson's method unreliable for the purpose of identifying "unique payors."

A.    **Mr. Thompson's Data Cleaning Is Ineffective for the Purpose of Identifying Unique Payors**

56.    While Mr. Thompson described "layers of proprietary data cleansing code,"[67] his code falls far short of resolving data quality issues that might improve the results of Mr. Thompson's deduplication efforts.

57.    First, Mr. Thompson's principal data cleaning operations simply replace one invalid entry with another invalid entry.[68] Exhibit 6 shows the five most common values cleaned by Mr. Thompson in the *street1* field in the raw data and compares the values from the raw data to the values in the cleaned data that Mr. Thompson subsequently used in his matching. Rows 1 and 3, from the raw data, correspond to the address of Apple's Headquarters, and Mr. Thompson's code removed the period from the "Inc." string in the address. Mr. Thompson also admitted in his deposition that Apple's Headquarters is not a valid address for a payor, and yet it still appears in his output dataset of purported unique payors even after his cleaning effort. This is because his removal of punctuation or other special characters does not fix addresses that are invalid to begin

---

[67] Thompson Supplemental Report, ¶ 17.c.

[68] Mr. Thompson also has data cleaning operations that replace values with "missing." Those operations are not the focus of this discussion as replacing a value with missing does not retain information that can be used for matching.

with.[69] Rows 2 and 4 are cleaned to remove the hyphen, even though we do not know whether there is ambiguity between values like "182-21" and "18-221." This cleaning step would be invalid when the placement of the special character has meaning.[70]

58.    The addresses in Rows 2 or 4 may be actual addresses, but neither appears to be a valid address because each is associated with tens of thousands of payor records. Each is associated with tens of thousands of payor records and, yet again these addresses appear in Mr. Thompson's output dataset of purported unique payors. In Row 5, his Computer Code replaced "N/A" with "NA," but Mr. Thompson still used the value "NA" to attempt to match even though this again is not a valid payor street address.

---

*Exhibit 6*
*Most Common Values that Mr. Thompson Purportedly "Cleaned" in the street1 Field*

| | *street1* in Raw Apple Payor Data | *street1_cleaned* in Mr. Thompson's Backup Materials[1] | Count |
|---|---|---|---|
| 1. | Apple Computer Inc. 1 Infinite Loop | AppleComputerInc1InfiniteLoop | 177,041 |
| 2. | ███████████████████ | ███████████████████ | 147,376 |
| 3. | Apple Computer Inc. | AppleComputerInc | 101,070 |
| 4. | ███████████████████ | ███████████████████ | 86,475 |
| 5. | N/A | NA | 55,512 |

Source: Apple Payor Data; Thompson Backup Materials
Note: As I describe in Section VII.A, Mr. Thompson replaces the value "NA" with a missing value during his data cleaning. However, he does this *before* he removes the forward slash character "/". Consequently, he replaces "NA" with missing, but "N/A" becomes "NA" and is not subsequently updated to also be a missing value.
[1] This shows the purportedly "cleaned" values used in the first three rounds of Mr. Thompson's deduplication, prior to the NCOA standardization. I understand that the NCOA product used by Mr. Thompson through Melissa Data may perform additional standardization that may be applied to primary records before the last round of matching. However, I understand that such standardization would not include removal of invalid addresses like Apple's Headquarters in Rows 1 or 3.

---

[69] Thompson Deposition, pp. 89:20–90:8 ("Q: Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here? A. I do recall a small portion of Apple's address as the address, yeah… In my opinion, that -- Apple's address as an Apple payor address is not a valid address."). I discuss below in Section XIV that Mr. Thompson does not clean this value, even though he testifies in his deposition that he believed he did so.

[70] A similar example that does not appear in the top 5 is ███████████████████

59.     An analysis of the specific special characters removed by Mr. Thompson also demonstrates that his data cleaning did not resolve other fundamental problems with invalid entries. For example, Mr. Thompson removed the special character "@" from the *street1* field even though over 80 percent of the records that contain the "@" symbol in the *street1* field also contain ".com," ".net," ".edu," or ".org," and therefore appear to be email addresses, not valid street addresses to use for matching, an observation apparently missed by Mr. Thompson.[71] Similarly, Mr. Thompson removed the special character "#" from the *street1* field even though the top five most common occurrences of this special character in the *street1* field appear to use it to denote an apartment number, *i.e.,* "#1," "#2," "#3," "#4," and "#5."[72] He also removed the "/" special character where again, in each of the five most common instances of this character in the *street1* field ("1/2," "1/4," "c/o," "3/4," and "N/A"), this character appears to have a meaning important for matching.[73] Mr. Thompson then used these invalid street addresses for his street address matching in Tiers 1–16.

60.     Similar patterns hold for the other fields that Mr. Thompson cleaned. For example, Exhibit 7 shows the five most common values cleaned by Mr. Thompson in the *street2* field. As was the case for the *street1* field, Mr. Thompson's most common data cleaning modifications for *street2* do not improve the quality of the data that can be used for matching. The values "#2" and "Apt. 2" in the *street2* field in Rows 1 and 3 respectively may be synonymous in many instances, but Mr. Thompson's own cleaning does not standardize these values in a way that would permit a match during subsequent deduplication steps, for example his use of exact matching does not match "2" and "Apt2."

---

[71] *See* Workpaper 6.

[72] *See* Workpaper 7. The value "#2" is the most common, followed by "#1," "#3," "#4," and "#5."

[73] *See* Workpaper 8. Mr. Thompson's final output actually includes the "/" special character in the *street1* field because he conducts non-ASCII cleaning after this step. Specifically, Mr. Thompson replaced "½" with "1/2," and he does this after removing symbols "/."

61.    Mr. Thompson testified that Melissa Data's NCOA service may perform address standardization, but he was unable to describe the standardization process in his deposition and asserted that it would not be possible for him to validate the NCOA data processing done by Melissa Data.[74] In other words, Mr. Thompson admitted that he is unaware of the "internal processes" of this significant part of his data cleaning, leaving this potentially important step of his process a black box.[75] Additionally, as I described in Section V.C, Mr. Thompson only sent a subset of records to the NCOA, and that subset was arbitrarily chosen such that it may not always correspond to the most recent address available for a potential payor. Also, as I describe in Section XIII, I did not have sufficient access to the Melissa Data application to validate the additional standardization done by the Melissa Data operation myself.

---

**Exhibit 7**
*Most Common Values that Mr. Thompson Purportedly "Cleaned" in the street2 Field*

|  | *street1* in Raw Apple Payor Data | *street1_cleaned* in Mr. Thompson's Backup Materials[1] | Count |
|---|---|---|---|
| 1. | #2 | 2 | 529,730 |
| 2. | #1 | 1 | 393,997 |
| 3. | Apt. 2 | Apt2 | 391,553 |
| 4. | #3 | 3 | 388,081 |
| 5. | Apt. 1 | Apt1 | 377,465 |

Source: Apple Payor Data; Thompson Backup Materials
Note:
[1] This shows the purportedly "cleaned" values used in the ▇▇▇▇ rounds of Mr. Thompson's deduplication, prior to the NCOA standardization. I understand that the NCOA product used by Mr. Thompson through Melissa Data may perform additional standardization that may be applied to primary records before the last round of matching. However, Mr. Thompson was unable to describe the standardization performed by Melissa Data. *See* footnote 74.

---

[74] Thompson Deposition, pp. 186:11–188:10 ("[Melissa Data's NCOA] attempts to take the address input and standardize it to the -- basically, the postal -- the USPS form of an address, from -- from my understanding… Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly? A. No… Q. … [Y]ou're not aware whether they use exact matching or… fuzzy matching? A. I'm -- yeah I am not aware of their -- internal processes.").

[75] *See* footnote 74.

62.     These flaws also apply beyond the address fields. The five most common first names with numeric characters are "1" (which Mr. Thompson set to a missing value), "xp2n" (which becomes "xpn"), "M7md" (which becomes "Mmd"), "Applecard911" (which becomes "Applecard"), and "11" (which Mr. Thompson set to a missing value).[76] To the extent that some of these may be online usernames or another phrase unique payors identify with, removing numeric characters would decrease the quality of matching by removing information that could have helped to distinguish between distinct payors.

63.     These examples show that for the purpose of deduplicating records, Mr. Thompson's data cleaning is seriously deficient and ineffective, if not outright detrimental, and facilitates matching of records that should not be matched and does not allow matching of records that should be matched.

### B.  Mr. Thompson's Deduplication Is Unreliable for the Purpose of Identifying Unique Payors

64.     Mr. Thompson's deduplication approach is also unreliable, in some obvious instances erroneously assigning records corresponding to a single individual to multiple purported payors, and in other instances assigning records corresponding to multiple individuals to a single purported payor. Each type of error will be discussed in turn. Consider named Plaintiff Robert Pepper, for whom I list two records in Exhibit 8. Mr. Pepper has at least two different account identifiers, and the payor records associated with one account identifier use the first name "Rob," while the payor records associated with the other use the first name "Robert." However, Mr. Pepper's records share the same address, phone number, and credit card data.[77] Mr. Thompson's method incorrectly concludes that named Plaintiff Pepper is two "unique payors" ("Rob" and

---

[76] *See* Workpaper 9.

[77] I note that the address matches the one Mr. Pepper provided in his deposition. *See* Pepper Deposition, p. 16:3–9 (noting that Mr. Pepper's home address in 2021 was ████████████████████████

"Robert") because Mr. Pepper has records for which the first names and the Apple account

identifiers do not match exactly.[78]

---

*Exhibit 8*
*Mr. Thompson's Matched Results for Named Plaintiff Pepper*

| | Purported Payor 1 | Purported Payor 2 |
|---|---|---|
| person_id_hashed | | |
| compressed_full_name | | |
| hash_hashed | | |
| phone_number_hashed_cleaned | | |
| compressed_full_address | | |
| seq (JND_ID) | | |
| primary_seq (JND_Primary_ID) | | |

Source: Thompson Backup Materials
Note: Mr. Thompson incorrectly assigned the records associated with named Plaintiff Pepper to two purported unique payors. As I described in Section V.C, Mr. Thompson catenated cleaned fields into new fields (e.g., *compressed_full_name*, *compressed_full_address*) which he then used for his matching exercise.

---

65.    While Mr. Thompson appears to incorrectly identify records associated with named

Plaintiff Pepper,[79] the personally identifying information in these two sets of records could

correspond to Mr. Pepper and another individual at the same address with a similar name (e.g., █

█ ). Again, this would require individualized inquiry requiring more information than available

in the Apple Payor Data, which is consistent with Mr. Thompson's deposition testimony that he

---

[78] In █████ Mr. Thompson matched on ███████████████████████████ *See* Exhibit 3 above. It's also worth noting that Mr. Thompson's method would never match two records for an individual that used a *first_name* like "Bill" in some records and another *first_name* like "William" in other records. Since these two *first_name* values do not have the first three letters in common, Mr. Thompson's method will *never* attribute them to a single "unique payor" even if all other variables in the data match. As I discussed in Section II, I understand that disambiguating unique payors such as named Plaintiff Pepper who might have more than one Apple account, as well as disambiguating multiple payors who share a single Apple account, is the very reason that Plaintiffs have retained Mr. Thompson. That his method fails to disambiguate Mr. Pepper's records because Mr. Pepper used a different first name for these two records associated with different Apple account identifiers is evidence of the inability of Mr. Thompson's method to reliably perform the intended disambiguation.

[79] For example, I understand from Mr. Pepper's deposition that Mr. Pepper has a son ███████████ , but I see no indication that there is another individual living with Mr. Pepper who shares the name "Rob" or "Robert." *See* Pepper Deposition pp. 108:10–13 (describing that Mr. Pepper purchased an iPad for his "oldest son,████████████ ██████████████████████████████████████████████████████████████████████

could not distinguish cases based on the data alone.[80] However, even in this instance, it would still be appropriate to assign these records to a single "unique payor" if in fact only one person actually paid. Mr. Pepper used this notion of payor—i.e., the one who actually paid—in his deposition, describing that "it's me buying it" even if the app was for a family member's use.[81] There are many similar examples, such as records with different names and addresses but the same phone number, which might correspond to a single individual who changed their name and moved because of a marriage or divorce, or which could represent two individuals who had the same phone number at different points in time; records with different first names, but the same last name, address, and phone number, which could be due to the use of a nickname; and others. As I discuss in Section XI, Mr. Thompson made no attempt to quantify the portion of records he could not disambiguate, and even seemed to be unaware of the need to do so to assess the reliability of his method.

66.     Mr. Thompson's method is also unreliable because it produces a second type of error by erroneously assigning records for multiple people to the same purported "unique payor." As an example, consider the following records listed in Exhibit 9. These records share the first name "Kim," but they have no other information in common. When questioned in deposition, Mr. Thompson testified that "without any... additional information or evolution the data, [he]

---

[80] Thompson Deposition, pp. 146:13–147:7 (describing that Mr. Thompson "would not differentiate between those two payors … if they lived in the same household and had the same name."), 147:13–16 (discussing that Mr. Thompson could not rule out that records with the same last name but different first name might correspond to the same payor, "Q. … Do you agree that there could be records that have the same last name but different first names that could still correspond to the same payor? A. I certainly can't rule that out.").

[81] Pepper Deposition, p. 111:3–10 ("Q. And same for the iPad that was used by your son. Do you have any recollection of buying any apps on that iPad that your son was using? A. Yeah, I'm sure. So -- so it depends how you want to look at it. Would he ask me to buy an app for him, and I would say 'yes'? That happened. Do you classify that as him buying it or me? Like, I guess it's me buying it but it's for him.").

currently [didn't] see [these three records] as a...match."[82] However, Mr. Thompson's algorithm grouped these three records, and assigned them to a single purportedly "unique payor." This same purportedly "unique payor" was associated with over 40,000 records, some of which have little or no information in common other than the first name "Kim."[83] I reviewed Mr. Thompson's backup materials to determine why these records matched, and I was unable to replicate his result. When I ran Mr. Thompson's code, instead of one purportedly unique payor, I found 2,908 purportedly unique payors instead.[84] I return to this in Section XIII where I discuss that Mr. Thompson's methods are untestable because his backup materials do not produce his output. Notwithstanding the irreproducibility of Mr. Thompson's results, what is clear is that Mr. Thompson's final output associates these dissimilar records with the same purported "unique payor."

---

[82] Thompson Deposition, p. 151:20–25. Mr. Thompson also agreed that a large number, e.g. 1,000, of identical phone number records would be unlikely to be associated with a unique payor. *See* Thompson Deposition, pp. 137:18–138:1 ("Q. Do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors? A. It seems unlikely. I certainly couldn't rule it out. Q. Okay. What if it was more than 100,000 unique payors? A. It seems unlikely. Again, I cannot rule it out.").

[83] *See* Workpaper 10.

[84] *See* Workpaper 11.

*Exhibit 9*



67.     These examples show that Mr. Thompson's method has serious errors that cause his method to both overestimate and underestimate the number of distinct payors. The true number of "unique payors" may be higher or lower than what Mr. Thompson found, and I find that the correct set of records associated with any given "unique payor" may be different than the set of records that Mr. Thompson associated with that "unique payor." I understand that these sensitivities could affect the estimation of the number of uninjured class members. Mr. Thompson put no method forward for how to resolve these challenges, nor does he even attempt to assess the magnitude of the impact of these challenges on his deduplication methods and permit an assessment of the reliability of his methods.

### C.  Mr. Thompson's Deduplication Is Inappropriately Sensitive to Small Changes

68.     Compounding the cleaning and deduplication problems described in the preceding subsections, Mr. Thompson's deduplication algorithm is inappropriately sensitive to small changes, in particular to changes in parts of his method that have nothing to do with matching. The goal of sensitivity analysis is "to ascertain how a given model (numerical or otherwise)

depends on its input factors."[85] In fact, "it is generally agreed in existing guidelines that uncertainty and sensitivity analyses are both crucial for the validation or verification of a model."[86] "Sensitivity analysis provides information on the relative importance of model input parameters and assumptions. It is distinct from uncertainty analysis, which addresses the question 'How uncertain is the prediction?' Uncertainty analysis needs to map what a model does when selected input assumptions and parameters are left free to vary over their range of existence, and this is equally true of a sensitivity analysis."[87] Not only did Mr. Thompson provide no estimate of his output uncertainty (a topic discussed in Section XI.A), but also it is clear that a deduplication algorithm's effectiveness should not depend on unrelated information such as the sort order of the records. As I discuss in Section XII.A, Mr. Thompson provided no justification for the judgments used in his algorithm, such as the fields chosen for matching in the Tiers or the order of Tiers, other than his own experience and sometimes no justification at all is offered. I show that these judgments chosen by Mr. Thompson have unexplained and unjustified important effects on the outcome of the deduplication algorithm, rendering his results unreliable.[88]

69.     As one of many examples of his arbitrary judgments that lead to inappropriate sensitivity, Mr. Thompson assigned the ███████████████████████████████████████

---

[85] Andrea Saltelli et al., "A Quantitative, Model Independent Method for Global Sensitivity Analysis of Model Output," *Technometrics*, 41(1), 1999, pp. 39–56 at p. 39.

[86] Andrea Saltelli et al., "Sensitivity Analysis," *SSRN*, 2021, pp. 1–10, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3977108, at p. 1.

[87] Andrea Saltelli, "Why So Many Published Sensitivity Analyses are False: A Systematic Review of Sensitivity Analysis Practices," *Environmental Modelling & Software*, 114, 2019, pp. 29–39 at p. 29.

[88] It is important to note that because of numerous flaws in the contents and documentation of Mr. Thompson's backup, his methods were untestable. I discuss this in detail in Section XIII. However, I was able to operationalize parts of Mr. Thompson's method, including his matching Tiers that do not rely on NCOA address. I was thus able to test the sensitivity of small changes to *specific parts of the method*.



██████.[89] He provided no justification for this decision.[90] However, as I discussed in Section V.C, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████.[91]

70.    To demonstrate how Mr. Thompson's arbitrary choice of primary record affect the results of his matching, consider the example presented in Exhibit 9, which list records for a purported "unique payor" with the first name "Kim." As I described in Section VII.B, there are over 40,000 records in the Apple Payor Data that Mr. Thompson assigned to this purported payor. As the records assigned to this purported payor vary significantly in terms of the identifying information, the primary record selected at any given Tier of the matching process will have an important effect on the set of matches in the next Tier. To demonstrate this impact, I attempted to run Mr. Thompson's data cleaning and deduplication on all of the more than 40,000 records associated with this purported payor, except without the NCOA address cleaning step and ██ of the deduplication.[92] I also had to make some edits to Mr. Thompson's Computer Code, because as I discuss in Section XIII, that code did not run as produced.[93] Apart from these changes, I attempted to run Mr. Thompson's data cleaning and deduplication in exactly the same

---

[89] I discussed the arbitrary designation of a primary record in Section V.C. Another example of an arbitrary decision is the order of the matching tiers. While Mr. Thompson attempts to justify ██████████████████████ ████████████████████████████████████████ *See* Thompson Supplemental Report, ¶ 17.e.

[90] Another decision rule, for example, would have been to assign the most recently updated record to be the primary record. As I also noted in Section V.C, this may have been a more principled way of choosing which record to send to Melissa Data for NCOA and other address cleanup.

[91] Except during ████████ Mr. Thompson's matching, which attempts to deduplicate records with a missing name.

[92] I did not have access to NCOA data.

[93] ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

order specified in his ReadMe file, and with no changes to the substantive data cleaning or deduplication steps as specified in his code. This produced 2,908 purported "unique payors."[94]

71.    I then re-sorted the raw Apple Payor Data, and proceeded to rerun *exactly* the same set of cleaning and deduplication steps just discussed. With this new sort order for the raw Apple Payor Data, Mr. Thompson's code produced 2,429 purported "unique payors," a 16.5 percent change.[95] This sensitivity to an arbitrary change that should not affect the results shows that Mr. Thompson's deduplication method is unreliable.

72.    **Conclusion**. Mr. Thompson's method is flawed and unreliable, with no discernable methodology, for the purpose of deduplicating records because it relies on ineffective or even detrimental data cleaning operations, the deduplication is inconsistent—in some instances erroneously assigning records for a single individual to multiple purported payors, and in other instances erroneously assigning records corresponding to multiple individuals to a single purported payor—and is based on judgments that are unsupported, arbitrary, ad hoc, and inappropriately sensitive to small changes, rendering the output unreliable.

## VIII.    Mr. Thompson's Deduplication Method Was Designed For Providing Class Notice and Claims Administration, and Such an Approach Is Not Appropriate for a Reliable Identification of Unique Payors

73.    I understand that Mr. Thompson's methods were designed for the different purpose of providing class notice and claims administration, which rely on the substantially narrower task of deduplicating records in a dataset.[96] Mr. Thompson explained in his deposition testimony that in

---

[94] *See* Workpaper 11. This is far more than the single unique payor that Mr. Thompson identifies for these records, however it is not clear why Mr. Thompson's Computer Code did not produce the result in his final output.

[95] *See* Workpaper 12.

[96] Thompson Deposition, pp. 117:22–118:13 ("Q. … Your report states that in formulating your opinions in this case, you relied on well-accepted methods of consolidating contact data in the claims administration field including proprietary methods that JND has developed over the past nine years, correct? A. What section? Q. Let's see. Paragraph 10. Thank you. A. Okay. You see the language that I'm referring to in paragraph 10? A. I do. Q. All right. And the methods that you are describing in paragraph 10, they attempt to clean, deduplicate and match records, correct? A. Cleanse and deduplication, yes.").

every case that was included in Appendix B of his Supplemental Report (listing his work in the past four years), he reviewed or oversaw the review of data for the purpose of "class action settlement administrations."[97] Mr. Thompson also confirmed in his deposition testimony that when providing notice to class members in the claims administration field, "the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts."[98] He stated that "the intent [of deduplication] would be to combine [i.e., deduplicate] records that represent the same entity, so that whatever future action needs to be taken can be done for … an individual once. People are not a big fan of receiving 78 postcards … And also, 78 postcards … carry a cost."[99] Although deduplicating records is the goal in providing class notice, Mr. Thompson testified that it is permissible to under-aggregate records in a way that might result in "overnoticing" a certified class, as long as the class was notified "in the most efficient way possible."[100]

---

[97] Thompson Deposition pp. 24:14–18 ("Q. … And what is JND? A. JND is a legal administration firm. We provide legal administration -- or for -- administration services for class action lawsuits, securities cases. We also have a e-discovery division."), 26:5–10 ("Q. And in that paragraph 6, you state that Appendix B is a non-exhaustive list of class action settlement administrations for which I reviewed or oversaw the review of data in the last four years, correct? A. Yes.").

[98] Thompson Deposition, pp. 35:5–36:1 ("Q. All right. When deduplicating records within the claims administration process, the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts, correct? A. It is -- it is a goal. It's -- as I've mentioned, it is situational, what -- what is required for -- for any particular administration. Notice may not be one of the deliverables. But where administration -- or where noticing is and we have class data, then I believe that is a reasonable statement. Q. And what are other -- you mentioned -- you said that the deduplication with the goal of getting the best notice practicable under the circumstances to members of the class identified through reasonable effort, you said that is one goal -- or that is a goal. What are other goals? MR. BURT: Objection to form. A. We have situations -- administrations that we've administered where there is no noticing. We were just doing distribution.").

[99] Thompson Deposition, p. 37:13–20.

[100] Thompson Deposition, pp. 60:23–61:18 ("Q. (BY MR. LAZARUS) And the part about not deduplicating individuals that were not conclusively the same person, what does that refer to? A. That refers to not including logic within a deduplication process that we did not have high confidence that those -- the data points utilized would result in a -- a positive match ... Q. Is that an appropriate practice in deduplication for claims administration? A. I believe it to be, yes. Q. Okay. And why is that appropriate? A. If you are able to deduplicate with high confidence but don't deduplicate the records that you do not have confidence in the deduplication, you may slightly overnotice, but you are still notifying the class in the most efficient way possible"). *See also* Thompson Deposition, pp. 61:1–13

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

74.     Mr. Thompson took the same approach in this matter as he had taken in his prior claims administration work. He stated that as he "understood [his] assignment [for the present matter], it was to reduce duplication to the best of [his] ability where [he] had confidence that [he] had matched records that were of the same entity."[101] To do so, Mr. Thompson stated that he applied "well-accepted methods of consolidating contact data in the claims administration field."[102] He compared his process for deduplicating Apple Payor Data to the deduplication he conducted for a ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ before sending class notice.[103] The declaration submitted by JND—the firm at which Mr. Thompson works—to the court for that matter noted that "JND was trusted by the Parties to institute deduplication measures based on and in accord with [claims administration] industry best practices to combine records so that we could reduce duplicate mailings."[104]

75.     In this case, Mr. Thompson's assignment was different and required more than deduplication of contact information. As noted in Section VI, Mr. Thompson stated his assignment was to "determine whether there exists a reliable means by which to consolidate duplicative payor records *that all relate to the same person* [… and] if such a means exists, [… to ] proceed with deduplicating those records [… to *identify*] *each unique payor*" (emphasis

---

(discussing Mr. Thompson's approach that involved "not including logic within a deduplication process that we did not have high confidence that … the data points utilized would result in a … positive match"), 62:7–11 (discussing that Mr. Thompson's goal "was to deduplicate where I had high confidence in the match and not deduplicate where … I did not believe … it was reasonable to believe that the records were -- represented the same entity or individual.").

[101] Thompson Deposition, p. 96:6–13 ("Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level? A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity. I -- I cannot point to -- well, that's -- that's it.").

[102] Thompson Supplemental Report, ¶ 12.

[103] Thompson Declaration, ¶ 3; Thompson Supplemental Report, ¶ 4.

[104] Thompson Deposition, p. 36:2–19.

added).[105] As I discuss next in Section IX, the ability of a well-executed deduplication method to identify unique payors depends on the nature of the records being deduplicated, and in this case fails.

76.    **Conclusion**. Mr. Thompson's deduplication method was designed for providing class notice and claims administration, where it is permissible to under-aggregate records as long as the class was notified most efficiently, and the goal of such an approach is inappropriate for the reliable identification of unique payors in the Apple Payor Data.

## IX.    Mr. Thompson's Conclusion that His "Deduplication" Approach Reliably Identifies Unique Individuals is Unsupported By Any Evidence

77.    Mr. Thompson described the first part of his assignment as "determin[ing] whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person."[106] Despite the vast majority of the Thompson Report being devoted to the second part of Mr. Thompson's assignment (implementing a deduplication method intended to identify unique payors),[107] the first part—determining whether consolidating duplicative records can reliably identify unique payors—is just as necessary to support Mr. Thompson's assignment.[108] Assuming *arguendo* that Mr. Thompson's implemented algorithm flawlessly removed the "vast majority" of duplicate records (as he claims)[109], if it does not satisfy the first part of his assignment, Mr. Thompson's output can

---

[105] Thompson Supplemental Report, ¶ 9.

[106] Thompson Report, ¶ 7. I note that there are no files in Mr. Thompson's backup materials that appear to correspond to his purported analysis of a sample of Apple Payor Data that he claims to have used to form his opinion that "records could be deduplicated reliably." *See* Thompson Supplemental Report, ¶¶ 10, 13–14.

[107] Thompson Report, ¶ 7.

[108] Thompson Report, ¶ 7.

[109] Thompson Supplemental Report, ¶ 10.

only be interpreted as a version of the input data with duplicates removed.[110] That alone does not indicate the alleged "payors" identified by Mr. Thompson's method reliably represent unique individuals.

78.     Mr. Thompson's conclusion regarding the first part of his assignment is that "[i]t is [his] opinion, based on [his] considerable experience and the methods [he] applied here, that the final number of approximately 246 million records in the Final Payor Database is a reliable determination of unique individuals."[111] However, this conclusion is entirely unsupported by evidence, regardless of whether clear duplicates are removed correctly (which they are not, see Section VII). Despite Mr. Thompson's vague allusion to "methods [he] applied here," no method described in the Thompson Supplemental Report nor any code found in Mr. Thompson's Computer Code provides support for his conclusion.[112]

79.     When deduplication methods are used with the goal of reducing duplicative records (for example, to save money on postage), a competent deduplication method may be implemented to some benefit on virtually any data that contains duplicates.[113] However, for a deduplication-based approach to reliably identify unique individuals, as in this case, the method would need to be implemented proficiently *and* the dataset at issue would need to conform to certain assumptions. This fact is entirely missed by Mr. Thompson and consequently not addressed. Logically, for the task of reliably identifying unique individuals to be possible with a deduplication-based approach, all records attributable to the same individual must be sufficiently similar and all records attributable to different individuals must be sufficiently different. In other words,

---

[110] Thompson Deposition, p. 68:17–25 ("Q. Okay. And am I correct that, in broad 18 strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate the data by matching records that appear to you to represent the same person. Is that -- MR. BURT: Objection to form. Q. (BY MR. LAZARUS) Is that a fair characterization of what you have done? A. I think that is a reasonable summary.").

[111] Thompson Supplemental Report, ¶ 19.

[112] Thompson Supplemental Report, ¶ 19.

[113] I defined deduplication in footnote 34.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

disambiguation must be possible. Mr. Thompson stated this limitation during his deposition, noting that "[r]ecords would not be matched and deduplicated if they did not have the data points available to match records together to a level that I had confidence that they could be considered the same record."[114]

80.    **Example**. A deduplication-based method, when implemented correctly, can identify unique individuals in certain datasets. For example, unused portions of the ███████████

████████████████████████████████████████████████████████████████

███████████████████████    A deduplication-based method likely could reliably identify the number of individuals in an employer-maintained dataset containing names and Social Security numbers verified to be accurate for example, as all records attributable to a single individual would be sufficiently similar (same SSNs), while all records attributable to different individuals would be sufficiently different (different SSNs). However, for many datasets, this assumption does not hold. For example, if instead of verified SSNs, a dataset contained only birth month and year, it would likely not be possible to reliably produce a list of unique individuals, since a single combination of fields could correspond to multiple real individuals. It could similarly be impossible to identify unique individuals in a dataset that contained user-provided SSNs that contained typos and errors. Thus, the ability to reliably identify unique individuals depends on the fields available in the data and the quality of the data.

81.    For these reasons, whether the Apple Payor Data has the quality and characteristics that would allow deduplication to identify unique individuals is a fact-specific empirical question. Despite Mr. Thompson's conclusory language, Mr. Thompson left this question unanswered. As such, Mr. Thompson's claim—based only on his "considerable experience" from past engagements—that the methods described by the Thompson Supplemental Report produce a

---

[114] Thompson Deposition, p. 100:5–8.

"reliable determination of unique individuals" in this case lacks merit.[115] Whether Mr.
Thompson's deduplication method could reliably identify unique individuals in some past
dataset (which has not been demonstrated in this litigation) has no relevance to whether his
method can reliably identify records for unique individuals in the Apple Payor Data.

82.     In addition to Mr. Thompson apparently not directly analyzing whether the fields and
quality of the Apple Payor Data allow for deduplication to reliably identify unique individuals,
the evidence that Mr. Thompson does present regarding data quality points to the contrary
position. Mr. Thompson's analyses appear to corroborate Apple's assessment that the Apple
Payor data has significant issues that cannot be fully resolved.

83.     When producing these data, Apple warned that its data contain "user-generated data" that
are "not verified by Apple," and specifically that "not all data fields are populated for all payor
data records, and those that are populated may contain data that is not reliable."[116] Mr. Thompson
verified that Apple's representations regarding data quality were correct, confirming that
"significant data issues were identified with the quality" during his analysis of the sample.[117] Mr.
Thompson also noted that "[a] large portion of the records had missing data," and confirmed the
existence of apparently fake or unexpected values across many other fields.[118] While my analysis
validated the conclusions of both Apple and Mr. Thompson on this issue, even a brief review
would have been sufficient since just the first handful of records I reviewed contained missing,
anomalous, and apparently erroneous values.

84.     Mr. Thompson further declared that these issues were so pervasive that they could not be
fully resolved by his cleaning method, noting that for a dataset with "this many issues with data

---

[115] Thompson Supplemental Report, ¶ 19.

[116] *See* Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No.
4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024.

[117] Thompson Declaration, ¶ 5.

[118] Thompson Declaration, ¶ 5.

quality" there would be "no way to reach a perfectly cleansed set," which is also a conclusion that my analysis of Mr. Thompson's method supports (see Section VII.A).[119] Given that a deduplication-based method can only identify unique payors reliably if the input data is of sufficient quality, and Mr. Thompson's description of the quality of the Apple Payor Data appears to be consistent with Apple's understanding, it is unclear how Mr. Thompson then concludes that the Apple Payor Data is of sufficient quality such that removing similar rows can produce a "reliable determination of unique individuals."[120] The Thompson Supplemental Report is silent on this question.

85.     When describing his results, Mr. Thompson similarly provided no evidence that his method of deduplication reliably identifies individuals, instead focusing on how many records were combined. The sole statistic Mr. Thompson offered in apparent support of his method in the Thompson Supplemental Report is the claim that he reduced the number of primary records in the Apple Payor Data from "█████ billion to approximately █████ million unique individuals."[121] Mr. Thompson made a similar claim when asked about the quality of his results during his deposition, stating that "[w]hen you achieve over 80 percent reduction, my experience is that is an exceptional deduplication effort."[122] But these claims only evaluate the difference between Mr. Thompson's output and the input data he used, rather than the difference between Mr. Thompson's output and actual unique payors. Therefore, even if Mr. Thompson's deduplication method was adequate for eliminating duplicative records to save on mailing costs, or efficiently notice a class, there is no basis for his opinion that "█████ million records…is a reliable determination of unique individuals."[123] Therefore, even if all of the analyses performed by Mr.

---

[119] Thompson Declaration, ¶ 7.e.

[120] Thompson Supplemental Report, ¶ 19.

[121] Thompson Supplemental Report, ¶ 18.

[122] Thompson Deposition, p. 97:18–20.

[123] Thompson Supplemental Report, ¶ 19.

Thompson are accepted at face value, and every methodological and conceptual error ignored, his analyses could only support an opinion regarding the large proportion of duplicate records in the Apple Payor Data, rather than how close his output is to the true class, which he never purports to evaluate. I discuss this further in Section XI.B.

## X.    Mr. Thompson Provided No Evidence that His Method Can Be Relied Upon in a Process to Assign Transactions to Payors

86.    According to the Thompson Supplemental Report, Mr. Thompson was charged with identifying "payor records that all relate to the same person."[124] I understand from Counsel that for the purposes of calculating damages, Mr. Thompson's output was relied upon to assign individual transactions to payors, by mapping from transaction to payor record to a supposed class member identified by Mr. Thompson. For Mr. Thompson's output to be suitable for this purpose, merely identifying a list of unique potential class members (which I do not believe Mr. Thompson has done reliably) would be insufficient—the ▮ billion individual payor records must be assigned to the correct class member. However, when describing his conclusions, Mr. Thompson speaks only of the total number of potential class members, stating that "JND deduplicated the Apple Payor Data to reduce the number of potential Class members from approximately ▮ billion to approximately ▮ million unique individuals" and that "the final number of approximately ▮ million records… is a reliable determination of unique individuals."[125] It is unclear whether the Thompson Supplemental Report is intended to state that individual payor records are assigned reliably by his method, but his report and Computer Code provide no basis for that claim.

87.    Creating a class list that includes unique payors is a different and considerably simpler task compared to accurately assigning all ▮ billion payor records to class members, as it does not require correctly disambiguating individual records.  For example, consider a case where 15

---

[124] Thompson Supplemental Report, ¶ 7.

[125] Thompson Supplemental Report, ¶¶ 18–19.

payor records must be assigned correctly to 3 different potential class members. A given method might discern that there are 3 potential class members while assigning nearly all payor records and transactions to the wrong payors. While this output could be used for providing notice, and would qualify as a list of unique payors, any damages calculations that relied on it would be entirely incorrect.

88.     Whatever errors exist with regards to Mr. Thompson's purported list of unique payors, it is likely that those errors significantly understate his total error in assigning each of the ██ billion payor records to the particular grouping of records meant to represent unique payors.  As discussed previously (Section VII.B), Mr. Thompson's method appears to have difficulty disambiguating transactions in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account, with such cases being assigned in a manner that is inconsistent or incorrect.  In that section, I provided an example of the difficulty of disambiguating children who paid using a parent's credit card from parents paying with the same card, which is just one example where Mr. Thompson's method is unable to correctly assign transactions, regardless of whether it is able to identify the correct number of unique payors (which appears to vary case to case).

89.     The questionable nature of Mr. Thompson's matching of individual payor records to class members is highlighted by the number of conflicts between Mr. Thompson's method of assigning payors and the method it supposedly improves upon, which is a comparison Mr. Thompson never makes. The Thompson Supplemental Report claims the existence of ██ billion "potential Class members" prior to his deduplication (referencing the total number of records in the Apple Payor Data), and compares his ██ million alleged class members exclusively to this number. However, I understand from Counsel that the number of alleged potential class members prior to Mr. Thompson's analyses was ██ million, which is the number of potential class members if every account is assumed to belong to a unique payor. Mr. Thompson never engages with a comparison, and both methods would produce conflicting

results, he does not show why his method is an improvement on the previous flawed method Plaintiffs employed.[126]

90.     For *56 percent* of account-payor combinations in Mr. Thompson's output, the account corresponds to at least one other payor or the payor corresponds to at least one other account.[127] This shows the prevalence of potential disambiguation issues would need to be examined for a correct assignment of transaction to unique payors, but that Mr. Thompson did not examine. This need for disambiguation is true despite both methods producing a similar number of purported class members. Furthermore, Mr. Thompson's output implies the existence of payors associated with many accounts. For example, 4 payors are associated with over 100,000 accounts.[128] For the alleged payor associated with the most accounts, these accounts are also associated with approximately 65,000 others payors.[129] It is unclear why Mr. Thompson's method produces these results as no analyses supporting his unintuitive assignments of individual payor records to unique payors was described or provided. Therefore, even if Mr. Thompson's estimate that the Apple Payor Data contain "approximately ██ million unique individuals" were correct (and I do not believe that it is), there is no evidence supporting Mr. Thompson's conclusion that his output can be used to reliably match between individual transactions and class members.

91.     **Conclusion**. Mr. Thompson provides no evidence that his method reliably assigns individual records in the Apple Payor Data to the correct unique payor, and an examination of his method shows important examples where his method did not.

---

[126] *See* Thompson Supplemental Report, ¶ 18. *See* Workpaper 12.

[127] *See* Workpaper 13.

[128] Upon review, none of these payors appeared to be legitimate (i.e., none appear to belong to a large organization or government with over 100,000 accounts).

[129] *See* Workpaper 14.

**XI.    Mr. Thompson Provided No Assessment of the Error Rate of His Method and No Validation to Review Potential Sources of Error, Thus Omitting Key Components of Reliability Assessment**

92.    While Mr. Thompson purported to have performed "validation" of his work, my review of Mr. Thompson's Computer Code and his output shows that his purported validation was woefully inadequate and ineffective. He performed no estimation of the error rate, or confidence, associated with his method, including no appropriate validation of the data inputs he attempted to use to deduplicate, and no appropriate validation of the output of his method to confirm that he had reliably identified unique payors.

93.    In data analytics and statistics, validation is an essential step to ensure that a method is reliable.[130] In the context of Mr. Thompson's data cleaning, validation should be applied to the data, to ensure data cleaning actually brings the cleaned values closer to the correct values, and to the output itself, to ensure the statistical estimates are close to what they should be. As it relates to his deduplication effort, validation would allow the estimation of the magnitude of errors in his method that could either lead to incorrectly grouping records that should not have been grouped, and therefore underestimating the number of unique payors, or fail to group records that should be grouped, resulting in overestimation of the number of unique payors. Error estimation is crucial for assessing the reliability of Mr. Thompson's methods, and Mr. Thompson acknowledged that his method could simultaneously make underestimation and overestimation

---

[130] National Research Council, "Chapter 5: Model Validation and Prediction," in *Assessing the Reliability of Complex Models: Mathematical and Statistical Foundations of Verification, Validation, and Uncertainty Quantification*, (Washington, DC: The National Academies Press, 2012) pp. 52–85 ("NRC (2012)"). *See also* Soumia Belouafa et al., "Statistical Tools and Approaches to Validate Analytical Methods: Methodology and Practical Examples," *International Journal of Metrology and Quality Engineering* 8, 2017, pp. 1–10 ("Belouafa et al. (2017)") at p. 1 ("The principle of validation of quantitative analytical procedures is widely spread today in all domains of activities where measures are made. The objective of validation of an analytical method is to demonstrate that the method is suitable for the intended use... The intent of method validation is to provide scientific evidence that the analytical method is reliable and consistent before it can be used in routine analysis of product.").

errors. However, in defiance of standard practice and his assignment, Mr. Thompson made no attempt to assess or quantify the scope of those errors.[131]

### A. Mr. Thompson Provided No Assessment of the Error Rate of His Method, a Key Component of Reliability Assessment

94.    Mr. Thompson acknowledged in his deposition that his method may not deduplicate perfectly, and that he could not rule out the possibility of error.[132] Similarly, in the Thompson Declaration, he described that "[t]here is no way to reach a perfectly cleansed data set on a volume of records this large with this many issues with data quality."[133] Although estimating the error rate of his method and the uncertainty or confidence associated with his output of his method is a requirement for methods reliability assessment, Mr. Thompson made no such

---

[131] Thompson Deposition, pp. 166:3–11 ("Q…Is it possible that there were mistakes in cleaning the data? A. I certainly can't rule it out. Q. Is it possible that there were mistakes in matching the data? A. Also certainly cannot rule that out."), 164:15–165:6 ("Did you estimate a false positive rate, by which I mean the rate at which you identified two records as being the same payor even though they are not in reality? A. Did I estimate a false positive rate? Q. Yes. A. I did not. Q. Okay. And similar question, did you estimate a false negative rate? A. Can you expound by -- provide the full definition, please? Q. I will. So did you estimate a false negative rate, by which I mean the rate at which you identified two records as being different payors even though in reality they are the same payor? A. I did not.").

[132] Thompson Deposition, p. 166:3–11 ("Q. … Is it possible that there were mistakes in cleaning the data? A. I certainly can't rule it out. Q. Is it possible that there were mistakes in matching the data? A. Also certainly cannot rule that out."). *See also* Thompson Deposition, p. 99:9–22 ("Q. … In your analysis of the Apple payor data, is it possible that you eliminated 100 percent of the deduplication? A. I can't rule it out. Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication? A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to that. Q. Okay. Have you tried to quantify that at all? A. I have not.").

[133] Thompson Declaration, ¶ 7.e.

attempt.[134] Such quantification is a critical standard practice in the scientific community.[135] Indeed, in his deposition, Mr. Thompson testified that he didn't know how to quantify the amount of deduplication he had achieved through his method, i.e., the extent to which his method had grouped all records that should have been grouped.[136]

95.    In scientific work, typically a *confidence interval* is calculated, which allows a scientist to quantify the expected accuracy of the estimated output.[137] Thus, I would expect Mr. Thompson's estimate of unique payors to be accompanied by a measure of error such as a confidence interval,

---

[134] To understand how to assess and quantify an error rate associated with a statistical method, it is instructive to understand the types of errors that may occur. Deduplication can create two types of errors: the process can incorrectly match records that should not be matched, commonly referred to in statistics as a false positive, or the process can fail to match records that should have been matched, referred to as a false negative. *See* Comber and Arribas-Bel (2019), p. 343 (When evaluating the success of their address matching method, "In Figure 4, the top left quadrant shows true negatives, top right shows false positives, bottom left shows false negatives, and bottom right shows true positives. Briefly, true positives are address pairs labeled as matches that are true matches; false positives are address pairs mislabeled as matches; true negatives are records classified as non-matches which are true non-matches; and false negatives are addresses classified as non-matches but are actually true matches."). There is a tradeoff between these two types of error. To see this tradeoff, consider first a method that assigned every record in the data to a single "unique payor." In this case there would be no false negatives *i.e.*, by construction, no records are not matched that should have been matched. However, there would likely be significant false positives, i.e., many records that should not have been grouped together because they correspond to distinct payors would be incorrectly grouped together under this method. Conversely, now consider a method that assigned every record in the data to a distinct payor . In this case there would be no false positives, *i.e.*, there would be no records for two distinct payors that would be incorrectly grouped since by construction the approach would not group any records. However, there would likely be a significant number of false negatives, *i.e.*, the method would fail to group records that should have been grouped as a single payor.

[135] Robert V. Hogg et al., *Probability and Statistical Inference*, Ninth Edition, (Upper Saddle River, NJ: Pearson Education Inc., 2015), pp. vii ("Statisticians recognize that there are often small errors in their inferences, and they attempt to quantify the probabilities of those mistakes and make them as small as possible. That these uncertainties even exist is due to the fact that there is variation in the data... In light of this uncertainty, the statistician tries to determine the pattern in the best possible way, always explaining the error structures of the statistical estimates"), p. 2 ("[S]tatisticians know that mistakes will be made in data analysis, and they try to minimize those errors as much as possible and then give bounds on the possible errors. By considering these bounds, decision makers can decide how much confidence they want to place in the data and in their analysis of them.").

[136] Thompson Deposition, p. 99:16–22 ("Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication? A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to quantify that. Q. Okay. Have you tried to quantify it at all? A. I have not.").

[137] *See, e.g.*, Geoff Cumming et al., "Error Bars in Experimental Biology," *Journal of Cell Biology*, 177(1), 2007, pp. 7–11 at p. 7 (" Journals that publish science—knowledge gained through repeated observation or experiment—don't just present new conclusions, they also present evidence so readers can verify that the authors' reasoning is correct. Figures with error bars can, if used properly (1–6), give information describing the data (descriptive statistics), or information about what conclusions, or inferences, are justified (inferential statistics)."). *See also* Belouafa et al. (2017), p. 3 ("Confidence intervals are used to indicate the reliability of an estimate. Confidence intervals provide limits around the sample mean to predict the range of the true population of the mean.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

so a reader can assess the accuracy of his estimate of the true number of unique payors. Without this information, readers do not know whether Mr. Thompson's estimate of the number of unique payors is expected to be close or potentially far from the true number, given his methods.[138] Providing these confidence estimates is standard practice in data inference.[139]

96.     To assess and measure a method's error rate, it is common to employ statistical approaches. For example, one might evaluate an address matching algorithm against comparable external dataset or a "gold standard" benchmark dataset for a sample of correctly matched records.[140] The results of running the matching algorithm on the gold standard dataset could give an estimate of the accuracy of the matching algorithm under consideration.[141]

97.     While I have not attempted to perform a rigorous quantification of the error rate in Mr. Thompson's method, I anticipate that, if I did, I would find a high error rate given the numerous

---

[138] For example, take two different scenarios: one in which Mr. Thompson gave an estimate of the number of unique payors that with 95 percent confidence does not deviate by more than ▉ million payors from the true number of unique payors, and a second in which Mr. Thompson instead gave an estimate of the number of unique payors that with 95 percent confidence does not deviate by more than ▉▉ million payors from the true number of unique payors. The informativeness of Mr. Thompson's estimate of ▉ million unique payors would be very different in these two scenarios. Because Mr. Thompson did not apply standard confidence intervals to his work, he provides no basis on which to determine which of these situations is closer to reality. In the second case, our confidence in his methods would be much lower. While these two scenarios are hypothetical, they illustrate how important such estimates of precisions are for assessing the reliability of Mr. Thompson's method.

[139] *See, e.g.,* Dennis Gilliland and Vince Melfi, "A Note on Confidence Interval Estimation and Margin of Error," *Journal of Statistics Education*, 18(1), 2010, pp. 1–8 at p. 1 ("Confidence interval estimation is a widely used method of inference and margin of error is a commonly used term, and these occupy a large part of introductory courses and textbooks in Statistics…" (emphasis removed). As another example, the prestigious journal *Science* requires authors to report a measure of uncertainty of point estimates. *See* Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-editorial-policies#TOP-guidelines, accessed on June 16, 2025 ("Point estimates of population parameters (e.g., mean, correlation coefficient, slope) or comparative measures (e.g., mean difference, odds ratio, hazard ratio) should be accompanied by a measure of uncertainty, such as a standard error or a confidence interval.").

[140] Mr. Thompson testified in his deposition that, although he understood the concept of a gold standard test data set, he didn't know how the concept would apply in this matter. *See* Thompson Deposition, p. 168:9–24 ("A. Well, a -- a gold standard [data set is]… a perfect sample. But -- and, again, I don't know how that applies in this -- is applicable in this situation.").

[141] Other common metrics to assess error in address matching including precision (the ratio of true matches over the sum of true positives and false negatives), recall (the ratio of true positives over the sum of true positives and false negatives), accuracy (sum of precision and recall), and the f-measure (a summary metric computing an average of precision and recall). *See* David Hand and Peter Christen, "A Note on Using the F-Measure for Evaluating Record Linkage Algorithms," *Statistics and Computing*, 28, 2018, pp. 539–547.

problems I have identified and discussed in this report, including errors found even in the deduplication of named Plaintiff Robert Pepper's records. Mr. Thompson failed to perform any standard validation to confirm that his algorithm is producing reliably correct matches and deduplication, and further failed to provide any information of when his method is expected to work well, and when it isn't.

### B. Mr. Thompson Did Not Appropriately Validate the Inputs or Outputs to Identify Sources of Error

98.     In order to assess the error rate associated with a method, one must validate the input and output data to determine sources of error and the potential magnitude or prevalence of those errors.[142] While Mr. Thompson claims to have "evaluated the entire data set" for "data quality issues,"[143] he apparently reported no systematic evaluation of the prevalence of data quality issues, nor did he systematically correct or account for those issues or attempt to assess the success of his data cleaning efforts. He purports to have "looked for mistakes" in his deduplication output and he testified that he could not give "an example [of a mistake] because [he] attempted to identify and resolve them." However, I identified numerous important mistakes in his output upon a short initial review.[144]

99.     For example, as part of his data cleaning, Mr. Thompson purportedly removed 16 phone numbers "that appeared very frequently [in the full Apple Payor Data] and, therefore, could be

---

[142] *See, e.g.*, NRC (2012), p. 53 ("Identifying and representing uncertainties typically involves sensitivity analysis to determine which features or inputs of the model affect key model outputs.").

[143] Thompson Supplemental Report, ¶ 17.a.

[144] Thompson Deposition, pp. 165:15–166:2 ("Q. If there are mistakes in your matching, what are the sources of those mistakes? And I will revise it to say, if there are mistakes in the matching that you conducted in this case, what do you believe are likely to be the sources of those mistakes? A. I don't know how to answer that because I -- I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a -- a area where I thought, oh, there's mistakes, I would have attempted to identify and resolve. It's not to say there are no mistakes as much as I can't give you an example because I attempted to identify and resolve them.").

not legitimate phone numbers."[145] It is unclear how Mr. Thompson arrived at or validated his list of removed phone numbers. Specifically, while Apple provided Mr. Thompson with a list of 16 apparently fake phone numbers based on the Apple Payor Data Sample (*e.g.*, Apple provided the hashed values corresponding to 16 apparently fake numbers like 1234567 and 4567890 that each appeared in tens of thousands of sample records), Mr. Thompson does not appear to remove these 16 numbers. Inexplicably, two of the 16 phone numbers he removed are associated with only a single Apple account and a single record.[146] Therefore, it appears that the phone numbers he removed are not the same as the anomalous phone numbers provided by Apple. No validation is evident in the Computer Code or documentation to support Mr. Thompson's decision to remove values from the *phone_number_hashed* field that appear "too frequently," nor whether this was carried out successfully.

100.    Also, as I discussed in Section VII.A, Mr. Thompson claimed to have identified invalid characters to remove through "validation."[147] However I observe that the result of many of these data cleaning steps was simply to replace one invalid entry with another, suggesting that no true validation actually took place. As an additional example, Mr. Thompson removed the special character "/" from the *city* field. For some records, the *city* field contained values like "Bronx/Manhattan" or "Beverly Hills/Los Angeles." Thus, the result of removing the special character "/" was to change the *city* field for these records to "BronxManhattan" and "Beverly HillsLosAngeles," respectively. Had Mr. Thompson validated this cleaning, he would have seen the need to standardize these cities so they could potentially be matched with some version of

---

[145] Thompson Deposition, p. 136:20–24 ("Q. Did you investigate whether there were any other values for phone_number_hashed that appeared very frequently and, therefore, could be not legitimate phone numbers? A. I did.").

[146] *See* Workpaper 15. Additionally, another two phone numbers that Mr. Thompson removed are only associated with 7 records and 16 records, respectively.

[147] Thompson Supplemental Report, ¶ 17.e. *See also* Thompson Deposition, p. 87:14–20 ("Q. When you say 'cleanse the records,' does that mean cleanse them to remove the emojis and the profanity? A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.").

"New York City" and "Los Angeles," respectively. If Mr. Thompson had done appropriate validation, he presumably would have seen that his data cleaning resulted in values that would not match correctly.[148]

101.     Additionally, Mr. Thompson's purported validation of his output was not systematic. While he testified in his deposition that he performed "validation" on his matching,[149] it is clear from his final deduplicated results that his validation—if he in fact performed any—failed to identify (or perhaps identified but failed to correct for[150]) clearly erroneous matches that should have been corrected. There are purportedly unique payors in Mr. Thompson's matched results that are associated with hundreds or thousands of records, such as the example of purported payor "Kim" in Exhibit 9 above. In addition, certain locations are associated with an implausible number of payors. As one example, Mr. Thompson's results show that he purportedly identified 1.9 million "unique payors" with an address in the town of King Salmon, Alaska (zip code 99613), even though that town only has a total population of 375 residents according to the U.S.

---

[148] Mr. Thompson also described other anomalies that he observed in the data. Thompson Declaration, ¶ 5 ("Fields contained unexpected data. For example, the state field contained over 1600 unique values. That is because sometimes a state, like California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields — for example, some of the 1600 states were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example)."). I saw no indication in Mr. Thompson's code that he had attempted to clean such anomalies.

[149] Thompson Deposition, p. 142:2–17 ("Q. Well, describe to me, please, how review and validation was carried out… A. It -- it used code to -- to query the data and produce results… And then there would be -- we would additionally do manual review of the matches that occurred in any one tier to determine our -- you know, whether there was any issues or -- that we needed to address with regards to the matches that occurred. Q. Okay. The code that was used in review and validation, was that code produced to Apple? A. I -- I don't know off the top of my head.").

[150] Thompson Deposition, pp. 133:11–135:8 ("Q. Okay. And did you review the most common values for each variable to determine whether they were plausible?… A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Census.[151] There are many other examples where Mr. Thompson's results are clearly incorrect.[152] These examples were immediately obvious when I "review[ed] the most common values" for Mr. Thompson's output data, i.e., his matched records, just as Mr. Thompson purported to have done for common values in the raw data.[153]

102.    Finally, Mr. Thompson's validation, to the extent that he actually performed validation, was not even saved in his Computer Code. Mr. Thompson testified in his deposition that the code that he used to validate his matching "may or may not have been saved,"[154] and I did not identify any code in his backup materials that systematically validates his matching results. I return to this point in Section XIV.

103.    **Conclusion**. Mr. Thompson did not appropriately validate his methods, nor did he provide any evidence of reliability. In particular, he made no attempt to quantify the error rate of his method, he performed no systematic assessment of the prevalence of data issues in the input data that he attempted to deduplicate, and he substituted inadequate subjective heuristics in the place of standard measures of errors such as confidence intervals.

## XII.    Mr. Thompson Did Not Use or Even Acknowledge Applicable Widely-Accepted and Scientific Methods that Have Been Peer-Reviewed and Published

104.    The topics of data cleaning and deduplication have long been substantial and active areas of research in statistics and data science. There are many thousands of peer-reviewed and

---

[151] U.S. Census Bureau, "Explore Census Data," available at https://data.census.gov/, accessed on June 16, 2025. *See* Workpaper 16.

[152] A non-exhaustive list includes purported payors identified by Mr. Thompson's matching algorithm that each have over 100 distinct strings in the *compressed_full_name* field (*i.e.*, according to Mr. Thompson, each of these payors has provided more than 100 different combinations of name information); over 100 distinct strings in the *phone_number_hashed* field; or over 100 distinct addresses. *See* Workpaper 17.

[153] Thompson Deposition, p. 133:11–14 ("[D]id you review the most common values for each variable to determine whether they were plausible? A. I did.").

[154] Thompson Deposition, p. 142:15–20 ("Q. Okay. The code that was used in review and validation, was that code produced to Apple? A. I -- I don't know off the top of my head. It was certainly coded on the air-gapped machine. But those -- those scripts don't produce a -- an outcome and a result, so they may or may not have been saved.").

published research articles on methods for data cleaning, deduplication, and validation across many different disciplines.[155] While there is no one universally accepted way to clean and deduplicate every dataset, and none of the methods developed by the scientific community are expected to eliminate all errors, this vast body of research has identified certain commonly accepted best practices.[156] However, Mr. Thompson did not cite to a single peer-reviewed or published work to support any of his methodology, despite the vast bodies of literature on data cleaning and address matching.[157] In his deposition, Mr. Thompson testified that he is not aware of any literature that would support his selected methods.[158] Instead, he described his method as "proprietary,"[159] saying that "JND has developed unique expertise"[160] and that his unique method requires "subjective judgment."[161] These statements stand in stark contrast to his unfounded assertion that he uses "well-accepted methods."[162] In the following subsections, I explain why

---

[155] On Google Scholar, searching for "data cleaning" yields ~247,000 articles, "deduplication" yields ~55,900 articles, and "validation" yields ~6,210,000 articles. *See* Google Scholar search, "data cleaning," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22data+cleaning%22&btnG=, accessed on June 18, 2025; Google Scholar search, "deduplication," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22deduplication%22&oq=, accessed on June 18, 2025; Google Scholar search, "validation," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22validation%22&btnG=, accessed on June 18, 2025.

[156] *See, e.g.*, Davide Chicco et al., "Eleven Quick Tips For Data Cleaning and Feature Engineering," *PLoS Computational Biology*, 18(12), 2022, pp.1–21.

[157] In Mr. Thompson's deposition, he acknowledges that he does not rely on any academic literature and that the methods he used are entirely based on his experience. *See* Thompson Deposition, pp. 120:19–121:2 (noting that Mr. Thompson did not rely on anything other than his "experience and the data available" in forming his opinions). *See also* Thompson Deposition, p. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described? A. I am not.").

[158] Thompson Deposition, p. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described? A. I am not.").

[159] Thompson Supplemental Report, ¶ 17.b.

[160] Thompson Declaration, ¶ 7.d.

[161] Thompson Declaration, ¶ 7.e.

[162] *See, e.g.*, Thompson Supplemental Report, ¶ 12.

Mr. Thompson's failure to use established, well-accepted methods from the literature is problematic and undermines his assertion of reliability of his proffered method.

### A. Mr. Thompson's Methods Are Based Entirely on His Subjective Opinions and Beliefs

105.    Rather than relying on widely-accepted practices from the relevant scientific fields that I discuss below, Mr. Thompson repeatedly turned to his own subjective judgment and experience as the basis for his opinions. He testified in his deposition that "other than [his] experience and the data available," he did not rely on anything else in reaching his opinions.[163]

106.    Mr. Thompson testified that he did not match records together if he did not "[have] confidence that they could be considered the █████████ ██ ██████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████ ██ ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

[163] Thompson Deposition, pp. 120:19–121:2 (noting that Mr. Thompson did not rely on anything other than his "experience and the data available" in forming his opinions). *See also* Thompson Deposition, pp. 175:1–176:4 ("Q. We talked earlier about paragraph 15 of your report -- excuse me -- which states that, 'JND communicated to plaintiffs' counsel that it could reliably reduce duplication in the Apple data.'… I want to ask how you define 'reliably' as used in that sentence or to define the noun form of it, 'reliability'? A. Okay. So I would define that as being able to apply a set of methods that I have used extensively and have confidence in a -- a outcome based on both the methods used and the data available to apply it against… Q. Okay. And that again -- that understanding of reliability is based on your years of experience in the field? A. That is correct.").

[164] Thompson Deposition, p. 100:7–8.

[165] Thompson Deposition p. 100:21–23.

[166] Thompson Deposition, pp. 100:14–101:3.

███████████████████████████ ██ ██████████████████

████████████████████████ in the data simply because he "did not have confidence

that those would add meaningful value in matching."[168] But again, he provided no objective or

widely-accepted basis for his asserted "confidence."

107.    Similarly, Mr. Thompson's decision regarding when to stop trying to find additional

matches was not based on any objective or widely-accepted measures of "marginal returns,"

error rate, algorithm output stability, or any other well-accepted stopping criteria, rather it was

again inappropriately based on his subjective confidence in the results.[169] Mr. Thompson testified

that he did no estimation or quantification of marginal returns; he instead just decided he "was

not finding additional matches…in a both coded and confident manner," so he simply concluded

---

[167] Thompson Deposition, pp. 176:16–177:17 ("Q. Okay. And why were these variables chosen for matching in this top tier? A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual. And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all match, I have an extremely high confidence level that that should be the same person. Q. And what is that understanding based on? A. Experience… Q. You did not match based on phone number in this example -- in this top tier, correct? A. I didn't. Q. Why not? A. I -- I can't tell you specifically my thought process at the time, other than I -- I assess matching and it -- I can only assume that I made a determination that phone number did not meaningfully change the outcomes and, therefore, I was confident as this is the top tier.").

[168] Thompson Deposition, p. 135:12–19.

[169] Thompson Deposition, pp. 106:13–107:11 ("Q. And at some point you determined that the marginal returns in matches from continuing to iterate were so low that they were outweighed by the additional time and effort required to continue iterating? MR. BURT: Objection to form. Asked and answered. A. I did. Q. (BY MR. LAZARUS) And I understand you say that your experience has informed your decision on when to stop iterating that process. Can you describe the criteria that you used to make that decision? A. To make the decision that the marginal return was no longer justifying the -- the means so to speak -- or -- Q. Right. A. Okay. So as I -- as I recall, I reached a point of deduplication and analysis where I could no longer apply either cleansing or additional deduplication rules which would either produce a match result in one of the rules that I had already built or, with a new rule, that I would have high confidence that the records that matched were, in fact, the same entity."). *See, e.g.*, Joan Heck Wortman and Jerome P. Reiter, "Simultaneous Record Linkage and Causal Inference with Propensity Score Subclassification," *Statistics in Medicine*, 37, 2018, pp. 3533–3546 at p. 3539 ("Clearly, linkage errors can have negative consequences for causal inference. One could restrict causal inference to estimating only with cases known to be true links with complete certainty. However, this may exclude some links that are correct or possibly innocuously in error like those in Section 3.1, ultimately inflating mean squared errors. We thus need a rule for deciding which linked pairs to use … One approach is to attempt to choose the threshold for accepting links to minimize the mean squared error … The … error … should decrease as we add cases … until we start adding many nonlinks, when bias introduced by the invalid links can overwhelm the reductions in variance due to increased samples size.").

the costs outweighed the benefits of continuing.[170] This is problematic because Mr. Thompson's decision to stop was entirely based on his subjective judgment and his own incremental time spent trying to find additional matches. In other words, it would not matter if Mr. Thompson's estimate of "unique payors" was off from the true number by 2 million or 200 million; his method would stop when *he believed* additional changes that he could think of to his method did not produce a significant number of additional matches.

108.    As discussed in Section XI, Mr. Thompson did not provide any empirical measures of validation to allow others to assess or potentially gain a similar confidence in the reliability of his "various data matches."[171]

### B.  Mr. Thompson Does Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Data Cleaning Methods from the Published Literature

109.    Data cleaning—"the detection and removal of errors and inconsistencies from data with the aim of improving data quality"—is an integral part of working with data.[172] Data errors are a

---

[170] Thompson Deposition, pp. 103:17–104:13 ("Q. And how did you estimate the marginal returns? MR. BURT: Objection. Form. A. I was -- I don't believe there's an estimation of marginal returns. I believe it is more accurate to say I was not finding additional matches that I could effectuate in a -- in a both coded and confident manner, which is the -- the point we try to determine my returns here for the effort I'm putting in, I'm not -- I'm not finding additional things that I could match. Q. And did you -- are you saying that you did -- you got the marginal returns down to zero? A. I -- I'm saying that I -- I did not see things I could match but decided not to. I -- it required additional work for me to find add- -- additional possible matches. Q. Okay. And that's based on your -- your experience that you've described in your work in legal administration, claims administration? A. Correct. And my -- and my years of experience performing data match and data duplication -- deduplication, that's correct.").

[171] Thompson Deposition, pp. 100:24–101:3 ("A. And in applying those and utilizing them over this time, in my experience, I have assembled an understanding of the outcomes and -- and based on adequate matching points, have built a experience -- confidence in various data matches.").

[172] *See, e.g.*, Samson Oni et al., "A Comparative Study of Data Cleaning Tools," *International Journal of Data Warehousing and Mining*, 15(4), 2019, pp. 48–65 ("Oni et al. (2019)") at p. 48 48 ("Hence, data cleaning is essential and often takes more than 80 percent of time and resources of the data analyst."); Hadley Wickham, "Tidy Data," *Journal of Statistical Software*, 59(10), 2014, pp. 1–23 at p. 1 ("It is often said that 80% of data analysis is spent on the process of cleaning and preparing the data."); Oni et al. (2019), p. 48 ("Hence, data cleaning is essential and often takes more than 80 percent of time and resources of the data analyst.").

common data quality issue and are expected across all types of data, including in user-generated data, where humans can make mistakes when entering data.[173]

110.     There is extensive academic literature on the importance of identifying and eliminating data errors to maximize the accuracy and reliability of results.[174] Through proper data cleaning, the matching accuracy of records improves.[175] In contrast, failing to adequately and consistently fix data errors, such as "spelling errors, variation in the recording of street names (i.e. Martin Luther King Blvd, MLK, and Martin Luther Boulevard), the wrong directional identifiers, wrong or missing suffix or prefix, inconsistent abbreviations, and out-of-range or impossible address numbers" can lead to bias and inaccuracies in the deduplication and matching of records.[176] As described in Section VII.A, Mr. Thompson's data cleaning involved searching across records for one invalid character at a time and then removing that character (*e.g.*, the first name "J@ne" in Exhibit 2 would be cleaned by Mr. Thompson's method to "Jne"). Mr. Thompson's approach is starkly inadequate compared to modern widely-accepted methods, and does not align with best

---

[173] Kimberly A. Barchard and Larry A. Pace, "Preventing Human Error: The Impact of Data Entry Methods on Data Accuracy and Statistical Results," *Computers in Human Behavior*, 27(5), 2011, pp. 1834–1839 ("Barchard and Pace (2011)") at p. 1834 ("When humans do data entry, errors are therefore expected.").

[174] *See* Heiko Müller and Johann-Christoph Freytag, "Problems, Methods, and Challenges in Comprehensive Data Cleansing," *Humboldt University of Berlin*, Working Paper, 2003, available at https://pubs.dbs.uni-leipzig.de/dc/files/Mller2003ProblemsMethodsand.pdf ("Müller and Freytag (2003)") p. 3 ("This has led to the development of a broad range of methods intending to identify and eliminate [the existence of anomalies and impurities] in existing data").

[175] Oni et al. (2019), p. 48 ("Fusing poor quality data from various sources together will cause more issues afterwards. Therefore, adequate cleaning of data from various sources before integration will have significant impact on the outcome of data fusion."); Mong Li Lee et al., "Cleansing Data for Mining and Warehousing," *Database and Expert Systems Applications*, 1677, 1999, pp. 751–760 at p. 751 ("'Dirty' data files are prevalent because of incorrect or missing data values, inconsistent value naming conventions, and incomplete information. Hence, we may have multiple records refer[r]ing to the same real world entity.").

[176] Bias is defined as "a systematic tendency to over- or under-estimate the true population value." *See* David Diez et al., *OpenIntro Statistics*, Fourth Edition, (2019), p. 170; Gisela Bichler and Stefanie Balchak, "Address Matching Bias: Ignorance Is Not Bliss," *Policing: An International Journal of Police Strategies & Management*, 30(1), 2007, pp. 32–60 ("Bichler and Balchak (2007)") at p. 35 ("These factors together introduce potential bias").

practices used by practitioners across many fields that perform data cleaning of name or address data.[177]

111.    To identify and eliminate data errors, especially in large and complex datasets, such as the Apple Payor Data, where it is impossible to manually review all the observations, researchers typically follow a systematic approach of "auditing data to identify the types of anomalies reducing the data quality, … choosing appropriate methods to automatically detect and remove them, and … applying the methods."[178] Statistical methods are commonly used to parse the data and detect anomalies in string syntaxes,[179] where "string" refers to a field that contains characters, such as a name or address field. Some examples include examining the minimal and maximal length of strings, frequency of values, and searching for string patterns.[180] Mr.

---

[177] For general reviews on data cleaning algorithms, *see* Müller and Freytag (2003), Xu Chu et al., "Data Cleaning: Overview and Emerging Challenges," *Proceedings of the International Conference on Management of Data*, 2016, pp. 2201–2206 ("Chu et al. (2016)"), and Fakhitah Ridzuan and Wan Mohd Nazmee Wan Zainon, "A Review on Data Cleansing Methods for Big Data," *Procedia Computer Science*, 161, 2019, pp. 731–738. An overview of data cleaning methods for string data is in Mark van der Loo and Edwin de Jonge, *Statistical Data Cleaning with Applications in R*, (Hoboken, NJ: John Wiley & Sons, 2018), pp. 77–118 (including sections on character normalization, encoding, transliteration, pattern matching, and text matching). For a review of name matching techniques, *see, e.g.*, Peter Christen, "A Comparison of Personal Name Matching: Techniques and Practical Issues," *Proceedings of the Sixth IEEE International Conference on Data Mining Workshops*, 2006, pp. 290–294 ("Christen (2006)"), pp. 291–293, who discusses phonetic encoding, pattern matching (including distance measures), and combined techniques. For a standard methodology and software used for address cleaning and matching, *see, e.g.*, Bichler and Balchak (2007), pp. 35–44.

[178] Müller and Freytag (2003), pp. 10–11.

[179] Müller and Freytag (2003), p. 11 ("The first step in data cleansing is auditing the data to find the types of anomalies contained within it. The data is audited using statistical methods and parsing the data to detect syntactical anomalies.").

[180] Müller and Freytag (2003), p. 11 ("The instance analysis of individual attributes (data profiling) and the whole data collection (data mining) derives information such as minimal and maximal length, value range, frequency of values, variance, uniqueness, occurrence of null values, typical string patterns as well as patterns specific in the complete data collection.").

Thompson testified in his deposition that he has no expertise in statistics and that he did not use any statistical method in his review of the data.[181]

112.    Additionally, to detect and eliminate anomalies, researchers typically use existing published and tested approaches, software frameworks, and tools, since such published tools have typically been vetted by the research community and allow researchers to capitalize efficiently on the work required to build and vet these tools.[182] There are many widely used software tools that have been developed to clean names, addresses, and other data in a systematic manner.[183] Some of these tools have been downloaded millions of times for use by a multitude of practitioners across a wide range of disciplines.[184] These tools are reliable because they were

---

[181] Thompson Deposition, pp. 58:12–14 (confirming that Mr. Thompson does not purport to have expertise in statistics, "Q. Do you purport to have expertise in statistics? A. I do not."), 23:19–25 (describing that Mr. Thompson does not have a degree or a teaching position in statistics, "Q. And you don't have any degree in statistics, correct? A. I do not. Q. You're not a professor of management information systems, statistics or any other subject, correct? A. I am not."), 24:1–9 (discussing that Mr. Thompson has not authored any peer-reviewed publication related to statistical methodology, nor does he have any professional certifications or accreditation related to statistics, "Q. You have not authored any peer-reviewed published research on subjects relating to statistical methodology… You do not have any professional certifications or accreditations in management information systems, statistics or any other fields, correct? A. That is correct.").

[182] Müller and Freytag (2003), pp. 15–18 ("In this section we describe existing data cleansing projects.").

[183] Some common and widely-used open source tools that have been developed for data cleaning include: Tableau Prep, which offers "cleaning operations such as filtering, adding, renaming, splitting, grouping, or removing fields [for cleaning and shaping data];" OpenRefine, a Google tool for working with messy data that offers features such as "Clustering [to] [f]ix inconsistencies by merging similar values;" and Tidyverse, packages for "data import, tidying, manipulation, visualisation, and programming." "Welcome to the Tidyverse" is cited 18,164 times in Google Scholar, and the phrase "tidyVerse" produces 55,800 search results in Google Scholar. See Tableau, "Tableau Prep Help: Clean and Shape Data," available at https://help.tableau.com/current/prep/en-us/prep_clean htm, accessed on June 18, 2025; OpenRefine, "Homepage," available at https://openrefine.org/, accessed on June 18, 2025; Hadley Wickham et al., "Welcome to the Tidyverse," Journal of Open Source Software, 4(43), Article 1686, 2019, pp. 1–6; Google Scholar search, "Welcome to the Tidyverse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=Welcome+to+the+tidyverse&btnG=, accessed on June 19, 2025; Google Scholar search, "tidyVerse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22tidyVerse%22&btnG=, accessed on June 19, 2025. There are numerous papers that have examined and documented the accuracy and reliability of these or other data cleaning tools. See, e.g., Oni et al. (2019); Müller and Freytag (2003).

[184] See OpenRefine, "OpenRefine Usage," available at https://openrefine.org/usage, accessed on June 16, 2025 ("**OpenRefine is downloaded on average 15,500 times per month** and received over 800 academic citations in 2023.") (emphasis in original); "tidyverse," available at https://www.cran-e.com/package/tidyverse, accessed on

---

developed using high quality control standards (e.g., by using software tests and open source development methods), and have been vetted by the scientific community, and as a result are widely accepted in the scientific community.

113.    With the exception of the NCOA data solution from Melissa Data used by Mr. Thompson on a small subset of observations, and whose data cleaning operation Mr. Thompson was unable to describe in his deposition,[185] Mr. Thompson did not employ any standard tools for data cleaning. Instead of using a data cleaning tool that is reliable and well-accepted among researchers and practitioners, Mr. Thompson chose to clean the data by using code he wrote himself for this case that applies a small set of operations that he selected without providing any support as to how he selected them, or checks on whether they were implemented correctly. His decision not to use standard and widely-available tools developed by others and widely accepted by practitioners is compounded by his validation processes.[186] Mr. Thompson admitted in his deposition that while he was familiar with the concept of a "software test" to ensure that software

---

June 18, 2025 ("[The tidyverse] package has been downloaded 1,451,480 times in the last 30 days."); Tableau, "Why choose Tableau," available at https://www.tableau.com/why-tableau, accessed on June 18, 2025 ("The Tableau Community has more than one million members, spanning over 500 user groups worldwide and our active Community Forums and programs"); Kate VanDerAa, "11 Most-Favorite Data Visualizations on Tableau Public," *Tableau*, November 19, 2024, available at https://www.tableau.com/blog/most-favorited-data-visualizations-tableau-public, accessed on June 19, 2025 ("Since Tableau Public launched in 2009, over 5 million people worldwide have joined [Tableau's] free data visualization platform."). OpenRefine, Tidyverse, and Tableau can be used offline. *See* OpenRefine User Manual, "Running OpenRefine," available at https://openrefine.org/docs/manual/running, accessed on June 18, 2025 ("OpenRefine does not require internet access to run its basic functions."); "How to install Tidyverse without internet connection for R 3.5.2," Posit Community, November 7, 2019, available at https://forum.posit.co/t/how-to-install-tidyverse-without-internet-connection-for-r-3-5-2/44201, accessed on June 18, 2025; Tableau Deployment Guide, "Registers and Activate from the User Interface," available at https://help.tableau.com/current/desktopdeploy/en-us/desktop_deploy_activate_license htm, accessed on June 19, 2025 ("To activate Tableau Prep Builder offline, you will need your product key and Tableau Desktop version 2018.1 or later installed on the same computer that is offline.").

[185] Thompson Deposition, pp. 187:23–188:10 ("I'm -- I am unaware of Melissa Data's internal processes for … a NCOA output.").

[186] Mr. Thompson did not follow any best practices for statistical computing and code and software development in the scientific community, such as coding standards or code quality assurance processes. *See, e.g.*, Andrew Dovgal, "Coding Standards and Best Practices: Guide & Implementation Tips," *DevCom*, December 30, 2024, available at https://devcom.com/tech-blog/coding-standards-and-best-practices-guide-implementation-tips/, accessed on June 16, 2025; Ricardo Sanchez et al., "Best Practices in Statistical Computing," *Statistics in Medicine*, 40(27), 2021, pp. 6057–6068; Atieh Khanjani and Riza Sulaiman, "The Process of Quality Assurance Under Open Source Software Development," *Proceedings of the IEEE Symposium on Computers & Informatics*, 2011, pp. 548–552.

performed the desired operations correctly, he had "never seen those sort[s] of tests applied in this application" to determine that his claims administration code was working as intended.[187] As discussed in Section XIV, he further testified to a number of data cleaning steps that he stated in his deposition that he thought he had performed; however, when I reviewed his code, he had not actually performed these steps.[188] Well-accepted tools that have been developed by others and subjected to extensive review and testing are substantially more reliable than Mr. Thompson's code and memory. For example, in my experience, I have never seen a widely used tool that purports to have functionality that is in fact completely missing—as is the case with respect to Mr. Thompson's code.

114.    Mr. Thompson's disregard for the scientific literature is also apparent in his treatment of the common data issue of outliers, which are data points that significantly differ from other observations in a dataset.[189] Hawkins (1980) defines an outlier as "an observation which deviates so much from other observations as to arouse suspicions that it was generated by a different mechanism."[190] Because the presence of outliers can lead to inflated error rates and allow bias to creep into results, peer-reviewed research on outliers suggests that "researchers should

---

[187] Thompson Deposition, pp. 167:23–168:8 ("Q. Okay. I -- my understanding is that, for example, when a coder is submitting code to an open source software project, that code would typically contain tests to show that the code does what the author says it does. Is that a familiar concept to you? A. It is. Q. Okay. Does the code that you used to clean data in this case contain software tests of that kind? A. It does not. I've never seen those sort of tests applied in this application."). *See also* IEEE Computer Society, "The Importance of Software Testing," available at https://www.computer.org/resources/importance-of-software-testing, accessed on June 16, 2025 ("Software testing is a crucial activity in the software development life cycle that aims to evaluate and improve the quality of software products. Thorough testing is essential to ensure software systems function correctly, are secure, meet stakeholders' needs, and ultimately provide value to end users.").

[188] I discuss several discrepancies between Mr. Thompson's stated data cleaning and his actual data cleaning in Section XIV.

[189] Charu C. Aggarwal, "An Introduction to Outlier Analysis," in *Outlier Analysis*, Second Edition, (New York, NY: Springer, 2017), pp. 1–34 ("Aggarwal (2017)") p. 1 ("An outlier is a data point that is significantly different from the remaining data.").

[190] D.M. Hawkins, *Identification of Outliers*, (London, UK: Chapman and Hall, 1980), p. 1.

ALWAYS check for them" (emphasis in original) and resolve them or take steps to mitigate the bias they may induce.[191]

115.    Outliers are especially prevalent in user-generated data, such as the Apple Payor Data, because they "are often caused by human error, such as errors in data collection, recording, or entry."[192] The academic literature discusses many methods for detecting and handling outliers.[193] Some common methods for identifying outliers in non-numerical data involve computing the length and frequency of different string values in a dataset, identifying unusual groups or clusters of data values, and searching for repeated patterns of anomalous entries or mistakes.[194] For example, a value that appears unusually frequently, such as the address of Apple's Headquarters at "1 Infinite Loop" indicates a possible outlier. Some common methods for handling outliers include removing the outlier ("[e]limination of the data point from the analysis"), studying the outlier in detail ("[c]onducting follow-up work to study the case as a unique phenomenon of interest"), correcting the outlier (e.g., if it is a mistake), and reporting findings with and without outliers ("[r]eporting substantive results with and without the outliers – which also includes providing an explanation for any difference in the results.").[195]

116.    Mr. Thompson did not systematically use or acknowledge any of these published methods of data cleaning that I could verify in his backup files or documentation, and as noted in

---

[191] Jason W. Osborne and Amy Overbay, "The Power of Outliers (and Why Researchers Should Always Check for Them)," *Practical Assessment, Research & Evaluation*, 9, Article 6, 2004, pp. 1–8 ("Osborne and Overbay (2004)").

[192] Osborne and Overbay (2004).

[193] *See, e.g.*, Herman Aguinis et al., "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, 16(2), 2013, pp. 270–301 ("Aguinis et al. (2013)"); Chu et al. (2016).

[194] David Guthrie et al., "An Unsupervised Approach for the Detection of Outliers in Corpora," *Proceedings of the International Conference on Language Resources and Evaluation*, 2008, pp. 3409–3413 at p. 3410 lists some characteristics that can be used to find outliers ("Average sentence length, [a]verage word length, … [p]ercentage of all characters that are punctuation characters … [t]op 1000 words …"); Aggarwal (2017), p. 21 ("[D]emographic data might contain attributes such as race, gender, or ZIP code… Most of the existing models can be extended to this case… Other common methods for text and categorical data include clustering, proximity-based methods, probabilistic models, and methods based on frequent pattern mining.").

[195] Aguinis et al. (2013), p. 279.

Section VII.A, his method is so affected by poor data cleaning that it leads to unreliable match results.[196]

### C. Mr. Thompson Did Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Deduplication Methods from the Published Literature



or grouping addresses for demographic purposes such as community identification or geographically targeted social services or care delivery.[198] While there is no single approach from the published literature that works in all cases, there are certain best practices from the literature, which Mr. Thompson did not utilize, such as allowing matches for

---

[196] Mr. Thompson admitted in his deposition that any computer code steps he may have taken to correct outliers were not included in the backup code, and so that code is unverifiable by me, and what corrections to outliers, if any, were taken are not made clear. Thompson Deposition, pp. 133:22–135:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Q. Are those ▮▮▮▮ saved in the backup materials that you produced to Apple? A. I do not know if -- if ▮▮▮▮▮▮▮▮ -- are saved or not. They're -- some of them certainly may be transient. Q. And did you determine that action was required based on common values in the data? A. There were -- there were some scenarios where action was required. Q. What action did you take? A. As an example, as you previously mentioned, Apple's address was used a -- I couldn't give you a count, but it was used more than one would expect for -- for an address. And in those situations, I – I would remove the value and not utilize an address for that record in attempting to match it. Q. Okay. And is that exclusion of a value for matching purposes recorded in code? A. So the – it's not a -- well, yes. Q. Where is that recorded? A. So if a field is blank, it would be excluded from matching.").

[197] Monge (2000), at p. 15 ("The record matching problem has been recognized as important for at least 50 years."); Comber and Arribas-Bel (2019), p. 335 ("Traditionally, address matching has focused on the probabilistic linkage approaches developed by the US Census Bureau in the 1970s."). *See also* Müller and Freytag (2003); Newcombe et al. (1959). For a historical discussion, *see, e.g.*, Asher et al. (2020); Xia et al. (2016).

[198] *See* Ramani and Borrajo (2023), p. 348 ("Some potential applications of address matching are in the field of mail routing, clustering of addresses, and matching a given list of addresses of interest to a larger database."); Li et al. (2010), p. 264 ("Address matching and correction are widely used in daily life and business applications, in situations ranging from finding a friend who has moved to responding to a critical 911 call."); Comber and Arribas-Bel (2019), p. 335 ("In the absence of unique identifiers that enable direct linking of data in relational database management environments, practitioners have traditionally relied on mathematical linkage techniques broadly divided by deterministic or probabilistic principles.").

records for which it is sufficiently clear that they represent the same information and yet are not verbatim matches.[199]

118.     Despite the long line of research across a broad range of scientific disciplines that discusses various methods for matching records, names, and addresses,[200] Mr. Thompson did not consider any academic or industry publication for his matching methodology. Nor did he use any common matching tools. Instead, he chose to write "new code for this project"[201] to identify records that match exactly on certain fields and stated that his method required "a subjective judgment."[202] Mr. Thompson focused myopically on JND's own "proprietary" method that is demonstrated to be fatally flawed and inadequate, and that leads to uncontrolled and unmeasured errors as discussed in this report.

119.     In his deduplication process, Mr. Thompson required exact string matching in order to group records, meaning that he required that values in fields must be identical in order for multiple records to be grouped to the same payor.[203] However, exact string matching is not a commonly used approach for matching string fields such as names and addresses.[204] In fact,

---

[199] Thompson Deposition, p. 20:13–16 ("Q. (BY MR. LAZARUS) In forming your opinions in this case, did you review any peer-reviewed publications related to the methods you relied upon? A. I did not.").

[200] *See, e.g.*, William W. Cohen et al., "A Comparison of String Metrics for Matching Names and Records," *Proceedings of IJCAI-03 Workshop on Information Integration*, 2003, pp. 73–78 at p. 73 ("The task of matching entity names has been explored by a number of communities, including statistics, databases, and artificial intelligence… In statistics, a long line of research has been conducted in *probabilistic record linkage*.") (emphasis in original).

[201] Thompson Supplemental Report, ¶ 17.d.

[202] Thompson Declaration, ¶ 7.e.

[203] Thompson Deposition, p. 109:13–17 ("Q. And your algorithm for deduplication groups records if they match exactly on some combination of the cleaned variables in the payor data; is that correct? A. That is correct.").

[204] *See, e.g.*, Clodoveu A. Davis Jr. and Emerson de Salles, "Approximate String Matching for Geographic Names and Personal Names," *IX Brazilian Symposium on GeoInformatics*, 2007, pp. 49–60 ("Davis Jr. and de Salles (2007)") at p. 52 ("Matching names is a challenging task, mainly because of spelling variations and some widely used practices, such as abbreviation… Such variations usually keep exact matches from being effective."); Christen (2006), p. 290 ("As names are often recorded with different spelling variations, applying exact string matching leads to poor results.").

many scientific publications have found that exact string matching algorithms are significantly less reliable than alternative statistical methods because they can be too restrictive.[205] As discussed previously, Mr. Thompson failed to match records for named plaintiff Robert Pepper because "Rob" and "Robert" prevented an exact match on name in Mr. Thompson's Tiers 1 – 12.[206] Mr. Thompson also failed to match these records in Tier 13, in which he only required an exact match on the first three letters of the first name. This is because the records were not an exact match for *person_id_hashed* as required by Mr. Thompson's method even though address, phone number, and credit card information were all the same across these records.[207] Mr. Thompson's failure to match these records because of a different *person_id_hashed* value even when so much other information is shared undermines his purported ability to disambiguate payors that might have multiple accounts.

120.    In the academic literature, "two records are [considered] *equivalent* if they are equal semantically,"[208] meaning the two records convey equivalent information. Therefore, two records do not need to be exactly identical to be considered a match.[209] As a result, when matching addresses and names, researchers typically use methods that are designed to identify equivalent records for which it is sufficiently clear that they represent the same information and yet are not verbatim matches. One widely-accepted and widely-used matching approach involves defining

---

[205] *See, e.g.*, Tigran Avoundjian, "Comparing Methods for Record Linkage for Public Health Action: Matching Algorithm Validation Study," *JMIR Public Health Surveillance*, 2020, 6(2), e15917, pp. 1–12 at p. 1 ("In simulations, [the approximate matching algorithms] maintained a high recall at nearly all data quality levels, while being comparable with deterministic algorithms in terms of precision. Deterministic algorithms typically failed to identify matches in scenarios with low data quality.").

[206] *See* Section VII.B.

[207] *See* Exhibit 8.

[208] Monge (2000), p. 16.

[209] Monge (2000), p. 16 ("One important area of research that is relevant to approximate record matching is approximate string matching.").

metrics to measure the closeness, or similarity, of two strings, such as a name or address field.[210] Records that are sufficiently close along one or several fields according to these metrics are then considered to be matches.[211] Examples of such metrics include "edit distance," which refers to "the minimum number of operations on individual characters (e.g.[,] substitutions, insertions, and deletions) needed to transform one string of symbols to another."[212] There are also other approaches that are commonly used in the literature for matching.[213]

121.    Mr. Thompson acknowledged his ignorance of the extensive amount of research on methods to match records.[214] He confirmed that he was unaware of any literature, studies, or publications that suggest or recommend using exact matching for deduplication.[215] As discussed

---

[210] *See, e.g.*, Li et al. (2010), p. 265 ("As an alternative to this lengthy process of address standardization, we use string similarity techniques directly to calculate the string similarity between the customer's address string and the reference address string."); Ioannis Koumarelas et al., "Experience: Enhancing Address Matching with Geocoding and Similarity Measure Selection," *Journal of Data and Information Quality*, 10(2), Article 8, 2018, pp. 1–16 at p. 2 ("A typical method of classifying two records as duplicates is by determining the similarity or distance of their corresponding values.").

[211] Monge (2000), p. 16 ("An application will typically just compare scores to a threshold that depends on the domain and the particular record matching algorithm in use."). *See also* Christen (2006), p. 293 ("For the similarity measures a threshold can be varied between 0.0 and 1.0 that influences the classification performance (name pairs with a similarity value above the threshold are classified matches, and pairs with similarity value below as non-matches).").

[212] Monge (2000), p. 16. *See also* V. I. Levenshtein, "Binary Codes Capable of Correcting Deletions, Insertions, and Reversals," *Soviet Physics Doklady*, 10(8), 1966, pp. 707–710 at p. 707 ("Consider a function … equal to the smallest number of deletions and insertions that transform the word x into y."); Li et al. (2010), p. 265 ("The standard string similarity metrics, such as the edit distance, quantify differences between two strings").

[213] Bichler and Balchak (2007), pp. 39–41 ("Address matching tools allow for both automatic 'batch matches' and interactive or manual matching… ESRI software algorithms involve two steps in the process for developing match candidates: transformation tools (soundex) and a probabilistic scoring process."). *See also* Stacie B. Dusetzina et al., *Linking Data for Health Services Research: A Framework and Instructional Guide*, (Rockville, MD: Agency for Healthcare Research and Quality, 2014) at p. 36 ("Other methods are available for researchers who have more challenging linkage scenarios.").

[214] Thompson Deposition, pp. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described [regarding when to stop iterating Mr. Thompson's method]? A. I am not."), 114:6–19 ("Q. Okay. Are you aware of using distance metrics such as the Levenshtein or Hamming distance to determine whether names or addresses match? A. No. Q. Are you aware of the concept of thresholding to determine matches by using distance metrics in address matching? A. No. Q. Are you aware of the concept of a longest common subsequence in address matching? A. No. Q. Are you aware of the concept of an N-gram in address matching? A. No.").

[215] Thompson Deposition, p. 110:20–24 ("Q. Sure. So are you aware of literature, studies or publications that suggest or recommend using exact address matching for deduplication purposes? A. No.").

in the next subsection, Mr. Thompson testified that he had never produced his proprietary methodology for deduplication to another party, for testing or otherwise,[216] and that he did not have knowledge of anyone outside of JND using the methods he applied in this matter.[217]

122.    As noted in Section V.C, Mr. Thompson's matching efforts relied heavily on exact matching of the name and address fields, and as mentioned this is a technique recognized in the scientific community to be a poor choice for address matching.[218] Mr. Thompson however did not provide any support for his decision to use exact matching for example appropriate references to the scientific literature or widely-accepted methods. Best practices have emerged in the research community that indicate using more reliable fields rather than less reliable fields when address matching. Human-entered data like the addresses in the Apple Payor Data is especially prone to data errors because humans often make mistakes when manually entering data.[219] In contrast, credit card numbers generally have low error rates because there are restrictions on what people can enter for their credit card numbers; in particular, the numbers entered must consist of a certain string length, follow a specific pattern, and are validated by the relevant financial institution before a transaction can occur.[220] Similarly, zip codes may be less prone to data errors because they also have a fixed string length and can be verified against other

---

[216] Thompson Deposition, p. 59:12–15 ("Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

[217] Thompson Deposition, p. 20:5–12 ("Q. All right. And you maintain that parts of the methods and the code described in your report and the README file are proprietary to JND, correct? A. That is correct. Q. Do you have knowledge of anyone outside of JND using those methods? … A. Not -- not that I'm aware of.").

[218] *See, e.g.*, Davis Jr. and de Salles (2007), p. 52 ("Matching names is a challenging task, mainly because of spelling variations and some widely used practices, such as abbreviation…. Such variations usually keep exact matches from being effective."); Christen (2006) at p. 290 ("As names are often recorded with different spelling variations, applying exact string matching leads to poor results.").

[219] Barchard and Pace (2011), p. 1834 ("When humans do data entry, errors are therefore expected.").

[220] A common validation algorithm for credit card numbers in the Luhn Algorithm. *See, e.g.*, Khalid Waleed Hussein et al., "Enhance Luhn Algorithm for Validation of Credit Cards Numbers," *International Journal of Computer Science and Mobile Computing*, 2(7), 2013, pp. 262–272 at p. 262 ("The Luhn algorithm is the first line of defense in many e-commerce sites and is used to validate a variety of identification numbers such as credit card numbers.").

fields such as street, city, and state data. Mr. Thompson again provided no references to the scientific literature or to widely-accepted methods to justify his choice to rely heavily on exact matching of error prone fields such as name and street address, instead of relying on less error prone fields such as hashed credit card or zip code.

### D. Mr. Thompson's Methods Have Not Been Directly Evaluated by Any Third Party, Including Other Claims Administration Firms, or Any Opposing Party or Court in Previous Litigation

123.     While the Thompson Supplemental Report claims that Mr. Thompson's methods are "well-accepted…in the claims administration field,"[221] it does not appear that Mr. Thompson's methods have previously been directly evaluated, much less accepted, by any third party, including any claims administration firm. In his deposition, Mr. Thompson conceded he was unaware of *any* other firm that utilized his method.[222]

124.     Nor does Mr. Thompson's method appear to have been directly evaluated pursuant to any previous litigation by an opposing party or court. While Mr. Thompson listed other cases where JND provided class notice or claims administration, in his deposition Mr. Thompson confirmed that he had never been admitted as an expert in any previous case.[223] Mr. Thompson also stated that, in addition to the fact that his "proprietary" deduplication method has never been published in a journal or used outside of his firm, this method has also *never* been produced to an opposing party during litigation.[224] This implies that Mr. Thompson's methods have never been properly vetted by a third-party, such as by an expert retained by an opposing party in a litigation. A proper vetting would require review of the code and methodology used by Mr. Thompson. It is

---

[221] Thompson Supplemental Report, ¶ 10.

[222] Thompson Deposition, p. 20:9–12 ("Q. Do you have knowledge of anyone outside of JND using those methods? A. Not – not that I'm aware of.").

[223] Thompson Deposition, p. 10:5–7 ("Q. Okay. Have you ever been retained as a testifying expert in another case? A. I have not.").

[224] Thompson Deposition, p. 59:12–15 ("Q. Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

not possible for me to meaningfully analyze Mr. Thompson's methods using only the vague descriptions provided in the three-page methodology section of his reports. For example, his reports provided no description of the variables included in ████████ Tiers of matching, they were silent on whether the method required exact matching (it does), there was no indication of which records were candidates for matching at any given step (e.g., there was no indication of the concept of a ██████████ (see Section V.C), among many other omissions. It would be impossible for any third-party reader of Mr. Thompson's reports to grasp the material details of Mr. Thompson's method.

125.     In light of the foregoing, despite the term "well-accepted methods" appearing four times within Mr. Thompson's six-page report, there does not appear to be *any* relevant community within which Mr. Thompson's methods have been evaluated and are "well-accepted," nor could Mr. Thompson identify one. When Mr. Thompson was asked directly "who specifically are you claiming to have accepted these methods," Mr. Thompson clarified that this claim was referring to *his own* acceptance of his proprietary methods, stating "[s]o I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that – work at companies I work with, or work at."[225]

126.     **Conclusion**. Rather than relying on widely-accepted practices from the relevant scientific fields discussed in the previous sections, Mr. Thompson repeatedly turned to his own subjective

---

[225] Thompson Deposition, pp. 138:18–139:7 ("Q. All right. When you describe your methods as 'well accepted,' who specifically are you claiming to have accepted these methods? A. Well, these are methods that have evolved over the last 14 years of me working in the legal claims administration industry across two of the largest legal claims administration organizations that have existed, and utilized against thousands of, you know, administration services and datasets without, you know, having situations where these were not found to produce valid and useful results. So I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that -- that work at companies I work with, or work at."). While Mr. Thompson claims to have taught this method to many others in claims administration, this does not establish that his method is effective or correct. *See* Thompson Deposition, p. 211:3–19 ("Q. Have you ever taught other people how to do deduplication? A. I have. Q. Are the people that you've taught how to do deduplication people who worked on assignments that you've supervised? A. They were. Q. And have you ever taught anyone to teach other people the skill set of deduplicating? A. People that I have taught have become managers that then taught others, yes. Q. Okay. Are there any of the engagements that are listed in your Exhibit B to your report engagements where the people doing the hands-on deduplication were taught to do it by the people that you taught how to teach it? A. Most certainly, yes.").

judgment and experience as the basis for his opinions, not citing to or even considering any of the many widely-accepted and reliable data cleaning, deduplication, or validation methods from the published literature. Mr. Thompson's methods have not been validated by any third party, opposing parties, or other claims administration firms or courts in any previous litigation.

## XIII.    Mr. Thompson's Own Computer Code Does Not Produce His Results, Rendering His Method Untestable and Unreliable

127.    It is long established in the scientific community that reproducibility—"obtaining consistent computational results using the same input data, computational steps, methods, and code; and conditions of analysis"[226]—is a necessary condition for reliable scientific research.[227] To comply with this principle, researchers routinely share details of their methodology, including the data and code that generated their results, when publishing their research findings. Access to the precise computational methods and their implementation allows others to re-execute the computations and regenerate the findings, permitting review and testing of the correctness of the process that produced the scientific results.[228] Similarly, it is my understanding, based on past

---

[226] National Academies of Sciences, Engineering, and Medicine, *Reproducibility and Replicability in Science*, (Washington, DC: The National Academies Press, 2019) ("NASEM (2019)"), p. 1.

[227] Garret Christensen and Edward Miguel, "Transparency, Reproducibility, and the Credibility of Economic Research," *Journal of Economic Literature*, 56(3), 2018, pp. 920–980 at p. 920 ("Openness and transparency have long been considered key pillars of the scientific ethos (Merton 1973)."); Craig Willis and Victoria Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, 2(4), 2020, pp. 1–60 at p. 3 ("We propose and define a novel concept of assessable reproducible research artifacts and point the way to an improved understanding of how changes to author incentives and dissemination requirements impact the quality, rigor, and trustworthiness of published computational research.") (emphasis in original).

[228] For example, the publishing groups behind the most reputable and highest impact scientific journals, *Nature* and *Science*, require authors, as a condition of publication, to deposit all the data and code they used to generate the published results so that others can computationally reproduce and verify the findings. *See* Nature Portfolio, "Reporting Standards and Availability of Data, Materials, Code and Protocols," available at https://www.nature.com/nature-portfolio/editorial-policies/reporting-standards, accessed on June 16, 2025 ("A condition of publication in a Nature Portfolio journal is that **authors are required to make materials, data, code, and associated protocols promptly available to readers without undue qualifications,**" (emphasis in original)); Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-

experience, that expert witnesses are expected to produce all materials they relied upon, including code that can be run to produce their computational results. This allows other experts to verify, understand, test, and assess the methods and results presented in expert reports. In this case, the ability to reproduce Mr. Thompson's results using his Computer Code is crucial for me to understand and assess his methods, including the identification and estimation of the impact of any potential errors or other sources on unreliability.

128.    There are several fundamental flaws with Mr. Thompson's backup data production that make it untestable. First, the Computer Code did not run at all without making significant modifications. Mr. Thompson described in the ReadMe that "[t]here may be additiional [*sic*] places that require code to be commented or uncommented for a script to fully execute," and the ReadMe file indicates that "[n]o code [was] saved to create round 2" and "[n]o code [was] saved to create round 3."[229] In addition to fixing the issues specified by Mr. Thompson, there were many additional changes that were required, such as fixing code that references fields that did not exist in the tables generated by the Computer Code.[230]

129.    After making these modifications, the Computer Code produced results that were different from the output data provided by Mr. Thompson. I identified observations in Mr. Thompson's output that were matched even though they did not meet any conditions in Mr. Thompson's ▮ Tiers that he included in his code and described in his ReadMe, which indicates that even Mr. Thompson's own code cannot create the final output dataset of 246 million

---

editorial-policies#TOP-guidelines, accessed on June 16, 2025 ("The *Science* journals support the Transparency and Openness Promotion (TOP) guidelines to raise the quality of research published in *Science* and to increase transparency regarding the evidence on which conclusions are based."); *See also* NASEM (2019), p. 7 ("When results are produced by complex computational processes using large volumes of data, the methods section of a scientific paper is insufficient to convey the necessary information for others to reproduce the results. Additional information related to data, code, models, and computational analysis is needed for others to computationally reproduce the results.").

[229] *See* Mr. Thompson's ReadMe file.

[230] For example, in his ▮▮▮ Mr. Thompson used ▮▮▮▮▮▮ to match records. However, in his code for creating the intermediate data for ▮▮▮, he excluded these ▮ fields. In order to run his code, I had to edit the code to add ▮▮▮▮▮ to the intermediate data.

purportedly unique payors, and thus his method is effectively a black box.[231] Mr. Thompson conceded at deposition that his data production will not reproduce his final output dataset of 246 million records.[232]

130.    In the ReadMe, Mr. Thompson stated that users attempting to run his code should "comment and uncomment sections [of certain data cleaning code] as needed." When asked to clarify which lines of code he commented and uncommented at deposition, Mr. Thompson stated "… I'm sure the file is hundreds of lines long, and I certainly do not recall which or when."[233] When asked if this information is recorded anywhere, Mr. Thompson stated "[i]t is not."[234]

131.    I was also unable to perform any analyses regarding the Melissa Data Solutions NCOA product used by Mr. Thompson, except using the data he provided,[235] since my analytical use case did not meet the requirements for access under the Melissa Data Solutions policies.[236]

---

[231] Each of the examples I have discussed in this report exhibit this phenomenon. In Section VII.C, I discussed that Mr. Thompson's code produces nearly 3,000 payors associated with the "Kim" example, but in his final output this is a single payor. Additionally, both ▇▇▇▇▇▇ and ▇▇▇▇▇▇ have records that are not matched by Mr. Thompson's code, but are matched in Mr. Thompson's final output. *See* Workpaper 18.

[232] Thompson Deposition, p. 127:8–12 (Mr. Thompson confirms that his code will not run without modification, stating that "the code I provided was not a deliverable of this effort and, therefore, is not a situation where you would not have to change any code." After modifying his code, Mr. Thompson stated he believes another party could achieve "similar outcomes.").

[233] Thompson Deposition, p. 172:13–17 ("Q. Okay. Do you remember which lines of code you commented or uncommented in running those files? A. I'm sure the – I'm sure the file is hundreds of lines long, and I certainly do not recall which or when.").

[234] Thompson Deposition, p. 172:18–20 ("Q. And the commenting and uncommenting is not recorded in a file that you produced to Apple, correct? A. It is not.").

[235] For example, I was unable to validate how Melissa Data standardized different representations of the same information such as "Street" and "St." While I did observe some standardizations based on the data that Mr. Thompson provided to Melissa Data, and the output data returned by Melissa Data, this only permitted limited visibility into how the black box of Melissa Data's standardization functioned.

[236] According to the Melissa Data Solutions website, usage of the NCOA database for analytical purposes is disallowed. "NCOA$^{Link®}$ Processing Acknowledgement Form," *Melissa*, available at https://www.melissa.com/pdf/des-paf.pdf, accessed on June 22, 2025. The required PAF states that "… the sole purpose of the NCOA$^{Link}$ service is to provide a mailing list correction service for lists that will be used for preparation of mailings.") *See also* "Change of Address/NCOA Processing," *Melissa*, available at https://www.melissa.com/ncoalink-processing, accessed on June 22, 2025 ("Melissa is a NCOA$^{Link®}$ Full Service Provider licensee of the USPS. NCOA$^{Link®}$ processing requires a processing Acknowledgement Form (PAF).").

132.     Additionally, my review of Mr. Thompson's backup materials was limited by Plaintiffs' delay in providing those materials. His six-page expert report provided only a cursory description of how he purportedly cleaned and deduplicated the Apple Payor Data and how he validated his results, and the actual methodologies were only available in the Computer Code, which, as I described above in this section, was incomplete, disorganized, and not possible to run without modification. Consequently, while I was able to identify numerous deficiencies in Mr. Thompson's work that render his analysis unreliable in my opinion, it appears possible, or even likely, that there are additional problems with his analysis that I was unable to explore.

133.     In addition to the other flaws identified in this report, the insurmountable barriers to the reproducibility of Mr. Thompson's methods and results described above make it impossible to assess his methods as reliable.[237]  Importantly, since it was not possible to execute Mr. Thompson's code to verify his output, I could not test whether his methods are in fact reliable as he claims. As noted previously, Mr. Thompson testified that he had never produced his proprietary methodology for deduplication to another party,[238] and I found that his production in this matter was woefully below the standard necessary for meaningful testability and reliability.

134.     **Conclusion**. Several fundamental flaws with Mr. Thompson's backup production make it untestable and unreliable, including: missing information and files in Mr. Thompson's data production; unexplained additional files; and incorrect code. Mr. Thompson did not provide all the files necessary to test his method nor did he provide clear, complete, and unambiguous reproducibility instructions indicating how to recreate his output from the code his provided.

---

[237] NASEM (2019), p. xvi ("Repeated findings of comparable results tend to confirm the veracity of an original scientific conclusion, and, by the same token, repeated failures to confirm throw the original conclusions into doubt. When a scientific study becomes the basis of policy or has a direct or indirect impact on human well-being, scientific reliability becomes more than an academic question.").

[238] Thompson Deposition, p. 59:12–15 ("Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

## XIV.  Mr. Thompson's Implemented Method Differs Materially from the Method Described in His Reports and Deposition

135.    Notwithstanding the inadequacy of Mr. Thompson's backup materials, I was able to determine important ways that his actual data cleaning and validation, as implemented in his code, differ materially from the data cleaning and validation that he described in his Declaration, Report, Supplemental Report, and Deposition.[239] Moreover, because of the relationship between data cleaning, validation, and deduplication, the material differences in his actual data cleaning and validation relative to his stated data cleaning and validation have important effects on his actual deduplication results.

136.    While he did not provide specific details about his data cleaning in his reports or in his ReadMe,[240] Mr. Thompson described several aspects of his data cleaning during his deposition. Specifically, he testified in his deposition that his data cleaning method involved "removing profanity if [he] could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible."[241] He also testified that he observed some addresses, like the address for Apple's headquarters, that were not valid payor addresses.[242] With respect to those addresses, Mr. Thompson testified that he "would attempt to remove [such addresses] and

---

[239] In the Thompson Declaration, Mr. Thompson appears to describe the same approach as his expert report and supplemental report. Additionally, when asked what changes were made between them, Mr. Thompson stated in his deposition that he performed more data cleaning and more deduplication steps. Thompson Deposition, p. 140:3–8 ("Q. What changes did you make? A. I added multiple tiers to the deduplication logic. I added additional data cleansing…").

[240] Mr. Thompson described in ¶ 17.g of his report that he used National Change of Address ("NCOA") data to update address for individuals who have moved and reported a change of address to the United States Postal Service. *See* Thompson Supplemental Report, ¶ 17.g.

[241] Thompson Deposition, pp. 87:17–20 ("A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible."). *See also* Thompson Deposition, 88:13–17 ("Q. And with respect to profanity, did you write a piece of code to cleanse data of profanity? A. I -- I believe I -- there was some -- some code that removed some -- some amount of profanity at some point.").

[242] Thompson Deposition, p. 90:7–8 ("A. In my opinion, that -- Apple's address as an Apple payor address is not a valid address.").

not utilize [them] as a matching criteria."[243] Similarly, Mr. Thompson described in his deposition that he checked for outliers in all the fields and took actions to fix the outliers if needed.[244]

137.    By contrast, upon review of Mr. Thompson's Computer Code and materials, I determined that Mr. Thompson did not implement all the data cleaning methods that he presented in his report and described in more detail in his deposition. Exhibit 10 compares Mr. Thompson's stated data cleaning methods and his actual methods.

### Exhibit 10
### Comparison of Mr. Thompson's Stated Method and His Actual Method

|  | Stated Method | Actual Method |
|---|:---:|:---:|
| 1. Removed profanity | ✔ | |
| 2. Removed invalid addresses | ✔ | |
| 3. Checked and removed outliers | ✔ | |
| 4. Removed nonstandard ASCII characters | ✔ | ✔ |
| 5. Removed numeric and special characters from names, cities, and states | ✔ | ✔ |
| 6. Used data processed by NCOA | ✔ | ✔ |

Source: Computer Code
Note: The stated methods were collected from Mr. Thompson's reports and deposition. Mr. Thompson does have code to remove nonstandard ASCII characters (including emojis), but he does not run that code until the end of his matching process.

138.    Mr. Thompson's *actual data cleaning code* only removed a narrow set of invalid characters from names and addresses and updated addresses for a small subset of records based on the NCOA. Mr. Thompson's code implemented the following steps:

---

[243] Thompson Deposition, pp. 90:9–15 ("Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors? A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria…"), 134:14–20 ("Q. What action did you take? A. As an example, as you previously mentioned, Apple's address was used a -- I couldn't give you a count, but it was used more than one would expect for -- for an address. And in those situations, I -- I would remove the value and not utilize an address for that record in attempting to match it.").

[244] Thompson Deposition, pp. 133:15–134:9 ("Q. And what did you -- how many of the most common values did you review, like, the top ten or -- in terms of the most common values, which ones did you review? A. For each data point how many did I review? Q. Right. For each variable. A. Okay. I would -- for every -- every field, I would do a -- I would do a query against the data group for a value and -- and along with a count. And I would do that for, I don't know, the top 100,000, probably. And then review to see what the outliers were and if -- if they needed required action.").

a.  Mr. Thompson deleted the values "NA," "[MISSING FROM DS]," "X," "G£û"
    and "✖" from the fields *first_name, last_name, street1, street2, street3, city,
    state,* and *postal_code*;

b.  Mr. Thompson set the fields *first_name* and *last_name* to missing when both
    fields contained less than two characters;

c.  Mr. Thompson removed numeric digits (i.e., 0, 1, 2, 3, … 9) and invalid character
    symbols from *first_name, last_name, city,* and *state*; Mr. Thompson also removed
    the same set of invalid character symbols from *street1, street2,*[245] and
    *postal_code*;

d.  Mr. Thompson replaced *postal_code* with the first five digits when *postal_code*
    contains more than five digits;

e.  Mr. Thompson set 16 values that he identified as "bad phone numbers" to missing
    values;[246]

f.  Mr. Thompson replaced non-ASCII characters in the data (e.g., characters like
    "ĥ") with ASCII counterparts (e.g., "h"),[247] and replaced Chinese, Japanese,
    Korean, and other non-English and emoji characters with null values; and,

---

[245] Mr. Thompson replaced the values of *street3* with the values from the *street2* field, so *street2* was repeated twice,
and *street3* was not used in matching.

[246] I discussed this in Section XI.B.

[247] ASCII (American Standard Code for Information Interchange) is the most common character encoding format for
text data in computers and on the internet. *See* Rahul Awati and Peter Loshin, "What is ASCII (American Standard
Code for Information Interchange)?" *TechTarget*, January 24, 2025, available at
https://www.techtarget.com/whatis/definition/ASCII-American-Standard-Code-for-Information-Interchange,
accessed on June 16, 2025; ASCII-Code.com, "ASCII Table: Reference to ASCII Table of Windows-1252,"
available at https://www.ascii-code.com/, accessed on June 16, 2025.

g.  Mr. Thompson updated a subset of addresses based on the National Change of Address ("NCOA") data from the United States Postal Service, which he accessed through the third party vendor Melissa Data.[248]

139.  However, Mr. Thompson's data cleaning code performed no actual adjustments to remove illegitimate or outlier addresses (e.g., Apple's headquarters at 1 Infinite Loop[249]) despite his assertion during his deposition that he had done so;[250] similarly he performed no cleaning to remove profanity, even though he asserted in his deposition that he had performed this step as well.[251] I confirmed these discrepancies both by reviewing the code referenced in Mr. Thompson's ReadMe file and by verifying that many values Mr. Thompson purported to clean nonetheless appear unaltered in his final data and were therefore not in fact cleaned. He also made no adjustments in his code to account for different variations of the same information (e.g., names like "William" and "Bill").

140.  Mr. Thompson also testified that "a small subset of data" needed to be taken out of the air-gapped room to check certain names and addresses against the "NCOA (National Change of

---

[248] Mr. Thompson also asserts that he applied "additional layers of proprietary data cleansing code to address remaining data quality issues and repeated the process again until the marginal returns were very low." *See* Thompson Supplemental Report, ¶ 17.c. However, no additional data cleaning beyond the steps above are referenced in the ReadMe file that Mr. Thompson provided on May 28, 2025, listing the code Mr. Thompson purports to have run to produce his output.

[249] There were over a million records in the Apple Payor Data with an *street1* or *street2* resembling "Apple Computer," "Apple Inc," "Infinite Loop," or "1 Infinite." *See* Workpaper 19.

[250] Thompson Deposition, pp. 89:20–90:15 ("Q: Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here? A. I do recall a small portion of Apple's address as the address, yeah… In my opinion, that -- Apple's address as an Apple payor address is not a valid address. Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors? A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria.").

[251] Thompson Deposition, p. 87:10–20 ("A. In situations where I could identify data that – such as profanity, emojis, I would cleanse or remove the data and then use other available data points to attempt to match and deduplicate the records. Q. When you say 'cleanse the records,' does that mean cleanse them to remove the emojis and the profanity? A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.").

Address) search from the [United States Postal Service ("USPS")]."[252] According to Mr. Thompson, this step "determine[d] whether any particular name that has multiple addresses is actually the same person."[253] Mr. Thompson clarified in his deposition that the "small subpopulation" of names and addresses submitted to the NCOA data process included one primary record for every potential unique payor in the payor data.[254] He further testified in his deposition that these names and addresses had been uploaded to Melissa Data,[255] and that Melissa Data performed address standardization in addition to running data through the NCOA registry,[256] but that he was "unaware of Melissa Data's internal processes" for cleaning records or producing NCOA output.[257] Mr. Thompson also testified that he was "unclear on how [validation] would be done" on the Melissa Data NCOA output.[258]

---

[252] Thompson Declaration, ¶ 7.m.

[253] Thompson Supplemental Report, ¶ 17.g.

[254] Thompson Deposition, p. 189:1–10 ("[The records uploaded] represented the subset of the total population that at that point had -- was still identified as a primary record… The -- the intent of sending that small subpopulation instead of sending the entire 1.69 billion records was in complying with the protective order and protecting the data to best of our ability."). Mr. Thompson's methodology assigned every purported payor a unique "primary record."

[255] Thompson Deposition, p. 120:12–18 ("A. I ran a subset of the data through the National Change of Address, a process in order to get updated current addresses for a portion of the population, correct. Q. And that was through Melissa Data, if I -- is that the right name of the vendor? A. That is correct.").

[256] Thompson Deposition, p. 186:4–8 ("Q. Does that solution that you used only run the data through the NCOA database or does it do additional work on the data? A. The process does do -- perform some level of standardization of addresses as -- as an output.").

[257] Thompson Deposition, pp. 187:23–188:10 ("Q. (BY MR. LAZARUS) Well, let me back up. Does Melissa Data Solutions match addresses? A. I'm -- I am unaware of Melissa Data's internal processes for -- for how they connect a uploaded record to a record so they could produce a -- a NCOA output. Everything I -- everything I would say with regard to that would be speculation of a third party's internal workings. Q. So am I correct that you're not aware whether they use exact matching or what we were referring to earlier as fuzzy matching? A. I'm -- yeah, I am not aware of their -- their internal processes.").

[258] Thompson Deposition, p. 187:13–18 ("Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly? A. No. I'm -- I'm unclear on how that would be done, so no.").

141.     **Conclusion**. The Computer Code Mr. Thompson provided in his backup production is not correct or accurate, and differs materially and substantially from his description in his Declaration, Reports, and his Deposition Testimony.

**XV.     Conclusion**

142.     Mr. Thompson failed to meet the burden of his assignment. Given the lack of any attempt to quantify the types or amount of error his method produced, and the glaring failures I have pointed out throughout my report, I find that Mr. Thompson's method is unreliable for the purpose of identifying unique payors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 27th day of June, 2025 (with correction of a scrivener's error on the 28th day of June, 2025)

_____

Victoria C. Stodden, Ph.D.

**Appendix A**

Case 4:11-cv-06714-YGR     Document 1095-45     Filed 03/05/26     Page 92 of 117
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Victoria Stodden
Associate Professor
Department of Industrial and Systems Engineering
University of Southern California
victoria@stodden.net
*http://stodden.net*

---

Victoria Stodden is an internationally recognized statistician and data scientist. Professor Stodden analyzes the reliability of scientific results, particularly in the context of sophisticated computational approaches to research. Her expertise includes statistical data analyses, big data methods, the design and implementation of scientific validation systems, and openness standards for data and code sharing.

## EDUCATION

---

**Stanford University**, Ph.D., Statistics
**Stanford Law School**, M.L.S.
**Stanford University**, M.S., Statistics
**University of British Columbia**, M.S., Economics
**University of Ottawa**, B.Soc.Sci., Economics, *magna cum laude*

## ACADEMIC APPOINTMENTS

---

**University of Southern California**
Associate Professor, Department of Industrial and Systems Engineering
Viterbi School of Engineering                                                          1/2021–present

**Karlsruhe Institute of Technology (KIT)**
Visiting Professor in the KIT Graduate School Computational and Data Science (KCDS),
supported by the International Excellence Award of KIT and the MathSEE (Mathematics in     1/2025–present
Sciences, Engineering, and Economics) Distinguished Fellowship

**Stanford University**
Faculty Affiliate, Meta-Research Innovation Center (METRICS)                              2015–present

**Stanford Law School**
Affiliate Scholar, The Center for Internet and Society                                    2014–present

**University of Illinois Urbana-Champaign**
Associate Professor, School of Information Sciences, with courtesy appointments in the     8/2014–1/2021
College of Law and Departments of Statistics and Computer Science

**University of California at Berkeley**
Visiting Assistant Professor in the Statistics Department                                 1/2014–6/2014

**Columbia University**

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Assistant Professor, Department of Statistics, with affiliate appointment in the Institute for Data Sciences and Engineering | 7/2010–7/2014 |
| **Yale Law School** | |
| Kauffman Fellow in Law and Innovation | 8/2009–7/2010 |
| **MIT Sloan School of Management** | |
| Postdoctoral Researcher | 1/2009–7/2009 |
| **Harvard Law School** | |
| Fellow, Berkman Center for Internet & Society | 1/2008–12/2009 |

## HONORS AND RECOGNITIONS

| | |
|---|---|
| Professor Maurice H. Belz Fund Visiting Scholar, University of Melbourne, Australia | 6/25–8/25 |
| Karlsruhe Institute of Technology MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship | 1/25 |
| Alexander Humboldt Foundation Research Fellowship, Germany (€60,000) | 10/24 |
| International Excellence Award of KIT (Karlsruhe Institute of Technology), Germany | 9/24 |
| Stanford Centennial Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/02 |
| Merit Scholarship, Association of Professors of the University of Ottawa | 1993–94 |
| Merit Scholarship, University of Ottawa | 1992–93 |
| Dean's Honor List for Outstanding Academic Performance, University of Ottawa | 1991–94 |

## PROFESSIONAL ACTIVITIES

**Academic Journals/Editorial**

| | |
|---|---|
| Associate Editor for Reproducibility, *Technometrics* | 2024–present |
| Associate Editor, *Harvard Data Science Review* | 2019–present |
| Advisory Board Member, Research Ideas and Outcomes, *The Open Science Journal* | 2016–present |
| Associate Editor for Reproducibility, *IEEE Transactions on Parallel and Distributed Systems* | 2018–2022 |
| Associate Editor for Reproducibility, *Journal of the American Statistical Association, Applications and Case Studies* | 2016–2018 |
| Associate Editor, Institute of Mathematical Statistics, *Annals of Applied Statistics* | 2015–2020 |

**External Advisory Boards and Committees**

| | |
|---|---|
| National Science Foundation, *Committee of Visitors (COV) for the Office of Advanced Cyberinfrastructure (OAC), Directorate for Computer and Information Sciences and Engineering (CISE)* | 7/2022–8/2022 |
| National Academy of Engineering (NAE), *Advisory Group for the Online Resource Center for Ethics Education in Engineering and Science* | 2014–2020 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Inaugural Chair, *ACM Emerging Interest Group on Reproducibility and Independent Verification* | 2020–2021 |
| Member, National Institute of Statistical Sciences (NISS) Board of Trustees | 2020–2021 |
| Advisory Committee for American Educational Research Association (AERA) & Council of Graduate Schools (CGS), "Examining Impact and Fostering Academic Support for Open Science Products" | 2020–2021 |
| National Information Standards Organization (NISO) Working Group Member: Taxonomy, Definitions, and Recognition Badging Scheme Working Group | 2019–2021 |
| Advisor to the Curating for Reproducibility (CURE) Consortium, Yale University | 2017–present |
| ACM Task Force on Data, Software, and Reproducibility in Publication | 2013–present |
| Social Science Research Council, Digital Culture Advisory Board | 2015–2020 |
| Advisory Board, Project TIER (Teaching Integrity in Empirical Research), Haverford University. Funded by the Alfred P. Sloan Foundation. | 2015–present |
| The International Mathematical Union, Committee on Electronic Information and Communication | 2014–2020 |
| Board of Advisors, American Statistical Association, *Statistical Analysis and Data Mining* | 2013–2016 |
| Transparency and Openness Promotion (TOP) Guidelines Coordinating Committee, Center for Open Science | 2016–2021 |
| IEEE CS Ad Hoc Committee on Open Science and Reproducibility, reporting to the Board of Governors | 2020–2021 |
| ACM Ethics & Plagiarism Committee | 2017–2019 |
| American Statistical Association, Committee on Professional Ethics | 2016–2019 |
| Advisory Group on Reproducibility to the Supercomputing Conference, ACM, and IEEE | 2015–2018 |
| Member, *NSF Advisory Committee for the Computing and Information Science and Engineering (CISE) Directorate* | 2014–2017 |
| American Statistical Association, Committee on Privacy and Confidentiality | 2013–2015 |
| American Statistical Association, Presidential Strategic Initiative, Developing a Prototype Statistics Portal | 2013–2014 |
| Co-chair, Committee on Data Sharing and Reproducibility, American Statistical Association | 2013–2014 |
| *NSF Advisory Committee for Advanced CyberInfrastructure*, Office of Advanced Cyberinfrastructure, Computing and Information Science and Engineering (CISE) Directorate (ACCI) | |
| • Co-Chair | 2013–2014 |
| • Member | 2011–2015 |

## CONGRESSIONAL TESTIMONY

- Hearing on Scientific Integrity & Transparency, House Committee on Science, Space and Technology Subcommittee on Research, Washington, D.C., March 5, 2013.
  http://science.house.gov/hearing/subcommittee-research-scientific-integrity-transparency

**Appendix A**

**Victoria Stodden**
University of Southern California

## PUBLICATIONS: PEER-REVIEWED ARTICLES

- V. Stodden, "On Emergent Limits to Knowledge—Or, How to Trust the Robot Researchers: A Pocket Guide," *Harvard Data Science Review*, 6(1), 2024. DOI:10.1162/99608f92.dcaa63bc

- M. Parashar, M. A. Heroux and V. Stodden, "Research Reproducibility," *Computer*, Vol. 55, no. 8, Aug. 2022. DOI:10.1109/MC.2022.3176988.

- M. Schweinsberg, et al., "Same Data, Different Conclusions: Radical Dispersion in Empirical Results When Independent Analysts Operationalize and Test the Same Hypothesis," *Organizational Behavior and Human Decision Processes*, Vol. 165, July 2021. DOI:10.1016/j.obhdp.2021.02.003.

- M. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, "Three Empirical Principles for Computational Reproducibility and their Implementation: The Reproduction Package," Philosophical Transactions of the Royal Society A: Mathematical, Physical, and Engineering Sciences, Mar. 29, 2021. DOI:10.1098/rsta.2020.0069.

- H. Fineberg, V. Stodden, and X.L. Meng, "Highlights of the US National Academies Report on 'Reproducibility and Replicability in Science'," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.cb310198.

- C. Willis and V. Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.25982dcf.

- D. Chapp, V. Stodden and M. Taufer, "Approaching a Vision of Reproducibility in Cyberinfrastructure: Building on Community Efforts," *Supercomputing Frontiers and Innovations*, 7(1), Jan. 2020. DOI:10.14529/js200106.

- V. Stodden, "The Data Science Life Cycle: A Disciplined Approach to Advancing Data Science," Communications of the ACM, 63(7), July 2020. DOI:10.1145/3360646.

- J. Jeschke, K. Börner, V. Stodden, and K. Tockner, "Open Access Journals Need to Become First Choice in Invasion Ecology and Beyond," *NeoBiota*, 52, Nov. 2019. DOI:10.3897/neobiota.52.39542.

- H. Monajemi, R. Murri, E. Jonas, P. Liang, V. Stodden, and D. Donoho, "Ambitious Data Science Can Be Painless," *Harvard Data Science Review*, Issue 1.1, July 2019. DOI:10.1162/99608f92.02ffc552.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, M. Turk, and K. Turner, "Computing Environments for Reproducibility: Capturing the 'Whole Tale'," *Future Generation Computer Systems*, 94(C), May 2019. DOI:10.1016/j.future.2017.12.029.

- F. Berman, S. Davidson, D. Estrin, B. Halipern, M. Franklin, M. Martonosi, P. Raghavan, R. Rutenbar, V. Stodden, and A. Szalay, "Realizing the Potential of Data Science," Communications of the ACM, 61(4), Apr. 2018. DOI:10.1145/3188721.

- V. Stodden, J. Seiler, and Z. Ma, "An Empirical Analysis for Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, Mar. 2018. DOI:10.1073/pnas.1708290115.

- N. Kafkafi et al. "Reproducibility and Replicability of Rodent Phenotyping in Pre-clinical Studies," *Neuroscience & Biobehavioral Reviews*, Jan. 2018. DOI:10.1016/j.neubiorev.2018.01.003.

- R.C. Jiménez et al. "Four Simple Recommendations to Encourage Best Practices in Research Software," F1000Research 2017, 6(876), June 2017. DOI:10.12688/f1000research.11407.1.

- D. Greenbaum, J. Rozowsky, V. Stodden, and M. Gerstein, "Structuring Supplemental Materials in Support of Reproducibility," *Genome Biology*, 2017. DOI:10.1186/s13059-017-1205-3.

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Appendix A

**Victoria Stodden**
University of Southern California

- V. Stodden, M. McNutt, D. H. Bailey, E. Deelman, Y. Gil, B. Hanson, M. A. Heroux, J. P. A. Ioannidis, and M. Taufer, "The 'Reproducibility Enhancement Principles' for Computational Methods," *Science*, 354(6317), Dec. 2016. DOI:10.1126/science.aah6168.

- B. Alberts, R. J. Cicerone, S. E. Fienberg, A. Kamb, M. McNutt, R. M. Nerem, R. Schekman, R. Shiffrin, V. Stodden, S. Suresh, M. T. Zuber, B. Kline Pope, and K. Hall Jamieson, "Self-correction in Science at Work," *Science*, 348(6242), June 2015, pp. 1420–22. DOI:10.1126/science.aab3847.

- V. Stodden, "Reproducing Statistical Results," *Annual Review of Statistics and Its Application*, Vol. 2, 2015, pp. 1–19. DOI:10.1146/annurev-statistics-010814-020127.
  **Chosen by Annual Reviews for Open Access in support of the 2019 National Academies of Science, Engineering and Medicine report, "Reproducibility and Replicability in Science."**

- V. Stodden, J. Seiler, and S. Miguez, "ResearchCompendia: CyberInfrastructure for Reproducibility and Collaboration in Computational Science," *IEEE Computing in Science and Engineering*, 17(1), Jan./Feb. 2015, pp. 12–19. DOI:10.1109/MCSE.2015.18.

- V. Stodden, "The Reproducible Research Movement in Statistics," *Statistical Journal of the International Association of Official Statistics*, 30(2), 2014, pp. 91–93. DOI:10.3233/SJI-140818.

- V. Stodden and S. Miguez, "Best Practices for Computational Science: Software Infrastructure and Environments for Reproducible and Extensible Research," *Journal of Open Research Software* 2(1), Page/Article e21, 2014, pp. 1–6. DOI:10.5334/jors.ay.

- V. Stodden, P. Guo, and Z. Ma, "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," *PLOS ONE* 8(6), 2013. DOI:10.1371/journal.pone.0067111.
  **Chosen for inclusion in the PLOS Open Data Collection.**

- R. LeVeque, I. Mitchell, and V. Stodden, "Reproducible Research for Scientific Computing: Tools and Strategies for Changing the Culture," *IEEE Computing in Science and Engineering*, Vol. 14, Issue 4, 2012, pp. 13–17. DOI:10.1109/MCSE.2012.38.

- V. Stodden with Yale Roundtable Participants, "Reproducible Research: Addressing the Need for Data and Code Sharing in Computational Science," IEEE Computing in Science and Engineering, vol. 12, no. 5, pp. 8–13, Sep./Oct. 2010.

- V. Stodden, "Open Science: Policy Implications for the Evolving Phenomenon of User-Led Scientific Innovation*," Journal of Science Communication* 9(1), Mar. 2010. DOI:10.22323/2.09010205.

- V. Stodden with the Toronto International Data Release Workshop Authors, "Prepublication Data Sharing," *Nature*, 461(10), Sep.2009, pp. 168–70. DOI:10.1038/461168a.

- V. Stodden, "Enabling Reproducible Research: Open Licensing for Scientific Innovation," *International Journal of Communications, Law and Policy*, Issue 13, Winter 2008–09, pp.1–25.
  **Winner of the Access to Knowledge Kaltura prize.**

- V. Stodden, "The Legal Framework for Reproducible Research in the Sciences: Licensing and Copyright," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 35–40. DOI:10.1109/MCSE.2009.19.

- D. Donoho, A. Maleki, I. Rahman, M. Shahram, and V. Stodden, "Reproducible Research in Computational Harmonic Analysis," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 8–18. DOI:10.1109/MCSE.2009.15.

- E. Hurowitz, I. Drori, V. Stodden, D. Donoho, and P. Brown, "Virtual Northern Analysis of the Human Genome," *PLOS ONE*, May 23, 2(5), 2007. DOI:10.1371/journal.pone.0000460.

- I. Ur Rahman, I. Drori, V. Stodden, D. Donoho, and P. Schroeder, "Multiscale Representations of Manifold-valued Data," SIAM J. Multiscale Modeling and Simulation, 4(4), 2005, p. 1201–1232. DOI:10.1137/050622729.

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden, *Model Selection When the Number of Variables Exceeds the Number of Observations*, Doctoral thesis, Stanford University Department of Statistics, 2006.

# PUBLICATIONS: EDITED WORKS

- V. Stodden, "Reproducibility and Replicability in Science," Guest Editor's Introduction, *Harvard Data Science Review* 2020. (Five contributed articles). Special Issue for the National Academies "Reproducibility and Replicability in Science" Report.

- D. Allison, R. Shiffrin, and V. Stodden, "Reproducibility of Research: Issues and Proposed Remedies," Guest Editor's Introduction, Proceedings of the National Academy of Sciences, 115(11), pp. 2561–2562, Mar. 2018. DOI: 10.1073/pnas.1802324115. (Twelve contributed articles). Co-organizers' edited volume from the National Academies Arthur M. Sackler Colloquium on Improving the Reproducibility of Scientific Research.

- V. Stodden, "Reproducible Research: Tools and Strategies for Scientific Computing," Guest Editor's Introduction, *IEEE Computing in Science and Engineering*, 4(4), pp. 11–12, 2012. DOI:10.1109/MCSE.2012.82. (Seven contributed articles).

- J. Lane, V. Stodden, S. Bender, and H. Nissenbaum, eds., *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, Cambridge University Press, June 2014.

- V. Stodden, F. Leisch, and R. Peng, eds., *Implementing Reproducible Research (A Volume in the R Series)*, Taylor & Francis, Apr. 2014.

# PUBLICATIONS: BOOK CHAPTERS

- D. Donoho and V. Stodden, "Reproducible Research in Computational Mathematics," invited to *The Princeton Companion to Applied Mathematics*, edited by N. J. Higham; M. R. Dennis, P. Glendinning, P. A. Martin, F. Santosa, and J. Tanner, associate eds., 2015, pp. 916–925.

- D. Bailey, J. Borwein, and V. Stodden, "Facilitating Reproducibility in Scientific Computing: Principles and Practice," in *Reproducibility: Principles, Problems, Practices, Prospects*, H. Atmanspacher and S. Maasen, eds., Wiley, 2015. pp. 205–232.

- V. Stodden, "Enabling Reproducibility in Big Data Research: New Approaches to Intellectual Property and Privacy Law for Scientific Integrity," in *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, J. Lane, V. Stodden, H. Nissenbaum, and S. Bender, eds., Cambridge University Press, 2014. pp. 112–132.

- C. Hurlin, C. Perignon, and V. Stodden, "RunMyCode.org: A Research-Reproducibility Tool for Computational Sciences," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 367–382.

- V. Stodden, "Policy and Intellectual Property Rights in Computational Science," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 325–342.

- V. Stodden, "What Computational Scientists Need to Know About Intellectual Property Law: A Primer," in *Opening Science: The Evolving Guide on How the Web is Changing Research, Collaboration and Scholarly Publishing*, S. Bartling and S. Friesike, eds., Springer, 2013. pp. 225–235.

- V. Stodden, "Innovation and Growth through Open Access to Scientific Research: Three Ideas for High-Impact Rule Changes," in *Rules for Growth: Promoting Innovation and Growth Through Legal Reform*, edited by The Kauffman Task Force on Law, Innovation, and Growth. Feb. 2011. pp. 409–432.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Carey and V. Stodden, "Reproducible Research Concepts and Tools for Cancer Bioinformatics," *in Biomedical Informatics for Cancer Research*, M. F. Ochs, J. T. Casagrande, and R. V. Davuluri, eds., Springer, 2010. pp. 149–175.

# PUBLICATIONS: REFEREED CONFERENCE ARTICLES

- A. Bhaskar and V. Stodden. "Reproscreener: Leveraging LLMs For Assessing Computational Reproducibility Of Machine Learning Pipelines," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663629 (forthcoming)

- Y. Zheng and V. Stodden. "The Idealized Machine Learning Pipeline (IMLP) For Advancing Reproducibility In Machine Learning," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663630 (forthcoming)

- P. Zhang, Y. Jiang, A. Wei, V. Stodden, D. Marinov, and A. Shi, "Domain-Specific Fixes for Flaky Tests with Wrong Assumptions on Underdetermined Specifications," IEEE/ACM 43rd International Conference on Software Engineering (ICSE), 2021. DOI:10.1109/ICSE43902.2021.00018.

- V. Stodden, "Beyond Open Data: A Model for Linking Digital Artifacts to Enable Reproducibility of Scientific Claims," Third International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS20), June 2020. DOI:10.1145/3391800.3398172.

- W. Lam, S. Winter, A. Astorga, V. Stodden, and D. Marinov, "Understanding Reproducibility and Characteristics of Flaky Tests Through Test Reruns in Java Projects," 2020 IEEE 31st International Symposium on Software Reliability Engineering (ISSRE), 2020. DOI:10.1109/ISSRE5003.2020.00045.

- K. Chard, N. Gaffney, M. B. Jones, K. Kowalik, B. Ludäscher, J. Nabrzyski, V. Stodden, I. Taylor, T. Thelen, M. J. Turk, and C. Willis, "Application of BagIt-Serialized Research Object Bundles for Packaging and Re-execution of Computational Analyses," IEEE 15th International Conference on e-Science (e-Science), San Diego, 2019. DOI:10.1109/eScience.2019.00068.

- V. Stodden, V. Ferrini, M. Gabanyi, K, Lehnert, J. Morton, and H. Berman, "Open Access to Research Artifacts: Implementing the Next Generation Data Management Plan," Association for Information Science and Technology (ASIST19), 2019. DOI:10.1002/pra2.51.

- M. S. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, \Scientific Tests and Continuous Integration Strategies," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330595.

- V. Welch, E, Deelman, V. Stodden, and M. Taufer, "Initial Thoughts on Cybersecurity and Reproducibility," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330593.

- K. Chard, N. Gaffney, M. B. Jones, B. Ludäscher, J. Nabrzyski, V. Stodden, M. Turk, and C. Willis, "Implementing Computational Reproducibility in the Whole Tale Environment," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:.10.1145/3322790.3330594.

- B. Mecum, S. Wyngaard, C. Willis, M. Turk, T. Thelen, I. Taylor, V. Stodden, D. Perez, J. Nabrzyski, B. Ludäscher, S. Kulasekaran, K. Kowalik, M. B. Jones, M. Hategan, N. Gaffney, K. Chard, and A. Brinckman, "Science, Containerized: Integrating Provenance and Compute Environments with the Whole Tale," AGU Fall Meeting Abstracts, 2018.

- V. Stodden, X.Wu, and V. Sochat, "AIM: An Abstraction for Improving Machine Learning Prediction," IEEE Data Science Workshop Proceedings, June 2018. DOI:10.1109/DSW.2018.8439914.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden, M. S. Krafczyk, and A. Bhaskar, "Enabling the Verification of Computational Results: An Empirical Evaluation of Computational Reproducibility," First International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS18), June 2018. DOI:10.1145/3214239.3214242.

- V. Stodden and X. Wu, "Defining the AIM: An Abstraction for Improving Machine Learning Prediction," American Statistical Association Symposium on Data Science and Statistics, May 2018.

- H. Monajemi, D. L. Donoho, and V. Stodden, "Making Massive Computational Experiments Painless," IEEE BigData 2016, Open Science in Big Data (OSBD 2016), Dec. 5, 2016.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, and M. Turk, "Capturing the 'Whole Tale' of Computational Research: Reproducibility in Computing Environments," Science Gateways 2016.

- V. Stodden and S. Miguez, "Provisioning Reproducible Computational Science Information," reproducibility@XSEDE: An XSEDE14 Workshop, 2014.

- V. Stodden and H. Reich, "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, CA, Nov. 2012.

- V. Stodden, C. Hurlin, and C. Perignon, "RunMyCode.org: A Novel Dissemination and Collaboration Platform for Executing Published Computational Results," IEEE International Conference on eScience, Workshop on Analyzing and Improving Collaborative eScience with Social Networks, 2012.

- V. Stodden, "Data Sharing in Social Science Repositories: Facilitating Reproducible Computational Research," NIPS workshop: Computational Science and the Wisdom of Crowds, Dec. 2010.

- V. Stodden and P. Meier, "A Global Empirical Evaluation of New Communication Technology Use and Democratic Tendency."
  **Nominated for Best Paper, 3rd IEEE/ACM International Conference on Information and Communication Technologies and Development, Doha, Qatar, Apr. 2009.**

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," IEEE World Congress on Computational Intelligence, 2006.

- E. Hurowitz, I. Drori, and V. Stodden, "Fast l1 Minimization for Genomewide Analysis of mRNA Lengths," IEEE International Workshop on Genomic Signal Processing and Statistics, 2006.

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," Proc. IEEE International Joint Conference on Neural Networks, Vancouver, BC, 2006.

- D. Donoho and V. Stodden, "When Does Non-Negative Matrix Factorization Give a Correct Decomposition Into Parts?" Proceedings NIPS 2003.

## PUBLICATIONS: OTHER SCHOLARLY WORKS

- V. Stodden with Committee Members, "Reproducibility and Replication in Science," National Academies of Sciences, Engineering, and Medicine, Apr. 2019.

- V. Stodden with Committee Members, "Fostering Integrity in Research," National Academies of Sciences, Engineering, and Medicine, Apr. 2017.

- V. Stodden, "How do I know the right level of abstraction at which to explain a phenomenon?", Reply to The Edge Annual Question 2018: What is the Last Question? Jan. 2018.

- V. Stodden, "Epsilon," Reply to The Edge Annual Question 2017: What scientific term ought to be more widely known? Jan. 2017.

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden with Committee Members, "Realizing the Potential of Data Science," Final Report from the National Science Foundation Computer and Information Science and Engineering Advisory Committee Data Science Working Group, Dec. 2016.

- D. James, N. Wilkins-Diehr, V. Stodden, D. Colbry, and C. Rosales, "Standing Together for Reproducibility in Large-Scale Computing: Report on reproducibility@XSEDE, An XSEDE14 Workshop," Dec. 2014.

- V. Stodden, "Reproducibility," Reply To The Edge Annual Question 2014: What scientific idea is ready for retirement? Jan. 2014.

- J. Lane and V. Stodden, "What, Me Worry? What to Do about Privacy, Big Data, and Statistical Research," *Amstat News*, Dec. 2013.

- V. Stodden, "Resolving Irreproducibility in Computational and Empirical Research," invited *IMS Bulletin*, Dec. 2013.

- V. Stodden, D. Bailey, and J. Borwein, "'Setting the Default to Reproducible' in Computational Science Research," *SIAM News*, June 2013.

- D. Bailey, J. Borwein, and V. Stodden, "Set the Default to 'Open'," *Notices of the AMS*, June 2013.

- V. Stodden, D. Bailey, J. Borwein, R. LeVeque, W. Rider, and W. Stein "Setting the Default to Reproducible: Reproducibility in Computational and Experimental Mathematics," ICERM Workshop Report, 2013.

- V. Stodden, "Where did you get that fact?", Reply to The Edge Annual Question 2012: What should we be worried about? Jan. 2013.

- V. Stodden, "Fact, Fiction, and Our Probabilistic World," Reply to The Edge Annual Question 2011: What is your favorite deep, elegant, or beautiful explanation? Jan 2012. Published in *This Explains Everything: Deep, Beautiful, and Elegant Theories of How the World Works*, Harper Perennial, Jan. 22, 2013.

- V. Stodden, "Phase Transitions and 'Scale Transitions:' Conceptualizing Unexpected Changes Due to Scale," Reply to The Edge Annual Question 2010: What Scientific Concept Would Improve Everybody's Cognitive Toolkit? Jan 2011. Published in *This Will Make You Smarter: New Scientific Concepts to Improve Your Thinking*, Harper Perennial, Feb. 14, 2012.

- V. Stodden and S. Arbesman, "Scientists, Share Secrets or Lose Funding," Bloomberg View, Jan. 10, 2012.

- V. Stodden with Participants, "Changing the Conduct of Science: Summary Report of the Workshop," Held on Nov. 12, 2010," at the National Science Foundation Workshop Changing the Conduct of Science in the Information Age, June 2011.

- V. Stodden, "Trust your Science? Open Your Data and Code," *Amstat News*, July 1, 2011.

- V. Stodden, "White Paper for Expert Panel Discussion on Data Policies," for a Workshop of the National Science Board Expert Panel on Data Policies, Mar. 27–29, 2011.

- V. Stodden with Task Force co-authors, "Cyber Science and Engineering: A Report of the NSF Advisory Committee on Cyberinfrastructure," Task Force on Grand Challenges, Nov. 2010.

- V. Stodden, "Remarks," presented before The National Academies of Sciences, Engineering, and Medicine Committee on The Impact of Copyright Policy on Innovation in the Digital Era, Washington, D.C., Oct. 15, 2010.

- V. Stodden, "Cogitamus, Ergo Sum? The 'Difference Between Knowing the Name of Something and Knowing Something,'" Reply to The Edge Annual Question 2009: How Has the Internet Changed the Way You Think? Jan. 2010.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

Victoria Stodden
University of Southern California

## PUBLICATIONS: TECHNICAL REPORTS

- M. A. Heroux, L. Barba, M. Parashar, V. Stodden, and M. Taufer, "Toward a Compatible Reproducibility Taxonomy for Computational and Computing Sciences," Sandia National Lab (SNL-NM), Albuquerque, NM, 2018.
- V. Stodden, "The Scientific Method in Practice: Reproducibility in the Computational Sciences," MIT Sloan Research Paper No. 4773-10. 2010. DOI:10.2139/ssrn.1550193.
- D. Donoho, V. Stodden, and Y. Tsaig, "About SparseLab," Stanford Department of Statistics Technical Technical Report, SparseLab 2.0, Mar. 2007.
- D. Donoho, V. Stodden, and Y. Tsaig, "SparseLab Architecture," Stanford Department of Statistics Technical Report, SparseLab 2.0, Mar. 2007.

## SOFTWARE DEVELOPMENT

| | |
|---|---|
| **Reproscreener.org**: The Center for Research and Education in AI and Learning (**REAL@USC**)-funded collaborative project developing an open-source tools to evaluate machine learning pipelines to improve efficiency and reproducibility. | 8/2023–present |
| **WholeTale.org**: NSF-funded collaborative project to develop an open-source platform that supports modern research tools such as the Jupyter notebook, and creates online "research compendia" that make available data and code as a novel standardized re-executable package called a "Tale." | 10/2017–2/2023 |
| **ezdmp.org**: NSF-funded collaborative project to develop an open-source next generation data management plan tool. | 9/2016–8/2018 |
| **ResearchCompendia**: Sloan Foundation-funded project to develop an opensource platform to support online "research compendia" that make available data and code alongside published results and verify findings in the cloud. | 4/2013–10/2014 |
| **RunMyCode.org**: Collaboration to develop open availability of code and data with published computational results. | 3/2012–10/2014 |
| Developed and maintained SparseLab webpage for the collaborative Matlab toolbox distribution from my dissertation (over 7,000 downloads in 2008). | 9/2005–1/2022 |

## SELECTED PRESENTATIONS

| | |
|---|---|
| **Invited Colloquium Presentation**, Heidelberg Institute of Theoretical Studies Colloquium, "*Verifying Correctness in AI-enabled Scientific Research – A New Frontier.*" | 3/2025 |
| **Invited Presentation**, International Excellence Talk and MathSEE Lecture, Karlsruhe Institute of Technology, "*AI and the Future of Research: Stakeholders, Process, and Practices.*" | 1/2025 |
| **Invited Presentation**, US-UK Scientific Forum: Science in the Age of AI. "*On Emergent Limits to Knowledge Or, How to Trust the Robot Researchers: A Pocket Guide.*" | 6/2024 |
| **Keynote**, Learning from Authoritative Security Experiment Results (LASER) Workshop, Annual Computer Security Applications Conference (ACSAC). "*A Decade Later: Reproducibility & Reliability of Research Results.*" | 12/2023 |

# Appendix A

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Departmental Seminar, Alfred-Weber-Institut Für Wirtschaftswissenschaften, Heidelberg University, Germany. "*Automating Assessment of Machine Learning Research: Revisiting Arrow's Impossibility Theorem.*" | 11/2023 |
| **Invited Presentation**, Joint Statistical Meetings, Statistics and the Reproducibility Crisis. "*Automating Assessment of Computational Reproducibility in Machine Learning Research.*" | 8/2023 |
| **Invited Presentation**, The Center for Research and Education in AI and Learning (REAL@USC) First Anniversary Conference, "*Automating Machine Learning Model Checking.*" | 10/2022 |
| Building a Community Roadmap to Robust Science in High-Throughput Applications, SIAM Conference on Computational Science and Engineering (CSE21). "*Advancing Computational Scientific Discovery by Enabling Reproducibility and Transparency: Policies and Practice.*" | 3/2021 |
| **Invited Address**, Scholarship for a Post-Pandemic World: A Conversation; Council of Graduate Schools 60th Annual Meeting. "*Training and Scholarly Impact in a Digital World.*" | 12/2020 |
| Epstein Institute Seminar, University of Southern California. "*Two Projects for Advancing Scientific Reliability in Complex Computational and Human Systems.*" | 9/2020 |
| **Keynote**, Applied Human Factors and Ergonomics Conference: The Human-Side of Service Engineering. "*Toward a Computable Scholarly Record: Meta Science and Engineering Reproducibility in the Era of AI.*" | 7/2020 |
| **Invited Address**, IEEE CS Ad Hoc Committee on Open Science and Reproducibility. "*Reproducibility and Replicability in Science.*" | 6/2020 |
| The National Academies of Science, Engineering, and Medicine Committee | |
| • "Roundtable on Data Science Post-Secondary Education" | 2016–2019 |
| • "Reproducibility and Replicability in Science" | 2016–2019 |
| • "Responsible Science: Ensuring the Integrity of the Research Process" | 2014–2018 |
| **Invited Distinguished Speaker**, Northwestern Computer Science **Distinguished Lecture** Series, Northwestern University. "*The Lifecycle of Data Science: A Framework for Advancing Computational and Data-enabled Research.*" | 11/2019 |
| **Invited Distinguished Speaker**, Center for Data and Computing **Distinguished Speaker** Series, University of Chicago. "*Reproducibility is Not a Crisis. Now What? Next Steps for Advancing Computational and Data-enabled Science.*" | 11/2019 |
| **Keynote**, Parallel Computing 2019: Symposium Tools and Infrastructure for Reproducibility in Data-Intensive Applications, Prague, Czech Republic. "*Advancing Reproducibility and Transparency in Data Inference Applications.*" | 9/2019 |
| **Invited Seminar**, Space Telescope Science Institute, Baltimore, MD. "*Reproducibility in Scientific Inference, Data Dissemination, and Computational Environments.*" | 7/2019 |
| **Keynote**, Computational Reproducibility at Exascale 2018 (CRE2018), Supercomputing18, Dallas, TX. "*Reproducibility in Computational and Data-enabled Science.*" | 11/2018 |
| **Plenary**, Ethics, law, and transparency. "Institute for the Secure Sharing of Online Data" (ISSOD) Workshop, Boston, MA. "*A Future of Research Transparency: Enabling Reproducibility in Repository Design.*" | 11/2018 |
| **Keynote**, The 27th International Symposium on High-Performance Parallel and Distributed Computing, Arizona State University. "*Reproducibility in Computational and Data-enabled Science.*" | 6/2018 |

11

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Keynote**, IEEE Data Science Workshop, EPFL, Switzerland. "*Reproducibility and Generalizability in Data-enabled Discovery.*" | 6/2018 |
| **Keynote**, Northwestern Computational Research Day, Evanston, IL. "*Reproducibility in Computational Research: Code, Data, Statistics, and Implementation.*" | 4/2018 |
| **Invited Presentation**, Sandia National Laboratories, Oak Ridge National Laboratory, Swiss Institute of Technology (SOS) SOS-22 Workshop: HPC and Data Science, Waikoloa, HI. "*Reproducibility at Exascale.*" | 3/2018 |
| **Keynote**, Research Data Management Implementations (RDMI) Workshop, Arlington, VA. "*Research Data Management Implementations: Towards the Reproducibility of Science.*" | 9/2017 |
| **Invited Address**, European Alpbach Forum, Technology Symposium, Austria. "*Knowledge and Understanding in the Age of Data.*" | 8/2017 |
| **The Judith Resnik Year of Women in ECE Invited Seminar**, Carnegie Mellon University, Pittsburgh, PA. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| National Academy of Sciences, Arthur M. Sackler Colloquia, Reproducibility of Research: Issues and Proposed Remedies, Washington, D.C. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| Seance de reflexion of the Swiss National Research Council on "2050: A Science Odyssey," Interlaken, Switzerland. "*Science: Set the Default to Open.*" | 11/2016 |
| **Invited Talk**, SIAM Annual Meeting, Boston MA. "*Implementing Reproducibility in Computational Science.*" | 7/2016 |
| **Keynote**, Maria de Maeztu Annual Event: Data-driven Knowledge Extraction Workshop, Universitat Pompeu Fabra, Barcelona, Spain. "*Reproducibility in Computational Research.*" | 6/2016 |
| **Keynote**, Coalition for Networked Information Annual Meeting, San Antonio, TX. "*Defining the Scholarly Record for Computational Research.*" | 4/2016 |
| **Keynote**, AAAS Reproducibility Workshop: Modeling and Code, Washington, D.C. "*Software in Science.*" | 2/2016 |
| **Plenary Speaker**, SuperComputing15, Austin, TX. "*Reproducibility in High Performance Computing.*" | 11/2015 |
| **Keynote**, Open Access Week, Virginia Tech, Blacksburg, VA. "*Scholarly Communication in the Era of Big Data and Big Computation.*" | 10/2015 |
| **Invited Talk**, AAAS Annual Meeting, San Jose, CA. "*Integrity, Reproducibility, and the Changing Technological Environment for Research.*" | 2/2015 |
| **Keynote**, Berkeley Initiative for Transparency in the Social Sciences Conference, University of California, Berkeley. "*Framing Transparency in Research: Issues and Opportunities.*" | 12/2014 |
| **Keynote**, OpenCon 2014, American University Washington College of Law, Washington, D.C. "*Open Data and Reproducibility in Research.*" | 11/2014 |
| **Keynote**, Computational and Simulation Sciences and eResearch, Annual Conference, Melbourne, Australia. "*Open Data and Reproducibility in Research.*" | 3/2014 |
| **Plenary Speaker**, Open Repositories 2013, Charlottetown, Prince Edward Island, Canada. "*Re-use and Reproducibility: Opportunities and Challenges.*" | 7/2013 |

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Keynote**, PDE Software Frameworks, Muenster, Germany. "*Reproducible Results: Challenges for Computational Science and the Scientific Method.*" | 6/2012 |
| **Keynote**, 74th EAGE Conference & Exhibition: Open-source E+P Software - Six Years Later, Copenhagen, Denmark. "*The Central Role of Geophysics in the Reproducible Research Movement.*" | 6/2012 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Credibility Crisis in Computational Science: An Information Issue.*" | 2/2012 |
| **Plenary Keynote**, Cyberinfrastructure Days, University of Michigan. "*The Credibility Crisis in Computational Science: A Call to Action.*" | 12/2011 |
| National Science Foundation, Advisory Committee on Cyberinfrastructure, Washington, D.C. "*Report on Journal Policy and Reproducible Computational Research.*" | 11/2011 |
| **Keynote**, Open Science Summit, Computer History Museum, Mountain View, CA. "*Transparency in Scientific Discovery: Innovation and Knowledge Dissemination.*" | 10/2011 |
| National Science Board Expert Panel Discussion on Data Policy, Washington, D.C. "*Scientific Reproducibility: First Steps and Guiding Questions.*" | 3/2011 |
| **Keynote**, ICML Workshop on Machine Learning Open Source Software, Haifa, Israel. "*Reproducible Research in Computational Science: Problems and Solutions For Data and Code Sharing.*" | 6/2010 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Digitization of Science and the Degradation of the Scientific Method.*" | 5/2010 |
| The New Biology: Pathways to Convergence in the Life Sciences, MIT/Kauffman Seminar for Senior Congressional and Executive Branch Staff, MIT. "*Innovation and Openness in Science and the Exceptional Role of the Biological Sciences .*" | 4/2010 |
| **Invited Chaired Session** on Reproducibility: New England Statistics Symposium, Harvard University. "*Scientific Integrity and Reproducibility: Data and Code Sharing.*" | 4/2010 |
| **Invited Lecture**, UC Berkeley School of Information, Berkeley, CA. "*Open Licensing and Scientific Reproducibility.*" | 4/2010 |
| **Keynote**, Scientific Software Days, Texas Advanced Computing Center, University of Texas at Austin. "*The Impact of Computational Science on the Scientific Method.*" | 5/2009 |
| **Neyman Invited Seminar**, Department of Statistics, UC Berkeley. "*The Reproducible Research Standard: Legal Barriers to Practicing the Scientific Method in Computational Research.*" | 2/2009 |

# TEACHING

**Courses Developed**

**University of Southern California, Department of Industrial and Systems Engineering**
- PhD Seminar on Modern Machine Learning            8/2024-12/2024
- Predictive Analytics, Graduate                    1/2022-5/2024
- Engineering Statistics, Undergraduate             1/2022
- Discrete Systems Simulation, Undergraduate        8/2021

**University of Illinois Urbana-Champaign, School of Information Sciences**

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Concepts of Machine Learning, Undergraduate | 8/2019 |
| • Data Management, Curation & Reproducibility, Undergraduate | 8/2019 |
| • Legal Aspects of Information Systems, Undergraduate | 8/2019 |
| • Methods for Data Science, Master's | 8/2018 |
| • Introduction to Data Science, Master's, Departments of Computer Science (CS) and Statistics | 8/2015 |
| • Intellectual Property for Scholarship, Master's | 8/2015 |
| • Data Policy Seminar, Master's | 8/2014 |

**Columbia University, Department of Statistics**

| | |
|---|---|
| • Replicating Computational Results, Ph.D. Level Course, IGERT "From Data to Knowledge" crossover course, jointly offered between Statistics and EECS | 1/2012 |
| • Statistical Computing in SAS, Master's | 8/2010 |
| • Introduction to Data Science, Master's | 8/2010 |

**University of California, Berkeley, Department of Statistics**

| | |
|---|---|
| • Capstone Course in Data Science, Master's | 1/2011 |

**Stanford University, Department of Statistics**

| | |
|---|---|
| • Statistical Computing in SAS, Master's | 6/2003 |

**Courses Taught**

**University of Southern California, Department of Industrial and Systems Engineering**

| | |
|---|---|
| • Seminar on Modern Machine Learning | 8/2024-12/2024 |
| • Predictive Analytics, Master's | 1/2022-5/2024 |
| • Engineering Statistics, Undergraduate | 1/2022 |
| • Discrete Systems Simulation, Undergraduate | 8/2020–2021 |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2019 |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2019 |
| • Introduction to Data Science, Master's | Fall 2018 |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | |
| • Methods for Data Science, Master's | Spring 2018 |
| • Journal Club on Data Science and Reproducibility, all levels | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's | Fall 2015 |
| • Data Policy Seminar, Master's | Spring 2015 |
| • Socio-technical Data Analysis, Master's, co-taught | Spring 2015 |

**Columbia University**

| | |
|---|---|
| • Applied Data Mining, Undergraduate | Fall 2014 |
| • Introduction to Data Science, Undergraduate | Summer 2014 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Introduction to Probability, Undergraduate | Summer 2014 |
| • Linear Regression Models, Undergraduate | Fall 2013 |
| • Replicating Computational Results, Columbia University IGERT "From Data to Knowledge" crossover course, jointly offered between statistics and EECS | Spring 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2012 |
| • Linear Regression Models, Undergraduate | Fall 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2011 |
| • Linear Regression Models, Undergraduate | Summer 2011 |

**University of California, Berkeley**

| | |
|---|---|
| • Data Science, Capstone Master's Course | Spring 2014 |
| • Concepts in Computing with Data, Undergraduate | Summer 2013 |

**Stanford Law School**

| | |
|---|---|
| • Quantitative Methods: Statistical Inference | Spring 2007 |
| • Empirical Research Seminar, co-taught | Fall 2006 |

## MENTORING

**Postdoctoral Scholars**

| | |
|---|---|
| • Matthew Krafczyk, National Center for Supercomputing Applications, University of Illinois Urbana-Champaign | 8/2016–8/2019 |
| • Jennifer Seiler, Department of Statistics, Columbia University | 8/2013–8/2015 |

**Ph.D.**

| | |
|---|---|
| • Adhithya Bhaskar, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Yantong Zheng, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Becky Vandewalle, Geography University of Illinois Urbana-Champaign; Qualifying Exam Committee Member | 10/2020 |
| • Craig Willis, School of Information Sciences University of Illinois Urbana-Champaign; PhD Advisor | Graduated 8/2020 |
| • Rutvik Chaudhury, Department of Computer Science School of Engineering, University of Illinois Urbana-Champaign; PhD Advisor | 8/2019–1/2020 |
| • Kelechi Ikegwu, Informatics Qualifying Exam Committee Member | 5/2019 |
| • Q. Chelsea Song, Psychology, Doctoral Committee Member; now Assistant Professor, Department of Psychology, Purdue University | Graduated 5/2018 |

**Master's**

| | |
|---|---|
| • Vaishnavi Guntupalli, Research Assistant, Department of Industrial and Systems Engineering, University of Southern California | 11/2022–5/23 |
| • Peilun Zhang, Thesis Primary Co-advisor, Department of Computer Science, University of Illinois Urbana-Champaign | 8/2019–7/2020 |
| • Yang Yu, Department of Statistics Summer Intern, University of Illinois Urbana-Champaign | 6/2019–8/2019 |
| • Xiaomian Wu, Department of Statistics, University of Illinois Urbana-Champaign; coauthored "AIM: An Abstraction for Improving Machine Learning | 8/2017–5/2018 |

# Appendix A

**Victoria Stodden**
University of Southern California

> Prediction," with V. Stodden and V. Sochat, 2018 IEEE Data Science Workshop, June 2018.

- Jennifer Beamer, Summer Intern, Library Sciences, University of Hawai'i at Manoa — 6/2017–8/2017
- Yantong Zheng, Undergraduate and Master's Department of Statistics, University of Illinois Urbana-Champaign — 1/2017–5/2018
- William Pooler, School of Information Sciences, University of Illinois Urbana-Champaign — 8/2015–5/2016

**Undergraduate**

- Mingzhe Wang, Undergraduate Summer Intern, Department of Computer Science, University of Illinois Urbana-Champaign — 6/2020–8/2020
- Daniel Lee, Department of Statistics, University of Illinois Urbana-Champaign — 1/2017–5/2018
- Kefu Zhu, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign — 8/2016–12/2016
- Saumil Padhya, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign — 8/2016–12/2016
- April Tang, Department of Statistics, University of Illinois Urbana-Champaign — 8/2015–5/2016
- Pakwesi Taylor, Department of Statistics, Columbia University — 6/2014–8/2014
- Christine Byun, Independent Study, Department of Statistics, Columbia University — 8/2013–12/2013
- Zhaokun Ma, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013; and "Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, March 2018 — 6/2012–8/2012
- Isabel Reich, Department of Statistics, Columbia University; coauthored "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, Nov. 2012 — 6/2012–8/2012
- Peixuan Guo, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013 — 6/2011–8/2011
- Michael Fusella, Department of Statistics, Columbia University — 6/2011–8/2011
- Matthew Lewis, Department of Statistics, Columbia University — 6/2011–8/2011

# SERVICE

**School and Department Service**

**University of Southern California**

- Chair, Departmental Chair Review Subcommittee, Viterbi School of Engineering, Engineering Faculty Council — 8/2023–8/2024
- Merit Review Subcommittee Member, Viterbi School of Engineering, Engineering Faculty Council — 8/2022–8/2023
- Industrial and Systems Engineering Departmental Representative, Viterbi School of Engineering, Engineering Faculty Council — 8/2022–8/2025
- Inaugural Chair, Department of Industrial and Systems Engineering Diversity Committee — 8/2021–8/2025
- Chair, Department of Industrial and Systems Engineering Hiring Committee — 8/2021–8/2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Ph.D. Admissions Committee, Department of Industrial and Systems Engineering | 8/2021–8/2022 |
| • Ph.D. Curriculum Committee, Department of Industrial and Systems Engineering | 8/2020–8/2022 |
| • Chair, Department of Industrial and Systems Engineering Hiring Committee | Summer 2021 |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • School of Information Sciences Diversity Committee | 8/2019–8/2020 |
| • School of Information Sciences Master's of Information Management Committee | 8/2019–8/2020 |
| • School of Information Sciences Curriculum Committee | 8/2016–8/2019 |
| • School of Information Doctoral Students Committee | 8/2014–8/2015 |

**University Service**

**University of Southern California**

| | |
|---|---|
| • Member, Affinity Group for Computational Science and Engineering within the School of Advanced Computing, Viterbi School of Engineering, University of Southern California | 8/2023–present |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • Budget Committee | 8/2019–8/2022 |
| • Discovery Partners Institute (DPI) Culture & Society (C&S) Inaugural Working Subcommittee | 8/2018–8/2020 |
| • Scientific Advisory Board for the University of Illinois News Bureau | 10/2017–8/2020 |
| • IT Committee | 8/2015–8/2018 |

**Columbia University**

| | |
|---|---|
| • Senate IT Committee | 8/2016–8/2019 |

# RESEARCH GRANTS

| | |
|---|---|
| "ReproScreener: Enabling Robustness in Machine Learning at Scale via Automated Knowledge Verification," PI: Victoria Stodden $50,000. The Center for Research and Education in AI and Learning (REAL@USC). | 8/2022–7/2023 |
| "Collaborative Research: PPoSS: Planning: Performance Scalability, Trust, and Reproducibility: A Community Roadmap to Robust Science in High-throughput Applications," PI: Victoria Stodden $30,000. Part of collaborative award led by UTK (Entire award $150,000). National Science Foundation #2028881. | 10/2020–9/2022 |
| Supplement to "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (Illinois-led institution).<br>Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Supplement award: $304,774 with Illinois share $54,774 (sub-awards to University of Chicago ($150,000) and USC ($100,000)). National Science Foundation #1541450. | 3/2016–2/2022 |
| "EAGER: Reproducibility and Cyberinfrastructure for Computational and Data-Enabled Science," PI: Victoria Stodden. Co-PI: Michela Taufer (UTK), $300,000 ($149,997 to UTK). National Science Foundation #1941443. | 9/2019–8/2022 |

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| "EAGER: Preserve/Destroy Decisions for Simulation Data in Computational Physics and Beyond," PI: Victoria Stodden. Co-PI: Darko Marinov (University of Illinois), $300,000. National Science Foundation #1839010. | 8/2018–7/2022 |
| Discovery Partners Institute. PI: Victoria Stodden, $3,000. University of Illinois Economic Development and Innovation (VPEDI) International Travel Grant. | 6/2018–8/2018 |
| "EAGER: Collaborative Proposal: Supporting Public Access to Supplemental Scholarly Products Generated from Grant Funded Research," PI: Victoria Stodden. Collaborative proposal with Illinois share: $59,991. National Science Foundation #1649555. | 9/2016–8/2019 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Cooperative proposal $5,887,240. National Science Foundation #1541450. | 3/2016–2/2021 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago), Jarek Nabryszki (University of Notre Dame), Matthew B. Jones (University of California, Santa Barbara). Supplement $293,559. National Science Foundation #1541450. | 7/2019–2/2021 |
| "Facilitating Transparency in Scientific Publishing," PI: Victoria Stodden. $420,640. Alfred P. Sloan Foundation. | 7/2012–11/2014 |
| "EAGER: Policy Design for Reproducibility and Data Sharing in Computational Science," PI: Victoria Stodden, $168,800. National Science Foundation #1153384. | 9/2011–12/2013 |
| "Community Forum on Reproducible Research Policies," PI: Victoria Stodden. $3,800. Alfred P. Sloan Foundation. | 7/2011 |

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix B**

**Victoria Stodden, Ph.D.**                                September 2024

# Prior Testimony[1]

*Rumble, Inc., v. Google LLC et al.*, United States District Court, Northern District of California, Oakland Division, Case No. 4:21-cv-00229.  Deposed September 27, 2024.

---

[1] The party that retained me is underlined.

**Appendix C**

# Materials Relied Upon

**Academic Articles**

- Alvaro E. Monge, "Matching Algorithms Within a Duplicate Detection System," *IEEE Data Engineering Bulletin*, 23(4), 2000, pp. 14–20

- Andrea Saltelli, "Why So Many Published Sensitivity Analyses are False: A Systematic Review of Sensitivity Analysis Practices," *Environmental Modelling & Software*, 114, 2019, pp. 29–39

- Andrea Saltelli et al., "A Quantitative, Model Independent Method for Global Sensitivity Analysis of Model Output," *Technometrics*, 41(1), 1999, pp. 39–56

- Andrea Saltelli et al., "Sensitivity Analysis," *SSRN*, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3977108, pp. 1–10

- Atieh Khanjani and Riza Sulaiman, "The Process of Quality Assurance Under Open Source Software Development," *Proceedings of the IEEE Symposium on Computers & Informatics*, 2011, pp. 548–552

- Clodoveu A. Davis Jr. and Emerson de Salles, "Approximate String Matching for Geographic Names and Personal Names," *IX Brazilian Symposium on GeoInformatics*, 2007, pp. 49–60

- Craig Willis and Victoria Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, 2(4), 2020, pp. 1–60

- Davide Chicco et al., "Eleven Quick Tips For Data Cleaning and Feature Engineering," *PLoS Computational Biology*, 18(12), 2022, pp.1–21

- David Guthrie et al., "An Unsupervised Approach for the Detection of Outliers in Corpora," *Proceedings of the International Conference on Language Resources and Evaluation*, 2008, pp. 3409–3413

- David Hand and Peter Christen, "A Note on Using the F-Measure for Evaluating Record Linkage Algorithms," *Statistics and Computing*, 28, 2018, pp. 539–547

- Dengyue Li et al., "Approximate Address Matching," *Proceedings of the International Conference on P2P, Parallel, Grid, Cloud and Internet Computing*, 2010, pp. 264–269

- Dennis Gilliland and Vince Melfi, "A Note on Confidence Interval Estimation and Margin of Error," *Journal of Statistics Education*, 18(1), 2010, pp. 1–8

## Appendix C

- Fakhitah Ridzuan and Wan Mohd Nazmee Wan Zainon, "A Review on Data Cleansing Methods for Big Data," *Procedia Computer Science*, 161, 2019, pp. 731–738

- Garret Christensen and Edward Miguel, "Transparency, Reproducibility, and the Credibility of Economic Research," *Journal of Economic Literature*, 56(3), 2018, pp. 920–980

- Geoff Cumming et al., "Error Bars in Experimental Biology," *Journal of Cell Biology*, 177(1), 2007, pp. 7–11

- Gisela Bichler and Stefanie Balchak, "Address Matching Bias: Ignorance Is Not Bliss," *Policing: An International Journal of Police Strategies & Management*, 30(1), 2007, pp. 32–60

- H.B. Newcombe et al., "Automatic Linkage of Vital Records," *Science*, 130(3381), 1959, pp. 954–959

- Hadley Wickham, "Tidy Data," *Journal of Statistical Software*, 59(10), 2014, pp. 1–23

- Hadley Wickham et al., "Welcome to the Tidyverse," *Journal of Open Source Software*, 4(43), Article 1686, 2019, pp. 1–6

- Halbert L. Dunn, "Record Linkage," *American Journal of Public Health*, 36(12), 1946, pp. 1412–1416

- Heiko Müller and Johann-Christoph Freytag, "Problems, Methods, and Challenges in Comprehensive Data Cleansing," *Humboldt University of Berlin*, Working Paper, 2003, available at https://pubs.dbs.uni-leipzig.de/dc/files/Mller2003ProblemsMethodsand.pdf

- Herman Aguinis et al., "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, 16(2), 2013, pp. 270–301

- Ioannis Koumarelas et al., "Experience: Enhancing Address Matching with Geocoding and Similarity Measure Selection," *Journal of Data and Information Quality*, 10(2), Article 8, 2018, pp. 1–16

- Jana Lynn Asher et al., "An Introduction to Probabilistic Record Linkage with a Focus on Linkage Processing for WTC Registries," *International Journal of Environmental Research and Public Health*, 17(18), Article 6937, 2020, pp. 1–16

- Jason W. Osborne and Amy Overbay, "The Power of Outliers (and Why Researchers Should Always Check for Them)," *Practical Assessment, Research & Evaluation*, 9, Article 6, 2004, pp. 1–8

## Appendix C

- Joan Heck Wortman and Jerome P. Reiter, "Simultaneous Record Linkage and Causal Inference with Propensity Score Subclassification," *Statistics in Medicine*, 37, 2018, pp. 3533–3546

- Keshav Ramani and Daniel Borrajo, "Methods for Matching English Language Addresses," *Transactions in GIS*, 27(2), 2023, pp. 347–363

- Khalid Waleed Hussein et al., "Enhance Luhn Algorithm for Validation of Credit Cards Numbers," *International Journal of Computer Science and Mobile Computing*, 2(7), 2013, pp. 262–272

- Kimberly A. Barchard and Larry A. Pace, "Preventing Human Error: The Impact of Data Entry Methods on Data Accuracy and Statistical Results," *Computers in Human Behavior*, 27(5), 2011, pp. 1834–1839

- Mong Li Lee et al., "Cleansing Data for Mining and Warehousing," *Database and Expert Systems Applications*, 1677, 1999, pp. 751–760

- Otmane Azeroual et al., "A Record Linkage-Based Data Deduplication Framework with DataCleaner Extension," *Multimodal Technologies and Interaction*, 6(4), Article 27, 2022, pp. 1–18

- Peter Christen, "A Comparison of Personal Name Matching: Techniques and Practical Issues," *Proceedings of the Sixth IEEE International Conference on Data Mining Workshops*, 2006, pp. 290–294

- Ricardo Sanchez et al., "Best Practices in Statistical Computing," *Statistics in Medicine*, 40(27), 2021, pp. 6057–6068

- Sam Comber and Daniel Arribas-Bel, "Machine Learning Innovations in Address Matching: A Practical Comparison of Word2vec and CRFs," *Transactions in GIS*, 23(2), 2019, pp. 334–348

- Samson Oni et al., "A Comparative Study of Data Cleaning Tools," *International Journal of Data Warehousing and Mining*, 15(4), 2019, pp. 48–65

- Soumia Belouafa et al., "Statistical Tools and Approaches to Validate Analytical Methods: Methodology and Practical Examples," *International Journal of Metrology and Quality Engineering*, 8, 2017, pp. 1–10

- Tigran Avoundjian, "Comparing Methods for Record Linkage for Public Health Action: Matching Algorithm Validation Study," *JMIR Public Health Surveillance*, 2020, 6(2), e15917, pp. 1–12

- V. I. Levenshtein, "Binary Codes Capable of Correcting Deletions, Insertions, and Reversals," *Soviet Physics Doklady*, 10(8), 1966, pp. 707–710

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- Wen Xia et al., "A Comprehensive Study of the Past, Present, and Future of Data Deduplication," *Proceedings of the IEEE*, 104(9), 2016, pp. 1681–1710

- William W. Cohen et al., "A Comparison of String Metrics for Matching Names and Records," *Proceedings of IJCAI-03 Workshop on Information Integration*, 2003, pp. 73–78

- Xu Chu et al., "Data Cleaning: Overview and Emerging Challenges," *Proceedings of the International Conference on Management of Data*, 2016, pp. 2201–2206

### Books and Book Chapters

- Charu C. Aggarwal, "An Introduction to Outlier Analysis," in *Outlier Analysis*, Second Edition, (New York, NY: Springer, 2017), pp. 1–34

- David Diez et al., *OpenIntro Statistics*, Fourth Edition, (2019)

- D.M. Hawkins, *Identification of Outliers*, (London, UK: Chapman and Hall, 1980)

- Mark van der Loo and Edwin de Jonge, *Statistical Data Cleaning with Applications in R*, (Hoboken, NJ: John Wiley & Sons, 2018)

- National Academies of Sciences, Engineering, and Medicine, *Reproducibility and Replicability in Science*, (Washington, DC: The National Academies Press, 2019)

- National Research Council, "Chapter 5: Model Validation and Prediction," in *Assessing the Reliability of Complex Models: Mathematical and Statistical Foundations of Verification, Validation, and Uncertainty Quantification*, (Washington, DC: The National Academies Press, 2012) pp. 52–85

- Robert V. Hogg et al., *Probability and Statistical Inference*, Ninth Edition, (Upper Saddle River, NJ: Pearson Education Inc., 2015)

- Stacie B. Dusetzina et al., *Linking Data for Health Services Research: A Framework and Instructional Guide*, (Rockville, MD: Agency for Healthcare Research and Quality, 2014)

### Data

- Apple Payor Data

### Depositions

- Deposition of Darryl Thompson, June 5, 2025

- Deposition of Robert Pepper, June 14, 2021

## Appendix C

**Expert Reports and Declarations**

- Declaration of Darryl Thompson, August 1, 2024

- Declaration of Darryl Thompson, March 7, 2025

- Supplemental Expert Report of Darryl Thompson, April 16, 2025, with backup materials

**Legal Documents**

- Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, September 17, 2020

- Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, March 29, 2022

- Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024

- Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024

- Email chain from Kyle Wood to Eli Lazarus, "RE: [EXTERNAL] RE: 4:11-cv-06714-YGR In re Apple iPhone Antitrust Litigation -- D. Thompson backup materials," June 4, 2025

- Order Granting in Part Motion to Modify Class, *In re Apple iPhone Antitrust Litigation*, June 11, 2025

**Websites**

- "Change of Address/NCOA Processing," *Melissa*, available at https://www.melissa.com/ncoalink-processing, accessed on June 22, 2025

- "How to install Tidyverse without internet connection for R 3.5.2," Posit Community, November 7, 2019, available at https://forum.posit.co/t/how-to-install-tidyverse-without-internet-connection-for-r-3-5-2/44201, accessed on June 18, 2025

- "NCOALink® Full Service Provider Licensees," *USPS*, April 25, 2025, available at https://postalpro.usps.com/ncoalink/Full_Service_Provider_Licensees, accessed on June 23, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- "NCOA^Link® Processing Acknowledgement Form," *Melissa*, available at https://www.melissa.com/pdf/des-paf.pdf, accessed on June 22, 2025

- "NCOALink®," *USPS*, available at http://postalpro.usps.com/mailing-and-shipping-services/NCOALink, accessed on June 23, 2025

- "tidyverse," available at https://www.cran-e.com/package/tidyverse, accessed on June 18, 2025

- Andrew Dovgal, "Coding Standards and Best Practices: Guide & Implementation Tips," *DevCom*, December 30, 2024, available at https://devcom.com/tech-blog/coding-standards-and-best-practices-guide-implementation-tips/, accessed on June 16, 2025

- Apple Support, "Apple ID (or Apple Account)," available at https://support.apple.com/guide/itunes/aside/glos1009407f/windows, accessed on June 16, 2025

- ASCII-Code.com, "ASCII Table: Reference to ASCII Table of Windows-1252," available at https://www.ascii-code.com/, accessed on June 16, 2025

- Google Scholar search, "data cleaning," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22data+cleaning%22&btnG=, accessed on June 18, 2025

- Google Scholar search, "deduplication," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22deduplication%22&oq=, accessed on June 18, 2025

- Google Scholar search, "tidyVerse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22tidyVerse%22&btnG=, accessed on June 19, 2025

- Google Scholar search, "validation," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22validation%22&btnG=, accessed on June 18, 2025

- Google Scholar search, "Welcome to the Tidyverse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=Welcome+to+the+tidyverse&btnG=, accessed on June 19, 2025

- IEEE Computer Society, "The Importance of Software Testing," available at https://www.computer.org/resources/importance-of-software-testing, accessed on June 16, 2025

- Kate VanDerAa, "11 Most-Favorite Data Visualizations on Tableau Public," *Tableau*, November 19, 2024, available at https://www.tableau.com/blog/most-favorited-data-visualizations-tableau-public, accessed on June 19, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- Melissa Direct, "NCOALink® National Change of Address (NCOA) Service," available at https://www.melissa.com/direct/direct-mail/ncoa-link, accessed on June 25, 2025

- Nature Portfolio, "Reporting Standards and Availability of Data, Materials, Code and Protocols," available at https://www.nature.com/nature-portfolio/editorial-policies/reporting-standards, accessed on June 16, 2025

- OpenRefine, "Homepage," available at https://openrefine.org/, accessed on June 18, 2025

- OpenRefine, "OpenRefine Usage," available at https://openrefine.org/usage, accessed on June 16, 2025

- OpenRefine User Manual, "Running OpenRefine," available at https://openrefine.org/docs/manual/running, accessed on June 18, 2025

- Rahul Awati and Peter Loshin, "What is ASCII (American Standard Code for Information Interchange)?" *TechTarget*, January 24, 2025, available at https://www.techtarget.com/whatis/definition/ASCII-American-Standard-Code-for-Information-Interchange, accessed on June 16, 2025

- Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-editorial-policies#TOP-guidelines, accessed on June 16, 2025

- Tableau Deployment Guide, "Registers and Activate from the User Interface," available at https://help.tableau.com/current/desktopdeploy/en-us/desktop_deploy_activate_license.htm, accessed on June 19, 2025

- Tableau, "Tableau Prep Help: Clean and Shape Data," available at https://help.tableau.com/current/prep/en-us/prep_clean.htm, accessed on June 18, 2025

- U.S. Census Bureau, "Explore Census Data," available at https://data.census.gov/, accessed on June 16, 2025

- U.S. National Science Foundation, "Committees of Visitors," available at https://www.nsf.gov/about/performance/cov, accessed on June 16, 2025

**Note: In addition to the materials on this list, I relied on all materials cited in my report to form my opinions.**