# EXHIBIT 48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | Civil Action No. 4:11-cv-06714-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

<br><br><br>

## REBUTTAL EXPERT REPORT AND DECLARATION OF
## ARUN SUNDARARAJAN, PH.D.

<br><br>

**JUNE 13, 2025**

**Table of Contents**

I.   Introduction ................................................................................................... 1

II.  Assignment ..................................................................................................... 1

III. Summary of Opinions ...................................................................................... 3

   A.   Professor Stiglitz ..................................................................................... 3

   B.   Dr. Abrantes-Metz ................................................................................... 7

   C.   Professor McFadden and Dr. Song ............................................................ 8

   D.   Professor Martin ...................................................................................... 8

IV.  Rebuttal of Professor Stiglitz's Opinions ......................................................... 9

   A.   Professor Stiglitz Incorrectly Dismisses the Importance of the App Store's Two-Sidedness ........................................................................................ 10

      1.   Professor Stiglitz's Position Ignores the App Store is a Two-Sided Transaction Platform and the Importance of Indirect Network Effects ....... 10

      2.   Professor Stiglitz's Assertion About the Relevance of Indirect Network Effects Being Restricted to Whether They "Constrain Apple's Monopolistic Conduct" is Flawed ..................................................................................... 14

      3.   Professor Stiglitz Has Not Performed Any Analysis to Assess the Importance of Indirect Network Effects on the App Store or Support His Claim that Their Significance is Limited ........................................................ 16

      4.   Professor Stiglitz Mischaracterizes the Academic Papers He Cites to Support His Claim that the Significance of Indirect Network Effects is Limited on the App Store ............................................................................... 18

      5.   Professor Stiglitz Ignores Academic Papers Demonstrating the Importance of Considering Indirect Network Effects When Choosing Prices ............... 21

   B.   Professor Stiglitz's Definition of the Relevant Antitrust Product Market Is Flawed and Ignores the Fact that the App Store is a Two-Sided Transaction Platform.... 23

      1.   Overview of Professor Stiglitz's Market Definition Analyses .................... 23

      2.   Professor Stiglitz's Failure to Recognize that the App Store is a Two-Sided Transaction Platform Leads to an Incorrectly Defined Product Market ...... 24

      3.   Professor Stiglitz Ignores that Many Transactions on the App Store Have Substitutes Outside of the App Store ......................................................... 30

      4.   Professor Stiglitz's Dismissal of the App Store's Two-Sidedness Renders His Market Definition Analyses Incorrect ................................................... 38

         a)   Professor Stiglitz's SSNIP is Unreliable as It Is Based on Incorrect Inputs and Assumptions ......................................................................... 38

         b)   Professor Stiglitz Incorrectly Clusters All Apps and In-App Digital Content into a Single Relevant Product Market .......................................... 42

   C.   Professor Stiglitz Ignores the Conditions that Existed When the App Store Launched that Undermine His Opinions Regarding Apple's Monopoly Power .. 44

1. Professor Stiglitz Ignores Evidence of Competition When the App Store Launched, Apple's Low Market Share for the iPhone, and Apple's Declining Market Share for the iPad ........................................................... 44

2. Professor Stiglitz Ignores that the App Store's Business Model Lowered Costs for Developers and Set a Commission Rate Consistent with Other App Marketplaces ................................................................................................ 48

3. Apple Has Openly Communicated App Store Policies and Has Not Changed Them Since Launching the App Store and In-App Purchases ...................... 51

D. Professor Stiglitz's Market Power Analysis and Use of the Foremarket and Aftermarket Framework are Flawed and Lead to Incorrect Conclusions ............. 53

1. Overview of Professor Stiglitz's Market Power Analysis Based on the Foremarket and Aftermarket Framework ....................................................... 54

2. Professor Stiglitz's Application of the Foremarket and Aftermarket Framework Is Inappropriate Because It Ignores the App Store's Two-Sidedness ................................................................................................... 56

    a) Overview of the Foremarket and Aftermarket Framework     56

    b) Professor Stiglitz's Definition of the Aftermarket Ignores that the Relevant Product for the App Store Is a Transaction     60

    c) Professor Stiglitz Overlooks the Fundamental Differences between the Apps and In-App Digital Content and Typical Aftermarket Products     63

    d) Professor Stiglitz Ignores that the Transparency and Stability of Apple's Policies Undermine His Conclusion that Competition in the Alleged Foremarket Does Not "Constrain" Apple's Alleged Monopoly Power in the Alleged Aftermarket     72

3. Professor Stiglitz Incorrectly Asserts that Apple Has Monopoly Power in the Alleged Aftermarket ....................................................................................... 76

    a) Professor Stiglitz's Analysis and Conclusions Regarding Apple's Monopoly Power Ignore the App Store's Two-Sidedness     76

    b) Professor Stiglitz's Supposed Direct Evidence of Monopoly Power is Flawed and Ignores the App Store's Two-Sidedness     77

    c) Professor Stiglitz's Supposed Indirect Evidence of Monopoly Power is Flawed and Based on an Incorrect Definition of the Relevant Product Market     84

4. Professor Stiglitz Fails to Consider Reasons why the Alleged Aftermarket Restraints May Be Procompetitive ............................................................... 87

E. Professor Stiglitz's Argument that the Challenged Conduct is Equivalent to Anticompetitive Tying is Flawed ............................................................................ 88

1. Overview of Professor Stiglitz's Tying Arguments ...................................... 88

2. Professor Stiglitz's Tying Argument Ignores Evidence that Apple Did Not Have Market Power in the Sale of Smartphones at the Beginning of the Class Period ................................................................................................... 90

3. By Ignoring the App Store's Two-Sidedness, Professor Stiglitz Incorrectly Identifies the Alleged Tied Product ............................................................... 90

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

F. Professor Stiglitz Ignores Reasons that Explain Why the Challenged Conduct is Not Anticompetitive ................................................................................. 92

 1. Professor Stiglitz Fails to Consider Reasons Why the Centralized Distribution of Apps Is Not Anticompetitive ................................................. 92

  a) Professor Stiglitz Fails to Recognize that Centralized Distribution Has Not Reduced or Harmed Competition 93

  b) Professor Stiglitz Fails to Acknowledge Centralized Distribution Does Not Restrain Interbrand Competition 99

 2. Professor Stiglitz Fails to Consider Reasons why Apple's In-App Payment Requirement Is Not Anticompetitive ........................................... 100

 3. Professor Stiglitz Fails to Consider Reasons Why Apple's Former Anti-Steering Provisions Were Not Anticompetitive ......................................... 102

G. Professor Stiglitz Fails to Analyze the Procompetitive Benefits of Apple's Conduct ................................................................................................. 105

 1. Professor Stiglitz Fails to Consider the Procompetitive Justification for Centralized Distribution of Apps ................................................. 106

  a) Centralized Distribution Contributes to Protecting Consumers and Developers from Adverse Outcomes 106

  b) Centralized Distribution Facilitates Access to IP-Protected Tools, Technologies, and Services for Developers and Enables Apple to Monetize These Investments 124

 2. Professor Stiglitz Fails to Consider the Procompetitive Justifications for Apple's In-App Payment Requirement ........................................... 126

  a) Apple's In-App Payment Requirement Enables Apple to Efficiently Collect Commission from Developers 127

  b) Apple's In-App Payment Requirement Helps Protect Consumers and Developers from Potential Adverse Outcomes 129

  c) Apple's In-App Payment Requirement Eases Transacting for Consumers and Developers 133

 3. Professor Stiglitz Fails to Consider the Procompetitive Justifications for Apple's Former Anti-Steering Provisions ................................................. 134

H. Professor Stiglitz Does Not Provide Any Evidence that Procompetitive Benefits Do Not Offset Any Alleged Harm from Apple's Challenged Conduct .............. 135

V. Rebuttal of Dr. Abrantes-Metz's Opinions ................................................... 138

A. Dr. Abrantes-Metz's Approach to Calculate the But-For Commission Rate Is Inconsistent with Economic Principles and Competition of App Marketplaces 139

 1. Overview of Economic Modeling ............................................................. 139

 2. Overview of Dr. Abrantes-Metz's Approach ............................................. 142

 3. Dr. Abrantes-Metz's Approach Does Not Follow Accepted Principles of Economic Modeling ................................................................................ 144

B. Dr. Abrantes-Metz's Approach Fails to Appropriately Account for the Nature of Competition between App Marketplaces ................................................... 150

C. Dr. Abrantes-Metz's Approach Incorrectly Dismisses that Indirect Network Effects Can Impact the App Store's Commission Rate ...................................... 158

    1. Overview of Dr. Abrantes-Metz's Position on the Irrelevance of Indirect Network Effects in Her Analysis of the But-For Commission Rate .......... 158

    2. Dr. Abrantes-Metz Ignores Evidence that Indirect Network Effects Are Significant on the App Store and Other Two-Sided Transaction Platforms ................................................................................................................ 160

    3. Dr. Abrantes-Metz Incorrectly Dismisses the Impact of Indirect Network Effects on the Pricing Structure of the App Store ..................................... 167

D. Dr. Abrantes-Metz Ignores the Importance of Indirect Network Effects When the App Store Launched ...................................................................................... 177

E. Additional Economic Errors Associated with Dr. Abrantes-Metz's Model Inputs and Benchmark Analysis ...................................................................................... 182

    1. Dr. Abrantes-Metz's Accounting Identity Ignores How the Different Components of the Challenged Conduct Could Affect the But-For Commission Rate ...................................................................................... 182

    2. Dr. Abrantes-Metz's Claims that Her Modeling Assumptions Are Conservative Are Unsupported and Speculative ...................................... 184

    3. Dr. Abrantes-Metz's Benchmark Analysis Does Not Support the But-For Commission Rate ...................................................................................... 190

VI. Rebuttal of Professor McFadden's and Dr. Song's Opinions ...................................... 192

VII. Rebuttal of Professor Martin's Opinions ........................................................................ 196

A. Professor Martin Ignores that Apple Has a Strong Incentive to Protect Consumers from Privacy Violations ........................................................................................ 198

B. Professor Martin's Claim Regarding Apple's Revenue from Targeted Advertising Is Speculative ................................................................................................ 203

iv

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## I.  INTRODUCTION

1. I am the Harold Price Professor of Entrepreneurship and Professor of Technology, Operations and Statistics at the Leonard N. Stern School of Business at New York University ("NYU") in New York, New York, where I also serve as Director of their Fubon Center for Technology, Business, and Innovation.

2. My research studies different facets of the economics of digital technologies, including the economics of digital goods and network effects, competition and its implication for antitrust policy related to technology companies, the regulation and governance of artificial intelligence and digital platforms, and other related topics in industrial organization. I am the author of over 50 peer-reviewed papers published in academic journals. I am also the author of the award-winning book "The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism," published in 2016 by the MIT Press, which describes various economic and regulatory aspects of a specific set of two-sided platforms that, at the time of the book's publication, were commonly referred to as constituting the "sharing economy."

3. My curriculum vitae and list of prior testimony are in **Appendix A.**

4. In forming my opinions, I have relied on court documents, data and documents produced by the parties, academic publications and textbooks and other publicly available materials. These materials are cited throughout my report or otherwise listed in **Appendix B**. I am being compensated for my work in this matter at an hourly rate of $1,100. In working on this report, I have been assisted by certain employees of the firm Analysis Group, Inc., who worked under my direction, and I receive additional compensation in part based on their fees. The compensation Analysis Group and I receive is not dependent upon the outcome of this case or my findings.

## II.  ASSIGNMENT

5. I have been asked by counsel for Apple to respond to portions of the Opening Expert Reports of Professor Joseph Stiglitz, Dr. Rosa Abrantes-Metz, Professor Daniel McFadden, Dr. Minjae Song, and Professor Kirsten Martin. Specifically, I have been asked to:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a.   Evaluate Professor Stiglitz's definition of the relevant antitrust markets in the context of two-sided transaction platforms and his claims regarding the alleged foremarket and aftermarket;

b.   Evaluate Professor Stiglitz's claims regarding market power and competitive harm in the context of two-sided transaction platforms;

c.   Evaluate Professor Stiglitz's claims that the App Store's centralized distribution model, in-app payment requirement, and former anti-steering provisions are anticompetitive;

d.   Evaluate Dr. Abrantes-Metz's approach to estimating the but-for commission rate to determine whether it conforms to economic theory and principles, and whether it is consistent with the App Store being a two-sided transaction platform;

e.   Respond to Dr. Abrantes-Metz's and Professor Stiglitz's claims regarding the importance of indirect network effects when analyzing the App Store;

f.   Evaluate Professor McFadden's and Dr. Song's claims regarding the economic effects of a change in commission rates on app prices and consumer surplus.

g.   Evaluate Professor Martin's claims regarding the impact of competition from third-party app marketplaces on the App Store's privacy protections in the but-for world.

6.   I previously submitted an opening report in this matter on March 7, 2025 ("Sundararajan Opening Report").[1] In this current report, I rely on material from my opening report with additional content that responds to arguments in the reports of Professor Stiglitz, Dr. Abrantes-Metz, Professor McFadden, Dr. Song, and Professor Martin. Since my work on this matter is ongoing, I may review additional materials produced after the issuance of this report or conduct further analysis. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to the reports of other experts and any additional information I may receive.

---

[1]   Opening Expert Report and Declaration of Arun Sundararajan, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Sundararajan Opening Report").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### III.    SUMMARY OF OPINIONS

7.    The following is a summary of my opinions.

#### A.    Professor Stiglitz

8.    Professor Stiglitz's opinions ignore that the App Store is a two-sided transaction platform and ignore the importance of indirect network effects in shaping economic outcomes for two-sided transaction platforms. This calls into question the validity of all his analyses and conclusions, including his definition of the relevant product market, his assessment of Apple's alleged monopoly power, and his analysis of procompetitive benefits of the challenged conduct.

9.    Professor Stiglitz has incorrectly minimized the importance of indirect network effects when analyzing a two-sided transaction platform such as the App Store. His claim that indirect network effects are relevant only to the extent that they can constrain the App Store's alleged monopolistic conduct is flawed, mischaracterizes the papers he cites as support for this assertion, and ignores relevant literature showing the importance of indirect network effects on the pricing structure of two-sided transaction platforms even if the platform is a two-sided monopolist. (**Section IV.A**).

10.   Professor Stiglitz's analysis of the App Store as a one-sided one-stop shop instead of as a two-sided transaction platform leads him to define an incorrect product market, one involving the sale of iOS apps and in-app digital content. Because the App Store is a two-sided transaction platform, the actual relevant product market is providing simultaneous transactions between consumers and developers. As a result of this incorrect market definition, Professor Stiglitz fails to account for a wide variety of transactions which occur outside of the App Store and that are meaningful substitutes to transactions facilitated by the App Store. Furthermore, Professor Stiglitz's SSNIP test is unreliable because it is applied to the wrong relevant product market, ignores how indirect network effects can amplify the responses to price changes, relies on Dr. Abrantes-Metz's flawed calculation of the but-for commission rate, and focuses exclusively on one component of the App Store's pricing structure while ignoring others. The flaws in Professor Stiglitz's product market definition are compounded by his incorrect grouping of transactions that face different competitive conditions. (**Section IV.B**).

3

11. Professor Stiglitz's analysis is based on the incorrect premise that Apple possessed monopoly power in the alleged market for apps and in-app digital content since it launched the App Store in 2008 and in-app purchases in 2009, overlooking the evidence that the App Store has faced competition from numerous popular app marketplaces since it was launched, that the iPhone market share, according to Professor Stiglitz, was under 30 percent for many years, and that the App Store's commission rates have aligned with those of its competitors since its inception. Professor Stiglitz further ignores that Apple has been transparent since 2008 about the App Store policies regarding centralized distribution and in-app payments that constitute the challenged conduct and has not changed any of these requirements since it launched. (**Section IV.C**).

12. Professor Stiglitz's argument that the sale of iOS apps and in-app digital content in the U.S constitutes an alleged "aftermarket" to two alleged "foremarkets" comprising smartphones and tablets where Apple has durable market power is unreliable on many counts. (**Section IV.D**).

13. By failing to treat the App Store as a two-sided transaction platform, Professor Stiglitz identifies the wrong alleged aftermarket, one comprising iOS apps and in-app digital content rather than simultaneous transactions between consumers and app developers. Professor Stiglitz's incorrect definition of the relevant product market along with his reliance on flawed inputs from Mr. Barnes and Dr. Abrantes-Metz and a mischaracterization of Apple's commission rate changes as price discrimination renders the evidence of Apple's monopoly power he relies on invalid. **(Section IV.D.1** and **Section IV.D.3**).

14. Within his flawed aftermarket definition:

   a. Professor Stiglitz ignores that the products in this alleged aftermarket are not sold by Apple, but by hundreds of thousands of developers. Thus, Apple does not make the product line, pricing, and entry decisions associated with the products in Professor Stiglitz's alleged aftermarket. (**Section IV.D.2.b**).

   b. In contrast with typical aftermarket products that are perishable "maintenance" products, Professor Stiglitz ignores that apps and in-app digital content are "additive" products that enhance and expand the value and functionality of iOS

devices but not essential for the use of the iPhone or iPad, and are durable goods which, rather than requiring periodic replacement, can be used indefinitely and provide ongoing value to consumers. (**Section IV.D.2.c**).

c. Professor Stiglitz ignores that the challenged conduct has not changed since 2008 and that Apple has been transparent about it, and thus, there has been no policy shift under which allegedly locked-in customers unexpectedly face new restrictions. (**Section IV.D.2.d**).

These characteristics of the alleged aftermarket products, the fact that they are not sold by Apple, the absence of any relevant policy shift since 2008, and the absence of reliable evidence of market power each call into question Professor Stiglitz's theory of harm.

15. Professor Stiglitz's claim that the challenged conduct can be framed as anticompetitive tying incorrectly ignores that consumers who purchase an iPhone or iPad are not contractually required to complete any paid transactions on the App Store. Professor Stiglitz also ignores that Apple did not possess market power early in the class period, a necessary condition for tying, were it to exist, to be anticompetitive. (**Section IV.E**).

16. Professor Stiglitz's analysis of the different elements of the challenged conduct fails to consider the reasons why each of these elements may not be anticompetitive. (**Section IV.F**).

a. Professor Stiglitz does not provide any evidence that the centralized distribution of iOS apps has impacted competition or harmed consumers. Professor Stiglitz ignores that a firm has a natural economic incentive to insulate its innovation from free-riding by rivals, and that incentives to invest in innovation would otherwise be diminished, lowering consumer welfare. Professor Stiglitz also ignores that the challenged conduct does not restrain interbrand competition. (**Section IV.F.1**).

b. Professor Stiglitz does not define a relevant market for payment processing to support his claim that Apple's in-app payment requirement has foreclosed competition. Reasonable assumptions about the relevant market suggest that

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple's market share is small and likely insufficient to impose the type of competitive harmed alleged by Professor Stiglitz. (**Section IV.F.2**).

c. Professor Stiglitz has also failed to provide evidence that Apple's former anti-steering provisions regarding the App Store are anticompetitive, ignoring the fact that many other two-sided transaction platforms have similar provisions which help them protect their IP investments. (**Section IV.F.3**).

17. Professor Stiglitz's claims regarding the lack of procompetitive benefits from Apple's challenged conduct overlook that Apple has both a stronger economic incentive and possesses superior technological capabilities that enable it to, via the challenged conduct, protect consumers and developers from adverse outcomes while preserving the value of its brand and the consumer perception of the quality of its devices. (**Section IV.G**).

a. Professor Stiglitz ignores that centralized distribution of apps, and the accompanying revenue-sharing model that includes a commission on paid downloads and in-app digital content purchases are an important component of the App Store's business model and provides compensation to Apple for access to and use of its IP-protected tools, technologies, and services by developers. (**Section IV.G.1**).

b. Professor Stiglitz's claim that there are no procompetitive benefits of Apple's in-payment requirement ignores the business justification that the in-app payment requirement provides an efficient mechanism for Apple to collect its commission on App Store transactions, allowing Apple to monetize its investments in IP-protected tools, technologies, and services for developers. (**Section IV.G.2**).

c. Professor Stiglitz's analysis also fails to consider that Apple's anti-steering provisions enable Apple to preempt developer free-riding, thus enhancing Apple's ability to seek compensation for its investments and Apple's ability and incentive to invest in IP-protected tools, technologies, and services for developers that raise the quality and variety of apps available to consumers, ultimately benefiting the consumer experience on the App Store. (**Section IV.G.3**).

6

18. Finally, Professor Stiglitz fails to analyze whether any alleged harms of Apple's challenged conduct that he claims could be balanced by numerous benefits that the challenged conduct creates for consumers and developers. (**Section IV.H**).

## B.     Dr. Abrantes-Metz

19. Dr. Abrantes-Metz's approach does not adhere to accepted principles of economic modeling and, as a result, her approach yields predictions that are invalid and self-contradictory. She does not provide a mathematical or other specification of the objectives or goals of the two competing app marketplaces and their consumers and developers, nor does she explain how her assumptions combine with the choices made by these economic actors to generate predictions or explanations of relevant economic outcomes like the commission rates or market shares. (**Section V.A**).

20. In the hypothetical scenario where the App Store competes with a rival app marketplace in the but-for world, the App Store is likely to be viewed by consumers and developers as differentiated along different dimensions, including, but not limited to, security, privacy, app quality, user trust, and fraud protection. Ignoring this differentiation between app marketplaces further renders Dr. Abrantes-Metz's estimate of the but-for commission rate flawed and unreliable. (**Section V.B**).

21. Dr. Abrantes-Metz's calculation of the but-for commission rate incorrectly dismisses the widely accepted importance of incorporating indirect network effects into pricing decisions for two-sided transaction platforms without evidence to support this choice. Dr. Abrantes-Metz does not attempt to quantify the strength of indirect network effects on the App Store and ignores empirical research that provides evidence of significant indirect network effects on numerous two-sided transaction platforms including the App Store. Dr. Abrantes-Metz also ignores theory and empirical evidence that indirect network effects can influence the optimal pricing level on each side of a two-sided platform and can therefore have an impact on her but-for commission rate estimate. (**Section V.C**).

22. Dr. Abrantes-Metz's calculation of the but-for commission rate further ignores the importance of indirect network effects at the beginning of the Class Period and their influence in determining the App Store's pricing structure and commission rate, contradicting her own writings. (**Section V.D**).

7

23. Dr. Abrantes-Metz's accounting identity fails to capture how the rival app marketplace would respond to changes in individual elements of Apple's challenged conduct. Additionally, Dr. Abrantes-Metz's claim that her assumption of a single rival app marketplace is conservative because more competition would lead to lower commission rates is contradicted by her own accounting identity. Further, Dr. Abrantes-Metz's benchmark analysis is unable to confirm her estimated but-for commission rate. (**Section V.E**).

### C.    Professor McFadden and Dr. Song

24. Professor McFadden's and Dr. Song's conclusion that decreases in the App Store's commission rate will result in decreases in app and in-app digital content prices ignores that when developer marginal costs are low, changes in commission rate may not be passed on to consumers. Professor McFadden and Dr. Song also fail to assess the implications of changes in the App Store's commission rate being accompanied by other changes to its pricing structure. (**Section VI**).

### D.    Professor Martin

25. Professor Martin's argument that third-party app marketplaces could better meet the privacy needs of consumers overlooks the fact that as the seller of iOS devices, Apple has a stronger incentive and possesses superior technological capabilities than third-party app marketplaces to protect consumer privacy. It also ignores empirical evidence of the superior security and privacy outcomes for iOS users relative to users in settings with third-party app marketplaces. The empirical evidence she cites to support her claim that an increase in competition favors privacy-preserving providers suggests the opposite. (**Section VII.A**).

26. Professor Martin's claim also ignores economic theory that suggests that two-sided platforms that feature indirect network effects frequently make non-price choices that constrain one side to encourage participation from the other, and that in striking this balance in their privacy choices, third-party app marketplaces would have greater incentives than Apple to attract developers by offering options that rely heavily on privacy invading ads. (**Section VII.B**).

27. Professor Martin has not conducted any analysis or provided any support for her claim that revenue from "targeted advertising" is substantial for Apple, that it undermines Apple's superior privacy standards for apps and in-app digital content, or how third-party app marketplaces would pressure Apple to reduce "targeted advertising." (**Section VII.B**).

## IV. REBUTTAL OF PROFESSOR STIGLITZ'S OPINIONS

28. In this section, I discuss Professor Stiglitz's market definition, analysis of market power, and characterization of a foremarket and an aftermarket associated with the App Store. I first discuss how Professor Stiglitz incorrectly ignores indirect network effects in his analysis of the App Store (*see* **Section IV.A**). By failing to account for the App Store's two-sidedness, Professor Stiglitz's definition of the relevant antitrust product market is incorrect, thus failing to account for the fact that certain transactions on the App Store have relevant and meaningful substitutes outside of the App Store, resulting in an SSNIP test conducted on the wrong product market (*see* **Section IV.B**). I then discuss how Professor Stiglitz's conclusion regarding Apple's alleged monopoly power is flawed as it ignores the competitive conditions that existed when Apple launched the App Store and relies on the false premise that the App Store is a one-stop shop of apps and in-app digital content (*see* **Section IV.C**). I then discuss how Professor Stiglitz's argument that the sale of iOS apps and in-app digital content in the U.S constitutes an alleged "aftermarket" to two alleged "foremarkets" where Apple has durable market power is unreliable on many counts (*see* **Section IV.D**). I then evaluate Professor Stiglitz's argument that Apple's challenged conduct is equivalent to anticompetitive tying and conclude it is inconsistent with facts that include the App Store being a two-sided transaction platform (*see* **Section IV.E**). I explain how Professor Stiglitz ignores that the different elements of the challenged conduct may not be anticompetitive (*see* **Section IV.F**) while also dismissing procompetitive justifications of Apple's challenged conduct, also discussing why his assertion that the same procompetitive benefits could be achieved absent Apple's challenged conduct is unsupported and incorrect (*see* **Section IV.G**). Finally, I discuss how Professor Stiglitz fails to provide a quantification of the benefits to consumers of the challenged conduct to determine to what extent they balance its alleged harm (*see* **Section IV.H**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

A. **Professor Stiglitz Incorrectly Dismisses the Importance of the App Store's Two-Sidedness**

29. As I discussed in my opening report, the App Store is a <u>two-sided transaction platform</u> that connects two groups or sides (developers and consumers) and facilitates observable <u>transactions</u> that require participation from both sides. That is, the relevant product of the App Store is a simultaneous transaction between consumers and developers, and the App Store charges a commission rate on transactions that involve a payment from consumers to developers. These transactions facilitated by the App Store have relevant and meaningful substitutes (*see* **Section IV.B**). Like other two-sided transaction platforms, the App Store displays indirect network effects. Consistent with those of other two-sided transaction platforms, the App Store provides services and governance mechanisms to mitigate sources of market failure and create value for its users by encouraging and enhancing participation on both sides of the platform; by facilitating discovery, matching, and transacting; and by facilitating trusted and safe interactions between consumers and developers.[2]

    *1.    Professor Stiglitz's Position Ignores the App Store is a Two-Sided Transaction Platform and the Importance of Indirect Network Effects*

30. Even though numerous economists, including Plaintiffs' own experts, have endorsed the view that app marketplaces like the App Store are two-sided platforms, Professor Stiglitz has minimized the importance of analyzing the App Store's two-sidedness and the need to

---

[2] Sundararajan Opening Report, Section V.

account for indirect network effects.[3] Instead, he takes a position that the App Store is a one-stop-shop "retailer" of apps and in-app digital content, ignoring or dismissing the App Store's two-sidedness and the critical role indirect network effects play in shaping economic outcomes on platforms like the App Store (*see* **Section IV.B.2**).

31. For example, Professor Stiglitz argues in his report that, as an economic matter, whether the App Store is a two-sided transaction platform or not is only relevant if indirect network effects restrict Apple's "monopolistic conduct."[4] Professor Stiglitz goes on to assert that even if one were to view the App Store as a two-sided transaction platform, the significance of indirect network effects is limited because the challenged conduct has led to Apple monopolizing both the consumer and developer sides of said two-sided transaction platform, an assertion he supports by arguing that there are no close substitutes to the App Store for the sale of iOS apps and in-app digital content.[5] However, this view contradicts

---

[3]   I also understand that Dr. Song, one of Plaintiffs' experts, did not offer an opinion in his testimony on whether the App Store is a two-sided transaction platform. By contrast, Dr. Abrantes-Metz, another of Plaintiffs' experts, testified that the App Store exhibits key features of two-sided transaction platforms, as it connects consumers and developers, with each side deriving value from the participation of the other. She also acknowledged that the relevant App Store product is a simultaneous transaction between a developer and a consumer. Deposition of Minjae Song, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 4, 2025 ("Song June 2025 Deposition"), p. 79:3–18 ("Q. Is the App Store a two-sided transaction platform, yes or no? […] [A.] I'm not offering an expert opinion on that topic yet."); Deposition of Rosa Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, December 15, 2022 ("Abrantes-Metz December 2022 Deposition"), p. 107:2-4 ("Q. So do you agree there are two sides here? A. Yes, there are two sides."), p. 80:4–9 ("To the extent that one side of the transaction, consumers, for example, value the other side, the developers, and the developers are searching for consumers, that is a common feature of multisided platform."), pp. 106:18–107:1 ("Q. Do you agree that both users and developers consume App Store transactions? A. They use the App Store to sell and acquire apps, and the App Store is the place where such transaction occurs. They actually are buying and selling the apps."), p. 108:8–10 ("Q. Do you agree that the relevant App Store product is transactions? A. Transactions of apps, yes."); pp. 108:20–109:1 ("Q. The transaction must take place simultaneously with both a consumer and a developer, correct? A. The purchase and sale of apps does happen simultaneously.").

[4]   Expert Report of Joseph E. Stiglitz, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Stiglitz Report"), ¶ 372 ("Regardless of whether the App Store is considered a two-sided market or not, the most relevant question from an economic perspective is whether two-sided market features, and in particular, indirect network effects, can and do effectively constrain Apple's monopolistic conduct in the aftermarket.").

[5]   Stiglitz Report, ¶ 377 ("However, even if one were to view the App Store as a two-sided platform, Apple has monopolized both sides of the platform through the contractual and technological restrictions detailed in Section III. As I discussed in Section V.B, consumers have no close substitutes to the App Store for purchasing iOS apps and in-app content and are locked-in due to significant switching costs. Similarly, developers have no reasonable alternatives to sell their apps and in-app content to iOS mobile device users. This lack of competition limits the significance of indirect network effects as both consumers and developers have no other platform to turn to.").

11

Professor Stiglitz's own testimony, in which he confirmed that the App Store has two sides,[6] and his report, in which he identifies many substitutes for transactions that occur on the App Store.[7] It is also at odds with the Plaintiffs' theory of harm stemming from the allegedly supracompetitive commission rate chosen by the App Store that is only levied when a transaction is completed. Further, while accepting that economists focus on indirect network effects in settings involving "two-sided markets," and that a two-sided analysis is necessary if indirect network effects are strong,[8] when asked if he would change his analysis in the face of evidence that indirect network effects on the App Store are strong, Professor Stiglitz indicated that he would not.[9]

32.    As I detail in **Appendix Exhibit C.1–C.2**, several economists have noted that the App Store, and other online marketplaces, such as eBay, Uber, or Airbnb, which I discussed in my opening report as being similar to the App Store,[10] display the characteristics of two-sided platforms:

   a.    Marshall W. Van Alstyne, Geoffrey Parker, and Sangeet Paul Choudary explain that "Apple conceived the iPhone and its operating system as more than a product or a conduit for services. It imagined them as a way to connect participants in two-sided markets—app developers on one side and app users on the other—generating

---

[6]    Deposition of Joseph Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 30, 2025 ("Stiglitz May 2025 Deposition"), p. 183:1–4 ("Q. Do you agree the App Store has two sides to it as a platform? A. Well, the App Store has two sides like many other things have two sides.").

[7]    Stiglitz Report, ¶ 227 ("Similarly, two of Match Group's other apps for which it produced data—OkCupid and Plenty of Fish—report that over 80 percent of iOS users make digital purchases exclusively on the App Store. The notable exception to this trend is Match.com, for whom only 48 percent of iOS purchases exclusively used the App Store in 2019.").

[8]    Stiglitz May 2025 Deposition, pp. 181:18–182:10 ("Okay. Is it your opinion as an economist that the Apple App Store is a two-sided platform? A. So when an economist asks that question, the question they really are asking is are there significant indirect network effects? And the reason why I say that is that many, many markets are two-sided. You know, most markets by definition are two-sided. The buyers and sellers; stores are two-sided; newspapers are two-sided. And there is a long analysis of antitrust cases in markets where you bring people together from a one-sided perspective. So where the literature of the last two/three decades says is what are the circumstances in which that standard analysis needs to be changed to take into account indirect network effects? And that's when we use the word 'two-sided market analysis' or 'two-sided markets.' And that's when, as I said, when those indirect network effects are significant.").

[9]    Stiglitz May 2025 Deposition, p. 185:1–4 ("Q. If you concluded that marginal indirect network effects were strong for the App Store, would that change any of your opinions as set forth in your report? A. No, not really.").

[10]    Sundararajan Opening Report, Section IV.

value for both groups. As the number of participants on each side grew, that value increased—a phenomenon called 'network effects,' which is central to platform strategy."[11]

b.   David S. Evans and Richard Schmalensee[12] explain that "A year after its launch, the iPhone was a two-sided platform connecting users and app developers. […] Apple and Android have been more successful than others at making their multisided platforms for smartphones attractive to users and developers."[13]

c.   Michael Katz and Jonathan Sallet note "[m]any of the world's most prominent firms operate as 'platforms' that facilitate interactions between different groups of users. For example, Amazon brings together merchants and consumers; Google joins advertisers and consumers engaged in online search; Facebook connects advertisers with consumers engaged in social networking; the Apple 'App Store' links app sellers with iPhone and iPad users; and Airbnb introduces landlords to short-term renters."[14]

d.   Plaintiffs' expert Dr. Abrantes-Metz explains that Uber is an example of "two-sided networks" because it "brings together a network of passengers with a network of drivers" and notes that "Uber is valuable to drivers only to the extent that it supports a large network of passengers and vice versa from the passengers' perspective."[15]

---

[11]   Van Alstyne, Marshall W., Geoffrey G. Parker, and Sangeet Paul Choudary, "Pipelines, Platforms, and the New Rules of Strategy," *Harvard Business Review*, Vol. 94, No. 4, 2016, pp. 54–62, pp. 55–56.

[12]   David S. Evans and Richard Schmalensee were experts for Epic and Apple, respectively, in *Epic v. Apple*. I understand that both experts found that the App Store is a two-sided transaction platform. Trial Testimony of David Evans, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 11, 2021 ("Epic Trial Testimony of David Evans"), p. 1347:7–9 ("Q. Okay. Now, the App Store is a two-sided transaction platform; isn't that right? A. Yes, it is.").

[13]   Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, pp. 117–119.

[14]   Katz, Michael and Jonathan Sallet, "Multisided Platforms and Antitrust Enforcement," *Yale Law Journal*, Vol. 127, 2018, pp. 2142–2175, p. 2143.

[15]   Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 4 ("A platform or network (terms used interchangeably in this paper) could be either 'one-sided,' such as a purely social networking site which is funded by subscribers, or 'multi-sided,' such as Uber which brings together a network of passengers with a network of drivers. [...] The same principle is true in two-sided networks such as Uber. Uber is valuable to drivers only to the extent that it supports a large network of passengers and vice versa from the passengers' perspective.").

e. Nobel Laurate Jean Tirole notes that "[t]wo-sided 'platforms' bring together multiple user-communities that want to interact with each other: gamers and game developers for video games; users of operating systems and app developers for operating systems; 'eyeballs' and advertisers for search and media platforms; cardholders and merchants for payment card transactions[.]"[16]

33. Many of these quotes contradict Professor Stiglitz's testimony that economists do not use the term "platform."[17] While this may seem like a minor contradiction to highlight, it underscores how the natural and widely accepted characterization, by economists and by courts, of the App Store as a platform is being avoided.

34. In **Section IV.B**, I discuss in greater length the issues that result from Professor Stiglitz's incorrect characterization of the App Store, and the impact these issues have on the reliability of Professor Stiglitz's analyses.

> *2. Professor Stiglitz's Assertion About the Relevance of Indirect Network Effects Being Restricted to Whether They "Constrain Apple's Monopolistic Conduct" is Flawed*

35. Professor Stiglitz's assertion that indirect network effects might or might not "constrain monopolist conduct" is imprecise. He does not explain what he means by this assertion nor does he present any analysis to support his associated claims. Further, the claim that "the most relevant question from an economic perspective" of the role of two-sided network effects is whether they constrain Apple's alleged monopolistic conduct[18] lacks foundation and is inconsistent with the very papers that Professor Stiglitz cites, as I discuss in what follows.

---

[16] Tirole, Jean, "Market Failures and Public Policy," *American Economic Review*, Vol. 105, No. 6, 2015, pp. 1665–1682, p. 1674.

[17] Stiglitz May 2025 Deposition, p. 183:9-22 ("Q. So the -- you agree the Apple App Store is a two-sided platform; do you -- [overspeaking] A. No, I didn't say that it's a two-sided platform. Q. Oh, it has two sides? A. It has two --Q. Is it a platform? A. Well, as I said, economists -- we, we went through this linguistic thing before. Two-sided platforms are defined legally in a particular way. Q. I am not asking that. A. Okay. As an economist, we don't use the word 'platform.' That, I mean we don't use the word -- we don't distinguish the -- the characteristic of a two-sided market that we focus on is the indirect network effects.").

[18] Stiglitz Report, ¶ 372 ("Regardless of whether the App Store is considered a two-sided market or not, the most relevant question from an economic perspective is whether two-sided market features, and in particular, indirect network effects, can and do effectively constrain Apple's monopolistic conduct in the aftermarket.").

36.     Rather, by making this unsupported assertion, Professor Stiglitz fails to consider an important economic question associated with two-sidedness, which is whether the presence of indirect network effects and the importance of facilitating transactions from both sides can justify the challenged conduct.[19] In my opening report, I have discussed a number of reasons why Apple's challenged conduct is procompetitive once one recognizes that the App Store is a two-sided transaction platform. For example, I highlighted that in a but-for world without the challenged conduct, Apple's incentives to invest in developing its IP-protected developer tools, technologies, and services would be lower, which in turn would diminish the quality and variety of app and in-app digital content, harming consumers. As a result of these lower incentives, consumers may be less interested in engaging in transactions involving iOS apps, which in turn, owing to indirect network effects, would further impact the participation of developers negatively.[20] I expand further on this and other procompetitive justifications of Apple's challenged conduct in **Section IV.G**.

37.     In addition, Professor Stiglitz asserts that "the significance of indirect networks effects" is limited.[21] In **Sections IV.A.3-IV.A.5**, I explain why he has no basis for this assertion. In particular, he has not performed his own analysis to quantify indirect network effects (*see* **Section IV.A.3**), he mischaracterizes the academic papers he uses to support his unusual assertion that the significance of indirect network effects is limited (*see* **Section IV.A.4**), and finally, he ignores an extensive body of theoretical and empirical work, including the work of Dr. Abrantes-Metz, that establishes the importance of indirect network effects when conducting economic analysis involving two-sided transaction platforms (*see* **Section IV.A.5**).

---

[19]   Stiglitz Report, ¶ 372 ("In this section, I review the available evidence and find two-sided market dynamics cannot justify Apple's rent-seeking behavior.").

[20]   Sundararajan Opening Report, ¶¶ 189–190.

[21]   Stiglitz Report, ¶ 377 ("This lack of competition limits the significance of indirect network effects as both consumers and developers have no other platform to turn to.").

15

       *3.     Professor Stiglitz Has Not Performed Any Analysis to Assess the Importance of Indirect Network Effects on the App Store or Support His Claim that Their Significance is Limited*

38.    Professor Stiglitz testified that an analysis of indirect network effects could rely on direct and indirect evidence, that an example of direct evidence might be to demonstrate the strength of indirect network effects at the margin (i.e., marginal indirect network effects),[22] while an example of indirect evidence might be based on surveys or other sources of information that provide evidence that the usage choices of one side are positively affected by participation on the other side.[23] However, neither Professor Stiglitz nor Dr. Abrantes-Metz provide a calculation of the strength of indirect network effects associated with the App Store during the class period, at the margin or on average, nor do they investigate whether marginal indirect network effects were present or significant when the App Store launched,[24] or whether these marginal indirect network effects would be significant or different in the but-for world.[25]

39.    Professor Stiglitz also ignores that the presence of significant average indirect network effects on the App Store, evidence of which is widely available as I discuss in **Section V.C.2**, may still be of economic consequence. Granted, it is the strength of marginal

---

[22]    Stiglitz May 2025 Deposition, p. 40:2–9 ("Q. And what kind of evidence would lead you to conclude with respect to a set of transaction platforms that indirect network effects are strong? A. Well, there, there would be two kinds of evidence, direct and indirect evidence. The direct evidence would be […] showing that market participation or usage was dependent at one side of the market was very sensitive to those variables on the other side of the market at the margin.").

[23]    Stiglitz May 2025 Deposition, p. 41:7–16 ("The -- a second more casual, but still I would say empirical is, you know, you know a survey, consumer reports of what are the determinants of, of, you know, of usage. So it wouldn't necessarily be as grounded in statistics, but, but how do -- what are the determinants of peoples' usage or participation? And the standard discussion of an example which is totally non-PC today of the singles bar, where the number of men going to the singles bar effected by the number of women, and there being that indirect network effect.").

[24]    Stiglitz May 2025 Deposition, p. 185: 5–14 ("Q. Is it your opinion that marginal indirect network effects for the App Store were weak in 2008? A. I can't -- I didn't actually study the effects in that particular year or any particular year. The argument that I used is that once the App Store was created with its restrictions, and in the context of where the only way that a consumer could get an app or in-app content is through the App Store, the number of apps would not affect his participation in the App Store except through his decision to purchase a particular app.").

[25]    Stiglitz May 2025 Deposition, p. 186:7–13 ("Q. Would the Apple App Store have strong indirect network effects or display strong indirect network effects at the margin in the but-for world? […] A. I haven't studied the but-for world. There are considerations that, or circumstances in which that might be the case in some context.").

indirect network effects that shapes participant and platform choices. However, this strength may vary over time, [26] and the time period in question here and covered by Professor Stiglitz's report is from 2008 until the present, a period that spans the entire life of the App Store. [27] If there is reliable evidence of positive average indirect network effects associated with the App Store at some point in time, then it must have been the case that marginal indirect network effects were positive at some point during the App Store's evolution. For this reason, empirical evidence of significant average indirect network effects should not be dismissed.

40.   Apple's well-documented willingness to support the provision of free-to-download apps without in-app purchases, which constituted over 82 percent of all apps on the App Store by 2023, [28] may by itself constitute prima facie evidence of indirect network effects. Given the costs Apple bears in supporting free apps, there must be a corresponding benefit to Apple from this choice. The likely benefit stems from the presence of indirect network

---

[26]   Deposition of Rosa Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, May 23, 2025 ("Abrantes-Metz May 2025 Deposition"), pp. 86:15–88:5 ("Q. Network effects may change with the size and stage of the development of the platform. Do you see that? A. Yes. Q. Do you agree with this as a general matter? A. Yes. I explained this earlier when I told you I cannot tell you what is the strong network effects because it depends on where you are in the line, how large is the platform. Q. As a general matter, are indirect network effects likely to be stronger or weaker when a platform first launches? […] A. It depends whether they are convex, concave or linear and it depends obviously on a lot of other things. But if we're just focusing on the network effects, it depends on that shape because you have a line if it is linear and you write it close to zero and the network effects are convex, they come from below the line to cross it. So at the beginning, they're smaller than linear. If you're concave at the beginning, they're higher than linear and at some point, they cross each other. So it really depends on how large the platform is and really what is the shape of those curves. Q. So you can't say whether indirect network effects are likely to be stronger or weaker when the platform first launches? That's your testimony? A. Right. It depends on the shapes.").

[27]   Stiglitz Report, ¶¶ 18–19 ("I understand that the certified Consumer Class is defined as all persons in the United States who purchased one or more iOS apps from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS mobile device ('iOS device') at any time since July 10, 2008 (the 'Class Period'). […] Throughout this report, I will use the terms 'As-Is' or 'As-Is world' to refer to the economic conditions consumers actually faced during the Class Period and the terms 'But-For' or 'But-For world' to refer to the economic conditions that consumers would have faced but for Apple's conduct the complaint in this case alleges to be anticompetitive."); Stiglitz May 2025 Deposition, p. 185:15–21 ("Q. When you indicated that indirect network effects for the App Store were not strong, what time period were you referring to? A. It was -- I mean, in effect the entire period. Because what I just said was the monopoly power that it has, that if you want as a consumer to get an app, you effectively had to do it through the App Store.").

[28]   Opening Expert Report and Declaration of Lorin Hitt, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv– 06714–YGR, March 7, 2025 ("Hitt Opening Report"), Footnote 420 ("Between the first year of the App Store and 2023, the share of apps that were free-to-download without in-app purchases rose from 27.8 percent to 82.4 percent").

effects: the contribution of the presence of these free apps to increasing consumer participation would make the App Store more attractive to revenue-generating developers. The research I discuss in **Section V.C** provides evidence of significant indirect network effects on the App Store and further, that these indirect network effects should impact the pricing structure chosen and the optimal price charged on both sides of the platform in any but-for world. I also note that indirect network effects will magnify any impact from the change in the price to one side of the App Store because this change in price can impact participation on the other side, which in turn will further impact participation on the side where the price change occurred. I further discuss how indirect network effects are particularly important during the early stages of evolution of a two-sided transaction platform like the App Store, a point which Professor Stiglitz also acknowledges in his own report.[29]

4.   *Professor Stiglitz Mischaracterizes the Academic Papers He Cites to Support His Claim that the Significance of Indirect Network Effects is Limited on the App Store*

41.   In lieu of performing any analysis, Professor Stiglitz cites several academic papers as evidence for his proposition that the significance of indirect network effects is limited in the way he describes.[30] I explain below how he mischaracterizes these papers.

42.   Professor Stiglitz cites one paper by Weyl (2010) to support his assertion that "lack of competition limits the significance of indirect network effects."[31] However, Weyl (2010) says nothing about how lack of competition would limit the significance of indirect network effects. The quote that Professor Stiglitz draws from the paper ("does a monopolistic platform internalize and therefore neutralize network effects? The answer is yes") speaks to a different economic effect, namely the distortion that occurs because a profit-maximizing platform selects prices based on marginal users rather than average

---

[29]   Stiglitz Report, ¶ 279 ("A new entrant faces the classic 'chicken-and-egg' problem where developers are hesitant to invest in app development for a new operating system without a critical mass of users, while users are reluctant to purchase devices with the new operating system if it lacks an appealing collection of apps.").

[30]   Stiglitz Report ¶ 372 ("Regardless of whether the App Store is considered a two-sided market or not, the most relevant question from an economic perspective is whether two-sided market features, and in particular, indirect network effects, can and do effectively constrain Apple's monopolistic conduct in the aftermarket.").

[31]   Stiglitz Report, ¶ 377 ("This lack of competition limits the significance of indirect network effects as both consumers and developers have no other platform to turn to."), Footnote 730.

users.[32] In fact, there are results in Weyl (2010) that suggest the opposite of what Professor Stiglitz claims: that competition in the presence of indirect network effects could *hurt* consumers, depending on "the sources of user heterogeneity."[33]

43.     Professor Stiglitz also claims that "[a] two-sided market intermediary can have market power or monopoly power just as a conventional one-sided firm can—and the evidence here is overwhelming that Apple has monopoly power, and uses it, regardless of whether Apple is viewed as a one-sided or two-sided platform," citing two papers, Rysman (2007) and Lee (2013) in support Independent of whether a two-sided intermediary can have market power or not, these specific papers say nothing about Apple's monopoly power or lack thereof, and also show that when analyzing a two-sided market intermediary, market concentration is not necessarily anticompetitive.

44.     The first paper Professor Stiglitz cites is the 2007 study by Rysman of the payment card industry. The paper finds that while both users (one side) and merchants (the other side) multi-home in their *adoption* (that is, users hold credit cards that belong to different networks, and merchants accept cards from different networks), users tend to concentrate their *usage* on one platform because of indirect network effects.[34] However, the paper provides no evidence of a card platform exercising market power because of this usage concentration, in part perhaps because the consumers studied have the ability to switch

---

[32]    Weyl, E. Glen, "A Price Theory of Multi-Sided Platforms," *American Economic Review*, Vol. 100, No. 4, September 2010, pp. 1642–1672, p. 1643 ("Therefore, like any monopolist who must choose a single quality as well as quantity, the platform internalizes network effects to marginal rather than average participating users (Spence 1975)."), p. 1652 ("[T]here are two distortions in a two-sided market. First, classical marginal revenue lies below price by the amount of the market power $\mu^I$. Second, if [...] the average interaction values of marginal users differ from those of loyal users; the platform will either over- or under-subsidize (tax) users on side $\tau$. Like the classical market power distortion, this *Spence distortion* is a consequence of the platform's inability to price discriminate. The platform internalizes network externalities but does so imperfectly[.]").

[33]    Weyl, E. Glen, "A Price Theory of Multi-Sided Platforms," *American Economic Review*, Vol. 100, No. 4, September 2010, pp. 1642–1672, p. 1668 ("Third, my results suggest that in any model of competition, the source of user heterogeneity will be central to determining the positive and normative effects of mergers. Mergers largely affect firm market power, and potentially the size of network effects[.] [...] Furthermore, whether market power is more or less harmful in a two-sided market depends on the source of heterogeneity.").

[34]    Rysman, Marc, "An Empirical Analysis of Payment Card Usage," May 31, 2006, pp. 1-38, p. 34 ("Overall, the results provide support for the hypothesis that network merchant acceptance and network consumer usage are correlated.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

usage to a different network owing to the aforementioned multi-homing[35]—a point that Professor Stiglitz fails to consider. Thus, even though "concentration" might seem like a plausible indicator of market power, the evidence of usage concentration provided in this paper in no way supports Professor Stiglitz's specific assertions. In contrast, the paper seems to demonstrate that, despite observing high concentration in a two-sided platform, the fact that multi-homing users can easily switch away from their "favorite" credit card company limits the extent to which a card platform can benefit from high user concentration.[36]

45.     The other paper Professor Stiglitz cites in support of this assertion is Lee (2013), which examines exclusive vertical arrangements—such as integration and exclusive contracts—between hardware and software providers in the U.S. video game industry between 2000 and 2005.[37] The paper finds that "[p]latform competition may not always be desirable [for consumers], particularly when a platform cannot exercise market power upon establishing a dominant position."[38] The paper's finding thus suggests that having *less* competition

---

[35]   Rysman, Marc, "An Empirical Analysis of Payment Card Usage," May 31, 2006, pp. 1-38, p. 2 ("Most consumers put a great majority of their payment card purchase on a single network. […] However, with regards to ownership, most consumers do maintain cards from different networks, which would allow them to take advantage of different networks quickly if they chose to do so. […] A merchant in a highly competitive environment most likely must associate with multiple payment network or risk a real decrease in sales.").

[36]   Rysman, Marc, "An Empirical Analysis of Payment Card Usage," May 31, 2006, pp. 1-38, p. 13 ("Do some consumers concentrate spending on a single network while others spread their spending, or is it that almost all consumers concentrate spending on a single network and periodically switch networks [...]? These data indicate that consumers are better characterized as concentrating their spending and periodically switching their favorite network."), p. 22 ("The fact that consumers spread even a small percentage of their spending across networks suggests that if a consumer desires to buy from a particular merchant enough, the fact that a merchant accepts only a less-favored card will not prevent the consumer from purchasing.").

[37]   Lee, Robin S., "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, Vol. 103, No. 7, December 2013, pp. 2960–3000.

[38]   Lee, Robin S., "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, Vol. 103, No. 7, December 2013, pp. 2960–3000, p. 2997 ("Platform competition may not always be desirable, particularly when a platform cannot exercise market power upon establishing a dominant position. For example, following the recent standards battle between Blue-ray and HD DVD, neither standard sponsor could increase prices as both had committed to licensing rates with hardware manufacturers and content providers. Furthermore, having a single standard from the beginning would have reduced uncertainty and likely spurred consumer adoption, thereby increasing total welfare.").

*could* increase total welfare, as it reduces uncertainty and encourages adoption.[39] Thus, the applicability of the results of this paper to the specific setting of this case or to supporting Professor Stiglitz's aforementioned assertion are unclear.

> 5. *Professor Stiglitz Ignores Academic Papers Demonstrating the Importance of Considering Indirect Network Effects When Choosing Prices*

46. While Professor Stiglitz recognizes that indirect network effects may affect pricing for a two-sided platform,[40] his discussion of why the significance of indirect network effects would be limited ignores an extensive literature that shows evidence that indirect network effects shape a platform's pricing structure, including the pricing structure of a two-sided transaction platform monopolist. As an illustrative example, Professor Stiglitz fails to account for Dr. Abrantes-Metz's research in which she highlights the importance of considering both sides of a two-sided transaction platform when choosing prices,[41] and in which she finds that the optimal platform price chosen by a multi-sided platform

---

[39] Lee, Robin S., "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, Vol. 103, No. 7, December 2013, pp. 2960–3000, p. 2997 ("Furthermore, having a single standard from the beginning would have reduced uncertainty and likely spurred consumer adoption, thereby increasing total welfare.").

[40] Stiglitz Report, ¶ 373 ("In two-sided markets, two groups of economic agents interact with one another through an intermediary or platform. When the presence of economic agents on one side makes the market intermediary either more or less attractive to economic actors on the other side, their interactions create cross-market externalities known as indirect network effects. Unlike the case of one-sided markets, market intermediaries facing indirect network effects are sensitive to how prices or other actions on one side of the market affect demand on the other side, and vice versa."), ¶ 374 ("For instance, where agents on each side of the market positively value the presence of those on the other side, the platform's profit-maximizing strategies may involve offering discounts or providing subsidies to the group that is most price sensitive while charging higher prices to the group that is least price sensitive. However, the degree to which the platform employs such strategies depends on the strength of indirect network effects and the difference in demand elasticities between the two groups.").

[41] Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 52 ("Much has been made in the antitrust literature, and most recently in case law, about the importance of considering both sides of a two-sided platform when assessing pro- and anti-competitive effects. It is not enough to simply note that the platform earns 'supra-competitive' rents on one side without considering whether it is using those rents to subsidize the other side."), p. 47 ("When the [scale] of production for Side A is very low relative to B, the Monopolist responds by aggressively subsidizing prices to Side A. Prices are not only below cost but are actually negative in many cases. Interestingly, while the prices are very different between the sides, the level of subscription is not. The indirect network effect increases as the production scale for Side A increases and approaches that of Side B. As the INE increases, profit margins widen.").

monopolist depends on the magnitude of indirect network effects.[42] Specifically, her work finds that in most cases, the platform charges a "higher price to whichever side of the platform has the greater opposite-side elasticity" where she defines "opposite-side elasticity" as a measure of how much one side values the participation of the other side.[43] Professor Stiglitz also overlooks Professor MacCormack's writing, in which he noted that the pricing structure of a monopolist platform could still be constrained by the indirect network effects as the platform has an interest to ensure participation from participants on both sides.[44] Professor Stiglitz further ignores that the pioneering paper by Jean-Charles Rochet and Jean Tirole analyzes a two-sided platform monopolists and finds that the optimal price on each side depends on the demand elasticities on both sides of the platform.[45]

---

[42] Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 42 ("For very negative values of $\beta_A$ [opposite-side elasticity], the Monopolist responds by having an ad-free newspaper and selling it to a certain number of subscribers at a high price […] At some point however, the Monopolist decides to sell ads, even though this upsets some readers. He compensates by drastically lowering the price of the newspaper to the readers to maintain (or even increase) subscriptions. The Monopolist is then able to sell advertising at a high price. From this point on, as the readers' dislike of advertisers weakens, the Monopolist is able to (i) charge readers a higher a [*sic*] price while still increasing the level of reader subscription, and (ii) sell much more advertising, though at slightly lower prices.").

[43] Dr. Abrantes-Metz denotes $\beta_A$ as how much one side values the participation of the other side. Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, pp. 42–43 ("A positive $\beta_A$ (Table M2.2b) is more typical of 'two-sided platforms' as both sides value the platform because of (and only because of) the participation of the other side[.] […] As the opposite-side elasticity of Side A increases, […] the subscription of the other side increases sharply [.] […] The Monopolist generally charges a higher price to whichever side of the platform has the greater opposite-side elasticity, but the difference appears slight in these examples. And interestingly, the case of $\beta_A = 0$ is an exception: in that case, the price charged to Side A is greater than the price charged to Side B.").

[44] MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Teaching Note - Research in Motion: The Mobile OS Platform War," *Harvard Business School*, November 8, 2013, pp. 1–15 p. 13 ("With a single dominant OS that platform would have considerable leverage against both Application Developers and Customers, similar to the PC market dominated by Microsoft Windows. As in that case, however, the dominant platform has incentives to keep both sides reasonably happy – price gouging either side could keep participants out of the market and thus prevent the platform from maximizing profits. Interestingly, some economists have suggested that the monopoly form of two-sided markets offers consumers higher welfare than one where multiple platforms are available.").

[45] Rochet, Jean-Charles and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029, p. 997 ("The price structure [of a monopoly platform] is given by the ratio of elasticities […]: $\frac{p^B}{\eta^B} = \frac{p^S}{\eta^S}$.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

47. Additionally, Professor Stiglitz's claim that indirect network effects are stronger in the presence of competing platforms[46] implies that such indirect network effects would be stronger in Dr. Abrantes-Metz's but-for world in which the App Store competes with a rival app marketplace (*see* **Section V.A.2**). As a result, indirect network effects would be even more likely to influence the choice of the but-for commission rate, as I will discuss in **Section V.C.3**. Thus, Professor Stiglitz's claim of stronger indirect network effects in the presence of competition also highlights Dr. Abrantes-Metz's omission of indirect network effects in her but-for commission rate calculation, further reinforcing the unreliability of any analysis Professor Stiglitz conducts using this flawed but-for commission rate.

**B.      Professor Stiglitz's Definition of the Relevant Antitrust Product Market Is Flawed and Ignores the Fact that the App Store is a Two-Sided Transaction Platform**

48. In this section I discuss how ignoring the App Store's two-sidedness is a fundamental flaw in Professor Stiglitz's analysis that leads to an incorrect definition of the relevant product market, one that is inconsistent with economic reality.

*1.      Overview of Professor Stiglitz's Market Definition Analyses*

49. Professor Stiglitz defines the relevant antitrust market as the sale of iOS apps and in-app digital content in the U.S. He describes the App Store as a "digital one-stop shop" from which consumers buy iOS apps and in-app digital content.[47] Professor Stiglitz asserts that Apple has monopoly power in this market and supports this claim by performing a version of the Hypothetical Monopolist Test ("HMT") using the but-for commission rate calculated by Dr. Abrantes-Metz. The HMT purportedly shows that Apple could impose a small but

---

[46]     Stiglitz Report, ¶ 376 ("Indirect network effects may be more pronounced when there are multiple competing market intermediaries.").

[47]     Stiglitz Report, ¶ 154 ("Similar to supermarkets that offer consumers a 'one-stop shop' for food and other grocery products—many of which are not necessarily substitutable—the App Store constitutes a digital 'one-stop shop' in which consumers can purchase a combination of iOS apps and in-app content that may not be directly substitutable, either in a single purchase or in a sequence of purchases. Typically, the markets containing one-stop shops can consist of only one-stop shops or both one-stop shops and specialty shops for particular product categories. However, because Apple's exclusionary conduct has foreclosed nearly all alternative sales channels for iOS apps and in-app content, I show in the subsections below that the relevant antitrust market in this case is a one-stop shop market that is monopolized by the App Store.").

significant and non-transitory increase in price ("SSNIP") of over five percent .[48] Professor Stiglitz attributes Apple's alleged ability to impose a SSNIP of at least five percent to a "lack of substitutability."[49] He backs this assertion by arguing that non-iOS apps, web apps, apps obtained via jailbreaking,[50] enterprise apps, and purchasing in-app digital content outside of the App Store are not reasonable substitutes for iOS apps and in-app digital content.[51]

> ### 2. Professor Stiglitz's Failure to Recognize that the App Store is a Two-Sided Transaction Platform Leads to an Incorrectly Defined Product Market

50. Professor Stiglitz's characterization of the App Store as a one-stop shop where consumers can purchase iOS apps and in-app digital content[52] is incorrect. Consumers do not routinely buy bundles of apps or in-app digital content within or across app categories when engaging in transactions via the App Store. Moreover, the purpose of the App Store is to facilitate simultaneous transactions between consumers on one side and developers on the other side, with each paid transaction involving the sale by a developer of an app or in-app digital content to a consumer, as acknowledged by Dr. Abrantes-Metz.[53] Thus, as I discussed in my opening report, the App Store cannot generate a transaction with a

---

[48] Stiglitz Report, ¶ 158 ("Therefore, I conclude that Apple could, and has, imposed a price increase that likely exceeds a 5 percent SSNIP, and that the sale of iOS apps and in-app content thereby constitutes a relevant antitrust product market.").

[49] Stiglitz Report, ¶ 159 ("It is this lack of substitutability that allows the hypothetical monopolist to raise prices above the competitive level. If there were close substitutes, sales would decrease so much that raising prices would not be profitable.").

[50] Stiglitz Report, ¶ 72 ("Jailbreaking is the process by which iOS device users can access and unlock the iOS operating system to 'allow[] the downloading and installation of additional applications […] that are unavailable through the official Apple App Store.'").

[51] Stiglitz Report, Sections V.B.2–V.B.7.

[52] Stiglitz Report, ¶ 154 ("Similar to supermarkets that offer consumers a 'one-stop shop' for food and other grocery products—many of which are not necessarily substitutable—the App Store constitutes a digital 'one-stop shop' in which consumers can purchase a combination of iOS apps and in-app content that may not be directly substitutable, either in a single purchase or in a sequence of purchases.").

[53] Abrantes-Metz December 2022 Deposition, pp. 106:18–107:1 ("Q. Do you agree that both users and developers consume App Store transactions? A. They use the App Store to sell and acquire apps, and the App Store is the place where such transaction occurs. They actually are buying and selling the apps."), p. 108:8–10 ("Q. Do you agree that the relevant App Store product is transactions? A. Transactions of apps, yes."); pp. 108:20–109:1 ("Q. The transaction must take place simultaneously with both a consumer and a developer, correct? A. The purchase and sale of apps does happen simultaneously.").

consumer without simultaneously generating a transaction with a developer.[54] I understand that *Epic v. Apple* found that the App Store is a two-sided transaction platform,[55] that *Ohio v. Amex* established that the relevant product of a two-sided transaction platform is a simultaneous transaction between the two sides,[56] and as discussed in **Section IV.A**, I find considerable evidence that economists consider the App Store to be a two-sided platform in their research.

51.     Professor Stiglitz's characterization of the App Store as a one-stop shop, akin to a "retailer" from which consumers buy iOS apps and in-app digital content, is incorrect and is fundamentally at odds with the definition of a two-sided transaction platform. One-stop shops are businesses where customers can purchase a combination of products from a single seller and where consumers typically purchase these products together.[57] In contrast, a typical transaction conducted via the App Store involves a single app download or in-app purchase[58] from one of hundreds of thousands of developers who act as sellers. This

---

[54]   Sundararajan Opening Report, ¶ 17. *See also,* Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–51, p. 42 ("In fact, in a two-sided transaction market the product offered is the possibility to transact through the platform. It takes the form of two distinct products, one for each side of the transaction, because such possibility needs to be offered to both sides. Yet none of these two products is sufficient without the other. A customer on one side can consume his product only if the corresponding customer on the other side consumes his product too. In other words, the two products need to be consumed in a fixed 1:1 proportion, as perfect complements, but by two different consumers.").

[55]   Opinion, *Epic Games, Inc. v. Apple, Inc.*, No. 21–16506, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, April 24, 2023 ("Epic Ninth Circuit Opinion"), p. 80 ("Epic consumes the app transactions that Apple offers in a two-sided market—triggering the consumer test. *Cf. Amex*, 138 S. Ct. at 2286 (each side of two-sided market 'jointly consume[s] a single product' (citation omitted)).").

[56]   Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16–1454, Supreme Court of the United States, June 25, 2018 ("Amex Opinion"), p. 13 ("Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand. Transaction platforms are thus better understood as 'suppl[ying] only one product'—transactions.").

[57]   "Merger Guidelines," *U.S. Department of Justice and the Federal Trade Commission*, December 18, 2023, p. 47 ("Agencies may consider a candidate market that includes one or more 'one-stop shops,' where customers can select a combination of products to purchase from a single seller[.]").

[58]   "appTransactionID," *Apple Developer*, available at https://developer.apple.com/documentation/StoreKit/AppTransaction/appTransactionID ("The App Store generates a single, globally unique appTransactionID for each Apple Account that downloads your app and for each family group member for apps that support Family Sharing."); "Transation," *Apple Developer*, available at https://developer.apple.com/documentation/storekit/transaction ("A transaction represents a successful In-App Purchase. The App Store generates a transaction each time a customer purchases an In-App Purchase product or renews a subscription.").

contrast can be illustrated using a simple example from my opening report, in which I discussed Etsy and eBay as examples of popular two-sided transaction platforms that serve as intermediaries enabling retail transactions between buyers and sellers. [59] Granted, consumers can buy a combination of products on these platforms. But like the App Store, neither Etsy nor eBay are "one-stop shops." For example, on Etsy, were a consumer to buy a combination of items comprising a custom painting offered by one seller and an antique chair offered by another seller, the consumer would not be buying a combination of items from Etsy but would be buying each of these items directly from individual sellers that participate on the platform. As one might expect, each seller that lists these products on the platform determines the pricing for each item they offer, much like developers on the App Store set the prices of their apps and in-app digital content.

52.    Professor Stiglitz ignores the fact that unlike a typical one-stop shop, the App Store does not purchase iOS apps and in-app digital content from developers to sell them to consumers. [60] Additionally, the App Store does not choose the prices consumers pay for iOS apps and in-app digital content. Developers create iOS apps and in-app digital content that they publish for sale or as free downloads on the App Store, and if the apps are not free, unilaterally choose and update the price that consumers pay for the purchase of these digital goods. Further, developers, not Apple, can unilaterally decide whether to continue to offer a specific app or in-app digital content; in contrast, a retailer typically chooses the product line offered to its consumers. As I discussed in depth in my opening report, the role of the App Store is to provide services and governance mechanisms that facilitate observable and simultaneous <u>transactions</u> between developers on one side and consumers on the other side. [61] A buyer—the consumer— cannot purchase apps and in-app digital

---

[59]    Sundararajan Opening Report, Section IV.

[60]    Sundararajan Opening Report, ¶¶ 22, 144.

[61]    Abrantes-Metz December 2022 Deposition, p. 108:8-19 ("Q. Do you agree that the relevant App Store product is transactions? A. Transactions of apps, yes. Q. Do you agree that the App Store cannot sell transactions to either consumers or developers individually and separately? A. Individually or separately, well, I agree that if the transaction is going to happen, it needs to have a buyer and a seller, so that's when the transaction is executed."). *See also*, Deposition of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 14, 2025 ("McFadden May 2025 Deposition"), p. 56:4–25 ("Q. Let's start with -- is the App Store a two-sided platform? […] A. I think every market in which there are multiple sellers and multiple buyers that -- with transactions that go through some intermediary have -- have a two-sided aspect to them.").

content on the App Store without the seller—a developer—also participating in this transaction.[62]

53.    While Professor Stiglitz agreed in his testimony that simultaneity is a characteristic of two-sided transaction platforms, he subsequently indicates that because some aspects of what the App Store provides "are not simultaneous,"[63] he is unable to conclude whether it is a two-sided transaction platform. This is a point of view echoed by testimony from Dr. Song.[64] I do not have a complete understanding of what Professor Stiglitz means in his testimony when he said certain aspects of what the App Store provides are not simultaneous. Assuming he meant that the App Store provides services like search that resemble those provided by a traditional one-sided retailer, the fact that the App Store provides services that are not simultaneous does not detract from the fact that the relevant product of the App Store, namely transactions between consumers and developers, are simultaneous, and the aforementioned "non-simultaneous" services help facilitate this relevant product. Such "non-simultaneous" services are provided by other two-sided transaction platforms as well. For example, American Express provides certain services for merchants and consumers that are not simultaneous. For merchants, American Express

---

[62]    Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–51, p. 42 ("A payment card company such as Diners Club is either in the relevant market on both sides or on none, for the simple reason that either the transaction between the buyer and the merchant takes place using Diners Club services on both sides, or it does not take place through Diners Club.").

[63]    Stiglitz May 2025 Deposition, p. 179:12–22 ("And my understanding that the simultaneity was an important aspect of the legal framework of saying that transaction -- two-sided transaction platforms were – had to be treated from a two-sided perspective. There are as, aspects -- I'm not a lawyer so I wasn't asked to address the question whether this satisfies the legal definition of a two-sided transaction platform. I know that there are some aspects of what occurs is -- in the App Store is -- are not simultaneous. So I don't know whether it satisfies enough of the characteristics of simultaneity to be a two-sided transactions platform."), p. 180:4–12 ("Q. Are you saying that you have no opinion as an economist whether the App Store is a two-sided transaction platform? A. Yeah, I'm, I'm saying whether it satisfies the legal definition of what a transaction platform, that I understand requires simultaneity. I know looking at this as an economist that it isn't simultaneous; there are these aspects of it that are not simultaneous, and therefore would not satisfy a condition of simultaneity.").

[64]    Song June 2025 Deposition, pp. 86:18–87:13 ("Q. Do the consumers and developers use the Apple App Store platform simultaneously to engage in digital transactions? A. Again, as I said, the App Store provides transaction services, but that's not the only service. For example, when app developers put their apps on App Store front page or on the top of App Store as part of their search promotion, consumers can look at them anytime. It doesn't have to be simultaneous. I open my iPhone. Now I may see some apps that were -- that were posted two days ago, five days ago, maybe two months ago. In that sense, the App Store's function of promoting apps has no simultaneity feature.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

provides options like free advertising materials to signal to consumers that their business accepts the card.[65] It also provides fraud protection and business tools that aid in managing daily operations, delivering customer insights, and enhancing marketing efforts.[66] For consumers, American Express offers services such as extended warranties and travel benefits.[67] Moreover, American Express offers governance mechanisms by which both consumers and merchants are reviewed and approved by American Express before they

---

[65] "Small Shop Resource Hub," *American Express*, available at https://www.americanexpress.com/us/merchant/shop-small.html?intlink=us-mer-memberbenefits-exploreshopsmall("Download ready-to-use digital banners, social posts, and printable posters. Order free signs and supplies that can be placed in your storefront and download digital assets for your website.").

[66] "Merchant Member Benefits," *American Express*, available at https://www.americanexpress.com/us/merchant/member-benefits.html ("What if you had savings, marketing opportunities and payment solutions to help manage your day-to-day, plus support and insights to help plan for your business's future? Welcome to the benefits of accepting American Express. […] Get promoted for free : In 2023, American Express recommended nearly 10 million businesses to over 36 million Card Members across Amex-funded Marketing, driving over $43 million in new spend at businesses like yours!"); "Merchant Fraud Protection Solutions," *American Express*, available at https://www.americanexpress.com/us/merchant/fraud-solutions.html?intlink=us-mer-memberbenefits-fightfraud ("We provide fraud protection solutions that help your business run securely so that you can focus on what's next. How we Help you Fight Fraud: Help identify who is on the other side of a transaction in real-time, all while maintaining a seamless checkout experience. Eliminate the need to store real card account numbers so you can help maintain revenue continuity with no added friction to the customer experience. Receive fraud liability shift by providing an extra layer of security for online purchases and help reduce shopping cart abandonment. Help increase the security for all card-present transactions by heightening the level of card authentication.").

[67] "Retail and Travel Benefits," *American Express*, available at https://www.americanexpress.com/us/credit-cards/features-benefits/policies/("You can enjoy a variety of benefits with American Express Cards. Select the benefit you are interested in [] to view the eligible Cards and benefit Terms and Conditions[:] Extended Warranty, Purchase Protection, Return Protection, Cell Phone Protection, Baggage Insurance Plan, Car Rental Loss and Damage Insurance, Global Assist, Trip Delay Insurance, Trip Cancellation and Interruption Insurance.").

28

can transact.[68] These services are aligned with the examples listed by Professor Stiglitz (and Dr. Song) of the non-simultaneous services provided by the App Store,[69] and do not change the reality that transactions on the platform still involve simultaneous participation of consumers and developers.

54.   In addition, as I discussed in my opening report, to facilitate participation that yields successful transactions, two-sided transaction platforms must minimize certain economic conditions that may cause what economists commonly refer to as "market failure," wherein transactions that would have occurred absent such conditions do not occur. Two-sided transaction platforms must therefore devise services and governance mechanisms to mitigate these sources of market failure.[70] Such services and governance mechanisms include those that encourage and enhance participation on both sides; facilitate discovery, matching, and transacting; and facilitate trusted and safe interactions for participants on

---

[68]   "Merchant Regulations," *American Express*, April 2025, available at https://www.americanexpress.com/content/dam/amex/us/merchant/new-merchant-regulations/Regs_EN_US.pdf ("To serve all Merchants consistently, we require them to operate under the Merchant Regulations. The Merchant Regulations set forth the policies and procedures governing your acceptance of the American Express® Card. […] You agree to be bound by and accept all provisions in the Merchant Regulations (as changed from time to time) as if fully set out in the Agreement and as a condition of your agreement to accept the Card. […] We will obtain, verify, record, and analyze information (including your telephone calls) that identifies each person or Entity (which may, in our sole discretion, include information about its owners) applying to accept the Card and open a Merchant Account, as well as information that may be provided in subsequent calls or interactions with us. We will use such information to improve our Services, prevent fraud, or for other business purposes."); "American Express Personal Cards," *American Express*, available at https://www.americanexpress.com/us/credit-cards/?inav=us_menu_cards_personal_cards_view_all_credit_cards ("We'll get the information we need from you and share important terms and conditions. After you submit your application, we'll let you know if you're approved first – without any impact to your credit score."). *See also*, Pokora, Becky, "American Express Preapproval: How To Get It (And Why You Should Care)," *Forbes*, April 11, 2025, available at https://www.forbes.com/advisor/credit-cards/american-express-pre-approval/("American Express has three screening levels for credit card applicants: its Apply with Confidence feature and pre-qualification and preapproval.").

[69]   Stiglitz May 2025 Deposition, p. 179:23–180:3 ("Q. What aspects are you referring to that you understand are not simultaneous? A. Oh, well for instance the developer engages with Apple App Store, signs a contract, agrees to the review process; there is a review process, it can be back and forth, before it goes on to the App Store."); Song June 2025 Deposition, pp. 86:18–87:13 ("Q. Do the consumers and developers use the Apple App Store platform simultaneously to engage in digital transactions? A. Again, as I said, the App Store provides transaction services, but that's not the only service. For example, when app developers put their apps on App Store front page or on the top of App Store as part of their search promotion, consumers can look at them anytime. It doesn't have to be simultaneous. I open my iPhone. Now I may see some apps that were -- that were posted two days ago, five days ago, maybe two months ago. In that sense, the App Store's function of promoting apps has no simultaneity feature.").

[70]   Sundararajan Opening Report, Section IV.B.

29

both sides.[71] The fact that a subset of these services may be offered to one side of the platform rather than both does not alter the fact that the relevant product of the platform is a transaction in which both sides participate in simultaneously.

55. By defining the App Store as a one-stop shop and the relevant product market as comprising of iOS apps and in-app digital content instead of the simultaneous transactions between consumers and developers that are in fact the relevant product, Professor Stiglitz thus defines an incorrect product market.[72]

> **3.      *Professor Stiglitz Ignores that Many Transactions on the App Store Have Substitutes Outside of the App Store***

56. Ignoring that the App Store is a two-sided transaction platform where the relevant product is a simultaneous transaction between a developer and a consumer facilitated by the App Store leads to errors in Professor Stiglitz's assessment of substitutes. Based on his flawed view of the App Store as a one-sided retailer, Professor Stiglitz incorrectly concludes that there are no substitutes for iOS apps and in-app digital content because the App Store is the only place where consumers can get these iOS apps and make in-app digital content purchases within iOS apps through their iOS devices.[73] Ignoring the fact that some in-app digital content that is subsequently used within an iOS app is in fact available for purchase via channels other than the App Store, a point I return to later, a more critical flaw in Professor Stiglitz's analysis of substitutes is his failure to recognize the correct relevant product, namely transactions between consumers and developers. As I will explain in what follows, there are a variety of transactions made on iOS and non-iOS devices that do not involve the App Store but are nevertheless good substitutes for transactions that occur on the App Store.

---

[71]   Sundararajan Opening Report, Section IV.C.

[72]   Sundararajan Opening Report, ¶ 150.

[73]   Stiglitz Report, ¶ 152 ("[N]on-iOS (native) apps and in-app content are not reasonable substitutes for iOS apps and in-app content, especially given the significant switching costs between iOS and non-iOS devices. […] I examine other potential substitutes for the sale of iOS apps and in-app content such as the sale of web apps, progressive web apps, enterprise apps, or jailbreaking of iOS devices and conclude that consumers cannot substitute the sale of iOS apps and in-app content with these alternatives."), ¶ 377 ("[C]onsumers have no close substitutes to the App Store for purchasing iOS apps and in-app content and are locked-in due to significant switching costs.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

57.     To illustrate how Professor Stiglitz's mistaken conclusion about a "lack of substitutability" could stem from his erroneous market definition, consider the possible substitutes for a two-sided transaction platform like American Express. Such an analysis would include alternatives that buyers can use and merchants can accept to complete transactions.[74] Analogously, App Store transactions also have substitutes outside of the App Store that consumers and developers can avail of as alternatives to App Store transactions. Some of these substitutes for App Store transactions are transactions that may involve the subsequent use of what the consumer obtains via the transaction on an iOS device, while other substitutes are transactions that do not involve the subsequent use of an iOS device but are nevertheless substitutes for App Store transactions. A robust analysis of possible substitutes should naturally consider all these options. I understand that Professor Jin's and Professor Hitt's analyses of substitutes for App Store transactions are consistent with this conclusion, and shows that transactions on non-iOS apps, developer websites, and progressive web apps are all substitutes for App Store transactions.[75]

58.     For example, Fortnite is a popular video game that gives players the option of buying digital items that can be used to enhance their gaming experience. Examples of such digital items include character outfits, "Emotes" (dances or gestures), accessories, song tracks, and "Battle Passes."[76] Players buy these items by using V-Bucks, Fortnite's native currency. A consumer can add V-Bucks to their account in a variety of ways that are independent of the App Store.[77] For instance, a consumer can engage in a transaction wherein they

---

[74]   Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–54, p. 42 ("The analysis of a merger between two payment-card platforms should thus consider, for instance, whether cash transactions or PayPal exert competitive pressure on these payment card companies.").

[75]   Rebuttal Expert Report and Declaration of Ginger Jin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Jin Rebuttal Report"), Section 3.3; Rebuttal Expert Report and Declaration of Lorin M. Hitt, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Hitt Rebuttal Report"), Section 5.1.

[76]   "Fortnite Item Shop: In-Game Cosmetics & Items," *Fortnite*, available at https://www.fortnite.com/item-shop?lang=en-US; "Play the Fortnite BR Star Wars Season: GALACTIC BATTLE," *Fortnite*, May 1, 2025, available at https://www.fortnite.com/news/strap-in-starfighter-star-wars-is-taking-over-in-fortnite-galactic-battle.

[77]   Hitt Rebuttal Report, Section 5.1.1.

exchange $8.99 for 1,000 V-Bucks either on the Epic website [78] or on their Xbox console through the Microsoft Store.[79] The consumer can subsequently use these purchased V-Bucks on any device.[80] V-Bucks acquired via the Epic website are perfect substitutes for V-Bucks acquired via the App Store—an iOS device owner can use V-Bucks purchased on their Xbox while playing Fortnite on their iOS device. Consequently, the transactions that lead to V-Bucks acquisitions by consumers via the Epic Games Store or their Xbox console are substitutes for the corresponding subset of App Store transactions involving the purchase of V-Bucks.

59.     Similar substitutes that Professor Stiglitz has ignored include transactions that involve the acquisition by consumers of other virtual currencies like Robux[81] or Minecoins[82] that can be used within the iOS apps Roblox and Minecraft, respectively. The Robux and Minecoins a consumer obtains when completing a transaction via an Xbox are perfect substitutes for those obtained via a transaction completed on a different platform, including on the App Store, and thus these associated transactions are substitutes. For example, a consumer can log into their Roblox account online and buy Robux on the Roblox website, or via a PlayStation or Xbox console.[83] Once the Robux have been added to the consumer's Roblox account, the consumer can use this game currency on the iOS Roblox app to make purchases of items such as accessories and weapons for their game avatars that enhance

---

[78]   "V-Bucks," *Fortnite*, available at https://www.fortnite.com/item-shop/v-bucks?lang=en-US.

[79]   "Buy Fortnite - 1,000 V-Bucks," *Fortnite*, available at https://www.xbox.com/en-US/games/store/fortnite-1000-v-bucks/c0f5ht9nv86p.

[80]   Hitt Opening Report, ¶ 141 ("Epic […] connects content in Fortnite to a user's Fortnite account. Any digital products acquired in Fortnite (e.g., 'skins') are usable across all devices on which that user plays Fortnite. In addition, a user's Fortnite 'wallet' of V-bucks can be used across different devices, subject to constraints by some game transaction platforms.").

[81]   "Ways to Get Robux," *Roblox*, available at https://en.help.roblox.com/hc/en-us/articles/203313200-Ways-to-Get-Robux ("Robux are the virtual currency of Roblox and there are ways to purchase or earn Robux.").

[82]   "Buy Minecoins," *Minecraft*, available at www.minecraft.net/en-us/marketplace-buy-minecoins ("Minecoins are a digital currency used in the Minecraft Marketplace to purchase content on your account.").

[83]   "Ways to Get Robux," *Roblox*, available at https://en.help.roblox.com/hc/en-us/articles/203313200-Ways-to-Get-Robux ("You can purchase Robux in our mobile, browser, PlayStation, and Xbox One apps.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the consumer's gaming experience.[84] Similarly, a consumer can engage in a transaction to purchase Minecoins via the Minecraft Marketplace on their Xbox console if their Xbox account is linked to their Microsoft account.[85] The consumer can then spend these Minecoins at the Minecraft Marketplace using any device on which they are signed into their Microsoft account, including in the iOS Minecraft app, to make purchases such as skins, texture packs or adventure maps that enhance their Minecraft gaming experience.[86] Consequently, these transactions that lead to Robux or Minecoin acquisitions by consumers via channels other than the App Store are substitutes for the corresponding subset of App Store transactions involving the purchase of Robux or Minecoins. As Professor Hitt discusses, game developers offer bonuses and discounts that encourage consumers to transact on their websites instead of on app marketplaces, and consumers often take

---

[84] Hitt Opening Report, ¶ 141 ("Many game developers link in-game content and game progression across a user's devices by having a common user account which spans different game transaction platforms […] Roblox consumers log in to the game through a Roblox account, which allows them to transfer the game's digital currency, called Robux, across devices. In-game progress is also tied to a user's Roblox account which allows the user to continue playing the game on other devices."); "How To Purchase Items In Roblox From The Avatar Shop," *UMA Technology*, December 20, 2024, available at https://umatechnology.org/how-to-purchase-items-in-roblox-from-the-avatar-shop/ ("The Avatar Shop is a virtual marketplace where players can browse and purchase a wide variety of items for their avatars, such as clothing, accessories, gear, and more. These items can be purchased using Robux, which is the virtual currency of Roblox.").

[85] "About the Minecraft Marketplace on Xbox and PC," *Xbox*, available at https://support.xbox.com/en-US/help/games-apps/game-titles/minecraft-marketplace-faq ("Purchases made in the Minecraft Marketplace (in-game store) require Minecoins. To buy Minecoins, you must have a payment method set up on your Microsoft account. While in the Minecraft Marketplace: On PC, you can select the + icon to view Minecoin bundles that are available for purchase. On an Xbox console, press the X button to review the available Minecoin bundles. By signing in with the same Microsoft account on any device that you play Minecraft, you'll have access to your purchased Minecoins.").

[86] "Sign in to Minecraft with a Microsoft Account on Mobile," *Minecraft*, available at https://help.minecraft.net/hc/en-us/articles/31514831369869-Sign-in-to-Minecraft-with-a-Microsoft-Account-on-Mobile ("If you sign in with a Microsoft account when playing Minecraft on an Android or Apple device, you can enable crossplay and access Marketplace content on other gaming platforms."); "Buy Minecoins," *Minecraft*, available at www.minecraft.net/en-us/marketplace-buy-minecoins ("Minecoins are a digital currency used in the Minecraft Marketplace to purchase content on your account. […] Check out fresh new content in the Marketplace! Browse thousands of skins, texture packs, adventure maps, and mash-ups and play the game your way."). *See also*, Hitt Opening Report, ¶ 126 ("Evidence in the record on Minecraft game and in-app purchases across different device types confirms that Minecraft's availability across many platforms leads to many transactions taking place over different platforms.").

33

advantage of these options to complete transactions for digital goods that they can later use on apps.[87]

60.     Additional substitutes for App Store transactions that Professor Stiglitz has also ignored involve those related to iOS apps that are referred to as "reader apps." As I discuss in my opening report, reader apps are apps that provide one or more of the following digital content types—magazines, newspapers, books, audio, music, or video—as the primary functionality of the app.[88] Developers of reader apps may deliver certain digital content to iOS devices without requiring consumers to purchase the content through the App Store. The App Store also allows free access to previously purchased content or subscriptions associated with such apps (I understand Apple refers to this flexibility as the "Reader Rule").[89] For example, a consumer who purchased a Disney+ subscription on the Disney+

---

[87]   Hitt Rebuttal Report, Section 5.1.3. *See also,* Hitt Opening Report, ¶ 83 ("[S]ome game developers that use virtual currencies incentivize consumers to purchase these currencies from their own website rather than through the App Store. For example, Supercell, the developer of Super Brawls, offers bonuses on its website that are not available from other transaction platforms. Roblox also offers discounts for its virtual currencies that are available from their website.").

[88]   Sundararajan Opening Report, ¶ 133. *See also,* "Update on 'Reader' App Distribution," *Apple,* March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts; "App Review Guidelines," *Apple,* September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("'Reader' Apps: Apps may allow a user to access previously purchased content or content subscriptions (specifically: magazines, newspapers, books, audio, music, and video). Reader apps may offer account creation for free tiers, and account management functionality for existing customers. Reader app developers may apply for the External Link Account Entitlement to provide an informational link in their app to a web site the developer owns or maintains responsibility for in order to create or manage an account."); Deposition of Carson Oliver, Vol. 1, *In re Apple iPhone Antitrust Litigation,* No. 4:11–cv–06715YGR, January 26, 2021 ("Oliver January 2021 Deposition, Vol. 1"), p. 89:7–14 ("[Q.] We were talking about -- you were talking about the Reader Rule. And the notion that if content is purchased outside of the iPhone app but consumed within the iPhone app, meaning I watch something or I use my skin or whatever it is, that Apple does not receive a commission on that. Is that accurate? A That is accurate, yes.").

[89]   "Update on 'Reader' App Distribution," *Apple,* March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts ("Reader apps are apps that provide one or more of the following digital content types - magazines, newspapers, books, audio, music, or video - as the primary functionality of the app."); "App Review Guidelines," *Apple,* September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("'Reader' Apps: Apps may allow a user to access previously purchased content or content subscriptions (specifically: magazines, newspapers, books, audio, music, and video). Reader apps may offer account creation for free tiers, and account management functionality for existing customers. Reader app developers may apply for the External Link Account. Entitlement to provide an informational link in their app to a web site the developer owns or maintains responsibility for in order to create or manage an account."). *See also,* Oliver January 2021 Deposition, Vol. 1, p. 89:7–14 ("Q. We were talking about -- you were talking about the Reader Rule. And the notion that if content is purchased outside of the iPhone app but consumed within the iPhone app, meaning I watch something or I use my skin or whatever it is, that Apple does not receive a commission on that. Is that accurate? A. That is accurate, yes.").

website can access any content associated with this subscription on their iOS Disney+ app.[90] More broadly, the App Store's "multi-platform rule" allows iOS apps that operate across multiple platforms to give consumers access to in-app purchases (like subscriptions, content and features) made outside of the App Store.[91]

61. Most saliently, consumers and developers have a range of transaction options that are substitutes for App Store transactions and that yet do not involve the use of iOS devices. As Professor Hitt discusses in his opening report, game developers can offer their games across a wide variety of platforms, including game consoles, PCs, and non-iOS mobile devices.[92] He also notes that consumers can conduct game transactions via multiple platforms and subsequently play these games on a wide range of devices, including Android smartphones and tablets, Windows PCs, and the Xbox, PlayStation, and Nintendo Switch consoles.[93] Many popular games are available on multiple platforms and consumers may play these games on different devices. For example, Minecraft: Bedrock Edition is available on the App Store, as well as on the Google Play Store, the Xbox console, the

---

[90] *See, for example*, "Billing Partnerships on Disney+," *Disney+*, available at https://help.disneyplus.com/article/disneyplus-en-us-third-party-subscriptionapple, ("New and returning subscribers are no longer able to sign up and pay for Disney+ through Apple. However, you can see all plans and sign up directly on DisneyPlus.com and can still watch Disney+ content on supported Apple devices.").

[91] "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("Multiplatform Services: Apps that operate across multiple platforms may allow users to access content, subscriptions, or features they have acquired in your app on other platforms or your web site, including consumable items in multi-platform games, provided those items are also available as in-app purchases within the app."). *See also*, Oliver January 2021 Deposition, Vol. 1, p. 91:15–20 ("Q. You said there were two components for digital goods that we want to talk about, and one was the Reader Rule, and we talked about that. What was the other one? A. The other is related, and it is called the 'Multi-Platform Rule.'"), p. 96:7–24 ("Q. And so we started talking about these two components, I think, because these are examples of where the commission to Apple is zero even though digital goods are consumed within the app. Is that a fair summary of what these two roles are talking about or as you brought them up? […] [A.] Correct. […] [Q.] So other than subscriptions, the small business program, the video partner program, or content that is not subject to commission under the Reader Rule or the Multi-Platform Rule, are there other deviations from the 30 percent for digital goods on an iPhone app? A. Not to my knowledge, no.").

[92] Hitt Opening Report, Section 6.2.1.2 ("A range of successful game developers that currently transact through the App Store have chosen to also make game transactions for the same game available through alternative platforms other than Google Play. For example, Minecraft, one of the best-selling video games of all time, is available through many different transaction platforms including the App Store, Google Play, Microsoft Store, Amazon Appstore, Nintendo eShop, and PlayStation Store, as well as directly from Minecraft's website.").

[93] Hitt Opening Report, Section 6.2.2.1 ("Beyond simply owning multiple devices, consumers also make game transactions across multiple devices and through different game transaction platforms. Market research on gamers, the population of consumers who participate in game transactions, indicates that these consumers not only have multiple devices but also play games on multiple devices.").

PlayStation console, the Nintendo console, the Amazon Appstore, and the Minecraft website. This allows consumers to play Minecraft on devices such as Android devices, Xbox consoles, PlayStation consoles, Nintendo Switch, Amazon Fire tablets, and Windows PCs.[94] Similarly, Roblox is available through the App Store, the Google Play Store, the Amazon Appstore, the Microsoft Store, and the PlayStation Store, and can be played on iOS and Android devices, Xbox and PlayStation consoles, Amazon Fire tablets, and other supported platforms.[95] Thus, the transactions that lead to the acquisition of Minecraft: Bedrock Edition and Roblox via channels other than the App Store are substitutes for the subset of App Store transactions involving the acquisition of these games.[96]

62.    For games not available via multiple channels, comparable alternatives may exist within the same genre. For instance, consumers who are interested in action-adventure role-playing games can choose to download and play "The Legend of Zelda: Breath of the Wild," which is available exclusively on Nintendo Switch or Wii U consoles,[97] or they can select "Oceanhorn 2: Knights of the Lost Realm," which was initially released exclusively

---

[94]    Wells, Jay, "Minecraft Bedrock Edition 1.21.80," *Minecraft*, May 6, 2025, available at https://www.minecraft.net/en-us/article/minecraft-bedrock-edition-1-21-80 ("Supported devices include Xbox Series X|S, Xbox One, PlayStation 4, PlayStation 5, Android, iOS, and PC. Android: Adreno 640, Mali-G68, Mali-G77, or Xclipse 530 or higher. iOS: A12 or M1 or higher. PC: Running Minecraft on DX12"); Stone, Tom, "Better Together on Nintendo Switch!," *Minecraft*, June 21, 2018, available at https://www.minecraft.net/en-us/article/better-together-nintendo-switch ("This new version of Minecraft on Switch uses the Bedrock engine, and is available digitally on Nintendo eShop and at retail."); Vincent, Brittany, "How to download Minecraft " *Tom's Guide*, March 14, 2021, available at https://www.tomsguide.com/how-to/how-to-download-minecraft ("How to download Minecraft: All the platforms it's available on […] Bedrock Edition; Windows 10[;] iOS[;] Android[;] Microsoft Xbox One[;] Sony PlayStation 4[;] Nintendo Switch[;] Amazon Fire[;] Amazon Fire TV[;] Oculus[.]"). *See also*, Hitt Opening Report, ¶¶ 125-126.

[95]    "Download Roblox," *Roblox*, available at https://www.roblox.com/download ("Roblox on your Device. Download on the App Store. Get it on Google Play. PlayStation. Xbox. MetaQuest. Get it from Microsoft. Available at Amazon Appstore"). *See also*, Hitt Opening Report, ¶ 127.

[96]    Hitt Opening Report, ¶ 148 ("Evidence suggests that consumers can substitute transactions across platforms with the multiple devices they already own and use."), Section 6.2.2.2.

[97]    Rodriguez, Uriel, "The Legend of Zelda: Breath of the Wild Release Date and Time," *Game8*, April 14, 2025, available at https://game8.co/articles/release-dates/the-legend-of-zelda-breath-of-the-wild-release-date-and-time ("The Legend of Zelda: Breath of the Wild was released on March 3, 2017, at midnight local time in each region for both the Wii U and Nintendo Switch.").

for iOS devices.[98] Oceanhorn 2 is widely recognized as being inspired by the Zelda game series, and is functionally similar in key respects that include its stylized graphics and features like open-world exploration, puzzle-solving elements and item-based progression.[99] As a result, even though they do not involve the subsequent use of an iOS device, transactions involving the acquisition of games in the Zelda series via non-iOS platforms may serve as substitutes for App Store transactions involving the acquisition of Oceanhorn 2.

63.     Empirical evidence also indicates that many substitutes to transactions on the App Store that happen outside of the App Store account for a significant revenue share of the associated seller. For example, in his opening report, Professor Hitt estimated that the majority of Fortnite revenue was from PlayStation and Xbox transactions, and only 8.7 percent of the total associated Fortnite revenue was generated by App Store transactions.[100]

---

[98]   Lee, Keegan, "Oceanhorn 2 Golden Edition Releases On Apple Arcade," *RPGFan*, June 10, 2020, available at https://www.rpgfan.com/2020/06/10/oceanhorn-2-golden-edition-releases-on-apple-arcade/ ("Indie developer Cornfox & Brothers have announced that the Golden Edition of their hit game, *Oceanhorn 2: Knights of the Lost Realm*, is now available on Apple Arcade! Released exclusively for iOS and macOS devices in 2019, this new update brings plenty of quality of life changes to the game, along with some brand new content!").

[99]   Snaith, Kim, "Oceanhorn 2 Is the Closest We're Ever Going to Get to Zelda on Playstation and Xbox," *Gamespew*, August 3, 2023, available at https://www.gamespew.com/2023/08/oceanhorn-2-impressions/ ("Originally an Apple Arcade exclusive, the gorgeous Oceanhorn 2 is finally available on PS5, Xbox Series X/S and PC. It's been a long wait, but if you're a fan of Zelda-like adventures, it's well worth jumping into. […] It very much feels like an old-school Zelda experience, wrapped up with beautiful, modern visuals. Indeed, it's very clear where Oceanhorn 2's inspirations lie. Your adventurer even resembles Breath of the Wild-era Link in his blue tunic. But Oceanhorn 2 is far more than just a copycat. There's plenty here to make it stand on its own two legs: its gorgeous world, for example, that simply begs to be explored. And its weird and wonderful cast of characters, including the helpful robot Gen, who are a pleasure to talk to – and rather useful to have on board. […] But if you don't have a Nintendo console, this really is the closest you'll ever get to a Zelda game on Xbox and PlayStation. And it does a *very* good job of capturing the magic of getting lost in a good, old-fashioned adventure."); Berlinger, Joseph, "Inspired By Zelda: Dive Into The Vibrant Sea of Oceanhorn 2," *Zelda Dungeon*, August 14, 2021, available at https://www.zeldadungeon.net/inspired-by-zelda-dive-into-the-vibrant-sea-of-oceanhorn-2/ ("Like its predecessor, the gameplay in *Oceanhorn 2* pays homage to the *Zelda* franchise. While there are new items and quirks, the game carries many familiar elements and themes. […] If you are looking for a game that merges classic *Zelda* gameplay with some new twists, this budget eShop title might just fit the bill.").

[100]  Hitt Opening Report, ¶ 151 ("Fortnite users make a substantial share of their paid transactions for Fortnite outside of the App Store: while 19.3 percent of Fortnite user accounts made a paid transaction on the App Store, revenue from Fortnite transactions on the App Store was only 8.7 percent of total Fortnite revenue. Fortnite total revenues shares were higher on other platforms, such as PlayStation (40.4 percent) and Xbox (37.8 percent).").

Professor Hitt also estimated that Minecraft's revenue share from App Store transactions was just ▊ percent in 2020.[101]

64.   In summary, by ignoring the two-sidedness of the App Store and failing to recognize that the relevant product is a transaction between a consumer and a developer, Professor Stiglitz's analysis does not account for myriad transactions that are substitutes for those involving the App Store but that occur outside the App Store. This omission calls into question the validity of Professor Stiglitz's market definition, a flaw that is exacerbated by his ignoring indirect network effects and the App Store's two-sidedness, which I discuss further in the next section.

> 4.   *Professor Stiglitz's Dismissal of the App Store's Two-Sidedness Renders His Market Definition Analyses Incorrect*

65.   When one recognizes that the App Store is a two-sided transaction platform characterized by indirect network effects, and that the relevant product is an App Store transaction and its substitutes rather than the actual digital products or services obtained by completing these transactions, the implications of Professor Stiglitz's flawed market definition become more apparent.

> a)   Professor Stiglitz's SSNIP is Unreliable as It Is Based on Incorrect Inputs and Assumptions

66.   Professor Stiglitz conducts the HMT in the following way. He assumes that the but-for commission rate of 13.63 percent estimated by Dr. Abrantes-Metz induces a competitive single price for apps and in-app digital content.[102] He uses a "revealed preference" argument to assert that Apple's as-is commission rates must be generating higher profits for Apple than the but-for commission rate, and thus, if the app and in-app digital content price induced by the as-is commission rate is at least 5 percent higher than the

---

[101]   Hitt Opening Report, ¶ 126 ("Evidence in the record on Minecraft game and in-app purchases across different device types confirms that Minecraft's availability across many platforms leads to many transactions taking place over different platforms. Specifically, using Minecraft data produced by Microsoft, I find that the share of Minecraft revenue on iOS devices was ▊ percent in 2020, while it was ▊ percent on Java compatible devices, ▊ percent on PlayStation devices, ▊ percent on Xbox devices, ▊ percent on Nintendo devices, and ▊ percent on Android devices.").

[102]   Stiglitz Report, ¶ 156 ("Identifying the competitive price is critical but not always easy"), ¶ 157 ("I understand that Dr. Abrantes-Metz has established that the As-Is commission rate is supracompetitive and that the App Store can still be profitable when it charges a 13.6 percent commission rate for the sale of iOS apps and in-app content.").

corresponding price induced by the estimated but-for commission rate of 13.63 percent, this reflects evidence that Apple has successfully imposed an SSNIP of at least 5 percent and the sale of iOS apps and in-app content constitutes a relevant antitrust product market.[103] In particular, he uses Dr. Song's estimated average as-is commission rate of 27.2 percent and Professor McFadden's formula that calculates the "burden" consumers bear at the price for apps and in-app digital content induced by Apple's as-is commission rate to estimate the minimum burden a consumer has to bear from a commission rate change for the implied price change to be at least 5 percent, and finds that this minimum burden is 35 percent.[104] He then concludes that the HMT is passed because the estimated burden borne by consumers according to Professor McFadden's analysis is between 77 percent and 83 percent, higher than this aforementioned minimum burden of 35 percent.[105] Professor Stiglitz's SSNIP test has several flaws.

67.   First, Professor Stiglitz ignores that when making changes to prices on one side of two-sided transaction platform, one must consider changes to demand and therefore changes in profits stemming from the associated economic effects on both sides. This is an economic fact independent of whether one defines the App Store as a two-sided transaction platform, and stemming from the indirect network effects that Professor Stiglitz testified must be the focus of the economic analysis of any two-sided market.[106] As I explain in my opening report, economic choices that include changes to the price on one side of a two-sided

---

[103]   Stiglitz Report, ¶ 158 ("The fact that Apple charges an average effective commission rate of 27.2 percent when it could have charged a commission rate of 13.6 percent and still earned a competitive return indicates that Apple must be more profitable at the prevailing commission rate. Otherwise, it would have lowered its commission rate to 13.6 percent. This suggests that Apple could profitably impose a 5 percent SSNIP on iOS device users (through an increase of the commission rate from 13.6 percent to 27.2 percent), as long as consumers bear at least 35 percent of the burden actually borne of the commission rate increase[.]")

[104]   Stiglitz Report, ¶ 157 ("I understand that Dr. Song calculated the average effective commission rate levied on app and in-app content spending to be 27.2 percent[.]"), ¶ 158 ("This suggests that Apple could profitably impose a 5 percent SSNIP on iOS device users […], as long as consumers bear at least 35 percent of the burden actually borne of the commission rate increase[.]"), Footnote 302.

[105]   Stiglitz Report, ¶ 158 ("This suggests that Apple could profitably impose a 5 percent SSNIP on iOS device users […], as long as consumers bear at least 35 percent of the burden actually borne of the commission rate increase, which is far below Professor McFadden's estimates of the burden borne by consumers. Therefore, I conclude that Apple could, and has, imposed a price increase that likely exceeds a 5 percent SSNIP, and that the sale of iOS apps and in-app content thereby constitutes a relevant antitrust product market."), Footnote 302.

[106]   Stiglitz May 2025 Deposition, p. 183:19–22 ("A. Okay. As an economist, we don't use the word 'platform'. That, I mean we don't use the word -- we don't distinguish the -- the characteristic of a two-sided market that we focus on is the indirect network effects.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

transaction platform will affect participation on the other side due to indirect network effects.[107] Because of indirect network effects, a decrease in participation on one side due to a price increase may result in a decrease in participation on the other side, which in turn will affect quantity demand and further lower profits on the side where the price changed. That is, indirect network effects can magnify the response to a hypothetical price increase on one side. This point has been noted by numerous academic experts and regulatory bodies.[108] The importance of incorporating this critical aspect of two-sided transaction platforms into an HMT is also discussed by Professor Jin in her opening report.[109]

68. However, Professor Stiglitz's approach relies on comparing a threshold consumer's burden with the consumer burden estimated by Professor McFadden,[110] and there is no evidence

---

[107] Sundararajan Opening Report, ¶ 168.

[108] Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–51, p. 46 ("Consider a two-sided platform with sides A and B linked by positive indirect network effects. The application of a one-sided SSNIP test on side A would only account for the direct effect that a price increase will have on the demand and profits of side A. It would not account for the fact that a reduction of the number of customers on side A is likely to lead to a reduction of the number of customers on side B so that, if the price on side B is kept constant, there will be a loss in profits also on side B. It would also not envisage the fact that the smaller number of customers on side B will in turn reduce the demand of side A, and so on. Hence, it would also underestimate the loss in profits on side A. The iterative procedure of the SSNIP test would then stop too early. Similarly for the application of a one-sided test on side B. On both sides the market would be defined too narrowly."). *See also*, Wismer, Sebastian and Arno Rasek, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 55–67, p. 62 ("The original SSNIP test does not account for interdependencies between distinct customer groups. In a two-sided market, for example, a price increase for one customer group (side A) leads to changes in demand not only on this side, A, but also on the other side, B. Ignoring such volume changes that emanate from indirect network effects may distort the result of the SSNIP test."); Evans, David S. and Michael D. Noel, "Defining Markets That Involve Multi-Sided Platform Businesses: An Empirical Framework with an Application to Google's Purchase of Doubleclick," *SSRN*, 2007, p. 12 ("Since the analyst's estimate does not account for feedback effects, the full impact of the price increase on demand is underestimated. As a result, antitrust markets will be defined too narrowly, and merger analysis will overstate the increase in market power of merging parties and overstate the predicted unilateral price effects of the transaction.").

[109] Opening Expert Report and Declaration of Ginger Jin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Jin Opening Report"), ¶ 41 ("If an HMT is performed for a multi-sided platform, it will likely rely on many assumptions given the complexity of the calculation and the likely absence of appropriately granular data. In addition to assumptions about the pricing structure, the HMT framework must account not only for customers' direct responses but also for how these responses propagate across the platform's interconnected customer groups.").

[110] Stiglitz May 2025 Deposition, ¶ 158 ("This suggests that Apple could profitably impose a 5 percent SSNIP on iOS device users […], as long as consumers bear at least 35 percent of the burden actually borne of the commission rate increase, which is far below Professor McFadden's estimates of the burden borne by consumers.").

that Professor McFadden's consumer burden estimate has incorporated these spillover effects stemming from indirect network effects. In fact, while Professor Stiglitz, relying on Professor McFadden's analysis, assumes that a high share of any change in commission rate will be passed through to consumers and result in a corresponding change in the price of apps and in-app digital content, this is rarely the case, as Professor Hitt demonstrated in his opening report.[111] Thus, Professor Stiglitz's threshold test may be yielding incorrect results regarding the relevant product market, potentially leading to a market definition that is too narrow.[112]

69. Next, as I show in **Section V.A**, Dr. Abrantes-Metz's calculation of the but-for commission rate that results in a but-for commission rate of 13.63 percent is based on an unreliable approach that does not adhere to established principles of economic modeling and does not take indirect network effects into account. If the but-for commission rate based on a more reliable approach grounded in an actual economic model that incorporates indirect network effects turns out to be higher than the 13.63 percent presented by Dr. Abrantes Metz, Professor Stiglitz's SSNIP may fail. For example, were this hypothetical but-for commission rate to be greater than 23 percent and all other inputs to Professor Stiglitz's approach remained the same, the approach would not be able to conclude that Apple has

---

[111]   Hitt Opening Report, ¶ 305 ("I analyze three natural experiments: the launch of the SBP in December 2020, the implementation of the ARS policy in June 2016, and the launch of the VPP in 2016."), ¶ 306 ("[T]he results of these natural experiments show that, for the vast majority of products, app developers did not reduce consumer prices when they face lower commission rates.").

[112]   Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–51, pp. 45–46 ("Furthermore, in a two-sided transaction market, the SSNIP test should take into account the changes in overall profits (i.e. the sum of the profits on both sides of the market) and all feedbacks between the two sides of the market when judging the profitability of a price increase. Since positive indirect network effects between the different sides of the platform reduce the profitability of any price increase, the risk of applying a one-sided SSNIP test, which does not account for these feedback effects, is that in such cases the two markets may be defined too narrowly. Consider a two-sided platform with sides A and B linked by positive indirect network effects. The application of a one-sided SSNIP test on side A would only account for the direct effect that a price increase will have on the demand and profits of side A. It would not account for the fact that a reduction of the number of customers on side A is likely to lead to a reduction of the number of customers on side B so that, if the price on side B is kept constant, there will be a loss in profits also on side B. It would also not envisage the fact that the smaller number of customers on side B will in turn reduce the demand of side A, and so on. Hence, it would also underestimate the loss in profits on side A. The iterative procedure of the SSNIP test would then stop too early. Similarly for the application of a one-sided test on side B. On both sides the market would be defined too narrowly.").

profitably imposed a 5 percent SSNIP.[113] Further, I understand that in contrast, Professor Hitt reaches a conclusion that evidence shows that Apple's as-is commission rate is competitive.[114]

70.    Finally, while continuing to disagree with Professor Stiglitz that the flawed as-is commission rate estimated by Dr. Abrantes Metz is a good proxy for the competitive commission rate, Professor Stiglitz has not explained why other components of Apple's pricing structure would not change when commission rate on transactions is lower. As discussed in **Section IV.B.2**, Professor Stiglitz applies the SSNIP on the incorrect product market. He examines a SSNIP of 5 percent on app prices instead of the App Store's overall pricing structure.[115] Two-sided platforms have complex pricing structures that may involve access fees and usage fees. The App Store's as-is pricing structure does not charge consumers to participate while it does charge developers an annual access fee of $99. It also employs a revenue-sharing model that charges developers a commission rate ranging from 15 percent to 30 percent on certain paid transactions. Finally, it does not charge either side for transactions involving free apps.[116] There is no evidence provided by Professor Stiglitz that the but-for competitive pricing structure would be such that the commission rate would decrease from its as-is level while preserving other dimensions of the as-is pricing structure.

b)    <u>Professor Stiglitz Incorrectly Clusters All Apps and In-App Digital Content into a Single Relevant Product Market</u>

71.    By ignoring that the App Store is a two-sided transaction platform for which transactions are the relevant product, Professor Stiglitz ends up grouping together transactions that should not be clustered together because they face different competitive conditions.[117] A

---

[113]    Substituting a but-for commission rate of 23 percent into Professor Stiglitz's formula for the minimum consumer burden yields $\frac{0.05}{0.272-(0.95\times0.23)} = 93$ percent, which exceeds Professor McFadden's estimates of consumer burden.

[114]    Hitt Rebuttal Report, Section 8.4.2

[115]    Stiglitz Report, Footnote 302.

[116]    Sundararajan Opening Report, ¶ 177.

[117]    Stiglitz Report, ¶ 152 ("I explain that general market definition principles support a relevant antitrust market for the sale of iOS apps and in-app content.").

failure to isolate the appropriate competitive conditions faced by the relevant products can lead to a flawed analysis of market definition and market power.[118]

72.　As I discussed in **Section IV.B.3**, the set of transactions that are substitutes for those conducted via the App Store varies depending on the type of App Store transactions in question. In her opening report, Professor Jin concluded based on the evidence she analyzed that clustering different types of app transactions may not be appropriate and rather, different types of app transactions should be considered as part of different antitrust product markets whose competitive conditions are clearly different.[119] In contrast, Professor Stiglitz's analysis clusters together transactions that face different competitive conditions.

73.　Evidence presented by Professor Hitt in his opening report shows that game transactions can be facilitated on stores on a number of different devices including gaming consoles, PC devices, and other mobile devices, often with different operating systems.[120] Analogously, video streaming transactions can be facilitated through stores on a varying set of devices, including smart TVs, that may be distinct from those that are commonly used for game transactions.[121] Some of these substitute transactions involve the subsequent use of an iOS device, while others do not. As I discuss in **Section IV.B.3**, certain in-app purchases and subscriptions that involve the subsequent use of an iOS device may also be completed via channels other than the App Store. Clustering these different transactions together thus likely misrepresents the varying competitive constraints associated with transactions in different app and in-app digital content categories.[122]

---

[118]　Sundararajan Opening Report, ¶¶ 172–173.

[119]　Jin Opening Report, ¶ 93 ("I conclude that it is more appropriate to assess different types of app transactions in different antitrust markets where the evidence indicates they do not face similar competitive conditions.").

[120]　Hitt Opening Report, Section 6.2.1.1.

[121]　Hitt Opening Report, Section 6.3.2.

[122]　"Market Definition," *Organisation for Economic Co-operation and Development (OECD)*, October 11, 2012, available at www.oecd.org/daf/competition/Marketdefinition2012.pdf, p. 47 ("Cluster markets may, however, result in a deficient market definition if competition between the producers of part of the products restrict the range of possible prices available to the suppliers of the bundle."). *See also*, Sundararajan Opening Report, ¶ 173.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**C. Professor Stiglitz Ignores the Conditions that Existed When the App Store Launched that Undermine His Opinions Regarding Apple's Monopoly Power**

74. Before discussing other issues associated with Professor Stiglitz's analysis regarding Apple's alleged monopoly power, I first note that Professor Stiglitz's analysis is based on the fundamentally incorrect premise that Apple has had monopoly power in the market for apps and in-app digital content since it launched the App Store in 2008 and in-app purchases in 2009,[123] and that it was able to use this monopoly power at these times to set a supracompetitive commission rate.[124] However, this assumption ignores the reality of smartphone competition and app distribution at the time of the App Store's inception.

> *1. Professor Stiglitz Ignores Evidence of Competition When the App Store Launched, Apple's Low Market Share for the iPhone, and Apple's Declining Market Share for the iPad*

75. As I discussed in my opening report, Apple has faced persistent and intense competition from other device manufacturers since it launched the iPhone in 2007. When the iPhone was launched, many large and established device companies including Sony Ericsson, LG, Motorola, Nokia and Samsung already provided smartphones and their associated

---

[123] Stiglitz May 2025 Deposition, pp. 30:18–31:25 ("Q. In your opinion, at what point in time did Apple acquire monopoly power? […] A. It obtained the monopoly power in, as I say, in the realm of the market that we're talking about here -- distribution of apps and in-apps purchases and IAP payment mechanism -- when it created the Apple Store and started imposing the restrictions that were related to the Developer Agreement and the review guidelines.[...] Q. And is it your understanding that Apple created and introduced the Apple App Store in 2008? A. That's right. […] Q. So without addressing what the earliest time was, it's your opinion that at least as of the time Apple opened the App Store in 2008, it had obtained monopoly power in your opinion? A. That's right. And […] that is what enabled it to maintain that market power. And I give examples in my report of how the evidence that, but for those things, those restraints, there would have been other distribution -- viable distribution mechanisms."); Abrantes-Metz May 2025 Deposition, pp. 41:22–42:8 ("[Q.] Is it an implicit assumption of your methodology that Apple has held monopoly power since 2008? A. That's how I read Professor Stiglitz's report, so yes, that's how I take it for my analysis. Q. So you're assuming that Apple has had monopoly power since 2008? A. Yes. Since inception, because that is how I understand Professor Stiglitz has opined.").

[124] Stiglitz Report, ¶ 24 ("Apple possesses durable monopoly power in the aftermarket. This is demonstrated by the App Store's substantial and durable profit margins that exceed competitive levels, supracompetitive commission fees, and its ability to impose restrictive contractual terms on iOS app developers.").

operating systems.[125] Google announced its Android operating system in November 2007.[126] The intensity of competition faced by Apple during the early days of the iPhone is also highlighted by Professor MacCormack in his 2012 Harvard Business School case study, where he notes that "[b]y 2011, the mobile OS competition had become more heated than the [personal digital assistant] competition ever had."[127]

76.  Professor Stiglitz's own analysis indicates that Apple's market share as measured by the number of smartphone units sold was about 20 percent between 2008 and 2011.[128] These relatively low market shares may be, in part, a consequence of Apple's strategy to launch the iPhone exclusively through AT&T.[129] As Professor MacCormack has noted, at the time, many consumers preferred other wireless carriers over AT&T, citing perceived advantages in coverage and plan flexibility, and may have been reluctant to adopt the iPhone because it required switching to AT&T as their mobile carrier.[130] As Professor Stiglitz himself discusses, the Amazon Fire Phone adopted a similar strategy a few years later, and struggled to gain traction with consumers, partly due to its exclusive

---

[125]  Sundararajan Opening Report, ¶ 110. *See also*, Lancaster, Luke and Kent German, "The Original iPhone's Competition: Remember These Top Phones from 2007?," *CNET*, January 08, 2022, available at https://www.cnet.com/pictures/original-apple-iphone-competition-remember-these-top-phones-2007/; Trial Testimony of Philip Schiller, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 17, 2021 – May 18, 2021 ("Epic Trial Testimony of Phillip Schiller"), pp. 2720:7–9 ("Q. And you mentioned BlackBerry. Prior to the launch of the iPhone, were there other mobile devices on the market? A. Yes.").

[126]  Sundararajan Opening Report, ¶ 119. *See also*, Schonfeld, Erick, "Breaking: Google Announces Android and Open Handset Alliance," *TechCrunch*, November 5, 2007, available at https://techcrunch.com/2007/11/05/breaking-google-announces-android-and-open-handset-alliance/ ("Google just officially announced the Open Handset Alliance to create an open platform (to be called Android) for a Linux phone that can run mobile Google apps and others. […] The platform is open source, and that will be its competitive advantage over other mobile platforms.").

[127]  MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 7.

[128]  Stiglitz Report, Figure 7.

[129]  "Apple Chooses Cingular as Exclusive US Carrier for Its Revolutionary iPhone," *Apple Newsroom*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Chooses-Cingular-as-Exclusive-US-Carrier-for-Its-Revolutionary-iPhone/ ("Apple® and Cingular announced that Cingular, the largest wireless carrier in the US, will be Apple's exclusive US carrier partner for Apple's revolutionary iPhone unveiled today. Cingular is solely owned by AT&T Inc.").

[130]  MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 9 ("Not everyone, however, was excited by the iPhone. Many customers preferred other wireless carriers over AT&T due to the perceived superiority of coverage or flexibility of wireless plans.").

availability to AT&T subscribers.[131] Professor Stiglitz also indicates that Apple's market share as measured by the number of smartphone units sold was consistently below 50 percent during the 2008 to 2024 period, with the exception of 2023.[132]

77.   Facing intense competition and possessing a relatively small market share of smartphones when the App Store launched, it seems unlikely that Apple would have possessed sufficient market power to impose anticompetitive conditions on developers and consumers without critically impacting the chances of success of the iPhone and the App Store, and Professor Stiglitz does not provide any evidence to the contrary. Indeed, Professor Stiglitz himself testified that Apple did not have market power in the sales of smartphones in 2008 and also testified that Apple's 2008 market share is inconsistent with Apple possessing monopoly power before 2011.[133] Shortly after releasing the iPhone, on September 5, 2007, Apple introduced the iPod Touch, a portable media player featuring a touchscreen

---

[131]   Stiglitz Report, Footnote 568 ("'The Fire Phone faced a tough challenge in the highly competitive smartphone market, with exclusive availability on AT&T limiting its potential reach to customers, according to an Engadget review.'"); Stiglitz May 2025 Deposition, p. 91:9–14 ("Q. Do you doubt that the Amazon Fire Phone faced a tough challenge because of its exclusive availability on AT&T limiting its potential reach to customers? […] A. I'm quoting that particular author. I have no reason to doubt that that was one of the factors.").

[132]   Stiglitz Report, Figure 8.

[133]   Stiglitz May 2025 Deposition, p. 87:9–16 ("Q. Figure 8 measures market share by units, right? A. That's right. Q. And that figure shows that Apple had a 21 per cent market share in 2008 when the App Store opened; correct? A. That's right. Q. Would you agree that 21 per cent is not a monopoly market share? A. That's right."), pp. 92:25–93:5 ("Q. How about 2008? In your opinion, did Apple have market power in the smartphone market in 2008 when it opened the App Store? A. You know, almost by definition, did it have market power in the smartphone market as defined at the, by IDC at that time? The answer is no."), pp. 93:14–94:5 ("Q. When, in your opinion, did Apple first have market power in the smartphone market? A. I didn't have a strong view about the precise date. […] I think one could feel fairly confident that by 2011, it had a significant market power. And I would, you know, comment as I said before that the confounding effect of the 'other' category, not the -- non-android, non-iOS, the others, the Blackberry -- declined very rapidly from 2007 to 2011. And these did have -- were different in many ways, not being easy for running apps and, and so they were, they were different in some ways, significant ways."). *See also*, Stiglitz May 2025 Deposition, pp. 57:23–58:12 (Q. Is it important to your conclusions in this case that Apple possessed market power in the foremarkets at the time that Apple imposed the alleged anticompetitive restrictions at issue? A. It's relevant in the following sense: I'm not sure it could have had the ability to impose those restraints if it didn't have market power. So if there's strong competition in the foremarket and high levels of consumer informativeness and rationality, then actions which deteriorate the quality of the platform, which are an attempt to exercise market power in the aftermarket would be disciplined in the foremarket.").

46

interface, internet access, and the ability to run apps and play music and video.[134] Plaintiffs have recognized the iPod Touch as one of the iOS devices through which consumers and developers could engage in transactions involving apps or in-app digital content via the App Store.[135] Professor Jin notes in her rebuttal report that the iPod Touch accounted for between 21 and 36 percent of the App Store's revenue between 2008 and 2011.[136] While Professor Stiglitz does not analyze whether Apple had market power associated with the sales of the iPod Touch during this period,[137] he testified that, if such an analysis were conducted, it would likely show that Apple lacked market power in the relevant market for portable music devices.[138]

78.    Apple introduced the iPad on January 27, 2010, a tablet featuring a touchscreen interface that supported a wide range of apps, including those for video streaming, productivity, and

---

[134]    "Apple Unveils iPod Touch," *Apple Newsroom*, September 5, 2007, available at https://www.apple.com/newsroom/2007/09/05Apple-Unveils-iPod-touch/ ("Apple® today introduced the new iPod® touch featuring Apple's revolutionary multi-touch user interface that enables users to find and enjoy all of their music, videos and more on its gorgeous widescreen display with just the touch of a finger. First introduced on iPhone™, the multi-touch interface uses pioneering new software to present the perfect user interface for each application. The iPod touch also includes Wi-Fi wireless networking, the first on any iPod, and three amazing applications that use it—Safari™, the most advanced browser on any mobile device, lets users wirelessly view web pages just as they look on their computer, and features Google Search or Yahoo!").

[135]    Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C–11–06714–YGR, United States District Court for the Northern District of California, Oakland Division, September 11, 2020 ("Third Amended Complaint"), ¶ 1 ("This is an antitrust class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (2004) (the 'Sherman Act'), brought by Plaintiffs on their own behalf and on behalf of a class of persons similarly situated, those being persons who purchased software applications or licenses for software applications from the 'iTunes' site or 'App Store' owned and operated by Defendant Apple Inc. ('Apple'), or who made in-app purchases (defined herein) through such applications, for use on one or more Apple iPhones, iPads, or iPod Touches ('iOS Devices') between December 29, 2007 and the present (the 'Class Period').").

[136]    Jin Rebuttal Report, Section 6.1.

[137]    Stiglitz Report, Footnote 3 ("For the purposes of this report, I have been instructed by Counsel to treat iPhones and iPads, but not the iPod Touch, as iOS devices.").

[138]    Stiglitz May 2025 Deposition, p. 61:8–18 ("Q. Have you concluded that Apple lacks market power in the relevant market for portable music devices in which it sells iPod Touch devices? […] A. I haven't studied that with the detail that I would want to have studied it to make that claim. But on the basis of a quick, you might say analytic, you know, a quick look at the kinds of devices that would be substituted, that would be the likely finding that one would have, if one did that kind of a study. And the fact that iPod Touch disappeared suggests that there were substitutes to that.").

internet browsing.[139] Professor Stiglitz's analysis shows that Apple's iPad market share—measured by both tablet unit sales and tablet revenue—declined by approximately 50 percent over the five years following the iPad's launch in 2010,[140] which Professor Stiglitz testified is evidence that Apple faced significant competition from other tablet manufacturers.[141] Professor Stiglitz also agreed that because the iPad had not been introduced until 2010, Apple could not have had market power in the tablet market in 2008,[142] when the challenged conduct was established with the launch of the App Store.

> 2.   *Professor Stiglitz Ignores that the App Store's Business Model Lowered Costs for Developers and Set a Commission Rate Consistent with Other App Marketplaces*

79.   Prior to the launch of the App Store, developers faced significant financial barriers to developing and distributing apps. As I discussed in my opening report, Symbian, a popular mobile operating system in 2007, charged developers annual participation fees in excess

---

[139]   "Apple Launches iPad," *Apple Newsroom*, January 27, 2010, available at https://www.apple.com/newsroom/2010/01/27Apple-Launches-iPad/ ("Apple® today introduced iPad, a revolutionary device for browsing the web, reading and sending email, enjoying photos, watching videos, listening to music, playing games, reading e-books and much more. iPad's responsive high-resolution Multi-Touch™ display lets users physically interact with applications and content. […] iPad includes 12 new innovative apps designed especially for the iPad, and will run almost all of the over 140,000 apps in the App Store.").

[140]   Stiglitz Report, Figure 9 and Figure 10.

[141]   Stiglitz May 2025 Deposition, p. 79:5–20 ("Q. Would you agree that by either measure, value or units, Apple's tablet market share dropped precipitously over the five years following 2010? A. I would say it, it fell significantly. I don't know whether precipitously, but certainly significantly. Q. Dropped by approximately half by 2015, wouldn't you say? A. Yes. Q. Would you agree that such a drop in market share is evidence of vigorous competition in the tablet market? A. Evidence of competition, that's clear, yes. Q. Market share dropping by half is not evidence of vigorous competition? […] A. No, if you want to use vigorous, yeah, there's a lot of competition, I mean.").

[142]   Stiglitz May 2025 Deposition, p. 76:14–24 ("Q. Do you agree that Apple lacked any market power in the tablet foremarket in 2008 when it opened the App Store? A. I, I just don't recall the data for 2008. Q. Well, if you assume that the iPad was introduced in 2010, do you agree that Apple lacked any market power in the tablet foremarket in 2008? A. […] But if there were a market and if [Apple] wasn't in the market, then it would not have had market power.").

of $1,500, creating a barrier to entry for smaller developers.[143] In contrast, when the App Store launched in 2008, it charged a significantly lower annual nominal fee of just $99. Also, Apple's pricing structure included revenue sharing with developers that provided Apple with a fraction of the price consumers paid to developers for App Store transactions.[144] This lowered the entry cost for developers and encouraged developer participation, especially from smaller developers who might otherwise have been deterred by higher participation fees like those charged by platforms like Symbian.

80.     Moreover, as Professor MacCormack discusses in his Harvard Business School case study, the 30 percent commission rate associated with Apple's revenue sharing arrangements was below the commission rates charged by mobile carriers, which, at the time, had substantial control over app distribution on mobile platforms,[145] and was also lower than what brick-and-mortar stores typically charged software developers.[146] Most saliently, this commission rate of 30 percent was chosen when Apple's share of smartphone sales was 28 percent by revenue and 21 percent by units sold, as per Professor Stiglitz's analysis.[147] This market share and the associated competitive conditions contradict Professor Stiglitz's

---

[143]   Sundararajan Opening Report, ¶ 117. *See also*, West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, p. 46 ("In November 2007, Symbian began developing a new partner program to meet two key objectives. The first was to increase the efficiency of the program through the enhanced use of IT, particularly increased web-based automation of common activities and creation of an improved extranet (called 'SDN++') to communicate with ecosystem members. The second was to utilize that increased efficiency to lower the price and broaden the reach of the program, particularly with ISVs. The most visible change was a reduction in the annual fee from $5,000 to $1,500.").

[144]   Sundararajan Opening Report, ¶ 177.

[145]   MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 9 ("Customers seeking to extend the capabilities of their iPhones could do so by buying and downloading apps directly through the App Store. Apple retained a 30% commission on all apps sold, giving application developers a 70% cut, considerably more generous than the payments developers had received from wireless carriers.").

[146]   Sundararajan Opening Report, ¶ 108. *See also*, Epic Trial Testimony of Phillip Schiller, p. 2726:11–13 ("Q. And what was the cost to the developer of that system? A. Typically we'd see that the channel would get between 50 to 70 percent of the sale.). *See also,* Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/.

[147]   Stiglitz Report, Figure 7 and Figure 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

assertion that Apple possessed monopoly power and used it to set a supracompetitive commission rate at the beginning of the class period.[148]

81.    Beyond the absence of evidence of monopoly power or market power, Professor Stiglitz provides no evidence that the commission rate itself was supracompetitive at the time of the App Store's launch. As I discussed in my opening report, the App Store faced a number of competing app marketplaces at the time of and immediately after its launch, including Google Play (launched in 2008), BlackBerry World, Nokia's Ovi Store, HP's App Catalog, and Samsung's Galaxy Store (launched in 2009), and the Windows Phone Marketplace (launched in 2010).[149] The App Store also faced competition from several established app marketplaces and game distribution platforms that launched earlier, including those for PC-based platforms like Steam (launched in 2003) and major game consoles, such as Xbox (launched in 2005), PlayStation (launched in 2006), and Nintendo Wii (launched in 2006).[150] As **Figure IV.1** illustrates, the App Store's pricing structure and the level of the commission rate chosen by Apple was consistent with these other app marketplaces.

---

[148]    Stiglitz Report, ¶ 96 ("In this section, I explain how Apple has leveraged its monopoly power to charge a supracompetitive commission rate[.]"); Stiglitz May 2025 Deposition, p. 31:17–25 ("Q. So without addressing what the earliest time was, it's your opinion that at least as of the time Apple opened the App Store in 2008, it had obtained monopoly power in your opinion? A. That's right. And […] that is what enabled it to maintain that market power. And I give examples in my report of how the evidence that, but for those things, those restraints, there would have been other distribution -- viable distribution mechanisms.").

[149]    Sundararajan Opening Report, ¶ 119.

[150]    *See* **Appendix Exhibit E** for a list of digital distribution marketplaces that entered over time.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Figure IV.1**
**Comparison of Headline Commission Rates Levied by App Marketplaces at the Time the App Store Launched[151]**

| App Marketplace | Launch Year | Commission Rate at Launch |
|---|---|---|
| Handango | 1999 | 30-40% |
| Steam | 2003 | 30-40% |
| Mobile Carriers | Early-2000s | >>30% |
| GetJar | 2004 | 0% |
| Xbox | 2005 | 30% |
| PlayStation | 2006 | 30% |
| GOG.com | 2008 | 30% |
| App Store | 2008 | 30% |
| Google Play | 2008 | 30% |
| Blackberry World | 2009 | 30% |
| Nokia Ovi Store | 2009 | 30% |
| Galaxy Store | 2009 | 30% |

> 3.     *Apple Has Openly Communicated App Store Policies and Has Not Changed Them Since Launching the App Store and In-App Purchases*

82.     Furthermore, Professor Stiglitz ignores the fact that Apple established the challenged conduct in 2008 when it launched the App Store, and in 2009 when it launched in-app purchases. Apple has consistently communicated since its launch that the App Store would

---

[151]     **Note**: Commission rates are at launch, or as of earliest reporting. Google Play Store launched in October 2008 as Android Market but did not support paid apps until February 2009. Not all these examples offered the same services, tools, and technology for developers as Apple (*see* **Appendix Exhibits F.1-F.4**). **Source:** *See* **Appendix D**.

51

be the exclusive source for iOS apps,[152] and has openly prohibited sideloading.[153] For example, news stories prior to the App Store's announcement and launch acknowledged that Apple was planning to allow third-party developers create iOS apps, but noted that Apple was expected to keep a tight control on iOS app distribution,[154] and further, stringent restrictions on app distribution were not uncommon at the time. When announcing Apple's first Software Development Kit ("SDK") for iPhone applications, Steve Jobs noted that Nokia did not allow third-party applications that could not be "traced back to known developers" to be downloaded to their phones and indicated that Apple would take a similar

---

[152]   Sundararajan Opening Report, ¶¶ 123–124.

[153]   Trial Testimony of Craig Federighi, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021 ("Epic Trial Testimony of Craig Federighi"), p. 3416:6–16 ("Q. I want to ask you, Mr. Federighi, about the consequences of opening up iOS to sideloading. Suppose that going forward, anyone and everyone could distribute apps directly to iOS device users. What impact, if any, would that have on overall security? A. As I mentioned earlier, I think it would be a pretty devastating setback for iOS security. I think we would see the kinds of effects that have been experienced on Windows and on Android, in that it would become commonplace for users to be directed to download misleading/misrepresented software from untrusted sources where they would be subject to malware."), pp. 3421:16–3422:7 ("[Q.] If app distribution were to be opened up so that sideloading is allowed for iOS devices, do you think that that would have any impact on iOS developers? A. Certainly. One of the great things about -- we think about the App Store is it's a trusted source of apps. And because of that trust and that confidence that users have, they are very free about trying out new software, about trying new apps, about downloading lots of things. And that's helped build this really unprecedented scale of activity for developers, of opportunity for developers, on the App Store. If they become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users."); "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," *Apple*, October 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_Sideloading.pdf, p. 2 ("Supporting sideloading through direct downloads and third-party app stores would cripple the privacy and security protections that have made iPhone so secure, and expose users to serious security risks.").

[154]   Gilbertson, Scott, "Apple Opens The IPhone To Third Party Apps," *WIRED*, October 17, 2007, available at https://www.wired.com/2007/10/apple-opens-the-iphone-to-third-party-apps/ ("Jobs doesn't offer many specifics but he does mention Nokia's 'digital signature' requirement for its platform, which forces apps to verify that they come from a known developer, and seems to hint that Apple may do something similar. That falls in line with a number of rumors which have speculated that third party apps for the iPhone will be closely controlled by Apple and may well only be available through the iTunes Store. Jobs does not comment on any distribution specific plans.").

approach while acknowledging that such an approach was not going to make the iPhone "totally open."[155]

83.    The fact that Professor Stiglitz ignores the competitive conditions and other relevant facts at the time Apple set the App Store's commission rate and initiated the challenged conduct undermines his theory of harm. Rather, I explain further how Apple was not a monopolist, and its business decisions were aligned with those of other app marketplaces and consistently sought to protect consumers, its brand, devices, and IP investments. Further, I explain the implications of Apple not altering its policy of centralized distribution since the App Store's launch.

**D.    Professor Stiglitz's Market Power Analysis and Use of the Foremarket and Aftermarket Framework are Flawed and Lead to Incorrect Conclusions**

84.    Professor Stiglitz's reliance on the "foremarket" and "aftermarket" framework to assess Apple's alleged monopoly power is inappropriate. His definition of the alleged aftermarket overlooks the fact that the App Store is a two-sided transaction platform while also misunderstanding the nature of apps and in-app digital content purchases as additive complements to iOS devices rather than maintenance products essential for the continued use of the product sold in the alleged foremarkets. Moreover, Professor Stiglitz incorrectly concludes that competition in the alleged foremarkets cannot constrain Apple's alleged aftermarket monopoly power (*see* **Section IV.D.2**). Even if one were to accept Professor Stiglitz's flawed market definition and choice of framework, his market power analysis is unsupported as it relies on purported direct and indirect evidence that fails to account for the App Store's two-sidedness (*see* **Section IV.D.3**). Finally, Professor Stiglitz fails to consider potential procompetitive justifications for the alleged aftermarket restraints (*see* **Sections IV.D.4** and **IV.G**). Collectively, these flaws undermine Professor Stiglitz's conclusions and render his opinions about Apple's alleged monopoly power unreliable.

---

[155]    "iPhone SDK (Software Development Kit) Announced," *Apple Community*, October 18, 2007, available at https://discussions.apple.com/thread/1183763?sortBy=rank ("Some companies are already taking action. Nokia, for example, is not allowing any applications to be loaded onto some of their newest phones unless they have a digital signature that can be traced back to a known developer. While this makes such a phone less than 'totally open,' we believe it is a step in the right direction. We are working on an advanced system which will offer developers broad access to natively program the iPhone's amazing software platform while at the same time protecting users from malicious programs.").

### 1.   Overview of Professor Stiglitz's Market Power Analysis Based on the Foremarket and Aftermarket Framework

85.   Professor Stiglitz argues that Apple has durable market power in the sale of iOS apps and in-app digital content in the U.S, which he defines as an "aftermarket" complementary to two "foremarkets"—the market for smartphones and the market for tablets sold in the U.S.[156] Professor Stiglitz cites the App Store's allegedly high operating margins per the Barnes Opening Report,[157] the allegedly supracompetitive commission rate per the Abrantes-Metz Opening Report,[158] Apple's ability to price discriminate by charging some developers a lower App Store commission rate,[159] and Apple's control over developer terms as supposed direct evidence of Apple's monopoly power in the alleged aftermarket.[160] As supposed indirect evidence of Apple's monopoly power, Professor Stiglitz points to the App Store's market share of what he defines as the relevant product

---

[156]   Stiglitz Report, ¶¶ 23–24 ("[T]here may be goods or services that complement the durable good but are purchased after the consumer has invested in the durable good. […] [T]he market for the goods and services that are subsequently purchased is referred to as an 'aftermarket.' The sale of iOS apps and in-app content in the U.S. constitute the aftermarket derived from these foremarkets (i.e., the smartphone and tablet U.S. markets). Apple possesses durable monopoly power in the aftermarket."), ¶ 142 ("[T]he direct and indirect evidence I have reviewed strongly suggests that Apple has durable monopoly power in the sale of iOS and in-app content aftermarket.").

[157]   Stiglitz Report, ¶¶ 143–144 ("Mr. Ned Barnes reports gross and operating margins for the App Store. […] Mr. Barnes's results indicate that, from 2013 to 2022, the App Store consistently achieved gross margins of at least 84.9 percent and operating margins of at least 75.3 percent. In addition, in a comparative analysis, Mr. Barnes found that the App Store's operating margin percentages exceeded those of the Google Play Store […] This finding is particularly relevant because the Google Play Store was found to have a monopoly in the distribution of Android apps and in-app content in the Epic v. Google proceedings. This evidence supports Apple having monopoly power in the sale of iOS apps and in-app content.").

[158]   Stiglitz Report, ¶ 146 ("I understand that Dr. Abrantes-Metz has estimated that the App Store would have charged a single commission rate of 13.6 percent in a competitive But-For world. Apple's 30 percent commission rate and its average commission rate of 27.2 percent both far exceed Dr. Abrantes-Metz's But-For commission rate estimate and are clearly suggestive of Apple's significant market power or monopoly power.").

[159]   Stiglitz Report, ¶ 147 ("Another hallmark of market power or monopoly power is Apple's ability to price discriminate independent of cost differences. For example, Apple reduced the commission rate for small business developers and other selected programs to 15 percent. However, these reductions did not occur in the context of a sudden change in marginal costs, implying that before the reductions Apple was charging at least twice the marginal costs—an extraordinary 'power to price,' which is also evidence of market power.").

[160]   Stiglitz Report, ¶¶ 149–150 ("Apple has set forth a number of restrictions in its DPLA, which developers must sign before distributing their apps on the App Store, and in its App Store Review Guidelines. […] Economic theory implies that these restrictions would not be imposed if there were competition in the form of alternatives to the App Store.").

market,[161] and also cites significant barriers to entry for the sales of iOS apps and in-app digital content.[162]

86.    Professor Stiglitz further claims that Apple's alleged monopoly in the aftermarket is not constrained by competition in the relevant foremarkets.[163] Professor Stiglitz claims that Apple has market power in each of the alleged foremarkets (smartphones and tablets respectively), citing Apple's allegedly high profit margins and market shares. [164] Professor Stiglitz further asserts that the ability of competition in the foremarket to constrain Apple's market power in the aftermarket is limited by information frictions because consumers are generally unaware of the challenged conduct in the aftermarket and "face significant information costs that likely hinder their ability to accurately predict the life-cycle costs of using iOS devices."[165] He also claims that the high costs of switching from iOS to non-iOS devices limit the ability of consumers to discipline Apple's aftermarket conduct, even if they discover supracompetitive aftermarket pricing after their initial foremarket purchase.[166]

---

[161]    Stiglitz Report, ¶ 235 ("iOS device users do not have reasonable substitutes for purchasing iOS apps and in-app content through the App Store. Consequently, Apple holds nearly 100 percent market share in the iOS apps and in-app content aftermarket.").

[162]    Stiglitz Report, ¶¶ 236–238 ("Apple has established significant artificial barriers to entry for the sale of iOS apps and in-app content. […] These artificially erected barriers to entry have eliminated rival entry and insulated Apple from competition in the relevant aftermarket. As a result, Apple was able to maintain its monopoly position for more than a decade.").

[163]    Stiglitz Report, ¶ 242 ("Apple does in fact have market power in the relevant foremarkets for smartphones and tablets. As such, these relevant foremarkets lack sufficient competitive forces to discipline Apple's monopoly power in the aftermarket.").

[164]    Stiglitz Report, Section VI.

[165]    Stiglitz Report, ¶ 26 ("Exacerbating the problem of constraining Apple's market power in the aftermarket through competition in the foremarkets are what might be called information frictions. When purchasing iOS devices, consumers are generally unaware of Apple's challenged conduct and face significant information costs that likely hinder their ability to accurately predict the life-cycle costs of using iOS devices."), ¶¶ 307–308 ("[E]vidence suggests that [consumers] are unlikely to accurately incorporate aftermarket pricing into their foremarket purchase decision. [E]vidence on consumers' general unawareness of Apple's anticompetitive restrictions in the aftermarket [suggest] that [consumers] are unlikely to incorporate this information into their foremarket purchase decision.").

[166]    Stiglitz Report, ¶¶ 26, 309 ("The costs of switching from an iOS mobile device to a non-iOS mobile device are significant, further enhancing Apple's ability to engage in monopolistic conduct in the aftermarket, regardless of whether it has market power in the relevant foremarket.").

> **2.** *Professor Stiglitz's Application of the Foremarket and Aftermarket Framework Is Inappropriate Because It Ignores the App Store's Two-Sidedness*

87. Professor Stiglitz's definition of the relevant "aftermarket" as comprising iOS apps and in-app digital content is inconsistent with the product offered by the App Store and the fact that the App Store is a two-sided transaction platform.

> **a)** Overview of the Foremarket and Aftermarket Framework

88. Aftermarket products or services refer to complementary goods and services, such as maintenance, upgrades, and replacement parts that are required to maintain or operationalize a durable foremarket product.[167] Examples of foremarket and aftermarket pairs include computer printers and toner, cameras and film, and photocopiers and repair services.[168] Aftermarket products and services typically have a finite life and need to be repurchased periodically.[169] Because their acquisition is typically essential for the continued use of the durable foremarket product, they are often referred to as "maintenance" products.[170]

89. The foremarket and aftermarket framework may be relevant in antitrust settings in which a seller of the durable foremarket product participates in the relevant aftermarket as well and may display ex-post opportunistic behavior in the aftermarket. Even when the

---

[167] Cabral, Luís, "Aftermarket Power and Foremarket Competition," *International Journal of Industrial Organization*, Vol. 35, 2014, pp. 60–69, p. 60 ("Typically, the foremarket corresponds to a durable good, whereas the aftermarkets correspond to non-durable products or services."); Klein, Benjamin, "Market Power in Aftermarkets," *Managerial and Decision Economics*, Vol. 17, No. 2, 1996, pp. 143–164, p. 143 ("Many recent antitrust cases involve aftermarkets - the provision of spare parts or service for use with a previously purchased durable good.").

[168] Cabral, Luís, "Aftermarket Power and Foremarket Competition," *International Journal of Industrial Organization*, Vol. 35, 2014, pp. 60–69, p. 60 ("The printer–toner example is one of many instances of industries characterized by a foremarket that is complemented by one or several aftermarkets. […] Other than printers, examples include cameras and film, photocopiers and repair service, videogame consoles and games.").

[169] Cabral, Luís, "Aftermarket Power and Foremarket Competition," *International Journal of Industrial Organization*, Vol. 35, 2014, pp. 60–69, p. 60 ("Typically, the foremarket corresponds to a durable good, whereas the aftermarkets correspond to non-durable products or services.").

[170] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1289 ("[The] 'maintenance aftermarkets' [are] aftermarkets intended to merely upkeep or functionalize durable goods. […] [M]aintenance aftermarkets are required to keep the original durable good operational."), p. 1297 ("[T]he aftermarket is typically service and parts to maintain and upkeep the primary good or complements needed to operationalize the primary good such as ink for copiers.").

foremarket is competitive, the relevant theory of harm is based on the idea that a seller may nevertheless exercise aftermarket market power if consumers face high switching costs following the foremarket purchase or are unable to anticipate total lifecycle costs of aftermarket purchases at the time of the foremarket purchase.[171] The foremarket seller may exploit this consumer lock-in through unanticipated changes that follow investments made in durable foremarket products, for example, by raising the prices of the aftermarket products.[172]

90.   More specifically, in Professor Stiglitz's definition, iOS apps and in-app digital content constitute a single brand aftermarket.[173] In this case, consistent with the economic literature, the factors that are generally considered when determining a foremarket seller's ability to exercise market power in the aftermarket are (i) consumers' general unawareness

---

[171]   Borenstein, Severin, Jeffrey K. Mackie-Mason, and Janet S. Netz, "Antitrust Policy in Aftermarkets," *Antitrust Law Journal*, Vol. 63, 1995, pp. 455–482, p. 467 ("If switching costs are high, manufacturers have some room to raise their aftermarket prices or impose other onerous conditions (such as ties) without substantially reducing future profits when their incumbent equipment owners replace or upgrade equipment. This is so because the customer weighs the gain from switching to a manufacturer with lower equipment or aftermarket prices against the cost of switching. The lower the cost of aftermarket policies relative to switching costs, the fewer customers the firm will lose due to high aftermarket prices."), p. 468 ("[T]he less well informed new customers are about aftermarket policies, the less those policies will affect customer demand, and the higher will be the firm's optimal aftermarket prices.").

[172]   Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1291 ("Aftermarkets occupy a strange space in antitrust. They represent a particular construct of 'markets' that is not based on ex ante substitution but a lack of *ex post* options. Thus, the idea of antitrust aftermarkets explicitly recognizes that consumers can become 'locked in' to a particular durable good, and, consequently, they can be subject to *ex post* opportunism on complementary goods and services needed to maintain or operationalize the durable good. […] [Hold-up occurs when] once two parties enter into a contractual arrangement that involves product-specific investments, there is a fundamental 'transformation' in the relationship. Specifically, the relationship moves from one characterized by *ex ante* competition to one with the potential for *ex post* opportunism."); Borenstein, Severin, Jeffrey K. Mackie-Mason, and Janet S. Netz, "Exercising Market Power in Proprietary Aftermarkets," *Journal of Economics & Management Strategy*, Vol. 9, No. 2, 2000, pp. 157–188, p. 158 ("Once a customer purchases a particular brand of complex, durable equipment, she is likely to be 'locked in' to that manufacturer to some extent. There are often significant costs of switching to another brand: retraining, sunk investments in custom software, capital losses on the sale of the used equipment, etc. It would seem that these switching costs could provide the manufacturer with room to collect some monopoly rents by raising aftermarket prices above cost.").

[173]   Stiglitz May 2025 Deposition, p. 165:6–11 ("The, the question I asked was is there a relevant antitrust market for apps and in-app purchase through the App Store? A single brand as, as they use that term. And the answer is that is a market and that's a relevant antitrust market. There are other markets that one could define and one could study, but I didn't study them.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

of how the foremarket seller's policies would affect their aftermarket choices,[174] (ii) the inability of consumers to anticipate total lifecycle costs at the time of the foremarket product purchase due to information frictions,[175] (iii) the presence of high switching

---

[174]    Epic Ninth Circuit Opinion, pp. 33–34 ("In sum, to establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market."), p. 36 ("[T]he district court did not err when it required Epic to produce evidence regarding a lack of consumer knowledge of Apple's app-distribution and IAP restrictions. Such a requirement comes directly from *Kodak* and *Newcal.* The former stated that it is 'crucial' that aftermarket restrictions are not 'generally known.' *Kodak*, 504 U.S. at 477 n.24. The latter placed the burden on a plaintiff to 'rebut the economic presumption that consumers make a knowing choice to restrict their aftermarket options' when they make a foremarket purchase. *Newcal,* 513 F.3d at 1050."). *See also*, Jin Rebuttal Report, Section 5.1.

[175]    Opinion, *Eastman Kodak Co. v. Image Technical Services, Inc., et al.*, No. 90–1029, United States Court of Appeals for the Ninth Circuit, October 1991 ("Kodak Opinion"), pp. 473–476 ("Respondents offer a forceful reason why Kodak's theory, although perhaps intuitively appealing, may not accurately explain the behavior of the primary and derivative markets for complex durable goods: the existence of significant information and switching costs. […] For the service-market price to affect equipment demand, consumers must inform themselves of the total cost of the 'package'—equipment, service, and parts—at the time of purchase; that is, consumers must engage in accurate lifecycle pricing. […] Given the potentially high cost of information and the possibility that a seller may be able to price discriminate between knowledgeable and unsophisticated consumers, it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the machine."). *See also*, Shapiro, Carl, "Aftermarkets and Consumer Welfare: Making Sense of Kodak," *Antitrust Law Journal*, Vol. 63, No. 2, 1995, pp. 483–511, p. 487 ("Economics currently offers four theories of aftermarket power […] (2) The 'Costly Information' Theory. There are a large number of myopic or poorly informed buyers who fail to account for aftermarket costs when purchasing equipment. […] Costly information severs or at least weakens the link between aftermarkets and equipment markets, permitting a firm in a competitive equipment market to have aftermarket power."), p. 493 ("[T]he circumstances in which there is a significant market failure based on poor buyer information may not be all that common. Buyers have strong incentives to purchase equipment based upon the total cost of ownership of the equipment over its lifetime."); Jin Rebuttal Report, Section 5.1.

costs, [176] and (iv) a lack of competition in the foremarket. [177] In contrast with (i), if aftermarket restrictions are clearly disclosed and agreed upon at the time of the foremarket purchase and there are no sudden policy shifts, the arguments associated with consumers being susceptible to harm because they are "locked-in" to a particular foremarket seller may not be appropriate. [178] Similarly, if consumers do not need to participate in the

---

[176]   Kodak Opinion, p. 476 ("A second factor undermining Kodak's claim that supracompetitive prices in the service market lead to ruinous losses in equipment sales is the cost to current owners of switching to a different product. […] If the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands. Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers. *See also*, Shapiro, Carl, "Aftermarkets and Consumer Welfare: Making Sense of Kodak," *Antitrust Law Journal*, Vol. 63, No. 2, 1995, pp. 483–511, pp. 488, 490 ("The surprise theory starts from the assumption that buyers in the aftermarket are vulnerable, and asks whether the equipment manufacturer will find it profitable to unexpectedly change its policies so as to exploit them. The firm that takes advantage of its installed base of customers who find it costly to switch to other brands is said to engage in installed-base opportunism. […] Economics has much to say about installed-base opportunism. First, a manufacturer's ability to exploit any given customer cannot exceed (in present-value terms) that customer's brand-switching costs."); Jin Rebuttal Report, Section 5.1.

[177]   Capobianco, Antonio, Satoshi Ogawa, and Carolina Abate, "Competition Issues in Aftermarkets - Note from BIAC," *Organisation for Economic Co-operation and Development (OECD)*, 2017, available at https://one.oecd.org/document/DAF/COMP/WD(2017)51/en/pdf, ¶ 39 ("Even if competition on the primary market is not sufficient to dissipate all aftermarket profits as originally claimed by the Chicago school, it remains a relatively strong protection for customers. Indeed, the more competitive the primary market, the more the rebates in the primary market are likely to offset the aftermarket profits, since firms will tend to compete away the aftermarket rents to lock in customers. Thus, when there is low competition on the primary market, the harmful effects of anticompetitive practices on the aftermarket are more likely to be strong."). *See also*, Jin Rebuttal Report, Section 5.1.

[178]   Rule 52 Order After Trial on the Merits, *Epic Games Inc., v. Apple Inc.*, No. 4:20–cv–05640-YGR, United States District Court for the Northern District of California, September 10, 2021 ("Epic Order"), p. 128 ("Four years after Eastman Kodak, the Fifth Circuit in United Farmers Ass'n, Inc. v. Farmers Insurance Exchange, 89 F.3d 233, 238 (5th Cir. 1996) rejected a claim that insurance agents were 'locked-in' to a particular insurance company because the agents 'would clearly have become aware of [the alleged anticompetitive] policy long before they faced significant switching costs.'"). *See also*, Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, pp. 1298, 1306 ("[I]f Kodak always had a policy of requiring proprietary parts and service for its photocopiers, then there would be no antitrust issue as consumers would have complete information available to them when making their initial purchase decisions. […] Generally speaking, the more consumers consider the aftermarket as integrated with the primary product, the less likely there will be consumer myopia and post-sale lock-in due to information asymmetries."); Klein, Benjamin, "Market Power in Aftermarkets," *Managerial and Decision Economics*, Vol. 17, No. 2, 1996, pp. 143–164, p. 147 ("[W]hen customers are fully informed about aftermarket prices, a hold-up is not possible. If consumers know at the time they make their equipment purchases that later they will have to purchase aftermarkets parts and services from the same manufacturer and if consumers also know the prices they will be charged for these parts and services, then manufacturers do not have the ability to hold up consumers. Consumers can take account of known aftermarket conditions before they make their initial equipment purchase and become locked in to a particular brand in either of two ways. Informed consumers may attempt to control aftermarket prices contractually, for example, by negotiating long-term aftermarket prices as part of the initial equipment purchase.").

aftermarket in order to continue to derive value from the durable product they purchased in the foremarket, the arguments associated with consumers being susceptible to harm from opportunistic aftermarket seller behavior are not appropriate because consumers can respond to any opportunistic aftermarket seller behavior by simply choosing not to participate in the aftermarket.

91.     I discuss these points and how they apply to the facts of this case below.

b)     Professor Stiglitz's Definition of the Aftermarket Ignores that the Relevant Product for the App Store Is a Transaction

92.     Putting aside for now the question of whether Professor Stiglitz's theory of harm based on the foremarket and aftermarket framework is appropriate, a question I address later in this report, Professor Stiglitz nevertheless mistakenly asserts that the App Store's products are iOS apps and in-app digital content. The App Store's actual relevant product is simultaneous transactions between developers and consumers (*see* **Section IV.B**). This flaw undermines the reliability of Professor Stiglitz's conclusions relating to Apple's alleged exercise of monopoly power. To assess whether Apple has in fact exerted monopoly power in the alleged aftermarket, one must first identify the correct relevant aftermarket product.

93.     This incorrect definition of the aftermarket as comprising iOS apps and in-app digital content leads Professor Stiglitz to draw mistaken conclusions about switching costs and lock-in faced by Apple's consumers when considering transactions that may be conducted via the App Store. Consumers can (and do) complete transactions outside of the App Store that they could have conducted within the App Store and that involve iOS devices without having to incur switching costs (*see* **Section IV.B.3**). By incorrectly focusing on just one side of a two-sided platform, and thus by ignoring the developer side of the App Store, Professor Stiglitz fails to acknowledge that a majority of iOS developers of varying sizes multi-home across platforms as shown in **Figure IV.2** below. Based on data from 2015, among the developers that multi-home, 97 percent also develop apps and in-app digital content for Android, 33 percent in HTML5, 26 percent for Windows, and the remaining 20 percent for other systems.[179] Therefore, there are numerous substitutes involving non-iOS

---

[179]   Apple, "App Store Developers Profiling Research," March 2015, APL-APPSTORE_09126673–774, at 684.

devices for transactions that might have involved iOS devices and been conducted within the App Store (*see* **Section IV.B.3**).

**Figure IV.2**
**Percent of App Store Developers that Multi-Home by Size[180]**



■ Multi-Homing   ■ No Multi-Homing

| | Total<br>n = 3,556 | Large<br>n = 182 | Mid<br>n = 721 | Small<br>n = 2,653 |
|---|---|---|---|---|
| No Multi-Homing | 40% | 14% | 30% | 46% |
| Multi-Homing | 60% | 86% | 70% | 54% |

94. Perhaps as a consequence of mixing up the products and services offered by one side of the two-sided App Store (the developers) with the relevant product offered by the App Store itself (transactions), Professor Stiglitz also fails to recognize that Apple is not the seller of a vast majority of his purported aftermarket products. Rather, over 99.9 percent of iOS apps and in-app digital content available on the App Store are developed and sold by third-party developers who compete on various factors such as app quality, innovation, and price.[181]

95. The setting of the App Store thus contrasts with typical settings where the foremarket and aftermarket framework is applied, and where the foremarket seller is either the primary supplier of aftermarket products and/or can restrict aftermarket competition. For example,

---

[180]   Apple, "App Store Developers Profiling Research," March 2015, APL-APPSTORE_09126673–774, at 683.

[181]   Sundararajan Opening Report, ¶ 150.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a foremarket seller may limit its aftermarket competitors from accessing replacement parts it is the exclusive provider for, thereby reducing competition in the aftermarket and charging supracompetitive prices in the aftermarket. [182] In contrast, as a two-sided transaction platform whose product is a simultaneous transaction between a developer and a consumer, the App Store has a natural economic incentive to encourage the creation and adoption of apps and in-app digital content and the enhancing of competition in Professor Stiglitz's alleged aftermarket. Other than claiming that Apple's price tiers allegedly restrict competition between developers, [183] Professor Stiglitz provides no evidence that Apple has taken steps to restrict competition with or among developers, the sellers in his purported

---

[182] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1293 ("Kodak achieved this by withholding needed parts from ISOs and also pressuring third-party manufacturers of parts to do the same. This left the ISOs in a disadvantaged position and was effectively a method to raise the costs of these rivals."); Carlton, Dennis W. and Michael Waldman, "Competition, Monopoly, and Aftermarkets," *Journal of Law, Economics, & Organization*, Vol. 26, No. 1, April 2010, pp. 54–91, p. 54 ("A series of court cases concerning firms, such as Kodak, Data General, and Xerox, have focused attention on aftermarkets. […] A typical allegation is that the durable goods producer stops alternative producers from selling the complementary product with the result that the original durable goods producer monopolizes the aftermarket.").

[183] Stiglitz Report, ¶ 99 ("In particular, I find that Apple's restrictive price tiers limit competition between iOS app developers and reduce the variety of products available to consumers.").

aftermarket. Rather, as I discussed in my opening report, Apple has in fact made substantial and persistent investments towards facilitating entry by developers.[184]

> c) Professor Stiglitz Overlooks the Fundamental Differences between the Apps and In-App Digital Content and Typical Aftermarket Products

96. Professor Stiglitz's foremarket and aftermarket analysis ignores fundamental differences between typical aftermarket products and iOS apps and in-app digital content with respect to both the characteristics of the products and the way they are supplied.[185]

---

[184] Sundararajan Opening Report, ¶¶ 134, 151, 188. *See also*, Opening Expert Report and Declaration of James Malackowski, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Malackowski Opening Report"), ¶ 65 ("In March 2008, Apple introduced the new iPhone Developer Program. It was accompanied by Apple's release of an SDK that Apple had created for third-party developers to create native applications for the iPhone. Apple's SDK offered a framework and broad array of APIs and tools enabling independent software developers to design applications for the iPhone. […] According to Apple, within 'the first four days after its launch, there were more than 100,000 downloads of the SDK, a number that ballooned to 250,000 in a little over three months as iPhone application developers proliferated.'"); Epic Trial Testimony of Phillip Schiller, pp. 2730:24–2731:8 ("Q. And what is a Software Development Kit? A. It includes a number of resources for developers to write software, resources like the APIs that we have been talking about, developer tools like Xcode. It includes documentation to help understand the APIs and their functions. Often has sample code to help a developer start to write their application or learn how to use an API. Q. And do the Software Development Kits -- are they made up of Apple's intellectual property? A. Yes."); Trial Testimony of Michael Schmid, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021 ("Epic Trial Testimony of Michael Schmid"), p. 3239:6–22 ("Q. And we'll go through the categories you mentioned, but why does Apple make these investments in developers? A. We want to be the best platform to develop a game or app in the world. Q. Okay. And does Apple have to compete for developers to -- to compete, in other words, for developers to come to the platform? A. Absolutely. I think that it would be silly to suggest any developer that's looking to grow a business wouldn't be thinking about mobile as a huge opportunity. However, there's lots of options even within mobile. We want to do more than just be a -- a checkbox for a platform that a developer is going to ship a game or app on. We want to be the -- the primary platform. We want to be the place where they're spending time and energy and -- and committing to our user base that they're going to really focus on building a great experience for our users on the App Store.").

[185] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327 & Antitrust, p. 1289 ("While app stores and apps are aftermarkets in an economic sense-that is, complementary products to a primary product purchased after the primary product, they are not the type of aftermarkets ruled on in *Kodak* and subsequent antitrust cases invoking the *Kodak* precedent.").

97.     Apps and in-app digital content are characterized in the economics literature as "additive" products.[186] Downloading paid apps and accessing in-app digital content is not essential for the continued functioning of iOS devices. Rather, iOS apps and in-app digital content enhance and expand for consumers the value and functionality of their general-purpose iOS devices.

98.     As I discussed in my opening report, when the iPhone was launched in 2007, it was a pioneering device that provided consumers with access to features that surpassed those of existing mobile phones.[187] Saliently, the introduction of the iPhone and iOS[188] accelerated a shift in the mobile technology industry toward providing general-purpose computing

---

[186]   Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327 & Antitrust, p. 1289 ("Specifically, app store aftermarkets are additive in value while maintenance aftermarkets are not—in that app store aftermarkets increase the value of the primary product, often substantially. In contrast, maintenance aftermarkets are required to keep the original durable good operational."), p. 1307 ("The second point of difference between app stores and Kodak-like aftermarkets is the inherent function of the aftermarket. Specifically, we could label Kodak-like aftermarkets as 'maintenance aftermarkets,' that is, aftermarket goods and services used to upkeep, maintain, and operationalize the primary durable good. This description fits parts, repair services, and complements like ink and paper for printers. App stores, in contrast, conform with aftermarkets that are additive in value, which we could label as 'additive aftermarkets.'").

[187]   Sundararajan Opening Report, ¶ 111. *See also*, MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Teaching Note - Research in Motion: The Mobile OS Platform War," *Harvard Business School*, November 8, 2013, pp. 1–15, pp. 7–8 ("It could be pointed out that Android-based phones and iPhones have successfully implemented features that have not traditionally been available on BlackBerries [sic]. Previous to that, however, RIM incorporated features into the BlackBerry that were not previously available in any existing device. […] What additional functionalities the iPhone and/or Android phones have added that the BlackBerry generally has not? These may include gaming platform, GPS (via Google Maps and other apps), digital camera (still photos and video), video phone, music (MP3) player, video player, video editing, sales displays, productivity software platform, etc. […] BlackBerry, at the time of the case, represents a 'previous generation' device, while the iPhone and Android-based phones could be considered 'current generation'."); "Apple Reinvents the Phone with iPhone," *Apple*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/. *See also*, Epic Trial Testimony of Phillip Schiller, p. 2720:2–20 ("A. […] So those were the -- sort of the three leading functions we were trying to create with iPhone: A new generation phone, a replacement for iPod functionality, and the internet in your pocket. Q. And you mentioned BlackBerry. Prior to the launch of the iPhone, were there other mobile devices on the market? A. Yes. Q. Did any of them combine the features you just described? A. No. […] Q. And, Mr. Schiller, did Apple develop a unique operating system for the iPhone? A. Yes.").

[188]   When the iPhone was launched in 2007, its operating system was called the "iPhone OS." The name was changed to "iOS" in June 2010. For simplicity, I refer to both the iPhone OS and iOS as "iOS." Chartier, David, "IPhone OS Gets New Name, Video Calling," *Macworld*, June 7, 2010, available at https://www.macworld.com/article/205857/iphone_os_4_wwdc.html In addition, although Apple provides distinct operating systems for iPhones (iOS) and iPads (iPadOS), I use the term iOS to refer to iOS and iPadOS collectively throughout this report unless otherwise stated.

devices running operating systems,[189] and the introduction of the App Store in 2008 further cemented this shift, enhancing the experience of consumers by enabling the seamless installation of a wide variety of iOS third-party applications on the general-purpose iPhone.[190] The App Store also extended this functionality to other iOS devices such as the iPod Touch and, later, the iPad. The installation of third-party apps on the iPhone and iPad (and the iPod Touch when it was available) expanded their value to consumers, and continues to do so.[191] For example, the iPhone comes pre-installed with communication apps such as Phone (for voice calls), Messages (for text messages), and FaceTime (for video calls).[192] While these apps provide the basic communication capabilities expected from a smartphone, consumers can expand the capabilities of their devices by installing apps like Zoom, Microsoft Teams, or Slack to enable professional-grade video conferencing for large group meetings and team collaboration.[193] Similarly, privacy-conscious consumers can install encrypted messaging apps like Telegram and Signal to

---

[189] MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 8 ("The product offered a new way of interfacing with a smart phone; instead of trackballs and keypads as had become the norm for the BlackBerry and Palm smart phones, the iPhone had a touch screen as its primary interface. […] With this extra screen real estate, users could see and do more without having to access additional screens. While previous smart phones had been about e-mailing and telephoning, the touch screen focused users' attentions on the device's software—'apps' in the parlance of the iPhone.").

[190] Sundararajan Opening Report, ¶ 118. *See also*, "The App Store Turns 10," *Apple*, July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/

[191] For example, apps can extend the core functionality of the devices into new domains: additional productivity tools (e.g., Microsoft Office, Notion), additional communication services (e.g., WhatsApp, Slack), social media platforms (e.g., Facebook, TikTok), education (e.g., Duolingo, Khan Academy), health and fitness (e.g., MyFitnessPal, Headspace), entertainment (e.g., Netflix and Candy Crush), and countless others. Similarly, in-app digital content—such as a Headspace subscription or additional game moves in Candy Crush—further expands the value and functionality of apps.

[192] Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf, p. 21.

[193] Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf, p. 20 ("Consumers rely on a combination of phone calls (with or without VoIP), messages (SMS, MMS, or over internet), audio messages, and video calls to suit their professional and social needs and preferences. Popular communication apps offer most of these features and provide users with alternatives to Apple's built-in communication apps. […] For example, the coronavirus pandemic accelerated the need for group video calls to facilitate remote work and socially distanced gatherings, making Zoom the most downloaded free iPhone app in 2020, as well as accelerating the number of users of workplace-focused communication apps, such as Microsoft Teams and Slack.").

enhance communication security beyond what the Messages app provides.[194] Consumers have the option to install many of these apps on the iPad as well. The iPhone and iPad have the Weather app pre-installed for basic weather forecasting. Apps like Windy, Surfline, or SnowForecast allow professional pilots, sailors, skiers, and other outdoor professionals to access hyper-local and detailed environmental forecast data, including about wind gusts, wave heights, and snow conditions.[195] The iPad has the Notes app pre-installed, providing the device with basic functionality for recording text and handwritten notes. However, apps like Notability or GoodNotes provide a more advanced note-taking experience, with tools like audio recordings synced to notes, AI-generated note summaries, and advanced annotation and handwriting features with the Apple Pencil on the iPad, expanding the device's basic capabilities.[196] Third-party apps and in-app digital content can therefore be downloaded by consumers to expand and enhance the core capabilities of the iPhone and iPad.

99.     Third-party apps and in-app digital content can also expand the capabilities of the iPhone and iPad by enabling them to serve entirely new and diverse purposes. For example, apps like Calm and Headspace offer guided meditations and mindfulness exercises,[197] allowing the device to become one that provides personal wellness coaching. Apps like Sweat, BetterMe, and Daily Yoga provide consumers with personal fitness and workout routines,

---

[194]   Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf, pp. 20–21 ("Recently, growing concerns about privacy have led to surges in downloads of encrypted messaging apps like Signal and Telegram.").

[195]   "Weather & Radar on the App Store," *Apple*, available at https://apps.apple.com/us/app/windy-com-weather-radar/id1161387262; "Snow-Forecast.com on the App Store," *Apple*, available at https://apps.apple.com/us/app/snow-forecast-com/id418032026; "Surfline: Wave & Surf Reports," *Apple*, available at https://apps.apple.com/us/app/surfline-wave-surf-reports/id393782096.

[196]   "Notability: Smarter AI Notes," *Mac App Store*, available at https://apps.apple.com/us/app/notability-smarter-ai-notes/id360593530; "Goodnotes 6: AI Notes & Docs," *Mac App Store Preview*, available at https://apps.apple.com/us/app/goodnotes-6-ai-notes-docs/id1444383602.

[197]   Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf, p. 40 ("Mindfulness apps, which focus on users' mental health, providing guided meditation and mindfulness exercises, have become very popular. Calm and Headspace, two of the most popular mindfulness apps, have more than 7 million and 3 million monthly active iPhone users respectively.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

enabling their devices to be used as personal fitness tools.[198] Apps like Procreate and Astropad Studio, both exclusive to the iPad, enable consumers to draw and illustrate with high precision using the Apple Pencil, thus transforming the device into a professional creative tool used by artists, designers, and illustrators.[199] Apps like Toast POS and Vend POS, both designed for the iPad, transform the device into a dedicated point-of-sale terminal, enabling restaurants and retailers to manage orders, facilities, inventory, and payments with speed and efficiency.[200]

100.  These examples illustrate that apps and in-app digital content available on the App Store are *additive* to the functionality of iOS devices and extend the capabilities of the device. In contrast, traditional foremarket products *depend* on aftermarket services and replacement parts merely to maintain their core functionality. A photocopier, for example, cannot continue to operate without ink, replacement parts, or maintenance services. Further, even upon acquisition of these aftermarket products, the capabilities of the photocopier remain limited to its original purpose of making copies.

101.  Additionally, many apps and in-app digital content are durable, as Professor Stiglitz's testimony confirms.[201] Rather than requiring periodic replacement like copier toner or razor blades, many apps and in-app digital content can be used indefinitely and provide

---

[198]  Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf, p. 39 ("Guided workout apps (e.g., Nike Training Club and Sweat, which both received Editors' Choice awards) offer users access to on-demand and live workout videos taught by fitness instructors. This provides users with a convenient alternative to attending a gym and allows them to exercise at their homes. Our research and quantitative analyses show that these types of apps are popular among users, with many having more than 1 million monthly active iPhone users.").

[199]  "Procreate on the App Store," *Apple*, available at https://apps.apple.com/us/app/procreate/id425073498; "Astropad Studio," *App Store Preview*, available at https://apps.apple.com/us/app/astropad-studio/id1181582576.

[200]  "Toast Tables," *App Store Preview*, available at https://apps.apple.com/us/app/toast-tables/id1588284147; "Lightspeed Retail POS (X)," *App Store Preview*, available at https://apps.apple.com/us/app/lightspeed-retail-pos-x/id920603929.

[201]  Stiglitz May 2025 Deposition, p. 53:5-13 ("Q. Does a durable good have to be a physical good? A. I don't see why it would have to be a physical good. The examples that, that, you know, that are in the literature are, are mostly physical goods. But as we move in the digital age, it's not obvious to me, but I hadn't thought about that. Q. Are apps durable goods? A. Yeah, in that sense apps can be thought of as a, as a durable good that can last for a while.").

ongoing value to consumers.[202] In fact, the lifetime of many apps and in-app digital content exceeds the lifetime of the device a consumer may own when they acquire the app or in-app digital content, which is why the App Store allows consumers to restore or reinstall previously downloaded apps and in-app digital content across multiple devices and after switching to a new device.[203] The products Professor Stiglitz defines as being part of his purported aftermarket, namely iOS apps and in-app digital content, are thus quite different from the aftermarket products that are the typical focus when applying the foremarket and aftermarket framework,[204] undermining the applicability of the associated theory of harm, as I explain in what follows.

102.    In addition, a vast majority of these purported aftermarket products are free, as Professor Stiglitz testified.[205] ███ percent of iOS device users do not pay for apps or make in-app

---

[202]  In economics, a good is classified as a "durable good" if it can be stored and used repeatedly over a long period of time. Furniture and appliances are examples of durable goods. Software, including apps and in-app digital content, can be considered a durable good because it can be used repeatedly for an extended period of time without losing its value. In the case of apps and in-app digital content, so long as developers do not restrict the period of use of an app, apps can "live forever." European Central Bank, "Economic and Monetary Developments," 2014, pp. 58–61, p. 58 ("Consumer goods are classified in three categories, depending on their durability. Durable consumer goods typically include commodities with an expected lifetime of more than three years and with a relatively high value (e.g. cars, furniture, home appliances or electrical and electronic devices). Semi-durable and non-durable consumer goods have an expected lifetime of between one and three years and less than one year, respectively, and a comparatively lower value."); "Durable Goods," *Bureau of Economic Analysis*, April 13, 2018, available at https://www.bea.gov/help/glossary/durable-goods (Defining "durable goods" as "Tangible products that can be stored or inventoried and that have an average life of at least three years."); Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, Pearson, 2013, 8th Ed., p. 42 (Examples of durable goods include "automobiles [and] appliances" while examples of nondurable goods include "food, fuel, [and] clothing."). *See also*, Stiglitz May 2025 Deposition, p. 53:11–13 ("Q. Are apps durable goods? A. Yeah, in that sense apps can be thought of as a, as a durable good that can last for a while.").

[203]  Sundararajan Opening Report, ¶ 156. *See also*, "Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing ("Access purchases across all your devices[:] After you sign in with you Apple Account, you can redownload your previously purchased apps, music, and movies, and TV shows [*sic*].").

[204]  Cabral, Luís, "Aftermarket Power and Foremarket Competition," *International Journal of Industrial Organization*, Vol. 35, 2014, pp. 60–69, p. 60 ("Typically, the foremarket corresponds to a durable good, whereas the aftermarkets correspond to non-durable products or services.").

[205]  Stiglitz May 2025 Deposition, p. 167:8–10 ("Q. Do you agree that most apps in the App Store are free? A. Yes.").

digital content purchases,[206] and as of 2023, more than ▮▮▮ of apps on the U.S. App Store were free to download without in-app purchases.[207]

103.  Granted, there are maintenance functions associated with the iPhone and iPad. For example, the operating system of these devices must be periodically updated to maintain the security and performance of the devices.[208] Correspondingly, apps like Phone, Messages, and Weather must be periodically updated. However, such maintenance is provided by Apple for free. Thus, any transactions associated with the App Store that involve downloads that are analogous to the acquisition of aftermarket maintenance products in the traditional foremarket and aftermarket framework generate no incremental "aftermarket" revenue for Apple.[209]

104.  Collectively, these facts and statistics undermine the applicability to the current setting of the foremarket and aftermarket framework that Professor Stiglitz relies on. As I discuss in **Section IV.D.2.a**, this framework may address settings in which there may be antitrust concerns that a foremarket seller can exploit locked-in consumers by raising aftermarket

---

[206]  Hitt Opening Report, ¶ 59 ("[A]ccording to the App Store Transaction Data, there are approximately ▮▮ ▮▮▮ consumer accounts that have made a free or paid transaction through the U.S. Storefront of the App Store (i.e., downloaded an app or made a digital in-app purchase) during the portion of the Class Period for which I have transaction data. Of these, approximately ▮▮▮▮▮ consumer accounts have positive billings on net. Thus, t▮▮▮▮▮▮▮▮▮ accounts, ▮▮▮▮▮, have not spent any money through the U.S. App Store.").

[207]  Hitt Opening Report, Footnote 420 ("Between the first year of the App Store and 2023, the share of apps that were free-to-download without in-app purchases rose from 27.8 percent to ▮▮▮▮.").

[208]  "Apple Security Releases," *Apple*, June 12, 2025, available at https://support.apple.com/en-us/100100 ("Keeping your software up to date is one of the most important things you can do to maintain your Apple product's security.").

[209]  "Introduction to Apple Platform Security," *Apple*, December 19, 2024, available at https://support.apple.com/guide/security/intro-to-apple-platform-security-seccd5016d31/web ("Every Apple device combines hardware, software, and services designed to work together for maximum security and a transparent user experience in service of the ultimate goal of keeping personal information safe. For example, Apple-designed silicon and security hardware powers critical security features. And software protections work to keep the operating system and third-party apps protected. Finally, services provide a mechanism for secure and timely software updates, power a protected app ecosystem, and facilitate secure communications and payments. As a result, Apple devices protect not only the device and its data but the entire ecosystem, including everything users do locally, on networks, and with key internet services."); Epic Trial Testimony of Phillip Schiller, p. 2744:9–17 ("Q. And Mr. Jobs says, 'This is an international rollout. Everything we do will be in all the countries we are in with iPhones. This is not an open-source project. This is a for-profit project. Even though we are providing this as a free software update to all the iPhone customers, hopefully people will think iPhones are even more valuable and buy more of them.' Was that a statement that Mr. Jobs made? A. He did.").

69

prices or restricting aftermarket competition in a manner that consumers may not have anticipated. However, in the current setting, the apps essential to core iOS device functionality are pre-installed and free, the majority of apps available on the App Store that can expand the functionality of the iOS devices are free, and any essential device maintenance delivered via the App Store is provided free. Furthermore, most iOS device owners make no purchases at all, and most App Store transactions involve free downloads.[210] As a result, concerns about the ability of iOS device purchasers to predict app-related lifecycle costs are unfounded. Professor Stiglitz fails to distinguish this setting from typical settings involving aftermarkets for maintenance goods.

105. These fundamental differences—both the durability and the additive and value-expanding rather than "maintenance" nature of apps and in-app digital content—thus may affect the applicability of the theories of harm that Professor Stiglitz claims in the current case. For example, Yun (2021) emphasizes that apps and in-app digital content differ meaningfully from traditional aftermarket products, such as those that were the focus of *Eastman Kodak Co. v. Image Technical Services, Inc. (Kodak)*, and that aftermarket theories of harm based on lock-in or information asymmetry, as Professor Stiglitz argues, may thus be less credible.[211] As I explained earlier, in a traditional maintenance aftermarket, consumers must make ongoing aftermarket purchases to preserve the basic functionality of the foremarket product.[212] The theory of harm thus relies in part on a consumer's inability to accurately estimate the total lifecycle cost of owning a product and is predicated on the requirement that a consumer must make aftermarket purchases to preserve the value of

---

[210] Hitt Opening Report, Exhibit 1 (showing that free download constitute ██████ of App Store transactions between July 10, 2008 and February 2, 2024), ¶ 61 ("In addition to the 56.2 percent of consumer accounts without positive billing, ██████ of consumer accounts have spent less than $10 on paid download or digital in-app purchases, ██████ have spent between $10 and $50, and ██████ have spent between $50 and $150. At the same time, some consumer accounts that have spent a ██████ on paid downloads or digital in-app purchases— ██████ percent of consumer accounts have spent $1,000 or more through the App Store.").

[211] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1312 ("The bottom line is that app stores do not represent the same type of aftermarkets found in *Kodak* and subsequent cases, which highlights the importance of assessing the peculiar nature of each type of aftermarket. Theories of harm that rely on lock-in, consumer myopia, and other information asymmetries can be more or less credible depending on the circumstances.").

[212] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1307 ("Specifically, we could label Kodak-like aftermarkets as 'maintenance aftermarkets,' that is, aftermarket goods and services used to upkeep, maintain, and operationalize the primary durable good.").

their durable foremarket product.[213] In such cases, when making their foremarket purchase, consumers may not know how intensively they will use the product and how frequently maintenance will be needed, factors which contribute to the aforementioned uncertainty.[214] However, this theory of harm seems at odds with the current setting involving iOS devices and App Store transactions. Apps and in-app digital content are additive in value, and the iOS devices, the purported foremarket products, remain fully functional even absent any aftermarket purchases. Each aftermarket purchase is discretionary.[215] Additionally, there is no decline in device capability absent aftermarket purchases and further, a vast majority of apps are free to download and use. Professor Stiglitz's claims based on standard aftermarket theories of harm may thus not be applicable to this setting, and Professor Stiglitz provides no explanation reconciling the differentiating factors of this case.

106. Yun (2021) also notes that additive aftermarket products may diminish rather than enhance the risk of anticompetitive harm and may also offer procompetitive benefits.[216] In additive aftermarkets like Professor Stiglitz's alleged aftermarket of apps and in-app digital content,

---

[213] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1309 ("Under this setup, it is fairly straightforward to see how an aftermarket monopolist could try to extract monopoly profits from the consumer through a combined total 'price' to pay for the entirety of the system, that is, $P+M$. Thus, even if a consumer pays a competitive price in period 1, the same consumer can then pay the total monopoly price in period 2 with a supra-competitive maintenance cost. It is also evident how the aftermarket theory of harm relies on the consumer not making this total benefit calculation ex ante before purchasing the primary good. Otherwise, the consumer would shop at the supplier that offers the higher total benefit to the consumer.").

[214] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, pp. 1310–1311 ("If consumers do not have good ex ante assessments of the value of $\alpha$ [the probability that a consumer will need to repair the primary product in period 2], then this can lead to unexpected lock-in to the aftermarket services. The idea is that maintenance can be infrequent and discrete, which can create greater uncertainty. Additionally, a consumer may be uncertain of the intensity of use of the primary product, which could endogenously influence the probability that the consumer will need to use repair services in subsequent periods.").

[215] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1310 ("Consequently, under additive aftermarkets, the counterfactual (to avoiding the aftermarket) is not a significantly depreciated asset that needs maintenance expenditures to restore the original value, but rather the same highly valued product that was enjoyed in the first period. Thus, the choice in additive aftermarkets is whether the marginal benefit of the add-on, e.g., a specific app, is greater than the marginal cost.").

[216] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1310 ("Further, the [additive benefit of the aftermarket product] raises the plausibility of efficiency justifications if the alleged conduct at issue, such as exclusivity, directly impacts the value of the additive aftermarket product."), p. 1313 ("[A]dditive aftermarkets have characteristics that generally attenuate the potential for anticompetitive harm—while having the same potential for procompetitive benefits.").

products are purchased only when their marginal benefit exceeds their marginal cost. As a consequence, the foremarket seller has an incentive to enhance the value of aftermarket products in order to increase overall demand for its foremarket product, and is limited in its ability to exploit "locked-in" consumers via supracompetitive aftermarket pricing because the consumers can simply choose not to purchase aftermarket products.[217] As I discuss in **Section IV.G**, the App Store has strong incentives to offer innovative apps and in-app digital content to attract and retain consumers to iOS devices.[218] Additive aftermarkets can also provide a means for firms to recoup investments and monetize their intellectual property, further enhancing consumer value, a point I also return to in **Section IV.G**.[219]

> **d)** Professor Stiglitz Ignores that the Transparency and Stability of Apple's Policies Undermine His Conclusion that Competition in the Alleged Foremarket Does Not "Constrain" Apple's Alleged Monopoly Power in the Alleged Aftermarket

107. Professor Stiglitz argues that competition in the foremarket cannot constrain Apple's alleged aftermarket monopoly power. He claims that prior to purchasing a foremarket product like an iPhone or an iPad, consumers are generally unaware of the challenged conduct and further, cannot predict their lifetime aftermarket spending.[220] He further asserts that because consumers face high switching costs following their foremarket purchase, they are locked in, and therefore competition in the alleged foremarket is unable

---

[217] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1310 ("After all, a supplier has an incentive to increase the demand for the aftermarket product, which, in turn, could significantly increase the demand for the primary product.").

[218] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, pp. 1312–1313 ("Similarly, app stores have incentives to offer vibrant games and other offerings, which, in turn, attract users to the platform—and keep their interest while on the platform. Even a policy like aftermarket exclusivity can spur greater competition in the primary market. Therefore, suppliers who rely on a strategy of 'harvesting' profits in the aftermarket will, in turn, diminish the *ex ante* demand for the product.").

[219] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1313 ("Moreover, even if aftermarkets represent a major source of profits for suppliers, this does not necessarily mean there is an incentive to exploit consumers in the aftermarket. For instance, aftermarkets can be how firms obtain a return on investments in their systems and associated intellectual property rights.").

[220] Stiglitz Report, ¶¶ 307–308 ("I review the evidence on consumers' inability to accurately predict the costs of iOS apps and in-app content at the time of their foremarket purchase. This evidence suggests that they are unlikely to accurately incorporate aftermarket pricing into their foremarket purchase decision. […] I discuss the evidence on consumers' general unawareness of Apple's anticompetitive restrictions in the aftermarket. As a result, they are unlikely to incorporate this information into their foremarket purchase decision.").

to constrain Apple's alleged aftermarket monopoly power.[221] There are several reasons why Professor Stiglitz's arguments are flawed.

108.   Professor Stiglitz ignores the fact that Apple has been transparent since the App Store's inception regarding its restrictions on iOS apps and in-app digital content (*see* **Section IV.C**). There is considerable evidence which contradicts the flawed Hoyer Survey results and associated interpretation by Professor Stiglitz and which instead establishes that Apple consumers are aware of Apple's policies regarding sideloading and in-app payments.[222] I understand that Professor Berger concludes in his rebuttal report that Professor Stiglitz's opinion that consumers are generally unaware of Apple's alleged aftermarket restrictions is unsupported.[223] Professor Simonson's survey evidence shows that 71 percent of survey respondents who are current iPhone or iPad owners reported knowing at the time of purchase that the App Store would be the only way to obtain apps and in-app digital content,[224] and 58 percent of survey respondents who are prospective iPhone or iPad buyers indicated expected that the App Store would be the only channel via which to obtain

---

[221]   Stiglitz Report, ¶ 309 ("I have already shown that consumers face significant costs to switching from an iOS device to a non-iOS device […]. [These] significant switching costs limit consumers' ability to discipline Apple's conduct even if they discover supracompetitive aftermarket pricing after their initial foremarket purchase."), ¶ 357 ("[E]ven if consumers become aware of Apple's conduct and the resulting supracompetitive aftermarket prices after their initial foremarket purchase, many are unlikely to be able to effectively respond to aftermarket conditions because they have already become locked-in to the iOS ecosystem, meaning that they cannot easily switch to a competing non-iOS device. This is because of the significant costs associated with switching to a non-iOS mobile device[…].").

[222]   Stiglitz Report, ¶¶ 353–355 ("The Hoyer Survey assessed whether iOS device users are aware of these restrictions. Respondents were given an open-ended question asking whether they knew of any requirements that Apple imposes on app developers, and if so, to specify them. A significant majority of respondents were not aware of Apple's restrictions imposed on developers, with roughly 88 percent answering that they did not know of any requirements. Roughly 9 percent of respondents indicated that they knew of specific requirements but provided open-ended responses that were unrelated to the restrictions at issue. Only 2.8 percent provided answers that were related to any of the restrictions at issue in this litigation. This is clear evidence that most iOS device users are currently unaware of the restrictions that Apple has imposed on app developers, which resulted in the sale of iOS apps and in-app content being limited to the App Store. These results similarly suggest that iOS device users are generally not aware of Apple's restrictions that prevent app developers from informing them of channels through which they can acquire in-app content, nor are they aware of the restrictions on payment processing solutions used for in-app purchases. If current iOS device users are generally unaware of these restrictions, then it follows that consumers, at the time of their foremarket purchase, are even less likely to have been aware of these restrictions.").

[223]   Rebuttal Expert Report and Declaration of Jonah Berger, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Berger Rebuttal Report"), Section VII.

[224]   Rebuttal Expert Report and Declaration of Itamar Simonson, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Simonson Rebuttal Report"), Section III.C.

73

apps on their iOS devices.[225] I also understand that Professor Jin concludes in her rebuttal report that prior to purchasing an iOS device, most consumers are aware that the App Store will be the exclusive channel via which they may obtain iOS apps and in-app digital content.[226] As I discussed in **Section IV.C**, Apple has been transparent about this policy since the App Store launched.

109. Additionally, Professor Stiglitz fails to recognize that Apple has not changed the challenged conduct since the App Store launched and since it introduced in-app purchases in 2009. That is, there has not been any policy shift under which consumers who, having previously made a foremarket purchase, suddenly or unexpectedly faced new restrictions in the alleged aftermarket for apps or in-app digital content purchases. The academic literature recognizes the importance of such a policy shift in applying the theory of harm that Professor Stiglitz relies on. For example, in his 2000 paper, Professor Steven Salop explains that the hold-up problem[227] in *Kodak* arose only because Kodak changed its policy and stopped selling replacement parts to independent service providers. This unanticipated shift forced the installed base of equipment owners, who had previously expected continued access to competitive aftermarket services, to purchase higher-priced service

---

[225]  Simonson Rebuttal Report, Section III.C.

[226]  Jin Rebuttal Report, Section 7.1.

[227]  Hermalin, Benjamin E. and Michael L. Katz, "Information and the Hold-Up Problem," *RAND Journal of Economics*, Vol. 40, No. 3, Autumn 2009, pp. 405–423, p. 405 ("The hold-up problem is a central issue in economic analysis. It arises when one party makes a sunk, relationship-specific investment and then engages in bargaining with an economic trading partner. That partner may be able to appropriate some of the gains from the sunk investment, thus distorting investment incentives, either toward too little investment or toward investment that are less subject to appropriation."); Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, p. 1291 ("[Hold-up occurs when] once two parties enter into a contractual arrangement that involves product-specific investments, there is a fundamental 'transformation' in the relationship. Specifically, the relationship moves from one characterized by *ex ante* competition to one with the potential for *ex post* opportunism.").

from Kodak, resulting in harm from the policy change.[228] Correspondingly, Yun (2021) argues that the stability of the App Store's terms over time undermines the applicability of the foremarket and aftermarket framework to the App Store.[229]

110. Moreover, Professor Stiglitz fails to acknowledge that iOS devices remain fully functional without requiring any app or in-app digital content purchases, in contrast with traditional foremarket durable goods that often require continuous aftermarket inputs to remain operational, as I discuss in **Section IV.D.2.a**. Consequently, there is no inherent lifecycle cost uncertainty associated with the purchase of an iOS device. The iOS device by itself can continue to deliver the value any purchaser anticipates even if the purchaser does not engage in subsequent paid App Store transactions. All App Store transactions are additive, rather than being required for the continued operation or "maintenance" of the iOS device, and over 82 percent of apps on the App Store were free to download without in-app purchases in 2023.[230] Further, I understand that Professor Jin concludes that Professor Stiglitz and Professor Chen have not shown that information frictions would prevent a sufficient number of consumers from accurately estimating the total lifecycle costs at the time of the iOS device purchase and consequently switching to a non-iOS device.[231] My

---

[228] Salop, Steven C., "The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millenium," *Antitrust Law Journal*, Vol. 68, 2000, pp. 187–202, p. 191 ("According to the plaintiffs' 'installed base opportunism' theory of monopolization, for several years Kodak had permitted independent service operators (ISOs) to purchase replacement parts that they needed to service equipment in competition with Kodak, and consumers bought equipment on the expectation that this competition would continue. However, Kodak allegedly later adopted a new policy of refusing to sell parts to the ISOs. As a result of this unanticipated change in conduct and the new restraint, the installed base of equipment owners could no longer purchase service from the excluded ISOs. Because they were locked-in to the equipment they already owned, these customers were forced to purchase service from Kodak or service their machines themselves. According to the plaintiffs, Kodak's service was more expensive than the ISOs', and self-service was an inferior alternative for many customers. Thus, the plaintiffs argued that the locked-in installed base of customers was harmed by Kodak's change in conduct").

[229] Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327, pp. 1306–1307 ("What seems more relevant is whether, after significant lock-in, Apple changes the terms governing the App Store-whether for users, developers, or both-in a manner that is more restrictive and plausibly harms the competitive process in the aftermarket. This conduct does not seem to be the allegation against Apple-as Apple's policies have been in place since the App Store was introduced in 2008. This contrasts with Kodak, which after facing increased competition from ISOs, changed its policy and no longer supplied parts to rival ISOs.").

[230] Hitt Opening Report, Footnote 420 ("Between the first year of the App Store and 2023, the share of apps that were free-to-download without in-app purchases rose from 27.8 percent to ▮▮▮▮▮").

[231] Jin Rebuttal Report, Section 7.2.

understanding is that Professor Jin also finds that Professor Stiglitz and Professor Chen have failed to demonstrate that switching costs in the foremarket are high enough to deter a sufficient number of consumers from making such a substitution.[232]

### 3. Professor Stiglitz Incorrectly Asserts that Apple Has Monopoly Power in the Alleged Aftermarket

111. Even if one ignores Professor Stiglitz's flawed market definition and flawed use of the "foremarket" and "aftermarket" framework, his market power analysis is nevertheless unreliable. It relies on supposed direct and indirect evidence that ignores the App Store's two-sidedness, which leads him to draw incorrect conclusions about Apple's purported monopoly power in the alleged aftermarket.

#### a) Professor Stiglitz's Analysis and Conclusions Regarding Apple's Monopoly Power Ignore the App Store's Two-Sidedness

112. Professor Stiglitz's analysis of the App Store's alleged monopoly power ignores the fact that the App Store is a two-sided transaction platform.

113. As I discussed in my opening report, the App Store implements a revenue-sharing model under which developers pay a commission rate on certain transactions and consumers can access the App Store for free.[233] The App Store's pricing structure is designed to encourage and enhance participation from both developers and consumers.[234] Any reliable analysis of market power must consider the App Store's pricing structure in its entirety when presenting evidence of supracompetitive pricing. Instead, Professor Stiglitz focuses his analysis on a single aspect of this pricing structure, the commission rate associated with the App Store's revenue sharing model, or a single dimension of developer-side pricing. Examining whether this single aspect of a more complex pricing structure is allegedly supracompetitive is not sufficient to show that Apple is exercising anticompetitive market power or monopoly power. Furthermore, by ignoring the App Store's two-sidedness, Professor Stiglitz fails to recognize that changes to the commission rate applied on the

---

[232]  Jin Rebuttal Report, Section 7.3.

[233]  Sundararajan Opening Report, ¶ 129.

[234]  Sundararajan Opening Report, ¶ 177.

developer side may not affect the price of his alleged aftermarket product. Empirical evidence presented by Professor Hitt confirms this is nearly always true.[235]

> **b)** <u>Professor Stiglitz's Supposed Direct Evidence of Monopoly Power is Flawed and Ignores the App Store's Two-Sidedness</u>

114. Professor Stiglitz relies on evidence of the App Store's profitability and operating margins provided in the Barnes Report to support his conclusion that Apple has monopoly power in his alleged aftermarket. According to Mr. Barnes, the App Store's operating margins were consistently over 70 percent from 2013 to 2022.[236] There are flaws in Mr. Barnes' margin calculations, as addressed by Dr. Majumdar and Mr. Malackowski, that undermine Professor Stiglitz's use of those calculations as direct evidence of Apple's alleged monopoly power.[237]

115. Putting aside any issues with Mr. Barnes' calculations, Professor Stiglitz's reliance on this information as evidence of Apple's monopoly power is nevertheless fundamentally flawed.

116. Professor Stiglitz relies on Dr. Abrantes-Metz's fundamentally flawed calculation of the but-for commission rate to conclude that the commission rate set by Apple in 2008 was supracompetitive, a conclusion which he then presents as evidence of Apple's monopoly power.[238] As I discussed in **Section IV.C**, Professor Stiglitz's assertion that Apple was a monopolist since the launch of the App Store is implausible. Further, as I will discuss in **Section V**, there are significant economic flaws associated with Dr. Abrantes-Metz's approach that make her calculation of the but-for commission rate unreliable. These flaws

---

[235] Hitt Opening Report, ¶ 305 ("I analyze three natural experiments: the launch of the SBP in December 2020, the implementation of the ARS policy in June 2016, and the launch of the VPP in 2016."), ¶ 306 ("[T]he results of these natural experiments show that, for the vast majority of products, app developers did not reduce consumer prices when they face lower commission rates.").

[236] Stiglitz Report, ¶ 143 ("Mr. Barnes's results indicate that, from 2013 to 2022, the App Store consistently achieved […] operating margins of at least 75.3 percent.").

[237] Expert Report and Declaration of Adrian Majumdar, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Majumdar Report"), Section 5; Rebuttal Expert Report and Declaration of James E. Malackowski, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Malackowski Rebuttal Report "), Sections 6.3–6.5.

[238] Stiglitz Report, ¶ 146 ("I understand that Dr. Abrantes-Metz has estimated that the App Store would have charged a single commission rate of 13.6 percent in a competitive But-For world. Apple's 30 percent commission rate and its average commission rate of 27.2 percent both far exceed Dr. Abrantes- Metz's But-For commission rate estimate and are clearly suggestive of Apple's significant market power or monopoly power.").

invalidate any conclusion that Professor Stiglitz draws regarding whether Apple's commission rate is supracompetitive.

117. Professor Stiglitz also claims that the App Store's reduction of the commission rate for certain transactions—such as those involving developers eligible for the Small Business Program—constitutes price discrimination, a fact he presents as direct evidence of Apple's monopoly power.[239] However, Professor Stiglitz fails to acknowledge the academic literature showing that price discrimination can be welfare enhancing—particularly when it leads to increased output and allows firms to serve more price-sensitive consumers who might otherwise be excluded from the market.[240] In addition, Professor Stiglitz ignores the academic literature that finds that the impact of price discrimination on two-sided transaction platforms must be assessed based on its effects on both sides of the platform due to the presence of indirect network effects.[241] For example, de Cornière et al. (2025) analyze the effects of a two-sided transaction platforms charging different prices for different groups of sellers and find that, due to indirect network effects, platform price discrimination directed at sellers can enhance total welfare while leaving no participant worse off. Such price discrimination can increase participation from both buyers and

---

[239] Stiglitz Report, ¶ 147 ("Another hallmark of market power or monopoly power is Apple's ability to price discriminate independent of cost differences. For example, Apple reduced the commission rate for small business developers and other selected programs to 15 percent.").

[240] Schmalensee, Richard, "Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination," *The American Economic Review*, Vol. 71, No. 1, March 1981, pp. 242–247, p. 246 ("[S]uch discrimination makes it profitable to sell to markets that would not be served at all under single price monopoly. If discrimination makes possible a large volume of such new sales, it can lead to an increase in welfare even if total sales to previously served markets fail to expand."); Marshall, Guillermo, "Hassle Costs and Price Discrimination: An Empirical Welfare Analysis," *American Economic Association: Applied Economics*, Vol. 7, No. 3, July 2015, pp. 123–146, pp. 144–145 ("When evaluating the effects of market segmentation, I find that profits and average customer welfare would decrease by 4.21 and 12.61 percent, respectively, if the refillable products were removed from the market. This result reflects that the more price-sensitive customers are forced to exit the market as a consequence of the cheaper refillable products no longer being available. I also find that the gains of serving customers with both formats would be lower if the price-insensitive customers were not particularly deterred from purchasing refillables. This result suggests that the value of serving customers with both formats depends on the nature of customer heterogeneity, as it dictates whether the seller can use the refillable segment to price discriminate.").

[241] Jeon, Doh-Shin, Byung-Cheol Kim, and Domenico Menicucci, "Second-Degree Price Discrimination by a Two-Sided Monopoly Platform," *American Economic Journal: Microeconomics*, Vol. 14, No. 2, May 2022, pp. 322–369, p. 323 ("[I]t is important to understand how the logic and welfare consequences of second-degree price discrimination in a two-sided platform differ from the existing analysis, which is based on one-sided logic.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

sellers, and sellers who face higher fees under discriminatory pricing can be better off as the growth in buyer participation offsets any price increases they bear.[242]

118.   Professor Stiglitz's claim also ignores findings in the academic literature which has shown that price discrimination is not restricted to settings involving monopoly. For example, in the airline industry, firms routinely offer different prices for the same seat based on how much in advance tickets are purchased and the time of day of the flight.[243] In the telecommunication industry, firms often offer a range of pricing plans based on usage, contract length, and bundled services.[244] These are examples of industries with multiple competing firms, often subject to regulatory oversight and high rates of consumer

---

[242]   Cornière, Alexandre de, Andrea Mantovani, and Shiva Shekhar, "Third-Degree Price Discrimination in Two-Sided Markets," *Management Science*, Vol. 71, No. 4, April 2024, pp. 3340–3356, p. 3341 ("Our first result is that seller-side price discrimination leads to an increase in the participation of both buyers and sellers. Intuitively, allowing the platform to charge different seller fees allows it to capture more efficiently seller value from buyer participation, thereby giving it an incentive to attract more buyers. This in turn attracts more sellers, resulting in overall larger participation on both sides. Second, we show that total welfare increases with price discrimination. Third, we show that price discrimination can constitute a *strict* Pareto improvement: because of increased buyer participation, high-type sellers may be better off even if they end up paying a higher fee than under uniform pricing."), p. 3350 ("In this paper, we argue that third-degree price discrimination in markets featuring network effects is not only welfare enhancing but can also be Pareto improving. This result arises because of the presence of network externalities, as in their absence our analysis would reproduce the well-known findings from traditional markets. In particular, cross-sided network externalities render the multiple sides of a platform interdependent and changes in welfare on one side can have relevant repercussions on the other side.").

[243]   Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed., p. 361 ("Airlines often charge more for tickets ordered one day in advance than for those ordered several weeks in advance. One possible reason for this pricing behavior is that business people, who often travel on short notice, have a less elastic demand than tourists, who do not travel on short notice. In general, when obtaining a good is uncertain, it may be possible to price discriminate by charging different prices for different probabilities of obtaining the good (Harris and Raviv 1981, Maskin and Riley 1984)."); Hazledine, Tim, "Price Discrimination, Merger Policy, and the Competitive Constraint of Low-Value Customers in Airline Markets," *Journal of Competition Law & Economics*, Vol. 11, No. 4, December 2015, pp. 975–998, p. 997 ("The fact of substantial price discrimination in air travel markets is hardly to be disputed, though the marketing tools for partitioning travelers according to their willingness to pay have changed in interesting ways, largely as the result of incumbent or 'legacy' airlines responding to the innovations of low-cost carriers. Price discrimination is now largely affected by taking advantage of differences across time in willingness to pay, in two dimensions: time of ticket purchase before flight date, and time of day of the flight.").

[244]   Armstrong, Mark and John Vickers, "Price Discrimination, Competition and Regulation," *The Journal of Industrial Economics*, Vol. 41, No. 4, December 1993, pp. 335–359, p. 336 ("A different kind of price discrimination is practised in the telecommunications industry, where quantity discounts for large users are becoming prevalent. Related questions concern the appropriate balance between local and long-distance call charges, and between call charges and access charges. The incumbent firm, BT, provides services for all types of user, but it faces competition chiefly in the market for large users, for whom long-distance call charges are especially important whereas access charges matter proportionately more to the smaller user.").

switching,[245] and illustrate how the presence of price discrimination does not imply the existence of monopoly power, contrary to Professor Stiglitz's claim.[246]

119.    Rather, the reduction in the App Store's commission rate over time was aligned with Apple's desire to continue to encourage and enhance participation from both consumers and developers to ensure its continued success.[247] Specifically, under the Small Business Program cited by Professor Stiglitz, Apple reduced its commission rate from 30 percent to 15 percent and made this lower commission rate available to developers with less than one

---

[245]   *See*, *for example*, Hazledine, Tim, "Price Discrimination, Merger Policy, and the Competitive Constraint of Low-Value Customers in Airline Markets," *Journal of Competition Law & Economics*, Vol. 11, No. 4, December 2015, pp. 975–998, p. 10 ("Deregulation and liberalization in the aviation sector have had significant impacts on airline competition[.] […] Policies of deregulation and liberalization enable new carriers to entry markets, and all players to adjust operational strategies (e.g., routes, fares and frequency) under country-heterogenous and less stringent rules, leading to evolving patterns of airline market and competition […] [T]he proliferation of LCCs with route expansions and airfare declines, as well as various forms of cooperation in air service, has pushed the market structure of the aviation industry toward competition with changing market concentration ratios at different stages."), p. 13 ("Additionally, regulatory frameworks and policies play a significant role in shaping the competitive landscape of the airline industry, regarding new safety regulations, market access policies, consumer protection laws, etc."); "Competition Enforcement and Regulatory Alternatives – Note by the United States," *Organisation for Economic Co-operation and Development (OECD)*, May 27, 2021, available at https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/competition_enforcement_and_regulatory_alternatives_us_submission.pdf, ¶ 16 ("In 1988, however, Congress transferred authority for review of airline mergers from the DOT to the DOJ. Although the DOJ now has the lead role in merger review, the DOT continues to confer with the DOJ on the merits of each transaction."); "Are Airline Loyalty Programs Still Worth It? Why Passengers Are Breaking Up with Rewards," *Global Brands*, available at https://www.globalbrandsmagazine.com/are-airline-loyalty-programs-worth-it/ ("[M]ore travellers are turning away from frequent flyer programs and the challenges airlines now face [is] retaining their loyal customers."); "There Is a Turf War Escalating in the US Wireless Carrier Space; Who's Winning and Why? Market Force Study Reveals the Rankings," *PR Newswire*, November 21, 2023, available at https://www.prnewswire.com/news-releases/there-is-a-turf-war-escalating-in-the-us-wireless-carrier-space-whos-winning-and-why-market-force-study-reveals-the-rankings-301995088.html ("Among all US carriers, T-Mobile, Verizon, and AT&T are in a clear fight to dominate and win the battle for market share. […] Customers tend to stay with one of the major carriers for several years, but the current study demonstrates that value-first and non-contract carriers are also having success in taking customers away from the majors."); "Wireless Telecommunications," *Federal Communications Commission*, available at https://www.fcc.gov/wireless-telecommunications ("The Wireless Telecommunications Bureau (WTB) advises and makes recommendations to the Commission, or acts for the Commission under delegated authority, in matters pertaining to the regulation and licensing of wireless communications services, devices, facilities, and electromagnetic spectrum resources.").

[246]   Stiglitz Report, ¶ 147 ("Another hallmark of market power or monopoly power is Apple's ability to price discriminate independent of cost differences. For example, Apple reduced the commission rate for small business developers and other selected programs to 15 percent.").

[247]   Sundararajan Opening Report, ¶ 177.

million dollars in total earnings from all of their apps in the prior calendar year.[248] Small developers are particularly important to Apple, accounting for 90 percent of all developers on the App Store before the change[249] and representing a large share of the apps and in-app digital content transactions through the App Store.[250] Reducing the commission rate for small developers was thus consistent with Apple's strategy to attract and encourage the creation of apps and in-app digital content that would, in turn, attract consumers.[251]

---

[248] "App Store Small Business Program," *Apple*, available at https://developer.apple.com/app-store/small-business-program/; "Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/ ("The App Store Small Business Program, which will launch on January 1, 2021, comes at an important time as small and independent developers continue working to innovate and thrive during a period of unprecedented global economic challenge. Apps have taken on new importance as businesses adapt to a virtual world during the pandemic, and many small businesses have launched or dramatically grown their digital presence in order to continue to reach their customers and communities. The program's reduced commission means small developers and aspiring entrepreneurs will have more resources to invest in and grow their businesses in the App Store ecosystem."). *See also*, Trial Testimony of Tim Cook, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 21, 2021 ("Epic Trial Testimony of Tim Cook"), p. 3859:5–12 ("Q. When did Apple first start to consider the Small Business Program that you just referenced, the most recent commission reduction? A. It probably has its origins from several years ago. Q. And why did Apple decide to implement that program now? A. What was in my mind at the time was I was very worried about COVID and the effect of COVID on small businesses in particular."), pp. 4008:8–4009:3 ("Q. And could you read for the Court the last sentence of that paragraph? A. Let's see. "This proposal was our best idea to provide a positive improvement for small business while also advancing the App Store program ahead of our competition in a meaningful way." Q. Thank you. Did you understand that as a reference to providing improved business opportunities for small developers? A. Yes. […] Q. Please explain how you understood that language, sir, when you've seen it. A. Again, the way that I saw this and I believe the -- at least some members of the team saw it was by […] doing it now, it would help people at a really critical time with COVID. By extending it permanently, we're helping them invest even more in innovation than they were doing before."); Epic Trial Testimony of Phillip Schiller, pp. 2811:16–2812:4 ("Q. And why did Apple introduce this program when it did? A. […] [W]e can talk about all the reasons, but number one important to me personally was the -- the pandemic. Over the last year, I think a lot of us are concerned with small businesses in this country and how they'll make it through and […] whether they'll succeed, and that was a personal motivation for finally getting this done.").

[249] Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Apple*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf, p. 1 ("Small developers represented more than 90% of all developers on the App Store between 2015 and 2020").

[250] Hitt Opening Report, ¶ 308 ("This program applies to a large number of products offered on the App Store: in the year following its December 23, 2020 rollout, 23.7 percent of products that consumers made transactions with on the App Store were enrolled in the SBP at some point.").

[251] Sundararajan Opening Report, ¶ 148. *See also*, Etro, Federico, "Platform Competition With Free Entry of Sellers," *International Journal of Industrial Organization*, Vol. 89, 2023, pp. 1–17, p. 11 ("Moreover, a platform would ideally change the commission rate across [sellers'] types, reducing it in case of higher pass-through or more elastic demand, and for sellers whose entry is more elastic with respect to profitability.")

120. Decreases in the App Store's commission rate are also consistent with how two-sided transaction platforms evolve over time to adjust to changing conditions.[252] As I discussed in my opening report, successful two-sided transaction platforms adopt services and governance mechanisms that mitigate potential sources of market failure while also attracting and retaining participants on both sides, and these services and governance mechanisms along with the pricing structure of the platform may change over time as business conditions or the needs of platform participants evolve.[253] For example, in 2024, Lyft announced a change to its revenue-sharing model to guarantee that drivers would earn at least 70 percent (after deducting certain external fees) of rider fares each week. This policy was initially rolled out for drivers in what Lyft defines as "major markets" and later expanded across the U.S.[254] By increasing transparency and ensuring a consistent minimum earnings share, this change helped improve the perception drivers had of the

---

[252] Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *Antitrust Chronicle*, Vol. 2, No. 2, July 2022, pp. 16–19, p. 17 ("With interactions that are observable, transaction platform operators can track the quality of the interactions and user satisfaction based on the nature of the transactions (e.g., guaranteeing secure transfer of payment information or identifying accurate matches for user searches). Transaction platforms can continually adjust their policies so that all sides will continue to use the platform to transact through high-quality interactions rather than turn to an alternative.").

[253] Sundararajan Opening Report, ¶ 71. *See also*, Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *Antitrust Chronicle*, Vol. 2, No. 2, July 2022, pp. 16–19, p. 17 ("With interactions that are observable, transaction platform operators can track the quality of the interactions and user satisfaction based on the nature of the transactions (e.g., guaranteeing secure transfer of payment information or identifying accurate matches for user searches). Transaction platforms can continually adjust their policies so that all sides will continue to use the platform to transact through high-quality interactions rather than turn to an alternative.").

[254] "'No More Bad Weeks.' Lyft Expands Driver Earnings Commitment Nationwide," *Lyft*, May 14, 2024, available at https://www.lyft.com/blog/posts/lyft-expands-driver-earnings-commitment-nationwide ("Earlier this year, we set a new standard in driver pay and transparency. Now our pay standard is going national for all drivers. […] In February, we committed that drivers will always earn 70% or more of rider fares each week, after external fees. This is a rock-solid floor: if drivers are ever under 70% at the end of the week, they'll be paid the difference."); Bursztynsky, Jessica, "Lyft Introduces a Minimum Pay Standard for Its Drivers," *Fast Company*, February 6, 2024, available at https://www.fastcompany.com/91021785/lyft-introduces-a-minimum-pay-standard-for-its-drivers ("Lyft's own research found that, in any given week in 2023, about 15% of its drivers earned less than 70% of what riders paid, after external fees were taken out. (External fees include taxes, airport and venue fees, and commercial auto insurance.)").

platform,[255] thus contributing to Lyft's ability to attract and retain drivers as it competed with other ride-sharing platforms such as Uber.

121.   Finally, Professor Stiglitz cites, as evidence of Apple's monopoly power, certain requirements the App Store imposes on developers, such as the App Review Guidelines and the Developer Program License Agreement ("DPLA"), which allegedly restrict developers from distributing iOS apps outside the App Store.[256] As I discussed in my opening report and in **Section IV.C**, these App Store's requirements have existed since the App Store was launched in 2008.[257] Such agreements are a common part of app marketplaces and many others have similar agreements with their developers. . For example, the Amazon Appstore requires developers to adhere to its Developer Services Agreement, which sets rules for content, revenue sharing, and user data protection.[258] Similarly, the Microsoft Store requires developers to comply with agreements governing content standards, user privacy, data protection, and other criteria.[259] Likewise, the

---

[255]   "'No More Bad Weeks.' Lyft Expands Driver Earnings Commitment Nationwide," *Lyft*, May 14, 2024, available at https://www.lyft.com/blog/posts/lyft-expands-driver-earnings-commitment-nationwide ("The pay standard launched in 20 of our top markets, and initial results have been incredible: Within one month of launch, an additional 20% of drivers said they were paid fairly. […] We've also heard directly from drivers who appreciate the commitment"); Bursztynsky, Jessica, "Lyft Drivers Will Now Earn More Whenever a Ride Takes Longer Than Expected," *Fast Company*, October 8, 2024, available at https://www.fastcompany.com/91205303/lyft-drivers-will-now-earn-more-whenever-a-rider-takes-longer-than-expected ("Drivers perception of pay fairness, which Lyft said is a leading indicator of driver preference, also saw a meaningful increase since it announced that drivers would earn at least 70% of rider payments in February.").

[256]   Stiglitz Report, ¶¶ 68-69, 71 ("In order to distribute their apps on the App Store, Apple requires iOS app developers to agree to the DPLA and ensure their apps comply with the App Store Review guidelines. […] Among other requirements, it stipulates that iOS app developers cannot distribute their iOS apps outside of the App Store. […] After creating an iOS app, developers must submit that app to Apple for review before it is listed on the App Store. The App Review Guidelines […], which were released in 2010, establish the requirements an app must meet to be approved for distribution on the App Store. […] Together, these restrictions foreclose virtually all alternatives for distributing iOS apps to consumers: The App Review Guidelines prevent the distribution of store-like apps through the App Store, and the DPLA prevents developers who sell their apps through the App Store from distributing their apps, both their store-like apps and others, via an alternative iOS app store if one were to exist.").

[257]   Sundararajan Opening Report, ¶¶ 123-125. *See also*, Epic Trial Testimony of Phillip Schiller, pp. 2832:25–2833:2 ("Q. And by the way, when were the app review guidelines first published to developers? A. The first time we published them externally was in 2010.").

[258]   "Amazon Developer Services Agreement," *Amazon*, July 16, 2024, available at https://www.developer.amazon.com/support/legal/da.

[259]   "Microsoft Store Policies," *Microsoft*, September 17, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/store-policies; "Microsoft Developer Agreement," *Microsoft*, 2018, available at https://learn.microsoft.com/en-us/legal/mdsa.

Samsung Galaxy Store requires developers to follow its Galaxy Store Seller Portal terms, which address app content guidelines, data handling practices, and the use of Samsung's in-app purchase and ad platforms.[260]

      c)     Professor Stiglitz's Supposed Indirect Evidence of Monopoly Power is Flawed and Based on an Incorrect Definition of the Relevant Product Market

122. Professor Stiglitz's incorrect definition of the relevant antitrust product market has led to flaws in his calculation of Apple's share in the alleged aftermarket. Specifically, Professor Stiglitz's claim that Apple holds "nearly 100 percent market share"[261] is based on Professor Stiglitz's incorrect identification of the App Store's relevant product as the sale of iOS apps and in-app digital content rather than what the relevant product actually is, namely simultaneous transactions between consumers and developers.[262]

123. As discussed in **Section IV.B.3**, there are a variety of viable substitutes for transactions conducted within the App Store, including those that involve the use of the associated digital good on an iOS device, and those that involve the use of these digital goods on a non-iOS device. An appropriate estimate of the App Store's market share would measure the transactions that are provided by the App Store as a fraction of all relevant transactions. This is not the market share provided by Professor Stiglitz. Professor Stiglitz himself notes that ███████████████ of transactions involving the use of Match.com on iOS devices were conducted through the App Store.[263] Furthermore, as I discussed in **Section IV.B**, in his opening report, Professor Hitt estimated that only 8.7 percent of the total associated

---

[260] "Terms and Conditions," *Samsung*, available at https://seller.samsungapps.com/terms/termsAndConditions.as.

[261] Stiglitz Report, ¶ 235 ("iOS device users do not have reasonable substitutes for purchasing iOS apps and in-app content through the App Store. Consequently, Apple holds nearly 100 percent market share in the iOS apps and in-app content aftermarket.").

[262] Stiglitz May 2025 Deposition, p. 163:19–22 ("Q. You are aware that consumers purchase content for their iOS apps outside of their iOS apps all the time, aren't you? A. Yes."), p. 164:4–7 ("Q. Well, you don't attribute any market share at all to all of those purchases of iOS in-app content that are made outside of iOS apps; right? A. No[.]").

[263] Stiglitz Report, ¶ 227 ("The notable exception to this trend is Match.com. ███████████████████████████████████████████").

Fortnite revenue was generated by App Store transactions,[264] and that Minecraft's revenue share from App Store transactions was just ▮ percent in 2020.[265] Under Professor Stiglitz's "aftermarket" definition, a market share calculation focused on these two developers would conclude that Apple has a 100 percent market share. However, when one considers the set of all economically relevant transactions, Apple's market share for Fortnite and Minecraft transactions would be accurately determined as 8.7 percent and ▮ percent respectively. In fact, Professor Stiglitz's definition of the relevant product market would mean that every single video console maker is also a monopolist if it operates the only app marketplace available on the console, ignoring the fact that users can obtain the same games across multiple devices and platforms. To illustrate, assume that, for a given game, 25 percent of in-app digital content transactions were conducted via the PlayStation console, 50 percent via the Xbox, and 25 percent happened via the App Store. In this case, Professor Stiglitz's approach would conclude that Apple's market share for transactions involving this game is 100 percent, and also conclude that Sony's and Microsoft's market share for transactions involving this game is 100 percent. These examples show that Professor Stiglitz's assessment of Apple's monopoly power is fundamentally flawed and overstates Apple's alleged market power.

124.   Professor Stiglitz claims that certain terms of Apple's DPLA that impose "entry barriers" on developers of iOS apps and in-app digital content are evidence of Apple's monopoly power.[266] However, independent of whether the terms of Apple's DPLA are harmful or

---

[264]   Hitt Opening Report, ¶ 151 ("Fortnite users make a substantial share of their paid transactions for Fortnite outside of the App Store: while 19.3 percent of Fortnite user accounts made a paid transaction on the App Store, revenue from Fortnite transactions on the App Store was only 8.7 percent of total Fortnite revenue. Fortnite total revenues shares were higher on other platforms, such as PlayStation (40.4 percent) and Xbox (37.8 percent).").

[265]   Hitt Opening Report, ¶ 126 ("Evidence in the record on Minecraft game and in-app purchases across different device types confirms that Minecraft's availability across many platforms leads to many transactions taking place over different platforms. Specifically, using Minecraft data produced by Microsoft, I find that the share of Minecraft revenue on iOS devices was ▮ in 2020, while it was ▮ on Java compatible devices, ▮ on PlayStation devices, ▮ on Xbox devices, ▮ on Nintendo devices, and ▮ on Android devices.").

[266]   Stiglitz Report, ¶ 236 ("Apple has established significant artificial barriers to entry for the sale of iOS apps and in-app content. These barriers to entry are easily recognizable in the restrictions and conditions imposed by Apple in its DPLA and App Store Review Guidelines and through Apple's conduct towards past entry attempts in the relevant aftermarket."). *See also* Stiglitz Report, Section V.A.3 ("Apple's Restrictive Contractual Terms with Developers Reduce the Value of the App Store").

not, arguing that the challenged conduct itself is indirect evidence Apple's monopoly power seems circular. Moreover, this claim ignores the procompetitive justifications for centralized distribution that benefit developers under the DPLA requirements, which I discussed in my opening report and discuss in **Section IV.G**. Professor Stiglitz's alleged "entry barriers" related to centralized distribution and the App Store Review Guidelines instead allow Apple to set standards for security, privacy, quality, and reliability for all iOS apps and in-app digital content, and help maintain consumer trust in the Apple brand,[267] a procompetitive justification I return to in **Section IV.G**.

125.  Setting aside these procompetitive justifications, Professor Stiglitz's flawed market definition also results in his not accounting for the many digital distribution platforms that have entered since the App Store launched in 2008 and that offer substitutes for transactions conducted via the App Store, as discussed in **Section IV.B**. **Figure IV.3** below (and **Appendix Exhibit E**) illustrate the scale of entry of digital distribution platforms that enabled transactions like those facilitated by the App Store.

---

[267] Sundararajan Opening Report, ¶ 203. *See also*, Epic Trial Testimony of Phillip Schiller, pp. 2737:15–2738:8 ("Q. And what were the business reasons that Apple decided that it would only distribute third-party native apps on its App Store? A. Well, we've covered a number of the important reasons to us. Maintaining the quality of iPhone, maintaining the security and privacy of our users were all critical to the idea of opening it up for native apps. Q. And have those priorities for privacy, security, and reliability ever changed? A. No. Q. And has the need to safeguard those things changed over time? A. Yes. Q. And can you describe how? A. I think that over the years, the ways and methods developers and bad actors try to get at users and their data has only increased dramatically, and we see this from all the important data we have. The many attacks and attempts to steal it and get access to it have increased."); Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL–APPSTORE_11235149–198 at 171 ("The App Association warns that sideloading mandates 'will increase consumer exposure to risk of malware giving hackers access to users' personal information' and notes that the 'layer of restrictions' on sideloading (e.g., needing to jailbreak a device or change settings) serves to prevent malicious actors from having access to 'unwitting consumers.'"), at 181 ("While there is some debate over the relative security of both platforms, Android is the subject of more malware attacks. For example, Nokia's 2020 Threat Intelligence Report found that '26.6 percent of all malware infestations across all platforms' were on Android mobile devices in 2020, compared to 1.7 percent on iPhones."); "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," *Apple*, October 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_Sideloading.pdf, p. 2 ("Over the past four years, Android devices were found to have 15 to 47 times more malware infections than iPhone.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Figure IV.3**
**Digital Distribution Platforms Launched by Year[268]**



4.       *Professor Stiglitz Fails to Consider Reasons why the Alleged Aftermarket Restraints May Be Procompetitive*

126.     Aftermarket restraints can be procompetitive if they contribute to protecting the reputation of the seller in the foremarket, a point that Professor Stiglitz fails to consider. As I explained in my opening report and expand upon in **Section IV.G** below, negative experiences for consumers who own iOS devices that are caused by third-party apps could adversely impact their perception of the quality of their iOS device, or Apple's reputation in Professor Stiglitz's purported foremarket, as it is likely that consumers would associate this negative experience with their devices rather than with the offending app.[269] Further, since the App Store is a two-sided transaction platform characterized by indirect network effects, a negative impact on Apple's reputation could lower the number of iOS device users, which

---

[268]     **Source:** *See* **Appendix Exhibit E**.

[269]     Sundararajan Opening Report, ¶ 206.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

could in turn diminish the incentives for developers to create iOS apps, leading to lower consumer participation and lower consumer surplus from the App Store.[270]

127.     Aftermarket restraints have also been shown to encourage investments in new products, services, and technologies that can benefit consumers.[271] As I discuss in **Section IV.G** and explained in my opening report, Apple invests significantly in the development of IP-protected tools, technologies, and services for developers that facilitate and encourage the development of new apps.[272] If changes in these vertical restraints or other requirements of forced dealing cause Apple to lower its investments in the development of IP-protected tools, technologies, and services for developers that facilitate and encourage the development of new apps and in-app digital content, this would render Apple a weaker competitor. Perceiving the App Store as a weaker competitor, hypothetical competing app marketplaces may also lower their corresponding investments. As a result, consumers may be less interested in engaging in transactions involving iOS apps, which in turn, owing to indirect network effects, would further impact the participation of developers negatively.[273]

**E.     Professor Stiglitz's Argument that the Challenged Conduct is Equivalent to Anticompetitive Tying is Flawed**

128.     In this section, I discuss why Professor Stiglitz's arguments that the challenged conduct can be viewed as anticompetitive tying is flawed and inconsistent with the fact that the App Store is a two-sided transaction platform. Further, Professor Stiglitz's theory is inconsistent with Plaintiffs' claims, which do not include any tying allegations.

*1.     Overview of Professor Stiglitz's Tying Arguments*

129.     Professor Stiglitz argues that the challenged conduct can be characterized as anticompetitive tying because iOS apps and in-app digital content can be obtained by

---

[270]   Sundararajan Opening Report, ¶ 215.

[271]   Bauer, Joseph P., "Antitrust Implications of Aftermarkets," *The Antitrust Bulletin*, Vol. 52, No. 1, Spring 2007, pp. 31–51, p. 42 ("But, to the extent that higher prices, or even merely loss of choice, in fact are by-products of these forms of marketing the primary product, they also argue that these rewards are useful ways of inducing higher levels of investment and research, which would benefit the consumer by the development of new and better products and services. This argument has particular resonance where the primary product is protected by a form of intellectual property.").

[272]   Sundararajan Opening Report, ¶ 188.

[273]   Sundararajan Opening Report, ¶ 190.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

iPhone and iPad users only through the App Store.[274] This claim of anticompetitive tying has not been made by Plaintiffs. Nevertheless, Professor Stiglitz argues that Apple is effectively tying the sale of iOS apps and in-app digital content to the sale of iOS devices (the alleged tying product), a market in which Apple has alleged monopoly power, thus effectively foreclosing competition in the market for iOS apps and in-app digital content (the alleged tied product).[275]

130. Professor Stiglitz claims that consumers are not able to predict their demand for iOS apps and in-app digital content and therefore, the lifecycle costs of owning an iOS device, and further claims that there are significant switching costs that limit a consumer's ability to transition to non-iOS devices, which limits the consumer's ability to avoid allegedly supracompetitive prices in the tied market by shifting their purchases in the tying market.[276]

131. Thus, Professor Stiglitz concludes that Apple can increase its overall profits by tying iOS devices to the sale of iOS apps and in-app digital content.[277]

---

[274] Stiglitz Report, ¶ 361 ("[I]n this case, Apple's highly restrictive tie effectively deprives iOS device users of the option to purchase iOS apps and in-app content from rival app stores, ensuring that consumers who purchase the tying product (iPhones and iPads) can only acquire the tied product (iOS apps and in-app content) from Apple.").

[275] Stiglitz Report, ¶¶ 363–365 ("I establish that Apple leverages its market power in the smartphone market to monopolize the market for the sale of iOS apps and in-app content.[…] I show that Apple leverages its market power in the tablet market to monopolize the market for the sale of iOS apps and in-app content.[…] [T]he sale of iOS apps and in-app content in the U.S. constitutes a relevant antitrust market, one in which Apple has monopoly power. Through its contractual and technological restrictions, Apple gives iOS mobile device users no effective choice but to purchase iOS apps and in-app content exclusively through the App Store. As such, the sale of iOS apps and in-app content constitutes the tied market.").

[276] Stiglitz Report, ¶ 370 ("First, the single monopoly profit theory presumes that consumers can anticipate what will happen in the tied market and can adjust their purchases in the tying market accordingly. However, as I discussed in Section VII, there are significant information frictions whereby consumers cannot accurately anticipate their demand for iOS apps or in-app content and the life-cycle cost of an iOS device. Second, the theory relies on the assumption that consumers can switch between different products while incurring zero or minimal switching costs. Here, as I showed in Sections V.B.2.b and VII.C, consumers cannot effectively reduce their demand in the tying market to avoid supracompetitive prices in the tied market as there are significant switching costs that prevent consumers from easily switching to a non-iOS mobile device in the tying markets.").

[277] Stiglitz Report, ¶ 371 ("In sum, I find that the restrictive conditions under which the single monopoly profit theory applies do not comport with the market realities in this case. I thus conclude that Apple is able to increase its overall profits across the tying and tied markets by imposing a tie between iOS devices and the sale of iOS apps and in-app content.").

        *2.      Professor Stiglitz's Tying Argument Ignores Evidence that Apple Did Not Have Market Power in the Sale of Smartphones at the Beginning of the Class Period*

132.    A necessary condition for tying to be anticompetitive is that the firm must have sufficient market power in the tying market to be able to disadvantage rivals in the tied market.[278] Thus, for Professor Stiglitz's theory of anticompetitive tying to be valid, a necessary assumption is that Apple had sufficient market power in the market for iOS devices during the Class Period. However, this assumption ignores that the challenged conduct was implemented by Apple since the day the App Store launched in 2008. As I discussed in **Section IV.C**, Apple did not have market power in the alleged tying markets, a point Professor Stiglitz has also conceded in his testimony.

        *3.      By Ignoring the App Store's Two-Sidedness, Professor Stiglitz Incorrectly Identifies the Alleged Tied Product*

133.    Even ignoring the absence of market power in the alleged tying market during much of the class period, which I discussed in **Section IV.C**, and setting aside the fact Plaintiffs do not have any tying allegations, Professor Stiglitz's claim that the challenged conduct can be framed as anticompetitive tying incorrectly ignores that, as a two-sided transaction platform, the relevant product provided by the App Store is simultaneous transactions between consumers and developers. In contrast, under Professor Stiglitz's theory, the tied market comprises iOS apps and in-app digital content,[279] the App Store is mistakenly characterized as the seller of iOS app and in-app digital content, and the role of developers is ignored. Conceptually, defining transactions as the product tied to iOS devices is inconsistent with the concept of tying because consumers who purchase an iPhone or iPad

---

[278]   Ahlborn, Christian, David S. Evans, and Jorge Padilla, "The Antitrust Economics of Tying: A Farewell to Per Se Illegality," *Antitrust Bulletin*, Vol. 49, 2004, pp. 1–43, p. 2 ("Tying may also cause harm. This could happen when the tying firm enjoys monopoly power and tying leads to the exclusion of competitors; it could not happen when the tying firm lacks significant market power."); Carlton, Dennis W. and Michael Waldman, "Tying," *Issues in Competition Law and Policy*, No. 3, 2008, pp. 1859–1879, p. 1875 ("The Supreme Court has ruled that tying is per se illegal if certain conditions are satisfied. One key condition is that the seller must have significant market power in the tying market, with the result that the tie 'forces' consumers to buy a 'separate' product, namely, the tied product. In addition, the tie should limit competition in the market for the tied good and affect a not insubstantial amount of commerce.").

[279]   Stiglitz Report, ¶ 365 ("As such, the sale of iOS apps and in-app content constitutes the tied market.").

are not contractually required to complete any paid transactions on the App Store.[280] Moreover, consumers who do complete transactions on the App Store have available hundreds of thousands of developers to buy apps and in-app digital content from.[281]

134.   This fundamental mischaracterization of the relevant product market leads to additional flaws in Professor Stiglitz's theory of anticompetitive tying. Professor Stiglitz ignores the fact that while Apple sets the commission rate for the App Store, Apple does not set the prices consumers face in his alleged tied market. Rather, as one might expect, as sellers, developers choose the prices for the apps and in-app digital content they sell. Professor Stiglitz's claim that consumers cannot "avoid supracompetitive prices in the tied market"[282] is thus either mistakenly asserting that the App Store sets prices for apps and in-app digital content, which is factually incorrect, or is implicitly assuming that consumers bear the burden of the App Store commission rate chosen by Apple.[283] More precisely, under Professor Stiglitz's assumption, were consumers always bearing the burden of the App Store commission rate, a reduction in the commission rate should result in an equivalent reduction in consumer prices. However, as Professor Hitt explained in his opening report, a change in the App Store commission rate rarely leads to a change in the prices consumers face for apps and in-app digital content. Specifically, Professor Hitt examines the prices of apps and in-app digital content provided by developers that enrolled in the Small Business Program, which benefited from a 15 percentage point commission rate reduction in 2021, and shows that developers left consumer prices unchanged for 93.8

---

[280]   "Tying the Sale of Two Products," *Federal Trade Commission*, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/tying-sale-two-products ("This may limit consumer choice for buyers wanting to purchase one ('tying') product by forcing them to also buy a second ('tied') product as well.").

[281]   Hitt Opening Report, ¶ 46.b ("The number of distinct developers with transactions on the U.S. App Store has increased every year for the last 15 years, from 351 developers in July 2008 to more than ███████████.").

[282]   Stiglitz Report, ¶ 370.

[283]   Stiglitz Report, ¶ 106 ("The impact of Apple's higher commission rate on consumer prices is reflected in many real-world examples of developers charging higher prices on iOS devices relative to other platforms and consumers bearing the burden of Apple's supracompetitive commission rate").

percent of these products, despite the substantial commission rate reduction.[284] Similarly, Professor Hitt finds that 90.8 percent of subscriptions eligible for 15 percent commission rates under the auto-renewing subscription policy, and 85 percent of products from app developers in the Video Partner Program also eligible for a 15 percent reduction in the commission rate experienced no price decrease following the decrease in the commission rate.[285] Thus, Professor Stiglitz's assertion that it is Apple that chooses or indirectly determines prices (supracompetitive or otherwise) in the alleged tied market when consumers engage in App Store transactions is fundamentally flawed.[286]

### F.    Professor Stiglitz Ignores Reasons that Explain Why the Challenged Conduct is Not Anticompetitive

135.   In this section, I explain why Professor Stiglitz's analyses fail to address the question whether different elements of the challenged conduct—centralized distribution of iOS apps, Apple's in-app payment system requirements, and former anti-steering of in-app purchases—have harmed competition and consumers.

#### 1.    Professor Stiglitz Fails to Consider Reasons Why the Centralized Distribution of Apps Is Not Anticompetitive

136.   Professor Stiglitz claims that Apple imposes contractual and technological restrictions on developers and consumers to centralize the distribution of iOS apps on iPhone and iPad

---

[284]   Hitt Opening Report, ¶¶ 301, 306 ("Specifically, I study the SBP, ARS, and VPP programs, which introduced large (15 percentage point) commission rate reductions and which affected ▇▇▇▇▇ of all iOS app developers and ▇▇▇▇▇ of all App Store consumer accounts who made at least one purchase in 2023. […] For the ARS policy and VPP, app developers did not lower prices for ▇▇ and ▇▇▇ of affected products respectively after receiving lower commission rates. For the SBP (the partner program that affected the greatest number of products), app developers did not lower prices for ▇▇▇▇▇ of such products.").

[285]   Hitt Opening Report, Section 9.1, Exhibit 51.

[286]   Even putting aside the fact that the challenged conduct does not meet any reasonable definition of tying and that the tied product has been mischaracterized, by ignoring the importance of indirect network effects in his analysis, Professor Stiglitz further does not consider the economic literature that explains how in certain settings where products display network effects, there can be welfare gains when tying involves two-sided platforms. *See, for example,* Choi, Jay Pil, "Tying in Two-Sided Markets with Multi-Homing," *The Journal of Industrial Economics*, Vol. LVIII, No. 3, September 2010, pp. 607–626; Choi, Jay Pil and Doh-Shin Jeon, "A Leverage Theory of Tying in Two-Sided Markets with Nonnegative Price Constraints," *American Economic Journal: Microeconomics*, Vol. 13, No. 1, 2021, pp. 283–337.

devices, thereby foreclosing alternative channels to the App Store.[287] On the developer side, these alleged restrictions include the DPLA and the App Review Guidelines.[288] On the consumer side, the alleged restrictions include Apple's prohibition of jailbreaking and sideloading.[289] Professor Stiglitz presents several examples supposedly illustrating how the challenged conduct limits options for consumers and developers. Professor Stiglitz ignores that the challenged conduct has not harmed competition and does not restrain interbrand competition.

<blockquote>a)    <u>Professor Stiglitz Fails to Recognize that Centralized Distribution Has Not Reduced or Harmed Competition</u></blockquote>

137.    Professor Stiglitz claims that as per the DPLA, developers can distribute their iOS apps only via the App Store and that only Apple has the ability to approve or reject iOS apps for

---

[287]    Stiglitz Report, ¶ 64 ("In Section III.A, I describe Apple's contractual and technological restrictions that precluded alternative channels of iOS app sales, which allowed Apple to acquire and maintain its monopoly power in the sale of iOS apps. Evidence suggests that, in the absence of Apple's conduct, the App Store would likely have faced more competition from alternative purchase channels, and that Apple's current security and privacy safeguards could be replicated or improved upon by alternative app stores."). *See also*, Stiglitz Report, ¶¶ 68–74.

[288]    Stiglitz Report, ¶¶ 68–69 ("In order to distribute their apps on the App Store, Apple requires iOS app developers to agree to the DPLA and ensure their apps comply with the App Store Review guidelines. The DPLA […] outlines the terms under which developers may create, distribute, and update applications within the iOS ecosystem, including iOS devices. Among other requirements, it stipulates that iOS app developers cannot distribute their iOS apps outside of the App Store. […] After creating an iOS app, developers must submit that app to Apple for review before it is listed on the App Store. The App Review Guidelines […] establish the requirements an app must meet to be approved for distribution on the App Store. These requirements […] give Apple full discretion over approval and rejection decisions of both apps and their subsequent updates.[…] Apple rejects apps that function like an app store."), ¶ 71 ("Together, these restrictions foreclose virtually all alternatives for distributing iOS apps to consumers: The App Review Guidelines prevent the distribution of store-like apps through the App Store, and the DPLA prevents developers who sell their apps through the App Store from distributing their apps, both their store-like apps and others, via an alternative iOS app store if one were to exist.").

[289]    Stiglitz Report, ¶¶ 72–73 ("Apple has erected additional barriers to accessing the few remaining alternatives to its App Store. One method consumers could attempt to use is 'jailbreaking.' […] Apple has issued multiple iOS updates that have further complicated the process. […] Apple's actions have made jailbreaking a rare practice over time, and "only an option for 'very skilled hackers or teams of hackers.'""), ¶¶ 74–75 ("Alternatively, consumers may attempt to sideload apps […] Apple facilitates sideloading for large organizations to distribute proprietary, internal-use apps directly to employees via its Apple Developer Enterprise program. […] Outside of the Apple Developer Enterprise program, consumers could attempt to download apps from third-party app developers' websites. However, I understand from available evidence that Apple's restrictions prevent this form of sideloading. […] With these barriers in place, developers have effectively no options to distribute their iOS apps to iOS device users, who comprise more than half of the U.S. smartphone and tablet markets, other than to adhere to Apple's restrictive agreements. As a consequence, the App Store is the near exclusive channel through which developers can sell their iOS apps").

distribution.[290] Professor Stiglitz then asserts that "Apple rejects apps that function like an app store."[291] To illustrate this point, he provides Facebook Gaming and Tencent's WeChat as examples of apps that were flagged by the App Store for having store-within-a-store functionality.[292] He also discusses cloud gaming apps, such as Microsoft's Xbox Cloud Gaming, and super apps—single apps that host mini-programs and offer access to various products and services—as examples of apps rejected by App Store.[293] According to Professor Stiglitz, these examples show how Apple's centralized distribution has harmed competition by excluding alternative stores within the App Store.[294] For example, the distribution of Microsoft's Xbox Cloud Gaming on the App Store would allow consumers to engage in transaction involving apps offered by Microsoft's Xbox Cloud Gaming while allowing Microsoft to benefit from the App Store's services. Therefore, Apple's restriction is akin to a refusal to deal, limiting a rival app marketplace's ability to free-ride on the

---

[290] Stiglitz Report, ¶ 69 ("After creating an iOS app, developers must submit that app to Apple for review before it is listed on the App Store. The App Review Guidelines (previously referred to by Apple as the 'App Store Review Guidelines'), which were released in 2010, establish the requirements an app must meet to be approved for distribution on the App Store. These requirements encompass technical, legal, content, and user experience criteria apps must satisfy, and give Apple full discretion over approval and rejection decisions of both apps and their subsequent updates.").

[291] Stiglitz Report, ¶ 69.

[292] Stiglitz Report, ¶ 70 ("[I]n 2019, Apple contacted Facebook about an "issue" with the live Facebook app because its 'design [was] considered store-like' with 'tiles [that] look[ed] like the App Store,' it contained features, such as 'game icons' or 'recommending games,' that were 'very similar to App Store features.' Apple has similarly sent Tencent 'notice to take down' third-party sellers who have sold digital goods through its WeChat app because apps with '[s]tore-in-store' features are prohibited by the App Store Review guidelines.").

[293] Stiglitz Report, ¶¶ 117–120 ("Apple's restrictions force game developers to develop multiple versions of their app (i.e., one for the cloud and one for iOS devices) instead of just one version for the cloud. […] Apple requires that users download the games they want to play separately, as individual apps.[…] The first restriction prevents games within the catalog app from being launched directly from the cloud streaming app. The second restriction means that while games can still be run on the cloud, each must be downloaded as a separate app from the App Store.[…] Documents also show that Microsoft initially planned to release its popular cloud streaming service, xCloud, on iOS devices and invested in developing a native iOS app, Xbox Game Pass. However, Apple rejected the Xbox Game Pass app in 2020 […] [Microsoft] ultimately decided to launch xCloud as a browser-based web app that is not subject to Apple's restrictions on cloud streaming apps.[…] Apple has also imposed restrictions on super apps (single apps that run a number of mini programs and offer access to a wide range of physical and digital products as well as online and offline services), prohibiting digital transactions and stripping away the design and visual presentation of their content, such as recommending and categorizing games, because it has a 'store-like' resemblance.").

[294] Stiglitz Report, ¶ 70 ("Together, these restrictions foreclose virtually all alternatives for distributing iOS apps to consumers: The App Review Guidelines prevent the distribution of store-like apps through the App Store, and the DPLA prevents developers who sell their apps through the App Store from distributing their apps, both their store-like apps and others, via an alternative iOS app store if one were to exist.").

94

innovations provided by the App Store. Professor Stiglitz claims this restriction reduces the quantity and quality of iOS apps. However, as I explain below, this restriction protects Apple from having to deal with competitors in a way that would allow competing app marketplaces to free-ride on its investments.

138.   Professor Stiglitz also argues that Apple's sideloading restriction limits options for consumers,[295] and Apple's prohibition of jailbreaking prevents the installation of third-party app marketplaces like Cydia.[296] In this case, Professor Stiglitz's view appears to be that the challenged conduct involves Apple engaging in a refusal to redesign iOS to permit sideloading options, thereby reducing competition from rival app marketplaces and the quantity and quality of apps.

139.   Irrespective of whether centralized distribution of iOS apps is viewed as a refusal to deal or a refusal to redesign iOS, Professor Stiglitz fails to show how these alleged restrictions on store-within-stores or sideloading have harmed competition. As I discussed in my opening report, Apple designed the App Store and iOS app distribution in a manner that would address the significant interest in third-party native apps for the iPhone, while also maintaining a sufficiently high-quality experience for consumers, protecting consumers from potential security and privacy threats, protecting consumers and developers from

---

[295]   Stiglitz Report, ¶ 75 ("With these barriers in place, developers have effectively no options to distribute their iOS apps to iOS device users, who comprise more than half of the U.S. smartphone and tablet markets, other than to adhere to Apple's restrictive agreements. As a consequence, the App Store is the near exclusive channel through which developers can sell their iOS apps.").

[296]   Stiglitz Report, ¶ 73 ("iOS device consumers could access Cydia via the internet, but only if they were to jailbreak their phones. In its attempts to discourage users to jailbreak their phones, Apple claimed in 2009 that jailbreaking constituted a copyright infringement and a violation of the Digital Millenium Copyright Act (DMCA), and Apple also regularly updated its iOS to make jailbreaking progressively more difficult over time. Cydia has alleged that Apple eventually updated its iOS in 2018 to make it 'essentially impossible' for app stores like Cydia to operate on iPhones.").

fraud, and protecting developers from software piracy.[297] In fact, there are several reasons why these restrictions are not anticompetitive and can have procompetitive benefits as I discuss in **Section IV.G**.

140.   Professor Stiglitz ignores that these restrictions do not bar developers from listing these apps on the App Store on a standalone basis. As such, Professor Stiglitz's interpretation of these restrictions as limiting competition by refusing to allow third-parties app marketplaces to distribute iOS apps and in turn reducing output and lowering consumer surplus is incorrect.[298]

141.   In addition, as I discussed in **Section IV.C**, Apple did not have market power, let alone monopoly power, in the smartphone or tablet market when it chose the App Store model based on centralized distribution of iOS apps. Therefore, even if Professor Stiglitz views this conduct as a refusal to deal and a refusal to redesign iOS, this challenged conduct was not chosen by Apple as a mechanism to assert its monopoly power, or as an attempt to monopolize another market, since Apple did not possess monopoly power at the time it chose the challenged conduct, a point Professor Stiglitz agrees with in his testimony.[299]

---

[297]   Sundararajan Opening Report, ¶ 114. *See also,* "Nine Years of Apple's iOS SDK Generated $60 Billion, 1.4 Million Jobs," *AppleInsider*, March 7, 2017, available at https://appleinsider.com/articles/17/03/07/nine-years-of-apples-ios-sdk-generated-60-billion-14-million-jobs (A note from Steve Jobs [in October 2007] was posted to Apple's Hot News site, which reads: "'It will take until February to release an SDK because we're trying to do two diametrically opposed things at once— provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc. This is no easy task. Some claim that viruses and malware are not a problem on mobile phones— this is simply not true. There have been serious viruses on other mobile phones already, including some that silently spread from phone to phone over the cell network. As our phones become more powerful, these malicious programs will become more dangerous. And since the iPhone is the most advanced phone ever, it will be a highly visible target.'").

[298]   Stiglitz Report, ¶ 150 ("Each of these restrictions functions to constrict the offerings on the App Store. As a result of the restrictions, the App Store does not offer, for example, game streaming functionality, or in-app options for subscriptions or purchases for certain developers, or may have fewer bundled offerings. Keeping these restrictions in place degrades the user experience and limits the total output on the App Store, which reduces the App Store's quality and value. Economic theory implies that these restrictions would not be imposed if there were competition in the form of alternatives to the App Store.").

[299]   Stiglitz May 2025 Deposition, pp 92:25-93:13 ("Q. How about 2008? In your opinion, did Apple have market power in the smartphone market in 2008 when it opened the App Store? A. You know, almost by definition, did it have market power in the smartphone market as defined at the, by IDC at that time? The answer is no. There might have been another definition of smartphone and I mentioned that the, the fact that -- I think it's somewhere in my report -- at that particular time, the competitor firms like Blackberry were in many ways significantly different. They were differentiated from -- but, you know, I focused only on, on that particular definition for my purposes, my report. And given that definition of the market, obviously it didn't have a significant share.").

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

142. Moreover, Apple's IP investments related to its devices and its systems for facilitating transactions involving iOS app and in-app digital content distribution have benefited developers and consumers (*see* **Section IV.G**). Centralized distribution contributes to protect these investments, and therefore should not be viewed as anticompetitive. [300] Allowing store-within-stores such as Microsoft's Xbox Cloud Gaming would have forced Apple to let competitors free-ride on its investments in innovation for the distribution of iOS apps. It is not in the economic interest of firms to allow competitors to benefit from their investments without compensation, and I understand that antitrust authorities and economists have agreed that firms should not be compelled to deal with rivals in a way that can undermine their investments in innovation. [301] As I discuss in **Section IV.G**, allowing

---

[300] Carlton, Dennis W. and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, Autumn 2008, pp. 285–305, pp. 285-287 ("An essential element of appropriate antitrust policy is to allow a firm to capture as much of the surplus that, by its own investment, innovation, industry, or foresight, the firm has itself brought into existence. Alternative policy approaches to single-firm conduct […] seriously threaten to impede economic growth and welfare over time. […] For firms to have the proper incentives to invest and create, they must be permitted to profit from their success."). *See also*, Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755, p. 12749 ("Compulsory licensing may undermine incentives for research and development by reducing the value of an innovation to the inventor.").

[301] Garza, Deborah A., Jonathan R. Yarowsky, Bobby R. Burchfield, W. Stephen Cannon, Dennis W. Carlton, Makan Delrahim, Jonathan M. Jacobson, Jr. Donald G. Kempf, Sanford M. Litvack, John H. Shenefield, Debra A. Valentine, and John L. Warden, "Antitrust Modernization Commission Report and Recommendations," April 2007, pp. 101-102 ("[A]bsent a right to refuse to deal with a rival, a firm that lawfully obtained a monopoly through superior acumen, skill, foresight, or industry would find itself forced to share the fruits of its investment with rivals, thereby undermining the value of its lawfully acquired monopoly and discouraging others from making similar investments. Because investments in new facilities and assets often enhance consumer welfare, antitrust rules that discourage such activity should be avoided. Forced sharing stultifies the incentives of smaller firms to develop alternatives to the monopolist's product. Moreover, forced sharing requires courts to determine the price at which such sharing must take place, thereby transforming antitrust courts into price regulators, a role to which they are ill suited."). *See also*, Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755, p. 12753–54("[C]ompulsory licensing can have two negative effects on economic welfare. It can reduce welfare in the short run by compelling inefficient licensing. It can also reduce welfare in the long run by reducing incentives for innovation. In general, the effects of compulsory licensing may act to increase or decrease economic welfare in both the short and the long run, depending on specific parameter values and the dynamics of competition. It is this indeterminacy that makes compulsory licensing a potentially very costly public policy instrument […] An obligation to deal does not necessarily increase economic welfare even in the short run. In the long run, obligations to deal can have profound adverse incentives for investment and for the creation of intellectual property…. the crucial role of incentives for the creation of intellectual property is reason enough to justify skepticism toward policies that call for compulsory licensing. Equal access (compulsory licensing in the case of intellectual property) is an efficient remedy only if the benefits of equal access outweigh the regulatory costs and the long run disincentives for investment and innovation. This is a high threshold, particularly in the case of intellectual property.").

rival marketplaces to free-ride on Apple's investments in innovation would lower Apple's incentive to invest, thereby lowering overall consumer welfare.

143.  Furthermore, Professor Stiglitz has not provided any evidence that Apple's alleged refusal to deal and refusal to redesign iOS have harmed competition in any way. In fact, the vast majority of iOS apps and in-app digital content on the App Store are provided by third-party developers, not by Apple,[302] and Apple does not collect any commission on nearly ███████ of accounts that transact on the App Store.[303] Professor Stiglitz and Plaintiffs provide no evidence to back their claim Apple's challenged conduct has resulted a reduction in output. Rather, the evidence I reviewed and discussed in my opening report shows rapid and persistent increase in the number of iOS apps and App Store transactions since 2008. As an illustration, following the launch of the App Store, the number of available iOS apps reached 10,000 by the beginning of 2009. Five years later, the App Store had one million apps, and by its 10th anniversary, the number of available apps was nearly two million. In 2008, consumers downloaded 439 million apps from the App Store. Three years later, the total number of app downloads had increased to 12.4 billion. By 2022, this total number of app downloads surpassed 370 billion.[304]

144.  Professor Stiglitz also ignores that Professor McFadden's and Dr. Song's model and Dr. Abrantes-Metz's calculation of the but-for commission rate do not provide a way to separately quantify alleged anticompetitive harm from the different elements of the challenged conduct. I discuss this issue with Dr. Abrantes-Metz's calculation in **Section V.E**, and I understand Professor Prince discusses this issue with Professor McFadden's and Dr. Song's model in his report, noting that Professor McFadden and Dr. Song have not defined a way to allocate what the harm to consumers would be from each element of the challenged conduct.

---

[302]  Sundararajan Opening Report, ¶ 150.

[303]  Hitt Opening Report, ¶ 59 ("[A]ccording to the App Store Transaction Data, there are approximately ████ ███████ consumer accounts that have made a free or paid transaction through the U.S. Storefront of the App Store (i.e., downloaded an app or made a digital in-app purchase) during the portion of the Class Period for which I have transaction data. Of these, approximately ██████ consumer accounts have positive billings on net. Thus, ████████ consumer accounts, ████████, have not spent any money through the U.S. App Store.").

[304]  Sundararajan Opening Report, ¶ 121.

b)   Professor Stiglitz Fails to Acknowledge Centralized Distribution
Does Not Restrain Interbrand Competition

145.   Professor Stiglitz also ignores in his analysis that Apple's centralized distribution of iOS apps does not restrain interbrand competition. In my opening report, I discussed that while Apple's centralized distribution may reduce *intrabrand* competition, which Professor Stiglitz also asserts in his testimony,[305] Professor Stiglitz ignores in his analysis that this challenged conduct can simultaneously foster *interbrand* competition.[306] Competition among manufacturers of similar products can benefit consumers by leading to more innovation, improved quality, and more competitive pricing.[307]

146.   The App Store's services and governance mechanisms, made possible through the challenged conduct, differentiate the App Store and Apple's devices from other app marketplaces and other devices along dimensions valued by certain consumers, including privacy, security, reliability, app quality, and fraud protection. Professor Stiglitz fails to recognize that the challenged conduct enables Apple to compete for consumers that care about these attributes, while not restraining the ability of app marketplaces that run on other

---

[305]   Stiglitz May 2025 Deposition, p. 121:11–25 ("Q. Are you familiar with the economic distinction between interbrand and intrabrand restrictions? A. In general, yeah. Q. What's the difference? A. Well, maybe we'll put it -- well, we talk about -- competition between two brands and that restrictions of one particular provider -- I'm, I'm, I'm not saying this very well. So in this particular case, you, you could think of competition between Android and Apple; that's interbrand competition. And then restrictions within the Apple system and restrictions within the Android system. Q. And those would be intra, I-N-T-R-A, brand restrictions? A. That's right.").

[306]   Sundararajan Opening Report, ¶ 224. *See also*, Friedman, Alan, "From the Antitrust Mailbag: Manufacturer–Imposed Requirements," *Federal Trade Commission*, October 22, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/10/antitrust-mailbag-manufacturer-imposed-requirements ("For instance, manufacturer-imposed restrictions that reduce competition among dealers in the same brand ('intrabrand competition') can serve to sharpen contrasts between brands ('interbrand competition'), and as a result, enhance price, quality, and service competition between different brands for the net benefit of consumers. The bottom line is that the antitrust laws primarily protect and promote interbrand competition and evaluate any restrictions on intrabrand competition through that lens." Emphasis omitted.); Epic Order, pp. 145–146 ("As a corollary of the security justification, the app distribution restrictions promote interbrand competition. The Supreme Court has recognized that limiting intrabrand competition can promote interbrand competition. *Leegin*, 551 U.S. at 890. For example, restricting price competition among retailers who sell a particular product can help the manufacturer of that product compete against other manufacturers. *Id.* at 890–91. It is this interbrand competition that 'the antitrust laws are designed primarily to protect.' *Id.* at 895. Here, centralized app distribution and the 'walled garden' approach differentiates Apple from Google. That distinction ultimately increases consumer choice by allowing users who value open distribution to purchase Android devices, while those who value security and the protection of a 'walled garden' to purchase iOS devices. This, too, is a legitimate procompetitive justification.").

[307]   Sundararajan Opening Report, ¶ 224.

operating systems or manufacturers of other devices to compete for consumers by adopting comparable or different services and governance mechanisms.[308]

> 2. *Professor Stiglitz Fails to Consider Reasons why Apple's In-App Payment Requirement Is Not Anticompetitive*

147. Professor Stiglitz claims that Apple's in-app payment requirement is anticompetitive and has foreclosed competition. However, he does not define a relevant market for alternative in-app payment providers,[309] does not present any quantitative analysis to support the extent of foreclosure he alleges, and does not demonstrate that competition has been harmed in any way for alternative payment providers. Moreover, as Professor Stiglitz himself acknowledges, Apple permits alternative in-app payment systems for developers in the Video Partner Program,[310] which undermines his claim of near-total foreclosure.

148. To claim foreclosure, Professor Stiglitz needs to define a market for in-app payment systems and show that Apple's in-app payment requirements, launched in 2009, has foreclosed entry into this market. As Professor Stiglitz confirmed in his testimony, this analysis has not been conducted.[311] Let's suppose the market in which Professor Stiglitz claims Apple has foreclosed competition of payment processing systems is restricted to those involving apps on iOS devices. Even within this relatively small market, Professor Stiglitz's claim regarding Apple's ability to foreclose competition seems suspect since in-app purchase transactions are only a small fraction of all transactions processed

---

308   Sundararajan Opening Report, ¶ 225.

309   Stiglitz May 2025 Deposition, pp. 159:19–160:6 ("Q. Well in the next sentence in paragraph 80, you say that: '... in the absence of [the iAP requirement] ... [would lead] to a more competitive landscape for in-app payment processing solutions.' Correct? A. That's right.  Q. And that's not a market that you've defined in your opinions, is it? A. It's not a market that I've really focused on and, and the consequences of lack of competition in that, with respect to the purchase -- to the acquisition of apps and in-app content, I've not really investigated[.]").

310   Stiglitz Report, ¶¶ 83–84 ("Apple allows its video entertainment partners to use their choice of payment system for in-app transactions made by their existing users. […] Additionally, Apple allows iOS app developers selling physical goods and services to utilize alternatives to Apple's IAP system. These developers have their choice of non-IAP in-app iOS payment solutions.").

311   Stiglitz May 2025 Deposition, pp. 159:19–160:6 ("Q. Well in the next sentence in paragraph 80, you say that: '... in the absence of [the iAP requirement] ... [would lead] to a more competitive landscape for in-app payment processing solutions.' Correct? A. That's right.  Q. And that's not a market that you've defined in your opinions, is it? A. It's not a market that I've really focused on and, and the consequences of lack of competition in that, with respect to the purchase -- to the acquisition of apps and in-app content, I've not really investigated[.]").

by payment systems that involve the use of an iOS device,[312] and Apple does not and has never required the use of its in-app purchase system for transactions involving iOS devices that occur outside of the App Store. If the market in which Professor Stiglitz claims foreclosure by Apple is not restricted to transactions involving iOS devices, Professor Stiglitz's claim seems somewhat ludicrous, since iOS transactions are but a tiny fraction of all transaction processed by digital payment systems.[313]

149.    Furthermore, Apple's in-app payment requirement is consistent with the business practices of other two-sided transaction platforms that charge a commission rate and require in-app transactions to be processed through their own payment system. For example, the Galaxy Store requires developers to use Samsung's designated in-app payment systems.[314] Similarly, the Microsoft Store requires that developers of games and digital products on Xbox consoles use Microsoft's in-product purchasing system for in-app transactions.[315]

---

[312]    "App Store Developers Generated $1.1 Trillion in Total Billings and Sales in the App Store Ecosystem in 2022," *Apple Newsroom*, May 31, 2023, available at https://www.apple.com/gw/newsroom/2023/05/one-point-one-trillion-generated-in-app-store-ecosystem-in-2022/ ("The App Store continues to create incredible opportunity for developers around the world, with more than 90 percent of the billings and sales accruing solely to developers and businesses of all sizes — without any commission paid to Apple.").

[313]    "10 Years of Cash, Cards and Crypto: Worldpay's Global Payments Report Tracks a Decade of Transformation," *Worldplay*, March 11, 2025, available at https://corporate.worldpay.com/node/7111/pdf, p. 1 ("Spending through digital payment methods [including account-to-account (A2A), buy now pay later (BNPL), cryptocurrencies and digital wallets] in e-commerce and in-person shopping grew from $1.7 trillion in 2014 to $18.7 trillion globally in 2024, a nearly eleven-fold increase.").

[314]    "Samsung Galaxy Store Seller Portal," *Samsung*, May 15, 2025, available at https://seller.samsungapps.com/help/termsAndConditions.as ("All Sales Proceeds generated whether by credit card, mobile phone or third party carrier billing shall be processed by one or two payment gateway companies designated by us.").

[315]    "Microsoft Store Policies Version 7.18," *Microsoft*, available at https://learn.microsoft.com/en-us/windows/apps/publish/store-policies ("The following products are required to use the Microsoft Store in-product purchase APIs for the purchase of digital goods and services. Purchase of digital goods and services includes voluntary donations that result in the user receiving digital goods or services in return for the donation, including but not limited to additional features or removal of advertising. (a) Games (excluding games made available through a subscription in PC gaming subscription products and in-app purchases in such games) (b) Products offered on Xbox consoles. If your product is required to use the Microsoft in-product purchase API it must not direct users to a purchase mechanism other than the Microsoft Store in-product purchase API but may enable users to consume previously purchased digital content or services.").

Steam requires developers to use its internal payment system for all in-game purchases.[316] Likewise, the Amazon Appstore requires developers to use Amazon's in-app purchasing system under the Amazon Developer Services Agreement.[317] All of these platforms charge developers a commission rate and, like Apple, rely on their in-app payment systems to reliably collect this revenue share.[318] The prevalence of centralized distribution with revenue sharing among other platforms is not surprising because there are several benefits to consumers and developers from this pricing structure. There are thus business reasons unrelated to the allegation of monopoly power that justify this choice, as I further discuss in **Section IV.G)**.[319]

### 3. *Professor Stiglitz Fails to Consider Reasons Why Apple's Former Anti-Steering Provisions Were Not Anticompetitive*

150.    Professor Stiglitz argues that Apple's former anti-steering provisions, which until 2024 prohibited most developers from directing users to "alternative purchase channels outside

---

[316]   "Microtransactions (In-Game Purchases)," *Steamworks*, available at https://partner.steamgames.com/doc/features/microtransactions ("For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet."), ("The purchase process occurs in the following sequence. Your customer always starts and completes his order in your game. 1. When a user wishes to buy something in-game, your game sends a purchase request to your purchasing server … The server will need to communicate with the Steam billing servers over HTTP […] 2. Your purchasing server then initiates a payment transaction on behalf of the client to the Steam web service […] 3. Upon receiving this request, Steam will automatically activate the client's in-game overlay and present a dialog to the user listing all of the items, their cost and a button to confirm or authorize the transaction […] The Steam overlay handles collecting all of the user's billing information […] 4. Your purchasing server receives the notification and posts a FinalizeTransaction call to Steam to complete the operation […]").

[317]   "Monetization and Advertising Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/monetization.html ("As detailed in the Amazon Developer Services Agreement, if you make digital content available for purchase that can be used in your app, you must use our In-App Purchasing API or other methods we make available to you. If you make such content available for purchase, you may not enable account creation within your app unless you use our IAP API. You also may not direct customers to use other methods of paying for such content.").

[318]   Sundararajan Opening Report, ¶ 130, Exhibit C.3.

[319]   Sundararajan Opening Report, ¶ 186.

of the App Store," has restricted competition.[320] Professor Stiglitz claims that these restrictions imposed costs on consumers, who must either search separately to purchase in-app digital content outside the app or pay higher prices within the app.[321] In Professor Stiglitz's view, these provisions affected competition outside the App Store and increased Apple's revenues at the expense of consumers.[322] I note that this view, which implies that absent Apple's former anti-steering provisions, consumers would substitute to non-App Store options for in-app digital content purchases, is inconsistent with Professor Stiglitz's market definition which implies that out-of-app transactions are not reasonable substitutes for in-app digital content transactions.[323] Professor Stiglitz also claims that Apple's former anti-steering provisions led to certain developers not offering the option for in-app digital content purchases, thus degrading the consumer experience and reducing the number of possible transactions for developers.[324] As I noted earlier, this conduct is not part of Plaintiffs' complaint. I nevertheless explain why this conduct is not anticompetitive.

151.   ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

---

[320] Stiglitz Report, ¶ 63 ("The case at hand is about Apple's alleged anticompetitive conduct associated with the sale of iOS apps and in-app content and the resulting harm to competition and consumers. In this section, I explain Apple's at issue conduct, including […] Apple's antisteering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."), ¶ 87 ("From the release of the App Review Guidelines in 2010, Apple has imposed 'anti-steering provisions' that limit the ability of developers to direct users to payment methods outside of the App Store. Until January 2024, Apple prohibited developers from including 'buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [Apple's In-App Purchase system].").

[321] Stiglitz Report, ¶ 93 ("These restrictions are costly to consumers, who either bear the inconvenience of having to separately search for and purchase in-app content outside of the app or suffer from paying higher prices for in-app content within the app.").

[322] Stiglitz Report, ¶ 93 ("By actively policing these rules, Apple further tightens its monopolistic control over the sale of in-app content and prohibits any meaningful competition from outside of the App Store, thereby generating higher revenues for the App Store.").

[323] Stiglitz Report, Section V.B.7 ("Purchasing In-App Content Outside of the App Store Is Not a Reasonable Substitute for Purchasing In-App Content Through the App Store.").

[324] Stiglitz Report, ¶¶ 113–114 ("In addition, as a result of Apple's anti-steering restrictions, some developers have decided to not offer the option for in-app purchases. Spotify and Netflix are two prominent examples, which instead only provided users with the option to subscribe via their websites. This resulted in consumers not being able to purchase their subscription services within the app, increasing the costs of setting up or managing their subscription and degrading the user experience. In fact, Apple has acknowledged its that anti-steering restrictions have resulted in a decline in premium memberships for Spotify.").



152.    For example, American Express prohibits merchants who advertise that they accept American Express cards from encouraging consumers to switch to lower-cost payment options at the point of sale.[326] If merchants could steer consumers to lower-cost payment options at the point-of-sale, they could benefit from the consumer base and reputation of American Express which may have influenced the consumer's decision to visit the

---

[325]    Stiglitz Report, ¶¶ 89–92 ("In 2016, Spotify attempted to remove the option to subscribe via Apple's IAP and direct new users to sign up via its website. This update to the iOS Spotify app was swiftly rejected by Apple. […] In 2022, Spotify's attempts to integrate audiobooks into its app without using Apple's IAP led to multiple rejections by Apple, citing violations of rules against steering users toward external purchase channels […] Another example of developers' failed attempt to direct users out of the App Store for the purchase of in-app content is Netflix. Between 2016 and 2018, Netflix engaged in multiple attempts to direct users to external payment methods but faced consistent rejections from Apple. These attempts to include external links were rejected by Apple, which culminated in Netflix withdrawing from Apple's IAP system: first by disabling in-app subscriptions for new customers in December 2018, and ultimately by terminating all legacy in-app subscriptions in February 2024.[…] In another case, the Sony e-reader app included a link that directed users to purchase e-books through Sony's website, thereby circumventing Apple's IAP requirements. In 2011, Apple informed Sony that all transactions within the app must go through the IAP, citing to the antisteering provisions in its App Store Review Guidelines.[…] ▬▬▬▬▬▬▬▬▬

[326]    "Merchant Operating Guide: All Regions," *American Express*, April 2025, available at https://icm.aexp-static.com/content/dam/gms/en_us/optblue/us-mog.pdf, p. 10 ("Except as expressly permitted by Applicable Law, you must not: […] indicate or imply that you prefer, directly or indirectly, any Other Payment Products over the Card, try to dissuade Cardmembers from using the Card,[…] try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check) […].").

merchant in the first place[327] without compensating American Express for its brand-building investments. Similarly, ridesharing platforms such as Uber and Lyft explicitly prohibit drivers from steering riders toward off-platform payment methods.[328] If drivers could steer riders to off-platform payment methods, they would benefit from the platform's user base, reputation, services, and governance mechanisms while bypassing the transaction completion and payment steps that allows the platform to earn revenue and fund its investments and operations.

153.   In addition, I understand that Professor Jin explains several reasons why Professor Stiglitz has failed to establish that Apple's former anti-steering provisions have harmed consumers. For example, Professor Jin also highlights the inconsistency between Professor Stiglitz's market definition and the anti-steering claims.[329]

### G.   Professor Stiglitz Fails to Analyze the Procompetitive Benefits of Apple's Conduct

154.   In this section, I explain that Professor Stiglitz' analysis is also flawed because he fails to analyze the procompetitive justifications of Apple's alleged anticompetitive conduct.

---

[327]   Evans, David S. and Richard Schmalensee, "The American Express Decision and Its Critics: Reflections After Five Years," December 6, 2023, pp. 1–11 p. 3 ("Without the antisteering rules, merchants could get the benefit of the business the Amex signs generated without paying American Express."). *See also*, "Value of Acceptance," *American Express*, available at https://www.americanexpress.com/content/dam/amex/us/merchant/pdf/value_of_acceptance_b2b.pdf ("Businesses that accept American Express can attract high-quality buyers."). For example, displaying Amex signage at a business attracts more cardholders to the business. Specifically, Amex states that the majority of Amex card members look for signs that a business accepts Amex card. "Free Signage to Attract More Card Members," *American Express*, available at https://www.americanexpress.com/en-au/business/merchant/free-signage.html, ("Displaying American Express signage encourages spending, 65% of Amex Card Members say they look for signs that a business accepts American Express. Displaying American Express signage brings in customers, 65% of Amex Card Members say they look for signs that American Express is accepted before making a purchase.").

[328]   "My Driver Asked to Be Paid in Cash or Charged Me a Taxi Fare Outside of the Uber App," *Uber*, available at https://help.uber.com/riders/article/my-driver-asked-to-be-paid-in-cash-or-charged-me-a-taxi-fare-outside-of-the-uber-app?nodeId=784e9d0e-c95f-40a9-a08d-3a51798d7aed ("[P]ayments, including tips, are made via the Uber app – just like any other trip you take with Uber. There is no reason to hand cash or make a separate payment to the driver. If you encounter Uber Driver Partners soliciting trips off-app, asking for your trip to be paid in cash or directly to them, please complete this form.").

[329]   Jin Rebuttal Report, Section 3.3.2.

*1.      Professor Stiglitz Fails to Consider the Procompetitive Justification for Centralized Distribution of Apps*

155.   As I explained in **Section IV.F**, Professor Stiglitz claims that Apple imposes contractual and technological restrictions on developers and consumers to centralize the distribution of iOS apps on the App Store, thereby foreclosing other alternative channels.[330]

156.   Professor Stiglitz cites the opinions of Professor Kohno and Professor Martin to argue that Apple's current security and privacy safeguards, including the App Review process, can be replicated and improved upon by alternative app marketplaces, and based on these opinions, concludes there are no procompetitive justifications to Apple's challenged conduct.[331] He does not provide any additional support for this assertion or discuss whether third-party app marketplaces would have the same economic incentives as Apple does to achieve the same benefits for consumers and developers. As I explain below, Professor Stiglitz's claims regarding the lack of procompetitive justifications of the challenged conduct are flawed and unsupported.

a)      Centralized Distribution Contributes to Protecting Consumers and Developers from Adverse Outcomes

157.   As I discussed in my opening report, the challenged conduct is procompetitive because it contributes to enhancing security, privacy, reliability, and app quality while protecting both consumers and developers from adverse outcomes.[332] Professor Stiglitz's claims regarding the anticompetitive effects of Apple's challenged conduct overlook the reasons why Apple is better positioned than any third-party app marketplace to implement the services and governance mechanisms required to achieve each of these goals. Apple's advantage stems from at least two factors: (i) Apple has a stronger economic incentive than any third-party app marketplace would have to protect both consumers and developers from adverse outcomes to preserve the value of its brand and the consumer perception of the quality of

---

[330]   Stiglitz Report, ¶¶ 64, 68–74.

[331]   Stiglitz Report, ¶ 79 ("I understand from Professor Kohno and Professor Martin that Apple's current security and privacy safeguards could be replicated, and in many regards improved upon, by alternative app stores. […] Professor Kohno and Professor Martin both conclude that Apple could replicate its current security and user privacy standards through much less restrictive means. Based on this evidence, I conclude that Apple does not need to foreclose other sale channels for iOS apps in order to maintain security and user privacy.").

[332]   Sundararajan Opening Report, Section VI.C.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

its devices, and (ii) as the manufacturer of the iPhone and iPad and the developer of their operating systems, Apple has technical advantages over any third-party app marketplace.

### i. Apple Has a Stronger Incentive than Third-Party App Marketplaces to Protect Consumers and Developers from Adverse Outcomes

158. Putting aside the issue that it may not be technologically feasible for a third-party app marketplace to implement an app review process of comparable quality and security to that of the App Review process, a point I discuss later, Professor Stiglitz ignores that these third-party app marketplaces may have a weaker incentive than Apple does to invest in developing and conducting a rigorous app review process, for the reasons I describe below.

159. As the seller of iOS devices, Apple has a stronger incentive than any third-party app marketplace to implement services and governance mechanisms that improve app security, privacy, reliability, and quality, and reduce the risk of adverse outcomes for consumers and developers.[333] If an iOS device owner has a negative experience on the App Store, this experience can negatively affect the consumer's perception of the app developer and the value of the App Store. In addition, it can negatively affect the consumer's perception of Apple's devices and consequently, the value of Apple's brand.[334] Apple's brand perception is particularly important to the company's business strategy. As Professor MacCormack described in his 2012 Harvard Business School case study, Apple's superior brand

---

[333] Sundararajan Opening Report, ¶¶ 206, 216–220.

[334] Sundararajan Opening Report, ¶ 206. *See also*, "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," *Apple*, October 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_Sideloading.pdf ("If Apple were forced to support sideloading: More harmful apps would reach users because it would be easier for cybercriminals to target them – even if sideloading were limited to third-party app stores only. The large amount of malware and resulting security and privacy threats on third-party app stores shows that they do not have sufficient vetting procedures to check for apps containing known malware, apps violating user privacy, copycat apps, apps with illegal or objectionable content, and unsafe apps targeted at children. […] Users would have less information about apps up front, and less control over apps after they download them onto their devices. Users may not get accurate information about apps they sideload through third-party app stores or via direct downloads because these app stores would not be required to provide the information displayed on the App Store product pages and privacy labels. […] Some sideloading initiatives would also mandate removing protections against third-party access to proprietary hardware elements and non-public operating system functions. This would undermine core components of platform security that protect the operating system and iPhone data and services from malware, intrusion, and even operational flaws that could affect the reliability of the device and stop it from working." ).

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

perception among consumers was one of the strengths that Apple leveraged in its negotiations with wireless carriers when it first launched the iPhone.[335] Apple's brand is currently estimated to be the most valuable in the world. With the exception of the year 2023, Apple has held the top spot as the world's most valuable brand since 2021.[336] Apple thus has a strong incentive to protect its brand.

160. If a consumer downloads an app that inordinately drains the device battery, increases the device temperature, causes apps to slow down, or leads to app crashes, the consumer may not realize that the source of these issues is the app, and may instead attribute the negative experience to the device or Apple's brand. When Apple uses the App Review process to screen for and reject apps that abuse device resources[337] and to enforce the broader considerations set forth in the App Review Guidelines that I discussed in my opening report, it thus clearly has a greater incentive to prevent bad outcomes than would a third-party app marketplace which does not bear any direct costs if Apple's devices are perceived less favorably by consumers.[338] Thus, the challenged conduct maintains higher standards for privacy, security, reliability and quality of apps and in-app digital content and reduces the risk of such adverse experiences for consumers more than would be the case in a but-for world with third-party app marketplaces.[339]

---

[335] MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 8 ("Apple's brand perception gave it a considerable leverage in negotiating with wireless carriers, which had previously dictated terms to phone manufacturers.").

[336] "Apple is the 2025 Most Valuable Brand in the World, NVIDIA Breaks into Top Ten," *Brand Finance*, January 21, 2025, available at https://brandfinance.com/press-releases/apple-is-the-2025-most-valuable-brand-in-the-world-nvidia-breaks-into-top-ten ("Apple is once again the world's most valuable brand. Brand Finance, the world's leading brand valuation consultancy, values Apple's brand at USD574.5 billion for 2025, keeping it ahead of its closest rival, Microsoft, valued at USD461 billion. Except for 2023, when Apple briefly trailed Amazon by a margin of just 1%, it has held the top spot as the world's most valuable brand since 2021."). *See also*, "Best Global Brands 2024," *Interbrand*, available at https://interbrand.com/best-global-brands/.

[337] "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("Design your app to use power efficiently and be used in a way that does not risk damage to the device. Apps should not rapidly drain battery, generate excessive heat, or put unnecessary strain on device resources. For example, apps should not encourage placing the device under a mattress or pillow while charging or perform excessive write cycles to the solid state drive. Apps, including any third-party advertisements displayed within them, may not run unrelated background processes, such as cryptocurrency mining.").

[338] Sundararajan Opening Report, ¶¶ 125–126.

[339] Sundararajan Opening Report, ¶¶ 201–202.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

161. In a but-for world where a consumer could complete transactions for iOS apps and in-app digital content from alternative third-party app marketplaces, Apple would not be able to ensure that these apps and in-app digital content would have the same level of security, privacy, reliability, and quality as those that had undergone the App Review process.[340]

162. For example, I understand that the App Review process flags apps that request access to device features that are inconsistent with the purpose of the app. Craig Federighi has explained that the App Review process "take[s] a look at what the app is going to represent itself to the user as doing and what the app actually does when it is run."[341] Apple's head of App Review, Trystan Kosmynka, explained that the App Review process considers the "entitlements" that an app requests, where "an entitlement gives an app a particular

---

[340] Epic Trial Testimony of Tim Cook, pp. 3885:19–3886:1 ("Q. What would be the impact [of allowing sideloading] on Apple's ability to meet its commitments to its customers, the safety, security, and privacy commitments we talked about at the outset? A. We could no longer make the promise because […] if you think about how we make the promise of safety, security, and privacy, a large part of that is -- depends on this app review. And we believe customers want that. I know they do because they tell me that."); Trial Testimony of Trystan Kosmynka, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021 – May 7, 2021 ("Epic Trial Testimony of Trystan Kosmynka"), pp. 1076:14–1077:3 ("Q. Do you believe, Mr. Kosmynka, that allowing a store within a store on the App Store would create safety issues? A. Absolutely. Q. And can you explain why? A. So users, when they buy an iPhone or an iPad […], they expect to go to the App Store and get safe and trusted apps. There are absolutely cases where, whether it be through advertising or other ways to get in touch with a particular user, that they could be manipulated into an experience that they think is safe and trusted on the surface, and then you go deeper into that experience and realize that actually none of the content is reviewed, none of the software is reviewed, and that has severe ramifications for security, privacy, and customer safety.").

[341] Epic Trial Testimony of Craig Federighi, pp. 3385:8–3386:8 ("[A]. […] for an app to be reviewed, it has to represent what it does. It has to say, I am this app from this developer. I have this kind of functionality. I have these screenshots of what my app does. And what a human reviewer can do is then take a look at what the app is going to represent itself to the user as doing and what the app actually does when it is run and say, these two match. This is doing the same thing. This frustrates the attacker's most common technique, which is to impersonate being someone else, distributing something else. […] And a human reviewer can make that determination, which means an attacker can't take that popular piece of software -- it used to be popular -- and convince users, oh, you want to download that, here it is. Because the marketing description is going to be rejected by the App Store and so the user is never going to see that when they go to download. Q. Okay. What is functionality in the context of human policy review? A. Well, this is making sure that the app actually performs the functions it alleges to perform. If it doesn't, if it says it is a calculator and it is not actually a calculator, then this can be detected by a human reviewer."); "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("[…] Apps should only request access to data relevant to the core functionality of the app and should only collect and use data that is required to accomplish the relevant task. Where possible, use the out-of-process picker or a share sheet rather than requesting full access to protected resources like Photos or Contacts.").

109

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

permission to a set of resources or APIs on the device."[342] If an app seeks an entitlement that is inconsistent with the operation of the app itself, or where the "developer's justification or explanation as to why they need [a particular entitlement] […] is [] not accurate, not meaningful, and not reasonable within the guidelines and in the point of the view of the consumer," the App Review process will identify an issue.[343] As an example of a problematic app, Mr. Kosmynka described a social networking app that seeks access to a user's health records.[344] Similarly, Mr. Federighi provided the example of a calculator app that seeks access to health information, the device microphone, or contact information.[345] Absent the same incentives as Apple, a third-party app marketplace may not impose the same requirement in their app review process, potentially allowing a social

---

[342] Epic Trial Testimony of Trystan Kosmynka, pp. 1102:11–1102:17 ("Q. Thank you, Mr. Kosmynka. Is the terminology 'entitlement issues' used within Apple? A. Yes. Certainly we have a wide range of entitlements, and there are frequently issues with third-party apps and their entitlement requests. Q. And what is an entitlement request? A. So an entitlement gives an app a particular permission to a set of resources or APIs on the -- on the device on the user's device.").

[343] Epic Trial Testimony of Trystan Kosmynka, pp. 1102:18–1103:24 ("Q. And is there a look for potential entitlement issues during the static and dynamic analysis phase? A. Yeah. In both, and then in the human review phase as well. […] There are certain entitlements in APIs that also need a permission prompt, a TCC prompt we call them, and so I mentioned earlier in the Privacy Guideline that if the user's or developer"s [sic] justification or explanation as to why they need HealthKit, why they need health records access is, you know, not accurate, not meaningful, and not reasonable within the guidelines and in the point of the view of the consumer, we would reject that as well. So those are examples of entitlement issues.").

[344] Epic Trial Testimony of Trystan Kosmynka, pp. 1102:21–1103:15 ("[A.] […] What I can say, as like way of an example, if, say, a social networking app wanted to access health records, they would need to include the HealthKit entitlement, and if they did not, then those API calls to health records would not function as they would expect. And so that would be an issue. And so if they were to submit, our static analysis would be able to say you're calling these APIs, but you don't have the entitlement, that will not work. And so that would be one class of an issue. Another class of the issue is the opposite, actually, in which they are -- have the entitlement present but they have not called the APIs. And so in the case of HealthKit, this is a concern because if the entitlement is present in an app that conceptually likely not doing good things with HealthKit, is could be a signal to us that there's potential abuse in the future. We wouldn't want to open our customers up to that, and so we would say you need to drop the entitlement, even though there is no API calls because they potentially could introduce that dynamically post review, and we wouldn't want to take the risk.").

[345] Epic Trial Testimony of Craig Federighi, pp. 3386:9–3387:4 ("Q. Okay. And then what about entitlements? A. Well, so we have talked about some of the ways that a human can be socially engineered to authorize an app some access, perhaps to personal information. The way that is handled in iOS is governed by what we call entitlements. And so if a developer says, I have an app that I want to -- I want this app to be able to ask users for access to their microphone or I want to ask them for access to their contacts, they have to include in the submission a request for an entitlement, I wish to have the contact's entitlement. An app reviewer can then look at the purpose of the app and the entitlements the author is asking for and say why is this calculator asking for permission to ask for health information? Why is it asking for permission to access the contacts? This makes no sense for this calculator. And at that point, the app won't be approved, and, therefore, the app will never be able to ask for -- ask a user and try to fool or socially engineer the user into that request. Because without the entitlement, they are not even allowed to make the request at runtime.").

networking app or calculator app that can request inappropriate information or access to device resources to be made available for download.[346] The consequences of this could be significant. During the use of the app, if the app requests microphone access, although iOS may nevertheless caution the consumer when the app requests microphone access, the consumer may not pay attention to the associated alert, may not understand the prompt (for example, if a child is using the device), or may mistakenly assume that the request is legitimate. As a result, the consumer could unknowingly grant microphone access to a bad actor who has created a wallpaper app to act as surveillanceware and make unauthorized audio recordings of the consumer.[347] Even though Apple has created safeguards that require developers to obtain user consent for access to the microphone, health records, contact information, and other data or features, such apps nevertheless may trick the consumer into circumventing those safeguards via attacks referred to as "social engineering attacks,"[348] and their availability on iOS through third-party app marketplaces could adversely affect the consumer's perception of the security of iOS devices.

163. As another example, I understand that by centralizing distribution of all iOS apps and implementing the rigorous App Review process, Apple requires that apps and in-app digital content meet its privacy standards, including those requiring clear privacy disclosures and

---

[346] Epic Trial Testimony of Craig Federighi, pp. 3386:9–3387:4; Epic Trial Testimony of Trystan Kosmynka, pp. 1102:11–1103:24.

[347] Epic Trial Testimony of Craig Federighi, p. 3367:16–22 ("Q. And what is 'surveillanceware'? A. Well, so surveillanceware takes advantage of if you can get deep access to a device, get the user to give you perhaps access to their camera or microphone, you might listen in on them. You might install what is called a keylogger to try to get all the passwords you are typing or account numbers and exfiltrate that information.").

[348] Opening Expert Report and Declaration of J. Alexander Halderman, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Halderman Opening Report"), ¶97 ("[…] As with code signing, the protection of sandboxing and entitlements is stronger when used together with Apple's other layers of defense. For instance, without App Review, developers could opt into whatever entitlements they wanted, including potentially dangerous capabilities such requesting to access the device's microphone or location. Likewise, apps can still be extremely harmful even if sandboxed. Sandboxing does not, for instance, prevent social engineering. For example, sandboxing would not prevent a malicious app from mimicking an app from a user's bank and stealing their login credentials, but such an app could be caught by App Review or detected and removed by the App Store. Bad actors often prefer this kind of simple social engineering attack to more complicated attacks that would require technically circumventing on-device protections. Moreover, sandboxing can only protect user privacy and enforce consent at a coarse mechanical level. For example, based on an app's entitlements, it will be granted or denied the ability to request the device's location, but whether this access is harmful depends on what the app does with the location data. Scrutiny such as that provided during App Review can determine whether the app contains spyware or whether user consent for location access is fraudulently obtained.").

111

limiting data collection.[349] These requirements can help reduce the risk of adverse outcomes for consumers such as data breaches or sharing of more data than intended.[350] In a but-for world without centralized distribution, apps obtained via store-within-a-store apps, such as WeChat's mini programs, Facebook Gaming, or other super apps mentioned by Professor Stiglitz could seek inordinately broad access to a user's data. The developers of these store-within-a-store apps have a lower incentive than does Apple to ensure that the developers of apps made available within their store-within-a-store apps keep these apps updated, fix bugs, limit data sharing appropriately, or maintain a high level of app security, privacy, reliability, and quality. Studies have identified that such third-party app marketplaces do not necessarily enforce privacy standards adequately; for example, WeChat's mini programs often collect personal data without adequate disclosure and lack essential protections such as data encryption, thereby exposing consumers to heightened

---

[349]    "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/privacy ("5.1.1 Data Collection and Storage (i) Privacy Policies: All apps must include a link to their privacy policy in the App Store Connect metadata field and within the app in an easily accessible manner. […] (ii) Permission: Apps that collect user or usage data must secure user consent for the collection, even if such data is considered to be anonymous at the time of or immediately following collection. […] 5.1.2 Data Use and Sharing (i) Unless otherwise permitted by law, you may not use, transmit, or share someone's personal data without first obtaining their permission. You must provide access to information about how and where the data will be used.").

[350]    Halderman Opening Report, ¶ 15 ("Defending iOS against the heightened threats it faces from harmful apps calls for a defense-in-depth strategy, in which multiple defensive layers must all be breached for an attack to succeed. iOS's layers of defense include the App Review process, Apple's centralized App Store, and on-device protections implemented by the operating system and device hardware. These layers are designed to work together, and working together increases their effectiveness as a defense. In combination, they form an integrated defense system that effectively protects iOS devices and their users. Without iOS's defense-in-depth security strategy, iOS devices could serve as a highly attractive target for attackers and thus endanger their users.").

privacy risks.[351] Such privacy violations may lead to issues that the consumer associates with the device or operating system rather than with the developer, the app, or in-app digital content. Faced with this kind of negative experience, a consumer's perception of the value of iOS devices and the Apple brand could be affected adversely. This could also in turn make developing apps for iOS less attractive to developers.[352]

164.   Moreover, if a third-party app marketplace chooses an app review process that is of lower quality along the dimensions described above than what is offered by the App Store's App Review process, leading to a reduction in the perceived quality of iOS devices as described above, this suboptimal level of app review chosen by the third-party app marketplace

---

[351] Shen, Xinmei, "WeChat Mini Programs for Banking Pose 'Significant' Risks of Personal Data Leakeage, Says Report," *South China Morning Post*, July 23, 2021, available at https://www.scmp.com/tech/tech-trends/article/3142239/wechat-mini-programs-banking-pose-significant-risks-personal-data ("Mini programs that operate within Tencent's all-purpose WeChat super app pose 'significant' risks for personal data leakage, according to an annual cybersecurity report published by a group reporting to China's powerful internet watchdog. The National Computer Network Emergency Response Technical Team/Coordination Centre of China (CNCERT/CC) tested 50 personal banking mini programs and found that over 60 per cent did not encrypt any user information either on the device or when it was transmitted. In addition, more than 90 per cent of those apps were found to have no protections in place for users' sensitive data, said the report, which was released on Thursday."); Wang, Mona, Pellaeon Lin, and Jeffrey Knockel, "Should We Chat? Privacy in the WeChat Ecosystem," *The Citizen Lab*, June 28, 2023, available at https://citizenlab.ca/2023/06/privacy-in-the-wechat-ecosystem-full-report/ ("All Mini Programs, and thereby their users, are enrolled in usage tracking, meaning that a large amount of users' activity in the Mini Program is sent to WeChat and not just the Mini Program developers themselves. Permission boundaries between Mini Programs and the host WeChat platform are unclear. As one consequence, we found that granting permissions such as location permission during the use of a Mini Program will also enable the larger transmission of geolocation data to WeChat. We identify disclosure gaps with WeChat's privacy policy, which implies that only third-parties collect usage data related to Mini Programs, when, in fact, WeChat also collects this data."); Ikeda, Scott, "First Major Analysis of WeChat Ecosystem Network Requests Finds Privacy Gaps, Undisclosed Data Sharing," *CPO Magazine*, July 1 8, 2023, available at https://www.cpomagazine.com/data-privacy/first-major-analysis-of-wechat-ecosystem-network-requests-finds-privacy-gaps-undisclosed-data-sharing/ ("Most of the trouble in the WeChat ecosystem originates when users download mini programs. WeChat facilitates access to assorted sensitive device operating system functions, in addition to providing the developer access to user contact and stored payment information. Mini programs have already been the focus of controversy, with prior research finding that a good deal of them were not encrypting sensitive user data in transit or properly notifying users of information sharing with third parties. WeChat has responded to these issues by forcing mini programs to make requests through its own API, which imposes things like encryption standards. But the Citizen Lab study finds that this also provides WeChat with an alternate pipeline of first-party data that the user might not otherwise share with the app, and that it is unclear what is being done with this data as it passes through WeChat servers.").

[352] Epic Trial Testimony of Tim Cook, p. 3885:9–11 ("[A.] It would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Epic Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

imposes a negative externality on Apple: the decline in perceived quality can reduce demand for iOS devices, which in turn, can weaken Apple's incentive to invest given the lower return on its investment in innovation. This lower incentive to invest into creating innovative devices lowers consumer surplus.[353]

165.     These lower incentives to innovate are not limited to Apple's investments in its devices, but might also extend to Apple's investments in its own App Review process. In a but-for world where negative experiences from an inferior app review process on a third-party app marketplace can potentially diminish the perceived value of Apple's devices, the return to Apple derived by preserving the positive perception of its devices from its App Review investments is lower because this perception may nevertheless be tarnished by inferior apps that a consumer obtains from a third-party app marketplace. Consequently, Apple's incentives to invest in a higher quality App Review process are diminished. This could, in turn, reduce the number of developers interested in creating apps for Apple devices, which could lead to a decrease in innovative apps for all iOS consumers,[354] further decreasing the returns on Apple's investments in its App Review process, thereby weakening its incentive to continue innovating the same level. Lower incentives to innovate can make the App Store a weaker competitor. Perceiving the App Store as a weaker competitor, hypothetical competing app marketplaces may also lower their corresponding investments. As a result, consumers may be less interested in engaging in transactions involving iOS apps, which in turn, owing to indirect network effects, would further impact the participation of developers negatively.[355]

---

[353]   Sundararajan Opening Report, ¶¶ 25, 28, 189.

[354]   Sundararajan Opening Report, ¶ 206. *See also*, Epic Trial Testimony of Craig Federighi, pp. 3421:16–3422:7 ("[Q.] If app distribution were to be opened up so that sideloading is allowed for iOS devices, do you think that that would have any impact on iOS developers? A. Certainly. One of the great things about -- we think about the App Store is it's a trusted source of apps. And because of that trust and that confidence that users have, they are very free about trying out new software, about trying new apps, about downloading lots of things. And that's helped build this really unprecedented scale of activity for developers, of opportunity for developers, on the App Store. If they become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

[355]   Sundararajan Opening Report, ¶ 190.

166.    Professor Stiglitz also argues that absent the centralized distribution, consumers would benefit from third-party app marketplaces such as Aptoide which allows consumers to download older versions of apps.[356] However, Professor Stiglitz does not consider the significant risks to consumers associated with installing older versions of apps. Such apps may lack compatibility with newer operating systems, may not include critical security updates, and can expose the consumers to threats to the security, privacy, and reliability of their devices.[357] I also understand that under the present model with centralized distribution of all iOS apps, Apple devices offer consumers the ability to automatically update apps downloaded from the App Store[358]—including removing apps that have been determined to be malicious or are defunct.[359] In a world without centralized distribution of apps, third-party app marketplaces have a lower incentive than does Apple to ensure that developers keep their apps updated, fix bugs, or improve app security, privacy, reliability, and quality because the issues associated with outdated apps may lead to issues that the consumer associates with the device or operating system rather than with the app or the app marketplace. For example, outdated apps may crash on newer versions of iOS, or outdated

---

[356]    Stiglitz Report, ¶ 103 ("Following the passage of the Digital Markets Act (DMA), consumers located in the European Union have greater access to third-party app stores. One such app store, Aptoide, allows users to download older versions of apps. This functionality is particularly useful to owners of older iPhones and iPads, whose devices cannot run the newest applications.").

[357]    Sundararajan Opening Report, ¶ 208; Halderman Opening Report, ¶ 91 ("Even non-malicious apps can cause security problems if they contain unpatched vulnerabilities. When new vulnerabilities are discovered, app developers typically create software updates that correct them. […] This leaves users who have older versions of the apps installed at risk of being compromised.").

[358]    Hays, Leanne, "How to Turn On Automatic App Updates," *iPhoneLife*, September 18, 2024, available at https://www.iphonelife.com/content/how-to-set-your-iphone-apps-to-update-automatically ("When you enable automatic updates for your apps, the iPhone will update all your apps at once instead of requiring you to manually update each app individually.").

[359]    Halderman Opening Report, ¶ 15.h ("Centralized distribution through the App Store is another crucial layer of iOS's security design. […] For instance, centralized distribution of apps through the App Store is what enforces that all apps must undergo App Review before reaching users—and that all apps will continue to be subject to App Review even after becoming available for distribution to users. [...] The App Store also provides visibility into customer feedback and other signals that help Apple detect harmful apps that manage to enter distribution, and it lets Apple halt further distribution of a harmful app simply by removing it from the store. Centralized distribution also helps keep users safe when legitimate apps have vulnerabilities, as it provides an easy and efficient mechanism for security updates to reach every iOS device with the vulnerable app installed.").

apps may be more vulnerable to exploitation by bad actors.[360] Faced with this kind of negative experience, a consumer's perception of the value of iOS devices and the Apple brand could be affected adversely. This could also in turn make developing apps for iOS less attractive to developers.[361]

167. Professor Stiglitz also argues that, in the absence of the challenged conduct, consumers would benefit from having a wider range of choices of app marketplaces. He cites the examples of Windows PC and macOS users who can access and purchase apps through multiple app distribution channels.[362] However, this comparison fails to account for the distinct technical demands and risk profile associated with the iPhone and iPad environment. Mobile devices like the iPhone and the iPad are inherently more personal, more portable, and subject to more frequent and intensive use than personal computers, factors that increase the potential for security and privacy risks.[363] These risks are

---

[360] Still, Jennifer, William Antonelli, and Dave Johnson, "How to Update Your iPhone Apps, and What to Do If They Won't Update," *Business Insider*, February 16, 2022, available at https://www.businessinsider.com/guides/tech/how-to-update-apps-on-iphone ("Keeping your iPhone apps up-to-date is incredibly important. Not only will it make sure that you've got all the latest features that your apps have to offer, but it also lets the developers patch up security flaws that can leave you at risk.").

[361] Epic Trial Testimony of Tim Cook, p. 3885:9–11 ("[A.] It would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Epic Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

[362] Stiglitz Report, ¶ 77 ("[F]unctionally similar marketplaces demonstrate how Apple's restrictions foreclose competition. For instance, Microsoft does not impose such restrictions on PC app developers.[…] Likewise, Apple does not impose similar restrictions for its Mac computers. Instead, MacOS users have access to a multitude of different distribution channels, including third-party app stores and direct-to-consumer distribution. Options like these are not available to iOS device consumers."), ¶ 101 ("Both Windows PC and macOS users can access and purchase apps from a number of different channels, such as the Microsoft Store (Microsoft's own PC app store), the Mac App Store (Apple's app store for Mac PCs), specialized third-party stores like Steam (a third-party app store focused on gaming), or direct downloads from developers' websites.[…] In the absence of Apple's restrictions, iOS mobile device users would likely have benefited from a variety of choices between different app purchasing methods.").

[363] Sundararajan Opening Report, ¶ 112. *See also*, Epic Trial Testimony of Craig Federighi, pp. 3362:20–3363:7 ("Q. Okay. And then, finally, what does the value of access mean in the context of iOS devices? A. Well, iPhones are very attractive targets. They are very personal devices that are with you all the time. They have some of your most personal information, of course your contacts, your photos, but other things. They have cameras on them and microphones. They are capable of knowing your location. And so they are also often -- because they are always with you, they may be used as a key to get into your place of business or an authentication token to unlock your bank account. All of these things make access or control of these devices potentially incredibly valuable to an attacker."), pp. 3364:18–3365:3 ("A. […] iOS devices have an additional

---

116

significantly more pronounced on mobile devices than on personal computers because mobile devices include hardware like cameras, microphones, and biometric sensors, and also track a user's location, and apps on mobile devices may thus gain broader access to sensitive consumer data than apps installed on a personal computer.[364]

---

level of value or concern, in part by nature of the fact that it is a device that is always with you. And because it is always with you, if someone wanted to track your location, if someone wanted to have a live mic on you to capture your conversations, if they wanted to get access to certain kinds of credentials and tokens you use to access maybe work systems, those are likely to be on your iOS device, not nearly as likely to be on the Mac. So, in general, the iOS is -- iOS devices are a more attractive, higher-value target."); Epic Trial Testimony of Phillip Schiller, p. 2722:6–16 ("Q. And can you describe a bit more the thought process around the security and privacy issues, please. A. Yes. The idea of this new computing device in your pocket means it's capable of more new things. It's going to store information around in our life that we're not used to having all the time in our pocket. Simple example of course being location data, knowing where you are, when you are, how long you're in places is extremely personal, so these are highly personal devices with a growing amount of information available everywhere you go, roaming on other networks everywhere you go."), pp. 2733:17–2734:2 ("Q. Can you describe what the tension is between [providing an advanced platform to developers while protecting iPhone users from viruses, malware, and privacy attacks, etc.]? A. Yes. I think this is the -- the core thing at the base of all that we're talking about. We want to create a more powerful, capable platform that enables developers to create wonderful applications for all of us, but we need to find ways to do it that helps to protect users from this malware, from the threats that they're going to receive, the attacks, and to try to keep your device functioning properly. Again, this is not a general PC. This is your phone in your pocket that needs to work reliably.").

[364]   Halderman Opening Report, ¶¶ 49–51 ("iOS devices have special capabilities that could make harmful apps particularly dangerous. For instance, iOS devices have powerful sensors that could be highly invasive if abused, including cameras, microphones, location tracking sensors, and sensors related to biometrics and health monitoring. Since many users carry their iOS devices with them everywhere they go, these sensors could be used to track and eavesdrop on users throughout their daily activities.[…] iOS users often store private photographs and videos, among many other kinds of confidential data. People also use their iOS devices as password managers and to perform multifactor authentication, so they are a gateway to numerous online accounts. iOS devices are widely used for financial transactions, both by consumers and by merchants, and so they must protect card numbers, bank account credentials, contactless payment transactions, and cryptocurrency wallets. Users also trust their iOS devices for secret personal and business communications and for life-safety functions, such as calling for help in an emergency."). *See also*, Temming, Maria, "Your Phone Is Like a Spy in Your Pocket," *Science News*, January 23, 2018 available at https://www.sciencenews.org/article/smartphones-data-collection-security-privacy ("Along with the familiar camera and microphone, smartphones can pack a slew of other exquisitely sensitive sensors. Fingerprint/TouchID: Scans the user's fingerprint […] Online app store Google Play has already discovered apps abusing sensor access. Google recently booted 20 apps from Android phones and its app store because the apps could — without the user's knowledge — record with the microphone, monitor a phone's location, take photos, and then extract the data. Stolen photos and sound bites pose obvious privacy invasions. But even seemingly innocuous sensor data can potentially broadcast sensitive information. A smartphone's movement may reveal what users are typing or disclose their whereabouts. Even barometer readings that subtly shift with increased altitude could give away which floor of a building you're standing on[.]"); Doffman, Zak, "NSA Warns Smartphone Users—Disable Location Tracking," *Forbes*, January 16, 2025, available at https://www.forbes.com/sites/zakdoffman/2025/01/16/nsa-warns-iphone-and-android-users-disable-location-tracking/ ("Our phones know where we are and they know where we have been—the problem is they have a nasty habit of sharing that information with others. And the latest location tracking nightmare to hit phone users shows the threat remains[.]").

168.    Absent centralized distribution and its associated robust App Review process, apps and in-app digital content distributed through third-party app marketplaces could thus pose risks to consumers that are significantly more pronounced than those faced by personal computer users.[365] The alleged "technological barriers" that Professor Stiglitz claims have deterred the entry of third-party app marketplaces like Cydia[366] actually contribute to protecting consumers from adverse outcomes. [367] For example, circumventing these protections through jailbreaking to install app marketplaces like Cydia, an app marketplace whose absence Professor Stiglitz cites as evidence of anticompetitive conduct,[368] can lead to risks

---

[365]   Halderman Opening Report, ¶¶ 31–32 ("Like Windows, macOS and Android are more permissive in their approaches to app distribution […] this flexibility has exposed them to the risk of harmful and malicious apps. Apple has taken a different approach to security for iOS. iOS employs a security architecture referred to as defense-in-depth, which […] entails layers of security protections. This includes centralizing distribution of apps in the App Store, where every app and app update available to users for installation has been subjected to vetting by automated computer analysis and human experts. The centralized App Store and the App Review process work together with protections built into iOS devices to seek to avert and limit the harm apps can cause. This security design has allowed iOS to maintain strong protection from harmful software while supporting millions of apps being made available to users."), ¶¶ 49–51 ("iOS devices have special capabilities that could make harmful apps particularly dangerous. […] It is necessary and appropriate for Apple to pursue a defense-in-depth strategy in light of the heightened security threats that iOS faces.").

[366]   Stiglitz Report, ¶ 237 ("Apple has erected and reinforced technological barriers that prevent iOS device users from purchasing apps from third-party app stores, such as Cydia, on their iOS devices.").

[367]   Halderman Opening Report, Section III.C, Rebuttal Expert Report and Declaration of J. Alexander Halderman, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Halderman Rebuttal Report"), Sections II, III.C.2.e., Section V; Epic Trial Testimony of Trystan Kosmynka, pp. 1076:14–1077:3 ("Q. Do you believe, Mr. Kosmynka, that allowing a store within a store on the App Store would create safety issues? A. Absolutely. Q. And can you explain why? A. So users, when they buy an iPhone or an iPad – thinking about my kids -- when this do this, they expect to go to the App Store and get safe and trusted apps. There are absolutely cases where, whether it be through advertising or other ways to get in touch with a particular user, that they could be manipulated into an experience that they think is safe and trusted on the surface, and then you go deeper into that experience and realize that actually none of the content is reviewed, none of the software is reviewed, and that has severe ramifications for security, privacy, and customer safety."); Epic Trial Testimony of Phillip Schiller, pp. 3185:20–3186:13 ("Q. And how would having stores within stores impact App Review? A. Well, clearly, if there is a store within a store, all the apps and services that are delivered through those stores are not reviewed by App Review. Q. And so, in fact, it would eliminate App Review to the extent that third parties decided to put stores within the App Store; is that fair? A. Yes. And, further, we've tried on every rule of the App Store to try to make rules that apply to all developers. So the part that we keep talking about adding stores within stores, for me, it means an unbounded number of stores within stores. Because if there's a rule that allows stores within stores, it allows every developer to be a store within a store if they choose to because it applies to all developers, big and small. And so I don't know how this scales. I don't know the -- how the idea of unreviewed apps within other apps in endless amount of times can be reviewed and managed.").

[368]   Stiglitz Report, ¶ 73 ("iOS device consumers could access Cydia via the internet, but only if they were to jailbreak their phones […] Cydia has alleged that Apple eventually updated its iOS in 2018 to make it 'essentially impossible' for app stores like Cydia to operate on iPhones. […] Apple's actions have made jailbreaking a rare practice over time, and 'only an option for 'very skilled hackers or teams of hackers.''").

for consumers that can negatively impact their experience with iOS devices by, for example, shortening battery life as Professor Stiglitz acknowledged,[369] and affecting the reliability of their iOS devices.[370] While Professor Stiglitz testified that he did not examine whether jailbreaking would increase risks to the security, privacy, and reliability of iOS devices,[371] it is generally accepted that jailbroken devices are more vulnerable to security

---

[369]   Sundararajan Opening Report, ¶ 114; Stiglitz May 2025 Deposition, p. 144:3–9 ("Q. Did you study whether jailbreaking can shorten battery life? A. I think I do make a reference in my report to that being one of the concerns that -- about jailbreaking and makes one of the reasons why jailbreaking is not a viable alternative, another way, a viable alternative to using the App Store."); Stiglitz Report, Footnote 439 ("Unauthorized modifications to iOS (also known as 'jailbreaking') bypass security features and can cause numerous issues such as security vulnerabilities, instability, and shortened battery life to the hacked iPhone."); Halderman Opening Report, ¶ 105 ("[J]ailbreaking carries risks, including potentially rendering the device unreliable or inoperable, degrading its performance or battery life, and increasing susceptibility to malware and other attacks. Apple warns users against jailbreaking their devices for these reasons.").

[370]   "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," *Apple*, October 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_Sideloading.pdf, p. 3 ("Some sideloading initiatives would also mandate removing protections against third-party access to proprietary hardware elements and non-public operating system functions. This would undermine core components of platform security that protect the operating system and iPhone data and services from malware, intrusion, and even operational flaws that could affect the reliability of the device and stop it from working.")

[371]   Stiglitz May 2025 Deposition, pp. 142:25–144:2 ("Q. Do you have any understanding of whether there are any security risks associated with jailbreaking? A. […] But I don't know the answer to that question. […] Q. Are there privacy risks associated with jailbreaking? A. Again, I, I don't -- I didn't study that issue. If there were security risks, the security risk would obviously open up privacy risks. But I, I didn't study that question. Q. Do you have any understanding of whether jailbreaking can adversely affect the reliable operation of the iPhone? A. Again, I didn't study that. Q. Did you study whether jailbreaking can cause […] instability in the iOS operating system? A. I didn't study that.").

threats, data breaches, and device instability, among other issues.[372] I understand that Professor Halderman addresses how Professor Stiglitz fails to account for the risks of jailbreaking in his rebuttal report.[373] To the extent that consumers are unaware of these risks, consumers could attribute any issues caused by jailbreaking to their iOS device, which as I noted previously, can negatively impact a consumer's perception of Apple's devices and brand.

---

[372]  Halderman Opening Report, ¶¶ 106–107 ("One reason that jailbreaking impairs security is that users who jailbreak their devices often avoid installing iOS security updates, since such updates can make jailbreaking techniques stop working. Many iOS updates include fixes for critical security flaws, so running an out-of-date version leaves the user's device at greater risk of being exploited. Currently, there are no widely available jailbreaking techniques for most iOS devices that work with iOS versions more recent than 16.5.1, which was released in June 2023. Since then, Apple has published more than 30 security-related iOS updates to correct vulnerabilities or introduce new security features. Among these are patches that correct zero-day vulnerabilities that were being actively exploited by attackers. Users who want to continue using their devices in a jailbroken state are unable to install these critical security updates, which leaves their devices open to compromise. Jailbreaking can also introduce security flaws, as it involves modifying some of the device's most security-critical functionality in unvetted and dangerous ways. This can include disabling the on-device protections that protect users' data from being stolen by malicious apps and that prevent iOS from being modified by an attacker. Jailbroken devices are also exposed to more malware than devices that are not jailbroken. There are numerous strains of malware that exclusively target jailbroken devices and exploit the weakened iOS protections caused by jailbreaking. Underground app stores that are accessed via jailbreaking often host pirated or Trojan apps that contain malware."); "Unauthorized Modification of iOS," *Apple*, available at https://support.apple.com/guide/iphone/unauthorized-modification-of-ios-iph9385bb26a/ios ("Unauthorized modifications to iOS (also known as 'jailbreaking') bypass security features and can cause numerous issues such as security vulnerabilities, instability, and shortened battery life to the hacked iPhone. Security vulnerabilities. Jailbreaking your device eliminates security layers designed to protect your personal information and your iOS device. With this security removed from your iPhone, hackers may steal your personal information, damage your device, attack your network, or introduce malware, spyware, or viruses. Instability. Unauthorized modifications can cause frequent and unexpected crashes of the device, crashes and freezes of built-in apps and third-party apps, and loss of data. Shortened battery life. Hacked software can cause an accelerated battery drain that shortens the operation of iPhone on a single battery charge. Unreliable voice and data. Unauthorized modifications can cause dropped calls, slow or unreliable data connections, and delayed or inaccurate location data. […] Inability to apply future software updates. Some unauthorized modifications may cause damage to iOS that is not repairable. This can result in the hacked iPhone becoming permanently inoperable when a future Apple-supplied iOS update is installed.").

[373]  Halderman Rebuttal Report, Section V.

          *ii.*    *Apple Has a Technical Advantage Over Third-Party App Marketplaces*

169. Professor Stiglitz also ignores the academic literature that has found that vertical restraints by multi-sided platforms can be procompetitive.[374] As the manufacturer of iOS devices and the associated operating systems, Apple has technical advantages—including its proprietary knowledge of its own hardware and software design and the more seamless exchange of information between the App Review team and the engineering team—over third-party app marketplaces in their ability to screen apps and in-app digital content for potential security and privacy concerns.[375] This contributes to maintaining a high standard for security, privacy, reliability, and app quality for apps and in-app digital content, as well as protecting both consumers and developers from adverse outcomes.[376]

170. As the manufacturer of the iPhone and iPad and the developer of the associated iOS operating system, I understand that Apple has a deeper understanding of its own proprietary hardware and software than what third-party app marketplaces can achieve.[377] I understand that this integration has enabled the App Review process to detect issues arising from the ways in which third-party iOS apps may seek to access or use Apple's hardware and

---

[374] *See, for example*, Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24, p. 7 (" [V]ertical restraints help platforms deal with expectation and coordination problems that result in welfare gains for platform users. […] [V]ertical restraints on one side of the platform benefit the other side of the platform and increase consumer welfare overall.").

[375] Halderman Opening Report, ¶ 69 ("Apple keeps its computer review tools secret and does not share them with other companies. These tools incorporate Apple's detailed, proprietary knowledge of its own hardware and software."); ¶ 132 ("Third-party stores also have not been observed to match App Review's ability to detect harmful apps, and do not have the same benefits and resources as Apple's App Review. App Review benefits from Apple's many years of data and experience from running the App Store, its knowledge of its own, proprietary devices' hardware and software, its extensive technical resources, and the sophisticated proprietary analysis tools it has built.").

[376] Halderman Opening Report, ¶ 135 ("In some cases, Apple has leveraged this ability to raise the bar for security and privacy throughout its platform by establishing uniform, platform-wide policies that give users greater transparency and control over privacy.").

[377] Halderman Opening Report ¶ 15.g ("Apple's review tools incorporate the company's internal proprietary knowledge of its own products and technology as well as data and experience Apple has amassed from its commitment to reviewing the tens of millions of app submissions made since 2007. It would be very difficult for third parties to create similarly effective automated review tools for iOS apps that have the benefits of all of Apple's proprietary knowledge, data, and experience, particularly in view of Apple's commitment to App Review and security.").

software capabilities. [378] Professor Stiglitz ignores that Apple has an advantage in identifying ways to protect consumers from potential security and privacy threats by leveraging its knowledge of the hardware and the App Review process and tools to help detect and then identify solutions to security and privacy risks. For example, I understand that Apple has identified malicious apps that sought to use social engineering attacks to take advantage of Apple's "Touch ID" technology. Such apps would, for example, ask consumers to provide their fingerprint for an ostensibly innocuous purpose and while the user was providing authentication with their fingerprint, the app would obtain authorization for a purchase. Bad actors could thus prompt a user to enter their biometric information

---

[378] Halderman Opening Report, ¶ 69 ("These [computer review] tools incorporate Apple's detailed, proprietary knowledge of its own hardware and software. They further benefit from Apple's unique visibility into future changes to Apple hardware and software, such as new iPhone models and iOS versions, which give Apple the ability to begin preparing to review apps that leverage newly introduced platform capabilities before such functionality becomes public. Apple's computer review tools also incorporate data and experience that Apple has amassed from reviewing millions of apps since the App Store launched. Apple also continues to improve its tools in response to evolving threats facing the platform. For example, when the App Review team discovers a new kind of harmful software, such as a novel variety of malware, it adds detection heuristics to the review tools that enable them to automatically detect other apps that contain similar threats. For these reasons, it would be difficult or impossible for third parties to create similarly effective tools for reviewing iOS apps that have the benefits of all of Apple's proprietary knowledge, data, and experience, particularly in view of Apple's commitment to App Review and security."), ¶ 132 ("Third-party stores also have not been observed to match App Review's ability to detect harmful apps, and do not have the same benefits and resources as Apple's App Review. App Review benefits from Apple's many years of data and experience from running the App Store, its knowledge of its own, proprietary devices' hardware and software, its extensive technical resources, and the sophisticated proprietary analysis tools it has built."). *See also*, Deposition of C. K. Haun, Vol. I, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715YGR, January 13, 2021 ("Haun January 2021 Deposition"), pp. 58:3–59:1 ("Q. You mentioned […] that in reviewing applications for the App Store, Apple uses its knowledge of its hardware in the review process and that other organizations may not have that knowledge. Am I recalling that correctly? A. Yes. Q. What nonpublic information about Apple hardware and software does Apple use to review apps that others don't have? A. Hardware such as the products Apple provides is often developed with confidential business processes and with interactions between components that are known to us in great detail, but cannot be determined by a third party without extensive engineering knowledge. And even if they can determine what they see happening at an electronic level, they may not be cognizant of all the ramifications or all the other interactions that may be happening in the hardware because they are looking at a slice in time, or a particular subsystem, and by the very nature of the difference between someone who has not built something and someone who has built something, there will be a difference in knowledge and understanding."), p. 62:12–19 ([A.] I have described Apple's ability to understand more of the integration between third-party applications, the operating system and the hardware as being more complete than any other organization by the nature of hardware manufacturing, by nature of software development and the confidentiality that accompanies both activities."); Epic Trial Testimony of Trystan Kosmynka, pp. 1122:13–1123:21 ("Q. Mr. Kosmynka, do you believe Apple is unique in its ability to review iOS apps? A. Yes. […] Q. Does Apple's specialized knowledge of the iPhones hardware, the iPad's hardware, enhance its ability to conduct app review? A. Yes. Q. What about its knowledge of the iOS system itself? Does that enhance its ability to conduct app review? A. Absolutely. Q. Do you believe third parties could do just as good a job with app review as your team at Apple? A. No. Q. Can you explain why not? A. As I mentioned, I think there's other companies that also have app stores, and the example we shared today of an app that is on their store with human review, that app would not be on our store.").

122

and then instantly use this information to take an adversarial action like enabling a payment that the consumer had not authorized. After this risk was recognized, which I understand was not easy to do, Apple was able to leverage the App Review process to identify apps that were taking advantage of this feature and remove them from the App Store and additionally, was able to design additional protections into the device, including introducing a delay.[379] This example highlights a critical security issue that was identified and addressed specifically because of the challenged conduct, which allows Apple's App Review team to work closely with Apple's engineering team to address malicious issues.

171.  Lacking the same capabilities, the presence of third-party app marketplaces would make it more likely that mobile device consumers experience adverse outcomes. As Professor Halderman concluded in his opening report, it "would be difficult if not impossible for third parties to create similarly effective tools for reviewing apps" because they lack Apple's knowledge and experience.[380] Professor Halderman also noted that Apple compiles information from different sources like AppleCare and user reviews that provide valuable data for Apple to detect harmful apps. Absent centralized distribution, Apple would lack access to this information which helps detect potentially malicious apps.[381]

172.  Contrary to Professor Kohno's view, which is the basis for Professor Stiglitz's dismissal of this procompetitive benefit of centralized distribution, I understand that Professor Halderman also concludes that the App Review process plays a critical role in

---

[379]  Conversation with Trystan Kosmynka, May 13, 2025.

[380]  Halderman Opening Report, ¶ 69 ("Apple keeps its computer review tools secret and does not share them with other companies. These tools incorporate Apple's detailed, proprietary knowledge of its own hardware and software. They further benefit from Apple's unique visibility into future changes to Apple hardware and software, such as new iPhone models and iOS versions, which give Apple the ability to begin preparing to review apps that leverage newly introduced platform capabilities before such functionality becomes public. Apple's computer review tools also incorporate data and experience that Apple has amassed from reviewing millions of apps since the App Store launched. Apple also continues to improve its tools in response to evolving threats facing the platform. For example, when the App Review team discovers a new kind of harmful software, such as a novel variety of malware, it adds detection heuristics to the review tools that enable them to automatically detect other apps that contain similar threats. For these reasons, it would be difficult or impossible for third parties to create similarly effective tools for reviewing iOS apps that have the benefits of all of Apple's proprietary knowledge, data, and experience, particularly in view of Apple's commitment to App Review and security.").

[381]  Halderman Rebuttal Report, Section III.D.4.

protecting consumer security, and that the protections it offers cannot be replicated as effectively by third-party app marketplaces.[382]

> **b)** Centralized Distribution Facilitates Access to IP-Protected Tools, Technologies, and Services for Developers and Enables Apple to Monetize These Investments

173. Professor Stiglitz also ignores that the centralized distribution of apps and the accompanying revenue-sharing model that includes a commission on paid app downloads and in-app digital content purchases is an important component of Apple's business model and provides compensation to Apple for the access to and use of its IP-protected tools, technologies, and services by developers, a point I noted in my opening report.[383] Such compensation contributes to Apple's continued investment in innovation that benefits both developers and consumers.[384]

174. Apple's IP-protected tools, technologies, and services, including its SDKs and Application Programming Interfaces ("APIs"), benefit developers.[385] Developers can access and use these IP-protected tools, technologies and services subject to the terms of Apple's Developer Program and accompanying agreements including the DPLA to create and

---

[382] Halderman Rebuttal Report, Section III.

[383] Sundararajan Opening Report, ¶ 185.

[384] Epic Order, p. 104 ("Second, Apple claims that the distribution restrictions are part of its intellectual property licensing arrangement for which it is entitled to be paid. As the owner of the devices and operating system, Apple could choose not to license its IP and remain the exclusive developer of iOS apps. Instead, Apple has actively licensed, developed, and improved its IP for others, but only on the condition of iOS remaining a 'walled garden.' Thus, Apple argues that its contractual restrictions are necessary to protect its IP investments and prevent free riding."), p. 113 ("Turning to the intellectual property justification, the Court agrees with the general proposition that Apple is entitled to be paid for its intellectual property.").

[385] Sundararajan Opening Report, ¶ 134; Malackowski Opening Report, ¶ 23 ("Apple has many IP assets relating to technologies applicable to iOS and the App Store, development tools, and other related technology. Apple's IP-protected tools, technology, and services are utilized for and integral to the development, testing, distribution, and usage of iOS apps. By way of example, Apple provides app developers an extensive library of frameworks, software, and documentation, including tutorials, sample code, articles, software development kits ('SDKs'), and application programming interfaces ('APIs')."). *See also*, Epic Trial Testimony of Phillip Schiller, pp. 2730:24–2731:8 ("Q. And what is a Software Development Kit? A. It includes a number of resources for developers to write software, resources like the APIs that we have been talking about, developer tools like Xcode. It includes documentation to help understand the APIs and their functions. Often has sample code to help a developer start to write their application or learn how to use an API. Q. And do the Software Development Kits -- are they made up of Apple's intellectual property? A. Yes.").

distribute apps and in-app digital content to consumers.[386] Access to these IP-protected developer tools, technologies, and services contributes to lowering the knowledge and financial barriers that would otherwise hinder the ability of many developers to create new apps and in-app digital content.[387] Centralized distribution and the associated revenue-sharing model enable Apple to monetize its investments in IP-protected tools, technologies, services, and programs for developers that simplify and encourage the creation of new apps, while also attracting a wide variety of developers to the App Store.[388]

175. Absent centralized distribution, developers could free-ride on Apple's investments by leveraging Apple's IP-protected tools, technologies, and services to create apps and distribute apps on alternative app marketplaces without compensating Apple.[389] Requiring

---

[386] Sundararajan Opening Report, ¶ 134; Malackowski Opening Report, ¶ 25 ("The Developer Program, and related agreements, set out the terms by which app developers may access and use the tools, technology, and services that Apple has created for developers to use in developing, testing, and distributing their iOS apps, along with other technology and services made available to developers."). *See also*, "Apple Developer Program License Agreement," *Apple*, February 6, 2025, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/ ("You would like to use the Apple Software (as defined below) to develop one or more Applications (as defined below) for Apple-branded products. Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement.").

[387] Sundararajan Opening Report, ¶ 151. *See also*, Epic Trial Testimony of Michael Schmid, p. 3239:3–22 ("Q. And we'll go through the categories you mentioned, but why does Apple make these investments in developers? A. We want to be the best platform to develop a game or app in the world. Q. Okay. And does Apple have to compete for developers to -- to compete, in other words, for developers to come to the platform? A. Absolutely. I think that it would be silly to suggest any developer that's looking to grow a business wouldn't be thinking about mobile as a huge opportunity. However, there's lots of options even within mobile. We want to do more than just be a -- a checkbox for a platform that a developer is going to ship a game or app on. We want to be the -- the primary platform. We want to be the place where they're spending time and energy and -- and committing to our user base that they're going to really focus on building a great experience for our users on the App Store.").

[388] Sundararajan Opening Report, ¶ 188. *See also*, Malackowski Opening Report, ¶ 27 ("In the field of technology development and licensing, the owners of IP-protected technologies can and do set the terms of access and use to their property using a variety of forms. The law enables IP-protected technology owners to select the strategy they find most beneficial in offering their IP-protected technology, including by setting the monetary and nonmonetary terms of use and access to such technology.").

[389] Sundararajan Opening Report, ¶ 189. *See also*, Malackowski Opening Report, ¶¶ 44–45 ("Broadly speaking, a free-rider is any individual or entity who receives a benefit from an innovation, creation, or technology without contributing towards the cost of its production. IP rights help reduce the risks and harm of free-riding."), ¶¶ 148–149 ("Apple maintains IP protections related to the App Store and developer tools. […] The number of public iOS APIs made available by Apple to app developers has grown from 10,000 to 250,000 since Apple's first SDK was released in 2008. Apple has continued to add and update features in new versions of its SDKs, including new APIs, new versions of Xcode and performance monitoring tools, and new developer support documentation. As a result of Apple's continuous IP innovation and the ongoing development of an integrated ecosystem of products and services, both developers and consumers have benefitted."); Malackowski Rebuttal Report , Section 5.2.

Apple to support alternative app marketplaces would effectively require Apple to provide its competitors with access to Apple's IP-protected tools, technologies, and services for developers, which regulators and economists recognize would undermine Apple's ability to seek compensation for its IP investments through the revenue-sharing model, lowering its incentive to invest in further innovation in such developer tools, technologies, and services.[390] Lowered incentives for Apple to invest in its IP-protected developers tools, technologies, and services would, in turn, diminish the quality and variety of apps and in-app digital content, harming consumers.[391] It could also weaken the App Store's competitive position and discourage investment by rival app marketplaces, ultimately reducing developer participation and thereby harming consumers.[392]

### 2. Professor Stiglitz Fails to Consider the Procompetitive Justifications for Apple's In-App Payment Requirement

176. Professor Stiglitz claims that Apple's requirement that developers use its in-app payment system for the sale of a majority of in-app digital content effectively forecloses nearly all

---

[390] The Antitrust Modernization Commission, a commission established by Congress, noted that "absent a right to refuse to deal with a rival, a firm that lawfully obtained a monopoly through superior acumen, skill, foresight, or industry would find itself forced to share the fruits of its investment with rivals, thereby undermining the value of its lawfully acquired monopoly and discouraging others from making similar investments. Because investments in new facilities and assets often enhance consumer welfare, antitrust rules that discourage such activity should be avoided. Forced sharing stultifies the incentives of smaller firms to develop alternatives to the monopolist's products." "Report and Recommendations," *Antitrust Modernization Commission*, April 2007, available at
https://digital.library.unt.edu/ark:/67531/metadc1228317/m2/1/high_res_d/amc_final_report.pdf, pp. 1–449, pp. 101–102. Economic literature has noted that forced dealing could discourage investment and welfare. Carlton, Dennis W. and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, Autumn 2008, pp. 285–305, p. 285–287 ("An essential element of appropriate antitrust policy is to allow a firm to capture as much of the surplus that, by its own investment, innovation, industry, or foresight, the firm has itself brought into existence. Alternative policy approaches to single-firm conduct […] seriously threaten to impede economic growth and welfare over time. […] For firms to have the proper incentives to invest and create, they must be permitted to profit from their success."). *See also*, Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755, p. 12749 ("Compulsory licensing may undermine incentives for research and development by reducing the value of an innovation to the inventor."); Sundararajan Opening Report, ¶ 189; Epic Trial Testimony of Tim Cook, p. 3864:3–5 ("Q. Does the commission bear any relationship to Apple's investment in research and development? A. Yes. It provides a return on our -- our investment."); Malackowski Opening Report, ¶ 50 ("Unless the free-rider problem is meaningfully addressed in some way, those who might otherwise undertake risky and expensive R&D will not do so. Fewer technologies will be developed, and consumers will face higher prices and fewer choices.").

[391] Sundararajan Opening Report, ¶ 189.

[392] Sundararajan Opening Report, ¶¶ 189–190.

126

alternative in-app payment systems.[393] Professor Stiglitz also claims that absent Apple's restrictions, many developers would opt to use alternative payment options, and that these restrictions have resulted in reduced consumer choice, higher prices, and lower output.[394] In support of this opinion, Professor Stiglitz cites Professor Kohno's opinion that Apple's security practices can be easily replicated by third-party payment providers, and Professor Martin's view that Apple's privacy rationale does not justify its in-app payment requirement.[395]

a)   Apple's In-App Payment Requirement Enables Apple to Efficiently Collect Commission from Developers

177.   Professor Stiglitz ignores that Apple's in-app payment requirement provides an efficient mechanism for Apple to collect its commission on App Store transactions and allows Apple to monetize its investments in IP-protected tools, technologies, and services for developers.[396] Apple's in-app payment requirement ensures that when a transaction for in-app digital content occurs, Apple can efficiently process the transaction, collect payment

---

[393] Stiglitz Report, ¶ 63 ("Apple's mandate that developers must use Apple's own proprietary in-app payment system ("IAP") for the sale of in-app content within the app"), ¶ 80 (Apple's foreclosure of alternative iOS in-app payment processing solutions […] Apple mandates that nearly all in-app transactions for digital content utilize IAP as a payment processing solution").

[394] Stiglitz Report, ¶ 85 ("[A]lternatives to Apple's IAP exist today, and in the absence of Apple's restrictions, many developers would likely have elected to use these or other alternative payment solutions for in-app purchases in addition to, or in replacement of, Apple's IAP. […] This lack of competition has likely resulted in fewer options, higher prices, and lower output for consumers of iOS in-app content.").

[395] Stiglitz Report, ¶ 86 ("[A]vailable evidence suggests that Apple's monopolization of in-app payment solutions is not necessary to safeguard the security and privacy of iOS users. In particular, Professor Kohno concludes that Apple's security practices are easily replicated by third-party payment systems like PayPal, and that its monopolization of payment solutions does not benefit security on iOS devices. Moreover, in Professor Martin's opinion, the use of IAP actually *violates* user privacy, as Apple uses the data collected by IAP, including user search and transaction history, for targeted advertising. Additionally, Apple allows limited exceptions to its IAP mandate— including the Video Partner program and the sale of physical goods and services as discussed earlier in this section. According to Professor Martin, Apple has presented no evidence that these exceptions compromise user privacy or security, further suggesting that the IAP requirement is not justified by privacy rationales.").

[396] Sundararajan Opening Report, ¶¶ 187–190.

from the consumer on behalf of the developer, and automatically collect the commission that the developer pays under Apple's revenue-sharing model.[397]

178.   In a but-for world where payments could be handled by third-party payment systems that do not automatically remit commissions to Apple, Apple would need to rely on developers to track their own sales, calculate the commissions owed, and ensure timely and accurate payments. To prevent free-riding by developers who might underreport sales or fail to remit payments, Apple would be forced to conduct regular audits to detect fraud. This would be a costly and logistically complex process, given that the App Store supports more than ██████████████████, and handles more than ████████ in-app digital content purchases annually.[398] If Apple were to pass on some of these compliance and audit costs to developers, it could discourage developer participation, particularly among the smaller developers, thereby diminishing the quality and variety of apps and in-app digital content, and harming consumers.[399]

179.   Further, with a higher likelihood of developer free-riding in this but-for world, Apple would face increased difficulty in recouping its investments through its current revenue-sharing model, thereby reducing its incentive and capacity to invest in IP-protected

---

[397]   Epic Trial Testimony of Tim Cook, pp. 3863:18–3864:5 ("Q. What is IAP's role with respect to the commission? A. IAP helps Apple efficiently collect the commission. The commission is for a number of different things, from developer tools to the APIs and to the customer service that's provided. And one of those things is obviously the payment processing itself. But all of these things, it enables Apple to efficiently do it. If not for IAP, we would have to come up with another system to invoice developers, which I -- I think would be a mess. Q. Does the commission bear any relationship to Apple's investment in research and development? A. Yes. It provides a return on our -- our investment."); "In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/ ("Apple handles worldwide end-to-end payment processing — from decrypting payments, to validating tokens, to receiving payments — so you don't have to coordinate with multiple payment providers."). *See also*, Stiglitz May 2025 Deposition, p. 160:10–12 ("Q. Do you agree that Apple's iAP mandate ensures that app developers pay Apple's commission fees? A. Yes.").

[398]   Hitt Opening Report, ¶¶ 46–47 ("The number of distinct developers with transactions on the U.S. App Store has increased every year for the last 15 years, from 351 developers in July 2008 to more than ████████ in 2023. […] Similarly, the total *volume of transactions* on the U.S. Storefront has also risen significantly since the launch of the App Store. […] In 2023, consumers made more than ████████ downloads and more than █ ████ in-app purchases.").

[399]   Sundararajan Opening Report, ¶¶ 157, 189. *See also*, "In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/ ("Apple handles worldwide end-to-end payment processing — from decrypting payments, to validating tokens, to receiving payments — so you don't have to coordinate with multiple payment providers.").

developer tools, technologies, and services.[400] This would discourage the creation of new apps and in-app digital content on the developer side, which, in turn, would harm consumers by diminishing the quality and variety of apps available to consumers, contrary to Professor Stiglitz's unsupported claim.[401]

> **b)** <u>Apple's In-App Payment Requirement Helps Protect Consumers and Developers from Potential Adverse Outcomes</u>

180.    Professor Stiglitz overlooks the fact that Apple's in-app payment requirement contributes to mitigating risks that could lead to adverse outcomes for both consumers and developers. These risks include security and privacy breaches—such as data loss and identity theft—for consumers, as well as fraudulent transactions that can harm both consumers and developers.[402]

181.    Professor Stiglitz ignores that Apple's in-app payment requirement provides security and privacy for iOS consumers by limiting third-party access to sensitive payment data and

---

[400]    Epic Trial Testimony of Tim Cook, pp. 3863:18–3864:5 ("Q. What is IAP's role with respect to the commission? A. IAP helps Apple efficiently collect the commission. The commission is for a number of different things, from developer tools to the APIs and to the customer service that's provided. And one of those things is obviously the payment processing itself. But all of these things, it enables Apple to efficiently do it. If not for IAP, we would have to come up with another system to invoice developers, which I -- I think would be a mess. Q. Does the commission bear any relationship to Apple's investment in research and development? A. Yes. It provides a return on our -- our investment.").

[401]    Stiglitz Report, ¶ 85 ("[T]his lack of competition has likely resulted in fewer options, higher prices, and lower output for consumers of iOS in-app content.").

[402]    Halderman Rebuttal Report, Section III.D.4.c.

securely storing encrypted consumer payment information such as credit card numbers,[403] thus reducing the risk of potential adverse consumer outcomes.[404] Consumers seeking to use third-party payment mechanisms for in-app digital content purchases instead of Apple's in-app payment system would have to transmit payment information such as credit card numbers and contact information to developer-chosen third-party payment providers using varying privacy and authentication procedures, rather than utilizing the familiar and secure process of Apple's in-app purchase process. This would increase potential security

---

[403] Sundararajan Opening Report, ¶ 156. *See also*, Epic Trial Testimony of Phillip Schiller, p. 3165:13–25 ("Q. And when an iPhone user submits payment information, a credit card number to Apple, how is that information stored? A. There is a payment processing system. Again, I'm not the expert of all that. That's part of the commerce engine. And it's stored there in a secure manner. And using technologies like our Apple pay, we are even able to transact without your credit card number being shared with a vendor in order to make that transaction happen. There's a bunch of processes around protecting user privacy with payment transactions. Q. Do any Apple employees have access to that information? A. No. Q. Does Apple ever sell data? A. No."); "App Store & Privacy," *Apple*, available at https://www.apple.com/legal/privacy/data/en/app-store/ ("We use your personal data to provide the services and features in the App Store and other Apple online stores. This information includes, for example, your account and payment information, which you can access and change in settings, and your purchase history. […] We are obligated to provide some non-personal data to strategic partners that work with Apple […] Developers can access usage information, provided by users who opt in […]. Developers can access receipt information for purchases and refunds of their products and services in the App Store. Receipts do not include personal data […]."); "Apple Pay Security and Privacy Overview," *Apple*, available at https://support.apple.com/en-us/101554 ("When you add a credit, debit, prepaid, or transit card (where available) to Apple Pay, information that you enter on your device is encrypted and sent to Apple servers. If you use the camera to enter the card information, the information is never saved on your device or photo library. Apple decrypts the data, determines your card's payment network, and re-encrypts the data with a key that only your payment network (or any providers authorized by your card issuer for provisioning and token services) can unlock."); "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Additionally, credit and debit card numbers are never shared with developers, thus eliminating another risk factor in the payment transaction process.").

[404] "The App Store Prevented More Than $9 Billion in Fraudulent Transactions Over the Last Five Years," *Apple Newsroom*, May 27, 2025, available at https://www.apple.com/newsroom/2025/05/the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/ ("Preserving the App Store's safe and secure marketplace requires constant vigilance, as bad actors continue to evolve their tactics in an attempt to defraud users. These threats range from deceptive apps designed to steal personal information, to fraudulent payment schemes that attempt to exploit users. […] In the last five years, the App Store has protected users by preventing over $9 billion in fraudulent transactions, including over $2 billion in 2024 alone, according to Apple's annual App Store fraud analysis.").

risks for consumers that can lead to, for example, fraud or identify theft,[405] adverse outcomes that might undermine a consumer's perception of the quality of Apple's devices and the value of its brand. To contribute to protecting privacy and security for consumers that transact on the App Store, Apple would need to vet and continuously monitor third-party payment providers for compliance with its privacy and security standards, and even if feasible, this would be logistically complex and raise Apple's operational costs. If Apple were to pass on some of these cost increases to developers, it could discourage developer participation, thereby reducing the quality and diversity of apps available to consumers, thereby diminishing the quality and variety of apps and in-app digital content, and harming consumers.[406]

182. In addition, I understand that the ability to detect and block fraudulent activity is superior if transactions are not distributed across multiple third-party payment systems.[407] Apple's fraud prevention benefits from significant economies of scale, made possible by its processing all in-app payments for iOS in-app digital content.[408] Where the data for about ███████ in-app digital content purchases each year can be analyzed together by machine learning algorithms,[409] abnormal transaction behaviors can be detected even if they are

---

[405] "Comptroller's Handbook: Payment Systems," *Office of the Comptroller of the Currency*, October 2021, available at https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/payment-sys-funds-transfer-activities/pub-ch-payment-systems.pdf, p. 22 ("Fraud risk is a form of operational risk. Fraud can exist in any part of a payment transaction. Fraud during authentication is often referred to as identity theft. Fraud during authorization may be caused by a variety of internal or external sources. Exploitation of emerging technologies, increased use and availability of alternative payment methods and products, and cyber threats are some of the factors contributing to fraud and criminal activity.").

[406] Sundararajan Opening Report, ¶¶ 157, 189.

[407] Halderman Opening Report, ¶ 86 ("Similarly, Apple's review of in-app purchases of digital content and services, which must be made using Apple's In-App Purchase ('IAP') functionality, also helps guard against fraud, scams, and other harms. In 2023, App Review rejected 248,000 submissions for being 'spam, blatantly copying other apps, or otherwise misleading users.' Apple can provide this safeguard because apps are required to be distributed through the App Store, which gives the App Review team visibility into how apps are presented to users at the time of purchase.").

[408] Halderman Rebuttal Report, Section III.B.3; Sundararajan Opening Report, ¶ 156.

[409] Hitt Opening Report, ¶¶ 46–47 ("The number of distinct developers with transactions on the U.S. App Store has increased every year for the last 15 years, from 351 developers in July 2008 to more than ██████ in 2023. […] Similarly, the total *volume of transactions* on the U.S. Storefront has also risen significantly since the launch of the App Store. […] In 2023, consumers made more than ████████ downloads and more than ████ in-app purchases.").

distributed across different apps or app categories.[410] For example, by analyzing cross-app transaction patterns, Apple can identify and block the use of stolen credit cards, thus protecting consumers from unauthorized charges on their accounts.[411] This, in turn, benefits developers, who otherwise might end up distributing apps and in-app digital content without receiving compensation for the investments they made creating these apps, or might have to bear additional costs associated with fraudulent transactions.[412] Apple can also detect and block consumers who repeatedly exploit refund policies across multiple apps and take action to prevent abuse, further shielding developers from revenue loss due to fraudulent chargebacks.[413]

183.   In a but-for world where third-party payment systems were allowed, Apple would have access to only a subset of transactions, thus limiting its ability to train effective machine learning models and to detect cross-app fraud.[414] I understand that when a machine learning model is provided with incomplete data, for example because bad actors design

---

[410]   Halderman Rebuttal Report, Section III.D.4.c; Hong, Zhong, "Fraud Detection with Machine Learning: Identifying Suspicious Patterns in Financial Transactions," *Medium*, April 20, 2024, available at https://medium.com/@zhonghong9998/fraud-detection-with-machine-learning-identifying-suspicious-patterns-in-financial-transactions-8558f3f1e22a ("The first step in building a fraud detection system is collecting relevant data. This may include transaction history, user behavior, and other contextual information. Data can be sourced from internal databases, third-party providers, or generated synthetically for testing purposes.").

[411]   "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Apple also leverages a combination of advanced technology and human review to detect when a stolen credit card is being used for illicit purposes.").

[412]   Sundararajan Opening Report, ¶ 219. *See also*, Karp, Gregory, "Who Pays When Merchants Are Victims of Credit Card Fraud?," *NerdWallet*, March 31, 2023, available at https://www.nerdwallet.com/article/credit-cards/merchants-victims-credit-card-fraud ("This can get tricky and could come down to whether the fraudulent transaction involved an actual card — called 'card-present' fraud — or just the credit card number, called 'card-not-present' fraud. Examples are a card dipped into a payment-card reader in a retail store versus paying for an online transaction by typing in a credit card number. Generally, the bank is more likely to be liable for the fraud for card-present transactions, while the merchant might get stuck with the cost for transactions without a physical card. (Merchants using the older swipe payment terminals and not the newer chip readers also incur more liability.)").

[413]   "Apple Media Services Terms and Conditions," *Apple*, September 16, 2024, available at https://www.apple.com/legal/internet-services/itunes/us/terms.html ("From time to time, Apple may suspend or cancel payment or refuse a refund request if we find evidence of fraud, abuse, or unlawful or other manipulative behavior that entitles Apple to a corresponding counterclaim."); "Handling Refund Notifications," *Apple*, available at https://developer.apple.com/documentation/storekit/handling-refund-notifications ("Reduce refund abuse and identify repeated refunded purchases by mapping REFUND notifications to the player accounts on your server. Monitor and analyze your data to identify suspicious refund activity.").

[414]   Halderman Rebuttal Report, Section III.B.3.

their apps to funnel fraudulent transactions through third-party payment providers and legitimate transactions through in-app digital content purchases, in the event that a consumer elects to use in-app digital content purchases, the training data provided for Apple's machine learning algorithms would be incomplete and, consequently, it would be more difficult for such algorithms to identify the signs of a fraudulent transaction.[415] In addition, for the reasons discussed earlier, third-party payment providers may have fewer resources, may not have the datasets, or may not have the same incentive to detect fraud related to App Store payments at the same level of effectiveness as Apple. As a result, the overall system would be less effective at identifying and preventing fraudulent behaviors, thus increasing the risk of financial harm to both consumers and developers.

c)    Apple's In-App Payment Requirement Eases Transacting for Consumers and Developers

184.    Professor Stiglitz also overlooks the fact that Apple's in-app payment requirement contributes to increasing the ease of use in transacting for both consumers and developers, thus increasing the likelihood that consumers will engage in in-app digital content transactions.[416] As part of Apple's in-app payment requirement, Apple manages agreements directly with payment providers, which significantly reduces the administrative and transactional burden on developers.[417] This streamlined process is particularly valuable for small developers, who account for the majority of the developer base on the App Store.[418]

185.    Further, Professor Stiglitz ignores other ways that Apple's in-app payment requirement reduces search and transacting costs for participants.[419] For example, Apple's in-app payment system streamlines the App Store transaction process by reducing what might otherwise be multiple payment steps to a single click, eliminating the need for consumers

---

[415]    Halderman Rebuttal Report, Sections III.B.3 and III.D.4.c.

[416]    Sundararajan Opening Report, Section VI.B.

[417]    Sundararajan Opening Report, ¶¶157, 219. *See also*, "In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/ ("Apple handles worldwide end-to-end payment processing — from decrypting payments, to validating tokens, to receiving payments — so you don't have to coordinate with multiple payment providers.").

[418]    Sundararajan Opening Report, ¶ 132.c.

[419]    Sundararajan Opening Report, ¶¶ 82, 157.

to enter credit card details and complete additional verification steps.[420] If developers were permitted to use third-party payment providers for in-app digital content purchases, those providers might not offer the same seamless integration as Apple's in-app payment system, instead possibly requiring consumers to enter passwords, payment details, or undergo additional authentication steps. This could diminish the consumer experience on the App Store, potentially reducing consumer engagement, and because of indirect network effects, discouraging developer participation in the process, thus harming both consumers and developers.

### 3. Professor Stiglitz Fails to Consider the Procompetitive Justifications for Apple's Former Anti-Steering Provisions

186.  As I mentioned in **Section IV.F**, Professor Stiglitz argues that Apple's former anti-steering provisions, which until 2024 prohibited most developers from directing users to "alternative purchase channels outside of the App Store," have restricted competition.[421] Professor Stiglitz claims that these restrictions imposed costs on consumers who must either conduct a separate search to purchase in-app digital content outside the app or pay higher prices within the app.[422]

187.  However, Professor Stiglitz fails to consider that by allowing developers to build their apps using Apple's IP-protected tools, technologies, and services for developers and then preventing developers from directing users to alternative purchase channels outside of the

---

[420]  Sundararajan Opening Report, ¶ 156. *See also*, "In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/ ("The App Store In-App Purchase system makes it simple for customers to purchase your digital goods and services on the App Store and in your apps. When creating an Apple Account, customers add a payment method that can be used to make purchases. And with secure authentication using Face ID, Optic ID, or Touch ID, customers can make purchases within your app in just a few taps — minimizing abandoned purchases.").

[421]  Stiglitz Report, ¶ 63 ("The case at hand is about Apple's alleged anticompetitive conduct associated with the sale of iOS apps and in-app content and the resulting harm to competition and consumers. In this section, I explain Apple's at issue conduct, including […] Apple's antisteering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."), ¶ 87 ("From the release of the App Review Guidelines in 2010, Apple has imposed 'anti-steering provisions' that limit the ability of developers to direct users to payment methods outside of the App Store. Until January 2024, Apple prohibited developers from including 'buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [Apple's In-App Purchase system].'").

[422]  Stiglitz Report, ¶ 93 ("These restrictions are costly to consumers, who either bear the inconvenience of having to separately search for and purchase in-app content outside of the app or suffer from paying higher prices for in-app content within the app.").

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

App Store. Apple's restraints prevented free-riding by developers, who may have otherwise benefited from Apple's investments in IP-protected developer tools, technologies, and services while underreporting or avoiding paying commissions. Indeed, the apps cited by Professor Stiglitz as being affected by Apple's former anti-steering provisions rely on Apple-developed technologies to function effectively on iOS devices. For example, Spotify integrates with SiriKit to enable seamless voice commands on iOS devices.[423] Netflix benefits from Apple technologies such as Picture-in-Picture mode, which allows consumers to continue watching videos on their iOS devices while multitasking.[424]

188.  Absent Apple's former anti-steering provisions, developers, including those examples cited by Professor Stiglitz, would have benefited from Apple's investments in its IP-protected tools, technologies, and services for developers, while potentially being able to evade mechanisms for collecting the commission by shifting in-app digital content purchases outside the App Store ecosystem. As a result, it would be more difficult for Apple to preempt developer free-riding, thereby undermining Apple's ability to seek a return on its investments from these transactions and reducing its ability and incentive to continue to invest in IP-protected tools, technologies, and services for developers.[425] This free-riding could lower the quality and variety of apps available to consumers, ultimately harming the consumer experience on the App Store. Because of indirect network effects, any decrease in participation on the consumer side would in turn impact participation on the developer side, thereby making all participants potentially worse off.

### H.  Professor Stiglitz Does Not Provide Any Evidence that Procompetitive Benefits Do Not Offset Any Alleged Harm from Apple's Challenged Conduct

189.   As I discussed in the prior sections, Professor Stiglitz's analysis has not considered the procompetitive benefits of Apple's challenged conduct, and whether the same benefits could have been achieved in the absence of Apple's challenged conduct or with less

---

[423]  "Siri and Spotify," *Spotify*, available at https://support.spotify.com/us/article/siri-and-spotify/ ("Use voice commands to control what plays with Siri."); Abent, Eric, "Spotify Finally Gets Siri Support in iOS 13: Here's How It Works," *Slash Gear*, October 7, 2019 available at https://www.slashgear.com/spotify-finally-gets-siri-support-in-ios-13-heres-how-it-works-07594351/.

[424]  "Multitask With Picture in Picture on iPhone," *Apple*, available at https://support.apple.com/en-by/guide/iphone/iphcc3587b5d/18.0/ios/18.0.

[425]  Sundararajan Opening Report, ¶ 189.

restrictive policies. This flaw in his analysis is compounded by Professor Stiglitz's failure to analyze whether the alleged harms of Apple's challenged conduct could be outweighed by the benefits that the challenged conduct creates for consumers and developers, which I discussed in my opening report and the sections above. Furthermore, Professor Stiglitz has not considered that there are multiple aspects of the App Store's business model that Apple can change in the but-for world that I have discussed, in addition to the commission rate, and these changes may offset some of the harms claimed by Plaintiffs.

190. While it is not possible for me to exhaustively quantify all the benefits that consumers and developers derive from the challenged conduct, there is evidence that can inform the quantitative value of some of these benefits which suggests they are substantial. For example:

   a. Apple has reported that since 2020, the App Store has averted fraudulent transactions valued in excess of nine billion dollars.[426]

   b. Between 2020 and 2023, Apple's ability to identify and investigate potentially fraudulent transactions has helped the App Store block over 14 million stolen credit cards worldwide,[427] including 4.7 million in 2024 alone.[428] These actions have prevented billions of dollars in fraudulent transactions.[429]

191. Other benefits whose monetary value is more difficult to quantify but nonetheless important to consider, as these benefits are likely substantial, include:

---

[426] "The App Store Prevented More Than $9 Billion in Fraudulent Transactions Over the Last Five Years," *Newsroom*, May 27, 2025, available at https://www.apple.com/newsroom/2025/05/the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/ ("In the last five years, the App Store has protected users by preventing over $9 billion in fraudulent transactions, including over $2 billion in 2024 alone, according to Apple's annual App Store fraud analysis.").

[427] "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[428] "The App Store Prevented More Than $9 Billion in Fraudulent Transactions Over the Last Five Years," *Newsroom*, May 27, 2025, available at https://www.apple.com/newsroom/2025/05/the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/.

[429] Sundararajan Opening Report, ¶ 219.

a.  Between 2020 and 2023, the App Store rejected over 1.3 million apps for privacy violations.[430] Between 2022 and 2023, the App Store rejected over two million apps worldwide for related reliability issues,[431] and over half a million apps for design issues.[432]

b.  In 2023, the App Store rejected over 286,000 submissions for including hidden or undocumented features or features that mislead consumers.[433]

c.  Between 2020 and 2023, the App Store deactivated over one billion consumer accounts due to fraudulent and abusive activity.[434]

---

[430]  Sundararajan Opening Report, ¶ 203.

[431]  "2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf; "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

[432]  "2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf; "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

[433]  "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/; "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("In 2023, more than 248,000 app submissions were rejected from the App Store because they violated Apple's policies against spam, blatantly copying other apps, or otherwise misleading users. This is in addition to over 38,000 app submissions that were rejected for containing hidden or undocumented features." In aggregate, App Store rejected over 286,000 apps due to these issues.).

[434]  Sundararajan Opening Report, ¶ 218. *See also*, "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("If we find that you have attempted to manipulate reviews, inflate your chart rankings with paid, incentivized, filtered, or fake feedback, or engage with third-party services to do so on your behalf, we will take steps to preserve the integrity of the App Store, which may include expelling you from the Apple Developer Program.").

> d.   Between 2020 and 2024, the App Store removed over 300,000 bait-and-switch apps from the App Store, stopping bad actors from "[deceiving] users by disguising potentially risky software as an innocuous app."[435]

192.   An assessment of the harms of the challenged conduct must account for the alleged harm the individual elements of the challenged conduct purportedly caused, which I understand from Professor Prince's report that Plaintiffs do not do, as well as the benefits that each of these elements can create, which Professor Stiglitz does not consider, and that the evidence I review suggests these benefits may be considerable during the class period.

## V.   REBUTTAL OF DR. ABRANTES-METZ'S OPINIONS

193.   In this section, I discuss Dr. Abrantes-Metz's calculation of App Store's but-for commission rate. In **Section V.A**, I explain that Dr. Abrantes-Metz's calculation is unreliable because it does not conform to widely accepted principles of economic modeling and generates predictions inconsistent with her testimony. In **Section V.B**, I explain that further, her assumptions about the but-for world are at odds with the differentiated nature of competition between app marketplaces. In **Section V.C**, I explain that an approach that ignores indirect network effects is not appropriate when analyzing competition between app marketplaces. Contrary to Dr. Abrantes-Metz's claims, I detail evidence of significant indirect network effects on the App Store, and explain how ignoring how indirect network effects might affect the pricing structure of the App Store renders her calculation of the but-for commission rate unreliable. In **Section V.D**, I discuss how indirect network effects likely played a key role in shaping the App Store's early decisions about its pricing

---

[435]   "App Store Stopped More Than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple Newsroom*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/; "App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple Newsroom*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021/; "App Store Stopped More Than $2 Billion in Fraudulent Transactions in 2022," *Apple Newsroom*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022/; "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/; "The App Store Prevented More Than $9 Billion in Fraudulent Transactions Over the Last Five Years," *Newsroom*, May 27, 2025, available at https://www.apple.com/newsroom/2025/05/the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/.

structure, services, and governance mechanisms. In **Section V.E**, I discuss other assorted economic flaws associated with the inputs used by Dr. Abrantes-Metz's analysis.

## A. Dr. Abrantes-Metz's Approach to Calculate the But-For Commission Rate Is Inconsistent with Economic Principles and Competition of App Marketplaces

194. In this section, I provide an overview of economic modeling (*see* **Section V.A.1**). I then provide a brief explanation of Dr. Abrantes-Metz's approach to the calculation of the but-for commission rate (*see* **Section V.A.2**). I then explain how her approach fails to conform to widely accepted principles of economic modeling that Dr. Abrantes-Metz herself has frequently used in the past and also generates predictions inconsistent with her testimony (*see* **Section V.A.3**).

### *1. Overview of Economic Modeling*

195. An economic model is a simplified representation of a more complex economic reality that is used by economists to understand economic outcomes and is typically described using mathematics. An economic model starts with a set of assumptions, which are postulates about the actors in the economy, their goals or objectives, and the nature of the relationship between the choices made by these actors in the economy.[436] As explained by Gibbard and Varian (1978), "a model is involved whenever there is economic reasoning from exactly specified premises."[437] For example, a common assumption in economic models is that, all else equal, consumers prefer to spend less rather than more, which in turn implies that an increase in price will lead to a reduction in demand for a product. Similarly, another common assumption is that firms prefer an outcome with higher profits over those with

---

[436] Gibbard, Allan and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677, p. 666 ("The *structure* is given by the logical and mathematical form of a set of postulates, the assumptions of the model. The structure forms an uninterpreted system, in much the way the postulates of a pure geometry are now commonly regarded as doing. The theorems that follow from the postulates tell us things about the structure that may not be apparent from an examination of the postulates alone."). *See also*, Hausman, Daniel M., "Economic Methodology in a Nutshell," *Journal of Economic Perspectives*, Vol. 3, No. 2, Spring 1989, pp. 115–127, p. 121 ("Even if all one wants of theories are valid predictions concerning particular phenomena, one needs to judge whether the needed assumptions are reasonable approximations, and one thus needs to be concerned about incorrect predictions, no matter how irrelevant.").

[437] Gibbard, Allan and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677, p. 666.

lower profits. These assumptions can be expressed mathematically within the economic model.

196.   However, these stated assumptions or postulates by themselves are typically insufficient for a mathematical specification to be called an economic model. Rather, a model includes the analysis of choices made by economic actors like firms and consumers who are pursuing and trying to optimize different goals. These choices and the associated economic outcomes they affect are expressed as variables in the economic model. For example, the price of a product is one such variable. The demand for a product is another such variable. The model then poses a "what if" question whose answer is provided by its analysis, and the interpretation of these results "tell a story"[438] and provides predictions about the real-world outcomes that may be likely.[439]

197.   When analyzing competition in an industry, a model typically specifies how consumers and firms interact, and how those interactions influence economic variables such as price and quantity.[440] The results obtained from economic models of competition also depend on assumptions that are made about the choices and nature of the strategic interaction between firms—for example, whether firms choose prices or production quantities to

---

[438]   Gibbard, Allan and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677, p. 668 ("All economic models have this, at least, in common: a model poses a question of the form, 'What would happen if such and such were the case?' in such a way that it can be answered deductively.").

[439]   Gibbard, Allan and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677, pp. 666–667 ("In economists' use of models, there is always an element of interpretation: the model always tells a story. If we think of the structure as containing uninterpreted predicates, quantifiers, and the like, we can think of the story as telling what kind of extension each predicate has and what kind of domain each quantifier has: a model will talk of firms, consumers, preferences, prices, information, and the like. The story may be vague: a model involving preferences and information, for instance, will ordinarily offer no explication of what preferences and information are, beyond what it says about their structure. The structure itself must be specified with the precision needed for mathematical reasoning.").

[440]   Hubbard, R. Glenn and Anthony Patrick O'Brien, *Microeconomics*, Pearson, 2018, 7 Ed., pp. 4, 12 ("Economic models are simplified versions of reality used to analyze real-world economic situations. […] Economic models make behavioral assumptions about the motives of consumers and firms. Economists assume that consumers will buy the goods and services that will maximize their well-being or their satisfaction. Similarly, economists assume that firms act to maximize their profits.").

maximize their profits, how these choices made by each firm affect outcomes for its competitors, and whether the firms act simultaneously or sequentially.[441]

198.    Different economic models, including those that study competition among sellers, may yield different predictions depending on their underlying assumptions. A valid economic model of competition for a particular situation must thus make assumptions that adequately reflects the nature of competition in the setting of interest.[442] For example, a model that describes two identical firms that offer identical products and compete by choosing prices may not be appropriate for a setting in which products are differentiated when aspects of what different products or services provide consumers cause certain consumers to prefer

---

[441]   Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed., p. 182 ("The various oligopoly models differ in the type of actions firms may use (such as setting prices or outputs), the order in which they may take actions (such as which firm sets its price first), the length of the game (a one-period model or many periods), and in other ways."). *See also*, Panhans, Matthew T., "Vertical Integration in a Sequential Model of a Supply Chain with Bargaining," September 2024, pp. 1–44, p. 3 ("Because different timing assumptions generate different strategic interactions, the same demand and costs will yield different equilibria and therefore different predicted merger effects in a sequential model than in models with simultanous [*sic*] timing. Indeed, I find that with the exact same demand parameters, bargaining weights, and marginal costs, a model with the sequential timing assumption can yield substantially different results on consumer welfare than a model with a simultaneous timing assumption."); Panhans, Matthew T. and Charles Taragin, "Consequences of Model Choice in Predicting Horizontal Merger Effects," *International Journal of Industrial Organization*, Vol. 89, 2023, pp. 1–22, pp. 1–2 ("In order to simulate a merger's effects, practitioners must decide which models of competition best characterize the market in question, and then decide how to obtain demand and cost parameters required by the chosen models. In business-to-business markets, where firms procure inputs from other firms, three models of differentiated product competition are often used by antitrust practitioners to assess competitive interactions: Bertrand price setting, second score auction, and Nash bargaining. However, it is often not obvious which of the three models is best suited to a particular business-to-business context, and often an argument can be made for the applicability of each one. This article demonstrates how the choice of model can play an important role in the predicted merger effects, even given the same observable inputs.").

[442]   Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed., p. 182 ("Although there is extensive agreement among economists on the models of competition and monopoly, there is no consensus on a single noncooperative oligopoly model. One reason for the lack of agreement is that the market characteristics of real-world oligopolies differ substantially, so the appropriate model varies by market.").

certain products or services over others, all else equal. [443] Similarly, a model which describes competition between one-sided retailers may not be appropriate for analyzing a setting involving competition between two-sided transaction platforms. [444]

### 2. Overview of Dr. Abrantes-Metz's Approach

199. Dr. Abrantes-Metz's approach uses what she incorrectly labels as "an economic model" to calculate the but-for commission rate in a but-for world where a single rival app marketplace competes with the App Store. [445] In her opening report, Dr. Abrantes-Metz assumes that both app marketplaces (the App Store and the hypothetical rival app marketplace) have identical cost structures, and are otherwise identical in their characteristics. She also assumes that each app marketplace adopts a revenue-sharing model and chooses a single commission rate. [446] Based on these assumptions, she asserts

---

[443] Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed., p. 224 ("In many industries, however, products are typically heterogeneous or differentiated: Consumers consider products or brands of various firms to be imperfect substitutes. If consumers view brands in an industry as imperfect substitutes, a firm may raise its price above that of its rivals without losing all its customers."), pp. 226–227 ("The study of an industry of differentiated products is based on two key concepts. First, products are differentiated because consumers think they differ. That is, even though aspirin brands may be chemically identical, if consumers believe that the products differ and shop accordingly, then the products are effectively differentiated. […] Second, the pricing of one brand exerts a greater constraint on another brand's pricing when the two brands are close substitutes than when they are not."); Krugman, Paul and Robin Wells, *Microeconomics*, Worth Publishers, New York, NY, 2009, 2nd Ed., p. 417 ("The key to product differentiation is that consumers have different preferences and are willing to pay somewhat more to satisfy those preferences. Each producer can carve out a market niche by producing something that caters to the particular preferences of some group of consumers better than the products of other firms. There are three important forms of product differentiation: differentiation by style or type, differentiation by location, and differentiation by quality.").

[444] Rochet, Jean-Charles and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029, p. 991 ("From both positive and normative viewpoints, two sided markets differ from the textbook treatment of multiproduct oligopoly or monopoly."); Wright, Julian, "One-Sided Logic in Two-Sided Markets," *Review of Network Economics*, Vol. 3, No. 1, March 2004, pp. 44–64, p. 44 ("In this paper, I consider eight basic fallacies that can arise from using conventional wisdom from one-sided markets in two-sided market settings. […] I discuss how these fallacies may be reconciled by proper use of a two-sided market analysis[.]").

[445] Report of Rosa M. Abrantes-Metz, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Abrantes-Metz Report"), ¶ 23 ("My model considers a But-For World in which, in the absence of significant entry barriers, a single rival third-party app store competes against the Apple App Store.").

[446] Abrantes-Metz Report, ¶ 23 ("The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects, with each charging a single commission rate to all game developers. Commissions are the sole source of revenue for the app stores and remain constant over time. Moreover, I assume that app stores do not subsidize consumers by paying them to buy a game. Finally, I assume that the two stores entered the market around the same time, neither having a first mover advantage.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

that both app marketplaces will charge the same commission rate.[447] To calculate the but-for commission rate, Dr. Abrantes-Metz relies on an accounting identity that defines operating profit margin as the difference between revenue and cost, expressed as a share of revenue. She calibrates this accounting identity using data from various sources. The input values she uses include the Microsoft Store's operating margin obtained from its financial statement and a set of hypothetical market share estimates based on her interpretation of results from Professor Simonson's survey.[448] She assigns these input values to variables in her accounting identity to calculate the hypothetical rival app marketplace's but-for commission rate, arriving at a value of 13.63 percent.[449] Based on her assumptions, she asserts that the App Store's but-for commission rate would be the same as that of the rival app marketplace.[450] Dr. Abrantes-Metz further asserts that the reliability of her but-for commission rate is supported by a benchmark analysis using data from the sale of Windows PC game apps and in-app digital content, a setting which she contends is "functionally similar" to the App Store setting.[451]

---

[447]  Abrantes-Metz Report, ¶ 24 ("From the assumptions of my model, two key results emerge. First, the commission rates charged by both stores must be identical. Given that app stores generally do not face capacity constraints and are assumed to be homogeneous, any disparity in commission rates would lead all developers to sell exclusively on the cheaper store.").

[448]  Abrantes-Metz Report, ¶¶ 31, 33 ("I calibrate the market shares of Apple and its rival using a consumer survey conducted by Apple's expert, Professor Simonson […] I use the operating profit margin of Microsoft Store in 2019, which was 23%, as the benchmark for the rival app store's equilibrium operating margin in the But-For World.").

[449]  Abrantes-Metz Report, ¶ 35 ("To calculate the But-For commission rate, I solve the equation presented in Section II.A for the commission rate, as shown below. I then substitute all the parameters on the right-hand side of the equation with the calibrated values described in the previous Section for the rival app store.").

[450]  Abrantes-Metz Report, ¶ 35 ("As previously explained, since the two app stores are assumed to be homogeneous, this commission rate would be charged not only by the rival store but also by Apple.").

[451]  Abrantes-Metz Report, ¶ 20 ("To support the conclusions of my economic model, I conduct a benchmark analysis using empirical data from a functionally similar, yet relatively more competitive market – the sale of Windows PC game apps and in-app content. This market includes both third-party stores (e.g. Steam, Microsoft Store, Epic Games Store) and direct-to-consumer stores (e.g. Battle.net, Origin, Ubisoft Connect). I compute the sales-weighted average effective commission rate across all Windows PC game app stores and find that it ranges from approximately ███ to ███ This finding further supports the reasonableness of the But-For commission rate estimated from my economic model."); Abrantes-Metz May 2025 Deposition, pp. 30:21–31:11 ("Q. What do you mean by functionally similar in that sentence? A. That this market is also distributing game apps, though in a different operating system. This one is Windows, while Apple's is iOS. Q. When you say functionally similar, what is it functionally similar to? A. That they have a very similar product, game apps, only that one -- distribution of game apps -- one operating in Windows and the other in iOS. Q. So you're comparing Window PC game apps and iOS game apps. Is that correct? A. Yes.").

      3.      *Dr. Abrantes-Metz's Approach Does Not Follow Accepted Principles of Economic Modeling*

200.    Dr. Abrantes-Metz's approach does not adhere to accepted principles of economic modeling and as a result, her approach yields predictions that are invalid. I discuss the problems with her approach below. In **Section V.B**, I will also additionally discuss how Dr. Abrantes-Metz's approach does not appropriately reflect a setting involving competition between two-sided transaction platforms because she ignores the presence of indirect network effects.

201.    I do not dispute that as an accounting identity, Dr. Abrantes-Metz's mathematical equation is correct—it is the accounting definition of operating margin. However, this accounting identity is not an economic model. While Dr. Abrantes-Metz makes certain assumptions, she does not provide a mathematical or other specification of the objectives or goals of the economic actors (the two competing app marketplaces, their developers and their consumers), nor does she explain how her assumptions combine with the choices made by these economic actors to generate predictions or explanations of relevant economic outcomes like the commission rates or market shares.[452] For example, her accounting identity does not specify the basis on which consumers and developers choose between the App Store and the rival app marketplace. Similarly, it does not provide any details about the effects that a change in one app marketplace's commission rate might have on the demand obtained by the other app marketplace.

202.    Here is an example that illustrates why Dr. Abrantes-Metz's accounting identity is not an economic model that can generate meaningful predictions. Consider a customer who uses a ridesharing service to commute five miles from their home to their place of work in the morning (during peak hours) and from their place of work back to their home in the evening (after peak hours). If the ridesharing service uses a per-mile fare, there is an accounting identity linking three variables: total fare, driving distance, and fare per mile. In particular:

$$Total\ Fare = Driving\ Distance \ \times Fare\ per\ Mile.$$

---

452    Abrantes-Metz Report, Sections II, III, and IV.

Let's suppose I observe that the customer pays $30 in the morning and $25 in the evening. By rearranging the accounting identity, one can calculate a fare of $6 per mile for the morning commute (30 ÷ 5), and a fare of $5 per mile for the evening commute (25 ÷ 5). However, the accounting identity does not explain *why* the morning fare per mile ($6) is higher than the evening fare per mile ($5). It cannot provide any information about how the fare will change in response to changes in demand or supply. In other words, the accounting identity simply documents the fare per mile and cannot provide meaningful economic explanations about why fares differ between peak and off-peak times. In contrast, an actual economic model—one that accounts for how rider demand and driver supply interact—might predict that fare per mile increases during periods when demand is high relative to supply and provide additional insight into what these fares might be as supply and demand conditions vary.

203.   By using an accounting identity rather than an economic model, Dr. Abrantes-Metz cannot consider the economic interlinkages among the variables in her accounting identity implied by the app marketplaces optimizing their economic goals. In a reasonable economic model, an app marketplace would choose its optimal commission rate and other elements of its pricing structure to maximize some measure of profit while considering its cost structure, details about consumer and developer preferences and the nature of competition. The resulting commission rate, operating margin, and market share (highlighted in red) would be jointly determined. In contrast, Dr. Abrantes-Metz's approach does not provide any specification of the nature of strategic interaction between the two app marketplaces. It ignores that price, operating margin, and market shares are interrelated. Put differently, were the commission rate to change by 1 percentage point, her approach is silent on how operating margin and share would change.

$$Commission\ Rate = \frac{Variable\ Cost}{(1 - Operating\ Margin)} + \frac{Fixed\ Cost}{Share\ \times (1 - Operating\ Margin) \times Market\ Size}$$

204.   By ignoring the economic interlinkages among the economic variables in her accounting identity, Dr. Abrantes-Metz's predictions are at odds with widely accepted principles of economic modeling. Not surprisingly, her approach also yields relationships between variables that are at odds with her own subsequent arguments. For example, Dr. Abrantes-Metz concludes that "a higher market share or a greater market size is associated with a

145

lower commission rate."[453] However, the predictions of Dr. Abrantes-Metz's accounting identity contradict her deposition testimony, in which she stated that an increase in competition would lead to a lower price.[454] Consider, for example, a setting in which two competing app marketplaces each have a 50 percent share of the market. Retaining all Dr. Abrantes-Metz's other inputs, her accounting identity predicts a shared commission rate of 8.96 percent. Now contrast this with a setting in which there are four competing app marketplaces, each with a market share of 25 percent. Again, retaining all Dr. Abrantes-Metz's other inputs, her accounting identity predicts a shared commission rate of 12.96 percent, thus suggesting that an increase in competition would raise rather than lower commission rates.[455]

205.   As another example, consider **Figure V.1** shown below, reflecting the setting presented by Dr. Abrantes-Metz under which the App Store has a 76.9 percent market share. Preserving Dr. Abrantes-Metz's assumption of one rival app marketplace that has a 23.1 percent market share, her accounting identity predicts a commission rate of 13.63 percent.[456] Now contrast this with a setting in which, rather than one app marketplace competing with the App Store, there are instead five app marketplaces competing with the App Store. Under this setting, Dr. Abrantes-Metz's methodology would still predict a market share of 76.9 percent for the App Store, since the survey of Professor Simonson that market share estimates are based on simply asks about consumer preferences for the App Store versus rival app marketplaces. Following her current assumptions, Dr. Abrantes-Metz's methodology would likely assume that the five app marketplaces, being identical, would

---

[453]   Abrantes-Metz Report, ¶ 26.

[454]   Abrantes-Metz May 2025 Deposition, pp. 106:21–107:5 ("Q. In fact, it's a fundamental principle of competition economics that an increase in the number of competitors drives down prices. Is that correct? A. Yes, because competitors only come in if they see a profit opportunity and when they come in, there's less profit to spread around and prices are reduced.").

[455]   Assuming an equal market share of 25% for each of the four rivals and holding all of Dr. Abrantes-Metz's other inputs fixed, her accounting identity would generate a But-For commission rate of:

$$\tau_i = \frac{3.828\%}{1 - 22.973\%} + \frac{0.786}{25\% \times 51.1 \times (1 - 22.973\%)} = 12.96\%$$

[456]   Abrantes-Metz Report, Footnote 3 ("In my economic model, I conservatively assume that the market share for Apple and its rival would be 76.9% and 23.1%, respectively."), ¶ 21 ("Using generally conservative assumptions and calibrating my model with conservative inputs, I estimate a But-For commission rate of 13.63%.").

divide up the remaining 23.1 percent share, leading to a market share of 4.6 percent each. Retaining all of Dr. Abrantes-Metz's other inputs, in this scenario, her accounting identity predicts a shared commission rate of 48.3 percent.[457] This example shows yet again how Dr. Abrantes-Metz's accounting identity predicts that an increase in competition would raise rather than lower commission rates.[458] I understand that Professor Hitt performs a similar analysis and also finds that Dr. Abrantes-Metz's accounting identity implies that an increase in competition would raise commission rates.[459]

---

[457] Assuming an equal market share of 4.6 percent for each of the five rival app marketplaces and holding all of Dr. Abrantes-Metz's other inputs fixed, her accounting identity would generate a but-for commission rate of:

$$\tau_i = \frac{3.828\%}{1 - 22.973\%} + \frac{0.786}{\left[\frac{23.062\%}{5}\right] \times 51.1 \times (1 - 22.973\%)} = 48.3\%$$

[458] Any division of the 23.1 percent market share between the five rival app marketplaces would result in Dr. Abrantes-Metz's accounting identity predicting a commission rate greater than 13.63 percent.

[459] Hitt Rebuttal Report, Exhibit 4.

**Figure V.1**
**Commission Rates Implied by Dr. Abrantes-Metz's Accounting Identity**
**Under Different Assumptions About the Number of Rival App Marketplaces**[460]



206.    The contradictions illustrated by these examples further underscore the fundamental issues with Dr. Abrantes-Metz's approach that I previously discussed. Commission rates, operating margins, and market shares are interrelated variables, and Dr. Abrantes-Metz ignores the economic interlinkages among these economic variables in her accounting identity.

207.    Dr. Abrantes-Metz's approach is also inconsistent with accepted principles of economic modeling that she has advocated for and used in her own writings. In one of her papers, she calibrates a model to examine economic outcomes in a setting involving a profit-maximizing two-sided platform monopoly.[461] The variables she uses include marginal

---

[460]    **Notes**: [1] Commission rates are calculated using Dr. Abrantes-Metz's identity equation and inputs, and varying the competitor's market share given the number of competitors.  [2] Average market share of competitor is calculated by dividing 23%, Dr. Abrantes-Metz's choice of the total non-Apple market share, by the number of competitors.
         **Source**: Abrantes-Metz Report.

[461]    Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020.

costs,[462] measures of the non-monetary costs to participants for using the platform,[463] and measures of the strength of direct and indirect network effects.[464] Other economic variables including the output of the platform and its profits are jointly determined as outcomes of the platform's profit-maximizing behavior.[465] Put differently, in this paper, Dr. Abrantes-Metz recognizes that the output of the platform and its ensuing profits are jointly determined by the platform's profit-maximizing behavior. In another of Dr. Abrantes-Metz's papers, she models the economic behavior of single-sided and two-sided platforms,[466] using variables such as platform costs, the strength of network effects, and choices of whether to multi-home to describe economic outcomes that are determined by

---

[462]   Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 29 ("In our applications we will assume no fixed cost and constant marginal costs, that is $c_i(n) = c_i n$[.]"), p. 40 ("Our baseline specification is $\{\lambda_A = 10, \alpha_A = 0, \beta_A = 1.0, \mathrm{r}_A = 1/2, c_A = 1\}$ for Side A and $\{\lambda_B = 10, \alpha_B = 1.0, \beta_B = 0, \mathrm{r}_B = 1/2, c_B = 1\}$ for Side B. We will vary each of these in turn while holding the others at their respective baseline level.").

[463]   Dr. Abrantes-Metz refers to these variables as measures of "disutility." Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, pp. 27–28 ("Besides the price, each subscriber experiences a unique disutility from using the platform. This disutility can be motivated as the value of time lost to use the network, as just one example, and is the source of subscriber heterogeneity which ultimately determines who subscribes to the platform and who does not."), p. 29 ("As previously, we assume the disutilities ε are independently, exponentially distributed: $\varepsilon_i \sim$ $\exp(\gamma_i)$ […] Importantly, we do not require that $\gamma_A = \gamma_B$."), p. 40 ("Our baseline specification is $\{\lambda_A = 10, \alpha_A = 0, \beta_A = 1.0, \mathrm{r}_A = 1/2, c_A = 1\}$ for Side A and $\{\lambda_B = 10, \alpha_B = 1.0, \beta_B = 0, \mathrm{r}_B = 1/2, c_B = 1\}$ for Side B. We will vary each of these in turn while holding the others at their respective baseline level.").

[464]   Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p.28 ("The prototypical two-sided platform would arguably be characterized by own-side production elasticities $\{\alpha_A, \beta_B\}$ of zero and opposite-side elasticities $\{\beta_A, \alpha_B\}$ greater than zero. A negative own-side elasticity would capture a congestion effect. To take Uber as an example, passengers positively value drivers ($\beta_A > 0$), but likely value other passengers negatively ($\alpha_A < 0$), other things equal, since what they really value are available drivers or 'drivers per passenger.' Similarly, drivers clearly want passengers to join ($\alpha_B > 0$) but, other things being equal, would prefer fewer competing drivers ($\beta_A < 0$), since what they really value are available passengers or 'passengers per driver.'"), p. 40 ("Our baseline specification is $\{\lambda_A = 10, \alpha_A = 0, \beta_A = 1.0, \mathrm{r}_A = 1/2, c_A = 1\}$ for Side A and $\{\lambda_B = 10, \alpha_B = 1.0, \beta_B = 0, \mathrm{r}_B = 1/2, c_B = 1\}$ for Side B. We will vary each of these in turn while holding the others at their respective baseline level. The metrics we will track are: […] The monopolist's optimal steady-state network size; The monopolist's steady-state profit margins; The monopolist's critical mass[.]").

[465]   Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 40.

[466]   Abrantes-Metz, Rosa M. and Albert D. Metz, "Collusion and Network Effects: Modeling the Dynamics of Single- And Multi-Sided Platforms," *SSRN*, May 2021, pp. 1–53, p. 2 ("In this paper we extend that framework to study the case of duopoly collusion under both single- and multi-homing regimes. We model collusion as joint profit maximization and assume that the collusive arrangement is binding in perpetuity, even if the optimal arrangement is to have only one of the platforms operating.").

149

the associated firms maximizing their profits.[467] Thus, despite using accepted principles of economic modeling in almost all of her prior academic writings, her report has inexplicably chosen not to articulate a model of competition between app marketplaces that derives their market shares and operating margins as an outcome of their profit maximizing behavior.

208.  In summary, Dr. Abrantes-Metz's approach is not based on an economic model, is inconsistent with widely accepted principles of economic modeling, and produces predictions that contradict her testimony.

## B.  Dr. Abrantes-Metz's Approach Fails to Appropriately Account for the Nature of Competition between App Marketplaces

209.  Setting aside the varied flaws in the approach adopted by Dr. Abrantes-Metz as I have discussed in **Section V.A.3**, an actual economic model that retains the set of assumptions chosen by Dr. Abrantes-Metz would not reflect the reality of app marketplace competition. As I discussed in this section, for a specific economic model to be an appropriate basis to draw inferences about a setting, its assumptions must reflect key economic characteristics of the setting in question. If the assumptions of the economic model are at odds with the reality it claims to represent, the predictions from the model can be at odds with real-world data about the setting.[468] Setting aside the issue that the choice by two competing app

---

[467]  Abrantes-Metz, Rosa M. and Albert D. Metz, "Collusion and Network Effects: Modeling the Dynamics of Single- And Multi-Sided Platforms," *SSRN*, May 2021, pp. 1–53, p. 2 ("Through a series of sensitivity experiments, we vary key model parameters to understand their effect on metrics like platform size, profit margins and deadweight loss."), Table C2.1, pp. 37–38 ("Results are presented in Table C2.1 and are consistent with the one-sided network results. Even with moderate but still concave network effects, the colluders make little use of the second platform. There is of course no difference in results between the first two types of platforms: whether the sides value themselves or value each other, the optimal network size and prices are the same. The third type, where Side 1 values Side 2 which values itself, is different, since in this type one side rides off the other.").

[468]  Gibbard, Allan and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677, p. 669 ("[W]hen an investigator applies a model to a situation, he hypothesizes that the assumptions of the applied model are close enough to the truth for his purposes."), p. 670 ("First, if the assumptions of the applied model were true, the conclusions would be—here the proof is mathematical. Second, the assumptions in fact are sufficiently close to the truth to make the conclusions approximately true. For this no argument within the model can be given; it is rather a hypothesis, for and against which evidence might be given."). *See also*, Hausman, Daniel M., "Economic Methodology in a Nutshell," *Journal of Economic Perspectives*, Vol. 3, No. 2, Spring 1989, pp. 115–127, p. 121 ("Without assessments of realism (approximate truth) of assumptions, the process of theory modification would be hopelessly inefficient and the application of theories to new circumstances nothing but arbitrary guesswork. […] Even if all one wants of theories are valid predictions concerning particular phenomena, one needs to judge whether the needed assumptions are reasonable approximations, and one thus needs to be concerned about incorrect predictions, no matter how irrelevant.").

marketplaces of identical commission rates must be an outcome that emerges from the analysis of an economic model rather than being assumed as part of an accounting identity as Dr. Abrantes-Metz has done, the assumption that identical firms choose identical prices is at odds with both the observed market structure of app marketplaces and the actual values that Dr. Abrantes-Metz uses. Rather, as I will explain in what follows, app marketplaces are often differentiated from one another.

210. Dr. Abrantes-Metz assumes that the App Store and its rival app marketplace in the but-for world are identical rather than differentiated. When I say that two products or services are "differentiated" from one another, I mean that there are aspects of what these products or services provide consumers that cause certain consumers to prefer one of these products over the other, all else equal.[469]

211. There are many reasons why a consumer might prefer one product over another. Consumers may vary in their preferences. For example, some people like chocolate ice cream more than vanilla ice cream, while others prefer vanilla ice cream to chocolate ice cream. Economists sometimes refer to this as differentiation by taste or variety, or horizontal differentiation.[470] Alternatively, one product may simply be superior in quality to another product, causing all consumers to prefer the former to the latter for a given price. For example, assuming both options were free and there were no considerations of

---

[469] Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed., p. 224 ("In many industries, however, products are typically heterogeneous or differentiated: Consumers consider products or brands of various firms to be imperfect substitutes. If consumers view brands in an industry as imperfect substitutes, a firm may raise its price above that of its rivals without losing all its customers."), pp. 226–227 ("The study of an industry of differentiated products is based on two key concepts. First, products are differentiated because consumers think they differ. That is, even though aspirin brands may be chemically identical, if consumers believe that the products differ and shop accordingly, then the products are effectively differentiated. […] Second, the pricing of one brand exerts a greater constraint on another brand's pricing when the two brands are close substitutes than when they are not."); Krugman, Paul and Robin Wells, *Microeconomics*, Worth Publishers, New York, NY, 2009, 2nd Ed., p. 417 ("The key to product differentiation is that consumers have different preferences and are willing to pay somewhat more to satisfy those preferences. Each producer can carve out a market niche by producing something that caters to the particular preferences of some group of consumers better than the products of other firms. There are three important forms of product differentiation: differentiation by style or type, differentiation by location, and differentiation by quality.").

[470] Elizalde, Javier, "Horizontal Product Differentiation," *Encyclopedia of Law and Economics*, Springer, March 23, 2021, edited by Alain Marciano and Giovanni Battista Ramello, p. 1 ("Horizontal product differentiation takes place when, at a given price, different consumers prefer different varieties of the goods, so all varieties have a positive demand.").

environmental impact, all consumers would prefer a spacious first-class seat on an airplane to a smaller economy-class seat. Economists sometimes refer to this as differentiation by quality, or vertical differentiation.[471]

212.  As I discussed in my opening report, two-sided transaction platforms often are viewed by consumers as differentiated along many dimensions, including through their services and governance mechanisms.[472] Competition among app marketplaces is similarly characterized by differentiation across multiple dimensions. App marketplaces offer different services and governance mechanisms that are perceived by consumers as being of differing value because of differences in the quality of these services and governance mechanisms along multiple dimensions, including, but not limited to security, privacy, app quality, user trust, and fraud prevention. App marketplaces are thus not identical but are differentiated.[473] As discussed in my opening report, the App Store implements a more rigorous App Review process than the Google Play Store.[474] This difference in app review standards has led to some developers preferring the App Store, citing higher quality levels

---

[471]  Beath, John and Yannis Katsoulacos, "6 - Vertical Product Differentiation," *The Economic Theory of Product Differentiation*, Cambridge University Press, 1991, pp. 109–134, p. 109 ("Products are said to be 'vertically' differentiated if, when offered at the same price, *all consumers choose to purchase the same one*: that of highest quality.").

[472]  Sundararajan Opening Report, Section IV.C.

[473]  Halderman Opening Report, ¶ 131 ("Some Android app stores are more dangerous than others, reflecting variations in the quality of their review processes.").

[474]  Sundararajan Opening Report, ¶ 220. *See also*, Cunningham, Andrew, "Google Play Apps and Updates Are Now Subject to a Review Process," *Ars Technica*, March 17, 2015 available at https://arstechnica.com/gadgets/2015/03/google-play-apps-and-updates-are-now-subject-to-a-review-process/. ("Apple has had a team of real humans evaluating third-party app submissions since the dawn of the App Store, but the Android Market (now Google Play) was more permissive—aside from some automated malware scanning, Google didn't do much to make sure apps worked like they were supposed to and did what they said they did. The Google Play store had apps that did more things, but the quality and security of those apps could be all over the place.").

of apps and lower rates of piracy.[475] I also discussed how Handy, a two-sided transaction platform that enables transactions between home cleaners and customers, allows home cleaners to opt into jobs that align with their schedules and preferences, but does not allow users to choose specific home cleaners. This differentiates it from TaskRabbit, whose users can choose from a set of listed Taskers for their home cleaning needs.[476]

213.    In the hypothetical scenario where the App Store competes with a rival app marketplace in the but-for world, the App Store is likely to be viewed by consumers and developers as differentiated along several dimensions, including, but not limited to security, privacy, app quality, user trust, and fraud protection. As I have explained in my opening report (and in **Section IV.G** of this report), a negative experience with an app or with in-app digital content can reflect negatively on the iOS device and the Apple brand.[477] Therefore, as the manufacturer of iOS devices, Apple has stronger incentives than any third-party app marketplace to safeguard the overall consumer and developer experience, and the perceived quality of the App Store, which would cause it to invest in a higher quality App Review process than its rival app marketplace in a but-for world.[478]

214.    Further, unlike the hypothetical rival app marketplace, Apple can draw on its proprietary knowledge of iOS hardware and software in connection with its review of apps, the development of its computer analysis tools, and the training of its human reviewers. This

---

[475]    Sundararajan Opening Report, ¶ 220. *See also*, Apple, "iPhone Developer Program Satisfaction Survey," March 2010, APL_APPSTORE_09324150–288 at 241; Apple, "iPhone Developer Program Satisfaction Survey," August 2010, APL_APPSTORE_09324447–608 at 559; Koetsier, John, "App Developers Losing $3-4 Billion Annually Thanks to 14 Billion Pirated Apps," *Forbes*, July 24, 2017, available at https://www.forbes.com/sites/johnkoetsier/2017/07/24/app-developers-losing-3-4-billion-annually-thanks-to-14-billion-pirated-apps/ ("The pirated app economy is almost entirely invisible to consumers in Europe and North America, where most install apps from two sources: Google Play and the iOS App Store. These apps are generally safe and generally kosher. App pirating generally occurs on third-party app stores in China and other countries [...] All that piracy is expensive. 'This means that the developer community stands to lose between $3 billion and $3.8 billion in revenue per year.'").

[476]    Sundararajan Opening Report, ¶ 81. *See also*, "How are Customers Matched with Pros?," *Handy*, available at https://help.handy.com/handysupport/s/article/How-are-customers-matched-with-pros--How-Handy-Works ("When you make a booking, we share it with the network of professionals using our platform, and they're able to claim the bookings that suit their preferences. If you find a pro you really love, you can add them to your Pro Team [...], so they get priority access to your bookings."); "How Do I Hire a Tasker?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/210861763-How-Do-I-Hire-a-Tasker.

[477]    Sundararajan Opening Report, ¶¶ 214–215, 222.

[478]    Sundararajan Opening Report, ¶ 28.

may lead to the App Store having a higher quality than its rival app marketplace in a but-for world.[479] This quality differentiation may be reinforced by likely differences in each app marketplace's manual review process, a component of the App Review process into which Apple makes substantial investments. Apple does not rely on contractors or outsource this manual review. Members of the App Review team are all Apple employees, and Apple employs a cross functional team that includes senior Apple staff and other Apple engineering teams to develop App Review tools, evaluate App Store policies, and improve the App Review process.[480] The sustained and high level of commitment that Apple has demonstrated to reviewing all apps and in-app digital content is unlikely to be replicated by a competing app marketplace because, as I discuss in **Section IV.G**, beyond the technical advantages described above, and irrespective of the level of resources held by the competing app marketplace, Apple has a stronger incentive than any third-party app marketplace that does not sell iOS devices would have to protect both consumers and developers from adverse outcomes to preserve the value of its brand and the consumer perception of the quality of its devices. This combination of factors may lead to the App Store having a higher perceived quality than its rival app marketplace in a but-for world.[481]

215.    The very survey that Dr. Abrantes-Metz relied on to compute her but-for market shares of the App Store and its rival app marketplace is predicated on a but-for world featuring the App Store and a competing app marketplace in which most consumers would prefer the App Store while a small share of consumers would prefer the rival app marketplace.[482] Specifically, the survey asked respondents to pick between the App Store and a rival app marketplace which offers the same price for apps and in-app digital content as the App Store but is differentiated along multiple dimensions. The survey described the App Store as "High" on the following attributes: app variety, malware protection, privacy, and app-

---

[479]    Sundararajan Opening Report, ¶ 206.

[480]    Halderman Opening Report, ¶¶ 68–104; Conversation with Trystan Kosmynka, May 13, 2025.

[481]    Epic Trial Testimony of Tim Cook, pp. 3934:23–3935:2 ("Q. If there were another app store or app stores available, Apple would have to actually compete and persuade users that it had the best offering, right? A. We'd have to differentiate in some way. I don't know what we would do.").

[482]    Abrantes-Metz Report, ¶ 31 ("I calibrate the market shares of Apple and its rival using a consumer survey conducted by Apple's expert, Professor Simonson. The survey results suggest that in the But-For World, the Apple App Store would have a market share of 77%, while the rival app store would hold 23%.").

by-app quality control. In contrast, the survey described the rival app marketplace as "Lower variety" for app variety, and "Unknown at this time" for the following attributes: malware protection, privacy, and app-by-app quality control. The survey found that 50.4 percent of respondents indicated they would make all their paid app and in-app digital content purchases on the App Store. Another 17.9 percent of respondents indicated they would make most of their purchases on the App Store. 11.0 percent of respondents preferred to split their purchases equally between both app marketplaces.[483] These survey results, which Dr. Abrantes-Metz found sufficiently compelling to use as the basis for her but-for world market share estimates, indicate that her analysis is based on a but-for world in which consumers perceive differences between the app marketplaces, and in which the majority of respondents would prefer to make their purchases of apps and in-app digital content on the App Store when both charge the same commission rate. Dr. Abrantes-Metz's testimony further suggested that she believes there could be differentiation between the app marketplaces because of one offering a larger selection of apps and in-app digital content.[484]

216.   Dr. Abrantes-Metz incorrectly claims that ignoring these numerous factors that would differentiate the App Store from its rival app marketplace is conservative because she does not account for "potential losses related to quality improvements and innovation" arising

---

[483]   For the remaining respondents, 7.8 percent of respondents would favor the rival app marketplace for most of their purchases, and 5.6 percent of respondents would make all of their purchases from the rival app marketplace. Lastly, 7.5 percent of respondents were unsure or did not have a clear preference. Opening Expert Report and Declaration of Itamar Simonson, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Simonson Opening Report"), Exhibit 22.

[484]   Abrantes-Metz May 2025 Deposition, pp. 90:25–92:17 ("Q. Does that mean that the app store and its rival offer identical products? A. Potentially, yes. At least the products that they offer that are the same, the two products, so they may have – one may have a bigger universe than the other of products, but the products that are sold in both are equal. […] Q. Are you testifying now that the App Store and the rival store may offer some different products? A. Well, it could end up being that one platform is larger than the other and there's more developers in one platform than in the other. And imagine that each developer is associated with one game to simplify. So, there would be more games in one than in the other, but the games that exist in both are equal and the quality of the app stores are equal. That's -- and other aspects are equal. That's what I'm referring to here.").

from Apple's challenged conduct.[485] However, she provides no quantitative analysis to support this claim, and has made no documented attempt to model how incorporating differentiation would affect her but-for commission rate. As discussed in my opening report, Apple's incentive to provide consumers with free access to the App Store and to invest in creating and offering superior IP-protected tools, technologies, and services for developers would be *lower* and not higher absent Apple's challenged conduct in the but-for world.[486] Given Apple's diminished incentives in the but-for world, Dr. Abrantes-Metz's estimate cannot be justified as being conservative on this basis because it does not take into account offsetting harm arising from possible decreases in Apple's quality of services to developers.

217. Dr. Abrantes-Metz cites many academic papers whose assumptions reflect competitors who offer identical products and have identical cost structures.[487] I do not dispute that such assumptions are sometimes made in economic models, but the existence of academic papers that make these simplifying assumptions does not justify the assumptions in a

---

[485] Abrantes-Metz Report, ¶ 63 ("[I]f the app stores in the But-For World were differentiated, they would likely have competed on more than just price. Both stores might also have improved their service quality to attract developers and consumers, striving to offer the best platform. This competition on quality would have likely resulted in a better experience for both developers and users in the But-For World. By simplifying the analysis to focus exclusively on price effects, my model does not account for additional potential losses related to quality improvements and innovation that may have been stifled by Apple's conduct.").

[486] Sundararajan Opening Report, ¶¶ 25, 189. The Antitrust Modernization Commission, a commission established by Congress, noted that "absent a right to refuse to deal with a rival, a firm that lawfully obtained a monopoly through superior acumen, skill, foresight, or industry would find itself forced to share the fruits of its investment with rivals, thereby undermining the value of its lawfully acquired monopoly and discouraging others from making similar investments. Because investments in new facilities and assets often enhance consumer welfare, antitrust rules that discourage such activity should be avoided. Forced sharing stultifies the incentives of smaller firms to develop alternatives to the monopolist's products." "Report and Recommendations," *Antitrust Modernization Commission*, April 2007, available at https://digital.library.unt.edu/ark:/67531/metadc1228317/m2/1/high_res_d/amc_final_report.pdf, pp. 1–449, pp. 101–102. Economic literature has noted that forced dealing could discourage investment and welfare. Carlton, Dennis W. and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, Autumn 2008, pp. 285–305, p. 285–287 ("An essential element of appropriate antitrust policy is to allow a firm to capture as much of the surplus that, by its own investment, innovation, industry, or foresight, the firm has itself brought into existence. Alternative policy approaches to single-firm conduct […] seriously threaten to impede economic growth and welfare over time. […] For firms to have the proper incentives to invest and create, they must be permitted to profit from their success.").

[487] Abrantes-Metz Report, ¶70 ("Economic models predicting symmetric (equal) prices are standard in the literature, including those on platform competition. For example, both Tan and Zhou (2021) and Teh et al. (2022) analyze symmetric equilibria.").

setting where the App Store will almost certainly be viewed by consumers as being differentiated from a rival app marketplace, something Dr. Abrantes-Metz herself implicitly acknowledges by her reliance on Professor Simonson's survey and explicitly acknowledges in her testimony.

218. Additionally, many academic papers have studied competition between platforms that leads to differentiated products, non-identical pricing strategies, and unequal shares among competing platforms. For example, Halaburda, Jullien, and Yehezkel (2020) finds that the presence of indirect network effects and quality differentiation can lead to a higher quality entrant gaining more market share than an incumbent platform if the quality difference between the two platforms is large.[488] As another example, a paper by Ambrus and Argenziano (2009) finds that when consumers on one side of a platform differ in how much they value participation on the other side, one platform may differentiate itself by attracting the consumers who care more about participation of the other side by charging a lower price on the other side to attract more participants relative to the other platforms, and simultaneously charging consumers a higher price.[489] As yet another example, Caillaud and Jullien (2003) shows that in a setting involving competition between two platforms, when participants on both sides of a platform can multi-home, one platform may charge a

---

[488] Halaburda, Hanna, Bruno Jullien, and Yaron Yehezkel, "Dynamic Competition With Network Externalities: How History Matters," *RAND Journal of Economics*, Vol. 51, No. 1, Spring 2020, pp. 3–31, p. 5 ("However, when the future is important for the platforms or the quality gap is sufficiently large, the higher-quality platform wins the market at the start of the game and maintains its leadership. This outcome follows because a high-quality platform can earn higher profits than the low-quality one as the focal platform in the last period. So, as compared with the low-quality platform, the high-quality platform has a larger incentive to fight for focality in the game's early stages.").

[489] Ambrus, Attila and Rossella Argenziano, "Asymmetric Networks in Two-Sided Markets," *American Economic Journal: Microeconomics*, Vol. 1, No. 1, 2009, pp. 17–52, p. 18 ("A central feature of our model is that we allow for heterogeneity among consumers with respect to how much they care about the externality (how much they value if there are a lot of consumers from the other side of the market on the same platform).") and p. 36 ("[I]n any equilibrium with positive profits, the two competing networks have to be asymmetric (prices and market shares are different at least on one side), with the particular structure that one network is cheaper and larger on one side, and the other network is cheaper and larger on the other side.").

low transaction fee and a high access fee while the other platform may charge a high transaction fee and a low access fee.[490]

219.   In summary, Dr. Abrantes-Metz's assumption that app marketplaces would be identical in the but-for world is not realistic. By ignoring the differentiation between app marketplaces that is evident in the survey results she relies on and would arise from the many economic factors I described above, the but-for commission rate estimated by her approach is flawed.

## C.   Dr. Abrantes-Metz's Approach Incorrectly Dismisses that Indirect Network Effects Can Impact the App Store's Commission Rate

220.   In this section, I explain why an economic model that ignores indirect network effects is not appropriate for analyzing competition between app marketplaces. I first provide an overview of Dr. Abrantes-Metz's claims regarding indirect network effects on the App Store (*see* **Section V.C.1**). Next, I explain why contrary to Dr. Abrantes-Metz's claims, economic theory and empirical research suggest that indirect network effects are an important feature of two-sided transaction platforms, including the App Store (*see* **Section V.C.2**). Dr. Abrantes-Metz also overlooks an extensive economics literature describing the impact of indirect network effects on the optimal pricing structure of two-sided transaction platforms (*see* **Section V.C.3**).

### 1.   *Overview of Dr. Abrantes-Metz's Position on the Irrelevance of Indirect Network Effects in Her Analysis of the But-For Commission Rate*

221.   Dr. Abrantes-Metz claims that it is not necessary to account for the presence of indirect network effects when estimating the but-for commission rate. Dr. Abrantes-Metz supports this claim by arguing that indirect networks effects are not relevant to her economic analysis because in the as-is world, consumers do not pay participation fees or receive subsidies when transacting on the App Store or engaging in digital transactions involving

---

[490]   Caillaud, Bernard and Bruno Jullien, "Chicken & Egg: Competition Among Intermediation Service Providers," *RAND Journal of Economics*, Vol. 34, No. 2, Summer 2003, pp. 309–328, p. 318 ("The maximal-profit, global multihoming equilibrium is not symmetric: matchmakers play different roles. Firm *I* sets a low transaction fee and acts as a first source of intermediation, that is, as the provider through which transactions are implemented whenever possible, while [Firm] *E* sets a high transaction fee and acts as a second source, concluding transactions between trading partners who have not been matched elsewhere. Overall *E* is cheaper in terms of registration fees for both categories of users, but once registered with *E*, all users are still willing to register with *I* because this allows them to save on the transaction fee if they are matched. The equilibrium configuration exhibits endogenous differentiation between the matchmakers.").

Windows PC game apps, which Dr. Abrantes-Metz presents as a reasonable benchmark for the but-for world.[491]

222.  Dr. Abrantes-Metz further claims that ignoring indirect network effects in her current analysis aligns with the methodology she has used in other litigation matters, including *Sabre* and *Surescripts*.[492] She explains that the reason she quantified indirect network effects in *Sabre* was because travel agents on one side of the platform who engaged in transactions by buying tickets from airlines on the other side of the platform received direct subsidies in the as-is world. She claims that the quantification of indirect network effects was necessary to assess whether these subsidies would persist in the but-for world.[493] In *Surescripts*, Dr. Abrantes-Metz indicates that she deemed quantifying indirect network effects unnecessary because the case "was not concerned with how the price would be allocated between the various sides of the platform."[494]

---

[491]  Abrantes-Metz Report, ¶ 43 ("Apple's App Store collects an ad valorem commission from developers and neither makes subsidy payments to consumers nor collects participation fees from them. The same pricing structure is observed in the Windows PC game apps marketplace, which, as explained in Section VI.A, serves as a reasonable benchmark for the But-For World. […] Therefore, with the price structure in the But-For World already established, there is no need to assess the strength of indirect network effects."), ¶ 84 ("Empirical evidence from app distribution markets indicates that there are no meaningful consumer subsidies or participation fees. In the As-Is iOS app distribution market, developers pay commission rates, while consumers are neither charged nor receive meaningful subsidy payments per transaction from the platform. The same holds for the sale of digital Windows PC game apps, a reasonable benchmark for a more competitive But-For World.").

[492]  Abrantes-Metz Report, ¶¶ 42–43 ("When estimating But-For profits involving multi-sided markets, there may not be a need to directly assess network effects, depending on the specifics of the case. Indirect network effects may influence how a platform balances prices between its different sides, and in some cases, the economist may undertake their measurement in order to estimate a But-For price for one of the sides. In the Sabre matter there was a need to empirically assess these. However, in other cases, such as Surescripts and the current matter, such an analysis is not necessary. […] Consistent with my approach in other litigation matters, an analysis of indirect network effects is not necessary in this case.").

[493]  Abrantes-Metz Report, ¶ 42.a ("In the Sabre matter, I found very large subsidy payments to one side of the platform in the As-Is World. […] Hence, I conducted a thorough analysis of the strength of indirect network effects to inform my opinion that the payment was not likely to continue in a But-For World."); Class Certification Deposition of Rosa Abrantes-Metz, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715–YGR, December 15, 2022 ("Abrantes-Metz Class Certification Deposition"), pp. 151:17–152:3 ("Q. Did you estimate the magnitude of indirect network effects? A. Yes, in that case it was particularly important because it was tied to the allegations of the case and to the liability arguments that Sabre was very heavily subsidizing the travel agent side and making airlines pay over 150 percent of the net price, and that the subsidy to travel agents was more consistent with wanting to lock them in and less based on principled economic theory.").

[494]  Abrantes-Metz Report, ¶ 42.b ("In the Surescripts matter, it was not necessary for me to analyze indirect network effects because [it] was not concerned with how the price would be allocated between the various sides of the platform.").

223. Additionally, during the class certification stage, Dr. Abrantes-Metz presented the same accounting identity that she uses in her opening report and the same estimated but-for commission rate. [495] When characterizing her report during class certification, Dr. Abrantes-Metz testified that indirect network effects would not have impacted her analysis.[496] She further testified that the dimension of relevance in assessing the need to quantify indirect network effects was whether they would have been sufficiently great to deter the entry of a competing app marketplace, and she concluded that indirect network effects on the App Store would be not be sufficiently large to have this entry-deterring effect.[497] However, Dr. Abrantes-Metz did not present any analysis to verify this assertion about entry-deterrence. As I will explain in what follows, indirect network effects alter relevant economic outcomes in the setting analyzed by Dr. Abrantes-Metz in ways that suggest that entry deterrence is not the sole dimension of relevance when considering whether to quantify indirect network effects.

### 2. Dr. Abrantes-Metz Ignores Evidence that Indirect Network Effects Are Significant on the App Store and Other Two-Sided Transaction Platforms

224. As I discussed in my opening report and in **Section IV** of this report, the App Store is a two-sided transaction platform, and a distinctive feature of two-sided transaction platforms is that they exhibit indirect network effects: users on one side gain greater value when they

---

[495] Expert Class Certification Report of Rosa M. Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, September 26, 2022 ("Abrantes-Metz Class Certification Report"), ¶¶ 26–28, 59 ("I calculate the But-For commission using a market share of 23.1 percent and an operating profit margin of 23.0 percent for the rival app store. This analysis results in a But-For commission rate of 13.63 percent."); Abrantes-Metz Report, ¶ 35 ("I replace [] the rival's market share $s_i$ with 23%, [] and the operating margin of the rival sore with 23% []. This results in a But-For commission rate of 13.63%.").

[496] Abrantes-Metz Class Certification Deposition, p. 157:8–14 ("So what I want to come across is that by not quantifying the indirect network effects in this case does not mean that they're not there, it means that they would not have impacted the economic analysis and my opinion, and that's why I didn't undertake that analysis.").

[497] Abrantes-Metz Class Certification Deposition, pp. 157:15–158:23 ("Q. So you reached the conclusion that indirect network effects were not of a nature to impact your analysis without analyzing qualitatively or quantitatively what their magnitude is? [...] A. Clearly in a comparable market others have entered, therefore indirect network effects are not so great to an extent that they would have prevented entry, and that is the only thing that I need to feel comfortable with that it is true. [...] So given the similarities between these two types of products, I was not convinced that in iOS app market product that the indirect network effect would be just such a humongous barrier to entry that would impede anybody else to come in when that was not the case in the Windows PC digital game market.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

have access to a larger number of users on the other side.[498] Further, because both sides of a two-sided transaction platform need to simultaneously agree to the transaction to complete it, indirect network effects are often more pronounced in two-sided transaction platforms than on other two-sided platforms.[499] Indirect network effects can generate a positive feedback loop that drives growth for two-sided transaction platforms. However, correspondingly, a decline in participation or willingness to transact on one side of the platform can reduce activity on the other side, creating a negative feedback loop that may threaten the platform's long-term viability.[500] As a result, the strength and persistence of

---

[498]   Sundararajan, Arun, "The Economic Impacts of Crowd-Based Capitalism," *The Sharing Economy: The End of Employment and the Rise of Crowd-based Capitalism*, MIT Press, 2016, pp. 106–130, pp. 118, 120 ("This effect—when more usage of the product by any user increases the product's value for other users (and sometimes all users)—is also often called a network effect. […] In a sense, the 'fractal' structure of the [platform] network effects […] makes their economics more complex than those of traditional two-sided markets, potentially making them either stronger or weaker."). *See also*, Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Kate Ho, Ali Hortaçsu, and Alessandro Lizzeri, p. 491 ("The impact of one set of agents on the other, and the resulting feedback to the first set of agents, is an indirect network effect."); Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?," *Antitrust*, Vol. 32, No. 2, 2018, pp. 72-79, p. 72 ("Economists use 'network effects' to describe contexts in which a good or service offers increasing benefits the more users it has. Network effects can be direct—for example, a fax machine becomes more useful as other people also use fax machines. Network effects can also be indirect so that they flow across different sets of users. For example, Uber would not be a very useful app for a rider if there were no drivers using the platform. Similarly, drivers would not want to use the Uber app if no riders were using it.").

[499]   Amex Opinion, p. 13 ("Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand."). *See also*, Sundararajan Opening Report, ¶¶ 32–35.

[500]   Sundararajan Opening Report, ¶ 36. *See also*, Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 114 ("The trick is thus to convince a sufficient number of early users, who will then naturally attract new users thanks to the attraction loop that network effects nourish. […] Typically, users in group A value the platform because it allows them to interact with users of group B, and vice versa. Expectations have thus to be formed regarding the participation of users in the other group. Here, the null equilibrium arises when users expect that the platform will not be able to attract any counterparty from the other group (and does not offer a sufficiently large stand-alone utility to at least some users of a group)."); Varian, Hal R., "Use and Abuse of Network Effects," *Toward a Just Society*, 2018, p. 227 ("The concept is easy to describe: a good exhibits network effects if the value to a new user from adopting the good is increasing in the number of users who have already adopted it. This generates a positive feedback loop: the more users who adopt the good, the more valuable it becomes to potential adopters. This positive feedback loop also works in reverse […] the good or service may fall into a 'death spiral' and ultimately disappear."); Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24, p. 3 ("In this case the platform 'implodes' through a process in which positive feedback effects work in reverse: as members of one side stop participating, the value to members of the other side falls and some of them stop participating, which leads to more members of the first side to stop participating.").

indirect network effects are central to both the success and the viability of two-sided transaction platforms.

225. Empirical research provides evidence that indirect network effects on two-sided transaction platforms are significant. Evidence of the strength of these indirect network effects has been established for the App Store and other app marketplaces. For example, Singh et al. (2021) establish the presence of indirect network effects on the App Store and Google Play Store.[501] Using iPhone and Android smartphone sales data and demand data for the top 500 downloaded apps on the App Store and on Google Play Store between 2013 and 2014,[502] the study show that, on average across the App Store and Google Play Store, a one percent increase in the number of apps leads to a 1.5 percent increase in smartphone sales.[503] The paper's results also show that the effect is larger for top-ranked apps, and that the strength of indirect network effects is higher on the App Store than on the Google Play store.[504]

---

[501] Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70, p. 40 ("[W]e quantify the heterogeneous indirect network externalities, thereby determining the economic value of apps […] Understanding the two-sided nature of the market and the resulting network externalities becomes all the more critical given the recent legal precedent emphasizing the need to examine both sides of the market when indirect network effects are deemed substantial.").

[502] Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70, pp. 5–6 ("The smartphone sales data are from Counterpoint Research, a marketing research firm that tracks smartphones sold in the U.S. We observe the number of smartphones sold and the average price of each handset sold every month. We combine these sales data with handset characteristics. After dropping handsets that report either zero sales or price, we are left with data for Apple and Android-based handsets. […] The app data come from App Annie, a firm that collects data from both Google Play and the Apple app store. We observe the list of top 500 apps downloaded (across all genres) on the Apple and Google Play U.S. store each day from 2013-2014, the same two-years for which we observe handset sales. The app data come from App Annie, a firm that collects data from both Google Play and the Apple app store. We observe the list of top 500 apps downloaded (across all genres) on the Apple and Google Play U.S. store each day from 2013-2014, the same two-years for which we observe handset sales. This process results in 6, 950 and 13, 731 unique Google Play and Apple apps, respectively. For each of these apps, we observe the genre, daily price and sales rank, number and prices of its in-app purchase assortment, daily review activity, app developers' (firm) characteristics, and versioning activity. We want readers to note that due to our data collection process if an app drops below rank 500 it is still tracked and not dropped from the dataset.").

[503] Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70, p. 31 ("Averaging across both platforms, increasing the number of these apps by 1% increases the sales of a particular platform on an average of 1.5%").

[504] Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70, p. 32 ("Regarding the effect on handset demand, we find that the externality exerted by the top app is around 2700 and 5600 times that of the median app among those that appeared at least once in the top 500 on iOS and Google Play platforms, respectively").

226.  An earlier study by Garcia-Swartz and Garcia-Vicente (2015) provides additional empirical evidence of indirect network effects between iPhone users and iOS developers.[505] The paper uses data about iPhone shipments to estimate the stock of iPhone devices in circulation between 2007 and 2013,[506] finding positive and statistically significant bidirectional indirect network effects: an increase in iPhone shipments is associated with an increase in app submissions, and vice versa.[507] Similarly, the growth in the stock of available apps is associated with an increase in the stock of iPhone devices and vice versa.[508] Building on this paper, the study by Garcia et al. (2019) finds a positive and statistically significant relationship between the stock of iPhone devices in past periods and app submissions in the current period, as well as a positive and statistically significant

---

[505]  Garcia-Swartz, Daniel D. and Florencia Garcia-Vicente, "Network Effects on the iPhone Platform: An Empirical Examination," *Telecommunications Policy*, Vol. 39, August 21, 2015, pp. 877–895.

[506]  Garcia-Swartz, Daniel D. and Florencia Garcia-Vicente, "Network Effects on the iPhone Platform: An Empirical Examination," *Telecommunications Policy*, Vol. 39, August 21, 2015, pp. 877–895, p. 882 ("[W]e have [...] data on world quarterly shipments of smartphones (in units) for the key operating systems starting in early 2007. […] We do have monthly information […] on both the flow of application submissions to the App Store and the total stock of active applications available on the App Store.").

[507]  Garcia-Swartz, Daniel D. and Florencia Garcia-Vicente, "Network Effects on the iPhone Platform: An Empirical Examination," *Telecommunications Policy*, Vol. 39, August 21, 2015, pp. 877–895, p. 889 ("First, the growth of app submissions contributed in a statistically significant manner to the growth of iPhone shipments. The elasticity of shipments vis-à-vis app submissions is roughly between 0.19 and 0.58 in models that also include the iPhone's hedonic price index. Second, the elasticity of shipments vis-à-vis the iPhone's hedonic price index is around 0.90 and statistically significant. Third, the growth of shipments contributed in a statistically significant manner to the growth of app submissions. The elasticity of app submissions relative to shipments is roughly between 0.44 and 0.79.").

[508]  Garcia-Swartz, Daniel D. and Florencia Garcia-Vicente, "Network Effects on the iPhone Platform: An Empirical Examination," *Telecommunications Policy*, Vol. 39, August 21, 2015, pp. 877–895, p. 889 ("We also found economically substantial and statistically significant relationships between the stock of iPhones and the stock of active apps on the App Store. An extra app on the stock of active apps is associated with roughly between 271 and 386 additional users, whereas 1000 additional users in the user stock are associated with roughly 2.5–3.6 additional apps in the stock of active apps. The estimated relationships tend to be statistically significant, which suggests that indirect network effects have indeed played an important role in the growth of the iPhone.").

163

relationship between the stock of apps in past periods and iPhone adoption in the current periods.[509]

227.    Other academic papers have also documented the importance of the economic effects that changes to participation on one side of a two-sided transaction platform can have on the other side, as would be expected in the presence of indirect network effects. For example, Chu and Manchanda (2016) assess indirect network effects on Taobao, a large two-sided transaction platform in China connecting buyers and sellers of different retail products.[510] Using daily data on the number of newly registered buyers and sellers from May 2003 through December 2012, the authors estimate the number of buyers and sellers on each day, and estimate indirect network effects in both directions.[511] The paper finds evidence of significant indirect network effects: a one percent increase in the seller base is associated

---

[509]    Garcia-Swartz, Daniel D., Mensur Muhamedagić, and Diana Saenz, "The Role of Prices and Network Effects in the Growth of the iPhone Platform," *Technological Forecasting & Social Change*, Vol. 147, March 19, 2019, pp. 110–122, p. 115 ("[T]he lagged stock of apps has a positive effect on the current flow of phones, although the effect becomes truly significant for deeper lags of the stock of apps. The elasticity of current iPhone shipments vis-a-vis the lagged stock of apps varies between 0.04 and 0.10, depending on model specification, which provides evidence supporting the existence of indirect network effects from apps to phones."); p. 116 ("The elasticity of the current flow of apps vis-a-vis the lagged stock of phones is between 0.55 and 0.62, depending on model specification.").

[510]    Chu, Junhong and Puneet Manchanda, "Quantifying Cross and Direct Network Effects in Online Consumer-to-Consumer Platforms," *Marketing Science*, Vol. 35, No. 6, 2016, pp. 870-893, p. 871 ("We look at the following novel questions. First, how large is the cross-network effect (CNE) on both sides of the platform? As for any network, the growth and evolution of one side has a direct impact—the CNE—on the growth and evolution of the other side. Our objective is to quantify the CNEs—the impact of the installed base of sellers on the growth of buyers and the impact of the installed base of buyers on the growth of sellers. Second, this quantification leads us to discover whether the two CNEs are asymmetric. This asymmetry, if it exists, allows us to pinpoint the side of the platform that is more important for the overall growth (of the platform). […] To do this, we exploit a new data set from Alibaba Group's http://www.taobao.com, the world's largest online C2C platform based in China. Taobao.com (referred to as Taobao for the rest of the paper) has 7.1 million sellers and 435 million buyers (as of December 2012).").

[511]    Chu, Junhong and Puneet Manchanda, "Quantifying Cross and Direct Network Effects in Online Consumer-to-Consumer Platforms," *Marketing Science*, Vol. 35, No. 6, 2016, pp. 870-893, p. 876 ("Specifically, we have daily observations from May 11, 2003, the day when the first seller registered on Taobao, to December 31, 2012. For each we observe the number of new buyers, new sellers, transacting buyers, transacting sellers […]."), p. 877 ("We use the cumulative sum of registered buyers each day as the installed base of buyers, and that of registered sellers each day as the installed base of sellers."), p. 883 ("First, there exists a large, significant, and positive CNE on both sides of the platform, indicating that the installed base of either side of the platform has propelled the growth of the other side.").

with a 1.5 percent increase in new buyers, while a one percent increase in the buyer base is associated with a 0.4 percent increase in new sellers.[512]

228.   Other studies have shown that partnerships or mergers between two-sided transaction platforms that lead to significant increases in participation on one side can have substantial economic effects on the other side, an outcome one would expect in the presence of indirect network effects. For example, Reshef (2023) studies a 2018 partnership that Yelp Transactions Platform (YTP), an online platform for takeout and delivery that connects local restaurants with consumers, formed with Grubhub, a leading multi-sided transaction platform for food ordering and delivery, that significantly expanded the number of restaurants on YTP's platform.[513] Using data from 2017 to 2019, and taking advantage of a staggered rollout of the partnership, the study finds that as a consequence of indirect network effects, in areas where the partnership with Grubhub delivery was rolled out, the increase in the number of restaurants listed on YTP led to a 36 percent average increase in weekly consumers[514] and revenue gains of up to 4.5 percent for restaurants that were

---

[512]   Chu, Junhong and Puneet Manchanda, "Quantifying Cross and Direct Network Effects in Online Consumer-to-Consumer Platforms," *Marketing Science*, Vol. 35, No. 6, 2016, pp. 870-893, p. 883( "[W]e find that when the installed base of sellers increases by 1%, the number of new buyers will on average increase by 1.53% [...] when the installed base of buyers increases by 1%, the number of new sellers will on average increase by 0.44%").

[513]   Reshef, Oren, "Smaller Slices of a Growing Pie: The Effects of Entry in Platform Markets," *American Economic Journal: Microeconomics*, Vol. 15, No. 4, 2023, pp. 183-207" American Economic Journal: Microeconomics, Vol. 15, No. 4, 2023, pp. 183-207, p. 187 ("In August 2017, YTP, a medium-sized player in the food order market, signed a new partnership with the industry leader, Grubhub, that allowed users to begin ordering from Grubhub through YTP. Importantly, all Grubhub restaurants were automatically added to YTP. The partnership between YTP and Grubhub launched in mid-February 2018, with the systems gradually integrating across platforms (iOS, Android, desktop) and geographical areas thereafter.").

[514]   Reshef, Oren, "Smaller Slices of a Growing Pie: The Effects of Entry in Platform Markets," *American Economic Journal: Microeconomics*, Vol. 15, No. 4, 2023, pp. 183-207, p. 194 ("[F]or example, markets that experienced entry experience an increase of over 36 percent in the number of weekly users compared to markets that were unaffected. […] This outcome implies a demand elasticity of approximately 0.6 with respect to supply. Note that, as mentioned above, this increase is not mechanically created by the partnership, as only Grubhub businesses—rather than Grubhub users—were added to YTP. Another apparent trend is that the effect seems to increase over time, suggesting that consumer learning or word of mouth lead to increases in the number of platform users."), p. 200 ("Perhaps more importantly, indirect network effects lead to an increase in the number of new users joining the platform[.]").

originally listed on YTP before the partnership.[515] Similarly, Farronato, Fong, and Fradkin (2024) study the merger of Rover and DogVacay, a pair of two-sided transaction platforms connecting pet owners with providers of pet-related services.[516] The paper finds that Rover "experience sizable network effect benefits" in areas where the number of service providers on Rover increased following the addition of DogVacay, the number of transactions involving existing Rover consumers also increased, driven by existing Rover consumers posting more service requests following the merger in response to the greater variety of service providers on the platform.[517]

229. Evidence of indirect network effects has also been provided in several contexts involving devices and their associated software or content. Clements and Ohashi (2005) find that a one percent increase in the number of video game titles on average leads to a 1.9 percent

---

[515] Reshef, Oren, "Smaller Slices of a Growing Pie: The Effects of Entry in Platform Markets," *American Economic Journal: Microeconomics*, Vol. 15, No. 4, 2023, pp. 183-207, p. 185 ("Focusing on incumbent [sellers or restaurants], I find that on average, incumbents in treated markets experienced moderate increases in weekly revenue of up to 4.5 percent compared to incumbents in untreated markets."), p. 196 ("Taken together, I find positive—but weak—effects of entry on incumbents' performance; the estimated effects are substantially smaller in magnitude than the total increases in aggregated demand and market size. These results support the existence of the two countervailing forces as suggested in previous research: while the incumbents enjoy the market expansion through indirect network effects, the benefits are diminished by the increased competition on the platform.").

[516] Farronato, Chiara, Jessica Fong, and Andrey Fradkin, "Dog Eat Dog: Balancing Network Effects and Differentiation in a Digital Platform Merger," *Management Science*, Vol. 70, No. 1, 2024, pp. 464–483, p. 465 ("Our identification strategy relies on the sudden increase in the number of buyers and sellers induced by a platform merger. Specifically, in March 2017, Rover, the biggest U.S. platform for pet-sitting services, acquired DogVacay, their closest and largest competitor. […] This acquisition provides an excellent natural experiment to not only measure network effects but also, evaluate whether network effects are large enough to offset the loss of platform differentiation. […] Specifically, we assess the effect of the merger for the buyers on the acquiring platform, exploiting variation in premerger market shares that are at least in part explained by differences in early stage growth efforts. In our setting, network effects arise because more sellers improve buyer outcomes by providing more and higher-quality matches, and the same holds true for sellers when there are more buyers.").

[517] Farronato, Chiara, Jessica Fong, and Andrey Fradkin, "Dog Eat Dog: Balancing Network Effects and Differentiation in a Digital Platform Merger," *Management Science*, Vol. 70, No. 1, 2024, pp. 464–483, p. 479 ("In analyzing the merger of the two largest platforms for pet-sitting services, we observe that the acquiring platform did experience sizable network effect benefits. Its existing buyers increased their platform activity, particularly in locations that saw a bigger influx of users from the acquired platform."), p. 465 ("We find that buyers on the acquiring platform engaged in more transactions after users of the acquired platform joined."), p. 474 ("This rise in transactions is consistent with the increased variety of sellers on the platform because of the migration of sitters from DogVacay, as opposed to other explanations such as relatively less competition from other buyers. The increase in Rover buyer activity comes from the extensive margins—more users posting requests—rather than match quality or match rates.").

increase in adoption of a compatible console.[518] Similarly, Dranove and Gandal (2003) find that a one percentage point increase in the share of top box office hits available on DVD can lead to a five percent increase in DVD console adoption.[519] Nair et al. (2004) study the demand for Personal Digital Assistants (PDAs) and the available compatible software on Palm and Microsoft—the two leading operating systems for PDAs in late 1990s and early 2000s, finding that an increase in software variety results in a corresponding increase in hardware sales.[520]

230.   Thus, the empirical evidence on the strength and significance of indirect network effects on the App Store, in other app marketplaces and on other two-sided platforms is extensive.

### 3.   Dr. Abrantes-Metz Incorrectly Dismisses the Impact of Indirect Network Effects on the Pricing Structure of the App Store

231.   The evidence described in **Section V.C.2** calls into question any analysis of the but-for commission rate that ignores them. Indeed, the economic literature, including Dr. Abrantes-Metz's own work, underscores the role played by indirect network effects when choosing a pricing structure and determining the optimal price to charge each side of

---

[518]   Clements, Matthew T. and Hiroshi Ohashi, "Indirect Network Effects and the Product Cycle: Video Games in the U.S., 1994–2002," *Journal of Industrial Economics*, Vol. LIII, No. 4, December 2005, pp. 515–542, p. 533 ("Table IV also shows the elasticity of demand with respect to software variety […]. While the demand is found to be elastic at 1.89 on average, the elasticity values vary a lot across the consoles, from a high point of 5.51 for PS2 down to 0.75 for Saturn."). *See also*, Lee, Robin S., "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, Vol. 103, No. 7, December 2013, pp. 2960–3000; Kim, Jin-Hyuk, Jeffrey Prince, and Calvin Qiu, "Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry," *International Journal of Industrial Organization*, Vol. 37, 2014, pp. 99–108.

[519]   Dranove, David and Neil Gandal, "The DVD vs. DIVX Standard War: Empirical Evidence of Network Effects and Preannouncement Effects," *Journal of Economics & Management Strategy*, Vol. 12, No. 3, Fall 2003, pp. 363–386, p. 380 ("[O]ne-percentage-point increase in BOA [i.e. % of top box office hits available on DVD] caused DVD sales to increase by approximately 5 percent.").

[520]   Nair, Harikesh, Pradeep Chintagunta, and Jean-Pierre Dubé, "Empirical Analysis of Indirect Network Effects in the Market for Personal Digital Assistants," *Quantitative Marketing and Economics*, Vol. 2, No. 1, March 2004, pp. 23–58, p. 44 (Table 3), p. 43 ("Software variety has a positive and significant effect on hardware sales[.]"), p. 45 ("We see that after using instruments, the effect of software variety is positive and significant, indicating that a higher software variety results in higher hardware sales for that technology.").

a two-sided transaction platform.[521] Further, Dr. Abrantes-Metz testified that the strength of indirect network effects can affect the pricing decision of a platform like the App Store that monetizes in part through a commission charged to one side.[522] Yet, Dr. Abrantes-Metz's calculation of the but-for commission rate incorrectly dismisses indirect network effects without evidence to support this choice.

232.   Dr. Abrantes-Metz does not attempt to quantify the strength of indirect network effects on the App Store, instead providing unsupported and speculative claims about why indirect network effects can be ignored because of the absence of subsidies in the as-is App Store pricing structure.[523] Dr. Abrantes-Metz testified that because there is no cost incurred by Apple from charging consumers a price of zero for transactions, the absence of a positive

---

[521]   Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Ho, et al., p. 497 ("The only novelty relative to one-sided markets is that such elasticity is now computed by accounting for the fact that it depends on the size of the [other side's] participation […].");  Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691, p. 672 ("[T]he optimal price for group 1, say, equals the cost of supplying service to a type 1 agent adjusted downwards by the external benefit that an extra group 1 agent brings to the group 2 agents on the platform."); Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, pp. 28, 33 (Equations GM2-1, M2-11).

[522]   Abrantes-Metz May 2025 Deposition, pp. 84:6–85:24 ("Q. If you turn to […] page 33 of your article, you write in the first paragraph, middle of the first paragraph on the left, that platform pricing is not set only by the size of the direct elasticities of demand and marginal cost, but also by the strength of the network effect. Do you see that? […] A. Yes. […] Q. Could that statement apply to the pricing of a platform that monetizes through a commission charged to one side of the platform? A. Well, this applies in general to any platform that is faced with normal market conditions, meaning there's no illegal conduct where you are just locking in one side to get the other on board or things like the ones that existed in Sabre. Q. So is the answer to that question yes then? It could apply to the pricing of a platform that monetizes through a commission charged to one side of the platform? A. Yes.").

[523]   Abrantes-Metz Report, ¶ 43 ("Apple's App Store collects an ad valorem commission from developers and neither makes subsidy payments to consumers nor collects participation fees from them. The same pricing structure is observed in the Windows PC game apps marketplace, which, as explained in Section VI.A, serves as a reasonable benchmark for the But-For World. […] Therefore, with the price structure in the But-For World already established, there is no need to assess the strength of indirect network effects."), ¶ 84 ("Empirical evidence from app distribution markets indicates that there are no meaningful consumer subsidies or participation fees. In the As-Is iOS app distribution market, developers pay commission rates, while consumers are neither charged nor receive meaningful subsidy payments per transaction from the platform. The same holds for the sale of digital Windows PC game apps, a reasonable benchmark for a more competitive But-For World.").

price paid by Apple to consumers does not constitute a subsidy.[524] However, this claim contradicts Professor MacCormack's deposition testimony that the App Store would in fact incur costs when providing transactions to consumers, including maintenance, support, and infrastructure expenses.[525] Moreover, Dr. Abrantes-Metz's claim that for every App Store transaction, "developers pay a positive price," is also incorrect.[526] For transactions involving free-to-download apps without in-app purchases, which accounted for over █ █ of apps on the App Store in 2023,[527] developers pay a price of zero while still benefiting from the App Store's IP-protected developer tools, technologies, and services. Thus, these developers are effectively subsidized: transactions involving their free apps imposes costs on Apple without generating direct revenue for Apple.

233.  In addition, there is no economic basis provided by Dr. Abrantes-Metz connecting the alleged absence of subsidies to the ignoring of indirect network effects in a two-sided transaction platform's choice of pricing structure, and in any case, as I will explain in what follows, the App Store's current pricing structure does include a "subsidy" as defined by

---

[524]  Abrantes-Metz May 2025 Deposition, pp. 79:2–80:6 ("[Q.] [D]o both sides of the market pay a positive unsubsidized price? A. No. Just developers pay a positive price. Q. If one side pays zero, could that be considered a subsidized price? A. No. In my definition, a subsidy means if you're subsidizing one side, just as on Sabre, it means that it is a cost to the platform and here, there is no cost to the platform to charge zero to consumers. Q. Is that an issue that you've analyzed? A. Which issue? Zero is not a subsidy. A subsidy is a negative transaction price. Q. Your testimony was that subsidy means that it's a cost to the platform and here, there's no cost to the platform to charge zero to consumers. Have you analyzed the issue as to whether there's no charge to the platform to charge zero to consumers? A. I'm referring to the price per transaction. The price per transaction is 30% and zero. Zero means there is no cost on that transaction that Apple is giving the consumer and therefore, there is no subsidy.").

[525]  Deposition of Alan D. MacCormack, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 23, 2025 ("MacCormack May 2025 Deposition"), p. 2260:11–22 ("Q. Does [the App Store] fall into a category of software that you think is not appropriate to look at in coming to the conclusions that you reached in your report? […] A. Given it's software, I think it would obey -- it would have these universal costs that I've talked about, so it would have UAR [user acquisition and retention] costs. It would have maintenance and support costs, infrastructure costs. It would have all of these costs.").

[526]  Abrantes-Metz May 2025 Deposition, p. 79:2–5 ("[Q.] [D]o both sides of the market pay a positive unsubsidized price? A. No. Just developers pay a positive price.").

[527]  Hitt Opening Report, Footnote 420 ("Between the first year of the App Store and 2023, the share of apps that were free-to-download without in-app purchases rose from 27.8 percent to █████ ").

169

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Dr. Song in his prior work.[528] This omission also ignores the extensive theoretical and empirical literature discussed above, which includes studies by Dr. Abrantes-Metz and Dr. Song, that establishes the strength of indirect network effects and its connection to pricing choices on two-sided platforms, two-sided transaction platforms, app marketplaces, and the App Store.

234.    The presence of indirect network effects may make it optimal for a two-sided platform to charge one side a price below the marginal cost (or stated differently, providing that side with a subsidy) if it leads to an increase in participation that significantly enhances the platform's value to the other side. As Dr. Abrantes-Metz herself (along with Dr. Song) has argued, the presence of indirect network effects may lead a platform to choose a pricing strategy under which participants on one side effectively pay a subsidy to participants on the other side to enhance their participation,[529] a strategy that is commonly found to be

---

[528]    Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics*, Vol. 13, No. 2, 2021, pp. 35-67, p. 35 ("Common pricing behavior observed in two-sided markets is that platforms make a profit from agents on one side of a market and subsidize agents on the other side of the market. Internet platforms such as Google and Facebook do not charge users for 'consuming' content on their websites, while they do charge advertisers for showing their ads to users. Credit card companies charge businesses fees for accepting their cards, while they charge nothing to card users or give them 'rewards.'"), p. 61 ("Predicting merger outcomes without accounting for the advertising side is mis leading. Accounting for a merged publisher's incentives associated with advertising revenues is particularly important for industries where firms use advertising revenues to subsidize their customers. In the TV magazine market in Germany, for example, advertising revenues are about five times larger than the revenues obtained from selling magazines.").

[529]    Abrantes-Metz, Rosa M., Michael Cragg, Albert Metz, and Minjae Song, "Understanding the Economics of Platforms," *Antitrust*, Vol. 36, No. 1, 2021, pp. 30–36, pp. 32–33 ("The economics literature provides that both sides of a platform market are expected to pay a positive, 'unsubsidized price' in the absence of network effects. However, when the indirect network effect from side B to side A is sufficiently large, cases can arise where side A pays side B a 'subsidy' for the benefit of the externality it creates."). *See also*, Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p. 64 ("Firms acting as catalysts set prices below marginal cost and sometimes at zero.").

desirable in the broader economic literature about two-sided platforms.[530] Dr. Song further clarifies in his research that subsidies do not need to involve a payment or inducement from the platform to participants, but can merely involve charging one side a price of zero. Dr. Song explains that this asymmetric pricing structure—charging a price of zero to participants on one side and a positive price to participants on the other side—can reflect how platforms account for indirect network effects in their profit-maximization strategies.[531] Indeed, the App Store's current pricing structure, a revenue-sharing model under which developers pay a commission rate while consumers access the platform and other App Store services to complete transactions for free, reflects this kind of asymmetric pricing involving a subsidy to one side that Dr. Abrantes-Metz and Dr. Song have described in their writings.[532] Professor Stiglitz also highlights the role played by indirect network effects in determining the pricing structure for a two-sided transaction platform and the likelihood that Apple's pricing structure subsidizes consumers to attract developers. In particular, Professor Stiglitz notes that in the presence of significant indirect network effects, the App Store may employ an asymmetric pricing structure, using

---

[530] *See*, *for example*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 130 ("[P]rice below marginal cost or even negative prices can easily arise in a two-sided market. For example, a platform might charge a price below cost on one side if those agents have a large price elasticity and their participation attracts a large number of participants on the other side who are relatively price inelastic (and hence have a high mark-up)."); Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691, p. 673 ("It is possible that the profit-maximizing outcome involves [one group] being offered a subsidized service [.]. […] [T]his occurs if the group's elasticity of demand is high and/or the external benefit enjoyed by [the other group] is large. Indeed, the subsidy might be so large that the price is negative (or zero, if negative prices are not feasible). This analysis applies, in a stylized way, to a market with a monopoly yellow pages directory. Such directories typically are distributed for free, and profits are made solely from charges to advertisers.").

[531] Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics*, Vol. 13, No. 2, 2021, pp. 35-67, pp. 35–36 ("Common pricing behavior observed in two-sided markets is that platforms make a profit from agents on one side of a market and subsidize agents on the other side of the market. Internet platforms such as Google and Facebook do not charge users for 'consuming' content on their websites, while they do charge advertisers for showing their ads to users. Credit card companies charge businesses fees for accepting their cards, while they charge nothing to card users or give them 'rewards.' This pricing behavior is a result of platforms accounting for indirect network externalities in their profit maximization."), pp. 36–37 ("The second feature is that platforms charge access (or membership) fees to agents on both sides of the market. We observe free membership given to one group of agents in some two-sided markets, such as the online search engine industry, the social media industry, the Yellow Pages (Rysman 2004), and the radio industry Jeziorski 2014), but this zero price is often part of platforms' profit maximization strategies rather than an exogenous constraint.").

[532] Sundararajan Opening Report, ¶ 177.

revenues collected from developers to subsidize consumers, thereby encouraging consumer participation and, in turn, attracting additional developer participation. [533]

235.    Despite this consensus and contrary to Dr. Abrantes-Metz's own writings, [534] she incorrectly ignores that the presence and strength of indirect network effects is a critical factor that determines optimal pricing on each side of a two-sided transaction platform, [535] regardless of whether the platform is a monopoly or faces competitors, and independent of whether there are subsidies involved. This is because the presence of indirect network

---

[533]   Stiglitz Report, ¶¶ 374–375 ("For instance, where agents on each side of the market positively value the presence of those on the other side, the platform's profit-maximizing strategies may involve offering discounts or providing subsidies to the group that is most price sensitive while charging higher prices to the group that is least price sensitive. However, the degree to which the platform employs such strategies depends on the strength of indirect network effects and the difference in demand elasticities between the two groups. [...] If there were significant indirect network effects, Apple might use what it collects from one side of the market to subsidize agents on the other side as the value of the platform to consumers increases with the number of iOS apps that are available. Alternatively, Apple might attempt to extract rents from developers to subsidize consumers, since developers are more likely to develop apps for a platform on which there are many consumers.").

[534]   Abrantes-Metz, Rosa M. and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020, p.42 ("For very negative values of $\beta_A$ [opposite side elasticity], the Monopolist responds by having an ad-free newspaper and selling it to a certain number of subscribers at a high price [...] At some point however, the Monopolist decides to sell ads, even though this upsets some readers. He compensates by drastically lowering the price of the newspaper to the readers to maintain (or even increase) subscriptions. The Monopolist is then able to sell advertising at a high price. From this point on, as the readers' dislike of advertisers weakens, the Monopolist is able to (i) charge readers a higher a price while still increasing the level of reader subscription, and (ii) sell much more advertising, though at slightly lower prices.").

[535]   Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 129 ("The main result is that pricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation."); Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Ho, et al., p. 497 ("The only novelty relative to one-sided markets is that such elasticity is now computed by accounting for the fact that it depends on the size of the [other side's] participation [].")

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

effects causes the price on one side of the platform to affect participation on both sides, making it unlikely that a platform will set prices for each side independently.[536]

236.    Further, there is no reason to assume, as Dr. Abrantes-Metz does, that the as-is pricing structure under which developers pay a commission rate and consumers do not pay any fees would hold in a but-for world where the introduction of a rival app marketplace changes the nature of competition. For example, in my opening report I noted that Apple may have a lower incentive to offer free access to consumers absent the challenged conduct.[537] Professor Stiglitz noted in his report that whether platforms apply strategies such as subsidies or discounts "depends on the strength of indirect network effects and the difference in demand elasticities between the two groups."[538] It is plausible that these factors could change with the entry of rival app marketplaces. Dr. Abrantes-Metz also argues that certain Windows PC game app marketplaces, where developers pay a commission and consumers pay a price of zero on transactions, serve as a reasonable benchmark for the but-for world.[539] However, there is also no basis to assume, absent

---

[536]  Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, No. 1, 2008, pp. 667–693, pp. 675 ("For two-sided platforms, three results appear to be robust: 1. the optimal prices depend in a complex way on the price sensitivity of demand on both sides, the nature and intensity of the indirect network effects between the two sides, and the marginal costs that result from changing output of each side; 2. the profit-maximizing, nonpredatory price for either side may be below the marginal cost of supply for that side or even negative; and 3. the relationship between price and cost is complex, and the simple formulas that have been derived for single-sided markets do not apply."). *See also*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 129 ("[P]ricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation.").

[537]  Sundararajan Opening Report, ¶ 189.

[538]  Stiglitz Report, ¶ 374 ("For instance, where agents on each side of the market positively value the presence of those on the other side, the platform's profit-maximizing strategies may involve offering discounts or providing subsidies to the group that is most price sensitive while charging higher prices to the group that is least price sensitive. However, the degree to which the platform employs such strategies depends on the strength of indirect network effects and the difference in demand elasticities between the two groups.").

[539]  Abrantes-Metz Report, ¶ 43 ("Apple's App Store collects an ad valorem commission from developers and neither makes subsidy payments to consumers nor collects participation fees from them. The same pricing structure is observed in the Windows PC game apps marketplace, which, as explained in Section VI.A, serves as a reasonable benchmark for the But-For World. […] Therefore, with the price structure in the But-For World already established, there is no need to assess the strength of indirect network effects."), ¶ 84 ("Empirical evidence from app distribution markets indicates that there are no meaningful consumer subsidies or participation fees. In the As-Is iOS app distribution market, developers pay commission rates, while consumers are neither charged nor receive meaningful subsidy payments per transaction from the platform. The same holds for the sale of digital Windows PC game apps, a reasonable benchmark for a more competitive But-For World.").

173

supporting evidence, that the pricing structure in a but-for world involving the App Store and a rival app marketplace would be identical to the pricing structure chosen by Windows PC game app marketplaces, given the material differences between the two settings.[540]

237.   Further, even if the structure of pricing chosen by the App Store and its competing app marketplace remained the same as the App Store's current pricing structure in the but-for world, as Dr. Abrantes-Metz has assumed, the presence of indirect network effects could still impact the magnitude of the but-for commission rate. Economic theory suggests that prices must be carefully calibrated based on the strength of indirect network effects, and must be designed to leverage indirect network effects to attract and retain participants, thereby ensuring long-term sustainability and supporting platform profitability. [541] Furthermore, as discussed in my opening report and in **Section IV.B.4**, the presence of indirect network effects can amplify the demand effects of changes in the price level on

---

[540]   *See also*, Hitt Rebuttal Report, Section 8.5.1.

[541]   Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691, p. 672 ("[T]he optimal price for group 1, say, equals the cost of supplying service to a type 1 agent adjusted downwards by the external benefit that an extra group 1 agent brings to the group 2 agents on the platform."), p. 673 ("It is possible that the profit-maximizing outcome involves group 1, say, being offered a subsidized service, i.e., $p_1 < f_1$. From (4), this happens if the group's elasticity of demand is high and/or if the external benefit enjoyed by group 2 is large. Indeed, the subsidy might be so large that the resulting price is negative (or zero, if negative prices are not feasible).");Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Ho, et al., p. 497–498 ("The above formula is the two-sided analog of the familiar monopoly price formula in one-sided markets. The right-hand side is the familiar effect by which a monopolist's ability to price above marginal cost is inversely related to the elasticity of the demand. The only novelty relative to one-sided markets is that such elasticity is now computed by accounting for the fact that it depends on the size of the side-j's participation, $q_j^*$. The term in square parenthesis on the left-hand-side is the cost of bringing a marginal agent on board, $c_i$, augmented by the cost of matching the agent to all agents on board from the opposite side, $\sigma q_j^*$, and reduced by the product between the average interaction benefit $\gamma_j(P_1^*, P_2^*)$ experienced by the side-j marginal agents and the size of the side-j demand $q_j^*$. To understand this last term, note that when the platform brings on board an extra agent from side i, it can then increase its side-j price by $\gamma_j(P_1^*, P_2^*)$ while keeping constant the demand on side j at $q_j^*$"); Kaiser, Ulrich and Julian Wright, "Price Structure in Two-Sided Markets: Evidence from the Magazine Industry," *International Journal of Industrial Organization*, Vol. 24, No. 1, 2006, pp. 1-28, pp. 12-13 ("One of the key points of interest in a two-sided market is to understand the determinants of the structure of prices. How much is charged to readers versus advertisers? […] The additional terms in Eqs. (7) and (8) are the network externality terms that arise from the two-sided nature of the market. Given positive network effects, magazines will charge readers less to the extent this attracts more readers, and thereby more demand (and profits) from advertisers. Similarly, by charging advertisers less, each magazine attempts to attract more ads so as to attract readers.").

one side of a two-sided transaction platform.[542] As explained in Filistrucchi (2018), a price increase on one side of a two-sided platform has a direct effect by reducing demand on that side. Additionally, due to indirect network effects, this decrease in demand also reduces demand on the opposite side, which in turn, further reduces demand on the side of the platform that experienced the price change.[543] As a result, due to indirect network effects, the total demand impact of the price increase is greater than the direct effect on demand on the side that experienced the price change.

238.    Dr. Abrantes-Metz also ignores empirical research finding that indirect network effects can influence the optimal pricing level on each side of a two-sided platform. For example, Liu (2010) estimates the impact of indirect network effects between game consoles and video

---

[542] Sundararajan Opening Report, ¶ 39. *See also*, Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, No. 1, 2008, pp. 667–693, pp. 675 ("For two-sided platforms, three results appear to be robust: 1. the optimal prices depend in a complex way on the price sensitivity of demand on both sides, the nature and intensity of the indirect network effects between the two sides, and the marginal costs that result from changing output of each side; 2. the profit-maximizing, nonpredatory price for either side may be below the marginal cost of supply for that side or even negative; and 3. the relationship between price and cost is complex, and the simple formulas that have been derived for single-sided markets do not apply."). *See also*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 129 ("[P]ricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation.").

[543] Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 37–51, p. 46 ("Consider a two-sided platform with sides A and B linked by positive indirect network effects. The application of a one-sided SSNIP test on side A would only account for the direct effect that a price increase will have on the demand and profits of side A. It would not account for the fact that a reduction of the number of customers on side A is likely to lead to a reduction of the number of customers on side B so that, if the price on side B is kept constant, there will be a loss in profits also on side B. It would also not envisage the fact that the smaller number of customers on side B will in turn reduce the demand of side A, and so on. Hence, it would also underestimate the loss in profits on side A. The iterative procedure of the SSNIP test would then stop too early. Similarly for the application of a one-sided test on side B. On both sides the market would be defined too narrowly."). *See also*, Filistrucchi, Lapo and Tobias J. Klein, "Price Competition in Two-Sided Markets with Heterogeneous Consumers and Network Effects," *SSRN*, October 1, 2013, pp. 37–51, p. 17 ("This is because of the presence of feedback loops, which means that quantities on one market side depend on prices on the same market side and on quantities on the other market side. But quantities on the other market side again depend on quantities on the one market side, which again depend on prices on that first market side, and so on."); Wismer, Sebastian and Arno Rasek, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018, pp. 55–67, p. 62 ("The original SSNIP test does not account for interdependencies between distinct customer groups. In a two-sided market, for example, a price increase for one customer group (side A) leads to changes in demand not only on this side, A, but also on the other side, B. Ignoring such volume changes that emanate from indirect network effects may distort the result of the SSNIP test.").

game titles on optimal console prices,[544] finding that console prices, that is the amount charged to consumers, would have been, on average, 17.5 percent higher if indirect network effects were absent.[545]

239. Other studies have also found evidence of the importance of accounting for indirect network effects when assessing questions of pricing on two-sided platforms. For example, Song (2021) finds evidence of indirect network effects between readers and advertisers in the German TV magazine market,[546] concluding that ignoring indirect network effects would lead to an understatement of reader price sensitivity, with the median own-price elasticity underestimated by more than 40 percent when indirect network effects are omitted.[547]

240. Collectively, Dr. Abrantes-Metz's failure to consider the presence of indirect network effects when calculating the but-for commission rate is unsupported and at odds with empirical evidence regarding the effects of indirect network effects on prices. Therefore, the but-for commission rate estimated by her approach is unreliable.

---

[544] Liu, Hongju, "Dynamics of Pricing in the Video Game Console Market: Skimming or Penetration?," *Journal of Marketing Research*, Vol. 47, No. 3, 2010, pp. 428–443, p. 434 ("I have monthly data on price, unit sales, and number of games for PS [PlayStation] and N64."), p. 430 ("The period of this study starts in September 1996 when Nintendo launched N64 in the U.S. market.").

[545] Liu, Hongju, "Dynamics of Pricing in the Video Game Console Market: Skimming or Penetration?," *Journal of Marketing Research*, Vol. 47, No. 3, 2010, pp. 428–443, p. 436 ("To better understand the impact of indirect network effects on pricing, consider a market situation in which consumers derive no benefit from software [...] On average, the predicted prices without network effects deviate from actual ones by 17.5%."), Figure 6.

[546] Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics*, Vol. 13, No. 2, 2021, pp. 35-67, p. 65 ("In this paper I develop a structural model of two-sided markets where two groups of agents interact through platforms and estimate platform demand and markup using TV magazine data in Germany. My model has two key features of the two-sided market. First, both groups care about the presence of the other group, so indirect network externalities are present on both sides of the market."), pp. 55–56 ("The cross-group elasticities show that advertisers are much more sensitive than readers to a price change on the other side of the market. The median cross-group elasticity with respect to copy prices […] is -5.26 while it is -0.52 with respect to prices.").

[547] Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics*, Vol. 13, No. 2, 2021, pp. 35-67, p. 38 ("The results also show that the magnitude of the feedback loop effect is substantive such that the median own-price elasticity for readers, when computed without fully tracing the feedback loop, is less than 60 percent of the correctly calculated one.").

### D. Dr. Abrantes-Metz Ignores the Importance of Indirect Network Effects When the App Store Launched

241. As I discussed in my opening report, indirect network effects can create a positive feedback loop that attracts participants on both sides and foster growth. However, they can also accelerate a platform's decline if participation on either side diminishes.[548] This is particularly important during the early stages of a two-sided transaction platform's evolution, a fact that is well recognized in the platform economics literature, including in Dr. Abrantes-Metz's own writings.[549] Nurturing balanced platform growth by choosing effective pricing strategies, services, and governance mechanisms plays a central role in ensuring the long-term success and growth of a two-sided transaction platform.

---

[548] Sundararajan Opening Report, ¶ 36. *See also*, Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 114 ("The trick is thus to convince a sufficient number of early users, who will then naturally attract new users thanks to the attraction loop that network effects nourish. […] Typically, users in group A value the platform because it allows them to interact with users of group B, and vice versa. Expectations have thus to be formed regarding the participation of users in the other group. Here, the null equilibrium arises when users expect that the platform will not be able to attract any counterparty from the other group (and does not offer a sufficiently large stand-alone utility to at least some users of a group)."); Varian, Hal R., "Use and Abuse of Network Effects," *Toward a Just Society*, 2018, p. 227 ("The concept is easy to describe: a good exhibits network effects if the value to a new user from adopting the good is increasing in the number of users who have already adopted it. This generates a positive feedback loop: the more users who adopt the good, the more valuable it becomes to potential adopters. This positive feedback loop also works in reverse […] the good or service may fall into a 'death spiral' and ultimately disappear.").

[549] Abrantes-Metz, Rosa M., Michael Cragg, Albert Metz, and Minjae Song, "Understanding the Economics of Platforms," *Antitrust*, Vol. 36, No. 1, 2021, pp. 30–36, p. 32 ("[I]n the context of platforms and often extensive network effects, the market evolution for both effects and justifications may be more dynamic than in typical antitrust cases, and thus, the assessments of such effects and justifications require a dynamic inquiry. For instance, the early stage of platform development often requires hitting a critical mass at which there are enough users on both sides of the market to realize network effects[.]"); Evans, David S. and Richard Schmalensee, "Failure to Launch: Critical Mass in Platform Businesses," *Review of Network Economics*, Vol. 9, No. 4, 2010, pp. 1–26, pp. 21–22 ("We have shown that when participation decisions are easily reversible and a few other standard assumptions are satisfied, platform businesses, which rely on direct or indirect network effects to attract customers, confront demand-side constraints when they are launched that other businesses do not. […] [W]e have shown here why even without fixed costs or economies of scale, platform businesses typically need to attain critical mass when they are launched in order even to survive.[…] In the case of indirect network effects, […] participation by each customer group affects the quality of the product experienced by the other group, and, though the dynamics are more complicated, participation levels below critical mass will set off a similar downward spiral."). *See also*, MacCormack, Alan D., Brian Kimball Dunn, and Chris F. Kemerer, "Teaching Note - Barnes & Noble: Managing the E-Book Revolution," *Harvard Business School*, November 8, 2013, pp. 1–11, p. 6 ("Cross-side network effects are also evident. The more consumers there are who adopt an e-book reading platform, the more important that platform becomes for book publishers. Similarly, the more content there is available on a platform, the more attractive the platform becomes for consumers. This effect may seem more important for a new entrant into the market — consider how (un-)attractive Apple's iBooks platform would have been to consumers had Apple's agency model idea not encouraged publishers to get on board.").

242.   Dr. Abrantes-Metz testified that indirect network effects are among the factors that a newly launched platform should consider when determining its pricing structure.[550] Since the App Store is a two-sided transaction platform, indirect network effects were likely an important consideration as Apple chose its pricing structure when the App Store launched. The academic literature has also recognized that indirect network effects can affect the initial pricing strategies of two-sided platforms.[551] Professor Stiglitz himself acknowledges that the pricing strategies on two-sided platforms depend on the strength of indirect network effects,[552] and Dr. Abrantes-Metz recognizes in her research that platform pricing needs to account for the importance of early-stage growth for a platform's eventual success.[553]

243.   As I discussed in my opening report and in **Section IV.C**, following its launch, the App Store faced competition from many mobile app marketplaces and other digital distribution platforms, including Google Play (launched in 2008), BlackBerry World, Nokia's Ovi Store, HP's App Catalog, and Samsung's Galaxy Store (launched in 2009), and the

---

[550]   Abrantes-Metz May 2025 Deposition, pp. 88:7-90:5 ("[Q.] Do you agree that a new entrant platform is more likely to fail if it sets prices without regard to indirect network effects? […] [A.] [I]f they are optimizing price, then indirect network effects is one of the factors they will take into consideration. […] [Q.] If a platform is a profit-maximizing firm, is one of the factors it needs to consider in setting prices indirect network effects? A. It's one of the things that [it] should consider[.]").

[551]   *See*, *for example*, Dubé, Jean-Pierre H., Günter J. Hitsch, and Pradeep K. Chintagunta, "Tipping and Concentration in Markets with Indirect Network Effects," *Marketing Science*, Vol. 29, No. 2, March-April 2010, pp. 216–249, p. 217 ("In markets with strong network effects, firms literally price below cost during the initial periods of the diffusion to invest in network growth. Interestingly, the emergence of penetration pricing as an equilibrium strategy dissipates as we weaken (but do not eliminate) the indirect network effects.").

[552]   Stiglitz Report, ¶ 374 ("However, the degree to which the platform employs such [pricing] strategies depends on the strength of indirect network effects […] Absent indirect network effects, pricing strategies for the market intermediary would be similar in form to firms in one-sided markets.").

[553]   Abrantes-Metz, Rosa M., Michael Cragg, Albert Metz, and Minjae Song, "Understanding the Economics of Platforms," *Antitrust*, Vol. 36, No. 1, 2021, pp. 30–36, p. 32 ("[T]he early stage of platform development often requires hitting a critical mass at which there are enough users on both sides of the market to realize network effects[.]"), p. 34 ("To achieve critical mass, a nascent platform may need to operate below cost, subsidizing both sides in an effort to grow.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Windows Phone Marketplace (launched in 2010).[554] App marketplaces like the App Store that were able to attract and retain both developers and consumers for a sufficient period of time managed to create positive feedback loops that aided their growth and success over time, and to reach a level of activity where indirect network effects worked in their favor.[555] In contrast, many app marketplaces that failed to attract and retain enough consumers and developers faced the kind of decline that indirect network effects induce—where low participation from one side discourages participation from the other side because users are unable to derive sufficient value from the platform—and were eventually discontinued.[556]

244.   When the App Store launched in 2008, choosing the right pricing structure, revenue-sharing model, and associated commission rate was essential to attract participants and ensure its long-term success. If the App Store had selected a commission rate that was too high, it could have failed to attract sufficient developers, which in turn would have limited the number of consumers willing to participate, further making the App Store less attractive to developers and leading to the possible demise of the App Store. In contrast, if instead

---

[554]   Sundararajan Opening Report, ¶ 119. *See also*, "From Android Market to Google Play: A Brief History of the Play Store," *Android Authority*, March 6, 2017, available at https://www.androidauthority.com/android-market-google-play-history-754989/; "Celebrating 5 Years of BlackBerry World: Infographic," *BlackBerry*, April 1, 2014, available at https://blogs.blackberry.com/en/2014/04/blackberry-world-anniversary; Woyke, Elizabeth, "Nokia's Gigantic App Store," *Forbes*, July 11, 2012, available at https://www.forbes.com/2009/05/07/nokia-ovi-store-technology-wireless-nokia.html; Ganapati, Priya, "Palm Pre App Store to Get Paid Apps in September," *WIRED*, August 18, 2009, available at https://www.wired.com/2009/08/palm-pre-paid-apps/; "Samsung Galaxy Store App | Download Apps/Games from Galaxy Store," *Mini Tool*, October 12, 2022, available at https://www.minitool.com/news/samsung-galaxy-store-app.html.

[555]   Sundararajan Opening Report, ¶ 148.

[556]   Sundararajan Opening Report, ¶¶ 120–122. *See also*, MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 12 ("Despite these moves, many in the industry were negative about Microsoft's prospects. At the time of Windows Phone 7's release, observers wondered at the lack of available apps for the OS. Both iOS and Android had hundreds of thousands of applications available, but Microsoft's at-launch catalog was relatively meager. Relatedly, applications developers were giving mixed reviews regarding the ease of use of the software development kit Microsoft had provided."); Stiglitz Report, ¶ 280 ("Microsoft entered the smartphone market in 2010 and exited in 2017. […] [I]t was unable to attract developers to the platform or provide access to popular apps such as YouTube, ultimately contributing to its market exit. […] Industry commentators highlight several contributing factors for Lumia's exit from the market. First, Nokia was unable to attract enough developers to make apps compatible with Lumia's operating system. […] The Amazon Fire phone entered the market in July 2014 and exited just over a year later in September 2015. Among the exit factors is that Amazon was unable to attract developers to make apps for its proprietary app store and operating system, and many popular apps such as Gmail, YouTube, Google Maps, and Dropbox were missing from its app store.").

179

Apple had selected a commission rate that was too low, it may have needed to alter its pricing structure to monetize a larger volume of transactions, including monetizing transactions involving free app downloads in some way, or may have needed to consider an increase in the price of the iPhone to cover the varied costs associated with operating the App Store[557] (*see* **Section V.C.2** of my opening report). Fewer free apps or a higher device price may have discouraged consumers, which in turn may have negatively impacted the participation of developers. Because of indirect network effects, lower developer participation would have further decreased consumer participation, potentially inducing a downward spiral that may have led to the failure of the App Store.

245.   As I discussed in **Section IV.C**, Apple did not have market power at the beginning of the class period when it first launched the App Store, a point Professor Stiglitz also conceded in his testimony. Had Apple charged developers a supracompetitive commission rate at the time, as Dr. Abrantes-Metz (and Professor Stiglitz) claim, this would have discouraged developer participation, and, because of indirect network effects, reduced consumer participation. Instead, the App Store adopted a pricing structure that lowered the entry cost for developers and encouraged developer participation, while featuring a commission rate that was consistent with other app marketplaces at the time and was also lower than the commission rate charged for app downloads by mobile carriers (as discussed by Professor MacCormack)[558] and by brick-and-mortar sellers of software at the time.[559]

---

[557]   MacCormack May 2025 Deposition, p. 2260:11–22 ("Q. Does [the App Store] fall into a category of software that you think is not appropriate to look at in coming to the conclusions that you reached in your report? […] A. Given it's software, I think it would obey -- it would have these universal costs that I've talked about, so it would have UAR costs. It would have maintenance and support costs, infrastructure costs. It would have all of these costs.").

[558]   MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15, p. 9 ("Apple retained a 30% commission on all apps sold, giving application developers a 70% cut, considerably more generous than the payments developers had received from wireless carriers.").

[559]   Sundararajan Opening Report, ¶ 108. *See also*, Epic Trial Testimony of Phillip Schiller, pp. 2725:10–2726:13 ("Q. And aside from these early digital platforms, how did developers distribute their games and other software? A. Well, the most common way still at the time was through physical distribution. […] Q. And can you describe that, please, generally. A. Sure. In making products for physical distribution, you, of course, engineer the software. You usually license installer and uninstaller software that you need to put together with it. You put it on a CD. You design the CD. You design the packaging. You design the manuals. You put that all together, and you then take it through distribution channels, stores like CompUSA and Fry's. And with them, you have to cut deals for how much shelf space you get. […] You used to pay by what is called

246. Dr. Abrantes-Metz's calculation of the but-for commission rate in this matter ignores the importance of indirect network effects at the beginning of the class period and their influence in determining the App Store's pricing structure and commission rate, despite the well-documented evidence of the role of indirect network effects in shaping a two-sided transaction platform's initial success.[560] Any change to the App Store's pricing structure, including a modification of the commission rate, would have affected developer participation, which in turn would have influenced the variety and quality of available apps, in turn affecting consumer engagement and creating a feedback loop that further impacted developer participation,[561] consequently affecting the sustainability of the App Store.

247. Ignoring the role that indirect network effects played early in the class period is fundamentally flawed and contradicts Dr. Abrantes-Metz's own writings, Professor Stiglitz's testimony about the importance of indirect network effects for a platform's pricing structure, and well-established and widely accepted principles of platform economics. These facts render the but-for commission rate estimated by Dr. Abrantes-Metz's approach unreliable.

---

'facings.' If you have room for one box, two boxes, or three boxes, the more facings, the better chance of a sale. You paid for things called end caps to be able to market at the end of the row of an aisle. You paid for weekend flyers. This was actually one of the biggest demand drivers, was whether you paid for quarter, half-page, full-page ad in the weekend flyers that we all got in our mailboxes back then. You had to cover all the returns when you updated your software. On and on. There are just many elements of that distribution. Q. And what was the cost to the developer of that system? A. Typically we'd see that the channel would get between 50 to 70 percent of the sale."); "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *The App Association*, 2018, available at https://actonline.org/wp-content/uploads/2018_ACT-App-Store-Ten-Year-Retro-Doc.pdf, p. 3 ("Before the introduction of the iPhone, software developers had to build consumer trust slowly and at great expense, and that trust was and remains essential for a software developer to bring a product to market. Most did not have a widely recognizable brand to endorse the software. Prior to mobile platforms like the App Store or Google Play, software developers often had to break through the trust barrier by handing over their products to companies with a significant reputation."); Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/.

560  Sundararajan Opening Report, ¶ 37, 42–43. *See also*, Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, pp. 99–100 ("[T]he presence of network effects makes fee setting a rather complex exercise, because (i) pricing is affected by – and may affect – users' expectations, (ii) multiple equilibria may result from a given combination of fees, and (iii) pricing may be 'a matter of life or death,' as markets may tip when network effects are strong. Platforms must thus carefully factor in network effects in their choice of pricing strategy.").

561  Sundararajan Opening Report, ¶ 168.

E.    **Additional Economic Errors Associated with Dr. Abrantes-Metz's Model Inputs and Benchmark Analysis**

  1.    *Dr. Abrantes-Metz's Accounting Identity Ignores How the Different Components of the Challenged Conduct Could Affect the But-For Commission Rate*

248.    In addition to the numerous flaws associated with Dr. Abrantes-Metz's approach that I have already discussed, her accounting identity fails to capture how the rival app marketplace would respond to changes in individual elements of Apple's challenged conduct—including its choice of centralized distribution, the in-app payment requirement, and the former anti-steering provisions that until 2024 prohibited most developers from directing users to "alternative purchase channels outside of the App Store."[562] As a result, her accounting identity cannot assess the individual impact that these elements of Apple's strategy would have on the but-for commission rate.[563]

249.    Dr. Abrantes-Metz testified that *any* change in competitive pressure resulting from entry would lead to a but-for commission rate of 13.63 percent, regardless of what the but-for

---

[562]    Stiglitz Report, ¶ 63 ("The case at hand is about Apple's alleged anticompetitive conduct associated with the sale of iOS apps and in-app content and the resulting harm to competition and consumers. In this section, I explain Apple's at issue conduct, including […] Apple's antisteering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."), ¶ 87 ("From the release of the App Review Guidelines in 2010, Apple has imposed 'anti-steering provisions' that limit the ability of developers to direct users to payment methods outside of the App Store. Until January 2024, Apple prohibited developers from including 'buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [Apple's In-App Purchase system].'").

[563]    Abrantes-Metz May 2025 Deposition, pp. 50:24–55:2 ("Q. So you believe the jury could adjust the inputs to your formula to calculate a different but-for world commission rate in the event it concluded that some, but not all, of the conduct was unlawful? […] A. As I answered earlier, the jury can, but I wouldn't because my opinion is that 13.63 is the reasonable -- is a reasonable and conservative commission rate, as long as at least one of the conducts is illegal. Q. So let me ask about you now. Would you need to adjust any of the inputs to your formula if some, but not all, of the conduct was found to be illegal? A. As I answered earlier, no. Q. Would you need to adjust any of your formula's assumptions if some, but not all, of the conduct was found to be illegal in order to calculate the but-for world commission rate? A. No. […] Q. Is that [competitive pressure from a rival app store] the only competitive pressure your model captures? A. The model captures entry through an app store -- a competing app store -- but that entry could have happened in other ways and it would still lead to a commission rate of 13.63. Q. Does it capture how competitive pressures from alternative in-app payment processors would affect Apple's commission rate? A. It captures to the extent that if there are alternative payment systems that can be used to do your in-app purchases, developers would adjust their conduct and Apple, faced with lower rates for in-app purchases, would end up reducing its commission rate, and therefore would end up at a reasonable commission rate of around 13.63 that is more reflective of the actual costs. Q. Does your model capture how competitive pressures from removing Apple's [anti] steering rules would affect Apple's commission rate? A. Yes. That would work similarly. Instead of calling it an app store, you could call it a steering ability to steer customers somewhere else. And so long as there is that kind of entry, there is competitive pressure to reduce the commission rate.").

world looks like, which is implausible, as I discuss below.[564] Dr. Abrantes-Metz does not provide any evidence or analysis to verify that this assertion would hold if one or more of the elements of the challenged conduct were found to be lawful.[565]

250. For example, consider the scenario where only Apple's in-app payment requirement is found unlawful. Absent Apple's in-app payment requirement, while developers might use alternative payment providers for their transactions within the App Store, app distribution would nevertheless still be centralized through the App Store, and no rival app marketplaces would be present. In this but-for world, any competitive pressure would thus be limited to the addition of rival payment solutions and would not stem from the type of entry claimed by Dr. Abrantes-Metz. Moreover, even if developers could use alternative in-app payment systems, they would still likely be charged a commission by Apple on the associated transactions, something that Dr. Abrantes-Metz does not consider.

251. Alternatively, were only centralized distribution to be found unlawful, there is no reason to assume that the competitive pressure stemming from the entry of a rival app marketplace would necessarily cause Apple to alter the App Store commission rate. Indeed, as I have discussed in **Section V.B**, entry alone may not have an impact on the commission rate if the rival app marketplace is differentiated from the App Store. Moreover, were there a change in pricing structure due to this competitive pressure, there is no evidence that the element of pricing structure that Apple would change would necessarily be the commission rate, consistent with Mr. Malackowski's opinion.[566] As a two-sided transaction platform, Apple has a complex business model and might instead adjust other elements of its business model. **Appendix Exhibits F.1-F.4** show the different elements of the business models of

---

[564] Abrantes-Metz May 2025 Deposition, p. 50:6–23 ("Q. Understood, but if the -- but you have indicated that it's possible for the jury to adjust your model and I'm asking how it would do that. […] A. To the extent that there's an equation, juries can adjust however they would like. My opinion is that it shouldn't be adjusted because so long as there is entry in any of the relevant conduct alleged by plaintiffs that -- to be illegal, that will be enough to put competitive pressure on Apple because agents in the market will change their actions in response to the entry and that will cause Apple to also change its conduct, facing that type of competitive pressure, and over the long run, the rate will again reasonably be 13.63.").

[565] Abrantes-Metz May 2025 Deposition, 53:19–25 ("Q. Is that the only competitive pressure your model captures? A. The model captures entry through an app store -- a competing app store -- but that entry could have happened in other ways and it would still lead to a commission rate of 13.63.").

[566] Malackowski Rebuttal Report, Section 7.1.

the App Store and other app marketplaces. Any of these elements could change in the but-for world. Dr. Abrantes-Metz's claim that the same predictions of her accounting identity would accurately reflect outcomes in the face of these diverse possible changes is unsupported and speculative.

252. Moreover, even though Dr. Abrantes-Metz claims that a jury "could adjust [her equation] however they would like,"[567] to assess how changes to different elements of the challenged conduct could affect the but-for commission rate, she does not explain how this adjustment would work. Collectively, these examples underscore how untethered from economic principles and the reality of the case her approach is, and how unreliable the resulting but-for commission rate is.

### 2. Dr. Abrantes-Metz's Claims that Her Modeling Assumptions Are Conservative Are Unsupported and Speculative

253. Dr. Abrantes-Metz's defense of many of her modeling assumptions is a claim that they are "conservative."[568] Dr. Abrantes-Metz provides no empirical support for this claim other than asserting that alternative plausible assumptions would lead to even lower commission rates. However, it is not clear that these assumptions are indeed conservative, and regardless, simply labeling an assumption as "conservative" does not make it correct or defensible.

254. First, Dr. Abrantes-Metz claims that assuming two rather than multiple competing app marketplaces (or a duopoly) in the but-for world is conservative because more competition would lead to lower commission rates, a position she reaffirms in her recent testimony.[569] However, this claim is contradicted by Dr. Abrantes-Metz's own accounting identity, as discussed in **Section V.A**.

---

[567] Abrantes-Metz May 2025 Deposition, p. 50:11–13.

[568] Abrantes-Metz Report, ¶ 46 ("I therefore made reasonable and conservative modeling choices to analyze the But-For World.").

[569] Abrantes-Metz May 2025 Deposition, pp. 106:21–107:5 ("Q. In fact, it's a fundamental principle of competition economics that an increase in the number of competitors drives down prices. Is that correct? A. Yes, because competitors only come in if they see a profit opportunity and when they come in, there's less profit to spread around and prices are reduced.").

255. While it is indeed possible that the entry of additional app marketplaces could lower the but-for commission rate that Dr. Abrantes-Metz calculates, absent supporting analysis, this claim is speculative. Dr. Abrantes-Metz ignores theoretical and empirical results in the economic literature that show that prices do not necessarily decrease when competition increases, an outcome that could also apply to competition between the App Store and rival app marketplaces.

256. For example, in my opening report, I discussed how "[p]articipants incur search costs when acquiring information about the prices and features of other participants or the products offered by these participants."[570] Dr. Abrantes-Metz does not consider evidence from the academic literature which finds that, in the presence of search costs, increasing the number of competitors can lead to higher prices.[571] This is a plausible scenario in a but-for world where the App Store competes with multiple app marketplaces and where differentiation between the app marketplaces would likely create search costs for consumers. As I explained in my opening report, centralized distribution through the App Store allows

---

[570] Sundararajan Opening Report, ¶ 49. *See also*, Backus, Matthew R., Joseph Uri Podwol, and Henry S. Schneider, "Search Costs and Equilibrium Price Dispersion in Auction Markets," *Economic Analysis Group*, Vol. 13, No. 2, November 2013, pp. 1–34, p. 2 ("[W]e add search costs as in Varian (1980) and others, which are costs incurred by buyers to identify all available sellers."); Salop, Steven and Joseph Stiglitz, "A Model of Monopolistically Competitive Price Dispersion," *Review of Economic Studies*, Vol. 44, No. 3, pp. 493–510, p. 493 ("The central implication of costly information-gathering is that the equilibrium will not occur at the perfectly competitive price.").

[571] *See*, *for example*, Janssen, Maarten C. W. and José Luis Moraga-González, "Strategic Pricing, Consumer Search and the Number of Firms," *Review of Economic Studies*, Vol. 71, 2004, pp. 1089–1118, p. 1089 ("[T]he prediction that emerges from a market where firms interact in a Cournot fashion has come to dominate economic thought, namely, that an increase in the number of competitors leads to larger aggregate production, lower market price and improved market performance measured in terms of some social welfare criterion […] This paper challenges the generality of this belief by presenting an oligopoly model with consumer search where the equilibrium expected price may be constant, increasing or non-monotonic in the number of firms."), pp. 1090–1091 ("[F]irms respond to entry by decreasing the frequency with which they charge intermediate prices and by increasing the frequency with which they charge more extreme prices. […] We first study the moderate search intensity equilibrium. […] Our first finding is that the equilibrium expected price increases in the number of firms […] We finally focus on the high search intensity equilibrium, where consumers randomize between obtaining one and two price quotations […] [T]he incentives of the firms to increase prices and the incentives of the consumers to search initially more and then less interact in a manner such that the equilibrium expected price is non-monotonic with respect to the number of firms.").

consumers to "learn by doing" from a single, consistent search and ranking system.[572] It also enables data aggregation, improving features like search suggestions and trending recommendations.[573] In contrast, competition from multiple app marketplaces would likely require consumers to learn to navigate different search and ranking systems and invest time and resources comparing offers across alternatives. Additionally, the quality of search recommendations could decrease because consumer searches are divided among multiple app marketplaces,[574] thereby raising the marginal search costs for consumers.

257.    Dr. Abrantes-Metz also ignores empirical evidence that shows that the entry of additional competitors will not always lead to lower prices. Research in the healthcare and food industry sectors has documented that a larger number of competitors does not necessarily lower prices when there is evidence that consumers value a specific brand and would not

---

[572]    Sundararajan Opening Report, ¶ 198. *See also*, Alhejaili, Adel and James Blustein, "Users' Sophisticated Information Search Behaviour," *Design, Operation and Evaluation of Mobile Communications*, Springer Cham, July 9, 2023, edited by Gavriel Salvendy and June Wei, pp. 3–17, p. 3 ("Smartphone use has become a part of many people's everyday life. Over the past years, the number of smartphone users has increased significantly. Understanding how and why users select apps to install is essential for app developers, designers and store owners. […] This work argues, showcases and explains that users' behaviour is dynamic and constantly changing throughout the app search process. Our findings indicate that users adjust and adapt to accommodate the implications of the acquired knowledge gained from the environment.").

[573]    Sundararajan Opening Report, ¶ 199. *See also*, "Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/ ("When customers search for an app, the App Store returns a list of apps that are ranked based on a number of factors, including text relevance (matches for the app's title, keywords, and primary category) and customer behavior (downloads and the number and quality of ratings and reviews). In addition to getting results for their specific search query, customers are shown suggested search terms to help them find what they're looking for. They can also view Trending Searches to see what other customers in their region are interested in.").

[574]    Yoganarasimhan, Hema, "Search Personalization Using Machine Learning," *Management Science*, Vol. 66, No. 3, March 2020, pp. 1045–1070, p. 1045 ("Firms typically use query-based search to help consumers find information/products on their websites. We consider the problem of optimally ranking a set of results shown in response to a query. We propose a personalized ranking mechanism based on a user's search and click history. […] We find that there is significant heterogeneity in returns to personalization as a function of user history and query type. The quality of personalized results increases monotonically with the length of a user's history."). *See also*, Jones, Charles I. and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review*, Vol. 110, No. 9, September 2020, pp. 2819–2858, p. 2849 ("Furthermore, as data proliferates, firms will develop new algorithms and applications that make even better use of more data.").

be sensitive to price changes.[575] Professor Simonson's survey suggests that App Store users may display this kind of brand loyalty, and Dr. Abrantes-Metz does not provide any evidence that shows otherwise.[576] Empirical evidence also shows that if consumers differ sufficiently in their preferences, or alternatively, if products are sufficiently differentiated, more competition can lead to higher prices.[577] As discussed in **Section V.B**, in any but-for world, the App Store would likely be viewed by consumers as differentiated from other competing app marketplaces through its services and governance mechanisms.

258.    Consider the example of China, where Google Play is not available and there are multiple competing Android app marketplaces. As I explained in my opening report, most Android app marketplaces in China charge a 30 percent commission rate for non-game apps and in-app digital content, and commission rates for game transactions can be up to 50 percent.[578]

---

[575]    Ward, Michael B., Jay P. Shimshack, Jeffrey M. Perloff, and J. Michael Harris, "Effects of the Private-Label Invasion in Food Industries," *American Journal of Agricultural Economics*, Vol. 84, No. 4, November 2002, pp. 961–973, pp. 7–8 ("A similar phenomenon has been observed in the pharmaceutical market […] When generic pharmaceutical manufacturers are allowed to sell an exact clone of a previously proprietary drug, they sell at a price far below the original name-brand product price. Although price-sensitive consumers switch to the generics, the brand-conscious consumers who continue to buy the name-brand drug are frequently charged a higher price than they paid originally."). *See, also,* Regan, Tracy L., "Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market," *International Journal of Industrial Organization*, Vol. 26, No. 4, 2008, pp. 930–948, p. 947 ("This paper tests and finds further evidence of the 'generic competition paradox' with the principle empirical result that branded drug prices increase with generic entry."), p. 946 ("[T]hese findings lend support to the predictions of a segmented market: upon generic entry, branded firms charge their price insensitive customers (i.e. those with some type of prescription drug coverage) higher prices in order to increase their total revenue in this submarket."). I note that even though these are not examples of two-sided platforms, they do fit the setting purported by Dr. Abrantes-Metz, where indirect network effects do not matter.

[576]    Simonson Opening Report, Section IV.B.1.d, ¶ 84 ("In addition to showing preference heterogeneity, the results of Survey 2 again demonstrated that the preferences of the great majority of respondents for the Apple App Store are insensitive to price differences when evaluating a potential alternative app store on their device.").

[577]    *See, for example*, Chen, Yongmin and Scott J. Savage, "The Effects of Competition on the Price for Cable Modem Internet Access," *The Review of Economics and Statistics*, Vol. 93, No. 1, February 2011, pp. 201–217, p. 201 ("We further find that the comparison of duopoly price and monopoly price depends crucially on preference diversity. In markets where the standard deviation of education attainment is relatively low (at the 50th percentile), competition reduces monthly subscription prices by about $5.33 per month. As the standard deviation of education attainment increases the negative effect of competition on prices diminishes and when the standard deviation is high enough, competition can increase prices."). *See also* Chen, Jihui, "The Pricing Effects of Entry by Hainan Airlines: Evidence from the U.S.-China International Air Travel Market," *Journal of Economics and Business*, Vol. 114, No. 4, November 2020, pp. 1–29, p. 3 ("As [the new airline] HA appears to cater more price-sensitive travelers, the incumbents strategically raise fares to exploit their loyal customers, who would not switch to a new entrant even if it offers relatively lower fares").

[578]    Sundararajan Opening Report, ¶ 193.

Dr. Abrantes-Metz incorrectly dismisses this example, claiming without supporting evidence that it does not apply to the U.S. because it does not have "economic value" and is just a "snapshot in time."[579] The latter justification is especially puzzling given that all the inputs to Dr. Abrantes-Metz's calibration exercise are also just "snapshot[s] in time."

259.   Rather, the example of Android app marketplaces in China demonstrates that an increase in the number of competing app marketplaces may not always lead to lower commission rates. Dr. Abrantes-Metz does not provide evidence to demonstrate that the economic conditions that have led to commission rates of 30 percent or more among multiple competing Android app marketplaces in China do not apply to the hypothetical app marketplace competition in the U.S., and her dismissal of this evidence from China is speculative.

260.   Dr. Abrantes-Metz also assumes, without any supporting evidence, that the App Store and the rival app marketplace would charge the same commission rate in the but-for world, contends that this is a conservative assumption,[580] and further claims that tiered commission rates are "a form of price discrimination that requires market power."[581] As I discussed in **Section IV.D.3**, there may be positive welfare effects from price discrimination, in general and on two-sided platforms. Moreover, implicit in this assertion is an assumption made by Dr. Abrantes-Metz that in the but-for world, the App Store would not have market power that would allow it to "price discriminate." However, this assumption is inconsistent with Dr. Abrantes-Metz's choice for the App Store's but-for world revenue share, which she sets at 76.9 percent.[582] In a but-for world where the App Store has a 76.9 percent revenue share, it seems quite likely that the App Store has some market power stemming from consumer perceptions of its superior services and

---

[579]   Abrantes-Metz Report, ¶¶ 57–58.

[580]   Abrantes-Metz Report, ¶¶ 74–75 ("Given the empirical evidence from Windows PC game app stores, it is reasonable to conclude that the Apple App Store would charge a single commission rate in the competitive But-For World. My assumption of a single commission rate is also conservative. […] I calibrate the rival's operating profit margin using […] the highest tier among Microsoft Store's commission rates.").

[581]   Abrantes-Metz Report, ¶ 72 ("Charging tiered commission rates is a form of price discrimination, and price discrimination requires market power.").

[582]   Abrantes-Metz Report, FN 3.

governance mechanisms. [583] Further, Dr. Abrantes-Metz claims that because more competition closes the gap between prices and costs, it would be harder for the App Store and the competing app marketplace to sustain a tiered commission rate. [584] However, Dr. Abrantes-Metz has not provided any evidence or conducted any analysis to support this claim. As I discussed in **Section V.B**, it is likely that the App Store would be perceived by consumers as having higher quality than a rival app marketplace, which would make it likely that it would choose a different commission rate than what is chosen by the rival app marketplace.

261.   Moreover, Dr. Abrantes-Metz claims that her benchmark analysis of the PC Windows game app marketplaces supports the assumption of a single but-for commission rate because the app marketplaces she includes in this analysis all charge a single commission rate with the exception of Steam. [585] To support her claim, she explicitly chooses to ignore Steam's tiered commission rate structure by asserting that Steam has market power. [586] Her line of logic in this argument is circular. Her claim that the App Store could not charge a tiered commission rate due to a lack of market power in the but-for world is inexplicably supported by dismissing real-world evidence of a platform having market power in the very setting Dr. Abrantes-Metz presents as comparable—the PC Windows game app marketplace—where Steam purportedly has market power and charges a tiered

---

[583]   Abrantes-Metz Report, ¶ 72.

[584]   Abrantes-Metz Report, ¶ 72 ("As competition tends to drive prices closer to costs, in the But-For World competitive pressure would likely constrain app stores' ability to sustain materially different tiered commission rates. As a result, I do not incorporate tiered commissions in my model.").

[585]   Abrantes-Metz Report, ¶ 73 ("My decision to model a single commission rate is supported by my benchmark analysis in Section VI, which examines the marketplace for digital Windows PC game apps as a robustness check for the But-For commission rate estimated by my economic model. In this relatively more competitive market, I have not identified any third-party app store charging tiered commissions, except for Steam").

[586]   Abrantes-Metz Report, ¶ 73.c ("Steam, on the other hand, is alleged to have substantial market power in the PC game distribution market, so its commission rate structure is less representative of the rate structure in the competitive But-For World.").

commission rate. Moreover, Dr. Abrantes-Metz ignores that other platforms included in her benchmark analysis, such as the Microsoft Store, also have tiered commission rates.[587]

262.    Dr. Abrantes-Metz's assumption that in the but-for world, the App Store and its rival app marketplace would retain the App Store's current pricing structure and reject any alternative monetization strategies is unsupported. As I have discussed earlier, **Appendix Exhibits F.1-F.4** illustrates how app marketplaces, including the App Store, have varied pricing structures and business models.[588] In a but-for world, in addition to (or instead of) changing the same commission rate, Apple could update any of the different components of their business model, a possibility Dr. Abrantes-Metz ignores without any justification.

263.    Finally, Dr. Abrantes-Metz's but-for commission rate is unreliable because it is calculated based on flawed inputs. As Dr. Abrantes-Metz herself notes in her report, flawed inputs will result in flawed outputs.[589] I understand that Professor Hitt discusses various flaws associated with operating margin, market share, and fixed cost and variable cost of the rival app marketplace, as well as the market size used by Dr. Abrantes-Metz.[590]

### 3.    Dr. Abrantes-Metz's Benchmark Analysis Does Not Support the But-For Commission Rate

264.    Dr. Abrantes-Metz relies on a benchmark analysis using data for 2019 from stores that distribute Windows PC game apps to support her calculation of the but-for commission rate. This analysis includes both two-sided platforms that distribute their own games and/or third-party games and one-sided direct-to-consumer vendors.[591] To calculate the

---

[587]    Conditt, Jessica, "Microsoft Follows Epic and Cuts Xbox PC Revenue Share to 12 Percent," *Engadget*, April 29, 2021, available at https://www.engadget.com/xbox-pc-rev-share-88-12-epic-apple-130036485.html ("Microsoft has long employed a revenue-sharing model of 70 percent for creators and 30 percent for Xbox, but starting August 1st, that's shifting to 88 percent for developers and 12 percent for Xbox, at least when it comes to PC releases. Xbox console developers won't see a change to the existing revenue-sharing model.").

[588]    Sundararajan Opening Report, ¶¶ 36–37.

[589]    Abrantes-Metz Report, ¶ 34 ("But using inputs that are flawed or lack economic justification would lead to outputs that are similarly flawed.").

[590]    Hitt Rebuttal Report, Section 8.3.

[591]    Abrantes-Metz Report, ¶ 168 ("My benchmark analysis largely resembles the 'Commission Rate Yardstick' analysis Prof. Economides presented in his expert report filed on behalf of the Developer Class. Prof. Economides also considered the Windows PC app distribution market as a reliable benchmark and included both third-party stores and direct-to-consumer stores in his analysis. […] I use the same benchmark as Prof. Economides (i.e. the sale of Windows PC game apps).").

benchmark commission rate, Dr. Abrantes-Metz relies on the headline commission rate for marketplaces that distribute third-party apps, and on data about distribution costs for developers that distribute their own apps from both the Epic Store and Humble Widget and Xsolla. Using these data, Dr. Abrantes-Metz estimates a benchmark commission rate between ▮▮ percent and 14.18 percent.[592]

265. Even ignoring the myriad other issues with Dr. Abrantes-Metz's approach to calculating the but-for commission rate discussed earlier, the benchmark analysis that Dr. Abrantes-Metz implements using Windows PC game apps is also flawed and does not provide support for Dr. Abrantes-Metz's but-for commission rate. First, Dr. Abrantes-Metz's own assumption is that the App Store competes with a rival app marketplace that is identical to the App Store.[593] This would imply that, like the App Store, the rival app marketplace is also a two-sided transaction platform. Thus, limiting the analysis to two-sided transaction platforms would be consistent with Dr. Abrantes-Metz's favored approach to estimating the but-for commission rate, and would be a more conservative calculation. By including direct-to-consumer one-sided vendors, Dr. Abrantes-Metz presents a benchmark that is inconsistent with her approach. This is an important distinction because, as I discussed in my opening report, two-sided transaction platforms must offer varied services and governance mechanisms to attract both developers and consumers and ensure that transactions go well. Further, two-sided transaction platforms are subject to indirect network effects, which amplify the demand responses to price changes.[594]

266. Further, by focusing on 2019 commission rates, Dr. Abrantes-Metz ignores that a commission rate based on 2019 data would be inconsistent with the economic reality of the beginning of the class period in 2008, where the commission rate for the benchmarks used by Dr. Abrantes-Metz was 30 percent. As I explained in my opening report, many other app marketplaces featured commission rates of 30 percent prior to the launch of the App

---

[592]  Abrantes-Metz Report, Figure 1.

[593]  Abrantes-Metz Report, ¶ 23 ("The two app stores are assumed to be homogeneous, meaning they are equal from the consumers' perspective in all relevant aspects, with each charging a single commission rate to all game developers.").

[594]  Sundararajan Opening Report, ¶ 106.

Store. [595] Dr. Abrantes-Metz does not provide any support to justify ignoring the commission rate for the benchmark app marketplaces for the full class period, thus rendering this benchmark analysis unreliable.

## VI.   REBUTTAL OF PROFESSOR MCFADDEN'S AND DR. SONG'S OPINIONS

267.   Professor McFadden claims that the App Store's commission rate has the economic effects of an *ad valorem* tax that Apple imposes on the alleged app and in-app digital purchase aftermarket, which harms developers and consumers. [596] According to Professor McFadden, when this commission rate increases, developers will in turn increase prices for apps and in-app digital content. [597] Therefore, in his view, Apple's alleged supracompetitive commission rate harms consumers by increasing prices for iOS apps and in-app digital content. [598] The implementation of what Professor McFadden terms his "tax incidence framework" relies on Dr. Abrantes-Metz's flawed but-for commission rate, an estimate of consumer demand, and an estimation of the costs borne by App Store

---

[595]   Sundararajan Opening Report, ¶ 130.

[596]   Expert Report of Daniel L. McFadden, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("McFadden Report"), ¶ 30 ("The App Store's excess commission is an ad valorem tax levied on app developers in the aftermarket for iOS apps and IAP, and both the Consumer Class members and app developers share its burden.").

[597]   McFadden Report, ¶ 21 ("The underlying economic principles of the App Store's commission are straightforward. Apple charges developers a percentage of the sales price for their apps and digital in-app content in the form of a commission. The commissions Apple collects is therefore a component of app developers' effective operating costs, which are a key determinant of prices offered by profit-maximizing developers. When marginal operating costs, including the App Store commissions, increase, developers will increase their price to offset a portion of those costs.").

[598]   McFadden Report, ¶¶ 28–29, Figure 2.

developers.[599] Dr. Song has supported Professor McFadden in the development and estimation of his model to assess damages for consumers.[600]

268.     I understand that other experts, including Professor Hitt and Professor Watson, address many flaws associated with Professor McFadden's and Dr. Song's model, econometric estimation, and damages calculation.[601] My critique focuses on the inconsistency in Professor McFadden's and Dr. Song's *ad valorem* tax framework, and the prediction that increases in the commission rate will always result in increases in app and in-app digital content prices.

269.     In my opening report,[602] and in **Section IV.E.3** above, I have discussed the empirical evidence presented by Professor Hitt in his opening report that contradicts the assumption made by Professor McFadden and retained by Dr. Song.[603] Using a natural experiment that relies on three programs from Apple that reduced commission rates for certain app developers or transactions—the launch of the Small Business Program, the implementation of the auto-renewing subscription policy, and the launch of the Video Partner Program— Professor Hitt analyzed the impact of the decrease in commission rates on the prices of apps and in-app digital content. His analyses indicate that across all three programs, most developers did not reduce the app prices charged to consumers.[604]

---

[599]  McFadden Report, ¶ 38 ("The tax incidence framework described in Section III requires three components as an input. First, it requires an estimate of the App Store commission rate that would prevail absent its alleged conduct. In both my 2023 Supplemental Report and the present report, Counsel provided me with the But-For commission rate, which I understand is consistent with the opinions of Dr. Abrantes-Metz. Hence, I do not discuss its estimation in this report. Second, the tax incidence framework requires an estimate of consumer demand, which was represented by the curve labeled *D* in Figure 2. Third, I must estimate developers' costs, which, together with estimates for consumer demand and developers' profit maximization conditions, allow me to determine how developer pricing changes in response to commission rate changes.").

[600]  Expert Report of Minjae Song, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Song Report"), ¶ 8 ("I supported Prof. McFadden and acted under his direction during the creation, testing, and implementation of his model during this time.").

[601]  Hitt Rebuttal Report, Sections 9 and 10; Expert Report and Declaration of Mark Watson, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025 ("Watson Report").

[602]  Sundararajan Opening Report, ¶ 194.

[603]  Hitt Opening Report, Section 9.1.

[604]  Hitt Opening Report, ¶ 305 ("I analyze three natural experiments: the launch of the SBP in December 2020, the implementation of the ARS policy in June 2016, and the launch of the VPP in 2016."), ¶ 306 ("[T]he results of these natural experiments show that, for the vast majority of products, app developers did not reduce consumer prices when they face lower commission rates.").

270.   This evidence underscores how Professor McFadden and Dr. Song ignore that app developers typically have a very low marginal cost of production, as they incur a majority of their costs in the development phase.[605] The fact that a developer's marginal costs are close to zero is consistent with Professor Stiglitz's declaration in *United States of America v. Microsoft*,[606] his testimony on this matter,[607] as well as Professor MacCormack's testimony.[608] Indeed, Professor Hitt concludes that the zero (or very low) marginal cost of producing one additional app or in-app item "unit" is likely one of the reasons why many app developers did not lower prices when commission rates decreased.[609] This conclusion is consistent with findings from the academic literature. For example, Kobayashi and Wright (2019) show that when developer marginal costs are zero and commission fees are structured as *ad valorem* royalties, the commission rate has no effect on the profit-maximizing price charged to consumers. This result follows from the fact that, when

---

[605]   Hitt Opening Report, Section 9.2.1; Nunes, Joseph C., Christopher K. Hsee, and Elke U. Weber, "Why Are People So Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, Vol. 23, No. 1, 2004, pp. 43–53, p. 44 ("Software is an example of a product that possesses a cost structure with a relatively low [variable cost] and a high [fixed cost]."); Posner, Richard A., "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, Vol. 19, No. 2, 2005, pp. 57–73, p. 58 ("[I]n the case of software distributed over the Internet (including digitized musical recordings), variable cost, and hence marginal cost, are close to zero.").

[606]   Declaration of Joseph E. Stiglitz and Jason Furman, *United States of America v. Microsoft Corporation*, Civil Action No. 98-1232 (CKK), January 28, 2002 ("USA v. Microsoft Declaration"), p. 33 ("In effect, it implies that the marginal cost of any item in the bundle [of Microsoft Windows and software such as Internet Explorer, Windows Media Player, and Windows Messenger] is zero").

[607]   Stiglitz May 2025 Deposition, p. 175:9–19 ("Q. Do you agree that if marginal costs for developers is zero, that they will pass on none of the commission to consumers? A. I know […] that if there were no marginal cost, then maximizing 70 per cent of revenues is the same as maximizing 100 per cent of revenues. […] Q. So the answer is 'yes'? A. Yes.").

[608]   MacCormack May 2025 Deposition, pp. 97:24–98:11 ("Q. A digital good also includes an app download, correct? A. I would think so. Q. You go on to state that 'In such cases, the cost of creating another unit, i.e., the marginal original cost, is often extremely low, sometimes approaching zero.' By 'such cases' in this sentence, are you referring to the sale of digital goods? […] A. Yes. The marginal cost would be close to zero for certainly something like a token."), pp. 112:20–113:2 ("Q. And so those particular purchases generally have a marginal cost that's close to zero, correct? A. I […] concede the point that digital goods have close to zero marginal cost.").

[609]   Hitt Opening Report, Section 9.2.1; Sundararajan Opening Report, ¶ 194. *See also*, Nunes, Joseph C., Christopher K. Hsee, and Elke U. Weber, "Why Are People So Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, Vol. 23, No. 1, 2004, pp. 43–53, p. 44 ("Software is an example of a product that possesses a cost structure with a relatively low [variable cost] and a high [fixed cost]."); Posner, Richard A., "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, Vol. 19, No. 2, 2005, pp. 57–73, p. 58 ("[I]n the case of software distributed over the Internet (including digitized musical recordings), variable cost, and hence marginal cost, are close to zero.").

developers face zero marginal cost and earn a fixed percentage of revenue, they maximize the same profit function—up to a multiplicative constant—regardless of the commission rate.[610] Similarly, Etro (2023) demonstrates that in app marketplaces, if developers have zero marginal costs, the commissions they face under a revenue-sharing model are not passed through to consumers, and thus, changes in commission rates leave consumer surplus unaffected.[611]

271. Additionally, as I discussed in my opening report and in my rebuttal of the opinions of Professor Stiglitz (*see* **Section IV**) and Dr. Abrantes-Metz (*see* **Section V**), the App Store is a two-sided transaction platform.[612] Two-sided transaction platforms display indirect network effects which cause the prices directed at one side of the platform to affect participation on both sides of the platform.[613] Thus, even were the prices associated with apps and in-app digital content to change in response to a change in commission rate, this change in price will cause consumer demand to change, which in turn will affect developer participation, in turn altering the demand assumptions made by Professor McFadden and Dr. Song. This spillover effect is ignored by Professor McFadden and Dr. Song. In **Section V.C**, I discuss empirical evidence showing that indirect network effects affect the optimal

---

[610] Kobayashi, Bruce H. and Joshua D. Wright, "What's Next in *Apple Inc. v. Pepper*? The Indirect-Purchaser Rule and the Economics of Pass-Through," *Cato Supreme Court Review*, 2019, pp. 249–269, pp. 261–262 ("[W]hile app developers must incur the costs of developing and updating the software, these costs are largely fixed with respect to output. To the extent that the marginal costs of producing and distributing another copy of the app is zero, the theoretical calculation of the markup is far from complex—it is simple. And the effect of the Apple 30 percent ad valorem royalty on the optimal price set by the app developer is zero."), p. 266 ("[C]ompared to the equilibrium in the absence of a retail markup [...], there is no effect of the ad valorem App Store charge [...] on the price of the app to consumers[.] [...] [T]here is no pass-through charge to the consumer caused by Apple increasing its ad valorem rate above what would have been charged in a world with competitive retailer/app stores.").

[611] Etro, Federico, "Platform Competition With Free Entry of Sellers," *International Journal of Industrial Organization*, Vol. 89, 2023, pp. 1–17, p. 5 ("Notice that with [marginal cost] $c = 0$, the profit-maximizing price would be independent from the commission: in the absence of variable costs (as for apps providing software) the percentage commission on revenues is equivalent to a commission on profits which does not affect the profit-maximizing price [...] Only with zero marginal cost the pass-through is null and surplus and revenues are independent from the commission[.]"), p. 11 ("This is consistent with the fact that the mobile platforms of Apple and Google collect high commission revenues from digital apps provided at zero marginal cost and largely used on devices [...]").

[612] Sundararajan Opening Report, Section V.

[613] Sundararajan Opening Report, ¶ 39.

pricing structure of a two-sided transaction platform, which underscores the unreliability of analysis that ignores them.

272.   Additionally, as I discuss in **Section V.D**, the success of two-sided transaction platforms depends in part on their pricing strategies. Two-sided transaction platforms often have complex pricing structures,[614] and these pricing structures must be carefully calibrated because indirect network effects cause the prices directed at one side of the platform to affect participation on both sides of the platform.[615] Professor McFadden and Dr. Song ignore that even were the commission rate to decrease, there is no reason to assume that there would not be other changes to the pricing structure. In **Appendix Exhibits F.1-F.4**, I show the different components of the App Store's business model, and how these components change across different app marketplaces. In a but-for world, Apple could change any of these components in addition to (or instead of) any possible change to the commission rate. Such changes would alter the assumptions Professor McFadden and Dr. Song need to make about developer costs and their analysis of developer profit maximization. Developers may well choose the same prices for apps and in-app digital content. Professor McFadden and Dr. Song provide no evidence to the contrary.

## VII.   REBUTTAL OF PROFESSOR MARTIN'S OPINIONS

273.   Professor Martin argues that in the absence of competitive pressure, Apple has not invested adequately in addressing privacy issues,[616] despite being aware of potential violations and

---

[614]   Sundararajan Opening Report, ¶ 37. *See also*, Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, pp. 99–100 ("[T]he presence of network effects makes fee setting a rather complex exercise, because (i) pricing is affected by – and may affect – users' expectations, (ii) multiple equilibria may result from a given combination of fees, and (iii) pricing may be 'a matter of life or death,' as markets may tip when network effects are strong. Platforms must thus carefully factor in network effects in their choice of pricing strategy.").

[615]   Sundararajan Opening Report, ¶ 39. *See also*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 129 ("[P]ricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation.").

[616]   Expert Report of Kirsten Martin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714-YGR, March 7, 2025 ("Martin Report"), Section V.C ("Without any competitive pressure, Apple has not invested the resources required to better meet user privacy needs, preferences, and expectations"), ¶ 65 ("However, without competition, Apple has not devoted additional internal resources to dynamically analyze whether the practices of apps and SDKs violate privacy.").

possible solutions.[617] Professor Martin further claims, without any relevant support, that competition with third-party app marketplaces could better meet the privacy needs of consumers because such app marketplaces would have both the ability and the incentive to invest in privacy-enhancing features to attract consumers.[618] According to Professor Martin, third-party app marketplaces could "better meet consumer privacy preferences and needs" than Apple.[619]

274.    Professor Martin also indicates that competition with third-party app marketplaces could "pressure Apple to stop relying on revenue from targeted advertising,"[620] justifying her claim by arguing that Apple charges a commission rate on app and in-app digital content purchases but not on advertising revenue, thus incentivizing developers to rely on privacy-invasive advertising monetization models rather than monetizing by charging a non-zero price and protecting user data privacy.[621]

275.    In the following sections I discuss the many flaws, unsupported statements, and general speculation in Professor Martin's claims. I understand that Professor Halderman further

---

[617]    Martin Report, ¶ 62 ("Apple documents I reviewed suggest proactively (dynamically) identifying privacy violating behavior both in the initial App Review and later in the App Store was necessary and feasible […] I have not seen any evidence that Apple ever made these investments."), ¶ 63 ("Internal Apple documents show Apple had identified practices to proactively identify and address privacy violations but did not commit resources to build out those abilities. […] There is no evidence that Apple has ever invested in any of these solutions."), ¶ 64 ("In response to external reports of privacy violations of apps on the App Store, Apple identified additional internal controls that would better protect user privacy […] There is no evidence that Apple has ever invested in any of these internal controls.").

[618]    Martin Report, ¶ 65 ("In general, Apple's internal proposal to 'devote additional internal resources to analyzing apps for privacy violations' could be pursued by an alternative app store focused on identifying and removing privacy violating apps."), ¶ 71 ("In forcing users to settle for Apple's minimalistic App Review process and data collection practices, Apple's App Store monopoly does not allow alternative app stores to invest the resources required to compete for users based on privacy. Such competition would better meet the privacy needs of users.").

[619]    Martin Report, ¶ 8.

[620]    Martin Report, Section V.D ("Competition with alternative app stores could pressure Apple to stop relying on revenue from targeted advertising – a practice that is a privacy violation and decreases consumer welfare – rather than prioritizing revenue from targeted advertising.").

[621]    Martin Report, ¶ 67 ("Apple does not require any parallel commission on revenue generated through targeted advertising. Apple's policy incentivizes developers to focus on privacy violating targeted advertising rather than protecting user data privacy.").

discusses how Professor Martin overlooks the privacy benefits and safeguards that Apple provides to iOS consumers, including those who opt into personalized advertising.[622]

### A.     Professor Martin Ignores that Apple Has a Strong Incentive to Protect Consumers from Privacy Violations

276.    Professor Martin's argument that third-party app marketplaces could better meet the privacy needs of consumers is unsupported and ignores Apple's strong incentives to provide privacy protections for iOS device users. Professor Martin's analysis overlooks the fact that as the seller of iOS devices, Apple has a stronger incentive than third-party app marketplaces to protect the privacy of the consumer data on its devices, and maintain and enhance consumer perception of Apple's devices and brand (*see* **Section VI.C.1** of my opening report and **Section IV.G.1**).

277.    As I discussed in my opening report, privacy is a central component of Apple's brand identity.[623] If an iOS device owner has a negative experience with an iOS app as a result of it not meeting their perceived privacy expectations, this experience can negatively affect the consumer's perception of the app developer and the value of the distribution channel, as well as the value of Apple's devices and brand.[624] Contrary to Professor Martin's claims,

---

[622]   Halderman Rebuttal Report, Section IV.

[623]   Sundararajan Opening Report, ¶ 203. *See also*, Epic Trial Testimony of Phillip Schiller, pp. 2737:15–2738:8 ("Q. And what were the business reasons that Apple decided that it would only distribute third-party native apps on its App Store? A. Well, we've covered a number of the important reasons to us. Maintaining the quality of iPhone, maintaining the security and privacy of our users were all critical to the idea of opening it up for native apps. Q. And have those priorities for privacy, security, and reliability ever changed? A. No. Q. And has the need to safeguard those things changed over time? A. Yes. Q. And can you describe how? A. I think that over the years, the ways and methods developers and bad actors try to get at users and their data has only increased dramatically, and we see this from all the important data we have. The many attacks and attempts to steal it and get access to it have increased."); Epic Trial Testimony of Craig Federighi, p. 3359:14-19 ("And we also understood that the cell phone market was a market of billions of devices. It was going to touch many more people in a wide range of age groups and a wide range of kind of understanding of operating a computer, and so we really had to think about a security architecture that could protect all of them in that kind of context.").

[624]   Epic Trial Testimony of Tim Cook, pp. 3884:22–3885:11 ("A. […] An order requiring Apple to permit sideloading of unreviewed apps on the iPhone and to permit alternative app stores that would offer apps that have not been reviewed by Apple […] would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Epic Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

third-party app marketplaces would thus likely have a lower incentive to provide consumers with adequate information about the privacy of the apps and in-app digital content, and invest less into developing and conducting a process for the review of privacy requirements of the app and in-app digital content through a rigorous app review process as the App Store does.[625]

278.  Professor Martin's argument also ignores how the presence of indirect network effects for two-sided transaction platforms like the App Store and the hypothetical third-party app marketplaces cause decisions made about one side to have repercussions for the other side,[626] and how this may cause third-party app marketplaces to choose lower rather than higher levels of privacy protection than the App Store. For example, as I discussed in my opening report, all else equal, two-sided transaction platforms tend to charge lower prices to the side whose users who have higher price elasticities of demand and therefore are more sensitive to price changes.[627] In fact, it is not unusual for a two-sided transaction platform to encourage participation from members of the more price sensitive group by imposing

---

[625]  Sundararajan Opening Report, ¶ 206.

[626]  Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Ho, et al., p. 488 ("Pricing decisions in the face of indirect network effects are complex because raising the price on one side of the market affects demand not only on that side of the market but also on the other, as each side responds to changes in the participation on the other side. Finding the correct approach to pricing is key to the success of a platform.").

[627]  Sundararajan Opening Report, ¶ 40. *See also,* Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, pp. 129–130 ("Since the platform faces a similar computation on the other side, prices on both sides of the market depend on the joint set of demand elasticities and marginal costs on each side (Rochet and Tirole, 2003, 2006; Weyl, 2009). This result has important implications for prices. For instance, in any market, prices typically fall as the price elasticity of demand increases, but in a two-sided market the effect can be even larger: The low price on one side not only attracts elastic consumers on that side but also, as a result, leads to higher prices or more participation on the other side. The increased value extracted from the other side magnifies the value of having consumers on the first side, which leads to a yet bigger price decrease and quantity increase for the side that experiences the increase in elasticity."); Niels, Gunnar, "Transaction Versus Non-Transaction Platforms: A False Dichotomy in Two-Sided Market Definition," *Journal of Competition Law & Economics*, Vol. 15, No. 2-3, 2019, pp. 327–357, p. 351 ("We also saw that skewed pricing structures commonly arise in two-sided platforms. […] But the skewed structure can also be influenced by the relative own-price elasticities on each side, and these in turn can be a function of the competitive pressure on each side.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

no access or usage fees on them.[628] This argument can be extended to non-price choices that have repercussions for both sides of the platform as well. The academic literature recognizes that this balancing act by two-sided platforms which constrains one side to boost participation from the other side also applies to non-price choices that can affect participation on both sides. For example, Rochet and Tirole (2004) explain that a platform may adjust its services and governance mechanisms to balance constraining one side in order to attract the other side, thereby ensuring its viability.[629] Similarly, Hagiu (2015) observes that platforms often face tradeoffs between the interests of each side, particularly

---

[628] *See, for example*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 130 ("Such seeming anomalies as price below marginal cost or even negative prices can easily arise in a two-sided market. For example, a platform might charge a price below cost on one side if those agents have a large price elasticity and their participation attracts a large number of participants on the other side who are relatively price inelastic (and hence have a high mark-up)."). *See also*, Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691, p. 673 ("It is possible that the profit-maximizing outcome involves group 1, say, being offered a subsidized price[.] [T]his occurs if the group's elasticity of demand is high and/or the external benefit enjoyed by group 2 is large. Indeed, the subsidy might be so large that the price is negative (or zero, if negative prices are not feasible)."); Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 115 ("As a two-sided platform serves two different groups of users, it is in a position to set a different tariff for each group. […] Our main point in this section is that the ability for a platform to set different fees for the different groups of participants is key for solving the chicken-and-egg problem. Moreover, the platform may have to set a fee for one group of users that is below its cost of serving these users, thereby subsidizing their participation.").

[629] Rochet, Jean-Charles and Jean Tirole, "Two-Sided Markets: An Overview," March 12, 2004, pp. 1–44, pp. 40–41 ("Platforms must perform the balancing act between the two sides along various policy dimensions and not only with respect to the price structure. They therefore often regulate the terms of the transactions between end-users, screen members in non-price related ways and monitor intra-side competition. In all instances, they sacrifice profit by constraining one side to boost attractiveness for and recoup losses on the other side."). *See also*, Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, No. 1, 2008, pp. 667–693, pp. 677–678 ("Given that platforms promote interactions between customers and seek to harness indirect network externalities it should come as no surprise that two-sided platforms have an incentive to devise rules and regulations that promote these externalities and limit negative externalities between customers. […] Cooperative two-sided platforms have further need for rules and regulations because the behavior of their members can affect the value of the two-sided platform as a whole. Visa, for example, has rules that govern the appearance of cards issued by members, to provide some uniformity for the common brand, as well as to prevent members from using the brand inappropriately. The system also has rules that address disputed transactions. Acquirers would have an incentive to favor their customers (merchants) in a dispute while issuers would favor their customers (cardholders). The system's rules attempt to find a balance between these competing interests, to increase the attractiveness of the system as a whole.").

when a feature benefits one side or the platform itself but imposes costs on the other, specifically highlighting the tradeoff between advertising effectiveness and privacy.[630]

279. These considerations are thus directly relevant to platform choices around privacy protections. When choosing the extent to which services and governance mechanisms protect user privacy, an app marketplace is balancing the interests of its two sides. Developers who wish to monetize using advertising can benefit from lower user privacy protections because this enables more invasive and profitable advertisers, while users are harmed by lower privacy protections. As I discuss in **Section IV.G**, Apple has a stronger economic incentive than third-party app marketplaces would have to protect both consumers and developers from adverse privacy outcomes to preserve the value of its brand and the consumer perception of the quality of its devices. For these reasons discussed in **Section IV.G**, the cost borne by a third-party app marketplace from user privacy backlash is lower than the cost borne by Apple for the same privacy violation, and thus, all else equal, a third-party app marketplace will make privacy choices that favor developers over users more than the privacy choices made by Apple favor developers over users. Put differently, all else equal, third-party app marketplaces would adopt less restrictive privacy protections, such as allowing excessive advertising or extensive data collection without sufficient transparency or disclosure to consumers, to encourage greater developer participation on their platform. In contrast, Apple has a vested interest in protecting

---

[630]  Hagiu, Andrei, "Strategic Decisions for Multisided Platforms," *MIT Sloan Management Review*, Summer 2015, pp. 4–13, pp. 7–8 ("The most difficult MSP design decisions are those that involve features putting the interests of different sides of the MSP at odds with each other or with those of the MSP. Such features create strategic trade-offs for the MSP because they generate positive value for some participant groups or for the MSP itself, but negative value for other participant groups. These can be difficult trade-offs to navigate, even without taking into account the cost of building and implementing the features in question. Examples include the following: •Any advertising-supported medium (such as magazines, over-the-air television channels, search engines or social networks) must constantly balance advertisers' desire to expose users to more numerous, prominent and targeted advertisements with users' preference for less intrusion.").

consumers to preserve the value of its brand and maintain consumer trust.[631] This contradicts Professor Martin's claim that third-party app marketplaces would naturally enhance privacy protections for consumers, a claim for which she provides no economic justification.

280. Finally, Professor Martin asserts that competition with third-party app marketplaces could better meet the privacy needs of consumers.[632] She supports this assertion by claiming that "consumers were more likely to choose more privacy respecting alternatives to the dominant search engine" after policy interventions allowed for increased competition for search engines in Europe,[633] backing her claim by citing a single paper, Decarolis et al. (2024), which estimates the change in market shares of search engines following policy interventions in Europe that purportedly enhanced user privacy.[634] However, this paper

---

[631] Hagiu, Andrei and Bruno Jullien, "Why Do Intermediaries Divert Search?," *RAND Journal of Economics*, Vol. 42, No. 2, Summer 2011, pp. 337–362, p. 352 ("As a consequence, depending on the nature of competition between intermediaries—in particular on the intensity of competition for stores relative to the intensity of competition for consumers—the resulting level of search effectiveness might place a higher weight on maximizing consumer surplus or stores' profits. In other words, given that two-sided platforms have to balance the interests of the two sides they serve, competition will tend to make the balance tilt in favor of the side that needs to be "courted" more assiduously by the intermediaries."); Hagiu, Andrei, "Strategic Decisions for Multisided Platforms," *MIT Sloan Management Review*, Summer 2015, pp. 4–13, p. 8 ("How should MSPs resolve such conflicts between the interests of their various participant groups? […] A better principle would be to consistently solve trade-offs in favor of the participant group that is most important to the MSP's long-term success.").

[632] Martin Report, ¶ 71 ("In forcing users to settle for Apple's minimalistic App Review process and data collection practices, Apple's App Store monopoly does not allow alternative app stores to invest the resources required to compete for users based on privacy. Such competition would better meet the privacy needs of users.").

[633] Martin Report, ¶ 71 ("In markets where data privacy is important, allowing alternative services to compete to better meet privacy needs, improves user privacy protections. For example, when Europe allowed for greater competition in search engines, users were more likely to choose more privacy respecting alternatives to the dominant search engine."), Footnote 135.

[634] Decarolis, Francesco, Muxin Li, and Filippo Paternollo, "Competition and Defaults in Online Search," pp. 1–32, p. 2 ("We study various interventions aimed at removing restrictive terms imposed by Google to restrict the pre-installation of competing search engines as defaults on Android mobile devices. […] We study three different but related policies implemented in the European Economic Area (EEA), Russia, and Turkey. In Russia, a choice screen is provided to all Android users to choose between Google, Mail.ru, and Yandex as their default search engine. In the EEA, a similar choice screen has been introduced, but it is only accessible during the initial setup of new Android devices and features a regularly changing list of search engines for users to choose from. In Turkey, a different approach has been taken to target Google's default role: the Turkish Competition Authority mandated changes to the contracts between Google and mobile device manufacturers to ensure the manufacturers' freedom in negotiating the default search engine. […] This enables us to quantify the effect of the three policy interventions on search engine market shares and Google's advertising revenues via a difference-in-differences strategy").

was unable to establish that DuckDuckGo—a search engine described in the paper as emphasizing "strong protection of user privacy" [635]—experienced any statistically significant change in market share following the European Economic Area (EEA) intervention. [636] In contrast, Yandex—a search engine based in Russia that has been criticized for privacy concerns[637]—experienced an increase in market share following the EEA intervention.[638] I am thus unable to find results in the cited paper that support her claim, and find results in the paper that contradict them.

### B. Professor Martin's Claim Regarding Apple's Revenue from Targeted Advertising Is Speculative

281. Professor Martin claims that targeting advertising can be privacy invasive and, without any support, claims that competition from third-party app marketplaces could "pressure Apple to stop relying on revenue from targeted advertising." [639] Professor Martin further speculates without any support that a third-party app marketplace might impose a commission on targeted advertising revenue, eliminate fees on privacy-preserving revenue

---

[635]  Decarolis, Francesco, Muxin Li, and Filippo Paternollo, "Competition and Defaults in Online Search," pp. 1–32, p. 6. *See also*, Propper, Nathaniel, "A Feisty Google Adversary Tests How Much People Care About Privacy," *The New York Times*, July 15, 2019, https://www.nytimes.com/2019/07/15/technology/duckduckgo-private-search.html ("Mr. Weinberg's company, DuckDuckGo, has become one of the feistiest adversaries of Google. Started over a decade ago, DuckDuckGo offers a privacy-focused alternative to Google's search engine. The company's share of the search engine market is still tiny — about 1 percent compared with Google's 85 percent, according to StatCounter.").

[636]  Decarolis, Francesco, Muxin Li, and Filippo Paternollo, "Competition and Defaults in Online Search," pp. 1–32, Table 2 (DuckDuckGo experienced a 0.019 percentage-point increase in market share, and this increase is not statistically significant (t-statistic is approximately 1.06)).

[637]  *See*, *for example*, Bajic, Mila and Veszna Wessenauer, "Ranking Digital Rights - The 2025 Big Tech Edition," *Yandex LLC*, August 1, 2024, available at https://rankingdigitalrights.org/bte25/companies/Yandex ("Yandex ranked eighth in the privacy category [after Alphabet]").

[638]  Decarolis, Francesco, Muxin Li, and Filippo Paternollo, "Competition and Defaults in Online Search," pp. 1–32, Table 2 (Yandex experienced a 0.106 percentage-point increase in market share, and this increase is weakly significant (t-statistic is approximately 1.80).

[639]  Martin Report, ¶ 8, Section V.D.

streams,[640] or adopt monetization strategies that are less reliant on targeted advertising than Apple.[641]

282. Professor Martin has not conducted any analysis to show that revenue from "targeted advertising" is so substantial for Apple that it undermines its superior privacy standards for apps and in-app digital content. In fact, Professor Halderman notes that Apple's revenue is primarily derived from selling devices, rather than monetizing users' data through advertising.[642] Moreover, Professor Martin's flawed assertion fails to consider that as the seller of iOS devices, Apple has a stronger incentive than third-party app marketplaces to increase privacy standards for apps and in-app digital content. This is because, as discussed earlier, if an iOS device owner has a negative experience with an iOS app, such as experiencing excessive privacy invading ads that do not meet their perceived privacy expectations, this experience can negatively affect the consumer's perception of Apple's devices and brand.[643] Professor Martin's claim that third-party app marketplace would rely less on targeted advertising is thus unsupported and speculative. As discussed earlier, the single study cited by Professor Martin in support has contradictory results that do not support her claim.

283. Professor Martin's claim that Apple's commission structure incentivizes developers to adopt privacy-invasive advertising models[644] is speculative and unsupported. Apple does not require developers to use targeted advertising and does not earn revenue from developer advertising revenue, which Professor Martin acknowledges.[645] Moreover, Professor

---

[640] Martin Report, ¶ 68 ("In a competitive market, alternative app stores could create competitive pressure to charge a punitive commission on all revenue from targeted advertising or, at a minimum, not having a "tax" based on revenue earned through privacy preserving practices as Apple does.").

[641] Martin Report, ¶ 69 ("An alternative app store could choose to contrast itself from Apple by refusing to rely on the collection and use of user data for advertising. Further, an alternative app store could choose to be less reliant than Apple on targeted advertising as the driver of profitability. Allowing alternative app distribution channels could lead to even better protection of user privacy.").

[642] Halderman Rebuttal Report, Section IV.G.

[643] Sundararajan Opening Report, ¶ 206.

[644] Martin Report, ¶ 67 ("Apple does not require any parallel commission on revenue generated through targeted advertising. Apple's policy incentivizes developers to focus on privacy violating targeted advertising rather than protecting user data privacy.").

[645] Martin Report, ¶ 67 ("Apple does not require any parallel commission on revenue generated through targeted advertising.").

Martin does not provide any supporting evidence regarding the share of free apps on the App Store and how many of these free apps rely on advertising to monetize their apps in a way that is privacy invasive. In addition, Professor Martin's claim ignores the possibility that third-party app marketplaces could have greater incentives to attract developers by offering options that rely heavily on privacy invading ads, as discussed in **Section VII.A**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Respectfully submitted,


_____    June 13, 2025

Arun Sundararajan, Ph.D.    Date

206

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# APPENDIX A

## Curriculum Vitae and Prior Testimony

## Arun Sundararajan

### CONTACT INFORMATION

| | |
|---|---|
| Leonard N. Stern School of Business | Phone: (212) 998 0833 |
| New York University | Web: *https://digitalarun.io/* |
| 44 West 4TH Street, KMC 8-90 | Email: *digitalarun@nyu.edu* |
| New York, NY 10012 | *https://linkedin.com/in/digitalarun* |

U.S. Permanent Resident (Indian Citizen)

### SUMMARY

Arun Sundararajan is the Harold Price Professor of Entrepreneurship and Technology at New York University's (NYU) Stern School of Business, where he is also Director of the Fubon Center for Technology, Business and Innovation. An internationally recognized expert on artificial intelligence governance and digital strategy, his best-selling and award-winning book, "The Sharing Economy," published by the MIT Press, has been translated into Japanese, Korean, Mandarin Chinese, Portuguese and Vietnamese.

Arun's research studies how digital technologies transform business, government and civil society, with a recent focus on the trust in artificial intelligence, generative AI and platform-driven change, digital strategy, platform strategy, and the digital future of work. He has published numerous scientific papers in peer-reviewed academic journals and conferences, and op-eds in outlets that include The New York Times, The Financial Times, CNBC, TIME, The Guardian, Wired, Bloomberg View, Le Monde, El Pais, the Economic Times and the Japan Times. His scholarship has been recognized by numerous Best Paper awards, two Google Faculty awards, an Axiom Best Business Books Award, and a Thinkers50 Award. He has given hundreds of keynote and plenary talks. He has been invited to speak to the United States Congress, the European Parliament, the United Nations, and numerous regulators globally.

For 2025-26, Arun is co-chair of the World Economic Forum's Global Future Council on Data Frontiers, and is also a member of their AI Governance Alliance. He is a former member of the Carnegie Council's AI and Equality advisory board, and serves as a board member and advisor to numerous organizations, ranging from startups to Fortune 100s. He teaches in executive education programs in the United States, Europe and Asia, focusing primarily on AI, platforms and governance. He is a frequent angel investor.

### EDUCATION

**1998**  **University of Rochester**                                                          **Rochester, NY**

*Ph.D. in Business Administration*
*Dissertation Title:* Modeling and Designing Business Processes
Thesis Committee: Abraham Seidmann (advisor), Marshall Freimer, Eugene Kandel, Harry Groenevelt (reader), Leslie Marx (reader).

**1995**  **University of Rochester**                                                          **Rochester, NY**

*Master of Science in Management Science*
Major in operations research, completed requirements for major in applied economics.

**1993**  **Indian Institute of Technology**                                              **Madras, India**

*Bachelor of Technology in Electrical Engineering*

### EMPLOYMENT

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**1998-present**   **New York University, Leonard N. Stern School of Business**        **New York, NY**

*Director, Fubon Center for Technology, Business and Innovation (2024-present)*
*Harold Price (Endowed Chair) Professor of Entrepreneurship (2019-present)*
*Robert L. and Dale Atkins Rosen Faculty Fellow (2014-2019)*
*Full Professor of Technology, Operations and Statistics (2013-present)*
*Affiliated Faculty Member, NYU Center for Data Science (2013-present)*
*NEC Faculty Fellow (2007-2014)*
*Director, IS Doctoral Program (2007-16)*
*Associate Professor with Tenure (2007-2013)*

**Visiting Faculty Positions:** Indian School of Business (2006, 2012), Seoul National University (2009)

**SELECTED OTHER PROFESSIONAL APPOINTMENTS**

Co-Chair, World Economic Forum Global Future Council on Data Frontiers (2025-26)

World Economic Forum AI Governance Alliance (2023-present)

Advisory Board, Carnegie Council on Ethics in International Affairs (2020-24)

Steering Committee, World Economic Forum Future Models in Consumer Industries (2017-19)

Board of Directors, RSE Markets Inc. (2016-21)

Member, World Economic Forum Global Future Council (2016-20)

Fellow, Urban Design Forum (2016-17)

Policy Advisor, Walmart Corporation (2017-present)

Advisor, Samasource (2017-19)

Advisor, Female Founders Fund (2016-present)

Technology Advisory Board, City of New York (2015-16)

Advisor, OuiShare (2014-18)

Advisor, National League of Cities (2014-19)

**SELECTED LEADERSHIP EXPERIENCE, GRANTS AND RECOGNITION**

- Chair, Undergraduate AI Committee (2024-present)
- Director, Fubon Center for Technology, Business and Innovation (2024-present)
- Head, NYU Stern-Flipkart Digital India Initiative (2024-present)
- Recruiting Chair, Technology, Operations and Statistics Department (2023, 2022, 2019, 2018, etc)
- NYU Stern Schoolwide Promotion and Tenure Committee (2019-present)
- Faculty Senator, NYU University Senate (2016-17)
- Chair, Administration and Technology Committee, NYU Faculty Senators Council (2016-17)
- Chair, NYU Stern Faculty Council (2014-15)
- NYU Stern Faculty Council (2013-16)
- NYU Center for Urban Science and Progress, Head of Social Cities Initiative (2013-19)
- Director (IT Economics Track), NYU Stern Center for Digital Economy Research (2004-2011).
- Dean Menon Research Award (2023)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Workshop on Information Systems and Economics, Best Overall Paper Award, Runner-up (2020)
- Network Science, Inaugural Best Paper Award (2017)
- Axiom Best Business Books Award (2017)
- Thinkers 50 Radar Thinker (2016)
- Best Conference Paper Award, INFORMS Conference on Information Systems and Technology (2008 and 2014)
- Management Science Best Paper Award, Runner-up (2013)
- Best Paper Award (JSBM Editor's Choice Award), Conference of the US Association for Small Business and Entrepreneurship (January 2006).
- Best Overall Paper Award, Twenty-Fifth International Conference on Information Systems (2004).
- Facebook Research Award (2015)
- Google Faculty Research Award (2010 and 2015)
- Research Grant, Kauffman Foundation (2014)
- NYU Stern Center for Global Business Research Grant (2012 and 2013)
- IBM Shared University Research Grant (2008 and 2009)
- IIIP Research Grant (2008)
- MSI Research Grant, Marketing Science Institute (2007).
- Kauffman Research Grant, NYU Stern Berkley Center for Entrepreneurship (2006).
- NET Institute Summer Research Grants (2005, 2006 and 2011)

**PUBLICATIONS**

**(A) BOOKS**

Sundararajan, A., 2016. *The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism* (Hardcover). Boston: MIT Press, June 2016 (***http://s12y.com***)

*(Japanese language translation published November 2016; Mandarin Chinese language translation published April 2017; US English paperback version published April 2017; translations into Korean, Portuguese and Vietnamese published 2018.)*

Selected acclaim and coverage for the book
- Awards: *Axiom Best Business Books Award 2017 (Economics, Bronze)*
- Features: *The New York Times, TIME Magazine, The Wall Street Journal, The Washington Post, The Atlantic, Bloomberg View, TED Ideas, Fortune, Quartz*
- Editorial reviews: *The Financial Times, The Chronicle of Higher Education, Strategy+Business, Stanford Social Innovation Review, Management Today, International Monetary Fund*
- TV/Radio interviews: *The Charlie Rose Show, NPR's The Diane Rehm Show, Bloomberg Markets, NPR's Marketplace, The Bloomberg Advantage*
- Podcasts: *a16z Podcast, Curious Minds, Bloomberg Masters in Business, Smart People Podcast*

**(B) JOURNAL ARTICLES**

- Sundararajan, A., 2025. How Corporate Boards Must Approach AI Governance. *Journal of Financial Transformation*, forthcoming.

- D' Auria, G., Sundararajan, A, 2023. Rethinking Intellectual Property Law in an Era of Generative AI. *TechREG Chronicle*, November 2023, 3-11.

- Filippas, A., Jagabathula, S., Sundararajan, A., 2023. The Limits of Centralized Pricing in Online Markets and the Value of User Control. *Management Science* 69(12), 7202-7216.

- Nian, T. and A. Sundararajan, 2022. Social Media Marketing, Quality Signaling and the Goldilocks Principle. *Information Systems Research* 33(2), 540-556.

- Xin, M. and Sundararajan, A., 2020. Nonlinear Pricing of Software with Local Demand Inelasticity. *Information Systems Research* 31(4), 1224–1239.

- Rhue, L. and A. Sundararajan. 2019. Playing to the Crowd? How Digital Visibility Alters Consumer Choice. *MIS Quarterly* 43(4), 1127-1141

- Sundararajan, A., 2019. The Twilight of Brand and Consumerism? Digital Trust, Cultural Meaning, and the Quest for Connection in the Sharing Economy. *Journal of Marketing* 83 (5), 32-35.

- Sundararajan, A., 2018. Crowd-Based Capitalism, Automation, and the Future of Work. *University of Chicago Legal Forum* Volume 2017, 487-511.

- Sundararajan, A., 2017. The Future of Work. *Finance and Development* 54 (2), 6-11.

- Oestreicher-Singer, Sundararajan, A., and G. Kane, 2017. The Power of Product Recommendation Networks. *MIT Sloan Management Review* 59 (1), 7-10.

- Carmi, E., Oestreicher-Singer, G. and A. Sundararajan, 2017. Is Oprah Contagious? The Depth of Diffusion of Demand Shocks in Online Networks. *MIS Quarterly* 41 (1), 207-221.

- Bapna, R., Gupta, A., Rice, S., Sundararajan, A., 2017. Trust and the Strength of Ties in Online Social Networks: An Exploratory Field Experiment. *MIS Quarterly* 41 (1), 115-130.

- Cohen, M. and A. Sundararajan, 2015. Self-Regulation and Innovation in the Peer-to-Peer Sharing Economy. *University of Chicago Law Review* 82, 116-131.

- Dhar, V., Geva, T., Oestreicher-Singer, G., and A. Sundararajan, 2014. Prediction with Economic Networks. *Information Systems Research* 25 (2), 264 - 284.

- Rhue, L. and A. Sundararajan, 2014. Digital Access, Political Networks and the Diffusion of Democracy. *Social Networks* 36(1): 40-53.

- Radner, R., Radusnksaya, A., and A. Sundararajan, 2014. Dynamic Pricing of Network Goods with Boundedly Rational Consumers. *Proceedings of the National Academy of Sciences* 111, 99-104.

- Aral, S., Muchnik, L. and A. Sundararajan, 2013. Engineering Social Contagions: Optimal Network Seeding in the Presence of Homophily. *Network Science* 1 (2): 125–153
  ***(Winner, 2017 Best Paper Award for Best Published Paper in Network Science, 2013-16)***

- Sundararajan, A., F. Provost, G. Oestreicher-Singer and S. Aral, 2013. Information in Digital, Economic and Social Networks. *Information Systems Research* 24(4): 883-905.

- Oestreicher-Singer, G. and A. Sundararajan, 2012. The Visible Hand?  Demand Effects of Recommendation Networks in Electronic Markets. *Management Science* 58 (12): 1963-1981.
  ***(First Runner-Up Award for Best Published IS Paper in Management Science, 2010-12)***

- Oestreicher-Singer, G. and A. Sundararajan, 2012. Recommendation Networks and the Long Tail of Electronic Commerce. *MIS Quarterly* 36 (1): 65-83.

- Huang, K. and A. Sundararajan, 2011. Pricing Digital Goods: Discontinuous Costs and Shared Infrastructures. *Information Systems Research* 22 (4): 712-738.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Sankaranarayananan, R. and A. Sundararajan, 2010. Electronic Markets, Search Costs and Firm Boundaries. *Information Systems Research* 21 (1): 154-169.

- Aral, S., Muchnik, L. and A. Sundararajan, 2009. Distinguishing Influence Based Contagion from Homophily Driven Diffusion in Dynamic Networks. *Proceedings of the National Academy of Sciences* 106: 21544-21549.

- Dhar, V. and A. Sundararajan, 2007. Information Technologies in Business: A Blueprint for Education and Research. *Information Systems Research* 18 (2), 125-141.

- Sundararajan, A., 2007. Local Network Effects and Complex Network Structure. *Contributions to Theoretical Economics* 7 (1).

- Ghose, A. and A. Sundararajan, 2006. Evaluating Pricing Strategy Using Ecommerce Data: Evidence and Estimation Challenges. *Statistical Science* 21: 131-142.

- Aron, R., A. Sundararajan, A., and S. Viswanathan, 2006. Intelligent Agents in Electronic Markets for Information Goods: Customization, Preference Revelation and Pricing. *Decision Support Systems* 41: 764-786.

- Sundararajan, A., 2004. Nonlinear Pricing of Information Goods. *Management Science* 50 (12): 1660-1673.

- Sundararajan, A., 2004. Managing Digital Piracy: Pricing and Protection. *Information Systems Research* 15 (3): 287-308.

- Sundararajan, A., 2004. Nonlinear Pricing and Type-Dependent Network Effects. *Economics Letters* 83: 107-113.

- Arunkundram, R., and A. Sundararajan, 1998. An Economic Analysis of Electronic Secondary Markets: Installed Base, Technology, Durability and Firm Profitability. *Decision Support Systems* 24: 3-16.

- Seidmann, A. and A. Sundararajan, 1997. Competing in Information Intensive Services: Analyzing the Impact of Task Consolidation and Employee Empowerment. *Journal of Management Information Systems* 14: 33-56.

- Seidmann, A. and A. Sundararajan, 1997. The Effects of Task and Information Asymmetry on Business Process Redesign. *International Journal of Production Economics* 50: 117-128.


## (C) PAPERS UNDER REVIEW

- Li, R., Sedoc, J. and Sundararajan, A., 2025. [Reasoning and the Trusting Behavior of DeepSeek and GPT: An Experiment Revealing Hidden Fault Lines in Large Language Models.](#)

- Wu, C. and Sundararajan, A., 2025. Generative AI, Productivity and Incentives for AI Twins.

- Rhue, L., Goethals, S. and A. Sundararajan, 2024. [Evaluating LLMs for Gender Disparities in Notable Persons.](#)

- Li, R. and A. Sundararajan, 2024. [The Rise of Recommerce: Ownership and Sustainability with Overlapping Generations.](#)

- Raj, M., Sundararajan, A., You, C., 2024. [How Disrupting a Traditional Channel Reshapes Platform Consumption and Provider Resilience: Evidence from Uber Eats During the COVID-19 Pandemic](#) *(Runner Up for Best Paper Award, 2020 Workshop on Information Systems and Economics)*


## (D) PATENTS

A-5

- Sundararajan, A., Ipeirotis, P. and A. Ghose, 2010. System, method, software arrangement and computer-accessible medium for incorporating qualitative and quantitative information into an economic model. US Patent # 7848979, issued 12/07/10.

### (E) BOOK CHAPTERS AND OTHER INVITED WRITINGS

- Miller, C., Sprigman, C., and Sundararajan, A., 2025. The Economic Importance Of Fair Use For Generative AI Development. Data Catalyst Institute (in press)

- Jacobides, M., Sundararajan, A. and van Alstyne, M. 2019. Platforms and Ecosystems: Enabling the Digital Economy. *World Economic Forum Briefing Paper*. Available at http://www3.weforum.org/docs/WEF_Digital_Platforms_and_Ecosystems_2019.pdf

- Coles, Egesdal, Ellen, Li and Sundararajan, 2018. Airbnb Usage across New York City Neighborhoods: Geographic Patterns and Regulatory Implications. *The Cambridge Handbook of the Law of the Sharing Economy*, 108-128.

- Junglas, I., Koch, H., Sundararajan, A., and P. Wang, 2017. Shared Responsibility and Blurring Boundaries: Strategic Implications of the Sharing Economy (Editorial). *MIS Quarterly Executive* 16 (4), iii-ix.

- Sundararajan, A., 2017. The Sharing Economy, Digital Innovation, and the Future of Work. *Written Testimony to the US House of Representatives, September 6.* Available at https://edworkforce.house.gov/uploadedfiles/sundararajan_-_testimony.pdf

- Karim R. Lakhani, Arun Sundararajan, Emilie Billaud, Caroline Caltagirone, 2017. BlaBlaCar: The Road Ahead... *Harvard Business School Case* #617050.

- Sundararajan, A., 2017. Crowd-Based Capitalism. *Integration and Trade Journal* 21(42), 58-69.

- Sundararajan, A., 2017. The Collaborative Economy: Socioeconomic, Regulatory and Labor Issues. *Prepared for the European Parliament: Economic and Scientific Policy*

- Sundararajan, A., 2017. The Sharing Economy, in Passiak, D. (ed.) *Empower: How to Co-Create The Future,* Social Mediate Press, 167-182.

- Sundararajan, A., 2017. Governance and Trust in Blockchain Markets, In Epstein, J. (ed.) *Blockchains in the Mainstream*.

- Sundararajan, A., 2016. Economic Barriers and Enablers of Distributed Ownership, in Scholz, T. and N. Schneider (eds.) *Ours To Hack and Own*, OR Books.

- Mazzella, F., Sundararajan, A, Butt d'Espous, V. and M. Möhlmann, 2016. How Digital Trust Powers the Sharing Economy. *IESE Insight*, Issue 30, 24-31, September.

- Sundararajan, A., 2014. Peer-to-Peer Businesses and the Sharing (Collaborative) Economy: Overview, Economic Effects and Regulatory Issues. *Written Testimony to the US House of Representatives, January 15.* Available at https://smallbusiness.house.gov/uploadedfiles/1-15-2014_revised_sundararajan_testimony.pdf

- Sundararajan, A., 2006. Review of 'Digital phoenix: how the information economy collapsed and how it will rise again.' *Journal of Economic Literature* 44 (3).

- Seidmann, A. and A. Sundararajan, 1998. Sharing logistics information across organizations: technology, competition and contracting, in Kemerer, C.K. (ed.) *Information Technology and Industrial Competitiveness: How I.T. Shapes Competition*, Kluwer Academic Publishers.

### (F) OTHER PUBLISHED ARTICLES
(all articles **not** marked with an * are op-eds).

- Sundararajan, A., Artificial Intelligence, Human Intellectual Autonomy and the Future of Work,* *Aspen Institute*, August 2024

- Sundararajan, A., Time to end fee caps on restaurant delivery platforms. *Crain's New York Business*, February 2023

- Sundararajan, A. How Your Brand Should Use NFTs. *Harvard Business Review*, February 2022.

- Sundararajan, A. COVID makes tech policy like CDA 230 more important than ever. *The Hill*, June 2020

- Sundararajan, A. How Japan can win in the ongoing AI war. *Japan Times*, September 2019

- Sundararajan, A. We can do better than universal basic income for the looming end of work as we know it. *CNBC*, May 2019

- Sundararajan, A. The right way to handle Airbnb. *New York Daily News*, June 2018.

- Sundararajan, A., 2018. The YouTube Shooting Reflects a Growing Anger in the Digital Workforce. *TIME*, April 2018

- Sundararajan, A. London's Uber ban is a message to a reckless tech ethos. *The Guardian*, September 2017

- Sundararajan, A. How the Trump presidency will affect Silicon Valley and the sharing economy. *Nikkei,* February 2017.

- Sundararajan, A. Invest in Technology with Social Benefits. *The New York Times*, October 2016.

- Sundararajan, A.  Why Uber's China Loss Will Actually Be a Long-Run Victory for the Company. *Entrepreneur*, August 2016.

- Sundararajan, A.  What Governments Can Learn From Airbnb And the Sharing Economy. *Fortune*, July 2016.

- Sundararajan, A.  Uber and Airbnb Could Reverse America's Decades-long Slide Into Mass Cynicism. *Quartz,* June 2016.

- Sundararajan, A.  What Uber and Lyft's Austin Exit Says About the Future of Regulation. *Fortune*, May 2016.

- Sundararajan, A. Will The On-Demand Economy Raise Global Living Standards? *World Economic Forum Agenda*, September 2015.

- Sundararajan, A.  The Gig Economy Is Coming. What Will It Mean For Work? *The Guardian*, July 2015.

- Sundararajan, A.   If You Want to Reduce Traffic, Ridesharing Apps Hold Much Promise. *The New York Times*, July 2015.

- Sundararajan, A.  A Safety Net Fit For the Sharing Economy. *The Financial Times*, June 2015.

- Sundararajan, A.  Airbnb is an Ally to Cities, Not an Adversary. *The New York Times*, June 2015.

- Sundararajan, A.  Curbing the New Corporate Power: Response.* *Boston Review*, May 2015.

- Sundararajan, A. What Airbnb Gets About Culture That Uber Doesn't. *Harvard Business Review*, November 2014.

- Sundararajan, A. The New 'New Deal?' Sharing Responsibility in the Sharing Economy. *Policy Network*, October 2014.

- Sundararajan, A. Les Nouvelles Institutions Economiques Du XXIe Siecle. *Le Monde*, July 2014.

- Sundararajan, A. Time to Adapt to a New Economy. *The New York Times*, May 2014.

- Sundararajan, A. Trusting the Sharing Economy to Regulate Itself. *The New York Times*, March 2014.

- Sundararajan, A. With Graph Search, It's Facebook vs Facebook. *WIRED,* March 2013.
- Sundararajan, A. More Problems Ahead for Apple. *CNBC*, January 2013.
- Sundararajan, A. From Zipcar to the Sharing Economy. *Harvard Business Review*, January 2013.
- Rhue, L and A. Sundararajan. Digital Social Visibility: How Facebook Gifts Change Our Choices. *WIRED*, December 2012.
- Sundararajan, A. All hail next-wave taxicab apps: the rules should invite innovation. *The New York Daily News*, December 2012
- Sundararajan, A.  Why Government Doesn't Need To Regulate the Sharing Economy. *WIRED*, October 2012.
- Sundararajan, A.  How Facebook Can Still Rule the Internet Economy. *Bloomberg View*, September 2012.
- Bapna, R. and A. Sundararajan. Nurturing the Aadhaar Ecosystem. *LiveMint,* November, 2011.
- Sundararajan, A.  Steve Jobs: The "Consumerizer" of Digital Technology.* *NYU Stern,* October 2011.
- Dhar, V. and A. Sundararajan. Lessons in Privacy from Sony's Data Theft. *The Financial Times,* June 2011.
- Dhar, V. and A. Sundararajan. Don't Gamble Your Company's Reputation on Data Governance. *CIO Magazine*, May 2011.
- Bapna, R. and A. Sundararajan. Too Much Transparency? *LiveMint,* April 2011.
- Bapna, R., Gupta, A. and A. Sundararajan. Auctions, Governance and Transparency: The Devil Is in the Details. *Knowledge@Wharton*, December 2010.
- Aral, S., Sundararajan, A. and M. Xin. Developing Competitive Advantage in the Cloud. *Harvard Business Review*, December 2010.
- Bapna, R. and A. Sundararajan. Building Institutions through Identity. *LiveMint*, September 2010.
- Dhar, V. and A. Sundararajan. Plugging in to Transformation.* *The Financial Times*, February 2009.
- Bapna, R. and A. Sundararajan. Getting the 3G Policy Right. *The Economic Times,* September 2007.
- Bapna, R. and A. Sundararajan.  The Scramble for Spectrum. *Business Today*, December 2006.

**(G) COMPLETED WORKING PAPERS AND WORKS IN PROGRESS**

- Douglas, C., Provost, F. and A. Sundararajan, 2024. [Naive Algorithmic Collusion: When Do Bandit Learners Cooperate and When Do They Compete?](#)
- Cho, E., Sedoc, J., and A. Sundararajan, 2025. How Complexity Shapes Trust in a Generative AI Investment Advisor.
- Li, R., Sedoc, J. and A. Sundararajan, 2025. Exploring Human-Like Trusting Behaviors in Generative AI Systems.
- Li, R., Ruben, A. and A. Sundararajan, 2024. Visible Localized Climate Change Events Alter Sustainable Consumption Behaviors.
- Li, R. and A. Sundararajan, 2022. Of Bored Apes and CryptoPunks: How Rarity, Market Power and Cryptocurrency Exchange Rates Shape NFT Pricing
- Hoffmann-Pham, K., Ipeirotis, P., Sundararajan, A., 2019. Ridesharing and the Use of Public Transportation. ***(Best Paper Award, 2019 Winter Conference on Business Analytics)***
- Fraiberger, S. and A. Sundararajan, 2017. Peer-to-Peer Rental Markets in the Sharing Economy.
- Fraiberger, S., Herrera-Yague, C., and A. Sundararajan, 2017. Personality, Homophily and Embeddedness.

A-8

- Archak, N. and A. Sundararajan, 2012. The crowdsourcer's dilemma: design and efficiency of all-pay contests with incomplete information.

- Ghose, A., Ipeirotis, P. and A. Sundararajan, 2011. The Dimensions of Reputation in Electronic Markets.

- Oestreicher-Singer, G. and A. Sundararajan, 2011. Influence in social networks: an identification result.

- Mantena, R. and A. Sundararajan, 2010. Competing Across Boundaries: Technological Scope and Inter-Industry Convergence.

- Sundararajan, A., 2008. Network seeding with local network effects.

- Sundararajan, A., 2007. Network effects, nonlinear pricing and entry deterrence.

- Huang, K. and A. Sundararajan, 2006. Pricing models for on-demand computing.

- Campo-Rembado, M., and A. Sundararajan, 2005. Capital-skill accumulation and the origins of early-stage growth: evidence from three technology industries.

- Campo-Rembado, M. and A. Sundararajan, 2004. Competition in wireless telecommunications.

- Sundararajan, A., 2004. Resource allocation in organizations: an optimality result.

- Sundararajan, A., 2003. Pricing digital marketing: information, risk sharing and performance.

- Seidmann, A., and A. Sundararajan, 2002. Trade-offs in organizational architecture: information, incentives and process design.


**(H) PAPERS IN REFEREED CONFERENCE PROCEEDINGS** *(incomplete)*
(available on request)

**SELECTED KEYNOTES, PANELS, TESTIMONY** (Since 2014)
- Keynote: Alianza In Evento (April 2025)*
- Panel: World Economic Forum Strategic Intelligence Summit (November 2024)
- Panel: G1 Global Summit (October 2024)
- Keynote: AI Global Summit (September 2024)
- Speaker: World Economic Forum Annual Meeting of the New Champions (June 2024)
- Panel: Web Summit - Collision (June 2024)
- Panel: Mobile World Congress 4YFN (February 2024)
- Panel: World Government Summit (February 2024)
- Panel: World Economic Forum AI Governance Summit (November 2023)
- Panel: World Economic Forum Annual Meeting of the New Champions (June 2023)
- Speaker, TEDxGateway (June 2023)
- Keynote: Mobile World Congress 4YFN (February 2023)
- Keynote: UNESCO LAC Digital Talent Summit (November 2022)
- Panel: EPFL Zurich Digital Currency Risk Governance (October 2022)
- Panel: Propelify Innovation Festival (October 2022)
- Panel: NAD The Next Era of Ad Law (September 2022)
- Panel: EXPO 2020 World Majlis (February 2022)
- Panel: Competition Policy International (January 2022)
- Conference: Econometric Society North American Winter Meeting (January 2022)
- Seminar: Toulouse Economics of Platforms (June 2020)
- Seminar: Facebook Computational Social Science (March 2021)

A-9

- Plenary: Japan Global AI Forum (March 2021)
- Panel: Expo 2020 World Majlis on Trust in Technology (February 2021)
- Conference: Workshop on Information Systems and Economics (December 2020)
- Keynote: CTeInnova 2020 Forum (November 2020)
- Keynote: Princeton Old Guard (October 2020)
- Keynote: IIM Ahmedabad Alumni Association (October 2020)
- Plenary: Orange Silicon Valley (October 2020)
- Keynote: Korea Investment Festival (October 2020)
- Keynote: Nomura "Future Creation" Forum (October 2020)
- Panel: California Resilience and Recovery (October 2020)
- Panel: ICMA Marketplace Conference (October 2020)
- Panel: Sharing Cities (September 2020)
- TEDxGateway, "The World Has Changed" (June 2020)
- Seminar: Crisis and Technological Change (May 2020)
- Fireside Chat: Digital Leadership Series with Airbnb co-founder Nate Blecharczyk (February 2020)
- Michael Sheridan Lecture, UNC Chapel Hill (January 2020)
- Keynote: ENANDES 2019 (October 2019)
- Panel: G1 Global Summit (September 2019)
- Keynote: CFA Institute (July 2019)
- Keynote: AI4 Retail (June 2019)
- Panel: World Economic Forum AMNC China (June 2019)
- Plenary: Trust and Digital Platforms: The New Rules (April 2019)
- Keynote: Seoul Global Financial Conference (April 2019)
- Plenary: World Economic Forum C4IR (February 2019)
- Keynote: Credit Union Executive Society (November 2018)
- Plenary: Future Consensus Forum (November 2018)
- Panel: World Economic Forum AMNC China (September 2018)
- Keynote: KPMG Amsterdam (August 2018)
- Panel: United Nations Disarmament for Future Generations (August 2018)
- Keynote: CARE Conference (May 2018)
- United Nations STI Forum 2018 (June 2018)
- Keynote: Digital Business World Congress (May 2018)
- Panel: SXSW Austin (March 2018)
- Panel: World Bank IFC (March 2018)
- Keynote United Nations Breakfast (February 2018)
- Panel: Harvard Social Enterprise Conference (February 2018)
- Plenary: Walmart Conference on American Life (January 2018)
- Keynote: STIR Conference (January 2018)
- Seminar: Nomura Research Institute (December 2017)
- Workshop on Information Systems and Economics (December 2017)
- Keynote: Wuzhen Summit (December 2017)
- Panel: Yahoo! Finance All Markets Summit (October 2017)
- Debate: The Economist Finance Disrupted! (September 2017)
- Panel: Academy of Management Conference (August 2017)

- Plenary: Wall Street Journal CFO Network Summit (June 2017)
- Keynote: Latin American Telecommunications Congress (June 2017)
- Keynote: BCCP- Regulatory Challenges in Digital Markets, Berlin (June 2017)
- Plenary: 70th CFA Institute Annual Conference (May 2017)
- Organizer: The Digital Future of Work Summit (April 2017)
- Plenary: TTI/Vanguard Conference (April 2017)
- Plenary: Journee de Economie Luxembourg (March 2017)
- Keynote: WeB 2016, Dublin (December 2016)
- Keynote: Share!Summit Tokyo (November 2016)
- Testimony: European Parliament (November 2016)
- Fireside Chat, Airbnb Inc. (November 2016)
- Panel: The Atlantic Future of Work Summit (October 2016)
- Keynote: Inter-American Development Bank (October 2016)
- Keynote: Altroconsumo Festival (September 2016)
- Keynote Speaker, Adigital Outthink, Madrid (September 2016)
- Talks@Google, Google Inc. (September 2016)
- Seminar Lyft Inc. (September 2016)
- Keynote: MSCI Economic Summit (September 2016)
- Book signing: Politics and Prose (August 2016)
- Keynote: Digital Economy Forum, Bogota (August 2016)
- Panel: Brookings Blum Roundtable (August 2016)
- Seminar: Didi Chuxing, Beijing (June 2016)
- Keynote: Annual Conference on Internet Commerce and Innovation (June 2016)
- Panel: The Common Good (June 2016)
- Panel: New Cities Summit (June 2016)
- Plenary:Collective Intelligence Conference (June 2016)
- Plenary: Techonomy NY New York (May 2016)
- Panel: The Economist Innovation Forum (March 2016)
- Panel: SXSW Innovation Policy Day (March 2016)
- Plenary: World Government Summit Dubai (February 2016)
- Keynote: Second International Workshop on the Sharing Economy (January 2016)
- Panel: World Economic Forum Annual Meeting Davos (January 2016)
- Panel: Consumer Electronics Show (January 2016)
- Federal Reserve Bank, Washington DC (January 2016)
- Panel: Aspen Institute, Washington DC (December 2015)
- Panel: Aspen Institute: Hamilton Project (December 2015)
- Keynote: Chief Risk Officer Assembly, Zurich (November 2015)
- Plenary: MSI Board of Trustees Meeting (November 2015)
- Keynote: Marketing Outlook Forum, Philadelphia (October 2015)
- Plenary: NASSCOM Product Conclave (October 2015)
- Panel: White House Summit On Worker Voice (October 2015)
- Panel: TAP conference, New York (October 2015)
- Panel: World Economic Forum Annual Meeting of New Champions (September 2015)
- Keynote: Richemont Innovation Day (July 2015)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Panel: Kauffman Foundation New Entrepreneurial Growth Conference (June 2015)
- Panel: CIO Summit, Center for Digital Transformation (June 2015)
- Keynote: Federal Trade Commission  (June 2015)
- Panel: Techonomy Policy (June 2015)
- Panel: NYU Annual Conference on Labor (June 2015)
- Panel: Asian Leadership Conference, Seoul (May 2015)
- Panel: OuiShare Fest (May 2015)
- Panel: British American Business Conference, New York (May 2015)
- Keynote: Zinc Shower Madrid (May 2015)
- Plenary: PACH Summit  (March 2015)
- Talk: Young Presidents' Organization, New York (March 2015)
- Keynote: Workshop on Complex Networks (March 2015)
- Panel: Leadership in the Digital Age, UC Irvine (March 2015)
- Talk: Federal Reserve Bank Public Affairs Forum (March 2015)
- Conference: NBER Economics of Digitization Workshop (March 2015)
- Panel: The Economist: Buttonwood Gathering (February 2015)
- Plenary: L2 Clicks and Mortar Summit (January 2015)
- Panel: Congressional Internet Caucus (December 2014)
- Panel: NY Sharing Economy Meetup (November 2014)
- Panel: National League of Cities Annual Congress (November 2014)
- Keynote: CDO Executive Summit (November 2014)
- Conference: Digital Labor (November 2014)
- Plenary: L2 Innovation Forum (November 2014
- Panel:  Aspen Institute on Sharing Cities (October 2014)
- Panel: Techonomy Detroit (September 2014) details   watch my panel
- Panel: SOCAP14 (September 2014)
- Keynote: Seoul Metropolitan Government Summit (September 2014)
- Plenary: NYU Stern Launch (August 2014)
- Seminar: Federal Trade Commission (July 2014)
- Panel: Microsoft Faculty Summit (July 2014)
- Panel: Rencontres Économiques d'Aix-en-Provence (July 2014)
- Panel: La French Touch Conference (June 2014)
- Panel: Northside Festival, Williamsburg (June 2014)
- Plenary: SHARE Conference (May 2014)
- Panel: OECD Forum (May 2014)
- Keynote: OuiShare Fest (May 2014)
- Panel: Piper Jaffray Technology/Media Investor Conference (March 2014)
- Panel: Social Media Week (February 2014)
- Panel: US House of Representatives (January 2014)
- Organizer: The Digital Future of Higher Education (November 2013)
- Panel: Techonomy 2013 (November 2013)
- Panel: HBS Cyberposium (November 2013)
- Panel: Economic Sociology Workshop (October 2013)
- Panel: Shared Use Mobility Summit (October 2013)

- Keynote: Federal Reserve Bank of San Francisco (October 2013)

**SELECTED MEDIA COVERAGE (UPDATED 2024)**

**(A) BLOOMBERG TV**

- Chinese Government May Not Block the Sale of TikTok (Wall Street Week, April 2024)
- Legal Debate Over Content in Training AI (Wall Street Week, January 2024)
- Generative AI: The Accuracy of AI (Wall Street Week, April 2023)
- New Lyft CEO Takes the Reins (The Close, April 2023)
- Future of the gig economy (Triple Take, November 2022)
- Sharing economy earnings (What'd You Miss, February 2022)
- Uber's Q3 earnings (What'd You Miss, November 2021)
- Uber and Lyft Q2 earnings (August 2021)
- Lyft Q1 earnings (The Close, May 2021)
- Uber Benefitting From Diversification (The Close, February 2021)
- DoorDash and Airbnb IPOs (December 2020)
- The road to Proposition 22 (The Close, August 2020)
- Uber's Online Delivery Push (What'd You Miss, August 2020)
- Big Tech's Hearing Fallout (Technology, July 2020)
- Declining GDP (Daybreak, April 2020)
- Uber and autonomous vehicles (The Close, November 2019)
- Peloton's IPO (The Close, September 2019)
- Uber's path to profitability (The Close, August 2019)
- Lyft includes drivers in its IPO (The Close, March 2019)
- Against ride-sharing caps (from the beach) (Emily Chang, August 2018)
- Airbnb, automation and the future of work (Technology, March 2017)
- Uber, Didi and the future of mobility (The Close, June 2016)
- Uber settles with the Teamsters (Emily Chang, April 2016)

**(B) CNBC TV**

- OpenAI has first mover advantage but Google remains a 'formidable' competitor: NYU's Sundararajan (Squawk Box, October 2024)
- The world is going to follow China rather than the EU on many aspects of A.I. rules, says professor. (Squawk Box, August 2023)
- Tesla lacks the platform to justify its market valuation: Expert (Squawk Box, July 2023)
- Google is the leader in A.I. but it hasn't delivered a DTC product (Power Lunch, April 2023)
- Tech layoffs, building diverse teams (November 2022)
- Big Tech and Antitrust (Squawk Box, July 2021)
- Facebook-Trump Controversy (Squawk Box, June 2020)
- WeWork turnaround will be a challenge (Squawk Box, February 2020)
- Airbnb should be the most valuable platform (Squawk Box, December 2019)
- How Tim Cook stands out (Power Lunch, November 2019)
- Why California's AB5 is flawed (Closing Bell, September 2019)*
- France's tech tax (Squawk Box, July 2019)
- Income stability for freelance workers (June 2019)
- Breaking up Facebook won't solve core issues (Power Lunch, May 2019)

- Facebook has government-like power (Power Lunch, November 2018)
- Facebook and public trust (Squawk Box, November 2018)
- Combating fake news (The Rundown, November 2017)
- Uber enters Japan (Squawk Box, October 2017)
- Consumer support is Uber's most powerful weapon (Squawk Box, October 2015)

**(C) NPR MARKETPLACE RADIO**

- Uber finally makes a profit off ridesharing (August 2023)
- How the gig economy could change as the nature of work evolves (October 2022)
- Uber versus Taxis (October 2021)
- The evolution of delivery apps (September 2021)
- Congress gets tough with Big Tech (June 2021)
- Proposition 22 passes (November 2020)
- Classifying gig workers (September 2020)
- Flexibility versus benefits (August 2020)
- Uber doubles down on delivery (August 2020)
- COVID-19 and the safety net 2 (March 2020)
- COVID-19 and the safety net 1 (March 2020)
- Platform work in traditional companies (August 2019)
- Provider stock options in the platform economy (March 2019)
- What game theory says about trade wars (October 2018)
- Platforms for high-end professional work (April 2018)
- Libraries and the sharing economy (August 2017)
- Trump's possible impact on the economy (November 2016)
- The Sharing Economy (June 2016)
- Platform work and the safety net (April 2016)
- The huge potential of local delivery platforms (February 2016)
- Live from Davos (January 2016)
- Free Facebook in India (January 2016)
- How big is the gig economy? (October 2015)
- Expanding the safety net to non-employees (August 2015)

**(D) OTHER NPR RADIO**

- Tech layoffs and the future of work (NPR Morning Edition, January 2023)
- Benefits for Freelance Workers (NPR All Things Considered, January 2018)
- The Rise of the Contract Workforce (NPR All Things Considered, January 2018)
- EU ruling against Uber (NPR The Takeaway, December 2017)
- Amazon's contract workers (NPR OnPoint, December 2017)
- Uber banned in London (NPR All Things Considered, September 2017)
- The future of the sharing economy (NPR The Diane Rehm Show, June 2016)
- The Uber for everything economy (NPR OnPoint, June 2015)
- Apps that share parking spots (NPR All Tech Considered, July 2014)

- The sharing economy (NPR The Diane Rehm Show, July 2014)

**(E) OTHER BROADCAST TV**

- Arun Sundararajan discusses AI Issues (CGTN, June 2024)
- Understanding AI: Is My Job Safe? (The Core, June 2023)
- Inflation driving a return to the gig economy (Cheddar News, April 2022)
- Rideshare and fuel surcharges (NBC News, March 2022)
- America's attitudes towards tech billionaires (Cheddar News, December 2021)
- Tesla's humanoid robots (Cheddar News, August 2021)
- Full Frame: The Gig Economy Part 1  Part 2 (CGTN, March 2021)
- Uber, Lyft and Proposition 22 (Yahoo! Finance, August 2020)
- Anthony Lewandowski charges (Yahoo! Finance, August 2019)
- Skill gaps in emerging economies (CGTN, May 2019)
- Can Amazon disrupt grocery shopping? (Yahoo! Finance, March 2019)
- Google vs Apple vs Amazon (Fox Business, September 2017)
- Uber tracking consumers (CBC News, December 2016)
- The Sharing Economy (Charlie Rose, July 2016)
- The new carpool (CBS This Morning, Mach 2015)

**(F) SELECTED PODCASTS**

- Unprompted: AI Arms Race (2023)
- The NFT PhD (2022)AI Gl
- State of Independence (2021)
- Brave New World with Vasant Dhar (2020)
- The Prof G Pod with Scott Galloway (2020)
- Protocol Source Code (2020)
- Subscribed Podcast (2020)
- Masters In Business with Barry Ritzholz (2017)
- a16z podcast: An Economics Take on the Sharing Economy (2016)
- Future Squared (2016)
- Curious Minds with Gayle Allen (2016)
- Smart People Podcast (2016)
- Congressional Internet Caucus (2014)

**(G) PRINT INTERVIEWS AND FEATURES (UPDATED 2023)**

- Who owns the song you wrote with AI? An expert explains. (World Economic Forum, August 2023)
- Food-Delivery Workers in New York City Launch Labor Fight 'Just to Survive (The Wall Street Journal, August 2023)
- Elon Musk: Tesla may cut prices again in turbulent times. (BBC News, July 2023)
- Meta has launched its Twitter competitor. Here's how it might work out. (Yahoo! Finance, July 2023)

A-15

- The edge of tomorrow: How far into the future can we see? (Hindustan Times, June 2023)
- Interview Of The Week: Arun Sundararajan, AI And Future Of Work Expert (The Innovator, March 2023)
- Worried about Layoffs? (The Wall Street Journal, March 2023)
- ChatGPT vai demorar para substituir Google, diz professor da NYU (Fohla de S.Paulo, February 2023)
- How Reddit Became One of the World's Biggest NFT Marketplaces in Just Four Months (The Observer, November 2022)
- Three Reasons Why Big Brands Don't Need To Jump On The NFT Train Yet (Forbes, April 2022)
- Airbnb, BlaBlaCar and Humanitarian Aid (Quartz, March 2022)
- Pandemic Platforms Offer a New Vision of the Internet (Pitchbook, March 2022)
- Airbnb, Vrbo Share Details on Party Houses, Not Violent Crime (Bloomberg News, July 2021)
- Will Public Transit Get a Lift from Ridesharing. (Governing, May 2021)
- Yahoo! Answers is Shutting Down (Marketplace, April 2021)
- Turo CEO Says Car-Renting App Plans to Go Public in 2021 (The Wall Street Journal,  January 2021)
- DoorDash Shows Delivery Can Be Profitable—in a Pandemic (WIRED, November 2020)
- Ride sharing, delivery giants win fight against labor law (AP News, November 2020)
- Fight for a fair Play Store (The Economic Times, October 2020)
- The pros and cons of Proposition 22 (OneZero, September 2020)
- Airbnb files to go public (Bloomberg News, August 2020)
- Big Tech Congressional hearings (The Hill, July 2020)
- Online retail during COVID-19 (Barrons, June 2020)
- Predicting an automation boom from COVID (Protocol, April 2020)
- The future of office life (The Wall Street Journal, March 2020)
- Why Airbnb should delay it's IPO (Bloomberg News, March 2020)
- How Airbnb's regulatory path has been tough (Bloomberg News, February 2020)
- The future of capitalism (Nikkei Asia, January 2020)
- Why Uber should play the long game post-IPO (Bloomberg News, May 2019)
- Why hasn't the gig economy killed traditional work? (NPR Planet Money, March 2019)
- Apple's new Austin campus (The New York Times, December 2018)
- Regulating Airbnb (The Washington Post, October 2018)
- Ridesharing for kids (The Atlantic, October 2018)
- World Economic Forum in China (CNBC, September 2018)
- Sharing economy safety (CNN Business, August 2018)
- Airbnb is the new NATO (The New York Times, August 2018)
- GM's autonomous cars (The Washington Post, June 2018)
- Airbnb in NYC (Fast Company, May 2018)
- Worker classification in CA (WIRED, May 2018)
- Harnessing "New Power" (Entrepreneur, April 2018)
- The new generation of work (BBC News, February 2018)

- The Uber-Waymo Settlement (Fast Company, February 2018)
- Coverage of my congressional testimony (Inc., September 2017)
- On Uber's CEO search (Washington Post, August 2017)
- On Amazon's needs for human labor (New York Times, August 2017)
- Sharing economy advice to Cosmo's readers (Cosmopolitan, July 2017)
- Uber in Russia (Washington Post, July 2017)
- Uber's long-term strategy (MIT Technology Review, June 2017)
- CIO Forum interview (Wall Street Journal, June 2017)
- Lyft partners with Waymo (The Atlantic, May 2017)
- Regulating the sharing economy (The New Yorker, May 2017)
- Airbnb settles with SF (The New York Times, May 2017)
- Snapchat faces the public (TIME, February 2017)
- Davos comments (January 2017)
- The Whatchamacallit Economy (The New York Times, December 2016)
- Airbnb versus NYC (The Economist, November 2016)
- Tesla's path to fully autonomous cars (USA Today, October 2016)
- How Juno competed with Uber (The New Yorker, October 2016)
- Juno offers equity to drivers (The New York Times, October 2016)
- Joel Stein makes fun of my Uber rating (TIME, September 2016)
- How stifling Airbnb hurts cities (The Wall Street Journal, August 2016)
- Uber exits China (The Atlantic, August 2016)
- Uber exits China (The Guardian, July 2016)
- Rethinking the Social Safety Net for Freelancers (WSJ, 2016)
- What happens when we are all entrepreneurs? (The Washington Post, June 2016)
- Change is good. Exchange is better. (TED, June 2016)
- Secrets of the Sharing Economy (Bloomberg, June 2016)
- What is the Sharing Economy? (Quartz, June 2016)
- The On-Demand Economy isn't about to Implode (WIRED, March 2016)
- Rideshare is the future of public transit (The Washington Post, March 2016)
- Regulating Uber in NYC (The Wall Street Journal, January 2016)
- Protecting Workers in the Sharing Economy (The Atlantic, December 2015)
- The rise of Lyft in NYC (The Wall Street Journal,  November 2015)
- Salon interview about Airbnb (Salon, November 2015)
- Proposition F in SF (Bloomberg News, October 2015)
- Politicians Turn to Start-Ups for Grasp of Gig Economy (The New York Times, October 2015)
- On La'Zooz, which pioneered blockchain-based social tokens, way ahead of its time. Bloomberg Business, September 2015.
- How the sharing economy changes lives (Deutsche Well, August 2015)
- This Uber lawsuit could have big implications for the sharing economy. Fortune, August 2015.

- The On-demand Economy Takes Workers for a Ride. TIME Magazine, July 2015.
- Uber vs. Laws. Politico, July 2015.
- Uber Won New York Fight, but Remains a Flashpoint in the Inequality Debate. Bloomberg, July 2015.
- Gigs with Benefits. The New Yorker, June 2015.
- HopSkipDrive, a Ride Start-Up for the After-School Set. The New York Times, June 2015.
- Uber and the Not-Quite-Independent Contractor. Bloomberg View, June 2015.
- California's Stand on Behalf of Uber Drivers. The Atlantic, June 2015.
- Washington Scrutinizes the Sharing Economy. The New York Times, June 2015.
- Uber and Airbnb urge watchdog to back off. The Financial Times, June 2015.
- Wallets Over Ballots. TIME Magazine, May 2015.
- Meet The Congressional Sharing Economy Caucus. Forbes, May 2015.
- Communal living projects moving from hippie to mainstream. The Guardian, May 2015.
- Sharing economy benefits lower income groups. The Financial Times, April 2015.
- Amazon, Google and More Are Drawn to Home Services Market. The New York Times, April 2015.
- There Are Good Reasons Why People Love to Sue Uber. WIRED, March 2015.
- The real promise of the 'sharing economy' is what it could do for the poor. Washington Post, March 2015.
- How The Sharing Economy Could Help The Poorest Among Us. Fast Company, March 2015.
- Can Uber and Airbnb boost lower-income consumers? A new study says so. Mashable, March 2015.
- How Technology Turned Ideas Into a Part-Time Occupation. Variety, February, 2015.
- What happens when Uber and Airbnb become their own regulators? Washington Post, February 2015.
- Robot Cars Wont Rescue Uber From Its Clash With Drivers.. WIRED, February 2015.
- Baby, You Can Drive My Car, and Do My Errands, and Rent My Stuff…. TIME, February 2015.
- E' 'condividere' la parola chiave del futuro (L'Espresso, January 2015)
- Uber, A Rising Business Model That Could Change How You Work. New York Times, January 2015.
- What the Sharing Economy Takes. The Nation, January 2015.
- Now we know how many drivers Uber has. The Washington Post, January 2015.
- Trading Places, In Style. The New York Times, January 2015.
- The sharing economy must share the risks. Financial Times, December 2014.
- The Sharing-Economy PR Stunt That Turned Into a Real Business. WIRED, December 2014.
- An Uber Valuation Comes with Uber Problems. TechCrunch, December 2014.
- Airbnb has One Million Homes. Slate, December 2014.
- Airbnb and Ubers cultures couldnt be more different. Pando Daily, December 2014.
- The Business Tycoons of Airbnb. The New York Times Magazine, November 2014.
- A Visit to the Temple of Urban Progressive Leadership. Reason, October 2014.
- Taxi Sharing Could Revolutionize New York Citys Transportation System. Newsweek, September 2014.
- On the three types of behaviors and how to change them Fast Company, August 2014.
- Socialter cover story (July 2014)
- Ne prenons pas (tous) les scouts numeriques de l'economie collaborative pour de naifs altruistes. Slate, July 2014.
- Recycle, Reuse, Reprofit. TIME Magazine, July 2014.
- Is Uber Above the Law? Probably Not.. Bloomberg BusinessWeek, July 2014.
- Uber's Brilliant Strategy to Make Itself Too Big To Ban. WIRED, July 2014.
- A Victory for Airbnb in New York. The New York Times, May 2014.

- What drives America's go-to expert on the sharing economy Next City, May 2014
- La economía colaborativa es una oportunidad para los países en desarrollo El Pais, May 2014
- How Airbnb and Lyft Finally Got Americans to Trust Each Other. WIRED, May 2014.
- Some TaskRabbit handymen can make $78,000 a year. MarketWatch, April 2014.
- Change Habits, Change Your Behavior. Entrepreneur, April 2014.
- How The Word Entrepreneur Got Too Popular For Its Own Good. Fast Company, April 2014.
- Experts Bullish on Citibike. The Wall Street Journal, March 2014
- Uber Cab Confessions. GQ Magazine, March 2014
- Digital doubts after Bitcoin debacle. Reuters, February 2014
- Editors' Choice: Information and Freedom Science, January 2014
- The sharing economy: would you get in a car with a stranger? The Guardian, January 2014
- Congress takes a casual look at the peer-to-peer economy. Financial Times, January 2014
- Why Does New York Hate the Sharing Economy? Bloomberg, January 2014

**PRIOR TESTIMONY**

Dallas/Fort Worth International Airport Board v. Turo, Inc., Docket No. 352-329488-21, In the 352nd District Court of Tarrant County, Texas. Deposition (2023).

A-19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX B
### Materials Relied Upon

### Complaints and Legal Documents

Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16–1454, Supreme Court of the United States, June 25, 2018.

Opinion, *Epic Games, Inc. v. Apple, Inc.*, No. 21–16506, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, April 24, 2023.

Opinion, *Eastman Kodak Co. v. Image Technical Services, Inc., et al.*, No. 90–1029, United States Court of Appeals for the Ninth Circuit, October 1991.

Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C–11–06714–YGR, United States District Court for the Northern District of California, Oakland Division, September 11, 2020.

Rule 52 Order After Trial on the Merits, *Epic Games Inc., v. Apple Inc.*, No. 4:20–cv–05640-YGR, United States District Court for the Northern District of California, September 10, 2021.

### Expert Reports

Expert Class Certification Report of Rosa M. Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, September 26, 2022.

Expert Report and Declaration of Adrian Majumdar, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Expert Report and Declaration of Mark Watson, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Expert Report of Daniel L. McFadden, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Expert Report of Joseph E. Stiglitz, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Expert Report of Kirsten Martin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714-YGR, March 7, 2025.

Expert Report of Minjae Song, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Arun Sundararajan, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Ginger Jin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Itamar Simonson, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of J. Alexander Halderman, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of James Malackowski, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Lorin Hitt, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Rebuttal Expert Report and Declaration of Ginger Jin, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Rebuttal Expert Report and Declaration of Itamar Simonson, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Rebuttal Expert Report and Declaration of J. Alexander Halderman, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Rebuttal Expert Report and Declaration of James E. Malackowski, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Rebuttal Expert Report and Declaration of Jonah Berger, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Rebuttal Expert Report and Declaration of Lorin M. Hitt, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 13, 2025.

Report of Rosa M. Abrantes-Metz, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

## Depositions

Class Certification Deposition of Rosa Abrantes-Metz, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715–YGR, December 15, 2022.

Deposition of Alan D. MacCormack, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 23, 2025.

Deposition of C. K. Haun, Vol. I, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715YGR, January 13, 2021.

Deposition of Carson Oliver, Vol. 1, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715YGR, January 26, 2021.

Deposition of Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 14, 2025.

Deposition of Joseph Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714 YGR, May 30, 2025.

Deposition of Minjae Song, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, June 4, 2025.

Deposition of Rosa Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, December 15, 2022.

Deposition of Rosa Abrantes-Metz, *In re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, May 23, 2025.

## Trial Testimony

Trial Testimony of Craig Federighi, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021.

Trial Testimony of David Evans, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 11, 2021.

Trial Testimony of Michael Schmid, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021.

Trial Testimony of Philip Schiller, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 17, 2021 – May 18, 2021.

Trial Testimony of Tim Cook, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 21, 2021.

Trial Testimony of Trystan Kosmynka, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021 – May 7, 2021.

## Bates-Stamped Documents

Apple, "App Store Developers Profiling Research," March 2015, APL-APPSTORE_09126673–774.

Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL–APPSTORE_11235149–198.

Google, "Google Play Partner Deal Program Overview," April 2021, GOOG–APPL–00155992–999.

Apple, "iPhone Developer Program Satisfaction Survey," August 2010, APL_APPSTORE_09324447–608.

Apple, "iPhone Developer Program Satisfaction Survey," March 2010, APL_APPSTORE_09324150–288.

Chinn, Kurtis, Kristian Miller, Angie Teetzel, Lisa Strago, and Chris Schenck, "Steam Revenue Share Model," VALVE000675–676.

## Academic Articles, Books, and Publications

Abrantes-Metz, Rosa M., Michael Cragg, Albert Metz, and Minjae Song, "Understanding the Economics of Platforms," *Antitrust*, Vol. 36, No. 1, 2021, pp. 30–36.

Abrantes-Metz, Rosa M., and Albert D. Metz, "Collusion and Network Effects: Modeling the Dynamics of Single- And Multi-Sided Platforms," *SSRN*, May 2021, pp. 1–53.

Abrantes-Metz, Rosa M., and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN*, No. 3692861, September 2020.

Abrantes-Metz, Rosa M., and Albert D. Metz, "How to Approach the Calculation of Overcharge by Multisided Platforms," *Competition Policy International Antitrust Chronicle*, January 2023, pp. 1–8.

Abrantes-Metz, Rosa M., and Albert D. Metz, "Regulating Multisided Platforms? The Case Against Treating Platforms as Utilities," *Competition Policy International Antitrust Chronicle*, August 2020, pp. 1–8.

Ahlborn, Christian, David S. Evans, and Jorge Padilla, "The Antitrust Economics of Tying: A Farewell to Per Se Illegality," *Antitrust Bulletin*, Vol. 49, 2004, pp. 1–43.

Alhejaili, Adel, and James Blustein, "Users' Sophisticated Information Search Behaviour," *Design, Operation and Evaluation of Mobile Communications*, Springer Cham, July 9, 2023, edited by Gavriel Salvendy and June Wei.

Ambrus, Attila, and Rossella Argenziano, "Asymmetric Networks in Two-Sided Markets," *American Economic Journal: Microeconomics*, Vol. 1, No. 1, 2009, pp. 17–52.

Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691.

Armstrong, Mark, and John Vickers, "Price Discrimination, Competition and Regulation," *The Journal of Industrial Economics*, Vol. 41, No. 4, December 1993, pp. 335–359.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Backus, Matthew R., Joseph Uri Podwol, and Henry S. Schneider, "Search Costs and Equilibrium Price Dispersion in Auction Markets," *Economic Analysis Group*, Vol. 13, No. 2, November 2013, pp. 1–34.

Bauer, Joseph P., "Antitrust Implications of Aftermarkets," *The Antitrust Bulletin*, Vol. 52, No. 1, Spring 2007, pp. 31–51.

Beath, John, and Yannis Katsoulacos, "6 - Vertical Product Differentiation," *The Economic Theory of Product Differentiation*, Cambridge University Press, 1991, pp. 109–134.

Belleflamme, Paul, and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021.

Borenstein, Severin, Jeffrey K. Mackie-Mason, and Janet S. Netz, "Antitrust Policy in Aftermarkets," *Antitrust Law Journal*, Vol. 63, 1995, pp. 455–482.

Borenstein, Severin, Jeffrey K. Mackie-Mason, and Janet S. Netz, "Exercising Market Power in Proprietary Aftermarkets," *Journal of Economics & Management Strategy*, Vol. 9, No. 2, 2000, pp. 157–188.

Cabral, Luís, "Aftermarket Power and Foremarket Competition," *International Journal of Industrial Organization*, Vol. 35, 2014, pp. 60–69.

Caillaud, Bernard, and Bruno Jullien, "Chicken & Egg: Competition Among Intermediation Service Providers," *RAND Journal of Economics*, Vol. 34, No. 2, Summer 2003, pp. 309–328.

Carlton, Dennis W., and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, Autumn 2008, pp. 285–305.

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, England, 2015, 4th Ed.

Carlton, Dennis W., and Michael Waldman, "Competition, Monopoly, and Aftermarkets," *Journal of Law, Economics, & Organization*, Vol. 26, No. 1, April 2010, pp. 54–91.

Carlton, Dennis W., and Michael Waldman, "Tying," *Issues in Competition Law and Policy*, No. 3, 2008, pp. 1859–1879.

Chen, Jihui, "The Pricing Effects of Entry by Hainan Airlines: Evidence from the U.S.-China International Air Travel Market," *Journal of Economics and Business*, Vol. 114, No. 4, November 2020, pp. 1–29.

Chen, Yongmin, and Scott J. Savage, "The Effects of Competition on the Price for Cable Modem Internet Access," *The Review of Economics and Statistics*, Vol. 93, No. 1, February 2011, pp. 201–217.

Choi, Jay Pil, "Tying in Two-Sided Markets with Multi-Homing," *The Journal of Industrial Economics*, Vol. LVIII, No. 3, September 2010, pp. 607–626.

Choi, Jay Pil, and Doh-Shin Jeon, "A Leverage Theory of Tying in Two-Sided Markets with Nonnegative Price Constraints," *American Economic Journal: Microeconomics*, Vol. 13, No. 1, 2021, pp. 283–337.

Chu, Junhong, and Puneet Manchanda, "Quantifying Cross and Direct Network Effects in Online Consumer-to-Consumer Platforms," *Marketing Science*, Vol. 35, No. 6, 2016, pp. 870-893.

Clements, Matthew T., and Hiroshi Ohashi, "Indirect Network Effects and the Product Cycle: Video Games in the U.S., 1994–2002," *Journal of Industrial Economics*, Vol. LIII, No. 4, December 2005, pp. 515–542.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Cornière, Alexandre de, Andrea Mantovani, and Shiva Shekhar, "Third-Degree Price Discrimination in Two-Sided Markets," *Management Science*, Vol. 71, No. 4, April 2024, pp. 3340–3356.

Decarolis, Francesco, Muxin Li, and Filippo Paternollo, "Competition and Defaults in Online Search," pp. 1–32.

Dranove, David, and Neil Gandal, "The DVD vs. DIVX Standard War: Empirical Evidence of Network Effects and Preannouncement Effects," *Journal of Economics & Management Strategy*, Vol. 12, No. 3, Fall 2003, pp. 363–386.

Dubé, Jean-Pierre H., Günter J. Hitsch, and Pradeep K. Chintagunta, "Tipping and Concentration in Markets with Indirect Network Effects," *Marketing Science*, Vol. 29, No. 2, March-April 2010, pp. 216–249.

Elizalde, Javier, "Horizontal Product Differentiation," *Encyclopedia of Law and Economics*, Springer, March 23, 2021, edited by Alain Marciano and Giovanni Battista Ramello.

Etro, Federico, "Platform Competition With Free Entry of Sellers," *International Journal of Industrial Organization*, Vol. 89, 2023, pp. 1–17.

European Central Bank, "Economic and Monetary Developments," 2014, pp. 58–61.

Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24.

Evans, David S., "Vertical Restraints in a Digital World," *Competition Policy International Antitrust Chronicle*, December 2020, pp. 1–15.

Evans, David S., and Michael D. Noel, "Defining Markets That Involve Multi-Sided Platform Businesses: An Empirical Framework with an Application to Google's Purchase of Doubleclick," *SSRN*, 2007.

Evans, David S., and Richard Schmalensee, "The American Express Decision and Its Critics: Reflections After Five Years," December 6, 2023, pp. 1–11.

Evans, David S., and Richard Schmalensee, "Failure to Launch: Critical Mass in Platform Businesses," *Review of Network Economics*, Vol. 9, No. 4, 2010, pp. 1–26.

Evans, David S., and Richard Schmalensee, "Ignoring Two-Sided Business Reality Can Also Hurt Plaintiffs," *Competition Policy International Antitrust Chronicle*, Vol. 1, April 2018, pp. 47–51.

Evans, David S., and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, No. 1, 2008, pp. 667–693.

Evans, David S., and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016.

Farronato, Chiara, Jessica Fong, and Andrey Fradkin, "Dog Eat Dog: Balancing Network Effects and Differentiation in a Digital Platform Merger," *Management Science*, Vol. 70, No. 1, 2024, pp. 464–483.

Filistrucchi, Lapo, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018.

Filistrucchi, Lapo, and Tobias J. Klein, "Price Competition in Two-Sided Markets with Heterogeneous Consumers and Network Effects," *SSRN*, October 1, 2013.

Garcia-Swartz, Daniel D., and Florencia Garcia-Vicente, "Network Effects on the iPhone Platform: An Empirical Examination," *Telecommunications Policy*, Vol. 39, August 21, 2015, pp. 877–895.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Garcia-Swartz, Daniel D., Mensur Muhamedagić, and Diana Saenz, "The Role of Prices and Network Effects in the Growth of the iPhone Platform," *Technological Forecasting & Social Change*, Vol. 147, March 19, 2019, pp. 110–122.

Gibbard, Allan, and Hal R. Varian, "Economic Models," *The Journal of Philosophy*, Vol. 75, No. 11, November 1978, pp. 664–677.

Gilbert, Richard J., and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755.

Hagiu, Andrei, "Strategic Decisions for Multisided Platforms," *MIT Sloan Management Review*, Summer 2015, pp. 4–13.

Hagiu, Andrei, and Hanna Hałaburda, "Information and Two-Sided Platform Profits," *International Journal of Industrial Organization*, Vol. 34, 2014, pp. 25–35.

Hagiu, Andrei, and Bruno Jullien, "Why Do Intermediaries Divert Search?," *RAND Journal of Economics*, Vol. 42, No. 2, Summer 2011, pp. 337–362.

Hagiu, Andrei, Bruno Jullien, and Julian Wright, "Creating Platforms by Hosting Rivals," *Management Science*, Vol. 66, No. 7, 2020, pp. 3234–3248.

Hagiu, Andrei, and Julian Wright, "Multi-Sided Platforms," *International Journal of Industrial Organization*, Vol. 43, 2015, pp. 162–174.

Halaburda, Hanna, Bruno Jullien, and Yaron Yehezkel, "Dynamic Competition With Network Externalities: How History Matters," *RAND Journal of Economics*, Vol. 51, No. 1, Spring 2020, pp. 3–31.

Hausman, Daniel M., "Economic Methodology in a Nutshell," *Journal of Economic Perspectives*, Vol. 3, No. 2, Spring 1989, pp. 115–127.

Hazledine, Tim, "Price Discrimination, Merger Policy, and the Competitive Constraint of Low-Value Customers in Airline Markets," *Journal of Competition Law & Economics*, Vol. 11, No. 4, December 2015, pp. 975–998.

Hermalin, Benjamin E., and Michael L. Katz, "Information and the Hold-Up Problem," *RAND Journal of Economics*, Vol. 40, No. 3, Autumn 2009, pp. 405–423.

Hubbard, R. Glenn, and Anthony Patrick O'Brien, *Microeconomics*, Pearson, 2018, 7 Ed.

Janssen, Maarten C. W., and José Luis Moraga-González, "Strategic Pricing, Consumer Search and the Number of Firms," *Review of Economic Studies*, Vol. 71, 2004, pp. 1089–1118.

Jeon, Doh-Shin, Byung-Cheol Kim, and Domenico Menicucci, "Second-Degree Price Discrimination by a Two-Sided Monopoly Platform," *American Economic Journal: Microeconomics*, Vol. 14, No. 2, May 2022, pp. 322–369.

Jeon, Doh-Shin, and Patrick Rey, "Platform Competition and App Development," *Toulouse School of Economics Working Papers*, No. 1566, September 17, 2024, pp. 1–75.

Jones, Charles I., and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review*, Vol. 110, No. 9, September 2020, pp. 2819–2858.

Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Kate Ho, Ali Hortaçsu and Alessandro Lizzeri, pp. 485–592.

Kaiser, Ulrich, and Julian Wright, "Price Structure in Two-Sided Markets: Evidence from the Magazine Industry," *International Journal of Industrial Organization*, Vol. 24, No. 1, 2006, pp. 1-28.

Katz, Michael, and Jonathan Sallet, "Multisided Platforms and Antitrust Enforcement," *Yale Law Journal*, Vol. 127, 2018, pp. 2142–2175.

Kim, Jin-Hyuk, Jeffrey Prince, and Calvin Qiu, "Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry," *International Journal of Industrial Organization*, Vol. 37, 2014, pp. 99–108.

Klein, Benjamin, "Market Power in Aftermarkets," *Managerial and Decision Economics*, Vol. 17, No. 2, 1996, pp. 143–164.

Kobayashi, Bruce H., and Joshua D. Wright, "What's Next in *Apple Inc. v. Pepper*? The Indirect-Purchaser Rule and the Economics of Pass-Through," *Cato Supreme Court Review*, 2019, pp. 249–269.

Krugman, Paul, and Robin Wells, *Microeconomics*, Worth Publishers, New York, NY, 2009, 2nd Ed.

Lee, Robin S., "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, Vol. 103, No. 7, December 2013, pp. 2960–3000.

Liu, Hongju, "Dynamics of Pricing in the Video Game Console Market: Skimming or Penetration?," *Journal of Marketing Research*, Vol. 47, No. 3, 2010, pp. 428–443.

MacCormack, Alan D., Brian Kimball Dunn, and Chris F. Kemerer, "Teaching Note - Barnes & Noble: Managing the E-Book Revolution," *Harvard Business School*, November 8, 2013, pp. 1–11.

MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, April 3, 2014, pp. 1–15.

MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Teaching Note - Research in Motion: The Mobile OS Platform War," *Harvard Business School*, November 8, 2013, pp. 1–15.

Marshall, Guillermo, "Hassle Costs and Price Discrimination: An Empirical Welfare Analysis," *American Economic Association: Applied Economics*, Vol. 7, No. 3, July 2015, pp. 123–146.

Nair, Harikesh, Pradeep Chintagunta, and Jean-Pierre Dubé, "Empirical Analysis of Indirect Network Effects in the Market for Personal Digital Assistants," *Quantitative Marketing and Economics*, Vol. 2, No. 1, March 2004, pp. 23–58.

Niels, Gunnar, "Transaction Versus Non-Transaction Platforms: A False Dichotomy in Two-Sided Market Definition," *Journal of Competition Law & Economics*, Vol. 15, No. 2-3, 2019, pp. 327–357.

Nunes, Joseph C., Christopher K. Hsee, and Elke U. Weber, "Why Are People So Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, Vol. 23, No. 1, 2004, pp. 43–53.

Panhans, Matthew T., "Vertical Integration in a Sequential Model of a Supply Chain with Bargaining," September 2024, pp. 1–44.

Panhans, Matthew T., and Charles Taragin, "Consequences of Model Choice in Predicting Horizontal Merger Effects," *International Journal of Industrial Organization*, Vol. 89, 2023, pp. 1–22.

Pindyck, Robert S., and Daniel L. Rubinfeld, *Microeconomics*, Pearson, 2013, 8th Ed.

Posner, Richard A., "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, Vol. 19, No. 2, 2005, pp. 57–73.

Regan, Tracy L., "Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market," *International Journal of Industrial Organization*, Vol. 26, No. 4, 2008, pp. 930–948.

Reshef, Oren, "Smaller Slices of a Growing Pie: The Effects of Entry in Platform Markets," *American Economic Journal: Microeconomics*, Vol. 15, No. 4, 2023, pp. 183-207.

Rochet, Jean-Charles, and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029.

Rochet, Jean-Charles, and Jean Tirole, "Two-Sided Markets: An Overview," March 12, 2004, pp. 1–44.

Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143.

Rysman, Marc, "An Empirical Analysis of Payment Card Usage," May 31, 2006, pp. 1-38.

Salop, Steven C., "The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millenium," *Antitrust Law Journal*, Vol. 68, 2000, pp. 187–202.

Salop, Steven, and Joseph Stiglitz, "A Model of Monopolistically Competitive Price Dispersion," *Review of Economic Studies*, Vol. 44, No. 3, pp. 493–510.

Schmalensee, Richard, "Output and Welfare Implications of Monopolistic Third-Degree Price Discrimination," *The American Economic Review*, Vol. 71, No. 1, March 1981, pp. 242–247.

Shapiro, Carl, "Aftermarkets and Consumer Welfare: Making Sense of Kodak," *Antitrust Law Journal*, Vol. 63, No. 2, 1995, pp. 483–511.

Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70.

Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics*, Vol. 13, No. 2, 2021, pp. 35-67.

Sriram, S., Puneet Manchanda, Mercedes Esteban Bravo, Junhong Chu, Liye Ma, Minjae Song, Scott Shriver, and Upender Subramanian, "Platforms: A Multiplicity of Research Opportunities," *Marketing Letters*, Vol. 26, 2015, pp. 141–152.

Stiglitz, Joseph E., and Andrew Kosenko, "Robust Theory and Fragile Practice: Information in a World of Disinformation Part 2: Direct Communication," *The Elgar Companion to Information Economics*, 2024pp. 53–80.

Sundararajan, Arun, "The Economic Impacts of Crowd-Based Capitalism," *The Sharing Economy: The End of Employment and the Rise of Crowd-based Capitalism*, MIT Press, 2016.

Teh, Tat-How, "Platform Governance," *American Economic Journal: Microeconomics*, Vol. 14, No. 3, August 2022, pp. 213–254.

Tirole, Jean, "Market Failures and Public Policy," *American Economic Review*, Vol. 105, No. 6, 2015, pp. 1665–1682.

Trabucchi, Daniel, Antonella Moretto, Tommaso Buganza, and Alan MacCormack, "Disrupting the Disruptors or Enhancing Them? How Blockchain Reshapes Two-Sided Platforms," *Journal of Product Innovation Management*, Vol. 37, No. 6, 2020, pp. 552–574.

Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *Antitrust Chronicle*, Vol. 2, No. 2, July 2022, pp. 16–19.

Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?," *Antitrust*, Vol. 32, No. 2, 2018, pp. 72-79.

Van Alstyne, Marshall W., Geoffrey G. Parker, and Sangeet Paul Choudary, "Pipelines, Platforms, and the New Rules of Strategy," *Harvard Business Review*, Vol. 94, No. 4, 2016, pp. 54–62.

Varian, Hal R., "Use and Abuse of Network Effects," *Toward a Just Society*, 2018.

Ward, Michael B., Jay P. Shimshack, Jeffrey M. Perloff, and J. Michael Harris, "Effects of the Private-Label Invasion in Food Industries," *American Journal of Agricultural Economics*, Vol. 84, No. 4, November 2002, pp. 961–973.

West, Joel, and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67.

Weyl, E. Glen, "A Price Theory of Multi-Sided Platforms," *American Economic Review*, Vol. 100, No. 4, September 2010, pp. 1642–1672.

Wismer, Sebastian, and Arno Rasek, "Market Definition in Multi-Sided Markets," *Rethinking Antitrust Tools for Multi-Sided Platforms*, Organisation for Economic Co-operation and Development (OECD), 2018.

Wright, Julian, "One-Sided Logic in Two-Sided Markets," *Review of Network Economics*, Vol. 3, No. 1, March 2004, pp. 44–64.

Yoganarasimhan, Hema, "Search Personalization Using Machine Learning," *Management Science*, Vol. 66, No. 3, March 2020, pp. 1045–1070.

Yun, John M., "App Stores, Aftermarkets, & Antitrust," *Arizona State Law Journal*, Vol. 53, No. 4, 2021, pp. 1283–1327.

Zennyo, Yusuke, "A Model of Mobile App and Ad Platform Markets," *International Journal of Industrial Organization*, Vol. 97, 2024, pp. 103–117.

Zhang, Xingyue, Kitty Wang, and Hemant K. Bhargava, "If Digital Platforms Are Exploiting Producers, Is Platform Competition the Solution?," pp. 1-25.

### Publicly Available Sources

"10 Years of Cash, Cards and Crypto: Worldpay's Global Payments Report Tracks a Decade of Transformation," *Worldplay*, March 11, 2025, available at https://corporate.worldpay.com/node/7111/pdf.

"13 New Features in Windows 8 Consumer Preview," *PC Mag*, February 29, 2012, available at https://www.pcmag.com/archive/13-new-features-in-windows-8-consumer-preview-294819.

"2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf.

"2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

"About GetJar App Store and App Marketplace," *GetJar*, available at https://www.getjar.com/about.

"About the Minecraft Marketplace on Xbox and PC," *Xbox*, available at https://support.xbox.com/en-US/help/games-apps/game-titles/minecraft-marketplace-faq.

"All PS4 Games," *Sony PlayStation*, available at https://store.playstation.com/en-us/category/85448d87-aa7b-4318-9997-7d25f4d275a4/1.

"All PS5 Games - Free," *Sony Playstation*, available at https://store.playstation.com/en-us/category/d71e8e6d-0940-4e03-bd02-404fc7d31a31/1?0-0=webBasePrice.

"All the Data and Stats About Steam Games - All," *SteamSpy*, available at https://steamspy.com/year/.

"All the Data and Stats About Steam Games - Free," *SteamSpy*, available at https://steamspy.com/genre/Free.

"Amazon Developer Services Agreement," *Amazon*, July 16, 2024, available at https://www.developer.amazon.com/support/legal/da.

"American Express Personal Cards," *American Express*, available at https://www.americanexpress.com/us/credit-cards/?inav=us_menu_cards_personal_cards_view_all_credit_cards.

"Android Market: Now Available for Users," *Google Android*, October 22, 2008, available at https://android-developers.googleblog.com/2008/10/android-market-now-available-for-users.html.

"App & Browser Control in the Windows Security App," *Microsoft*, available at https://support.microsoft.com/en-us/windows/app-browser-control-in-the-windows-security-app-8f68fb65-ebb4-3cfb-4bd7-ef0f376f3dc3.

"The App Certification Process for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/app-certification-process?pivots=store-installer-msix.

"App Developer Agreement," *Microsoft*, October 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf.

"App Discovery and Ranking," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9958766.

"App Distribution Guide," *Samsung*, available at https://developer.samsung.com/galaxy-store/distribution-guide.html.

"App Privacy Details on the App Store," *Apple*, available at https://developer.apple.com/app-store/app-privacy-details/.

"App Registration," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0201030000&localeLanguage=en.

"App Registration: Requesting App Review," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0201060000&localeLanguage=en.

"App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/.

"App Review: App Review Process," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0202010000&localeLanguage=en.

"App Review: Information about App Review Policy," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0202020000&localeLanguage=en.

"App Store Developers Generated $1.1 Trillion in Total Billings and Sales in the App Store Ecosystem in 2022," *Apple Newsroom*, May 31, 2023, available at https://www.apple.com/gw/newsroom/2023/05/one-point-one-trillion-generated-in-app-store-ecosystem-in-2022/.

"App Store & Privacy," *Apple*, available at https://www.apple.com/legal/privacy/data/en/app-store/.

"The App Store Prevented More Than $9 Billion in Fraudulent Transactions Over the Last Five Years," *Apple Newsroom*, May 27, 2025, available at https://www.apple.com/newsroom/2025/05/the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"App Store Small Business Program," *Apple*, available at https://developer.apple.com/app-store/small-business-program/.

"App Store Stopped More Than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple Newsroom*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020/.

"App Store Stopped More Than $2 Billion in Fraudulent Transactions in 2022," *Apple Newsroom*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022/.

"App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple Newsroom*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021/.

"App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple Newsroom*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

"The App Store Turns 10," *Apple*, July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

"App Submission FAQ," *Amazon*, available at https://developer.amazon.com/docs/app-submission/faq-submission.html.

"AppGallery is Huawei's Alternative to Google's Play Store on Android," *XDA Developers*, September 22, 2019, available at https://www.xda-developers.com/appgallery-huawei-alternative-google-play-store-android/.

"Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.

"Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch.

"Apple Announces iPhone 2.0 Software Beta," *Apple Newsroom*, March 6, 2008, available at https://www.apple.com/newsroom/2008/03/06Apple-Announces-iPhone-2-0-Software-Beta/.

"Apple Chooses Cingular as Exclusive US Carrier for Its Revolutionary iPhone," *Apple Newsroom*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Chooses-Cingular-as-Exclusive-US-Carrier-for-Its-Revolutionary-iPhone/.

"Apple Developer Enterprise Program," *Apple*, available at https://developer.apple.com/programs/enterprise/.

"Apple Developer Enterprise Program License Agreement," *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/apple-developer-enterprise-program/Apple-Developer-Enterprise-Program-License-Agreement-20240610-English.pdf.

"Apple Developer Program License Agreement," *Apple*, February 6, 2025, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.

"Apple is the 2025 Most Valuable Brand in the World, NVIDIA Breaks into Top Ten," *Brand Finance*, January 21, 2025, available at https://brandfinance.com/press-releases/apple-is-the-2025-most-valuable-brand-in-the-world-nvidia-breaks-into-top-ten.

B-11

"Apple Launches iPad," *Apple Newsroom*, January 27, 2010, available at https://www.apple.com/newsroom/2010/01/27Apple-Launches-iPad/.

"Apple Media Services Terms and Conditions," *Apple*, September 16, 2024, available at https://www.apple.com/legal/internet-services/itunes/us/terms.html.

"Apple Pay Security and Privacy Overview," *Apple*, available at https://support.apple.com/en-us/101554.

"Apple Reinvents the Phone with iPhone," *Apple*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/.

"Apple Search Ads Advanced," *Apple*, available at https://searchads.apple.com/advanced.

"Apple Security Releases," *Apple*, June 12, 2025, available at https://support.apple.com/en-us/100100.

"Apple Unveils iPod Touch," *Apple Newsroom*, September 5, 2007, available at https://www.apple.com/newsroom/2007/09/05Apple-Unveils-iPod-touch/.

"Apple Video Partner Program " *Apple*, available at https://developer.apple.com/programs/video-partner/.

"Apple's Mac App Store Opens for Business," *Apple Newsroom*, January 6, 2011, available at https://www.apple.com/newsroom/2011/01/06Apples-Mac-App-Store-Opens-for-Business/.

"Apply for a Blackberry World Vendor Account," *BlackBerry*, available at https://web.archive.org/web/20190818205817/http://developer.blackberry.com/devzone/blackberryworld/apply_for_a_blackberry_world_membership_account.html.

"Apps and Game Development " *Amazon*, available at https://developer.amazon.com/apps-and-games.

"Appstore Payments," *Amazon*, available at https://developer.amazon.com/docs/reports-promo/payments-understand.html.

"appTransactionID," *Apple Developer*, available at https://developer.apple.com/documentation/StoreKit/AppTransaction/appTransactionID.

"Are Airline Loyalty Programs Still Worth It? Why Passengers Are Breaking Up with Rewards," *Global Brands*, available at https://www.globalbrandsmagazine.com/are-airline-loyalty-programs-worth-it/.

"Asian Game Developers Summit 2005, Day One," *GameDev.net*, October 13, 2005, available at https://www.gamedev.net/tutorials/industry/event-coverage/asian-game-developers-summit-2005-day-one-r2271/.

"Astropad Studio," *App Store Preview*, available at https://apps.apple.com/us/app/astropad-studio/id1181582576.

"At Valve, We Make Games, Steam, and Hardware.," *Valve*, available at https://www.valvesoftware.com/en/about.

"Beamdog," *Games Industry*, July 30, 2010, available at https://www.gamesindustry.biz/beamdog-new-pc-game-download-site-launched-by-bioware-founder-trent-oster.

"Benefits of Distributing Your Apps via Microsoft Store," *Microsoft*, December 14, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/why-distribute-through-store.

"Best Global Brands 2024," *Interbrand*, available at https://interbrand.com/best-global-brands/.

"Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing.

"Billing Partnerships on Disney+," *Disney+*, available at https://help.disneyplus.com/article/disneyplus-en-us-third-party-subscription.

"BlackBerry Developer Frequently Asked Questions," *BlackBerry*, available at https://web.archive.org/web/20210916181507/http://developer.blackberry.com/blackberryworld/faq/.

"BlackBerry World," *BlackBerry*, January 4, 2022, available at https://web.archive.org/web/20220104210858/http://developer.blackberry.com/blackberryworld/.

"Blackberry World Vendor Agreement," *Blackberry*, available at https://www.blackberry.com/content/dam/blackberry-com/Documents/pdf/legal/blackberry-world/BlackBerry_World_Vendor_Agreement.pdf.

"Blackberry World Vendor Agreement," *BlackBerry*, February 12, 2012, available at https://www.blackberry.com/content/dam/blackberry-com/Documents/pdf/legal/blackberry-world/BlackBerry_World_Vendor_Agreement.pdf.

"BlackBerry World Vendor Portal - User Guide," *BlackBerry*, available at https://developer.blackberry.com/devzone/files/blackberryworld/BlackBerry_World_Vendor_Portal_UG.pdf.

"Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," *Apple*, October 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_Sideloading.pdf.

"Buy Fortnite - 1,000 V-Bucks," *Fortnite*, available at https://www.xbox.com/en-US/games/store/fortnite-1000-v-bucks/c0f5ht9nv86p.

"Buy Minecoins," *Minecraft*, available at www.minecraft.net/en-us/marketplace-buy-minecoins.

"Categories and Subcategories for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/categories-and-subcategories?pivots=store-installer-msix.

"Celebrating 5 Years of BlackBerry World: Infographic," *BlackBerry*, April 1, 2014, available at https://blogs.blackberry.com/en/2014/04/blackberry-world-anniversary.

"Choose a Category and Tags for Your App or Game," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9859673#zippy=%2Capps%2Cgame%2Cgames.

"Cingular Widens Mobile E-mail Access," *NBC News*, October 24, 2005, available at https://www.nbcnews.com/id/wbna9802191.

"Compare Memberships," *Apple*, available at https://developer.apple.com/support/compare-memberships.

"Competition Enforcement and Regulatory Alternatives – Note by the United States," *Organisation for Economic Co-operation and Development (OECD)*, May 27, 2021, available at https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/competition_enforcement_and_regulatory_alternatives_us_submission.pdf.

"The Complete Reference for Big Fish Games," *Game Yum*, available at https://www.gameyum.com/pc-gaming/126006-reeling-in-the-best-games-produced-by-big-fish-games-a-guide/.

"Comptroller's Handbook: Payment Systems," *Office of the Comptroller of the Currency*, October 2021, available at https://www.occ.gov/publications-and-

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

resources/publications/comptrollers-handbook/files/payment-sys-funds-transfer-activities/pub-ch-payment-systems.pdf.

"Content Guidelines," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/requirements-guidelines/content-ratings/content-guidelines.

"Create Custom Price Tiers," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/custom-price-tiers.

"Create Promotions," *Google*, available at https://support.google.com/googleplay/android-developer/answer/6321495#zippy=%2Cstep-get-your-app-ready-to-use-promo-codes%2Cstep-review-%E2%80%A61%2F3.

"Create Sales for Paid Apps," *Google*, available at https://support.google.com/googleplay/android-developer/answer/7271135.

"Curators and Curator Connect (Steamworks Documentation)," *Steam*, available at https://partner.steamgames.com/doc/marketing/curators.

Declaration of Joseph E. Stiglitz and Jason Furman, *United States of America v. Microsoft Corporation*, Civil Action No. 98-1232 (CKK), January 28, 2002.

"Desura," *openSUSE Wiki*, available at https://en.opensuse.org/Desura.

"Developer Account Fees and Locations," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/partner-center/account-types-locations-and-fees.

"Developer Agreements," *Epic Games*, February 14, 2024, available at https://onlineservices.epicgames.com/en-US/services/terms/agreements.

"Developer Portal Introduction," *Epic Games*, available at https://dev.epicgames.com/docs/dev-portal/dev-portal-intro.

"Developer Promotions Console," *Amazon*, available at https://developer.amazon.com/docs/reports-promo/promo-overview.html.

"Developers, Meet Microsoft Store Ads," *Microsoft Windows*, February 2, 2023, available at https://blogs.windows.com/windowsdeveloper/2023/02/02/developers-meet-microsoft-store-ads/.

"Discounting (Steamworks Documentation)," *Steam*, available at https://partner.steamgames.com/doc/marketing/discounts.

"Discounting App Price," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0401020000&localeLanguage=en.

"Discounting App Price: Issuing Coupons," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0401010000&localeLanguage=en.

"Discover Galaxy Store," *Samsung*, available at https://developer.samsung.com/galaxy-store/discover-galaxy-store.html.

"Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/.

"Distribution of Free and Paid Android Apps in Amazon Appstore from September 2020 to January 2025," *Statista*, available at https://www.statista.com/statistics/256776/distribution-paid-free-amazon-appstore-apps/.

"DotEmu.com," *Games Industry*, May 6, 2010, available at https://www.gamesindustry.biz/dotemu-com-dotemu-s-online-store-launched-with-another-world-hd-and-broken-sword-2-and-3.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Download Roblox," *Roblox*, available at https://www.roblox.com/download.

"Durable Goods," *Bureau of Economic Analysis*, April 13, 2018, available at https://www.bea.gov/help/glossary/durable-goods.

"Enroll as a Developer for Microsoft Store," *Microsoft*, available at https://developer.microsoft.com/en-us/microsoft-store/register.

"Epic First Run," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/epic-first-run.

"Epic Games Privacy Policy," *Epic Games*, January 17, 2025, available at https://www.epicgames.com/site/en-US/privacypolicy.

"Epic Games Store Offers App, Software and Game Distribution," *Epic Games*, available at https://store.epicgames.com/en-US/distribution.

"Epic Games Store Updates Revenue Share: Keep 100% of the First $1M Per Product, Per Year," *Epic Games*, June 3, 2025, available at https://store.epicgames.com/en-US/news/epic-games-store-updates-revenue-share-keep-100-of-the-first-1m-per-product-per-year.

"Everything You Need to Know About Snap and Snap Store," *UMA Technology*, December 28, 2024, available at https://umatechnology.org/everything-you-need-to-know-about-snap-and-snap-store/.

"Find the Google Play Store App," *Google*, available at https://support.google.com/googleplay/answer/190860.

"Fortnite Item Shop: In-Game Cosmetics & Items," *Fortnite*, available at https://www.fortnite.com/item-shop?lang=en-US.

"Free Games," *Epic Games*, available at https://store.epicgames.com/en-US/free-games.

"Free Signage to Attract More Card Members," *American Express*, available at https://www.americanexpress.com/en-au/business/merchant/free-signage.html.

"Frequently Asked Question," *Samsung*, available at https://developer.samsung.com/galaxy-games/faq.html.

"From Android Market to Google Play: A Brief History of the Play Store," *Android Authority*, March 6, 2017, available at https://www.androidauthority.com/android-market-google-play-history-754989/.

"FSF Adds PureOS to List of Endorsed GNU/Linux Distributions," *Free Software Foundation*, December 21, 2017, available at https://www.fsf.org/news/fsf-adds-pureos-to-list-of-endorsed-gnu-linux-distributions-1.

"Galaxy Accessory Downloads SDK," *Samsung*, available at https://developer.samsung.com/galaxy-accessory/download.html.

"Galaxy AR Emoji SDK for Unity," *Samsung*, available at https://developer.samsung.com/galaxy-ar-emoji/overview.html.

"Game Jolt Home," *Game Jolt*, available at https://web.archive.org/web/20040101195736/http://gamejolt.com/.

"GameHouse Operates Two Differnet Websites. Which One Do I Play On? ," *GameHouse Support*, available at https://support.gamehouse.com/hc/en-us/articles/360019753514-GameHouse-operates-two-different-websites-Which-one-do-I-play-on.

"Get Started with Play Console," *Google*, available at https://support.google.com/googleplay/android-developer/answer/6112435?hl=en#zippy=%2Cstep-pay-registration-fee.

"Getting Featured on the App Store," *Apple*, available at https://developer.apple.com/app-store/getting-featured/.

"Goodnotes 6: AI Notes & Docs," *Mac App Store Preview*, available at https://apps.apple.com/us/app/goodnotes-6-ai-notes-docs/id1444383602.

"Google Play Developer Distribution Agreement," *Google*, February 5, 2024, available at https://play.google/developer-distribution-agreement.html.

"Google Play Media Experience Program," *Google*, available at https://play.google.com/console/about/programs/mediaprogram/.

"Google Play Services," *Google*, available at https://developers.google.com/android.

"Green Man Gaming Finally Goes Live," *MCV/DEVELOP*, May 10, 2010, available at https://mcvuk.com/business-news/consoles/green-man-gaming-finally-goes-live/.

"Handango CEO Is Dialed In," *D Magazine*, February 22, 2007, available at https://www.dmagazine.com/publications/d-ceo/2007/march/handango-ceo-is-dialed-in/.

"Handling Refund Notifications," *Apple*, available at https://developer.apple.com/documentation/storekit/handling-refund-notifications.

"How are Customers Matched with Pros?," *Handy*, available at https://help.handy.com/handysupport/s/article/How-are-customers-matched-with-pros--How-Handy-Works.

"How Do I Hire a Tasker?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/210861763-How-Do-I-Hire-a-Tasker.

"How Microsoft Identifies Malware and Potentially Unwanted Applications," *Microsoft*, February 12, 2025, available at https://learn.microsoft.com/en-us/unified-secops-platform/criteria.

"How to Disable Data Collection on PS5," *SeekingTech*, available at https://seekingtech.com/how-to-disable-data-collection-on-ps5/.

"How to Make Purchases from PlayStation Store," *Sony PlayStation*, available at https://www.playstation.com/en-us/support/store/purchase-games-apps-ps-store/.

"How To Purchase Items In Roblox From The Avatar Shop," *UMA Technology*, December 20, 2024, available at https://umatechnology.org/how-to-purchase-items-in-roblox-from-the-avatar-shop/.

"HUAWIE AppGallery Overview," *HUAWEI*, available at https://consumer.huawei.com/en/support/content/en-us00769778/.

"ID@Xbox," *Microsoft*, available at https://developer.microsoft.com/en-us/games/publish.

"If an App Asks to Track Your Activity," *Apple*, available at https://support.apple.com/en-us/102420.

"IGN Entertainment Launches Direct2Drive Digital Retail Store," *IGN*, September 7, 2004, available at https://corp.ign.com/press/press/2004/ign-entertainment-launches-direct2drive-digital-retail-store-lrgs8.

"Implementing Promotional Offers in Your App," *Apple*, available at https://developer.apple.com/documentation/storekit/implementing-promotional-offers-in-your-app.

"Improve the Visibility of Your App in the Microsoft Store," *Microsoft*, available at https://developer.microsoft.com/en-us/microsoft-store/ads.

"In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/.

"Install Snap Store on Ubuntu using the Snap Store," *Snapcraft*, available at https://snapcraft.io/install/snap-store/ubuntu.

"Introducing the News Partner Program," *Apple*, available at https://developer.apple.com/apple-news/program/.

"Introduction to Apple Platform Security," *Apple*, December 19, 2024, available at https://support.apple.com/guide/security/intro-to-apple-platform-security-seccd5016d31/web.

"Introduction to the Privacy Sandbox on Android," *Google*, available at https://developers.google.com/privacy-sandbox/overview/android.

"iPhone SDK (Software Development Kit) Announced," *Apple Community*, October 18, 2007, available at https://discussions.apple.com/thread/1183763?sortBy=rank.

"Join PlayStation Partners," *Sony Playstation*, available at https://partners.playstation.net.

"Joining The Steamworks Distribution Program," *Steam*, available at https://partner.steamgames.com/steamdirect.

"Keep Costs in Check," *Microsoft Advertising*, available at https://ads.microsoft.com.

"Korean App Market "ONE Store" Announces Its Entry Into the Global Market This Year," *PR Newswire*, April 15, 2022, available at https://www.prnewswire.com/news-releases/korean-app-market-one-store-announces-its-entry-into-the-global-market-this-year-301526505.html.

"LG Smartworld to Open Premuim App Service," *LG*, October 19, 2011, available at https://www.lgnewsroom.com/wp-content/uploads/2011/10/LG_SMARTWORLD_TO_OPEN_PREMIUM_APP_SERVICE.pdf.

"Licensing," *Unreal Engine*, available at https://www.unrealengine.com/en-US/license.

"Lightspeed Retail POS (X)," *App Store Preview*, available at https://apps.apple.com/us/app/lightspeed-retail-pos-x/id920603929.

"Make Money from Your Apps," *Amazon*, available at https://developer.amazon.com/apps-and-games/services-and-apis/monetization.

"Make Your App Easier to Promote," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/make-your-app-easier-to-promote.

"Manage App Pricing: Set a Price," *Apple*, available at https://developer.apple.com/help/app-store-connect/manage-app-pricing/set-a-price.

"Market Definition," *Organisation for Economic Co-operation and Development (OECD)*, October 11, 2012, available at www.oecd.org/daf/competition/Marketdefinition2012.pdf.

"Merchant Fraud Protection Solutions," *American Express*, available at https://www.americanexpress.com/us/merchant/fraud-solutions.html?intlink=us-mer-memberbenefits-fightfraud.

"Merchant Member Benefits," *American Express*, available at https://www.americanexpress.com/us/merchant/member-benefits.html.

"Merchant Operating Guide: All Regions," *American Express*, April 2025, available at https://icm.aexp-static.com/content/dam/gms/en_us/optblue/us-mog.pdf.

"Merchant Regulations," *American Express*, April 2025, available at https://www.americanexpress.com/content/dam/amex/us/merchant/new-merchant-regulations/Regs_EN_US.pdf.

"Merger Guidelines," *U.S. Department of Justice and the Federal Trade Commission*, December 18, 2023.

"Metaboli SA / Gamesplanet.com," *LinkedIn*, available at https://www.linkedin.com/company/metaboli.

B-17

"Metaboli/Epic Games Deal," *GamesIndustry.biz*, April 6, 2009, available at https://www.gamesindustry.biz/metaboli-epic-games-deal-unreal-series-gets-digital-distribution.

"Microsoft Developer Agreement," *Microsoft*, 2018, available at https://learn.microsoft.com/en-us/legal/mdsa.

"Microsoft Gaming Tools and Services," *Microsoft*, available at https://developer.microsoft.com/en-us/games/products/.

"Microsoft Store Policies," *Microsoft*, September 17, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/store-policies.

"Microsoft Store Policies Version 7.18," *Microsoft*, available at https://learn.microsoft.com/en-us/windows/apps/publish/store-policies.

"Microtransactions (In-Game Purchases)," *Steamworks*, available at https://partner.steamgames.com/doc/features/microtransactions.

"Mobile App Stores and the Power of Incentives," *Purism*, July 9, 2020, available at https://puri.sm/posts/mobile-app-stores-and-the-power-of-incentives/.

"Monetization and Advertising Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/monetization.html.

"Multitask With Picture in Picture on iPhone," *Apple*, available at https://support.apple.com/en-by/guide/iphone/iphcc3587b5d/18.0/ios/18.0.

"My Driver Asked to Be Paid in Cash or Charged Me a Taxi Fare Outside of the Uber App," *Uber*, available at https://help.uber.com/riders/article/my-driver-asked-to-be-paid-in-cash-or-charged-me-a-taxi-fare-outside-of-the-uber-app?nodeId=784e9d0e-c95f-40a9-a08d-3a51798d7aed.

"Native SDK for BlackBerry 10," *BlackBerry*, 2022, available at https://web.archive.org/web/20220102074332/http://developer.blackberry.com/native/downloads/.

"Native SDK for PlayBook - Linux," *BlackBerry*, September 7, 2015, available at https://web.archive.org/web/20220102083308/http://developer.blackberry.com/playbook/native/download?os=linux.

"Native SDK for PlayBook - MacOS," *BlackBerry*, September 7, 2015, available at https://web.archive.org/web/20220102081829/http://developer.blackberry.com/playbook/native/download?os=mac.

"Native SDK for PlayBook OS - Native," *BlackBerry*, September 7, 2015, available at https://web.archive.org/web/20220102203046/http://developer.blackberry.com/playbook/native/download/.

"New Revenue Share Model for Galaxy Store," *Samsung Developer*, March 13, 2025, available at https://developer.samsung.com/sdp/news/en/2025/03/13/new-revenue-share-model-for-galaxy-store.

"New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," *Steam*, November 30, 2018, available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

"Nine Years of Apple's iOS SDK Generated $60 Billion, 1.4 Million Jobs," *AppleInsider*, March 7, 2017, available at https://appleinsider.com/articles/17/03/07/nine-years-of-apples-ios-sdk-generated-60-billion-14-million-jobs.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"'No More Bad Weeks.' Lyft Expands Driver Earnings Commitment Nationwide," *Lyft*, May 14, 2024, available at https://www.lyft.com/blog/posts/lyft-expands-driver-earnings-commitment-nationwide.

"Notability: Smarter AI Notes," *Mac App Store*, available at https://apps.apple.com/us/app/notability-smarter-ai-notes/id360593530.

"Notarizing Macos Software Before Distribution," *Apple*, available at https://developer.apple.com/documentation/security/notarizing-macos-software-before-distribution.

"Notice on Termination of Services of LG Health / LG Mobile Switch / Smart World / Remote Consultation / Quick Help / Remote Unlock / Quick Translator," *LG*, May 2, 2023, available at https://www.lg.com/us/support/announcements-detail/notice-on-termination-of-services-of-lg-health-lg-mobile-switch-smart-world-remote-consultation-quick-help-remote-unlock-quick-translator-USNTC20230503200080.

"Now on Epic," available at https://dev.epicgames.com/docs/epic-games-store/store-presence/now-on-epic.

"Oberon Media Reborn as Iplay," *Business Wire*, July 17, 2012, available at https://web.archive.org/web/20130629214349/http://www.businesswire.com/news/home/20120717006053/en/Oberon-Media-Reborn-Iplay.

"On-Device Protections," *Google*, available at https://developers.google.com/android/play-protect/client-protections.

"Opera Launches the Opera Mobile Store, Available in Over 200 Countries," *Opera Press*, March 8, 2011, available at https://press.opera.com/2011/03/08/opera-launches-the-opera-mobile-store-available-in-over-200-countries/.

"Origin Shutdown: Everything You Need to Know," *EA Help*, April 17, 2025, available at https://help.ea.com/en/help/origin/origin/origin-shutdown/?cid=83608.

"Overview of Google Play Services," *Google*, available at https://developers.google.com/android/guides/overview.

"Paradox Interactive Launches Large-Scale International Digital Distribution Service," *GlobalNewswire*, November 20, 2006, available at https://www.globenewswire.com/news-release/2006/11/20/351416/109087/en/Paradox-Interactive-Launches-Large-Scale-International-Digital-Distribution-Service.html.

"Play More, Pay Less ONE Store," *ONE Store*, available at https://m.onestore.net/en-sg/etc/marketDownloadGuide.

"Play the Fortnite BR Star Wars Season: GALACTIC BATTLE," *Fortnite*, May 1, 2025, available at https://www.fortnite.com/news/strap-in-starfighter-star-wars-is-taking-over-in-fortnite-galactic-battle.

"PocketGear Acquires Handango, Creating the World's Largest Cross Platform, Open App Store," *PR Newswire*, February 23, 2010, available at https://www.prnewswire.com/news-releases/pocketgear-acquires-handango-creating-the-worlds-largest-cross-platform-open-app-store-85027772.html.

"Prepare Your App for Review," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9859455?hl=en.

"Pricing (Steamworks Documentation)," *Steam*, available at https://partner.steamgames.com/doc/store/pricing.

"Pricing and Purchasing Options," *Microsoft*, available at https://visualstudio.microsoft.com/vs/pricing/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Privacy and Security Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/privacy-security.html#user-data.

"Privacy Policy Agreement," *Steam*, available at https://store.steampowered.com/privacy_agreement/.

"Privacy, Account Security & Online Safety," *Sony Playstation*, available at https://www.playstation.com/en-us/privacy-security-safety/.

"The Problem With Buying Games on Steamand Other App Stores," *MyGaming*, May 2, 2017, available at https://mygaming.co.za/news/pc/117237-the-problem-with-buying-games-on-steam-and-other-app-stores.

"Procreate on the App Store," *Apple*, available at https://apps.apple.com/us/app/procreate/id425073498.

"Promote Your App Across Google - All from a Single Campaign," *Google*, available at https://ads.google.com/home/campaigns/app-ads/.

"Provide Information for Google Play's Data Safety Section," *Google*, available at https://support.google.com/googleplay/android-developer/answer/10787469.

"Put Apps and Add-Ons on Sale," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/put-apps-and-add-ons-on-sale.

"Q&A;: itch.io Interview with Leaf Corcoran," *Itch.io*, December 1, 2014, available at https://web.archive.org/web/20211016002206/https://www.gamedeveloper.com/business/q-a-itch-io-interview-with-leaf-corcoran.

"Registering with PlayStation Partners," *Sony Playstation*, available at https://playstationpartners.service-now.com/csm?id=kb_article2&sys_id=cf748f22db599b0082af8e146b96193c&smcid=partnerportal:help.

"Reminder: Beginning April 1, 2018 BlackBerry World Will Only Offer Free Apps," *CrackBerry*, March 31, 2018, available at https://crackberry.com/beginning-april-1-2018-blackberry-world-will-only-offer-free-apps.

"Report and Recommendations," *Antitrust Modernization Commission*, April 2007, available at https://digital.library.unt.edu/ark:/67531/metadc1228317/m2/1/high_res_d/amc_final_report.pdf, pp. 1–449.

"Retail and Travel Benefits," *American Express*, available at https://www.americanexpress.com/us/credit-cards/features-benefits/policies/.

"Rick's Ubuntu for Phones FAQ," *The Raving Rick*, October 17, 2013, available at https://theravingrick.blogspot.com/2013/10/ricks-ubuntu-for-phones-faq.html.

"Samsung Developer Terms of Use," *Samsung*, September 26, 2024, available at https://developer.samsung.com/terms?location=us.

"Samsung Galaxy Store App | Download Apps/Games from Galaxy Store," *Mini Tool*, October 12, 2022, available at https://www.minitool.com/news/samsung-galaxy-store-app.html.

"Samsung Galaxy Store Seller Portal," *Samsung*, May 15, 2025, available at https://seller.samsungapps.com/help/termsAndConditions.as.

"Samsung How to Turn On/Off Google Play Protect," *TechBone*, June 18, 2021, available at https://www.techbone.net/samsung/user-manual/google-play-protect#google_vignette.

"Schedule 2 and 3," *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20240610-English.pdf.

"SDKs and Samples," *Amazon*, available at https://developer.amazon.com/apps-and-games/sdks.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"SEC Form 10–Q Exhibit 10.1 Playstation Global Developer and Publisher Agreement," *Sony Interactive Entertainment*, April 1, 2018, available at https://www.sec.gov/Archives/edgar/data/712515/000071251518000045/ex-101playstationglobaldev.htm.

"Service Fees," *Google*, available at https://support.google.com/googleplay/android-developer/answer/112622?hl=en.

"Set and Schedule App Pricing for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/schedule-pricing-changes?pivots=store-installer-msix.

"Set Up Your App's Prices," *Google*, available at https://support.google.com/googleplay/android-developer/answer/6334373.

"Sign in to Minecraft with a Microsoft Account on Mobile," *Minecraft*, available at https://help.minecraft.net/hc/en-us/articles/31514831369869-Sign-in-to-Minecraft-with-a-Microsoft-Account-on-Mobile.

"Siri and Spotify," *Spotify*, available at https://support.spotify.com/us/article/siri-and-spotify/.

"Small Shop Resource Hub," *American Express*, available at https://www.americanexpress.com/us/merchant/shop-small.html?intlink=us-mer-memberbenefits-exploreshopsmall.

"Snow-Forecast.com on the App Store," *Apple*, available at https://apps.apple.com/us/app/snow-forecast-com/id418032026.

"Sony Facing $7.9 Billion Mass Lawsuit over Playstation Store Prices," *Reuters*, November 22, 2023, available at https://www.reuters.com/technology/sony-facing-79-bln-mass-lawsuit-over-playstation-store-prices-2023-11-21/.

"Sony's State of Play," *InvestGame*, June 5, 2022, available at https://naavik.co/digest/state-of-play-06-2022/.

"Standard Privacy Report for Steam," *Steam*, February 13, 2024, available at https://privacy.commonsense.org/privacy-report/Steam.

"Stardock Launches Impulse: The PC's Next-Generation Distribution Platform," *Stardock Forums*, June 17, 2008, available at https://web.archive.org/web/20080708091849/http:/tgnforums.stardock.com/315290.

"Stay Protected With the Windows Security App " *Microsoft*, available at https://support.microsoft.com/en-us/windows/stay-protected-with-the-windows-security-app-2ae0363d-0ada-c064-8b56-6a39afb6a963.

"Steamworks SDK (Steamworks Documentation)," *Steam*, available at https://partner.steamgames.com/doc/sdk.

"Step 3: Add Appstore Details," *Amazon*, available at https://developer.amazon.com/docs/app-submission/appstore-details.html.

"Step 4: Review and Submit," *Amazon*, available at https://developer.amazon.com/docs/app-submission/review-submit.html.

"Sunsetting Kartridge & Kartridge.com," *Kongregate*, available at https://web.archive.org/web/20231204234520/https://kong.zendesk.com/hc/en-us/articles/16394691968660-Sunsetting-Kartridge-Kartridge-com.

"Sunsetting the Bethesda.net Launcher & Migrating to Steam," *Bethesda*, April 7, 2022, available at https://bethesda.net/en/article/2RXxG1y000NWupPalzLblG/sunsetting-the-bethesda-net-launcher-and-migrating-to-steam.

"Supported Locations for Distribution to Google Play Users," *Google*, available at https://play.google.com/supported-locations/?hl=en&sjid=3484639093668717565-NC.

"Surfline: Wave & Surf Reports," *Apple*, available at https://apps.apple.com/us/app/surfline-wave-surf-reports/id393782096.

"The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *The App Association*, 2018, available at https://actonline.org/wp-content/uploads/2018_ACT-App-Store-Ten-Year-Retro-Doc.pdf.

"Taxes and Fees When Using Your Microsoft Account," *Microsoft*, available at https://support.microsoft.com/en-us/account-billing/taxes-and-fees-when-using-your-microsoft-account-769f257d-60fe-dd84-4ff9-2e4ab44e97bd.

"Terms and Conditions," *Samsung*, available at https://seller.samsungapps.com/terms/termsAndConditions.as.

"There Is a Turf War Escalating in the US Wireless Carrier Space; Who's Winning and Why? Market Force Study Reveals the Rankings," *PR Newswire*, November 21, 2023, available at https://www.prnewswire.com/news-releases/there-is-a-turf-war-escalating-in-the-us-wireless-carrier-space-whos-winning-and-why-market-force-study-reveals-the-rankings-301995088.html.

"Toast Tables," *App Store Preview*, available at https://apps.apple.com/us/app/toast-tables/id1588284147.

"Transation," *Apple Developer*, available at https://developer.apple.com/documentation/storekit/transaction.

"Tying the Sale of Two Products," *Federal Trade Commission*, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/tying-sale-two-products.

"Ubuntu 16.04 LTS (Xenial Xerus) Overview," *HowtoForge*, available at https://www.howtoforge.com/tutorial/ubuntu-16-04-lts-overview/.

"Unauthorized Modification of iOS," *Apple*, available at https://support.apple.com/guide/iphone/unauthorized-modification-of-ios-iph9385bb26a/ios.

"Understanding Google Play's Service Fee," *Google*, available at https://support.google.com/googleplay/android-developer/answer/11131145?hl=en.

"Upcoming Changes to Amazon Appstore for Android Devices and Other Programs," *Amazon Appstore*, February 20, 2025, available at https://developer.amazon.com/apps-and-games/blogs/2025/02/upcoming-changes-to-amazon-appstore-for-android-devices-and-coins-program.

"Update on 'Reader' App Distribution," *Apple*, March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts.

"Use Google Play Protect to Help Keep Your Apps Safe & Your Data Private," *Google*, available at https://support.google.com/googleplay/answer/2812853?hl=en.

"User Data Privacy Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/user-data-privacy.html.

"V-Bucks," *Fortnite*, available at https://www.fortnite.com/item-shop/v-bucks?lang=en-US.

"Value of Acceptance," *American Express*, available at https://www.americanexpress.com/content/dam/amex/us/merchant/pdf/value_of_acceptance_b2b.pdf.

"Vendor Guidelines," *BlackBerry*, September 7, 2015, available at https://web.archive.org/web/20150907004643/https://appworld.blackberry.com/isvportal/guidelines.do.

"Vendor Guidelines and App Vetting Criteria," *BlackBerry*, August 18, 2019, available at https://web.archive.org/web/20190818205820/https://developer.blackberry.com/devzone/blackberryworld/vendor_app_vetting_guidelines.html.

"Vetting Criteria," *BlackBerry*, September 7, 2014, available at https://web.archive.org/web/20150907012758/https://appworld.blackberry.com/isvportal/downloadAWVettingCriteriaDoc.do?csrfToken=XU72-JQRP-U7NQ-7Y3C-42MB-M7E9-N371-W6WR.

"Video Game Distribution Platforms: GOG.com," *1D3 Digitech*, July 25, 2024, available at https://www.1d3.com/blog/video-game-distribution-platforms-gog-com.

"Visibility on Steam (Steamworks Documentation)," *Steam*, available at https://partner.steamgames.com/doc/marketing/visibility.

"Ways to Get Robux," *Roblox*, available at https://en.help.roblox.com/hc/en-us/articles/203313200-Ways-to-Get-Robux.

"Weather & Radar on the App Store," *Apple*, available at https://apps.apple.com/us/app/windy-com-weather-radar/id1161387262.

"webOS Cloud Services to end 3-15-2015 (updated) :(" *HP Support Community*, January 13, 2015, available at https://h30434.www3.hp.com/t5/Tablets-and-Mobile-Devices-Archive-Read-Only/webOS-Cloud-Services-to-end-3-15-2015-updated/td-p/4614446.

"What is Aptoide?," *Aptoide*, available at https://en.aptoide.com/company/faq/what-is-aptoide.

"Wii Shop Channel Discontinuation," *Nintendo Support*, available at https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation.

"Windows Marketplace Opens for Business; Consumers Can Easily Discover a World of Products That Work With Windows," *Microsoft*, October 12, 2004, available at https://news.microsoft.com/source/2004/10/12/windows-marketplace-opens-for-business-consumers-can-easily-discover-a-world-of-products-that-work-with-windows/.

"Wireless Telecommunications," *Federal Communications Commission*, available at https://www.fcc.gov/wireless-telecommunications.

"Xbox Developer Programs," *Microsoft*, available at https://www.xbox.com/en-us/publish.

"Xbox Live Creators Program Is Now Live!," *Microsoft*, available at https://blogs.windows.com/windowsdeveloper/2017/08/10/xbox-live-creators-program-now-live/.

"Xbox Live Marketplace Launch Content," November 15, 2005, available at https://news.xbox.com/en-us/2005/11/15/xbox-live-marketplace-launch-content/.

"Xcode," *Apple*, available at https://developer.apple.com/support/xcode/.

Abent, Eric, "Spotify Finally Gets Siri Support in iOS 13: Here's How It Works," *Slash Gear*, October 7, 2019 available at https://www.slashgear.com/spotify-finally-gets-siri-support-in-ios-13-heres-how-it-works-07594351/.

Bajic, Mila, and Veszna Wessenauer, "Ranking Digital Rights - The 2025 Big Tech Edition," *Yandex LLC*, August 1, 2024, available at https://rankingdigitalrights.org/bte25/companies/Yandex.

Balu, Nievedita, and Stephen Nellis, "Explainer: Apple Gives 'Reader' Apps a Way Around Commissions. Who Wins?," *Reuters*, September 2, 2021, available at

https://www.reuters.com/technology/apple-gives-reader-apps-way-around-commissions-who-wins-2021-09-02/.

Berlinger, Joseph, "Inspired By Zelda: Dive Into The Vibrant Sea of Oceanhorn 2," *Zelda Dungeon*, August 14, 2021, available at https://www.zeldadungeon.net/inspired-by-zelda-dive-into-the-vibrant-sea-of-oceanhorn-2/.

Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Apple*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf.

Bursztynsky, Jessica, "Lyft Drivers Will Now Earn More Whenever a Ride Takes Longer Than Expected," *Fast Company*, October 8, 2024, available at https://www.fastcompany.com/91205303/lyft-drivers-will-now-earn-more-whenever-a-rider-takes-longer-than-expected.

Bursztynsky, Jessica, "Lyft Introduces a Minimum Pay Standard for Its Drivers," *Fast Company*, February 6, 2024, available at https://www.fastcompany.com/91021785/lyft-introduces-a-minimum-pay-standard-for-its-drivers.

Caminade, Juliette, and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Apple*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf.

Campbell, Ian Carlos, and Julia Alexander, "A Guide to Platform Fees," *The Verge*, August 24, 2021, available at https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google.

Cantisano, Timi, "Samsung's Galaxy Store Is Offering Time-Exclusive Promotions for Genshin Impact and Pokémon Go," *XDA*, August 23 2022, available at https://www.xda-developers.com/samsungs-galaxy-store-promotions-for-genshin-impact-and-pokemon-go/.

Capobianco, Antonio, Satoshi Ogawa, and Carolina Abate, "Competition Issues in Aftermarkets - Note from BIAC," *Organisation for Economic Co-operation and Development (OECD)*, 2017, available at https://one.oecd.org/document/DAF/COMP/WD(2017)51/en/pdf.

Ceci, Laura, "Distribution of Free and Paid Android Apps in the Google Play Store from June 2019 to January 2025," *Statista*, January 16, 2025, available at https://www.statista.com/statistics/266211/distribution-of-free-and-paid-android-apps/.

Ceci, Laura, "Number of Free and Paid Apps in the Microsoft Store in 2nd Quarter 2022, by Category," *Statista*, August 11, 2023, available at https://www.statista.com/statistics/251947/share-of-free-and-paid-apps-in-the-windows-store/.

Chalk, Andy, "DotEmu Is Closing Its Online Store, Games Will Will Be Gone on June 1," *PC Gamer*, March 20, 2017, available at https://www.pcgamer.com/dotemu-is-closing-its-online-store-games-will-will-be-gone-on-june-1/.

Chartier, David, "IPhone OS Gets New Name, Video Calling," *Macworld*, June 7, 2010, available at https://www.macworld.com/article/205857/iphone_os_4_wwdc.html.

Conditt, Jessica, "Microsoft Follows Epic and Cuts Xbox PC Revenue Share to 12 Percent," *Engadget*, April 29, 2021, available at https://www.engadget.com/xbox-pc-rev-share-88-12-epic-apple-130036485.html.

Cox, Kate, "Ubisoft Launches Their Own PC Gaming Client, and Is Selling Some Games For $1 to Get You To Try It," *Kotaku*, August 16, 2012, available at https://kotaku.com/ubisoft-launches-their-own-pc-gaming-client-and-is-sel-5935427.

Cunningham, Andrew, "Google Play Apps and Updates Are Now Subject to a Review Process," *Ars Technica*, March 17, 2015 available at https://arstechnica.com/gadgets/2015/03/google-play-apps-and-updates-are-now-subject-to-a-review-process/.

Doffman, Zak, "NSA Warns Smartphone Users—Disable Location Tracking," *Forbes*, January 16, 2025, available at https://www.forbes.com/sites/zakdoffman/2025/01/16/nsa-warns-iphone-and-android-users-disable-location-tracking/.

Ebersol, Alessandro, "Online Game Stores For PCLinuxOS," *The PCLinuxOS Magazine*, available at https://pclosmag.com/html/Issues/202112/page06.html.

Eun-Soo, Jin, "Homegrown App Marketplace One Store Steps Onto the Global Stage," *Korea JoonAng Daily*, August 28, 2024, available at https://koreajoongangdaily.joins.com/news/2024-08-28/business/industry/Homegrown-app-marketplace-One-Store-steps-onto-the-global-stage/2122789.

Fahey, Mike, "GameStop's Online Store Becomes One with Impulse," *Kotaku*, July 13, 2011, available at https://kotaku.com/gamestops-online-store-becomes-one-with-impulse-5820890.

Fingas, Roger, "Sony Charging $25,000 for PS Store Visibility Confirmed by Multiple Devs," *Screenrant*, July 1, 2021, available at https://screenrant.com/ps4-sony-charging-money-playstation-store-visibility-ps5/.

Foley, Mary Jo, "Microsoft to Shutter Its Ad Monetization Platform for Universal Windows Platform Apps," *ZDNet*, January 31, 2020, available at https://www.zdnet.com/article/microsoft-to-shutter-its-ad-monetization-platform-for-universal-windows-platform-apps/.

Friedman, Alan, "From the Antitrust Mailbag: Manufacturer–Imposed Requirements," *Federal Trade Commission*, October 22, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/10/antitrust-mailbag-manufacturer-imposed-requirements.

Ganapati, Priya, "Palm Pre App Catalog Makes a Slow Start," *WIRED*, June 19, 2009, available at https://www.wired.com/2009/06/palm-pre-apps/.

Ganapati, Priya, "Palm Pre App Store to Get Paid Apps in September," *WIRED*, August 18, 2009, available at https://www.wired.com/2009/08/palm-pre-paid-apps/.

Ganapati, Priya, "Samsung Joins the App Store Party," *WIRED*, August 31, 2009, available at https://www.wired.com/2009/08/samsung-app-store/.

Garza, Deborah A., Jonathan R. Yarowsky, Bobby R. Burchfield, W. Stephen Cannon, Dennis W. Carlton, Makan Delrahim, Jonathan M. Jacobson, Jr. Donald G. Kempf, Sanford M. Litvack, John H. Shenefield, Debra A. Valentine, and John L. Warden, "Antitrust Modernization Commission Report and Recommendations," April 2007.

Gibson, Geoff, "Desura, the Indie Digital Distribution Site, Is Now Open," *DIYGamer*, December 18, 2010, available at https://web.archive.org/web/20120422212943/http://www.diygamer.com/2010/12/desura-indie-digital-distribution-site-open/.

Gilbertson, Scott, "Apple Opens The IPhone To Third Party Apps," *WIRED*, October 17, 2007, available at https://www.wired.com/2007/10/apple-opens-the-iphone-to-third-party-apps/.

Giles, Amari, "Ubisoft's Uplay App is Being Rebranded as Ubisoft Connect," *Game Rant*, October 21, 2020, available at https://gamerant.com/ubisoft-connect-uplay/.

Gohring, Nancy, "PocketGear Buys Handango," *Network World*, February 23, 2010, available at https://www.networkworld.com/article/773427/wireless-pocketgear-buys-handango.html.

Hardawar, Devindra, "Blackberry OS Devices Are Pretty Much Dead After January 4th," *Engadget*, December 30, 2021, available at https://www.engadget.com/blackberry-os-devices-january-4th-service-shutdown-220421328.html.

Hays, Leanne, "How to Turn On Automatic App Updates," *iPhoneLife*, September 18, 2024, available at https://www.iphonelife.com/content/how-to-set-your-iphone-apps-to-update-automatically.

Heath, Alex, "Apple's New App Store Tax on Ads Is a Direct Shot at Meta," *The Verge*, October 25, 2022, available at https://www.theverge.com/2022/10/25/23423637/apple-app-store-tax-boosted-social-media-posts.

Hong, Zhong, "Fraud Detection with Machine Learning: Identifying Suspicious Patterns in Financial Transactions," *Medium*, April 20, 2024, available at https://medium.com/@zhonghong9998/fraud-detection-with-machine-learning-identifying-suspicious-patterns-in-financial-transactions-8558f3f1e22a.

Ikeda, Scott, "First Major Analysis of WeChat Ecosystem Network Requests Finds Privacy Gaps, Undisclosed Data Sharing," *CPO Magazine*, July 1 8, 2023, available at https://www.cpomagazine.com/data-privacy/first-major-analysis-of-wechat-ecosystem-network-requests-finds-privacy-gaps-undisclosed-data-sharing/.

Joseph, Elizabeth K., "Ubuntu Weekly Newsletter Issue 339," *Ubuntu*, October 21, 2013, available at https://lists.ubuntu.com/archives/ubuntu-news/2013-October/000417.html.

Karp, Gregory, "Who Pays When Merchants Are Victims of Credit Card Fraud?," *NerdWallet*, March 31, 2023, available at https://www.nerdwallet.com/article/credit-cards/merchants-victims-credit-card-fraud.

Kerr, Dara, "Samsung Rebrands App Store as Galaxy Apps, Adds New Perks," *CNET*, July 10, 2014, available at https://www.cnet.com/tech/services-and-software/samsung-rebrands-app-store-as-galaxy-apps-adds-new-perks/.

Koetsier, John, "App Developers Losing $3-4 Billion Annually Thanks to 14 Billion Pirated Apps," *Forbes*, July 24, 2017, available at https://www.forbes.com/sites/johnkoetsier/2017/07/24/app-developers-losing-3-4-billion-annually-thanks-to-14-billion-pirated-apps/.

Lancaster, Luke, and Kent German, "The Original iPhone's Competition: Remember These Top Phones from 2007?," *CNET*, January 08, 2022, available at https://www.cnet.com/pictures/original-apple-iphone-competition-remember-these-top-phones-2007/.

Lee, Keegan, "Oceanhorn 2 Golden Edition Releases On Apple Arcade," *RPGFan*, June 10, 2020, available at https://www.rpgfan.com/2020/06/10/oceanhorn-2-golden-edition-releases-on-apple-arcade/.

Lempel, Eric, "PlayStation Store: Celebrating a Decade of Downloads," *PlayStation.Blog*, November 8, 2016, available at https://blog.playstation.com/2016/11/08/playstation-store-celebrating-a-decade-of-downloads/.

Litchfield, Ted, "Steam Makes Its Ban on Games That Rely on Ingame Ads Even More Explicit, So No 'Watch This to Continue Playing' Stuff Will Be Making Its Way to Our PCs," *PCGamer*, February 2, 2025, available at https://www.pcgamer.com/gaming-industry/valve-bans-games-that-rely-on-in-game-ads-from-steam-so-no-watch-this-to-continue-playing-stuff-will-be-making-its-way-to-our-pcs/.

Loveridge, Sam, "PS5 Exclusives: Every Game Released and Confirmed So Far," *Games Radar*, December 5, 2024, available at https://www.gamesradar.com/ps5-exclusives/.

Low, Aloysius, "Microsoft to Shut Down Nokia Store for Feature Phones," *CNET*, November 18, 2014, available at https://www.cnet.com/tech/services-and-software/microsoft-to-shut-down-nokia-store-for-feature-phones.

Macgregor, Jody, "Indie Publisher Playism Is Closing Its DRM-Free Store This Month," *PC Gamer*, March 20, 2021, available at https://www.pcgamer.com/indie-publisher-playism-is-closing-its-store-this-month/.

Machkovech, Sam, "RIP Bethesda Launcher: Here's How Its Nearly Full Transfer to Steam Will Work," *ARS Technica*, February 22, 2022, available at https://arstechnica.com/gaming/2022/02/rip-bethesda-launcher-heres-how-its-nearly-full-transfer-to-steam-will-work/.

Makuch, Eddie, "GOG Celebrates Six Years of Advancing the 'DRM-Free Movement'," *GameSpot*, September 8, 2014, available at https://www.gamespot.com/articles/gog-celebrates-six-years-of-advancing-the-drm-free/1100-6422150/.

Malik, Om, "Updated: GetJar, an Early App Store Maker, Has Been Acquired," *GigaOm*, February 11, 2014 available at https://web.archive.org/web/20191129042855/https:/gigaom.com/2014/02/11/exclusive-getjar-an-early-app-store-maker-has-been-acquired/.

Marks, Tom, "Report: Steam's 30% Cut Is Actually the Industry Standard," *IGN*, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

Marshall, Matt, "Kongregrate, the Online Social Game Hub," *VentureBeat*, March 21, 2007, available at https://venturebeat.com/business/kongregrate-the-online-social-game-hub/.

Mies, Ginny, "First Look: BlackBerry App World Open for Business," *PCWorld*, April 1, 2009, available at https://www.pcworld.com/article/528244/rim_blackberry_app_world_first_look.html.

Murphy, David, "Windows Phone Store Pushes Past 300,000 Apps," *PCMag*, August 8, 2014, available at https://www.pcmag.com/news/windows-phone-store-pushes-past-300000-apps.

Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/.

Nelson, Major, "Xbox Live Marketplace Launch Content," *Xbox Wire*, November 15, 2005, available at https://news.xbox.com/en-us/2005/11/15/xbox-live-marketplace-launch-content/.

O'Brien, Terrence, "Humble Store Launches, Skips the Bundles and Flash Sales," *Engadget*, November 11, 2013, available at https://www.engadget.com/2013-11-11-humble-store.html.

O'Reilly, PJ, Fraser Gilbert, and Ben Kerry, "Best Xbox Exclusives," *Pure*, December 31, 2024, available at https://www.purexbox.com/guides/best-xbox-exclusives.

Otuteye, Bethel, and Khawaja Shams, "Google Online Security Blog: How We Kept the Google Play & Android App Ecosystems Safe in 2024," *Google*, January 29, 2025, available at https://security.googleblog.com/2025/01/how-we-kept-google-play-android-app-ecosystem-safe-2024.html.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Pelegrin, Williams, "Galaxy Apps is Being Renamed to Galaxy Store Ahead of S10 Unveiling," *Android Authority*, Feburary 19, 2019, available at https://www.androidauthority.com/samsung-galaxy-apps-renamed-galaxy-store-956075/.

Petersen, Scot, "Wireless Carriers Get Religion for Business Applications," *eWeek*, March 26, 2004, available at https://www.eweek.com/mobile/wireless-carriers-get-religion-for-business-applications/.

Phillips, Tom, "Xbox Live Marketplace Retitled as Xbox Games Store," *Eurogamer.net*, August 30, 2013, available at https://www.eurogamer.net/xbox-marketplace-retitled-as-xbox-games-store.

Pinter, Justin, "History of PlayStation: PS1, PS2,PS3, PS4, PS5 – Launch Prices, Specs, Games," *PlayStation Universe*, November 19, 2020, available at https://www.psu.com/news/history-of-playstation-ps1-ps2-ps3-ps4-and-ps5-launch-prices-specs-and-games/.

Pokora, Becky, "American Express Preapproval: How To Get It (And Why You Should Care)," *Forbes*, April 11, 2025, available at https://www.forbes.com/advisor/credit-cards/american-express-pre-approval/.

Porter, Jon, "Epic Spent at Least $11.6 Million on Free Games and Gained 5 Million New Users in Return / Over $11.6 Million for 38 Games," *The Verge*, March 4, 2021, available at https://www.theverge.com/2021/5/4/22418782/epic-games-store-free-games-cost-apple-trial-arkham-subnautica-mutant-year-zero.

Propper, Nathaniel, "A Feisty Google Adversary Tests How Much People Care About Privacy," *The New York Times*, July 15, 2019, available at https://www.nytimes.com/2019/07/15/technology/duckduckgo-private-search.html.

Purslow, Matt, "Microsoft Puts Pressure on Steam by Increasing Revenue Share by 18% for PC Developers," *IGN*, April 29, 2021, available at https://www.ign.com/articles/microsoft-puts-pressure-on-steam-by-increasing-revenue-share-by-18-for-pc-developers.

Rao, Leena, "PocketGear Rebrands To Appia; Shifts To White-Label App Marketplace Platform," *TechCrunch*, February 3, 2011, available at https://techcrunch.com/2011/02/03/pocketgear-rebrands-to-appia-shifts-to-white-label-app-marketplace-platform/.

Rice, Greg, "PlayStation Indies: Development Hardware Loan Program," *Sony*, July 26, 2022, available at https://sonyinteractive.com/en/news/blog/playstation-indies-development-hardware-loan-program/.

Richman, Dan, "RealNetworks to Buy Game Developer GameHouse," *Seattle Post-Intelligencer*, Januanry 26, 2004, available at https://www.seattlepi.com/business/article/realnetworks-to-buy-game-developer-gamehouse-1135467.php.

Ricknäs, Mikael, "Nokia Opens the Door to Its Ovi Mobile Apps Store," *Macworld*, May 26, 2009, available at https://www.macworld.com/article/196859/nokia-ovistore.html.

Rodriguez, Uriel, "The Legend of Zelda: Breath of the Wild Release Date and Time," *Game8*, April 14, 2025, available at https://game8.co/articles/release-dates/the-legend-of-zelda-breath-of-the-wild-release-date-and-time.

Russell, Jon, "The Epic Games Store Is Now Live," *TechCrunch*, December 6, 2018, available at https://techcrunch.com/2018/12/06/epic-games-store/.

Sato, Mia, "Sony Reportedly Plans to Put Ads in Playstation Games," *The Verge*, April 21, 2022, available at https://www.theverge.com/2022/4/21/23035875/sony-playstation-microsoft-games-in-game-ads.

Schonfeld, Erick, "Breaking: Google Announces Android and Open Handset Alliance," *TechCrunch*, November 5, 2007, available at https://techcrunch.com/2007/11/05/breaking-google-announces-android-and-open-handset-alliance/.

Schreier, Jason, "EA Launches 'Origin,' Downloadable Games Service," *WIRED*, June 3, 2011, available at https://www.wired.com/2011/06/ea-origin/.

Shen, Xinmei, "WeChat Mini Programs for Banking Pose 'Significant' Risks of Personal Data Leakeage, Says Report," *South China Morning Post*, July 23, 2021, available at https://www.scmp.com/tech/tech-trends/article/3142239/wechat-mini-programs-banking-pose-significant-risks-personal-data.

Snaith, Kim, "Oceanhorn 2 Is the Closest We're Ever Going to Get to Zelda on Playstation and Xbox," *Gamespew*, August 3, 2023, available at https://www.gamespew.com/2023/08/oceanhorn-2-impressions/.

Statt, Nick, "Blizzard Revives Battle.net and Admits It Made a Mistake With Rebranding," *The Verge*, August 14, 2017, available at https://www.theverge.com/2017/8/14/16147102/blizzard-entertainment-battle-net-pc-gaming-online-service-rebranding.

Stevens, Tim, "Nintendo 3DS eShop to Launch on June 6 With Internet Browser and Free Excite Bike," *Engadget*, June 2, 2011, available at https://www.engadget.com/2011-06-02-nintendo-3ds-eshop-to-launch-on-june-6-with-internet-browser-and.html.

Still, Jennifer, William Antonelli, and Dave Johnson, "How to Update Your iPhone Apps, and What to Do If They Won't Update," *Business Insider*, February 16, 2022, available at https://www.businessinsider.com/guides/tech/how-to-update-apps-on-iphone.

Stone, Tom, "Better Together on Nintendo Switch!," *Minecraft*, June 21, 2018, available at https://www.minecraft.net/en-us/article/better-together-nintendo-switch.

Takahashi, Dean, "Kongregate's Kartridge App Store Opens With Hundreds of Indie PC Games," *VentureBeat*, November 1, 2018, available at https://venturebeat.com/business/kongregates-kartridge-app-store-opens-with-hundreds-of-indie-pc-games/.

Temming, Maria, "Your Phone Is Like a Spy in Your Pocket," *Science News*, January 23, 2018 available at https://www.sciencenews.org/article/smartphones-data-collection-security-privacy.

Thang, Jimmy, "Download PC Classics with GOG," *IGN*, June 14, 2012, available at https://www.ign.com/articles/2008/07/10/download-pc-classics-with-gog.

Tweny, Dylan, "Amazon Launches Its Own Android App Store," *WIRED*, March 22, 2011, available at https://www.wired.com/2011/03/amazon-android-app-store-2/.

Valentine, Rebekah, "Epic Games Store Implements In-Game Purchases for Third-Parties," *Games Industry*, December 6, 2019, available at https://www.gamesindustry.biz/epic-games-store-implements-in-game-purchases-for-third-parties.

Velazco, Chris, "Goodbye Android Market, Hello Google Play," *TechCrunch*, March 6, 2012, available at https://techcrunch.com/2012/03/06/goodbye-android-market-hello-google-play/.

Vincent, Brittany, "How to download Minecraft " *Tom's Guide*, March 14, 2021, available at https://www.tomsguide.com/how-to/how-to-download-minecraft.

Vogt, MIchael, "Ubuntu Software Center," *Launchpad*, August 24, 2009, available at https://launchpad.net/software-center.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Wang, Mona, Pellaeon Lin, and Jeffrey Knockel, "Should We Chat? Privacy in the WeChat Ecosystem," *The Citizen Lab*, June 28, 2023, available at https://citizenlab.ca/2023/06/privacy-in-the-wechat-ecosystem-full-report/.

Warren, Tom, "Microsoft Claims Sony Pays for 'Blocking Rights' to Keep Games off Xbox Game Pass," *The Verge*, August 10, 2022, available at https://www.theverge.com/2022/8/10/23300133/microsoft-sony-xbox-game-pass-blocking-rights-accusation.

Warren, Tom, "Microsoft Exec Hints at Free Ad-Supported Xbox Cloud Gaming," *The Verge*, December 13, 2023, available at https://www.theverge.com/2023/12/13/23999661/microsoft-xbox-cloud-gaming-free-version-ads.

Warren, Tom, "Microsoft Planning 'Windows Store' App Store for Windows 8," *Neowin*, June 28, 2010, available at https://www.neowin.net/news/microsoft-planning-039windows-store039-app-store-for-windows-8/.

Warren, Tom, "Microsoft Rebrands Windows Phone Marketplace to Windows Phone Store," *The Verge*, August 7, 2012, available at https://www.theverge.com/2012/8/7/3225996/windows-phone-store-rebrand-for-windows-phone-marketplace.

Warren, Tom, "Windows Store Rebranded to Microsoft Store in Windows 10," *The Verge*, September 22, 2017, available at https://www.theverge.com/2017/9/22/16348986/microsoft-store-windows-10-app-store.

Weinberger, Matt, "Microsoft Is Mashing Windows and the Xbox Together to Win over Its Most Critical Market," *Business Insider*, March 16, 2016, available at https://www.businessinsider.com/microsoft-merging-windows-and-xbox-together-to-win-over-its-most-critical-market-2016-3?op=1.

Wells, Jay, "Minecraft Bedrock Edition 1.21.80," *Minecraft*, May 6, 2025, available at https://www.minecraft.net/en-us/article/minecraft-bedrock-edition-1-21-80.

Westerlund, William, "How to Download Counter Strike 2?," *Tradeit*, May 18, 2024, available at https://tradeit.gg/blog/how-to-download-counter-strike-2/.

Whitney, Lance, "Microsoft Offers All-Inclusive App Store for PCs, Tablets and Phones," *CNET*, July 16, 2015, available at https://www.cnet.com/tech/services-and-software/microsoft-opens-all-inclusive-app-store-for-pcs-tablets-and-phones/.

Woyke, Elizabeth, "Nokia's Gigantic App Store," *Forbes*, July 11, 2012, available at https://www.forbes.com/2009/05/07/nokia-ovi-store-technology-wireless-nokia.html.

Zeis, Adam, "Press Release: Rim Launches Blackberry Advertising Service," *Crackberry*, September 27, 2010, available at https://crackberry.com/rim-launches-blackberry-advertising-service.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit C.1**
**Examples of Instances in the Economic Literature that Describe the App Store as a Two-Sided Platform**

| Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|
| [1] David S. Evans | Evans, David S., "Vertical Restraints in a Digital World," *Competition Policy International Antitrust Chronicle,* December 2020, pp. 1–15. | App Store and Google Play Store | Digital platforms compete horizontally with other platforms to get both types of participants to join and use them. Apple's iPhone platform and Google's Android platform compete for users, beginning with buying a smartphone, and developers writing apps. (p. 7) |
| [2] David S. Evans and Richard L. Schmalensee | Evans, David S., and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* , Harvard Business Review Press, Boston, Massachusetts, 2016. | Apple, Google, Alibaba, Facebook, Microsoft, Visa, Airbnb, Spotify, Uber, etc. | Many of the biggest companies in the world, including Alibaba, Apple, Facebook, Google, Microsoft, News Corp., Rakuten, Tencent, and Visa, are matchmakers. So are many of the most exciting and valuable start-ups, such as Airbnb, BlaBlaCar, Didi Kuaidi, Flipkart, Lending Club, Pinterest, Spotify, and Uber. What these businesses have in common is that they all connect members of one group, like people looking for a ride, with another group, like drivers looking for passengers. […] For this reason, they are often called multisided platforms. (p. 1)

A year after its launch, the iPhone was a two-sided platform connecting users and app developers. […] Google succeeded in getting a thriving community of app developers around Android, as Apple did around the iPhone's iOS. […] Apple and Android have been more successful than others at making their multisided platforms for smartphones attractive to users and developers. Much of that has to do with the inner workings of the platforms. This chapter has looked at how multisided platforms establish the perimeters of their platform to deal with the broader ecosystem beyond. (pp. 117-119) |
| [3] Andrei Hagiu | Hagiu, Andrei, "Strategic Decisions for Multisided Platforms," *MIT Sloan Management Review* , Summer 2015, pp. 4–13. | Mobile Operating Systems (e.g., iOS and Android), E-Commerce Platforms (e.g., Alibaba.com, eBay, Taobao, and Rakuten), Ridesharing Platforms (e.g., Uber), Lodging Platforms (e.g., Airbnb), Payment Systems (e.g., American Express, Paypal, and Square), etc. | Multisided platforms such as eBay and Facebook create value by enabling interactions between two or more customer groups. (p. 4)

Prominent examples of MSPs [multisided platforms] and the participants they connect include Alibaba.com, eBay, Taobao and Rakuten (buyers and sellers); Airbnb (dwelling owners and renters); the Uber app (professional drivers and passengers); Facebook (users, advertisers, third-party game or content developers and affiliated third-party sites); Apple's iOS (application developers and users); Google's Android operating system (handset manufacturers, application developers and users); Sony's PlayStation and Microsoft's Xbox gaming consoles (game developers and users); American Express, PayPal and Square (merchants and consumers); shopping malls (retail stores and consumers); Fandango (cinemas and consumers); and Ticketmaster (event venues and consumers). (p. 4) |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit C.1**
**Examples of Instances in the Economic Literature that Describe the App Store as a Two-Sided Platform**

| | Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|---|
| [4] | Andrei Hagiu and Hanna Halaburda | Hagiu, Andrei, and Hanna Halaburda, "Information and Two-Sided Platform Profits," *International Journal of Industrial Organization*, Vol. 34, 2014, pp. 25–35. | Smartphone Platforms (e.g., iPhone, Android), Payment Systems (e.g., PayPal, Visa), Video Game Consoles (e.g., PlayStation 3, Xbox 360) | In markets with two-sided network effects, the value that an agent derives from joining a platform is determined by the number of agents on the other side (cross-group network effects). Examples include payment systems like PayPal or Visa, videogame systems like PlayStation 3 and Xbox 360, smartphone platforms like Apple's iPhone or Google's Android, etc. (p. 25) |
| [5] | Andrei Hagiu, Bruno Jullien, and Julian Wright | Hagiu, Andrei, Bruno Jullien, and Julian Wright, "Creating Platforms by Hosting Rivals," *Management Science*, Vol. 66, No. 7, 2020, pp. 3234–3248. | App Store and Other App Marketplaces (e.g., AppExchange, QuickBooks) | [I]n many cases, existing product (or service) companies have the potential to become (multi-sided) platforms too [...] Two well-known and successful examples are Apple's iPhone and Salesforce's customer relationship management (CRM) software [...] [I]n July 2008 the company [Apple] opened up the iPhone to third-parties (including those producing rival apps) and created the App Store [...] In 2005, the company [Salesforce] created a platform (Force.com) and an app marketplace (AppExchange) around its offering, which allows third-party software developers to build and sell other software to Salesforce's CRM customers. (p. 3234) <br><br> Over the past seven years, Intuit has progressively turned QuickBooks into a multi-sided platform. Specifically, the company opened up application-programming interfaces, created a developer program, and launched an app store, all of which allow third-party developers to build and sell software products to QuickBooks' customer base. Today, the platform offers QuickBooks customers around 1,400 apps. (p. 3235) |
| [6] | Doh-Shin Jeon and Patrick Rey | Jeon, Doh-Shin, and Patrick Rey, "Platform Competition and App Development," *Toulouse School of Economics Working Papers*, No. 1566, September 2024, pp. 1–75. | App Store and Google Play Store | Two platforms, P1 and P2, compete for (single-homing) consumers and (single- or multihoming) apps. On the app side, platforms set ad valorem commissions; app developers, facing heterogeneous investment costs, then decide on which platform(s) to invest, if any. On the consumer side, platforms set access prices; consumers then choose which platform to join, if any. This setting corresponds for example to the two leading mobile OS platforms (iOS and Android, with their app stores, App Store and Google Play), interpreting consumer prices as the prices of the devices (iPhone or Android phone), and treating for simplicity the Android platform as vertically integrated, like the iPhone platform. (p. 7) |
| [7] | Michael Katz and Jonathan Sallet | Katz, Michael, and Jonathan Sallet, "Multisided Platforms and Antitrust Enforcement," *Yale Law Journal*, Vol. 127, 2018, pp. 2142–2175. | App Store, Amazon, Google, Facebook, and Airbnb | Many of the world's most prominent firms today operate as 'platforms' that facilitate interactions among different groups of users. For example, Amazon brings together merchants and consumers; Google joins advertisers and consumers engaged in online search; Facebook connects advertisers with consumers engaged in social networking; the Apple 'App Store' links app sellers with iPhone and iPad users; and Airbnb introduces landlords to short-term renters. (p. 2143) |
| [8] | Amandeep Singh, Kartik Hosanagar, and Aviv Nevo | Singh, Amandeep, Kartik Hosanagar, and Aviv Nevo, "Network Externalities and App Store Fees in Mobile Platforms," *SSRN*, No. 3911638, August 2021, pp. 1–70. | App Store and Google Play Store | The two-sided nature of mobile, or smartphone, platforms creates interdependent relationships between consumers and app developers, as the value of the platform to one user group depends on the size and engagement of the other. (p. 1) |

**Appendix Exhibit C.1**
**Examples of Instances in the Economic Literature that Describe the App Store as a Two-Sided Platform**

| Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|
| [9] Tat-How Teh | Teh, Tat-How, "Platform Governance," *American Economic Journal: Microeconomics* , Vol. 14, No. 3, August 2022,  pp. 213–254. | App Store, Google Play Store, Amazon, eBay, Airbnb, Steam, and Video Game Console (e.g. PS4) | A growing number of proprietary platforms operate as marketplaces through which buyers and third-party sellers trade. Well-known examples include third-party marketplaces Amazon and eBay; accommodation sharing site Airbnb; software distribution platforms such as Google's Playstore, Steam, and Apple's App Store; video game console such as Sony's PS4; as well as brick and-mortar shopping malls. (p. 213) |
| [10] Marshall W. Van Alstyne, Geoffrey G. Parker, and Sangeet Paul Choudary | Van Alstyne, Marshall W., Geoffrey G. Parker, and Sangeet Paul Choudary, "Pipelines, Platforms, and the New Rules of Strategy," *Harvard Business Review* , Vol. 94, No. 4, 2016, pp. 54–62. | App Store | Apple conceived the iPhone and its operating system as more than a product or a conduit for services. It imagined them as a way to connect participants in two-sided markets—app developers on one side and app users on the other—generating value for both groups. As the number of participants on each side grew, that value increased—a phenomenon called 'network effects,' which is central to platform strategy. By January 2015 the company's App Store offered 1.4 million apps and had cumulatively generated $25 billion for developers. (p. 54) |
| [11] Yusuke Zennyo | Zennyo, Yusuke, "A Model of Mobile App and Ad Platform Markets," *International Journal of Industrial Organization,*  Vol. 97, 2024, pp. 103–117. | App Store and Google Play Store | Mobile apps are listed on app platforms specific to each operating system, such as Apple's App Store for iOS and Google's Play Store for Android OS. The app platform facilitates transactions between users and app developers and collects commissions from sales made on the platform. (p. 103) |

**Appendix Exhibit C.2**
**Examples of Instances in the Economic Literature that Describe Other Two-Sided Platforms**

| Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|
| [1] **Rosa M. Abrantes-Metz** and Albert D. Metz | Abrantes-Metz, Rosa M., and Albert D. Metz, "How to Approach the Calculation of Overcharge by Multisided Platforms," *Competition Policy International Antitrust Chronicle* , January 2023, pp. 1–8. | Virtual Store | Two-sided platforms come in a variety of forms, but broadly speaking we can consider two types. The first is a transaction platform. As the name suggests, this platform brings together buyers and sellers. Such a platform can be thought of as a (virtual) store. (p. 3) |
| [2] **Rosa M. Abrantes-Metz** and Albert D. Metz | Abrantes-Metz, Rosa M., and Albert D. Metz, "Regulating Multisided Platforms? The Case Against Treating Platforms As Utilities," *Competition Policy International Antitrust Chronicle* , August 2020, pp. 1–7. | Facebook | Social networking sites such as Facebook which are in fact funded by advertisers, are also considered examples of two-sided platforms. (p. 3) |
| [3] **Rosa M. Abrantes-Metz** and Albert D. Metz | Abrantes-Metz, Rosa M., and Albert D. Metz, "The Dynamics of Single- and Multi-Sided Platform Monopolies," *SSRN* , No. 3692861, September 2020. | Ride-Sharing Platforms (e.g., Uber) | Network businesses provide value by facilitating interactions among their subscribers. These businesses may be "one-sided," meaning their subscribers value interacting with other subscribers of the same type (perhaps a professional networking site), or they may be "multisided," meaning they have subscribers who value interacting with those of other types (perhaps a ride-sharing platform which brings drivers and passengers together). (p. 2)<br><br>A platform or network (terms used interchangeably in this paper) could be either "one-sided," such as a purely social networking site which is funded by subscribers, or "multi-sided," such as Uber which brings together a network of passengers with a network of drivers. [...] The same principle is true in two-sided networks such as Uber. Uber is valuable to drivers only to the extent that it supports a large network of passengers and vice versa from the passengers' perspective. (p. 4) |
| [4] David S. Evans and Richard Schmalensee | Evans, David S., and Richard Schmalensee, "Ignoring Two-Sided Business Reality Can Also Hurt Plaintiffs," *Competition Policy International Antitrust Chronicle* , April 2018, pp. 47–51. | Ride-Sharing Platforms | Stripped to the essence, platforms enable two distinct types of participants to interact more readily and realize gains from trade or other interaction. The participants on one side generate externalities for the participants on the other. […] As a result the demand for joining and using the platform by one group of participants depends on the demand for joining and using the platform by the other group of participants. In the case of ride-sharing apps, for example, drivers value a platform that has more riders in their area who have the app and use it, and passengers value a platform that has more drivers who are on the platform and available to pick them up. (p. 48) |
| [5] Andrei Hagiu and Julian Wright | Hagiu, Andrei, and Julian Wright, "Multi-Sided Platforms," *International Journal of Industrial Organization* , Vol. 43, 2015, pp. 162–174. | Uber, Airbnb, eBay, Xbox | There is growing interest in the economics of multi-sided platforms (MSPs), which get two or more sides on board and enable interactions between them (e.g., Airbnb, eBay, Uber, and XBox). (p. 162) |

C – 4

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 265 of 300

**Appendix Exhibit C.2**
**Examples of Instances in the Economic Literature that Describe Other Two-Sided Platforms**

| | Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|---|
| [6] | **Alan D. MacCormack**, Brian Kimball Dunn, and Chris F. Kemerer | MacCormack, Alan D., Brian Kimball Dunn, and Chris F. Kemerer, "Teaching Note - Barnes & Noble: Managing the E-Book Revolution," *Harvard Business School* , 2013. (Revised April 2014). | Apple's iBooks | Cross-side network effects are also evident. The more consumers there are who adopt an e-book reading platform, the more important that platform becomes for book publishers. Similarly, the more content there is available on a platform, the more attractive the platform becomes for consumers. This effect may seem more important for a new entrant into the market — consider how (un-)attractive Apple's iBooks platform would have been to consumers had Apple's agency model idea not encouraged publishers to get on board. (p. 6) |
| [7] | Alan D. MacCormack, Brian Kimball Dunn, and Chris F. Kemerer | MacCormack, Alan D., Brian Kimball Dunn, and Chris F. Kemerer, "Teaching Note - Research In Motion: The Mobile OS Platform War," *Harvard Business School* , 2013. | Mobile Operating Systems | [Killer apps are] applications that add substantial value to the smart phone platform. The discussion also lends itself to a two-sided market diagram: Application Developers <---> OS Platform <---> Customers. (p. 4)<br><br>Platforms [smart phone operating systems] have influence on both Application Developers and Customers in that, without the platform, the two groups would have no way of interacting with (and benefitting from) one another. (p. 12) |
| [8] | **Minjae Song** | Song, Minjae, "Estimating Platform Market Power in Two-Sided Markets with an Application to Magazine Advertising," *American Economic Journal: Microeconomics* , Vol. 13, No. 2, 2021, pp. 35–67. | Google, Facebook | Common pricing behavior observed in two-sided markets is that platforms make a profit from agents on one side of a market and subsidize agents on the other side of the market. Internet platforms such as Google and Facebook do not charge users for "consuming" content on their websites, while they do charge advertisers for showing their ads to users. (p. 35) |
| [9] | Srinivasaraghavan Sriram, Puneet Manchanda, Mercedes Esteban Bravo, Junhong Chu, Liye Ma, **Minjae Song**, Scott Shriver, and Upender Subramanian | Sriram, Srinivasaraghavan, Puneet Manchanda, Mercedes Esteban Bravo, Junhong Chu, Liye Ma, Minjae Song, Scott Shriver, and Upender Subramanian, "Platforms: A Multiplicity of Research Opportunities," *Marketing Letters* , Vol. 26, 2015, pp. 141–152. | E-Commerce Platforms (e.g., eBay), Dating Platforms (e.g., eHarmony), Video Game Consoles, Operating Systems, etc. | Given the ubiquity of platforms, it is useful to classify them into four broad types (as suggested in Evans and Schmalensee 2008). The first category of platforms is *exchanges* (e.g., eBay or eHarmony), which facilitate transactions between buyers and sellers by enabling them to search for feasible contracts. […] The fourth category is *hardware/software platforms* such as video game consoles and computer operating systems. A video game console platform brings together software developers that are more likely to offer a wide variety of games if the platform has a large installed base. At the same time, users are likely to prefer a platform that offers a wide(r) variety of games. (p. 143) |
| [10] | **Joseph E. Stiglitz** and Andrew Kosenko | Stiglitz, Joseph E., and Andrew Kosenko, "Robust Theory and Fragile Practice: Information in a World of Disinformation Part 2: Direct Communication," *The Elgar Companion to Information Economics* , 2024, pp. 53-80. | Dating Platforms, Ride-Sharing Platforms, Facebook | While the applications of this literature have, so far, been relatively limited, one potential area where information design may be relevant in the future relates to the platforms over which so many transactions occur and which can observe so much behaviour. [...] For instance, Kanoria and Saban (2017) study an example where platforms (such as dating or ride-sharing apps) can improve welfare by restricting what information agents have access to. (p. 60)<br><br>The value of being on a platform like Facebook depends on the presence of others being on the platform. (p. 72) |

**Appendix Exhibit C.2**
**Examples of Instances in the Economic Literature that Describe Other Two-Sided Platforms**

| Economists | Reference | Platform Examples | Quotes |
|---|---|---|---|
| [11] Jean Tirole | Tirole, Jean, "Market Failures and Public Policy," *American Economic Review*, Vol. 105, No. 6, 2015, pp. 1665–1682. | Mobile Operating Systems, Media Platforms, Payment Systems, Video Game Platforms | Two-sided 'platforms' bring together multiple user-communities that want to interact with each other: gamers and game developers for video games; users of operating systems and app developers for operating systems; 'eyeballs' and advertisers for search and media platforms; cardholders and merchants for payment card transactions[.] (p. 1674) |
| [12] Daniel Trabucchi, Antonella Moretto, Tommaso Buganza, and **Alan MacCormack** | Trabucchi, Daniel, Antonella Moretto, Tommaso Buganza, and Alan MacCormack, "Disrupting the Disruptors or Enhancing Them? How Blockchain Reshapes Two-Sided Platforms," *Journal of Product Innovation Management*, Vol. 37, No. 6, 2020, pp. 552–574. | Uber, Airbnb | [T]he relative weight of platform-based businesses in the modern economy has been growing continuously and becoming increasingly relevant to academic study (e.g., Evans and Schmalensee, 2016; Parker et al., 2016). Companies like Uber and Airbnb, with their stratospheric market values making them two of the most valuable "Unicorns" (companies with a value exceeding 1-billion-dollar that are not yet public), are often used as key examples of this paradigm. [...] Nevertheless, all the aforementioned platforms share a common characteristic: they match two (or more) groups of customers as their main value proposition; that is, they are two-sided platforms (Evans and Schmalensee, 2016). (p. 553) |

**Appendix Exhibit D**

**Comparison of Headline Commission Rates Levied by App Marketplaces at the Time the App Store Launched**

| Marketplace | Launch Year | Commission Rate at Launch[1] |
| --- | --- | --- |
| Handango | 1999 | 30-40% |
| Steam | 2003 | 30-40% |
| Mobile Carriers | Early-2000s | >>30% |
| GetJar | 2004 | 0% |
| Xbox | 2005 | 30% |
| Playstation | 2006 | 30% |
| GOG.com | 2008 | 30% |
| App Store | 2008 | 30% |
| Google Play[2] | 2008 | 30% |
| Blackberry World | 2009 | 30% |
| Nokia Ovi Store | 2009 | 30% |
| Galaxy Store | 2009 | 30% |

**Notes:**

[1] Commission rates are at launch, or as of earliest reporting.

[2] Google Play Store launched in October 2008 as Android Market but did not support paid apps until February 2009.

[3] Not all of these examples offered the same services, tools, and technology for developers as Apple. *See* **Appendix Exhibits F.1-F.4.**

**Sources:**

[1] Sundararajan Opening Report, ¶¶ 130-131.

[2] Marks, Tom, "Report: Steam's 30% Cut Is Actually the Industry Standard," *IGN*, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

[3] "Cingular Widens Mobile E-mail Access," *NBC News*, October 24, 2005, available at https://www.nbcnews.com/id/wbna9802191.

[4] Petersen, Scot, "Wireless Carriers Get Religion for Business Applications," *eWeek*, March 26, 2004, available at https://www.eweek.com/mobile/wireless-carriers-get-religion-for-business-applications/.

[5] MacCormack, Alan, Brian Dunn, and Chris F. Kemerer, "Research in Motion: The Mobile OS Platform War," *Harvard Business School*, November 8, 2013, pp. 1–15, p. 9 ("Another fundamental smart-phone business change was Apple's 'App Store.' […] Apple retained a 30% commission on all apps sold, giving application developers a 70% cut, considerably more generous than the payments developers had received from wireless carriers.").

[6] Loh, Er Lern, "Asian Game Developers Summit 2005, Day One," *GameDev*, October 13, 2005, available at https://www.gamedev.net/tutorials/industry/event-coverage/asian-game-developers-summit-2005-day-one-r2271/.

[7] Vincent-Galva, Diana, "GetJar's 'Open Billing' and 'No Fee' Philosophy Proves Profitable," *Business Wire*, March 1, 2011, available at https://web.archive.org/web/20130801025727/https://www.businesswire.com/news/home/20110301005248/en/GetJar%E2%80%99s-%E2%80%9COpen-Billing%E2%80%9D-

[8] Campbell, Ian Carlos and Julia Alexander, "A Guide to Platform Fees," *The Verge*, August 24, 2021, available at https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google.

[9] Video Game Distribution Platforms: GOG.com," *GOG.com*, July 25, 2024, available at https://www.1d3.com/blog/video-game-distribution-platforms-gog-com.

[10] "Apple Announces iPhone 2.0 Software Beta," *Apple Newsroom*, March 6, 2008, available at https://www.apple.com/newsroom/2008/03/06Apple-Announces-iPhone-2-0-Software-Beta/.

[11] "Android Market: Now Available for Users," *Android Developers*, October 22, 2008, https://android-developers.googleblog.com/2008/10/android-market-now-available-for-users.html.

[12] "Blackberry World Vendor Agreement," *Blackberry*, https://www.blackberry.com/content/dam/blackberry-com/Documents/pdf/legal/blackberry-world/BlackBerry_World_Vendor_Agreement.pdf.

[13] "Terms and Conditions," *Samsung*, 2009, available at https://web.archive.org/web/20090815155035/https:/seller.samsungapps.com/help/termsAndConditions.as.

[14] **Appendix Exhibit E.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

| Marketplace[1] | Year Introduced | Year Discontinued |
|---|---|---|
| **Consoles** | | |
| Xbox Live Marketplace[2] | 2005 | |
| PlayStation Store | 2006 | |
| Nintendo Wii Shop Channel | 2006 | 2019 |
| Nintendo eShop | 2011 | |
| | | |
| **Mobile** | | |
| Handango InHand[3] | 1999 | 2011 |
| GetJar | 2004 | |
| Nokia Ovi Store[4] | 2006 | 2015 |
| Apple App Store | 2008 | |
| Google Play[5] | 2008 | |
| BlackBerry World[6] | 2009 | 2019 |
| HP App Catalog | 2009 | 2015 |
| Galaxy Store[7] | 2009 | |
| Windows Phone Marketplace[8] | 2010 | |
| Aptoide | 2011 | |
| Opera Mobile Store | 2011 | |
| Amazon Appstore | 2011 | 2025 |
| LG SmartWorld[9] | 2011 | 2023 |
| Huawei AppGallery[10] | 2011 | |
| OpenStore for Ubuntu Touch | 2013 or earlier | |
| ONE Store[11] | 2016 | |
| PureOS Software Center | 2017 or earlier | |
| | | |
| **PC** | | |
| Battle.net (Blizzard) | 1996 | |
| RealArcade[12] | 2001 | |
| Big Fish Games | 2002 | |
| Steam | 2003 | |
| iPlay[13] | 2003 | |
| Game Jolt | 2004 | |
| Direct2Drive | 2004 | |
| Windows Marketplace[14] | 2004 | |
| GamersGate | 2006 | |
| Metaboli/Gamesplanet[15] | 2006 | |
| Kongregate | 2007 | |
| Impulse/GameStop PC Downloads[16] | 2008 | 2014 |
| GOG.com | 2008 | |
| Ubuntu Software Center[17] | 2009 | |
| Green Man Gaming | 2010 | |
| Beamdog | 2010 | |
| Desura | 2010 | 2015 |
| DotEmu | 2010 | 2017 |
| Mac App Store | 2011 | |
| Playism | 2011 | 2021 |
| Origin[18] | 2011 | |
| Ubisoft Connect[19] | 2012 | |
| Humble Bundle[20] | 2013 | |
| itch.io | 2013 | |
| Snap Store | 2014 | |
| Bethesda.net | 2016 | 2022 |
| Kartridge | 2018 | 2023 |
| Epic Games Store | 2018 | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Notes:**

[1]   This list represents a sample of marketplaces and is not intended to be an exhaustive list.

[2]   Xbox Live Marketplace was rebranded as Xbox Store in 2013 and merged with Microsoft Store in 2017.

[3]   Handango InHand, the on-device app store, launched in 2003. Handango was acquired by PocketGear in 2010, and PocketGear rebranded as Appia in 2011. Appia shifted its business model to a white-label content and commerce platform.

[4]   Nokia Catalogs, later renamed Nokia Download!, launched in 2006. In 2009 it was replaced by Ovi Store, which later became Nokia Store and was replaced by Opera Mobile in 2015.

[5]   Google Play was formerly known as Android Market.

[6]   Prior to its shutdown in 2019, in April 2018 Blackberry World began limiting its offerings to only free apps.

[7]   Galaxy Store was formerly known as Samsung Apps and Galaxy Apps.

[8]   Windows Phone Marketplace was rebranded as Windows Phone Store in August 2012 and merged with Windows Store in 2015. The store was rebranded as the Microsoft Store in 2017.

[9]   LG SmartWorld's paid app store launched in July 2011 in the UK and October 2011 in the US.

[10]   Huawei AppGallery launched in 2011 in China and in 2018 worldwide.

[11]   ONE Store was launched in South Korea in 2016 and in the US in 2024.

[12]   RealNetworks, owner of RealArcade, bought GameHouse in 2004. RealArcade.com redirects to GameHouse.com.

[13]   iPlay was formerly known as Oberon.

[14]   Windows Marketplace was replaced with Windows Store in 2012 and rebranded as Microsoft Store in 2017.

[15]   Metaboli launched in France in 2001 and launched the Gamesplanet platform in 2006.

[16]   GameStop PC Downloads was formerly known as Impulse. PC games are still available for download through GameStop.com as of January 2021.

[17]   Ubuntu Software Center was replaced by GNOME in 2015.

[18]   EA has ended support for Origin as of April 2025, and has replaced it with the EA app.

[19]   Ubisoft Connect was formerly known as Uplay.

[20]   The Humble Store, which allowed for purchase of individual games, launched in 2013.

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Sources:**

**Xbox Live Marketplace**
[1]  Nelson, Major, "Xbox Live Marketplace Launch Content," *Microsoft Xbox Wire*, November 15, 2005, available at https://news.xbox.com/en-us/2005/11/15/xbox-live-marketplace-launch-content/.
[2]  Phillips, Tom, "Xbox Live Marketplace retitled as Xbox Games Store," *Eurogamer*, August 30, 2013, available at https://www.eurogamer.net/xbox-marketplace-retitled-as-xbox-games-store.
[3]  Weinberger, Matt, "Microsoft is Mashing Windows and the Xbox Together to Win Over Its Most Critical Market," *Business Insider*, March 16, 2016, available at https://www.businessinsider.com/microsoft-merging-windows-and-xbox-together-to-win-over-its-most-critical-market-2016-3?op=1.

**PlayStation Store**
[1]  Lempel, Eric, "PlayStation Store: Celebrating a Decade of Downloads," *PlayStation*, November 8, 2016, available at https://blog.playstation.com/2016/11/08/playstation-store-celebrating-a-decade-of-downloads/.

**Nintendo Wii Shop Channel**
[1]  "Wii Shop Channel Discontinuation," *Nintendo*, available at https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation.

**Nintendo eShop**
[1]  Stevens, Tim, "Nintendo 3DS eShop to launch on June 6 with internet browser and free Excite Bike," *Engadget*, June 2, 2011, available at https://www.engadget.com/2011-06-02-nintendo-3ds-eshop-to-launch-on-june-6-with-internet-browser-and.html.

**Handango InHand**
[1]  "Handango CEO Is Dialed In," *D Magazine*, February 22, 2007, available at https://www.dmagazine.com/publications/d-ceo/2007/march/handango-ceo-is-dialed-in/.
[2]  "PocketGear Acquires Handango, Creating the World's Largest Cross Platform, Open App Store," *PR Newswire*, February 23, 2010, available at https://www.prnewswire.com/news-releases/pocketgear-acquires-handango-creating-the-worlds-largest-cross-platform-open-app-store-85027772.html.
[3]  Gohrig, Nancy, "PocketGear buys Handango," *NetworkWorld*, February 23, 2010, available at https://www.networkworld.com/article/773427/wireless-pocketgear-buys-handango.html.
[4]  Rao, Leena, "PocketGear Rebrands To Appia; Shifts To White-Label App Marketplace Platform," *TechCrunch*, February 3, 2011, available at https://techcrunch.com/2011/02/03/pocketgear-rebrands-to-appia-shifts-to-white-label-app-marketplace-platform/.

**GetJar**
[1]  "About GetJar App Store and App Marketplace," *GetJar*, available at https://www.getjar.com/about.

**Apple App Store**
[1]  "Apple Announces iPhone 2.0 Software Beta," *Apple*, March 6, 2008, available at https://www.apple.com/newsroom/2008/03/06Apple-Announces-iPhone-2-0-Software-Beta/.

**Google Play**
[1]  "Android Market: Now Available for Users," *Android Developers Blog*, October 22, 2008, available at https://android-developers.googleblog.com/2008/10/android-market-now-available-for-users.html.
[2]  "Goodbye Android Market, Hello Google Play," *TechCrunch*, March 6, 2012, available at https://techcrunch.com/2012/03/06/goodbye-android-market-hello-google-play/.

**BlackBerry World**
[1]  Mies, Ginny, "First Look: BlackBerry App World Open for Business," *PCWorld*, April 1, 2009, available at https://www.pcworld.com/article/528244/rim_blackberry_app_world_first_look.html.
[2]  "Reminder: Beginning April 1, 2018 BlackBerry World Will Only Offer Free Apps," *CrackBerry*, March 31, 2018, available at https://crackberry.com/beginning-april-1-2018-blackberry-world-will-only-offer-free-apps.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Sources:**

**Ovi Store**
[1]  Ricknäs, Mikael, "Nokia Opens the Door to its Ovi Mobile Apps Store," *Macworld* , May 26, 2009, available at https://www.macworld.com/article/196859/nokia-ovistore.html.
[2]  Low, Aloysius, "Microsoft to Shut Down Nokia Store for Feature Phones," *CNET* , November 18, 2024, available at https://www.cnet.com/tech/services-and-software/microsoft-to-shut-down-nokia-store-for-feature-phones/.

**HP App Catalog**
[1]  Ganapati, Priya, "Palm Pre App Catalog Makes a Slow Start," *Wired* , June 19, 2009, available at https://www.wired.com/2009/06/palm-pre-apps/.
[2]  "webOS Cloud Services to end 3-15-2015," *HP Community Forum* , October 15, 2014, available at https://h30434.www3.hp.com/t5/Tablets-and-Mobile-Devices-Archive-Read-Only/webOS-Cloud-Services-to-end-3-15-2015-updated/td-p/4614446.

**Galaxy Store**
[1]  Ganapati, Priya, "Samsung Joins the App Store Party," *Wired* , August 31, 2009, available at https://www.wired.com/2009/08/samsung-app-store/.
[2]  Kerr, Dara, "Samsung rebrands app store as Galaxy Apps, adds new perks," *CNET* , July 10, 2014, available at https://www.cnet.com/tech/services-and-software/samsung-rebrands-app-store-as-galaxy-apps-adds-new-perks/.
[3]  Pelegrin, Williams, "Galaxy Apps is being renamed to Galaxy Store ahead of S10 unveiling," *Android Authority* , February 19, 2019, available at https://www.androidauthority.com/samsung-galaxy-apps-renamed-galaxy-store-956075/.

**Windows Phone Marketplace**
[1]  Murphy, David, "Windows Phone Store Pushes Past 300,000 Apps," *PCMag* , August 8, 2014, available at https://www.pcmag.com/news/windows-phone-store-pushes-past-300000-apps.
[2]  Warren, Tom, "Microsoft rebrands Windows Phone Marketplace to Windows Phone Store," *The Verge* , August 7, 2012, available at https://www.theverge.com/2012/8/7/3225996/windows-phone-store-rebrand-for-windows-phone-marketplace.
[3]  Whitney, Lance, "Microsoft Offers All-Inclusive App Store for PCs, Tablets and Phones," *CNET* , July 16, 2015, available at https://www.cnet.com/tech/services-and-software/microsoft-opens-all-inclusive-app-store-for-pcs-tablets-and-phones/.
[4]  Warren, Tom, "Windows Store Rebranded to Microsoft Store in Windows 10," *The Verge* , September 22, 2017, available at https://www.theverge.com/2017/9/22/16348986/microsoft-store-windows-10-app-store.

**Aptoide**
[1]  "What is Aptoide?," *Aptoide* , available at https://en.aptoide.com/company/faq/what-is-aptoide.

**Opera Mobile Store**
[1]  "Opera launches the Opera Mobile Store, available in over 200 Countries," *Opera* , March 8, 2011, available at https://press.opera.com/2011/03/08/opera-launches-the-opera-mobile-store-available-in-over-200-countries/.

**Amazon App Store**
[1]  Tweney, Dylan, "Amazon Launches Its Own Android App Store," *Wired* , March 22, 2011, available at https://www.wired.com/2011/03/amazon-android-app-store-2/.
[2]  "Upcoming changes to Amazon Appstore for Android devices and other programs," *Amazon* , February 20, 2025, available at https://developer.amazon.com/apps-and-games/blogs/2025/02/upcoming-changes-to-amazon-appstore-for-android-devices-and-coins-program.

**LG SmartWorld**
[1]  "LG SmartWorld to Open Premium App Service," *LG* , October 19, 2011, available at https://www.lgnewsroom.com/wp-content/uploads/2011/10/LG_SMARTWORLD_TO_OPEN_PREMIUM_APP_SERVICE.pdf.
[2]  "Notice on Termination of Services of LG Health / LG Mobile Switch / Smart World / Remote Consultation / Quick Help / Remote Unlock / Quick Translator," *LG* , May 2, 2023, available at https://www.lg.com/us/support/announcements-detail/notice-on-termination-of-services-of-lg-health-lg-mobile-switch-smart-world-remote-consultation-quick-help-remote-unlock-quick-translator-USNTC20230503200080.

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Sources:**

**Huawei AppGallery**
[1]   "AppGallery is Huawei's alternative to Google's Play Store on Android," *XDA* , September 22, 2019, available at https://www.xda-developers.com/appgallery-huawei-alternative-google-play-store-android/.
[2]   "HUAWEI AppGallery overview," *Huawei* , available at https://consumer.huawei.com/en/support/content/en-us00769778/.

**OpenStore for Ubuntu Touch**
[1]   "Ubuntu Weekly Newsletter Issue 339," *Ubuntu* , October 21, 2013, available at https://lists.ubuntu.com/archives/ubuntu-news/2013-October/000417.html.
[2]   Spencer, Rick, "Rick's Ubuntu for Phones FAQ," *The Raving Rick* , October 17, 2013, available at https://theravingrick.blogspot.com/2013/10/ricks-ubuntu-for-phones-faq.html.

**ONE Store**
[1]   "Korean App Market 'ONE store' Announces Its Entry Into the Global Market This Year," *PR Newswire* , April 15, 2022, available at https://www.prnewswire.com/news-releases/korean-app-market-one-store-announces-its-entry-into-the-global-market-this-year-301526505.html.
[2]   Eun-Soo, Jin, "Homegrown App Marketplace One Store Steps onto the Global Stage," *Korean JoongAng Daily* , August 28, 2024, available at https://koreajoongangdaily.joins.com/news/2024-08-28/business/industry/Homegrown-app-marketplace-One-Store-steps-onto-the-global-stage/2122789.
[3]   "Play More, Pay Less ONE store," *ONE Store* , available at https://m.onestore.net/en-sg/etc/marketDownloadGuide.

**PureOS Software Center**
[1]   Robertson, Donald, "FSF adds PureOS to list of endorsed GNU/Linux distributions," *Free Software Foundation* , December 21, 2017, available at https://www.fsf.org/news/fsf-adds-pureos-to-list-of-endorsed-gnu-linux-distributions-1.
[2]   Rankin, Kyle, "Mobile App Stores and the Power of Incentives," *Purism* , July 9, 2020, available at https://puri.sm/posts/mobile-app-stores-and-the-power-of-incentives/.

**Battle.net (Blizzard)**
[1]   Statt, Nick, "Blizzard Revives Battle.net and Admits it Made a Mistake With Rebranding," *The Verge* , August 14, 2017, available at https://www.theverge.com/2017/8/14/16147102/blizzard-entertainment-battle-net-pc-gaming-online-service-rebranding.'

**RealArcade**
[1]   Richman, Dan, "RealNetworks to Buy Game Developer GameHouse," *Seattle Post-Intelligencer* , January 26, 2004, available at https://www.seattlepi.com/business/article/realnetworks-to-buy-game-developer-gamehouse-1135467.php.
[2]   "GameHouse Operates Two Different Websites - Which One Do I Play On?," *GameHouse* , available at https://support.gamehouse.com/hc/en-us/articles/360019753514-GameHouse-operates-two-different-websites-Which-one-do-I-play-on.

**Big Fish Games**
[1]   "The Complete Reference for Big Fish Games," *Game Yum* , available at https://www.gameyum.com/pc-gaming/126006-reeling-in-the-best-games-produced-by-big-fish-games-a-guide/.

**Steam**
[1]   "At Valve We Make Games, Steam, and Hardware," *Valve* , available at https://www.valvesoftware.com/en/about.

**iPlay**
[1]   "Oberon Media Reborn as Iplay," *Business Wire* , July 17, 2012, available at https://web.archive.org/web/20130629214349/http://www.businesswire.com/news/home/20120717006053/en/Oberon-Media-Reborn-Iplay.

**Game Jolt**
[1]   "Game Jolt - Home," *Game Jolt* , January 1, 2004, available at https://web.archive.org/web/20040101195736/http://gamejolt.com/.
[2]   Ebersol, Alessandro "Online Game Stores For PCLinuxOS," *PCLinnuxOS Magazine* , available at https://pclosmag.com/html/Issues/202112/page06.html.

**Direct2Drive**
[1]   "IGN Entertainment Launches Direct2Drive Digital Retail Store," *IGN Entertainment* , September 7, 2004, available at https://corp.ign.com/press/press/2004/ign-entertainment-launches-direct2drive-digital-retail-store-lrgs8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Sources:**

**Windows Marketplace**

[1] "Windows Marketplace Opens for Business; Consumers Can Easily Discover A World of Products That Work With Windows," *Microsoft* , October 12, 2004, available at https://news.microsoft.com/source/2004/10/12/windows-marketplace-opens-for-business-consumers-can-easily-discover-a-world-of-products-that-work-with-windows/.

[2] Warren, Tom, "Microsoft planning 'Windows Store' App Store for Windows 8," *Neowin* , June 28, 2010, available at https://www.neowin.net/news/microsoft-planning-039windows-store039-app-store-for-windows-8/.

[3] "13 New Features in Windows 8 Consumer Preview," *PCMag* , February 29, 2012, available at https://www.pcmag.com/archive/13-new-features-in-windows-8-consumer-preview-294819.

[4] Warren, Tom, "Windows Store rebranded to Microsoft Store in Windows 10," *The Verge* , September 22, 2017, available at https://www.theverge.com/2017/9/22/16348986/microsoft-store-windows-10-app-store.

**GamersGate**

[1] "Paradox Interactive Launches Large-Scale International Digital Distribution Service," *Paradox Interactive* , November 20, 2006, available at https://www.globenewswire.com/news-release/2006/11/20/351416/109087/en/Paradox-Interactive-Launches-Large-Scale-International-Digital-Distribution-Service.html.

**Metaboli/Gamesplanet**

[1] "Metaboli SA / Gamesplanet.com," *LinkedIn* , available at https://www.linkedin.com/company/metaboli.

[2] "Metaboli/Epic Games Deal," *GamesIndustry.biz* , April 6, 2009, available at https://www.gamesindustry.biz/metaboli-epic-games-deal-unreal-series-gets-digital-distribution.

**Kongregate**

[1] Marshall, Matt, "Kongregate, the online social game hub," *VentureBeat* , March 21, 2007, available at https://venturebeat.com/business/kongregrate-the-online-social-game-hub/.

**GameStop PC Downloads**

[1] Yarlen, "Stardock Launches Impulse: The PC's Next-Generation Distribution Platform," *TGN Forums* , June 17, 2008, available at https://web.archive.org/web/20080708091849/http://tgnforums.stardock.com/315290.

[2] Vermeulen, Jan, "The Problem with Buying Games on Steam and Other App Stores," *MyGaming* , May 2, 2017, available at https://mygaming.co.za/news/pc/117237-the-problem-with-buying-games-on-steam-and-other-app-stores.

[3] Fahey, Mike, "GameStop's Online Store Becomes One with Impulse," *Kotaku* , July 13, 2011, available at https://kotaku.com/gamestops-online-store-becomes-one-with-impulse-5820890.

**GOG.com**

[1] Thang, Jimmy, "Download PC Classics with GOG," *IGN* , June 14, 2012, available at https://www.ign.com/articles/2008/07/10/download-pc-classics-with-gog.

**Ubuntu Software Center**

[1] "Ubuntu Software Center," *Canonical* , August, 24, 2009, available at https://launchpad.net/software-center.

[2] "Ubuntu 16.04 LTS (Xenial Xerus) Overview," *HowToForge* , available at https://www.howtoforge.com/tutorial/ubuntu-16-04-lts-overview/.

**Green Man Gaming**

[1] "Green Man Gaming Finally Goes Live," *MCV* , May 10, 2010, available at https://mcvuk.com/business-news/consoles/green-man-gaming-finally-goes-live/.

**Beamdog**

[1] "Beamdog," *GameIndustry International* , July 30, 2010, available at https://www.gamesindustry.biz/beamdog-new-pc-game-download-site-launched-by-bioware-founder-trent-oster.

**Desura**

[1] Gibson, Geoff, "Desura, the Indie Digital Distribution Site, is Now Open," *DIY Gamer* , December 18, 2010, available at https://web.archive.org/web/20120422212943/http://www.diygamer.com/2010/12/desura-indie-digital-distribution-site-open/.

[2] "Desura," *openSUSE Wiki* , available at https://en.opensuse.org/Desura.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix Exhibit E**
**Overview of Digital Distribution Marketplaces**

**Sources:**

**DotEmu**
[1]  "DotEmu's Online Store Launched with Another World HD and Broken Sword 2 and 3," *GamesIndustry International* , May 6, 2010, available at https://www.gamesindustry.biz/dotemu-com-dotemu-s-online-store-launched-with-another-world-hd-and-broken-sword-2-and-3.
[2]  Chalk, Andy, "DotEmu is Closing its Online Store, Games Will Be Gone on June 1," *PC Gamer* , March 20, 2017, available at https://www.pcgamer.com/dotemu-is-closing-its-online-store-games-will-will-be-gone-on-june-1/.

**Mac App Store**
[1]  "Apple's Mac App Store Opens for Business," *Apple* , January 6, 2011, available at https://www.apple.com/newsroom/2011/01/06Apples-Mac-App-Store-Opens-for-Business/.

**Playism**
[1]  Macgregor, Jody, "Indie Publisher Playism is Closing its DRM-Free Store This Month," *PCGamer* , March 20, 2021, available at https://www.pcgamer.com/indie-publisher-playism-is-closing-its-store-this-month/.

**Origin**
[1]  Schreier, Jason, "EA Launches 'Origin,' Downloadable Games Service," *WIRED* , June 3, 2011, available at https://www.wired.com/2011/06/ea-origin/.
[2]  "Origin Shutdown: Everything You Need to Know," *EA Help* , April 17, 2025, available at https://help.ea.com/en/help/origin/origin/shutdown/.

**Ubisoft Connect**
[1]  Cox, Kate, "Ubisoft Launches Their Own PC Gaming Client, and Is Selling Some Games for $1 to Get You To Try It," *Kotaku* , August 16, 2012, available at https://kotaku.com/ubisoft-launches-their-own-pc-gaming-client-and-is-sel-5935427.
[2]  Giles, Amari, "Ubisoft's Uplay App Is Being Rebranded as Ubisoft Connect," *Game Rant* , October 21, 2020, available at https://gamerant.com/ubisoft-connect-uplay/.

**Humble Bundle**
[1]  O'Brien, Terrence, "Humble Store launches, skips the Bundles and flash sales," *Engadget* , November 11, 2013, available at https://www.engadget.com/2013-11-11-humble-store.html.

**Itch.io**
[1]  "Q&A: itch.io Interview with Leaf Corcoran," *Gamasutra* , December 1, 2014, available at https://web.archive.org/web/20211016002206/https://www.gamedeveloper.com/business/q-a-itch-io-interview-with-leaf-corcoran.

**Snap Store**
[1]  "Everything You Need to Know About Snap and Snap Store," *UMA Technology* , December 28, 2024, available at https://umatechnology.org/everything-you-need-to-know-about-snap-and-snap-store/.
[2]  "Snap Store," *Canonical* , available at https://snapcraft.io/install/snap-store/ubuntu.

**Bethesda.net**
[1]  Machkovech, Sam, "RIP Bethesda Launcher: Here's How Its Nearly Full Transfer to Steam Will Work," *Ars Technica* , February 22, 2022, available at https://arstechnica.com/gaming/2022/02/rip-bethesda-launcher-heres-how-its-nearly-full-transfer-to-steam-will-work/.
[2]  "Sunsetting the Bethesda.net Launcher & Migrating to Steam," *Bethesda* , April 7, 2022, available at https://bethesda.net/en/article/2RXxG1y000NWupPalzLblG/sunsetting-the-bethesda-net-launcher-and-migrating-to-steam.

**Kartridge**
[1]  Takahashi, Dean, "Kongregate's Kartridge App Store Opens with Hundreds of Indie PC Games," *VentureBeat* , November 1, 2018, available at https://venturebeat.com/business/kongregates-kartridge-app-store-opens-with-hundreds-of-indie-pc-games/.
[2]  "Sunsetting Kartridge & Kartridge.com," *Kongregate* , September 2023, available at https://web.archive.org/web/20231204234520/https://kong.zendesk.com/hc/en-us/articles/16394691968660-Sunsetting-Kartridge-Kartridge-com.

**Epic Games Store**
[1]  Russell, Jon, "The Epic Games Store Is Now Live," *TechCruch* , December 6, 2018, available at https://techcrunch.com/2018/12/06/epic-games-store/.

**Appendix Exhibit F.1**
**Pricing Strategies, Developer Considerations, OS Developer Benchmarks in the United States**

| Policy Considerations | Apple's Pricing Strategies | Potential OS Developer Benchmarks' Pricing Strategies | | | | | |
|---|---|---|---|---|---|---|---|
| | App Store | Google Play | Microsoft Store (Windows PC) | Mac App Store | Microsoft Store (Xbox) | PlayStation | BlackBerry[1] |
| **Developer Considerations** | | | | | | | |
| *Access to IP and Distribution on Store* | | | | | | | |
| Fee to Access Developer Environment[A] (e.g., Xcode) | Free[1] | Free[1] | Free[1] | Free[1] | Free[1] | Free developer kits on loan for some developers; undisclosed for other developers[1] | Free[2] |
| Fee to Distribute on Store (e.g., Developer Program Fee) | $99/year (Individual)[2] $299/year (Enterprise)[3] | $25[2] | $19 (Individual) $99 (Company)[2] | $99/year (Individual)[2] $299/year (Enterprise)[3] | $19 (Individual) $99 (Company)[2] | Undisclosed[2] | Free[3] |
| Separate Charge for Use of Specialized Developer Tools (e.g., Metal) | Free[2] | Free[1] | Yes (e.g., Visual Studio Professional IDE and Visual Studio Enterprise IDE)[1] | Free[2] | Yes (e.g., CommunitySift, Simplygon, Havok)[3] | Undisclosed[2] | N/A |
| Review of Own Store Content[B] | Free app review[4] | Free app review[3] | Free app review[3] | Free app review[4] | Free app review[4] | Free app review[2] | Free app review[4] |
| Review of Non-Store Content | N/A | Warns user or blocks installation if known harmful or malicious content is found in the app[4] | Warns user or blocks installation if known harmful or malicious content is found in the app[4] | Notarization[5] | N/A | N/A | N/A |
| *Commissions on Developers' Monetization Strategies* | | | | | | | |
| Commission on Paid Apps | 30% (or 15% for App Store Small Business Program)[5] | 15% for first $1M, 30% above $1M[5] | 12% for games, 15% otherwise[3] | 30% (or 15% for App Store Small Business Program)[6] | 30%[5] | 30%[3] | 30% prior to April 1, 2018, 0% after[5] |
| Commission on In-App Purchases | 30% (or 15% for App Store Small Business Program)[5] | 15% for first $1M, 30% above $1M[5] | 12% for games, 15% otherwise[3] | 30% (or 15% for App Store Small Business Program)[6] | 30%[5] | 30%[3] | 30% prior to April 1, 2018, 0% after[5] |
| Commission on Subscriptions[C] | 30% in the first year, 15% after[5] | 15%[5] | Headline Rates | 30% in the first year, 15% after[6] | Headline Rate | Headline Rate | Headline Rate |
| Policies Regarding Cross-Channel Content | No commission for some types of content (Reader Rule, Multiplatform Rule)[6] | N/A | N/A | No commission for some types of content (Reader Rule, Multiplatform Rule)[7] | N/A | Cross-channel revenue share, with cross-channel approach largely limited to aged exclusives[4] | N/A |
| Commission on In-App Ads[D] | Headline Rates on only sales of "boosts" for posts in social media apps[7] | None[6] | None[5] | Headline Rates on only sales of "boosts" for posts in social media apps[8] | N/A[6] | N/A[5] | 40%[6] |
| Commission Rates for Small Developers[C] (e.g., Small Business Program) | 15%[5] | 15%[5] | Headline Rates | 15%[6] | Headline Rate | Headline Rate | Headline Rate |
| Other Special Commission Rates for Developers | 15% (News Partner Program[8] and Video Partner Program[9]) | ≤15% (Play Media Experience Program; Accelerator Programs, e.g., LRAP)[7] | 0% for non-game apps when using third-party payment system[6] | 15% (News Partner Program[9]) | N/A | N/A | N/A |

Notes:
[A] Only required fees have been included.
[B] "Free App Review" indicates that the developer agreement and publicly available sources either explicitly state that no charge is levied or imply this by not stating an associated cost.
[C] "Headline Rate(s)" indicates that the channel does not specify a different rate specific to subscriptions/in-app ads/small developers.
[D] Blackberry collected a commission on its Blackberry Ad Services; Amazon collects a commission on its Unified Ad Marketplace services.
[E] N/A indicates insufficient information.
[F] All percentages are with respect to revenue.
[G] All pricing strategies apply only to digital content, and not the sales of physical products or services.

**Appendix Exhibit F.2**
**Pricing Strategies, Developer Considerations, Non-OS Developer Benchmarks in the United States**

| Policy Considerations | Apple's Pricing Strategies | Potential Non-OS Developer Benchmarks' Pricing Strategies | | | |
| --- | --- | --- | --- | --- | --- |
| | App Store | Steam | Galaxy Store | Amazon Appstore | Epic Games Store |
| **Developer Considerations** | | | | | |
| *Access to IP and Distribution on Store* | | | | | |
| Fee to Access Developer Environment[A] (e.g., Xcode) | Free[1] | Free[1] | Free[1] | Free[1] | Free[1] |
| Fee to Distribute on Store (e.g., Developer Program Fee) | $99/year (Individual)[2] $299/year (Enterprise)[3] | $100/product[2] | Free[2] | Free[2] | Free[2] |
| Separate Charge for Use of Specialized Developer Tools (e.g., Metal) | Free[2] | ████████ | Free[1] | Free[1] | 5% (for game developers) or $1,850 per license per year (for non-game developers) for apps using Unreal Engine[3] |
| Review of Own Store Content[B] | Free app review[4] | Included in $100 Fee[2] | Undisclosed certification fee[3] | Free app review[3] | Free app review[2] |
| Review of Non-Store Content | N/A | N/A | Warns user or blocks installation if known harmful or malicious content is found in the app[4] | N/A | N/A |
| *Commissions on Developers' Monetization Strategies* | | | | | |
| Commission on Paid Apps | 30% (or 15% for App Store Small Business Program)[5] | 30% for revenue ≤ $10M, 25% for > $10M and < $50M, 20% for ≥ $50M[4] | 20%[5] | 30% (or 20% for Small Business Accelerator Program)[4] | 0% for revenue ≤ 1M per title, 12% for revenue ≥ 1M per title (or 0% for developers on the Epic First Run and Now On Epic programs)[4] |
| Commission on In-App Purchases | 30% (or 15% for App Store Small Business Program)[5] | 30% for revenue ≤ $10M, 25% for > $10M and < $50M, 20% for ≥ $50M[4] | 20%[5] | 30% (or 20% for Small Business Accelerator Program)[4] | 0% for revenue ≤ 1M per title, 12% for revenue ≥ 1M per title (or 0% for developers on the Epic First Run and Now On Epic programs)[4] |
| Commission on Subscriptions[C] | 30% in the first year, 15% after[5] | Headline Rates | 15%[5] | 20% for movies and TV, Headline Rates otherwise[4] | Headline Rates |
| Policies Regarding Cross-Channel Content | No commission for some types of content (Reader Rule, Multiplatform Rule)[6] | N/A | N/A | N/A | N/A |
| Commission on In-App Ads[D] | Headline Rates on only sales of "boosts" for posts in social media apps[7] | In-app ads not allowed[5] | None[6] | None[5] | N/A |
| Commission Rates for Small Developers[C] (e.g., Small Business Program) | 15%[5] | Headline Rates[4] | Headline Rate | 20%[4] | Headline Rates[4] |
| Other Special Commission Rates for Developers | 15% (News Partner Program[8] and Video Partner Program[9]) | N/A | Upon agreement[5] | N/A | 0% for developers on the Epic First Run and Now On Epic Programs and when using third-party payment system[4] |

Notes:
[A] Only required fees have been included.
[B] "Free App Review" indicates that the developer agreement and publicly available sources either explicitly state that no charge is levied or imply this by not stating an associated cost.
[C] "Headline Rate(s)" indicates that the channel does not specify a different rate specific to subscriptions/in-app ads/small developers.
[D] Blackberry collected a commission on its Blackberry Ad Services; Amazon collects a commission on its Unified Ad Marketplace services.
[E] N/A indicates insufficient information.
[F] All percentages are with respect to revenue.
[G] All pricing strategies apply only to digital content, and not the sales of physical products or services.

Case 4:11-cv-06714-YGR   Document 1095-47   Filed 03/05/26   Page 277 of 300

**Appendix Exhibit F.3**

**Pricing Strategies, Consumer Considerations, OS Developer Benchmarks in the United States**

| Policy Considerations | Apple's Pricing Strategies | Potential OS Developer Benchmarks' Pricing Strategies | | | | | |
|---|---|---|---|---|---|---|---|
| | App Store | Google Play | Microsoft Store (Windows PC) | Mac App Store | Microsoft Store (Xbox) | PlayStation | BlackBerry[1] |
| **Consumer Considerations** | | | | | | | |
| *Charges to Consumers for Use of Store* | | | | | | | |
| Fee to Access Store | None | None[8] | None[7] | None | None | None | None |
| Commission on Consumer Transactions | None | None | None | None | None | None | None |
| **Other Considerations** | | | | | | | |
| *Scope of Apps* | | | | | | | |
| Primary Categories of Apps Transacted | All | All[9] | All[8] | All | Games | Games[6] | All |
| Allow Free Apps - % Free[A] | Yes - 95.5%[10] | Yes - 96.98%[10] | Yes - 91.59%[9] | Yes - N/A[10] | Yes - N/A[7] | Yes - 1.8%[7] | Yes - N/A[7] |
| *User Privacy* | | | | | | | |
| Data Gathering by Third Parties[B] | Allowed with disclosure[11] | Allowed with disclosure[11] | User choice[10] | Allowed with disclosure[11] | User choice[8] | User choice[8] | Allowed with disclosure[8] |
| Cross-App Data Gathering | User choice[12] | Allowed with disclosure[12] | Not specified[10] | User choice[12] | Not specified[8] | User choice[8] | N/A |
| *Tools for Facilitating App Discovery* | | | | | | | |
| Search Ads | Paid service[13] | Paid service[13] | Paid service[11] | N/A | N/A[9] | N/A | N/A |
| Curation of Featured Apps | Free[14] | No fee indicated[14] | No fee indicated[12] | Free[13] | No fee indicated[10] | $25,000 for increased visibility[9] | No fee indicated, with optional nomination[9] |
| *Facilitation of Payments / Pricing Guidelines* | | | | | | | |
| Minimum Price | $0.29[15] | $0.05[15] | $0.99[9] | $0.29[10] | $0.99[7] | Price set by channel[10] | $0.99[10] |
| Pre-Set Price Tiers | Yes[15] | No[16] | Yes[9] | Yes[10] | Yes[7] | Price set by channel[10] | Yes[10] |
| *Incentives for Consumer Participation* | | | | | | | |
| Subsidies or Price Reductions | Decided by developer[16] | Decided by developer[17] | Decided by developer[13] | Decided by developer[14] | Decided by developer[11] | Decided by channel[10] | N/A |
| Exclusive Deals | N/A | N/A | N/A | N/A | Yes[12] | Yes[11] | N/A |

**Notes:**

[A] Includes all apps that are free to download, regardless of if in-app purchases are included.

[B] "User Choice" indicates that the channel currently allows, or has active plans to allow, users to opt-out of data tracking.

[C] N/A indicates insufficient information.

[D] All pricing strategies apply only to digital content, and not the sales of physical products or services.

**Appendix Exhibit F.4:**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

| Policy Considerations | Apple's Pricing Strategies | Potential Non-OS Developer Benchmarks' Pricing Strategies | | | |
|---|---|---|---|---|---|
| | App Store | Steam | Galaxy Store | Amazon Appstore | Epic Games Store |
| **Consumer Considerations** | | | | | |
| *Charges to Consumers for Use of Store* | | | | | |
| Fee to Access Store | None | None | None | None | None |
| Commission on Consumer Transactions | None | None | None | None | None |
| **Other Considerations** | | | | | |
| *Scope of Apps* | | | | | |
| Primary Categories of Apps Transacted | All | Games | All | All | Games |
| Allow Free Apps - % Free[A] | Yes - 95.5%[10] | Yes - 4.6%[6] | Yes - N/A[6] | Yes - 80.6%[6] | Yes - N/A[5] |
| *User Privacy* | | | | | |
| Data Gathering by Third Parties[B] | Allowed with disclosure[11] | Allowed[7] | Allowed with disclosure[7] | User choice[7] | Allowed with disclosure[6] |
| Cross-App Data Gathering | User choice[12] | N/A[7] | N/A | N/A[7] | Allowed with disclosure[6] |
| *Tools for Facilitating App Discovery* | | | | | |
| Search Ads | Paid service[13] | Not allowed[8] | N/A[8] | N/A | N/A |
| Curation of Featured Apps | Free[14] | No fee indicated[8] | No fee indicated[9] | No fee indicated[8] | N/A |
| *Facilitation of Payments / Pricing Guidelines* | | | | | |
| Minimum Price | $0.29[15] | $0.99[5] | Price options set by channel[6] | $0.99[9] | N/A |
| Pre-Set Price Tiers | Yes[15] | No[5] | Price options set by channel[6] | No[9] | Yes, with possible customization[7] |
| *Incentives for Consumer Participation* | | | | | |
| Subsidies or Price Reductions | Decided by developer[16] | Decided by developer with channel limitations/ decided by channel[9] | Decided by developer[10] | Decided by developer[10] | Free subsidized games with flat fees to developers[8] |
| Exclusive Deals | N/A | N/A[10] | N/A[11] | N/A | Yes[4] |

Notes:
[A] Includes all apps that are free to download, regardless of if in-app purchases are included.
[B] "User Choice" indicates that channel currently allows, or has active plans to allow, users to opt-out of data tracking.
[C] N/A indicates insufficient information.
[D] All pricing strategies apply only to digital content, and not the sales of physical products or services.

Case 4:11-cv-06714-YGR   Document 1095-47   Filed 03/05/26   Page 279 of 300

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

**Apple App Store**

[1] "The current release of Xcode is available as a free download from the Mac App Store." "Xcode," *Apple*, available at https://developer.apple.com/support/xcode/.

[2] "Choosing a Membership," *Apple*, available at https://developer.apple.com/support/compare-memberships.

[3] "Apple Developer Enterprise Program," *Apple*, available at https://developer.apple.com/programs/enterprise/.

[4] "Apple Developer Program License Agreement," *Apple*, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/. *See also*, "Apple Developer Enterprise Program License Agreement," *Apple*, available at https://developer.apple.com/support/downloads/terms/apple-developer-enterprise-program/Apple-Developer-Enterprise-Program-License-Agreement-20240610-English.pdf; "App Review," *Apple*, available at https://developer.apple.com/app-store/review/; "App Store Review Guidelines," *Apple*, available at https://developer.apple.com/app-store/review/guidelines.

[5] "Apple Developer Program License Agreement, Schedules 2 and 3," *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20240610-English.pdf.

[6] "App Store Review Guidelines," *Apple*, available at https://developer.apple.com/app-store/review/guidelines/. *See also*, Balu, Nivedita and Nellis, Stephen, "Explainer: Apple Gives 'Reader' Apps a Way Around Commissions. Who Wins?" *Reuters*, available at https://www.reuters.com/technology/apple-gives-reader-apps-way-around-commissions-who-wins-2021-09-02/.

[7] "App Store Review Guidelines," *Apple*, available at https://developer.apple.com/app-store/review/guidelines/. *See also*, Heath, Alex, "Apple's New App Store Tax on Ads Is a Direct Shot at Meta," *The Verge*, available at https://www.theverge.com/2022/10/25/23423637/apple-app-store-tax-boosted-social-media-posts.

[8] "Publishers that work with Apple News may qualify for a commission rate of 15% on qualifying in-app purchase subscriptions from day one." "Introducing the News Partner Program," *Apple*, available at https://developer.apple.com/apple-news/program/.

[9] "As a program member, you earn 85% of sales from customers who sign up using Apple's in-app purchase system." "Apple Video Partner Program," *Apple*, available at https://developer.apple.com/programs/video-partner/.

[10] Expert Report and Declaration of Lorin M. Hitt, *In Re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, March 7, 2025 ("Hitt Opening Merits Report"), Section 5.1.

[11] "App Privacy Details on the App Store, Optional Disclosure," *Apple*, available at https://developer.apple.com/app-store/app-privacy-details/.

[12] "If you see a request to track your activity, you can tap Allow or Ask App Not to Track. You can still use the full capabilities of the app, regardless of whether you allow the app to track your activity." "If an App Asks to Track Your Activity," *Apple*, available at https://support.apple.com/en-us/102420.

[13] "With cost-per-tap (CPT) pricing, you only pay when a customer engages with your ad." "Designed to Turn Intent into Downloads," *Apple*, available at https://searchads.apple.com/advanced.

[14] "Our worldwide team of editors curates selections on the App Store for each Apple platform in order to help your apps and games get in front of the right users, in the right places, at the right times." Developers are invited to contact Apple's editorial team if their app has a "unique story" for the chance to be featured. "Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/. Furthermore, Apple states that in deciding which apps to feature, "there's no checklist

F–5

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

of requirements," but considers factors including but not limited to user experience, UI design, innovation, and uniqueness. *See also*, "Getting Featured on the App Store," *Apple*, available at https://developer.apple.com/app-store/getting-featured/.

[15] "To provide developers around the world with even more flexibility, price points — which will start as low as $0.29 and, upon request, go up to $10,000 — will offer an enhanced selection of price points, increasing incrementally across price ranges (for example, every $0.10 up to $10; every $0.50 between $10 and $50; etc.)." "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, available at https://developer.apple.com/news/?id=qzex35ch. *See also*, "Set a Price," *Apple*, available at https://developer.apple.com/help/app-store-connect/manage-app-pricing/set-a-price.

[16] "Implementing Promotional Offers in Your App," *Apple*, available at https://developer.apple.com/documentation/storekit/in-app_purchase/original_api_for_in-app_purchase/subscriptions_and_offers/implementing_promotional_offers_in_your_app. ''

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 282 of 300

**Notes and Sources:**

**Google Play**

[1] "Overview of Google Play Services," *Google*, available at https://developers.google.com/android/guides/overview. *See also,* "Google Play Services," *Google*, available at https://developers.google.com/android.

[2] "There is a US$25 one-time registration fee[.]" "Get Started With Play Console," *Google*, available at https://support.google.com/googleplay/android-developer/answer/6112435?hl=en#zippy=%2Cstep-pay-registration-fee.

[3] "Google Play Developer Distribution Agreement," *Google*, February 5, 2024, available at https://play.google/developer-distribution-agreement.html. *See also*, "Prepare Your App for Review," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9859455?hl=en.

[4] "Google Play Protect offers protection for apps that are installed from sources outside of Google Play. When a user tries to install an app, Play Protect conducts a real-time check of the app against known harmful or malicious samples that Google Play Protect has cataloged. […] If the app is identified as malicious or suspicious, we will warn users or block the installation in extreme cases." "On-Device Protections," *Google*, available at https://developers.google.com/android/play-protect/client-protections. *See also*, "Use Google Play Protect to Help Keep Your Apps Safe & Your Data Private," *Google*, available at https://support.google.com/googleplay/answer/2812853?hl=en; "How We Kept the Google Play & Android App Ecosystems Safe in 2024," *Google*, January 29, 2025, available at https://security.googleblog.com/2025/01/how-we-kept-google-play-android-app-ecosystem-safe-2024.html.

[5] Google charges a service fee of 15% on the first $1M in earnings and 30% on subsequent earnings to all developers. Google also charges a service fee of 15% on all subscription revenue. "Service Fees," *Google*, available at https://support.google.com/googleplay/android-developer/answer/112622?hl=en.

[6] "Only developers who sell paid apps or in-app access to digital content or services, are subject to a service fee." "Understanding Google Play's Service Fee," *Google*, available at https://support.google.com/googleplay/android-developer/answer/11131145?hl=en.

[7] Under the Play Media Experience Program, Google charges a service fee of 15% or lower on applicable earnings for apps that primarily offer "video, audio, or books in which users pay to consume content" and that meet additional criteria. "Play Media Experience Program," *Google*, available at https://play.google.com/console/about/programs/mediaprogram/. Google implements several accelerator programs, including the Living Room Accelerator Program (LRAP), in which it charges a lower service fee to certain developers to "address[] margin constraints of certain app verticals." *See also*, "Google Play Partner Deal Program Overview," *Google*, April 2021, GOOG-APPL-00155992-999 at 993-994.

[8] Google does not disclose an access fee in its description of how a consumer can use the Play Store. "Find the Google Play Store App," *Google*, available at https://support.google.com/googleplay/answer/190860.

[9] "Choose a Category and Tags for Your App or Game," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9859673#zippy=%2Capps%2Cgame%2Cgames.

[10] Based on January 2025 data. "Distribution of Free and Paid Android Apps in the Google Play Store from June 2019 to January 2025," *Statista*, available at https://www.statista.com/statistics/266211/distribution-of-free-and-paid-android-apps/.

F–7

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[11] "All developers must declare how they collect and handle user data for the apps they publish on Google Play, and provide details about how they protect this data through security practices like encryption. This includes data collected and handled through any third-party libraries or SDKs used in their apps." "Provide Information for Google Play's Data Safety Section," *Google*, available at https://support.google.com/googleplay/android-developer/answer/10787469.

[12] At present, Google requires app developers to declare how they collect and handle data through any third-party libraries or SDKs used in their apps. "Provide Information for Google Play's Data Safety Section," *Google*, available at https://support.google.com/googleplay/android-developer/answer/10787469. Google is currently undertaking a multi-year project to bring Privacy Sandbox to Android. *See also*, "Introduction to the Privacy Sandbox on Android," *Google*, available at https://developers.google.com/privacy-sandbox/overview/android.

[13] Developers can set their advertising campaign objectives such as "driving mobile app installs or in-app actions" and set their target bids and max daily budget. "Find People Who Will Love Your App," *Google*, available at https://ads.google.com/home/campaigns/app-ads/.

[14] Google states that in curating "Editor's Choice" apps, it focuses on the quality of the app experience, novelty, design, usefulness of the content and breadth of appeal. "App Discovery and Ranking," *Google*, available at https://support.google.com/googleplay/android-developer/answer/9958766.

[15] "Buyer currency and price range" is indicated as "USD 0.05 - 999.99" for the United States. "Supported Locations for Distribution to Google Play Users," *Google*, available at https://play.google.com/supported-locations/?hl=en&sjid=3484639093668717565-NC.

[16] Google's description of how a developer can set prices for an app does not include a requirement that price tiers be used. "Set Your App's Prices," *Google*, available at https://support.google.com/googleplay/android-developer/answer/6334373.

[17] Developers can create sales to offer their paid apps at discounted prices. "Create Sales for Paid Apps," *Google*, available at https://support.google.com/googleplay/android-developer/answer/7271135. Additionally, developers can create promotions for paid apps, in-app products and subscriptions. "Create Promotions," Google, available at https://support.google.com/googleplay/android-developer/answer/6321495#zippy=%2Cstep-get-your-app-ready-to-use-promo-codes%2Cstep-review-%E2%80%A61%2F3.

## Exhibit F.1 – F.4
## Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States

**Notes and Sources:**

**Microsoft Windows**

[1] Microsoft offers free tools, Visual Studio Community and Visual Studio Code, which it recommends for individuals (at tab "Free tools"). For businesses and enterprises, it recommends paid subscriptions which include access to the Visual Studio Professional IDE and the Visual Studio Enterprise IDE (at tab "Paid subscriptions"). "Visual Studio Subscriptions Pricing," *Microsoft*, available at https://visualstudio.microsoft.com/vs/pricing/.

[2] "Developer Account Fees and Locations," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/partner-center/account-types-locations-and-fees.

[3] "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf. *See also*, "The App Certification Process for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/app-certification-process?pivots=store-installer-msix.

[4] "The Windows Security app is a comprehensive security solution integrated into Windows, designed to protect your device and data from various threats. It includes features such as Microsoft Defender Antivirus, Windows Firewall, and Smart App Control, which work together to provide real-time protection against viruses, malware, and other security threats." "Stay Protected With the Windows Security App," *Microsoft*, available at https://support.microsoft.com/en-us/windows/stay-protected-with-the-windows-security-app-2ae0363d-0ada-c064-8b56-6a39afb6a963. "Potentially unwanted apps (PUA) aren't malware, but they might display advertising, use your PC for crypto mining, or do other things you'd prefer they not do. Microsoft Defender tries to identify those apps for you and block them before they can install, or download, and cause issues with your system." "App & Browser Control in the Windows Security App – Reputation-Based Protection," *Microsoft*, available at https://support.microsoft.com/en-us/windows/app-browser-control-in-the-windows-security-app-8f68fb65-ebb4-3cfb-4bd7-ef0f376f3dc3. *See also*, "How Microsoft Identifies Malware and Potentially Unwanted Applications," *Microsoft*, February 12, 2025, available at https://learn.microsoft.com/en-us/unified-secops-platform/criteria.

[5] Microsoft shut down the Microsoft Ad Monetization Platform for Universal Windows Platform (UWP) apps as of June 1, 2020. Microsoft advised UWP developers to make a transition to another ad platform. Foley, Mary J, "Microsoft to Shutter Its Ad Monetization Platform for Universal Windows Platform Apps," *ZDNET*, January 31, 2020, https://www.zdnet.com/article/microsoft-to-shutter-its-ad-monetization-platform-for-universal-windows-platform-apps/.

[6] "Microsoft Store offers developers a flexible and transparent revenue sharing model (including in-app purchases, subscriptions, ads, and tips) that lets you choose your own commerce platform and keep 100% of the revenue for non-gaming apps, or use Microsoft's commerce platform and pay a competitive fee of 12% for games and 15% for apps." "Benefits of Distributing Your Apps via Microsoft Store," *Microsoft*, December 14, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/why-distribute-through-store.

[7] "There are no fees for having a Microsoft account, putting money into it, or using it to buy stuff from us. In other words, it's free!" "Taxes and fees When Using Your Microsoft Account," *Microsoft*, available at https://support.microsoft.com/en-us/account-billing/taxes-and-fees-when-using-your-microsoft-account-769f257d-60fe-dd84-4ff9-2e4ab44e97bd.

[8] "Categories and Subcategories for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/categories-and-subcategories?pivots=store-installer-msix.

[9] Based on Q2 2022 data. "Number of Free and Paid Apps in the Microsoft Store in 2nd Quarter 2022, By Category," *Statista*, available at https://www.statista.com/statistics/251947/share-of-free-and-paid-apps-in-the-windows-store/. "You can set the Base price to Free, or you can choose an available price tier, which sets the price in all the countries where you choose to distribute your app. Price tiers start at 0.99 USD." "Set and Schedule App Pricing for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/categories-and-subcategories?pivots=store-installer-msix.

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 284 of 300

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[10] "Microsoft Store Policies," *Microsoft*, September 17, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/store-policies.

[11] Microsoft announced the launch of Microsoft Store Ads in 2023. "Developers, Meet Microsoft Store Ads," *Microsoft*, February 2, 2023, available at https://blogs.windows.com/windowsdeveloper/2023/02/02/developers-meet-microsoft-store-ads/. *See also*, "Keep Costs in Check," *Microsoft*, available at https://ads.microsoft.com/.

[12] Microsoft does not include the payment of a fee in its list of requirements for apps to be eligible to be featured. "Make Your App Easier to Promote," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/make-your-app-easier-to-promote.

[13] "You can promote your app or add-on in the Microsoft Store by putting it on sale for a limited time." "Put Apps and Add-Ons on Sale," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/put-apps-and-add-ons-on-sale.

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

**Mac App Store**

[1] "The current release of Xcode is available as a free download from the Mac App Store." "Xcode," *Apple*, available at https://developer.apple.com/support/xcode/.

[2] "Choosing a Membership," *Apple*, available at https://developer.apple.com/support/compare-memberships.

[3] "Apple Developer Enterprise Program," *Apple*, available at https://developer.apple.com/programs/enterprise/.

[4] "Apple Developer Program License Agreement," *Apple*, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/. *See also*, "Apple Developer Enterprise Program License Agreement," *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/apple-developer-enterprise-program/Apple-Developer-Enterprise-Program-License-Agreement-20240610-English.pdf; "App Review," *Apple*, available at https://developer.apple.com/app-store/review/; "App Store Review Guidelines," Apple, available at https://developer.apple.com/app-store/review/guidelines.

[5] "Notarizing macOS Software Before Distribution," *Apple*, available at https://developer.apple.com/documentation/security/notarizing-macos-software-before-distribution.

[6] "Apple Developer Program License Agreement, Schedules 2 and 3" *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20240610-English.pdf.

[7] "App Store Review Guidelines," *Apple*, available at https://developer.apple.com/app-store/review/guidelines/. *See also*, Balu, Nivedita and Nellis, Stephen, "Explainer: Apple Gives 'Reader' Apps a Way Around Commissions. Who Wins?" *Reuters*, September 2, 2021, available at https://www.reuters.com/technology/apple-gives-reader-apps-way-around-commissions-who-wins-2021-09-02/.

[8] "App Store Review Guidelines," *Apple*, available at https://developer.apple.com/app-store/review/guidelines/. *See also*, Heath, Alex, "Apple's New App Store Tax on Ads Is a Direct Shot at Meta," *The Verge*, October 25, 2022, available at https://www.theverge.com/2022/10/25/23423637/apple-app-store-tax-boosted-social-media-posts.

[9] "Publishers that work with Apple News may qualify for a commission rate of 15% on qualifying in-app purchase subscriptions from day one." "Introducing the News Partner Program," *Apple*, available at https://developer.apple.com/apple-news/program/.

[10] "In order to offer paid content on the App Store, your membership Account Holder will need to accept the Paid Apps Agreement in the Tax and Banking section of App Store Connect. If the most recent version of this agreement hasn't been accepted, you can only offer your app for free." "Set a Price," *Apple*, available at https://developer.apple.com/help/app-store-connect/manage-app-pricing/set-a-price. Apple announced in December 2022 that new price tiers, including a new minimum price of $0.29, would be rolled out in spring 2023. *See also*, "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://www.apple.com/newsroom/2022/12/apple-announces-biggest-upgrade-to-app-store-pricing-adding-700-new-price-points.

[11] "App Privacy Details on the App Store," *Apple*, available at https://developer.apple.com/app-store/app-privacy-details/#user-tracking.

[12] "Apple Developer Program License Agreement," *Apple*, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 286 of 300

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[13] Apple states that in deciding which apps to feature, "there's no checklist of requirements," but considers factors including but not limited to user experience, UI design, innovation, and uniqueness. "Getting Featured on the App Store," *Apple*, available at https://developer.apple.com/app-store/getting-featured/.

[14] "Implementing Promotional Offers in Your App," *Apple*, available at https://developer.apple.com/documentation/storekit/implementing-promotional-offers-in-your-app.

F–12

## Exhibit F.1 – F.4
## Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States

**Notes and Sources:**

**Microsoft Xbox**

[1] Independent developers and studios can apply to join ID@Xbox, which is free but includes an additional concept approval requirement for apps. "There are no fees to apply to ID@Xbox, to submit a game to certification, publish, or update your games. There may be a very modest one-time cost associated with development for access to our Partner Center publishing portal. Developers with an approved concept will receive access to dev kits, free of charge." "Xbox Developer Programs," *Microsoft*, available at https://www.xbox.com/en-us/publish. Hobbyists or small studios can also use the Creators Program to publish their games to Xbox One or Windows 10, which provides developers with a standard certification and does not require a concept approval and only requires a payment of a developer registration fee. Parsons, Andrew, "Xbox Live Creators Program Is Now Live!" *Microsoft*, August 10, 2017, available at https://blogs.windows.com/windowsdeveloper/2017/08/10/xbox-live-creators-program-now-live/. Microsoft offers both free (e.g., Visual Studio Community, Visual Studio for Mac and Visual Studio Code, at tab "Individual") and paid (e.g., Visual Studio Professional IDE and Visual Studio Enterprise IDE at tabs "Business" and "Enterprise") versions of Visual Studio. "Buy Visual Studio," *Microsoft*, available at https://visualstudio.microsoft.com/vs/pricing/.

[2] Developers must pay a one-time registration fee to enroll in Microsoft's Partner Center which costs $19 for individuals and $99 for companies. "Enroll as a Developer for Microsoft Store," *Microsoft*, available at https://developer.microsoft.com/en-us/microsoft-store/register.

[3] Microsoft offers specialized tools for game development that developers can pay for. "Microsoft Gaming Tools and Services," *Microsoft*, available at https://developer.microsoft.com/en-us/games/products/.

[4] Microsoft's Developer Agreement states that developers who elect to enable Xbox Live Services in their apps must submit their apps through the Xbox certification process, but does not quote an associated cost. "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf, p. 15.

[5] "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf,  pp. 17-18.

[6] Third-party sources report that Microsoft is considering creating an ad program to allow brands to advertise in free-to-play Xbox Cloud games, but it is unclear if this program was rolled out and what commission rate, if any, would be associated with the service. Currently, Xbox offers free access to Fortnite on its Xbox Cloud Gaming Service.  Warren, Tom. "Microsoft Exec Hints at Free Ad-Supported Xbox Cloud Gaming," *The Verge*, December 13, 2023, available at https://www.theverge.com/2023/12/13/23999661/microsoft-xbox-cloud-gaming-free-version-ads.

[7] "You can set the Base price to Free, or you can choose an available price tier, which sets the price in all the countries where you choose to distribute your app. Price tiers start at 0.99 USD[.]" "Set and Schedule App Pricing for MSIX app," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/schedule-pricing-changes?pivots=store-installer-msix.

[8] "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf, p. 13.

F–13

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 288 of 300

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[9] Microsoft announced previously that it would be introducing Microsoft Store Ads. "Improve the Visibility of Your App in the Microsoft Store," *Microsoft*, available at https://developer.microsoft.com/en-us/microsoft-store/ads. Since the announcement, Microsoft has launched Microsoft Store Ads as a paid service for Windows PC, but it is unclear if Microsoft intends to launch the service for Xbox, when such a launch may take place for Xbox, or whether a cost would be associated with such a service for Xbox.

[10] Microsoft does not include the payment of a fee in its list of requirements for apps to be eligible to be featured. "Make Your App Easier to Promote," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/make-your-app-easier-to-promote.

[11] "You can promote your app or add-on in the Microsoft Store by putting it on sale for a limited time." "Put Apps and Add-Ons On Sale," *Microsoft*, March 15, 2023, available at https://learn.microsoft.com/en-us/windows/apps/publish/put-apps-and-add-ons-on-sale.

[12] O'Reilly, PJ, Fraser Gilbert, and Ben Kerry, "Best Xbox Exclusives," *PureXbox,* February 13, 2025, available at https://www.purexbox.com/guides/best-xbox-exclusives.

## Exhibit F.1 – F.4
## Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States

**Notes and Sources:**

**PlayStation**

[1] "Dedicated development hardware from SIE is required for content creation on PlayStation platforms." "Registering with PlayStation Partners," *PlayStation Partners*, available at https://playstationpartners.service-now.com/csm?id=kb_article2&sys_id=cf748f22db599b0082af8e146b96193c&smcid=partnerportal:help. On July 26, 2022, PlayStation announced a new initiative under which newly-licensed PlayStation developers are eligible to receive PlayStation 5 development kits for free, on loan. Rice, Greg, "PlayStation Indies: Development Hardware Loan Program," *Sony Interactive Entertainment*, July 26, 2022, available at https://sonyinteractive.com/en/news/blog/playstation-indies-development-hardware-loan-program/.

[2] PlayStation does not disclose fees associated with distributing on its store on either the PlayStation Partners registration page, or the related help page. "Your Journey Begins Here at PlayStation Partners," *PlayStation Partners*, available at https://partners.playstation.net/ ("Registration Page"); "Registering with PlayStation Partners," *PlayStation Partners*, available at https://playstationpartners.service-now.com/csm?id=kb_article2&sys_id=cf748f22db599b0082af8e146b96193c&smcid=partnerportal:help ("Help Page"). Additionally, the Help Page states that "SIE development hardware can be obtained after signing the GDPA agreement," but does not disclose if there are any costs associated with obtaining these developer tools – including specialized developer tools, if any; though Section 7.1 of the GDPA states that SIE "may sell or loan Development Tools to Publisher," suggesting that there may be costs associated with obtaining developer tools, at least in some instances. "PlayStation Global Developer & Publisher Agreement," *Sony Computer Entertainment*, effective April 1, 2018, available at https://www.sec.gov/Archives/edgar/data/712515/000071251518000045/ex-101playstationglobaldev.htm ("GDPA"). Moreover, there are no fees associated with app reviews mentioned in the GDPA.

[3] "Sony Facing $7.9 Billion Mass Lawsuit Over PlayStation Store Prices," *Reuters*, November 22, 2023, available at https://www.reuters.com/technology/sony-facing-79-bln-mass-lawsuit-over-playstation-store-prices-2023-11-21/.

[4] Sony enforces a cross-platform revenue sharing policy which requires publishers to pay Sony royalties whenever PlayStation players contribute more than a certain percentage to their game's bottom line. Warren, Tom, "Microsoft Claims Sony Pays for 'Blocking Rights' to Keep Games Off Xbox Game Pass," *The Verge*, available at https://www.theverge.com/2022/8/10/23300133/microsoft-sony-xbox-game-pass-blocking-rights-accusation. Despite Sony receiving revenue from allowing cross-platform play, consulting firm Naavik, which specializes in the gaming industry, observed that "exclusivity still remains a huge advantage for the company, so we are unlikely to see both fresh released and upcoming exclusives ported to PC in the foreseeable future," especially given that historically, "Sony has ported only aged exclusives from PS4" to other platforms. "Sony's State of Play," *InvestGame*, available at https://naavik.co/digest/state-of-play-06-2022/.

[5] Sony was reportedly considering introducing in-game ads in 2022 but has not announced a launch yet. It remains to be seen if Sony will collect a portion of the in-game ad revenue. Sato, Mia, "Sony Reportedly Plans to Put Ads in PlayStation Games," *The Verge*, available at https://www.theverge.com/2022/4/21/23035875/sony-playstation-microsoft-games-in-game-ads.

[6] "How to Make Purchases from PlayStation Store," *PlayStation*, available at https://www.playstation.com/en-us/support/store/purchase-games-apps-ps-store/.

[7] As of February 10, 2025, 7,713 and 5,821 games are listed for PlayStation 4 and PlayStation 5 respectively. Upon applying the "Free" price filter, the number of items remaining for PlayStation 4 and PlayStation 5 are 145 and 105 respectively. (145 + 105) / (7,713 + 5,821) = 1.8%. "All PS4 Games," *PlayStation Store*, available at https://store.playstation.com/en-us/category/85448d87-aa7b-4318-9997-7d25f4d275a4/1; "All PS5 Games," *PlayStation Store*, available at https://store.playstation.com/en-us/category/d71e8e6d-0940-4e03-bd02-404fc7d31a31/1.

[8] On PlayStation 5, users can choose to limit data collection to the extent necessary for services to be delivered. "Online Safety, Account Security, and Privacy," *PlayStation*, available at https://www.playstation.com/en-us/privacy-security-safety/. *See also*, Chen, Kevin, "How to Disable Data Collection on PS5," *Seeking Tech*, available at https://seekingtech.com/how-to-disable-data-collection-on-ps5/.

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 290 of 300

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[9] Fingas, Roger, "Sony Charging $25,000 For PS Store Visibility Confirmed By Multiple Devs," *ScreenRant*, July 1, 2021, available at https://screenrant.com/ps4-sony-charging-money-playstation-store-visibility-ps5/.

[10] Sony reserves "the sole and exclusive right to set the retail price to Users for Digitally Delivered Products sold or otherwise made available for purchase on or through PSN." Moreover, Sony "may modify any Digitally Delivered Product's retail price at any time without notice to Publisher." "PlayStation Global Developer & Publisher Agreement," Sony Computer Entertainment, effective April 1, 2018, available at https://www.sec.gov/Archives/edgar/data/712515/000071251518000045/ex-101playstationglobaldev.htm.

[11] Loveridge, Sam, "PS5 Exclusives: Every Game Released and Confirmed So Far," *GamesRadar+*, February 12, 2025, available at https://www.gamesradar.com/ps5-exclusives/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Exhibit F.1 – F.4
## Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States

**Notes and Sources:**

**Blackberry World**

[1] BlackBerry World was shut down in 2019 and was no longer functional beginning January 4, 2022. Hardawar, Devindra, "BlackBerry OS Devices Are Pretty Much Dead After January 4th," *Engadget*, December 30, 2021, available at https://www.engadget.com/blackberry-os-devices-january-4th-service-shutdown-220421328.html.

[2] BlackBerry made the BlackBerry 10 Native SDK available for download with no fee indicated. "Native SDK for BlackBerry 10," *BlackBerry*, available at https://web.archive.org/web/20220102074332/http://developer.blackberry.com/native/downloads/. Additionally, BlackBerry made the BlackBerry Native SDK for PlayBook OS available for download with no fee indicated, for use on Windows, Mac and Linux computers. "BlackBerry Native SDK for PlayBook OS," *BlackBerry*, available at https://web.archive.org/web/20220102203046/http://developer.blackberry.com/playbook/native/download/; "BlackBerry Native SDK for PlayBook OS – MacOS," *BlackBerry*, available at https://web.archive.org/web/20220102081829/http://developer.blackberry.com/playbook/native/download?os=mac; "BlackBerry Native SDK for PlayBook OS – Linux," *BlackBerry*, available at https://web.archive.org/web/20220102083308/http://developer.blackberry.com/playbook/native/download?os=linux.

[3] "No registration or submission fees." "BlackBerry World," *BlackBerry*, available at https://web.archive.org/web/20220104210858/http://developer.blackberry.com/blackberryworld/. "There is no registration fee for creating a vendor account, or for submitting products to BlackBerry World." "Apply for a BlackBerry World Vendor Account," *BlackBerry*, available at https://web.archive.org/web/20190818205817/http://developer.blackberry.com/devzone/blackberryworld/apply_for_a_blackberry_world_membership_account.html.

[4] "There is no registration fee for creating a vendor account, or for submitting products to BlackBerry World." "Apply for a BlackBerry World Vendor Account," *BlackBerry*, available at https://web.archive.org/web/20190818205817/http://developer.blackberry.com/devzone/blackberryworld/apply_for_a_blackberry_world_membership_account.html. Additionally, no app review fee is indicated in BlackBerry's instructions to vendors, vendor guidelines or app vetting criteria. "Vendor Guidelines and App Vetting Criteria," *BlackBerry*, available at https://web.archive.org/web/20190818205820/https://developer.blackberry.com/devzone/blackberryworld/vendor_app_vetting_guidelines.html; "Vendor Guidelines," *BlackBerry*, available at https://web.archive.org/web/20150907004643/https://appworld.blackberry.com/isvportal/guidelines.do; "BlackBerry World Vetting Criteria," *BlackBerry*, available at https://web.archive.org/web/20150907012758/https://appworld.blackberry.com/isvportal/downloadAWVettingCriteriaDoc.do?csrfToken=XU72-JQRP-U7NQ-7Y3C-42MB-M7E9-N371-W6WR.

[5] According to the February 12, 2014 BlackBerry World Vendor Agreement, BlackBerry charged a 30% Commission on Paid Offerings, which included both paid aps and in-app purchases. "BlackBerry World Vendor Agreement," *BlackBerry*, effective May 8, 2012, available at https://www.blackberry.com/content/dam/blackberry-com/Documents/pdf/legal/blackberry-world/BlackBerry_World_Vendor_Agreement.pdf. Beginning April 1, 2018, BlackBerry World moved to a free-only storefront. Vendors were allowed to continue monetizing their applications only if they supplied their own payment mechanisms and related support. Correspondingly, no revenue split was required. "Reminder: Beginning April 1, 2018 BlackBerry World Will Only Offer Free Apps," *CrackBerry*, March 31, 2018, available at https://crackberry.com/beginning-april-1-2018-blackberry-world-will-only-offer-free-apps.

[6] "Under the program, developers will receive an industry standard 60 percent of the advertising revenue." Zeis, Adam, "Press Release: RIM Launches BlackBerry Advertising Service," *CrackBerry*, September 27, 2010, available at https://crackberry.com/rim-launches-blackberry-advertising-service.

[7] Beginning April 1, 2018, BlackBerry World moved to a free-only storefront, with all paid content removed on March 31, 2018. However, even then, vendors were allowed to continue monetizing their applications if they supplied their own payment mechanisms and related support. "Reminder: Beginning April 1, 2018 BlackBerry World Will Only Offer Free Apps," *CrackBerry*, March 31, 2018, available at https://crackberry.com/beginning-april-1-2018-blackberry-world-will-only-offer-free-apps. Moreover, it is unclear what the percentage of free apps offered on the store when the store supported paid content was.

F–17

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 292 of 300

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[8] "BlackBerry World Vendor Portal," *BlackBerry*, March 5, 2015, available at
https://developer.blackberry.com/devzone/files/blackberryworld/BlackBerry_World_Vendor_Portal_UG.pdf.

[9] BlackBerry did not list the payment of a fee as one of the factors taken into consideration when selecting featured applications. "Frequently Asked Questions," *BlackBerry*, available at https://web.archive.org/web/20210916181507/http://developer.blackberry.com/blackberryworld/faq/, Question 13.d. BlackBerry allowed vendors to nominate their applications to be featured. BlackBerry did not quote a fee for this option either. "Frequently Asked Questions," *BlackBerry*, available at https://web.archive.org/web/20210916181507/http://developer.blackberry.com/blackberryworld/faq/, Question 13.a.

[10] "For paid applications, BlackBerry World will allow you to select a suggested retail price in US dollars for your application. The US dollar price is associated with a pricing tier." The available tiers listed by BlackBerry imply a minimum price of $0.99. "Frequently Asked Questions," *BlackBerry*, available at https://web.archive.org/web/20210916181507/http://developer.blackberry.com/blackberryworld/faq/, Question 7.b.

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

**Steam**

[1] Valve offers the Steamworks SDK for download free of charge on Steam's site. "Steamworks SDK," *Steam*, available at https://partner.steamgames.com/doc/sdk.

[2] Valve charges developers a $100 Steam Direct Fee for each product they distribute on Steam, which is non-refundable but recoupable after the product amasses at least $1,000 in Adjusted Gross Revenue on Steam. No additional fee associated with the app review process is disclosed. "Joining The Steamworks Distribution Program," *Steam*, available at https://partner.steamgames.com/steamdirect, accessed on November 4, 2022.

[3] VALVE000675.

[4] Historically, Steam has charged developers a 30% commission. Purslow, Matt, "Microsoft Puts Pressure on Steam by Increasing Revenue Share by 18% for PC Developers," *IGN*, available at https://www.ign.com/articles/microsoft-puts-pressure-on-steam-by-increasing-revenue-share-by-18-for-pc-developers. This remains the case for small developers with game revenues up to $10 million, but Steam now charges a 25% commission for revenues over $10 million and below $50 million, as well as a 20% commission for revenues at or above $50 million. These revenues include "game packages, DLC, in-game sales, and Community Marketplace game fees." "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," *Steam*, available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[5] Steam does not support games with paid ads. In particular, Valve states, "[i]f your game's revenue relies on advertising on other platforms, you will need to find a new model to ship on Steam." Additionally, "[d]evelopers on Steam have control over their own prices, in every currency." However, Valve notes that "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve." "Pricing," *Steam*, available at https://partner.steamgames.com/doc/store/pricing. Valve has recently reiterated this stance. Litchfield, Ted, "Steam Makes Its Ban on Games that Rely on In-Game Ads Even More Explicit, So No 'Watch This to Continue Playing' Stuff Will Be Making Its Way to Our PCs," *PC Gamer*, February 9, 2025, https://www.pcgamer.com/gaming-industry/valve-bans-games-that-rely-on-in-game-ads-from-steam-so-no-watch-this-to-continue-playing-stuff-will-be-making-its-way-to-our-pcs/.

[6] As of February 17, 2025, SteamSpy estimates that there are 4,164 free games, out of a total of 90,076 on Steam. 4,164 / 90,765 = 4.6%. "Games Released in Free Genre," *SteamSpy*, available at https://steamspy.com/genre/Free; "Games Released in Previous Months," *SteamSpy*, available at https://steamspy.com/year/.

[7] Section 5 of Steam's privacy policy states that Valve may share users' data with third parties. Valve's policies on cross-app data gathering are unclear, though Valve notes in Section 3.6 of its privacy policy that it uses cookies and other similar tracking technologies. "Privacy Policy Agreement," *Steam*, available at https://store.steampowered.com/privacy_agreement/. In its February 13, 2024, review of Steam, non-profit organization Common Sense noted that third parties have access to and can collect Steam users' data (Sections 3.7 and 3.8), and that it is unclear whether Steam may "track users across different applications and services on the internet." "Standard Privacy Report for Steam," *Common Sense Privacy Program*, available at https://privacy.commonsense.org/privacy-report/Steam.

[8] "Q. Can I pay for my game to show up to more customers? A. Nope. You focus on making a compelling, interesting, and unique game, and Steam will work out the best places to feature your game based on customers' interests, preferences, and feedback." "Visibility on Steam," *Steam*, available at https://partner.steamgames.com/doc/marketing/visibility. Aside from visibility in the Steam Store, Valve also offers a Curator Connect program through which developers can have their games reviewed by Steam Curators. Valve does not indicate a fee for this program. "Curators and Curator Connect," *Steam*, available at https://partner.steamgames.com/doc/marketing/curators.

[9] Valve allows developers to offer both self-serve and curated promotions. Curated promotions are ideated, created and managed by Valve, though developers are asked for their approval and can opt out of participating. While self-serve promotions are created and managed by developers, they are still subject to limitations. For example, there is a 40% limit on launch discounts and more broadly, discount percentages must be between 10% and 95%. Moreover, Valve imposes limitations on the timing and length of self-serve promotions. "Discounting," *Steam*, available at https://partner.steamgames.com/doc/marketing/discounts.

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[10] Valve's self-developed games, such as Counter Strike 2, may be exclusively available via Steam, but we do not treat them as exclusive deals as they are not with third parties. Westerlund, William, "How to Download Counter Strike 2?" *Tradeit.gg*, May 18, 2024, https://tradeit.gg/blog/how-to-download-counter-strike-2/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

**Galaxy Store**

[1] "The use of the Samsung Developers services is free of charge." "Samsung Developer Terms of Use," *Samsung*, effective September 26, 2024, available at https://developer.samsung.com/terms?location=us. Additionally, most of the SDKs it lists for Samsung Mobile can be freely downloaded. *See for e.g.*, "Galaxy Accessory SDK," *Samsung*, available at https://developer.samsung.com/galaxy-accessory/download.html. However, to gain access to some SDKs, developers must request partnership with Samsung. *See for e.g.*, "Galaxy AR Emoji SDK for Unity," *Samsung*, available at https://developer.samsung.com/galaxy-ar-emoji/overview.html.

[2] "[T]here is no sign-up nor annual fee to use Galaxy Store." "FAQ: Galaxy Store," *Samsung*, available at https://developer.samsung.com/galaxy-games/faq.html.

[3] "Within a reasonable period of time after you submit an Application to Samsung, and provided that you have (i) paid any applicable certification or other fees and (ii) accepted any additional terms of service from Samsung's designated certification vendors, Samsung (or Samsung's designated certification vendor) will evaluate the Application to determine whether the Application complies with the certification requirements (including any requirements in the Documentation)." "Galaxy Store Seller Portal: Terms and Conditions," *Samsung*, available at https://seller.samsungapps.com/help/termsAndConditions.as. Samsung does not specify the potential certification fees in the app review process. "Requesting app review," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0201060000&localeLanguage=en; "App Review Process," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0202010000&localeLanguage=en; "Information about App Review Policy," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0202020000&localeLanguage=en.

[4] Samsung Galaxy devices have Google Play Protect pre-installed. "Samsung - How to Turn On/Off Google Play Protect," *Techbone*, June 18, 2021, available at https://www.techbone.net/samsung/user-manual/google-play-protect#google_vignette. "Google Play Protect offers protection for apps that are installed from sources outside of Google Play. When a user tries to install an app, Play Protect conducts a real-time check of the app against known harmful or malicious samples that Google Play Protect has cataloged. […] If the app is identified as malicious or suspicious, we will warn users or block the installation in extreme cases." "On-Device Protections," *Google*, available at https://developers.google.com/android/play-protect/client-protections. *See also,* "Use Google Play Protect to Help Keep Your Apps Safe & Your Data Private," *Google*, available at https://support.google.com/googleplay/answer/2812853?hl=en; "How We Kept the Google Play & Android App Ecosystems Safe in 2024," *Google*, January 29, 2025, available at https://security.googleblog.com/2025/01/how-we-kept-google-play-android-app-ecosystem-safe-2024.html.

[5]  "Starting May 15, 2025 [...], developers and publishers of paid games, apps, and consumable and non-consumable in-app items using Samsung Checkout will start receiving 80% of the net sales proceeds[] generated and received through Galaxy Store, while Samsung will retain 20%. For subscription services, the revenue share model will be 85% / 15%." "New Revenue Share Model for Galaxy Store," *Samsung Developer*, March 13, 2025, available at https://developer.samsung.com/sdp/news/en/2025/03/13/new-revenue-share-model-for-galaxy-store.

[6] Samsung allows developers to offer free apps. For paid apps, Samsung enforces a minimum payment amount by country/region, and if the price set by a developer falls below this minimum, Samsung automatically updates the price to the minimum. Additionally, developers "can adjust the price only to the available prices, and the permitted mobile payment amounts differ by country." "Entering Information on Country/Region and Price," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0201030000&localeLanguage=en.

[7] "App Distribution Guide," *Samsung*, available at https://developer.samsung.com/galaxy-store/distribution-guide.html.

[8] Samsung allows developers to "boost their ranks" in the Galaxy Store's search results. "Galaxy Store Seller Portal: Terms and Conditions," Samsung, available at https://seller.samsungapps.com/help/termsAndConditions.as. However, it is unclear what fees, if any, Samsung charges for this service.

**Exhibit F.1 – F.4**

**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[9] Samsung states that developers "can request to promote your app in Galaxy Store when your app meets the selection criteria" and that developers' apps "may qualify to be part of a collection of apps that fit a trending topic" but does not indicate any fees charged to developers for such promotional opportunities. "Discover Galaxy Store," *Samsung*, available at https://developer.samsung.com/galaxy-store/discover-galaxy-store.html.

[10] "Issuing Coupons," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0401010000&localeLanguage=en. *See also*, "Discounting App Price," *Samsung*, available at https://seller.samsungapps.com/guidePopup.as?numcid=0401020000&localeLanguage=en.

[11] Samsung has previously implemented limited time, short-term exclusive promotional offers related to Genshin Impact and Pokémon GO, which were only available to consumers who downloaded the games through the Galaxy Store. However, these games were still available for download through other stores. Cantisano, Timi, "Samsung's Galaxy Store is Offering Time-Exclusive Promotions for Genshin Impact and Pokémon GO," *XDA Developers*, August 23, 2022, available at https://www.xda-developers.com/samsungs-galaxy-store-promotions-for-genshin-impact-and-pokemon-go/.

## Exhibit F.1 – F.4
## Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States

**Notes and Sources:**

**Amazon App Store**

[1] Amazon's SDKs are available to download for free. *See for e.g.*, "SDKand Samples," *Amazon*, available at https://developer.amazon.com/apps-and-games/sdks. Additionally, Amazon notes that "The [developer] program is free. You pay nothing to create a developer account, use Amazon APIs, and submit apps." "Amazon Appstore Payments," *Amazon*, available at https://developer.amazon.com/docs/reports-promo/payments-understand.html, "FAQs for Payments and Reporting".

[2] "Create a free developer account and distribute your app to a global audience." "Reach Millions of New Customers," *Amazon*, available at https://developer.amazon.com/apps-and-games.

[3] Amazon does not disclose an app review fee in its description of the app submission and review process. *See for e.g.*, "Step 4: Review and Submit," *Amazon*, available at https://developer.amazon.com/docs/app-submission/review-submit.html.

[4] "Amazon Developer Services Agreement," *Amazon*, available at https://www.developer.amazon.com/support/legal/da.

[5] The Amazon Developer Services Agreement does not outline any commission charged on in-app advertising. "Amazon Developer Services Agreement," *Amazon*, available at https://www.developer.amazon.com/support/legal/da. Additionally, Amazon supports integrations of multiple third-party SDKs to enable in-app advertising but does not specify any commission charged to developers. "Make Money from Your Apps," *Amazon*, available at https://developer.amazon.com/apps-and-games/services-and-apis/monetization.

[6] Based on January 2025 data. "Distribution of Free and Paid Android Apps in Amazon Appstore from September 2020 to January 2025," *Statista*, available at https://www.statista.com/statistics/256776/distribution-paid-free-amazon-appstore-apps/.

[7] App developers must "[o]btain applicable consent of users to collect, use or share" user data if their app, or any third-party plug-in or service provider their app uses, collects user data. "Privacy and Security Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/privacy-security.html#user-data. Amazon's user data privacy policy does not elaborate on its cross-app data gathering policy. "User Data Privacy Policy," *Amazon*, available at https://developer.amazon.com/docs/policy-center/user-data-privacy.html.

[8] Amazon allows developers to submit their apps for consideration for featured marketing placement but does not indicate an associated fee. "App Submission FAQs," *Amazon*, available at https://developer.amazon.com/docs/app-submission/faq-submission.html.

[9] Developers who offer paid apps must "enter a base list price and currency from the drop-down menu." $0.99 is the minimum price for USD. "Step 3: Add Appstore Details," *Amazon*, available at https://developer.amazon.com/docs/app-submission/appstore-details.html.

[10] "Developer Promotions Console," *Amazon*, available at https://developer.amazon.com/docs/reports-promo/promo-overview.html.

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 298 of 300

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

**Epic Games Store**

[1] Epic does not indicate a fee for using its Developer Portal. "Developer Portal Introduction," *Epic Games Store*, available at https://dev.epicgames.com/docs/dev-portal/dev-portal-intro.

[2] Epic notes in its content guidelines that it reviews products prior to their launch but does not disclose an associated cost. "Content Guidelines," *Epic Games Store*, available at https://dev.epicgames.com/docs/epic-games-store/requirements-guidelines/content-ratings/content-guidelines. Additionally, Epic does not indicate any fees for distributing on its store or for app reviews in its developer agreements. "Developer Agreements," *Epic Games Store*, available at https://onlineservices.epicgames.com/en-US/services/terms/agreements.

[3] Game developers who use the Unreal Engine are subject to a 5% royalty for revenues generated from games distributed *outside of the Epic Games Store*. Developers who use the Unreal Engine for commercial purposes, such as for linear content like film and television shows, are subject to "seat-based" license fee of $1,850 per license per year. Games developers, individuals and businesses with less than $1 million USD in annual gross revenue do not have to pay royalty or license fee. "Licensing," *Unreal Engine*, available at https://www.unrealengine.com/en-US/license.

[4] Epic charges a 0% commission on the first $1 million in net revenue per title, which then reverts to a 12% commission on net revenue after the $1 million threshold for each title on the Epic Games Store. "The $1M revenue threshold started June 1, 2025, and applies through December 31, 2025. From 2026 onward, the $1M threshold for each product resets annually on January 1." "Epic Games Store Updates Revenue Share: Keep 100% of the First $1M Per Product, Per Year," *Epic Games Store,* June 3, 2025, available at https://store.epicgames.com/en-US/news/epic-games-store-updates-revenue-share-keep-100-of-the-first-1m-per-product-per-year. *See also* "Frequently Asked Questions," *Epic Games Store*, available at https://store.epicgames.com/en-US/distribution. Additionally, Epic allows developers to offer in-game purchases. Developers who set up their own payment processing functionality "will not need to share any revenue with Epic on in-game transactions." Valentine, Rebekah, "Epic Games Store Implements In-Game Purchases for Third Parties," *Games Industry.biz*, available at https://www.gamesindustry.biz/epic-games-store-implements-in-game-purchases-for-third-parties. Currently, Epic has two additional incentive programs, Epic First Run and Now on Epic, both allow a 0% commission for six months. "The Epic First Run program is an opt-in exclusivity program for developers on the Epic Games Store. You can boost your net revenue from user spending on your product to 100% in the first six months on the store. This applies no matter what your product's total net revenue is. After the six-month run, you benefit from Epic Games' 100% / 0% revenue split for the first $1 million net revenue from your product, and then an 88% / 12% revenue split." "Epic First Run," *Epic Games Store*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/epic-first-run. "Use the Now On Epic program to bring your previously-released products to the Epic Games Store. You can boost your net revenue from user spending on your product to 100% in the first six months on the store, on all payments processed by Epic Games. This applies no matter what your product's total net revenue is. After the six-month run, you benefit from Epic Games' 100% / 0% revenue split for the first $1 million net revenue from your product, and then an 88% / 12% revenue split." "Now on Epic," *Epic Games Store*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/now-on-epic.

[5] "Free Games," *Epic Games Store*, available at https://store.epicgames.com/en-US/free-games.

[6] "Please note that if certain features on the Epic Services are provided by third parties, those third parties may also use automated means of data collection and may record information about your use of the Epic Services or others' websites over time. […] These features are subject to those third parties' privacy notices and policies." "Epic Games Privacy Policy," *Epic Games Store*, available at https://www.epicgames.com/site/en-US/privacypolicy.

F–24

Case 4:11-cv-06714-YGR    Document 1095-47    Filed 03/05/26    Page 299 of 300

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Exhibit F.1 – F.4**
**Pricing Strategies, Consumer Considerations, Non-OS Developer Benchmarks in the United States**

**Notes and Sources:**

[7] "The Developer Portal automatically populates the price tier with prices for the various regions based on the price you select here. You can leave these prices as the default values, or edit them." "Create Custom Price Tiers," *Epic Games Store*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/custom-price-tiers.

[8] "Epic CEO Tim Sweeney previously revealed that the company pays a flat fee to each developer to give away their games, rather than paying per download." Porter, Jon, "Epic Spent At Least $11.6 million on Free Games and Gained 5 Million New Users In Return," *The Verge*, May 4, 2021, https://www.theverge.com/2021/5/4/22418782/epic-games-store-free-games-cost-apple-trial-arkham-subnautica-mutant-year-zero.