# EXHIBIT 49

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | Civil Action No. 4:11-cv-06714-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

**OPENING EXPERT REPORT AND DECLARATION OF
ARUN SUNDARARAJAN, PH.D.**

**MARCH 7, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Table of Contents**

I.      Introduction ................................................................................................ 1

II.     Allegations and Assignment .................................................................... 3

        A.      Allegations ................................................................................... 3

        B.      Assignment .................................................................................. 4

III.    Summary of Opinions ............................................................................. 5

IV.     The Economics of Two-Sided Platforms ............................................. 10

        A.      Introduction to Two-Sided Platforms and Two-Sided Transaction Platforms ..... 10

        B.      Two-Sided Transaction Platforms Must Try to Mitigate Market Failure to Be
                Successful ................................................................................... 20

                1.      Overview of Market Failure ............................................ 21

                2.      Sources of Market Failure for Two-Sided Transaction Platforms ............... 22

                        a)      Search and Other Costs Related to Transacting        22

                        b)      Willful Adverse Outcomes        25

                        c)      Information Asymmetry        27

                        d)      Cognitive Costs        29

        C.      Two-Sided Transaction Platforms Create Value by Providing Services and
                Governance Mechanisms that Mitigate Market Failure ......................................... 31

                1.      Two-Sided Transaction Platforms Encourage and Enhance Participation on
                        Both Sides of the Platform ................................................ 32

                2.      Two-Sided Transaction Platforms Facilitate Discovery, Matching, and
                        Transacting ..................................................................... 37

                3.      Two-Sided Transaction Platforms Facilitate Trusted and Safe Interactions
                        Between Consumers and Providers ................................. 42

        D.      Many Two-Sided Transaction Platforms Have Failed to Implement Services and
                Governance Mechanisms to Mitigate Market Failure and Achieve Success ........ 50

V.      The App Store Is a Two-Sided Transaction Platform ......................... 57

        A.      Origin and Evolution of the App Store ...................................... 58

                1.      The Introduction of the iPhone ....................................... 58

                2.      The Introduction of the App Store ................................... 63

                3.      Apple's Strategic Choices Made When the App Store Was Launched in
                        2008 Still Remain Central to the App Store Today ......... 73

                        a)      Apple Chose to Review, Approve, and Distribute Every iOS App, All In-
                                App Digital Content, and Every Update Made Available to Consumers    73

                        b)      Apple Chose to Implement a Revenue-Sharing Model with Developers and
                                Has Only Lowered Its Commission Rate Since 2008        80

                        c)      Apple Chose to Enable Developers to Take Advantage of Price Tiers and
                                Use Flexible Monetization Strategies        90

        B.      Analysis of the App Store as a Two-Sided Transaction Platform ........................ 96

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

1.  The App Store Encourages and Enhances Participation on Both Sides of the Platform................................................................................ 99

2.  The App Store Facilitates Discovery, Matching, and Transacting ............ 101

3.  The App Store Facilitates Trusted and Safe Interactions Between Consumers and Developers.......................................................................... 105

C.  Economic Considerations When Analyzing Two-sided Transaction Platforms such as the App Store............................................................................ 108

1.  Market Definition Considerations............................................................. 109

    a)  The Relevant Market Must Encompass Both Sides of the Two-Sided Transaction Platform                                                       109

    b)  There May Be Multiple Product Markets If Different Categories of Transactions Experience Different Competitive Conditions             111

2.  Market Power Considerations.................................................................... 113

3.  Competitive Effects Considerations ......................................................... 117

VI.  The Challenged Conduct Is Procompetitive .................................................... 118

A.  The Challenged Conduct Encourages and Enhances Participation on Both Sides of the Platform.......................................................................... 119

B.  The Challenged Conduct Facilitates Discovery, Matching, and Transacting..... 124

C.  The Challenged Conduct Facilitates Trusted and Safe Interactions Between Consumers and Developers.......................................................................... 126

1.  Centralized Distribution Through the App Store with App Review Fosters Participant Trust Through the Transparent Representation of Products and the Intentions of Platform Participants, and Through Inducing the Provision of Better Products ........................................................................ 126

2.  Centralized Distribution Through the App Store, with App Review, Raises Quality and Prevents Adverse Transaction Outcomes.............................. 132

    a)  Preventing Adverse Consumer Outcomes                                     132

    b)  Preventing Adverse Post-Transaction Developer Outcomes                 137

D.  The Challenged Conduct Does Not Restrain Interbrand Competition .............. 145

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION

1.    I am the Harold Price Professor of Entrepreneurship and Professor of Technology, Operations and Statistics at the Leonard N. Stern School of Business at New York University ("NYU") in New York, New York, where I also serve as Director of their Fubon Center for Technology, Business, and Innovation.

2.    I earned an undergraduate degree in Electrical Engineering from the Indian Institute of Technology in Madras, India in 1993. I earned a M.S. in Management Science in 1995 and a Ph.D. in Business Administration in 1998, both from the University of Rochester. I have been at NYU since completing my Ph.D., where I have taught courses about artificial intelligence and platforms, digital economics, fintech platforms, and network analytics, among other topics. My research studies different facets of the economics of digital technologies, including the economics of digital goods and network effects, competition and its implication for antitrust policy related to technology companies, the regulation and governance of artificial intelligence and digital platforms, and other related topics in industrial organization. I am the author of over 50 peer-reviewed papers published in academic journals that include *Management Science*, *Proceedings of the National Academy of Sciences*, *Information Systems Research*, *Network Science, Statistical Science*, the *Journal of Marketing*, the *University of Chicago Law Review* and the *University of Chicago Legal Forum*, and conference proceedings that include those of the *International Conference on Information Systems* and the *ACM Conference on Economics and Computation*. My published work has been recognized by numerous "best paper" awards. Earlier in my career, I served on editorial boards in the role of Senior Editor for the journal *Information Systems Research* and the role of Associate Editor for the journal *Management Science*.

3.    I am the author of the award-winning book "The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism" published in 2016 by the MIT Press, which describes various economic and regulatory aspects of a specific set of two-sided platforms that, at the time of the book's publication, were commonly referred to as constituting the "sharing economy." The book has been translated into Mandarin Chinese, Japanese, Korean, Portuguese, and Vietnamese. I have authored over 40 op-eds on issues

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

related to the digital economy and platform regulation that have been published in outlets that include the *New York Times*, the *Financial Times*, *The Guardian*, *Harvard Business Review*, *WIRED*, *Le Monde,* and the *Japan Times*, and have also published numerous book chapters and policy papers.

4.    I have provided expert testimony to the United States House of Representatives at the congressional hearing titled "The Power of Connection: Peer-to-Peer Businesses" in January 2014,[1] and at the congressional hearing titled "The Sharing Economy: Creating Opportunities for Innovation and Flexibility" in September 2017.[2] I delivered the policy framing presentation at the Federal Trade Commission workshop titled "The "Sharing" Economy: Issues Facing Platforms, Participants, and Regulators" in June 2015.[3] I have also been invited to speak about platforms and the digital economy to numerous other bodies that include the European Parliament, the United Nations, federal government agencies that include the Presidential Council of Advisors on Science and Technology, the National Economic Council, the Federal Reserve Banks of New York, San Francisco and Atlanta, and various other state and city legislative bodies in the United States.

5.    On March 26, 2025, I will begin a two-year term as co-chair of the World Economic Forum's Global Future Council on Data Frontiers. I am also a member of their AI Governance Alliance and have previously served as a member of their other councils and steering committees, including the Global Future Council on Technology, Values and Policy. In 2016, I spoke at their Annual Meeting in Davos on the "platform economy."

6.    My curriculum vitae and list of prior testimony are in **Appendix A.**

7.    In forming my opinions, I have relied on court documents, data and documents produced by the parties, academic publications and textbooks, and other publicly available materials.

---

[1]    "The Power of Connection: Peer-to-Peer Businesses," January 15, 2014, available at https://smallbusiness.house.gov/calendar/eventsingle.aspx?EventID=364939.

[2]    "The Sharing Economy: Creating Opportunities for Innovation and Flexibility," *Hearing Before the Committee on Education and the Workforce*, United States House of Representatives, House Education and the Workforce, 2017, available at https://www.congress.gov/event/115th-congress/house-event/106358.

[3]    "The 'Sharing Economy': Issues Facing Platforms, Participants, and Regulators," *Federal Trade Comission*, June 9, 2015, available at https://www.ftc.gov/news-events/events/2015/06/sharing-economy-issues-facing-platforms-participants-regulators.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

These materials are cited throughout my report or otherwise listed in **Appendix B**. I am being compensated for my work in this matter at an hourly rate of $1,100. In working on this report, I have been assisted by certain employees of the firm Analysis Group, Inc., who worked under my direction, and I receive additional compensation in part based on their fees. The compensation Analysis Group and I receive is not dependent upon the outcome of this case or my findings.

## II.    ALLEGATIONS AND ASSIGNMENT

### A.    Allegations

8.    Plaintiffs allege that Apple acquired and maintained monopoly power in the alleged aftermarket of iOS apps by "designing iOS as a closed system" and making the App Store[4] the "exclusive" distributor of iOS apps.[5] That is, Apple "centralized" the distribution of iOS apps on the App Store, which means there is no sideloading of third-party app marketplaces or alternative stores within the App Store. I refer to this as the challenged conduct throughout the report.

9.    Plaintiffs also claim Apple has used "security measures" and "program locks" to prevent third-party app downloads; has terminated developers that "sold apps in competition with Apple," and has voided the warranties of consumers who obtained apps from sources other

---

[4]    I understand that Apple considers each of Apple's six App Stores in the United States (iOS App Store, iPadOS App Store, macOS App Store, tvOS App Store, watchOS App Store and visionOS App Store) to be distinct. I use the term 'App Store' to refer to the iOS App Store and the iPadOS App Store in the United States for convenience only.

[5]    Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re Apple iPhone Antitrust Litigation*, No. C 11–06714–YGR, United States District Court for the Northern District of California, Oakland Division, September 11, 2020 ("Third Amended Complaint"), ¶ 51 ("By designing iOS as a closed system, installing security measures and program locks to prevent Third Party App downloads, establishing the App Store as the exclusive worldwide distributor of iOS apps, enforcing the App Store's exclusive distributor status by terminating apps developers who sold apps in competition with Apple, voiding the warranties of iOS Devices consumers who bought competing apps, and denying authorization of apps with in-app purchasing features that do not meet Apple's payment requirements, Apple has since June 2007 willfully acquired and maintained a monopoly in the iOS apps aftermarket and has positioned itself as the one and only distributor of iOS apps on the entire planet. Apple has no competition in the multi-billion dollar iOS apps aftermarket, domestically or abroad, whatsoever.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

than the App Store. Plaintiffs allege Apple never disclosed or asked for consent regarding limits to acquiring iOS apps outside of the App Store.[6]

10. Plaintiffs claim that because of Apple's decision to centralize iOS app distribution on the App Store and allegedly exclude third-party app marketplaces, Apple has been able to charge a higher-than-competitive commission rate on the sale of apps and in-app digital content purchases through the App Store, causing consumers to pay higher prices for apps and in-app digital content than they otherwise would have.[7]

11. Further, Plaintiffs claim that Apple's decisions to centralize iOS app distribution on the App Store do not have any procompetitive justification.[8]

## B.    Assignment

12. I have been asked by counsel for Apple to:

   a.    Provide an overview of the economics of two-sided platforms and two-sided transaction platforms.

   b.    Analyze the origin and evolution of the App Store and choices that Apple made when the App Store was launched in 2008.

---

[6]    Third Amended Complaint, ¶ 52 ("Prior to Plaintiffs' purchases of their iOS Devices, Apple had not even disclosed – much less obtained the Plaintiffs' contractual consent to – either (a) Apple's monopolization of and collection of monopoly profits from the iOS applications aftermarket, or (b) having their iOS Devices locked to prohibit Plaintiffs from using any app that was not approved or sold by Apple. Absent obtaining Plaintiffs' contractual consent, Apple's monopolization of the iOS applications aftermarket constitutes an antitrust violation under Section 2 of the Sherman Act.").

[7]    Third Amended Complaint, ¶ 53 ("Plaintiffs have been injured by Apple's anticompetitive conduct because they paid more for their iOS apps than they would have paid in a competitive market."). *See also*, Third Amended Complaint, ¶ 56 ("In a truly competitive iOS apps distribution environment, Apple's 30% margin would be simply unsustainable.").

[8]    Plaintiffs' Responses and Objections to Defendant Apple Inc.'s First Set of Interrogatories, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714-YGR, United States District Court Northern District of California, Oakland Division, May 12, 2024 ("Plaintiffs' Responses and Objections to Defendant Apple Inc.'s First Set of Interrogatories"), p. 26 ("Apple has unlawfully foreclosed competition in the iOS app distribution and in-app payment aftermarket through various exclusionary acts, including conditioning the purchase of iOS devices on use of the Apple App Store, conditioning developers' access to iOS developer tools and iOS device customers on exclusive use of the Apple App Store and in-app purchase, increasing switching costs for iOS device owners, voiding the warranties of iOS device customers that venture outside of Apple's walled garden, and preventing consumers from becoming aware of cheaper options through its anti-steering provision. See Responses to Interrogatory Nos. 2, 4, & 12. Those acts have resulted in various competitive harms. See Responses to Interrogatory Nos. 1 & 2. No procompetitive justification exists for those acts.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

    c.      Evaluate based on economic principles whether the App Store is a two-sided transaction platform.

    d.      Examine selected economic considerations related to market definition, market power, and competitive effects for two-sided transaction platforms.

    e.      Evaluate whether Apple's challenged conduct is procompetitive.

    f.      Provide a preliminary evaluation of the economic implications of requiring Apple to allow distribution of iOS app and in-app digital content through sideloaded app marketplaces or alternative stores within the App Store.

13. The opinions I express in this report are solely from the perspective of an economist and business school professor. I offer no legal opinions or interpretations of the law.

14. Since my work on this matter is ongoing, I may review additional materials produced after the issuance of this report or conduct further analysis. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to other experts' reports and any additional information I may receive.

## III.    SUMMARY OF OPINIONS

15. The following is a summary of my opinions.

16. A two-sided platform is a specific type of business that brings together two distinct user groups. A two-sided platform derives value from indirect network effects, wherein the value realized by members of one group is higher when they have access to more members of a different group with whom they might interact. The presence of indirect network effects makes the business strategies of two-sided platforms complex (*see* **Section IV.A**).

17. A two-sided transaction platform is a special type of two-sided platform, which facilitates simultaneous transactions between participants on the two sides of the platform. As the United States Supreme Court recognized in *Ohio v. American Express*, two-sided transaction platforms facilitate simultaneous transactions between participants and cannot make a sale to one side of the platform without making a sale to the other side. Two-sided transaction platforms display particularly strong indirect network effects (*see* **Section IV.A**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

18.   Prices on two-sided transaction platforms are unlikely to be set independently for each side. Owing to the presence of indirect network effects, the responses to price changes directed at one group from members within that group indirectly affects participation from members of the other group (*see* **Section IV.A**).

19.   To facilitate participation that yields successful transactions, two-sided transaction platforms must minimize certain economic conditions that may cause what economists commonly refer to as "market failure," wherein transactions that would have occurred absent such conditions do not occur.[9] Sources of market failure in two-sided transaction platforms include the presence of search and other costs related to transacting, potential opportunistic behavior by participants, the presence of information asymmetry, and the presence of participant cognitive costs (*see* **Section IV.B**). Two-sided transaction platforms must therefore devise services and governance mechanisms to mitigate these sources of market failure. Such services and governance mechanisms include those that encourage and enhance participation on both sides; facilitate discovery, matching, and transacting; and facilitate trusted and safe interactions for participants on both sides. A reason competing platforms may adopt different governance mechanisms is to differentiate themselves from one another (*see* **Section IV.C**).

20.   Owing in part to the presence of indirect network effects, when two-sided transaction platforms do not provide effective services and governance mechanisms, participation on both sides can be negatively impacted and transactions may not occur. Launching a new two-sided transaction platform is fraught with risk, a point often missed if one focuses on the few highly visible examples of successful platforms while ignoring the hundreds of failed ones. Achieving early success and maintaining this success requires careful and constant attention to selecting and refining effective services and governance mechanisms, an undertaking that is complex and uncertain, as illustrated by numerous examples of two-sided transaction platforms that have failed (*see* **Section IV.D**).

---

[9]   I use the term "market failure" as used by economists to refer to the outcomes associated with the economic conditions that I describe in what follows. My usage of the term "market" in "market failure" does not connote that the phenomenon operates only at the level of the market but can apply to individual platforms operating in the market.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

21. When Apple launched the App Store, app distribution for (then nascent) smartphones was inefficient and fragmented due to various technological and business reasons (*see* **Section V.A.2**). Facing a challenging environment involving entrenched mobile device manufacturers and mobile carriers as well as looming competition from new app marketplaces, Apple made some important strategic choices to enhance participation in its new platform and avoid sources of market failure:

    a.    Apple implemented a centralized review, approval, and distribution process for all iOS apps that aimed to screen the apps and minimize security and privacy risks for consumers, a process which continues today (*see* **Section V.A.3.a**).

    b.    Apple implemented a revenue sharing model with developers, choosing a commission rate comparable to those of existing app marketplaces while also providing consumers with free access to the App Store and not charging either developers or consumers for the download of free apps. This commission rate has never increased since 2008 and has decreased for many developers and transactions (*see* **Section V.A.3.b**).

    c.    Apple enabled a range of developer monetization strategies, which it has progressively expanded since 2008 (*see* **Section V.A.3.c**).

22. Contrary to Plaintiffs' claims, the App Store is not a retailer of apps. Rather, the App Store is a two-sided transaction platform that connects two groups or sides (developers and consumers) and facilitates observable transactions that require participation from both sides. Like other two-sided transaction platforms, the App Store displays indirect network effects. Consistent with those of other two-sided transaction platforms, the App Store provides services and governance mechanisms to mitigate sources of market failure and creates value for its users by encouraging and enhancing participation on both sides of the platform; by facilitating discovery, matching, and transacting; and by facilitating trusted and safe interactions between consumers and developers (*see* **Section V.B**).

23. The challenged conduct does not harm competition and instead promotes procompetitive outcomes by mitigating sources of market failure. The challenged conduct encourages and enhances participation on both sides of the platform. The challenged conduct facilitates

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

discovery, matching, and transacting. The challenged conduct facilitates safer and more trusted interactions between consumers and developers (*see* **Section VI**).

24.   Questions remain regarding what alternative iOS distribution channels would characterize but-for worlds absent the challenged conduct. These are questions that Plaintiffs must address in their but-for world, and I will evaluate Plaintiffs' answers to these questions in due course. However, I do not believe they will affect my opinion that consumers and developers would be worse off in potential but-for worlds absent the challenged conduct (*see* **Section VI**).

25.   Without the challenged conduct, Apple's diminished ability to monetize its investments in the tools, technologies, and services it provides consumers and developers, would, as an economic matter, lower its incentives to offer free access to consumers and invest in these tools, technologies, and services. Such changes could also render the App Store a weaker competitor, and hypothetical competing app marketplaces may lower their corresponding investments, affecting the participation of developers negatively and harming consumers (*see* **Section VI.A**).

26.   While I understand that Plaintiffs' view is that alternative iOS distribution channels will exert a downward pressure on commission rates, leading to lower commission rates and lower app prices, there are economic reasons why the introduction of alternative iOS distribution channels may not lead to either of these outcomes. On the contrary, alternative iOS distribution channels could lead to lower-quality iOS apps and in-app digital content, without any impact on commission rates or app prices (*see* **Section VI.A**).

27.   The challenged conduct enables the App Store to offer superior services and governance mechanisms that address sources of market failure (including search costs, cognitive and other costs related to transacting, and information asymmetry) that would otherwise reduce the ability and willingness of consumers and developers to find each other, successfully match, and complete transactions (*see* **Section VI.B**).

28.   As the seller of iOS devices, Apple has a stronger incentive than a third-party iOS app marketplace to increase transparency into iOS app security, privacy, reliability, and quality, and to ensure that the actual security, privacy, reliability, and quality of iOS apps is high. This is because if an iOS device owner has a negative experience with an iOS app due to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

it not meeting their perceived security, privacy, reliability, or quality expectations, this experience can negatively affect the consumer's perception of the value of Apple's devices and brand. Thus, absent the challenged conduct:

a.  Consumers would be more likely to have a negative iOS app experience, subsequently associating the negative app experience with iOS or their iOS device rather than with the app, potentially leading them to have a negative perception of iOS and Apple devices in general, reducing the number of developers interested in creating apps for Apple devices, and decreasing the value of apps for all iOS consumers (*see* **Section VI.C.1**).

b.  Apple's lowered ability to minimize the likelihood of adverse outcomes for consumers that include exposure to malware, the breach of their private data, and security or reliability issues associated with outdated apps would increase the prevalence of such adverse outcomes, harming consumers (*see* **Section VI.C.2.a**).

c.  Apple's lowered ability to minimize the likelihood of adverse outcomes for developers that include the incidence of copycat apps, the likelihood of app piracy, and the prevalence of financial fraud would increase the prevalence of such adverse outcomes, negatively impacting the perception among developers about the value of developing apps for iOS and lowering the level of iOS app development, thereby harming consumers. I provide evidence of these risks and of the App Store's superior current performance along some of these dimensions (*see* **Section VI.C.2.b**).

29.  Conduct that may reduce intrabrand competition can simultaneously foster or enhance interbrand competition, which the Supreme Court has consistently maintained for over 40 years is the primary concern of antitrust law. The App Store's challenged conduct differentiates the App Store and Apple's devices from other app marketplaces and other devices along dimensions that include privacy, security, reliability, app quality, and fraud protection. The challenged conduct thus enables Apple to compete for consumers who value these attributes, while not restraining the ability of app marketplaces that run on other operating systems or manufacturers of other devices to compete for consumers by adopting comparable or different services and governance mechanisms. Thus, the challenged

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

conduct does not restrain interbrand competition with or among other app marketplaces that run on other operating systems and devices, or competition with or among devices used to run the apps obtained from these app marketplaces (*see* **Section VI.D**).

## IV.    THE ECONOMICS OF TWO-SIDED PLATFORMS

### A.    Introduction to Two-Sided Platforms and Two-Sided Transaction Platforms

30.    Economists use the term "two-sided platform" to designate an entity that acts as an intermediary to connect two distinct user groups. The Supreme Court in *Ohio v. Amex* ("*Amex*") provided a similar definition stating that "[a]s the name implies, a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."[10]

31.    Two-sided platforms are not new. For example, a shopping mall is a two-sided platform that creates a space where shoppers can connect with sellers.[11] However, recent new technologies, including personal computers, widespread access to the Internet, smartphones, and wireless networks have contributed to increase the popularity of two-sided platforms and made them a ubiquitous part of the economy and everyday life.[12] For example, Airbnb, a popular two-sided platform that serves as an intermediary enabling guests to obtain accommodation supplied by property owners ("hosts"), had over eight

---

[10]    Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16–1454, Supreme Court of the United States, June 25, 2018 ("Amex Opinion"), p. 2.

[11]    Hagiu, Andrei, "Two-Sided Platforms: Product Variety and Pricing Structures," *Journal of Economics and Management Strategy*, Vol. 18, No. 4, 2009, pp. 1011–1043, p. 1011 ("An increasing number of industries in today's economy are organized around platforms, which enable consumers to access, purchase and/or use a great variety of products. The classic example is shopping malls: the mall developers have to attract retailers and shoppers.").

[12]    Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 19 ("The Internet has provided the foundation for many other multisided platforms by making it possible to connect potential trading partners residing almost anywhere in the world. Rapid advances in the Internet's coverage, speed, and reliability have made those connections easier over time. Then smartphones and advances in the speed and reliability of wireless networks have put connected computing devices into the hands of almost two billion people around the world […] The birth of commercial Internet in the mid-1990s and mobile broadband in the early 2000s combined with the earlier intervention of personal computers and programming languages, has set forth armies of multisided platforms working to reduce transaction costs of all sorts in most countries on the planet […] the pace has been frenetic for the last two decades and it is quickening. The Internet and smartphones have turbocharged the ancient matchmaker business model.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

million property listings as of Q3 2024.[13] In contrast, at the same time, the world's largest hotel chain, Marriott International, had just over 1.6 million rooms in its global inventory.[14]

32.    As noted in *Amex*, a key distinctive feature of two-sided platforms is that they derive value from indirect network effects.[15] Indirect network effects are said to be prevalent in settings where the value realized by members of one group is higher when they have access to more members of a different group with whom they might interact.[16] The presence of indirect network effects increases the complexity of the business strategies of two-sided platforms, because decisions made about one side have repercussions for the other side, a point I discuss in greater detail in what follows.[17]

---

[13]    "Airbnb Q3 2024," *Airbnb*, November 7, 2024, available at https://news.airbnb.com/airbnb-q3-2024-financial-results/; "Airbnb Q4-2023 and Full-Year Financial Results," *Airbnb*, February 13, 2024, available at https://news.airbnb.com/airbnb-q4-2023-and-full-year-financial-results/.

[14]    "Marriott International Reports Third Quarter 2024 Results," *Marriott*, November 4, 2024, available at https://marriott.gcs-web.com/news-releases/news-release-details/marriott-international-reports-third-quarter-2024-results. *See also*, "Leading Hotel and Resort Companies Worldwide in 2023, by Sales," *Statista*, September 12, 2024, available at https://www.statista.com/statistics/273064/revenue-of-the-largest-hotel-groups-worldwide/.

[15]    Amex Opinion, p. 3 ("Two-sided platforms differ from traditional markets in important ways. Most relevant here, two-sided platforms often exhibit what economists call 'indirect network effects.' Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate.").

[16]    Sundararajan, Arun, "The Economic Impacts of Crowd-Based Capitalism," *The Sharing Economy: The End of Employment and the Rise of Crowd-based Capitalism*, MIT Press, January 1, 2016, pp. 106–130, pp. 118, 120 ("This effect—when more usage of the product by any user increases the product's value for other users (and sometimes all users)—is also often called a network effect. […] In a sense, the 'fractal' structure of the [platform] network effects […] makes their economics more complex than those of traditional two-sided markets, potentially making them either stronger or weaker."). *See also*, Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Kate Ho, Ali Hortaçsu, and Alessandro Lizzeri, p. 485–592, p. 491 ("The impact of one set of agents on the other, and the resulting feedback to the first set of agents, is an indirect network effect."); Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?," *Antitrust*, Vol. 32, No. 2, 2018, p. 72 ("Economists use 'network effects' to describe contexts in which a good or service offers increasing benefits the more users it has. Network effects can be direct—for example, a fax machine becomes more useful as other people also use fax machines. Network effects can also be indirect so that they flow across different sets of users. For example, Uber would not be a very useful app for a rider if there were no drivers using the platform. Similarly, drivers would not want to use the Uber app if no riders were using it.").

[17]    *See, for example*, Amex Opinion, p. 3 ("To ensure sufficient participation, two-sided platforms must be sensitive to the prices that they charge each side. […] Two-sided platforms therefore must take these indirect network effects into account before making a change in price on either side." References omitted.). *See also*, Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Ho, et al., p. 488 ("Pricing decisions in the face of indirect network effects are complex because raising the price on one side of the market affects

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

33.    A special type of two-sided platform is a two-sided transaction platform, which, as described in *Amex*, "facilitate[s] […] simultaneous transaction[s] between participants,"[18] and "cannot make a sale to one side of the platform without simultaneously making a sale to the other."[19] That is, the product of a two-sided transaction platform is a <u>transaction</u> simultaneously facilitated for two groups—the providers (the supply side) and the consumers (the demand side). For example, as concluded in *Amex*, credit card companies are two-sided transaction platforms; their product is a transaction that both credit card customers (consumers) and merchants (providers) seek to engage in and that is processed by the credit card company, the intermediary between the two transacting parties.[20] In contrast, a shopping mall may facilitate interactions between shoppers (consumers) and sellers (providers) but it is not responsible for or does not directly process the transactions that may emerge from their interactions.[21]

34.    An art gallery is another example of a two-sided transaction platform that serves as an intermediary between artists (providers) and art buyers (consumers), connecting these two groups by curating exhibitions, providing a venue, and facilitating the transaction

---

demand not only on that side of the market but also on the other, as each side responds to changes in the participation on the other side. Finding the correct approach to pricing is key to the success of a platform.").

[18]   Amex Opinion, p. 13.

[19]   Amex Opinion, p. 2.

[20]   Amex Opinion, p. 2 ("When a cardholder uses a credit card to buy something from a merchant, the transaction is facilitated by a credit card network. The network provides separate but interrelated services to both cardholders and merchants. For cardholders, the network extends them credit, which allows them to make purchases without cash and to defer payment until later. Cardholders also can receive rewards based on the amount of money they spend, such as airline miles, points for travel, or cash back. For merchants, the network allows them to avoid the cost of processing transactions and offers them quick, guaranteed payment. This saves merchants the trouble and risk of extending credit to customers, and it increases the number and value of sales that they can make.").

[21]   Belleflamme, Paul and Martin Peitz, "Platforms and Network Effects," *University of Mannheim Department of Economics Working Paper Series*, Working Paper, September 2016, p. 1 ("The platform managing the interaction among distinct groups of consumers is called two-sided. Some platforms allow [] for the interaction of buyers and sellers. Shopping malls are an example, as they offer retail space to sellers and invite buyers to go shopping. Everything else given, sellers prefer a shopping mall that attracts more buyers and buyers prefer a shopping mall that hosts more sellers."). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 18 ("If you look at shopping malls more closely, though, you'll see they are multisided platforms that connect shoppers and retailers. […] Mall developers match particular kinds of shoppers and retailers by deciding where to locate their malls and what kind of stores to recruit for them. They build upscale malls in well-off areas and recruit high-end stores for them, for instance. They then design the mall layout to balance increasing the amount of foot traffic that passes by the retail stores against annoying shoppers by making them walk more.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

associated with the sale of artwork from an artist to an art buyer. Like an art gallery, an auction house is another example of a two-sided transaction platform that connects sellers (providers) and buyers (consumers), acts as an intermediary enabling buyers to bid against each other for an item, and provides additional services to facilitate transactions, such as advisory services to sellers, verification of the authenticity and quality of the for-sale items, and payment management between the parties.

35.    To succeed, a two-sided platform needs to attract a sufficient number of participants on both sides of the platform (*see* **Section IV.D**).[22] Because both sides of a two-sided transaction platform need to simultaneously agree to the transaction to complete it, indirect network effects are often more pronounced in two-sided transaction platforms.[23] Thus, users on one side of a two-sided transaction platform do not merely derive higher value from greater participation of users on the other side (sometimes called a membership

---

[22]    Belleflamme, Paul and Nicolas Neysen, "Understanding and Activating Network Effects," *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, Routledge, London, 2023, 1st Ed., p. 33 ("We defined platforms as managers of network effects. Obviously, if network effects remain virtual, there will be nothing to manage. So, your first job as a platform operator is to activate the network effects. That is, you must find ways to attract users to the platform and allow them to interact as smoothly as possible."). *See also*, Rochet, Jean-Charles and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029, p. 990 ("More generally, many if not most markets with network externalities are characterized by the presence of two distinct sides whose ultimate benefit stems from interacting through a common platform. Platform owners or sponsors in these industries must address the celebrated 'chicken-and-egg' problem and be careful to 'get both sides on board.'").

[23]    Amex Opinion, p. 13 ("Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

externality),[24] they also derive higher value from greater ongoing engagement or usage by users on the other side (sometimes called a usage externality).[25]

36.    Indirect network effects can create a positive feedback loop for a two-sided transaction platform. Increased participation from providers can improve the availability, selection, or quality of what they offer, thereby attracting consumers. A larger consumer base can increase a provider's revenue potential, thereby attracting even more providers.[26] However, indirect network effects can, correspondingly, accelerate a platform's decline— low participation from providers can discourage consumers from participating, which further reduces incentives for other providers to join, potentially leading to platform failure[27] A two-sided transaction platform that has achieved some initial success may

---

[24]   Amex Opinion, p. 3 ("In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases. A credit card, for example, is more valuable to cardholders when more merchants accept it, and is more valuable to merchants when more cardholders use it.").

[25]   Amex Opinion, pp. 4–5 ("[I]ncreasing the number of cardholders increases the value of accepting the card to merchants and, thus, increases the number of merchants who accept it."). *See also*, Johnson, Paul A., "Indirect Network Effects, Usage Externalities, and Platform Competition," *Journal of Competition Law & Economics*, Vol. 15, No. 2–3, November 18, 2019, pp. 283–297, p. 2 ("[A] 'usage externality' reflects the fact that one user imparts an externality on another user when the former chooses to use the platform."); Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 212 ("Usage externality [is t]he benefit that one party receives as a result of engaging in an exchange with another party. Two people benefit from being able to use a matchmaker to engage in a transaction, even if they can't connect with any other people. All multisided platforms have indirect network externalities as well as usage externalities."); Rochet, Jean-Charles and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029, p. 647 ("Usage externalities arise from usage decisions: if I strictly benefit from using my card rather than cash, then the merchant exerts a (positive) usage externality on me by accepting the card. Similarly, if I benefit from being able to call a friend on his mobile phone, then this friend's willingness to give me his number and receive the call exerts a positive usage externality on me.").

[26]   Belleflamme, Paul and Nicolas Neysen, "Understanding and Activating Network Effects," *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, Routledge, London, 2023, 1st Ed., p. 35 ("Recall that the cross-side network effects among hosts and guests are positive in both directions: Hosts are better off when additional guests join the platform and vice versa. The participation of an extra user generates thus a positive feedback loop, that is, a self-enforcing process that magnifies the initial change: More users in group A attract more users in group B, who attract in turn more users in group A, and so on so forth.").

[27]   Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 114 ("The trick is thus to convince a sufficient number of early users, who will then naturally attract new users thanks to the attraction loop that network effects nourish. […] Typically, users in group A value the platform because it allows them to interact with users of group B, and vice versa. Expectations have thus to be formed regarding the participation of users in the other group. Here, the null equilibrium arises when users expect that the platform will not be able to attract any counterparty from the other group (and does not offer a sufficiently large stand-alone utility to at least some users of a group)."). *See also*, Varian, Hal R., "Use and Abuse of Network Effects," *Toward a Just Society*, 2018, p. 227 ("The concept

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

therefore fail if it does not innovate and adapt to evolving business conditions (*see* **Section IV.D**).

37.    The success of two-sided transaction platforms depends in part on their pricing strategies.[28] Two-sided transaction platforms often have complex pricing structures that may involve access fees and usage fees. Access fees are charges associated with the right to participate on the platform. Usage fees are charges that vary based on the frequency of participating or transacting. Usage fees may involve listing fees that are levied when a provider lists (or makes available to consumers) an item or a service and may also involve revenue shares that are assessed as a percentage (the "commission rate") of the revenue a provider receives from their transactions. These fees can apply to one or both sides of a two-sided transaction platform.[29] For example, Airbnb employs two usage fee structures for property bookings: (i) the split-fee model, where hosts pay about three percent and guests up to 14.2 percent of the booking total, and (ii) the host-only model, where hosts pay between 14 percent and 16 percent of the booking total.[30] eBay charges no listing fees for the first 250 listings per

---

is easy to describe: a good exhibits network effects if the value to a new user from adopting the good is increasing in the number of users who have already adopted it. This generates a positive feedback loop: the more users who adopt the good, the more valuable it becomes to potential adopters. This positive feedback loop also works in reverse […] the good or service may fall into a 'death spiral' and ultimately disappear.");Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24, p. 3 ("In this case the platform 'implodes' through a process in which positive feedback effects work in reverse: as members of one side stop participating, the value to members of the other side falls and some of them stop participating, which leads to more members of the first side to stop participating.").

[28]    Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, pp. 99–100 ("[T]he presence of network effects makes fee setting a rather complex exercise, because (i) pricing is affected by – and may affect – users' expectations, (ii) multiple equilibria may result from a given combination of fees, and (iii) pricing may be 'a matter of life or death,' as markets may tip when network effects are strong. Platforms must thus carefully factor in network effects in their choice of pricing strategy.").

[29]    Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, Vol. 667, 2008, pp. 667–693, p. 675 ("For many platforms, it is possible to charge two different kinds of prices: an access fee for joining the platform and a usage fee for using the platform. Although these are interdependent, one can think of the access fee as mainly affecting how many customers join the platform and the usage fee as mainly affecting the volume of interactions between members of the platform.").

[30]    "How Much Does Airbnb Charge Hosts?," *Airbnb*, November 16, 2020, available at https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288 ("Most hosts with only one listing pay a split fee of 3%. Most guests pay less than 14.2% of the booking subtotal, but various factors could make it higher. […] This structure is less common. Hosts pay the whole service fee, typically 14% to 16% of the booking subtotal.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

month and then $0.35 per listing thereafter.[31] American Express charges usage fees to merchants by collecting a commission associated with each transaction, and also charges cardholders an access fee, the annual credit card fee.[32]

38.    Decisions about these pricing structures must be carefully calibrated because indirect network effects cause the prices directed at one side of the platform to affect participation on both sides of the platform. Similarly, because of indirect network effects, restrictions associated with any services and governance mechanisms (discussed further in **Section IV.C**) directed at one side of the platform can affect participation on both sides of the platform. I discuss some general economic features of these pricing structures below.

39.    First, due to bidirectional indirect network effects, two-sided transaction platforms are unlikely to set prices for each side independently because the responses to price changes directed at one group from members within the group indirectly affects participation from the other group as well, amplifying responses to price changes in a cascading fashion.[33]

---

[31]    "Selling Fees," *eBay*, available at https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 ("First 250 listings free per month, then $0.35 per listing").

[32]    Amex Opinion, p. 1 ("Visa and MasterCard—two of the major players in the credit-card market—have significant structural advantages over Amex. Amex competes with them by using a different business model, which focuses on cardholder spending rather than cardholder lending. To encourage cardholder spending, Amex provides better rewards than the other credit-card companies. Amex must continually invest in its cardholder rewards program to maintain its cardholders' loyalty. But to fund those investments, it must charge merchants higher fees than its rivals."). *See also*, American Express Company, Form 10–K, filed February 9, 2024, https://s26.q4cdn.com/747928648/files/doc_financials/2023/ar/American-Express-Annual-Report-2023.pdf, accessed February 4, 2025, p. 4 ("Our 'spend-centric' business model focuses on generating revenues primarily by driving spending on our cards and secondarily through finance charges and fees. Spending on our cards, which is higher on average on a per-card basis versus our network competitors, offers superior value to merchants in the form of loyal customers and larger transactions. Because of the revenues generated from having high-spending Card Members and the annual card fees we charge on many of our products, we are able to invest in attractive rewards and other benefits for Card Members, as well as targeted marketing and other programs and investments for merchants. This creates incentives for Card Members to spend more on their cards and positively differentiates American Express cards.").

[33]    Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, Vol. 667, 2008, pp. 667–693, pp. 675 ("For two-sided platforms, three results appear to be robust: 1. the optimal prices depend in a complex way on the price sensitivity of demand on both sides, the nature and intensity of the indirect network effects between the two sides, and the marginal costs that result from changing output of each side; 2. the profit-maximizing, nonpredatory price for either side may be below the marginal cost of supply for that side or even negative; and 3. the relationship between price and cost is complex, and the simple formulas that have been derived for single-sided markets do not apply."). *See also*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 129 ("[P]ricing to one side of the market depends not only on the demand and costs that those consumers bring but also on how their participation affects participation on the other side and the profit that is extracted from that participation.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

For example, consider a two-sided transaction platform that serves two groups, A and B. If the platform increases the price charged to members of group A, fewer members of this group will engage in transactions, thus reducing group A's participation. All else equal, since members of group B value the platform more when group A's participation is higher, fewer members of group B will engage in transactions even if the price charged to members of group B remains unchanged, thus reducing participation from members of group B. This reduction in participation from members of group B will in turn make the platform less attractive to members of group A, lowering participation from members of group A, which will further make the platform less attractive to members of group B, and so on.

40.     Second, the pricing structure will depend, in part, on the price elasticities of demand of the two groups.[34] All else equal, two-sided transaction platforms tend to charge lower prices to users who have higher price elasticities of demand and therefore are more sensitive to price changes.[35] In fact, it is not unusual for a two-sided transaction platform to encourage participation from members of the more price sensitive group by imposing no access or usage fees on them.[36] For example, OpenTable is free for restaurant goers, while

---

[34] Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2015, 7 Ed., p. 90 ("The price elasticity of demand measures how much the quantity demanded responds to a change in price. Demand for a good is said to be elastic if the quantity demanded responds substantially to changes in the price. Demand is said to be inelastic if the quantity demanded responds only slightly to changes in the price. The price elasticity of demand for any good measures how willing consumers are to buy less of the good as its price rises.").

[35] Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, pp. 129–130 ("Since the platform faces a similar computation on the other side, prices on both sides of the market depend on the joint set of demand elasticities and marginal costs on each side (Rochet and Tirole, 2003, 2006; Weyl, 2009). This result has important implications for prices. For instance, in any market, prices typically fall as the price elasticity of demand increases, but in a two-sided market the effect can be even larger: The low price on one side not only attracts elastic consumers on that side but also, as a result, leads to higher prices or more participation on the other side. The increased value extracted from the other side magnifies the value of having consumers on the first side, which leads to a yet bigger price decrease and quantity increase for the side that experiences the increase in elasticity."). *See also* Niels, Gunnar, "Transaction Versus Non-transaction Platforms: A False Dichotomy in Two-Sided Market Definition," *Journal of Competition Law & Economics*, Vol. 15, No. 2-3, 2019, pp. 327–357, p. 351 ("We also saw that skewed pricing structures commonly arise in two-sided platforms. […] But the skewed structure can also be influenced by the relative own-price elasticities on each side, and these in turn can be a function of the competitive pressure on each side.").

[36] *See, for example*, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143, p. 130 ("Such seeming anomalies as price below marginal cost or even negative prices can easily arise in a two-sided market. For example, a platform might charge a price below cost on one side if those agents have a large price elasticity and their participation attracts a large number of participants on the other side who are relatively price inelastic (and hence have a high mark-up)."). *See also*, Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

restaurants pay access and usage fees.[37] In addition, the pricing structure may also depend on the nature and intensity of indirect network effects between the two groups of users.[38] As a result, the optimal price for one group could be lower than the marginal cost, zero, or even less than zero. Consider the example of payment card systems like American Express. Merchants typically pay a usage fee for each transaction but no access fees, while cardholders may pay annual fees for access but face no usage fees and can earn rewards for higher card usage. The value of these rewards may effectively exceed the annual fee for users with high transaction volume. This pricing structure also reflects the nature of the associated indirect network effects: cardholders value card acceptance by merchants, while merchants value card usage by cardholders, and thus it seems sensible to not charge merchants for access or cardholders for usage.[39]

---

pp. 668–691, p. 673 ("It is possible that the profit-maximizing outcome involves group 1, say, being offered a subsidized price[.] [T]his occurs if the group's elasticity of demand is high and/or the external benefit enjoyed by group 2 is large. Indeed, the subsidy might be so large that the price is negative (or zero, if negative prices are not feasible)."); Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 115 ("As a two-sided platform serves two different groups of users, it is in a position to set a different tariff for each group. […] Our main point in this section is that the ability for a platform to set different fees for the different groups of participants is key for solving the chicken-and-egg problem. Moreover, the platform may have to set a fee for one group of users that is below its cost of serving these users, thereby *subsidizing* their participation.").

[37] Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 95 ("OpenTable, for example, charges restaurants a monthly fee for licensing the computer-based reservation system they need to get access to the reservation platform. […] In addition, to paying that access fee, they pay a $1.00 usage fee for every seat they fill through a reservation made on the OpenTable website. Diners do not pay an access fee or a usage fee – the whole thing is free for them, plus they get rewards (a negative fee) for usage.").

[38] Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, Vol. 667, 2008, pp. 667–693, p. 675 ("For two-sided platforms, three results appear to be robust: 1. the optimal prices depend in a complex way on the price sensitivity of demand on both sides, the nature and intensity of the indirect network effects between the two sides, and the marginal costs that result from changing output of each side; 2. the profit-maximizing, nonpredatory price for either side may be below the marginal cost of supply for that side or even negative; and 3. the relationship between price and cost is complex, and the simple formulas that have been derived for single-sided markets do not apply").

[39] Evans, David S. and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, Vol. 667, 2008, pp. 667–693, p. 675 ("Payment card systems generally charge merchants a usage fee but no access fee. Cardholders may pay an access fee (the annual card fee); they often pay either no usage fee or a negative one (to the extent they receive rewards based on transactions volume). The profit-maximizing reliance on access versus usage fees depends on many factors including the difficulty of monitoring usage and the nature of the externality between the two sides. Cardholders care about card acceptance, for instance, while merchants care about usage. It thus seems sensible not to charge merchants for access and not to charge consumers for usage.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

41.   Third, the pricing structure of two-sided transaction platforms often includes collecting a commission that is a percentage of the revenue associated with successful transactions, frequently levied on the providers, but sometimes split between the providers and consumers. For example, art galleries typically charge commission rates that range from 30 percent to 60 percent of the price paid by the art buyer.[40] Such a revenue sharing pricing structure creates a co-production system that shares risk and reward between the platform and its providers, aligning their economic incentives.[41] When no transactions take place, both parties share the risk, as the providers receive no revenue, and the platforms receive no payment. When transactions take place, both parties benefit, as the providers earn more revenue and the platform's commission income grows with the success of its providers.

42.   Fourth, the pricing structure can also vary among different groups of participants on the same side of a two-sided transaction platform. For example, pricing can vary depending on transaction volume or item value. As discussed earlier, eBay waives listing fees for the first 250 listings per month but charges sellers $0.35 per listing beyond that threshold.[42] Auction house Sotheby's charges buyers at a commission rate of 20 percent for works up to $6 million, and then decreases the rate to 10 percent for works above $6 million.[43] Similarly, pricing can differ based on the type of product or service offered by providers. For instance, Airbnb hosts are charged at a maximum commission rate of 16 percent for property

---

[40]   "Commission Rates to Artists," *Fine Art*, available at https://www.fineart.co.uk/faq/commission-rates-to-artists-32.aspx ("Galleries typically retain between 30% and 60% of the selling price."). *See also*, "Gallery-Artist Agreement," *Dinoart*, available at http://www.dinoart.com/publications/prt2pg11.html ("Standard commission percentages range from 32%, (where the artist takes care of many of the show expenses,) to 50%, (where the gallery absorbs all costs except framing.)"); "Selling Art in Galleries: Everything You Need to Know," *PetaPixel*, November 14, 2014, available at https://petapixel.com/2014/11/14/selling-art-galleries-everything-need-know/ ("Every gallery is different, but most galleries take somewhere around a 50% commission from pieces you sell. Some take 40%, but rarely do any take more than 50%.").

[41]   For example, an artist whose art has sold at a higher price pays a higher fee.

[42]   "Selling Fees," *eBay*, available at https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 ("First 250 listings free per month, then $0.35 per listing").

[43]   Cassady, Daniel, "Sotheby's New Fee Structure is a Big Gamble," *ARTnews*, February 15, 2024, available at https://www.artnews.com/art-news/market/sothebys-new-fee-structure-experts-gamble-1234696421/ ("To recap, the restructure will decrease the buyer's premium—essentially, a commission paid by lot winners that Sotheby's and Christie's introduced in 1975[]—from 26 percent of the hammer price to 20 percent, for works up to $6 million. For works above that lavish threshold, the premium falls to 10 percent.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

bookings as described earlier, [44] while hosts of local experiences such as tours, or workshops are charged at a commission rate of 20 percent. [45]

43.    Success for a two-sided transaction platform depends on attracting, retaining, and encouraging transacting between the two user groups whose participation is interlinked by indirect network effects. These goals can be challenged by multiple sources of market failure, as I discuss in the next section.

### B.    Two-Sided Transaction Platforms Must Try to Mitigate Market Failure to Be Successful

44.    Participants on both sides of a two-sided transaction platform must simultaneously agree to a transaction to complete it, and therefore, two-sided transaction platforms must encourage and enhance participation from the right users on both sides. As discussed above, the willingness of users on each side to participate is linked to participation from the other side because of indirect network effects. To facilitate participation that yields successful transactions, two-sided transaction platforms must thus lower the occurrence of certain conditions that may cause what economists refer to as "market failure." [46] This section describes common types of market failure that two-sided transaction platforms must mitigate.

---

[44]    "How Much Does Airbnb Charge Hosts?," *Airbnb*, November 16, 2020, available at https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288 ("Split fee. This fee structure is the most common. Most hosts with only one listing pay a split fee of 3%. […] Host-only fee This structure is less common. Hosts pay the whole service fee, typically 14% to 16% of the booking subtotal.").

[45]    "Airbnb Service Fees for Experiences," *Airbnb*, available at https://web.archive.org/web/20250122205515/https://www.airbnb.com/help/article/3164 ("To ensure we can continue to offer benefits like 24/7 customer support, we charge Experience Hosts a 20% service fee. This is based on the price of the Experience and it's automatically deducted from your payout."); "The 3 Pillars of a Quality Experience," *Airbnb*, Aug 25, 2021, available at https://www.airbnb.com/resources/hosting-homes/a/the-3-pillars-of-a-quality-experience-680.

[46]    Bator, Francis M., "The Anatomy of Market Failure," *Quarterly Journal of Economics*, Vol. 72, No. 3, August 1958, pp. 351–379, p. 351 ("What is it we mean by 'market failure'? Typically, at least in allocation theory, we mean the failure of a more or less idealized system of price-market institutions to sustain 'desirable' activities or to stop 'undesirable' activities.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 1.    Overview of Market Failure

45.    Market failure refers to economic conditions that may prevent achieving efficient outcomes. [47] Market failure occurs when "desirable" activities cannot be sustained or "undesirable" activities cannot be stopped. [48] Under these economic conditions, transactions that would have occurred absent such conditions end up not occurring,[49] an inefficient outcome that result in a loss of value for participants and the platform alike. [50] I explain some of these conditions and the associated "failure" and loss of efficiency in what follows.

46.    Economists have studied market failure in various contexts. A classic example of market failure concerns the provision of public goods such as streetlights or national defense— products or services whose use by one person neither prevents access by other people nor reduces availability to others.[51] One reason why market failure occurs with public goods is because of the "free-rider" problem: private companies generally may not want to produce public goods because people can often benefit from these public goods without paying for them.[52] For example, if a private company builds a lighthouse and tries to collect fees from

---

[47]    Randall, Alan, "The Problem of Market Failure," *Natural Resources Journal*, Vol. 23, No. 1, 1983, pp. 131–148, p. 1 ("The concept of market failure seems entrenched in the conventional wisdom of the economics discipline[.] [T]he notion that, under certain conditions prevalent in the real world, markets fail to perform efficiently[.]").

[48]    Bator, Francis M., "The Anatomy of Market Failure," *Quarterly Journal of Economics*, Vol. 72, No. 3, August 1958, pp. 351–379, p. 351 ("What is it we mean by 'market failure'? Typically, at least in allocation theory, we mean the failure of a more or less idealized system of price-market institutions to sustain 'desirable' activities or to stop 'undesirable' activities.").

[49]    The inefficiency may also stem from transactions occurring that generate lower gains from trade than other transactions that might have otherwise occurred and yielded higher gains from trade absent the factors that lead to market failure. I sometimes refer to this kind of inefficient outcome by associating market failure with the occurrence of "lower quality transactions," where, by "lower quality," I mean lower gains from trade, and refer to the missed transactions that may have yielded higher gains from trade as transactions of "higher quality."

[50]    Dahlman, Carl J., "The Problem of Externality," *Journal of Law and Economics*, Vol. 22, No. 1, 1979, pp. 141–162, p. 141 ("We interpret this to mean that when all voluntary contractual arrangements have been entered into by market transactors, there still remain some interactions that ought to be internalized but which the market forces left to themselves cannot cope with.").

[51]    Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2015, 7 Ed., p. 216 ("Public goods are neither excludable nor rival in consumption. That is, people cannot be prevented from using a public good, and one person's use of a public good does not reduce another person's ability to use it.").

[52]    Groves, Theodore and John Ledyard, "Optimal Allocation of Public Goods: A Solution to the "Free Rider" Problem," *Econometrica*, Vol. 45, No. 4, May 1997, pp. 783–809, p. 783 ("Samuelson, in particular, has argued this point most forcefully in showing the difficulties of extending the competitive market system to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

sailors for the use of the light generated by the lighthouse, sailors could avoid paying the fees and nevertheless benefit from the light produced by the lighthouse.[53] In turn, the incentive of the private company to build a lighthouse is lowered, which can lead to an inefficiently low supply of lighthouses.

### 2.    Sources of Market Failure for Two-Sided Transaction Platforms

47.    This section focuses on some sources of market failure that are particularly relevant to two-sided transaction platforms, including those arising from (a) search and other costs related to transacting, (b) willful adverse outcomes, (c) information asymmetry, and (d) cognitive costs. Each of these sources of market failure increases the likelihood that users from two distinct groups will fail to complete a valuable transaction.

### a)    Search and Other Costs Related to Transacting

48.    The presence of search and other costs related to transacting may result in market failure on a two-sided transaction platform by altering the number and quality of bilaterally value-creating transactions and by possibly discouraging certain users from participating on the platform altogether.[54]

49.    Participants incur search costs when acquiring information about the prices and features of other participants or the products offered by these participants.[55] For example, a consumer considering purchasing a smart TV may spend time obtaining and comparing the prices of

---

cover the allocation of public goods. This belief is so firmly embedded in conventional wisdom that the problem has acquired a name-the Free Rider Problem.").

[53]    Coase, Ronald H., "The Lighthouse in Economics," *Journal of Law and Economics*, Vol. 17, No. 2, 1974, pp. 357–376, p. 357 ("What economists usually seem to have in mind is that the impossibility of securing payment from the owners of the ships that benefit from the existence of the lighthouse makes it unprofitable for any private individual or firm to build and maintain a lighthouse.").

[54]    Neto, Caio Mario S. Pereira and Filippo Lancieri, "Towards A Layered Approach to Relevant Markets in Multi-Sided Transaction Platforms," *Antitrust Law Journal*, Vol. 83, No. 2, 2020, pp. 429–481, p. 437 ("[C]ongestion or other problems increase intra-platform search costs or other costs that diminish the chance of an agent finding its best counterpart.").

[55]    *See, for example*, Backus, Matthew R., Joseph Uri Podwol, and Henry S. Schneider, "Search Costs and Equilibrium Price Dispersion in Auction Markets," *Economic Analysis Group*, Vol. 13, No. 2, November 2013, pp. 1–34, p. 2 ("[W]e add search costs as in Varian (1980) and others, which are costs incurred by buyers to identify all available sellers."). *See also*, Salop, Steven and Joseph Stiglitz, "A Model of Monopolistically Competitive Price Dispersion," *Review of Economic Studies*, Vol. 44, No. 3, pp. 493–510, p. 493 ("The central implication of costly information-gathering is that the equilibrium will not occur at the perfectly competitive price.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

smart TVs from multiple sources such as brick and mortar stores, online retail stores, and websites that provide recommendations and editorial reviews about smart TVs.

50.    Academic papers have studied the impact of search costs on prices in various settings.[56] Although the early focus of such studies was on costs incurred by consumers when searching for the prices charged by competing sellers of a uniform product, economists have since recognized that the information gathered by consumers when "searching" may extend beyond prices. Returning to the example above, a consumer considering the purchase of a smart TV may also spend time gathering information about the features of different smart TVs and investigating the relative quality and reliability of different smart TVs. If the costs of acquiring information on smart TV features, quality or reliability are high, a consumer may end up not purchasing a smart TV that they would have purchased had they found and understood this information or may end up missing a smart TV that could have been more suitable.[57] In some cases, search costs may discourage participation altogether. For example, a potential homebuyer may be discouraged from searching for a

---

[56]    *See, for example*, Varian, Hal R., "A Model of Sales," *American Economic Review*, Vol. 70, No. 4, September, 1980, pp. 651–659, p. 658 ("I have shown how [retail] stores may find it in their interest to randomize prices in an attempt to price discriminate between informed [(low search cost)] and uninformed [(high search cost)] consumers, and have solved explicitly for the resulting monopolistically competitive equilibrium in randomized pricing strategies."). *See also*, Stigler, George J., "The Economics of Information," *The University of Chicago Press*, Vol. 69, No. 3, June, 1961, pp. 213–225, p. 216 ("Advertising is, of course, the obvious modern method of identifying buyers and sellers: the classified advertisements in particular form a meeting place for potential buyers and sellers. The identification of buyers and sellers reduces drastically the cost of search."); Weitzman, Martin L., "Optimal Search for the Best Alternative," *Econometrica*, Vol. 47, No. 3, May, 1979, pp. 641–654, p. 641 ("A broad class of economic search problems can be cast in the following form. There are a number of different opportunities or sources, each yielding an unknown reward. The uncertainty about the reward from a source can be eliminated, at a fee, by searching or sampling.").

[57]    *See, for example*, Taylor, Greg, "Raising Search Costs to Deter Window Shopping Can Increase Profits and Welfare," *RAND Journal of Economics*, Vol. 48, No. 2, 2017, pp. 387–408, p. 388 ("[H]igh search costs exclude some consumers who would otherwise have purchased."). *See also*, Argyle, Bronson, Taylor Nadauld, and Christopher Palmer, "Real Effects of Search Frictions in Consumer Credit Markets," *Review of Financial Studies*, Vol. 36, 2023, pp. 2685–2720, p. 2694 ("Here, we focus on the dimension of search costs that scales with time and distance, such as the time and hassle required to travel to a branch and physically sign financial paperwork or the cost of ascertaining the choice set of potential lenders."), p. 37 ("Proxying for the costliness of loan shopping with the density of nearby lenders, we show that borrowers in higher-search-cost areas face more dispersed prices, are more likely to accept quasi-randomly offered dominated loan terms, and apply for fewer loans.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

new home if they perceive the costs of finding information about potential purchases to be too onerous.[58]

51.    There are numerous examples illustrating how search costs may reduce the number or quality of transactions on a two-sided transaction platform. When TaskRabbit launched, Taskers—independent contractors who work on tasks that consumers want performed—had to submit bids whenever a new task was posted by a consumer. Although the number of participants on the platform was growing, transactions were not increasing.[59] It turned out that Taskers spent an average of two hours per week reviewing various task requests before deciding what to bid for, resulting in many tasks remaining unaddressed.[60]

52.    Participants may also incur additional expenses and administrative costs associated with completing a transaction. Even if a participant finds viable transaction partners after incurring search costs, the transaction may not occur because the administrative and other cost associated with completing it are too high. For example, a potential homebuyer may be deterred from completing a purchase if costs unrelated to the property's price such as attorney fees are too high.[61]

53.    The presence of transacting costs may reduce the number or quality of transactions that are completed on two-sided transaction platforms. Studies have shown that a consumer is less

---

[58]    Ha, Sejeong and Christian A. L. Hilber, "Do Long Distance Moves Discourage Homeownership?," *Spatial Economics Research Centre*, September 2013, pp. 1–35, pp. 15–16 ("Overall, our empirical findings suggest that information gathered on local housing markets has an important adverse effect on the propensity of a household to own: The difficulty of collecting information on the destination housing market discourages homeownership.").

[59]    Perez, Sarah, "Following A Drop In Completed Jobs, Errands Marketplace TaskRabbit Shakes Up Its Business Model," *TechCrunch*, June 17, 2014, available at https://techcrunch.com/2014/06/17/following-a-drop-in-completed-jobs-errands-marketplace-taskrabbit-shakes-up-its-business-model/ ("TaskRabbit realized that while both sides of its business were still growing, its task-completion rate was dropping. The problem, the company realized, is that it was not being efficient in matching supply and demand effectively.").

[60]    Newton, Casey, "TaskRabbit Is Blowing Up Its Business Model and Becoming the Uber for Everything," *The Verge*, June 17, 2014, available at https://www.theverge.com/2014/6/17/5816254/taskrabbit-blows-up-its-auction-house-to-offer-services-on-demand ("People who posted tasks complained that they never knew what starting price to set and that it took too long for contractors to bid on their jobs. The contractors (which the company now calls 'taskers') complained it was taking too long to find jobs — on average, they were spending two hours a week scrolling through endless pages of open tasks looking for matches.").

[61]    Donofrio, Craig, "10 Costs of Buying a Home You Need To Know About," *Realtor*, November 7, 2023, available at https://www.realtor.com/advice/buy/10-home-buying-costs-need-know/ ("Some states, such as Georgia, require an attorney to be present at closing. In some other areas, this is optional. If you use a lawyer, expect to cover the costs, which vary by area and lawyer.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

likely to complete a purchase on an e-commerce site if they are required to create a new account before checkout or if the checkout process is excessively burdensome or complicated.[62] Similarly, a tourist considering transacting with an Airbnb host in a foreign country may incur an additional service fee if the payment must be made in a currency different from the host's listing currency,[63] which can reduce the number of transactions involving properties in countries different from than that of the guest.[64]

54.     Thus, to facilitate successful transactions, two-sided transaction platforms must ensure that the search costs and other costs related to transacting are sufficiently low.

### b)     Willful Adverse Outcomes

55.     Market failure can also occur because of potential opportunistic behavior by participants. For example, a provider may misrepresent the quality of their product, attempt to list counterfeit products, or not deliver the product after a payment has been received.[65] Similarly, a consumer may refuse to pay for a product or service after receiving it or may cause damage to assets associated with a transaction.[66]

---

[62]     Holst, Christian, "Reasons for Cart Abandonment – Why 68% of Users Abandon Their Cart," *Baymard Institute*, September 21, 2016, available at https://baymard.com/blog/ecommerce-checkout-usability-report-and-benchmark (26% of survey participants stated that they abandoned their cart during checkout because '[t]he site wanted [them] to create an account,' and 22% of survey participants stated that they abandoned their cart during checkout because of '[t]oo long/complicated checkout process.'").

[63]     "Supported Currencies and Currency Fees," *Airbnb*, available at https://www.airbnb.com/help/article/95#section-heading-3-0section-heading-3-0 ("If a guest pays in a different currency than the host's listing currency, an additional fee is charged. Find out more about how the service fee may change for cross-currency bookings.").

[64]     *See*, *for example*, January 31, 2024, "Airbnb's New Charge for Differing Currencies," *Airbnb*, available at https://community.withairbnb.com/t5/Support-with-your-bookings/Airbnb-s-new-charge-for-differing-currencies/m-p/1889349 ("I will think again before I book another Airbnb for international travel. […] On Wise and Remitly the charges are much lower. Well below 2%. International transactions are becoming cheaper and easier."). *See also*, Carino, Meghan McCarty, "Airbnb Introduces Fee for Properties Booked In a Different Currency," *Marketplace*, February 13, 2024, available at https://www.marketplace.org/2024/02/13/airbnb-introduces-fee-for-properties-booked-in-a-different-currency/ ("Now, the company is making a push to expand internationally and adding an additional 2% fee for properties booked in a different currency. […] Chuck Bell at Consumer Reports […] has surveyed consumers about extra fees. 'Basically, everyone is really irritated at this,' he said.").

[65]     Evans, David S., "Governing Bad Behavior by Users of Multi-Sided Platforms," *Berkeley Technology Law Journal*, April 2012, pp. 1–39, p. 10 ("Fraud may occur when merchants sell counterfeit goods or accept payment but then do not ship the goods.").

[66]     Fullerton, Ronald A. and Girish Punj, "Choosing to Misbehave: A Structural Model of Aberrant Consumer Behavior," *Advances in Consumer Research*, Vol. 20, 1993, pp. 570–574, p. 570 ("Aberrant consumer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

56.     There are numerous examples of how the prospect of opportunistic behavior may reduce the number of transactions on a two-sided transaction platform. Before Airbnb introduced identity verification for users, short-term accommodation offered on Airbnb would sometimes be ostensibly booked for individual use but then used to throw large parties without the consent of the host,[67] and guests sometimes used stolen credit card information and false identities to defraud hosts.[68] This kind of opportunistic behavior by guests discouraged potential hosts from offering their properties on Airbnb or accepting guests whose intentions may have been honest.[69] Similarly, prior to the introduction of "eBay Authenticate," sellers on eBay were more likely to offer counterfeit luxury items, leading to hesitance among potential buyers to engage in transactions involving high-end items.[70]

---

behavior (hereafter ACB) may be defined as behavior in exchange settings which violates the generally accepted norms of conduct in such situations and which is therefore held in disrepute by marketers and by most consumers. […] ACB includes both individual and group acts. It can result in serious financial, physical, and/or psychological harm to marketing institutions and their employees, and to other consumers.").

[67]    Griffith, Erin, "Airbnb Fights Its 'Party House Problem'," *New York Times*, October 27, 2020, available at https://www.nytimes.com/2020/10/27/business/airbnb-party-house-coronavirus.html ("In 2016, Christopher Thorpe, an entrepreneur in Lincoln, Mass., said he faced $28,000 in damage after an Airbnb guest threw an 80-person rave, complete with ticket sales, at his home. Mr. Thorpe later learned that other hosts had reported that guest for parties, but Airbnb had not removed the renter from the platform.").

[68]    *See, for example*, Thomas, Ian, "Airbnb Is Making a Simple, but Big Booking Change Bringing It Closer to Hotel Check-in," *CNBC*, February 3, 2023, available at https://www.cnbc.com/2023/02/03/airbnb-will-soon-push-all-vacationers-and-hosts-to-verify-identity.html ("While infrequent, Bunch said there have been examples of people purposely using false identities to dupe other users or defraud them. Bunch noted that there have been instances of financial fraud schemes where unverified users have looked to use stolen credit cards via fake identities, or even looked to move money between fictional guest and host combos. 'An innocent guest can get caught up in that, so we felt that taking that completely out of the system, preventing any sort of financial fraud or being able to take advantage of someone with say a fake identity was really important,' she said.").

[69]    "Why Your Reservation Request May Have Been Declined by the Host," *Airbnb*, available at https://www.airbnb.com/help/article/3592 ("Reasons why Hosts may decline reservation requests. […] Guest has no reviews or negative reviews. Hosts often rely on a guest's past reviews to gauge reliability and compatibility with their house rules.").

[70]    Novotny, Dave, "How eBay Is Fighting Counterfeit Products," *The American Genius*, January 19, 2017, available at https://theamericangenius.com/ebay-fighting-counterfeit-products/ ("It only took a $63 million dollar fine to get eBay to pay attention to the slew of fake luxury goods being sold on its platform. To combat the sale of counterfeit fashion items, eBay has announced a new service they refer to as "eBay Authenticate" that features professional authenticators who will independently verify that a product is legitimate."). *See also*, Rubin, Ben Fox, "Is That Hermes Real? With eBay Authenticate, You'll Know for Sure," *CNET*, January 12, 2017 available at https://www.cnet.com/tech/services-and-software/ebay-authenticate-is-that-hermes-rolex-real-fake-counterfeit/ ("While fakes on eBay aren't proliferating, many consumers likely still hesitate about buying big-ticket items online, especially those heavily targeted by counterfeiters, such as Nike shoes, Rolex watches and Louis Vuitton handbags.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

57.    Two-sided transaction platforms must therefore find ways to discourage opportunistic behaviors and protect participants from the ensuing willful adverse outcomes.

### c)    Information Asymmetry

58.    Information asymmetry is present when information that would aid in evaluating the viability of a transaction is available to a participant on one side but is unavailable or imprecisely available to a participant on the other side. For example, a driver on Uber knows more about their driving ability than a potential passenger does. A host on Airbnb knows more about the quality of their property that a potential guest does, and in turn, a guest knows more about their propensity to keep the property tidy than the host does.[71]

59.    Information asymmetry can increase the likelihood of market failure arising from perceived opportunistic behavior. For example, Airbnb hosts have more information about their properties than guests do, and a guest may not engage in an otherwise desirable transaction because of concerns that a host has overstated the desirability of their offered accommodations.[72] Similarly, acquiring a luxury item can involve a considerable financial expense and when the transaction happens online, it is harder for consumers to attest to the authenticity of the item.[73] Consumers thus may choose to forgo the luxury item they might have valued rather than buying it online to avoid the potential associated financial loss.

60.    Even in the absence of opportunistic behavior by participants, information asymmetry can lead to market failure. For example, a consumer who does not have reliable information about the quality of a product offered may demand a lower price to compensate for the possibility that the product is of lower quality than advertised. In turn, the seller of the

---

[71]    Cohent, Molly and Arun Sundararajan, "Self-Regulation and Innovation in the Peer-to-Peer Sharing Economy," *University of Chicago Law Review Online*, Vol. 82, No. 1, 2017, pp. 116–133, p. 120 ("A host knows more about the quality of her short-term accommodation than a potential guest does, and in turn, a guest knows more about her own reliability and level of cleanliness.").

[72]    Dugan, Kevin T., "The 5 Reasons Airbnb Is Having a Terrible Summer," *Intelligencer*, August 8, 2024, available at https://nymag.com/intelligencer/article/5-reasons-airbnb-is-having-a-terrible-summer.html ("But even if a rental turns out not to be a bait and switch, a sizable number of listings that don't quite deliver on their promises — or just aren't nice places to stay — have long strained the platform.").

[73]    Matarese, John, "Fake Designer Goods Warning: Could You Spot a Counterfeit?," *Scripps Media*, November 22, 2024 available at https://www.ksby.com/dont-waste-your-money/fake-designer-goods-warning-could-you-spot-a-counterfeit ("She showed a Gucci bag that would look great in a web photo but, she said, 'This is your run-of-the-mill counterfeited Gucci,' with a flimsy strap and an internal zipper that got stuck while unzipping. Insignares says if it's cheaply made and you paid $200, you'd feel ripped off. That special someone in your life would also feel ripped off.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

product may be reluctant to transact because the price offered by the potential buyer is lower than what the seller knows the product is worth. This can lead to sellers of higher quality products choosing to withdraw from making offers, further lowering the average value perception by potential buyers, and in the extreme, causing the possibility of trade to unravel entirely.[74]

61.    Information asymmetry is a particularly prominent source of market failure in settings where transactions occur online or are mediated by a digital interface rather than occurring in person. For example, evaluating a used car in a setting where one can view or test-drive it naturally provides a buyer with information about the quality of the vehicle that is not available to the buyer in an online setting. Similarly, a seller of a product who transacts with a buyer in person may need to worry less about whether they have reliable information about whether the buyer intends to pay, since the seller can simply ask for payment in cash before handing over the product.

62.    There are numerous examples where information asymmetry may reduce the number of viable value-creating transactions on two-sided transaction platforms. A potential rider in Europe who is considering a trip to another city using the city-to-city ridesharing platform BlaBlaCar may choose to take the train instead because they are unable to ascertain whether the person offering a ride is a safe driver.[75] An Airbnb host may choose to reject a reservation request from a new guest due to limited information about the guest's reliability or cleanliness habits.[76]

---

[74]    Akerlof, George A., "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *Quarterly Journal of Economics*, Vol. 84, No. 3, August, 1970, pp. 488–500, p. 488 ("There are many markets in which buyers use some market statistic to judge the quality of prospective purchase. In this case there is incentive for sellers to market poor quality merchandise, since the returns for good quality accrue mainly to the entire group whose statistic is affected rather than to the individual seller. As a result there tends to be a reduction in the average quality of goods and also in the size of the market.").

[75]    *See, for example*, "About Us," *BlaBlaCar*, available at https://blog.blablacar.com/about-us; "Where Is BlaBlaCar Available?," *BlaBlaCar*, available at https://support.blablacar.com/s/article/Where-is-BlaBlaCar-available-1729197111772?language=en_GB. *See also*, "Verifying Your ID," *BlaBlaCar*, November 28, 2024, available at https://support.blablacar.com/s/article/Verifying-your-ID-1729196958697?language=en_GB ("Depending on what country you are from and your location, you can add your Passport or Driver's [license]. Verifying your ID is optional [...] [n]either BlaBlaCar nor our provider will perform any background checks on your past, personal, or professional life.").

[76]    "Why Your Reservation Request May Have Been Declined by the Host," *Airbnb*, available at https://www.airbnb.com/help/article/3592 ("Reasons why Hosts may decline reservation requests. […] Guest

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

63. Therefore, two-sided transaction platforms generally find ways to lower information asymmetry by providing more and higher quality information about participants and the products or services offered, by guaranteeing minimum quality standards, and by otherwise reducing uncertainty on both sides that may otherwise prevent viable and value-creating transactions from occurring.

### d)    Cognitive Costs

64. Humans have cognitive bounds and incur costs associated with processing information presented to them. Thus, even after incurring search costs and successfully acquiring high-quality transaction-relevant information, transactions that participants value may still not occur because participants may be precluded by these cognitive costs from evaluating all available transaction opportunities.[77]

65. The results of a study on defined contribution retirement plans like 401(k) plans illustrates how such cognitive costs can lead to market failure. When organizations introduced defined contribution plans for their employees, employees were required to join a plan and select a savings rate.[78] However, when required to evaluate and actively choose a saving rate, the study documents that "some employees at firms that offer only defined contribution plans contribute little or nothing to the plan."[79] A subsequent study then

---

has no reviews or negative reviews. Hosts often rely on a guest's past reviews to gauge reliability and compatibility with their house rules.").

[77] *See*, *for example*, Masatlioglu, Yusufcan, Daisuke Nakajima, and Erkut Y. Ozbay, "Revealed Attention," *American Economic Review*, Vol. 102, No. 5, 2012, pp. 2183–2205, p. 2184 ("It has been argued that due to cognitive limitations, [decision makers] cannot pay attention to all the available alternatives. […] Therefore, a [decision maker] with limited cognitive capacity (possibly stemming from unawareness […]), restricts her attention to only a small fraction of the objects present in the associated market[.] In sum, a [decision maker] intentionally or unintentionally filters out some alternatives to prevent her cognitive capacity from being overloaded."). *See also*, Sarma, Agnitra Das, Juhi Gahlot Sarkar, and Abhigyan Sarkar, "E-Tail Format, Cognitive Orientation and Device: Shaping Variety's Impact on Online Cart Abandonment," *Journal of Consumer Marketing*, Vol. 42, No. 1, 2025, pp. 72–92, p. 73 ("Perceived variety increases the likelihood of [online shopping cart abandonment] via the mediation of cognitive load.").

[78] Thaler, Richard H. and Shlomo Benartzi, "Save More Tomorrow: Using Behavioral Economics to Increase Employee Saving," *Journal of Political Economy*, Vol. 112, No. S1, February, 2004, pp. S164–S1857, p. S165 ("Over the past decade, there has been a rapid change toward defined-contribution plans that require employees to actively join and select their own savings rate.").

[79] Thaler, Richard H. and Shlomo Benartzi, "Save More Tomorrow: Using Behavioral Economics to Increase Employee Saving," *Journal of Political Economy*, Vol. 112, No. S1, February, 2004, pp. S164–S1857, p. S166 ("For whatever reason, some employees at firms that offer only defined contribution plans contribute little or nothing to the plan.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

established that the cognitive costs associated with making this determination could be reduced through "[m]easures put in place by some employers, such as automatic enrollment in [defined contribution retirement accounts], [which] allow individuals to begin investing without having to confront their lack of knowledge."[80] These measures helped increase participation and savings. One study reported "a high proportion (78 percent) of those offered the plan joined," and that "the average saving rates for […] participants increased from 3.5 percent to 13.6 percent over the course of 40 months."[81]

66.   Cognitive costs are more likely to lead to market failure in online settings because the number of transaction options available to participants is higher. For example, a potential buyer of vintage t-shirts who is perusing items at their local thrift shop is presented with a manageable number of possible transactions since the number of items offered for sale is constrained by the available shelf space of the physical store. The same buyer may encounter thousands of t-shirts offered by hundreds of sellers when using an online platform like Depop or eBay.

67.   Consumers can also incur cognitive costs when reviewing different prices for similar goods and services. Prices that are unfamiliar (as discussed in the footnote) or difficult to compare can reduce the propensity of consumers to complete transactions. Professor Berger has provided evidence that consumer familiarity with certain pricing, such as 99-ending prices, reduces cognitive cost.[82]

---

[80]   Knoll, Melissa A. Z., "The Role of Behavioral Economics and Behavioral Decision Making in Americans' Retirement Savings Decisions," *Social Security Bulletin*, Vol. 70, No. 4, 2010, pp. 1–23, p. 5 ("Nevertheless, when one does decide to save for retirement, apprehension resulting from a lack of knowledge could arise. Measures put in place by some employers, such as automatic enrollment in individual retirement accounts (IRAs), allow individuals to begin investing without having to confront their lack of knowledge (for example, Thaler and Benartzi 2004).").

[81]   Thaler, Richard H. and Shlomo Benartzi, "Save More Tomorrow: Using Behavioral Economics to Increase Employee Saving," *Journal of Political Economy*, Vol. 112, No. S1, February, 2004, pp. S164–S1857, p. S165 ("Our key findings, from the first implementation, which has been in place for four annual raises, are as follows: (1) a high proportion (78 percent) of those offered the plan joined, (2) the vast majority of those enrolled in the SMarT plan (80 percent) remained in it through the fourth pay raise, and (3) the average saving rates for SMarT program participants increased from 3.5 percent to 13.6 percent over the course of 40 months. The results suggest that behavioral economics can be used to design effective prescriptive programs for important economic decisions.").

[82]   Opening Expert Report and Declaration of Jonah Berger, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Berger Opening Report"), Section VI.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

68.    Two-sided transaction platforms, and especially those that facilitate online transactions, therefore generally find ways to reduce the cognitive costs associated with transacting on their platforms.

### C.    Two-Sided Transaction Platforms Create Value by Providing Services and Governance Mechanisms that Mitigate Market Failure

69.    As discussed in **Section IV.A**, the product of a two-sided transaction platform is a transaction between members of two groups. To be successful, two-sided transaction platforms must therefore actively mitigate the varied sources of market failure discussed in **Section IV.B** that might otherwise prevent these transactions from occurring, and must also recalibrate these mitigation strategies as conditions change and evolve.

70.    The presence of indirect network effects makes mitigating market failure especially crucial for two-sided transaction platforms. If participants from one side of the two-sided transaction platform transact less or leave the platform entirely, participation on the other side becomes less attractive. In turn, participants from the other side may also transact less frequently or leave the platform entirely. Without interventions that mitigate market failure on either side of the platform, indirect network effects can lead to a self-reinforcing downward spiral that can hinder a platform's ability to succeed (*see* **Section IV.D**).[83]

71.    Thus, successful two-sided transaction platforms adopt services and governance mechanisms that mitigate the potential sources of market failure discussed above while also attracting and retaining participants on both sides. These services and governance mechanisms can change over time as business conditions or the needs of platform participants evolve.[84]

---

[83]    Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24, p. 3 ("In this case the platform 'implodes' through a process in which positive feedback effects work in reverse: as members of one side stop participating, the value to members of the other side falls and some of them stop participating, which leads to more members of the first side to stop participating.").

[84]    Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *Antitrust Chronicle*, Vol. 2, No. 2, July 2022, pp. 16–19, p. 17 ("With interactions that are observable, transaction platform operators can track the quality of the interactions and user satisfaction based on the nature of the transactions (e.g., guaranteeing secure transfer of payment information or identifying accurate matches for user searches). Transaction platforms can continually adjust their policies so that all sides will continue to use the platform to transact through high-quality interactions rather than turn to an alternative.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a.   To ensure that transactions can occur, two-sided transaction platforms offer services and create governance mechanisms to attract participants and enhance participation on both sides of the platform.

b.   Two-sided transaction platforms offer services and create governance mechanisms that aid in the discovery of, matching, and transaction completion between potential transaction partners in a manner that lowers search and transacting costs, and lowers associated cognitive costs that may otherwise preclude successful or higher quality transactions.

c.   Two-sided transaction platforms offer services and create governance mechanisms that facilitate trusted and safe interactions in a manner that addresses varied sources of information asymmetry, lowers the likelihood of willful adverse outcomes whose occurrence can be exacerbated by information asymmetry, and provides recourse when participants face adverse outcomes.

72.   In this section, I discuss various services and governance mechanisms two-sided transaction platforms can introduce to mitigate these many sources of market failure. As I discuss below, competing platforms may adopt different governance mechanisms to differentiate themselves from one another. As such, the examples below are illustrative of the varying approaches different two-sided transaction platforms have adopted over time to aid their continued growth and success.

### 1.   *Two-Sided Transaction Platforms Encourage and Enhance Participation on Both Sides of the Platform*

73.   Two-sided transaction platforms may use various strategies to attract and retain demand. They may offer low prices, waive fees, or provide referral-related promotions. For example, credit card companies often waive renewal fees or offer lower interest rates to attract or retain consumers.[85] They may reach out to consumers through communication

---

[85]   *See, for example*, Payne, Kevin, Julie Sherrier, and Robin Saks Frankel, "Chase Freedom Unlimited Review 2025: An Excellent Everyday Cash-Back Card," *BluePrint*, May 9, 2024, available at https://www.usatoday.com/money/blueprint/credit-cards/reviews/chase-freedom-unlimited-card-review/ ("The Chase Freedom Unlimited offers a 0% intro APR for the first 15 months on purchases and balance transfers"). *See also,* Russell, Scott, "How Do I Get My American Express Platinum Annual Fee Waived?," *WalletHub*, August 22, 2024, available at https://wallethub.com/answers/cc/american-express-platinum-annual-fee-waived-2140711260/; Aydinyan, Tamara, "Amex Retention Offers: How to Get Them," *Forbes*, April 3, 2024,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

methods that range from word-of-mouth to sophisticated ad targeting campaigns and traditional TV ads.[86] Uber has a "refer-a-friend" program that encourages consumers to get other consumers to use their platform in exchange for Uber credits applicable towards future rides.[87]

74.    Two-sided transaction platforms may also attract and retain demand by (i) increasing the volume and variety of supply, which attracts consumers who anticipate a better fit between their preferences and what is offered by providers on the platform; (ii) reducing quality uncertainty, which attracts demand by making customers anticipate greater ease engaging in transactions; and (iii) increasing the ease with which consumers may transact. As an example of (i), Airbnb has encouraged participation by increasing the variety of different types of short-term accommodation offered by its providers, including shared or private rooms, entire dwellings of different kinds (e.g., windmills, tiny houses, treehouses), and even private islands, thus attracting demand by better catering to different traveler preferences.[88] In addition to short-term accommodation, Airbnb also offers experiences organized by local hosts in different destinations (e.g., "NYC Chinatown Food Tour with

---

available at https://www.forbes.com/advisor/credit-cards/amex-retention-offers/ ("[Y]ou can be offered an annual fee waiver, statement credit or bonus rewards. A retention offer often includes stipulations like a minimum spend requirement and another year of card membership.").

[86]    *See, for example*, Blanding, Michael, "How Uber, Airbnb and Etsy Attracted Their First 1,000 Customers," *Forbes*, July 13, 2016, available at https://www.forbes.com/sites/hbsworkingknowledge/2016/07/13/how-uber-airbnb-and-etsy-attracted-their-first-1000-customers/ ("In each case the strategies are different. While word-of-mouth might work for the first thousand it's not going to get you to a million […] That's where digital marketing can help, allowing companies to target specific customers through search ads or social media at a low cost […] As a company grows, it must consider the purpose of advertising in order to achieve the best effects in gaining new customers.").

[87]    "Refer-a-friend Program," *Uber*, available at https://help.uber.com/en/riders/article/refer-a-friend-program?nodeId=4d918571-17ab-4d8f-8967-2be24bea8800 ("Refer-a-friend program is eligible only for a customer who received a program email. Referrer must share a referral code on your email with your friend. To earn referral rewards, a referee must complete a first trip with the referral code. Referral rewards will be auto-added to the referrer's Uber account. Please check the program email to learn about the timing of earning rewards and details of the program.").

[88]    "How Pioneering Hosts Created 10 Years of Firsts on Airbnb," *Airbnb*, August 13, 2018, available at https://news.airbnb.com/how-pioneering-hosts-created-10-years-of-firsts-on-airbnb/ ("As Airbnb has grown and expanded over its first decade, hosts have been as innovative as they are welcoming, continually coming up with new ways to accommodate guests and give them an ever-increasing range of accommodations from which to choose."); "How Listings Are Categorized," *Airbnb*, available at https://www.airbnb.com.mt/help/article/3374.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a Chef"), which can attract travelers and local residents looking for alternative activities.[89] In **Section IV.C.3**, I discuss a range of examples of (ii) when explaining how two-sided transaction platforms reduce quality uncertainty. As an example of (iii), Amazon eases transacting for consumers of their Marketplace platform by accepting and managing a variety of payment methods, including credit cards, gift cards, and electronic benefit cards.[90] Because this information is stored by Amazon, consumers do not have to provide credit card information to unknown sellers, can avoid going through multiple payment verification steps to complete a transaction, and can use the payment option best aligned with their preferences.[91]

75.    To attract supply and encourage the creation of supply, two-sided transaction platforms may use a variety of strategies that include (i) outreach and marketing, (ii) lowering knowledge or financial barriers, and (iii) providing support that makes it easier for providers to join. For example, Uber's outreach and marketing strategies include localized ads and direct mail campaigns to recruit new drivers in targeted areas, making it easy for drivers to join the platform.[92] Steam, a digital storefront and distribution channel for games

---

[89]    "Booking Experiences," *Airbnb*, available at https://www.airbnb.com/help/article/1584 ("Wine tastings. Survival workshops. Horseback riding. Airbnb Experiences truly offer something for everyone. It's easy to book—just find the Experiences section on the Airbnb website or app. You can choose a specific city and dates, or browse through all experiences. Keep in mind, experience availability is set by the individual Host. Need a great staycation activity? You don't need to have a home booked on Airbnb in order to book an experience."); "The 3 Pillars of a Quality Experience," *Airbnb*, Aug 25, 2021, available at https://www.airbnb.com/resources/hosting-homes/a/the-3-pillars-of-a-quality-experience-680 ("Experience Hosts take travelers into their worlds, helping them feel like an insider, even if for just a few hours. The 3 quality pillars that an Experience submission should demonstrate are: expertise, insider access, and connection. These pillars set Experiences apart from typical tours, and help ensure that the market has high-quality Experience listings led by knowledgeable, hospitable Hosts.").

[90]    I recognize that Amazon operates both a single-sided business and a two-sided transaction platform. The Amazon examples I discuss are related to Amazon's two-sided transaction platform.

[91]    "Accepted Payment Methods " *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=GFBWMNXEPYVJAY9A ("Amazon.com accepts various payment options, including credit, debit, and gift cards. We also accept FSA, HSA, and EBT cards in participating states.").

[92]    "Uber Postcard," *Uber*, available at https://swiped.co/file/uber-facebook/ ("I came across this ad recently on Facebook, guaranteeing NYC drivers $35,000 in 6 months. When you click through, they give you the specifics. There are three stipulations: you must accept 90% of trips within the month, be online for at least 200 hours a month and complete at least 200 trips in that month (only NYC trips count towards this total). [...] They geo-target with certain ads, advertising the wages for that area, which are often impressive."). *See also,* Cradeur, Jay, "Why Is Uber Sending Out Postcards to Recruit Drivers?," *The Rideshare Guy*, July 27, 2020, available at https://therideshareguy.com/uber-driver-recruitment/ ("Uber is just focused on recruiting more

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and other content, sends its employees to game developer conferences to give presentations, and host discussions with developers in order to encourage these developers to develop games that increase the supply on Steam's storefront. [93] Amazon lowers knowledge barriers that may otherwise preclude sellers from joining their Marketplace platform For example, in 2021, it opened its first seller training center in Hangzhou, China, offering multilingual training with modules on operational practice, policy compliance, and brand building. [94] Similarly, Ola, a ridesharing company based in India, partners with a driving school to train aspiring drivers and create new supply. [95] To lower financial barriers, Uber has offered financing for drivers to purchase vehicles, [96] and partners with rental companies like Avis and Hertz to offer rental options that eliminate the upfront vehicle purchase costs for potential drivers. [97]

---

drivers! Uber has taken to direct mail in order to reach out to unsuspecting potential drivers. Here is a postcard Harry received in the mail in Los Angeles[.]").

[93] "Steamworks Development - Developer Conferences, 2025 (A Quick Survey)," *Steam*, available at https://store.steampowered.com/news/group/4145017/view/4547039255696769962 ("Folks from the Steam Team travel to various game developer industry events throughout the year and around the globe, hosting talks, meetups, and roundtable discussions.").

[94] "The First Seller Training Center for Amazon to Open a Store in the World Is Located in Hangzhou," *GlobalCross Border E-commerce Knowledge Service Center*, October 15, 2021, available at https://m.gce-news.com/en/article/show_0_0_635.html ("Amazon Global Store has announced that it will upgrade the business of Hangzhou Cross-Border E-commerce Park, officially launching and settling down Amazon's first comprehensive seller training center in Asia, which will provide one-stop training services for sellers in the Asia-Pacific region.").

[95] "Maruti Suzuki Collaborates with Ola to Create a Pool of Skilled Drivers and Promote Entrepreneurship," *Maruti Suzuki*, available at https://www.marutisuzukidrivingschool.com/media/maruti-suzuki-collaborates-with-ola-to-create-a-pool-of-skilled-drivers-and-promote-entrepreneurship ("Maruti Suzuki India Limited (MSIL), India's leading passenger vehicle manufacturer today signed a Memorandum of Understanding with Ola, the online cab aggregator, to train aspiring drivers-partners. Under the 'Maruti Ola Training Program', the Company targets to benefit 40,000 individuals/ Ola partner-drivers in safe driving, over a period of three years.").

[96] "Rent or Buy a Rideshare Car to Drive and Earn," *Uber*, available at https://www.uber.com/us/en/drive/vehicle-solutions/Vehicle Solutions ("Ready to buy your next car? Check out Uber's car sales partners in the Vehicle Marketplace for great deals on your next ride, whether gas or electric. If you're ready to go electric, you may be eligible for exclusive incentives."). *See also,* "TrueCar Welcomes Drivers on the Uber Platform," *TrueCar*, available at https://uber.truecar.com/landing/?_tc_src=unauthorized ("For a limited time, get $1,000 when you report your purchase of an electric vehicle and complete 100 trips in the vehicle with Uber.").

[97] "Rent or Buy a Rideshare Car to Drive and Earn," *Uber*, available at https://www.uber.com/us/en/drive/vehicle-solutions/Vehicle Solutions ("Do you need access to a car to earn with Uber? Uber's Vehicle Marketplace offers car rental and purchase options from a variety of vehicle partners exclusively for Uber drivers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

76.    The strategies used to attract supply by two-sided transaction platforms may vary depending on the growth stage and the type of goods or services offered by the platforms. In some instances, two-sided transaction platforms choose to implement strategies that may not readily scale up as the platform grows but that nevertheless seed early growth. For example, in 2010,[98] the initial listings on Airbnb used photos taken by professional photographers hired by Airbnb.[99] Juno initially attracted drivers to its ridesharing platform by offering appealing incentives, including 24/7 driver phone support, free mobile phones, and complimentary cellular data.[100] When PayTrust launched its bill-payment platform in 1998, it simplified bill management for consumers by letting consumers redirect paper bills (even those from vendors who were not yet on the PayTrust platform) to PayTrust. After a consumer securely provided their bank account details to PayTrust, the platform would then mail a check to the vendor on the consumer's behalf. While mailing paper checks to vendors on behalf of consumers may not be scalable, it allowed PayTrust to acquire customers early on, thus positioning itself to eventually attract more supply by convincing vendors to offer paperless billing and digital data transfers on their platform, further increasing the ease with which consumers could pay their bills.[101]

---

[98]    Brown, Morgan, "AirBnb: The Growth Story You Didn't Know," *GrowthHackers Team*, available at https://growthhackers.com/growth-studies/airbnb/ ("This led to the Airbnb photography program, which was officially launched in the summer of 2010. Hosts could automatically schedule a professional photographer to come and photograph their space.").

[99]    Blanding, Michael, "How Uber, Airbnb and Etsy Attracted Their First 1,000 Customers," *Forbes*, July 13, 2016, available at https://www.forbes.com/sites/hbsworkingknowledge/2016/07/13/how-uber-airbnb-and-etsy-attracted-their-first-1000-customers/ ("In order to do that, Chesky and Gebbia did something that would never be scalable: hired professional photographers to go to property owners' homes to take inviting pictures. The gambit worked, making the site much more attractive than the competition, and setting a standard for photography that later property owners rose to match in order to compete against other homes.").

[100]    Kessler, Sarah, "Inside Juno, the Company That Wants to Beat Uber by Wooing Its Drivers," *Fast Company*, February 29, 2016, available at https://www.fastcompany.com/3057182/inside-juno-the-company-that-wants-to-beat-uber-by-wooing-its-drivers ("Juno plans to offer 24-hour driver phone support […] Juno will provide each driver with a phone and pay for data.").

[101]    *See, for example*, Edelman, Benjamin, "How to Launch Your Digital Platform," *Harvard Business Review*, April 2015, available at https://hbr.org/2015/04/how-to-launch-your-digital-platform ("Consider the launch of Paytrust, the online bill-payment service, in 1998. […] [I]t was unrealistic to ask, say, Comcast or Verizon to connect its systems to an unproven start-up that at the outset had no users. Instead, Paytrust encouraged customers to update their billing addresses so that their bills would be sent directly to Paytrust, which scanned each bill and posted it to the corresponding person's account. Meanwhile, with information about a customer's bank account, Paytrust could write checks on the customer's behalf. Thus, Paytrust made itself compatible with billers' legacy systems, so the service was useful to consumers even before billers 'signed up.' With a viable

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

77. Devising and implementing the right strategies to encourage and enhance participation on both sides of a two-sided transaction platform is challenging, yet it is crucial to their initial and continued success. While my examples thus far highlight strategies that led to success, flawed implementation of services and governance mechanisms that encourage and enhance participation may lead to the failure of a two-sided transaction platform (*see* **Section IV.D** for some examples).

> 2. *Two-Sided Transaction Platforms Facilitate Discovery, Matching, and Transacting*

78. Merely getting consumers and providers to join a two-sided transaction platform is insufficient to ensure its success. The platform must also ensure members of these groups engage in transactions. For this reason, two-sided transaction platforms have in place services and governance mechanisms to facilitate discovery, matching, and the successful completion of transactions.

79. Two-sided transaction platforms facilitate search and highlight supply that is better aligned with what consumers want. They accomplish this through actions that reduce search costs and cognitive costs borne by consumers.[102] Two-sided transaction platforms can offer tools that narrow the set of potential providers that a user may consider transacting with, for example, by offering digital search capabilities and other tools that highlight more relevant providers and exclude less relevant ones. For example, like many other two-sided transaction platforms, Airbnb offers keyword-based search capabilities that enable guests to focus on a relevant subset of the millions of hosts on the platform, and further allow filtering based on dates, price range, location, and lodging type, enabling more targeted

---

product to attract consumers, Paytrust's pitch to billers was much more appealing, and billers were soon able to justify digital data transfers that eliminated paper and scanning.").

[102] Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation*, Vol. 20, No. 325, 2003, pp. 325–381, pp. 332–333 ("Generally, in matchmaking markets customers of each type benefit from being able to search a larger group of customers of the other type for a suitable match. They also benefit from being able to search among a group that has been narrowed to suitable matches. […] Information and transaction costs as well as free-riding make it difficult in practice for members of distinct customer groups to internalize the externalities on their own.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and relevant search results for consumers and thereby increasing the likelihood that consumers will find the right provider to engage in a transaction with. [103]

80.    Two-sided transaction platforms can also offer tools that help categorize and rank search results and feature specific providers in a way that better align a consumer's eventual consideration set with what the consumer wants, thereby increasing the likelihood that consumers will find the right provider to engage in a transaction with. For example, Airbnb ranks search results using an algorithm that evaluates factors such as the popularity, price, and location of the listing to decide how displayed search results are ordered/ranked, and organizes lodging into categories such as "tiny homes," "camping," and "lakefront" to help users find specific types of accommodations more easily. [104] eBay categorizes the products offered by its sellers into categories such as motors, electronics and sporting goods, allowing consumers to more easily find items they may wish to purchase. [105] TaskRabbit Elite gives consumers a curated selection of Taskers (providers) that have consistently been assessed as being of quality, [106] and eBay has a "Top Seller Program" (formerly known as "PowerSellers") that improves the visibility of sellers with exceptional customer service by prioritizing the display of their listings to potential buyers. [107]

81.    In some cases, two-sided transaction platforms may proactively match a provider with a consumer. Uber and Lyft assign drivers to riders rather than letting riders choose a specific

---

[103] "How Search Results Work," *Airbnb*, available at https://www.airbnb.com/help/article/39 ("We offer a variety of search filters and other settings that guests can use to adjust their search results. For example, guests can filter stays by the type of place, price range, number of rooms and beds, amenities, booking options, and accessibility features. We also offer guests the ability to find their search results on a map.").

[104] "How Search Results Work," *Airbnb*, available at https://www.airbnb.com/help/article/39 ("The algorithm considers many factors to determine how to order search results, but some factors have a larger impact than others. In particular, the quality, popularity, price, and location of a listing heavily influence how a listing appears in search results. The algorithm also encourages variety within search results—so that guests are presented with listings that have different Hosts, different characteristics, and a range of prices." Emphasis omitted.).

[105] "Shop by Category," *eBay*, available at https://www.ebay.com/n/all-categories.

[106] "The TaskRabbit Elite," *TaskRabbit*, available at https://www.taskrabbit.com/taskrabbit-elite ("The TaskRabbit Elite showcases Taskers who consistently provide the highest level of service and professionalism.").

[107] "Top Rated Seller Program," *eBay*, available at https://www.ebay.com/sellercenter/protections/top-rated-program ("Sellers who deliver exceptional customer service may qualify for eBay's Top Rated Seller program. We support Top Rated Sellers with exclusive benefits that can help boost your listings visibility, improve conversion, save money, and protect you from abusive buying behavior and events outside your control.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

driver, although Lyft allows riders to be matched with drivers recognized as a "preferred driver."[108] Lyft further differentiates itself from Uber through a recently launched feature (Women+ Connect) that recognizes the preference of some women and nonbinary riders to be matched with women and nonbinary drivers when such matches are available.[109] In contrast, Sidecar, a ridesharing platform that competed with Uber and Lyft until 2015, differentiated itself from its competitors by allowing riders to proactively choose from a small set of available drivers.[110] Handy, a two-sided transaction platform that enables transactions between home cleaners and customers, allows home cleaners to opt into jobs that align with their schedules and preferences, but does not allow users to choose specific home cleaners.[111] This differentiates it from TaskRabbit, whose users can choose from a set of listed Taskers for their home cleaning needs.[112]

82.    Two-sided transaction platforms may offer payment and settlement services to increase the ease of transacting for consumers and providers and facilitate the completion of transactions, which further reduces search and transacting costs for participants and the risk of adverse outcomes. Uber offers the option to use credit cards, debit cards, Uber Cash,

---

[108]  "Preferred Driver for Riders," *Lyft*, available at https://help.lyft.com/hc/en-us/all/articles/4819516913-Preferred-Driver-for-riders ("We'll prioritize matching you with Preferred Drivers. Preferred Drivers are consistently safe and reliable. Choosing to ride with Preferred Drivers won't affect the cost of rides. If there aren't enough Preferred Drivers near you or the wait time is too long, we'll match you with other drivers.").

[109]  Khalid, Amrita, "Lyft's Feature That Matches Women and Nonbinary Riders and Drivers Now Available Nationwide," *The Verge*, February 13, 2024, available at https://www.theverge.com/2024/2/13/24071237/lyft-women-plus-connect-riders-availability ("Lyft is expanding Women Plus Connect, an in-app feature that matches women and nonbinary drivers with women and nonbinary riders, to all US cities. The rideshare service initially launched the initiative in five cities last fall, with the goal of both improving safety and recruiting more female and nonbinary users. Over 2.4 million riders have activated Women Plus Connect since its rollout, according to Lyft's press materials.").

[110]  Schwartz, Ariel, "Sidecar's New Ridesharing Model: Pick Your Own Driver And Price," *Fast Company*, February 21, 2014, available at https://www.fastcompany.com/3026675/sidecars-new-ridesharing-model-pick-your-own-driver-and-price ("This week, Sidecar announced that it's making a big move to distinguish itself from the pack, with a new marketplace model that allows drivers to set their own prices and riders to select nearby drivers based on price, user ratings, and their distance.").

[111]  "How Handy Works," *Handy*, available at https://help.handy.com/handysupport/s/article/How-are-customers-matched-with-pros--How-Handy-Works ("When you make a booking, we share it with the network of professionals using our platform, and they're able to claim the bookings that suit their preferences. If you find a pro you really love, you can add them to your Pro Team […], so they get priority access to your bookings.").

[112]  "How Do I Hire a Tasker?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/210861763-How-Do-I-Hire-a-Tasker.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and other electronic payment methods such as Apple Pay, PayPal, and Venmo,[113] and further streamlines settlement by providing detailed receipts and offering in-app support to resolve payment discrepancies.[114] eBay handles payment disputes between buyers and sellers, allowing buyers to file disputes and sellers to either accept or challenge these claims.[115] Airbnb receives payment from a guest in advance of their stay, and pays the host after the guest has arrived at their short-term accommodation.[116]

83. Two-sided transaction platforms can also further facilitate transactions by simplifying pricing. In some cases, the platform sets the price associated with the transaction centrally. For example, Lyft and Uber determine a price for each ride using inputs like the level of supply and demand at the time, the estimated distance and duration of the ride, and traffic conditions.[117] Airbnb offers hosts the option to use centrally determined pricing through their Smart Pricing feature, which adjusts the recommended prices of listings based on market conditions. However, hosts on Airbnb may choose to ignore this centrally

---

[113]    "Updating a Payment Method on Your Account," *Uber*, available at https://help.uber.com/riders/article/updating-a-payment-method-on-your-account?nodeId=8f78dca4-9d75-44f1-bdc1-e90ca3da0319. *See also*, "Payment Methods," *Uber*, available at https://help.uber.com/riders/section/payment-methods?nodeId=6f1bdcf2-af89-4294-a89e-cb7d76ff81d6 ("Payment methods: […] Paying with Google Pay. Paying with PayPal. Paying with Apple Pay. Paying with Venmo. Pay with a Bank Account Using Link (By Stripe)"); "What is Uber Cash?," *Uber*, available at https://www.uber.com/us/en/ride/how-it-works/uber-cash/ ("From paying for anything on Uber hassle-free to earning extra perks through Partner Rewards, do it all with Uber Cash.").

[114]    "Getting a Trip Receipt," *Uber*, available at https://help.uber.com/riders/article/getting-a-trip-receipt?nodeId=846f6cad-6f27-492a-9e0b-d2f056e1298e ("When a trip ends, we automatically send a receipt to the email address on your Uber account."). *See also*, "Fare Review," *Uber*, available at https://help.uber.com/riders/section/fare-review?nodeId=16decb08-ae67-4cb8-ad8e-176dd6446ea5.

[115]    "Handling Payment Disputes," *eBay*, available at https://www.ebay.com/help/selling/getting-paid/handling-payment-disputes?id=4799 ("If your buyer opens a payment dispute, you can generally choose to accept the dispute, or challenge the dispute with supporting evidence.").

[116]    "Paying for Your Trip," *Airbnb*, available at https://www.airbnb.com/help/article/3119 ("Your payment method will be charged as soon as your reservation is confirmed (excluding any security deposits)."). *See also*, "When You'll Get Your Payout," *Airbnb*, available at https://www.airbnb.com/help/article/425 ("For most stays of 27 nights or less, we'll initiate your payout by the end of the business day after the guest's scheduled check-in date. […] If the reservation is a monthly stay of 28 nights or more, we'll send the first month's payout by the end of the business day after the guest's scheduled check-in date, and we'll send any payouts monthly after that.").

[117]    "How Uber's Dynamic Pricing Model Works," *Uber*, available at https://www.uber.com/en-GB/blog/uber-dynamic-pricing/ ("When you go to request a ride on a Saturday night, you might find that the price is different than the cost of the same trip a few days earlier. That's because of our dynamic pricing algorithm, which adjusts rates based on a number of variables, such as time and distance of your route, traffic and the current rider-to-driver demand. Sometimes, this can mean a temporary increase in price during particularly busy periods.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

determined price and instead set their own price.[118] Similarly, in 2016, the car sharing platform Turo offered vehicle owners two ways of setting their prices: vehicle owners could either set their rental price manually or use Turo's centralized pricing through its Automatic Pricing feature.[119] This centralized pricing system differentiated Turo from its competitor Getaround, which, at the time, required providers to set their own prices,[120] and only introduced a similar centralized pricing option in selected markets as a competitive response to Turo.[121] In other cases, providers set their own prices but the platform may provide guidance or specific ranges that providers can choose from. For example, TaskRabbit provides pricing guidelines for Taskers, suggesting prices that are competitive for their task and their specific region, but Taskers are not mandated to price within these ranges.[122] In other cases, two-sided transaction platforms may choose to set specific price

---

[118]  "Use Smart Pricing to Automatically Adjust Your Prices Based on Demand," *Airbnb*, available at https://www.airbnb.com/help/article/1168 ("Turn on Smart Pricing if you want your listing to be automatically competitively priced for your area—without you needing to constantly monitor it. […] You can override Smart Pricing for a night or multiple nights in your calendar without turning off Smart Pricing by setting custom pricing for those nights. Your custom price will be the price for that date or multiple dates.").

[119]  "Introducing Dynamic Pricing to Help Maximize Your Earnings," *Turo*, May 23, 2024, available at https://turo.com/blog/news/introducing-dynamic-pricing-to-help-maximize-your-earnings/ ("Automatic Pricing, our current pricing algorithm, created back in 2016, offers hosts daily pricing recommendations for their vehicles. […] You can always change prices set by dynamic pricing."). In 2024, Turo replaced the Automatic Pricing feature with dynamic pricing. *See also*, "Pricing Your Vehicle," *Turo*, available at https://help.turo.com/en_us/setting-your-vehicle-price-S12VrVlVc ("All US, Canada, and UK listings use dynamic pricing. […] You'll still have the option to customize prices on your calendar.").

[120]  Casserly, Meghan, "Getaround's Jessica Scorpio On The Rise Of Collaborative Consumption," *Forbes*, December 18, 2011, available at https://www.forbes.com/sites/meghancasserly/2011/12/12/getaround-jessica-scorpio-rise-of-collaborative-consumption/ ("With Getaround, instead of leaving their car in the garage or parking lot, owners can post their vehicle for hire and name their price through the smartphone app.").

[121]  *See*, *for example*, Baruchman, Michelle, "Airbnb for Cars? Getaround App Lets Users Rent Cars from Strangers by the Hour," *The Seattle Times*, June 4, 2018, available at https://www.seattletimes.com/seattle-news/transportation/airbnb-for-cars-getaround-app-lets-users-rent-cars-from-strangers-by-the-hour/ ("An app-based service letting people rent their cars by the hour launched in Seattle last week as part of the growing attempts to innovate traditional means of getting around. […] In exchange for sharing their car, owners receive compensation per hour their vehicle is in use, based on a pricing algorithm determined by the year, make and model of the vehicle, the part of town in which the car is located and the day of the week an owner is offering.").

[122]  "How Pricing Guidance Works on Taskrabbit," *TaskRabbit*, April 13, 2022, available at https://www.taskrabbit.ca/blog/how-pricing-guidance-works-on-taskrabbit ("While Taskers always have control of their pricing, our app incorporates a pricing guidance feature that shows Taskers the rates at which clients are most likely to hire them […] With all this said, you still have 100% control of the rates you set. Pricing guidance recommendations are just that—recommended rates that will help you grow your businesses—but you maintain full control over what rates you select and how often you change them.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

tiers, helping consumers compare prices and identify discounts and promotions.[123] For example, the Microsoft Store offers pre-set price tiers for developers of Windows apps and games to choose from.[124]

84.    Certain two-sided transaction platforms may also offer services and governance mechanisms to aid in the transfer from providers to consumers of the goods associated with their transactions. Platforms whose transactions involve the exchange of physical goods may create physical infrastructure to store and deliver these goods, ensuring the safe and reliable delivery of merchandise. For example, Amazon's Marketplace includes the "Fulfilled by Amazon" option that allows a seller to store items they intend to offer on the platform in Amazon's warehouses, and to have Amazon handle the delivery of these products to consumers following a purchase.[125]

85.    Finally, transactions on two-sided transaction platforms are also facilitated by the services and governance mechanisms that facilitate trusted and safe interactions, discussed in detail in **Section IV.C.3**. As a by-product of facilitating trust and safety, these services and governance mechanisms enhance transparency into product capability and quality, thereby mitigating information asymmetry while also lowering search and cognitive costs for participants.

### 3.    *Two-Sided Transaction Platforms Facilitate Trusted and Safe Interactions Between Consumers and Providers*

86.    After consumers and providers have joined, matched and perhaps transacted, two-sided transaction platforms must also ensure that transactions "don't just happen, but they go

---

[123]    Berger Opening Report, Section VI.

[124]    "Set and Schedule App Pricing for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/schedule-pricing-changes?pivots=store-installer-msixoverride-base-price-for-specific-markets ("[Y]ou can choose an available price tier, which sets the price in all the countries where you choose to distribute your app. Price tiers start at 0.99 USD, with additional tiers available at increasing increments (1.09 USD, 1.19 USD, and so on). The increments generally increase as the price gets higher.").

[125]    "Amazon FBA: Fulfillment Services for Your Ecommerce Business," *Amazon*, available at https://sell.amazon.com/fulfillment-by-amazon ("By enrolling in FBA, you can send your products into Amazon's global network of fulfillment centers, and we'll pick, pack, and ship orders, as well as handle customer service and returns.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

well." [126] To achieve this goal, two-sided transaction platforms provide services and governance mechanisms to (1) foster participant trust through transparent representation of products and the intentions of platform participants, and through inducing the provision of better products, and (2) lower the likelihood of adverse transaction outcomes for consumers and providers.

87.    Two-sided transaction platforms provide services and governance mechanisms to ensure the products and services offered by providers as well as the participants themselves are represented transparently and accurately, which reduces information asymmetry and contributes to preventing adverse outcomes for participants on both sides.

88.    Some two-sided transaction platforms implement centralized review processes of varying complexity to ensure that the products and services offered on the platform are authentic, meet minimum quality thresholds, and perform as advertised. For example, StockX, an online retailer for clothes and sneakers, centrally verifies that every item listed on its platform is in fact authentic and described accurately. [127] eBay offers an "Authenticity Guarantee" program on items such as sneakers, watches, jewelry, trading cards, and other products that non-experts may not be easily able to determine the authenticity of, employing dedicated teams of authenticators to verify that such products are in fact genuine. [128]

89.    Two-sided transaction platforms may provide guidelines that describe what to include and what not to include in a profile or a product posting. For example, TaskRabbit encourages Taskers to build profiles which include structured information about their skills, the tools

---

[126]    Tucker, Catherine, "Comment on 'Digital Infrastructure'," *Economic Analysis and Infrastructure Investment*, University of Chicago Press, November 2021, edited by Edward L. Glaeser and James M. Poterba, p. 451 ("The way I describe this in the classroom is that ultimately as a platform your major job is to make sure interactions on your platform do not just happen but also go well. This requires relinquishing a technical mindset and adopting the mindset of a government or police officer to put into place the right incentives for successful interactions.").

[127]    "Every Item Is StockX Verified," *StockX*, available at https://stockx.com/about/verification/ ("Shop on StockX with confidence knowing every purchase is StockX Verified. StockX Verified is our own designation and not endorsed by any brands sold on StockX. […] We only allow deadstock on our marketplace. That means every item, except refurbished watches and electronics, bought or sold must be brand new and never worn.").

[128]    "Authenticity Guarantee," *eBay*, available at https://www.ebay.com/authenticity-guarantee ("Before you receive your item, a team of experienced authenticators applies their years of industry-specific knowledge to meticulously examine the details of your item, guaranteeing that it's authentic.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and transportation methods they use, and to post pictures of their work to demonstrate the quality of their work to consumers.[129]

90.    Two-sided transaction platforms may also provide guidelines or requirements that providers must comply with to meet the minimum standards for transparency, product capability, and quality, thereby mitigating information asymmetry while also lowering search and cognitive costs for participants. For instance, Etsy requires that items sold on the platform must be "made, designed, handpicked, or sourced" by the seller.[130] Turo requires that all vehicles listed on its platform in Canada, the UK, and most states in the United States get an annual vehicle safety inspection.[131]

91.    Two-sided transaction platforms may offer services and governance mechanisms to lower the likelihood of adverse outcomes for both consumers and providers. In addition to the steps taken to ensure the quality and authenticity of the products and services offered by their participants, many two-sided transaction platforms implement screening mechanisms aimed at the participants themselves to proactively identify and prevent bad actors from joining or remaining on the platform.

92.    Some two-sided transaction platforms may also require evidence that providers have the necessary skills and associated certifications for the products or services they offer. For

---

[129]    Beier, Matt, "New to Tasking? We Have All the Info You Need!," *TaskRabbit*, April 18, 2023, available at https://www.taskrabbit.com/blog/new-to-tasking-we-have-all-the-info-you-need ("In this last tab, you can build out your profile by sharing personal information, including: [s]pecial tools you own; [t]ransportation methods you have (some tasks require specific vehicle types, which means you'll only show up in search results if you have the specific vehicle added to your profile); [q]uick facts about any pet allergies you have, your language preferences, and whether you have a 2-hour minimum (which Taskers recommend noting in your Skills & Experience description and confirming in the chat thread); [b]usiness photos ("before and after" task photos, pictures of your tools, and whatever else shows off your skills!)").

[130]    "Seller Policy," *Etsy*, available at https://www.etsy.com/legal/sellers ("Etsy is a unique marketplace. Buyers come here to purchase items that they might not find anywhere else, or to spark their own creativity. As such, everything listed for sale on Etsy must be made, designed, handpicked, or sourced by a seller.").

[131]    "Annual safety inspections," *Turo*, available at https://help.turo.com/en_us/annual-vehicle-safety-inspections-ByJmUVg4c ("Canada: Hosts must get an annual vehicle safety inspection from a qualified mechanic. United Kingdom: Hosts must confirm annual vehicle servicing and pass a MOT test where required. US: Hosts, with the exception of those in the states listed below, must get an annual vehicle safety inspection from a qualified mechanic").

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

example, Uber requires new drivers to have at least one year of driving experience, or three years if they are under the age of 25.[132]

93.    Most two-sided transaction platforms offer online feedback or peer rating systems that enhance transparency by aggregating and summarizing information from participants in past transactions. [133] Peer rating systems on two-sided transaction platforms allow participants on one side to rate participants on the other side following a transaction, with ratings often visible to other participants. Etsy offers a one-sided peer rating system where buyers may review sellers and their products after a purchase, but sellers may not rate buyers.[134] In contrast, Uber offers a two-sided peer rating system, where riders and drivers may both rate each other after a transaction, with the average ratings for both riders and drivers being subsequently visible on the platform.[135]

94.    The transparency provided by peer rating systems, and the associated trust, accountability, and improvement in transaction quality that they engender, depends in part on the ratings provided by participants being honest, accurate and authentic. Two-sided transaction platforms therefore may use a variety of methods to detect fraudulent reviews, to encourage

---

[132]    "Driver Requirements in the USA," *Uber*, available at https://www.uber.com/us/en/drive/requirements/?city=boston ("There are a few minimum requirements to meet before you can sign up to drive with Uber: Meet the minimum age to drive in your state. Have at least one year of licensed driving experience in the US (3 years if you are under 25 years old). *Some states require an in-state license*.").

[133]    *See, for example*, Goldfarb, Avi and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No. 1, 2019, pp. 3–43, p. 24 ("The most common such mechanism is an online rating systems in which ratings from past buyers and sellers are posted for future market participants to see […] [A] ratings system can enable trust in the absence of repeated interactions."). *See also*, Dellarocas, Chrysanthos, "The Digitization of Word of Mouth: Promise and Challenges of Online Feedback Mechanisms," *Management Science* Vol. 49, No. 10, 2003, pp. 1407–1424, p. 1411 ("eBay's feedback mechanism is, arguably, the best-studied online feedback mechanism to date. […] One of the most remarkable aspects of eBay is that the transactions performed through it are not backed up by formal contractual guarantees. Instead, cooperation and trust are primarily based on the existence of a simple feedback mechanism. This mechanism allows eBay buyers and sellers to rate one another following transactions and makes the history of a trader's past ratings public to the entire community.").

[134]    "How the Review System Works for Sellers," *Etsy*, available at https://help.etsy.com/hc/en-us/articles/360000572708-How-the-Review-System-Works-for-Sellers?segment=selling ("How the Review System Works for Sellers: Buyers use Etsy's five-star review system […] to review their purchases. […] Buyers have 100 days to review an order, beginning on the delivery date or estimated delivery date.").

[135]    "Rating FAQs," *Uber*, available at https://help.uber.com/riders/article/rating-faqs?nodeId=0539e772-747c-49a7-8c26-f28c65e6f14d ("After each trip, riders and drivers can rate each other from 1 to 5 stars based on their trip experience. You can also provide this rating at the bottom of your receipt. Ratings are always reported as averages, and neither riders nor drivers will see the individual rating left for a particular trip.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

accuracy, and to highlight reviews that stem from authentic transactions, towards lowering information asymmetry, willful adverse outcomes, and the mismatch between perceived quality and actual quality.[136] Booking.com employs both people and automated systems to detect fake reviews.[137] Amazon adds a "Verified Purchase" sticker to reviews left by consumers who have verifiably bought the product.[138] Peer rating systems may also be designed to increase the likelihood that users provide truthful ratings without worrying about retaliation. For example, making reviews anonymous,[139] may increase their informativeness in the face of "reputation inflation."[140] In addition to only allowing guests

---

[136]  Hadero, Haleluya, "The Internet Is Filled with Fake Reviews. Here Are Some Ways to Spot Them," *AP News*, December 23, 2024, available at https://apnews.com/article/fake-online-reviews-generative-ai-40f5000346b1894a778434ba295a0496 ("Prominent companies are developing policies for how AI-generated content fits into their systems for removing phony or abusive reviews. Some already employ algorithms and investigative teams to detect and take down fake reviews but are giving users some flexibility to use AI. […] Tech companies, including Amazon, Yelp and Google, have sued fake review brokers they accuse of peddling counterfeit reviews on their sites. The companies say their technology has blocked or removed a huge swath of suspect reviews and suspicious accounts.").

[137]  "How Guest Reviews Work," *Booking.com*, available at https://www.booking.com/reviews_guidelines.html ("We have people and automated systems that specialize in detecting fake reviews submitted to our platform. If we find any, we delete them and, if necessary, take action against whoever is responsible.").

[138]  "Amazon Verified Purchase Reviews," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=G75XTB7MBMBTXP6W ("'Verified Purchase' means the reviewer bought or used the item on Amazon, and paid a price available to most Amazon shoppers.").

[139]  eBay's original rating system did not have anonymous reviews, which allowed participants to identify the user who gave the reviews and retaliate. The act of retaliation on eBay was a substantial problem because it discouraged participations and honest, critical reviews. *See, for example*, Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 51 ("Klein, Lambertz, and Stahl (2016) investigate the effects of eBay's redesign of its rating system in May 2008, when eBay introduced one-sided feedback that is not subject to retaliation and, thus, can be seen as more accurately reflecting a buyer's experience […]. Since, prior to that date, in May 2007, eBay introduced an anonymous detailed seller rating (DSR) on top of its rating system, Klein, Lambertz, and Stahl could use this DSR before and after the change to a one-sided rating system as a measure of buyer satisfaction. […] The authors found a significant increase in buyer satisfaction with the introduction of the one-sided rating system, but did not observe a significant change in the sellers' exit rate. This can be seen as evidence that, in this instance, the redesign of the rating system was successful in reducing moral hazards but did not significantly affect the composition of sellers [...] [T]he redesign of the rating system would then encourage truthful announcements by sellers but would not remove their incentive to participate. […] [L]ow-quality sellers do not exit more often after the policy change. However, they sell fewer items, which implies that buyers obtain a higher quality on average." References omitted.).

[140]  Filippas, Apostolos, John J. Horton, and Joseph M. Goldend, "Reputation Inflation," *Marketing Science*, Vol. 41, No. 4, 2022, pp. 733–745, pp. 31–33 ("This paper documents that the reputation system in an online marketplace was subject to inflation—we observe systematically higher scores over time, which cannot be fully explained by overall improvements in fundamentals. […] Platforms could also give other incentives for having a reputation for good, 'honest' reviews. Local business reviewing website Yelp employs mechanisms such as badges for top reviewers, as well as making the feedback score distribution of each reviewer publicly

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and hosts who have verifiably completed a transaction to leave reviews for each other, Airbnb encourages hosts to rate their guests before the host sees the guest's rating (and vice versa), thereby making it less likely that a participant's rating is influenced by how their counterparty rated them rather than by the actual quality of the transaction.[141]

95.  The peer rating systems offered by many two-sided transaction platforms play an additional role of giving participants user-generated information about positive and negative outcomes associated with prior transactions, which further foster participant trust, encourage good behavior, and provide one form of recourse for adverse post-transaction outcomes. Two-sided transaction platforms can further utilize these peer rating systems to encourage good behavior by offering incentives to top providers and penalties for those with poor ratings. For example, TaskRabbit's "Elite" status—awarded to Taskers who maintain a positive rating of 98 percent or higher and complete a minimum number of tasks each month—showcases Taskers' reliability, experience and consistent client satisfaction to potential consumers.[142] TaskRabbit further contributes to maintaining quality by

accessible, and casual inspection suggests far more centered ratings distributions. […] Fradkin et al. (2017) find that introducing a simultaneous reveal feature in Airbnb reviews only reduced the percentage of 5-star ratings by 1.5 percentage points."). *See also*, Tadelis, Steve, "Reputation and Feedback Systems in Online Platform Markets," *Annual Review of Economics*, Vol. 8, August 19, 2016, pp. 321–340, pp. 336–338 ("Fradkin et al. (2015) study the bias in online reviews by using internal data from Airbnb, and […] report results from field experiments conducted by the online marketplace. In one experiment they offer users a coupon to leave feedback and show that the users who did reported more negative experiences than reviewers in the control group, suggesting that otherwise they would have probably been silent. […] As such, marketplaces may provide incentives to motivate more truthful feedback from buyers, such as the coupons described in Fradkin et al. (2015).").

[141]  "Host and Guest Reviews for Stays," *Airbnb*, available at https://www.airbnb.com/help/article/13 ("Hosts and guests can only leave reviews for stays that have been booked and paid for on Airbnb."). *See also*, Fradkin, Andrey, Elena Grewal, and David Holtz, "Reciprocity and Unveiling in Two-Sided Reputation Systems: Evidence from an Experiment on Airbnb," *Marketing Science*, Vol. 40, No. 6, November 2021, pp. 1013–1029, pp 1026–1027 ("We find that the simultaneous reveal policy increased review rates and decreased the average valence of reviews. It also reduced retaliatory one-star reviews as well as the correlation between guest and host ratings.").

[142]  "The TaskRabbit Elite," *TaskRabbit*, available at https://www.taskrabbit.com/taskrabbit-elite ("Why customers love working with the TaskRabbit Elite[.] People rave about their service, earning them a Positive Rating of 98% and higher. […] They're highly active, completing a significant number of tasks each month.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

offering one-on-one calls to Elite Taskers to provide feedback on their work.[143] Uber may deactivate drivers if their ratings fall below a minimum threshold for their city.[144]

96. Beyond their peer rating systems, two-sided transaction platforms may also offer reporting mechanisms that participants on both sides can use to report adverse transaction outcomes. These reporting mechanisms help two-sided transaction platforms identify and exclude bad actors from the platforms and reduce negative behaviors that could affect participation on both sides. Amazon allows buyers to report suspicious products or sellers electronically on the product's listing page or by contacting an Amazon customer service agent.[145] eBay allows sellers to report a buyer for issues such as excessive messaging or asking the seller to complete a sale off the platform.[146]

97. Two-sided transaction platforms may also provide services and governance mechanisms that proactively seek to identify potential instances of fraudulent or harmful behavior before they lead to adverse transaction outcomes.[147] eBay reviews messages exchanged via the messaging system of their platform to detect sellers of potentially fraudulent listings. Amazon offers a buyer-seller message service that buyers can use in lieu of other channels of communication with sellers that may make the buyer more susceptible to spam or

---

[143] "What Are the Perks of Elite Status?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/360034623292-What-Are-the-Perks-of-Elite-Status ("One-on-one calls: Elite Taskers can sign up for one-on-one calls to provide feedback and discuss their business.").

[144] "Understanding Why Drivers and Delivery People Can Lose Access to Their Accounts," *Uber*, available at https://www.uber.com/us/en/drive/driver-app/deactivation-review/ ("A driver or delivery person can lose access to part or all of the Uber platform for ratings that are below the minimum average rating in their city. If their rating is approaching the minimum limit, we will let them know and may share information that may help them improve their rating from users, customers, or restaurants.").

[145] "Report Suspicious Activity," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=T3MYikBay7swNeFqFo ("If you believe that any product, seller, or activity is suspicious, follow these steps to report it.").

[146] "Report an Issue with a Buyer," *eBay*, available at https://www.ebay.com/help/selling/resolving-buyer-issues/reporting-issue-buyer?id=4084.

[147] A survey shows that consumers are more concerned about sharing their personal information (e.g., credit card, address, phone number) with websites on which they have never shopped before compared to large retail websites such as Amazon.com. The same survey shows that over 40 percent of customers who abandoned their online shopping cart did so because of concerns related to having their credit card information stolen. *See, for example*, "The State of Ecommerce Trust in 2020," *Ecommerce Research*, June 25, 2020, available at https://blog.trustedsite.com/2020/06/25/the-state-of-ecommerce-trust-in-2020-original-research/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

phishing.[148] Airbnb utilizes machine learning technology to assess listings for potential fraud based on a variety of risk signals.[149]

98.    Two-sided transaction platforms may offer insurance or refund policies designed to compensate consumers or providers if an adverse outcome occurs after a transaction. For example, eBay's Money Back Guarantee ensures that buyers receive a refund if an item does not arrive, arrives damaged, or does not match the listing description.[150] Airbnb offers optional insurance for guests in the United States to cover potential losses from issues such as trip cancellation or delayed or missing luggage.[151] In addition, Airbnb provides automatic, complimentary host liability insurance with coverage of up to $1 million to protect hosts in rare cases where they are held responsible for a guest's injury, damage, or theft of a guest's belongings during the guest's stay.[152] Airbnb also offers Host Damage Protection, providing hosts with up to $3 million in coverage for property damage caused

---

[148]    "User Agreement," *eBay*, July 26, 2024, available at https://www.ebay.com/help/policies/member-behaviour-policies/user-agreement?id=4259#4 ("eBay's automated systems scan and analyze the contents of every message sent through its messaging platforms, […] including messages between users, to (i) detect and prevent fraudulent activity or violations of eBay's User Agreement, including the incorporated terms, notices, rules, and policies."). *See also*, "The Buyer-Seller Messaging Service," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=G3JQ9V9LQ8FFMR7W ("You can use any information the seller provides to contact the seller. However, we recommend that you use the Buyer-Seller Message Service. This service ensures that emails are filtered for spam and phishing attempts. We'll also keep a copy of all correspondence, which can be used to support any A-to-z Guarantee claims you submit.").

[149]    "What We're Doing to Prevent Fake Listing Scams," *Airbnb*, April 21, 2017, available at https://news.airbnb.com/what-were-doing-to-prevent-fake-listing-scams/ ("Leveraging machine learning technology. To detect fake listings before they ever go live on the platform, our technology evaluates each listing against hundreds of risk signals such as host reputation, template messaging, duplicate photos and other discrepancies — using data learnings from millions of listings. When we predict a high likelihood that a listing is fake, we automatically block it from appearing on Airbnb or, in other cases, delay the listing from going live while we conduct additional reviews." Emphasis omitted.).

[150]    "Money Back Guarantee " *eBay*, available at https://pages.ebay.com/ebay-money-back-guarantee/ ("eBay Money Back Guarantee. Get the item you ordered or your money back—it's that simple. […] If an item hasn't arrived or isn't as described, go to My eBay, select the item in your purchase history, and reach out to your seller.").

[151]    "Travel Insurance and Assistance Services for US Residents," *Airbnb*, available at https://www.airbnb.com/help/article/3443 ("Airbnb guests who live in the United States can add travel insurance and assistance services on the checkout page or after booking.").

[152]    "Host Liability Insurance," *Airbnb*, available at https://www.airbnb.com/help/article/937 ("Host liability insurance, a part of AirCover for Hosts, provides Hosts with $1 million in coverage in the rare event you are found legally responsible for a guest getting hurt or their belongings being damaged or stolen while they're staying at your place. People who help you host, like Co-Hosts and cleaners, are also included, so you can feel confident hosting on Airbnb.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

by guests during their stay.[153] Steam allows free refunds for digital games purchased via its platform if the request is made within 14 days of purchase and the game has been played for less than two hours, considering refund requests that fall outside of these limits on a case-by-case basis.[154]

### D.   Many Two-Sided Transaction Platforms Have Failed to Implement Services and Governance Mechanisms to Mitigate Market Failure and Achieve Success

99.   Choosing and implementing the set of services and governance mechanisms that effectively address the various sources of market failure I have discussed above is complex. Studies have shown that among failed two-sided platforms, transaction platforms are most likely to fail and have the shortest lifespans.[155] Over the years, numerous two-sided transaction platforms have failed to implement effective services and governance mechanisms to encourage and enhance participation; to facilitate discovery, matching, and transacting; and/or to facilitate trusted and safe interactions between consumers and providers. This failure often undermines the platform's ability to achieve and maintain success. In what follows, I discuss some examples of such failure, underscoring the complex nature of two-sided transaction platforms, the inherent risks associated with their

---

[153]   "Host Damage Protection," *Airbnb*, available at https://www.airbnb.com/help/article/279 ("Host damage protection, part of AirCover for Hosts, reimburses Hosts up to $3 million in the rare event your place or belongings are damaged by a guest during an Airbnb stay. You're reimbursed for certain damage caused by guests to your home and belongings if the guest does not pay for the damage. It also reimburses for extra cleaning services in certain cases, like removing stains left by guests (or their invitees) or pet accidents and smoke odor removal.").

[154]   "Common Refund Questions," *Steam*, available at https://help.steampowered.com/en/faqs/view/5FDE-BA65-ACCE-A411 ("Valve will, upon request via help.steampowered.com, issue a refund for any title that is requested within 14 days of purchase and has been played for less than 2 hours (this includes online, offline and shared library playtime). Even if you fall outside of the refund rules we've described, you can submit a request and we'll take a look at it. Please review our Refund Policy for more information.").

[155]   Cusumano, Michael A., Anabelle Gawer, and David B. Yoffie, *The Business of Platforms: Strategy in the Age of Digital Competition, Innovation, and Power*, Harper Business, 2019, p. 144 ("The 209 failures that we found, while by no means exhaustive, allow us to make some general observations about why platforms struggle. First, […]the most obvious pattern is the predominance of failed transaction platforms, representing nearly 85 percent of the sample. Transaction platforms have a somewhat shorter life as well, averaging 4.6 years, compared to 7.4 and 5 years for the hybrid and innovation platforms we identified, respectively.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

business models, their low likelihood of success, and that achieving initial success for a few years does not guarantee future success.[156]

100.    Sidecar, a ridesharing platform I introduced in **Section IV.C**, competed with Uber and Lyft between 2011 and 2015.[157] During this period, Uber and Lyft spent significantly more money than Sidecar on marketing and financial incentives which included sign-up bonuses and guaranteed earnings for drivers, and discounted fares for riders.[158] Lacking comparable incentives,[159] Sidecar struggled to attract and retain a substantial base of drivers and riders.[160] Sidecar also chose to differentiate itself from competitors like Uber and Lyft by

---

[156]    Van Alstyne, Marshall, Geoffrey G. Parker, and Sangeet P. Choudary, "6 Reasons Platforms Fail," *Harvard Business Review*, March 31, 2016, available at https://hbr.org/2016/03/6-reasons-platforms-fail ("For every successful platform, there are many more that struggle or simply don't make it.").

[157]    Hawkins, Andrew J., "Uber Rival Sidecar Is Ending Ride-Sharing and Delivery Services This Week," *The Verge*, December 29, 2015, available at https://www.theverge.com/2015/12/29/10685050/sidecar-rideshare-delivery-uber-cease-operations.

[158]    Huet, Ellen, "How Uber and Lyft Are Trying to Kill Each Other," *Forbes*, May 30, 2014, available at https://www.forbes.com/sites/ellenhuet/2014/05/30/how-uber-and-lyft-are-trying-to-kill-each-other/ ("The driver promotions are eye-popping and clearly unsustainable: Do you drive for Uber? Here, Lyft will give you $500 to give 10 Lyft rides. Drive for Lyft? Uber's got $500 for you -- plus a guarantee that you'll net $45 an hour until the end of June. Refer a driver to Uber? Here's $500 for you and $500 for your friend, too."). *See also*, Diakopoulos, Nicholas, "How Uber Surge Pricing Really Works," *The Washington Post*, April 17, 2015, available at https://www.washingtonpost.com/news/wonk/wp/2015/04/17/how-uber-surge-pricing-really-works/; Somerville, Heather, "True Price of an Uber Ride in Question as Investors Assess Firm's Value," *Reuters*, August 23, 2017, available at https://www.reuters.com/article/technology/true-price-of-an-uber-ride-in-question-as-investors-assess-firms-value-idUSKCN1B3103/ ("In 2015, Uber passengers were paying only 41 percent of the actual cost of their trips[.]"); Solomon, Brian, "Lyft: We're Closing in on Uber with a 'Path to Profitability'," *Forbes*, May 12, 2016, available at https://www.forbes.com/sites/briansolomon/2016/05/12/lyft-were-closing-in-on-uber-with-path-to-profitability/ ("Of course, plenty of money also has been spent on current passengers, with many Lyft users in the San Francisco area receiving promotions like the temporary 50% voucher email below. Such deals may partially account for the 28% increase from last year [(2014)] in average rides per month taken by Lyft passengers.").

[159]    Yoffie, David B., Annabelle Gawer, and Michael A. Cusumano, "A Study of More Than 250 Platforms Reveals Why Most Fail," *Harvard Business Review*, May 29, 2019, available at https://hbr.org/2019/05/a-study-of-more-than-250-platforms-reveals-why-most-fail ("Sidecar pioneered the peer-to-peer ridesharing model before Uber and Lyft, but it never became a household name. It deliberately pursued innovation and a conservative slow-growth strategy in order to be financially responsible. The fatal flaw was not recognizing the importance of attracting both sides of the platform. Sidecar also raised much less venture capital than Uber and Lyft, and was unable to attract enough drivers and riders to survive much beyond the startup phase. […] Uber's great insight (and Sidecar's great failure) was recognizing the power of network effects to drive volume by dramatically lowering prices and costs on both sides of the market.").

[160]    Cusumano, Michael A., Anabelle Gawer, and David B. Yoffie, *The Business of Platforms: Strategy in the Age of Digital Competition, Innovation, and Power*, Harper Business, 2019, pp. 154-157 ("Despite its first-mover status, Sidecar expanded much more slowly than its rivals and was eventually squeezed out of the market. In the absence of competition, Sidecar's strategy might have worked. But the frenetic pace of growth, especially

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

allowing riders to manually select their drivers based on price, rating, and proximity (*see* **Section IV.C.2**).[161] However, riders found the discovery and matching process cumbersome compared to Uber's and Lyft's automated matching systems.[162] Sidecar's failure to encourage and enhance participation coupled with its experimental matching process contributed to its eventual demise in 2015.[163]

---

by Uber, eliminated Sidecar' s first-mover advantage. […] [I]t spent less than its competitors on building a great platform by spending to attract drivers and market aggressively."). *See also*, Huet, Ellen, "Sidecar Puts Passengers Aside, Pivots to a Mostly Deliveries Company," *Forbes*, August 05, 2015, available at https://www.forbes.com/sites/ellenhuet/2015/08/05/sidecar-pivots-to-mostly-deliveries-company/ ("'Customer acquisition and driver acquisition in this category are very expensive, and it does make a big difference when you offer promotions -- $500 for a driver, or $20 credit -- versus our more typical $5 offerings of credit.'"); Freed, Benjamin, "Ride-Sharing Company Sidecar Gives Up on Competing With Uber and Ly," *Washingtonian*, December 29, 2015, available at https://www.washingtonian.com/2015/12/29/ride-hailing-company-sidecar-gives-up-on-competing-with-uber-and-lyft/ ("Its coverage area in Washington never penetrated the suburbs like Uber and Lyft have, and it failed to recruit a big roster of drivers. […] Sidecar lost the marketing race […] Still, simplicity to users matters greatly in the transportation-app market, and Sidecar was perhaps too wonky for its own good. Its other built-in options—allowing drivers to set their own rates and letting users pick their driver—might have been too much choice at both ends. Uber and Lyft give customer far less control over their ride experiences, but with the promise of much greater simplicity and ubiquity.").

[161]  Schwartz, Ariel, "Sidecar's New Ridesharing Model: Pick Your Own Driver And Price," *Fast Company*, February 21, 2014, available at https://www.fastcompany.com/3026675/sidecars-new-ridesharing-model-pick-your-own-driver-and-price ("This week, Sidecar announced that it's making a big move to distinguish itself from the pack, with a new marketplace model that allows drivers to set their own prices and riders to select nearby drivers based on price, user ratings, and their distance.").

[162]  Freed, Benjamin, "Ride-Sharing Company Sidecar Gives Up on Competing With Uber and Ly," *Washingtonian*, December 29, 2015, available at https://www.washingtonian.com/2015/12/29/ride-hailing-company-sidecar-gives-up-on-competing-with-uber-and-lyft/ ("Still, simplicity to users matters greatly in the transportation-app market, and Sidecar was perhaps too wonky for its own good. Its other built-in options—allowing drivers to set their own rates and letting users pick their driver—might have been too much choice at both ends. Uber and Lyft give customer far less control over their ride experiences, but with the promise of much greater simplicity and ubiquity."); Schwartz, Ariel, "Sidecar's New Ridesharing Model: Pick Your Own Driver And Price," *Fast Company*, February 21, 2014, available at https://www.fastcompany.com/3026675/sidecars-new-ridesharing-model-pick-your-own-driver-and-price ("Both Uber and Lyft (and formerly Sidecar) make the choice of a driver on behalf of riders, based on distance alone. Now, armed with $10 million in a funding round led by Union Square Ventures, Sidecar has rolled out the new model to all of its customers. Nobody uses Uber because it's friendly and personal. […] Now the question becomes whether people want so much micro-control of their drivers. I did a search on the new Sidecar for drivers who could take me from my home to downtown San Francisco and came up with 11 options, many of whom were extremely close by, charged similar amounts of money, and had top-notch ratings. The selection process could quickly get complicated, offering a little too much choice for drivers who want to get from A to B.").

[163]  Hawkins, Andrew J., "Uber Rival Sidecar Is Ending Ride-Sharing and Delivery Services This Week," *Verge*, December 29, 2015, available at https://www.theverge.com/2015/12/29/10685050/sidecar-rideshare-delivery-uber-cease-operations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

101.    Billpoint, eBay's original payment system in 1999,[164] also failed to encourage and enhance participation by not providing sufficient incentives for users to join and use the platform. Billpoint charged fees for participation to secure revenues early and cover its costs associated with payment fraud. In contrast, competitor PayPal grew its customer base by offering financial incentives for customer referrals.[165] Billpoint's strategy was not successful, and eBay ultimately discontinued the service in 2003 after acquiring PayPal in 2002.[166]

102.    BlackJet, a ridesharing service for private jets that launched in 2012, failed to align its business model with the expectations of its customers. The platform charged consumers an annual fee to book seats on pre-determined routes,[167] an offer which conflicted with the preferences of its target users who typically valued the more flexible and exclusive service

---

[164]    Cox, Beth, "eBay Bidding Bye Bye to Billpoint," *InternetNews.com*, December 16, 2002, available at https://web.archive.org/web/20021217063516/http://www.internetnews.com/ec-news/article.php/1557551.

[165]    Van Alstyne, Marshall, Geoffrey G. Parker, and Sangeet P. Choudary, "6 Reasons Platforms Fail," *Harvard Business Review*, March 31, 2016, available at https://hbr.org/2016/03/6-reasons-platforms-fail ("But where Billpoint emphasized fraud prevention, PayPal emphasized ease of use. While Billpoint charged higher transaction fees, PayPal gave away $5 and $10 payments to users who signed up other users. Fraud prevention can keep platform costs down over the long term but puts friction on user transactions, which dissuades value-creating activity.").

[166]    Van Alstyne, Marshall, Geoffrey G. Parker, and Sangeet P. Choudary, "6 Reasons Platforms Fail," *Harvard Business Review*, March 31, 2016, available at https://hbr.org/2016/03/6-reasons-platforms-fail ("PayPal ate the costs of fraud and emphasized rapid growth by simplifying transactions and incenting participants to attract others. As a result, PayPal rapidly surpassed Billpoint as the payment system of choice on eBay. Conceding defeat in 2002, eBay bought PayPal for $1.4 billion and phased out Billpoint a year later. Billpoint made the mistake of emphasizing revenue generation at the start rather than, first, attracting a critical mass of participants.").

[167]    Carson, Biz, "The 'Uber for Private Jets' Startup Backed by an Uber Cofounder Is Shutting Down," *Business Insider*, May 6, 2016, available at https://www.businessinsider.com/private-plane-startup-blackjet-shuts-down-2016-5. *See also*, Heilpern, Will, "Why the 'Uber for Private Jets' Blackjet Really Failed—According to Its More Successful Rival," *Business Insider*, May 11, 2016, available at https://www.businessinsider.com/one-theory-explaining-why-jay-z-blackjet-failed-2016-5 ("Rather than allowing flyers to charter jets on-demand like Victor, BlackJet required an annual fee, giving members access to a network of jets on which they could book seats on pre-determined routes.").

53

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

associated with private jets.[168] This misalignment contributed to the failure of the platform in 2016.[169]

103.    Spring, a mobile fashion shopping app launched in 2014, sought to connect consumers with fashion retailers or brands.[170] While offering a broad selection of supply,[171] Spring lacked personal recommendations, instead using a search and matching process that required consumers to individually follow the numerous brands on the platform to buy their items,[172] which raised search costs and made product discovery difficult. In contrast, Lyst leveraged algorithm-driven approaches to offer personalized recommendations,

---

[168]    Heilpern, Will, "Why the 'Uber for Private Jets' Blackjet Really Failed—According to Its More Successful Rival," *Business Insider*, May 11, 2016, available at https://www.businessinsider.com/one-theory-explaining-why-jay-z-blackjet-failed-2016-5 ("Jackson explained that BlackJet, which sold seats on a shuttle service was 'intrinsically ... at odds with those that traditionally fly private.'"). *See also*, Wynbrandt, James, "Flying Inside Charters: Buying Charter by the Seat," *Business Jet Traveler*, September 2013, available at https://www.bjtonline.com/business-jet-news/inside-charters-buying-charter-by-the-seat ("Nonetheless, many charter professionals remain skeptical of per-seat's appeal, because of its reduced privacy and flexibility.").

[169]    Heilpern, Will, "Why the 'Uber for Private Jets' Blackjet Really Failed—According to Its More Successful Rival," *Business Insider*, May 11, 2016, available at https://www.businessinsider.com/one-theory-explaining-why-jay-z-blackjet-failed-2016-5 ("BlackJet CEO Dean Rotchin cited investment problems for his company's ceasing of operations in an interview with Fortune: 'We probably did more with less than anyone but it's a critical mass business,' Rotchin said. 'There's a reason why 'critical' is part of 'critical mass'.'").

[170]    Macon, Alexandra, "This App Will Change the Way You Shop Forever," *Vogue*, August 14, 2014, available at https://www.vogue.com/article/spring-app-changes-mobile-shopping.

[171]    Sherman, Laura, "Spring: What's Working - And What Isn't - Six Weeks In," *Fashionista*, September 30, 2014, available at https://fashionista.com/2014/09/spring-shopping-app-review ("Spring launched with 250 brands. There are now 450 active on the app, with 500 more set to onboard by the holidays. 'Right now, we have brands in every category, because we wanted to reflect the high-low way people really shop,' Spring CEO Alan Tisch told me. 'As we're heading into holiday, we're bringing depth to those categories.' The biggest surprise for Spring, Tisch says, has been how much product customers want to see. 'There are 8,500 products on the platform, we're adding 250 new products every day, and that was nowhere near enough products to really quench the customer thirst,' he said.").

[172]    *See, for example*, Kessler, Sarah, "Spring, The App That Promises To Make Mobile Shopping Fun," *Fast Company*, August 14, 2014, available at https://www.fastcompany.com/3034362/spring-the-app-that-promises-to-make-mobile-shopping-fun ("Users can follow about 100 brands, including Alice + Olivia, Rebecca Minkoff, and Del Toro at launch."); Macon, Alexandra, "This App Will Change the Way You Shop Forever," *Vogue*, August 14, 2014, available at https://www.vogue.com/article/spring-app-changes-mobile-shopping ("Everything is shoppable, and each brand controls what's featured—from the imagery to the number of items available. You can love items to save them for later, share them with friends, and discover new brands by searching categories or exploring curated collections. Additionally, the app sends you push notifications if something you loved goes on sale or quantities are suddenly dwindling."); Fisher, Lauren, "New App Introduces The Future of Mobile Shopping," August 14, 2014, available at https://www.harpersbazaar.com/fashion/trends/a3194/spring-shopping-app-launch/ ("Shoppers can personalize their feed by selecting the brands they want to shop and browse all in one stream.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

simplifying search and better matching consumers with relevant products.[173] Although Spring eventually introduced personalized shopping features in 2017,[174] the delay in creating effective discovery and matching contributed to hindering its growth. The platform was acquired by Shopify in 2018 and shut down in 2019.[175]

104.    In 2000, Covisint launched, aiming to create a two-sided transaction platform that connected auto parts suppliers with buyers by providing an electronic catalogue from which automakers (buyers) could directly order parts from suppliers.[176] However, suppliers found it hard to integrate their product catalogues into the platform's commerce system, sometimes resulting in buyers encountering limited, outdated, or irrelevant products in catalogues. Facing high search costs and transacting costs, buyers found it

---

[173]    "Fashion Goes Deep: Data Science at Lyst," *Cloudera*, December 9, 2015, available at https://blog.fastforwardlabs.com/2015/12/09/fashion-goes-deep-data-science-at-lyst.html ("Lyst provides fashion consumers with a central platform where they can mix and match millions of products from 11,500 different brands. In this context, data science serves as a virtual personal shopper, recommending products to users based upon insights from their behavior using the site. […] Instead, recommendation algorithms align consumer behavior with product features. And as the world of fashion is one dominated by image and appearance, fashion data science has a lot to do with image analysis.").

[174]    "Spring 2.0: The Shopping App Looks To Reinvent," *Glossy*, August 2, 2017, available at https://www.glossy.co/fashion/spring-2-0-the-shopping-app-looks-to-reinvent/ ("The new app uses consumer data to identify recommended products by analyzing browsing history and personal preferences, such as size, style and price point. It also includes editorial content tailored to each individual user to help with product discovery, with recent features focused on topics including hot-weather workwear and summer travel apparel.").

[175]    Crets, Stephanie, "ShopRunner Dives Deeper Into Marketplace Offerings After Spring Acquisition," *Digital Commerce*, May 15, 2019, available at https://www.digitalcommerce360.com/2019/05/15/shoprunner-is-shuttering-its-spring-marketplace-app/ ("Less than a year after ShopRunner acquired Spring, it is shuttering the Spring app and website to boost marketplace capabilities on its District app.").

[176]    Arbin, Katarina and Ulf Essler, "Covisint in Europe: Analysing the B2B Auto E-marketplace," *International Journal Automotive Technology and Management*, Vol. 5, No. 1, 2005, pp. 31–45, pp. 36–38 ("Covisint launched the exchange on 29 September [, 2000.] […] Covisint offers catalogues, auctions, quote manager and asset control, and provides tools and services to convert product information (supplier information) into an electronic catalogue. […] [T]he main purpose of these companies when using the catalogue service at Covisint, is to navigate and control purchases made internally. […] The search cost for finding products is consequently reduced for the buyer, the employees in the organisation do not have to spend time searching for the right product, since employees are allowed to order products through the catalogue hosted by Covisint only").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

difficult to engage in transactions with suppliers,[177] making the platform less attractive to suppliers, and culminating in the platform shutting down in 2004.[178]

105. As a final example, Yahoo! Auctions launched in 1998, competing with (then) market leader eBay in the United States, Canada and Japan, among other locations.[179] However, Yahoo! Auctions did not provide services to verify product authenticity, ensure quality standards, or guarantee that items were as portrayed by sellers.[180] Further, the platform did not help resolve disputes between buyers and sellers.[181] As a result, Yahoo! Auctions failed

---

[177] Arbin, Katarina and Ulf Essler, "Covisint in Europe: Analysing the B2B Auto E-marketplace," *International Journal Automotive Technology and Management*, Vol. 5, No. 1, 2005, pp. 31–45, pp. 42–43 ("Covisint offers suppliers content service for a price. Many suppliers have their own electronic catalogues which they manage themselves. Covisint has apparently not managed basic technical integration with its marketplace. 'We do have a catalogue on Covisint and it is being used to a limited extent. It is though a very limited catalogue with limited information. A problem for us as a supplier is that we cannot be integrated with Covisint, which makes it impossible for us to update the information in the catalogue. The result is a catalogue with old and irrelevant information. To integrate is, according to Covisint, not possible.' (Supplier). The conclusion is that Covisint has several problems. […]The lack of the technical readiness and ability of Covisint i.e., Covisint is apparently not in an operational state, and if Covisint cannot technically integrate the catalogues, customer cannot buy through Covisint, and if customers cannot buy, the marketplace does not exist."). *See also*, "Public Net Exchanges May Be Losing Their Luster," *CNET*, February 22, 2001, available at https://www.cnet.com/tech/tech-industry/public-net-exchanges-may-be-losing-their-luster/ ("Analysts said many suppliers have had problems integrating their systems with the new auto exchange, showing that even the most well planned marketplace venture is having difficulty getting fully off the ground."); Rabbitte, Sonya, "Covisint Ditches In-House Catalogue System," *ZDNET*, March 1, 2002, available at https://www.zdnet.com/article/covisint-ditches-in-house-catalogue-system/ ("Covisint's own system, Covisint Tracker, involved a manual process whereby catalogue data accepted in different formats had to be manually translated into language that worked with the catalogue systems of Covisint's buyers.").

[178] Van Alstyne, Marshall, Geoffrey G. Parker, and Sangeet P. Choudary, "6 Reasons Platforms Fail," *Harvard Business Review*, March 31, 2016, available at https://hbr.org/2016/03/6-reasons-platforms-fail ("As a result, parts suppliers left the platform and the market never became sustainably profitable. In 2004, the residual assets were sold off for a mere $7 million, a tiny fraction of the $500 million auto manufacturers had invested."). *See also*, "Revolutionary On-Line OEM Parts Auction Shutting Down," *Auto Service*, January 12, 2004, available at https://www.autoserviceworld.com/revolutionary-on-line-oem-parts-auction-shutting-down/ ("According to industry reports, the company sold its online auction service and has shut down its electronic parts catalogue.").

[179] Gately, Gary, "Yahoo! Auctions Go Global," *Yahoo*, May 13, 1999, available at https://www.ecommercetimes.com/story/yahoo-auctions-go-global-73.html.

[180] "Yahoo! Auctions Guidelines," *Yahoo*, September 6, 2002, available at https://web.archive.org/web/20020906023403/http://user.auctions.yahoo.com/html/guidelines.html ("Yahoo! does not screen or control users who may sell or bid on auction items, nor does Yahoo! review or authenticate all auction listings or items offered for sale."). *See also*, "Are There Scams on Yahoo Japan Auctions? What to Know," *Nikaga*, available at https://nikaga.com/are-there-scams-on-yahoo-japan-auctions/ ("Unlike eBay, Yahoo Japan Auctions doesn't have strong buyer protection. So, it's key for buyers to know the risks. Understanding and avoiding scams is crucial for a safe online shopping experience.").

[181] "Yahoo! Auctions Guidelines," *Yahoo*, September 6, 2002, available at https://web.archive.org/web/20020906023403/http://user.auctions.yahoo.com/html/guidelines.html ("Sellers

---

56

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

to facilitate trusted and safe interactions between buyers and sellers, leading to its eventual failure in many locations a few years later.[182]

106. To summarize: to be successful, two-sided transaction platforms must implement services and governance mechanisms to mitigate potential sources of market failure. These services and governance mechanisms include those that encourage and enhance participation; that facilitate discovery, matching, and transacting; and that facilitate trusted and safe interactions (*see* **Section IV.C**). Because of indirect network effects, the lowering of participation and willingness to transact on one side of the platform can reinforce an unwillingness to participate or transact on the other side, potentially threatening the viability of the platform. Consequently, if two-sided transaction platforms fail to provide effective services and governance mechanisms, participation on both sides can be negatively impacted and transactions may not occur. Thus, launching a new two-sided transaction platform is fraught with risk, a point often missed if one focuses on the few highly visible examples of successful platforms while ignoring the hundreds of failed ones. Achieving and maintaining success requires careful and constant attention to selecting and refining effective services and governance mechanisms, an undertaking that is complex and uncertain, as illustrated by numerous examples of two-sided transaction platforms that have failed (*see* **Section IV.D**).

## V.    THE APP STORE IS A TWO-SIDED TRANSACTION PLATFORM

107. In this section, I discuss the introduction of the iPhone and the App Store, outlining some strategic choices Apple made as it faced a challenging environment involving entrenched mobile device manufacturers and mobile carriers as well as looming competition from new

---

and buyers are completely responsible for working out the sale and exchange of goods. Sellers and buyers must resolve any disputes that may arise from auction transactions.").

[182] Arrington, Michael, "Yahoo Shutting Down Auctions – Second Service to Deadpool This Month," *TechCrunch*, May 9, 2007, available at https://techcrunch.com/2007/05/09/yahoo-shutting-down-auctions-second-service-to-deadpool-this-month/?guccounter=1*See also*, Steiner, Ina, "Yahoo Closes Australian Auction Site," *AuctionBytes*, August 7, 2003, available at https://web.archive.org/web/20110615073304/http://www.auctionbytes.com/cab/abn/y03/m08/i07/s03; Weizhen, Tan, "No Yahoo Auctions Site? No Problem!," *AsiaOne Business*, September 27, 2008, available at https://web.archive.org/web/20081005223154/http://www.asiaone.com/Business/SME%2BCentral/eBiz%2BHub/Story/A1Story20080925-89901.html. Yahoo! Auction is still operating in Japan and Taiwan. *See*, *for example*, "Yahoo Auction Taiwan," *Yahoo*, available at https://tw.bid.yahoo.com; "Yahoo Auction Japan," *Yahoo*, available at https://auctions.yahoo.co.jp/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

app marketplaces. I also explain why, contrary to what Plaintiffs have claimed, the App Store is not a one-sided retailer of apps. Rather, the App Store is a two-sided transaction platform whose product is a transaction simultaneously facilitated between app developers and consumers, that displays indirect network effects, and that, consistent with other two-sided transaction platforms, implements services and governance mechanisms to (1) encourage and enhance participation; (2) facilitate discovery, matching, and transacting; and (3) facilitate trusted and safe interactions. Finally, I explain that the two-sided nature of the App Store should be considered when analyzing economic issues related to market definition, market power, and competitive effects.

## A.    Origin and Evolution of the App Store

### 1.    The Introduction of the iPhone

108.   Software applications (apps) that can be installed on personal computing devices have been available for many decades. Before the advent of mobile computing devices like the Palm Pilot and the iPhone, apps ran on other devices like personal computers or gaming consoles. These apps were typically offered for sale at brick-and-mortar stores. App developers incurred costs that included those associated with hiring third parties to handle financial transactions, employing legal teams to protect their intellectual property (IP), and contracting with distributors to secure trust and get their products onto the shelves of brick-and-mortar stores.[183] These costs were substantial, frequently estimated to be as much as

---

[183]   Trial Testimony of Philip Schiller, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 17, 2021 – May 18, 2021 ("Trial Testimony of Phillip Schiller"), pp. 2725:10–2726:10 ("Q. And aside from these early digital platforms, how did developers distribute their games and other software? A. Well, the most common way still at the time was through physical distribution. […] Q. And can you describe that, please, generally. A. Sure. In making products for physical distribution, you, of course, engineer the software. You usually license installer and uninstaller software that you need to put together with it. You put it on a CD. You design the CD. You design the packaging. You design the manuals. You put that all together, and you then take it through distribution channels, stores like CompUSA and Fry's. And with them, you have to cut deals for how much shelf space you get. […] You used to pay by what is called 'facings.' If you have room for one box, two boxes, or three boxes, the more facings, the better chance of a sale. You paid for things called end caps to be able to market at the end of the row of an aisle. You paid for weekend flyers. This was actually one of the biggest demand drivers, was whether you paid for quarter, half-page, full-page ad in the weekend flyers that we all got in our mailboxes back then. You had to cover all the returns when you updated your software. On and on. There are just many elements of that distribution."). *See also*, "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *The App Association*, 2018, available at https://actonline.org/wp-content/uploads/2018_ACT-App-Store-Ten-Year-Retro-Doc.pdf, p. 3 ("Before the introduction of the iPhone, software developers had to build consumer trust slowly and at great expense, and that trust was and remains

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

70 percent of the app's retail price. Further, it was often challenging for smaller app developers to gain visibility with consumers who purchased apps at these brick-and-mortar stores. [184] A significant additional challenge for smaller app developers was building sufficient consumer trust to overcome the risk perceived by a consumer when installing an app from an unknown creator on their device. [185] Software app piracy was also widespread.[186]

109.    With the advent of mobile computing devices from companies like Palm,[187] channels for online app distribution became available in the late 1990s.[188] An early example was

---

essential for a software developer to bring a product to market. Most did not have a widely recognizable brand to endorse the software. Prior to mobile platforms like the App Store or Google Play, software developers often had to break through the trust barrier by handing over their products to companies with a significant reputation.").

[184]   Trial Testimony of Phillip Schiller, p. 2726:11–13 ("Q. And what was the cost to the developer of that system? A. Typically we'd see that the channel would get between 50 to 70 percent of the sale.). *See also,* Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/.

[185]   "The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *The App Association*, 2018, available at https://actonline.org/wp-content/uploads/2018_ACT-App-Store-Ten-Year-Retro-Doc.pdf, p. 3 ("Even shareware products that could be digitally distributed would end up partnering with trusted brands to gain consumer trust. For example, in 1996, the developers of computer game Ultimate Doom contracted with Chex cereal to augment their consumer base. Developers converted their game software to create the child-friendly game Chex Quest that the cereal company usually affixed to its boxes.").

[186]   In the early 1990s, the United States experienced a piracy rate of approximately 40 percent. The United States government estimated approximately $4.1 billion in losses to software development due to inadequate copyright protection in the country. Givon, Moshe, Vijay Mahajan, and Eitan Muller, "Software Piracy: Estimation of Lost Sales and the Impact of Software Diffusion," *Journal of Marketing*, Vol. 59, No. 1, January 1995, pp. 29–37, p. 29 ("It has been estimated by the SPA [Software Publishers Association] that [...] 40% […] of the software used in the United States is illegal."). *See also*, Robinson, Robert K. and Brian J. Reithel, "The Software Piracy Dilemma in Public Administration: A Survey Of University Software Policy Enforcement," *Public Administration Quarterly*, 1994, pp. 485–497, p. 485.

[187]   Ward, Hannah, "Palm Pilot: Everything You Need to Know," *History-Computer*, April 16, 2024, available at https://history-computer.com/technology/palm-pilot-guide/ ("The Palm Pilot was created by Jeff Dawkins, Donna Dubinsky, and Ed Colligan and was initially released in March 1996. The Palm Pilot was a PDA device which could be used to take notes, manage and view documents, manage contacts, and even play games. Some later models could also be used to send text messages and multimedia files, surf the web, take photos, and record videos.").

[188]   *See, for example,* "PocketGear Buys Handango," *Reuters*, February 23, 2010, available at https://www.reuters.com/article/business/pocketgear-buys-handango-idUS1366735222/. *See also*, "Counterclockwise: The First App Store," *GSMArena*, July 8, 2018, available at https://www.gsmarena.com/counterclockwise_the_first_app_store-news-32061.php ("1998 saw the first web-based app store for mobile devices – PDAs that ran Palm OS, Windows CE or EPOC. The service was called Palmix and was launched by Information Technologies India.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Handango, which offered apps for mobile devices running operating systems that included the Symbian OS, Windows Mobile, and Palm OS.[189]

110.    On January 9, 2007, Apple announced the iPhone, its first smartphone, which was subsequently made available for purchase on June 29, 2007.[190] At the time, Apple was a new entrant: many established players, including Sony Ericsson, LG, Motorola, Nokia, Rim, Samsung, and Windows Mobile, already provided smartphones and their associated operating systems.[191] Over 1 billion mobile phones were sold worldwide in 2006, of which 6.3 percent were considered smartphones.[192]

111.    The iPhone provided an integrated design that melded a phone, an iPod with a larger screen, and Internet access capabilities within a single device powered by the new iPhone operating system. With the iPhone, consumers could browse the Internet, access email, use maps for navigation, and access their iTunes content by syncing the iPhone to their iTunes

---

[189]    Trial Testimony of Phillip Schiller, pp. 2725:1–2725:6 ("Q. And can you name any examples for us? A. Well, I know of two personally that I used at the time. One is Steam, […] and the other was actually for mobile apps called Handango, and Handango is a -- was an online store for apps for BlackBerry, PalmPilot, and other platforms."). *See also*, "PocketGear Buys Handango," *Reuters*, February 23, 2010, available at https://www.reuters.com/article/business/pocketgear-buys-handango-idUS1366735222/ ("PocketGear on Tuesday said it acquired Handango, creating the biggest cross-platform mobile application store. The combined store will have more than 140,000 applications, PocketGear said. Users of Android, Symbian, BlackBerry, Windows Mobile, Palm, Linux and Java phones can shop for and buy applications for their phones from the sites. Both companies [PocketGear and Handango] in one form or another date back to 1999, when the market for mobile applications was very different from what it is now."); "Handango Company Profile," *Pocket Gamer*, available at https://www.pocketgamer.biz/industry/handango/.

[190]    Trial Testimony of Phillip Schiller, p. 2718:8–19 ("Q. And when did the -- when was the first iPhone released? A. 2007. […] Q. Thank you. And do you recognize this document? A. Yes, I do. Q. What is it? A. This is our press announcement launching the iPhone. Q. And the date is January 9, 2007; correct? A. Yes, it is."). *See also*, "iPhone Premieres This Friday Night at Apple Retail Stores," *Apple*, June 28, 2007, available at https://www.apple.com/newsroom/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores/.

[191]    Lancaster, Luke and Kent German, "The Original iPhone's Competition: Remember These Top Phones from 2007?," *CNET*, January 08, 2022, available at https://www.cnet.com/pictures/original-apple-iphone-competition-remember-these-top-phones-2007/. *See also*, Trial Testimony of Phillip Schiller, pp. 2720:7–9 ("Q. And you mentioned BlackBerry. Prior to the launch of the iPhone, were there other mobile devices on the market? A. Yes.").

[192]    Kenney, Martin and Bryan Pon, "Structuring the Smartphone Industry: Is the Mobile Internet OS Platform the Key?," *Journal of Industry, Competition and Trade*, Vol. 11, No. 3, 2011, pp. 239–261, p. 255, Table 3 Nystedt, Dan, "IDC: One Billion Mobile Phones Were Shipped in 2006," *Macworld*, January 25, 2007, available at https://www.macworld.com/article/183312/phones.html ("Handset vendors shipped a record high 294.9 million mobile phones in the last three months of 2006, propelling the full year total to 1.02 billion, according to IDC.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

libraries.[193] Its new operating system featured a touch interface and a virtual keyboard that highlighted Apple's reputation for design and innovation.[194] Superior design and usability were important parts of Apple's brand identity then and continue to be so today.[195]

112. When the iPhone launched in 2007, Apple was aware that the mobile device environment had significant risks beyond those associated with the personal computer environment.[196] One such risk was that mobile phones might potentially contain more personal information about their users, such as the user's location and location history.[197] Another such risk was

---

[193] "Apple Reinvents the Phone with iPhone," *Apple*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/. *See also*, Trial Testimony of Phillip Schiller, p. 2720:2–20 ("A. […] So those were the -- sort of the three leading functions we were trying to create with iPhone: A new generation phone, a replacement for iPod functionality, and the internet in your pocket. Q. And you mentioned BlackBerry. Prior to the launch of the iPhone, were there other mobile devices on the market? A. Yes. Q. Did any of them combine the features you just described? A. No. […] Q. And, Mr. Schiller, did Apple develop a unique operating system for the iPhone? A. Yes.").

[194] Trial Testimony of Phillip Schiller, p. 2718:20–25. ("Q. […] Apple today introduced iPhone, combining three products -- a revolutionary mobile phone, a widescreen iPod with touch controls, and a breakthrough Internet communications device with desktop class email, web browsing, searching and maps -- into one small and lightweight handheld device."). *See also*, "Apple Reinvents the Phone with iPhone," *Apple*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ ("iPhone introduces an entirely new user interface based on a large multi-touch display and pioneering new software, letting users control iPhone with just their fingers. iPhone also ushers in an era of software power and sophistication never before seen in a mobile device, which completely redefines what users can do on their mobile phones. […] When users need to type, iPhone presents them with an elegant touch keyboard which is predictive to prevent and correct mistakes, making it much easier and more efficient to use than the small plastic keyboards on many smartphones.").

[195] Trial Testimony of Tim Cook, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 21, 2021 ("Trial Testimony of Tim Cook"), pp. 3845:23–3846:2 ("Q. And what are the key commitments that Apple makes to its customers? A. Simplicity, security, safety, privacy are key, reliability, quality. You know, the things that make the best products in the world."). *See also*, "Apple's Product Ecosystem Strategy: Key Insights," *Aryo Consulting Group*, July 30, 2024, available at https://aryocg.com/apples-product-ecosystem-strategy-key-insights/ ("By focusing on user experience and design, Apple has built a loyal customer base that trusts and values its products.").

[196] Trial Testimony of Craig Federighi, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021 ("Trial Testimony of Craig Federighi"), pp. 3364:18–3365:3 ("A. […] iOS devices have an additional level of value or concern, in part by nature of the fact that it is a device that is always with you. And because it is always with you, if someone wanted to track your location, if someone wanted to have a live mic on you to capture your conversations, if they wanted to get access to certain kinds of credentials and tokens you use to access maybe work systems, those are likely to be on your iOS device, not nearly as likely to be on the Mac. So, in general, the iOS is -- iOS devices are a more attractive, higher-value target.").

[197] Trial Testimony of Phillip Schiller, p. 2722:6–16 ("Q. And can you describe a bit more the thought process around the security and privacy issues, please. A. Yes. The idea of this new computing device in your pocket means it's capable of more new things. It's going to store information around in our life that we're not used to having all the time in our pocket. Simple example of course being location data, knowing where you are, when

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

that mobile devices were likely to be used more frequently and intensively by consumers than personal computers because of their portability.[198] Apple executives were therefore concerned that iPhone users would be especially vulnerable to viruses, malware, and privacy attacks.[199]

113.    Apple thus set out to design the iPhone and its operating system, iOS,[200] to be a "next generation" device with superior security to that of its existing personal computing devices[201]—the Macs—which themselves had a reputation among consumers and industry

---

you are, how long you're in places is extremely personal, so these are highly personal devices with a growing amount of information available everywhere you go, roaming on other networks everywhere you go.").

[198]    Trial Testimony of Craig Federighi, pp. 3362:20–3363:7 ("Q. Okay. And then, finally, what does the value of access mean in the context of iOS devices? A. Well, iPhones are very attractive targets. They are very personal devices that are with you all the time. They have some of your most personal information, of course your contacts, your photos, but other things. They have cameras on them and microphones. They are capable of knowing your location. And so they are also often -- because they are always with you, they may be used as a key to get into your place of business or an authentication token to unlock your bank account. All of these things make access or control of these devices potentially incredibly valuable to an attacker.").

[199]    Trial Testimony of Phillip Schiller, pp. 2733:17–2734:2 ("Q. Can you describe what the tension is between [providing an advanced platform to developers while protecting iPhone users from viruses, malware, and privacy attacks etc.]? A. Yes. I think this is the -- the core thing at the base of all that we're talking about. We want to create a more powerful, capable platform that enables developers to create wonderful applications for all of us, but we need to find ways to do it that helps to protect users from this malware, from the threats that they're going to receive, the attacks, and to try to keep your device functioning properly. Again, this is not a general PC. This is your phone in your pocket that needs to work reliably.").

[200]    When the iPhone was launched in 2007, its operating system was called the "iPhone OS." The name was changed to "iOS" in June 2010. For simplicity, I refer to both the iPhone OS and iOS as "iOS." Chartier, David, "iPhone OS Gets New Name, Video Calling," *Macworld*, June 7, 2010, available at https://www.macworld.com/article/205857/iphone_os_4_wwdc.html. In addition, although Apple provides distinct operating systems for iPhones (iOS) and iPads (iPadOS), I use the term iOS to refer to iOS and iPadOS collectively throughout this report unless otherwise stated.

[201]    Trial Testimony of Craig Federighi, pp. 3358:22–3359:19 ("Q. And given that macOS and iOS share the same operating system kernel, did the initial iOS operating system share the same security mechanisms as macOS, which had preceded iOS? A. There were tremendous differences. Q. Why was that? A. […] When we set out to create iPhone, we recognized this was a kind of once-in-a-generation opportunity to take what we learned in security and really build a system for the next generation. The fundamental computer architecture of something like the Mac and its security architecture has its roots going back 40 years. We learned a lot with iOS. And we also understood that the cell phone market was a market of billions of devices. It was going to touch many more people in a wide range of age groups and a wide range of kind of understanding of operating a computer, and so we really had to think about a security architecture that could protect all of them in that kind of context."). In an open letter written by Steve Jobs in 2007, Jobs explained that third-party distribution of iPhone apps was delayed because Apple was trying to do "two diametrically opposed things at once--provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc." Trial Testimony of Phillip Schiller, pp. 2733:17–2734:2 ("Q. Can you describe what the tension is between [providing an advanced platform to developers while protecting iPhone users from viruses, malware, and privacy attacks etc.]? A. Yes. I think this is the -- the core thing at the base of all that we're talking about. We want to create a more powerful, capable platform that enables developers to create

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

experts for experiencing fewer security attacks and breaches relative to those observed on PCs.[202] Aligned with this goal, Apple did not initially allow the installation of third-party iOS apps by users.[203] Rather, Apple chose a more tightly controlled approach to security for its new mobile device where third-party developers could create web applications that would run in the secure Safari browser, but would not subject iPhones to as much risk from viruses, malware, and privacy threats as would the ability to install native apps.[204,205] Some early examples of such web applications were Digg, a news aggregating app, and OneTrip, a grocery list app.[206]

### 2.    The Introduction of the App Store

114.    As the iPhone succeeded as a consumer device, developers found ways to create apps that could be natively downloaded onto, installed, and run on the iPhone through "jailbreaking," a process by which users could modify the iPhone's operating system to install unauthorized apps. However, jailbreaking (both then and now) posed multiple risks to the

wonderful applications for all of us, but we need to find ways to do it that helps to protect users from this malware, from the threats that they're going to receive, the attacks, and to try to keep your device functioning properly. Again, this is not a general PC. This is your phone in your pocket that needs to work reliably.").

[202]    *See, for example*, "Why Is Apple's Mac OS X So Much More Secure than Microsoft's Windows?," MacDailyNews, October 1, 2006, available at https://macdailynews.com/2006/10/01/why_is_apples_mac_os_x_so_much_more_secure_than_microsofts_windows/comment-page-2/.

[203]    "Nine Years of Apple's iOS SDK Generated $60 Billion, 1.4 Million Jobs," *AppleInsider*, March 7, 2017, available at https://appleinsider.com/articles/17/03/07/nine-years-of-apples-ios-sdk-generated-60-billion-14-million-jobs.

[204]    A native app is a software application specifically developed for a particular platform or operating system, such as iOS or Android. "Difference Between Native Apps and Web Apps," *GeeksforGeeks*, February 14, 2023, available at https://www.geeksforgeeks.org/difference-between-native-apps-and-web-apps/.

[205]    Trial Testimony of Phillip Schiller, pp. 2726:17–2727:4 ("Q. Were there any third-party native apps on the iPhone when it launched? A. No. Q. And was that a conscious decision on the part of Apple management? A. Yes. Q. What was the reasoning behind that decision? A. We thought that we wanted to create an Apple experience with some built-in native apps from Apple and that the security and privacy risks of opening it up to other native apps was too great and not something that we could solve when we launched the iPhone, so instead, we offered up the idea of web apps."). *See also*, "The Revolution Steve Jobs Resisted: Apple's App Store Marks 10 Years of Third-Party Innovation," *AppleInsider*, July 10, 2018, available at https://appleinsider.com/articles/18/07/10/the-revolution-steve-jobs-resisted-apples-app-store-marks-10-years-of-third-party-innovation ("'The full Safari engine is inside of iPhone,' Jobs said at WWDC in 2007. 'And so, you can write amazing Web 2.0 and Ajax apps that look exactly and behave exactly like apps on the iPhone. And these apps can integrate perfectly with iPhone services. They can make a call, they can send an email, they can look up a location on Google Maps. And guess what? There's no SDK that you need!'").

[206]    Mortensen, Pete, "First iPhone Web Apps Available," *Wired*, June 12, 2007, available at https://www.wired.com/2007/06/first-iphone-we/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer experience with the iPhone, including to both the reliable functioning of the iPhone and from the installation of unauthorized apps that had been developed by third parties.[207] In response to the significant interest in third-party native apps for the iPhone, Apple wished to allow developers to create and distribute third-party native iOS apps, but also needed to maintain a sufficiently high quality experience for consumers; protect consumers from potential security and privacy threats; protect consumers and developers from fraud; and protect developers from software piracy.[208] Allowing the installation of apps that failed to achieve these goals would have compromised the alignment of Apple's brand with security, privacy, and reliability, would have threatened Apple's broader investments in its brand, and would have adversely affected the nascent positive perception of the iPhone.[209]

---

[207]  Trial Testimony of Phillip Schiller, pp. 2728:19–2729:17 ("And secondly, we saw users and developers starting to try anyway. They were creating what's called 'jailbreaking,' a way to sideload software onto iPhone, and they were writing apps without any documented APIs to build with that were creating great quality risks, so we saw this beginning of demand and quality and security risks on the iPhone […] Well, one, the software being created with undocumented APIs becomes incredibly unstable and unreliable. These are things that Apple doesn't know and never promised it should work the way they're being used, it won't work the next time the software gets updated, maybe the APIs are being used for unintended purposes, and they give access into the system in places that were not intended and risks the privacy and security of the users, and so there -- I think there are great risks to the iPhone when this started to happen. Q. And did it also put the functioning of the iPhone itself at risk? A. Of course, yes.").

[208]  "Nine Years of Apple's iOS SDK Generated $60 Billion, 1.4 Million Jobs," *AppleInsider*, March 7, 2017, available at https://appleinsider.com/articles/17/03/07/nine-years-of-apples-ios-sdk-generated-60-billion-14-million-jobs (A note from Steve Jobs [in October 2007] was posted to Apple's Hot News site, which reads: "'It will take until February to release an SDK because we're trying to do two diametrically opposed things at once— provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc. This is no easy task. Some claim that viruses and malware are not a problem on mobile phones— this is simply not true. There have been serious viruses on other mobile phones already, including some that silently spread from phone to phone over the cell network. As our phones become more powerful, these malicious programs will become more dangerous. And since the iPhone is the most advanced phone ever, it will be a highly visible target.'").

[209]  Trial Testimony of Phillip Schiller, pp. 2737:15–2738:8 ("Q. And what were the business reasons that Apple decided that it would only distribute third-party native apps on its App Store? A. Well, we've covered a number of the important reasons to us. Maintaining the quality of iPhone, maintaining the security and privacy of our users were all critical to the idea of opening it up for native apps. Q. And have those priorities for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

115.   The challenges faced by Apple in designing an appropriate model for the development and distribution of third-party iOS apps were substantial. Prior to 2008, device manufacturers and mobile carriers exerted substantial control over the availability and installation of mobile apps.[210] The leading mobile operating system in 2007 was the Symbian OS.[211] Although Symbian had thousands of associated apps,[212] app development and distribution was challenging and fragmented due to Symbian's complex relationship with device manufacturers. Symbian had to provide a flexible operating system that allowed device manufacturers to customize user interfaces to differentiate their devices, resulting in different versions of the Symbian OS with varying user interfaces across devices.[213]

privacy, security, and reliability ever changed? A. No. Q. And has the need to safeguard those things changed over time? A. Yes. Q. And can you describe how? A. I think that over the years, the ways and methods developers and bad actors try to get at users and their data has only increased dramatically, and we see this from all the important data we have. The many attacks and attempts to steal it and get access to it have increased."). Trial Testimony of Tim Cook, p. 3845:8–25 ("Q. Mr. Cook, how would you describe Apple's mission? A. It's to make the best products in the world that really enrich people's lives. Q. And what do you do to try and meet that mission? A. We do a number of things. We invest like crazy in R&D. We've invested a hundred billion dollars since -- since the start of the iPhone development, and -- and that number is just accelerated. In fact, we've invested 50 billion in the last three years. […] [Q.] And what are the key commitments that Apple makes to its customers? A. Simplicity, safety, security, privacy are key,"), p. 3849:8–20 ("Q. Let's turn to the development of the iPhone and the App Store. Did Apple's safety, security, and privacy commitments impact development of the iPhone? A. Oh, of course. When we launched the iPhone in 2007, there wasn't an App Store. And so the way that you would have -- put an app on the phone was using a web app, instead of a -- using the App Store. And it wasn't until the following year that we figured out that we could implement such a process of app review that would allow us to let native apps on there without having the security and safety and privacy issues that go along with that if you -- if you do it without a review.").

[210]   Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, pp. 101-102 ("Every mobile carrier operated a walled garden for the handsets it offered: software developers needed to get a carrier's permission to put their apps on the carriers' phones. […] They also needed to customize their apps for dozens of different handsets with different operating systems and hardware configurations."); Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733 at 715.

[211]   Kenney, Martin and Bryan Pon, "Structuring the Smartphone Industry: Is the Mobile Internet OS Platform the Key?," *Journal of Industry, Competition and Trade*, Vol. 11, No. 3, 2011, pp. 239–261, p. 255, Table 3. *See also*, West, Joel and David Wood, "Creating and Evolving an Open Innovative Ecosystem: Lessons from Symbian Ltd.," *SSRN*, July 2008, pp. 1–35; Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733 at 714; Shaheen, Susan, Adam Cohen, and Elliot Martin, "Smartphone App Evolution and Early Understanding from a Multimodal App User Survey," *Disrupting Mobility. Lecture Notes in Mobility.*, Springer Cham, January 5, 2017, edited by Gereon Meyer and Susan Shaheen, p. 153.

[212]   "Symbian Reports First Quarter Results for 2008," *Symbian*, May 20, 2008, available at https://web.archive.org/web/20080709203505/http://www.symbian.com:80/news/pr/2008/pr20089950.html ("Highlights – Q1 2008 as [of] 31 March 2008 […] 9,282 third-party Symbian applications now commercially available, a 24% increase on 31 March 2007 (7478 applications)").

[213]   West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, p. 36, Table 2 (showing different "Symbian-

65

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Further, Symbian encountered additional challenges due to the limited software development capabilities of device manufacturers.[214] Facing this business dynamic with device manufacturers, Symbian could not simply roll out new versions of its operating system, but had to instead negotiate with different device manufacturers about customization and deployment.[215] As a result of this dynamic, in addition to considering differing hardware features across different devices,[216] Symbian app developers needed to customize their apps to adapt to multiple operating systems versions and user interfaces.[217]

---

Based Sub-platforms" across different user interfaces), pp. 35–38 ("Each user interface was in effect a sub-platform of the Symbian platform, each with its own UI-specific APIs. Because the UI makers had source code to the OS, they (particularly Nokia) added their own UI specific APIs to the Symbian OS; most (but not all) APIs were eventually migrated back to the shared Symbian code. Each user interface also had its own preferred web browser."). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, pp. 111–112 ("To begin with, each of Symbian's handset-maker owners wanted to differentiate its own products. Given its ownership and governance structure, Symbian had to go along. It developed multiple user interfaces for the handset makers, which could then choose among these and customize them further.").

[214] West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, p. 59 ("[H]ere the limiting factor was the ability of handset makers to integrate software. Even after Symbian had shipped its first complete OS, the weaker software development capabilities of its handset makers (and their UI companies) meant they had difficulty keeping up with Symbian (and eventually, rival platforms) in implementing new platform features. As with other examples of loose coupling identified by Brusoni and Prencipe (2013), the entire ecosystem suffered when there was poor execution by one key party.").

[215] Best, Jo, "'Android before Android': The Long, Strange History of Symbian and Why It Matters for Nokia's Future," April 4, 2013, available at https://www.zdnet.com/article/android-before-android-the-long-strange-history-of-symbian-and-why-it-matters-for-nokias-future/ ("Unfortunately there were three things that really held Symbian back – one, having to charge a licence fee (which we eventually solved); two, not having a unified and complete UI developed with the OS; and three, the fragmented app/ecosystem community,' said Clifford. 'We wanted to have control of these last two elements but the handset vendors guarded them jealously as they saw these as differentiators for their individual devices and companies. They therefore kept these pieces in their organisations rather than allowing us to develop them alongside the OS to create a fabulous unified user experience like you get from Apple - and so make their devices more compelling and competitive in the face of the bigger threat of Android, Apple, RIM competition.'"). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 112 ("Each mobile carrier had restrictions on what Symbian handsets could do. […] Symbian couldn't build a new release and roll it out globally to its handset-maker partners.").

[216] *See*, *for example*, Siegemund, Frank et al., "Porting the .NET Compact Framework to Symbian Phones," *Journal of Object Technology*, Vol. 5, No. 3, 2006, pp. 83–106, pp. 89–90 ("A crucial aspect when trying to target a different computing platform for .NET is to be aware of the computational and functional restrictions of the underlying hardware. […] The most striking difference when comparing Symbian smartphones to Windows CE devices is in the amount of random access memory available. […] We suspect that the main reason to limit volatile memory apart from cost is battery consumption. […] Especially the memory constraints of Symbian smartphones, however, need to be considered when making design decisions.").

[217] Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733, at 716 (showing an example where developers may need to create 'potentially thousands of versions of an app' for Symbian OS for Nokia S60

66

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Further, between 2002 and 2008, Symbian prioritized its partnerships to focus on device manufacturers rather than app developers.[218] Altogether, these factors made it difficult for Symbian developers to develop and distribute apps to larger audiences.[219]

116. In addition, prior to the launch of the iPhone in 2007 and the App Store in 2008, mobile carriers exerted significant influence on app development and distribution. In 2006, the four major mobile carriers in the United States—Verizon, T-Mobile, AT&T, and Sprint— collectively accounted for 82 percent of all mobile subscribers in the country.[220] At the time, each carrier operated its own proprietary app marketplace, which allowed its subscribers to access and purchase apps and other digital content.[221] In part due to security

---

handsets). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 111 ("Between the differences in software environments and phone features, software developers couldn't just write an app for Symbian as they could for the Mac OS or Windows for desktops. They had to tailor their apps for each handset maker."); Harrison, Richard et al., *Symbian OS C++ for Mobile Phones*, John Wiley & Sons, West Sussex, England, September 17, 2004, pp. xi-xii ("Symbian OS is used in a variety of phones with widely differing screen sizes. Some have full alphanumeric keyboards, some have touch-sensitive screens, and some have neither. In order to enable this kind of variation, a range of user interface designs is required.").

[218] West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, pp.32–33, Table 1 ("April 2002 Symbian launches Symbian Platinum Partner Program, a revised ecosystem relations program. […] August 2008 Symbian Platinum Partner program discontinued."), p. 51 ("During the second (Platinum Partner) phase, applications were de-emphasized and [independent software vendors (ISVs)] received less attention. Only limited progress was made on improving tools and broadening developer support, and the cost to ISVs remained relatively high. It was only after the release of the iPhone that Symbian began to develop the Symbian Partner Network to broaden the reach and lower the cost – a development that was rendered moot by Nokia's acquisition of Symbian.").

[219] Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 111 ("Between the differences in software environments and phone features, software developers couldn't just write an app for Symbian as they could for the Mac OS or Windows for desktops. They had to tailor their apps for each handset maker.").

[220] "FCC Annual Report on Mobile Competition Reveals Penetration Reaching 80%," *S&P Global*, February 6, 2008, available at https://www.spglobal.com/marketintelligence/en/mi/country-industry-forecasting.html?id=106597164 ("Overall, 2006 proved to be a strong year for the industry, adding some 28.8 million new subscribers, the largest number ever added in one year to reach 241.8 million, taking the penetration level to 80%. This was driven by growth in prepaid subscribers, which take an increasing proportion of customers. The four national carriers—AT&T, Verizon, Sprint Nextel and T-Mobile—counted for some 198 million or 82% of these subscribers at the end of 2006.").

[221] Parsons, David, "Mobile Portal Technologies and Business Models," *Encyclopedia of Portal Technologies and Applications*, Information Science Reference, 2007, p. 2 ("[M]obile carriers have worked with handset manufacturers to provide branded phones that include single key access to the carrier's mobile portal. This makes it easier to access the carriers own portal but harder to access other portals."). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 102 ("Every mobile carrier operated a walled garden for the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

concerns,[222] mobile carriers exercised significant influence over the functionality and features of applications running on the phones on their network.[223] As a result, even though Symbian was the leading mobile operating system, it lacked the ability to coordinate seamless app distribution and availability on Symbian phones.[224]

---

handsets it offered: software developers needed to get a carrier's permission to put their apps on the carrier's phones. Most countries had several mobile carriers."); "Verizon Wireless To Offer Brew-Enabled Service from Qualcomm," *Verizon*, February 7, 2002, available at https://www.verizon.com/about/news/press-releases/verizon-wireless-offer-brewenabled-service-qualcomm ("'The BREW platform puts the power to personalize with the consumer - to download applications over the air, virtually anytime and anywhere. It's like having a software store in your hand.'"); "Sprint Touts PCS Vision," *LightReading*, September 5, 2002, available at https://www.lightreading.com/business-management/sprint-touts-pcs-vision ("The shift to providing clarity you can see and hear has revolutionized virtually every aspect of wireless service from Sprint to provide the introduction of applications, features and devices that no other wireless carrier in the nation can match."); Charny, Ben, "AT&T Debuts "mMode" Wireless Web," *CNET*, April 16, 2002, available at https://www.cnet.com/tech/mobile/at-t-debuts-mmode-wireless-web/ ("With the debut of 'mMode,' the carrier is offering games, messaging services and other features on a customer's mobile phone--all for an additional monthly fee.").

[222] West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, p. 38 ("Finally, at the behest of network operators (who distributed more than 90% of the world's mobile phones) in 2004, Symbian took steps that ended up making software development more difficult. The Symbian Signed initiative was intended to prevent viruses and other malware from taking over a handset and causing damage to a handset or the network […]. While security was widely seen as necessary, software developers voiced frustration over the resulting technical difficulty and bureaucratic approval delays.").

[223] Best, Jo, "'Android before Android': The Long, Strange History of Symbian and Why It Matters for Nokia's Future," April 4, 2013, available at https://www.zdnet.com/article/android-before-android-the-long-strange-history-of-symbian-and-why-it-matters-for-nokias-future/ ("'To release Symbian products at that time [when the Symbian Foundation was created], we were certified on over 200 operator or carrier networks around the world. I remember in one case there were 10,000 requirements to get Symbian products onto that one carrier's network. A typical carrier requirement would anything from do or don't include wi-fi support to where things showed up on a menu.'"); Mosemghvdlishvili, Lela and Jeroen Jansz, "Negotiability of Technology and Its Limitations," *Information, Communication & Society*, Vol. 16, No. 10, December 2013, pp. 1596–1618, p. 1598 ("As Zuckerman (2010) explains, this was due to the tight control of transnational mobile network carriers, which meant that software developers needed to conclude agreements with carriers to offer their applications to users."); Zuckerman, Ethan, "Decentralizing the Mobile Phone: A Second ICT4D Revolution?," *Information Technologies & International Development*, Vol. 6, 2010, pp. 99–103 p. 101 ("It's possible for a software developer to create a novel application, distribute it online, and create functionality that's never existed before. […] It's much harder to create novel functionality on a mobile phone network. Truly revolutionary applications like mobile money transfer have generally been deployed in tight collaboration with network operators—M-PESA was not an independent startup, but an initiative of Vodaphone/Safaricom, with further support from IBM and DFID."), p. 102 ("Perhaps most promising for the concerns expressed here would be a regulatory structure that encouraged openness of mobile networks to innovation and development of third-party applications and services, preventing mobile operators from vetoing innovative services unless they could demonstrate technical infeasibility.").

[224] Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 112 ("Each mobile carrier had restrictions on what Symbian handsets could do. […] Symbian couldn't build a new release and roll it out globally to its handset-maker partners. It had to engage in many individual negotiations with carriers and make modifications

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

117.    Additionally, at the time, developers faced financial barriers to developing and distributing mobile apps. For example, Symbian chose to charge a high fee for membership in its partner networks (initially $5,000 along with a surcharge to license the software development kit, later reduced to $1,500), significantly limiting the ability of smaller software developers to join and develop apps.[225] Similarly, the membership cost for developers on Verizon's BREW platform ranged from $5,000 to $15,000.[226] Together, these factors led to a costly and fragmented process of app development and distribution, and developers faced significant barriers to reaching a broad audience.[227]

118.    Faced with this business environment, Apple took strategic risks, negotiating distribution agreements with mobile carriers that avoided giving the carriers control over the iPhone, its operating system, and the associated apps.[228] In October 2007, Steve Jobs announced that Apple would make available a Software Development Kit ("SDK") for the iPhone, and the first SDK was released on March 6, 2008.[229] Steve Jobs also announced the

to the operating system as a result. Symbian also wasn't in a position to help software developers in their negotiations with the mobile carriers to make their apps available on Symbian phones.").

[225]    West, Joel and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67, p. 46 ("In November 2007, Symbian began developing a new partner program to meet two key objectives. The first was to increase the efficiency of the program through the enhanced use of IT, particularly increased web-based automation of common activities and creation of an improved extranet (called 'SDN++') to communicate with ecosystem members. The second was to utilize that increased efficiency to lower the price and broaden the reach of the program, particularly with ISVs. The most visible change was a reduction in the annual fee from $5,000 to $1,500.").

[226]    Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733 at 719–720.

[227]    Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733 at 732.

[228]    Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, pp. 113–114 ("Finally, Apple entered into exclusive contracts with a single mobile carrier in each country to distribute the iPhone. […] In return for exclusivity, the carriers essentially gave Apple complete control over the handset. Based on the consistent iPhone interface, carriers did not seem to be allowed to block Apple apps or features, and they couldn't install their own apps."). *See also*, "AT&T and Apple Announce Simple, Affordable Service Plans for iPhone," *Apple*, June 26, 2007, available at https://www.apple.com/newsroom/2007/06/26AT-T-and-Apple-Announce-Simple-Affordable-Service-Plans-for-iPhone/.

[229]    Trial Testimony of Phillip Schiller, pp. 2730:4–2731:8 ("Q. Looking at the second item in this exhibit, what does it address? A. This is a letter from Steve Jobs to the world, to our user community and to developers about our intention in this area. Q. And what was the date of this document, of this announcement? A. October 17th, 2007. […] Q. And in the first sentence of that section, Mr. Jobs says, 'Let me just say it. We want native third-party applications on the iPhone, and we plan to have an SDK in developers' hands in February.' I believe we've heard the term 'SDK' a time or two here, but can you tell us what that of stands for A. Sure. That's Software Development Kit. Q. And what is a Software Development Kit? A. It includes a number of resources for developers to write software, resources like the APIs that we have been talking about, developer tools like

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

creation of an App Store for iOS apps, a platform that would intermediate transactions between app developers and iPhone users, envisioning "a safe and trusted place for customers to discover and download apps, and a great business opportunity for all developers."[230] The App Store debuted on July 10, 2008 with about 500 iPhone iOS apps from third-party developers.[231] Apple hoped that the SDK and the App Store would attract sufficient participation from developers, leading to further value creation for iPhone users.

119. The App Store also faced looming competition from other app marketplaces. For example, Google had started developing an open-source operating system for mobile devices in 2005,[232] and announced its Android operating system in November 2007.[233] The first Android phone was released in October 2008 with an associated app marketplace for

---

Xcode. It includes documentation to help understand the APIs and their functions. Often has sample code to help a developer start to write their application or learn how to use an API. Q. And do the Software Development Kits -- are they made up of Apple's intellectual property? A. Yes."). *See also*, "The Revolution Steve Jobs Resisted: Apple's App Store Marks 10 Years of Third-Party Innovation," *AppleInsider*, July 10, 2018, available at https://appleinsider.com/articles/18/07/10/the-revolution-steve-jobs-resisted-apples-app-store-marks-10-years-of-third-party-innovation.

[230] "App Store: Principles and Practices," *Apple*, available at https://web.archive.org/web/20200919073321/https://www.apple.com/mz/ios/app-store/principles-practices/.

[231] "The App Store Turns 10," *Apple*, July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

[232] Google acquired Android, Inc., the company that originally developed the Android OS, in 2005. Callaham, John, "The History of Android: The Evolution of the Biggest Mobile OS in the World," *Android Authority*, October 15, 2024, available at https://www.androidauthority.com/history-android-os-name-789433/ ("In 2005, the next significant chapter in Android history began when Google acquired the original company. Rubin and other founding members continued developing the OS under their new owners. They then decided to use Linux as the basis for the Android OS. That made it possible to offer the operating system to third-party mobile manufacturers for free. Google and the Android team felt the company could profit from providing other services, including apps."). *See also*, Evans, David S. and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016, p. 114 ("In the spring of 2005, Page met with Andy Rubin, an entrepreneur who had a vision for cleaning up the mess in the mobile phone industry and had started developing a platform to do so.[34] The idea was to create a mobile operating system provided under an open source license so that anyone could take it and modify it, and any handset maker could install it for free. Within weeks, Google decided to buy the company and its software, both called Android, and to bring Rubin and his team on board to help the search-engine giant shake up the mobile phone business.").

[233] Schonfeld, Erick, "Breaking: Google Announces Android and Open Handset Alliance," *TechCrunch*, November 5, 2007, available at https://techcrunch.com/2007/11/05/breaking-google-announces-android-and-open-handset-alliance/ ("Google just officially announced the Open Handset Alliance to create an open platform (to be called Android) for a Linux phone that can run mobile Google apps and others. […] The platform is open source, and that will be its competitive advantage over other mobile platforms.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Android apps, Google Play (formerly Android Market).[234] Many other app marketplaces launched in 2009, including BlackBerry World (for Blackberry 10/OS), Ovi Store (for Symbian/Nokia), App Catalog (for Linux/webOS), and Galaxy Store (for Android, Windows Mobile, and Samsung's Bada OS and Tizen OS).[235] In 2010, the Windows Phone Marketplace (for Windows Phone) was launched.[236]

120.    The complexity and fragmentation associated with the growth trajectory of the Symbian ecosystem, the prior dynamic between mobile operating systems and mobile carriers that I described earlier, and the looming competition from new app marketplaces meant that the success of the App Store was not a foregone conclusion. In fact, many of the aforementioned app marketplaces were not able to achieve the success associated with the App Store. Blackberry World, Ovi Store, App Catalog, and Windows Phone Marketplace were all discontinued a few years after their launch.[237]

---

[234]    The first Android phone was initially designed for use with a physical keyboard and had no touchscreen, and was subsequently reworked to include a touchscreen after Apple introduced the iPhone in 2007. Smith, Chris, "How the Original iPhone Forced Google to Completely Rebuild Android," *Yahoo*, December 19, 2013, available at https://www.yahoo.com/news/original-iphone-forced-google-completely-rebuild-android-152547037.html ("'Sooner' was the codename of the first Android handset that never shipped because of the iPhone. The device was arguably 'more revolutionary than what had just been revealed in the iPhone,' […] but it was 'ugly,' featuring a traditional keyboard and a touch-less small display. […] After working for two years on Sooner, which was supposed to ship in late 2007, the Android team had to refocus on a different device, a phone with a touchscreen that could compete with the iPhone, codenamed Dream at the time, and whose launch was pushed back to fall 2008."); Cheng, Jacqui, "T-Mobile, Google Finally Unveil the First Android Phone," *Ars Technica*, September 23, 2008, available at https://arstechnica.com/gadgets/2008/09/t-mobile-google-finally-unveil-the-first-android-phone/ ("T-Mobile, Google, and HTC finally officially launched the first Android-enabled mobile device to hit the market. […] The official commercial launch date will be October 22 at T-Mobile stores. […] And finally, the G1 will come equipped with the Android Market, a mobile app store akin to Apple's own App Store for the iPhone."); "From Android Market to Google Play: A Brief History of the Play Store," *Android Authority*, March 6, 2017, available at https://www.androidauthority.com/android-market-google-play-history-754989/.

[235]    *See, for example*, "Celebrating 5 Years of BlackBerry World: Infographic," *BlackBerry*, April 1, 2014, available at https://blogs.blackberry.com/en/2014/04/blackberry-world-anniversary. *See also*, Woyke, Elizabeth, "Nokia's Gigantic App Store," *Forbes*, July 11, 2012, available at https://www.forbes.com/2009/05/07/nokia-ovi-store-technology-wireless-nokia.html; Ganapati, Priya, "Palm Pre App Store to Get Paid Apps in September," *Wired*, August 18, 2009, available at https://www.wired.com/2009/08/palm-pre-paid-apps/; Alisa, "Samsung Galaxy Store App | Download Apps/Games from Galaxy Store," *Mini Tool*, October 12, 2022, available at https://www.minitool.com/news/samsung-galaxy-store-app.html.

[236]    Perez, Sarah, "Windows Phone Marketplace: One Year In," *TechCrunch*, November 22, 2011, available at https://techcrunch.com/2011/11/22/windows-phone-marketplace-one-year-in/.

[237]    Moscaritolo, Angela, "BlackBerry World App Store Is Shutting Down," *PCMag*, December 15, 2017, available at https://www.pcmag.com/news/blackberry-world-app-store-is-shutting-down. *See also,* Reisinger,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

121.  To be competitive and succeed, the App Store needed an innovative business model, as well as effective services and governance mechanisms that would attract and retain sufficient developers and consumers who could then transact apps. The App Store grew rapidly following its launch. The number of available iOS apps reached over 10,000 by the beginning of 2009. Five years later, the App Store had one million apps, and by its 10th anniversary, the number of available apps was nearly two million.[238] In 2008, consumers downloaded 439 million apps from the App Store. Three years later, total app downloads increased to 12.4 billion.[239] By 2022, total app downloads surpassed 370 billion.[240] The App Store has thus been a massive success for Apple, consumers, and developers.

122.  There are many reasons why the app marketplaces discussed above failed to attract sufficient developers and consumers to succeed. Certain decisions made by some of the

Don, "Nokia Officially Walks Away from Symbian, Meego," *CNET*, January 2, 2014, available at https://www.cnet.com/tech/mobile/nokia-officially-walks-away-from-symbian-meego/ ("Symbian was once central to Nokia's success. But as the iOS and Android onslaught hit Nokia hard, the company decided to ditch Symbian and MeeGo and go with Windows Phone. Its Asha line, which has been in place for years, is central to the company's efforts at appealing to developing countries."); Arora, Himanshu, "HP to End Support for App Catalog and WebOS Device Cloud Services in January," *TechSpot*, October 16, 2014, available at https://www.techspot.com/news/58459-hp-end-support-app-catalog-webos-device-cloud.html; Endicott, Sean, "The Windows Phone 8.1 Store Shuts Down in December," *Windows Central*, October 15, 2019, available at https://www.windowscentral.com/windows-phone-81-store-shuts-down-december.

238  "The Revolution Steve Jobs Resisted: Apple's App Store Marks 10 Years of Third-Party Innovation," *AppleInsider*, July 10, 2018, available at https://appleinsider.com/articles/18/07/10/the-revolution-steve-jobs-resisted-apples-app-store-marks-10-years-of-third-party-innovation ("There were 500 apps available at the time of launch, a number that would grow to 3,000 by that September and 15,000 by the following January. The growth was exponential in the ensuing years, as the App Store hit 1 million apps in the fall of 2013, and reportedly reached 2 million earlier this year.").

239  Apple, "App Store and Mac App Store Presentation," 2011, APL–APPSTORE_10857840–919 at 850.

240  Caminade, Juliette and Jonathan Borck, "The Continued Growth and Resilience of Apple's App Store Ecosystem," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf, p.14 ("Since the launch of the App Store, users have downloaded apps more than 370 billion times.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

failed app marketplaces contrast with the choices that Apple made for the App Store. [241] I explain some of Apple's key strategic choices below.[242]

### 3. Apple's Strategic Choices Made When the App Store Was Launched in 2008 Still Remain Central to the App Store Today

#### a) Apple Chose to Review, Approve, and Distribute Every iOS App, All In-App Digital Content, and Every Update Made Available to Consumers

123. As part of the original design of the App Store, Apple chose to review every third-party app available on the App Store, aiming to lower the security and privacy risks for iPhone users, offer consumers a more reliable and high-quality experience with apps and in-app

---

[241] For example, Blackberry World struggled, in part, because its app review process led to apps of insufficient quality; its pricing tiers restricted apps to be either free or charge a minimum price of $2.99, which deterred cost-sensitive users; and its high developer fees, which discouraged app development. *See*, *for example*, Hristov, Victor, "Blackberry World App Store Flooded by 47 000 Apps from One Developer (Hint: Most of Them Are Crap)," *PhoneArena*, available at https://www.phonearena.com/news/BlackBerry-World-app-store-flooded-by-47-000-apps-from-one-developer-hint-most-of-them-are-crap_id46654 ("BlackBerry World, the 'Berry app store, is flooded with low quality apps from a single developer. 47 000 out of some 120 000 total apps on it are made by S4BB, and a lot of them are city guides, audio books, phrasebook and others. The mysterious developer seems to be focused on quantity rather than quality and is taking advantage of the liberal publishing rules in the app catalog."). *See also*, "5 Reasons App World Could Hurt The BlackBerry," *CRN*, March 6, 2009, available at https://www.crn.com/blogs-op-ed/the-channel-wire/215800925/5-reasons-app-world-could-hurt-the-blackberry ("According to the pricing structure for applications that are going to be available through App World, RIM has neglected the 99 cent and $1.99 application price points that are a sweet spot for the competition. RIM has indicated that the store will offer free applications. From there, applications jump to $2.99 and increase in $1 increments up to $19.99. […] Setting the lowest application price at $2.99 could work against RIM when users can get the same application cheaper somewhere else. […] According to BlackBerry App World, there is a $200 administration fee for developers to register and submit applications. That fee covers 10 application submissions. […] That's more than double the price Apple charges for its standard developer program for iPhone applications. The higher cost could drive away potential developers, pushing them to build their applications for the iPhone or for Android Market, saving BlackBerry application development for the rich folk."). In addition, technical issues and the difficulty that consumers faced while transacting on Ovi Store contributed to its failure to attract and retain consumers. *See*, *for example*, "Nokia Ovi Store Launch Is A Complete Disaster," *TechCrunch*, May 26, 2009, available at https://techcrunch.com/2009/05/26/nokia-ovi-store-launch-is-a-complete-disaster/ ("Today sees the worldwide roll-out of Nokia's Ovi Store, the company's response to Apple's App Store (and other centralized content stores for mobile phones and OS'es) […] Here's the thing: the launch is an utter disaster and I assume (hope) Nokia executives are outraged with the way things are going."); Miller, Matthew, "Nokia Ovi Store Fails in Many Ways, Buy with Extreme Caution," *ZDNET*, June 17, 2009, available at https://www.zdnet.com/article/nokia-ovi-store-fails-in-many-ways-buy-with-extreme-caution/ ("Apps and supported devices: […] One advertised feature of the Ovi Store is that it is supposed to only present you with apps that can be used on the device you are using to access the store. That is something I am not personally experiencing and seems to be a failure at this time. […] Unable to redownload apps: […] There is NO capability to redownload your apps or reinstall them so if you ever reset or have an issue with your device you currently LOSE ALL purchased apps forever.").

[242] For the remainder of the report, my discussion of App Store services and governance mechanisms will focus on those applicable in the United States.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

digital content, and protect the investments developers might make into creating new and innovative apps. Addressing these persistent concerns remains the motivation for Apple's continued decision to review, approve, and distribute every iOS third-party app and app update before they are made available on the App Store.[243]

124. Apple decided against permitting third-party app marketplaces on the iPhone, either through sideloading of third-party app marketplaces or alternative stores within the App Store, instead choosing a centralized distribution model for apps through the App Store.[244] Centralized distribution through the App Store enabled Apple to review every app made available to iPhone users for security, privacy, and reliability risks, potentially fraudulent activities, and other risks that could arise where an app was not compliant with Apple's

---

[243] Trial Testimony of Phillip Schiller, pp. 2737:15–2738:8 ("Q. And what were the business reasons that Apple decided that it would only distribute third-party native apps on its App Store? A. Well, we've covered a number of the important reasons to us. Maintaining the quality of iPhone, maintaining the security and privacy of our users were all critical to the idea of opening it up for native apps. Q. And have those priorities for privacy, security, and reliability ever changed? A. No. Q. And has the need to safeguard those things changed over time? A. Yes. Q. And can you describe how? A. I think that over the years, the ways and methods developers and bad actors try to get at users and their data has only increased dramatically, and we see this from all the important data we have. The many attacks and attempts to steal it and get access to it have increased."). *See also*, Apple, "App Store Trust and Safety Priorities and Resourcing," July 2021, APL-APPSTORE_10980784–843 at 784 ("Trust & safety is a big part of why the App Store exists, we helped users have the confidence to install and try software, which laid the groundwork for a robust 3rd party app ecosystem.").

[244] Trial Testimony of Craig Federighi, p. 3416:6–16 ("Q. I want to ask you, Mr. Federighi, about the consequences of opening up iOS to sideloading. Suppose that going forward, anyone and everyone could distribute apps directly to iOS device users. What impact, if any, would that have on overall security? A. As I mentioned earlier, I think it would be a pretty devastating setback for iOS security. I think we would see the kinds of effects that have been experienced on Windows and on Android, in that it would become commonplace for users to be directed to download misleading/misrepresented software from untrusted sources where they would be subject to malware."), pp. 3421:16–3422:7 ("[Q.] If app distribution were to be opened up so that sideloading is allowed for iOS devices, do you think that that would have any impact on iOS developers? A. Certainly. One of the great things about -- we think about the App Store is it's a trusted source of apps. And because of that trust and that confidence that users have, they are very free about trying out new software, about trying new apps, about downloading lots of things. And that's helped build this really unprecedented scale of activity for developers, of opportunity for developers, on the App Store. If they become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users."); Trial Testimony of Phillip Schiller, p. 2830: 7–21 ("Q. Why doesn't Apple permit stores within stores, within its store, should I say? A. There are -- there are a few reasons. It -- if -- if apps are being delivered in -- from another developer through a store, number one, those apps don't – haven't taken out a license with Apple, haven't committed to any of the terms that we've set up to make our systems safe for us and our users. Those apps don't have to follow any guidelines or rules and therefore can create problems for us and the users. And there would be no integration across our systems, our store systems and our -- and our iPhone itself counts on things that -- that happen through the App Store. The store within a store, you wouldn't get parental controls through your iPhone. And there are many other examples.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

guidelines. Apple could not provide similar safeguards for apps distributed outside of the App Store because "[n]o human policy review could be enforced."[245] Were consumers harmed by apps distributed outside of the App Store, they may have attributed such issues to the iPhone and App Store (*see* **Section VI.C**).

125.  Apple also chose to undertake the review and approval of all third-party iOS apps and updates distributed through the App Store before they became available to iOS device owners. Apple implemented an App Review process designed to ensure that apps and updates on the App Store complied with the standards for security, privacy, reliability, quality, fraud protection, and other considerations set forth in the App Review Guidelines (published starting in 2010 on the Apple's website[246]), and to mitigate developer risks that include software piracy and copycat apps.[247]

---

[245]  Trial Testimony of Craig Federighi, pp. 3388:24–3389:12 ("Q. If sideloading were to be allowed for iOS and Apple did not have centralized distribution, would that change have any impact on the security of the platform? A. Oh, dramatically, yeah. No human policy review could be enforced, because if software could be signed by people and downloaded directly, now there -- you could put an unsafe app up and no one would have checked that policy. You could misrepresent -- and, as I said, the most common attack is to say, hey, I'm Microsoft Word, here I am, and you could represent it that way, and then you could even create a website that was indistinguishable to the human eye as to whether it was Microsoft or not. And now you think you're downloading legitimate software and, in fact, you are downloading a trojan.").

[246]  Trial Testimony of Phillip Schiller, pp. 2832:25–2833:2 ("Q. And by the way, when were the app review guidelines first published to developers? A. The first time we published them externally was in 2010.").

[247]  Trial Testimony of Trystan Kosmynka, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021 – May 7, 2021 ("Trial Testimony of Trystan Kosmynka"), pp. 985:25–986:25 ("Q. And the App Store review guidelines themselves are used globally to conduct reviews of apps, right? A. Yes. The guidelines apply to all storefronts.[…] Q. So other than the enterprise program and things like Test Flight or testing, in order for a consumer to obtain a native app on their iPhone, they need to have an app that has gone through the app review process by the iOS app store, correct? A. Yes. Q. And that's true whether they are game apps, or social apps, or weather apps, for example, right? A. Yes."), pp. 1089:14–1090:16 ("Q. And, Mr. Kosmynka, let's look at Guideline 4.1 [of the App Review process]. This is on copycats. It's on page 14 of the guidelines. And the language here is 'Come up with your own ideas. We know you have them so make yours come to life. Don't simply copy the latest popular app on the App Store.'[…] Q. Can you give us examples of rejections you've had to make as a result of that guideline? A. Yes. I think the -- I don't know individual examples, but the examples are broad in terms of the numbers of apps and developers that attempt to abuse the App Store and other developers by being a copycat. So notably I can think of cases where developers have submitted free V-Bucks for *Fortnite*. *Fortnite* wallpaper, get free V-Bucks. There is [*sic*] hundreds of these examples where a developer has tried to capitalize on the name of 'Fortnite,' and, in addition to that, trick customers into thinking that there is some official affiliation with that and that they're going to get some type of reward. So this would have been rejected as a 4.1 copycat. The same exists for things like Spotify, Headspace. These are popular apps that developers that are bad actors attempt to leverage their popularity and their names and submit hundreds upon hundreds of apps that steal their artwork, their screenshots, their icons, their names. This is absolutely a game of whack-a-mole, but we do so as proactively as possible, and we react swiftly if we do find an example of a copycat that is, you know, making it a less exciting opportunity for our great developers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

126.    The App Review Guidelines have evolved over the years to account for new risks, technologies, and considerations, including those related to in-app digital content when Apple introduced In-App Purchases (*see* **Section V.A.3.c**).[248] The App Review Guidelines identify five broad categories that Apple uses to review apps and in-app digital content for App Store distribution, summarized in what follows:

a.    Safety: Apps should not contain offensive or inappropriate content, should not lead to the physical harm of iOS users, and should contain appropriate parental controls if they are designed for use by children.[249]

---

[248]    For example, the October 2022 updates to the App Review Guidelines covered additional rules and clarifications regarding crypto currencies and non-fungible tokens (NFTs), among others. *See, for example,* "App Store Review Guideline Updates Now Available," *Apple*, October 24, 2022, available at https://developer.apple.com/news/?id=xk8d7p8c. *See also*, Trial Testimony of Phillip Schiller, pp. 2832:15–24 ("Q. And are the app review guidelines ever modified? A. Yes. Q. Under what circumstances? A. They are modified at least yearly, sometimes more than once in a year when we run into situations that are new or feedback from developers about something that isn't working, or various situations. Q. And would the addition, for example, of – of cross-platform play be an example of that in recent years? A. Absolutely.").

[249]    "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 1. Safety ("1.1 Objectionable Content. Apps should not include content that is offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy. […] 1.3 Kids Category. […] If you want to participate in the Kids Category, […] apps must not include links out of the app, purchasing opportunities, or other distractions to kids unless reserved for a designated area behind a parental gate. Keep in mind that once customers expect your app to follow the Kids Category requirements, it will need to continue to meet these guidelines in subsequent updates, even if you decide to deselect the category. You must comply with applicable privacy laws around the world relating to the collection of data from children online. […] 1.4 Physical Harm. If your app behaves in a way that risks physical harm, we may reject it. […] Medical apps that could provide inaccurate data or information, or that could be used for diagnosing or treating patients may be reviewed with greater scrutiny. […] Apps should not urge customers to participate in activities (like bets, challenges, etc.) or use their devices in a way that risks physical harm to themselves or others.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

b.   Performance: Apps should be fully functional, bug-free, complete, and have accurate metadata. Demos, betas, and trial versions are not allowed on the App Store.[250] In addition, apps should not place undue strain on device resources.[251]

c.   Business: Apps should be transparent about their business model, including with respect to in-app digital content purchases, subscriptions, and monetization strategies through advertisements. Apps attempting to perpetrate scams or engage in fraud are not allowed on the App Store.[252]

d.   Design: Apps should have simple, refined, innovative, and easy to use interfaces. Developers should not submit copycat apps, list the same app multiple times, or submit apps that are already very commonplace (for example, flashlight apps or drinking games).[253]

---

[250]   "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 2. Performance ("2.1 App Completeness. […] Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. […] 2.2 Beta Testing. Demos, betas, and trial versions of your app don't belong on the App Store – use TestFlight instead. […] 2.3 Accurate Metadata. Customers should know what they're getting when they download or buy your app, so make sure all your app metadata, including privacy information, your app description, screenshots, and previews accurately reflect the app's core experience and remember to keep them up-to-date with new versions.").

[251]   "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 2. Performance ("2.4 Hardware Compatibility. […] Apps should not rapidly drain battery, generate excessive heat, or put unnecessary strain on device resources.").

[252]   "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 3. Business ("3. Business. […] If your business model isn't obvious, make sure to explain in its metadata and App Review notes. If we can't understand how your app works or your in-app purchases aren't immediately obvious, it will delay your review and may trigger a rejection. And while pricing is up to you, we won't distribute apps and in-app purchase items that are clear rip-offs. We'll reject expensive apps that try to cheat users with irrationally high prices. […] If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store and you may be removed from the Apple Developer Program.").

[253]   "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 4. Design ("4. Design. Apple customers place a high value on products that are simple, refined, innovative, and easy to use, and that's what we want to see on the App Store. Coming up with a great design is up to you, but the following are minimum standards for approval to the App Store. […] 4.1 Copycats. (a) Come up with your own ideas. […] (b) Submitting apps which impersonate other apps or services is considered a violation of the Developer Code of Conduct and may result in removal from the Apple Developer Program. 4.2 Minimum Functionality. Your app should include features, content, and UI that elevate it beyond a repackaged website. If your app is not particularly useful, unique, or 'app-like,' it doesn't belong on the App Store. […] 4.3 Spam. […] (b) Also avoid piling on to a category that is already saturated; the App Store has enough fart, burp, flashlight, fortune telling, dating, drinking games, and Kama Sutra apps,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

e.    Legal: Apps should provide a clear user privacy policy regarding data collection and usage, respect intellectual property rights, and comply with all applicable laws and regulations.[254]

These categories reflect Apple's procompetitive intent to provide a safe, trustworthy, and positive experiences for all consumers and developers.

127.    From my review of documents produced in this matter, including testimony from Apple executives, I understand that Apple's App Review process uses a combination of computer-based review using proprietary tools for apps and app updates,[255] and reviews by trained

---

etc. already. We will reject these apps unless they provide a unique, high-quality experience. Spamming the store may lead to your removal from the Apple Developer Program.").

[254]    "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/, Section 5. Legal ("5.1 Privacy. Protecting user privacy is paramount in the Apple ecosystem, and you should use care when handling personal data to ensure you've complied with privacy best practices, applicable laws, and the terms of the Apple Developer Program License Agreement, not to mention customer expectations. […] 5.2 Intellectual Property. Make sure your app only includes content that you created or that you have a license to use. Your app may be removed if you've stepped over the line and used content without permission. Of course, this also means someone else's app may be removed if they've 'borrowed' from your work. […] Laws differ in different countries and regions[.]").

[255]    Trial Testimony of Trystan Kosmynka, pp. 1095:24–1096:17 ("Q. [W]hat is the first set of analyses that are done after a developer submits their app for review? A. When an app is submitted, it goes through an incredibly complex workflow system […]. [T]here [are] portions of those tasks specific to app review, and we refer to those as Static and Dynamic Analysis […]. Static analysis is binary analysis. It is analyzing the compiled binary and the package that the developer has submitted to Apple without actually executing the binary. It's not being run at this point."), pp. 1096:23–1097:1 ("Q. And dynamic analysis, can you tell us how that differs from static analysis? A. Dynamic analysis we are actually executing the binary. We are running it."), pp. 1099:4–6 ("Both static and dynamic analysis work together to grab facts about the submission such that we can inform our tools and inform our reviewers."), pp. 1097:22–1099:21 ("A. So DT App Analyzer scans the developer's submission and will inform us of frameworks that the app uses, classes, and methods that the app has available to it. At this point, we would not know if those are executed or simply present in the app. […] A. So App Similarity will look at the machine language of the app and provide a signature, and that signature will be used as a way to find whether or not there are clones of this particular binary moving forward but also presently, and so that's a tool that helps us with copycat rejections. […] A. So if you were to look at a compiled binary, there are cases where a developer has had variables that are strings, and those strings include things like URLs, IP addresses, information that could also be used to link and identify potential malicious behavior. […] So App Transparency I believe sits really in between static and dynamic analysis. It provides us a very similar output, in fact, I think the same output that DT App Analyzer provides, but in addition to statically analyzing the binary, it also is doing some dynamic analysis or forced execution, if you will, to resolve call paths so that we can get a better understanding of whether or not there is obfuscated API calls and they may be having hid methods or classes that would have otherwise statically been undetectable […] Mercury is a grid of devices that is actually -- I think we have over 2,000 devices in this that is iOS apps on physical iPhones, physical iPads. […] A. So this is one of the racks in one of our data centers that shows the Mercury infrastructure, so you can see here we have actually had custom -- custom cages built for such devices. And the Macs on the top are performing the orchestration in connecting to overall App Store infrastructure to drive this process. And these devices would be running 24/7 to, upon submission, exercise an app in an automated fashion."), pp. 1104:17–1105:6 ("So I mentioned that there is facts that are gathered here.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

human reviewers to detect potential threats and risks informed by the computer-based process.[256] As of May 2024, approximately 130,000 app submissions are made to App Review per week.[257] I understand the details of this process are discussed by Professor Halderman in his expert report.[258,259]

---

These facts we move into MOZART. The last three letters of MOZART, ART stands for App Review Tools. Our vision of this was that it would it be kind of the canonical source of truth for apps facts that pertain to App Review. So all these facts gather into MOZART. And within MOZART, we also have a rules engine. And so the rules engine allows us to codified scenarios that we have seen historically, whether that be malware and other safety and privacy concerns such that we can take proactive action when one of these facts trips one of those types of rules. Q. And is MOZART also a computer analysis tool developed by Apple? A. Yes, it is. And I would go beyond tool. It's a very complex and evolved system.").

[256] Trial Testimony of Trystan Kosmynka, p. 992:13–15 ("[Q.] Apple's app review process involves both human-led review and automated tools for review, correct? A. That's right."), p. 1105:9-10 ("So the next step would be human review."), pp. 1086:5–1087:8 ("A. This guideline gets applied frequently. Some, I think, notable disturbing examples, we had an app named Paca Girls. What Paca Girls had as far as content was women in what looked to be compromised positions […] Q. And, Mr. Kosmynka, can computer analysis alone identify objectionable content of that type? A. No. […] Q. Can computer analysis, the automated tools that Apple has developed, alone identify things like that that violate the Kids Category guideline? A. No."), pp. 1093:23–1094:1 ("[Q]. And for these privacy issues and, in fact, for all of the issues that you've given us examples of, do you believe that the computer automated tools alone can address those issues? A. No."), p. 1108:1–19 ("The team that reviews apps, each and every day they see a lot of apps, a lot of scenarios. They are familiar with the history of these apps, the history of the rejections. They're also familiar with -- when they send an app to Technical Investigations and Technical Investigations finds something, they familiarize themselves with the patterns. And so in the case of an app that switches from a wallpaper app to a full-blown pornography website, they're aware of the icon and the imagery that that wallpaper app had. They are aware of the call to actions of the keywords and the marketing texts that that app had. And so they're astute enough to find similar apps that are tools are [sic] not capable of detecting that are attempting to do the same thing. And so not only is there things that they see personally that are clearly offensive, clearly a rejection, they're also able to astutely know that there is a potential concern in these apps, and they send them to TI, and more often than not, they are able to verify it."). See also, Trial Testimony of Tim Cook, p. 3847:8–14 ("Q. Are computer tools able to replace human assessment for app review, in your view? A. I don't think so. You know, I think it's important to have both. But today, the -- it is -- despite the advancements in machine learning, machine learning will not address all of the issues on the App Store. It still needs human judgment.").

[257] "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[258] Opening Expert Report and Declaration of J. Alexander Halderman, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Halderman Opening Report"), Section III.B.

[259] In 2023, Apple reviewed nearly seven million app submissions, of which about 25 percent were rejected. *See,* "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.; "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/.Where an app has been rejected, Apple provides feedback to developers to fix issues identified with their apps and offers video consultations to help developers succeed through the review process. *See also*, "App Review," *Apple*, available at https://developer.apple.com/distribute/app-review/#contact-uscontact-us ("If your submission didn't pass review, details are provided, including any specific App Review Guidelines that your submission didn't follow.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

128.    Third-party iOS apps that have received approval via the App Review process are nevertheless continuously monitored subsequently for fraudulent activity and potential violations of the App Store Guidelines,[260] and manual reviews play an important role in identifying potential threats (*see* **Section VI.C** for examples). The App Review team obtains information via AppleCare, monitors social media and the news for emerging issues, and employs automated tools to detect potentially problematic apps.[261]

b)    Apple Chose to Implement a Revenue-Sharing Model with Developers and Has Only Lowered Its Commission Rate Since 2008

129.    Since its launch in 2008, the App Store has used a model of revenue-sharing with developers, collecting a percentage, as a commission, of the price consumers pay to the developers for app and in-app digital content purchases. At launch in 2008, the commission rate was 30 percent.[262] The App Store facilitated this transaction by collecting payment on behalf of the developer. If the developer set a price of zero, that is, if a consumer downloaded a free app and consequently did not pay the developer, the developer was not

---

[260]    Apple, "iPhone SDK Launch," March 6, 2008, APL–APPSTORE_00000055–087 at 079–080 ("[D]evelopers have to register with us and for that $99.00 that they pay to join the program, they actually get a [*sic*] electronic certificate and that tells us who they are so if they write a malicious app, we can track them down, […] and we will know who they are. The other thing that we can do since the distribution of their applications is going to be through the App Store, if we are alerted to a malicious app that we didn't catch, we'll turn off the spigots so no more people download it.").

[261]    Trial Testimony of Trystan Kosmynka, p. 1120:5–20 ("Q. Okay. And then I want to talk about what happens post approval. Do you sometimes learn that there are apps in the store that don't meet the guidelines, notwithstanding your efforts in the app review process? A. Yes. Q. And how do you learn that? A. We learn it through a variety of ways. Customers can report it to us through AppleCare in the -- report a concern, report a problem flow through iTunes and the App Store. We also learn it through watching social media and watching the news, PR, and our customers happen to also email executives, and so we'll see those types of emails as well. And we take them all with the same level of seriousness. Q. Do any of your tools, your automated tools, monitor for problematic apps? A. They do."). *See also*, Apple, "CyberSecurity," February 27, 2013, APL-APPSTORE_11139116–141 at 128 ("'Bad' Apps do get past App Approval, but are quickly removed."); Apple, "Apple Internal Email Communication," December 12, 2019, APL-APPSTORE_11350207–215 at 207–212; Apple, "Apple Internal Email Communication," February 24, 2022, APL-APPSTORE_11077016–026 at 016–021; Apple, "Apple Internal Email Communication," October 16, 2018, APL-APPSTORE_11042424–501 at 425–429.

[262]    Apple, "iPhone SDK Launch," March 6, 2008, APL–APPSTORE_00000055–087 at 075 ("Pick whatever price you want to sell your app at. When we sell the app through the App Store, the developer gets 70% of the revenues right off the top[.]"). *See also*, Trial Testimony of Phillip Schiller, p. 2739:3–13 ("Q. And Mr. Jobs then goes on to say, 'Pick whatever price you want to sell your app at, and when we sell the app through the App Store, the developer gets 70 percent of the revenues right off the top and we keep 30 percent.' Correct? A. That's right. Q. And is that what we've heard in this trial referred to as kind of the 70/30 revenue share? A. Yes. Q. And was that the revenue share as of the launch of the App Store? A. Yes.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

charged any fee by Apple for that transaction.[263] Thus, the model of revenue sharing encourages free apps more than a model under which, for example, a listing fee is collected. Although Apple gains no commissions from transactions involving free apps, consumers benefit from more apps being available because of indirect network effects, which in turn could increase the likelihood of paid transactions for developers that also yield commissions for Apple.[264] Apple continues to use this revenue sharing model for App Store transactions today, although the commission rates have been lowered for many developers, as I discuss later in the report. Consumers have never been required to pay Apple any fees to access or use the App Store. The App Store's revenue sharing model is thus inconsistent with the allegation made by Plaintiffs that consumers purchase apps directly from the App Store and that they pay Apple a 30 percent commission rate.[265]

130. This revenue sharing structure and level of commission rate set by Apple in 2008 was comparable to or lower than the commission rates charged by other app marketplaces.[266] Revenue sharing models with associated commission rates of between 30 percent and 40 percent on apps have been common since the advent of online app distribution.[267] Steam charged third-party developers a 40 percent commission rate in 2005 on sales of games to consumers.[268] App marketplaces for gaming devices like Xbox, PlayStation, and Nintendo

---

[263]   Trial Testimony of Phillip Schiller, p. 2740:18–21 ("Q. And what did Apple charge developers for free apps [in 2008]? A. Nothing. There was no commission for a free app. Q. And has that ever changed? A. No.").

[264]   In a Wall Street Journal interview, Steve Jobs discussed the importance of free apps to the App Store, stating, "Our purpose in the App Store is to add value to the iPhone. Free apps do that just as well as paid apps sometimes. We love free apps." "'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *Wall Street Journal*, July 25, 2018, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1.

[265]   Third Amended Complaint, ¶ 47 ("When an iOS Device customer buys an app from Apple, it pays the full purchase price, including Apple's 30% commission, directly to Apple. Apple takes its 30% commission off the top and then remits the balance, or 70% of the purchase price, to the developer. Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iOS Devices customers or collect payments from the customers.").

[266]   Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733 at 729.

[267]   Opening Expert Report and Declaration of Lorin Hitt, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Hitt Opening Report"), Section 5.4.

[268]   Loh, Er Lern, "Asian Game Developers Summit 2005, Day One," *GameDev*, October 13, 2005, available at https://www.gamedev.net/tutorials/industry/event-coverage/asian-game-developers-summit-2005-day-one-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Wii, which began operations in 2005 and 2006, charged a commission rate of 30 percent.[269] Many early mobile app marketplaces like Handango also charged commission rates between 30 percent and 40 percent.[270] Nokia's Ovi Store and Blackberry's Blackberry World charged commission rates of 30 percent in 2011.[271] Many other mobile app marketplaces that launched soon thereafter, including the Windows Phone Marketplace (which launched in 2011 for the Windows Phone device) and Amazon Appstore (which launched in 2011 for Android devices and 2014 for the Blackberry 10 device) also charged commission rates of 30 percent (*see* **Exhibits C.1–C.3**).[272]

131.    The widespread use of commission-based revenue models by app marketplaces is natural when one considers that their objective is to facilitate transactions between developers and

---

r2271/ ("Steam is actually a main part of Valve's business platform. […] Revenue sharing with developers under the Steam system is 60/40 (developer/Valve)."). *See also*, "Strategy First to Deliver Multiple Titles On-Line via Steam," *Strategy First*, December 8, 2005, available at https://web.archive.org/web/20060328053420/http://www.strategyfirst.com/press/DisplayArticle.asp?sLanguageCode=EN&iArticleID=3250 ("Software publisher Strategy First, Inc. […] and Valve Corporation, […] are pleased to announce a multi-title distribution deal that will deliver a collection of Strategy First's front line titles and new releases via Steam, Valve's online platform for digital content distribution and management. Strategy First is the first entertainment software publisher to move forward with Valve's Steam, which connects nearly 6 million gamers worldwide.").

[269]    Marks, Tom, "Report: Steam's 30% Cut Is Actually the Industry Standard," *IGN*, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

[270]    Trial Testimony of Phillip Schiller, p. 2725:7–9 ("Q. And what did Steam and Handango charge developers as commissions at the time that the iPhone was released? A. 30 percent."). *See also*, Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/ ("Bajarin said the App Store's predecessor was Handango, a service that around 2005 let developers deliver apps over cellular connections to users' Palm and other devices for a 40% commission.").

[271]    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 22, 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf, p. A-4.

[272]    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 22, 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf, p. A-1–A-2. *See also*, "Introducing Amazon Appstore for Android," *Amazon*, March 22, 2011, available at https://press.aboutamazon.com/2011/3/introducing-amazon-appstore-for-android, ("Amazon.com, Inc. (NASDAQ:AMZN) today announced the launch of the Amazon Appstore for Android at www.amazon.com/appstore."); "Blackberry to Expand Application Ecosystem by Making Amazon Appstore Available on Blackberry 10 Smartphones," *Blackberry*, June 18, 2014, available at https://www.blackberry.com/us/en/company/newsroom/press-releases/2014/blackberry-to-expand-application-ecosystem-by-making-amazon-appstore-available-on-blackberry-10-smartphones.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumers and to increase these transaction volumes. Because of the nature of the indirect network effects associated with app marketplaces, and in particular, because they have a usage-based dimension in addition to a participation-based dimension (*see* **Section IV.A**), a commission-based revenue model better aligns with creating value from indirect network effects than an alternative that might erect barriers to participation, for example, through a consumer membership fee. Additionally, since every actual completed transaction is initiated by a consumer rather than by a developer, levying this commission on the developer rather than the consumer encourages usage.

132.    Since 2008, Apple has reduced its commission rate for certain transactions and developers.[273]

a.    The App Store introduced in-app subscriptions in February 2011. Over the years, subscriptions have become popular with many developers, accounting for one third of their earnings in 2022.[274] The commission rate on developer revenue generated from subscription fees was initially 30 percent, in line with the rate levied on developer revenue from other transactions like app downloads and in-app digital content purchases. However, in 2016, Apple lowered the commission rate on revenues generated from in-app subscription renewals (after the first year) to 15 percent. [275]

---

[273]    Trial Testimony of Phillip Schiller, p. 2803:18–22 (Q. Now, you told us earlier that Apple has never increased its commission level; correct? A. Yes. Q. Has it ever decreased its commission levels? A. Yes.). *See also*, Trial Testimony of Tim Cook, p. 3861:11–18 ("Q. How has the share of revenue developers retain changed since the App Store was introduced? A. It's only gone down. It started with zero percent for the free, but 30 percent for everything else. But with the change of subscriptions with the Video Partners Program, with the Small Business Program, with the --things like the reader rule and the multiplatform rule, all of these things drive down the price.").

[274]    Caminade, Juliette and Jonathan Borck, "The Continued Growth and Resilience of Apple's App Store Ecosystem," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf, p. 14 ("In-app purchases account for the majority of developer earnings (about two-thirds), and subscriptions, which now account for about one-third of earnings, are growing.").

[275]    Goode, Lauren, "Apple's New Subscription Offerings Are Now Available to App Store Developers," *The Verge*, September 2, 2016, available at https://www.theverge.com/2016/9/2/12774758/apple-developers-app-store-new-subscription-rules ("Perhaps more notably is the change in revenue split: for app developers who have long-term paying subscribers, Apple will only take a 15 percent revenue cut after a year, rather than the standard rev-share plan, in which Apple takes a 30 percent cut and gives the developer 70 percent."). *See also*, Trial Testimony of Phillip Schiller, pp. 2803:23–2804:11 ("Q. We just talked about subscriptions. Has the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

b.  Apple launched the Apple Video Partner Program in 2016 to enable premium subscription video providers like Amazon Prime Video and Disney+ to integrate their services with Apple's technologies, such as the Apple TV app and Siri.[276] By participating in this program, partners benefit from a reduced commission rate of 15 percent on in-app digital content purchases.[277]

c.  On January 1, 2021, Apple launched the App Store Small Business Program for new developers and existing developers with less than one million dollars in total earnings from all of their apps in the prior calendar year.[278] Developers that qualify for this program receive a 50 percent reduction in the commission rate levied on developer revenue from apps and in-app digital content purchase; this commission

---

commission on subscriptions ever been decreased? A. Yes, it was [*sic*]. Q. And can you describe that, please. A. Yes. In 2016, we changed the commission model to be different on the second year. So in the first year when you -- a new user sets up a subscription, it's still a 70/30 commission, and then if that user stays with that subscription, on the second year and all successive years, it goes to 85/15. In addition, when we made that change to the commission in 2016, we then automatically started any existing subscriptions that were more than a year old for all developers at 85/15. We didn't make them wait a year for those.").

[276]  "Apple Video Partner Program " *Apple*, available at https://developer.apple.com/programs/video-partner/ ("Since 2016, the Apple Video Partner Program has enabled premium subscription video providers to participate in a new TV watching experience on the Apple TV app, helping customers discover the world's best premium video content in one app, across all their devices. […] This program is designed for apps that deliver premium subscription video entertainment services. Participating apps are required to integrate with a number of Apple technologies, such as Universal Search, Siri, AirPlay, and single sign-on or zero sign-on, to ensure a seamless experience for customers. […] As of fall 2020, over 130 premium subscription video entertainment providers around the world have signed on to participate in this program, such as Amazon Prime Video, Binge, Canadian Broadcasting Corporation (CBC), Claro Video, C More, DAZN, Disney+, Globo, HBO Max, Joyn, Molotov, MUBI, myCanal, STARZ, and Viaplay.").

[277]  "Apple Video Partner Program " *Apple*, available at https://developer.apple.com/programs/video-partner/ ("As a program member, you earn 85% of sales from customers who sign up using Apple's in-app purchase system."). *See also*, Trial Testimony of Phillip Schiller, p. 2805:5–21 ("Q. And what is the Video Partner Program? A. It's a program we created a few years back. The Apple TV Team was working on a new generation of an app on Apple TV where new digital TV services were cropping up as separate services, separate applications, and we wanted to bring them all together into one experience for users. And so the Apple TV Team started meeting with TV content providers and described the work they were going to do to integrate into this new experience. For example, they needed to integrate with our Siri voice assistant so you could find any show across any one of these app experiences, and in talking with those developers, the Apple TV Team asked if we could lower the commission on 85/15, not in the second year, but in the first year to help them cover the costs of all this engineering work. And so in doing that, we created a Video Partner Program for any developer who wants to be in that service and do that work to get that benefit.").

[278]  "Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/. *See also*, "App Store Small Business Program," *Apple*, available at https://developer.apple.com/app-store/small-business-program/ ("Your eligibility is based on your total App Store proceeds converted into United States dollars (USD) in the prior calendar year. Proceeds are your sales net of Apple's commission and certain taxes and adjustments.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

rate thus decreases to 15 percent so long as the developer meets the aforementioned eligibility criteria of the program.[279] Small developers account for the majority of developers on the App Store,[280] and most developers who offer apps via the App Store are therefore eligible for this lower 15 percent commission rate.

133.  In addition to reducing its commission rate, Apple has also altered its App Store business model in ways that allow developers to deliver certain digital content to iOS devices without requiring consumers to purchase the content through the App Store. Reader apps are apps that provide one or more of the following digital content types—magazines, newspapers, books, audio, music, or video—as the primary functionality of the app. The App Store allows free access to previously purchased content or subscriptions associated with such apps (I understand Apple refers to this rule as the "Reader Rule").[281] In 2018,[282]

---

[279]  "Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/ ("[T]he essentials of the program's participation criteria are easy and streamlined: Existing developers who made up to $1 million in 2020 for all of their apps, as well as developers new to the App Store, can qualify for the program and the reduced commission. If a participating developer surpasses the $1 million threshold, the standard commission rate will apply for the remainder of the year. If a developer's business falls below the $1 million threshold in a future calendar year, they can requalify for the 15 percent commission the year after.").

[280]  Caminade, Juliette and Jonathan Borck, "Small Business Developers and App Creators on the App Store in 2022," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/small-business-developers-and-app-creators-on-the-app-store-in-2022.pdf ("In 2022, more than 90% of developers on the App Store were considered small developers, and the App Store ecosystem continued to attract thousands of new small developers.").

[281]  "Update on 'Reader' App Distribution," *Apple*, March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts; "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("'Reader' Apps: Apps may allow a user to access previously purchased content or content subscriptions (specifically: magazines, newspapers, books, audio, music, and video). Reader apps may offer account creation for free tiers, and account management functionality for existing customers. Reader app developers may apply for the External Link Account Entitlement to provide an informational link in their app to a web site the developer owns or maintains responsibility for in order to create or manage an account."). *See also*, Remote Proceedings of Videotaped Deposition of Carson Oliver, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715YGR, January 26, 2021 ("Oliver Deposition"), p. 89:7–14 ("[Q.] We were talking about -- you were talking about the Reader Rule. And the notion that if content is purchased outside of the iPhone app but consumed within the iPhone app, meaning I watch something or I use my skin or whatever it is, that Apple does not receive a commission on that. Is that accurate? A That is accurate, yes.").

[282]  Miller, Chance, "Apple Updates App Store Review Guidelines w/ Free Trial Details, Remote Mirroring Changes, More," *9to5Mac*, June 4, 2018, available at https://9to5mac.com/2018/06/04/new-app-store-review-guidelines/ ("Apple today has updated its App Store Review Guidelines with a handful of changes. […] Apple now says that apps operating across multiple platforms may allow users to access content acquired elsewhere, but that content must also be available via in-app purchases.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

in response to feedback from developers,[283] Apple allowed apps that operate across multiple platforms to enable consumers to access content, subscriptions, or features purchased on other platforms or websites with no levied commission, provided the same content was available for purchase on the App Store (I understand Apple refers to this rule as the "Multi-platform Rule").[284] Together, these policies mean that much of the digital commerce facilitated by the App Store is not subject to any commission.[285]

---

[283]   Trial Testimony of Phillip Schiller, pp. 2807:19–2808:14 ("Q. And why did Apple decide to support cross-platform and cross-wallet play? A. Well, we had some game developers come to us and express that this is a growing trend in gaming, that we're going to see new developers come on to iPhone from consoles and other platforms where they already had a large user base, and they allowed cross-platform play, and that if we wanted to continue to be competitive with the App Store, we needed to add that capability. So hearing that feedback, we made that a term for all developers. Q. And does Apple's acceptance of cross-wallet play impact the amount of commission paid to Apple by developers? A. Sure. Q. How? A. Well, previously the rules had been that if there is any digital content paid for within an app, that you pay for that with IAP on iPhone. After the multiplatform rule, a developer now can sign up users off of iPhone on whatever platform they want and then the user can now have that content in their iPhone, and there's no IAP process, there is no commission to Apple.").

[284]   "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("Multiplatform Services: Apps that operate across multiple platforms may allow users to access content, subscriptions, or features they have acquired in your app on other platforms or your web site, including consumable items in multi-platform games, provided those items are also available as in-app purchases within the app."). *See also*, Oliver Deposition, p. 91:15–20 ("Q. You said there were two components for digital goods that we want to talk about, and one was the Reader Rule, and we talked about that. What was the other one? A. The other is related, and it is called the 'Multi-Platform Rule.'"), p. 96:7–24 ("Q. And so we started talking about these two components, I think, because these are examples of where the commission to Apple is zero even though digital goods are consumed within the app. Is that a fair summary of what these two roles are talking about or as you brought them up? […] [A.] Correct. […] [Q.] So other than subscriptions, the small business program, the video partner program, or content that is not subject to commission under the 21 Reader Rule or the Multi-Platform Rule, are there other deviations from the 30 percent for digital goods on an iPhone app? A. Not to my knowledge, no.").

[285]   Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 22, 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketpl aces_a_comparison_of_commission_rates.pdf, p. 4 ("Developers can also monetize digital content and services on their apps in ways that do not involve transacting directly through the App Store, in which case Apple collects no commission. Specifically, developers can sell digital content, services, and subscriptions outside of the App Store that can be consumed and enjoyed within apps on Apple devices. In a [2020] study, we estimated that the revenue driven by app users' engagement with music and video streaming apps on Apple devices in the US is roughly twice as large as in-app purchases through the App Store. For newspapers, magazines, and audiobooks, this discrepancy is even greater, and enterprise apps are usually paid for by businesses and institutions entirely outside of the App Store despite being used by many employees, students, and others on Apple devices.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

134.    The App Store's revenue sharing model has enabled Apple to earn compensation for the tools, technologies, and services Apple offers to developers.[286] Since launching the iPhone SDK and the App Store in 2008, Apple has invested in developing proprietary tools, technologies, and services for developers to create and distribute applications to users. For example, since 2008, Apple has developed and released over 40 SDKs that allow developers to enhance app functionality in various ways.[287] For developers seeking advanced capabilities, Apple provides tools and technologies such as ARKit for augmented

---

[286]    Trial Testimony of Phillip Schiller, pp. 2759:22–2760:14 ("Q. And you've described it generally, but when comparing the first contract we looked at, the developer -- the Apple Developer Agreement, compared to the Apple Developer Program License Agreement, what additional tools or APIs in general are received under this contract [the Developer Program License Agreement]? A. You get access to more beta or pre-released software through this program. You get access to some additional APIs that have service components to them like push notifications or HealthKit. They have extra security concerns as well. Or Apple Wallet and Apple Pay so there is some extra things that take additional work to support. You also get access to TestFlight for distributing and testing software. And tools for the App Store. For example, for managing your apps on the store, running marketing campaigns on the store, getting data analytics about how your apps are running on the store. Those are all the kinds of things that are additionally covered with this program agreement."). *See also*, Opinion, *Epic Games, Inc. v. Apple, Inc.*, No. 21–16506, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, April 24, 2023 ("Epic Ninth Circuit Opinion"), p. 14 ("By agreeing to the DPLA, developers unlock access to Apple's vast consumer base—the over 1 billion users that make up about 15% of global smartphone users. They also receive tools that facilitate the development of iOS aps, including advanced application-programming interfaces, beta software, and an app-testing software. In essence, Apple uses the DPLA to license its IP to developers in exchange for a $99 fee and an ongoing 30% commission o developers' iOS revenue.").

[287]    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Analysis Group*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf, p. 15 ("Apple offers over 250,000 APIs, and, as Figure 6 illustrates, it has released new SDKs every year since 2008, adding up to more than 40."). *See also,* Trial Testimony of Phillip Schiller, pp. 2730:24–2731:8 ("Q. And what is a Software Development Kit? A. It includes a number of resources for developers to write software, resources like the APIs that we have been talking about, developer tools like Xcode. It includes documentation to help understand the APIs and their functions. Often has sample code to help a developer start to write their application or learn how to use an API. Q. And do the Software Development Kits -- are they made up of Apple's intellectual property? A. Yes.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

reality[288] and Core ML for integrating machine learning models into apps,[289] along with over 250,000 application programming interfaces (APIs) such as HealthKit and MapKit.[290] Developers can access and use these tools, technologies, and services subject to the terms of Apple's Developer Program and accompanying agreements, including the Developer Program License Agreement (DPLA). Developers can enroll in the Apple Developer Program for an annual fee of $99.[291] Enrolled developers can develop their apps on the

[288]    Trial Testimony of Phillip Schiller, pp. 2924:14–2926:5 ("Q. When was ARKit released by Apple? A. In 2017. Q. What did ARKit do? A. It is software technology for app developers to build applications that take advantage of augmented reality within their applications. Q. And how do developers use ARKit? A. Well, there are a number of ways. Advanced developers can take advantage of the APIs in ARKit to build their own applications, and with ARKit, there is a number of advanced technologies that allow for placing computer-generated imaginaries in the real world as seen through your iPhone's camera, and it does many very technical cool things like what's called people occlusion. […] Q. And have any new versions of ARKit been released since 2017? A. Yes. We're up to Version 4 of ARKit."). *See also,* "ARKit Integrate Hardware Sensing Features to Produce Augmented Reality Apps and Games," *Apple*, available at https://developer.apple.com/documentation/arkit ("Augmented reality (AR) describes user experiences that add 2D or 3D elements to the live view from a device's sensors in a way that makes those elements appear to inhabit the real world. ARKit combines device motion tracking, world tracking, scene understanding, and display conveniences to simplify building an AR experience.").

[289]    Trial Testimony of Phillip Schiller, pp. 2928:11–2930:20 ("Q. And let's circle back, sir, to Core ML. A. Yes. Q. First of all, are you familiar with that API? A. I am. Q. And when was it released by Apple? A. In 2017. Q. And has Apple continued to invest in improving Core ML? A. We have. Q. And can you describe what Core ML does, please. A. Yes. The ML stands for machine learning, which we've spoken about briefly a bit yesterday. It is a branch of augmented reality -- excuse me -- of artificial intelligence that allows to you write software that would be very difficult to do with traditional software programming techniques. These are tools that help software predict what may happen and then respond appropriately for the user to help them do things not possible with traditional software. […] Q. Has Apple continued to invest in improving Core ML? A. We have."). *See also,* "Core ML Integrate Machine Learning Models Into Your App," *Apple*, available at https://developer.apple.com/documentation/coreml ("Use Core ML to integrate machine learning models into your app. Core ML provides a unified representation for all models. Your app uses Core ML APIs and user data to make predictions, and to train or fine-tune models, all on a person's device.").

[290]    Trial Testimony of Phillip Schiller, pp. 2759:22–2760:5 ("Q. And you've described it generally, but […] what additional tools or APIs in general are received under this contract [Developer Program License Agreement]? A. You get access to more beta or pre-released software through this program. You get access to some additional APIs that have service components to them like push notifications or HealthKit."). *See also,* "HealthKit," *Apple*, available at https://developer.apple.com/documentation/healthkit; "MapKit," *Apple*, available at https://developer.apple.com/documentation/mapkit; Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Analysis Group*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf, pp. 15-17.

[291]    This $99 fee has not changed since 2008, meaning that it has fallen in real terms. Kim, Arnold, "$99/Year Developer Fee to Publish Applications," *MacRumors*, March 6, 2008, available at https://www.macrumors.com/2008/03/06/99-year-developer-fee-to-publish-applications/ ("From Apple's press release: The Standard Program costs $99 (US) per year and gives members an iPhone SDK and development tools; access to pre-release iPhone software; technical support; the ability to get code onto iPhones for testing; and distribution of applications via the new App Store."). *See also,* Trial Testimony of Phillip Schiller, pp. 2760:15–2761:2 ("Q. And do the terms of this license agreement [the Developer Program License Agreement] restrict the developers' use of those tools? A. Yes. Q. And are those restrictions a condition of entry into this

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

App Store under the terms of the DPLA.[292] Enrolled developers also can, under the terms of the DPLA, test and launch iOS apps,[293] as well as analyze the performance and user engagement of their apps,[294] and engage in various consultations, challenges, labs and workshops that Apple organizes to help developers who seek support in their app development process.[295] Apple also offers educational and mentorship programs to attract

---

contract? A. Yes. Q. And is there a cost to developers who enter into the Apple Developer Program License Agreement? A. Yes. Q. And what is that cost? A. $99 Q. How often is that $99 fee charged? A. Once a year."); "Apple Developer Program " *Apple*, available at https://developer.apple.com/programs/ ("Join the Apple Developer Program to reach customers around the world on the App Store for all Apple platforms. Membership provides the tools, resources, and support you need to develop and distribute apps and games, including access to app services, testing tools, app analytics, and more."); "Membership Details," *Apple*, available at https://developer.apple.com/programs/whats-included/ ("Membership provides the tools, resources, and support you need to create and deliver software and services to users around the world on over 2 billion active Apple devices […] The Apple Developer Program is 99 USD per membership year, or in local currency where available."). In addition, Apple offers a fee waiver for the Apple Developer Program for eligible organizations, including nonprofits, accredited educational institutions, and government entities that distribute only free apps on the App Store and are based in eligible regions. "Apple Developer Program Fee Waiver," *Apple*, available at https://developer.apple.com/support/fee-waiver/.

[292]  "Apple Developer Program License Agreement," *Apple*, February 6, 2025, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/ ("You would like to use the Apple Software (as defined below) to develop one or more Applications (as defined below) for Apple-branded products. Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement.").

[293]  "Membership Details," *Apple*, available at https://developer.apple.com/programs/whats-included/. *See also,* "Apple Developer Program License Agreement," *Apple*, February 6, 2025, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.

[294]  "Measuring App Performance," *Apple*, available at https://developer.apple.com/app-store/measuring-app-performance/ ("Find out how many times your app has been downloaded — and get breakouts by territory, device, and source — by viewing Total Downloads. […] Measure app usage — including active devices, sessions, and retention — as well as user acquisition sources for your iOS, iPadOS, macOS, tvOS, and visionOS apps. […] Understand your app's performance across the customer journey by comparing results across several key metrics, including conversion rate; retention rate on day 1, 7, and 28; crash rate; and average proceeds per paying user."). *See also*, "Gain Insights with Analytics," *Apple*, available at https://developer.apple.com/app-store-connect/analytics/.

[295]  "Meet with Apple," *Apple*, available at https://developer.apple.com/events/ ("Sessions are presentations that explore the latest in Apple tools, technologies, features, and best practices. Appointments are one-on-one appointments with Apple experts for guidance on your app or game. Labs provide hands-on opportunities to test and optimize your apps for Apple platforms. Workshops are interactive experiences that allow you to dive into new features and technologies in small group settings. Special events include a variety of activities designed to inspire, guide, and connect the Apple developer community."). In a session from 2023, Apple reported that over 80 percent of developers were "Very satisfied" or "Somewhat satisfied" with their App Review consultation experience, a "30-minute video appoint where [developers] can ask for advice on what to expect during review, how [an] app can best align with guidelines, reasons for common rejections, and topics related to the process of reviewing [an] app." Apple, "Tech Talk Sessions," November 23, 2023, APL–APPSTORE_10834687–774. *See also*, "App Review," *Apple*, available at https://developer.apple.com/distribute/app-review/#contact-us.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

new iOS app developers.[296] In addition to tools, technologies, and services offered to developers, Apple also facilitates app and in-app digital content distribution for all developers at no additional costs. The App Store Content Delivery Network stores apps and updates on servers worldwide, enabling faster downloads by delivering content from locations geographically closer to the user, alleviating bandwidth demands and helping developers handle high consumer download volumes.[297] I understand that James Malackowski will be addressing Apple IP relating to the App Store and iOS, and related issues, in his report.[298]

c)    Apple Chose to Enable Developers to Take Advantage of Price Tiers and Use Flexible Monetization Strategies

135.    When the App Store launched, developers set their own prices for their apps, a policy that remains in place today.[299] App prices were chosen by the developer from a set of determined price tiers that ranged from zero to a maximum of $999.99.[300] These original

---

[296]    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Analysis Group*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf, pp. 18–19. *See also*, Trial Testimony of Phillip Schiller, pp. 2763:5–2764:8 ("Q. […] Are you familiar with the Worldwide Developer Conference? A. Yes. I run it. Q. And can you please describe what that is. A. Well, we have a number of programs to help educate developers, give them access to all of these APIs and tools and help them create their software, and this is probably one of the most notable parts of that program. […] I think it's a great way for everyone to become a better developer, make better apps."), pp. 2765:17–2765:21 ("Q. And does Apple run any school programs regarding development? A. Yes. We have a number of education programs. Q. And are those charged to the App Store in any way? A. No.").

[297]    Hodgkins, Kelly, "Apple's Content Delivery Network Now Live, Making Faster OS X/iOS Downloads Possible," *MacRumors*, July 31, 2014, available at https://www.macrumors.com/2014/07/31/apple-content-delivery-network/ ("The [content delivery network] may deliver multiple terabits of data per second, allowing Apple to more efficiently to [sic] distribute software updates and other content to its customers."). *See also*, Fingas, Jon, "Apple's New Online Content Network Should Deliver Your Files Faster," *Engadget*, July 31, 2014, available at https://www.engadget.com/2014-07-31-apple-content-delivery-network.html ("In addition to offering 'multiple terabits per second' of bandwidth, Apple has clearly struck Netflix-like connection deals that link it directly to internet providers. If all goes well, you should get speedy app updates and media streams even when the internet is extra-busy.").

[298]    Opening Expert Report and Declaration of James Malackowski, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Malackowski Opening Report").

[299]    Trial Testimony of Phillip Schiller, p. 2739:3–7 ("Q. And Mr. Jobs then goes on to say, 'Pick whatever price you want to sell your app at, and when we sell the app through the App Store, the developer gets 70 percent of the revenues right off the top and we keep 30 percent.' Correct? A. That's right."). *See also*, "Manage App Pricing: Set a Price," *Apple*, available at https://developer.apple.com/help/app-store-connect/manage-app-pricing/set-a-price ("You'll need to set pricing for your app before you submit it for review.").

[300]    Trial Testimony of Phillip Schiller, p. 3094:8–13 ("And the price tiers are in denominations of 99 cents, correct? A. In the U.S., yes. Q. And so if a developer wanted to offer an in-app purchase for less than 99 cents, they can't do so, correct? A. Correct."). *See also*, Spencer, Graham, "A Beginner's Guide to App Store Pricing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

price tiers increased in one dollar increments until the price point of $49.99, at which point the successive gaps between price points increased.[301] Developers could select any price they want within these tiers for their apps and in-app digital content, including offering them for free (i.e., at a price set at zero).[302]

136.   At the end of 2022, Apple announced an update to the App Store's price tiers for apps and in-app digital content that expanded the number of price points significantly.[303] The lowest price tier decreased to $0.29 and the highest increased to $10,000. Instead of price increments of one dollar, the new pricing structure varies price increments depending on the price range.[304] In addition, Apple expanded the App Store pricing conventions to

---

Tiers," *MacStories*, September 1, 2015 available at https://www.macstories.net/stories/a-beginners-guide-to-app-store-pricing-tiers/ ("Apple only permits developers to sell apps at certain price points. For example, customers in the US App Store will see apps costing $0.99, $1.99, and $2.99 but they won't find any apps costing $5.20 or $2.75 […] Apple permits developers to choose from 94 price tiers, which range from US$0.99 to US$999.99. Developers pick one price tier, which applies to every country that their app is distributed in.").

[301]   Spencer, Graham, "A Beginner's Guide to App Store Pricing Tiers," *MacStories*, September 1, 2015 available at https://www.macstories.net/stories/a-beginners-guide-to-app-store-pricing-tiers/ ("Each price tier corresponds to a different price that the app will sell for on the App Store, which in the US ranges from $0.99 to $999.99. In the US App Store, the first 50 tiers increase in value in $1 increments from $0.99 (tier 1) to $49.99 (tier 50). Beyond tier 50, the prices increase in an accelerated nature, with the last 5 tiers increasing in $100 increments (e.g. $899.99 to $999.99).").

[302]   "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch ("Under the updated App Store pricing system, all developers will have the ability to select from 900 price points[.]"). *See also*, Trial Testimony of Phillip Schiller, p. 2740:7–19 ("Q. And can you describe what you meant by 'the two big important classes [of developers that will be using the App Store]'? A. Yes. There -- right from the beginning we knew there would be many developers who simply want to distribute a free app, and there are many business reasons why to do so, and then there are others that would like to use the App Store to sell their app, and we want to create an easy, secure model for doing that. Q. And were there any other classes, if you will, of developers at that time? A. No. Q. And what did Apple charge developers for free apps? A. Nothing. There was no commission for a free app.").

[303]   "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch ("Under the updated App Store pricing system, all developers will have the ability to select from 900 price points, which is nearly 10 times the number of price points previously available for most apps. This includes 600 new price points to choose from, with an additional 100 higher price points available upon request.").

[304]   The price tiers are as follows: (a) $0.29 to $9.99: prices can be set in $0.10 increments; (b) $10.00 to $49.99: prices can be set in $0.50 increments; (c) $50.00 to $199.99: prices can be set in $1.00 increments; (d) $200.00 to $499.99: prices can be set in $5.00 increments; (e) $500.00 to $999.99: prices can be set in $10.00 increments; (f) $1,000.00 to $9,999.99: prices can be set in $100.00 increments. "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch ("To provide developers around the world with even more flexibility, price points — which will start as low as $0.29 and, upon request, go up to $10,000 — will offer an enhanced selection of price points, increasing incrementally across price ranges (for example, every $0.10 up to $10; every $0.50 between $10 and $50; etc.).").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

include formats beyond the traditional "ending in .99" format.[305] Developers could avail of these new price tiers starting in March 2023.[306]

137.   In addition, over the years Apple has offered a variety of ways for developers of third-party iOS apps listed in the App Store to monetize.

138.   The option to list an app that a consumer can download without any upfront payment (henceforth, a "free app") has been available to developers since the App Store launched in 2008. [307] As discussed in **Section V.A.3.b**, the App Store does not collect any commission for transactions involving free apps. At the time, about 32 percent of the 500 or so apps offered in the United States were free apps. By 2023, free apps constituted about ███████ of apps available in the United States on the App Store.[308] Examples of apps that are free to download include: Google Maps, a navigation app; Nike Training Club, a fitness app; and NetNewsWire, a news app.[309]

139.   A developer may embed alternative monetization options into a free app. For example, developers might earn money from the sale of physical goods and services offered through

---

[305]   "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch ("In each of the App Store's 175 storefronts, developers will be able to leverage additional pricing conventions, including those that begin with two repeating digits (e.g., ₩110,000), and will be able to price products beyond $0.99 or €X.99 endings to incorporate rounded price endings (e.g., x.00 or x.90), which are particularly useful for managing bundles and annual plans.").

[306]   "App Store Pricing Upgrades Have Expanded to All Purchase Types," *Apple*, March 9, 2023, available at https://developer.apple.com/news/?id=dbrszv62.

[307]   Apple, "iPhone SDK Launch," March 6, 2008, APL–APPSTORE_00000055–087 at 081 ("When I think about the class of developers that will be using this store, I think we've really come up with the best model for the two big important classes. One is imagine you are just a free developer. You want to get it to everyone for free. Well, there's no better way to get it to everyone for free and we've enabled that and it's literally the best way, so for those developers, it's the best."). *See also*, Trial Testimony of Phillip Schiller, pp.2740:7–21 ("Q. And can you describe what you meant by 'the two big important classes' [of developers]? A. Yes. There -- right from the beginning we knew there would be many developers who simply want to distribute a free app, and there are many business reasons why to do so, and then there are others that would like to use the App Store to sell their app, and we want to create an easy, secure model for doing that.").

[308]   Hitt Opening Report, Section 5.1.3.

[309]   "Google Maps on the App Store," *Apple*, available at https://apps.apple.com/us/app/google-maps/id585027354. *See also*, "Nike Training Club: Wellness on the App Store," *Apple*, available at https://apps.apple.com/us/app/nike-training-club-wellness/id301521403; "NetNewsWire: RSS Reader on the App Store," *Apple*, available at https://apps.apple.com/us/app/netnewswire-rss-reader/id1480640210.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the app or from the sales of ads that are displayed in the apps.[310] Uber's iOS app is free to download, and Uber monetizes by charging participants when facilitating transportation, food delivery, and other services through the app.[311] Retail banks like Chase and Citibank offer free iOS apps with the objective of attracting and retaining consumers.[312] iOS game apps such as Solitaire, a card game, and 2048, a puzzle game, which are free to download, generate revenue through in-app advertisements shown to users,[313] and Apple does not levy a commission on this revenue.[314] Thus, Apple chose to enable developers to monetize their apps in a variety of ways that require no payment to Apple.

140.    Another monetization option that was available to developers when the App Store launched in 2008 involved a one-time payment by the consumer when they first download the app ("paid apps").[315] When the App Store launched, about 75 percent of the 500 apps offered

---

[310]    "Choosing a Business Model," *Apple*, available at https://developer.apple.com/app-store/business-models/ ("Free with physical goods and services. Users can purchase physical goods and services — such as clothing or food — within your app or order rides from transportation services. You earn revenue from these sales.").

[311]    "Uber - Request a Ride on the App Store," *Apple*, available at https://apps.apple.com/us/app/uber-request-a-ride/id368677368. *See also*, "Service Fee, Explained," *Uber*, available at https://www.uber.com/us/en/drive/driver-app/service-fee/; "Pricing That Works for Your Business," *Uber*, available at https://merchants.ubereats.com/us/en/pricing/.

[312]    "Chase Mobile: Bank & Invest on the App Store," *Apple*, available at https://apps.apple.com/us/app/chase-mobile-bank-invest/id298867247. *See also*, "Citi Mobile on the App Store," *Apple*, available at https://apps.apple.com/us/app/citi-mobile/id301724680; White, Martha C., "Mobile Banking? There's an App for That — And Often a Sizable Fee Too," *Time*, July 5, 2013, available at https://business.time.com/2013/07/05/mobile-banking-theres-an-app-for-that-and-often-a-big-fee-too/ ("In a case study of SunTrust bank, CEB TowerGroup found that customers who used mobile banking were 53% less likely to leave.").

[313]    "Solitaire on the App Store," *Apple*, available at https://apps.apple.com/us/app/solitaire/id593715088. *See also*, "Solitaire Ratings and Reviews," *Apple*, available at https://apps.apple.com/us/app/solitaire/id593715088?see-all=reviews ("I do like this game & I don't think there are too many ads."); "2048 (3x3, 4x4, 5x5) AI on the App Store," *Apple*, available at https://apps.apple.com/us/app/2048-3x3-4x4-5x5-ai/id1518647699; "2048 Ratings and Reviews," *Apple*, available at https://apps.apple.com/us/app/2048-3x3-4x4-5x5-ai/id1518647699?see-all=reviews  ("Hi, I [the developer] have recently reduced ad frequency (and will keep reducing it in upcoming updates). Please download the latest version.").

[314]    Caminade, Juliette and Jonathan Borck, "The Continued Growth and Resilience of Apple's App Store Ecosystem," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf ("Appendix Table 1 […] No commission: […] In-app advertising for apps that make money through in-app advertising[.]").

[315]    "Choosing a Business Model," *Apple*, available at https://developer.apple.com/app-store/business-models/ ("In the paid model, users pay once to download your app and use all of its functionality. There are no additional charges or in-app purchases. You earn revenue from the sales of your app.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

were paid apps.[316] Examples of paid apps include: Procreate, a graphics and design app; Stardew Valley, a game app; and the Elements, an education app.[317] Although monetizing by charging consumers a one-time download fee remains available to App Store developers, it has, over time, accounted for a progressively lower fraction of developer earnings on the App Store,[318] as other monetization strategies have been made available.

141. On October 15, 2009, Apple launched *in-app purchases*, a significant innovation that expanded monetization possibilities for developers.[319] Prior to this option being available, developers of free apps could not offer consumers the opportunity to "unlock" additional functionalities for a fee after trying out the app at no cost.[320] This was an important innovation because it enabled what is commonly called a *freemium* monetization strategy: developers may offer apps that are initially "free apps," and subsequently monetize from a subset of consumers by offering access to additional or "premium" functionalities that

---

[316] Friedman, Lex, "The App Store Turns Five: A Look Back and Forward," *Macworld*, July 8, 2013, available at https://www.macworld.com/article/221393/the-app-store-turns-five-a-look-back-and-forward.html ("The App Store launched on July 10, 2008, with a whopping 552 apps on its virtual shelves; the most common prices were $1 and $10, and there were a mere 135 free apps."). (552 − 135) ÷ 552 ≈ 75 percent.

[317] "Procreate on the App Store," *Apple*, available at https://apps.apple.com/us/app/procreate/id425073498. *See also*, "Stardew Valley on the App Store," *Apple*, available at https://apps.apple.com/us/app/stardew-valley/id1406710800; "The Elements by Theodore Gray on the App Store," *Apple*, available at https://apps.apple.com/us/app/the-elements-by-theodore-gray/id364147847.

[318] Hitt Opening Report, Section 8.3. *See also,* Caminade, Juliette and Jonathan Borck, "The Continued Growth and Resilience of Apple's App Store Ecosystem," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf ("Monetization options have expanded: When the App Store started, developers could only monetize their apps directly via the App Store through app purchases; now, app purchases are responsible for less than 1% of earnings.").

[319] Kincaid, Jason, "Apple Announces In-App Purchases for Free iPhone Applications," *TechCrunch*, October 15, 2009, available at https://techcrunch.com/2009/10/15/apple-announces-in-app-purchases-for-free-iphone-applications/ ("Apple has just announced that it will now support in-app purchasing for free applications on the App Store. This is absolutely huge news for developers, and will likely lead to a fundamental shift in the way applications are marketed and priced. It's hard to overstate just how much this will change the App Store.").

[320] Trial Testimony of Phillip Schiller, pp.2768:23–2769:14 ("Q. And let's talk about -- we've heard about in-app purchases, and were in-app purchases possible on the App Store when it launched in 2008? A. No. Q. Why not? A. Our model, when we started, was the idea that a developer would want to sell their application, and so we created the ability to pay before the user downloads for getting that application if that's what the developer wanted, and that was the only business model involving any transaction we created for the store for the start of it. Q. And did that change at some point? A. Yes. Q. Again, why we're here. And why did that change; in other words, what prompted the change? A. Input from developers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumers have the option to pay for.[321] In-app digital content purchases include digital goods that consumers can use inside an app, additional functionalities to improve the capabilities of the app, and subscriptions.[322] The freemium model is a popular monetization strategy on the App Store.[323] Examples of apps that monetize through a freemium strategy include: Candy Crush Saga, a game that offers in-app digital content purchases for additional functionalities such as additional "turns" to complete a game level; Sweat, a fitness app which offers in-app purchases of fitness subscriptions; and Headspace, a mental health and mindfulness app which offers subscriptions that grant the consumer access to a broader range of mindfulness and meditation resources.[324]

142. The capability of in-app purchasing also enables the *paymium* monetization strategy, under which consumers pay a fee to download the app, and subsequently also have the option of buying additional digital goods and services through in-app purchases. Much like the *freemium* model, what is purchased in-app can include digital goods that consumers can use inside an app, additional functionalities to improve the capabilities of the app, or subscriptions.[325] Examples of apps that monetize through a *paymium* strategy include:

---

[321]  Roma, Paolo and Daniele Ragaglia, "Revenue Models, In-App Purchase, and the App Performance: Evidence from Apple's App Store and Google Play," *Electronic Commerce Research and Applications*, Vol. 17, No. 1567-4223, 2016, pp. 173–190, pp. 174–175 ("[I]n the Apple's App Store, [the] freemium model[] [is] shown to be more effective than the free model in terms app revenue performance [*sic*]. […] [I]n-app purchase is shown to positively influence the app revenue performance in Apple's App Store[.]").

[322]  "Choosing a Business Model," *Apple*, available at https://developer.apple.com/app-store/business-models/ ("With freemium models, users pay nothing to download your app and are offered optional in-app purchases for premium features, additional content, subscriptions, or digital goods. Freemium apps are accessible to all users, regardless of whether or not they choose to spend, and offer the option to pay to enhance or customize the experience.").

[323]  Dogtiev, Artem, "App Monetization Strategies (2023)," *Business of Apps*, February 27, 2025, available at https://www.businessofapps.com/marketplace/app-monetization/research/app-monetization-strategies ("Today the freemium model dominates the landscape of app monetization strategies of popular mobile apps.").

[324]  "Candy Crush Saga on the App Store," *Apple*, available at https://apps.apple.com/us/app/candy-crush-saga/id553834731;  "Sweat: Fitness App For Women on the App Store," *Apple*, available at https://apps.apple.com/us/app/sweat-fitness-app-for-women/id1049234587; "Headspace: Sleep & Meditation on the App Store," *Apple*, available at https://apps.apple.com/us/app/headspace-sleep-meditation/id493145008; "What Do I Get with a Headspace Subscription?," *Headspace*, available at https://help.headspace.com/hc/en-us/articles/360000211347-What-do-I-get-with-a-Headspace-subscription.

[325]  "Choosing a Business Model," *Apple*, available at https://developer.apple.com/app-store/business-models/ ("In this combination of the paid and freemium models, users pay to download your app and have the option to buy additional features, content, or services through in-app purchases if they want to engage more deeply. It offers the possibility of lowering the app's download price while using in-app purchases for ongoing monetization.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Minecraft, a game which offers in-app digital content purchases for additional functionalities to enhance the gaming experience and Due, a productivity app which grants consumers default access to all functionalities released within one year of purchase and offers a subscription allowing consumers to unlock any new functionalities for an additional year.[326]

143.    To summarize: Apple launched the App Store at a time when the success of third-party app distribution was far from guaranteed. In fact, some app marketplaces that launched concurrently or soon after failed. Apple made several important strategic choices when it launched the App Store in 2008 to address potential issues that could have deterred the App Store's success and has preserved many of these choices to date. To facilitate the distribution of safe, trustworthy, and high-quality apps and to minimize security, privacy, and reliability risks for consumers and developers, Apple chose to review, approve, and distribute all apps and updates for iOS devices. Apple also has and continues to create and provide IP-protected proprietary tools, technologies, and services to developers to further facilitate the development and distribution of valuable apps. Apple also chose to provide free access and use of the App Store to consumers, while implementing a revenue sharing model with developers. Apple set the App Store's commission rate at 30 percent, a rate which was (and continues to be) aligned with the rates of other apps stores, and has selectively lowered this commission rate since 2008. Finally, developers set their own app prices and Apple enabled developers to rely on different monetization strategies, including free apps with ads, *freemium* apps (free apps with paid in-app digital content), paid apps, and *paymium* apps (paid apps with paid in-app digital content). These different monetization strategies let developers cater to different consumer preferences.

### B.    Analysis of the App Store as a Two-Sided Transaction Platform

144.    Contrary to the view of the economic experts on both sides in the *Epic v. Apple* matter that the App Store is a two-sided transaction platform—a fact found by this Court and upheld

---

Successful paymium apps offer premium design, functionality, and content, as well as advanced features intended to complement the experience.").

[326]    "Minecraft: Play With Friends on the App Store," *Apple*, available at https://apps.apple.com/us/app/minecraft-play-with-friends/id479516143. *See also*, "Due - Reminders & Timers on the App Store," *Apple*, available at https://apps.apple.com/us/app/due-reminders-timers/id390017969.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

by the Ninth Circuit[327]—I understand that Plaintiffs here claim that the App Store is not a two-sided transaction platform but rather "an exclusive distributor" of iOS apps,[328] that is, a one-sided retail business that "sells the apps directly to iPhone owners,"[329] and that these apps are provided by developers, who are "upstream suppliers" to Apple, and who "contract with Apple to make the apps available to iPhone owners."[330] In this section, I explain why, contrary to the Plaintiffs' claim, the App Store is not a one-sided retail business but rather a two-sided transaction platform as described in **Section IV.A**. That is, the App Store connects developers and consumers while implementing services and governance mechanisms consistent with those of other two-sided transaction platforms to facilitate transactions between developers who set prices for their own apps and in-app digital content and consumers who buy apps from said developers (with Apple acting as the developers' agent). Consumers do not pay any fees to Apple for participating in these transactions.

---

[327] Trial Testimony of Richard Schmalensee, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 12, 2021 ("Trial Testimony of Richard Schmalensee"), p. 1938:15–17 ("A. [The App Store is] a two-sided platform, and one wants to be clear. But it is also clear that the Apple people treat it like a two-sided transaction platform."); Trial Testimony of David Evans, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 11, 2021 ("Trial Testimony of David Evans"), p. 1347:7–9 ("Q. […] Now, the App Store is a two-sided transaction platform; isn't that right? A. Yes, it is."); Epic Ninth Circuit Opinion, p.80 ("Epic consumes the app transactions that Apple offers in a two-sided market[.]").

[328] Third Amended Complaint, ¶¶ 51, 47 ("By designing iOS as a closed system, installing security measures and program locks to prevent Third Party App downloads, establishing the App Store as the exclusive worldwide distributor of iOS apps, enforcing the App Store's exclusive distributor status by terminating apps developers who sold apps in competition with Apple, voiding the warranties of iOS Devices consumers who bought competing apps, and denying authorization of apps with in-app purchasing features that do not meet Apple's payment requirements, Apple has since June 2007 willfully acquired and maintained a monopoly in the iOS apps aftermarket and has positioned itself as the one and only distributor of iOS apps on the entire planet."), ("Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iOS Devices customers or collect payments from the customers."). *See also*, Opinion, *Apple, Inc., Petitioner, v. Pepper, et al.*, No. 17–204, Supreme Court of the United States Court of Appeals for the Ninth Circuit, May 13, 2019 ("Apple Pepper Opinion"), p. 1 ("The consumers argue, in particular, that Apple has monopolized the retail market for the sale of apps and has unlawfully used its monopolistic power to charge consumers higher-than competitive prices. A claim that a monopolistic retailer (here, Apple) has used its monopoly to overcharge consumers is a classic antitrust claim.").

[329] Apple Pepper Opinion, p. 2 ("Through the App Store, Apple sells the apps directly to iPhone owners.").

[330] Apple Pepper Opinion, p. 2 ("For the most part, Apple does not itself create apps. Rather, independent app developers create apps. Those independent app developers then contract with Apple to make the apps available to iPhone owners in the App Store."), p. 12 (referencing "upstream app developers" and "upstream suppliers").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

145. In *Amex*, the Supreme Court noted that two-sided platforms "offer[] different products or services to two different groups who both depend on the platform to intermediate between them."[331] As I described in **Section V.A**, the App Store offers different services to its two groups, app developers and iOS users, both of whom depend on the App Store to intermediate their interaction. Further, the Court noted that "[…] two-sided transaction platforms […] are different. These platforms facilitate a single, simultaneous transaction between participants."[332] The App Store correspondingly facilitates transactions between app developers and iOS users. The App Store generates value for both groups when there is a transaction—an app download or an in-app digital content purchase—between a consumer and a developer. If the App Store sells one transaction's worth of services to an app developer, it must simultaneously sell one transaction's worth of services to an iOS user.[333] The App Store thus features a proportional interdependence between participants in two groups that engage in transactions with each, and "the presence and observability of a transaction between the two groups of platform users" is consistent with its status as a two-sided transaction platform.[334]

146. In **Section IV.A**, I explained how two-sided transaction platforms display indirect network effects, a point also noted by the Supreme Court in *Amex*: "Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected

---

[331]   Amex Opinion, p. 2.

[332]   Amex Opinion, p. 13.

[333]   Amex Opinion, p. 13 ("For credit cards, the network can sell its services only if a merchant and cardholder both simultaneously choose to use the network. Thus, whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder. It cannot sell transaction services to either cardholders or merchants individually.").

[334]   Filistrucchi, Lapo et al., "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, Vol. 10, No. 2, June 2014, pp. 293–339, p. 298 ("Two-sided transaction markets, such as payment cards, are instead characterized by the presence and observability of a transaction between the two groups of platform users."); Klein, Benjamin et al., "Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," *Antitrust Law Journal*, Vol. 73, No. 3, July 2011, pp. 571–626, p. 580 ("In particular, while a newspaper publisher supplies two distinct but interrelated products, newspapers for readers and a medium for advertisers, a payment card system supplies only one product, payment card transactions that are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment. Accordingly, the two sides of a payment card system are not only interdependent, as are the two sides of the newspaper market, but their consumption of payment card transactions must be directly proportional. The two sides of the market can be thought of as providing inputs into the supply by the payment system of this single product.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

pricing and demand."[335] The App Store displays indirect network effects—an increase in participation by developers increases the quantity and variety of available third-party iOS apps, which increases value for consumers. Symmetrically, an increase in participation by consumers benefits developers by increasing the number of potential users of a developer's app. The App Store displaying indirect network effects is consistent with it being a two-sided transaction platform.[336]

147.    Further, in **Section IV.C**, I explained how two-sided transaction platforms offer services and implement governance mechanisms to encourage participation; facilitate discovery, matching, and transacting; and facilitate trusted and safe interactions. Consistent with its status as a two-sided transaction platform characterized by strong indirect network effects, the App Store has established services and governance mechanisms to achieve each of these goals.

> 1.    *The App Store Encourages and Enhances Participation on Both Sides of the Platform*

148.    As with other two-sided transaction platforms, the success of the App Store depends on Apple being able to encourage and enhance the participation of developers and consumers (*see* **Section IV.D**). To achieve these goals, the App Store has implemented services and governance mechanisms, consistent with those of other two-sided transaction platforms, to attract and secure the continued participation of consumers and developers. Encouraging and enhancing participation was, and continues to be, especially important for a two-sided transaction platform like the App Store because of indirect network effects. Attracting consumers encourages developers to join and vice versa.

149.    To attract demand, the App Store has, since its inception, imposed no fees on consumers. Access to the App Store remains free for iOS device users. It has also attracted demand by

---

[335]    Amex Opinion, p. 13.

[336]    While my discussion here is focused on two-sided transaction platforms, all two-sided platforms generally display indirect network effects. *See, for example,* Belleflamme, Paul and Nicolas Neysen, "Understanding and Activating Network Effects," *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, Routledge, London, 2023, 1st Ed., p. 33 ("We defined platforms as managers of network effects. Obviously, if network effects remain virtual, there will be nothing to manage. So, your first job as a platform operator is to activate the network effects. That is, you must find ways to attract users to the platform and allow them to interact as smoothly as possible.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

taking steps to increasing the variety of available apps, reducing quality uncertainty, and simplifying transacting steps for consumers. Through its App Review process, Apple reviews apps for reliability, performance, security, privacy, safety, transparency, and other considerations, including to evaluate that an app and the available in-app digital content does what they are described as doing by the developer.[337] In **Section VI.A**, I discuss some associated details, all of which serve to lower quality uncertainty and build trust, thereby attracting demand. Apple's internal surveys of consumers consistently show that security and privacy are important for consumers and are among the top factors influencing a consumer's decision to purchase an iPhone.[338]

150.    Over 99.99 percent of apps available on the App Store are provided by third-party developers rather than by Apple.[339] Apple uses a variety of strategies to attract developers and encourage the creation of new apps.

---

[337]    Cusumano, Michael A., Anabelle Gawer, and David B. Yoffie, *The Business of Platforms: Strategy in the Age of Digital Competition, Innovation, and Power*, Harper Business, 2019, pp. 116-117 ("When Armin Heinrich posted his app called 'I Am Rich' on Apple' s App Store in 2008, and sold it for $999.99, the challenges of governing a platform became apparent to Apple. The app itself did nothing except show a glowing red stone with the text: 'I am rich, I deserv [sic] it, I am good, healthy & successful.' Eight people bought it, and Apple made $2,400 in revenues (which was mostly profit). Obviously a scam of sorts, Apple had to decide how to govern its platform: Should it take the money and run, or establish and enforce standards for its end users? Apple chose to delete the app and create relatively strict standards that all app developers had to meet."). *See also*, "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("The guiding principle of the App Store is simple—we want to provide a safe experience for users to get apps and a great opportunity for all developers to be successful. We do this by offering a highly curated App Store where every app is reviewed by experts and an editorial team helps users discover new apps every day. We also scan each app for malware and other software that may impact user safety, security, and privacy. These efforts have made Apple's platforms the safest for consumers around the world.").

[338]    Apple, "iPhone Buyer: FY22-Q1 | Switcher Analysis," 2021, APL–APPSTORE–11110923–1076 at 970 (66 percent of consumers in the United States upgrading their iPhone and 66 percent of consumers in the United States switching to iPhone considered security and privacy to be "extremely important" in their purchase decision); Apple, "iPhone Buyer FY21-Q1 Global Report," 2021, APL_APPSTORE_11109980–251 at 049 (66 percent of consumers in the United States considered security and privacy to be "extremely important" in their purchase decision); Apple, "iPhone Buyer FY21-Q3 Global Report," 2021, APL_APPSTORE_11110316–557 at 349 (65 percent of consumers in the United States upgrading their iPhone and 54 percent of consumers in the United States switching to iPhone considered security and privacy to be "extremely important" in their purchase decision); Apple, "iPhone Buyer: FY21-Q4 Global Report," 2021, APL–APPSTORE–11110558–738 at 631 (66 percent of consumers in the United States considered security and privacy to be "extremely important" in their purchase decision); Apple, "iPhone Buyer: FY22-Q1 Marcom Report," 2021, APL–APPSTORE–11110827–922 at 858 (67 percent of consumers in the United States considered security and privacy to be "extremely important" in their purchase decision).

[339]    Caminade, Juliette and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Analysis Group*, April 2022, available at https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

151. Apple has made investments in developing tools, technologies, and services for developers, (*see* **Section V.A.3.b**), which lower knowledge and financial barriers that otherwise might be faced by developers.[340]

152. The App Store's revenue sharing model charges developers a commission rate on certain transactions. The App Store's flexible monetization options allow developers to provide free apps and monetize using alternative options like advertisements,[341] provide free apps and charge consumers for in-app digital content purchases, charge consumers for their app downloads, or charge consumers for both app downloads and in-app digital content purchases (*see* **Section V.A.3.c**). This flexibility attracts developers whose apps may be suited to varying business models and which cater to consumers with different preferences and willingness to pay. It also, in turn, attracts consumer demand by expanding the range of transactions they might engage in.

### 2. *The App Store Facilitates Discovery, Matching, and Transacting*

153. To facilitate transactions happening and increase the likelihood that they are of high value to both consumers and developers, consistent with what other two-sided transaction platforms do, the App Store offers services and governance mechanisms to facilitate discovery, matching, and the successful completion of transactions. Below I discuss some examples of these services and governance mechanisms.

---

app-store.pdf, p. 1 ("The App Store is home to about 2 million apps with only about 60 from Apple, meaning that more than 99.99% of apps are third-party apps.").

[340] Trial Testimony of Michael Schmid, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021 ("Trial Testimony of Michael Schmid"), p. 3239:3–22 ("Q. And we'll go through the categories you mentioned, but why does Apple make these investments in developers? A. We want to be the best platform to develop a game or app in the world. Q. Okay. And does Apple have to compete for developers to -- to compete, in other words, for developers to come to the platform? A. Absolutely. I think that it would be silly to suggest any developer that's looking to grow a business wouldn't be thinking about mobile as a huge opportunity. However, there's lots of options even within mobile. We want to do more than just be a -- a checkbox for a platform that a developer is going to ship a game or app on. We want to be the -- the primary platform. We want to be the place where they're spending time and energy and -- and committing to our user base that they're going to really focus on building a great experience for our users on the App Store."). Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733.

[341] In contrast, other channels like Steam do not allow developers to monetize their apps through advertisements. Wright, Steven T., "Valve Seemingly Bans All Steam Games That Require Watching Advertisements to Play," *GameSpot*, Februry 10, 2025, available at https://www.gamespot.com/articles/valve-seemingly-bans-all-steam-games-that-require-watching-advertisements-to-play/1100-6529356/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

154.    To enable consumers to find the apps they are looking for and discover new apps, the App Store provides a search engine that enables consumers to conduct keyword-based searches that return ranked results highlighting apps that may align with the consumer's preferences. It further reduces consumer search costs by providing personalized recommendations and targeted product landing pages that showcase particular content from each app.[342] The App Store gives consumers the option to turn on personalization features that use information about their prior behavior on the App Store (including app downloads and purchases) as well as data on app usage obtained from their device to provide recommendations about apps, in-app digital content, and in-app events that are better tailored to what they might find interesting or desirable.[343]

155.    On the developer side, the App Store facilitates, among other things, matching between developers and consumers by providing developers with recommendations on how to create app descriptions, how to choose app names, and how to select the best app category.[344] Each of these services increases the likelihood that consumers can discover and match with the right developer.

---

[342]    "Apple Introduces New Developer Tools and Technologies to Create Even Better App," *Apple*, June 7, 2021, available at https://www.apple.com/newsroom/2021/06/apple-introduces-new-developer-tools-and-technologies-to-create-even-better-apps/ ("With more apps and games featuring events like live competitions, movie premieres, live-streamed experiences, and much more, it's now easier for users to discover these events right on the App Store — in personalized recommendations, editorial selections, search results, and on app product pages. This greatly expands the reach of developers' events — helping connect them with new users, keep their current users informed, or reconnect them with past users. It's a whole new way for developers to showcase what's happening in their apps.").

[343]    "App Store & Privacy," *Apple*, available at https://www.apple.com/legal/privacy/data/en/app-store/ ("We use your interactions with the App Store to help you discover the content that's most relevant to you. For example, we recommend content that we think will be of interest to you based on what you've previously searched for, viewed, downloaded, updated, or reviewed in the App Store. We also use your purchase history, including in-app purchases, subscriptions, and payment methods together with account information derived from your Apple Account, such as the devices you use and new devices you activate. To make better recommendations, we also use aggregate information about app launches, installs, and deletions from users who choose to share device analytics with Apple, and aggregate information about app ratings. The App Store uses local, on-device processing to enhance our recommendations. Using app usage data stored on your device — such as the apps you frequently open, the time you spend using certain apps, and your app installs and uninstalls — the App Store can suggest apps and in-app events that are more relevant to you. The information Apple receives about your usage of the stores includes information about the personalized content you tap and view.").

[344]    "Optimizing for App Store Search," *Apple*, available at https://developer.apple.com/app-store/search/ ("The App Store makes it easy for people around the world to find apps, games, and content. Search results include developers, in-app purchases, in-app events, categories, editorial stories, tips and tricks, and collections. Apps appear in search results with the app name, icon, and subtitle displayed. Depending on the platform and image orientation, the app's single rating and up to three screenshots or app previews are also shown.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

156.    The App Store also enables commerce tools, technologies, and services, including payment and settlement mechanisms, to increase the ease of transacting for consumers and developers. The App Store's payment system lowers the number of steps consumers need to take in order to pay for apps and in-app digital content compressing them into a single tap/click, thereby eliminating the barriers to transacting that may arise from having to enter credit card information or go through multiple validation steps.[345] The App Store also limits the third parties that can access a consumer's payment information, while storing this payment information in a secure and encrypted manner.[346] In addition, the App Store facilitates discovery, matching, and transacting by giving consumers options to review app preview videos that offer consumers information into an app's functionality,[347] access to

---

[345]    "Apple Pay," *Apple*, available at https://www.apple.com/apple-pay/ ("To get started on iPhone, open the Wallet app and tap the plus symbol. Then add a credit or debit card by tapping the back of your iPhone with your eligible card. You'll have the option to add your card to your other devices at the same time. When you want to pay, just double-click, tap, and you're set.").

[346]    Trial Testimony of Phillip Schiller, p. 3165:13–25 ("Q. And when an iPhone user submits payment information, a credit card number to Apple, how is that information stored? A. There is a payment processing system. Again, I'm not the expert of all that. That's part of the commerce engine. And it's stored there in a secure manner. And using technologies like our Apple pay, we are even able to transact without your credit card number being shared with a vendor in order to make that transaction happen. There's a bunch of processes around protecting user privacy with payment transactions. Q. Do any Apple employees have access to that information? A. No. Q. Does Apple ever sell data? A. No."). *See also,* "App Store & Privacy," *Apple*, available at https://www.apple.com/legal/privacy/data/en/app-store/ ("We use your personal data to provide the services and features in the App Store and other Apple online stores. This information includes, for example, your account and payment information, which you can access and change in settings, and your purchase history. […] We are obligated to provide some non-personal data to strategic partners that work with Apple […] Developers can access usage information, provided by users who opt in […]. Developers can access receipt information for purchases and refunds of their products and services in the App Store. Receipts do not include personal data […]."); "Apple Pay Security and Privacy Overview," *Apple*, available at https://support.apple.com/en-us/101554 ("When you add a credit, debit, prepaid, or transit card (where available) to Apple Pay, information that you enter on your device is encrypted and sent to Apple servers. If you use the camera to enter the card information, the information is never saved on your device or photo library. Apple decrypts the data, determines your card's payment network, and re-encrypts the data with a key that only your payment network (or any providers authorized by your card issuer for provisioning and token services) can unlock.").

[347]    Trial Testimony of Matthew Fischer, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021 ("Trial Testimony of Matthew Fischer"), pp. 922:18–922:22 ("Q. And can you describe your responsibilities in running whatever aspect of that store is? A. Sure. I focus on creating a great app discovery experience for our customers and helping developers succeed on the App Store."), pp. 927:13–928:10 ("Q. […] What does that [the App Store product] team do? A. So my product team is responsible for creating a great app discovery experience for our customers and also to support our developers with great tools and technologies. So there's a consumer-facing part of that team that focuses on discovery, you know, features like search, browse, and personalization. […] Q. And you mentioned that as part of that, the consumer facing team, I think you mentioned, the product team itself focuses on discovery features. And why is that issue app discoverability important? A. App

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

app downloads and in-app digital content purchases across all iOS devices,[348] sharing of app and in-app digital content purchases through options such as "Family Sharing," tools to allow parents to manage their children's app purchases and usage,[349] and options to track and manage their app-related purchases and subscriptions in one place.[350]

157. The App Store eases transacting for app developers by handling agreements directly with payment providers, which substantially lower a developer's cost of transacting.[351] In addition, the App Store also streamlines app delivery and management for developers. The

---

discoverability is incredibly important for us and for everyone that works at the App Store. First and foremost, we love helping our customers discover [great] apps and games that can help them get the most out of their Apple devices and we also love helping developers reach more users and help grow their business. And so I think both sides of that coin are really important and that's why I think discoverability is important."). *See also,* "Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/; "iPhone Top Charts on the App Store," *Apple*, available at https://apps.apple.com/us/charts/iphone.

[348] "Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing ("Access purchases across all your devices[:] After you sign in with you Apple Account, you can redownload your previously purchased apps, music, and movies, and TV shows [*sic*].").

[349] Trial Testimony of Phillip Schiller, pp. 2795:16–2796:2 ("Q. And we've heard talk at various times here about things called parental controls and things referenced as 'ask to buy.' Are you familiar with those? A. I am. Q. And do the IAP APIs interact with those functions in the commerce engine? A. Exactly. The commerce engine provides the ability to handle things like 'ask to buy' that you want to set up that you have to be asked each time you make a purchase to protect your purchases, and that commerce engine provides that capability to all the payment choices, pay to download, in-app purchase, subscription. Exactly."). *See also,* "Approve What Kids Buy with Ask to Buy," *Apple*, available at https://support.apple.com/en-us/105055 ("With Ask to Buy, when kids want to make an eligible purchase — such as buying an app from the App Store or a TV show, movie, or book from Apple Media Services — they send a request to the family organizer. The family organizer can use their own device to approve or decline the request. […] If the family organizer approves the request and completes the purchase, the item automatically downloads to the child's device. If the family organizer declines the request, no purchase or download will take place.").

[350] Trial Testimony of Phillip Schiller, pp. 2792:7–2793:7 ("Q. And you mentioned earlier what you called the – the commerce engine at Apple. Can you tell us what you were referring to. A. Yes. The App Store is sort of built with a commerce engine that handles many of the responsibilities of functioning and securing the App Store[.] […] Q. And what else is the commerce engine used for? And, for example, do paid downloads go through the commerce engine? A. They do. Q. And do free downloads go through the commerce engine? A. They do. Q. If they're free, why do they go through the commerce engine? A. Well, you still want to make sure you have a valid developer, safe developer account. You want to make sure you have a valid user. We still protect our developers from fraudulent users, even if they have a different business model like advertising. We worry about the transaction and the download of that application and to make sure that when you later look at the App Store, the list of all the apps you've acquired, even the free ones are listed there. The commerce engine provides the information to support that. So there are many functions that the commerce engine supports, even for free apps as well as paid apps."). *See also,* "Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing.

[351] "In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/ ("Apple handles worldwide end-to-end payment processing — from decrypting payments, to validating tokens, to receiving payments — so you don't have to coordinate with multiple payment providers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

App Store Content Delivery Network allows developers to efficiently manage high consumer download volumes,[352] and the App Store's automatic update features ensure timely delivery of new functionalities while reducing support costs.[353]

158.   Finally, the App Store's use of price tiers aligns with the use by other two-sided transaction platforms of pricing guidelines to simplify consumer decision-making, enhance price transparency, and the likelihood of a successful match and subsequent transaction (*see* **Section V.A.3.c**).[354]

> 3.    *The App Store Facilitates Trusted and Safe Interactions Between Consumers and Developers*

159.   Like other two-sided transaction platforms, the App Store offers services and governance mechanisms for detecting if apps and in-app digital content offered by developers are represented accurately and meet minimum security, safety, privacy, reliability, and other thresholds, thus improving user experience, lowering quality uncertainty, and lowering the likelihood of adverse post-transaction outcomes for developers and consumers. These services and governance mechanisms, designed to facilitate trusted and safe interactions, aid in increasing transaction volumes, which is aligned with the App Store's commission-based revenue model, while also benefiting developers.

160.   The App Store offers multiple services and governance mechanisms to reduce adverse transaction outcomes. The App Review process (which I discussed in **Section V.A.3.a** and is addressed in detail by Professor Halderman[355]) includes steps that contribute to preventing a consumer's exposure to dangerous content that could cause harm online (for example, the installation of malware or being exposed to offensive content) or offline (for example, the provision of inaccurate medical advice or the encouragement of harmful

---

[352]   Hodgkins, Kelly, "Apple's Content Delivery Network Now Live, Making Faster OS X/iOS Downloads Possible," *MacRumors*, July 31, 2014, available at https://www.macrumors.com/2014/07/31/apple-content-delivery-network/ ("Apple is paying for this direct route in order to avoid congestion and other issues during times of high volume traffic[.]").

[353]   "How to Turn On Automatic App Updates," *iPhoneLife*, available at https://www.iphonelife.com/content/how-to-set-your-iphone-apps-to-update-automatically ("When you enable automatic updates for your apps, the iPhone will update all your apps at once instead of requiring you to manually update each app individually.").

[354]   Berger Opening Report, Section VI.

[355]   Halderman Opening Report, Section III.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

behaviors).[356] Further, the App Store does not share a consumer's credit card information with developers. The App Store uses its own technology and human oversight to detect and protect against the use of stolen credit cards for fraudulent activities.[357] In addition, the App Store aids consumers by increasing transparency into the capabilities and quality of apps. For example, all apps are required to have privacy labels, which allow consumers to understand what data the apps might collect about them.[358] All of these services and governance mechanisms serve to increase the frequency and quality of transactions, benefiting developers and aligning with the App Store's commission-based revenue model.

161. Like many other two-sided transaction platforms, the App Store provides a peer rating system which consumers can use to rate apps and write reviews about them.[359] Apple uses a variety of methods to detect and remove fake reviews from the App Store,[360] increasing the reliability of the rating system and transparency into app quality and capability.

---

[356] "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("We also scan each app for malware and other software that may impact user safety, security, and privacy. These efforts have made Apple's platforms the safest for consumers around the world. […] Apps should not include content that is offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy. […] Medical apps that could provide inaccurate data or information, or that could be used for diagnosing or treating patients may be reviewed with greater scrutiny. […] Apps that encourage consumption of tobacco and vape products, illegal drugs, or excessive amounts of alcohol are not permitted.").

[357] "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Additionally, credit and debit card numbers are never shared with developers, thus eliminating another risk factor in the payment transaction process […] Apple also leverages a combination of advanced technology and human review to detect when a stolen credit card is being used for illicit purposes.").

[358] "App Privacy Details on the App Store," *Apple*, available at https://developer.apple.com/app-store/app-privacy-details/ ("The App Store helps people better understand an app's privacy practices before they download the app on any Apple platform. On each app's product page, users can learn about some of the data types the app may collect, and whether that data is linked to them or used to track them. [Developers will] need to provide information about [their] app's privacy practices, including the practices of third-party partners whose code [they] integrate into [their] app, in App Store Connect. This information is required to submit new apps and app updates to the App Store."). *See also*, Apple, "App Store Product Page Privacy Nutrition Labels," December 2019, APL-APPSTORE_10860403–427 at 406.

[359] "Ratings, Reviews, and Responses," *Apple*, available at https://developer.apple.com/app-store/ratings-and-reviews/ ("Customers provide ratings and reviews on the App Store to give feedback on their experience with an app and help others decide which apps they'd like to try. You can ask for ratings and respond to reviews to improve your app's discoverability, encourage downloads, and build rapport with people who use your app.").

[360] "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Every day, teams across Apple monitor and investigate fraudulent

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

162.   The App Store also provides systems through which consumers can report quality issues, offensive content, and possible instances of fraud, and other problems that may not have been detected during the App Review process.[361] The App Review Compliance team investigates these reports and works with developers to facilitate the adherence of the reported apps with the App Store Guidelines.[362]

163.   In addition, the App Store offers services and governance mechanisms to lower the likelihood that developers face adverse transaction outcomes. For example, Apple identifies and removes fraudulent customer accounts created to post fake ratings and reviews—which can harm developer reputations or app quality perceptions, or might harm consumers by causing them to obtain an app that does not do what they thought the app

---

activity on the App Store, and utilize sophisticated tools and technologies to weed out bad actors and help strengthen the App Store ecosystem. […] In 2023, with over 1.1 billion ratings and reviews processed, Apple removed nearly 152 million fraudulent ratings and reviews from the App Store.").

[361]   "Report A Problem," *Apple*, available at https://reportaproblem.apple.com. *See also*, "Apple Developer Is Now on Wechat," *Apple*, February 24, 2025, available at https://developer.apple.com/news/?id=j5uyprul ("Now App Store product pages on iOS 15, iPadOS 15, and macOS Monterey display a 'Report a Problem' link, so users can more easily report concerns with content they've purchased or downloaded. This feature is currently available for users in Australia, Canada, New Zealand, and the United States, and will expand to other regions over time. In addition, users worldwide can now choose from 'Report a scam or fraud' and 'Report offensive, abusive, or illegal content' options at reportaproblem.apple.com, and report issues with their apps, including free apps that do not offer in-app purchases. Apple's App Review, Discovery Fraud and Live Moderation, and Financial Fraud teams investigate reported problems for signs of fraud, manipulation, abuse and other violations of the App Store Review Guidelines, and will reach out to developers to resolve issues.").

[362]   Trial Testimony of Trystan Kosmynka, pp. 1120:24–1122:4 ("Q. What happens when a problem app is brought to your attention? A. So the team will investigate the app. […] One example of this is we had a report of an app that was collecting location data and sending that location data to data brokers without user consent. And so by looking at the app, doing signal collection, we could track this back to a third-party developer SDK that was behaving in this manner, and we could find all of the apps that happened to have that SDK. We could let the developers of those apps know that this is what their app is doing, how it is behaving, and that they need to resolve it. So people, signal investigation, and then using the tools to assist us in having the most efficient, high quality impact we can have for our customers."). *See also*, Apple, "Apple Internal Email Communication," December 12, 2019, APL-APPSTORE_11350207–215 at 207–212; Apple, "Apple Internal Email Communication," February 24, 2022, APL-APPSTORE_11077016–026 at 016–021; Apple, "Apple Internal Email Communication," October 16, 2018, APL-APPSTORE_11042424–501 at 425–429.

107

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

would do.[363] The App Store also protects the reputation of developers by rejecting pirated or copycat apps during the App Review process, as discussed in **Section VI.C.2.b**.[364]

164.    To summarize: contrary to Plaintiffs' view that the App Store is a retailer that sells to consumers apps manufactured and supplied by developers, the App Store is a two-sided transaction platform that facilitates transactions between app developers and iOS users, generating value for both groups when there is a transaction between a consumer and a developer whose associated price is determined by the developer, and collecting a commission on those digital content transactions for which the developer chose a non-zero price. Like other two-sided transaction platforms, the App Store displays strong indirect network effects. Consistent with the actions of other two-sided transaction platforms, the App Store offers services and governance mechanisms designed to increase the volume and quality of transactions that take place on the App Store, and that encourage and enhance participation from both consumers and developers; facilitate discovery, matching, and transacting; and facilitate trusted and safe transactions.

### C.      Economic Considerations When Analyzing Two-sided Transaction Platforms such as the App Store

165.    As established in **Section V.B**, the App Store is a two-sided transaction platform that facilitates transactions between app developers and consumers. I explain in this section why the fact that the App Store is a two-sided transaction platform has implications for market definition, the assessment of market power, and the evaluation of competitive effects. Assuming that the App Store is instead a retailer of apps, as I understand Plaintiffs do, ignores the two-sided nature of the App Store and the importance of indirect network

---

[363]  "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Apple takes a number of measures to protect users and developers from ill-intended parties. These accounts tend to be bots that are created for the purposes of spamming or manipulating ratings and reviews, charts, and search results, which threaten the integrity of the App Store and its users and developers. In 2023, Apple blocked over 153 million fraudulent customer account creations and deactivated nearly 374 million accounts for fraud and abuse.").

[364]  "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("Blocking apps from pirate storefronts is also beneficial to developers, whose apps could be modified or used to disguise malicious software for distribution on these platforms. […] In 2023, more than 248,000 app submissions were rejected from the App Store because they violated Apple's policies against spam, blatantly copying other apps, or otherwise misleading users.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

effects. Ignoring the App Store's two-sidedness would lead to unreliable and erroneous economic conclusions. As I explain in what follows, analyses of two-sided transaction platforms like the App Store that only focus on one side may lead to projected outcomes that are flawed and inconsistent with economic reality.

### 1.    Market Definition Considerations

166.    An important part of assessing alleged anticompetitive conduct is defining the relevant antitrust market. Market definition for a product is based on the idea of "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[365] That is, relevant markets should include possible alternatives that participants find sufficiently substitutable for the products or services being analyzed.

167.    When addressing market definition for a two-sided transaction platform, one needs to account for the interdependencies between the two sides of the platforms. As I will explain below, analyses of two-sided transaction platforms that only focus on one side may lead to projected outcomes that are flawed and inconsistent with economic reality.

### a)    The Relevant Market Must Encompass Both Sides of the Two-Sided Transaction Platform

168.    A relevant antitrust market cannot decouple the two sides of a two-sided transaction platform by focusing on one side (e.g., consumers) while ignoring the other (e.g., sellers). As I discussed above and as noted in *Amex,* the relevant product for two-sided transaction platforms is a transaction.[366] In order to produce the platform's output—transactions— two-sided transaction platforms compete for two distinct groups of users (or "sides") that must simultaneously reach an agreement. It is thus important for the market to include both sides of a two-sided transaction platform because, as explained in **Section IV.A**, economic choices that include changes to the price on one side will affect participation on the other side due to indirect network effects. For example, if a component of the price charged to a certain segment of App Store developers was increased, there would, as expected, be less participation from that segment of the developer group. However, defining a market that

---

[365]    "Merger Guidelines," *U.S. Department of Justice and the Federal Trade Commission*, December 18, 2023, p. 40.

[366]    Amex Opinion, p. 14 ("For all these reasons, '[i]n two-sided transaction markets, only one market should be defined.'").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

focuses on just the developer side would ignore how the decrease in participation from the developer side also decreases the participation from the consumer side, which in turn lowers the desirability of participation for developers, further reducing developer participation. The presence of *multiple* prices on one side of a two-sided transaction platform (*see* **Section IV.A**) introduces additional complexity, as pricing changes for one group of participants on one side of the platform may influence the participation not only from the other side of the platform but also from the other groups on the same side of the platform.

169. By ignoring this spillover, the analysis of one side of the two-sided transaction platform in isolation could therefore underestimate the decrease in demand from developers that may result from the increase in a component of pricing on the developer side.[367] A variety of studies have demonstrated that market definition analyses that focus on one side of a two-sided transaction platform in isolation rather than assessing both sides simultaneously can lead to misleading conclusions, including providing a market definition that is too narrow.[368]

170. Additionally, although the standard sets of tools typically used to determine whether a product market is a relevant antitrust market, such as the hypothetical monopolist test (HMT), which I understand is discussed by Professor Jin in her expert report,[369] may still be relevant to analyses involving two-sided transaction platforms, these approaches must account for the two-sidedness of the platform, which makes implementing these

---

[367] Opening Expert Report and Declaration of Ginger Jin, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Jin Opening Report"), Section 3.4.

[368] Filistrucchi, Lapo et al., "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, Vol. 10, No. 2, June 2014, pp. 293–339, p. 331 ("As there is always at least one positive indirect network effect, the risk of applying a standard SSNIP test, which does not account for feedback effects, is that in such cases the market will be defined too narrowly."), p. 339 ("We also argued that, in most cases, applying a one-sided approach, including a one-sided SSNIP test, would lead to the definition of a market that is too narrow."). *See also,*; Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation*, Vol. 20, No. 325, 2003, pp. 325–381, p. 358 ("Suppose a correct application of the merger guidelines approach finds that a single side of a multi-sided market is a relevant antitrust market. In practice, that will tend to lead the court to view market power and anti-competitive conduct within the four corners of that market. The court will tend to get the economics wrong, since the principles that explain pricing and other business behavior in a multi-sided market are fundamentally different than in a single-sided market.").

[369] Jin Opening Report, Section 3.3, Section 3.4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

approaches more complex and the inputs to the associated models more challenging to estimate accurately.[370] Failing to account for the two-sided nature of the App Store, as I understand Plaintiffs do, would result in a flawed definition of the relevant product market, rendering any conclusions drawn from this market definition analysis unreliable.

b)    There May Be Multiple Product Markets If Different Categories of Transactions Experience Different Competitive Conditions

171.    Another important consideration when defining the relevant product market for two-sided transaction platforms is that competitive constraints may vary depending on the type of transactions being analyzed. If competitive conditions for these transactions are reasonably different, then deeming all transactions to be in the same relevant product market may not be appropriate, and the analysis must consider the possibility of multiple relevant markets with different market participants. For example, in the 1950s, the American Hotel Association launched a credit card, which could only be used to pay at participating hotels.[371] To the extent these specialized cards are a meaningful competitive constraint for travel-related transactions, hotel transactions would then constitute a separate product market from other credit card transactions that are not hotel-related. In 2020, the Department of Justice ("DOJ") challenged Visa's acquisition of Plaid, claiming that online and in-person debit card transaction are two distinct product markets, and that online

---

[370]    Auer, Dirk and Nicolas Petit, "Two-Sided Markets and the Challenge of Turning Economic Theory Into Antitrust Policy," *Antitrust Bulletin*, Vol. 60, No. 4, 2015, pp. 426–461, p. 441 ("A number of authors have argued that in two-sided markets the SSNIP test might require significant tweaking. […] Those indirect network externalities should be brought into the picture when the SSNIP test is applied in two-sided markets. Such externalities may turn a profitable SSNIP on a single side into an unprofitable SSNIP when both sides are taken into account"). *See also,* Filistrucchi, Lapo, "A SSNIP Test for Two-sided Markets: The Case of Media," *SSRN*, Vol. 1287442, October 2008, p. 22 ("In order to ensure the same rationale, the SSNIP test in a two-sided market should take into account changes in profits on both sides of the market and all feedbacks between profits on the two sides of the market following the hypothetical monopolist raise in prices. In addition it should be implemented by raising first the price on one side of the market then the price on the other side of the market, each time allowing the hypothetical monopolist to optimally adjust the price structure. The antitrust authorities' worry that in a two-sided market with two positive indirect demand externalities, such a test would lead to a much wider market definition than single-sided market, is unjustified as the point is exactly that the market is two-sided market and should be treated as such.").

[371]    Evans, David S. and Richard Schmalensee, "More Than Money," *Paying with Plastic: The Digital Revolution in Buying and Borrowing*, MIT Press, 2004, 2nd Ed., p. 55.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

transactions are not a reasonable substitute for in-person transactions because the latter requires the consumer to be physically present.[372]

172.    In the context of the App Store, it is likely that the set of transactions that are substitutable can vary depending on the types of app transaction.



173.    Based on this evidence, it may be appropriate to define separate markets for different sets of app transactions with their own set of substitutes and unique competitive conditions, rather than aggregating all the transactions into one market.[376] Economists have periodically combined multiple markets into a cluster market for analytical convenience, but this is a valid approach only when competitive conditions are similar across the underlying markets.[377] In the context of the App Store, analysis that clusters transactions

---

[372]    Complaint, *United States of America v. Visa, Inc. and Plaid, Inc.*, No. 3:20–cv–07810, United States District Court Northern District of California, San Francisco Division, November 5, 2020, ¶ 54 ("In-person debit payments, known as 'card present' payments, are not reasonably interchangeable because, unlike an online debit payment, the consumer must be physically present in a store or using a physical debit card at a payment terminal to make a card-present debit payment.").

[373]    Hitt Opening Report, Section 6.1.

[374]    Hitt Opening Report, Section 6.2.1.1.

[375]    Hitt Opening Report, Section 6.3.2.

[376]    Jin Opening Report, Section 4.3.

[377]    Baker, Jonathan, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007, pp. 129–173, pp. 157–158 ("The cluster market approach is inappropriate for market definition because clusters include products and devices that are not demand substitutes (or supply substitutes). It can be defended as a matter of analytical convenience: there is no need to define separate markets for a large number of individual hospital services, for example, when market shares and entry conditions are similar for each […]. But cluster markets may mislead as to competitive effects when competition from sellers of a partial line of products or services constrains the pricing of the full-line sellers offering the cluster."). *See also*, Baker, Jonathan B., "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," *Law and Contemporary Problems*, Vol. 51, No. 2, 1989, pp. 93–164, p. 126 ("In hospital industry terms, cluster markets may lead courts to underestimate the significance of outpatient clinics in restraining some

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

across different app categories would likely misrepresent the varying competitive constraints associated with transactions in different app categories.

174. Ignoring these considerations when analyzing the App Store could lead to a flawed definition of the relevant product market and any conclusions derived based on that market definition may not be reliable.

### 2.    Market Power Considerations

175. Market power refers to a firm's ability to raise price above competitive levels for a sustained period.[378] Economists acknowledge that applying this definition strictly may suggest that nearly all firms have some level of market power. As a result, assessments of significant and lasting market power are those generally of concern for antitrust purposes.[379] Assessing market power for two-sided transaction platforms requires

---

forms of hospital collusion, and so to interdict mergers generating increased concentration among hospitals when the danger of collusion is limited.").

[378] Baker, Jonathan B. and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics*, MIT Press, 2008, edited by Paolo Buccirossi, p. 15 ("Market power—the ability of firms to raise price above the competitive level for a sustained period—is a part of the legal framework in multiple antitrust contexts"). *See also,* Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, 4th Ed., p. 666 ("A firm (or group of firms acting together) has market power if it is profitably able to charge a price above that which would prevail under competition, which is usually taken to be marginal cost").

[379] Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, 4th Ed., pp. 666–667 ("If this definition is applied literally, probably every firm in the United States has at least a tiny bit of market power. […] Therefore, presumably, when courts find that a firm has market power, they must mean that the firm has a substantial amount of market power for some significant period of time."). *See also,* Krattenmaker, Thomas G., Robert H. Lande, and Steven C. Salop, "Monopoly Power and Market Power in Antitrust Law," *U.S. Department of Justice Antitrust Division*, available at https://www.justice.gov/archives/atr/monopoly-power-and-market-power-antitrust-law ("Of course, different antitrust issues may, upon analysis, require different degrees or probabilities of anticompetitive economic power to prove a violation. For example, we may require a strong showing of a substantial degree of monopoly power before condemning practices that often can generate substantial efficiencies"); Landes, William M. and Richard A. Posner, "Market Power in Antitrust Cases," *Harvard Law Review*, Vol. 94, No. 5, March 1981, pp. 937–996, p. 937 ("A finding of monopolization in violation of section 2 of the Sherman Act requires an initial determination that the defendant has monopoly power - a high degree of market power. A lesser but still significant market power requirement is imposed in attempted-monopolization cases under section 2."); "Monopolization Defined," *Federal Trade Commission*, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined ("Courts do not require a literal monopoly before applying rules for single firm conduct; that term is used as shorthand for a firm with significant and durable market power — that is, the long term ability to raise price or exclude competitors. That is how that term is used here: a 'monopolist' is a firm with significant and durable market power.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

considerations that are distinct from those used when assessing market power for single-sided businesses.

176. Two-sided transaction platforms frequently have complex and asymmetric pricing structures with multiple components (*see* **Section IV.A**). Therefore, assessing whether a two-sided transaction platform can profitably maintain supra-competitive pricing requires analyzing the entire pricing structure and not just an individual pricing component like the specific commission rate associated with revenue sharing.[380]

177. Like other two-sided transaction platforms, the App Store has a pricing structure with many components (*see* **Section V.A.3.b**). As part of this pricing structure, the App Store does not charge consumers a fee to participate, even though their participation imposes costs on the App Store. As part of the same pricing structure, the Apple charges developers an annual fee of $99 (*see* **Section V.A.3.a**). Further, as part of the same pricing structure, the App Store employs a revenue sharing model with developers under which developers pay a commission rate on certain transactions (for example, paid downloads and in-app digital content purchases) while not being charged for other transactions (for example, those involving free downloads, or transactions eligible under the Reader Rule or the Multiplatform Rule (*see* **Section V.A.3.b**). This commission rate ranges from 15 to 30 percent (*see* **Section V.A.3.b**). Since 84 percent of apps on the App Store are free,[381] developers are not charged a commission for these transactions, even though these transactions, even though these transactions impose costs on the App Store. The App Store's asymmetric pricing structure likely reflects, among other things, differences in the price elasticities of developers and consumers and differences in the price elasticities of different groups of developers, as well as aligning with Apple's strategy to encourage participation by attracting and encouraging the creation of supply from small developers and developers of free apps which in turn attracts consumers.[382] Offering free apps and

---

[380]   Jin Opening Report, Section 5.5.

[381]   Trial Testimony of Phillip Schiller, p. 2766:13–15 ("Q. And today, what percentage of apps in the App Store are free? A. 84 percent.").

[382]   Trial Testimony of Phillip Schiller, p. 2740:7–19 ("Q. And can you describe what you meant by 'the two big important classes [of developers that will be using the App Store]'? A. Yes. There -- right from the beginning we knew there would be many developers who simply want to distribute a free app, and there are many

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

licensing developer tools for a low fee may be a costly choice for Apple, but choosing a pricing structure that includes these features attracts more consumers to the App Store, which in turn benefit developers. Ignoring these characteristics of the App Store's business model and pricing structure and instead focusing solely on a single component of the pricing structure—the commission rate associated with revenue sharing—would provide an inaccurate assessment of the App Store's market power or lack thereof. Further, even if some of the developers that are currently charged a 15 to 30 commission rate might prefer a different commission rate structure, these individual preferences for potentially lower commission rates do not provide any evidence of market power. It is not surprising that these developers, all else equal, would prefer lower commission rates. On a two-sided transaction platform like the App Store, what may not be preferable for a subset of developers can still be good for consumers, which in turn can indirectly benefit all developers.

178.  Analyzing market power can also involve the assessment of a firm's market share or the degree of market concentration,[383] which necessitates defining a relevant market and identifying market participants.[384] In *Amex*, the Court ruled that two-sided transaction

---

business reasons why to do so, and then there are others that would like to use the App Store to sell their app, and we want to create an easy, secure model for doing that. Q. And were there any other classes, if you will, of developers at that time? A. No. Q. And what did Apple charge developers for free apps? A. Nothing. There was no commission for a free app.").

[383]  Davis, Peter and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010, p. 286 ("Indeed, competition policy relies on structural indicators for an initial assessment of the extent of market power exercised by firms in a market. For example, conduct or mergers involving small firms with market shares below a certain threshold will normally not raise competition concerns."). *See also,* Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, 4th Ed., p. 668 ("In an attempt to reach some workable solution to the problem of determining market power, analysts and the courts often define a market and then construct a measure of market share.").

[384]  "Market Power Handbook," American Bar Association Book Publishing, March 8, 2012, 2nd Ed., edited by Mary Coleman and Bruce Hoffman, p. 71. *See also,* "Merger Guidelines," *U.S. Department of Justice and the Federal Trade Commission*, December 18, 2023, p. 49 ("All firms that currently supply products (or consume products, when buyers merge) in a relevant market are considered participants in that market. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently supplying products in the relevant market, but that have committed to entering the market in the near future, are also considered market participants."), p. 50 ("The Agencies normally calculate product market shares for all firms that currently supply products (or consume products, when buyers merge) in a relevant market, subject to the availability of data. […] How market shares are calculated may further depend on the characteristics of a particular market, and on the availability of data. Moreover, multiple metrics may be informative in any particular case.").

115

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

platforms only compete against other two-sided transaction platforms.[385] However, in addition to competing with other two-sided transaction platforms, two-sided transaction platforms may also, in certain circumstances, face competition from single-sided businesses that serve one side of the platforms.[386] Correspondingly, there are single-sided businesses that may compete with the App Store for transactions. For example, GameStop and Green Man Gaming are single-sided firms that compete with the App Store for gaming transactions.[387] As a result, market shares calculated in a market that includes only competing two-sided transaction platforms may overstate a two-sided transaction platform's market power because relevant single-sided businesses are excluded.

---

[385] Amex Opinion, p. 14 ("Evaluating both sides of a two-sided transaction platform is also necessary to accurately assess competition. Only other two-sided platforms can compete with a two-sided platform for transactions.").

[386] Evans, David S. and Richard Schmalensee, "The Industrial Organization of Markets with Two-Sided Platforms," *Competition Policy International*, Vol. 3, No. 1, Spring 2007, pp. 151–179, p. 153 ("Two-sided platforms often compete with ordinary (single-sided) firms and sometimes compete on one side with two-sided platforms that serve a different second side."), p. 175 ("[A two-sided platform] faces competition of some degree from other differentiated two-sided platforms that serve the same customer groups (e.g., the newspapers in a city). It also faces competition from single-sided businesses that provide competitive services to one side only (e.g., billboards). And it faces competition from other two-sided platforms that provide a product that competes mainly with one side but not the other (e.g., advertising-supported television)."). *See also,* Panner, Aaron M., "Market Definition and Anticompetitive Effects in *Ohio v. American Express*," *Yale Law Journal Forum*, January 18, 2021, pp. 608–621, pp. 620–621 ("At the same time, it would be equally wrong to ignore competitors that operate on one side of a two-sided platform when those competitors *constrain* the exercise of market power by the platform operator. For example, in their 2018 article (which pre-dated the Supreme Court's decision in American Express), Jonathan Baker and Fiona Scott Morton criticize platform 'most favored nations (MFN) provisions,' such as those imposed on hotels by online travel agents like Expedia, which restrict the ability of vendors to charge lower prices on other websites than they charge customers of, say, Expedia. […] The Court's decision in American Express might suggest that the relevant market for purposes of evaluating such an MFN is the market for online travel agents (a two-sided transaction platform). But, in selling travel services, Expedia competes not just with other two-sided platforms but also with vendors' own websites and other aggregators or resellers, all of which can be discovered by consumers through online search tools. This competition from other vendors makes a singular focus on the impact of the challenged provisions on other two-sided platforms inappropriate. Because a travel site must compete for sales with all such outlets, legal rules and standards should be constructed to avoid condemning vertical restraints that may intensify such interbrand competition.").

[387] "Video Games," *GameStop*, available at https://www.gamestop.com/video-games; "Digital Store," *GameStop*, available at https://www.gamestop.com/digital-store; GameStop, Form 10–K, filed February 3, 2024, https://news.gamestop.com/static-files/94ea835e-3253-4e6f-aaac-cdd7c1057f90, p. 1 ("GameStop Corp. […] offers games and entertainment products through its stores and ecommerce platforms."); "Buy Games, Game Keys & Digital Games Today," *Green Man Gaming*, March 6, 2025, available at https://www.greenmangaming.com ("Green Man Gaming is an official gaming retailer of PC and Xbox game keys. We make sure to get you the best prices on your next favourite game, from AAA blockbusters to indie hits. If it's gaming, think Green Man Gaming.").

116

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 3.    *Competitive Effects Considerations*

179.    As the Court in *Amex* recognized, when analyzing the competitive effects of actions taken by a two-sided transaction platform, it is important to consider the impact of these actions on both sides of the platform.[388] As discussed in **Section V.C.1**, focusing the analysis of competitive effects on a single side is likely to lead to unreliable and incorrect conclusions because the platform's product is provided to participants on both sides simultaneously. Similarly, evaluating the competitive effects of a single component of a pricing structure while ignoring other components is likely to lead to unreliable and incorrect conclusions. Choices that may be inconvenient for participants on one side might be beneficial to participants on the other side, leading to more participation from the other side, and ultimately benefiting participants on both sides.

180.    Analyses of competitive effects may require multiple metrics. For example, transaction volume, a measure that involves participation by both sides of the App Store, is one indicator that may be considered when evaluating competitive effects, but there are many ways one might evaluate "transaction volume" on the App Store. One might count the number of transactions (i.e., app downloads and in-app digital content purchases) or one might instead select a suitable measure of total revenue, such as earnings from paid apps and in-app digital content purchases. Additionally, an analysis of competitive effects that relies solely on the App Store's total revenue may be incomplete because it does not consider transactions involving free apps, ██████████████████████ ██.[389]

181.    This observation notwithstanding, each of these metrics associated with the App Store, whether considered individually or holistically, paint a consistent picture of significant growth and value creation that is inconsistent with harm arising from restraints on competition.[390]

---

[388]    Amex Opinion, p. 15 ("Accordingly, we will analyze the two-sided market for credit-card transactions as a whole to determine whether the plaintiffs have shown that Amex's antisteering provisions have anticompetitive effects.").

[389]    Hitt Opening Report, Section 8.3.

[390]    Hitt Opening Report, Section 5.1.3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## VI.   THE CHALLENGED CONDUCT IS PROCOMPETITIVE

182.   In this section, I discuss how Apple's challenged conduct (*see* **Section II.A**) enables procompetitive outcomes, mitigating sources of market failure by improving the associated App Store services and governance mechanisms. Consistent with other two-sided transaction platforms (*see* **Section IV.C**), these services and governance mechanisms create value for developers and consumers by: (1) encouraging and enhancing participation, (2) facilitating discovery, matching, and transacting, and (3) facilitating trusted and safe interactions. I also discuss how Apple's challenged conduct does not restrict interbrand competition among app marketplaces that run on different operating systems or devices, or competition among different operating systems or devices that facilitate app transactions.

183.   The challenged conduct is a core component of many of the services and governance mechanisms that Apple implements as a two-sided transaction platform to mitigate sources of market failure (*see* **Section V.B**). These services and governance mechanisms increase the likelihood that transactions occur, that they go well, and that consumers and developers remain on the platform and continue to interact. Apple accomplishes this by reducing search and other costs related to transactions, addressing information asymmetries, overcoming consumer cognitive costs, and lowering the likelihood of adverse outcomes. Further, the presence of indirect network effects makes mitigating potential sources of market failure especially crucial for two-sided transaction platforms (*see* **Section IV.C**). The absence of the challenged conduct would alter and/or diminish these services and governance mechanisms, weakening Apple's ability to mitigate market failure, thereby diminishing the quality of platform interactions, and potentially making participants on both sides worse off, as I explain in what follows.

184.   I note at the outset that questions remain regarding what would characterize the Plaintiffs' proposed but-for world absent the challenged conduct. I also note that the App Store has a comprehensive App Review process in a centralized app distribution model (*see* **Section V.A.3.a**). In a but-for-world absent the challenged conduct, there are questions as to what would change and how—including whether and how Apple would be compensated for what it would do in the but-for world. While these are issues that Plaintiffs must address in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

their but-for world, and I will evaluate Plaintiffs' answers to these questions in due course, I do not believe they will affect my opinion that consumers and developers would be worse off in a potential but-for worlds absent the challenged conduct.

## A.   The Challenged Conduct Encourages and Enhances Participation on Both Sides of the Platform

185.   Centralized distribution and the accompanying revenue sharing model that includes a commission on paid app downloads and in-app digital content purchases is an important component of the App Store's business model and provides compensation to Apple for the access to and use of its IP-protected tools, technologies, and services by developers. Absent the challenged conduct, inhibiting Apple's ability to collect the commission would affect Apple's ability to be compensated for access to and use of its IP-protected tools, technologies, and services by developers and, consequently, would also reduce Apple's incentives to innovate.

186.   Centralized distribution with revenue sharing is a commonly used approach for two-sided transaction platforms (*see* **Section IV.A.3.b**). The prevalence of centralized distribution with revenue sharing among other app marketplaces is not surprising because there are several benefits to consumers and developers from this structure.

187.   Under centralized distribution and the accompanying revenue sharing model, Apple is able to provide consumers with free access to the App Store. This ability to access the App Store and download apps for free likely attracts those consumers who may not participate if charged, thereby increasing participation.

188.   Developers benefit from centralized distribution and the associated revenue sharing model by being able to access and use Apple's IP-protected tools, technologies, and services. This simplifies and encourages the creation, testing, and distribution of new and better apps—which also attracts a wide variety of developers to the App Store. Apple's proprietary developer tools like SDKs and APIs (*see* **Section V.A.3.b**) lower the knowledge and financial barriers that would otherwise hinder the ability of many developers to create new apps and in-app digital content. For example, Apple SDKs such as ClassKit, CoreML, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

PencilKit enabled the development of the app *Learn Math Facts*, which assists children in learning math through in-app quizzes.[391]

189. Absent Apple's challenged conduct, and assuming initially that, for argument's sake, Apple's current pricing structure nevertheless remained unchanged in any possible but-for world but that Apple now faces diminished ability to seek compensation in connection with the tools, technologies, and services that Apple provides in connection with the Developer Program and its related agreements (irrespective of Apple's right to receive such compensation), this would, as an economic matter, lower Apple's incentive to (i) offer free access to consumers and (ii) invest in creating and offering developer tools, technologies, and services, thus lowering participation on both sides of the platform. This decrease in participation would be expected as an effect of the free-rider problem that was introduced and described in **Section IV.B**. For example, after leveraging Apple's proprietary tools, technologies, and services to create their apps, developers could seek to avoid paying Apple any compensation for the use of and access to such tools, technologies, and services by trying to distribute these apps outside of the App Store. As recognized by regulators and economists, requiring alternative iOS distribution channels (including under forced dealing mandates) would limit Apple's ability to seek compensation for the use of its IP-protected tools, technologies, and services—contrary to the understanding that an IP owner is incentivized to invest in innovation by receiving compensation for use of their IP.[392]

---

[391] Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Analysis Group*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf, p. 17.

[392] The Antitrust Modernization Commission, a commission established by Congress, noted that "absent a right to refuse to deal with a rival, a firm that lawfully obtained a monopoly through superior acumen, skill, foresight, or industry would find itself forced to share the fruits of its investment with rivals, thereby undermining the value of its lawfully acquired monopoly and discouraging others from making similar investments. Because investments in new facilities and assets often enhance consumer welfare, antitrust rules that discourage such activity should be avoided. Forced sharing stultifies the incentives of smaller firms to develop alternatives to the monopolist's products." "Report and Recommendations," *Antitrust Modernization Commission*, April 2007, pp. 101–102. Economic literature has noted that forced dealing could discourage investment and welfare. Carlton, Dennis W. and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, 2008, pp. 285–305, p. 285–287 ("An essential element of appropriate antitrust policy is to allow a firm to capture as much of the surplus that, by its own investment, innovation, industry, or foresight, the firm has itself brought into existence. Alternative policy approaches to single-firm conduct […] seriously threaten to impede economic growth and welfare over time. […] For firms to have the proper incentives to invest and create, they must be permitted to profit from their success."). *See also*, Gilbert, Richard J. and Carl Shapiro, "An Economic Analysis of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Lowered incentives for Apple to invest in developing its IP-protected developer tools, technologies, and services would, in turn, diminish the quality and variety of apps and in-app digital content, harming consumers.

190. These reductions in investments related to tools, technologies, and services for developers could render the App Store a weaker competitor by lowering the resources Apple allocates to fostering innovation in apps and in-app digital content created by developers, and to ensuring the quality of the App Store as a trusted platform on which consumers and developers transact. Perceiving the App Store as a weaker competitor, hypothetical competing app marketplaces may also lower their corresponding investments. As a result, consumers may be less interested in engaging in transactions involving iOS apps, which in turn, owing to indirect network effects, would further impact the participation of developers negatively.

191. Next, while I understand that Plaintiffs' view is that removing the challenged conduct will exert a downward pressure on commission rates, leading to lower commission rates and lower app prices,[393] there are economic reasons why removing the challenged conduct may not lead to either of these outcomes. On the contrary, a but-for world without centralized app distribution could simply reduce participation. For example, a but-for world for which App Review is not conducted on every app and app update available to iOS device users would lead to lower-quality iOS apps and in-app digital content, but without any impact on commission rates or app prices. I understand that Professor Halderman addresses the

---

Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755, p. 12749 ("Compulsory licensing may undermine incentives for research and development by reducing the value of an innovation to the inventor.").

[393] Third Amended Complaint, ¶¶ 56–57 ("In a competitive environment, where developers could sell their apps on their own websites without charging Apple's 30% mark-up and discount retailers could obtain volume discounts and sell for far less than a 30% profit, Apple would be under considerable pressure to substantially lower its 30% profit margin because, otherwise, its App Store would be priced out of the market and lose substantial market share. In a truly competitive iOS apps distribution environment, Apple's 30% margin would be simply unsustainable. A truly competitive iOS apps distribution market would also give Plaintiffs and other iOS Devices customers the freedom to choose between Apple's high-priced App Store and less costly alternatives, such as buying direct from apps developers or volume-driven and other software discounters. Plaintiffs' freedom to choose between these market alternatives has been eliminated by Apple's monopolistic conduct, and Plaintiffs have been forced to pay supracompetitive prices to Apple as a result.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

potential consequences of not having centralized app distribution and full App Review on every app and app update available for distribution on an iOS device in his report.[394]

192.    If consumers could download apps and purchase in-app digital content from outside of the App Store in a but-for world without centralized distribution, such as from alternative iOS distribution channels that offer lower commission rates, it is possible that Apple may still not alter the App Store's commission rate. For example, survey evidence collected by Professor Simonson shows that (i) there are consumers who would want to continue to use the App Store, as they view the security and privacy offered by the App Store as "must have" features;[395] and that (ii) the price sensitivity of consumers on the App Store is such that even if commission rates decreased, these lower commission rates may not have a substantial impact on the number of consumers that decide to use the App Store.[396] In the event that many consumers choose to continue to use the App Store instead of alternative iOS distribution channels, there may not be a competitive economic constraint on the App Store in this possible but-for world, which in turn would suggest that the App Store may experience insufficient competitive pressure to warrant reductions in its commission rate.

193.    Alternatively, Apple may or may not lower commission rates even in the presence of competitive pressure from alternative iOS distribution channels in a but-for world, as its current commission rates are aligned with or lower than those charged by other channels (*see* **Exhibits C.1–C.3**). Consider the example of China, where Google Play is not available and there are multiple competing Android app marketplaces. Most Android app marketplaces in China charge a 30 percent commission rate for non-game apps and in-app digital content, and commission rates for game transactions can be up to 50 percent.[397] China thus serves as an example of how the presence of multiple competing app

---

[394]    Halderman Opening Report, Section IV.

[395]    Opening Expert Report and Declaration of Itamar Simonson, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025 ("Simonson Opening Report"), Section IV.A.4.

[396]    Simonson Opening Report, Section IV.B.1.d.

[397]    Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 22, 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketpl aces_a_comparison_of_commission_rates.pdf, Appendix A1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

marketplaces may not lead to lower commission rates than those currently levied by the App Store.

194.     Third, even if commission rates were lower, this change likely would not result in a corresponding reduction in app and in-app digital content prices as demonstrated by Professor Hitt. Using three programs from Apple that reduced commission rates for certain app developers or transactions—the launch of the Small Business Program, the implementation of the auto-renewing subscription policy, and the launch of the Video Partner Program—Professor Hitt uses natural experiments to analyze the impact of the decrease in commission rates on the prices of apps and in-app digital content.[398] His analyses indicate that across all three programs, most developers did not reduce the app prices charged to consumers. Specifically, he finds that ▇ percent of all products from developers that enrolled in the Small Business Program saw no price reduction.[399] Similarly, ▇ percent of subscriptions eligible for lower commission rates under the auto-renewing subscription policy,[400] and ▇ percent of products from app developers in the Video Partner Program experienced no price decrease.[401] This evidence is consistent with developers setting prices based on consumer value rather than on cost. App developers typically have a very low marginal cost of production, as they incur the vast majority of their costs in the development phase and have few if any costs at the point of transaction with the consumer.[402] Professor Hitt concludes that the zero (or low) marginal cost of producing one additional app or in-app item "unit" is likely one of the reasons why many app developers did not lower prices when commission rates decreased.[403] This conclusion

---

[398]     Hitt Opening Report, Section 9.1.

[399]     Hitt Opening Report, Section 9.1.

[400]     Hitt Opening Report, Section 9.1.

[401]     Hitt Opening Report, Section 9.1.

[402]     Hitt Opening Report, Section 9.2.1; Nunes, Joseph C., Christopher K. Hsee, and Elke U. Weber, "Why Are People So Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, Vol. 23, No. 1, 2004, pp. 43–53, p. 44 ("Software is an example of a product that possesses a cost structure with a relatively low [variable cost] and a high [fixed cost]."); Posner, Richard A., "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, Vol. 19, No. 2, 2005, pp. 57–73, p. 58 ("[I]n the case of software distributed over the Internet (including digitized musical recordings), variable cost, and hence marginal cost, are close to zero.").

[403]     Hitt Opening Report, Section 9.2.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

is consistent with findings from the academic literature, which indicate that in settings such as software development, where the marginal cost of production is low or zero, pricing is based on the value placed by the consumers on the goods being sold rather than on production costs.[404]

195. It follows from the discussion above that regardless of what Apple may do in a potential but-for world absent the challenged conduct, factors that are important to encourage and enhance the participation of consumers and developers would be impacted in ways that could negatively affect iOS apps and in-app digital content, with no clear accompanying positive consumer benefits that may ensue from changes in commission rates or pricing.

## B.    The Challenged Conduct Facilitates Discovery, Matching, and Transacting

196. As I discussed in **Section IV.C.2**, in addition to attracting consumers and providers, a two-sided transaction platform must increase the likelihood that these two groups find each other, match, and transact. The challenged conduct enables the App Store to offer superior services and governance mechanisms that address sources of market failure (including search costs, cognitive and other costs related to transacting, and information asymmetry) that would otherwise reduce the ability and willingness of consumers and developers to find each other, successfully match, and complete transactions.

197. First, the challenged conduct reduces costs related to transacting, thereby encouraging consumer participation and transacting, by enabling consumers to access a repository of all their past purchases, which they can access and port across devices. If a consumer switches devices or acquires a new device, or wishes to consume their apps or in-app digital content purchases on multiple iOS devices, they do not need to repurchase their apps or in-app digital content.[405] Similarly, as I mentioned in **Section V.B.2** the App Store provides

---

[404]   Shapiro, Carl and Hal R. Varian, "The Information Economy," *Information Rules: A Strategic Guide To The Network Economy*, Harvard Business School Press, Boston, Massachusetts, pp.1–18, p. 3 ("Economists say that production of an information good involves high fixed costs but low marginal costs. The cost of producing the first copy of an information good may be substantial, but the cost of producing (or reproducing) additional copies is negligible. This sort of cost structure has many important implications. For example, cost-based pricing just doesn't work: a 10 or 20 percent markup on unit cost makes no sense when unit cost is zero. You must price your information goods according to consumer value, not according to your production cost.").

[405]   "Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing ("You can find a history of the apps, subscriptions, and media you bought from the App Store and iTunes Store. After you sign in with your Apple Account, you can redownload your previously purchased apps, music, and movies, and TV

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumers with the ability to share subscriptions through Family Sharing, allowing family members to independently enjoy a shared subscription on their respective accounts and devices without purchasing it multiple times.[406]

198.    Second, the challenged conduct reduces search and cognitive costs for consumers by increasing the alignment of search results with what consumers want. On the App Store, consumers use a single search and ranking mechanism to find apps and can, over time, learn how to provide appropriate keywords to this search and ranking mechanism that align different kinds of demand intent with appropriate results.[407] This "learning by doing" at a single location makes it easier for consumers to find apps and in-app digital content aligned with their preferences.

199.    The App Store's search and ranking mechanism is also able to provide suggestions for additional search terms that consumers can use to discover apps based on information from their searches, and to show apps that are trending based on the searches of all consumers.[408]

---

shows."). *See also* Basole, Rahul C. and Jürgen Karla, "Value Transformation in the Mobile Service Ecosystem: A Study of App Store Emergence and Growth," *Service Science*, Vol. 4, No. 1, March 2012, pp. 24–41, pp. 35–36 ("A key value proposition of the iPhone and Apple was the seamless integration of the iPhone into Apple's already highly popular music and media organizing software iTunes, which reduced the challenges of achieving a critical mass of users for a new platform. […] From an economic point of view, Apple made use of the lock-in effect for existing iTunes customers. Therefore, they benefited from users that— previous to the iPhone—were using Apple's music platform.").

[406]    "Family Sharing," *Apple*, available at https://www.apple.com/family-sharing/ ("With Family Sharing, your Apple subscriptions are shared with your family members at no extra cost. That includes eligible subscriptions from the App Store, as well as eligible purchases of apps, media, and books when you enable Purchase Sharing. You can even hide individual purchases that you want to keep private.").

[407]    Alhejaili, Adel and James Blustein, "Users' Sophisticated Information Search Behaviour," *Design, Operation and Evaluation of Mobile Communications*, Springer Cham, July 9, 2023, Vol. 14052, edited by Gavriel Salvendy and June Wei, pp. 3–17, p. 3 ("Smartphone use has become a part of many people's everyday life. Over the past years, the number of smartphone users has increased significantly. Understanding how and why users select apps to install is essential for app developers, designers and store owners. […] This work argues, showcases and explains that users' behaviour is dynamic and constantly changing throughout the app search process. Our findings indicate that users adjust and adapt to accommodate the implications of the acquired knowledge gained from the environment.").

[408]    "Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/ ("When customers search for an app, the App Store returns a list of apps that are ranked based on a number of factors, including text relevance (matches for the app's title, keywords, and primary category) and customer behavior (downloads and the number and quality of ratings and reviews). In addition to getting results for their specific search query, customers are shown suggested search terms to help them find what they're looking for. They can also view Trending Searches to see what other customers in their region are interested in.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Search and ranking systems can personalize more effectively as they gain more data.[409] More data about search keywords and the resulting behavior of consumers improves the App Store's search and ranking mechanism. Where all apps are distributed by the App Store, data can be aggregated and, consequently, search results can be improved and search costs lowered for all consumers. The quality of these search term suggestions and the effectiveness of the "trending" recommendations are thus both improved if all searches are conducted via a single search and ranking mechanism.

### C.    The Challenged Conduct Facilitates Trusted and Safe Interactions Between Consumers and Developers

200.    As I discussed in **Section IV.C.3**, two-sided transaction platforms provide services and governance mechanisms to (1) foster participant trust by increasing transparency into product representation and the intentions of platform participants, and by inducing the development of better products; and to (2) lower the incidence of adverse transaction outcomes for consumers and providers. The challenged conduct allows the App Store to implement superior services and governance mechanisms which mitigate behaviors that could undermine the trust and safety of transactions.

> *1.    Centralized Distribution Through the App Store with App Review Fosters Participant Trust Through the Transparent Representation of Products and the Intentions of Platform Participants, and Through Inducing the Provision of Better Products*

201.    The challenged conduct contributes to fostering a consumer's trust in the App Store and iOS developers by enhancing the services and governance mechanisms employed by the App Store, including the App Review process. These enhanced services and governance mechanisms reduce information asymmetry regarding the security, privacy, reliability and quality of apps and in-app digital content, and increase transparency for consumers by

---

[409]    Yoganarasimhan, Hema, "Search Personalization Using Machine Learning," *Management Science*, Vol. 66, No. 3, March 2020, pp. 1045–1070, p. 1045 ("Firms typically use query-based search to help consumers find information/products on their websites. We consider the problem of optimally ranking a set of results shown in response to a query. We propose a personalized ranking mechanism based on a user's search and click history. […] We find that there is significant heterogeneity in returns to personalization as a function of user history and query type. The quality of personalized results increases monotonically with the length of a user's history."). *See also*, Jones, Charles I. and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review*, Vol. 110, No. 9, September 2020, pp. 2819–2858, p. 2849 ("Furthermore, as data proliferates, firms will develop new algorithms and applications that make even better use of more data.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

closing the gap between a consumer's perceptions and the actual privacy, security, reliability, and quality of all iOS apps and in-app digital content. Further, by establishing and enforcing high standards for privacy, security, reliability and quality of apps and in-app digital content, the App Review process raises the overall value of apps and in-app digital content available to consumers on the App Store.

202. The services and governance mechanisms employed by the App Store—including requiring all apps to provide privacy labels to inform consumers about data collection, enabling users to rate and review apps, detecting and removing fake reviews (*see* **Section V.B.3**), and the quality and results of a rigorous App Review process (*see* **Section V.A.3.a**)—improve transparency in the representation of privacy, security, reliability, and quality across all iOS apps and in-app digital content and enhance their overall value.

203. Privacy is a central component of Apple's brand identity (*see* **Section V.A.2**),[410] and the security and privacy guaranteed by the App Store are "must have" features for consumers.[411] Studies suggest that Apple's security architecture,[412] with centralized distribution and the App Review process, has led to superior security and privacy outcomes for iOS users relative to Android users.[413] Unlike iOS, Android users can download and

---

[410] Trial Testimony of Phillip Schiller, pp. 2737:15–2738:8 ("Q. And what were the business reasons that Apple decided that it would only distribute third-party native apps on its App Store? A. Well, we've covered a number of the important reasons to us. Maintaining the quality of iPhone, maintaining the security and privacy of our users were all critical to the idea of opening it up for native apps. Q. And have those priorities for privacy, security, and reliability ever changed? A. No. Q. And has the need to safeguard those things changed over time? A. Yes. Q. And can you describe how? A. I think that over the years, the ways and methods developers and bad actors try to get at users and their data has only increased dramatically, and we see this from all the important data we have. The many attacks and attempts to steal it and get access to it have increased.").

[411] Simonson Opening Report, Section IV.A.4.

[412] Trial Testimony of Craig Federighi, p. 3359:14-19 ("And we also understood that the cell phone market was a market of billions of devices. It was going to touch many more people in a wide range of age groups and a wide range of kind of understanding of operating a computer, and so we really had to think about a security architecture that could protect all of them in that kind of context.").

[413] Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL-APPSTORE_11235149–198 at 171 ("The App Association warns that sideloading mandates 'will increase consumer exposure to risk of malware giving hackers access to users' personal information' and notes that the 'layer of restrictions' on sideloading (e.g., needing to jailbreak a device or change settings) serves to prevent malicious actors from having access to 'unwitting consumers.'"), at 181 ("While there is some debate over the relative security of both platforms, Android is the subject of more malware attacks. For example, Nokia's 2020 Threat Intelligence Report found that '26.6 percent of all malware infestations across all platforms' were on Android mobile devices in 2020, compared to 1.7 percent on iPhones."). *See also*, Apple, "Building a Trusted

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

install apps from multiple channels, including the Google Play Store, third-party stores and directly from developers.[414] These practices have resulted in increased security and privacy risks for Android consumers.[415] For example, a 2021 report from Apple indicates that despite being removed from the Google Play Store, certain Android apps for children that collect private data without parental consent or awareness remained available on third-party app marketplaces.[416] As shown below (*see* **Figure VI.1**), between 2020 and 2023, the App Store rejected over 1.3 million apps for privacy violations.

---

Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," October 2021, APL-APPSTORE_11111410–440 at 411 ("Over the past four years, Android devices were found to have 15 to 47 times more malware infections than iPhone.").

[414] Lookout, "Lookout Mobile Threat Report," August 2011, APL-APPSTORE_10779789–813 at 793 ("In terms of app distribution, the Android operating system utilizes an open application distribution model that allows users to download applications from variety of sources, including Google's Android Market, Amazon's Appstore for Android, carrier markets such as Verizon's V CAST network, and other alternative app markets. Android also has a setting, often referred to as sideloading, which enables or disables the capability to download applications from other sources outside of the Android Market."). *See also*, Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL-APPSTORE_11235149–198 at 171 ("Google does not strictly prohibit sideloading of native apps on Android devices, but it does create limitations on the practice that, as noted below, can be cumbersome for users trying to download apps.").

[415] *See*, *for example*, Rapoza, Kenneth, "Is The iPhone Safer Than Google's Android?," *Forbes*, November 3, 2011, available at https://www.forbes.com/sites/kenrapoza/2011/11/03/is-the-iphone-safer-than-googles-android/ ("John Dasher, McAfee senior director of mobile security, told the *Financial Times* this week that, 'Apple has a walled garden, with its curating of apps for its App Store, so it's had far fewer instances of malware, but Android is far more porous. There are more than a dozen apps sites, it's very easy to download apps and 'sideload' apps on to a device, and so it's far easier for a hacker to get an app published that contains malware.'").

[416] "Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf, p. 5 ("Android apps aimed at children were discovered to be engaging in data collection practices that violated kids' privacy. These apps continue to thrive and target Android users on third-party app stores, even though they were removed from the Google Play Store.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Figure VI.1**
**Estimated Number of Apps Rejected on the App Store Due to Privacy Violations**
**2020–2023[417]**



204. The App Review process also lowers the likelihood of the App Store listing incomplete apps and in-app digital content (for example, with links that do not work), apps that are buggy or unstable, or apps that have features that are not fully functional. For example, between 2022 and 2023, Apple rejected over two million apps worldwide for related reliability issues.[418]

205. The App Review process also aims to increase the likelihood that apps are of sufficiently high quality. This includes assessing whether apps and in-app digital content meet minimum standards for innovation and content, and whether they provide a sufficiently

---

417   **Sources:** [1]"App Store Stopped More than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020; [2]"App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021; [3]"App Store Stopped More than $2 Billion in Fraudulent Transactions in 2022," *Apple*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022; [4]"App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

418   "2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf; "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

engaging experience for consumers. Between 2022 and 2023, Apple rejected over half a million apps for design issues.[419] The manual review component of the App Review process improves Apple's ability to identify apps with potentially inappropriate content, and to remove apps that may have switched their original intent.[420] For example, the App Review team has rejected wallpaper apps that transformed into gambling casino apps or subsequently provided access to pornography.[421]

206.   As the seller of iOS devices, Apple has a stronger incentive than third-party app marketplaces to increase transparency into app security, privacy, reliability, and quality. This is because if an iOS device owner has a negative experience with an iOS app as a result of it not meeting their perceived security, privacy, reliability, or quality expectations, this experience can negatively affect the consumer's perception of not only the app developer and the value of the distribution channel, but also of the value of Apple's devices and brand.[422] For the same reason, Apple has a stronger incentive than any third-party app marketplace to monitor the actual security, privacy, reliability, and quality of apps, and to increase the likelihood that the perception of the value that iOS users associate with Apple's devices is not adversely affected by a negative experience with iOS apps. In

---

[419]   "2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf; "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

[420]   Trial Testimony of Trystan Kosmynka, p. 1086:22–25 ("So we've had to reject -- there was a trend of apps that were plastic surgery games marketed towards children, and so this was demeaning to women but also I think manipulative to children and terribly offensive."), p. 1087:5–8 ("Can computer analysis, the automated tools that Apple has developed, alone identify things like that that violate the Kids Category guideline? A. No.").

[421]   Trial Testimony of Trystan Kosmynka, pp. 1088:19–1089:13 ("Q. Let's look at a guideline on 'Performance,' 2.3.1. And the language here is 'Don't include any hidden, dormant, or undocumented features in your app. Your apps functionality should be clear to end users and App Review.' What types of submissions have you had to reject as a result of that guideline? A. This guideline is particularly challenging because if it's hidden, it's hard for us -- hard for us to find it, so we'll often have to find this post review. […] So, if you will, as a way of example, imagine a benign app that looks like it's for managing wallpapers and it then changes to a gambling casino or a -- a pornography site and it's a complete concept change post review.").

[422]   Trial Testimony of Tim Cook, p. 3884:22–3885:11 ("A. […] [An order requiring Apple to permit sideloading of unreviewed apps on the iPhone and to permit alternative app stores that would offer apps that have not been reviewed by Apple […] would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

contrast, third-party app marketplaces may not have the same incentive to provide consumers with adequate information about the security, privacy, reliability, and quality of the apps and in-app digital content, nor invest enough in developing and conducting a process for the review of security, privacy, reliability, and/or quality of the app and in-app digital content through a rigorous app review process as the App Store does.[423] However, consumers may nevertheless associate a negative app experience with iOS or their iOS device rather than with the app, thus diminishing their perception of Apple's security, privacy, reliability, and quality, and potentially leading them to have a negative perception of iOS and Apple devices in general, reducing the number of developers interested in creating apps for Apple devices,[424] which could lead to a decrease in innovative apps for all iOS consumers.

---

[423] Apple, "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," October 2021, APL-APPSTORE_11111410–440 at 412 ("If Apple were forced to support sideloading: More harmful apps would reach users because it would be easier for cybercriminals to target them – even if sideloading were limited to third-party app stores only. The large amount of malware and resulting security and privacy threats on third-party app stores shows that they do not have sufficient vetting procedures to check for apps containing known malware, apps violating user privacy, copycat apps, apps with illegal or objectionable content, and unsafe apps targeted at children. […] Users would have less information about apps up front, and less control over apps after they download them onto their devices. Users may not get accurate information about apps they sideload through third-party app stores or via direct downloads because these app stores would not be required to provide the information displayed on the App Store product pages and privacy labels. […] Some sideloading initiatives would also mandate removing protections against third-party access to proprietary hardware elements and non-public operating system functions. This would undermine core components of platform security that protect the operating system and iPhone data and services from malware, intrusion, and even operational flaws that could affect the reliability of the device and stop it from working."). *See also*, Evans, Jonny, "Apple Confirms the Scale of App Store Fraud," *ComputerWorld*, June 2, 2022, available at https://www.computerworld.com/article/1625926/apple-confirms-the-scale-of-app-store-fraud.html "[A]ny move to dilute the security iOS enjoys could make many more of us vulnerable, and the introduction of a non-curated App Store would do just that."); Evans, Jonny, "Apple: Sideloading Apps Will Undermine iOS Security," *ComputerWorld*, June 23, 2021, available at https://www.computerworld.com/article/1614272/apple-sideloading-apps-will-undermine-ios-security.html ("As things stand, you have a choice. You can choose platforms that permit sideloading, with all the risk that entails. Or you can choose Apple's curated platform, which is the right choice for anyone who wants the best privacy and security. […] If governments force Apple to support sideloading, you can rest assured that bad actors will use every tool in their arsenal to exploit the opportunity. Their creative approaches will span highly targeted phishing attacks, fake app download sites and malware-infested development environments, all bolstered by a network of genuine-seeming reviews designed to reassure suspicious users that these travesties are safe.").

[424] Trial Testimony of Tim Cook, p. 3885:1–11 ("[Q.] What, sir, would be the consequences of [requiring Apple to permit sideloading of unreviewed apps on the iPhone and to permit alternative app stores that would offer apps that have not been reviewed by Apple], in your view? A. I think it would be terrible for the user because if you look at it today, we reviewed a hundred thousand or so apps a week and reject about 40,000 for different reasons. You can imagine if you turn review off how long it would take the App Store to just become a toxic kind of a mess. And that would be terrible for the user. It would also be terrible for the developer because the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

> 2. *Centralized Distribution Through the App Store, with App Review, Raises Quality and Prevents Adverse Transaction Outcomes*

207. The challenged conduct also contributes to improving the services and governance mechanisms that prevent outcomes that could have adverse consequences for consumers and developers. These risks extend beyond the reductions in information asymmetry discussed above and relate to the services and governance mechanisms that involve taking the necessary steps to detect and remove harmful apps, developers, and consumer accounts.

### a)    Preventing Adverse Consumer Outcomes

208. There are many adverse outcomes that Apple's current services and governance mechanisms aim to minimize, including the risks posed by and resulting from malware; apps that contain hidden, dormant, or undocumented features that are not disclosed by developers or that could compromise a consumer's offline safety; social engineering attacks that seek to manipulate users into granting access or authorizations for an app to then harm the user; the perpetration of financial fraud; and security and reliability issues associated with outdated apps, among others. Professor Halderman explains these risks and why and how Apple's security architecture protects against these risks.[425] I first provide evidence of these risks and of the App Store's superior performance along some of these dimensions and then explain the different ways in which the challenged conduct contributes to lowering the likelihood of these adverse outcomes.

209. To provide just a few examples, I understand that the App Review process has detected and thwarted apps that masquerade as popular apps, such as Spotify, Headspace, Microsoft Word, and Adobe Flash Photoshop, to deliver malware and retrieve personal information

---

developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."). *See also*, Trial Testimony of Craig Federighi, pp. 3421:16–3422:7 ("[Q.] If app distribution were to be opened up so that sideloading is allowed for iOS devices, do you think that that would have any impact on iOS developers? A. Certainly. One of the great things about -- we think about the App Store is it's a trusted source of apps. And because of that trust and that confidence that users have, they are very free about trying out new software, about trying new apps, about downloading lots of things. And that's helped build this really unprecedented scale of activity for developers, of opportunity for developers, on the App Store. If they become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

[425]    Halderman Opening Report, Section III.A, Section III.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

from users. [426] Apps rejected from the App Store because they could cause adverse outcomes for consumers may nevertheless become available on other app marketplaces that lack the App Store's rigorous review standards. [427] Evidence shows that in other settings, the incidence of adverse consumer outcomes involving malware are significantly higher than those currently observed under Apple's centralized distribution model. For example, Android consumers have been more frequently misled into downloading

---

[426]    Trial Testimony of Trystan Kosmynka, pp. 1089:14–1090:16 ("Q. […] Can you give us examples of rejections you've had to make [because of copycat apps]? A. Yes. I think the -- I don't know individual examples, but the examples are broad in terms of the numbers of apps and developers that attempt to abuse the App Store and other developers by being a copycat. So notably I can think of cases where developers have submitted free V-Bucks for Fortnite. Fortnite wallpaper, get free V-Bucks. There is hundreds of these examples where a developer has tried to capitalize on the name of "Fortnite," and, in addition to that, trick customers into thinking that there is some official affiliation with that and that they're going to get some type of reward. So this would have been rejected as a 4.1 copycat. The same exists for things like Spotify, Headspace. These are popular apps that developers that are bad actors attempt to leverage their popularity and their names and submit hundreds upon hundreds of apps that steal their artwork, their screenshots, their icons, their names. This is absolutely a game of whack-a-mole, but we do so as proactively as possible, and we react swiftly if we do find an example of a copycat that is, you know, making it a less exciting opportunity for our great developers."). *See also*, Trial Testimony of Craig Federighi, pp. 3368:24–3369:15 ("Q. Okay. And so the "develop" part seems more self-evident, an attacker sits down and writes the code. So then what comes next? A. […] One thing [bad actors] might do is package [apps] as a trojan, meaning take something that the user already wants. Here is a free copy of Microsoft Word, of Adobe Flash Player or Photoshop, and, in fact, you don't just get Photoshop, you get Photoshop plus some extra malware added into it. That would be one kind of packaging.").

[427]    Trial Testimony of Trystan Kosmynka, pp. 1087:14–1088:9 ("A. Yes. From time to time, we see apps, and there's one particular that's coming to mind. I think it was called Challenge App, and what Challenge App did was it paid folks to participate in a dare challenge, and when we reject this, what we noticed was that one of the dares was daring someone to jump off a bridge and video it. So we rejected the app. The developer tried to make adjustments over time, but ultimately the app was -- is not available on the store. We've seen other examples of this app on Google Play as well where the video previews there show that in one of the videos, you can see a woman putting whip cream on her chest as a dare. This is a video on the marketing page. In the second image, you can see a male with an inflated condom over his head, which I think could also risk some pretty serious physical harm. And so that's – that's an example that this guideline is applicable to. Q. And, Mr. Kosmynka, the app that you're referencing, is it currently available on Google Play? Have you seen it on Google Play? A. Yeah. I would have to check again, but I recall recently looking at that, and it was still available.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

fraudulent apps,[428] apps with ransomware,[429] and apps with spyware.[430] Studies have estimated that Android devices are 15 times more likely than iOS devices to be affected by malware.[431]

210.    Apple's App Review process also identifies and excludes apps and in-app digital content that contain hidden, dormant, or undocumented features not disclosed by developers, or that could compromise consumers' offline safety, such as apps promoting dangerous offline behaviors or providing false medical data.[432] Apple's App Review process

---

[428]    "Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf, p. 6 ("Android users have been tricked into using insecure methods to download fake versions of apps like Netflix and Candy Crush. These fake apps, either when given access or by exploiting platform vulnerabilities, can spy on Android users via the microphone, take screen shots of their devices, view location, text messages and contacts, steal users' login credentials, and make changes to users' phones. Others have been used to steal banking credentials and take over users' bank accounts.").

[429]    "Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf, p. 6 ("Sideloaded apps on Android have been known to carry out 'locker' ransomware attacks. These malicious apps, if installed, lock users out of their phone or target their photos, unless they agree to pay a ransom. […] A recent ransomware scam involves an Android app masquerading as a COVID-19 contact tracing app. If installed, it encrypts all personal information, leaving an email address to contact if the user wants to rescue their data.").

[430]    "Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf, p. 6 ("One app found on third-party Android app stores tricks users by pretending to be a system update. Once installed, the app displays a 'Searching for update' notification, as it gets access to and steals the user's personal data, such as messages, contacts, and pictures.").

[431]    "Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf, p. 3 ("A study found that devices that run on Android had 15 times more infections from malicious software than iPhone, with a key reason being that Android apps 'can be downloaded from just about anywhere,' while everyday iPhone users can only download apps from one source: the App Store."). *See also*, Apple, "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," October 2021, APL-APPSTORE_11111410–440 at 411 ("Over the past four years, Android devices were found to have 15 to 47 times more malware infections than iPhone."); Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL-APPSTORE_11235149–198 at 181 ("While there is some debate over the relative security of both platforms, Android is the subject of more malware attacks. For example, Nokia's 2020 Threat Intelligence Report found that '26.6 percent of all malware infestations across all platforms' were on Android mobile devices in 2020, compared to 1.7 percent on iPhones.").

[432]    "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("If your app behaves in a way that risks physical harm, we may reject it. For example: […] Medical apps that could provide inaccurate data or information, or that could be used for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

leverages its computer-based and human review capabilities (*see* **Section V.A.3.a**) to reject and remove such apps.[433] In 2023, the App Store rejected over 286,000 submissions for including hidden or undocumented features or features that mislead consumers.[434]

211.  China provides a good illustration of how decentralized distribution of apps and in-app digital content can increase security and privacy violations, leading to adverse outcomes for consumers. A study of Chinese app marketplaces revealed that the measures implemented by many third-party Android app marketplaces to protect consumers from bad actors are weak.[435] These weak measures have led to a higher prevalence of apps that

---

diagnosing or treating patients may be reviewed with greater scrutiny. […] Apps should not urge customers to participate in activities (like bets, challenges, etc.) or use their devices in a way that risks physical harm to themselves or others. […] Don't include any hidden, dormant, or undocumented features in your app; your app's functionality should be clear to end users and App Review.").

[433]  Trial Testimony of Trystan Kosmynka, pp. 1088:19–1089:13 ("A. […] What types of submissions have you had to reject as a result of [the hidden feature guideline]? A. This guideline is particularly challenging because if it's hidden, it's hard for us -- hard for us to find it, so we'll often have to find this post review. But we're here today because of an example of a hidden, dormant, undocumented feature, and so we do see developers implement things that they enable server side, and so in that case, it's not dormant in the app. It's something they have introduced dynamically post review, and we can call it a hotfix, but we see many examples where it's used for incredibly malicious things. Entire concept changes. So, if you will, as a way of example, imagine a benign app that looks like it's for managing wallpapers and it then changes to a gambling casino or a -- a pornography site and it's a complete concept change post review.").

[434]  "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("In 2023, more than 248,000 app submissions were rejected from the App Store because they violated Apple's policies against spam, blatantly copying other apps, or otherwise misleading users. This is in addition to over 38,000 app submissions that were rejected for containing hidden or undocumented features." In aggregate, App Store rejected over 286,000 apps due to these issues.).

[435]  Wang, Haoyu et al., "Beyond Google Play: A Large-Scale Comparative Study of Chinese Android App Markets," *IMC*, Vol. 18, 2018, p. 1 ("Our findings also suggest heterogeneous developer behavior across app stores, in terms of code maintenance, use of third-party services, and so forth. Overall, Chinese app markets perform substantially worse [at] taking active measures to protect mobile users and legit developers from deceptive and abusive actors, showing a significantly higher prevalence of malware, fake, and cloned apps than Google Play.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

request sensitive consumer information or access to the phone camera without justification,[436] as well as a higher prevalence of malware.[437]

212.    Apple also provides services and implements governance mechanisms that seek to protect consumers from fraudulent transactions. For example, the payment services offered by the App Store (*see* **Section V.B.2**) allow consumers to complete app transactions without the need to provide sensitive financial information to developers. In addition to easing transacting for consumers and consequently increasing the likelihood that consumers will engage in transactions,[438] these lower the direct consumer costs associated with being a victim of financial fraud.

---

[436]    Wang, Haoyu et al., "Beyond Google Play: A Large-Scale Comparative Study of Chinese Android App Markets," *IMC*, Vol. 18, 2018, p. 11 ("Note that, in general, Chinese markets contain more over-privileged apps than Google Play. Approximately 65% of the apps in Google Play are overprivileged, while the percentage in Chinese markets is roughly 82%. In two particular cases (25PP and App China), more than 95% of apps requested at least one unused permission.").

[437]    Wang, Haoyu et al., "Beyond Google Play: A Large-Scale Comparative Study of Chinese Android App Markets," *IMC*, Vol. 18, 2018, p. 11 ("Remarkably, roughly 50% of the apps in Chinese markets are flagged at least by one anti-virus engine, while the percentage for Google Play is considerably lower (17.03%) […] In fact, for 11 out of the 16 Chinese markets the percentage of malware exceeds 10%. A particularly remarkable case is the PC Online market, with more than 24% of its apps labeled as potentially malicious. In absolute terms, Tencent and 25PP markets host the largest number of malicious apps (70,988 and 83,655, respectively). On the opposite side, we find Huawei's market, with a figure (4.71%) comparable in magnitude to that of Google Play (2.09%).").

[438]    "How We Pay Digitally: Store Credentials Edition," *PYMNTS*, November 2022, available at https://www.pymnts.com/wp-content/uploads/2022/11/PYMNTS-How-We-Pay-Digitally-November-2022.pdf, p. 7 ("Eighty percent of consumers use stored credentials for online transactions."), p. 15 ("Convenience drives consumers' use of stored payment credentials. […] PYMNTS' data shows that consumers primarily choose to store their payment information because this facilitates a convenient checkout experience. Specifically, 56% of consumers opted to store their payment data because it provides an easier checkout process, given that it is more convenient than manually entering information."). A survey of 2,000 Americans found that 30% of participants dropped out of the online checkout process because they "[had] to re-enter credit card info." "Friction-Filled Online Checkouts Cause Shopping Cart Abandonment," *Forter*, February 20, 2019, available at https://www.forter.com/blog/infographic-customers-wont-tolerate-friction-filled-checkout/. *See also*, Close, Angeline C., Monika Kukar-Kinney, and Timothy Kyle Benusa, "Toward a Theory of Consumer Electronic Shopping Cart Behavior Motivations of E-Cart Use and Abandonment," *Online Consumer Behavior*, 2012, pp. 323–343, p. 329 ("In order to complete a purchase and check out, online shoppers are most frequently required to enter payment information, such as credit card and billing information. […] The checkout phase of online shopping and traditional shopping differ due to the manual entry of credit card payment information by the customer and the customer selecting shipping information. The transaction inconvenience associated with the checkout phase has the ability to influence shoppers' experience and decision of whether to abandon their e-cart. A study conducted to focus specifically on the transaction completion stage discovered that perceived transaction inconvenience associated with the transaction completion process results in a higher propensity to abandon the shopping cart […].").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

213.   The services and governance mechanisms that mitigate market failure and benefit consumers, as demonstrated by the examples and statistics above, are improved in many ways by the challenged conduct, and the risk of market failure is also lowered by the challenged conduct.[439]

214.   Faced with a negative experience associated with an app transaction, a consumer's perception of the value of iOS devices and the Apple brand could be affected adversely as discussed earlier, in turn making developing apps for iOS less attractive to developers.[440]

215.   In summary, negative experiences that could be disruptive for consumers, such as exposure to malware, the breach of their private data (including financial or health information), or issues associated with outdated apps, can have negative impacts on a consumer's trust and willingness to engage with iOS devices in general. If consumers are discouraged in engaging with iOS apps and in-app digital content, then developer participation will be impacted as well, ultimately resulting in fewer iOS apps, fewer transactions for iOS apps, thereby harming consumers.

**b)    Preventing Adverse Post-Transaction Developer Outcomes**

216.   Developers also can face harm in the absence of the challenged conduct, which, for example, provides protections against copycat and pirated apps, consumer fraud, and the prevalence of fake user ratings and reviews. I understand that Professor Halderman explains various aspects of these risks and the App Store's superior performance along

---

[439]   Trial Testimony of Craig Federighi, pp. 3389:14–3390:12 ("THE COURT: So I'm going to ask the obvious question, and because it has come up so many times during the trial. There are multiple stores on the Mac, so that, then, could happen on the Mac. Why can't you -- you know, why should we not allow the same stores to exist on the phone? THE WITNESS: Yeah, it certainly -- it is how it is done on the Mac, and it is regularly exploited on the Mac. iOS has established a dramatically higher bar for customer protection. […] THE COURT: Okay. Same question with the Android. THE WITNESS: So Android has a considerable malware problem, something like, you know, 50 times the malware of iOS.").

[440]   Trial Testimony of Tim Cook, p. 3885:3–11 ("A. […] [An order requiring Apple to permit sideloading of unreviewed apps on the iPhone and to permit alternative app stores that would offer apps that have not been reviewed by Apple] would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted dond they're less likely to have good opportunity to reach users.").

137

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

some of these dimensions,[441] and then explains why, were the incidence of these adverse developer outcomes to increase, the perception among developers about the value of developing apps for iOS could be negatively impacted, leading to a lower level of app development overall and thereby harming consumers.

217. To briefly summarize, the App Review process seeks to prevent the distribution of copycat apps, apps which closely imitate other apps or use their IP, as well as pirated apps, which are illegal versions of legitimate apps offered without the authorization of the original developer. [442] The App Review process identifies and removes such apps as well as the developers that create them.[443] Removing copycat apps protects the IP and earnings of developers of original and innovative apps.[444] Between 2020 and 2023, the App Store

---

[441] Halderman Opening Report, Section III.A, Section III.B.

[442] "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("Come up with your own ideas. We know you have them, so make yours come to life. Don't simply copy the latest popular app on the App Store, or make some minor changes to another app's name or UI and pass it off as your own. In addition to risking an intellectual property infringement claim, it makes the App Store harder to navigate and just isn't fair to your fellow developers. "Submitting apps which impersonate other apps or services is considered a violation of the Developer Code of Conduct and may result in removal from the Apple Developer Program."). *See also,* Trial Testimony of Trystan Kosmynka, p. 1028:710 ("A. If an app is confusingly similar, it would be rejected."), p. 1090:12–16 ("[Removing copycats] is absolutely a game of whack-a-mole, but we do so as proactively as possible, and we react swiftly if we do find an example of a copycat that is, you know, making it a less exciting opportunity for our great developers.").

[443] Trial Testimony of Trystan Kosmynka, pp. 1089:14–1090:16 ("Q. And, Mr. Kosmynka, let's look at Guideline 4.1 [of the App Review process]. This is on copycats. It's on page 14 of the guidelines. And the language here is 'Come up with your own ideas. We know you have them so make yours come to life. Don't simply copy the latest popular app on the App Store.' Q. Can you give us examples of rejections you've had to make as a result of that guideline? A. Yes. I think the -- I don't know individual examples, but the examples are broad in terms of the numbers of apps and developers that attempt to abuse the App Store and other developers by being a copycat. So notably I can think of cases where developers have submitted free V-Bucks for *Fortnite*. *Fortnite* wallpaper, get free V-Bucks. There is [*sic*] hundreds of these examples where a developer has tried to capitalize on the name of 'Fortnite,' and, in addition to that, trick customers into thinking that there is some official affiliation with that and that they're going to get some type of reward. So this would have been rejected as a 4.1 copycat. The same exists for things like Spotify, Headspace. These are popular apps that developers that are bad actors attempt to leverage their popularity and their names and submit hundreds upon hundreds of apps that steal their artwork, their screenshots, their icons, their names. This is absolutely a game of whack-a-mole, but we do so as proactively as possible, and we react swiftly if we do find an example of a copycat that is, you know, making it a less exciting opportunity for our great developers.").

[444] Trial Testimony of Trystan Kosmynka, pp. 1089:25–1090:16 ("So notably I can think of cases where developers have submitted free V-Bucks for Fortnite. Fortnite wallpaper, get free V-Bucks. There is [*sic*] hundreds of these examples where a developer has tried to capitalize on the name of 'Fortnite,' and, in addition to that, trick customers into thinking that there is some official affiliation with that and that they're going to get some type of reward. So this would have been rejected as a 4.1 copycat. The same exists for things like Spotify, Headspace. These are popular apps that developers that are bad actors attempt to leverage their

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

identified and removed over 400 copycat apps[445] and approximately 700,000 apps for misleading users.[446] A study using data from Chinese Android app marketplaces shows that copycat apps are common on these app marketplaces and especially on smaller app marketplaces that wish to increase their number of listed apps and downloads.[447] These copycat apps decrease the total number of downloads of the original apps, thereby harming legitimate developers,[448] and decrease the investments that legitimate app developers make in creating higher quality apps.[449]

---

popularity and their names and submit hundreds upon hundreds of apps that steal their artwork, their screenshots, their icons, their names.").

[445] The App Store identified 211 and 268 copycat apps in 2022 and 2023, respectively. "2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf. *See also*, "2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

[446] The App Store identified more than 150,000, 157,000, 153,000, and 248,000 apps for such violations in 2020, 2021, 2022, and 2023, respectively, totaling more than 708,000 apps during this period. "App Store Stopped More than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020. *See also*, "App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021;"App Store Stopped More than $2 Billion in Fraudulent Transactions in 2022," *Apple*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022; "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[447] Cao, Jingcun, Avery Haviv, and Nan Li, "The Spillover Effects of Copycat Apps and App Platform Governance," available at https://ssrn.com/abstract=4250292, p. 21 ("On average, each incumbent app has 3.6 copycat apps in our data. Recall that our sample consists of 10% of the top 50% of apps by downloads. Therefore, we estimate that the average incumbent in the top 50% of downloads has an average of 36 copycats across all Android markets. [...] Larger app markets, like Tencent, Baidu, and 360 Mobile, have the lowest percentage of copycats. This may be because smaller app markets have larger incentives to allow copycats on their platform to boost the total number of apps available.").

[448] Cao, Jingcun, Avery Haviv, and Nan Li, "The Spillover Effects of Copycat Apps and App Platform Governance," available at https://ssrn.com/abstract=4250292, p. 30 ("As an example of this spillover effect, consider 'My Talking Angela,' a popular casual mobile game available on the Baidu platform. On the Baidu platform, this game faced seven copycats, which were collectively downloaded 508,063 times in the first week of June 2017, while 'My Talking Angela' was downloaded 193,430 times. Our point estimates indicate that the existence of copycat apps resulted in a decrease of 40.4% for 'My Talking Angela' in that week, so in the absence of copycats, it would have been downloaded 478,887 times. While these copycats led to a substantial decrease in demand for the incumbent, they did increase the total downloads on the platform by 222,606.").

[449] Cao, Jingcun, Avery Haviv, and Nan Li, "The Spillover Effects of Copycat Apps and App Platform Governance," available at https://ssrn.com/abstract=4250292, p. 36 ("However, platform managers should be aware that highly rated, popular apps are harmed by the presence of copycats, and that this leads developers of highly rated incumbent apps launching on additional platforms, and to neglect improving the experiential quality of their apps.").

139

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

218.    The App Store also detects and removes fraudulent consumer accounts, which among other things, can manipulate peer ratings and user reviews.[450] Fake ratings and reviews can harm developers by, for example, allowing their competitors to engineer a negative perception of their apps or in-app digital content. Fraudulent ratings and reviews also affect a developer's perception about the value of developing apps for both iOS and in general.[451] As shown below (*see* **Figure VI.2**), between 2020 and 2023, the App Store deactivated over one billion consumer accounts due to fraudulent and abusive activity. In 2023, the App Store removed close to 152 million fake ratings or reviews.[452]

[450]    "App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/ ("If we find that you have attempted to manipulate reviews, inflate your chart rankings with paid, incentivized, filtered, or fake feedback, or engage with third-party services to do so on your behalf, we will take steps to preserve the integrity of the App Store, which may include expelling you from the Apple Developer Program.").

[451]    Lightner, Freeman and Richard Harris, "Fake App Reviews Impact Developers More than You Think," *App Developer Magazine*, June 29, 2023, available at https://appdevelopermagazine.com/fake-app-reviews-impact-developers-more-than-you-think/ ("Fake app reviews are not only unfair to users, but they are also not fair to developers who ethically work towards gaining authentic app reviews. […] Fake ratings can mislead users and damage the reputation of the app and its developers. […] It creates a distorted and dishonest environment that undermines the integrity of the app marketplace.").

[452]    "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/ ("In addition, Apple's persistent efforts to stop and reduce fraud on the App Store resulted in the termination of nearly 374 million developer and customer accounts, and removal of close to 152 million ratings and reviews over fraud concerns.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Figure VI.2**
**Estimated Number of Consumer Accounts Deactivated Due to Fraudulent and Abusive
Activity on the App Store (millions)
2020–2023[453]**



219.  In addition, the App Store identifies and blocks fraudulent transactions. Apple's ability to understand, detect, and block fraudulent transactions relies on a team of approximately 5,000 agents who investigate transaction concerns from consumers and use reported information to identify, for example, fraudulent credit cards.[454] Apple's ability to look for

---

[453]  **Sources:** [1]"App Store Stopped More than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020;[2]"App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021;[3]"App Store Stopped More than $2 Billion in Fraudulent Transactions in 2022," *Apple*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022; [4] "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[454]  Trial Testimony of Phillip Schiller, pp. 3186:18–3187:16 ("Q. [Epic's attorneys] suggested to you that perhaps third parties should be permitted to have their own payment mechanism within the App Store, correct? A. Yes. Q. And as a businessman, sir, do you have any objection to that? A. Certainly. I have a number of issues with that idea. Q. What are your issues? A. Well, first, I do think users value the features we provide through in-app purchase that allow you to know what purchases have occurred, manage those purchases, cancel subscriptions, use apps to buy, use parental controls, on and on. There are a number of features that all work because it all works and connects with that commerce engine. Secondly, it matters to our -- all the Apple care agents that handle refunds. We've got 5,000 agents users call looking for support for their refunds. If Apple actually didn't manage those transactions, it's just harder for us to support that as well. And we lose the ability to understand a number of the fraud vectors that our fair team manages to look for, fraudulent credit cards, fraudulent

141

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and investigate potentially fraudulent transactions has helped the App Store block over 14 million stolen credit cards worldwide,[455] and prevent billions of dollars in fraud between 2020 and 2023 (*see* **Figure VI.3**). Blocking fraudulent transactions can have a positive impact on developers, who otherwise may end up distributing apps and in-app digital content without receiving compensation for the investments they made creating these apps, or worse, causing developers to have to bear additional costs associated with fraudulent transactions.[456] Detecting these fraudulent transactions contributes to reducing adverse outcomes and increase trust.

---

transaction across applications, and so we'll just do a less good job for customers there as well."), p. 2796:3–23 ("Q. And do the IAP APIs interact with any fraud checks within the commerce engine? A. It does. Q. And can you describe that, please. A. Well, we have a team that manages looking out for fraudulent transactions, fraudulent credit cards, fraudulent trends from users or developers, and tries to protect those transactions from occurring before they happen, if they can. Q. And would -- and how do they do that? In other words, what are they looking for? A. They're looking at a lot of sources of data that use machine learning models to project trends in major transactions as they're occurring and understand a number of variables that detect whether a transaction is fraudulent. I'm not an expert in machine learning for fraudulent transactions, but we have a team of people that that's what they provide to the commerce process of the App Store. Q. And is having a large dataset helpful in that process? A. Absolutely. There are things you can't detect or see unless you see a large number of transactions coming from a user population or geography or across multiple applications.").

[455]  "App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

[456]  Karp, Gregory, "Who Pays When Merchants Are Victims of Credit Card Fraud?," *NerdWallet*, March 31, 2023, available at https://www.nerdwallet.com/article/credit-cards/merchants-victims-credit-card-fraud ("This can get tricky and could come down to whether the fraudulent transaction involved an actual card — called 'card-present' fraud — or just the credit card number, called 'card-not-present' fraud. Examples are a card dipped into a payment-card reader in a retail store versus paying for an online transaction by typing in a credit card number. Generally, the bank is more likely to be liable for the fraud for card-present transactions, while the merchant might get stuck with the cost for transactions without a physical card. (Merchants using the older swipe payment terminals and not the newer chip readers also incur more liability.)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Figure VI.3**
**Estimated Value of Fraudulent Transaction Blocked on the App Store (billions)**
**2020–2023**[457]



220.   The App Store's early commitment to limiting instances of adverse outcomes for developers contrasts with the approach of the Google Play Store, which had no app review prior to 2015, and whose subsequently introduced app review process appears to be less comprehensive than that of the App Store.[458] Developers have noted that that the lack of an app review process on the Play Store was "detrimental to the whole ecosystem,"[459] and

---

457   **Sources:** [1]"App Store Stopped More than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020; [2]"App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021;[3]"App Store Stopped More than $2 Billion in Fraudulent Transactions in 2022," *Apple*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022; [4]"App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

458   Cunningham, Andrew, "Google Play Apps and Updates Are Now Subject to a Review Process," *Ars Technica*, March 17, 2015 available at https://arstechnica.com/gadgets/2015/03/google-play-apps-and-updates-are-now-subject-to-a-review-process/. ("Apple has had a team of real humans evaluating third-party app submissions since the dawn of the App Store, but the Android Market (now Google Play) was more permissive—aside from some automated malware scanning, Google didn't do much to make sure apps worked like they were supposed to and did what they said they did. The Google Play store had apps that did more things, but the quality and security of those apps could be all over the place.").

459   Apple, "iPhone Developer Program Satisfaction Survey," March 2010, APL_APPSTORE_09324150–288 at 241.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

have expressed their preference for developing apps for the App Store over Android because "[t]he Android Market Place is unregulated, and swamped with poor quality Apps."[460] Additionally, piracy has been observed as prevalent in third-party app marketplaces, resulting in billions of dollars in losses for developers.[461]

221. The App Store's services and governance mechanisms that mitigate market failure and benefit developers, as demonstrated by the examples and statistics above, are improved for many reasons by the challenged conduct, and the risk of market failure is also lowered because of the challenged conduct. It is thus possible that absent the challenged conduct, developers would be at a greater risk of adverse outcomes.[462] As discussed earlier, Apple has a greater incentive to prevent adverse app transaction outcomes for consumers that may lower their quality perception of iOS and their iOS devices, and thus a greater incentive to lower the incidence of piracy and otherwise perform effective and ongoing review of apps. This assessment is borne out by the data. In 2018, it was estimated that of the 70 billion app downloads on third-party app marketplaces, 15 to 20 percent were downloads of pirated apps, resulting in losses of over $17 billion to legitimate developers between 2014 and 2018.[463]

222. Negative experiences that could be disruptive for developers can have negative impacts on a developer's trust and willingness to engage with iOS. Absent the challenged conduct, opportunistic developers could have greater opportunity to free-ride on other developers' investments in creating high-quality apps. These adverse outcomes could discourage

---

[460]  Apple, "iPhone Developer Program Satisfaction Survey," August 2010, APL_APPSTORE_09324447–608, 559.

[461]  Koetsier, John, "App Developers Losing $3-4 Billion Annually Thanks to 14 Billion Pirated Apps," *Forbes*, July 25, 2017, available at https://www.forbes.com/sites/johnkoetsier/2017/07/24/app-developers-losing-3-4-billion-annually-thanks-to-14-billion-pirated-apps/ ("The pirated app economy is almost entirely invisible to consumers in Europe and North America, where most install apps from two sources: Google Play and the iOS App Store. These apps are generally safe and generally kosher. App pirating generally occurs on third-party app stores in China and other countries [...] All that piracy is expensive. 'This means that the developer community stands to lose between $3 billion and $3.8 billion in revenue per year.'").

[462]  Halderman Opening Report, Section III.B, Section IV.A.

[463]  Koetsier, John, "The Mobile Economy Has a $17.5B Leak: App Piracy," *Forbes*, February 2, 2018, available at https://www.forbes.com/sites/johnkoetsier/2018/02/02/app-publishers-lost-17-5b-to-piracy-in-the-last-5-years-says-tapcore.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

developers from creating iOS apps and engaging in transactions of iOS apps, thereby harming consumers.

## D.    The Challenged Conduct Does Not Restrain Interbrand Competition

223.    As I showed in **Section V.B**, the App Store is a two-sided transaction platform that facilitates transactions between consumers and developers.[464] That is, the App Store does not, contrary to Plaintiffs' claims, buy the apps from developers and sell them directly to consumers as a typical one-sided business would do.[465] However, as discussed in **Section VI.C**, faced with a negative experience associated with an app transaction, a consumer's perception of the value of iOS devices and the Apple brand could be affected adversely,[466] which in turn could affect the overall participation in iOS. To mitigate this risk to its brand and mitigate the varied sources of market failure discussed in **Section IV.B**, Apple instituted services and governance mechanisms in the App Store, of which the challenged conduct is a core component.

224.    Conduct that may reduce *intrabrand* competition can simultaneously foster or enhance *interbrand* competition, which the Supreme Court has consistently maintained for over 40 years is the "primary concern of antitrust law."[467] Interbrand competition—competition

---

[464]    Belleflamme, Paul and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021, p. 110 ("[W]hen a firm is organized as a platform, it makes it possible for sellers (or service providers) and buyers (or customers) to interact directly; it therefore leaves the residual control rights over the provision of the service (or the sale of the product) to independent professionals. In contrast, when a firm is vertically integrated or when it operates as a reseller, it keeps the residual control rights for itself.").

[465]    Third Amended Complaint, ¶ 47 ("Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iOS Devices customers or collect payments from the customers.").

[466]    Trial Testimony of Tim Cook, p. 3885:3–11 ("A. […] [An order requiring Apple to permit sideloading of unreviewed apps on the iPhone and to permit alternative app stores that would offer apps that have not been reviewed by Apple] would also be terrible for the developer because the developer depends on the store being a safe and trusted place where customers want to come and feel good about transacting."); Trial Testimony of Craig Federighi, p. 3422:1–7 ("[A.] If [consumers] become more wary, if they start having bad experiences where they feel like they have to be careful and don't trust downloading, this will mean they are less likely to do so and this means less opportunities, especially for new developers who might be trying to get recognized. They might be seemingly less trusted and they're less likely to have good opportunity to reach users.").

[467]    Opinion, *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, No. 06–480, Supreme Court of the United States, 2006 127 S. Ct. 2705 (2007) 551 U.S. 877, No. 06-480, Supreme Court of the United States, p. 2 ("[minimum resale price maintenance] can stimulate interbrand competition among manufacturers selling different brands of the same type of product by reducing intrabrand competition among retailers selling the same brand. This is important because the antitrust laws' "primary purpose… is to protect interbrand

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

among different brands or manufacturers of similar products—can lead to more innovation, improved product and service quality and more competitive pricing, all of which benefit consumers.[468] As an economic matter, I agree with the findings of the district court and the Ninth Circuit in *Epic v. Apple* that the centralized app distribution on the App Store are restraints on in*tra*brand competition (competition between iOS apps) that do not restrain in*ter*brand competition.[469]

225.   Apple's challenged conduct does not restrain interbrand competition with or among other app marketplaces that run on other operating systems and devices, or competition with or among devices used to run the apps obtained from these app marketplaces. Owing to the challenged conduct, the App Store's services and governance mechanisms differentiate the App Store and Apple's devices from other app marketplaces and other devices along dimensions that include privacy, security, reliability, app quality and fraud protection. The challenged conduct thus enables Apple to compete for consumers who value these attributes, while not restraining the ability of app marketplaces that run on other operating

---

competition." References omitted.). *See also*, Opinion, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, No. 76–15, Supreme Court of the United States, 1977 Supreme Court of the United States, at 52, n. 19. ("Interbrand competition is the competition among the manufacturers of the same generic product— television sets in this case—and is the primary concern of antitrust law.").

[468]   Friedman, Alan, "From the Antitrust Mailbag: Manufacturer–Imposed Requirements," *Federal Trade Comission*, October 22, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/10/antitrust-mailbag-manufacturer-imposed-requirements ("For instance, manufacturer-imposed restrictions that reduce competition among dealers in the same brand ('intrabrand competition') can serve to sharpen contrasts between brands ('interbrand competition'), and as a result, enhance price, quality, and service competition between different brands for the net benefit of consumers. The bottom line is that the antitrust laws primarily protect and promote interbrand competition and evaluate any restrictions on intrabrand competition through that lens." Emphasis omitted.).

[469]   Rule 52 Order After Trial on the Merits, *Epic Games Inc., v. Apple Inc.*, No. 4:20–cv–05640-YGR, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, September 10, 2021 ("Epic Order"), pp. 145–146 ("As a corollary of the security justification, the app distribution restrictions promote interbrand competition. The Supreme Court has recognized that limiting intrabrand competition can promote interbrand competition. *Leegin*, 551 U.S. at 890. For example, restricting price competition among retailers who sell a particular product can help the manufacturer of that product compete against other manufacturers. *Id.* at 890–91. It is this interbrand competition that 'the antitrust laws are designed primarily to protect.' *Id*. at 895. Here, centralized app distribution and the "walled garden" approach differentiates Apple from Google. That distinction ultimately increases consumer choice by allowing users who value open distribution to purchase Android devices, while those who value security and the protection of a 'walled garden' to purchase iOS devices. This, too, is a legitimate procompetitive justification."); Epic Ninth Circuit Opinion, pp. 56–57 ("Rather, Apple imposed intrabrand limitations (that iOS devices use Apple distribution and payment-processing channels) and contends that these restrictions tap into consumer demand for a private and secure user experience and distinguish the App Store from its open-platform competitors.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

systems or manufacturers of other devices to compete for consumers by adopting comparable or different services and governance mechanisms.

226. Apple's choice to implement the services and governance mechanisms does not restrain in any way interbrand competition between app marketplaces that run on other operating systems or devices, or interbrand competition between devices that run the apps obtained from these app marketplaces. App marketplaces on other operating systems are free to adopt services and governance mechanisms of their choosing and device manufacturers are free to choose arrangements comparable to the challenged conduct. Depending on their choices, these app marketplaces and device manufacturers are free to choose any pricing structure to monetize their investments and innovation. Apple's challenged conduct neither precludes interbrand differentiation nor imposes any constraints on the choices of pricing structures or monetization strategies by other app marketplaces and device manufacturers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Respectfully submitted,


_____          March 7, 2025
Arun Sundararajan, Ph.D.                                    Date

148

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX A

## Curriculum Vitae and Prior Testimony

## Arun Sundararajan

CONTACT INFORMATION

Leonard N. Stern School of Business
New York University
44 West 4TH Street, KMC 8-90
New York, NY 10012

Phone: (212) 998 0833
Web: *https://digitalarun.io/*
Email: *digitalarun@nyu.edu*
*https://linkedin.com/in/digitalarun*

U.S. Permanent Resident (Indian Citizen)

### SUMMARY

Arun Sundararajan is the Harold Price Professor of Entrepreneurship and Technology at New York University's (NYU) Stern School of Business, where he is also Director of the Fubon Center for Technology, Business and Innovation. An internationally recognized expert on artificial intelligence governance and digital strategy, his best-selling and award-winning book, "The Sharing Economy," published by the MIT Press, has been translated into Japanese, Korean, Mandarin Chinese, Portuguese and Vietnamese.

Arun's research studies how digital technologies transform business, government and civil society, with a recent focus on the trust in artificial intelligence, generative AI and platform-driven change, digital strategy, platform strategy, and the digital future of work. He has published numerous scientific papers in peer-reviewed academic journals and conferences, and op-eds in outlets that include The New York Times, The Financial Times, CNBC, TIME, The Guardian, Wired, Bloomberg View, Le Monde, El Pais, the Economic Times and the Japan Times.  His scholarship has been recognized by numerous Best Paper awards, two Google Faculty awards, an Axiom Best Business Books Award, and a Thinkers50 Award. He has given hundreds of keynote and plenary talks. He has been invited to speak to the United States Congress, the European Parliament, the United Nations, and numerous regulators globally.

For 2025-26, Arun is co-chair of the World Economic Forum's Global Future Council on Data Frontiers, and is also a member of their AI Governance Alliance. He is a former member of the Carnegie Council's AI and Equality advisory board, and serves as a board member and advisor to numerous organizations, ranging from startups to Fortune 100s. He teaches in executive education programs in the United States, Europe and Asia, focusing primarily on AI, platforms and governance. He is a frequent angel investor.

### EDUCATION

**1998**        **University of Rochester**                                                **Rochester, NY**
*Ph.D. in Business Administration*
*Dissertation Title:* Modeling and Designing Business Processes
Thesis Committee: Abraham Seidmann (advisor), Marshall Freimer, Eugene Kandel, Harry Groenevelt (reader), Leslie Marx (reader).

**1995**        **University of Rochester**                                                **Rochester, NY**
*Master of Science in Management Science*
Major in operations research, completed requirements for major in applied economics.

**1993**        **Indian Institute of Technology**                                       **Madras, India**
*Bachelor of Technology in Electrical Engineering*

A-1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EMPLOYMENT**

**1998-present    New York University, Leonard N. Stern School of Business         New York, NY**

*Director, Fubon Center for Technology, Business and Innovation (2024-present)*
*Harold Price (Endowed Chair) Professor of Entrepreneurship (2019-present)*
*Robert L. and Dale Atkins Rosen Faculty Fellow (2014-2019)*
*Full Professor of Technology, Operations and Statistics (2013-present)*
*Affiliated Faculty Member, NYU Center for Data Science (2013-present)*
*NEC Faculty Fellow (2007-2014)*
*Director, IS Doctoral Program (2007-16)*
*Associate Professor with Tenure (2007-2013)*

**Visiting Faculty Positions:** Indian School of Business (2006, 2012), Seoul National University (2009)

**SELECTED OTHER PROFESSIONAL APPOINTMENTS**

Co-Chair, World Economic Forum Global Future Council on Data Frontiers (2025-26)

World Economic Forum AI Governance Alliance (2023-present)

Advisory Board, Carnegie Council on Ethics in International Affairs (2020-24)

Steering Committee, World Economic Forum Future Models in Consumer Industries (2017-19)

Board of Directors, RSE Markets Inc. (2016-21)

Member, World Economic Forum Global Future Council (2016-20)

Fellow, Urban Design Forum (2016-17)

Policy Advisor, Walmart Corporation (2017-present)

Advisor, Samasource (2017-19)

Advisor, Female Founders Fund (2016-present)

Technology Advisory Board, City of New York (2015-16)

Advisor, OuiShare (2014-18)

Advisor, National League of Cities (2014-19)

**SELECTED LEADERSHIP EXPERIENCE, GRANTS AND RECOGNITION**
- Chair, Undergraduate AI Committee (2024-present)
- Director, Fubon Center for Technology, Business and Innovation (2024-present)
- Head, NYU Stern-Flipkart Digital India Initiative (2024-present)
- Recruiting Chair, Technology, Operations and Statistics Department (2023, 2022, 2019, 2018, etc)
- NYU Stern Schoolwide Promotion and Tenure Committee (2019-present)
- Faculty Senator, NYU University Senate (2016-17)
- Chair, Administration and Technology Committee, NYU Faculty Senators Council (2016-17)
- Chair, NYU Stern Faculty Council (2014-15)
- NYU Stern Faculty Council (2013-16)
- NYU Center for Urban Science and Progress, Head of Social Cities Initiative (2013-19)
- Director (IT Economics Track), NYU Stern Center for Digital Economy Research (2004-2011).

A-2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Dean Menon Research Award (2023)
- Workshop on Information Systems and Economics, Best Overall Paper Award, Runner-up (2020)
- Network Science, Inaugural Best Paper Award (2017)
- Axiom Best Business Books Award (2017)
- Thinkers 50 Radar Thinker (2016)
- Best Conference Paper Award, INFORMS Conference on Information Systems and Technology (2008 and 2014)
- Management Science Best Paper Award, Runner-up (2013)
- Best Paper Award (JSBM Editor's Choice Award), Conference of the US Association for Small Business and Entrepreneurship (January 2006).
- Best Overall Paper Award, Twenty-Fifth International Conference on Information Systems (2004).
- Facebook Research Award (2015)
- Google Faculty Research Award (2010 and 2015)
- Research Grant, Kauffman Foundation (2014)
- NYU Stern Center for Global Business Research Grant (2012 and 2013)
- IBM Shared University Research Grant (2008 and 2009)
- IIIP Research Grant (2008)
- MSI Research Grant, Marketing Science Institute (2007).
- Kauffman Research Grant, NYU Stern Berkley Center for Entrepreneurship (2006).
- NET Institute Summer Research Grants (2005, 2006 and 2011)

PUBLICATIONS

(A) BOOKS

Sundararajan, A., 2016. *The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism* (Hardcover). Boston: MIT Press, June 2016 (***http://s12y.com***)

*(Japanese language translation published November 2016; Mandarin Chinese language translation published April 2017; US English paperback version published April 2017; translations into Korean, Portuguese and Vietnamese published 2018.)*

Selected acclaim and coverage for the book
- Awards: *Axiom Best Business Books Award 2017 (Economics, Bronze)*
- Features: *The New York Times, TIME Magazine, The Wall Street Journal, The Washington Post, The Atlantic, Bloomberg View, TED Ideas, Fortune, Quartz*
- Editorial reviews: *The Financial Times, The Chronicle of Higher Education, Strategy+Business, Stanford Social Innovation Review, Management Today, International Monetary Fund*
- TV/Radio interviews: *The Charlie Rose Show, NPR's The Diane Rehm Show, Bloomberg Markets, NPR's Marketplace, The Bloomberg Advantage*
- Podcasts: *a16z Podcast, Curious Minds, Bloomberg Masters in Business, Smart People Podcast*

A-3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**(B) JOURNAL ARTICLES**

- Sundararajan, A., 2025. How Corporate Boards Must Approach AI Governance. *Journal of Financial Transformation*, forthcoming.
- D' Auria, G., Sundararajan, A, 2023. Rethinking Intellectual Property Law in an Era of Generative AI. *TechREG Chronicle*, November 2023, 3-11.
- Filippas, A., Jagabathula, S., Sundararajan, A., 2023. The Limits of Centralized Pricing in Online Markets and the Value of User Control. *Management Science* 69(12), 7202-7216.
- Nian, T. and A. Sundararajan, 2022. Social Media Marketing, Quality Signaling and the Goldilocks Principle. *Information Systems Research* 33(2), 540-556.
- Xin, M. and Sundararajan, A., 2020. Nonlinear Pricing of Software with Local Demand Inelasticity. *Information Systems Research* 31(4), 1224–1239.
- Rhue, L. and A. Sundararajan. 2019. Playing to the Crowd? How Digital Visibility Alters Consumer Choice. *MIS Quarterly* 43(4), 1127-1141
- Sundararajan, A., 2019. The Twilight of Brand and Consumerism? Digital Trust, Cultural Meaning, and the Quest for Connection in the Sharing Economy. *Journal of Marketing* 83 (5), 32-35.
- Sundararajan, A., 2018. Crowd-Based Capitalism, Automation, and the Future of Work. *University of Chicago Legal Forum* Volume 2017, 487-511.
- Sundararajan, A., 2017. The Future of Work. *Finance and Development* 54 (2), 6-11.
- Oestreicher-Singer, Sundararajan, A., and G. Kane, 2017. The Power of Product Recommendation Networks. *MIT Sloan Management Review* 59 (1), 7-10.
- Carmi, E., Oestreicher-Singer, G. and A. Sundararajan, 2017. Is Oprah Contagious? The Depth of Diffusion of Demand Shocks in Online Networks. *MIS Quarterly* 41 (1), 207-221.
- Bapna, R., Gupta, A., Rice, S., Sundararajan, A., 2017. Trust and the Strength of Ties in Online Social Networks: An Exploratory Field Experiment. *MIS Quarterly* 41 (1), 115-130.
- Cohen, M. and A. Sundararajan, 2015. Self-Regulation and Innovation in the Peer-to-Peer Sharing Economy. *University of Chicago Law Review* 82, 116-131.
- Dhar, V., Geva, T., Oestreicher-Singer, G., and A. Sundararajan, 2014. Prediction with Economic Networks. *Information Systems Research* 25 (2), 264 - 284.
- Rhue, L. and A. Sundararajan, 2014. Digital Access, Political Networks and the Diffusion of Democracy. *Social Networks* 36(1): 40-53.
- Radner, R., Radusnksaya, A., and A. Sundararajan, 2014. Dynamic Pricing of Network Goods with Boundedly Rational Consumers. *Proceedings of the National Academy of Sciences* 111, 99-104.
- Aral, S., Muchnik, L. and A. Sundararajan, 2013. Engineering Social Contagions: Optimal Network Seeding in the Presence of Homophily. *Network Science* 1 (2): 125–153
  ***(Winner, 2017 Best Paper Award for Best Published Paper in Network Science, 2013-16)***
- Sundararajan, A., F. Provost, G. Oestreicher-Singer and S. Aral, 2013. Information in Digital, Economic and Social Networks. *Information Systems Research* 24(4): 883-905.
- Oestreicher-Singer, G. and A. Sundararajan, 2012. The Visible Hand?  Demand Effects of Recommendation Networks in Electronic Markets. *Management Science* 58 (12): 1963-1981.
  ***(First Runner-Up Award for Best Published IS Paper in Management Science, 2010-12)***
- Oestreicher-Singer, G. and A. Sundararajan, 2012. Recommendation Networks and the Long Tail of Electronic Commerce. *MIS Quarterly* 36 (1): 65-83.

A-4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Huang, K. and A. Sundararajan, 2011. Pricing Digital Goods: Discontinuous Costs and Shared Infrastructures. *Information Systems Research* 22 (4): 712-738.

- Sankaranarayananan, R. and A. Sundararajan, 2010. Electronic Markets, Search Costs and Firm Boundaries. *Information Systems Research* 21 (1): 154-169.

- Aral, S., Muchnik, L. and A. Sundararajan, 2009. Distinguishing Influence Based Contagion from Homophily Driven Diffusion in Dynamic Networks. *Proceedings of the National Academy of Sciences* 106: 21544-21549.

- Dhar, V. and A. Sundararajan, 2007. Information Technologies in Business: A Blueprint for Education and Research. *Information Systems Research* 18 (2), 125-141.

- Sundararajan, A., 2007. Local Network Effects and Complex Network Structure. *Contributions to Theoretical Economics* 7 (1).

- Ghose, A. and A. Sundararajan, 2006. Evaluating Pricing Strategy Using Ecommerce Data: Evidence and Estimation Challenges. *Statistical Science* 21: 131-142.

- Aron, R., A. Sundararajan, A., and S. Viswanathan, 2006. Intelligent Agents in Electronic Markets for Information Goods: Customization, Preference Revelation and Pricing. *Decision Support Systems* 41: 764-786.

- Sundararajan, A., 2004. Nonlinear Pricing of Information Goods. *Management Science* 50 (12): 1660-1673.

- Sundararajan, A., 2004. Managing Digital Piracy: Pricing and Protection. *Information Systems Research* 15 (3): 287-308.

- Sundararajan, A., 2004. Nonlinear Pricing and Type-Dependent Network Effects. *Economics Letters* 83: 107-113.

- Arunkundram, R., and A. Sundararajan, 1998. An Economic Analysis of Electronic Secondary Markets: Installed Base, Technology, Durability and Firm Profitability. *Decision Support Systems* 24: 3-16.

- Seidmann, A. and A. Sundararajan, 1997. Competing in Information Intensive Services: Analyzing the Impact of Task Consolidation and Employee Empowerment. *Journal of Management Information Systems* 14: 33-56.

- Seidmann, A. and A. Sundararajan, 1997. The Effects of Task and Information Asymmetry on Business Process Redesign. *International Journal of Production Economics* 50: 117-128.


**(C) PAPERS UNDER REVIEW**

- Li, R., Sedoc, J. and Sundararajan, A., 2025. Reasoning and the Trusting Behavior of DeepSeek and GPT: An Experiment Revealing Hidden Fault Lines in Large Language Models.

- Wu, C. and Sundararajan, A., 2025. Generative AI, Productivity and Incentives for AI Twins.

- Rhue, L., Goethals, S. and A. Sundararajan, 2024. Evaluating LLMs for Gender Disparities in Notable Persons.

- Li, R. and A. Sundararajan, 2024. The Rise of Recommerce: Ownership and Sustainability with Overlapping Generations.

- Raj, M., Sundararajan, A., You, C., 2024. How Disrupting a Traditional Channel Reshapes Platform Consumption and Provider Resilience: Evidence from Uber Eats During the COVID-19 Pandemic *(Runner Up for Best Paper Award, 2020 Workshop on Information Systems and Economics)*

A-5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**(D) PATENTS**

- Sundararajan, A., Ipeirotis, P. and A. Ghose, 2010. System, method, software arrangement and computer-accessible medium for incorporating qualitative and quantitative information into an economic model. US Patent # 7848979, issued 12/07/10.

**(E) BOOK CHAPTERS AND OTHER INVITED WRITINGS**

- Miller, C., Sprigman, C., and Sundararajan, A., 2025. The Economic Importance Of Fair Use For Generative AI Development. Data Catalyst Institute (in press)

- Jacobides, M., Sundararajan, A. and van Alstyne, M. 2019. Platforms and Ecosystems: Enabling the Digital Economy. *World Economic Forum Briefing Paper.* Available at http://www3.weforum.org/docs/WEF_Digital_Platforms_and_Ecosystems_2019.pdf

- Coles, Egesdal, Ellen, Li and Sundararajan, 2018. Airbnb Usage across New York City Neighborhoods: Geographic Patterns and Regulatory Implications. *The Cambridge Handbook of the Law of the Sharing Economy*, 108-128.

- Junglas, I., Koch, H., Sundararajan, A., and P. Wang, 2017. Shared Responsibility and Blurring Boundaries: Strategic Implications of the Sharing Economy (Editorial). *MIS Quarterly Executive* 16 (4), iii-ix.

- Sundararajan, A., 2017. The Sharing Economy, Digital Innovation, and the Future of Work. *Written Testimony to the US House of Representatives, September 6.* Available at https://edworkforce.house.gov/uploadedfiles/sundararajan_-_testimony.pdf

- Karim R. Lakhani, Arun Sundararajan, Emilie Billaud, Caroline Caltagirone, 2017. BlaBlaCar: The Road Ahead... *Harvard Business School Case* #617050.

- Sundararajan, A., 2017. Crowd-Based Capitalism. *Integration and Trade Journal* 21(42), 58-69.

- Sundararajan, A., 2017. The Collaborative Economy: Socioeconomic, Regulatory and Labor Issues. *Prepared for the European Parliament: Economic and Scientific Policy*

- Sundararajan, A., 2017. The Sharing Economy, in Passiak, D. (ed.) *Empower: How to Co-Create The Future,* Social Mediate Press, 167-182.

- Sundararajan, A., 2017. Governance and Trust in Blockchain Markets, In Epstein, J. (ed.) *Blockchains in the Mainstream*.

- Sundararajan, A., 2016. Economic Barriers and Enablers of Distributed Ownership, in Scholz, T. and N. Schneider (eds.) *Ours To Hack and Own*, OR Books.

- Mazzella, F., Sundararajan, A, Butt d'Espous, V. and M. Möhlmann, 2016. How Digital Trust Powers the Sharing Economy. *IESE Insight*, Issue 30, 24-31, September.

- Sundararajan, A., 2014. Peer-to-Peer Businesses and the Sharing (Collaborative) Economy: Overview, Economic Effects and Regulatory Issues. *Written Testimony to the US House of Representatives, January 15.* Available at https://smallbusiness.house.gov/uploadedfiles/1-15-2014_revised_sundararajan_testimony.pdf

- Sundararajan, A., 2006. Review of 'Digital phoenix: how the information economy collapsed and how it will rise again.' *Journal of Economic Literature* 44 (3).

- Seidmann, A. and A. Sundararajan, 1998. Sharing logistics information across organizations: technology, competition and contracting, in Kemerer, C.K. (ed.) *Information Technology and Industrial Competitiveness: How I.T. Shapes Competition*, Kluwer Academic Publishers.

A-6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**(F) OTHER PUBLISHED ARTICLES**
(all articles **not** marked with an * are op-eds).

- Sundararajan, A., Artificial Intelligence, Human Intellectual Autonomy and the Future of Work,* *Aspen Institute*, August 2024

- Sundararajan, A., Time to end fee caps on restaurant delivery platforms. *Crain's New York Business*, February 2023

- Sundararajan, A. How Your Brand Should Use NFTs. *Harvard Business Review*, February 2022.

- Sundararajan, A. COVID makes tech policy like CDA 230 more important than ever. *The Hill*, June 2020

- Sundararajan, A. How Japan can win in the ongoing AI war. *Japan Times*, September 2019

- Sundararajan, A. We can do better than universal basic income for the looming end of work as we know it. *CNBC*, May 2019

- Sundararajan, A. The right way to handle Airbnb. *New York Daily News*, June 2018.

- Sundararajan, A., 2018. The YouTube Shooting Reflects a Growing Anger in the Digital Workforce. *TIME*, April 2018

- Sundararajan, A. London's Uber ban is a message to a reckless tech ethos. *The Guardian*, September 2017

- Sundararajan, A. How the Trump presidency will affect Silicon Valley and the sharing economy. *Nikkei,* February 2017.

- Sundararajan, A. Invest in Technology with Social Benefits. *The New York Times*, October 2016.

- Sundararajan, A.  Why Uber's China Loss Will Actually Be a Long-Run Victory for the Company. *Entrepreneur*, August 2016.

- Sundararajan, A.  What Governments Can Learn From Airbnb And the Sharing Economy. *Fortune*, July 2016.

- Sundararajan, A.  Uber and Airbnb Could Reverse America's Decades-long Slide Into Mass Cynicism. *Quartz,* June 2016.

- Sundararajan, A.  What Uber and Lyft's Austin Exit Says About the Future of Regulation. *Fortune*, May 2016.

- Sundararajan, A. Will The On-Demand Economy Raise Global Living Standards? *World Economic Forum Agenda*, September 2015.

- Sundararajan, A.  The Gig Economy Is Coming. What Will It Mean For Work? *The Guardian*, July 2015.

- Sundararajan, A.   If You Want to Reduce Traffic, Ridesharing Apps Hold Much Promise. *The New York Times*, July 2015.

- Sundararajan, A.  A Safety Net Fit For the Sharing Economy. *The Financial Times*, June 2015.

- Sundararajan, A.  Airbnb is an Ally to Cities, Not an Adversary. *The New York Times*, June 2015.

- Sundararajan, A.  Curbing the New Corporate Power: Response.* *Boston Review*, May 2015.

- Sundararajan, A. What Airbnb Gets About Culture That Uber Doesn't. *Harvard Business Review*, November 2014.

- Sundararajan, A. The New 'New Deal?' Sharing Responsibility in the Sharing Economy. *Policy Network*, October 2014.

A-7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Sundararajan, A. Les Nouvelles Institutions Economiques Du XXIe Siecle. *Le Monde*, July 2014.
- Sundararajan, A. Time to Adapt to a New Economy. *The New York Times*, May 2014.
- Sundararajan, A. Trusting the Sharing Economy to Regulate Itself. *The New York Times*, March 2014.
- Sundararajan, A. With Graph Search, It's Facebook vs Facebook. *WIRED,* March 2013.
- Sundararajan, A. More Problems Ahead for Apple. *CNBC*, January 2013.
- Sundararajan, A. From Zipcar to the Sharing Economy. *Harvard Business Review*, January 2013.
- Rhue, L and A. Sundararajan. Digital Social Visibility: How Facebook Gifts Change Our Choices. *WIRED*, December 2012.
- Sundararajan, A. All hail next-wave taxicab apps: the rules should invite innovation. *The New York Daily News*, December 2012
- Sundararajan, A. Why Government Doesn't Need To Regulate the Sharing Economy. *WIRED*, October 2012.
- Sundararajan, A. How Facebook Can Still Rule the Internet Economy. *Bloomberg View*, September 2012.
- Bapna, R. and A. Sundararajan. Nurturing the Aadhaar Ecosystem. *LiveMint,* November, 2011.
- Sundararajan, A. Steve Jobs: The "Consumerizer" of Digital Technology.* *NYU Stern,* October 2011.
- Dhar, V. and A. Sundararajan. Lessons in Privacy from Sony's Data Theft. *The Financial Times,* June 2011.
- Dhar, V. and A. Sundararajan. Don't Gamble Your Company's Reputation on Data Governance. *CIO Magazine*, May 2011.
- Bapna, R. and A. Sundararajan. Too Much Transparency? *LiveMint,* April 2011.
- Bapna, R., Gupta, A. and A. Sundararajan. Auctions, Governance and Transparency: The Devil Is in the Details. *Knowledge@Wharton*, December 2010.
- Aral, S., Sundararajan, A. and M. Xin. Developing Competitive Advantage in the Cloud. *Harvard Business Review*, December 2010.
- Bapna, R. and A. Sundararajan. Building Institutions through Identity. *LiveMint*, September 2010.
- Dhar, V. and A. Sundararajan. Plugging in to Transformation.* *The Financial Times*, February 2009.
- Bapna, R. and A. Sundararajan. Getting the 3G Policy Right. *The Economic Times,* September 2007.
- Bapna, R. and A. Sundararajan. The Scramble for Spectrum. *Business Today*, December 2006.

**(G) COMPLETED WORKING PAPERS AND WORKS IN PROGRESS**

- Douglas, C., Provost, F. and A. Sundararajan, 2024. Naive Algorithmic Collusion: When Do Bandit Learners Cooperate and When Do They Compete?
- Cho, E., Sedoc, J., and A. Sundararajan, 2025. How Complexity Shapes Trust in a Generative AI Investment Advisor.
- Li, R., Sedoc, J. and A. Sundararajan, 2025. Exploring Human-Like Trusting Behaviors in Generative AI Systems.
- Li, R., Ruben, A. and A. Sundararajan, 2024. Visible Localized Climate Change Events Alter Sustainable Consumption Behaviors.
- Li, R. and A. Sundararajan, 2022. Of Bored Apes and CryptoPunks: How Rarity, Market Power and Cryptocurrency Exchange Rates Shape NFT Pricing
- Hoffmann-Pham, K., Ipeirotis, P., Sundararajan, A., 2019. Ridesharing and the Use of Public Transportation. *(Best Paper Award, 2019 Winter Conference on Business Analytics)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Fraiberger, S. and A. Sundararajan, 2017. Peer-to-Peer Rental Markets in the Sharing Economy.
- Fraiberger, S., Herrera-Yague, C., and A. Sundararajan, 2017. Personality, Homophily and Embeddedness.
- Archak, N. and A. Sundararajan, 2012. The crowdsourcer's dilemma: design and efficiency of all-pay contests with incomplete information.
- Ghose, A., Ipeirotis, P. and A. Sundararajan, 2011. The Dimensions of Reputation in Electronic Markets.
- Oestreicher-Singer, G. and A. Sundararajan, 2011. Influence in social networks: an identification result.
- Mantena, R. and A. Sundararajan, 2010. Competing Across Boundaries: Technological Scope and Inter-Industry Convergence.
- Sundararajan, A., 2008. Network seeding with local network effects.
- Sundararajan, A., 2007. Network effects, nonlinear pricing and entry deterrence.
- Huang, K. and A. Sundararajan, 2006. Pricing models for on-demand computing.
- Campo-Rembado, M., and A. Sundararajan, 2005. Capital-skill accumulation and the origins of early-stage growth: evidence from three technology industries.
- Campo-Rembado, M. and A. Sundararajan, 2004. Competition in wireless telecommunications.
- Sundararajan, A., 2004. Resource allocation in organizations: an optimality result.
- Sundararajan, A., 2003. Pricing digital marketing: information, risk sharing and performance.
- Seidmann, A., and A. Sundararajan, 2002. Trade-offs in organizational architecture: information, incentives and process design.

**(H) PAPERS IN REFEREED CONFERENCE PROCEEDINGS** *(incomplete)*
(available on request)

**SELECTED KEYNOTES, PANELS, TESTIMONY** (Since 2014)
- Keynote: Alianza In Evento (April 2025)*
- Panel: World Economic Forum Strategic Intelligence Summit (November 2024)
- Panel: G1 Global Summit (October 2024)
- Keynote: AI Global Summit (September 2024)
- Speaker: World Economic Forum Annual Meeting of the New Champions (June 2024)
- Panel: Web Summit - Collision (June 2024)
- Panel: Mobile World Congress 4YFN (February 2024)
- Panel: World Government Summit (February 2024)
- Panel: World Economic Forum AI Governance Summit (November 2023)
- Panel: World Economic Forum Annual Meeting of the New Champions (June 2023)
- Speaker, TEDxGateway (June 2023)
- Keynote: Mobile World Congress 4YFN (February 2023)
- Keynote: UNESCO LAC Digital Talent Summit (November 2022)
- Panel: EPFL Zurich Digital Currency Risk Governance (October 2022)
- Panel: Propelify Innovation Festival (October 2022)
- Panel: NAD The Next Era of Ad Law (September 2022)
- Panel: EXPO 2020 World Majlis (February 2022)
- Panel: Competition Policy International (January 2022)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Conference: Econometric Society North American Winter Meeting (January 2022)
- Seminar: Toulouse Economics of Platforms (June 2020)
- Seminar: Facebook Computational Social Science (March 2021)
- Plenary: Japan Global AI Forum (March 2021)
- Panel: Expo 2020 World Majlis on Trust in Technology (February 2021)
- Conference: Workshop on Information Systems and Economics (December 2020)
- Keynote: CTeInnova 2020 Forum (November 2020)
- Keynote: Princeton Old Guard (October 2020)
- Keynote: IIM Ahmedabad Alumni Association (October 2020)
- Plenary: Orange Silicon Valley (October 2020)
- Keynote: Korea Investment Festival (October 2020)
- Keynote: Nomura "Future Creation" Forum (October 2020)
- Panel: California Resilience and Recovery (October 2020)
- Panel: ICMA Marketplace Conference (October 2020)
- Panel: Sharing Cities (September 2020)
- TEDxGateway, "The World Has Changed" (June 2020)
- Seminar: Crisis and Technological Change (May 2020)
- Fireside Chat: Digital Leadership Series with Airbnb co-founder Nate Blecharczyk (February 2020)
- Michael Sheridan Lecture, UNC Chapel Hill (January 2020)
- Keynote: ENANDES 2019 (October 2019)
- Panel: G1 Global Summit (September 2019)
- Keynote: CFA Institute (July 2019)
- Keynote: AI4 Retail (June 2019)
- Panel: World Economic Forum AMNC China (June 2019)
- Plenary: Trust and Digital Platforms: The New Rules (April 2019)
- Keynote: Seoul Global Financial Conference (April 2019)
- Plenary: World Economic Forum C4IR (February 2019)
- Keynote: Credit Union Executive Society (November 2018)
- Plenary: Future Consensus Forum (November 2018)
- Panel: World Economic Forum AMNC China (September 2018)
- Keynote: KPMG Amsterdam (August 2018)
- Panel: United Nations Disarmament for Future Generations (August 2018)
- Keynote: CARE Conference (May 2018)
- United Nations STI Forum 2018 (June 2018)
- Keynote: Digital Business World Congress (May 2018)
- Panel: SXSW Austin (March 2018)
- Panel: World Bank IFC (March 2018)
- Keynote United Nations Breakfast (February 2018)
- Panel: Harvard Social Enterprise Conference (February 2018)
- Plenary: Walmart Conference on American Life (January 2018)
- Keynote: STIR Conference (January 2018)
- Seminar: Nomura Research Institute (December 2017)
- Workshop on Information Systems and Economics (December 2017)
- Keynote: Wuzhen Summit (December 2017)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Panel: Yahoo! Finance All Markets Summit (October 2017)
- Debate: The Economist Finance Disrupted! (September 2017)
- Panel: Academy of Management Conference (August 2017)
- Plenary: Wall Street Journal CFO Network Summit (June 2017)
- Keynote: Latin American Telecommunications Congress (June 2017)
- Keynote: BCCP- Regulatory Challenges in Digital Markets, Berlin (June 2017)
- Plenary: 70th CFA Institute Annual Conference (May 2017)
- Organizer: The Digital Future of Work Summit (April 2017)
- Plenary: TTI/Vanguard Conference (April 2017)
- Plenary: Journee de Economie Luxembourg (March 2017)
- Keynote: WeB 2016, Dublin (December 2016)
- Keynote: Share!Summit Tokyo (November 2016)
- Testimony: European Parliament (November 2016)
- Fireside Chat, Airbnb Inc. (November 2016)
- Panel: The Atlantic Future of Work Summit (October 2016)
- Keynote: Inter-American Development Bank (October 2016)
- Keynote: Altroconsumo Festival (September 2016)
- Keynote Speaker, Adigital Outthink, Madrid (September 2016)
- Talks@Google, Google Inc. (September 2016)
- Seminar Lyft Inc. (September 2016)
- Keynote: MSCI Economic Summit (September 2016)
- Book signing: Politics and Prose (August 2016)
- Keynote: Digital Economy Forum, Bogota (August 2016)
- Panel: Brookings Blum Roundtable (August 2016)
- Seminar: Didi Chuxing, Beijing (June 2016)
- Keynote: Annual Conference on Internet Commerce and Innovation (June 2016)
- Panel: The Common Good (June 2016)
- Panel: New Cities Summit (June 2016)
- Plenary:Collective Intelligence Conference (June 2016)
- Plenary: Techonomy NY New York (May 2016)
- Panel: The Economist Innovation Forum (March 2016)
- Panel: SXSW Innovation Policy Day (March 2016)
- Plenary: World Government Summit Dubai (February 2016)
- Keynote: Second International Workshop on the Sharing Economy (January 2016)
- Panel: World Economic Forum Annual Meeting Davos (January 2016)
- Panel: Consumer Electronics Show (January 2016)
- Federal Reserve Bank, Washington DC (January 2016)
- Panel: Aspen Institute, Washington DC (December 2015)
- Panel: Aspen Institute: Hamilton Project (December 2015)
- Keynote: Chief Risk Officer Assembly, Zurich (November 2015)
- Plenary: MSI Board of Trustees Meeting (November 2015)
- Keynote: Marketing Outlook Forum, Philadelphia (October 2015)
- Plenary: NASSCOM Product Conclave (October 2015)
- Panel: White House Summit On Worker Voice (October 2015)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Panel: TAP conference, New York (October 2015)
- Panel: World Economic Forum Annual Meeting of New Champions (September 2015)
- Keynote: Richemont Innovation Day (July 2015)
- Panel: Kauffman Foundation New Entrepreneurial Growth Conference (June 2015)
- Panel: CIO Summit, Center for Digital Transformation (June 2015)
- Keynote: Federal Trade Commission  (June 2015)
- Panel: Techonomy Policy (June 2015)
- Panel: NYU Annual Conference on Labor (June 2015)
- Panel: Asian Leadership Conference, Seoul (May 2015)
- Panel: OuiShare Fest (May 2015)
- Panel: British American Business Conference, New York (May 2015)
- Keynote: Zinc Shower Madrid (May 2015)
- Plenary: PACH Summit  (March 2015)
- Talk: Young Presidents' Organization, New York (March 2015)
- Keynote: Workshop on Complex Networks (March 2015)
- Panel: Leadership in the Digital Age, UC Irvine (March 2015)
- Talk: Federal Reserve Bank Public Affairs Forum (March 2015)
- Conference: NBER Economics of Digitization Workshop (March 2015)
- Panel: The Economist: Buttonwood Gathering (February 2015)
- Plenary: L2 Clicks and Mortar Summit (January 2015)
- Panel: Congressional Internet Caucus (December 2014)
- Panel: NY Sharing Economy Meetup (November 2014)
- Panel: National League of Cities Annual Congress (November 2014)
- Keynote: CDO Executive Summit (November 2014)
- Conference: Digital Labor (November 2014)
- Plenary: L2 Innovation Forum (November 2014
- Panel:  Aspen Institute on Sharing Cities (October 2014)
- Panel: Techonomy Detroit (September 2014) details   watch my panel
- Panel: SOCAP14 (September 2014)
- Keynote: Seoul Metropolitan Government Summit (September 2014)
- Plenary: NYU Stern Launch (August 2014)
- Seminar: Federal Trade Commission (July 2014)
- Panel: Microsoft Faculty Summit (July 2014)
- Panel: Rencontres Économiques d'Aix-en-Provence (July 2014)
- Panel: La French Touch Conference (June 2014)
- Panel: Northside Festival, Williamsburg (June 2014)
- Plenary: SHARE Conference (May 2014)
- Panel: OECD Forum (May 2014)
- Keynote: OuiShare Fest (May 2014)
- Panel: Piper Jaffray Technology/Media Investor Conference (March 2014)
- Panel: Social Media Week (February 2014)
- Panel: US House of Representatives (January 2014)
- Organizer: The Digital Future of Higher Education (November 2013)
- Panel: Techonomy 2013 (November 2013)

A-12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Panel: HBS Cyberposium (November 2013)
- Panel: Economic Sociology Workshop (October 2013)
- Panel: Shared Use Mobility Summit (October 2013)
- Keynote: Federal Reserve Bank of San Francisco (October 2013)

**SELECTED MEDIA COVERAGE (UPDATED 2024)**

**(A) BLOOMBERG TV**
- Chinese Government May Not Block the Sale of TikTok (Wall Street Week, April 2024)
- Legal Debate Over Content in Training AI (Wall Street Week, January 2024)
- Generative AI: The Accuracy of AI (Wall Street Week, April 2023)
- New Lyft CEO Takes the Reins (The Close, April 2023)
- Future of the gig economy (Triple Take, November 2022)
- Sharing economy earnings (What'd You Miss, February 2022)
- Uber's Q3 earnings (What'd You Miss, November 2021)
- Uber and Lyft Q2 earnings (August 2021)
- Lyft Q1 earnings (The Close, May 2021)
- Uber Benefitting From Diversification (The Close, February 2021)
- DoorDash and Airbnb IPOs (December 2020)
- The road to Proposition 22 (The Close, August 2020)
- Uber's Online Delivery Push (What'd You Miss, August 2020)
- Big Tech's Hearing Fallout (Technology, July 2020)
- Declining GDP (Daybreak, April 2020)
- Uber and autonomous vehicles (The Close, November 2019)
- Peloton's IPO (The Close, September 2019)
- Uber's path to profitability (The Close, August 2019)
- Lyft includes drivers in its IPO (The Close, March 2019)
- Against ride-sharing caps (from the beach) (Emily Chang, August 2018)
- Airbnb, automation and the future of work (Technology, March 2017)
- Uber, Didi and the future of mobility (The Close, June 2016)
- Uber settles with the Teamsters (Emily Chang, April 2016)

**(B) CNBC TV**

- OpenAI has first mover advantage but Google remains a 'formidable' competitor: NYU's Sundararajan (Squawk Box, October 2024)
- The world is going to follow China rather than the EU on many aspects of A.I. rules, says professor. (Squawk Box, August 2023)
- Tesla lacks the platform to justify its market valuation: Expert (Squawk Box, July 2023)
- Google is the leader in A.I. but it hasn't delivered a DTC product (Power Lunch, April 2023)
- Tech layoffs, building diverse teams (November 2022)
- Big Tech and Antitrust (Squawk Box, July 2021)
- Facebook-Trump Controversy (Squawk Box, June 2020)
- WeWork turnaround will be a challenge (Squawk Box, February 2020)
- Airbnb should be the most valuable platform (Squawk Box, December 2019)
- How Tim Cook stands out (Power Lunch, November 2019)
- Why California's AB5 is flawed (Closing Bell, September 2019)*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- France's tech tax (Squawk Box, July 2019)
- Income stability for freelance workers (June 2019)
- Breaking up Facebook won't solve core issues (Power Lunch, May 2019)
- Facebook has government-like power (Power Lunch, November 2018)
- Facebook and public trust (Squawk Box, November 2018)
- Combating fake news (The Rundown, November 2017)
- Uber enters Japan (Squawk Box, October 2017)
- Consumer support is Uber's most powerful weapon (Squawk Box, October 2015)

### (C) NPR MARKETPLACE RADIO

- Uber finally makes a profit off ridesharing (August 2023)
- How the gig economy could change as the nature of work evolves (October 2022)
- Uber versus Taxis (October 2021)
- The evolution of delivery apps (September 2021)
- Congress gets tough with Big Tech (June 2021)
- Proposition 22 passes (November 2020)
- Classifying gig workers (September 2020)
- Flexibility versus benefits (August 2020)
- Uber doubles down on delivery (August 2020)
- COVID-19 and the safety net 2 (March 2020)
- COVID-19 and the safety net 1 (March 2020)
- Platform work in traditional companies (August 2019)
- Provider stock options in the platform economy (March 2019)
- What game theory says about trade wars (October 2018)
- Platforms for high-end professional work (April 2018)
- Libraries and the sharing economy (August 2017)
- Trump's possible impact on the economy (November 2016)
- The Sharing Economy (June 2016)
- Platform work and the safety net (April 2016)
- The huge potential of local delivery platforms (February 2016)
- Live from Davos (January 2016)
- Free Facebook in India (January 2016)
- How big is the gig economy? (October 2015)
- Expanding the safety net to non-employees (August 2015)

### (D) OTHER NPR RADIO

- Tech layoffs and the future of work (NPR Morning Edition, January 2023)
- Benefits for Freelance Workers (NPR All Things Considered, January 2018)
- The Rise of the Contract Workforce (NPR All Things Considered, January 2018)
- EU ruling against Uber (NPR The Takeaway, December 2017)
- Amazon's contract workers (NPR OnPoint, December 2017)
- Uber banned in London (NPR All Things Considered, September 2017)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- The future of the sharing economy (NPR The Diane Rehm Show, June 2016)
- The Uber for everything economy (NPR OnPoint, June 2015)
- Apps that share parking spots (NPR All Tech Considered, July 2014)
- The sharing economy (NPR The Diane Rehm Show, July 2014)

**(E) OTHER BROADCAST TV**

- Arun Sundararajan discusses AI Issues (CGTN, June 2024)
- Understanding AI: Is My Job Safe? (The Core, June 2023)
- Inflation driving a return to the gig economy (Cheddar News, April 2022)
- Rideshare and fuel surcharges (NBC News, March 2022)
- America's attitudes towards tech billionaires (Cheddar News,December 2021)
- Tesla's humanoid robots (Cheddar News,August 2021)
- Full Frame: The Gig Economy Part 1  Part 2 (CGTN, March 2021)
- Uber, Lyft and Proposition 22 (Yahoo! Finance, August 2020)
- Anthony Lewandowski charges (Yahoo! Finance, August 2019)
- Skill gaps in emerging economies (CGTN, May 2019)
- Can Amazon disrupt grocery shopping? (Yahoo! Finance, March 2019)
- Google vs Apple vs Amazon (Fox Business, September 2017)
- Uber tracking consumers (CBC News, December 2016)
- The Sharing Economy (Charlie Rose, July 2016)
- The new carpool (CBS This Morning, Mach 2015)

**(F) SELECTED PODCASTS**

- Unprompted: AI Arms Race (2023)
- The NFT PhD (2022) AI Gl
- State of Independence (2021)
- Brave New World with Vasant Dhar (2020)
- The Prof G Pod with Scott Galloway (2020)
- Protocol Source Code (2020)
- Subscribed Podcast (2020)
- Masters In Business with Barry Ritzholz (2017)
- a16z podcast: An Economics Take on the Sharing Economy (2016)
- Future Squared (2016)
- Curious Minds with Gayle Allen (2016)
- Smart People Podcast (2016)
- Congressional Internet Caucus (2014)

**(G) PRINT INTERVIEWS AND FEATURES (UPDATED 2023)**

- Who owns the song you wrote with AI? An expert explains. (World Economic Forum, August 2023)
- Food-Delivery Workers in New York City Launch Labor Fight 'Just to Survive (The Wall Street Journal, August 2023)

A-15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Elon Musk: Tesla may cut prices again in turbulent times. (BBC News, July 2023)
- Meta has launched its Twitter competitor. Here's how it might work out. (Yahoo! Finance, July 2023)
- The edge of tomorrow: How far into the future can we see? (Hindustan Times, June 2023)
- Interview Of The Week: Arun Sundararajan, AI And Future Of Work Expert (The Innovator, March 2023)
- Worried about Layoffs? (The Wall Street Journal, March 2023)
- ChatGPT vai demorar para substituir Google, diz professor da NYU (Fohla de S.Paulo, February 2023)
- How Reddit Became One of the World's Biggest NFT Marketplaces in Just Four Months (The Observer, November 2022)
- Three Reasons Why Big Brands Don't Need To Jump On The NFT Train Yet (Forbes, April 2022)
- Airbnb, BlaBlaCar and Humanitarian Aid (Quartz, March 2022)
- Pandemic Platforms Offer a New Vision of the Internet (Pitchbook, March 2022)
- Airbnb, Vrbo Share Details on Party Houses, Not Violent Crime (Bloomberg News, July 2021)
- Will Public Transit Get a Lift from Ridesharing. (Governing, May 2021)
- Yahoo! Answers is Shutting Down (Marketplace, April 2021)
- Turo CEO Says Car-Renting App Plans to Go Public in 2021 (The Wall Street Journal,  January 2021)
- DoorDash Shows Delivery Can Be Profitable—in a Pandemic (WIRED, November 2020)
- Ride sharing, delivery giants win fight against labor law (AP News, November 2020)
- Fight for a fair Play Store (The Economic Times, October 2020)
- The pros and cons of Proposition 22 (OneZero, September 2020)
- Airbnb files to go public (Bloomberg News, August 2020)
- Big Tech Congressional hearings (The Hill, July 2020)
- Online retail during COVID-19 (Barrons, June 2020)
- Predicting an automation boom from COVID (Protocol, April 2020)
- The future of office life (The Wall Street Journal, March 2020)
- Why Airbnb should delay it's IPO (Bloomberg News, March 2020)
- How Airbnb's regulatory path has been tough (Bloomberg News, February 2020)
- The future of capitalism (Nikkei Asia, January 2020)
- Why Uber should play the long game post-IPO (Bloomberg News, May 2019)
- Why hasn't the gig economy killed traditional work? (NPR Planet Money, March 2019)
- Apple's new Austin campus (The New York Times, December 2018)
- Regulating Airbnb (The Washington Post, October 2018)
- Ridesharing for kids (The Atlantic, October 2018)
- World Economic Forum in China (CNBC, September 2018)
- Sharing economy safety (CNN Business, August 2018)
- Airbnb is the new NATO (The New York Times, August 2018)
- GM's autonomous cars (The Washington Post, June 2018)
- Airbnb in NYC (Fast Company, May 2018)
- Worker classification in CA (WIRED, May 2018)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Harnessing "New Power" (Entrepreneur, April 2018)
- The new generation of work (BBC News, February 2018)
- The Uber-Waymo Settlement (Fast Company, February 2018)
- Coverage of my congressional testimony (Inc., September 2017)
- On Uber's CEO search (Washington Post, August 2017)
- On Amazon's needs for human labor (New York Times, August 2017)
- Sharing economy advice to Cosmo's readers (Cosmopolitan, July 2017)
- Uber in Russia (Washington Post, July 2017)
- Uber's long-term strategy (MIT Technology Review, June 2017)
- CIO Forum interview (Wall Street Journal, June 2017)
- Lyft partners with Waymo (The Atlantic, May 2017)
- Regulating the sharing economy (The New Yorker, May 2017)
- Airbnb settles with SF (The New York Times, May 2017)
- Snapchat faces the public (TIME, February 2017)
- Davos comments (January 2017)
- The Whatchamacallit Economy (The New York Times, December 2016)
- Airbnb versus NYC (The Economist, November 2016)
- Tesla's path to fully autonomous cars (USA Today, October 2016)
- How Juno competed with Uber (The New Yorker, October 2016)
- Juno offers equity to drivers (The New York Times, October 2016)
- Joel Stein makes fun of my Uber rating (TIME, September 2016)
- How stifling Airbnb hurts cities (The Wall Street Journal, August 2016)
- Uber exits China (The Atlantic, August 2016)
- Uber exits China (The Guardian, July 2016)
- Rethinking the Social Safety Net for Freelancers (WSJ, 2016)
- What happens when we are all entrepreneurs? (The Washington Post, June 2016)
- Change is good. Exchange is better. (TED, June 2016)
- Secrets of the Sharing Economy (Bloomberg, June 2016)
- What is the Sharing Economy? (Quartz, June 2016)
- The On-Demand Economy isn't about to Implode (WIRED, March 2016)
- Rideshare is the future of public transit (The Washington Post, March 2016)
- Regulating Uber in NYC (The Wall Street Journal, January 2016)
- Protecting Workers in the Sharing Economy (The Atlantic, December 2015)
- The rise of Lyft in NYC (The Wall Street Journal,  November 2015)
- Salon interview about Airbnb (Salon, November 2015)
- Proposition F in SF (Bloomberg News, October 2015)
- Politicians Turn to Start-Ups for Grasp of Gig Economy (The New York Times, October 2015)
- On La'Zooz, which pioneered blockchain-based social tokens, way ahead of its time. Bloomberg Business, September 2015.

A-17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- How the sharing economy changes lives (Deutsche Well, August 2015)
- This Uber lawsuit could have big implications for the sharing economy. Fortune, August 2015.
- The On-demand Economy Takes Workers for a Ride. TIME Magazine, July 2015.
- Uber vs. Laws. Politico, July 2015.
- Uber Won New York Fight, but Remains a Flashpoint in the Inequality Debate. Bloomberg, July 2015.
- Gigs with Benefits. The New Yorker, June 2015.
- HopSkipDrive, a Ride Start-Up for the After-School Set. The New York Times, June 2015.
- Uber and the Not-Quite-Independent Contractor. Bloomberg View, June 2015.
- California's Stand on Behalf of Uber Drivers. The Atlantic, June 2015.
- Washington Scrutinizes the Sharing Economy. The New York Times, June 2015.
- Uber and Airbnb urge watchdog to back off. The Financial Times, June 2015.
- Wallets Over Ballots. TIME Magazine, May 2015.
- Meet The Congressional Sharing Economy Caucus. Forbes, May 2015.
- Communal living projects moving from hippie to mainstream. The Guardian, May 2015.
- Sharing economy benefits lower income groups. The Financial Times, April 2015.
- Amazon, Google and More Are Drawn to Home Services Market. The New York Times, April 2015.
- There Are Good Reasons Why People Love to Sue Uber. WIRED, March 2015.
- The real promise of the 'sharing economy' is what it could do for the poor. Washington Post, March 2015.
- How The Sharing Economy Could Help The Poorest Among Us. Fast Company, March 2015.
- Can Uber and Airbnb boost lower-income consumers? A new study says so. Mashable, March 2015.
- How Technology Turned Ideas Into a Part-Time Occupation. Variety, February, 2015.
- What happens when Uber and Airbnb become their own regulators? Washington Post, February 2015.
- Robot Cars Wont Rescue Uber From Its Clash With Drivers.. WIRED, February 2015.
- Baby, You Can Drive My Car, and Do My Errands, and Rent My Stuff…. TIME, February 2015.
- E' 'condividere' la parola chiave del futuro (L'Espresso, January 2015)
- Uber, A Rising Business Model That Could Change How You Work. New York Times, January 2015.
- What the Sharing Economy Takes. The Nation, January 2015.
- Now we know how many drivers Uber has. The Washington Post, January 2015.
- Trading Places, In Style. The New York Times, January 2015.
- The sharing economy must share the risks. Financial Times, December 2014.
- The Sharing-Economy PR Stunt That Turned Into a Real Business. WIRED, December 2014.
- An Uber Valuation Comes with Uber Problems. TechCrunch, December 2014.
- Airbnb has One Million Homes. Slate, December 2014.
- Airbnb and Ubers cultures couldnt be more different. Pando Daily, December 2014.
- The Business Tycoons of Airbnb. The New York Times Magazine, November 2014.
- A Visit to the Temple of Urban Progressive Leadership. Reason, October 2014.
- Taxi Sharing Could Revolutionize New York Citys Transportation System. Newsweek, September 2014.
- On the three types of behaviors and how to change them Fast Company, August 2014.
- Socialter cover story (July 2014)
- Ne prenons pas (tous) les scouts numeriques de l'economie collaborative pour de naifs altruistes. Slate, July 2014.
- Recycle, Reuse, Reprofit. TIME Magazine, July 2014.
- Is Uber Above the Law? Probably Not.. Bloomberg BusinessWeek, July 2014.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Uber's Brilliant Strategy to Make Itself Too Big To Ban. WIRED, July 2014.
- A Victory for Airbnb in New York. The New York Times, May 2014.
- What drives America's go-to expert on the sharing economy Next City, May 2014
- La economía colaborativa es una oportunidad para los países en desarrollo El Pais, May 2014
- How Airbnb and Lyft Finally Got Americans to Trust Each Other. WIRED, May 2014.
- Some TaskRabbit handymen can make $78,000 a year. MarketWatch, April 2014.
- Change Habits, Change Your Behavior. Entrepreneur, April 2014.
- How The Word Entrepreneur Got Too Popular For Its Own Good. Fast Company, April 2014.
- Experts Bullish on Citibike. The Wall Street Journal, March 2014
- Uber Cab Confessions. GQ Magazine, March 2014
- Digital doubts after Bitcoin debacle. Reuters, February 2014
- Editors' Choice: Information and Freedom Science, January 2014
- The sharing economy: would you get in a car with a stranger? The Guardian, January 2014
- Congress takes a casual look at the peer-to-peer economy. Financial Times, January 2014
- Why Does New York Hate the Sharing Economy? Bloomberg, January 2014

**PRIOR TESTIMONY**

Dallas/Fort Worth International Airport Board v. Turo, Inc., Docket No. 352-329488-21, In the 352nd District Court of Tarrant County, Texas. Deposition (2023).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## APPENDIX B
## Materials Relied Upon

### Complaints and Legal Documents

Complaint, *United States of America v. Visa, Inc. and Plaid, Inc.*, No. 3:20–cv–07810, United States District Court Northern District of California, San Francisco Division, November 5, 2020.

Opinion, *Epic Games, Inc. v. Apple, Inc.*, No. 21–16506, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, April 24, 2023.

Opinion, *Apple, Inc., Petitioner, v. Pepper, et al.*, No. 17–204, Supreme Court of the United States Court of Appeals for the Ninth Circuit, May 13, 2019.

Opinion, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, No. 76–15, Supreme Court of the United States, 1977.

Opinion, *Ohio et al. v. American Express Co. et al.*, No. 16–1454, Supreme Court of the United States, June 25, 2018.

Opinion, *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, No. 06–480, Supreme Court of the United States, 2006.

Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re Apple iPhone Antitrust Litigation*, No. C 11–06714–YGR, United States District Court for the Northern District of California, Oakland Division, September 11, 2020.

Plaintiffs' Responses and Objections to Defendant Apple Inc.'s First Set of Interrogatories, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714-YGR, United States District Court Northern District of California, Oakland Division, May 12, 2024.

Rule 52 Order After Trial on the Merits, *Epic Games Inc., v. Apple Inc.*, No. 4:20–cv–05640-YGR, United States Court of Appeals for the Ninth Circuit, District Court for the Northern District of California, September 10, 2021.

### Expert Reports

Opening Expert Report and Declaration of Ginger Jin, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Itamar Simonson, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of J. Alexander Halderman, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of James Malackowski, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Jonah Berger, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

Opening Expert Report and Declaration of Lorin Hitt, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06714–YGR, March 7, 2025.

### Depositions

Remote Proceedings of Videotaped Deposition of Carson Oliver, *In Re Apple iPhone Antitrust Litigation*, No. 4:11–cv–06715YGR, January 26, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Trial Testimony

Trial Testimony of Craig Federighi, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021.

Trial Testimony of David Evans, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 11, 2021.

Trial Testimony of Matthew Fischer, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021.

Trial Testimony of Michael Schmid, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 19, 2021.

Trial Testimony of Philip Schiller, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 17, 2021 – May 18, 2021.

Trial Testimony of Richard Schmalensee, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 12, 2021.

Trial Testimony of Tim Cook, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 21, 2021.

Trial Testimony of Trystan Kosmynka, *Epic Games, Inc. vs. Apple, Inc.*, No. C–20–5640 YGR, United States District Court for the Northern District of California, Oakland Division, May 6, 2021 – May 7, 2021.

## Bates-Stamped Documents

Apple, "App Store and Mac App Store Presentation," 2011, APL–APPSTORE_10857840–919.

Apple, "App Store Product Page Privacy Nutrition Labels," December 2019, APL-APPSTORE_10860403–427.

Apple, "App Store Trust and Safety Priorities and Resourcing," July 2021, APL-APPSTORE_10980784–843.

Apple, "Apple Internal Email Communication," December 12, 2019, APL-APPSTORE_11350207–215.

Apple, "Apple Internal Email Communication," February 24, 2022, APL-APPSTORE_11077016–026.

Apple, "Apple Internal Email Communication," October 16, 2018, APL-APPSTORE_11042424–501.

Apple, "Apple Internal Email Communication," August 31, 2015, APL–APPSTORE_10861735–749.

Apple, "Building a Trusted Ecosystem for Millions of Apps: A Threat Analysis of Sideloading," October 2021, APL-APPSTORE_11111410–440.

Department of Commerce, "Competition in the Mobile Application Ecosystem," February 2023, APL-APPSTORE_11235149–198.

Apple, "CyberSecurity," February 27, 2013, APL-APPSTORE_11139116–141.

Apple, "Developer Program Analysis," 2007, APL–EG_01025711–733.

B-2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple, "iPhone Buyer FY21-Q1 Global Report," 2021, APL_APPSTORE_11109980–251.

Apple, "iPhone Buyer FY21-Q3 Global Report," 2021, APL_APPSTORE_11110316–557.

Apple, "iPhone Buyer: FY21-Q4 Global Report," 2021, APL–APPSTORE–11110558–738.

Apple, "iPhone Buyer: FY22-Q1 | Switcher Analysis," 2021, APL–APPSTORE–11110923–1076.

Apple, "iPhone Buyer: FY22-Q1 Marcom Report," 2021, APL–APPSTORE–11110827–922.

Apple, "iPhone Developer Program Satisfaction Survey," March 2010, APL_APPSTORE_09324150–288.

Apple, "iPhone Developer Program Satisfaction Survey," August 2010, APL_APPSTORE_09324447–608.

Apple, "iPhone SDK Launch," March 6, 2008, APL–APPSTORE_00000055–087.

Lookout, "Lookout Mobile Threat Report," August 2011, APL-APPSTORE_10779789–813.

Apple, "Tech Talk Sessions," November 23, 2023, APL–APPSTORE_10834687–774.

## Academic Articles, Books, and Publications

"Market Power Handbook," American Bar Association Book Publishing, March 8, 2012, 2nd Ed., edited by Mary Coleman and Bruce Hoffman, pp. 71–103.

Akerlof, George A., "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," *Quarterly Journal of Economics*, Vol. 84, No. 3, August, 1970, pp. 488–500.

Alhejaili, Adel, and James Blustein, "Users' Sophisticated Information Search Behaviour," *Design, Operation and Evaluation of Mobile Communications*, Springer Cham, July 9, 2023, Vol. 14052, edited by Gavriel Salvendy and June Wei.

Arbin, Katarina, and Ulf Essler, "Covisint in Europe: Analysing the B2B Auto E-marketplace," *International Journal Automotive Technology and Management*, Vol. 5, No. 1, 2005, pp. 31–45.

Argyle, Bronson, Taylor Nadauld, and Christopher Palmer, "Real Effects of Search Frictions in Consumer Credit Markets," *Review of Financial Studies*, Vol. 36, 2023, pp. 2685–2720.

Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, pp. 668–691.

Auer, Dirk, and Nicolas Petit, "Two-Sided Markets and the Challenge of Turning Economic Theory Into Antitrust Policy," *Antitrust Bulletin*, Vol. 60, No. 4, 2015, pp. 426–461.

Backus, Matthew R., Joseph Uri Podwol, and Henry S. Schneider, "Search Costs and Equilibrium Price Dispersion in Auction Markets," *Economic Analysis Group*, Vol. 13, No. 2, November 2013, pp. 1–34.

Baker, Jonathan, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007, pp. 129–173.

Baker, Jonathan B., "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," *Law and Contemporary Problems*, Vol. 51, No. 2, 1989, pp. 93–164.

Baker, Jonathan B., and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics*, MIT Press, 2008, edited by Paolo Buccirossi.

Basole, Rahul C., and Jürgen Karla, "Value Transformation in the Mobile Service Ecosystem: A Study of App Store Emergence and Growth," *Service Science*, Vol. 4, No. 1, March 2012, pp. 24–41.

Bator, Francis M., "The Anatomy of Market Failure," *Quarterly Journal of Economics*, Vol. 72, No. 3, August 1958, pp. 351–379.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Belleflamme, Paul, and Nicolas Neysen, "Understanding and Activating Network Effects," *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, Routledge, London, 2023, 1st Ed.

Belleflamme, Paul, and Martin Peitz, *The Economics of Platforms: Concepts and Strategy*, Cambridge University Press, 2021.

Belleflamme, Paul, and Martin Peitz, "Platforms and Network Effects," *University of Mannheim Department of Economics Working Paper Series*, Working Paper, September 2016.

Cao, Jingcun, Avery Haviv, and Nan Li, "The Spillover Effects of Copycat Apps and App Platform Governance," available at https://ssrn.com/abstract=4250292.

Carlton, Dennis W., and Ken Heyer, "Extraction vs. Extension: The Basis For Formulating Antitrust Policy Towards Single-Firm Conduct," *Competition Policy International*, Vol. 4, No. 2, 2008, pp. 285–305.

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, 2015, 4th Ed.

Close, Angeline C., Monika Kukar-Kinney, and Timothy Kyle Benusa, "Toward a Theory of Consumer Electronic Shopping Cart Behavior Motivations of E-Cart Use and Abandonment," *Online Consumer Behavior*, 2012, pp. 323–343.

Coase, Ronald H., "The Lighthouse in Economics," *Journal of Law and Economics*, Vol. 17, No. 2, 1974, pp. 357–376.

Cohent, Molly, and Arun Sundararajan, "Self-Regulation and Innovation in the Peer-to-Peer Sharing Economy," *University of Chicago Law Review Online*, Vol. 82, No. 1, 2017, pp. 116–133.

Cusumano, Michael A., Anabelle Gawer, and David B. Yoffie, *The Business of Platforms: Strategy in the Age of Digital Competition, Innovation, and Power*, Harper Business, 2019.

Dahlman, Carl J., "The Problem of Externality," *Journal of Law and Economics*, Vol. 22, No. 1, 1979, pp. 141–162.

Davis, Peter, and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010.

Dellarocas, Chrysanthos, "The Digitization of Word of Mouth: Promise and Challenges of Online Feedback Mechanisms," *Management Science* Vol. 49, No. 10, 2003, pp. 1407–1424.

Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation*, Vol. 20, No. 325, 2003, pp. 325–381.

Evans, David S., "Economics Of Vertical Restraints For Multi-Sided Platforms," *Competition Policy International*, Vol. 9, No. 1, 2013, pp. 1–24.

Evans, David S., "Governing Bad Behavior by Users of Multi-Sided Platforms," *Berkeley Technology Law Journal*, April 2012, pp. 1–39.

Evans, David S., and Richard Schmalensee, "The Industrial Organization of Markets with Two-Sided Platforms," *Competition Policy International*, Vol. 3, No. 1, Spring 2007, pp. 151–179.

Evans, David S., and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues in Competition Law and Policy*, Vol. 667, 2008, pp. 667–693.

Evans, David S., and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Harvard Business Review Press, Boston, Massachusetts, 2016.

Evans, David S., and Richard Schmalensee, "More Than Money," *Paying with Plastic: The Digital Revolution in Buying and Borrowing*, MIT Press, 2004, 2nd Ed.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Filippas, Apostolos, John J. Horton, and Joseph M. Goldend, "Reputation Inflation," *Marketing Science*, Vol. 41, No. 4, 2022, pp. 733–745.

Filistrucchi, Lapo, "A SSNIP Test for Two-sided Markets: The Case of Media," *SSRN*, Vol. 1287442, October 2008.

Filistrucchi, Lapo, Damien Geradin, Eric van Damme, and Pauline Affeldt, "Market Definition in Two-Sided Markets: Theory and Practice," *Journal of Competition Law & Economics*, Vol. 10, No. 2, June 2014, pp. 293–339.

Fradkin, Andrey, Elena Grewal, and David Holtz, "Reciprocity and Unveiling in Two-Sided Reputation Systems: Evidence from an Experiment on Airbnb," *Marketing Science*, Vol. 40, No. 6, November 2021, pp. 1013–1029.

Fullerton, Ronald A., and Girish Punj, "Choosing to Misbehave: A Structural Model of Aberrant Consumer Behavior," *Advances in Consumer Research*, Vol. 20, 1993, pp. 570–574.

Gilbert, Richard J., and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences*, Vol. 93, November 1996, pp. 12749–12755.

Givon, Moshe, Vijay Mahajan, and Eitan Muller, "Software Piracy: Estimation of Lost Sales and the Impact of Software Diffusion," *Journal of Marketing*, Vol. 59, No. 1, January 1995, pp. 29–37.

Goldfarb, Avi, and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No. 1, 2019, pp. 3–43.

Groves, Theodore, and John Ledyard, "Optimal Allocation of Public Goods: A Solution to the "Free Rider" Problem," *Econometrica*, Vol. 45, No. 4, May 1997, pp. 783–809.

Ha, Sejeong, and Christian A. L. Hilber, "Do Long Distance Moves Discourage Homeownership?," *Spatial Economics Research Centre*, September 2013.

Hagiu, Andrei, "Two-Sided Platforms: Product Variety and Pricing Structures," *Journal of Economics and Management Strategy*, Vol. 18, No. 4, 2009, pp. 1011–1043.

Harrison, Richard, Alan Robinson, Arwel Hughes, Carol Holmes, Colin Anthony, Dan Daly, David Cunado, Dominic Pinkman, Elisabeth Mawe, Ian Bunning, Ian McDowall, John Crickett, John Davis, John McAleely, John Pagonis, Laura McLeod, Malcolm Box, Nao Kagabu, and Stuart Fisher, *Symbian OS C++ for Mobile Phones*, John Wiley & Sons, West Sussex, England, September 17, 2004.

Johnson, Paul A., "Indirect Network Effects, Usage Externalities, and Platform Competition," *Journal of Competition Law & Economics*, Vol. 15, No. 2–3, November 18, 2019, pp. 283–297.

Jones, Charles I., and Christopher Tonetti, "Nonrivalry and the Economics of Data," *American Economic Review*, Vol. 110, No. 9, September 2020, pp. 2819–2858.

Jullien, Bruno, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," *Handbook of Industrial Organization*, Elsevier, 2021, Vol. 4, edited by Kate Ho, Ali Hortaçsu and Alessandro Lizzeri.

Kenney, Martin, and Bryan Pon, "Structuring the Smartphone Industry: Is the Mobile Internet OS Platform the Key?," *Journal of Industry, Competition and Trade*, Vol. 11, No. 3, 2011, pp. 239–261.

Klein, Benjamin, Andres Lerner, Kevin Murphy, and Lacey Plache, "Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," *Antitrust Law Journal*, Vol. 73, No. 3, July 2011, pp. 571–626.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Knoll, Melissa A. Z., "The Role of Behavioral Economics and Behavioral Decision Making in Americans' Retirement Savings Decisions," *Social Security Bulletin*, Vol. 70, No. 4, 2010, pp. 1–23.

Landes, William M., and Richard A. Posner, "Market Power in Antitrust Cases," *Harvard Law Review*, Vol. 94, No. 5, March 1981, pp. 937–996.

Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2015, 7 Ed.

Masatlioglu, Yusufcan, Daisuke Nakajima, and Erkut Y. Ozbay, "Revealed Attention," *American Economic Review*, Vol. 102, No. 5, 2012, pp. 2183–2205.

Mosemghvdlishvili, Lela, and Jeroen Jansz, "Negotiability of Technology and Its Limitations," *Information, Communication & Society*, Vol. 16, No. 10, December 2013, pp. 1596–1618.

Neto, Caio Mario S. Pereira, and Filippo Lancieri, "Towards A Layered Approach to Relevant Markets in Multi-Sided Transaction Platforms," *Antitrust Law Journal*, Vol. 83, No. 2, 2020, pp. 429–481.

Niels, Gunnar, "Transaction Versus Non-transaction Platforms: A False Dichotomy in Two-Sided Market Definition," *Journal of Competition Law & Economics*, Vol. 15, No. 2-3, 2019, pp. 327–357.

Nunes, Joseph C., Christopher K. Hsee, and Elke U. Weber, "Why Are People So Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, Vol. 23, No. 1, 2004, pp. 43–53.

Panner, Aaron M., "Market Definition and Anticompetitive Effects in *Ohio v. American Express*," *Yale Law Journal Forum*, January 18, 2021.

Parsons, David, "Mobile Portal Technologies and Business Models," *Encyclopedia of Portal Technologies and Applications*, Information Science Reference, 2007.

Posner, Richard A., "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, Vol. 19, No. 2, 2005, pp. 57–73.

Randall, Alan, "The Problem of Market Failure," *Natural Resources Journal*, Vol. 23, No. 1, 1983, pp. 131–148.

Robinson, Robert K., and Brian J. Reithel, "The Software Piracy Dilemma in Public Administration: A Survey Of University Software Policy Enforcement," *Public Administration Quarterly*, 1994, pp. 485–497.

Rochet, Jean-Charles, and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, June 2003, pp. 990–1029.

Roma, Paolo, and Daniele Ragaglia, "Revenue Models, In-App Purchase, and the App Performance: Evidence from Apple's App Store and Google Play," *Electronic Commerce Research and Applications*, Vol. 17, No. 1567-4223, 2016, pp. 173–190.

Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspective*, Vol. 23, No. 3, 2009, pp. 125–143.

Salop, Steven, and Joseph Stiglitz, "A Model of Monopolistically Competitive Price Dispersion," *Review of Economic Studies*, Vol. 44, No. 3, pp. 493–510.

Sarma, Agnitra Das, Juhi Gahlot Sarkar, and Abhigyan Sarkar, "E-Tail Format, Cognitive Orientation and Device: Shaping Variety's Impact on Online Cart Abandonment," *Journal of Consumer Marketing*, Vol. 42, No. 1, 2025, pp. 72–92.

Shaheen, Susan, Adam Cohen, and Elliot Martin, "Smartphone App Evolution and Early Understanding from a Multimodal App User Survey," *Disrupting Mobility. Lecture Notes in Mobility.*, Springer Cham, January 5, 2017, edited by Gereon Meyer and Susan Shaheen, pp. 149–164.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Shapiro, Carl, and Hal R. Varian, "The Information Economy," *Information Rules: A Strategic Guide To The Network Economy*, Harvard Business School Press, Boston, Massachusetts.

Siegemund, Frank, Robert Sugar, Alain Gefflaut, and Friedrich van Megen, "Porting the .NET Compact Framework to Symbian Phones," *Journal of Object Technology*, Vol. 5, No. 3, 2006, pp. 83–106.

Stigler, George J., "The Economics of Information," *The University of Chicago Press*, Vol. 69, No. 3, June, 1961, pp. 213–225.

Sundararajan, Arun, "The Economic Impacts of Crowd-Based Capitalism," *The Sharing Economy: The End of Employment and the Rise of Crowd-based Capitalism*, MIT Press, January 1, 2016.

Tadelis, Steve, "Reputation and Feedback Systems in Online Platform Markets," *Annual Review of Economics*, Vol. 8, August 19, 2016, pp. 321–340.

Taylor, Greg, "Raising Search Costs to Deter Window Shopping Can Increase Profits and Welfare," *RAND Journal of Economics*, Vol. 48, No. 2, 2017, pp. 387–408.

Thaler, Richard H., and Shlomo Benartzi, "Save More Tomorrow: Using Behavioral Economics to Increase Employee Saving," *Journal of Political Economy*, Vol. 112, No. S1, February, 2004, pp. S164–S1857.

Tucker, Catherine, "Comment on 'Digital Infrastructure'," *Economic Analysis and Infrastructure Investment*, University of Chicago Press, November 2021, edited by Edward L. Glaeser and James M. Poterba, pp. 448–452.

Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *Antitrust Chronicle*, Vol. 2, No. 2, July 2022, pp. 16–19.

Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?," *Antitrust*, Vol. 32, No. 2, 2018.

Varian, Hal R., "A Model of Sales," *American Economic Review*, Vol. 70, No. 4, September, 1980, pp. 651–659.

Varian, Hal R., "Use and Abuse of Network Effects," *Toward a Just Society*, 2018.

Wang, Haoyu, Zhe Liu, Jingyue Liang, Narseo Vallina-Rodriguez, Yao Guo, Li Li, Juan Tapiador, Jingcun Cao, and Guoai Xu, "Beyond Google Play: A Large-Scale Comparative Study of Chinese Android App Markets," *IMC*, Vol. 18, 2018.

Weitzman, Martin L., "Optimal Search for the Best Alternative," *Econometrica*, Vol. 47, No. 3, May, 1979, pp. 641–654.

West, Joel, and David Wood, "Creating and Evolving an Open Innovative Ecosystem: Lessons from Symbian Ltd.," *SSRN*, July 2008, pp. 1–35.

West, Joel, and David Wood, "Evolving an Open Ecosystem: The Rise and Fall of the Symbian Platform," *Advances in Strategic Management*, Vol. 30, 2013, pp. 27–67.

Yoganarasimhan, Hema, "Search Personalization Using Machine Learning," *Management Science*, Vol. 66, No. 3, March 2020, pp. 1045–1070.

Zuckerman, Ethan, "Decentralizing the Mobile Phone: A Second ICT4D Revolution?," *Information Technologies & International Development*, Vol. 6, 2010, pp. 99–103.

**Publicly Available Sources**

"The 3 Pillars of a Quality Experience," *Airbnb*, Aug 25, 2021, available at https://www.airbnb.com/resources/hosting-homes/a/the-3-pillars-of-a-quality-experience-680.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"5 Reasons App World Could Hurt The BlackBerry," *CRN*, March 6, 2009, available at https://www.crn.com/blogs-op-ed/the-channel-wire/215800925/5-reasons-app-world-could-hurt-the-blackberry.

"11 Places to Publish & Release Your Indie Game," *Ninichi Music*, September 12, 2017, available at https://ninichimusic.com/blog/2017/9/1/11-places-to-publish-release-your-indie-game.

"2022 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2022-App-Store-Transparency-Report.pdf.

"2023 App Store Transparency Report," *Apple*, available at https://www.apple.com/legal/more-resources/docs/2023-App-Store-Transparency-Report.pdf.

"2048 (3x3, 4x4, 5x5) AI on the App Store," *Apple*, available at https://apps.apple.com/us/app/2048-3x3-4x4-5x5-ai/id1518647699.

"2048 Ratings and Reviews," *Apple*, available at https://apps.apple.com/us/app/2048-3x3-4x4-5x5-ai/id1518647699?see-all=reviews.

"About Itch.io," *Itch.io*, available at https://itch.io/docs/general/about.

"About Us," *BlaBlaCar*, available at https://blog.blablacar.com/about-us.

"Accepted Payment Methods " *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=GFBWMNXEPYVJAY9A.

"Airbnb Q3 2024," *Airbnb*, November 7, 2024, available at https://news.airbnb.com/airbnb-q3-2024-financial-results/.

"Airbnb Q4-2023 and Full-Year Financial Results," *Airbnb*, February 13, 2024, available at https://news.airbnb.com/airbnb-q4-2023-and-full-year-financial-results/.

"Airbnb Service Fees for Experiences," *Airbnb*, available at https://web.archive.org/web/20250122205515/https://www.airbnb.com/help/article/3164.

"Amazon Developer Services Agreement," *Amazon*, July 16, 2024, available at https://developer.amazon.com/support/legal/da.

"Amazon FBA: Fulfillment Services for Your Ecommerce Business," *Amazon*, available at https://sell.amazon.com/fulfillment-by-amazon.

"Amazon Verified Purchase Reviews," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=G75XTB7MBMBTXP6W.

"Android Market Update: Support for Priced Applications," *Google Android*, February 13, 2009, available at https://android-developers.googleblog.com/2009/02/android-market-update-support-for.html.

"Android Market: Now Available for Users," *Google Android*, October 22, 2008, available at https://android-developers.googleblog.com/2008/10/android-market-now-available-for-users.html.

"Annual safety inspections," *Turo*, available at https://help.turo.com/en_us/annual-vehicle-safety-inspections-ByJmUVg4c.

"App Developer Agreement," *Microsoft*, October 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf.

"App Privacy Details on the App Store," *Apple*, available at https://developer.apple.com/app-store/app-privacy-details/.

"App Review," *Apple*, available at https://developer.apple.com/distribute/app-review/#contact-us.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"App Review Guidelines," *Apple*, September 13, 2024, available at https://developer.apple.com/app-store/review/guidelines/.

"App Store & Privacy," *Apple*, available at https://www.apple.com/legal/privacy/data/en/app-store/.

"App Store Pricing Upgrades Have Expanded to All Purchase Types," *Apple*, March 9, 2023, available at https://developer.apple.com/news/?id=dbrszv62.

"App Store Review Guideline Updates Now Available," *Apple*, October 24, 2022, available at https://developer.apple.com/news/?id=xk8d7p8c.

"App Store Small Business Program," *Apple*, available at https://developer.apple.com/app-store/small-business-program/.

"App Store Stopped More than $1.5 Billion in Potentially Fraudulent Transactions in 2020," *Apple*, May 11, 2021, available at https://www.apple.com/newsroom/2021/05/app-store-stopped-over-1-5-billion-in-suspect-transactions-in-2020.

"App Store Stopped More than $2 Billion in Fraudulent Transactions in 2022," *Apple*, May 16, 2023, available at https://www.apple.com/newsroom/2023/05/app-store-stopped-more-than-2-billion-in-fraudulent-transactions-in-2022.

"App Store Stopped Nearly $1.5 Billion in Fraudulent Transactions in 2021," *Apple*, June 1, 2022, available at https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraudulent-transactions-in-2021.

"App Store Stopped Over $7 Billion in Potentially Fraudulent Transactions in Four Years," *Apple*, May 14, 2024, available at https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-billion-usd-in-potentially-fraudulent-transactions/.

"The App Store Turns 10," *Apple*, July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

"App Store: Principles and Practices," *Apple*, available at https://web.archive.org/web/20200919073321/https://www.apple.com/mz/ios/app-store/principles-practices/.

"Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.

"Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," *Apple*, December 6, 2022, available at https://developer.apple.com/news/?id=qzex35ch.

"Apple Developer Is Now on Wechat," *Apple*, February 24, 2025, available at https://developer.apple.com/news/?id=j5uyprul.

"Apple Developer Program " *Apple*, available at https://developer.apple.com/programs/.

"Apple Developer Program Fee Waiver," *Apple*, available at https://developer.apple.com/support/fee-waiver/.

"Apple Developer Program License Agreement," *Apple*, February 6, 2025, available at https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.

"Apple Introduces New Developer Tools and Technologies to Create Even Better App," *Apple*, June 7, 2021, available at https://www.apple.com/newsroom/2021/06/apple-introduces-new-developer-tools-and-technologies-to-create-even-better-apps/.

"Apple Pay," *Apple*, available at https://www.apple.com/apple-pay/.

"Apple Pay Security and Privacy Overview," *Apple*, available at https://support.apple.com/en-us/101554.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Apple Reinvents the Phone with iPhone," *Apple*, January 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/.

"Apple Video Partner Program " *Apple*, available at https://developer.apple.com/programs/video-partner/.

"Apple's Product Ecosystem Strategy: Key Insights," *Aryo Consulting Group*, July 30, 2024, available at https://aryocg.com/apples-product-ecosystem-strategy-key-insights/.

"Approve What Kids Buy with Ask to Buy," *Apple*, available at https://support.apple.com/en-us/105055.

"Aptoide - Partners Program," *Aptoide*, available at https://dev2.aptoide.com/partners?lang=en.

"Aptoide Connect's Certified Developer Distribution Agreement's Annex I," *AptoideConnect*, available at https://connect.aptoide.com/developers-distribution-policy-annex-I.

"Are There Scams on Yahoo Japan Auctions? What to Know," *Nikaga*, available at https://nikaga.com/are-there-scams-on-yahoo-japan-auctions/.

"ARKit Integrate Hardware Sensing Features to Produce Augmented Reality Apps and Games," *Apple*, available at https://developer.apple.com/documentation/arkit.

"AT&T and Apple Announce Simple, Affordable Service Plans for iPhone," *Apple*, June 26, 2007, available at https://www.apple.com/newsroom/2007/06/26AT-T-and-Apple-Announce-Simple-Affordable-Service-Plans-for-iPhone/.

"Authenticity Guarantee," *eBay*, available at https://www.ebay.com/authenticity-guarantee.

"Billing and Subscriptions," *Apple*, available at https://support.apple.com/billing.

"Blackberry to Expand Application Ecosystem by Making Amazon Appstore Available on Blackberry 10 Smartphones," *Blackberry*, June 18, 2014, available at https://www.blackberry.com/us/en/company/newsroom/press-releases/2014/blackberry-to-expand-application-ecosystem-by-making-amazon-appstore-available-on-blackberry-10-smartphones.

"Booking Experiences," *Airbnb*, available at https://www.airbnb.com/help/article/1584.

"Building a Trusted Ecosystem for Millions of Apps: The Important Role of App Store Protections," *Apple*, June 2021, available at https://www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps.pdf.

"Buy Games, Game Keys & Digital Games Today," *Green Man Gaming*, March 6, 2025, available at https://www.greenmangaming.com.

"The Buyer-Seller Messaging Service," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=G3JQ9V9LQ8FFMR7W.

"Candy Crush Saga on the App Store," *Apple*, available at https://apps.apple.com/us/app/candy-crush-saga/id553834731.

"Celebrating 5 Years of BlackBerry World: Infographic," *BlackBerry*, April 1, 2014, available at https://blogs.blackberry.com/en/2014/04/blackberry-world-anniversary.

"Changes to Google Play's Service Fee in 2021," *Google*, 2021, available at https://support.google.com/googleplay/android-developer/answer/10632485.

"Chase Mobile: Bank & Invest on the App Store," *Apple*, available at https://apps.apple.com/us/app/chase-mobile-bank-invest/id298867247.

"Choosing a Business Model," *Apple*, available at https://developer.apple.com/app-store/business-models/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Citi Mobile on the App Store," *Apple*, available at https://apps.apple.com/us/app/citi-mobile/id301724680.

"Commission Rates to Artists," *Fine Art*, available at https://www.fineart.co.uk/faq/commission-rates-to-artists-32.aspx.

"Common Refund Questions," *Steam*, available at https://help.steampowered.com/en/faqs/view/5FDE-BA65-ACCE-A411.

"Core ML Integrate Machine Learning Models Into Your App," *Apple*, available at https://developer.apple.com/documentation/coreml.

"Counterclockwise: The First App Store," *GSMArena*, July 8, 2018, available at https://www.gsmarena.com/counterclockwise_the_first_app_store-news-32061.php.

"Difference Between Native Apps and Web Apps," *GeeksforGeeks*, February 14, 2023, available at https://www.geeksforgeeks.org/difference-between-native-apps-and-web-apps/.

"Digital Store," *GameStop*, available at https://www.gamestop.com/digital-store.

"Discovery on the App Store and Mac App Store," *Apple*, available at https://developer.apple.com/app-store/discoverability/.

"Driver Requirements in the USA," *Uber*, available at https://www.uber.com/us/en/drive/requirements/?city=boston.

"Due - Reminders & Timers on the App Store," *Apple*, available at https://apps.apple.com/us/app/due-reminders-timers/id390017969.

"The Elements by Theodore Gray on the App Store," *Apple*, available at https://apps.apple.com/us/app/the-elements-by-theodore-gray/id364147847.

"Every Item Is StockX Verified," *StockX*, available at https://stockx.com/about/verification/.

"Evolving Our Business Model to Address Developer Needs," *Google Android*, October 21, 2021, available at https://android-developers.googleblog.com/2021/10/evolving-business-model.html.

"Family Sharing," *Apple*, available at https://www.apple.com/family-sharing/.

"Fare Review," *Uber*, available at https://help.uber.com/riders/section/fare-review?nodeId=16decb08-ae67-4cb8-ad8e-176dd6446ea5.

"Fashion Goes Deep: Data Science at Lyst," *Cloudera*, December 9, 2015, available at https://blog.fastforwardlabs.com/2015/12/09/fashion-goes-deep-data-science-at-lyst.html.

"FCC Annual Report on Mobile Competition Reveals Penetration Reaching 80%," *S&P Global*, February 6, 2008, available at https://www.spglobal.com/marketintelligence/en/mi/country-industry-forecasting.html?id=106597164.

"The First Seller Training Center for Amazon to Open a Store in the World Is Located in Hangzhou," *GlobalCross Border E-commerce Knowledge Service Center*, October 15, 2021, available at https://m.gce-news.com/en/article/show_0_0_635.html.

American Express Company, Form 10–K, filed February 9, 2024, https://s26.q4cdn.com/747928648/files/doc_financials/2023/ar/American-Express-Annual-Report-2023.pdf, accessed February 4, 2025.

GameStop, Form 10–K, filed February 3, 2024, https://news.gamestop.com/static-files/94ea835e-3253-4e6f-aaac-cdd7c1057f90.

"Friction-Filled Online Checkouts Cause Shopping Cart Abandonment," *Forter*, February 20, 2019, available at https://www.forter.com/blog/infographic-customers-wont-tolerate-friction-filled-checkout/.

B-11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"From Android Market to Google Play: A Brief History of the Play Store," *Android Authority*, March 6, 2017, available at https://www.androidauthority.com/android-market-google-play-history-754989/.

"Gain Insights with Analytics," *Apple*, available at https://developer.apple.com/app-store-connect/analytics/.

"Gallery-Artist Agreement," *Dinoart*, available at http://www.dinoart.com/publications/prt2pg11.html.

"Getting a Trip Receipt," *Uber*, available at https://help.uber.com/riders/article/getting-a-trip-receipt?nodeId=846f6cad-6f27-492a-9e0b-d2f056e1298e.

"Google Maps on the App Store," *Apple*, available at https://apps.apple.com/us/app/google-maps/id585027354.

"Handango Company Profile," *Pocket Gamer*, available at https://www.pocketgamer.biz/industry/handango/.

"Handling Payment Disputes," *eBay*, available at https://www.ebay.com/help/selling/getting-paid/handling-payment-disputes?id=4799.

"Headspace: Sleep & Meditation on the App Store," *Apple*, available at https://apps.apple.com/us/app/headspace-sleep-meditation/id493145008.

"HealthKit," *Apple*, available at https://developer.apple.com/documentation/healthkit.

"Host and Guest Reviews for Stays," *Airbnb*, available at https://www.airbnb.com/help/article/13.

"Host Damage Protection," *Airbnb*, available at https://www.airbnb.com/help/article/279.

"Host Liability Insurance," *Airbnb*, available at https://www.airbnb.com/help/article/937.

"How Do I Hire a Tasker?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/210861763-How-Do-I-Hire-a-Tasker.

"How Guest Reviews Work," *Booking.com*, available at https://www.booking.com/reviews_guidelines.html.

"How Handy Works," *Handy*, available at https://help.handy.com/handysupport/s/article/How-are-customers-matched-with-pros--How-Handy-Works.

"How Listings Are Categorized," *Airbnb*, available at https://www.airbnb.com.mt/help/article/3374.

"How Much Does Airbnb Charge Hosts?," *Airbnb*, November 16, 2020, available at https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288.

"How Pioneering Hosts Created 10 Years of Firsts on Airbnb," *Airbnb*, August 13, 2018, available at https://news.airbnb.com/how-pioneering-hosts-created-10-years-of-firsts-on-airbnb/.

"How Pricing Guidance Works on Taskrabbit," *TaskRabbit*, April 13, 2022, available at https://www.taskrabbit.ca/blog/how-pricing-guidance-works-on-taskrabbit.

"How Search Results Work," *Airbnb*, available at https://www.airbnb.com/help/article/39.

"How the Review System Works for Sellers," *Etsy*, available at https://help.etsy.com/hc/en-us/articles/360000572708-How-the-Review-System-Works-for-Sellers?segment=selling.

"How to Turn On Automatic App Updates," *iPhoneLife*, available at https://www.iphonelife.com/content/how-to-set-your-iphone-apps-to-update-automatically.

"How Uber's Dynamic Pricing Model Works," *Uber*, available at https://www.uber.com/en-GB/blog/uber-dynamic-pricing/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"How We Pay Digitally: Store Credentials Edition," *PYMNTS*, November 2022, available at https://www.pymnts.com/wp-content/uploads/2022/11/PYMNTS-How-We-Pay-Digitally-November-2022.pdf.

"In-App Purchase " *Apple*, available at https://developer.apple.com/in-app-purchase/.

"Introducing Amazon Appstore for Android," *Amazon*, March 22, 2011, available at https://press.aboutamazon.com/2011/3/introducing-amazon-appstore-for-android.

"Introducing Dynamic Pricing to Help Maximize Your Earnings," *Turo*, May 23, 2024, available at https://turo.com/blog/news/introducing-dynamic-pricing-to-help-maximize-your-earnings/.

"Introducing Open Revenue Sharing," *Itch.io*, March 4, 2015, available at https://itch.io/updates/introducing-open-revenue-sharing.

"Introducing the Epic First Run program," *Epic Games*, August 23, 2023, available at https://store.epicgames.com/en-US/news/introducing-the-epic-first-run-program.

"Introducing the News Partner Program," *Apple*, available at https://developer.apple.com/apple-news/program/.

"iPhone Premieres This Friday Night at Apple Retail Stores," *Apple*, June 28, 2007, available at https://www.apple.com/newsroom/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores/.

"iPhone Top Charts on the App Store," *Apple*, available at https://apps.apple.com/us/charts/iphone.

"Leading Hotel and Resort Companies Worldwide in 2023, by Sales," *Statista*, September 12, 2024, available at https://www.statista.com/statistics/273064/revenue-of-the-largest-hotel-groups-worldwide/.

"Manage App Pricing: Set a Price," *Apple*, available at https://developer.apple.com/help/app-store-connect/manage-app-pricing/set-a-price.

"MapKit," *Apple*, available at https://developer.apple.com/documentation/mapkit.

"Marriott International Reports Third Quarter 2024 Results," *Marriott*, November 4, 2024, available at https://marriott.gcs-web.com/news-releases/news-release-details/marriott-international-reports-third-quarter-2024-results.

"Maruti Suzuki Collaborates with Ola to Create a Pool of Skilled Drivers and Promote Entrepreneurship," *Maruti Suzuki*, available at https://www.marutisuzukidrivingschool.com/media/maruti-suzuki-collaborates-with-ola-to-create-a-pool-of-skilled-drivers-and-promote-entrepreneurship.

"Measuring App Performance," *Apple*, available at https://developer.apple.com/app-store/measuring-app-performance/.

"Meet with Apple," *Apple*, available at https://developer.apple.com/events/.

"Membership Details," *Apple*, available at https://developer.apple.com/programs/whats-included/.

"Merger Guidelines," *U.S. Department of Justice and the Federal Trade Commission*, December 18, 2023.

"Minecraft: Play With Friends on the App Store," *Apple*, available at https://apps.apple.com/us/app/minecraft-play-with-friends/id479516143.

"'The Mobile Industry's Never Seen Anything Like This': An Interview With Steve Jobs at the App Store's Launch," *Wall Street Journal*, July 25, 2018, available at https://www.wsj.com/articles/the-mobile-industrys-never-seen-anything-like-this-an-interview-with-steve-jobs-at-the-app-stores-launch-1.

B-13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Money Back Guarantee " *eBay*, available at https://pages.ebay.com/ebay-money-back-guarantee/.

"Monopolization Defined," *Federal Trade Commission*, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined.

"NetNewsWire: RSS Reader on the App Store," *Apple*, available at https://apps.apple.com/us/app/netnewswire-rss-reader/id1480640210.

"New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," *Steam*, November 30, 2018, available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

"Nike Training Club: Wellness on the App Store," *Apple*, available at https://apps.apple.com/us/app/nike-training-club-wellness/id301521403.

"Nine Years of Apple's iOS SDK Generated $60 Billion, 1.4 Million Jobs," *AppleInsider*, March 7, 2017, available at https://appleinsider.com/articles/17/03/07/nine-years-of-apples-ios-sdk-generated-60-billion-14-million-jobs.

"Nokia Ovi Store Launch Is A Complete Disaster," *TechCrunch*, May 26, 2009, available at https://techcrunch.com/2009/05/26/nokia-ovi-store-launch-is-a-complete-disaster/.

"Now on Epic," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/now-on-epic.

"Optimizing for App Store Search," *Apple*, available at https://developer.apple.com/app-store/search/.

"Paying for Your Trip," *Airbnb*, available at https://www.airbnb.com/help/article/3119.

"Payment Methods," *Uber*, available at https://help.uber.com/riders/section/payment-methods?nodeId=6f1bdcf2-af89-4294-a89e-cb7d76ff81d6.

"PocketGear Buys Handango," *Reuters*, February 23, 2010, available at https://www.reuters.com/article/business/pocketgear-buys-handango-idUS1366735222/.

"The Power of Connection: Peer-to-Peer Businesses," January 15, 2014, available at https://smallbusiness.house.gov/calendar/eventsingle.aspx?EventID=364939.

"Preferred Driver for Riders," *Lyft*, available at https://help.lyft.com/hc/en-us/all/articles/4819516913-Preferred-Driver-for-riders.

"Pricing That Works for Your Business," *Uber*, available at https://merchants.ubereats.com/us/en/pricing/.

"Pricing Your Vehicle," *Turo*, available at https://help.turo.com/en_us/setting-your-vehicle-price-S12VrVlVc.

"Procreate on the App Store," *Apple*, available at https://apps.apple.com/us/app/procreate/id425073498.

"Public Net Exchanges May Be Losing Their Luster," *CNET*, February 22, 2001, available at https://www.cnet.com/tech/tech-industry/public-net-exchanges-may-be-losing-their-luster/.

"Rating FAQs," *Uber*, available at https://help.uber.com/riders/article/rating-faqs?nodeId=0539e772-747c-49a7-8c26-f28c65e6f14d.

"Ratings, Reviews, and Responses," *Apple*, available at https://developer.apple.com/app-store/ratings-and-reviews/.

"Refer-a-friend Program," *Uber*, available at https://help.uber.com/en/riders/article/refer-a-friend-program?nodeId=4d918571-17ab-4d8f-8967-2be24bea8800.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Rent or Buy a Rideshare Car to Drive and Earn," *Uber*, available at https://www.uber.com/us/en/drive/vehicle-solutions/Vehicle Solutions.

"Report A Problem," *Apple*, available at https://reportaproblem.apple.com.

"Report an Issue with a Buyer," *eBay*, available at https://www.ebay.com/help/selling/resolving-buyer-issues/reporting-issue-buyer?id=4084.

"Report and Recommendations," *Antitrust Modernization Commission*, April 2007.

"Report Suspicious Activity," *Amazon*, available at https://www.amazon.com/gp/help/customer/display.html?nodeId=T3MYikBay7swNeFqFo.

"The Revolution Steve Jobs Resisted: Apple's App Store Marks 10 Years of Third-Party Innovation," *AppleInsider*, July 10, 2018, available at https://appleinsider.com/articles/18/07/10/the-revolution-steve-jobs-resisted-apples-app-store-marks-10-years-of-third-party-innovation.

"Revolutionary On-Line OEM Parts Auction Shutting Down," *Auto Service*, January 12, 2004, available at https://www.autoserviceworld.com/revolutionary-on-line-oem-parts-auction-shutting-down/.

"Schedule 2 and 3," *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20240610-English.pdf.

"Seller Policy," *Etsy*, available at https://www.etsy.com/legal/sellers.

"Selling Art in Galleries: Everything You Need to Know," *PetaPixel*, November 14, 2014, available at https://petapixel.com/2014/11/14/selling-art-galleries-everything-need-know/.

"Selling Fees," *eBay*, available at https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822.

"Service Fee, Explained," *Uber*, available at https://www.uber.com/us/en/drive/driver-app/service-fee/.

"Set and Schedule App Pricing for MSIX App," *Microsoft*, July 23, 2024, available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/msix/schedule-pricing-changes?pivots=store-installer-msix.

"The Sharing Economy: Creating Opportunities for Innovation and Flexibility," *Hearing Before the Committee on Education and the Workforce*, United States House of Representatives, House Education and the Workforce, 2017, available at https://www.congress.gov/event/115th-congress/house-event/106358.

"The 'Sharing Economy': Issues Facing Platforms, Participants, and Regulators," *Federal Trade Comission*, June 9, 2015, available at https://www.ftc.gov/news-events/events/2015/06/sharing-economy-issues-facing-platforms-participants-regulators.

"Shop by Category," *eBay*, available at https://www.ebay.com/n/all-categories.

"Solitaire on the App Store," *Apple*, available at https://apps.apple.com/us/app/solitaire/id593715088.

"Solitaire Ratings and Reviews," *Apple*, available at https://apps.apple.com/us/app/solitaire/id593715088?see-all=reviews.

"Spring 2.0: The Shopping App Looks To Reinvent," *Glossy*, August 2, 2017, available at https://www.glossy.co/fashion/spring-2-0-the-shopping-app-looks-to-reinvent/.

"Sprint Touts PCS Vision," *LightReading*, September 5, 2002, available at https://www.lightreading.com/business-management/sprint-touts-pcs-vision.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"Stardew Valley on the App Store," *Apple*, available at https://apps.apple.com/us/app/stardew-valley/id1406710800.

"The State of Ecommerce Trust in 2020," *Ecommerce Research*, June 25, 2020, available at https://blog.trustedsite.com/2020/06/25/the-state-of-ecommerce-trust-in-2020-original-research/.

"Steamworks Development - Developer Conferences, 2025 (A Quick Survey)," *Steam*, available at https://store.steampowered.com/news/group/4145017/view/4547039255696769962.

"Strategy First to Deliver Multiple Titles On-Line via Steam," *Strategy First*, December 8, 2005, available at https://web.archive.org/web/20060328053420/http://www.strategyfirst.com/press/DisplayArticle.asp?sLanguageCode=EN&iArticleID=3250.

"Supported Currencies and Currency Fees," *Airbnb*, available at https://www.airbnb.com/help/article/95#section-heading-3-0.

"Sweat: Fitness App For Women on the App Store," *Apple*, available at https://apps.apple.com/us/app/sweat-fitness-app-for-women/id1049234587.

"Symbian Reports First Quarter Results for 2008," *Symbian*, May 20, 2008, available at https://web.archive.org/web/20080709203505/http://www.symbian.com:80/news/pr/2008/pr20089950.html.

"The Symbiotic Relationship Between App Developers and Platforms: A Ten-Year Retrospective," *The App Association*, 2018, available at https://actonline.org/wp-content/uploads/2018_ACT-App-Store-Ten-Year-Retro-Doc.pdf.

"The TaskRabbit Elite," *TaskRabbit*, available at https://www.taskrabbit.com/taskrabbit-elite.

"Terms and Conditions," *Samsung*, 2009, available at https://web.archive.org/web/20090815155035/https:/seller.samsungapps.com/help/termsAndConditions.as.

"Terms and Conditions," *Samsung*, August 13, 2020, available at https://seller.samsungapps.com/help/termsAndConditions.as.

"Top Rated Seller Program," *eBay*, available at https://www.ebay.com/sellercenter/protections/top-rated-program.

"Travel Insurance and Assistance Services for US Residents," *Airbnb*, available at https://www.airbnb.com/help/article/3443.

"TrueCar Welcomes Drivers on the Uber Platform," *TrueCar*, available at https://uber.truecar.com/landing/?_tc_src=unauthorized.

"Uber - Request a Ride on the App Store," *Apple*, available at https://apps.apple.com/us/app/uber-request-a-ride/id368677368.

"Uber Postcard," *Uber*, available at https://swiped.co/file/uber-facebook/.

"Understanding Why Drivers and Delivery People Can Lose Access to Their Accounts," *Uber*, available at https://www.uber.com/us/en/drive/driver-app/deactivation-review/.

"Update on 'Reader' App Distribution," *Apple*, March 30, 2022, available at https://developer.apple.com/news/?id=grjqafts.

"Updating a Payment Method on Your Account," *Uber*, available at https://help.uber.com/riders/article/updating-a-payment-method-on-your-account?nodeId=8f78dca4-9d75-44f1-bdc1-e90ca3da0319.

"Use Smart Pricing to Automatically Adjust Your Prices Based on Demand," *Airbnb*, available at https://www.airbnb.com/help/article/1168.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"User Agreement," *eBay*, July 26, 2024, available at https://www.ebay.com/help/policies/member-behaviour-policies/user-agreement?id=4259#4.

"Verifying Your ID," *BlaBlaCar*, November 28, 2024, available at https://support.blablacar.com/s/article/Verifying-your-ID-1729196958697?language=en_GB.

"Verizon Wireless To Offer Brew-Enabled Service from Qualcomm," *Verizon*, February 7, 2002, available at https://www.verizon.com/about/news/press-releases/verizon-wireless-offer-brewenabled-service-qualcomm.

"Video Game Distribution Platforms: GOG.com," *GOG.com*, July 25, 2024, available at https://www.1d3.com/blog/video-game-distribution-platforms-gog-com.

"Video Games," *GameStop*, available at https://www.gamestop.com/video-games.

"What Are the Perks of Elite Status?," *TaskRabbit*, available at https://support.taskrabbit.com/hc/en-us/articles/360034623292-What-Are-the-Perks-of-Elite-Status.

"What Do I Get with a Headspace Subscription?," *Headspace*, available at https://help.headspace.com/hc/en-us/articles/360000211347-What-do-I-get-with-a-Headspace-subscription.

"What is Uber Cash?," *Uber*, available at https://www.uber.com/us/en/ride/how-it-works/uber-cash/.

"What We're Doing to Prevent Fake Listing Scams," *Airbnb*, April 21, 2017, available at https://news.airbnb.com/what-were-doing-to-prevent-fake-listing-scams/.

"When You'll Get Your Payout," *Airbnb*, available at https://www.airbnb.com/help/article/425.

"Where Is BlaBlaCar Available?," *BlaBlaCar*, available at https://support.blablacar.com/s/article/Where-is-BlaBlaCar-available-1729197111772?language=en_GB.

"Why Is Apple's Mac OS X So Much More Secure than Microsoft's Windows?," *MacDailyNews*, October 1, 2006, available at https://macdailynews.com/2006/10/01/why_is_apples_mac_os_x_so_much_more_secure_than_microsofts_windows/comment-page-2/.

"Why Your Reservation Request May Have Been Declined by the Host," *Airbnb*, available at https://www.airbnb.com/help/article/3592.

"Yahoo Auction Japan," *Yahoo*, available at https://auctions.yahoo.co.jp/.

"Yahoo Auction Taiwan," *Yahoo*, available at https://tw.bid.yahoo.com.

"Yahoo! Auctions Guidelines," *Yahoo*, September 6, 2002, available at https://web.archive.org/web/20020906023403/http://user.auctions.yahoo.com/html/guidelines.html.

Alisa, "Samsung Galaxy Store App | Download Apps/Games from Galaxy Store," *Mini Tool*, October 12, 2022, available at https://www.minitool.com/news/samsung-galaxy-store-app.html.

Arora, Himanshu, "HP to End Support for App Catalog and WebOS Device Cloud Services in January," *TechSpot*, October 16, 2014, available at https://www.techspot.com/news/58459-hp-end-support-app-catalog-webos-device-cloud.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Arrington, Michael, "Yahoo Shutting Down Auctions – Second Service to Deadpool This Month," *TechCrunch*, May 9, 2007, available at https://techcrunch.com/2007/05/09/yahoo-shutting-down-auctions-second-service-to-deadpool-this-month/?guccounter=1.

Aydinyan, Tamara, "Amex Retention Offers: How to Get Them," *Forbes*, April 3, 2024, available at https://www.forbes.com/advisor/credit-cards/amex-retention-offers/.

Baruchman, Michelle, "Airbnb for Cars? Getaround App Lets Users Rent Cars from Strangers by the Hour," *The Seattle Times*, June 4, 2018, available at https://www.seattletimes.com/seattle-news/transportation/airbnb-for-cars-getaround-app-lets-users-rent-cars-from-strangers-by-the-hour/.

Beier, Matt, "New to Tasking? We Have All the Info You Need!," *TaskRabbit*, April 18, 2023, available at https://www.taskrabbit.com/blog/new-to-tasking-we-have-all-the-info-you-need.

Best, Jo, "'Android before Android': The Long, Strange History of Symbian and Why It Matters for Nokia's Future," April 4, 2013, available at https://www.zdnet.com/article/android-before-android-the-long-strange-history-of-symbian-and-why-it-matters-for-nokias-future/.

Blanding, Michael, "How Uber, Airbnb and Etsy Attracted Their First 1,000 Customers," *Forbes*, July 13, 2016, available at https://www.forbes.com/sites/hbsworkingknowledge/2016/07/13/how-uber-airbnb-and-etsy-attracted-their-first-1000-customers/.

Booty, Matt, "Continuing Our PC Gaming Journey in 2021 and Beyond," *Microsoft Xbox*, April 29, 2021, available at https://news.xbox.com/en-us/2021/04/29/continuing-our-pc-gaming-journey-in-2021-and-beyond/.

Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "Apple's App Store and Other Digital Marketplaces," *Analysis Group*, July 22, 2020, available at https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf.

Borck, Jonathan, Juliette Caminade, and Markus von Wartburg, "A Global Perspective on the Apple App Store Ecosystem," *Analysis Group*, June 2021, available at https://www.apple.com/newsroom/pdfs/apple-app-store-study-2020.pdf.

Brown, Morgan, "AirBnb: The Growth Story You Didn't Know," *GrowthHackers Team*, available at https://growthhackers.com/growth-studies/airbnb/.

Callaham, John, "The History of Android: The Evolution of the Biggest Mobile OS in the World," *Android Authority*, October 15, 2024, available at https://www.androidauthority.com/history-android-os-name-789433/.

Caminade, Juliette, and Jonathan Borck, "The Continued Growth and Resilience of Apple's App Store Ecosystem," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf.

Caminade, Juliette, and Jonathan Borck, "Small Business Developers and App Creators on the App Store in 2022," *Analysis Group*, May 2023, available at https://www.apple.com/newsroom/pdfs/small-business-developers-and-app-creators-on-the-app-store-in-2022.pdf.

Caminade, Juliette, and Markus von Wartburg, "The Success of Third-Party Apps on the App Store," *Analysis Group*, April 2022, available at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

https://www.apple.com/newsroom/pdfs/the-success-of-third-party-apps-on-the-app-store.pdf.

Carino, Meghan McCarty, "Airbnb Introduces Fee for Properties Booked In a Different Currency," *Marketplace*, February 13, 2024, available at https://www.marketplace.org/2024/02/13/airbnb-introduces-fee-for-properties-booked-in-a-different-currency/.

Carrasqueira, João, "Microsoft Is Apparently Canceling Its 95% Revenue Share Program [Update]," *NeoWin*, January 15, 2020, available at https://www.neowin.net/news/microsoft-is-apparently-canceling-its-95-revenue-share-program/.

Carson, Biz, "The 'Uber for Private Jets' Startup Backed by an Uber Cofounder Is Shutting Down," *Business Insider*, May 6, 2016, available at https://www.businessinsider.com/private-plane-startup-blackjet-shuts-down-2016-5.

Cassady, Daniel, "Sotheby's New Fee Structure is a Big Gamble," *ARTnews*, February 15, 2024, available at https://www.artnews.com/art-news/market/sothebys-new-fee-structure-experts-gamble-1234696421/.

Casserly, Meghan, "Getaround's Jessica Scorpio On The Rise Of Collaborative Consumption," *Forbes*, December 18, 2011, available at https://www.forbes.com/sites/meghancasserly/2011/12/12/getaround-jessica-scorpio-rise-of-collaborative-consumption/.

Charny, Ben, "AT&T Debuts "mMode" Wireless Web," *CNET*, April 16, 2002, available at https://www.cnet.com/tech/mobile/at-t-debuts-mmode-wireless-web/.

Chartier, David, "iPhone OS Gets New Name, Video Calling," *Macworld*, June 7, 2010, available at https://www.macworld.com/article/205857/iphone_os_4_wwdc.html.

Cheng, Jacqui, "T-Mobile, Google Finally Unveil the First Android Phone," *Ars Technica*, September 23, 2008, available at https://arstechnica.com/gadgets/2008/09/t-mobile-google-finally-unveil-the-first-android-phone/.

Chidambaram, Palanidaran, "Coming Soon: Amazon Appstore Small Business Accelerator Program," *Amazon*, June 15, 2021, available at https://developer.amazon.com/apps-and-games/blogs/2021/06/small-business-accelerator-program.

Cox, Beth, "eBay Bidding Bye Bye to Billpoint," *InternetNews.com*, December 16, 2002, available at https://web.archive.org/web/20021217063516/http://www.internetnews.com/ec-news/article.php/1557551.

Cradeur, Jay, "Why Is Uber Sending Out Postcards to Recruit Drivers?," *The Rideshare Guy*, July 27, 2020, available at https://therideshareguy.com/uber-driver-recruitment/.

Crets, Stephanie, "ShopRunner Dives Deeper Into Marketplace Offerings After Spring Acquisition," *Digital Commerce*, May 15, 2019, available at https://www.digitalcommerce360.com/2019/05/15/shoprunner-is-shuttering-its-spring-marketplace-app/.

Cunningham, Andrew, "Google Play Apps and Updates Are Now Subject to a Review Process," *Ars Technica*, March 17, 2015 available at https://arstechnica.com/gadgets/2015/03/google-play-apps-and-updates-are-now-subject-to-a-review-process/.

Diakopoulos, Nicholas, "How Uber Surge Pricing Really Works," *The Washington Post*, April 17, 2015, available at https://www.washingtonpost.com/news/wonk/wp/2015/04/17/how-uber-surge-pricing-really-works/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Dogtiev, Artem, "App Monetization Strategies (2023)," *Business of Apps*, February 27, 2025, available at https://www.businessofapps.com/marketplace/app-monetization/research/app-monetization-strategies.

Donofrio, Craig, "10 Costs of Buying a Home You Need To Know About," *Realtor*, November 7, 2023, available at https://www.realtor.com/advice/buy/10-home-buying-costs-need-know/.

Dugan, Kevin T., "The 5 Reasons Airbnb Is Having a Terrible Summer," *Intelligencer*, August 8, 2024, available at https://nymag.com/intelligencer/article/5-reasons-airbnb-is-having-a-terrible-summer.html.

Edelman, Benjamin, "How to Launch Your Digital Platform," *Harvard Business Review*, April 2015, available at https://hbr.org/2015/04/how-to-launch-your-digital-platform.

Endicott, Sean, "The Windows Phone 8.1 Store Shuts Down in December," *Windows Central*, October 15, 2019, available at https://www.windowscentral.com/windows-phone-81-store-shuts-down-december.

Evans, Jonny, "Apple Confirms the Scale of App Store Fraud," *ComputerWorld*, June 2, 2022, available at https://www.computerworld.com/article/1625926/apple-confirms-the-scale-of-app-store-fraud.html.

Evans, Jonny, "Apple: Sideloading Apps Will Undermine iOS Security," *ComputerWorld*, June 23, 2021, available at https://www.computerworld.com/article/1614272/apple-sideloading-apps-will-undermine-ios-security.html.

Fingas, Jon, "Apple's New Online Content Network Should Deliver Your Files Faster," *Engadget*, July 31, 2014, available at https://www.engadget.com/2014-07-31-apple-content-delivery-network.html.

Fingas, Roger, "Apple Announces It Will Offer App Store Subscriptions to All Apps, Take Smaller 15% Cut," *AppleInsider*, June 8, 2016, available at https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut.

Fisher, Lauren, "New App Introduces The Future of Mobile Shopping," August 14, 2014, available at https://www.harpersbazaar.com/fashion/trends/a3194/spring-shopping-app-launch/.

Freed, Benjamin, "Ride-Sharing Company Sidecar Gives Up on Competing With Uber and Ly," *Washingtonian*, December 29, 2015, available at https://www.washingtonian.com/2015/12/29/ride-hailing-company-sidecar-gives-up-on-competing-with-uber-and-lyft/.

Friedman, Alan, "From the Antitrust Mailbag: Manufacturer–Imposed Requirements," *Federal Trade Comission*, October 22, 2014, available at https://www.ftc.gov/enforcement/competition-matters/2014/10/antitrust-mailbag-manufacturer-imposed-requirements.

Friedman, Lex, "The App Store Turns Five: A Look Back and Forward," *Macworld*, July 8, 2013, available at https://www.macworld.com/article/221393/the-app-store-turns-five-a-look-back-and-forward.html.

Ganapati, Priya, "Palm Pre App Store to Get Paid Apps in September," *Wired*, August 18, 2009, available at https://www.wired.com/2009/08/palm-pre-paid-apps/.

Ganapti, Priya, "Samsung Joins the App Store Party," *WIRED*, August 31, 2009, available at https://www.wired.com/2009/08/samsung-app-store/.

Gately, Gary, "Yahoo! Auctions Go Global," *Yahoo*, May 13, 1999, available at https://www.ecommercetimes.com/story/yahoo-auctions-go-global-73.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Goode, Lauren, "Apple's New Subscription Offerings Are Now Available to App Store Developers," *The Verge*, September 2, 2016, available at https://www.theverge.com/2016/9/2/12774758/apple-developers-app-store-new-subscription-rules.

Griffith, Erin, "Airbnb Fights Its 'Party House Problem'," *New York Times*, October 27, 2020, available at https://www.nytimes.com/2020/10/27/business/airbnb-party-house-coronavirus.html.

Grubb, Jeff, "Epic Games Store Devs Can Now Choose Their Own In-Game Payment Processor," *VentureBeat*, December 6, 2019, available at https://venturebeat.com/pc-gaming/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

Hadero, Haleluya, "The Internet Is Filled with Fake Reviews. Here Are Some Ways to Spot Them," *AP News*, December 23, 2024, available at https://apnews.com/article/fake-online-reviews-generative-ai-40f5000346b1894a778434ba295a0496.

Hawkins, Andrew J., "Uber Rival Sidecar Is Ending Ride-Sharing and Delivery Services This Week," *The Verge*, December 29, 2015, available at https://www.theverge.com/2015/12/29/10685050/sidecar-rideshare-delivery-uber-cease-operations.

Heilpern, Will, "Why the 'Uber for Private Jets' Blackjet Really Failed—According to Its More Successful Rival," *Business Insider*, May 11, 2016, available at https://www.businessinsider.com/one-theory-explaining-why-jay-z-blackjet-failed-2016-5.

Hodgkins, Kelly, "Apple's Content Delivery Network Now Live, Making Faster OS X/iOS Downloads Possible," *MacRumors*, July 31, 2014, available at https://www.macrumors.com/2014/07/31/apple-content-delivery-network/.

Holst, Christian, "Reasons for Cart Abandonment – Why 68% of Users Abandon Their Cart," *Baymard Institute*, September 21, 2016, available at https://baymard.com/blog/ecommerce-checkout-usability-report-and-benchmark.

Hristov, Victor, "Blackberry World App Store Flooded by 47 000 Apps from One Developer (Hint: Most of Them Are Crap)," *PhoneArena*, available at https://www.phonearena.com/news/BlackBerry-World-app-store-flooded-by-47-000-apps-from-one-developer-hint-most-of-them-are-crap_id46654.

Huet, Ellen, "How Uber and Lyft Are Trying to Kill Each Other," *Forbes*, May 30, 2014, available at https://www.forbes.com/sites/ellenhuet/2014/05/30/how-uber-and-lyft-are-trying-to-kill-each-other/.

Huet, Ellen, "Sidecar Puts Passengers Aside, Pivots to a Mostly Deliveries Company," *Forbes*, August 05, 2015, available at https://www.forbes.com/sites/ellenhuet/2015/08/05/sidecar-pivots-to-mostly-deliveries-company/.

January 31, 2024, "Airbnb's New Charge for Differing Currencies," *Airbnb*, available at https://community.withairbnb.com/t5/Support-with-your-bookings/Airbnb-s-new-charge-for-differing-currencies/m-p/1889349.

Karp, Gregory, "Who Pays When Merchants Are Victims of Credit Card Fraud?," *NerdWallet*, March 31, 2023, available at https://www.nerdwallet.com/article/credit-cards/merchants-victims-credit-card-fraud.

Kessler, Sarah, "Inside Juno, the Company That Wants to Beat Uber by Wooing Its Drivers," *Fast Company*, February 29, 2016, available at https://www.fastcompany.com/3057182/inside-juno-the-company-that-wants-to-beat-uber-by-wooing-its-drivers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Kessler, Sarah, "Spring, The App That Promises To Make Mobile Shopping Fun," *Fast Company*, August 14, 2014, available at https://www.fastcompany.com/3034362/spring-the-app-that-promises-to-make-mobile-shopping-fun.

Khalid, Amrita, "Lyft's Feature That Matches Women and Nonbinary Riders and Drivers Now Available Nationwide," *The Verge*, February 13, 2024, available at https://www.theverge.com/2024/2/13/24071237/lyft-women-plus-connect-riders-availability.

Kim, Arnold, "$99/Year Developer Fee to Publish Applications," *MacRumors*, March 6, 2008, available at https://www.macrumors.com/2008/03/06/99-year-developer-fee-to-publish-applications/.

Kincaid, Jason, "Apple Announces In-App Purchases for Free iPhone Applications," *TechCrunch*, October 15, 2009, available at https://techcrunch.com/2009/10/15/apple-announces-in-app-purchases-for-free-iphone-applications/.

Koetsier, John, "App Developers Losing $3-4 Billion Annually Thanks to 14 Billion Pirated Apps," *Forbes*, July 25, 2017, available at https://www.forbes.com/sites/johnkoetsier/2017/07/24/app-developers-losing-3-4-billion-annually-thanks-to-14-billion-pirated-apps/.

Koetsier, John, "The Mobile Economy Has a $17.5B Leak: App Piracy," *Forbes*, February 2, 2018, available at https://www.forbes.com/sites/johnkoetsier/2018/02/02/app-publishers-lost-17-5b-to-piracy-in-the-last-5-years-says-tapcore.

Kovach, Steve, "Microsoft Will Launch Windows 8 On October 26," *Business Insider*, July 18, 2012, available at https://www.businessinsider.com/windows-8-launch-date-2012-7.

Krattenmaker, Thomas G., Robert H. Lande, and Steven C. Salop, "Monopoly Power and Market Power in Antitrust Law," *U.S. Department of Justice Antitrust Division*, available at https://www.justice.gov/archives/atr/monopoly-power-and-market-power-antitrust-law.

Lancaster, Luke, and Kent German, "The Original iPhone's Competition: Remember These Top Phones from 2007?," *CNET*, January 08, 2022, available at https://www.cnet.com/pictures/original-apple-iphone-competition-remember-these-top-phones-2007/.

Lightner, Freeman, and Richard Harris, "Fake App Reviews Impact Developers More than You Think," *App Developer Magazine*, June 29, 2023, available at https://appdevelopermagazine.com/fake-app-reviews-impact-developers-more-than-you-think/.

Loh, Er Lern, "Asian Game Developers Summit 2005, Day One," *GameDev*, October 13, 2005, available at https://www.gamedev.net/tutorials/industry/event-coverage/asian-game-developers-summit-2005-day-one-r2271/.

Macon, Alexandra, "This App Will Change the Way You Shop Forever," *Vogue*, August 14, 2014, available at https://www.vogue.com/article/spring-app-changes-mobile-shopping.

Marks, Tom, "Report: Steam's 30% Cut Is Actually the Industry Standard," *IGN*, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

Matarese, John, "Fake Designer Goods Warning: Could You Spot a Counterfeit?," *Scripps Media*, November 22, 2024 available at https://www.ksby.com/dont-waste-your-money/fake-designer-goods-warning-could-you-spot-a-counterfeit.

B-22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Miller, Chance, "Apple Updates App Store Review Guidelines w/ Free Trial Details, Remote Mirroring Changes, More," *9to5Mac*, June 4, 2018, available at https://9to5mac.com/2018/06/04/new-app-store-review-guidelines/.

Miller, Matthew, "Nokia Ovi Store Fails in Many Ways, Buy with Extreme Caution," *ZDNET*, June 17, 2009, available at https://www.zdnet.com/article/nokia-ovi-store-fails-in-many-ways-buy-with-extreme-caution/.

Mortensen, Pete, "First iPhone Web Apps Available," *Wired*, June 12, 2007, available at https://www.wired.com/2007/06/first-iphone-we/.

Moscaritolo, Angela, "BlackBerry World App Store Is Shutting Down," *PCMag*, December 15, 2017, available at https://www.pcmag.com/news/blackberry-world-app-store-is-shutting-down.

Nellis, Stephen, "App Store Chief Says Apple Aimed to Level Playing Field for Developers," *Reuters*, July 28, 2020, available at https://www.reuters.com/article/business/app-store-chief-says-apple-aimed-to-level-playing-field-for-developers-idUSKCN24T2HH/.

Newton, Casey, "TaskRabbit Is Blowing Up Its Business Model and Becoming the Uber for Everything," *The Verge*, June 17, 2014, available at https://www.theverge.com/2014/6/17/5816254/taskrabbit-blows-up-its-auction-house-to-offer-services-on-demand.

Nguyen, Chuong, "Microsoft Wants a Bigger Cut of the Revenue from Windows Developers," *Microsoft Windows*, November 21, 2018, available at https://www.windowscentral.com/microsoft-wants-bigger-cut-revenue-windows-developers.

Novotny, Dave, "How eBay Is Fighting Counterfeit Products," *The American Genius*, January 19, 2017, available at https://theamericangenius.com/ebay-fighting-counterfeit-products/.

Nystedt, Dan, "IDC: One Billion Mobile Phones Were Shipped in 2006," *Macworld*, January 25, 2007, available at https://www.macworld.com/article/183312/phones.html.

Payne, Kevin, Julie Sherrier, and Robin Saks Frankel, "Chase Freedom Unlimited Review 2025: An Excellent Everyday Cash-Back Card," *BluePrint*, May 9, 2024, available at https://www.usatoday.com/money/blueprint/credit-cards/reviews/chase-freedom-unlimited-card-review/.

Perez, Sarah, "Following A Drop In Completed Jobs, Errands Marketplace TaskRabbit Shakes Up Its Business Model," *TechCrunch*, June 17, 2014, available at https://techcrunch.com/2014/06/17/following-a-drop-in-completed-jobs-errands-marketplace-taskrabbit-shakes-up-its-business-model/.

Perez, Sarah, "Windows Phone Marketplace: One Year In," *TechCrunch*, November 22, 2011, available at https://techcrunch.com/2011/11/22/windows-phone-marketplace-one-year-in/.

Peters, Jay, "Microsoft Will Let Devs Keep Every Penny Their Windows App Makes–Unless It's a Game," *The Verge*, June 24, 2021, available at https://www.theverge.com/2021/6/24/22549222/microsoft-store-developers-windows-11-revenues-games.

Purslow, Matt, "Microsoft Puts Pressure on Steam by Increasing Revenue Share by 18% for PC Developers," *IGN*, April 29, 2021, available at https://www.ign.com/articles/microsoft-puts-pressure-on-steam-by-increasing-revenue-share-by-18-for-pc-developers.

Rabbitte, Sonya, "Covisint Ditches In-House Catalogue System," *ZDNET*, March 1, 2002, available at https://www.zdnet.com/article/covisint-ditches-in-house-catalogue-system/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Rapoza, Kenneth, "Is The iPhone Safer Than Google's Android?," *Forbes*, November 3, 2011, available at https://www.forbes.com/sites/kenrapoza/2011/11/03/is-the-iphone-safer-than-googles-android/.

Reisinger, Don, "Nokia Officially Walks Away from Symbian, Meego," *CNET*, January 2, 2014, available at https://www.cnet.com/tech/mobile/nokia-officially-walks-away-from-symbian-meego/.

Rubin, Ben Fox, "Is That Hermes Real? With eBay Authenticate, You'll Know for Sure," *CNET*, January 12, 2017 available at https://www.cnet.com/tech/services-and-software/ebay-authenticate-is-that-hermes-rolex-real-fake-counterfeit/.

Russell, Scott, "How Do I Get My American Express Platinum Annual Fee Waived?," *WalletHub*, August 22, 2024, available at https://wallethub.com/answers/cc/american-express-platinum-annual-fee-waived-2140711260/.

Schonfeld, Erick, "Breaking: Google Announces Android and Open Handset Alliance," *TechCrunch*, November 5, 2007, available at https://techcrunch.com/2007/11/05/breaking-google-announces-android-and-open-handset-alliance/.

Schwartz, Ariel, "Sidecar's New Ridesharing Model: Pick Your Own Driver And Price," *Fast Company*, February 21, 2014, available at https://www.fastcompany.com/3026675/sidecars-new-ridesharing-model-pick-your-own-driver-and-price.

Sherman, Laura, "Spring: What's Working - And What Isn't - Six Weeks In," *Fashionista*, September 30, 2014, available at https://fashionista.com/2014/09/spring-shopping-app-review.

Smith, Chris, "How the Original iPhone Forced Google to Completely Rebuild Android," *Yahoo*, December 19, 2013, available at https://www.yahoo.com/news/original-iphone-forced-google-completely-rebuild-android-152547037.html.

Solomon, Brian, "Lyft: We're Closing in on Uber with a 'Path to Profitability'," *Forbes*, May 12, 2016, available at https://www.forbes.com/sites/briansolomon/2016/05/12/lyft-were-closing-in-on-uber-with-path-to-profitability/.

Somerville, Heather, "True Price of an Uber Ride in Question as Investors Assess Firm's Value," *Reuters*, August 23, 2017, available at https://www.reuters.com/article/technology/true-price-of-an-uber-ride-in-question-as-investors-assess-firms-value-idUSKCN1B3103/.

Spencer, Graham, "A Beginner's Guide to App Store Pricing Tiers," *MacStories*, September 1, 2015 available at https://www.macstories.net/stories/a-beginners-guide-to-app-store-pricing-tiers/.

Statt, Nick, "Google Matches Apple by Reducing Play Store Fee for Android App Subscriptions / From 30 Percent to 15 Percent," *The Verge*, October 19, 2017, available at https://www.theverge.com/2017/10/19/16502152/google-play-store-android-apple-app-store-subscription-revenue-cut.

Steiner, Ina, "Yahoo Closes Australian Auction Site," *AuctionBytes*, August 7, 2003, available at https://web.archive.org/web/20110615073304/http://www.auctionbytes.com/cab/abn/y03/m08/i07/s03.

Thomas, Ian, "Airbnb Is Making a Simple, but Big Booking Change Bringing It Closer to Hotel Check-in," *CNBC*, February 3, 2023, available at https://www.cnbc.com/2023/02/03/airbnb-will-soon-push-all-vacationers-and-hosts-to-verify-identity.html.

B-24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Van Alstyne, Marshall, Geoffrey G. Parker, and Sangeet P. Choudary, "6 Reasons Platforms Fail," *Harvard Business Review*, March 31, 2016, available at https://hbr.org/2016/03/6-reasons-platforms-fail.

Vincent-Galva, Diana, "GetJar's 'Open Billing' and 'No Fee' Philosophy Proves Profitable," *Business Wire*, March 1, 2011, available at https://www.businesswire.com/news/home/20110301005248/en/GetJar%E2%80%99s-%E2%80%9COpen-Billing%E2%80%9D-and-%E2%80%9CNo-Fee%E2%80%9D-Philosophy-Proves-Profitable.

Ward, Hannah, "Palm Pilot: Everything You Need to Know," *History-Computer*, April 16, 2024, available at https://history-computer.com/technology/palm-pilot-guide/.

Warren, Tom, "Windows Store Rebranded to Microsoft Store in Windows 10," *The Verge*, September 22, 2017, available at https://www.theverge.com/2017/9/22/16348986/microsoft-store-windows-10-app-store.

Weinberger, Matt, "Microsoft Is Mashing Windows and the Xbox Together to Win over Its Most Critical Market," *Business Insider*, March 16, 2016, available at https://www.businessinsider.com/microsoft-merging-windows-and-xbox-together-to-win-over-its-most-critical-market-2016-3?op=1.

Weizhen, Tan, "No Yahoo Auctions Site? No Problem!," *AsiaOne Business*, September 27, 2008, available at https://web.archive.org/web/20081005223154/http://www.asiaone.com/Business/SME%2BCentral/eBiz%2BHub/Story/A1Story20080925-89901.html.

White, Martha C., "Mobile Banking? There's an App for That — And Often a Sizable Fee Too," *Time*, July 5, 2013, available at https://business.time.com/2013/07/05/mobile-banking-theres-an-app-for-that-and-often-a-big-fee-too/.

Woyke, Elizabeth, "Nokia's Gigantic App Store," *Forbes*, July 11, 2012, available at https://www.forbes.com/2009/05/07/nokia-ovi-store-technology-wireless-nokia.html.

Wright, Steven T., "Valve Seemingly Bans All Steam Games That Require Watching Advertisements to Play," *GameSpot*, Februry 10, 2025, available at https://www.gamespot.com/articles/valve-seemingly-bans-all-steam-games-that-require-watching-advertisements-to-play/1100-6529356/.

Wynbrandt, James, "Flying Inside Charters: Buying Charter by the Seat," *Business Jet Traveler*, September 2013, available at https://www.bjtonline.com/business-jet-news/inside-charters-buying-charter-by-the-seat.

Yoffie, David B., Annabelle Gawer, and Michael A. Cusumano, "A Study of More Than 250 Platforms Reveals Why Most Fail," *Harvard Business Review*, May 29, 2019, available at https://hbr.org/2019/05/a-study-of-more-than-250-platforms-reveals-why-most-fail.

**Exhibit C.1: Headline Commission Rates in the US - Windows**
**2008 - 2024**



Case 4:11-cv-06714-YGR    Document 1095-48    Filed 03/05/26    Page 197 of 202

**Exhibit C.1: Headline Commission Rates in the US - Windows**

**2008 - 2024**

**Notes and Sources:**

[1] Windows Store launched in October 2012 and was rebranded as Microsoft Store in 2017. Kovach, Steve, "Microsoft Will Launch Windows 8 on October 26," *Business Insider*, July 18, 2012, available at https://www.businessinsider.com/windows-8-launch-date-2012-7; "Windows Store Rebranded to Microsoft Store in Windows 10," *Microsoft*, September 22, 2017, available at https://www.theverge.com/2017/9/22/16348986/microsoft-store-windows-10-app-store. In 2016, the Xbox Store was merged with the Microsoft Store. Weinberger, Matt, "Microsoft is Mashing Windows and the Xbox Together to Win Over Its Most Critical Market," *Business Insider*, March 16, 2016, available at https://www.businessinsider.com/microsoft-merging-windows-and-xbox-together-to-win-over-its-most-critical-market-2016-3?op=1.

[2] Prior to January 1, 2015, Microsoft charged developers earning more than $25,000 in a given year a 20% commission rate. Beginning in 2015, all developers were charged a 30% commission rate. Nguyen, Chuong, "Microsoft Wants a Bigger Cut of the Revenue from Windows Developers," *Windows Central*, November 21, 2018, available at https://www.windowscentral.com/microsoft-wants-bigger-cut-revenue-windows-developers. In its App Developer Agreement, Microsoft stated it charges a 30% commission on all in-app products acquired on a non-subscription bases and all apps and in-app products acquired by customers in the Microsoft Store on Windows 8 devices or on Windows Phone 8 devices. "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf, pp. 17-19.

[3] In March 2019 Microsoft announced an increase in revenue share for developers to 95% for non-game and non-Xbox purchases made when a customer discovered an app through a developer's promotion. The revenue share was lowered to 85% for developers if the customer discovered the app "in a Microsoft Store collection, through Microsoft Store search, or through any other Microsoft-owned properties." Microsoft ended this program in January 14, 2020 when it updated its App Developer Agreement to remove this program, and noted that they would revert to offering "a consistent 85% model." "Updated Microsoft Store App Developer Agreement: New Revenue Share," *Microsoft*, March 6, 2019, available at https://blogs.windows.com/windowsdeveloper/2019/03/06/updated-microsoft-store-app-developer-agreement-new-revenue-share/; "App Developer Agreement," *Microsoft*, effective November 30, 2023, available at https://cdn-dynmedia-1.microsoft.com/is/content/microsoftcorp/microsoft/final/en-us/store/legal-and-policy-documents/ada/MS-Store-ADA-v8.9-FINAL-EN.pdf, pp.17-18; Carrasqueira, João, "Microsoft is Apparently Canceling its 95% Revenue Share Program [Update]," *Neowin*, January 15, 2020, available at https://www.neowin.net/news/microsoft-is-apparently-canceling-its-95-revenue-share-program/.

[4] Effective July 28, 2021, developers of non-game apps now have the option to use their own billing system or a third party commerce platform on their apps. This will allow them to keep 100% of app revenue. Peters, Jay, "Microsoft Will Let Devs Keep Every Penny Their Windows App Makes — Unless It's a Game," *The Verge*, June 24, 2021, available at https://www.theverge.com/2021/6/24/22549222/microsoft-store-developers-windows-11-revenues-games.

[5] Microsoft announced PC/non-Xbox game apps will be charged a 12% commission beginning in August 2021. Booty, Matt, "Continuing Our PC Gaming Journey in 2021 and Beyond," *Xbox Wire*, April 29, 2021, available at https://news.xbox.com/en-us/2021/04/29/continuing-our-pc-gaming-journey-in-2021-and-beyond/.

[6] On October 1, 2018, Steam updated its standard 30% commission to a tiered commission system where game earnings below $10 million are charged a 30% commission, game earnings between $10 and $50 million are charged a 25% commission, and game earnings over $50 million are charged a 20% commission. Purslow, Matt, "Microsoft Puts Pressure on Steam by Increasing Revenue Share by 18% for PC Developers," *IGN*, April 29, 2021, available at https://www.ign.com/articles/microsoft-puts-pressure-on-steam-by-increasing-revenue-share-by-18-for-pc-developers; "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," *Steamworks*, November 30, 2018, available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[7] One third-party source from 2017 states that the commission charged by GOG.com was 40% if the developer opted for an advance on their royalties. However, a third-party source from 2024 notes the platform exclusively charges a 30% commission and does not publicly disclose any other options. "11 Places to Publish & Release Your Indie Game," *Ninichi Music*, September 12, 2017, available at https://ninichimusic.com/blog/2017/9/1/11-places-to-publish-release-your-indie-game; "Video Game Distribution Platforms: GOG.com," *1D3 Digitech*, July 25, 2024, available at https://www.1d3.com/blog/video-game-distribution-platforms-gog-com.

[8] When itch.io launched, it took a 0% revenue share on all transactions. On March 23, 2015, itch.io switched to an open revenue sharing model by which it allows a developer to choose any commission rate between 0-100%. However, the default rate is set to 10%, unless changed by the developer. "Introducing Open Revenue Sharing," *Itch.io*, March 4, 2015, available at https://itch.io/updates/introducing-open-revenue-sharing; "About itch.io," *Itch.io*, available at https://itch.io/docs/general/about.

[9] Epic typically charges a 12% commission to developers. In December 2019, Epic announced that developers could use alternative, third-party payment services for in-app purchases. Developer can keep 100% of the revenue generated through an alternative payment service. Grubb, Jeff, "Epic Games Store Devs Can Now Choose Their Own In-Game Payment Processor," *VentureBeat*, December 6, 2019, available at https://venturebeat.com/pc-gaming/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

[10] Epic First Run is an opt-in exclusivity program launched in October 2023 that offers third-party developers 100% net revenue in their first six months of exclusivity on the Epic Games Store. When the exclusivity period ends, the revenue share captured from user spending reverts to 88%/12%. "Introducing the Epic First Run program," *Epic Games*, August 23, 2023, available at https://store.epicgames.com/en-US/news/introducing-the-epic-first-run-program. Now on Epic is another developer incentive program launched in 2023 through which game developers are encouraged to bring previously-released products to the Epic Games Store, in exchange for a 0% commission for six months, after which the commission reverts to 12%. "Now on Epic," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/now-on-epic.

Case 4:11-cv-06714-YGR   Document 1095-48   Filed 03/05/26   Page 198 of 202

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Exhibit C.2: Headline Commission Rates in the US - macOS**
**2008 - 2024**



Case 4:11-cv-06714-YGR    Document 1095-48    Filed 03/05/26    Page 199 of 202

Commission Rates (%)

**Mac App Store[1], [4]**
Subscriptions > 1 year[2]    Small Developers[3]

**Steam**
Game earnings < $10M[5]
Game earnings $10-50 M[5]
Game earnings > $50 M[5]

**GOG.com[6]**

**itcho.io[7]**

**Epic Games Store[8]**
Epic First Run and Now on Epic exclusivity programs[9]

**Exhibit C.2: Headline Commission Rates in the US - macOS**
**2008 - 2024**

**Notes and Sources:**

[1] Commission rates defined within the Apple Developer Program License Agreement and displayed within this chart apply uniformly across iOS and macOS applications. App Store commission for macOS for paid apps and in-app purchases is 30%. "Apple Developer Program License Agreement, Schedules 2 and 3" *Apple*, June 10, 2024, available at https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20240610-English.pdf.

[2] Apple began offering a decreased commission applied to subscriptions after the first twelve months starting in June 2016. Fingas, Roger, "Apple Announces it Will Offer App Store Subscriptions to All Apps, Take Smaller 15% Cut," *AppleInsider*, June 8, 2016, available at https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut.

[3] Apple announced its App Store Small Business Program in November 2020, which reduces the App Store's commission to 15% for small businesses earning up to $1 million in a previous calendar year. "Apple Announces App Store Small Business Program," *Apple*, November 18, 2020, available at https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.

[4] In August 2021, Apple introduced the News Partner program. "Publishers that work with Apple News may qualify for a commission rate of 15% on qualifying in-app purchase subscriptions from day one." "Introducing the News Partner Program," *Apple*, available at https://developer.apple.com/apple-news/program/; "Apple Introduces the News Partner Program," *Apple*, August 26, 2021, available at https://www.apple.com/newsroom/2021/08/apple-introduces-the-news-partner-program/.

[5] On October 1, 2018, Steam updated its standard 30% commission to a tiered commission system where game earnings below $10 million are charged a 30% commission, game earnings between $10 and $50 million are charged a 25% commission, and game earnings over $50 million are charged a 20% commission. Purslow, Matt, "Microsoft Puts Pressure on Steam by Increasing Revenue Share by 18% for PC Developers," *IGN*, April 29, 2021, available at https://www.ign.com/articles/microsoft-puts-pressure-on-steam-by-increasing-revenue-share-by-18-for-pc-developers; "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," *Steamworks*, November 30, 2018, available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[6] One third-party source from 2017 states that the commission charged by GOG.com was 40% if the developer opted for an advance on their royalties. However, a third-party source from 2024 notes the platform exclusively charges a 30% commission and does not publicly disclose any other options. "11 Places to Publish & Release Your Indie Game," *Ninichi Music*, September 12, 2017, available at https://ninichimusic.com/blog/2017/9/1/11-places-to-publish-release-your-indie-game; "Video Game Distribution Platforms: GOG.com," *1D3 Digitech*, July 25, 2024, available at https://www.1d3.com/blog/video-game-distribution-platforms-gog-com.

[7] When itch.io launched, it took a 0% revenue share on all transactions. On March 23, 2015, itch.io switched to an open revenue sharing model by which allows a developer to choose any commission rate between 0-100%. However, the default rate is set to 10%, unless changed by the developer. "Introducing Open Revenue Sharing," *Itch.io*, March 4, 2015, available at https://itch.io/updates/introducing-open-revenue-sharing; "About itch.io," *Itch.io*, available at https://itch.io/docs/general/about.

[8] Epic typically charges a 12% commission to developers. In December 2019, Epic announced that developers could use alternative, third-party payment services for in-app purchases. Developer can keep 100% of the revenue generated through an alternative payment service. Grubb, Jeff, "Epic Games Store Devs Can Now Choose Their Own In-Game Payment Processor," *VentureBeat*, December 6, 2019, available at https://venturebeat.com/pc-gaming/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

[9] Epic First Run is an opt-in exclusivity program launched in October 2023 that offers third-party developers 100% net revenue in their first six months of exclusivity on the Epic Games Store. When the exclusivity period ends, the revenue share captured from user spending reverts to 88%/12%. "Introducing the Epic First Run program," *Epic Games*, August 23, 2023, available at https://store.epicgames.com/en-US/news/introducing-the-epic-first-run-program. Now on Epic is another developer incentive program launched in 2023 through which game developers are encouraged to bring previously-released products to the Epic Games Store, in exchange for a 0% commission for six months, after which the commission reverts to 12%. "Now on Epic," *Epic Games*, available at https://dev.epicgames.com/docs/epic-games-store/store-presence/now-on-epic.

**Exhibit C.3: Headline Commission Rates in the US - Android
2008 - 2024**

**Commission Rates (%)**



Case 4:11-cv-06714-YGR    Document 1095-48    Filed 03/05/26    Page 201 of 202

**Exhibit C.3: Headline Commission Rates in the US - Android**
**2008 - 2024**

**Notes and Sources:**

[1] Google Play Store launched in October 2008 as Android Market but did not support paid apps until February 2009. Its initial fees on paid apps were 30%, used to cover carriers and billing settlement fees with no share being taken by Google. "Android Market: Now Available for Users," *Android Developers Blog*, October 22, 2008, available at https://android-developers.googleblog.com/2008/10/android-market-now-available-for-users.html; "Android Market Update: Support for Priced Applications," *Android Developers Blog*, February 13, 2009, available at https://android-developers.googleblog.com/2009/02/android-market-update-support-for.html.

[2] Effective January 1, 2018, the commission applied to subscriptions after the first twelve months decreased to 15%. Statt, Nick, "Google Matches Apple By Reducing Play Store Fee for Android App Subscriptions," *The Verge*, October 19, 2017, available at https://www.theverge.com/2017/10/19/16502152/google-play-store-android-apple-app-store-subscription-revenue-cut. As of January 1, 2022, Google Play lowered its commission on all subscriptions to 15%. "Evolving Our Business Model to Address Developer Needs," *Android Developers Blog*, October 21, 2021, available at https://android-developers.googleblog.com/2021/10/evolving-business-model.html.

[3] As of July 1, 2021, Google Play charges a 15% commission for the first $1 million of developers' earnings in a year and a 30% commission for all earnings in excess of $1 million. "Changes to Google Play's Service Fee in 2021," *Google*, available at https://support.google.com/googleplay/android-developer/answer/10632485.

[4] Galaxy Store has charged a 30% commission to developers since its launch in 2009. Ganapati, Priya, "Samsung Joins the App Store Party," *Samsung*, August 31, 2009, available at https://www.wired.com/2009/08/samsung-app-store/; "Terms and Conditions," *Samsung*, August 15, 2009, available at https://web.archive.org/web/20090815155035/https:/seller.samsungapps.com/help/termsAndConditions.as; "Terms and Conditions," *Samsung*, effective August 13, 2020, available at https://seller.samsungapps.com/help/termsAndConditions.as.

[5] "GetJar's 'Open Billing' and 'No Fee' Philosophy Proves Profitable," *BusinessWire*, March 1, 2011, available at https://www.businesswire.com/news/home/20110301005248/en/GetJar%E2%80%99s-%E2%80%9COpen-Billing%E2%80%9D-%E2%80%9CNo-Fee%E2%80%9D-Philosophy-Proves.

[6] Developers using Aptoide keep 75% of earnings. Aptoide then splits the remaining 25% with partners of the company, giving the partners 15% of total developer earnings and keeping 10%. "Annex I to the Aptoide Connect Certified Developer Distribution Agreement," *AptoideConnect*, available at https://connect.aptoide.com/developers-distribution-policy-annex-I; "Partners," Aptoide, available at https://dev2.aptoide.com/partners?lang=en.

[7] Amazon charges a 20% commission for video streaming subscriptions. "Amazon Developer Services Agreement," *Amazon*, available at https://developer.amazon.com/support/legal/da.

[8] In June 2021, Amazon announced its Small Business Accelerator Program set to start in Q4 2021, charging small developers a lowered 20% commission. Amazon App Store defines small developers as those with earnings below $1 million in a calendar year. Amazon provides AWS promotional credits in an amount equivalent to 10 percent of revenue to qualifying small developers. Chidambaram, Palanidaran, "Coming soon: Amazon Appstore Small Business Accelerator Program," *Amazon*, June 15, 2021, available at https://developer.amazon.com/apps-and-games/blogs/2021/06/small-business-accelerator-program; "Amazon Developer Services Agreement," *Amazon*, available at https://developer.amazon.com/support/legal/da.