# EXHIBIT 50

1  BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
2  **WOLF HALDENSTEIN ADLER**
     **FREEMAN & HERZ LLP**
3  750 B Street, Suite 1820
   San Diego, CA 92101
4  Telephone: (619) 239-4599
   Facsimile: (619) 234-4599
5  manifold@whafh.com
   byrd@whafh.com
6
7  MARK C. RIFKIN (*pro hac vice*)
   MATTHEW M. GUINEY (*pro hac vice*)
8  THOMAS H. BURT (*pro hac vice*)
   **WOLF HALDENSTEIN ADLER**
9    **FREEMAN & HERZ LLP**
   270 Madison Ave
10 New York, NY 10016
   Telephone: (212) 545-4600
11 Facsimile: (212) 686-0114
   rifkin@whafh.com
12 guiney@whafh.com
   burt@whafh.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DECLARATION OF DARRYL THOMPSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK**<br><br>CTROOM:  1, 4th Floor<br>JUDGE:   Hon. Yvonne Gonzalez Rogers |

[UNREDACTED VERSION]

I, Darryl Thompson, declare as follows:

1. I am the Chief Information Officer and Chief Operating Officer for JND Legal Administration, located in Seattle, Washington. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I understand from Counsel that Apple is moving to preclude me from testifying at trial regarding the deduplication work that I performed in this case. I submit this Declaration to clarify certain aspects of my work and my deposition testimony based on the statements that I have seen Apple make about both.

3. As I testified during my deposition, the list that accompanies my expert report as Appendix B represents the cases in which I have either personally performed deduplication work, or supervised my team's deduplication work. The number of cases in which I have either personally performed or supervised deduplication work in my time in the legal administration field working for Garden City and JND is easily in the thousands.

4. My work in this matter began in the summer of 2024, when counsel asked me to review a sample of data that Apple intended to produce that contained records reflecting the names, addresses, and other personal identifying information for people who purchased apps or made in-app purchases on their iPhone or iPad during the Class Period. Throughout this Declaration, I will refer to these purchasers as Apple's "customers."[1]

5. As a result of conversations that I understand took place between Plaintiffs' Counsel and Apple's Counsel, Apple agreed to produce the sample data to Plaintiffs, but it placed many conditions on the production. The data had to be hand-delivered by Apple's Counsel to me personally at my offices in Seattle. The data had to be kept on an "air-gapped computer," which is shorthand way of saying that the computer is connected to nothing—no Internet or JND internal servers. It is just an isolated, stand-alone computer with storage drives and software that allows

---

[1] Throughout my assignment, I have referred to the data Apple produced as "payor data." During my deposition, Apple's counsel asked me what I meant by a "payor." I responded, "[A] individual that paid for something. . . . [T]hey have a . . . record in the transaction data with their personal information on it." Ex. 23 (Thompson Dep.) at 160:16-24. I understand from Plaintiffs' counsel there is now a dispute over the use of the word "payor." To avoid confusion, I now use the word "customer" instead of "payor."

me to perform, relevant here, deduplication work.

6. On request of Plaintiffs' counsel, I reviewed in July 2024 a sample of the customer data that Apple delivered to me on the air-gapped computer I created for this assignment. As I explained in an earlier Declaration, my task was to evaluate the data to see if I could confidently deduplicate, or roll-up, those records. Dkt. 906-2 ¶ 4. Part of the request I received from counsel was to describe the data quality issues, if any, I found.

7. The sample data contained 13,281,916 total customer records. Overall, more than 1.2 million records were missing data in at least one field. There were, as I wrote before, significant data issues. Dkt. 906-2 ¶ 5. To name a few:

   a. 172,000 records were missing a first name. The way Apple noted that data was missing varied. Sometimes it was expressed as "N/A," as "MIDS" (Missing In Data Set), in non-ASCII characters, or the field was simply empty.

   b. For records that did have a first name, many contained foreign characters, emojis, or other non-English language characters that increased the need for cleaning. Still other records had first names, but the entry appeared in a different data field (e.g., I observed first names in the phone number field).

   c. 670,000 records had no street address.

   d. 680,000 records had no city.

   e. 1.1 million records had no data in the state field. And for those that did have the state field completed, the fifty United States were represented in 1,671 unique ways. As just one example, the State of California was represented as "CA," "Cali," "California," and "Los Angeles."

   f. 815,000 records had no postal code.

   g. Both the credit card and phone number fields were hashed, meaning that all I could see was a randomized string of numbers and letters instead of the actual value.

   h. Apple also provided Plaintiffs' counsel (who then provided me) with a list of 16 phone numbers, and their corresponding hash values, that were "non-exhaustive example[s]" of ones "entered by users [that] appear[ed] to not be genuine phone

numbers." Ex. 94 (July 10, 2024 Email from R. Lin to K. Wood). Some of those 16 "examples" included phone numbers like "0" or "456789," which are invalid entries because the phone number field is supposed to have seven digits (XXX-XXXX). But it was impossible for me to see that from the hashed values, because every hash value is a lengthy combination of random letters and numbers. Having the actual phone numbers would have been very helpful in cleaning and matching the data.

    i.    Apple also represented to Plaintiffs' counsel that the credit card field—which consisted of another lengthy, randomized alpha-numeric string for each record—represented only the last four digits of one's credit card. That same representation was repeated in the data dictionary that Apple provided to me. That limited credit card information (less than the full credit card number) is much less useful for a deduplication analysis of this magnitude because there are only 10,000 possible combinations of the last four numbers of a credit card.

8. Apple delivered to me, on September 12, 2024, what it purported to be a full Apple customer dataset. Specifically, I understood that the data produced to me was supposed to be in the same form as the earlier sample, and would contain records reflecting the personal identifying information for every person with a billing event (*i.e.*, transaction) during the Class Period.

9. The files produced to me on September 12, 2024, contained ▬▬▬▬ records. I had no reason to doubt that number was incorrect. However, I soon observed two things. *First*, Apple included in this production a new field called "ppal_payment_number_hashed." That was not included in the sample data. *Second*, twenty percent of all records— ▬▬▬▬ records, to be exact—were missing an entry in the "person_id_hashed" field. Aside from these differences, I was not aware of any information that Apple provided to me or Plaintiffs' counsel suggesting that the data fields in the September 12, 2024, data production were any different than those in the earlier sample data production.

10. Apple then delivered to me a supplemental data production on October 25, 2024. That production fixed the missing "person_id_hashed" issue only in part. I found that there were

DECL. OF DARRYL THOMPSON ISO PLAINTIFFS' OPP. TO DEF. APPLE INC'S MOT.
EXCLUDE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK
Case No. 11-cv-06714-YGR
-3-

1    still at least 38 million records missing a person_id_hashed value.

2    11.     Apple then delivered to me a second supplemental data production on November 7, 2024.  This production contained the rest of the missing "person_id_hashed" values.  From there, I was able to begin my deduplication work in earnest. At that time, I still understood that the full data production was in the same form as the earlier sample, as Apple represented it in the data dictionary that Apple supplied on July 10, 2024.  In particular, I understood that hashed value for each credit card record contained only the actual last four digits of any particular credit card.

12.    I started with cleaning the data.  As I stated in my report, this is an iterative process involving many repetitive steps.  To start, I "developed a data cleansing algorithm to address any data issues in an attempt to leave usable data for future matching."  Ex. 44 (Thompson Suppl. Rep.) ¶ 17(b).  The algorithm is, at its most basic level, a series of files (or what I call "scripts") that contain commands written in structured query language (SQL), a very common and popular coding language.

13.    The data cleaning algorithm I use is a variant of a template that is used by all data analysts that JND employs.  I helped to create that code, and continually work to refine it based on the experiences that I and other data analysis have on particular projects.  I also have trained JND's data analysts on how to tailor algorithms to the particular needs in a given project.  That code, and the processes that we use for tailoring it to a given project, are highly proprietary to JND.  Before this engagement, I have never provided any of our code files to anyone outside my firm, because the inadvertent disclosure of our code would cause incalculable damage to our competitive position.  The way our firm distinguishes itself is on the efficiency and efficacy of its work.

14.    Relevant to this project, I refined the algorithm to address the data issues I observed during my initial inspections of the sample data, plus additional issues I found in the full dataset.  To just name a few, there were emojis in many fields; profanity in various data fields; and non-ASCII characters that had to be cleaned throughout multiple fields.  I also had to figure out where data entries had been shifted to an incorrect field (e.g., a name appearing in the phone number field).

1  ██████████████████████████████████████████████████████████████████ I
2  continued this process until the marginal returns were very low—that is, I continued until I reached
3  a point where I could no longer apply cleansing rules that would yield additional beneficial results.
4  *See* Ex. 23 (Thompson Dep.) at 106:20-107:11.

5      15.    After initial rounds of cleansing, the data was ready for deduplication. That
6  process, like the cleaning stage, required me to develop code for the deduplication. Again, JND
7  has deduplication code that is tailored to the particular needs of a given project. I helped develop
8  that code, and I have trained JND's data analysts on how to best deploy it. For the same reasons I
9  articulated above, this code is just as competitively sensitive as the code we use to clean data.

10      16.    At a high level, the deduplication process took place in ███ stages, or rounds.
11  ████████████████████████████████████████████████████████████████████████████████
12  ███████████████████████████████████████████████████████████████████████████████ I
13  then took the records that I had rolled-up to that point and used a third-party vendor to obtain data
14  from the United States Postal Service's National Change of Address ("NCOA") database in an
15  effort to achieve more roll-ups. ████████████████████████████████████ After this
16  process, I determined that within the ███ billion customer records that Apple produced, there were
17  243,636,655 unique Apple customers who might be Class members.

18      17.    ████████████ of the deduplication process, I applied ██████████ different
19  versions, or what I like to call "tiers," of matching logic. Each of those tiers was formed based on
20  what I saw in the Apple customer data and what I knew from my prior deduplication experience
21  would lead to the most reliable roll-up of records. ████████████████████████████████
22  ████████████████████████████████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████████████████████████████
26      18.    ████████████████████████████████████████████████████
27  ████████████████████████████████████
28    █ ████████████████████████████████████████████████████████████████

1  ███████████████████████████████████████
2  █ ███████████ ████████████████████████
3  █████████████████████████████████
4  █ ████████████████████████████████████
5  █ ████████████████████████████████████
6  █ ███████████████████████
7  █ █████████████████████████████████████
8  ███
9  █ ████████████████████████████████████
10 █████████████████████████████████████
11 █████████████████████████████████████
12 ████████████████████████████████
13 █ ███████████████████████████████████
14 ████████████████████
15     19.   ████████████████████████████████
16 ████████████████████████ Ex. 23 (Thompson Dep.) at 109:13-17.
17 █████████████████████████████████████████
18 ██████ ████████ █████████████ ██████████
19 ██████ ████████ █████████████
20    ████████████████████████████████
21    ████
22    ████████████████████████████████████
23    ████
24     20.   After each tier, and before proceeding to the next, I examined the deduplication
25 results to validate the results—to see if the code was rolling up records that obviously should not
26 have been rolled up, or failing to roll up records that obviously should have been matched.  As I
27 explained in my deposition, I did that by ████████████ Ex. 23 (Thompson Dep.) at 141:2-10.
28 ██████████████████████████████████████████

1 ████████████████████████████████████████████████████████████████
2 ████████████████████████████████████████████████████████████████
3 ████████████████████████████████████████████████████████████████
4 ████████████████████████████████████████████████████████████████
5 ███████████████████████████████████████

21. My validation process also entailed reviewing the code to see if there was a way I could tweak it to achieve better roll-ups. Sometimes I did that process myself. Other times one of my colleagues, Cameron Karlin, assisted me.

22. I, or we, continued that iterative process of running a matching tier, performing quality control checks of the results and tweaking the code, and then re-running it until, again, the marginal returns were outweighed by the time and effort that was required to generate more matches. As I previously testified, I knew it was time to move on when I "was not finding additional matches that I could effectuate . . . in a both coded and confident manner," a balance that I have learned to strike after doing data analysis for over 27 years and deduplication in the legal administration field specifically for nearly 15 years. Ex. 23 (Thompson Dep.) at 103:17-104:13.

23. One final nuance with ███████ is that the process explained above was performed on four different data files simultaneously. Because Apple's data production was so large, and the air-gapped computer only had a finite amount of processing power, it was necessary and appropriate for me to split the data file into four equal "pieces," or sub-files. I then ran the same code on all four files in the same manner described above.

24. Once I was finished with ███████ I combined the four files back into a single data file and ██████████████████████████████████████████████████████████████
████████████████████████████████████████

25. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████

|   |   |   |
|---|---|---|
| 1 | b. | ███████████████████████████████ |
| 2 | c. | ███████████████████████████████████ |
| 3 |   | ██████████████ |

4   26.   ██████████, I used the same iterative process described above in paragraphs 20-22 to validate the results and improve the coding.

6   27.   ████████████████, I decided it was the right time to run a cross-check of the addresses that were in the customer dataset against the NCOA database. *See* Ex. 44 (Thompson Suppl. Rep.) ¶ 17(g). As I explained in my report, "[t]his is standard industry practice," because it helps us "determine whether any particular name that has multiple addresses" can be rolled up with someone that my analysis up to that point had already identified as an Apple customer. *Id.*

11   28.   For the last several years, JND has utilized the firm Melissa Data Solutions for this NCOA process. That is because JND does not have its own license from the United States Postal Service to access the NCOA database. I extracted a subset of data from the air-gapped computer of the potential Class members as I had identified them to that point—just names and addresses—and uploaded them to a secure file transfer protocol (SFTP) that Melissa Data Solutions provided me. Once uploaded to that SFTP, a computerized application that Melissa Data Solutions developed extracted the data and ran it through the NCOA database, pulling from it any addresses associated with the names that I had uploaded. Melissa Data Solutions's computerized application then created a new file that attached to the data I uploaded the additional addresses that it discovered in the NCOA database. I downloaded that output from the SFTP, then uploaded it to the air-gapped computer that housed the rest of my work product.

22   29.   Once the NCOA data was on the air-gapped computer, ████████████████████████████████████████████████████████████████████████████████████████████████████████████ I validated the resulting roll-ups using the same process described above in paragraphs 20-22.

26   30.   I then conducted one last round of deduplication. ████████████████████████████████████████████████████ █ █████████ ████████████████

---

DECL. OF DARRYL THOMPSON ISO PLAINTIFFS' OPP. TO DEF. APPLE INC'S MOT.
EXCLUDE OPINIONS OF MR. DARRYL THOMPSON & PROF. ALAN MACCORMACK
Case No. 11-cv-06714-YGR
-8-

1  ███████████████████████████████████████████████████
2  █ ████████████████████████████
3  █████████ █ ██████████████████████████████████████
4  ██████████████████████
5  █ ██████████████████████

6  31. Once this process was complete, pursuant to a protocol that I understand Plaintiffs and Apple agreed upon, I created for Apple a database ("the Final Payor Database") containing three fields: ████████████████████████████████████ and a new field, "JND_Assigned_ID." Ex. 44 (Thompson Suppl. Rep.) ¶ 20. The last field is one I created simply so that Apple could verify that my final output contained every single record that was originally produced to me.

32. I understand that Apple's motion makes a number of claims about the quality of my work and about my deposition testimony. There are several claims that I believe warrant a brief response from me.

33. First, I understand that Apple claims that I have no idea what a "gold standard" dataset is. That is not true. During my deposition, I had the following exchange with Apple's counsel:

> Q. Are you familiar with the concept of a gold standard validation set?
>
> A. Theoretically, but I would love to hear the definition in this context.
>
> Q. I don't know that I have a -- a definition. But what's -- what's your understanding of the concept?
>
> A. Well, a -- a gold standard from -- from what I could -- and, again, without looking at a definition, I believe that is a -- a -- sort of a perfect sample. But -- and again, I don't know how that applies in this -- is applicable in this situation. But that's how I would understand the term here.
>
> Q. And do you mean that you don't see how that concept is applicable in this situation because there is no gold standard validation set available?
>
> A. Well, and I -- again, what -- what is the validation? Part of this is, gold standard, okay. But validation set, what does that mean? I don't -- I don't understand the -- what the -- is being referenced. That I cannot give you an example of because I do not know what it's attempting to reference.

Ex. 23 (Thompson Dep.) at 168:9-169:6.

1    34.    What I thought was clear from my answers, but now I understand was not, is that I am well aware of what a "gold standard" dataset is. As I said, it is, simply put, a perfect sample. It did not make sense to me how Apple's counsel thought that concept could apply to the Apple dataset I was working with. As Apple repeatedly stated, all of the data was user-input. Looking just at the data, I cannot know which entries are 100% accurate and which are not. The only way to know if two records both contain accurate data and accurately reflect the same unique customer is to do what we would do during class action claim administration: send correspondence both directly to the noted address and indirectly (*e.g.*, a notice posted online), and give the customer the opportunity to verify or correct their information. As I understand the Protective Order I had to sign, I had no authority to do that here.

35.    Second, I understand that Apple claims that my methods are unreliable because during the cleaning process, I removed the character "/" from a street address like "101 ½ Main Street," and I removed the character "@" from entries in the street address field. I disagree that these data cleaning methods make my analysis unreliable. As I explained above, the code that I wrote required the data in each relevant field to match exactly. So to take the 101 ½ Main Street example, when I clean that data entry consistently to become "10112 Main Street," that address will only cause two records to roll up if all of the other data in the fields implicated by a given matching tier exactly match across the two records. As evident above, I did not run any code that would simply allow two records to roll up based on the cleaned street address (which I applied consistently in any event). Nor would I run such code, as that would generate unreliable results. I am unaware of any records that improperly rolled up because I removed the "/" or "@" characters from street addresses, and I am unaware that either Apple or its expert, Prof. Stodden, claims to have identified any instance where those cleaning techniques resulted in me improperly rolling up any customer records.

36.    Third, I understand that Apple claims my work is unreliable because the Final Payor Database includes (1) 1.9 million customers who have self-reported that they live in King Salmon, Alaska, and (2) that there are four customers who collectively have associated with them over 100,000 different ▮▮▮▮▮ values. I have reviewed these claims. Apple is correct: there

are 1.9 million customers who self-reported to reside in King Salmon, and there are four customers that are recorded in the data with 100,000 different person_id_hashed values. But that says nothing about my methodology. As best as I can tell, all of these records rolled up together correctly and in exactly the way my deduplication methodology was supposed to work. I understand that Prof. Stodden has hinted that these records might show fraudulent activity by the users who entered the data. Her speculation may or may not be true, but I have no way of knowing one way or another just by looking at the data.

37. Fourth, I understand that Apple claims my methods are unreliable because of some roll-ups impacting records for customers with the first name "Kim." Slightly over 40,000 records for Apple customers with the first name "Kim" were rolled up into a single "payor" (*i.e.*, customer) in the Final Payor Database. That roll-up was caused by a unique confluence of factors. To begin, I understand that Apple maintains there were over 100,000 records in the dataset I started with that listed Apple's former corporate address (1 Infinite Loop, Cupertino, California) in the "street address" field. I did not immediately recognize this as an invalid data entry because it is plausible that some number of Apple employees could have validly listed Apple's old corporate address as their own when entering their billing information. But as I continued on and the number of times the address appeared grew much larger, I realized that the address could not be relied on for deduplication, and so I cleaned it from the dataset. Before I did so, however, some records—the "Kim" records—rolled up during one of my tiers of matching. Specifically, based on my analysis, I believe these records matched when I used the following matching tier:

first name, street address, city, state, postal code, and phone number.

The records all had the same first name (Kim); the same street address, city, state, and postal code (Apple's address in first name (Kim); the same addresses (street, city, state, and postal code, forms of Apple's address in Cupertino); and, crucially, the same phone numbers. The matching phone numbers is the key to the problem. Somehow, all of these user-entered records had the same phone numbers, which can only mean that they were all using the same invalid phone number entries. I had no way of knowing that, though, because again, the phone number field was not actual phone numbers but a hashed alpha-numeric record (*i.e.*, a long string of random letters and numbers).

1  Whatever the phone number entry was for those records, Apple never flagged it for me as an
2  invalid phone number, although it did identify several other hashed phone numbers as invalid.
3  Without that information from Apple, I had no way to know of the user error when I performed
4  my roll-up.

5     38.     Apple also overstates the magnitude of this roll-up. While there approximately
6  42,000 customer records implicated in this situation, there are only approximately 7,330 unique
7  first name and last name combinations within those records. So, at most, this data issue would
8  have increased the number of customer records from 243,646,655 to 243,653,985, or an increase
9  of just 0.003% (three one-thousandths of one percent).

10    39.     To verify that the first name/full address/phone number matching logic did not have
11 a material impact on the final deduplication results, after the issue was identified by Prof. Stodden,
12 I re-ran a modified version of the deduplication analysis to test the impact of including that
13 matching logic. To start, I ran a baseline test of simply applying the full set of matching tiers on
14 all of the customer records, without incorporating the NCOA address changes or all data cleansing
15 steps. After running the full set of matching tiers, there were ▮▮▮▮▮▮ records flagged as
16 duplicates. I then re-ran that same test, except I omitted the code that matched records based on
17 first name/full address/phone number. The number of records flagged as duplicates in that scenario
18 was ▮▮▮▮▮▮. In other words, removing the code in question reduced the number of roll-ups
19 by only 0.09% (less than one-tenth of one percent), or ▮▮▮▮ records. In my experience, such
20 a small change shows that any impact on the final output is immaterial.

21    40.     Finally, I understand that Apple raises a question about the correct total number of
22 "payors" that were included in the Final Payor Database. That number is 243,646,655 payors. In
23 my report (at ¶ 18), I mistakenly reported the figure as "approximately 246 million." That was a
24 typographical error. I believed as much when I was asked about this during my deposition, but I
25 did not want to make an affirmative representation to that effect while under oath without double-
26 checking the database. *See* Ex. 23 (Thompson Dep.) at 193:6-14.

1    I declare under penalty of perjury under the laws of the United States of America that the
2    foregoing is true and correct.  Executed this 2nd day of September, 2025, at Seattle, Washington.
3
4    DATED: September 2, 2025
5
6                                            *Darryl Thompson*
                                             Darryl Thompson