# EXHIBIT 51

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

   _____

4   IN RE APPLE IPHONE          ) Case No.

5   ANTITRUST LITIGATION,       ) 4:11-cv-06714 YGR

   _____

6

7         **HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY**

8

9    VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

10                 DARRYL THOMPSON

11                   9:05 A.M.

12                 JUNE 5, 2025

13            1200 SIXTH AVENUE, SUITE 610

14              SEATTLE, WASHINGTON

15

16

17

18

19

20   REPORTED BY:

21   CARLA R. WALLAT, CRR, RPR

22   WA CCR 2578, OR CSR 16-0443, CA CSR 14423

23   JOB No. 7376385

24

25   PAGES 1 - 218

                                        Page 1

APPEARANCES

FOR THE CERTIFIED CLASS:

THOMAS H. BURT
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
212.545.4600
burt@whafh.com

KYLE M. WOOD
ANNA K. LINK - via Zoom
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street NW, Suite 400
Washington, DC 20036
202.326.7900
kwood@kellogghansen.com
alink@kellogghansen.com

FOR THE DEFENDANT:

ELI M. LAZARUS
CAELI A. HIGNEY - via Zoom
Gibson, Dunn & Crutcher LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111
415.393.8200
elazarus@gibsondunn.com
chigney@gibsondunn.com

RAMONA LIN
HARRY R. S. PHILLIPS - via Zoom
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
202.955.8500
rlin@gibsondunn.com
hphillips@gibsondunn.com

ALSO PRESENT:

LORI TALBOTT, Videographer
JEREMIAH RONDEAU, Cornerstone Research
CHRIS BRUEGGE, Cornerstone Research - via Zoom

Page 2

I N D E X

EXAMINATION BY:                              PAGE(S)
MR. LAZARUS                                     9
MR. BURT                            209

EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit DX 112   Supplemental Expert Report of    14
        Darryl Thompson, April 16,
        2025
Exhibit DX 113   README file              18
Exhibit DX 114   Exhibit 1, In Re: Blue Cross    33
        Blue Shield Antitrust
        Litigation, Declaration of
        Jennifer M. Keough
Exhibit DX 115   Exhibit A, In Re Blue Cross    47
        Blue Shield Antitrust
        Litigation, Declaration of
        Megan E. Jones
Exhibit DX 116   Declaration of Darryl Thompson    72
Exhibit DX 117   7/10/2024 email from Ramona    80
        Lin to Rachele Byrd and Kyle
        Wood

Page 3

EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit DX 118   7/10/2024 letter to Rachele    84
        Byrd and Kyle Wood from Eli
        Lazarus
Exhibit DX 119   Kim B                   148
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 120   Kim J                   149
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 121   Kim H                   150
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885

Page 4

EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit DX 122   Debra                   153
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 123   Deb                   154
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 124   Cindy - Jason             156
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885

Page 5

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1  EXHIBITS FOR IDENTIFICATION                    PAGE
2  Exhibit DX 125  Cindy                      156
3          Excerpts from Apple Payor Data
4          Produced as
5          APL-APPSTORE_10767813,
6          APL-APPSTORE_10809581,
7          APL-APPSTORE_10857484, and
8          APL-APPSTORE_10864885
9  Exhibit DX 126  Cindy - Ellie             158
10         Excerpts from Apple Payor Data
11         Produced as
12         APL-APPSTORE_10767813,
13         APL-APPSTORE_10809581,
14         APL-APPSTORE_10857484, and
15         APL-APPSTORE_10864885
16 Exhibit DX 127  1/15/2025 letter to Eli    196
17         Lazarus from Kyle Wood
18 Exhibit DX 128  Declaration of Darryl      199
19         Thompson, March 7, 2025
20
21
22
23 REPORTER'S NOTE:  All quotations from exhibits are
     reflected in the manner in which they were read
24  into the record and do not necessarily indicate an
     exact quote from the document.
25

Page 6

1  please state them at the time of your appearance.
2          Counsel and all present, including remotely,
3  will now state their appearances and affiliations for
4  the record, beginning with the noticing attorney.
5          MR. LAZARUS:  I'm Eli Lazarus of Gibson,
6  Dunn & Crutcher for Apple, Inc., the defendant.  I'm
7  joined here by Ramona Lin, who is a colleague at Gibson
8  Dunn, and Jeremiah Rondeau from Cornerstone Research.
9  And joining on the Zoom line we have Caeli Higney from
10 Gibson Dunn and Chris Bruegge from Cornerstone
11 Research.
12         MR. BURT:  I am Thomas Burt from Wolf,
13 Haldenstein, Adler, Freeman & Herz LLP for the
14 certified class.
15         BY MR. WOOD:  Kyle Wood from Kellogg,
16 Hansen, Todd, Figel & Frederick, also for the certified
17 class.
18         THE VIDEOGRAPHER:  Thank you.
19         Would the court reporter please swear in the
20 witness.
21
22         DARRYL THOMPSON,
23 sworn as a witness by the Certified Court Reporter,
24         testified as follows:
25

Page 8

1          SEATTLE, WASHINGTON; JUNE 5, 2025
2              9:05 A.M.
3              --oOo--
4
5          THE VIDEOGRAPHER:  Good morning.  We are
6  going on the record at 9:05 a.m. on June 5th, 2025.
7          Please note that the microphones are sensitive
8  and may pick up whispering and private conversations.
9  Please mute your phones at this time.  Audio and video
10 recording will continue to take place unless both
11 parties agree to go off the record.
12         This is Media Unit 1 in the video-recorded
13 deposition of Darryl Thompson taken by counsel for
14 defendant in regards to Apple iPhone Antitrust
15 Litigation filed in the United States District Court,
16 Northern District of California, Oakland Division.
17 Case number 4:11-cv-06714-YGR.  The location of the
18 deposition is 1200 Sixth Avenue, Suite 610, Seattle,
19 Washington.
20         My name is Lori Talbott representing Veritext
21 and I am the videographer.  The court reporter is
22 Carla Wallat from the firm Veritext.
23         I'm not related to any party in this action,
24 nor am I financially interested in the outcome.
25         If there are any objections to proceeding,

Page 7

1              EXAMINATION
2  BY MR. LAZARUS:
3      Q.  Please state your full name for the record.
4      A.  Darryl Wayne Thompson.
5      Q.  All right.  We have met a few times,
6  Mr. Thompson.  And I think you know from our prior
7  meetings that I am not a data expert or computer
8  scientist, so I think I'm going to have to ask you to
9  explain a lot of things to me today.  So thank you for
10 your patience with that.
11         But first I have a few preliminary questions.
12         Have you been deposed before?
13     A.  Yes.
14     Q.  Okay.  How many times?
15     A.  Once.
16     Q.  Okay.  And what case was that?
17     A.  I actually don't recall the case.
18     Q.  Okay.  When was that?
19     A.  Approximately seven -- six to seven years ago.
20     Q.  Okay.  What was the general topic of your
21 testimony?
22     A.  I was providing information with regards to a
23 class action administration my company was
24 administering.
25     Q.  Did it -- did your testimony deal with

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1  deduplication of data?
2      A. It did not.
3      Q. Have you ever testified in a trial?
4      A. I have not.
5      Q. Okay. Have you ever been retained as a
6  testifying expert in another case?
7      A. I have not.
8      Q. And has a court -- has a court ever expressed
9  disagreement with any of your opinions in a case?
10     A. Not that I am aware of.
11     Q. Have you ever submitted a declaration in a
12 court case prior to this case?
13     A. Yes, I have.
14     Q. Okay. What cases?
15     A. I could not name any of them I -- but I have.
16     Q. Okay. About how many?
17     A. Maybe a dozen.
18     Q. Okay. Did those declarations deal with
19 deduplication of data?
20         MR. BURT: Objection. Form.
21     A. The declaration -- some -- some of the
22 declarations I believe contained information regarding
23 the total population received and the ultimate size of
24 the class after going through deduplication without
25 specifically referencing deduplication.

Page 10

1      Q. (BY MR. LAZARUS) And when you say the
2  population received, that's the population receiving
3  notice in the case?
4      A. The population received is the -- in that --
5  what I was referencing is the population we received
6  from third party, usually the defendant, and then we
7  would perform analysis and deduplication and then the
8  final outcome. So those numbers may have been included
9  in -- in one or more of my declarations.
10     Q. Thank you.
11        Just some more preliminaries.
12        If I ask a question and you don't understand
13 it, please tell me that. If you answer a question, I
14 will assume that you understood the question and have
15 answered it to the fullest extent of your recollection;
16 is that fair?
17     A. Yes.
18     Q. Okay. And you may request breaks during the
19 deposition. I just ask that if when you request a
20 break if I have asked a question, I ask that you answer
21 the question before we take a break.
22        Does that make sense?
23     A. Yes.
24     Q. And do you understand that you are under oath
25 today?

Page 11

1      A. I do.
2      Q. Is there any reason that you would be unable
3  to give your honest and best testimony today?
4      A. Not -- no.
5      Q. We are being helped today by a court reporter.
6  And for her sake, and the sake of the transcript, I'd
7  ask that you wait until I have finished asking a
8  question before you answer. It can be difficult to
9  take down what we're saying if we're talking over each
10 other.
11        MR. LAZARUS: And finally for the
12 preliminaries, given the topics we will discuss today,
13 I will designate the transcript as "highly confidential
14 - attorneys' only" for Apple.
15     Q. (BY MR. LAZARUS) All right. What did you do
16 to prepare for today's -- sorry?
17        MR. BURT: I note that you said, "for
18 Apple." I just want to join in the "highly
19 confidential" designation because we expect to be
20 discussing matters that have source code protection.
21     Q. (BY MR. LAZARUS) All right. What did you do
22 to prepare for today's deposition?
23     A. I met with counsel. I did some high-level
24 review of deduplication code that I wrote. I read some
25 sections of my declaration and my expert documentation.

Page 12

1      Q. Okay. When you -- when did you meet with
2  counsel?
3      A. I met last Friday, last Monday, last Tuesday,
4  which I guess would have been the day before yesterday.
5      Q. All right.
6      A. And yesterday. Additionally, we had met three
7  weeks ago in preparation for when my declaration was
8  previously scheduled.
9      Q. Your deposition was previously scheduled?
10     A. Or my deposition, apologies.
11     Q. And how long were those meetings with counsel?
12     A. They varied from two hours to four hours.
13     Q. And you mentioned some code and documents that
14 you looked at.
15        Did you look at any documents other than the
16 ones that you just named in preparation for this
17 deposition?
18     A. There was a letter that I also scanned that
19 pertained to -- or at least had a section that
20 pertained to NCOA data.
21     Q. Who was that letter from?
22     A. I believe it was from Mark Rifkin.
23     Q. Okay. Counsel for the plaintiffs?
24     A. Yes.
25     Q. Okay. Any other documents?

Page 13

4 (Pages 10 - 13)

1    A. None that jump out at me right at the moment.
2    Q. Okay.
3        MR. LAZARUS: And can we now mark
4 document -- the supplemental expert report, Tab 1, as
5 DX 112.
6        (Deposition Exhibit DX 112 was marked.)
7    Q. (BY MR. LAZARUS) And I think that will come
8 up on the screen here.
9        MR. LAZARUS: And can we also get the
10 paper copies, please.
11    Q. (BY MR. LAZARUS) All right. This document is
12 labeled "Supplemental Expert Report of Darryl
13 Thompson," correct?
14    A. That is correct.
15    Q. Is this a copy of your final report in this
16 case?
17    A. It appears to be, yes.
18    Q. Okay. On page 7 of this report, is that your
19 electronic signature?
20    A. It is.
21    Q. Okay. And is it okay if I call this document
22 "your report" so that when I say "your report," you'll
23 understand I'm referring to this document and not any
24 prior declaration or other document?
25    A. I'm fine with that.

Page 14

1    Q. Okay. Did you write this report yourself?
2    A. I -- I wrote the significant components of it.
3 Portions of it came out of my original declaration and
4 were provided to me by counsel in a template. And so
5 they filled in certain sections that came out of my
6 declaration and then I -- they provided sections that
7 said, all right, this is sections that you need to
8 provide what you did.
9    Q. Understood.
10        What portions did counsel write?
11        MR. BURT: Objection to
12 characterization.
13    Q. (BY MR. LAZARUS) You can answer.
14    A. I'm not sure I can point to any section that
15 I know counsel wrote. As I said, the -- from my
16 recollection, the -- the expert -- the report came over
17 with sections filled out from my declaration, so I
18 don't believe that qualifies that they wrote it. They
19 copied it from my declaration and then they identified
20 sections that I need to mic up.
21    Q. Okay. But you adopted all of the language in
22 this document as your final report?
23    A. I did.
24    Q. Okay. Let's see. Okay.
25        When did you start drafting this document?

Page 15

1    A. Oh, I could not give you a date. I've --
2    Q. Roughly?
3    A. I want to say March of this year, but I --
4 again, I can't -- I could not give you with high
5 confidence when I started writing this.
6    Q. Understood.
7        Were any portions of this report or the
8 declaration -- well, scratch that.
9        Were any portions of this report taken from
10 prior declarations that you had given in any other
11 matter?
12        MR. BURT: Object to form.
13    A. Possibly bio information would have been
14 brought forward, but -- but nothing with regards to
15 work on this -- on this matter. But possibly bio
16 information.
17    Q. (BY MR. LAZARUS) Okay. Bio information
18 meaning your own biography --
19    A. That is correct.
20    Q. -- background information?
21        Okay. Have you been asked to prepare any
22 reports to be submitted in this case after this
23 document?
24        MR. BURT: Objection. I -- I don't
25 think I need to let him answer that.

Page 16

1        MR. LAZARUS: Your -- what -- what's the
2 basis for the objection?
3        MR. BURT: You're asking whether he's
4 going to file a report in the future. I don't --
5 I think that's objectionable.
6        MR. LAZARUS: And you're --
7        MR. BURT: Because it goes to attorney
8 work product.
9        MR. LAZARUS: And you're instructing him
10 not to answer?
11        MR. BURT: I'm instructing him not to
12 answer.
13        MR. LAZARUS: All right. I'll withdraw
14 that question for now.
15        I hear there's a request on the Zoom for all
16 of us to speak up, so --
17        MR. BURT: I'm a quiet objector so as
18 not to interfere with your examination.
19        MR. LAZARUS: Much appreciated.
20        MR. BURT: I'll move my mic up.
21        MR. LAZARUS: That probably does it.
22    Q. (BY MR. LAZARUS) Okay. Do you intend to
23 offer any opinions in rebuttal to any of Apple's
24 experts in this case?
25        MR. BURT: I think that's still attorney

Page 17

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 work product.

2     MR. LAZARUS: Okay. I'll withdraw that

3 question for the moment also.

4     Q. (BY MR. LAZARUS) All right. Are all of the

5 opinions that you are offering in this case contained

6 in your report?

7     A. Yes.

8     Q. Okay. And are all of the bases for those

9 opinions described in your report?

10     A. I believe so.

11     Q. Okay. You also provided a README file on

12 May 28, 2025; is that correct?

13     A. I provided a README file. I don't know the

14 exact date, but I will accept that it's that date.

15     Q. Okay.

16     MR. LAZARUS: Can we go ahead and

17 mark -- it's Tab 17 -- as an exhibit?

18     MR. BURT: Is this 113?

19     LAZARUS: I'm sorry?

20     MR. BURT: Is this 113?

21     MR. LAZARUS: It should be 113, right.

22     (Deposition Exhibit DX 113 was marked.)

23     Q. (BY MR. LAZARUS) Okay. Is this the README

24 file that you produced?

25     A. Yes.

1     Q. All right. And your report and this README

2 file both describe the methods you used to form your

3 opinions in this case, correct?

4     MR. BURT: Objection to form.

5     A. The README file simply lists a -- a -- a set

6 of steps to executing code that I believe represents

7 the -- a -- substantially all of the code I ran in

8 order to achieve the outcome.

9     Q. (BY MR. LAZARUS) Okay. And just the -- so

10 the question I asked is, your report and the README

11 file both describe the methods you used to form your

12 opinions in this case; is that -- is that correct?

13     MR. BURT: Same objection.

14     A. The README file gives a list of -- of code to

15 execute and -- and some additional instruction.

16 I don't know that it -- it actually direct -- provides

17 detail on, you know, the actual activity. Simply the

18 code being run.

19     Q. (BY MR. LAZARUS) Okay. But to understand the

20 methods that you used in this case in your analysis, we

21 should look at the report and this README file?

22     MR. BURT: Objection. Asked and

23 answered.

24     A. Yes. The -- the README file did provide

25 information on how -- which scripts I ran, yes.

1     Q. (BY MR. LAZARUS) Okay. And we'll come back

2 to talk more about your background, but your current

3 employer is JND Legal Administration; is that correct?

4     A. That is correct.

5     Q. All right. And you maintain that parts of the

6 methods and the code described in your report and the

7 README file are proprietary to JND, correct?

8     A. That is correct.

9     Q. Do you have knowledge of anyone outside of JND

10 using those methods?

11     MR. BURT: Objection to form.

12     A. Not -- not that I'm aware of.

13     Q. (BY MR. LAZARUS) In forming your opinions in

14 this case, did you review any peer-reviewed

15 publications related to the methods you relied upon?

16     A. I did not.

17     Q. Are there any analyses that you relied upon

18 for the opinions in your report that are not included

19 in the -- well, scratch that. Let me back up.

20     In addition to the report and this README

21 file, you also provided backup materials of computer

22 files that you relied on in your analysis in this case;

23 is that right?

24     MR. BURT: Objection to form.

25     A. Yes. I provided the code, yes.

1     Q. (BY MR. LAZARUS) Okay. Are there any

2 analyses that you relied upon for the opinions in your

3 report that are not included in the computer files that

4 you provided to Apple?

5     A. I'm not sure I understand the -- the question.

6     Q. Okay. So you provided computer files to

7 Apple, more specifically, to Apple's consultants at

8 Cornerstone Research, correct?

9     A. That is correct.

10     Q. Are there any -- scratch that.

11     Did you conduct any analysis that you rely

12 upon in your report other than those that are reflected

13 in the computer files that you produced?

14     A. I do not believe I relied on any -- anything

15 other than what's -- what was provided in -- in --

16 I did not rely on anything -- or I do not believe I

17 relied on anything other than what I provided in the

18 outcome and what I -- what I determined in the report.

19     Q. Okay. So tell me if I have this right.

20     You do not believe that you relied upon any --

21 you do not believe you relied upon anything other than

22 what is in your report, what is in your README file and

23 what is in the computer files and code that you

24 produced to Cornerstone Research.

25     Is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1    A. If I understand the question, I believe that
2  is correct.
3    Q. Okay. Are there any questions that you have
4  that -- to help clarify the question?
5    A. I'm trying to -- I'm trying to determine if
6  there was something that -- that it's -- that is --
7  would qualify as -- as meeting the -- the criteria you
8  speak of. I -- and I can't think of anything.
9    Q. Okay. Understood.
10       Have you identified any errors or omissions in
11  your report since you submitted it?
12    A. Not to my -- no, not to my knowledge.
13    Q. Okay. You hold yourself out as a data
14  specialist, correct?
15    A. I -- I have extensive experience in utilizing
16  and working with data.
17    Q. Okay. If you look at page 1 of the report,
18  there's a line that says, "I have worked as a data --
19  data specialist for over 25 years."
20       Is that right?
21    A. Line 1, Section 3?
22    Q. Correct. In paragraph 3.
23    A. That is correct.
24    Q. Okay. And that's -- you stand by that
25  assertion?

Page 22

1    A. I do.
2    Q. Okay.
3    A. I've worked as a data specialist for over
4  25 years.
5    Q. All right. And you graduated from Washington
6  State University in 1996 with a bachelor of arts in
7  management information systems; is that correct?
8    A. That's correct.
9    Q. Have you resided outside of the state of
10  Washington since you graduated in 1996?
11    A. No.
12    Q. Okay. Do you have any formal education beyond
13  the bachelor's degree in management information systems
14  that we just referred to?
15    A. No.
16    Q. Okay. You don't have any advanced degrees
17  like a master's or a Ph.D., right?
18    A. I do not.
19    Q. And you don't have any degree in statistics,
20  correct?
21    A. I do not.
22    Q. You're not a professor of management
23  information systems, statistics or any other subject,
24  correct?
25    A. I am not.

Page 23

1    Q. You have not authored any peer-reviewed
2  published research on subjects relating to statistical
3  methodology, correct?
4    A. I have not.
5    Q. You do not have any professional
6  certifications or accreditations in management
7  information systems, statistics or any other fields,
8  correct?
9    A. That is correct.
10    Q. All right. So we mentioned that your current
11  employer is JND Legal Administration. Okay if we refer
12  to the company as JND?
13    A. Certainly.
14    Q. All right. And what is JND?
15    A. JND is a legal administration firm. We
16  provide legal administration -- or for --
17  administration services for class action lawsuits,
18  securities cases. We also have a e-discovery division.
19    Q. All right. And what is your job title?
20    A. I am chief information officer and chief
21  operating officer.
22    Q. And what are your main responsibilities?
23    A. I -- I oversee the entire IT organization.
24  I oversee the operations organization. So the -- the
25  IT organization includes the infrastructure,

Page 24

1  networking, data administration. Operations includes
2  the -- the teams that do project management and
3  administration of our -- administration of our
4  projects.
5    Q. Understood.
6       And what are your responsibilities on the
7  legal cases that JND handles claims administration for?
8    A. What are my responsibilities?
9    Q. Yes.
10    A. It can -- it varies widely, from performing
11  oversight of actual and managing the delivery of a
12  project, from -- from noticing to distribution.
13  I also, for our most complex cases, I am involved in
14  the data management and processing and prep and
15  deduplication of data.
16    Q. Okay. And when you say "noticing," and
17  "distribution," what do those terms refer to?
18    A. Noticing is sending either mail or email or
19  some other information to class members about the
20  administration.
21       Distribution refers to once the administration
22  has completed the -- it's -- it's process and
23  determined who received payment, distribution is
24  sending some sort of payment.
25    Q. Understood.

Page 25

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1     And you say at paragraph 6 of your report,
2  which is on page 2, that there is an Exhibit B --
3  excuse me, Appendix B to the report, correct?
4     A. Paragraph -- yes.
5     Q. And in that paragraph 6, you state that
6  Appendix B is a non-exhaustive list of class action
7  settlement administrations for which I reviewed or
8  oversaw the review of data in the last four years,
9  correct?
10    A. Yes.
11    Q. And Appendix B contains 11 page -- an 11-page
12  list of cases, correct?
13    A. Yes.
14    Q. And did you personally conduct deduplication
15  of individual persons based on personally identifiable
16  information in all of these cases?
17    A. No.
18        MR. BURT: Objection to form.
19    Q. (BY MR. LAZARUS) For what percentage of those
20  cases would you estimate that you did personally
21  conduct deduplication work?
22    A. I -- I don't believe I could give a -- a
23  realistic answer to that. I -- I do not know.
24    Q. Is it fair to say it is neither zero percent
25  nor 100 percent?

Page 26

1     A. It is absolutely not zero and it is not 100.
2  That is correct.
3     Q. Would you say it's closer to 25 or 75 percent?
4     A. I believe it'd be closer to 25 percent that I
5  actually did the hands on deduplication.
6     Q. Okay. And in the cases where you did do
7  hands-on deduplication, what types of data did you
8  deduplicate?
9        MR. BURT: Objection to form.
10    A. In general? In general, it would have been
11  contact data for individual -- or for individuals,
12  name, address, situationally phone, situationally
13  email, situationally some sort of other identifier.
14    Q. (BY MR. LAZARUS) Okay. In all of those
15  cases, was it always personal information that you were
16  deduplicating as opposed to some other kind of data?
17  Does that make sense?
18        MR. BURT: Objection to form.
19    A. I would need an example of "some other kind of
20  data." That's too broad for me, I think, to answer.
21    Q. (BY MR. LAZARUS) Was it always contact
22  information for people that you were deduplicating?
23    A. No.
24    Q. Okay. What was an example of when it was not
25  that?

Page 27

1     A. Business data.
2     Q. Okay. What do you mean by "business data"?
3     A. Names of businesses, addresses of businesses.
4     Q. Understood.
5        Okay. So other than contact information for
6  persons and business information, is there other data
7  that you can think of that you have deduplicated in any
8  of those cases in Exhibit -- in Appendix B?
9     A. Yes.
10    Q. Okay. What other kinds of information?
11    A. Vehicle data could be involved, but an
12  association with people or businesses.
13    Q. Okay. Understood.
14        Okay. And then from September 1998 to
15  July 2010 you were employed by a company called
16  Adaptis, correct?
17    A. That is correct.
18    Q. And what is Adaptis?
19    A. Adaptis was a health care claims
20  administration company.
21    Q. Okay. And you say "was."
22        Does the company no longer exist?
23    A. The company no longer exists.
24    Q. Okay. Were your responsibilities at Adaptis
25  similar to your current responsibilities at JND?

Page 28

1        MR. BURT: Objection to form.
2     Q. (BY MR. LAZARUS) You can answer.
3     A. I -- I had overlapping responsibilities at
4  Adaptis as what I do at JND, yes.
5     Q. Okay. What's different between your
6  responsibilities at Adaptis and your responsibilities
7  at JND?
8     A. Currently, I'm -- oversee operations. I did
9  not do that at Adaptis. Currently, I'm CIO in the IT
10  arena and at Adaptis I held various roles as I became
11  more and more senior, from data analyst to managing
12  director of IT.
13    Q. Understood.
14        Did you do what you describe as hands-on data
15  deduplication work at Adaptis?
16    A. I did hands-on data analysis work at Adaptis.
17  I did hands-on data matching work at Adaptis, which is
18  matching to, you know, to contact records to determine
19  they're the same. The purpose and outcome was in
20  deduplication, but roll up in that situation. But the
21  function was the same and similar.
22    Q. What's the difference between matching and
23  deduplication?
24    A. For -- so deduplication is to identify a -- a
25  primary record and all of its related records.

Page 29

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 Matching is to take records and merge details about
2 them to determine a final.
3    Q. Okay. That sounds very similar to me.
4    A. It is very similar.
5    Q. Okay. All right. Let's go to -- from
6 October 2010 to June 2016 you were employed by Garden
7 City Group, correct?
8    A. That is correct.
9    Q. And what is Garden City Group?
10    A. Garden City Group was a legal claims
11 administration company.
12    Q. And it no longer exists?
13    A. It no longer exists.
14    Q. And was it -- how did it cease to exist?
15    A. It was acquired by a competitor.
16    Q. Okay. What competitor was that?
17    A. Epiq.
18    Q. Okay. Spelled E-P-I-Q; is that correct?
19    A. No clue.
20    Q. Okay. Were your responsibilities at Garden
21 City Group similar to your responsibilities at JND?
22    A. Yes.
23    Q. Are there differences?
24    A. Yes.
25    Q. And what are those?

Page 30

[Lines 1-12 redacted]

13    Q. Okay. Can you define "claims administration"?
14    A. Claims administration in general?
15    A. Claims administration as the field that you
16 work in?
17    A. So legal claims administration?
18    Q. Yes.
19    A. It is a -- service of taking a -- well, a
20 class action administration as an example, and
21 providing a life cycle of steps. And it is very
22 dependent on the case which of those pieces of the life
23 cycle actually are required in order to frequently
24 effectuate notice, effectuate, you know, claims
25 receipt, processing claims, claims determination and

Page 32

1    A. At Garden City Group, again, I was not the --
2 I was not COO or head of operations. So I was not
3 responsible for the operations organization.
4      Other than that, as my role grew, I -- I
5 filled the similar role as a CIO for Garden City Group.
6    Q. All right. Did you do data deduplication or
7 data matching at Garden City Group?
8    A. I did.
9    Q. Okay. Did you do both of those, matching and
10 deduplication?
11    A. At Garden City Group primarily it was
12 deduplication, similar to JND.
13    Q. Okay. Were the methods that you used at
14 Garden City Group similar to the methods that you use
15 at JND for deduplication?
16      MR. BURT: Objection. Form.
17    A. I believe so.
18    Q. (BY MR. LAZARUS) Can you think of any
19 differences between them?
20    A. Only that as I have gained more and more and
21 more and more experience over the years, I've evolved
22 and improved my methods. And so I believe they've
23 gotten better.
24    Q. Can you give examples of how they've gotten
25 better?

Page 31

1 ultimately some sort of benefit distribution to harmed
2 parties.
3    Q. All right.
4      MR. LAZARUS: Could we pull up the
5 document Tab 18C, please?
6      MR. BURT: And is this going to be a
7 source code protected document?
8      MR. LAZARUS: No. This is a public
9 filing. Okay.
10      (Deposition Exhibit DX 114 was marked.)
11      MR. LAZARUS: And is this Exhibit 114?
12    Q. (BY MR. LAZARUS) All right. This is a public
13 filing dated September 3, 2001.
14      Do you recognize this as a declaration of a
15 Jennifer Keough -- and I don't know if I'm pronouncing
16 that --
17    A. Keough.
18    Q. Keough.
19      So do you recognize this as a declaration of a
20 Jennifer Keough submitted in In Re: Blue Cross Blue
21 Shield Antitrust Litigation concerning a class
22 settlement in that litigation?
23    A. I have no reason to believe that's not what
24 this is.
25    Q. Okay. And you referred to this litigation in

Page 33

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 your report, correct?
2     A. I did.
3     Q. All right. And do you see that in
4 paragraph 99, which is on the last page of that
5 declaration of Ms. Keough, it refers to due process and
6 Rule 23 requirements?
7     A. I do.
8     Q. Based on your work in claims administration,
9 are you aware that for a damages class action Rule 23
10 requires the best notice that is practicable under the
11 circumstances including individual notice to all
12 members who can be identified through reasonable
13 effort?
14         MR. BURT: Objection to the extent it
15 calls for a legal conclusion.
16         But you can answer to the extent you
17 understand.
18     A. Okay.
19         Can you repeat the question?
20     Q. (BY MR. LAZARUS) Sure.
21         Based on your work in claims administration,
22 are you aware that for a damages class Rule 23
23 requires, quote, "The best notice that is practicable
24 under the circumstances, including individual notice to
25 all members who can be identified through reasonable

Page 34

1 effort"?
2     A. I am aware of Rule 23. I've not read it.
3     Q. Okay.
4     A. But I am aware of it and its purpose.
5     Q. All right. When deduplicating records within
6 the claims administration process, the goal is to get
7 the best notice practicable under the circumstances to
8 members of the class identified through reasonable
9 efforts, correct?
10     A. It is -- it is a goal. It's -- as I've
11 mentioned, it is situational, what -- what is required
12 for -- for any particular administration. Notice may
13 not be one of the deliverables. But where
14 administration -- or where noticing is and we have
15 class data, then I believe that is a reasonable
16 statement.
17     Q. And what are other -- you mentioned -- you
18 said that the deduplication with the goal of getting
19 the best notice practicable under the circumstances to
20 members of the class identified through reasonable
21 effort, you said that is one goal -- or that is a goal.
22         What are other goals?
23         MR. BURT: Objection to form.
24     A. We have situations -- administrations that
25 we've administered where there is no noticing. We were

Page 35

1 just doing distribution.
2     Q. (BY MR. LAZARUS) Okay. And so what -- okay.
3         If you look at paragraph 24 of Ms. Keough's
4 declaration, it states, quote, "Based on JND's
5 experience in handling class action mailings, JND was
6 trusted by the parties to institute deduplication
7 measures based on and in accord with industry best
8 practices to combine records so that we could reduce
9 duplicate mailings," correct?
10         Do you see that?
11     A. This is paragraph 25?
12     Q. 24.
13     A. 24. I don't believe that is paragraph 24.
14     Q. Is it not?
15     A. Oh, hold on. Second part of paragraph 24.
16 Got it.
17     Q. Yes.
18         Do you see that language?
19     A. Yes.
20     Q. Okay. Do you understand the practice that
21 Ms. Keough is describing in that paragraph?
22         MR. BURT: Objection to form.
23     A. I -- I believe I know what she is referring
24 to.
25     Q. (BY MR. LAZARUS) Okay. Why does the claims

Page 36

1 administration process require or benefit from
2 deduplicating records as -- as Ms. Keough is describing
3 it?
4         MR. BURT: Objection. Form.
5     A. Why does the claim administration industry
6 benefit?
7     Q. (BY MR. LAZARUS) Yes, from deduplication of
8 data?
9     A. I don't know that the -- that the claims
10 administrator benefits from deduplication.
11     Q. Why does the claims administrator do
12 deduplication?
13     A. The -- the intent would be to -- I --
14 I believe it would be several fold. The -- the intent
15 would be to combine records that represent the same
16 entity, so that whatever future action needs to be
17 taken, that can be done for a -- an individual once.
18 People are not a big fan of receiving 78 postcards
19 of -- about a notice. And also, 78 postcards are --
20 carry a cost.
21         So I think they're -- they're a benefit to
22 the -- the class and -- but I don't believe it is --
23 there's a benefit to the administrator.
24     Q. Understood. Fair enough.
25         How do you know how effective the

Page 37

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 deduplication process was in achieving intended goals
2 in class administration?
3      A. I missed a word. Can you repeat that one more
4 time for me?
5      Q. Let me rephrase it.
6          When you are involved in deduplication for
7 class administration, how do you know that the
8 deduplication process is achieving the intended goals?
9      A. So we -- I mean, we spend extensive time, both
10 performing deduplication and reviewing and -- and kind
11 of quality reviewing the outcome to -- to ensure
12 accuracy.
13          And then we do -- you know, for most
14 administrations, we have paths for class members to
15 contact us. And if there are issues, they have the
16 ability to contact us and let us know that there was an
17 issue with whatever they received, and that can provide
18 feedback.
19      Q. And when you refer to quality reviewing of the
20 outcome, what does that involve?
21      A. It involves a -- additional resources with
22 extensive experience in doing deduplication, experience
23 utilizing JND methods and methodologies for
24 deduplication to review how -- how deduplication was
25 performed and evaluating both code and the data outcome

1      Is that right?
2      A. Yes, I believe that's correct.
3      Q. And you refer to those cases in paragraph 5 of
4 your report, correct?
5      A. Yes, that is correct.
6      Q. All right. Let's start with the Lerman versus
7 Apple case.
8          Were you personally involved in that case?
9      A. Can -- can you give me a little -- well, what
10 scope is personally involved mean?
11      Q. What does it mean to you?
12      A. I had -- I -- communications with the people
13 running the case about the case. I had knowledge about
14 the case. I had -- so if that is personally involved,
15 then, yes, I was personally involved in that case.
16      Q. Did you do what you have described as hands-on
17 deduplication of data in that case?
18      A. I don't recall. I don't believe so.
19      Q. Okay. Do you know what data, if any, JND used
20 to deduplicate in that case?
21      A. I don't in that particular case. I don't
22 recall.
23      Q. Okay.
24      A. I do know at one point I looked at the data.
25      Q. Okay. Do you know what -- do you recall what

1 to see if there's anything identifiable that would
2 suggest an issue.
3      Q. And when you say "additional resources," are
4 you referring to people?
5      A. I'm referring to people.
6      Q. So the -- the quality review process at JND
7 involves additional people, human resources with
8 extensive experience in doing deduplication reviewing
9 the process that has been undertaken in a given case;
10 is that right?
11      A. I think I missed -- again, I missed a word.
12 Can you please repeat that question?
13      Q. So I'm saying the -- I'm trying to recap what
14 you have said.
15          The quality review process for deduplication
16 at JND involves additional people, human resources with
17 extensive experience in deduplication reviewing the
18 process that has been undertaken in a particular case?
19          MR. BURT: Objection to form.
20      Q. (BY MR. LAZARUS) Is that right?
21      A. Yes.
22      Q. Okay. JND was or has been the claims
23 administrator in two cases involving Apple, Inc.,
24 Lerman versus Apple and the MacBook Keyboard
25 Litigation.

1 kind of data that was?
2      A. I do not.
3      Q. Was it personally identifying -- personally
4 identifiable information about customers?
5      A. I apologize, I do not recall.
6      Q. Okay. How large was the class in Lerman
7 versus Apple?
8      A. I do not recall.
9      Q. Would -- does it sound right to you that it
10 was 1.5 million customers?
11      A. I -- I can't either confirm or deny.
12      Q. Understood.
13          Okay. And then for the MacBook Keyboard
14 Litigation, were you personally involved in that case?
15      A. Yes, I was.
16      Q. Okay. What were your responsibilities with
17 respect to that case?
18      A. I both worked closely with the VP of
19 operations on the administration, as well as I did
20 extensive data analysis on the case.
21      Q. Okay. Did you do hands-on deduplication of
22 data in that case?
23      A. I -- it -- it appears I did. I don't recall
24 doing it, but, yes, I did.
25      Q. Okay. Understood.

11 (Pages 38 - 41)

1    What data did JND use to deduplicate in that
2 case?
3    A. It was a number of years ago. I don't recall
4 the exact data.
5    Q. Okay. But would it have been personally
6 identifiable information for customers?
7    A. I do know there were -- was information about
8 customers in the data.
9    Q. Okay. Do you recall that Apple did not --
10 well, do you recall that data used for deduplication in
11 that case came from Apple?
12    A. Yes.
13    Q. Is it correct that Apple did not provide
14 credit card information in that case?
15    A. I do not recall.
16    Q. Okay. Do you recall how large the class was
17 in that litigation?
18    A. I -- I don't remember a count.
19    Q. Okay. Does 15 million sound right to you?
20    A. I -- I do not remember a count.
21    Q. And you write in paragraph 5 of your
22 report that in the MacBook Keyboard Settlement, JND
23 analyzed data, quote, "using an agreed upon data
24 hierarchy," correct?
25    A. Yes, I did write that.

Page 42

1    Q. What does "data hierarchy" mean there?
2    A. As I recall, the data contained information
3 with regards to MacBook ownership and dates and time --
4 of when they were owned, and we had to apply a
5 hierarchical ownership of when somebody may have been
6 the owner to determine whether they were the valid -- a
7 valid class member to receive payment. I believe
8 that's the case.
9    Q. Okay. And I guess just backing up for me
10 because, again, I am not an expert in these areas.
11    But -- so data hierarchy, what does that mean,
12 generally?
13    A. I -- I think that could vary massively
14 depending on the -- the situation. But in -- in the
15 most generic terms I think it would be a way to apply,
16 for lack of a better term, priority to -- to data
17 amongst itself.
18    Q. Okay. And why was there an agreed hierarchy
19 in the MacBook Keyboard Settlement?
20    A. I -- I don't recall the -- where the
21 hierarchical definition came from.
22    Q. In that case, in that data, were there
23 multiple possible hierarchies?
24    A. I'm not sure I understand the question.
25    Q. So there was an agreed upon hierarchy, right?

Page 43

1    Does that imply that there were alternative
2 hierarchies that could have been used?
3        MR. BURT: Objection. Form.
4    A. I -- I don't know that I can answer that
5 question. I...
6    Q. (BY MR. LAZARUS) Does the choice of a data
7 hierarchy affect the results of the deduplication
8 process?
9        MR. BURT: Objection. Form. Incomplete
10 hypothetical.
11    A. I -- I suppose it could.
12    Q. (BY MR. LAZARUS) So looking at the MacBook
13 Keyboard Settlement, there was an agreed hierarchy, as
14 you write in your report.
15    If a different hierarchy had been used, would
16 you agree it is possible that a different deduplication
17 result would have obtained?
18        MR. BURT: Same objection.
19    A. I do not believe -- if I recall correctly,
20 I do not believe the hierarchy relevant to MacBook was
21 deduplication based. I believe it was ownership based,
22 which would not be relevant to deduplication.
23    Q. (BY MR. LAZARUS) Understood. Okay.
24    You personally have never been an employee of
25 Apple; is that right?

Page 44

1    A. I have not.



Page 45

12 (Pages 42 - 45)



8  Q. Okay. But do you agree that when an
9  individual enrolls in an employer-sponsored health
10  plan, the employer may provide some information like
11  name and address for the employee?
12      MR. BURT: Objection. Form.
13  A. Yes.
14  Q. (BY MR. LAZARUS) Okay. Did that data also --
15  I'll scratch that.
16      The [REDACTED]
17  [REDACTED] does not appear in your Appendix B of your
18  report.
19      Why is that?
20  A. I believe because it was referenced in my --
21  in the content of the report.
22  Q. Okay.
23      MR. LAZARUS: Can we mark Tab 2 as the
24  next exhibit, which will be -- this should be 115; is
25  that right?

Page 46

1      (Deposition Exhibit DX 115 was marked.)
2  Q. (BY MR. LAZARUS) All right. This is a public
3  filing dated March 6, 2024, although the signature at
4  the bottom is dated March 5.
5      Do you recognize this as a declaration of a
6  Megan Jones submitted in In Re: Blue Cross Blue Shield
7  Antitrust Litigation?
8  A. I -- yes, I -- that's what it looks to be.
9  Q. Okay. And do you know Megan Jones?
10  A. I believe I have been on a conference call
11  that Megan Jones attended at some point.
12  Q. Okay. And Megan Jones appears to be
13  affiliated with the Hausfeld LLP firm; is that correct?
14  A. I assume so.
15  Q. Okay [REDACTED]
16  [REDACTED]
17  [REDACTED]
19  Q. Okay. But you have no reason to doubt it?
20  A. I have no reason to doubt it.
21  Q. If you look at paragraph 6 of this
22  declaration, do you see that the middle sentence refers
23  to JND's fees and expenses as more than $76.5 million?
24  A. I do.
25  Q. And is that correct, that those were JND's

Page 47

1  fees and expenses for administering claims in that case
2  at that point?
3  A. I -- I could not confirm or deny a -- a total
4  of JND's fees for Blue Cross Blue Shield.
5  Q. Okay. But do you have any reason to doubt
6  that number in this declaration?
7  A. No.
8  Q. Why would -- that seems like a large
9  number to me.
10      Why would JND's fees and expenses be so high
11  for administering claims in that litigation?
12      MR. BURT: Objection. Form.
13  A. The -- the scope of services requested and
14  provided.
15  Q. (BY MR. LAZARUS) Was this -- is that a large
16  number -- compared to other cases that JND is involved
17  in, is that amount of fees and expenses typical of
18  cases or would that be on the high side?
19  A. That -- that is a -- a significant -- that's
20  not -- JND received significant revenue from Blue Cross
21  Blue Shield.
22  Q. Okay. If I'm understanding correctly that the
23  revenue received from this case is larger than other
24  cases, why would that be? Why is that?
25      MR. BURT: Objection. Form. "This

Page 48

1  case."
2  A. Again, scope -- scope of services provided,
3  size of -- of case, size of class, size of notice,
4  volume of claims, volume of, you know, activity with
5  the class, the contact -- our contact center. You
6  know, it is a -- a very, very large complex
7  administration.
8  Q. (BY MR. LAZARUS) And there was an objection
9  on -- that my question referred to "this case."
10      You understood I was referring to the Blue
11  Cross Blue Shield litigation in that question; is that
12  right?
13  A. I did.
14  Q. Okay. So looking at your answer to that
15  question, are you saying that -- or would you agree
16  that, as a general matter, the -- the more class
17  members there are, the more -- the higher the fees and
18  expenses would be to administer claims; is that fair to
19  say?
20      MR. BURT: Objection. Form.
21  A. I would say there is a relationship, but,
22  again, it also is heavily dependent on services
23  provided.
24  Q. (BY MR. LAZARUS) Right.
25  A. And requested.

Page 49

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1  Q. Understood.
2      But, I guess, holding those services provided
3  constant, there is a positive correlation between the
4  number of class members and the fees that will be
5  required for class administration?
6      MR. BURT: Objection. Form.
7  Foundation.
8  A. If you're doing the same type of work for more
9  people, yes, that would cost more.
10 Q. (BY MR. LAZARUS) Okay. When you say, "if
11 you're doing the same type of work for more people,"
12 does that mean if you're doing the same type of work in
13 class administration for a class with more members,
14 that would cost more?
15 A. It could cost more.
16 Q. As a general -- as a general rule, you would
17 expect it to cost more, right?
18     MR. BURT: Objection. Form.
19 A. As a general rule. I've seen exceptions where
20 very small classes are very, very costly to administer
21 because of the nature of the class, the nature of the
22 individuals involved.
23 Q. (BY MR. LAZARUS) But that would be the
24 exception to the rule; is that right?
25 A. I believe so.

Page 50

1  Q. Generally, a larger class will mean larger
2  class administration fees; is that right?
3  A. It would mean more work to administer the
4  class, so that would result in higher fees.
5  Q. All right. Why did you write about JND's
6  experience in the ███████████████ in
7  your report in the case that we are talking about
8  today -- the Apple case that we're talking about today?
9  A. The work I performed in the ███████████
10 ██████ settlement with regards to data deduplication
11 was on a large dataset and it, to me, represented a --
12 a logical example of my experience working with large
13 datasets doing complex deduplication.

14 ████████████████████████████████
15 ██████████████████████
16 ██████
17 ██████████████████
18 ████████████████████████████████
19 ██████████████████████
22     MR. BURT: Objection. Form.

23 ████████████████████████.
24 ████████████████████████████████
25 ████████████████████

Page 51

11 A. There was different data to -- to utilize.
12 There was different quality issues to address. ████
████████████████████████████████████

15 Q. Okay. When you say, "different data quality
16 issues to address," if I heard that right, can you give
17 us example -- an example of data -- a data quality
18 issue that applied to one of those cases but not the
19 other, the Blue Cross Blue Shield litigation versus the
20 Apple case that we are talking about today?
21 A. I don't recall not -- a -- a smiley face emoji
22 in the Blue Cross Blue Shield data, and there was a --
23 a small portion of the Apple data that had some --
24 some -- some things like that.
25 Q. Okay. Are you saying that you do recall a

Page 52

1  smiley face emoji in Blue Cross Blue Shield or --
2  A. I -- I -- I was saying that I didn't recall
3  seeing that in the Blue Cross Blue Shield data, but I
4  do recall, you know, emoji type data in the Apple data
5  in some -- some instances.
6  Q. Understood. Okay.
7  A. As an example.
8  Q. All right. And for the Equifax data breach,
9  you write in your report, again, at paragraph 4, that
10 you also personally worked on the data analysis and
11 deduplication, correct?
12 A. That is correct.
13 Q. And am I correct that that Equifax litigation
14 was about a class of consumers whose personal
15 information was held by Equifax and may have been
16 impacted by a data breach of the Equifax computer
17 systems?
18 A. That is correct.
19 Q. So in the deduplication in the Equifax case,
20 am I correct that you were deduplicating records
21 representing individual consumers?
22 A. Can -- can you restate that question?
23 Q. Sure.
24     So in the deduplication work in the Equifax
25 case, am I correct that you were deduplicating records

Page 53

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 representing individual consumers?
2     A. The -- yeah, the data that we had was -- or
3 were provided was for individuals. I don't know how to
4 respond to the statement "consumers" other than it's
5 individuals.
6     Q. Understood.
7        And those records that you were deduplicating
8 contained personally identifiable information like name
9 and address; is that right?
10     A. That is correct.
11     Q. Were addresses in that case cross-checked
12 against any external datasets?
13     A. Yes.
14     Q. What external datasets?



20     Q. Okay. The National Change of Address
21 database, is that administered by the US Postal
22 Service?
23     A. Yes. As far as I'm aware.
24     Q. And do you use a third-party vendor in order
25 to access that dataset?

1     A. Yes, I do.
2     Q. Okay. And who is that vendor?
3     A. The current vendor is Melissa Data.
4     Q. Was Melissa Data used as a vendor in the
5 Equifax data breach litigation for your deduplication
6 work?
7     A. I don't know if that was the vendor we were
8 using at the time. We've been using Melissa Data for a
9 number of years, but I don't remember exactly.
10     Q. Okay. And the information that you were
11 deduplicating, was that information that had been
12 provided by individuals to banks or credit card
13 companies in applying for loans or credit, do you know?
14     A. I have no visibility into how Equi- -- yeah,
15 Equifax collects their data.
16     Q. Okay. But you would agree that when
17 individuals submit documents -- let me retract that.
18        You would agree that when individuals apply
19 for loans or credit, they might submit documents such
20 as pay stubs or other documentation to verify the
21 information they are providing?
22        MR. BURT: Objection. Form.
23 Foundation.
24     Q. (BY MR. LAZARUS) Would you agree with that?
25     A. I think that is a reasonable statement.

1     Q. Okay. And is it possible that banks would
2 validate that sort of information before issuing a loan
3 or providing credit to an individual?
4        MR. BURT: Objection. Form.
5 Foundation.
6     A. I -- I assume a competent bank would, yes.
7     Q. (BY MR. LAZARUS) Okay. And why -- why --
8 again, why did you write about the Equifax work in your
9 report in this case that we're talking about today?
10     A. Similarly, it represented a large, complex
11 deduplication effort that I personally performed.
12     Q. Okay. And you say in paragraph 4 of your
13 report that the deduplication work for the Equifax case
14 took months.
15        Do you recall how many months that was?
16     A. That was -- I -- I do not know exactly. That
17 also was several years ago, though, pre-COVID years.
18     Q. Understood. Time has lost meaning since then.
19     A. It really has.
20     Q. Is -- do you recall whether you spent more
21 time on the deduplication work in the Equifax case than
22 the Apple payor data in this case?
23     A. I don't recall.
24     Q. Okay. Did you use the same methods for data
25 evaluation, cleaning, deduplicating and validating in

1 the Equifax case as you used in the Apple case we are
2 talking about today?



10     Q. All right. For purposes of this case, the
11 Apple case we're talking about today, in what field do
12 you purport to be an expert?
13     A. Data deduplication.
14     Q. Okay. Any other fields or is that --
15     A. That I am purporting to be an expert today?
16     Q. Right.
17     A. No.
18     Q. Okay. Do you purport to have expertise in
19 data analysis?
20     A. I purport to have decades of experience in
21 data analysis.
22     Q. Okay. Is there a difference in your mind
23 between decades of experience and having expertise in
24 data analysis?
25        MR. BURT: Objection. Form. Calls for

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 a legal conclusion.
2     A.  Decades of experience is a -- is a
3 quantifiable effort.  Expertise, you know, requires me
4 to make a determination compared to others that I don't
5 know.
6     Q.  (BY MR. LAZARUS)  All right.  Do you purport
7 to have expertise in natural language processing?
8     A.  I do not.
9     Q.  Do you purport to have expertise in
10 statistical modeling?
11     A.  I do not.
12     Q.  Do you purport to have expertise in
13 statistics?
14     A.  I do not.
15     Q.  And we have discussed that you produced to
16 Apple or Apple's consultants code that you used in your
17 analysis in this case, correct?
18     A.  We did discuss that, yes.
19     Q.  And when you perform deduplication work, do
20 you normally produce your proprietary methodology to an
21 opposing party?
22     A.  We do not.
23         MR. BURT:  Eli, we've been going about
24 an hour and a half.
25         MR. LAZARUS:  Yes.

Page 58

1         MR. BURT:  And if the witness doesn't
2 need a break and if you don't need a break, eventually
3 I'm going to, so if you got a stopping point.
4         MR. LAZARUS:  Understand.
5     Would you like a break at this point?  We can
6 take one.
7         THE WITNESS:  I -- I'm fine until
8 someone else needs a break.
9         MR. LAZARUS:  Okay.
10         MR. BURT:  We can keep going.
11         MR. LAZARUS:  Okay.
12     Q.  (BY MR. LAZARUS)  Have you ever produced your
13 proprietary methodology for deduplication to an
14 opposing party?
15     A.  I have not.
16     Q.  And let me see.  Okay.  I'm going backwards a
17 little bit here, but if we could go back to
18 Ms. Keough's declaration, which was Exhibit 114.
19     I did not ask, who is Ms. Keough?
20     A.  Jennifer Keough is the CEO of JND Legal
21 Administration and the J in JND.
22     Q.  It stands for Jennifer.  Understood.
23     Paragraph 26 of Ms. Keough's declaration
24 starting on the second line of that paragraph states, the
25 quote, "JND again analyzed the data to determine the

Page 59

1 most effective rules in order to achieve the highest
2 quantity of deduplication while not deduplicating
3 individuals that were not conclusively the same
4 person."
5     Do you see that language?
6     A.  I do.
7     Q.  Okay.  Do you understand what practice
8 Ms. Keough is describing there?
9     A.  I do.
10     Q.  Can you explain in your own words what the
11 practice is with respect to achieving the highest
12 quality of deduplication while not deduplicating -- I'm
13 sorry, the highest quantity of deduplication while not
14 deduplicating individuals that were not conclusively
15 the same person?
16         MR. BURT:  Objection to form.
17     A.  My understanding of what she was communicating
18 there was a validated review deduping process where we
19 utilized the data points available to identify the same
20 individuals and where we would have high confidence
21 that those matches would, in fact, be the same
22 individual.
23     Q.  (BY MR. LAZARUS)  And the part about not
24 deduplicating individuals that were not conclusively
25 the same person, what does that refer to?

Page 60

1     A.  That refers to not including logic within a
2 deduplication process that we did not have high
3 confidence that those -- the data points utilized would
4 result in a -- a positive match.
5     Q.  And why is that an appropriate practice, if it
6 is?
7         MR. BURT:  Objection.  Form.
8     Q.  (BY MR. LAZARUS)  Let me withdraw that
9 question.
10     Is that an appropriate practice in
11 deduplication for claims administration?
12     A.  I believe it to be, yes.
13     Q.  Okay.  And why is that appropriate?
14     A.  If you are able to deduplicate with high
15 confidence but don't deduplicate the records that you
16 do not have confidence in the deduplication, you may
17 slightly overnotice, but you are still notifying the
18 class in the most efficient way possible.
19     Q.  Okay.  Has any employee or executive of JND
20 served as a testifying expert witness in another case,
21 to your knowledge?
22     A.  In -- I believe so, but I couldn't --
23 I couldn't point to a specific situation.
24     Q.  Okay.  Okay.  And I guess in the -- the
25 language we were just talking about from Ms. Keough's

Page 61

16 (Pages 58 - 61)

**Page 62**

1 declaration where she says that JND analyzed the data
2 to determine the most effective rules in order to
3 achieve the highest quantity of deduplication while not
4 deduplicating individuals that were not conclusively
5 the same person, is that something that you did in this
6 case that we're talking about today?
7     A. My -- my goal was to deduplicate where I had
8 high confidence in the match and not deduplicate where
9 the -- I did not believe the -- it was reasonable to
10 believe that the records were -- represented the same
11 entity or individual.
17     MR. BURT: Objection. Form.
21     Q. (BY MR. LAZARUS) All right. And we will get
22 more obviously into your assignment in this case.
23     On -- on the question about other JND
24 employees or executives serving as testifying expert
25 witnesses in other cases, did that happen in any of the

**Page 63**

1 cases listed in Appendix B in your report?
2     A. Actually, can you restate that question?
3     Q. Sure.
4     So initially I asked or intended to ask, has
5 any employee or executive of JND served as a testifying
6 expert witness in another case other than the case
7 we're talking about here today?
8     A. And I don't know off the top of my head.
9     Q. Okay. And you don't know off the top of your
10 head if that is true of any case listed in Appendix B
11 of your report, right?
12     A. I do not know that off the top of my head, no.
13     Q. Okay. When was JND first retained in this
14 case?
15     A. Actually, I don't -- I don't know a specific
16 date when -- when counsel reached out to my senior
17 management.
18     Q. How did you first hear about JND's retention?
19     A. I spoke to one of the founders and discussed
20 what -- the assignment.
21     Q. And one of the founders of JND?
22     A. Yes.
23     Q. Do you remember which one?
24     A. It was either Jennifer Keough or Neil Zola.
25     Q. And do you remember ballpark when that was?

**Page 64**

1     A. I would say, approximately, a year ago.
2     Q. Okay. So, approximately, June of 2024?
3     A. I'd probably say, approximately, May of 2024.
4     Q. Okay. Why was JND first retained in this
5 case?
6     MR. BURT: Objection. Form.
7     A. I -- all I can tell you is what I was
8 requested to do.
9     Q. (BY MR. LAZARUS) Okay. Okay. We will move
10 on to that.
11     But, I guess, first, do you understand that
12 you may need to testify in front of a jury in this
13 case?
14     A. I do.
15     Q. When did you learn that?
16     A. Earlier this year.
17     MR. LAZARUS: This might be a good time
18 for a break if that's --
19     THE WITNESS: I'm fine with that.
20     MR. LAZARUS: -- good for you all.
21     Okay. Why don't we go off the record.
22     THE VIDEOGRAPHER: We are going off the
23 record at 10:42.
24     (Break from 10:42 a.m. to 10:58 a.m.)
25     THE VIDEOGRAPHER: We are back on the

**Page 65**

1 record. The time is 10:58. Please proceed.
2     MR. WOOD: Noting for the record that
3 Anna Link of Kellogg Hansen has also joined, also
4 counsel of record for the certified class.
5     Q. (BY MR. LAZARUS) All right. We'll jump back
6 into the questions.
17     MR. BURT: Objection to form.
18     A. No, not that I'm aware of.
19     Q. (BY MR. LAZARUS) Okay. Are you -- so you're
20 not aware that JND's compensation would change at all
21 if the plaintiffs' class is decertified or remains
22 certified?
23     A. Not that I'm aware of, no.
24     Q. Okay. And you're not aware that JND's
25 compensation would change at all if the plaintiffs

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 prevail at trial or do not prevail at trial?
2    A.  That is correct.
3    Q.  Is JND being paid any compensation other than
4 for your services in this case?
5        MR. BURT:  Objection to form.
6    Q.  (BY MR. LAZARUS) I should -- let me rephrase
7 that.
8        Is JND being paid any other compensation in
9 this case other than for your services?
10    A.  I -- I do not know if, for example, the --
11 Jennifer or Neil may be billing time.  It would be time
12 in relation to this effort.
13    Q.  Okay.  So to your knowledge, JND is not being
14 paid for anything in this case other than your
15 deduplication work or other people's work in connection
16 with your deduplication work; is that right?
17        MR. BURT:  Objection to form.
18        If I -- if I understand the question, you can
19 answer only to the extent that you know.
20    A.  From what I know, that is correct, we are only
21 being compensated for -- for work related to
22 deduplication and our retention for that -- for that
23 service.
24    Q.  (BY MR. LAZARUS) Okay.  Do you know if JND
25 has had any discussions with plaintiffs' counsel about

Page 66

1 the possibility that JND would have a role in claims
2 administration for this case?
3    A.  Repeat the question.  I think I --
4    Q.  Are you aware of whether JND has had any
5 discussions with plaintiffs' counsel about the
6 possibility that JND would have a role in claims
7 administration for this case?
8    A.  I believe conversations have occurred.  I'm
9 not privy to any details.
10    Q.  Okay.  Do you know whether JND expects to have
11 a role in claims administration in this case?
12        MR. BURT:  Objection.  Asked and
13 answered.
14    A.  I -- I don't know that I can say expects.
15 I -- I believe I can say interested in.
16    Q.  (BY MR. LAZARUS) Okay.  Interested in
17 meaning, if you can perform a role in claims
18 administration in this case, JND would like to do so?
19 Let me rephrase that.
20        If JND can play a role in claims
21 administration, JND would like to do that; is that
22 right?
23    A.  That is correct.  We provide claims
24 administration, and if there is claims administration
25 here, we would be interested in providing the service.

Page 67

1    Q.  Okay.  Do you know -- do you know when
2 discussions on that topic have taken place between
3 plaintiffs' counsel and JND?
4    A.  I -- I do not.
5    Q.  Okay.  Even ballpark?
6    A.  I -- I don't know.  Again, I was not privy
7 to -- to -- I was not involved in the conversation, nor
8 privy to any details about a conversation.
9    Q.  Okay.  And how are you personally being
10 compensated for your work in this case?
11    A.  I get a salary from JND for all of the work I
12 do.  The work I'm doing on this has no impact except
13 increasing my work.
14    Q.  Okay.  About how many hours have you spent on
15 this case to date?
16    A.  I would estimate several hundred.
17    Q.  Okay.  And am I correct that, in broad
18 strokes, what you did in this case was to evaluate data
19 produced by Apple, cleanse the data and deduplicate the
20 data by matching records that appear to you to
21 represent the same person.  Is that --
22        MR. BURT:  Objection to form.
23    Q.  (BY MR. LAZARUS)  Is that a fair
24 characterization of what you have done?
25    A.  I think that is a reasonable summary.

Page 68

1    Q.  Okay.  Did you personally perform all of the
2 data evaluation, cleaning and matching for this
3 project?
4    A.  Yes.
5    Q.  Has anyone assisted you in this matter?
6    A.  Yes.
7    Q.  Okay.  Who -- who was that?
8    A.  Cameron Karlin.
9    Q.  Can you spell that, please?
10    A.  I don't think I can.
11    Q.  Okay.
12    A.  C-A-M-E-R-O-N, K-A-R-L-I-N.
13    Q.  Who is that?
14    A.  Cameron is a manager of data analysis at JND.
15    Q.  Okay.  And what did Cameron do in connection
16 with this work that we are talking about today?
17    A.  Cameron performed quality review of my efforts
18 to -- yeah, he performed quality review.
19    Q.  Did anyone else assist you on your work in
20 this matter?
21    A.  No.
22    Q.  Okay.  How much time did Cameron spend on this
23 assignment?
24    A.  I -- I don't have a number.  I would --
25 I could provide an estimate.

Page 69

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1    Q.  Okay.  What estimate would you provide?
2    A.  A hundred hours or less.
3    Q.  Okay.  And in your Summary of Results at
4  paragraph 10 in your report, you state that, "JND
5  determined that Apple payor data could be reliably
6  deduplicated."
7      Do you see that, paragraph 10?
8        MR. BURT:  Page 3.
9    A.  "JND determined that Apple payor data could be
10  reliably deduplicated to remove the vast majority of
11  duplicate entities"?
12    Q.  (BY MR. LAZARUS)  Yes.
13    A.  Yes.
14    Q.  Okay.  Who does "JND" refer to in that
15  paragraph?
16        MR. BURT:  Objection.  Form.
17    A.  That refers to my company, JND Legal
18  Administration.
19    Q.  (BY MR. LAZARUS)  So who at JND determined
20  that Apple payor data could be reliably deduplicated,
21  etcetera, as stated in that paragraph?
22    A.  I did.
23    Q.  And if you look at paragraphs 16 and 17 of
24  your report, you'll see that it uses the word "we."
25  So, "We first needed to review the data submission," in

1    Q.  I don't know that we actually do.  So -- but
2  if you recall, do you -- did you review --
3    A.  I don't recall.
4    Q.  -- plaintiffs' Third Amended Complaint?  Okay.
5    A.  Apologies for not letting you complete your
6  sentence.
7    Q.  Right.  No problem.  No worries.
8      So you --
9        MS. LIN:  I can upload it, too.  I just
10  need a second.
11        MR. LAZARUS:  May as well do that and
12  we'll just come back to those.
13        But in the meantime, can we go -- can we do
14  Tab 10B first?
15        (Deposition Exhibit DX 116 was marked.)
16    Q.  (BY MR. LAZARUS)  All right.  Mr. Thompson, do
17  you -- well, first of all, this document is being
18  marked as Exhibit 116.
19        MR. LAZARUS:  Thank you.
20    Q.  (BY MR. LAZARUS)  Do you recognize this
21  document as a declaration dated August 1, 2024, that
22  you signed in connection with this litigation?
23    A.  I do.
24    Q.  All right.  I'll ask you to look at
25  paragraph 4, please.  You state in that paragraph,

1  paragraph 16, and then, "We commenced our process of
2  deduplicating the data," in paragraph 17.
3      Do you see that?
4    A.  I do.
5    Q.  Okay.  Who does "we" refer to there?
6        MR. BURT:  Objection.  Form.
7    Q.  (BY MR. LAZARUS)  In those paragraphs?
8    A.  That refers to me.
9    Q.  Does it refer to you and Cameron Karlin or
10  should it be just you?
11        MR. BURT:  Objection.  Form.
12    A.  This refers to me.
13    Q.  (BY MR. LAZARUS)  Okay.  Have you had any
14  communications about Apple with any governmental agency
15  or regulator, whether foreign or domestic?
16    A.  Not -- not that I recall.
17    Q.  The same question for, have you had any
18  communications about the app store or any app
19  marketplace with any governmental agency or regulator,
20  whether foreign or domestic?
21    A.  Also not that I recall, no.
22    Q.  Okay.  In your work on this case, did you
23  review plaintiffs' Third Amended Complaint in this
24  case?
25    A.  Do you have a copy of that?

1  quote, "In this case, JND was requested to evaluate a
2  sample dataset of Apple payor data in order to design
3  an algorithm to deduplicate/roll-up payor records."
4      Do you see that?
5    A.  I do see that.
6    Q.  And a little later in that paragraph it says,
7  "In order to accurately determine a total transaction
8  value for a payor, all instances of the payor need to
9  be linked as they represent the same
10  individual/entity."
11      Did I read that correctly?
12    A.  You did.
13    Q.  Okay.  Does that paragraph accurately describe
14  what plaintiffs' counsel asked you to do in this case?
15        MR. BURT:  Objection.  Form.
16    A.  The -- all but the last sentence accurately
17  defines what the -- what plaintiffs' counsel requested
18  us to do on the sample data.  And I believe the last
19  sentence represents why.
20    Q.  (BY MR. LAZARUS)  You say, "All but the last
21  sentence accurately defines what plaintiffs' counsel
22  requested us to do on the sample data"?
23    A.  That is correct.
24    Q.  Okay.  And then what are you saying about the
25  last sentence?

Case 4:11-cv-06714-YGR    Document 1095-50    Filed 03/05/26    Page 21 of 120

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

---

1    A. And -- the last sentence is -- represents the
2  why. They didn't ask us to -- there's no action with
3  regards to us and actually the transaction value.
4    Q. Understood. Okay. Thank you.
5      Okay. Now, let's turn back to Exhibit 112,
6  which is your report.
7      If you look at paragraphs 8 and 9 of your
8  report, do those paragraphs state the questions you
9  were asked to investigate as your assignment in this
10 case?
11   A. I believe that represents a fair summary of
12 the assignment.
13   Q. Okay. And did plaintiffs' counsel ask you
14 those questions at the start of your engagement on this
15 matter?
16      MR. BURT: I'm going to object to the
17 extent that you're calling for the substance of
18 communication that's attorney work product.
19      MR. LAZARUS: I think it's -- I think
20 the question is fair because it is asking -- and I'll
21 preface it this way to say, I'm only asking for
22 information from plaintiffs' counsel that you relied on
23 in drafting your report.
24      MR. BURT: I just want to make sure I
25 understand. You're saying you're asking for the

Page 74

---

1    Q. (BY MR. LAZARUS) Did your assignment change
2  after you first started working on this case?
3      MR. BURT: Objection. Form.
4      MR. LAZARUS: Okay.
5    Q. (BY MR. LAZARUS) Excuse me. Let me -- let me
6  rephrase it slightly this way.
7      Did your assignment in this case change after
8  you first started working on this case?
9      MR. BURT: Objection to form. I --
10 I can help you out by explaining why I'm objecting.
11      MR. LAZARUS: Okay. Please.
12      MR. BURT: He's -- what he's described
13 is that he started working, and the declaration shows,
14 he started working during the period when we had an
15 active disagreement with Apple about the data, for
16 example, the contemplation of a sample process that's
17 described in the declaration.
18      I -- I don't want to say more words, but
19 that's the basis of the objection.
20      MR. LAZARUS: Okay. Understood. Thank
21 you.
22   Q. (BY MR. LAZARUS) Okay. Well, I will still
23 ask the question.
24      Did your assignment change after you had
25 started work in this case?

Page 76

---

1  instruction about the assignment upon which he relied
2  in reaching his conclusions?
3      MR. LAZARUS: Correct.
4      MR. BURT: Yeah, I have no problem with
5  him answering what he understood his assignment to be.
6    Q. (BY MR. LAZARUS) And I think my question here
7  is the timing of when did you receive these questions
8  that are what you said was a fair summary of your
9  assignment in this case.
10      MR. BURT: To the extent that you're
11 asking him about communications with counsel, those are
12 work product, but I have no problem with him answering
13 when he understood his assignment.
14      MR. LAZARUS: Okay. Let's go with that.
15   A. I -- the best I can do is a ballpark of,
16 approximately, a year ago I understood the overall
17 assignment. Maybe several months later, when we
18 received the full dataset, clarity on the work product
19 and desired outcome of the -- or desired output of
20 the -- of my work.
21   Q. (BY MR. LAZARUS) Okay. Did the assignment
22 change after you first started working on the case?
23      MR. BURT: Objection. Objection to
24 form. I can explain it if you need me to.
25   A. Please repeat the question.

Page 75

---

1      MR. BURT: Same objection.
2      To the extent you understand it, go ahead and
3  answer.
4    A. Okay.
5      So from -- from -- my question, from -- from
6  the moment I started working to some later point, did
7  the -- did the assignment change?
8    Q. (BY MR. LAZARUS) Yes.
9    A. The initial assignment involved a sample
10 dataset and a determination of whether deduplication
11 could be applied based on the sample set. When a full
12 dataset was provided, the addition of producing a
13 deduplicated set was added.
14   Q. Okay. And I guess I want to ask about the
15 August 1 declaration that we were looking at as
16 Exhibit 116.
17      So the description there appears to request --
18 the description there appears to describe a request to
19 design an algorithm to deduplicate/roll-up payor
20 records, which is different from what's described in
21 paragraph 8 of the final report of determining whether
22 a reliable means exists for deduplicating.
23      Is that -- is that indeed a difference?
24   A. Can you specify in the expert report exactly
25 where -- what you're referencing?

Page 77

---

20 (Pages 74 - 77)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q.  Paragraph 8 of the expert report.  I'm sorry,
2  paragraph 9.
3        So my question is, in paragraph 9 of your
4  expert report, you state, "Counsel requested that
5  I determine whether there exists a reliable means by
6  which to consolidate duplicative payor records that all
7  relate to the same person and associate those names to
8  a unique person."
9        And the "determine whether there exists a
10  reliable means," language does not appear in
11  paragraph 4 of the August 1 declaration.
12        Is there a reason for that?
13    A.  No, not that I'm aware of, there's no reason
14  that the -- the words are slightly different.
15    Q.  Okay.  But they are describing the same
16  assignment that you received?
17    A.  I -- I believe, yes, that -- that I had
18  overlapping assignments in -- in concept and direction
19  for -- for both a sample set of determining whether a
20  deduplication can occur and for the full dataset of
21  performing a deduplication providing an outcome.
22    Q.  And in -- so now the final report, in
23  paragraph 8, you state that, quote, "JND was requested
24  to evaluate a large dataset produced by Apple
25  containing information that it collects from 'payors' -

1    (Deposition Exhibit DX 117 was marked.)
2    Q.  (BY MR. LAZARUS)  This is a copy of an email
3  from my colleague, Ramona Lin, to plaintiffs' counsel
4  dated July 10, 2024.
5        Do you recognize this document?
6    A.  Yes.  It looks familiar to me.
7    Q.  Okay.  So this document was previously shared
8  with you; is that right?
9    A.  The contents are familiar to me.
10    Q.  Okay.
11    A.  I don't remember if it came to me originated
12  from Ramona Lin, but the contents look familiar to me.
13    Q.  Okay.  This email was sent just after
14  production to your office of the sample dataset, the
15  sample of the Apple payor data, correct?
16    A.  Oh, I don't know the -- the dates.  I have no
17  reason to believe that's incorrect.
18    Q.  Okay.  And this email lists 17 fields,
19  including first_name, last_name, city, state, postal
20  code, etcetera.
21        Do you recognize those as the fields included
22  in the Apple payor data?
23    A.  Yes.
24    Q.  And for the sake of the transcript, I'll try
25  to list out the field names -- list out field names

1  individuals that purchase apps and in-app content on
2  Apple iPhones and iPads," correct?
3    A.  Correct.
4    Q.  All right.  You use the term "unique payor" in
5  paragraph 9.  And then in paragraph 18 you use the term
6  "unique individual."
7        Do those mean the same thing in this context?
8    A.  Where's the reference on the second one,
9  please?
10    Q.  Paragraph 18.
11    A.  Yeah, I think if -- entire sentence read
12  in context would suggest, that, yeah, individuals
13  represents Apple payor.
14    Q.  Okay.  And Apple did, in fact, produce a
15  dataset to your office in Seattle in a few
16  installments, correct?
17    A.  Yeah, Apple payor data was delivered to -- to
18  our Seattle office.
19    Q.  And in your report you refer to that dataset
20  as the Apple payor data, correct?
21    A.  That is correct.
22        MR. LAZARUS:  Can we please mark Tab 3
23  as the next exhibit which will be 117?
24        And this is a three-page document that is not
25  stapled at this moment.

1  when they come up, including the underscores, just the
2  first time.  And then after that, we can just refer to
3  them with -- without the underscore, like "first name,"
4  "last name," if that's okay with you?
5    A.  That's fine with me.
6    Q.  Okay.  So one of the fields listed in this
7  Exhibit 117 is billing_info_id_hashed.
8        Did you understand that that variable refers
9  to unique -- unique identifiers for each payor record?
10    A.  For each payor record in the dataset provided?
11    Q.  Yes.
12    A.  So it was the -- essentially, the unique ID
13  for each of the 1.69 billion records?
14    Q.  Right.
15    A.  I understood that as the intent.
16    Q.  Okay.  You understood that as the intent, but
17  is that different from what you saw in the data?
18    A.  There was some small -- very small portion of
19  those -- those hashed values that were not unique in
20  the data.
21    Q.  Okay.  And another --
22    A.  As I recall.
23    Q.  Okay.  Did you do anything to try to correct
24  the -- sorry.
25        And so you said that you saw some small

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 portion of the hashed values that were not unique in
2 the data.
3      Is that a problem in the data?
4 A. Not for the purpose of deduplication.
5 Q. Okay. So you did not do anything to try to
6 correct that non-uniqueness of those particular hashed
7 values?
8 A. I -- I evaluated them to determine if there
9 was a -- issue with how the data was produced to me.
10 But it appeared for -- for all records that I recall,
11 that they -- the billing_info_id when duplicated also
12 represented duplicate information about the individual
13 and, therefore, didn't impact the deduplication.
14      I also, when I produced the ultimate outcome
15 to -- back to Apple, I provided a -- an ID indicator so
16 that they understood that I was not providing duplicate
17 records. They provided duplicate records to me and I
18 was just providing an outcome for what they gave me.
19 Q. And another field in this Exhibit 117 is
20 person_id_hashed.
21      Do you understand that variable to indicate
22 the account associated with the payor record?
23 A. Yes, I understood person_id_hashed was
24 intended to represent a -- a payor entity in -- in the
25 Apple data.

Page 82

1 Q. Okay. And do you understand that an account
2 with Apple is sometimes referred to as an Apple ID or
3 an Apple ID account? This is just for ease of talking
4 about it.
5 A. Can you please repeat the question?
6 Q. Do you understand that an account with
7 Apple -- I'll say, do you understand that a customer
8 account with Apple is sometimes referred to as an
9 Apple ID or an Apple ID account?
10 A. And this would be for a Apple accountholder as
11 opposed to a payor? You're distinguishing those two
12 things?
13 Q. Correct.
14 A. Okay. Unrelated to person_id_hashed?
15 Q. I'm asking about in everyday parlance when
16 people talk about having an account -- a customer
17 account with Apple, they might use the term "Apple ID"
18 or "Apple ID account."
19      And I'm just asking if you're aware of that
20 terminology.
21 A. I'm aware of and understand that terminology,
22 yes.
23 Q. Okay. And the fields that are listed in this
24 email were the fields in the sample dataset and also
25 the full Apple payor dataset; is that correct?

Page 83

1      MR. BURT: Objection to foundation.
2 Q. (BY MR. LAZARUS) You can answer the question.
3 A. Okay.
4      These look to be the fields. I would have to
5 do an actual compare to the actual to say with
6 100 percent certainty, yes, these represent every field
7 and there's no extras we're missing.
8 Q. Okay. And this email states that, quote,
9 "This sample production," -- I'm looking at -- okay.
10      So bottom of the first page as you're looking
11 at it, "This sample production includes user-generated
12 data that is received by Apple during its ordinary
13 course of business but is not verified by Apple."
14      Do you see that?
15 A. I do.
16      MR. LAZARUS: All right. Can we please
17 mark Tab 4 as the next exhibit?
18      This will be a copy of a letter from me to
19 plaintiffs' counsel. This is a two-page letter printed
20 two sided.
21      (Deposition Exhibit DX 118 was marked.)
22 Q. (BY MR. LAZARUS) Do you recognize this
23 letter?
24 A. I'm not sure I've ever seen this letter.
25 Q. Okay. If you look at in your report

Page 84

1 footnote 2, I believe you are referencing this letter;
2 is that right?
3 A. Okay.
4 Q. Does that indicate that you -- does that
5 refresh your recollection that you have seen this
6 letter?
7 A. Yeah, it -- it is vaguely familiar.
8 Q. Okay.
9 A. Pieces of it are vaguely familiar.
10 Q. On page 2 of this letter, beginning on the
11 third line, it says, "Apple further provides notice
12 that this sample production includes user-generated
13 data that is received by Apple during its ordinary
14 course of business but is not verified by Apple. For
15 example, Apple device users supply data concerning
16 their street addresses, phone numbers and similar
17 information, or users may on occasion omit such data in
18 submissions to Apple, or submit fictitious values. As
19 a result, not all data fields are populated for all
20 payor data records and those that are populated may
21 contain data that is not reliable."
22      Do you see that?
23 A. I do.
24 Q. So did you understand when you began your
25 assignment in this case that these limitations

Page 85

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**Page 86**

1  described in my letter applied to the sample Apple
2  payor data?
3      A.  I did.
4      Q.  And did you understand that these limitations
5  applied to the full Apple payor dataset when you began
6  to analyze it?
7      A.  I did.
8      Q.  And you understood that these limitations
9  applied to the full Apple payor dataset when you
10  finalized your opinions about the data, correct?
11      A.  I'm sorry, please repeat that.
12      Q.  You understood that these limitations
13  described in my letter applied to the full Apple payor
14  dataset when you finalized your opinions about the
15  data?
16      A.  I did.
17      Q.  And you mentioned before that you saw, for
18  example, smiley face emojis in the Apple payor data,
19  correct?
20      A.  I did.
21      Q.  And did you see entries in the Apple payor
22  data that appeared to not be legitimate names and
23  addresses?
24      A.  I did.
25      Q.  Did you see names or addresses that included

**Page 87**

1  profanity?
2      A.  Yes.
3      Q.  For example, addresses that contained the
4  letters F-U-C and K?
5      A.  I don't remember specifically, but profanity
6  in -- existed, yeah.
7      Q.  Okay.  How did you handle entries in the data
8  like that, data that included profanity or otherwise
9  appeared to be not legitimate names and addresses?
10      A.  In situations where I could identify data
11  that -- such as profanity, emojis, I would cleanse or
12  remove the data and then use other available data
13  points to attempt to match and deduplicate the records.
14      Q.  When you say "cleanse the records," does that
15  mean cleanse them to remove the emojis and the
16  profanity?
17      A.  It means, yeah, removing profanity if I could
18  identify it and removing emojis, or in nonstandard
19  ASCII characters, potentially translating them if
20  possible.

**Page 88**

18      Q.  Okay.  Can you -- if we look at your README
19  file, which we have marked as Exhibit --
20          MR. BURT:  113.
21          MR. LAZARUS:  113.  Thank you.
22      Q.  (BY MR. LAZARUS)  Do you have your README
23  file --
24      A.  I do.
25      Q.  -- in front of you?

**Page 89**

1          Does the README file name any file or code
2  that was used for cleaning profanity?
3      A.  I do not know off the top of my head.
4      Q.  Okay.  Why don't we -- we'll put a pin in that
5  and maybe come back to it.
6          Did you see addresses that were illegitimate
7  like in the street1 field values like "your mom" or
8  other things like that?
9      A.  I'm -- I -- I don't recall.  I know there was
10  data -- data -- data issues that -- but in some
11  portion, but I don't recall "your mom."
12      Q.  But when you say, "data issues," are you
13  referring to other values that did not appear to
14  represent legitimate addresses?
15      A.  I believe that is -- is reasonable in some --
16  some small portion, yeah.
17      Q.  Okay.  Did you see instances of famous
18  addresses like The White House in the data?
19      A.  I don't recall off the top of my head.
20      Q.  Okay.  Or another example, Apple's
21  headquarters at 1 Infinite Loop, did you see that
22  address entered into the payor -- Apple payor data
23  here?
24      A.  I do recall a small portion of Apple's address
25  as the address, yeah.

23 (Pages 86 - 89)

1    Q.  And how did you deal with addresses like those
2   that were -- well, let me ask the initial question.
3        Do you believe in your expert opinion that
4   those are legitimate addresses representing the
5   addresses of Apple payors?
6        MR. BURT:  Objection to form.
7    A.  No.  In my opinion, that -- Apple's address as
8   an Apple payor address is not a valid address.
9    Q.  (BY MR. LAZARUS)  And what did you do in your
10  deduplication work with respect to addresses like
11  Apple's headquarters that do not, in your opinion,
12  represent valid addresses for Apple payors?
13   A.  Part of the cleansing analysis I identified
14  that.  I believe I would attempt to remove it and not
15  utilize it as a matching criteria --
16   Q.  Okay.
17   A.  -- at some point.
18   Q.  And looking again at your README file,
19  Exhibit 113, can you point to a file listed there that
20  does the work you just described of removing invalid
21  address entries so that they would not be utilized as
22  matching criteria?
23   A.  Not off the top of my head, no.
24   Q.  Okay.  Would it help if we looked at the
25  individual files?

Page 90

1    A.  It -- yeah, possibly.  If we want to go
2   through all of them and review them, I could -- I could
3   search.
4    Q.  Is there one file, looking at your README
5   file, that you think is more likely to contain the
6   cleaning code that you are thinking of?
7    A.  Not one particular, no.  I -- not at the
8   moment.
9    Q.  Okay.  We talked before about the Blue Cross
10  Blue Shield data and Equifax data.
11       Would I be correct that there appear to be
12  more illegitimate addresses in the Apple payor data
13  ███████████████████████████████████████████████
14  ██████████████████████
15       MR. BURT:  Objection to form.
16  █  ████████████████████████████████████████████
17  ███████████████████████████████████
18  ██████████████████████████████████████████
19  ██████████████████████████████████
20  █  ███████████████████████████
21  ███████████████████████████████████████████████
22  █████████████████████████████████████
23  ██████████████████████████████████████████████
24  █████████████████████████████

Page 91

10   Q.  So returning to your report at paragraph 8, I
11  want to focus on your reference to payors as,
12  "individuals that purchased apps and in-app content on
13  Apple iPhones and iPads."
14       Do you see that language in paragraph 8?
15   A.  I do.
16   Q.  Okay.  What was the basis for your
17  understanding that payors are individuals making
18  purchases on iPhones and iPads and not other devices?
19   A.  I believe that was communicated to me, but
20  I couldn't -- I couldn't confirm who communicated that
21  to me, that defined the class.
22   Q.  Okay.  Are you aware that the payor dataset
23  produced by Apple included information collected from
24  payors who made purchases on iPod Touch devices?
25   A.  Did not.

Page 92

1    Q.  Do you know whether the Apple payor data
2   included entries for consumers who only downloaded free
3   apps and never paid for apps or in-app content?
4    A.  That is not information I would have had.
5    Q.  So you do not know that sitting here today?
6    A.  (Shaking head.)
7    Q.  And for the court reporter --
8    A.  No.
9    Q.  -- say an audible.  Yeah, thank you.
10       Do you know whether the Apple payor data
11  included entries for consumers who paid for
12  transactions using gift cards?
13   A.  I do not.
14   Q.  Okay.  Do you know whether the Apple payor
15  data included entries for consumers who paid for
16  transactions using credit card points?
17   A.  I do not.
18   Q.  Do you know whether the Apple payor data
19  included entries for consumers who only made purchases
20  that were refunded, charged back or reversed?
21   A.  I do not.
22   Q.  In paragraph 9 of your report, you stated
23  that, quote, "Counsel requested that I determine
24  whether there exists a reliable means by which to
25  consolidate duplicative payor records that all relate

Page 93

24 (Pages 90 - 93)

1 to the same person and associate those names to a
2 unique person," correct?
3    A.  That is paragraph 9 of the expert --
4 supplemental expert report?
5    Q.  Yes.
6    A.  Okay.
7    Q.  Okay.  And let's see.
8       And then the next part of paragraph 9 states,
9 "If such a means exists, counsel further requested that
10 I proceed with deduplicating those records and create
11 an anonymized identifier for each unique payor, and
12 then match those payor identifiers to create a primary
13 person ID," correct?
14    A.  That is correct.
15    Q.  Okay.  In that first question in paragraph 9,
16 were plaintiffs' counsel asking you -- I'll rephrase.
17       In that first question in paragraph 9 of your
18 report, is that part of your assignment asking you
19 whether there was a means to fully consolidate
20 duplicative payor records or partially consolidate
21 them?
22       MR. BURT:  Objection.  Form.
23    A.  I -- I don't believe I understand the -- the
24 difference between those statements.
25    Q.  (BY MR. LAZARUS)  So in -- in paragraph 9,

Page 94

1 "Counsel requested that I determine whether there
2 exists a reliable means by which to consolidate
3 duplicative payor records that all relate to the same
4 person."
5       My question is, in this assignment, were you
6 asked to consolidate all records that relate to the
7 same person or, as we were discussing before, those
8 about which you had high confidence or any different
9 metric?
10       MR. BURT:  Objection.  Form.
11    A.  I -- I do not believe there was any
12 conversation about a -- a partial versus complete.  It
13 was a deduplication to the best of my ability based on
14 my experience doing deduplication, which would go back
15 to my applying the methodologies I've used and have
16 confidence in the outcome of.
17    Q.  (BY MR. LAZARUS)  But you did not conclude
18 that there was a means to fully deduplicate all records
19 in the payor data, did you?
20       MR. BURT:  Objection.  Form.
21    Q.  (BY MR. LAZARUS)  And let me -- well, I'll
22 refer you to paragraph 15 of your report that states
23 that you, quote, "determined and communicated to
24 plaintiffs' counsel that JND could reliably reduce
25 duplication in the Apple data," correct?

Page 95

1    A.  Yes, that is what it says.
2    Q.  And that is reduce but not eliminate, correct?
3    A.  I don't -- I don't believe it references a --
4 a -- to degree reduced to zero would be eliminate.  So
5 I don't believe it's referenced there.
6    Q.  Okay.  And as you understood your assignment,
7 was that assignment asking you to reduce duplication to
8 zero or reduce duplication to some other level?
9    A.  As I understood my assignment, it was to
10 reduce duplication to the best of my ability where I
11 had confidence that I had matched records that were of
12 the same entity.  I -- I cannot point to -- well,
13 that's -- that's it.
14    Q.  And your report states at paragraph 10 that,
15 quote, "JND determined that the Apple payor data could
16 be reliably deduplicated to remove the vast majority of
17 duplicate entities," correct?
18    A.  That is correct.
19    Q.  Okay.  And that's -- you're stating there that
20 you could deduplicate to remove the vast majority of
21 duplicate entities but not all duplicate entities,
22 correct?
23    A.  I cannot rule out the possibility that
24 additional -- that records as this that are of the same
25 entity that did not have adequate information for me to

Page 96

1 reliably determine they're the same.
2    Q.  How do you know you -- or do you know that you
3 did not fully deduplicate the data?
4    A.  Can you restate that?  I think that's a double
5 negative.
6    Q.  Yes, there's -- yeah, a lot of "not's" in
7 there.
8       My question is, you refer to having identified
9 that there -- you communicated to plaintiffs' counsel
10 that JND could reliably reduce duplication in the Apple
11 data.  And then you state that, "JND determined that
12 the Apple payor data could be reliably deduplicated to
13 remove the vast majority of duplicate entities."
14       And my question is whether you are certain
15 that you removed the vast majority of duplicate
16 entities but not all?
17    A.  I have high confidence that I -- that a vast
18 majority of duplicates were removed. ███████████
19 ████████████████████████  my experience is that is an
20 exceptional deduplication effort.
21       I -- I cannot rule out the possibility that
22 additional -- or that records exist that are the same
23 entity still in the data.
24       THE VIDEOGRAPHER:  Counsel, I'm so sorry
25 to interrupt, but we lost the remote people.  Do you

Page 97

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 want to go off the record or not?
2         THE WITNESS: And it's noon.
3         MR. LAZARUS: It is noon. Sure, why
4 don't we go off the record. Thank you.
5         THE VIDEOGRAPHER: We are going off the
6 record at 12:01.
7         (Deposition recessed at 12:01 p.m. to be
8         reconvened at 12:45 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 98

1 hypothetical.
2     Q. (BY MR. LAZARUS) If -- if in your analysis in
3 this case you did not eliminate 100 percent of the
4 duplication in the Apple payor data, why is that?
5     A. Records would not be matched and deduplicated
6 if they did not have the data points available to match
7 records together to a level that I had confidence that
8 they could be considered the same record.
9     Q. To a level that you would have confidence?
10    A. That is correct.
11    Q. Okay. And how did you determine whether you
12 had sufficient confidence or not?
13        MR. BURT: Objection. Form.
14    Q. (BY MR. LAZARUS) I'll rephrase again.
15        How did you determine whether you had
16 sufficient confidence in deduplicating particular
17 records or not?
18        MR. BURT: Objection. Form.
19    A. So I -- in evaluating the data and determining
20 what data was available, I -- I build -- built a set of
21 deduplication scripts that I -- that align with
22 deduplication methodologies I've used for -- for years,
23 if not decades.
24        And in applying those and utilizing them over
25 this time, in my experience, I have assembled an
                                                    Page 100

1         AFTERNOON SESSION
2             12:49 P.M.
3             --oOo--
4
5         THE VIDEOGRAPHER: We are back on the
6 record. The time is 12:49. Please proceed.
7         EXAMINATION RESUMED
8 BY MR. LAZARUS:
9     Q. All right. Before we went off the record,
10 I was inarticulately trying to ask a question with a
11 bunch of double negatives. So I will try that again.
12        In your analysis of the Apple payor data, is
13 it possible that you eliminated 100 percent of the
14 duplication?
15    A. I can't rule it out.
16    Q. Okay. How likely do you think it is that you
17 eliminated 100 percent of the duplication?
18    A. I -- I don't know how to quantify -- quantify
19 that. I -- I -- yeah, I don't know how to quantify
20 that.
21    Q. Okay. Have you tried to quantify it at all?
22    A. I have not.
23    Q. And why -- if you didn't deduplicate
24 100 percent, why not?
25        MR. BURT: Objection. Form. Incomplete
                                                    Page 99

1 understanding of the outcomes and -- and based on
2 adequate matching points, have built a experience --
3 confidence in various data matches.
4     Q. (BY MR. LAZARUS) And I'll point to
5 paragraph 17F of your report where you refer to an
6 iterative process that you repeat until, in your words,
7 "the marginal returns are outweighed by the time and
8 effort required to continue."
9         In that language, when you say, "marginal
10 returns," does that refer to additional duplicates that
11 could be potentially identified with additional
12 iterations of your process?
13    A. I think you're going to have to re- -- restate
14 that, please.
15    Q. Yeah.
16        So you refer in paragraph 17F to marginal
17 returns.
18        And I'll just ask, what do marginal returns --
19 what does "marginal returns" mean there?
20    A. Okay. I understand the question.
21        So if -- in -- in analyzing records that still
22 are identified as unique or primary, and I'm not able
23 to find ways to code and generate a match based on the
24 data available, that then I -- then that is a time
25 where I -- I determine that I have -- I have
                                                    Page 101

26 (Pages 98 - 101)

1 effectively matched as -- as many as I can identify
2 with -- with the information available.
3     Q. But the 17F language refers to the marginal
4 returns being outweighed by the time and effort
5 required to continue.
6     Does that mean that if you took the time and
7 effort to run additional iterations of your method, you
8 might identify additional matches, but so few that it
9 would be outweighed by spending any additional time and
10 effort; is that right?
11    A. I -- I can't rule out that, you know,
12 additional -- you know, unlimited time and unlimited
13 money could -- could result in some additional
14 matching.
15    Q. But that's what marginal returns refers to,
16 right?
17    A. Yeah.
18    Q. The returns is additional matches, right?
19    A. The -- the -- yeah, marginal returns would be,
20 in this context, additional matches.
21    Q. Okay. And the point you refer to when the
22 marginal costs are outweighed by the time and effort
23 required to continue, that means the point when you
24 determined that the additional duplicates you might be
25 able to find would not be worth the time and effort

Page 102

1 required to identify them, correct?
2     A. Actually, can you -- can you re- -- restate
3 that question because I think you missed -- misused a
4 word.
5     Q. Okay.
6     A. I believe you said "marginal cost."
7     Q. I'm sorry. Well, and I have it -- I have it
8 written down as marginal cost, too. But thank you for
9 catching that.
10    The point you refer to when the marginal
11 returns are outweighed by the time and effort required
12 to continue, that means the point when you determine
13 that the additional duplicates you might be able to
14 find would not be worth the time and effort required to
15 identify them; is that correct?
16    A. That is correct.
17    Q. And how did you estimate the marginal returns?
18    MR. BURT: Objection. Form.
19    A. I was -- I don't believe there's an estimation
20 of marginal returns. I believe it is more accurate to
21 say I was not finding additional matches that I could
22 effectuate in a -- in a both coded and confident
23 manner, which is the -- the point we try to determine
24 my returns here for the effort I'm putting in, I'm
25 not -- I'm not finding additional things that I could

Page 103

1 match.
2     Q. And did you -- are you saying that you did --
3 you got the marginal returns down to zero?
4     A. I -- I'm saying that I -- I did not see things
5 I could match but decided not to. I -- it required
6 additional work for me to find add- -- additional
7 possible matches.
8     Q. Okay. And that's based on your -- your
9 experience that you've described in your work in legal
10 administration, claims administration?
11    A. Correct. And my -- and my years of experience
12 performing data match and data duplication --
13 deduplication, that's correct.
14    Q. So since we're talking about marginal returns
15 that could be generated if additional time and effort
16 was spent, am I right, to take this to the extreme, it
17 would be possible to identify additional matches by
18 examining every single possible match, but you would
19 say the benefit of doing that would be outweighed by
20 the amount of time and effort it would require to do
21 that; is that right?
22    MR. BURT: Objection to form.
23    A. I'm sorry, please restate because I think a
24 piece of that is -- I have -- I have a question about
25 how you framed it. So please restate.

Page 104

1     Q. (BY MR. LAZARUS) Okay. So I guess to take a
2 step back.
3     You referred to marginal returns being
4 outweighed by time and effort required to identify any
5 additional matches?
6     A. That is correct.
7     Q. Excuse me.
8     And I'm trying to understand -- I think what I
9 have heard you say is that it would -- in order to find
10 additional matches, it would require -- and to back up.
11    In order to identify additional potential
12 matches, it would require the expenditure of more time
13 and more effort than you thought in your judgment
14 worthwhile in the analysis; is that correct?
15    A. I -- I was -- yeah, I was no longer seeing a
16 benefit and additional matches from the work
17 continuing, so I stopped.
18    Q. But would you agree that -- that you did not
19 examine every possible match, you personally sitting
20 down and examining every possible match?
21    A. If you're asking if I looked at all
22 1.7 billion records individually and tried to match
23 them individually, I did not do that.
24    Q. And why not?
25    A. It would have been ineffective and time

Page 105

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 consuming beyond measure.
2    Q.  But if the time were available to examine
3 every single possible match, do you agree that an
4 individualized analysis of every possible match could
5 yield additional matches?
6    A.  I can't rule it out.
7    Q.  Okay.  All right.  Let's go back to your
8 report at paragraph 10.  You know what?  Well, hold on,
9 let me see.  Let's see.
10       So you ran your iterative process for
11 deduplication, right?
12    A.  That is correct.
13    Q.  And at some point you determined that the
14 marginal returns in matches from continuing to iterate
15 were so low that they were outweighed by the additional
16 time and effort required to continue iterating?
17       MR. BURT:  Objection to form.  Asked and
18 answered.
19    A.  I did.
20    Q.  (BY MR. LAZARUS)  And I understand you say
21 that your experience has informed your decision on when
22 to stop iterating that process.
23       Can you describe the criteria that you used to
24 make that decision?
25    A.  To make the decision that the marginal return

Page 106

1 was no longer justifying the -- the means, so to
2 speak -- or --
3    Q.  Right.
4    A.  Okay.
5       So as I -- as I recall, I reached a point of
6 deduplication and analysis where I could no longer
7 apply either cleansing or additional deduplication
8 rules which would either produce a match result in one
9 of the rules that I had already built or, with a new
10 rule, that I would have high confidence that the
11 records that matched were, in fact, the same entity.
12    Q.  Okay.  And if I'm understanding right, that --
13 does that mean that at the end -- the last round of
14 iteration that you did run, you got zero matches?
15       MR. BURT:  Objection.  Form.
16 Foundation.
17    Q.  (BY MR. LAZARUS)  And I'll say my question is,
18 that sounds different from marginal returns being
19 outweighed, you know, marginal returns being low enough
20 that outweighed by the additional time and effort,
21 versus marginal returns got down to zero, the last
22 iteration produced zero matches and, therefore, you
23 stopped.
24       Do you understand the difference that I'm
25 asking about?

Page 107

1    A.  I do.
2    Q.  And which one accurately describes your
3 approach, your method on -- on determining when to stop
4 iterating on your method?
5    A.  I do not believe they're mutually exclusive.
6    Q.  Okay.  Can you explain more?
7    A.  So the last iteration run produced a result.
8 Additional analysis to determine if additional
9 iterations would benefit I didn't identify, I'll say,
10 meaningful results to justify continuing.
11    Q.  How do you determine whether the next round
12 iteration would yield results before you've run it, if
13 that makes sense?
14    A.  The analysis of the data is the determination
15 of whether there is something there to -- to either
16 cleanse or apply new rules to that -- so that's --
17 that's how you determine whether there's something
18 there to -- to actually iterate on.
19    Q.  So the -- the last iteration produced some
20 level of matching --
21    A.  Uh-huh.
22    Q.  -- some number of matches?
23    A.  Uh-huh.
24    Q.  And you did analysis and determined that the
25 next round of iteration, which you did not run, likely

Page 108

1 would -- would not produce matches or would produce
2 very few; is that right?
3       MR. BURT:  Objection.  Form.
4    A.  Give me a second.
5    Q.  (BY MR. LAZARUS)  No problem.
6    A.  I -- I -- as I recall, I do -- reached a point
7 where I was not identifying any matches that I could
8 apply a -- a process to deduplicate further.
9    Q.  Okay.  Are you aware of any literature or
10 studies that support the decision-making process that
11 you've just described?
12    A.  I am not.
13    Q.  And your algorithm for deduplication groups
14 records if they match exactly on some combination of
15 the cleaned variables in the payor data; is that
16 correct?
17    A.  That is correct.
18    Q.  Why did you use that approach?
19    A.  Why did I use the approach of matching on the
20 data available to determine if somebody's the same
21 person?
22    Q.  Let's start there.
23    A.  That is -- the information in the data is what
24 I had available to define what each individual, you
25 know, data points were, their contact information.  And

Page 109

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 so in -- as far as data based contact information goes,
2 those are the data points that define an individual.
3    Q. And in many -- you describe tiers of your
4 matching process, correct?
5    A. Could you point out to where I did?
6    Q. I believe in your report you refer to tiers of
7 matching.
8      But you agree, sitting here today, that you
9 used different tiers of matching in your process; is
10 that right?
11    A. I did use different tiers in my deduplication
12 matching process, yes.
13    Q. Okay. And in many tiers, you include address
14 as part of the match, correct?
15    A. I do.
16    Q. Are you aware of literature, studies or
17 publications that suggest that using -- that suggest
18 using exact address matching?
19    A. Can -- can you restate it?
20    Q. Sure.
21      So are you aware of literature, studies or
22 publications that suggest or recommend using exact
23 address matching for deduplication purposes?
24    A. No.
25    Q. Are you aware of other methods commonly used

*Page 110*

1    Q. So I think I'm trying to focus in on exact
2 matching --
3    A. Okay.
4    Q. -- of cleaned address.
5    A. Okay.
6    Q. Are there other -- are you aware of other ways
7 to, as part of a deduplication process, use address
8 data other than exact matching of --
9    A. Yes.
10    Q. -- a cleaned address? Okay.
11      What -- what other methods are you familiar
12 with?
13    A. I am familiar with processes of using, as an
14 example, a -- an address combined with city and state
15 and not using postal code because postal code sometimes
16 can -- can be inaccurate, or using address along with
17 postal code and not city and state. And to -- because
18 sometimes the postal code is more accurate than the --
19 than the city.
20    Q. Are you aware of any publication criticizing
21 as outdated or unreliable processes of deduplication
22 that rely on coding by hand depending on the results of
23 the previous step -- previous step?
24      MR. BURT: Objection. Form.
25    A. Coding by hand?

*Page 112*

1 to deduplicate and/or determine association between
2 records that include address?
3    A. To -- to clarify, you said, "other methods."
4 Address by itself is not a method of matching
5 individuals to -- so I want to make sure that that's
6 not what you're suggesting when you say "other
7 methods."
8    Q. What I'm suggesting is, your -- your method
9 uses, as we just discussed, as one part of your method,
10 you use exact matching between the cleaned addresses of
11 different entries.
12    A. Addresses utilized as a -- as a one piece in a
13 collection of data points and matching, yes, I agree
14 with that.
15    Q. And so as opposed to using exact matching of
16 cleaned address values, are you aware of other methods
17 commonly used in deduplication that involves address
18 matching?
19    A. I was with you until your last word.
20    Q. Okay.
21    A. Because you ended with "in address matching,"
22 and I don't believe that's what your intent was.
23 Because you're saying what -- what I believe your
24 question was, what else other than address do you use
25 in address matching?

*Page 111*

1    Q. (BY MR. LAZARUS) Coding by hand.
2    A. Versus?
3    Q. Any alternatives you can think of.
4      MR. BURT: Objection. Form.
5    A. I am not aware of any publications like that.
6    Q. (BY MR. LAZARUS) Okay. Are you aware of the
7 concept of geocoding in address matching?
8    A. I am aware of the concept.
9    Q. Okay. And what is that?
10    A. It is -- from -- from my memory, I believe
11 geocoding is a method of assigning essentially a
12 coordinate to a location.
13    Q. Okay. And you did not use that concept in
14 your analysis in this case, correct?
15    A. No, I did not.
16    Q. Okay. Why not?
17    A. It -- it is not a method or practice that I
18 have commonly used. I have used geocoding infrequently
19 and didn't find it to be overly valuable.
20    Q. Okay. When -- when have you used geocoding?
21 Do you remember particular instances when you did?
22    A. Not specifics. I have used geocoding on a
23 number, and I cannot give you a specific number, a
24 number of administrations in order to apply geocoding
25 to -- to addresses.

*Page 113*

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1  Q. Okay. Do you remember when the last time you
2  used it was?
3  A. I do not.
4  Q. Ballpark?
5  A. I -- no, I do not.
6  Q. Okay. Are you aware of using distance metrics
7  such as the Levenshtein or Hamming distance to
8  determine whether names or addresses match?
9  A. No.
10  Q. Are you aware of the concept of thresholding
11  to determine matches by using distance metrics in
12  address matching?
13  A. No.
14  Q. Are you aware of the concept of a longest
15  common subsequence in address matching?
16  A. No.
17  Q. Are you aware of the concept of an N-gram in
18  address matching?
19  A. No.
20  Q. Are you aware of the concept of user defined
21  parameters in address matching?
22  A. Can you provide clarity on what you mean by
23  "user defined parameters"?
24  Q. I think let's -- let's move on.
25  Oh, are you aware of the concept of SOUNDEX

Page 114

1  what SOUNDEX properties are?
2  A. I believe it's a -- a -- essentially, phonetic
3  matching.
4  Q. Are you aware of the concept of predictive
5  modeling such as logistic regression in address
6  matching?
7  A. No.
8  Q. I did want to -- so on paragraph 9 of your
9  report, it states that if a reliable means for
10  deduplication exists, I'm paraphrasing there, quote,
11  "Counsel further requested that I proceed with
12  deduplicating those records and create an anonymized
13  identifier for each unique payor, and then match those
14  payor identities to create a primary person ID."
15  I'd like to suggest one thing that might be a
16  typographical error there.

Page 116

1  properties in addressing matching -- in address
2  matching?
3  A. What is that? Repeat that.
4  Q. SOUNDEX properties?
5  A. In address matching? No, not in address
6  matching.
7  Q. Are you familiar with SOUNDEX properties in
8  other contexts?
9  A. Aware of them, yes.
10  Q. What's your understanding of what SOUNDEX
11  properties are?
12  A. My understanding would be a -- I believe I've
13  experienced it with regards to more in the -- I'm
14  trying to think of a situation where it's actually --
15  I've actually been involved in it. I don't know that
16  I can --
17  Q. Well --
18  A. Yeah, I don't --
19  MR. BURT: Let the witness finish.
20  THE WITNESS: Huh?
21  MR. BURT: Let the witness finish.
22  A. I can't think of a context or a situation
23  where I've been involved with it.
24  Q. (BY MR. LAZARUS) Whether or not you've been
25  involved with it, do you have a -- an understanding of

Page 115

22  Q. Okay. Okay. Your report states that in
23  formulating your opinions in this case, you relied on
24  well-accepted methods of consolidating contact data in
25  the claims administration field including proprietary

Page 117

30 (Pages 114 - 117)

1 methods that JND has developed over the past nine
2 years, correct?
3    A. What section?
4    Q. Let's see.
5       Paragraph 10. Thank you.
6    A. Okay.
7    Q. You see the language that I'm referring to in
8 paragraph 10?
9    A. I do.
10   Q. All right. And the methods that you are
11 describing in paragraph 10, they attempt to clean,
12 deduplicate and match records, correct?
13   A. Cleanse and deduplication, yes.
14   Q. Outside of claims administration, are you
15 aware of any other fields that have developed methods
16 to clean and deduplicate records in a dataset?
17   A. I am not -- I've personally not worked in
18 other fields that -- other than health care claims
19 administration where we did clean and match data. So
20 I -- I can't speak to fields I've not -- not worked in
21 or with.
22   Q. And you're not aware of other fields that
23 do -- that have developed methods to clean and
24 deduplicate data?
25       MR. BURT: Objection. Asked and

Page 118

1 outcome is essentially the same.
2    Q. Okay. And in the process that you undertook
3 in this case, were there any different steps that you
4 took to identify unique individuals different from the
5 deduplicating records or are those essentially the same
6 effort?
7    A. The effort of deduplication's goal essentially
8 is to produce a list of unique individuals.
9    Q. In addition to the Apple payor data in this
10 case, you used a National Change of Address search in
11 your analysis in this case, correct?
12   A. I ran a subset of the data through the
13 National Change of Address, a process in order to get
14 updated current addresses for a portion of the
15 population, correct.
16   Q. And that was through Melissa Data, if I -- is
17 that the right name of the vendor?
18   A. That is correct.
19   Q. Okay. And other than your -- other than the
20 Apple payor data itself, the data or results that you
21 received from Melissa Data and your own JND methods,
22 did you rely on anything else in reaching your opinions
23 in this case?
24   A. Other than my experience and the data
25 available?

Page 120

1 answered.
2    A. No.
3    Q. (BY MR. LAZARUS) Would you be surprised to
4 learn that other disciplines use data cleaning?
5    A. It -- I -- I'm not sure if you're asking my
6 emotional response -- response to the statement. But
7 I -- I -- I would expect other industries to utilize
8 these process -- or similar processes and methodologies
9 based on how much data exists in the world today.
10   Q. And is that true for both cleansing data and
11 deduplicating data?
12   A. Cleansing data, yes. Matching data, yes.
13 Deduplication may be a -- a function of the various
14 industries.
15   Q. Okay. Maybe related to that point that you
16 were just making, is identifying unique individuals
17 distinct from deduplicating records?
18   A. Can -- can you repeat that question?
19 I thought there was something --
20   Q. Sure.
21   A. -- something didn't make sense to me.
22   Q. Is identifying unique individuals distinct
23 from deduplicating records?
24   A. I'm trying to determine what the outcome of --
25 of -- of both efforts are in my head. I believe the

Page 119

1    Q. That's correct.
2    A. No, that's what I relied on.
3    Q. Okay.
4    A. And I believe that's complete.
5    Q. There was no other external data source that
6 was used other than the Melissa Data data?
7    A. No, due to the limitations of the protection
8 orders of very limited what could be done with the
9 data.
10   Q. Would additional data have been helpful in
11 conducting this analysis?
12       MR. BURT: Objection. Form.
13   Q. (BY MR. LAZARUS) Would additional data have
14 been helpful in your deduplication effort in this case?
15       MR. BURT: Objection. Form.
16   A. It is possible.
17   Q. (BY MR. LAZARUS) Is there any particular data
18 that you think of that would have been helpful?
19   A. It is possible that running a subset of the
20 data through a -- one of the big three credit bureaus
21 for advanced address search could have produced
22 additional updated addresses that would have benefitted
23 the matching.
24   Q. Did you request the ability to do that
25 additional running of data through one of the big

Page 121

31 (Pages 118 - 121)

1 credit bureau's data?
2    A. It was -- I believe there was discussion, but
3 due to the aggressive nature of the protective order
4 surrounding the Apple data, it was -- I don't believe
5 that running this -- that there was much appetite
6 for -- for sending the data out to a second vendor for
7 that additional search.
8    Q. Okay. Did plaintiffs' counsel provide any
9 assumptions that you relied on in forming your
10 opinions?
11    A. Did plaintiffs' counsel -- I'm going to repeat
12 your question to make sure I understand.
13       Did plaintiffs' counsel provide any
14 assumptions that I used to form my conclusion, was that
15 your question?
16    Q. Yes.
17    A. Not that I can think of.
18    Q. Other than asking you the questions that
19 formed your assignment, did counsel give you
20 instructions on how you should conduct your analysis?
21       MR. BURT: Objection. Form.
22    A. Not -- not that I can think of. Counsel are
23 not versed in data deduplication.
24    Q. (BY MR. LAZARUS) Did plaintiffs' counsel
25 advise you to be aggressive or conservative in

Page 122

1 came up over dinner.
2    Q. Okay. And if it came up over dinner -- well,
3 I'll withdraw that.
4       You don't have a memory of it coming up over
5 dinner?
6    A. I do not.
7    Q. Okay. And you're not remembering any other
8 conversations at dinner or otherwise about your work in
9 this case?
10    A. Outside of counsel or JND staff?
11    Q. Outside of counsel or JND staff.
12    A. I -- not that I can think of.
13    Q. Okay. Are you familiar with someone named
14 Minjae Song?
15    A. I -- I am.
16    Q. Okay. Who is that?
17    A. I believe that he works for Brattle.
18    Q. And have you discussed with him your work in
19 this case?
20    A. I was on a conference call with Minjae prior
21 to work starting. So I don't believe I've ever -- I
22 don't recall talking to him since this work commenced.
23    Q. Okay.
24    A. So I don't think I could talk to him about the
25 work occurring, at least that I recall.

Page 124

1 assigning matches?
2    A. They were -- they provided neither direction
3 on either of those things.
4    Q. Okay. Did they identify a target number for
5 your end result of identified unique payors?
6    A. They did not.
7    Q. Did they identify a range of numbers to target
8 for the end result?
9    A. They did not.
10    Q. Okay.
11       MR. BURT: I should object to the form
12 of those questions to the extent that they go beyond
13 what he relied on. But I let him answer.
14    Q. (BY MR. LAZARUS) Before submitting your
15 report, did you know whether any of plaintiffs' other
16 experts intended to rely on your opinions?
17    A. No. I'm -- was, and for the most part, still
18 unaware of any other experts that exist.
19    Q. Okay. Experts that exist in this case, is
20 that --
21    A. That's correct.
22    Q. Other than staff at JND and plaintiffs'
23 counsel, did you discuss the opinions in your report
24 with anyone else?
25    A. Not that I can think of. I don't know if it

Page 123

1    Q. Okay. Did -- did Dr. Song say anything in
2 that conversation that you relied upon in doing the
3 work on your assignment in this case?
4    A. Not that I recall.



11    Q. Okay. How many times did you cleanse and
12 deduplicate?
13    A. I -- many.
14    Q. Okay. But you don't know an exact number?
15    A. I do not know an exact number.
16    Q. Is an exact number recorded in your materials
17 that you've produced to Apple's consultants?
18    A. No.
19       MR. BURT: Objection. Form.
20    Q. (BY MR. LAZARUS) All right. Looking back at
21 the -- at Tab 10B -- sorry. That's -- let's -- what's
22 our exhibit number? 116. Thank you. Exhibit 116.
23    This is your August 1st, 2024, declaration.
24    A. Yep.
25    Q. Do you see at paragraph 7D, you state, "I do

Page 125

32 (Pages 122 - 125)

**Page 126**

1  not know how to mechanically duplicate the skill of
2  recognizing how successful each iteration has been at
3  resolving issues with incomplete personally identifying
4  data.  JND has developed unique expertise to do so over
5  the course of many years and many engagements."
6        Do you see that?
7     A.  I do.
8     Q.  How many people outside of JND have the skill
9  and expertise that you refer to in that paragraph 7D,
10  to the extent you know?
11     A.  I -- I can't imagine a way I would know that.
12     Q.  Okay.  All right.  Will you get -- so the next
13  one I want to refer to is your README file, which has
14  already been marked as Exhibit 113.
15        The purpose of that README file was to explain
16  the order in which code files should be run to produce
17  the final output from your analysis with sufficient
18  information to allow Apple's expert to replicate JND's
19  analysis with no changes to the code other than updates
20  to file paths; is that right?
21     A.  I'm unclear where that -- you determined that
22  was the -- what I -- my marching order for producing
23  this.
24     Q.  Okay.  I -- I can represent to you that that
25  is the request that our team made for the README file.

**Page 128**

7     Q.  Okay.  Can you confirm -- actually, let me
8  take that back.
9        MR. LAZARUS:  Okay.  It's been another
10  hour.  I think it might be good to take a break.  So
11  why don't we go off the record.
12        THE VIDEOGRAPHER:  We are going off the
13  record at 1:48.
14        (Break from 1:48 p.m. to 2:06 p.m.)
15        THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 2:06.  Please proceed.
17        MR. LAZARUS:  Thank you.
18     Q.  (BY MR. LAZARUS)  Okay.  Now I want to ask a
19  series of questions looking at paragraph 17 of your
20  report.  And also looking at the README file which
21  is --
22        MR. BURT:  113.
23        MR. LAZARUS:  113.  Thank you.
24     Q.  (BY MR. LAZARUS)  So let me know when you have
25  paragraph 17.

**Page 127**

1     A.  Okay.
2     Q.  Is that consistent with your goal in creating
3  the README file?
4     A.  My goal in producing the README file was, to
5  the best of my ability and limited time, provide the --
6  the approximate order of running the -- the files that
7  I used to produce results in order for a third party to
8  try to replicate the effort and come up with similar
9  outcomes, recognizing that the code I provided was not
10  a deliverable of this effort and, therefore, is not a
11  situation where you would not have to change any code
12  in order to achieve the goal.
13     Q.  The README file lists dot SQL scripts,
14  correct?
15     A.  That is correct.
16     Q.  Besides SQL, which I'm -- I understand would
17  be spelled S-Q-L?
18     A.  Of course.
19     Q.  Did you use any other software or computer
20  programs for your work in this case?
21     A.  The NCOA process.

**Page 129**

21     A.  Yes, I do.
22

33 (Pages 126 - 129)



Page 130 (left column):

```
1  [REDACTED]
```

21  Q. Okay. And your report refers to tiers and
22  rounds.
23      Can you say what you mean by "tiers" and
24  "rounds"?
25      A. Can you point out to me where I refer to

Page 130

Page 132 (right column):

1  your deduplication algorithm, can you identify the
2  scripts listed in your README file that correspond to
3  that round?
4          MR. BURT: I'm sorry. Did you mean F?
5          MR. LAZARUS: I believe I mean E. Yeah,
6  I mean -- I mean in paragraph 17E where there is a
7  description of the top tier and then in 17F, yes, it
8  refers to the first round. So thank you.
9      Q. (BY MR. LAZARUS) Paragraph 17E and F.
10         In your README file, can you point to the
11  files that correspond to the first round of
12  deduplication?

[REDACTED]

18  Q. Okay. All right. In paragraph 17A of your
19  report, you state that you, quote, "evaluated the
20  entire dataset to determine what data quality issues
21  exist."
22         Do you see that?
23  A. I do.
24  Q. What data quality issues did you identify?
25         MR. BURT: Object to form.

Page 132

Page 131 (left column):

1  "tiers" and I refer to "rounds"?
2  Q. I will in just a moment.
3      Do you -- 17E.
4  A. Okay. I see "tiers" in E. I don't see
5  "rounds." Where do I refer to "rounds"?
6  Q. In F, 17F.
7  A. Okay. All right.
8  Q. What do you mean by "tiers" and "rounds"?
9  A. In this context, I referred to tiers as the --
10  the tiers of the deduplication matching logic within
11  the various deduplication algorithms that, based on the
12  hierarchy of the -- of the tier within the overall
13  file, I apply to have a -- a confidence level in the
14  matching based on the data points utilized for each
15  tier.
16         With regards to round, I -- that is the
17  iterative process of applying and then making changes
18  and applying and making changes as necessary to improve
19  and enhance and evolve the -- the matching.
20  Q. Okay. So within a round, am I correct that
21  you would apply various tiers of your process; is that
22  right?
23  A. That is a fair characterization, yes.
24  Q. Okay. And can you identify what is described
25  in paragraph 17E of your report as the first round of

Page 131

Page 133 (right column):

1  A. I don't remember a list off the top of my
2  head. In -- I -- I can give you some examples. There
3  were records that had missing fields, missing address
4  or a missing name or states that weren't a US state as
5  a value.
6         But overall, as I recall, this was a -- a
7  small subset of the overall data.
8  Q. (BY MR. LAZARUS) Okay. And did you analyze
9  the frequency of missing values for each variable?
10  A. At the time I did.
11  Q. Okay. And did you review the most common
12  values for each variable to determine whether they were
13  plausible?
14  A. I did.
15  Q. And what did you -- how many of the most
16  common values did you review, like, the top ten or --
17  in terms of the most common values, which ones did you
18  review?
19  A. For each data point how many did I review?
20  Q. Right. For each variable.
21  A. Okay.
22  [REDACTED]

Page 133

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127



10    Q. And did you determine that action was required
11 based on common values in the data?
12    A. There were -- there were some scenarios where
13 action was required.
14    Q. What action did you take?



21    Q. Okay. And is that exclusion of a value for
22 matching purposes recorded in code?
23    A. So the -- it's not a -- well, yes.
24    Q. Where is that recorded?
25    A. So if a field is blank, it would be excluded

1 I have no way to know based on a hashed value that it
2 wasn't already there.
3    Q. Okay. Did you ask that question of anyone?
4    A. I did not.
5    Q. And if you look back at the email from my
6 colleague Ramona, which is Exhibit 117.
7    A. Yep.
8    Q. There is a list of 16 phone numbers hashed
9 that are included in that email, correct?
10    A. It looks like about 16, yeah.
11    Q. And am I correct that you replaced those phone
12 numbers with missing values?
13    A. I replaced these hashed values with blanks in
14 the sample data for these particular values.
15    Q. Okay. Did you also do so in the full dataset?
16    A. With a different set of hashed values because
17 these weren't -- were not consistently carried over to
18 the full dataset. But, yes, I followed a similar
19 process.
20    Q. Did you investigate whether there were any
21 other values for phone_number_hashed that appeared very
22 frequently and, therefore, could be not legitimate
23 phone numbers?
24    A. I did.
25    Q. Okay. And what did you find in that



20    Q. Okay. When you matched on a phone number and
21 the field is phone_number_hashed, did you include the
22 area code in that matching?
23    A. I did not. But I -- I do not know that I had
24 clarity whether the area code was included in the
25 hashed value and also provided separately, therefore,

1 from matching.
2    A. I don't recall specifically. I believe there
3 were some -- some additional phone numbers that the --
4 the volumes seemed unduly high. But because I had no
5 visibility into the actual phone number since I had a
6 hashed value, it was difficult to make a determination.
7    Q. So you did not then replace those phone
8 numbers that you identified with blank values?
9    A. I don't recall if I -- I added to the list of
10 approximately 16 off the top of my head.
11    Q. Okay. And do you think it is plausible that a
12 single phone number, including area code, would be
13 associated with over 1,000 unique payors?
14        MR. BURT: Objection. Form.
15 Foundation.
16    Q. (BY MR. LAZARUS) You can answer.
17    A. Okay. Please -- please repeat, then.
18    Q. Do you think it is plausible that a single
19 phone number, including area code, would be associated
20 with over 1,000 unique payors?
21    A. It seems unlikely. I certainly couldn't rule
22 it out.
23    Q. Okay. What if it was more than 100,000 unique
24 payors?
25    A. It seems unlikely. Again, I cannot rule it

**Page 138**

1 out.
2    Q. Okay. The hash_hashed field represents
3 payment -- payment method information, correct?
4    A. My understanding of the hash_hashed was a
5 hashed of the last four digits of the payor's credit
6 card number for that -- for that record is what I
7 understood it to be.
8    Q. Did you investigate whether there were any --
9 well, let me scratch that.
10    Okay. Let's look at paragraph 10 of your
11 report.
12    In paragraph 10 you write about, quote,
13 "well-accepted methods of consolidating contact data in
14 the claims administration field, including proprietary
15 methods that JND has developed over the past nine
16 years," correct?
17    A. That is correct.
18    Q. All right. When you describe your methods as
19 "well accepted," who specifically are you claiming to
20 have accepted these methods?
21    A. Well, these are methods that have evolved over
22 the last 14 years of me working in the legal claims
23 administration industry across two of the largest legal
24 claims administration organizations that have existed,
25 and utilized against thousands of, you know,

**Page 139**

1 administration services and datasets without, you know,
2 having situations where these were not found to produce
3 valid and useful results.
4    So I would say, myself, for extensive
5 experience doing this and working with, you know,
6 individuals in the industry that -- that work at
7 companies I work with, or work at.
8    Q. Have any of those well-accepted methods that
9 you describe been published in any publications,
10 periodicals, journals, to your knowledge?
11    A. No. As stated, we've -- we feel that the --
12 the methods that we utilize are -- are proprietary and
13 a competitive advantage for our organization. And I
14 can't see a situation where we would -- would publish
15 those.
16    Q. And you write also in paragraph 10 of your
17 report that you applied your deduplication methods to,
18 quote, "a random sample of approximately 13 million
19 payor records."
20    Do you see that?
21    A. I do.
22    Q. Did you make any changes to your methods after
23 you applied them to this sample and before you applied
24 them to the full payor dataset?
25    MR. BURT: Objection. Form.

**Page 140**

1    A. Let me reread the sentence, please.
2    Got it. Yes.
3    Q. (BY MR. LAZARUS) What changes did you make?
4    A. I added multiple tiers to the deduplication
5 logic. I added additional data cleansing because the
6 full dataset represented additional, you know,
7 opportunities for both cleansing and deduplication
8 based on shear volume.
9    Q. Okay. In paragraph 17E, you write that, "Each
10 tier of the deduplication algorithm utilizes different
11 available data points in combination, or alone, to
12 produce a match, and each match requires a different
13 level of review and validation based on the data points
14 used in the match," correct?
15    A. Correct.
16    Q. And in the statement that, "each match
17 requires a different level of review and validation,"
18 do you mean to say that you or someone at JND reviewed
19 and validated some matches or all matches for each tier
20 of the algorithm?
21    MR. BURT: Objection. Form and
22 foundation.
23    A. Some matches. It would be -- I don't see a
24 situation where, again, one point -- a total of
25 1.44 billion records that were -- were identified as

**Page 141**

1 duplicates could realistically be reviewed.
2    Q. (BY MR. LAZARUS) How was the review carried
3 out? You mentioned Cameron assisted with that.
4    What review was done by you and Cameron?
5    [REDACTED]
6    [REDACTED]
7    [REDACTED]
8    [REDACTED]
9    [REDACTED]
10    [REDACTED].
11    Or -- and additionally, we would do the same
12 analysis, see if there's matches that didn't occur that
13 if, with additional either cleansing or deduplication
14 we could apply to, you know, create the match.
15    [REDACTED]
16    [REDACTED]
17    [REDACTED]
18    [REDACTED]
19    [REDACTED]
20    MR. BURT: Objection. Form.
21    [REDACTED]
22    [REDACTED]
23    [REDACTED]
24    [REDACTED]
25    [REDACTED]

36 (Pages 138 - 141)



15  Q. Okay. The code that was used in review and
16  validation, was that code produced to Apple?
17  A. I -- I don't know off the top of my head. It
18  was certainly coded on the air-gapped machine.

21  Q. In paragraph 17F, you say that you, "ran the
22  deduplication algorithm against the data and reviewed
23  the outcome, evaluated records that are potential
24  matches that did not match in version 1."
25      What is version 1 there?

Page 142

1  A. So in any particular round, I'm -- I may run
2  a -- a code set, evaluate whether the outcome -- if
3  there's additional matching opportunities or cleansing
4  and matching opportunities that occur, make a -- a
5  modification to the -- that -- the code for that round
6  and then rerun it as that round before I determine that
7  I've -- I've completed the -- the efforts of that round
8  and move on to the next one for -- for additional, you
9  know, types of matching.
10  Q. Okay. What assumptions did you make, if any,
11  in conducting your deduplication work?
12  A. Let's see. I assumed that the
13  person_id_hashed provided by Apple was as they defined
14  it that represented, for the most part, a payor
15  individual and that it could reliably be treated as
16  such.
17  Q. Can I ask where you saw a representation from
18  Apple that person_id_hashed represented, for the most
19  part, a payor individual?
20  A. I believe I read that in the data dictionary
21  provided, but I do not -- I cannot be certain that that
22  is where I received that information.
23  Q. Okay. Any other assumptions that you made in
24  conducting your deduplication work?
25  A. That's the -- that's the most -- that's the

Page 143

1  one I can think of off the top of my head.
2  Q. Okay. For each tier of the deduplication
3  method that you used, you required values of the
4  relevant variables to match exactly and without using,
5  quote-unquote, "fuzzy matching"; is that right?
6      MR. BURT: Objection. Form.
7  Foundation.
8  Q. (BY MR. LAZARUS) Okay. I can -- I'll break
9  it up.
10      For each tier of the deduplication method that
11  you used, you required values of the relevant variables
12  to match exactly across records, correct?
13  A. Can you -- you're going to have to restate
14  that or give an example or -- or something of that
15  nature.
16  Q. Sure.
17      So to -- my basic question is, you used exact
18  matching rather than fuzzy matching; is that correct?
19  A. Fuzzy matching isn't a real thing.
20  Q. Okay. I'm interested to hear about that.
21  A. But I believe your question is, for example,
22  did I only match a record when using the name if the
23  full name matched completely to the other full name?
24  The answer to that is no.
25  Q. What did you do instead?

Page 144

1  A. As an example, along with additional data
2  points, if a partial address matched, say, the first
3  ten digits of the address line 1, along with the full
4  name, along with the person ID, along with the city and
5  state, that would be considered a match in one of the
6  tiers of the -- of the deduplication, which in -- in
7  some realms would -- I think people might use the
8  phrase "fuzzy matching" on that. I would refer to it
9  as logical partial data points.
10  Q. Did you do any analysis that matched, for
11  example, first name that would match -- let me restart.
12      So did you do any analysis that would match in
13  the first name field for the values of William and
14  Bill?
15  A. No.
16  Q. And why not?
17  A. There -- there -- there are tools, you know,
18  available that would allow for, you know, the variable
19  names representations to be matched, but I don't
20  believe it's something that I could easily access from
21  an air-gapped computer.
22  Q. Did you request the ability to access tools to
23  do that?
24  A. I did not.
25  Q. Do you agree that requiring exact matching for

Page 145

37 (Pages 142 - 145)

1 a variable for two records to be a match could result
2 in some records not being matched due to slight
3 differences in the values entered by a single payor?
4      A. As -- as -- I mean, I don't know how to answer
5 that because it -- it feels like you're asking me to
6 agree to that when, in fact, that is not the
7 situation -- I did not in every situation require a
8 full match of the data.
9          So I will say, with the caveat that I --
10 I coded to deal with not full matches of every field
11 necessarily, that, yes, requiring full matches could
12 potentially repress matching.
13      Q. Okay. Do you agree that there could be
14 different people with the same first name and same last
15 name at the same address?
16      A. I can't rule that out.
17      Q. For example, Bob Smith, Senior and Bob Smith,
18 Junior, those could both show up as Bob Smith in the
19 data, but they could actually be different people,
20 right?
21      A. I -- I cannot rule out that Junior and Senior
22 still living at home don't use their Junior and Senior,
23 even though they know if they don't, they're going to
24 get each other's mail.
25      Q. And your algorithm would not differentiate

Page 146

1 between those two payors with the same first name and
2 last name based on their name if they didn't use some
3 other indicator like a suffix Junior and Senior; is
4 that right?
5      A. If -- if they lived in the same household and
6 had the same name and did not use their Junior and
7 Senior, I would not distinguish them.
8      Q. Okay. Do you agree that there could be
9 records that have the same last name but different
10 first names that could still correspond to the same
11 payor?
12      A. I certainly can't rule that out.
13      Q. Okay. And your algorithm would not be able to
14 match those records based on the name, correct?
15      A. Because the names are different.
16      Q. Right.
17      A. That is correct.
18      Q. You did not use some variables in your
19 matching algorithm, correct?
20      A. Can you be more specific with variables?
21      Q. Variables available in the Apple payor data?
22      A. So data fields?
23      Q. Okay.
24      A. There were some data fields, as mentioned
25 previously. I did not use county. I did not use area

Page 147

1 code. I did not -- so, yes, those -- those as examples
2 I did not use.
3      Q. Why -- why was county not used?
4      A. I -- I'm -- I do not see a situation that
5 county benefits in an address match where a street
6 address and a city/state or a street address and a
7 postal code would not create the match. I do not see
8 what data point I would replace county with to give me
9 confidence in a match.
10      Q. Okay. Let's look at an example.
11          MR. LAZARUS: 19A, please.
12          (Deposition Exhibit DX 119 was marked.)
13          MR. LAZARUS: And I will represent that
14 this is a record from the Apple payor data.
15      Q. (BY MR. LAZARUS) Do you see the field names
16 listed at the left here?
17      A. I do.
18      Q. And those match the fields in the raw Apple
19 payor data that you received?
20      A. They appear to be, yes.
21      Q. And in this record, the last name listed is
22 ███, correct?
23      A. That is correct.
24      Q. And the first name listed is ███, correct?
25      A. Correct.

Page 148

1      Q. So this is a ███████ living at -- or let me
2 take that back.
3          This is -- this record lists ███████
4 together with the address -- an address in ███████
5 ███████, correct?
6      A. That is correct.
7          MR. LAZARUS: Okay. If we could get 19B
8 and then C after that.
9          (Deposition Exhibit DX 120 was marked.)
10          MR. LAZARUS: And I'm sorry, what was
11 the exhibit number on that last one?
12          MS. LIN: 119.
13          MR. LAZARUS: 119. Okay. So this one
14 will be 120.
15      Q. (BY MR. LAZARUS) All right. This is
16 Exhibit 120, which I will represent is another record
17 from the Apple payor data.
18          And if you see the first name here is ███ and
19 the last name is ███, correct?
20      A. Correct.
21      Q. And the address listed is in ███████
22 ███████, correct?
23      A. Correct.
24      Q. Okay. And then I will show you another
25 Exhibit.

Page 149

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1    MR. LAZARUS: So this should be
2 Exhibit 121.
3        (Deposition Exhibit DX 121 was marked.)
4    MR. LAZARUS: I should be saying DX 121.
5    Q. (BY MR. LAZARUS) In DX 121, the name -- the
6 first name listed is ████ correct?
7    A. Correct.
8    Q. And the last name listed is ████ correct?
9    A. Correct.
10    Q. And the address listed is Apple's headquarters
11 at 1 Infinite Loop in Cupertino, California, correct?
12    A. Correct.
13    Q. All right. Do you agree that all three of
14 these exhibits at DX 119, DX 120 and DX 121 have
15 different person_id_hashed values?
16    A. Looks to, yes.
17    Q. And they all have different last names,
18 correct?
19    A. They do.
20    Q. And they have a different payment credential
21 in the hash_hashed column, correct?
22    A. Okay. Correct.
23    Q. And they have different phone numbers in the
24 phone number field, correct?
25    A. Appears to, yes.

Page 150

1    Q. And they have different city, state, postal
2 code and street 1 values, correct?
3    A. Correct.
4    Q. Would you agree, then, that the only
5 identifying information shared by all three of these
6 records is the first name "████"
7        MR. BURT: Objection.
8        Withdrawn.
9    A. In -- in the data provided as it exists, yes,
10 I -- the only -- the only common data point I see is
11 "████" correct.
12    Q. (BY MR. LAZARUS) And sitting here today, is
13 it your opinion that these three records correspond to
14 three unique individuals or one payor or two -- let me
15 rephrase that.
16        Sitting here today, is it your opinion that
17 these three records correspond to one, two or three
18 unique individuals?
19        MR. BURT: Objection. Form.
20    A. I -- I don't -- I do not know that I have
21 enough information to actually render an opinion on
22 that. If you are -- in its static state where --
23 without any -- any additional information or evolution
24 of the data, I -- I currently don't see them as a -- as
25 a -- as a match, but...

Page 151

1    Q. (BY MR. LAZARUS) And you would agree that it
2 is not -- it would not be appropriate to group these
3 three records together as a unique individual based
4 solely on the first name, correct?
5    A. As a -- as a general statement, I agree that
6 matching on first name alone is not a -- a valid match
7 criteria.
8    Q. And that is, again -- that is the -- well,
9 withdrawn.
10        Did you review matches to see if records like
11 these that only share one data point in the first name
12 field were matched together?
13    A. I -- I reviewed matches based on a broad
14 spectrum of criteria and in looking for situations
15 where matches occurred where not all fields matched to
16 determine if there -- there was a -- a concern or issue
17 with the match.
18        And so, in general, I can't say that I
19 specifically analyzed that as you described it. But,
20 yes, on -- at the field by field level I did look for
21 and review matches and where data points did and didn't
22 match.
23    Q. Would you be surprised to learn that your
24 method did group these three records together?
25    A. Again, if you're looking for me to gauge my

Page 152

1 emotional opinion to it, I have no comment. To -- is
2 it possible that these three records matched for a
3 variety of reasons? It is possible, but I can't speak
4 to it in isolation.
5    Q. Understood.
6        So I will represent to you that I understand
7 that these three records were grouped together in a
8 collection of 42,555 records from 17,683 accounts as
9 identified by person ID.
10        Do you consider it plausible that all 42,555
11 records in that grouping represent a single unique
12 payor?
13    A. Again, I would need to examine in detail the
14 data, the criteria, the match, how it occurred before
15 I could render an opinion. Is it -- and determine
16 whether a -- a viable valid match could exist and why.
17        MR. LAZARUS: Can I have 19G, please?
18 And I'll do H after that.
19        (Deposition Exhibit DX 122 was marked.)
20        MR. LAZARUS: So this will be DX 122.
21    Q. (BY MR. LAZARUS) I will again represent that
22 this exhibit is a record from the Apple payor data.
23        And this record lists first name ████
24 correct?
25    A. Correct.

Page 153

39 (Pages 150 - 153)



1  Q.  Last name listed is ████ correct?
2  A.  Correct.
3  Q.  And the address listed is ████████
████████████████, correct?
5  A.  Correct.
6  Q.  Okay.
7      MR. LAZARUS:  I'll now mark DX 123.
8      (Deposition Exhibit DX 123 was marked.)
9  Q.  (BY MR. LAZARUS)  DX 123 is another record
10 from the Apple payor data.
11     And do you see that the first name listed here
12 is ████
13 A.  Yes.
14 Q.  And the last name listed here is ████
15 correct?
16 A.  Correct.
17 Q.  And the address listed is ████████████
████████, correct?
19 A.  Correct.
20 Q.  So these two records have the same last name,
21 the same -- the same last name, correct?
22 A.  Correct.
23 Q.  On the address -- the street address, the two
24 values are the same except for a period at the end of
25 the address in one of them, correct?
                                    Page 154

1  A.  Correct.
2  Q.  But the records have different values for
3  person_id_hashed, correct?
4  A.  Correct.
5  Q.  And they have different values for phone
6  number, correct?
7  A.  Correct.
8  Q.  Based on the information that you can see in
9  these two records, do you believe, in your opinion,
10 that these are two distinct individuals, ████████,
11 at the same address or a single individual?
12 A.  Seems to be, with the information in front of
13 me, plausible that they're the same individual.
14 Q.  I will represent that in the output data that
15 we received from your production, that these two
16 records were not matched.
17     Why would that be, or why is that, I should
18 say?
19 A.  So the -- the al- -- matching algorithm does
20 do a partial first name along with last name and
21 address.  But I believe because partial first name
22 does, you know, present a -- a increased risk of
23 overmatching, I believe the algorithm includes a -- the
24 phone_number_hashed as a -- as a validator to
25 compensate for the increased risk of a partial name.
                                    Page 155

1  Q.  I see.
2      MR. LAZARUS:  I will mark another
3  document.  This one will be DX 124.
4      (Deposition Exhibit DX 124 was marked.)
5  Q.  (BY MR. LAZARUS)  Looking at DX 124, the first
6  name listed is ████ correct?
7  A.  Correct.
8  Q.  The last name listed is ████ correct?
9  A.  Correct.
10 Q.  And the address listed is ████████ --
11 excuse me -- ████████████ written
12 out completely, correct?
13 A.  Correct.
14 Q.  And that address is in ████████████,
15 as identified here, correct?
16 A.  Correct.
17     MR. LAZARUS:  We'll mark the next
18 document as DX 125, correct?
19     (Deposition Exhibit DX 125 was marked.)
20 Q.  (BY MR. LAZARUS)  This document identifies
21 the -- this document is another record from the Apple
22 payor data.
23     The first name listed is ████ correct?
24 A.  Not on mine.
25 Q.  Oh, what do you have?
                                    Page 156

1  A.  I have another ████
2  Q.  Well, let's -- I do have an extra ████
3  here.
4      MR. LAZARUS:  This -- yes, this one with
5  ████ should be DX 125.  Is that correct on the
6  Exhibit Share?
7  Q.  (BY MR. LAZARUS)  Okay.  So in DX 125, the
8  first name listed is ████ correct?
9  A.  Correct.
10 Q.  And the last name listed is ████ correct?
11 A.  Correct.
12 Q.  And the address listed is ████████████
████ period, correct?
14 A.  Correct.
15 Q.  And that address is listed as being in
16 ████████████ correct?
17 A.  Correct.
18 Q.  And so looking at DX 124 and DX 125, these
19 list, would you agree, the same address?
20 A.  It does, yes.
21 Q.  And DX 124 and DX 125 identify the same
22 payment method in the hash_hashed field, correct?
23 A.  Looks to, yes.
24 Q.  So looking at these two records, do
25 ████████ and ████████████, in your
                                    Page 157

40 (Pages 154 - 157)



1 opinion, to be different payors?
2   A. In -- in isolation, they do not.
3   Q. They do not look to be different payors?
4   A. They -- they do not -- they -- they look to be
5 different payors.
6   Q. Okay. Thank you.
7     And do you agree that it would be plausible
8 that ███████ and ███████████ are a married
9 couple that share a credit card and live at the same
10 address?
11   A. Do I agree it's plausible? I agree it's
12 plausible.
13   Q. Okay.
14     MR. LAZARUS: We'll mark this as DX 126.
15     (Deposition Exhibit DX 126 was marked.)
16   Q. (BY MR. LAZARUS) DX 126 I will represent is
17 another record from the Apple payor data.
18     The first name listed in this record is ███████
19 ███████ correct?
20   A. Correct.
21   Q. And the last name listed is ███████ correct?
22   A. Correct.
23   Q. And the address listed is ███████████
24 ███████████████ fully spelled out, correct?
25   A. Correct.

Page 158

1   Q. And that address is listed as being in
2 ███████████████, correct?
3   A. Correct.
4   Q. Looking at these three exhibits, DX 124,
5 DX 125 and DX 126, do you see that they all three have
6 the same address except that ███████ is fully spelled
7 out in two of them and abbreviated in one of them?
8   A. I do.
9   Q. And do you see that all three of them use the
10 same payment method in the hash_hashed field?
11   A. I do.
12   Q. Would it be -- well, in your opinion sitting
13 here today, do you believe that these are one, two or
14 three unique payors?
15   A. With the data available in front of me, in
16 isolation, it looks to be three different people.
17     MR. BURT: I'm going to object that
18 Apple's counsel is marking as exhibits paper copies of
19 data removed from the system which, of course, since
20 it's Apple's data, they have the right to do, but that
21 the expert on plaintiffs' side could not similarly
22 remove for the purpose of examination preparation.
23     MR. LAZARUS: Understood. The objection
24 is noted.
25   Q. (BY MR. LAZARUS) Would it be consistent with

Page 159

1 the information you see in these three records that
2 ███████ and ███████ are a married couple and have a
3 daughter named ███████
4   A. There is nothing in the information I have in
5 front of me that I -- I can draw that conclusion
6 definitively. I can't rule it out.
7   Q. Okay. If we assume that that is the case,
8 then would you agree that it is also plausible that the
9 daughter, ███████ was using her parents' credit card?
10   A. I certainly couldn't rule it out.
11   Q. But in that case, ███████ would not be a unique
12 payor, would she?
13     MR. BURT: Objection. Form.
14   A. What -- what's your definition of "payor,"
15 then?
16   Q. (BY MR. LAZARUS) This is an important
17 question.
18     What is your definition of "payor"?
19   A. A -- a individual that paid for something.
20 And I'm not aware of anything that suggests that it has
21 to be their own credit card, just that they have to
22 make a payment. And, therefore, they have a
23 transact -- a record in the transaction data with their
24 personal information on it.
25   Q. But would you agree that in a hypothetical in

Page 160

1 which a parent has a credit card and pays the credit
2 card bills from the parents' bank account and let's a
3 child use that credit card, but pays, again, for the
4 bill on that credit card out of the parents' bank
5 account, would you agree that in that situation the
6 parent is the payor?
7     MR. BURT: Objection. Form and scope.
8   Q. (BY MR. LAZARUS) I will -- if you followed
9 that hypothetical that I described, then you can
10 answer. If not, I can break it down into the
11 individual pieces.
12   A. I -- I followed it. I -- and I -- it is --
13 I think my -- the hypothetical, sure, the hypothetical
14 is possible. It is unclear to me while -- within the
15 data how any of those hypotheticals could be
16 definitively determined.
17   Q. So your last statement was: It was unclear to
18 me within the data how any of those hypotheticals could
19 definitely be determined.
20   Why not?
21   A. So, based on the data available, it's equally
22 as possible that ███████ and ███████ are a married couple
23 and ███████ is the live-in nanny that uses their credit
24 card.
25   Q. Did you seek to -- well, I'm trying to decide

Page 161

41 (Pages 158 - 161)

1 the order of the questions here.
2        But did you attempt to resolve uncertainties
3 like that?
4        MR. BURT: Objection. Form.
5     A. And, again, I -- I think this goes back to the
6 definition of "payor." And I am unaware of any
7 document or documentation that suggests that a --
8 assuming your hypothetical is correct, there's -- I am
9 unaware of any definition of -- of a class member that
10 suggests that it's the -- the cardholder as opposed to
11 the information available, which is an individual
12 associated to a record that has transactions and made
13 payments.
14     Q. (BY MR. LAZARUS) Do you not agree that the --
15 the payor is the person who -- whose money was used to
16 pay for a transaction?
17        MR. BURT: Objection. Form.
18 Foundation.
19     A. Again, you are -- that -- that's a class
20 definition that I'm certain I am not the person to
21 define.
22     Q. (BY MR. LAZARUS) And in -- on the question
23 of, did you attempt to resolve any uncertainties like
24 the ones we're discussing right now, did you ask for
25 any additional data in order to resolve these sorts of
Page 162

1 privy to it, but I am unaware of anything within the
2 class definition that suggests that a payor had to use
3 their own credit card or -- and I don't -- I am unaware
4 of how, on an individual basis, one could determine
5 that regardless of the data. Because ███ could have
6 used her -- whoever's credit card and gave him 20 bucks
7 for it, and so she did actually pay.
8        So the -- I don't see how the hypotheticals in
9 this situation could ever be resolved.
10     Q. Did you make an attempt to determine if two --
11 You know what? I'll withdraw that.
12        All right. Let's see.
13        This relates to a topic that we discussed
14 earlier, but I have some slightly different questions.
15        Did you estimate a false positive rate, by
16 which I mean the rate at which you identified two
17 records as being the same payor even though they are
18 not in reality?
19     A. Did I estimate a false positive rate?
20     Q. Yes.
21     A. I did not.
22     Q. Okay. And similar question, did you estimate
23 a false negative rate?
24     A. Can you expound by -- provide the full
25 definition, please?
Page 164

1 uncertainties?
2        MR. BURT: Objection. Form.
3     A. You're -- you're -- I didn't have an
4 uncertainty about this so, therefore, there would be no
5 reason for me to request data to resolve something I
6 did not see as an uncertainty.
7     Q. (BY MR. LAZARUS) Okay. And I apologize if
8 I've missed it, but can you explain why you don't see
9 an uncertainty as to -- let's stick with the ███████
███████████████ situation in DX 124, DX 125 and DX 126.
11        Am I correctly understanding that you are
12 saying you do not see uncertainty in who the unique
13 payors were among those three?
14     A. I do not.
15     Q. Okay. And can you explain why you don't see
16 uncertainty there?
17     A. My understanding of the Apple payor data is
18 that each line represents a -- a billing event
19 associated with transactions that I did not have and --
20 but represented billing events or purchases.
21        And the -- each -- each individual that made a
22 purchase represented a potential class member if they
23 fulfilled all additional requirements for being --
24 being part of the class.
25        It -- I am unaware if it exists, but I am not
Page 163

1     Q. I will.
2        So did you estimate a false negative rate, by
3 which I mean the rate at which you identified two
4 records as being different payors even though in
5 reality they are the same payor?
6     A. I did not.
7     Q. If there are mistakes in your matching, what
8 do you believe would be the -- what do you believe are
9 the sources of those mistakes?
10        MR. BURT: Objection to form. Compound.
11     Q. (BY MR. LAZARUS) I'll stick with the question
12 if you understand it.
13     A. I do. Repeat it for me, but I -- I believe I
14 understand your question.
15     Q. If there are mistakes in your matching, what
16 are the sources of those mistakes? And I will revise
17 it to say, if there are mistakes in the matching that
18 you conducted in this case, what do you believe are
19 likely to be the sources of those mistakes?
20     A. I don't know how to answer that because I --
21 I looked for mistakes. I tried to identify mistakes
22 and then fix mistakes. So if I had a -- area where I
23 thought, oh, there's mistakes, I would have attempted
24 to identify and resolve.
25        It's not to say there are no mistakes as much
Page 165

42 (Pages 162 - 165)

1 as I can't give you an example because I attempted to
2 identify and resolve them.
3    Q.  So, for example, if there were mistakes in
4 cleaning the data versus cleaning -- excuse me.  Let me
5 ask it this way.
6        Is it possible that there were mistakes in
7 cleaning the data?
8    A.  I certainly can't rule it out.
9    Q.  Is it possible that there were mistakes in
10 matching the data?
11   A.  Also certainly cannot rule that out.
12   Q.  In the review that you conducted in looking
13 for mistakes to correct, did you see mistakes in
14 cleaning?
15   A.  I -- I cannot say -- I could not give
16 examples, but it is certainly likely that I identified
17 areas where cleansing was -- was inaccurate and I fixed
18 or resolved the -- the issue that I identified.  I have
19 confidence that that occurred.
20   Q.  And to make sure we're using -- we're
21 understanding each other, is cleaning the same as
22 cleansing?  Are those two synonyms?
23   A.  I -- I would use those -- those terms
24 interchangeably in this situation.
25   Q.  Okay.  And in the review searching for

Page 166

1 contain tests to show that the code does what the
2 author says it does.
3        Is that a familiar concept to you?
4    A.  It is.
5    Q.  Okay.  Does the code that you used to clean
6 data in this case contain software tests of that kind?
7    A.  It does not.  I've never seen those sort of
8 tests applied in this application.
9    Q.  Are you familiar with the concept of a gold
10 standard validation set?
11   A.  Theoretically, but I would love to hear the
12 definition in this context.
13   Q.  I don't know that I have a -- a definition.
14       But what's -- what's your understanding of the
15 concept?
16   A.  Well, a -- a gold standard from -- from what I
17 could -- and, again, without looking at a definition, I
18 believe that is a -- a -- sort of a perfect sample.
19 But -- and, again, I don't know how that applies in
20 this -- is applicable in this situation.  But that's
21 how I would understand the term here.
22   Q.  And do you mean that you don't see how that
23 concept is applicable in this situation because there
24 is no gold standard validation set available?
25   A.  Well, and I -- again, what -- what is the

Page 168

1 mistakes, did you identify mistakes in matching as
2 opposed to cleaning?
3    A.  I -- I'm confident I identified issues where
4 there -- I needed to add additional matching logic.
5 I don't recall off the top of my head identifying
6 situations where a match occurred where it shouldn't
7 have, but I can't categorically say that that didn't
8 happen also.
9    Q.  Did you take steps to determine whether any
10 mistakes had been made in coding the analysis?
11   A.  I -- as previously mentioned, I had a
12 additional person review both code and results
13 attempting to identify errors.
14   Q.  Does the code used in this case to clean the
15 data contain any software tests?
16   A.  Such as?
17   Q.  I'll turn the question back to you.
18       What does "software tests" mean to you?
19   A.  And that's why I'm asking.  It's -- they're --
20 software tests can -- can, in theory, mean a -- a wide
21 ranging set of things.  So I'm -- I'm -- as stated, I'm
22 not sure how to answer.
23   Q.  Okay.  I -- my understanding is that, for
24 example, when a coder is submitting code to an open
25 source software project, that code would typically

Page 167

1 validation?  Part of this is, gold standard, okay.  But
2 validation set, what does that mean?  I don't --
3 I don't understand the -- what the -- is being
4 referenced.  That I cannot give you an example of
5 because I do not know what it's attempting to
6 reference.
7    Q.  Okay.
8        MR. BURT:  We've been going about
9 90 minutes, Eli.
10       MR. LAZARUS:  Okay.  Shall we take a
11 break?
12       THE VIDEOGRAPHER:  We are going off the
13 record at 3:31.
14       (Break from 3:31 p.m. to 3:51 p.m.)
15       THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 3:51.  Please proceed.
17       MR. LAZARUS:  Thank you.
18   Q.  (BY MR. LAZARUS)  I'd like to go back to your
19 README file, which is Exhibit DX 113.  And that file --
20 at the point that you're describing the nonstandard
21 ASCII files, there's a statement, "I would comment and
22 uncomment sections as needed."
23       Do you see that?
24   A.  I do.
25   Q.  Do you remember that?

Page 169

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1    Can you explain to me, and this is where not
2  being a computer person, what "comment" and "uncomment"
3  means?
4    A. Certainly.
5      So the -- the -- those particular files are
6  a -- a set of executables. And I would -- and
7  commenting is simply flagging particular sections as,
8  don't run -- when this file is executed, don't run
9  these -- this section. So that would be commenting it
10  out. Or uncommenting it would be, make this particular
11  section of code available for execution.
12    Q. I see.
13      Okay. So it's more or less turning on and off
14  different parts of the code.
15      Is that a fair description?
16    A. I think that's a -- a fair laymen's
17  determination of it, yes. Absolutely.
18    Q. Okay. And why -- why did you do that in this
19  case in -- in those files?
20    A. Certainly.



Page 170



14      And other sections I would continue to run
15  until I cleansed to the best of my ability the -- the
16  nonstandard ASCII and either, again, remove it or -- or
17  translate it to something that is more logical in order
18  to do matching on.
19    Q. Okay. In the situation that you just
20  described, it sounds like commenting or uncommenting
21  that portion of the code might affect the time that's
22  required to -- to run code but would not affect the
23  results of -- of running the code; is that right?
24    A. That is correct.
25    Q. Okay. Is that always the case in all of the

Page 171

1  times that you commented and uncommented portions of
2  the code in those files that you're talking about at
3  this point in your README file?
4    A. For these -- these two particular files?
5    Q. Right.
6    A. Yeah, the primary driver was I wasn't getting
7  any additional results, meaningful results. And so I
8  commented out so that it would -- yeah, it'd speed up.
9    Q. Okay. Are there -- were there instances in
10  those particular files when you commented a portion of
11  code in a way that did affect the output?
12    A. I don't believe so.
13    Q. Okay. Do you remember which lines of code you
14  commented or uncommented in running those files?
15    A. I'm sure the -- I'm sure the file is hundreds
16  of lines long, and I certainly do not recall which or
17  when.
18    Q. And the commenting and uncommenting is not
19  recorded in a file that you produced to Apple, correct?
20    A. It is not.
21    Q. Okay. And at the bottom of the README file
22  there's a statement, "There may be additional places
23  that require code to be commented for a script to fully
24  execute."
25      Do you remember which lines of code are

Page 172

1  referenced there that need to be commented or
2  uncommented -- uncommented to make all of the scripts
3  fully execute?
4    A. I -- I do not remember which -- which scripts
5  or which line in scripts. It should be relatively
6  obvious to an individual experienced in -- in SQL code.
7      Just wanted to make it clear that some
8  analysis and -- and evaluation was required in order
9  for certain scripts to run without -- all it really
10  would do is, generally speaking, without kicking off
11  the SQL statement that ran a query.
12    Q. Is it recorded somewhere what portions would
13  need to be commented or uncommented in order to make
14  all of the scripts fully execute?
15    A. It is not.
16    Q. And would -- am I correct that commenting or
17  uncommenting some portions of the code would affect the
18  output of the code?
19    A. Oh, certainly commenting out certain portions
20  of code would change the outcome.
21    Q. And so as produced, without commenting or
22  uncommenting certain portions of the code, the scripts
23  that you provided to Apple's consultants will not
24  replicate your final output again --
25      MR. BURT: Objection. Form.

Page 173

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 Foundation.
2    Q. (BY MR. LAZARUS) Let me repeat that.
3       Am I correct that without commenting or
4 uncommenting certain portions of code, the scripts that
5 you provided to Apple's consultants as produced will
6 not replicate your final output?
7       MR. BURT: Objection. Form.
8 Foundation.
9    A. I believe that the -- that the code that I
10 produced is substantially in the form that I ran it
11 with, and -- and if run as is, should substantially
12 produce the -- should produce similar outcomes.
13      It would -- I think the majority of things
14 that would be commented are not items that produce a
15 change to the data outcome as much as queries that
16 would be used to analyze a step.
17      So I believe that the -- run as is, they
18 would -- should produce similar -- very similar
19 results.
20    Q. (BY MR. LAZARUS) Okay. Similar but not
21 exactly the same?
22    A. I -- I certainly can't say exactly. I
23 can't -- I can't rule out that -- that there would be
24 some -- some level of a discrepancy.
25    Q. Okay. Excuse me.

Page 174

1       We talked earlier about paragraph 15 of your
2 report -- excuse me -- which states that, "JND
3 communicated to plaintiffs' counsel that it could
4 reliably reduce duplication in the Apple data."
5       How do you define "reliably" in that sentence?
6 "Reliably" or "reliability," how do you define those
7 terms?
8    A. Okay. I'm sorry, I was reading the section.
9 Can you repeat the question?
10    Q. I want to ask how you define "reliably" as
11 used in that sentence or to define the noun form of it,
12 "reliability"?
13    A. Okay.
14      So I would define that as being able to apply
15 a set of methods that I have used extensively and have
16 confidence in a -- a outcome based on both the methods
17 used and the data available to apply it against.
18    Q. And is that the same definition of "reliably"
19 or "reliability" that you have used in other
20 deduplication work in the past?
21    A. I -- I don't know that I can say I've used the
22 term "reliably" or "reliability" in reference to a
23 previous deduplication. I can say that applying
24 methods and based on the data available is the process
25 by which I determine a confidence level in an outcome.

Page 175

1    Q. Okay. And that again -- that understanding of
2 reliability is based on your years of experience in the
3 field?
4    A. That is correct.
5    Q. All right. Sticking with your report, the
6 paragraph 17E states that, "the top tier of the
7 matching algorithm is the most stringent and matched on
8 Person_ID_Hashed, first name, last name, full address,
9 city, state and postal code."
10      Do you see where I'm reading that from?
11    A. I do.
12    Q. And when you say, "top tier," does that mean
13 that this tier was run first before other matching
14 tiers?
15    A. I -- yes, I believe that is correct.
16    Q. Okay. And why were these variables chosen for
17 matching in this top tier?
18    A. I -- I tier the -- the deduplication based on
19 a confidence level that the amount -- the data being
20 matched is most likely to represent the -- the same
21 individual.
22      And so in this situation, if exact first name,
23 exact last name, exact full address, exact cities,
24 exact state, exact postal code, along with the person
25 ID that bundles people in -- within the Apple data all

Page 176

1 match, I have an extremely high confidence level that
2 that should be the same person.
3    Q. And what is that understanding based on?
4    A. Experience.
5    Q. And, now, in this example, you did not match
6 based on payment information. Let me -- well, let
7 me -- let me ask about phone number.
8       You did not match based on phone number in
9 this example -- in this top tier, correct?
10    A. I didn't.
11    Q. Why not?
12    A. I -- I can't tell you specifically my thought
13 process at the time, other than I -- I assess matching
14 and it -- I can only assume that I made a determination
15 that phone number did not meaningfully change the
16 outcomes and, therefore, I was confident as this is the
17 top tier.
18    Q. And paragraph 17E also states that this tier
19 "required minimal validation as it matched on virtually
20 every available and relevant personal identifying data
21 point."
22      What validation did you perform for this top
23 tier?
24    A. Similar to all tiers. I did queries. I
25 looked for, you know, matches that -- for, you know,

Page 177

45 (Pages 174 - 177)

1 any reason I could identify, any analysis seemed
2 anomalous, to see if I needed to adjust any -- any sort
3 of matching logic.
4     But as -- as stated, when -- when you have the
5 same full name, you have the same full address and you
6 have the same person_id_hashed, there -- there's
7 limited data to -- that -- that could definitively say
8 that this is not a match. You know, things like phone
9 number or, you know, a -- the last four digits of his
10 credit card, people have multiple credit cards, people
11 have multiple phone numbers. It's not a -- not a
12 definitive that it -- it could change the outcome of
13 that.
14    Q. Did you identify matches that you thought may
15 not be true matches in that first tier?
16    A. I -- I don't recall specifically as -- as I
17 analyzed. I'm sure I did analyze and evaluate.
18    Q. Okay. How was the validation for that first
19 tier different from validation for other tiers?
20    A. Primarily, it would have been based on the
21 types of queries run, the -- the what -- what matching
22 or no matching to compare in -- in the records that
23 were rolled up, and quantity of time spent performing
24 the analysis. The -- the fewer the data points, the
25 greater the analysis performed to try to determine

Page 178

1 erroneous matches.
2    Q. And was the validation performed by both you
3 and the Cameron person that you mentioned before?
4    A. Yes.
5    Q. Is the validation work documented in your
6 materials that you produced to Apple?
7    A. There could be validation code in -- in the
8 scripts provided.
9    Q. All right. In your second example in
10 paragraph 17E, you state that you █████████████████
█████████████████████████████████████████████████
█████████████████████████
13    Did I read that correctly?
14    A. That is correct.
15    Q. Okay. Why was the variable last name no
16 longer included -- or why was the variable last name
17 not included in this second -- in this second example?
18    A. So, in my experience, there is a -- a
19 meaningful population of individuals where they have
20 changed their last name, the most common being somebody
21 getting married, that this produces a significant
22 positive match for.
23    So we -- we look at these and -- and attempt
24 to match. But -- and, again, combining that not just
25 with address, but person ID, which is purported to be

Page 179

1 a -- a somewhat bundling of -- of a record, it gave me
2 confidence that that was a logical match.
3     THE COURT REPORTER: Logical?
4     THE WITNESS: Logical match. Apologies.
5     MR. LAZARUS: I was just going to check
6 the transcript and tell you, but that -- that wouldn't
7 work.
8    Q. (BY MR. LAZARUS) On address, you agree that
9 there are 50 and more than 51 different values for
10 state in the data?
11    A. I haven't looked at in a long time, but that
12 sounds right.
13    Q. There are -- my understanding is that there
14 are over 200 different values.
15    Am I correct that you did not make adjustments
16 to values for state that do not correspond to an actual
17 state abbreviation?
18    A. I don't recall off the top of my head what I
19 did with state.
20    Q. Okay. Am I correct that fractions sometimes
21 appear in street addresses?
22    A. I -- I'm not disputing it. I -- I don't know
23 the answer to that.
24    Q. Okay. In the Apple payor data, you don't
25 recall whether there were fractions in street

Page 180

1 addresses?
2    A. I don't.
3    Q. Okay. And you don't recall how you coded or
4 matched based on those?
5    A. I do not.
6    Q. Okay. The example that I'm thinking of is
7 ████████████████, Pennsylvania.
8     You would agree that that could be written in
9 various ways, in unicode with ████ █████
11    A. I don't dispute that.
12    Q. Okay. And it could be written other ways,
13 like ██████.
14    Do you agree with that?
15    A. I do. It could be, I suppose.
16    Q. All right. Okay. Do you agree that the same
17 street numbers and street names can appear in different
18 cities?
19    A. Yes. Street -- street numbers and street
20 names do appear in different cities.
21    Q. Okay. And do you agree that a ZIP Code can
22 cover multiple cities?
23    A. I don't know that I -- I can't -- I can't --
24 I can neither confirm or deny that.
25    Q. Okay.

Page 181

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1    A. That would be somewhat unusual, I think. But
2 I suppose it's possible.
3    Q. Okay. All right. For the address 123 West
4 Main Street, you can imagine a number of different
5 permutations of the spelling with West abbreviated as
6 W and Street abbreviated as ST, right?
7    A. Yes.
8    Q. Would all combinations of those be treated as
9 a match in your process?
10    A. The -- if they are -- if they are spelled out
11 differently, and so they're West and W, may -- they
12 would not match. However, various other processes
13 throughout the matching or cleansing could ultimately
14 produce a match, such as running them through the NCOA
15 standardized as the address for an ultimate match.
16    Q. And is it also true that an address -- well,
17 let me scratch that.
18       If you had a tier that matched on every
19 available and relevant personal identifying data point,
20 in other words, if records were exact duplicates on
21 every available relevant piece of personal identifying
22 information in the data, would any validation be
23 required to evaluate resulting matches?
24    A. Every single data point available? Well,
25 that I think in some situations did exist because

Page 182

1 validate that there was nothing anomalous. It's just
2 that there's -- I'm not sure what would be identifiable
3 to determine that something isn't since all data points
4 are -- are the same. There's nothing that can be
5 identified that would cause them to not be the same
6 entity.
7       So out of -- out of process, I would. But,
8 yes, it would -- it wouldn't -- it would bear no fruit.
9    Q. And if you had matched on every available
10 personal identifying data point, excluding
11 billing_info_id because it's the record identifier and
12 not personally identifiable information, in that case,
13 would you view any validation as necessary?
14    A. Same answer. I would -- I would perform
15 validation, but I -- it would -- I do not see how it
16 would bear fruit. But out of process I would follow my
17 process.
18    Q. Next I want to ask some questions about the
19 NCOA check that is described in paragraph 17G of your
20 report.
21       You write that you, quote, "cross-checked the
22 address information against publicly available data
23 obtained through an NCOA (National Change of Address)
24 search from the United States Postal Service."
25       Do you see where I'm reading that?

Page 184

1 billing ID was duplicate, in which case I was
2 looking -- I was trying to figure out why billing ID
3 was there multiple times.
4       But other than that, if every single data
5 point for -- was the same, then I -- I'm unaware of how
6 to dispute that those -- those two records are the
7 same.
8    Q. And so that's -- am I understanding correctly
9 that that's true if you included every data field
10 including billing_info_id and also true if you excluded
11 billing_info_id and ran the match -- ran -- excuse me,
12 the tier based on all personal identifiable data points
13 not including billing_info_id_hashed?
14       MR. BURT: Objection to form.
15       MR. LAZARUS: Yeah, that was a long
16 question.
17    Q. (BY MR. LAZARUS) Let me break that down into
18 two parts.
19       The first one is, do I understand correctly
20 that if there were records that matched on every single
21 data field including billing_info_id_hashed, you would
22 not view any validation as required in that situation?
23    A. It's a hypothetical as I did not do that
24 match. If I did, I -- I would have -- I would have --
25 pure -- process I would still probably run queries to

Page 183

1    A. I do.
2    Q. And we discussed earlier that this search was
3 run through a third-party vendor, Melissa Data
4 Solutions, correct?
5    A. That is correct.
6    Q. And you mentioned at one point earlier that
7 you may have used a different vendor at another time.
8       Is that -- is that true, that you have used
9 other -- another vendor or multiple other vendors for
10 NCOA searches?
11       MR. BURT: Objection to characterization
12 of prior testimony.
13    A. Over -- over -- over the many years I've done
14 this, I, myself and my organization, have used more
15 than one vendor to provide NCOA services.
16    Q. (BY MR. LAZARUS) Why change vendors for NCOA
17 search services?
18    A. Melissa Data provided a better solution at a
19 competitive price.
20    Q. What was the name of the Melissa Data
21 Solutions product that you used in this case?
22    A. I don't know that I -- I know it is Melissa
23 Data.
24    Q. Are you aware that they have different --
25 Melissa Data Solutions has different product offerings?

Page 185

47 (Pages 182 - 185)

1    A.  I do know they have multiple offerings.
2  I believe we just use their NCOA product or their --
3  their solution.
4    Q.  Does that solution that you used only run the
5  data through the NCOA database or does it do additional
6  work on the data?
7    A.  The process does do -- perform some level of
8  standardization of addresses as -- as an output.
9    Q.  Okay.  And what's your understanding of that
10 standardization?  What does it do?
11   A.  It attempts to take the address input and
12 standardize it to the -- basically, the postal -- the
13 USPS form of an address, from -- from my understanding.
14   Q.  Does it do anything else, to your
15 understanding?
16   A.  Standardization and looking for a change of
17 address is -- is my understanding of its -- its
18 function.
19   Q.  And does -- my understanding is that you
20 uploaded a portion of the Apple payor data to Melissa
21 Data Solutions; is that correct?
22   A.  That is correct.
23   Q.  And then does Melissa Data -- did Melissa Data
24 Solutions automatically conduct all of those
25 standardization and NCOA checks on all of those
Page 186

1  uploaded records or did you need to request steps to be
2  taken on particular records or portions of the uploaded
3  data?
4    A.  The process as I understand it on the Melissa
5  Data side, as they've communicated, is we upload the --
6  I upload the file.  Their system automatically picks it
7  up.  There is no request.  There is no person
8  interaction.
9    Q.  Do you know whether Melissa Data Solutions
10 offers a product that does NCOA lookup only and not the
11 additional standardization steps that you described?
12   A.  I -- I don't know.
13   Q.  Okay.  Did you perform any validation to
14 confirm that the address cleaning steps being
15 outsourced to Melissa Data Solutions were done
16 correctly?
17   A.  No.  I'm -- I'm unclear on how that would be
18 done, so, no.
19   Q.  Do you know how Melissa Data Solutions matches
20 addresses?
21      MR. BURT:  Objection to form.
22 Foundation.
23   Q.  (BY MR. LAZARUS)  Well, let me back up.
24      Does Melissa Data Solutions match addresses?
25   A.  I'm -- I am unaware of Melissa Data's internal
Page 187

1  processes for -- for how they connect a uploaded record
2  to a record so they could produce a -- NCOA output.
3  Everything I -- everything I would say with regard to
4  that would be speculation of a third party's internal
5  workings.
6    Q.  So am I correct that you're not aware whether
7  they use exact matching or what we were referring to
8  earlier as fuzzy matching?
9    A.  I'm -- yeah, I am not aware of their -- their
10 internal processes.
11   Q.  Okay.  How many name and address combinations
12 did you cross-check against the NCOA data through
13 Melissa Data Solutions?
14   A.  290 million.  I'm -- I'm trying to pull from
15 my memory, but I -- I couldn't -- couldn't swear to an
16 exact number.
17   Q.  Okay.  Why does 290 million come to mind?
18   A.  Other than that's what comes to mind.  I --
19 it's somewhere -- I think it's somewhere in the
20 ballpark, but -- but I don't know exactly the number.
21 Somewhere between -- yeah, I -- I don't know exact
22 number.  But it's -- it's about that.  Somewhere in the
23 neighborhood.
24   Q.  And is that 290 million, is that all of the
25 name and address combinations in the Apple payor data?
Page 188

1    A.  That represented the subset of the total
2  population that at that point had -- was still
3  identified as a primary record based on all of the
4  deduplication and cleansing that occurred up until that
5  point.
6      The -- the intent of sending that small
7  subpopulation instead of sending the entire
8  1.69 billion records was in complying with the
9  protective order and protecting the data to best of our
10 ability.
11   Q.  For how many records did you verify a change
12 in address using the NCOA data search?
13   A.  I don't have that number in -- on top of my
14 head.
15   Q.  Okay.  Is that number available in the
16 materials that you've made available to Apple?
17   A.  It is available in the data I made available.
18   Q.  Okay.  And once you got any change of address
19 associated with a name, did you then add the new
20 address information back to your computer at JND and
21 merge it onto the Apple payor data?
22   A.  You're going to have to say that one more time
23 for me.
24   Q.  Let me -- I'll break it up into two.
25      Once you got any change of address associated
Page 189

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 with a name, did you then add the new address
2 information back to your computer at JND?
3    A. Got it.
4       We -- I -- I took the results of the NCOA
5 process and I uploaded back to the air-gapped PC, that
6 is correct.
7    Q. And you merged it onto the Apple payor dataset
8 that you had on that computer?
9    A. That is correct.
10    Q. Did you record anywhere the full list of names
11 checked against the NCOA data?
12    A. There is -- are -- there is a table within the
13 data provided made available to Apple that contains a
14 list of records that I uploaded to -- or that I --
15 yeah, that I downloaded and then uploaded for the NCOA
16 process.
17    Q. Okay. And do I understand correctly that that
18 table shows the results from the NCOA data search for
19 each name checked?
20    A. I do not recall if the results are in a table.
21 They are, however, in text files that were provided and
22 made available to Apple's consultants. So the -- all
23 of the data is there in some form. It may -- they may
24 not be in tables simply because they take up a lot of
25 space in the database.

Page 190

1    Q. Okay. And when you say that the NCOA search
2 results data are in the materials provided to Apple in
3 some form, does that include if there was no change to
4 the address?
5    A. It would have in the -- in the data it would
6 have the information -- I'm speaking from memory, but
7 I'm pretty certain that the result file had the data
8 uploaded for processing, as well as the output of the
9 process.
10    Q. In your opinion, did checking against the NCOA
11 data resolve most of the address changes in the data?
12       MR. BURT: Objection to form.
13    A. Did it resolve -- I'm -- I don't believe
14 I understand the question with regards to "Did it
15 resolve most of the changes to the address --
16 addresses." Can you -- can you clarify what you mean
17 by that?
18    Q. (BY MR. LAZARUS) I will try.
19       So the NCOA data is intended to identify
20 individuals who have changed their address; is that
21 correct?
22    A. That is correct.
23    Q. And so within the Apple payor data there are
24 records representing some number of individuals who
25 have changed addresses, correct?

Page 191

1    A. Almost certainly, yes.
2    Q. And is it your opinion that most of those
3 people represented in the Apple payor data who had
4 changed their address were identified through the NCOA
5 search?
6    A. I -- I can't -- I don't believe I could
7 classify it as "most." I can say the -- the NCOA
8 look-back period is four years. So if an individual
9 moved within the last four years, then the process is
10 likely to have been successful in identifying and
11 updating that address.
12    Q. All right. What is the file
13 Apple_final_deduplication_ouput? And in the file name
14 the last part is spelled O-U-P-U-T, but I imagine, is
15 that a typo that it should have an extra T so it should
16 be "output"?
17    A. Seems reasonable, yes.
18    Q. So to read it that way, what is the file named
19 Apple_final_deduplication_output?
20    A. I think that that is the piece of code that
21 spools out the -- essentially, the -- the three columns
22 mentioned earlier. Again, I'm working from memory and
23 I don't have the code in front of me. But I believe
24 that is the code that spools out a -- the
25 billing_info_id, the primary_billing_info_id, and the

Page 192

1 JND sequence number.
2       THE COURT REPORTER: Was it JD?
3    A. JND sequence number.
4       MR. LAZARUS: And is that a file that we
5 have a printout of?
6    Q. (BY MR. LAZARUS) Your report references that
7 you reduced duplication down to approximately
8 246 million payors, correct?
9    A. That is correct.
10    Q. The number that we see in
11 Apple_final_deduplication_output is 243,646,638.
12       Do you know why that is different from
13 approximately 246 million?
14    A. Not off the top of my head.
15    Q. Okay. Don't hold me to it, but I think we're
16 winding down.
17       All right. Apple's consultants visited your
18 office at JND in Seattle on May 5 to 6, 2025, correct?
19    A. I'll take your word for it. I won't dispute
20 that.
21    Q. And they were given access to inspect files on
22 an air-gapped computer at JND, correct?
23    A. That sounds correct.
24    Q. And let's see.
25       After that, you brought a hard drive

Page 193

49 (Pages 190 - 193)

1 containing computer files to the office of Apple's
2 consultants in San Francisco, correct?
3    A. That is correct.
4    Q. And is it okay if I refer to those files on
5 the hard drive that you brought to San Francisco as
6 your backup files?
7    A. I -- I have no issue with you referring to
8 them that way.
9    Q. Okay. And you -- you delivered that hard
10 drive with your backup files to San Francisco initially
11 on May 21st, 2025, correct?
12    A. I'll take your word for it. I don't --
13    Q. Okay.
14    A. -- I don't have a phone or a calendar in front
15 of me, but, sure.
16    Q. Right.
17       Did you make any modifications to your backup
18 files after Apple's consultants were given access to
19 JND's computer on May 5 to 6, 2025 and before you
20 transported your backup files to the office of Apple's
21 consultants on May 21, 2025?
22    A. Not that I recall, no.
23    Q. In the final Apple -- the file
24 Apple_final_deduplication_output, you referenced there
25 were three fields generated by that code; is that -- is

Page 194

1 records back, I needed to show they existed multiple
2 times in the data I received.
3    Q. All right.
4       MR. LAZARUS: I'll ask that we mark for
5 identification a letter here and this will be Exhibit
6 DX 127.
7       (Deposition Exhibit DX 127 was marked.)
8    Q. (BY MR. LAZARUS) And the letter is dated
9 January 15, 2025, and it is from plaintiffs' counsel to
10 myself.
11       I apologize, I may be looking at the wrong
12 document.
13       MR. LAZARUS: Could we go off the record
14 for a moment?
15       THE WITNESS: I'd love the use the
16 restroom if we take five.
17       THE VIDEOGRAPHER: We are going off the
18 record at 4:48.
19       (Break from 4:48 p.m. to 4:52 p.m.)
20       THE VIDEOGRAPHER: We are back on the
21 record. The time is 4:52. Please proceed.
22       MR. LAZARUS: Thank you.
23    Q. (BY MR. LAZARUS) As I was just saying, the
24 document that we have marked as Exhibit 127 is, in
25 fact, the document that I intended to mark as Exhibit

Page 196

1 that correct?
2    A. If it does what I recall it doing, I think the
3 better way -- it -- it spools them out to -- to flat
4 files.
5    Q. Okay.
6    A. I think.
7    Q. Thank you.
8       So in the final output, those three fields
9 that you produced were billing_info_id_hashed, second
10 field primary_billing_info_id_hashed and
11 JND_assigned_ID, correct?
12    A. That is correct.
13    Q. And can you explain what that additional field
14 JND_assigned_id was?
15    A. Certainly.
16       So I added a numeric sequence to every record
17 I received from Apple as a external or internal
18 identifier, however you want to phrase it, but a JND
19 specific identifier that had no -- contained no meaning
20 other than it's a numeric.
21       And the purpose of providing it back to
22 Apple -- or to -- in that file was, as I mentioned
23 previously, billing_info_id was not unique in the file
24 I received. And, therefore, the only way to provide
25 clarity that I wasn't providing duplicate billing info

Page 195

1 DX 127. So I'll proceed to ask a couple of questions
2 about it.
3       On the first page here, at the bottom of the
4 paragraph that starts with the word "First," the last
5 sentence refers to a solution that plaintiffs and their
6 claims administrator have created.
7       And I'll give you a moment to look at the
8 paragraph, but claims administrator there refers to
9 JND, correct?
10    A. Well, I -- I did not author the letter.
11 I think -- I assume claims administrator means JND.
12    Q. Understood.
13    A. But, yeah, I need a minute to read the whole
14 paragraph, please.
15    Q. Okay. Go ahead.
16    A. Okay.
17    Q. All right. And understanding that you did not
18 write the letter, do you understand the reference to
19 claims administrator here to be a reference to JND?
20    A. That's what I would understand it to be.
21    Q. Okay. And on the second page in the paragraph
22 beginning "Second," do you see -- I'll read -- this is
23 in the middle of the paragraph, there's a sentence that
24 says, "Specifically, with a double-hashed billing info
25 id field, plaintiffs would have to provide their

Page 197

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 damages calculations back to Apple to remove a layer of
2 hashing from the double-hashed billing info ID field
3 before JND could begin administering damages to class
4 members."
5      Do you see that?
6   A. Okay.
7   Q. Before -- earlier in the deposition we
8 discussed the possibility that JND would serve a role
9 in claims administration in this case.
10     Does this -- reading this sentence change your
11 recollection at all about whether JND is expected to
12 have a role in claims administration in this case?
13         MR. BURT: Objection to form.
14   A. I don't know that it changes my -- my position
15 on that. It -- I -- as sort of discussed previously,
16 JND's not been hired to be the claims administrator for
17 this, as there's nothing to be the administrator of at
18 this time.
19   Q. (BY MR. LAZARUS) Okay. Was one of the
20 purposes of the JND_assigned_id field to assist with
21 claims administration in the event that JND was
22 assisting with claims administration?
23   A. That is not why I assigned it. I assigned it
24 so that it was clear that I was returning a record for
25 every record provided to me.

Page 198

1         MR. LAZARUS: Let's see. Can we get
2 Tab 9, please? This will be marked as DX 128.
3         (Deposition Exhibit DX 128 was marked.)
4   Q. (BY MR. LAZARUS) And this is a document
5 titled "Declaration of Darryl Thompson" dated March 7,
6 2025.
7      This is a declaration from you; is that
8 correct?
9   A. It looks to be, yes.
10   Q. Okay. And this is your electronic signature
11 on page 8, correct?
12   A. It is.
13   Q. Okay. Did you author this declaration?
14         MR. BURT: Objection to form.
15         MR. LAZARUS: Withdrawn.
16   Q. (BY MR. LAZARUS) Did you write this
17 declaration?
18   A. I -- I wrote the majority of it. Some of it
19 was taken from previous declarations, but I was the
20 primary author.
21   Q. Okay. When you say "previous declarations,"
22 what declarations are you referring to?
23   A. I couldn't point to -- I don't recall. But
24 things like my bio information as an example would
25 have -- would have come from -- likely come from

Page 199

1 previous -- a previous declaration. No reason to
2 rewrite it.
3   Q. And the previous declarations from which
4 material was drawn for this declaration, were those
5 previous declarations all declarations from you or from
6 other people?
7   A. Certainly that piece would have been from a
8 declaration where I was the signatory.
9   Q. Right. Any other -- any -- any declarations
10 from other people that you drew from in writing this
11 declaration?
12   A. It is -- I think it's likely that I -- there
13 may be some information out of the Blue Cross Blue
14 Shield declaration Exhibit 114 that may have
15 contributed to some information in here with regards to
16 Blue Cross Blue Shield. But other than that, I can't
17 think of where -- any others.
18   Q. Understood.
19      And did -- did counsel write any portions of
20 this declaration?
21   A. I -- counsel reviewed and provided markups
22 that I would review and determine if they were accurate
23 and accept or reject, depending on accuracy.
24   Q. Okay. And you decided what language was
25 ultimately included in the declaration?

Page 200

1   A. I did.
2   Q. Okay. Does this declaration reflect the same
3 analysis as the report that we've been discussing
4 today?
5   A. I believe so, yes.
6   Q. Why did you decide to title this a declaration
7 instead of an expert report?
8   A. I believe at the time of its -- that it was
9 delivered, it was not being delivered as an expert
10 report, but a -- a declaration.
11   Q. And the footers on pages 1 and 3 through 8 do
12 refer to "Expert Report of Darryl Thompson."
13      Why didn't you change them to say
14 "declaration"?
15         MR. BURT: Objection. Form.
16   A. I do not -- I don't know why it is stated that
17 way. An error.
18   Q. (BY MR. LAZARUS) Are you aware that
19 plaintiffs' counsel were obligated to disclose their
20 expert witnesses to Apple on March 7, 2025?
21         MR. BURT: Objection. Calls for a legal
22 conclusion.
23   A. Restate -- can you repeat?
24   Q. (BY MR. LAZARUS) Just if you're aware.
25      Are you aware that plaintiffs' counsel was

Page 201

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 obligated to disclose their expert witnesses to Apple
2 on March 7, 2025?
3     A. I was not.
4     Q. Okay. Are you aware that Apple requested
5 access to inspect your code at JND's office in Seattle
6 on May 1 and 2, 2025?
7     A. I -- I don't know if I'm -- if I was included
8 in -- in that information, but I may have.
9     Q. Okay. Do you -- do you know where you were on
10 May 1 and 2, 2025?
11     A. No.
12     Q. All right. Do you think it is likely that
13 some number of payors in the Apple payor data have
14 provided fictitious contact information in order to
15 protect their own privacy?
16         MR. BURT: Objection. Form.
17     A. I -- I don't know how I would be able to
18 speculate on that with any accuracy at all.
19     Q. (BY MR. LAZARUS) Do you think it's likely
20 that some number of payors in the Apple payor data have
21 engaged in fraud?
22         MR. BURT: Same objection.
23     A. I'm -- I also would have no way to speculate
24 with any accuracy on that question.
25     Q. (BY MR. LAZARUS) Okay. And I'll ask a

Page 202

1 additional data in order to identify payor records that
2 might have been created by bots?
3         MR. BURT: Objection. Form.
4 Foundation.
5     A. I -- sorry, but -- but based on what it took
6 to get the data I got, I don't see how that was a
7 conceivable thing.
8     Q. (BY MR. LAZARUS) And not a conceivable
9 thing --
10     A. To receive additional data from Apple.
11     Q. And so you did not request any --
12     A. I requested --
13         MR. BURT: Object to form. Foundation.
14     A. I requested no additional data from Apple.
15     Q. (BY MR. LAZARUS) Do you agree that fraudulent
16 activity, whether by a human operator or by a bot, is
17 more likely to be found where the payor spends money
18 through multiple accounts rather than just one?
19         MR. BURT: Objection. Form.
20 Foundation.
21     A. Please -- please restate your question.
22     Q. (BY MR. LAZARUS) Do you agree that fraudulent
23 activity, whether by a human operator or by a bot, is
24 more likely to be found where the payor spends money
25 through multiple accounts rather than just one account?

Page 204

1 follow-up question to that.
2     Do you think it is likely that some number of
3 payors represented in the Apple payor data have entered
4 fictitious contact information as part of committing
5 fraud?
6         MR. BURT: Objection to form.
7 Foundation.
8     A. And, again, I don't -- I don't know how -- how
9 I could possibly accurately speculate on -- on that
10 situation.
11     Q. (BY MR. LAZARUS) Okay. Do you think it is
12 likely that some number of payor records in the Apple
13 payor data were set up by bots and not directly by
14 human operators?
15         MR. BURT: Objection. Form.
16 Foundation.
17     A. Similarly, I -- it is -- without deeper access
18 to Apple's systems I would have no way to assess that
19 accurately.
20     Q. (BY MR. LAZARUS) And when I say, "bots," do
21 you understand I mean computer programs designed to
22 perform automated tasks?
23     A. I -- I take bots as a term of art in my -- in
24 my industry.
25     Q. And am I correct that you did not request any

Page 203

1     A. Not my -- not my field of expertise. So I --
2 I can't speak to fraudulent purchasing.
3     Q. Okay. Just to ask one follow-up there.
4     Do you suspect that it is true that fraudsters
5 would tend to set up one account and run all of their
6 frauds out of that one account or set up many accounts?
7         MR. BURT: Objection. Form.
8 Foundation.
9     A. Again, I -- other than speculation, I have
10 no -- I have no experience with fraud -- fraudulent
11 purchasing accounts. So I have no -- I have no way to
12 give you a -- a answer that I can have confidence in.
13         MR. LAZARUS: Okay. So -- okay. Well,
14 I think -- why don't we go off the record and take a
15 break and then come back and we'll see if we have
16 anything else.
17         THE VIDEOGRAPHER: We are going off the
18 record at 5:11.
19         (Break from 5:11 p.m. to 5:24 p.m.)
20         THE VIDEOGRAPHER: We are back on the
21 record. The time is 5:24. Please proceed.
22         MR. LAZARUS: Thank you.
23     Q. (BY MR. LAZARUS) Mr. Thompson, you mentioned
24 that in your review and validation of the data that
25 both you and the person, Cameron, who I apologize, the

Page 205

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY



**Page 206**

1  last name is --
2      A.  Karlin.
3      Q.  Karlin.
4          You mentioned that both you and Karlin -- I'm
5  sorry, I'll start over.
6          You mentioned that both you and Cameron Karlin
7  conducted review and validation of your deduplication
8  results; is that right?
9      A.  That is correct.
10     Q.  And did you and Cameron have any disagreements
11  over any particular finding in that review?
12         MR. BURT:  I'm going to object.  And
13  I think that's a discussion within an expert shop and
14  I --
15         MR. LAZARUS:  You're right.  You're
16  right.  Withdrawn.
17     Q.  (BY MR. LAZARUS)  All right.  Let me ask this.

**Page 208**

21         MR. BURT:  Objection.  Form.
22  Foundation.

**Page 207**

1          MR. BURT:  Object to form.
2          Go ahead.

**Page 209**

4      Q.  (BY MR. LAZARUS)  All right.  And then one
5  other point.  So I asked earlier where you were on
6  May 1 and 2, and you said you don't have a calendar in
7  front of you.
8          Do you have your phone with you that -- would
9  you be able to look at your calendar and refresh your
10  memory as to where you --
11     A.  My phone is not on me right this second, no.
12     Q.  All right.  We will let that go.
13         MR. LAZARUS:  Okay.  Those are all the
14  questions I have.  Thank you.
15         MR. BURT:  I think I don't need to take
16  a break to ask what I need to ask.  And this will not
17  take very long.  Thank you for your patience,
18  Mr. Thompson.
19
20         EXAMINATION
21  BY MR. BURT:
22     Q.  You know who I am, but just so the record's
23  clear, Thomas Burt from Wolf Haldenstein.  You know me.
24          Is this the first engagement you've worked on
25  deduplication for where there were user-generated data

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

1 fields that were some measure of populated with
2 inaccurate, noninformative or nonstandard entries?
3         MR. LAZARUS: Object to form.
4     A. This is not the first engagement that I've had
5 to deal with similar data, no.
6     Q. (BY MR. BURT) In the past, has that happened
7 once or more than once?
8     A. It has happened more than once.
9     Q. So early this morning, Mr. Lazarus asked you
10 about your hands-on involvement in the list of
11 engagements that is attached as Appendix B to your
12 report.
13        Do you generally remember discussing that
14 subject?
15     A. I do.
16     Q. And taking not just -- withdrawn. Let me ask
17 you first.
18        What period's covered by that list?
19     A. I believe the list is the last four years.
20     Q. Okay. Taking not just that period, but your
21 entire experience at Garden City and at JND together,
22 can you quantify for me how often you've been the
23 supervisor of the folks doing hand -- hands on
24 deduplication work?
25     A. Over the entire period, probably well over

Page 210

1     MR. LAZARUS: What does that mean?
2         THE VIDEOGRAPHER: Transcript order --
3 transcript orders and video orders.
4         MR. LAZARUS: So we would like the rough
5 transcript as soon as it can be delivered today. And
6 the -- an expedited transcript tomorrow, if that's --
7 and then in terms of video --
8         THE VIDEOGRAPHER: Copy or sync?
9         MR. LAZARUS: I think we want a copy.
10 Is that what we have done for other depositions?
11        THE VIDEOGRAPHER: Yeah, I don't know
12 what your standing order is -- or if there is a
13 standing order, what it is.
14        MR. LAZARUS: Do you know, Ramona?
15        MS. LIN: No idea. It's a standing
16 order.
17        THE VIDEOGRAPHER: Okay. I will have
18 them check. All right.
19        MR. LAZARUS: Okay. Thank you.
20        MR. BURT: Rough and regular on the
21 transcript. Video, we'll circle back.
22        THE VIDEOGRAPHER: Okay. All right.
23 Thank you, everyone.
24        This concludes today's testimony of
25 Darryl Thompson. The total number of media units used

Page 212

1 50 percent of the time. Possibly 60 to 70 percent of
2 the time.
3     Q. Have you ever taught other people how to do
4 deduplication?
5     A. I have.
6     Q. Are the people that you've taught how to do
7 deduplication people who worked on assignments that
8 you've supervised?
9     A. They were.
10     Q. And have you ever taught anyone to teach other
11 people the skill set of deduplicating?
12     A. People that I have taught have become managers
13 that then taught others, yes.
14     Q. Okay. Are there any of the engagements that
15 are listed in your Exhibit B to your report engagements
16 where the people doing the hands-on deduplication were
17 taught to do it by the people that you taught how to
18 teach it?
19     A. Most certainly, yes.
20        MR. BURT: Unless Mr. Lazarus has more
21 questions, I do not.
22        MR. LAZARUS: I do not either.
23        MR. BURT: We're off the record.
24        THE VIDEOGRAPHER: Before we conclude,
25 can we please get orders on the record?

Page 211

1 was five and will be retained by Veritext. We're going
2 off the record at 5:35.
3        (Deposition concluded at 5:35 p.m.)
4        (Signature was reserved.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 213

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

| | |
|---|---|
| 1     REPORTER'S CERTIFICATE | 1  xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF |
| 2     I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned | 2     Transcript - The witness should review the transcript and |
| 3  Certified Court Reporter, authorized to administer oaths and | 3     make any necessary corrections on the errata pages included |
| 4  affirmations in and for the states of Washington (2578), | 4     below, noting the page and line number of the corrections. |
| 5  Oregon (16-0443), and California (14423) do hereby certify: | 5     The witness should then sign and date the errata and penalty |
| 6     That the sworn testimony and/or proceedings, a | 6     of perjury pages and return the completed pages to all |
| 7  transcript of which is attached, was given before me at the | 7     appearing counsel within the period of time determined at |
| 8  time and place stated therein; that any and/or all witness(es) | 8     the deposition or provided by the Federal Rules. |
| 9  were duly sworn to testify to the truth; that the sworn | 9 |
| 10  testimony and/or proceedings were by me stenographically | 10  __ Federal R&S Not Requested - Reading & Signature was not |
| 11  recorded and transcribed under my supervision. That the | 11     requested before the completion of the deposition. |
| 12  foregoing transcript contains a full, true, and accurate | 12 |
| 13  record of all the sworn testimony and/or proceedings given and | 13 |
| 14  occurring at the time and place stated in the transcript; that | 14 |
| 15  a review of which was requested; that I am in no way related | 15 |
| 16  to any party to the matter, nor to any counsel, nor do I have | 16 |
| 17  any financial interest in the event of the cause. | 17 |
| 18     WITNESS MY HAND AND DIGITAL SIGNATURE this 6th day of | 18 |
| 19  June, 2025. | 19 |
| 20 | 20 |
| 21 | 21 |
|      *Carla R. Wallat* | 22 |
| 22  CARLA R. WALLAT, RPR, CRR | 23 |
| 23  Washington CCR #2578, Expires 1/5/2026 | 24 |
| 24  Oregon CSR #16-0443, Expires 9/30/2027 | 25 |
| 25  California CSR #14423, Expires 1/31/2026 | |
|      Page 214 |      Page 216 |

| | |
|---|---|
| 1  THOMAS H. BURT | 1     I declare under penalty of perjury |
| 2  burt@whafh.com | 2  under the laws that the foregoing is |
| 3     June 6, 2025 | 3  true and correct. |
| 4  RE: In Re Apple Iphone Antitrust Litigation | 4 |
| 5  6/5/2025, Darryl Thompson, (#7376385). | 5     Executed on _____ , 20___, |
| 6  The above-referenced transcript has been | 6  at _____, _____. |
| 7  completed by Veritext Legal Solutions and | 7 |
| 8  review of the transcript is being handled as follows: | 8 |
| 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext | 9 |
| 10  to schedule a time to review the original transcript at | 10 |
| 11  a Veritext office. | 11  _____ |
| 12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF | 12  Darryl Thompson |
| 13  Transcript - The witness should review the transcript and | 13 |
| 14  make any necessary corrections on the errata pages included | 14 |
| 15  below, noting the page and line number of the corrections. | 15 |
| 16  The witness should then sign and date the errata and penalty | 16 |
| 17  of perjury pages and return the completed pages to all | 17 |
| 18  appearing counsel within the period of time determined at | 18 |
| 19  the deposition or provided by the Code of Civil Procedure. | 19 |
| 20  Contact Veritext when the sealed original is required. | 20 |
| 21  __ Waiving the CA Code of Civil Procedure per Stipulation of | 21 |
| 22  Counsel - Original transcript to be released for signature | 22 |
| 23  as determined at the deposition. | 23 |
| 24  __ Signature Waived – Reading & Signature was waived at the | 24 |
| 25  time of the deposition. | 25 |
|      Page 215 |      Page 217 |

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

```
 1  In Re Apple Iphone Antitrust Litigation
 2  Darryl Thompson (#7376385)
 3        E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  (Darryl Thompson)          Date
25
                                          Page 218
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[& - 17,683]**

| **&** |
|---|
| **&**   2:4,8,14,18 |
| 8:6,13,16 |
| 129:13 215:24 |
| 216:10 |

| **0** |
|---|
| **0**   132:14 |
| **06714**   1:5 7:17 |

| **1** |
|---|
| **1**   1:25 3:14 |
| 7:12 14:4 |
| 22:17,21 72:21 |
| 77:15 78:11 |
| 89:21 142:24 |
| 142:25 145:3 |
| 150:11 151:2 |
| 201:11 202:6 |
| 202:10 209:6 |
| 216:1 |
| **1,000**   137:13,20 |
| **1.44**   140:25 |
| **1.5**   41:10 |
| **1.69**   81:13 |
| 189:8 |
| **1.7**   105:22 |
| **1/15/2025**   6:16 |
| **1/2**   181:10 |
| **1/31/2026** |
| 214:25 |
| **1/5/2026** |
| 214:23 |
| **10**   70:4,7 80:4 |
| 96:14 106:8 |
| 118:5,8,11 |

138:10,12
139:16
**100**   26:25 27:1
84:6 99:13,17
99:24 100:3
**100,000**   133:25
137:23
**10016**   2:5
**10767813**   4:8
4:15,22 5:5,12
5:19 6:5,12
**10809581**   4:9
4:16,23 5:6,13
5:20 6:6,13
**10857484**   4:10
4:17,24 5:7,14
5:21 6:7,14
**10864885**   4:11
4:18,25 5:8,15
5:22 6:8,15
**10:42**   64:23,24
**10:58**   64:24
65:1
**10b**   72:14
125:21
**11**   26:11,11
**112**   3:10 14:5,6
74:5 129:1
**113**   3:13 18:18
18:20,21,22
88:20,21 90:19
126:14 128:22
128:23 129:2
129:23 169:19

**114**   3:14 33:10
33:11 59:18
200:14
**115**   3:18 46:24
47:1
**116**   3:22 72:15
72:18 77:16
125:22,22
**117**   3:23 79:23
80:1 81:7
82:19 136:6
**118**   4:2 84:21
**119**   4:5 148:12
149:12,13
150:14
**120**   4:12 149:9
149:14,16
150:14
**1200**   1:13 7:18
132:17
**1201**   132:17
**121**   4:19 150:2
150:3,4,5,14
**122**   5:2 153:19
153:20
**123**   5:9 154:7,8
154:9 182:3
**124**   5:16 156:3
156:4,5 157:18
157:21 159:4
163:10
**125**   6:2 156:18
156:19 157:5,7
157:18,21
159:5 163:10

**126**   6:9 158:14
158:15,16
159:5 163:10
**127**   6:16 196:6
196:7,24 197:1
**128**   6:18 199:2
199:3
**12:01**   98:6,7
**12:45**   98:8
**12:49**   99:2,6
**13**   139:18
**14**   3:10 138:22
**14423**   1:22
214:5,25
**148**   4:5
**149**   4:12
**15**   42:19 95:22
175:1 196:9
**150**   4:19
**153**   5:2
**154**   5:9
**156**   5:16 6:2
**158**   6:9
**16**   3:11 70:23
71:1 136:8,10
137:10
**16-0443**   1:22
214:5,24
**1615**   2:9
**17**   18:17 70:23
71:2 80:18
128:19,25
129:1,3
**17,683**   153:8

Page 1

**[1700 - 7376385]**

| | | | |
|---|---|---|---|
| **1700** 2:19 | **2016** 30:6 | **2578** 1:22 | **4:52** 196:19,21 |
| **17a** 132:18 | **202.326.7900** | 214:4,23 | **5** |
| **17b** 129:17,24 | 2:10 | **26** 59:23 | **5** 1:12 7:1 40:3 |
| **17e** 131:3,25 | **202.955.8500** | **2600** 2:14 | 42:21 47:4 |
| 132:6,9 140:9 | 2:20 | **270** 2:5 | 130:7 193:18 |
| 176:6 177:18 | **2024** 47:3 64:2 | **28** 18:12 | 194:19 |
| 179:10 | 64:3 72:21 | **290** 188:14,17 | **5.sql** 130:8 |
| **17f** 101:5,16 | 80:4 125:23 | 188:24 | **50** 180:9 211:1 |
| 102:3 131:6 | **2025** 1:12 3:12 | **2:06** 128:14,16 | **51** 180:9 |
| 132:7 142:21 | 6:19 7:1,6 | **3** | **5315** 156:10,11 |
| **17g** 184:19 | 18:12 193:18 | **3** 22:21,22 | 157:12 158:23 |
| **18** 3:13 79:5,10 | 194:11,19,21 | 33:13 70:8 | **5:11** 205:18,19 |
| **18c** 33:5 | 196:9 199:6 | 79:22 201:11 | **5:24** 205:19,21 |
| **196** 6:16 | 201:20 202:2,6 | **30** 216:1 | **5:35** 213:2,3 |
| **19863** 214:21 | 202:10 214:19 | **33** 3:14 | **5th** 7:6 |
| **199** 6:18 | 215:3 | **35** 45:21 | **6** |
| **1996** 23:6,10 | **2025.520** 215:9 | **395** 65:7,10 | **6** 26:1,5 47:3 |
| **1998** 28:14 | 215:12 | **3:31** 169:13,14 | 47:21 193:18 |
| **19a** 148:11 | **209** 3:5 | **3:51** 169:14,16 | 194:19 215:3 |
| **19b** 149:7 | **21** 194:21 | **4** | **6/5/2025** 215:5 |
| **19g** 153:17 | **212.545.4600** | **4** 51:14 53:9 | **60** 211:1 |
| **1:48** 128:13,14 | 2:6 | 56:12 72:25 | **610** 1:13 7:18 |
| **1st** 125:23 | **218** 1:25 | 78:11 84:17 | **6th** 214:18 |
| **2** | **21st** 194:11 | **400** 2:9 132:14 | **7** |
| **2** 26:2 46:23 | **23** 34:6,9,22 | **401** 132:16 | **7** 6:19 14:18 |
| 85:1,10 202:6 | 35:2 | **415.393.8200** | 199:5 201:20 |
| 202:10 209:6 | **24** 36:3,12,13 | 2:15 | 202:2 |
| **20** 116:17 | 36:13,15 | **42,555** 153:8,10 | **7/10/2024** 3:23 |
| 164:6 217:5 | **243,646,638** | **43.5** 181:13 | 4:2 |
| **200** 180:14 | 193:11 | **43rd** 181:7,9 | **70** 211:1 |
| **2001** 33:13 | **246** 193:8,13 | **47** 3:18 | **72** 3:22 |
| **20036** 2:9,19 | **249** 154:3,17 | **4:11** 1:5 7:17 | **7376385** 1:23 |
| **2010** 28:15 | **25** 22:19 23:4 | **4:48** 196:18,19 | 215:5 218:2 |
| 30:6 | 27:3,4 36:11 | | |

[75 - additional]

| | | | |
|---|---|---|---|
| **75** 27:3 | **ability** 38:16 | **accounts** 153:8 | **actually** 9:17 |
| **76.5** 47:23 | 95:13 96:10 | 204:18,25 | 19:16 27:5 |
| **78** 37:18,19 | 121:24 127:5 | 205:6,11 | 32:23 63:2,15 |
| **7d** 125:25 | 145:22 171:15 | **accreditations** | 72:1 74:3 |
| 126:9 | 189:10 208:11 | 24:6 | 87:24 103:2 |
| **8** | **able** 61:14 | **accuracy** 38:12 | 108:18 115:14 |
| **8** 74:7 77:21 | 88:12 101:22 | 200:23 202:18 | 115:15 128:7 |
| 78:1,23 92:10 | 102:25 103:13 | 202:24 | 146:19 151:21 |
| 92:14 199:11 | 147:13 175:14 | **accurate** | 164:7 |
| 201:11 | 202:17 209:9 | 103:20 112:18 | **adaptis** 28:16 |
| **80** 3:23 97:19 | **above** 215:6 | 125:9,10 | 28:18,19,24 |
| **800** 132:16 | **absolutely** 27:1 | 200:22 206:24 | 29:4,6,9,10,15 |
| **801** 132:16 | 170:17 | 209:2 214:12 | 29:16,17 |
| **84** 4:2 | **accept** 18:14 | **accurately** 73:7 | **add** 104:6 |
| **9** | 200:23 | 73:13,16,21 | 135:18 167:4 |
| **9** 3:4 74:7 78:2 | **accepted** | 108:2 203:9,19 | 189:19 190:1 |
| 78:3 79:5 | 117:24 138:13 | **achieve** 19:8 | **added** 77:13 |
| 93:22 94:3,8 | 138:19,20 | 60:1 62:3 | 137:9 140:4,5 |
| 94:15,17,25 | 139:8 | 97:18 127:12 | 195:16 |
| 116:8 117:1,5 | **access** 54:25 | **achieving** 38:1 | **addition** 20:20 |
| 199:2 | 145:20,22 | 38:8 60:11 | 77:12 120:9 |
| **9/30/2027** | 193:21 194:18 | **acquired** 30:15 | **additional** |
| 214:24 | 202:5 203:17 | **action** 7:23 | 19:15 38:21 |
| **90** 169:9 | **accomplished** | 9:23 24:17 | 39:3,7,16 |
| **94111** 2:15 | 130:17 | 26:6 32:20 | 96:24 97:22 |
| **99** 34:4 | **accomplishes** | 34:9 36:5 | 101:10,11 |
| **9:05** 1:11 7:2,6 | 129:23 | 37:16 74:2 | 102:7,8,9,12,13 |
| **a** | **accord** 36:7 | 134:2,10,13,14 | 102:18,20,24 |
| **a.m.** 1:11 7:2,6 | **account** 82:22 | **active** 76:15 | 103:13,21,25 |
| 64:24,24 | 83:1,3,6,8,9,16 | **activity** 19:17 | 104:6,6,15,17 |
| **abbreviated** | 83:17,18 117:8 | 49:4 204:16,23 | 105:5,10,11,16 |
| 159:7 182:5,6 | 117:15 161:2,5 | **actual** 19:17 | 106:5,15 107:7 |
| **abbreviation** | 204:25 205:5,6 | 25:11 84:5,5 | 107:20 108:8,8 |
| 180:17 | **accountholder** | 137:5 180:16 | 121:10,13,22 |
| | 83:10 | | 121:25 122:7 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[additional - agree]**

137:3 140:5,6
141:13 143:3,8
145:1 151:23
162:25 163:23
167:4,12 172:7
172:22 186:5
187:11 195:13
204:1,10,14
**additionally**
13:6 141:11
142:11
**address**   27:12
32:2,5 45:15
45:17 46:11
52:12,16 54:9
54:17,20 89:22
89:24,25 90:7
90:8,8,21
91:22 92:2
110:13,18,23
111:2,4,16,17
111:21,24,25
112:4,7,10,14
112:16 113:7
114:12,15,18
114:21 115:1,5
115:5 116:5
120:10,13
121:21 129:4
129:18 130:10
133:3 134:16
134:18,19
142:14 145:2,3
146:15 148:5,6
148:6 149:4,4

149:21 150:10
154:3,17,23,23
154:25 155:11
155:21 156:10
156:14 157:12
157:15,19
158:10,23
159:1,6 176:8
176:23 178:5
179:11,25
180:8 182:3,15
182:16 184:22
184:23 186:11
186:13,17
187:14 188:11
188:25 189:12
189:18,20,25
190:1 191:4,11
191:15,20
192:4,11 207:4
**addresses**   28:3
54:11 85:16
86:23,25 87:3
87:9 89:6,14
89:18 90:1,4,5
90:10,12 91:12
111:10,12
113:25 114:8
120:14 121:22
180:21 181:1
186:8 187:20
187:24 191:16
191:25
**addressing**
115:1

**adequate**   96:25
101:2
**adjust**   178:2
**adjustment**
209:3
**adjustments**
180:15
**adler**   2:4 8:13
**administer**
49:18 50:20
51:3 214:3
**administered**
35:25 54:21
**administering**
9:24 48:1,11
198:3
**administration**
9:23 20:3
24:11,15,16,17
25:1,3,3,7,20
25:21 28:20
30:11 32:13,14
32:15,17,20
34:8,21 35:6
35:12,14 37:1
37:5 38:2,7
41:19 49:7
50:5,13 51:2
59:21 61:11
67:2,7,11,18,21
67:24,24 70:18
104:10,10
117:25 118:14
118:19 138:14
138:23,24

139:1 198:9,12
198:21,22
**administrations**
26:7 35:24
38:14 113:24
**administrator**
37:10,11,23
39:23 197:6,8
197:11,19
198:16,17
**adopted**   15:21
**advanced**
23:16 121:21
**advantage**
139:13
**advise**   122:25
**affect**   44:7
171:21,22
172:11 173:17
**affiliated**   47:13
**affiliations**   8:3
**affirmations**
214:4
**afternoon**   99:1
**agency**   71:14
71:19
**aggressive**
122:3,25
**ago**   9:19 13:7
42:3 51:18
56:17 64:1
75:16 92:1,2
**agree**   7:11
44:16 46:8
49:15 55:16,18

**[agree - appearing]**

55:24 105:18
106:3 110:8
111:13 145:25
146:6,13 147:8
150:13 151:4
152:1,5 157:19
158:7,11,11
160:8,25 161:5
162:14 180:8
181:8,14,16,21
204:15,22
**agreed**   42:23
43:18,25 44:13
**ahead**   18:16
77:2 197:15
207:2
**aip**   130:2
**air**   127:23
128:1 142:18
145:21 190:5
193:22
**al**   155:19
**algorithm**   73:3
77:19 109:13
129:4,18 132:1
140:10,20
141:23 142:22
146:25 147:13
147:19 155:19
155:23 176:7
**algorithmically**
141:19,22
**algorithms**
131:11 142:3,7

**align**   100:21
**alink**   2:11
**allow**   126:18
145:18
**alternative**
44:1
**alternatives**
113:3
**amended**   71:23
72:4
**amount**   48:17
88:16 104:20
176:19 208:9
**analyses**   20:17
21:2 208:20
**analysis**   11:7
19:20 20:22
21:11 29:16
41:20 53:10
57:19,21,24
58:17 69:14
90:13 99:12
100:2 105:14
106:4 107:6
108:8,14,24
113:14 120:11
121:11 122:20
126:17,19
135:15 141:12
145:10,12
167:10 173:8
178:1,24,25
201:3 206:20
207:17,22
208:3,4

**analyst**   29:11
**analyze**   86:6
133:8 174:16
178:17
**analyzed**   42:23
59:25 62:1
91:13 152:19
178:17
**analyzing**
101:21 207:14
**anna**   2:8 65:3
**anomalous**
178:2 184:1
**anonymized**
94:11 116:12
**answer**   11:13
11:20 12:8
15:13 16:25
17:10,12 26:23
27:20 29:2
34:16 44:4
49:14 66:19
77:3 84:2
123:13 137:16
141:25 144:24
146:4 161:10
165:20 167:22
180:23 184:14
205:12
**answered**
11:15 19:23
67:13 106:18
119:1
**answering**   75:5
75:12

**antitrust**   1:5
3:15,19 7:14
33:21 46:16
47:7 215:4
218:1
**apl**   4:8,9,10,11
4:15,16,17,18
4:22,23,24,25
5:5,6,7,8,12,13
5:14,15,19,20
5:21,22 6:5,6,7
6:8,12,13,14,15
**apologies**   13:10
72:5 180:4
**apologize**   41:5
163:7 196:11
205:25
**app**   71:18,18
79:1 92:12
93:3
**appear**   46:17
68:20 78:10
89:13 91:11
148:20 157:25
180:21 181:17
181:20
**appearance**   8:1
**appearances**
8:3
**appeared**   82:10
86:22 87:9
91:23 136:21
**appearing**
215:18 216:7

**[appears - asked]**

| | | | |
|---|---|---|---|
| **appears**  14:17 | 92:4,13,23 | 159:20 173:23 | **approximately** |
| 41:23 47:12 | 93:1,10,14,18 | 174:5 190:22 | 9:19 64:1,2,3 |
| 77:17,18 | 95:25 96:15 | 193:17 194:1 | 75:16 137:10 |
| 150:25 | 97:10,12 99:12 | 194:18,20 | 139:18 193:7 |
| **appendix**  26:3 | 100:4 117:20 | 203:18 | 193:13 |
| 26:6,11 28:8 | 120:9,20 122:4 | **applicable** | **apps**  79:1 |
| 46:17 63:1,10 | 130:3,7,8,9 | 168:20,23 | 92:12 93:3,3 |
| 210:11 | 134:6 142:16 | **application** | **appstore**  4:8,9 |
| **appetite**  122:5 | 143:13,18 | 168:8 | 4:10,11,15,16 |
| **apple**  1:4 4:6 | 147:21 148:14 | **applied**  52:18 | 4:17,18,22,23 |
| 4:13,20 5:3,10 | 148:18 149:17 | 77:11 86:1,5,9 | 4:24,25 5:5,6,7 |
| 5:17 6:3,10 | 153:22 154:10 | 86:13 139:17 | 5:8,12,13,14,15 |
| 7:14 8:6 12:14 | 156:21 158:17 | 139:23,23 | 5:19,20,21,22 |
| 12:18 21:4,7 | 163:17 172:19 | 168:8 | 6:5,6,7,8,12,13 |
| 39:23,24 40:7 | 175:4 176:25 | **applies**  168:19 | 6:14,15 |
| 41:7 42:9,11 | 179:6 180:24 | **apply**  43:4,15 | **april**  3:11 |
| 42:13 44:25 | 186:20 188:25 | 55:18 107:7 | **area**  135:12,22 |
| 51:8,21 52:9 | 189:16,21 | 108:16 109:8 | 135:24 137:12 |
| 52:20,23 53:4 | 190:7,13 191:2 | 113:24 131:13 | 137:19 147:25 |
| 56:22 57:1,11 | 191:23 192:3 | 131:21 141:14 | 165:22 |
| 58:16 68:19 | 192:13,19 | 175:14,17 | **areas**  43:10 |
| 70:5,9,20 | 193:11 194:23 | **applying**  55:13 | 166:17 |
| 71:14 73:2 | 194:24 195:17 | 95:15 100:24 | **arena**  29:10 |
| 76:15 78:24 | 195:22 198:1 | 131:17,18 | **art**  203:23 |
| 79:2,13,14,17 | 201:20 202:1,4 | 175:23 | **arts**  23:6 |
| 79:20 80:15,22 | 202:13,20 | **appreciated** | **ascii**  87:19 92:6 |
| 82:15,25 83:2 | 203:3,12 | 17:19 | 130:5 169:21 |
| 83:2,3,7,8,9,9 | 204:10,14 | **approach** | 170:23 171:1 |
| 83:10,17,17,18 | 215:4 218:1 | 108:3 109:18 | 171:16 |
| 83:25 84:12,13 | **apple's**  17:23 | 109:19 | **ascii.sql**  130:4 |
| 85:11,13,14,15 | 21:7 58:16 | **appropriate** | **asked**  11:20 |
| 85:18 86:1,5,9 | 89:20,24 90:7 | 61:5,10,13 | 16:21 19:10,22 |
| 86:13,18,21 | 90:11 125:17 | 152:2 | 63:4 67:12 |
| 89:22 90:5,8 | 126:18 134:16 | **approximate** | 73:14 74:9 |
| 90:12 91:12 | 150:10 159:18 | 127:6 | 95:6 106:17 |

**[asked - b]**

118:25 209:5
210:9
**asking**  12:7
17:3 74:20,21
74:25 75:11
83:15,19 94:16
94:18 96:7
105:21 107:25
119:5 122:18
146:5 167:19
**assembled**
100:25
**assertion**  22:25
**assess**  177:13
203:18
**assigned**
116:22 195:11
195:14 198:20
198:23,23
**assigning**
113:11 123:1
**assignment**
62:22 63:20
69:23 74:9,12
75:1,5,9,13,17
75:21 76:1,7
76:24 77:7,9
78:16 85:25
94:18 95:5
96:6,7,9
122:19 125:3
135:10 208:18
**assignments**
78:18 211:7

**assist**  69:19
198:20
**assisted**  69:5
141:3
**assisting**
198:22
**associate**  78:7
94:1
**associated**
82:22 137:13
137:19 162:12
163:19 189:19
189:25
**association**
28:12 111:1
**assume**  11:14
47:14,18 56:6
160:7 177:14
197:11
**assumed**
143:12
**assuming**  162:8
**assumptions**
122:9,14
143:10,23
**attached**
210:11 214:7
**attempt**  87:13
90:14 118:11
129:5,19 162:2
162:23 164:10
179:23 208:9
**attempted**
165:23 166:1
208:18

**attempting**
134:20 167:13
169:5
**attempts**
186:11
**attended**  47:11
**attorney**  8:4
17:7,25 74:18
**attorneys**  1:7
12:14
**audible**  93:9
**audio**  7:9
**august**  72:21
77:15 78:11
125:23
**austin**  149:4
**author**  168:2
197:10 199:13
199:20
**authored**  24:1
**authorized**
214:3
**automated**
203:22
**automatically**
186:24 187:6
**available**  60:19
87:12 100:6,20
101:24 102:2
106:2 109:20
109:24 120:25
140:11 145:18
147:21 159:15
161:21 162:11
168:24 170:11

175:17,24
177:20 182:19
182:21,24
184:9,22
189:15,16,17
189:17 190:13
190:22
**ave**  154:3,17
157:12
**avenue**  1:13 2:5
7:18 156:11,11
158:24,24
159:6
**aware**  10:10
20:12 34:9,22
35:2,4 54:23
65:18,20,23,24
67:4 78:13
83:19,21 92:22
109:9 110:16
110:21,25
111:16 112:6
112:20 113:5,6
113:8 114:6,10
114:14,17,20
114:25 115:9
116:4 118:15
118:22 160:20
185:24 188:6,9
201:18,24,25
202:4

| **b** |
|---|
| **b**  4:5 26:2,3,6
26:11 28:8
46:17 63:1,10 |

**[b - billed]**

| | | | |
|---|---|---|---|
| 129:9 154:12 | 114:4 188:20 | **beginning** 8:4 | 165:13,18 |
| 210:11 211:15 | **bank** 56:6 | 85:10 197:22 | 168:18 172:12 |
| 216:1 | 161:2,4 | **believe** 10:22 | 174:9,17 |
| **bachelor** 23:6 | **banks** 55:12 | 13:22 15:18 | 176:15 186:2 |
| **bachelor's** | 56:1 | 18:10 19:6 | 191:13 192:6 |
| 23:13 | **based** 26:15 | 21:14,16,20,21 | 192:23 201:5,8 |
| **back** 20:1,19 | 34:8,21 36:4,7 | 22:1 26:22 | 206:18,21 |
| 59:17 64:25 | 44:21,21 77:11 | 27:4 31:17,22 | 207:4 210:19 |
| 65:5 72:12 | 95:13 101:1,23 | 33:23 35:15 | **benefit** 33:1 |
| 74:5 82:15 | 104:8 110:1 | 36:13,23 37:14 | 37:1,6,21,23 |
| 89:5 91:24 | 119:9 131:11 | 37:22 40:2,18 | 104:19 105:16 |
| 93:20 95:14 | 131:14 134:11 | 43:7 44:19,20 | 108:9 |
| 99:5 105:2,10 | 136:1 140:8,13 | 44:21 46:20 | **benefits** 37:10 |
| 106:7 125:8,20 | 141:25 147:2 | 47:10 50:25 | 148:5 |
| 128:8,15 136:5 | 147:14 152:3 | 61:12,22 62:9 | **benefitted** |
| 141:17 149:2 | 152:13 155:8 | 62:10,19 65:9 | 121:22 |
| 162:5 167:17 | 161:21 175:16 | 67:8,15 73:18 | **best** 12:3 34:10 |
| 169:15,18 | 175:24 176:2 | 74:11 78:17 | 34:23 35:7,19 |
| 187:23 189:20 | 176:18 177:3,6 | 80:17 85:1 | 36:7 75:15 |
| 190:2,5 192:8 | 177:8 178:20 | 88:15 89:15 | 95:13 96:10 |
| 195:21 196:1 | 181:4 183:12 | 90:3,14 91:18 | 127:5 171:15 |
| 196:20 198:1 | 189:3 204:5 | 92:19 94:23 | 189:9 207:15 |
| 205:15,20 | **bases** 18:8 | 95:11 96:3,5 | 207:19 208:10 |
| 212:21 | **basic** 144:17 | 103:6,19,20 | **better** 31:23,25 |
| **backfill** 130:10 | **basically** 171:7 | 108:5 110:6 | 43:16 185:18 |
| **background** | 186:12 | 111:22,23 | 195:3 |
| 16:20 20:2 | **basis** 17:2 | 113:10 115:12 | **beyond** 23:12 |
| **backing** 43:9 | 76:19 92:16 | 116:2 119:25 | 106:1 123:12 |
| **backup** 20:21 | 164:4 | 121:4 122:2,4 | **big** 37:18 54:18 |
| 134:5 194:6,10 | **bcbs** 45:8 | 124:17,21 | 121:20,25 |
| 194:17,20 | **bear** 184:8,16 | 130:7 132:5 | 127:25 |
| **backwards** | **beaver** 154:4 | 137:2 143:20 | **bill** 145:14 |
| 59:16 | 154:18 | 144:21 145:20 | 161:4 |
| **ballpark** 63:25 | **began** 85:24 | 155:9,21,23 | **billed** 65:13 |
| 68:5 75:15 | 86:5 | 159:13 165:8,8 | |

**[billing - burt]**

| | | | |
|---|---|---|---|
| **billing**  65:7 | 51:6,9,9,15,15 | **bruegge**  2:25 | 71:6,11 73:15 |
| 66:11 81:7 | 52:8,8,19,19,22 | 8:10 | 74:16,24 75:4 |
| 82:11 116:19 | 52:22 53:1,1,3 | **bucks**  164:6 | 75:10,23 76:3 |
| 116:20,21 | 53:3 62:12,13 | **build**  100:20 | 76:9,12 77:1 |
| 117:3,19 | 91:9,10,13 | **built**  100:20 | 84:1 88:20 |
| 163:18,20 | 92:1,1,5,7 | 101:2 107:9 | 90:6 91:15 |
| 183:1,2,10,11 | 200:13,13,16 | **bunch**  99:11 | 94:22 95:10,20 |
| 183:13,21 | 200:16 | **bundles**  176:25 | 99:25 100:13 |
| 184:11 192:25 | **bob**  146:17,17 | **bundling**  180:1 | 100:18 103:18 |
| 192:25 195:9 | 146:18 | **bureau's**  122:1 | 104:22 106:17 |
| 195:10,23,25 | **bot**  204:16,23 | **bureaus**  54:19 | 107:15 109:3 |
| 197:24 198:2 | **bots**  203:13,20 | 121:20 | 112:24 113:4 |
| **billion**  81:13 | 203:23 204:2 | **burt**  2:4,6 3:5 | 115:19,21 |
| 105:22 140:25 | **bottom**  47:4 | 8:12,12 10:20 | 117:4,12 |
| 189:8 | 84:10 172:21 | 12:17 15:11 | 118:25 121:12 |
| **bills**  161:2 | 197:3 | 16:12,24 17:3 | 121:15 122:21 |
| **bio**  16:13,15,17 | **brattle**  124:17 | 17:7,11,17,20 | 123:11 125:19 |
| 199:24 | **breach**  45:4 | 17:25 18:18,20 | 128:22 132:4 |
| **biography** | 53:8,16 55:5 | 19:4,13,22 | 132:25 137:14 |
| 16:18 | **break**  11:20,21 | 20:11,24 26:18 | 139:25 140:21 |
| **bit**  59:17 | 59:2,2,5,8 | 27:9,18 29:1 | 141:20 144:6 |
| **blank**  134:25 | 64:18,24 | 31:16 33:6 | 151:7,19 |
| 135:8 137:8 | 128:10,14 | 34:14 35:23 | 159:17 160:13 |
| **blanks**  136:13 | 144:8 161:10 | 36:22 37:4 | 161:7 162:4,17 |
| **bleed**  32:10 | 169:11,14 | 39:19 44:3,9 | 163:2 165:10 |
| **blue**  3:14,15,18 | 183:17 189:24 | 44:18 46:12 | 169:8 173:25 |
| 3:19 33:20,20 | 196:19 205:15 | 48:12,25 49:20 | 174:7 183:14 |
| 45:3,3,6,11,12 | 205:19 209:16 | 50:6,18 51:22 | 185:11 187:21 |
| 45:21,22,23,24 | **breaks**  11:18 | 55:22 56:4 | 191:12 198:13 |
| 45:25,25 46:2 | **brian**  148:22 | 57:25 58:23 | 199:14 201:15 |
| 46:2,3,3,6,6,16 | 149:1,3 | 59:1,10 60:16 | 201:21 202:16 |
| 46:16 47:6,6 | **broad**  27:20 | 61:7 62:17 | 202:22 203:6 |
| 47:15,16 48:4 | 68:17 152:13 | 64:6 65:17 | 203:15 204:3 |
| 48:4,20,21 | **brought**  16:14 | 66:5,17 67:12 | 204:13,19 |
| 49:10,11 51:6 | 193:25 194:5 | 68:22 70:8,16 | 205:7 206:12 |

**[burt - certainly]**

207:1 208:21
209:15,21,23
210:6 211:20
211:23 212:20
215:1,2
**business**  28:1,2
28:6 84:13
85:14
**businesses**  28:3
28:3,12
**byrd**  3:24 4:3

**c**

**c**  2:1 69:12 87:4
129:9,17,24
149:8
**ca**  1:22 215:9
215:12,21
**caeli**  2:13 8:9
**calculations**
198:1
**calendar**
194:14 209:6,9
**california**  1:2
2:15 7:16
150:11 214:5
214:25
**call**  14:21
47:10 124:20
207:9
**called**  28:15
**calling**  74:17
**calls**  34:15
57:25 201:21
**cameron**  69:8
69:14,15,17,22

71:9 141:3,4
141:16 179:3
205:25 206:6
206:10
**capture**  170:25
**card**  42:14
55:12 93:16
138:6 158:9
160:9,21 161:1
161:2,3,4,24
164:3,6 178:10
**cardholder**
162:10
**cards**  93:12
178:10
**care**  28:19
118:18
**carla**  1:21 7:22
214:2,22
**carried**  136:17
141:2 142:3
**carry**  37:20
**case**  1:4 7:17
9:16,17 10:6,9
10:12,12 11:3
14:16 16:22
17:24 18:5
19:3,12,20
20:14,22 32:22
39:9,18 40:7,8
40:13,13,14,15
40:17,20,21
41:14,17,20,22
42:2,11,14
43:8,22 48:1

48:23 49:1,3,9
51:7,8,21 52:1
52:2,9,9,20
53:19,25 54:11
56:9,13,21,22
57:1,1,6,7,10
57:11 58:17
61:20 62:6,13
62:22 63:6,6
63:10,14 64:5
64:13 66:4,9
66:14 67:2,7
67:11,18 68:10
68:15,18 71:22
71:24 73:1,14
74:10 75:9,22
76:2,7,8,25
85:25 100:3
113:14 117:23
120:3,10,11,23
121:14 123:19
124:9,19 125:3
125:6 127:20
160:7,11
165:18 167:14
168:6 170:19
171:25 183:1
184:12 185:21
198:9,12
**cases**  10:14
24:18 25:7,13
26:12,16,20
27:6,15 28:8
39:23 40:3
48:16,18,24

52:18 62:25
63:1 92:9
206:22 208:16
**catching**  103:9
**categorically**
167:7
**cause**  184:5
214:17
**cautious**
208:10
**caveat**  146:9
**ccp**  215:9,12
**ccr**  1:22 214:2
214:23
**cease**  30:14
**center**  2:14
49:5
**ceo**  59:20
**certain**  15:5
97:14 143:21
162:20 173:9
173:19,22
174:4 191:7
206:20
**certainly**  24:13
57:3 130:1
134:8 137:21
142:18 147:12
160:10 166:8
166:11,16
170:4,20
172:16 173:19
174:22 192:1
195:15 200:7
211:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[certainty - cleanse]**

| | | | |
|---|---|---|---|
| **certainty** 84:6 | **characterizati...** | **city** 30:7,9,10 | 25:19 26:6 |
| **certificate** | 15:12 68:24 | 30:21 31:1,5,7 | 32:20 33:21 |
| 214:1 | 131:23 185:11 | 31:11,14 80:19 | 34:9,22 35:8 |
| **certifications** | **characters** | 112:14,17,19 | 35:15,20 36:5 |
| 24:6 | 87:19 | 145:4 148:6 | 37:22 38:2,7 |
| **certified** 2:3 | **charged** 93:20 | 151:1 176:9 | 38:14 41:6 |
| 8:14,16,23 | **chase** 156:14 | 179:11 210:21 | 42:16 43:7 |
| 65:4,22 214:3 | 157:16 159:2 | **civil** 215:19,21 | 49:3,5,16 50:4 |
| **certify** 214:5 | **check** 180:5 | **claim** 37:5 | 50:5,13,13,21 |
| **change** 54:17 | 184:19 188:12 | **claiming** | 51:1,2,4 53:14 |
| 54:20 65:20,25 | 206:22 212:18 | 138:19 | 61:18 65:4,21 |
| 75:22 76:1,7 | **checked** 54:11 | **claims** 25:7 | 92:21 162:9,19 |
| 76:24 77:7 | 184:21 190:11 | 28:19 30:10 | 163:22,24 |
| 120:10,13 | 190:19 | 32:13,14,15,17 | 164:2 198:3 |
| 127:11 173:20 | **checking** | 32:24,25,25 | **classes** 50:20 |
| 174:15 177:15 | 191:10 | 34:8,21 35:6 | **classify** 192:7 |
| 178:12 184:23 | **checks** 186:25 | 36:25 37:9,11 | **clean** 118:11,16 |
| 185:16 186:16 | **chevy** 156:14 | 39:22 48:1,11 | 118:19,23 |
| 189:11,18,25 | 157:16 159:2 | 49:4,18 61:11 | 135:12,16 |
| 191:3 198:10 | **chief** 24:20,20 | 67:1,6,11,17,20 | 167:14 168:5 |
| 201:13 218:4,7 | **chigney** 2:16 | 67:23,24 | **cleaned** 109:15 |
| 218:10,13,16 | **child** 161:3 | 104:10 117:25 | 111:10,16 |
| 218:19 | **choice** 44:6 | 118:14,18 | 112:4,10 130:3 |
| **changed** | **chosen** 176:16 | 138:14,22,24 | 130:7,8,9 |
| 179:20 191:20 | **chris** 2:25 8:10 | 197:6,8,11,19 | **cleaning** 51:25 |
| 191:25 192:4 | **cindy** 5:16 6:2 | 198:9,12,16,21 | 56:25 69:2 |
| **changes** 126:19 | 6:9 | 198:22 | 89:2 91:6 |
| 131:17,18 | **cio** 29:9 31:5 | **clarify** 22:4 | 119:4 166:4,4 |
| 139:22 140:3 | **circle** 212:21 | 111:3 191:16 | 166:7,14,21 |
| 191:11,15 | **circumstances** | **clarity** 75:18 | 167:2 187:14 |
| 198:14 | 34:11,24 35:7 | 114:22 135:24 | **cleanse** 32:2 |
| **character** | 35:19 | 141:21 195:25 | 68:19 87:11,14 |
| 170:23 171:1,8 | **cities** 176:23 | **class** 2:3 8:14 | 87:15 88:14 |
| 171:8 | 181:18,20,22 | 8:17 9:23 | 108:16 118:13 |
| | | 10:24 24:17 | 125:11 171:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[cleansed - compare]**

cleansed
132:14 171:15
cleansing  32:5
87:22,23 88:4
88:4 90:13
107:7 119:10
119:12 125:6,7
125:8 129:4,18
129:24 130:1,2
130:4,11,15,17
130:18 140:5,7
141:13 143:3
166:17,22
182:13 189:4
cleansing.sql.
130:2
cleanup.sql.
130:5
clear  45:10
173:7 198:24
209:23
closely  41:18
closer  27:3,4
clue  30:19
code  12:20,24
13:13 19:6,7
19:14,18 20:6
20:25 21:23
33:7 38:25
58:16 80:20
87:22 88:4,9
88:14,16 89:1
91:6 101:23
112:15,15,17
112:18 126:16

126:19 127:9
127:11 129:22
130:19 134:3
134:22 135:12
135:13,22,24
137:12,19
142:4,5,8,15,16
143:2,5 148:1
148:7 151:2
167:12,14,24
167:25 168:1,5
170:11,14,21
171:3,21,22,23
172:2,11,13,23
172:25 173:6
173:17,18,20
173:22 174:4,9
176:9,24 179:7
179:12 181:21
192:20,23,24
194:25 202:5
215:9,12,19,21
coded  103:22
142:18 146:10
181:3
coder  167:24
coding  112:22
112:25 113:1
167:10
colleague  8:7
80:3 136:6
collected  92:23
collection
111:13 142:7
153:8

collects  55:15
78:25
college  154:3
154:17
column  150:21
columns
192:21
combination
109:14 140:11
combinations
182:8 188:11
188:25
combine  36:8
37:15
combined  32:9
112:14
combining
179:24
come  14:7 20:1
72:12 81:1
89:5 127:8
188:17 199:25
199:25 205:15
comes  128:5
188:18
coming  124:4
commenced
71:1 124:22
comment  153:1
169:21 170:2
commented
172:1,8,10,14
172:23 173:1
173:13 174:14

commenting
170:7,9 171:20
172:18 173:16
173:19,21
174:3
committing
203:4
common
114:15 133:11
133:16,17
134:11 151:10
179:20
commonly
110:25 111:17
113:18
communicated
92:19,20 95:23
97:9 175:3
187:5
communicating
60:17
communication
74:18
communicati...
40:12 71:14,18
75:11
companies
55:13 139:7
company  9:23
24:12 28:15,20
28:22,23 30:11
70:17
compare  84:5
178:22 208:2
208:24

Page 12

**[compared - consumers]**

**compared**
48:16 58:4
**compensate**
155:25
**compensated**
66:21 68:10
**compensation**
65:14,20,25
66:3,8
**competent** 56:6
**competitive**
139:13 185:19
**competitor**
30:15,16
**complaint**
71:23 72:4
**complete** 72:5
95:12 121:4
**completed**
25:22 143:7
215:7,17 216:6
**completely**
144:23 156:12
**completion**
216:11
**complex** 25:13
49:6 51:13
56:10
**complying**
189:8
**components**
15:2
**compound**
165:10

**computer** 9:7
20:21 21:3,6
21:13,23 53:16
127:19 145:21
170:2 189:20
190:2,8 193:22
194:1,19
203:21
**conceivable**
204:7,8
**concept** 78:18
88:6 113:7,8
113:13 114:10
114:14,17,20
114:25 116:4
168:3,9,15,23
**concern** 152:16
**concerning**
33:21 85:15
**conclude** 95:17
211:24
**concluded**
213:3
**concludes**
212:24
**conclusion**
34:15 58:1
122:14 160:5
201:22
**conclusions**
75:2
**conclusively**
60:3,14,24
62:4,15

**conduct** 21:11
26:14,21 87:22
122:20 186:24
207:22
**conducted**
165:18 166:12
206:7
**conducting**
121:11 143:11
143:24
**conference**
47:10 124:20
**confidence**
16:5 60:20
61:3,15,16
62:8,19 95:8
95:16 96:11
97:17 100:7,9
100:12,16
101:3 107:10
131:13 135:18
148:9 166:19
175:16,25
176:19 177:1
180:2 205:12
**confident**
103:22 167:3
177:16
**confidential**
1:7 12:13,19
**confirm** 41:11
48:3 92:20
128:7 181:24
187:14

**connect** 188:1
**connection**
66:15 69:15
72:22
**conservative**
122:25
**consider**
153:10
**considered**
100:8 145:5
**consistent**
127:2 159:25
**consistently**
136:17
**consolidate**
78:6 93:25
94:19,20 95:2
95:6
**consolidating**
117:24 138:13
**constant** 50:3
**constitute**
130:11
**consultants**
21:7 58:16
125:17 173:23
174:5 190:22
193:17 194:2
194:18,21
**consumed**
207:13
**consumers**
53:14,21 54:1
54:4 93:2,11
93:15,19

Page 13

**[consuming - correct]**

| | | | |
|---|---|---|---|
| **consuming** | 103:12 106:16 | 35:9 36:9 40:2 | 144:12,18 |
| 106:1 | 171:14 | 40:4,5 42:13 | 147:14,17,19 |
| **contact** 27:11 | **continuing** | 42:24 45:4,5,8 | 148:22,23,24 |
| 27:21 28:5 | 105:17 106:14 | 45:9,10,13 | 148:25 149:5,6 |
| 29:18 38:15,16 | 108:10 | 47:13,25 53:11 | 149:19,20,22 |
| 49:5,5 109:25 | **contributed** | 53:12,13,18,20 | 149:23 150:6,7 |
| 110:1 117:24 | 200:15 | 53:25 54:10 | 150:8,9,11,12 |
| 138:13 202:14 | **conversation** | 58:17 65:9 | 150:18,21,22 |
| 203:4 215:9,20 | 68:7,8 95:12 | 66:2,20 67:23 | 150:24 151:2,3 |
| **contain** 85:21 | 125:2 | 68:17 73:23 | 151:11 152:4 |
| 91:5 167:15 | **conversations** | 75:3 79:2,3,16 | 153:24,25 |
| 168:1,6 | 7:8 67:8 124:8 | 79:20,21 80:15 | 154:1,2,4,5,15 |
| **contained** | **coo** 31:2 | 81:23 82:6 | 154:16,18,19 |
| 10:22 18:5 | **coordinate** | 83:13,25 86:10 | 154:21,22,25 |
| 43:2 45:14,17 | 113:12 | 86:19 91:11 | 155:1,3,4,6,7 |
| 45:18 54:8 | **copied** 15:19 | 94:2,13,14 | 156:6,7,8,9,12 |
| 87:3 116:19 | **copies** 14:10 | 95:25 96:2,17 | 156:13,15,16 |
| 195:19 | 159:18 | 96:18,22 | 156:18,23 |
| **containing** | **copy** 14:15 | 100:10 103:1 | 157:5,8,9,10,11 |
| 78:25 194:1 | 71:25 80:2 | 103:15,16 | 157:13,14,16 |
| **contains** 26:11 | 84:18 212:8,9 | 104:11,13 | 157:17,22 |
| 190:13 214:12 | **cornerstone** | 105:6,14 | 158:19,20,21 |
| **contemplation** | 2:24,25 8:8,10 | 106:12 109:16 | 158:22,24,25 |
| 76:16 | 21:8,24 | 109:17 110:4 | 159:2,3 162:8 |
| **content** 46:21 | **correct** 14:13 | 110:14 113:14 | 166:13 171:24 |
| 79:1 92:12 | 14:14 16:19 | 117:3,15 118:2 | 172:19 173:16 |
| 93:3 | 18:12 19:3,12 | 118:12 120:11 | 174:3 176:4,15 |
| **contents** 80:9 | 20:3,4,7,8 21:8 | 120:15,18 | 177:9 179:14 |
| 80:12 | 21:9 22:2,14 | 121:1 123:21 | 180:15,20 |
| **context** 79:7,12 | 22:22,23 23:7 | 125:5 127:14 | 185:4,5 186:21 |
| 102:20 115:22 | 23:8,20,24 | 127:15 131:20 | 186:22 188:6 |
| 131:9 168:12 | 24:3,8,9 26:3,9 | 135:12 136:9 | 190:6,9 191:21 |
| **contexts** 115:8 | 26:12 27:2 | 136:11 138:3 | 191:22,25 |
| **continue** 7:10 | 28:16,17 30:7 | 138:16,17 | 193:8,9,18,22 |
| 101:8 102:5,23 | 30:8,18 34:1 | 140:14,15 | 193:23 194:2,3 |

**[correct - darryl]**

194:11 195:1
195:11,12
197:9 199:8,11
203:25 206:9
217:3
**corrections**
215:14,15
216:3,4
**correctly** 44:19
48:22 73:11
163:11 179:13
183:8,19
187:16 190:17
**correlation**
50:3
**correspond**
132:2,11
147:10 151:13
151:17 180:16
**cost** 37:20 50:9
50:14,15,17
103:6,8
**costly** 50:20
**costs** 102:22
**counsel** 7:13
8:2 12:23 13:2
13:11,23 15:4
15:10,15 63:16
65:4 66:25
67:5 68:3
73:14,17,21
74:13,22 75:11
78:4 80:3
84:19 93:23
94:9,16 95:1

95:24 97:9,24
116:11 122:8
122:11,13,19
122:22,24
123:23 124:10
124:11 159:18
175:3 196:9
200:19,21
201:19,25
214:16 215:18
215:22 216:7
**count** 42:18,20
133:24 134:17
**country** 135:13
**county** 147:25
148:3,5,8
**couple** 158:9
160:2 161:22
197:1
**course** 84:13
85:14 126:5
127:18 159:19
**court** 1:1 7:15
7:21 8:19,23
10:8,8,12 12:5
93:7 180:3
193:2 214:3
**cover** 181:22
**covered** 210:18
**covid** 56:17
**create** 94:10,12
116:12,14
130:3,7,8,9
141:14 148:7

**created** 116:18
197:6 204:2
**creating** 117:1
127:2
**credential**
150:20
**credit** 42:14
54:18 55:12,13
55:19 56:3
93:16 121:20
122:1 138:5
158:9 160:9,21
161:1,1,3,4,23
164:3,6 178:10
178:10
**criteria** 22:7
90:15,22
106:23 152:7
152:14 153:14
207:5,10,11
**criticizing**
112:20
**cross** 3:14,18
33:20 45:3,6
45:12,21,24,25
46:2,3,6,16
47:6,15 48:4
48:20 49:11
51:6,9,15 52:8
52:19,22 53:1
53:3 54:11
62:13 91:9,13
92:1,5,7
184:21 188:12
200:13,16

**crr** 1:21 214:2
214:22
**crutcher** 2:14
2:18 8:6
129:13
**csr** 1:22,22
214:2,24,25
**cupertino**
150:11
**current** 20:2
24:10 28:25
55:3 120:14
**currently** 29:8
29:9 151:24
**customer** 83:7
83:16
**customers** 41:4
41:10 42:6,8
45:12,22 46:3
**cutoff** 207:15
**cv** 1:5 7:17
**cycle** 32:21,23
**cyndi** 163:10
**cynthia** 156:23
157:2,5,8,25
158:8 160:2
161:23

| d |
|---|

**d** 3:1 154:12
**d.c.** 2:19
**damages** 34:9
34:22 198:1,3
**darryl** 1:10
3:11,22 6:18
7:13 8:22 9:4

## [darryl - dataset]

| | | | |
|---|---|---|---|
| 14:12 199:5 | 69:2,14 70:5,9 | 121:25 122:1,4 | 178:24 180:10 |
| 201:12 212:25 | 70:20,25 71:2 | 122:6,23 126:4 | 180:24 182:19 |
| 215:5 217:12 | 73:2,18,22 | 127:24 129:4,4 | 182:22,24 |
| 218:2,24 | 76:15 79:17,20 | 129:5,18,18,19 | 183:4,9,12,21 |
| **data**   4:6,13,20 | 80:15,22 81:17 | 129:24 130:1,2 | 184:3,10,22 |
| 5:3,10,17 6:3 | 81:20 82:2,3,9 | 130:2,10 | 185:3,18,20,23 |
| 6:10 9:7 10:1 | 82:25 84:12 | 131:14 132:14 | 185:25 186:5,6 |
| 10:19 13:20 | 85:13,15,17,19 | 132:20,24 | 186:20,21,23 |
| 22:13,16,18,19 | 85:20,21 86:2 | 133:7,19,23 | 186:23 187:3,5 |
| 23:3 25:1,14 | 86:10,15,18,22 | 134:11 135:5 | 187:9,15,19,24 |
| 25:15 26:8 | 87:7,8,10,12,12 | 136:14 138:13 | 188:12,13,25 |
| 27:7,11,16,20 | 88:10,14 89:10 | 140:5,11,13 | 189:9,12,17,21 |
| 28:1,2,6,11 | 89:10,10,12,18 | 141:16 142:5 | 190:11,13,18 |
| 29:11,14,16,17 | 89:22 91:10,10 | 142:22 143:20 | 190:23 191:2,5 |
| 31:6,7 32:10 | 91:12,13,16,17 | 145:1,9 146:8 | 191:7,11,11,19 |
| 35:15 37:8 | 92:4,5,7 93:1 | 146:19 147:21 | 191:23 192:3 |
| 38:25 40:17,19 | 93:10,15,18 | 147:22,24 | 196:2 202:13 |
| 40:24 41:1,20 | 95:19,25 96:15 | 148:8,14,19 | 202:20 203:3 |
| 41:22 42:1,4,8 | 97:3,11,12,23 | 149:17 151:9 | 203:13 204:1,6 |
| 42:10,23,23 | 99:12 100:4,6 | 151:10,24 | 204:10,14 |
| 43:1,2,11,16,22 | 100:19,20 | 152:11,21 | 205:24 209:25 |
| 44:6 45:4,11 | 101:3,24 | 153:14,22 | 210:5 |
| 45:14,23 46:2 | 104:12,12 | 154:10 155:14 | **data's**   187:25 |
| 46:7,14 51:10 | 108:14 109:15 | 156:22 158:17 | **database**   54:17 |
| 51:21,25 52:11 | 109:20,23,25 | 159:15,19,20 | 54:21 116:18 |
| 52:15,17,17,22 | 110:1,2 111:13 | 160:23 161:15 | 186:5 190:25 |
| 52:23 53:3,4,4 | 112:8 117:6,11 | 161:18,21 | **dataset**   51:11 |
| 53:8,10,16 | 117:20,24 | 162:25 163:5 | 54:25 73:2 |
| 54:2,15,18 | 118:19,24 | 163:17 164:5 | 75:18 77:10,12 |
| 55:3,4,5,8,15 | 119:4,9,10,11 | 166:4,7,10 | 78:20,24 79:15 |
| 56:22,24 57:13 | 119:12,12 | 167:15 168:6 | 79:19 80:14 |
| 57:19,21,24 | 120:9,12,16,20 | 171:2,4 174:15 | 81:10 83:24,25 |
| 59:25 60:19 | 120:20,21,24 | 175:4,17,24 | 86:5,9,14 |
| 61:3 62:1 | 121:5,6,6,9,10 | 176:19,25 | 92:22 118:16 |
| 68:18,19,20 | 121:13,17,20 | 177:20 178:7 | 132:20 136:15 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[dataset - deduplication]**

136:18 139:24
140:6 190:7
**datasets**  51:13
54:12,14 91:14
91:16 139:1
208:1,24
**date**  16:1 18:14
18:14 63:16
68:15 215:16
216:5 218:24
**dated**  33:13
47:3,4 72:21
80:4 196:8
199:5
**dates**  43:3
80:16
**daughter**  160:3
160:9
**day**  13:4
214:18
**dc**  2:9
**deal**  9:25 10:18
90:1 91:25
92:6,8 146:10
210:5
**deb**  5:9 154:12
155:10
**debra**  5:2
153:23 155:10
**decades**  57:20
57:23 58:2
100:23
**decertified**
65:21

**decide**  161:25
201:6 207:7
**decided**  104:5
200:24
**decision**  106:21
106:24,25
109:10
**declaration**
3:16,20,22
6:18 10:11,21
12:25 13:7
14:24 15:3,6
15:17,19 16:8
33:14,19 34:5
36:4 47:5,22
48:6 59:18,23
62:1 72:21
76:13,17 77:15
78:11 125:23
199:5,7,13,17
200:1,4,8,11,14
200:20,25
201:2,6,10,14
**declarations**
10:18,22 11:9
16:10 199:19
199:21,22
200:3,5,5,9
**declare**  217:1
**deduping**  60:18
**deduplicate**
27:8 40:20
42:1 61:14,15
62:7,8,14,18
68:19 73:3

77:19 87:13
95:18 96:20
97:3 99:23
109:8 111:1
118:12,16,24
125:12
**deduplicated**
28:7 70:6,10
70:20 77:13
96:16 97:12
100:5
**deduplicating**
27:16,22 35:5
37:2 45:11
52:1 53:20,25
54:7 55:11
56:25 60:2,12
60:14,24 62:4
71:2 77:22
94:10 100:16
116:12 119:11
119:17,23
120:5 211:11
**deduplication**
10:1,19,24,25
11:7 12:24
25:15 26:14,21
27:5,7 29:15
29:20,23,24
31:6,10,12,15
35:18 36:6
37:7,10,12
38:1,6,8,10,22
38:24,24 39:8
39:15,17 40:17

41:21 42:10
44:7,16,21,22
45:8 51:10,13
51:15 53:11,19
53:24 55:5
56:11,13,21
57:13 58:19
59:13 60:2,12
60:13 61:2,11
61:16 62:3
66:15,16,22
77:10 78:20,21
82:4,13 90:10
95:13,14 97:20
100:21,22
104:13 106:11
107:6,7 109:13
110:11,23
111:17 112:7
112:21 116:10
118:13 119:13
121:14 122:23
125:7,8 131:10
131:11 132:1
132:12,13
139:17 140:4,7
140:10 141:13
142:22 143:11
143:24 144:2
144:10 145:6
175:20,23
176:18 189:4
192:13,19
193:11 194:24
206:7 208:17

Page 17

**[deduplication - determined]**

209:25 210:24
211:4,7,16
**deduplication's**
120:7
**deeper** 203:17
**defendant** 2:12
7:14 8:6 11:6
**define** 32:13
109:24 110:2
162:21 175:5,6
175:10,11,14
**defined** 92:21
114:20,23
143:13
**defines** 73:17
73:21
**definitely**
161:19
**definition**
43:21 142:8
160:14,18
162:6,9,20
164:2,25
168:12,13,17
175:18
**definitive**
178:12
**definitively**
160:6 161:16
178:7
**degree** 23:13
23:19 96:4
**degrees** 23:16
**deliverable**
127:10

**deliverables**
35:13
**delivered** 79:17
194:9 201:9,9
212:5
**delivery** 25:11
**deltas** 208:25
**deny** 41:11
48:3 181:24
**depend** 65:14
**dependent**
32:22 49:22
**depending**
43:14 112:22
200:23
**depends** 142:8
**deposed** 9:12
**deposition** 1:9
7:13,18 11:19
12:22 13:9,10
13:17 14:6
18:22 33:10
47:1 72:15
80:1 84:21
98:7 148:12
149:9 150:3
153:19 154:8
156:4,19
158:15 196:7
198:7 199:3
213:3 215:19
215:23,25
216:8,11
**depositions**
212:10

**describe** 19:2
19:11 29:14
73:13 77:18
106:23 110:3
116:17 138:18
139:9 142:2
**described** 18:9
20:6 40:16
76:12,17 77:20
86:1,13 90:20
104:9 109:11
131:24 152:19
161:9 171:20
184:19 187:11
**describes** 108:2
**describing**
36:21 37:2
60:8 78:15
118:11 169:20
**description**
77:17,18 132:7
170:15
**design** 73:2
77:19
**designate** 12:13
**designation**
12:19
**designed**
203:21
**desired** 75:19
75:19 207:24
**detail** 19:17
153:13
**details** 30:1
67:9 68:8

**determination**
32:25 58:4
77:10 108:14
137:6 170:17
177:14
**determine** 22:5
29:18 30:2
43:6 59:25
62:2 73:7 78:5
78:9 82:8
93:23 95:1
97:1 100:11,15
101:25 103:12
103:23 108:8
108:11,17
109:20 111:1
114:8,11
119:24 132:20
133:12 134:10
142:12 143:6
152:16 153:15
164:4,10 167:9
175:25 178:25
184:3 200:22
207:18,21,22
208:25
**determined**
21:18 25:23
70:5,9,19
95:23 96:15
97:11 102:24
106:13 108:24
126:21 135:17
161:16,19
215:18,23

Page 18

**[determined - doing]**

216:7

**determining**
77:21 78:19
100:19 108:3

**developed**
118:1,15,23
126:4 138:15

**device** 85:15

**devices** 92:18
92:24

**dial** 135:13

**dictionary**
143:20

**difference**
29:22 57:5,22
77:23 94:24
107:24

**differences**
30:23 31:19
52:5,7 146:3
208:20

**different** 29:5
44:15,16 45:21
52:11,12,15
77:20 78:14
81:17 95:8
107:18 110:9
110:11 111:11
120:3,4 136:16
140:10,12,17
146:14,19
147:9,15
150:15,17,20
150:23 151:1
155:2,5 158:1

158:3,5 159:16
164:14 165:4
170:14 178:19
180:9,14
181:17,20
182:4 185:7,24
185:25 193:12
208:16,19

**differentiate**
146:25

**differently**
182:11

**difficult** 12:8
137:6

**digital** 214:18

**digits** 138:5
145:3 178:9
206:20 207:8

**dinner** 124:1,2
124:5,8

**direct** 19:16

**direction** 78:18
123:2 208:7

**directly** 65:11
203:13

**director** 29:12

**disagreement**
10:9 76:15

**disagreements**
206:10

**disciplines**
119:4

**disclose** 201:19
202:1

**discovery**
24:18

**discrepancy**
174:24

**discuss** 12:12
58:18 123:23

**discussed** 58:15
63:19 111:9
117:7 124:18
164:13 185:2
198:8,15

**discussing**
12:20 95:7
162:24 201:3
210:13

**discussion**
122:2 206:13

**discussions**
66:25 67:5
68:2

**dispute** 181:11
183:6 193:19

**disputing**
180:22

**distance** 114:6
114:7,11

**distinct** 119:17
119:22 155:10

**distinction** 88:3

**distinguish**
147:7

**distinguishing**
83:11

**distracted**
129:15

**distribution**
25:12,17,21,23
33:1 36:1

**district** 1:1,2
7:15,16

**divider** 32:9

**division** 1:3
7:16 24:18

**document** 6:24
14:4,11,21,23
14:24 15:22,25
16:23 33:5,7
72:17,21 79:24
80:5,7 156:3
156:18,20,21
162:7 171:2
196:12,24,25
199:4

**documentation**
12:25 55:20
162:7

**documented**
179:5

**documents**
13:13,15,25
55:17,19

**doing** 36:1
38:22 39:8
41:24 50:8,11
50:12 51:13
68:12 95:14
104:19 125:2
139:5 195:2
210:23 211:16

**[domestic - email]**

**domestic** 71:15
71:20
**dot** 127:13
**double** 97:4
99:11 197:24
198:2
**doubt** 47:19,20
48:5
**downloaded**
93:2 190:15
**dozen** 10:17
**dozens** 207:13
208:1
**dr** 125:1
**drafting** 15:25
74:23
**draw** 88:3
160:5
**drawn** 200:4
**drew** 200:10
**drive** 193:25
194:5,10
**driver** 172:6
**due** 34:5 121:7
122:3 146:2
**duly** 214:9
**dunn** 2:14,18
8:6,8,10
129:13
**duplicate** 36:9
70:11 82:12,16
82:17 96:17,21
96:21 97:13,15
126:1 132:14
183:1 195:25

**duplicated**
82:11
**duplicates**
97:18 101:10
102:24 103:13
141:1 182:20
**duplication**
95:25 96:7,8
96:10 97:10
99:14,17 100:4
104:12 175:4
193:7
**duplicative**
78:6 93:25
94:20 95:3
**dx** 3:10,13,14
3:18,22,23 4:2
4:5,12,19 5:2,9
5:16 6:2,9,16
6:18 14:5,6
18:22 33:10
47:1 72:15
80:1 84:21
148:12 149:9
150:3,4,5,14,14
150:14 153:19
153:20 154:7,8
154:9 156:3,4
156:5,18,19
157:5,7,18,18
157:21,21
158:14,15,16
159:4,5,5
163:10,10,10
169:19 196:6,7

197:1 199:2,3

**e**

**e** 2:1,1 3:1,21
24:18 30:18
69:12 131:4
132:5 154:4,12
154:18 157:13
158:19,19
215:9,12 216:1
218:3,3,3
**earlier** 64:16
117:7 164:14
175:1 185:2,6
188:8 192:22
198:7 209:5
**early** 210:9
**ease** 83:3
**easily** 145:20
**education**
23:12
**effective** 37:25
60:1 62:2
**effectively**
102:1
**effectuate**
32:24,24
103:22
**efficient** 61:18
**effort** 34:13
35:1,21 52:3,4
56:11 58:3
62:13 66:12
97:20 101:8
102:4,7,10,22
102:25 103:11

103:14,24
104:15,20
105:4,13
106:16 107:20
120:6,7 121:14
127:8,10
**efforts** 35:9
69:17 119:25
143:7
**either** 25:18
41:11 63:24
107:7,8 108:15
123:3 141:13
171:16 211:22
**elazarus** 2:16
**electronic**
14:19 199:10
**eli** 2:13 4:3
6:16 8:5 58:23
169:9
**eliminate** 96:2
96:4 100:3
**eliminated**
99:13,17
**ellie** 6:9 158:18
160:3,9,11
161:22 163:10
164:5
**elmwood**
149:21
**email** 3:23
25:18 27:13
80:2,13,18
83:24 84:8
136:5,9

**[embarcadero - example]**

embarcadero
  2:14
emoji  52:21
  53:1,4
emojis  86:18
  87:11,15,18
  92:4
emotional
  119:6 153:1
employed
  28:15 30:6
employee  44:24
  46:11 61:19
  63:5
employees
  62:24
employer  20:3
  24:11 46:9,10
employers  46:4
ended  111:21
engaged  202:21
engagement
  74:14 209:24
  210:4
engagements
  126:5 210:11
  211:14,15
enhance  131:19
enrolls  46:9
ensure  32:9
  38:11
entered  89:22
  146:3 203:3
entire  24:23
  79:11 132:20

  189:7 210:21
  210:25
entities  70:11
  96:17,21,21
  97:13,16
entity  37:16
  62:11 73:10
  82:24 96:12,25
  97:23 107:11
  117:18 184:6
entries  86:21
  87:7 90:21
  93:2,11,15,19
  111:11 210:2
epiq  30:17
equally  161:21
equi  55:14
equifax  45:3
  53:8,13,15,16
  53:19,24 55:5
  55:15 56:8,13
  56:21 57:1,6
  91:10,14 92:2
errata  215:14
  215:16 216:3,5
erroneous
  179:1
error  116:16
  201:17
errors  22:10
  167:13
es  214:8
essentially
  81:12 113:11
  116:2 120:1,5

  120:7 192:21
estimate  26:20
  51:19 68:16
  69:25 70:1
  103:17 164:15
  164:19,22
  165:2
estimation
  103:19
etcetera  70:21
  80:20
evaluate  68:18
  73:1 78:24
  141:6 143:2
  178:17 182:23
  209:1
evaluated  82:8
  132:19 142:23
evaluating
  38:25 100:19
evaluation
  51:25 56:25
  69:2 173:8
event  163:18
  198:21 214:17
events  163:20
eventually  59:2
everyday  83:15
evolution
  151:23
evolve  131:19
evolved  31:21
  138:21
exact  6:24
  18:14 42:4

  51:19 110:18
  110:22 111:10
  111:15 112:1,8
  125:14,15,16
  144:17 145:25
  176:22,23,23
  176:23,24,24
  182:20 188:7
  188:16,21
exactly  55:9
  56:16 77:24
  109:14 144:4
  144:12 174:21
  174:22 188:20
examination
  1:9 3:3 9:1
  17:18 99:7
  159:22 209:20
examine
  105:19 106:2
  153:13
examining
  104:18 105:20
example  27:19
  27:24 32:1,3,8
  32:20 51:12
  52:17,17 53:7
  66:10 76:16
  85:15 86:18
  87:3 89:20
  112:14 127:25
  134:15 141:24
  144:14,21
  145:1,11
  146:17 148:10

**[example - expertise]**

166:1,3 167:24
169:4 177:5,9
179:9,17 181:6
199:24
**examples** 31:24
133:2 148:1
166:16
**excel** 127:25
128:1
**except** 68:12
132:16 154:24
159:6
**exception**
50:24
**exceptional**
97:20
**exceptions**
50:19
**excerpts** 4:6,13
4:20 5:3,10,17
6:3,10
**excluded**
134:25 135:6
183:10
**excluding**
184:10
**exclusion**
134:21 135:3
**exclusive** 108:5
**excuse** 26:3
76:5 105:7
156:11 166:4
174:25 175:2
183:11

**executables**
170:6
**execute** 19:15
172:24 173:3
173:14
**executed** 170:8
217:5
**executing** 19:6
**execution**
170:11
**executive** 61:19
63:5
**executives**
62:24
**exercise** 208:17
**exhaustive** 26:6
**exhibit** 3:10,13
3:14,14,18,18
3:22,23 4:2,5
4:12,19 5:2,9
5:16 6:2,9,16
6:18 14:6
18:17,22 26:2
28:8 33:10,11
46:24 47:1
59:18 72:15,18
74:5 77:16
79:23 80:1
81:7 82:19
84:17,21 88:19
90:19 125:22
125:22 126:14
129:23 136:6
148:12 149:9
149:11,16,25

150:2,3 153:19
153:22 154:8
156:4,19 157:6
158:15 169:19
196:5,7,24,25
199:3 200:14
211:15
**exhibits** 3:9 4:1
5:1 6:1,23
150:14 159:4
159:18
**exist** 28:22
30:14 32:12
97:22 123:18
123:19 132:21
153:16 182:25
**existed** 87:6
138:24 196:1
**exists** 28:23
30:12,13 77:22
78:5,9 93:24
94:9 95:2
116:10 119:9
151:9 163:25
**expect** 12:19
50:17 119:7
134:17
**expected**
198:11
**expects** 67:10
67:14
**expedited**
212:6
**expenditure**
105:12

**expenses** 47:23
48:1,10,17
49:18
**experience**
22:15 31:21
36:5 38:22,22
39:8,17 45:3
51:6,12 57:20
57:23 58:2
95:14 97:19
100:25 101:2
104:9,11
106:21 120:24
139:5 176:2
177:4 179:18
205:10 208:15
208:16 210:21
**experienced**
115:13 173:6
**expert** 3:10 9:7
10:6 12:25
14:4,12 15:16
43:10 57:12,15
61:20 62:24
63:6 77:24
78:1,4 90:3
94:3,4 126:18
159:21 201:7,9
201:12,20
202:1 206:13
**expertise** 57:18
57:23 58:3,7,9
58:12 126:4,9
205:1

Page 22

**[experts - files]**

**experts** 17:24
123:16,18,19
**expires** 214:23
214:24,25
**explain** 9:9
60:10 75:24
108:6 126:15
163:8,15 170:1
195:13
**explaining**
76:10
**expound**
164:24
**expressed** 10:8
**extensive** 22:15
38:9,22 39:8
39:17 41:20
139:4 207:17
**extensively**
175:15
**extent** 11:15
34:14,16 66:19
74:17 75:10
77:2 123:12
126:10
**external** 54:12
54:14 121:5
195:17
**extra** 157:2
192:15
**extras** 84:7
**extreme** 104:16
**extremely**
177:1

**f**

**f** 87:4 131:6
132:4,9
**face** 52:21 53:1
86:18
**fact** 60:21
79:14 107:11
146:6 196:25
**fair** 11:16
26:24 37:24
49:18 68:23
74:11,20 75:8
131:23 170:15
170:16
**false** 164:15,19
164:23 165:2
207:16 208:8
**familiar** 80:6,9
80:12 85:7,9
112:11,13
115:7 124:13
168:3,9
**famous** 89:17
**fan** 37:18
**far** 54:23 110:1
208:8
**federal** 216:1,8
216:10
**feedback** 38:18
**feel** 139:11
**feels** 146:5
**fees** 47:23 48:1
48:4,10,17
49:17 50:4
51:2,4

**fewer** 178:24
**fictitious** 85:18
202:14 203:4
**field** 32:2,5,10
32:11,15 57:11
80:25,25 82:19
84:6 89:7
116:20,21
117:25 133:22
134:25 135:21
138:2,14
145:13 146:10
148:15 150:24
152:12,20,20
157:22 159:10
170:22,23
171:2,4,7
176:3 183:9,21
195:10,13
197:25 198:2
198:20 205:1
206:19
**fields** 24:7 32:9
57:14 80:18,21
81:6 83:23,24
84:4 85:19
116:19,23
118:15,18,20
118:22 130:3
133:3 147:22
147:24 148:18
152:15 171:10
194:25 195:8
210:1

**figel** 2:8 8:16
**figure** 183:2
**file** 3:13 17:4
18:11,13,24
19:2,5,11,14,21
19:24 20:7,21
21:22 88:19,23
89:1,1 90:18
90:19 91:4,5
126:13,15,20
126:25 127:3,4
127:13,24
128:20 129:23
130:17 131:13
132:2,10
169:19,19
170:8 172:3,15
172:19,21
187:6 191:7
192:12,13,18
193:4 194:23
195:22,23
**filed** 7:15
**files** 20:22 21:3
21:6,13,23
45:21 90:25
126:16 127:6
130:16 132:11
132:15 169:21
170:5,19 172:2
172:4,10,14
190:21 193:21
194:1,4,6,10,18
194:20 195:4

Page 23

**[filing - found]**

**filing**   33:9,13
  47:3
**fill**   15:20
**filled**   15:5,17
  31:5
**final**   11:8 14:15
  15:22 30:2
  77:21 78:22
  116:18,24
  126:17 173:24
  174:6 192:13
  192:19 193:11
  194:23,24
  195:8
**finalized**   86:10
  86:14
**finally**   12:11
**financial**
  214:17
**financially**   7:24
**find**   101:23
  102:25 103:14
  104:6 105:9
  113:19 136:25
**finding**   103:21
  103:25 206:11
**fine**   14:25 59:7
  64:19 81:5
**finish**   115:19
  115:21
**finished**   12:7
**firm**   7:22 24:15
  47:13
**first**   9:11 63:13
  63:18 64:4,11

  70:25 72:14,17
  75:22 76:2,8
  80:19 81:2,3
  84:10 94:15,17
  131:25 132:8
  132:11,13
  145:2,11,13
  146:14 147:1
  147:10 148:24
  149:18 150:6
  151:6 152:4,6
  152:11 153:23
  154:11 155:20
  155:21 156:5
  156:23 157:8
  158:18 170:25
  176:8,13,22
  178:15,18
  179:11 183:19
  197:3,4 206:19
  206:20,23
  207:3,3,7
  209:24 210:4
  210:17
**five**   92:1
  196:16 213:1
**fix**   165:22
**fixed**   166:17
**flagging**   170:7
**flat**   195:3
**focus**   92:11
  112:1
**focusing**   207:6
**fold**   37:14

**folks**   210:23
**follow**   184:16
  203:1 205:3
**followed**
  136:18 161:8
  161:12
**follows**   8:24
  215:8
**footers**   201:11
**footnote**   85:1
**foregoing**
  214:12 217:2
**foreign**   71:15
  71:20
**form**   10:20
  16:12 19:2,4
  19:11 20:11,24
  26:18 27:9,18
  29:1 31:16
  35:23 36:22
  37:4 39:19
  44:3,9 46:12
  48:12,25 49:20
  50:6,18 51:22
  55:22 56:4
  57:25 60:16
  61:7 62:17
  64:6 65:17
  66:5,17 68:22
  70:16 71:6,11
  73:15 75:24
  76:3,9 90:6
  91:15 94:22
  95:10,20 99:25
  100:13,18

  103:18 104:22
  106:17 107:15
  109:3 112:24
  113:4 117:4,12
  121:12,15
  122:14,21
  123:11 125:19
  132:25 137:14
  139:25 140:21
  141:9,20 144:6
  151:19 160:13
  161:7 162:4,17
  163:2 165:10
  173:25 174:7
  174:10 175:11
  183:14 186:13
  187:21 190:23
  191:3,12
  198:13 199:14
  201:15 202:16
  203:6,15 204:3
  204:13,19
  205:7 207:1
  208:21 210:3
**formal**   23:12
**formed**   122:19
**forming**   20:13
  122:9
**formulating**
  117:23
**forth**   125:8
**forward**   16:14
**found**   139:2
  204:17,24

**[foundation - go]**

**foundation**
50:7 55:23
56:5 84:1
107:16 137:15
140:22 144:7
162:18 174:1,8
187:22 203:7
203:16 204:4
204:13,20
205:8 208:22
**founders** 63:19
63:21
**four** 13:12 26:8
138:5 178:9
192:8,9 210:19
**fractions**
180:20,25
**framed** 104:25
**francisco** 2:15
194:2,5,10
**fraud** 202:21
203:5 205:10
**frauds** 205:6
**fraudsters**
205:4
**fraudulent**
204:15,22
205:2,10
**frcp** 216:1
**frederick** 2:8
8:16
**free** 93:2
**freeman** 2:4
8:13

**frequency**
133:9
**frequently**
32:23 136:22
**friday** 13:3
**front** 64:12
88:25 129:1,2
155:12 159:15
160:5 192:23
194:14 209:7
**fruit** 184:8,16
**fulfill** 208:18
**fulfilled** 163:23
**full** 9:3 75:18
77:11 78:20
83:25 86:5,9
86:13 136:15
136:18 139:24
140:6 144:23
144:23 145:3
146:8,10,11
164:24 176:8
176:23 178:5,5
179:11 190:10
207:4 214:12
**fullest** 11:15
**fully** 94:19
95:18 97:3
158:24 159:6
172:23 173:3
173:14
**function** 29:21
119:13 186:18
**fundamentally**
52:13

**further** 85:11
94:9 109:8
116:11
**future** 17:4
37:16 129:5,19
**fuzzy** 144:5,18
144:19 145:8
188:8

**g**

**gained** 31:20
**gapped** 127:23
128:1 142:18
145:21 190:5
193:22
**garden** 30:6,9
30:10,20 31:1
31:5,7,11,14
210:21
**gauge** 152:25
**general** 9:20
27:10,10 32:14
49:16 50:16,16
50:19 152:5,18
**generally** 43:12
51:1 142:7
173:10 206:24
210:13
**generate**
101:23
**generated**
84:11 85:12
104:15 194:25
209:25
**generic** 43:15

**geocoding**
113:7,11,18,20
113:22,24
**getting** 35:18
172:6 179:21
**gibson** 2:14,18
8:5,7,10
129:13
**gibsondunn.c...**
2:16,16,20,21
**gift** 93:12
**give** 12:3 16:1,4
26:22 31:24
40:9 51:18
52:16 91:18,20
109:4 113:23
122:19 133:2
134:16 141:21
141:24 144:14
148:8 166:1,15
169:4 197:7
205:12 207:19
**given** 12:12
16:10 39:9
193:21 194:18
214:7,13
**gives** 19:14
**go** 7:11 18:16
30:5 59:17
64:21 72:13
75:14 77:2
91:1,24 95:14
98:1,4 106:7
123:12 128:11
169:18 196:13

**[go - hierarchical]**

197:15 205:14
207:2 209:12
**goal** 35:6,10,18
35:21,21 62:7
120:7 127:2,4
127:12
**goals** 35:22
38:1,8
**goes** 17:7 110:1
162:5
**going** 7:6 9:8
10:24 17:4
33:6 58:23
59:3,10,16
64:22 74:16
98:5 101:13
122:11 128:12
144:13 146:23
159:17 169:8
169:12 180:5
189:22 196:17
205:17 206:12
213:1
**gold** 168:9,16
168:24 169:1
**good** 7:5 64:17
64:20 117:21
128:10
**gotten** 31:23,24
**governmental**
71:14,19
**graduated** 23:5
23:10
**gram** 114:17

**great** 129:12
**greater** 178:25
**grew** 31:4
**group** 30:7,9
30:10,21 31:1
31:5,7,11,14
133:23 152:2
152:24
**grouped** 153:7
**grouping**
153:11
**groups** 109:13
**guess** 13:4 43:9
46:6 50:2
61:24 64:11
77:14 105:1

**h**

**h** 2:4 4:19
153:18 215:1
218:3
**haldenstein** 2:4
8:13 209:23
**half** 58:24
181:7
**hamming** 114:7
**hand** 87:24
112:22,25
113:1 210:23
214:18
**handle** 87:7
**handled** 215:8
**handles** 25:7
**handling** 36:5
**hands** 27:5,7
29:14,16,17

40:16 41:21
210:10,23
211:16
**hansen** 2:8
8:16 65:3
**happen** 62:25
167:8
**happened**
210:6,8
**happens** 65:15
**hard** 193:25
194:5,9
**harmed** 33:1
**harry** 2:18
129:11,12
**hash** 138:2,4
150:21 157:22
159:10
**hashed** 81:7,19
82:1,6,20,23
83:14 116:20
116:21 117:3
117:10,14,17
117:19 135:21
135:25 136:1,8
136:13,16,21
137:6 138:2,4
138:5 143:13
143:18 150:15
150:21 155:3
155:24 157:22
159:10 176:8
178:6 179:11
183:13,21
195:9,10

197:24 198:2
**hashing** 198:2
**hausfeld** 47:13
**head** 31:2
45:18 63:8,10
63:12 89:3,19
90:23 93:6
119:25 130:13
130:20 133:2
137:10 142:17
144:1 167:5
180:18 189:14
193:14
**headquarters**
89:21 90:11
150:10
**health** 28:19
46:9 118:18
**hear** 17:15
63:18 144:20
168:11
**heard** 52:16
105:9
**heavily** 49:22
**held** 29:10
53:15
**help** 22:4 76:10
90:24
**helped** 12:5
**helpful** 121:10
121:14,18
**herz** 2:4 8:13
**hierarchical**
43:5,21

**[hierarchies - included]**

| | | | |
|---|---|---|---|
| **hierarchies** 43:23 44:2 | **house** 89:18 | **identified** 15:19 22:10 | **identifying** 32:1 41:3 |
| **hierarchy** 42:24 43:1,11 43:18,25 44:7 44:13,15,20 131:12 | **household** 147:5 | 34:12,25 35:8 35:20 90:13 97:8 101:11,22 123:5 137:8 | 109:7 119:16 119:22 126:3 151:5 167:5 177:20 182:19 |
| **high** 12:23 16:4 48:10,18 60:20 61:2,14 62:8 95:8 97:17 107:10 137:4 177:1 | **hphillips** 2:21 **huh** 108:21,23 115:20 **human** 39:7,16 203:14 204:16 204:23 | 140:25 153:9 156:15 164:16 165:3 166:16 166:18 167:3 171:1 184:5 189:3 192:4 | 182:21 184:10 192:10 **identities** 116:14 **illegitimate** 89:6 91:12,22 |
| **higher** 49:17 51:4 | **hundred** 68:16 70:2 | **identifier** 27:13 94:11 116:13 | **imagine** 126:11 182:4 192:14 |
| **highest** 60:1,11 60:13 62:3 | **hundreds** 172:15 207:14 208:1 | 184:11 195:18 195:19 | **impact** 68:12 82:13 170:24 |
| **highly** 1:7 12:13,18 | **hyojin** 150:8 | **identifiers** 81:9 94:12 | **impacted** 53:16 **imply** 44:1 |
| **higney** 2:13 8:9 | **hypothetical** 44:10 100:1 | **identifies** 156:20 | **important** 160:16 |
| **hired** 198:16 | 160:25 161:9 | **identify** 29:24 | **improve** 131:18 |
| **hit** 171:8 | 161:13,13 | 60:19 87:10,18 | **improved** |
| **hitting** 171:11 | 162:8 183:23 | 88:12 102:1,8 | 31:22 32:3 |
| **hold** 22:13 36:15 106:8 193:15 | 208:12,23 **hypotheticals** 161:15,18 164:8 | 103:1,15 104:17 105:4 105:11 108:9 120:4 123:4,7 | **inaccurate** 112:16 166:17 210:2 |
| **holding** 50:2 | **i** | 129:22 131:24 132:1,24 | **inarticulately** 99:10 |
| **home** 146:22 **honest** 12:3 | **idea** 212:15 **identifiable** | 157:21 165:21 165:24 166:2 | **include** 110:13 111:2 135:21 |
| **hour** 58:24 65:8 128:10 | 26:15 39:1 41:4 42:6 | 167:1,13 170:23,25 | 191:3 **included** 11:8 |
| **hours** 13:12,12 65:16 68:14 70:2 207:14 | 45:15 54:8 183:12 184:2 184:12 **identification** 3:9 4:1 5:1 6:1 196:5 | 178:1,14 191:19 204:1 | 20:18 21:3 80:21 86:25 |

**[included - intend]**

87:8 92:23
93:2,11,15,19
116:24 135:24
136:9 179:16
179:17 183:9
200:25 202:7
215:14 216:3
**includes**  24:25
25:1 84:11
85:12 155:23
**including**  8:2
34:11,24 61:1
80:19 81:1
117:25 137:12
137:19 138:14
183:10,13,21
**incomplete**
44:9 99:25
126:3
**incorrect**  80:17
**increased**
155:22,25
**increasing**
68:13
**independently**
141:6
**indicate**  6:24
82:21 85:4
**indicator**  82:15
147:3
**individual**
26:15 27:11
34:11,24 37:17
46:9 53:21
54:1 56:3

60:22 62:11,20
73:10 79:6
82:12 90:25
109:24 110:2
117:15 143:15
143:19 152:3
155:11,13
160:19 161:11
162:11 163:21
164:4 173:6
176:21 192:8
**individualized**
106:4
**individually**
65:12 105:22
105:23
**individuals**
27:11 50:22
54:3,5 55:12
55:17,18 60:3
60:14,20,24
62:4,15 79:1
79:12 92:12,17
111:5 119:16
119:22 120:4,8
139:6 151:14
151:18 155:10
179:19 191:20
191:24
**industries**
119:7,14
**industry**  36:7
37:5 138:23
139:6 203:24

**ineffective**
105:25
**infinite**  89:21
150:11
**info**  81:7 82:11
116:20,21
117:3,19
183:10,11,13
183:21 184:11
192:25,25
195:9,10,23,25
197:24 198:2
**information**
9:22 10:22
16:13,16,17,20
19:25 23:7,13
23:23 24:7,20
25:19 26:16
27:15,22 28:5
28:6,10 41:4
42:6,7,14 43:2
45:15,20 46:10
53:15 54:8
55:10,11,21
56:2 74:22
78:25 82:12
85:17 92:23
93:4 96:25
102:2 109:23
109:25 110:1
126:18 138:3
143:22 151:5
151:21,23
155:8,12 160:1
160:4,24

162:11 177:6
182:22 184:12
184:22 189:20
190:2 191:6
199:24 200:13
200:15 202:8
202:14 203:4
**informed**  52:3
106:21
**infrastructure**
24:25
**infrequently**
113:18
**initial**  77:9
90:2
**initially**  63:4
194:10
**input**  186:11
**inspect**  193:21
202:5
**installments**
79:16
**instance**  171:1
**instances**  53:5
73:8 89:17
113:21 172:9
**institute**  36:6
**instructing**
17:9,11
**instruction**
19:15 75:1
**instructions**
122:20
**intend**  17:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[intended - jnd's]**

**intended** 38:1,8
63:4 82:24
123:16 191:19
196:25
**intent** 37:13,14
81:15,16
111:22 189:6
**interaction**
187:8
**interchangea...**
166:24
**interest** 214:17
**interested** 7:24
67:15,16,25
144:20
**interfere** 17:18
**intermittent**
130:18
**internal** 187:25
188:4,10
195:17
**interrupt** 97:25
**introducing**
32:8
**invalid** 90:20
135:3
**investigate**
74:9 136:20
138:8
**investigation**
137:1
**involve** 38:20
**involved** 25:13
28:11 38:6
40:8,10,14,15

41:14 48:16
50:22 68:7
77:9 115:15,23
115:25
**involvement**
210:10
**involves** 38:21
39:7,16 111:17
**involving** 39:23
**ipads** 79:2
92:13,18
**iphone** 1:4 7:14
215:4 218:1
**iphones** 79:2
92:13,18
**ipod** 92:24
**isolation** 153:4
158:2 159:16
**issue** 38:17
39:2 52:18
82:9 91:17
152:16 166:18
194:7
**issues** 38:15
52:12,16 89:10
89:12 92:2
126:3 129:5,18
132:20,24
142:13 167:3
**issuing** 56:2
**it'd** 27:4 172:8
**items** 174:14
**iterate** 106:14
108:18

**iterating**
106:16,22
108:4
**iteration**
107:14,22
108:7,12,19,25
126:2
**iterations**
101:12 102:7
108:9
**iterative** 101:6
106:10 131:17
**ivanchan** 154:1
154:14

**j**

**j** 4:12 59:21
**january** 196:9
**jason** 5:16
156:6 157:1,25
158:8 160:2
161:22 163:9
**jay** 149:19
**jd** 193:2
**jennifer** 3:17
33:15,20 59:20
59:22 63:24
66:11
**jeremiah** 2:24
8:8
**jersey** 149:22
**jnd** 20:3,7,9
24:11,12,14,15
25:7 28:25
29:4,7 30:21
31:12,15 36:5

38:23 39:6,16
39:22 40:19
42:1,22 46:1
48:16,20 59:20
59:21,25 61:19
62:1,23 63:5
63:13,21 64:4
65:11,13 66:3
66:8,13,24
67:1,4,6,10,18
67:20,21 68:3
68:11 69:14
70:4,9,14,17,19
73:1 78:23
91:13 95:24
96:15 97:10,11
116:22 118:1
120:21 123:22
124:10,11
126:4,8 138:15
140:18 175:2
189:20 190:2
193:1,3,18,22
195:11,14,18
197:9,11,19
198:3,8,11,20
198:21 208:14
210:21
**jnd's** 36:4
47:23,25 48:4
48:10 51:5
63:18 65:14,20
65:24 126:18
194:19 198:16
202:5

**[job - lazarus]**

| | | | |
|---|---|---|---|
| **job** 1:23 24:19 | **keough** 3:17 | 66:19,20,24 | 209:22,23 |
| **join** 12:18 | 33:15,17,18,20 | 67:10,14 68:1 | 212:11,14 |
| **joined** 8:7 65:3 | 34:5 36:21 | 68:1,6 72:1 | **knowledge** |
| **joining** 8:9 | 37:2 59:19,20 | 80:16 89:3,9 | 20:9 22:12 |
| 129:11 | 60:8 62:12 | 93:1,5,10,14,18 | 40:13 61:21 |
| **jones** 3:21 47:6 | 63:24 | 97:2,2 99:18 | 66:13 139:10 |
| 47:9,11,12 | **keough's** 36:3 | 99:19 102:11 | **kwood** 2:10 |
| **journals** | 59:18,23 61:25 | 102:12 106:8 | **kyle** 2:7 3:24 |
| 139:10 | **keyboard** | 107:19 109:25 | 4:3 6:17 8:15 |
| **judgment** | 39:24 41:13 | 115:15 123:15 | |
| 105:13 | 42:22 43:19 | 123:25 125:14 | **l** |
| **july** 28:15 80:4 | 44:13 | 125:15 126:1 | **l** 69:12 127:17 |
| **jump** 14:1 65:5 | **kicking** 173:10 | 126:10,11 | 158:19,19 |
| **june** 1:12 7:1,6 | **kim** 4:5,12,19 | 128:24 133:25 | **labeled** 14:12 |
| 30:6 64:2 | 148:24 149:1,3 | 134:7 135:23 | **lack** 43:16 |
| 214:19 215:3 | 149:18 150:6 | 136:1 138:25 | **language** 15:21 |
| **junior** 146:18 | 151:6,11 | 139:1,5 140:6 | 36:18 58:7 |
| 146:21,22 | **kind** 27:16,19 | 141:9,14 142:6 | 60:5 61:25 |
| 147:3,6 | 38:10 41:1 | 142:7,12,17 | 78:10 92:14 |
| **jury** 64:12 | 168:6 | 143:9 145:17 | 101:9 102:3 |
| **justify** 108:10 | **kinds** 28:10 | 145:18 146:4 | 118:7 200:24 |
| **justifying** | **know** 9:6 15:15 | 146:23 151:20 | **large** 41:6 |
| 107:1 | 18:13 19:16,17 | 155:22 164:11 | 42:16 48:8,15 |
| | 26:23 29:18 | 165:20 168:13 | 49:6 51:11,12 |
| **k** | 32:7,24 33:15 | 168:19 169:5 | 56:10 78:24 |
| **k** 2:8 69:12 | 36:23 37:9,25 | 175:21 177:25 | **larger** 48:23 |
| 87:4 | 38:7,13,16 | 177:25 178:8,9 | 51:1,1 |
| **karlin** 69:8 | 40:19,24,25 | 180:22 181:23 | **largest** 138:23 |
| 71:9 206:2,3,4 | 42:7 44:4 | 185:22,22 | **laws** 217:2 |
| 206:6 | 45:20 46:4,6 | 186:1 187:9,12 | **lawsuits** 24:17 |
| **keep** 59:10 | 47:9 49:4,6 | 187:19 188:20 | **layer** 198:1 |
| **kellogg** 2:8 | 53:4 54:3 55:7 | 188:21 193:12 | **laymen's** |
| 8:15 65:3 | 55:13 56:16 | 198:14 201:16 | 170:16 |
| **kelloghanse...** | 58:3,5 63:8,9 | 202:7,9,17 | **lazarus** 2:13 |
| 2:10,11 | 63:12,15 66:10 | 203:8 207:8 | 3:4 4:4 6:17 |
| | | | 8:5,5 9:2 11:1 |

Page 30

**[lazarus - line]**

| | | | |
|---|---|---|---|
| 12:11,15,21 | 95:17,21 98:3 | 196:8,13,22,23 | 85:1,6,10 86:1 |
| 14:3,7,9,11 | 99:8 100:2,14 | 198:19 199:1,4 | 86:13 196:5,8 |
| 15:13 16:17 | 101:4 105:1 | 199:15,16 | 197:10,18 |
| 17:1,6,9,13,19 | 106:20 107:17 | 201:18,24 | **letters** 87:4 |
| 17:21,22 18:2 | 109:5 113:1,6 | 202:19,25 | **letting** 72:5 |
| 18:4,16,19,21 | 115:24 117:7 | 203:11,20 | **level** 12:23 |
| 18:23 19:9,19 | 117:14 119:3 | 204:8,15,22 | 91:17 96:8 |
| 20:1,13 21:1 | 121:13,17 | 205:13,22,23 | 100:7,9 108:20 |
| 26:19 27:14,21 | 122:24 123:14 | 206:15,17 | 131:13 140:13 |
| 29:2 31:18 | 125:20 128:9 | 207:6 209:4,13 | 140:17 152:20 |
| 33:4,8,11,12 | 128:17,18,23 | 210:3,9 211:20 | 174:24 175:25 |
| 34:20 36:2,25 | 128:24 129:12 | 211:22 212:1,4 | 176:19 177:1 |
| 37:7 39:20 | 129:16 132:5,9 | 212:9,14,19 | 186:7 |
| 44:6,12,23 | 133:8 137:16 | **lead** 207:23 | **levenshtein** |
| 46:14,23 47:2 | 140:3 141:2,23 | **learn** 64:15 | 114:7 |
| 48:15 49:8,24 | 144:8 148:11 | 119:4 152:23 | **life** 32:21,22 |
| 50:10,23 51:24 | 148:13,15 | **leave** 129:5,19 | **likely** 91:5 |
| 55:24 56:7 | 149:7,10,13,15 | **left** 148:16 | 99:16 108:25 |
| 58:6,25 59:4,9 | 150:1,4,5 | **legal** 20:3 | 165:19 166:16 |
| 59:11,12 60:23 | 151:12 152:1 | 24:11,15,16 | 176:20 192:10 |
| 61:8 62:21 | 153:17,20,21 | 25:7 30:10 | 199:25 200:12 |
| 64:9,17,20 | 154:7,9 156:2 | 32:17 34:15 | 202:12,19 |
| 65:5,19 66:6 | 156:5,17,20 | 58:1 59:20 | 203:2,12 |
| 66:24 67:16 | 157:4,7 158:14 | 70:17 104:9 | 204:17,24 |
| 68:23 70:12,19 | 158:16 159:23 | 138:22,23 | **limitations** |
| 71:7,13 72:11 | 159:25 160:16 | 201:21 215:7 | 85:25 86:4,8 |
| 72:16,19,20 | 161:8 162:14 | **legitimate** | 86:12 121:7 |
| 73:20 74:19 | 162:22 163:7 | 86:22 87:9 | **limited** 121:8 |
| 75:3,6,14,21 | 165:11 169:10 | 89:14 90:4 | 127:5 178:7 |
| 76:1,4,5,11,20 | 169:17,18 | 136:22 | **lin** 2:17 3:24 |
| 76:22 77:8 | 174:2,20 180:5 | **lerman** 39:24 | 8:7 72:9 80:3 |
| 79:22 80:2 | 180:8 183:15 | 40:6 41:6 | 80:12 149:12 |
| 84:2,16,22 | 183:17 185:16 | **letter** 4:2 6:16 | 212:15 |
| 88:21,22 90:9 | 187:23 191:18 | 13:18,21 84:18 | **line** 8:9 22:18 |
| 91:20 94:25 | 193:4,6 196:4 | 84:19,23,24 | 22:21 59:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[line - made]**

85:11 130:18
145:3 163:18
173:5 215:15
216:4 218:4,7
218:10,13,16
218:19
**lines**  172:13,16
172:25
**link**  2:8 65:3
**linked**  73:9
**list**  19:14 26:6
26:12 32:7
80:25,25 120:8
133:1 136:8
137:9 157:19
190:10,14
210:10,18,19
**listed**  63:1,10
81:6 83:23
90:19 130:16
132:2 148:16
148:21,24
149:21 150:6,8
150:10 154:1,3
154:11,14,17
156:6,8,10,23
157:8,10,12,15
158:18,21,23
159:1 211:15
**lists**  19:5 80:18
127:13 149:3
153:23
**literature**
109:9 110:16
110:21

**litigation**  1:5
3:16,20 7:15
33:21,22,25
39:25 41:14
42:17 46:17
47:7,16 48:11
49:11 51:6,16
52:19 53:13
55:5 65:15
72:22 215:4
218:1
**little**  40:9 59:17
73:6
**live**  158:9
161:23
**lived**  147:5
**living**  146:22
149:1
**llp**  2:4,14,18
8:13 47:13
**load**  130:12
**loan**  56:2
**loans**  55:13,19
**local**  128:2
**location**  7:17
113:12
**locked**  215:12
216:1
**logic**  61:1
131:10 140:5
167:4 178:3
**logical**  51:12
145:9 171:17
180:2,3,4

**logistic**  116:5
**long**  13:11
172:16 180:11
183:15 209:17
**longer**  28:22,23
30:12,13
105:15 107:1,6
171:11 179:16
207:23 208:2
**longest**  114:14
**look**  13:15
19:21 22:17
36:3 47:21
70:23 72:24
74:7 80:12
84:4,25 88:18
136:5 138:10
141:7 148:10
152:20 158:3,4
170:22 179:23
192:8 197:7
209:9
**looked**  13:14
40:24 90:24
105:21 165:21
177:25 180:11
**looking**  44:12
49:14 77:15
84:9,10 90:18
91:4 125:20
128:19,20
141:16 152:14
152:25 156:5
157:18,24
159:4 166:12

168:17 183:2
186:16 196:11
208:4
**looks**  47:8 80:6
136:10 150:16
157:23 159:16
199:9
**lookup**  187:10
**loop**  89:21
150:11
**lori**  2:23 7:20
**lost**  56:18
97:25
**lot**  9:9 97:6
190:24
**love**  168:11
196:15
**low**  106:15
107:19

**m**

**m**  2:7,9,13,19
3:17 69:12
**macbook**  39:24
41:13 42:22
43:3,19 44:12
44:20
**machine**
127:23 128:2
142:18
**made**  92:24
93:19 126:25
143:23 162:12
163:21 167:10
177:14 189:16
189:17 190:13

**[made - matches]**

190:22
**madison** 2:5
**mail** 25:18
146:24
**mailings** 36:5,9
**main** 24:22
182:4
**maintain** 20:5
**majority** 70:10
96:16,20 97:13
97:15,18
174:13 199:18
**make** 11:22
27:17 58:4
74:24 106:24
106:25 111:5
119:21 122:12
137:6 139:22
140:3 143:4,10
160:22 164:10
166:20 170:10
173:2,7,13
180:15 194:17
215:14 216:3
**makes** 108:13
207:18
**making** 92:17
109:10 119:16
131:17,18
**management**
23:7,13,22
24:6 25:2,14
63:17
**manager** 69:14

**managers**
211:12
**managing**
25:11 29:11
**manner** 6:23
103:23
**manual** 87:25
142:11
**manually** 87:22
87:24 88:4,7
141:16,19
**march** 6:19
16:3 47:3,4
199:5 201:20
202:2
**marching**
126:22
**marginal** 101:7
101:9,16,18,19
102:3,15,19,22
103:6,8,10,17
103:20 104:3
104:14 105:3
106:14,25
107:18,19,21
**mark** 13:22
14:3 18:17
46:23 79:22
84:17 154:7
156:2,17
158:14 196:4
196:25
**marked** 14:6
18:22 33:10
47:1 72:15,18

80:1 84:21
88:19 126:14
148:12 149:9
150:3 153:19
154:8 156:4,19
158:15 196:7
196:24 199:2,3
**marketplace**
71:19
**marking**
159:18
**markups**
200:21
**married** 158:8
160:2 161:22
179:21
**maryland**
156:14 157:16
159:2
**massively**
43:13
**master's** 23:17
**match** 32:11
61:4 62:8
87:13 94:12
100:6 101:23
104:1,5,12,18
105:19,20,22
106:3,4 107:8
109:14 110:14
114:8 116:13
118:12,19
134:20 140:12
140:12,14,16
141:9,14,18

142:24 144:4
144:12,22
145:5,11,12
146:1,8 147:14
148:5,7,9,18
151:25 152:6
152:17,22
153:14,16
167:6 177:1,5
177:8 178:8
179:22,24
180:2,4 182:9
182:12,14,15
183:11,24
187:24 207:5
207:15,19
**matched** 96:11
100:5 102:1
107:11 135:20
144:23 145:2
145:10,19
146:2 152:12
152:15 153:2
155:16 176:7
176:20 177:19
179:10 181:4
182:18 183:20
184:9
**matches** 60:21
101:3 102:8,18
102:20 103:21
104:7,17 105:5
105:10,12,16
106:5,14
107:14,22

**[matches - method]**

| | | | |
|---|---|---|---|
| 108:22 109:1,7 | 144:18,19 | 164:16 165:3 | **melissa** 55:3,4 |
| 114:11 123:1 | 145:8,25 | 167:18,20 | 55:8 120:16,21 |
| 140:19,19,23 | 146:12 147:19 | 168:22 169:2 | 121:6 185:3,18 |
| 141:12 142:11 | 152:6 155:19 | 176:12 191:16 | 185:20,22,25 |
| 142:14,24 | 165:7,15,17 | 203:21 212:1 | 186:20,23,23 |
| 146:10,11 | 166:10 167:1,4 | **meaning** 16:18 | 187:4,9,15,19 |
| 152:10,13,15 | 170:24 171:5 | 56:18 67:17 | 187:24,25 |
| 152:21 177:25 | 171:18 176:7 | 141:16 195:19 | 188:13 |
| 178:14,15 | 176:13,17 | **meaningful** | **member** 43:7 |
| 179:1 182:23 | 177:13 178:3 | 108:10 135:18 | 162:9 163:22 |
| 187:19 207:16 | 178:21,22 | 172:7 179:19 | **members** 25:19 |
| 207:19 208:7,8 | 182:13 188:7,8 | **meaningfully** | 34:12,25 35:8 |
| 208:9 | 206:21 | 177:15 | 35:20 38:14 |
| **matching** 29:17 | **material** 200:4 | **means** 77:22 | 49:17 50:4,13 |
| 29:18,22 30:1 | **materials** 20:21 | 78:5,10 87:17 | 198:4 |
| 31:7,9 32:2 | 125:16 134:6 | 88:1 93:24 | **memory** 113:10 |
| 68:20 69:2 | 179:6 189:16 | 94:9,19 95:2 | 124:4 188:15 |
| 90:15,22 101:2 | 191:2 | 95:18 102:23 | 191:6 192:22 |
| 102:14 108:20 | **matter** 16:11 | 103:12 107:1 | 209:10 |
| 109:19 110:4,7 | 16:15 49:16 | 116:9 170:3 | **mention** 92:3 |
| 110:9,12,18,23 | 65:7 69:5,20 | 197:11 | **mentioned** |
| 111:4,10,13,15 | 74:15 214:16 | **measure** 106:1 | 13:13 24:10 |
| 111:18,21,25 | **matters** 12:20 | 209:3 210:1 | 35:11,17 86:17 |
| 112:2,8 113:7 | **maximize** 32:2 | **measures** 36:7 | 134:15 141:3 |
| 114:12,15,18 | **mean** 28:2 38:9 | **mechanically** | 147:24 167:11 |
| 114:21 115:1,2 | 40:10,11 43:1 | 126:1 | 179:3 185:6 |
| 115:5,6 116:3 | 43:11 50:12 | **media** 7:12 | 192:22 195:22 |
| 116:6 119:12 | 51:1,3 79:7 | 212:25 | 205:23 206:4,6 |
| 121:23 129:6 | 87:15,24,25 | **meet** 13:1 | **merge** 30:1 |
| 129:19 131:10 | 101:19 102:6 | **meeting** 22:7 | 189:21 |
| 131:14,19 | 107:13 114:22 | **meetings** 9:7 | **merged** 190:7 |
| 134:22 135:1 | 130:23 131:8 | 13:11 | **met** 9:5 12:23 |
| 135:19,22 | 132:4,5,6,6 | **megan** 3:21 | 13:3,6 |
| 141:7 143:3,4 | 140:18 141:22 | 47:6,9,11,12 | **method** 102:7 |
| 143:9 144:5,18 | 141:25 146:4 | | 108:3,4 111:4 |

**[method - names]**

111:8,9 113:11
113:17 138:3
144:3,10
152:24 157:22
159:10
**methodologies**
38:23 52:13
57:4,6 95:15
100:22 119:8
**methodology**
24:3 58:20
59:13
**methods** 19:2
19:11,20 20:6
20:10,15 31:13
31:14,22 38:23
51:25 52:8,13
56:24 57:3,5
110:25 111:3,7
111:16 112:11
117:24 118:1
118:10,15,23
120:21 138:13
138:15,18,20
138:21 139:8
139:12,17,22
175:15,16,24
**metric** 95:9
**metrics** 114:6
114:11
**mic** 17:20
**microphones**
7:7
**middle** 47:22
197:23

**million** 41:10
42:19 47:23
132:15,16,16
132:16,17,17
139:18 188:14
188:17,24
193:8,13
**mind** 57:22
128:6 188:17
188:18
**mine** 156:24
**minimal** 177:19
**minjae** 124:14
124:20
**minute** 197:13
**minutes** 169:9
**missed** 38:3
39:11,11 103:3
163:8
**missing** 84:7
133:3,3,4,9
136:12
**mistakes** 165:7
165:9,15,16,17
165:19,21,21
165:22,23,25
166:3,6,9,13,13
167:1,1,10
**misused** 103:3
**modeling** 58:10
116:5
**modification**
143:5
**modifications**
194:17

**mom** 89:7,11
**moment** 14:1
18:3 77:6
79:25 91:8
131:2 196:14
197:7
**monday** 13:3
**money** 102:13
162:15 204:17
204:24
**months** 51:16
51:17 56:14,15
75:17
**morning** 7:5
210:9
**move** 17:20
64:9 114:24
143:8
**moved** 192:9
208:1,6,8
**multiple** 43:23
140:4 178:10
178:11 181:22
183:3 185:9
186:1 196:1
204:18,25
**mute** 7:9
**mutually** 108:5

**n**

**n** 2:1 3:1 69:12
69:12 114:17
**n.w.** 2:19
**name** 7:20 9:3
10:15 27:12
45:15,17 46:11

54:8 80:19,19
81:3,4 89:1
120:17 133:4
144:22,23,23
145:4,11,13
146:14,15
147:1,2,2,6,9
147:14 148:21
148:24 149:18
149:19 150:5,6
150:8 151:6
152:4,6,11
153:23 154:1
154:11,14,20
154:21 155:20
155:20,21,25
156:6,8,23
157:8,10
158:18,21
176:8,8,22,23
178:5 179:11
179:15,16,20
185:20 188:11
188:25 189:19
190:1,19
192:13 206:1
206:19,21,23
207:3,3,4,7
**named** 13:16
124:13 132:15
160:3 192:18
**names** 28:3
78:7 80:25,25
86:22,25 87:9
94:1 114:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[names - object]**

145:19 147:10
147:15 148:15
150:17 181:17
181:20 190:10
**nanny** 161:23
**national** 54:16
54:20 120:10
120:13 184:23
**natural** 58:7
**nature** 50:21
50:21 122:3
144:15
**ncoa** 13:20
127:21,22
130:6,10,12
182:14 184:19
184:23 185:10
185:15,16
186:2,5,25
187:10 188:2
188:12 189:12
190:4,11,15,18
191:1,10,19
192:4,7
**ncoa.sql** 130:9
**necessarily**
6:24 146:11
**necessary**
131:18 184:13
215:14 216:3
**need** 15:7,20
16:25 27:19
59:2,2 64:12
72:10 73:8
75:24 135:6

153:13 173:1
173:13 187:1
197:13 209:15
209:16
**needed** 70:25
134:2 135:7
142:13 167:4
169:22 178:2
196:1 209:3
**needle** 208:7
**needs** 37:16
59:8
**negative** 97:5
164:23 165:2
**negatives** 99:11
**neighborhood**
188:23
**neil** 63:24
66:11
**neither** 26:24
123:2 181:24
**networking**
25:1
**never** 44:24
93:3 168:7
**new** 2:5,5 107:9
108:16 149:22
189:19 190:1
**nine** 118:1
138:15
**non** 26:6 82:6
92:6 130:4,5
170:23 171:1
**noninformative**
210:2

**nonstandard**
87:18 169:20
171:16 210:2
**noon** 98:2,3
**normally** 58:20
**northern** 1:2
7:16
**not's** 97:6
**notating**
215:15 216:4
**note** 6:23 7:7
12:17
**noted** 159:24
**notepad** 127:23
**notice** 11:3
32:24 34:10,11
34:23,24 35:7
35:12,19 37:19
49:3 85:11
**noticing** 8:4
25:12,16,18
35:14,25
**notifying** 61:17
**noting** 65:2
**noun** 175:11
**number** 7:17
42:3 45:16,18
48:6,9,16 50:4
55:9 69:24
108:22 113:23
113:23,24
123:4 125:9,14
125:15,16,22
135:20,21
136:21 137:5

137:12,19
138:6 149:11
150:24 155:6
155:24 177:7,8
177:15 178:9
182:4 188:16
188:20,22
189:13,15
191:24 193:1,3
193:10 202:13
202:20 203:2
203:12 206:20
207:5,8 208:15
212:25 215:15
216:4
**numbers** 11:8
85:16 123:7
136:8,12,23
137:3,8 150:23
178:11 181:17
181:19 206:22
**numeric** 195:16
195:20
**nw** 2:9

| **o** |
| --- |

**o** 69:12 192:14
**oakland** 1:3
7:16
**oath** 11:24
**oaths** 214:3
**object** 16:12
74:16 123:11
132:25 159:17
204:13 206:12
207:1 210:3

**[objecting - okay]**

| | | | |
|---|---|---|---|
| **objecting** 76:10 | 151:7,19 | **occurring** | 30:3,5,16,18,20 |
| **objection** 10:20 | 159:23 160:13 | 124:25 214:14 | 31:9,13 32:13 |
| 15:11 16:24 | 161:7 162:4,17 | **occurs** 130:2,4 | 33:9,25 34:18 |
| 17:2 19:4,13 | 163:2 165:10 | **october** 30:6 | 35:3 36:2,2,20 |
| 19:22 20:11,24 | 173:25 174:7 | **offer** 17:23 | 36:25 39:22 |
| 26:18 27:9,18 | 183:14 185:11 | **offering** 18:5 | 40:19,23,25 |
| 29:1 31:16 | 187:21 191:12 | **offerings** | 41:6,13,16,21 |
| 34:14 35:23 | 198:13 199:14 | 185:25 186:1 | 41:25 42:5,9 |
| 36:22 37:4 | 201:15,21 | **offers** 187:10 | 42:16,19,21 |
| 39:19 44:3,9 | 202:16,22 | **office** 79:15,18 | 43:9,18 44:23 |
| 44:18 46:12 | 203:6,15 204:3 | 80:14 193:18 | 45:19,23 46:8 |
| 48:12,25 49:8 | 204:19 205:7 | 194:1,20 202:5 | 46:14,22 47:9 |
| 49:20 50:6,18 | 208:21 | 215:11 | 47:12,15,19 |
| 51:22 55:22 | **objectionable** | **officer** 24:20,21 | 48:5,8,22 |
| 56:4 57:25 | 17:5 | **oh** 16:1 36:15 | 49:14 50:10 |
| 60:16 61:7 | **objections** 7:25 | 80:16 114:25 | 51:20,24 52:5 |
| 62:17 64:6 | **objector** 17:17 | 156:25 165:23 | 52:7,15,25 |
| 65:17 66:5,17 | **obligated** | 173:19 | 53:6 54:20 |
| 67:12 68:22 | 201:19 202:1 | **okay** 9:14,16 | 55:2,10,16 |
| 70:16 71:6,11 | **observe** 208:2 | 9:18,20 10:5 | 56:1,7,12,24 |
| 73:15 75:23,23 | **obtained** 44:17 | 10:14,16,18 | 57:14,18,22 |
| 76:3,9,19 77:1 | 184:23 | 11:18 13:1,23 | 59:9,11,16 |
| 84:1 90:6 | **obvious** 173:6 | 13:25 14:2,18 | 60:7 61:13,19 |
| 91:15 94:22 | **obviously** | 14:21,21 15:1 | 61:24,24 63:9 |
| 95:10,20 99:25 | 62:22 | 15:21,24,24 | 63:13 64:2,4,9 |
| 100:13,18 | **occasion** 85:17 | 16:17,21 17:22 | 64:9,21 65:14 |
| 103:18 104:22 | **occur** 78:20 | 18:2,8,11,15,23 | 65:19,24 66:13 |
| 106:17 107:15 | 141:12 143:4 | 19:9,19 20:1 | 66:24 67:10,16 |
| 109:3 112:24 | 171:5 | 21:1,6,19 22:3 | 68:1,5,9,14,17 |
| 113:4 117:4,12 | **occurred** 67:8 | 22:9,13,17,24 | 69:1,7,11,15,22 |
| 118:25 121:12 | 130:15 142:12 | 23:2,12,16 | 70:1,3,14 71:5 |
| 121:15 122:21 | 142:14 152:15 | 24:11 25:16 | 71:13,22 72:4 |
| 125:19 137:14 | 153:14 166:19 | 27:6,14,24 | 73:13,24 74:4 |
| 139:25 140:21 | 167:6 189:4 | 28:2,5,10,13,14 | 74:5,13 75:14 |
| 141:20 144:6 | 209:1 | 28:21,24 29:5 | 75:21 76:4,11 |

**[okay - orders]**

| | | | |
|---|---|---|---|
| 76:20,22 77:4 | 132:18 133:8 | 197:15,16,21 | 153:1,15 155:9 |
| 77:14 78:15 | 133:11,21 | 198:6,19 | 158:1 159:12 |
| 79:14 80:7,10 | 134:21 135:2 | 199:10,13,21 | 191:10 192:2 |
| 80:13,18 81:4 | 135:20 136:3 | 200:24 201:2 | **opinions**   10:9 |
| 81:6,16,21,23 | 136:15,25 | 202:4,9,25 | 17:23 18:5,9 |
| 82:5 83:1,14 | 137:11,17,23 | 203:11 205:3 | 19:3,12 20:13 |
| 83:23 84:3,8,9 | 138:2,10 140:9 | 205:13,13 | 20:18 21:2 |
| 84:25 85:3,8 | 142:15 143:10 | 209:13 210:20 | 86:10,14 |
| 87:7 88:11,18 | 143:23 144:2,8 | 211:14 212:17 | 117:23 120:22 |
| 89:4,17,20 | 144:20 146:13 | 212:19,22 | 122:10 123:16 |
| 90:16,24 91:9 | 147:8,13,23 | **omissions** | 123:23 |
| 92:16,22 93:14 | 148:10 149:7 | 22:10 | **opportunities** |
| 94:6,7,15 96:6 | 149:13,24 | **omit**   85:17 | 140:7 143:3,4 |
| 96:19 99:16,21 | 150:22 154:6 | **once**   9:15 25:21 | **opposed**   27:16 |
| 100:11 101:20 | 157:7 158:6,13 | 37:17 189:18 | 65:11 83:11 |
| 102:21 103:5 | 160:7 163:7,15 | 189:25 210:7,7 | 111:15 162:10 |
| 104:8 105:1 | 164:22 166:25 | 210:8 | 167:2 |
| 106:7 107:4,12 | 167:23 168:5 | **ones**   13:16 | **opposing**   58:21 |
| 108:6 109:9 | 169:1,7,10 | 133:17 162:24 | 59:14 |
| 110:13 111:20 | 170:13,18 | **ooo**   7:3 99:3 | **oral**   1:9 |
| 112:3,5,10 | 171:19,25 | **open**   127:25 | **order**   19:8 |
| 113:6,9,13,16 | 172:9,13,21 | 167:24 | 32:23 54:24 |
| 113:20 114:1,6 | 174:20,25 | **operating** | 60:1 62:2 73:2 |
| 117:22,22 | 175:8,13 176:1 | 24:21 | 73:7 105:9,11 |
| 118:6 119:15 | 176:16 178:18 | **operations** | 113:24 120:13 |
| 120:2,19 121:3 | 179:15 180:20 | 24:24 25:1 | 122:3 126:16 |
| 122:8 123:4,10 | 180:24 181:3,6 | 29:8 31:2,3 | 126:22 127:6,7 |
| 123:19 124:2,7 | 181:12,16,21 | 41:19 | 127:12 135:7 |
| 124:13,16,23 | 181:25 182:3 | **operator** | 162:1,25 |
| 125:1,5,11,14 | 186:9 187:13 | 204:16,23 | 171:17 173:8 |
| 126:12,24 | 188:11,17 | **operators** | 173:13 189:9 |
| 127:1,22 128:3 | 189:15,18 | 203:14 | 202:14 204:1 |
| 128:7,9,18 | 190:17 191:1 | **opinion**   90:3,7 | 212:2,12,13,16 |
| 129:3 130:21 | 193:15 194:4,9 | 90:11 151:13 | **orders**   121:8 |
| 131:4,7,20,24 | 194:13 195:5 | 151:16,21 | 211:25 212:3,3 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[ordinary - paragraph]**

**ordinary**  84:12
85:13
**oregon**  214:5
214:24
**organization**
24:23,24,25
31:3 139:13
185:14
**organizations**
138:24 207:17
**original**  15:3
215:10,20,22
**originated**
80:11
**ouput**  192:13
**outcome**  7:24
11:8 19:8
21:18 29:19
38:11,20,25
75:19 78:21
82:14,18 95:16
119:24 120:1
142:19,23
143:2 173:20
174:15 175:16
175:25 178:12
**outcomes**  101:1
127:9 141:7
174:12 177:16
208:24 209:1
**outdated**
112:21
**outliers**  134:1
**output**  75:19
116:24 126:17

155:14 172:11
173:18,24
174:6 186:8
188:2 191:8
192:16,19
193:11 194:24
195:8
**outside**  20:9
23:9 118:14
124:10,11
126:8
**outsourced**
187:15
**outweighed**
101:7 102:4,9
102:22 103:11
104:19 105:4
106:15 107:19
107:20
**overall**  75:16
131:12 133:6,7
**overlapping**
29:3 78:18
**overly**  113:19
**overmatching**
155:23 207:20
208:10
**overnotice**
61:17
**oversaw**  26:8
45:7
**oversee**  24:23
24:24 29:8
**oversight**  25:11

**own**  16:18
60:10 120:21
160:21 164:3
202:15
**owned**  43:4
**owner**  43:6
**ownership**  43:3
43:5 44:21

**p**

**p**  2:1,1 30:18
192:14
**p.m.**  98:7,8
99:2 128:14,14
169:14,14
196:19,19
205:19,19
213:3
**page**  3:3,9 4:1
5:1 6:1 14:18
22:17 26:2,11
26:11 34:4
70:8 79:24
84:10,19 85:10
197:3,21
199:11 215:15
216:4 218:4,7
218:10,13,16
218:19
**pages**  1:25
201:11 215:14
215:17,17
216:3,6,6
**paid**  65:11,13
66:3,8,14 93:3
93:11,15

160:19
**paper**  14:10
159:18
**paragraph**
22:22 26:1,4,5
34:4 36:3,11
36:13,15,21
40:3 42:21
47:21 51:14
53:9 56:12
59:23,24 70:4
70:7,15,21
71:1,2 72:25
72:25 73:6,13
77:21 78:1,2,3
78:11,23 79:5
79:5,10 92:10
92:14 93:22
94:3,8,15,17,25
95:22 96:14
101:5,16 106:8
116:8,17 117:1
117:5 118:5,8
118:11 125:25
126:9 128:19
128:25 129:3
129:17 131:25
132:6,9,18
138:10,12
139:16 140:9
142:21 175:1
176:6 177:18
179:10 184:19
197:4,8,14,21
197:23

**[paragraphs - people]**

**paragraphs**
70:23 71:7
74:7,8
**parameters**
114:21,23
**paraphrasing**
116:10
**parent** 161:1,6
**parents** 160:9
161:2,4
**park** 149:21
**parlance** 83:15
**part** 36:15
60:23 90:13
94:8,18 110:14
111:9 112:7
123:17 143:14
143:19 163:24
169:1 192:14
203:4
**partial** 95:12
145:2,9 155:20
155:21,25
207:3
**partially** 94:20
**particular**
32:10 35:12
39:18 40:21
82:6 88:10
91:7 100:16
113:21 117:10
121:17 136:14
143:1 170:5,7
170:10,21,22
171:2 172:4,10

187:2 206:11
207:12,13
**parties** 7:11
33:2 36:6
**parts** 20:5
170:14 183:18
**party** 7:23 11:6
46:1 54:24
58:21 59:14
127:7 185:3
214:16
**party's** 188:4
**past** 118:1
138:15 175:20
210:6
**paths** 38:14
126:20
**patience** 9:10
209:17
**pay** 55:20
162:16 164:7
**payment** 25:23
25:24 43:7
138:3,3 150:20
157:22 159:10
160:22 177:6
**payments**
162:13
**payor** 4:6,13,20
5:3,10,17 6:3
6:10 51:21
56:22 70:5,9
70:20 73:2,3,8
73:8 77:19
78:6 79:4,13

79:17,20 80:15
80:22 81:9,10
82:22,24 83:11
83:25 85:20
86:2,5,9,13,18
86:21 89:22,22
90:8 91:12
92:22 93:1,10
93:14,18,25
94:11,12,20
95:3,19 96:15
97:12 99:12
100:4 109:15
116:13,14,18
117:8,8,15,15
117:16,18,20
120:9,20 130:3
130:7,8,9
139:19,24
143:14,19
146:3 147:11
147:21 148:14
148:19 149:17
151:14 153:12
153:22 154:10
156:22 158:17
160:12,14,18
161:6 162:6,15
163:17 164:2
164:17 165:5
180:24 186:20
188:25 189:21
190:7 191:23
192:3 202:13
202:20 203:3

203:12,13
204:1,17,24
**payor's** 138:5
**payors** 78:25
90:5,12 92:11
92:17,24 123:5
137:13,20,24
147:1 158:1,3
158:5 159:14
163:13 165:4
193:8 202:13
202:20 203:3
**pays** 161:1,3
**pc** 190:5
**pdf** 215:12
216:1
**peer** 20:14 24:1
**penalty** 215:16
216:5 217:1
**pennsylvania**
154:4,18 181:7
**people** 27:22
28:12 37:18
39:4,5,7,16
40:12 50:9,11
62:19 83:16
97:25 126:8
145:7 146:14
146:19 159:16
176:25 178:10
178:10 192:3
200:6,10 211:3
211:6,7,11,12
211:16,17

Page 40

**[people's - please]**

**people's** 66:15
**percent** 26:24
  26:25 27:3,4
  84:6 97:19
  99:13,17,24
  100:3 211:1,1
**percentage**
  26:19
**perfect** 168:18
**perform** 11:7
  58:19 67:17
  69:1 88:9
  177:22 184:14
  186:7 187:13
  203:22
**performed**
  38:25 51:9
  56:11 69:17,18
  125:6 141:15
  141:19 178:25
  179:2
**performing**
  25:10 38:10
  78:21 104:12
  178:23
**period** 76:14
  154:4,24
  157:13 192:8
  210:20,25
  215:18 216:7
**period's** 210:18
**periodicals**
  139:10
**perjury** 215:17
  216:6 217:1

**permutations**
  182:5
**person** 60:4,15
  60:25 62:5,15
  68:21 78:7,8
  82:20,23 83:14
  94:1,2,13 95:4
  95:7 109:21
  116:14 117:2,8
  117:10,14,17
  143:13,18
  145:4 150:15
  153:9 155:3
  162:15,20
  167:12 170:2
  176:8,24 177:2
  178:6 179:3,11
  179:25 187:7
  205:25 207:4
  208:14,17
**personal** 27:15
  53:14 160:24
  177:20 182:19
  182:21 183:12
  184:10
**personally**
  26:14,15,20
  40:8,10,14,15
  41:3,3,14 42:5
  44:24 45:7,14
  53:10 54:8
  56:11 68:9
  69:1 105:19
  118:17 126:3
  184:12

**persons** 26:15
  28:6
**pertained**
  13:19,20
**ph.d.** 23:17
**phillips** 2:18
  129:11,12
**phone** 27:12
  45:15,18 85:16
  135:20,21
  136:8,11,21,23
  137:3,5,7,12,19
  150:23,24
  155:5,24 177:7
  177:8,15 178:8
  178:11 194:14
  206:22 207:4
  209:8,11
**phones** 7:9
**phonetic** 116:2
**phrase** 145:8
  195:18
**pick** 7:8
**picks** 187:6
**piece** 88:9,14
  104:24 111:12
  182:21 192:20
  200:7
**pieces** 32:22
  85:9 161:11
  170:21
**pin** 89:4
**pittsburgh**
  181:7

**place** 7:10 68:2
  214:8,14
**places** 172:22
**plaintiffs** 13:23
  65:21,25 66:25
  67:5 68:3
  71:23 72:4
  73:14,17,21
  74:13,22 80:3
  84:19 94:16
  95:24 97:9
  122:8,11,13,24
  123:15,22
  159:21 175:3
  196:9 197:5,25
  201:19,25
**plan** 46:10
**plans** 45:22
**plausible**
  133:13 137:11
  137:18 153:10
  155:13 158:7
  158:11,12
  160:8
**play** 67:20
**please** 7:7,9 8:1
  8:19 9:3 11:13
  14:10 33:5
  39:12 65:1
  69:9 72:25
  75:25 76:11
  79:9,22 83:5
  84:16 86:11
  99:6 101:14
  104:23,25

Page 41

**[please - primary]**

128:16 129:14
129:14,22
137:17,17
140:1 142:2
148:11 153:17
164:25 169:16
196:21 197:14
199:2 204:21
204:21 205:21
211:25
**pllc** 2:8
**plus** 132:17
**point** 15:14
32:7 40:24
47:11 48:2
54:15 59:3,5
61:23 77:6
88:17 90:17,19
96:12 101:4
102:21,23
103:10,12,23
106:13 107:5
109:6 110:5
117:6,11
119:15 128:1
130:25 132:10
133:19 135:5
140:24 148:8
151:10 152:11
169:20 172:3
177:21 182:19
182:24 183:5
184:10 185:6
189:2,5 199:23
206:19 209:5

**points** 54:16
60:19 61:3
87:13 93:16
100:6 101:2
109:25 110:2
111:13 131:14
140:11,13
145:2,9 152:21
178:24 183:12
184:3 208:2
**populated**
85:19,20 210:1
**population**
10:23 11:2,2,4
11:5 120:15
179:19 189:2
**portion** 52:23
81:18 82:1
89:11,16,24
120:14 130:14
171:21 172:10
186:20
**portions** 15:3
15:10 16:7,9
172:1 173:12
173:17,19,22
174:4 187:2
200:19
**position** 198:14
**positive** 50:3
61:4 164:15,19
179:22 207:19
**possibility** 67:1
67:6 96:23
97:21 198:8

**possible** 43:23
44:16 56:1
61:18 87:20
99:13 104:7,17
104:18 105:19
105:20 106:3,4
121:16,19
153:2,3 161:14
161:22 166:6,9
182:2
**possibly** 16:13
16:15 91:1
203:9 211:1
**postal** 54:21
80:19 112:15
112:15,17,18
148:7 151:1
176:9,24
179:12 184:24
186:12
**postcards**
37:18,19
**potential** 32:11
105:11 142:23
163:22
**potentially**
87:19 101:11
146:12 170:24
**pour** 65:10
**practicable**
34:10,23 35:7
35:19
**practice** 36:20
60:7,11 61:5
61:10 113:17

**practices** 36:8
**pre** 56:17
**predictive**
116:4
**preface** 74:21
**preliminaries**
11:11 12:12
**preliminary**
9:11
**prep** 25:14 32:1
**preparation**
13:7,16 159:22
**prepare** 12:16
12:22 16:21
**present** 2:22
8:2 155:22
**pretty** 191:7
**prevail** 66:1,1
**previous**
112:23,23
175:23 199:19
199:21 200:1,1
200:3,5
**previously** 13:8
13:9 32:6 80:7
134:15 147:25
167:11 195:23
198:15
**price** 185:19
**primarily**
31:11 178:20
**primary** 29:25
94:12 101:22
116:14,21
117:2,3 172:6

Page 42

**[primary - provided]**

189:3 192:25
195:10 199:20
**printed** 84:19
**printout** 193:5
**prior** 9:6 10:12
14:24 16:10
124:20 185:12
**priority** 43:16
**privacy** 202:15
**private** 7:8
**privy** 67:9 68:6
68:8 164:1
**probably** 17:21
64:3 133:25
183:25 210:25
**problem** 72:7
75:4,12 82:3
109:5 129:16
**procedure**
215:19,21
**proceed** 65:1
94:10 99:6
116:11 128:16
169:16 196:21
197:1 205:21
**proceeding**
7:25
**proceedings**
214:6,10,13
**process** 25:22
34:5 35:6 37:1
38:1,8 39:6,9
39:15,18 44:8
45:8,10 60:18
61:2 71:1

76:16 101:6,12
106:10,22
109:8,10 110:4
110:9,12 112:7
119:8 120:2,13
127:21,22
131:17,21
134:3 135:9
136:19 175:24
177:13 182:9
183:25 184:7
184:16,17
186:7 187:4
190:5,16 191:9
192:9
**processes**
112:13,21
119:8 182:12
188:1,10
**processing**
25:14 32:25
58:7 191:8
**produce** 32:11
58:20 79:14
107:8 109:1,1
120:8 126:16
127:7 139:2
140:12 142:6
142:19 171:13
174:12,12,14
174:18 182:14
188:2 207:16
**produced** 4:7
4:14,21 5:4,11
5:18 6:4,11

18:24 21:13,24
58:15 59:12
68:19 78:24
82:9,14 92:23
107:22 108:7
108:19 121:21
125:17 134:6
142:16 172:19
173:21 174:5
174:10 179:6
195:9 207:15
209:2
**produces**
179:21
**producing**
77:12 126:22
127:4
**product** 17:8
18:1 74:18
75:12,18
185:21,25
186:2 187:10
**production**
80:14 84:9,11
85:12 155:15
**profanity** 87:1
87:5,8,11,16,17
87:21 88:13,14
88:16 89:2
**professional**
24:5
**professor** 23:22
**programs**
127:20 203:21

**project** 25:2,12
69:3 167:25
**projects** 25:4
**pronouncing**
33:15
**properties**
115:1,4,7,11
116:1
**proprietary**
20:7 58:20
59:13 117:25
138:14 139:12
**protect** 202:15
**protected** 33:7
**protecting**
189:9
**protection**
12:20 121:7
**protective**
122:3 189:9
**provide** 15:8
19:24 24:16
38:17 42:13
46:10 67:23
69:25 70:1
114:22 122:8
122:13 127:5
141:21 164:24
185:15 195:24
197:25
**provided** 15:4
15:6 18:11,13
20:21,25 21:4
21:6,15,17
46:1,3 48:14

Page 43

**[provided - quote]**

49:2,23 50:2
54:3 55:12
77:12 81:10
82:15,17 123:2
127:9 135:25
143:13,21
151:9 173:23
174:5 179:8
185:18 190:13
190:21 191:2
198:25 200:21
202:14 215:19
216:8
**provides**   19:16
85:11
**providing**   9:22
32:21 55:21
56:3 67:25
78:21 82:16,18
195:21,25
**public**   33:8,12
47:2
**publication**
112:20
**publications**
20:15 110:17
110:22 113:5
139:9
**publicly**   184:22
**publish**   139:14
**published**   24:2
139:9
**pull**   33:4
188:14

**purchase**   79:1
163:22
**purchased**
92:12
**purchases**
92:18,24 93:19
163:20
**purchasing**
205:2,11
**pure**   183:25
**purport**   57:12
57:18,20 58:6
58:9,12
**purported**
179:25
**purporting**
57:15
**purports**
117:19
**purpose**   29:19
35:4 82:4
126:15 159:22
195:21
**purposes**   57:10
110:23 134:22
198:20 206:21
**put**   89:4
**putting**   103:24

**q**

**qualifies**   15:18
**qualify**   22:7
**quality**   38:11
38:19 39:6,15
52:12,15,17
60:12 69:17,18

91:17 132:20
132:24
**quantifiable**
58:3
**quantification**
91:19,21
**quantify**   99:18
99:18,19,21
210:22
**quantity**   60:2
60:13 62:3
178:23
**queries**   134:4,5
134:7 141:6
174:15 177:24
178:21 183:25
**query**   133:23
135:6 142:5
173:11
**question**   11:12
11:13,14,20,21
12:8 17:14
18:3 19:10
21:5 22:1,4
34:19 39:12
43:24 44:5
49:9,11,15
53:22 61:9
62:23 63:2
66:18 67:3
71:17 74:20
75:6,25 76:23
77:5 78:3 83:5
84:2 88:2 90:2
94:15,17 95:5

97:8,14 99:10
101:20 103:3
104:24 107:17
111:24 119:18
122:12,15
136:3 142:1
144:17,21
160:17 162:22
164:22 165:11
165:14 167:17
175:9 183:16
191:14 202:24
203:1 204:21
207:13
**questions**   9:11
22:3 65:6 74:8
74:14 75:7
122:18 123:12
128:19 162:1
164:14 184:18
197:1 209:14
211:21
**quiet**   17:17
**quotations**   6:23
**quote**   6:24
34:23 36:4
42:23 45:7
59:25 73:1
78:23 84:8
93:23 95:23
96:15 116:10
129:4 132:19
138:12 139:18
144:5 184:21

**[r - record]**

| r | | | |
|---|---|---|---|
| **r**  1:21 2:1,18<br>69:12,12 214:2<br>214:22 218:3,3<br>**r&s**  216:1,10<br>**rachele**  3:24<br>4:2<br>**ramona**  2:17<br>3:23 8:7 80:3<br>80:12 136:6<br>212:14<br>**ran**  19:7,25<br>106:10 120:12<br>135:9 142:21<br>171:6 173:11<br>174:10 183:11<br>183:11 208:17<br>**random**  139:18<br>**range**  123:7<br>**ranging**  167:21<br>**rate**  65:7<br>164:15,16,19<br>164:23 165:2,3<br>**rather**  144:18<br>204:18,25<br>**raw**  148:18<br>**reached**  63:16<br>107:5 109:6<br>**reaching**  75:2<br>120:22<br>**read**  6:23 12:24<br>35:2 73:11<br>79:11 143:20<br>179:13 192:18<br>197:13,22 | **reading**  175:8<br>176:10 184:25<br>198:10 215:24<br>216:10<br>**readme**  3:13<br>18:11,13,23<br>19:1,5,10,14,21<br>19:24 20:7,20<br>21:22 88:18,22<br>89:1 90:18<br>91:4 126:13,15<br>126:25 127:3,4<br>127:13 128:20<br>129:23 130:17<br>132:2,10<br>169:19 172:3<br>172:21<br>**real**  144:19<br>**realistic**  26:23<br>**realistically**<br>141:1<br>**reality**  164:18<br>165:5<br>**really**  56:19<br>173:9<br>**realms**  145:7<br>**reason**  12:2<br>33:23 47:19,20<br>48:5 78:12,13<br>80:17 163:5<br>178:1 200:1<br>218:6,9,12,15<br>218:18,21<br>**reasonable**<br>34:12,25 35:8 | 35:15,20 55:25<br>62:9 68:25<br>89:15 91:18<br>192:17<br>**reasons**  153:3<br>**rebuttal**  17:23<br>**recall**  9:17<br>40:18,22,25<br>41:5,8,23 42:3<br>42:9,10,15,16<br>43:2,20 44:19<br>45:17 52:21,25<br>53:2,4 56:15<br>56:20,23 57:5<br>71:16,21 72:2<br>72:3 81:22<br>82:10 89:9,11<br>89:19,24 92:7<br>107:5 109:6<br>116:23 124:22<br>124:25 125:4<br>133:6 137:2,9<br>167:5 172:16<br>178:16 180:18<br>180:25 181:3<br>190:20 194:22<br>195:2 199:23<br>**recap**  39:13<br>**receipt**  32:25<br>**receive**  43:7<br>75:7 204:10<br>**received**  10:23<br>11:2,4,5 25:23<br>38:17 45:21<br>48:20,23 75:18 | 78:16 84:12<br>85:13 120:21<br>143:22 148:19<br>155:15 195:17<br>195:24 196:2<br>**receives**  46:6<br>**receiving**  11:2<br>37:18<br>**recessed**  98:7<br>**recognize**<br>33:14,19 47:5<br>72:20 80:5,21<br>84:22 135:2<br>**recognizing**<br>126:2 127:9<br>135:5<br>**recollection**<br>11:15 15:16<br>85:5 198:11<br>**recommend**<br>110:22<br>**reconvened**<br>98:8<br>**record**  6:24 7:6<br>7:11 8:4 9:3<br>29:25 64:21,23<br>65:1,2,4 81:9<br>81:10 82:22<br>98:1,4,6 99:6,9<br>100:8 117:9,16<br>117:19 128:11<br>128:13,16<br>129:11 132:14<br>134:20 138:6<br>144:22 148:14 |

**[record - reject]**

148:21 149:3
149:16 153:22
153:23 154:9
156:21 158:17
158:18 160:23
162:12 169:13
169:16 180:1
184:11 188:1,2
189:3 190:10
195:16 196:13
196:18,21
198:24,25
205:14,18,21
211:23,25
213:2 214:13
**record's**  209:22
**recorded**  1:9
7:12 125:16
134:22,24
172:19 173:12
214:11
**recording**  7:10
**records**  29:18
29:25 30:1
35:5 36:8 37:2
37:15 53:20,25
54:7 61:15
62:10 68:20
73:3 77:20
78:6 81:13
82:10,17,17
85:20 87:13,14
87:25 88:10
91:25 93:25
94:10,20 95:3

95:6,18 96:11
96:24 97:22
100:5,7,17
101:21 105:22
107:11 109:14
111:2 116:12
118:12,16
119:17,23
120:5 133:3
135:8 139:19
140:25 142:23
144:12 146:1,2
147:9,14 151:6
151:13,17
152:3,10,24
153:2,7,8,11
154:20 155:2,9
155:16 157:24
160:1 164:17
165:4 178:22
182:20 183:6
183:20 187:1,2
189:8,11
190:14 191:24
196:1 203:12
204:1
**reduce**  36:8
95:24 96:2,7,8
96:10 97:10
175:4
**reduced**  96:4
193:7
**reduction**
97:19

**refer**  24:11
25:17 38:19
40:3 47:16
60:25 70:14
71:5,9 79:19
81:2 95:22
97:8 101:5,10
101:16 102:21
103:10 110:6
126:9,13
129:17 130:25
131:1,5 145:8
194:4 201:12
**reference**  79:8
92:11 169:6
175:22 197:18
197:19
**referenced**
46:20 96:5
169:4 173:1
194:24 215:6
**references**  96:3
193:6
**referencing**
10:25 11:5
77:25 85:1
**referred**  23:14
33:25 49:9
83:2,8 105:3
129:24 131:9
**referring**  14:23
36:23 39:4,5
49:10 89:13
117:6 118:7
188:7 194:7

199:22
**refers**  25:21
34:5 47:22
61:1 70:17
71:8,12 81:8
102:3,15 117:1
117:8,10,14,17
130:21 132:8
197:5,8
**reflect**  201:2
**reflected**  6:23
21:12
**refresh**  85:5
209:9
**refunded**  93:20
**regard**  62:12
188:3
**regarding**
10:22 45:22
**regardless**
164:5
**regards**  7:14
9:22 16:14
43:3 51:10
74:3 92:1
115:13 117:5
131:16 142:14
191:14 200:15
**regression**
116:5
**regular**  212:20
**regulator**  71:15
71:19
**reject**  200:23

**[relate - represent]**

relate  78:7
93:25 95:3,6
related  7:23
20:15 29:25
66:21 119:15
214:15
relates  164:13
relating  24:2
relation  66:12
relationship
49:21
relatively  173:5
released  215:22
relevant  44:20
44:22 144:4,11
177:20 182:19
182:21
reliability
175:6,12,19,22
176:2
reliable  77:22
78:5,10 85:21
93:24 95:2
116:9
reliably  70:5,10
70:20 95:24
96:16 97:1,10
97:12 143:15
175:4,5,6,10,18
175:22
relied  20:15,17
20:22 21:2,14
21:17,20,21
74:22 75:1
117:23 121:2

122:9 123:13
125:2
rely  21:11,16
112:22 120:22
123:16
remains  65:21
remember
42:18,20 55:9
57:9 63:23,25
80:11 87:5
91:22 113:21
114:1 133:1
169:25 172:13
172:25 173:4
210:13
remembering
124:7
remote  97:25
remotely  8:2
129:11
remove  70:10
87:12,15 88:10
90:14 96:16,20
97:13 134:19
159:22 171:16
198:1
removed  88:16
97:15,18
159:19
removing
87:17,18 90:20
render  151:21
153:15
repeat  34:19
38:3 39:12

67:3 75:25
83:5 86:11
101:6 115:3
119:18 122:11
137:17 165:13
174:2 175:9
201:23
rephrase  38:5
66:6 67:19
76:6 94:16
100:14 151:15
replace  137:7
148:8
replaced
136:11,13
replicate
126:18 127:8
173:24 174:6
report  3:10
14:4,12,15,18
14:22,22 15:1
15:16,22 16:7
16:9 17:4 18:6
18:9 19:1,10
19:21 20:6,18
20:20 21:3,12
21:18,22 22:11
22:17 26:1,3
34:1 40:4
42:22 44:14
45:2 46:18,21
47:17 51:7,14
53:9 56:9,13
63:1,11 70:4
70:24 74:6,8

74:23 77:21,24
78:1,4,22
79:19 84:25
92:10 93:22
94:4,18 95:22
96:14 101:5
106:8 110:6
116:9,17
117:22 123:15
123:23 128:20
129:25 130:21
131:25 132:19
138:11 139:17
175:2 176:5
184:20 193:6
201:3,7,10,12
210:12 211:15
reported  1:20
reporter  7:21
8:19,23 12:5
93:7 180:3
193:2 214:3
reporter's  6:23
214:1
reports  16:22
represent
37:15 68:21
73:9 82:24
84:6 89:14
90:12 117:19
126:24 130:14
148:13 149:16
153:6,11,21
155:14 158:16
176:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[representation - returns]**

| | | | |
|---|---|---|---|
| **representation** 143:17 | 216:1,10,11 | 191:13,15 | 123:5,8 142:20 |
| **representations** 145:19 | **require** 37:1 | 208:20 | 146:1 191:7 |
| **represented** | 104:20 105:10 | **resolved** 164:9 | **resulting** |
| 51:11 56:10 | 105:12 146:7 | 166:18 | 182:23 208:24 |
| 62:10,20 82:12 | 172:23 | **resolving** 126:3 | **results** 44:7 |
| 140:6 143:14 | **required** 32:23 | **resources** | 70:3 108:10,12 |
| 143:18 163:20 | 35:11 50:5 | 38:21 39:3,7 | 112:22 120:20 |
| 163:22 189:1 | 101:8 102:5,23 | 39:16 | 127:7 130:6 |
| 192:3 203:3 | 103:1,11,14 | **respect** 41:17 | 139:3 142:6 |
| **representing** | 104:5 105:4 | 60:11 87:21 | 167:12 171:13 |
| 7:20 45:11 | 106:16 134:2 | 88:13 90:10 | 171:23 172:7,7 |
| 53:21 54:1 | 134:10,13 | **respond** 54:4 | 174:19 190:4 |
| 90:4 191:24 | 144:3,11 | **response** 119:6 | 190:18,20 |
| **represents** 19:6 | 171:22 173:8 | 119:6 | 191:2 206:8 |
| 73:19 74:1,11 | 177:19 182:23 | **responsibilities** | 207:24 208:3,3 |
| 79:13 138:2 | 183:22 215:20 | 24:22 25:6,8 | 208:4,19 209:2 |
| 163:18 | **requirements** | 28:24,25 29:3 | **resumed** 99:7 |
| **repress** 146:12 | 34:6 163:23 | 29:6,6 30:20 | **retained** 10:5 |
| **request** 11:18 | **requires** 34:10 | 30:21 41:16 | 63:13 64:4 |
| 11:19 17:15 | 34:23 58:3 | **responsible** | 213:1 |
| 77:17,18 | 140:12,17 | 31:3 | **retention** 63:18 |
| 121:24 126:25 | **requiring** | **restart** 145:11 | 66:22 |
| 145:22 163:5 | 145:25 146:11 | **restate** 53:22 | **retract** 55:17 |
| 187:1,7 203:25 | **reread** 140:1 | 63:2 97:4 | **return** 106:25 |
| 204:11 | **rerun** 143:6 | 101:13 103:2 | 215:17 216:6 |
| **requested** | **research** 2:24 | 104:23,25 | **returning** |
| 48:13 49:25 | 2:25 8:8,11 | 110:19 129:14 | 92:10 198:24 |
| 64:8 73:1,17 | 21:8,24 24:2 | 144:13 201:23 | **returns** 101:7 |
| 73:22 78:4,23 | 134:7 | 204:21 | 101:10,17,18 |
| 93:23 94:9 | **reserved** 213:4 | **restroom** | 101:19 102:4 |
| 95:1 116:11 | **resided** 23:9 | 196:16 | 102:15,18,19 |
| 202:4 204:12 | **resolve** 162:2 | **result** 44:17 | 103:11,17,20 |
| 204:14 214:15 | 162:23,25 | 51:4 61:4 | 103:24 104:3 |
| | 163:5 165:24 | 85:19 102:13 | 104:14 105:3 |
| | 166:2 191:11 | 107:8 108:7 | 106:14 107:18 |

Page 48

**[returns - run]**

107:19,21
**revenue** 48:20
48:23
**reversed** 93:20
**review** 12:24
20:14 26:8
38:24 39:6,15
60:18 69:17,18
70:25 71:23
72:2 91:2
133:11,16,18
133:19 134:1
140:13,17
141:2,4,15,18
142:2,11,15
152:10,21
166:12,25
167:12 200:22
205:24 206:7
206:11 214:15
215:8,10,13
216:2
**reviewed** 20:14
24:1 26:7
140:18 141:1
142:22 152:13
200:21
**reviewing**
38:10,11,19
39:8,17
**revise** 165:16
**rewrite** 200:2
**richman**
157:10,25
158:8

**rifkin** 13:22
**right** 9:5 12:15
12:21 13:5
14:1,11 15:7
17:13 18:4,21
19:1 20:5,23
21:19,25 22:20
23:5,17 24:10
24:14,19 30:5
31:6 33:3,12
34:3 35:5
39:10,20 40:1
40:6 41:9
42:19 43:25
44:25 45:24
46:2,25 47:2
47:17 49:12,24
50:17,24 51:2
51:5 52:16
53:8 54:9
57:10,16 58:6
62:16,21 63:11
65:5,8,10
66:16 67:22
72:7,16,24
79:4 80:8
81:14 84:16
85:2 91:23
92:5 99:9
102:10,16,18
104:16,21
106:7,11 107:3
107:12 109:2
110:10 117:9
118:10 120:17

125:20 126:12
126:20 128:3
129:22 130:16
130:20 131:7
131:22 132:18
133:20 138:18
144:5 146:20
147:4,16
149:15 150:13
159:20 162:24
164:12 171:23
172:5 176:5
179:9 180:12
181:16 182:3,6
192:12 193:17
194:16 196:3
197:17 200:9
202:12 206:8
206:15,16,17
208:12 209:4
209:11,12
212:18,22
**risk** 155:22,25
**rlin** 2:20
**role** 31:4,5 67:1
67:6,11,17,20
198:8,12
**roles** 29:10
**roll** 29:20 73:3
77:19
**rolled** 178:23
**rollup** 132:14
**rondeau** 2:24
8:8

**rough** 212:4,20
**roughly** 16:2
**round** 107:13
108:11,25
130:7,8 131:16
131:20,25
132:3,8,11,13
143:1,5,6,7
**round4.sql.**
130:12
**rounds** 130:22
130:24 131:1,5
131:5,8
**row** 171:7
**rpr** 1:21 214:2
214:22
**rule** 34:6,9,22
35:2 50:16,19
50:24 96:23
97:21 99:15
102:11 106:6
107:10 137:21
137:25 146:16
146:21 147:12
160:6,10 166:8
166:11 174:23
**rules** 60:1 62:2
107:8,9 108:16
216:8
**run** 19:18
54:16,17 102:7
107:14 108:7
108:12,25
126:16 141:6
143:1 170:8,8

[run - see]

170:21 171:3
171:12,14,22
173:9 174:11
174:17 176:13
178:21 183:25
185:3 186:4
205:5 207:25
207:25
**running** 40:13
121:19,25
122:5 127:6
171:23 172:14
182:14

**s**

**s** 2:1,18 3:3
127:17 218:3
**sake** 12:6,6
80:24
**salary** 68:11
**sample** 73:2,18
73:22 76:16
77:9,11 78:19
80:14,15 83:24
84:9,11 85:12
86:1 136:14
139:18,23
168:18
**san** 2:15 194:2
194:5,10
**saved** 134:5,8
142:20
**saw** 81:17,25
86:17 92:3
143:17

**saying** 12:9
39:13 49:15
52:25 53:2
73:24 74:25
104:2,4 111:23
150:4 163:12
196:23
**says** 22:18 62:1
73:6 85:11
96:1 168:2
197:24
**scanned** 13:18
**scenario**
207:20
**scenarios**
134:12
**schedule**
215:10
**scheduled** 13:8
13:9
**scientist** 9:8
**scope** 40:10
48:13 49:2,2
161:7
**scratch** 16:8
20:19 21:10
46:15 138:9
182:17
**screen** 14:8
**script** 135:7
172:23
**scripts** 19:25
100:21 127:13
132:2 135:9
142:4,19 173:2

173:4,5,9,14,22
174:4 179:8
**se** 88:8
**sealed** 215:20
**search** 91:3
120:10 121:21
122:7 184:24
185:2,17
189:12 190:18
191:1 192:5
**searches**
185:10
**searching**
166:25
**seattle** 1:14 7:1
7:18 79:15,18
193:18 202:5
**second** 36:15
59:24 72:10
79:8 109:4
116:20 122:6
179:9,17,17
195:9 197:21
197:22 209:11
**secondary**
171:3
**section** 13:19
15:14 22:21
118:3 129:1
170:9,11 175:8
**sections** 12:25
15:5,6,7,17,20
169:22 170:7
171:14

**securities** 24:18
**see** 15:24 34:3
36:10,18 39:1
47:22 59:16
60:5 70:7,24
71:3 73:4,5
84:14 85:22
86:21,25 89:6
89:17,21 92:4
92:14 94:7
104:4 106:9,9
118:4,7 125:25
126:6 129:7,20
130:13 131:4,4
132:22 134:1
139:14,20
140:23 141:12
143:12 148:4,7
148:15 149:18
151:10,24
152:10 154:11
155:8 156:1
159:5,9 160:1
163:6,8,12,15
164:8,12
166:13 168:22
169:23 170:12
176:10 178:2
184:15,25
193:10,24
197:22 198:5
199:1 204:6
205:15 208:8
208:25

Page 50

**[seeing - sitting]**

| | | | |
|---|---|---|---|
| **seeing** 53:3 | **sequence** 193:1 | 68:16 75:17 | **signatory** 200:8 |
| 105:15 | 193:3 195:16 | **shaking** 93:6 | **signature** 14:19 |
| **seek** 62:14,18 | **series** 128:19 | **shape** 141:9 | 47:3 199:10 |
| 161:25 | **serve** 198:8 | **share** 152:11 | 213:4 214:18 |
| **seemed** 137:4 | **served** 61:20 | 157:6 158:9 | 214:21 215:22 |
| 178:1 | 63:5 | **shared** 80:7 | 215:24,24 |
| **seems** 48:8 | **server** 128:5 | 151:5 | 216:10 |
| 137:21,25 | **service** 32:19 | **shear** 140:8 | **signed** 72:22 |
| 155:12 192:17 | 54:22 66:23 | **shield** 3:15,19 | **significant** 15:2 |
| **seen** 50:19 | 67:25 184:24 | 33:21 45:3,12 | 48:19,20 |
| 84:24 85:5 | **services** 24:17 | 45:22,24,25 | 130:14 179:21 |
| 168:7 | 48:13 49:2,22 | 46:3,3,6,16 | **similar** 28:25 |
| **sending** 25:18 | 50:2 66:4,9 | 47:6,16 48:4 | 29:21 30:3,4 |
| 25:24 122:6 | 139:1 185:15 | 48:21 49:11 | 30:21 31:5,12 |
| 189:6,7 | 185:17 | 51:6,10,15 | 31:14 51:23 |
| **senior** 29:11 | **serving** 62:24 | 52:8,19,22 | 52:3,14 57:3 |
| 63:16 146:17 | **session** 99:1 | 53:1,3 62:13 | 85:16 119:8 |
| 146:21,22 | **set** 19:5 77:11 | 91:10 92:1 | 127:8 136:18 |
| 147:3,7 | 77:13 78:19 | 200:14,16 | 164:22 174:12 |
| **sense** 11:22 | 100:20 136:16 | **shop** 206:13 | 174:18,18,20 |
| 27:17 108:13 | 143:2 167:21 | **shortened** | 177:24 208:16 |
| 119:21 207:18 | 168:10,24 | 206:23 207:7 | 210:5 |
| **sensitive** 7:7 | 169:2 170:6 | **shorter** 207:23 | **similarly** 56:10 |
| **sent** 80:13 | 175:15 203:13 | 208:2 | 159:21 203:17 |
| **sentence** 47:22 | 205:5,6 211:11 | **show** 146:18 | **simply** 19:5,17 |
| 72:6 73:16,19 | **settlement** 26:7 | 149:24 168:1 | 170:7 190:24 |
| 73:21,25 74:1 | 33:22 42:22 | 196:1 | **single** 104:18 |
| 79:11 140:1 | 43:19 44:13 | **shows** 76:13 | 106:3 137:12 |
| 175:5,11 197:5 | 45:6 51:10 | 190:18 | 137:18 146:3 |
| 197:23 198:10 | **settlements** | **side** 48:18 | 153:11 155:11 |
| **separate** 32:11 | 45:4 | 159:21 187:5 | 182:24 183:4 |
| **separately** | **seven** 9:19,19 | **sided** 84:20 | 183:20 |
| 135:25 | 92:2 | **sign** 215:16 | **sitting** 91:21 |
| **september** | **several** 37:14 | 216:5 | 93:5 105:19 |
| 28:14 33:13 | 51:18 56:17 | | 110:8 151:12 |

Page 51

**[sitting - spent]**

| | | | |
|---|---|---|---|
| 151:16 159:12 | 89:16,24 133:7 | 86:11 97:24 | **specific**  57:9 |
| **situation**  29:20 | 189:6 | 103:7 104:23 | 61:23 63:15 |
| 43:14 61:23 | **smiley**  52:21 | 125:21 129:14 | 113:23 147:20 |
| 115:14,22 | 53:1 86:18 | 129:14 130:8 | 195:19 |
| 127:11 139:14 | 92:4 | 132:4 149:10 | **specifically** |
| 140:24 146:7,7 | **smith**  146:17 | 175:8 204:5 | 10:25 21:7 |
| 148:4 161:5 | 146:17,18 | 206:5 | 87:5 137:2 |
| 163:10 164:9 | **snyder**  156:8 | **sort**  25:24 | 138:19 152:19 |
| 166:24 168:20 | 157:25 158:8 | 27:13 33:1 | 177:12 178:16 |
| 168:23 171:19 | 158:21 | 56:2 168:7,18 | 197:24 |
| 176:22 183:22 | **software** | 178:2 198:15 | **specifics** |
| 203:10 | 127:19 128:3 | **sorts**  162:25 | 113:22 |
| **situational** | 167:15,18,20 | **sound**  41:9 | **specify**  77:24 |
| 35:11 | 167:25 168:6 | 42:19 | **spectrum** |
| **situationally** | **solely**  152:4 | **soundex**  114:25 | 152:14 |
| 27:12,12,13 | **solution**  185:18 | 115:4,7,10 | **speculate** |
| **situations** | 186:3,4 197:5 | 116:1 | 202:18,23 |
| 35:24 87:10 | **solutions**  185:4 | **sounds**  30:3 | 203:9 |
| 92:8 134:18 | 185:21,25 | 107:18 171:20 | **speculation** |
| 139:2 152:14 | 186:21,24 | 180:12 193:23 | 188:4 205:9 |
| 167:6 171:10 | 187:9,15,19,24 | **source**  12:20 | **speed**  172:8 |
| 182:25 208:6 | 188:13 215:7 | 33:7 45:19 | **spell**  69:9 |
| **six**  9:19 | **somebody**  43:5 | 121:5 127:24 | **spelled**  30:18 |
| **sixth**  1:13 7:18 | 179:20 | 127:24 167:25 | 127:17 158:24 |
| **size**  10:23 49:3 | **somebody's** | **sources**  165:9 | 159:6 182:10 |
| 49:3,3 | 109:20 | 165:16,19 | 192:14 |
| **skill**  126:1,8 | **somewhat** | **space**  190:25 | **spelling**  182:5 |
| 211:11 | 180:1 182:1 | **speak**  17:16 | **spend**  38:9 |
| **slight**  146:2 | 208:19 | 22:8 107:2 | 69:22 |
| **slightly**  61:17 | **song**  124:14 | 118:20 153:3 | **spending**  102:9 |
| 76:6 78:14 | 125:1 | 205:2 | **spends**  204:17 |
| 164:14 | **soon**  212:5 | **speaking** | 204:24 |
| **small**  32:8 | **sorry**  12:16 | 173:10 191:6 | **spent**  56:20 |
| 50:20 52:23 | 18:19 60:13 | **specialist**  22:14 | 68:14 104:16 |
| 81:18,18,25 | 78:1 81:24 | 22:19 23:3 | 178:23 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[spoke - subset]**

spoke  63:19
sponsored  46:9
spools  192:21
   192:24 195:3
sql  127:13,16
   128:5 173:6,11
ssms  128:5
st  182:6
staff  123:22
   124:10,11
stand  22:24
standard  130:4
   130:5 168:10
   168:16,24
   169:1
standardization
   186:8,10,16,25
   187:11
standardize
   186:12
standardized
   182:15
standing
   212:12,13,15
stands  59:22
stapled  79:25
start  15:25
   40:6 45:6
   74:14 109:22
   206:5 208:8
started  16:5
   75:22 76:2,8
   76:13,14,25
   77:6

starting  59:24
   124:21
starts  197:4
state  8:1,3 9:3
   23:6,9 26:5
   70:4 72:25
   74:8 78:4,23
   80:19 97:11
   112:14,17
   125:25 132:19
   133:4 145:5
   148:6 151:1,22
   176:9,24
   179:10,11
   180:10,16,17
   180:19 215:9
   215:12
stated  70:21
   93:22 139:11
   167:21 178:4
   201:16 214:8
   214:14
statement
   35:16 54:4
   55:25 119:6
   140:16 152:5
   161:17 169:21
   172:22 173:11
statements
   94:24
states  1:1 7:15
   36:4 59:24
   84:8 94:8
   95:22 96:14
   116:9 117:22

133:4 175:2
   176:6 177:18
   184:24 214:4
static  151:22
stating  96:19
statistical  24:2
   58:10
statistics  23:19
   23:23 24:7
   58:13
stenographic...
   214:10
step  105:2
   112:23,23
   129:24 171:6
   174:16
steps  19:6
   32:21 120:3
   135:3 167:9
   187:1,11,14
stick  163:9
   165:11
sticking  176:5
stipulation
   215:21
stop  106:22
   108:3
stopped  105:17
   107:23 171:9
stopping  59:3
store  71:18
straying  207:20
street  2:9,19
   85:16 148:5,6
   151:2 154:23

180:21,25
   181:7,13,17,17
   181:19,19,19
   182:4,6
street1  89:7
string  207:23
stringent  176:7
strokes  68:18
stubs  55:20
studies  109:10
   110:16,21
subject  23:23
   210:14
subjects  24:2
submission
   70:25
submissions
   85:18
submit  55:17
   55:19 85:18
submitted
   10:11 16:22
   22:11 33:20
   47:6
submitting
   123:14 167:24
subpopulation
   189:7
subsection
   129:8
subsequence
   114:15
subset  120:12
   121:19 133:7
   189:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[substance - testified]**

**substance**
74:17
**substantially**
19:7 174:10,11
**successful**
126:2 192:10
**sufficient**
100:12,16
126:17
**suffix** 147:3
**suggest** 39:2
79:12 110:17
110:17,22
116:15 141:8
**suggesting**
111:6,8
**suggests** 160:20
162:7,10 164:2
**suite** 1:13 2:9
2:14 7:18
**summary** 68:25
70:3 74:11
75:8
**supervised**
211:8
**supervision**
214:11
**supervisor**
210:23
**supplemental**
3:10 14:4,12
94:4
**supply** 85:15
**support** 109:10

**suppose** 44:11
181:15 182:2
**sure** 15:14 21:5
34:20 43:24
53:23 63:3
74:24 84:24
98:3 110:20
111:5 119:5,20
122:12 128:1
144:16 161:13
166:20 167:22
172:15,15
178:17 184:2
194:15
**surprised**
119:3 152:23
**surrounding**
122:4
**suspect** 205:4
**swear** 8:19
188:15
**sworn** 8:23
214:6,9,9,13
**symbol** 181:9
**sync** 212:8
**synonyms**
166:22
**system** 159:19
187:6
**systems** 23:7,13
23:23 24:7
53:17 203:18

**t**

**t** 192:14,15
218:3,3
**tab** 14:4 18:17
33:5 46:23
72:14 79:22
84:17 125:21
199:2
**table** 190:12,18
190:20
**tables** 190:24
**take** 7:10 11:21
12:9 30:1 59:6
104:16 105:1
128:8,10
134:14 149:2
167:9 169:10
171:3,12
186:11 190:24
193:19 194:12
196:16 203:23
205:14 208:23
209:15,17
**taken** 7:13 16:9
37:17 68:2
187:2 199:19
**talbott** 2:23
7:20
**talk** 20:2 83:16
124:24
**talked** 91:9
175:1
**talking** 12:9
51:7,8 52:2,9
52:20 56:9

57:2,7,11
61:25 62:6,14
63:7 69:16
83:3 88:5
104:14 124:22
172:2 206:18
**target** 123:4,7
**tasks** 203:22
**taught** 211:3,6
211:10,12,13
211:17,17
**tbl** 130:3
**teach** 211:10,18
**team** 126:25
**teams** 25:2
**tell** 11:13 21:19
64:7 177:12
180:6
**template** 15:4
**ten** 133:16
145:3
**tend** 205:5
**term** 43:16
79:4,5 83:17
88:7 168:21
175:22 203:23
**terminology**
83:20,21
**terms** 25:17
43:15 88:5
133:17 166:23
175:7 212:7
**testified** 8:24
10:3

Page 54

**[testify - time]**

| | | | |
|---|---|---|---|
| **testify** 64:12 | 89:8 103:25 | 205:14 206:13 | 152:24 153:2,7 |
| 214:9 | 104:4 123:3 | 209:15 212:9 | 159:4,5,9,14,16 |
| **testifying** 10:6 | 167:21 174:13 | **thinking** 91:6 | 160:1 163:13 |
| 61:20 62:24 | 178:8 199:24 | 181:6 | 192:21 194:25 |
| 63:5 | **think** 9:6,8 | **third** 11:6 | 195:8 |
| **testimony** 9:21 | 14:7 16:25 | 45:25 54:24 | **threshold** |
| 9:25 12:3 | 17:5,25 22:8 | 71:23 72:4 | 207:18 |
| 185:12 212:24 | 27:20 28:7 | 85:11 116:21 | **thresholding** |
| 214:6,10,13 | 31:18 32:1 | 127:7 185:3 | 114:10 |
| **tests** 167:15,18 | 37:21 39:11 | 188:4 | **tier** 131:12,15 |
| 167:20 168:1,6 | 43:13,15 55:25 | **thomas** 2:4 | 132:7 140:10 |
| 168:8 | 67:3 68:25 | 8:12 209:23 | 140:19 141:5,7 |
| **texas** 149:5 | 69:10 74:19,19 | 215:1 | 142:12 144:2 |
| **text** 190:21 | 75:6 79:11 | **thompson** 1:10 | 144:10 176:6 |
| **thank** 8:18 9:9 | 88:7 91:5 97:4 | 3:11,22 6:19 | 176:12,13,17 |
| 11:10 72:19 | 99:16 101:13 | 7:13 8:22 9:4,6 | 176:18 177:9 |
| 74:4 76:20 | 103:3 104:23 | 14:13 72:16 | 177:17,18,23 |
| 88:21 93:9 | 105:8 112:1 | 199:5 201:12 | 178:15,19 |
| 98:4 103:8 | 113:3 114:24 | 205:23 209:18 | 182:18 183:12 |
| 118:5 125:22 | 115:14,22 | 212:25 215:5 | **tiers** 110:3,6,9 |
| 128:17,23 | 117:5 121:18 | 217:12 218:2 | 110:11,13 |
| 129:13 132:8 | 122:17,22 | 218:24 | 130:21,23 |
| 158:6 169:17 | 123:25 124:12 | **thought** 105:13 | 131:1,4,8,9,10 |
| 195:7 196:22 | 124:24 128:10 | 119:19 165:23 | 131:21 140:4 |
| 205:22 207:11 | 130:19 137:11 | 177:12 178:14 | 145:6 176:14 |
| 209:14,17 | 137:18 144:1 | **thousands** | 177:24 178:19 |
| 212:19,23 | 145:7 161:13 | 138:25 | **time** 7:9 8:1 |
| **theoretically** | 162:5 170:16 | **three** 13:6 | 32:3 38:4,9 |
| 168:11 | 174:13 182:1 | 51:19 54:18 | 43:3 51:20 |
| **theory** 167:20 | 182:25 188:19 | 79:24 91:16 | 55:8 56:18,21 |
| **thing** 79:7 | 192:20 193:15 | 116:19,23 | 64:17 65:1 |
| 116:15 144:19 | 195:2,6 197:11 | 121:20 132:15 | 66:11,11 69:22 |
| 204:7,9 | 200:12,17 | 150:13 151:5 | 81:2 99:6 |
| **things** 9:9 32:8 | 202:12,19 | 151:13,14,17 | 100:25 101:7 |
| 52:24 83:12 | 203:2,11 | 151:17 152:3 | 101:24 102:4,6 |

**[time - type]**

| | | | |
|---|---|---|---|
| 102:9,12,22,25 | 201:4 212:5 | **touch** 92:24 | 205:4 214:12 |
| 103:11,14 | **today's** 12:16 | **transact** 160:23 | 217:3 |
| 104:15,20 | 12:22 212:24 | **transaction** | **trusted** 36:6 |
| 105:4,12,25 | **todd** 2:8 8:16 | 73:7 74:3 | **truth** 214:9 |
| 106:2,16 | **together** 100:7 | 160:23 162:16 | **try** 80:24 81:23 |
| 107:20 114:1 | 149:4 152:3,12 | **transactions** | 82:5 99:11 |
| 127:5 128:16 | 152:24 153:7 | 93:12,16 | 103:23 127:8 |
| 133:10 169:16 | 210:21 | 162:12 163:19 | 170:23 178:25 |
| 171:12,21 | **tomorrow** | **transcribed** | 191:18 |
| 177:13 178:23 | 212:6 | 214:11 | **trying** 22:5,5 |
| 180:11 185:7 | **took** 51:16 | **transcript** 12:6 | 39:13 99:10 |
| 189:22 196:21 | 56:14 102:6 | 12:13 80:24 | 105:8 112:1 |
| 198:18 201:8 | 120:4 190:4 | 180:6 212:2,3 | 115:14 119:24 |
| 205:21 207:14 | 204:5 | 212:5,6,21 | 161:25 183:2 |
| 211:1,2 214:8 | **tools** 128:2 | 214:7,12,14 | 188:14 |
| 214:14 215:10 | 145:17,22 | 215:6,8,10,13 | **tuesday** 13:3 |
| 215:18,25 | **top** 45:18 63:8 | 215:13,22 | **turn** 74:5 |
| 216:7 | 63:9,12 89:3 | 216:2,2 | 167:17 |
| **times** 9:5,14 | 89:19 90:23 | **transient** 134:9 | **turning** 170:13 |
| 125:9,11 172:1 | 130:13,20 | **translate** | **two** 13:12 |
| 183:3 196:2 | 132:7 133:1,16 | 171:17 | 39:23 83:11 |
| **timing** 75:7 | 133:25 137:10 | **translating** | 84:19,20 |
| **title** 24:19 | 142:17 144:1 | 87:19 | 138:23 146:1 |
| 201:6 | 167:5 176:6,12 | **transported** | 147:1 151:14 |
| **titled** 199:5 | 176:17 177:9 | 194:20 | 151:17 154:20 |
| **today** 9:9 11:25 | 177:17,22 | **treated** 143:15 | 154:23 155:9 |
| 12:3,5,12 51:8 | 180:18 189:13 | 182:8 | 155:10,15 |
| 51:8 52:2,10 | 193:14 | **trial** 10:3 66:1 | 157:24 159:7 |
| 52:20 56:9 | **topic** 9:20 68:2 | 66:1 | 159:13 164:10 |
| 57:2,8,11,15 | 164:13 | **tried** 99:21 | 164:16 165:3 |
| 62:6,14 63:7 | **topics** 12:12 | 105:22 165:21 | 166:22 172:4 |
| 69:16 91:22 | **total** 10:23 48:3 | **true** 63:10 | 183:6,18 |
| 93:5 110:8 | 73:7 140:24 | 119:10 178:15 | 189:24 208:20 |
| 119:9 151:12 | 189:1 212:25 | 182:16 183:9 | **type** 50:8,11,12 |
| 151:16 159:13 | | 183:10 185:8 | 53:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[types - updating]**

| | | | |
|---|---|---|---|
| **types**  27:7 | **uncommenting** | **understanding** | **unicode**  181:9 |
| 143:9 178:21 | 170:10 171:20 | 48:22 60:17 | **unique**  78:8 |
| **typical**  48:17 | 172:18 173:17 | 92:17 101:1 | 79:4,6 81:9,9 |
| **typically** | 173:22 174:4 | 107:12 115:10 | 81:12,19 82:1 |
| 167:25 | **under**  11:24 | 115:12,25 | 94:2,11 101:22 |
| **typing**  141:17 | 34:10,24 35:7 | 117:18 138:4 | 116:13 119:16 |
| **typo**  192:15 | 35:19 214:11 | 163:11,17 | 119:22 120:4,8 |
| **typographical** | 217:1,2 | 166:21 167:23 | 123:5 126:4 |
| 116:16 | **underscore** | 168:14 176:1 | 137:13,20,23 |

|  **u**  | 81:3 | 177:3 180:13 | 151:14,18 |
|---|---|---|---|
| | **underscores** | 183:8 186:9,13 | 152:3 153:11 |
| **u**  87:4 192:14 | 81:1 | 186:15,17,19 | 159:14 160:11 |
| 192:14 | **undersigned** | 197:17 | 163:12 195:23 |
| **uh**  108:21,23 | 214:2 | **understood** | **uniqueness** |
| **ultimate**  10:23 | **understand** | 11:14 15:9 | 82:6 |
| 82:14 182:15 | 11:12,24 14:23 | 16:6 22:9 25:5 | **unit**  7:12 |
| **ultimately**  33:1 | 19:19 21:5 | 25:25 28:4,13 | **united**  1:1 7:15 |
| 182:13 200:25 | 22:1 34:17 | 29:13 37:24 | 184:24 |
| **unable**  12:2 | 36:20 43:24 | 41:12,25 44:23 | **units**  212:25 |
| **unaware** | 59:4 60:7 | 49:10 50:1 | **university**  23:6 |
| 123:18 162:6,9 | 64:11 66:18 | 53:6 54:6 | **unlimited** |
| 163:25 164:1,3 | 74:25 77:2 | 56:18 59:22 | 102:12,12 |
| 183:5 187:25 | 81:8 82:21 | 74:4 75:5,13 | **unquote**  144:5 |
| **uncertainties** | 83:1,6,7,21 | 75:16 76:20 | **unrelated** |
| 162:2,23 163:1 | 85:24 86:4 | 81:15,16 82:16 | 83:14 |
| **uncertainty** | 94:23 101:20 | 82:23 86:8,12 | **unreliable** |
| 163:4,6,9,12,16 | 105:8 106:20 | 96:6,9 138:7 | 112:21 |
| **unclear**  126:21 | 107:24 122:12 | 153:5 159:23 | **unusual**  182:1 |
| 141:25 161:14 | 127:16 153:6 | 197:12 200:18 | **update**  88:9 |
| 161:17 187:17 | 165:12,14 | **undertaken** | 130:10 135:7,7 |
| **uncomment** | 168:21 169:3 | 39:9,18 | **updated**  120:14 |
| 169:22 170:2 | 183:19 187:4 | **undertook** | 121:22 |
| **uncommented** | 190:17 191:14 | 120:2 | **updates**  126:19 |
| 172:1,14 173:2 | 197:18,20 | **unduly**  137:4 | **updating** |
| 173:2,13 | 203:21 | | 192:11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[upload - variables]**

upload  72:9
  187:5,6
uploaded
  186:20 187:1,2
  188:1 190:5,14
  190:15 191:8
uploading
  130:6
usable  129:5,19
use  31:14 42:1
  51:24 54:24
  56:24 79:4,5
  83:17 87:12
  88:5,7 109:18
  109:19 110:11
  111:10,24
  112:7 113:13
  119:4 127:19
  134:3 135:19
  145:7 146:22
  147:2,6,18,25
  147:25 148:2
  159:9 161:3
  164:2 166:23
  186:2 188:7
  196:15 207:8
used  19:2,11,20
  31:13 40:19
  42:10 44:2,15
  52:1,8 55:4
  57:1,3,6,7
  58:16 89:2
  95:15 100:22
  106:23 110:9
  110:25 111:17

113:18,18,20
113:22 114:2
120:10 121:6
122:14 127:7
127:23 128:4
134:16,17
140:14 142:3,5
142:15 144:3
144:11,17
148:3 162:15
164:6 167:14
168:5 174:16
175:11,15,17
175:19,21
185:7,8,14,21
186:4 206:20
206:22,23
212:25
useful  139:3
user  84:11
  85:12 114:20
  114:23 209:25
users  85:15,17
uses  70:24
  111:9 161:23
using  20:10
  42:23 55:8,8
  93:12,16
  110:17,18,22
  111:15 112:13
  112:15,16
  114:6,11
  141:23 144:4
  144:22 160:9
  166:20 189:12

usps  186:13
usually  11:6
utilize  52:11
  90:15 119:7
  134:19 139:12
utilized  60:19
  61:3 90:21
  111:12 128:1
  131:14 138:25
utilizes  140:10
utilizing  22:15
  38:23 100:24

**v**

v  154:4,18
  157:13
v2.sql.  130:3
vaguely  85:7,9
valid  43:6,7
  90:8,12 139:3
  141:10 152:6
  153:16 208:9
validate  56:2
  184:1
validated  60:18
  140:19
validating  52:1
  56:25
validation
  140:13,17
  141:15,18
  142:3,16
  168:10,24
  169:1,2 177:19
  177:22 178:18
  178:19 179:2,5

179:7 182:22
183:22 184:13
184:15 187:13
205:24 206:7
validator
  155:24
valuable
  113:19
value  73:8 74:3
  133:5,24
  134:19,21
  135:3,18,25
  136:1 137:6
values  81:19
  82:1,7 85:18
  87:23 89:7,13
  91:23 92:7
  111:16 133:9
  133:12,16,17
  134:11 135:8
  136:12,13,14
  136:16,21
  137:8 144:3,11
  145:13 146:3
  150:15 151:2
  154:24 155:2,5
  180:9,14,16
variable  81:8
  82:21 133:9,12
  133:20 145:18
  146:1 179:15
  179:16
variables
  109:15 135:13
  135:16 144:4

**[variables - witness]**

144:11 147:18
147:20,21
176:16
**varied** 13:12
**varies** 25:10
**variety** 153:3
**various** 29:10
54:15 101:3
119:13 131:11
131:21 181:9
182:12
**vary** 43:13
**vast** 70:10
96:16,20 97:13
97:15,17
**vehicle** 28:11
**vendor** 54:24
55:2,3,4,7
120:17 122:6
185:3,7,9,15
**vendors** 185:9
185:16
**verified** 84:13
85:14
**verify** 55:20
189:11
**veritext** 7:20,22
213:1 215:7,9
215:11,20
**versed** 122:23
**version** 142:24
142:25 207:7
**versus** 39:24
40:6 41:7 52:9
52:19 57:7

88:4 95:12
107:21 113:2
166:4
**viable** 153:16
**video** 1:9 7:9
7:12 212:3,7
212:21
**videographer**
2:23 7:5,21
8:18 64:22,25
97:24 98:5
99:5 128:12,15
129:10 169:12
169:15 196:17
196:20 205:17
205:20 211:24
212:2,8,11,17
212:22
**view** 127:24
183:22 184:13
**virtually**
177:19
**virtue** 130:6
**visibility** 55:14
137:5
**visited** 193:17
**volume** 49:4,4
140:8
**volumes** 137:4
**vp** 41:18

| w |
| --- |

**w** 182:6,11
**wa** 1:22
**wait** 12:7

**waived** 215:24
215:24
**waiving** 215:21
**walk** 135:2
**wallat** 1:21
7:22 214:2,22
**want** 12:18
16:3 74:24
76:18 77:14
91:1 92:11
98:1 111:5
116:8 126:13
128:18 175:10
184:18 195:18
208:13 212:9
**wanted** 173:7
**washington**
1:14 2:9,19 7:1
7:19 23:5,10
214:4,23
**way** 43:15
61:18 74:21
76:6 87:22
88:4 126:11
136:1 141:9
166:5 172:11
192:18 194:8
195:3,24
201:17 202:23
203:18 205:11
214:15
**wayne** 9:4
**ways** 101:23
112:6 181:9,12

**we've** 35:25
55:8 58:23
139:11 169:8
201:3
**weeks** 13:7
**went** 99:9
125:7
**west** 182:3,5,11
**whafh.com** 2:6
215:2
**whispering** 7:8
**white** 89:18
**whoever's**
164:6
**wide** 167:20
**widely** 25:10
**william** 145:13
**winding** 193:16
**withdraw**
17:13 18:2
61:8 124:3
164:11
**withdrawn**
151:8 152:9
199:15 206:16
210:16
**witness** 8:20,23
59:1,7 61:20
63:6 64:19
98:2 115:19,20
115:21 180:4
196:15 214:8
214:18 215:13
215:16 216:2,5

Page 59

**[witnesses - zoom]**

| | | | |
|---|---|---|---|
| **witnesses**  62:25 | 90:10,20 104:6 | **writing**  16:5 | 55:9 56:17,17 |
| 201:20 202:1 | 104:9 105:16 | 200:10 | 92:1,2 100:22 |
| **wolf**  2:4 8:12 | 124:8,18,21,22 | **written**  103:8 | 104:11 118:2 |
| 209:23 | 124:25 125:3,5 | 156:11 181:8 | 126:5 138:16 |
| **wood**  2:7 3:25 | 127:20 139:6,7 | 181:12 | 138:22 176:2 |
| 4:3 6:17 8:15 | 139:7 143:11 | **wrong**  196:11 | 185:13 192:8,9 |
| 8:15 65:2 | 143:24 175:20 | **wrote**  12:24 | 207:12 208:15 |
| **woodlawn** | 179:5 180:7 | 15:2,15,18 | 210:19 |
| 156:11 157:12 | 186:6 210:24 | 134:4 199:18 | **yep**  125:24 |
| 158:23 | **worked**  22:18 | | 136:7 |

**x**

| | | | |
|---|---|---|---|
| **woodline** | 23:3 41:18 | **x**  3:1 | **yesterday**  13:4 |
| 156:10 | 45:8 53:10 | **xx**  216:1 | 13:6 |

**y**

| | | | |
|---|---|---|---|
| **word**  38:3 | 118:17,20 | | **ygr**  1:5 7:17 |
| 39:11 70:24 | 209:24 211:7 | **yeah**  54:2 | **yield**  106:5 |
| 103:4 111:19 | **working**  22:16 | 55:14 69:18 | 108:12 |
| 193:19 194:12 | 51:12 75:22 | 75:4 79:11,12 | **york**  2:5,5 |
| 197:4 | 76:2,8,13,14 | 79:17 85:7 | |

**z**

| | | | |
|---|---|---|---|
| **words**  60:10 | 77:6 138:22 | 87:6,17 89:16 | **zero**  26:24 27:1 |
| 76:18 78:14 | 139:5 192:22 | 89:25 91:1,24 | 96:4,8 104:3 |
| 101:6 182:20 | **workings**  188:5 | 93:9 97:6 | 107:14,21,22 |
| **work**  16:15 | **works**  124:17 | 99:19 101:15 | **zip**  181:21 |
| 17:8 18:1 | **world**  119:9 | 102:17,19 | **zola**  63:24 |
| 26:21 29:15,16 | **worries**  72:7 | 105:15 115:18 | **zoom**  2:8,13,18 |
| 29:17 32:16 | **worth**  102:25 | 132:5 134:4 | 2:25 8:9 17:15 |
| 34:8,21 50:8 | 103:14 | 136:10 172:6,8 | |
| 50:11,12 51:3 | **worthwhile** | 183:15 188:9 | |
| 51:9,15,21 | 105:14 | 188:21 190:15 | |
| 53:24 55:6 | **write**  15:1,10 | 197:13 212:11 | |
| 56:8,13,21 | 42:21,25 44:14 | **year**  16:3 64:1 | |
| 58:19 65:16 | 45:2,7 51:5 | 64:16 75:16 | |
| 66:15,15,16,21 | 53:9 56:8 88:8 | **years**  9:19 | |
| 68:10,11,12,13 | 88:8,13 138:12 | 22:19 23:4 | |
| 69:16,19 71:22 | 139:16 140:9 | 26:8 31:21 | |
| 74:18 75:12,18 | 184:21 197:18 | 42:3 51:18 | |
| 75:20 76:25 | 199:16 200:19 | | |

Page 60

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.