# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4:11-cv-06714-YGR

-----------------------------------x

IN RE APPLE iPHONE ANTITRUST LITIGATION

-----------------------------------x

December 15, 2022

9:08 a.m.

    Videotaped Deposition of ROSA
ABRANTES-METZ, Ph.D., taken by Defendant,
pursuant to Notice, held at the offices of
Gibson Dunn & Crutcher LLP, 200 Park
Avenue, New York, New York, before Todd
DeSimone, a Registered Professional
Reporter and Notary Public of the State of
New York.

Page 1

Q.   If you see a different commission in the actual world, do you assume that there are different costs of distribution?

A.   Different commission for what?

Q.   Take the PC world.  You know there are different commissions for game and non-game apps at various points in time, correct?

MR. RIFKIN:  Objection to the form of the question.

A.   Some of them have different commissions, but they also have the option of opting out of the processing payment, therefore it's not exactly the same thing.

For example, currently Microsoft has the 12 percent for game apps, 15 percent for non-game, but then has the option of zero, if the developer opts out of processing through Apple.  So I don't quite know what's the effective rate for non-games, because once you do the weighted average of the 15 with the zero, depending on the sales, which I don't know how many went through the 15 and how many went

Page 190

through the zero, but it may at the end of the day be not that different from 12.

But, again, Microsoft non-game apps are essentially different from Apple's, not Apple's apps, but the apps that are sold through Apple that are non-games.  So they wouldn't be a good comparison for that anyway.

Q.   Have you calculated Apple's effective commissions with respect to developers who sell, for example, virtual currency through their web?

A.   I have not.  I have not seen Apple separately identify those either as particularly different and in need of a separate identification.

Q.   If you had that data, would you calculate an effective commission rate?

A.   Depending on the data, if there is enough data to calculate, yes.  As I said, I haven't seen the data.

Q.   Do you agree that if Apple allows consumers to consume content in-app by buying it outside of the app that that should be incorporated in the effective

Page 191

commission rate?

MR. RIFKIN:  Can you read that question back, if you don't mind.

(The record was read.)

A.   The effective commission rate is what developers pay.  So the effective commission rate for Apple is a difference between what it collects minus what it pays, and that is how it is calculated.  So if it sometimes collects zero, that zero will be there.  If it sometimes collects more than zero, and sometimes even if it subsidizes, all of that will be incorporated into calculating the effective commission rate charged to developers.

Q.   Does your economic model distinguish between subscription in-app purchases and other kinds of in-app purchases?

A.   No, it does not.  It applies to game apps, and in the PC digital game markets, I don't recall, but I don't think there are meaningful distinctions with respect to subscriptions or not.  Steam has some tiers, but they relate I believe to

Page 192

volume of sales, not necessarily subscriptions versus non-subscriptions.  So the evidence from the Windows PC digital game app sales is that that doesn't tend to exist.

Q.   Does your economic model apply to any other type of store other than an iOS App Store?

A.   Well, I am modeling the but-for commission rate for Apple in the iOS operating system, so that is what I'm modeling.  So anyone who would exist in the but-for world as a competitor, the more competitors there are whose games are distributed that operate in iOS, the more they exist, to the extent that they are viable alternatives to both developers to place their apps and to consumers to download the apps, they will all just put downward pressure on the commission rate.  So I could have considered more, I didn't, I was conservative by allowing just these two stores to compete.

Q.   Would your model apply to app stores on Android?

Page 193

49 (Pages 190 - 193)

A.    Yes, in principle, but that is a different product, unless there is -- were to be an iPhone that operated with both Android and iOS so that consumers could easily switch within the same phone or iPad between operating systems, that would, just in the context of buying apps, would not be necessarily a competitor. Once you have purchased the device, you have chosen the operating system.

Q.    Does your model assume that the rival iOS app store uses Apple's intellectual property to compete in the but-for world?

A.    I'm sorry, could you repeat the question, please?

Q.    Does your model assume that the rival iOS app store uses Apple's intellectual property to compete in the but-for world?

A.    Not in any different way from the one, the fact that everyone distributing games either directly or through third party in the Windows PC game world uses intellectual property from

Page 194

Microsoft.

Q.    Well, Microsoft charges some players in the market for its intellectual property, correct?

A.    It may charge, and that is also part of the reason I am -- one more reason I am conservative with my model, allowing Apple to have significantly more profits than the competitor, in fact, more than double the profit, because it could potentially also be collecting those sorts of fees. Of course the model is a simplified version of all of these, but there is many reasons why it does consider those possibilities.

Q.    Well, are you assuming that the rival makes any payment to Apple for a license to iOS?

A.    I didn't explicitly assume it, but given that the rival firm has much smaller profit margin and much smaller market share than Apple in the but-for world, that is also consistent with that possibility as well.

Q.    So your model is consistent

Page 195

with the possibility that Apple charges the rival for making 23 percent of all iOS sales in the but-for world?

A.    I don't think in the but-for world Apple is going to charge for 23 percent sales. Apple could charge for the use of the operating system, not necessarily because it is 23 percent of the sales.

Q.    Okay. Have you made any estimate of how much Apple would charge its rival for use of its intellectual property in the but-for world?

A.    No, I didn't have to, because I calculated -- my task was to calculate the but-for commission rate and to be conservative enough to allow for those types of possibilities.

Q.    Well, if Apple imposed a license fee on its rival for use of iOS based on the number of transactions that the rival facilitated, would that affect how your model operates?

A.    Well, I didn't speculate in all of the many different thousands of ways

Page 196

that Apple could have done things that it actually never did, because one can conceive different ways in which Apple could in the but-for world have gone about this.

My task is to put forward a but-for commission rate that is reasonable, that has -- is backed by the best, not perfect, but the best similar competitive, more competitive, as-is world that exists, and that was what I calculated.

Q.    When two rivals offer differentiated products, does an economist presume that they would be expected to charge the same price?

A.    So as I mentioned, the but-for world is one where the same app would be available in two different stores. If the same app is available in two different stores and both developers and consumers can multi-home, you would expect that the price of the app should be about the same. That's how I went about postulating the but-for world.

Q.    Do you assume if two grocery

Page 197

50 (Pages 194 - 197)

stores sell the same products, those products will be sold at the same price?

A. Depending on their location and a variety of other factors, yes. They may or may not, but they will be, if there is competition, be equivalent to each other after having controlling for those facts, yes.

Q. Is it common for differentiated products to have different prices in markets that are concentrated?

A. Price differentiation is a signal of market power. I am postulating that the but-for world is competitive and therefore the ability to differentiate is going to be more limited.

Q. And you are postulating that Apple has a 77 percent market share and the but-for world is competitive despite that?

A. Yes, because the product that -- the products that the two stores sell in terms of apps and in-app sales are the same, so long as there is multi-homing on all sides and there are no artificial barriers to entry, all I have done is to

Page 198

calculate a conservative but-for rate.

I could have, and I think the but-for world would be one where direct to consumer distribution would also exist, which would put further downward pressure in commissions, but I wanted to be conservative and I didn't further allow for the possibility of even more competitors.

Clearly an operating profit margin of 50-something percent you would think would attract entry.

Q. Are the same apps available in the Google Play Store and the Samsung Galaxy Store?

A. I don't know. Maybe not exactly the same apps, but I don't know.

Q. Does the Samsung Galaxy Store come preinstalled on every Samsung phone?

A. I don't know. I know from the Android matters that there are concerns that Google has engaged in anticompetitive conduct, that it is creating artificial barriers to Samsung and others that prevents them from either entering or growing, and I wanted to have a benchmark

Page 199

that was as competitive as possible. And whether or not Google's conduct ends up being proven to be anticompetitive, a 90 percent market share by Google is not one that I would characterize as naturally competitive, and therefore I didn't use that market as a comparison and I didn't study which type of apps are available in Samsung versus Google.

Q. But 77 percent is competitive for purposes of your but-for world?

A. Is conservative. As I explained earlier, I do think that 50-something percent profit margin would attract entry, but such entry would just further lower commission rates, raising damages.

So I just wanted to postulate a commission rate that was reasonable, conservative, for several of the reasons we have been discussing over the last hour, and my view is that 13.6 percent is all of that, and also matches up against an as-is market that is more competitive than the market under study here.

Page 200

Q. If there are multiple reasonable assumptions that you can make, how do you determine which one is the more conservative one?

A. Well, you know that I don't have to rank which of my assumptions is more conservative to the least conservative. What I have to put forward is a benchmark rate that is reasonable, and to the extent that certain possibilities are not directly modeled or explicitly modeled, that I in particular like to be conservative.

If the omission of something leads to, in this case, a lower commission rate which would then get plugged into Professor McFadden's model and lead to higher damages, I find that to be conservative. I cannot rank to you which one of all of those is the most to the least conservative. I can tell you that these decisions were all conservative.

Q. So would it be conservative to assume a 90 percent market share for Apple in the but-for world?

Page 201

51 (Pages 198 - 201)

A. It depends on the specific type of model, but it will lead to equal prices.

Q. And so will Bertrand competition, correct?

A. Yes, but one maximizes quantity given the price function and the other does the opposite.

Q. So they are both consistent with equal prices, is that the only basis that you say your model is consistent with a Cournot model?

A. In that sense, yes. As we discussed earlier, both Cournot, and I don't think that earlier we mentioned Bertrand, but those are models that one would say are more general equilibrium models because they model both the demand and the supply. My model does not explicitly model the demand, it only models the supply, and it is from that perspective consistent with a variety of duopoly models that model both the demand and the supply.

MR. SWANSON: Okay, that is it for me.

MR. RIFKIN: Okay, I think

Page 302

we're done.

THE VIDEOGRAPHER: The time is 6:33 p.m. We are off the record.

[TIME NOTED: 6:33 p.m.]

_____

ROSA ABRANTES-METZ, Ph.D.

_____

Subscribed and sworn to before me this _____ day of _____, 2022.

_____
Notary Public

Page 303

I N D E X

WITNESS    EXAMINATION BY    PAGE

ABRANTES-METZ SWANSON    5, 301
RIFKIN    298

E X H I B I T S

DEFENDANT'S    DESCRIPTION    PAGE
Exhibit 46  Expert Report of Rosa    7
Abrantes-Metz
Exhibit 47  Errata to Expert Report    39
of Rosa Abrantes-Metz
Exhibit 48  EPIC_00127277-00127297    295

DIRECTIONS NOT TO ANSWER
Page    Line
(NONE)

REQUESTS
Page    Line
(NONE)

Page 304

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of December, 2022.

TODD DESIMONE

*    *    *

Page 305

77 (Pages 302 - 305)