# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4:11-cv-06714-YGR

------------------------------------x

IN RE APPLE iPHONE ANTITRUST LITIGATION

------------------------------------x

December 15, 2022

9:08 a.m.

Videotaped Deposition of ROSA ABRANTES-METZ, Ph.D., taken by Defendant, pursuant to Notice, held at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

Page 1

is a written decision or not.  That case, half of my work was on liability, the other half was on damages.  Professor Stiglitz did the rest of the work in liability.  And we worked with O'Melveny for US Airways/American Airlines.  US Airways won on liability, on monopolization, but only got $1 of damages.  So even though I haven't read the decision, the Court did not agree in giving the damages that I estimated.

Q.    And that was the jury in that case I take it?

A.    Yes.

Q.    And that was the recent Sabre/US Airways case, right, not the first one?

A.    Yes, it was the second turn.

Q.    Turn, please, to page 5, paragraph 15 of your report.  I wanted to ask you about the second sentence there. It indicates you have been asked by counsel for consumer plaintiffs to, one, assess whether the App Store commission rate that would reasonably be expected to prevail in

Page 27

a competitive but-for world without Apple's alleged misconduct can be determined using a common approach, and, two, if a common approach exists, estimate the but-for commission rate that is common to the consumer class.

Do you see that?

A.      Yes.

Q.      Does that describe your assignment in this case as you understand it?

A.      Yes.

Q.      Did you have any other assignments in this case beyond what's stated in paragraph 15?

A.      No, these were the two core assignments.

Q.      And what do you understand is meant by the term "competitive but-for world" as used in this sentence?

A.      The world that would have happened absent Apple's alleged anticompetitive conduct.

Q.      And what conduct by Apple in the way that you understand it is absent

Page 28

from the but-for world but present in the actual world?

A.    Blocking assets of competitors to distributing iOS apps and in-app purchases.

Q.    So would that include preventing other companies from having stores on the iPhone app stores?

A.    Yes.

Q.    Would that include preventing others from sideloading apps on to the iPhone?

MR. RIFKIN:    Objection to form.

A.    What do you mean by "sideloading"?

Q.    Is that a term you are familiar with?

A.    I believe it is -- my understanding is it's that it means that other app stores could be available, for example, in your phone.

Q.    And is it your understanding that that is conduct that would be allowed in the but-for world?

A.    In the but-for world, yes,

Page 29

consumers would be able to pick up their phones, for example, and choose where they could -- they wanted to buy the game from and would not be locked in from using the Apple App Store necessarily.

Q.     And in the but-for world would there be app stores other than Apple's that would be available in the Apple App Store?

A.     I don't know whether that would necessarily exist.  I think that we never know, because of Apple's alleged anticompetitive conduct, we will not know exactly the specificity of the but-for world.  What we know is that it would be competitive and at least two competitors would have started in about equal standing.

Q.     And would those competitors operate, do you know -- or strike that.

Do you have an understanding as to how those competitors would operate?  Would they operate as apps available in the App Store or would they operate as apps that could be downloaded by a consumer independent of Apple's App Store?

MR. RIFKIN:  Objection to form.

Page 30

more broadly, one finds that there are a variety of businesses where those types of interactions do happen.

Q. In your opinion, is the Apple App Store a two-sided transaction platform?

A. So I have not put forward an opinion on that because it is not necessary for the opinion I'm providing, for the methodology that I put forward in order to determine the but-for commission rate. It applies whether at the end of the day the Court finds that we are in the presence of a multisided platform or not.

Q. Well, whether or not you put the opinion forward, do you have an opinion as to whether the Apple App Store is a two-sided transaction platform as an economist?

A. I'm not going to put forward an opinion. I was not asked to put forward that opinion and I'm not going to put it forward.

Q. Well, I'm asking you if you have that opinion. If you don't want to answer that, we are going to have the Court

Page 103

have you answer it.

A.    No, I don't have that opinion, because typically one has to consider several things that I have not considered here.

I did consider the possibility that it is, and therefore I developed a methodology based on economic principles that can sustain whether the Court decides at the end of the day that it is a multisided platform or whether it decides it is not.

Q.    And do you discuss that in your report where you offer a methodology that does not depend on whether or not the App Store is a multisided transaction platform?

A.    The methodology itself stands whether it is or is not, and I will be happy to explain to you why that is the case.

Q.    Are you aware that in the Epic Games case Dr. Evans concluded that the App Store was a two-sided transaction platform?

A.    I don't particularly recall, no.

Page 104

Q.    You don't recall reading that testimony?

A.    No, I don't recall reading his testimony.  I read -- with respect to that part -- I read his testimony with respect to other parts.  I did read the Epic decision when it came out.

Q.    And do you recall that the Court in that decision ruled that the App Store is a two-sided transaction platform?

A.    I believe I recall that, yes.

Q.    When you read that, do you recall whether you agreed or disagreed with that conclusion?

MR. RIFKIN:  Objection to the form of the question.

A.    So I didn't conduct any of the analysis, and I did not necessarily agree or disagree.  What is important is that the methodologies developed -- whether the methodologies developed do stand if the Court decides that it is a multisided platform or not.

For example, in Sabre, I was asked to assume it was a multisided

Page 105

does happen simultaneously.

Q.    Do you agree that to optimize sales the App Store must find the balance of pricing that encourages the greatest number of matches between consumers and developers?

A.    Typically the economist thinks of the problem the platform solves as maximizing profits and not optimizing sales.

Q.    Fair enough.  Do you agree that to maximize profits the App Store must find the balance of pricing that encourages the greatest number of matches between consumers and developers?

MR. RIFKIN:  Can I ask to have that question read back again?  I'm sorry, I apologize.

(The record was read.)

A.    In order to maximize profits, it's not necessarily the case that -- well, let me strike that.

It is not necessarily the case that maximizing the transactions maximizes profits.  So the platform will maximize the

Page 109

profits, and, yes, it may do so by maximizing what we call the net price, which is the price to one side minus the price to the other, and that's really -- you can interpret that as what the platform gets to keep.  And after that decision is taken, the economist can think of these things sequentially.  Once the net price is taken then the platform will allocate how much will go to each of the sides.

Q.    Do you have an understanding as to whether the plaintiffs in this case define the market as one-sided or two-sided?

A.    My understanding is that that is not an opinion that -- my understanding is that that opinion would be rendered at the merits stage.  I do believe as of now that the understanding of plaintiffs is that the App Store is seen more as a retailer.

Q.    A one-sided business?

A.    Yes.

Q.    Do you have an understanding as to what the plaintiffs allege the relevant

Page 110

product is in this case?

A.    The purchase and sale of iOS apps and in-app.

Q.    Is that the same as transactions?

A.    I'm sorry, I don't understand the question.

Q.    Is that the same as transactions?

A.    Transactions of apps.

Q.    So the answer is yes?

A.    Yes.

MR. RIFKIN:  Objection to the form of the question.

A.    Well, transactions of apps, yes.  So the purchase and the sale is a transaction of apps.

Q.    If you could turn to paragraph 20 again, page 7.  I want to ask you a question about the first sentence.  You say "As Professor McFadden explains in his opening report, the App Store commission is effectively the 'price' that Apple charges for selling iOS apps and in-app content." Is that your opinion as well as

Page 111

Professor McFadden?

A.    My opinion is that the net price that Apple, and as I refer to Apple, I'm referring to Apple App Store, that Apple charges is net of the two sides, and it is conceptually a commission rate minus a subsidy, the commission rate being paid by the developer and the subsidy, for example, that would be paid to the consumer, or you can also think of the price that is paid by the developer and you could potentially think of the price that a consumer would be paid.

We don't see in the actual world that consumers are paying a positive price in that specific transaction.  We also don't observe subsidies to consumers typically at the transaction level.  There is a few loyalty programs, but typically loyalty programs, you accumulate points that you may use later in different apps or in different products.  So typically loyalty programs influence more where you purchase rather than whether you make that specific purchase.

Page 112

So we don't tend to see subsidies to consumers, and in the but-for world I put forward with two competitors at least and multi-homing of everybody, it is unlikely that subsidies would happen.  So from that point of view, and as I put forward, the net price that I calculate is the price charged to the developers, because I find that it is unlikely that subsidies would exist to any meaningful extent.

And that is also why, if I may say that that is why my methodology stands whether one thinks of these as a one-sided market or a two-sided market.  If it is a one-sided, then, you know, we are really just computing the commission directly in my methodology.  If it is a two-sided, I'm computing a net price, but given that I believe that there wouldn't necessarily be meaningful subsidies, it still stands that the price I calculate is the commission.

Q.    In your opinion, does Apple charge a price to the consumer side of the App Store platform?

Page 113

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of December, 2022.

TODD DESIMONE

*     *     *

Page 305