# EXHIBIT 7

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4:11-cv-06714-YGR


- - - - - - - - - - - - - - - - - - x


In re: Apple iPhone Antitrust

Litigation

- - - - - - - - - - - - - - - - - - x

                         May 23, 2025

                         9:05 a.m.




      CONFIDENTIAL VIDEO RECORDED DEPOSITION of

ROSA ABRANTES-METZ, Ph.D., an Expert Witness for

the Plaintiffs herein, taken by the Defendant,

held at the offices of Gibson Dunn & Crutcher

LLP, 200 Park Avenue, New York, New York, before

Sara K. Killian, a Registered Professional

Reporter, Realtime Certified Reporter and Notary

Public.

                                            Page 1

CONFIDENTIAL

R. Abrantes-Metz, Ph.D.

Q. What do you mean by technological restrictions there?

A. That companies like Cydia -- if I'm saying it correctly -- were unable to operate within the iOS operating system because technological restrictions were put in place so that it really could not operate.

Q. And so do you understand plaintiffs are challenging technological restrictions on sideloading? Is that accurate?

A. I can't recall exactly.

Q. You can't recall if plaintiffs are challenging the conduct that you describe here related to Cydia?

A. Only because sideloading, the way I tend to think about it tends to be something that is done somehow illegally.

Yes, plaintiffs are alleging that when you get into -- when you have an iPhone and you want to download an app and/or do in-app purchases, there's no way you can do any of that outside of Apple,

Page 46

R. Abrantes-Metz, Ph.D.

whether that is through a company like Cydia type or another app store more recently or different payment system.

Q. I'm just asking about how Apple implements the restriction.

Is it through technological means?

A. I'm not the right person to answer that question.

Q. Okay.

Do you know whether plaintiffs are challenging contractual restrictions on sideloading?

A. I know there are challenges on contractual restriction, yes.

Q. But you're not sure about the technological restrictions?

A. I don't exactly know how everything fits on sideloading or not. The steering -- for example, the steering allegations could be related to that. There would be other options that you could sideload the app store and obtain your apps in a different way.

Page 47

R. Abrantes-Metz, Ph.D.

I don't know if technically or legally that falls into the bucket exactly that you're asking me -- that you're calling sideloading.

Q. You can flip back to page six. 17B.

In this paragraph, you say: Absent Apple's anti-competitive conduct, Apple -- Apple's App Store would have charged a single but-for commission rate that would not have exceeded 13.63% throughout the class action period.

We looked at this paragraph before.

Do you see it?

A. Yes.

Q. So in this paragraph, what do you mean by Apple's anti-competitive conduct?

A. The conduct that I described that plaintiffs alleged that falls broadly into three categories.

Q. Okay.

Would all the conduct that

Page 48

R. Abrantes-Metz, Ph.D.

falls into the three categories be absent in the but-for world?

A. Only the conduct that is determined to be illegal.

Q. Okay.

Can the jury adjust your model to calculate the but-for commission rate of some but not all of the alleged conduct if unlawful?

MR. RIFKIN: Objection to form.

A. The jury could, but my opinion is that so long as some entry exists in any of the different type of conduct that is alleged, that will put pressure for the but-for commission rate to come down.

Q. How would the jury adjust your commission -- strike that.

How would the jury adjust your model to calculate the but-for world commission rate if it concluded that some, but not all, of the alleged conduct is unlawful?

MR. RIFKIN: Objection to form.

A. So as I said earlier, the jury

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL

R. Abrantes-Metz, Ph.D.
could adjust, but I wouldn't adjust because in my opinion, the long run equilibrium is 13.63 reasonably, as long as some conduct is determined to be illegal.

Q.    Understood, but if the -- but you have indicated that it's possible for the jury to adjust your model and I'm asking how it would do that.

MR. RIFKIN:  Objection to form.

A.    To the extent that there's an equation, juries can adjust however they would like.  My opinion is that it shouldn't be adjusted because so long as there is entry in any of the relevant conduct alleged by plaintiffs that -- to be illegal, that will be enough to put competitive pressure on Apple because agents in the market will change their actions in response to the entry and that will cause Apple to also change its conduct, facing that type of competitive pressure, and over the long run, the rate will again reasonably be 13.63.

Q.    So you believe the jury could adjust the inputs to your formula to

Page 50

R. Abrantes-Metz, Ph.D.
calculate a different but-for world commission rate in the event it concluded that some, but not all, of the conduct was unlawful?

MR. RIFKIN:  Objection to form.

A.    As I answered earlier, the jury can, but I wouldn't because my opinion is that 13.63 is the reasonable -- is a reasonable and conservative commission rate, as long as at least one of the conducts is illegal.

Q.    So let me ask about you now.
Would you need to adjust any of the inputs to your formula if some, but not all, of the conduct was found to be illegal?

A.    As I answered earlier, no.

Q.    Would you need to adjust any of your formula's assumptions if some, but not all, of the conduct was found to be illegal in order to calculate the but-for world commission rate?

A.    No.

Q.    Was it part of your assignment to determine the but-for world commission

Page 51

R. Abrantes-Metz, Ph.D.
rate if some, but not all, of the conduct is found to be unlawful?

A.    My methodology is supposed to reflect anti-competitive conduct and as I explained earlier, so long as there is entry in payment systems or app stores or whatever is relevant for the different types of conducts that are alleged, so long as there is entry in one at least app, Apple's app store will face competitive pressure and it will lead Apple to a rate that is more competitive, such as the 13.63.  So the model fits for any of those situations.

Q.    Okay.  Let's try this again because that was not my question.
My question was was it part of your assignment to determine the but-for world commission rate if some, but not all, of the conduct is found to be unlawful?

MR. RIFKIN:  Objection to form.

A.    My assignment was to determine a but-for commission rate and the one that I determined would be the one prevailing if some or not all or all of the conduct is

Page 52

R. Abrantes-Metz, Ph.D.
illegal.

Q.    So then is that a yes?  It was part of your assignment to determine the but-for world commission rate if some, but not all, of the conduct is found to be unlawful?

MR. RIFKIN:  Objection.

A.    Yes, in every situation and combination.

Q.    Okay.
On paragraph 19, which is on the next page, you write that your model captures how competitive pressure from a rival app store would have driven Apple's app store's commission rate down.
Is that right?

A.    Yes.

Q.    Is that the only competitive pressure your model captures?

A.    The model captures entry through an app store -- a competing app store -- but that entry could have happened in other ways and it would still lead to a commission rate of 13.63.

Page 53

14 (Pages 50 - 53)

R. Abrantes-Metz, Ph.D.

Q.   Does it capture how competitive pressures from alternative in-app payment processors would affect Apple's commission rate?

A.   It captures to the extent that if there are alternative payment systems that can be used to do your in-app purchases, developers would adjust their conduct and Apple, faced with lower rates for in-app purchases, would end up reducing its commission rate, and therefore would end up at a reasonable commission rate of around 13.63 that is more reflective of the actual costs.

Q.   Does your model capture how competitive pressures from removing Apple's ain't steering rules would affect Apple's commission rate?

A.   Yes.  That would work similarly.  Instead of calling it an app store, you could call it a steering ability to steer customers somewhere else.  And so long as there is that kind of entry, there is competitive pressure to reduce the

R. Abrantes-Metz, Ph.D.

commission rate.

Q.   Does your reference here to competitive pressure from a rival app store also encompass how competitive pressures from removing Apple's price tiers would affect Apple's commission rate?

A.   Yes, because faced with competitive pressure, for example, from an app score that does not have those tiers, if Apple does not -- if Apple's app store does not just adjust its pricing, it risks losing customers.  So again, it would likely lead to a commission rate that is about 13.63.

Q.   So let me ask a slightly different question.

Would removing competitive pressure from -- excuse me.

Let me try that again.

Does it capture whether removing Apple's price tiers alone would result in a more competitive market and drive Apple's commission rate down?

A.   Yes, the fact that Apple is able to have those pricing tiers is

R. Abrantes-Metz, Ph.D.

reflective of market power.  In a competitive world, Apple would not have the ability to do so because it would be facing competition and that competition would lead Apple to change its pricing structure and that competition would also lead to a lower commission rate closer to costs.

Q.   So in the but-for world where the only thing that changes is removal of Apple's price tiers, everything else stays the same in terms of Apple's restrictions, it's your opinion that the but-for world commission rate would be 13.63%?

A.   I'm always assuming there is going to be entry.  That is a fundamental assumption of this model.

As I was answering your question on pricing tiers, I was assuming that there would be entry and that would put pressure for pricing tiers to disappear.

Q.   So you're not offering an opinion as to whether removal of price tiers in and of itself would result in entry?

A.   No, I'm not offering that

R. Abrantes-Metz, Ph.D.

opinion.

MS. RICHMAN:  Okay.

MR. RIFKIN:  Good time to take a break or do you have some more on this topic?

MS. RICHMAN:  No.  I've got a couple more to go, as long as that's okay, as long as it's fine with Dr. Abrantes-Metz.  Then we can take a break.

MR. RIFKIN:  That's fine.

THE WITNESS:  Ten minutes?

MS. RICHMAN:  It'll be less than that.

THE WITNESS:  Okay.

BY MS. RICHMAN:

Q.   Dr. Abrantes-Metz, do you understand plaintiffs are asserting two legal claims in this case, monopolization and attempted monopolization?

A.   Yes.

Q.   Have you drawn any distinction between those two legal theories in reaching your opinions?

15 (Pages 54 - 57)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127