# EXHIBIT 10

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4:11-cv-06714-YGR


- - - - - - - - - - - - - - - - - x


In re: Apple iPhone Antitrust

Litigation

- - - - - - - - - - - - - - - - - x

July 11, 2025

9:00 a.m.


CONTINUED CONFIDENTIAL VIDEO RECORDED

DEPOSITION of ROSA ABRANTES-METZ, Ph.D., an

Expert Witness for the Plaintiffs herein, taken

by the Defendant, held remotely via Zoom vide

conference before Sara K. Killian, a Registered

Professional Reporter, Realtime Certified

Reporter and Notary Public.

Page 131

R. Abrantes-Metz, Ph.D.

In general -- though there might be different a little bit now in some states versus others -- but in general, a merchant cannot charge a different price for a product that is paid in cash versus -- or check -- and versus the credit card. Typically, the price of the product is the same.

That's a constraint that the merchant has to face and therefore when the credit card company decides how much it's going to charge to merchants and the card holders, it has to have that in consideration. And because of that, it really needs to balance the two sides.

Q.    Okay.

A.    And because of that, in Professor Roget and Tirole, how the company balances the two sides matters. It is important. There's an actual effective balancing of the two sides because there is this outside restrictive phase by the merchants.

Under their definition also of

Page 248

R. Abrantes-Metz, Ph.D.

multi-sided platform, this balancing that exists because of that fact is really the distinguishing feature between what is a multi-sided platform and what is not.

MR. RIFKIN:  Ms. Richman, you asked her what factors she would consider in deciding whether that was a transaction platform. I think you should let her finish her answer.

MS. RICHMAN:  I'm happy to. I think we've moved on from that actual response to that question, but --

MR. RIFKIN:  I respectfully disagree, but if you want to cut her off, let the record reflect that you're cutting her off before she could finish her answer.

BY MS. RICHMAN:

Q.    Dr. Metz, was there something you wanted to add?

A.    Yes.

So that is the key factor to determine whether there's what's called a neutrality of how you balance the size or

Page 249

R. Abrantes-Metz, Ph.D.

not, a neutrality of the statutory incidence or not. That is a key feature to understand whether something is really balancing the act -- the sides and therefore if it's a multi-sided platform or not.

But there's other things that Professor Stiglitz has pointed out simultaneous -- so, you know, I would not be able to provide an opinion on something just like that out of the blue without knowing better how things actually work in that industry.

Q.    Does an app store on a game console platform bring together buyers and sellers through electronic intermediation?

MR. RIFKIN:  Objection to form and scope.

A.    Specifically in a console?

Q.    Yes.

A.    The app store specifically in a console? Well, the app store is a place where buyers and sellers meet, just like in any other market. Any market brings buyers and sellers together. I don't see a

Page 250

R. Abrantes-Metz, Ph.D.

difference with respect to the app store in consoles or outside of consoles.

Q.    Okay.

So the answer to my question is yes then?

A.    Every market has two sides:  A buyer and a seller. Every market brings together buyers and sellers. That is not a particular difference or feature of a multi-sided platform because every market does sell.

Q.    Have you considered whether game console platforms are characterized by substantial indirect network effects?  Yes or no?

A.    In the abstract, no. I didn't have to consider that for the opinion that I'm putting forward.

Q.    Is a gaming console an example of an operating system-based network?

MR. RIFKIN:  Objection to form and scope.

A.    I don't have an opinion on that.

Page 251

31 (Pages 248 - 251)

R. Abrantes-Metz, Ph.D.

Q.    Okay.

During your last deposition, you testified that it does not matter whether the relevant market in this case is one- or two-sided for the purposes of your opinions regarding the commission rate that would prevail in the but-for world.

Is that a fair characterization?

A.    Yes, in the sense that I considered both and I determined that the same methodology and numbers apply.

Q.    You're not offering the opinion that the market in this case is two-sided.

Correct?

A.    Well, I think we have to be precise about what two-sided means. As I said earlier, any market has two sides because people can't buy without people selling. If it is a market, it has to be two sides.

If your question is instead am I offering an opinion as to whether the App Store is a simultaneous transaction platform

Page 252

R. Abrantes-Metz, Ph.D.

in the sense of Amex, my answer is no, I am not putting such opinion forward.

Q.    And you also are not putting forward the opinion that the relevant market is one-sided.

Correct?

A.    I don't have an opinion on relevant market. Professor Stiglitz conducts that analysis.

Q.    Do you disagree with Apple's experts' opinions that the market is a two-sided transaction market?

A.    I don't know how you're defining two-sided transaction market. While any market has two sides and, in principle, a market where things happens does have transactions. If you're asking me whether I have an opinion, as I explained earlier, as to whether the App Store is a simultaneous transaction platform in the sense as defined in the Amex decision, I am not putting forward such opinion. I did not have to put forth such opinion for my analysis because, as I explained extensively

Page 253

R. Abrantes-Metz, Ph.D.

in my report, I have what I need to make a determination of what the number would be whether the court decides that the App Store is a simultaneous transaction platform in the sense of Amex or not. So I didn't have to put that opinion.

Q.    I understand, Dr. Metz, that you didn't have to put forward an opinion on that issue.

I'm asking you whether you dispute Apple's experts' opinions that the market is two-sided. And for the purposes of the precision that you are requesting, we can use your example of the Amex case as the definition for a two-sided transaction platform.

A.    So as I said earlier, if we're talking about simultaneous transaction platforms in the sense of Amex, I don't put forth an opinion. That is something that has to be studied with care, various aspects have to be determined. If anything, and given, for example, the seminal work I just mentioned to you by Professor Tirole and

Page 254

R. Abrantes-Metz, Ph.D.

Rochet from 2003 paper where much of this literature is based on, there is evidence that is consistent with the App Store really not having to balance the two sides when it decides at a statutory level whether it's going to levy 30% on the developers and zero on the consumers or if it were to have decided to put 20% on the developers and ten on the consumers or however it's going to do because prices adjust.

Prices adjust at the end of the day. Consumers pay and it is estimated by Apple's experts that consumers actually pay about 8% of the increase of the overcharge in the commission rate. So if anything, while I don't have a completely formed opinion, the evidence to me today, the way I have seen without making additional studies in order to form a completely full opinion that I don't have to, is that the App Store would not be a transaction platform that must balance the two sides because it would be a platform that for which the neutrality of the fee structure at the statutory

Page 255

32 (Pages 252 - 255)

R. Abrantes-Metz, Ph.D.
structure level exists because any such incidents from tax principles and economics is transferred to the ultimate price paid by the consumer. So the incidence of the tax is divided up between the developer and the consumer.

And so given that simple observation, the -- I would tend to say that the App Store would be more consistent with not balancing the act, not balancing the sides, not being a simultaneous transaction platform in the sense of Amex.

Q. Is your --

A. So again, there's more things that I would have to consider that I have not considered because that is not part of my role here and it was not necessary to do so for the opinion that I put forward.

Q. Is it your understanding that Professor Tirole has said that the App Store is not a two-sided transaction platform in the sense of Amex?

A. The paper I'm referring is from 2003.

Page 256

R. Abrantes-Metz, Ph.D.

Q. Okay.

A. The App Store did not exist then. The paper describes what, in their view, is a multi-sided platform, transaction platform. And they walk through situations where the balancing of the sides doesn't really happen at the end of the day because prices -- the ultimate economic incidence, prices adjust. Those conditions are, to a great extent, verified in the App Store.

So if one were to look only through those lens, one would say the App Store would not fit the criteria put forward in the Amex decision of what a simultaneous transaction platform is.

But again, there's other things that may have -- may be relevant which are also addressed by Professor Stiglitz. But as I explained earlier, I don't have a fully formed opinion. I do happen to know that this is one of the definitions of multi-sided platforms that would have to be considered in such a context.

And hence, while not having a

Page 257

R. Abrantes-Metz, Ph.D.
final opinion, the evidence that I have seen to date is not consistent with Apple's experts' opinion that the App Store would be a simultaneous transaction platform in the sense of Amex, so that all the sides would have to be considered and there would be disbalancing.

But let me just --

Q. I'm going to move to strike everything you've said, Dr. Metz, because it's completely unresponsive to my question.

I was asking about Dr. Tirole -- Professor Tirole.

A. I'm sorry. Then I got confused with a previous question.

Q. So we're going to strike that and start over.

Dr. Metz, are you aware of anything that Professor Tirole has said about whether the App Store is a two-sided transaction platform in the sense of Amex since 2003?

A. No. As I said, this is one of the definitions they put in 2003. Other

Page 258

R. Abrantes-Metz, Ph.D.
people have put forward other definitions. There are many different kinds of definitions. So that is why I haven't looked into it closely. I haven't formed an opinion, but here's a piece of evidence that is not consistent with your original question as to whether I agreed with Apple's experts on these.

Q. Dr. Metz, are you fully ignoring the court's decision in this case that the App Store is a two-sided transaction platform in the sense of Amex?

MR. RIFKIN: Objection to form.

A. Which court decision is that in this case?

Q. I'm sorry. I apologize.

In the Epic case that was rendered by the District Court in this case and affirmed by the Ninth Circuit.

MR. RIFKIN: Objection to the form.

A. I'm not ignoring the court decision, but I'm just saying that economic literature may well define the App Store

Page 259

33 (Pages 256 - 259)

R. Abrantes-Metz, Ph.D.
monopolist when it charged 30%?

Q.    Well, let's start with the 20%.

So you note that BlackBerry initially charged a 20% commission for a short period, but then increased the rate to 30% by 2010?

A.    Yes.

Q.    That's on page 16 of your report, 24B?

A.    Yes.

Q.    Are you offering the opinion that BlackBerry had market power in 2009?

A.    No.  As I mentioned earlier, I'm not offering an opinion of market power for any app store.  That's not the opinion I put forward.

Q.    Are you offering the opinion that BlackBerry had market power in 2010 when it raised its commission rate from 20% to 30%?

A.    Again, I'm not offering an opinion on market power for any app store. All I show in here is all of the changes and struggles that BlackBerry did have in the

Page 284

R. Abrantes-Metz, Ph.D.
market for the time that its app store -- for the time that it did exist and those were struggles that are not characteristic of a stable duopoly that I postulate for the but-for world.

Q.    Were BlackBerry devices competing with Apple devices in 2010?

A.    I don't put an opinion as to whether BlackBerry devices were competing with Apple devices in 2021.

Q.    IPhones?

MR. RIFKIN:  Objection to form.

A.    You can think of that people would choose between BlackBerry and iPhone, but I am not putting forward necessarily that opinion because that is not something that is needed for my assignment in this matter.

Q.    Your view is that BlackBerry is not a good comparable because it was struggling during this period.

Correct?

A.    Yes.  Its app store kept moving around, making changes, being comparable

Page 285

R. Abrantes-Metz, Ph.D.
with different things, was eventually discontinued.

This is obviously not consistent with a company with an App Store that is actually making a stable profit margin to remain in the market because it left.  Therefore, that is not a comparison for my but-for world.

Q.    What was the cause of BlackBerry's declining market share in this period?

A.    Are we talking about the BlackBerry app store or BlackBerry device?

Q.    Let's take each one.

The BlackBerry device, what was the cause of its declining market share in this period?

A.    It clearly was not being able to compete.

Q.    With what?

A.    With whatever was out there. Android, iPhones, I don't know.  I didn't have to provide such an opinion.  The opinion I do put forward, though, is that

Page 286

R. Abrantes-Metz, Ph.D.
BlackBerry's trajectory is not one of a stable second rival or even leading firm that I could use in the but-for model that I put forward.

Q.    What about the BlackBerry store?  What was the cause of its declining market share in this period?

MR. RIFKIN:  Objection to form.

A.    As I explained earlier, I didn't have to put forward that opinion. The opinion I put forward is that this was not a successful company and therefore it was going through a lot of changes, therefore it is not something -- a company that could be used as a benchmark to a competitive stable duopoly that I put forward in the but-for world.

Q.    Do you have any opinion if Verizon had market power when it set its headline at 30%?

A.    I do not put forward that opinion that it had market power.

Q.    Was Verizon's 30% commission rate super competitive?

Page 287

40 (Pages 284 - 287)

R. Abrantes-Metz, Ph.D.

A.    Super competitive in the sense that it was due to alleged market power -- of which I have no opinion -- or illegal conduct -- of which I am unaware -- no, I don't put forward an opinion as to whether it was super competitive.  Only the opinion that it's not an appropriate benchmark.

Q.    Was Verizon a monopolist when it charged a 30% commission rate?

A.    I don't -- I don't recall.  I know some of these smaller app stores at some point in time were the only one in their own system and if you think that, such as Nokia, if that were the market, they were the only ones providing.

But this platform for Verizon was discontinued by January 2013.  So it would also not have been a stable rival that I could have used in a duopoly long run equilibrium for my but-for world.

Q.    How long does a rival have to persist in order to be suitable for your duopoly long run equilibrium in your but-for world?

Page 288

R. Abrantes-Metz, Ph.D.

A.    Well, if the rival has exited, it clearly was not making enough profit for one reason or another and therefore it is not suitable for comparison.  How long that may be, I don't know.

Microsoft App Store has been in the market for a while.  It has been sustained and that is one of the reasons why its profit margin is appropriate to use as the benchmark that has the features I discussed earlier for the but-for world.

Q.    Have you estimated the effective commission rates paid by developers on the Nokia, BlackBerry and Verizon transaction platforms you describe in your report?

A.    No, but in some parts of my report, I do mention that there are other -- a variety of cash incentives.  So developers would effectively have paid less than the headline commission rate, for example, for the OV store.  So I had that discussion on page 19 for Nokia and BlackBerry.

Q.    Is it your understanding that

Page 289

R. Abrantes-Metz, Ph.D.

these incentive programs were only applicable to paid apps?

A.    No, I don't have such an opinion.

Q.    I didn't ask you whether you had an opinion.

I'm asking you if you had knowledge as to whether these incentive programs also applied to -- also applied to free apps.

A.    No, I can't recall that.

Q.    If they also applied to free apps, would those incentive programs have the effect of reducing the store's effective commission rate?

A.    Well, it depends on how you calculate the commission rate.

Q.    I'm asking you, in your opinion, if the incentive payments applied to free apps, would those incentive programs have the effect of reducing the store's effective commission rate?

A.    It depends on how you calculate the commission rate.  If you calculate it as

Page 290

R. Abrantes-Metz, Ph.D.

the revenue that is collected only from non-free apps, which is -- for the commission rate, is the only rate that is calculated, divided by the total revenue from the apps, it wouldn't.

But if you take into account -- which is typically how the effective commission rate is calculated.  But if you take into account that this is an actual cost to Apple and then you subtract that cost from the revenues that -- I'm sorry.  Not Apple -- to this app store and subtract those costs from the revenue that the App Store does collect from the paid apps, then it does reduce the revenue it gets to keep per developer, though not necessarily the effective commission rate the way it's standardly calculated.

Q.    Well, you offer the opinion that these incentive programs possibly resulted in negative effective commission rates in some cases.

Correct?

A.    They could have.  And that's

Page 291

41 (Pages 288 - 291)

R. Abrantes-Metz, Ph.D.

not odd. Epic does provide very large incentives and that is why it has negative profit.

Q. Would these incentive payments be a form of subsidy?

A. From whom to whom?

Q. You're the economist. You tell me. The payments from the --

A. You're asking the question, so I want to have it clear.

Q. The payment, as I understand from reading your report, is from the OEM to the developer.

MR. RIFKIN: Objection to form.

A. It would constitute a subsidy to developers, potentially yes. Not necessarily a subsidy per transaction, but if it is an incentive, it is a subsidy to developers.

Q. Have you seen any data that addresses the percentage of developers on these stores that benefited from the incentive programs?

A. I can't recall. Only that

Page 292

R. Abrantes-Metz, Ph.D.

these incentive programs were in place.

Q. Have you seen any data regarding the extent to which the data programs lowered the effective commission rates on these platforms?

A. I am not aware of such calculations. But again, I didn't have to embark that way because these are not appropriate benchmarks for other reasons that I explained earlier in the previous sections -- pages we just discussed.

Q. Have you seen any data regarding how often the incentives offered on these platforms were actually paid out to developers?

A. No. But again, I didn't have to embark on that calculation because I ruled out, for other reasons, these app stores as being reasonable comparators.

Q. In footnote 61 of your rebuttal report, you cite an article about BlackBerry App World.

A. I'm sorry. Page 61?

Q. No, footnote 61.

Page 293

R. Abrantes-Metz, Ph.D.

A. Yes.

Q. BlackBerry App World has also adopted the industry standard 70/30 revenue split having previously offered a more generous 80/20.

Do you see that?

A. Yes. I need to read the paragraph where this is referred to. Yes.

Q. Have you read it?

A. I read the paragraph portion leading to footnote 61, yes.

Q. Do you agree that in 2010 a 70/30 revenue split was the industry standard?

A. Well, I agree that's what the title of the article says. It does seem like a lot of them did charge 20/30. That's probably why the article says it.

Q. Just so the record is clear, the quote here says that BlackBerry App World has also adopted the industry standard 70/30 revenue split. It does not say that there's a 20/30 revenue split.

Is that right?

Page 294

R. Abrantes-Metz, Ph.D.

A. Where would 20/30 come from?

Q. Your testimony a minute ago.

A. I don't remember saying 20/30. If I said something like that, it was incorrect.

Q. Okay.

A. The article says, just to be clear, the quote that it has also adopted the industry standard 70/30 revenue split.

Q. Okay.

Let's turn to page 20 of your rebuttal report.

In paragraph 30, you say: Finally, it is important to emphasize that Apple's experts selectively cited examples of platforms charging a 30% commission rate to support their arguments while ignoring others that charge lower rates, yet Apple's own internal documents show that Apple was comparing its commission rate not only to game consoles, as its experts do, but also to e-commerce business services, and then it goes on where the document notes commission rates below 6% and physical retail and

Page 295

42 (Pages 292 - 295)

R. Abrantes-Metz, Ph.D.
public domain that discuss the MFNs by Valve. What I do site is the complaint I, believe. I can't recall if I cite anything else. So whatever I cite, you can take it as the source for the possibility that those MFNs exist.

Q.    Okay. We'll do that.

Dr. Metz, you agree that it's possible that Apple and its rival might have competed on quality rather than on price in the but-for world.

Correct?

A.    The quality of the App Store itself or the quality of apps?

Q.    Let's start with the quality of the App Store itself.

A.    That is what Apple controls. It doesn't control the quality of the apps. I just wanted to clarify.

Yes, they may have competed on quality. Actually, that's part of the benefit of competition.

Q.    Is it possible that Apple and its rival might have focused on different

Page 328

R. Abrantes-Metz, Ph.D.
dimensions of competition in the but-for world?

A.    Yes, and to the extent I do not consider other ways in which they could have competed further putting downward pressure on the commission rate, my commission rate would then be conservative.

Q.    Is it possible that the App Store rival might have tried to entice developers to its platform by charging a lower commission rate than Apple?

A.    Yes, but the long run equilibrium would be that either that's too low and it's not sustainable and therefore the rival store would increase or it is not too low and Apple would match, because otherwise it would risk losing lots of business to the rival app store and as a consequence, even papers such as Professor Nevo's paper lose in the devices.

Q.    Is it possible that in the but-for world Apple might have responded to the App Store rival's lower prices by focusing on providing better developer tools

Page 329

R. Abrantes-Metz, Ph.D.
and support than the rival?

A.    Is that possible? Yes, but I give the same cost to the rival and to Apple. Lots of things are possible. My task was to put forward the but-for rate that is reasonable.

And yes, it is possible, but I don't know why Apple would not already be doing all it could to provide the tools to developers. But if it isn't, that is one more reason why Apple's conduct would have been improved in the but-for world and competition would have gotten better.

Q.    Apple might charge a higher commission rate to developers if it is providing developers with better tools and support than the rival.

Correct?

A.    It could, but if Apple makes that cost reflected in the commission rate, for example, and therefore Apple has a higher commission rate than the other app stores, the developers would potentially would answer with, you know, putting a lot

Page 330

R. Abrantes-Metz, Ph.D.
of free apps, free of download, and then essentially let the users instead pay for the in-app purchase in the rival app store with the lower commission rate.

That would drive business out of the Apple App Store and it would put pressure on Apple to have a total cost to the developer in your hypothetical is all reflected in just the commission rate. That would be comparable to the commission rate of the rival store.

Q.    I'm sorry.

What would be comparable to the commission rate of the rival store?

A.    What I said is that if Apple makes developers pay a higher commission rate than the rival app store, a normal strategy for developers is to put more free apps to be downloaded on the app store and let consumers execute the in-app purchase on the rival store with the lower commission rate. And therefore, Apple would lose business to the rival app store and that would put downward pressure for Apple to

Page 331

51 (Pages 328 - 331)

R. Abrantes-Metz, Ph.D.
reduce its commission rate or risk not only to lose app store business but also additional device businesses.

So I don't expect that the but-for world would be one where realistically if prices can adjust, if the developer can adjust prices and monetization strategies, would be one where two different commission rates would be supported on average.

Q. Is there a demand curve for App Store transactions?

MR. RIFKIN: Objection to form.

A. There is a demand for apps.

Q. Is that different from the demand curve for App Store transactions?

MR. RIFKIN: Objection to form.

A. As a customer, I don't go buy transactions. I buy the app and the action of buying the app generates a transaction.

Q. Are developers buying an app transaction in the context of the App Store?

A. Developers are selling their apps to Apple -- I'm sorry -- to users. And

Page 332

R. Abrantes-Metz, Ph.D.
they're doing that through the App Store. What they sell are apps.

Q. And they're paying Apple to facilitate the transaction.

Correct?

A. Yes.

Q. Okay.

Is there a demand curve then for that product?

A. To buy apps? Yes, there is a demand and a supply curve for apps.

Q. Is there a demand curve for the product that we were just discussing, the product being facilitation of the transaction by Apple that the developers are paying for?

A. There's a demand and a supply for distribution. The business would be distribution of apps. Yes.

Q. Okay.

In the demand curve that you mentioned for apps, does that demand curve -- is it based on both developer demand and consumer demand?

Page 333

R. Abrantes-Metz, Ph.D.
A. The demand curve is only based on demand.

Q. Is it developer demand or consumer demand?

MR. RIFKIN: Objection to form.

A. Consumers buy the apps. Whoever buys the apps, even if it is a developer buying an app, at that moment in time, when they were buying the app, they are a consumer of the app. Whoever sells the app is the seller of the app. To a great extent, the developers are the sellers of the apps.

Q. The product that Apple is providing to developers as we discussed is the facilitation of the transaction with consumers.

Correct?

A. Yes, it's the distribution. Yes.

Q. Have you or anyone else estimated the elasticity of demand for that product in the relevant market?

MR. RIFKIN: Objection to form.

Page 334

R. Abrantes-Metz, Ph.D.
A. I have not. I didn't have to for my assignment.

Q. Does your model involve any assumption about the elasticity of demand at a 30% commission rate?

A. No. It has no assumption on the elasticity of demand.

Q. Does your model involve any assumption about the elasticity of demand at a 13.63 commission rate?

A. No. The firms are competing, the app stores are competing on price and because they are identical in cost and the product is homogenous, there will be two equal prices for whatever demand exists.

Q. Would you expect demand to be elastic or inelastic at a 30% commission rate?

MR. RIFKIN: Objection to form.

A. As we discussed, there are different types of demand. There's demand for small developers, demand for larger developers. Some may have different elasticities. I didn't have to address any

Page 335

52 (Pages 332 - 335)

CONFIDENTIAL

R. Abrantes-Metz, Ph.D. of that, so I have no opinion.

Q.   Is 30% the profit maximizing rate for Apple?

MR. RIFKIN:  Objection to form.

A.   If Apple is maximizing profits, given that it is the only store in iOS, if it is maximizing profits, I would expect 30% would be consistent with its profit maximizing position, given that it has no rivals.

MS. RICHMAN:  No further questions.

MR. RIFKIN:  Can we go off the record for just a moment?

THE VIDEOGRAPHER:  Sure can. Standby.

Time is 2:43.

We're going off the record.

(Recess taken)

THE VIDEOGRAPHER:  The time is 2:47.

We are back on the record.

MR. RIFKIN:  Nothing for plaintiffs.

Page 336

R. Abrantes-Metz, Ph.D.

MS. RICHMAN:  Nothing further for Apple except to say thank you, Dr. Metz, for making yourself available on a summer Friday afternoon.

THE WITNESS:  Thank you, Ms. Richman.

THE VIDEOGRAPHER:  Standby while I close the record.

This concludes today's deposition given by Rosa Abrantes-Metz.

The number of media units used was four.  They'll be retained by Veritext Legal Solutions.

We're going off the record at 2:48 p.m. Eastern daylight time.

Thank you, everybody.

Page 337

CERTIFICATION

I, SARA K. KILLIAN, RPR, RCR, CCR, do hereby certify that ROSA ABRANTES-METZ, Ph.D., the witness whose examination under oath is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of July, 2025.

_Sara K Kl._

SARA K. KILLIAN, RPR, RCR, CCR

Page 338

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Dr. Abrantes-Metz | Ms. Richman | 136 |

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit DX 221 | Reply Report of Rosa M. Abrantes-Metz, Ph.D., June 13, 2025 | 138 |
| Exhibit DX 222 | Expert Reply Report of Rosa Abrantes-Metz, Ph.D. Errata | 139 |
| Exhibit DX 223 | MSFT_EPIC_93 | 160 |
| Exhibit DX 224 | MSFT_AAPL_498 | 180 |
| Exhibit DX 225 | "The Hidden Costs of Fairness in Platform Markets:  The Dynamics of Lowering Developer Royalty Rates," by Annamaria Conti and Juan Santalo, November 14, 2023 | 240 |
| Exhibit DX 226 | CX-0014.1 | 296 |

Page 339

53 (Pages 336 - 339)