# EXHIBIT 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

In re Apple iPhone          ) Case No.

Antitrust Litigation,       ) 4:11-cv-06714-YGR

                            )

                            )

ZOOM VIDEOTAPED DEPOSITION OF EDWARD W. HAYTER

Long Beach, New Jersey

Friday, May 22, 2020

Volume I

Reported by:

LORI M. BARKLEY

CSR No. 6426

Job No. 4118269

PAGES 1 - 281

Page 1

A. Sure.                                    07:37:53

Q. Okay. And you do understand, Mr. Hayter,    07:37:53 that your testimony today is under oath and it's    07:37:59 subject to the penalty of perjury, right?        07:38:01

A. Yes.                                     07:38:03

Q. Okay. Is there any reason, sir, that you    07:38:04 cannot give your full and complete testimony today?  07:38:11

A. No.                                      07:38:13

Q. Okay. And just a few things, a few extra    07:38:15 things that we don't typically do but we're doing    07:38:21 because of this video setting, and that is: Can you    07:38:25 just confirm for the record that there are no other    07:38:28 individuals, including attorneys, who will be        07:38:30 physically present in the same room today while        07:38:34 you're giving your testimony?                    07:38:36

A. That is correct, no -- I am by myself.    07:38:39

Q. Okay. And except during recesses or breaks  07:38:41 that we will take in the deposition, you agree not to  07:38:44 communicate with anyone, including your attorneys, by  07:38:48 any other channel other than this video conference --  07:38:51

A. Yes.                                     07:38:54

Q. -- and --                               07:38:55

A. I read your rule requirements. I have them  07:38:58 here.                                           07:39:04

Q. I'm just -- I'm just doing -- I'm just doing  07:39:05

Page 14

this for the record, so it's in the transcript that    07:39:12 you've agreed to these things. And I think there's    07:39:14 just a few more.                                07:39:16

Actually just one more, while you are giving    07:39:18 your testimony, sir, you agree not to use any        07:39:20 technology, including a computer, a tablet, a        07:39:23 smartphone, smartwatch, anything, other than the      07:39:27 technology you're using right now to give your        07:39:31 testimony.                                      07:39:33

Do you agree with that?                    07:39:33

A. I didn't quite hear your question. Could    07:39:34 you repeat that, sir, please.                    07:39:37

Q. Sure.                                    07:39:38

While you're giving your testimony, I'm not    07:39:40 talking about a break, but while you're on the record  07:39:41 here, you agree not to use any technology, including    07:39:45 a computer, or a tablet, a smartphone, a smartwatch,  07:39:47 for any purpose other than this video that you're      07:39:51 appearing for now?                              07:39:54

A. Yes. That will be easy for me considering I  07:39:57 couldn't even get into in this morning, so the answer  07:39:59 is yes.                                         07:40:03

Q. Fair point.                              07:40:04

And have you brought any hard copy documents    07:40:06 with you that you have with you there to assist in    07:40:09

Page 15

giving your testimony at all?                    07:40:13

Are you consulting with anything?          07:40:14

A. No. I only have -- I have with me the --    07:40:17 the -- your deposition order and -- and a copy of the  07:40:21 e-mail of the rules that you just read for me.        07:40:28 That's the only documentation that I have.          07:40:31

Q. Got it.                                  07:40:35

And when you say the "deposition order," are    07:40:36 you referring to the notice of your deposition to      07:40:38 appear by deposition here today?                  07:40:41

A. Yes.                                     07:40:50

Q. And you are here in response to that notice,  07:40:50 correct?                                        07:40:52

A. I'm sorry?                               07:40:52

Q. You're here as a result of that notice, you  07:40:53 received a notice --                            07:40:54

A. Yes, yes.                                07:40:57

Q. Okay. Did you do anything to prepare for    07:40:58 today's deposition?                             07:41:00

A. No. I just worked with the technology        07:41:05 people last night to do an advance run and that was    07:41:09 it pretty much.                                 07:41:15

Q. Got it.                                  07:41:16

And when you say the "technology people,"    07:41:17 you mean the folks from Veritext who are running this  07:41:19

Page 16

deposition?                                     07:41:23

A. Yes.                                     07:41:24

Q. Did you meet with your lawyers at all by    07:41:26 phone or in person?                             07:41:29

A. I met with my lawyers, the video conference.  07:41:32

Q. And I don't want to hear about anything that  07:41:37 was discussed in your conference with your lawyers.    07:41:39 But I do, would like to know, can you tell me who you  07:41:43 met with, which of your lawyers?                  07:41:47

A. Mr. Rifkin.                              07:41:48

Q. Anyone else?                             07:41:51

A. Mr. Newman.                              07:41:53

Q. Anybody else?                            07:42:00

A. No.                                      07:42:01

Q. And when did you have the video conference    07:42:01 with them?                                      07:42:03

A. Yesterday.                               07:42:03

Q. Okay. And for about how long was the call?  07:42:04

A. I'd say 30 minutes to 45 minutes max, I'm    07:42:13 guessing.                                       07:42:17

Q. Was that the only meeting you had, telephone  07:42:19 or video or otherwise, with your lawyers to prepare    07:42:23 for this deposition?                            07:42:26

A. Pretty much so, yes. Recently. We've        07:42:29 discussed the case previously, but recently yesterday  07:42:35

Page 17

5 (Pages 14 - 17)

was it, yes.

Q. And we'll get to the other parts in a second, but as far as the deposition goes, it sounds like just yesterday for 30 minutes to 45 minutes?

A. It could have been an hour, but I'll say an hour to be safe, but in that vicinity. No longer than an hour.

Q. Thank you.

Did you review any documents as part of that?

A. No.

Q. Can you, sir -- again, without disclosing any communications with your attorneys, can you describe the nature of your involvement in the decision to file this lawsuit against Apple? Maybe I'll start with this: Was it your idea to sue Apple?

A. I'm sorry. I didn't quite hear you.

Q. Sure.

Was it your idea to sue Apple?

A. Yes.

Q. Okay. When did you make that decision?

A. Seems like half of my life ago. I believe around 2009 or '10, thereabouts. I don't recall exactly.

Page 18

Q. Okay.

A. A long time ago, it's been a long time.

Q. And can you explain why you sued -- why you wanted to sue Apple?

A. Well, I think it's unfair that -- that if I want to buy an application for any of my Apple products, I'm stuck with only having them -- I can only buy the application from them. I don't think that's fair. I don't -- I don't -- I don't think that's fair.

Q. Why don't you think that's fair?

A. Simply because I don't have the -- I don't have the ability to shop for better pricing.

Q. So are you saying, then, that if you had other places to go buy your apps on your phone or your iPad, the prices would be lower?

A. I don't know that. They could be higher. I -- I don't have the ability. I can't answer that question because there's no way to answer that question because there's no competition to see which way the pricing would make it.

Q. Sure.

But you said a minute ago that it was unfair --

A. I'll give you an example, sir. If you want

Page 19

to go buy a Chevrolet, there's more than one dealer to go buy one. I have the opportunity to shop for a better price.

If I want to buy an Apple application for my Apple products, there is nowhere else for me to go.

Q. Right. And that's what I'm getting at.

Ultimately, your belief is that you're paying too much, right? I mean, that's what's unfair.

Isn't that the issue here?

A. I believe that -- I believe that I don't have the opportunity to shop for a better, a worse, or a different price. There is nowhere else to go.

Q. Right.

But if the prices were higher, if you had multiple choices, that wouldn't benefit you at all, would it?

A. It depends -- ^ this was righttwo, ck

MR. RIFKIN: Mr. Hayter, this this is going to be a little awkward to begin with just because we're not used to being in different locations to do this, but if you wouldn't mind just pause for just a moment before you answer the questions. It will let me object.

And here I just want to object to the form

Page 20

of the question.

You can go ahead and answer it.

THE WITNESS: I forgot the question now. I'm sorry.

BY MR. SRINIVASAN:

Q. My question is: If you were given more choice but the prices were the same or higher, how would you benefit from that?

A. Well, again --

MR. RIFKIN: Objection to form.

THE WITNESS: -- I would have the opportunity to possibly get a better application for a lesser price.

I would have an opportunity to buy other applications that may not be available from the Apple store.

I would have the general abilities that consumers have to shop around for different products, different pricing, different general shopping, period.

BY MR. SRINIVASAN:

Q. Okay. We'll come back to that in a bit.

Do you know who the other named plaintiffs are in this case that joined you in this lawsuit?

A. I don't recall their names.

Page 21

6 (Pages 18 - 21)

Q. Okay. I'll just run down the names and you can let me know if you know them.

Mr. Robert Pepper, is that somebody you know?

A. When you say "somebody I know," do I recognize the name, or do I know them personally?

Q. Do you know them personally?

A. No.

Q. Mr. Eric Terrell?

A. No.

Q. Mr. Steven Schwartz?

A. No.

Q. And Mr. Edward Lawrence?

A. No.

Q. Okay. So you don't know any of the other named plaintiffs in this lawsuit personally?

A. No.

Q. Have you met any of them?

A. No.

Q. Okay. By the way, did you know that Mr. Terrell dismissed his lawsuit against Apple?

A. No.

Q. So that's news to you?

A. Right now, yes.

Q. Now, you understand that this is a -- you're

Page 22

bringing this lawsuit as a class action, correct?

A. Yes.

Q. And what's your understanding of what that means?

A. Be more definitive, please. I don't quite understand your question.

Q. Sure.

Let me ask this: Why did you bring it as a class action?

A. Because I believe that the general consumer overall is being -- being damaged by the inability of Apple to make the applications available through other means.

Q. So was it your idea, then, to bring this as a class action as opposed to an individual action on your own behalf?

A. Yes. I believe the general public was being damaged.

Q. Okay. So how -- well, okay. We'll get to that in a second.

Do you have an understanding of what your responsibilities and duties are as a class representative?

A. Yes.

Q. What do you believe those to be?

Page 23

A. To represent, to represent the class as a whole.

Q. Okay. And you produced documents in this case, correct?

A. I believe so.

Again, sir, a long time has -- has passed. Better than ten years, I believe.

Q. Okay. Well --

A. I can't remember every document I may have passed hands or what have you, is my point, because it's a long period of time.

Q. Okay. Did at some point, though, were you asked to collect documents related to this lawsuit and then provide them to your lawyers?

A. Asked by who?

Q. Anybody.

A. Anybody? My neighbor down the block? I don't understand the question.

Q. Oh, I'm sorry.

Were you asked by anybody to produce documents, to collect documents related to this case and give them to your lawyers? I presume it would have been your lawyers who asked.

A. Yeah. But I don't recall the nature of the documentation. Again, the case is -- it's been a

Page 24

long time.

Q. Okay. Do you recall producing, searching for, and providing receipts of app purchases?

A. On whose behalf? Myself, personally?

Q. Yes.

A. Yes.

Q. And when did you do that?

A. I would say within the last couple of months that request came in.

Q. Okay. And you searched for -- what did you search for -- well, let me ask: Did you search for receipts of your app purchases?

A. To the best of my ability, yeah. I -- I looked for any purchases through Apple, my Apple accounts, what have you. Some accounts I couldn't remember, I couldn't recall. I did the best that I could with that.

Q. And did you collect, attempt to look for receipts related to purchases of Apple devices themselves, the phones, the iPad that you purchased, anything else?

A. I don't recall if I looked for equipment, but I -- I own -- I've owned a lot of Apple product over the years, and I own Apple product now or we're talking on iPad, and I do currently use an iPhone, so

Page 25

7 (Pages 22 - 25)

MR. SRINIVASAN: This is the first time I've asked this question, Counsel.

MR. SIEGEL: Well, you're asking -- you keep asking him and he keeps giving you an answer you don't like, then you ask him about other consumers, which he clearly has no basis to speak about. So you're asking for speculation.

MR. SRINIVASAN: By the way, Counsel, if you give more speaking objections, I'm going to -- we'll reconvene this without -- with that not happening on the record, or off the record for that matter.

MR. SIEGEL: My second objection, and we have no agreements as to how objections should be done in this case, which we should do after this deposition.

BY MR. SRINIVASAN:

Q. Go ahead, Mr. Hayter.

My question is: Do you believe that other consumers -- you're representing consumers in this case, might have a different priority of security versus choice?

A. I believe given the choice the consumer would -- would choose choice over security because I believe that at this -- in this day and age, the consumers -- there's many ways to prevent security

Page 158

breaches, or what have you, in today's technological world.

So to answer your question --

Q. What about --

A. -- I believe that the consumers would choose choice over the questionable argument of security.

Q. What about privacy, is it important that your personal information not be shared to third parties without your consent?

A. I would say yes.

Q. And if Apple in its estimation discovers that one of the reasons to impose these restrictions on where apps can be bought is to protect, better protect consumers' private information, would you not agree that that's a justified reason to do so?

A. I would -- I would -- I would say that's more bologna is what I would say.

Q. I'm not asking you, sir, whether you believe --

A. You asked me a question -- you asked me a question. I gave you an answer. I said that's bologna.

Q. Let me finish. I'm not asking you about whether it's bologna or not. I'm asking you if it was true, not whether -- I mean, I'm not asking --

Page 159

look, assume that Apple concludes that they can better protect privacy. I'm not asking you to agree that that's true.

But if that was the case, would you agree that as a laudable goal, to prevent consumers' private information from being shared with harmful third parties, or any third party, for that matter?

A. Well, the answer is -- no. I think that's a flimsy excuse, to hold a monopoly on the iStore. The answer -- my answer would be no.

Again, I think choice over all these arguments you're making for them to be a monopoly, the consumer overall would choose choice.

Q. And I'm not going to go over this again, I'm going to move on, but I want to ask a separate question, which is: Leaving aside whether you believe Apple can protect it or not protect it, is it important for you that your personal information not be shared without your consent?

A. It's important for anybody, it's -- yes, it's important for myself, of course. That's a ridiculous question, but go ahead.

Q. Agreed.

Is it important for you that viruses should not be -- your phone should not be subject to virus

Page 160

attacks?

A. Again, it's a ridiculous question. Nobody's phone should be subject to viruses whether it's Apple, Samsung, whoever, L&G, LG. It doesn't matter.

Q. Is it important for you that other forms of malware aren't introduced to your phone?

A. Again, the same answer. It's important to anybody who owns a phone.

Q. And what about performance, is it important to you to have good, fast performance where everything works, everything works the way it should be, is that important to you?

A. Of course. If we buy a product, we want it to work.

Q. Right. Okay.

MR. SRINIVASAN: Folks, maybe we should take a break. It's now 2:20 and it's up to you, Mr. Hayter, maybe we can take a half hour lunch break. I think we probably have another hour or so.

THE WITNESS: Okay. So if you take a half an hour for lunch, you're estimating -- 'cause it's already 2:30 here in New York, New Jersey, I'm sorry, so 3:00 o'clock you think we'll be finished around 4:30-ish or something like that, 5:00?

MR. SRINIVASAN: Depending on how fast it

Page 161

41 (Pages 158 - 161)

goes. I mean, you know, this last few minutes we went pretty fast. You were answering my questions. If I'm going to get speeches, it's going to take longer.

THE WITNESS: All right.

Well, Randy, are you out there? Randy?

MR. SRINIVASAN: He's on mute, I think.

MR. NEWMAN: Yeah. Yeah. Yeah.

THE WITNESS: All right. Is that okay with you and Mark, I guess? I don't know.

MR. RIFKIN: Yeah. I just jumped back. Let's take a half an hour, and I sent around a -- yeah, a half an hour is fine.

MR. SRINIVASAN: Can we find out -- let's go off the record.

VIDEO OPERATOR: Yeah.

We are off the record at 2:23 p.m., Eastern Standard Time.

(Whereupon at the hour of 2:23 p.m., a luncheon recess was taken. The deposition was resumed at 3:12 p.m., the same persons being present.)

VIDEO OPERATOR: We are back on the record

Page 162

at 3:12 p.m., Eastern Standard Time.

BY MR. SRINIVASAN:

Q. Mr. Hayter, I wanted to come back on, on something you had said through much of the morning, and you have said repeatedly at various points in your testimony that Apple is holding, quote-unquote, a monopoly.

You agree that you've been saying that?

A. Yes.

Q. What do you mean specifically when you say they have a monopoly? What are you referring to?

A. I'm referring to that if I own an Apple product, specifically an iPhone, and I want to buy an app elsewhere, I'm not allowed, I can't, from my iPhone.

Q. Okay. That said you're not disagreeing, though, that there is -- there are a large variety of apps on the Apple App Store, right?

A. I haven't counted them. I don't think -- I'm sure they have a decent inventory, but I mean, I'm pretty sure.

Q. I mean, would it surprise you if it's in the hundreds of thousands of apps?

A. No.

Q. And you don't disagree that many of those

Page 163

apps, the vast majority of those apps, are not Apple apps, they're third parties, right, who are selling on the App Store?

A. I would assume so. I don't know what the numbers are and whatever. But I would assume so, yeah.

Q. Okay. Were there any apps on the App Store that you couldn't find or purchase?

A. I don't -- I don't recall one right at this moment.

Q. Right.

So your -- your claim that there are monopolies because they have a store of apps where there are plentiful options, plenty of non-Apple options, nothing you couldn't find --

A. No, that's your -- no, that's your claim. My claim is that if I wanted to buy an app outside of the iStore, as an iPhone order I cannot.

Q. And by the way, if that issue was remedied, meaning Apple allowed you to go elsewhere to buy an app on the iPhone, would you agree that there's no other issue left in this lawsuit, as far as you're concerned?

A. I would have to look at -- I would have to look at it more closely than over a teledeposition,

Page 164

over a video deposition, I mean.

Q. Well, I'm saying what would be left in your mind? What more would Apple need to do in your mind to address what you're complaining about in this lawsuit?

A. Well, I think that they would have to open up the ability of -- of iPhone owners, iPad owners, what have you, anyone who would want to buy an app, I think they -- they should open it up or would open it up to outside, outside vendors, I'll call them vendors, I don't know what you -- or other stores, if you will, other application stores. I don't know what the right terminology would be.

And I would also think that they would -- yeah, I think that's -- that's my main beef, yes.

The answer to your question is yes.

Q. Right.

So in other words, if they did that and they opened it up to other stores as you -- to use your terminology, you would be satisfied that their conduct that you're complaining about is -- would be remedied?

A. I believe so. And again, I would have to see what the arrangement is and what have you, but generally speaking, yes.

Page 165

42 (Pages 162 - 165)

Q. Got it. 12:15:29

Let's get to the apps themselves because you 12:15:30 have, in fact, downloaded apps and we have some 12:15:32 evidence of that. We can get into that, but do you 12:15:34 recall what the first app you downloaded was, just if 12:15:37 it has any memory to you? 12:15:40

A. I don't mean to laugh at your question, but 12:15:48 absolutely I -- no. The answer is no. 12:15:50

Q. Got it. I understand. 12:15:52

And do you keep any records of the apps you 12:15:53 downloaded? I mean, other than going to log on to 12:15:55 your account, do you separately keep track of that in 12:15:57 any way? 12:16:01

A. A log or something of that nature? Is that 12:16:04 what you're referring to? 12:16:06

Q. Yeah. Anything, any way that you would, you 12:16:07 know, keep track of what apps you have loaded on to 12:16:09 your various Apple devices over the last eight years? 12:16:12

A. No. Just the normal billing statements or 12:16:16 credit card -- or if I looked or whatever, I guess. 12:16:22 I -- no. The answer is no. 12:16:29

Q. And how frequently do you visit the App 12:16:34 Store in your experience? 12:16:37

A. I don't know. I really don't have an -- I 12:16:46 don't have an idea. 12:16:48

Page 166

Q. Let me ask you this: Do you go to the App 12:16:49 Store usually to specifically download something, 12:16:52 like you already have it in your mind, I want to go 12:16:53 get this or will you go to the App Store and browse 12:16:56 around? 12:16:59

A. It depends. It depends. If I'm looking for 12:17:03 something, I would browse. If I have something in my 12:17:05 mind, I would specifically look for it. I -- it 12:17:08 might be an app that I had or have that there's a new 12:17:11 version and you have to upgrade to download it or 12:17:17 whatever. 12:17:20

I mean, I don't have -- I don't have any set 12:17:20 pattern to -- when I go to the App Store, what have 12:17:23 you. 12:17:27

Q. And since you found out about apps like from 12:17:27 the internet, you're browsing somewhere and there's 12:17:30 some article or some service that attracts you and 12:17:33 you say, oh, I can get this app, is that something 12:17:36 you do? 12:17:44

A. I'm not quite sure of the question. 12:17:45

Q. Sure. 12:17:49

Let me give you an example. I don't know if 12:17:49 you're a sports fan, but you for instance, sometimes 12:17:51 go to espn.com, there might be something on the 12:17:53 website that says, you know, click our app and get 12:17:56

Page 167

our app, and then you click on it and then it takes 12:17:59 you to the App Store. 12:18:01

Have you done that? 12:18:03

A. I'm pretty sure I did it one time or 12:18:03 another. 12:18:08

Q. Yeah. I mean, you've done it where you are 12:18:09 visiting a page or you're visiting something and it 12:18:10 has a little button on the bottom that says click on 12:18:13 that. 12:18:16

Have you done that? 12:18:16

A. I don't -- I don't recall a specific 12:18:17 occasion, but I would have to say I'm pretty sure 12:18:19 yes. 12:18:21

Q. I mean, you're aware of that, right? I 12:18:22 mean, you're aware of you go on -- 12:18:24

A. Yeah. There -- there are banner ads and 12:18:26 things of that nature to drive traffic to wherever to 12:18:29 sell their apps. It's a business. 12:18:32

Q. Sure. 12:18:35

What I mean is, is the business is not by 12:18:36 Apple. These are folks that are the third parties, 12:18:38 right, whether it's ESPN or GQ or whoever, you're on 12:18:41 their website and they can direct you to the App 12:18:46 Store, right? 12:18:48

A. I don't know. I don't know who's providing 12:18:51

Page 168

the ad. I don't know. There's so much stuff on the 12:18:52 internet. It could a Google ad space. It could 12:18:56 be -- it could a third party. Who knows? I don't 12:18:59 know. I have no idea. I don't know. 12:19:06

Q. I guess what I'm saying, sir, is maybe I 12:19:07 don't want to complicate this too much, I'm saying 12:19:10 you can find out about apps on the App Store without 12:19:12 actually being in the App Store, right? 12:19:15

A. And I'm saying like I just told you before, 12:19:19 I've been on sites where there's a banner and you 12:19:24 click it and it clicks through. Whose banner it is, 12:19:27 is it a Google app space? Is it this? Is this that? 12:19:30 I don't know. I don't know. 12:19:35

But to answer your initial question, have I 12:19:36 ever been on a page like ESPN and clicked on a link 12:19:38 or a banner or whatever that brought me to an App 12:19:41 Store? Yes. I don't remember a specific occasion, 12:19:45 but I'm sure I have, yeah. The answer is yes. 12:19:46

Q. And you've seen it, I'm just saying whether 12:19:52 you've clicked on it or not, you've seen those 12:19:55 buttons that you can click to get to the App Store 12:19:56 all over on the internet, right? 12:20:00

A. I don't know about all over the place, but 12:20:02 I've seen them, yes. 12:20:04

Q. Now, how did you typically, then, download 12:20:05

Page 169

43 (Pages 166 - 169)