# EXHIBIT 59

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE: APPLE iPHONE

ANTITRUST LITIGATION,

Case No. 4:11-cv-06714

YGR

The Video Recorded Deposition of

Professor Alex Halderman,

Taken at 24 Frank Lloyd Wright Drive, Suite L-4110,

Ann Arbor, Michigan,

Commencing at 9:46 a.m.,

Monday, June 23, 2025,

Before Leisa M. Pastor, CSR-3500, RPR, CRR.

Veritext Job #7436368

Page 134

Q.  Sure.  And in paragraph 26 of your original report, that's the next paragraph I want to look at, you wrote, "Certain categories of illicit or objectionable apps create additional security concerns because they tend to be associated with malware distribution and other forms of online crime"; you wrote that, right?

A.  Yes.

Q.  And you chose to use the word additional because you mean separate and apart from whatever issues the content itself may raise that may be a security consideration, the tendency to be associated with malware or other online crime is also a problem, fair to say?

A.  Yes, for instance, in the eating disorder category, right, it may still be adversarial but not criminal to promote eating disorders, right.  That's adverse to the user's interest without being necessarily a crime.

Whereas content -- there may be content that's objectionable but legal and yet contains malware, and that would be creating both -- that would be creating this additional -- that would be this additional category of security concern that I'm saying here.  There could be multiple concerns about a single app under these different categories of harm.

Q.  Okay.  Does Apple catalog anywhere the genres or kinds

Page 135

of content that it has found to be associated with malware and online crime?

A.  I'm trying to recall whether there is a specific -- if I can point you to a specific document that -- or report that highlights that.  I'm not sure whether Apple has catalogued that or not.

But in the case of some of the most prominent kinds of problematic and objectionable content -- pornographic content, illicit gambling -- those are well documented by third-party studies to be associated with heightened -- heightened levels of malicious activity of pirated content, for instance.

Q.  Okay.  So if I were looking to assemble a list of those kinds of content that were widely associated with malware and online crime, where would I go for that list?

A.  Well, I would recommend that you start with the categories that you were considering and then see what the research literature says about whether they're associated with a higher level of malicious activity.  That's what I've done for my report.

Q.  Okay.

A.  Because we're starting with the categories of which ones are malicious, which ones are in other categories, but some of the prominent ones, especially

Page 136

pornographic content, just for multiple reasons, is associated with heightened security risks on top of potentially being objectionable for other reasons.

Q.  Okay.  So I think we would agree that content that promotes disordered eating is a good example of material that promotes self-harm, and, therefore, falls within what you've described in paragraph 25 of your report.  Is it also a genre of content that is associated with malware distribution or other forms of online crime as you described at paragraph 26 of your original report?

A.  I'm not sure that I've seen that categorized in itself as associated with malicious software distribution.  That's a category where the harm that the app is causing is more a direct harm to the user through the nature of what the app does and its content rather than through it potentially being used as a vector for malware.

Q.  Okay.

A.  But these are -- these are both reasons in different cases why apps that are -- I think one is a safety question, and the other is a category of objectionable content.

Q.  Okay.  So in addition to promoting disordered eating, would you agree with me that promoting dangerous

Page 137

driving would be a kind of content that under your paragraph 25, Apple could seek to exclude?

MR. LO:  Vague.

THE WITNESS:  It depends on -- it depends on what you mean by promoting -- by promoting dangerous driving, but -- for instance, and -- and I -- I can easily imagine an app that promoted drinking and driving as being one that would fall under this prohibition.

BY MR. BURT:

Q.  And would Apple exclude an app that promotes drinking and driving?

A.  I -- I am turning to the guidelines.  Let me... let me review this for a second.

Yes, there's a specific guideline, 1.4.4, that apps should never encourage drunk driving.

Q.  Okay.  How about reckless driving?

MR. LO:  Vague.

THE WITNESS:  I'm not sure quite what you mean, but I think it probably depends on the circumstances and how -- what does it -- what does it mean for the app to promote reckless driving?  How direct is the connection and so forth?

BY MR. BURT:

Q.  Okay.  So how does Apple determine, based on the

35 (Pages 134 - 137)

Page 138

review of Apple's policies, internal discussions, threat modeling thinking, etcetera, that you've done during the course of this engagement, whether an app directly enough promotes dangerous driving to be excluded as behavior that promotes self-harm?

A.   Well, this is where the human judgment involving -- involved in the app review process is so important, and so Apple has a process whereby reviewers flag potential issues, and if they are ones that are particularly subjective or need further research or -- or decision-making can be escalated for further review even up to the -- I think it's the executive review board, or ERB that Apple calls it, that ultimately consists of higher level Apple managers or executives who -- who review it and make a call.

     And as a result of some of those tough cases, right, the guidelines have been a product of having to make difficult calls calling for judgment and consideration of facts, and sometimes new guidelines have been added in the past as a basis of these difficult situations.

     But like this is the complexity of -- at the scale of iOS, managing an ecosystem of millions of apps that are frequently presenting new kinds of situations that are calling for complex human

Page 139

judgment, that's -- I think answering your question, how does Apple make that determination, well, this is the nature of the process.  They have an engineered process in place to try to make determinations up or down even in novel and difficult cases.

Q.   Why does Apple record its thinking about new app review guidelines in a document?

A.   Pardon me?

Q.   Why does Apple record its thinking about app review guidelines in a document?

     MR. LO:  Assumes facts.

     THE WITNESS:  Its thinking?  I'm not sure which document you...

BY MR. BURT:

Q.   The app review guidelines, it's been updated, right?

A.   What do you mean why does it -- does it record its thinking?  I just don't understand your question.

Q.   The app review guideline is -- the Apple review guidelines are a collection of descriptions of kinds of material that are not permitted on the App Store, right?

     MR. LO:  Vague.

     THE WITNESS:  No, the app review guidelines are directions for developers about how Apple will -- what apps are allowed and prohibited from doing what

Page 140

Apple will -- deems acceptable or not within the iOS ecosystem.

BY MR. BURT:

Q.   Okay.  Does -- Apple has human reviewers that review the content of apps; is that true?

A.   Yes.

Q.   And then they sometimes elevate what you call judgment calls to the ERB; is that right?

A.   Yes, it's situationally dependent.  If it's a difficult case, if it calls for further technical investigation, the app reviewer can -- can call for further help to understand the problem, and if it's a case that falls into certain categories or has certain risk or novelty, then those typically can go to the ERB.

Q.   And do they memorialize their decisions in any form?

A.   I have seen -- I have seen presentations from ERB meetings that indicate the material under consideration and then you can tell whether the app was accepted or not.  There may be other documents that I don't recall that memorialize the decisions.

Q.   Why do they memorialize their decisions?

     MR. LO:  Assumes facts, vague.

     THE WITNESS:  The -- ultimately the app has been rejected or not, and so that's a public fact, but

Page 141

I think app review -- app review in general operates based on wanting to treat developers consistently.  I understand that if a decision has been made in one case, then that can inform similar cases in the future, what was their reasoning, how did they interpret the guidelines.

BY MR. BURT:

Q.   Okay.  Do -- withdrawn.

     How many app reviewers does Apple employ as of the time you signed your rebuttal report?

A.   I understand it's about 500 --

Q.   Okay.

A.   -- people on the app review team.

Q.   Do they get any written materials that guide the determinations they make?

A.   I have seen documents related to -- to training that app review uses, maybe -- I have seen -- I have seen written documents that are internal app review, not instructions exactly, but further information for -- to guide some of the testing and decision-making.  I'm not sure how current.

Q.   As part of their performance evaluation process, are the reviewers' decisions ever compared to the written guidance that they're working from?

A.   Compared to the written guidance?  I'm not sure

36 (Pages 138 - 141)

Page 138

review of Apple's policies, internal discussions, threat modeling thinking, etcetera, that you've done during the course of this engagement, whether an app directly enough promotes dangerous driving to be excluded as behavior that promotes self-harm?

A. Well, this is where the human judgment involving -- involved in the app review process is so important, and so Apple has a process whereby reviewers flag potential issues, and if they are ones that are particularly subjective or need further research or -- or decision-making can be escalated for further review even up to the -- I think it's the executive review board, or ERB that Apple calls it, that ultimately consists of higher level Apple managers or executives who -- who review it and make a call.

And as a result of some of those tough cases, right, the guidelines have been a product of having to make difficult calls calling for judgment and consideration of facts, and sometimes new guidelines have been added in the past as a basis of these difficult situations.

But like this is the complexity of -- at the scale of iOS, managing an ecosystem of millions of apps that are frequently presenting new kinds of situations that are calling for complex human

Page 139

judgment, that's -- I think answering your question, how does Apple make that determination, well, this is the nature of the process. They have an engineered process in place to try to make determinations up or down even in novel and difficult cases.

Q. Why does Apple record its thinking about new app review guidelines in a document?

A. Pardon me?

Q. Why does Apple record its thinking about app review guidelines in a document?

MR. LO: Assumes facts.

THE WITNESS: Its thinking? I'm not sure which document you...

BY MR. BURT:

Q. The app review guidelines, it's been updated, right?

A. What do you mean why does it -- does it record its thinking? I just don't understand your question.

Q. The app review guideline is -- the Apple review guidelines are a collection of descriptions of kinds of material that are not permitted on the App Store, right?

MR. LO: Vague.

THE WITNESS: No, the app review guidelines are directions for developers about how Apple will -- what apps are allowed and prohibited from doing what

Page 140

Apple will -- deems acceptable or not within the iOS ecosystem.

BY MR. BURT:

Q. Okay. Does -- Apple has human reviewers that review the content of apps; is that true?

A. Yes.

Q. And then they sometimes elevate what you call judgment calls to the ERB; is that right?

A. Yes, it's situationally dependent. If it's a difficult case, if it calls for further technical investigation, the app reviewer can -- can call for further help to understand the problem, and if it's a case that falls into certain categories or has certain risk or novelty, then those typically can go to the ERB.

Q. And do they memorialize their decisions in any form?

A. I have seen -- I have seen presentations from ERB meetings that indicate the material under consideration and then you can tell whether the app was accepted or not. There may be other documents that I don't recall that memorialize the decisions.

Q. Why do they memorialize their decisions?

MR. LO: Assumes facts, vague.

THE WITNESS: The -- ultimately the app has been rejected or not, and so that's a public fact, but

Page 141

I think app review -- app review in general operates based on wanting to treat developers consistently. I understand that if a decision has been made in one case, then that can inform similar cases in the future, what was their reasoning, how did they interpret the guidelines.

BY MR. BURT:

Q. Okay. Do -- withdrawn.

How many app reviewers does Apple employ as of the time you signed your rebuttal report?

A. I understand it's about 500 --

Q. Okay.

A. -- people on the app review team.

Q. Do they get any written materials that guide the determinations they make?

A. I have seen documents related to -- to training that app review uses, maybe -- I have seen -- I have seen written documents that are internal app review, not instructions exactly, but further information for -- to guide some of the testing and decision-making. I'm not sure how current.

Q. As part of their performance evaluation process, are the reviewers' decisions ever compared to the written guidance that they're working from?

A. Compared to the written guidance? I'm not sure

36 (Pages 138 - 141)

Page 214

Yes, thank you. That refreshes my recollection of where I had seen this quote. I have reviewed this document.

Q. Okay.

MR. BURT: And I'm going to mark a document that bears the Bates No. Apple App Store 03232618, and that will be 969.

MARKED FOR IDENTIFICATION:
EXHIBIT 969
6:50 p.m.

BY MR. BURT:

Q. This is an email from Philip Shoemaker to Phil Schiller dated the 8th of July 2010, and you can take the time you need to review this. My first question to you will be did you review this document in the preparation of either of your reports.

A. All right. Thank you. I'm finished reviewing this, and yes, I did review it in the preparation of my reports. In fact, I discuss it at some length in paragraph 74 of my rebuttal.

Q. Okay. Is privacy part of the threat modeling process?

A. What do you mean?

Q. When one threat models, does one include privacy in one's threat modeling process?

A. Threats to privacy? Sure. It could be something that

Page 215

was incorporated into a consideration of threats.

Q. Okay.

MR. BURT: I think at this time, I have no further questions subject to reserving the balance of my time for any necessary recross.

MR. LO: No questions from me.

MR. BURT: Then we're done.

VIDEO TECHNICIAN: This completes the deposition of Professor Alex Halderman. Off the record at 6:55.

(The deposition was concluded at 6:55 p.m.
Signature of the witness was not requested
by counsel for the respective parties
hereto.)

Page 216

CERTIFICATE OF NOTARY

STATE OF MICHIGAN)
            ) SS
COUNTY OF MONROE )

I, LEISA PASTOR, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

LEISA PASTOR, CSR-3500, CRR,
Notary Public,
Monroe County, Michigan
My Commission expires: 9/7/27

55 (Pages 214 - 216)