# EXHIBIT 70

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

)

In re Apple iPhone            ) No. 4:11-cv-06714-YGR

Antitrust Litigation          )

)

_____

_____

VIDEO-RECORDED DEPOSITION

UPON ORAL EXAMINATION OF

TADAYOSHI KOHNO, PH.D.

(ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL)

_____

JUNE 25, 2025

9:12 A.M. PST

VERITEXT - SEATTLE, WA

1200 SIXTH AVENUE SUITE 610

SEATTLE, WA 98101

JOB NO. 7436293

REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322

Page 1

content should be permitted in the App Store.    01:28

Q. And in your personal view, apps with -- well,    01:28 is it correct that you don't believe apps with    01:28 pornographic content can facilitate human harm?    01:28

MR. BURT: Objection to form.    01:28

THE WITNESS: One of the things to --    01:28 sorry.    01:28

Could you ask me the question again?    01:28

BY MR. LO:    01:28

Q. Sure. Let me just ask it in an open-ended    01:28 way.    01:28

From a security perspective, why is it that    01:28 you believe that it is okay to have pornographic    01:28 content in the App Store?    01:28

A. One of the things to focus in on is, what is    01:29 the definition of "pornography"? And in this -- in    01:29 answering that question, I was focusing on whether    01:29 pornographic apps should be in the App Store or not.    01:29

Many -- within the literature focusing on sex    01:29 work and pornography and digital intimacy more broadly,    01:29 pornography is scoped to consensual sharing of intimate    01:29 images.    01:29

So in the scope of pornography as interpreted,    01:29 in interpreting pornography to be within the scope of    01:29 consensually created and consumed digital content, that    01:29

Page 134

is done with consent and I believe should -- should be    01:29 able to be included in the App Store.    01:29

Q. Do you believe that apps that facilitate    01:29 prostitution should be permitted in the App Store?    01:29

MR. BURT: Objection. Form.    01:30

THE WITNESS: I don't -- I feel like in    01:30 that context, I would like to familiarize myself with    01:30 the legality of prostitution in various jurisdictions.    01:30 And so I don't know if I'm in a position right now to    01:30 answer that question.    01:30

BY MR. LO:    01:30

Q. I assume prostitution is illegal in the state    01:30 of Washington, correct?    01:30

A. I would presume so also.    01:30

Q. Okay. In that context, would you believe that    01:30 apps that facilitate prostitution in the state of    01:30 Washington should or should not be permitted on the App    01:30 Store?    01:30

A. I don't think I've studied that question    01:30 enough to have an opinion yet. So I don't offer an    01:30 opinion.    01:30

Q. You don't have a personal view one way or the    01:30 other?    01:30

MR. BURT: Objection. Asked and    01:30 answered.    01:30

Page 135

THE WITNESS: Not yet.    01:30

BY MR. LO:    01:30

Q. Let's take a look at your opening report,    01:30 Paragraph 14. Paragraph 14 discusses Apple's control    01:31 of the marketplace for app sales and payment for in-app    01:31 digital content.    01:31

Do you see that?    01:31

A. I do.    01:31

Q. Okay. Let's take that one at a time.    01:31

When you're referring to Apple's control of    01:32 the marketplace for app sales, are you generally    01:32 referring to what I think both you and    01:32 Professor Halderman describe as centralized    01:32 distribution of apps in iOS?    01:32

A. I guess, at this point, Apple controls both    01:32 the review process and the distribution process. And    01:32 actually, I'm going to add to that, the monitoring    01:32 process. And when I'm talking about control of the    01:32 marketplace, I was referring to the control that Apple    01:32 currently has.    01:32

Does that answer your question?    01:32

Q. I think it does.    01:32

So you're referring to these controls    01:32 collectively, meaning, the review process, the    01:32 distribution process, and the monitoring process,    01:33

Page 136

correct?    01:33

A. Correct.    01:33

Q. Okay. And what do you mean by "the monitoring    01:33 process"?    01:33

A. Although Professor Halderman -- in my memory    01:33 of what Professor Halderman wrote about the centralized    01:33 distribution, he talked about one of the values of    01:33 centralized distribution being Apple's ability to    01:33 monitor reviews and, for example, remove apps that have    01:33 been identified post facto to have security concerns.    01:33

I distinguished it in my answer because it is    01:33 possible for the distribution mechanism and the    01:33 monitoring mechanism to be separate processes.    01:33

Q. I take it, it is your opinion that Apple has    01:33 not demonstrated -- well, let me ask you a separate    01:34 question.    01:34

Are you forming an opinion that the app review    01:34 process has zero contribution to security?    01:34

A. I do not believe I've -- no, I'm not forming    01:34 that opinion.    01:34

Q. Are you forming the opinion that Apple's    01:34 distribution, meaning the centralized distribution, has    01:34 zero contribution to security?    01:34

A. Keeping in mind that distribution can mean    01:34 both the act of distribution and the monitoring    01:34

Page 137

35 (Pages 134 - 137)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

thereafter, I am not saying it has zero contribution.  01:34

Q. I'm trying to take those apart as you have.  01:34

A. Okay. I see.  01:34

Q. So let's start with -- well, let's go to the  01:34 monitoring and then I'll come back to distribution.  01:34

Do you offer the affirmative opinion that  01:34 Apple's monitoring of apps after they have been  01:35 distributed has zero contribution to security?  01:35

A. No, I'm not offering that opinion.  01:35

Q. Are you offering the opinion that Apple's  01:35 current control of distribution of apps has zero  01:35 contribution to security?  01:35

A. No, I'm not offering that opinion.  01:35

Q. The review process -- well, you -- you make a  01:35 distinction in some of your opinions about on-device  01:35 security measures and the app review process.  01:35

Do you recall that, sir?  01:36

A. I do.  01:36

Q. Okay. And I think you talk about some of that  01:36 in the context of defense and depth and layering,  01:36 correct?  01:36

A. I suspect I do talk about in the context of  01:36 layering.  01:36

Q. Okay. Do you -- are you offering the  01:36 affirmative -- let me take a step back.  01:36

Page 138

Do you believe that the app review process  01:36 contributes to security?  01:36

A. I think I answered that, but just in case,  01:36 yes.  01:36

Q. Okay. And you believe that the distribution  01:36 and the monitoring by Apple also contribute to  01:36 security, correct?  01:36

A. Correct.  01:36

Q. Okay. With respect to the review process, do  01:36 you offer the opinion that any aspect of security  01:36 offered by that review process would be also fulfilled  01:37 by on-device protections, that there is complete  01:37 overlap? Is that an opinion you offer?  01:37

A. One of the reasons I wrote so much about  01:37 threat modeling was, in order to make a statement about  01:37 whether something is provided by one layer that is also  01:37 provided by another layer, it is a function of what we  01:37 have defined security to actually be and, hence, the  01:37 threat model.  01:37

So, that said, speaking of -- that said, part  01:37 of my answer to your question is that, in the absence  01:37 of a threat model, I don't think I can make that  01:37 statement.  01:37

At the same time, I have seen some things that  01:37 some people might define as security, some people might  01:37

Page 139

not define as security, for example, that app review  01:37 would detect but might not be present on on-device  01:38 protections.  01:38

Q. Would an example of that be, for example,  01:38 social engineering attacks?  01:38

A. I believe so, correct. Yes.  01:38

Q. So social engineering attack would be an  01:38 example that, if one considered it a threat, that app  01:38 review provides some measure of security protection,  01:38 but that on-device may not, agree?  01:38

A. Correct.  01:38

Q. Anything else that you can think of that would  01:38 fit in the category where app review might provide some  01:38 measure of protection, but on-device do not?  01:38

A. For example, to the degree that Apple does  01:38 define human trafficking as within their threat  01:38 model -- again, I don't have the threat model, so we  01:38 don't know for sure -- but to the degree Apple does  01:38 define human trafficking as something to address within  01:38 their threat model, then that would be another example.  01:38

Q. And if Apple were to define physical harm to  01:38 users as a security threat, would that be an example of  01:38 something that app review protects against but  01:39 on-device protections might not?  01:39

A. Focusing on the words "might not," yes, that  01:39

Page 140

is correct.  01:39

Q. You said earlier that Apple's distribution  01:39 contributes at least somewhat to security.  01:39

What did you have in mind when you said that?  01:39

A. I answered your question of whether do I think  01:39 that it provides zero. I don't think I said that I  01:39 thought it provided something.  01:39

In this particular context, are we separating  01:39 distribution from monitoring or thinking about  01:39 centralized distribution including the monitoring  01:39 process?  01:39

BY MR. LO:  01:39

Q. I'm going to try to take it separately, if you  01:39 are able to make that distinction. If you can only  01:39 consider them together in tandem, then, we can consider  01:39 them together in tandem.  01:39

A. For now, let's start by considering them  01:40 together in tandem because that is how it is  01:40 implemented in the Apple system.  01:40

And one of the measures to improve security  01:40 offered by the present system is the removal of apps  01:40 that do make it through the App Store but actually do  01:40 create security concerns or -- yeah.  01:40

Q. Anything else that you can think of?  01:40

A. I know Professor Halderman talked about how  01:40

Page 141

36 (Pages 138 - 141)

centralized distribution can be a valuable mechanism    01:40
for issuing software updates to vulnerable --    01:40
(Reporter admonition.)    01:40
THE WITNESS:  I hope it's okay if I    01:40
start over, because --    01:40
(Reporter admonition.)    01:40
THE WITNESS:  Could you repeat the    01:40
question?  Oh, wait, no, I think I remember the    01:40
question.  Yeah.    01:40
I know Professor Halderman talked about    01:40
centralized distribution providing value with respect    01:41
to issuing software updates for apps that they    01:41
themselves have vulnerabilities issues.    01:41
I agree that there is potential value to    01:41
centralized distribution for issuing software updates,    01:41
but as I wrote in my rebuttal report, I have seen    01:41
evidence that Apple's centralized distribution    01:41
mechanism actually does not embody the advantages    01:41
Professor Halderman mentioned but, rather, can actually    01:41
serve as the bottleneck.    01:41

BY MR. LO:    01:41

Q.  Are there any other instances in which you    01:41
agree that the combination of centralized distribution    01:41
and post distribution monitoring can contribute some    01:41
measure to security?    01:41

Page 142

A.  Off the top of my head, I don't recall more.    01:41
But if you have specific examples of things that    01:42
centralized distribution and monitoring does, I'm happy    01:42
to reflect on each of those.    01:42

MR. LO:  Why don't we take a break.    01:42

THE WITNESS:  Okay.    01:42

THE VIDEOGRAPHER:  We are going off the    01:42
record at 1:42.    01:42

(Recess taken 1:42 p.m. to 2:00 p.m.)    01:59

THE VIDEOGRAPHER:  We are back on the    01:59
record the time is two o'clock, please proceed.    01:59

BY MR. LO:    02:00

Q.  Let's take a look at your rebuttal report,    02:00
Paragraph 14.    02:00

A.  Okay.    02:00

Q.  And there is the first sentence talks about    02:00
applications with potentially offensive content or    02:00
content that can lead to manipulation or abuse of    02:00
users.    02:00

Do you see that, sir?    02:00

A.  Yes.    02:00

Q.  Let's just focus on the first part the    02:00
offensive content?    02:00

A.  Okay.    02:00

Q.  What's your understanding of what might fit    02:00

Page 143

that definition?    02:00

MR. BURT:  Objection to form.    02:00

THE WITNESS:  I would probably want to    02:00
refer to Professor Halderman's report to be sure I    02:01
capture this accurately.  But for example, I believe    02:01
this includes things like pornography.    02:01

BY MR. LO:    02:01

Q.  The next sentence says, "Apple has not and has    02:01
not systematically attempted to exclude from the    02:01
store -- App Store -- applications that meet this    02:01
definition.    02:01

Do you see that?    02:01

A.  I do see that.    02:01

Q.  And so the "has not" in the first part of that    02:01
sentence, you're saying that occasionally or more than    02:01
occasionally maybe in your view, some apps with    02:01
offensive content end up in the store.    02:01

Is that why you put that sentence there?    02:01

MR. BURT:  Objection to form.    02:01

THE WITNESS:  I mean, the first sentence    02:01
is -- has the word "offensive content," but the first    02:01
sentence also has or content that can lead to    02:01
manipulation or abuse of users.    02:02

In writing this paragraph, when I said that    02:02
Apple has not systematically attempted to exclude from    02:02

Page 144

the App Store applications that meet this definition, I    02:02
was -- I wrote with respect to that first sentence,    02:02
which included both offensive content and content that    02:02
can lead to manipulation of -- or abuse of users.    02:02

BY MR. LO:    02:02

Q.  Okay, well, let me try to take them one at a    02:02
time.    02:02

With respect to offensive content, has Apple,    02:02
in fact, excluded from the App Store applications that    02:02
meet this definition?    02:02

Has that ever occurred?    02:02

MR. BURT:  Objection.  Form.  Compound.    02:02

THE WITNESS:  It would help me if you    02:02
had a printed copy of the app review guidelines that    02:02
talks about offensive content so that I can make sure    02:02
to reference that as I answer your question.    02:02

BY MR. LO:    02:03

Q.  Okay.  So -- well, am I understanding your    02:03
statement here correctly that you intend to offer the    02:03
opinion that Apple has not excluded from the App Store    02:03
applications that include offensive content?    02:03

Am I understanding the sentence correctly?  Is    02:03
that your intent?    02:03

MR. BURT:  Objection to form.  Vague and    02:03
compound.    02:03

Page 145

37 (Pages 142 - 145)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

trafficking and so on. I now forget the exact paragraph number, but the reason that I included it in my report was not to offer my personal opinion on whether those apps should or should not be included in the App Store.

Rather, I included that discussion because Professor Halderman talks about those types of apps as being important to exclude from a security perspective, and hence, one can infer that exclusion of those types of apps are under Professor Halderman's threat model.

And so my goal of articulating this was to -- I'm pointing to "this," but I don't remember what page it is. My role in including that -- the purpose for me to include that in my report was, one, to reflect upon Professor Halderman's definition of security, and two, to assess whether -- to discuss whether Apple consistently applied the definition of security that Professor Halderman articulated.

And I guess there were several elements of this. One is, as I had observed in the report, Professor Halderman's definition seems to be constructed retroactively, based on the guidelines or at least my memory of his discussion cited heavily the guidelines themselves; and second, to the degree that Apple did, in fact, have those as mitigating human

Page 202

trafficking apps and so on as security objectives to discuss the inconsistent application of those, at least from a security perspective, though, again, we talked about there being business reasons, et cetera.

BY MR. LO:

Q. Professor, in the discussion earlier today of considerations of alternate possible security universes, did you only think about situations in which a new store enters now, or did you consider other possibilities?

A. I certainly considered the possibility of a new store having entered much earlier -- much earlier, perhaps even when the apps are launched.

MR. BURT: No further questions.

MR. LO: Nothing more.

THE VIDEOGRAPHER: Thank you. This concludes today's testimony of Tadayoshi Kohno. The total number of media units used was five and will be retained by Veritext. We are going off the record at 4:09.

(Signature reserved.)

(Deposition concluded at 4:09 p.m.)

Page 203

REPORTER'S CERTIFICATE

I, JUDY BONICELLI, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein;

That any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability;

That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript;

That I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause;

That a review was requested.

WITNESS MY HAND and DIGITAL SIGNATURE this: 6/2

*Judy Bonicelli*

JUDY BONICELLI, RPR, CSR
Washington Certified Court Reporter, CCR 2322

Page 204

In Re Apple Iphone Antitrust Litigation  v.
Tadayoshi Khono, Ph.D. (#7436293)

ACKNOWLEDGMENT OF DEPONENT

I, Tadayoshi Khono, Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Tadayoshi Khono, Ph.D. Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

Page 205

52 (Pages 202 - 205)