# EXHIBIT 71

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

)
In re Apple iPhone                ) No. 4:11-cv-06714-YGR
Antitrust Litigation              )
                                  )
_____

_____

VIDEO-RECORDED DEPOSITION

UPON ORAL EXAMINATION OF

TADAYOSHI KOHNO, PH.D.

(ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL)

_____

JUNE 25, 2025

9:12 A.M. PST

VERITEXT - SEATTLE, WA

1200 SIXTH AVENUE SUITE 610

SEATTLE, WA 98101

JOB NO. 7436293

REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322

Page 1

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

provide greater security protection," what threat model, if any, are you using to evaluate that statement?

A. Well, that's -- sorry. I spoke too quickly. That statement was written in the context of Professor Halderman's discussion of security of game consoles. If you have his report, I can refer to exactly what he wrote, but one of the things that he wrote in the context of the game consoles was a description of a rigorous process to achieve some security objective, among which one of the consequences was that, unlike what -- the Apple App Store where apps are approved and then removed later, there was an absence of evidence of apps for these game consoles being later removed, suggesting that the app review process was more rigorous from the start.

So in the context of this particular paragraph, I was not opining on a specific threat model so much as having observed, as Professor Halderman does, that the process used by the game console manufacturers were more rigorous, resulting -- thereby resulting in them, unlike Apple, not having the practice of removing apps after being approved.

Q. Take a look at your opening report, paragraph 215.

Page 170

A. Okay.

Q. I'm going to focus on the header, but obviously you're free to look at any portion of your report you need to to answer the question. The header leading to paragraph 215 states that "The app review process has significant performance pressures and limited human resources that reduced Apple's ability to thoroughly evaluate apps."

Do you see that?

A. I do.

Q. Okay, would you agree -- let's take this apart. The significant performance pressures, what is an example of that that you've found in your work?

A. I believe I quote some -- I definitely quote a number of emails. Trying to remember which came from which email, but there were definitely emails about the need to review apps more quickly and/or hire more people so that they could review apps more quickly.

There was one document that I saw talking about -- I'm going to get the numbers wrong but talking about every 30 seconds more an app review costs Apple millions of dollars or something like that.

Again, numbers are incorrect, just the general sentiment I remember seeing. I remember seeing emails from people who worked on app review talking about

Page 171

extensive amounts of overtime they needed to spend as an indicator of the need for them to spend overtime.

Even saw one email that someone within Apple said -- something that could be interpreted as app review being a sweat shop. I saw more than that, and if you want, I can try to go find individual statements, but it was these types of documents that led me to that conclusion.

Q. Okay. When you are talking about the alternate world in which there are alternates stores, I take it that you are assuming that the alternate stores are private enterprises, meaning that they're not governmentally funded, correct? Or are you?

A. I don't know if I made that assumption.

Q. Okay. Let's talk about in the alternate world where the alternate stores -- or the alternate stores that are privately funded, meaning they are profit-seeking enterprises. Do you have that in mind?

A. Profit-seeking enterprises, yes.

Q. Okay. Would you agree that any such privately-owned alternate app store would also have performance pressures and limited human resources?

MR. BURT: Objection. Incomplete hypothetical.

THE WITNESS: I don't think that all

Page 172

such alternate app stores would have those limitations.

BY MR. LO:

Q. Well, let's take those one at a time. Would any alternate app store that is privately funded have limited human resources?

MR. BURT: Objection. Form.

THE WITNESS: Can I ask for an interpretation of the word "any" in that sentence? Meaning, are you saying any of them, or there is one?

BY MR. LO:

Q. Well, fair enough. Let me rephrase the question.

Any alternate app store, all of them, that are privately funded would at some point face limited resource, correct? Money is not --

MR. BURT: Objection.

THE WITNESS: So I'm having a hard time understanding the sentence. So maybe I will state an observation. I see no reason to believe that an alternate app store could not have sufficient human resources.

BY MR. LO:

Q. And in making that statement, have you considered what human resources would be required for the alternate app store to offer superior security to

Page 173

44 (Pages 170 - 173)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

the iOS App Store?    02:52

A.  If I understand your question correctly -- and I apologize if I'm mischaracterizing it -- there seems to be a presumption that the alternate app store would be somehow equivalent to the Apple App Store in terms of size and the number of apps they need to review.

I don't think that necessarily needs to be an assumption.  For example, one could envision an alternate app store specifically focused on some sort of parental type of technologies or an alternate app store specifically focused on retro games or other types of things.

For these alternate app stores, the number of apps that they reviewed, they're very highly specialized, and as such, I don't see any reason to believe that these alternate app stores would not have sufficient human resources.

Q.  In the alternate world, do you assume that Apple has the ability to impose certain requirements on the third-party stores?

Let me give you -- let me take the question back, and I'll give you something more specific, and then I'll broaden it out.

In the alternate world, do you assume that Apple has the ability to impose on third-party stores

Page 174

that they have to identify for Apple any security breaches they find in apps on their store so that Apple can know about those potentially dangerous apps as well?

A.  To distinguish between "has the ability to" and "will," and chooses to leverage that ability, in my opinion, I -- if I understand your question correctly, I do assume that Apple would have the ability to do that, but I did not assume that Apple would do that.

Q.  Okay.  For your alternate world do you assume that Apple imposes any kind of requirement on third-party stores, and if so, what are those requirements?

A.  I know that it's -- trying to figure out the right way to phrase this.  I know that it's somehow computer security 101 to be talking about threat modeling, but the requirements that Apple would or would not impose are not things that we should just say, "Oh, this is the right solution."

But, rather, should be mechanisms, both policy and technical, responsive to the threat model and the threats they consider.

So while I could make assumptions on what Apple would do, what Apple should do is identify -- define their threat model, define what a system might

Page 175

look like in this alternate universe where they -- in this alternate world where they support alternate app stores, threat model there, and then use the results of that threat model to guide not just the design of the system but what requirements they impose on alternate app stores.

Q.  Let's take a quick break.

MR. BURT:  So let me just -- yeah, let's go off.

THE VIDEOGRAPHER:  We are going off the record at 2:57.

(Recess taken 2:57 p.m. to 3:12 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:12.  Please proceed.

BY MR. LO:

Q.  Professor Kohno, you're familiar with the term jailbreaking as it relates to iOS?

A.  Yes, I am.

Q.  Are you familiar generally with how that is done?

A.  Yes.

Q.  And have you ever examined a jailbroken iPhone before?

A.  Yes, I believe so, many years ago, with a student.  I don't believe I was the one who did the

Page 176

jailbreaking.

Q.  Do you have a view as to whether jailbreaking an iPhone decreases the security of that phone in general?

A.  It was certainly not a question I needed to study for the context of this report, but I would say that I personally -- I would not jailbreak my own phone.

Q.  And you would not jailbreak your own phone in part for security reasons; is that accurate?

A.  For me, in the absence of knowing whether something is secure, I end up not doing it.  So by me not doing it, I'm not necessarily saying it is less secure, but I certainly don't have confidence in it being as secure.

Q.  Are you knowledgeable about whether jailbreaking a phone has any impact on the warranty?

A.  I can't remember what -- at this time no, I -- I believe I had known at one point in time, but I don't know now.

Q.  So let's go back in time to the years leading up to the initial iOS App Store.  So we're talking about the 2007-2009 timeframe.  During that timeframe, if Apple had sought to consult with you on best practices for creating a threat model, is that

Page 177

45 (Pages 174 - 177)

ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

something that you would have been able to assist with in terms of offering advice?

A. Yes, I believe -- yes.

Q. If you were giving the advice at that time, you would, then, presumably tell Apple to go through and do some of the things you lay out in Paragraph 20 of your opening report; is that correct?

A. Let me come to Paragraph 20 just to be sure, but my memory of the paragraph we discussed before, the answer is, yes, that's correct. And I found it, and yes, that's correct.

Q. Okay. And we've already talked about the fact that whatever occurs in that process, you would want Apple to do it systematically and reduce it in writing, correct?

A. We talked about the systematic part. I don't think we've talked about the writing part yet.

Q. Well, if Apple had come to you during that time frame and wanted industry best practices, would you advise them to do it in writing?

A. I would have advised them to do it in writing. If we refer to either the Microsoft book or Lipner's keynote, he says they should be stored in machine readable form.

To the degree that there are mechanisms beyond

Page 178

writing to put them into a machine readable -- to store them, the reason why this is important, if we were to step back -- and I'm happy to answer this if you want, but the reason I would recommend in writing or as -- I believe it was Steve Lipner or one of the other references said machine readable form, is that the goal of threat modeling -- the reason we have threat modeling as part of the process is not just to say that we have threat modeled but so that the threat model is then useful later.

Q. What distinction, if any, are you drawing between writing and machine readable form?

A. The reason I made that distinction was to -- was in part because it's a quote that I have in my opening report. It was -- I'm making that distinction -- while off the top of my head I cannot think of a way of doing threat modeling without writing it, if I were to step back and think about the goal, the reason for threat modeling in the context of a broader system, among the reasons we have it as a process, is so that we can then evaluate a system with respect to it.

So having an artifact that we can then evaluate a system with respect to is the key part. The full generality is making it an artifact, but if I were

Page 179

to recommend someone to threat model, I would recommend writing.

Q. Okay. So systematic writing. Now, let's go through Paragraph 20. You would want Apple to catalog the assets to be protected, correct?

A. Systematically identify and catalog the assets to be protected, yes.

Q. And knowing what you know about the iPhone, one of the things you might want to catalog is just the type of data that might be stored on the phone user data, accurate?

A. Yes.

Q. Would another asset be the fact that there's a camera on the phone?

A. The asset would not be that there is a camera. The asset would be the ability -- the asset -- figure out the right phrasing of it, but the asset is the ability to take a photo through the camera, but the asset is the photo.

Q. Okay. Or video?

A. Or video, yes.

Q. And another asset would be location information that may be present on the phone?

A. Yes.

Q. Another asset would be the ability to activate

Page 180

the mic and listen in on conversations?

A. Essentially, yes. You know, we can tease apart whether it's the audio that's the asset or the ability to turn on the mic, but yes.

Q. Okay. Would you want Apple to take into consideration how many iPhones there are in the world or would be in the world once -- you know, once the -- once consumers decided that they liked the iPhone?

A. Let me find the relevant part. So I believe I talk about this in multiple spots, but at least paragraph 35 of my opening report. And I think I talked about it in other spots too, but I wanted to call out the list of bullets.

Bullet 8 is determined risks. So as part of a threat modeling process, we would identify the assets. We would identify the threats. Somewhere I think I actually have a paragraph that says some people consider risk management as part of -- or risk management as part of threat modeling. Some people don't. Regardless of whether you consider it as part of the threat modeling process, studying risks is part of the process of building a secure system.

(Reporter admonition.)

THE WITNESS: I'm not sure how to fix -- how to jump in? Is it better to go back to the audio

Page 181

46 (Pages 178 - 181)