# EXHIBIT 85

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,                    Case No. 11-cv-06714

_____                YGR (TSH)

DONALD R. CAMERON, et al.,

     Plaintiffs,

            vs.                         Case No. 19-cv-03074

                                                YGR (TSH)

Apple Inc.,

     Defendant.

_____


ZOOM DEPOSITION OF DANIEL McFADDEN, Ph.D.

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Tuesday, August 3, 2021

Volume I


STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 4737818

PAGES 1 - 249

Page 1

Mr. Economides -- Dr. Economides as well -- have    09:35:42

described the Apple App Store as a -- as a platform

business, and I -- I don't -- I don't use that term

for the Apple App Store in my report, and we can

discuss what the economic -- whether there's any    09:36:07

economic difference in our -- our usages or

meaning.

Q.   Okay.  Well, we'll -- we'll come back to

that topic, then.

Did -- do -- did you or any of the staff    09:36:26

working under your direction communicate with

Professor Elhauge or Professor Economides prior to

submitting your report?  I'm not asking -- I'm not

asking for what you've communicated about, just

whether -- whether there was any communication.    09:36:44

A.   I -- as far as I'm aware, there's been no

communication.

Q.   Okay.  Aside from counsel and your staff

at Brattle, have you discussed your opinions about

the case with anyone?    09:37:02

A.   No, I have not.

Q.   Could you turn to paragraph 42 on page 21

of your report?

A.   Paragraph 44?  Was that the --

Q.   Paragraph 42.    09:37:51

Page 28

A.    42.    Okay.                                                09:37:53

I have that in front of me, yes.

Q.    Okay.  In paragraph 42, you state:
"Common economic evidence supports the conclusion
that there exists a relevant antitrust market for        09:38:03
selling consumers iOS apps and in-app content,
which are relevant products in this market."

You define, therefore, a relevant
antitrust market for selling consumers iOS apps
and in-app content; is that right?                       09:38:24

A.    As I understand the question, the answer
is:  Yes, I -- I -- it's my opinion that iOS apps
are a relevant aftermarket.

Q.    And you regard consumers who have iOS
mobile devices as the consumers in that market,          09:38:55
correct?

A.    Correct.

Q.    And in your relevant market, Apple is a
retailer that sells iOS apps and in-app content;
is that right?                                           09:39:10

A.    Yes, I think that's my economic
terminology for their activity.

Q.    Okay.  And in your relevant market, app
developers are suppliers that manufacture apps and
in-app content and supply them through Apple; is         09:39:23

Page 29

that right?                                          09:39:27

A.   Yes.

Q.   And your opinion is that the relevant products in your relevant market are iOS apps and in-app content; is that correct?                09:39:41

A.   Correct.

Q.   In paragraph 41, which is -- starts on the prior page, page 20, you state that "Defining relevant markets allows for identification of market participants..."                              09:40:04

Do you see that?

A.   Yes.

Q.   Okay.  Are consumers direct participants in your relevant market?

A.   Yes.                                            09:40:18

Q.   Are developers direct participants in your relevant market?

A.   I would say yes.

Q.   And how is it that developers are direct participants in your relevant market?               09:40:33

A.   Well, this is -- this is a -- a market in which developers sell to consumers through the intermediary, which is the App Store, the retailer and distributor.

Q.   If developers sell through an            09:40:58

intermediary, are they direct participants in your 09:41:00

relevant market?

A.   In my -- in my view, the market is -- the

market for iOS apps is -- is one with -- with two

stages.  There's a stage in which developers 09:41:20

provide downloads of their apps to -- to the -- to

the gateway provided by the App Store, and the

second stage is the transfer of those downloads

from the App Store to the -- to the consumer.

Q.   Have you defined a relevant wholesale 09:41:52

market in this case?

A.   I have not specifically defined a -- a

wholesale market, but using the terminology that I

have used and -- and -- which is that the

Apple Store is an intermediary retailer and 09:42:12

distributor.  The -- the relationship between the

Apple Store and the developers is -- is a wholesale

market relationship, and the relationship between

the App Store and consumers is a retail market

relationship, and those two markets are bound -- 09:42:32

closely bound together.

Q.   Are those markets, while closely bound

together, nonetheless distinct?

A.   I am not sure what -- what the -- you

would mean by "distinct."  For -- for what purposes 09:42:59

Page 31

are they distinct?  They clearly are distinct in

terms of who the -- who the actors are in each side

of this market.  Are they distinct in the point of

view of an economic analysis of -- of how this

market operates and how it would operate under

different conduct?  They -- they are not distinct.

They're -- they need to be treated together.

Q.   Do they need to be treated together for

market definition purposes?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I would say that it -- it

shouldn't matter for market definition purposes

whether -- whether they -- they are linked.  If you

talk about the -- the retail market -- and that's

tied to the wholesale market -- the -- the retail

market may be a -- a relevant market for antitrust

purposes, but the wholesale market may be

sufficiently closely tied to it so that you cannot

analyze the retail market for antitrust purposes

without also considering the impacts on the -- on

the wholesale side.

Q.   (By Mr. Swanson)  And -- and is the

relevant market that you have defined the retail

market?

A.   I would say it is the retail market,

09:43:02

09:43:16

09:43:37

09:44:03

09:44:24

09:44:42

Page 32

empirical practical distinction.  Of course, it --   10:35:57

it matters in cases like this.

Q.   Professor, it's your opinion, is it not,

that common economic evidence supports the

antitrust market alleged by Consumer Plaintiffs?   10:36:16

A.   Yes.

Q.   Are -- are you aware that Consumer

Plaintiffs allege that the market in this case is

different from the two-sided transaction platform

at issue in the Amex case?   10:36:33

MR. BURT:  Objection to form.

THE DEPONENT:  I don't recall the details

of the Amex case, so perhaps you can, in your

questions, tell me what the difference is.

Q.   (By Mr. Swanson)  Well, do you understand   10:36:50

what industry was at issue in the Amex case?

A.   I know it involved credit card

transactions.

Q.   Okay.  And is it your opinion that the

market in this case is different from the type of   10:37:05

two-sided transaction platforms that exist in the

credit card business?

A.   I would say that -- that from an

economist's point of view, functionally, they --

the app -- iOS app market has similarities to   10:37:32

Page 56

the -- to credit cards in that primary function of    10:37:39

the -- of this intermediary is to facilitate

transactions and -- and fulfill -- fulfill

transactions.  So those are -- those are common --

common features in those two markets.    10:37:58

Now, Amex is different in the sense

that I -- I believe that credit card companies are

not in the business of trying to match individual

consumers with individual sellers.  They -- they

just facilitate the -- the -- the transactions.    10:38:13

And the Apple Store, in some sense, does

that too but plays a -- plays a more prominent role

in that the way it posts the apps in its -- in its

App Store directory, that can certainly influence

what consumers see, what -- what developers -- who    10:38:42

developers can access on the consumer side.

So that the Apple Store has a -- has --

has a function, which is, I think, different than

credit cards.

Q.    Do you believe that a credit card    10:39:01

company -- let's choose American Express as an

example -- is not in the business of trying to

match American Express cardholders with merchants

who accept the American Express card?

A.    I think the term -- the term "match" in    10:39:30

Page 57

your question here is a different meaning than it    10:39:32

does in -- previously.

When I talk about matching in the credit

card business, I'm -- I'm saying that they're --

there is -- there -- they're not matching.  They're    10:39:45

essentially facilitating transactions, facilitating

fulfillment of -- of transactions.

Certainly, a credit card company will be

in the business of -- of acquiring sellers who will

accept their card and trying to -- persuading    10:40:04

consumers to acquire their card.  I wouldn't call

those matching activities.  Those are, you know,

customer -- customer acquisition activities.

Q.   Are you aware that the Consumer

Plaintiffs allege that the App Store does not sell    10:40:25

only one product jointly consumed by parties on

both sides of the transaction the way ancillary

credit card transactions were sold to both parties

in American Express?

THE DEPONENT:  Would you -- Reporter,    10:40:42

would you read that question back, please.

(Record read as follows:

"QUESTION:  Are you aware that the

Consumer Plaintiffs allege that the

App Store does not sell only one    10:40:46

Page 58

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  August 4, 2021

Rebecca L. Romano, RPR, CCR

CSR. No 12546

Page 247