# EXHIBIT 86

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re Apple iPhone

Antitrust Litigation          Case No. 4:11-cv-06714

_____          YGR

ZOOM DEPOSITION OF DANIEL L. McFADDEN

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Monday, December 5, 2022

Volume 1

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 5601935

PAGES 1 - 271

Page 1

A.   That's correct.                                      01:22:35

Q.   Okay.  What is the more reliable way to
determine but-for IAP item prices, the percentage
method or direct estimation of item level IAP
prices?                                                  01:22:39

MR. RIFKIN:  Objection to the form of the
question.

THE DEPONENT:  Again, I would emphasize
that I don't -- I don't do that calculation, and
that's a gran- -- granularity of calculation that I     01:22:41
actually think is inappropriate for this
application, because that requires a great deal of
information on consumer substitution between items
and -- and the developer's design of menus and --
of different items and -- and would amend their         01:22:46
menus, and that's a degree of granularity that I
think is unnecessary for this case and a
distraction from its primary purpose.

Q.   (By Mr. Swanson)  Is it -- well, why is
it unnecessary, in your opinion?  Are you relying       01:22:51
on some legal premise?

A.   I'm relying on the -- the -- the
assumption that underlies my analysis that
developers are profit maximizers and that they seek
to maximize the profits from their apps, and that       01:22:56

Page 104

includes the prices they set for various things          01:22:57

that can be purchased.

Q.   Do consumers -- do consumers make

purchasing decisions for a specific item of in-app

content based on the price of that item rather than      01:23:01

the average price of all of the in-app content for

the app?

MR. RIFKIN:  Objection to the form of the

question.

THE DEPONENT:  I do not model what              01:23:05

consumers are doing in terms of their trade-offs

between items within an app, nor do I model the

developer's decisions on how to organize and price

their menus on different items.  I don't believe

that's a granularity that is required or useful for      01:23:10

the determination of damages in this case.

I -- and I believe that for purposes of

this -- a model which is grounded on product

maximization by developers that the appropriate

granularity is the -- the level of their average        01:23:15

pricing for IAP and the total spending they -- they

get on IAP as a result.

Q.   (By Mr. Swanson)  Do you agree that

in-app purchase transactions make up the great bulk

of paid transactions in the App Store transaction       01:23:20

Page 105

data?                                                      01:23:21

     A.   I'm -- I'm aware that it is -- it is a

substantial plurality.  I don't have an exact

number in mind on the share.

     Q.   What portion of your damages estimate is    01:23:24

accounted for by in-app purchase transactions?

     A.   I don't have that number in -- in front

of me.  Or I don't remember it.

     Q.   Is it higher than 95 percent?

     A.   Again, I don't have the number in front     01:23:29

of me.

     Q.   Well, do you dispute that the enormous

bulk of the damages you calculate are attributable

to in-app purchase transactions?

          MR. RIFKIN:  Objection to the form of the   01:23:33

question.

          THE DEPONENT:  That may be true.

     Q.   (By Mr. Swanson)  Is it important to you

to know?

     A.   Is it important to me to know?  Is that     01:23:35

the question?

     Q.   Is it important to you to know that fact?

          MR. RIFKIN:  Objection to the form of the

question.

          THE DEPONENT:  I think the purpose of       01:23:39

Veritext Legal Solutions
866 299-5127

data we have, we cannot tell a difference, but I

believe that analyzing them together with -- with

the assumption that they have the same marginal

cost -- as a reverse implication of product

maximization is a -- is appropriate granularity for

purposes of this case.

MR. SWANSON:  All right.  Why don't we take our break now.

THE VIDEOGRAPHER:  Going off the record. The time is 3:25 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record. The time is 3:35 p.m.

Q.   (By Mr. Swanson)  Professor, are you aware that in the real world, some developers sell in-app content through the Web?

A.   The answer is that I -- I understand that Apple --

(Discussion off the stenographic record.)

MR. RIFKIN:  That's my fault.  I apologize.  I had the wrong button pushed.  My apologies.

THE DEPONENT:  Please -- please repeat the question.

Q.   (By Mr. Swanson)  Are you aware that in

Page 186

the real world some developers sell in-app content          03:36:22

through the Web?

A.   I'm aware that Apple has substantial

restrictions on the ability for -- for developers

to sell outside the Apple Store, that -- that there      03:36:38

are in particular some -- some developers in the

music and entertainment business as have -- have

been able to obtain exceptions to that, perhaps

because of grandfathering or perhaps because of

their -- their market position.                          03:37:01

Q.   Are you saying it's your understanding

that Apple prohibits developers from selling in-app

content through the Web?

A.   I'm saying that Apple has restrictions

which prevent developers from let- -- letting         03:37:16

consumers know that there are alternative channels

that are available.

Q.   Well, my question was about the

alternative channels that are available.  We can

get to what developers can or can't say about         03:37:38

those.

But you agree that there are alternative

channels available, correct?

A.   In a few cases.  I think in -- in

considering this question, you have to consider       03:37:56

Page 187

Veritext Legal Solutions
866 299-5127

that the vast majority -- apparently the vast          03:37:59

majority of developers do not have that option.

Q.   And have you done this factual or

empirical study of how many developers,

particularly among those who account for the          03:38:15

70 percent of revenues, how much they use

alternative channels?

A.   I haven't done a systematic study of it,

no.

Q.   Have you done any study of that?          03:38:32

A.   Well, I had reports from my team and from

counsel, and in cases where developers have been

able to develop alternative channels, then it's a

unique enough event so it's newsworthy.  That's the

state of my information.          03:38:53

Q.   Are you aware of the model that game

developers have been known to use of selling

virtual currency in-app?

A.   No.

Q.   Okay.  Are you -- well, strike that.          03:39:14

How --

A.   Let -- I'm sorry.  Let me -- let me

respond to that.

I assume you meant by virtual currency

cryptocurrency, but that -- that's a          03:39:33

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.  Dated:  December 6, 2022

Rebecca L. Romano, RPR, CCR

CSR. No 12546

Page 266